1  BOIES, SCHILLER & FLEXNER LLP
   RICHARD J. POCKER (NV Bar No. 3568)
2  300 South Fourth Street, Suite 800
   Las Vegas, NV 89101
3  Telephone: (702) 382-7300
   Facsimile: (702) 382-2755
4  rpocker@bsfllp.com

5  BOIES, SCHILLER & FLEXNER LLP
   STEVEN C. HOLTZMAN
6  FRED NORTON
   KIERAN P. RINGGENBERG
7  1999 Harrison Street, Suite 900
   Oakland, CA 94612
8  Telephone: (510) 874-1000
   Facsimile: (510) 874-1460
9  sholtzman@bsfllp.com
   fnorton@bsfllp.com
10 kringgenberg@bsfllp.com
   (admitted pro hac vice)

11
   Attorneys for Plaintiffs Oracle USA, Inc.,
12 Oracle America, Inc., and Oracle International
   Corp.

BINGHAM MCCUTCHEN LLP
GEOFFREY M. HOWARD
THOMAS S. HIXSON
KRISTEN A. PALUMBO
Three Embarcadero Center
San Francisco, CA  94111-4067
Telephone:  415.393.2000
Facsimile:  415.393.2286
geoff.howard@bingham.com
thomas.hixson@bingham.com
kristen.palumbo@bingham.com
(admitted pro hac vice)

DORIAN DALEY (pro hac vice application to be
submitted)
DEBORAH K. MILLER (admitted pro hac vice)
JAMES C. MAROULIS (admitted pro hac vice)
ORACLE CORPORATION
500 Oracle Parkway
M/S 5op7
Redwood City, CA 94070
Telephone:  650.506.4846
Facsimile:  650.506.7114
dorian.daley@oracle.com
deborah.miller@oracle.com
jim.maroulis@oracle.com

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| ORACLE AMERICA, INC., a Colorado corporation; ORACLE USA, INC., a Delaware Corporation, and ORACLE INTERNATIONAL CORPORATION, a California corporation, <br><br> Plaintiffs, <br> v. <br><br> RIMINI STREET, INC., a Nevada corporation; and SETH RAVIN, an individual, <br><br> Defendants. | Case No. 2:10-cv-0106-LRH-PAL <br><br> **PLAINTIFFS ORACLE AMERICA INC., ORACLE USA, INC. AND ORACLE INTERNATIONAL CORP.'S OPPOSITION TO DEFENDANT RIMINI STREET, INC.'S MOTION TO DISMISS THE FIRST AMENDED COMPLAINT** |

**TABLE OF CONTENTS**

I.   INTRODUCTION ............................................................................................ 1

II.  SUMMARY OF ALLEGATIONS ................................................................ 3

     A.   Oracle's Enterprise Software and Support Business................................ 3

     B.   Oracle's Licensing Terms and Website Terms of Use............................. 3

     C.   Rimini's Support Business ..................................................................... 5

     D.   Rimini's Field-Tested Unlawful Scheme ................................................ 6

III. ARGUMENT ................................................................................................ 9

     A.   Applicable Standard ............................................................................... 9

     B.   Oracle Has Stated a Claim for Violation of the Federal Computer Fraud
          and Abuse Act (Count 2) ....................................................................... 9

          1.   "Authorization" and "Exceeds Authorized Access" Under the
               CFAA ......................................................................................... 10

          2.   Rimini's Access Was "Without Authorization" or "Exceeded
               Authorized Access"..................................................................... 12

          3.   Oracle Need Not Show Unauthorized Access Under 18 U.S.C.
               Section 1030(a)(5)(A) ................................................................. 14

     C.   Oracle Has Stated a Claim for Under California Penal Code Section 502
          and Nevada Revised Statute Section 205.4765 (Counts 3, 4)................ 14

     D.   Oracle Has Stated a Claim for Inducing Breach of Contract (Count 6)............... 15

     E.   Oracle Has Stated a Claim for Intentional and Negligent Interference With
          Prospective Economic Advantage (Counts 7, 8)................................... 17

     F.   Oracle Has Stated a Claim for Unfair Competition (Count 9)............... 18

     G.   Oracle Has Stated a Claim for Trespass to Chattels (Count 10)........... 19

     H.   Oracle Has Stated a Claim for Unjust Enrichment (Count 11)............. 20

     I.   Oracle Has Stated a Claim for Unfair Business Practices (Count 12)................ 21

     J.   Oracle Has Stated a Claim for an Accounting (Count 13).................... 22

CONCLUSION........................................................................................................ 23

i

1

**TABLE OF AUTHORITIES**

2

<u>CASES</u>

3

*America Online, Inc. v. LCGM, Inc.*,
    46 F. Supp. 2d 444 (E.D. Va. 1998) ..................................................................................... 12

4

*America Online, Inc. v. Nat'l Health Care Disc., Inc.*,
    174 F. Supp. 2d  890 (N.D. Iowa 2001) ............................................................................... 12

5

*Ashcroft v. Iqbal*,
    __ U.S. __, 129 S.Ct. 1937 (2009) ........................................................................................ 9

6

7

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ........................................................................................................ 9, 18

8

*eBay, Inc. v. Digital Point Solutions, Inc.*,
    608 F. Supp. 2d 1156 (N.D. Cal. 2009) ................................................................ 11, 13, 20

9

10

*Edwards v. Arthur Andersen LLP*,
    44 Cal. 4th 937 (2008) ....................................................................................................... 17

11

*EF Cultural Travel BV v. Zefer Corp.*,
    318 F.3d 58 (1st Cir. 2003) ............................................................................................... 12

12

13

*Intel Corp. v. Hamidi*,
    30 Cal. 4th 1342 (2003) ............................................................................................... 19, 20

14

*Int'l Ass'n of Machinists & Aerospace Workers v. Werner-Masuda*,
    390 F. Supp. 2d 479 (D. Md. 2005) ................................................................................. 12

15

16

*Kema, Inc. v. Koperwhats*,
    2010 WL 726640 (N.D. Cal. Mar. 1, 2010) ..................................................................... 18

17

*Las Vegas-Tonopah-Reno Stage Line, Inc. v. Gray Line Tours of S. Nevada*,
    106 Nev. 283 (Nev. 1990) ................................................................................................. 17

18

19

*Lectrodryer v. Seoulbank*,
    77 Cal. App. 4th 723 (Cal. Ct. App. 2000) ...................................................................... 20

20

*LVRC Holdings LLC v. Brekka*,
    581 F.3d 1127 (9th Cir. 2009) ........................................................................... 10, 11, 13, 14

21

22

*Mikohn Gaming v. Acres Gaming, Inc.*,
    2001 WL 34778689 (D. Nev. Aug. 2, 2001) .................................................................... 22

23

*Mintz v. Blue Cross of California*,
    172 Cal.App.4th 1594 (Cal. Ct. App. 2009) .................................................................... 17

24

25

*Morgan v. AT & T Wireless Servs., Inc.*,
    177 Cal. App. 4th 1235 (Cal. Ct. App. 2009) .................................................................. 18

26

*Oracle Corp. v. SAP AG*,
    2008 WL 5234260 (N.D. Cal. Dec. 15, 2008) ............................................................ 20, 21

27

28

*Paulus v. Bob Lynch Ford, Inc.,*
   139 Cal. App. 4th 659 (2006) ............................................................................... 19

*People's Fin. & Thrift Co. of Visalia v. Bowman,*
   58 Cal. App. 2d 729 (Cal. Ct. App. 1943) ........................................................... 23

*Register.com, Inc. v. Verio, Inc.,*
   126 F. Supp. 2d 238 (S.D.N.Y. 2000)................................................................... 12

*Rosal v. First Federal Bank*
   671 F. Supp. 2d 1111 (N.D. Cal. 2009) ............................................................... 20

*RSI Corp. v. Int'l Business Machines Corp.,*
   2010 WL 726032 (N.D. Cal. Feb. 26, 2010) ....................................................... 18

*SalesTraq America, LLC v. Zyskowski,*
   635 F. Supp. 2d 1178 (D. Nev. 2009) .................................................................. 12

*Snap-On Business Solutions, Inc. v. O'Neil & Assocs., Inc.,*
   __ F. Supp. 2d ___, 2010 WL 1539958 (N.D. Ohio Apr. 16, 2010) .................... 13

*Southwest Airlines Co. v. Farechase, Inc.,*
   318 F. Supp. 2d 435 (N.D. Tex. 2004).................................................................. 12

*Teselle v. McLoughlin,*
   173 Cal. App. 4th 156 (Cal. Ct. App. 2009) ................................................... 22, 23

*Theofel v. Farey-Jones,*
   359 F.3d 1066 (9th Cir. 2004)............................................................................... 11

*Transcription Comms. Corp. v. John Muir Health,*
   2009 WL 666943 (N.D. Cal. Mar. 13, 2009)........................................................ 18

*Unionamerica Mortgage and Equity Trust v. McDonald,*
   97 Nev. 210 (Nev. 1981)....................................................................................... 20

*United States v. Drew,*
   259 F.R.D. 449 (C.D. Cal. 2009) .......................................................................... 12

*Venhaus v. Shultz,*
   155 Cal. App. 4th 1072 (Cal. Ct. App. 2007) ...................................................... 17

**STATUTES**

18 U.S.C. § 1030............................................................................................................. 10

18 U.S.C. § 1030 (a)(2)(C) ............................................................................................. 10

18 U.S.C. § 1030 (a)(4) ................................................................................................... 10

18 U.S.C. § 1030 (a)(5)(A) ............................................................................................. 14

18 U.S.C. § 1030 (a)(5)(B) ............................................................................................. 10

iii

**1**    18 U.S.C. § 1030 (a)(5)(C) ................................................................................. 10

**2**    18 U.S.C. § 1030 (e)(6) ............................................................................... 11, 14

**3**    18 U.S.C. § 2701 ........................................................................................... 11

**4**    Cal. Bus. & Prof. Code § 17030 ..................................................................... 21

**5**    Cal. Bus. & Prof. Code § 17044 ..................................................................... 21

**6**    Cal. Bus. & Prof. Code § 17200 ..................................................................... 18

**7**    Cal. Penal Code § 502 ............................................................................. 1, 14, 15

**8**    Cal. Penal Code § 502(a) ............................................................................... 15

**9**    Cal. Penal Code § 502 (b)(1) ......................................................................... 15

**10**   Cal. Penal Code § 502(c)(2) ........................................................................... 15

**11**   Nev. Rev. Stat. § 205.4765 ............................................................... 1, 2, 14, 15

**12**

**OTHER AUTHORITY**

**13**
Restatement (Second) Torts, § 218 .................................................................. 19

**14**
Stern, Bus. & Prof. Code, § 17200 Practice (The Rutter Group 2006) ¶ 3:56 ............................. 19

**15**

**16**

**17**

**18**

**19**

**20**

**21**

**22**

**23**

**24**

**25**

**26**

**27**

**28**

ORACLE'S OPPOSITION TO RIMINI STREET'S MOTION TO DISMISS COMPLAINT

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
FIRST AMENDED COMPLAINT**

Plaintiffs Oracle America, Inc. ("Oracle America"), Oracle USA, Inc. ("Oracle USA")
and Oracle International Corporation ("OIC") (together "Oracle" or "Plaintiffs") file this
memorandum of law in support of their opposition to Rimini Street, Inc.'s ("Rimini's" or
"Rimini Street's"), motion to dismiss Oracle's First Amended Complaint.

## I.    INTRODUCTION

Oracle's First Amended Complaint ("FAC") describes an illegal scheme by defendants
Rimini Street and Seth Ravin.  Defendants logged on to Oracle's customer support websites
using the credentials of Oracle's existing support customers; agreed to Oracle's website Terms of
Use; used web "crawlers" and other means to obtain access to copyrighted material that
defendants were not authorized to access, copy, or use; stole that intellectual property; and used
it to allow Rimini's own competing software support business to substantially undercut Oracle's
prices with Oracle's own proprietary information.

On the basis of these allegations, set forth in considerably greater detail in the FAC,
Oracle has pled thirteen causes of action.  Rimini concedes that Oracle has pled copyright
infringement and breach of contract, but moves to dismiss the remaining eleven claims.  Rimini
is wrong.  All of the challenged causes of action are properly and sufficiently pled.

CFAA.  Oracle has pled multiple violations of the Computer Fraud and Abuse Act
("CFAA").  Rimini had no permission to access Oracle's website and data except as expressly
permitted by Oracle's Terms of Use, which Rimini breached.  Contrary to Rimini's assertion,
website terms of use can determine when access to a computer is unauthorized, as federal courts
repeatedly have held.  Moreover, Rimini offers no argument at all to defend its use of crawlers,
one of the specific CFAA violations that Oracle has pled.

California and Nevada Computer Access Claims.  On Oracle's claims under California
Penal Code Section 502 and Nevada Revised Statute Section 205.4765, Rimini merely repeats
the meritless arguments it raised against Oracle's CFAA claim, while ignoring the actual
language of the California and Nevada statutes.  Under state law, in contrast to the CFAA,

1

1   unauthorized access to any "data" or "documentation" is unlawful, regardless of whether the

2   defendant was authorized to use the computer in the first place.  Oracle has pled those facts;

3   Rimini never argues otherwise.

4       <u>Inducing breach of contract</u>.  Rimini argues that it cannot be liable for inducing Oracle

5   licensees to breach their contracts because Rimini supposedly acted as their agent.  Rimini has

6   the facts wrong.  The FAC never alleges that Rimini acted as an agent of Oracle licensees when

7   it engaged in unlawful copying; instead, the FAC alleges that Rimini "purported" to do so.

8   Further, the FAC alleges specific unlawful acts by Rimini that took place outside any principal-

9   agent relationship, which caused Oracle licensees to be in breach of their license agreements.

10      <u>Interference with prospective economic advantage</u>.  Rimini merely claims that Oracle

11  fails to plead an economic relationship with current and prospective support customers.  Yet

12  Oracle alleges that its software licensees typically contract for support as well, and that it has a

13  large, successful software support business.  Rimini *itself* alleges that Oracle has a dominant

14  market share and substantial gross profit margins.  Rimini cannot seriously argue that Oracle has

15  failed to plead the required economic relationship or that Rimini lacks adequate notice of what

16  that relationship is.

17      <u>Unfair competition</u>.  Rimini argues that Oracle has not pled an unlawful act that would

18  support a claim for "unlawful" business practices under California's Unfair Competition Law

19  ("UCL").  In fact, Oracle has pled violations of the CFAA, California Penal Code Section 502

20  and Nevada Revised Statute Section 205.4765, tortious interference, inducing breach of contract,

21  trespass to chattels, and unjust enrichment.  Each of these is enough to support a UCL claim.

22      <u>Trespass to chattels</u>.  The FAC states that Rimini's use of crawlers caused Oracle's

23  websites to freeze, slow down, or become temporarily non-operational, disrupting their operation

24  and impeding their availability to Oracle's customers.  The very California Supreme Court case

25  that Rimini cites holds that "unauthorized robotic data collection from a company's publicly

26  available Web site" may constitute a trespass to chattels.  Any impairment of the condition,

27  quality, or value of the computer is enough to state a claim; any deprivation of use is sufficient if

28  the loss caused thereby can be measured.  Oracle has pled these facts.

2

1       <u>Unjust enrichment</u>.  Rimini argues that unjust enrichment it is precluded when there is a

2   contract between the parties – without acknowledging that Rimini denies the existence of any

3   contract.  Oracle can plead breach of contract and unjust enrichment in the alternative.

4       <u>Unfair business practices</u>.  Oracle alleges that Rimini does not have the resources, and

5   has not made the investment, necessary to offer the levels of support Rimini advertises.  Instead,

6   Rimini steals Oracle's support materials and uses them to sell support at less than its actual cost

7   – as little as $100 per year.  These allegations establish below-cost pricing.

8       <u>Accounting</u>.  Rimini argues that an accounting is unavailable unless there is a relationship

9   between the parties, but fails to recognize that the relationship may be contractual.  Oracle has

10  pled a contractual relationship between the parties, as Rimini concedes.

11      The motion to dismiss should be denied.

12  **II.   SUMMARY OF ALLEGATIONS**

13      **A.   Oracle's Enterprise Software and Support Business**

14      Oracle is the world's largest enterprise software company.  It develops, manufactures,

15  and distributes database, middleware, and applications software programs, including the

16  PeopleSoft, J.D. Edwards, and Siebel families of software products to business customers.  (FAC

17  ¶¶ 5, 15, 25)  Oracle earns revenue by licensing software to businesses and by providing support

18  services, among other things.  (*Id.* ¶ 33)  Like other companies in the enterprise software

19  industry, Oracle does not sell ownership rights to its software or related support products.  (*Id.* ¶

20  26)  Instead, Oracle grants its customers limited rights to use specific Oracle software programs;

21  Oracle retains all copyrights and other intellectual property rights.  (*Id.*)  As a result, no one may

22  use, copy, or access Oracle's intellectual property, including software and related documentation,

23  without Oracle's express written permission:  an Oracle license agreement.

24      **B.   Oracle's Licensing Terms and Website Terms of Use**

25      Oracle's license agreements narrowly limit access to Oracle's intellectual property and

26  place restrictions on what licensees may do with those materials.  The licenses define Oracle's

27  confidential information to include, without limitation, Oracle's software, its object and source

28  code, and any associated documentation or source offerings, and define "software" to include

3

1    update products made available to customers under Oracle's support contracts.  (*Id.* ¶ 28.)  They

2    prohibit access to, reproduction, distribution, and use, of any portion of Oracle's software except

3    what is expressly licensed and paid for by the licensee. (*Id.* ¶ 27.)  The license agreements allow

4    only access that is solely in support of the licensee's authorized use of the Oracle programs for

5    which the licensee holds a supported license from Oracle.  (*Id.* ¶ 29.)  Any use of the software

6    other than by the customer for production, back up, archival, or in-house disaster recovery

7    purposes is prohibited.  (*Id.* ¶ 28.)

8           The license agreements also place limits on what can be shared with third parties, and

9    how.  The licenses restrict where the customer may install the software, to whom it may provide

10    copies, and the purposes for which it may make copies.  (*Id.* ¶ 27.)  Further, a licensee may not

11    sublicense, disclose, use, rent, or lease the software to third parties.  (*Id.*)  Third parties cannot

12    maintain Oracle software except as expressly permitted by the license agreements with Oracle's

13    customers (*id.* ¶ 28), cannot install or use Oracle software on an offsite server, and cannot access

14    the source code of the software (*id.*).

15           Licensed customers can, and typically do, purchase technical support services from

16    Oracle, in addition to licensing the software applications themselves.  (*Id.* ¶ 26.)  As part of its

17    support business, Oracle maintains password-protected Technical Support websites, such as

18    MetaLink3, where Oracle customers with active support agreements and log-in credentials can

19    access and download software applications and environments, program updates, bug fixes,

20    patches, custom solutions, and instructional documents ("Software and Support Materials")

21    relating to their licensed Oracle products.  (*Id.*  ¶¶ 5 n.1, 26, 29, 32, 39.)

22           Oracle has invested billions of dollars in research, development, and engineering to create

23    the Software and Support Materials.  (*Id.* ¶ 39.)  As noted above, these materials are also

24    Oracle's confidential information under the terms of the customers' license agreements, and are

25    protected by copyrights owned by Oracle.  (*Id.* ¶¶ 28, 61-62, 71-74.)

26           Given the size of Oracle's investment and its importance to Oracle's business, it is

27    unsurprising that Oracle's Technical Support websites are password-protected and access is

28    governed by written Terms of Use.  (*Id.* ¶ 39.)  Anyone who has used or accessed Oracle's

4

1   Technical Support websites has agreed to be bound by Oracle's Terms of Use.  (*Id.* ¶ 32, 111.)

2   The Terms of Use incorporate the terms and restrictions of Oracle's license agreements (*id.* ¶ 32)

3   and further impose restrictions on access.  For example, access to the websites is granted only to

4   the customer's designated Oracle support contacts, and only for use in support of the customer's

5   authorized use of Oracle programs for which the customer has a support license from Oracle.

6   (*Id.* ¶ 29.)

7   Oracle restricts not only *who* can get access to the Technical Support websites, it also

8   restricts *how* a person can get access.  A user cannot access or use the website in any way that

9   could damage, disable, overburden, impair, or otherwise result in unauthorized access to or

10   interference with the proper functioning of any Oracle computer system or networks (*id.* ¶ 30)

11   and cannot use software routines such as roots, spider, scrapers, or other automated means to

12   access the websites (*id.* ¶ 31).

13   The Terms of Use further specify how the materials on the Technical Support websites

14   can and cannot be used.  The user of the website may not use, disclose, reproduce, or transmit, or

15   otherwise copy the materials on the website for any purpose except to support the user's

16   authorized use of Oracle programs for which the user has a support license from Oracle. (*Id.* ¶

17   30.)  In particular, the materials on the website cannot be used to provide services to third parties

18   (*id.* ¶ 29) and a user who downloads materials from the websites cannot modify or alter them in

19   any way (*id.* ¶ 32).

20   Customers have no right, contractual or otherwise, to download Software and Support

21   Materials relating to software programs they have not licensed from Oracle, or for which the

22   customers did not purchase support rights, or once the support rights they did purchase have

23   expired.  (*Id.* ¶ 39.)

24   **C.      Rimini's Support Business**

25   Defendant Rimini Street seeks to compete with Oracle's support business by providing

26   support services to customers who use Oracle software, including Oracle's J.D. Edwards

27   ("JDE"), Siebel, and PeopleSoft families of applications.  (*Id.* ¶¶ 33-34.)  Rimini Street claims

28   that it can provide fixes and updates for older versions of Oracle's software, along with

5

1   customization fixes, tax and regulator updates, applications and repository fixes, and "24/7

2   Support with Guaranteed 30 minutes or less Response" on Oracle's software programs – despite

3   the fact that Rimini has no intellectual property rights to that software at all.  (*Id.* ¶¶ 35-36.)

4   Moreover, Rimini claims that it can provide this support at 50% of the price that Oracle charges

5   for its support services.  (*Id.*)  Rimini has even offered to provide annual maintenance service for

6   customers using PeopleSoft, JDE, or Siebel software for $100 per year for two years.  (*Id.* ¶ 38.)

7          One Rimini customer aptly observed that "anything that sounds too good to be true

8   probably is."  (*Id.*)  Rimini's claims about its support services *are* too good to be true.  Rimini

9   Street does not have the development capability to meet the support commitments it advertises at

10  any price, much less the 50% discount it promotes.  (*Id.* ¶ 37.)  It certainly has not matched

11  Oracle's investment in development resources, or even come close to it.  (*Id.*)  Instead, Rimini

12  cheats.

13          **D.      Rimini's Field-Tested Unlawful Scheme**

14          Rimini is the second illegal business of its CEO and President, Seth Ravin.  Before

15  starting Rimini, Ravin was the president of a company called TomorrowNow, Inc.

16  TomorrowNow gained repeated unauthorized access to Oracle's intellectual property.  It made

17  and used thousands of copies of Oracle's copyrighted software applications and relied on illegal

18  downloading from Oracle websites, using custom programmed "scraping" tools designed to

19  "scrape" Oracle's website for bug fixes, patches, updates, and instruction manuals.  (*Id.* ¶¶ 10,

20  49.)  Ravin sold his stake in that business to SAP AG, which eventually admitted that Rimini had

21  improperly copied Oracle Software and Support Materials.  (*Id.* ¶ 11.)  SAP shut down

22  TomorrowNow in October 2008, having concluded that it could not provide support services

23  without infringing Oracle's intellectual property rights.  (*Id.*)

24          Like TomorrowNow's, Rimini's unlawful scheme has three basic steps.  <u>First</u>, a Rimini

25  employee – acting directly, or through an automated software routine, such as a crawler – obtains

26  access to Oracle's Technical Support Websites using the log-in credential of an actual Oracle

27  support licensee.  (*Id.* ¶¶ 39-44.)  <u>Second</u>, Rimini downloads Software and Support Materials

28  that neither the licensee nor Rimini has any right to access, copy, or use.  (*Id.*)  <u>Third</u>, Rimini

6

1    uses these unlawfully obtained copies to offer low-cost support and induce Oracle's customers to

2    cancel their support contracts in favor of Rimini.  (*Id.* ¶¶ 37, 39-44.)

3        Rimini has repeatedly logged on to Oracle's Technical Support websites using the log-in

4    credentials of Oracle's licensed support customers.  (*Id.* ¶¶ 5, 39-46, 57.)[1]  As discussed above,

5    the rights of those customers to access the Technical Support websites are limited by Oracle's

6    license agreements and Terms of Use.  Customers have no right to use or download Software and

7    Support Materials relating to software programs for which the customers do not have active

8    support licenses.  (*Id.* ¶ 39.)

9        Rimini is well aware of these restrictions.  Of Rimini's ten-member management team,

10   seven list prior employment experience with PeopleSoft, Siebel, or Oracle.  (*Id.* ¶ 58.)  In

11   addition, other Rimini Street managers and employees claim to have years of experience

12   providing support services for PeopleSoft software.  (*Id.*)  Seth Ravin, Rimini's CEO and

13   President, has publicly admitted that

14       It is very common for [a customer] to provide a password and ID for us to get to
         download upgrades and support.  It's a standard industry practice across every
15       consulting firm.  *The key is you have to be authorized.* . . .  You need to be very
         careful about parsing documents – whether you take 20 or hundreds.  *Either*
16       *you're authorized or you're not.*"

17   (*Id.* ¶ 7) (emphasis added)

18       Rimini is *not* authorized – it repeatedly downloads thousands of files that the customer on

19   whose behalf it purports to act has no right to copy or use, and does so for purposes that are not

20   in furtherance of the customer's relationship with Oracle.  (*Id.* ¶¶ 39-45, 57, 113)  Rimini does so

21   by retrieving individual files and by using the automated crawlers that are specifically prohibited

22   by Oracle's Terms of Use.  For example,

23   _____

24   [1] In its brief, Rimini falsely states that Oracle "admits" that Rimini used "valid, Oracle-supplied
     log-in credentials" and that "Oracle's allegations demonstrate that Oracle itself provided Rimini
25   Street with direct access to its computers."  Rimini Mot. at 3.  Nothing in the FAC supports the
     inferences that Rimini seeks to draw in its own favor.  The complaint never identifies any log-in
26   credential as "valid," nor does the complaint ever allege that Rimini was ever authorized by any
     customer to actually use any log-in credential to download materials, nor does the complaint
27   allege that Oracle "supplied" Rimini with log-in credentials.

28

1
2
3

- in November 2008, Rimini accessed the Oracle website and downloaded tens of thousands of documents relating to the PeopleSoft and JDE families of applications, even though the customer whose login credentials Rimini used had no license for any PeopleSoft or JDE software (*Id.* ¶ 43);

4
5

- between November 18 and 24, 2008, Rimini used an automated crawler to systematically search for and copy every conceivable numerical sequence in a range of 800,000 document titles, successfully copying about 120,000 of Oracle's proprietary documents (*Id.* ¶ 41);

6
7
8

- between December 10 and 28, 2008, a Rimini employee downloaded more than 100,000 files to servers associated with IP addresses owned by Rimini; thousands of these downloaded files were Software and Support Materials for which the supposed customer had no license (*Id.* ¶ 40);

9
10

- between April 20 and May 1, 2009, a Rimini employee downloaded several thousand files to servers associated with IP addresses owned by Rimini; thousands of these downloaded files were Software and Support Materials for which the supposed customer had no license (*Id.* ¶ 40); and

11
12
13

- Rimini President and CEO Seth Ravin personally logged into the Technical Support website, purportedly on behalf of a customer, and downloaded over 5,000 documents and 11,000 files associated with those documents, including many for which neither the customer nor Rimini had any license. (*Id.* ¶¶ 46, 53.)

14  All of these actions were unauthorized, as they were in violation of the express terms of Oracle's

15  license agreements and Terms of Use – the only source of authorization available to a user of

16  Oracle's intellectual property.  (*Id.* ¶¶ 26, 39, 57)

17          Although the extent of Rimini's unauthorized access and copying is not known to Oracle,

18  Rimini has directly admitted to Oracle that Rimini used crawlers and other automated means of

19  mass downloading as the only feasible way for Rimini to "identify, download, and catalog such a

20  large volume of Support Materials."  (*Id.* ¶¶ 47- 48)[2]  Moreover, the examples above were

21  discovered because Rimini's involvement was betrayed by its IP address or by a log-in credential

22  that specifically identified Rimini (e.g., "rimini_street") or a known Rimini employee (e.g.,

23  "Dennis Chiu").  (*Id.* ¶ 44)  On other occasions, Oracle licensees who are also listed as customers

24  on Rimini's website appear to have engaged in similar, unauthorized mass downloading of

25  materials for which the customer has no license.  Rimini Street either performed these downloads

26  _____

27  [2] *See also* Rimini Counterclaim at ¶ 26 (admitting to use of crawlers).

28

1    with the customer's own credentials or induced the customer to do so.  (*Id.* ¶ 44)

2           Having obtained Oracle's Software and Support Materials – without incurring Oracle's

3    enormous costs of development – Rimini then uses those materials to advertise its services and

4    retain the current and prospective customers of Oracle.  (*Id.* ¶ 125)  As a result, Rimini has

5    succeeded in persuading some of these customers to contract with Rimini instead of Oracle for

6    support.  (*Id.* ¶¶ 124, 127-28)

7           Loss of customers is not the only way in which Rimini's conduct has caused injury to

8    Oracle, however.  In addition, Rimini's use of crawlers and other means of mass downloading

9    have caused the databases that host the Software and Support Materials to freeze, disrupting their

10   operation and impeding the availability of lawful downloads to Oracle's other customers.  (*Id.* ¶¶

11   6, 45)  This impedes the functioning of Oracle's business, increases costs to Oracle of

12   maintaining and repairing the servers, and disrupts Oracle's ability to provide service to its

13   customers.  (*Id.* ¶ 45)  Rimini has expressly admitted to Oracle that Rimini's automated crawlers

14   damaged Oracle's servers:  in November 2008, Oracle blocked access to a Rimini Street IP

15   address which had downloaded thousands of Software and Support Materials.  A Rimini Street

16   employee complained to Oracle about its response, but admitted that the mass downloading

17   impaired the performance of Oracle's servers:  "I understand our current methodology creates

18   issues with the CPU utilization on Oracle's servers, and as such, you've had to block any access

19   from our IP addresses."  (*Id.* ¶ 47)

20   **III.    ARGUMENT**

21          **A.    Applicable Standard**

22          A complaint survives a motion to dismiss if, taking all well pleaded factual allegations as

23   true, it contains enough facts to "state a claim to relief that is plausible on its face."  *Ashcroft v.*

24   *Iqbal*, __ U.S. __, 129 S.Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S.

25   544, 570 (2007)).

26          **B.    Oracle Has Stated a Claim for Violation of the Federal Computer Fraud and**
                 **Abuse Act (Count 2)**
27
            Based on the facts summarized above, Oracle claims that Rimini has violated five distinct
28
                                                   9

provisions of the Federal Computer Fraud and Abuse Act (CFAA), 18 U.S.C. § 1030:

    (1)  intentionally accessing the Technical Support websites without authorization or exceeding authorized access and obtaining information from that website (18 U.S.C. § 1030 (a)(2)(C));

    (2)  knowingly, and with intent to defraud Oracle, accessing the Technical Support websites without authorization or exceeding authorized access, furthering the fraud and obtaining one or more things of value (18 U.S.C. § 1030 (a)(4));

    (3)  knowingly causing transmission of robots and crawlers to engage in massive downloading of Software and Support Materials from Oracle's Technical Support websites, and as a result intentionally causing damage to Oracle's computers without authorization (18 U.S.C. § 1030(a)(5)(A));

    (4)  intentionally accessing Oracle's Technical Support websites without authorization and recklessly causing damage (18 U.S.C. § 1030 (a)(5)(B)); and

    (5)  intentionally accessing Oracle's Technical Support websites without authorization and causing damage (18 U.S.C. § 1030(a)(5)(C)).

In response, Rimini focuses on a single element of the CFAA claim: that the access to the computer must be "without authorization" or "exceed authorized access," and argues that neither alternative has been satisfied. Rimini is mistaken.

Below, we explain the meaning of the terms "authorization" and "exceeds authorized access" under the CFAA and discuss the extensive case law – ignored by Rimini – that holds that contracts and website terms of use can determine what access is unauthorized or in excess of authorization. We then explain how Rimini's access to Oracle's websites was "without authorization." We further explain how, even assuming that Rimini had some right to access Oracle's computers, Rimini's conduct described in the FAC clearly exceeded authorized access. Finally, we explain how Rimini's argument about "access" offers no defense at all to its unauthorized use of web crawlers, which is an independent violation of the CFAA.

        **1.**      **"Authorization" and "Exceeds Authorized Access" Under the CFAA**

Under the CFAA, "authorization" is not defined, but the courts give it its ordinary, contemporary, common meaning, "permission or power granted by an authority." *LVRC Holdings LLC v. Brekka*, 581 F.3d 1127, 1132-33 (9th Cir. 2009) (citation omitted). Access to a computer is "without authorization" if the defendant "accesses a computer without any permission at all." *Id.* at 1133.

1    Congress did provide an express definition of the term "exceeds authorized access" – "to

2    access a computer with authorization and to use such access to obtain or alter information in the

3    computer that the accesser is not entitled so to obtain or alter."  18 U.S.C. § 1030 (e)(6).  *See*

4    *also LVRC*, 581 F.3d at 1133 (holding that "exceeds authorized access" means that a person "has

5    permission to access the computer, but accesses information on the computer that the person is

6    not entitled to access").

7    Consequently, the touchstone for liability under the CFAA is *permission* to access.  In an

8    effort to avoid the CFAA's emphasis on permission, Rimini tries to characterize the CFAA as

9    merely "a federal statute intended to address computer hacking," and argues that it did not

10   "hack" into Oracle's computers.  Rimini Mot. at 3.  But hacking is not the only way to violate the

11   CFAA.  Indeed, in *LVRC*, the Ninth Circuit expressly held that hacking *or access without*

12   *permission* constitutes unauthorized access, specifying that a person accesses a computer

13   "without authorization" if the person "has not received permission to use the computer for any

14   purpose (such as when a hacker accesses someone's computer without any permission), or when

15   the employer has rescinded permission to access the computer and the defendant uses the

16   computer anyway." *LVRC*, 581 F.3d at 1135; *see also Theofel v. Farey-Jones*, 359 F.3d 1066

17   (9th Cir. 2004) (holding that defendants had accessed a computer "without authorization" for

18   purposes of the Stored Communications Act, 18 U.S.C. § 2701 *et seq.*, when defendants

19   procured access by fraud).

20   Permission may be granted, revoked, or forbidden in any number of ways, but one of the

21   most obvious and common ways of regulating access to an internet website is by a contract

22   contained in the website terms of use.  Thus, in *eBay, Inc. v. Digital Point Solutions, Inc.*, 608 F.

23   Supp. 2d 1156, 1164 (N.D. Cal. 2009), the court held that the plaintiff pled a CFAA claim by

24   alleging violation of contractual terms, specifically, eBay's website terms of use, that specified

25   what access was allowed and what was not:  "Allegations with respect to access and use beyond

26   those set forth in a user agreement constitute unauthorized use under the CFAA."  *Id.*  Numerous

27   other federal courts have relied on contract provisions concerning access rights, including

28   website terms of use, to decide whether access to a computer was without authorization or

11

1    exceeded authorized access.  *See*, *e.g.*, *EF Cultural Travel BV v. Zefer Corp.*, 318 F.3d 58, 62-63

2    (1st Cir. 2003) ("A lack of authorization could be established by an explicit statement on the

3    website restricting access").[3]

4          Accordingly, Rimini's argument that "the CFAA does not address breach of contract,"

5    Rimini Mot. at 8, is simply wrong.  The CFAA looks to contracts when the contracts specify

6    what access is authorized.[4]

                **2.**      **Rimini's Access Was "Without Authorization" or "Exceeded**
                              **Authorized Access"**

9          Applying these principles, the FAC alleges access of Oracle's Technical Support

10   websites by Rimini without authorization.  Although Rimini tries to spin the FAC to suggest that

11   Oracle admits that Rimini had permission to access Oracle's website every time Rimini did so,

---

13   [3] *See also*, *e.g.*, *Southwest Airlines Co. v. Farechase, Inc.*, 318 F. Supp. 2d 435, 439-40 (N.D. Tex. 2004) ("Use Agreement" posted on website stated that scrapers, robots, and similar programs were prohibited, so use of any such program by defendant was unauthorized access under CFAA); *America Online, Inc. v. Nat'l Health Care Disc., Inc.*, 174 F. Supp. 2d  890, 899 (N.D. Iowa 2001) (access that violated website terms of use exceeded authorized access under CFAA); *Register.com, Inc. v. Verio, Inc.*, 126 F. Supp. 2d 238, 247-51 (S.D.N.Y. 2000) (analyzing terms of use as one way to decide whether use of robots to access site was authorized under CFAA); *America Online, Inc. v. LCGM, Inc.*, 46 F. Supp. 2d 444, 450 (E.D. Va. 1998) (holding that CFAA claim was established where "[d]efendants' actions violated AOL's Terms of Service, and as such was unauthorized").

[4] The cases that Rimini cites do not support its assertions.  *SalesTraq America, LLC v. Zyskowski*, 635 F. Supp. 2d 1178 (D. Nev. 2009), did not hold, as Rimini suggests, that there cannot be a CFAA claim based on a breach of contract.  Rimini Mot. at 5.  In *SalesTraq*, the defendants actually paid for a license to access plaintiff's website, but then copied licensed content from the website and used it for defendants' commercial use, in violation of the license agreement.  *Id.* at 1183-84.  This Court rejected the CFAA claim, holding that "[t]here is a crucial difference between misusing information properly accessed and exceeding one's authorized access to obtain restricted information."  *Id.* at 1183.  Rimini ignores that "crucial difference" by failing to recognize that breach of a contract term concerning access violates the CFAA, while breach of a term unrelated to access does not.  Rimini's other citations suffer from similar defects.  *See United States v. Drew*, 259 F.R.D. 449, 452-55, 459, 467 (C.D. Cal. 2009) (in misdemeanor criminal prosecution under CFAA, holding that void for vagueness doctrine prevented government from using breaches of MySpace website terms of service that forbade use of false names and harassing use of website to establish that access to site was unauthorized); *Int'l Ass'n of Machinists & Aerospace Workers v. Werner-Masuda*, 390 F. Supp. 2d 479, 498-99 (D. Md. 2005) (rejecting CFAA claim were defendant was authorized by contract to access all information at issue, but plaintiff claimed that the defendant *used* the information in a manner not permitted by the contract).

28

1    Rimini Mot. at 5-6, the FAC says no such thing.

2         The source of all authorization to access the Oracle websites is the license agreement,

3    further limited by the Terms of Use.  (FAC ¶¶ 26-32.)  *See also eBay, Inc. v. Bidder's Edge, Inc.*,

4    100 F. Supp. 2d 1058, 1070 (N.D. Cal. 2000) ("eBay's servers are private property, conditional

5    access to which eBay grants the public.")  Rimini had no right to access any of Oracle's

6    computers unless an actual Oracle licensee designated Rimini to act on its behalf, subject to the

7    restrictions in the underlying license. (FAC ¶ 28.)  Those restrictions forbid access to any portion

8    of Oracle's software except what is expressly licensed and paid for by the licensee (*Id.* ¶¶ 27,

9    39).  They permit access to the websites solely in support of the licensee's authorized use of the

10   Oracle programs for which it holds a supported license from Oracle (*Id.* ¶ 29).  They forbid the

11   use of "crawlers" or "scrapers." (*Id.* ¶ 31).  Oracle's licensees had no power to authorize

12   Rimini's access to the website on terms that were forbidden by Oracle.  *Cf. Snap-On Business

13   Solutions, Inc. v. O'Neil & Assocs., Inc.*, __ F. Supp. 2d ___, No. 5:09-CV-1547, 2010 WL

14   1539958, *6-7 (N.D. Ohio Apr. 16, 2010).

15        Thus, on the "many occasions" that Rimini "downloaded documents in a particular

16   software family while purporting to act on behalf of customers who had no license to any

17   application for any product in that family" (FAC ¶¶ 5, 40, 43, 46, 57, 59, 113), Rimini accessed

18   Oracle's computers "without any permission at all."  *LVRC*, 531 F.3d at 1132-33.  Likewise,

19   when Rimini logged onto Oracle's website with a customer's credentials for the purpose of

20   stealing those materials and using them to lure other customers away from Oracle (FAC ¶¶ 9,

21   113), Rimini accessed Oracle's computers "without any permission at all."  When Rimini used

22   automated mechanisms, such as robots or crawlers, to perform downloads from the Technical

23   Support website (*Id.* ¶¶ 6, 31, 41, 57, 59, 113), Rimini accessed the computers Oracle's

24   computers "without any permission at all."

25        The FAC also establishes access that exceeds authorization, which provides an

26   independent basis to deny Rimini's motion.  Assuming, for sake of argument, that on some of the

27   occasions of illegal copying, Rimini had permission to access Oracle's computers, the FAC

28   plainly alleges that Rimini accessed information on Oracle's computers that Rimini was not

1   entitled to access.  (*Id.* ¶¶ 40-46).  That is the very definition of "exceeds authorized access."

2   *See* 18 U.S.C. § 1030 (e)(6); *LVRC*, 581 F.3d at 1133.

3        Indeed, Rimini offers no argument whatsoever that its conduct complied with Oracle's

4   license agreements and Terms of Use; Rimini even concedes that Oracle has pled a breach of

5   those agreements.  Instead, Rimini merely argues that the CFAA does not address breach of

6   contract.  Rimini Mot. at 3.  For the reasons stated above, that argument is wrong.  The motion to

7   dismiss the CFAA claim should be denied.

8              **3.       Oracle Need Not Show Unauthorized Access Under 18 U.S.C. Section
                          1030(a)(5)(A)**
9

10       Finally, Oracle has also pled a violation of 18 U.S.C. § 1030 (a)(5)(A) based on Rimini's

11  use of crawlers.  That subsection prohibits knowingly causing "the transmission of a program,

12  information, code, or command, and as a result of such conduct, intentionally causes damage

13  without authorization, to a protected computer."  Unlike the other prongs of section 1030,

14  1030(a)(5)(A) does not depend on "access" at all.  Rather, Oracle need only show a transmission

15  that damaged its computers without authorization.  Rimini does not dispute the allegations that

16  Rimini's crawlers damaged Oracle's servers.  (FAC ¶ 45.)  And the use of crawlers is always

17  forbidden (FAC ¶ 31), and thus never authorized.  Rimini makes no argument at all that its use of

18  crawlers was authorized; indeed, Rimini has made no argument at all applicable to Oracle's

19  claim under section 1030(a)(5)(A).  Consequently, Rimini's motion as to Count 2 fails for this

20  reason as well.

21       **C.    Oracle Has Stated a Claim for Under California Penal Code Section 502 and
                 Nevada Revised Statute Section 205.4765 (Counts 3, 4)**

22       Oracle also pleads violations of Nevada and California counterparts to the CFAA (Counts

23  3 and 4), and Rimini's motion to dismiss these claims merely repeats, in truncated fashion, the

24  same erroneous challenges to Oracle's CFAA claim.

25       Once again, Rimini tries to argue that California Penal Code Section 502 and Nevada

26  Revised Statute Section 205.4765 are merely "hacking" statutes.  Again, Rimini ignores the fact

27  that neither the Nevada law nor the California law is so limited.  Both impose liability where the

28  defendant obtains access "without permission," Cal. Penal Code § 502, or "without

14

1    authorization," Nev. Rev. Stat. § 205.4765.  Indeed, the preamble to California Penal Code

2    Section 502 emphasizes that the legislature sought to protect commercial computer systems from

3    "unauthorized access," with access defined broadly to mean "to gain entry to, instruct, or

4    communicate with the logical, arithmetical, or memory function resources of a computer,

5    computer system, or computer network."  Cal. Penal Code § 502(a), (b)(1).

6          Similarly, Rimini again incorrectly asserts that Oracle gave Rimini permission to access

7    its computers on the occasions that Rimini unlawfully copied Oracle's Software and Support

8    Materials.  As noted above, this is not true, as Rimini's access was a direct breach of the license

9    agreements and Terms of Use.  In addition to that error, Rimini wholly ignores the actual

10   language of California Penal Code Section 502(c)(2) and Nevada Revised Statute Section

11   205.4765.  The CFAA prohibits unauthorized access to a "protected computer," and Rimini

12   argues (incorrectly) that it was authorized to access Oracle's computers.  Under section

13   502(c)(2), in contrast, a person breaks the law if he or she

14             Knowingly accesses and without permission takes, copies, or makes use of ***any
15             data from*** a computer, computer system, or computer network, or takes or copies
           ***any supporting documentation***, whether existing or residing internal or external
16             to a computer, computer system, or computer network.

17   Cal. Penal Code § 502(c)(2) (emphasis added).  Under section 502, it is irrelevant whether

18   Rimini had permission to access Oracle's *computers* on any given occasion; all that matters is

19   that Rimini accessed and took, copied, or used "any data" or "any supporting documentation"

20   from any Oracle computer, system, or network.  (Nevada law is substantially the same.)[5]  There

21   is no serious dispute that the FAC alleges that Rimini engaged in precisely that conduct.  (FAC

22   ¶¶ 39-45.)

23          **D.      Oracle Has Stated a Claim for Inducing Breach of Contract (Count 6)**

24          Rimini next argues that Oracle has failed to state a claim for inducing breach of contract

25   ───────────────────

26   [5] Nevada Revised Statute Section 205.4765(1) has a similar construction to California Penal
     Code Section 502, forbidding any unauthorized access, taking, copying, or use, of "data,
27   program, or any supporting documents" in a computer or computer system.

28

1   (Count 6).  Rimini argues that the FAC alleges only that Rimini, acting as an agent of Oracle's

2   customers, performed acts that caused those customers to breach their contracts.  Rimini Mot. at

3   7-8.  Rimini contends that this claim must fail because agents cannot induce their principals to

4   breach contracts.  Rimini misapprehends the FAC and thus misapplies the law.

5       First, the FAC never alleges that Rimini is acting on behalf of the clients whose

6   credentials it uses.  Rather, the FAC alleges that Rimini "purports" to act on behalf of customers,

7   or "ostensibly" acts on their behalf, by logging onto the Oracle website using customer

8   credentials. (FAC ¶¶ 40, 43, 46)  There is no allegation in the FAC that Rimini's customers

9   authorized Rimini to engage in unlawful access and copying as their agent, or even that Rimini

10  disclosed to its customers the extent of its scheme.

11      Second, the FAC alleges that Rimini uses the stolen Software and Support Materials to

12  create copies and derivative works that Rimini uses in its own support business, and to provide

13  low-cost support to induce existing Oracle support licensees to become Rimini customers.  (*Id.* ¶

14  9)  Rimini is not acting as an "agent" for its customers when it sells them repackaged, stolen

15  Oracle intellectual property.  Because all of its customers are still Oracle licensees, however, the

16  customers remain subject to contractual provisions prohibiting them from copying or using any

17  Oracle software that they have not licensed and paid for.  (*Id.* ¶ 27)  Rimini's conduct thus causes

18  software licensees to be in breach of their agreements with Oracle.

19      Third, the FAC alleges efforts by Rimini to induce breach that occurred *before* Rimini

20  became an agent of the relevant Oracle customer.  For example, Rimini induced Oracle licensees

21  to enter into support contracts with Rimini, in which Rimini committed to research, develop, and

22  test updates and fixes to Oracle's PeopleSoft products at Rimini Street's business location, using

23  Rimini Street's computer system hardware and software.  As Rimini and Mr. Ravin knew, this

24  was a violation of the PeopleSoft license agreements, which required that all such software be

25  maintained at the licensee's site. (*Id.* ¶ 54)  In each of these ways, Rimini induced breaches of

26  contract by persons who were not Rimini's principals.

27      Consequently, Rimini's reliance on the rule that "corporate agents and employees acting

28  for and on behalf of a corporation cannot be held liable for inducing a breach of the corporation's

16

1   contract," *Mintz v. Blue Cross of California*, 172 Cal.App.4th 1594, 1604 (Cal. Ct. App. 2009)

2   (citation omitted), is misplaced – Rimini was not a corporate agent "acting for and on behalf of"

3   Rimini's clients at the time that it engaged in the unlawful conduct.

4       **E.**    **Oracle Has Stated a Claim for Intentional and Negligent Interference With**

5                 **Prospective Economic Advantage (Counts 7, 8)**

6       Oracle establishes intentional interference with prospective economic advantage by

7   showing:

8       (1)    an economic relationship between plaintiff and a third party, with the probability
of future economic benefit to the plaintiff;

9       (2)    defendant's knowledge of the relationship;

10      (3)    an intentional act by the defendant, designed to disrupt the relationship;

11      (4)    actual disruption of the relationship; and

12      (5)    economic harm to the plaintiff proximately caused by the defendant's wrongful
act, including an intentional act by the defendant that is designed to disrupt the

13             relationship between the plaintiff and a third party.

14   *Edwards v. Arthur Andersen LLP*, 44 Cal. 4th 937, 944 (2008); *see also Las Vegas-Tonopah-*

15   *Reno Stage Line, Inc. v. Gray Line Tours of S. Nevada,* 106 Nev. 283, 287 (Nev. 1990).  The

16   elements of negligent interference are similar, except that Oracle need show only that Ravin and

17   Rimini acted negligently, not intentionally.  *See Venhaus v. Shultz*, 155 Cal. App. 4th 1072, 1078

18   (Cal. Ct. App. 2007) (listing elements of negligent interference).

19       Rimini's only argument on these claims is that Oracle fails to adequately plead the

20   existence of Oracle's economic relationship with current and prospective customers.  Rimini

21   Mot. at 9.  To the contrary, Oracle alleges – and Rimini admits – that Oracle is the "world's

22   largest enterprise software company," and that it earns revenues by licensing software

23   applications and providing support services to customers.  (FAC ¶¶ 25-26; Rimini Counterclaim

24   ¶ 9, 11)  Oracle further alleges that Rimini has improperly disrupted these customer relationships

25   by offering current and prospective customers Oracle's own proprietary information, stolen from

26   Oracle, at 50% of Oracle's prices (or even $100 per year) in order to induce those customers to

27   contract with Rimini instead of with Oracle.  (FAC ¶¶ 9, 36-38, 127)  Furthermore, Rimini's

28   Answer and Counterclaims *admit* the existence of Oracle's economic relationships when Rimini

17

1    complains of Oracle's remarkable business success and the profitability of Oracle's support

2    services – such as Rimini's allegation that Oracle has a "dominant 95% market share" and

3    substantial gross profit margins on the after-market support of its products, and its allegations

4    that Rimini is Oracle's "fastest-growing competitor" and that "[h]undreds" of organizations have

5    "already made the switch to Rimini."  (Rimini Counterclaim ¶¶ 7, 10)  There is no serious

6    question that Oracle's claim that it has economic relationships with current and prospective

7    customers, and that Rimini has disrupted those relationships, is plausible.  *See Transcription*

8    *Comms. Corp. v. John Muir Health*, No. C. 08-4418 (TEH), 2009 WL 666943, at *10-11 (N.D.

9    Cal. Mar. 13, 2009) (holding that plaintiff claiming tortious interference with prospective

10   economic advantage satisfied pleading standards of *Twombly* by alleging that plaintiff had a

11   single terminable-at-will contract with one customer, which was interfered with by defendant).[6]

12        **F.    Oracle Has Stated a Claim for Unfair Competition (Count 9)**

13        California's unfair competition law, Cal. Bus. & Prof. Code § 17200 outlaws "any

14   unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading

15   advertising."  Cal. Bus. & Prof. Code § 17200.  "An unlawful business practice under the UCL is

16   anything that can properly be called a business practice and that at the same time is forbidden by

17   law."  *Morgan v. AT & T Wireless Servs., Inc.*, 177 Cal. App. 4th 1235, 1254 (Cal. Ct. App.

18   2009).

19        Rimini argues that Oracle has failed to plead any unlawful act.  Rimini Mot. at 10.  While

20   Rimini focuses on the allegation of RICO violations, Rimini ignores the other allegations of the

21   _____

22   [6] The two unpublished district court decision that Rimini cites in support of this argument do not
     help it.  In *Kema, Inc. v. Koperwhats*, No. C-09-1587 MMC, 2010 WL 726640, at *8 (N.D. Cal.
23   Mar. 1, 2010), the court held that the counterclaim plaintiff had failed to identify any prospective
     business relationship other than a "generic assertion that 'current and prospective customers'
24   were 'dissuaded' from purchasing or licensing Koperwhats' software."  In contrast, here Oracle
     has alleged detailed facts about its support business, its success, its contractual relationships with
25   customers, and its licensing practices.  *RSI Corp. v. Int'l Business Machines Corp.*, No. C-08-
     3414 RMW (RS), 2010 WL 726032 (N.D. Cal. Feb. 26, 2010) was decided under *New York* law,
26   which, the court observed, imposes an unusually heightened pleading standard on tortious
     interference claims.  *See id.* at *4.
27

28

1   FAC.  As discussed above, Oracle alleges that Rimini has violated the CFAA as well as its

2   California and Nevada analog, and violations of these statutes – as Rimini does not dispute – are

3   each independently sufficient to support a UCL unlawful claim.  Moreover, Oracle has also

4   shown it has stated claims for tortious interference, inducing breach of contract, trespass to

5   chattels, and unjust enrichment, each of which is also sufficient to support a UCL claim.  *See*,

6   *e.g.*, *Paulus v. Bob Lynch Ford, Inc.*, 139 Cal. App. 4th 659, 681 (2006) (noting that common-

7   law violations "can serve as [a] predicate for a [UCL] 'unlawful' violation") (quoting Stern, Bus.

8   & Prof. Code, § 17200 Practice (The Rutter Group 2006) ¶ 3:56, p. 3-13).

9   **G.       Oracle Has Stated a Claim for Trespass to Chattels (Count 10)**

10          Oracle alleges that Rimini committed the tort of trespass to chattels by accessing Oracle's

11  computer systems without permission, including by using automated programs, such as crawlers

12  and scrapers, to access Oracle's websites without permission and systematically download

13  thousands of documents. That conduct by Rimini caused Oracle's computers to freeze, slow

14  down, or become temporarily non-operational.  (FAC ¶¶ 6, 41, 45, 47, 57, 59, 156, 157, 159)  A

15  Rimini employee admitted to Oracle that Rimini's use of crawlers impaired Oracle's computers,

16  writing:  "I understand our current methodology creates issues with the CPU utilization on

17  Oracle's servers, and as such, you've had to block any access from our IP addresses."  (*Id.* ¶ 47)

18          Rimini moves to dismiss the claim for trespass to chattels, making two arguments.  First,

19  Rimini claims that the FAC fails to give it notice of the specific conduct that constitutes trespass

20  to chattels.  As noted immediately above, those facts are set forth clearly in the FAC.

21          Rimini then argues that the trespass to chattels claim fails because, according to Rimini,

22  Oracle has not alleged "physical harm to the chattel or deprivation of the use of the chattel for a

23  substantial time."  Rimini Mot. at 11.  But that is *not* what the law requires – as is established by

24  the block quote in Rimini's *own brief* immediately following this assertion.  Under California

25  law, electronic intermeddling with a computer is actionable "only if 'the chattel is impaired as to

26  its condition, quality, or value, or . . .  the possessor is deprived of the use of the chattel for a

27  substantial time.'"  *Intel Corp. v. Hamidi*, 30 Cal. 4th 1342, 1357 (2003) (quoting Restatement

28  (Second) Torts, § 218 (alteration in original)).  The period of deprivation is "substantial" if "it is

19

1   possible to estimate the loss caused thereby." *Id.*

2       Thus, as *Intel* expressly recognizes, impairment of the condition, quality, or value of

3   Oracle's computers constitutes trespass to chattels, as does deprivation that lasts long enough to

4   cause a measurable injury.  Oracle has pled such impairment and deprivation by alleging that

5   Rimini's crawlers caused Oracle's computers to freeze, slow down, or become temporarily non-

6   operational, which impeded the functioning of Oracle's business, increased costs to Oracle of

7   maintaining and repairing the servers, and disrupted Oracle's ability to provide service to its

8   customers.  (FAC ¶ 45)  Indeed, as the California Supreme Court noted with approval in *Intel*,

9   courts have recognized that "unauthorized robotic data collection from a company's publicly

10  available Web site" may constitute a trespass to chattels.  *Intel*, 30 Cal. 4th at 1354-55 (citing

11  cases with approval); *see also eBay*, 100 F. Supp. 2d at 1066, 1071-72 (on trespass to chattels

12  theory, enjoining defendant's use of crawlers on eBay's website based on risk that continued use

13  by defendant and others would cause "reduced system performance, system unavailability, or

14  data loss").

15      **H.      Oracle Has Stated a Claim for Unjust Enrichment (Count 11)**

16      Under California law, "the elements for a claim of unjust enrichment [are]:  receipt of a

17  benefit and unjust retention of the benefit at the expense of another." *Lectrodryer v. Seoulbank*,

18  77 Cal. App. 4th 723, 726 (Cal. Ct. App. 2000); *see also Oracle Corp. v. SAP AG*, No. C 07-

19  1658 PJH, 2008 WL 5234260, at *8-9 (N.D. Cal. Dec. 15, 2008) (holding, on near-identical

20  factual allegations, that Oracle had pled a claim for unjust enrichment under California law).

21  Other courts also recognize the claim.  *See also Unionamerica Mortgage and Equity Trust v.*

22  *McDonald,* 97 Nev. 210, 212 (Nev. 1981).

23      Rimini argues that the FAC has only conclusory allegations of unjust enrichment.  To the

24  contrary, the FAC sets out detailed allegations that, rather than develop intellectual property of

25  its own, Rimini misappropriated the Software and Support Materials that Oracle developed at

26  substantial expense, and then used that wrongfully acquired advantage to attract Oracle's support

27  customers.  No more is required, and the sole case that Rimini cites, *Rosal v. First Federal Bank*,

28  does not suggest otherwise.  In *Rosal*, the plaintiff sued after defendant began foreclosure

1  proceedings, claiming that defendant failed to make certain statutorily required disclosures.  The

2  unjust enrichment claim consisted of nothing more than an allegation that "[d]efendants received

3  and continue to receive benefits of profits and material gains by unjustly retaining profits,

4  income and ill-gotten gains at the expense of the Plaintiff who acted in detrimental reliance upon

5  the defendants' false assurances, representations and promises."  671 F. Supp. 2d 1111, 1133

6  (N.D. Cal. 2009).

7        Rimini next argues that Oracle's unjust enrichment claim is "untenable" because an

8  unjust enrichment claim is inconsistent with a contract claim.  The district court in Oracle's

9  lawsuit against SAP considered and rejected this precise argument:

10        A defendant is not entitled to have a cause of action dismissed for failure to state a
         claim simply because it conflicts with another cause of action. Thus, to the extent
11        that plaintiffs are ultimately able to prevail under a breach of contract theory or a
         tort theory, they will be precluded from also recovering under a claim of unjust
12        enrichment.  However, for pleading purposes, plaintiffs are entitled to plead
         inconsistent causes of action.
13

14  *Oracle Corp. v. SAP AG*, 2008 WL 5234260 at *9.  Although Rimini does not dispute that

15  Oracle has pled a claim for breach of contract, it has not admitted that Oracle will prevail on a

16  contract theory, or that there is even a contract between the parties.  *See* Rimini Answer to FAC

17  ¶¶ 110-14 (denying all allegations under breach of contract count).  None of the cases that

18  Rimini cites indicate that the defendant disputed the existence of the contract.  At the pleading

19  stage, with its contract claims still disputed, Oracle is not required to abandon alternate theories

20  of liability.

21     **I.     Oracle Has Stated a Claim for Unfair Business Practices (Count 12)**

22        The Unfair Practices Act, Cal. Bus. & Prof. Code § 17044, provides: "It is lawful for

23  any person engaged in business within this State to sell or use any article or product as a 'loss

24  leader' as defined in Section 17030 of this chapter." Section 17030 defines "loss leader" as

25        any article or product sold at less than cost: (a) Where the purpose is to induce,
         promote or encourage the purchase of other merchandise; or (b) Where the effect
26        is a tendency or capacity to mislead or deceive purchasers or prospective
         purchasers; or (c) Where the effect is to divert trade from or otherwise injure
27        competitors.

28        The conduct at issue in Count 12 includes, but is not limited to, Rimini's sales of

                                          21

1  software support at cut-rate prices – such as support for $100 per year – that were possible only

2  because it acquired Oracle support materials unlawfully.  FAC ¶¶ 9, 33-38, 164.  Through its

3  cut-rate pricing, made possible by its illegal business model, Rimini was able to lure customers

4  away from Oracle.  FAC ¶¶ 34-37.

5      Rimini argues that Count 12 fails because Oracle has not alleged violations of the Unfair

6  Practices Act with sufficient specificity, yet acknowledges that Oracle alleges that Rimini has

7  violated this section by "[s]elling articles or products at less than the cost."  Rimini Mot. at 13

8  (quoting FAC ¶ 164).  The FAC further alleges specific facts in support of this claim, including

9  that Rimini sells support at 50% of Oracle's prices, that Rimini offers two years of support at

10  only $100 per year, that Oracle – which has the advantage of expertise in having developed the

11  software applications in the first place – has spent billions of dollars to develop the Software and

12  Support Materials necessary for its support business.  These allegations are sufficient to support

13  a plausible claim that Rimini is selling support for less than what it costs to develop them.

14      **J.      Oracle Has Stated a Claim for an Accounting (Count 13)**

15      "A cause of action for an accounting requires a showing that a relationship exists between

16  the plaintiff and defendant that requires an accounting, and that some balance is due the plaintiff

17  that can only be ascertained by an accounting.  An action for accounting is not available where

18  the plaintiff alleges the right to recover a sum certain or a sum that can be made certain by

19  calculation."  *Teselle v. McLoughlin*, 173 Cal. App. 4th 156, 179 (Cal. Ct. App. 2009) (citation

20  omitted).  *See also Mikohn Gaming v. Acres Gaming, Inc.*, No. CV-S-97-1383 (EJW), 2001 WL

21  34778689, at *19 (D. Nev. Aug. 2, 2001).

22      Citing *Teselle*, Rimini argues that "Oracle cannot allege any relationship between Oracle

23  and Rimini Street that requires an accounting, and its claim fails for this reason alone."  Rimini

24  Mot. at 18.  Once again, Rimini's argument is foreclosed by the very case that it cites.  The court

25  in *Teselle* held that

26      A fiduciary relationship between the parties is not required to state a cause of
   action for accounting. *All that is required is that some relationship exists that*
27  *requires an accounting.*  The right to an accounting can arise from the possession
   by the defendant of money or property which, because of the defendant's
28  relationship with the plaintiff, the defendant is obliged to surrender.

1    *Teselle*, 173 Cal. App. 4th at 179 (emphasis added) (citation omitted).  A contractual relationship

2    between the parties – like the one that Rimini concedes Oracle has sufficiently pled – provides a

3    basis for seeking an accounting.  *See, e.g.*, *People's Fin. & Thrift Co. of Visalia v. Bowman*, 58

4    Cal. App. 2d 729, 731-32 (Cal. Ct. App. 1943) (holding that a claim for an accounting seeks a

5    "detailed statement of the mutual demands in the nature of debt and credit between parties,

6    *arising out of contracts* or some fiduciary relation") (emphasis added).

7         Finally, Rimini argues that an accounting is not necessary in this case, apparently arguing

8    that the amounts that it owes to Oracle are susceptible to calculation as a sum certain.  But the

9    nature and extraordinary scope of Rimini's misappropriation of Oracle's proprietary information,

10   combined with Rimini's use of that information to create derivative works that further infringe

11   on Oracle's rights, make it likely that the amounts that Rimini owes to Oracle, as a result of its

12   unlawful possession of Oracle's property, cannot be ascertained without the benefit of an

13   accounting.  Consequently, Oracle's claim for an accounting is proper, and the motion to dismiss

14   Count 13 should be denied.

15                                    **CONCLUSION**

16         For the foregoing reasons, Rimini's motion to dismiss should be denied.  In the event that

17   the Court grants Rimini's motion as to any cause of action, Oracle respectfully requests an

18   opportunity to amend.

19

20

21   DATED: March 24, 2010                 BOIES SCHILLER & FLEXNER LLP

22

23                              By:  /s/ Fred Norton
                                        Fred Norton

24                             Attorneys for Plaintiffs
                    Oracle America, Inc., Oracle USA, Inc., and

25                           Oracle International Corp.

26

27

28

1

## **CERTIFICATE OF SERVICE**

2        I hereby certify that on the 24th day of May, 2010, I electronically transmitted the

3   foregoing **PLAINTIFF ORACLE AMERICA INC., ORACLE USA, INC. AND ORACLE**

4   **INTERNATIONAL CORP.'S OPPOSITION TO DEFENDANT RIMINI STREET, INC.'S**

5   **MOTION TO DISMISS THE FIRST AMENDED COMPLAINT** to the Clerk's Office using

6   the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to all counsel in

7   this matter; all counsel being registered to receive Electronic Filing.

8

9                                     /s/ Christina Seki

10                               An employee of Boies, Schiller & Flexner LLP

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ORACLE'S OPPOSITION TO RIMINI STREET'S MOTION TO DISMISS COMPLAINT