# EXHIBIT A



# Rimini Street
Redefining Enterprise Software Support™

Print | Close Window

**Press Release**

### Rimini Street Sues Oracle

Leading Support Provider Aims to End Oracle's Campaign of Anticompetitive Tactics

Las Vegas, March 29, 2010 – Rimini Street, Inc., the leading third-party maintenance and support provider for enterprise software, including Oracle Corporation's (NASDAQ: ORCL) for Siebel, PeopleSoft, and JD Edwards software, and SAP AG (NYSE:SAP) software, today announced that it filed suit against Oracle in U.S. District Court for the District of Nevada by presenting counterclaims alleging copyright misuse, defamation, disparagement, trade libel, and unfair competition under the California Business and Professions Code. With its filing, Rimini Street aims to end Oracle's five year campaign of anticompetitive tactics against Rimini Street that most recently includes a baseless lawsuit. Additionally, Rimini Street announced today that it filed its response to Oracle's complaint, showing Rimini Street's business processes and procedures are entirely legal and vehemently denying Oracle's false and malicious allegations.

### Rimini Street is Oracle's Primary Competition for Annual Support Services

Rimini Street is Oracle's fastest-growing and leading competitor for the annual support of Oracle's Siebel, PeopleSoft, and JD Edwards software products. In 2009, Rimini Street saw growth of more than 270 percent in year-over-year revenue, doubled its global workforce to 160 professionals, and accumulated nearly $150 million in sales backlog serving hundreds of Global, Fortune 500, mid-market, and public sector organizations around the world.

### Oracle has a Long History of Trying to Stifle Rimini Street Competition

Oracle and its predecessors began a systematic campaign to disrupt and halt Rimini Street's business since the inception of the company in 2005. As Rimini Street's success grew, so did Oracle's apparent determination and efforts to disrupt Rimini Street's growth. Rimini Street's response to Oracle's complaint details examples of Oracle's business interference over many years including:

Initially, beginning in September 2005, Oracle's efforts consisted of numerous hostile letters. Over the years, Rimini Street responded to each letter, explained the appropriateness of Rimini Street's practices and procedures, and repeatedly offered to meet and discuss any questions or concerns Oracle might have about Rimini Street processes and procedures.

In June 2007, Oracle interfered with authorized work on behalf of Rimini Street clients by changing its website usage terms. Rimini Street wrote Oracle about the anticompetitive tactic against Rimini Street and informed Oracle that the change was likely a breach of Oracle's client license agreements, which expressly prevent service rights degradation. As such, the changes were not enforceable.

In December 2008, Oracle escalated its tactics by intentionally blocking Rimini Street's IP addresses and interfering with Rimini Street's authorized work on behalf of a large client switching from Oracle to Rimini Street support. After correspondence from both the client and Rimini Street demanding Oracle cease and desist, Oracle stopped the interference.

Most recently, in January 2010, Oracle once again escalated its anticompetitive tactics, this time through litigation. Oracle filed a baseless lawsuit against Rimini Street, choosing to ignore Rimini Street's numerous invitations for dialogue, offer to view internal Rimini Street information, and even the opportunity to engage a third party auditor.

### Oracle Chooses Competition in the Courtroom Rather than the Marketplace

In February 2009, Rimini Street sought to stop Oracle's campaign of anticompetitive actions once and for all by again requesting and finally being granted a call with Oracle representatives. On the call, Rimini Street offered to share Rimini Street internal information and/or work out an agreement that would utilize an independent third party auditor reporting back to both parties to confirm Rimini Street's compliance with its standard processes and procedures. Oracle never responded to any of Rimini Street's proposals.

Instead, Oracle filed a baseless lawsuit against Rimini Street in an apparent effort to try and protect its 95% dominant market share and monopoly-like 92% gross margins on the annual support of its products.

### Rimini Street Vehemently Denies Oracle's False Accusations

Rimini Street's business processes and procedures are entirely legal, and Rimini Street vehemently denies Oracle's accusations. Rimini Street has implemented extraordinary processes and procedures to assure the proper use of Oracle's intellectual property as detailed more fully in Rimini Street's response to Oracle's complaint. For example:

Each client authorizes Rimini Street to perform work on its behalf

Rimini Street only delivers Oracle software and support materials to each client who is entitled to receive such materials

Rimini Street uses separate data "silos" for each client and has policies against co-mingling data

Rimini Street is authorized by its clients to possess and use copies of their Oracle licensed products to provide services to them, just like IBM, AT&T, Accenture, CedarCrestone and virtually every other hosting service provider working with copies of their client's licensed products

**Support Innovation, Better Value and Ultra Responsive Service**

"Rimini Street looks forward to positively resolving its disputes with Oracle, and we remain focused on continuing to deliver award-winning, ultra-responsive service as always to our fast-growing client base who seeks a better software support value," said Seth Ravin, president and CEO, Rimini Street. "Rimini Street will also continue to aggressively innovate its service offering and expand its popular service to even more software product lines as we continue to execute against our business plan."

**About Rimini Street, Inc.**

Rimini Street is the leading third-party provider of enterprise software support services. The company is redefining enterprise support services with an innovative, award-winning program that enables Siebel, PeopleSoft, JD Edwards, and SAP licensees to save at least 50% in annual support fees and save up to 90% in total support costs over a decade. Clients can remain on their current software release without any required upgrades or migrations through 2020 and beyond. Hundreds of Global, Fortune 500, midmarket, and public sector organizations from virtually all industries have selected Rimini Street as their trusted, software vendor independent support provider. To learn more, please visit http://www.riministreet.com or call within the USA (888) 870-9692 or internationally +1 (702) 839-9671.

Rimini Street and the Rimini Street logo are trademarks of Rimini Street, Inc. All other company and product names may be trademarks of their respective owners. Copyright © 2010. All rights reserved.

# EXHIBIT B

# DOCUMENT FILED UNDER SEAL

# EXHIBIT C



News   Reviews   How-To's   Downloads   Shop & Compare   Forums   Business Center

Sign in | Join US | Newsletters |

  American Express Travel. A wealth of travel options. Countless savings opportunities. Book Now ▸

 Magazine
Subscribe & Get a Bonus CD
Customer Service

Discover news, guides, and products for your business

Search

| Software & Services | Office Hardware | Security | Servers & Storage | Cell Phones & Mobile | Operating Systems | Networking & VOIP |

SOFTWARE / SERVICES    March 29, 2010 9:00 AM

# Rimini Street Files Countersuit Against Oracle

**By Chris Kanaracus, IDG News Service**   🖶 Print   Digg   Twitter   ▯ Facebook   More…

Oracle on Monday was hit with a counterclaim by Rimini Street, the third-party software maintenance provider it sued in January over alleged intellectual property violations.

PEOPLE WHO READ THIS ALSO READ:

The iPad: Granny's Computer?

Bullzip PDF Printer
**8,870 PEOPLE VIEWED THIS**

Karen's Directory Printer
**773 PEOPLE VIEWED THIS**

5 PSP Games to Play Before its Lifecycle Ends

Top 12 Weirdest Notebooks

Avery Wizard for Microsoft Office

Recommended by loomia

Oracle's suit is groundless, anticompetitive and disparaging, Rimini Street said in the response filed Monday in U.S. District Court for the District of Nevada.

Rimini Street provides support for SAP and Oracle applications, pledging that customers will save at least 50 percent off their vendor-provided support bills. While third-party support means customers don't receive product upgrades, Rimini Street caters to companies with stable legacy systems and no immediate desire for updates.

Vendors fiercely covet annual software maintenance revenues, which are charged as a percentage of a customer's license fees and provide steady income even when new business is harder to find. "Software license updates and product support" accounted for 51 percent of Oracle's total revenue in its most recent quarter, generating US$3.3 billion against just $281 million in associated expenses, for a profit margin north of 90 percent.

Oracle's suit against Rimini Street followed a similar one it filed in 2007 against SAP and its former subsidiary, TomorrowNow, which also offered third-party support for Oracle applications. TomorrowNow workers illegally downloaded software from Oracle's support systems, according to Oracle. SAP has said the employees were authorized to download the materials on behalf of TomorrowNow customers, but also that some "inappropriate downloads" had occurred.

Rimini Street CEO Seth Ravin [was a founder of TomorrowNow. Oracle has alleged Rimini Street amounts to a redux of TomorrowNow's "corrupt" business model.

Rimini Street "typically logs on to Oracle's password protected Technical Support websites using a customer credential, then downloads Software and Support Materials in excess of the customer's authorization under its license agreement," according to Oracle's suit.

The company then uses automatic crawling tools to download Oracle materials "in intentional violation of Oracle's Technical Support website Terms of Use," the complaint states. "These intrusions have damaged Oracle's support services by causing the databases which host the Software and Support Materials to freeze, disrupting their operation and impeding the availability of lawful downloads to Oracle's other customers."

Rimini Street's answer and counterclaim denies wrongdoing on its part.

"Oracle had full knowledge that Rimini Street's actions were authorized by Oracle's customers," it states. "Far from acting as 'fraudulent thieves,' Rimini Street has acted legally, openly (and often with Oracle's full cooperation)." In addition, Oracle has been unresponsive to invitations to discuss Rimini's business practices or have them independently vetted, the filing alleges.

**Is Your Data at Risk?**

⚠ Downtime can be disastrous for a business. Learn to mitigate business risks and costs. **Read this Strategy Guide.**

Need a server that can wear multiple hats?





 **Premier IT Professionals**

Investigating alternate compute models?

Explore dynamic virtual client computing—thin client advantages with rich client user experience and mobility

Find out more

**Business News Daily**

Get the latest technology news that's important to you and your business, fresh seven days a week.

Enter e-mail address          Subscribe

Best Prices on Management Software

| MOST POPULAR | ALL CATEGORIES |

 Project 2007 Standard
$356.88 and up
See All Prices

 Act! 2010 (Full Product)
$90.00 and up
See All Prices

ACT! 2009 (Full Product)
$59.89 and up
See All Prices

Office Project Professional 2007 (Academic)

Rimini Street also takes "extraordinary efforts ... to ensure that Oracle's intellectual property rights are respected," whereas Oracle has conducted a "systematic campaign" against Rimini, including a series of "hostile" letters, the filing states.

"Over the years, Rimini Street responded to each Oracle letter, explained the appropriateness of Rimini Street's practices and procedures, and repeatedly offered to meet and discuss any questions or concerns Oracle might have about Rimini Street's processes and procedures," it states.

Rimini admitted it has used automated downloading tools, but said they were necessary "because Oracle refused to help its customers identify and take delivery of such large volumes of materials."

In June 2007, Oracle changed the terms and conditions on its Web site, disallowing the use of such tools, according to Rimini Street. This action was anticompetitive and in violation of Oracle's customers' contractual rights, the filing states.

"Oracle's efforts escalated in December 2008 when Oracle began interfering with Rimini Street's performance of an authorized download for a large client switching from Oracle to Rimini Street support by blocking Rimini Street access to the Oracle support websites," it adds. Oracle relented after appeals from Rimini and the customer, according to the filing.

As "a good-faith attempt at conflict reduction," Rimini agreed to stop using automated download tools in January 2009, telling Oracle of its decision the following month.

Rimini Street also spoke with Oracle representatives in February 2009 and offered to share internal information with the vendor "and/or to work out an agreement that would utilize an independent third party auditor reporting back to both parties to confirm Rimini Street's compliance with its standard processes and procedures," the filing states.

Oracle did not respond to Rimini Street's proposals, and subsequently filed suit, it adds.

"Oracle has had unlimited opportunities over nearly five years to dialogue and work directly with Rimini Street ... but, as the facts demonstrate, that is not Oracle's objective. Instead, Oracle's goal is to forestall after-market product support competition," the filing states.

An Oracle spokeswoman declined to comment Monday.

Privately held Rimini Street says revenue grew 270 percent year-over-year in 2009, and that it now has nearly 300 clients, 160 employees and $150 million in "sales backlog." In addition, it claims a 95 percent annual renewal rate.

In an interview, Ravin equated third-party software maintenance to independent oil change shops, saying the same rights consumers have to take their cars to places besides the original dealer apply to his own business.

Oracle's suit has put a slight damper on sales, according to Ravin.

"We continued to close business, including some of the largest deals ever," since the suit was filed, he said. "[But] I think we had a few deals that have not moved forward because of the litigation. We believe that's a good part of the intent of the suit, to slow our business down."

Rimini Street expects to spend "millions and millions of dollars" to pay its legal counsel in the case, he said. The company anticipated the suit and budgeted for the legal fees, which it considers "an investment we are making to finally put this issue to rest."

The case is "critical on so many counts," said Ray Wang, partner with analyst firm Altimeter Group.

"It's imperative that the rules of engagement for third-party maintenance be established," Wang said. "That's the big question in the room. People want it. How can you do it in a way that's respectful to Oracle's intellectual property rights and respectful to the customer's rights? Right now, the rules are just murky."

"If anything (comes) out of all this, hopefully there are some rules of engagement that are created," he added. "Right now customers are looking everywhere to cut costs."

If Rimini Street wins, the market for third-party maintenance will be a more welcome prospect to other providers, he said. But if it loses, Oracle may have "shut out or stopped people from thinking about this."

WAS THIS ARTICLE USEFUL?  Yes  0  No  0



$99.99 and up
See All Prices

See all Best Prices on Management Software
See also: Best Prices on Antivirus Software, Best Prices on Groupware, Best Prices on Security Software, Best Prices on Backup Utilities, Best Prices on Productivity Software, Best Prices on Software Suites

## Latest in Business Center Blogs


**TECH AUDIT** - MARCH 29, 2010 7:46 AM
**Brightcove Plugs Flash Hole in iPad**
Apple's iPad doesn't support Flash, but businesses can still deliver content with this solution from Brightcove.


**BIZFEED** - MARCH 29, 2010 9:00 AM
**iPad Launch Sellout Indicates Strong Business Demand**
Apple has sold out hundreds of thousands of iPads, indicating strong demand from business professionals.


**TECH AUDIT** - MARCH 26, 2010 3:42 PM
**Nokia Wins Battle for Mobile Web with Novarra Acquisition**
Nokia acquires browser developer Novarra to enter fray for mobile Web dominance.


**TECH AUDIT** - MARCH 26, 2010 10:00 AM
**Protect Your Data from the Next 'Card Hacker'**
Card hacker receives 20 year prison sentence, but others will follow. Protect your data.


**TECH AUDIT** - MARCH 26, 2010 9:23 AM
**Improve Your 3G Connection with an AT&T MicroCell**
AT&T is making its 3G MicroCell available nationwide to improve 3G voice and data networking.


**TECH AUDIT** - MARCH 25, 2010 3:31 PM
**Protecting Sensitive Business Data on the iPad**
Users want to use the iPad at work, so businesses need to protect sensitive data on the tablet device.

All Blogs »


Does your PC come with its own "Virtual IT" department?


For a limited time, purchase an AT&T Tech Support 360* Premium subscription with select Lenovo PCs and get 24/7 remote technical support for your new computer for one year, for less than the cost of onsite technical services.[1]

Learn more

[1]comparison based on three service calls in one year from local IT service provider at cost per visit of $175, compared to AT&T service included in this bundle for a limited time promotional cost of $253/year with unlimited calls. *Other brands are the property of their respective owners.

## Featured Webcasts


Death to PST Files
**Type:** whitepaper
**Company:** MessageLabs - Symantec Hosted Services

Sponsored Resource: Find your perfect All-in-One printing solution from HP.

Categories: Compliance, System Management

## Free Whitepapers

**Sponsored Links**

**11g DBA, ERP Consultants**
Multiple consulting companies bid instantly on your Oracle Project.
ConsultingExpress.com

**Hot Stock Alert - EHSI**
Profit From Healthcare Explosion. New Millionaires Created Today.
EmergingHealthcareSolutionsInc.com

**Need a Real Psychic?**
How to avoid scams and find a real psychic you can trust. Free report.
TheConsumerAdvisor.org

**Software Maintenance**
Find Software Maintenance Here, Save Money, Live Better!
seoma.net

Tangled Web
Type: whitepaper
Company: MessageLabs - Symantec Hosted Services
Categories: Security

More webcasts »

## Comments Readers reply with their ideas and expertise.   Add Yours
SUBSCRIBE TO THIS DISCUSSION VIA EMAIL OR RSS

## What do you think?

Sign in to post a comment. New to PCWorld Comments? Register here.

**Connect with Facebook**

### Software and Services Whitepapers from PCWorld

Case Study - OEM's Increased Global Network Performance

How Your Organization Can Profit From On-Demand Learning

High Availability Doesn't have to be Expensive

The Time Is Now for Considering Workload Automation

Getting Business Requirements Right

The Human Factor in Laptop Encryption

Squeezing More Value Out of Data Warehouses through the Power of Database Com...

Magic Quadrant for E-Commerce

The Growing Email Archiving Dilemma: 11 Considerations to Control Your Email ...

Achieving Compliant Manufacturing Excellence through Real-time Performance Ma...

Virtualization: Optimized Power and Cooling to Maximize Benefits

Choosing the right call center for you

More whitepapers »

#### Featured Whitepapers

**mimecast**   **The Growing Archiving Dilemma**

According to industry analysts, email volume in organizations is growing by more than 30% annually. and the average user receives 7MB of data per day via email. if not more. As a result of this growth. the handling of email has become a critical b...

#### Whitepaper Alerts

Get updates on white papers, case studies, and spotlights on tech products and solutions for your business.

Enter e-mail address   Subscribe

### More from the PCWorld BusinessCenter







U.S. Wireless Carriers Take Different Routes Toward Fast 4G Service

Tech Equipment Tax Deduction Tips

DOJ, EC Clear Microsoft-Yahoo Search Deal



TRY **2** RISK-FREE ISSUES

Plus Get a FREE CD-ROM

Name           City

Address 1

Address 2       State   Zip

                E-mail (optional)

**CLICK HERE**

Canadian Residents | Foreign Residents | Gift Subscriptions
Customer Service | Privacy Policy

PCWorld.com is the Web's trusted resource for management-level buyers and users of technology products, reaching an average of more than 11 million unique visitors per month (HitBox, January - June 2009).

More About Us » FAQ »

| Resources | Network |
|---|---|
| Twitter | PCWorld |
| RSS | PCWorld Business Center |
| Newsletters | Macworld |
| Contact Us | MacUser |
| Magazine Customer Service | Mac OS X Hints |
| Advertise | iPhone Central |

© 1998-2009, PCWorld Communications, Inc   Terms of Service Agreement   Privacy Policy   Community Standards

# EXHIBIT D



Snell & Wilmer
———— L.L.P. ————
LAW OFFICES

One Arizona Center
Phoenix, AZ 85004-2202
602.382.6000
602.382.6070 (Fax)
www.swlaw.com

DENVER

LAS VEGAS

ORANGE COUNTY

PHOENIX

SALT LAKE CITY

TUCSON

Dan W. Goldfine
602.382.6282
dgoldfine@swlaw.com

December 3, 2008

**VIA EMAIL**

Jeffrey S. Ross
Legal Department
Oracle USA, Inc.
10 Van de Graaf Drive
Burlington, MA 01803

      **Re:**    **Continued Business Interference and Anti-Competitive Practices**

Dear Mr. Ross:

      As you will recall, Snell & Wilmer L.L.P. represents Rimini Street, Inc. ("Rimini") as lead counsel for matters involving Oracle Corporation and its acquired entities.

      In our June 28, 2007 letter, Rimini brought to Oracle's attention, amongst other issues, serious customer access and downloading impediments relating to Oracle's web portals required for use by Oracle's annual maintenance-paying PeopleSoft, JD Edwards, and Siebel licensees.

      It does not appear that Oracle has taken any corrective actions to resolve the issues. In fact, Oracle has expanded the issues with its recent introduction of Oracle's new web portal http://www.metalink3.oracle.com ("MetaLink3/MyOracle Support") which denies Oracle's annual maintenance-paying clients the ability to reasonably identify, catalog, and take delivery of all available program updates, software updates, bug fixes, patches, custom solutions, and instructional documents ("Support Materials") for covered products.

      Even accepting that Oracle may have an interest in protecting its intellectual property, the antitrust laws only permit a company to impose the least restrictive means to protect that property. The new MetaLink3/MyOracle Support web portal far exceeds the least restrictive means to achieving that interest. Even if the web portal was the least restrictive means, the antitrust laws would still bar Oracle's new web portal because Oracle's imposition of it after its customers and their agents have billions of dollars of sunk costs, if not more, into having access to the Support Materials.

Snell & Wilmer
———— L.L.P. ————

Jeffrey S. Ross
December 3, 2008
Page 2

The antitrust laws further prohibit a company's pretextual use of intellectual property protection to bar competition. Accepting for argument sake that Oracle can otherwise engage in exclusionary conduct to protect legitimate intellectual property rights, the new web portal is facially and massively overbroad. In this light, Oracle's object of protecting intellectual property rights is not genuine and obviously pretextual. Moreover, as explained below, this object can be more simply *and more effectively* achieved without having the effect of excluding Oracle's customers from engaging in "self-support" and "self-performance" with respect to minor and major upgrades to other currently available software releases. Further, this change – after Oracle's customers have expended substantial sunk costs – is evidence of exclusionary effect and Oracle's anticompetitive intent. This evidence strongly supports antitrust claims based on either a tying or monopolization of an after-market theory.

Oracle maintenance-paying customers have collectively paid Oracle billions of dollars in annual support fees to obtain and be able to use all available "Support Materials," and Oracle has recently taken additional actions to make it potentially impossible for customers to ever obtain or be able to obtain by reasonable means all the Support Materials they have already paid for. Such actions might entitle customers to potentially substantial refunds, damages, and settlements for fraud, false and misleading advertising, or breach of contract claims. Further, Oracle may also be liable to thousands of PeopleSoft licensees for substantial claims related to the PeopleSoft Customer Assurance Program that are triggered by material reductions in support services.

We can only surmise that Oracle preventing annual maintenance-paying customers from being able to reasonably identify, catalog, and take delivery of all available Support Materials for which a customer has already paid substantial sums of money would, from Oracle's position, have a potentially negative impact on its total annual maintenance renewal rates, maintenance revenues, and consulting revenues. Oracle may view a customer's possession of all Support Materials as making it easier for customers to "self-support" their licenses and "self-perform" minor and major upgrades to other currently available software releases.

In addition to the foreclosure effect described above, Oracle's actions appear intended to intimidate Oracle customers from terminating Oracle annual maintenance services that are contractually optional and not required to be purchased by Oracle licensees as a condition of their software license; self-supporting licensed Oracle products; or pursuing the purchase of maintenance services from Rimini Street and/or other third party consultants. Thus, in addition to the antitrust claim arising from the foreclosure effect in the tied maintenance services market as well as a monopolization claim, Rimini Street and/or other third party consultants may have a common law tortious interference with contract and/or business expectancy claim.

Once again, and because of the overwhelming breadth and exclusionary effect of the new web portal, we are bringing this matter to your attention to afford Oracle another opportunity to promptly investigate and resolve the legal issues presented, mitigate potential accrued liabilities,

Snell & Wilmer
———— L.L.P. ————

Jeffrey S. Ross
December 3, 2008
Page 3

and avoid future potential liabilities. Oracle has both the technological means and resources to assure annual maintenance-paying Oracle licensees can fully exploit their contractual rights while ensuring reasonable, adequate protection of Oracle's intellectual property.

### Impediments to Oracle Annual Support Customers Seeking to Obtain From Oracle Materials for which They Paid

In consideration of Oracle Annual Support fees paid for listed licensed products, licensees have been and remain entitled to access to and rights to download and use all Support Materials for such licensed products from the start through the end of a pre-paid "Support Period." Oracle terms usually require pre-payment of annual support fees at time of annual contract renewal.

### *Issue #1:  Annual Support Paying Clients Cannot Properly Identify Each and Every One of the Support Materials They Are Entitled to Obtain and Use*

Although Oracle has full knowledge of the actual licensed products for each licensee and each annual maintenance renewal clearly indicates what licensed products are covered by the support fees, Oracle continues to choose not to utilize this information to help licensees identify all the Support Materials the maintenance-paying licensee is entitled to obtain and use under their Oracle licenses and the annual maintenance agreement.

Instead, Oracle continues to leave its entire intellectual property set available to each and every maintenance-paying licensee with a login and password, regardless of what Support Materials the maintenance-paying licensee is actually entitled to obtain and use. Oracle then claims that full license and intellectual property compliance is solely the responsibility of the maintenance-paying licensee. This is not reasonable or workable since (a) there have been many product name changes and recombination of features and products over the years that make it nearly impossible for a reasonable customer to be 100 percent sure of license compliance and match up to their license agreements; and (b) users of Oracle Support Services are the users of the software products and rarely have access to or have ever seen the legal license agreement which is usually filed away in the customer's legal department and therefore are not 100 percent sure of license compliance with their original license agreement.

Oracle has the technological means to resolve this license ambiguity issue to the benefit of all parties. As an example of one possible solution, Oracle can (a) tag each item on its web portal with metadata that clearly indicates what licensed product or product line is associated with each item, and (b) only display for viewing, selection, and download to the licensee and its representatives those Support Materials where the metadata tag matches the maintenance-paying client's licensed product list and where support fees have been paid for such licensed product.

Snell & Wilmer
———— L.L.P. ————

Jeffrey S. Ross
December 3, 2008
Page 4

As Oracle is the world leader in manufacturing the very software products needed to implement this solution, taking steps (a) and (b) above would be reasonable steps by Oracle that would assure that its intellectual property is being protected by making sure that Oracle intellectual property is only being obtained by those maintenance-paying customers with a right to obtain particular and specific intellectual property that is licensed to them.  Clients would immediately benefit by being able to search on Support Materials where the metadata indicates a link to a particular and specific licensed product where maintenance-fees have been paid.

*Issue #2:  Annual Support Paying Clients Cannot Obtain a Catalog of All Support Materials They Are Entitled to Obtain and Use*

It remains impossible for a maintenance-paying client to self-identify and produce a full and complete catalog of the Support Materials a maintenance-paying licensee is entitled to obtain and use following payment of support fees, the sufficiency of which is agreed upon with Oracle's acceptance of fees.  Oracle claims that it does not have the current technical capability of identifying and producing such a catalog based on each customer's own list of licensed products that are covered under a support agreement.  Oracle also claims provision of the catalog is not a service they provide maintenance-paying customers on demand or at any time during their paid Support Period.  Therefore, due solely as a result of intentional acts and decisions by Oracle, at this time, neither Oracle nor a maintenance-paying customer have (and never have had) the ability to determine with 100 percent accuracy the catalog of Support Materials that a maintenance-paying customer is entitled to obtain and use of a particular date and time.

Oracle's decision not to provide this catalog of Support Materials impacts (in a negative manner) the framework on which the above-mentioned legal claims are evaluated.  Clearly, if Oracle elects to implement a metadata solution on all Support Material items, it could easily develop a search capability that could provide Oracle and licensees a 100 percent accurate catalog of the Support Materials a particular maintenance-paying customer is entitled to obtain and use.  That is telling about the pretext that Oracle is undertaking here.

*Issue #3:  Annual Support Paying Clients Cannot Reasonably Obtain All Support Materials They Are Entitled to Obtain and Use*

With Issues #1 and #2 above we have established that, due solely to Oracle's intentional acts and decisions, it is impossible today (and previously) for an Oracle maintenance-paying customer to determine with 100 percent certainty all Support Materials it is entitled to obtain and use from Oracle and for which they paid.  Without the ability to determine 100 percent what Support Materials a maintenance-paying client is entitled to obtain and use and no active guidance from Oracle, Oracle leaves its maintenance-paying customers on their own to use their best reasonable efforts to identify and catalog the Support Materials each customer believes they may be entitled to obtain and use.

Snell & Wilmer
———— L.L.P. ————

Jeffrey S. Ross
December 3, 2008
Page 5


A maintenance-paying customer with several products may be entitled to obtain and use tens of thousands or more Support Material items available on Oracle's web portal. Manually identifying which tens of thousands of items in a total of web portal pool of potentially millions of items would require professional labor time of potentially hundreds and thousands of hours. Such labor expenditures and timelines are so extensive and unreasonably burdensome as to assure any reasonable person would conclude that Oracle has, solely through its own intentional acts and decisions, made it virtually impossible to complete such a task manually.

Therefore, if a maintenance-paying customer wishes to attempt to use best efforts to identify, catalog, and obtain all Support Materials they are entitled to obtain and use, the only potential solutions are:

1.     Develop and use automated tools to search the Oracle web portal and make educated, reasonable guesses as to which Support Materials most likely match with the Oracle maintenance-paying customer's licensed product set and then automatically download such items.

2.     Oracle staff can search the Oracle web portal and make educated, reasonable guesses as to which Support Materials most likely match with the Oracle maintenance-paying customer's licensed product set and then deliver the entire set of Support Material electronically or on media.

However, not only does Oracle refuse or otherwise fail to deliver, upon request, all Support Materials for which its Oracle Support Services customers have contracted and paid to access, possess, and use within their license rights, but Oracle has recently attempted to ban the use of any automation tools to assist with the massive, burdensome projects. While Oracle has publicly cited "performance concerns" for their web portal as a result of the use of such tools as the reason for banning their usage, Oracle's letter of October 11, 2007 to Rimini Street clearly stated a different, more troubling explanation for the new policy that indicated the change was anticompetitive behavior.

Historically, maintenance-paying licensees and their contracted agents have had no choice but to resort to automation tools as the only feasible way to try and identify, catalog, and download such a large volume of Support Materials. Maintenance-paying clients who did not invest significant sums of money and technical time to develop such automation tools more than likely are entitled to obtain and use an incalculable number of Support Materials they paid for but have been unable to reasonably identify, obtain, and enjoy the benefits of their purchase.

Beginning in late November 2008, with the move of PeopleSoft, JD Edwards, and Siebel support to the MetaLink3/MyOracle Support web portal, Oracle has escalated its anticompetitive

Snell & Wilmer
————— L.L.P —————

Jeffrey S. Ross
December 3, 2008
Page 6

activities and has made it impossible for Oracle maintenance-paying customers to download any substantial amount of items from its new MetaLink3/MyOracle Support web site in a single login session. According to our experience and subsequently confirmed and documented by Oracle personnel, any attempt to access and download a substantial amount of Support Material items, without any regard to the verification of any actual rights of the customer to the Support Materials, will cause Oracle's network to immediately shutdown the valid login session and automatically block the initiator's valid IP address so that no additional or subsequent login requests are accepted from such IP address.

With Oracle's recent implementation of the ban on the use of automation tools designed to help with the massive, unreasonably costly, and time consuming project of identifying, cataloging, and downloading authorized Support Materials or even allowing long, manual sessions of downloading Support Materials, Oracle no longer provides any reasonable mechanism by which a licensee paying support fees to Oracle can physically obtain what it reasonably believes are all the Support Materials they have paid for and are entitled to obtain, possess, and use.

If Oracle implements and utilizes its own software products, it would be capable of matching the metadata of authorized Support Material items to the maintenance-paying customer's licensed product and supported product lists – assuring control and protection of its intellectual property.

If Oracle has chosen to use data volume measures and session timers to allegedly protect intellectual property, this is invalid. Such measures are completely useless in determining the extent of the intellectual property rights of the downloading party.

If Oracle has chosen to use data volume measures and session timers to allegedly protect its web user population from significant performance degradation, this is invalid. Oracle sells billions of dollars a year in annual maintenance with a ninety percent gross profit margin and claims to manufacture the heaviest-duty database products in the world capable of record performance under heavy loads. If Oracle's web portal performance is unreasonably slow under the heavy load of its customers trying to obtain all of their rightful Support Materials, then Oracle has the capabilities, resources and obligation to increase performance to levels that are acceptable and reasonable under all loads and user conditions.

Unfortunately, based on the information available and Oracle's past comments, it appears that Oracle is simply using such measures to effectively block maintenance-paying customers from identifying, cataloging, and obtaining all the Support Materials they have paid for and are entitled to use under their Oracle agreements.

Snell & Wilmer
———— L.L.P ————

Jeffrey S. Ross
December 3, 2008
Page 7

Until and unless Oracle agrees to indentify, catalog, and package-up on demand of the customer all Support Materials that it reasonably believes a maintenance-paying customer is entitled to obtain and use, Oracle should immediately (a) suspend its "no automation tools" rules, (b) remove session timeout and data volume cutoff thresholds, and (c) provide reasonable extended access for maintenance-paying customers to get all the Support Materials they should have been able to identify, catalog, and obtain while their Oracle maintenance contract was valid and in force.

### Issue #4:  "Only in Furtherance..." Website Use Term Designed as a Competitive Barrier

The revised Terms of Use on Oracle's website state that a licensee's "username and password are confidential information and may only be distributed to persons within [licensee's] organization who have a legitimate business purpose for accessing the materials contained on this server in furtherance of [licensee's] relationship with Oracle/PeopleSoft/JDEdwards." To the extent Oracle interprets this language and seeks to enforce this provision in a way that prevents Oracle licensees from enabling their third party agents to access Support Materials on the Oracle customer support websites—on the licensees' behalf and for the purpose of obtaining authorized content—such enforcement activities are clearly anticompetitive and tortious interference with contractual relationships as well as a myriad of claims belonging to the licensee. Moreover, any attempt by Oracle to redefine the terms and scope of a licensee's access to and downloads of authorized Support Materials after that licensee's decision to terminate Oracle Support Services, but during the valid, paid Support Period, would be nothing more than a scheme to deprive the licensee of the Support Materials for which it invested significant resources (to Oracle's benefit).

### Issue #5:  Annual Support Paying Clients May Be Intimidated Away From Obtaining All Support Materials They Are Entitled to Obtain and Use Because of Support Portal Design and Oracle's Attempt to Make License Compliance 100% Client Responsibility

Oracle's company-wide policy of attempting to make license and intellectual property compliance 100 percent the sole responsibility of its licensees and customers is not reasonable and creates ambiguity with respect to license rights.

Because Oracle maintenance-paying clients must make educated, reasonable guesses about what Support Materials might be appropriately licensed to them without 100 percent certainty, many clients may be intimidated from trying to identify, catalog, and obtain the Support Materials they have paid for and are legally entitled to use to their benefit.

Snell & Wilmer
——————— L.L.P. ———————

Jeffrey S. Ross
December 3, 2008
Page 8

It is anticompetitive to intimidate Oracle customers from terminating Oracle annual maintenance services, self-supporting licensed Oracle products, or pursuing the purchase of maintenance services from Rimini Street and/or other third party consultants.

Oracle's failure to take timely corrective action to resolve the above issues could lead to a further response from Rimini Street, government entities with jurisdiction, and/or Oracle's customers.

Sincerely,

SNELL & WILMER L.L.P.

Dan W. Goldfine

cc:     Daniel Wall, Latham & Watkins (*via e-mail and facsimile*)
        Board of Directors, Rimini Street, Inc. (*via e-mail*)

9321342

# EXHIBIT E

# Snell & Wilmer
**L.L.P.**
LAW OFFICES

One Arizona Center
Phoenix, AZ 85004-2202
602.382.6000
602.382.6070 (Fax)
www.swlaw.com

DENVER

LAS VEGAS

ORANGE COUNTY

PHOENIX

SALT LAKE CITY

TUCSON

Dan W. Goldfine
602.382.6282
dgoldfine@swlaw.com

December 19, 2008

## VIA FAX AND MAIL

Daniel Wall, Esq.
Latham & Watkins LLP
505 Montgomery Street, Suite 2000
San Francisco, California 94111

### Re: Continued Business Interference and Anti-Competitive Practices

Dear Dan:

This is a follow-up to Rimini Street, Inc.'s ("Rimini") December 3, 2008 letter and letters from 2007 as well as our recent discussions. In particular, on December 10, 2008, you and I discussed Rimini's allegations that Oracle Corporation ("Oracle") is engaging in wrongful conduct and whether Oracle's intent was to effectively block Oracle's licensees and their authorized agents from obtaining all the support materials that Oracle is contractually obligated to provide its licensees. These same licensees have paid significant fees to obtain and use such support materials.

You and I agreed that it might be in both parties' interests for you to confer with your client and clarify Oracle's intent.

You informed me that you anticipated that you would be able to get back to me by December 12, 2008. That did not occur. I attempted to reach you by phone and email during the week of December 15th, reaching you on December 17, 2008. You indicated that your client had not responded to your inquiries and that you would follow-up immediately. As of the date of this letter, you have not gotten back to me with Oracle's response to the allegations or my offer to try and amicably and quickly resolve the matter so all parties can return to conducting their business without disruption.

Given Rimini's continued offers of willingness to work cooperatively with Oracle for the benefit of their mutual clients, it could be reasonable to infer by the lack of response to the serious allegations that Oracle's intent is to purposely engage in the wrongful conduct identified in my December 3, 2008 letter.

# Snell & Wilmer
### L.L.P.

Daniel Wall, Esq.
December 19, 2008
Page 2

The ramifications of Oracle's conduct are severe and immediate for Oracle licensees whose contract rights Oracle is violating, and Oracle's conduct has forced Rimini to head down a path that seems counterproductive to Oracle's overall business goals. If Rimini or I have misunderstood Oracle's intent in this matter, please commence remedial steps immediately and contact me so I can, if necessary, arrange a meeting and hopefully avoid having to take any additional steps to remedy Oracle's wrongful and illegal conduct.

Very truly yours,

Snell & Wilmer

Dan W. Goldfine

cc:    Jeffrey S. Ross
       Jennifer Gloss

9361864

9361864

# EXHIBIT F

Daniel M. Wall
Direct Dial: (415) 395-8240
dan.wall@lw.com

505 Montgomery Street, Suite 2000
San Francisco, California 94111-6538
Tel: +1.415.391.0600  Fax: +1.415.395.8095
www.lw.com

# LATHAM&WATKINS LLP

FIRM / AFFILIATE OFFICES

| | |
|---|---|
| Abu Dhabi | Munich |
| Barcelona | New Jersey |
| Brussels | New York |
| Chicago | Northern Virginia |
| Doha | Orange County |
| Dubai | Paris |
| Frankfurt | Rome |
| Hamburg | San Diego |
| Hong Kong | San Francisco |
| London | Shanghai |
| Los Angeles | Silicon Valley |
| Madrid | Singapore |
| Milan | Tokyo |
| Moscow | Washington, D.C. |

December 23, 2008

## VIA EMAIL

Dan W. Goldfine, Esq.
Snell & Wilmer LLP
One Arizona Center
Phoenix, AZ 85004-2202

        Re:     Oracle Corporation and Rimini Street, Inc.

Dear Dan:

        I am following up on our telephone conversation on December 10, your letter to Jeff Ross dated December 3, 2008, and your subsequent letter to me. I have discussed the matter with Oracle and this is the company's response both to the letters and to your inquiry as to whether there is a "remedy" addressing Rimini Street's complaints that is acceptable to Oracle.

        A remedy implies a problem, so let me state our understanding of the problem Rimini Street would like to have solved. From what you told me and what Rimini Street's Dennis Chiu wrote in his November 25 email to Oracle's John Marandola, it appears that Rimini Street has a business practice of downloading Oracle support materials that a new customer may need immediately prior to the time when the customer ends its support relationship with Oracle and commences Rimini Street support. As you explained this, the "problem" is that the customer will lose access to the Oracle support materials when it discontinues its support relationship with Oracle. Therefore, Rimini Street, ostensibly acting as the customer's agent, uses the customer's log-on credentials to download materials from Oracle for use after the support term ends. This is what your letter refers to as "the ability to reasonably identify, catalog, and take delivery of all available program updates, software updates, bug fixes, patches, custom solutions, and instructional documents ('Support Materials') for covered products."

        We now know that, in violation of Oracle's Terms of Use, Rimini Street acquires Oracle Support Materials for its customers through automated means such as crawlers. This explains the mass downloading Rimini Street's undertakes—as I mentioned, information that has recently come to Oracle's attention suggests that Rimini Street is downloading tens of thousands of discrete Support Materials at a time. Rimini Street suggests these technological measures are necessary because Oracle has not created a better way for departing customers to quickly identify, gather and store what they want before the right to access the support site terminates (or expires).

A/72791560.1

## LATHAM&WATKINSⴸⴸᴾ

The "problem" is actually that Oracle has recently been able to detect this downloading activity and block the IP addresses from which Oracle's MetaLink3 web portal is being accessed. You acknowledged Rimini Street's awareness during at least the last fourteen or fifteen months that Oracle's "policy" has been not to allow this kind of mass downloading of Support Materials. However, you argued that Oracle's "practice" was more lenient as evidenced by the fact that Rimini Street has been able to obtain those materials that it has sought. In other words, the "problem" is that Oracle is now effectively enforcing a policy that Rimini Street acknowledges has been in effect for a considerable amount of time.

This led to your letter of December 3. That letter reprises claims of anticompetitive behavior made a year-and-a-half ago and about which we have heard nothing for the thirteen months since Oracle responded to Rimini Street's contentions. Under the circumstances it is clear that you have resurfaced those claims as a pretextual defense of the downloading activity that has recently come to light. If Rimini Street truly believed itself the victim of anticompetitive behavior by Oracle, we doubt it would have sat on Oracle's letter for thirteen months. The real problem is not Rimini Street's stale and unsupportable antitrust claims; it is that Rimini Street has now been caught doing exactly what Oracle sued SAP for doing.

At the root of this "problem" is Rimini Street's contention that it may ignore Oracle's Terms of Use prohibition on automated downloading from its support website, regardless of the consequences. We disagree. Oracle's policy against the type of automated downloaded conducted by Rimini Street exists for two reasons.

First, Oracle's value as a software company originates in large measure from its intellectual property, and the policy is necessary to protect this intellectual property. Automated downloading of the type done by Rimini Street invariably results in downloaded copyrighted support materials not licensed to the customers whose credentials are being used to take them. This is what Rimini Street has apparently done through its automated downloading. Oracle has preliminarily identified thousands of files taken from Oracle's systems by Rimini Street, using XO Communications' credentials, which neither Rimini Street nor XO Communications have any license to or right to have. This is illegal—customers must pay for the support materials they take from Oracle.

Oracle does not agree that mass downloading through the use of crawlers is justified because departing Oracle support customers have no convenient way to harvest licensed materials only. The fact that Oracle provides an array of support materials to its support customers does not create or imply a duty to facilitate a practice of mass downloading that has utility only for those who intend to end their Oracle support relationship. The typical Oracle support customer never has the "problem" you have identified—that is, a need to copy all support materials to which they might be entitled at one time. The typical Oracle support customer knows what it needs, and what it has paid for, and it downloads particular support materials using normal means over time. Oracle establishes its support infrastructure for those customers and the normal business practice, and that is sufficient. Oracle is not required to enable any kind of mass downloading program and Rimini Street's conduct does not become justified because Oracle has not done that.

Dan W. Goldfine, Esq.
December 23, 2008
Page 3

## LATHAM&WATKINSᴸᴸᴾ

Moreover, based on its experience, Oracle is skeptical that Rimini Street has used a crawler to harvest thousands of unlicensed support materials from Oracle by "accident" or because it cannot identify the right files. Rimini Street operates a competitive business serving many customers that may have use for the support materials copied in this unlawful manner. As the SAP/TomorrowNow case illustrates, Oracle has no assurance that a third party support provider will download materials solely for the benefit of a customer that might have a license to use them. It is entirely reasonable for Oracle to anticipate and guard against the possibility that a competitor will store and use these materials for the benefit of all of its customers and its overall business without regard to the license rights of particular customers. For example, Oracle is deeply concerned that the library Rimini Street apparently has compiled for the ostensible benefit of XO Communications, which includes material relating to an entire product family not licensed to or in use by XO Communications, has been or will be used to support other customers in violation of Oracle's copyrights and the licenses under which each of Oracle's customers operates. This is similar to what Oracle has seen in the case of SAP/TomorrowNow, and it certainly has not escaped Oracle's notice that Mr. Ravin, the founder of Rimini Street, was also a founder of TomorrowNow.

Second, Oracle's policy is designed to preserve the operational integrity and functionality of Oracle's support systems. Automated downloading of the type Rimini Street has engaged in can interfere with the ability of other customers to download materials from Oracle's systems, and also prevents Oracle from using the system for its intended purpose.

In sum, there is no justification for *Rimini Street's* use of crawlers and similar technologies to download Oracle Support Materials *en masse* without apparent regard for whether the customer is licensed to the materials or not. There is no other apparent justification for this activity except that Rimini is stockpiling these materials for other, illicit uses. A competitively motivated program of accessing Oracle's support web portals and downloading Oracle's intellectual property lacks any justification and is unlawful on numerous grounds including the Computer Fraud and Abuse Act and the computer trespass (or trespass to chattels) doctrine. Rimini Street knows full well how seriously Oracle takes that practice, having followed and publicly commented on Oracle's ongoing litigation against SAP. There is no merit to any argument that an Oracle customer may authorize Rimini Street to engage in this plainly illegal activity.

The direct answer to your question as to whether Oracle will remedy Rimini Street's current problem is "no." Oracle will not facilitate what it regards as unauthorized, unlicensed and unlawful access to, and copying of, its intellectual property assets. Further, these revelations about Rimini Street's business practices require Oracle to demand that Rimini Street cease from any further automated downloading of Oracle Support Materials and subject itself to an audit to determine which materials it lawfully obtained and may continue to have and use in support of licensed customers, and then promptly to return all other Oracle Support Materials it may have in its possession. Oracle will also need to fully understand any and all instances in which Rimini Street may have used materials downloaded for one customer to support another customer. If Rimini Street contends that it has never used any Oracle intellectual property, whether a download or some or all of any Oracle software environment, to support a different customer, please provide the requisite proof. Otherwise, Rimini Street's copying and/or use of those

**Dan W. Goldfine, Esq.**
**December 23, 2008**
**Page 4**

## LATHAM&WATKINSᴸᴸᴾ

materials infringes on Oracle's copyrights, and other intellectual property rights, and is an invasion of its computer systems contrary to CAFA and other relevant laws. Oracle also demands and expects that Rimini Street will immediately take all necessary measures to preserve all documents, electronic records, and Support Materials that relate or bear witness to the access to and downloading of Oracle Support Materials that has occurred thus far.

I understand, of course, that this is not the answer you were looking for. I cannot stress enough how seriously Oracle takes these issues, however. Rimini Street has no right to access, acquire, maintain possession of and use Oracle Support Materials not licensed by Rimini Street customers and that were created and licensed for the benefit of ongoing Oracle support customers, or to harvest these Oracle Support Materials through these electronic intrusions into Oracle's support infrastructure. I need to hear back from you by January 5, 2009, on whether Rimini Street will agree to cease these practices, allow the audit we have requested, and return any improperly downloaded Oracle Support Materials or other improperly obtained Oracle intellectual property as are in its possession.

Very truly yours,

Daniel M. Wall
of LATHAM & WATKINS LLP

cc: Jeffrey S. Ross, Esq.

# EXHIBIT G

# DOCUMENT FILED UNDER SEAL

# EXHIBIT H

1

2

3                                    UNITED STATES DISTRICT COURT

4                                    NORTHERN DISTRICT OF CALIFORNIA

5

6

7
ORACLE CORPORATION, et al.,
8
                    Plaintiffs,                    No. C 07-1658 PJH
9
            v.                                     **ORDER RE MOTIONS FOR**
10                                                 **PARTIAL SUMMARY JUDGMENT**
SAP AG, et al.,
11
                    Defendants.
12  _____/

13        The parties' motions for partial summary judgment came on for hearing before this

14  court on May 5, 2010.  Plaintiffs appeared by their counsel Geoffrey Howard, Donn Pickett,

15  Chad Russell, Holly House, Amy Donnelly, Zachary Alinder, and John Polito.  Defendants

16  appeared by their counsel Tharan Gregory Lanier, Elaine Wallace, and Jane Froyd.

17  Having read the parties' papers and carefully considered their arguments, and the relevant

18  legal authority, the court hereby GRANTS the motions in part and DENIES them in part.

19                                          **BACKGROUND**

20        Plaintiffs in this action are Oracle USA, Inc. ("Oracle USA"[1]); Oracle International

21  Corporation ("OIC"); Oracle EMEA Ltd. ("OEMEA"); and Siebel Systems, Inc. ("Siebel")

22  (collectively, "Oracle" or "plaintiffs").  Oracle USA is the successor to PeopleSoft USA, Inc.

23  ("PeopleSoft") and the successor in interest to certain PeopleSoft, J.D. Edwards ("JDE"),

24  and Siebel entities.  Plaintiffs allege that intellectual property rights formerly held by

25  PeopleSoft, JDE, and Siebel entitles were transferred to OIC as part of the acquisition of

26  PeopleSoft and Siebel by Oracle; and that OEMEA is also the successor in interest to

27  certain PeopleSoft and JDE entities.

28  _____

        [1] Oracle USA is now known as Oracle America, Inc.

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1    Defendants are SAP AG ("SAP AG"); SAP America, Inc. ("SAP America"); and

2  TomorrowNow, Inc. ("SAP TN") (collectively "SAP" or "defendants").  SAP America is a

3  wholly-owned subsidiary of SAP AG, and SAP TN is a wholly-owned subsidiary of SAP

4  America.

5    The fourth amended complaint assert ten causes of action against the three

6  defendants:  (1) copyright infringement, alleged by OIC; (2) violations of the Computer

7  Fraud and Abuse Act ("CFAA"), 18 U.S.C. §§ 1030(a)(2)(C), 1030(a)(4), & 1030(a)(5)(A),

8  alleged by Oracle USA and OIC; (3) violations of the California Data Access and Fraud Act

9  ("CDAFA"), Cal. Penal Code § 502(c)(7), alleged by Oracle USA and OIC; (4) breach of

10  contract, alleged by Oracle USA; (5) intentional interference with prospective economic

11  advantage, alleged by Oracle USA, OIC, and OEMEA; (6) negligent interference with

12  prospective economic advantage, alleged by Oracle USA, OIC, and OEMEA; (7) unfair

13  competition, under Cal. Bus. & Prof. Code § 17200 ("UCL"), alleged by Oracle USA, OIC,

14  OEMEA, and Siebel; (8) trespass to chattels, alleged by Oracle USA; (9) unjust enrichment

15  and restitution, alleged by Oracle USA, OIC, OEMEA, and Siebel; and (10) entitlement to

16  an accounting, alleged by Oracle USA, OIC, OEMEA, and Siebel.

17    On March 3, 2010, each side filed a motion for partial summary judgment.  Plaintiffs

18  sought a ruling that SAP TN directly infringed OIC's copyrights;[2] that SAP AG and SAP

19  America are liable for vicarious and contributory infringement; and that SAP TN violated the

20  CFAA and the CDAFA.  Defendants sought a ruling that OEMEA's California claims should

21  be dismissed; that plaintiffs could not recover damages incurred by related non-parties; that

22  "saved development costs" are an impermissible measure of damages; and that plaintiffs

23  could not recover under claims for which they did not disclose damage calculations.

24

25    [2] Plaintiffs seek summary judgment as to infringement of six of the approximately 120
26  copyright registrations at issue.  The six registrations are HRMS 7.0 (TX 4-792-577), HRMS
   7.5 (TX 4-792-575), HRMS 8, Service Pack 1 ("HRMS 8 SP1") (TX 5-501-312), Database 8.1.6
27  (TX 5-222-106), Database 9i, Release.2 ("9.2") (TX 5-673-282), and Database 10g, Release.2
   ("10.2") (TX 6-942-003). The HRMS software is used to run business payrolls and to automate
28  various complex processes, and the Database software stores and organizes business data
   used by HRMS and other business application software.

2

1 In their opposition to plaintiffs' motion, defendants conceded SAP TN's liability for

2 direct infringement of the three PeopleSoft (HRMS) registrations for the period beginning

3 March 1, 2005, and the three Oracle Database registrations with no time limitation; as well

4 as SAP AG's and SAP America's vicarious liability for infringement of the six registrations

5 over the same time period. Defendants also conceded SAP TN's liability for violations of

6 CFAA § 1030(a)(2)(C) and CDAFA.

7 On August 5, 2010, the parties filed their trial briefs and the joint pretrial statement.

8 Based on those filings, the court requested that the parties submit a joint statement

9 clarifying which, if any, of the issues disputed in the motions for partial summary judgment

10 had been resolved and need not be addressed by the court.

11 In response, the parties filed a statement indicating that they had met and conferred,

12 and that they agreed that plaintiffs were entitled to summary judgment as to the issues of

13 direct copyright infringement of the six registrations by SAP TN, as indicated above;

14 vicarious copyright infringement of the six registrations by SAP AG and SAP America;

15 direct liability of SAP TN for violations of CFAA § 1030(a)(2)(C); and direct liability of SAP

16 TN for violations of CDAFA.

17 The parties agreed that certain other issues were ripe for decision – the contributory

18 copyright infringement of the six registrations by SAP AG and SAP America; the indirect

19 liability of SAP AG and SAP America for CFAA and CDAFA violations; the availability of

20 "saved costs" as a measure of damages in this case; the availability of lost profits of related

21 non-party entities in this case; and the limitation of damages under CDAFA, if at all, to no

22 more than plaintiffs' alleged "investigation costs."

23 Finally, the parties were unable to reach agreement as to whether defendants'

24 concessions had mooted the following issues: the direct liability of SAP TN for violations of

25 CFAA § 1030(a)(5)(A)(i)-(iii); the availability of damages for trespass to chattels and

26 CDAFA claims; the dismissal of OEMEA's claims; and the dismissal of the pre-March 1,

27 2005 copyright infringement claims for the PeopleSoft/JDE registrations based on lack of

28 standing.

3

**DISCUSSION**

A.    Legal Standard

Summary judgment is appropriate when there is no genuine issue as to material facts and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. Material facts are those that might affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. Id.

A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion, and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Where the moving party will have the burden of proof at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. Southern Calif. Gas. Co. v. City of Santa Ana, 336 F.3d 885, 888 (9th Cir. 2003). The court must not weigh the evidence or determine the truth of the matter but only determine whether there is a genuine issue for trial. See Balint v. Carson City, 180 F.3d 1047, 1054 (9th Cir. 1999).

On an issue where the nonmoving party will bear the burden of proof at trial, the moving party can prevail merely by pointing out to the district court that there is an absence of evidence to support the nonmoving party's case. Celotex, 477 U.S. at 324-25. If the moving party meets its initial burden, the opposing party must then set forth specific facts showing that there is some genuine issue for trial in order to defeat the motion. See Fed. R. Civ. P. 56(e); Anderson, 477 U.S. at 250.

B.    Plaintiffs' Motion

1.    SAP TN's Liability for Direct Infringement

To prove a claim of direct copyright infringement, a plaintiff must show that he owns the copyright and that the defendant himself violated one or more of the plaintiff's exclusive rights under the Copyright Act. See 17 U.S.C. § 501(a); Ellison v. Robertson, 357 F.3d 1072, 1076 (9th Cir. 2004). Only a "legal or beneficial owner of an exclusive right under a

copyright is entitled . . . to institute an action for any infringement of that right while he or she is the owner of it." 17 U.S.C. § 501(b); see also Sybersound Records, Inc. v. UAV Corp., 517 F.3d 1137, 1144 (9th Cir. 2008); Silvers v. Sony Pictures Entm't, Inc., 402 F.3d 881, 884-85 (9th Cir. 2005).

The parties dispute whether OIC qualifies as the owner of the three HRMS copyrights at issue during the pre-March 1, 2005 period. The evidence provided by plaintiffs shows that PeopleSoft obtained valid registrations for the three copyrights within five years of publication. On March 1, 2005, PeopleSoft and the various JDE entities merged into Oracle Systems Corporation ("OSC"), with OSC surviving the merger. The merger agreements were recorded with the Delaware Secretary of State as of that same date. The evidence shows further that on March 1, 2005, the PeopleSoft registrations were transferred to OIC. The PeopleSoft/JDE/OIC asset transfer agreement was recorded in the Copyright Office on August 12, 2008.

On July 10, 2009, pursuant to an "IP Rights Transfer Clarification Agreement," OSC transferred to OIC all of its rights to sue for past infringement of the transferred copyrights. This agreement states that "at the time of the transfer of the PeopleSoft/JDE Assets and the JDE IP Assets to OIC [March 1, 2005], the parties intended that all of the IP Rights (as defined herein) be transferred to OIC, effective as of the Effective Date[.]" The "IP Rights" include "all rights to sue for or otherwise enforce past, present, and future infringement claims with respect to the IP Assets . . ."

In their opposition and "cross-motion," defendants argue that OIC does not have standing to sue for pre-March 1, 2005 infringement of any PeopleSoft/JDE copyrights, because prior to that date, OIC did not own the registrations. Thus, defendants assert, OIC may sue for pre-March 1, 2005 infringement only if it received a valid transfer of the right to pursue those claims at the time of the mergers.

The general rule is that a general transfer or assignment of "exclusive rights" does not convey accrued causes of action, because the right to sue for an accrued claim is not an exclusive right under § 106 of the Copyright Act. Silvers, 402 F.3d at 884. Such

5

**United States District Court**

For the Northern District of California

1  preexisting causes of action must be expressly included in the assignment or transfer.

2  ABKCO Music, Inc. v. Harrisongs Music, Ltd., 944 F.2d 971, 980 (2nd Cir. 1991); Co-

3  opportunities, Inc. v. National Broadcasting Co., Inc., 510 F.Supp. 43, 46-47 (N.D. Cal.

4  1981).

5  However, accrued claims may also be transferred, either in the assignment/transfer

6  agreement itself, or in a separate agreement, Co-opportunities, 510 F.Supp. at 46-48, and

7  the weight of authority holds that a document executed subsequent to the transfer may

8  effectively covey to the transferee the right to sue for infringements occurring prior to the

9  transfer, even where the subsequent assignment of the right to sue was executed after the

10  commencement of litigation by the transferee.  See, e.g., Wade Williams Distribution, Inc.

11  v. American Broadcasting Co., Inc., 2005 WL 774275 at *3-4 (S.D.N.Y., Apr. 5, 2005);

12  Intimo, Inc. v. Briefly Stated, Inc., 948 F.Supp. 315, 317-19 (S.D.N.Y. 1996); Infodeck, Inc.

13  v. Meredith-Webb Printing Co., Inc., 830 F.Supp. 614, 620 (N.D. Ga. 1993); Co-

14  opportunities, 510 F.Supp. at 46-47; see also 2 Patry on Copyright (2010) § 5:113 (and

15  cases cited therein).

16  The Ninth Circuit provides no clear guidance on this issue.  In Intimo, a case that

17  has been cited for this point by a number of courts, the original owner of the copyrights

18  assigned them to the plaintiff six months before the plaintiff filed suit for copyright

19  infringement that was alleged to have occurred both before and after the assignment.  A

20  year after the complaint was filed, the plaintiff submitted an amended assignment, which

21  stated that the intent of the original owner when it assigned its copyright was also to assign

22  its cause of action to the plaintiff.  The court found that the amended assignment was

23  effective and that the plaintiff had standing to sue for infringement that allegedly occurred

24  before the first assignment.  Intimo, 948 F.Supp. at 318-19.  The court concluded that "an

25  assignment of interest should be recognized provided the assignment occurs before trial,

26  the plaintiff is the real party in interest in at least one other claim, and the defendant suffers

27  no prejudiced from its recognition.  Id. at 318.

28  Here, in line with the above-described analysis, the court notes that the assignment

6

1   of the right to sue for past infringement was executed on July 10, 2009, more than a year
2   before the scheduled trial date. In addition, there appears to be no dispute that OIC is the
3   real party in interest with regard to the infringements that occurred after the March 1, 2005
4   merger and transfer of copyrights. Finally, although defendants have not addressed this
5   particular issue from this perspective, the court sees no prejudice to defendants, in view of
6   the facts that the parties have conducted discovery on the substantive issues in this case,
7   discovery has closed, and the assignment will not change the issues to be litigated at trial.

8          Accordingly, defendants' cross-motion for summary judgment of non-infringement
9   based on pre-March 1, 2005 conduct with regard to the PeopleSoft/JDE registrations at
10  issue is DENIED. In addition, however, because it is not clear to the court that OIC has
11  established infringement during the pre-March 1, 2005 period, and because defendants'
12  concession with regard to the claim of direct infringement by SAP TN appears to have been
13  limited to the post-March 1, 2005 period, plaintiffs' motion for summary judgment as to any
14  such pre-March 1, 2005 infringement claims is DENIED. Based on defendants'
15  concessions, the motion is GRANTED as to plaintiffs' claim of direct infringement of the
16  three HRMS registrations by SAP TN post-March 1, 2005, and as to the three Database
17  registrations by SAP TN without time limitation.

18          2.     SAP AG's and SAP America's Liability for Contributory Infringement
19          Plaintiffs argue that SAP AG and SAP America are liable for vicarious and
20  contributory infringement of OIC's copyrights. A defendant may be liable as a contributory
21  copyright infringer if he "with knowledge of the infringing activity, induces, causes or
22  materially contributes to the infringing conduct of another." Ellison, 357 F.3d at 1076
23  (citation and quotation omitted). The Ninth Circuit interprets the knowledge requirement for
24  contributory copyright infringement to include both those with actual knowledge and those
25  who have reason to know of direct infringement. Id.; see also Fonovisa, Inc. v. Cherry
26  Auction, Inc., 76 F.3d 259, 264 (9th Cir. 1996) (contributory infringement "imposes liability
27  where one person knowingly contributes to the infringing conduct of another").

28          Plaintiffs contend that SAP AG and SAP America knew about SAP TN's copying of

United States District Court
For the Northern District of California

7

1 Oracle's software, even before SAP acquired TomorrowNow, and that SAP AG and SAP
2 America also knew about SAP TN's use of the database software. Plaintiffs assert that
3 SAP AG and SAP America exercised control over SAP TN following SAP's acquisition of
4 Tomorrow Now, which SAP announced on January 19, 2005. Finally, plaintiffs claim that
5 SAP AG admitted it enjoyed significant financial and strategic benefits from SAP TN's
6 allegedly illegal business model.

7      In response, defendants argue that plaintiffs' motion should be denied because they
8 have no evidence that SAP AG or SAP America took any specific, affirmative steps that
9 actively contributed to infringement. Defendants assert that one cannot induce, cause, or
10 materially contribute to infringement through mere inaction. It is this, according to
11 defendants, that distinguishes "contributory" liability from "vicarious" liability.

12      The court finds that the motion must be DENIED. While mere knowledge of
13 infringing conduct is insufficient to show contributory infringement, inaction can in some
14 cases constitute material contribution. See, e.g., Ellison, 375 F.3d at 1076-78. Here, the
15 court finds that triable issues exist with regard to the extent of SAP AG's and SAP
16 America's knowledge of the alleged infringement; with regard to whether SAP AG or SAP
17 America induced, caused, or materially contributed to the alleged infringement; and also
18 with regard to the extent of any actual involvement by SAP AG or SAP America in any
19 copying that was performed by SAP TN.

20      3.     SAP TN's Liability for Violation of the CFAA

21      Plaintiffs argue that SAP TN violated the CFAA, 18 U.S.C. §§ 1030(a)(2)(C) and
22 1030(a)(5)(A)(i)-(iii).

23      Subsection (a)(2) of CFAA § 1030 provides that whoever

24      (a)(2) intentionally accesses a computer without authorization or exceeds
        authorized access, and thereby obtains –
25
26      (A) information contained in a financial record of a financial institution,
        or of a card issuer as defined in section 1602(n) of title 15, or contained in a
        file of a consumer reporting agency on a consumer, as such terms are
27      defined in the Fair Credit Reporting Act (15 U.S.C. 1681 et seq.);

28      (B) information from any department or agency of the United States; or

8

1
        (C) information from any protected computer if the conduct involved an interstate or foreign communication . . .

2

3
shall be punished as provided in subsection (c) of this section.

18 U.S.C. § 1030(a)(2) (2007) (emphasis added).

4

5
Subsection (a)(5)(A) of CFAA § 1030 provides that whoever

6
(a)(5)(A)(i) knowingly causes the transmission of a program, information, code, or command, and as a result of such conduct, intentionally causes damage without authorization, to a protected computer;

7

8
        (ii) intentionally accesses a protected computer without authorization, and as a result of such conduct, recklessly causes damage; or

9
        (iii) intentionally accesses a protected computer without authorization, and as a result of such conduct, causes damage; . . .

10
shall be punished as provided in subsection (c) of this section.

11
18 U.S.C. § 1030(a)(5)(A) (2007) (emphasis added).[3]

12
As indicated above, defendants have conceded that SAP TN violated CFAA

13
§ 1030(a)(2)(C). Thus, the only issue for decision as to SAP TN's liability under CFAA is

14
with regard to § 1030(a)(5)(A)(i)-(iii).

15
In order to establish a violation of subsection (i), plaintiffs must show that SAP TN

16
"knowingly cause[d] the transmission of a program, information, code, or command."

17
Plaintiffs argue that SAP TN was fully aware of its illegal Titan and post-MED downloading

18
and the resulting harm to Oracle. Similarly, with regard to all three subsections, plaintiffs

19
must show that SAP TN caused "damage" to Oracle, and for subsection (ii), acted

20
"recklessly."

21
Plaintiffs claim that the evidence shows at least three different types of damage from

22
SAP TN's illegal downloading – the downloading took so much bandwidth that it impaired

23
the ability of customers to separately log in to Oracle's system; the same downloading also

24
skewed customer support data that Oracle uses to improve its customer support

25
experience, making that data useless for its intended purpose; and the access and use of

26

27
    [3] CFAA § 1030 was amended in 2008, and it is the former version (in effect from 2001

28
until the 2008 amendments) that is referenced here. The 2008 version eliminated subsections (i), (ii), and (iii) as part of (a)(5).

1  Oracle's confidential support materials, including the use of scrapers to access internal
2  Oracle files, for use in competition with Oracle and in violation of the Terms of Use, also
3  impaired the integrity and confidentiality of that data.

4       In opposition, defendants contend that plaintiffs are not entitled to summary
5  judgment on these claims because there is no evidence that their computers suffered
6  "damage," and there is no evidence of any "intent to damage."

7       First, defendants assert that a showing of "damage" requires more than a showing
8  that a defendant copied data from a plaintiff's website – rather, a plaintiff must establish
9  that the defendant's activities impaired the "integrity" or the "availability" of the defendant's
10  data or systems, such that existing data was corrupted or delayed, or the servers crashed.

11       Here, defendants contend, there is no evidence that SAP TN's downloading caused
12  "damage" to plaintiffs' servers.  They argue that plaintiffs' claim that SAP TN's use of Titan
13  impaired Oracle's customers' ability to log onto Oracle's customer support websites relies
14  entirely on speculation about what might have happened.  They also contend that "skewed
15  customer feedback" is not cognizable "damage."

16       Defendants argue further that "impairment" to the confidentiality of plaintiffs'
17  materials is not cognizable "damage."  They note that "accessing" and "using" confidential
18  information on plaintiffs' support websites does not result in "damage" under the CFAA,
19  because it does not result in the corruption or deletion of existing data – which is what
20  defendants assert is typically required to show "damage" under the CFAA.  They argue that
21  mere copying does not constitute "damage" because it does not "impair" data.

22       Similarly, defendants argue, plaintiffs have failed to demonstrate that defendants
23  acted with an "intent to damage" Oracle's computers.  They argue that simply asserting that
24  the downloading or access was intentional is not sufficient – plaintiffs must allege and
25  prove that SAP TN specifically "intended" to "cause damage."  In the absence of this proof,
26  defendants argue, plaintiffs' motion as to the (a)(5)(A)(i) claim should be denied.

27       The court finds that the existence of triable issues precludes summary judgment,
28  and that the motion must therefore be DENIED.  For example, the evidence is inconclusive

10

1    as to whether the alleged copying constitutes "impairment to the integrity or availability of

2    data, a program, a system, or information" that caused a loss aggregating at least $5000 in

3    value during a one-year period. 18 U.S.C. § 1030(e)(8).

4        The evidence presented does not clearly establish that SAP TN's copying of

5    plaintiffs' files caused any slowdowns, disruptions in service, crashes, or other impairments

6    to the availability or accessibility of the systems or data; that SAP TN's access or

7    downloading activities ever changed, altered, deleted, or destroyed any data, programs,

8    systems, or other information on Oracle's customer support websites, or resulted in any

9    other type of damage to the computer system or data; or that Oracle's systems were

10   compromised as a result of SAP TN's activities.

11       Similarly, the evidence is inconclusive as to whether any "damage" was "intentional."

12   Undoubtedly any copying of plaintiffs' files was deliberate; it is not clear, however, whether

13   in copying the files, SAP TN intended to cause "damage."

14           d.      Indirect Liability of SAP AG and SAP America for CFAA/CDAFA

15                   violations

16       Plaintiffs argue that under the law of agency, SAP AG and SAP America are just as

17   liable for the CFAA violations as SAP TN, because of the nature and extent of the control

18   exercised over SAP TN by SAP AG and SAP America.

19       Plaintiffs contend that SAP AG and SAP America admit that they had control of SAP

20   TN's management, and that through SAP TN, they assumed complete responsibility for

21   maintenance, service, and support of Oracle's applications, which included the

22   downloading referenced above. Plaintiffs assert that SAP TN admits that its downloading

23   from Oracle's website was an "urgent step" in providing its service offering – according to

24   plaintiffs, the very offering for which SAP AG and SAP America marketed SAP TN in an

25   effort to win Oracle's customers.

26       To prove a violation of § 1030(a)(2)(C), plaintiffs must show that SAP AG and/or

27   SAP America accessed a "protected computer," that the access was done "intentionally,"

28   that the access was "without authorization" or "exceeded authorized access," that SAP TN

United States District Court
For the Northern District of California

11

1   thereby obtained information, and that there was resulting damage to plaintiffs aggregating

2   at least $5000 in a one-year period. See 18 U.S.C. §§ 1030(a)(2)(C), 1030(a)(5)(b)(1),

3   1030(g)).[4]

4        Under CFAA § 1030(e) (definitions), the term "computer" means

5        an electronic, magnetic, optical, electrochemical, or other high speed data
         processing device performing logical, arithmetic, or storage functions, and
6        includes any data storage facility or communications facility directly related to
         or operating in conjunction with such device, but such term does not include
7        an automated typewriter or typesetter, a portable hand held calculator, or
         other similar device;

8
     and the term "protected computer" means
9
         a computer –
10
         (A) exclusively for the use of a financial institution or the United States
11       Government, or, in the case of a computer not exclusively for such use, used
         by or for a financial institution or the United States Government and the
12       conduct constituting the offense affects that use by or for the financial
         institution or the Government; or
13
         (B) which is used in or affecting interstate or foreign commerce or
14       communication, including a computer located outside the United States that is
         used in a manner that affects interstate or foreign commerce or
15       communication of the United States;

16   18 U.S.C. § 1030(e)(1), (e)(2) (2007).

17        Defendants argue that SAP AG and SAP America are not indirectly liable under the

18   CFAA or CDAFA for SAP TN's allegedly wrongful conduct.  First, with regard to CFAA,

19   defendants contend that contrary to plaintiffs' position, broad agency principles do not

20   trigger liability under CFAA's civil remedy provision.  They argue that CFAA imposes

21   liability only where a defendant has actually directed the wrongful acts.

22        The CFAA was enacted as a criminal statute in 1984 to "enhance the government's

23   ability to prosecute computer crimes." LVRC Holdings LLC v. Brekka, 581 F.3d 1127, 1130

24   (9th Cir. 2009).  In 1994, a provision was added allowing the filing of a civil action:

25       Any person who suffers damage or loss by reason of a violation of this
         section may maintain a civil action against the violator to obtain compensatory
26

27        [4] In a footnote, plaintiffs assert that the evidence of CFAA violations presented in their
28   motion also meets the elements of CDAFA, and that summary judgment is therefore
     appropriate on that claim as well.

12

United States District Court

For the Northern District of California

damages and injunctive relief or other equitable relief. A civil action for a violation of this section may be brought only if the conduct involves 1 of the factors set forth in clause (i), (ii), (iii), (iv), or (v) of subsection (a)(5)(B). . . .

18 U.S.C. § 1030(g) (2007). The factors set forth in § 1030(a)(5)(B)(i)-(v) are

(i) loss to 1 or more persons during any 1-year period (and, for purposes of an investigation, prosecution, or other proceeding brought by the United States only, loss resulting from a related course of conduct affecting 1 or more other protected computers) aggregating at least $5,000 in value;

(ii) the modification or impairment, or potential modification or impairment, of the medical examination, diagnosis, treatment, or care of 1 or more individuals;

(iii) physical injury to any person;

(iv) a threat to public health or safety; or

(v) damage affecting a computer system used by or for a government entity in furtherance of the administration of justice, national defense, or national security....

18 U.S.C. § 1030(a)(5)(B).

By its terms, therefore, subsection (g) provides a civil remedy "against the violator." Defendants assert that "the violator" is the person who violated the statute with the requisite criminal intent, and that the CFAA does not provide a cause of action against individuals who fail to supervise violators, fail to train them properly, or conspire to cover up their conduct.

Defendants argue that given the plain language of § 1030(g) and the predominately criminal nature of the statute, courts have expressly limited the scope of civil liability, and have imposed indirect liability on defendants only where it was clear that they directed the allegedly wrongful acts. Defendants argue in addition that even if agency-liability principles were applicable, the appropriate standard would be based on federal common law agency rules, not on the state law agency rules cited by plaintiffs. Under federal common law agency rules, a plaintiff seeking to demonstrate parent-subsidiary agency liability must show a manifestation by the principal that the agent shall act for him; that the agent has accepted the undertaking; and that there is an understanding between the parties that the principal is to be in charge of the undertaking. See Restatement (Third) of Agency, § 2.03

13

1 (2006); see also Bowato v. Chevron Texaco Corp., 312 F.Supp. 2d 1229, 1239-40 (N.D.

2 Cal. 2004) (plaintiff "must" establish these elements).

3 Here, defendants argue, plaintiffs have pointed to no evidence in the record showing

4 that SAP AG and SAP America directed SAP TN to take any of the improper actions.  They

5 note that plaintiffs claim that SAP TN violated the CFAA by accessing Oracle customer

6 support websites to develop and test Titan, after a customer's maintenance end date.  To

7 hold SAP AG and SAP America liable, defendants argue, plaintiffs must show that they

8 "directed" SAP TN to access Oracle's support system.

9 Defendants contend that plaintiffs have pointed to SAP AG's and SAP America's

10 control over SAP TN's support activities – but have not shown that SAP AG or SAP

11 America "directed" any particular wrongful action, must less the particular alleged acts.  In

12 addition, they assert, it is irrelevant that access-related issues were "discussed" with SAP

13 AG or SAP America, or that they "continued to allow" this access, as plaintiffs argue.

14 Defendants assert that the CFAA imposes liability only for committing CFAA violations, or

15 for directing such violations – it does not create a duty to prevent CFAA violations.

16 Moreover, defendants contend, SAP AG's and SAP America's ability to issue

17 directives – as evidenced by the directive that SAP TN remove software copies from its

18 computers – does not establish that SAP AG or SAP America actually directed SAP TN's

19 alleged improper access in the first place.  Finally, they assert that it makes no difference

20 that SAP TN's downloading activities may have been an "urgent step" in its service offering,

21 because plaintiffs cite no evidence showing that SAP AG or SAP America directed SAP TN

22 to take that "step."

23 With regard to the CDAFA claim, defendants argue that plaintiffs' motion cannot

24 reasonably be considered a motion for summary judgment under the CDAFA.  They note

25 that plaintiffs' motion exclusively addresses SAP TN's alleged liability under the CFAA,

26 referencing direct liability under the CDAFA only in a footnote; and that with regard to the

27 claim of indirect liability as to SAP AG and SAP America, plaintiffs do not even go so far as

28 to include it in the footnote.

United States District Court
For the Northern District of California

14

1       Moreover, defendants argue, as with the CFAA, the criminal nature of the CDAFA
2   statute and the text of its civil remedy provision indicate that indirect liability should apply
3   only where there is evidence that the defendant "directed" the alleged unlawful action
4   (comparing Cal. Penal Code § 502(e)(1) with 18 U.S.C. § 1030(g)).  They assert that even
5   if state law agency principles applied in the context of the state-law CDAFA claim, summary
6   judgment would still be inappropriate because California law considers agency to be a
7   question of fact that should not typically be decided on summary judgment.

8       The court finds that the existence of triable issues precludes summary judgment,
9   and that the motion for summary judgment as to SAP AG's and SAP America's indirect
10  liability under CFAA (or, to the extent that plaintiffs also seek summary judgment as to the
11  CDAFA claim) must therefore be DENIED.  Because the CFAA has both criminal and
12  noncriminal applications, the court finds that the statute should be construed narrowly, as
13  opposed to broadly.  See, e.g., LVRC Holdings, 581 F.3d at 1134-35 (where a statute has
14  both criminal and noncriminal applications, courts should interpret the statute consistently
15  in both contexts; ambiguity concerning ambit of criminal statutes should be resolved in
16  favor of lenity) (quotations and citations omitted); see also Shamrock Foods Co. v. Gast,
17  535 F.Supp. 2d 962, 966-67 (D.Ariz. 2008).

18      As an initial matter, plaintiffs have not established that either SAP AG or SAP
19  America is a "violator" under the CFAA.  In addition, plaintiffs have not established liability
20  under agency principles.  Federal common law controls with regard to federal claims such
21  as the CFAA.  See, e.g., Sun Microsystems, Inc. v. Hynix Semiconductor, Inc., 622 F.Supp.
22  2d 890-99 (N.D. Cal. 2009).  Here, plaintiffs have not shown any manifestation by SAP AG
23  or SAP America that SAP TN act on their behalf; have not established that SAP TN
24  accepted this undertaking; and have not established that there was an understanding
25  among the defendants that SAP AG or SAP America was to be in charge of the
26  undertaking.  Plaintiffs simply assert that SAP TN's downloading was within the scope of
27  SAP TN's authority as agent for SAP AG and SAP America, but this is not sufficient to
28  establish liability under the federal common law of agency.

15

C. Defendants' Motion

Defendants seek a ruling that OEMEA's California claims should be dismissed; that plaintiffs may not recover damages incurred by related non-parties; that "saved development costs" are an impermissible measure of damages, for both the non-copyright claims and the copyright claims; and that plaintiffs may not recover under claims for which they did not disclose damage calculations.

1. OEMEA's California claims

OEMEA is an Irish private limited company with its principal place of business in Ireland, and which has software distribution rights in Europe, the Middle East, and Africa. OEMEA asserts state law claims of intentional and negligent interference with prospective economic advantage, unfair competition, unjust enrichment/restitution, and entitlement to an accounting, against all defendants.

Defendants argue that OEMEA's claims fail as a matter of law because California does not provide a remedy for non-residents alleging injuries caused by out-of-state conduct, and because applying California law to extraterritorial claims runs afoul of the due process clause of the U.S. Constitution.

The court finds that the motion must be GRANTED, as plaintiffs have failed to show the required California nexus. In general, "a court should not ordinarily construe a statute as regulating occurrences outside the state unless a contrary intention is clearly expressed or reasonably can be inferred from the language or purpose of the statute." J.P. Morgan & Co., Inc. v. Superior Court, 113 Cal. App. 4th 195, 221 (2003) (citing Norwest Mortgage, Inc. v. Superior Court, 72 Cal. App. 4th 214, 222 (1999)).

Thus, for example, courts have held with regard to UCL claims that while the UCL applies to wrongful conduct that occurs out-of-state but results in injury in California, regardless of the injured party's citizenship, the UCL does not apply to out-of-state conduct that does not cause injury in California. See Speyer v. Avis Rent a Car Sys., Inc., 415 F.Supp. 2d 1090, 1098-99 (S.D. Cal. 2005) (citing Norwest Mortgage, 72 Cal. App. 4th at 222-25; Yu v. Signet Bank, 69 Cal. App. 4th 1377 (1999)).

16

1    Here, the relevant question is not whether defendants have operations in California,

2  but whether a sufficient connection exists between those operations and OEMEA's claims.

3  Plaintiffs do not provide evidence sufficient to refute defendants' claims that OEMEA is a

4  non-resident Irish corporation, that it is not registered to do business in California, that it

5  has no customers in California, that its sales territory is limited to Europe and the Middle

6  East, that it suffered no injury in California, and that SAP TN's support and marketing

7  activities for OEMEA customers occurred in Texas and Europe, not in California.

8    While plaintiffs assert that SAP TN's contacts with California were widespread

9  enough to provide a basis for OEMEA's claims in this action, the court notes that plaintiffs'

10  own damages expert Paul Meyer confirmed that OEMEA's alleged damages are based on

11  harm that occurred outside of California.  The court finds that plaintiffs have failed to

12  provide evidence sufficient to create a triable issue as to the required California nexus

13  between OEMEA's claims and defendants' operations.

14    2.    Damages incurred by related non-parties

15    Defendants contend that plaintiffs may recover only their own lost profits, and that

16  they cannot assert the rights of third parties – even affiliated entities.  Defendants assert

17  that because corporations are considered separate legal entities, a plaintiff may seek

18  damages only on its own behalf, and not on behalf of a subsidiary corporation.

19    The Oracle organization consists of a parent corporation (Oracle Corporation) plus

20  hundreds of subsidiary corporations – only four of which (Oracle USA, OIC, OEMEA, and

21  Siebel) are plaintiffs in this action.  The court has previously dismissed two other plaintiffs

22  for lack of standing, and defendants contend that plaintiffs cannot circumvent the court's

23  dismissal by seeking to recover damages on behalf of dismissed parties, and also may not

24  recover on behalf of entities they chose not to join as plaintiffs.

25    In opposition, plaintiffs argue that they do not seek to recover the lost profits that

26  defendants are asking the court to bar – that is, they seek only lost support profits to which

27  each plaintiff is legally entitled.  Plaintiffs assert  that Oracle is not seeking, as defendants

28  argue, to avoid its corporate structure, and reiterate that they are seeking only those lost

United States District Court
For the Northern District of California

17

1 profits that should have flowed to the individual named plaintiffs.

2 The court finds that the motion must be GRANTED, as plaintiffs have effectively

3 conceded that they do not seek lost profits from non-parties.

4 3. "Saved development costs" as measure of damages

5 Defendants assert that plaintiffs are not entitled to recover damages based on

6 "saved development costs" for any of their claims.

7 a. Non-copyright claims

8 Defendants contend that unjust enrichment damages based on "saved development

9 costs" are not available under claims permitting only the recovery of compensatory

10 damages (the CFAA/CDAFA claims, the breach of contract claim, the trespass to chattels

11 and tortious interference claims); and are also not available under claims permitting only

12 recovery of restitutionary damages (the UCL and unjust enrichment/restitution claims). In

13 opposition, plaintiffs contend that they may pursue "saved development costs" under their

14 unjust enrichment claim, and assert that they do not seek them under any of the other non-

15 copyright claims.

16 With regard to the unjust enrichment/restitution claim, defendants argue that under

17 California law, a plaintiff asserting unjust enrichment may seek only restitution of benefits

18 the plaintiff conferred on the defendant, which the defendant wrongfully retained. Thus,

19 they contend, since Oracle did not literally confer "saved development costs" on defendants

20 in this case, whatever benefit defendants may have incurred as represented by those

21 saved costs is not an appropriate subject of restitution, and plaintiffs cannot recover those

22 costs under the unjust enrichment claim.

23 Plaintiffs submit, however, that the "benefit conferred" need not be money or

24 property directly conferred on the defendant, but can also be something that saves the

25 defendant from expense or loss. In support, plaintiffs cite Ghirardo v. Antonioli, 14 Cal. 4th

26 39 (1996). In that case, the court noted that "[u]nder the law of restitution, an individual

27 may be required to make restitution if he is unjustly enriched at the expense of another,"

28 and that "[a] person is enriched if he receives a benefit at another's expense." The court

United States District Court
For the Northern District of California

1  added that "[t]he term 'benefit' denotes any form of advantage," and that a benefit is

2  conferred "not only when one adds to the property of another, but also when one saves the

3  other from expense or loss."  However, "[e]ven when a person has received a benefit from

4  another, he is required to make restitution only if the circumstances of its receipt or

5  retention are such that, as between the two persons, it is unjust for him to retain it."  Id. at

6  51 (citing Restatement, Restitution § 1, com. (a), (c)).

7       Here, plaintiffs assert, the fact that Oracle did not directly confer the "saved

8  development costs" on defendants does not mean that plaintiffs may not recover those

9  "saved development costs" as damages.

10      Plaintiffs also cite Ajaxo, Inc. v. E*Trade Group, Inc., 135 Cal. App. 4th 21 (2005).  In

11  that case, the defendant (E*Trade) gave the plaintiff's trade secrets to one of the plaintiff's

12  competitors, which used the trade secrets and saved some development costs for E*Trade.

13  The court upheld an award of damages that included the saved development costs based

14  on a theory of unjust enrichment/restitution.  Id. at 55-57.  The court held that the purpose

15  of unjust enrichment/restitution is to require the wrongdoer to restore what he has received,

16  and thus restitution required E*Trade to return to the plaintiff the value or benefit that it

17  received from the plaintiff's competitor.  Id. at 56.  The court also held that the saved

18  development costs provided evidence of unjust enrichment on the plaintiff's claim for

19  misappropriation of trade secrets – a claim that plaintiffs argue is analogous to defendants'

20  conduct here.

21      The court find that the motion must be GRANTED.  Plaintiffs cannot recover "saved

22  development costs" for alleged unjust enrichment, where plaintiffs retained their right to

23  use, distribute, license, and profit from the software and support materials at issue.  It

24  would not be equitable, logical, or legally permissible to award plaintiffs the full replacement

25  value of property that they never lost or gave away.

26      The cases on which plaintiffs rely do not support their argument as applied to the

27  facts of the present case.  Ghirardo does not support a ruling that plaintiffs can recover the

28  full replacement value of their intellectual property absent loss or conveyance of that

United States District Court
For the Northern District of California

1 property, as the court there simply permitted a plaintiff who had conveyed real property to
2 the defendant to recover the unpaid balance of the purchase price. The remaining cases
3 (Ajaxo and cases cited for the same point as Ajaxo) concern trade secret claims in which
4 the court permitted recovery of "development costs" saved by misappropriating, rather than
5 developing, the trade secrets at issue. Moreover, these cases are inapposite because,
6 unlike the contract or tort claims for which plaintiffs' unjust enrichment claim serves as an
7 alternative here, trade secret law allows recovery of saved development costs.

8                    b.    Copyright claims

9         Defendants also assert that "saved development costs" are not a permissible
10 measure of recovery for the copyright claims. Apart from statutory damages, the Copyright
11 Act provides for two types of monetary recovery – actual damages, and recovery of
12 wrongful profits. "These remedies are two sides of the damages coin – the copyright
13 holder's losses and the infringer's gains." Polar Bear Prods., Inc. v. Timex Corp., 384 F.3d
14 700, 708 (9th Cir. 2004). Actual damages are awarded to compensate for demonstrable
15 harm caused by the infringement. 17 U.S.C. § 504(b); Polar Bear, 384 F.3d at 708.
16 Infringer's profits are analyzed from the infringer's point of view – if the infringer has earned
17 a profit, it must disgorge that profit so that it does not benefit from wrongdoing. Id.

18         Courts have applied different calculations to determine the amount of actual
19 damages that a copyright owner is entitled to recover as a result of infringement. One
20 method assesses the damage to the "fair market value" of the plaintiff's work caused by the
21 defendant's infringement. See, e.g., Abend v. MCA, Inc., 863 F.2d 1465, 1479-80 (9th Cir.
22 1988). Another method attempts to prove actual damages by indirectly proving the
23 plaintiff's lost profits. This method is often impractical because of the difficulty of proving
24 such lost profits with specificity. See, e.g., Polar Bear, 384 F.3d at 709-10.

25         In Sid & Marty Krofft Television Prods, Inc. v. McDonald's Corp., 562 F.2d 1157 (9th
26 Cir. 1977), the Ninth Circuit held that "[t]he value of an infringer's use is a permissible basis
27 for estimating actual damages." Id. at 1174. The test of market value is "what a willing
28 buyer would have been reasonably required to pay to a willing seller for plaintiffs' work."

United States District Court
For the Northern District of California

20

1  Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc., 772 F.2d 505, 512 (9th Cir. 1985)
2  (quoting id.).

3      In Deltak, Inc. v. Advanced Sys., Inc., 767 F.2d 357 (7th Cir. 1985), the defendant
4  copied the plaintiff's written materials, and distributed the copies without charge to its
5  customers. Because the materials were not registered, and no sales resulted, the court
6  attempted to resolve the question of how to determine damages when there had been no
7  profit to the infringer and no lost sales to the copyright holder. The Seventh Circuit cited
8  Krofft, but equated "value of use" with the fair market value of the infringed materials, as it
9  found that there were damages in the value of the use of the infringing materials to the
10  infringer. Id. at 360-63. The court concluded that "[e]ach of the copies [defendant]
11  distributed had a value of use to it equal to the acquisition cost saved by infringement
12  instead of purchase, which [defendant] was then free to put to other uses." Id. at 361.

13      In the present case, plaintiffs' expert Mr. Meyer measured actual damages for
14  copyright infringement using both a traditional lost profits analysis, and a "fair market value"
15  license analysis. For the latter, he calculated "hypothetical licenses" using three different
16  approaches – a "market approach," an "income approach," and a "cost approach."
17  According to Mr. Meyer, "[t]he cost approach attempts to measure the future benefit of the
18  intellectual property by quantifying the cost to develop alternative technology or replace the
19  technology being valued."

20      The underlying assumption, according to Mr. Meyer, "is that the cost to buy or
21  develop alternative intellectual property is commensurate with the economic benefit, or
22  value, of the intellectual property." Thus, under this "cost approach," Mr. Meyer considered
23  the acquisition cost to Oracle of purchasing the intellectual property from PeopleSoft and
24  J.D. Edwards, plus the amounts that PeopleSoft and J.D. Edwards spent on research and
25  development, plus the amounts Oracle has subsequently spent in research and
26  development in connection with the copyrighted materials. Thus, plaintiffs are seeking to
27  recover damages based on the purported amount that defendants would have spent to
28  acquire the relevant technology through their own development efforts – that is, the amount

United States District Court
For the Northern District of California

21

1 that defendants saved by infringing, rather than developing or directly purchasing, the
2 technology.

3 Defendants contend that there is no authority to support Mr. Meyer's reliance on a
4 "cost approach" to calculate the value of a fair-market value license. In their prior motion
5 for partial summary judgment, on the question of the availability of "hypothetical license"
6 damages, defendants argued that plaintiffs were not entitled to such damages if they were
7 based on "saved acquisition costs." In the January 28, 2010 order denying defendants'
8 motion, the court held that plaintiffs were not precluded from seeking actual damages for
9 copyright infringement in the form of a "fair market value" or "hypothetical" license.

10 The court found it unnecessary to reach the specific question whether "saved
11 acquisition costs" are a permissible component of such a license, as it assumed, based on
12 the particular facts of this case, and also based on the relevant case law, that any damages
13 in the form of a "hypothetical license" would more or less replicate the costs to defendants
14 of acquiring a license permitting the use of the allegedly infringed copyrights (though not
15 the costs of acquiring ownership of the copyrights). The court notes, in addition, however,
16 that no court in this Circuit has considered "saved costs" when calculating a fair market
17 value license, and the Ninth Circuit's "value of use" analysis says nothing about "saved
18 costs."

19 In any event, the concept of "saved development costs" raises an entirely different
20 issue – whether plaintiffs are entitled to recoup all their research and development costs as
21 actual damages for defendants' infringement. The court has located no case law
22 supporting a theory of copyright damages based on "saved development costs," and
23 plaintiffs have proffered none. Thus, the court is not persuaded by plaintiffs' argument that
24 authority exists for such a proposition. Even the Seventh Circuit – which in Deltak
25 introduced the concept of "saved acquisition costs" as a measure of actual damages (and
26 for which it has been criticized by commentators and other courts) – did not go so far as
27 plaintiffs would have this court go.

28 Accordingly, in the absence of Ninth Circuit authority for awarding research and

United States District Court
For the Northern District of California

1   development costs to plaintiffs as actual damages for infringement, this court declines to

2   permit plaintiffs to seek such damages.[5]  Defendants' motion is GRANTED.

3          4.      Claims for which plaintiffs did not disclose damage calculations

4          Defendants argue that plaintiffs may not recover damages for any claims for which

5   they did not disclose damages calculations – specifically, the trespass to chattels claim,

6   and the CDAFA claim.  They argue that under Rule 26(a)(1), a plaintiff is required to

7   provide in its initial disclosures a computation of each category of damages claimed, and

8   that failure to do so results in exclusion of evidence.

9          Defendants assert that it is undisputed that plaintiffs did not disclose in their initial

10  disclosures any damages calculations for their trespass to chattels claim, as they made

11  only general allegations of damage to Oracle's "computers, data, and systems" caused by

12  SAP TN's alleged trespass on plaintiffs' computer systems.  Defendants contend that even

13  in their supplemental and amended disclosures, plaintiffs provide no calculations or

14  amounts to establish any actual damages, stating only that such amounts will be provided

15  "in connection with Oracle's expert report or before" – and that no such calculations have

16  been forthcoming.

17         In opposition, plaintiffs argue that they have disclosed all the damages they intend to

18  seek for their trespass to chattels and CDAFA claims.  Those damages, according to

19  plaintiffs, include lost profits, harm and impairment to Oracle's computer systems,

20  investigation costs, attorney's fees, and punitive damages.  They contend that the cited

21  investigation and lost profits damages evidence is what their damages expert relied on and

22  quantified in his expert report.

23         The court finds that the motion must be DENIED, as inappropriate for resolution on a

24

25         [5] Even were there some authority for calculating actual damages under the Copyright

26  Act using a "saved development costs" calculation, the court finds plaintiffs' calculations to be
    highly speculative, as they are based on the amounts that Oracle allegedly spent to develop

27  and/or acquire the intellectual property at issue, not on what it would have cost SAP for
    research and development.  As noted above, actual damages based on "value of use" are

28  derived from "the value of an infringer's use," and plaintiffs have provided no evidence of what
    SAP would have spent.

1 summary judgment motion. Defendants are, of course, free to move for preclusion of

2 evidence of damages as to which plaintiffs may have failed to comply with the disclosure

3 requirements.[6]

**CONCLUSION**

5 In accordance with the foregoing, the court rules as follows:

6 1. Plaintiffs' motion for summary judgment as to SAP TN's liability for direct

7 infringement of the three HRMS registrations at issue is GRANTED as to the post-March 1,

8 2005 period, based on defendants' concessions, and DENIED as to the pre-March 1, 2005

9 period.

10 2. Defendants' cross-motion for summary judgment of non-infringement based

11 on pre-March 1, 2005 conduct with regard to the three HRMS registrations at issue is

12 DENIED.

13 3. Plaintiffs' motion for summary judgment as to the SAP TN's liability for direct

14 infringement of the three Database registrations at issue is GRANTED without time

15 limitation, based on defendants' concessions.

16 4. Plaintiffs' motion for summary judgment as to SAP AG's and SAP America's

17 liability for vicarious infringement of the six registrations at issue is GRANTED, based on

18 defendants' concessions.

19 5. Plaintiffs' motion for summary judgment as to SAP AG's and SAP America's

20 liability for contributory infringement of the six registrations at issue is DENIED.

21 6. Plaintiffs' motion for summary judgment as to SAP TN's liability for violation of

22 CFAA § (a)(2)(C) is GRANTED, based on defendants' concessions; and is DENIED as to

23 SAP TN's liability for violation of CFAA § (a)(5)(A)(i)-(iii).

24 7. Plaintiffs' motion for summary judgment as to SAP TN's liability for violation of

25 the CDAFA is GRANTED, based on defendants' concessions.

26 8. Plaintiffs' motion for summary judgment as to SAP AG's and SAP America's

27

28 ⁶ In light of this ruling, the court also does not decide whether plaintiffs' damages under the CDAFA should be limited to no more than alleged "investigation costs."

United States District Court
For the Northern District of California

1    indirect liability for violation of the CFAA is DENIED.

2        9.      Plaintiffs' motion for summary judgment as to SAP AG's and SAP America's

3    indirect liability for violation of the CDAFA is DENIED.

4        10.     Defendants' motion for summary judgment as to OEMEA's California claims

5    is GRANTED.

6        11.     Defendants' motion for summary judgment as to damages incurred by non-

7    parties is GRANTED.

8        12.     Defendants' motion for summary judgment as to "saved development costs"

9    as a measure of damages is GRANTED, as to both non-copyright claims and copyright

10   claims.

11       13.     Defendants' motion for summary judgment as to claims for which plaintiffs did

12   not disclose damage calculations is DENIED.

13       14.     The parties' objections to evidence are OVERRULED.

14

15   **IT IS SO ORDERED.**

16   Dated: August 17, 2010

17                                           PHYLLIS J. HAMILTON
                                             United States District Judge
18

19

20

21

22

23

24

25

26

27

28

25

# EXHIBIT I

1  AARON D. FORD, Esq. NSBN 7704
   aford@swlaw.com
2  SNELL & WILMER LLP
   3883 Howard Hughes Parkway, Suite 1100
3  Las Vegas, Nevada 89169
   Telephone:  (702) 784-5265
4  Facsimile:  (702) 784-5252

5  JONATHAN M. JACOBSON, Esq. (admitted *pro hac vice*)
   jjacobson@wsgr.com
6  MICHAEL B. LEVIN, Esq. (admitted *pro hac vice*)
   mlevin@wsgr.com
7  WILSON SONSINI GOODRICH & ROSATI
   Professional Corporation
8  650 Page Mill Road
   Palo Alto, CA 94304-1050
9  Telephone:  (650) 493-9300
   Facsimile:  (650) 565-5100

10
   Attorneys for Non-Parties
11 Seth Ravin and Rimini Street, Inc.

12              UNITED STATES DISTRICT COURT

13                 DISTRICT OF NEVADA

14
   ORACLE USA, INC, a Colorado        )   CASE NO.: 2:09-CV-01591 KJD (GWF)
15 Corporation, *et. al.*,            )
                                      )   Pending in CASE NO.: 07-CV-01658 PJH
16         Plaintiffs,                )   (EDL) (N.D. Cal.)
                                      )
17 vs.                                )   **NON-PARTY SETH RAVIN'S AND**
                                      )   **NON-PARTY RIMINI STREET'S**
18 SAP AG, a German corporation, *et. al.*, )  **OPPOSITION TO ORACLE'S MOTION**
                                      )   **TO COMPEL SETH RAVIN TO**
19         Defendants.                )   **ANSWER DEPOSITION QUESTIONS**
                                      )   **AND TO COMPEL RIMINI STREET**
20                                    )   **TO PRODUCE DOCUMENTS**
                                      )
21                                    )   Hrg. Date:   October 6, 2009, 9:30am
                                      )   Before:      Hon. George W. Foley, Jr.
22                                    )   Courtroom:   3A
                                      )
23                                    )
                                      )
24 _____)

25

26

27

28
   NON-PARTIES RAVIN AND RIMINI STREET'S                        3782771_3.DOC
   OPPOSITION TO MOTION TO COMPEL
   CASE NO.: 2:09-CV-01591 KJD (GWF)

1

**TABLE OF CONTENTS**

2

Page

3   I.      INTRODUCTION....................................................................................................... 1

4   II.     FACTUAL BACKGROUND ..................................................................................... 4

5           A.      Rimini Street Competes With Oracle and SAP as a Third Party Support
6                   Provider ............................................................................................................ 4

7           B.      Oracle's Successful Effort to Shut Down TomorrowNow Through Scorched
                    Earth Litigation ............................................................................................... 5

8           C.      Oracle's Efforts to Obtain Irrelevant, Proprietary and Burdensome
9                   Information From Rimini Street....................................................................... 6

10  III.    ORACLE'S MOTION TO COMPEL SHOULD BE DENIED IN ITS ENTIRETY ........ 8

            A.      Applicable Legal Standards ............................................................................. 8

11          B.      The Information Oracle Is Seeking Is Not Relevant to the Underlying
12                  Litigation ......................................................................................................... 9

13                  1.      The Parties Agree that Discovery Concerning the Details of Rimini
                            Street's Operations Is Not Relevant .................................................... 9

14
15                          a.      Oracle Previously Successfully Argued that Rimini Street
                                    Discovery Is Irrelevant ............................................................ 9

16                          b.      Defendant SAP Agrees With Rimini Street that the
                                    Discovery Oracle Seeks Is Irrelevant, and Disputes Oracle's
17                                  Characterizations to the Contrary.......................................... 11

18                          c.      Contrary to Oracle's Claim, the California Court Has Not
                                    Ruled on this Issue in Oracle's Favor, But Has Expressed
19                                  Skepticism as to the Relevance of Third Party Discovery ........... 12

20                  2.      Under the Applicable Copyright Damages Case Law, the Details of
                            Rimini Street's Operations — or Other Information Related to
21                          Whether Rimini Street Infringes Oracle's Copyrights — Are Not
                            Relevant................................................................................................. 14

22          C.      Even if Some Level of Relevance Could Be Established, the *Micro Motion*
23                  Decision Compels Rejecting Oracle's Attempt to Try Rimini Street *In*
                    *Absentia* in the SAP Litigation.......................................................................... 16

24          D.      Oracle's Requests Should Be Denied As Improper Pre-Litigation Discovery ..... 18

25          E.      Oracle's Specific Requests Are Not Relevant to the Underlying Litigation,
26                  and Are Proprietary and/or Burdensome............................................................. 19

27                  1.      Document Request No. 1: The Details of Rimini Street's "Business
                            Model" Are Not Relevant, Are Incredibly Burdensome, and Involve
28                          Rimini Street's Core Trade Secrets ...................................................... 20

2.   Document Request No. 2:  Rimini Street's Automated Software
Tools Are Not Relevant, And Are Potentially Proprietary And
Burdensome...............................................................................................22

3.   Document Request No. 3:  Rimini Street's "Checklists" Are
Irrelevant and Potentially Proprietary and Burdensome ...........................23

4.   The Further Deposition Testimony Oracle Seeks From Ravin Is Not
Relevant to the Underlying Litigation, Is Highly Proprietary, and
Could Open the Door to Additional Burdensome Discovery ...................24

IV.   THE PROTECTIVE ORDER IN THE UNDERLYING LITIGATION BETWEEN
ORACLE AND SAP IS NOT A SUBSTITUTE FOR ESTABLISHING
RELEVANCY FOR FURTHER NON-PARTY DISCOVERY, AND IS IN ANY
EVENT INADEQUATE..................................................................................................26

V.   NON-PARTIES ARE ENTITLED TO REIMBURSEMENT OF COSTS AND
ATTORNEY'S FEES IN OPPOSING THIS MOTION....................................................28

VI.   CONCLUSION ...............................................................................................................30

1

## TABLE OF AUTHORITIES

2

**Page(s)**

3

### CASES

4   *Am. Metal Prods. Co. v. Gutter Topper, Ltd.*, No. M 8-85,
        1997 WL 666291 (S.D.N.Y. Oct. 24, 1997) ......................................................................16

5

*Cacique, Inc. v. Robert Reiser & Co.*, 169 F.3d 619 (9th Cir. 1999)..............................8, 9, 16, 26

6

*Cram v. Elec. Data Sys. Corp.*, No. 07cv1842,
7       2008 WL 115438 (S.D. Cal. Jan 25, 2008) .......................................................................29

8   *Epstein v. MCA, Inc.*, 54 F.3d 1422 (9th Cir. 1995) ........................................................................2

9   *Fort James Corp. v. Sweetheart Cup Co.*, No. 97-C-1221,
        1998 WL 709813 (S.D.N.Y. Oct. 8, 1998) .......................................................8, 16, 23, 26

10

*Hamil Am., Inc. v. GFI*, 193 F.3d 92 (2d Cir. 1999) ......................................................................15

11

*Heraeus Inc. v. Solar Applied Material Tech. Corp.*, No. 06-01191,
12      2006 WL 2067859 (N.D. Cal. July, 24, 2006) ..................................................................16

13  *In re Shubov*, 253 B.R. 540 (9th Cir. B.A.P. 2000) .................................................................29, 30

14  *In re Stratosphere Corp. Securities Litig.*, 182 F.R.D. 614 (D. Nev. 1998) .................................24

15  *Katz v. Batavia Marine & Sporting Supplies, Inc.*, 984 F.2d 422 (Fed. Cir. 1993) ........8, 9, 16, 23

16  *Micro Motion, Inc. v. Kane Steel Co.*, 894 F.2d 1318 (Fed. Cir. 1990)................................*passim*

17  *Nugget Hydroelectric, L.P. v. Pac. Gas & Elec. Co.*, 981 F.2d 429 (9th Cir. 1992) ...............8, 23

18  *Pearce v. Club Med Sales, Inc.*, 172 F.R.D. 407 (N.D. Cal. 1997).........................................29, 30

19  *Polar Bear Prods., Inc. v. Timex Corp.*, 384 F.3d 700 (9th Cir. 2004) ..............................1, 14, 15

20  *Trading Techs. Int'l, Inc. v. eSpeed, Inc.*, No. 04 C 5312,
        2006 WL 3541933 (N.D. Ill. Dec. 5, 2006) ................................................................16, 22

21

*Truswal Systems Corp. v. Hydro-Air Eng'g, Inc.*, 813 F.2d 1207 (Fed. Cir. 1987)........................8

22

*Ultimate Timing LLC v. Simms*, No. 3:09-mc-6RLYWGH,
23      2009 WL 1148056 (S.D. Ind. Apr. 28, 2009) ...................................................................19

24

### RULES

25  Fed. R. Civ. P. 26(b)(1)................................................................................................8, 16, 19, 20

26  Fed. R. Civ. P. 26(b)(2)(C)(iii).........................................................................................................8

27  Fed. R. Civ. P. 32(d)(3)(A) ............................................................................................................24

28  Fed. R. Civ. P. 37(a)(5)(B)........................................................................................................28, 30

1   Fed. R. Civ. P. 45(c)(3) ................................................................................................................22

2                                              **MISCELLANEOUS**

3   4 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 14.02[A][1] (2009)..........1, 14

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1   Non-Party Seth Ravin ("Ravin") and Non-Party Rimini Street, Inc. ("Rimini Street")

2   (together, the "Non-Parties") respectfully submit this Memorandum of Points and Authorities in

3   Opposition to the Motion to Compel Ravin to Answer Deposition Questions and to Compel

4   Rimini Street to Produce Documents in Response to Oracle's Subpoena ("Motion"), filed by

5   Plaintiffs Oracle USA, Inc., Oracle International Corporation, and Oracle EMEA Limited

6   (collectively, "Oracle").

7   **I.   INTRODUCTION**

8        By its motion, Plaintiff Oracle is seeking to compel certain discovery (the "Discovery")

9   from its competitor, Non-Party Rimini Street, hoping to discover that Rimini Street is infringing

10  Oracle's copyrights.  Oracle attempts to justify its intrusive and burdensome third party

11  discovery requests on the grounds that whether or not Rimini Street infringes Oracle's copyrights

12  is purportedly relevant to the damages Oracle is entitled to collect against the defendants

13  TomorrowNow, Inc. ("TomorrowNow") and its parent, SAP, AG ("SAP") in the underlying

14  litigation in California (the "SAP Litigation").  But it is undisputed that lost profits damages in a

15  copyright case are measured by the "profits that the plaintiff might have accrued *but for the*

16  *defendant's infringement*."  4 Melville B. Nimmer & David Nimmer, Nimmer on Copyright §

17  14.02[A][1] at 14-14 (2009) (emphasis added); *see also Polar Bear Prods., Inc. v. Timex Corp.*,

18  384 F.3d 700, 709 (9th Cir. 2004).  Contrary to Oracle's assertion, copyright damages *do not*

19  depend on whether *third party competitors* infringe the plaintiff's copyrights, and Oracle does

20  not cite any authority holding otherwise.  Thus, whether or not *Rimini Street* infringes Oracle's

21  copyrights (which Rimini Street denies) simply has no relevance to what damages, if any,

22  defendants might owe, or any other issue in the SAP Litigation.

23       Given its complete lack of relevance, it is therefore not surprising that both Oracle and

24  SAP apparently agree that discovery into the technical details of Rimini Street's operations is not

25  relevant.  In a prior discovery dispute between the parties in the underlying suit, referenced by

26  Oracle in its Motion (*see* Motion at 7), Oracle successfully resisted SAP's discovery requests

27  regarding Rimini Street on relevance grounds, telling the court that "information regarding

28  Rimini Street — or any other third-party support provider — *do not relate to any claim or*

1    *defense in this case*" and that "third-party support requests" cannot be justified "as damages

2    discovery." Declaration of Michael B. Levin ("Levin Decl."), Exhibit ("Ex.") A at p. 4

3    (emphasis added).

4         Notwithstanding the fact that Oracle served the Discovery, Oracle apparently does not

5    believe it is relevant. In connection with the present Motion, Oracle recently conceded that it did

6    *not* seek the Discovery "because *Oracle* believed it was relevant." Levin Decl., Ex. B at 3.

7    Rather, Oracle claims it served the Discovery because SAP supposedly believes it is relevant.

8    *Id.*; Motion at 7. However, SAP has made it quite clear it *does not* believe the Discovery is

9    relevant. After receiving a copy of Oracle's Motion, SAP's counsel indicated that it disputes

10   Oracle's claim that SAP believes the Discovery is relevant, and that it plans to submit a separate

11   filing with this Court confirming this. Levin Decl., ¶¶ 39-42. Given the parties' apparent

12   agreement that the Discovery is irrelevant, [1] that should end the inquiry, as lack of relevance is a

13   sufficient ground for denying Oracle's motion to compel. *See Epstein v. MCA, Inc.*, 54 F.3d

14   1422, 1424-25 (9th Cir. 1995).

15        In a highly analogous case, the Federal Circuit in *Micro Motion* quashed a subpoena

16   inquiring into whether a non-party competitor infringed the plaintiff's intellectual property

17   rights, which — as Oracle argues here — the plaintiff claimed was relevant to address a possible

18   defense to the plaintiff's lost profits damages theory. *See Micro Motion, Inc. v. Kane Steel Co.*,

19   894 F.2d 1318, 1324-25 (Fed. Cir. 1990). There, the Court held that if merely asserting a lost

20   profits damages theory were sufficient to justify intrusive discovery into whether a non-party

21   infringes, a plaintiff "could, in virtually every infringement suit, obtain immediate discovery

22

23

24        [1] Oracle incorrectly asserts that the California court found the Discovery to be relevant. *See*
     Motion at 8-9. In fact, because the Oracle subpoenas issued out of the District of Nevada, the
25   California court has never ruled upon the legitimacy of the Discovery, and has no jurisdiction to
     do so. Indeed, the statements from Magistrate Judge Laporte cited by Oracle were made in the
26   context of a discovery conference addressing the *length* of Mr. Ravin's deposition. To the extent
     Judge Laporte provided preliminary thoughts on relevance, these were made without briefing on
27   the subject, and *nearly two months before* the Discovery requests at issue here were even made
     by Oracle. Thus Judge Laporte did not rule, and could not have ruled, upon their legitimacy.

28

1   from all possible competitors by merely filing a complaint asking for damages against one." *Id.*

2   at 1324-25. Fortunately, that is not the law.

3        Even if Oracle could articulate some speculative theory of relevance, it is clear that

4   Oracle's true purpose for serving the Discovery is an improper attempt to take pre-complaint

5   discovery. In late 2008 and early 2009, Oracle began making threats against Rimini Street

6   concerning a potential claim that Rimini Street infringes Oracle's intellectual property rights, and

7   began seeking from Rimini Street information concerning such allegations, hoping Rimini Street

8   would consent to a voluntary audit. Declaration of Seth Ravin ("Ravin Decl."), ¶ 7. The same

9   day that Oracle and Rimini Street had their last conversation on the subject, Oracle executed

10  subpoenas for three Rimini Street executives, including Ravin, which it served a week later.

11  This timing suggests Oracle's third party discovery requests are part of a fishing expedition into

12  Rimini Street's confidential business operations, presumably in the hopes of obtaining evidence

13  for a claim against Rimini Street. Over the last several years, Oracle has successfully used the

14  litigation process to shut down one competitor, TomorrowNow. Now, Oracle is seeking to

15  impede Rimini Street's growth and further success in the marketplace through, among other

16  things, its improper and intrusive third party discovery requests.[2] Rimini Street respectfully

17  requests that this Court not condone such behavior.

18        Notwithstanding the lack of relevance of the Discovery, Oracle poses a classic catch-22

19  in its Motion: According to Oracle, if Rimini Street is not infringing, it should have nothing to

20  hide; but if Rimini Street is infringing, then it should not be permitted to avoid producing such

21  evidence. *See* Motion at 5:4-5:6. This is pure sophistry. Rather, Rimini Street submits that the

22

23        [2] No doubt, Oracle was also mindful of the media attention it would gain from bringing this
    Motion, and the unsubstantiated accusations contained in it. Shortly after Oracle filed its motion,
24  several media outlets reported on the motion, quoting Oracle's misleading statements suggesting
    that Rimini Street might be misappropriating Oracle's intellectual property rights. *See* Levin
25  Decl., Ex. C. As one commentator has noted, this is just the latest in Oracle's attempts to use the
    legal process to inhibit competition in the marketplace. *See* Levin Decl., Ex. D ("Oracle's high-
26  stakes game of 'Winning by Litigating Competitors into Submission' has been working so far.
    So why stop now?"). Oracle currently earns approximately 84% gross margins on the fees it
27  charges its customers for annual support services, and those fees now account for at least 50% of
    Oracle's total revenues. *See* Levin Decl., Ex. BB.

28

1   proper analysis should be: If Oracle has sufficient evidence that Rimini Street is infringing

2   (which it does not),[3] Oracle is free to bring an infringement action against Rimini Street, where it

3   can seek damages allegedly caused by Rimini Street. If, on the other hand, Oracle has no basis

4   to bring suit (as indeed it does not), Oracle should not be permitted to use non-party discovery

5   requests into Rimini Street's confidential and trade secret operations for the purpose of a fishing

6   expedition looking for alleged infringement purportedly for purposes of determining what

7   damages SAP owes in the SAP Litigation.

8          Given Oracle's complete failure to articulate any support for its theory of relevance,

9   given Oracle's own admissions that the discovery it is seeking is not relevant, and given Oracle's

10   mischaracterizations of SAP's positions (and the court's supposed "findings"), Rimini Street

11   respectfully requests that the Court deny the Motion, and require Oracle to pay the costs and fees

12   Rimini Street has incurred as a result of Oracle's improper and abusive discovery practices.

13   **II.     FACTUAL BACKGROUND**

14          **A.     Rimini Street Competes With Oracle and SAP as a Third Party Support
                     Provider**

15          More than four years ago, Ravin founded Rimini Street for the purpose of providing

16   third-party support and maintenance services for enterprise software at a substantial discount

17   compared to the prices charged by the major software vendors. *See* Ravin Decl., ¶¶ 2-3. Rimini

18   Street allows customers to maximize their return on existing software investments with support

19   programs that provide more than 50% savings on annual support fees, eliminating forced

20   upgrades, and delivering other services not available within standard vendor support. *Id.*

21   Based on its proprietary processes, Rimini Street consistently provides quality tax and regulatory

22

23

---

24          [3] As Oracle concedes, it is not illegal to offer third party support services to Oracle's
      enterprise software customers. *See* Motion at 3:11. Rimini Street has been legally operating its
25   business since its founding in 2005, and neither Oracle nor any other company has sued Rimini
      Street alleging intellectual property infringement. Oracle's motion to compel relies entirely on
      innuendo and speculation, hoping to leave the impression that Rimini Street is a mere "carbon
26   copy" of TomorrowNow, which Oracle contends is infringing its intellectual property rights.
      While Rimini Street offers many similar services as TomorrowNow formerly offered, that does
27   not make Rimini Street an infringer.

28

1   updates to its customers ahead of the date on which Oracle provides updates to its customers.

2   Ravin Decl., ¶¶ 15-16. Today, Rimini Street is a leading third-party maintenance

3   provider, offering support for Oracle's PeopleSoft, Siebel and J.D. Edwards product lines, as

4   well as for products offered by defendant SAP. *Id.* ¶ 4. Not surprisingly, Rimini Street's

5   discounted service offerings have made Rimini Street a target of both the parties in the

6   underlying action, Oracle and SAP.

7          **B.      Oracle's Successful Effort to Shut Down TomorrowNow Through Scorched
                    Earth Litigation**

8

9          In March 2007, two years after Ravin had left TomorrowNow to start Rimini Street,

10  Oracle filed the underlying suit in the Northern District of California, alleging, *inter alia*, that

11  third party support provider TomorrowNow had made illegal downloads of Oracle's copyrighted

12  software. Oracle also named SAP, which had acquired TomorrowNow in early 2005. In May

13  2007, SAP's CEO publicly stated that Oracle's purpose in bringing the lawsuit was "'to limit

14  customer choices by trying to discredit their competition.'" Levin Decl., Ex. E. The SAP

15  Litigation has already achieved that purpose, as TomorrowNow shut down operations last fall as

16  a result of Oracle's litigation campaign. Levin Decl., Ex. F.

17         Oracle has been employing "scorched earth" tactics in the SAP Litigation. Oracle has

18  taken more than 300 hours of depositions, and has served over 100 third party subpoenas. Levin

19  Decl., Ex. G at 1. In response to Oracle's discovery requests, defendants have produced more

20  than 7 million pages of documents, and more than 17 terabytes of electronic data. *Id.* The

21  parties have engaged in frequent motion practice, and there have already been more than 450

22  pleadings filed in the case. The suit is currently scheduled to go to trial in November 2010.

23

24

25

26

27

28

1

2

**C.    Oracle's Efforts to Obtain Irrelevant, Proprietary and Burdensome Information From Rimini Street**

3    Beginning in 2008, Oracle began raising questions with Rimini Street about whether or not

4  Rimini Street was potentially violating Oracle's intellectual property rights.  Ravin Decl., ¶ 7.

5  Oracle became increasingly aggressive, and in December 2008 and January 2009 demanded that

6  Rimini Street voluntarily provide certain confidential information regarding Rimini Street's

7  proprietary processes, including agreeing to an audit, *id.*, no doubt hoping that the results would

8  allow Oracle to bring a copyright infringement claim against Rimini Street.  The last

9  communication between Oracle and Rimini Street on this subject occurred on February 2, 2009.

10  Levin Decl., ¶ 29.

11    At that point, Oracle apparently decided to take a different tack.  On the very same day as

12  the last conversation between Oracle's counsel and Rimini Street's counsel, Oracle's counsel in

13  the SAP Litigation executed deposition and document subpoenas with respect to three Rimini

14  Street executives, Ravin and George and Beth Lester, who were served shortly thereafter.  Levin

15  Decl., Ex. H; Ex. I; Ex. J.  Oracle thus began using the SAP Litigation to attempt to obtain the

16  very same pre-complaint discovery regarding potential infringement allegations that it had

17  previously been trying to pursue from Rimini Street.

18    Although the three subpoenas sought information relating to the witnesses' former

19  employment at TomorrowNow, they were not limited to TomorrowNow topics.  They also

20  included requests regarding Rimini Street's operations. *See, e.g.*, *id.* at Requests Nos. 5, 8(iii), 9,

21  10.  During the parties' meet and confer discussions, Ravin and the Lesters objected to

22  providing any information concerning Rimini Street.  Levin Decl., ¶¶ 30-31.  At the time,

23  counsel for Oracle agreed that these witnesses would not have to produce any Rimini Street

24  documents. *Id.* ¶ 31.

25    Nonetheless, at Ravin's deposition, Oracle attempted to obtain confidential information

26  relating to Rimini Street, including Rimini Street's proprietary methodologies used to develop,

27  test, package and deliver to customers software, updates and fixes.  While counsel allowed Ravin

28  to answer some high level foundational questions so as to avoid a potentially unnecessary

1    discovery dispute, counsel objected that a number of these questions were being improperly

2    interposed as attempts to obtain pre-litigation discovery, improper inquiries into competitive

3    trade secrets, and sought information wholly irrelevant to the SAP Litigation. *See* Levin Decl.,

4    Ex. K; Ex. L. Counsel for the parties agreed Oracle could continue asking additional non-Rimini

5    Street questions and that Oracle would notify Rimini Street's counsel if it intended to seek a

6    motion to compel regarding the unanswered questions, which is at issue here.

7      Shortly before the Ravin deposition, Oracle served a document subpoena on Rimini

8    Street, which is also at issue here. *See* Russell Decl., Ex. L. As discussed in Section III.E, *infra*,

9    the subpoena requests confidential information concerning Rimini Street's proprietary business

10    and technical operations. In response to the subpoena, Rimini Street asserted timely objections.

11    Levin Decl., Ex. M. Rimini Street objected to the relevance of the requests relating to Rimini

12    Street's "business model." Nonetheless, to avoid a discovery dispute, Rimini Street produced

13    what Rimini Street believes are documents "sufficient to show" Rimini Street's business model,

14    including the products Rimini Street offers, the advantages those products provide, and

15    information regarding Rimini Street's pricing. Ravin Decl., ¶¶ 11-14. Because it was irrelevant,

16    burdensome and intrusive pre-litigation discovery, Rimini Street did not produce the additional

17    technical information sought by the subpoena. During the parties' meet and confer session,

18    Oracle failed to provide any legal authority supporting the relevance of the legality of a non-

19    party's products or services to the copyright damages owed by an unrelated party. Levin Decl., ¶

20    35.

21      On August 21, 2009, Oracle filed the Motion. Thereafter, on September 2, 2009, counsel

22    for SAP requested that Oracle and Rimini Street meet and confer, noting that SAP believed that

23    Oracle had mischaracterized SAP's position concerning relevance in the Motion. Levin Decl.,

24    Ex. N. During the subsequent meet and confer teleconference, counsel for SAP indicated SAP's

25    belief that the Discovery was *not relevant*. Levin Decl., ¶¶ 39-42. SAP's counsel further

26    indicated that if Oracle is successful in obtaining the Discovery, SAP would potentially seek

27

28

1 additional discovery from Ravin and Rimini Street, presumably to rebut Oracle's attempts to

2 prove Rimini Street's operations are illegal. *Id.*[4]

3 **III.   ORACLE'S MOTION TO COMPEL SHOULD BE DENIED IN ITS ENTIRETY**

4    **A.   Applicable Legal Standards**

5    Rule 26 provides that discovery should not be permitted in either of two circumstances:

6 (i) where it is not relevant, or (ii) where the burden or expense of the proposed discovery

7 outweighs its likely benefit in light of the relevant factors. *See* Fed. R. Civ. P. 26(b)(2)(C)(iii).

8 In the context of a motion to compel, when a subpoena to a non-party seeks confidential

9 commercial information, the burden is on the demanding party to show a substantial need for the

10 information that cannot otherwise be met without undue hardship. *See Katz v. Batavia Marine &*

11 *Sporting Supplies, Inc.*, 984 F.2d 422, 424-25 (Fed. Cir. 1993); *Nugget Hydroelectric L.P. v.*

12 *Pac. Gas & Elec. Co.*, 981 F.2d 429, 438-39 (9th Cir. 1992); *Fort James Corp. v. Sweetheart*

13 *Cup Co.*, No. 97-C-1221, 1998 WL 709813, at *2 (S.D.N.Y. Oct. 8, 1998).[5]

14    Where the discovery sought is not relevant to any issues in the underlying litigation, a

15 motion seeking to compel such discovery will be denied. *Micro Motion*, 894 F.2d at 1325-28;

16 *Cacique, Inc. v. Robert Reiser & Co.*, 169 F.3d 619, 622-23 (9th Cir. 1999). While relevancy for

17 the purposes of Rule 26 is broadly construed, the potential for discovery abuse is ever-present,

18 and courts are authorized to limit discovery to that which is proper and warranted in the

19 circumstances of the case. *See* Fed. R. Civ. P. 26(b)(1); *Micro Motion,* 894 F.2d at 1325; *Katz,*

20        —————————————

21    [4] Oracle, SAP and Rimini Street further agreed that SAP could submit a response to the
Motion on the same day Rimini Street's opposition is due, that Rimini Street could submit any

22 response to SAP's filing on September 17, 2009, with Oracle submitting any further response in
conjunction with its Reply on September 24, 2009. Levin Decl., Ex. O.

23    [5] Oracle cites a Federal Circuit decision, *Truswal Systems Corp. v. Hydro-Air Engineering,*

24 *Inc.*, 813 F.2d 1207, 1210 (Fed. Cir. 1987), for the proposition that an ancillary court reviewing a
discovery dispute should be "hesitant to pass judgment on what constitutes relevant evidence" in
the main action. Motion at 12. In a highly analogous subsequent decision, however, the Federal

25 Circuit distinguished *Truswal*, finding the ancillary court's deference to the plaintiff's relevance
arguments in permitting discovery of a non-party competitor was an abuse of discretion. *See*

26 *Micro Motion*, 894 F.2d at 1324-25 (declining to remand the relevancy inquiry to the trial court,
and finding that deference should not be given where the specific relevancy question has not

27 been given proper consideration in the main action).

28

     -8-        3782771_3.DOC

1   984 F.2d at 424.  Merely intoning that the discovery sought from a non-party is relevant to

2   plaintiff's damage theory is insufficient to establish relevancy for purposes of discovery. *See*

3   *Micro Motion*, 894 F.2d at 1325.  Nor is a protective order a substitute for demonstrating

4   relevance.  *Id.*; *Cacique,* 169 F.3d at 622-23.

5        Courts must exercise particular caution when determining whether to permit discovery of

6   commercial information from a non-party competitor, for a holding to the contrary can

7   potentially lead to abuse by enabling a plaintiff "in virtually every infringement suit, [to]

8   immediately obtain discovery from all possible competitors by merely filing a complaint asking

9   for damages against one." *Micro Motion*, 894 F.2d at 1324-25.  Although discovery of persons

10  not party to the litigation is contemplated by the Rules, the fact of non-party status may be

11  considered by the court in weighing the burdens imposed in the circumstances. *Katz*, 984 F.2d at

12  424.

13        **B.**      **The Information Oracle Is Seeking Is Not Relevant to the Underlying**
                  **Litigation**

14

15             **1.**      **The Parties Agree that Discovery Concerning the Details of Rimini**
                       **Street's Operations Is Not Relevant**

16       The discovery Oracle seeks is simply not relevant to any issue in the SAP Litigation.  In

17  fact, it appears that — other than Oracle in connection with the present motion — the parties to

18  the SAP Litigation *agree* that information regarding the legality of, and technical details

19  concerning, Rimini Street's services and operations are *not relevant*.

20             **a.**      **Oracle Previously Successfully Argued that Rimini Street**
                       **Discovery Is Irrelevant**

21

22       Oracle has repeatedly made concessions that discovery concerning the third party support

23  market is not relevant to any issue in the SAP Litigation, including damages.  In its Motion,

24  Oracle cites a January 28, 2008 letter from SAP (*see* Motion at 7) regarding an earlier discovery

25  dispute in which SAP was seeking information from Oracle concerning third party maintenance

26  providers, including Rimini Street.  However, Oracle's Motion makes a telling and material

27  omission — Oracle's February 7, 2008 *response* to the letter quoted in the Motion.  In that letter,

28

NON-PARTIES RAVIN AND RIMINI STREET'S      -9-                           3782771_3.DOC
OPPOSITION TO MOTION TO COMPEL
CASE NO.: 2:09-CV-01591 KJD (GWF)

1  which Oracle failed to provide to this Court (and refused to provide to Rimini Street),[6] Oracle

2  took the following positions, which are fatal to Oracle's Motion:

3      Nothing in this case relates to the 'market' for third-party support. This case is
        about Defendants' unlawful access to, and downloading from, Oracle's password-
4       protected website for their use of those downloaded materials. . . .

5      [Oracle's] *information regarding Rimini Street* — or any other third-party support
        provider — *do not relate to any claim or defense in this case*. This case is about
6       Defendants' theft and misuse of Oracle's intellectual property. . . .

7      Neither can Defendants justify their overbroad third-party support requests as
        damages discovery. . . . Oracle has never claimed, contrary to Defendants'
8       assertion, that it has only lost customers to SAP TN. But, whether another third-
        party support provider took customers from Oracle is irrelevant to the claims and
9       defenses here . . . The issue here is whether Defendants acquired customers by
        offering stolen intellectual property and support services provided through the use
10      of that stolen intellectual property. *Whether Oracle lost customers to other third-
        party support providers has nothing to do with this case. Defendants have no
11      legal support for spinning their own unlawful acts into a need for market
        research into their competitors*. There is none.

12

13  Levin Decl., Ex. A at 4-8 (emphasis added).

14      Oracle's letter apparently persuaded the court. In denying SAP the discovery it sought,

15  Judge Legge stated in his Report and Recommendation:

16      [SAP's request for discovery concerning third party support] is tangential at best. .
        . . That information does not appear to be directly or presently relevant.
17      Defendant argues that it will have something to do with damages . . . . However,
        such extensive third party discovery does not now appear to be justified by those
18      narrow potential arguments.

19  Levin Decl., Ex. R at 7.

20      While Oracle may argue that circumstances have changed since the 2008 dispute

21  regarding the discoverability of Rimini Street information, Oracle continues to assert that Oracle

22  does not believe Rimini Street discovery is relevant. As stated in recent meet and confer

23
    ───────────────
24  [6] Because Rimini Street does not have access to much of the record in the SAP Litigation,
    Rimini Street sought from Oracle's counsel other related pleadings (and unredacted portions of the
    same pleadings) to those on which Oracle relied in its Motion, and specifically requested a copy of
25  Oracle's February 7, 2008 letter to the Special Master responding to SAP's letter. Levin Decl., ¶¶
    36-38 & Ex. P. Oracle refused to produce any of the materials Rimini Street requested, or to
26  provide information as to where such materials could be found among the voluminous record.
    Levin Decl., Ex. B (Howard 9/1/09 letter to Levin). Fortunately, however, Rimini Street was able
27  to locate on PACER a partially unredacted copy of Oracle's February 7, 2008 letter as an exhibit to
    a pleading filed in the case. *See* Levin Decl., ¶ 38 & Ex. A.
28

1  correspondence, Levin Decl., Ex. B at 3, Oracle claims it is not seeking this discovery "because

2  Oracle believed it was relevant to this case," but because SAP supposedly believes so.

3                                    **b.     Defendant SAP Agrees With Rimini Street that the Discovery
                                             Oracle Seeks Is Irrelevant, and Disputes Oracle's
4                                            Characterizations to the Contrary**

5       Oracle's sole argument for relevance of the Discovery rests on its position that SAP has

6  made the Discovery relevant to its damages theory. What does SAP have to say about Oracle's

7  requests? SAP denies the relevance of the Discovery. Levin Decl., ¶¶ 39-42. Rimini Street is

8  informed that SAP intends to file its own submission stating that SAP ***does not*** contend that the

9  discovery Oracle is seeking is relevant. As indicated in its counsel's prior correspondence, Levin

10 Decl., ¶¶ 39-42 & Ex. N, SAP believes Oracle has mischaracterized SAP's position. Thus,

11 Oracle's entire motion — which is premised on Oracle's false statement that "Defendants

12 Contend That Rimini Is Relevant to Their Defense" (Motion at 7:3) — crumbles.

13      Contrary to Oracle's assertion, the SAP letter quoted by Oracle (*see* Motion at 7) does not

14 suggest otherwise. In the 2008 discovery dispute, SAP argued (unsuccessfully) that discovery

15 concerning the existence of alternative third party support options may be relevant to damages

16 because it may show Oracle would have lost sales even if TomorrowNow had not committed the

17 allegedly infringing acts, and thus the damages were not caused by TomorrowNow's alleged

18 infringement. But SAP was not seeking information concerning the ***legality*** of other third party

19 support providers, or the technical details of their operations.[7]

20      Because neither Oracle nor SAP believes the legality of Rimini Street's services —

21 Oracle's purported justification for the discovery it is seeking — is relevant to any issue in the

22 underlying litigation Oracle's motion should be denied.

23

24 _____
         [7] Oracle contends SAP's statements requesting discovery on "*how* those companies were doing
25 business" (Motion at 7 (emphasis added by Oracle)) supports Oracle's position. During meet and
   confer conversations, counsel for SAP has explained that SAP's statement was not intended to be
26 an inquiry into the legality of or technical details concerning third party support providers. Rather,
   in referring to "how" third parties were doing business, SAP was seeking information concerning
27 whether third parties offered the services required to meet the demand met by TomorrowNow,
   such as which product lines they supported for which types of customers. Levin Decl., ¶ 41.

28

**c.      Contrary to Oracle's Claim, the California Court Has Not Ruled on this Issue in Oracle's Favor, But Has Expressed Skepticism as to the Relevance of Third Party Discovery**

Nor is there any basis for Oracle's argument that the California court "found" that discovery into the details of Rimini Street's business model, software tools, checklists, or the legality of Rimini Street's business, is relevant to damages. As far as Rimini Street is aware, the presiding judge, Judge Phyllis J. Hamilton, has not addressed this issue.[8] As described above, the Special Master originally handling discovery disputes, Judge Charles A. Legge (retired), unequivocally concluded that SAP's requests for discovery concerning Rimini Street "[do] not appear to be directly or presently relevant" to the issues in the case, including to damages. *See* Levin Decl., Ex. R at 7.

Nonetheless, Oracle asserts that Magistrate Judge Elizabeth D. Laporte, who is presently overseeing discovery in the case, "found" that discovery related to Rimini Street is relevant to damages following a March 31, 2009 discovery conference. Motion at 8. Oracle is mistaken.

First, the April 2, 2009 order does not speak to, much less make "findings" on, the relevance of discovery concerning the topics at issue here. Indeed, the discovery requests at issue in this Motion — Oracle's May 18, 2009 subpoena to Rimini Street and the desired further answers to the questions Oracle asked Ravin at his May 21, 2009 deposition — were not propounded by Oracle until *seven weeks after* Judge Laporte's April 2, 2009 order. *See* Motion at 8-9. Accordingly, Judge Laporte could not have made any findings of relevance regarding the specific requests that had not yet been propounded to Rimini Street.

Second, the only issue briefed by the parties was the appropriate *length* of Ravin's deposition. While counsel for Ravin was invited to appear at the discovery conference to address Oracle's request that the parties be given 14 hours to complete Ravin's deposition, neither Ravin nor the parties briefed the appropriate *scope* of Ravin's testimony, as it was premature. Thus, the

---

[8] Rimini Street understands that SAP contests Oracle's damages theories in the SAP Litigation, and has recently moved for summary judgment with respect to at least one of the theories. *See* Docket # 447 in Case No. 07-cv-01658-PJH (N.D. Cal.).

1  only "finding" that Judge Laporte made was that Ravin could sit for 10.5 hours of deposition.

2  *See* Levin Decl., Exs. S (3/31/09 transcript) at 18:8-14 & T (4/02/09 Order).

3      Third, as both Oracle's counsel and Judge Laporte recognized at the March 31, 2009

4  hearing, Levin Decl., Ex. S at 22:10-14, Judge Laporte did not have jurisdiction to affect the

5  scope of the Ravin subpoena, which issued out of the District of Nevada. So any "findings" by

6  the California court would, in any event, be non-binding.

7      While Judge Laporte indicated at the discovery conference that "the Rimini thing *seems*

8  to have ***some*** relevance" and stated in her order following the discovery conference that "***some***

9  testimony" regarding Rimini Street "***appears***" relevant, Judge Laporte ***did not*** indicate what, if

10  anything, was relevant concerning Rimini Street's business model or technical operations. *See*

11  Levin Decl., Ex. S at 18:18; Ex. T (emphasis added).

12      Accordingly, Oracle's suggestion that the California court has already ruled on the

13  relevance of the May 2009 Discovery at issue here is erroneous. As the Federal Circuit held in

14  *Micro Motion*, an ancillary court should not defer to the court in the main action where – as here

15  -- that court has not given "meaningful consideration" to the specific relevancy issue. *Micro*

16  *Motion*, 894 F.2d at 1324, 1325. The Federal Circuit found discovery directed to whether a non-

17  party infringed was not relevant, and that the ancillary court's failure to require a stronger

18  showing of relevance — in apparent deference to the court in the main action[9] — was an abuse

19  of discretion. *Micro Motion*, 894 F.2d at 1324, 1325.

20      While Rimini Street respectfully suggests that, as in the *Micro Motion* case, this Court

21  should make its own relevance determination, Rimini Street notes that Judge Laporte has

22  expressed general skepticism with respect to the damages theories that the parties have used to

23  justify other discovery regarding third party support providers. At a February 10, 2009 hearing,

24  Judge Laporte stated that she found the lost profits "causation argument . . . not very convincing

25

26      [9] In the *Micro Motion* case, the trial court had generally authorized the reopening of damages discovery with respect to the non-party. *Id.* at 1325. Nonetheless, the Federal Circuit found that the court deciding the motion to quash should have required a proper showing of relevance with respect to the specific discovery requests. *Id.* at 1324-25.

27

28

1 and sort of baffling." Levin Decl., Ex. U at 38. While Judge Laporte stated she believed that

2 *where* TomorrowNow's customers went after TomorrowNow shut down in 2008 "has some

3 relevance to damages," *id.* at 48:18, she also stated "I don't think it has a whole lot of relevance,"

4 *id.* at 48:6; *see also id.* at 38.[10]

5 While Rimini Street does not concede the relevance of information concerning *where*

6 TomorrowNow customers went following TomorrowNow's shut down, Rimini Street

7 nonetheless has provided discovery on this topic. Ravin testified at his deposition regarding the

8 number of former TomorrowNow customers who switched to Rimini Street, *see* Russell Decl.,

9 Ex. D at 256-57, thus satisfying whatever relevance there might be to this theory.

10

     **2.    Under the Applicable Copyright Damages Case Law, the Details of Rimini Street's Operations — or Other Information Related to Whether Rimini Street Infringes Oracle's Copyrights — Are Not Relevant**

11

12

13 The sole basis of relevance asserted for the Discovery is in connection with Oracle's

14 prayer for lost profits damages under its copyright claim. However, Oracle has wholly failed to

15 show how — under any cognizable lost profits damages theory — the alleged infringement of a

16 *non-party* matters.

17 Under Section 504(b) of the Copyright Act, a plaintiff is entitled to recover, among other

18 things, "the actual damages suffered by him or her as a result of the [defendant's] infringement."

19 As stated in the leading copyright treatise, "plaintiff's damages may be said to equal the profits

20 that the plaintiff might have accrued *but for the defendant's infringement.*" 4 Nimmer on

21 Copyright, § 14.02[A][1] at 14-14 (emphasis added). Moreover, lost profits may only be

22 recovered when the plaintiff can demonstrate a "legally sufficient causal link between the

23 [defendant's] infringement and the subsequent indirect profits." *Polar Bear*, 384 F.3d at 709.

24

25     [10] Rimini Street notes that, following the February 10 hearing, in a February 11, 2009 order
26 Judge Laporte permitted SAP to take certain very limited "non-burdensome" discovery of Oracle regarding its partnership program, which SAP contended was relevant to Oracle's "reasonable royalty" theory of damages. Levin Decl., Ex. V. In that order, Judge Laporte made no rulings
27 regarding the relevance of the *legality* of third party support providers such as Rimini Street.

28

1  "[M]ere speculation does not suffice to link the losses to the infringement." *Polar Bear*, 384

2  F.3d at 710; *see also Hamil Am., Inc. v. GFI*, 193 F.3d 92, 108 (2d Cir. 1999).

3      The authority cited by Oracle does not hold otherwise. It merely states the general test

4  for lost profits damages, which, as shown above, is concerned with the damages caused by the

5  ***defendant's*** infringement. Rimini Street is unaware of any copyright cases considering whether

6  ***non-party competitors*** infringe to be relevant to the damages owed by a defendant. Oracle is

7  apparently not aware of any such case either; Oracle previously represented to the California

8  court:

9      Defendants cite no legal support for the argument — and Oracle is aware of none — that
       Defendants can deduct what they speculate could be "inevitable" losses from the
10     calculation of copyright damages. . . . Defendants' speculation that customers would
       have left Oracle regardless of [Defendants'] unlawful acts is not a defense to any of the
11     claims here.

12  Levin Decl., Ex. W at 16. Even if "inevitable" losses were a defense to a lost profits damages

13  claim, Oracle has not cited — and Rimini Street is not aware of — any copyright cases

14  precluding such a defense because the losses were to a third party who is alleged to have

15  committed its own acts of infringement.

16      Nonetheless, Oracle baldly asserts that SAP's damages theory "rests on the assumption

17  that the Rimini [Street] business model is legal and that Rimini [Street] is a legitimate alternative

18  destination for these customers." Motion at 4. Not so. It appears SAP's damages theory rests

19  simply on the premise that if Oracle would have lost sales even in the absence of

20  ***TomorrowNow's*** alleged infringement, Oracle is unable to prove the lost profits that would

21  "have accrued *but for the **defendant's** infringement*." There is no support for the theory that a

22  copyright owner may recover lost profits damages "but for" the existence of ***any non-party*** who

23  it may establish infringes.

24      Accordingly, Oracle is not permitted to use hypothetical damages theories in its suit

25  against SAP to see how many other possible copyright infringement cases it can establish. To

26  the extent a plaintiff can establish that non-parties infringe its copyrights, the plaintiff has an

27  adequate remedy: it can bring lawsuits against such entities and seek damages caused by such

28  third party infringement in those suits. Absent that, whether a non-party infringes simply has

1  nothing to do with the damages owed by a defendant.  Thus, the legality of Rimini Street's

2  operations is not relevant here.

3                                    *      *      *

4      Because discovery concerning the legality of Rimini Street's operations is wholly

5  irrelevant — as the parties agree, and as compelled by copyright case law — Oracle's motion to

6  compel should be denied.  *See Cacique*, 169 F.3d at 622-23.

7      **C.    Even if Some Level of Relevance Could Be Established, the *Micro Motion*
          Decision Compels Rejecting Oracle's Attempt to Try Rimini Street *In*
8          *Absentia* in the SAP Litigation**

9      As discussed in Section III.B above, discovery into whether a non-party infringes is

10  wholly irrelevant to copyright damages.  However, even if some relevance could be shown,

11  discovery will not be permitted if the harm to the person from whom the discovery is sought

12  outweighs the need of the party seeking the discovery.  *See* Fed. R. Civ. P. 26(b)(1); *Micro*

13  *Motion*, 894 F.2d 1323.  In a number of analogous situations, courts have precluded discovery

14  seeking confidential information regarding non-party competitors.  *See id.* at 1324-28.[11]

15      The Federal Circuit's decision in *Micro Motion* is instructive.  Like Oracle here, the

16  plaintiff Micro Motion sought discovery from a non-party (K-Flow) claiming whether it

17  infringed was relevant to rebutting the defendant's defense to a lost profits damages theory.[12]

18

19      [11] *See also Katz*, 984 F.2d at 424-25 (citing *Micro Motion* and holding that the subpoenaed
     information from a non-party was not relevant to the pending litigation); *Am. Metal Prods. Co. v.*
20   *Gutter Topper, Ltd.*, No. M 8-85, 1997 WL 666291, at *1-2 (S.D.N.Y. Oct. 24, 1997) (citing
     *Micro Motion* and denying a motion to compel claiming relevance based on lost profits
21   argument); *Fort James Corp.* 1998 WL 709813, at *2 (citing *Micro Motion* for the principles
     that a damages theory for lost profits and a protective order between the main parties is not
22   sufficient to establish that the documents requested of a non-party are relevant to the pending
     litigation); *Heraeus Inc. v. Solar Applied Material Tech. Corp.*, No. 06-01191, 2006 WL
23   2067859, *2 (N.D. Cal. July 24, 2006) (citing *Micro Motion* and holding that "the potential
     relevance on which [plaintiff] relies is too speculative, ill-defined, and tangential to support
24   discovery of critical competitive information of this nature from a non-party competitor");
     *Trading Techs. Int'l, Inc. v. eSpeed, Inc.*, No. 04 C 5312, 2006 WL 3541933, at *1-2 (N.D. Ill.
25   Dec. 5, 2006) (same).

26      [12] Notably, the *Micro Motion* case involved a ***patent*** infringement claim, not a copyright
     claim.  Under the applicable law concerning lost profits damages in patent cases, courts have
27   recognized the potential relevance of whether there were acceptable "noninfringing" substitutes
     to the patented product.  *See Micro Motion,* 894 F.2d at 1322.  Thus, unlike the SAP Litigation,
28   which involves a ***copyright*** claim, in *Micro Motion* there was at least a plausible argument that
                                                                                          (continued...)

1  *See Micro Motion,* 894 F.2d at 1322-23. Through its subpoena, Micro Motion sought

2  confidential technical information from the non-party, including information regarding the

3  "configuration and operation" of each of the non-party's competing products, as well as

4  documents relating to "comparisons of" the non-party's products to those of the plaintiff and

5  defendant, hoping to establish that the non-party infringed. *Id.* at 1320-21, 1327. The non-

6  party's motion to quash was denied in relevant part by the district court. *Id.* at 1321. On appeal,

7  the Federal Circuit reversed the denial, holding that Micro Motion had failed to establish the

8  relevance of the requested information. In a detailed analysis, the court addressed many of the

9  same issues present in the instant case:

10  First, as further discussed in Section IV *infra*, the Federal Circuit rejected the argument

11  by Micro Motion (similar to Oracle's argument here) that the protective order entered into by the

12  plaintiff and defendant obviated the non-party's objections to discovery, holding that a

13  "protective order is not a substitute for establishing relevance or need." *Id.* at 1325. The Federal

14  Circuit reasoned that any confidential information supplied by the non-party to the competitor

15  parties would be at risk, especially because the non-party would have no means to control or

16  enforce the terms of the protective order. *Id.*

17  Next, the Court held that a possible lost profits damages theory did not make relevant

18  discovery regarding the non-party. *Id.* at 1325-27 ("Micro Motion's assertion of a claim for

19  damages or even lost profit damages in itself does not provide a mantle of relevancy with respect

20  to all of the information it sought from K-Flow."). The court held that if the plaintiff's lost

21  profits damages theory were sufficient to justify discovery into whether a non-party infringes, a

22  plaintiff "could, in virtually every infringement suit, immediately obtain discovery from all

23  possible competitors by merely filing a complaint asking for damages against one." *Id.* at 1324-

24  25.

25  _____

26  (...continued from previous page)
   discovery into whether a non-party competitor infringes should be allowed as part of damages

27  discovery. Thus, any ***patent*** cases ***permitting*** discovery into whether a third party infringes are
   distinguishable, as there is at least a possible argument for relevance in such cases.

28

NON-PARTIES RAVIN AND RIMINI STREET'S                      -17-                                    3782771_3.DOC
OPPOSITION TO MOTION TO COMPEL
CASE NO.: 2:09-CV-01591 KJD (GWF)

1   The Court further reasoned that if Micro Motion brought a suit directly against the non-

2   party "on a mere suspicion of infringement," discovery would not be allowed without more.  *Id.*

3   at 1327.  The Court rejected Micro Motion's argument that discovery might ***uncover*** a legitimate

4   claim, holding that "discovery rules are designed to assist a party to prove a claim it reasonable

5   believes to be viable ***without discovery***, not to find out if it has any basis for a claim."  *Id.*

6   (emphasis in original).  The Court noted that the mere fact that the non-party was in the same

7   business as the plaintiff at best provided plaintiff with some suspicion of infringement, but it was

8   insufficient to justify intrusive discovery into that subject matter.  *Id.*  Because the plaintiff in

9   *Micro Motion* did not have a valid Rule 11 basis for alleging infringement, it was not entitled to

10   use the vehicle of a non-party subpoena to obtain discovery for purposes of determining whether

11   or not there was infringement.  *Id.*

12   Just as the plaintiff in *Micro Motion* was not permitted to pursue discovery regarding

13   alleged infringement by a non-party to rebut a speculative damages theory it claimed the

14   defendant would assert, here too Oracle should not be permitted to conduct such discovery.  Nor

15   should Oracle be permitted intrusive discovery based merely on its apparent "suspicion of

16   infringement" — consisting of such "evidence" as the fact that Rimini Street offers its services at

17   a discount, or innocuous statements by Ravin to the effect that the general services previously

18   offered by TomorrowNow (which have not even been found to infringe in the underlying

19   litigation) are similar to the current offerings of Rimini Street.  *See* Motion at 4, 13:15; *cf.* Ravin

20   Decl., ¶¶ 9-10.

21   Because Oracle should not be permitted to "engage in merely speculative inquiries in the

22   guise of relevant discovery," *Micro Motion*, 894 F.2d at 1328, Oracle's motion should be denied.

23   **D.      Oracle's Requests Should Be Denied As Improper Pre-Litigation Discovery**

24   Oracle's Motion should be denied for the additional reason that the requests are seeking

25   improper pre-litigation discovery.

26   As noted in Section II.C above, Oracle executed its subpoenas for Ravin and two other

27   Rimini Street executives ***the very same day*** that Oracle concluded discussions with Rimini Street

28   aimed at obtaining information for a possible claim against Rimini Street.  Given this timing, it is

NON-PARTIES RAVIN AND RIMINI STREET'S                    -18-                                3782771_3.DOC
OPPOSITION TO MOTION TO COMPEL
CASE NO.: 2:09-CV-01591 KJD (GWF)

1   apparent that Oracle served the requests in the SAP Litigation not for use in that action, but for

2   the improper purpose of fishing for information Oracle hoped it could use in a separate action

3   against Rimini Street. Even if Oracle were able to establish some degree of relevance (which it

4   cannot), the Court should not allow Oracle to use the discovery rules to solicit pre-complaint

5   discovery from the Non-Parties.

6       "The discovery rules are designed to assist a party to prove a claim it reasonably believes

7   to be viable without discovery, not to find out if it has any basis for a claim." *Micro Motion*, 894

8   F.2d at 1327; Fed. R. Civ. P. 26(b)(1). "[I]n a circumstance involving direct competitors, caution

9   must be used in pre-litigation discovery devices to limit the potential that discovery directed to

10   non-parties is used for the improper purpose of obtaining proprietary information of the

11   competitor." *Ultimate Timing LLC v. Simms*, No. 3:09-mc-6RLYWGH, 2009 WL 1148056, at

12   *2 (S.D. Ind. Apr. 28, 2009) (granting motion to squash a subpoena where plaintiff sought

13   discovery from a non-party competitor in a patent matter where the plaintiff had sent the non-

14   party "cease and desist letters" and accused the non-party of infringement).

15       Here, as in *Ultimate Timing*, Oracle's pre-litigation discovery should be prohibited.

16   Oracle and Rimini Street are direct competitors. Oracle has exchanged correspondence with

17   Rimini Street suggesting that Oracle may be interested in investigating, and possibly pursuing, a

18   potential claim against Rimini Street. *See* Sections I, II.C, *supra*. The timing of the initial Ravin

19   subpoena is telling evidence that Oracle is merely using the SAP Litigation as a vehicle to pursue

20   discovery for another purpose. Given these facts, and given that Rimini Street is not adequately

21   protected by the protective order between Oracle and SAP (as further discussed below), Oracle's

22   attempt to obtain improper pre-litigation discovery should be denied.

23       **E.**    **Oracle's Specific Requests Are Not Relevant to the Underlying Litigation,
           and Are Proprietary and/or Burdensome**

24

25       As discussed above, the legality of Rimini Street's services — Oracle's stated line of

26   relevance in the Motion — is not germane to any issue in the SAP Litigation as a general matter.

27   Accordingly, to the extent that — as Oracle contends — each of Oracle's discovery requests is

28   deemed to relate to the legality of Rimini Street's services, then the requests are all irrelevant.

1   Nonetheless, even when each of the discovery requests at issue here is analyzed on its own

2   merits (or lack thereof), it is even more apparent that the requests (a) are irrelevant, (b) are

3   unduly burdensome, and/or (c) seek proprietary and trade secret information. As such, the

4   requests should be denied under Fed. R. Civ. P. 26(b)(1). *See Micro Motion*, 894 F.2d at 1326-

5   27.

6               **1.    Document Request No. 1: The Details of Rimini Street's "Business**

7                      **Model" Are Not Relevant, Are Incredibly Burdensome, and Involve**
                      **Rimini Street's Core Trade Secrets**

8   Oracle has failed to establish the relevance of the first request for "documents sufficient

9   to show Rimini Street's business model." Oracle's sole relevance argument is its assertion that

10   Defendants have "thrust" Rimini Street's business model into the damages question related to the

11   underlying litigation, and that SAP's damages theory fails if Rimini Street operates in the "same

12   infringing way" as TomorrowNow. Motion at 12. As discussed above, whether Rimini Street

13   infringes is not relevant. Nor is it clear how discovery into Rimini Street's "business model"

14   will provide evidence relating to the alleged infringement.[13]

15   Depending on how one interprets this request, there are also additional relevance, burden,

16   and trade secret problems.[14]

17

18   [13] Oracle quotes snippets from an interview in which Ravin makes general comparisons of the services offered by TomorrowNow and Rimini Street. *See* Motion at 13. Nothing in these

19   quotations — or any other evidence cited by Oracle — even begins to suggest that Rimini Street is engaged in any infringing activities. *See* Ravin Decl., ¶ 5.

20   [14] Oracle does not define "business model" in the Rimini Street subpoena. It could be interpreted in at least a couple of different ways:

21       • One definition of "business model," available from a leading online dictionary site,

22         provides: "[A] design of the operations of a business which focuses on how revenue will be generated . . . Example: A restaurant's business model is to make money by

23         cooking and serving food to hungry customers." Levin Decl., Ex. X
      • Oracle provided a different — and likely overbroad — definition of "Business

24         Model" as part of the document requests accompanying the Ravin subpoena (which requests are not at issue in the Motion):

25           any framework for creating economic, social, and/or other forms of value, including a broad range of informal and formal descriptions to represent core

26           aspects of a business, including purpose, offerings, strategies, infrastructure, organization structures, trading practices, and operational processes and policies;

27           and the method of doing business by which a company can sustain itself and generate revenue.

28                                          (continued...)

1    Under a narrower definition of "business model" (*see* note 14 *supra*), Rimini Street

2    submits that the materials produced by Rimini Street,[15] and the testimony provided by the Rimini

3    Street witnesses, are "sufficient to show" generally how Rimini Street provides its services and

4    "how revenue [is] generated."[16] As such, Rimini Street has complied with this request, and there

5    is nothing to compel.

6    Under a broader definition of business model, Oracle's request is clearly overbroad and

7    unduly burdensome. While the "sufficient to show" limitation would ordinarily circumscribe a

8    request, in the context of a subjective, non-quantifiable concept like a "business model," it is

9    unclear what would be "sufficient." If Rimini Street is required to provide documents

10    adequately describing every single aspect of its "infrastructure," its "processes," and its

11    "policies," among other aspects of Oracle's broad definition, this would be a herculean effort.

12    Given that Rimini Street has nearly one hundred and fifty employees located around the world,

13    and provides a wide range of services to each of its more than two hundred customers, each of

14    whom receives unique deliverables, providing documents "sufficient to show" Rimini Street's

15    "infrastructure," "processes," and "policies" would also impose an enormous and undue burden

16    on Rimini Street. Ravin Decl., ¶ 12.

17    The request is separately objectionable because it calls for Rimini Street's most

18    confidential and proprietary trade secrets. To the extent the request requires Rimini Street to

19

20    (...continued from previous page)
          Russell Decl., Ex. K at 4. Oracle's definition appears to be taken from an entry from
          the Wikipedia web site, an on-line, user-edited encyclopedia. *See* Levin Decl., Ex. Y

21

22    [15] Oracle asserts that by agreeing to provide documents in response to this request, Rimini
Street "acknowledged that its business model is relevant to some extent." *See* Motion at 13:9.
Nonsense. Rimini Street served written objections to the requests, which included relevance

23    objections. *See* Levin Decl., Ex. M. Producing some discovery subject to one's objections in the
hopes of avoiding a discovery dispute does not waive one's objections, or constitute an

24    "acknowledge[ment]" as to relevance.

25    [16] *See, e.g.*, Russell Decl., Ex. F at RS-ORACLE 0012-13 (describing, among other things,
how Rimini Street provides full 24x7x365 support on various listed product lines, including fixes

26    and tax and regulatory updates, support for customizations, a more responsive level of service,
no requirement of upgrades, all at prices that save clients at least 50% on annual support costs

27    compared to Oracle Annual Support); *see also, e.g.*, Levin Decl., Ex. Z (Ravin Tr.) at 200:11-20,
203:2-204:10 (generally describing the services Rimini Street offers to generate revenue).

28

1   define each of its "strategies," describe its entire "infrastructure," and catalogue at a detailed

2   level its many "operational processes" (among other things), this request goes to the heart of

3   Rimini Street's trade secrets.  The proprietary details of how Rimini Street generates its revenue

4   are precisely what provides Rimini Street with its competitive advantage.  Rimini Street has gone

5   to great lengths to protect these trade secrets, in which it has invested substantial money and

6   resources, and requiring Rimini Street to turn over such information to Oracle and SAP could

7   substantially harm Rimini Street.  Ravin Decl., ¶ 13.  As a competitor to both Oracle and SAP,

8   Rimini Street should not be required to produce its confidential and proprietary business and

9   technical documents, especially given the lack of relevance.  Speculation as to what defendants

10  may argue at trial regarding damages is not enough to warrant such intrusive discovery of a

11  competitor.  *See Micro Motion*, 894 F.2d at 1328; *see also Trading Techs. Int'l*, 2006 WL

12  3541933, at *2.[17]

13                      **2.      Document Request No. 2:  Rimini Street's Automated Software Tools
                                  Are Not Relevant, And Are Potentially Proprietary And Burdensome**

14

15          In its Motion, Oracle has provided no argument — let alone any factual or legal basis —

16  to demonstrate how documents relating to Rimini Street's "automated tools" are supposedly

17  relevant to the underlying litigation.  *See* Motion at 11-14 (lacking even a mention of "automated

18  tools").  As Oracle has failed to meet its burden under Federal Rule of Civil Procedure 45(c)(3)

19  with respect to Oracle's second document request to Rimini Street, this request should be

20

21

22

23          [17] Although unclear what this has to do with Rimini Street's "business model," the first
    document request additionally purports to seek information regarding "whether Rimini Street
24  currently relies or ever has relied on copies of customer's licensed Oracle software to provide
    software support."  Rimini Street submits that this information is irrelevant for the reasons
25  discussed in Section III. B & C, as it is propounded for the purpose of exploring whether Rimini
    Street may be infringing Oracle's copyrighted works.  Moreover, even if the legality of Rimini
26  Street's offerings were relevant (and it is not), whether or not Rimini Street relies on Oracle's
    copyrighted works to service customers — who are permitted to authorize third parties such as
27  Rimini Street to use such works — does not establish copyright infringement, and therefore the
    requested information could not be used to determine whether there is infringement.

28

1   denied.[18]  *See Katz*, 984 F.2d 422, 424-25; *Nugget Hydroelectric,* 981 F.2d at 438-39; *Fort*

2   *James Corp.*, 1998 WL 709813, at *2.

3          Were Oracle to have argued that this request is relevant to whether Rimini Street's

4   services are infringing (and it is not clear how it relates to this), as discussed above, whether

5   Rimini Street infringes is simply not relevant to the damages SAP potentially owes.  And to the

6   extent this request seeks information concerning proprietary internal software tools and

7   processes, Rimini Street maintains the confidentiality of its internal software tools and processes,

8   which are valuable trade secrets of the company.  Ravin Decl., ¶ 14.  To the extent the request

9   calls for discovery concerning every time Rimini Street has used any software tools for the

10  benefit of a customer, this request could additionally be very burdensome, as Rimini Street

11  provides customized deliverables and services to each of its hundreds of customers.  *Id.*  Sharing

12  proprietary and potentially burdensome Rimini Street trade secrets with Rimini Street's two

13  principal competitors would impose an undue burden on Rimini Street and cause potentially

14  significant loss of value in Rimini Street's proprietary know-how, Ravin Decl., ¶¶ 11-17, and

15  should not be permitted.

16                    **3.      Document Request No. 3: Rimini Street's "Checklists" Are Irrelevant
                              and Potentially Proprietary and Burdensome**

17

18         Oracle has also failed to provide a factual or legal basis to support how the requested

19  "checklists" are relevant to the underlying litigation.  Similar to its argument concerning Rimini

20  Street's business model, Oracle relies only on speculation to support its contention that the

21  checklists are relevant.  Oracle claims that the checklists "may" reveal certain information that

22  could be relevant to whether Rimini Street is infringing Oracle's copyrights.  Motion at 12.

23  Despite the fact that any alleged infringement by Rimini Street is not relevant to the underlying

24  litigation, the possibility that the checklists "may" identify some speculative occurrence is not

25

26          [18] Rimini Street notes that Oracle should not be permitted to address in its Reply Brief this

27  topic — or any other topic — not addressed in Oracle's opening brief, as Rimini Street will not
    have an opportunity to respond.

28

1 enough to support Oracle's argument that the checklists are relevant.[19] *See Micro Motion*, 894

2 F.2d at 1326-27.

3      Additionally, Rimini Street's proprietary processes used to develop, test, package and

4 deliver its services are company trade secrets, and are critical to Rimini Street's competitive

5 advantage. Ravin Decl., ¶ 15; Declaration of Beth Lester ("Lester Decl.") ¶¶ 9-10. Rimini Street

6 offers a competitive advantage over Oracle and other competitors because it is able to

7 consistently release to its customers new tax and regulatory updates **before** Oracle and other

8 competitors are able to do so, and with what many clients believe is higher quality. Ravin Decl.,

9 ¶¶ 5, 15. It is therefore not surprising Oracle would want to obtain discovery into those

10 processes.

11      Moreover, to the extent this request calls for **all** checklists or "**other documents**" used to

12 track the development, testing, documentation, packaging, or delivery of tax updates, this would

13 encompass a massive volume of materials over a long time span, and would be burdensome to

14 collect. Lester Decl., ¶¶ 6-7.

15      Balanced against the complete lack of relevance, Oracle's unduly burdensome request for

16 these highly proprietary documents should be denied. *See Micro Motion*, 894 F.2d at 1325.

17           **4.**     **The Further Deposition Testimony Oracle Seeks From Ravin Is Not Relevant to the Underlying Litigation, Is Highly Proprietary, and**

18                **Could Open the Door to Additional Burdensome Discovery**

19      Nor should Oracle be permitted to re-open the Ravin deposition to pursue its suspicions

20 of alleged infringement against Rimini Street. The parties already spent approximately seven

21 hours deposing Ravin on May 21, 2009. Levin Decl., ¶ 31, Ex. S. During that time, in addition

22 to providing testimony regarding his time at TomorrowNow, Ravin provided substantial

23                [19] Incredibly, Oracle suggests Rimini Street waived its objections to the requests for

24 checklists at Beth Lester's deposition. Motion at 13:1-4. Not so. Allowing Ms. Lester to provide generalized foundational testimony as to the likely **existence** of a class of documents is

25 not a concession the documents are relevant, or that Rimini Street has waived confidentiality objections regarding the documents themselves. Indeed, failure to object to relevance at a

26 deposition does not waive the objection. *See* Fed. R. Civ. P. 32(d)(3)(A) ("An objection to . . . relevance . . . is not waived by a failure to make the objection before or during the deposition,

27 unless the ground for it might have been corrected at that time."); *In re Stratosphere Corp. Securities Litig.*, 182 F.R.D. 614, 618 (D. Nev. 1998).

28

1   testimony concerning Rimini Street, notwithstanding its irrelevance. For example, Ravin

2   testified as to the number of customers Rimini Street has, the number of support personnel, the

3   product lines it supports, the types of services it offers, the number of former TomorrowNow

4   customers it supports, among other things. Levin Decl., Ex. Z. Even if Judge Laporte's

5   statement that "some" Rimini Street testimony "may be relevant" (*see* 13 *supra*) were controlling

6   here, Ravin has already provided sufficient testimony.

7        Nonetheless, Oracle now seeks an additional two hours to further question Ravin on the

8   details of Rimini Street's business model, the technical operation of Rimini Street, Rimini

9   Street's development and testing environments, and Rimini Street's intellectual property policies,

10   as well as unspecified follow-up questions "flowing" from Ravin's answers. Motion at 14. As

11   demonstrated *supra* at 9-20, this information — which is being sought for the purposes of

12   exploring whether Rimini Street infringes Oracle's copyrights — is irrelevant, and constitutes

13   improper pre-litigation discovery. As such, further testimony should not be ordered. *See Micro*

14   *Motion*, 894 F.2d at 1328 (quashing deposition subpoena seeking information regarding non-

15   party's infringement). Moreover, as discussed in Sections III.E.1-3 above, inquiries into Rimini

16   Street's technical operations get at Rimini Street's highly confidential technical information and

17   other trade secrets, and should therefore not be permitted. *See Micro Motion*, 894 F.2d at 1328.

18        While two additional hours of testimony may not be burdensome on its own, to the extent

19   this court allows Oracle to conduct the Discovery, SAP has already indicated that it needs to be

20   permitted to conduct follow-up discovery. Once this door has been opened, Rimini Street is

21   skeptical that the parties will be satisfied that the issue of alleged infringement — which has

22   been the subject of more than 300 hours of deposition testimony of TomorrowNow witnesses in

23   the SAP Litigation — can be fully explored within reasonable limits. *See* Levin Decl. Ex. G.

24   Allowing such further discovery could result in the "quagmire" of multiple "mini-infringement

25   trials on each competing product" that the *Micro Motion* court warned against. *See Micro*

26   *Motion*, 894 F.2d at 1324. As the *Micro Motion* court further noted, the "doors of the discovery

27   process may not be so easily opened." *Id.* at 1325.

28

**IV. THE PROTECTIVE ORDER IN THE UNDERLYING LITIGATION BETWEEN ORACLE AND SAP IS NOT A SUBSTITUTE FOR ESTABLISHING RELEVANCY FOR FURTHER NON-PARTY DISCOVERY, AND IS IN ANY EVENT INADEQUATE**

Oracle would have this Court believe that Rimini Street should not be concerned about producing the Discovery because there is an adequate protective order in place in the SAP Litigation. *See* Motion at 9, 13-14. That is not the case.

As a preliminary matter, as the Ninth Circuit held in the *Cacique* case, a protective order "does not absolve [plaintiff] from showing that the information sought is relevant." *Cacique,* 169 F.3d at 622-23. Rather, a protective order's purpose "'is to prevent harm by limiting disclosure of *relevant and necessary* information.'" *Id.* (emphasis in original) (citation omitted); *see also Micro Motion*, 894 F.2d at 1325. Accordingly, Rimini Street submits that it should not be required to produce the Discovery under *any* protective order, regardless of the safeguards built into it.

To the extent this Court concludes that at least some further confidential Rimini Street information should be disclosed, Rimini Street submits that, for a number of reasons, the protective order in place in the litigation between Oracle and SAP is wholly inadequate to protect Non-Party Rimini Street's interests.

First, the parties to the protective order are Oracle and SAP, Rimini Street's two principal competitors, and Rimini Street has no standing to enforce the order. As noted by the Federal Circuit in *Micro Motion*:

> It would be divorced from reality to believe that either party here would serve as the champion of its [non-party competitor] either to maintain the confidentiality designation or to limit public disclosure as much as possible during trial. [The non-party] would, in fact, lose all control of the situation since disclosure of its information depends on the action by a court before whom it has no standing.

894 F.2d at 1325; *see also Fort James Corp.*, 1998 WL 709813, at *2. Thus, the protective order hardly provides Rimini Street with any comfort that any valuable trade secrets it might produce will be protected. Unless the protective order could be modified so that Rimini Street could be given full knowledge as to how its materials are being used, and an opportunity to oppose such usage, the protective order will not afford Rimini Street with the necessary protections.

1    Second, the current protective order does not allow a party to designate information so

2    that Oracle or SAP employees may not have access to it.  Rather, it provides that Oracle and SAP

3    may each designate two in-house attorneys who have direct access to even materials designated

4    "Highly Confidential," such as trade secrets.  *See* Russell Decl., Ex. N at 7.

5    The first Oracle employee with access to such materials is Dorian Daley, Oracle's Senior

6    Vice President, General Counsel, and Secretary.  The other individual Rimini Street understands

7    to be covered under the order was one of the attorneys involved in the discussions that took place

8    between Oracle and Rimini Street, Levin Decl., ¶ 34, and would thus likely be involved in

9    deciding whether to pursue any future potential action against Rimini Street.  Providing such

10   Oracle representatives with access to Rimini Street's highly confidential information would

11   enable Oracle to use such information for purposes other than the SAP Litigation.  In its Motion,

12   far from assuring the court that Oracle's counsel would not use materials obtained in the SAP

13   Litigation for any other purpose, Oracle's counsel instead states that it should be entitled to the

14   Discovery "regardless of where else that discovery might lead." Motion at 5:6.[20]

15   When the parties met and conferred to discuss these discovery issues, Oracle refused to

16   preclude its in-house counsel from viewing Rimini Street's highly confidential documents.  *See*

17   Levin Decl., ¶ 34.  As such, any confidential information supplied by Rimini Street to its

18   competitors — Oracle and SAP — would be at risk, especially because Rimini Street would have

19   no means to control or enforce the terms of the protective order in a suit where it is not a party.

20   Contrary to Oracle's suggestion, *see* Motion at 9, 14, Judge Laporte has not ruled on —

21   much less "rejected" — Rimini Street's arguments concerning the adequacy of the protective

22

23

24   [20] After Ravin testified at his deposition as to the names of Rimini Street's confidential
     investors (Rimini Street is a private company that does not publicly disclose such information),
25   Ravin's counsel requested that Oracle voluntarily agree not to share with its in-house counsel
     this information, which could not possibly have any relevance even under the arguments Oracle
26   asserts in this Motion. Levin Decl., ¶ 34 & Ex. AA.  Oracle refused.  *Id.* ¶ 35.  Rimini Street
     submits that this refusal to forego sharing with its in-house counsel even the irrelevant names of
27   Rimini Street's investors raises red flags suggesting Oracle should not be trusted to use any
     confidential Rimini Street discovery it obtains solely for purposes of the SAP Litigation.

28

1  order.[21]  When the issue of the protective order (which had not been briefed) came up at the

2  discovery conference, Judge Laporte stated: "I haven't thought about [it] and that was just raised

3  today and I don't have any particular position on that." Levin Decl., Ex. S at 18:21-23.  Judge

4  Laporte concurred with counsel for Ravin that any issues concerning the protective order were

5  not yet ripe for review. *Id.* at 19:4-7.  Judge Laporte further stated that she was "not prejudging

6  the issue" at that time. *Id.* at 20:5.  In her order following the conference, while Judge Laporte

7  speculated that issues concerning confidentiality "may" be satisfied by the existing protective

8  order, she ordered that the parties should "meet and confer" regarding Ravin's confidentiality

9  concerns, as the issue had not yet ripened. *See* Russell Decl., Ex. M at 2.

10       Given the inadequacy of the existing protective order, Rimini Street respectfully submits

11  that any further discovery required under the subpoenas should be produced under an amended

12  protective order which would, at a minimum:  (a) prohibit in-house attorneys at Oracle or SAP

13  from having access to Highly Confidential Rimini Street materials, such as those sought by the

14  Discovery; (b) provide Rimini Street with advance notice, and an opportunity to object, to the

15  extent any party intends to use any of the Rimini Street confidential materials in any pleading or

16  at any hearing, or otherwise disclose such materials; and (c) preclude the use in open court of any

17  Rimini Street confidential materials.

18  **V.  NON-PARTIES ARE ENTITLED TO REIMBURSEMENT OF COSTS AND
       ATTORNEY'S FEES IN OPPOSING THIS MOTION**

19

20       Rimini Street requests that this Court additionally order Oracle to reimburse Rimini

21  Street for the attorney's fees and expenses it has been forced to expend in opposing Oracle's

22  abusive and intrusive non-party discovery requests, as authorized by the Federal Rules.

23       Federal Rule of Civil Procedure 37(a)(5)(B) provides:

24       If the motion [to compel] is denied, the court . . . must, after giving an opportunity
       to be heard, require the movant . . . to pay the party or deponent who opposed the

25       motion its reasonable expenses incurred in opposing the motion, including

26      [21] Indeed, as discussed above with the relevancy issue, Judge Laporte properly recognized
       that any issues related to a Nevada subpoena (such as Ravin's deposition) would need to be

27  decided by the Nevada Court, not the California Court. *Id.* at 22:10-12.

28

attorney's fees. But the court must not order this payment if the motion was substantially justified or other circumstances make an award of expenses unjust.

A motion to compel is not "substantially justified" where "the vast bulk of legal authority [i]s against [the movant's] position, and there are no circumstances evident which would make an award of expenses unjust." *Pearce v. Club Med Sales, Inc.*, 172 F.R.D. 407, 411 (N.D. Cal. 1997); *see also Cram v. Elec. Data Sys. Corp.*, No. 07cv1842, 2008 WL 115438, at *1-2 (S.D. Cal. Jan 25, 2008). When a motion to compel is made in bad faith or is not warranted by law, an award of attorneys' fees under Rule 37(a)(5)(B) is not unjust. *See In re Shubov*, 253 B.R. 540, 549-50 (9th Cir. B.A.P. 2000).

Here, an award of fees is appropriate. As the court in *Micro Motion* recognized, the possibility that non-party discovery regarding infringement could be abused to "harass a competitor" is readily apparent. *Micro Motion*, 894 F.2d at 1324-25. Rimini Street respectfully submits that, in light of the facts and circumstances of this case, including the timing of the Ravin subpoena, *see* Section II.C *supra*, Oracle's requests were made for the improper purpose of intimidating a far smaller competitor with less financial resources than Oracle, attempting to learn valuable trade secret information about Rimini Street's successful business model and operations, and trolling for evidence of infringement against a competitor.

Moreover, Oracle has failed to demonstrate how its requests are relevant to the underlying litigation. Indeed, on at least two occasions, Oracle conceded that information concerning Rimini Street is not relevant to the underlying litigation (and has further attempted to preclude Rimini Street from obtaining some of these admissions), yet it now disingenuously bases its Motion on the purported relevance of this information. *See supra* at 9-11.

In addition, Oracle has mischaracterized statements made by the California court regarding the relevancy of the Discovery. *See supra* at 12-14. Oracle has further mischaracterized the positions taken by SAP concerning the Discovery. *See supra* at 11-12. Finally, Oracle has not cited a single authority supporting its entitlement to the Discovery based on a theory of lost profits copyright damages. *See* Motion at 11-14.

1     For the foregoing reasons, Non-Parties respectfully submit they are entitled to

2   reimbursement of costs and attorney's fees from Oracle.  *See* Fed. R. Civ. P. 37(a)(5)(B*)*;

3   *Pearce*, 172 F.R.D. at 411; *Shubov*, 253 B.R. at 549-50.

4   **VI.     CONCLUSION**

5     Oracle's attempt to obtain pre-complaint discovery into the proprietary trade secrets of

6   Non-Party Rimini Street — fishing for hoped-for evidence of copyright infringement based on

7   nothing more than its own speculation and innuendo — should be denied because it is

8   undisputedly irrelevant and because it is highly intrusive.  For the foregoing reasons, Non-Parties

9   Rimini Street and Ravin respectfully request that the Court deny Oracle's Motion to Compel and

10   award Non-Parties their attorney's fees and costs in opposing the Motion.

11

12   Dated: September 14, 2009          WILSON SONSINI GOODRICH & ROSATI
                                        Professional Corporation
13

14                                     By: /s/  Michael B. Levin
                                            MICHAEL B. LEVIN
15
                                       Attorneys for Non-Parties
16                                     RIMINI STREET, INC. AND SETH RAVIN

17

18

19

20

21

22

23

24

25

26

27

28

1  AARON D. FORD, Esq. NSBN 7704
   SNELL & WILMER LLP
2  3883 Howard Hughes Parkway, Suite 1100
   Las Vegas, Nevada 89169
3  Telephone:  (702) 784-5265
   Facsimile:  (702) 784-5252
4  Email: aford@swlaw.com

5  JONATHAN M. JACOBSON, Esq. (admitted *pro hac vice*)
   MICHAEL B. LEVIN, Esq. (admitted *pro hac vice*)
6  WILSON SONSINI GOODRICH & ROSATI
   Professional Corporation
7  650 Page Mill Road
   Palo Alto, CA 94304-1050
8  Telephone:  (650) 493-9300
   Facsimile:  (650) 565-5100
9  Email: jjacobson@wsgr.com; mlevin@wsgr.com

10 Attorneys for Non-Parties
   SETH RAVIN AND RIMINI STREET INC.
11

12              UNITED STATES DISTRICT COURT

13                  DISTRICT OF NEVADA

14
   ORACLE USA, INC, a Colorado        )   CASE NO.: 2:09-CV-01591 KJD (GWF)
15 Corporation, *et. al.*,            )
                                      )
16          Plaintiffs,               )
                                      )
17 vs.                                )
                                      )
18 SAP AG, a German corporation, *et. al.*,  )
                                      )
19          Defendants.               )
                                      )
20 _____  )

21

22              **CERTIFICATE OF SERVICE**

23       I am an employee at Wilson Sonsini Goodrich & Rosati.  I certify that I served a copy of

24 the foregoing on the 14th day of September 2009 via electronic service through the United States

25 District Court for the District of Nevada's ECF System upon each party in the case who is

26 registered as an electronic case filing user with the Clerk.

27

28                              /s/  Michael B. Levin _____

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT J

BOIES, SCHILLER & FLEXNER LLP

1999 HARRISON STREET • SUITE 900 • OAKLAND, CA 94612 • PH. 510.874.1000 • FAX 510.874.1460

**By Email and US Mail**

January 28, 2010

Jonathan M. Jacobson, Esq.
Michael B. Levin, Esq.
Wilson Sonsini Goodrich & Rosati
650 Page Mill Road
Palo Alto, CA 94304-1050

      Re:    *Oracle USA, Inc. and Oracle International Corporation v. Rimini Street,*
              *Inc. and Seth Ravin*, No. 2:10-cv-00106 (D. Nev. filed Jan. 25, 2010)

Dear Messrs. Jacobson and Levin,

      We are counsel to Oracle USA, Inc. and Oracle International Corporation
(collectively, "Oracle") in the above-referenced matter, in which Rimini Street, Inc. and
Seth Ravin are named as defendants. We understand that you represent Rimini Street and
Mr. Ravin.

      The purposes of this letter are to remind Rimini Street and Mr. Ravin that they are
obligated to identify, retain and preserve relevant evidence; to request confirmation that
they have done so since receiving the December 23, 2008 letter from Oracle's outside
counsel; and to demand that they do so (or continue to do so) now that a complaint has
been filed.

      Oracle also recognizes the need for parties to comply with their preservation
obligations while avoiding excessive burdens and disruption of their businesses.
Accordingly, we propose that we meet with you to consider a reasonable, agreed-upon
procedure and stipulation regarding preservation of documents and data that will ensure
the preservation of relevant evidence in this case, with due consideration to the relative
burdens on the parties. Please contact me to begin that discussion.

      In the meantime, Oracle demands that Rimini Street and Mr. Ravin immediately
take appropriate steps to identify, retain, and preserve documents, data, and other
evidence, as well as electronic media in their possession or control that contain data, that

BOIES, SCHILLER & FLEXNER LLP

Jonathan M. Jacobson, Esq.
Michael B. Levin, Esq.
January 28, 2010
Page 2 of 2

are relevant to Oracle's claims and any defenses Rimini Street and Mr. Ravin may assert in this case. Oracle further demands that Rimini Street and Mr. Ravin avoid spoliation of relevant documents and data. Further, this letter is notice and demand that Rimini Street and Mr. Ravin put in place appropriate safeguards to prevent destruction of relevant data, including destruction caused by Rimini Street's or Mr. Ravin's policies related to retention or destruction of electronic data, including by the failure of Rimini Street employees to preserve potentially responsive data in systems under their control (e.g., home computers used for business).

We furthermore expect that Rimini Street and Mr. Ravin will institute these obligatory identification, retention and preservation efforts for documents and evidence under Rimini Street's or Mr. Ravin's control, custody or possession, regardless whether Rimini Street or Mr. Ravin currently has actual custody of the materials.

Please confirm that Rimini Street and Mr. Ravin have undertaken, or will immediately undertake, appropriate steps to identify, retain, and preserve relevant evidence and contact me to discuss a stipulated protocol for preservation of data and documents.

Very truly yours,

Fred Norton

cc:
James C. Maroulis
Geoffrey M. Howard

# EXHIBIT K



Wilson Sonsini Goodrich & Rosati
PROFESSIONAL CORPORATION

650 Page Mill Road
Palo Alto, CA 94304-1050

PHONE 650.493.9300
FAX 650.493.6811
www.wsgr.com

WRITER'S DIRECT DIAL 650.320.4929

February 6, 2010

*VIA EMAIL AND FACSIMILE*

Fred Norton, Esq.
Boies, Schiller & Flexner LLP
1999 Harrison Street
Suite 900
Oakland, California 94612

> **Re:** *Oracle USA, Inc. and Oracle Int'l Corp. v. Rimini Street, Inc. and Seth Ravin*
> **District Court of Nevada, Case No. 2:10-cv-106**

Dear Fred:

I write in response to your January 28, 2010 letter to Jon Jacobson and me concerning document preservation. Be assured that Rimini Street and Mr. Ravin take the issue of document preservation very seriously, and that appropriate measures are in place to preserve potentially relevant materials.

While your letter focuses on the obligations of Rimini Street and Mr. Ravin, you fail to provide any assurances that Oracle has taken measures to preserve its potentially relevant documents. By this letter, we similarly seek confirmation that Oracle will adopt reasonable measures to identify and preserve all materials potentially relevant to any claims, defenses or counterclaims anticipated to be litigated in this action.

Among other categories of information, Rimini Street expects that Oracle will preserve all materials relating to Oracle's websites, including use policies, usage monitoring, website design and strategy, and issues and complaints regarding the web site; communications and contracts with customers, vendors, and partners regarding support services for Oracle's software; communications and analyses relating to third-party support providers and competitors; all Oracle servers pertaining to the software at issue, including associated usage data, server incident reports, down-time logs, and access logs. It is of course impossible for Rimini Street to delineate all categories of potentially relevant information, and by listing certain categories above Rimini Street does not intend to suggest that Oracle's preservation obligations do not extend to other categories. We fully expect that Oracle will preserve *all* categories of information potentially relevant to the parties' dispute.

With respect to the types of materials that must be preserved, they include all manners of correspondence, documents, systems, databases, programs, and other relevant data. Oracle's obligations extend to materials whether in hardcopy or stored electronically on hard drives, servers, removable media, or PDAs. Further, we expect that Oracle has adopted appropriate

Wilson Sonsini Goodrich & Rosati
PROFESSIONAL CORPORATION

Fred Norton, Esq.
February 6, 2010
Page 2

safeguards to prevent any intentional or inadvertent modification, alteration, or destruction of potentially relevant materials by its employees or consultants either in their workplaces or elsewhere.

We look forward to Oracle's confirmation that it has undertaken suitable steps to preserve potentially relevant information.  Once we have received your response, we will be happy to discuss a process for ensuring that both parties live up to their document preservation obligations.

Sincerely,

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation

Michael Levin

cc:     Geoffrey M. Howard, Esq. (via email)

# EXHIBIT L

# BOIES, SCHILLER & FLEXNER LLP

1999 HARRISON STREET • SUITE 900 • OAKLAND, CA 94612 • PH. 510.874.1000 • FAX 510.874.1460

March 16, 2010

## VIA E-MAIL & U.S. MAIL

Michael B. Levin, Esq.
Wilson Sonsini Goodrich & Rosati
650 Page Mill Road
Palo Alto, California 94304-1050

> Re: *Oracle USA, Inc. and Oracle International Corp. v. Rimini Street, Inc. and Seth Ravin*, No. 2:10-cv-00106

Dear Mike,

I write to follow up once again on my efforts to meet and confer about an agreed protocol for the preservation of relevant evidence in this case, and to advise you that unless we are able to schedule a meet and confer to take place by Friday, March 19, plaintiffs intend to seek relief from the Court.

I have written to you several times to try to schedule a meet and confer session on this issue, dating back to January 28, 2010. I understand that Geoff Howard also raised this issue with you by telephone last Wednesday, and you informed him that by Friday, March 12, you would try to provide a date for us to speak. Still, we have heard nothing.

I remind you that in your letter to me on February 6, you professed that you would be "happy" to discuss document preservation. In that letter, you stated that Rimini Street and Mr. Ravin "take the issue of document preservation very seriously, and appropriate measures are in place to preserve potentially relevant materials." Your letter also included a lengthy list of broad categories of evidence that you demanded that Oracle take "reasonable measures" to preserve, including evidence related to unspecified "defenses" and "counterclaims."

Accordingly, I would expect that as of February 6, you were in a position to explain, at the very least, (1) the "appropriate measures" that Rimini Street and Mr. Ravin already had in place, (2) what further measures they intended to employ, and (3) the defenses and counterclaims that Rimini Street or Mr. Ravin expect to assert that might implicate Oracle documents. With the benefit of the past five weeks, I would expect that you would have even better information about what the defendants have done and what

BOIES, SCHILLER & FLEXNER LLP

Michael B. Levin, Esq.
March 16, 2010
Page 2 of 2

they will do. Nonetheless, each time we have asked for a meeting, you have found reason for delay.

We need to begin this discussion as soon as possible. It is in the interest of all the parties at least to explain the measures that they have each put in place thus far, identify the further measures that each believes are appropriate, and reach agreement to the extent we can. There is no reason why we cannot start discussing those matters now.

In short, we should talk, and we should not wait any longer to do so. Please respond by close of business tomorrow, March 17, with a date and time between now and Friday, March 19 when you – or some other attorney for defendants – will be available to discuss an agreed protocol for the preservation of evidence.

If we do not hear from you, or you refuse to schedule a meet and confer session on this issue before Friday, we will have no choice but to seek relief from the Court. If you wish to discuss scheduling by telephone, I am of course available to speak with you. As you know, my direct line is 510-874-1007.

I look forward to your prompt response.

Very truly yours,

Fred Norton

cc:
James C. Maroulis
Geoffrey M. Howard
Jonathan M. Jacobson

# EXHIBIT M

# BOIES, SCHILLER & FLEXNER LLP

1999 HARRISON STREET • SUITE 900 • OAKLAND, CA 94612 • PH. 510.874.1000 • FAX 510.874.1460

**By E-mail & U.S. Mail**

March 22, 2010

Michael B. Levin, Esq.
Wilson Sonsini Goodrich & Rosati
650 Page Mill Road
Palo Alto, California 94304-1050

      Re:    *Oracle USA, Inc. and Oracle International Corp. v. Rimini Street, Inc. and
Seth Ravin*, No. 2:10-cv-00106 (D. Nev., filed Jan. 25, 2010)

Dear Mike,

      Thank you for your letter of March 17. With respect to your request that we
prepare a proposal, we need additional information to be able to ultimately enter into a
stipulation. That is one purpose of the meet-and-confer process we have been seeking for
some time. Consequently, it is not possible for Oracle to identify all of the categories of
documents and data that defendants should be preserving. In the interim, however, here
is a list of the items we would like Rimini Street and Ravin to confirm that they have
retained or preserved and will continue to do so:

1. All files downloaded from any Oracle (as used here and below including
   PeopleSoft, JD Edwards, or Siebel) source;

2. All machines on which any downloads from any Oracle source are saved;

3. All versions of any tool used to download files from any Oracle source;

4. All machines used to download files from any Oracle source;

5. All logs reflecting downloads from any Oracle source;

6. All machines and electronic files for any employee involved in any
   downloading from any Oracle source;

7. Any machines on which customer and generic environments or sandboxes
   relating to any Oracle product were created or are maintained or preserved;

8. All copies of any Oracle software or support material obtained from any
   source;

BOIES, SCHILLER & FLEXNER LLP

Michael B. Levin, Esq.
March 22, 2010
Page 2 of 2

9. All machines on which any Oracle software or support material were created or are maintained or preserved;

10. All machines and electronic files for any employee receiving, copying, or distributing any Oracle software or support material;

11. All data sources and locations containing or including all (a) Rimini Street and Ravin's contracts and communications with any actual or prospective customer provided with any supporting relating to any Oracle product; (b) communications between Rimini Street and Oracle; (c) all communications among Rimini Street employees concerning the downloading or copying of any Oracle software or support materials; (d) material obtained directly or indirectly from TomorrowNow, Inc. (including any predecessor or successor); (e) Rimini Street and Ravin regular financial, cash flow, profit/loss, revenue, budget, and expense reports; and (f) communications regarding this litigation or Oracle's litigation with SAP;

12. All machines, documents and electronic files in Ravin's possession, custody, or control; and

13. Any database(s) or other tools used to track support for any Rimini Street customer.

We note that Oracle has undertaken extensive document preservation efforts on its own, consistent with the claims in this action, its role in the relevant events, and the size and nature of its operations.

We look forward to your confirmation that all materials in the above categories have been and will be preserved.

Very truly yours,

Fred Norton

cc:

James C. Maroulis
Geoffrey M. Howard
Jonathan M. Jacobson

# EXHIBIT N



Wilson Sonsini Goodrich & Rosati
PROFESSIONAL CORPORATION

650 Page Mill Road
Palo Alto, CA 94304-1050
PHONE 650.493.9300
FAX 650.493.6811
www.wsgr.com

WRITER'S DIRECT DIAL 650.320.4929

March 17, 2010

*VIA EMAIL*

Fred Norton, Esq.
Boies, Schiller & Flexner LLP
1999 Harrison Street, Suite 900
Oakland, California 94612

> **Re:** ***Oracle USA, Inc. and Oracle Int'l Corp. v. Rimini Street, Inc. and Seth Ravin***
> **District Court of Nevada, Case No. 2:10-cv-106**

Dear Fred:

I write in response to your March 16, 2010 letter concerning document preservation.

Rimini Street remains willing to dialogue regarding the parties' preservation issues. However, a meet-and-confer in the absence of any defined dispute and in the current pre-Answer timeframe is premature and likely inefficient. Nonetheless, from Rimini Street's perspective, the parties can certainly lay the groundwork so that any preservation issues can be resolved as quickly and efficiently as possible.

To that end, in your January 28 and February 11 letters, you propose that the parties enter into a stipulation setting forth an agreed-upon procedure regarding preservation of potentially relevant documents and data. Rimini street suggests that Oracle provide its proposed written stipulation at its earliest convenience. Once Rimini Street has had a chance to evaluate Oracle's proposal, Rimini Street will provide proposed written modifications or additions. At that point, the parties can evaluate items of disagreement, if any, and meet and confer to resolve such disagreements.

I look forward to your response.

Sincerely,

Michael Levin

cc:    Geoffrey M. Howard, Esq. (via email)

AUSTIN    NEW YORK    PALO ALTO    SAN DIEGO    SAN FRANCISCO    SEATTLE    SHANGHAI    WASHINGTON, D.C.

# EXHIBIT O



www.shb.com

March 29, 2010

**Robert H. Reckers**

*Via Email*
Fred Norton, Esq.
Boies, Schiller & Flexner LLP
1999 Harrison Street, Suite 900
Oakland, California 94612

JPMorgan Chase Tower
600 Travis Street, Suite 1600
Houston
Texas 77002-2992
713.227.8008
713.546.5626 DD
713.227.9508 Fax
rreckers@shb.com

Re:   *Oracle USA, Inc. and Oracle International Corp. v. Rimini Street, Inc. and
      Seth Ravin,* No. 2:10-cv-00106 (D. Nev., filed Jan 25, 2010)

Dear Mr. Norton:

Thank you for your letter of March 22, 2010 to Mr. Michael Levin. Your list of
categories, while extremely broad, is duly noted. Based on the extensive preservation
efforts and investigation to date, Defendants Ravin and Rimini Street are preserving
information consistent with each of the categories you have identified, and consistent
with the claims and defenses in this matter.

Of course, Rimini Street asks you to confirm that Oracle will comply with its duties to
preserve evidence relevant to its claims, and Rimini Street's Counterclaims and Defenses,
paying special attention to the following non-exhaustive categories of information:

   1. The documents, programs, data and files that were allegedly improperly
      accessed, copied, or made use of by the Defendants;

   2. The machines, including computers, computer systems and/or computer
      networks, that housed the programs, data and files that were allegedly
      improperly accessed, copied, or made use of by the Defendants;

   3. Logs or other records of software shipments by Plaintiffs to Rimini Street
      or Rimini Street clients and records concerning Plaintiffs' policies
      regarding shipping software, changes to such policies and reasoning for
      these changes;

   4. Logs or other records of Defendants' alleged access of Plaintiffs'
      websites, records concerning the design and monitoring of these websites,
      records concerning the use of automated tools or "crawlers" on these
      websites and records concerning the terms and conditions for using these
      websites;

   5. Records of communications by Oracle to third parties regarding Seth
      Ravin and Rimini Street, including communications to Rimini Street's

Geneva
Houston
Kansas City
London
Miami
Orange County
San Francisco
Tampa
Washington, D.C.



www.shb.com

customers and potential customers, Oracle customers, the media, analysts and others;

March 29, 2010
Page 2

6. Records of Defendants' alleged interference with, or damage to, the integrity and functionality of Plaintiffs' computer systems and data, including all computer and network performance data for each computer allegedly interfered with or damaged;

7. Records of the terms and conditions of Plaintiffs' contracts and licenses for PeopleSoft, JD Edwards and Siebel software and for Oracle databases and copies of the contracts and licenses for these products and databases; and

8. Records of Plaintiffs' protection and enforcement of copyrights relating to PeopleSoft, JD Edwards and Siebel software.

9. Records of communications between Oracle and third parties regarding contractual terms and restrictions governing the possession and usage of Oracle software products.

We look forward to your confirmation that Plaintiffs are preserving the materials described in the categories above.

Very truly yours,

*/s/Robert H. Reckers*

Geneva
Houston
Kansas City
London
Miami
Orange County
San Francisco
Tampa
Washington, D.C.

310722v1

# EXHIBIT P

| | |
|---|---|
| 1 | BOIES, SCHILLER & FLEXNER LLP |
| | RICHARD J. POCKER (NV Bar No. 3568) |
| 2 | 300 South Fourth Street, Suite 800 |
| | Las Vegas, NV 89101 |
| 3 | Telephone: (702) 382-7300 |
| | Facsimile: (702) 382-2755 |
| 4 | rpocker@bsfllp.com |

1  BOIES, SCHILLER & FLEXNER LLP
   RICHARD J. POCKER (NV Bar No. 3568)
2  300 South Fourth Street, Suite 800
   Las Vegas, NV 89101
3  Telephone: (702) 382-7300
   Facsimile: (702) 382-2755
4  rpocker@bsfllp.com

5  BOIES, SCHILLER & FLEXNER LLP
   STEVEN C. HOLTZMAN (*pro hac vice*)
6  FRED NORTON (*pro hac vice*)
   KIERAN P. RINGGENBERG (*pro hac vice*)
7  1999 Harrison Street, Suite 900
   Oakland, CA 94612
8  Telephone: (510) 874-1000
   Facsimile: (510) 874-1460
9  sholtzman@bsfllp.com
   fnorton@bsfllp.com
10 kringgenberg@bsfllp.com

11 Attorneys for Oracle USA, Inc., Oracle
   America, Inc., and Oracle International
12 Corporation

BINGHAM MCCUTCHEN LLP
GEOFFREY M. HOWARD (*pro hac vice*)
THOMAS S. HIXSON (*pro hac vice*)
KRISTEN A. PALUMBO (*pro hac vice*)
Three Embarcadero Center
San Francisco, CA  94111-4067
Telephone:  415.393.2000
Facsimile:  415.393.2286
geoff.howard@bingham.com
thomas.hixson@bingham.com
kristen.palumbo@bingham.com

DORIAN DALEY (*pro hac vice application
to be submitted*)
DEBORAH K. MILLER (*pro hac vice*)
JAMES C. MAROULIS (*pro hac vice*)
ORACLE CORPORATION
500 Oracle Parkway
M/S 5op7
Redwood City, CA 94070
Telephone:  650.506.4846
Facsimile:  650.506.7114
dorian.daley@oracle.com
deborah.miller@oracle.com
jim.maroulis@oracle.com

13

14

15               UNITED STATES DISTRICT COURT

16                   DISTRICT OF NEVADA

17 ORACLE USA, INC., a Colorado corporation,        Case No. 2:10-cv-0106-LRH-PAL
   ORACLE AMERICA, INC., a Delaware
18 corporation; and ORACLE INTERNATIONAL           **ORACLE'S FIRST NOTICE OF**
   CORPORATION, a California corporation,          **DEPOSITION PURSUANT TO**
19                                                 **FED. R. CIV. P. 30(b)(6)**
                   Plaintiffs,
20
         v.
21
   RIMINI STREET, INC., a Nevada corporation;
22 and SETH RAVIN, an individual,

23                 Defendants.

24

25

26

27

28

1  TO:   Defendant Rimini Street, Inc., by and through its attorney of record, Eric A.
         Buresh; Shook, Hardy & Bacon LLP; 2555 Grand Blvd., Kansas City, MO 64108.

2         PLEASE TAKE NOTICE that the named plaintiffs ("Oracle") will take the deposition of

3  defendant Rimini Street, Inc. ("Rimini") pursuant to Fed. R. Civ. P. 30(b)(6), on June 14, 2010 at

4  9:30 a.m.  The deposition shall take place at the office of Boies, Schiller & Flexner LLP, 300

5  South Fourth Street, Suite 800, Las Vegas, NV 89101, commencing at the designated date and

6  time, and shall continue on consecutive days thereafter until completed.  The deposition will be

7  videotaped and stenographically recorded by a person authorized by law to administer oaths.

8  Pursuant to Fed. R. Civ. P. 30(b)(6), Rimini shall designate one or more officers, directors,

9  managing agents or other persons who consent to testify on its behalf with respect to the topics

10 set forth in Schedule A.  At least five business days prior to the date of the deposition, Rimini is

11 also requested to provide Oracle's counsel with written notice of the name(s) and position(s) of

12 the designee(s) who will testify on behalf of Rimini, and to identify the matters to which each

13 designee will testify.

14

15 DATED: June 2, 2010                    BOIES SCHILLER & FLEXNER LLP

16

17                                        By:_____
18                                            Kieran P. Ringgenberg
                                             Attorneys for Oracle USA, Inc., Oracle
19                                           America, Inc., and Oracle International
                                             Corporation
20

21

22

23

24

25

26

27

28
                                        1

1     <u>**SCHEDULE A**</u>

2     **I.     DEFINITIONS AND INSTRUCTIONS**

3          In addition to the definitions set forth in the Federal Rules of Civil Procedure, the

4     following definitions and instructions apply to each topic contained herein, and are deemed to be

5     incorporated in each of said requests:

6          1.     The term "Oracle" means all named plaintiffs in this case, and all of their present

7     and former officers, directors, agents, consultants, attorneys, employees, or other persons acting

8     for or on behalf of any of them, and all of their parents, subsidiaries and affiliates.

9          2.     The terms "Rimini" and "you" (or "your") refer Rimini Street, Inc., and all of its

10    present and former officers, directors, agents, consultants, attorneys, employees – including Seth

11    Ravin – or other persons acting for or on behalf of any of them, and all of its parents, subsidiaries

12    and affiliates.

13         3.     The term "document(s)" shall be synonymous in meaning and equal in scope to

14    the broadest meaning provided by Rule 34 of the Federal Rules of Civil Procedure, including

15    without limitation, hard copies, electronic documents, electronic or computerized data

16    compilations, software, software images, or downloads.  This term shall apply to documents,

17    whether in hard copy or electronic form, on your computers or the computers of your employees

18    and independent contractors or consultants, whether provided by you to such individuals or

19    otherwise

20         4.     The term "this Action" refers to this lawsuit, captioned as *Oracle USA, Inc.,*

21    *Oracle America, Inc., and Oracle International Corporation v. Rimini Street, Inc. and Seth*

22    *Ravin*, Case No. 2:10-cv-0106-LRH-PAL (D. Nev.).

23         5.     Unless otherwise stated, the time period covered by these topics is the time period

24    beginning January 1, 2005.

25

26

27

28

2

1    II.    **TOPICS**

2        1.    The general configuration and operation of any computers, computer systems,

3    servers, electronic storage environments, or network devices identified in Rimini Street Inc.'s

4    Objections and Responses to Plaintiffs' First Set of Interrogatories, Nos. 6, 7, 8, 9, 10, 11 or 12.

5        2.    Any steps taken by or on behalf of Rimini to preserve documents that may be

6    relevant to the claims, counterclaims, or defenses in this Action, including any litigation hold

7    notice provided to Rimini employees or others who hold documents in Rimini's possession,

8    custody, or control.

9        3.    The collection of documents for potential production in this Action by or on

10    behalf of Rimini, including the process used to identify documents to be collected.

11        4.    Rimini's disaster recovery backup systems and procedures, including the scope

12    and frequency of backups and any steps to modify Rimini's disaster recovery backup procedures

13    (including recycling and retention of media) in connection with this Action.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3

BOIES, SCHILLER & FLEXNER LLP
RICHARD J. POCKER (NV Bar No. 3568)
300 South Fourth Street, Suite 800
Las Vegas, NV 89101
Telephone: (702) 382-7300
Facsimile: (702) 382-2755
rpocker@bsfllp.com

BOIES, SCHILLER & FLEXNER LLP
STEVEN C. HOLTZMAN (*pro hac vice*)
FRED NORTON (*pro hac vice*)
KIERAN P. RINGGENBERG (*pro hac vice*)
1999 Harrison Street, Suite 900
Oakland, CA 94612
Telephone: (510) 874-1000
Facsimile: (510) 874-1460
sholtzman@bsfllp.com
fnorton@bsfllp.com
kringgenberg@bsfllp.com

Attorneys for Oracle USA, Inc., Oracle America, Inc., and Oracle International Corporation

BINGHAM MCCUTCHEN LLP
GEOFFREY M. HOWARD (*pro hac vice*)
THOMAS S. HIXSON (*pro hac vice*)
KRISTEN A. PALUMBO (*pro hac vice*)
Three Embarcadero Center
San Francisco, CA 94111-4067
Telephone: 415.393.2000
Facsimile: 415.393.2286
geoff.howard@bingham.com
thomas.hixson@bingham.com
kristen.palumbo@bingham.com

DORIAN DALEY (*pro hac vice
application to be submitted*)
DEBORAH K. MILLER (*pro hac vice*)
JAMES C. MAROULIS (*pro hac vice*)
ORACLE CORPORATION (*pro hac vice*)
500 Oracle Parkway
M/S 5op7
Redwood City, CA 94070
Telephone: 650.506.4846
Facsimile: 650.506.7114
dorian.daley@oracle.com
deborah.miller@oracle.com
jim.maroulis@oracle.com

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| ORACLE USA, INC., a Colorado corporation; ORACLE AMERICA, INC., a Delaware corporation; and ORACLE INTERNATIONAL CORPORATION, a California corporation, | CASE NO. 2:10-cv-0106-LRH-PAL |
| Plaintiffs, | CERTIFICATE OF SERVICE |
| v. | |
| RIMINI STREET, INC., a Nevada corporation; SETH RAVIN, an individual;, | |
| Defendants. | |

1

1    **CERTIFICATE OF SERVICE**

2    At the time of service I was over 18 years of age and **not a party to this action.**
My business address is 1999 Harrison Street, Suite 900, Oakland, CA 94612.

3    On June 2, 2010, I served the following documents:

4    **(1)    ORACLE'S FIRST NOTICE OF DEPOSITION PURSUANT TO**
5    **FED. R. CIV. P. 30(b)(6)**

6    I served the documents on the **persons** below, as follows:

7

8    Mark Tratos, Esq.
Brandon Roos, Esq.
Leslie A.S. Godfrey, Esq.
9    Greenberg Traurig, LLP
3773 Howard Hughes Pkwy
10   Ste 400 North
Las Vegas, NV 89169
11   tratosm@gtlaw.com
roosb@gtlaw.com
12   godfreyl@gtlaw.com

13   Michael B. Levin, Esq.
**Wilson Sonsini Goodrich & Rosati**
14   650 Page Mill Road
Palo Alto, CA 94304
15   mlevin@wsgr.com

16   Jonathan M. Jacobson, Esq.
**Wilson Sonsini Goodrich & Rosati**
17   1301 Avenue of the Americas, 40th Floor
New York, NY 10019
18   jjacobson@wsgr.com

19   Eric Buresh, Esq.
Shook, Hardy & Bacon L.L.P.
20   2555 Grand Blvd.
Kansas City, Missouri 64108
21   EBURESH@shb.com

22   Robert H. Reckers, Esq.
Shook, Hardy & Bacon L.L.P.
23   600 Travis Street, Suite 1600
Houston, Texas 77002
24   Telephone: (713) 227-8008
RRECKERS@shb.com

25

26   The documents were served pursuant to FRCP 5(b) **by sending it by electronic mail.** Based on a court order or an agreement of the parties to accept service by e-mail or
27   electronic transmission, I caused the documents to be sent to the persons at the e-mail addresses listed above. I did not receive, within a reasonable time after the transmission,

28

2

1   any electronic message or other indication that the transmission was unsuccessful.

2       I hereby certify that I am employed in the office of a member of the Bar of this
    Court at whose direction the service was made.  I declare under penalty of perjury under
3   the laws of the United States of America that the foregoing information contained in the
4   Certificate of Service is true and correct.

5   Date: June 2, 2010

6                                           Jessica Chavez
                                            Jessica Chavez
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
                                    1

# EXHIBIT Q

**From:** Reckers, Robert H. (SHB) [mailto:RRECKERS@shb.com]
**Sent:** Friday, August 13, 2010 8:47 AM
**To:** Kieran Ringgenberg
**Subject:** RE: Oracle v. Rimini

Kieran,

The initial hold notice was sent on Feb. 4, 2010.

As I indicated at the depo, we'll reflect the notices on Rimini's priv. log.

Thanks, Rob

**From:** Kieran Ringgenberg [mailto:kringgenberg@BSFLLP.com]
**Sent:** Thursday, August 12, 2010 7:35 PM
**To:** Reckers, Robert H. (SHB)
**Subject:** Re: Oracle v. Rimini

Rob:

Would you please confirm to us the date the initial hold notice was sent?

**From**: Reckers, Robert H. (SHB) <RRECKERS@shb.com>
**To**: Kieran Ringgenberg
**Cc**: jim.maroulis@oracle.com <jim.maroulis@oracle.com>; thomas.hixson@bingham.com
<thomas.hixson@bingham.com>; kristen.palumbo@bingham.com <kristen.palumbo@bingham.com>;
Buresh, Eric A. (SHB) <EBURESH@shb.com>; Sykes, Terry R. (SHB) <TSYKES@shb.com>; Sexton,
Rhonda (SHB) <RSEXTON@shb.com>
**Sent**: Tue Aug 10 16:29:33 2010
**Subject**: Oracle v. Rimini

Kiernan,

This is in response to your letter of Aug. 9, requesting a legible copy of the document bates labeled
RSI00005858-95. I have attached herewith a native copy of this document.

Given the size of the attachment, please confirm receipt of this email.

Thanks, Rob



**Robert H. Reckers**
*Associate*
JP Morgan/Chase Tower
600 Travis, Suite 1600
Houston, TX 77002-2992
PHONE: 713.227.8008 x65014
FAX: 713.227.9508
RRECKERS@shb.com

**From:** Denise Nasca [mailto:dnasca@BSFLLP.com]
**Sent:** Monday, August 09, 2010 7:03 PM
**To:** Reckers, Robert H. (SHB)
**Cc:** Kieran Ringgenberg; jim.maroulis@oracle.com; thomas.hixson@bingham.com;
kristen.palumbo@bingham.com
**Subject:** Oracle v. Rimini

Dear Mr. Reckers:

Please see the attached letter of today's date from Kieran P. Ringgenberg.

Thank you.

*Denise Nasca*
Legal Assistant to Kieran P. Ringgenberg
BOIES, SCHILLER & FLEXNER LLP
1999 Harrison Street, Suite 900
Oakland, CA 94612
Direct: (510) 874-1010
Fax: (510) 874-1460
Email: dnasca@bsfllp.com
www.bsfllp.com

IRS Circular 230 disclosure:
To ensure compliance with requirements imposed by the IRS, unless we expressly state otherwise, we inform you that any U.S. federal tax advice
contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding
penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

The information contained in this electronic message is confidential information intended only for the use of the named recipient(s) and may contain
information that, among other protections, is the subject of attorney-client privilege, attorney work product or exempt from disclosure under applicable
law. If the reader of this electronic message is not the named recipient, or the employee or agent responsible to deliver it to the named recipient, you
are hereby notified that any dissemination, distribution, copying or other use of this communication is strictly prohibited and no privilege is waived. If you
have received this communication in error, please immediately notify the sender by replying to this electronic message and then deleting this electronic
message from your computer. [v.1]

Mail Gate made the following annotations on Tue Aug 10 2010 15:29:39

CONFIDENTIALITY NOTICE: This e-mail message including attachments, if any, is intended for the
person or entity to which it is addressed and may contain confidential and/or privileged material. Any

unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message. Thank you.

The information contained in this electronic message is confidential information intended only for the use of the named recipient(s) and may contain information that, among other protections, is the subject of attorney-client privilege, attorney work product or exempt from disclosure under applicable law. If the reader of this electronic message is not the named recipient, or the employee or agent responsible to deliver it to the named recipient, you are hereby notified that any dissemination, distribution, copying or other use of this communication is strictly prohibited and no privilege is waived. If you have received this communication in error, please immediately notify the sender by replying to this electronic message and then deleting this electronic message from your computer. [v.1]

Mail Gate made the following annotations on Fri Aug 13 2010 10:47:29

CONFIDENTIALITY NOTICE: This e-mail message including attachments, if any, is intended for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message. Thank you.

# EXHIBIT R



www.shb.com

**Robert H. Reckers**

JPMorgan Chase Tower
600 Travis Street, Suite 1600
Houston
Texas 77002-2992
713.227.8008
713.227.9508 Fax
rreckers@shb.com

August 18, 2010

**VIA E-MAIL**

Kieran P. Ringgenberg
Boies, Schiller & Flexner LLP
1999 Harrison Street Suite 900
Oakland, CA 94612
kringgenberg@bsfllp.com

Re:  *Oracle USA, Inc. et al. v. Rimini Street, Inc. and Seth Ravin*
      Case No. 2:10-cv-0106-LRH-PAL (D. Nev. filed Jan. 25th, 2010)

Dear Kieran:

I write in response to your letter of August 13, 2010. While Rimini has repeatedly attempted to work with Oracle in good faith to address any and all preservation and collection concerns, Oracle has responded to Rimini's efforts with increasingly onerous demands based on mischaracterizations of the parties' exchanges. Your most recent letter continues this pattern of conduct. Once the misrepresentations contained in your letter are corrected, Oracle's present demands are legally unjustified and unsupported by the factual record.

Your letter raises two issues: Rimini's supposed failure to meet its preservation obligations; and Rimini's supposed failure to produce a knowledgeable 30(b)(6) witness on document collection issues. I will address each of these issues in turn.

## I.  Document Preservation

Your characterization of Rimini's preservation efforts relies on two incorrect premises: (1) that "Rimini did not take *any action* to preserve evidence until well after this case was filed"; and (2) that "there are entire categories of data that Rimini has apparently failed to preserve."

First, as we have informed you, Rimini's initial hold notice was issued February 4, 2010 – *ten days after this case was filed*.[1] This is hardly an unreasonable delay, particularly

---

[1] Your attempt to point out a "conflict" between my representation as to the date of the letter and the witnesses' "sworn" testimony is disingenuous. As you know, the witness testified that he could not remember the exact date of the email, and attempted an estimate – *at your request*. Shortly thereafter, I provided you the true date of this specific email. Your attempt to create the appearance of impropriety from such a triviality is disheartening.

Geneva
Houston
Kansas City
London
Miami
Orange County
San Francisco
Tampa
Washington, D.C.



www.shb.com

August 18, 2010
Page 2

given that Rimini is a small company, has not previously been involved in substantial litigation, and does not have in-house litigation counsel.  Further, Oracle had not communicated with Rimini in over a year, and at no point had the possibility of future litigation become probable.   As such, Rimini was under no obligation to begin preservation efforts until this litigation began.  *In re Napster, Inc. Copyright Litigation*, 462 F. Supp. 2d 1060, 1068 (N.D. Cal. 2006) ("The future litigation must be 'probable,' which has been held to mean 'more than a possibility.'").

Moreover, in contrast to your characterizations, Rimini is not relying on "employee discretion" to meet its document preservation obligations.  As Rimini's witness Mr. Dones testified, shortly after Oracle's complaint was filed Rimini disabled certain delete functionality.   Rimini has also monitored preservation compliance by periodically reminding employees of their ongoing obligations to preserve any and all potentially relevant materials, communicating directly with key employees about discovery obligations, and taking steps to assure that backup media is retained, identified and secured against loss.  For instance, as we informed you during the parties' meet and confer on May 21, 2010, Rimini had, at that point, already collected the potentially relevant documents from each of the thirty key custodians identified by counsel.  Such collection efforts ensure proper preservation and were elaborated on by Mr. Dones during his deposition. How Oracle can characterize Rimini's preservation efforts as "left to individual employees" is truly perplexing, and Rimini is confident that it has more than complied with its preservation obligations.

Turning to the "entire categories of data that Rimini has apparently failed to preserve," you mention "log files" that are supposedly destroyed every time the "Customer Connect Extract Program" is run.  However, Rimini has repeatedly informed Oracle that it terminated the use of extract programs in January of 2009.  Further, Oracle discontinued its "Customer Connect" website in 2008.  So, the "Customer Connect Extract Program" has long been retired, and any log files generated by this program, to the extent they were in existence when the litigation began, are properly being preserved.  Speaking more broadly, we are not aware of any system or log files reflecting relevant information that are being "destroyed or overwritten," and your allegations of "gross inadequacy" in Rimini's preservation efforts find no factual support.

Your letter also refers to data generated through the use of the Yahoo! Instant Messenger program.  As indicated by Mr. Dones, Rimini does not have its own instant messenger system, though some employees use a free Internet-based system provided by Yahoo!. Each employee who chose to use Yahoo! Messenger made his or her own decision, well before the litigation, whether to archive or not.  When the litigation commenced, those who had been archiving messages were instructed by counsel to continue to archive messages and to continue to preserve such archives.  Further, it is our understanding that

Geneva
Houston
Kansas City
London
Miami
Orange County
San Francisco
Tampa
Washington, D.C.



www.shb.com

August 18, 2010
Page 3

certain employees decided to begin archiving their messages after the litigation commenced. These archives are being preserved as well.

Turning to your demand that Rimini begin archiving instant messages of all employees, I note that, given the nature of Oracle's allegations, it is unlikely that the Yahoo! Instant Messenger program will generate data relevant to this matter, and the collection and production of data from this program would likely prove unduly burdensome. Certainly, details regarding the processes underlying Oracle's allegations are far more likely to be reflected in traditional documents and correspondence than instant messages.

Further, for those employees that use Yahoo! Instant Messenger and who were not previously archiving, we are not aware of any obligation to create documents (i.e., archives) that are not maintained in the ordinary course of business. *See, e.g., Convolve v. Compaq*, 223 F.R.D. 162 (S.D.N.Y. 2004) ("the data at issue here are ephemeral. . . . No business purpose ever dictated that they be retained, even briefly."). And apparently Oracle was not aware of such an obligation either as it did not identify this as an issue in its extensive correspondence regarding items it wanted preserved and collected. Nevertheless, in an effort to avoid unnecessary disputes, Rimini is willing to begin preserving its employees' instant messaging data for employees who were not already archiving so the parties may move on to more important matters.

With respect to the "necessary remedial measures" demanded by Oracle, such measures are predicated on your unsupported allegations that Rimini's preservation efforts have been grossly inadequate. As previously explained, your allegations of inadequacy find no factual support, and, thus, Oracle's demanded measures are not warranted.

You first demand that Rimini insure continuing compliance with preservation obligations by archiving instant messages and creating backup copies of relevant files. As previously set forth, Rimini has ensured such compliance, has created the necessary backup copies and is willing to begin archiving instant messages. To the extent Oracle has additional preservation measures in mind, Rimini remains willing to consider any reasonable requests.

You second demand that Rimini take forensic copies of all relevant custodians' media. As we have reiterated on numerous occasions, Rimini Street does not agree that forensic copying is necessary in this case or that Oracle has or can establish good cause for this unconventional preservation measure. Certainly, forensic preservation is not necessary for each and every employee that is likely to have relevant documents, and broadly employing this form of data preservation would create substantial expense and interruption to Rimini Street's business. As the Sedona Principles state: "Absent a showing of special need and relevance, a responding party should not be required to

Geneva
Houston
Kansas City
London
Miami
Orange County
San Francisco
Tampa
Washington, D.C.



www.shb.com

preserve, review, or produce deleted, shadowed, fragmented, or residual electronically stored information."

Indeed, computer forensics are considered an extraordinary discovery measure and are typical created only after evidence of spoliation has surfaced. *See McCurdy Group v. American Biomedical Group, Inc.*, 9 Fed. Appx. 822, 831 (10th Cir. 2001)*; Antioch Co. v. Scrapbook Borders, Inc.*, 210 F.R.D. 645, 652 (D. Minn. 2002); *Orrell v. Motorcarparts of America, Inc.*, 2007 U.S. Dist. LEXIS 89524 (W.D.N.C. Dec. 5, 2007). And, even in light of spoliation, in virtually every case the party requesting forensics must bear the associated expense. *See, e.g., Koninklijke Philips Electronics N.V. v. KXD Technology, Inc.*, 2007 U.S. Dist. LEXIS 20205 (D. Nev. Mar. 20, 2007)*; Balboa Threadworks*, 2006 U.S. Dist. LEXIS 29265 *13; *Orrell*, 2007 U.S. Dist. LEXIS 89524 (W.D.N.C. 2007).

Yet even though Oracle has shown no special need for forensics and though such measures would burden Rimini's business operations, in the spirit of cooperation and to address Oracle's concerns, Rimini agreed, back on May 25, 2010, to submit to the requested measures provided Oracle bear the associated monetary expense. Again, that the party requesting forensics bears the cost is the standard practice for virtually every case where forensics are conducted. We again reiterate that, even though Oracle has not shown adequate cause, Rimini is willing to submit to computer forensics provided Oracle bear the associated expense.

## II. Document Collection

Your letter also contends that Rimini's designee was not prepared to testify regarding the collection of documents by Rimini, and you demand that Rimini provide Oracle four items of information – namely, the number and identity of custodians from whom documents have been collected, the sources of collected information and whether search terms or automated methods were used to collect documents. But each of these items reflects either information that the witness competently testified about, information already in Oracle's possession or information subject to work product protection.

Turning first to the number and identity of custodians from whom information was collected, as mentioned, *supra*, we informed you during the parties meet and confer on May 21, 2010, Rimini had at that point already collected the potentially relevant documents from each of the thirty key custodians identified by counsel. Moreover, as mentioned by my letters to Mr. Norton dated May 25, 2010 and June 3, 2010, Rimini Street had collected a substantial number of documents from the computers of its key custodians around the country. Though Mr. Dones did not recall the exact number of custodians, he testified regarding this initial collection of individual data, explaining that he was given the list of these custodians so he could allow their user data to be collected

Geneva
Houston
Kansas City
London
Miami
Orange County
San Francisco
Tampa
Washington, D.C.



www.shb.com

August 18, 2010
Page 5

from Rimini's file system. Consistent with Mr. Dones' testimony, there have been no additional custodians from which collections have been made, so the number of custodians from whom information was collected remains at thirty.

As to the listing of the key custodians (*i.e.*, those individuals most likely to have relevant documents), such a list clearly reflects the mental impressions of counsel and are subject to work product protections. *In re New York Renu with Moistureloc Prod. Liab. Litig.*, 2008 U.S. Dist. LEXIS 88515, at *51 (D.S.C. May 6, 2008) ("Certainly compiling a list of those with relevant documents involves trial preparation, and disclosure of that list could reveal mental impressions concerning claims or defenses."). And, even if the names were not protected from disclosure, having a witness memorize a list of 30 names is not required for a 30(b)(6) deposition. *EEOC v. American Int'l Group, Inc.*, 1994 WL 376052, at *3 (S.D.N.Y. July 18, 1994) ("Rule 30(b)(6) is not designed to be a memory contest.").[2] The fact that the witness could not testify as to information protected by attorney work product hardly evidences a lack of preparedness.

With respect to the sources of documents, your assertion that "Rimini's designee was unable to . . . specify from what electronic sources documents were collected" is incorrect. Beyond the previously mentioned collections from individual's computers, Mr. Dones testified that counsel, at their discretion, collected documents from Rimini's SharePoint platform, its email system and its network file system. With respect to the network file system, he testified that collections were taken from the department drives and the user data but not from client archives or database files. Of the department drives, Mr. Dones' testimony reflects that collections were taken for the following departments: PeopleSoft, JD Edwards, Siebel, Client Care and Success and Sales. Given this testimony, your characterization of the record is utterly unsupported.

Finally, you demand to know whether search terms or automated methods were used to collect documents. The answer to your question is no. Consistent with Mr. Dones' testimony, counsel worked with the relevant personnel to obtain access to and then select the documents included in the initial wave of collections. No search terms or other automated methods were employed at this collection stage.

Though we remain willing to meet and confer with Oracle as to any additional subject matter it believes it is entitled, it is telling that, following Mr. Dones' deposition, Oracle was in possession of each non-privileged item of information it presently demands. Though you argue that the witness was not prepared, the simple truth is that the

Geneva
Houston
Kansas City
London
Miami
Orange County
San Francisco
Tampa
Washington, D.C.

---

[2]    Though Rimini contends that the list of its custodians is subject to work product protection, Rimini will agree to provide Oracle this list provided Oracle agrees to provide Rimini with corresponding information and also agrees that this exchange does not constitute a waiver of any applicable privilege or protection.



www.shb.com

August 18, 2010
Page 6

discoverable information regarding Rimini collection efforts can be succinctly described: counsel selected key custodians and data stores likely to contain relevant information; counsel was granted access to these data stores and the files of the key custodians (i.e., laptops, emails and network user data); and counsel selected the files to be collected based on their own discretion and without the aid of automated or search tools. This is precisely the collection process described by Mr. Dones, and Rimini does not see any justification for the additional deposition demanded by your letter.

In conclusion, I simply cannot stress enough that Oracle's charge of "stonewalling" is without merit. Rimini's goal in this matter has been to move forward expeditiously and resolve this case on its merits. We have long hoped that this was a goal shared by Oracle, and we remain cautiously optimistic that the parties can work together to resolve any remaining issues.

Please feel free to contact me with questions or concerns.

Sincerely,

*/s/Robert H. Reckers*

Geneva
Houston
Kansas City
London
Miami
Orange County
San Francisco
Tampa
Washington, D.C.

# EXHIBIT S



www.shb.com

**Robert H. Reckers**

JPMorgan Chase Tower
600 Travis Street, Suite 1600
Houston
Texas 77002-2992
713.227.8008
713.227.9508 Fax
rreckers@shb.com

August 20, 2010

<u>**VIA E-MAIL**</u>

Kieran P. Ringgenberg
Boies, Schiller & Flexner LLP
1999 Harrison Street Suite 900
Oakland, CA 94612
kringgenberg@bsfllp.com

Re:  *Oracle USA, Inc. et al. v. Rimini Street, Inc. and Seth Ravin*
     Case No. 2:10-cv-0106-LRH-PAL (D. Nev. filed Jan. 25th, 2010)

Dear Kieran:

This letter pertains to the deposition of Rimini Street conducted pursuant to Rule 30.b.6 on August 12, 2010.  In the last few days, it has come to the attention of Rimini's counsel that the testimony of Rimini's designee, Mr. Dones, was not accurate in one aspect regarding Rimini's preservation of emails.  The purpose of this letter is to identify the error and to provide Oracle an accurate description of Rimini's preservation efforts with respect to emails.  To the extent Oracle has follow-up questions with respect to the erroneous testimony, Rimini will be happy to provide verified responses to the extent Oracle's questions seek information that is not otherwise protected.

As you may recall, Mr. Dones testified that Rimini disabled the delete functionality from its email system as part of its preservation efforts in this case.  Earlier this week, one of the members of Rimini's legal team questioned the accuracy of this testimony.  Upon further investigation, we have concluded that the testimony was, in fact, incorrect. Though Mr. Dones was prepared on this issue directly, it appears that Mr. Dones inadvertently developed a misunderstanding.  His testimony reflected this honest but incorrect understanding.

While Rimini has not disabled the delete functionality, Rimini has taken reasonable steps to ensure the proper preservation of emails.  As background, there are no mail box size quotas imposed, and there is no auto-delete agent employed on Rimini Street's emails. As such, Rimini's email system maintains any emails not designated for deletion, including emails of departed employees (which are preserved in "disabled" state to prevent any deletion or usage).

With respect to preservation efforts for this litigation, Rimini made a copy or "snapshot" of its entire email system early in the litigation to ensure proper preservation of any emails existing at that time.  Subsequently, counsel collected the email accounts of the 30 key custodians, and, of course, there will be likely additional email collections as

Geneva
Houston
Kansas City
London
Miami
Orange County
San Francisco
Tampa
Washington, D.C.



www.shb.com

necessary during the course of discovery. Additionally, monthly full disaster recovery backups of the email environment are being created and preserved.

In addition to copying and collecting email data, Rimini has both instructed and reminded its employees not to delete email that may have any potential relevance to this matter. As mentioned in my letter to you on August 18, 2010, Rimini has monitored compliance with these preservation directives by periodically reminding employees of their ongoing obligations to preserve any potentially relevant materials and by communicating directly with key employees about discovery obligations. As the total volume of stored emails has increased nearly 50 percent over the last 6 months, Rimini has every reason to believe that its employees are indeed preserving potentially relevant emails.

Though the erroneous testimony is regrettable, it was entirely inadvertent. Upon recognizing the inaccuracy, Rimini has moved quickly and in good faith to alert Oracle. Further, as mentioned above, Rimini is prepared to follow-up with further information to the extent Oracle requires further information to clarify the error.

Please feel free to contact me with questions or concerns.

Sincerely,


*/s/Robert H. Reckers*


Geneva
Houston
Kansas City
London
Miami
Orange County
San Francisco
Tampa
Washington, D.C.

# EXHIBIT T

**DOCUMENT FILED UNDER SEAL**

# EXHIBIT U

**DOCUMENT FILED UNDER SEAL**

# EXHIBIT V

# DOCUMENT FILED UNDER SEAL

# EXHIBIT W

# DOCUMENT FILED UNDER SEAL

# EXHIBIT X

# DOCUMENT FILED UNDER SEAL

# EXHIBIT Y

# DOCUMENT FILED UNDER SEAL

# EXHIBIT Z

# DOCUMENT FILED UNDER SEAL

# EXHIBIT AA

# DOCUMENT FILED UNDER SEAL

# EXHIBIT BB

# DOCUMENT FILED UNDER SEAL

# EXHIBIT CC

# DOCUMENT FILED UNDER SEAL

# EXHIBIT DD

# DOCUMENT FILED UNDER SEAL

# EXHIBIT EE

# BOIES, SCHILLER & FLEXNER LLP

1999 HARRISON STREET • SUITE 900 • OAKLAND, CA 94612 • PH. 510.874.1000 • FAX 510.874.1460

August 13, 2010

**VIA E-MAIL**

Robert H. Reckers, Esq.
Shook, Hardy & Bacon LLP
600 Travis Street, Suite 1600
Houston, TX 77002
Email: rreckers@shb.com

> **Re:** ***Oracle USA Inc., et al. v. Rimini Street, Inc. and Seth Ravin,***
> **No. 2:10-cv-00106 (D. Nev. filed Jan. 25, 2010)**

Dear Rob:

I write to address two fundamental problems exposed by Rimini Street's 30(b)(6) deposition testimony of August 12, 2010. First, the witness's testimony revealed that Rimini has failed to adequately preserve evidence – failures that almost certainly have already led to the spoliation of evidence relevant to the central issues of this litigation. Second, Rimini failed to produce a witness who could testify knowledgeably on topic 3 in the deposition notice, that is, Rimini's collection of documents in this action.

These are crucial matters that need to be addressed immediately. We demand that Rimini Street confirm in writing that it will take the necessary steps identified below, and that such confirmation be provided by the close of business on August 16. If Rimini will not do so, we will need to seek intervention from the Court.

## I. Document Preservation

Rimini's 30(b)(6) designee made clear that Rimini has not met its obligations to preserve relevant evidence, in at least two important respects.

### A. Rimini's Late and Inadequate Hold Notice

To begin, Rimini did not take *any action* to preserve evidence until well after this case was filed. The witness said the first step Rimini took to preserve evidence was to send an e-mail to employees on February 27, 2010, more than a month after this case was

BOIES, SCHILLER & FLEXNER LLP

Robert Reckers, Esq.
August 13, 2010
Page 2 of 5

filed. You have subsequently represented that the e-mail was sent on February 4 – ten days after the complaint was filed. (This conflict between your representation and the witness's sworn testimony is but one illustration of the inadequacy of your efforts to produce a truly knowledgeable witness under Rule 30(b)(6) on an issue clearly central to the noticed topics.) Even if the Rule 30(b)(6) designee's testimony was wrong, sending an initial preservation e-mail on February 4 was inadequate to comply with Rimini's obligations. The "duty to preserve documents attaches 'when a party should have known that the evidence may be relevant to future litigation.'" *In re Napster, Inc. Copyright Litigation*, 462 F.Supp.2d 1060, 1068 (N.D. Cal. 2006) (quoting *Zubulake v. UBS Warburg LLC,* 220 F.R.D. 212, 216 (S.D.N.Y. 2003)). Rimini's duty certainly attached earlier – probably far earlier – than February 4, 2010.

Moreover, the obligation to preserve evidence does not end with the issuance of a legal hold notice. Counsel must take "affirmative steps" to monitor compliance with the litigation hold; "it is not sufficient to notify all employees of a litigation hold and expect that the party will then retain and produce all relevant information." *Treppel v. Biovail Corp.*, 249 F.R.D. 111, 118 (S.D.N.Y. 2008) (quoting *Zubulake v. UBS Warburg LLC,* 229 F.R.D. 422, 432 (S.D.N.Y. 2004)); *see also Housing Rights Center v. Sterling*, 2005 WL 3320739, at *5 (C.D. Cal. 2005) ("A party's discovery obligations do not end with the implementation of a 'litigation hold' – to the contrary, that's only the beginning. Counsel must oversee compliance with the litigation hold, monitoring the party's efforts to retain and produce the relevant documents").

Rimini's designee testified that Rimini has done nothing to ensure that Rimini employees are preserving relevant documents aside from sending a single follow-up email two months after distributing the litigation hold notice and disabling the delete function on Rimini's e-mail and Sharepoint systems. Outside those narrow exceptions, Rimini has left it to individual employees to ensure that Rimini fulfills its preservation obligations. Relying on an employee's discretion to ensure preservation is insufficient as a matter of law. *See, e.g., Treppel*, 249 F.R.D. at 118. Coupled with the designee's inability to confirm that Rimini has preserved any data residing on individual employees' computers (such as by imaging those computers), Rimini's lapse in monitoring preservation creates a very real risk of spoliation.

## B.    Rimini's Failure to Preserve Other Files and Data

Moreover, the likelihood that relevant evidence has been destroyed has been multiplied because there are entire categories of data that Rimini has apparently neglected to preserve. For example, Rimini has apparently made no efforts to preserve or archive

BOIES, SCHILLER & FLEXNER LLP

Robert Reckers, Esq.
August 13, 2010
Page 3 of 5

instant messages, even though the 30(b)(6) designee testified that many employees regularly use Yahoo Instant Messenger to communicate within Rimini. Likewise, although the witness lacked knowledge about many of the systems in use at Rimini and the data that is created by them, it appears that little or nothing has been done to preserve system files that otherwise will be destroyed or overwritten – for example, the log files created when Rimini conducts mass downloads of Oracle software and support material. These log files are obviously relevant; they list which files Rimini is copying from Oracle. Rimini's own document states that the log files are overwritten (*i.e.*, destroyed) every time the process is run. The witness said that, as far as he knew, nothing was done to preserve these files. (To be clear, we do not mean to suggest that the witness's testimony was adequate in this or many other respects. It clearly was not.)

## C.     Necessary Remedial Measures

Given the gross inadequacy of Rimini's preservation efforts – exacerbated by the critical significance of electronic evidence in this case – several remedial measures are required. To begin, and in light of your past repeated refusal to do so, we demand that you immediately confirm that:

1. Rimini will take immediate steps to ensure employees' continuing compliance with the legal hold, including at a minimum archiving instant messages and preserving all relevant custodian and system files that exist as of now, both on active servers and client devices and on all backup and disaster recovery tapes or other systems; and

2. Rimini will immediately prepare and preserve forensic images of the hard drives of relevant custodians' computers to preserve evidence of deleted files and ensure compliance with the litigation hold.

Please confirm in writing that these measures will be taken. Please also subsequently confirm exactly what steps are completed and when they are completed. Please also identify all materials that have been deleted or otherwise destroyed since January 25, 2010 (the date this case was filed).

To be clear, we expect additional steps will be necessary to try to make up for Rimini's failure to preserve relevant evidence, including restoration of potentially multiple back-ups or disaster recovery tapes and systems. However, more information is needed to identify all that needs to be done. And, even then, it is likely that evidence has

BOIES, SCHILLER & FLEXNER LLP

Robert Reckers, Esq.
August 13, 2010
Page 4 of 5

been destroyed that can never be recovered. We write now to demand that Rimini take immediate action to prevent the ongoing loss of relevant evidence.

## II.    Document Collection

Rimini failed to produce a witness who could testify regarding "the collection of documents for potential production in this Action by or on behalf of Rimini, including the process used to identify documents to be collected," the third topic in Oracle's Notice of Deposition. Rimini's designee was unable to explain Rimini's document collection process, provide even a rough estimation of the number of custodians from whom documents were collected, identify the general types or categories of documents that were collected, or specify from what electronic sources documents were collected. The designee was not even able to say whether any data had been collected from Rimini CEO's Seth Ravin's computer or allocated network storage. Instead, the designee repeatedly said that counsel performed collection and he did not know what was done.

"Once served with the deposition notice under Rule 30(b)(6), the responding party is required to produce one or more witnesses knowledgeable about the subject matter of the noticed topics," even if the topic is outside the witness's personal knowledge. *Great American Ins. Co. of New York v. Vegas Const. Co., Inc.*, 251 F.R.D. 534, 538 (D. Nev. 2008) (Leen, M.J.). Upon receiving the deposition notice, Rimini was required to "educate an appropriate Rule 30(b)(6) designee to provide knowledgeable answers reasonably available to the corporation, which include information ascertainable from project files and documents in the repository, information from past employees, witness testimony and exhibits, or any other sources available to the corporation, **including factual information learned through or from its counsel.**" *Id.* at 541 (emphasis added). Rimini's failure to produce an adequately prepared Rule 30(b)(6) deponent is sanctionable. *Id.* at 542-43 (sanctioning party whose 30(b)(6) witness was unprepared to speak to topics in notice of deposition). That Rimini had over two months to prepare a witness to testify competently to its collection efforts makes its failure to do so even more troubling.

Rimini continues to represent to the Court that it wants to resolve this litigation as quickly as possible, but its actions belie its professed interest in efficiency. Over the course of several months, Oracle sent Rimini repeated requests to meet and confer concerning issues of document collection and preservation. Rimini refused Oracle's requests, writing on June 3 that "the normal discovery process is the appropriate means for disclosing such information, to the extent it is non-privileged and discoverable." But when Oracle attempted to follow the process that Rimini preferred by employing the

BOIES, SCHILLER & FLEXNER LLP

Robert Reckers, Esq.
August 13, 2010
Page 5 of 5

"normal" discovery mechanism of a Rule 30(b)(6) deposition, Rimini produced a witness unable to speak meaningfully to the noticed topics.

Rimini cannot continue to stonewall Oracle's attempt to obtain the most basic of information regarding the sufficiency of Rimini's collection. Given the delays Rimini has already caused and in light of the need to make progress in advance of the next case management conference, we demand that Rimini provide a sworn, written response describing Rimini's collection procedures, including the identity and number of custodians from whom you collected information, the other sources from which you collected information, and any search terms or automated methods you used to collect information. Please provide this written response by August 20. In addition, we demand that Rimini make a knowledgeable witness available on August 25 to answer any follow-up questions that arise from our review of your response. Should Oracle decide to depose this witness, it will not count against Oracle's allotted number or hours of deposition. Because Rimini bears responsibility for the ignorance of its original designee, Oracle may demand another deposition, at Rimini's expense, of a knowledgeable witness. *See Great American Ins. Co.*, 251 F.R.D. at 542-43.

Please contact me if you have questions concerning any of the demands outlined above. I look forward to your written confirmation you will take the essential steps outlined above by August 16.

Very truly yours,

Kieran Ringgenberg

cc:    Eric Buresh, Esq.
       Aaron D. Ford, Esq.
       Geoff Howard, Esq.
       James C. Maroulis, Esq.

# EXHIBIT FF

----------------------------------------------
**From:** Reckers, Robert H. (SHB)[SMTP:RRECKERS@SHB.COM]
**Sent:** Monday, August 23, 2010 7:31:14 PM
**To:** Kieran Ringgenberg
**Cc:** 'jim maroulis'; 'kristen.palumbo@bingham.com'; Fred Norton;
'thomas.hixson@bingham.com'; Steven Holtzman; Buresh, Eric A. (SHB)
**Subject:** RE: Oracle v. Rimini
**Auto forwarded by a Rule**

Kieran,

With respect to our conversation on Friday:

1. Per your request, Rimini is agreeable to proceeding with tomorrow's deposition at Bingham's San Francisco office at 9:30 am.

2. Rimini agrees to provide the below-mentioned declaration regarding steps taken to preserve and collect relevant evidence.

3. Rimini also agrees that it has preserved or will preserve logical copies/snapshots of servers used to directly provide service and support to its clients running Oracle software, namely Rimini's client archives, client environments, email, Devtrack, dotproject, WebCM, Rimini website, SharePoint, user home directories and department share drives. To the extent there are additional servers Oracle contends should be copied for preservation purposes, please let us know, and we will consider the request.

4. Though Rimini does not agree that formal briefing is proper in light of the comments in the Court's most recent case management order, Rimini agrees it will file its opposition to Oracle's motion on preservation and collection by August 31.

5. The below schedule for CMC statement exchanges is fine.



**Robert H. Reckers**
*Associate*
JP Morgan/Chase Tower
600 Travis, Suite 1600
Houston, TX 77002-2992
PHONE: 713.227.8008 x65014
FAX: 713.227.9508
RRECKERS@shb.com

**From:** Kieran Ringgenberg [mailto:kringgenberg@BSFLLP.com]
**Sent:** Friday, August 20, 2010 5:03 PM
**To:** Reckers, Robert H. (SHB)
**Cc:** jim maroulis; kristen.palumbo@bingham.com; Fred Norton; thomas.hixson@bingham.com; Steven Holtzman
**Subject:** Oracle v. Rimini

Rob:

I write to confirm a few points from our conversation today.

With regard to preservation and collection issues, you are going to confer with your client on whether Rimini will agree to (1) provide declaration(s) from individual(s) with firsthand knowledge describing comprehensively the steps taken to preserve and collect relevant evidence in this case; and (2) collect logical copies/snapshots of Rimini's servers. You will get back to us late Monday on these issues. Rimini will not agree to take forensic images of user hard drives at its own expense.

Assuming the parties cannot agree on the preservation and collection issues, Oracle will file a motion Tuesday, August 24, Rimini will file an opposition Tuesday, August 31, and Oracle file any reply on Friday, September 3.

With regard to other discovery issues, we agreed that, in order to create the joint submission requested by the Court for the 9/9/ CMC, a party complaining regarding another's discovery responses will provide its portion of a joint statement on those issues on Thursday, August 26. The opposing party will provide its portion on those issue on Tuesday, August 31. The complaining party will provide its final portion on of the joint statement by 3 pm on September 3. We will put them together and file with the CMC.

We did not discuss this, but it would also be good to work out a schedule on the exchange sections of the remainder of the CMC statement – say, Oracle will provide draft on 8/30, and Rimini will provide its portions by 9/1, and we will file it on 9/3.

I don't mean to suggest this was the entirety of our discussion; we discussed other issues. I just want to confirm these points now given the scheduling.

Best,

Kieran

IRS Circular 230 disclosure:

To ensure compliance with requirements imposed by the IRS, unless we expressly state otherwise, we inform you that any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

The information contained in this electronic message is confidential information intended only for the use of the named recipient(s) and may contain information that, among other protections, is the subject of attorney-client privilege, attorney work product or exempt from disclosure under applicable law. If the reader of this electronic message is not the named recipient, or the employee or agent responsible to deliver it to the named recipient, you are hereby notified that any dissemination, distribution, copying or other use of this communication is strictly prohibited and no privilege is waived. If you have received this communication in error, please immediately notify the sender by replying to this electronic message and then deleting this electronic message from your computer. [v.1]

Mail Gate made the following annotations on Mon Aug 23 2010 21:31:15

CONFIDENTIALITY NOTICE: This e-mail message including attachments, if any, is intended for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient,

please contact the sender by reply e-mail and destroy all copies of the original message. Thank you.