1   SHOOK, HARDY & BACON LLP
    B. Trent Webb, Esq. *(pro hac vice)*
2   Eric Buresh, Esq. *(pro hac vice)*
    2555 Grand Boulevard
3   Kansas City, Missouri 64108-2613
    Telephone: (816) 474-6550
4   Facsimile: (816) 421-5547
    bwebb@shb.com
5   eburesh@shb.com

6   Robert H. Reckers, Esq. *(pro hac vice)*
    600 Travis Street, Suite 1600
7   Houston, Texas   77002
    Telephone: (713) 227-8008
8   Facsimile: (731) 227-9508
    rreckers@shb.com
9

GREENBERG TRAURIG
Mark G. Tratos, Esq. (Nevada Bar No. 1086)
Brandon Roos, Esq. (Nevada Bar No. 7888)
Leslie Godfrey, Esq. (Nevada Bar No. 10229)
3773 Howard Hughes Parkway
Suite 400 North
Las Vegas, NV 89169
Telephone:  (702) 792-3773
Facsimile:  (702) 792-9002
tratosm@gtlaw.com
roosb@gtlaw.com
godfreyl@gtlaw.com

*Attorneys for Defendants*
*RIMINI STREET, INC. and SETH RAVIN*

10

11

12

13              UNITED STATES DISTRICT COURT
14                  DISTRICT OF NEVADA

15

16   ORACLE USA, INC., a Colorado corporation;
     ORACLE AMERICA, INC., a Delaware
     corporation; and ORACLE INTERNATIONAL
17   CORPORATION, a California corporation,

18   Plaintiffs,

19   v.

20   RIMINI STREET, INC., a Nevada corporation;
     SETH RAVIN, an individual,

21

22   Defendants.

Case No. 2:10-cv-0106-LRH-PAL

**DEFENDANTS' OPPOSITION TO
ORACLE'S MOTION FOR
PRESERVATION ORDER**

**Date: Sept. 10, 2010**
**Time: 9:00**

23

24

25

26

27

28

1

## <u>TABLE OF CONTENTS</u>

2    I.      INTRODUCTION ..................................................................................................... 1

3    II.     FACTUAL BACKGROUND ...................................................................................... 4

4    III.    ARGUMENT .............................................................................................................. 8

5            A.      Rimini Street Has More Than Complied with its Preservation Obligations........... 9

6            B.      Oracle is Not Entitled to the Forensic Images it Seeks......................................... 13

7            C.      Oracle's Forensic Demand is Unjustified in Burden and Scope............................ 17

8            D.      Orders Regarding Forensic Imaging Must be Narrow in Scope............................ 20

9            E.      Oracle Should Pay if Forensic Imaging is Required.............................................. 21

10   IV.    CONCLUSION........................................................................................................... 22

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## TABLE OF AUTHORITY

**Cases**

*Antioch Co. v. Scrapbook Borders, Inc.*, 210 F.R.D. 645, 652 (D. Minn. 2002)................................22

*Balboa Threadworks, Inc. v. Stucky*, No. 05-1157, 2006 U.S. Dist. LEXIS 29265, *16 (D. Kan. Mar. 24, 2006)........................................................................................................21

*Balfour Beatty Rail, Inc. v. Vaccarello*, Case No: 3:06-cv-551-J-20MCR, 2007 WL 169628, at *3 (M.D. Fla. Jan. 18, 2007)...........................................................................14

*Bethea v. Comcast*, 218 F.R.D. 328, 331-32 (D.D.C. 2003) ...........................................................14

*Children's Legal Servs. v. Kresch*, No. 07-cv-10255, 2007 WL 4098203 (E.D. Mich. Nov. 16, 2007) ............................................................................................................16

*Columbia Pictures Indus. v. Bunnell*, No. CV 06-1093FMCJCX, 2007 WL 2080419 at *14 (C.D. Cal. May 29, 2007) ...............................................................................17

*Convolve v. Compaq*, 223 F.R.D. 162, 177 (S.D.N.Y. 2004).........................................................15, 16

*Covad Commc'ns Co. v. Revonet, Inc.*, 258 F.R.D. 5, 11 (D.D.C. 2009)................................. passim

*Diepenhorst v. City of Battle Creek*, Case No. 1:05-CV-734, 2006 WL 1851243, at *3 (W.D. Mich. June 30, 2006) ......................................................................................14

*In re Napster, Inc. Copyright Litigation*, 462 F. Supp. 2d 1060, 1068 (N.D. Cal. 2006).....................9

*John B. v. Goetz*, 531 F.3d 448, 460–61 (6th Cir. 2008) ...........................................................14, 20

*Lanelogic, Inc. v Great Amer. Spirit Ins. Co.*, Case No. 3-08-CV-1164-BD, 2010 WL 1839294 (N.D. Tex. May 6, 2010)...........................................................................14

*Malletier v. Dooney & Bourke, Inc.*, No. 04 Civ. 5316 RMB MHD, 2006 WL 3851151, *2 (S.D.N.Y. Dec. 22, 2006) ....................................................................................16

*McCurdy Group v. American Biomedical Group, Inc.*, 9 Fed. Appx. 822, 831 (10th Cir. 2001) ..........................................................................................................................8

*N.H. Ball Bearings, Inc. v. Jackson*, 969 A.2d 351, 360 (N.H. 2009)....................................8, 20, 21

*Playboy Enterprises, Inc. v. Welles*, 60 F. Supp. 2d 1050, 1053 (S.D. Cal. 1999).......................20, 22

*Ponca Tribe of Indians v. Cont'l Carbon Co.*, No. CIV-05-445-C, 2006 WL 2927878 (W.D. Okla. Oct. 11, 2006).............................................................................................14

*Powers v. Thomas M. Cooley Law Sch.*, No. 5:05-cv-117, 2006 WL 2711512 at *5 (W.D. Mich. Sept. 21, 2006)................................................................................................18

*Rowe Entertainment, Inc. v. William Morris Agency, Inc.*, 205 F.R.D. 421, 427-28, 432-33 (S.D.N.Y. 2002) ...............................................................................................20, 21

*Samsung Elecs. Co. v. Rambus Inc*., 439 F. Supp. 2d 524, 542–43 (E.D. Va. 2006)..........................15

*Simon Property Group L.P. v. mySimon, Inc.*, 194 F.R.D. 639, 641 (S.D. Ind. 2000).......................20

*Treppel v. Biovail Corp.*, 249 F.R.D. 111, 118 (S.D.N.Y. 2008) .......................................................13

*Zubulake v. UBS Warburg LLC*, 217 F.R.D. 309, 319–20 n.61 (S.D.N.Y. 2003)..............................21

*Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 216–18 (S.D.N.Y. 2003)............................9, 10, 15

*Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422, 432 (S.D.N.Y. 2004)............................................13

## Other Authorities

Federal Rules of Civil Procedure Advisory Committee, Minutes of the April 15-16, 2004 Meeting in Washington D.C., at 18, available at http://www.uscourts.gov/rules/Minutes/CRAC0404.pdf.................................................15

Withers, Kenneth J., *Ephemeral Data and the Duty to Preserve Discoverable Electronically Stored Information*, 37 U. BALT. L. REV. 349, 363 (2007-2008)....................................16

## Rules

Federal Rule of Civil Procedure 26 ............................................................................................ passim

Rule 34 Advisory Committee ............................................................................................................14

1

## DEFENDANTS' OPPOSITION TO ORACLE'S MOTION FOR PRESERVATION ORDER

2

Defendants Rimini Street Inc. and Seth Ravin (collectively "Rimini Street" or "Rimini") file

3

this Opposition to Plaintiffs Oracle USA, Inc., Oracle America, Inc., and Oracle International

4

Corporation (together "Oracle" or "Plaintiffs") Motion for Preservation Order. *See* Doc No. 80.

5

## I.    INTRODUCTION

6

Rimini Street has fully met and exceeded its obligations to preserve potentially relevant

7

material, and Oracle's motion reveals a strategy designed to manufacture discovery issues where

8

none exist.  Consistent with its desire to litigate this case on the merits, Rimini has consistently

9

attempted to work with Oracle in good faith to reach agreement on all issues related to document

10

preservation so as to avoid unnecessary disputes.  Yet Oracle states that "Rimini refuses to create

11

forensic images of the computers of its relevant custodians."  Doc No. 80 at 2.  This simply is not

12

true.  While Rimini believes there is no good cause for requiring forensic imaging, Rimini has

13

repeatedly agreed to reasonable forensic imaging so long as Oracle agreed to pay the exorbitant cost

14

of this extraordinary preservation measure.  *See* Reckers Decl. Ex. A, May 25, 2010 letter from R.

15

Reckers ("Rimini Street, in the interest of reaching a compromise, will agree to a limited collection

16

of forensic images on the condition that the associated costs are borne by Oracle.").  Despite the

17

purported importance of this measure to Oracle, Oracle would not agree to this reasonable

18

compromise.  Such an amicable resolution is not in Oracle's strategic interest.  Without the forensic

19

issue as a pretext, Oracle would have lost its mechanism to level the numerous disconnected

20

allegations of misconduct presented in its motion.  Oracle would not be deterred by compromise.

21

Indeed, even the Court's instruction not to file such motions before the next Status Conference was

22

no deterrent to Oracle's strategy.

23

Oracle's motion is replete with unsupported attacks on Rimini's preservation efforts and

24

gross mischaracterizations of the parties' preservation-related interactions.  Unfortunately, despite

25

Rimini's best efforts to clear the underbrush, the Court is now burdened with wading through

26

Oracle's diatribe and Rimini's response to discern Oracle's numerous fictions.  Once the true facts

27

are examined, there can be no doubt that Rimini has more than met its obligations to preserve

28

relevant materials, and that Oracle's motion should be denied.

1    Oracle's motion is premised on alleged "failures [by Defendants] to comply with their

2    preservation obligations."  Doc. No. 80 at 3.  Because no such failures exist, Oracle's motion fails.

3    First, Oracle alleges that "Defendants took no steps to preserve information until after the complaint

4    had been filed" and "waited some indefinite amount of time to begin their preservation efforts."  *Id*.

5    at 1.  This is false.  Rimini has traditionally configured its computer systems to maintain a great deal

6    of information, including materials relevant to the present action.  As one salient example, the

7    archives containing the downloaded Oracle software and support materials at the core of Oracle's

8    allegations have long been configured as "read only, " meaning that those users permitted access to

9    these archives cannot delete or modify the stored software and support materials.  Further, Rimini

10   has never had a policy requiring older documents to be deleted after some period of time, and Rimini

11   has, for many years, employed processes for creating and preserving backups of its key systems,

12   including its email archives.  These backup tapes are incremented on a daily basis, and monthly

13   backup tapes are stored indefinitely.  Finally, Rimini issued a litigation hold memorandum in the

14   Spring of 2009 that required Rimini employees to preserve, *inter alia*, documents reflecting use by

15   Rimini of copies of customers' licensed Oracle software to provide software support, documents

16   regarding automated tools Rimini Street used to download materials from Oracle customer support

17   websites and documents regarding the development, testing, documentation, packaging, and delivery

18   of Rimini's software updates.  Obviously, these broad categories of documents reflect documents

19   now sought by Oracle in the present action. Given Rimini's long standing document retention

20   measures and its issuance of a litigation hold notice, Oracle's complaints regarding Rimini's pre-

21   litigation preservation efforts find no factual basis.

22        After Oracle filed its complaint, Rimini promptly initiated additional measures to further

23   ensure compliance with preservation obligations.  Rimini's initial hold notice was issued February 4,

24   2010 – *ten days after this case was filed*.   Contrary to Oracle's suggestions, this is hardly an

25   unreasonable delay, particularly given that Rimini is a small company, has not previously been

26   involved in substantial litigation, and does not have in-house litigation counsel.  In addition to the

27   customary hold notice, Rimini disabled the delete function from its document repository and also

28   made copies of its email environment, its client archives, and client environments to ensure proper

preservation of any then-existing data.  Such copies were made in addition to Rimini's normal data backup processes, which are extensive.

In addition, counsel for Rimini individually interviewed thirty Rimini Street employees identified as most likely to have relevant documents.  During these interviews, counsel re-iterated preservation obligations to these key custodians and collected potentially relevant materials from the custodians' laptop computers and other media.  Counsel also collected documents from Rimini's network file systems, document repository, email systems, and department share drives.  Such collection efforts, of course, ensure proper preservation.  Given these extensive efforts on the part of Rimini to preserve relevant documents, how Oracle can characterize Rimini's preservation efforts as "delegated . . . to the discretion of individual employees" is truly perplexing.

Finally, Oracle contends that Rimini has "failed to take steps . . . to prevent the deletion of critical data such as system files and logs, and failed to take any steps to preserve highly relevant forms of communication used at Rimini, such as instant messages."  Doc. No. 80 at 1.  With respect to system-level files and logs, neither Oracle nor its expert provides any explanation as to how the data in these files provides information relevant to Oracle's copyright infringement, breach of contract or other claims.  *See* Doc. No. 80 at 13, 20–21; Doc. No. 85 at 2.  Put simply, there is no reason to believe that the system-level files mentioned by Oracle provide relevant information or should reasonably be included within the scope of preservation.

Likewise, the fact that certain employees did not archive their instant messages ("IMs") does not establish a failure on the part of Rimini to comply with its discovery obligations.  For those employees who were not previously archiving IMs, case law does not support an obligation to create documents (*i.e.*, IM archives) that are not maintained in the ordinary course of business.  While Oracle touts instant messages produced in the *TomorrowNow* litigation as demonstrating the potential relevance of these messages, it is telling that Oracle first requested that Rimini preserve these messages just days before it filed its motion.  If instant messages were truly as "highly relevant" as Oracle now represents, it would have raised this issue before discovery commenced as required by Rule 26(f), not almost eight months into the litigation.

RIMINI STREET INC.'S OPPOSITION TO ORACLE'S MOTION FOR PRESERVATION ORDER

In sum, Oracle's broad demand for a forensic copy of virtually every employee's laptop computer finds no legal or factual support.   While Oracle's motion is premised on gross mischaracterizations of Rimini's preservation efforts and the parties' exchanges, the evidence in this case tells a very different story.   Oracle has failed to establish that Rimini's preservation actions were inadequate or that it is entitled to the relief it seeks.   Oracle's motion must be denied.

## II.      FACTUAL BACKGROUND

Shortly after Oracle filed its original forty-two page Complaint, Oracle began what has become a campaign of increasingly onerous and unwarranted demands directed to the preservation of electronically stored information.   While many of these demands (such as those directed to forensic imaging) extend far beyond any generally recognized preservation obligations, Rimini has offered to comply, either outright or conditionally, in an effort to proceed on the merits and to avoid burdening the Court with such matters.   Oracle cannot point to a single instance otherwise.   Thus, to bring this motion, Oracle has resorted to mischaracterizing Rimini's efforts and focusing on supposed preservation failures.     Oracle's motion even neglects to mention several key correspondences from Rimini, thereby providing a misleading narrative to this Court.

Oracle's preservation demands began three days after filing its Complaint, when it sent Rimini a letter stating: "Oracle demands Rimini and Mr. Ravin immediately take appropriate steps" to identify and preserve documents and electronic media.   Ringgenberg Decl. Ex. J, Jan. 28, 2010 letter from Mr. Norton.   Rimini responded to this letter on February 6, 2010, stating that "Rimini Street and Mr. Ravin take the issue of document preservation very seriously, and [] appropriate measures are in place to preserve potentially relevant materials."   Ringgenberg Decl. Ex. K, Feb. 6, 2010 letter from Mr. Levin.   Oracle sent another letter shortly thereafter stating that Rimini had failed to provide the assurances it required.   Reckers Decl. Ex. B, Feb. 11, 2010 letter from Mr. Norton.   At that point, Rimini was obviously in the process of retaining outside litigation counsel, reviewing Oracle's Complaint, and investigating its Answer and Counterclaims.   Indeed, Oracle stated that *its* ability to identify and preserve relevant documents was "necessarily limited" because Rimini had yet to answer Oracle's complaint.   *Id.*   Regardless, Oracle then demanded that the parties "discuss a stipulated protocol for both parties to preserve data and documents."   *Id.*   Thereafter,

counsel for Rimini and Oracle had several conversations regarding a future meet-and-confer regarding preservation. Ringgenberg Decl. Ex. L, Mar. 16, 2010 letter from Mr. Norton. On March 16, 2010, Oracle threatened to seek relief from the Court. *Id.* Notably, this threat was levied several weeks before Rimini even had a chance to file its Answer, which was filed on March 29, 2010.

Rimini responded to this threat the very next day, reiterating that while "a meet-and-confer in the absence of any defined dispute and in the current pre-Answer timeframe is premature and likely inefficient," it was willing to lay the groundwork so that any preservation issues could be resolved efficiently. Ringgenberg Decl. Ex. N, Mar. 17, 2010 letter from Mr. Levin. To this end, Rimini suggested that Oracle provide a proposed written stipulation, after which the parties could meet and confer to resolve any disagreements. *Id.* Oracle responded by saying it would not prepare such a stipulation, then proceeded to list thirteen broad categories of documents that it demanded Rimini preserve. Ringgenberg Decl. Ex. M, Mar. 22, 2010 letter from Mr. Norton. Notably, again, this list did not request computer forensics or the preservation of transitory instant messaging data. *Id.* Rimini, in response, complied with each of Oracle's demands and confirmed that it was "preserving information consistent with each of the categories you have identified." Ringgenberg Decl. Ex. O, Mar. 29, 2010 letter from Mr. Reckers. In this letter, Rimini also requested confirmation that Oracle was preserving nine key categories of documents. *Id.* In contrast to Rimini, however, Oracle never provided such confirmation and still has not identified the categories of documents it is preserving in connection with this matter.[1]

On April 29, 2010, counsel for Rimini and Oracle then held a Rule 26(f) conference, wherein Oracle, for the first time, raised the issue of computer forensics. Rimini indicated that it felt forensics were an extraordinary measure at that time, but that the parties could work in good faith to compromise. To that end, the parties held an additional meet-and-confer on May 20, 2010. Though Rimini still asserted that such an unconventional measure was unwarranted, Rimini nonetheless offered to create forensic images of its computers, provided the costs were borne by Oracle:

---

[1] Oracle has indicated is that it has created forensic images of 200 of its custodians – a measure never requested by Rimini and of little use given the expense of extracting and analyzing such forensic data. Oracle has yet to provide an adequate answer to Rimini's March 29, 2010 request regarding the *contents* of preserved Oracle materials.

> Rimini Street does not agree that forensic copying is necessary in this case or that Oracle has or can establish good cause for the unconventional preservation measure … Nevertheless, Rimini Street, in the interest of reaching a compromise, will agree to a limited collection of forensic images on the condition that the associated costs are borne by Oracle.

Reckers Decl. Ex. A, May 25, 2010 Letter from Mr. Reckers.  This letter went on to state that Rimini would allow forensic imaging of its key custodians.[2]  *Id.*  Oracle responded to Rimini's offer by stating that it somehow raised "substantial concerns about Rimini Street's compliance with its obligations to preserve relevant evidence."  Reckers Decl. Ex. C, May 27, 2010 Letter from Mr. Norton.  Oracle then demanded seven more categories of information "to address our concerns."  *Id.* These categories related in part to technical details of Rimini's computer systems, including Rimini's procedures for backing up its data.  *Id.*

A few days later, Oracle decided to engage in formal discovery and issued its first Rule 30(b)(6) notice to Rimini on June 2, 2010.  Ringgenberg Decl. Ex. P, Jun. 2, 2010 Notice of Deposition.  Notably, the decision to proceed to formal discovery was Oracle's, and Oracle's numerous statements that Rimini "insisted" on such formal discovery are untrue.  Reckers Decl. Ex. D, Jun. 3, 2010 letter from Mr. Reckers (noting Oracle's Rule 30(b)(6) notice and "agree[ing]" that normal discovery was the appropriate route to address such topics).  The June 3rd correspondence from Rimini's counsel also corrected a number of mischaracterizations by Oracle, noted that Oracle had not requested forensic imaging at any time before the April 29 conference, and reiterated Rimini's offer to create forensic images if Oracle were willing to pay for the associated costs.[3] Reckers Decl. Ex. D Jun. 3, 2010 letter from Mr. Reckers.  Oracle never responded to Rimini's offer. Rimini also noted that *Oracle* had not provided confirmation that *it* was meeting its preservation obligations, and repeated that "we continue to await confirmation that Oracle is preserving information consistent with my letter of March 29."  *Id.*

Oracle took Rimini's 30(b)(6) deposition regarding document collection and preservation on August 12, 2010.  The next day, Oracle wrote a letter to Rimini asserting that there were "fundamental problems exposed by Rimini Street's 30(b)(6) deposition testimony."  Ringgenberg

---

[2] Oracle failed to attach this letter to its motion.

[3] Oracle failed to attach this letter to its motion.

Decl. Ex. EE, Aug. 13, 2010 letter from Mr. Ringgenberg.  The letter went on to mischaracterize Rimini's preservations efforts and the preparedness of Rimini's 30(b)(6) witness, and to, for the first time, demand the preservation of instant messages.  *Id.*  Though this letter does not acknowledge Rimini's previous offers, it once again demanded computer forensics, stating "we demand that  . . . Rimini will immediately prepare and preserve forensic images of the hard drives of relevant custodians . . ." *Id.*

Rimini promptly responded, first correcting each mischaracterization of Rimini's 30(b)(6) testimony and preservation efforts, and then, once again, attempting to address each of Oracle's unfounded demands.  Ringgenberg Decl. Ex. R, Aug. 18 letter from Mr. Reckers.  Specifically, while noting that preserving instant messages was not required, Rimini stated that "Nevertheless, in an effort to avoid unnecessary disputes, Rimini is willing to begin preserving its employees' instant messaging data for employees who were not already archiving so the parties may move on to more important matters." *Id.*  Rimini's correspondence also thoroughly addressed Oracle's unfounded allegations that Rimini's witness was unprepared, and Rimini thereafter offered to supplement its 30(b)(6) testimony and provide a declaration to clarify any issues Oracle felt necessary.  *Id.*  And for the third time Rimini offered to perform forensic imaging:

> Rimini agreed, back on May 25, 2010, to submit to the requested measures provided Oracle bear the associated monetary expense.  Again, that the party requesting forensics bears the cost is the standard practice for virtually every case where forensics are conducted. We again reiterate that, even though Oracle has not shown adequate cause, Rimini is willing to submit to computer forensics provided Oracle bear the associated expense.

*Id.*  Following this correspondence, Oracle informed Rimini that it would file the present motion and continued its failure to even acknowledge Rimini's offers, instead proceeding on the false premise that "Rimini has flatly refused to take forensic images."  Reckers Decl. Ex. E, Aug. 24, 2010 email from Mr. Ringgenberg.  Oracle repeated this false accusation in its motion to this Court, stating "Rimini refuses to create forensic images of the computers of its relevant custodians" and that "Rimini has refused to take forensic images of user hard drives."  Doc. No. 80 at 2, 10.  The only conceivable reason for these misstatements of Rimini's position by Oracle is that Oracle perceives some benefit in casting Rimini as unreasonable and as obstructing proper preservation efforts.  The

correspondence record, however, directly refutes Oracle's characterizations in this regard, and there can be no doubt that Rimini has consistently worked to meet each of Oracle's preservation demands and to avoid a dispute on such issues.

As explained below, in almost every case involving forensics the party requesting this unconventional measure bears the cost. Ultimately, Rimini could not agree to swallow the costs associated with Oracle's broad forensic demands. These costs, according to quotes obtained by Rimini from multiple independent venders, would likely exceed $200,000.[4] *See* Reckers Decl. Ex. F; Reckers Decl. Ex. G. As Comment 8.c. to the Sedona Principles explains, "[M]aking forensic image backups of computers is only the <u>first step of an expensive, complex, and difficult process of data analysis that can divert litigation into side issues and satellite disputes</u> involving the interpretation of potentially ambiguous forensic evidence." (emphasis added). As set forth below, Oracle has not established the good cause necessary to bring the "expensive, complex and difficult" forensic process to this litigation, and Oracle should not be permitted to divert the litigation towards such forensic "side issues and satellite disputes" and away from the true merits of the case.

## III.   ARGUMENT

Oracle seeks an order from this Court requiring Rimini to create forensic images of all computers of Rimini employees likely to have relevant data. Doc. No. 80 at 23. Oracle argues that creation of such images "has become essential because of Rimini's failure to adequately preserve documents." *Id*. at 22. In reality, Rimini has fully complied with its discovery obligations, and, thus, Oracle is not entitled to "the 'drastic discovery measure' of permitting a party to image all of an opponent's electronic media." *N.H. Ball Bearings, Inc. v. Jackson*, 969 A.2d 351, 360 (N.H. 2009) (quoting *McCurdy Group v. American Biomedical Group, Inc.*, 9 Fed. Appx. 822, 831 (10th Cir. 2001)). Further, the burden of creating a large number of forensic images far outweighs any potential benefit that might result. Even in cases where forensic imaging is warranted, courts have routinely required the party seeking the forensics to bear the associated costs and have narrowly tailored the scope of forensic preservation orders. Oracle ignores this authority, broadly seeking

---

[4] Rimini arrived at this estimate based on the vendor quotes of approximately $800 to $1,200 per employee and Rimini's approximately 200 employees and former employees.

forensic images for virtually all of Rimini's employees.  Oracle's motion lacks both legal and factual support and must be denied.

### A.    Rimini Street Has More Than Complied with its Preservation Obligations.

Oracle's motion is premised on the notion that Rimini's preservation efforts suffer from two "fundamental flaws."  First, Oracle contends that Rimini failed to preserve evidence when it anticipated litigation.  Second, Oracle argues that that Rimini impermissibly left preservation "to its individual employees' discretion." Doc. No. 80 at 18.  Each of these unfounded allegations will be addressed in turn.

As indicated by the authority cited by Oracle, courts have required parties to take measures to preserve relevant information when the threat of future litigation becomes "probable."  *In re Napster, Inc. Copyright Litigation*, 462 F. Supp. 2d 1060, 1068 (N.D. Cal. 2006) ("The future litigation must be 'probable,' which has been held to mean 'more than a possibility.'").  In such cases, a party may meet its preservation obligations by taking measures such as suspending existing policies related to deleting or destroying relevant files and putting in place a litigation hold to ensure the preservation of relevant documents (including relevant backup tapes).  *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 216–18 (S.D.N.Y. 2003) ("Zubulake IV").  Rimini, for its part, has acted consistent with this authority.  Though Oracle jumps to the conclusion that "Rimini necessarily deleted or lost relevant evidence," the reality is that Rimini has indeed been preserving relevant documents from long before Oracle filed its complaint. In fact, many of these documents have already been produced to Oracle.

Rimini has never had a document destruction policy, as exists in some companies, where older documents are destroyed as a matter of course after some period of time.  Dones Decl., ¶ 3. Rather, Rimini documents were and are maintained indefinitely unless a user made the affirmative decision to delete a particular document.  *Id.*  Likewise, there are no mail box size quotas for Rimini's email system, and there is no auto-delete agent employed on Rimini Street's emails.  *Id.* at ¶ 4.  As with other documents, Rimini's system maintains emails not designated for deletion, including emails of departed employees (which are preserved in "disabled" state to prevent deletion or usage).  *Id.*  As such, there was no "routine document retention/destruction policy" that required

1    suspension in light of Oracle's threats.  *See Zubulake*, 220 F.R.D. at 218.

2          In addition, Rimini has also long employed processes for creating and preserving backups of

3    its data for, e.g., disaster recovery.  Dones Decl., ¶ 6.  This backup process gathers data on a daily

4    basis from a variety of data sources and generates daily, weekly and monthly tape backups.  *Id.*

5    Monthly tapes are retained indefinitely.  *Id.*  Many of the key data sources that may contain relevant

6    data are subject to this back-up process, including departmental shared drives, internal company

7    databases, document repositories, email, user directories and FTP servers.  *Id.*  Given these extensive

8    backup processes, Rimini's retention of backup tapes further evidences its compliance with

9    perseveration obligations.  *See Zubulake*, 220 F.R.D. at 218 ("[L]itigants are free to choose how this

10   task [retaining relevant documents] is accomplished. For example, a litigant could choose to retain

11   all then-existing backup tapes for the relevant personnel.").

12         Further, Rimini has long employed security measures to prevent deletion or modification of

13   potentially relevant materials, including the stored Oracle software and support materials at the core

14   of Oracle's allegations.  Dones Decl., ¶ 5.  These downloaded materials are locked in a restricted-

15   access file store such that the limited number of Rimini employees permitted access to these archives

16   cannot delete or modify the stored software and support materials.  *Id.*  Here again, the security

17   restrictions employed by Rimini, well before the present litigation, have served to preserve

18   potentially relevant data, and Rimini's pre-suit document policies evidence that Rimini has ensured

19   the preservation of relevant documents in a manner consistent with well settled authority.

20         Finally, Rimini issued a memorandum in the Spring of 2009 requiring the retention of all

21   documents relevant to Oracle's ongoing litigation with SAP and to the subpoena issued to Rimini in

22   connection therewith.  Reckers Decl., ¶ 9.  In this memorandum, Rimini first noted the importance of

23   retaining all such relevant documents, and specifically outlined a number of categories of documents

24   that Oracle now contends are relevant to this litigation.  *Id.*  Specifically, Rimini employees were

25   instructed to maintain any documents related to:

26         • Rimini's business model, including whether Rimini has relied on copies of
             customer's Oracle software to provide customer support;

27         • Any automated tools Rimini has used to download materials from any Oracle
28           customer support website; and

- Any checklists or other documents designed to track the development, testing, documentation, packaging, or delivery of tax updates.

*Id.*   This memorandum was circulated to Rimini management with the instructions that such managers were required to confirm that all employees and consultants are aware of the need to maintain these documents.  *Id.*  This letter further evidences Rimini's compliance with its obligations to preserve documents. As the *Zubulake* Court explained, "The scope of a party's preservation obligation can be described as follows: Once a party reasonably anticipates litigation, it must suspend its routine document retention/destruction policy and put in place a 'litigation hold' to ensure the preservation of relevant documents."  220 F.R.D.  at 218.  Rimini has acted in accordance with this authority, and Oracle's allegations that Rimini "did nothing" until after this litigation began are unfounded. [5]

The second alleged "fundamental flaw" Oracle cites with respect to Rimini's preservation efforts is "that Rimini left preservation to its individual employees' discretion." Doc. No. 80 at 18. Contrary to Oracle's allegations, Rimini has employed a variety of measures to preserve potentially relevant materials, including utilizing technical means to prevent file deletion, making copies or "snapshots" of relevant servers, collecting documents from relevant custodians and data sources, and repeatedly informing employees of their preservation obligations.  Dones Decl., ¶ 7.  Oracle is well aware of Rimini's extensive efforts in this regard (*see* Ringgenberg Decl. Ex. R, Aug. 18 letter from Mr. Reckers), and it is beyond disingenuous to suggest that Rimini's preservation actions are "insufficient as a matter of law" or left to the "discretion of individual, non-lawyer employees." Doc. No. 80 at 3.

Following the filing of Oracle's complaint, Rimini moved quickly to implement the requisite "litigation hold," issuing a three page memorandum to all Rimini employees and contractors on February 4, 2010.  Dones Decl., ¶ 8.  This memorandum stressed the requirement that all hardcopy and electronic materials potentially relevant to the Oracle litigation be maintained.  *Id.*   The

---

[5] It should be noted that while Oracle attempts to rely on Rimini's 30(b)(6) testimony to support its pre-litigation preservation deficiency allegations, Oracle's First 30(b)(6) Notice was expressly directed to Rimini's preservation efforts in connection with this Action. Ringgenberg Decl. Ex. P, Oracle's First 30(b)(6) Notice, Topic No. 2 ("Any steps taken by or on behalf of Rimini to preserve documents that may be relevant to the claims, counterclaims, or defenses in this Action …").

memorandum also instructed all managers to confirm that all their reports—including consultants—were aware of the need to maintain potentially relevant documents. *Id.* The initial memorandum was re-circulated to the company on April 20, 2010 along with a reminder that all employees must continue to comply with their preservation obligations. *Id.* Yet another reminder email was sent on August 20, 2010, again reminding employees to preserve potentially relevant materials. *Id.* The August 20 reminder directed anyone using an instant messenger application to archive their messages. As one indication that employees are complying with their document preservation obligations, the volume of stored emails has increased nearly 50 percent over the last 6 months. *Id.*

While document preservation efforts in all cases require some level of employee cooperation, Oracle is simply wrong to suggest that Rimini has relied exclusively on its employees, in some "passive" manner, to ensure preservation. For instance, the delete feature was disabled for Rimini's document repository, SharePoint. *Id*. at ¶ 10. And, as previously mentioned, numerous data stores, including Rimini's archives of Oracle software and support material, have long been configured as "read only" so as to eliminate the potential for deletion or modification of the stored data. *Id*. at ¶ 5.

In addition, a copy or "snapshot" was made of Rimini's entire email environment on March 3, 2010 to ensure proper preservation of any emails existing at that time. *Id*. at ¶ 10. In April of 2010, Rimini created a copy of its client archives and client environments, which contain the copies of the Oracle software and support materials subject to Oracle's allegations. *Id*. at ¶ 11. Such copies of email and client archives and environment were made in addition to Rimini's normal backup process, which is run on a daily basis and which generates monthly backup tapes that are stored indefinitely. [6] *See id*. at ¶ 6.

Rimini Street has also implemented preservation processes with respect to laptops that are no longer in active service. *Id*. at ¶ 14. With respect to the laptops of exiting employees, Rimini retains the exiting individuals' hard drives in a fire-safe at its Pleasanton office. *Id.* Likewise, if a computer malfunctions or a hard drive crashes, Rimini attempts to extract as much information as possible in

---

[6] Oracle states that Rimini has done nothing to preserve documents for 170 of Rimini's employees or servers. Doc. No. 80 at 19. Oracle is wrong. For instance, Rimini copied the entire email environment and is continuously backing up its document repository, as well as other key file stores on Rimini's servers. Dones Decl., ¶ 10-12. Clearly, these preservation efforts encompass relevant information from each of its employees and from Rimini's servers.

1    order to rebuild a new computer.  *Id.*  The hard drive that failed is then labeled and retained in

2    Rimini's fire safe, and the identity of the person to whom the hard drive belonged is maintained.  *Id.*

3             Counsel for Rimini also selected and individually interviewed the thirty Rimini employees

4    most likely to have relevant documents prior to the start of discovery.  *Id.* at ¶¶ 18–19.  During these

5    interviews, counsel re-iterated preservation obligations to the custodians and collected potentially

6    relevant materials from the custodians' laptop computers and other media.  *Id.*  Document collection

7    is obviously one form of preservation.

8             In addition to collections for individual employees, counsel collected potentially relevant

9    documents from Rimini's network file systems, SharePoint, email, department shares, and user data.

10   Department shares to which counsel was given access included PeopleSoft, JD Edwards, Siebel,

11   Client Care and Success and Sales, Global Tax and Regulations, and Marketing.  *Id.* at ¶ 20. These

12   collections occurred before May 21, 2010 and resulted in a substantial number of documents being

13   collected (and therefore preserved) from Rimini's computers across the United States.  *Id.* at ¶ 12.

14            Contrary to Oracle's arguments, Rimini has not left preservation to its employee's discretion.

15   Rather, Rimini has followed well established preservation protocols in which counsel has taken

16   numerous "affirmative steps" to monitor compliance with the litigation hold.  *See Treppel v. Biovail*

17   *Corp.*, 249 F.R.D. 111, 118 (S.D.N.Y. 2008); *Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422, 432

18   (S.D.N.Y. 2004) ("Zubulake V").  Despite Oracle's attempt to minimize and misconstrue Rimini's

19   substantial preservation effects, the facts simply do not support Oracle's allegations of insufficiency.

20   For this reason alone, Oracle's motion must be denied.

21        **B.    Oracle is Not Entitled to the Forensic Images it Seeks.**

22            Federal Rule of Civil Procedure 26 places limits on electronic discovery, and discovery in

23   general, precisely to guard against the intrusive tactics Oracle attempts to employ here.  Specifically,

24   Rule 26(b)(2)(C) provides that a court must limit discovery, even relevant and allowable discovery,

25   if "the burden or expense of the proposed discovery outweighs its likely benefit . . . ."[7]  File

26

27   ───────────────
     [7] Courts consider "the needs of the case, the amount in controversy, the parties' resources, the
28            importance of the issues at stake in the action, and the importance of the discovery in
             resolving the issues."  Fed. R. Civ. P. 26(b)(2)(C)(iii).

1  fragments of a computer, which are not accessible to the user, are clear examples of electronically

2  stored information that "is not reasonably accessible because of burden or cost."  Fed. R. Civ. P.

3  26(b)(2)(B); *accord* Sedona Principles Comment 2.c. ("[D]ata that was 'deleted' but remains in

4  fragmented form, requiring a modern version of forensics to restore and retrieve" is data "that is 'not

5  reasonably accessible' because of undue burden or cost.").

6        Given the strictures of the Federal Rules, it is well settled that forensic imaging should only

7  be compelled in exceedingly limited circumstances.[8]  The Rule 34 Advisory Committee "cautions

8  against making forensic examination the default [] and encourages courts to 'guard against undue

9  intrusiveness.'"  *Covad Commc'ns Co. v. Revonet, Inc.*, 258 F.R.D. 5, 11 (D.D.C. 2009) (citing Fed.

10 R. Civ. P. 34, Advisory Comm. Note (2006)).  Sedona Principle Nine highlights the high standard a

11 party seeking forensics must overcome:  "Absent a showing of special need and relevance, a

12 responding party should not be required to preserve, review, or produce deleted, shadowed,

13 fragmented, or residual electronically stored information."  Thus, forensic imaging is generally not

14 appropriate, and "courts must consider the significant interests implicated by forensic imaging

15 before ordering such procedures."  *John B. v. Goetz*, 531 F.3d 448, 460 (6th Cir. 2008).

16       Attempting to establish the good cause necessary to compel forensic imaging, Oracle points

17 to two types of data that forensic imaging might recover:  (i) system-level files; and (ii) instant

18 messages.  However, the preservation of ephemeral data such as system-level files and instant

---

19 [8]  *See, e.g., John B. v. Goetz*, 531 F.3d 448, 460–61 (6th Cir. 2008) (denying request for forensic
20      images of responding party's computers due to requesting party's failure to show relevance
        and need, as well as countervailing burdens and privacy concerns); *Lanelogic, Inc. v Great*
21      *Amer. Spirit Ins. Co.*, Case No. 3-08-CV-1164-BD, 2010 WL 1839294 (N.D. Tex. May 6,
        2010) (denying request to forensic-image responding party's computers where no basis for
22      doing so was established); *Bethea v. Comcast*, 218 F.R.D. 328, 331-32 (D.D.C. 2003) ;
        *Balfour Beatty Rail, Inc. v. Vaccarello*, Case No: 3:06-cv-551-J-20MCR, 2007 WL 169628,
23      at *3 (M.D. Fla. Jan. 18, 2007) (denying "fishing expedition" request for access to party's
        hard drives where requesting party failed to demonstrate responding party's non-compliance
24      with its discovery duties.); *Ponca Tribe of Indians v. Cont'l Carbon Co.*, No. CIV-05-445-C,
        2006 WL 2927878 (W.D. Okla. Oct. 11, 2006) (denying requesting party's request to create
25      mirror image of responding party's database where requesting party failed to demonstrate
        relevance and need.); *Diepenhorst v. City of Battle Creek*, Case No. 1:05-CV-734, 2006 WL
26      1851243, at *3 (W.D. Mich. June 30, 2006) (denying request for mirror-imaging of
        responding party's laptop as not supported by evidence that responding party destroyed
27      evidence or otherwise failed to meet discovery obligations.); *Powers v. Thomas M. Cooley*
        *Law Sch.*, No. 5:05-cv-117, 2006 WL 2711512 at *5 (W.D. Mich. Sept. 21, 2006) (denying
28      requesting party's motion to forensic-image computers where doing so would cause undue
        burden and expense).

messages is not typically required, especially when no business purpose exists for its preservation. *See e.g.*, *Convolve v. Compaq*, 223 F.R.D. 162, 177 (S.D.N.Y. 2004) ("the data at issue here are ephemeral.   .  .  .   No business purpose ever dictated that they be retained, even briefly."). Preservation of such data in the normal course of business is not required precisely because of its limited usefulness as compared to the substantial cost of retaining it.  *See Covad*, 258 F.R.D. at 16 ("[K]eep[ing] electronically stored information [] when any need for it has long since disappeared" is "the antitheses of a sound records management policy" and "leads to even increasing expenses." (emphasis added)).  Oracle's claimed relevance of the system-level file data and instant messages, and any potential need for it, is undermined by the very fact that litigants are not required to retain such data in their everyday business operations.

With respect to system-level files and logs, neither Oracle nor its expert provides any explanation as to how the data in these files provides information relevant to Oracle's copyright infringement, breach of contract, or other claims.  *See* Doc. No. 80 at 13, 20–21; Doc. No. 85 at 2. In fact, Oracle provides no explanation as to what *specific* information it expects to find in the system files, how that information might be relevant to this case, or why such information is not available via conventional means.  *See* Doc. No. 80 at 13, 20–21; Doc. No. 85 at 2.  While it is certainly true that all computers automatically generate and log system data in their normal course of operation, the Federal Rules do not require that every item of data, such as the automatically-generated system files, be maintained.  *See Samsung Elecs. Co. v. Rambus Inc.*, 439 F. Supp. 2d 524, 542–43 (E.D. Va. 2006)(explaining that corporate defendants are not obligated to "preserve every shred of paper, every e-mail or electronic document, and every backup tape"); *Zubulake*, 220 F.R.D. at 217 (same); Federal Rules of Civil Procedure Advisory Committee, Minutes of the April 15-16, 2004 Meeting in Washington D.C., at 18, available at http://www.uscourts.gov/rules/Minutes/CRAC0404.pdf ("Reasonable steps do not always preserve everything.").  There is no reason to believe that the system-level files mentioned by Oracle provide relevant information or should reasonably be included within the scope of preservation.  The significant burden required to retrieve such files easily outweighs their potential relevance and Oracle's theoretical need for obtaining them.

1    Likewise, the fact that certain employees did not archive their instant messages ("IMs") does

2    not establish a failure on the part of Rimini to comply with its discovery obligations or open the door

3    to the "remedial measure" of forensic preservation.   As previously mentioned, case law does not

4    support an obligation to create documents (*i.e.*, IM archives) that are not maintained in the ordinary

5    course of business.   *See, e.g., Malletier v. Dooney & Bourke, Inc.*, No. 04 Civ. 5316 RMB MHD,

6    2006 WL 3851151, *2 (S.D.N.Y. Dec. 22, 2006) (holding that a party had no duty to preserve "chat

7    room" conversations, stating that such a request "is more akin to a demand that a party to a litigation

8    install a system to monitor and record phone calls ..."); *Convolve*, 223 F.R.D. at 177.   In fact, given

9    the burdens associated with preservation of instant messages, courts routinely exclude instant

10   messages from their preservation orders.   *See, e.g., In re Yasmin and Yaz (Drospirenone) Mktg.,*

11   *Sales Practices and Prods. Liab. Litig*., No. 3:09-md-02100, at 2 (S.D. Ill. Feb. 18, 2010) (Case

12   Management Order No. 11) ("No Party is under an obligation to preserve . . . instant messages.").

13   As one commentator stated when observing the rareness that IMs are subject to discovery, "IMs are

14   more likely to be considered ephemeral by users and system administrators, and therefore fall

15   outside the records management policy."   Withers, Kenneth J., *Ephemeral Data and the Duty to*

16   *Preserve Discoverable Electronically Stored Information*, 37 U. BALT. L. REV. 349, 363 (2007-

17   2008) (citing *Children's Legal Servs. v. Kresch*, No. 07-cv-10255, 2007 WL 4098203 (E.D. Mich.

18   Nov. 16, 2007) (denying unduly broad request for instant messages)).

19   While Oracle cites instant messages produced in the *TomorrowNow* litigation as

20   demonstrating the potential relevance of these messages, Oracle first requested that Rimini preserve

21   these messages just days before it filed its motion.   As the Court is aware, Fed. R. Civ. P. 26(f) was

22   designed to prevent the very ambush Oracle now attempts, requiring an early discussion between the

23   parties of the various forms of electronic information to be preserved and produced.   This is

24   especially true in the case of electronic information, such as instant messages, that is not typically

25   maintained in the normal course of business. *See Malletier*, 2006 WL 3851151 at *2; *Convolve*, 223

26   F.R.D. at 177.   When evaluating the propriety of preservation decisions with respect to transient

27   data, courts consider the "absence of (1) prior precedent directly on point in the discovery context;

28   (2) a specific request by defendants to preserve [the data at issue]; and (3) a violation of a

preservation order . . ." *Columbia Pictures Indus. v. Bunnell*, No. CV 06-1093FMCJCX, 2007 WL 2080419 at *14 (C.D. Cal. May 29, 2007) (addressing preservation obligations for transient data in the sanctions context). Here, (1) established precedent supports Rimini's decision not to preserve instant messages that are not maintained in the course of business; (2) Oracle had not previously made a specific request for preservation of instant messages; and (3) there is no preservation order in this case dictating that instant messages should be preserved. Therefore, Rimini was under no obligation to preserve its instant messages, and, Oracle's allegations that Rimini failed to comply with its discovery obligations are again unfounded.

Though some "needle in the haystack" relevant instant messages could theoretically exist in the deleted memory of Rimini's computers, "the burden or expense" of extracting such instant messages substantially "outweighs its likely benefit" in this case. Fed. R. Civ. P. 26(b)(2)(C). Even if IM archives were recovered by the forensic imaging requested by Oracle, those archives will most likely contain a significant amount data that is cumulative or completely irrelevant to Oracle's claims in this case. Given the very nature of instant messages, the marginal relevance of any potentially recovered data proves that the information can likely be obtained through "more convenient, less burdensome, or less expensive" means, such as the types of data currently being preserved and other forms of traditional discovery. Therefore, Oracle has failed to establish the good cause necessary to compel the forensic imaging that it seeks, and its motion must be denied

### C.    Oracle's Forensic Demand is Unjustified in Burden and Scope.

Oracle has not established good cause for *any* forensic testing, and it certainly cannot justify the broad scope of forensics it seeks. As mentioned, the court must limit discovery if it is cumulative, more easily obtained through other methods, or the burden or expense outweighs any potential benefit. Fed. R. Civ. P. 26(b)(2)(C). "[F]orensic inspection is unquestionably subject to the balancing required by Rule 26(b)(2)(C) whenever any discovery is challenged as an undue and unnecessary burden." *Covad*, 258 F.R.D. at 12. As stated in Sedona Principle 8, "Resort to . . . sources of electronically stored information that are not reasonably accessible requires the requesting party to demonstrate need and relevance that outweigh the costs and burdens of retrieving and processing the electronically stored information from such sources, including the disruption of

business and information management activities."

The burden on Rimini that would be caused by compelled production of forensic images is substantial, both financially and through the significant disruption of its business practices.[9]   As Oracle notes, "Rimini is an information technology company . . . that provides highly technical services . . . ."  Doc. No. 80 at 22.  As a result, the downtime inherent in the creation of forensic images would significantly disrupt Rimini's "highly technical" business operations.  The nature of Rimini's business also implies that the scope of forensic imaging requested by Oracle is overly broad  *See id.* (Oracle requesting "forensic images of the computers of its employees who possess relevant data").  Virtually every Rimini employee could possess some items of relevant data and would therefore be the subject of forensic testing under Oracle's request.

In addition to significant business interruptions, the costs associated with forensic imaging greatly outweigh any theoretical benefits that might result.  "Forensic inspection of computer hard drives is an expensive process . . . [and] examination of a hard drive inevitably results in the production of massive amounts of irrelevant, and perhaps privileged, information."  *Powers v. Thomas M. Cooley Law Sch.*, No. 5:05-cv-117, 2006 WL 2711512 at *5 (W.D. Mich. Sept. 21, 2006).  In an early attempt to appease Oracle and move one to more important matters, Rimini obtained quotes from two independent vendors to determine the cost of creating forensic images.  Reckers Decl., Ex. F; Ex. G.  These quotes indicated a cost of up to $1,200 per machine, just to make a forensic collection.[10]   Applying these quotes to the full scope of Oracle's broad request would yield a total price tag of over $200,000.  Even at the prices noted by Oracle's paid expert, imaging potentially 200 of Rimini's computers and other media would reach upwards of $100,000.

---

[9] Oracle repeatedly references Rimini's "$150 million in revenue backlog" (Doc. No. 80 at 4, 23) in support of its theory that forensic imaging is not unduly burdensome.  But a "revenue backlog" is exactly that, a backlog of money that has not been paid.

[10] Oracle alleges:  "Rimini's assertions that the cost is too great are apparently no more than speculation . . . ."  Oracle is wrong.  Rimini's argument as to the excessiveness of such costs is supported by two quotes from actual vendors.  Reckers Decl., Ex. F; Ex. G.  Rimini made Oracle aware of these quotes in its May 25, 2010 letter.  *Id*, Reckers Decl. Ex. A.  Also, Mr. Dones testified:  "It's common knowledge in the IT industry that any kind of forensic information-gathering is going to be expensive."  Doc. No. 83, Ringgenberg Decl. Ex. B, Dones Deposition Transcript at 43:20-22.

Doc. No. 86 at 2. (noting that the cost to create forensic images may be as high as $25,000 per 50 machines). These significant costs must be considered in light of the likelihood that little, if any, relevant information might ultimately be gleaned from the recovery of system files or instant messages.

Notably, Oracle's brief and accompanying expert declaration address only the costs associated with *creating* the forensic images.[11] Although such costs are significant in and of themselves, they pale in comparison to the financial burden associated with reviewing evidence from those images for relevance and privilege. *See Covad*, 258 F.R.D. at 16 ("'Production' of electronic information can quickly become quite expensive and disproportionate to what is truly in stake in the lawsuit."); Sedona Principle 2 ("When balancing the cost, burden, and need for electronically stored information," courts should consider "costs of preserving, retrieving, reviewing, and producing electronically stored information"). Sorting the data from forensic images for relevance and privilege "may dwarf the cost of the search". *Covad*, 258 F.R.D. at 14. Thus, the Court must consider these costs during its analysis here.

Oracle itself realizes the significant burden associated with forensic evidence: "It bears emphasis that the process of restoring and analyzing forensic images for deleted files and other evidence of wrongdoing is substantially more difficult and expensive than creating the image in the first place." Doc. No. 80 at 23 (emphasis added). Attempting to circumvent the problem created by this admission, Oracle alleges that it merely wants the images created, and that the cost of forensic "analysis" can be postponed. *Id.* But if the images will not be analyzed, then they need not even be created. If the images will in fact be analyzed, then the costs of such analysis must factor into the Court's analysis of the current motion. Such costs are truly substantial. When combined with the significant cost of creating the images, and the resulting disruption to Rimini's business operations, the burden of forensic imaging clearly outweighs any potential benefit that might result. Ultimately, the Court must balance the significant expense, burden, interruption of business, privacy, and

---

[11] Oracle's expert offers no opinion as to the cost of reviewing that data for production. *See* Doc. No. 86.

1   confidentiality concerns against the purported utility of forensic imaging.  *John B.*, 531 F.3d at 460–

2   61.  Each of the considerations weighs strongly against Oracle.

3         **D.**      **Orders Regarding Forensic Imaging Must be Narrow in Scope.**

4         As discussed above, the technical nature of Rimini's business implies that the scope of

5   Oracle's request for forensic images encompasses the computer of virtually every Rimini employee,

6   as well as numerous former employees.  *See* Doc. No. 80 at 22 (Oracle requesting "forensic images

7   of the computers of its employees who possess relevant data.").  While Oracle ultimately suggests

8   imaging computers for "a limited group of relevant custodians" (*id.*), it does not identify these

9   people or in any other way suggest a cap on the particular number of computers to be imaged.

10   Rimini has consistently "agree[d] to a limited collection of forensic images" as a potential starting

11   point.  Reckers Decl. Ex. A, May 25, 2010 Letter from Mr. Reckers.  However, Oracle has

12   consistently refused to limit the scope of its request in any meaningful way.

13         When the extraordinary measure of forensic imaging is requested, any resulting order should

14   be narrowly focused in scope.  *See N.H. Ball Bearings*, 969 A.2d at 360.  In the face of a request for

15   forensic imaging, trial courts are "permitted to keep discovery within reasonable limits and avoid

16   'open-ended fishing expeditions' or harassment to ensure that discovery contributes to the orderly

17   dispatch of judicial business."  *Id.*  "Because electronic discovery can easily become broad and

18   intrusive, courts have been cautious in requiring the mirror imaging of computers where the request

19   is extremely broad in nature and the connection between the computers and the claims in the lawsuit

20   are unduly vague or unsubstantiated in nature."  *Id.* (internal quotation marks omitted).  In contrast

21   to the broad preservation that Oracle seeks here, "[c]ourts are more receptive . . . to circumscribed

22   requests limited to specified individuals or computers expected to produce relevant information."

23   *Id.*; *accord Rowe Entertainment, Inc. v. William Morris Agency, Inc.*, 205 F.R.D. 421, 427-28, 432-

24   33 (S.D.N.Y. 2002) (granting revised and limited request for defendants' backup tapes and emails

25   and prescribing protocols for imaging); *Simon Property Group L.P. v. mySimon, Inc.*, 194 F.R.D.

26   639, 641 (S.D. Ind. 2000) (granting access to computers used by four named individuals at

27   requestor's expense); *Playboy Enterprises, Inc. v. Welles*, 60 F. Supp. 2d 1050, 1053 (S.D. Cal.

28   1999) (granting access to defendant's personal computer)."

1    As dictated by this authority, Oracle's request for a broad preservation order should be

2    denied.   Any order that this Court might deem appropriate should be narrow in scope to "avoid

3    'open-ended fishing expeditions' or harassment" that would result from a blanket grant of Oracle's

4    motion.  *See N.H. Ball Bearings*, 969 A.2d at 360.   At a minimum, forensic imaging should be

5    limited to a reasonable number of key relevant custodians likely to have specific relevant data (such

6    as instant messages) that Oracle claims has been deleted.   Oracle has failed to even attempt to

7    appropriately narrow the scope of its forensic request, and such a failure provides yet a further

8    indication of Oracle's lack of entitlement to the relief it seeks.

9    **E.      Oracle Should Pay if Forensic Imaging is Required.**

10   It bears repeating that Rimini offered to take forensic images soon after Oracle expressed an

11   interest in them.   Reckers Decl. Ex. A, May 25, 2010 Letter from Mr. Reckers.   Considering the

12   exhaustive scope of Oracle's requests for preservation, Rimini offered, as early as May 25, 2010, to

13   create the forensic images of its thirty key custodians provided that Oracle bear the associated

14   expense.  *Id*.   Oracle, of course, failed to address this offer and refuses to accept that forensic

15   imaging is precisely the type of extreme discovery measure that warrants cost-shifting.

16   Cost-shifting is particularly appropriate where, as here, the information sought is not readily

17   accessible to the producing party.  *Zubulake v. UBS Warburg LLC*, 217 F.R.D. 309, 319–20 n.61

18   (S.D.N.Y. 2003) ("Zubulake I") (noting that consideration of cost-shifting is appropriate where

19   stored data is not in a "readily usable" format); Sedona Principle 13 ("If the information sought is

20   not reasonably available to the responding party in the ordinary course of business, then, absent

21   special circumstances, the costs of retrieving and reviewing such electronic information may be

22   shared by or shifted to the requesting party.").   For the rare cases in which forensic imaging is

23   allowed, the party seeking such discovery is almost always required to pay the associated costs.  *See,*

24   *e.g., Balboa Threadworks, Inc. v. Stucky*, No. 05-1157, 2006 U.S. Dist. LEXIS 29265, *16 (D. Kan.

25   Mar. 24, 2006); *Rowe Entertainment*, 205 F.R.D. at 431 ("Thus, since there has been no showing

26   that the defendants access either their back-up tapes or their deleted e-mails in the normal course of

27   business, this factor tips in favor of shifting the costs of discovery to the plaintiffs."); *Antioch Co. v.*

28   *Scrapbook Borders, Inc.*, 210 F.R.D. 645, 652 (D. Minn. 2002) (discovering party agreeing to pay

1    costs).  This requirement stems from the significant burden imposed on the opposing party when

2    forensic imaging is requested.  *See Playboy Enters.*, 60 F. Supp. 2d at 1053 ("the courts have ample

3    power under Rule 26(c) to protect respondent against undue burden or expense, either by restricting

4    discovery or requiring that the discovering party pay costs").  Expanding technologies, such as

5    forensic imaging, make such a requirement even more appropriate:

6           [N]ew technologies have the capacity to be outcome determinative but often at
            significant expense. Thus the courts are required to strike a balance between allowing
7           the requesting party to take full advantage of the technologies available to it and
            protecting the producing party from having to pay to leave no stone unturned. Resting
8           all of the costs of electronic discovery on the producing party may create a perverse
            incentive on the part of the requesting party to dispense with reason and restraint and
9           unleash every new technology under the sun to try and find information that supports
            the requesting party's claims.
10

11   *Covad*, 258 F.R.D. at 16 (emphasis added).  Here, Oracle should not be afforded the opportunity or

12   incentive to "dispense with reason and restraint and unleash every new technology under the sun to

13   try and find information that supports [its] claims."  *Id*.  Oracle's attempt to "unleash" forensic

14   imaging on a large number of Rimini's computers while arguing that Rimini must bear the

15   associated cost ignores settled law, reveals a strategy of attrition, and should be rejected.

16   **IV.    CONCLUSION**

17          Rimini has fully complied with its discovery obligations, and, thus, Oracle is not entitled to

18   the "drastic discovery measure" of compelled forensic preservation of Rimini's computers.

19   Oracle's motion lacks merit and must be denied.

20

21

22

23

24

25

26

27

28

1

2

| DATED:    AUGUST 31, 2010 | SHOOK HARDY & BACON |
|---|---|
| | By:   */s/ Robert H. Reckers*        |
| | B. Trent Webb, Esq. *(pro hac vice)*<br>Eric Buresh, Esq. *(pro hac vice)*<br>2555 Grand Boulevard<br>Kansas City, Missouri 64108-2613<br>Telephone: (816) 474-6550<br>Facsimile: (816) 421-5547<br>bwebb@shb.com<br>eburesh@shb.com |
| | Robert H. Reckers, Esq. *(pro hac vice)*<br>600 Travis Street, Suite 1600<br>Houston, Texas   77002<br>Telephone: (713) 227-8008<br>Facsimile: (731) 227-9508<br>rreckers@shb.com |
| | *Attorney for Defendants*<br>*Rimni Street, Inc. and Seth Ravin* |

RIMINI STREET INC.'S OPPOSITION TO ORACLE'S MOTION FOR PRESERVATION ORDER
23

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I hereby certify that on the 31th day of August, 2010, I electronically filed the foregoing document with the clerk of the court for the U.S. District Court, District of Nevada, using the electronic case filing system. The electronic case filing system sent a "Notice of Electronic Filing" to the attorneys of record who have consented in writing to accept this Notice as service of this document by electronic means.

By:   */s/ Robert H. Reckers* _____
        Robert H. Reckers

        *Attorney for Defendants*
        *Rimni Street, Inc. and Seth Ravin*

RIMINI STREET INC.'S OPPOSITION TO ORACLE'S MOTION FOR PRESERVATION ORDER
24