1    BOIES, SCHILLER & FLEXNER LLP
     RICHARD J. POCKER (NV Bar No. 3568)
2    300 South Fourth Street, Suite 800
     Las Vegas, NV 89101
3    Telephone: (702) 382-7300
     Facsimile: (702) 382-2755
4    rpocker@bsfllp.com

5    BOIES, SCHILLER & FLEXNER LLP
     STEVEN C. HOLTZMAN (*pro hac vice*)
6    FRED NORTON (*pro hac vice*)
     KIERAN P. RINGGENBERG (*pro hac vice*)
7    1999 Harrison Street, Suite 900
     Oakland, CA 94612
8    Telephone: (510) 874-1000
     Facsimile: (510) 874-1460
9    sholtzman@bsfllp.com
     fnorton@bsfllp.com
10   kringgenberg@bsfllp.com

11   Attorneys for Plaintiffs Oracle USA, Inc.,
     Oracle America, Inc. and Oracle International
12   Corp.

BINGHAM MCCUTCHEN LLP
GEOFFREY M. HOWARD (*pro hac vice*)
THOMAS S. HIXSON (*pro hac vice*)
KRISTEN A. PALUMBO (*pro hac vice*)
Three Embarcadero Center
San Francisco, CA 94111-4067
Telephone: 415.393.2000
Facsimile: 415.393.2286
geoff.howard@bingham.com
thomas.hixson@bingham.com
kristen.palumbo@bingham.com

DORIAN DALEY (*pro hac vice application
to be submitted*)
DEBORAH K. MILLER (*pro hac vice*)
JAMES C. MAROULIS (*pro hac vice*)
ORACLE CORPORATION (*pro hac vice*)
500 Oracle Parkway
M/S 5op7
Redwood City, CA 94070
Telephone: 650.506.4846
Facsimile: 650.506.7114
dorian.daley@oracle.com
deborah.miller@oracle.com
jim.maroulis@oracle.com

13

14

UNITED STATES DISTRICT COURT

15

DISTRICT OF NEVADA

16

| | |
|---|---|
| 17   ORACLE USA, INC., a Colorado corporation; ORACLE AMERICA, INC., a Delaware corporation; and ORACLE INTERNATIONAL CORPORATION, a California corporation, | Case No  2:10-cv-0106-LRH-PAL |
| 18 | |
| 19            Plaintiffs, | **PLAINTIFFS ORACLE USA, INC., ORACLE AMERICA, INC., AND ORACLE INTERNATIONAL CORPORATION'S REPLY IN SUPPORT OF MOTION FOR PRESERVATION ORDER [REDACTED]** |
| 20      v. | |
| 21   RIMINI STREET, INC., a Nevada corporation; SETH RAVIN, an individual, | |
| 22 | |
| 23          Defendants. | |

24

25

26

27

28

1

## TABLE OF CONTENTS

I.  INTRODUCTION ................................................................................................. 1

II.  ARGUMENT ..................................................................................................... 2

    A.  Rimini's Failed to Take Adequate Preservation Measures ................................... 2

        1.  Rimini's "Pre-Suit Document Policies" Are No Substitute for
             Preservation ................................................................................................. 3

        2.  The "Spring of 2009" Third-Party Subpoena Memorandum Was
             Narrow in Scope and Lacked Any Follow-Up ............................................. 5

        3.  Rimini's Post-Lawsuit Litigation Hold Likewise Depends on
             Employee Discretion ................................................................................... 7

        4.  Rimini Admittedly Failed to Preserve Instant Messages ........................... 8

        5.  Rimini's Collection for Production Is Not a Substitute for
             Preservation ............................................................................................... 10

    B.  Forensic Images Are a Necessary and Reasonable Preservation Measure .......... 11

        1.  The Benefit of Forensic Images Would Be Substantial ........................... 11

        2.  The Burden Would Not Be Undue ............................................................ 13

    C.  Rimini Should Bear the Costs of Forensic Imaging ........................................... 14

III.  CONCLUSION ................................................................................................ 15

i

1

## <u>TABLE OF AUTHORITIES</u>

2

3    <u>Cases</u>

4    *Antioch Co. v. Scrapbook Borders, Inc.*,
        210 F.R.D. 645 (D. Minn. 2002) ........................................................................ 12
5
      *Balboa Threadworks, Inc. v. Stucky*,
6        No. 05-1157, 2006 WL 763668 (D. Kan. Mar. 24, 2006) .................................... 12

7    *Children's Legal Services v. Kresch*,
        No. 07-cv-10255, 2007 WL 4098203 (E.D. Mich. Nov. 16, 2007) ..................... 10
8
      *Convolve v. Compaq Computer Corp.*,
9        223 F.R.D. 162 (S.D.N.Y. 2004) ......................................................................... 10

10   *Covad Comm'ns Co. v. Revonet, Inc.*,
        258 F.R.D. 5 (D.D.C. 2009) ................................................................................. 13
11
      *Genworth Fin. Wealth Mgt., Inc. v. McMullan*,
12       267 F.R.D. 443 (D. Conn. 2010) .................................................................... 12, 15

13   *In re Motor Fuel Temperature Sales Practices Litig.*,
        No. 07-MD-1840, 2009 WL 3045718 (D. Kan Sept. 21, 2009) ......................... 10
14
      *In re Yasmin and Yaz* (*Drospirenone) Mktg., Sales Practices and Prods. Liab.*
15      *Litig.*,
        No 3:09-md-02100 (S.D. Ill. Feb. 18, 2010) ...................................................... 10
16
      *John B. v. Goetz*,
17       531 F.3d 448 (6th Cir. 2008) ............................................................................... 12

18   *Malletier v. Dooney & Bourke, Inc.*,
        No. 04 Civ. 5316, 2006 WL 3851151 (S.D.N.Y. Dec. 22, 2006) ........................ 10
19
      *Passlogix, Inc. v. 2FA Technology, LLC*, ___ F. Supp. 2d ___, No. 08 Civ. 10986,
20       2010 WL 1702216 (S.D.N.Y. Apr. 27, 2010) ..................................................... 10

21   *Playboy Enterprises, Inc. v. Welles*,
        60 F. Supp. 2d 1050 (S.D. Cal. 1999) ................................................................. 12
22
      *Powers v. Thomas M . Cooley Law Sch.*,
23       No 5:05-cv-117, 2006 WL 2711512 (W.D. Mich. Sept. 21, 2006) ..................... 14

24   *Preferred Care Partners Holding Corp. v. Humana, Inc.*,
        No. 08-CV-20424, 2009 WL 982460 (S.D. Fla. Apr. 9, 2009) ........................... 15
25
      *Quotient, Inc. v. Toon*,
26       No. 13-C-05-64087, 2005 WL 400649 (Md. Cir. Ct. Dec. 23, 2005) ................. 10

27   *Simon Prop. Group L.P. v. mySimon, Inc.*,
        194 F.R.D. 639 (S.D. Ind. 2000) ......................................................................... 12

28

*Swofford v. Eslinger,*
   671 F. Supp. 2d 1274 (M.D. Fla. 2009) ................................................................. 10

*Treppel v. Biovail Corp.,*
   249 F.R.D. 111 (S.D.N.Y. 2008) ............................................................. 7, 12, 15

*Zubulake v. UBS Warburg, LLC,*
   217 F.R.D. 309 (S.D.N.Y. 2003) ......................................................................... 14

*Zubulake v. UBS Warburg, LLC,*
   220 F.R.D. 212 (S.D.N.Y. 2003) ........................................................................... 4

Rules

Fed. R. Civ. P. 26(c).................................................................................................. 15

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

PLAINTIFFS' REPLY ISO MOTION FOR PRESERVATION ORDER

## I.     INTRODUCTION

Oracle's motion seeks an order requiring Rimini to prepare forensic images of the computer hard drives of no more than 60 employees with relevant evidence because such images are necessary to preserve crucial evidence that otherwise will be lost.

It is no answer for Rimini to say it has taken steps to preserve <u>other</u> evidence, such as information on Rimini's servers and email.  Oracle has grave concerns about what Rimini has done to preserve that evidence, particularly given Rimini's ever-shifting claims about what measures it has taken.  The issue on this motion is whether Rimini has adequately preserved the evidence on its employees' computer hard drives.  And there is nothing in Rimini's opposition to show <u>that</u> evidence has been adequately preserved.

For example, Rimini concedes that it failed to take simple, easy steps to preserve instant messages ("IMs") until August 2010, seven months after this lawsuit was filed and nearly two years after Rimini anticipated this lawsuit.  Rimini cannot dispute that recovering the IMs that have been deleted before and during this lawsuit will only be possible with forensic images of employee hard drives, and that unless forensic images are taken now, those deleted IMs will be even more difficult – if not impossible – to recover later.

Evidence on individual employee hard drives, of which IMs are but one important example, will be critical.  Rimini's central defense in this case is that it has careful safeguards to make sure that Oracle's intellectual property is copied and used only in ways Rimini claims it is permitted to copy and use them.  Evidence disproving Rimini's assertions – showing what Rimini employees *actually do* – will be found on Rimini's employees' hard drives.  That is particularly true where there are efforts to conceal wrongdoing. ████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

1

1 ████████████████████████████████████████████████████

2 ███████

3     Rimini repeatedly says that Oracle never asked it to preserve IMs. That is incorrect.

4 More than a year before this case was filed, and then again three days after this case was filed,

5 Oracle sent letters to Rimini demanding that Rimini preserve all potentially relevant information,

6 and Rimini cannot deny that IMs contain such information. Thereafter, Oracle specifically asked

7 Rimini to preserve "all communications" among Rimini employees about downloading and

8 copying Oracle software, which obviously includes the very IMs that Rimini failed to preserve.

9 Rimini knew that it had relevant IMs, and thus Rimini knew it should preserve them.

10     Nor should Rimini be permitted to avoid its obligations by saying it will only live up to

11 them if Oracle agrees to pay Rimini's expenses. Oracle has borne the substantial costs of

12 preserving its own evidence, including forensic images of approximately 200 custodians'

13 computers. It is Rimini's obligation to preserve its data, and Rimini's failure to take other timely

14 and adequate preservation efforts – such as preserving IMs – makes forensic imaging crucial.

15 Oracle should not be required to bear the costs of Rimini's error, particularly by issuing the

16 blank check Rimini has sought to cover whatever costs Rimini decides to run up.

17     Oracle should not have to pay to make up for Rimini's failures. However, if the Court

18 does conclude that some measure of cost-sharing is appropriate, Oracle respectfully submits that

19 the forensic imaging should be conducted at Oracle's direction or at the direction of a court-

20 appointed neutral, to ensure that *these* preservation efforts, at the very least, are adequate and that

21 Oracle has some control over the costs incurred.

22 **II. ARGUMENT**

23     As shown below, after Rimini anticipated litigation, it failed to take necessary measures

24 to preserve evidence on individual employee hard drives, including IMs. As a result, files have

25 already been deleted, and forensic images are a necessary step to preserve what remains of those

26 files and ensure that additional files are not deleted.

27     **A. Rimini Failed to Take Adequate Preservation Measures**

28     Rimini concedes that probable litigation creates a duty to preserve evidence in advance of

2

1  suit.  (Opp. at 9.)  Rimini does not contest any of the facts that show that Rimini saw litigation

2  with Oracle as probable well in advance of this lawsuit's filing:

3  • in December 2008, Rimini threatened Oracle with antitrust claims and Oracle put

4     Rimini on notice of the claims asserted in this action (Mot. at 5);

5  • ████████████████████████████████████████████████████████

6  • in September 2009, Ravin represented to this Court that Oracle was preparing

7     litigation against Rimini (*id.* at 6); and

8  • after this litigation was filed, Ravin told the press that Rimini "anticipated" this

9     litigation and prepared for it financially (*id.* at 4.)

10  Rimini not only fails to dispute these facts, it fails to even specifically argue that it did not see

11  litigation as probable.  Instead, Rimini agues it took adequate measures.  (Opp. at 9.)  It is wrong.

12          1.     Rimini's "Pre-Suit Document Policies" Are No Substitute for Preservation

13          Rimini argues that, even if it took no affirmative steps to preserve evidence in light its

14  anticipation of this litigation, the Court can trust that documents were preserved because "Rimini

15  has never had a document destruction policy."  (Opp. at 9.) ████████████████████████

16  █████████████████████████████████████████████████████████████

17      █████████████████████████████████████████████

18      ████████████████████████████████████

19      ████████████████████████████████████████

20      ████████████████████████████

21      ████████████████████████

22  ████████████████████████     Indeed, even Rimini's brief, in a backhanded way,

23  concedes that it had no document retention policy: "Rimini documents were and are maintained

24  indefinitely unless a user made the affirmative decision to delete a particular document."  (Opp.

25  at 9.)  That is to say, individual users decided what to keep and what to delete.  It defies common

26  sense to say that merely because Rimini supposedly did not *require* documents to be destroyed,

27  they never would be.  Unless told to do otherwise, many people clean their offices and their

28  computers and get rid of documents and files they think they no longer need – or that might

3

1    incriminate them or their employer.  For this reason, Rimini's own authorities find a legal hold

2    notice an indispensible part of preservation.  *Zubulake v. UBS Warburg LLC,* 220 F.R.D. 212,

3    218 (S.D.N.Y. 2003).

4        Rimini's own evidence proves the point.  Rimini says it does not "auto-delete" emails or

5    put a limit on the size of employee's email inboxes.  (Opp. at 9.)  Thus, Rimini suggests,

6    employees never have any reason to get rid of emails.  But Rimini's own evidence shows that

7    they do:  since Rimini began taking measures to direct employees to preserve emails for this

8    case, it reports that "the total volume of stored emails has increased nearly 50 percent over the

9    last 6 months," which, according to Rimini, demonstrates that employees are *now* "preserving

10   potentially relevant emails."  (Dones Decl. ¶ 9.)   But the rapid growth of stored emails also

11   shows that, prior to these measures over the last six months, emails were *not* being preserved.

12   Rimini's email experience disproves its claim that so long as a company does not tell its

13   employees to delete files, they will be preserved.[1]

14       The other "pre-suit policies" referenced in Rimini's opposition likewise do not offer any

15   assurance that data on employee hard drives was preserved.



24       Likewise, Rimini offers no argument why the supposed security restrictions protecting a

25   certain subset of information on its servers – namely, the stored Oracle software and support

26       [1] Oracle's motion is not focused on emails, which Rimini generally stores on servers, but

27   rather is about any relevant information stored on individual employee hard drives, which may

     include emails deleted from the servers.

28

1    materials located in Rimini's archives (Opp. at 10) – serve as a substitute for different

2    information on Rimini employees' hard drives that is not preserved.

3            2.    The "Spring of 2009" Third-Party Subpoena Memorandum Was Narrow
                   in Scope and Lacked Any Follow-Up
4

5            Thus, Rimini is left to rely on a memorandum circulated in the Spring of 2009 that

6    followed Rimini's receipt of a third-party subpoena in the *SAP TN* action. ████████████

7    ████████████████████████████

8         ████████████████████████████████████████████████

9         ████████████████████████████████████

10        ████

11

12        ████████████████████████████████████████████

13        ████████████████████████████████████████████████

14              ████████████████████████████████████████

15        ████████████████████████████████████████████████

16        ████████████████

17        ████████████

18        ████████████████

19

20   ████████████████████████████████████████████████████████████████

21   ████████████████████████████████████████████████████████████████████

22   ████████████████████████████████████████████████████████████████████

23   ████████████████████████████████████████████████████████████   Yet, in

24   its opposition, Rimini claims that the Spring of 2009 memorandum called for the retention of "a

25   number of categories of documents that Oracle now contends are relevant to this litigation."

26   (Opp. at 10.)  This typifies Rimini's string of incomplete and inconsistent explanations of what it

27   has done to preserve evidence.  Rimini's repeated inability to provide an accurate,

28   comprehensive picture of its preservation efforts exacerbates the need for forensic imaging, the

5

1   only technique capable of creating a definitive record of what is on employee hard drives and

2   putting an end to the months-long run-around following Rimini's ever-shifting account of what

3   data are preserved and what are not.[2]

4          In any event, the Spring of 2009 memorandum is deficient to meet Rimini's preservation

5   obligations in two respects.[3]  First, the memorandum does not even request that employees

6   preserve all of the information relevant to this lawsuit.  To the contrary, as described by Rimini,

7   the memorandum was drafted to preserve evidence responsive to third-party subpoenas issued to

8   Ravin and Rimini.  (Ringgenberg Reply Decl. Ex. GG .)  The memorandum is narrow as a

9   result.[4]  For example, as described by Rimini, the memorandum sought preservation of

10  "checklists or other documents designed to track the development of . . . tax updates," (Opp. at

11  10-11) excluding wide swaths of other evidence regarding Rimini's use of Oracle software in its

12  _____

13       [2]      Rimini defends its failure to disclose the Spring 2009 memorandum until now by
14  arguing that Oracle's 30(b)(6) deposition only addressed preservation measures taken in this
     litigation.  (Opp. at 11 n. 5.)  But the Rule 30(b)(6) notice called for information about "Any
15  steps" taken to "to preserve documents that may be relevant" to this action.  (Id.)
16                                                         Rimini cannot invoke the Spring of 2009
     memorandum to argue that it timely preserved documents relevant to this action but then attempt
17  to excuse its failure to disclose the notice by also claiming that the Spring of 2009 memorandum
     did not preserve documents relevant to this action.

18       [3]      The memorandum is also late, coming months after December 2008, when Rimini
19  threatened Oracle with antitrust litigation and when Oracle put Rimini on written notice of the
     claims at issue in this litigation and its duty to preserve evidence.  (Mot. at 16.)

20       [4]      When describing the Spring of 2009 memorandum, Rimini's brief quotes the
21  subpoena issued to Rimini nearly verbatim, suggesting that the hold memorandum tracked the
     subpoenas issued to Rimini and Ravin.  The subpoena issued to Ravin focuses on
22  TomorrowNow and SAP, not Rimini, so a memorandum based on that subpoena would not
     preserve the vast majority of documents relevant to this litigation.  The Ravin subpoena mentions
23  Rimini in only two document requests – one asking whether Ravin had recruited any former
     TomorrowNow employees and one asking for any documents comparing TomorrowNow and
24  Rimini.  (Ringgenberg Reply Decl. Ex. GG at 7-8) (Requests 5, 10.)  The subpoena issued to
     Rimini includes only the three document requests listed in Rimini's brief, that is, 1) Rimini's
25  business model, 2) Rimini's use of automated tools to download Oracle software, and 3)
     checklists designed to track the development, testing, documentation, packaging, or delivery of
26  tax updates.  (Id. at 32-33.)  As explained above, these three requests are far narrower than the
     issues in this litigation.  The memorandum tracking the subpoenas is thus of limited use to
27  Rimini's document preservation efforts related to this litigation.

28

PLAINTIFFS' REPLY ISO MOTION FOR PRESERVATION ORDER

1   development of tax updates, and including absolutely nothing about development of non-tax

2   patches and updates.  Rimini's description of the memorandum also does not refer to other

3   important categories of information, such as communications among Rimini employees about

4   downloading and copying Oracle software.  (*Id.*)

5           <u>Second</u>, Rimini identifies no meaningful follow-up to the single memorandum.  As

6   shown in Oracle's motion and undisputed by Rimini, such "notify and hope" preservation

7   measures fail as a matter of law.  *See, e.g.*, *Treppel v. Biovail Corp.*, 249 F.R.D. 111, 118

8   (S.D.N.Y. 2008) ("it is not sufficient to notify all employees of a litigation hold and expect the

9   party will then retain and produce all relevant information") (citation omitted); *see also* cases

10  cited in Mot. at 18-19.

11          Rimini has itself provided quantitative proof that the Spring of 2009 memorandum did

12  not adequately preserve evidence.  As noted above, Rimini itself calculated that its

13  implementation of a new hold notice in February of 2010 caused the size of its e-mail stores to

14  grow 50% in six months.  (Dones Decl. ¶ 9.)  If employees had been preserving relevant

15  evidence since the Spring of 2009, then there would have been no reason for such dramatic

16  growth starting later.

17          Put simply, starting in at least December 2008, Rimini anticipated this lawsuit, but did

18  not take adequate steps to preserve files on employee hard drives.

19            3.    <u>Rimini's Post-Lawsuit Litigation Hold Likewise Depends on Employee</u>

20                 <u>Discretion</u>

21          Oracle also showed that, even after Rimini was sued in this action and its counsel issued

22  litigation hold notices by emails, Rimini's preservation efforts with regard to data on employee

23  hard drives have depended centrally on the discretion of individual employees.  (Mot. at 18.)

24  Rimini says it is "beyond disingenuous to suggest that Rimini's preservation" efforts were "left

25  to the discretion of individual, non-lawyer employees." (Opp. at 11.)  Rimini's brief ignores the

26  testimony of its own Rule 30(b)(6) designee on this topic, who was quite clear that Rimini's

27  counsel merely sent two e-mails requesting preservation and hoped employees would comply:

28  

PLAINTIFFS' REPLY ISO MOTION FOR PRESERVATION ORDER



1

2

3

4

5

6

7

8

9

10

11    Rimini attempts to distract the Court from its failure to preserve employees' hard drives

12  by describing its preservation efforts directed elsewhere, namely a "snapshot" it took of company

13  email and client archives found on Rimini servers.  (Opp. at 12.)  But those measures do nothing

14  to preserve information on employees' hard drives.

15              4.      Rimini Admittedly Failed to Preserve Instant Messages

16    Rimini's IMs are a specific example of evidence that Rimini's employees failed to

17  preserve despite receiving a litigation hold notice supposedly instructing them to preserve all

18  relevant evidence.  Rimini has conceded many employees failed to preserve IMs until at least

19  August 2010.  (Ringgenberg Decl. Ex. R at 2-3.)

20

21                                                                                Rimini

22  nonetheless offers three arguments that it had no obligation to preserve IMs.  None has merit.

23    First, Rimini offers an unsupported and factually incorrect argument that preserving IMs

24  would be burdensome or would require Rimini to *create* documents because IMs are

25  "ephemeral." (Opp. at 16-17.)  Computer scientist Paul Mattal analyzed the instant message tool

26  used by Rimini employees, "Yahoo! Instant Messenger," and demonstrated that instant messages

27  can be preserved with the mere click of a mouse by simply selecting "Yes, save all of my

28

8

1  messages." (Mattal Aff. Ex. 2.) ████████████████████████████████████

2  ████████████████████████████████████████████████████████████████████

3  ████████████████████████████████████████████████████

4  ███████████████████████████████████████  In August, Rimini agreed to start

5  preserving IMs, and has offered no technical or practical reason for failing to do so previously.

6  Mattal also demonstrated that the IMs used by Rimini are not "ephemeral." Rather, in the

7  default configuration of the application, IMs are saved to a user's hard drive and then deleted.

8  (Mattal Aff. ¶¶ 9-11.) Preservation of IMs in this circumstance would not require the creation of

9  any new document; it just requires that documents that already exist on the hard drives not be

10  deleted.

11       Second, Rimini's claim that Oracle never asked Rimini to preserve IMs is wrong. On

12  December 23, 2008, Oracle broadly notified Rimini of its obligation to preserve "all documents"

13  and "electronic records" that relate to the claims asserted in this case. (Ringgenberg Decl. Ex. F

14  at 4.) Three days after this case was filed, Oracle reiterated its demand regarding Rimini's

15  preservation obligations. (Id. Ex. J.) And, in response to a request by Rimini to specify relevant

16  materials, on March 22, 2010, Oracle requested that Rimini preserve all "communications

17  between Rimini Street employees concerning the downloading or copying of any Oracle

18  software and support materials." (Id. Ex. M at 2.) That plainly includes IMs between Rimini

19  employees. After Oracle learned at the August 12 Rule 30(b)(6) deposition that Rimini was not

20  preserving IMs, Oracle demanded the next day that Rimini begin to do so. (Id. Ex. EE at 2-3.)[5]

21       Third, Rimini fails in its effort to find caselaw establishing IMs as somehow beyond the

22  scope of preservation or discovery. Rimini's authorities are inapposite; most address the

23  preservation of data that, unlike Rimini's IMs, require far more than just a few clicks to preserve.

24  ———————————

25  [5]     In any event, what Oracle asked for is beside the point. Rimini, not Oracle, has information about the tools that its employees use to communicate, and it is Rimini's obligation

26  to understand and preserve its own data. ████████████████████████████████████

27  ████████████████████████████████████████████████████████████████████

28

1    *See Malletier v. Dooney & Bourke, Inc.,* No. 04 Civ. 5316, 2006 WL 3851151, at *2 (S.D.N.Y.

2    Dec. 22, 2006) (chat room programs that used a technology that "did not provide a ready means

3    for retaining such communications"); *Convolve v. Compaq Computer Corp.*, 223 F.R.D. 162,

4    177 (S.D.N.Y. 2004) ("preservation of the wave forms in a tangible state would have required

5    heroic efforts").[6]   In fact, courts have repeatedly recognized the importance of preserving and

6    producing relevant IMs.  *See, e.g.*, *Passlogix, Inc. v. 2FA Technology, LLC*, ___ F. Supp. 2d ___,

7    No. 08 Civ. 10986, 2010 WL 1702216, at *31 (S.D.N.Y. Apr. 27, 2010) (finding that defendants

8    breached their duty to preserve documents by not preserving instant messages sent using Skype

9    program); *In re Motor Fuel Temperature Sales Practices Litig.*, No. 07-MD-1840, 2009 WL

10    3045718, at *3 n.22, *4 (D. Kan Sept. 21, 2009) (ordering production of relevant IMs); *Swofford*

11    *v. Eslinger,* 671 F. Supp. 2d 1274, 1284 (M.D. Fla. 2009) (imposing sanctions for destroying

12    laptop containing incriminating instant message conversation); *Quotient, Inc. v. Toon*, No. 13-C-

13    05-64087, 2005 WL 400649, at *3 (Md. Cir. Ct. Dec. 23, 2005) (ordering forensic image of

14    defendant's hard drive to preserve instant messages).

15                  5.    <u>Rimini's Collection for Production Is Not a Substitute for Preservation</u>

16           Finally, Rimini relies on its collection of documents from 30 custodians for production as

17    a substitute for preservation efforts.  (Opp. at 12-13.)  But that does nothing to preserve *any*

18    documents from its remaining 170 employees.  And Rimini has yet to demonstrate that its

19    collection procedure sufficiently preserved even those 30 employees' data.  Rimini does not say

20    what types of data were collected, whether counsel collected any metadata or ensured that the

21    metadata was not altered during collection.  (Dones Decl. ¶ 19.)  Rimini does not contend that

22    counsel collected any IMs.  (*Id.*)  And Rimini provides no detail regarding the preservation

23    _____

24          [6] Another order cited by Rimini was the result of a stipulation and reflects no judicial determination.  Case Management Order No. 11, *In re Yasmin and Yaz (Drospirenone) Mktg.,*

25    *Sales Practices and Prods. Liab. Litig.*, No 3:09-md-02100, at *2 (S.D. Ill. Feb. 18, 2010).  And in *Children's Legal Services v. Kresch,* No. 07-cv-10255, 2007 WL 4098203 (E.D. Mich. Nov.

26    16, 2007), the court denied an entire production request in which instant messaging usernames

27    was just one item requested.

28

1    instructions that counsel gave to these 30 employees.  (*Id.*¶¶ 18-19.)

2         **B.      Forensic Images Are a Necessary and Reasonable Preservation Measure**

3              Forensic imaging is the most effective way to ensure preservation of information,

4    including deleted IMs and other deleted files, on Rimini's employees' computers.  Rimini does

5    not dispute this.  Instead, Rimini incorrectly asserts that the burden would outweigh the benefit.

6              1.    The Benefit of Forensic Images Would Be Substantial

7              Here, forensic images of Rimini's computers are critical.  Oracle alleges that Rimini

8    downloads Oracle software and support materials in an indiscriminate manner without regard for

9    what Rimini's customers are licensed to use.  (FAC ¶¶ 6, 8, 42.)  Oracle also alleges that once

10   Rimini does this, it cross-uses software obtained on one customer's behalf for the benefit of other

11   customers, in violation of the customer's license agreements with Oracle.  (*Id.* ¶¶ 59, 76.)

12   ████████████████████████████████████████████████████████████████████

13   ████████████████████████████████████████████████████████████

14   ██████████████████████████████████████████████████████████████████

15   ███████████████████████████████████████████████████████████

16   ████████████████████████████████████████████████████████████████

17   ██████████████████████████████████████████████████████████

18   █████████████████████████████████████████  Forensic images of those

19   hard drives will preserve what files exist, including any files deleted by employees (whether in

20   good faith or to conceal wrongdoing) to the extent such files still remain.

21              Rimini's assertion (Opp. at 10, 12) that it has preserved the end result of these processes,

22   *i.e.*, the downloaded materials in customer folders in a read-only format, is wholly inadequate.

23   Oracle's allegations of improper downloading and impermissible cross-use relate directly to *how*

24   *the software got there*.  Forensic images of relevant hard drives, if the underlying data has not

25   been already destroyed, should have the electronic footprints showing Rimini's steps.  ██████

26   ████████████████████████████████████████████████████████████████████

27   ██████████████████████████████████████████████████████████

28   ████████████████████████████████████████████████████████████████████

                                               11

1 ████████████████████████████████████████████████████

2 ████████████████████████████████████████████████████

3 ████████████████████      The preservation of electronic evidence thus takes on a heightened

4 importance because historical, deleted, overwritten, edited, or transferred data is highly relevant

5 to the litigation.  *See, e.g.*, *Genworth Fin. Wealth Mgt., Inc. v. McMullan*, 267 F.R.D. 443,

6 448 (D. Conn. 2010) ("[t]here is a sufficient nexus between Genworth's claims and its need to

7 obtain a mirror image of the computer's hard drive, warranting the imaging requested by the

8 Plaintiff").

9      Rimini's cases are in accord: forensic imaging is warranted where computer evidence is

10 likely relevant.  *See, e.g., Balboa Threadworks, Inc. v. Stucky*, No. 05-1157, 2006 WL 763668, at

11 *4 (D. Kan. Mar. 24, 2006) (noting that "because the alleged infringement in this case is claimed

12 to have occurred through the use of computers to download copyrighted material, the importance

13 and relevance of computer evidence is particularly important"); *Antioch Co. v. Scrapbook

14 Borders, Inc*., 210 F.R.D. 645, 651-53 (D. Minn. 2002) (granting plaintiff's motion for forensic

15 imaging and inspection of defendants' hard drives and noting that "'it is a well accepted

16 proposition that deleted computer files, whether they be e-mails or otherwise, are discoverable");

17 *see also Simon Prop. Group L.P. v. mySimon, Inc.,* 194 F.R.D. 639, 641 (S.D. Ind. 2000)

18 (ordering forensic inspection of relevant computers); *Playboy Enterprises, Inc. v. Welles*, 60 F.

19 Supp. 2d 1050, 1054-55 (S.D. Cal. 1999) (same).[7]

20      Of course, "compelled forensic imaging is not appropriate in all cases."  *John B. v. Goetz,*

21 531 F.3d 448, 460 (6th Cir. 2008).  But the specifics of this case establish that imaging is not just

22 "appropriate," but necessary, given the importance of the data and Rimini's failures to preserve

23 data found only on individuals' hard drives.  *See Treppel*, 249 F.R.D. at 124 (ordering forensic

24 inspection of inadequately preserved hard drive).  As shown above, Rimini failed since at least

25 _____

26 [7]      The string cite Rimini lists in a footnote simply demonstrates that forensic imaging is
warranted where the requesting party demonstrates a need for forensic images.  (Opp. at 14 n.8.)

27 The paramount importance of ESI to the subject matter of this case and the evidence that Rimini
has not adequately preserved ESI on employees' hard drives demonstrates such a need.

28

1    December 2008 to take adequate steps to ensure that employees preserved evidence on their hard

2    drives, making inevitable the deletion of relevant evidence.  ██████████████████

3    ██████████████████████████████████████████████████████

4    ██████████████████████████████████████████████████████

5    ████    But Rimini failed to ensure that IMs in this case were preserved.  Deleted IMs and other

6    deleted files now sit on Rimini's employees' hard drives, at risk of being overwritten every day

7    by new files.  (Mattal Aff. ¶¶ 5, 12.)  Forensic imaging will protect absolutely the files that

8    remain on those hard drives, including what is left of those deleted IMs and other deleted files,

9    making them available for recovery.  Without forensic images, other files will be deleted, and

10   files already deleted are likely to be gone forever.

11          This is not a mere "fishing expedition" or some effort to "unleash every new

12   technology…to try and find information," as Rimini suggests.  (Opp. at 21-22.)  This is an effort

13   to preserve basic data relevant to Oracle's claims that, because of Rimini's failures, may now be

14   preserved only through forensic imaging.  Where "there is simply no other way in which to seek

15   this information," forensic imaging is warranted.  *Covad Comm'ns Co. v. Revonet, Inc.*, 258

16   F.R.D. 5, 13 (D.D.C. 2009).

17          2.    <u>The Burden Would Not Be Undue</u>

18          Rimini's opposition asserts that forensic imaging could cost up to $200,000.  This is

19   grossly exaggerated in at least two respects.  First, Oracle does not ask that Rimini image each of

20   its 200 employees' computers.  Oracle has proposed that the parties agree on 60 custodians per

21   side from which to produce documents, and the parties are conferring regarding the number and

22   identify of custodians.  Oracle only seeks forensic imaging of the same individuals.

23          Second, Rimini's estimate of the costs per computer is substantially overstated.  ████

24   ████████████████████████████████████████

25   ██████████████████    ██████████████████████████

26   ████████████████████████████████████████  As the

27   declaration of an experienced computer forensics technician demonstrates, ██████████

28   ██████████    Where the subjects are far-flung, the imaging can be conducted remotely, and this

13

1    process can be conducted overnight, avoiding interrupting the employee's use of the computer

2    during business hours.  (Cheng Decl. ¶¶ 8, 11.) ████████████████████████████████████

3    ████████████████████████████████████████████████████████████████████████████████

4    ████████████████████    in line with the estimate provided by Oracle that 50 computers could be

5    imaged for as little as $10,000 and no more than $25,0000.  (Cheng Decl. ¶¶ 8-12.)  Such an

6    expense is hardly unreasonable given Rimini's size, revenues, and the magnitude of the issues at

7    stake – including whether Rimini's business model is fundamentally legal.

8            Rimini also asserts that the costs of imaging "pale in comparison" to the costs of

9    reviewing such documents for privilege and relevance.  (Opp. at 19.)  But Oracle has only asked

10   Rimini to create and *preserve* forensic images to ensure that no more data is lost, not, at this

11   stage, to *produce* forensic images.  *See Covad*, 258 F.R.D. at 9 (distinguishing between a request

12   for the creation of forensic images and a more intrusive request for a forensic inspection).  The

13   case Rimini cites to demonstrate that forensic imaging is burdensome actually addresses the

14   more time-consuming request for forensic investigation of forensic images, not just preparation

15   of the image itself.  *See Powers v. Thomas M. Cooley Law Sch.,* No 5:05-cv-117, 2006 WL

16   2711512, at *5 (W.D. Mich. Sept. 21, 2006).

17           It is premature for the parties or the Court to determine what searching and analysis of the

18   forensic data should be undertaken because the parties are just now completing the foundational

19   discovery period.  After Oracle receives and is able to digest additional documents and data, the

20   need for any forensic analysis and its appropriate scope will be more clear.  But it is important

21   that the forensic evidence be *preserved* now, for otherwise relevant information that may be

22   needed will be lost and irretrievable.

23           **C.    Rimini Should Bear the Costs of Forensic Imaging**

24           Finally, Rimini makes much of its supposed "compromise" in which Rimini would

25   control forensic imaging of its computers but Oracle would foot the bill.  (Opp. at 1.)  Rimini's

26   approach would reverse our litigation system's basic presumption that the producing party bears

27   the cost of production.  *See Zubulake v. UBS Warburg, LLC,* 217 F.R.D. 309, 317 (S.D.N.Y.

28   2003) (further noting that "[a]ny principled approach to electronic evidence must respect that

                                            14

1    presumption").   Such cost-shifting is not appropriate unless discovery imposes an "undue"

2    burden.  Fed. R. Civ. P. 26(c).  As explained above, forensic imaging imposes no undue burden

3    here, and cost shifting is thus inappropriate.

4           Rimini also overlooks that forensic imaging is necessary here because of its own failure

5    to preserve its employees' hard drives and to timely discuss its preservation efforts.  Where a

6    defendant has "failed to take adequate measures to prevent the destruction of discoverable

7    materials," courts have permitted the plaintiff to conduct a forensic *search* – not just imaging –

8    of the relevant computer at defendants' expense.  *Treppel*, 249 F.R.D. at 124.   For example, in

9    *Genworth Fin. Wealth Mgt., Inc. v. McMullan*, 267 F.R.D. 443 (D. Conn. 2010), the court

10   ordered defendants to pay for a forensic investigation because of defendants' failure to preserve

11   "relevant information, that the Defendants were required to maintain and preserve, [which]

12   necessitates the retention of a neutral forensic expert to ascertain what, if any, data existed on

13   any and all computer and electronic storage devices to which the Defendants had access during

14   the relevant time period." *Id.* at 448.[8]   Shifting the costs of forensic imaging or inspection to the

15   receiving party is not appropriate where the producing party's failure to adequately preserve

16   evidence created the need for forensic imaging in the first place.  *See, e.g., Preferred Care*

17   *Partners Holding Corp. v. Humana, Inc.*, No. 08-CV-20424, 2009 WL 982460, at *17 (S.D. Fla.

18   Apr. 9, 2009) (allowing forensic examination at producing party's expense because of discovery

19   failings).

20   **III.  CONCLUSION**

21          For the reasons expressed above, Oracle respectfully requests that the Court enter

22   Oracle's Proposed Preservation Order.

23

24

25   ───────────────────

26   [8] The *Genworth* court apportioned 80% costs of the forensic inspection to defendants and 20% to
27   plaintiffs.  Because Oracle has asked for the less burdensome measure of forensic imaging, no
     such cost-shifting is necessary here.

28

───────────────────────────────────────────────

1   DATED: September 3, 2010                    BOIES SCHILLER & FLEXNER LLP

2

3                                              By: /s/ Kieran P. Ringgenberg
4                                                  Kieran P. Ringgenberg
                                                   Attorneys for Plaintiffs
5                                                  Oracle USA, Inc., Oracle America, Inc.,
                                                   and Oracle International Corp.
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                              16

1

## CERTIFICATE OF SERVICE

2      I hereby certify that on the 3rd day of September, 2010, I electronically transmitted the

3 foregoing **PLAINTIFFS ORACLE USA, INC., ORACLE AMERICA, INC., AND**

4 **ORACLE INTERNATIONAL CORPORATION'S REPLY IN SUPPORT OF MOTION**

5 **FOR PRESERVATION ORDER [REDACTED]** to the Clerk's Office using the CM/ECF

6 System for filing and transmittal of a Notice of Electronic Filing to all counsel in this matter; all

7 counsel being registered to receive Electronic Filing.

8

9                                             /s/ Catherine Duong

10                                       An employee of Boies, Schiller & Flexner LLP

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1