1   BOIES, SCHILLER & FLEXNER LLP
    RICHARD J. POCKER (NV Bar No. 3568)
2   300 South Fourth Street, Suite 800
    Las Vegas, NV 89101
3   TELEPHONE: (702) 382-7300
    FACSIMILE: (702) 382-2755
4   rpocker@bsfllp.com

5   BOIES, SCHILLER & FLEXNER LLP
    STEVEN C. HOLTZMAN (*pro hac vice*)
6   FRED NORTON (*pro hac vice*)
    KIERAN P. RINGGENBERG (*pro hac vice*)
7   1999 Harrison Street, Suite 900
    Oakland, CA 94612
8   TELEPHONE: (510) 874-1000
    FACSIMILE: (510) 874-1460
9   sholtzman@bsfllp.com
    fnorton@bsfllp.com
10  kringgenberg@bsfllp.com

11  BINGHAM MCCUTCHEN LLP
    GEOFFREY M. HOWARD (*pro hac vice*)
12  BREE HANN (*pro hac vice*)
    THOMAS S. HIXSON (*pro hac vice*)
13  KRISTEN A. PALUMBO (*pro hac vice*)
    THREE EMBARCADERO CENTER
14  SAN FRANCISCO, CA  94111-4067
    Telephone:  415.393.2000
15  Facsimile:  415.393.2286
    geoff.howard@bingham.com
16  thomas.hixson@bingham.com
    kristen.palumbo@bingham.com
17
    DORIAN DALEY (*pro hac vice*)
18  DEBORAH K. MILLER (*pro hac vice*)
    JAMES C. MAROULIS (*pro hac vice*)
19  ORACLE CORPORATION
    500 Oracle Parkway
20  M/S 5op7
    Redwood City, CA 94070
21  Telephone:  650.506.4846
    Facsimile:  650.506.7114
22  dorian.daley@oracle.com
    deborah.miller@oracle.com
23  jim.maroulis@oracle.com

24  Attorneys for Plaintiffs
    Oracle USA, Inc., Oracle America, Inc., and
25  Oracle International Corp.

26

27

28

SHOOK, HARDY & BACON LLP
B. Trent Webb (*pro hac vice*)
Eric Buresh (*pro hac vice*)
2555 Grand Boulevard
Kansas City, Missouri 64108-2613
Telephone: (816) 474-6550
Facsimile: (816) 421-5547
bwebb@shb.com
eburesh@shb.com

Robert H. Reckers (*pro hac vice*)
600 Travis Street, Suite 1600
Houston, Texas  77002
Telephone: (713) 227-8008
Facsimile: (713) 227-9508
rreckers@shb.com

LEWIS AND ROCA LLP
W. West Allen (Nevada Bar No. 5566)
3993 Howard Hughes Parkway, Suite 600
Las Vegas, Nevada 89169
Tel: (702) 949-8200
Fax: (702) 949-8398
WAllen@LRLaw.com

GREENBERG TRAURIG
Mark G. Tratos (Nevada Bar No. 1086)
Brandon Roos (Nevada Bar No. 7888)
Leslie Godfrey  (Nevada Bar No. 10229)
3773 Howard Hughes Parkway
Suite 400 North
Las Vegas, NV 89169
Telephone: (702) 792-3773
Facsimile: (702) 792-9002
tratosm@gtlaw.com
roosb@gtlaw.com
godfreyl@gtlaw.com

Attorneys for Defendants Rimini Street,
Inc., and Seth Ravin

1      UNITED STATES DISTRICT COURT

2      DISTRICT OF NEVADA

3

4    ORACLE USA, INC., a Colorado corporation;        Case No. 2:10-cv-0106-LRH-PAL
     ORACLE AMERICA, INC., A Delaware
5    corporation; and ORACLE INTERNATIONAL           JOINT CASE MANAGEMENT
     CORPORATION, a California corporation,          STATEMENT
6
                    Plaintiffs,                       Date:      May 17, 2011
7          v.                                         Time:      9:00 a.m.
                                                      Place:     Courtroom 3B
8    RIMINI STREET, INC., a Nevada corporation;      Judge:     Magistrate Peggy A. Leen
     AND SETH RAVIN, an individual,
9
                    Defendants.
10

11

12          Plaintiffs Oracle USA, Inc., Oracle America, Inc., and Oracle International Corp.

13   (collectively, "Oracle" or "Plaintiffs") and Defendants Rimini Street, Inc. ("Rimini Street") and

14   Seth Ravin ("Ravin") (together, "Rimini" or "Defendants") jointly submit this Case Management

15   Conference Statement in advance of the May 17, 2011 Case Management Conference ("CMC")

16   to provide the Court with a status report of the pending matters.

17          Part I addresses the current status of the pleadings.  Part II provides a status report on

18   party and non-party discovery to date.  Part III describes discovery disputes as to which the

19   Parties request resolution by the Court.  Part IV sets forth the Parties' joint request for a two-

20   month extension of the case schedule and for a further CMC on June 28, 2011, and summarizes

21   the Parties' extensive meet and confer efforts on the subjects of a framework for streamlined

22   litigation, proposed stipulations, and discovery burden since the last CMC.  Oracle views the

23   extension as an interim measure, subject to the Parties' meet and confer efforts and the progress

24   of discovery.

25   I.     STATE OF THE PLEADINGS

26          Defendants have agreed to the filing of Oracle's Second Amended Complaint ("SAC"),

27   which contains additional copyright claims related to Oracle's Relational Database Management

28   System software.  Oracle has not filed the SAC yet because the Parties are negotiating a

1

1    stipulation regarding the scope and licensing of Oracle's derivative-work registrations.  The

2    stipulation would somewhat reduce the overall list of registered works in the SAC.  The Parties

3    hope to finalize the stipulation within the next two weeks.

4    **II.      DISCOVERY PROGRESS**

5          Since the last scheduled Case Management Conference of March 29, 2011, the Parties

6    have made the following progress in discovery:

7          **A.      Discovery Sought From and Produced By Plaintiffs.**

8               **1.      Documents**

9          Rimini has served no additional Requests for Production.  Between March 29 and the

10   submission of this statement, Oracle has produced an additional 41,000 pages of documents and

11   thousands of voluminous Excel files, including customer contracts and related documentation;

12   customer-specific reports (referred to as oki3 reports); software support materials; Oracle partner

13   documentation; and deposition transcripts and exhibits from the Oracle-SAP litigation.  Oracle

14   has also completed document productions from 11 Oracle custodians.  Oracle continues to

15   review documents of the agreed production custodians (including server emails, laptop/desktop

16   images, and documents from network share files), as well as additional customer contracts and

17   related documents.

18         At Rimini's request, Oracle has prioritized the production of seven custodians'

19   documents.  At the time of this submission, Oracle has completed the production of five of these

20   priority custodians.  Oracle expects to complete production of the other two priority custodians

21   by May 31, 2011.  Oracle expects to complete its currently scheduled productions by July 25,

22   2011.

23              **2.      Interrogatories**

24         On April 15, 2011, Oracle responded to Rimini's second set of Interrogatories, numbered

25   13 and 14 and also supplemented its response to Interrogatory No. 3.  The Parties are meeting

26   and conferring regarding the sufficiency of those responses.

27              **3.      Depositions**

28         Rimini took one individual deposition on April 21, 2011, and one on May 12.  A Rule

2

1  30(b)(6) deposition is scheduled for May 26.  Rimini has also noticed five additional individual

2  depositions of Oracle employees: one set for May 12, one set for June 17, two to be scheduled

3  for additional dates in June, and one to be scheduled for early August.

4       **B.**     **Documents Sought From and Produced By Defendants.**

5           **1.**     **Documents**

6       Oracle has not served any additional Requests for Production on Defendants since March

7  29, 2011.  In the last CMC statement, the Parties described and noted the status of production of

8  the significant Rimini data sources and custodial documents.  The following updates that

9  statement as to centralized data sources and custodial documents and then address some related

10  issues not yet ripe for resolution.

11           **2.**     **Centralized data sources**

12       Since the last CMC, Defendants have produced additional centralized data sources then

13  known to and requested by Oracle, including 150 additional Oracle software environments.

14  Oracle's experts are still decompressing this recently received data.  However, they estimate that

15  the four terabytes of compressed data for these environments will amount to 12-13 terabytes of

16  uncompressed data.[1]  Oracle contends the processing of such productions, and decompression of

17  noncustodial materials such as environments, often necessitates a several-day delay between

18  receipt of materials and the ability even to begin analyzing materials.  Oracle further contends

19  that time-consuming analysis of these large volumes of data both depends upon and informs

20  Oracle's depositions of technical personnel.

21       On April 15, Rimini produced approximately 40,000 files (totaling approximately 23 GB)

22  from its customer archives which Oracle had identified and requested by file name and location.

23  These requested files are largely log files providing certain information about Rimini's

---

24  [1] A terabyte is 1 trillion (or $10^{12}$) bytes, and "represents the equivalent of 500 [m]illion

25  typewritten pages of plain text." *Manual for Complex Litigation, Fourth* § 11.446 (2004).  The
printed collection of the Library of Congress could be maintained in 10 terabytes of storage.  *See*

26  *United States v. Faulkner*, Case No. 3:09-CR-249-D, 2010 U.S. Dist. LEXIS 141816 at *3 n.2
(N.D. Tex. Dec. 28, 2010).

27

28

1    downloading of Oracle software and support material from Oracle sources.  Because Rimini's

2    customer archives comprise over 22 terabytes of data, Rimini has provided read-only VPN

3    access to the archives and produced some metadata associated with the archives.  Rimini has

4    agreed to produce any archive files requested for Oracle clients from Rimini's archives.  Oracle

5    continues to analyze metadata from the archives and the files provided from the archives and will

6    request additional material as appropriate.

7         **Oracle's Position**:  Since the last CMC, Oracle has learned about the existence of certain

8    other data sources that Defendants had not previously identified or produced.  For example,

9    during its review of Rimini e-mails, Oracle learned that Rimini Street maintained a Lotus Notes

10   database that tracked the use of certain of Rimini's automated downloading tools.

11        From Oracle's perspective, despite extensive foundational discovery and months of

12   discussion between the Parties concerning available sources of data tracking Rimini's

13   downloading activity, Defendants had not disclosed the existence of this database, and in fact

14   had never disclosed that any centralized repository tracking Rimini's automated downloading

15   tools existed.  Defendants produced a copy of the database on May 5 pursuant to a specific

16   request by Oracle.  The database contains details of more than 5,000 separate uses of Rimini's

17   automated downloading tools.  Oracle and its experts have spent hundreds of hours attempting to

18   compile from numerous sources the information that was sitting undisclosed on Rimini's server.

19   In addition, the database contains substantial material not identified in prior Rimini Street

20   sources, including records of which customer login credential was for which download and log

21   files that exist nowhere else.

22        **Defendants' position**:  From Rimini's perspective, it indeed disclosed the logs tracking

23   Rimini's use of downloading tools during the foundational discovery, as Oracle's counsel

24   acknowledged in a letter dated October 5, 2010.  As explained to Oracle around that time, the

25   logs tracking Rimini's use of downloading tools are stored along with the client archives.  Oracle

26   has had access to the client archives (and thus the download logs) since December of 2010.  In

27   fact, as discussed, *supra*, Oracle specifically requested production of approximately 40,000 of

28   these log files in April of this year.  While Rimini promptly produced the Notes database at

JOINT CASE MANAGEMENT STATEMENT

1   Oracle's request, this database is simply duplicative of information already in Oracle's

2   possession, as its contents are limited to emails forwarding the download logs along with a cover

3   sheet with summarizing the attached data.

4               **3.      Custodial Productions**

5          **<u>Oracle's Position</u>**:  Since the last CMC, Defendants have produced approximately over

6   100,000 documents (comprising over 700,000 pages) from just from one priority custodian,

7   Dennis Chiu, and additional documents from three other priority custodians and approximately

8   25 additional custodians.  Oracle has now deposed two of these priority custodians.  Depositions

9   for the other two priority custodians were rescheduled due to the volume and timing of

10  Defendants' productions (for example, Mr. Chiu's 700,000-plus pages of documents were

11  produced only 16 days before his scheduled deposition).  The postponed depositions have been

12  rescheduled for June.

13         **<u>Defendants' Position</u>**:  Defendants have produced approximately 265,000 documents

14  totaling nearly 3.2 million Bates-numbered pages.  This page count is more than double the 1.5

15  million pages that had been produced as of the last CMC on March 29.  In addition, Defendants

16  have produced in excess of 5,600 files in native format.  Defendants plan to make multiple

17  additional productions in the next few weeks, which will soon bring Rimini's total production to

18  over 3.5 million pages. The documents produced include client contracts, correspondence and

19  emails between Rimini Street and its clients, documents regarding policies and procedures

20  related to Rimini Street's business activities, documents related to investments in Rimini Street,

21  documents related to maintenance end dates and download authorizations, documents related to

22  on-boarding, documents related to extraction tools, and documents related to customized fixes

23  and tax and regulatory updates.

24         **C.      Third Party Discovery**

25               **1.      Customers**

26         Since March 29, Oracle has served subpoenas on approximately 56 of Rimini's

27  customers (including subpoenas Oracle anticipates will have been served by May 17) for a total

28  of 252 subpoenas.  Oracle has received approximately 159 document productions in response to

1   these and prior-served subpoenas.  Oracle's effort to process, review, and produce these

2   productions to Rimini is ongoing.

3       **Oracle's Position**:  Discovery from customers is important for many reasons.  Customers

4   are likely to have multiple categories of documents relevant to the Parties' claims and defenses,

5   including, for instance, internal emails documenting the reasons for the decision to switch to

6   Rimini Street, reflecting concerns about the legality of Rimini Street's services, and reflecting

7   Rimini's representations concerning the same; software updates provided by Rimini Street based

8   on infringing code; download log files; documents evidencing attempts by Rimini to mislead

9   Oracle or avoid detection; or documents discussing Rimini's alleged authority to access and

10  download from Oracle's websites and copy software.  Perhaps most important, Defendants will

11  claim that none of these customers left Oracle due to Defendants' infringement, but rather for

12  other reasons.  The most direct way to test this contention is to ask the customer.  Having

13  recruited these customers with illegal activity, Defendants should not now be able to play the

14  victim and oppose these queries.  If it opposes a handful of depositions, then Rimini should be

15  precluded at trial from contending that Oracle has not met its burden of proof, and Rimini should

16  be precluded from contending that the customers would have left Oracle anyway.  In all, this

17  evidence may provide evidence of causation, damages, willfulness, infringement, or computer

18  fraud that Oracle cannot obtain from Rimini or anywhere else.

19      Oracle has been reluctant to start these depositions without resolution on its request for

20  additional depositions because Oracle expects them only to last a one or two hours each and

21  cannot afford to spend a deposition slot on such a short deposition with so much party discovery

22  yet to complete and the case schedule uncertain.  To avoid delay, at the Parties' meet-and-confer

23  in Kansas City on April 14, 2011 (described more fully below), Oracle proposed a stop-gap

24  agreement to allow the Parties seven hours of third-party deposition time, not counted against the

25  current total, to be allocated at the discretion of the noticing Party.  Defendants responded to this

26  proposal in their May 3 letter, in which they proposed six customer depositions, which would

27  allow 42 additional hours of deposition.  At the last CMC, Oracle proposed 50 additional hours.

28  Because Oracle does not anticipate these depositions will take more than a couple of hours each,

1    Oracle would accept the 42 hours proposed by Defendants, so long as it could allocate them in

2    one- or two-hour increments to depositions of its choosing.

3    **Rimini's Position**:  To the extent Oracle is afforded any customer depositions, these

4    depositions should be subject to a reasonable numerical limit, not the unrestricted hours-based

5    approach advanced by Oracle.  This reasonable numerical limit should not be greater than six

6    depositions.  Given the already extensive party and non-party discovery regarding Rimini's

7    customers, six additional depositions (totaling up to 42 hours) will allow Oracle to garner more

8    than a sufficient amount of customer testimony.  For instance, Oracle could depose two

9    customers for each of the relevant Oracle product lines.  Any further customer depositions

10    would, by definition, be cumulative and duplicative.  Oracle does not need and should not be

11    allowed to seek the same information from multiple third party witnesses.

12    Oracle requests up to 40 depositions of Rimini's customers, allocated in one to two hour

13    increments.  Oracle has already systematically subpoenaed over 250 of Rimini's customers with

14    subpoenas requesting the exact same documents.  Oracle appears to be on a crusade to burden

15    every single one of Rimini's customers even though they all have essentially the same

16    information.  Now, Oracle wants to extend its crusade to what are sure to be duplicative

17    depositions.

18    And such is precisely the undesirable result that stems from Oracle's hours-based

19    approach to deposition limits.  For instance, Oracle's request for an unfettered 42 deposition

20    hours would allow Oracle to take dozens of customer depositions all over the country.  Oracle

21    itself suggests it will take 20 such depositions in this time frame.  The business interruption and

22    legal expense associated with such proposed depositions simply cannot be justified, and Oracle

23    fails to explain the specific and unique information it would hope to glean from these disparate

24    customer depositions.  This Court has already considered a similar proposal in rejecting Oracle's

25    request for a bare limit of 200 deposition hours.  And even then, Oracle was granted over twice

26    the number of depositions contemplated by the Federal Rules.  Oracle has not demonstrated why

27    it needs potentially dozens of depositions directed solely at Rimini's customers, or why such

28    depositions would not be duplicative of depositions Oracle can take within the current deposition

1   limit. Oracle should get the discovery it needs from exemplary customers, but the Court should

2   not facilitate Oracle's non-discovery goals by enabling another rampage through Rimini's

3   customer list.

4              **2.**     **Public Entities**

5        As of the last CMC, Oracle had made state "sunshine act" requests of 46 public entities

6   that may have had significant contact with Rimini, 40 of which had responded with substantive

7   productions or statements that they had no responsive documents.  Since the last CMC, another

8   entity has responded with a substantive production (bringing the total responses to 41 entities),

9   and two entities that had previously responded have made supplemental productions.

10       The Parties' review of the sunshine act materials is ongoing.

11              **3.**     **Other Third Parties**

12       Since March 29, Oracle has continued to negotiate with respect to subpoenas served on

13   third-party support providers Spinnaker Support, CedarCrestone, and netCustomer.  Oracle has

14   also served subpoenas on Rimini Street consultants Aner Group and Summit Technology, and

15   has received a production of documents from Rimini Street investor Adams Street Partners.

16   Defendants have subpoenaed these same companies, and also have served subpoenas on nine

17   providers of consultant services for Oracle-branded products.  Most of these providers are Oracle

18   partners.

19   **III.**    **DISCOVERY IMPASSES**

20       Since the last scheduled Case Management Conference of March 29, 2011, the Parties

21   have reached impasses on certain discovery issues, and request the Court's assistance in

22   resolving these issues.

23       **A.**     **Oracle's Request for Additional Custodians**

24       On March 25, Oracle requested that Defendants add nine additional custodians to the list

25   of agreed-upon custodians for document production.  Defendants ultimately declined to add any

26   new custodians on April 21, asserting that no sufficient basis for identifying additional

27   custodians beyond the previously agreed limit of 54 had been stated.  The Parties' most recent

28   letters on this topic, dated March 25, March 31, April 12 and April 21, are attached as **Exhibit A**.

1    **Oracle's Position**:  On November 17, 2010, the Parties agreed that each side would

2    identify 54 party custodians, "without prejudice to revision if either side discovers material new

3    information revealing additional sources of evidence."  Oracle's position is that incomplete

4    testimony and inaccurate testimony by Defendants' corporate designees pursuant to Fed. R. Civ.

5    P. 30(b)(6) each serve as an appropriate basis for designation of additional custodians.

6        First, Defendants' corporate designees frequently referred questions within the scope of

7    the noticed topics to individual developers and other technical personnel, many of whom Oracle

8    had not previously named as custodians.  Oracle then sought to add a small number of technical

9    personnel (either directly implicated by the 30(b)(6) designees or revealed to hold analogous

10   positions upon review of Defendants' later productions) as additional custodians.  Oracle

11   contends that this addition of a small number of additional custodians is warranted under the

12   Parties' agreement, given this incomplete testimony.  Accordingly, Oracle requests that the Court

13   allow Oracle to name additional developers and technical personnel as custodians so that Oracle

14   can seek more complete information about Rimini's conduct.

15       Second, the testimony of Defendants' corporate designees both before and after the

16   November 17, 2010 agreement has been shown to be inaccurate through the process of taking

17   additional discovery.  For example, Rimini Street's 30(b)(6) designee, Brian Slepko, testified

18   that all PeopleSoft fixes for a given customer were developed using only that same customer's

19   PeopleSoft environment and that same customer's other software and support materials.  *See*

20   Deposition of Brian Slepko Pursuant to Fed. R. Civ. P. 30(b)(6), August 24, 2010, at 74:16-

21   76:16.  In contradiction of that testimony, another corporate designee, Beth Lester, testified that

22   certain PeopleSoft fix objects would be developed once but delivered to multiple customers.  *See*

23   Deposition of Beth Lester Pursuant to Fed. R. Civ. P. 30(b)(6), March 17, 2011, at 100:18-

24   101:22.  As another example, Ms. Lester testified that there were no non-customer specific (or

25   "generic") development environments distinct from customer environments.  *See*, *e.g.*, *id.* at

26   52:9-53:2 (asserting that Rimini Street had no development environments that were not client

27   environments).  In other words, according to Ms. Lester, Rimini Street did not take a copy of

28   Oracle's software and keep it with no customer affiliation as a resource for supporting multiple

1    other customers.  Six weeks later, Rimini Street's manager for PeopleSoft fix development,

2    Susan Tahtaras, testified at length about the distinct roles that client environments and non-

3    customer specific development environments played during development and unit testing.  *See,*

4    *e.g.*, Deposition of Susan Tahtaras, April 27, 2011, at 164:12-167:7.  From memory, Ms.

5    Tahtaras easily listed almost all of the approximately 10 non-customer specific development

6    environments that Rimini Street uses to service more than 100 PeopleSoft customers.  *See id.* at

7    102:1-104:25, 106:19-107:5 & Depo. Ex. 112 (listing the virtual machines used as development

8    environments).

9          Based on these examples and instances of similar conduct, Oracle needs not only to

10   propound discovery on Defendants to obtain information directly relevant to the claims and

11   defenses, but also to test the truthfulness of Defendants' witnesses.  Defendants dispute that their

12   witnesses have contradicted each other, and acknowledge that resolution of such disputes is a

13   task for the finder of fact, but assert that these contradictions have no relevance to the discovery

14   limits.  Defendants' assertion in fact proves Oracle's point:  Oracle is requesting additional

15   discovery that can be used to assist the finder of fact in judging the credibility of Defendants'

16   witnesses and public statements, based upon evidence that Defendants' corporate designees have

17   made inaccurate statements under oath.  For this purpose, as an independent basis, Oracle

18   requests that the Court allow Oracle to identify additional personnel involved in the front lines of

19   Rimini Street's technical support as document custodians.

20         **Defendants' Position**:

21         Following this Court's guidance, the parties have cooperated to appropriately tailor the

22   discovery in this matter to reduce the burden to both parties. Accordingly, the parties previously

23   agreed to limit the number of custodians for each side to 54.  This number was reached through

24   compromise, and each party was allowed to choose its 54 custodians. Such an agreement was

25   necessary given the large number of witnesses on both sides with relevant material. For instance,

26   Oracle's initial disclosures list over 200 individuals with relevant information, a number that

27   exceeds Rimini's entire employee headcount.  Because the production of custodian documents is

28   one of the most time consuming and expensive aspects of litigation, the parties agreed that

JOINT CASE MANAGEMENT STATEMENT

1    additional custodians could be added only upon the discovery of "material new information

2    revealing additional sources of evidence."

3         Oracle now seeks to expand Rimini's custodial productions beyond the limits to which it

4    agreed, but Oracle has provided no material, new information revealing additional sources of

5    evidence.  Instead, it bases its requests on the premise that certain Rimini employees may have

6    information regarding the projects they worked on.  It is, of course, obvious that *any* employee

7    will have information regarding the work they did, but that fact does not justify the expansion of

8    discovery that Oracle seeks.  Most importantly, Oracle's original list of 54 custodians includes

9    numerous employees with virtually identical positions and responsibilities as the nine additional

10   employees it now seeks to add.  Therefore, Oracle's request for additional custodians is

11   duplicative of its previous requests.  Rimini has already produced millions of pages from the

12   agreed-upon custodians, and millions more will be produced before the close of discovery.

13   These custodian productions, along with Rimini's substantial non-custodial productions, provide

14   more than sufficient evidence for Oracle to litigate this case on the merits.

15        Oracle also claims that inaccurate or inconsistent testimony from three Rimini deponents

16   merits the addition of these nine new custodians. As a preliminary matter, Oracle's assertions are

17   false – based on out-of-context sound-bites selected to create the appearance of inconsistency.

18   For example, Oracle asserts that Ms. Lester's testimony that certain files are delivered to

19   multiple clients somehow contradicts Mr. Slepko's testimony that fixes created in a particular

20   client environment are created for that client. But the testimony demonstrates that Rimini

21   typically does not even use client environments to create files at all.  Likewise, Oracle

22   misrepresents Ms. Tahtaras' testimony to falsely claim that Rimini maintains "generic," non-

23   client-specific development environments, which Oracle then argues contradicts Ms. Lester's

24   testimony. But the testimony of both Ms. Lester and Ms. Tahtaras is quite clear that Rimini does

25   not maintain generic environments, and that each development environment is tied to a particular

26   client and used to support that client.

27        Moreover, even if Oracle's assertions of inconsistent testimony were true – which they

28   are not – this would not be "material new information revealing additional sources of evidence."

1   None of this supposedly inconsistent testimony is in regards to "new" information – let alone

2   new information "revealing additional sources of evidence."  If Oracle believes it has discovered

3   inconsistent testimony, it may bring it before the factfinder.  It may also use its numerous

4   remaining depositions and discovery requests to seek additional information regarding this

5   subject matter. It should not, however, be allowed to use out-of-context sound-bites as a

6   justification to expand the reasonable discovery limits agreed to by the parties at the insistence of

7   this Court.

8        Every custodial production is a significant burden, requiring considerable time and

9   resources to complete. This is the very reason the parties reached their agreement in the first

10  place.  In choosing its initial 54 custodians, Oracle selected numerous custodians in similar or

11  identical positions to the employees it now wishes to add. As Rimini has repeatedly stated, if

12  Oracle does indeed discover "material new information revealing additional sources of

13  evidence," Rimini will produce documents from additional custodians as necessary pursuant to

14  the November 2010 negotiations.  Otherwise, Rimini should not be required to undergo the

15  considerable burden of furnishing additional custodial productions any time Oracle discovers a

16  supposed "inaccuracy" or simply wants to add more custodians.  Oracle has taken only 6

17  depositions, and now requests 9 additional custodians premised on the proffered testimony.

18  There can be no doubt that Oracle will use its additional 14 deposition to lodge additional and

19  unreasonable demand for custodial documents.  Such scorched-earth tactics have no legitimate

20  place, and the reasonable discovery limits negotiation by the parties should be maintained.

21        **B.    Oracle's Request for Additional Depositions**

22        Oracle requests six additional non-customer depositions and (as discussed above) 42

23  additional hours of customer depositions, to be allocated in one- or two-hour increments.  As

24  discussed above, Defendants have offered six additional customer depositions comprising up to

25  42 additional record hours in total.

26        <u>**Oracle's Position**</u>: Including the two depositions that would have been completed before

27  this CMC, but which were rescheduled to June due to late productions, Oracle will have taken

28  eight of its allotted 20 depositions by June 3.  Four of these are foundational Rule 30(b)(6)

1    depositions (computer systems and preservation, Rimini's onboarding process, PeopleSoft

2    support services, and JD Edwards support services).  The remaining four are depositions of

3    individual Rimini employees.  As explained at the last CMC, even with an agreement to

4    streamline litigation regarding certain aspects of liability, it will require some additional

5    discovery to understand Rimini's business processes (involving three different Oracle product

6    lines), to collect a fraction of the available third party discovery (nearly all of which relates to

7    damages), and to address all other aspects of damages discovery.  Therefore, Oracle renews its

8    request, on an interim basis, for a modest expansion of the non-customer depositions, with a

9    reservation of rights to request more depending on the outcome of the Parties' negotiations.  The

10   chart below is adapted from the last CMC statement, where each of the categories of deponents

11   on the left is explained in more detail.  In this interim proposal, Oracle has reduced by more than

12   half its requested additional non-customer depositions (from 13 additional non-customer

13   depositions to six), and has adopted Defendants' proposed customer deposition hours total

14   (though not adopting Defendants' proposed cap of six customers), per the discussion above.

| Category | Proposed Depositions | Total Number of Individuals |
|---|---|---|
| Downloaders | 3: 1 PeopleSoft, 1 JD Edwards, 1 Siebel | At least 5 |
| Support and Updates | 3: 1 PeopleSoft, 1 JD Edwards, 1 Siebel) | More than 50 |
| PeopleSoft Developers, Testers and Packagers | 5 (previous request: 10) | At least 25 |
| PeopleSoft Environment Builders | 1 (previous request: 2) | At least 5 |
| JD Edwards and Siebel Developers, Testers, Packagers and/or Environment builders | 2 (previous request: 3) | At least 12 |
| Sales | 4 | At least 12 |
| Other Executives (including Defendant Seth Ravin) | 4 | At least 12 (senior executives) |
| Other Third-Party Support Providers | 3 | 3 companies with more than 2000 combined employees |
| Rimini Street Investors | 1 | At least 4 |
| Customers | 42 hours total (previous request: 50 hours total) | More than 300 past or present business customers for PeopleSoft, JD Edwards, and Siebel services |

JOINT CASE MANAGEMENT STATEMENT

| Category | Proposed Depositions | Total Number of Individuals |
|---|---|---|
| Total | 26 depositions + 42 hours of customer depositions (previous request: 33 depositions + 50 hours of customer depositions) | Approximately 180 total Rimini Street employees, 3 identified competitors, and more than 300 business customers |

**Defendants' Position**:

Oracle requests "on an interim basis" the Court expand its number of allotted depositions by six party depositions and dozens of depositions of Rimini clients. Oracle has already been granted twice the number of depositions contemplated by the Federal Rules, and Rimini is agreeable to six additional customer depositions. Oracle makes little effort to explain why its already extraordinary deposition limits are inadequate. Oracle's requests, if granted, would serve only to impose unnecessary and duplicative burdens on Rimini and potentially dozens of non-parties.

Oracle has not demonstrated "good cause" for adjusting the deposition limit. Instead, it argues that these additional depositions are necessary "to understand Rimini's business processes (involving three different Oracle product lines), to collect a fraction of the available third party discovery (nearly all of which relates to damages), and to address all other aspects of damages discovery." But the specifics of Oracle's requests belie its supposed justifications. For example, Oracle requests 5 depositions of employees working in Rimini's PeopleSoft development organization alone. It is hard to imagine what unique information Oracle hopes to learn from 5 employees in the same department. Indeed, it has already conducted two depositions on such employees, and even these two depositions have exhibited substantial overlap in their subject matter. Oracle can readily obtain the information it seeks if it is mindful of the boundaries set by this Court.

Similarly, as explained *supra* in Section 2(c)(1), Oracle's suggestion that it requires 42 hours of deposition testimony for an unlimited number of Rimini clients cannot withstand scrutiny. It is hard to imagine what Oracle hopes to gain from deposing dozens of Rimini clients rather than the six offered by Rimini (other than burdening a competitors' customers).

1      The present limit of 20 depositions set by the Court appropriately requires the parties to

2    avoid duplication in selecting the witnesses they choose to personally depose. These 20 party

3    depositions, along with the six customer depositions proposed by Rimini, will allow Oracle to

4    obtain the discovery it desires. Oracle has taken only six depositions and has 14 remaining.

5    Oracle does not need and should not be allowed to seek the same information from multiple

6    witnesses.

7      **C.**    **Rimini's Statement Regarding Discovery Deficiencies**

8      <u>**Rimini's Position**</u>:

9      On April 15, 2011, Oracle served its responses to Rimini's Third Set of Requests for

10   Production ("RFP") and its Responses to Rimini's Second Set of Interrogatories.  *See* Ex. B,

11   Plaintiffs' Responses to Defendant Rimini Street Inc.'s Third Set of Request for Production; Ex.

12   C, Excerpt from Plaintiffs' Responses to Rimini's Second Set of Interrogatories (filed under

13   seal).  In these responses, Oracle refused to produce documents responsive to Rimini's RFP No.

14   1.  Oracle also refused to respond to Rimini's Interrogatory No. 14.c.  These discovery requests

15   are directed to the protective measures used by Oracle to protect the computers it alleges were

16   damaged as a result of Defendants' conduct.

17      This request seeks discoverable information that is directly relevant to Oracle's computer

18   hacking, copyright infringement and breach of contract claims.  Rimini has addressed the

19   deficiencies of Oracle's responses in a letter dated May 3, 2011.  *See* Ex. D, May 3, 2011 letter

20   from Robert H. Reckers to Thomas S. Hixson.  Additionally, on May 6, 2011, the parties met

21   and conferred regarding these issues.  Despite these efforts, Oracle remains steadfast in its

22   refusal to produce the requested information.  Because these requests are squarely connected to

23   Oracle's damage claims, Rimini is now forced to bring these issues to the Court for resolution.

24   Rimini requests an order compelling Oracle to immediately produce documents responsive to

25   RFP Nos. 1 and to answer Rimini's Interrogatory No. 14.c.

26      First, the nature of the protective measures used by Oracle to protect its computers from

27   potentially damaging internet traffic is highly relevant to whether Rimini actually caused any

28   damage to Oracle's computers.  Specifically, while Oracle alleges that Rimini accessed its

1   customer support websites in a manner that damaged Oracle's servers, the evidence it has

2   produced regarding this topic is circumstantial, at best.  Oracle has even stated that it is expects

3   this to be the subject of expert testimony.  It is prejudicial to Rimini Street for Oracle to withhold

4   information about its computer systems that would shed light on the plausibility of Oracle's

5   claims -- particularly when its claims apparently rely on ambiguous information and will be the

6   subject of expert opinions.

7           While Rimini denies having created any harmful internet traffic, there can be no question

8   that harmful traffic is pervasive on the Internet, and website providers typically employ any

9   number of protective measures to guard against damage from such traffic.  As listed by Rimini's

10   discovery requests, these protective measures typically include "firewalls, rate controllers,

11   reverse proxies, router configurations, bandwidth limits. . ." etc.  These measures are designed to

12   prevent the very damage from harmful internet traffic that Rimini is alleged to have caused.

13           Oracle admits it utilizes such measures, stating that it has "numerous mechanisms that

14   regulate access and traffic on it, which protect the hundreds of servers behind the portal,

15   including the handful at issue here." Oracle also admits that these websites are "designed to

16   support thousands of customers." This begs Rimini's very question: If Oracle indeed has these

17   measures in place, and can serve tens of thousands of customers, how plausible is it that that

18   Rimini's activities damaged Oracle's servers in the manner claimed? Oracle's experts will

19   undoubtedly attempt to answer this question by assessing the capabilities of Oracle's systems to

20   handle certain volumes of traffic.  Yet this analysis must also consider whether Oracle was

21   employing traffic-limiting devices preventing high levels of traffic from ever reaching the

22   servers-at-issue.  In short, the existence of the protective measures speaks directly to whether

23   Rimini's access to Oracle's computers (authorized or not) could have caused the damages Oracle

24   alleges, and, thus, Oracle's relevancy objections are without merit.

25           Second, Rimini's requests are not overly broad and unduly burdensome.  Rimini has

26   already restricted its requests to the specific computers Oracle alleges were damaged as a result

27   of Rimini's conduct. Indeed, Oracle identified only nine servers that were allegedly impacted by

28   Rimini's downloading activities.  Also, Rimini's requests themselves are already narrowly

JOINT CASE MANAGEMENT STATEMENT

1   tailored in seeking primarily identification of the measures employed and providing a list of

2   exemplary measures.  It is difficult to image how such requests could be further narrowed.

3   Nevertheless, Oracle advances an impossibly broad and unreasonable reading of the requests to

4   excuse its refusal to provide any responsive information.  For instance, Oracle argues that

5   answering Rimini's request would require disclose of "detailed map" of that, if leaked, would

6   comprise Oracle entire computer system to "hackers or other criminal." Any reasonable reading

7   of Rimini's requests reveals that it is not seeking the type of information that would allow

8   criminals to break into Oracle's computer system, though Rimini remains willing to work with

9   Oracle to address any specific security concerns.  However, given the limited number of

10   machines and narrow scope of Rimini's requests, Oracle's suggestion that Rimini's responses are

11   overly broad and unduly burdensome is without merit.

12         Finally, Oracle suggests that it has disclosed database deadlock logs and documents

13   related to the banning of IP addresses, and that this is sufficient.  But such evidence is, at best,

14   incomplete.  While this evidence comprises a subset of responsive material, there can be no

15   question that Rimini is entitled to identification of each of the protective measures employed

16   by Oracle to protect its computers from damaging Internet traffic.  Only through the

17   identification of Oracle's protective measures can Rimini assess the plausibility of Oracle's

18   damage claims. Therefore, Rimini requests that the Court compel Oracle to immediately produce

19   documents in response to Request No. 2 and answer Interrogatory No. 14.

20         **<u>Oracle's Position</u>**:

21         Oracle does not "refuse" to produce documents responsive to Rimini's RFP Nos. 1.  To

22   the contrary, Oracle has produced enormous quantities of documents responsive to this request.

23   For the reasons explained below, it has refused to produce more because Rimini now pushes the

24   request past any reasonable boundary of relevance or scope.  As to Interrogatory 14, Oracle

25   responded in depth as to all other aspects of the interrogatory but could not reasonably, and

26   should not have to under these circumstances, summarize its entire global network security

27   system in an interrogatory.

28         Rimini's Third Set of RFPs, Request No. 2, seeks "[d]ocuments sufficient to show the

1   protective measures, if any, used by Oracle to protect any of the computers you allege were

2   damaged as a result of Defendants' conduct, *including but not limited to* any web access

3   management or security platforms (including Siteminder), firewalls, rate controllers, reverse

4   proxies, router configurations, bandwidth limits, IP address banning, intrusion detection system

5   (IDS), and/or database deadlocks."  The first four words of the RFP – "[d]ocuments sufficient to

6   show" – are presumably intended to sound reasonable.  But they are followed by "including but

7   not limited to," and then a list of numerous aspects of network operation and configuration,

8   apparently every one that Rimini could think of.

9       Likewise, Rimini's Interrogatory No. 14.c. asks Oracle to "identify any measures in place

10  at the time of damage meant to protect the device from potentially damaging internet traffic (i.e.,

11  firewalls, rate controllers, reverse proxies, database deadlocks, software configurations, router

12  configurations, bandwidth limits, IP address banning, IDS, etc.)."  The interrogatory does not

13  have any qualifying language in it.

14      Beyond the voluminous materials and information Oracle already has provided (*e.g.,*

15  ORCLRS0000575, ORCLRS0000576, ORCLRS0000577, ORCLRS0069106,

16  ORCLRS0069107, ORCLRS0083105), these requests seek vast amounts of irrelevant

17  information, are overbroad, and unnecessarily implicate extremely sensitive confidential

18  information about Oracle's network and security systems.

19      By way of background, the materials that Defendants searched and downloaded reside in

20  databases maintained on Oracle's servers.  Rimini accessed the materials in these databases by

21  submitting requests through Oracle's public-facing customer support internet portal, or website.

22  Rimini's requests concerning Oracle's "protective measures" ignore the fact that Oracle

23  implements protective measures for its websites to control traffic through them.  Oracle's

24  customer support portal, and the approximately 100 servers and other equipment that run it,

25  constitute Oracle's primary method of support delivery for its tens of thousands of customers all

26  over the world.

27      Thus, in response to Interrogatory No. 14, Oracle identified mid-tier servers (SES and

28  KM-MT servers) and its SURe database server (then RMSUN08), relating to knowledge

JOINT CASE MANAGEMENT STATEMENT

1   documents, as the ones whose functionality Rimini's conduct impaired.  These servers are not

2   directly connected to the internet.  Rather, access to them goes through Oracle's public-facing

3   websites, including myoraclesupport.com, which is the gateway for customers to nearly all of the

4   Oracle systems used for customer support.  The "protective measures, if any, used by Oracle to

5   protect" its mid-tier and database servers include every protective measure used for Oracle's

6   entire worldwide customer support portal, a system that spans machines around the world –

7   because that portal is what Rimini went through to affect these servers.  This complex,

8   interrelated website portal system runs dozens of applications designed to regulate internet traffic

9   through it and maximize responses to customer inquiries that come through it, including by

10   directing traffic to a massive system of applications and machines, designed to support Oracle's

11   customers.  Rather than describe the universe of protective measures applicable to that entire

12   system, an essentially impossible task in the context of an interrogatory response, and a pointless

13   one at that, Oracle described the impairment it had identified to date in response to subpart (b) of

14   the Request, and described actions taken to mitigate the impairment in response to subpart (d).

15   Oracle has also agreed to produce a Rule 30(b)(6) witness to testify regarding the impairment,

16   and has stated repeatedly that it will provide an expert witness to address these topics.

17       Thus, Rimini's RFP and interrogatory ostensibly seeking information on "protective

18   measures" are improper for several reasons.  First, they seek information that is not reasonably

19   calculated to lead to the discovery of admissible evidence.  If Rimini accessed Oracle's websites

20   without authorization or in excess of authorization and damaged a server, it violated the

21   Computer Fraud and Abuse Act.  It does not matter what protective measures Oracle had in

22   place, then or now.  CFAA liability and damages do not turn on how easy or hard it was to

23   commit the unlawful access.  By analogy, it is likewise no defense to bank robbery to say that the

24   bank should have had better security cameras or more security guards.  And it is just as illogical

25   to say, as Rimini appears to be saying, that if the bank had many security guards, that proves the

26   defendant did not rob it.

27       Rather, what is relevant to the CFAA claim is whether Rimini accessed Oracle's systems

28   improperly and, in doing so, damaged Oracle's servers.  Oracle has produced the relevant

1   documents and described the information relevant to that claim, including electronic records and

2   log files, that show Defendants' traffic through the websites to the servers.  These documents

3   include internet log files reflecting the occurrence of database deadlocks for the time period six

4   months before Rimini's mass downloading to three months after it, and of course during it.

5   These also include non-privileged documents reflecting Oracle's investigation into and

6   assessment of Rimini's activity.  The documents also include an email by a Rimini executive,

7   Dennis Chiu, after committing one of the episodes of downloading in which he stated "I

8   understand our current methodology creates issues with CPU utilization on Oracle's servers."

9         Oracle is not aware of other records that show this traffic, nor does the existence of any

10   "protective measures" have anything to do with this traffic.

11         Second, Rimini's discovery requests are also improper because, even assuming that some

12   portion of them seeks relevant information, they still are overbroad.  Why does Rimini want or

13   need the router configurations, bandwidth limits, rate controllers, and reverse proxies for the

14   many machines that play some role in Oracle's customer support portal?  It does not say, even

15   though any one of these materials would impose significant burden for Oracle to collect across

16   the approximately 100 machines and multiple systems implicated by the request.  Oracle

17   designed the portal to serve Oracle's tens of thousands of customers, and it has numerous

18   mechanisms that regulate access and traffic on it, which protect the hundreds of servers behind

19   the portal, including the handful at issue here.  For example, security measures that monitor

20   bandwidth activity by users in China or Russia protect the SURe database and KM-MT and SES

21   servers, as they protect everything behind Oracle's support portal, because knowledge

22   documents are one type of thing that someone conducting excessive downloads in China or

23   Russia might try to obtain.  Bandwidth monitoring for users in China or Russia – or anywhere –

24   would be responsive to Rimini's RFP.  Indeed, looking at the totality of protective measures that

25   Oracle uses in running its global support portal, through which Rimini accessed the servers at

26   issue, it is difficult to see what would *not* fall within the broad scope of the RFP.

27         Rimini asserts that if Oracle has protective measures in place for its global support portal,

28   then the ability of the portal to withstand high levels of traffic becomes an issue in the case

1  because it goes to the question of whether Rimini's conduct could have caused the alleged

2  damage.  However, that is not accurate, and the argument underscores why Rimini's discovery is

3  overbroad.  Rimini's discovery should be proportional to the scope of Oracle's claims.

4  Presumably, the reason Rimini propounded an interrogatory asking Oracle to identify the servers

5  that were impaired was to prevent Oracle from surprising Rimini at trial with contentions that

6  numerous other machines were impaired.  Oracle has complied with the request that it identify

7  the affected machines.  Rimini is therefore not entitled to sweeping discovery into the protective

8  measures used for the entirety of Oracle's support portal.  However, Rimini is seeking the same

9  broad scope of discovery into system-wide protective measures that it would presumably have

10  sought if Oracle had claimed that Rimini crashed the entirety of Oracle's global support portal

11  and every server accessible through it.  In Rimini's view, there is no relationship between the

12  scope of permissible discovery and the breadth of Oracle's claims, as their assertion is that

13  impairment to any server behind the global support portal means that all the protective measures

14  in the global portal are now swept into relevance.  The Court should not accept such an

15  unbounded view of discovery.

16         Accordingly, Rimini's broadly written discovery requests call for the production of

17  enormous amounts of irrelevant information, eclipsing its limited or nonexistent relevance.

18  What exists specific to the machines Oracle has identified, Oracle has produced.  The Court

19  should reject Rimini's request that Oracle produce these documents and information.

20         Third, Rimini's RFP and interrogatory raise serious confidentiality concerns.  As the

21  Court knows, Oracle alleges that Rimini has stolen significant amounts of Oracle's intellectual

22  property.  Rimini is now asking for a detailed map that describes every single security measure

23  Oracle has for its support portal.  Any bare relevance of these requests (which Oracle does not

24  concede) is outweighed by the possibly competitive harm in disclosing this information.  In

25  theory the protective order prohibits Rimini from using confidential information for a purpose

26  unrelated to the defense of this lawsuit, just as the CFAA prohibits the automated downloading

27  giving rise to the current discovery dispute.  However, *any* even inadvertent leak of this

28  information by *anyone* (Rimini employees, attorneys, experts, vendors, etc.) would threaten the

1   security of Oracle's entire system, exposing it to hackers or other criminals.  Given the low to

2   nonexistent relevance, the Court should not impose that risk.  *See Brown Bag Software v.*

3   *Symantec,* 960 F.2d 1465, 1470-71 (9th Cir. 1992) (Court must balance risk of competitive harm

4   from disclosure against need for information to prosecute case).

5       Accordingly, the Court should deny Rimini's motion to compel further responses to these

6   requests.

7   **IV.   SUMMARY OF MEET AND CONFER EFFORTS REGARDING
        CASE SCHEDULE, DISCOVERY LIMITS AND BIFURCATION**

8

9       Following the Court's guidance, on the evening of March 29, 2011, the same day that the

10  last Case Management Conference was held, Oracle sent Defendants a letter proposing that the

11  Parties hold a series of in-person meet and confer discussions focused on entering into one or

12  more factual or methodological stipulations.  Counsel for the Parties conferred in person on April

13  14 at the Kansas City office of Defendants' counsel, and on April 26 at the San Francisco office

14  of Oracle's counsel.  The Parties also conferred by telephone on May 5.  The Parties exchanged

15  substantive letters and e-mails, collectively attached as **Exhibit E**, on March 29, April 8, April

16  18, April 22, May 3, May 4 and May 6.

17      As discussed further below, the Parties intend to enter certain stipulations as to

18  undisputed facts and are negotiating others, including a potential agreement to litigate certain

19  issues only as to a subset of alleged infringement and alleged licenses.  The Parties' joint request

20  for a two-month extension to the case schedule (except as to the deadline to amend the pleadings,

21  as to which the Parties do not agree) and conditional request for an additional CMC in 45 days is

22  set forth in Part A.

23      Despite the meet and confer, the Parties have not yet resolved some fundamental

24  differences about (1) whether the licenses that Defendants may assert must relate to the alleged

25  infringement to be tested and (2) how to extrapolate liability and damages from the analysis of

26  any chosen subset of allegedly improper acts to Rimini's support of its entire customer base.

27  Absent resolution of these differences, the Parties may be unable to agree on a process by which

28  to narrow the remaining legal and factual issues in dispute.

1      The Parties' discussions of narrowing the issues in this case are summarized in Part B

2  below.  Part C describes a proposed stipulation regarding the scope of Oracle's copyright

3  registrations for derivative works that the Parties have also addressed in the meet-and-confer

4  process.

5      In light of the Parties' joint request for an extension, the issues described in section B are

6  not ripe for judicial resolution at this time.

7      **A.**    **Joint Request for Two-Month Extension of the Case Schedule and for a Further CMC**

8

9      Recognizing the importance of the meet and confer process, and the need to defer certain

10  discovery until the conclusion of the meet and confer process, the Parties jointly propose that the

11  case calendar be continued by two months, which Oracle regards as an interim measure.  (Rimini

12  proposes that the date for amending the pleadings remain the same, while Oracle proposes that it

13  move by the same two months as the other dates).  Custodial productions will not be completed

14  until July, and it will be essential to have an opportunity to review these productions prior to

15  completing all party depositions.  Furthermore, as discussed above, the volume of produced data

16  continues to grow, requiring additional time for analysis prior to the close of fact discovery.

17      Should the Court grant the Parties' joint request for an extension, the Parties

18  conditionally request to return for a further Case Management Conference in six weeks, on June

19  28, 2011.  The Parties believe that their diligent efforts to meet and confer regarding a roadmap

20  for fair and effective resolution of many of the remaining, disputed issues should be completed

21  by that time, and that an opportunity to present the results of the meet and confer and to discuss

22  any remaining disputes would benefit both the Court and the parties.  At that time the Parties

23  would also address whether the stipulated two month extension is sufficient or whether an

24  additional extension is stipulated, or is requested by Oracle and opposed by Defendants.

25      The chart below shows the proposed effect of the joint request upon the current

26  schedule:[2]

    ————————————————

27  [2] Oracle requests that the deadline to amend the pleading and add new parties be extended two months as well.  Oracle believes the extension is necessary to allow sufficient time to complete

28                                (Footnote Continued on Next Page.)

|  | Current Schedule | Proposal |
|---|---|---|
| Last date to complete fact discovery | August 1, 2011 | October 3, 2011 |
| Last date to file motions to compel related to fact discovery | August 15, 2011 | October 17, 2011 |
| Last date to disclose experts on issues for which a party has the burden of proof, pursuant to Fed. R. Civ. P. 26(a)(2) | September 1, 2011 | November 1, 2011 |
| Last date to disclose rebuttal experts | October 15, 2011 | December 15, 2012 |
| Last date to complete expert discovery | December 1, 2011 | February 1, 2012 |
| Last date to file dispositive motions | January 15, 2012 | March 15, 2012 |
| Last date to file joint pretrial order | February 15, 2012 | April 16, 2012 |

Oracle reserves its rights to request a further extension of the case calendar and to request additional discovery pending the outcome of the meet and confer process. Absent resolution of the Parties' current differences, discussed below in Parts B and C, the agreements the Parties otherwise reach may not, at least in Oracle's view, alter the reasons expressed by Oracle at the last CMC and in this statement why more time is needed.

**B.     Meet and Confer Discussions Regarding Oracle's Copyright Claims and Rimini's Defenses to Copyright Infringement**

With respect to Oracle's copyright claims, the Parties have organized their discussions around Rimini Street's alleged improper activity into four categories: Rimini Street's fix-generation process, environments, downloading, and copies of Oracle's database software. As further described below, for the first three of these categories, the Parties have developed a possible framework for analysis of a subset of allegedly improper actions or conduct. However, the Parties disagree about how Rimini Street's license defense should be tested against any such subset. For the fourth category, discussed separately, the Parties are not likely to litigate as to a

_____

(Footnote Continued from Previous Page.)

the stipulation that may affect what registrations it pleads, and also because Rimini's recent global expansion possibly implicates other Oracle entities as plaintiffs, an issue that Oracle actively is assessing. Rimini does not join this request as the purpose of the extension is to afford the Parties time to discuss focusing and streamlining the litigation, not to facilitate expansion of the claims and parties.

1  subset of allegedly improper actions or conduct.

2          **1.**      **Categories of Rimini Street's allegedly improper conduct**

3      **PeopleSoft fixes**:  Rimini Street develops fixes for Oracle software.  As explained in the

4  last CMC statement, the term "fix" (or, equivalently, "update") here refers to a collection of one

5  or more code "objects" that in combination modify or implement some functionality in the

6  overall product.  These fixes are a key part of Oracle's liability case, because they are what

7  Rimini Street sells to its customers as its competing "service."

8      Each fix object is, itself, an independently created software program.  Many fix objects

9  are over 100 printed pages.  Rimini Street has delivered close to 2,000 PeopleSoft fixes to its

10  customers (a number that continues to increase over time), corresponding to an estimated 20,000

11  fix objects.[3]

12      Defendants have agreed to provide a list of all PeopleSoft fixes that Rimini Street has

13  generated but have not yet done so.  The Parties expect that they will be able to agree to a list of

14  customers that received each fix.

15      **Environments**:  An environment is the result of an installation of a version of

16  PeopleSoft, JD Edwards or Siebel software.[4]  Each environment comprises thousands of code

17  "objects" and a database that stores additional code, data and metadata.  PeopleSoft, JD Edwards

18  and Siebel also each have a "tools" component that supplies further functionality.  Every

19  environment thus is a complex system of independently created software programs.

20      Defendants have disclosed a list of 271 PeopleSoft, nine JD Edwards and 124 Siebel

21  environments present on Rimini Street's computer systems.  Oracle contends that, through their

22  deposition testimony, Defendants do not dispute that at least a subset of environments are

23     _____

24  [3] The discussion as to Rimini Street's development processes for JD Edwards and Siebel
    software has been deferred pending further discovery.  The Parties agreed during the course of

25      meet and confer discussions that Oracle will conduct Fed. R. Civ. P. 30(b)(6) depositions as to
    Rimini Street's support for JD Edwards and Siebel.

26      [4] Environments are created either by using "install media" such as CDs, DVDs or electronic

27      installation files, or by copying other environments.

28

1   regularly used to support multiple customers, for instance, by creating fix objects once and

2   sending copies of those objects to multiple customers.  Defendants have agreed to supplement

3   their disclosed list of environments to identify the version of PeopleSoft, JD Edwards or Siebel

4   software corresponding to each local environment and to identify the service packs, maintenance

5   packs, updates and patches that have been applied to each environment (to the extent such

6   information is reasonable available to Rimini).  Oracle will also require some discovery as to the

7   source of each environment.

8          **<u>Downloads</u>**:  Oracle's technical websites contain install media, collections of code

9   objects, documentation and other reference materials.  Rimini Street has performed multiple

10  downloads from one or more of Oracle's technical websites for most if not all of Rimini's

11  clients.  Rimini Street agrees that it makes at least one internal copy of these downloads before it

12  copies the materials to what it describes as "client archives."  Oracle contends that Rimini Street

13  admits it has used automated crawlers and other mass download tools to perform these

14  downloads.

15          **2.        Litigation as to a subset of allegedly improper actions or conduct**

16          As described above, Rimini Street has created substantial populations of fixes,

17  environments and downloaded materials.  Rimini Street does not dispute that the conduct that

18  gave rise to these populations  resulted in the creation of multiple copies of Oracle's copyrighted

19  software.  Through extensive meet and confer, the Parties have explored whether it would be

20  possible to litigate only as to the conduct giving rise to subset of these copies (and to focus

21  discovery upon that conduct), and then to extrapolate the results of that targeted litigation to the

22  entire populations.

23          As to each of these broad categories of activity, Rimini alleges that it is able to assert one

24  or more customer licenses as a defense to liability for copyright infringement.  Oracle disputes

25  that Rimini can meet its burden to show that it can properly assert any customer's license as a

26  defense.  Furthermore, Oracle's position is that it is also Defendants' burden to identify the

27  licenses and the provisions within those licenses that Defendants intend to assert as a defense to

28  each act of infringement.

JOINT CASE MANAGEMENT STATEMENT

1      Oracle's position is that the Parties should litigate as to specific subsets of fixes,

2    environments and customer archives, and that Defendants should attempt to assert any license

3    defenses as to those subsets.  Defendants agree that the Parties should litigate as to specific

4    subset of fixes, environments and customer archives and has proposed that Oracle identify the

5    subset of items it intends to litigate, as well as the alleged misconduct it alleges occurred with

6    respect to that subset.

7      Because the ultimate goal of this process is to establish a list of copies and customers that

8    give rise to liability and damages (if either is established), the Parties are working to reach

9    agreement in advance regarding how to extend the determinations of liability and eligibility for

10    damages as to the subset of copies and customers to the remaining copies and customers.  Rimini

11    has proposed that the previously mentioned subset of fixes, environments and customer archives

12    should serve as test cases (or "trial balloons") for the alleged misconduct to be tested against

13    Rimini's various defenses, including a set of representative license provisions.  To the extent

14    liability is established as to the identified test case versus Rimini's defenses, such a liability

15    determination would extend to similar instances of conduct.  Though work remains to be done,

16    the Parties have begun discussions regarding the exemplary instances of alleged misconduct and

17    the methodology for identifying similar instances of such conduct in the overall population of

18    evidence.

19      Oracle intends to hold Defendants to their burden regarding the propriety of the assertion

20    of any license defense.  If the Parties agree to litigate only as to a subset of materials for each

21    category (fixes, environments, customer archives), then Oracle's position is that the Parties

22    should agree in advance how to extend the determinations of liability and eligibility for damages

23    as to the subset of copies and customers to the remaining copies and customers.  The Parties have

24    agreed that for purposes of these streamlining discussions, the trial should not be bifurcated so

25    that any extension or extrapolation of the sample set would be for all purposes at a single trial.

26          **3.**      **Copies of Oracle's Database Software**

27      Defendants have agreed to stipulate that Rimini Street has reproduced each of Oracle's

28    copyright registrations for Oracle Database software that will be listed in the Second Amended

1    Complaint, and are likely to agree upon the number of copies that Rimini Street has made.

2    Rimini Street's liability for direct infringement of these registrations will thus be established

3    unless Defendants successfully assert a license or other defense.

4              **4.       Customer Licenses**

5              As discussed above, Defendants' position, with which Oracle does not agree, is that the

6    alleged misconduct identified by Oracle with respect to its subset of fixes, environments and

7    customer archives should be tested against a sample set of licenses.  Defendants have proposed

8    that the sample set of licenses include 25 PeopleSoft customers, 10 JD Edwards customers and

9    10 Siebel customers.  Defendants have further proposed that the sample be deemed to include

10   license provisions identified in Oracle's Response (including any amended and supplemental

11   responses) to Defendants' Interrogatory No. 11, and Rimini Street's Response (including any

12   amended and supplemental responses) to Oracle's Interrogatory No. 15.

13             The Parties have agreed that Oracle will identify licenses for a set of customers related to

14   any sample exercise by Bates number.  Oracle's agreement to identify customer licenses by

15   Bates numbers in response to requests from Defendants shall not constitute waiver of Oracle's

16   rights to hold Defendants to their burden to show that they can assert any given license and to

17   identify any relevant licenses to any relevant provisions within those licenses.

18             **Oracle's Position**:  Even if Defendants were permitted to assert a customer's license as a

19   defense to copying of that customer's software (which Oracle does not concede), only the license

20   provisions found in that customer's license could serve to excuse the infringement.  Defendants'

21   proposal to decouple the licensing from the infringement finds no support under the law.

22             **Defendants' Position**:  From Rimini's perspective, the use of representative license

23   provisions is a necessary prerequisite to any extrapolation of liability stemming from a subset of

24   trial cases.  Just as such extrapolation would greatly streamline the liability determination,

25   Rimini still must be permitted to fairly assert its defenses, including presentation of at least

26   representative license provisions relevant to the allegedly improper conduct.

27             **C.       Derivative Works and Oracle's Second Amended Complaint**

28             The Parties tentatively have agreed to stipulate regarding the scope of Oracle's copyright

1  registrations for derivative works, so as to reduce the number of copyright registrations that

2  Oracle must allege and to simplify the Parties' analysis of any relevant licenses.

3

4

5  DATED:  May 13, 2011

6  BINGHAM McCUTCHEN LLP                    SHOOK, HARDY & BACON LLP

7  By:  /s/ Geoffrey M. Howard            By:  /s/  Robert H. Reckers

8      Geoffrey M. Howard (*pro hac vice*)       Robert H. Reckers (*pro hac vice*)
       Three Embarcadero Center                 600 Travis Street, Suite 1600
9      San Francisco, CA 94111-4067             Houston, Texas  77002
       Telephone:     415.393.2000              Telephone: (713) 227-8008
10     Facsimile:     415.393.2286              Facsimile: (731) 227-9508
       geoff.howard@bingham.com                 rreckers@shb.com
11  *Attorneys for Plaintiffs*

12                                             *Attorneys for Defendants*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## **ATTESTATION OF FILER**

2          The signatories to this document are myself and Robert Reckers and I have obtained Mr.

3   Reckers's concurrence to file this document on his behalf.

4   DATED:  May 13, 2011                    BINGHAM McCUTCHEN LLP

5                                           By: /s/ Geoffrey M. Howard

6                                               Geoffrey M. Howard (*pro hac vice*)
                                                Three Embarcadero Center
7                                               San Francisco, CA 94111-4067
                                                Telephone:     415.393.2000
8                                               Facsimile:     415.393.2286
                                                geoff.howard@bingham.com
9

10                                              *Attorneys for Plaintiffs*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

JOINT CASE MANAGEMENT STATEMENT