BOIES, SCHILLER & FLEXNER LLP
RICHARD J. POCKER (NV Bar No. 3568)
300 South Fourth Street, Suite 800
Las Vegas, NV 89101
TELEPHONE: (702) 382-7300
FACSIMILE: (702) 382-2755
rpocker@bsfllp.com

BOIES, SCHILLER & FLEXNER LLP
STEVEN C. HOLTZMAN (*pro hac vice*)
FRED NORTON (*pro hac vice*)
KIERAN P. RINGGENBERG (*pro hac vice*)
1999 Harrison Street, Suite 900
Oakland, CA 94612
TELEPHONE: (510) 874-1000
FACSIMILE: (510) 874-1460
sholtzman@bsfllp.com
fnorton@bsfllp.com
kringgenberg@bsfllp.com

BINGHAM MCCUTCHEN LLP
GEOFFREY M. HOWARD (*pro hac vice*)
BREE HANN (*pro hac vice*)
THOMAS S. HIXSON (*pro hac vice*)
KRISTEN A. PALUMBO (*pro hac vice*)
THREE EMBARCADERO CENTER
SAN FRANCISCO, CA  94111-4067
Telephone:  415.393.2000
Facsimile:  415.393.2286
geoff.howard@bingham.com
thomas.hixson@bingham.com
kristen.palumbo@bingham.com

DORIAN DALEY (*pro hac vice*)
DEBORAH K. MILLER (*pro hac vice*)
JAMES C. MAROULIS (*pro hac vice*)
ORACLE CORPORATION
500 Oracle Parkway
M/S 5op7
Redwood City, CA 94070
Telephone:  650.506.4846
Facsimile:  650.506.7114
dorian.daley@oracle.com
deborah.miller@oracle.com
jim.maroulis@oracle.com

Attorneys for Plaintiffs
Oracle USA, Inc., Oracle America, Inc., and
Oracle International Corp.

SHOOK, HARDY & BACON LLP
B. Trent Webb (*pro hac vice*)
Eric Buresh (*pro hac vice*)
2555 Grand Boulevard
Kansas City, Missouri 64108-2613
Telephone: (816) 474-6550
Facsimile: (816) 421-5547
bwebb@shb.com
eburesh@shb.com

Robert H. Reckers (*pro hac vice*)
600 Travis Street, Suite 1600
Houston, Texas  77002
Telephone: (713) 227-8008
Facsimile: (713) 227-9508
rreckers@shb.com

LEWIS AND ROCA LLP
W. West Allen (Nevada Bar No. 5566)
3993 Howard Hughes Parkway, Suite 600
Las Vegas, Nevada 89169
Tel: (702) 949-8200
Fax: (702) 949-8398
WAllen@LRLaw.com

GREENBERG TRAURIG
Mark G. Tratos (Nevada Bar No. 1086)
Brandon Roos (Nevada Bar No. 7888)
Leslie Godfrey  (Nevada Bar No. 10229)
3773 Howard Hughes Parkway
Suite 400 North
Las Vegas, NV 89169
Telephone: (702) 792-3773
Facsimile: (702) 792-9002
tratosm@gtlaw.com
roosb@gtlaw.com
godfreyl@gtlaw.com

Attorneys for Defendants Rimini Street,
Inc., and Seth Ravin

---

A/74572609.6

1    UNITED STATES DISTRICT COURT

2    DISTRICT OF NEVADA

3

4    ORACLE USA, INC., a Colorado corporation;          Case No. 2:10-cv-0106-LRH-PAL
     ORACLE AMERICA, INC., A Delaware
5    corporation; and ORACLE INTERNATIONAL               **JOINT CASE MANAGEMENT
     CORPORATION, a California corporation,              CONFERENCE STATEMENT**
6
                        Plaintiffs,                      Date:      November 8, 2011
7              v.                                        Time:      9:00 a.m.
                                                         Place:     Courtroom 3B
8    RIMINI STREET, INC., a Nevada corporation;          Judge:     Magistrate Peggy A. Leen
     AND SETH RAVIN, an individual,
9
                        Defendants.
10

11

12          Plaintiffs Oracle USA, Inc., Oracle America, Inc., and Oracle International Corp.

13   (collectively, "Oracle" or "Plaintiffs") and Defendants Rimini Street, Inc. ("Rimini Street") and

14   Seth Ravin ("Ravin") (together, "Rimini" or "Defendants") jointly submit this Case Management

15   Conference Statement in advance of the November 8, 2011 Case Management Conference

16   ("CMC") to provide the Court with a status report of the pending matters.

17          There have been no updates to the pleadings since the last CMC statement was filed on

18   September 19, 2011.  Below, Part I provides a status report on the party and non-party discovery

19   to date.  Part II sets forth the Parties' different proposals for scheduling the next CMC or CMCs.

20   In Part III, the Parties set forth their positions on current discovery disputes which they request

21   that the Court resolve at this CMC.

22   I.     **DISCOVERY PROGRESS**

23          Since the last CMC statement was filed on September 19, 2011, the Parties have made

24   the following progress in discovery:

25          A.     **Discovery Sought From and Produced By Plaintiffs.**

26                 1.     **Documents**

27          On September 26, 2011 Oracle responded to Rimini's fourth set of requests for

28   production, which included 19 new requests.

                                          1

A/74572609.6

1    On October 3, 2011, Rimini served its fifth set of requests for production on Oracle,

2    which included 57 new requests.  Oracle's responses to the fifth set of requests are not yet due.

3    Between September 19, 2011 and the submission of this statement, Oracle has produced

4    approximately 36 additional native files and 1309 additional documents, totaling approximately

5    12,378 pages, including Defendant Seth Ravin's PeopleSoft personnel files, customer contracts,

6    customer-specific documentation, customer-specific oki3 reports, and additional documents

7    responsive to Rimini's document requests.  Oracle also produced a hard drive containing

8    approximately 320 gigabytes of web server logs.

9    To date, Oracle has produced approximately 268,492 responsive documents, totaling

10   approximately 1,325,161 pages, including thousands of voluminous excels; hundreds of software

11   disks and customer-specific oki3 reports; several hard drives of server log files; customer

12   contracts; copyright registrations; deposit materials; technical support policies; product tables;

13   terms of use; organizational charts; financial data and damages-related documents, including

14   research and development reports, reports of support cancellation and renewal rates, and price

15   lists; Oracle partner documentation; pre-litigation correspondence between Oracle and Rimini;

16   deposition transcripts, exhibits, and written discovery from *Oracle USA, Inc. et al. v. SAP AG et*

17   *al*, No. 07-cv-01658 (N.D. Cal. filed March 22, 2007); and responsive, unprivileged documents

18   from all 55 agreed-upon Oracle custodians.  In addition, Oracle has produced hundreds of

19   gigabytes of compressed files on hard drives.

20                          **a.      Custodial Productions**

21   As stated in the last CMC Statement, Oracle substantially completed document

22   productions from all 55 agreed-upon Oracle production custodians on September 8, 2011,

23   consistent with Oracle's discovery responses and objections.

24                          **b.      Non-Custodial Productions**

25   Oracle continues to gather and review non-custodial documents for production, including

26   customer contract documents.  Oracle will produce by November 1st all of the requested

27   customer contract documents that it has been able to locate after a reasonable and diligent search

28   for customers identified prior to September 28, 2011.  Oracle will complete its production of

2

A/74572609.6

1    customer contract documents for customers newly identified by Rimini on September 28, 2011

2    by December 5, 2011.

3        Oracle will produce by November 1st Oracle RDBMS database licenses for each of

4    fifteen customers requested by Rimini as well as Oracle's generic Oracle RDBMS database

5    licenses in use from 2002-2011, all as part of a compromise reached between the parties

6    regarding production of Oracle database licenses,.

7                **2.    Interrogatories**

8        On October 6, Oracle responded to Rimini's fourth set of interrogatories.  On October 3,

9    Rimini served Oracle with its fifth set of interrogatories, consisting of Interrogatories No. 17-40.

10   Oracle's responses to the Fifth Set of Interrogatories are not yet due.

11               **3.    Depositions**

12       Rimini served a Rule 30(b)(6) deposition notice on Oracle on September 28 that

13   contained 61 topics and 101 subtopics.  Oracle served objections to this deposition notice on

14   October 11 and proposed to meet and confer regarding the scope of the deposition notice and the

15   topics contained in it.  Rimini, for its part, has agreed to confer with Oracle regarding narrowing

16   the noticed topics in an attempt to avoid the need for judicial intervention on these issues.

17       On August 22, Rimini noticed the depositions of two additional Oracle employees.  On

18   September 13, Rimini withdrew those deposition notices.  Rimini has also noticed the deposition

19   of another Oracle employee on a date to be determined.

20       **B.    Documents Sought From and Produced By Defendants.**

21               **1.    Documents**

22       On September 28, 2011, Oracle served Rimini with its third request for inspection.  On

23   October 3, 2011, Oracle served Rimini with its seventh set of requests for production, numbered

24   83 through 90.  On that same date, Oracle served Rimini with its eighth set of requests for

25   production, numbered 91 through 98.  Rimini's responses to these requests for production are not

26   yet due.  On October 10, 2011, Rimini served its responses to Oracle's sixth set of requests for

27   production.

28       Between September 19, 2011, and the submission of this statement, Rimini has produced

A/74572609.6

1   approximately 460 additional documents, totaling approximately 2,300 pages.  These materials

2   include e-mails, log files, client physical media inventory spreadsheets, PS Backup & PSRestore

3   Logs, International Partner Agreements, documents initially withheld for privilege but since

4   downgraded, and over 141 native files.  Defendant Seth Ravin also produced documents

5   regarding his pre-Rimini work history.  To date, Rimini has produced over 754,450 documents

6   totaling over 6,050,000 pages, as well as over 81,350 native files, numerous environments,

7   financial information, ticketing system data, data archives, source code, log files, productions

8   relating to SalesForce exports, TUSS spreadsheet, DevTrack spreadsheets, various extract and

9   individual VMs and network shares.

10                       **a.       Custodial Productions**

11          As of the date of the submission of this statement, Rimini has completed a good-faith

12   review and production of responsive, non-privileged documents collected from all 55 Rimini

13   custodians, consistent with Rimini's discovery responses and objections, and subject to further

14   requests or developments.

15                       **b.       Non-Custodial Productions**

16          Aside from the non-custodial productions for  Plaintiffs' recently served Seventh and

17   Eighth Set of Requests for Production, Rimini has completed gathering, reviewing and producing

18   non-custodial documents, including materials from various department shares and non-custodial

19   email files.  Productions from these sources included data relating to financial, client

20   relationships, marketing and sales.  Further, Rimini has agreed to produce copies of the "FSCM

21   Development," "FSCM Functional," FSCM Staging," "FSCM Delivered," "SA Development,"

22   "SA Functional," "SA Staging," and "SA Delivered" folders and to make available Rimini's

23   client archives for its EBS clients via VPN access.

24                       **2.       Interrogatories**

25          On September 28, Rimini responded to Oracle's Seventh set of Interrogatories.  On

26   October 3, Oracle served Rimini with its Eighth set of Interrogatories, consisting of

27   interrogatories No. 32-40.

28

A/74572609.6

1          **3.**     **Depositions**

2         Oracle took depositions on September 27, October 5, and October 18, totaling three

3    depositions since the last CMC.  Oracle has noticed a Rimini employee deposition for November

4    11, 2011, and Oracle's deposition of Defendant Seth Ravin has been rescheduled a second time

5    to November 17, 2011 at Defendants' request.

6        **C.**    **Third Party Discovery**

7            **1.**    **Customers**

8         Since the last CMC, Oracle has served 21 additional subpoenas on Rimini customers for

9    a total of 275 customer subpoenas.  Oracle has received approximately 243 document

10   productions in response to these subpoenas.  Oracle continues to seek the cooperation of

11   subpoenaed customers with outstanding or deficient productions.

12        Oracle's effort to process and produce customer productions to Rimini is ongoing.

13   Oracle has sent approximately 227 customer productions to Rimini and received approximately

14   18 customer productions from Rimini.  Pursuant to their June 17, 2011 agreement, the Parties

15   continue to exchange copies of third-party productions as soon as reasonably practicable with all

16   documents provisionally designated as Highly Confidential – Attorneys' Eyes Only.  Re-

17   designations and de-designations occur as necessary per the terms of that agreement.

18        At the last CMC, the Court ordered that Oracle may take up to 20 customer depositions

19   limited to two hours in duration.  Oracle has noticed all of the customer depositions, has firm

20   deposition dates and locations for six of the outstanding customer depositions, and has taken five

21   of the customer depositions.  Oracle will continue to diligently work to confirm firm dates and

22   locations for the outstanding customer depositions.

23           **2.**    **Public Entities**

24        Oracle has made state "sunshine act" requests of 51 public entities that may have had

25   significant contact with Rimini, and 43 entities have responded with a substantive production.

26   Oracle's effort to process and produce public entity productions to Rimini is ongoing.  Oracle

27   has sent approximately 41 public entity productions to Rimini.  The Parties' review of the

28   sunshine act materials is ongoing.

A/74572609.6

3.      **Other Third Parties**

Oracle has noticed the deposition of CedarCrestone, a Rimini Street competitor, for December 1st, 2011.

Since the last CMC, Oracle has reviewed a supplemental production it received from Rimini Street investor Adams Street Partners on September 22.   It has also reviewed the initial production from broker JMP Securities received on October 12 and is currently negotiating a further production of documents.

On October 12, 2011, Oracle received a production of documents in response to its September 2, 2011 subpoena of JMP Securities.

On November 1, 2011, Oracle served Vinnie Mirchandani with a document subpoena.

II.    **PROPOSALS CONCERNING FURTHER CASE MANAGEMENT CONFERENCE OR CONFERENCES**

The Parties request that the Court address the scheduling of the next CMC or CMCs, to provide an efficient vehicle to resolve outstanding discovery disputes given the upcoming close of fact discovery on December 5.[1]   However, the Parties have different proposals.

Oracle proposes that the next CMC be scheduled for November 22 to resolve discovery disputes that may be ripe by that time.  In addition, Oracle requests that a CMC be rescheduled for the second full week of December to resolve any final motions to compel concerning fact discovery.  Depending on the outcome of the meet and confer process, it seems likely that there will be a number of discovery disputes that will require judicial resolution, more than can be efficiently handled in one CMC.  Further, having a CMC on November 22 increases the likelihood that additional discovery that may come out of a Court ruling could be completed by or near the scheduled discovery cutoff.

Defendants propose that the Court schedule the next CMC early in December but after

---

[1] The Parties have previously agreed that depositions may take place after the discovery cutoff if they were noticed at least four weeks prior to the cutoff.  Oracle will have served the remaining deposition subpoenas on Rimini customers by four weeks prior to the cutoff.  To accommodate the customer, some of those depositions may be rescheduled for after the discovery cutoff.

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

A/74572609.6

1  the close of fact discovery.  As discussed above, the Parties have a tremendous amount of work

2  ahead of them as the fact discovery cutoff approaches, including taking numerous party and

3  customer depositions, responding to written discovery and finalizing document productions.

4  Given this work, the Parties should focus their resources on actually completing discovery, not

5  litigating motions to compel.  This is precisely why the Court's schedule sets the deadline to file

6  motions to compel regarding fact discovery for December 19, two weeks *after* the discovery cut

7  off.  Oracle's request to set the next case management conference in a mere two weeks

8  unnecessary strains already stretched resources.  Rimini proposes setting the next CMC in early

9  December after the close of fact discovery so, consistent with the Court's schedule, motions to

10  compel can be resolved after the discovery cutoff and not in the mist of the Parties' collective

11  push to complete their discovery.

12  **III.     DISCOVERY DISPUTES REQUIRING JUDICIAL RESOLUTION**

13          **A.     Oracle's Motion to Compel Amended Responses to its
                        Interrogatories 24-25**

14

15  **Oracle's Position:**

16          Oracle moves to compel adequate responses to its Interrogatories 24 and 25.  Below

17  Oracle describes the information sought by these interrogatories and why Rimini Street's

   responses are deficient.

18          Interrogatories 24 and 25 address one of Rimini's central defenses:  that it respects

19  Oracle's intellectual property rights by creating customer-specific "silos" such that "clients'

20  Oracle Software and Support Materials are not physically co-mingled together."  Rimini Street's

21  Second Amended Answer and Counterclaims, Dkt. 153 ("Answer"), ¶ 34.  Oracle has uncovered

22  evidence that, in fact, Rimini maintained a central repository of Oracle software and shared that

23  software among Rimini's customers.  *See, e.g.*, Declaration of Geoffrey M. Howard ("Howard

24  Decl."), Ex. A (Deposition of Krista Williams, October 5, 2011 ("Williams Depo"), at 25:1-14;

25  26:9-27:13; 29:10-29:19 (acknowledging and describing central "software library") (filed under

26  seal).  This central repository (which Rimini employees often called its "software library" or

27  "internal software" share) is plainly not authorized by Rimini's customers' licenses with Oracle,

28

7

1    and squarely contradicts Rimini's pleadings, which state that "[s]uch a 'library' has never existed

2    at Rimini Street."  Answer ¶ 34.  Rimini deleted at least one such centralized software repository

3    only one week before this lawsuit was filed.   *See* Howard Decl. Ex. B, (RSI01990917

4    (describing deletion of contents of software library around January 12, 2010)) (filed under seal).

5           Thus, Oracle propounded Interrogatory No. 24, which asks Rimini Street to identify the

6    contents of generic repositories like the software library, and Interrogatory No. 25, which asks

7    Rimini Street how the contents of repositories like the software library have been used.  Howard

8    Decl. Ex. C.  Oracle cannot learn the answer to these questions directly from the contents of the

9    software library itself because Rimini deleted it.  Rimini Street's response does not even attempt

10   to provide a straightforward description of what it kept in the software library or how it was

11   used.  Instead, relying on Federal Rule of Civil Procedure 33(d), Rimini Street provided a thirty-

12   page-long list of Bates numbers with no explanation of the contents of any of the documents,

13   except a vague statement that they "indicate the contents of the Oracle Specified Locations, as

14   well as use of such information."  In fact, the 1200-odd documents listed are mostly e-mails, and

15   many are entirely irrelevant to the issue of whether Rimini stored Oracle software centrally.  *See,*

16   *e.g.*, Howard Decl. Exs. D-F (RSI04233157 (sixteen-page e-mail exchange concerning

17   Microsoft's SQL Server software); RSI04787135 (instant message conversation suggesting an

18   application named Kdiff (not an Oracle product) was kept in a central repository); RSI04787619

19   (email directing employee to place Serv-U software (not an Oracle product) in central

20   repository)) (filed under seal).  Others are too incomprehensible to decipher.  *See, e.g.*, *id.*, Ex. G

21   (RSI04787128 (three-page instant messaging exchange not clearly relating to any software

22   repository)) (filed under seal).

23                    **1.       Rimini Street's Reliance Response Is Inadequate**

24          Interrogatories "should be answered directly and without evasion in accordance with

25   information that the answering party possesses after due inquiry."  Wright & Miller, Fed. Prac. &

26   Proc. § 2177 (2011); *see also* Fed. R. Civ. P. 37(a)(4) ("an evasive or incomplete disclosure,

27   answer, or response must be treated as a failure to disclose, answer, or respond").  Rimini

28   Street's 1200-document reference is not a direct, complete, and non-evasive answer.  Rimini

1    Street attempts to rely on Rule 33(d), which permits a party to answer an interrogatory by

2    referencing business records only if (1) "the answer…may be determined by examining,

3    auditing, compiling, abstracting, or summarizing a party's business records" and (2) "if the

4    burden of deriving or ascertaining the answer will be substantially the same for either party."

5    For the following reasons, Rimini Street's reliance is misplaced, and Rimini Street must provide

6    a straightforward answer.

7         First, while Rimini internal emails and instant messages may well be party admissions,

8    they are not the types of objective business records (such as financial reports or contracts)

9    envisioned by the rule, and thus do not provide a straightforward answer.  Rimini, in fact, has

10   repeatedly attempted to dispute the meaning of emails listed in its response, thus establishing that

11   even it does not believe that the "answer . . . may be determined" by examining the emails.  *See,*

12   *e.g.*, Howard Decl. Ex. H (Deposition of Dennis Chiu, June 24, 2011, at 174:9-179:7; 190:16-

13   192:23; 201:13-206:23) (filed under seal).  "Fed. R. Civ. P. 33(d) has been narrowly interpreted

14   by the courts and [] in cases not involving 'business records' federal courts have generally

15   refused to let parties respond to interrogatories by referring to outside materials."  *Dilts v. Penske*

16   *Logistics, LLC*, No. C080318, 2011 WL 2971096, at *3 n.3 (S.D. Cal. July 21, 2011).  While

17   Rule 33(d) does not define "business records," courts have examined whether e-mails qualify as

18   business records when considering whether to admit e-mails under the business records

19   exception to the hearsay rule, Federal Rule of Evidence 803(6).  To introduce an e-mail as a

20   business record, the party "must show that the employer imposed a business duty to make and

21   maintain such a record."  *Canatxx Gas Storage Ltd., v. Silverhawk Capital Partners, LLC*, No.

22   H–06–1330, 2008 WL 1999234, at *12 (S.D. Tex. May 8, 2008) (emails satisfied business

23   record exception where defendant submitted an affidavit establishing that "[i]t was Silverhawk's

24   regular practice to make and/or keep these records").  Absent "evidence of a business duty to

25   make and regularly maintain records of this type," emails do not qualify as business records.

26   *United States v. Ferber*, 966 F. Supp. 90, 98 (D. Mass. 1997) (e-mails fell outside the business

27   records exception, even though employee routinely sent them, because there was insufficient

28   evidence that the company "required such records to be maintained."); *Adderley v. National*

A/74572609.6

1   *Football League Players Ass'n*, No. C 07-00943, 2009 WL 4250792, *5 (N.D. Cal. Nov. 23,

2   2009) (party seeking to introduce emails must establish that "it was a regular practice within the

3   company to send emails to co-workers summarizing conversations with outside parties").

4          The set of 1,200 documents does not meet this standard.  Rimini has never claimed that it

5   was a regular practice to send emails whenever software was placed in or removed from the

6   software library.  In fact, Rimini witnesses have disavowed the very idea.  Rimini Street

7   employee J.R. Corpuz was directed in an email to "copy this peoplebooks cd" and "these

8   Maintenance Packs cds" to specified locations in the Rimini Street's "internal software" library

9   ("\\rsi-clsvr01\internal_software\PeopleSoft"), and Mr. Corpuz responded by email, "these have

10  been uploaded to your specified location."  Howard Decl. Ex. I (Exhibit 39, RSI00907871-72)

11  (filed under seal).  Yet when deposed, Mr. Corpuz denied the obvious inference from the e-mail,

12  that he had uploaded Oracle's CDs to the "internal software" folder specified in the email, and

13  instead Mr. Corpuz stated that "I need more information" and that "all the communication wasn't

14  through e-mail.  It may have been through some other forms, so I can't -- I don't know."  Howard

15  Decl. Ex. J (Deposition of J.R. Corpuz, March 15, 2011, at 179:4-181:13) (filed under seal).

16         <u>Second</u>, even if the Court is willing to accept them as business records, the 1,200

17  documents are inadequate because they do not provide a complete answer.  A Rule 33(d)

18  response is inadequate if "the information is not fully contained in the documents."  *SEC v.*

19  *Elfindepan*, 206 F.R.D. 574, 576 (M.D.N.C. 2002).  The emails are a collection of ad hoc

20  correspondence and incomplete conversations relating to central software repositories; they do

21  not suggest any sort of process to document the repositories' contents.  For example,

22  RSI04787829 ends with an e-mail in which a Rimini employee asks "where should I upload it

23  to?"  Howard Decl. Ex. K (RSI04787829) (filed under seal).  This leaves open the question of

24  whether the software discussed in the e-mail in fact was ever centrally stored.

25         It is no answer to say that Rimini Street's employees do not remember *every* detail that

26  Interrogatories 24 and 25 seek.  Given the acknowledged incompleteness of e-mail records, it is

27  plainly inadequate to rely on them unless Rimini Street has *no other* information "available to"

28  it.  Fed. R. Civ. P. 33(b)(1)(B).  And Rimini Street does not contend – and cannot reasonably

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

1   contend –that none of its employees and no other data sources have *any* additional responsive

2   information, including about how to interpret and understand emails and other documents they

3   created and used.

4        In sum, Rimini Street's responses to Interrogatory 24 and 25, by providing no substantive

5   answer except referencing arguably ambiguous documents such as emails, operate to preserve

6   Rimini Street's ability to dispute at trial what the referenced documents mean and what

7   inferences may be drawn from them.  That is exactly the sort of "an evasive or incomplete

8   disclosure, answer, or response" that the Rules prohibit.  Fed. R. Civ. P. 37(a)(4).

9        <u>Third</u>, including irrelevant documents in the set violates Rimini Street's obligation to

10  specify the appropriate documents from which the information sought can be derived.  It is "an

11  abuse of the [Rule 33(d)] option" to merely direct the interrogating party to a "mass of records."

12  *Compagnie Francaise d'Assurance Pour le Commerce Exterieur v. Phillips Petroleum Co.*, 105

13  F.R.D. 16, 44 (S.D.N.Y. 1984); *see also Martin v. Easton Pub. Co.*, 85 F.R.D. 312, 315 (E.D. Pa.

14  1980) (Rule 33(d) did not permit party to cite 630 pages of notebooks and 2,000 pages of

15  deposition transcripts).  Rimini Street cannot "escape [its] responsibility of providing direct,

16  complete and honest answers to interrogatories with the cavalier assertion that required

17  information can be found in this massive amount of material."  *Martin*, 85 F.R.D. at 315.  Nor

18  may Rimini Street shift the burden "to find out whether sought after information is ascertainable

19  from the files tendered," as it has done by providing a mix of relevant and irrelevant material.  *In*

20  *re Master Key Antitrust Litig.*, 53 F.R.D. 87, 90 (D. Conn.1971).

21       <u>Fourth</u>, Rimini Street's response imposes an outsized burden on Oracle.   Referring to

22  documents in lieu of providing a straightforward response is allowed only "if the burden of

23  deriving or ascertaining the answer [from the business records] will be substantially the same for

24  either party."  Fed. R. Civ. P. 33(d).  The answering party's "greater familiarity with its own

25  business records" is a "critical factor."  *Puerto Rico Aqueduct and Sewer Authority v. Clow*

26  *Corp.*, 108 F.R.D. 304, 308 (D.P.R. 1985); *see also Fresenius Medical Care Holding Inc. v.*

27  *Baxter Intern., Inc.*, 224 F.R.D. 644, 650 (N.D. Cal 2004).  Most of the emails included in the set

28  of 1,200 were written by individuals employed by Rimini Street.  Rimini Street is thus in the

1   superior position to ascertain what the documents mean.   And by disputing the plain meaning of

2   the emails' text in depositions, Rimini Street has taken the position that the accurate meaning of

3   these "records" is known only by Rimini employees.

4        Oracle explained all of these issues to Rimini in July after Rimini Street provided its

5   initial responses to Interrogatories No. 24 and 25, which referred to approximately 150

6   documents.  Rather than provide the straightforward answer requested, Rimini Street provided

7   the current list of 1,200 documents.  This has only compounded the problem.  It increased the

8   burden of compiling any sort of clear answer, requiring Oracle to review and synthesize an even

9   larger pool of disorganized emails and make even more judgment calls concerning the

10   interpretation of correspondence that Rimini Street may later dispute.

11        For all of these reasons, the Court should not permit Rimini Street to task Oracle with

12   making sense of over 1,200 scattered emails to reconstruct the contents of the software library

13   from a series of often-incomplete conversations.  Moreover, Rimini Street chose to delete the

14   software library when this lawsuit was imminent, creating this very issue.  It should not be able

15   to shift the burden of that strategic choice to Oracle by forcing Oracle to piece together the

16   puzzle of what exactly Rimini Street erased and how it was used.[2]  It is only fair that Rimini

17   Street should undertake a reasonable investigation and provide straightforward responses to

18   Interrogatories 24 and 25.

19        Rimini Street's suggestion that it was under no duty to preserve evidence at the time it

20   deleted the software library is wrong and irrelevant to this motion.  Oracle will separately show,

21   at an appropriate time, that Rimini Street anticipated this litigation in advance of this and other

22   substantial deletions of evidence, in the context of a request for relief from this spoliation.  On

23   this motion, it suffices Rimini Street has failed to adequately answer Interrogatories 24 and 25.

24        **2.    Rimini Street's Objections Are Meritless**

25        Rimini's objections to these interrogatories are meritless.  Rimini's only substantive

26   
27   [2] Oracle will separately present, at an appropriate time, any request for relief from this and other
     Rimini breaches of its duty to preserve relevant evidence.

28   

A/74572609.6

1    objection not already resolved by the parties' discussions is that the interrogatories are "overly

2    broad and unduly burdensome."  In light of the clear relevance of the information – directly

3    contradicting one of Rimini's core defenses – Rimini would have to prove facts showing an

4    extraordinary burden to justify its failure to meaningfully respond, and it has not done so.  *See,*

5    *e.g., Thomas v. Cate*, 715 F. Supp. 2d 1012, 1033 (E.D. Cal. 2010) ("Discovery should be

6    allowed unless the hardship is unreasonable in the light of the benefits to be secured from the

7    discovery. . . . .Although Interrogatory No. 8 may indeed be burdensome, it is not unduly so

8    given the importance [of the information sought].")  In any event, Rimini Street has represented

9    that it is withholding no information on the basis of its objections.

10        **Rimini's Position:**

11        Oracle's motion to compel regarding its Interrogatories 24 and 25 relies on a series of

12    mischaracterizations, lacks merit and should be denied.  Rimini's responses are as full and

13    detailed as Rimini could provide given the information in its possession, custody, and control.

14    Oracle may desire additional low-level details, but this is of no moment where the additional

15    information does not exist.  Oracle's Interrogatories No. 24 and 25 are extraordinarily broad,

16    requesting detailed identification of *every* piece of Software and Support Material "that is or has

17    at any time" been stored in various folders by Rimini over a five-year period, as well as "each

18    instance" in which any of these items was "copied or used" in support of Rimini's customers.

19    Though Rimini maintained certain records reflecting the contents and use of this software, it is

20    unreasonable to think that Rimini would keep detailed records of every routine interaction with

21    every item of software on its systems. It is likewise unreasonable to think that Rimini's

22    employees would have detailed recollections of "each" instance in which they used a piece of

23    software over a five-year period of time, particularly at the low-level of detail expressly called

24    for by Oracle's interrogatories.

25        Accordingly, Rimini lodged overbreadth and undue burden objections but answered

26    Oracle's interrogatories as best it could. To do so, it interviewed employees knowledgeable

27    about this software and the various locations identified by Oracle, as well as employees

28    knowledgeable about Rimini's current and historical processes and procedures.  In addition,

13

1    Rimini searched for and identified emails and other historical documents to provide as full a

2    response as possible.  These communications, in addition to the other documentation cited by

3    Rimini's responses and a recent deposition of the most knowledgeable Rimini employee on this

4    subject, provide Oracle substantial discovery into Rimini's storage and use of the software-at

5    issue.  Because there are not additional sources of information available to provide the detail

6    Oracle unreasonably demands, Oracle's motion to compel amended responses to its

7    Interrogatories 24 and 25 should be denied.

8         **1.  Oracles' Allegations of Misconduct are Unfounded and Belied by the Record.**

9         First and foremost, Rimini must correct Oracle's assertion that Rimini made a "strategic

10   choice" to "delete the software library when this lawsuit was imminent, creating this very issue."

11   These allegations of misconduct are baseless, and Oracle is fully aware that the deletion of the

12   software-at-issue had nothing to do with the present litigation.

13        The software-at-issue was deleted at the direction of a Rimini employee, Ms. Krista

14   Williams.  In an email to her supervisor, Ms. Williams explained that the software folder was no

15   longer in use and suggests it be deleted to "reclaim [disk] space" for other folders.  Declaration

16   of Robert H. Reckers ("Reckers Decl."), Ex. A.  Ms. William's supervisor approved the deletion

17   of the folder, requesting that she direct the matter to Rimini's IT department, according to Rimini

18   policy.  Reckers Decl. Ex. A.  As instructed, Ms. Williams submitted the request to the IT

19   department and specifically documented exactly the software to be deleted.  Reckers Decl. Ex. B.

20   Indeed, Rimini specifically documented what it was deleting, and Oracle has these documents.

21   Reckers Decl. Exs. A, B, C.

22        Oracle is well aware of the above facts, as it questioned Ms. Williams this very topic

23   during her recent deposition.  Reckers Decl. Ex. D.   While Oracle now suggests that the

24   deletion of the software was related to the "imminent" lawsuit, neither Ms. Williams nor anyone

25   else at Rimini knew this lawsuit was about to be filed.  Oracle's attempt to cast the removal of

26   unused software as a "strategic litigation" choice is uncalled for and unfortunate.  The record is

27   clear that the software folder-at-issue was deleted to reclaim disk space, not as a strategic and

28   litigation-inspired choice.

A/74572609.6

1

      **2.  Oracles' Interrogatories Call for Historical, Low-Level Details Found Only in the Cited Documents.**

2

Oracle also resorts to oversimplifying the information requested by its own

3

interrogatories in an attempt to show some inadequacy in Rimini's answers.  Contrary to

4

Oracle's suggestion, these interrogatories do not call for a "straightforward description of what it

5

kept in the software library or how it was used."  Rather, Oracle's Interrogatory No. 24 requests

6

identification "<u>every</u> copy of any Software and Support Material that <u>is or has at any time been</u>

7

<u>stored</u> at each Non-Customer Location, and the Non-Customer location where it was stored."

8

Oracle's Interrogatory No. 25 requests a description of "<u>each instance</u> in which that copy of

9

Software and Support Materials was <u>copied or used</u>" and, in some circumstances, identification

10

of the customer associated with each instance.  Therefore, when read together, Interrogatory Nos.

11

24 and 25 request detailed identification of *every* item of software stored in various folders by

12

Rimini over a five-year window and identification of *each* instance in which that software was

13

ever copied or used.

14

Given the granular level of detail requested by Oracle's interrogatories, Rimini searched

15

its internal records for documents reflecting the software found in the identified folders, as well

16

as uses of such software.  Resort to such business records was necessary because, contrary to

17

Oracle's suggestion, Rimini's employees do not have specific recollections at the level of detail

18

called for by Oracle's interrogatories.  Indeed, the software at issue has not been used for a

19

number a years, and it would be unreasonable to suggest that Rimini employees would remember

20

the specific instances of storing or using software in 2009 and earlier.

21

Rimini originally responded to Oracle's interrogatory by identifying approximately 150

22

documents that, after a reasonable search and review, were identified as including responsive

23

information regarding the pertinent software folders.  Reckers Dec. Ex. E.  Oracle then requested

24

supplementation, arguing that Rimini had not identified all the documents containing responsive

25

information and requesting a narrative response reflecting any employee knowledge that is not

26

included within the documents identified pursuant to Rule 33(d).  Reckers Dec. Ex. F.  In

27

response to these concerns, Rimini served amended responses to Oracle's interrogatories, citing

28

A/74572609.6

1    additional documents and including a narrative response compiled from employee interviews.

2    Reckers Decl. Ex. G.

3         A simple review of these responses easily disproves Oracle allegation that Rimini Street's

4    responses to Interrogatory 24 and 25 provides "no substantive answer except referencing

5    arguably ambiguous documents such as emails . . ."  In addition to a detailed, folder-by-folder

6    narrative response, Rimini also references records such as its environment Build Requests, which

7    clearly identify the relevant software and its use.  And while Oracle attempts to cast the cited

8    emails as "ambiguous" and non-responsive, this characterization is refuted by the very email

9    thread Oracle cites in its brief.  This email thread contains an instruction to Rimini employee,

10   Mr. Corpuz, to "copy this peoplebooks cd" and "these Maintenance Packs cds" to specified

11   locations and Mr. Corpuz's response "these have been uploaded to your specified location."

12   While Mr. Corpuz understandably did not remember this mundane event during his depositions,

13   the cited email provides a clear record of what happened.  As the Corpuz email demonstrates, the

14   documents cited by Rimini pursuant to Rule 33(d) provide unambiguous information regarding

15   the specified software and its uses by Rimini, and Oracle is incorrect to cast the documents

16   identified by Rimini pursuant to Rule 33(d) as a "mass of records" that fail to adequately answer

17   the interrogatories.

18        Oracle also incorrectly argues that the emails and other documents cited by Rimini are

19   not the sort of objective business records contemplated by Rule 33(d).  This argument is legally

20   unsupported, and Oracle falls to cite a single case for this proposition.[3]  Because certain

21   responsive information is found solely in emails and other "non-objective" records of Rimini

22   employees, citation to this material pursuant to 33(d) is appropriate and necessary.

23        Further, Oracle argues that Rimini is "in the superior position to ascertain what the

24   documents mean," but this is unavailing.  While a routine email sent years ago referencing an

25   _____

26   [3] Rather, the authority cited by Oracle focuses on the irrelevant question of whether the emails
     meet the "business records" exception to the hearsay rule under Federal Rule of Evidence 803;
27   Oracle fails to cite a single case tying this evidentiary rule to Rule 33(d).

28

                                              16
                        JOINT CASE MANAGEMENT CONFERENCE STATEMENT

1   item of software may be responsive to Oracle's requests, a Rimini employee is unlikely to be

2   able to remember details beyond what is stated in the email.  In fact, these are precisely the types

3   of questions Oracle has asked during depositions, and the responses verify that employees

4   generally do not recall routine, day-to-day (yet responsive) information from several years ago.

5   *See, e.g.,* Reckers Decl. Ex J, Deposition of Mr. Corpuz at 27:4 (unable to remember various

6   details from 2006), 67:13-19 (does not remember an email from 2007), 88:8-13 ("I don't

7   remember getting this [February, 2007] e-mail. It was so long ago"), 191:7-10 ("Again, it's so

8   long ago, I can't remember."), etc.).  As these exemplary citations reflect, the issue here is not

9   one of "outsized burden" as Oracle suggests, but the simple reality that Rimini cannot

10  supplement its response with information beyond Rimini's corporate records or the memory of

11  its employees.

12        Finally, as a matter of housekeeping, Rimini will be amending its current response to

13  Oracle's interrogatories to include citations to portions of Ms. Krista William's deposition

14  testimony.  The information provided in the deposition is already reflected in Rimini's existing

15  responses, but the deposition transcript does provide another source document.  Ms. Williams is

16  the most knowledgeable Rimini employee on the topic of Rimini's alleged "software library,"

17  and she provided extensive information during her deposition regarding both the type of software

18  typically stored in the pertinent software folders, as well as how this software was generally used

19  by Rimini to support its customers.  *See, e.g.,* Reckers Dec. Ex. D.  With these transcript

20  citations included, Oracle will have all available discovery sought by its motion.

21        **B.    Oracle's Motion to Compel Direct Read-Only Access to
                  Rimini's SharePoint Intranet**

22        **Oracle's Position:**

23        Oracle requests direct, read-only access to Rimini's SharePoint site.  SharePoint is the

24  main intranet for Rimini's operations.  Although Rimini's Initial Disclosures did not disclose the

25  existence of SharePoint, as they were required to, Rimini's witnesses have testified that it

26  contains numerous documents responsive to Oracle's Requests for Production.  Oracle requests

27  direct access for two reasons.

28

17

A/74572609.6

1    First, the Court should end a chicken and egg game that Rimini is playing.  On July 1,

2    2011, Oracle requested that Rimini produce all responsive documents located on SharePoint,

3    citing the testimony of Rimini's witnesses that showed that SharePoint is a repository for many

4    responsive documents.  On July 18, 2011, Rimini responded that it had produced many

5    documents from SharePoint, and it objected to producing any additional ones unless Oracle

6    specifically identified them.  On September 28, 2011, Oracle served Rimini with a Request for

7    Inspection of Rimini's SharePoint site so that Oracle could identify what additional documents to

8    request.  On October 12, 2011, Rimini objected to that too, claiming that Oracle's request was

9    overbroad, unduly burdensome, and unnecessary.

10    Rimini perpetuates this problem in its response below, stating that it "remains willing to

11    work with Oracle regarding additional responsive documents Oracle believes are housed on

12    Rimini's SharePoint site."  Yet *in three separate letters*, counsel for Oracle have laid out in detail

13    excerpts from deposition transcripts that clearly identify responsive documents that Rimini stores

14    on its SharePoint system.  *See* Howard Decl. Exs. L-N (letters from Oracle counsel to Rimini

15    dated July 1, 2011, September 28, 2011, and October 27, 2011).  Oracle has explained in each

16    instance that Rimini either has not produced the documents or that Oracle cannot review the

17    documents in the form Rimini has produced them.  Although Rimini has continuously stated that

18    it has produced "thousands of documents" from SharePoint, nowhere in its three separate replies,

19    including its objections served on October 31 in response to Oracle's Third Request for

20    Inspection, has Rimini stated that it has produced – or even searched for – all the responsive

21    documents referred to in the excerpts of deposition testimony.  *See* Howard Decl. Exs. O-Q

22    (letters from Rimini counsel to Oracle dated July 18, 2011 and October 12, 2011, and Rimini's

23    Responses and Objections to Plaintiffs' Third Set of Requests for Inspection of Documents and

24    Things).  Rimini has not identified a single SharePoint document referred to in deposition

25    testimony that it has already produced.

26    Instead, Rimini continues to demand that Oracle identify specific documents that have

27    not been produced or that Oracle cannot adequately review.  Oracle has already provided

28    numerous examples of deposition testimony referring to precisely those categories of documents,

1    including Tahtaras Dep. 155:22-156:21, 252-253, Apr. 27, 2010; B. Lester Dep. 92-93, 105:4,

2    213:20-214:10, 264:16, March 17, 2011; Grigsby Dep. 116:10, 136:5, 224:17-225:6, 324:3-18,

3    June 8, 2011; Corpuz Dep. 44:23-45:4, Mar. 15, 2011;; Rowe Dep. 32:4-12, 36:12-17, 36:24-

4    37:9, Aug. 24, 2010; Baron Dep. 218:23-219:3, May 10, 2010; Conley Dep. 29:23-25, 155:1- 17,

5    167:23-186:16, 169:16-25, 170:19-171:9, 173:17-25, 196:19-197:3, Sep. 1, 2011; Radtke Dep.

6    61:10-25, 180:9-18, 221:1-20, 227:10-20, 229:6-9, 229:24-230:1, 232:1-8, 232:20-233:14, Sep.

7    7, 2011.  *See* Howard Decl. Exs. L-N

8           Without access to Rimini's SharePoint site, Oracle cannot give any further identifying

9    details beyond the citations to the deposition testimony.  Further, even if Rimini does produce

10   the documents, without access to SharePoint, Oracle cannot determine whether or not the

11   produced documents are those referred to in deposition testimony, since the SharePoint

12   documents' linking relations (as explained further below, and which are an essential element of

13   the information Oracle seeks) are not reviewable when the documents are produced outside of

14   SharePoint.

15          Oracle should not have to *specifically* identify documents in order to request them;

16   serving a Request for Production is fully sufficient under the Rules.  But if Rimini is going to

17   refuse to produce all responsive documents located on SharePoint and demand some greater

18   level of specificity, then Rimini is obligated to take reasonable steps to enable Oracle to frame a

19   more specific request.  Oracle does not know how Rimini's SharePoint site, which is designed to

20   be highly customizable, is organized, including for example, if there are certain folders or

21   network locations that would likely contain relevant, unproduced documents.  Oracle needs

22   access to SharePoint so that it can make some meaningful attempt to specify what documents it

23   requests.

24          Second, Rimini has not explained how Oracle can review the SharePoint documents

25   referred to in deposition testimony where the essential component of the document is its linking

26   relations to other documents.  Those linking relations are not present when a document is

27   produced in TIFF or native form.

28          When SharePoint documents are produced in standard production format, any SharePoint

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

1    links in the documents and the targets of the links are removed.  For example, Oracle has seen

2    pages from Sharepoint in some cases only because it discovered them in temporary cache files

3    from the personal Virtual Machines of developer custodians that Rimini has produced.  *See, e.g.*

4    Howard Decl. Ex. R (Exhibit 338 to Deposition of Tim Conley, Sep. 1, 2011) (filed under seal).

5    Those pages show links that would take the operator to documents relating directly to Rimini's

6    copies of Oracle's software and the uses made of them.  However, the link in the produced

7    document does not work.  Much like when a page from a website is printed on a piece of paper,

8    Oracle can tell from the appearance of the produced document that certain lines were originally

9    hyperlinks to something else, but the links have no functionality in the produced document.

10   Further, even if the linked documents have been produced elsewhere, Rimini has produced no

11   metadata to show which document was linked to the first one.

12        There are also certain documents on Rimini's SharePoint site that are unintelligible as

13   produced.  For example, some spreadsheets that Rimini has produced from SharePoint contain

14   thousands of cells containing strings of numbers and letters where, based on the document

15   context, it is clear one would see names of persons and customers if viewing the document live

16   on SharePoint.  *See, e.g.* Howard Decl. Ex. S (RSI01990917) (filed under seal).  If Oracle could

17   view this type of document directly on SharePoint, it could see the names that are essential for its

18   review of the documents.

19        The four cases that Rimini cites below in support of its denial of access to its SharePoint

20   site either turn on unrelated issues or provide no legal discussion relevant to the present dispute.

21   The court in *Cummings v. Gen. Motors Corp.*, 365 F.3d 944, 954 (10th Cir. 2004) simply

22   declined to find abuse of discretion in the lower court's denial of a motion to compel and gave no

23   detail of the underlying facts.  The holding in *In re Ford Motor Co.*, 345 F.3d 1315, 1316 (11th

24   Cir. 2003) was simply that, absent some wrongdoing by the responding party, the movant was

25   not entitled to direct access to the responding party's computer systems simply to perform

26   requested searches.  The court did not contemplate the present scenario, where the request for

27   access is based on the impossibility of identifying and reviewing documents without direct

28   access.  Similarly, the issue in *Convolve, Inc. v. Compaq Computer Corp.*, 223 F.R.D. 162, 169

1   (S.D.N.Y. 2004) was about direct access in the event of concerns about spoliation.  That is not at

2   issue here.  Finally, *Sec. & Exch. Comm'n v. Strauss*, No. 09 Civ. 4150 (RMB) (HBP), 2009 U.S.

3   Dist. LEXIS 101227, 2009 WL 3459204, at *35 (S.D.N.Y. Oct. 28, 2009) deals with issues of

4   the responding party's custody and control of the computer systems, work product concerns, and

5   availability of the documents from other sources, all irrelevant concerns.

6        In contrast to each of these cases, the central issue here is that SharePoint shows the

7   *relationship* between numerous relevant documents.  When Rimini produces each such

8   document separately, all of that metadata showing the relationships is eliminated.  This

9   production does not comply with Federal Rule of Civil Procedure 34's requirement that "[a]

10  party must produce documents as they are kept un the usual course of business," Fed. R. Civ.

11  Proc. 34(b)(2)(e), because when the SharePoint documents are produced, they contain less useful

12  information than they do when they reside on Rimini's systems in the ordinary course of

13  business.  *See, e.g.*, *Quality Inv. Props. Santa Clara, LLC v. Serrano Elec., Inc.*, No. 09-5376,

14  2011 WL 1364005, *3 (N.D. Cal. Apr. 11, 2011) (holding that conversion of electronic

15  documents into TIFF and load files prior to production did not satisfy Fed. R. Civ. P. 34 where

16  "the documents were not kept in those formats in the usual course of business"). Oracle is

17  entitled to see the relationships between the documents Rimini has produced, if those

18  relationships are normally visible to users of SharePoint, as they appear to be.  Accordingly,

19  Oracle requests access to SharePoint to view those documents.

20       Oracle acknowledges that because SharePoint is Rimini's main intranet, it may contain

21  irrelevant or sensitive information.  Oracle has offered to restrict its access to only the necessary

22  areas of the SharePoint site.  However, Rimini's concern about potentially confidential

23  information does not justify totally denying Oracle access to relevant locations on SharePoint.

24  On other discovery matters, Oracle has worked cooperatively to obtain live access to Rimini's

25  systems, including DevTrack and Rimini's customer archives.  This access has enabled Oracle to

26  review significant quantities of relevant materials, without disruption to Rimini's business or

27  operations.  There is no reason why access to SharePoint would pose greater concerns.  In fact,

28  Oracle and Rimini contemplated exactly this kind of e-discovery issue in their Stipulated

1   Discovery Plan:  "The Parties, with the assistance of experts, will attempt to reach agreement on

2   appropriate measures to ensure that relevant information from Defendants' computer systems are

3   preserved and produced in a format that can be examined, tested, and analyzed by the Parties'

4   respective consulting and testifying experts."  Dkt. 51, p. 12.

5         Rimini has not asserted that providing Oracle access to SharePoint would be unduly

6   burdensome, and such an argument would not make sense, since if anything providing access is

7   less burdensome to Rimini than collecting the broader set of relevant, unproduced documents

8   and providing the metadata that Rimini has not provided in its document production.  Rather,

9   Rimini claims that Oracle's request is unduly burdensome because Rimini would have to

10   individually review every document on its SharePoint for privilege before giving access to

11   Oracle.  That is not true; Oracle has offered to restrict its access to certain areas on a "quick

12   peek" basis that will not result in any privilege waiver and likely no disclosure because of the

13   search limitations.  The resulting burden on Rimini would be minimal.

14         If Rimini can show that it is not possible to limit Oracle's access to areas unlikely to

15   contain privileged documents, Oracle is willing to meet and confer on procedures for a

16   supervised inspection, so that Rimini can ensure that Oracle does not view any privileged

17   documents.

18   **Rimini's Position:**

19         Oracle moves to compel "direct access to Rimini's SharePoint site."  Though the request

20   is submitted as a "request for inspection," in reality it seeks active log-in credentials to Rimini's

21   intranet and internal document management system.  In particular, Oracle's motion relates to its

22   Third Request for Inspection, which requests access to Rimini's SharePoint intranet "for

23   inspection via Read-Only Credentials not expiring before the Close of Expert Discovery in This

24   Lawsuit."  The relevant case law simply does not support the sort of unlimited and unsupervised

25   access to an adversary's internal network Oracle now requests.  Further, Oracle's argument here

26   principally relies on the false assertion that Rimini has refused to produce responsive documents

27   located on SharePoint unless Oracle specifically identifies them. Rimini has never taken this

28   position, but has consistently produced all responsive SharePoint documents to Oracle and has

A/74572609.6

1   consistently communicated its belief that it has done so.  Rimini has further offered to confer

2   with Oracle regarding the basis for its belief that some un-identified SharePoint material

3   purportedly justifies live access to Rimini's intranet.  Oracle's failure to identify any such

4   material serves only to illustrate that Rimini has indeed met its obligation of producing the

5   relevant materials from its internal SharePoint network.  Oracle's extraordinary request for direct

6   access to Rimini's internal corporate intranet should be denied.

7           **1.   The Relevant Materials from Rimini's SharePoint Intranet Have Already Been**
8               **Produced.**

9            "SharePoint" is the name of the software underlying Rimini's main intranet.   More

10  specifically, SharePoint® is a standard Microsoft product that allows for disseminating

11  information and maintaining corporate documents via a corporate intranet. *See, generally*,

12  http://sharepoint.microsoft.com/en-us/product/capabilities/Pages/default.aspx (Microsoft's

13  product information page for SharePoint®).

14         As with other sources of electronic information, thousands of relevant documents housed

15  on the SharePoint platform were collected and produced to Oracle in this litigation.  When

16  appropriate, Rimini has made supplemental productions of SharePoint material, and Oracle

17  cannot point to a single SharePoint item that Rimini has not produced.  In addition, the parties

18  have conferred regarding the suitable format for the production of certain documents, as

19  contemplated by the Stipulated Discovery Plan. In this regard, Rimini has produced, at Oracle's

20  request, hundreds of documents in native formats, including files in native SharePoint formats.

21         Despite the extensive discovery already produced from SharePoint, Oracle now requests

22  unfettered access to this network on the theory that there may be some additional but

23  unidentified relevant material that remains unproduced.  In making this argument, Oracle

24  contends that Rimini is refusing to produce all the responsive documents on SharePoint unless

25  Oracle specifically identifies them.  Rimini has never taken this position.  As stated in a letter to

26  Oracle's counsel, "Rimini has already produced thousands of documents from its SharePoint site,

27  including the sort of documents referenced during the depositions of Rimini deponents. That

28  being said, Rimini remains willing to work with Oracle regarding additional responsive

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

1    documents Oracle believes are housed on Rimini's SharePoint site." Reckers Decl. Ex. L.  This

2    is hardly a refusal, and belies Oracle's attempts to characterize Rimini as unreasonable,

3    uncooperative and evasive.

4          Contrary to Oracle's suggestion that Rimini is playing some "chicken and egg game,"

5    Oracle has taken extensive discovery regarding the documents available via SharePoint, having

6    discussed SharePoint during virtually every deposition of Rimini employees.  Despite this

7    investigation, Oracle still fails to cite any categories of documents missing from Rimini's

8    SharePoint production.  Instead, Oracle continues to simply provide a lengthy list of deposition

9    citations that seems to arbitrarily include virtually ever reference to SharePoint by Rimini

10   witnesses.  Oracle, however, has not identified a single item of *content* mentioned in its

11   deposition citations that is has searched for and not found in Rimini's voluminous document

12   production.  In contrast, Rimini has examined the deposition testimony cited by Oracle's letters,

13   and has confirmed that it has already produced the referenced materials.

14         In short, Oracle has had ample opportunity to test Rimini's production against the

15   testimony of numerous witnesses, as well as Rimini's extensive document production.  Oracle's

16   failure to identify deficiencies serves only to illustrate that Rimini has indeed met its obligation

17   of producing the relevant materials from its internal network, thereby making Oracle's request

18   unnecessary and inappropriate.

19         **2.   Rimini Has Followed the Production Methodology Set Forth By the Stipulated**
          **Discovery Plan and Remains Willing to Work with Oracle Regarding the**
20        **Appropriate Format for Producing SharePoint Files.**

21         Oracle argues that Rimini's production format, primarily TIFF images and load files,

22   unfairly strips out relevant information.  The parties, however, expressly agreed to this

23   production format in the Stipulated Discovery Plan.  Dkt. 51, p. 11 ("the Parties shall produce

24   documents in 'tiff' format along with the [agreed upon] metadata fields").  The Stipulated

25   Discovery Plan further provides that "materials that require native format to be reasonably

26   usable, shall be produced in native format . . ."  *Id.*  Consistent with this provision, Rimini has

27

28

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

A/74572609.6

1    produced thousands of documents in native format, including numerous native SharePoint files.

2    Therefore, Oracle's suggestion that Rimini has not properly produced its records is baseless.

3         Oracle's argument that it is entitled to direct SharePoint access to examine the

4    relationships or organization of SharePoint is equally without merit.  Oracle has not

5    demonstrated a need to see how the documents are organized on Rimini's network or explained

6    how such organization has any bearing on the infringement questions in this case or any other

7    relevant issues.  Indeed, its hard see how the organization of Rimini's SharePoint intranet could

8    possibly bear on such issues as SharePoint® is a standard Microsoft product presumably used by

9    hundreds of companies in generally the same manner as Rimini.

10        Second, assuming *arguendo* there are certain relationships or links found in SharePoint

11   that are reasonably subject to discovery, Rimini has already demonstrated its willingness to

12   provide discovery on such linking relationships.  For example, Oracle requested that Rimini

13   produce hundreds of linked documents referenced by certain identified files.  Reckers Dec. Ex. J.

14   Rimini readily agreed to produce the hundreds of linked files in response to Oracle's request.

15   Reckers Decl. Ex. K.  Likewise, Rimini remains willing to confer with Oracle regarding the

16   appropriate production methods for information Oracle asserts cannot be adequately reviewed

17   using the production methods previously agreed to by the parties.  Such production methods are

18   the appropriate discovery vehicle here, not the live credentials and unfettered access requested by

19   Oracle.

20        **3.   Courts Have Consistently Denied Inspections Like Now Sought by Oracle.**

21        Finally, it bears reiteration that Oracle's request for "direct access to Rimini's SharePoint

22   site" via "Read-Only Credentials not expiring before the Close of Expert Discovery in This

23   Lawsuit" is simply unprecedented and unsupported by existing legal authority.  The Advisory

24   Committee Notes to the 2006 Amendments to Federal Rule of Civil Procedure Rule 34 explain

25   that Rule 34(a) is not meant to "create a routine right of direct access to a party's electronic

26   information system" and advises that courts should "guard against undue intrusiveness resulting

27   from inspecting or testing such systems."  Thus, courts have declined to find an entitlement to

28   direct access an adversary's computer systems. *Cummings v. Gen. Motors Corp.*, 365 F.3d 944,

25

1    954 (10th Cir. 2004) ("we find no abuse of discretion in the denial of the motion to compel

2    access to GM's databases … 'Plaintiffs' proposed computer database searches are overly broad

3    in scope, duplicative of prior requests and unduly burdensome.'"), *abrogated on other grounds*

4    *by Unitherm Food Sys., Inc. v. Swift Eckrich, Inc.* 546 U.S. 394, 126 S. Ct. 980, 163 L. Ed. 2d

5    974 (2006); *In re Ford Motor Co.*, 345 F.3d 1315, 1316 (11th Cir. 2003) (stating that "Rule 34(a)

6    does not grant unrestricted, direct access to a respondent's database compilations" and holding

7    that the district court abused its discretion by granting direct access to a defendant's database

8    without a finding of noncompliance with the discovery rules.); *see Convolve, Inc. v. Compaq*

9    *Computer Corp.*, 223 F.R.D. 162, 169 (S.D.N.Y. 2004) (direct access to adversary's databases

10   not warranted where adversary had not destroyed or withheld relevant information); *Sec. &*

11   *Exch. Comm'n v. Strauss*, No. 09 Civ. 4150 (RMB) (HBP), 2009 U.S. Dist. LEXIS 101227, 2009

12   WL 3459204, at *35 (S.D.N.Y. Oct. 28, 2009) ("There is a general reluctance to allow a party to

13   access its adversary's own database directly.").

14          *In re Ford Motor Co.*, 345 F.3d 1315 (11th Cir. 2003), is instructive.  In that case, the

15   Eleventh Circuit granted mandamus to prevent implementation of a district court order allowing

16   plaintiffs to directly inspect certain data stores on Ford's computers.  The Eleventh Circuit found

17   that this was an abuse of discretion, explaining that Rule 34(a) requires the responding party to

18   search his records to produce the required, relevant data. "Rule 34(a) does not give the

19   requesting party the right to conduct the actual search." 345 F.3d at 1317. The Eleventh Circuit

20   stated that "perhaps due to improper conduct on the part of the responding party," an adversary

21   may need to do its own examination, but noted that the district court here had made no findings

22   that Ford had failed to comply properly with its discovery obligations. *Id*. Consequently, the

23   court found that the record did not justify such unusual relief and that the district court district

24   court clearly abused its discretion.  *Id*.

25          Likewise, Oracle has made no showing here which would justify granting access to

26   Rimini's internal network, and Rimini respectfully requests that Oracle's request for direct

27   access to the SharePoint intranet be denied.

28

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

A/74572609.6

1

### C.     Oracle's Motion to Compel a Two-Day Deposition of Seth Ravin

2

**Oracle's Position:**

3

4

Oracle requests leave to depose Defendant Seth Ravin for two days, instead of the default

5

seven hours.  Ravin is a defendant in this case in his own right.  He is also the founder of

6

Defendant Rimini Street and is a critical witness on all aspects of the case.  As Rimini's founder,

7

he has been with the company for the entire period of its existence, and he established the Rimini

8

business model that Oracle contends is illegal.  Documents produced in this action attest to

9

Ravin's direct involvement in every facet of Rimini's conduct that is at issue in this lawsuit.

10

Ravin is a key witness in every area of liability (including unauthorized downloading, copyright

11

infringement, and interference with Oracle's relationships with its customers) as well as

12

damages, since Ravin is the lead decision maker at Rimini and has been throughout his tenure

13

there.  In addition to his importance to all aspects of the case and his status as an individual

14

defendant, Ravin is also associated with more documents than any Rimini witness but one – over

15

170,000 pages.  Accordingly, Oracle requests permission to depose him for two full days.

16

Federal Rule of Civil Procedure 30(d)(1) states that "[t]he court must allow additional

17

time" beyond the default seven hours for a deposition "consistent with Rule 26(b)(2) if needed to

18

fairly examine the deponent . . ."  In addition, this Court's September 21, 2010 Order provides

19

that deposition time beyond seven hours for a given witness may be allowed if "good cause" is

20

shown.  Dkt. No. 109, p.5, ¶ 4.  Here, both Rule 30(d)(1) and this Court's Order are satisfied.

21

Given Ravin's unique role and importance in this case, a two-day deposition for him is necessary

22

and appropriate.

23

During the meet and confer process, Rimini stated that it was unwilling in advance to

24

agree to more than seven hours of deposition time for Ravin, but that after the first day was over,

25

Rimini would consider whether to produce Ravin for some period of time the next day.  That

26

response is inadequate because it does not allow Oracle to plan.  Oracle would conclude the first

27

day of deposition without knowing if it would have any further opportunity to examine Ravin.

28

That would make it difficult to know what topics would have to be covered in the first day.

A/74572609.6

1    Oracle should know in advance of the deposition how much time it has for questioning.  Here,

2    two days is warranted.

3          The Court should reject each of the argument provided below by Rimini in opposition to

4    this request.

5          First, although Oracle did depose Mr. Ravin in the SAP litigation, the first deposition was

6    limited by Ravin only to matters involving his time at TomorrowNow.  After this Court held

7    Rimini and Ravin in contempt of court for having failed to obey this Court's order to answer

8    questions about Rimini Street, Ravin relented and agreed to comply with the Court's order.  *See*

9    Howard Decl. Exs. T, U (Stipulation and Order Finding Non-Parties Rimini Street, Inc. and Seth

10   Ravin in Civil Contempt, Case 2:09-cv-01591-KJD-GWF Dkt. 49; Agreement Dismissing

11   Appeal (filed under seal)).  However, that order limited Oracle to two hours of questioning and

12   the examination necessarily focused on the issues most germane to the SAP litigation.

13         Second, it is simply false that Ravin has only a sales background and is not technical

14   enough to understand Rimini's illegal conduct regarding Oracle software.  Attached as Ex. V

15   (ORCLRS1312835 (filed under seal) to the Howard Decl. is Ravin's resume submitted to

16   PeopleSoft as part of his job application there.  It lists his "technical familiarity" as involving no

17   less than fifteen languages/relational databases, including Java, HTML, C++ and Visual Basic.

18   This is the type of misdirection that requires more deposition time.  Ravin will disavow technical

19   expertise and it will take time to impeach that contention.

20         Third, for the reasons Oracle provides above, this is the type of case, where the CEO is a

21   founder, individual defendant, and has been personally involved for years in all aspects of the

22   company's operations, that additional deposition time is warranted.

23   **Rimini's Position:**

24         Oracle's request to depose Rimini's CEO, Seth Ravin, for 14 hours over a two day period

25   lacks good cause and provides another example of Oracle attempting to expand discovery in

26   advance rather than tailoring its discovery to fit the available parameters.  Oracle should *plan* to

27   fit within the parameters first, and only go outside those if there is legitimate need.  Oracle's

28   request should be denied.

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

A/74572609.6

1    First, Oracle has already deposed Mr. Ravin on two separate occasions in connection

2    with the Oracle-SAP litigation, including a deposition last year that squarely addressed the

3    aspects of Rimini's operations that are most relevant to this case.  The testimony from the first

4    deposition focused on Ravin's pre-Rimini work history, while the second deposition focused

5    exclusively on Rimini's business and operations.  These depositions collectively included over 7

6    hours of testimony by Mr. Ravin.  This testimony regarding Mr. Ravin's background and

7    knowledge of Rimini's operations undoubtedly provides Oracle valuable insight that should

8    enable it to tailor its examination to fit within the confines of a seven hour deposition.

9    Second, Mr. Ravin, as the CEO and with his sales background, does not have the detailed

10   knowledge regarding the technical operations underlying the core of Oracle's allegations in this

11   case.  Oracle has repeatedly commented on the technical complexity of this case, but Mr. Ravin

12   admittedly does not have a technical background.  This fact is reflected in Mr. Ravin's previous

13   deposition testimony, where he repeatedly referred questions to Rimini engineers and

14   developers.  *See* Reckers Decl. Exhibit L (Deposition of Seth Ravin) at 291:2-16 (Stating that he

15   wasn't sure of the technical details and suggesting employee John Royce); 293:2-15 (Referring

16   technical JDE questions to Ray Grigsby); 297:4-16 (Referring technical onboarding questions to

17   Dennis Chui); 298:16-299:4 ("I wouldn't know that level of detail."); 306:14-21 ("I think there

18   are people who would know more than me, but my understanding is that it would be done one

19   after the other.").   As Mr. Ravin's established lack of knowledge regarding many of the key

20   complex technical issues in this case demonstrates, there is not good cause for subjecting Mr.

21   Ravin to a 14 hour deposition.

22   Third, courts have consistently recognized the need for strict limits when it comes to

23   depositions of high-level employees, and such increased scrutiny is necessary here.  As one court

24   explained, "When the discovery to be obtained is through the deposition of a senior executive, a

25   court must remain mindful that 'permitting unfettered discovery of corporate executives would

26   threaten disruption of their business and could serve as a potent tool for harassment in

27   litigation.'"  *Tri-Star Pictures, Inc. v. Unger*, 171 F.R.D. 94, 102 (S.D.N.Y. 1997).   Needless to

28   say, the deposition of a company's CEO visits a heavy burden on any company, especially a

1    small company like Rimini.  Doubling the time allocated to the deposition serves only to increase

2    that burden.  Moreover, there can be no doubt that Mr. Ravin lacks unique or superior knowledge

3    of many of the important facts in dispute, especially when compared to Rimini's technical

4    employees.  Oracle has already taken nearly a dozen depositions of such employees and does not

5    need to spend 14 hours asking Mr. Ravin questions that have already been answered by

6    employees with superior knowledge.

7         In short, seven hours should be more than a sufficient time period to thoroughly depose

8    Mr. Ravin, and Mr. Ravin's decision-making role as CEO and founder of Rimini does not

9    establish the good cause necessary to double the deposition limits.  Rimini requests that the

10   Court deny Oracle's request to depose Mr. Ravin for two days.

11        **D.      Rimini's Request for Clarification Regarding Pre-Trial
                    Depositions**

12        **Rimini's's Position:**

13        A disagreement between the Parties has recently surfaced upon which Rimini requests

14   clarification from the Court given its importance to pre-trial preparation.  In the Stipulated

15   Discovery Plan, the Parties mutually and unequivocally agreed that any "Party has right to

16   depose any person designated as a trial witness by another Party, if that person was not deposed

17   previously."  Dkt. No. 51 at 13.  Despite having agreed to this provision in the Stipulated

18   Discovery Plan, Oracle has now expressed its belief that Rimini is not entitled to take pretrial

19   depositions of witnesses it "could" have deposed during fact discovery.  *See* Reckers Decl.

20   Exhibit M. Oracle's position squarely conflicts with the Stipulated Discovery Plan, and Rimini

21   respectfully seeks clarification regarding its entitlement to pretrial depositions.

22        As the Parties discussed during the Rule 26(f) conference, there are a large number of

23   potential witnesses in this case that have discoverable information.  For instance, Oracle's Rule

24   26(a) disclosure lists well over one hundred Oracle employees likely to have discoverable

25   information.  Given the large number of potential witnesses, the Parties agreed that they each had

26   the right to depose any person designated as a trial witness, if that person was not deposed

27   previously.

28

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

A/74572609.6

1    Rimini has endeavored to take the fact discovery needed to present its case and expects to

2  consume substantially all of its fact deposition allocation.  But, Rimini has also relied on the

3  Parties' trial witness agreement and has not attempted to somehow "guess" Oracle's trial

4  witnesses from the pool of potentially hundreds of individuals.  Even if Rimini had engaged in

5  such an impractical guessing game, it still could not have taken the depositions of each of

6  Oracle's potential trial witness given the reasonable deposition limits in this case.  For instance,

7  Oracle suggests that "Rimini has the depo transcripts from the SAP case, so it has a good idea of

8  who Oracle's witnesses are likely to be."   Oracle, however, has produced on the order of 50

9  deposition transcripts from the SAP case, a number far exceeding the fact deposition limits.

10    While it has never been Rimini's intent to substitute the pretrial depositions for fact

11  discovery, the pretrial depositions contemplated by the Stipulated Discovery Plan are necessary

12  to prevent unfair surprise at trial in this case.  Notably, the Court's order setting discovery limits

13  expressly contemplates additional fact depositions when such testimony is "required to prepare

14  this case" for trial for "good cause" shown.  Dkt. No. 109, p.5 ¶ 4.  The pretrial depositions of

15  previously un-deposed witnesses unquestionably meet this standard— such depositions are

16  obviously "required to prepare this case" for trial and "good cause" exists given the high risk of

17  unfair surprise in light of the large number of potential witnesses.  These bases are precisely why

18  the Parties included the right to depose trial witnesses in the Stipulated Discovery Plan, and

19  Rimini respectfully requests that the Court clarify that the Parties do indeed enjoy the right "to

20  depose any person designated as a trial witness by another Party, if that person was not deposed

21  previously."

22    **Oracle's Position:**

23    Rimini should not be allowed to conduct the bulk of its fact depositions on the eve of

24  trial, long after the close of fact discovery.  Oracle never agreed to this, and the proposal makes a

25  mockery of the discovery cut-off and the trial schedule set by the Court, not to mention the entire

26  discovery process.  Rimini's argument is foreclosed by the Court's September 21, 2010 Order,

27  which stated that any depositions "required to prepare this case for trial," beyond those provided

28  for in the Order, require "good cause shown."   Dkt. No. 109, p.5, ¶ 4.

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

A/74572609.6

1         Of the 20 depositions that Rimini is authorized to take during fact discovery, so far it has

2    taken 8.  Two others were noticed and scheduled, but withdrawn unilaterally by Rimini.  One

3    more has been noticed for a date not yet set.  In this CMC statement, Rimini states it plans to

4    issue another 30(b)(6) deposition notice.  So, Rimini is currently on track to have taken 10

5    depositions in a year and a half of fact discovery – half the number the Court allowed – all while

6    resisting the *expansion* of deposition discovery at every turn.

7         Having chosen not to complete depositions during the fact discovery period, Rimini plans

8    to sandbag Oracle right before trial with a slew of depositions that should have been taken

9    earlier.  That is improper.  The identity of Oracle's likely trial witnesses is in most cases easy to

10   determine.  Rimini has the deposition transcripts from the *SAP* lawsuit, and the *SAP* trial was

11   public.  Given the heavy overlap between this case and *SAP*, Rimini has a good sense of who it

12   should be deposing and on what subjects.  Further, both Oracle and Rimini have agreed upon a

13   set of Oracle employees whose documents were searched and produced in this case, reflecting

14   both sides' understanding of the likely relevant witnesses.  In addition, the documents

15   themselves show the role of various Oracle employees concerning conduct relevant to this

16   lawsuit.  Rimini can determine who to depose the same way that Oracle has done –  by looking at

17   the evidence – as parties normally do in litigation.  Finally, Oracle's initial disclosures are

18   detailed.  Rimini has had ample opportunity to take foundational discovery aimed at the trial

19   issues, but has just chosen not to do so.

20        Rimini complains that there are more than 20 Oracle employees who could potentially be

21   trial witnesses, but that does not explain Rimini's decision to take only 10 depositions during fact

22   discovery.  That argument is also inconsistent with Rimini's repeated opposition to expanding

23   the discovery limits in this case to the extent requested by Oracle.  In the May 13, 2010

24   Stipulated Discovery Plan that Rimini points to, Oracle proposed that each side could take 15

25   individual depositions, 15 hours of Rule 30(b)(6) corporate designee testimony, and 45 hours of

26   third party deposition time.  In that context, Oracle also proposed that "[a]ny Party has the right

27   to depose any person designated as a trial witness by another Party, if that person was not

28   deposed previously."  Dkt. No. 51 at 13.  Rimini seizes on that one sentence while ignoring

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

1   everything that preceded it and ignoring the purpose of pretrial depositions:  to protect a diligent

2   party from last minute, unfair surprise.  The pretrial depositions were intended as a failsafe

3   mechanism, not to give Rimini the strategic option to reserve the bulk of its depositions until

4   shortly before trial.

5          Conducting numerous substantive depositions immediately before trial is also impractical

6   and unfair.  The period of time between disclosure of trial witnesses and the beginning of trial is

7   short, and the parties and their counsel will be devoted to trial preparation.  To attempt to

8   squeeze into that already busy period a large number of key depositions, which could have been

9   conducted during fact discovery, would impose a significant burden for no good reason.

10          Further, Rimini's argument is inconsistent with the Court's order, which stated that

11   "[e]ach side will be allowed to take up to twenty (20) depositions of seven (7) hours in duration

12   *unless, for good cause shown, additional deposition testimony is required to prepare this case*

13   *for trial*."  September 21, 2010 Order, Dkt. No. 109, p.5 ¶ 4 (emphasis added).  The Court's

14   order established a "good cause" standard to take depositions outside the limits placed on fact

15   discovery.  This is fully in keeping with Oracle's intent that the pretrial depositions address

16   issues of unfair surprise and are not a substitute for diligent fact discovery.  The Court's order

17   forecloses Rimini's argument that it may take the deposition as of right of every witness not

18   previously deposed.  Instead, Rimini must show "good cause."  A decision to withhold

19   depositions of witnesses known to have relevant knowledge does not constitute good cause.

20          The Court should hold Rimini to the "good cause" standard set forth the in September 21,

21   2010 Order.

22          **E.**      **Rimini's Motion for a Protective Order**

23          <u>**Rimini's's Position:**</u>

24          While not included in this submission, Rimini will be separately filing an emergency

25   motion for a protective order by Monday November 7 to address a highly prejudicial and

26   improper line of questions directed to Rimini customers by Oracle over recent depositions.

27   Rimini has corresponded separately with Oracle on this issue and requests that the dispute raised

28   by its emergency motion be taken up at the CMC hearing given the numerous customer

A/74572609.6

1    depositions scheduled over the next two weeks.

2           **Oracle's Position:**

3           At 2:14 p.m. Pacific time on the day this CMC statement is due, Rimini emailed a letter

4    stating that it intends to file an emergency motion for a protective order concerning questions

5    Oracle has asked at two depositions about TomorrowNow's guilty plea to 12 counts of copyright

6    infringement and violations of the Computer Fraud and Abuse Act.  Rimini also stated that it

7    intends to notice its motion for the November 8 CMC.  Oracle objects to this last minute

8    "emergency" motion.  Oracle first referenced the plea agreement in a customer deposition on

9    October 20, 2011, which was more than two weeks ago.  It was unreasonable for Rimini to wait

10   until the Friday afternoon before a Tuesday morning CMC to give any notice that it was going to

11   bring this motion.  Oracle requests that the Court set a schedule for full briefing on Rimini's

12   motion.

13

14   DATED:  November 4, 2011

15   BINGHAM McCUTCHEN LLP                      SHOOK, HARDY & BACON LLP

16   By: /s/ Geoffrey M. Howard                        By: /s/ Robert H. Reckers

17        Geoffrey M. Howard (*pro hac vice*)              Robert H. Reckers (*pro hac vice*)
          Three Embarcadero Center                         600 Travis Street, Suite 1600
18        San Francisco, CA 94111-4067                     Houston, Texas  77002
          Telephone:     415.393.2000                      Telephone: (713) 227-8008
19        Facsimile:     415.393.2286                      Facsimile: (731) 227-9508
          geoff.howard@bingham.com                         rreckers@shb.com
20
21        *Attorneys for Plaintiffs*                        *Attorneys for Defendants*

22

23

24

25

26

27

28

34

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

1

## ATTESTATION OF FILER

2      The signatories to this document are myself and Robert Reckers and I have obtained Mr.

3 Reckers' concurrence to file this document on his behalf.

4

5 DATED:  November 4, 2011                    BINGHAM McCUTCHEN LLP

6                                             By: /s/ Geoffrey M. Howard

7                                                 Geoffrey M. Howard (*pro hac vice*)
                                                  Three Embarcadero Center
8                                                 San Francisco, CA 94111-4067
                                                  Telephone:    415.393.2000
9                                                 Facsimile:    415.393.2286
                                                  geoff.howard@bingham.com
10

11                                            *Attorneys for Plaintiffs*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

A/74572609.6