# EXHIBIT D

1  BINGHAM McCUTCHEN LLP
   CHRISTOPHER B. HOCKETT (SBN 121539)
2  GEOFFREY M. HOWARD (SBN 157468)
   ZACHARY J. ALINDER (SBN 209009)
3  BREE HANN (SBN 215695)
   Three Embarcadero Center
4  San Francisco, CA  94111-4067
   Telephone:  (415) 393-2000
5  Facsimile:  (415) 393-2286
   chris.hockett@bingham.com
6  geoff.howard@bingham.com
   zachary.alinder@bingham.com
7  bree.hann@bingham.com

8  DORIAN DALEY (SBN 129049)
9  JEFFREY S. ROSS (SBN 138172)
   500 Oracle Parkway
10 M/S 5op7
   Redwood City, CA  94070
11 Telephone:  (650) 506-4846
   Facsimile:  (650) 506-7114
12 dorian.daley@oracle.com
13 jeff.ross@oracle.com

14 Attorneys for Plaintiffs
   Oracle Corporation, Oracle USA, Inc.,
15 and Oracle International Corporation

                                                          EMC

16

17              UNITED STATES DISTRICT COURT

18          NORTHERN DISTRICT OF CALIFORNIA        C 07    1658

19              SAN FRANCISCO DIVISION

20

21 ORACLE CORPORATION, a Delaware         CASE NO.
   corporation, ORACLE USA, INC., a Colorado
22 corporation, and ORACLE INTERNATIONAL   COMPLAINT FOR DAMAGES AND
   CORPORATION, a California corporation,   INJUNCTIVE RELIEF FOR:
23
                Plaintiffs,                (1) VIOLATIONS OF THE COMPUTER
24                                          FRAUD AND ABUSE ACT;
        v.                                  (2) VIOLATIONS OF THE COMPUTER
25                                          DATA ACCESS AND FRAUD ACT;
   SAP AG, a German corporation, SAP        (3) INTENTIONAL INTERFERENCE
26 AMERICA, INC., a Delaware corporation,   WITH PROSPECTIVE ECONOMIC
   TOMORROWNOW, INC., a Texas corporation,  ADVANTAGE;
27 and DOES 1-50, inclusive,                (4) NEGLIGENT INTERFERENCE WITH
                                            PROSPECTIVE ECONOMIC
28              Defendants.                 ADVANTAGE;

                           COMPLAINT

(5) UNFAIR COMPETITION;
(6) CONVERSION;
(7) TRESPASS TO CHATTELS;
(8) UNJUST ENRICHMENT /
RESTITUTION;
(9) CIVIL CONSPIRACY;
(10) AIDING AND ABETTING; AND
(11) AN ACCOUNTING.

DEMAND FOR JURY TRIAL

Plaintiffs Oracle Corporation, Oracle USA, Inc. ("Oracle USA"), and Oracle International Corporation ("OIC") (together "Oracle" or "Plaintiffs") for their Complaint against Defendants SAP AG ("SAP AG"), SAP America, Inc. ("SAP America"), TomorrowNow, Inc. ("SAP TN"), and Does 1 through 50 (collectively referred to as "SAP" or "Defendants"), allege as follows based on their personal knowledge as for themselves, and on information and belief as to the acts of others:

## I.    INTRODUCTION

1.    This case is about corporate theft on a grand scale, committed by the largest German software company – a conglomerate known as SAP.  Oracle is a leading developer of database and applications software, and SAP is Oracle's largest enterprise applications software competitor.

2.    Oracle brings this lawsuit after discovering that SAP is engaged in systematic, illegal access to – and taking from – Oracle's computerized customer support systems.  Through this scheme, SAP has stolen thousands of proprietary, copyrighted software products and other confidential materials that Oracle developed to service its own support customers.  SAP gained repeated and unauthorized access, in many cases by use of pretextual customer log-in credentials, to Oracle's proprietary, password-protected customer support website.  From that website, SAP has copied and swept thousands of Oracle software products and other proprietary and confidential materials onto its own servers.  As a result, SAP has compiled an illegal library of Oracle's copyrighted software code and other materials.  This storehouse of stolen Oracle intellectual property enables SAP to offer cut rate support services to

1

1    customers who use Oracle software, and to attempt to lure them to SAP's applications software

2    platform and away from Oracle's.  Through this Complaint, Oracle seeks to stop SAP's illegal

3    intrusions and theft, to prevent SAP from using the materials it has illegally acquired to compete

4    with Oracle, and to recover damages and attorneys' fees.

5              3.      In late November 2006, there occurred unusually heavy download activity

6    on Oracle's password-protected customer support website for its PeopleSoft and J.D. Edwards

7    ("JDE") product lines.  That website, called Customer Connection, permits licensed Oracle

8    customers with active support agreements to download a wide array of copyrighted, proprietary

9    software programs and other support materials.  Oracle has invested billions of dollars in

10   research, development, and engineering to create these materials, which include program

11   updates, software updates, bug fixes, patches, custom solutions, and instructional documents –

12   all copyrighted by Oracle – across the entire PeopleSoft and JDE family of software products

13   (the "Software and Support Materials").  Customers who have contracted for support with Oracle

14   have log-in credentials to access Customer Connection and download Software and Support

15   Materials.  However, Oracle's support contracts limit customers' access and download rights to

16   Software and Support Materials pertaining to the customers' licensed products.  Customers have

17   no contractual right to download Software and Support Materials relating to software programs

18   they have not licensed from Oracle, or for which the customers did not purchase support rights.

19             4.      The Software and Support Materials are a subset of the technical support

20   services that Oracle makes available to its customers that have licensed Oracle software

21   programs and purchased the right to receive technical support services related to them.  The full

22   suite of technical support services (also known as "support" or "maintenance") generally

23   includes three types of offerings that Oracle, like most other enterprise software vendors, makes

24   available to its licensed customers: (i) telephone or email access to Oracle's support technicians

25   regarding the operation of Oracle's software; (ii) software program code for the customers'

26   licensed software programs which adds new functionality or features to the software (generally

27   referred to as "software updates"), or that addresses errors or "bugs" in the software program

28   (generally referred to as "software patches"); and (iii) "knowledge management" articles that

2

COMPLAINT

1   help with problem solving and provide suggestions relating to the customer's use of licensed

2   software programs.  Because of the complexity of enterprise software applications and the

3   business environments in which they run, regular software updates and patches and knowledge

4   management articles are critical components of a software maker's support offering.  For

5   purposes of this case, Oracle's claims against SAP only concern Oracle's Software and Support

6   Materials, and not Oracle's provision of telephone or online assistance in response to customers'

7   support queries.

8        5.      The access and download activity Oracle observed on its systems in late

9   November and December 2006 did not resemble the authorized, limited access to which its

10  customers were entitled.  Instead, SAP employees using the log-in credentials of Oracle

11  customers with expired or soon-to-expire support rights had, in a matter of a few days or less,

12  accessed and copied thousands of individual Software and Support Materials.  For a significant

13  number of these mass downloads, the users lacked any contractual right even to access, let alone

14  copy, the Software and Support Materials.  The downloads spanned every library in the

15  Customer Connection support website.  For example, using one customer's credentials, SAP

16  suddenly downloaded an average of over 1,800 items per day for four days straight (compared to

17  that customer's normal downloads averaging 20 per month).  Other purported customers hit the

18  Oracle site and harvested Software and Support Materials after they had cancelled all support

19  with Oracle in favor of SAP TN.  Moreover, these mass downloads captured Software and

20  Support Materials that were clearly of no use to the "customers" in whose names they were

21  taken.  Indeed, the materials copied not only related to unlicensed products, but to entire Oracle

22  product families that the customers had not licensed.

23        6.      For example, in January 2007, a user on an SAP TN computer signed in as

24  Oracle customer Honeywell International, Inc., a Fortune 100 technology and manufacturing

25  company, to access Oracle's support system and copy literally thousands of Oracle's Software

26  and Support Materials in virtually every product library in every line of business.  This copying

27  went well beyond the products that Honeywell had licensed and to which it had authorized

28  access.  In other examples, users from SAP TN logged in using the credentials of recently

3

COMPLAINT

1    departed customers, like Metro Machine Corp., and downloaded Software and Support Materials

2    even after the customer had dropped its support rights with Oracle.

3         7.    Oracle has found many examples of similar activity. Across its entire

4    library of Software and Support Materials in Customer Connection, Oracle to date has identified

5    more than 10,000 unauthorized downloads of Software and Support Materials relating to

6    hundreds of different software programs.

7         8.    This systematic theft of Oracle's Software and Support Materials did not

8    originate from any actual customer location. Rather, the access originated from an internet

9    protocol (IP) address in Bryan, Texas, an SAP America branch office location and home of its

10   wholly-owned subsidiary SAP TN. SAP TN is a company that purports to provide technical

11   support services on certain versions of Oracle's PeopleSoft and JDE software programs. The

12   Bryan, Texas IP address used to access and download Oracle's Software and Support Materials

13   is connected directly to SAP's computer network. Indeed, Oracle's server logs have recorded

14   access through this same IP address by computers labeled with SAP identifiers using SAP IP

15   addresses.

16        9.    In many instances, including the ones described above, SAP employees

17   used the log-in IDs of multiple customers, combined with phony user log-in information, to gain

18   access to Oracle's system under false pretexts. Employing these techniques, SAP users

19   effectively swept much of the contents of Oracle's system onto SAP's servers. These "customer

20   users" supplied user information (such as user name, email address, and phone number) that did

21   not match the customer at all. In some cases, this user information did not match anything: it

22   was fake. For example, some users logged in with the user names of "xx" "ss" "User" and

23   "NULL." Others used phony email addresses like "test@testyomama.com" and fake phone

24   numbers such as "7777777777" and "123 456 7897." In other cases, SAP blended log-in

25   information from multiple customers with fake information. For example, one user name

26   connected to an SAP IP address appears to have logged in using the credentials of *seven* different

27   customers in a span of just 15 days – all from SAP computers in Bryan, Texas. **All of these**

28   **customers whose IDs SAP appropriated had one critical fact in common: they were, or**

4

COMPLAINT

1   were just about to become, new customers of SAP TN – SAP AG's and SAP America's

2   software support subsidiary whose sole purpose is to compete with Oracle.

3        10.     As a result of this illegal activity, SAP apparently has now warehoused an

4   extensive library of Oracle's proprietary, copyrighted Software and Support Materials.  As

5   explained below, this theft appears to be an essential – and illegal – part of SAP's competitive

6   strategy against Oracle.

7                      *                       *                       *

8        11.     In the world of enterprise software applications, revenue comes from three

9   basic activities:  (a) license of the underlying software, (b) consulting relating to the

10  implementation and operation of the software, and (c) support contracts to keep the software

11  updated and upgraded.  In January 2005, through SAP America, SAP AG acquired SAP TN, an

12  independent software support company founded by former PeopleSoft software engineers,

13  developers, and support technicians.  Not by coincidence, Oracle had previously announced that

14  in January 2005 it would complete its acquisition of PeopleSoft, increasing Oracle's potency as a

15  competitor to SAP AG for enterprise applications software, consulting, and support.

16       12.     Industry observers noted this fundamental shift in the competitive

17  landscape.  One industry analyst stated that, "Oracle Corp. is developing a 'super set' of

18  applications, combining features from the PeopleSoft and JDE[1] software and its CEO Larry

19  Ellison has been vocal about his intentions to take market share away from SAP.  Oracle said it

20  has thousands of developers building the new application suite, called Project Fusion, aimed at

21  taking market share from No. 1 ranked SAP."  Another mused, "After the acquisition of

22  PeopleSoft earlier this year, Oracle officially became a player on SAP's turf."

23       13.     SAP AG's hasty acquisition of SAP TN was widely perceived as a

24  response to the new competitive threat from Oracle.  SAP's own statements confirmed it.  SAP

25  AG spokesman Bill Wohl vowed that SAP AG would use SAP TN to "keep the pressure on

26  _____

27  [1]    "JDE" refers to J.D. Edwards World Solutions, a software company acquired by
     PeopleSoft, Inc. in 2003.

28

COMPLAINT

1    Oracle" by exploiting legacy PeopleSoft customers' perceived unease about Oracle's

2    commitment to support legacy PeopleSoft software.  Publicly, SAP advertised this strategy as its

3    "Safe Passage" program, explicitly designed to transition customers away from Oracle products

4    and onto the SAP software platform.  As reported in industry publications, SAP TN's services

5    "form[ed] the basis of [SAP AG's] Safe Passage initiative, a program aimed at siphoning off

6    valuable software maintenance revenue from Oracle and persuading Oracle customers to switch

7    software products [to SAP]."  Although SAP America President and CEO, Bill McDermott,

8    committed to throw "a lot of additional resources" behind SAP TN (which consisted of only 37

9    employees in total), SAP appeared to focus more on growing the SAP TN sales force rather than

10   investing in or expanding SAP TN's tiny development team.  Indeed, SAP TN did not appear to

11   have the development capability to meet the support commitments advertised in the "Safe

12   Passage" brochures at any price, much less the 50% discount promoted by SAP.  It certainly did

13   not match Oracle's investment in development resources, or even come close to it.  These facts

14   raised questions about how SAP could offer the type of comprehensive technical support

15   services on Oracle programs that customers of enterprise applications typically require.

16          14.     Nevertheless, industry observers deemed the "Safe Passage" program

17   "measurably more aggressive," and a sign that "SAP has taken the gloves off."  In connection

18   with the SAP TN acquisition, SAP America's CEO, Bill McDermott, crowed "There's nothing

19   that I love more than to win."  But win at what cost?  SAP appears to have taken a short cut to

20   equip itself to support Oracle's software programs at half Oracle's price.  SAP stole much of the

21   Software and Support Materials directly from Oracle.

22          15.     SAP's unlawful copying and theft includes, by way of example, the

23   following:

24          •   More than 10,000 illicit downloads from Customer Connection between

25              September 2006 and January 2007, with indications that this number may

26              go significantly higher if traced further back in time.

27          •   A systematic pattern of "sweeping" Oracle's Customer Connection

28              support website from SAP TN servers just days before, or the day of, the

                                                    6

expiration of a new SAP TN customer's support contract with Oracle, or in some cases on behalf of former Oracle customers with no access rights to Oracle's Software and Support Materials whatsoever.

- On multiple occasions, the indiscriminate, wholesale copying of vast libraries of available Software and Support Materials from Oracle's Customer Connection support website through downloads too rapid to permit any real-time use of the downloaded Software and Support Material.

- The improper access to, and theft of, clearly-marked internal proprietary Oracle support documents not available even to licensed, authorized customers or through normal access to Oracle's Customer Connection system.

- Accessing and downloading Software and Support Materials across multiple product lines in multiple lines of business available on the Customer Connection support website, in the purported name of customers that had never licensed those products and had no legal access to them.

16.     In short, to try to "keep the pressure on Oracle," SAP has been engaged in a systematic program of unfair, unlawful, and deceptive business practices that continues to this day.  Through its illegitimate and illegal business practices, SAP has taken Oracle's Software and Support Materials and apparently used them to insinuate itself into Oracle's customer base, and to attempt to convert these customers to SAP software applications.  Oracle also has concerns that SAP may have enhanced or improved its own software applications offerings using information gleaned from Oracle's Software and Support Materials.  These illegal business practices threaten to cause irreparable harm to Oracle, its many employees, and its customers. Oracle has no adequate remedy at law for the harm threatened and caused by these acts.

7

COMPLAINT

1   II.      THE PARTIES

2              17.      Oracle Corporation is a Delaware corporation with its principal place of

3   business in Redwood City, County of San Mateo, State of California.  Directly and through its

4   subsidiaries, Oracle Corporation develops and licenses database and applications software

5   programs and provides related services around the world.

6              18.      Oracle USA is a Colorado corporation duly authorized to do business in

7   the State of California, with its principal place of business in Redwood City, County of San

8   Mateo, State of California.  Oracle USA develops and licenses database and applications

9   software programs and provides related services.  Oracle USA is the successor to PeopleSoft

10  USA, Inc., ("PeopleSoft") and JDE.

11             19.      OIC is a California corporation duly authorized to do business in the State

12  of California, with its only place of business in Redwood City, County of San Mateo, State of

13  California.

14             20.      OIC is the owner of the copyrights at issue in this action.  Oracle

15  Corporation and Oracle USA are the licensees of the copyrights at issue in this action.  Oracle

16  Corporation and Oracle USA are authorized to license to end users the copyrighted computer

17  software programs and other works at issue in this action.

18             21.      SAP AG is a German corporation with its principal place of business in

19  Walldorf, Germany.

20             22.      SAP America is a Delaware corporation with its principal place of

21  business in Newtown Square, Pennsylvania.  SAP America is a wholly-owned subsidiary of SAP

22  AG.

23             23.      SAP TN is a Texas corporation with its principal place of business in

24  Bryan, Texas.  SAP TN is a wholly-owned subsidiary of SAP America.  The corporate

25  relationship of the three named defendants is set forth in the chart below.

26

27

28

8

COMPLAINT

```
┌─────────────────────────────────┐
│           SAP AG                │
│   (German Parent Corporation)   │
└─────────────────────────────────┘
                 │
┌─────────────────────────────────┐
│         SAP America             │
│  (Wholly-owned U.S. Subsidiary) │
└─────────────────────────────────┘
                 │
┌─────────────────────────────────┐
│           SAP TN                │
│  (Wholly-owned U.S. Subsidiary) │
└─────────────────────────────────┘
```

24.     Oracle is currently unaware of the true names and capacities of Does 1 through 50, inclusive, whether individual, partnership, corporation, unincorporated association, or otherwise, and therefore sues these defendants by such fictitious names.  Oracle will amend this Complaint to allege their true names and capacities when ascertained.

25.     Defendants all are doing business in and/or have directed their activities at California, and specifically this judicial district.  By way of example only, SAP America and SAP TN advertise, promote, sell, license, service, and support customers in California and in this judicial district.  SAP AG negotiates and enters into software license and support agreements directly within the United States and, specifically in this judicial district, negotiates certain software-related contracts directly with Oracle that contain provisions by which SAP AG consents to the jurisdiction of California courts and the application of California law.  SAP AG also holds an annual meeting of its Board of Directors in Palo Alto, California, and finances the sales and promotional activities of both SAP America and SAP TN throughout the United States and in California.

26.     At all material times, through its 100% ownership of both SAP America and SAP TN, SAP AG had both the right and the authority to control the actions of both corporations.  Similarly, at all material times, through its 100% ownership of SAP TN, SAP America had both the right and authority to control the actions of SAP TN.

27.     At all material times, each of the Defendants, including Does 1 through 50, was the agent, servant, employee, partner, joint venturer, representative, subsidiary, parent, affiliate, alter ego, or co-conspirator of the others, had full knowledge of and gave substantial

9

COMPLAINT

1    assistance to the alleged activities, and in doing the things alleged, each was acting within the

2    scope of such agency, service, employment, partnership, joint venture, representation, affiliation,

3    or conspiracy, and each is legally responsible for the acts and omissions of the others.

4    III.    JURISDICTION

5            28.    Oracle's first cause of action arises under the Computer Fraud and Abuse

6    Act, 18 U.S.C. §§ 1030 *et seq.*, and this Court has subject-matter jurisdiction over this action

7    pursuant to 18 U.S.C. § 1030(g) and 28 U.S.C. § 1331.  In addition, Oracle will seek to amend

8    this Complaint to add claims for copyright infringement under the Copyright Act, 17 U.S.C.

9    §§ 101, *et seq.*, when the relevant copyright registrations issue, and the Court will have subject-

10   matter jurisdiction over those claims pursuant to 28 U.S.C. § 1338.

11           29.    This Court has supplemental subject matter jurisdiction over the pendent

12   state law claims under 28 U.S.C. § 1367 because these claims are so related to Oracle's claims

13   under federal law that they form part of the same case or controversy and derive from a common

14   nucleus of operative facts.

15   IV.    VENUE

16           30.    Venue in this district is appropriate, pursuant to 28 U.S.C. § 1391, because

17   a substantial part of the events giving rise to the dispute occurred in this district, a substantial

18   part of the property that is the subject of the action is situated in this district, and the Court has

19   personal jurisdiction over each of the parties as alleged throughout this Complaint.

20   V.    INTRADISTRICT ASSIGNMENT

21           31.    Assignment is proper in this division under Civil L.R. 3-2 (c) and (d),

22   because a substantial part of the events giving rise to the claims occurred in San Mateo County

23   and a substantial part of the property that is the subject of the action is situated in San Mateo

24   County.

25   VI.    FACTUAL ALLEGATIONS

26       A.    **Oracle's Software and Support Materials**

27           32.    Oracle is the world's largest enterprise software company, and the first to

28   receive J.D. Power & Associates' global certification for outstanding service and support based

10

1    on measuring customer satisfaction worldwide. Oracle develops, manufactures, markets,

2    distributes, and services software designed to help its customers manage and grow their business

3    operations. Oracle's software offerings include database, middleware, and applications software

4    programs.

5           33.    As is typical in the enterprise software industry, Oracle does not sell

6    ownership rights to its software or related support products to its customers. Instead, Oracle's

7    customers purchase licenses that grant them limited rights to use specific Oracle software

8    programs with Oracle retaining all intellectual property rights in these works. In addition,

9    licensed customers can, and typically do, purchase some set of technical support services that

10   include the right to obtain upgraded products such as updates, bug fixes, or patches to those

11   software programs the customers have expressly licensed from Oracle and have the right to use.

12          34.    Oracle's license agreements with its customers may vary according to the

13   products licensed, including because the customers originally contracted with companies later

14   acquired by Oracle, but all of the relevant license agreements for what is now Oracle software set

15   comparable rules for access to, and use of, that software. Among other things, those rules

16   prohibit access to, or use of, any portion of the software not expressly licensed and paid for by

17   the licensee, and any sublicense, disclosure, use, rent, or lease of the software to third parties.

18          35.    Oracle's license agreements define Oracle's confidential information to

19   include, without limitation, Oracle's software, its object and source code, and any associated

20   documentation or service offerings. As defined in one illustrative license agreement, "software"

21   specifically includes the update products made available to customers as part of the support

22   contracts that customers purchased from Oracle.

23          36.    Oracle also restricts access to the Customer Connection technical support

24   website, through the terms of use:

25          You agree that access to Customer Connection...will be granted
            only to your designated Oracle technical support contacts and that
26          the Materials [on the support website] may be used solely in
            support of your authorized use of the Oracle Programs for which
27          you hold a supported license from Oracle. Unless specifically
            provided in your licensing or distribution agreement with Oracle,
28          the Materials may not be used to provide services for or to third

11

COMPLAINT

1    parties and may not be shared with or accessed by third parties.

2        37.    The terms of use explicitly describe the confidential nature of the material

3   on Customer Connection: "the information contained in the Materials [on Customer Connection]

4   is the confidential proprietary information of Oracle. *You may not use, disclose, reproduce,*

5   *transmit, or otherwise copy in any form or by any means the information contained in the*

6   *Materials for any purpose*, other than to support your authorized use of the Oracle Programs for

7   which you hold a supported license from Oracle...." (emphasis supplied)

8        38.    Access to the secured areas of Customer Connection is also governed by

9   Special Terms of Use. By using the secured website, the user agrees to accept and comply with

10   these Special Terms of Use. The Special Terms of Use provide that access is only permitted via

11   the user's "personal username and password" and that all materials on the secured website are

12   confidential and proprietary. The Special Terms of Use clearly provide that: "Use of such

13   CONFIDENTIAL and PROPRIETARY information and materials for any other purpose is

14   strictly prohibited."

15        39.    Prior to downloading Software and Support Materials from Oracle's

16   support websites, a user must also specifically agree to additional terms of use and restrictions

17   specified in Oracle's Legal Download Agreement:

18
        Your username and password are provided to you for your sole use
19      in accessing this Server and are confidential information subject to
        your existing confidentiality agreement with Oracle / PeopleSoft /
20      JDEdwards. If you do not have a confidentiality agreement in
        effect with Oracle / PeopleSoft / JDEdwards, you are hereby
21      notified that your username and password are confidential
        information and may only be distributed to persons within your
22      organization who have a legitimate business purpose for accessing
        the materials contained on this server in furtherance of your
23      relationship with Oracle / PeopleSoft / JDEdwards.

24        40.    The Legal Download Agreement also puts the user on notice as to the

25   confidential, proprietary and copyrighted nature of the Software and Support Materials available

26   for download:

27
        Any software that is made available to download from this server
28      ("Software") is the copyrighted work of Oracle / PeopleSoft /

                                        12

                                    COMPLAINT

1    JDEdwards and/or its affiliates or suppliers.  All Software is
     confidential information of Oracle / PeopleSoft / JDEdwards and
2    its use and distribution is governed by the terms of the software
     license agreement that is in effect between you and Oracle /
3    PeopleSoft / JDEdwards ("License Agreement").  The Software is
     part of the Licensed Products under the License Agreement and
4    may only be downloaded if a valid License Agreement is in place
     between you and Oracle / PeopleSoft / JDEdwards.  The Software
5    is made available for downloading solely for use by licensed end
     users according to the License Agreement and any reproduction or
6    redistribution of the Software not in accordance with the License
     Agreement is expressly prohibited.  WITHOUT LIMITING THE
7    FOREGOING, COPYING OR REPRODUCTION OF THE
     SOFTWARE TO ANY OTHER SERVER OR LOCATION FOR
8    FURTHER REPRODUCTION OR REDISTRIBUTION IS
     EXPRESSLY PROHIBITED.

9

10        41.    The Legal Download Agreement further restricts use of documents

11   downloaded from the website:

12        Permission to use Documents (such as white papers, press releases,
          product or upgrade announcements, software action requests,
13        datasheets and FAQs) from this server ("Server") is granted,
          provided that (1) the below copyright notice appears in all copies
14        and that both the copyright notice and this permission notice
          appear, (2) use of such Documents from this Server is for
15        informational and non-commercial or personal use only and will
          not be copied or posted on any network computer or broadcast in
16        any media, and (3) no modifications of any Documents are made.
          Use for any other purpose is expressly prohibited.

17

18        42.    In addition, users accessing specific materials, such as a Software

19   Application Request ("SAR") through the SAR Search Web Application, agree to additional

20   legal restrictions.  These terms notify the user that the software available to download from

21   Oracle is Oracle's copyrighted material.  The terms further provide that the "software is part of

22   the Licensed Products under the License Agreement" and "is made available for downloading

23   solely for use by licensed end users according to the License Agreement.  Any reproduction or

24   redistribution of the Software not in accordance with the License Agreement is expressly

25   prohibited."  To download a SAR, the user must click on a button indicating that it accepts these

26   terms.

27

28
                                    13

                                COMPLAINT

1    **B.    Oracle Threatens To Unseat SAP**

2        43.    On January 7, 2005, Oracle completed its acquisition of PeopleSoft to

3    emerge as the second-largest provider of business software applications in the world and the first

4    to rival SAP AG in market share, size, and geographic and product scope.  As SAP America's

5    Vice President of Operations, Richard Knowles, testified on June 23, 2004 at the trial on the

6    Department of Justice's unsuccessful effort to block Oracle's acquisition of PeopleSoft, the

7    combination revitalized Oracle overnight as a competitor in the business software applications

8    business.  SAP AG suddenly found itself in a far different competitive environment than the one

9    in which it had grown comfortable.  As SAP AG reeled, events unfolded at a rapid pace:  eleven

10   days after its announcement, Oracle launched the newly-united company and unveiled, at its

11   headquarters with more than 48,000 people joining by Webcast and phone, how the nearly

12   50,000-strong combined workforce of Oracle and PeopleSoft would provide unparalleled

13   innovation and support to 23,000 business applications software customers throughout the world.

14       44.    SAP AG's top executives publicly downplayed the threat that a combined

15   Oracle and PeopleSoft entity would pose to its competitive position for business software

16   applications.  SAP AG CEO Henning Kagermann claimed that even with PeopleSoft, Oracle

17   would "not [be] a competitor which could really hurt us."  After the merger, he even claimed to

18   wish Oracle "good luck" in competing with SAP AG.

19       45.    But SAP AG had no answer for the business proposition the new Oracle

20   offered.  Not only do many SAP AG customers use Oracle's superior database software

21   programs, but now Oracle offered a deeper, broader product line of enterprise applications

22   software programs to compete against SAP AG.

23       46.    Rather than improve its own products and offerings, SAP AG instead

24   considered how to undermine Oracle.  One way was to hit at Oracle's customer base – and

25   potentially increase its own – by acquiring and bankrolling a company that claimed the ability to

26   compete with Oracle support and maintenance services on Oracle's own software products,

27   despite not owning any of the software code for, or intellectual property rights to, these same

28   products.

14

COMPLAINT

1      C.      **SAP TN**

2             47.      In December 2004, SAP TN was a small software services company,

3      headquartered in Bryan, Texas and founded by former PeopleSoft employees.  It claimed to

4      compete with PeopleSoft, JDE, and later, Oracle, by providing low-cost maintenance and support

5      services to PeopleSoft and JDE customers running assorted versions of these software programs.

6      SAP TN claimed that it could cut customer maintenance and support bills in half and give

7      customers a reprieve from software upgrade cycles by allowing customers to remain on older,

8      often outdated, versions of PeopleSoft or JDE software rather than moving to later versions by

9      implementing upgrades that the customers would receive by paying for support services from the

10     software vendors themselves.  As one industry journalist explained, SAP TN promised to offer

11     such cheap support "because it is not investing millions of dollars in research and development

12     for future versions of the software; it instead focuses on simply keeping the software up and

13     running for an annual fee."

14            D.      **SAP Responds To Oracle Competition With Its "Safe Passage" Scheme**

15            48.      As described in a glossy spread in a leading industry publication, in

16     December 2004, just weeks before Oracle would close the PeopleSoft acquisition, SAP TN

17     president Andrew Nelson got "the magic phone call" from Jim Mackey, SAP AG's "front man

18     for SAP AG's mergers and acquisitions strategy."  Mackey made Nelson an offer "he couldn't

19     refuse."

20            49.      To retain full control over every detail of its scheme to lure away

21     customers from Oracle, and to use SAP TN to do it, SAP AG proposed to buy SAP TN outright

22     and make it a wholly-owned – and wholly-beholden – subsidiary.  Acquiring SAP TN was not a

23     mere investment by SAP AG, but a calculated competitive move.  As one industry observer put

24     it, SAP AG bought "another arrow in its quiver to hunt after Oracle's customers."  Aligning with

25     SAP AG made little sense for SAP TN, however, because to the extent SAP AG successfully

26     undermined Oracle by having its customers move from Oracle's software to SAP AG's software,

27     SAP TN would eventually lose its customer base.  So SAP AG had to make the price right.  SAP

28     AG has refused to disclose the terms of its SAP TN purchase, but – with the Oracle/PeopleSoft

15

COMPLAINT

1   deal about to close – the "magic phone call" conveyed terms rich enough that, in barely a month,

2   SAP TN agreed to the deal and cast its lot with SAP AG.

3           50.     On January 19, 2005, SAP AG's top executives unveiled SAP AG's

4   acquisition of SAP TN as the centerpiece of its new "Safe Passage" scheme.  SAP AG's CEO,

5   Henning Kagermann, identified SAP TN as instrumental to the parent company's "Safe Passage"

6   program, publicly indicating that SAP TN was authorized and intended to implement SAP AG's

7   goals.  SAP America's CEO, Bill McDermott, publicly vowed to bankroll this effort to

8   undermine Oracle by putting "a lot of additional resources into TomorrowNow."  The Senior

9   Vice President and Chief Operating Officer of SAP Asia Pacific, Colin Sampson, admitted that

10  the SAP TN acquisition was "an integral part" of SAP's Safe Passage program, which in turn

11  was part of SAP's "ongoing strategy to compete with Oracle."  And SAP TN certainly knew its

12  role was to achieve SAP AG's ends:  as SAP TN's CEO, Andrew Nelson, stated, "We're owned

13  by SAP.  We want them to be successful."

14          51.     After the acquisition, SAP TN's new parent companies directed it to begin

15  to implement a two-phase plan to increase SAP's enterprise application market share.  First, to

16  lure the support business over, SAP would offer cut-rate pricing combined with the promise of

17  essentially unlimited future support to former PeopleSoft and JDE support customers.  Second,

18  in connection with converting Oracle customers to SAP support (via SAP TN), SAP would

19  aggressively campaign to migrate those customers to an SAP enterprise software platform.  As

20  SAP AG Managing Director Alan Sedghi admitted, SAP AG would try to use SAP TN as a

21  means of "speeding-up" the migration of PeopleSoft and JDE users to SAP platforms.

22          52.     The CEOs stated the proposition more bluntly.  In April 2005, SAP

23  America CEO Bill McDermott claimed "The SAP Safe Passage offering gives companies an

24  affordable way to protect their current investments, ease integration with SAP NetWeaver(TM)

25  and begin the process of innovating their businesses today."  A month later, at the SAP AG

26  annual meeting, SAP AG CEO Henning Kagermann confirmed: "We worked with [SAP TN] to

27  very quickly set up a comprehensive program for SAP customers running PeopleSoft and JD

28  Edwards solutions."

COMPLAINT

53.     SAP implemented Phase One immediately.  As reflected on SAP AG's website: "SAP offers Safe Passage for PeopleSoft, JD Edwards, and Siebel customers – If Oracle's options have you worried, consider another option:  SAP.  SAP provides solutions, technology *and maintenance services*." (emphasis supplied)  SAP America's website promises that "SAP and TomorrowNow can cut your maintenance costs by as much as 50% through 2015," and elsewhere says that "Safe Passage maintenance and support are delivered worldwide through TomorrowNow."  SAP TN's website confirms its acceptance and undertaking of the SAP-controlled Safe Passage program:  "TomorrowNow can also provide our support services as part of the SAP Safe Passage Program."

54.     Beginning in January 2005, SAP sales representatives unleashed a torrent of marketing materials designed to exacerbate and leverage perceived, albeit unfounded, PeopleSoft and JDE customer uncertainty about the prospects for long-term, quality support from Oracle.  An April 2005 SAP AG press release apparently aimed to increase perceived doubt among Oracle customers by announcing a "second wave" of "Safe Passage."  To exploit the fear it intended to create,  SAP AG's "second wave" included "an intensive customer recruitment campaign, offering significantly lower cost maintenance alternatives to Oracle customers running PSFT/JDE solutions" through 70,000 direct mail solicitations to Oracle customers.  These lower cost alternatives advertised by SAP AG were to come directly through SAP TN.

55.     To implement Phase Two of its plan (luring Oracle customers to the SAP enterprise software platform), SAP AG did not simply sit back and leave the recruiting of potential Safe Passage customers to SAP TN's sales force.  Instead, it took a hands-on approach.  It deployed its salespeople to contact potential customers and push them to switch to SAP TN's services.  If customers declined to convert to SAP TN, the SAP AG sales personnel would pressure the customers to drop Oracle products outright in favor of SAP AG's suite.  To give teeth to these commingled sales efforts, SAP AG offered maintenance support through SAP TN, officially "bundled" with SAP AG enterprise software as a centerpiece of the Safe Passage program.

COMPLAINT

56.    SAP executives touted the Safe Passage program's limited success in its first year. SAP AG's CEO, Henning Kagermann, promised SAP AG would use SAP TN and the Safe Passage program to "fight for" more customers. By March 2006, SAP AG boasted in a press release that more than 200 customers had signed up for Safe Passage, the program it implemented partly through SAP TN, and which it claimed "offers companies SAP solutions, technology, maintenance services, investment protection and a clear road map to the next generation of business software."

57.    However, as Oracle continued to take market share and expand its product offerings, including through its September 12, 2005 announcement that it would acquire Siebel Systems, SAP grew more desperate, and more aggressive. In October 2005, SAP announced it would extend its Safe Passage program to Siebel customers, including apparently instantaneous round the clock support from SAP TN – whose engineers at that time presumably had spent virtually no time to develop Siebel support software products. As reported on Forbes.com after Oracle's announcement of its impending Siebel acquisition, "SAP AG plans to announce . . . that it will offer technical support for more of rival software maker Oracle Corp.'s own products [the Siebel products] for a far cheaper price." SAP's "cheaper price" (referred to elsewhere as "cut rate" support) continued at "50 cents on the dollar for maintenance fees," but its services were expanded to support more Oracle product lines and a wider range of customers. SAP America President and CEO, Bill McDermott, confirmed that SAP intended to use the Siebel acquisition as another opportunity to lure Oracle customers to SAP stating that SAP is "not distracted by the challenges of integrating multiple code bases, companies and corporate cultures." How SAP could offer instantaneous, round the clock Siebel code support within a few weeks of Oracle's acquisition announcement remained a mystery.

58.    By July 2006, SAP AG CEO Henning Kagermann conceded that SAP had lost as much as 2% market share to Oracle. At the same time, curiously, SAP AG continued to tout the success of Safe Passage. In a July 2006 earnings call, SAP AG's President of Customer Solutions and Operations, Léo Apotheker, boasted that Safe Passage "continues to do really well," including because SAP AG "extended the program in order to offer it as well to Siebel

18

COMPLAINT

1    customers." By extending the Safe Passage program to Siebel customers, and in conjunction

2    with opening new SAP TN offices around the world, Apotheker claimed that SAP now had "a

3    global network of [SAP TN] capabilities" – enough to "gain[] significant traction."

4        **E.**    **A Deal Too Good To Be True**

5           59.    Although SAP put a brave face on its ability to compete with the

6    increasingly potent Oracle applications offerings, some industry analysts wondered whether a

7    small company like SAP TN, even after having expanded its ranks to 150 employees, could

8    actually develop and offer the hundreds of regulatory updates, bug fixes, patches, and other

9    labor-intensive support items that a customer would need to maintain useful, optimally

10   functioning Oracle software, without infringing on Oracle's intellectual property. Oracle, by

11   comparison, maintains a development force of more than 15,000 software and support engineers

12   to create and help implement the code fixes, patches, and updates that comprise the advanced

13   support services required by Oracle's licensed customers.

14          60.    It was not clear how SAP TN could offer, as it did on its website and its

15   other materials, "customized ongoing tax and regulatory updates," "fixes for serious issues,"

16   "full upgrade script support," and, most remarkably, "30-minute response time, 24x7x365" on

17   software programs for which it had no intellectual property rights. To compound the puzzle,

18   SAP continued to offer this comprehensive support to hundreds of customers at the "cut rate" of

19   50 cents on the dollar, and purported to add full support for an entirely different product line –

20   Siebel – with a wave of its hand. The economics, and the logic, simply did not add up.

21          61.    Oracle has now solved this puzzle. To stave off the mounting competitive

22   threat from Oracle, SAP unlawfully accessed and copied Oracle's Software and Support

23   Materials.

24       **F.**    **The SAP Solution: Stolen Passage**

25          **1.**    **Oracle Finds A Suspicious Pattern**

26          62.    To analyze and improve on its industry leading support services, Oracle

27   asks each customer searching for a solution on Oracle's Customer Connection website to click

28   on a button after each search to indicate whether or not a particular search result helped solve the

19

COMPLAINT

1    customer's problem.  If the customer selects the "No, continue search" option, the support

2    system responds by offering the customer further options.  Oracle regularly compiles this data to

3    assess whether its system helped customers resolve their support issues, with the aim of

4    continually improving the support system for customers.

5        63.    In late 2006, Oracle noticed huge, unexplained spikes in the number of

6    customers on the online support website who had clicked the "No, continue search" option.

7    These clicks numbered in the thousands for several customers, and Oracle discovered that each

8    response – each answer by users pretending to be the customer – occurred in a matter of seconds

9    or less.  Given the extreme speed at which the activity occurred, these clicks could not reflect

10   real responses from any human customers actually reading the solutions they had accessed.

11   Instead, these click patterns showed that the users had employed an automated process to move

12   with lightning speed through the entire library of Software and Support Materials on the

13   Customer Connection website.  And, apparently, to take a copy of them all.

14       64.    Indeed, Oracle soon discovered that many of these "customers" had taken

15   massive quantities of Software and Support Materials beyond their license rights, over and over

16   again.  Oracle also discovered that the downloaded Software and Support Materials included

17   *internal* documents not available even to licensed customers and not available through normal,

18   authorized use of Customer Connection.

19       2.    **Oracle Discovers The SAP Link**

20       65.    Oracle embarked on a time-consuming and costly investigation to assess

21   the damage done to its customer response database and fully understand the sources of the

22   unauthorized downloads.  In the course of this investigation, Oracle discovered a pattern.

23   Frequently, in the month before a customer's Oracle support expired, a user purporting to be that

24   customer, employing the customer's log-in credentials, would access Oracle's system and

25   download large quantities of Software and Support Materials, including dozens, hundreds, or

26   thousands of products beyond the scope of the specific customer's licensed products and

27   permitted access.  Some of these apparent customer users even downloaded materials after their

28   contractual support rights had expired.

20

COMPLAINT

66.     Several of these apparent customer users supplied misleading identification information as part of the log-on process to Oracle's systems.  The users presumably intended this misinformation, which included false names and phone numbers, to mask from Oracle their true identity and the fact of their improper access to the Software and Support Materials.  Despite this subterfuge, Oracle has traced the illegal download activity to computers using an SAP IP address.  When Oracle first noticed that the unlawful access and downloads originated almost exclusively from one IP address in Bryan, Texas, Oracle shut down access to that IP address.  If the access and downloads had been legitimate, the customer or vendor would have called in right away to get its access reinstated.  Instead, a new IP address, also linked to SAP, sprouted up almost immediately and the unlawful access and downloading resumed.

67.     Although it is now clear that the customers initially identified by Oracle as engaged in the illegal downloads are SAP TN customers, those customers do not directly appear to have engaged in the download activity; rather, the unlawful download activity observed by Oracle and described here originates directly from SAP's computer networks.  Oracle's support servers have even received hits from URL addresses in the course of these unlawful downloads with SAP TN directly in the name (e.g. *http://hqitpc01.tomorrownow.com*).  Indeed, for many of these downloads, Oracle noticed that SAP TN did not even bother to change the false user information from customer to customer when it logged in.

68.     The wholesale nature of this unlawful access and downloading was extreme.  SAP TN appears to have downloaded virtually *every* file, in *every* library that it could find.

### 3.     SAP TN's Access Was Unauthorized

69.     SAP TN's access to, and taking from, Oracle's system violated the terms of the Oracle customers' License Agreement, the Customer Connection Terms of Use, and the Legal Download Agreement.  These terms included agreeing:

- Not to access or use any portion of the Software, including updates, not expressly licensed and paid for by the Licensee;

21

- Not to directly or indirectly, sublicense, relicense, distribute, disclose, use, rent, or lease the Software or Documentation, or any portion thereof, for third party use, or third party training;
- Not to access the customer support system if it is not the customer's authorized and designated Oracle technical support contact;
- Not to use the Materials on the support website except in support of the customer's authorized use of the Oracle Programs for which the customer holds a supported license from Oracle;
- That the customer username and password are for the customer's sole use in accessing this support server;
- That the customer username and password may only be distributed to persons in the customer's organization who have *a legitimate business purpose for accessing the materials contained on the support server in furtherance of the customer's relationship with Oracle*;
- That the Materials on the support website are confidential information subject to existing confidentiality agreements.

70. SAP TN has intimate familiarity with these important restrictions and conditions relating to Oracle's Software and Support Materials. SAP TN's management, and a significant number of its employees, formerly worked at PeopleSoft and JDE. Of SAP TN's ten-member management team, six list prior employment experience with PeopleSoft, JDE, or Oracle, including: (1) Andrew Nelson, President and CEO; (2) Bob Geib, V.P. North American Sales; (3) Laura Sweetman, V.P. Global J.D. Edwards Support; (4) Mel Gadd, V.P. Quality; (5) Nigel Pullan, V.P. International Sales; and (6) Shelley Nelson, V.P. Global PeopleSoft Support. In addition, former PeopleSoft employees who work for SAP, such as Wade Walden, who is reflected as the person performing many of the downloads at issue, appear to have applied their familiarity with the Customer Connection website to directly participate in and perfect the illegal

22

COMPLAINT

1   downloading scheme.  In short, SAP TN cannot credibly claim ignorance of Oracle's access

2   rules.

3         71.      Notwithstanding SAP TN's knowledge of Oracle's license agreements

4   with its customers, the support website terms of use, and the confidential, proprietary, and

5   copyrighted nature of Oracle's Software and Support Materials, Oracle has learned that SAP TN

6   accessed and downloaded the Software and Support Materials when it either had no legitimate

7   basis to access Oracle's restricted website, or in a way that grossly violated the limited access

8   rights it did have.  Further, during the period of time between when the customer's support

9   license lapsed and when Oracle decommissioned the customer's password credentials, SAP TN

10  *still* accessed and downloaded Software and Support Materials using the old customer

11  passwords.  SAP TN did so despite its knowledge that it had no legal right or legitimate purpose

12  to access Oracle's system *at all* after the customer's support license lapsed.

13        72.      SAP TN did not innocently download the Software and Support

14  Materials – the obvious purpose was to copy them from Oracle's Customer Connection support

15  website and store them on SAP TN's servers for its use in marketing and providing support

16  services to Oracle customers.  The rate that SAP TN accessed these materials – at intervals of

17  just seconds or less – shows that no one used or reviewed those materials in real time.  Further,

18  the scope of the downloaded Software and Support Materials – across *multiple* libraries in

19  *multiple* lines of business – for customers that had no license to take, or need for, those products,

20  suggests that SAP TN took the Software and Support Materials to stockpile a library to support

21  its present and prospective customers.

22        73.      SAP TN conducted these high-tech raids as SAP AG's agent and

23  instrumentality and as the cornerstone strategy of SAP AG's highly-publicized Safe Passage

24  program.  Further, to the extent SAP TN had any legitimate basis to access Oracle's site as a

25  contract consultant for a customer with current licensed support rights, SAP TN committed to

26  abide by the same license obligations and usage terms and conditions described above applicable

27  to licensed customers.  Indeed, *anyone* accessing such Software and Support Materials on the

28  Oracle support website must agree to Oracle's terms and conditions, which restrict access to

23

COMPLAINT

1    support only for products that a company has licensed, and impose strict confidentiality

2    requirements.  SAP TN reviewed and agreed to the terms and conditions on Oracle's support

3    website before proceeding, and therefore committed its theft knowingly and intentionally, and in

4    conscious disregard of Oracle's protected intellectual property and the integrity of its computer

5    systems.

6            74.    The Software and Support Materials that SAP TN downloaded from

7    Oracle's systems also included numerous works that are protected under the Federal Copyright

8    Laws, 17 U.S.C. §§ 101 *et seq.*  SAP TN's acts violated Oracle's exclusive rights to use,

9    reproduce, create derivative works, publish, display, offer for sale, and distribute these works.

10   Such acts constitute copyright infringement under 17 U.S.C. § 501 and also willful and

11   intentional copyright infringement under 17 U.S.C. § 506.  With literally thousands of software

12   programs available for licensing, Oracle does not typically obtain copyright registrations on all

13   programs or related Software and Support Materials as it generally does not find itself in the

14   position of having to enforce its copyrights through litigation to stop conduct constituting an

15   intentional infringement of Oracle's rights.  Accordingly, Oracle will amend its Complaint to add

16   further copyright allegations and causes of action when the registrations for these copyrights

17   issue from the United States Copyright Office.

18           **4.    Specific Examples Of SAP TN's Unlawful Customer Downloads**

19           75.    SAP TN's improper access to, and taking from, Oracle's Customer

20   Connection website is too pervasive, and covers too many individual violations, to

21   comprehensively detail here.  Oracle has uncovered unlicensed downloads linked to SAP TN on

22   behalf of numerous customers, including without limitation, Abbott Laboratories, Abitibi-

23   Consolidated, Inc., Bear, Stearns & Co., Berri Limited, Border Foods, Caterpillar Elphinstone,

24   Distribution & Auto Service, Fuelserv Limited, Grupo Costamex, Helzberg Diamonds, Herbert

25   Waldman, Honeywell International, Interbrew UK, Laird Plastics, Merck & Co., Metro Machine

26   Corp., Mortice Kern Systems, Inc., National Manufacturing, NGC Management Limited, OCE

27   Technologies, B.V., Ronis, S.A., Smithfield Foods, SPX Corporation, Stora Enso, Texas

28   Association of School Boards, VSM Group AB, and Yazaki North America.  By way of example

1  of the nature and extent of SAP's theft, Oracle sets forth below illustrative instances of SAP

2  TN's illegal conduct regarding a few of its customers.

3       76.  **Honeywell.** Honeywell International ("Honeywell") is listed on SAP

4  TN's website as a client. In the approximately three and a half year period before Honeywell

5  switched to SAP TN, it averaged just over 20 downloads of Software and Support Materials per

6  month. Then, after switching to SAP TN, a user employing Honeywell's log-in ID downloaded

7  over 7,000 Software and Support Materials in less than two weeks in January 2007. Most of

8  these excessive downloads came during the course of *four days*, during which "Honeywell" was

9  downloading almost *1800 solutions per day*. Over 2,000 of the Software and Support Materials

10  taken in this period were solutions that Honeywell was not licensed to take at all. In one specific

11  library containing solutions for Enterprise One software, "Honeywell" downloaded over 450

12  distinct unlicensed solutions on January 16, 2007 and nearly 400 more the next day. These

13  downloads spanned virtually every library in every line of business – far beyond the products to

14  which Honeywell had authorized access as an Oracle customer. This unlawful downloading

15  even stretched across product families. Honeywell used and licensed PeopleSoft software

16  applications, but Oracle discovered users downloading JDE products with Honeywell's

17  credentials. Oracle subsequently connected many of the illegal downloads to an SAP TN IP

18  address and to SAP TN's employee, Wade Walden – a former PeopleSoft employee now

19  employed by SAP.

20       77.  **Merck.** Merck & Company, Inc. ("Merck"), one of the largest

21  pharmaceutical companies in the world, licenses and receives support for many Oracle software

22  products. Merck's support rights for its JDE software products expired on January 1, 2007. In

23  the three months prior to that date, users purporting to be "Merck" logged into the Oracle support

24  system and downloaded over 9,000 distinct Software and Support Materials for JDE software.

25  More than 5,000 of these downloads related to JDE software products for which Merck had no

26  license. But, the unauthorized downloads did not stop there. Users logging into Oracle's support

27  system with Merck's credentials continued to download Software and Support Materials into

28  March 2007. Many of these "Merck" downloads came directly from an IP address in Bryan,

25

1    Texas that belongs to SAP TN, and some were traced to a computer with SAP TN's initials in

2    the title, "TN-DL03." In many cases, SAP TN users employed fake identification information to

3    download the Software and Support Materials, using names such as "xx" "ss" and "NULL," and

4    phone numbers such as "4444444444" and "999 999 9999." Neither Merck nor SAP TN had

5    any license, authorization or other right to access and download the 5,000-plus unlicensed

6    Software and Support Materials from Oracle.

7            78.    **OCE**. OCE-Technologies B.V. ("OCE") is located in the Netherlands and

8    appears as a customer on SAP TN's website. In the months leading up to the expiration of

9    OCE's support rights for its Oracle products, users employing OCE's credentials downloaded a

10   large number of Oracle products relating to US Payroll, Canadian Payroll, Homebuilder

11   Management, and Real Estate Management – none of which make sense coming from a

12   European customer in support of its European business. From December of 2006 to January of

13   2007, SAP TN users logged into Oracle's support system using OCE's credentials (and, in some

14   cases, false user names) and downloaded over 12,000 distinct Software and Support Materials.

15   These downloads included over 3,000 distinct items for which OCE had no license. There is

16   little chance that SAP TN intended OCE as the beneficiary of these massive sweeps, since OCE

17   does not run many of the software programs to which these downloads relate, and neither OCE

18   nor SAP TN have any license, authorization, or other right to access and download these

19   Software and Support Materials. Like the other companies, these illegal downloads are

20   associated with the same IP address belonging to SAP TN in Bryan, Texas, including specifically

21   to a computer with SAP TN's initials in the title, "TNL-02." Similar to the other customer

22   examples, many of these "OCE" users entered phony identification information, such as the

23   name "user" and phone numbers such as "123 456 7897," "9999999999," and even "xxx xxx

24   xxxx." This systematic sweep of products across numerous licensed and unlicensed Oracle

25   product lines and libraries dramatically exceeded the access for which OCE (and SAP TN acting

26   on its behalf) had any right or authority, and could serve no legitimate or lawful business

27   purpose.

28

COMPLAINT

1       79.   **SPX.** SPX Corporation ("SPX") dropped all Oracle support on December

2   10, 2006 and became an SAP TN customer, listed on its website. For the nine month period

3   prior to October 2006, SPX averaged approximately eleven downloads per month from Oracle's

4   support system. Then, between October and December 2006, users purporting to represent SPX

5   accessed and downloaded over 8,000 distinct Oracle Software and Support Materials (far more

6   than SPX could legitimately access or use). These SPX downloads included over 1,700 distinct

7   Software and Support Materials for which SPX had no license. Over 300 distinct downloads just

8   on November 30, 2006 were Software and Support Materials related to unlicensed Payroll

9   software. In some cases, these users logged in using SPX credentials, but used fake

10   identification information like the name "NULL" and phone numbers like "7777777777" and

11   "999 999 9999." Many of these SPX downloads, like the others, originated from the same IP

12   address belonging to SAP TN, and some were traced to a computer with SAP TN's initials in the

13   title, "tn-wts01."

14       80.   **Metro Machine.** Metro Machine Corp. ("Metro Machine") dropped all

15   Oracle support effective on January 1, 2007 and switched to SAP TN, as reflected on SAP TN's

16   website. In the month before Metro Machine dropped its support rights with Oracle, users

17   purporting to represent Metro Machine logged onto Oracle's support servers and downloaded

18   nearly 6,000 distinct Software and Support Materials. Nearly 400 of those downloads related to

19   software programs that Metro Machine had not licensed from Oracle. In addition, users logging

20   into Oracle's support system with Metro Machine's credentials continued to download Software

21   and Support Materials into March 2007. Oracle has traced these illegal and unauthorized

22   downloads to the same SAP TN IP address employed for the Honeywell downloads described

23   above.

24   **G.   SAP Adds The Ill-Gotten Gains To Its Coffers**

25       81.   SAP TN now claims to have delivered thousands of fixes and more than

26   800 tax and regulatory updates to Oracle's former customers. Not coincidentally, SAP TN, at

27   SAP AG's and SAP America's direction, illegally downloaded thousands of fixes and updates

28   from Oracle's restricted customer support website. SAP AG and SAP America directed this

27

COMPLAINT

1    download scheme, ratified it, and never disavowed it.  Using Oracle's own protected property to

2    unfairly compete against and undercut Oracle, SAP has illegally converted Oracle's former,

3    current, and prospective customers and the associated license and support revenue to artificially

4    inflate its market share.  SAP has thereby caused significant damage to Oracle through its SAP

5    TN subsidiary, in addition to the irreparable harm caused by Defendants' unfair competition,

6    interference with Oracle's business relationships, trespass on Oracle's support website, and

7    related computer fraud.

8                                    **First Claim for Relief**

9    **Violation of Federal Computer Fraud and Abuse Act (18 U.S.C. §§ 1030(a)(2)(C) & (a)(4)**

10                                       **& a(5))**

11                              (By Oracle Against All Defendants)

12              82.    Oracle incorporates by reference each of the allegations in the preceding

13    paragraphs of this Complaint as though fully set forth here.

14              83.    Defendants have violated the Computer Fraud and Abuse Act, 18 U.S.C.

15    § 1030(a)(2)(C), by intentionally accessing a computer used for interstate commerce or

16    communication, without authorization or by exceeding authorized access to such a computer, and

17    by obtaining information from such a protected computer.

18              84.    Defendants have violated the Computer Fraud and Abuse Act, 18 U.S.C. §

19    1030(a)(4) by knowingly, and with intent to defraud Oracle, accessing a protected computer,

20    without authorization or by exceeding authorized access to such a computer, and by means of

21    such conduct furthered the intended fraud and obtained one or more things of value, including

22    but not limited to Oracle's Software and Support Materials.

23              85.    Defendants have violated the Computer Fraud and Abuse Act, 18 U.S.C.

24    § 1030(a)(5)(A)(i) by knowingly causing the transmission of a program, information, code, or

25    command and as a result intentionally causing damage without authorization to a protected

26    computer owned by Oracle.

27

28

COMPLAINT

86.     Defendants have violated the Computer Fraud and Abuse Act, 18 U.S.C. §§ 1030(a)(5)(A)(ii) & (iii) by intentionally accessing a protected computer without authorization, causing damage to Oracle, recklessly or without due regard for their actions.

87.     The computer system or systems that Defendants accessed as described above constitute a "protected computer" within the meaning of 18 U.S.C. § 1030(e)(2).

88.     Oracle has suffered damage and loss by reason of these violations, including, without limitation, harm to Oracle's data, programs, and computer systems and other losses and damage in an amount to be proved at trial, but, in any event, in an amount well over $5000 aggregated over a one-year period.

89.     Defendants' unlawful access to and theft from Oracle's computers also have caused Oracle irreparable injury.  Unless restrained and enjoined, Defendants will continue to commit such acts.  Oracle's remedy at law is not adequate to compensate it for these inflicted and threatened injuries, entitling Oracle to remedies including injunctive relief as provided by 18 U.S.C. § 1030(g).

**Second Claim for Relief**

**Computer Data Access and Fraud Act - Cal. Penal Code § 502**

(By Oracle Against All Defendants)

90.     Oracle incorporates by reference each of the allegations in the preceding paragraphs of this Complaint as though fully set forth here.

91.     Defendants have violated California Penal Code § 502(c)(2) by knowingly and fraudulently, and without permission, accessing, taking, copying, and making use of programs, data, and files from Oracle's computers, computer system, and/or computer network.

92.     Defendants have violated California Penal Code § 502(c)(3) by knowingly, fraudulently, and without permission accessing and using Oracle's computer services.

93.     Defendants have violated California Penal Code § 502(c)(6) by knowingly, fraudulently, and without permission providing, or assisting in providing, a means of accessing Oracle's computers, computer system, and/or computer network.

29

COMPLAINT

1        94.     Defendants have violated California Penal Code § 502(c)(7) by

2  knowingly, fraudulently, and without permission accessing, or causing to be accessed, Oracle's

3  computers, computer system, and/or computer network.

4        95.     Oracle owns the data that comprises the Software and Support Materials

5  obtained by Defendants as alleged above.

6        96.     As a direct and proximate result of Defendants' unlawful conduct within

7  the meaning of California Penal Code § 502, Defendants have caused damage to Oracle in an

8  amount to be proven at trial.  Oracle is also entitled to recover its reasonable attorneys' fees

9  pursuant to California Penal Code § 502(e).

10       97.     Oracle is informed and believes that the aforementioned acts of the

11  Defendants were willful and malicious in that Defendants' acts described above were done with

12  the deliberate intent to injure Oracle's business and improve its own.  Oracle is therefore entitled

13  to punitive damages.

14       98.     Oracle has also suffered irreparable injury from these acts, and due to the

15  continuing threat of such injury, has no adequate remedy at law, entitling Oracle to injunctive

16  relief.

### Third Claim for Relief

**Intentional Interference With Prospective Economic Advantage**

(By Oracle Against All Defendants)

20       99.     Oracle incorporates by reference each of the allegations in the preceding

21  paragraphs of this Complaint as though fully set forth here.

22       100.    Oracle has an expectancy in continuing and advantageous economic

23  relationships with current and prospective purchasers and licensees of Oracle's support services

24  and software.

25       101.    These relationships contained the probability of future economic benefit in

26  the form of profitable support service contracts and software licenses.  Had Defendants refrained

27  from engaging in the unlawful and wrongful conduct described in this complaint, there is a

28

COMPLAINT

1    substantial probability that Oracle support customers would have initiated, renewed, or expanded

2    support contracts and software licenses with Oracle rather than Defendants.

3            102.    On information and belief, Defendants were aware of these economic

4    relationships and intended to interfere with and disrupt them by unlawfully and wrongfully

5    taking and using Oracle's Software and Support Materials to obtain and retain Oracle's own

6    customers at little to no cost.  These acts were undertaken by Defendants to obtain for

7    themselves the software support contract revenue at Oracle's expense, and without the cost of

8    competing fairly by independently developing the same support materials, and ultimately to

9    migrate such customers away from Oracle's software programs and onto their own.

10           103.    Defendants' conduct was wrongful by a measure beyond the fact of the

11   interference itself.  Defendants gained unauthorized access to Oracle's password-protected

12   Customer Connection support website through false or improper credentials, copied Oracle's

13   intellectual and contractual property, and used that property to obtain and retain Oracle's current

14   and prospective clients.

15           104.    This conduct, as alleged above, constitutes violations of numerous state

16   and federal statutes and codes, including, but not limited to, violation of the Federal Computer

17   Fraud and Abuse Act, 18 U.S.C. § 1030 *et seq.*, receipt of stolen property, Cal. Penal Code §

18   496, unauthorized access to computers, Cal. Penal Code § 502, wire fraud, 18 U.S.C. § 1343,

19   violation of RICO, 18 U.S.C. § 1962, fraud and related activity in connection with an access

20   device, 18 U.S.C. § 1029, and violation of the Stored Communications Act, 18 U.S.C. §§ 2701-

21   11.  Defendants' conduct also constitutes trespass to chattels, conversion, unjust enrichment, and

22   conspiracy.

23           105.    As a result of Defendants' acts, the above-described relationships have

24   been actually disrupted, causing certain current and prospective support clients to contract with

25   Defendants instead of Oracle for their software support and maintenance and, in some cases, for

26   their enterprise software.

27           106.    As a direct and proximate result of Defendants' actions, Oracle has

28   suffered economic harm, including, but not limited to, loss of profits from sales or licenses to

                                                 31

                                            COMPLAINT

1  current and potential customers of Oracle support services and software programs.  Defendants'

2  wrongful conduct was a substantial factor in causing this harm.

3        107.    Unless Defendants are restrained by appropriate injunctive relief, their

4  actions are likely to recur and will cause Oracle irreparable injury for which there is no adequate

5  remedy at law.

6        108.    Defendants' interference with Oracle's prospective economic advantage

7  with its current and future customers, as described above, was willful, malicious, oppressive, and

8  in conscious disregard of Oracle's rights, and Oracle is therefore entitled to an award of punitive

9  damages to punish their wrongful conduct and deter future wrongful conduct.

10                     **Fourth Claim for Relief**

11        **Negligent Interference With Prospective Economic Advantage**

12                     (By Oracle Against All Defendants)

13        109.    Oracle incorporates by reference each of the allegations in the preceding

14  paragraphs of this Complaint as though fully set forth here.

15        110.    Oracle has an expectancy in continuing and advantageous economic

16  relationships with current and prospective purchasers and licensees of Oracle's support services

17  and software.

18        111.    These relationships contain the probability of future economic benefit in

19  the form of profitable support service contracts and software licenses.  Had Defendants refrained

20  from engaging in the unlawful and wrongful conduct described in this complaint, there is a

21  substantial probability that Oracle support customers would have initiated, renewed, or expanded

22  support contracts and software licenses with Oracle rather than Defendants.

23        112.    Defendants knew or should have known about the economic relationship,

24  described above, and knew or should have known that these relationships would be interfered

25  with and disrupted if Defendants failed to act with reasonable care in their use of Oracle's

26  Software and Support Materials.  Defendants failed to act with reasonable care.  Instead, they

27  used Oracle's Software and Support Materials to obtain and retain for themselves software

28

                          32

1   support contract revenue at Oracle's expense and without the cost of competing fairly by

2   independently developing the same support materials.

3           113.   Defendants' conduct was wrongful by a measure beyond the fact of the

4   interference itself.  Defendants gained unauthorized access to Oracle's password-protected

5   Customer Connection support website through false or improper credentials, copied Oracle's

6   intellectual and contractual property, and used that property to obtain and retain Oracle's current

7   and prospective clients.

8           114.   This conduct, as alleged above, constitutes violations of numerous state

9   and federal statutes and codes, including, but not limited to, violation of the Federal Computer

10   Fraud and Abuse Act, 18 U.S.C. § 1030 *et seq.*, receipt of stolen property, Cal. Penal Code §

11   496, unauthorized access to computers, Cal. Penal Code § 502, wire fraud, 18 U.S.C. § 1343,

12   violation of RICO, 18 U.S.C. § 1962, fraud and related activity in connection with an access

13   device, 18 U.S.C. § 1029, and violation of the Stored Communications Act, 18 U.S.C. §§ 2701-

14   11.  Defendants' conduct also constitutes trespass to chattels, conversion, unjust enrichment, and

15   conspiracy.

16           115.   As a result of Defendants' acts, the above-described relationships have

17   been actually disrupted, causing certain current and prospective support clients to contract with

18   Defendants instead of Oracle for their software support and maintenance and, in some cases, for

19   their enterprise software.

20           116.   As a direct and proximate result of Defendants' actions, Oracle has

21   suffered economic harm, including, but not limited to, loss of profits from sales to current and

22   potential customers of Oracle support, maintenance, and software products.  Defendants'

23   wrongful conduct was a substantial factor in causing this harm.

24           117.   Unless Defendants are restrained by appropriate injunctive relief, their

25   actions are likely to recur and will cause Oracle irreparable injury for which there is no adequate

26   remedy at law.

27

28

COMPLAINT

**Fifth Claim for Relief**

**Unfair Competition - Cal. Bus. & Prof. Code § 17200**

(By Oracle Against All Defendants)

118.     Oracle incorporates by reference each of the allegations in the preceding paragraphs of this Complaint as though fully set forth here.

119.     Defendants have engaged in unlawful business acts or practices by committing acts including computer fraud, trespass, conversion, interference with business relationships, and other illegal acts and practices as alleged above, all in an effort to gain unfair competitive advantage over Oracle.

120.     These unlawful business acts or practices were committed pursuant to business activity related to providing business applications software and related support and maintenance for that software.

121.     The acts and conduct of Defendants constitute fraudulent, unlawful, and unfair competition as defined by California Bus. & Prof. Code §§ 17200, *et seq.*

122.     Defendants' conduct constitutes violations of numerous state and federal statutes and codes, including, but not limited to, violation of the Computer Fraud and Abuse Act, 18 U.S.C. §§ 1030 *et seq.*, receipt of stolen property, Cal. Penal Code § 496, unauthorized access to computers, Cal. Penal Code § 502, wire fraud, 18 U.S.C. § 1343, violation of RICO, 18 U.S.C. § 1962, fraud and related activity in connection with an access device, 18 U.S.C. § 1029, and violation of the Stored Communications Act, 18 U.S.C. §§ 2701-11.  Defendants' conduct also constitutes trespass to chattels, intentional interference with prospective economic advantage, negligent interference with prospective economic advantage, conversion, unjust enrichment, and conspiracy.

123.     Defendants have improperly and unlawfully taken commercial advantage of Oracle's investment in its confidential, proprietary, and copyrighted Software and Support Materials.  In light of Defendants' conduct, it would be inequitable to allow Defendants to retain the benefit of the funds obtained though the unauthorized and unlawful use of Oracle's property.

34

COMPLAINT

1    124.    Defendants' unfair business practices have unjustly minimized Oracle's

2    competitive advantage and have caused and are causing Oracle to suffer damages.

3    125.    As a result of such unfair competition, Oracle has also suffered irreparable

4    injury and, unless Defendants are enjoined from such unfair competition, will continue to suffer

5    irreparable injury, whereby Oracle has no adequate remedy at law.

6    126.    Defendants should be compelled to disgorge and/or restore any and all

7    revenues, earnings, profits, compensation, and benefits they may have obtained in violation of

8    California Business & Professions Code § 17200 et seq., including, but not limited to, returning

9    the value of the stolen property itself and any revenue earned from it, and should be enjoined

10   from further unlawful, unfair, and deceptive business practices.  Defendants should further be

11   ordered to return all materials taken from Oracle, and all copies of such, in their possession,

12   custody, or control.

13                              **Sixth Claim for Relief**

14                                   **Conversion**

15                          (By Oracle Against All Defendants)

16   127.    Oracle incorporates by reference each of the allegations in the preceding

17   paragraphs of this Complaint as though fully set forth here.

18   128.    Instead of paying Oracle for the use of its property, Defendants

19   intentionally and willfully entered Oracle's password-protected Customer Connection support

20   website without permission and took possession of Oracle's property, including, but not limited

21   to, Oracle's confidential, proprietary, and copyrighted Software and Support Materials, all of

22   which Oracle stored on its computer system.

23   129.    This property is the sole and exclusive property of Oracle.  Oracle has an

24   exclusive right to possession and distribution of such property, which is valuable to Oracle and

25   vital to its continued business operations.

26   130.    Oracle at no time consented, expressly or impliedly, to Defendants'

27   copying, downloading, removal, retention, or distribution of such property.

28

COMPLAINT

1    131.   Defendants have been in knowing and unauthorized possession and

2    control of such property since at least between September 2006 and the present.  Since that time,

3    at the latest, Defendants may have been obtaining unjust and substantial benefit from the sale and

4    distribution of Oracle's property to third parties without Oracle's consent and without paying

5    Oracle for the value of such property.

6    132.   Defendants' improper assumption and exercise of dominion and control

7    over Oracle's property and their likely sale and distribution of the same has and will continue to

8    interfere with and diminish Oracle's rights in that property.

9    133.   Allowing Defendants to retain the benefits received as a result of their

10   wrongful acts would unjustly benefit Defendants at Oracle's expense.

11   134.   As a direct and proximate result of Defendants' actions, Oracle has lost,

12   and will continue to lose, profits from potential purchasers of Oracle support services and

13   licensees of Oracle software products, in an amount to be determined at trial.  Defendants'

14   wrongful conduct was a substantial factor in causing this harm.

15   135.   Oracle is entitled to an award of the value of the property taken, with

16   interest, and other damages in an amount to be proven at trial.  In addition, or in the alternative,

17   Oracle is entitled to damages and repossession of the converted property.  In addition, or in the

18   alternative, Oracle is entitled to restitution of the Defendants' ill-gotten gains.  Oracle will seek

19   its election of remedies at trial.

20                          **Seventh Claim for Relief**

21                          **Trespass To Chattels**

22                          (By Oracle Against All Defendants)

23   136.   Oracle incorporates by reference each of the allegations in the preceding

24   paragraphs of this Complaint as though fully set forth here.

25   137.   At all times mentioned in this Complaint, Oracle had legal title to and

26   actual possession of Customer Connection, its access-restricted internet-based support system,

27   and the Software and Support Materials on that support system, as described above.

28

36

COMPLAINT

138.    Defendants intentionally interfered with Oracle's use or possession of both Customer Connection and Oracle's related internal databases and systems, and the Software and Support Materials housed for licensed access through Customer Connection.

139.    Defendants' trespass and interference proximately caused damage to Oracle, including, but not limited to, damage to the functionality of Oracle's computer system and data, damage to Oracle's rights to dominion and control over its property, and damage to the confidential and copyrighted nature of the information on Oracle's website. As a result, Defendants caused Oracle's property to greatly diminish in value and deprived Oracle of the intended use of its computer systems.

140.    Oracle is entitled to recover any and all damages it sustained as a result of such trespass, in an amount to be determined at trial.

141.    Defendants' trespass interfered with, and damaged, the integrity and functionality of Oracle's computer system and data. Defendants will continue to commit such acts and other competitors will be encouraged to sweep Oracle's website, potentially to the point of denying effective access to Oracle's customers and preventing Oracle from using its systems and data for their intended purpose. Defendants' trespass therefore threatens to cause irreparable harm to Oracle, for which Oracle's remedy at law is not adequate to compensate it for the injuries inflicted and threatened.

**Eighth Claim for Relief**

**Unjust Enrichment/Restitution**

(By Oracle Against All Defendants)

142.    Oracle incorporates by reference each of the allegations in the preceding paragraphs of this Complaint as though fully set forth here.

143.    Defendants unjustly received benefits at the expense of Oracle through their wrongful conduct, including Defendants' interference with Oracle's business relationships and other unfair business practices, as well as Defendants' trespass on, computer fraud concerning, and conversion of the Software and Support Materials, which took substantial time and money for Oracle to develop. Defendants continue to unjustly retain these benefits at the

37

COMPLAINT

1  expense of Oracle.  It would be unjust for Defendants to retain any value they obtained as a

2  result of their wrongful conduct.

3         144.    Oracle is accordingly entitled to full restitution of all amounts in which

4  Defendants have been unjustly enriched at Oracle's expense.

5                              **Ninth Claim for Relief**

6                                **Civil Conspiracy**

7                          (By Oracle Against All Defendants)

8         145.    Oracle incorporates by reference each of the allegations in the preceding

9  paragraphs of this Complaint as though fully set forth here.

10         146.    Defendants willfully, intentionally, and knowingly agreed and conspired

11  with each other to engage in the alleged wrongful conduct, including Defendants' interference

12  with Oracle's business relationships and other unfair business practices, as well as Defendants'

13  trespass on, computer fraud concerning, and conversion of the Software and Support Materials.

14         147.    Defendants did the acts alleged pursuant to, and in furtherance of, that

15  agreement and/or furthered the conspiracy by cooperating, encouraging, ratifying, or adopting

16  the acts of the others.

17         148.    As a direct and proximate result of the acts in furtherance of the

18  conspiracy, Oracle has suffered injury, damage, loss, and harm, including, but not limited to, loss

19  of profits from sales to current and potential customers of Oracle support services and licenses

20  for Oracle's software programs.  The wrongful conduct committed pursuant to the conspiracy

21  was a substantial factor in causing this harm.

22         149.    Defendants' intentional agreement to commit, and commission of, these

23  wrongful acts was willful, malicious, oppressive, and in conscious disregard of Oracle's rights,

24  and Oracle is therefore entitled to an award of punitive damages to punish their wrongful

25  conduct and deter future wrongful conduct.

26

27

28

                                        38

**Tenth Claim for Relief**

**Aiding and Abetting**

(By Oracle Against All Defendants)

150.    Oracle incorporates by reference each of the allegations in the preceding paragraphs of this Complaint as though fully set forth here.

151.    As fully described above, Defendants had full knowledge or should have reasonably known of the true nature of the wrongful conduct of each other Defendant, and aided and abetted such wrongful conduct, including interference with Oracle's business relationships and other unfair business practices, as well as Defendants' trespass on, computer fraud concerning, and conversion of the Software and Support Materials, by providing substantial assistance and/or encouraging the others to act.

152.    Defendants also aided and abetted the described wrongful conduct of the other Defendants by giving substantial assistance and/or encouragement that, separately considered, was wrongful in and of itself.

153.    As a direct and proximate result of the aiding and abetting of these acts, Oracle has suffered injury, damage, loss, and harm, including, but not limited to, loss of profits from sales to current and potential customers of Oracle support services and licenses to Oracle software programs. The wrongful conduct aided and abetted by the Defendants was a substantial factor in causing this harm.

154.    Defendants' aiding and abetting of these wrongful acts was willful, malicious, oppressive, and in conscious disregard of Oracle's rights, and Oracle is therefore entitled to an award of punitive damages to punish their wrongful conduct and deter future wrongful conduct.

**Eleventh Claim for Relief**

**An Accounting**

(By Oracle Against All Defendants)

155.    Oracle incorporates by reference each of the allegations in the preceding paragraphs of this Complaint as though fully set forth here.

39

COMPLAINT

1    156.   Since at least September 2006, Defendants have obtained business through

2  the use of unlawful conduct including, but not limited to:

3         (a)    Intentionally and/or negligently interfering with Oracle's

4  prospective economic advantage with its existing and potential customers;

5         (b)    Improperly, willfully, and unlawfully taking commercial advantage

6  of Oracle's investment in its Software and Support Materials, for the purpose of sabotaging

7  Oracle's ability to do business and compete in the market;

8         (c)    Willfully converting Oracle's confidential, proprietary, and

9  copyrighted Software and Support Materials; and,

10        (d)    Fraudulently accessing and intentionally trespassing on Oracle's

11  password-protected Customer Connection website, without authorization or consent, in

12  furtherance of their unlawful and deceptive scheme as described above.

13    157.   Defendants have received money as a result of their misconduct, at

14  Oracle's expense, and that some or all of such money is rightfully due to Oracle.

15    158.   The amount of money due from Defendants to Oracle is unknown to

16  Oracle and cannot be ascertained without an accounting of the income and gross profits

17  Defendants have obtained through their wrongful and unlawful conduct.  Oracle is entitled,

18  therefore, to a full accounting.

19                         **Prayer For Relief**

20    WHEREFORE, Oracle respectfully prays for the following:

21        A.    For a preliminary and permanent injunction restraining

22  Defendants, their officers, agents, servants, employees, and attorneys, and those in active concert

23  or participation with any of them from:

24        (1)    accessing any Oracle restricted-access or customer website,

25  including without limitation the Customer Connection website, without Oracle's authorization;

26        (2)    selling, distributing, or using any property obtained from

27  Oracle's website, including without limitation, Oracle's confidential, proprietary, and

28  copyrighted Software and Support Materials, including data, internal documents, and valuable

40

COMPLAINT

1    updates, patches, fixes, and other computer code;

2                (3)      removing, downloading or copying property from Oracle's

3    website without Oracle's authorization, including, but not limited to Oracle's confidential,

4    proprietary, and copyrighted Software and Support Materials, including data, internal documents,

5    and valuable updates, patches, fixes, and other computer code;

6                (4)      otherwise engaging in acts of unfair competition and

7    interference with Oracle's business relationships;

8          B.      That the Court order Defendants to file with the Court and serve on

9    Oracle within thirty (30) days after the service on Defendants of such injunction a report in

10    writing, under oath, setting forth in detail the manner and form in which Defendants have

11    complied with the injunction;

12         C.      For an Order directing Defendants to return Oracle's property,

13    including, without limitation, Oracle's confidential, proprietary, and copyrighted Software and

14    Support Materials, including data, internal documents, and valuable updates, patches, fixes, and

15    other computer code, that Defendants took from Oracle, as set forth in this Complaint;

16         D.      That the Court order Defendants to pay Oracle punitive damages in

17    a sum to be determined at trial, on the basis of their willful and deliberate unauthorized computer

18    access, intentional interference with Oracle's prospective economic advantage, aiding and

19    abetting and conspiracy;

20         F.      For restitution and disgorgement of all ill-gotten gains unjustly

21    obtained and retained by Defendants through the acts complained of here;

22         G.      For damages to be proven at trial;

23         H.      For prejudgment interest;

24         I.      For an accounting;

25         J.      For an Order awarding Oracle its attorneys' fees and costs; and,

26         K.      For an Order awarding Oracle such other and further relief as the

27    Court deems just and proper.

28

COMPLAINT

1    DATED:  March 22, 2007

2                                         BINGHAM McCUTCHEN LLP

3

4                                         By:_____

5                                               Christopher B. Hockett
                                               Attorneys for Plaintiffs
6                                         Oracle Corporation, Oracle USA, Inc., and
                                             Oracle International Corporation

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SF/21707189.2/2021039-0000324170                    42

COMPLAINT

<u>DEMAND FOR JURY TRIAL</u>

In accordance with Fed. R. Civ. P. 38(b), Plaintiffs Oracle Corporation, Oracle International Corporation and Oracle USA, Inc. demand a trial by jury on all issues triable by a jury.

DATED:  March 22, 2007

BINGHAM McCUTCHEN LLP

By:_____
Christopher B. Hockett
Attorneys for Plaintiffs
Oracle Corporation, Oracle USA, Inc., and
Oracle International Corporation

SF/21707189.2/2021039-0000324170

43

COMPLAINT