Page 1

1            UNITED STATES DISTRICT COURT
2                 DISTRICT OF NEVADA
3    -------------------------------
4    ORACLE USA, INC., a Colorado   )
5    Corporation; ORACLE AMERICA,   )
6    INC., a Delaware corporation,  )
7    and ORACLE INTERNATIONAL       )
8    CORPORATION, a California      )
9    corporation,                   )
10                  Plaintiffs,     )
11          vs.                     ) No. 2:10-cv-000106
12                                  ) LRH-PAL
13   RIMINI STREET, INC., a         )
14   Nevada corporation; SETH       )
15   RAVIN, an individual,          )
16                                  )
17                  Defendants.     )
18   -------------------------------
19
20
21         VIDEOTAPED DEPOSITION OF RICHARD ALLISON
22               Tuesday, December 20, 2011
23
24
25   PAGES 1 - 280



Page 162

Page 164

Page 163

```
10    Q.  Okay.  Have you or your group been
11  specifically -- or have you or your group been
12  involved in analyzing contracts for purposes of this
13  litigation?
14    A.  So there are, specific to this litigation,    12:42:30
15  there are the agreements that were submitted to
16  yourselves for your customer -- for Rimini's
17  customers --
18    Q.  Uh-huh.
19    A.  -- with an analysis of -- of use rights and
20  copying rights and things along those lines.  You
21  were provided a summary of that.  I did talk to the
22  attorneys before they -- to talk about the
23  methodology for doing so.
24    Q.  Uh-huh.
25    A.  This was similar to the -- what we did for    12:42:58
```

Page 165

Pages 162 to 165

**Page 166**

```
 1    the SAP TomorrowNow case.
 2      Q.  Okay.  And are you talking about the
 3    spreadsheet that we received just last week, like --
 4      A.  Spreadsheet, in addition, I think, to the
 5    agreements --
 6      Q.  Uh-huh.
 7      A.  -- if I'm not mistaken.
 8      Q.  Uh-huh.  It was a spreadsheet that listed
 9    specific contractual terms?
10      A.  Correct.
11      Q.  Okay.  And that was produced to us just
12    last week.  Did you review it?
13      A.  I reviewed the -- I reviewed the specific
14    custom- -- basically I was -- I gave them a few
15    random numbers to give them to me so I could review
16    those versus the agreements to ensure that that was
17    being done the way that I thought it should be done.    12:43:29
18      Q.  Uh-huh.
19      A.  So I didn't review -- I didn't review every
20    single one of those contracts in every single
21    summary.
22      Q.  Okay.
23      A.  So I reviewed the methodology.
24      Q.  Okay.
25      A.  I reviewed the summary for several
```

**Page 167**

```
 1    customers to ensure that that was what I thought
 2    they should do.
 3      Q.  And what was the methodology?
 4      A.  What was -- them going back to their
 5    contract systems, pulling up the agreements and
 6    looking to the -- the usage rights granted section,
 7    the rights granted sections and the copying --
 8      Q.  Uh-huh.
 9      A.  -- the right to copy some other -- couple
10    other sections.  I'm going to have to look at the
11    sheet and tell you what was on there.  But off the
12    top of my head, it might be a little more             12:44:00
13    difficult.
14      Q.  Okay.  So pulling up the contracts -- did
15    you work with the lawyers on how to pull up the
16    contracts within Oracle system?
17      A.  No, the -- the attorneys that did that
18    worked with Oracle internal folks to do so.  I
19    didn't instruct them on how to get the contracts.
20    I'm assuming they worked with the contract
21    organization for that.
22      Q.  And I think you testified that you reviewed    12:44:33
23    a handful of -- a small sampling of the terms
24    identified for specific customers?
25      A.  Yes.
```

**Page 168**

```
 1      Q.  Okay.  What terms did you instruct the
 2    lawyers to look for?
 3      A.  Again, I don't remember the specific
 4    conversation, but they were looking at -- I know
 5    they were looking at the rights granted section --
 6      Q.  Uh-huh.                                         12:45:00
 7      A.  -- of the agreements, any other
 8    restrictions, like to copy, use, site, things like
 9    that that occurred.
10      Q.  Copy, use --
11      A.  And site restrictions.
12      Q.  Site restrictions.  Any others?
13      A.  Off the top of my head, no.  But, again,
14    the agreements, I believe, in their entirety were
15    provided to yourself, so --
16      Q.  We'll look at a couple in just a minute.
17    Why don't we do that now and you can tell me -- and
18    just like how you reviewed a handful, I have just a
19    handful.  I mean, we're not going to go through all   12:45:24
20    of those.
21      A.  Sure.
22      Q.  We would be here for days.                      12:45:34
23          THE REPORTER:  6.
24          MS. MARRIOTT:  Okay.
25          (Discussion off the record.)
```

**Page 169**

```
 1          (Exhibit 6 marked for identification.)
 2          THE REPORTER:  There you go.
 3
```

