1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

SHOOK, HARDY & BACON LLP
B. Trent Webb, Esq. (*pro hac vice*)
2555 Grand Boulevard
Kansas City, Missouri 64108-2613
Telephone: (816) 474-6550
Facsimile: (816) 421-5547
bwebb@shb.com

Robert H. Reckers, Esq. (*pro hac vice*)
600 Travis Street, Suite 1600
Houston, Texas   77002
Telephone: (713) 227-8008
Facsimile: (731) 227-9508
rreckers@shb.com

GREENBERG TRAURIG
Mark G. Tratos, Esq. (Nevada Bar No. 1086)
Brandon Roos, Esq. (Nevada Bar No. 7888)
Leslie Godfrey, Esq. (Nevada Bar No. 10229)
3773 Howard Hughes Parkway
Suite 400 North
Las Vegas, NV 89169
Telephone:  (702) 792-3773
Facsimile:  (702) 792-9002
tratosm@gtlaw.com
roosb@gtlaw.com
godfreyl@gtlaw.com

LEWIS AND ROCA LLP
W. West Allen (Nevada Bar No. 5566)
3993 Howard Hughes Parkway, Suite 600
Las Vegas, Nevada 89169
Tel: (702) 949-8200
Fax: (702) 949-8398
WAllen@LRLaw.com

*Attorneys for Defendants*
*Rimini Street, Inc., and Seth Ravin*

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

ORACLE USA, INC., a Colorado corporation;
and ORACLE INTERNATIONAL
CORPORATION, a California corporation,

Plaintiffs,

v.

RIMINI STREET, INC. , a Nevada corporation;
SETH RAVIN, an individual,

Defendants.

Case No. 2:10-cv-0106-LRH-PAL

**DEFENDANT RIMINI STREET, INC.'S MEMORANDUM AND POINTS OF AUTHORITY IN OPPOSITION TO ORACLE'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

**[FILED UNDER SEAL]**

Date:        _____, 2012
Time:
Place:       Courtroom __
Judge:      Hon. Larry R. Hicks

1

2

## TABLE OF CONTENTS

3   I.   INTRODUCTION ...................................................................................................1

4   II.  FACTUAL BACKGROUND.................................................................................3

5        A.   Industry and License Overview ................................................................3

6        B.   Rimini Street Overview ............................................................................5

7   III. RELEVANT LEGAL STANDARDS REGARDING CONSTRUING THE SCOPE OF
8        LICENSES ............................................................................................................7

9   IV.  RIMINI'S ACTIONS ARE EXPRESSLY PERMITTED BY ORACLE'S LICENSES ...........8

10       A.   City of Flint, Michigan ............................................................................8

11            1.   Oracle's Focus on the Source of Installation Media Ignores the Language
12                 of the Licenses. .............................................................................8

13            2.   The City of Flint's License Agreement Allows for a Reasonable Number
                   of Copies of the Software, Including Rimini's Offsite Copies........................10
14

15            3.   Rimini's Use of the Environments is Supported by Each Customer's
                   License that Received Support Though the Environments' Use. ...................13

16       B.   School District of Pittsburgh.....................................................................17

17            1.   Again, Oracle's Focus on the Source of Environments Ignores the
18                 Language of the Licenses...............................................................18

19            2.   Rimini's Maintenance of Environments on Behalf of the School District is
                   Authorized by the School District's License. .................................................18
20

21            3.   The Alleged "Chain of Cloning" Does Not Evidence Acts of Copyright
                   Infringement..........................................................................................19

22            4.   Rimini's Actions Fully Comport with the Customs and Practices in the
23                 Industry. ..........................................................................................20

24       C.   Giant Cement Holding, Inc.......................................................................21

25       D.   Novell, Inc...............................................................................................24

26  V.   ORACLE CONSENTED TO RIMINI'S ACTIONS ...............................................26

27       A.   Oracle's Reliance on the Terms of its Customers' License Agreements Fails............26

28

i

B.    Oracle's Narrow Standard for Implied License is Incorrect........................................27

C.    The Implied License Reaches the Full Scope of Rimini's Activities. .........................29

D.    Material Issues of Fact Remain..................................................................................30

VI.    CONCLUSION..................................................................................................................30

RIMINI STREET INC.'S OPPOSITION TO ORACLE'S MOTION FOR PARTIAL SUMMARY JUDGMENT

360808 v1

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*A&M Records, Inc. v. Napster, Inc.*,
   239 F.3d 1004 (9th Cir. 2001) ...........................................................................27

*A. Kemp Fisheries, Inc. v. Castle & Cooke, Inc., Bumble Bee Seafoods Div.*,
   852 F.2d 493 (9th Cir. 1988) ...............................................................................7

*Adobe Sys. Inc. v. One Stop Micro, Inc.*,
   84 F. Supp. 2d 1086 (N.D. Cal. 2000) .................................................................7

*Bourne v. Walt Disney Co.*,
   68 F.3d 621 (2nd Cir. 1995) and SOS .................................................................10

*Dastar Corp. v. Twentieth Century Fox Film Corp.*,
   539 US 23 (2003)..............................................................................................8, 18

*De Forest Radio Tel. & Tel. Co. v. United States*,
   273 U.S. 236 (1927).............................................................................................27

*Field v. Google Inc.*,
   412 F. Supp. 2d 1106 (D. Nev. 2006).............................................................27, 30

*Foad Consulting Group, Inc. v. Azzalino*,
   270 F.3d 821 (9th Cir. 2001) ...............................................................................7

*Harris v. Emus Records Corp.*,
   734 F.2d 1329 (9th Cir. 1984) .........................................................................8, 18

*Maffei v. Northern Ins. Co*,
   12 F.3d 892 (9th Cir. 1993) .................................................................................7

*MDY Indus., LLC v. Blizzard Entm't, Inc.*,
   No. 09-15932, 2011 U.S. App. LEXIS 3428 (9th Cir. Feb. 17, 2011) ...................23

*Meridian Project Sys. v. Hardin Constr. Co., L.L.C.*,
   426 F. Supp. 2d 1101 (E.D. Cal. 2006)................................................................13

*Microsoft Corp. v. AT&T Corp.*,
   550 U.S. 437 (2007)..............................................................................................9

*Miller v. Glenn Miller Prods., Inc.*,
   454 F. 3d 975 (9th Cir. 2006) ...............................................................................3

iii

*Mirpad v. Cal. Ins. Guarantee Assn.*,
    34 Cal. Rptr. 3d 136 (Cal. App. 2006)....................................................................................11

*Netbula, LLC v. BindView Dev. Corp.*,
    516 F. Supp. 2d 1137 (N.D. Cal. 2007)...................................................................................10

*Netbula, LLC v. Chordiant Software, Inc.*,
    No. C 08-00019, 2009 U.S. Dist. LEXIS 58690 (N.D. Cal. July 9, 2009).......................27, 30

*Realnetworks, Inc. v. DVD Copy Control Ass'n*,
    641 F. Supp. 2d 913 (N.D. Cal. 2009)......................................................................12, 20, 24

*S. Cal. Gas Co. v. City of Santa Ana*,
    336 F.3d 885 (9th Cir. 2003) ....................................................................................................7

*S.O.S., Inc. v. Payday, Inc.*,
    886 F. 2d 1081 (9th Cir. 1989) ..............................................................................6, 10, 18, 23

*Schuck Corp. v. Sorkowitz*,
    686 P.2d 1366 (Colo. Ct. App. 1984) .....................................................................................26

*Schwartz v. Rent A Wreck of Am., Inc.*,
    No. 10-2114, 2012 U.S. App. LEXIS 5049 (4th Cir. Mar. 9, 2012) .................................26, 27

*Sola Salon Studios, LLC v. Heller*,
    No. 08-cv-01565-PAB-BNB, 2012 U.S. Dist. LEXIS 36247 (D. Colo. Mar. 19, 2012) ..........7

*SQL Solutions v. Oracle Corp.*,
    No. C-91-1079 MHP, 1991 U.S. Dist. LEXIS 21097 (N.D. Cal. Dec. 18, 1991).............10, 18

*Storage Tech. Corp. v. Custom Hardware Eng'g & Consulting, Inc.*,
    421 F.3d 1307 (Fed. Cir. 2005)..........................................................................................23, 24

*Welles v. Turner Entm't Co.*,
    503 F.3d 728 (9th Cir. 2007) ....................................................................................................7

**STATUTES**

17 U.S.C. § 202...............................................................................................................................8

iv

1        Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Defendant Rimini Street, Inc.

2    ("Rimini") submits the following memorandum and points of authority in opposition to the motion

3    for partial summary judgment filed by Plaintiffs Oracle USA, Inc., Oracle America, Inc., and Oracle

4    International Corp. (collectively, "Oracle").  (Dkt. 237)

5    **I.      INTRODUCTION**

6        Oracle argues, "[w]ith fact discovery closed, the truth about Rimini's business model is

7    clear," alleging Rimini's business is built on the use of "hundreds of unlicensed copies" of Oracle's

8    software.  Plaintiffs' Brief ("Plt. Br.") at 1.  Oracle's allegations are demonstrably false, reaching its

9    distorted version of the "truth" only by turning a blind eye to critical evidence demonstrating that:

10   (1) Oracle's own license agreements expressly authorize the allegedly "hundreds of unlicensed

11   copies" used by Rimini to support its hundreds of customers; (2) Rimini's practices are consistent

12   with and supported by the accepted customs and practices in the industry, including Oracle's own

13   recommended practices; and (3) Oracle has been well aware, ███████████, that it was

14   voluntarily shipping software to Rimini to be maintained by Rimini on behalf of its customers,

15   discontinuing this practice only months before initiating the present litigation.  In light of this

16   evidence, Oracle's arguments suffer from three critical defects.

17       First, Oracle's motion blatantly disregards key provisions of the relevant license agreements

18   that authorize Rimini's access to and use of the licensed software, including provisions that clearly

19   state that licensees can █████████████

20   ████████████████████.  These provisions expressly permit Rimini's

21   actions and, at the very least, demonstrate an ambiguity militating against Oracle's narrow reading of

22   the licenses.  Indeed, hundreds of Rimini's clients – including many of the world's largest and best

23   known organizations consisting of dozens of Fortune 500 and Global 100 companies and numerous

24   governmental agencies – have determined that Rimini <u>is</u> permitted under their Oracle licenses to

25   possess and maintain copies of Oracle software on their behalf to support said Oracle software.

26       To the extent an ambiguity in the licenses must be resolved, resort to evidence of the custom

27   and practice in the industry is proper.  In this case, such evidence establishes that Rimini's support

28   1

practices are fully consistent with accepted practices in the industry, including the practices recommended by Oracle's own technical documentation and the practices of Oracle's own industry Partners.

Second, many of Oracle's arguments are premised on the assertion that "Rimini uses one customer's software to support other customers." Plt. Br. at 1. Oracle continues this argument throughout its brief, attempting to require Rimini prove the exact source of installation media used to create each copy of Oracle software on Rimini's system. Oracle, however, has not and cannot point to a single provision in the relevant license agreements restricting the license rights to software created from a specific source. Rather, Oracle's licenses provide " ███████████████████ ████████████████████████████████████████████. Consistent with Oracle's actual licensing regime, Rimini complies with the relevant license agreements by ensuring each customer receives the benefit of only the software versions the customer has licensed from Oracle.

Third, Oracle's motion for summary judgment as to Rimini's implied license and consent defenses fails given the existence of hotly contested issues of material facts. Oracle's motion here is largely based on the unsupported argument that "[n]o reasonable juror could conclude from Oracle's shipments to a location described as a 'secondary offsite backup location' that Oracle authorized Rimini to do something entirely different: copy that software onto Rimini's system." Plt. Br. at 30. Contrary to this suggestion, Oracle was well aware that it was shipping software to Rimini to be maintained by Rimini on behalf of its customers ██████ and continued this practice for years, sending literally hundreds (if not thousands) of installation disks directly to Rimini. At the same time, Oracle was well aware of Rimini's existence in the market as a provider of support services for Oracle software, as well as Oracle's own technical recommendations regarding the provision of such support. Based on this evidence, it is more than reasonable to conclude that Oracle consented to Rimini's use of this media to support licensed customers. At a minimum, there are genuine issues of material of fact precluding summary judgment. Oracle's motion should be denied.

## II.  FACTUAL BACKGROUND

### A.  Industry and License Overview

Oracle's motion is largely focused on interpreting certain software license agreements for its PeopleSoft, J.D. Edwards and Siebel families of software products.  "The fundamental goal of contract interpretation is to give effect to the mutual intent of the parties as it existed at the time of contracting."  *Miller v. Glenn Miller Prods., Inc.*, 454 F. 3d 975, 989 (9th Cir. 2006) (internal citations omitted).  As the Ninth Circuit has recognized, "the words of a written instrument often lack a clear meaning apart from the context in which the words were written," and courts may thus consider "the circumstances in which a contract was written, the subsequent conduct of the parties, and the common usage of particular terms in a given industry."  *Id.*  Given the complexity of both the licenses and the technology at issue in this matter, it is particularly important to understand the context in which the licenses-at-issue are negotiated, executed, and performed.

This case involves complex software platforms known as Enterprise Resource Planning (ERP) systems.  The popularity of ERP platforms has greatly increased in the last twenty years with the release of fully developed enterprise applications that provide the ability to computerize functions across an entire organization.  Today, ERP systems are used primarily by large and mid-size organizations to integrate internal and external management information, with the goal of managing customer relationships, accounting, finances, supply chains, and human resources within a single software platform.  Because of its complexity, ERP software is expensive to license, implement and maintain, with license fees reaching into the millions of dollars.

These up-front licensing costs are just the beginning.  Implementation costs can easily top the license fees because most companies require extensive customizations and modification to the software to fit their unique business needs.  To allow such customizations, ERP vendors (including Oracle) typically grant customers access to a portion of the source code for the licensed applications to allow for customer modifications.  Statement of Facts in Supp. of Rimini's Opp. ("Rimini SOF") 1 (Decl. of Robert H. Reckers in Supp. of Rimini's Opp. To Oracle's Mot. For Partial Summ. J. ("Reckers Decl.") ¶ 6 & Ex. 5 (Davis Report) at 14).  Once implemented, the software must be

3

maintained through periodic updates. *Id.* For example, the software must be continuously updated to reflect changes in tax laws and governmental regulations. *Id.* To keep up with such dynamic requirements, software vendors offer support services for a fee, distributing updates and fixes to ensure licensees remain compliant and operational. Rimini SOF 2 (Reckers Decl. ¶ 6 & Ex. 5 (Davis Report) at 14). For instance, Oracle typically offers technical support and maintenance services for an annual fee equal ████████████████████. Rimini SOF 3 (Reckers Decl. ¶ 2 & Ex. 1 (Catz Depo.) at 65:10-11)).

   Given the substantial efforts associated with implementing, customizing and supporting EPR platforms, an industry of third party consultants has developed to assist licensees by providing services with respect to the ERP software. Rimini SOF 4 (Reckers Decl. ¶¶ 2, 3 & Ex. 1 (Catz Depo.) at 36:12-16, Ex. 2 (Phillips Depo.) at 38:17-39:4). This industry includes recognizable names such as IBM, AT&T and Accenture.[1] Oracle has acknowledged that ████████████ ██████████████████████ relies on these consultants to implement, support, and customize its licensees' Oracle, PeopleSoft, J.D. Edwards, or Siebel software, even designating some of these consultants as business "Partners." Rimini SOF 5 (*See* Reckers Decl. ¶¶ 3, 15 & Ex. 2 (Phillips Depo.) at 37:8-13, 38:17-39:4, Ex. 14 (Oracle's Supp. and Amended Responses to Rimini's First Set of Interrogatories (No. 1-12)) at 69-70). Likewise, licensees typically lack the in-house technical resources and expertise needed to customize and otherwise implement the software and, thus, also rely on third parties to provide services in connection with the software. Rimini SOF 6 (Decl. of Brooks L. Hilliard in Supp. of Rimini's Opp. To Oracle's Mot. For Partial Summ. J. ("Hilliard Decl.") ¶ 10; Reckers Decl. ¶¶ 2, 6 & Ex. 1 (Catz Depo.) at 36:12-16, Ex. 5 (Davis Report) at 14).

   To further assist licensees and their consultants implement and modify the software, Oracle provides a variety of technical recommendations. *See, e.g.*, Reckers Decl. ¶¶ 20, 29 & Ex. 19

---

[1] *See, e.g.*, IBM – Application Hosting - PeopleSoft, http://www-935.ibm.com/services/us/en/it-services/application-hosting-peoplesoft.html (last visited Apr. 25, 2012); Accenture and PeopleSoft: Creating and Delivering Better Performance, Accenture http://www.accenture.com/SiteCollectionDocuments/jp-ja/PDF/technology/systems-integration/oracle-solutions/Accenture_technology_peoplesoft_capabilities.pdf (last visited Apr. 25, 2012); AT&T PeopleSoft Services, http://www-.business.att.com/content/productbrochures/PeopleSoft_Services.pdf (last visited Apr. 25, 2012).

4

1  (ORCLRS0055893), Ex. 28 (ORCLRS0811873).   At the highest level, these recommendations

2  describe two types of software environments that licensees should deploy: *production environments*

3  for running the organization's payroll, financial or other critical systems; and *non-production*

4  *environments* for developing and testing updates or otherwise supporting the production

5  environments.  Rimini SOF 7 (citing various Oracle technical documentation; Hilliard Decl. ¶ 11).

6  Given the critical nature of the production system, changes or updates obviously must be verified in

7  a non-production system before being promoted to the production system.   As a result, Oracle

8  "███████████████████████████████████████████████████████████████████

9  ████████████████████████████████████████   Reckers Decl. ¶ 18 & Ex. 17 (ORCLRS0018170) at

10  ORCLRS0018284.   Likewise, Oracle further explains, "Throughout the implementation process,

11  your testers need to constantly test the application to make sure that it performs properly.  Your team

12  would also be constantly migrating configuration changes from *development to test to staging*

13  *environments*.   Ultimately, when you are ready to go live with your PeopleSoft applications, your

14  administrators would deploy your tested configuration from staging to *production environment*."

15  Reckers Decl. ¶ 25 & Ex. 24 (ORCLRS0811822) at ORCLRS0811824.

16      As will be addressed herein, Oracle's license agreements also reflect the critical distinction

17  between production and non-production environments and reflect the market reality that licensees

18  depend on third parties to provide services with respect to the licensees' use of the software.

19      **B.   Rimini Street Overview**

20      Rimini is an enterprise software support consulting organization, similar in its operation to

21  other firms that provide services to the licensees of ERP software.  A significant difference between

22  Rimini and other major consulting firms is that Rimini focuses its business strictly on providing

23  software maintenance services.  Rimini offers this support at a significant discount to the venders'

24  fees and provides clients with a "concierge" level service, assigning each client a named,

25  experienced Primary Support Engineer and guaranteeing 30 minute response time anywhere in the

26  world.  Rimini's track-record of meeting these service level commitments and providing excellent

27  service is evidenced by its over 90% historic renewal rate.  Reckers Decl. ¶ 14 & Ex. 13 (Zorn

28

1   Depo.) at 225:15-21.  Recently, Rimini announced that it became the world's first and only third-

2   party enterprise software support provider to receive ISO 9001:2008 Quality Management System

3   certification, earning ISO certification for its provision of third-party enterprise software support

4   services.[2]  As a result of its efforts and its industry reputation, Rimini has achieved a customer base

5   encompassing almost 500 hundred clients in the for-profit, not-for-profit and governmental industry

6   sectors, including a diverse mix of Fortune 500, mid-market, small, and public sector organizations.

7           Contrary to Oracle's allegations of widespread misuse of its intellectual property, the

8   evidence in this case establishes that Rimini Street respects Oracle's intellectual property rights and

9   takes extraordinary efforts, in both process and procedure, to ensure the proper treatment of Oracle

10  software.   In particular, Rimini's processes are designed to ensure that each client receives the

11  benefit of only the software to which it is licensed.  Rimini SOF 8 (Reckers Decl. ¶¶ 8, 11 & Ex. 7

12  (B. Lester Depo.) at 17:8-22, Ex. 10 (Slepko Rule 30(b)(6) Depo.) at 14:5-23, 34:5-10, 36:4-37:17).

13  Rimini carefully tracks the software for which each of its clients is licensed and utilizes only that

14  licensed software when supporting a client.  *Id.*  For example,

15

16                                                            Rimini SOF 9 (Reckers Decl. ¶ 11

17  & Ex. 10 (Slepko Rule 30(b)(6) Depo.) at 37:2-25).  Similarly, environments are only built for a

18  customer by Rimini once the customer's entitlement to the software is verified,

19                                                          . Rimini SOF 10 (Reckers Decl.

20  ¶¶ 9, 11 & Ex. 8 (G. Lester Depo.) at 58:15-21, Ex. 10 (Slepko Rule 30(b)(6) Depo.) at 36:11-24).

21  As will be explained, Rimini's procedures are similar to other leading consulting firms and follow

22  generally accepted practices in the industry.  Hilliard Decl. ¶ 15.  Far from Oracle's allegations of

23  massive theft, Rimini's practices are legal and supported by industry-leading practices, as well as

24  express provisions of Oracle's license agreements.

25

26          [2] *See* Press Release, Rimini Street, Rimini Street Becomes First and Only ISO-Certified
    Provider of Third-Party Enterprise Software Support Services (Sept. 7, 2011), *available at*
27  http://www.riministreet.com/news.php?id=995 .

28                                              6

## III.   RELEVANT LEGAL STANDARDS REGARDING CONSTRUING THE SCOPE OF LICENSES

Construing the scope of a license is principally a matter of contract interpretation.  *S.O.S., Inc. v. Payday, Inc.*, 886 F. 2d 1081, 1088 (9th Cir. 1989) ("We rely on state law to provide the canons of contractual construction, but only to the extent such rules do not interfere with federal copyright law or policy.").  As the Ninth Circuit has explained, though interpreting a contract is generally a matter of law, when a contract is susceptible to more than one reasonable interpretation, summary judgment is "improper because differing views of the intent of parties will raise genuine issues of material fact." *Maffei v. Northern Ins. Co*, 12 F.3d 892, 898 (9th Cir. 1993); *see S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003).

Additionally, when construing licenses under California law, "the exception to the parol evidence rule is broad – extrinsic evidence is admissible to demonstrate that there is an ambiguity in an instrument and for the purpose of construing this ambiguity." *Adobe Sys. Inc. v. One Stop Micro, Inc.*, 84 F. Supp. 2d 1086, 1090 (N.D. Cal. 2000) (internal citations omitted); *see Welles v. Turner Entm't Co.*, 503 F.3d 728, 737 (9th Cir. 2007) (holding that extrinsic evidence should be consulted where the scope of a license is ambiguous).[3]  A court may consider industry customs, course of dealing, and course of performance in interpreting an ambiguity and in determining whether an ambiguity exists.  *Id.* "If a party's extrinsic evidence creates the possibility of an ambiguity, a court may not rely on the text of the contract alone to determine the intent of the parties." *Foad Consulting Group, Inc. v. Azzalino*, 270 F.3d 821, 828 (9th Cir. 2001) (citation omitted).  Further, extrinsic evidence should be consulted *even if* a Court determines that a contract is fully integrated, so long as the resulting interpretation does not contradict the express terms of the contract. *A. Kemp*

1  *Fisheries, Inc. v. Castle & Cooke, Inc., Bumble Bee Seafoods Div.*, 852 F.2d 493, 495 (9th Cir.

2  1988).  Summary judgment is inappropriate where the interpretation of a license may turn on the

3  credibility of extrinsic evidence.  *Welles*, 503 F.3d at 737.

4  **IV.   RIMINI'S ACTIONS ARE EXPRESSLY PERMITED BY ORACLE'S LICENSES**

5       In attacking Rimini's express license defense, Oracle reiterates two arguments:  (1) that some

6  of the environments-at-issue were not installed from the subject customer's own installation media;

7  and (2) that Rimini's copying and use of the environments-at-issue violated certain restrictions found

8  in the subject customers' license agreements with Oracle.  As to the first argument, Oracle's focus

9  on the installation media ignores both settled law and the express language of its own licenses.  The

10  law is clear: Copyrights are separate and distinct from the physical objects on which they may be

11  embodied.  *Harris v. Emus Records Corp.*, 734 F.2d 1329, 1336 (9th Cir. 1984) ("The ownership of

12  the copyright is separate and independent from ownership of the material object in which it is

13  embodied."); *see Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 US 23, 37 (2003) (citing

14  17 U.S.C. § 202 in noting the statutory distinction between a copyright and a physical item that may

15  embody it).  Nowhere do the licenses-at-issue require the licensed software be created solely from an

16  identified copy of installation media. To the contrary, the licenses expressly ███████████

17  ████████████████████████████.  As to Oracle's second argument, Oracle's restrictive

18  reading of the licenses ignores key additional rights granted to the licensees, ████████████

19  ████████████████████████████████████████████████████████████

20  ████████████████████████████████████████████████████.

21       **A.   City of Flint, Michigan**

22           **1.  Oracle's Focus on the Source of Installation Media Ignores the Language**

23              **of the Licenses.**

24       Oracle incorrectly argues that "Rimini cannot carry its initial burden of identifying a relevant

25  license permitting the local environments allegedly associated with the City of Flint because Rimini

26  does not know which, if any, customer's software it used to create" those environments.  Plt. Br. at

27  18.  Oracle's argument relies upon the errant assumption that the City of Flint's rights are restricted

28                                     8

to a particular piece of installation media.  The City of Flint's license,

██████████████████████████████████████████████████████████.  Rimini SOF 11 (Dkt.

239, O'Neill Decl. ¶ 3 & Dkt. 248, Plt. Ex. 10 (City of Flint License) at § 16).  Rather, the license

grants the City the right to ████████

██████████████████████████████████████.  Other provisions of the license are in

accord, differentiating between the "software" for which the license is granted, and the physical

installation media.  For example, █████

███████████████████████████████"  Rimini SOF 12 (Dkt. 239, O'Neill Decl. ¶ 3 & Dkt. 248, Plt. Ex. 10 (City

of Flint License)  at §§ 4.1,  4.2).

██████████████████████████████████████████████

█████████████████████████████████.  Rimini SOF 11 (Dkt. 239,

O'Neill Decl. ¶ 3 & Dkt. 248, Plt. Ex. 10 (City of Flint License) at § 16).  In fact, the license clarifies

that ███

██████████████████████████████████████████████████████████ there can be no question that the City of Flint's

license rights are not constrained to software created from specific media. *See id.*[4]

As the Supreme Court has observed, software code "is an idea without physical

embodiment." *Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437, 449 (2007).  Consistent with this

authority, the rights granted by Oracle's licenses are not limited to any specific physical embodiment

of the software, and Oracle fails to establish any basis for requiring Rimini to "prove City of Flint's

software was actually used to create" the environments used to support the City.  Plt. Br. at 18.

---

[4] As Rimini's expert witness, Mr. Brooks Hilliard explains, "ERP software venders
customarily afford their clients non-exclusive, perpetual, limited licenses to use the licensed software
programs," but do not restrict such license rights to any specific piece of installation media.  Rimini
SOF 13 (Hilliard Decl. ¶ 14; Reckers Decl. ¶ 2 & Ex. 1 (Catz Depo.) at 11:15-12:6).

9

Rimini has properly identified the existence of a license agreement supporting its environments maintained on behalf of the City of Flint. *See* Dkt. 239, O'Neill Decl. ¶ 3 & Dkt. 248, Plt. Ex. 10 (City of Flint License). As a result, Oracle now bears the burden of proving that Rimini's copying was unauthorized. *See Netbula, LLC v. BindView Dev. Corp.*, 516 F. Supp. 2d 1137, 1151 (N.D. Cal. 2007) (citing *Bourne v. Walt Disney Co.*, 68 F.3d 621, 631 (2nd Cir. 1995) and *SOS, Inc.*, 886 F.2d at 1085). As explained below, Oracle cannot meet this burden.

### 2. The City of Flint's License Agreement Allows for a Reasonable Number of Copies of the Software, Including Rimini's Offsite Copies.

Oracle alleges the City of Flint's license allows for ██████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████.[5] Plt. Br. at 19. These rights are identified in Section 1 of the City of Flint's license at Sections 1.1 and 1.2.a. However, Section 1 of the license grants ████████████ ████████████

Specifically, Section 1.2.b permits ████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████████████ "The Ninth Circuit has recognized that modification of copyrighted software, which involves use 'otherwise reserved to the copyright holder,' is legally distinct from the general right to possess and use software." *SQL Solutions v. Oracle Corp.*, No. C-91-1079 MHP, 1991 U.S. Dist. LEXIS 21097, at *13 (N.D. Cal.

---

[5] As previously explained, such copies used for actual "data processing operations" (here, as a human resources system) are known typically referred to as "production environments."

10

1    Dec. 18, 1991) (citing *S.O.S. Inc. v. Payday Inc*., 886 F.2d at 1088 n.8 (9th Cir. 1989)).

2

3

4

5                                                                  license authorize the non-production copies of

6    the software created by Rimini, and Oracle is wrong to ignore these license provisions.

7            Likewise, Oracle is equally wrong to impose

8

9

10

11

12

13

14

15

16

17                                                                             .

18            The license also expressly allows

19

20

21

22

23

24            As evidenced by Rimini's service agreement with City of Flint, Rimini meets

25   each of these criteria and, thus, the City may provide Rimini access and use the software on the

26   City's behalf

27                                                                             This is exactly

28                                              11

1   what the City of Flint did.  It provided access and use of the licensed software to Rimini so that

2   Rimini could provide services to the City concerning Licensee's use of the software.  *Id.*

3         Taken as a whole, ████████████████████████████████████████████████████

4   ████████████████████████████████████████████████████████████████████████████

5   ████████████████████████████████████████████████████████.  These express license

6   provisions support Rimini's maintenance of copies of the software on the City's behalf.

7         Indeed, any attempt to reconcile Oracle's narrow (and erroneous) reading of the City's

8   License with ████████████████████eveals ambiguity in the contract, requiring consideration

9   of industry custom and practices.  *Realnetworks, Inc. v. DVD Copy Control Ass'n*, 641 F. Supp. 2d

10  913, 949 (N.D. Cal. 2009) (noting that courts consider "extrinsic evidence to assist in contract

11  interpretation when the text of the Agreement can reasonably be understood in more than one

12  way.").   Here, the evidence establishes that licensees often engage third parties to implement,

13  customize and otherwise support the software because they lack the requisite the in-house resources.

14  Rimini SOF 6 (Hilliard Decl. ¶ 10; Reckers Decl. ¶¶ 2, 6 & Ex. 1 (Catz Depo.) at 36:12-16, Ex. 5

15  (Davis Report) at 14).  In performing services in connection with the software, it is understood and

16  accepted in the industry for non-production copies of software to be maintained by third parties on a

17  licensee's behalf, including copies maintained by third parties that modify and provide other services

18  in connection with the software.  Rimini SOF 19 (Hilliard Decl. ¶ 12; Reckers Decl. ¶¶ 4, 28 & Ex. 3

19  (Simmons Depo.) at 198:16-200:2, Ex. 27 (ORCLRS0811866)).  As explained by Rimini's technical

20  and industry expert, Mr. Brooks Hilliard, the "normal and customary way that a professional

21  software development organization (such as a consulting organization) modifies and updates a

22  customer's software is to create non-production copies of the software on the consultant's computer

23  systems, such that the non-production versions of the software can be maintained and modified as

24  needed."  *Id.*  Demonstrating this industry practice, hundreds of Oracle's licensees have authorized

25  Rimini to maintain non-production copies of Oracle software on their behalf, including dozens of

26

27

28                                                    12

Fortune 500 companies and various state and Federal agencies.[6]

Further, Oracles' own documents recognize the industry practice of development work being performed remotely, ███████████████████████. *Id.* Likewise, several of Oracle's consulting "Partners" tout their ability to create software modifications at their own facilities, advertising use of an "upgrade lab" on the consultant's computer systems wherein the licensee's environments are replicated and used to provide services to the licensee. Rimini SOF 19-20 (Hilliard Decl. ¶ 12). As one Oracle Partner explains, "Our PeopleSoft Center of Excellence hosts and manages an 'Upgrade Lab' which replicates the client environment at our offshore locations. The initial and most time consuming activities are carried out in our Upgrade Lab thus benefiting the clients with immense cost savings." Hilliard Decl., Ex. 32.

Given this evidence, the replication of client environments on the consultant's computer systems complies with accepted customs and practices in the software industry, and, therefore, Rimini's maintenance of local environments for the City of Flint is fully supported by the customs and practices of the industry. This evidence further supports Rimini's reading of ████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████. At the very least, this evidence— reflecting Oracle's own technical recommendation and the practices of Oracle's own industry Partners—raises serious questions as the propriety of Oracle's narrow reading of the license, precluding summary judgment. *See Meridian Project Sys. v. Hardin Constr. Co., L.L.C.*, 426 F. Supp. 2d 1101, 1109 (E.D. Cal. 2006) (finding that an ambiguity precluded "the court from interpreting the terms of the contract on a motion for summary judgment").

### 3. Rimini's Use of the Environments is Supported by Each Customer's License that Received Support Though the Environments' Use.

Oracle argues that "Rimini used City of Flint's software to support multiple customers, not

---

[6] Rimini relies on its customers to interpret their own license agreement with Oracle in deciding whether to allow Rimini to create a local environment on their behalf. Reckers Decl. ¶ 13 & Ex. 12 (Slepko 2011 Depo.) at 13:18-24.

13

just City of Flint." Plt. Br. at 20.  Here again, Oracle's argument ignores its own licensing practices. As Oracle makes clear in its Complaint, Oracle does not actually <u>sell</u> software but rather <u>licenses</u> the software to its various customers.  Dkt. No. 146, at ¶ 26.  During her deposition, Oracle's co-President Safra Catz explained that

████████████████████████████████████ Rimini SOF 21 (Reckers Decl. ¶ 2 & Ex. 1 (Catz Depo.) at  11:22-12:6, 12:21-13:21).  The result of this business and licensing model is, of course, that multiple different customers have license rights in the same intellectual property. *Id.*  As previously mentioned, Oracle's licenses grant ████████████████████████████████

████████████████████████████████████████████████.  Rimini SOF 11 (Dkt. 239, O'Neill Decl. ¶ 3 & Dkt. 248, Plt. Ex. 10 (City of Flint License) at § 16).  Each and every Rimini customer has rights to the software used on its behalf, and Rimini's use of the software on behalf of any client is authorized by that client's license agreements with Oracle.

For instance, the environments associated with the City of Flint are comprised of ████████
████████████████████████████████  Plt. Br. at 8 (█████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████.  Obviously, many entities other than the City of Flint are also licensed to this software.  *See* Rimini SOF 21 (Reckers Decl. ¶ 2 & Ex. 1 (Catz Depo.) at 11:22-12:6, 12:21-13:21).  For instance, Oracle's Brief notes that █████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████.

Like the City of Flint, Cowlitz County is also licensed ████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████

14

The license agreement between Cowlitz County and Oracle also

Rimini SOF 23 (Reckers Decl. ¶ 19 & Ex. 18 (Cowlitz County's License (ORCLRS0053129) at §§ 1.2.c, 14.2). Consistent with these express license grants,

uch access and use is fully authorized by Cowlitz County's license. *Id.* More broadly, Rimini only uses instances of PeopleSoft software to support customers licensed to that software. Rimini SOF 8 (Reckers Decl. ¶¶ 8, 11 & Ex. 7 (B. Lester Depo.) at 17:8-22, Ex. 10 (Slepko 30(b)(6) Depo.) at 14:5-23, 34:5-10, 36:4-37:17). Thus, any copies of PeopleSoft software made pursuant to Rimini's support activities are within the scope of the licenses for the clients receiving support.[7]

Finally, contrary to Oracle's suggestion,

Rimini SOF 14-15 (Dkt. 239, O'Neill Decl. ¶ 3 & Dkt. 248, Plt. Ex. 10 (City of Flint License) at §§ 1.2b-c).

Second, Oracle attempts to

---

[7] While Oracle argues that Rimini made improper "RAM" copies of the software, Oracle's "RAM" copying argument relies on an unworkable reading of the license agreements and must be rejected. Oracle admits that any access or use of an environment necessary creates at least a partial copy of the environment. Dkt. 247, Oracle SOF 42. Given this reality, any license grant directed to providing access to or use of the software necessary includes the right to make RAM copies. Rimini SOF 24 (Hilliard Decl. ¶ 16; Oracle SOF 41-42). Otherwise, the right to access and use would be ineffective and pointless because there is no way to access or use the software without having at least a portion of the software loaded into RAM. Hilliard Decl. ¶ 16.

15

At the very least, Oracle's attempt to impose its narrow understanding of the licensed software to permissive license provisions reveals an ambiguity requiring examination of the custom and practices in the industry. Here again, the evidence in this case reveals that Rimini's practices are consistent with long-accepted industry practices. While Oracle argues that it is impermissible to use one copy of the software to support multiple licensed clients,

at

16

45:4-46:15, 101:1-9; 200:11-15).  Rimini likewise focuses on the customers' licensed versions when selecting the software to be used to develop updates for clients on a given release.  Rimini SOF 8 (Reckers Decl. ¶¶ 8, 11 & Ex. 7 (B. Lester Depo.) at 17:8-22; Ex. 10 (Slepko 30(b)(6) Depo.) at 14:5-23, 34:5-10, 36:4-37:17

Rimini's adherence to similar practices to this close Oracle Partner demonstrates both that Rimini's practices comply with accepted customs and practices in the industry and that Oracle's overly restrictive reading of the license agreements is improper.[8]  Rimini SOF 25 (Hilliard Decl. ¶ 14; Reckers Decl. ¶ 4 & Ex. 3 (Simmons Depo.) at 121:11-122:1, 200:3-15); Hilliard Decl. ¶ 15.  When properly construed, the license agreements fully authorize Rimini's copying and use of PeopleSoft software for non-production purposes on behalf of the City of Flint, and Oracle's challenge to Rimini's express license defense must be rejected.

### B.   School District of Pittsburgh

In moving for summary judgment as to Rimini's maintenance of environments on behalf of the School District of Pittsburgh, Oracle argues that Rimini's maintenance of these environments is improper because: (1) these environments were not "actually built using the" School District's own installation media"; (2) the relevant license agreements state "that the software can only be located at the customer's facilities," not Rimini's; and (3) Rimini improperly created a "chain of cloning leading back to environments built on with the City of Des Moines's software."  *See* Plt. Br. at 22-24.  Oracle is wrong on all three points.

**1. Again, Oracle's Focus on the Source of Environments Ignores the Language of the Licenses.**

Oracle argues Rimini cannot rely on the School District's software license because "Rimini does not contend that any of the School District of Pittsburgh's software was used as a source for" the environments-at-issue. Plt. Br. at 21. Like the City of Flint's license, the School District's license

As copyrights are separate and distinct from the physical objects on which they may be embodied, the School District's license is not limited to software installed from some specific source. *See Emus Records Corp.*, 734 F.2d at 1336; *Dastar Corp.*, 539 U.S. at 37. As a result, Rimini may properly rely on the School District's software license to authorize its copying and use of the environments-at-issue on the School District's behalf.

**2. Rimini's Maintenance of Environments on Behalf of the School District is Authorized by the School District's License.**

Regarding whether Rimini may maintain a copy of the licensed software on behalf of the School District, the grant to the School District is broader than Oracle alleges.

As previously noted, the Ninth Circuit has recognized that modification of copyrighted software is legally distinct from the general right to possess and use software. *SQL Sol.*, 1991 U.S. Dist. LEXIS 21097, at *13 (citing *S.O.S. Inc.*, 886 F.2d at 1088). To assist with such software modification or other services, the license

18

As evidenced by Rimini's service agreement with the School District, Rimini meets each of these criteria.   Rimini SOF 31 (Reckers Decl. ¶ 31 & Ex. 30 (Support Services Agreement, RSI03016354) at 1, 4, 8).   Therefore, the express language of the license permits

.

### 3. The Alleged "Chain of Cloning" Does Not Evidence Acts of Copyright Infringement.

Oracle also alleges the environments maintained by Rimini on behalf of the School District "are part of a chain of cloning that leads back to environments built with the City of Des Moines's software." Plt. Br. at 21. As an initial matter, Oracle is wrong to refer to the software as "City of Des Moines's software."   As the City of Des Moines's license clearly states,

Therefore, the software is *Oracle's* software for which Oracle grants numerous customers "non-exclusive" rights.

One

other customers are also licensed to the exact same software, and Rimini relies on such customers' licenses to authorize any copying done on their behalf.

For instance, Oracle alleges impropriety in Rimini's copying of PeopleSoft environments for City of Eugene and Dave & Buster's.

RIMINI STREET INC.'S OPPOSITION TO ORACLE'S MOTION FOR PARTIAL SUMMARY JUDGMENT
360808 v1

As a result, each link in the so-called "chain of cloning" was authorized by the customers' license agreements, and Oracle has not established any unauthorized copying.

### 4. Rimini's Actions Fully Comport with the Customs and Practices in the Industry.

Finally, Oracle's narrow reading of the School District's license cannot be reconciled with the additional license rights ███████████████ demonstrating at best an ambiguity in the contract that requires of consideration customs and practices in the industry. *Realnetworks, Inc.*, 641 F. Supp. 2d at 949. As noted, it is accepted in the

20

software industry for non-production copies of software to be maintained by third party service providers on a licensee's behalf, including copies maintained for offsite modifications to the software.  Hilliard Decl. ¶ 12.  As Oracle's own documents recommend, ██████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████.

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

████████████████████████  This testimony  ████████████████████████

████████████████████████  stands in stark contrast to Oracle's present and overly restrictive interpretation of the license agreements.[9]

Given this evidence, the industry customs and practices show Rimini's maintenance of local environments on the School District's behalf, as well as Rimini's cloning of the software on behalf of licensed clients, is supported by any proper interpretation of the School District's license.  Hilliard Decl. ¶ 15.   At the very least, Rimini's interpretation reveals an ambiguity within the School District's license that precludes summary judgment.

### C.   Giant Cement Holding, Inc.

Oracle also alleges that Rimini maintains an unlicensed copy of J.D. Edwards ("JDE") software on behalf of it customer Giant Cement Holding, Inc.  This environment was created from installation media received or maintained on behalf of Giant Cement. *See* Oracle SOF 93.  Unlike Rimini's support of PeopleSoft software, Rimini's JDE support professionals generally do not use

---

[9] ██████████████████████████████████████████████████, Rimini's expert, Mr. Hilliard, confirms that it is customary in the software industry for consulting firms to provide cloned portions of Oracle software to multiple customers licensed to the underlying software. Rimini SOF 38 (Hilliard Decl. ¶ 14; Reckers Decl. ¶ 4 & Ex. 3 (Simmons Depo.) at 120:14-25, 121:11-122:1, 200:3-15).   As Mr. Hilliard explains, such cloning permits efficient and cost effective development, while reflecting the practice of the software vendors to license the same software to multiple clients.  *Id.*

21

the local JDE environments for development, and these environments are rarely accessed.  Rimini

SOF 39 (Reckers Decl. ¶¶ 11, 7 & Ex. 10 (Slepko Rule 30(b)(6) Depo.) at 62:19–63:5, Ex. 6

(Grigsby Depo.) at 11:24-13:9, 28:15-29:1).   As a result, Oracle does not allege improper "cross

use" with respect to the Giant Cement environments.   Instead, Oracle restricts its arguments to

whether the license agreement between Giant Cement and J.D. Edwards (now Oracle) permits a non-

production environment to be maintained by Rimini on Giant Cement's behalf.  *See* Plt. Br. at 24-

25.  In so doing, Oracle again ████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████████.

In its brief, Oracle focuses the "█████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████████████

████████████████  Rimini SOF 41 (Reckers Decl. ¶ 7 & Ex. 6 (Grigsby Depo.) at 13:5-15,

28:15-29:1).

Turning to the permitted location of the software copies, Oracle notably does not allege this

software must be maintained on the customer's facilities, ████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████  The environment maintained by Rimini on behalf

of Giant Cement is unquestionably stored on a system meeting this definition.  *See* Oracle SOF 92.

Further, contrary to Oracle's argument that the ████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████████████

Rimini SOF 43 (Dkt. 239, O'Neill Decl. ¶ 9 & Dkt. 248, Plt. Ex. 16 (Giant Cement License) at Art. VI, § 4).   The evidence in this case demonstrates that Rimini meets these three conditions.   Rimini SOF 44 (Reckers Decl. ¶ 30 & Ex. 29 (Support Services. Agreement, RSI00002747) at 4, 8).

Oracle also argues "

Oracle, however, has no evidence that Rimini breached this provision of the license, though Oracle holds the burden of establishing that Rimini acted beyond the scope of the license grant. *See S.O.S., Inc.*, 886 F.3d at 885.   In fact,

Rimini typically does not access the source code of the local J.D. Edwards.   Rimini SOF 39 (Reckers Decl. ¶¶ 11, 7 & Ex. 10 (Slepko 30(b)(6) Depo.) at 62:19–63:5, Ex. 6 (Grigsby Depo.) at 11:24-13:9, 28:15-29:1); Rimini SOF 41 (Reckers Decl. ¶ 7 & Ex. 6 (Grigsby Depo.) at 13:5-15, 28:15-29:1); Hilliard Decl. ¶ 7.

Moreover,                                                              , such access would not constitute an act of copyright infringement.   To recover for copyright infringement based on breach of a license agreement, "the copyright owner's complaint must be grounded in an exclusive right of copyright (e.g., unlawful reproduction or distribution)."   *MDY Indus., LLC v. Blizzard Entm't, Inc.*, No. 09-15932, 2011 U.S. App. LEXIS 3428, at *17 (9th Cir. Feb. 17, 2011); *see Storage Tech. Corp. v. Custom Hardware Eng'g & Consulting, Inc.*, 421 F.3d 1307, 1315-16 (Fed. Cir. 2005).   The Federal Circuit has explained:

> As an example, consider a license in which the copyright owner grants a person the right to make one and only one copy of a book with the caveat that the licensee may not read the last ten pages. . . . . [I]f the licensee made a single copy of the book, but

23

> read the last ten pages, the only cause of action would be for breach of contract, because reading a work does not violate any right protected by copyright law. Likewise, in this case, the copying of the maintenance code is permitted by the license. The use of the code may violate the license agreement, but it is not forbidden by copyright law and cannot give rise to an action for copyright infringement.

*Storage Tech Corp.* 421 F.3d at 1316; *see MDY Indus., LLC.*, No. 09-15932, 2011 U.S. App. LEXIS 3428, at *17-*18.  Applying this authority, ██████████████████████████████ may violate the license agreement but such access is "not forbidden by copyright law and cannot give rise to an action for copyright infringement." *Storage Tech. Corp.*, 421 F.3d at 1316.

Finally, any attempt to reconcile Oracle's improper reading of Giant Cement's license with the sections of the license tha██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ reveals ambiguity in the contract, requiring consideration to evidence of industry custom and practice. *Realnetworks, Inc.*, 641 F. Supp. 2d at 949.  As noted, the evidence in this case establishes that it is accepted in the software industry for non-production copies of software to be maintained by third parties on a licensee's behalf.  Rimini SOF 19 (Hilliard Decl. ¶ 12; Reckers Decl. ¶ 4, 28 & Ex. 3 (Simmons Depo.) at 198:16-200:2, Ex. 27 (ORCLRS0811866) at ORCLRS0811870).  Given this evidence, the industry customs and practices show Rimini's maintenance of a local environment on Giant Cement's behalf is supported by any proper interpretation of the license.  At the very least, Rimini's interpretation reveals an ambiguity within the license that precludes summary judgment.

### D.   Novell, Inc.

Oracle also alleges that Rimini maintains unlicensed copies of Siebel software on behalf of it customer Novell, Inc.  Because Rimini does not perform development for Siebel software and because Rimini created these Siebel installations from media from or maintained behalf of Novell (*see* Oracle SUF 99), Oracle does not level "cross use" allegations with respect to the Novell environments, focusing strictly on whether the license agreement between Oracle and Novell permits non-production environments maintained by Rimini on Novell's behalf.  *See* Plt. Br. at 25-26.

24



1   Again, Oracle's arguments inexplicable ignore key provisions of the license agreement that

4   In its motion, Oracle focuses on

11                                                                    These provisions

12   expressly authorize Rimini's installation of Siebel software on Novell's behalf.

13   By its plain language,

25   When read in conjunction,

27   This is exactly what Novell did, and Oracle's attempt to ignore the relevant license

25

provisions must be rejected.  As discussed at length, *supra*, it is common and accepted in the industry for third party service providers to maintain non-production copies of software on behalf of their clients.  Rimini SOF 19 (Hilliard Decl. ¶ 12; Reckers Decl. ¶ 4, 28 & Ex. 3 (Simmons Depo.) at 198:16-200:2, Ex. 27 (ORCLRS0811866) at ORCLRS0811870).  Given the language of the contract that supports Rimini's actions and the evidence regarding the industry customs and practices, Oracle is not entitled to summary judgment as to the Siebel software Rimini maintains on Novell's behalf.

## V.     ORACLE CONSENTED TO RIMINI'S ACTIONS

In an effort to avoid Rimini's implied license and consent defenses, Oracle feigns ignorance and charges dishonest behavior by Rimini.  The facts, however, show that for years Oracle sent installation media to Rimini with full knowledge that the disks were being sent to Rimini to be maintained at an "offsite" location, i.e., away from the customers' premises.  Rimini SOF 47 (Reckers Decl. ¶¶ 16, 23 & Ex. 15 (Oracle's First Amended Response to Rimini's Interrogatory No. 26) at 8-9 (                                                                            )).  Throughout the years, Oracle never voiced concerns to Rimini regarding the hundreds of disks requested by, and sent to, Rimini.  Oracle's conduct demonstrates that it consented to Rimini maintaining local software copies, giving rise to an implied license.

### A.     Oracle's Reliance on the Terms of its Customers' License Agreements Fails.

Oracle argues that the express terms of its customers' license agreements preclude any implied license in Rimini's favor.  Plt. Br. at 27.  This argument fails both legally and factually.  Oracle's own authority recognizes that express contracts do not supersede implied contracts "where the implied agreement is based upon the conduct of the parties subsequent to, and not covered by, the terms of the express contract."  *Schuck Corp. v. Sorkowitz*, 686 P.2d 1366, 1368 (Colo. Ct. App. 1984); *see also* Plt. Br. at 27.  Thus, "[e]ven when a written contract exists, evidence derived from experience and practice can now trigger the incorporation of additional, implied terms."  *Schwartz v. Rent A Wreck of Am., Inc.*, No. 10-2114, 2012 U.S. App. LEXIS 5049, at *23 (4th Cir. Mar. 9, 2012) (interpreting California law).

As previously discussed, Oracle's licenses with Rimini's customers do not contain any

26

provisions prohibiting Rimini from maintaining copies of the software on behalf of its clients.  As

discussed, *supra*, Oracle's motion ignores key provisions to the licenses that ███████████████

███████████████████████████████████████████████  Thus, there is no "contrary term"

that might preclude the existence of an implied license between Oracle and Rimini.  Indeed, Oracle's

voluntary shipment of hundreds of disks to Rimini's admittedly "offsite" address demonstrates that

Oracle's contracts should not be construed to include the site restrictions Oracle now proffers.

Without a "contrary term" in the express license, "experience and practice can now trigger the

incorporation of additional, implied terms" permitting Rimini to maintain the customer software on

its servers. *See Schwartz*, 2012 U.S. App. LEXIS 5049, at *23.[10]

### B.   Oracle's Narrow Standard for Implied License is Incorrect.

Oracle's brief focuses on an overly narrow implied license standard and relies heavily on the

fact that Oracle never "'created' a work at Rimini's request."  Plt. Br. at 27–28 (citing *A&M*

*Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1026 (9th Cir. 2001)).  Under Oracle's interpretation

of the law, implied licenses can exist only when software was custom made for a particular licensee.

*See id.*  Rejecting this interpretation, "courts have held that an implied license can exist even where

the copyright owner does not create a custom work for the putative licensee."  *Netbula, LLC v.*

*Chordiant Software, Inc.*, No. C 08-00019, 2009 U.S. Dist. LEXIS 58690, at *15–16 (N.D. Cal. July

9, 2009).  As this Court has explained, "[a]n implied license can be found where the copyright holder

engages in conduct 'from which [the] other [party] may properly infer that the owner consents to his

use.'"  *Field v. Google Inc.*, 412 F. Supp. 2d 1106, 1116 (D. Nev. 2006) (alterations in original)

(quoting *De Forest Radio Tel. & Tel. Co. v. United States*, 273 U.S. 236, 241 (1927)).  Further,

"[c]onsent to use the copyrighted work need not be manifested verbally and may be inferred based

on silence where the copyright holder knows of the use and encourages it."  *Id.*  Oracle's conduct

---

[10]   Oracle's reliance to the customers' licenses is further misplaced because these licenses are not between Oracle and Rimini and, therefore, cannot preclude the existence of an implied license. As Oracle notes, Rimini is not a party to the "licenses between Oracle and Oracle's customers." Plt. Br. at 17 n.4. As a result, the express contracts between Oracle and its <u>licensees</u> cannot preclude an implied license between Oracle and <u>Rimini</u>.

27

1  clearly meets this standard, permitting the reasonable inference that Oracle consented to Rimini's

2  maintenance of Oracle software on its customers' behalf.

3       The evidence in this case establishes that Oracle has long been aware of whom Rimini is and

4  that Rimini provides software support for Oracle's licensed customers.

5

6

7

8

9                                                                                      Oracle also

10  knew, as evidenced by its own technical recommendations, that multiple non-production instances of

11  its software are required to provide proper software support.  Rimini SOF 7 (citing numerous Oracle

12  technical documents; Hilliard Decl. ¶ 11).   Despite knowing that Rimini provided third party

13  support, and knowing that copies of the software were required to do so, Oracle shipped hundreds of

14  software installation disks directly to Rimini Street                                          .  Rimini

15  SOF 49  (Reckers Decl. ¶¶ 16,  23 & Ex. 15 (Oracle's First Amended Response to Rimini's

16  Interrogatory No. 26) at 8-9 (

17                        e), Ex. 22 (ORCLRS0518901)).

18       While Oracle now argues it was deceived by Rimini's shipping requests, the evidence

19  establishes that, in reality, Oracle fully recognized the disks were being sent to Rimini on the

20  customer's behalf.  Rimini SOF 47 (Reckers Decl. ¶¶ 16, 23 & Ex. 15 (Oracle's First Amended

21  Response to Rimini's Interrogatory No. 26) at 8-9, Ex. 22 (ORCLRS0518901)); Rimini SOF 48;

22  Rimini SOF 49 (Reckers Decl. ¶¶ 16, 23 & Ex. 15 (Oracle's First Amended Response to Rimini's

23  Interrogatory No. 26) at 8-9, Ex. 22 (ORCLRS0518901)).  As one Oracle employee commented in

24

25

26

27                                         Given these facts, Oracle cannot credibly claim to be surprised

28                                                  28

that Rimini was using the _installation_ media to _install_ the software to support licensees in accordance with Oracle's own technical recommendations.

Finally, there is no evidence of deception or deceit by Rimini. Rimini's shipping requests clearly informed Oracle that the media was to be maintained "offsite", i.e. off the customer's premises. Hann Decl. ¶ 30 & Dkt. 249, Plt. Ex. 45 (Oracle Depo. Ex. 33) at 9-10. Significantly, Oracle's "dishonesty" allegations rely heavily on the deposition testimony of J.R. Corpuz. Plt. Br. at 29. However, Oracle fails to inform the Court that Mr. Corpuz is a junior-level employee who repeatedly explained during his deposition that he did not know details of Rimini's technical operations. Dkt. 240, Hann Decl. ¶ 28 & Dkt. 249, Ex. 43 (Corpuz Depo.) at 10:17-11:11. Because he did not know the details of Rimini's operations, Mr. Corpuz testified that he lacked the knowledge necessary to give a definitive answer about the accuracy of the requests. _Id._ (Corpuz Depo.) at 160:5-161:3. This employee's lack of knowledge is not evidence of deception and cannot change the fact that Oracle knowingly shipped hundreds of copies of its software to Rimini.

###### C.   The Implied License Reaches the Full Scope of Rimini's Activities.

Oracle is also wrong to suggest that the implied license is not broad enough to cover the scope of conduct addressed by Oracle's motion. As previously discussed, the evidence establishes that Oracle long knew who Rimini was and that Rimini was supporting Oracle-licensed customers. Rimini SOF 48 (███████████████████████████████); Rimini SOF 49 (Reckers Decl. ¶¶ 16, 23 & Ex. 15 (Oracle's First Amended Response to Rimini's Interrogatory No. 26) at 8-9, Ex. 22 (ORCLRS0518901)). ████████████████████ ████████████████████████   Based on such conduct, a reasonable jury could—and should—conclude that Oracle consented to Rimini making a reasonable number of software copies, as necessary to support its customers.

Oracle's consistent shipment of software to Rimini, taken as a whole, indicates Oracle's consent to Rimini maintaining copies of the customer software on its premises and using such copies to support licensed customers. Rimini SOF 7 (citing numerous Oracle technical documents; Hilliard Decl. ¶ 11); Rimini SOF 48 (████████████████████████████████████);

---

1   Rimini SOF 49 (Reckers Decl. ¶¶ 16, 23 & Ex. 15 (Oracle's First Amended Response to Rimini's

2   Interrogatory No. 26) at 8-9, Ex. 22 (ORCLRS0518901)).   This is not a matter of Rimini using

3   Oracle's software for any purpose it wished, as Oracle argues.   *See* Plt. Br. at 30.   Instead, the

4   evidence demonstrates that Rimini limited its use of the software to support its licensed clients in a

5   manner consistent with the accepted practices in the industry.   Rimini SOF 50 (Hilliard Decl. ¶¶ 12-

6   15, Rimini SOF 7, 19, 25, 27, 37, 38).   Such constrained use of the software reasonably falls within

7   the scope of the implied license arising from Oracle's conduct.   Based on Oracle's conduct, it can be

8   properly inferred that Oracle consented to Rimini's use of the software in a reasonable manner to

9   support its customers.   *See Field*, 412 F. Supp. 2d at 1116.

10           **D.   Material Issues of Fact Remain.**

11           Ultimately, there are at least genuine issues of material fact regarding Rimini's implied

12   license and consent defenses.   Indeed, "[w]hether the licensor intended to grant an implied license 'is

13   a question of fact that must be left to the jury.'"   *Netbula*, 2009 U.S. Dist. LEXIS 58690, at *16.   In

14   *Netbula*, for example, the plaintiff sent CDs containing updated versions of its software to Chordiant

15   Inc., an unlicensed company.   *Id.* at *5, *16–17.   Denying a motion for summary judgment, the court

16   noted ambiguities created by the parties' interactions and found "that genuine issues of material fact

17   remain as to whether Chordiant Inc. possessed an implied license to use Plaintiffs' Software."   *Id.* at

18   18.   Like in *Netbula*, Oracle's knowledge and conduct regarding the delivery of software to Rimini,

19   at a minimum, creates genuine issues of material fact as to whether Rimini possesses an implied

20   license to Oracle's software, as well as the scope of such an implied license.   *See id.*   Such

21   "question[s] of fact [ ] must be left to the jury."   *Id.* at *16.

22   **VI.   CONCLUSION**

23           For the foregoing reasons, Rimini respectfully requests that this Court deny Oracle's Motion

24   for Partial Summary Judgment.

25

26

27

28                                                            30

DATED:  April 27, 2012

SHOOK, HARDY & BACON LLP

By:   */s/Robert H. Reckers*
      Robert H. Reckers, Esq

*Attorneys for Defendants*
*Rimini Street, Inc. and Seth Ravin*

31