1

```
1                   UNITED STATES DISTRICT COURT
                         DISTRICT OF NEVADA
2              BEFORE THE HONORABLE PEGGY A. LEEN
                     U.S. MAGISTRATE JUDGE
3
   ORACLE USA, INC., a              :
4  Colorado corporation;           :
   ORACLE AMERICA, INC., a         :
5  Delaware corporation; and       : No. 2:10-cv-0106-LRH-PAL
   ORACLE INTERNATIONAL            :
6  CORPORATION, a California       : July 17, 2012
   corporation,                    :
7                                  : Las Vegas, Nevada
            Plaintiffs,            :
8                                  :
         vs.                       :
9                                  :
   RIMINI STREET, INC., a          :
10 Nevada corporation; and         :
   SETH RAVIN, an individual,      :
11                                 :
            Defendants.            :
12 _____    :
```

13                 TRANSCRIPT OF MOTION HEARING

14
   APPEARANCES:
15
   For the Plaintiffs:       KIERAN P. RIGGENBERG
16                           RICHARD POCKER
                             DARIEN MEYER
17                           JAMES MAROULIS (By Telephone)
                             Attorneys at Law
18
   For the Defendants:       ROBERT H. RECKERS
19                           B. TRENT WEBB
                             W. WEST ALLEN
20                           Attorneys at Law

21 FTR No. 3B/20120717

22       (Transcript produced from digital voice recording;
              transcriber not present at proceedings)
23
   Transcribed by:           Donna Davidson, RDR, CRR, CCR 318
24                           Certified Realtime Reporter
                             400 South Virginia Street
25                           Reno, Nevada  89501
                             (775) 329-0132

                                                              2

1              LAS VEGAS, NEVADA, JULY 17, 2012, 1:46 P.M.

2                           --oOo--

3                    P R O C E E D I N G S

4

5              THE COURT:  Good afternoon.  Please be seated.

6              THE CLERK:  Your Honor, we are now calling the

7    motion hearing in the matter of Oracle USA, Inc., versus

8    Rimini Street, Inc.

9              The case number is 2:10-CV-0106-LRH-PAL.

10             Beginning with plaintiffs' counsel, Counsel,

11   please state your names for the record.

12             MR. RINGGENBERG:  Kiernan Ringgenberg from

13   Boies, Schiller & Flexner for the plaintiffs.

14             Also here from Boies, Schiller is Darien Meyer

15   and Richard Pocker.

16             MR. RECKERS:  Good afternoon, Your Honor.  Rob

17   Reckers for the defendants, Shook, Hardy & Bacon.

18             With me is Wes Allen and Trent Webb.

19             THE COURT:  This is --

20             MR. MAROULIS:  And, Your Honor, on the telephone

21   is James Maroulis from Oracle for plaintiffs.

22             THE COURT:  All right.  This is set for hearing

23   on the motion for an adverse inference and other evidentiary

24   sanctions for spoliation.

25             I have read the moving and responsive papers.

3

1    But this is your time for oral argument.

2              I'll hear from Oracle, the movant, at this

3    time.

4              MR. RINGGENBERG:  Thank you, Your Honor.  We

5    have put together -- tried to address what we think is the

6    key issue.  Four pages of demonstratives that, with Your

7    Honor's indulgence, I would like to hand up.  Would that be

8    okay?

9              What we know and what's undisputed is that in

10   January of 2010 Rimini Street anticipated this litigation.

11   And at that time, two fairly senior employees took it upon

12   themselves to delete a central repository of software.

13             THE COURT:  Ms. Williams and Mr. Chiu?

14             MR. RINGGENBERG:  That's correct.  And that that

15   material is relevant.

16             Those three facts are not disputed.  And those

17   make out spoliation.  The question is what do we do about it.

18   What's the remedy?

19             And there's two types of information that the

20   library created that we no longer have access to.  One is

21   its contents; that is, what software was there.  And the

22   second is the metadata, which showed -- according to a

23   declaration that Rimini submitted, at the very least,

24   would show the dates on which particular files were copied

25   into the library and the last access date, meaning the

4

1   date which the file was last copied out of the library

2   into another location.

3              And those pieces of metadata would be

4   extremely important to addressing some disputed facts.

5   And it's for that reason that the stipulation that Rimini

6   proposes is insufficient to address the prejudice that

7   Oracle would suffer and accordingly why the full remedy

8   that we've asked for --

9              THE COURT:  Well, let me stop you.

10             MR. RINGGENBERG:  -- is appropriate.

11             THE COURT:  It's inadequate with respect to the

12  metadata issue.

13             Is it adequate or inadequate with respect to

14  the contents of the library?

15             MR. RINGGENBERG:  It is sufficient.  The

16  stipulation that they've offered is effectively equivalent to

17  one of the three remedies we've asked for.  And so to that

18  degree, that is -- what software was in the library, that

19  question -- well, there's no disagreement that, you know, if

20  they stipulate to those facts, they've addressed that point.

21             Now --

22             THE COURT:  All right.  That's what --

23             MR. RINGGENBERG:  -- the contents --

24             THE COURT:  -- I understand.  I just wanted to

25  make sure that we're on the --

5

1          MR. RINGGENBERG:  Right.

2          THE COURT:  Where we're on the same page and

3    where we're still in dispute.

4          MR. RINGGENBERG:  Sure.  The only reason I would

5    depart from answering just with a straightforward yes to your

6    question, Your Honor, is that the contents of the library

7    plus the metadata could be useful to answering some of the

8    questions.  And so the stipulation doesn't solve that

9    problem.

10          And that's what I want to talk about.  Because I

11   think that's where this -- why this motion is really clear at

12   the end of the day.

13          So there's three things that we could learn

14   from the material that's been deleted that is in dispute.

15   And let me give you one clear example.

16          There is a question as to whether between June

17   and September of 2006 Rimini Street downloaded material

18   from Oracle's website, the PeopleSoft software, before

19   Rimini Street had a PeopleSoft customer.

20          There's contemporaneous evidence that senior

21   Rimini executives planned to do this and that they began

22   to implement their plans.

23          THE COURT:  All right.  Because you have the

24   e-mail chains, the lock -- to open the buffet, and they

25   didn't password protect it, and so it's free to download?

6

1              MR. RINGGENBERG:  Right.

2              THE COURT:  Right.  And so how is that

3     significant in terms of what it is you have to prove in this

4     case?

5              MR. RINGGENBERG:  Their central defense, Your

6     Honor, is that the copies that they made were covered by

7     customer licenses; that is, they were acting on behalf of the

8     customer.

9              If they downloaded the software before they had

10    a customer for that product, it couldn't possibly be

11    licensed.

12             So their witnesses have disputed whether they

13    actually did what the e-mail suggested they did.  Fair

14    enough.  The jury will have to resolve that question --

15             THE COURT:  Okay.  But carry out that line of

16    logic through its conclusion.

17             MR. RINGGENBERG:  So --

18             THE COURT:  If we assume that they downloaded

19    before they had customer number one, what does that mean in

20    terms of your ability to recover in this case?

21             MR. RINGGENBERG:  It means that their primary

22    defense does not apply.  I mean, that is -- we will prove at

23    trial -- we intend to prove at trial that in June of 2006 --

24             THE COURT:  Well, or does it mean -- and this is

25    where I'm going.  Does it mean that the conduct between June

7

1   '06 and September '06, before they had customer number one,

2   was indefensible, but they may still have a logical argument

3   or a legal argument that is for the court and the jury to

4   decide with respect to any conduct occurring after that?

5              MR. RINGGENBERG:  That's correct, Your Honor.

6              THE COURT:  Okay.

7              MR. RINGGENBERG:  And so they downloaded

8   software that a customer would--

9              THE COURT:  I mean --

10             MR. RINGGENBERG:  -- pay tens or--

11             THE COURT:  -- you're not claiming --

12             MR. RINGGENBERG:  -- hundreds of thousands of

13  dollars for a license for without any plausible customer

14  license.

15             THE COURT:  All right.  But you're talking about

16  a window of time in which they had no defense.  You're not

17  talking about the fact that they may have done this during

18  any discreet period of time, erasing a defense for all

19  purposes for the entire case?

20             MR. RINGGENBERG:  That's correct.

21             THE COURT:  All right.

22             MR. RINGGENBERG:  And we have not asked for a

23  default judgment or to strike their license defense --

24             THE COURT:  No, no --

25             MR. RINGGENBERG:  -- in entirety.

8

1       THE COURT:  I just want to make sure that I

2  understand you.

3       MR. RINGGENBERG:  No.  That's exactly right,

4  Your Honor.

5       So the first slide that I've handed up, it

6  tends to show this point; that is that Rimini's -- the

7  thrust of Rimini's opposition is they say, well, all you

8  know is some dates, you know, the creation date and the

9  last access date.  It doesn't tell you what it's for, who

10  it's for.

11       And by itself, it doesn't.  But you can

12  corroborate it with other evidence and, with that other

13  evidence, learn important facts.  And so this is one case

14  in point, which is there is a dispute.  When do they start

15  downloading?

16       Well, if the metadata existed, you could look

17  at the file and see when was that placed in a library?  If

18  it was placed in that library in June '06, clearly their

19  witnesses are testifying falsely and the e-mails are

20  correct.

21       And it's possible the metadata would show they

22  actually downloaded as consistent with the CEO's

23  testimony.  But we'll never know the answer to that

24  question.  It's not speculation to suggest this evidence

25  could support this.

1          And to the contrary, the Ninth Circuit law

2    clearly says if a litigant is on notice that information

3    is relevant and they don't preserve it, the appropriate

4    inference is it would support the other side.  And that's

5    exactly what we've asked.

6          THE COURT:  If it was willfully destroyed or

7    deleted?

8          MR. RINGGENBERG:  Correct.  And I don't think

9    there's any dispute about that here, with the definition of

10   willful meaning with knowledge that it's potentially

11   relevant.

12         THE COURT:  Meaning it was done by purpose, and

13   not by mistake or accident?

14         MR. RINGGENBERG:  That's right.  And at a time

15   when --

16         THE COURT:  And so if it's willful, then there's

17   a presumption that it would be helpful.

18         MR. RINGGENBERG:  That's right.  If it's -- if

19   it's willful and relevant --

20         THE COURT:  And relevant.

21         MR. RINGGENBERG:  And here --

22         THE COURT:  And they're on notice.

23         MR. RINGGENBERG:  -- willfulness and relevance

24   are conceded, Your Honor.

25         So the only question is, you know, what's the

1  right outcome.  And here, I think on this point, it's very

2  clear.

3           So this point about when the downloading began

4  is not trivial at all.  And this evidence is extremely

5  powerful and will be to the jury.

6           And if they can say, yeah, well, I know the

7  e-mails said that, but we never really did it, we'll be

8  prevented at trial from showing that their CEO is

9  dishonest in saying that.

10           And the remedy would partially address that,

11  by telling the jury they can infer from the deletion

12  that --

13           THE COURT:  Okay.  But how does -- if you have

14  the ability to adduce evidence of this spoliating conduct,

15  coupled with what the e-mail says, how doesn't that put you

16  in the same seat, as it were, as a judicial instruction

17  that's saying -- that's saying -- that's saying what the

18  cases call a bad act or instruction?

19           MR. RINGGENBERG:  I -- I'm not sure I understand

20  Your Honor's question.  That is if we just presented to the

21  jury the deletion --

22           THE COURT:  You have the --

23           MR. RINGGENBERG:  -- and allowed them to draw

24  their own inference from it?

25           THE COURT:  Correct.  You have evidence of the

1  spoliating conduct.  You have evidence of -- in the records

2  that have been produced, that show what you think happened.

3  And you -- by contrast, you have the testimony which doesn't

4  own up to the documents and the e-mail exchanges that have

5  been produced in the way that you think Rimini should.

6          How doesn't that put you in the same position in

7  terms of creating the impression before the jury without the

8  Court's *imprimatur* on it?

9          Because I'm looking at what's the fair thing

10  to do in the overall scheme of things.

11          MR. RINGGENBERG:  I understand, Your Honor.  And

12  I think we could try to let the jury sort it all out.  But

13  the Ninth Circuit guidance is that an adverse inference

14  instruction serves two purposes; one of which is to

15  ameliorate the prejudice to the complaining party, and the

16  other --

17          THE COURT:  And that's where I'm going, is if

18  you get all this other stuff in, doesn't that ameliorate the

19  prejudice?  And you're going to put it in anyway; right?

20          MR. RINGGENBERG:  Presumably.  To the extent the

21  Court allows.

22          Now, I could see a ruling that says we're not

23  going to have a side show about this.  Now, I think that

24  would not be the correct ruling in this case, but the trial

25  judge might well --

12

1          THE COURT:  No, but that's --

2          MR. RINGGENBERG:  -- make that decision.

3          THE COURT:  -- one of the sanctions that I have

4   available.  That's one of the arrows in my quiver and one

5   that the *Zubulake* court, for example, has adopted from time

6   to time as something that -- and it is collateral in a sense.

7   But, on the other hand, you're arguing this to show

8   willfulness and to show that the testimony of the deponents

9   is not worthy of belief, so that there's also -- it's not

10  strictly a collateral issue in this case.

11          MR. RINGGENBERG:  I agree.  I mean, certainly we

12  think this is relevant, the fact of the deletion and the

13  history is relevant to our -- there's no question about that.

14          I would not want to be whipsawed in that, to

15  have Your Honor rule that we don't need an adverse inference

16  instruction.  Because you can tell the jury and then have --

17          THE COURT:  And then have the trial judge say

18  not so fast.

19          MR. RINGGENBERG:  Exactly.  So -- and that is a

20  concern.  So let me address it another -- so that the first

21  purpose of an adverse inference instruction is to address

22  prejudice suffered by the complaining party.

23          The second is as a deterrent.  And here we

24  have a clear breach of illegal duty conceded.  And it's

25  appropriate to -- in evaluating what the right outcome of

13

1    it is, to consider what the impact of the future party

2    will be.

3              I don't disagree with Rimini that an

4    instruction will be prejudicial to them in the sense of

5    the jury will be actually instructed that they did

6    something wrong.  But that's not unfair prejudice.  That's

7    truth.  It's accurate.  And it's what the law requires.

8              It's true that some cases outside the circuit

9    have looked more askance at an adverse inference

10   instruction.

11             But under the Ninth Circuit authority in the

12   *BIC* case, for example, it's very clear that if you

13   establish willful destruction of relevant evidence,

14   adverse inference is appropriate.  It --

15             THE COURT:  At a time when the adverse party is

16   on notice?

17             MR. RINGGENBERG:  Correct.  And all those things

18   are met here.

19             And so the -- so I think the deterrent value

20   alone is reason enough to choose an instruction over

21   letting the jury sort it out.

22             Let me offer you another practical reason,

23   which is this is going to be a fairly complex trial in any

24   event, because the technology is complicated, the conduct

25   is complicated, you have a lot of experts to talk about

14

1    the various versions of software and downloading and --

2    there's a lot for the jury to get through.

3            To add on top of that a question about what

4    was deleted and what would have been there I think is

5    going to expand the trial and might be the straw that

6    broke the camel's back, or might be a bridge too far to

7    keep this thing manageable.  At least it would make it

8    less manageable than it otherwise would be.

9            It's certainly within --

10           THE COURT:  Well, which is why I started off,

11   because aren't you really going to try to pound this into the

12   jury, is that they -- in cross-examining their key witnesses

13   that are involved in this whole dispute, that you deleted the

14   evidence that would be used to support your position or --

15   and so why should we believe you, that you did this or you

16   did not do this?

17           MR. RINGGENBERG:  I certainly cannot rule out

18   the possibility that if they testified that they didn't do

19   something and there's evidence that they did, we would use

20   that, including the deletion.  I certainly think that's

21   relevant.

22           THE COURT:  And you're not going to bring out

23   the four times in the pleadings on file in this court that

24   they denied the existence of the software library at all,

25   said it never existed?

15

1          MR. RINGGENBERG:  I -- I think that the jury

2    probably ought to hear about that.

3          THE COURT:  Right.

4          MR. RINGGENBERG:  So -- but let me say -- let me

5    give you this specific example of the 75 or so copies, the 75

6    environments.

7          THE COURT:  And that's down from 143 that you

8    talked about in the initial motion.

9          MR. RINGGENBERG:  That's right.

10          THE COURT:  And the reason you -- because you

11    acknowledge that some of those are impossibilities, you'd be

12    asking me for an instruction that you knew was false?

13          MR. RINGGENBERG:  I would say -- we hadn't put

14    two and two together.  If I had seen -- it was an error on

15    our part not to put two and two together and to do that.

16          In our defense, Your Honor, the presumption we

17    asked for is rebuttable, so they could certainly explain

18    to the jury why it -- why we were wrong and why, in fact,

19    those copies were made.  And there would be no --

20    honestly, that might be a better trial strategy for them.

21          And so in cutting down our claim, I think we

22    may have made it stronger.  And so I apologize to the

23    Court for not catching that, which now -- which I did not

24    do.  I mean, certainly we want to be --

25          THE COURT:  No, but it means you didn't mean to

16

1   request the relief that you actually requested in your

2   initial motion?

3          MR. RINGGENBERG:  We asked for relief that we

4   thought was appropriate and been shown that some of the --

5   some of the copies were not -- there was evidence that some

6   of the copies couldn't have been the result, we were happy to

7   meet them in the middle and say, okay, we'll keep it to those

8   that there's no dispute about.

9          We may have claims that some of those other

10  environments were actually created from the library,

11  either a prior time or in a way that is contrary to the

12  representations they've made.  And I'm not going to give

13  up that claim at trial.  But today we're not attempting to

14  do that.  So it is limited to that 75 or so.

15         So that's a fairly complicated question.  And

16  let me try to explain quickly why that inference is

17  appropriate.  And I think it will also help explain why it

18  is -- it's helpful for the Court to resolve this now

19  rather than just let the jury sort it out.

20         So the second slide shows that -- correlations

21  between two sets of dates, okay.  The first set of dates

22  is the dates when customers are onboard.  That means the

23  dates when the customers first came on to Rimini Street.

24         And so the general process, according to the

25  deposition testimony, is when they show up, we get copies

17

1    of their CDs, and if the material is not in the library,

2    we load them into the library.

3              So if you know that a particular piece of

4    software was loaded on a day in 2007, and you know that

5    that was the time that a customer was coming onboard who

6    had that same version of software, there's a very strong

7    inference that that's where the software came from, by

8    correlating those two dates.

9              We don't know that the red dots are still in

10   the record because we can establish, through

11   contemporaneous evidence, when customers came onboard to

12   Rimini Street.  But we will not know and cannot know the

13   creation date metadata because it's been destroyed.  So we

14   can't do that correlation.

15             Rimini Street claims to be unable to identify

16   the source of software for these 75 environments.  And

17   there's some spotty evidence about it that we could use at

18   trial, but it's hardly complete.  So that's step one,

19   where did the software come from.

20             The next step is where did the software go to?

21   So the next slide is -- the other piece of metadata, this

22   material which they've conceded, is access date.  That

23   means the last time the software was copied.

24             THE COURT:  Right.  And you don't have a dispute

25   anymore.  It's not going to show every time it was accessed.

18

1   It is going to show the last access date.

2              MR. RINGGENBERG:  That's right.  And so -- and

3   let me show you how we can -- what we can prove with that.

4   And that's -- is it indefeatable proof?  No, but it's

5   relevant evidence that we could present at trial that we no

6   longer have.

7              If you have a series of environments that are

8   created from 2006, 2009, and you have an access date that

9   matches one of those environments -- so, for example, if

10  you know an environment was built in July of 2008 and you

11  know that there's a -- for a particular version of

12  PeopleSoft, and there's software in the library, the same

13  version, and it has an access date that matches the

14  creation date, it's a reasonable inference, it's pretty

15  good evidence that when they built that environment they

16  copied that software.  That's what their process was.

17             So we could prove that at trial.  We're

18  lacking that proof.  And we've been prejudiced in that

19  regard.

20             So the last step is to put all those things

21  together.  And that's slide four.  So if you know where

22  software came from by correlating the dates, software in

23  the library, creation date February 2007, customer came

24  onboard in 2007 with that version, if you could

25  establish -- you have a reasonable basis to establish that

1    the software in the library came from that customer.

2              Then you have three environments built

3    subsequent to that that had the same version of software,

4    the third of which has a matching access date, so that you

5    have a reasonable basis to assume the third of the three

6    was created using that software.  That's pretty good proof

7    that the third was created.  And it's also not bad proof

8    that the preceding two were, as well, because it's

9    consistent with the evidence.

10             So maybe the way to -- the way of an analogy

11   is to say if you can establish a pattern and that

12   something was done three times, and the third one matches

13   up exactly with the conduct we allege is illegal, and

14   attempt to -- you know, have a pending motion for summary

15   judgment on that point, it stands to reason that the

16   preceding two were, as well, because they've testified

17   that was their general practice.

18             So if -- we believe that that is far more than

19   speculation, far more than a fertile imagination as to

20   what the evidence would have proved and why it would have

21   supported Oracle's claims.  And that's more than an

22   adequate basis to award the rebuttable presumption for the

23   75 or so environments that we've requested.

24             And if we were forced to try to explain all

25   that to the jury, it's both a bit of a side show and,

1    arguably, time wasting and would not serve the -- fully,

2    the deterrent value that the Ninth Circuit has recommended

3    of spoliation.

4              So that's why, Your Honor, I respectfully

5    submit that -- that the instruct -- what we regard as

6    modest remedies that we proposed are the right answer in

7    this case.

8              THE COURT:  Thank you, sir.

9              MR. RINGGENBERG:  Thank you.

10             THE COURT:  And who will be addressing the

11   defendant's position?  Mr. Reckers?

12             MR. RECKERS:  Yes, Your Honor.

13             THE COURT:  Yes, sir?

14             MR. RECKERS:  There are two categories of

15   allegations that Oracle raises in its briefing.

16             The first category they've lodged a number of

17   allegations of misconduct and dishonesty against a whole

18   host of Rimini personnel.  Counsel didn't address those

19   allegations.

20             I would like to briefly, before the Court,

21   sort of point out some factual matters because I don't

22   want overhanging the decision on this issue determination

23   that Rimini was being dishonest, either its witnesses or

24   its pleadings.

25             Oracle says in their reply brief at page two

1   that Rimini is now claiming for the first time to -- that

2   we made a complete record of these files and that we never

3   explained why these files, this complete record was not

4   produced or identified in the discovery responses.

5            I'd just like to bring to the Court's

6   attention -- this issue has only come before the Court

7   once before, and that was in November at a CMC.  And we

8   have a CMC statement from that hearing.

9            And it says, specifically as to that folder,

10  Rimini specifically documented what it was deleting, and

11  Oracle has these documents.

12           In November, which was right after

13  Ms. Williams' deposition, we did disclose to the Court and

14  to Oracle that we document the contents of this folder.

15  We included the exhibits, the very evidence that we're

16  talking about now, including the record of the files'

17  conduct -- contents, which was included with Oracle's

18  briefing in their initial motion as Exhibit 50, which is

19  an e-mail from October of 2011, where we again -- we

20  identified the contents of this file.

21           So we produced it during discovery.  It was

22  before the [indiscernible] discovery.  We have not changed

23  our position on this.

24           They say a host of our witnesses weren't

25  truthful at their depositions.  I think, by way of

22

1  context, this is one file -- one folder on a file system.

2  Only an isolated number of employees would have been

3  working with it.  The primary employee who worked with

4  this file is Ms. Williams.  And she --

5           THE COURT:  The one who requested the deletion.

6           MR. RECKERS:  She was.  Absolutely.  And at her

7  deposition she testified fully and accurately about the file.

8           I'm not disputing that obviously it was

9  deleted during a time period that Rimini was under a legal

10 obligation to preserve.  It's really a question of whether

11 any of the other witnesses -- or any of the witnesses were

12 dishonest.  She is the witness who was presented.

13           THE COURT:  So what, if any, preservation

14 efforts -- and perhaps you've told me this.  And this has

15 been a very long case, and I've heard many, many hearings in

16 this case.  So forgive me if I don't remember the details.

17 But what, if any, preservation holds were in place at the

18 time Ms. Williams deleted these materials?

19           MR. RECKERS:  There was a hold notice that was

20 issued by Rimini's management to people -- to managers and

21 other employees such as Ms. Williams in May of 2009.  Excuse

22 me one second.

23           So just for the record, document number 91 was

24 a previous declaration that I filed in October 2010.  And

25 it details at page two a hold notice that was issued by

1  Rimini's management that should have covered this, should

2  have covered this file.

3             There wasn't litigation at the time, but it

4  was -- it was anticipated.  And I don't have an

5  explanation as to why this folder was deleted despite the

6  hold notice.

7             I will say it's a -- almost a unique

8  situation, or at least a rare one, where we have e-mails

9  from the people who are doing the deletion, talking about

10  why they are doing the deleting, making a record, the

11  record that we now have, Exhibit 50, of what was in the

12  folder.

13             So, again, I don't need to -- I'm certainly

14  not questioning the fact that they were under a legal

15  obligation.  I would say that it wasn't in bad faith.  It

16  wasn't to secure a litigation advantage.

17             We have their e-mails.  We can judge their

18  state of mind based on those e-mails.  And of course, you

19  know, we all can read them.  None of us were there.  It

20  seems to me that it's very plausible for them to

21  suggest --

22             THE COURT:  Was there anything else that was

23  deleted from your computer system at or near the time that

24  this -- these folders were deleted, or this folder containing

25  the subfolders?

24

1          MR. RECKERS:  We don't believe so.  As part of

2    the preservation effort certain files were locked down and

3    prevented from being deleted.  And the best I can say is that

4    this file sort of slipped through the cracks, if you will.

5    Because not many people, I don't believe, knew about it.  And

6    so it wasn't locked down in a way.

7          So we have a ton of evidence, you know, over

8    six million pages and a hundred thousand files that were

9    preserved, and they've been produced in this case.  This

10   folder, notwithstanding the preservation efforts,

11   notwithstanding the --

12          THE COURT:  Which leads to the question, why was

13   it so important to delete this or, you know, the --

14   particularly the legitimate reason for it was that you needed

15   to free up some space.  How much space are we talking about?

16   And since you had locked down whole categories of zillions of

17   documents -- obviously I'm being -- engaging in hyperbole

18   there.  But why is it that just this gets destroyed?

19          MR. RECKERS:  Your Honor, I really can't answer

20   that.  But I will say the things that were locked down

21   generally were things that were being used.  The real

22   difference with this particular file was it wasn't being used

23   anymore.

24          It was obsolete.  It was a file -- for example,

25   one of the things that was locked down were the silos of the

1   customer-specific downloads.  Rimini employed, as part of the

2   preservation effort in 2009, a mechanism so nothing could get

3   deleted out of those.

4          And those are active files that people were

5   accessing on a regular basis.  This is part of operations.

6   The main difference between those files that were locked

7   down in this particular folder was use.  No one was using

8   this folder anymore.  It had become antiquated based on

9   changes in Rimini's procedures.

10          Again, I mean, really the only thing I can

11  point to is the evidence that was made at the time.  They

12  made a record of --

13          THE COURT:  They weren't trying to hide it --

14          MR. RECKERS:  Well, yeah, if --

15          THE COURT:  -- is what you're saying?

16          MR. RECKERS:  -- they were trying to hide it, I

17  don't -- I don't think they would have made -- taken a

18  screenshot of what it was that they were deleting.  And we

19  can tell clearly what it was.

20          Oracle claims prejudice.  They put in their

21  motion, you know, how it corresponds to the registered

22  works, how the files correspond to the registered works.

23  And it's consistent with the testimony.

24          And that's what the proposed stipulation

25  shows, hey, look, these are the files that were deleted.

26

1  These are the register -- these are the software.  We'll

2  stipulate to it.

3              Rimini has stipulated to hundreds of copies of

4  Oracle's software --

5              THE COURT:  Well, you've offered to stipulate.

6  They haven't offered to accept it.  Nor has the Court

7  endorsed your stipulation in the form of an order.

8              MR. RECKERS:  Yes, Your Honor.  Yes, Your Honor.

9              We've offered to stipulate as we have -- as

10  we've admitted in the request for admissions to hundreds

11  of other copies.

12              So the question of what Rimini has copied is

13  something that I think we have a record in this case of

14  being open to a stipulation or admissions to.

15              Yeah, I don't think it makes any sense for us

16  to admit to all these other copies but for some reason

17  want to delete this one set of Oracle material under the

18  system.

19              If I could, I wanted to address the

20  allegations regarding Rimini's answer.  Rimini, in their

21  answer, responds as specific denial regarding library.

22              And as answers go, we are obviously -- Rimini

23  is obviously responding to a specific allegation in

24  Oracle's complaint.  It's an allegation -- the allegation

25  that they're responding to is from paragraph 50 of

27

1   Oracle's complaint.  And that is an allegation directed to

2   downloaded support material.

3           And that's key because Rimini -- it's true.

4   Rimini does not have a library of downloaded support

5   material as described in paragraph 50 of Oracle's

6   complaint.  What we're talking about here is installation

7   media.  So Oracle distributes installation media different

8   than the support material.  It's licensed differently.  We

9   have different defenses.

10          So it's true that Rimini denied, and correctly

11  so, the allegations in paragraph 50 regarding a library of

12  support material.

13          And we have the dispute as to what the import

14  of Rimini's in store of installation media is.  And

15  there's going to be different defenses.  And I think

16  we'll -- it will be addressed on the merits differently.

17  But I didn't want to leave it --

18          THE COURT:  And your point was you don't believe

19  that you have misrepresented the nonexistence of the library

20  because it wasn't adequately defined in the pleadings as such

21  that you had to admit it?

22          MR. RECKERS:  I wouldn't quite say it that way.

23  I would say that the allegation that we were denying as to

24  the library was to the support downloads.

25          The complaint -- I'm sure it's been a long time

1    since Your Honor looked at the complaint, but it has a -- it

2    has some very specific allegations about download being

3    support material from your -- from Oracle's website with

4    automated crawlers and other types of alleged improper tools.

5           What we were denying in that specific denial

6    at issue was using the website and whatever tools Rimini

7    had to generate a library of that material.  As Oracle

8    offers on its website, it is basically a knowledge base on

9    Oracle's website.

10          The -- what Oracle is using -- the term I

11   bring up in a much broader way, in trying to use our

12   denial as to a specific allegation in the complaint at

13   paragraph 50, to say that we didn't have any non-client

14   specific folders on Rimini's system.  And that's never

15   been our position in litigation.

16          In fact, in Rimini's responses to

17   interrogatories, number 24 and number 25, we list out

18   eight different folders which had Oracle support material

19   that was not stored in client-specific ways.  So we, in

20   the course of discovery, have disclosed where we had

21   files, where we had Oracle sworn material, in non-client

22   passage places.

23          In the case of this particular folder, it was

24   installation media, which is different than what we were

25   denying in the answer.

1        So I don't want to leave the Court with the

2    misimpression that the answer was misleading or that we

3    were denying anything that could be called a library in

4    general.  That's not their intention.

5        We'll get into, I think, at trial or in the

6    merits what a library is.  So that term, I think, may not

7    be best to describe this file store.  But I don't think we

8    need to get into that today.

9        And those are really -- I mean, those are the

10    key, I think, allegations of misconduct.  The failure to

11    disclose in discovery, which I think I've shown in the

12    case management conference statement from November, We did

13    disclose this.  We addressed the answer and addressed the

14    witness testimony.

15        So now we get to the merits of the request for

16    sanctions.  We -- I think where we are is that we have two

17    types of metadata that we are left with, the date created

18    and the date last accessed metadata.  And from an

19    evidentiary standpoint, what did we do to deal with their

20    deletion?

21        So let me break it down.  Let me start with

22    the date created.  It's true that there are some e-mails

23    in this case that suggest that there might have been

24    downloads, at least contemplation of downloads, before the

25    first PeopleSoft customer.  This is -- these are downloads

1   that were done perhaps in mid 2006, where the first

2   PeopleSoft customer didn't come on until the fall of 2006.

3            And here's the problem with Oracle's theory,

4   however.  For their spoliation theory to be true, they

5   have to assume -- it has to be true that not only were

6   those files downloaded, which there's no direct evidence

7   of, but that they were put, out of the thousands of

8   folders on Rimini's system, into this one folder, where

9   they remained with the same metadata for years and years

10  until being deleted in 2010.

11           Now, I would suggest to you that that is

12  highly speculative.  These files, if they were even

13  downloaded, could have been put anywhere.  They could have

14  been deleted far before the litigation was contemplated.

15  Again, this would have been in '06.

16           So for them to advance what I would suggest is

17  a theory of relevance based on pure speculation -- courts

18  in this district and circuit and throughout the country

19  have rejected such basis of a sanction on -- based on such

20  speculation.

21           Really what we have here is they have the

22  evidence.  They have -- they have the e-mails.  And they

23  are free to cross-examine the witnesses and ask them if

24  they downloaded those files.

25           They have the evidence of the deletion.  It is

31

1    something that Ms. Williams testified to.  They have that

2    evidence.  They can, at trial, present their case as to

3    whether or not there were early 2006 downloads of

4    PeopleSoft support material.

5             Second, the -- the second category of

6    information that they assert could be relevant in this

7    case, it is the date last accessed.  Now, I think it's

8    important to notice, it's not date last copied.  You don't

9    know whether or not there's actual copying done on a

10   certain date.  You just know that it was accessed.

11            So it could have been accessed for any purpose

12   other than -- I mean, it does not necessarily need to be

13   accessed for purposes of copying the software to, for

14   example, create the environment.  So where does that

15   leave --

16            THE COURT:  Of course.  But whatever reason --

17   what other reason would there be?

18            MR. RECKERS:  Well, you could access --

19            THE COURT:  Why -- I mean, why do you just want

20   to go in and look at an old library copy of something?

21            MR. RECKERS:  Well, you know, typically you

22   would save your installation CD if you have to do a

23   reinstall.  So, for example, if they have an existing

24   environment that needs to be reinstalled, they could go in

25   and reinstall the environment from that installation media.

1          At the same time, they might be building --

2     rebuilding -- or building a new environment.  You don't

3     know which of the two is being -- it's being accessed for.

4     You could be -- they could be going through and looking to

5     see what they have in inventory.

6          I think really if you look at Oracle's

7     counsel's charts, they -- they could be helpful.  But what

8     you have to imagine is, instead of having five customers

9     that are coming onboard, being onboard in 2007, 2008, you

10    actually had hundreds.  And so instead of A, B, C, D, E,

11    and F, you would have one through 200.  And you wouldn't

12    just have dates.  You would have ranges.  It took weeks

13    and weeks to onboard.

14          So you would have all of these overlapping

15    dates on the lines.  And how would those correlate to

16    creation dates or even dates of use?  You would just have

17    a huge range of potential environments that a piece of

18    software could have been accessed in connection with.

19          You really wouldn't know what it was being

20    accessed for, who it was being accessed for.  Even if you

21    had dates that you could try to match up, there would be

22    too many different variables and too many different

23    options.

24          It would be, I would suggest, highly marginal,

25    very marginal correlation that would not truly

1   prejudice -- even if we had this information, Oracle would

2   not be prejudiced by it.  It is not prejudiced by the lack

3   of such data, given the fact that these are the

4   on-boarding ranges, and these are dates of last access,

5   not dates of last use.  We don't know, and we couldn't

6   know, what actually they're referring -- what these access

7   dates were actually referring to.

8           So, again, it's a matter of using these

9   examples.  We added -- we added a large number of

10  additional customers.  We took the build dates and

11  stretched out the time period.  Some of these builds took

12  months.  And we simply are left with the question of what

13  does that correlation mean?  I would submit that it would

14  have very low relevance and be -- its probative value

15  would be minimum.

16          Given such, I would submit that Oracle is not

17  prejudiced by the lack of these two pieces of metadata.

18  The case can be tried squarely on the basis of the

19  evidence that Rimini has produced and did preserve.

20          And unless the Court has any questions, I

21  request that Oracle's motion be denied.

22          THE COURT:  Will you acknowledge that as the

23  term is defined in the Ninth Circuit, the destruction of the

24  file was willful?

25          MR. RECKERS:  Yes, Your Honor.

34

1          THE COURT:  And isn't the law in the Ninth

2   Circuit that a willful spoliation creates a presumption that

3   deleted evidence would have supported the adverse party's

4   claims?

5          MR. RECKERS:  I think, Your Honor, that what we

6   have --

7          THE COURT:  The question, isn't that the law in

8   the Ninth Circuit?

9          MR. RECKERS:  I believe so.

10          THE COURT:  All right.  And so then the question

11   is, what's the appropriate sanction?

12          MR. RECKERS:  Yes, Your Honor.

13          And I believe that I have the burden to prove

14   lack of prejudice, which we have attempted to do in our

15   motion.  Lack of prejudice beyond the stipulation that

16   we've proposed.

17          THE COURT:  And what about the deterrent effect

18   of deterring parties spoliating evidence when they are on

19   notice of potential litigation?

20          In this case it's not even close because you

21   had a litigation hold.  You were advising your investors

22   that you were about to be sued or that -- and you were

23   giving Oracle notice that you thought what they were doing

24   was anti-trust violation.  And you knew exactly what their

25   claim was about cross-use at the time this information was

35

1    destroyed.

2              MR. RECKERS:  Yes, Your Honor.  And I'm not

3    disputing anything that you said.  I think there's a question

4    as to bad faith and whether or not these individuals deleted

5    this file --

6              THE COURT:  The Ninth Circuit doesn't require

7    bad faith for --

8              MR. RECKERS:  And they --

9              THE COURT:  -- an adverse for inference

10   instruction.

11             MR. RECKERS:  I don't --

12             THE COURT:  But it's a factor to take into

13   account in determining on the continual of sanctions that the

14   Court has authority to impose what's the fair thing to do.

15             MR. RECKERS:  Exactly.  And that's my only

16   point.  When you start talking about the deterrent effect and

17   punitive measures, I think that is where the intention of the

18   actors comes into play.

19             I think that's where it would spot in here, you

20   know, how much do you weigh the deterrent effect in this

21   particular instance when you have, you know -- again, I

22   wasn't there.  We have e-mails from the time period where

23   they're making records and they're discussing it.

24             We can -- and the Court is obviously in a

25   position to read those and to discern to the best you can,

36

1  you know, what their intent was in how -- how you will -- how

2  you will factor in their state of mind.

3          THE COURT:  So much was put at risk.  If I'm to

4  believe you, that this was just an obsolete little file, we

5  needed the space -- so much is put at risk for so little if

6  I'm supposed to believe what your clients have to say about

7  why this was deleted.

8          MR. RECKERS:  Your Honor, I mean, I agree with

9  you.  But, I mean, again, all I can --

10          THE COURT:  And I'm not throwing barbs in your

11  direction because I'm quite positive you're not the one that

12  counseled this conduct.

13          MR. RECKERS:  That's true as well.

14          But, again, I look to the records, and I -- I

15  can't say that I believe these people were --

16          THE COURT:  Sometimes, somewhere --

17          MR. RECKERS:  -- being dishonest.

18          THE COURT:  -- people have to get it.  The Court

19  means what it says when if you know you're going to be sued

20  or there's a reasonable likelihood you're going to be sued,

21  you have to keep the stuff, even though it's inconvenient.

22  You can't go on as business as usual.  People have to

23  understand that message.

24          MR. RECKERS:  I understand.

25          THE COURT:  Companies have to understand that

1    message.  Companies have to listen to their lawyers that, I'm

2    sure, convey that message.

3                MR. RECKERS:  Yes, Your Honor.

4                THE COURT:  Again, this isn't personal to you.

5                And I've cut you off.  Is there anything else

6    you would like to add?

7                MR. RECKERS:  No.  Thank you, Your Honor.

8                THE COURT:  It's your motion.  You get the last

9    word, sir.

10               MR. RINGGENBERG:  There's a lot I could say,

11   Your Honor, but I just want to focus in on two points, unless

12   you have any additional questions, which is, one, the parsing

13   of words to defend what is in their answering counterclaim is

14   artful, but it's not supported.

15               We put before the Court an exhibit in early

16   2007 which a Rimini employee says:  I've just downloaded

17   every version of PeopleSoft 8.8 and put it in the software

18   library.

19               So the idea that what they had, that -- the

20   allegation in the complaint that they downloaded material

21   and put it into a library was not what the conduct is,

22   it's not supportable based on the facts.

23               Second point is that the case for bad faith in

24   here, if you'd like to find it, lies with Dennis Chiu, who

25   cooked up the idea of the software library, wrote e-mails

38

1   describing how it would work, oversaw its implementation,

2   wrote numerous e-mails in which he thanked people for

3   putting material in the library; and then sat at his

4   deposition and said:  I have no recollection of anything

5   like that ever happening.

6           Ms. Williams, I don't want to throw any barbs

7   at her for intentionally testifying falsely.  We have some

8   disagreements with some of the things she said.

9           Mr. Chiu --

10          THE COURT:  She contradicted Mr. Chiu.

11          MR. RINGGENBERG:  She did.  And he said he

12  didn't remember.  But, frankly, Your Honor, we intend to show

13  the jury that he was lying.  And I think it's an entirely

14  fair inference, from his deep involvement in the activity and

15  his complete denial of the existence of the library at his

16  deposition, not it might have existed, I don't remember, but

17  now I don't remember anything like that ever happening.

18          And he was the guy that approved this.  There is

19  a record.  And the record we're talking about, it's a

20  screenshot that Ms. Williams created to tell the IT guy what

21  to delete.  And all it has is folder names.  It's an

22  inference what was in there.

23          But there's no evidence Mr. Chiu knew that

24  would be created or certainly that he suggested it to

25  preserve a record.  As far as the record reveals, that was

39

1 accidental.

2           THE COURT:  No, but it was Ms. Williams who

3 asked for permission to delete it.  So she's the one who is

4 preserving what she's asking to be deleted, which kind of

5 tells you that she's not trying to hide what she wants to

6 delete.

7           MR. RINGGENBERG:  She wasn't.  I think that's a

8 fair inference.

9           But she went to Mr. Chiu, who was her boss, who

10 knew that the library existed, who know the library was

11 illegal.  Because he told customers that and -- which we've

12 documented to the Court.

13           So when he approved it, Your Honor, I think it

14 is a -- not only is it a fair inference, the evidence is

15 overwhelming that he did so, at least in significant part, to

16 cover the tracks of what they were doing, which they knew was

17 illegal.

18           Now, you don't have to find that.  But I think

19 it's -- it would be entirely fair to find that inappropriate

20 to do so and to resolve that issue in support of the

21 sanctions that we've requested.

22           The last point I want to make.  Mr. Reckers

23 argues it's speculative that the downloading in early 2006

24 would have been to this library.

25           Well, the employee, Mr. Chiu, wrote at the

40

1   time, we have a new employee, Ms. Torres [phonetic], and I

2   want her to, quote, download all the PeopleSoft

3   application software that is currently available on the

4   Oracle website which would help with the software library

5   we want to set up, close quote.

6           It is not speculation that the software was

7   downloaded to exactly the location that was deleted, which

8   was the same library that was maintained for this exact

9   purpose for many years.  Contrary to the --

10          THE COURT:  Which means you also have the

11  evidence.

12          MR. RINGGENBERG:  Well, there is a dispute.

13  They say they didn't do it.  We think -- we think the

14  evidence shows they did.  The jury will have to decide that.

15          But if they hadn't deleted this evidence, we

16  would know the answer, or at least it's extremely likely that

17  we would, in a way that they couldn't dispute.

18          If there was a -- if there is creation date

19  metadata in the software library from June or July of

20  2006, we would have them dead to rights.  And they know

21  that.  But we're robbed of that evidence.  And so I think

22  that's clear prejudice in addition to the environment-

23  builds material, which -- which I think is clear enough.

24          The last point Mr. Reckers makes is, well, but

25  there was a lot of customers coming on, and it might get

41

1    sloppy in matching up the dates.  And that's a fair point

2    as far as it goes.

3             But we have to recall there's a lot of

4    different versions of software.  PeopleSoft HR software

5    version 8.8, service pack 1.  And, you know, there's not

6    200 customers that have that same version.  It's a much

7    smaller number.  So when you're trying to match up dates

8    for a particular software version, it's a lot easier.

9             Now, could we say -- can I stand here and say

10   we know with certainty what was created by what?  No, I

11   don't know that.  But what I do know is it would be

12   relevant evidence and that they deleted it with knowledge

13   that it would be relevant to litigation anticipated, and

14   the presumption, therefore, that it would be helpful to

15   us.

16            And I think it's a both fair and just result

17   to award the sanctions we've requested.

18            THE COURT:  Do you have any quarrel with the

19   proposed form of the stipulation other than it doesn't go far

20   enough?

21            MR. RINGGENBERG:  As -- no, Your Honor, we

22   don't.

23            THE COURT:  All right.  Thank you.

24            MR. RINGGENBERG:  Thank you.

25            THE COURT:  I'll enter a written decision and

42

1  order.

2          I'm not about to tell the district judge how he

3  should consider this in the context of summary judgment.

4  Just giving you the heads-up on that.  I'm not going to enter

5  any order that says what -- how he should treat this.

6          But I will enter a decision and order that

7  provides what I think is the appropriate sanction for the

8  admitted spoliation of evidence.

9          Okay.  Thank you.  I appreciate the quality of

10  your arguments.

11          MR. RINGGENBERG:  Thank you, Your Honor.

12          MR. RECKERS:  Thank you, Your Honor.

13                  (The proceedings were concluded at

14                  2:33 p.m.)

15                          *    *    *

16

17

18

19

20

21

22

23

24

25

43

-o0o-

I certify that the foregoing is a correct

transcript from the electronic sound recording

of the proceedings in the above-entitled matter.

_____        8/13/12
                                        _____

Donna Davidson, RDR, CRR, CCR #318        Date
Official Reporter