1
2
3
4
5
6
7
8
9
10
11
12
13

SHOOK, HARDY & BACON LLP
B. Trent Webb, Esq. (*pro hac vice*)
2555 Grand Boulevard
Kansas City, Missouri 64108-2613
Telephone: (816) 474-6550
Facsimile: (816) 421-5547
bwebb@shb.com

Robert H. Reckers, Esq. (*pro hac vice*)
600 Travis Street, Suite 3400
Houston, Texas   77002
Telephone: (713) 227-8008
Facsimile: (713) 227-9508
rreckers@shb.com

*Attorneys for Defendants*
*Rimini Street, Inc., and Seth Ravin*

GREENBERG TRAURIG
Mark G. Tratos, Esq. (Nevada Bar No. 1086)
Brandon Roos, Esq. (Nevada Bar No. 7888)
Leslie Godfrey, Esq. (Nevada Bar No. 10229)
3773 Howard Hughes Parkway
Suite 400 North
Las Vegas, NV 89169
Telephone:  (702) 792-3773
Facsimile:  (702) 792-9002
tratosm@gtlaw.com
roosb@gtlaw.com
godfreyl@gtlaw.com

LEWIS AND ROCA LLP
W. West Allen (Nevada Bar No. 5566)
3993 Howard Hughes Parkway, Suite 600
Las Vegas, Nevada 89169
Tel: (702) 949-8200
Fax: (702) 949-8398
WAllen@LRLaw.com

14

## UNITED STATES DISTRICT COURT

15

## DISTRICT OF NEVADA

16
17
18
19
20
21
22
23
24
25
26
27
28

ORACLE USA, INC., a Colorado corporation;
and ORACLE INTERNATIONAL
CORPORATION, a California corporation,

Plaintiffs,

v.

RIMINI STREET, INC. , a Nevada corporation;
SETH RAVIN, an individual,

Defendants.

Case No. 2:10-cv-0106-LRH-PAL

**DEFENDANT RIMINI STREET, INC.'S MEMORANDUM AND POINTS OF AUTHORITY IN OPPOSITION TO ORACLE'S SECOND MOTION FOR PARTIAL SUMMARY JUDGMENT**

**[REDACTED]**

Date:        _____, 2012
Time:
Place:      Courtroom __
Judge:     Hon. Larry R. Hicks

RIMINI STREET'S OPPOSITION TO ORACLE'S SECOND MOTION FOR PARTIAL SUMMARY JUDGMENT
370097 v1

## TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................................................1

II.   FACTUAL BACKGROUND.....................................................................................3

    A.    Facts Related to Oracle Database. .................................................................3

    B.    Facts Related to Rimini's Laches and Estoppel Defenses. ............................6

    C.    Facts Related to Rimini's Defamation Counterclaims...................................7

III.  LEGAL STANDARDS ..............................................................................................8

IV.   RIMINI'S USE OF ORACLE DATABASE IS PERMITTED BY EXPRESS LICENSE PROVISIONS. ...........................................................................................8

    A.    The Developer License Authorizes Rimini's Use of Oracle Database for Development Work. .......................................................................................9

        1.    The Developer License Does Not Prohibit Development Work by Commercial Enterprises.......................................................................9

        2.    Rimini's Development of Application Software for its Clients Falls Within the Scope of the Developer License..............................................10

    B.    The OLSA Authorizes Rimini's Copies of Oracle Database and Uses of the Database Beyond Development...........................................................12

        1.    The OLSA is Relevant and Permits Use of the Database by Rimini on Behalf of its Licensed Customers. ..................................................12

        2.    Rimini's Customers Expressly Authorize Rimini to Obtain and Install the Oracle Database on Their Behalf.....................................................13

        3.    Rimini's Use of the Oracle Database for Support Activities is Authorized by the OLSA. ..........................................................................15

V.    ORACLE'S COPYRIGHT CLAIMS ARE UNTIMELY. ......................................16

    A.    Legal Standards Governing Laches and Statute of Limitations....................16

    B.    Oracle Knew of the Alleged Infringement in 2005 and 2006.......................17

VI.   ORACLE IS NOT ENTITLED TO JUDGMENT ON RIMINI'S COUNTERCLAIMS .......20

    A.    Rimini Need Not Prove Actual Malice to Prevail on its Defamation Claim. ..............21

    B.    Rimini Possesses Sufficient Evidence to Prove Oracle Acted Either Negligently or with Actual Malice...................................................................23

i

C.    Oracle Has Failed to Establish that its "Massive Theft" Statements are True.............25

D.    Mr. McLeod's Email is Not Protected as a Truthful or Fair Report.............................26

E.    Rimini Need Not Prove Special Damages on its Defamation Claim...........................28

VII.   CONCLUSION.............................................................................................................28

RIMINI STREET INC.'S OPPOSITION TO ORACLE'S MOTION FOR PARTIAL SUMMARY JUDGMENT

370097 v1

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Allman v. Capricorn Records,*
    42 Fed. Appx. 82 (9th Cir. 2002)......................................................................8, 12

*Ampex Corp. v. Cargle,*
    27 Cal. Rptr. 3d 863 (Cal. Ct. App. 2005)......................................................21, 22

*Bally Techs., Inc. v. Bus. Intelligence Sys. Solutions, Inc.,*
    2012 U.S. Dist. LEXIS 120340 (D. Nev. Aug. 23, 2012) ........................................8

*Barnes v. Yahoo!, Inc.,*
    570 F.3d 1096 (9th Cir. 2009) .................................................................................26

*Board of Trustees of Leland v. Roche Molecular,*
    487 F. Supp. 2d 1099 (N.D. Cal. 2009) ............................................................17, 19

*Bongiovi v. Sullivan,*
    138 P.3d 433 (Nev. 2006)........................................................................................21

*Bourne v. Walt Disney Co.,*
    68 F.3d 621 (2d Cir. 1995).........................................................................................8

*Cianci v. New Times Pub. Co.,*
    639 F.2d 54 (2d Cir. 1980)........................................................................................26

*Clark County Sch. Dist. v. Virtual Educ. Software, Inc.,*
    213 P.3d 496 (Nev. 2009)........................................................................................28

*Crane v. Arizona Republic,*
    972 F.2d 1511 (9th Cir. 1992) ...........................................................................27, 28

*Danjaq LLC v. Sony Corp.,*
    263 F. 3d 942 (9th Cir. 2001) .......................................................................16, 17, 20

*Dowling v. United States,*
    473 U.S. 207 (1985)............................................................................................26, 27

*Flowers v. Carville,*
    310 F.3d 1118 (9th Cir. 2002) .................................................................................26

*Frommoethelydo v. Fire Ins. Exch.,*
    721 P.2d 41 (Cal. 1986)...........................................................................................26

*Gilbeard v. Dean Witter Reynolds, Inc.,*
    199 U.S. Dist. LEXIS 12388 (N.D. Cal. Aug. 12, 1992).........................................25

iii

*In re Napster, Inc. Copyright Litigation,*
    2005 WL 289977 (N.D. Cal. Feb. 3, 2005) .................................................................17

*Lubin v. Kunin,*
    17 P.3d 422 (Nev. 2001) ...............................................................................27, 28

*Makaeff v. Trump Univ., LLC,*
    2010 U.S. Dist. LEXIS 87112 (S.D. Cal. Aug. 23, 2010) .......................................22

*Medifast, Inc. v. Minkow,*
    2011 U.S. Dist. LEXIS 33412 (S.D. Cal. Mar. 29, 2011) ...........................21, 22, 23

*Michaels v. Internet Entm't Group, Inc.,*
    5 F. Supp. 2d 823 (C.D. Cal. 1998) ......................................................................12

*Microsoft Corp. v. AT&T Corp.,*
    550 U.S. 437 (2007).............................................................................................13

*Monesian v. McClatchy Newspapers,*
    233 Cal. Rptr. 430 (Cal. Ct. App. 1991) ...............................................................23

*Netbula, LLC v. BindView Dev. Corp.,*
    516 F. Supp. 2d 1137 (N.D. Cal. 2007) ..................................................................8

*Nguyen-Lam v. Cao,*
    90 Cal. Rptr. 3d 205 (Cal. Ct. App. 2009) .............................................................25

*Northrop Grumman Corp. v. Factory Mut. Ins. Co.,*
    563 F.3d 777 (9th Cir. 2009) ................................................................10, 11, 12

*Pegasus v. Reno Newspapers, Inc.*
    57 P.3d 82 (Nev. 2002) .......................................................................................23

*Petrella v. Metro-Goldwyn-Mayer, Inc.,*
    2012 U.S. App. LEXIS 18322 (9th Cir. Aug. 29, 2012) ...................................16, 17

*Polar Bear Prods. v. Timex Corp.,*
    384 F.3d 700 (9th Cir. 2004) ..........................................................17, 19, 20

*Roley v. New World Pictures,*
    19 F.3d 479 (9th Cir. 1994) ................................................................................17

*Sahara Gaming Corp. v. Culinary Workers Union Local 226,*
    984 P.2d 164 (Nev. 1999).....................................................................................27

*Vegod Corp. v. American Broadcasting Companies, Inc.,*
    603 P.2d 14 (Cal. 1979) .......................................................................................22

iv

*Wood . v. Santa Barbara Chamber of Commerce, Inc.,*
    507 F. Supp. 1128 (D. Nev. 1980) ....................................................................19

*Yow v. Nat'l Enquirer, Inc.,*
    550 F. Supp. 2d 1179 (E.D. Cal. 2008)............................................................28

**RULES**

Fed. R. Civ. P. 56(a) ...............................................................................................8

**STATUTES**

Cal. Civ. Code § 47(d) ...........................................................................................27

Cal. Civ. Code § 2332 ............................................................................................25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

RIMINI STREET INC.'S OPPOSITION TO ORACLE'S MOTION FOR PARTIAL SUMMARY JUDGMENT
370097 v1

1   Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Defendant Rimini Street, Inc.

2   ("Rimini") submits the following memorandum and points of authority in opposition to the second

3   motion for partial summary judgment filed by Plaintiffs Oracle USA, Inc., Oracle America, Inc., and

4   Oracle International Corp. (collectively, "Oracle") (Dkt. 405).

5   **I.      INTRODUCTION**

6   In Rimini's Opposition to Oracle's first motion for partial summary judgment, Rimini

7   established that Oracle's infringement theories rest on implausible interpretations of the relevant

8   licenses.  Oracle's interpretations ignore key rights granted to the licensees, including express

9   provisions permitting copying of the software and allowing third party service providers (such as

10   Rimini) to access, modify and use the software in support of licensees.  Oracle's second motion

11   continues this pattern of turning a blind eye to critical license provisions and ignoring the substantial

12   evidence that supports Rimini's claims and defenses in this matter.  Oracle's second motion for

13   partial summary judgment should be denied.

14   Oracle now moves for partial summary judgment for copyright infringement concerning

15   Oracle's Relational Database Management Software ("Oracle Database"), as well as Rimini's

16   license defense as to Oracle Database.  Oracle's motion lacks merit as two distinct sets of licenses

17   authorize Rimini's actions.

18   First, Rimini relies on Oracle's Developer License for its uses of the Oracle Database to

19   develop updates for Oracle's software applications. The Developer License expressly permits use of

20   Oracle Database for "developing, testing, prototyping and demonstrating your application . . . ."

21   While Oracle argues the Developer License may not be used to develop software that is ultimately

22   commercialized, the actual license agreement contains no such restrictions.  In fact, the very

23   sentence Oracle cites as containing the "commercial-use restriction" unambiguously includes an

24   exception permitting use of the database for "development of . . . your application."

25   Second, Rimini relies on its clients' database licenses with Oracle to makes copies of Oracle

26   Database.  As explained in Rimini's Opposition to Oracle's first motion for partial summary

27   judgment, Rimini follows the industry practice of installing non-production instances of its clients'

28   

1

1  software environments (including Oracle Database) for use when providing support services.

2  Oracle's standard database license permits ████████████████████████████████████████

3  ████████████████████████████████████████████████████████████████████████████████

4  ████████████████████████████████████████████████████████████████████████████████

5  ████████  Applying these license provisions, Rimini's installation and use of Oracle Database is fully

6  authorized by its clients' licenses with Oracle, and Oracle is not entitled to judgment on its claims

7  concerning Oracle Database.

8  Oracle also moves for judgment as to Rimini's eighth and ninth affirmative defenses of

9  laches and statute of limitations, arguing there is no evidence Oracle had notice of the alleged

10  infringement before January 25, 2007.  In reality, there is ample evidence that Oracle knew—or, at

11  least, should have known—of the alleged acts of infringement well before January 25, 2007.

12  For instance, Oracle, through its predecessor Siebel Systems Inc. ("Siebel"), raised the very

13  issues underlying this action on September 26, 2005.  In a letter to Rimini, Siebel's Director of Legal

14  Affairs asserted: ████████████████████████████████████████████████████████████████

15  ████████████████████████████████████████████████████████████████████████████████

16  Rimini promptly responded to Oracle's letter on October 6, 2005 by articulating the same positions it

17  now advances in this action, namely that Rimini's services ████████████████████████████

18  ████████████████████████████████████████████████████████████████████████████████

19  ████████████████  Oracle did not further press its positions, and Rimini launched its service shortly

20  thereafter in late 2005.  Since that time, Rimini has openly obtained, accessed, installed, and updated

21  Oracle software for its licensed clients.  Because Oracle was well aware of this allegedly infringing

22  conduct but unreasonably delayed in bringing the present suit, Oracle's claims are untimely, and

23  Oracle is not entitled to judgment as to Rimini's eighth and ninth affirmative defenses.

24  Finally, Oracle moves for summary judgment as to Rimini's counterclaims, which address

25  false and defamatory statements by Oracle to the press and a Rimini customer.  Oracle first argues

26  Rimini is a limited purpose public figure and therefore must prove the defamatory statements were

27  made with actual malice.  Oracle is wrong.  Rimini's business methods were not a matter of public

28

2

1  controversy until Oracle filed this suit, and Rimini's sporadic public statements are not evidence of

2  Rimini thrusting itself into the public eye, as Oracle suggests.

3      And even if Rimini were a limited purpose public figure, there is substantial evidence that

4  Oracle's statements were made with actual malice.   During the course of discovery, Rimini

5  requested, and Oracle produced, discovery firmly establishing that Oracle knew: (1) every Rimini

6  client is licensed by Oracle to the software products supported by Rimini; (2) Oracle's licenses

7  authorize third-party vendors (such as Rimini) to possess and work with the licensed products; and

8  (3) Oracle knowingly sent Rimini hundreds of copies of Oracle software.   Given Oracle's own

9  conduct, it is clear that Rimini did not "steal" any software, and a reasonable jury could find that

10  Oracle's defamatory "massive theft" allegations were made maliciously.   Rimini is entitled to

11  present its counterclaims to the jury.

12  **II.**      **FACTUAL BACKGROUND**

13          **A.    Facts Related to Oracle Database.**

14      Oracle Database is a popular database tool used by certain Rimini customers along with their

15  enterprise software platforms.   Oracle Database provides a foundation for the enterprise software

16  that manages various aspects of a business, such as supply chain, payroll or financial software

17  platforms.   To implement such platforms, the database is combined with applications, such as

18  Oracle's PeopleSoft, J.D. Edwards and Siebel products, to form a complete software environment

19  capable of managing information across the entire enterprise. Dkt. 418, Statement of Undisputed

20  Facts in Support of Oracle's Second Motion for Partial Summary Judgment (L.R. 56-1) ("Oracle

21  SUF") 8.

22      Oracle authorizes use of Oracle Database under two different licenses. The first license,

23  known as a "Developer License," is provided free of charge to software developers[1] to facilitate

---

[1]  It is common in the computer industry for software vendors to make software available to developers at little or no cost for purposes of development. Examples of common developer networks can be found in Microsoft's development community MSDN, Apple's iOS and Mac Developer Programs, and Google's Android Developers. *See* Microsoft Developer Network, http://msdn.microsoft.com (last visited Oct. 9, 2012); Apple Developer, https://developer.apple.com, (last visited Oct. 9, 2012); Android Developers, http://developer.android.com/index.html (last visited Oct. 9, 2012).

3

1  development of software applications that run in connection with Oracle Database.  Rimini's

2  Statement of Facts In Support of its Opposition to Oracle's Second Motion for Partial Summary

3  Judgment and Response to Oracle's Alleged Facts (L.R. 56-1) ("SOF") 1.  The Developer License

4  permits use of Oracle Database for "developing, testing, prototyping and demonstrating your

5  application" but disallows use of Oracle Database for "internal data processing or for any

6  commercial or production purposes . . . except the development of your application."  SOF 2.

7  Further, the license prohibits continued development of an application after the application is used

8  for "internal data processing, commercial or production purpose without securing" an additional

9  license.  SOF 3.

10      Oracle also licenses Oracle Database under the Oracle License and Service Agreement

11  ("OLSA").  SOF 4.  The OLSA provides licensees a limited right to use Oracle Database

12

13

14

15                                                                                The parties

16  have stipulated that the terms of the standard form OLSA's from 2002 to 2012 are representative of

17  the actual licenses Oracle granted for Oracle Database, including the database licenses granted to

18  Rimini's clients.  Dkt. 236 at ¶¶ 4-6.

19      Because certain Rimini clients use Oracle Database as part of their software environments,

20  Rimini creates instances of Oracle Database to support these clients.  SOF 7; Dkt. 418 at 7-8 (Oracle

21  SUF 9).

22

23

24                                  As detailed in Rimini's Opposition to Oracle's first

25  motion for partial summary judgment, the creation of non-production environments for support

26  purposes is a widely accepted practice in the industry and is encouraged by Oracle's own technical

27  recommendations.  SOF 9.  Further, it is common in the industry for third-party support

28                                          4

1   vendors to maintain a copy of a client's software environment, including an instance of the client's

2   database, for support purposes.  SOF 10.

3       Generally speaking, Rimini uses Oracle Database to support licensed clients in two different

4   ways.  First, Rimini uses Oracle Database for

13      To create updates for the software it supports, Rimini employs a team of full-time software

14  developers.  SOF 13.  These developers use

17                                                                                              While Oracle

18  incorrectly states that Rimini saves research and development costs by copying Oracle software (Plt.

19  Br. at 4), Rimini prides itself in the quality of the updates created by its dedicated development team,

20  and Rimini routinely delivers its updates to clients ahead of Oracle's delivery date for equivalent

21  updates.  Dkt. 407, Pradhan Decl. ¶ 103 & Dkt. 415, Oracle Ex. 96 at 5-6.

22      In addition to development work, Rimini also uses Oracle Database to address technical

23  support issues unique to a particular client.   To address such technical issues, Rimini offers

24  "break/fix" support and

28                                              5

[REDACTED]

**B.    Facts Related to Rimini's Laches and Estoppel Defenses.**

Rimini was founded in September of 2005.  Before Rimini even signed its first customer, in-house counsel for Oracle's predecessor, Siebel, sent Rimini a letter addressing Rimini's [REDACTED]

Rimini responded on October 6, 2005, confirming that it indeed required access to copies of its clients' software for [REDACTED]

Instead of taking Rimini up on its offer, Oracle stated that it had "no obligation" to inform Rimini of "what it must do to avoid engaging in unlawful conduct."  SOF 21.

Following the parties' exchange of letters, Rimini continued to grow its support business in late 2005 and in 2006.  During this time period, Rimini began requesting that Oracle directly ship

6

1    copies of its installation media to Rimini's address, and the evidence shows that

2

3

4                                                                Despite such knowledge, Oracle

5    continued sending Rimini media for years, discontinuing this practice only months before bringing

6    the present suit. *Id.*

7              **C.    Facts Related to Rimini's Defamation Counterclaims.**

8              Oracle filed its complaint against Rimini on January 25, 2010. Oracle SUF 57. In its

9    complaint, Oracle made several inflammatory and hyperbolic statements regarding Rimini, including

10   that Rimini was carrying out a "corrupt" and "illegal business model." Dkt. 1, at 2, 5. Following the

11   lead of Oracle's complaint, Oracle employees further communicated Oracle's baseless allegations to

12   members of the media and a Rimini customer. SOF 24-25. For example, Oracle's spokesperson,

13   Ms. Deborah Hellinger, responded to press inquiries stating that Oracle "draws the line with any

14   company, big or small, that steals its intellectual property. The massive theft that Rimini and Mr.

15   Ravin engaged in is not healthy competition." SOF 24. Ms. Hellinger, in her capacity as Senior

16   Director of Corporate Communications, sent this statement to at least two separate news services.

17   *Id.*

18             In its initial Answer, Rimini noted that it "expect[ed] discovery to illuminate a pattern of

19   similar defamatory communications by Oracle representatives." *See* Dkt. 30 at 11. Indeed, when

20   Rimini propounded its discovery requests, additional defamation by Oracle was revealed. For

21   instances, James McLeod, an Oracle Regional Services Sales Manager, distributed an article

22   containing defamatory statements to a Rimini customer, in an apparent attempt to secure that

23   customer's return to Oracle support. SOF 25. That article stated that Oracle sued Rimini Street for

24   "massive theft," but fails to mention Oracle's copyright infringement claims or any of the other

25   causes actually pled by Oracle. *Id.*[2]

26   _____
     [2]  In its motion, Oracle discusses three defamatory statements it made regarding Rimini, including
27        statements made to Pat Phelan. After conducting discovery, Rimini has elected not to rely on
          the statements made to Ms. Phelan as a basis of its counterclaims.
28                                                7

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## III.   LEGAL STANDARDS

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Bally Techs., Inc. v. Bus. Intelligence Sys. Solutions, Inc.*, No. 2:10-CV-00440-PMP-GWF, 2012 U.S. Dist. LEXIS 120340, at *8-*9 (D. Nev. Aug. 23, 2012). A genuine issue of fact exists if, based on the evidence, "a reasonable fact finder could find for the non-moving party." *Bally Techs., Inc.*, 2012 U.S. Dist. LEXIS 120340, at *8. The Court should view "all evidence in the light most favorable to the non-moving party." *Id.* at *9.

## IV.   RIMINI'S USE OF ORACLE DATABASE IS PERMITTED BY EXPRESS LICENSE PROVISIONS.

Two distinct licenses authorize the actions Rimini undertakes with respect to Oracle Database. First, Oracle's Developer License expressly permits use of the database for development of application software and, thus, authorizes Rimini's development work. Second, Oracle's License and Service Agreements ("OLSAs") authorize the support activities Rimini undertakes using Oracle Database, including Rimini's creation of database copies on its clients' behalf. In its brief, Oracle misconstrues the scope of these licenses and fails to establish actions by Rimini that exceed the conduct authorized by their combination. *See Netbula, LLC v. BindView Dev. Corp.*, 516 F. Supp. 2d 1137, 1151 (N.D. Cal. 2007) ("Where, the existence of a license is not in dispute, and only the scope of the license is at issue, the copyright owner bears the burden of proving that the defendant's copying was unauthorized." (citing *Bourne v. Walt Disney Co.*, 68 F.3d 621, 631 (2d Cir. 1995)). At the very least, summary judgment is inappropriate given genuine issues of material fact surrounding whether Rimini's actions fall within the scope of Oracle's licenses. *Allman v. Capricorn Records*, 42 Fed. Appx. 82, 83 (9th Cir. 2002) (reversing a grant of summary judgment because "genuine issues of fact remain for resolution to the scope of the license and whether the defendants exceeded the scope and thus infringed the copyright.").

**A.    The Developer License Authorizes Rimini's Use of Oracle Database for Development Work.**

The Developer License expressly permits use of Oracle Database for "developing, testing, prototyping and demonstrating your application . . . ."  SOF 2.   While Oracle suggests this authorized development is limited to "initial" stages of development, the license, in reality, contains no such restrictions.  SOF 3.  Rather, the license allows development until the application is used commercially, prohibiting continued development "after . . . you have used [the application] for any internal data processing, commercial or production purpose[ ] . . . ."  SOF 3.  As explained *infra*, the evidence establishes that Rimini's development work complies with these express license provisions. SOF 11 - 15.

**1.   The Developer License Does Not Prohibit Development Work by Commercial Enterprises.**

Oracle contends that Rimini's use of Oracle Database falls outside the scope of the Developer License because Rimini is a "commercial enterprise."  Plt. Br. at 13.  In essence, Oracle argues that the Developer License may not be used to develop software that will ultimately be commercialized.  *See id.*  The Developer License, however, does not prohibit such use of Oracle Database and, by its express terms, consistently makes clear that development activities are permitted, including commercial development.

Specifically, the purported commercial-use restriction cited by Oracle unambiguously includes an exception permitting use of the database for "development of . . . your application." SOF 2; Dkt. 407, Pradhan Decl. ¶ 7 & Dkt. 411, Plt. Ex. 5 ("You may not: - use the programs for your own internal data processing or for any commercial or production purposes, or use the programs for any purpose *except the development of your application*.").  Further, the license explicitly contemplates commercialization of the developed software, disallowing continued reliance on the Developer License "after . . . you have used [the application] for any commercial purpose . . ."  SOF 3.  As Oracle's corporate representative explained, █████████████████

9

1   ██████████████████████████████████████████████████

2   ████████████████████████████████   Indeed, software development is a

3   commercial activity, and ██████████████████████████████   Dkt.

4   407, Pradhan Decl. ¶ 18 & Dkt. 419, Plt. Ex. 16 (Seth Ravin Depo. (Nov. 17-18, 2011)) at 447:22-

5   448:5.  Tellingly, even Oracle tacitly admits that commercial development work is permitted under

6   the Developer License, stating that the license "precludes the free use of Oracle database 'for any

7   commercial purpose' *beyond* that initial development."  Plt. Br. at 13 (emphasis added).  Consistent

8   with this comment, Rimini relies on the Developer License to authorize its use of Oracle Database

9   for development, not "'for any commercial purpose' beyond" development.[3]

###   2.   Rimini's Development of Application Software for its Clients Falls Within the Scope of the Developer License.

12          Oracle also argues that Rimini's development is not authorized by the Developer License

13   because such development is not of "your application."  Plt. Br. at 14-15.  First, Oracle argues the

14   term "application," as used in the Developer License, does not encompass the software updates

15   developed by Rimini.  Second, Oracle argues the updates cannot be considered *Rimini's* because

16   they are "'derivative works' of Oracle's property.'"  *Id.* at 14-15.  In making these arguments, Oracle

17   seeks to impermissibly deviate from the plain and ordinary reading of the license's text.  As Oracle

18   states in its brief, "the Court should interpret the terms in those licenses 'based on their ordinary and

19   popular sense, unless a technical sense or special meaning is given to them by their usage.'"  *Id.* at

20   12 (quoting *Northrop Grumman Corp. v. Factory Mut. Ins. Co.*, 563 F.3d 777, 783 (9th Cir. 2009)).

21   When properly ascribed its "ordinary and popular" meaning (or even a technical meaning), the

22   phrase "your application" in the Developer License easily encompasses Rimini's software updates.

---

[3]  Oracle argues Rimini "has admitted" it is obligated to pay for "an appropriate license," citing an internal Rimini email from Chris Limburg. Plt. Br. at 14. Rimini has made no such admission. As explained, there is simply no such commercial-development prohibition in the actual text of the Developer Agreement, and Mr. Limburg's license interpretation, like Oracle's, is critically flawed.

1        Turning first to Oracle's attempt to distinguish an "application" from an "update," there is

2    ample evidence that Rimini's updates constitute application software that forms a critical portion of

3    applications such as PeopleSoft HRMS, for example.  SOF 11-12.  Even Oracle's technical expert,

4    Dr. Randall Davis, recognized that ███████████████████████████████████████

5    ████████████████████████████████████████████████████████████████

6    ████████████████████████████████████████████████████████  Reckers

7    Decl. ¶ 12 & Ex. 11 (Expert Report of Randall Davis) at 13.  The testimony of Rimini's expert and

8    fact witnesses is in accord.  SOF 12.  And, while Oracle's motion suggests otherwise (Plt. Br. at 14),

9    Rimini employee George Lester testified unequivocally that Rimini ██████████████████

10   ████████████████████████████████ in compliance with the terms of the Developer License.

11   SOF 11.

12       Oracle next argues Rimini's development work is not directed to "*your* application" because

13   Rimini does not own the code underlying its updates.  Plt. Br. at 14-15.  In making this argument,

14   Oracle contends Rimini's updates are derivative works of Oracle's intellectual property, citing

15   provisions of the Copyright Act.  *Id.*  The issue, however, does not turn on Rimini's ownership in the

16   alleged "derivative works" under the Copyright Act.

17       Rather, the critical inquiry is whether the updates are *Rimini's*, when applying a plain and

18   ordinary reading of the license text.  *Northrop Grumman Corp.*, 563 F.3d at 783.  As to this

19   question, the evidence establishes that the updates-at-issue are indeed *Rimini's* as they are developed

20   by Rimini's own team of full-time software developers.  SOF 13.  Rimini prides itself in the quality

21   of its updates and the timeliness of their delivery to clients.  In fact, Rimini Street routinely delivers

22   its updates to clients ahead of Oracle's delivery date for equivalent updates.  Dkt. 407, Pradhan Decl.

23   ¶ 103 & Dkt. 415, Oracle Ex. 96 at 5-6.  Such prior delivery removes any doubt that Rimini's

24   updates are developed by Rimini personnel, not copied from Oracle's updates.  SOF 13.  Further, the

25   updates are maintained solely in Rimini's possession until quality testing is performed for each

26   client.  SOF 14.  Because the updates: (1) are created by Rimini, (2) differ from the equivalent

27   Oracle updates, and (3) are maintained in Rimini's sole possession (until release to clients), such

28

11

updates are easily considered, in an "ordinary or popular sense," *Rimini's* updates.   SOF 14; *Northrop Grumman Corp.*, 563 F.3d at 783.  At the very least, there is ample evidence from which a reasonable jury could—and should—conclude that Rimini's development of updates constitutes "developing . . . your application," as permitted by the Developer License.  *See Allman*, 42 Fed. Appx. at 83 ("genuine issues of fact remain for resolution to the scope of the license and whether the defendants exceeded the scope and thus infringed the copyright.").

> **B.    The OLSA Authorizes Rimini's Copies of Oracle Database and Uses of the Database Beyond Development.**

In addition to the discussed uses of Oracle Database for development, Rimini also installs Oracle Database for certain clients to troubleshoot technical issues those clients may experience. SOF 16.   These support copies are permitted under the OLSA, which allows ██████████

Applying these express license provisions, it is common in the industry for third-party support vendors to maintain a copy of the client's software environment, including an instance of the clients' database, for support purposes.  SOF 10.  As such, Rimini's installation and use of support copies of Oracle Database is fully authorized by the OLSAs between Oracle and Rimini's clients.

> **1.    The OLSA is Relevant and Permits Use of the Database by Rimini on Behalf of its Licensed Customers.**

Oracle argues that the OLSA is irrelevant because Rimini downloaded the database software from Oracle's websites under the terms of the Developer License.  Plt. Br. at 15-16.   Oracle's reliance on the *source* of the database software is misplaced and finds no support in the actual text of the OLSAs.

In identifying the relevant OLSAs, Rimini has met its burden of identifying the relevant licenses.  *See Michaels v. Internet Entm't Group, Inc.*, 5 F. Supp. 2d 823, 834 (C.D. Cal. 1998).

12

1   Nothing more is required of Rimini as the parties have stipulated that the terms of the form OLSAs

2   are representative of the actual licenses Oracle entered into with its customers for the Oracle

3   Database. Dkt. 236 at ¶¶ 4-6. These licenses uniformly provide non-exclusive rights in the software

4   programs (here, Oracle Database) but **do not require** that the software be obtained from a specific

5   source. SOF 27. As the Supreme Court has observed, software code "is an idea without physical

6   embodiment." *Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437, 449 (2007). Consistent with this

7   authority, the rights granted by the OLSAs are not limited to any specific source of the database

8   software, and these licenses cannot be disregarded as Oracle suggests.

9           **2.   Rimini's Customers Expressly Authorize Rimini to Obtain and Install the
10               Oracle Database on Their Behalf.**

11          Oracle also argues "there is no evidence that the customers designated Rimini as their

12   ███████████████ under the OLSA for purposes of using the Oracle Database." Plt. Br. at 16.

13   In making this argument, Oracle relies heavily on the standard language found in Rimini's support

14   agreement with its customers, stating that such agreements █████████████████████

15   ████████████████████████████████ In reality, the Rimini

16   support agreements contain no such denial, express or otherwise. SOF 28. To the contrary, the

17   agreements unequivocally ████████████████████████

18   ████████████████████████████████████

19   ██████████████████████████████████████

20   ██████████████████████████████████████

21   ██████████████████████████████████████

22   ██████████████████████████████████████

23   ██████████████████████████████████████

24   ████████████████████████

27   [4] "RDBMS" stands for "Relational Database Management Software."

28                                        13

**REDACTED IMAGE**

Given this unequivocal language in Rimini's service agreements, there is simply no support for Oracle's contention that Rimini is not authorized to obtain copies of Oracle Database on its clients' behalf.[5]

Finally, Oracle attempts to rely on the "Independent Contractor Status" article of Rimini's standard agreement, arguing that

Therefore, the

---

[5] Nor do the support agreements limit Rimini's database access to "remote access" via the Internet, as Oracle incorrectly argues.  SOF 32.

14

"Independent Contractor Status" article within Rimini's support agreement further confirms that Rimini may rely on the OLSA to authorize its actions with respect to Oracle Database.

### 3. Rimini's Use of the Oracle Database for Support Activities is Authorized by the OLSA.

Oracle also argues that Rimini's use of the Oracle Database is not authorized by the OLSA because Rimini has "engaged in cross-use of Oracle Database." Plt. Br. at 16. To support this argument, Oracle cites both Rimini's use of the Oracle Database for development and Rimini's installation and use of the database for troubleshooting support issues for clients. *Id.* at 17. As to development, such uses are covered by the Developer License, and, thus, Oracle's discussion of the OLSA is misplaced. With respect to other support uses of the database by Rimini, such uses are solely for the benefit of a particular licensed client. SOF 18. Thus, Rimini's creation and use of Oracle Database is fully authorized by the OLSA.



Such copies of database software in non-production support environments are common in the industry. SOF 9-10.

RIMINI STREET INC.'S OPPOSITION TO ORACLE'S MOTION FOR PARTIAL SUMMARY JUDGMENT

370097 v1

Because Oracle has not established any unauthorized copying or unauthorized "cross-use" of Oracle Database, Oracle is not entitled to summary judgment as to Rimini's license defense.

## V.   ORACLE'S COPYRIGHT CLAIMS ARE UNTIMELY.

As detailed in Oracle's first motion for partial summary judgment, Oracle's claims in this suit center around allegations that Rimini illegally obtained, accessed, installed, copied, and updated the Oracle software licensed by Rimini's clients.  Such claims not only lack merit but are also untimely, as set forth by Rimini's eighth and ninth affirmative defenses of laches and statute of limitations.

### A.   Legal Standards Governing Laches and Statute of Limitations.

To establish laches in a copyright infringement action, a defendant must show that "(1) the plaintiff delayed in initiating the lawsuit; (2) the delay was unreasonable; and (3) the delay resulted in prejudice." *Petrella v. Metro-Goldwyn-Mayer, Inc.*, No. 10-55834, 2012 U.S. App. LEXIS 18322, *8-*9 (9th Cir. Aug. 29, 2012); *Danjaq LLC v. Sony Corp.*, 263 F. 3d 942, 951 (9th Cir. 2001).  Delay is measured from when "the plaintiff knew (or should have known) of the allegedly infringing conduct, until the initiation of the lawsuit." *Danjaq*, 263 F. 3d at 952.  In determining the reasonableness of the delay, courts look at the *cause* of the delay. *Id.* at 954.  Permissible causes for delay include "exhaustion of remedies through the administrative process," evaluation of "complicated claims," and determining "whether the scope of proposed infringement will justify the cost of litigation." *Id.* at 954-955.  Prejudice exists where "during the delay, [defendant] invested

16

1   money to expand its business or entered into business transactions based on [its] presumed rights."

2   *Petrella*, 2012 U.S. App. LEXIS 18322 at *13.

3          "Whether a plaintiff's conduct constitutes laches in any given circumstance is an issue of

4   fact." *Id.* at *6.  In evaluating laches on a motion for summary judgment, a court must construe all

5   facts in the light most favorable to the defendant, drawing all inferences in its favor. *Danjaq*, 263 F.

6   3d at 951-952.

7          As to statute of limitations, copyright actions must be filed "within three years after the claim

8   accrued."  *Roley v. New World Pictures*, 19 F.3d 479, 481 (9th Cir. 1994).  A copyright claim

9   accrues "when one has knowledge of a violation or is chargeable with such knowledge." *Id.*  One is

10   chargeable with knowledge of a violation if it could have reasonably been discovered. *Polar Bear*

11   *Prods. v. Timex Corp.*, 384 F.3d 700, 706 (9th Cir. 2004); *see In re Napster, Inc. Copyright*

12   *Litigation*, 2005 WL 289977, at *4 (N.D. Cal. Feb. 3, 2005) ("A claim for copyright infringement

13   accrues on the date that a reasonable investigation would have put the rights holder on notice that

14   potentially infringing conduct has occurred."); *see also  Board of Trustees of Leland v. Roche*

15   *Molecular*, 487 F. Supp. 2d 1099, 1113 (N.D. Cal. 2009) ("The claimant discovers his cause of

16   action when he becomes aware of facts which would make a reasonably prudent person suspicious

17   that he had been injured.").  The date one is chargeable with knowledge of infringement is a question

18   of fact. *Polar Bear*, 384 F.3d at 707.

19       **B.**    **Oracle Knew of the Alleged Infringement in 2005 and 2006.**

20          Oracle's motion for judgment as to Rimini's eighth and ninth affirmative defenses rests on

21   the single erroneous premise that there is no genuine dispute that Oracle lacked notice of Rimini's

22   infringements prior to January 25, 2007.  Plt. Br. at 18.  In reality, there is ample evidence that

23   Oracle knew—or, at least, should have known—of the alleged acts of infringement well before

24   January 25, 2007.

25          The evidence in this case establishes that Oracle knew Rimini intended to obtain, access,

26   install, copy, and update Oracle software before Rimini even signed its first client.  As previously

27   detailed, Oracle's predecessor, Siebel, first wrote Rimini a letter on September 26, 2005 to address

28

17

Rimini's [REDACTED]

[REDACTED] Rimini responded on October 6, 2005, confirming that it indeed required access to copies of its clients' software for [REDACTED] Rimini also advised that it [REDACTED] Instead of taking Rimini up on its offer, Siebel stated that it had "no obligation" to inform Rimini of "what it must do to avoid engaging in unlawful conduct." SOF 21.

Despite the allegations of unlawful conduct in Oracle's correspondence, Rimini continued to grow its support business in late 2005 and in 2006. During this time period, Rimini began requesting that Oracle directly ship copies of its installation media to Rimini's address, [REDACTED] Despite such knowledge, Oracle continued sending Rimini media for years, sending literally hundreds (if not thousands) of installation disks to Rimini. *Id.*

Given this evidence, Oracle cannot plausibly claim ignorance of Rimini's allegedly infringing practices. Oracle's motion attempts to dodge this problem by pointing to Rimini's purported "assurances that it was complying with Oracle's intellectual property rights and the terms of applicable licenses." Plt. Br. at 20. But the fact remains that Rimini bluntly told Oracle that it

18

was entitled to obtain, install, access, update, and copy Oracle software on its clients' behalf.[6]  While the parties obviously have different views as to whether such activities comply with "Oracle's intellectual property rights and the terms of applicable licenses," these differing license interpretations do not change the fact that Rimini put Oracle on notice in 2005 of the very practices that now underlie Oracle's claims. *Id.*

Oracle also argues it did not possess certain details of Rimini's practices before discovery in this case. Plt. Br. at 19-20.  While Oracle may not have known all the specifics of Rimini's practices in 2007, Oracle unquestionably knew, and is chargeable with knowledge that, Rimini was accessing, copying, and modifying Oracle software, including Rimini's installation of local copies to perform these support tasks.  Such activities were set forth in Rimini's 2005 letter to Oracle, and Rimini has never denied such copying of Oracle's software for its clients.  SOF 40.  Indeed, Rimini's letter explained that its services ███████████████████████████████████████████████

███████████████████████████████████████  Dkt. 407, Pradhan Decl. ¶ 60 & Dkt. 421, Plt. Ex. 58.  As established by Rimini's Opposition to Oracle's first motion for partial summary judgment, the regular way that "other independent consulting services" access Oracle software is by way of local copies of the software maintained on their clients' behalf.  SOF 41.

Moreover, it is well-settled that, "if a prudent person would have become suspicious from the knowledge obtained through the initial prudent inquiry and would have investigated further, a plaintiff will be deemed to have knowledge of facts which would have been disclosed in a more extensive investigation."  *Wood v. Santa Barbara Chamber of Commerce, Inc.*, 507 F. Supp. 1128, 1135 (D. Nev. 1980); *see Polar Bear Prods. v. Timex Corp.*, 384 F.3d 700, 706 (9th Cir. 2004).  In

---

[6]  Oracle argues that Rimini has taken a "contrary position" in both denying infringement and arguing that Oracle knew or should have known of the alleged infringement. Plt. Br. at 21, But the fact that Rimini denies liability for copyright infringement does not change the reality that Oracle has been on notice of the facts underlying much of its copyright claims since September of 2005. *Board of Trustees of Leland*, 487 F. Supp. 2d at 1113 ("The claimant discovers his cause of action when he becomes aware of facts which would make a reasonably prudent person suspicious that he had been injured.").

19

1  this regard, there is ample evidence that Oracle could have learned more of Rimini's business

2  practices had it investigated further in 2005 or 2006. SOF 20. Notably, Oracle's suspicion of

3  Rimini's activities is apparent from its September 26, 2005 letter, ████████████████████

4  ████████████████████████████████████████████████████████████████████████████████████

5  ████████████████████████████████████████████ SOF 19. Rimini, for its part, has consistently

6  admitted that it obtains, accesses, installs, and updates Oracle software for its clients—not only

7  confirming as much in its responsive letter, but also inviting a dialogue with Oracle as to Rimini's

8  practices. SOF 20; Dkt. 407, Pradhan Decl. ¶ 60 & Dkt. 421, Plt. Ex. 58 (stating that Rimini

9  executives ██████████████████████████████████████████████████████████████████████████

10 ████████████████████████████ *Had* Oracle further investigated, it would have obtained even more

11 facts regarding Rimini's uses of Oracle software. *Id.* While Oracle chose not to further engage

12 Rimini on this subject in 2005, Oracle is still charged with knowledge of the allegedly infringing

13 acts (here, accessing and copying Oracle software) that could have reasonably been discovered.

14 *Polar Bear Prods.*, 384 F.3d at 706. At the very least, when all inferences are drawn in Rimini's

15 favor, there is a genuine issue of material fact surrounding whether Oracle is chargeable with

16 knowledge of the alleged infringement prior to January 25, 2007. *Id.* at 707. Because genuine

17 issues of material fact remain, Oracle's motion for judgment as to Rimini's eighth and ninth

18 affirmative defenses fails. *Danjaq*, 263 F. 3d at 951-952.

19 **VI.    ORACLE IS NOT ENTITLED TO JUDGMENT ON RIMINI'S COUNTERCLAIMS**

20         In denying Oracle's motion to dismiss Rimini's counterclaims, this Court found that Rimini

21 sufficiently alleged a claim for defamation based on certain non-privileged statements made by

22 Oracle to members of the press and others. Dkt. 111 at 5-6. The declarations submitted along with

23 Oracle's instant motions now admit that the alleged defamatory statements set forth in Rimini's

24 pleadings were indeed communicated by Oracle employees to both the press and at least one Rimini

25 customer. Dkt. 409, Declaration of Deborah Hellinger In Support Of Oracle's Second Motion for

26 Partial Summary Judgment ("Hellinger Decl.") at ¶¶ 3-4, 6; Dkt. 410, Declaration of James McLeod

27 In Support Of Oracle's Second Motion for Partial Summary Judgment ("McLeod Decl.") at ¶¶ 2-4.

28

1   Such statements by Oracle, accusing Rimini of committing "massive theft" and engaging in "an

2   illegal business model," represent a classic case of defamation *per se*, and there is an abundance of

3   admissible evidence supporting Rimini's allegations.

4       **A.   Rimini Need Not Prove Actual Malice to Prevail on its Defamation Claim.**

5         Oracle argues that Rimini is a limited purpose public figure because "Rimini frequently

6   makes public comments – including statements to the press – about the legality of third-party

7   support and its own conduct." Plt. Br. at 24.  Contrary to Oracle's argument, Rimini is not a limited

8   purpose public figure and need not prove actual malice to prevail on its defamation claim.

9         To determine whether an individual is a limited purpose public figure:

> First, there must a public controversy, which means the issue was debated
> publicly and had foreseeable and substantial ramifications for
> nonparticipants.   Second, the plaintiff must have undertaken some
> voluntary act through which he or she sought to influence resolution of the
> public issue.  In this regard it is sufficient that the plaintiff attempts to
> thrust him or herself into the public eye.   And finally, the alleged
> defamation must be germane to the plaintiff's participation in the
> controversy.

16   *Medifast, Inc. v. Minkow,* No. 10-CV-382 JLS (BGS), 2011 U.S. Dist. LEXIS 33412, at *14 (S.D.

17   Cal. Mar. 29, 2011) (quoting *Ampex Corp. v. Cargle*, 27 Cal. Rptr. 3d 863, 870 (Cal. Ct. App.

18   2005)); *see also Bongiovi v. Sullivan*, 138 P.3d 433, 445 (Nev. 2006).  Oracle fails to show that

19   Rimini's activities meet this test.

20         Oracle identifies the existing public controversy as "the legality of third-party support and

21   [Rimini's] own conduct." Plt. Br. at 24.  However, there is no apparent public controversy as to the

22   legality of third-party support, as even Oracle concedes that third-party support is permissible.  SOF

23   35.  Therefore, the only salient controversy is the legality of Rimini's conduct, a private controversy

24   Oracle itself created by filing the present suit in January 2010.

25         First and foremost, there is no evidence of a public debate as to the legality of Rimini's

26   conduct when Oracle made its defamatory statements.  While these statements were made in January

27   and March 2010, Oracle fails to identify *any* public comments regarding the legality of its support

28

21

1    offerings *for almost two years* between April 25, 2008 and March 29, 2010, the date that Rimini

2    responded to Oracle's original Compliant.  SOF 36.  And even the communication by Rimini on

3    April 25, 2008 was an isolated comment as Oracle fails to identify any additional comments by

4    Rimini between July 12, 2007 and March 29, 2010.  The sporadic comments by Rimini regarding its

5    practices do not support Oracle's argument that there was some public debate raging as to the

6    legality of Rimini's practices.

7          The infrequent nature of Rimini's comments also demonstrate that Rimini has not "thrust

8    [itself] into the public eye" by undertaking "some voluntary act through which [it] sought to

9    influence resolution of the public issue." *Makaeff v. Trump Univ., LLC*, Case No. 10-CV-940-IEG

10   (WVG), 2010 U.S. Dist. LEXIS 87112, at *13 (S.D. Cal. Aug. 23, 2010).  Any review of the

11   communications-at-issue reveal that Rimini's statements were aimed at promoting Rimini's

12   business, not to influence resolution of some broader public issue.  For example, the Rimini

13   comment published on April 25, 2008 expressly notes the *lack* of debate regarding the legality of

14   third party support and promotes certain differences between Rimini and one of its former

15   competitors, TomorrowNow.  SOF 37.  Such comments are clearly not directed to influencing the

16   resolution of some public debate, and courts have explained that "advertising alone does not convert

17   a company into a public figure." *Medifast*, 2011 U.S. Dist. LEXIS 33412, at *23-*24; *see also*

18   *Vegod Corp. v. American Broadcasting Companies, Inc.*, 603 P.2d 14, 18 (Cal. 1979) ("[W]e

19   conclude that a person in the business world advertising his wares does not necessarily become part

20   of an existing public controversy." (citations omitted)).  Consistent with this authority, Rimini "is

21   not voluntarily injected into a public controversy when" publically promoting its services. *Medifast*,

22   2011 U.S. Dist. LEXIS 33412, at *25.[7]

---

[7]  Oracle also argues that Rimini is a limited purpose public figure because of its financial and market significance.  Plt. Br. at 25, n.8.  Oracle cites two cases to support its proposition, both of which are inapplicable.  First, Oracle cites *Ampex Corp. v. Cargle*, 27 Cal. Rptr. 3d 863, 870 (Cal. Ct. App. 2005), which held as a limited purpose public figure a corporation with 59,000 publicly-traded shares whose decision to discontinue its multimillion dollar venture was discussed publicly.  The corporation in *Ampex* responded to public criticism with press releases and letters posted on its web site.  *Id.* at 867.  In contrast, Rimini is a small, privately-held company, and Oracle has not put forth evidence that Rimini's business

22

Finally, Oracle cites comments by Rimini addressing Rimini's response to the allegations made in this lawsuit. Plt. Br. at 24. However, Rimini does not "become a public figure by responding to defamatory statements." *Medifast*, 2011 U.S. Dist. LEXIS 33412, at *25-*26 (citing *Monesian v. McClatchy Newspapers*, 233 Cal. Rptr. 430, 440 (Cal. Ct. App. 1991)). Rimini did not abuse its privilege of reply when it stated and detailed why its business model is entirely legal. Here again, Oracle fails to provide any viable basis for finding that Rimini is a limited purpose public figure, and Rimini need not prove actual malice to prevail on its defamation counterclaim.

**B.      Rimini Possesses Sufficient Evidence to Prove Oracle Acted Either Negligently or with Actual Malice.**

Oracle also argues that Rimini cannot prove Oracle acted with actual malice, or even negligently, because Rimini did not conduct sufficient discovery. Plt. Br. at 24. Oracle is wrong. Notwithstanding the conclusory and self-serving declarations proffered by Oracle, the evidence in this case is more than sufficient to establish that Oracle's defamatory comments were made with "reckless disregard" for the truth.

Oracle's claims of "massive theft" are based on Rimini's possession of Oracle software, as well as Rimini's use of this software to provide support services. Regarding such claims, Rimini's pleadings explain that:

> Oracle cannot truthfully claim that Rimini Street is not authorized to possess copies of Oracle's software. First, every Rimini Street client contract authorizes Rimini Street to possess or access copies of the client's licensed software. Second, as Oracle is well aware, it is common industry practice by other third party consulting venders such as IBM, AT&T, Accenture, Navisite, WTS, CedarCrestone, and virtually every other hosting service provider to possess and work with copies of their client's licensed software products. Third, until recently Oracle itself directly mailed or made available to Rimini Street through authorized downloads, as an authorized agent of Oracle's licensees, copies of the clients' licensed Oracle software.

methods were discussed publicly or that Rimini responded to those public discussions. Second, Oracle cites *Pegasus v. Reno Newspapers, Inc.* 57 P.3d 82, 92 (Nev. 2002), in which a restaurant was found to be a public figure for the "limited purpose of consumer reporting on their goods and services." While this might be true, Oracle's defamatory statements did not provide consumer reporting about Rimini's services as Oracle has never been a Rimini customer.

1    Dkt. 30 at 13.  Rimini conducted extensive discovery as to the subject matter set forth in its pleading

2    and obtained conclusive evidence demonstrating that: (1) every single Rimini client is licensed by

3    Oracle to the software products supported by Rimini; (2) it is industry practice for third party

4    vendors, including Oracle's own partners, to possess and work with copies of their client's licensed

5    software products; and (3) Oracle knowingly sent Rimini hundreds of copies of Oracle software,

6    ██████████████████████████████████████████████████████████████████████    SOFs

7    9, 10, 22, 23, 38.   Given these facts, a reasonable jury could—and should—find that Oracle's

8    litigation-inspired claims of "massive theft" were made with actual malice.

9          First, Oracle identified and produced ████████████████████████████████████

10   ████████████       SOF 38.   As set forth in Rimini's Opposition to Oracle's first motion for partial

11   summary judgment, Oracle's licenses ██████████████████████████████████████████████

12   ████████████████████████████████████████████████████████████████████████████

13   ████████████   Oracle's "massive theft" claim is proven false when considering the language of its own

14   licenses. *Id.*

15        Second, Rimini conducted extensive discovery into the practices of Oracle's Partners, as well

16   as Oracle's technical recommendations regarding the support of its software.  SOF 9.  This evidence

17   establishes that Rimini's practices are consistent with the normal practices in the industry, as set

18   forth in Rimini's Opposition to Oracle's first motion for partial summary judgment.  SOF 9-10.  For

19   instance, numerous Oracle Partners openly advertise the fact that they maintain internal non-

20   production copies their clients' Oracle software, as recommended by Oracle's own technical

21   literature.  *See* SOFs 9, 10.  Oracle condones (and even recommends) such practices when engaged

22   in by its Partners, but accuses Rimini of being a thief and running an illegal business.[8]   Such a

23   blatant contradiction in Oracle's position further proves that Oracle's defamatory comments were

24   indeed made maliciously.

25

26   [8]  While Oracle recently sued its former partner CedarCrestone for running the same allegedly

27        "illegal business model" as Rimini, Oracle cannot change the fact that its continued to renew
         its partnership agreement with CedarCrestone despite admitted knowledge of the conduct
         underlying its recent claims against CedarCrestone.  *See* Dkt. 428 at 3, 9.

28                                                    24

1    Third, the discovery in this case further reveals that Rimini was not stealing the Oracle

2    software in its possession—Oracle was knowingly sending it to Rimini.  SOF 22-23.  Without re-

3    hashing the merits of Rimini's implied license defense, Oracle cannot, on one hand, send Rimini

4    copies of its software and, on the other hand, accuse Rimini of stealing that very software.  Given

5    this conduct by Oracle, a reasonable jury could easily conclude that Oracle's "massive theft"

6    allegations were made maliciously.

7    Far from acting as fraudulent thieves, Rimini Street has acted legally, openly (and often with

8    Oracle's full cooperation), and in accordance with the agreements held by Rimini Street's clients.

9    Ms. Hellinger and Mr. McLeod are Oracle employees that, as part of their job responsibilities,

10   communicate with members of the public on behalf of Oracle regarding, *inter alia*, third party

11   support providers (such as Rimini).  SOF 24-25.  Courts have held in such circumstances that

12   knowledge of the principal is imputed to its agents.  *See Gilbeard v. Dean Witter Reynolds, Inc.*, No.

13   C91-3254 TEH, 199 U.S. Dist. LEXIS 12388, at *12 (N.D. Cal. Aug. 12, 1992) ("Common agency

14   principles hold that knowledge of any agent of a corporation is imputed to the other agents of the

15   corporation and to the principal."); *see also* Cal. Civ. Code § 2332 ("As against a principal, both

16   principal and agent are deemed to have notice of whatever either has notice of . . . .").  As such,

17   Oracle knew or should have known of the falsity of Ms. Hellinger's and Mr. McLeod's statements in

18   light of the discussed evidence, which was known to Oracle at the time the defamatory comments

19   were made.  *See Nguyen-Lam v. Cao*, 90 Cal. Rptr. 3d 205, 213-14 (Cal. Ct. App. 2009) (finding

20   evidence of actual malice when the publisher "had never met plaintiff and knew of her only through

21   media reports").  Rimini has more than sufficient evidence to carry its burden at trial as to Oracle's

22   state of mind in making defamatory statements about Rimini.

23       **C.    Oracle Has Failed to Establish that its "Massive Theft" Statements are True.**

24   Oracle argues that the defamatory statements made by Ms. Hellinger and Mr. McLeod are

25   true, relying on its first motion for partial summary judgment to prove that Rimini has engaged in

26   "massive theft" of Oracle's intellectual property.  Plt. Br. at 26.  However, as that motion is still

27   pending, Oracle's present arguments are, at best, premature.  Moreover, regardless of whether

28

25

1   Rimini is found to have infringed (which it has not), copyright infringement is not theft. *Dowling v.*

2   *United States*, 473 U.S. 207, 217 (1985) ("The infringer invades a statutorily defined province

3   guaranteed to the copyright holder alone. But he does not assume physical control over the

4   copyright; nor does he wholly deprive its owner of its use."). At most, Oracle can prove Rimini

5   engaged in copyright infringement. Oracle cannot prove that Rimini engaged in "massive theft"

6   because Oracle did not bring against Rimini an action for, *e.g.*, conversion or misappropriation.

7   Oracle is not entitled to summary judgment on the basis of its truth defense.

8           **D.    Mr. McLeod's Email is Not Protected as a Truthful or Fair Report.**

9           Oracle advances two related defenses as to Mr. McLeod's email. First, Oracle alleges the

10   email contained a truthful report that accurately quotes Oracle's complaint. Plt. Br. at 26-27.

11   Second, Oracle contends that the "fair reporting privilege" protects the communication. *Id.* at 28.

12   This Court has already rejected similar arguments in denying Oracle's motion to dismiss. Dkt. 111

13   at 5-6.

14          First, Oracle cannot rely on the "truthfulness" of Mr. McLeod's email because "liability for

15   repetition of a libel may not be avoided by the mere expedient of adding the truthful caveat that one

16   heard the statement from somebody else." *Flowers v. Carville*, 310 F.3d 1118, 1128 (9th Cir. 2002)

17   (internal citations omitted). Indeed, "a defamatory statement is not rendered nondefamatory merely

18   because it relies on another defamatory statement." *Id.* at 1129; *see Frommoethelydo v. Fire Ins.*

19   *Exch.*, 721 P.2d 41, 46 (Cal. 1986) ("When one person repeats another's defamatory statement, he

20   may be held liable for republishing the same libel or slander."). As the Ninth Circuit recently noted,

21   "[i]t is well established that every repetition of the defamation is a publication in itself, whether or

22   not the person repeating the defamation attributes it to its source." *Barnes v. Yahoo!, Inc.*, 570 F.3d

23   1096, 1104 (9th Cir. 2009) (internal quotation marks omitted); *see also Cianci v. New Times Pub.*

24   *Co.*, 639 F.2d 54, 60–61 (2d Cir. 1980) (noting the "widely recognized" "black-letter rule that one

25   who republishes a libel is subject to liability just as if he had published it originally, even though he

26   attributes the libelous statement to the original publisher . . . ." (internal quotation marks omitted)).

27

28

26

1    Thus, Oracle's first argument—that its libelous communication truthfully reported the contents of its

2    Complaint—cannot shield it from liability for defamation under settled law.

3         Oracle also argues that Mr. McLeod's email is protected by the "fair reporting" privilege

4    because the email includes a "fair and true" news article about this action. Plt. Br. at 28.  For the

5    "fair reporting privilege" to apply, both California and Nevada require that the report must be fair,

6    accurate, and impartial.  Cal. Civ. Code § 47(d); *Crane v. Arizona Republic*, 972 F.2d 1511, 1519

7    (9th Cir. 1992) (reversing a grant of summary judgment because a reasonable jury could find the

8    article was not fair and true); *Sahara Gaming Corp. v. Culinary Workers Union Local 226*, 984 P.2d

9    164, 166 (Nev. 1999) ("In exchange for this absolute privilege, comes the requirement and

10   responsibility that the report be fair, accurate, and impartial.").  It is well established that an article is

11   not fair and true when it "could reasonably be expected to affect the average reader's appraisal of the

12   story and evaluation of the merits of the charges." *Crane*, 972 F.2d at 1523; *see also Lubin v. Kunin*,

13   17 P.3d 422, 427 (Nev. 2001) (finding that a one-sided view of a child abuse complaint "went

14   beyond fair, accurate, and impartial reporting").  "Invocation of the [fair reporting] privilege . . .

15   requires the [Court] to determine whether [the statements] were fair, accurate, and impartial."

16   *Lubin*, 17 P.3d at 427.

17        In this case, the fair reporting privilege does not apply to Mr. McLeod's emails because the

18   article Mr. McLeod forwarded is not a fair, accurate and impartial report about Oracle's claims

19   against Rimini.  Rather, this article provides a sensationalized account that does not even mention

20   the words "copyright infringement" with respect to Rimini.[9]  SOF 25.  In fact, the article makes no

21   mention of *any* Oracle cause of action brought against Rimini.  *Id.*  Instead, the article regurgitates

22   Oracle's defamatory allegations of "massive theft" and accuses Rimini of "allegedly swiping Oracle

23   software and intellectual property."  Dkt. 410, McLeod Decl. ¶ 2 & Dkt. 422, Plt. Ex. 74.  As

24   established *supra*, copyright infringement and theft are two disparate causes of action.  *See Dowling*,

25   473 U.S. at 217.  The difference between copyright infringement and theft is of a "substantial

---

26   [9]   The article's only mention of "infringement" occurs in relation to Oracle's suit against SAP,

27        reporting that "Oracle promptly sued SAP for infringing on its business model and other
         charges."  SOF 25.

28                                                       27

1    character," and any article painting Rimini as a thief, rather than as an alleged copyright infringer, is

2    indeed "expected to affect the average reader's appraisal of the story," precluding application of the

3    fair reporting privilege. *Crane*, 972 F.2d at 1523.

4              **E.      Rimini Need Not Prove Special Damages on its Defamation Claim.**

5              Finally, Oracle advances arguments that Rimini is required to prove special damages for a

6    trade libel claim. Plt. Br. at 28-29. Rimini, however, is pursuing a claim for defamation, as well as a

7    claim for unfair practices predicated on such defamation. Oracle's allegation that Rimini engaged in

8    "massive theft" is a classic case of defamation *per se* as it tends to impute Rimini's lack of fitness

9    for its business and profession. *Clark County Sch. Dist. v. Virtual Educ. Software, Inc.*, 213 P.3d

10   496, 504 (Nev. 2009) ("[I]f the defamatory communication imputes a 'person's lack of fitness for

11   trade, business, or profession,' or tends to injure the plaintiff in his or her business, it is deemed

12   defamation per se and damages are presumed.") (internal citations omitted). As this Court has

13   already found, "an allegation that a party is guilty of a crime is defamatory on its face." Dkt. 111, at

14   5 (citing *Yow v. Nat'l Enquirer, Inc.*, 550 F. Supp. 2d 1179, 1183 (E.D. Cal. 2008)). As is well

15   established, "a defamation *per se* claim is actionable without proof of special damages." *Yow*, 550

16   F. Supp. 2d at 1183. Therefore, Rimini is not required to prove special damages because damages

17   are presumed.

18   **VII.   CONCLUSION**

19           For the foregoing reasons, Rimini respectfully requests that this Court deny Oracle's Second

20   Motion for Partial Summary Judgment.

21

22

23

24

25

26

27

28                                                          28

1    DATED:  October 9, 2012                    SHOOK, HARDY & BACON LLP

2

3                                               By:    */s/Robert H. Reckers*
                                                       Robert H. Reckers, Esq
4

5                                               *Attorneys for Defendants*
                                                *Rimini Street, Inc. and Seth Ravin*

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27
                                          29
28