# EXHIBIT 1

# EXHIBIT 1

1  KEKER & VAN NEST LLP
   ROBERT A. VAN NEST - #84065
2  rvannest@kvn.com
   CHRISTA M. ANDERSON - #184325
3  canderson@kvn.com
   DANIEL PURCELL - #191424
4  dpurcell@kvn.com
   633 Battery Street
5  San Francisco, CA 94111-1809
   Telephone:    415 391 5400
6  Facsimile:    415 397 7188

7  Attorneys for Defendant
   CEDARCRESTONE, INC.

8
                   UNITED STATES DISTRICT COURT
9
                NORTHERN DISTRICT OF CALIFORNIA
10
                    SAN FRANCISCO DIVISION
11

12 ORACLE AMERICA, INC., a Delaware        Case No. CV-12-4626
   corporation, and ORACLE
13 INTERNATIONAL CORPORATION, a            **DEFENDANT CEDARCRESTONE, INC.'S
   California corporation,                 ANSWER TO COMPLAINT FOR
14                                         DAMAGES AND INJUNCTIVE RELIEF
                Plaintiffs,                AND COUNTERCLAIMS**
15
          v.                              **DEMAND FOR JURY TRIAL**
16 CEDARCRESTONE, INC., a Delaware
   corporation,                           Date Filed:  September 5, 2012
17
                Defendant.                Trial Date:  None Set
18

19

20 CEDARCRESTONE, INC., a Delaware
   corporation,
21
                Counter-claimant,
22
          v.
23 ORACLE AMERICA, INC., a Delaware
   corporation, and ORACLE
24 INTERNATIONAL CORPORATION, a
   California corporation,
25
                Counter-defendants.
26

27

28

Defendant CedarCrestone, Inc. ("CedarCrestone") hereby responds to the Complaint filed by Plaintiffs Oracle America, Inc. ("Oracle America") and Oracle International Corporation ("OIC") (together "Oracle") as follows:

## I.       INTRODUCTION

1.       CedarCrestone admits that, prior to Oracle's pretextual termination of its contracts with CedarCrestone, it had been an Oracle Platinum Partner that provided services to Oracle licensees on its own and in conjunction with Oracle.  CedarCrestone was also an Oracle licensee itself.  CedarCrestone's services to Oracle licensees included consulting and advisory services related to PeopleSoft and Oracle E-Business Suites ("EBS") applications, hosting and management of PeopleSoft and EBS applications, and services related to tax and regulatory support for Oracle's PeopleSoft licensees who are using versions of PeopleSoft applications for which Oracle generally no longer provides tax and regulatory updates or who no longer have a maintenance or support contract with Oracle that includes tax or regulatory updates. CedarCrestone denies that it engaged in any "misappropriation" or "stealing" of any Oracle intellectual property, any unfair competition against Oracle, or any wrongdoing of any kind. With respect to the remaining allegations in paragraph 1, CedarCrestone lacks knowledge or information sufficient to form a belief to admit or deny those allegations, and on that basis denies those allegations.

## II.      THE PARTIES

2.       CedarCrestone lacks knowledge or information sufficient to form a belief to admit or deny the allegations in paragraph 2, and on that basis denies those allegations.

3.       CedarCrestone lacks knowledge or information sufficient to form a belief to admit or deny the allegations in paragraph 3, and on that basis denies those allegations.

4.       Admitted.

## III.     JURISDICTION

5.       This paragraph consists of legal conclusions to which no response is required.

6.       This paragraph consists of legal conclusions to which no response is required.

7.       This paragraph consists of legal conclusions to which no response is required.

1

ANSWER TO COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF AND COUNTERCLAIMS
Case No. CV-12-4626

694237.01

8.    CedarCrestone denies it has committed any wrongful acts, intentional or otherwise, aimed at Oracle, or that anything CedarCrestone may have done has caused any harm to Oracle.  CedarCrestone is not contesting that this Court has personal jurisdiction over it with respect to this case.  The remaining statements in paragraph 8 consist of legal conclusions to which no response is required.

**IV.    VENUE**

9.    This paragraph consists of legal conclusions to which no response is required. CedarCrestone is not contesting that this judicial District is a proper venue for this action.

10.    CedarCrestone denies it has committed any wrongful acts, intentional or otherwise, aimed at Oracle, or that anything CedarCrestone may have done has caused any harm to Oracle.  CedarCrestone is not contesting that this judicial District is a proper venue for this action.  The remaining statements in paragraph 10 consist of legal conclusions to which no response is required.

**V.    INTRADISTRICT ASSIGNMENT**

11.    CedarCrestone admits that Oracle has asserted a claim for copyright infringement. The remaining statements in paragraph 11 consist of legal conclusions to which no response is required.

**VI.    FACTUAL ALLEGATIONS**

12.    CedarCrestone admits that Oracle develops, manufactures, markets, distributes, and services database, middleware, and applications software programs.  With respect to the remaining allegations in paragraph 12, CedarCrestone lacks knowledge or information sufficient to form a belief to admit or deny those allegations, and on that basis denies those allegations.

13.    CedarCrestone lacks knowledge or information sufficient to form a belief to admit or deny the allegations in paragraph 13, and on that basis denies those allegations.

14.    CedarCrestone admits that it entered into the identified contracts with Oracle on the stated dates.  Except to the extent admitted above, CedarCrestone denies the allegations in this paragraph.

ANSWER TO COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF AND COUNTERCLAIMS
Case No. CV-12-4626

694237.01

15.     CedarCrestone admits that, by a letter dated September 4, 2012, Oracle purported to terminate its contracts with CedarCrestone. Except to the extent admitted above, CedarCrestone denies the allegations in this paragraph.

16.     CedarCrestone admits that its OPN Agreement with Oracle contained the language quoted in paragraph 16. The remainder of this paragraph consists of legal conclusions to which no response is required.

17.     CedarCrestone admits that its OPN Agreement with Oracle contained the language quoted in paragraph 17. The remainder of this paragraph consists of legal conclusions to which no response is required.

18.     CedarCrestone admits that Oracle's "Ethics Code" contained the language quoted in paragraph 18. The remainder of this paragraph consists of legal conclusions to which no response is required.

19.     CedarCrestone admits that Oracle's "Ethics Code" contained the language quoted in paragraph 19. The remainder of this paragraph consists of legal conclusions to which no response is required.

20.     CedarCrestone admits that Oracle's "Ethics Code" contained the language quoted in paragraph 20. The remainder of this paragraph consists of legal conclusions to which no response is required.

21.     CedarCrestone lacks knowledge or information sufficient to form a belief to admit or deny the allegations in paragraph 21, and on that basis denies those allegations.

22.     CedarCrestone admits the allegations in this paragraph, other than Oracle's claim that a customer who did not choose to purchase support services from CedarCrestone inevitably would purchase such services from Oracle, which allegation CedarCrestone denies. For many customers who use older versions of PeopleSoft applications, the tax and regulatory support and updates offered by Oracle are not even compatible with those customers' software. For other customers, the tax and regulatory support and updates they need are not offered by Oracle or, when they are offered, they are offered only as part of a larger maintenance and support offering that exceeds the scope of the client's needs. Accordingly, Oracle does not offer services that are a

3

694237.01

1  viable competitive alternative, much less the only such alternative, for customers who require tax

2  and regulatory services such as those previously offered by CedarCrestone.

3       23.    CedarCrestone admits that its proposal to the Oklahoma City Municipal Facilities

4  Authority and its August 19, 2011 letter to Oracle contained the language quoted in paragraph 23.

5  CedarCrestone further admits it has downloaded Oracle support materials from Oracle's website,

6  which are freely available to Oracle licensees, as it was (i) licensed or otherwise permitted to do

7  by Oracle; (ii) permitted to do under the client's license with Oracle; and/or (iii) in the case of

8  George Weston Bakeries and as disclosed to Oracle, acting as an agent for George Weston

9  Bakeries pursuant to a written contract, under which George Weston Bakeries was required to

10  have an active support contract with and license from Oracle which made it eligible to receive

11  Oracle tax and regulatory updates.  Except to the extent admitted above, CedarCrestone denies

12  the allegations in this paragraph.

13       24.    CedarCrestone admits that George Weston Bakeries was its customer and that its

14  website listed George Weston Bakeries as a "Client Success" as of September 4, 2012.

15  CedarCrestone further admits that its website contained the language quoted in paragraph 24

16  regarding its development services.  Except to the extent admitted above, CedarCrestone denies

17  the allegations in this paragraph.

18       25.    Denied.

19       26.    CedarCrestone denies that the relevant PeopleSoft licenses all contain similar such

20  restrictions.  While it lacks knowledge or information sufficient to form a belief to admit or deny

21  the allegations in paragraph 26 as to all of the relevant PeopleSoft licenses, and on that basis

22  denies those allegations, CedarCrestone is aware that PeopleSoft licenses drafted and executed in

23  the 1990s are substantially different than more recent, or current, PeopleSoft licenses.

24       27.    CedarCrestone admits it is familiar with the terms of its own licenses with Oracle,

25  but denies that it is generally familiar with PeopleSoft licenses.  CedarCrestone has never seen,

26  and accordingly lacks sufficient information to admit or deny any allegations regarding the

27  content of, most of the relevant PeopleSoft licenses.  Even as to those PeopleSoft licenses

28  CedarCrestone has reviewed, those licenses and their terms vary significantly depending on when

4

ANSWER TO COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF AND COUNTERCLAIMS
Case No. CV-12-4626

694237.01

1   they were drafted and executed, and all such PeopleSoft licenses that CedarCrestone has reviewed

2   in part contain a confidentiality clause that bars the licensee from sharing the entire license with

3   third parties.  CedarCrestone admits that the language quoted in paragraph 27 appears in its

4   proposal to the Oklahoma City Municipal Facilities Authority.  Except to the extent admitted

5   above, CedarCrestone denies the allegations in this paragraph.

6         28.     CedarCrestone admits that the language quoted in paragraph 28 appears in its

7   October 2009 proposal to the Tucson Unified School District.  Except to the extent admitted

8   above, CedarCrestone denies the allegations in this paragraph.

9         29.     Denied.

10         30.     CedarCrestone admits that the Tucson Unified School District purchased support

11   services from CedarCrestone after receiving CedarCrestone's proposal.  Except to the extent

12   admitted above, CedarCrestone denies the allegations in this paragraph.

13         31.     Denied.

14         32.     CedarCrestone admits that the language quoted in paragraph 32 appears in the two

15   proposals at issue.  Except to the extent admitted above, CedarCrestone denies the allegations in

16   this paragraph.

17         33.     CedarCrestone admits that the language quoted in paragraph 33 appears in its

18   proposal to the Oklahoma City Municipal Facilities Authority.  Except to the extent admitted

19   above, CedarCrestone denies the allegations in this paragraph.

20         34.     CedarCrestone denies that any of its statements in its proposal to the Oklahoma

21   City Municipal Facilities Authority was either false or misleading, or that CedarCrestone

22   proposed to engage in services that were unauthorized under its or its clients' agreements with

23   Oracle.  CedarCrestone further denies that it ever claimed, in that proposal or anywhere, that its

24   licenses with Oracle provided immunity for intellectual property infringement.  CedarCrestone

25   admits that the quoted language in paragraph 34 appears in Oracle's Ethics Code.  Except to the

26   extent admitted or specifically denied above, CedarCrestone denies the allegations in this

27   paragraph.

28

ANSWER TO COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF AND COUNTERCLAIMS
Case No. CV-12-4626

694237.01

**First Claim for Relief**
**Copyright Infringement**
**(Claim by OIC)**

35.     This paragraph does not state any facts requiring an admission or denial. CedarCrestone reasserts and hereby incorporates by reference its responses to the preceding paragraphs of the Complaint above as though fully set forth herein.

36.     This paragraph consists of legal conclusions to which no response is required.  To the extent the paragraph makes factual allegations regarding Oracle's registration of its purported copyrights, CedarCrestone lacks knowledge or information sufficient to form a belief to admit or deny those allegations, and on that basis denies those allegations.

37.     This paragraph consists of legal conclusions to which no response is required.  To the extent the paragraph makes factual allegations, CedarCrestone lacks knowledge or information sufficient to form a belief to admit or deny those allegations, and on that basis denies those allegations.

38.     This paragraph consists of legal conclusions to which no response is required.  To the extent the paragraph makes factual allegations, CedarCrestone lacks knowledge or information sufficient to form a belief to admit or deny those allegations, and on that basis denies those allegations.  To the extent this paragraph alleges that CedarCrestone infringed any Oracle copyrights, CedarCrestone denies that allegation.

39.     Denied.

40.     Denied.

41.     Denied.

42.     This paragraph consists of legal conclusions to which no response is required.  To the extent the paragraph makes factual allegations, CedarCrestone denies them.

43.     Denied.

44.     Denied.

45.     Denied.

46.     Denied.

6

694237.01

## Second Claim for Relief
### Breach of Contract
### (Claim by Oracle America)

47.     This paragraph does not state any facts requiring an admission or denial. CedarCrestone reasserts and hereby incorporates by reference its responses to the preceding paragraphs of the Complaint above as though fully set forth herein.

48.     CedarCrestone admits that it entered into the OPN Agreement with Oracle and that some iterations of the OPN Agreement purported to incorporate Oracle's "Ethics Code." CedarCrestone's agreements with Oracle speak for themselves, and the meaning of their terms is a legal question.

49.     CedarCrestone admits that it entered into the FUDA with Oracle and that some iterations of the FUDA purported to incorporate Oracle's "Ethics Code." CedarCrestone's agreements with Oracle speak for themselves, and the meaning of their terms is a legal question.

50.     This paragraph consists of legal conclusions to which no response is required. To the extent the paragraph makes factual allegations, CedarCrestone lacks knowledge or information sufficient to form a belief to admit or deny those allegations, and on that basis denies those allegations.

51.     Denied.

52.     Denied.

53.     Denied.

54.     Denied.

55.     Denied.

## Third Claim for Relief
### Unfair Competition – Cal. Bus. & Prof. Code § 17200
### (Claim by Oracle America)

56.     This paragraph does not state any facts requiring an admission or denial. CedarCrestone reasserts and hereby incorporates by reference its responses to the preceding paragraphs of the Complaint above as though fully set forth herein.

57.     Denied.

58.     Denied.

7

694237.01

59.     CedarCrestone admits that it entered into the OPN Agreement and FUDA, and that some iterations of those contracts purport to incorporate Oracle's "Ethics Code." CedarCrestone's agreements with Oracle speak for themselves, and the meaning of their terms is a legal question.  With respect to the remaining factual allegations in this paragraph, CedarCrestone lacks knowledge or information sufficient to form a belief to admit or deny those allegations, and on that basis denies those allegations.

60.     Denied.

61.     Denied.

62.     CedarCrestone admits that the OPN Agreement and FUDA identify Oracle as being located in Redwood City, California and Redwood Shores, California, respectively. CedarCrestone denies the remaining factual allegations in this paragraph.

63.     Denied.

64.     This paragraph states legal conclusions to which no response is required.

## PRAYER FOR RELIEF

Oracle's Prayer for Relief sets forth the statement of relief requested by Oracle, to which no response is required.  CedarCrestone denies that Oracle is entitled to any of the requested relief from CedarCrestone and denies any factual allegations contained in the Prayer for Relief.

## GENERAL DENIAL AND AFFIRMATIVE DEFENSES

65.     CedarCrestone denies each and every allegation of the Complaint not expressly admitted herein.  CedarCrestone further denies that it has violated the law and denies that it has injured or damaged Oracle in any manner or amount whatsoever or at all, or that Oracle has sustained or will sustain injuries or damages by reason of any act, omission or fault on the part of CedarCrestone, its agents, servants or employees.  By alleging the Affirmative Defenses set forth below, CedarCrestone is not agreeing or conceding that it has the burden of proof on any of the issues raised in these defenses.  All such defenses are pled in the alternative, and do not constitute an admission of liability or that Oracle is entitled to any relief whatsoever.

8

694237.01

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### FIRST AFFIRMATIVE DEFENSE
#### *(Failure to Provide Notice and an Opportunity to Cure)*

66.     For its first affirmative defense, CedarCrestone alleges that Oracle lacks standing to bring any claim for breach of contract, or to terminate either the OPN Agreement or the FUDA, because Oracle failed to comply with the requirements of those contracts requiring written notice and an opportunity to cure prior to bringing any lawsuit or terminating either contract.

67.     Both section K of the OPN Agreement and section J of the FUDA provide that, if either party breaches a material term of the contracts, the non-breaching party must provide "written specification of the breach" and give the breaching party 30 days "to correct the breach." Only if notice is given and the breach is not cured within 30 days may the non-breaching party terminate either contract, as Oracle has purported to do here.

68.     Prior to purporting to terminate the OPN Agreement and FUDA on September 4, 2012 and filing this Complaint on September 5, 2012, Oracle never provided CedarCrestone with any written specification of CedarCrestone's alleged breaches, much less gave CedarCrestone the opportunity to cure those alleged breaches.  Accordingly, Oracle had no right to terminate either contract or pursue any action for breach of contract.  Contrary to the allegations in Oracle's Complaint, CedarCrestone committed no acts in violation of Oracle's Partner Code of Conduct and Business Ethics ("Ethics Code") that could justify immediate termination of either the OPN Agreement or FUDA.

### SECOND AFFIRMATIVE DEFENSE
#### *(Contractual Statute of Limitations)*

69.     For its second affirmative defense, CedarCrestone alleges that Oracle's claims are barred, in whole or in part, by applicable statutes of limitation.

70.     Both section U.4 of the OPN Agreement and section T.4 of the FUDA provide that, "[e]xcept for actions for nonpayment or breach of Oracle's proprietary rights, no action, regardless of form, arising out of or related to this agreement may be brought by either party more than two years after the cause of action has accrued."  Oracle filed this action on September 5, 2012.

9

ANSWER TO COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF AND COUNTERCLAIMS
Case No. CV-12-4626

1        71.     As Oracle expressly pleads in paragraph 23 of the Complaint, and elsewhere,

2    Oracle is asserting claims arising out of statements made and business practices disclosed by

3    CedarCrestone in CedarCrestone's March 16, 2010 proposal to the Oklahoma City Municipal

4    Facilities Authority.  CedarCrestone's proposal has been a matter of public record, and available

5    to the general public over the Internet (at

6    http://www.okc.gov/agendapub/cache/2/hflcdfrosh5z1h55o3lcpif5/119038210062012013732145.

7    pdf), since at least June 2010.  Oracle did not assert any claims against CedarCrestone arising

8    from this proposal until the filing of the Complaint in this action on September 5, 2012—close to

9    two and a half years from the date of the proposal, and well over two years since the proposal was

10   publicly posted.  Accordingly, any claims by Oracle arising out of the March 16, 2010 proposal,

11   or the CedarCrestone business practices described therein, are within the scope of the limitations

12   provisions in the OPN Agreement and FUDA.  To the extent Oracle's claims are not "actions for

13   nonpayment or breach of Oracle's proprietary rights," those claims are time-barred.

14       72.     As Oracle expressly pleads in paragraph 28 of the Complaint, and elsewhere,

15   Oracle is asserting claims arising out of statements made and business practices disclosed by

16   CedarCrestone in CedarCrestone's October 22, 2009 proposal to the Tucson Unified School

17   District.  Oracle had actual possession of this proposal, and actual notice of its contents, no later

18   than August 5, 2010, when defendant SAP AG ("SAP") included the proposal as Exhibit A-6648

19   on its Trial Exhibit List in the *Oracle v. SAP* litigation in this District, Case No. 07-CV-1658 PJH

20   (EDL) (N.D. Cal.).  In this instance, Oracle had actual notice of the CedarCrestone statements and

21   business practices that are the basis of Oracle's claims more than two years prior to the filing of

22   the Complaint on September 5, 2012.  Despite that actual knowledge, Oracle did not assert any

23   claims against CedarCrestone until the filing of the Complaint in this action.  Accordingly, any

24   claims by Oracle arising out of the October 22, 2009 proposal are within the scope of the

25   limitations provisions in the OPN Agreement and FUDA.  To the extent Oracle's claims are not

26   "actions for nonpayment or breach of Oracle's proprietary rights," those claims are time-barred.

27

28

ANSWER TO COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF AND COUNTERCLAIMS
Case No. CV-12-4626

694237.01

### THIRD AFFIRMATIVE DEFENSE
#### *(Waiver)*

73.   For its third affirmative defense, CedarCrestone alleges that Oracle has waived, settled, satisfied, or extinguished its claims, which waiver, settlement, satisfaction, or extinguishment was supported by adequate consideration.

74.   As Oracle expressly pleads in paragraph 28 of the Complaint, and elsewhere, Oracle is asserting claims arising out of statements made and business practices disclosed by CedarCrestone in CedarCrestone's October 22, 2009 proposal to the Tucson Unified School District.  Oracle had actual possession of this proposal, and actual knowledge of its contents, no later than August 5, 2010, when defendant SAP included the proposal as Exhibit A-6648 on its Trial Exhibit List in the *Oracle v. SAP* litigation.  Despite having notice of CedarCrestone's statements and business practices as of August 5, 2010, Oracle did not assert any claims against CedarCrestone until the filing of the Complaint in this action more than two years later, on September 5, 2012.

75.   Similarly, as Oracle expressly pleads in paragraph 23 of the Complaint, and elsewhere, Oracle is asserting claims arising out of statements made and business practices disclosed by CedarCrestone in CedarCrestone's March 16, 2010 proposal to the Oklahoma City Municipal Facilities Authority.  CedarCrestone's proposal has been a matter of public record, and available to the general public over the Internet (at http://www.okc.gov/agendapub/cache/2/hflcdfrosh5z1h55o3lcpif5/11903821006201201373214 5.pdf), since at least June 2010.  Moreover, Oracle had actual possession of this proposal, and actual notice of its contents, no later than July 28, 2011, when CedarCrestone produced the proposal, among other documents, to Oracle in response to a subpoena in the pending *Oracle v. Rimini Street* litigation, Case No. 2:10-CV-0106-LRH-PAL (D. Nev.).  Despite having notice of CedarCrestone's statements and business practices at least since July 28, 2011, if not since June 2010, Oracle did not assert any claims against CedarCrestone until the filing of the Complaint in this action more than a year later, on September 5, 2012.

76.   Finally, as Oracle expressly pleads in paragraph 23 of the Complaint, and elsewhere, Oracle is asserting claims arising out of statements made and an event disclosed by

11

1    CedarCrestone in CedarCrestone's August 19, 2011 letter to Oracle regarding CedarCrestone's

2    work for George Weston Bakeries. Despite having notice of the relevant statements and events

3    no later than August 19, 2011, Oracle did not assert any claims against CedarCrestone until the

4    filing of the Complaint in this action on September 5, 2012.

5         77.    Despite having knowledge of all the purported wrongdoing by CedarCrestone

6    alleged in the Complaint no later than August 19, 2011—and much of the alleged wrongdoing for

7    more than two years—Oracle continued to do business with CedarCrestone until it purported to

8    terminate the OPN Agreement and FUDA on September 4, 2012. Indeed, despite having

9    knowledge of CedarCrestone's purported wrongdoing, Oracle renewed both the OPN Agreement

10   and the FUDA—in November 2011 and April 2012, respectively. Moreover, in the spring of

11   2012, Oracle took further affirmative acts to show support for CedarCrestone and its business

12   practices, by selecting CedarCrestone as an Oracle North America Public Sector SOA Pillar

13   Partner and accepting CedarCrestone into the Oracle Invested Partner Community for FMW.

14   Through all these affirmative acts taken over a period of months, during which Oracle failed to

15   assert any claims against CedarCrestone, Oracle unambiguously communicated to CedarCrestone,

16   with full knowledge of all material facts, that it either saw nothing wrong with CedarCrestone's

17   statements and business practices or that it was affirmatively electing to waive any claim it could

18   have asserted stemming from those statements or business practices.

19        78.    Oracle's conduct was so inconsistent with any intent to enforce the copyrights or

20   contractual rights it is purporting to enforce in this action that any reasonable contractual partner

21   reasonably would have come to believe that Oracle was relinquishing any rights it could have

22   pursued. In response to Oracle's actions, including but not limited to the renewal of the OPN

23   Agreement and FUDA, CedarCrestone reasonably and actually believed that Oracle had no

24   substantive objection to any of the statements or business practices that form the basis of Oracle's

25   claims in this action.

26

27

28

694237.01

**FOURTH AFFIRMATIVE DEFENSE**
*(Laches)*

79.     For its fourth affirmative defense, CedarCrestone alleges that Oracle's claims are

barred, in whole or in part, by the doctrine of laches.

80.     As Oracle expressly pleads in paragraph 28 of the Complaint, and elsewhere,

Oracle is asserting claims arising out of statements made and business practices disclosed by

CedarCrestone in CedarCrestone's October 22, 2009 proposal to the Tucson Unified School

District.  Oracle had actual possession of this proposal, and actual knowledge of its contents, no

later than August 5, 2010, when defendant SAP included the proposal as Exhibit A-6648 on its

Trial Exhibit List in the *Oracle v. SAP* litigation.  Despite having notice of CedarCrestone's

statements and business practices as of August 5, 2010, Oracle did not assert any claims against

CedarCrestone until the filing of the Complaint in this action more than two years later, on

September 5, 2012.

81.     Similarly, as Oracle expressly pleads in paragraph 23 of the Complaint, and

elsewhere, Oracle is asserting claims arising out of statements made and business practices

disclosed by CedarCrestone in CedarCrestone's March 16, 2010 proposal to the Oklahoma City

Municipal Facilities Authority.  CedarCrestone's proposal has been a matter of public record, and

available to the general public over the Internet (at

http://www.okc.gov/agendapub/cache/2/hflcdfrosh5z1h55o3lcpif5/119038210062012013732145.

pdf), since at least June 2010.  Moreover, Oracle had actual possession of this proposal, and

actual notice of its contents, no later than July 28, 2011, when CedarCrestone produced the

proposal, among other documents, to Oracle in response to a subpoena in the pending *Oracle v.*

*Rimini Street* litigation.  Despite having notice of CedarCrestone's statements and business

practices at least since July 28, 2011, if not since June 2010, Oracle did not assert any claims

against CedarCrestone until the filing of the Complaint in this action more than a year later, on

September 5, 2012.

82.     Finally, as Oracle expressly pleads in paragraph 23 of the Complaint, and

elsewhere, Oracle is asserting claims arising out of statements made and an event disclosed by

CedarCrestone in CedarCrestone's August 19, 2011 letter to Oracle regarding CedarCrestone's

13

1    work for George Weston Bakeries. Despite having notice of the relevant statements and event no

2    later than August 19, 2011, Oracle did not assert any claims against CedarCrestone until the filing

3    of the Complaint in this action on September 5, 2012.

4        83.    Despite having knowledge of all the purported wrongdoing by CedarCrestone

5    alleged in the Complaint no later than August 19, 2011—and much of the alleged wrongdoing for

6    more than two years—Oracle continued to do business with CedarCrestone until it purported to

7    terminate the OPN Agreement and FUDA on September 4, 2012. Indeed, despite having

8    knowledge of CedarCrestone's purported wrongdoing, Oracle renewed both the OPN Agreement

9    and the FUDA—in November 2011 and April 2012, respectively. Moreover, in the spring of

10    2012, Oracle took further affirmative acts to show support for CedarCrestone and its business

11    practices, by selecting CedarCrestone as an Oracle North America Public Sector SOA Pillar

12    Partner and accepting CedarCrestone into the Oracle Invested Partner Community for FMW.

13    Through all these affirmative acts taken over a period of months, during which Oracle failed to

14    assert any claims against CedarCrestone, Oracle unambiguously communicated to CedarCrestone,

15    with full knowledge of all material facts, that it either saw nothing wrong with CedarCrestone's

16    statements and business practices or that it was affirmatively electing to waive any claim it could

17    have asserted stemming from those statements or business practices or events.

18        84.    Oracle's delay in raising any objection to CedarCrestone's alleged conduct, and in

19    filing this lawsuit, was unreasonable and inexcusable and has prejudiced CedarCrestone. As a

20    result of Oracle's willful inaction, and the assurances Oracle provided to CedarCrestone by

21    expressing a willingness to continue working with CedarCrestone, and actually renewing its

22    contracts and partnerships with CedarCrestone, CedarCrestone elected to renew those contracts

23    and partnerships and to continue spending time and money providing and expanding services to

24    Oracle software licensees, assisting Oracle with activities designed to drive license revenue to

25    Oracle, and investing in co-development and marketing activities. CedarCrestone further relied

26    on its continuing status as a certified Oracle partner in continuing to allocate resources to its

27    existing initiatives with Oracle, including co-development, demonstrating Oracle software for

28    prospective Oracle licensees, and developing solutions and proposals on other contracts, the

ANSWER TO COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF AND COUNTERCLAIMS
Case No. CV-12-4626

694237.01

1   success of some of which bids was expressly contingent on CedarCrestone remaining an Oracle

2   partner.  CedarCrestone devoted resources to servicing those existing customers who required

3   Oracle partner status, preparing proposals for future work for such customers, and planning to

4   staff those future projects.  All of these commitments forced CedarCrestone to divert its scarce

5   resources from other potentially lucrative business lines and projects.

6
### FIFTH AFFIRMATIVE DEFENSE
#### *(Equitable Estoppel)*
7

8       85.     For its fifth affirmative defense, CedarCrestone alleges that Oracle's claims are

9   barred, in whole or in part, by the doctrine of equitable estoppel.

10      86.     As Oracle expressly pleads in paragraph 28 of the Complaint, and elsewhere,

11  Oracle is asserting claims arising out of statements made and business practices disclosed by

12  CedarCrestone in CedarCrestone's October 22, 2009 proposal to the Tucson Unified School

13  District.  Oracle had actual possession of this proposal, and actual knowledge of its contents, no

14  later than August 5, 2010, when defendant SAP included the proposal as Exhibit A-6648 on its

15  Trial Exhibit List in the *Oracle v. SAP* litigation.  Despite having notice of CedarCrestone's

16  statements and business practices as of August 5, 2010, Oracle did not assert any claims against

17  CedarCrestone until the filing of the Complaint in this action more than two years later, on

18  September 5, 2012.

19      87.     Similarly, as Oracle expressly pleads in paragraph 23 of the Complaint, and

20  elsewhere, Oracle is asserting claims arising out of statements made and business practices

21  disclosed by CedarCrestone in CedarCrestone's March 16, 2010 proposal to the Oklahoma City

22  Municipal Facilities Authority.  CedarCrestone's proposal has been a matter of public record, and

23  available to the general public over the Internet (at

24  http://www.okc.gov/agendapub/cache/2/hflcdfrosh5z1h55o3lcpif5/11903821006201201 3732145.

25  pdf), since at least June 2010.  Moreover, Oracle had actual possession of this proposal, and

26  actual notice of its contents, no later than July 28, 2011, when CedarCrestone produced the

27  proposal, among other documents, to Oracle in response to a subpoena in the pending *Oracle v.*

28  *Rimini Street* litigation.  Despite having notice of CedarCrestone's statements and business

15

ANSWER TO COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF AND COUNTERCLAIMS
Case No. CV-12-4626

694237.01

1    practices at least since July 28, 2011, if not since June 2010, Oracle did not assert any claims

2    against CedarCrestone until the filing of the Complaint in this action more than a year later, on

3    September 5, 2012.

4         88.    Finally, as Oracle expressly pleads in paragraph 23 of the Complaint, and

5    elsewhere, Oracle is asserting claims arising out of statements made and an event disclosed by

6    CedarCrestone in CedarCrestone's August 19, 2011 letter to Oracle regarding CedarCrestone's

7    work for George Weston Bakeries.  Despite having notice of the relevant statements and event no

8    later than August 19, 2011, Oracle did not assert any claims against CedarCrestone until the filing

9    of the Complaint in this action on September 5, 2012.

10        89.    Despite having knowledge of all the purported wrongdoing by CedarCrestone

11   alleged in the Complaint no later than August 19, 2011—and much of the alleged wrongdoing for

12   more than two years—Oracle continued to do business with CedarCrestone until it purported to

13   terminate the OPN Agreement and FUDA on September 4, 2012.  Indeed, despite having

14   knowledge of CedarCrestone's purported wrongdoing, Oracle renewed both the OPN Agreement

15   and the FUDA—in November 2011 and April 2012, respectively.  Moreover, in the spring of

16   2012, Oracle took further affirmative acts to show support for CedarCrestone and its business

17   practices, by selecting CedarCrestone as an Oracle North America Public Sector SOA Pillar

18   Partner and accepting CedarCrestone into the Oracle Invested Partner Community for FMW.

19   Through all these affirmative acts taken over a period of months, during which Oracle failed to

20   specify or assert any claims against CedarCrestone, Oracle unambiguously communicated to

21   CedarCrestone, with full knowledge of all material facts, that it either saw nothing wrong with

22   CedarCrestone's statements and business practices or that it was affirmatively electing to waive

23   any claim it could have asserted stemming from those statements or business practices.

24        90.    CedarCrestone had a right to assume, and did assume, that Oracle had concluded

25   that none of CedarCrestone's business practices or acts constituted any violation of Oracle's

26   rights.  Prior to September 4, 2012, when it abruptly terminated CedarCrestone's partner status,

27   Oracle had never given CedarCrestone any indication that Oracle considered any of the acts

28   alleged in the Complaint to constitute copyright infringement, breach of contract, unfair business

16

694237.01

1   practices, or any other civil wrong.  As a result of Oracle's willful inaction, and the assurances

2   Oracle provided to CedarCrestone by expressing a willingness to continue working with

3   CedarCrestone, and actually renewing its contracts and partnerships with CedarCrestone,

4   CedarCrestone elected to renew those contracts and partnerships and to continue spending time

5   and money providing and expanding services to Oracle software licensees, assisting Oracle with

6   activities designed to drive license revenue to Oracle, and investing in co-development and

7   marketing activities.  CedarCrestone further relied on its continuing status as a certified Oracle

8   partner in continuing to allocate resources to its existing initiatives with Oracle, including co-

9   development, demonstrating Oracle software for prospective Oracle licensees, and developing

10  solutions and proposals on other contracts, the success of some of which bids was expressly

11  contingent on CedarCrestone remaining an Oracle partner.  CedarCrestone devoted resources to

12  servicing those existing customers who required Oracle partner status, preparing proposals for

13  future work for such customers, and planning to staff those future projects.  All of these

14  commitments forced CedarCrestone to divert its scarce resources from other potentially lucrative

15  business lines and projects.

16                          **SIXTH AFFIRMATIVE DEFENSE**
                                 *(Implied License)*
17

18      91.     For its sixth affirmative defense, CedarCrestone alleges that Oracle's claims are

19  barred, in whole or in part, by the doctrine of implied license.

20      92.     As Oracle expressly pleads in paragraph 28 of the Complaint, and elsewhere,

21  Oracle is asserting claims arising out of statements made and business practices disclosed by

22  CedarCrestone in CedarCrestone's October 22, 2009 proposal to the Tucson Unified School

23  District.  Oracle had actual possession of this proposal, and actual knowledge of its contents, no

24  later than August 5, 2010, when defendant SAP included the proposal as Exhibit A-6648 on its

25  Trial Exhibit List in the *Oracle v. SAP* litigation.  Despite having notice of CedarCrestone's

26  statements and business practices as of August 5, 2010, Oracle did not assert any claims against

27  CedarCrestone until the filing of the Complaint in this action more than two years later, on

28  September 5, 2012.

---

                                            17

694237.01

93.     Similarly, as Oracle expressly pleads in paragraph 23 of the Complaint, and elsewhere, Oracle is asserting claims arising out of statements made and business practices disclosed by CedarCrestone in CedarCrestone's March 16, 2010 proposal to the Oklahoma City Municipal Facilities Authority.  CedarCrestone's proposal has been a matter of public record, and available to the general public over the Internet (at http://www.okc.gov/agendapub/cache/2/hflcdfrosh5z1h55o3lcpif5/1190382100620120137321 45.pdf), since at least June 2010.  Moreover, Oracle had actual possession of this proposal, and actual notice of its contents, no later than July 28, 2011, when CedarCrestone produced the proposal, among other documents, to Oracle in response to a subpoena in the pending *Oracle v. Rimini Street* litigation.  Despite having notice of CedarCrestone's statements and business practices at least since July 28, 2011, if not since June 2010, Oracle did not assert any claims against CedarCrestone until the filing of the Complaint in this action more than a year later, on September 5, 2012.

94.     Finally, as Oracle expressly pleads in paragraph 23 of the Complaint, and elsewhere, Oracle is asserting claims arising out of statements made and an event disclosed by CedarCrestone in CedarCrestone's August 19, 2011 letter to Oracle regarding CedarCrestone's work for George Weston Bakeries.  Despite having notice of the relevant statements and event no later than August 19, 2011, Oracle did not assert any claims against CedarCrestone until the filing of the Complaint in this action on September 5, 2012.

95.     Despite having knowledge of all the purported wrongdoing by CedarCrestone alleged in the Complaint no later than August 19, 2011—and much of the alleged wrongdoing for more than two years—Oracle continued to do business with CedarCrestone until it purported to terminate the OPN Agreement and FUDA on September 4, 2012.  Indeed, despite having knowledge of CedarCrestone's purported wrongdoing, Oracle renewed both the OPN Agreement and the FUDA—in November 2011 and April 2012, respectively.  Moreover, in the spring of 2012, Oracle took further affirmative acts to show support for CedarCrestone and its business practices, by selecting CedarCrestone as an Oracle North America Public Sector SOA Pillar Partner and accepting CedarCrestone into the Oracle Invested Partner Community for FMW.

18

694237.01

1    Through all these affirmative acts taken over a period of months, during which Oracle failed to

2    assert any claims against CedarCrestone, Oracle unambiguously communicated to CedarCrestone,

3    with full knowledge of all material facts, that it either saw nothing wrong with CedarCrestone's

4    statements and business practices or that it was affirmatively electing to waive any claim it could

5    have asserted stemming from those statements or business practices.

6        96.    The totality of Oracle's and CedarCrestone's conduct, in negotiating and then

7    agreeing to continue their long-standing contractual relationship, demonstrates Oracle's intent to

8    grant CedarCrestone permission to provide assurances to customers regarding the beneficial

9    effects of CedarCrestone's partnerships with Oracle, and to provide the alleged types of services

10   to CedarCrestone customers that Oracle now contends violated its rights. As a result of Oracle's

11   conduct, CedarCrestone reasonably inferred that Oracle had consented to CedarCrestone

12   continuing to do the alleged acts that Oracle now contends violate its rights.

13
                              **SEVENTH AFFIRMATIVE DEFENSE**
14                            *(De Minimis Use of Copyrighted Materials)*

15       97.    For its seventh affirmative defense, CedarCrestone alleges that, even if Oracle

16   could satisfy the other elements of its claim for copyright infringement, any use CedarCrestone

17   made of Oracle copyrighted material was either authorized by Oracle or, to the extent it was

18   unauthorized, was so trivial, insignificant, and harmless to Oracle that it is not actionable as

19   copyright infringement.

20       98.    The conduct Oracle asserts to be unlawful in its Complaint is trivial. First, Oracle

21   asserts that, in one instance, CedarCrestone mistakenly provided tax and regulatory software

22   updates to an Oracle licensee whose right to receive those updates had expired because it had

23   declined to continue making annual payments to Oracle for a maintenance and support contract,

24   which in some cases would have included a right to such updates. There is no dispute that, at the

25   start of its relationship with CedarCrestone, the client, George Weston Bakeries, had a valid and

26   current contract in place for Oracle support, and thus was entitled to receive Oracle update

27   material. There is also no dispute that George Weston Bakeries's contract with CedarCrestone

28   required George Weston Bakeries to have a current contract with Oracle and to notify

---

19

ANSWER TO COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF AND COUNTERCLAIMS
Case No. CV-12-4626

1    CedarCrestone of any change in the status of its contract with Oracle.  Thereafter, George Weston

2    Bakeries dropped Oracle support, but failed to notify CedarCrestone of having done so.  As soon

3    as CedarCrestone learned that George Weston Bakeries had dropped Oracle support, it

4    immediately stopped providing updates to George Weston Bakeries, recommended that George

5    Weston Bakeries contract directly with Oracle for its support needs (including for retroactive

6    payment for updates it had received after the expiration of its support contract with Oracle), and

7    self-reported all these facts to Oracle.

8         99.    Second, Oracle contends that CedarCrestone copied Oracle software onto

9    CedarCrestone's system, whereas the Oracle license requires that software to be maintained on

10   the client's system.  To begin with, CedarCrestone's relationships with its customers and those

11   customers' obligations to Oracle are governed by a variety of licenses with Oracle (and with

12   Oracle's predecessor PeopleSoft), and not all such licenses contain any limitation that the Oracle

13   software be maintained only on the client's system.  Likewise, many if not all of those licenses

14   permit Oracle clients themselves to make an unlimited number of copies of Oracle software for

15   the client's own use, and those licenses are silent as to where those copies may be maintained.  In

16   any event, Oracle is not disputing that CedarCrestone provided any services to any client that it

17   was not entitled to provide, or even that CedarCrestone could have worked remotely for clients on

18   a copy of software maintained on the client's system; Oracle is complaining only that

19   CedarCrestone did work for clients from a copy of software maintained in the wrong location.

20        100.   Third, Oracle complains that CedarCrestone used a single copy of Oracle software

21   as the basis for its work for various clients, rather than separately downloading the exact same

22   Oracle program repeatedly.  Oracle does not dispute, nor could it, that CedarCrestone could have

23   downloaded multiple instances of the same Oracle software from Oracle and, in doing so,

24   possessed, and used for the benefit of CedarCrestone clients, the same number of copies of the

25   identical software.

26        101.   Oracle's complaints of copyright infringement are form over substance and did not

27   effect any impairment of Oracle's copyrights, ability to license those copyrights, or revenue

28   derived from such licensing.  Indeed, for many of the clients for whom CedarCrestone has

ANSWER TO COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF AND COUNTERCLAIMS
Case No. CV-12-4626

694237.01

1    provided tax and regulatory support, Oracle did not even provide the tax or regulatory support

2    services that CedarCrestone provided, and consequently customers who used and relied on

3    CedarCrestone's support services would not have turned to Oracle for competing services even if

4    CedarCrestone had offered no services at all.  Accordingly, even if CedarCrestone did the acts

5    Oracle complains it did, any unauthorized use of Oracle copyrighted materials by CedarCrestone

6    was *de minimis* and does not constitute actionable copyright infringement.

7
                    **EIGHTH AFFIRMATIVE DEFENSE**
8                              *(Fair Use)*

9            102.    For its eighth affirmative defense, CedarCrestone alleges that, even if Oracle could

10    satisfy the other elements of its claim for copyright infringement, any use CedarCrestone made of

11    Oracle's copyrighted material was a fair use that is not actionable.  Among other factors

12    supporting a finding of fair use, Oracle is complaining about purely technical, non-substantive

13    alleged violations of its licenses.  It does not contend, nor could it, that CedarCrestone was barred

14    from providing the identical support services it provided on the identical software; it contends

15    merely that CedarCrestone did this work on copies of software maintained on CedarCrestone's

16    system rather than doing so remotely on identical copies maintained on the client's system.

17    Similarly, Oracle asserts that CedarCrestone violated the law by downloading a single copy of

18    software from Oracle, then copying it for multiple clients (all of whom were entitled to download

19    a copy of that exact software), rather than downloading the same software from Oracle multiple

20    times.  To the extent CedarCrestone engaged in any unauthorized copying, it was minuscule in

21    quantity and entirely non-substantive.  Moreover, any such unauthorized copying had no effect

22    whatsoever on the market for Oracle's software licensing business, and Oracle does not offer any

23    specific facts contending otherwise.  As discussed above, many of CedarCrestone's clients who

24    received CedarCrestone tax and regulatory support used older versions of Oracle applications, for

25    which Oracle no longer provided the sort and extent of software support services that

26    CedarCrestone provided.  Consequently, many of the customers who used and relied on

27    CedarCrestone's support services would not have turned to Oracle for competing services even if

28    CedarCrestone had offered no services at all, so the acts by CedarCrestone that Oracle alleges in

694237.01

1    its complaint had no affect on Oracle's licensing business or the value of the copyrighted material

2    at issue.

3    **NINTH AFFIRMATIVE DEFENSE**
     *(No Material Breach)*
4

5    103.    For its ninth affirmative defense, CedarCrestone alleges that, even if

6    CedarCrestone did breach either the OPN Agreement or the FUDA through the conduct alleged in

7    Oracle's Complaint (which alleged breach CedarCrestone denies), any such breach was not

8    material and does not justify termination of either contract.

9    104.    For the reasons set forth above in CedarCrestone's foregoing affirmative defenses,

10   Oracle is complaining about trivial purported violations of its licenses, to the extent those licenses

11   even contain the restrictions Oracle is attempting to enforce.  To begin with, CedarCrestone's

12   relationships with its customers and with Oracle are governed by a variety of licenses and other

13   agreements with Oracle (and with Oracle's predecessor PeopleSoft).  Not all such licenses and

14   agreements contain any limitation that the Oracle software be maintained only on the client's

15   system.  Likewise, many if not all of those licenses and agreements permit Oracle clients

16   themselves to make an unlimited number of copies of Oracle software for the client's own use,

17   and those licenses and agreements are silent as to where those copies must be maintained.

18   105.    Even assuming the relevant licenses do contain the restrictions Oracle is

19   attempting to enforce, the conduct by CedarCrestone that Oracle is alleging violated its rights was

20   trivial and did not impair the consideration Oracle received under the licensing contracts.  Oracle

21   does not contend, nor could it, that CedarCrestone was barred from providing the identical

22   support services it provided on the identical software; it contends merely that CedarCrestone did

23   this work on copies of software maintained on CedarCrestone's system rather than doing so

24   remotely on identical copies maintained on the client's system.  Similarly, Oracle asserts that

25   CedarCrestone violated the law by downloading a single copy of software from Oracle, then

26   copying it for multiple clients, rather than downloading multiple copies of the identical software

27   from Oracle.  Even if Oracle could prove CedarCrestone engaged in any unauthorized copying, it

28   would be minuscule in quantity and entirely non-substantive.

22

694237.01

106.    Moreover, any such unauthorized copying had no effect whatsoever on the market for Oracle's software licensing business, and Oracle does not offer any specific facts contending otherwise. CedarCrestone offered two types of tax-and-regulatory-update services. First, in CedarCrestone's Retro Support service, CedarCrestone, acting as an agent of an Oracle/PeopleSoft licensee, would customize a tax and regulatory update, which the licensee had paid Oracle to receive. The Retro Support service provided a client with a usable update that would work retroactively with the client's fully licensed (but unsupported by Oracle) PeopleSoft applications. Second, in CedarCrestone's Extend Support service, CedarCrestone would independently develop tax and regulatory updates of a sort that Oracle provided, if at all, only as part of a much larger, more expensive support package. Cedar Crestone's Retro Support services were complementary to Oracle's offerings and required the client to maintain Oracle support. Similarly, its Extend Support services filled a small need that Oracle did not offer independently, but only in the context of a larger, more expensive support package, which many clients could not afford and had elected not to purchase. In fact, both CedarCrestone's Retro and Extend services provided direct benefits to Oracle. In the case of Retro, these services kept clients on Oracle support contracts, thereby preserving Oracle's maintenance revenue, even though Oracle no longer actively supported the client's software. In the case of Extend, CedarCrestone's services allowed clients to keep using Oracle applications while staying current regarding their tax and regulatory obligations, notwithstanding Oracle's refusal to design a support package that met these clients' needs.

107.    As to at least some of the CedarCrestone clients at issue, Oracle did not even provide the sort and extent of tax and regulatory support services that CedarCrestone provided, and consequently customers who used and relied on CedarCrestone's tax and regulatory support services could not and would not have turned to Oracle for competing services even if CedarCrestone had offered no services at all. Even if Oracle could plead and prove actual harm stemming from CedarCrestone's alleged conduct, that harm plainly would have been compensable in damages, such as in the form of a somewhat enhanced licensing fee, and thus is not a material breach of either the OPN Agreement or FUDA that could justify termination.

23

694237.01

1

2

## TENTH AFFIRMATIVE DEFENSE
### (Failure to Mitigate)

3

108.    For its tenth affirmative defense, CedarCrestone alleges that Oracle has failed to

4

take any steps to mitigate any damages it might have suffered as the result of the alleged

5

misconduct in this case.  For example, Oracle alleges that CedarCrestone breached its contracts

6

with Oracle and committed unethical acts by providing Oracle tax and regulatory updates to

7

George Weston Bakeries, a former Oracle licensee whose support contract with Oracle had lapsed

8

after it began receiving updates from CedarCrestone.  CedarCrestone had no knowledge that

9

George Weston Bakeries's support contract, which allowed George Weston Bakeries to receive

10

Oracle updates, had lapsed, and relied on the express requirement in its contract with George

11

Weston Bakeries that required George Weston Bakeries to maintain a current license with Oracle

12

and to notify CedarCrestone if it no longer had such a license.  Upon discovering that George

13

Weston Bakeries had canceled its Oracle support contract, CedarCrestone immediately stopped

14

providing any Oracle materials to George Weston Bakeries, terminated its contract with George

15

Weston Bakeries, and self-reported this inadvertent mistake to Oracle in an August 19, 2011

16

letter.  Since August 19, 2011, Oracle has taken no steps to recover the value of the materials

17

George Weston Bakeries received without permission, either from George Weston Bakeries

18

directly or from CedarCrestone as George Weston Bakeries's agent.  It would be trivially easy for

19

Oracle to calculate the value of the Oracle materials at issue; Oracle maintains fee schedules that

20

set values for all the materials at issue.  In fact, for more than a year—until purporting to

21

terminate the OPN Agreement and FUDA on September 4, 2012—Oracle never even suggested

22

to CedarCrestone that it had done anything wrong or actionable with respect to George Weston

23

Bakeries.  Instead, it affirmatively chose to renew both the OPN Agreement and FUDA with

24

CedarCrestone after learning of George Weston Bakeries's misconduct.

25

## ELEVENTH AFFIRMATIVE DEFENSE
### (Reservation of Rights to Plead Additional Defenses)

26

109.    For its eleventh affirmative defense, CedarCrestone alleges that it has insufficient

27

knowledge and information upon which to form a basis as to whether it may have additional, as

28

yet unstated, separate defenses available.  CedarCrestone reserves the right to amend this Answer

24

694237.01

1    to add, delete, supplement, or modify these defenses based upon legal theories that may be or will

2    be divulged through clarification of Oracle's Complaint, through discovery, or through further

3    legal analysis of Oracle's position in this litigation.

4

5                                    **COUNTERCLAIMS**

6          CedarCrestone hereby counterclaims against Oracle as follows:

7          1.     This case is about Oracle's bad-faith and pretextual termination of contracts with

8    CedarCrestone and CedarCrestone's status as an Oracle partner, and Oracle's broader war on

9    competition in the downstream market for consulting, implementation, and support regarding

10   Oracle software. As one would expect from a "partnership" arrangement, Oracle's contracts with

11   CedarCrestone permitted termination only in the event of a material breach, and even then

12   required the non-breaching party to give the breaching party 30 days written notice and an

13   opportunity to cure. But on September 4, 2012, without providing a word of warning to

14   CedarCrestone or offering CedarCrestone the opportunity to cure any alleged contractual

15   breaches, Oracle purported to terminate both its OPN Agreement and FUDA with CedarCrestone,

16   stripping CedarCrestone of its status as a certified Oracle partner. The "violations" Oracle

17   alleged in its termination letter, and alleges in its Complaint in this case, are trivial and non-

18   substantive—certainly not "material" to Oracle's contracts or relationship with CedarCrestone.

19   Moreover, as detailed above, Oracle was well aware of the CedarCrestone business practices that

20   were the supposed basis of its termination and are the basis of this lawsuit long before September

21   4, 2012. In fact, after Oracle learned of those business practices, it affirmatively told

22   CedarCrestone that it saw nothing wrong with anything CedarCrestone was doing by renewing

23   both the OPN Agreement and the FUDA with CedarCrestone—in November 2011 and April

24   2012, respectively. Moreover, in the spring of 2012, Oracle took further affirmative acts to show

25   support for CedarCrestone and its business practices, by selecting CedarCrestone as an Oracle

26   North America Public Sector SOA Pillar Partner and accepting CedarCrestone into the Oracle

27   Invested Partner Community for FMW. Contrary to the allegations in Oracle's complaint, Oracle

28   did not bring this suit to enforce its contractual and intellectual-property rights, none of which

ANSWER TO COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF AND COUNTERCLAIMS
Case No. CV-12-4626

694237.01

1    were being threatened to any extent by anything CedarCrestone was doing.  It terminated and is

2    suing CedarCrestone (i) as part of an unlawful and systematic attack on competition by third-

3    party service providers like CedarCrestone, who for years have focused on assisting Oracle in the

4    support and licensing of Oracle software products; and (ii) to gain an advantage in its collateral

5    litigation against its direct competitor Rimini Street.

6    **ADDITIONAL FACTUAL BACKGROUND**

7    **CedarCrestone, Inc.**

8        2.      CedarCrestone provides a broad variety of information technology ("IT") services,

9    primarily related to enterprise software applications developed by Oracle.  The primary part of

10    CedarCrestone's business, which is not at issue in this case, involves business and technology

11    consulting services provided to users and licensees of Oracle's PeopleSoft and Oracle E-Business

12    Suites ("EBS") applications ("Consulting").  The next largest part of CedarCrestone's business,

13    which is also not accused in this case, involves the hosting and management of PeopleSoft

14    applications for clients, including Oracle ("Hosting" and "AMS").  Until 2011, nearly 100% of

15    CedarCrestone's revenue was derived from services related to Oracle's PeopleSoft and EBS

16    applications.  CedarCrestone is a licensee of Oracle's database products, middleware products,

17    and PeopleSoft applications.  CedarCrestone has also entered into software co-development

18    partnerships with both Oracle and Oracle's predecessor PeopleSoft.  CedarCrestone has paid

19    Oracle and PeopleSoft millions of dollars in license fees, currently paying Oracle over $1 million

20    annually in ongoing software maintenance on these licenses.

21        3.      This lawsuit involves only a very small percentage of CedarCrestone's business,

22    consisting of third-party tax and regulatory support for a small category of Oracle software

23    licensees who use older versions of Oracle software and/or whom Oracle itself generally declines

24    to support in the manner those licensees require ("Tax/Regulatory Support").  Unless and until

25    these licensees can upgrade to the current version of Oracle software or migrate to another

26    software product, they need for their current software to be retrofitted so their system can stay in

27    compliance with tax and regulatory obligations.  In 2002, when CedarCrestone first began

28    providing Tax/Regulatory Support services, its first client was referred to CedarCrestone by

26

694237.01

1    Oracle's predecessor PeopleSoft.  Since their introduction in 2002, Tax/Regulatory Support

2    services have remained a small part of CedarCrestone's business, earning CedarCrestone only

3    approximately $10 million in total revenue over the past 10 years, or approximately $1 million

4    per year.  This is less than 1% of CedarCrestone's total revenue.

5          4.      CedarCrestone offered two types of tax-and-regulatory-update services.  First, in

6    CedarCrestone's Retro Support service, CedarCrestone, acting as an agent of an

7    Oracle/PeopleSoft licensee, would customize a tax and regulatory update, which the licensee had

8    paid Oracle to receive.  The Retro Support service provided clients with tax and regulatory

9    updates that would work retroactively with the client's fully licensed (but unsupported by Oracle)

10   PeopleSoft application.  Second, in CedarCrestone's Extend Support service, CedarCrestone

11   would independently develop (and release, prior to the release of Oracle's own updates) tax and

12   regulatory updates of a sort that Oracle provided only as part of a much larger, more expensive

13   support package, if at all.  Cedar Crestone's Retro Support services were complementary to

14   Oracle's offerings and required the client to maintain Oracle support contracts.  Similarly, its

15   Extend Support services filled a small need that Oracle did not offer independently, but only in

16   the context of a larger, more expensive support package, which many clients could not afford and

17   had elected not to purchase.  In fact, both CedarCrestone's Retro and Extend services provided

18   direct benefits to Oracle.  In the case of Retro, these services kept clients on Oracle support

19   contracts, preserving Oracle's licensing and maintenance revenue, even though Oracle no longer

20   actively supported the client's software.  In the case of Extend, CedarCrestone's services allowed

21   clients to keep using Oracle applications while staying current regarding their tax and regulatory

22   obligations, notwithstanding Oracle's refusal to design a support package that met these clients'

23   needs.

24         5.      As discussed above, CedarCrestone's Tax/Regulatory Support customers are

25   generally clients who use an older, outdated version of PeopleSoft software that Oracle itself no

26   longer supports with tax and regulatory updates included in Oracle Software Support.  Typically,

27   Oracle licensees who purchase support contracts from Oracle are entitled to receive newer

28   versions of their licensed PeopleSoft application without any direct additional charges beyond

---

27

ANSWER TO COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF AND COUNTERCLAIMS
Case No. CV-12-4626

1   those related to the license metrics (number of employees, number of users of the licensed Oracle

2   products, total revenue, etc.).  But even though obtaining the new software release itself imposes

3   no additional direct cost, there are substantial costs associated with consulting on, implementing,

4   and customizing a new software release.  The overall cost of implementing and customizing a

5   new software upgrade typically will exceed $1 million.  Because many Oracle licensees are not in

6   a position to spend $1 million automatically, Oracle licensees who pay for Oracle support may

7   forego moving to a newer release of the PeopleSoft software immediately.  In fact, the majority of

8   Oracle PeopleSoft licensees originally acquired licenses for older versions of the software than

9   the versions they currently operate today.  In many cases, licensees have a license designed to

10  cover the original version of software they licensed years before, rather than a contemporary

11  license that would be granted for the newer version of the software they actually operate.

12        6.        Over the course of many years and numerous releases of PeopleSoft applications,

13  CedarCrestone's experience has shown that a small population of clients will choose not to

14  upgrade their software immediately, and therefore require third party tax and regulatory support

15  in order to keep their older software in compliance with tax and regulatory changes.  The majority

16  of these licensees, in CedarCrestone's experience, will continue to pay Oracle maintenance fees

17  and eventually will complete an upgrade to a newer version of the relevant Oracle application,

18  which Oracle itself will support, thereby eliminating their need for third party services.  Other

19  licensees will have made a decision to migrate to another software product and pay Oracle for

20  support during their migration.  Others will have made a decision to re-license Oracle applications

21  and need the tax and regulatory support services only until such implementation or migration is

22  complete.  A smaller population of clients, such as Tucson Public Schools, will elect to drop

23  Oracle maintenance altogether during a migration away from Oracle PeopleSoft.

24  CedarCrestone's phased out tax and regulatory update services filled a small need for several

25  specific types of Oracle PeopleSoft licensees, generally on a short term basis until they either

26  upgraded to a newer version of PeopleSoft or completed their software selection process and

27  migration.

28

ANSWER TO COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF AND COUNTERCLAIMS
Case No. CV-12-4626

694237.01

7.     CedarCrestone's business differs from that of other companies that provide tax and regulatory support services, such as Oracle itself and Oracle competitors TomorrowNow and Rimini Street. The tax and regulatory support services CedarCrestone offered are one small subset of the much broader portfolio of bundled support and maintenance services offered by Oracle, and a small subset of the type of support services offered by TomorrowNow and Rimini Street. In the case of TomorrowNow and Rimini Street, their services are, or were, focused on persuading clients to replace Oracle support offerings with TomorrowNow or Rimini Street offerings. CedarCrestone has never encouraged clients to drop Oracle maintenance and has never proactively solicited any client for that purpose. To the contrary, CedarCrestone has worked with Oracle to help Oracle regain business from clients who have previously dropped support and migrated to TomorrowNow or Rimini Street. CedarCrestone has approached such clients and made efforts to persuade them to relicense their application with Oracle (thereby entitling Oracle to full software maintenance agreement revenue), then purchase tax and regulatory support from CedarCrestone as they completed their reimplementations. On many occasions over the past 10 years, Oracle has referred Oracle customers who are in that in-between stage—not yet ready to upgrade or otherwise needing transitory assistance with tax and regulatory updates—to CedarCrestone for tax and regulatory support.

8.     As discussed above, the Tax/Regulatory Support business line has been only a minor part of CedarCrestone's business for the past 10 years. In January 2012, CedarCrestone decided to exit the Tax/Regulatory Support business altogether. CedarCrestone made the decision to close down its Tax/Regulatory Support business substantially before this lawsuit was filed. In February 2012, almost six months prior to Oracle's termination of CedarCrestone's partner status, CedarCrestone notified all its existing Tax/Regulatory Support clients that it was phasing out the tax and regulatory support service. CedarCrestone informed its Tax/Regulatory Support clients that it either would release them early from their contracts or would see out the remaining terms of its current support contracts, but would not renew those contracts for additional terms. When it provided these notices to clients, CedarCrestone referred clients to Oracle for their support concerns and needs. After giving these notices, CedarCrestone decided

29

694237.01

1   to terminate all contracts covering its Retro and Extend tax and regulatory services.  Prior to

2   Oracle's termination of CedarCrestone's partner status, CedarCrestone had delivered formal

3   notice of termination to all remaining Retro and Extend clients, with all services concluding on or

4   before December 31, 2012.

5          9.       After providing these notices to its existing Tax/Regulatory Support clients,

6   CedarCrestone received feedback from employees of Oracle and from clients indicating that

7   Oracle was unable to address some client needs for tax and regulatory support.  In at least one

8   case, CedarCrestone is aware that Oracle sent an email to an Oracle licensee in response to a

9   request for help admitting that Oracle could not help the client.  Instead, Oracle suggested two

10  possible options for the client.  First, the client could "ask a consulting firm like IBM to find out

11  if they would be willing and at what cost to provide these tax updates."  Second, the client could

12  "[g]o to Rimini Street.  Going to Rimini Street will most likely force you to pay ALL

13  maintenance cost with them, not just payroll tax updates."  At the time it sent this email, Oracle

14  was engaged in litigation with Rimini Street in which litigation it was contending that Rimini

15  Street's business model and services violated Oracle's intellectual-property rights.

16         10.      Despite choosing to phase out its tax and regulatory support business line,

17  CedarCrestone continues to provide services related to Oracle software applications through its

18  other business lines.  The fact that CedarCrestone's ongoing business, even if not accused in this

19  lawsuit, remains tied to Oracle products means that it is valuable to, and sometimes essential for,

20  CedarCrestone to be a certified Oracle partner.  Indeed, many potential CedarCrestone clients,

21  particularly in the public sector, would purchase consulting services only from Oracle itself or

22  formally certified Oracle partners.  To the extent CedarCrestone is not an officially certified

23  Oracle partner, or is perceived to be out of favor or in conflict with Oracle, that would make it

24  much less likely that some potential clients would choose to work with CedarCrestone, if not

25  remove CedarCrestone entirely from consideration by those potential clients.

26         11.      On information and belief, Oracle is well aware that companies like

27  CedarCrestone, which provide downstream services related to Oracle software, benefit from

28  certification as an official Oracle partner, and have greater difficulty competing for some

30

ANSWER TO COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF AND COUNTERCLAIMS
Case No. CV-12-4626

1   categories of new business if such certification is denied.  On information and belief, Oracle is

2   aware that many potential clients, particularly among public agencies, affirmatively require that

3   any vendor providing consulting or implementation services on particular software be officially

4   recognized as a "partner" by the software vendor, as CedarCrestone had been by Oracle prior to

5   Oracle's bad-faith and pretextual termination.

6                   **Oracle's Pretextual Complaints Against CedarCrestone**

7            12.      Oracle terminated its contracts with CedarCrestone and CedarCrestone's partner

8   status for three purported categories of acts by CedarCrestone that Oracle asserts violated the

9   terms of the OPN Agreement and the FUDA.  All the purported violations are trivial.  None

10   constitutes breach of contract (much less a material breach of any contract), actionable copyright

11   infringement, or unfair business practices.  In reality, Oracle terminated the contracts and severed

12   its partnership relationship with CedarCrestone as part of a concerted effort to destroy

13   competition in the downstream market for consulting and support services on Oracle software

14   (and to enable Oracle to capture business and profits formerly earned by competitors).  Oracle

15   also had the secondary, but also important, motivation of gaining an advantage in its ongoing

16   litigation against its competitor Rimini Street.  In that case, Oracle's damages theory depends on

17   the allegation that Rimini Street competed unfairly with Oracle and that, but for that alleged

18   unfair competition, Rimini Street customers would have had no choice but to buy services from

19   Oracle.  The fact that CedarCrestone was, and for years had been, operating as a competitor in

20   that same market—even if only with respect to tax and regulatory support generally

21   complementary to Oracle's own support offerings—was an obvious counterexample casting

22   doubt on Oracle's damages claim.  Accordingly, in order to shape reality to suit its damages

23   theory against Rimini Street, and maximize its potential recovery in the Rimini Street litigation,

24   Oracle for the first time took the position that CedarCrestone's business practices—which Oracle

25   had recommended to clients for years—were illegal and violated Oracle's rights.

26            13.      A quick review of Oracle's allegations reveals the triviality of the alleged conduct

27   that is the basis of Oracle's lawsuit.  First, Oracle complains of a single instance where

28   CedarCrestone allegedly delivered Oracle tax and regulatory updates to client George Weston

31

ANSWER TO COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF AND COUNTERCLAIMS
Case No. CV-12-4626

694237.01

1   Bakeries, even though George Weston Bakeries's Oracle support and maintenance contract

2   entitling it to acquire those Oracle updates had expired.  But as CedarCrestone proactively

3   disclosed to Oracle in its August 19, 2011 letter, during the entire time CedarCrestone was

4   obtaining Oracle tax and regulatory updates as George Weston Bakeries's agent and retrofitting

5   those updates for George Weston Bakeries, it believed based on George Weston Bakeries's

6   express contractual representations that George Weston Bakeries was a current Oracle licensee

7   that was fully entitled to receive such updates.  CedarCrestone began providing support services

8   to George Weston Bakeries in November 2008, at which point George Weston Bakeries actually

9   had a valid support contract and license with Oracle.  CedarCrestone's contract with George

10  Weston Bakeries specifically obligated George Weston Bakeries to inform CedarCrestone

11  immediately of any changes in the status of its then-current support contract with Oracle.  George

12  Weston Bakeries allowed its support contract with Oracle, and its right to receive Oracle updates,

13  to lapse as of January 31, 2009, but never took any steps to inform CedarCrestone of this fact.

14  Accordingly, in reliance on George Weston Bakeries's compliance with its contractual

15  obligations, CedarCrestone continued to provide Oracle updates to George Weston Bakeries.  On

16  August 10, 2011, CedarCrestone learned for the first time that George Weston Bakeries no longer

17  had a support and maintenance contract with Oracle.  That same day, CedarCrestone contacted

18  George Weston Bakeries about the issue.  Through its General Counsel, George Weston Bakeries

19  admitted that it had no current support contract with Oracle.  CedarCrestone immediately stopped

20  providing any Oracle materials to George Weston Bakeries and, on August 12, 2011,

21  CedarCrestone terminated its contract with George Weston Bakeries.

22          14.     CedarCrestone immediately took steps to inform Oracle of this issue.  Far from

23  acting in bad faith, attempting to conceal this problem, or behaving in any manner cavalier to the

24  rights of its contractual partner Oracle, CedarCrestone self-reported this inadvertent mistake to

25  Oracle in its August 19, 2011 letter.  Oracle did not accuse CedarCrestone of breaching any

26  contract or infringing any copyrights, or threaten to terminate CedarCrestone's partner status.  To

27  the contrary, in the eight months that followed, Oracle renewed both its OPN Agreement and

28  FUDA with CedarCrestone.  For Oracle to suggest that this single, reasonable, good-faith mistake

32

694237.01

1    by a longtime contractual partner constitutes a material breach of contract or caused Oracle more

2    than nominal harm is factually false.  It would be trivially simple for Oracle to calculate damages

3    from George Weston Bakeries's misconduct; Oracle maintains fee schedules reflecting the value

4    of the tax and regulatory updates George Weston Bakeries received without permission.  But, to

5    CedarCrestone's knowledge, Oracle has never taken any steps to recover this money, either from

6    George Weston Bakeries or from CedarCrestone, as George Weston Bakeries's agent.

7          15.     Second, Oracle accuses CedarCrestone of improperly copying Oracle software by

8    (1) making a non-production copy of clients' properly licensed customer software, so it can work

9    with that software on its own system, rather than doing the same work on the exact same software

10   maintained remotely on its clients' systems; and (2) downloading a single copy of Oracle

11   software for use with multiple (all properly licensed) clients, rather than downloading multiple

12   copies of the same software, one for each client.  Even if Oracle were right that CedarCrestone

13   did these things in violation of Oracle's relevant software licenses and contracts with

14   CedarCrestone (which CedarCrestone denies), all these acts would be trivial and non-substantive.

15         16.     With respect to maintaining a copy of Oracle software on CedarCrestone's system,

16   the contract terms Oracle is referring to and purporting to enforce were drafted by PeopleSoft,

17   long before Oracle acquired PeopleSoft, and generally before PeopleSoft version 8 was

18   architected and released for deployment over the Internet.  The terms of many older PeopleSoft

19   licenses are not consistent with the commercial reality of how the newer versions of the

20   PeopleSoft software (to which Oracle PeopleSoft licensees have gained access by paying annual

21   maintenance and support fees) is sold and used by Oracle licensees and supported by support

22   vendors.  In practice, Oracle has always recognized that, given that businesses today operate

23   significantly over the Internet, any licensing restrictions prohibiting a support vendor from

24   maintaining a copy of the client's software no longer reflect commercial realities or serve the

25   purpose for which they were designed.  Moreover, neither PeopleSoft nor Oracle has ever made

26   any effort to enforce these restrictions.  Prior to its acquisition by Oracle, PeopleSoft routinely

27   granted explicit permission for copies of the relevant software to be maintained for clients by

28   third parties.  After acquiring PeopleSoft, Oracle on multiple occasions told CedarCrestone and

33

ANSWER TO COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF AND COUNTERCLAIMS
Case No. CV-12-4626

1   clients that permission was no longer required to maintain copies of client software.  In fact,

2   current Oracle licenses to the PeopleSoft applications do not contain the purported restrictions on

3   third-party maintenance of client software that Oracle is attempting to enforce in this case.  In any

4   event, there is no dispute that CedarCrestone was entitled to provide the identical support services

5   it provided on the identical software; Oracle objects only that CedarCrestone wrongly did this

6   work on copies of software maintained on CedarCrestone's system rather than doing so remotely

7   on identical copies maintained on the client's system.

8         17.     Similarly, with respect to failing to download a distinct copy of software for each

9   client, there is no dispute that CedarCrestone and all of CedarCrestone's clients had the right to

10   use the software at issue; Oracle's only objection is that CedarCrestone itself made non-

11   production copies rather than obtaining the multiple copies (to which either it or its clients were

12   entitled) from Oracle.

13         18.     Third, Oracle complains that a series of statements about CedarCrestone's business

14   practices in a single client proposal to Oklahoma City are "intentional misrepresentations."  None

15   of the accused statements are any such thing.  All of the accused statements are factually true

16   representations of CedarCrestone's business practices.  With respect to CedarCrestone's

17   "statement," presented in a two-column table at page 11 of Oracle's Complaint, that its status as

18   an Oracle Platinum Partner was a differentiator relative to other potential service providers,

19   including providing "assurance that services are delivered free of intellectual property

20   infringement," Oracle wrongly asserts that CedarCrestone was asserting that its partner status

21   "immunized" it from infringement claims.  Of course, the statement says no such thing; it

22   conveys only the unobjectionable, factually true statement that a company that is a long-time

23   partner of a software maker is generally more likely to be aware of and respect intellectual

24   property restrictions than an unaffiliated service provider.  It defies belief that Oracle considers

25   any of the isolated statements in this single proposal to be genuinely objectionable, particularly

26   when taken in the context of the full RFP response, attached draft contract, questions and answers

27   circulated by Oklahoma City, and finally the deliberations and decision of Oklahoma City in

28   approving the contract—all of which are matters of public record that are freely available over the

34

ANSWER TO COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF AND COUNTERCLAIMS
Case No. CV-12-4626

694237.01

1    Internet.  That Oracle's complaints are pretextual is further proven by the fact that Oracle had

2    possession of this proposal no later than July 2011, and yet renewed both the OPN Agreement

3    and FUDA with CedarCrestone in November 2011 and April 2012, respectively, and never raised

4    any objection to CedarCrestone's supposed "misrepresentations" until filing this Complaint on

5    September 5, 2012.

6                              **Oracle's Assault on Competition in the Support Market**

7         19.     Oracle's Complaint is not a genuine effort to rein in a misbehaving contractual

8    partner and obtain compensation for harm, because CedarCrestone has not harmed Oracle in any

9    way.  Instead, Oracle's Complaint is only the latest salvo in an extended campaign by Oracle to

10   destroy competition in the market for downstream consulting, support, and implementation

11   services on Oracle software and to forestall entry of competing and innovative software products

12   into the ERP market.

13        20.     Despite being by far the world's dominant player in the market for database and

14   enterprise software, Oracle's monopoly power historically has not extended to the downstream

15   consulting, application management, and support markets.  To the contrary, for years, the

16   downstream support market has supported numerous, thriving third-party competitors to Oracle.

17   Many of these third-party competitors have historically been willing to provide a broader range or

18   better quality of support than Oracle, or have provided these services at cheaper prices.  In the

19   area of third-party maintenance and support, including tax and regulatory support, third-party

20   vendors such as TomorrowNow and Rimini Street have actively challenged Oracle's dominant

21   position by seeking to induce Oracle applications licensees to redirect their support spending

22   away from Oracle, reportedly charging often about half of what Oracle charges for its bundled

23   offering, which entitles clients to both the right to future software releases and maintenance.

24        21.     For example, Oracle periodically releases new software products, and new editions

25   or releases of existing software products.  These new products, or new releases of existing

26   products, supersede older products or releases, rendering the older products and releases obsolete.

27   At some point after releasing a new product or release, Oracle will cease providing tax and

28   regulatory support for older, legacy editions of software, even though Oracle may continue to

---

35

ANSWER TO COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF AND COUNTERCLAIMS
Case No. CV-12-4626

694237.01

1   provide technical support.  Oracle has every incentive to prevent third parties from providing tax

2   and regulatory support for such older software, because such third party offerings unbundle such

3   tax and regulatory support from the rights to future releases of the software.  Oracle offers tax and

4   regulatory support only in a bundle with the rights to future software releases.  Unbundling those

5   two product offerings allows Oracle software users to continue using their current software

6   without also committing to purchase new versions of software that it may not be in a financial

7   position to implement for years, if ever.  Yet until recently, there have been several other entities

8   willing and able to provide tax and regulatory support services for older software.  These

9   unbundled, stand-alone support offerings extend the life of older Oracle software, enabling users

10   to conserve their resources by avoiding the immediate need for costly upgrades to new versions of

11   software and implementation of those new versions.  In other words, the presence of third-party

12   support providers is not only good for competition and consumers on its own, it also has

13   beneficial, pro-competitive effects for Oracle software licensees.  Further, because Oracle is a

14   very large company with many different products and business lines, many Oracle applications

15   customers would prefer to purchase consulting, implementation, and support services from a third

16   party whose entire business, or a large portion of whose business, consists of providing those

17   services apart from the software itself.  Even putting relative quality to one side, there is no

18   question that many third-party support providers historically have provided services at a lower

19   price than Oracle.

20          22.     Of course, Oracle would rather leverage its dominant market position in database

21   and enterprise software into a monopoly in the different market for support services on its own

22   software.  A monopoly would allow Oracle to charge higher prices for support services, and to

23   ensure that tax and regulatory services are available only as part of a bundle with the software

24   itself.  It would also allow Oracle to dictate the terms of the range of support services available to

25   software licensees.  If Oracle chose to stop supporting any older software products or releases, its

26   licensees would face a stark and difficult choice: keep the older edition without any support from

27   the vendor, or spend its scarce resources on consulting enabling it to upgrade to the new edition

28   of software and implement that new edition.  Needless to say, not every Oracle licensee is in a

ANSWER TO COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF AND COUNTERCLAIMS
Case No. CV-12-4626

694237.01

1  market and financial position to upgrade to every new Oracle software product or release in the

2  time frame mandated by Oracle's limited support offerings.  Depending on the financial status of

3  a licensee, its survival may depend on the ability to make do with an older product for some

4  period of time before upgrading to a newer product.  Third-party support service providers are

5  particularly important to this group of Oracle customers, but they generally provide competition,

6  and thus downward pressure on prices in the support market, as they bifurcate Oracle's support

7  product offering into fees charged for support services and fees that are embedded in the support

8  offering but are designed to cover the cost of future software releases.  Competition also provides

9  an incentive for all market participants to provide a broader range of competent, attentive support

10  services.  For most clients, the most critical support service they receive are the tax and regulatory

11  updates provided by CedarCrestone's Tax/Regulatory Support business line.

12         23.      Oracle's pretextual termination of both its contracts with CedarCrestone and

13  CedarCrestone's partner status, without providing notice or any chance to cure the alleged

14  breaches, was an anti-competitive act designed to destroy a competitor in the downstream market

15  for consulting, implementation hosting and managed service, and tax and regulatory updates and

16  to discourage other vendors from entering that market or growing their market shares.  Here, the

17  particular CedarCrestone business line that Oracle accuses—CedarCrestone's Tax/Regulatory

18  Support services—was a very small part of CedarCrestone's business, accounting for about 1% of

19  CedarCrestone's annual revenue.  Moreover, as of January 2012, CedarCrestone had planned to

20  exit the Tax/Regulatory Support business line, committed not to renew any existing contracts.

21  Since then, it has given notice to all Tax/Regulatory Support clients that those services would no

22  longer be available from CedarCrestone after December 31, 2012.  Nevertheless, CedarCrestone

23  continues to provide other Consulting, Hosting, and AMS services for Oracle software, which

24  services are unrelated to claims at issue in Oracle's Complaint.  As discussed above, it is critical,

25  if not essential, for a provider of support services on Oracle software to have a good relationship

26  with Oracle and, if possible, to be an officially recognized Oracle partner.  Oracle was aware that,

27  by terminating its contracts with CedarCrestone and CedarCrestone's partner status, it would cast

28  a shadow on CedarCrestone's viability in the support market, making CedarCrestone a less viable

ANSWER TO COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF AND COUNTERCLAIMS
Case No. CV-12-4626

694237.01

1    competitor in the downstream market for consulting, implementation, and maintenance services

2    and causing substantial losses of business and revenue.

3        24.    Oracle's anti-competitive war on third-party support providers did not start with

4    CedarCrestone. In 2010, Oracle filed a lawsuit against a direct competitor, Rimini Street,

5    accusing Rimini Street of unfairly competing with Oracle using an illegal business model. That

6    case is pending. (CedarCrestone's business model, and the nature of its competition with Oracle,

7    was very different from Rimini Street's. Whereas Rimini Street seeks to steer customers away

8    from Oracle software and services, thereby competing directly and costing Oracle business and

9    revenue when it succeeds in landing clients, CedarCrestone's Tax/Regulatory Support business

10   did not compete with Oracle directly. In general, that business line offered only services that

11   Oracle did not offer and that were complementary to Oracle, thereby strengthening the

12   relationship between Oracle licensees and their Oracle software.) Oracle's damages theory

13   against Rimini Street in that lawsuit depends on the premise that, had Rimini Street not unfairly

14   competed against Oracle, Rimini Street's customers would have used Oracle's competing

15   services instead. There were also other companies offering support services complementary to

16   Oracle's services, including not only CedarCrestone, but also others, including Spinnaker and

17   netCustomer.

18       25.    Because these companies were offering similar, competing services during the

19   relevant time frame, and continued to offer such services even after Oracle filed suit against

20   Rimini Street, they were obvious, glaring counterexamples disproving Oracle's theory that Rimini

21   Street was its lone competitor. Tellingly, netCustomer is not currently actively competing in the

22   tax-and-regulatory-support market, and Spinnaker appears to have substantially revised its tax

23   and regulatory support practices. Both Spinnaker and netCustomer received subpoenas from

24   Oracle in the Rimini Street case, much as CedarCrestone did. Spinnaker subsequently revised the

25   scope of services advertised on its website to stress that it does work only on software maintained

26   on the client's system. NetCustomer has apparently gone out of the tax and regulatory support

27   business altogether since receiving Oracle's subpoena, with a website that has long promised that

28   the company "is revising its services."

ANSWER TO COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF AND COUNTERCLAIMS
Case No. CV-12-4626

694237.01

26.     Finally, in February 2012, Oracle filed suit against two other support vendors—ServiceKey and DLT Federal Business Systems Corporation ("DLT Federal"), accusing those companies of engaging in a conspiracy "to steal and distribute copyrighted, proprietary Oracle software code, along with the login credentials necessary to download this code from Oracle's password-protected websites." As with the Rimini Street case, this lawsuit, and Oracle's other conduct described above, Oracle's complaint against ServiceKey and DLT Federal made clear that Oracle's real concern was competition in the support market and the unbundling of Oracle's software offering from a complementary support offering.  Oracle asserted that the purpose of the alleged conspiracy by ServiceKey and DLT Federal was to "sell support on Oracle hardware to customers with no active support contract with Oracle."

27.     Oracle had long been fully aware of the nature of CedarCrestone's business, including the precise business practices that it now claims in this suit were unlawful.  Oracle had never previously accused CedarCrestone of doing anything that violated Oracle's rights.  In fact, as discussed above, after having notice of everything it now complaints was unlawful, Oracle took the affirmative step of blessing CedarCrestone's conduct by renewing both the OPN Agreement and FUDA with CedarCrestone.  It was only when it became necessary to justify its damages theory, and maximize its potential recovery, against Rimini Street that Oracle made the decision, for the first time in September 2012, to accuse CedarCrestone of breach of contract, copyright infringement, and unfair business practices.

**Harm to CedarCrestone from Oracle's Bad-Faith Anti-Competitive Conduct**

28.     CedarCrestone has suffered damages as the result of Oracle's anti-competitive acts, including its bad-faith breach of its contracts with CedarCrestone and its pretextual termination of CedarCrestone's partner status.  CedarCrestone has lost the benefit of the licensing fees CedarCrestone paid to Oracle after the renewals of the OPN Agreement and FUDA.  It has also lost the value of amounts paid for marketing activities to or in conjunction with Oracle, after Oracle barred CedarCrestone from participating in those marketing events.  Moreover, CedarCrestone has also suffered substantial lost business as the result of Oracle's termination of CedarCrestone's partner status.  As discussed above, even before Oracle's wrongful accusations

1   of breach of contract and copyright infringement, CedarCrestone was in the process of phasing

2   out its Tax/Regulatory Support business line—the business at issue with respect to all of Oracle's

3   claims of breach of contract and/or copyright infringement in Oracle's Complaint. CedarCrestone

4   had informed Oracle, and all of its customers, of this intention. But Oracle's accusations of

5   copyright infringement and breach of contract, and its decision to pursue litigation against

6   CedarCrestone, have caused harm to CedarCrestone's other, far more substantial Consulting,

7   Hosting, and AMS business lines. As Oracle undoubtedly knew they would, Oracle's accusations

8   and termination of CedarCrestone's partner status have cast a shadow over CedarCrestone's

9   business as a whole and caused some potential CedarCrestone customers to decide against doing

10  business with CedarCrestone.

11          29.     On September 18, 2012, the Los Angeles Community College District

12  ("LACCD") informed CedarCrestone that, because of Oracle's wrongful termination of

13  CedarCrestone's partner status and unfounded accusations of breach of contract and copyright

14  infringement, LACCD was no longer willing to hire CedarCrestone to provide implementation

15  services on PeopleSoft software. LACCD had previously selected CedarCrestone to provide

16  consulting services at the same time it selected the underlying software package—in this case

17  Oracle's PeopleSoft software. CedarCrestone and LACCD had successfully concluded contract

18  negotiations, leaving only the remaining step of ratification and approval of the contract by

19  LACCD's governing board, which approval was set for September 2012. That contract would

20  have resulted in approximately $17 million in revenue to CedarCrestone throughout its life. Upon

21  receiving Oracle's letter of termination and its lawsuit, CedarCrestone proactively disclosed to

22  LACCD that Oracle had terminated CedarCrestone's partner status. As LACCD informed

23  CedarCrestone, LACCD's request for proposal contained a material requirement that the vendor

24  providing implementation services "be in a formal relationship with the associated software

25  vendor." With Oracle having terminated CedarCrestone's partner status and initiated litigation,

26  CedarCrestone no longer satisfied this material requirement.

27          30.     The LACCD business did not relate to the small Tax/Regulatory Support part of

28  CedarCrestone's business that is at issue in this case. In other words, Oracle's bad-faith and

40

694237.01

1    pretextual termination of its agreements with CedarCrestone and CedarCrestone's partnership

2    status has had a direct negative financial impact on CedarCrestone's other business lines.

3        31.    Prior to terminating its agreements with CedarCrestone and CedarCrestone's

4    partner status, Oracle was aware that CedarCrestone had bid on, and was close to formally being

5    awarded, the LACCD contract.  As is generally the case with such contracts, LACCD negotiated

6    simultaneously with Oracle (the software vendor) and CedarCrestone (the implementation

7    vendor), and Oracle was aware that LACCD had selected and was negotiating a final agreement

8    with CedarCrestone.  Having concluded that it would successfully conclude negotiations with

9    CedarCrestone, LACCD completed its purchase of Oracle's PeopleSoft software in advance of

10   finalizing the consulting contract.  Further, Oracle was aware that LACCD's request for proposal

11   required that the implementation vendor have a "formal relationship" with the software vendor,

12   and thus that, by terminating CedarCrestone's partner status, Oracle would be making it

13   impossible for CedarCrestone to obtain the LACCD contract, and would force LACCD to choose

14   the only other Oracle partner who submitted a bid on the project.  Oracle thus retained the

15   LACCD software contract for itself, while causing LACCD to have no viable option other than to

16   contract with the competitor against which CedarCrestone had prevailed during the RFP process.

17       32.    On September 25, 2012, Midwest Independent Transmission System Operator

18   ("MISO") informed CedarCrestone that, because of Oracle's wrongful termination of

19   CedarCrestone's partner status and unfounded accusations of breach of contract and copyright

20   infringement, "MISO has made the decision that CedarCrestone no longer complies with MISO's

21   requirements" for a project CedarCrestone had bid on, "and, as a result, has been formally

22   eliminated from competition for the award of this project."  MISO further informed

23   CedarCrestone that this decision was final with respect to this project, but that, "[s]hould

24   CedarCrestone prevail in the aforementioned litigation or obtain a favorable settlement with

25   Oracle under which its status as a Platinum Oracle Partner is reinstated, MISO will be open to the

26   review CedarCrestone's possible reinstatement as an acceptable bidder for future MISO sourcing

27   projects."

28

ANSWER TO COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF AND COUNTERCLAIMS
Case No. CV-12-4626

694237.01

1      33.     The MISO project was projected to pay CedarCrestone $85,000 on finalization of

2   the contract and as much as $1,000,000 over the life of the contract. Prior to Oracle's wrongful

3   termination of the OPN Agreement and FUDA, CedarCrestone believed and expected that MISO

4   would award it the contract. Presently, CedarCrestone believes that MISO would have awarded

5   CedarCrestone the contract but for Oracle's breach of the OPN Agreement and FUDA by

6   terminating those contracts in the absence of any material breach, including any breach of

7   Oracle's Ethics Code, and without giving CedarCrestone notice or an opportunity to cure.

8      34.     The MISO business did not relate to the small Tax/Regulatory Support part of

9   CedarCrestone's business that is at issue in this case. In other words, Oracle's bad-faith and

10   pretextual termination of its agreements with CedarCrestone and CedarCrestone's partnership

11   status has had a direct negative financial impact on CedarCrestone's other business lines.

12     35.     Most recently, on October 8, 2012, the American Association of Retired Persons

13   ("AARP") informed CedarCrestone that, because of Oracle's wrongful termination of

14   CedarCrestone's partner status and unfounded accusations of breach of contract and copyright

15   infringement, AARP had decided to remove CedarCrestone from consideration for a contract for

16   software implementation, hosting, and support services.

17     36.     The AARP project was projected to pay CedarCrestone approximately $2 million

18   for implementation services and between $2 million and $3 million for hosting services over the

19   life of the contract. Prior to Oracle's wrongful termination of the OPN Agreement and FUDA,

20   CedarCrestone believed and expected that AARP would award it the contract. Presently,

21   CedarCrestone believes that AARP would have awarded CedarCrestone the contract but for

22   Oracle's breach of the OPN Agreement and FUDA by terminating those contracts in the absence

23   of any material breach, including any breach of Oracle's Ethics Code, and without giving

24   CedarCrestone notice or an opportunity to cure.

25     37.     CedarCrestone expects that there will be other instances in the near future where it

26   loses contracts it otherwise would have obtained as the result of Oracle's bad-faith and pretextual

27   termination of its agreements with CedarCrestone and CedarCrestone's partner status.

28

42

ANSWER TO COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF AND COUNTERCLAIMS
Case No. CV-12-4626

694237.01

38.     Further, Oracle has also undermined CedarCrestone's ability to capture consulting business by discriminating against CedarCrestone on pricing, and in favor of CedarCrestone competitors. In summer 2012, CedarCrestone bid on a contract with the Washington State Board for Community & Technical Colleges ("Washington"). The contract was for both software and consulting, implementation, and support services on that software, and was very large, valued at over $100 million. Some of the software CedarCrestone proposed in its bid to use was Oracle software. In cases where a client is seeking both software and system implementation services, Oracle insists that the system implementation vendor be the primary contractor with the client, and that its software be sold through one of its resellers. In this case, the relevant Oracle reseller was Mythics Consulting. On CedarCrestone bids prior to the Washington bid where this arrangement was in effect, Mythics had consistently provided all bidders with identical pricing, usually at about 95% less than Oracle's list price. But on the Washington bid, Mythics refused to provide CedarCrestone with any pricing at all, informing CedarCrestone that Oracle had directed Mythics not to provide such pricing to CedarCrestone only. Without any pricing from Mythics, much less the typical 95% discount from the list price, CedarCrestone had no choice but to submit its proposal using the rates available to the U.S. General Services Administration, which are approximately 35-44% less than Oracle list prices. CedarCrestone is informed and on that basis believes that its competing bidders obtained the usual 95% discount from list prices through Mythics. CedarCrestone's proposal was downscored and eliminated from consideration, in large part because its projected costs were substantially higher than those of the other bidders—a direct consequence of Oracle's price discrimination.

39.     The Washington proposal was not the first time Oracle had arbitrarily refused to provide pricing information to CedarCrestone for inclusion in a CedarCrestone proposal to a client. In May 2012, Oracle refused to provide any pricing for CedarCrestone for a bid that CedarCrestone was submitting to the San Mateo County, California on a joint services and software contract worth between approximately $2.5 million and $3 million. Because of Oracle's refusal to provide any software pricing information, CedarCrestone was forced to submit a bid only for the services portion of the contract. Because it was unable to bid on the entire project, its

43

694237.01

1    bid was unacceptable to the client and was not selected.  During the next month, June 2012,

2    Oracle refused to provide any pricing information for CedarCrestone for a bid that CedarCrestone

3    was submitting to Broward County, Florida.  Oracle eventually provided pricing information on

4    the same day the proposal was due.  It is usually the case that, by the due date of a proposal,

5    CedarCrestone has already delivered the proposal to the client and is well past the point of being

6    able to add new information.  In the case of the Broward County proposal, CedarCrestone was

7    able to incorporate Oracle's pricing information into the final proposal delivered to the

8    prospective client.

9                            **First Claim for Relief**
                              Breach of Contract
10                           (Against Oracle America)

11        40.    CedarCrestone hereby incorporates by reference each of the allegations in the

12   preceding paragraphs as though fully set forth here.

13        41.    As Oracle correctly pleads, Oracle and CedarCrestone were parties to at least two

14   separate valid contracts—the OPN Agreement and the FUDA.  The OPN Agreement was

15   renewed by Oracle and CedarCrestone most recently in November 2011.  The parties renewed the

16   FUDA most recently in April 2012.

17        42.    Both section K of the OPN Agreement and section J of the FUDA give either party

18   the right to terminate the contracts, but only in certain defined circumstances.  First, before either

19   party may terminate, the other party must have breached a material term of the contract.  Second,

20   after a material breach has occurred, the non-breaching party must provide "written specification

21   of the breach."  Third, after written specification of the material breach is provided, the non-

22   breaching party must give the breaching party 30 days "to correct the breach."  Only if the

23   material breach is not cured within 30 days of the written specification may the non-breaching

24   party terminate either contract, as Oracle has purported to do here.

25        43.    On September 4, 2012, without fulfilling any of the three necessary conditions

26   precedent to termination, Oracle purported to terminate both the OPN Agreement and FUDA

27   against CedarCrestone, revoking CedarCrestone's status as a licensed Oracle partner.  This

28   conduct by Oracle breached both the OPN Agreement and FUDA.

694237.01

44.     First, CedarCrestone had done nothing that could constitute a material breach of either contract, including any violation of Oracle's Ethics Code that purportedly could justify immediate termination of the OPN Agreement or FUDA.  Oracle contends in its Complaint that CedarCrestone breached the contracts by copying Oracle software without authorization in two separate ways.  Both allegations of copying are trivial and did not impair the consideration Oracle received under the licensing contracts.  First, Oracle contends that CedarCrestone did tax and regulatory support work for its clients on copies of software maintained on CedarCrestone's system.  Oracle contends this was unauthorized, even though Oracle gave CedarCrestone's clients the right to make an unlimited number of copies of Oracle software for its own use, and nothing in Oracle's license with these clients restricts the client from maintaining one of those copies on a support vendor's system.  Oracle asserts instead that CedarCrestone should have done this same work remotely (or locally at the client site) on identical copies of the same software maintained on the client's system.  Second, Oracle asserts that CedarCrestone violated Oracle's rights by downloading a single copy of software from Oracle, then copying it for more than one client.  Oracle asserts that CedarCrestone instead ought to have downloaded multiple copies of the same software from Oracle and used a distinct downloaded copy for each separate client.  Even if they otherwise had a basis in the contractual language and the parties' practices, both of these allegations of breach would be formal and technical.  None of these alleged violations, even assuming they are violations (which CedarCrestone denies), affected any of Oracle's substantive rights under the contracts.  Other than with respect to the alleged non-material breaches, which CedarCrestone contests, it is undisputed that CedarCrestone performed all aspects of the OPN Agreement and the FDA as those contracts require.

45.     Moreover, any such unauthorized copying had no effect whatsoever on the market for Oracle's software licensing business, and Oracle does not offer any specific facts contending otherwise.  As discussed above, Oracle does not even provide the sort and extent of tax and regulatory support services that CedarCrestone provided.  Instead, Oracle elected to limit its own tax and regulatory support offering to newer software, cutting off support customers after a specified time period after the given version of the software at issue first became available.

ANSWER TO COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF AND COUNTERCLAIMS
Case No. CV-12-4626

694237.01

1   Consequently, customers who used and relied on CedarCrestone's Tax/Regulatory Support

2   services would not have turned to Oracle for competing services even if CedarCrestone had

3   offered no services at all.  Even if Oracle could plead and prove actual harm stemming from

4   CedarCrestone's alleged conduct, that harm plainly would have been compensable in damages,

5   and thus is not a material breach of either the OPN Agreement or FUDA justifying termination.

6          46.     Second, even if CedarCrestone's purported breaches of the OPN Agreement and

7   FUDA were material (and they were not), Oracle was still obligated under those contracts to

8   provide written specification of, and give CedarCrestone 30 days to cure, the alleged breaches

9   before it could have the right to terminate either contract.  But prior to purporting to terminate the

10  OPN Agreement and FUDA on September 4, 2012 and filing this Complaint on September 5,

11  2012, Oracle never provided CedarCrestone with any written specification of CedarCrestone's

12  alleged breaches, much less gave CedarCrestone the opportunity to cure those alleged breaches.

13  Accordingly, Oracle had no right to terminate either contract, and Oracle's purported termination

14  was itself a material breach of both the OPN Agreement and the FUDA.

15         47.     Oracle asserts in its Complaint that it was entitled to immediately terminate the

16  OPN Agreement and FUDA notwithstanding the notice-and-cure terms, because CedarCrestone

17  purportedly violated the terms of Oracle's Ethics Code by making false statements and violating

18  Oracle's intellectual-property rights.  But, as already discussed, nothing CedarCrestone did was

19  any actionable violation of any Oracle intellectual-property rights.  Neither did CedarCrestone

20  make any material false or misleading statement regarding its services or business practices, or

21  commit any other act that could constitute a violation of the Ethics Code.

22         48.     As discussed above, CedarCrestone has already suffered substantial damages as

23  the result of Oracle's breaches of the OPN Agreement and FUDA.  CedarCrestone has lost a

24  contract with LACCD that was fully negotiated and pending only formal approval by the client's

25  Board.  That contract represented a substantial investment by CedarCrestone made over a nearly

26  two-year RFP process.  Once approved, it would have been worth $17 million in revenue to

27  CedarCrestone.  CedarCrestone also lost a contract with MISO that it was substantially likely to

28  be awarded, which contract would have resulted in approximately $1 million over its life.

46

ANSWER TO COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF AND COUNTERCLAIMS
Case No. CV-12-4626

694237.01

49.     Both the OPN Agreement and FUDA contain terms purporting to limit CedarCrestone's ability to seek or recover damages for Oracle's breaches of contract. Both contracts purport to limit recoverable damages to the fees paid by CedarCrestone to Oracle under those contracts, and to bar CedarCrestone from seeking consequential damages or lost profits, among other categories of damages. These damages limitations are unenforceable for various reasons. First, they are both substantively and procedurally unconscionable. Oracle is the world's dominant player in the market for database and enterprise software and retains the right to refuse licenses to its intellectual property, including its software, and to refuse to certify other support vendors as Oracle partners. Both the OPN Agreement and FUDA are form contracts of adhesion; they are presented to potential partners for acceptance or rejection, but are not subject to change through negotiation with Oracle. The OPN Agreement in particular is presented to potential partners through a click-through online interface, where there is no opportunity for the potential partner to engage to any degree with Oracle, much less negotiate a modification to any contractual term. Moreover, both the OPN Agreement and FUDA are non-reciprocal, purporting to place significant limitations on CedarCrestone's right (or the right of any Oracle "partner") to recover damages beyond recovery of fees paid to Oracle, while imposing no such limit on Oracle. Second, the damages limitations are also void as against California public policy to the extent they immunize Oracle's bad-faith, intentionally tortious, or unlawfully anti-competitive conduct.

## Second Claim for Relief
Intentional Interference with Prospective Economic Advantage
(Against all Oracle Counter-defendants)

50.     CedarCrestone hereby incorporates by reference each of the allegations in the preceding paragraphs as though fully set forth here.

51.     Oracle was generally aware that, for vendors hoping to compete in the downstream market for consulting, implementation, and maintenance of Oracle software, it is critical, if not essential, to have a non-adversarial relationship with Oracle. Oracle is further generally aware that many potential clients, particularly public agencies, refuse to consider working with a consulting, implementation, and maintenance vendor who is not in a formal partnership relationship with Oracle, in part as a result of Oracle's lobbying efforts. Oracle was generally

47

694237.01

1   aware that, if it terminated a vendor's partner status, it would have a substantial negative effect on

2   that vendor's existing business opportunities, make it much less likely that the vendor could

3   acquire future business, and would serve as an absolute bar to that vendor's prospects of working

4   with a substantial number of prospective clients, particularly in the public sphere.

5        52.     Moreover, it is generally the case that a client selecting a consulting and

6   implementation vendor will do so in conjunction with its purchase of software from Oracle, and

7   will negotiate both its software contract and its support contract contemporaneously. With

8   respect to the LACCD contract opportunities recently lost by CedarCrestone, Oracle was well

9   aware that those clients were selecting a support vendor and that CedarCrestone had pursued and

10   been awarded that business. Oracle knew that LACCD's contract with CedarCrestone was fully

11   negotiated and awaiting only formal Board approval. Oracle was also well aware that LACCD

12   required that any support vendor be in a formal partnership agreement with Oracle and/or in good

13   standing with Oracle. Accordingly, Oracle was aware that termination of CedarCrestone's

14   partnership status, its assertions that CedarCrestone violated Oracle's rights, and the initiation of

15   this lawsuit, taken together, would eliminate CedarCrestone from consideration by LACCD. In

16   choosing to terminate CedarCrestone's partnership status for bad-faith and pretextual reasons

17   related to the elimination of competition in the consulting, implementation, and maintenance

18   market and gaining an advantage in the collateral *Rimini Street* litigation, Oracle intended that

19   CedarCrestone suffer the consequences of Oracle's actions, including but not limited to the loss

20   of any opportunity to do business with LACCD in particular, and myriad other similarly situated

21   potential clients in general.

22        53.     Oracle's interference with CedarCrestone's prospective economic relations with

23   LACCD was wrongful for reasons independent of the interference itself. Oracle terminated the

24   CedarCrestone contracts as part of a sustained initiative to destroy competition in the downstream

25   market for consulting, support, and implementation of Oracle software, and to leverage its

26   monopoly in the market for its own software into an undeserved monopoly in the support market,

27   forcing clients to pay more for an Oracle-controlled product bundle containing those support

28   services Oracle chooses to provide along with new releases of Oracle software that the customer

ANSWER TO COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF AND COUNTERCLAIMS
Case No. CV-12-4626

694237.01

1    may not be in a position to implement.  Oracle's litigation against Rimini Street was a prior act in

2    furtherance of this same plan.  By terminating a competitor's partner status for no valid reason,

3    Oracle was aware it would greatly, if not entirely, compromise that partner's ability to compete,

4    removing that partner as a potential competitive threat and increasing the chances that Oracle

5    would eventually capture that business and the support market generally.  Oracle has taken other

6    anti-competitive steps to disadvantage CedarCrestone, harm its ability to turn business

7    opportunities into contracts, and funnel business away from CedarCrestone to itself and other

8    CedarCrestone competitors, including by instructing its software resellers not to provide price

9    quotes and price discounts to CedarCrestone, and thereby discriminating against CedarCrestone,

10   and in favor of other competitors, on the basis of price.

11          54.     Further, in order to interfere with CedarCrestone's prospective economic relations,

12   Oracle first had to commit a bad-faith breach of not one but two separate contracts of its own with

13   CedarCrestone, the OPN Agreement and the FUDA.  Both of those contracts permitted

14   termination by a party only in the event that the other party first committed a material breach of

15   the contract going to the heart of the consideration provided to the non-breaching party.  Nothing

16   CedarCrestone allegedly did that was the basis for Oracle's termination and is the basis of this

17   lawsuit comes close to being material or impairing Oracle's consideration under either contract.

18   Further, even if CedarCrestone had committed a material breach (which it did not), Oracle was

19   still obligated, under both contracts, to give CedarCrestone written notice specifying the breaches

20   and permitting CedarCrestone an opportunity to cure the breaches.  Oracle did neither.  Because

21   time was of the essence to Oracle in the *Rimini Street* litigation, Oracle simply ignored these

22   contractual covenants and purported to terminate, despite plainly having no right to do so,

23   including no right under the terms of Oracle's Ethics Code.  Oracle was aware of its contractual

24   obligations and intentionally disregarded them in order to maximize the harm to CedarCrestone

25   and its business, including depriving CedarCrestone of customers with which it was actively

26   negotiating and who would have hired CedarCrestone but for Oracle's willful acts.  This harm to

27   CedarCrestone's business was not only foreseeable by Oracle, it was Oracle's entire motivation in

28   terminating its partner relationship with CedarCrestone.

ANSWER TO COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF AND COUNTERCLAIMS
Case No. CV-12-4626

694237.01

1    55.    As discussed above, CedarCrestone has already suffered substantial damages as

2    the result of Oracle's intentional interference with its business opportunities. CedarCrestone has

3    lost the opportunity to finalize a nearly-completed contract with LACCD that was nearly finalized

4    and would have been worth $17 million in revenue to CedarCrestone.

5    56.    Both the OPN Agreement and FUDA contain terms purporting to limit

6    CedarCrestone's ability to seek or recover damages for Oracle's breaches of contract. Both

7    contracts purport to limit recoverable damages to the fees paid by CedarCrestone to Oracle under

8    those contracts, and to bar CedarCrestone from seeking consequential damages or lost profits,

9    among other categories of damages. These damages limitations are unenforceable for various

10    reasons. First, they are unenforceable as a matter of California law under California Civil Code

11    section 1668, which invalidates any contract to the extent it purports to exempt a party from

12    liability for intentional tortious or grossly negligent conduct, or any conduct constituting a

13    violation of law. Second, the damages limitations are both substantively and procedurally

14    unconscionable. Oracle is the world's dominant player in the market for database and enterprise

15    software and retains the right to refuse licenses to its intellectual property, including its software,

16    and to refuse to certify other support vendors as Oracle partners. Both the OPN Agreement and

17    FUDA are form contracts of adhesion; they are presented to potential partners for acceptance or

18    rejection, but are not subject to change through negotiation with Oracle. The OPN Agreement in

19    particular is presented to potential partners through a click-through online interface, where there

20    is no opportunity for the potential partner to engage to any degree with Oracle, much less

21    negotiate a modification to any contractual term. Moreover, both the OPN Agreement and FUDA

22    are non-reciprocal, purporting to place significant limitations on CedarCrestone's right (or the

23    right of any Oracle "partner") to recover damages beyond recovery of fees paid to Oracle, while

24    imposing no such limit on Oracle.

25    57.    Oracle's conduct, as described above, was oppressive and malicious and supports

26    an award of punitive damages against Oracle.

27

28

50

ANSWER TO COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF AND COUNTERCLAIMS
Case No. CV-12-4626

**Third Claim for Relief**
Unfair Business Practices
(Against all Oracle Counter-defendants)

58.     CedarCrestone hereby incorporates by reference each of the allegations in the preceding paragraphs as though fully set forth here.

59.     Oracle has engaged in unlawful, unfair, and/or fraudulent business acts or practices by, among other things, (a) engaging in unfair, fraudulent, and/or bad-faith conduct that violated its OPN Agreement and FUDA with CedarCrestone, as described above; (b) misleading prospective CedarCrestone customers about the content of CedarCrestone business practices and the extent to which Oracle had knowledge of and had affirmatively approved those business practices for years prior to Oracle's purported termination of CedarCrestone's partner status; (c) interfering with CedarCrestone's prospective economic advantage, as described above; and (d) taking affirmative and concerted acts to harm competition in the downstream market for support, consulting, and implementation of Oracle software, in which CedarCrestone is a participant.

60.     CedarCrestone committed these unlawful, unfair, and/or fraudulent business acts and practices in order to gain an unfair competitive advantage over CedarCrestone in competing for the provision of support services to Oracle software licensees, and in order to gain a tactical advantage in the collateral *Rimini Street* litigation.

61.     Oracle's unlawful, unfair, and/or fraudulent business acts and practices offend numerous California public policies, including policies against making false or misleading statements to potential consumers regarding commercial services, bad-faith and intentional breaches of contract, interference with a competitor's prospective economic advantage, and use of monopoly power in one market to harm competition in a downstream market.  Oracle's practices were and are immoral, unethical, oppressive, and/or unscrupulous, including because they intentionally and falsely seek to portray CedarCrestone as a company with no respect for Oracle's contractual and intellectual-property rights and to deceive potential clients into thinking that CedarCrestone engages in willful violations of Oracle's rights.

62.     Oracle's unlawful, unfair, and/or fraudulent business acts and practices already have caused CedarCrestone substantial injury, including without limitation by deceiving potential

51

1   CedarCrestone clients into believing that CedarCrestone has violated Oracle's rights, by

2   eliminating CedarCrestone from consideration by the substantial percentage of the market for

3   consulting, support, and implementation services on Oracle software which considers it essential

4   for a support vendor to be a certified Oracle partner, and reducing the availability of competing

5   support services for users of Oracle software.  Oracle has taken other anti-competitive steps to

6   disadvantage CedarCrestone, harm its ability to turn business opportunities into contracts, and

7   funnel business away from CedarCrestone to itself and other CedarCrestone competitors,

8   including by instructing its software resellers not to provide price quotes and price discounts to

9   CedarCrestone, and thereby discriminating against CedarCrestone, and in favor of other

10  competitors, on the basis of price.  More generally, Oracle has worked to destroy competition in

11  the downstream market for consulting, support, and implementation of Oracle software, and to

12  leverage its monopoly in the market for its own software into an undeserved monopoly in the

13  support market, which in turn forces clients to pay more for an Oracle-controlled product bundle

14  containing those support services Oracle chooses to provide, including new releases of Oracle

15  software that the customer may not be in a position to implement.  These unlawful, unfair, and/or

16  fraudulent business acts and practices offer no benefits to consumers or competition that outweigh

17  these injuries, which cannot reasonably be avoided because of, among other factors, Oracle's

18  market power, both in the markets for its own software (where Oracle has a monopoly) and in the

19  downstream market for support services, Oracle's deceptive and bad-faith conduct regarding the

20  terms of its partnership contracts, CedarCrestone's compliance with those terms, and Oracle's

21  actual approval of CedarCrestone's business practices, including without limitation any business

22  practices that are the subject of Oracle's complaint.

23      63.    Oracle's acts and conduct constitute unfair competition as defined by California

24  Business & Professions Code section 17200 *et seq.*

25      64.    As discussed above, CedarCrestone has already suffered substantial injury in fact

26  and lost money and property as the result of Oracle's unfair competition, including without

27  limitation loss of revenue from customers who instead would have purchased support services

28  from CedarCrestone, including without limitation LACCD and MISO.

65.     CedarCrestone also has suffered irreparable injury as a result of Oracle's unfair competition, including its bad-faith termination of CedarCrestone's partner status, which has put CedarCrestone off-limits to substantial segments of the market for CedarCrestone's support services.  Similarly, Oracle's price discrimination against CedarCrestone, and in favor of itself and its competitors, impairs if not destroys CedarCrestone's ability to compete for consulting and support business, and has already prevented CedarCrestone from converting business opportunities into revenue-producing contracts.  Unless Oracle is enjoined from further such unfair competition, CedarCrestone will continue to suffer such irreparable injury.  CedarCrestone has no adequate remedy at law.

66.     Oracle should be compelled to disgorge and/or restore any and all revenues, earnings, profits, compensation, and benefits it may have obtained in violation of California Business & Professions Code section 17200 *et seq.,* including but not limited to any such monies or other benefits earned from customers who chose to purchase Oracle support services, rather than like services from CedarCrestone, as the result of Oracle's bad-faith and anti-competitive termination of CedarCrestone's contracts and status as an Oracle partner.  Oracle should be enjoined from further unlawful, unfair, and/or fraudulent business practices.

67.     Both the OPN Agreement and FUDA contain terms purporting to limit CedarCrestone's ability to seek or recover damages for Oracle's breaches of contract.  Both contracts purport to limit CedarCrestone's remedies to the fees paid by CedarCrestone to Oracle under those contracts, and to bar CedarCrestone from seeking restitution of money wrongly retained by Oracle as the result of Oracle's unfair practices, among other categories of potential remedies.  These limitations are unenforceable for various reasons.  First, they are unenforceable as a matter of California law under California Civil Code section 1668, which invalidates any contract to the extent it purports to exempt a party from liability for intentional tortious or grossly negligent conduct, or any conduct constituting a violation of law.  Second, the remedies limitations are both substantively and procedurally unconscionable.  Oracle is the world's dominant player in the market for database and enterprise software and retains the right to refuse licenses to its intellectual property, including its software, and to refuse to certify other support

53

694237.01

1  vendors as Oracle partners.  Both the OPN Agreement and FUDA are form contracts of adhesion;

2  they are presented to potential partners for acceptance or rejection, but are not subject to change

3  through negotiation with Oracle.  The OPN Agreement in particular is presented to potential

4  partners through a click-through online interface, where there is no opportunity for the potential

5  partner to engage to any degree with Oracle, much less negotiate a modification to any

6  contractual term.  Moreover, both the OPN Agreement and FUDA are non-reciprocal, purporting

7  to place significant limitations on CedarCrestone's right (or the right of any Oracle "partner") to

8  recover remedies beyond recovery of fees paid to Oracle, while imposing no such limit on Oracle.

9  **Prayer for Relief**

10  Wherefore, CedarCrestone respectfully prays for the following:

11  A.  For compensatory damages against Oracle to be proven at trial;

12  B.  For punitive damages against Oracle to be assessed at trial;

13  C.  For restitution and disgorgement of all ill-gotten gains unjustly obtained and

14  retained by Oracle through the acts complained of in these Counterclaims;

15  D.  For an Order reinstating the OPN Agreement and FUDA purportedly terminated

16  by Oracle in September 2012, and directing Oracle to specifically perform the terms of those

17  contracts;

18  E.  For a preliminary and permanent injunction directing Oracle to cease the unlawful,

19  unfair, and/or fraudulent business practices identified in these Counterclaims;

20  F.  For prejudgment interest;

21  G.  For an accounting;

22  H.  For an Order awarding CedarCrestone its attorneys' fees; and

23  I.  For an Order awarding CedarCrestone such other additional relief as the Court

24  deems just and proper.

25

26

27

28

ANSWER TO COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF AND COUNTERCLAIMS
Case No. CV-12-4626

694237.01

1

## DEMAND FOR JURY TRIAL

2        In accordance with Federal Rule of Civil Procedure 38(b), CedarCrestone demands a trial

3   by jury on all issues so triable.

4   Dated: October 10, 2012                         KEKER & VAN NEST LLP

5

6                                          By:   /s/ Robert A. Van Nest
                                                 ROBERT A. VAN NEST
7
                                                 Attorneys for Defendant
8                                                CEDARCRESTONE, INC.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

694237.01