1

2

3

4

5

6                          UNITED STATES DISTRICT COURT

7                               DISTRICT OF NEVADA

8                                        * * *

9    ORACLE USA, INC.; et al.,                )
                                              )
10                      Plaintiffs,           )         2:10-CV-00106-LRH-PAL
                                              )
11   v.                                       )
                                              )         ORDER
12   RIMINI STREET, INC., a Nevada            )
     corporation; SETH RAVIN, an individual, )
13                                            )
                        Defendants.           )
14   _____)

15         Before the court is plaintiffs Oracle USA, Inc.; Oracle America, Inc.; and Oracle

16   International Corporation's (collectively "Oracle") motion for partial summary judgment on their

17   first cause of action for copyright infringement and on defendant Rimini Street, Inc.'s ("Rimini")

18   second, third, and sixth affirmative defenses. Doc. #237.[1] Defendant Rimini filed an opposition

19   (Doc. #259) to which Oracle replied (Doc. #281).

20   **I.     Facts and Procedural History**

21         Oracle develops, manufacturers, and licenses computer software, including Enterprise

22   Software programs.[2] Oracle is the current owner and/or exclusive licensee for various PeopleSoft,

23   _____

24         [1] Refers to the court's docket entry number.

25         [2] Enterprise Software is a type of computer software program that enables core operational tasks - like
     payroll, human resource tasking, and inventory management - across an entire organization. Instead of being
26   tied to a specific computer, Enterprise Software is hosted on a server and provides simultaneous access and
     service to a large number of users over a computer network. These features and functions are in contrast to

J.D. Edwards, and Siebel-branded Enterprise Software products. Rather than sell the software outright, Oracle licenses the use of the software to customers through software licensing agreements. Oracle also provides software support services to its customers, if requested, through separate software support service contracts.

Defendant Rimini is a company that provides similar software support services to customers licensing Oracle's Enterprise Software programs and competes directly with Oracle to provide these services.

On January 25, 2010, Oracle filed a complaint alleging that Rimini copied several of Oracle's copyright protected software programs onto its own computer systems in order to provide software support services to its customers. In its complaint, Oracle alleges thirteen separate causes of action against Rimini: (1) copyright infringement; (2) violation of the Federal Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. §§ 1030(a)(2)(C), (a)(4), & (a)(5); (3) violation of the California Computer Data Access and Fraud Act ("CDAFA"), Cal. Penal Code § 502; (4) violation of Nevada Revised Statutes ("NRS") § 205.4765; (5) breach of contract; (6) inducement of breach of contract; (7) intentional interference with prospective economic advantage; (8) negligent interference with prospective economic advantage; (9) unfair competition; (10) trespass to chattels; (11) unjust enrichment; (12) unfair practices; and (13) accounting. Doc. #1.

On March 29, 2010, Rimini filed an answer contesting Oracle's claims and alleging three counterclaims: (1) defamation, business disparagement, and trade libel; (2) copyright misuse; and (3) unfair competition in violation of California Business and Professional Code, Cal. BPC. § 17200. Doc. #30. Rimini also raised eleven affirmative defenses to Oracle's claims: (1) invalid copyrights; (2) express license; (3) consent of use; (4) copyright misuse; (5) improper registration;

---

typical computer software, which is generally a single-user application executed on a user's personal computer.
    A key feature of Enterprise Software is the ability to modify and customize the software for an entity's specific needs and to support the software through periodic software and regulatory updates to maintain the software's continuing functionality.

2

1    (6) implied license; (7) merger; (8) statute of limitations; (9) laches; (10) fair use; and

2    (11) limitations on exclusive rights of computer programs under 17 U.S.C. § 117. *Id.*

3        In April 2010, Oracle filed an amended complaint (Doc. #36) to which Rimini filed an

4    amended answer (Doc. #46) and a motion to dismiss (Doc. #48). On August 13, 2010, the court

5    granted in-part and denied in-part Rimini's motion, dismissing Oracle's eighth cause of action for

6    negligent interference with prospective economic advantage. Doc. #78.

7        In response to Rimini's amended answer, Oracle filed a motion to dismiss certain of

8    Rimini's counterclaims and affirmative defenses. Doc. #67. On October 29, 2010, the court granted

9    in-part and denied in-part Oracle's motion, dismissing several defamation allegations from

10   Rimini's first counterclaim for defamation and dismissing the entirety of Rimini's fourth

11   affirmative defense for copyright misuse. Doc. #111.

12       In June 2011, Oracle filed a second amended complaint. Doc. #146. In response, Rimini

13   filed its second amended answer raising six additional affirmative defenses: (12) contract defense;

14   (13) privilege; (14) economic interest; (15) consent; (16) preemption; (17) lack of contract; and

15   (18) mitigation of damages. Doc. #153. Thereafter, Oracle filed the present motion for partial

16   summary judgment on its first cause of action for copyright infringement and on Rimini's second,

17   third, and sixth affirmative defenses. Doc. #237.

18   **II.   Legal Standard**

19       Summary judgment is appropriate only when the pleadings, depositions, answers to

20   interrogatories, affidavits or declarations, stipulations, admissions, and other materials in the record

21   show that "there is no genuine issue as to any material fact and the movant is entitled to judgment

22   as a matter of law." Fed. R. Civ. P. 56(a). In assessing a motion for summary judgment, the

23   evidence, together with all inferences that can reasonably be drawn therefrom, must be read in the

24   light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio*

25   *Corp.*, 475 U.S. 574, 587 (1986); *Cnty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1154

26   (9th Cir. 2001).

The moving party bears the initial burden of informing the court of the basis for its motion, along with evidence showing the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). On those issues for which it bears the burden of proof, the moving party must make a showing that is "sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986); *see also Idema v. Dreamworks, Inc.*, 162 F. Supp. 2d 1129, 1141 (C.D. Cal. 2001).

To successfully rebut a motion for summary judgment, the non-moving party must point to facts supported by the record which demonstrate a genuine issue of material fact. *Reese v. Jefferson Sch. Dist. No. 14J*, 208 F.3d 736, 738 (9th Cir. 2000). A "material fact" is a fact "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Where reasonable minds could differ on the material facts at issue, summary judgment is not appropriate. *See v. Durang*, 711 F.2d 141, 143 (9th Cir. 1983). A dispute regarding a material fact is considered genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248. The mere existence of a scintilla of evidence in support of the party's position is insufficient to establish a genuine dispute; there must be evidence on which a jury could reasonably find for the party. *See id.* at 252.

**III.   Discussion**

This motion concerns Oracle's first cause of action for copyright infringement and Rimini's second affirmative defense for express license, third affirmative defense for consent of use, and sixth affirmative defense for implied license. *See* Doc. #237. Oracle's claim for copyright infringement, as it relates to the present motion, arises from Rimini's copying of Oracle's copyright protected PeopleSoft, J.D. Edwards, and Siebel-branded Enterprise Software programs on Rimini's company systems in order to provide software support services to four separate customers: the City of Flint, Michigan ("City of Flint"); the school district of Pittsburgh, Pennsylvania ("Pittsburgh Public Schools"); Giant Cement Holding, Inc. ("Giant Cement"); and Novell, Inc. ("Novell"). Each customer is a licensee of at least one of Oracle's copyright protected Enterprise

4

Software programs, but receives software support services from Rimini. In its motion for summary judgment, Oracle has identified the following licensed software products, registered copyrights, and alleged infringing copies of the licensed software for each customer:

| Customer | Enterprise Software Product | Copyrights[3] | Infringing Copy |
|---|---|---|---|
| City of Flint | PeopleSoft HRMS 7.5<br>PeopleTools 7.5 | TX 4-792-575<br>TX 4-792-578 | H751COFO #1<br>H751COFO #2<br>H751COF2<br>H751DEVO<br>H751AUC |
| Pittsburgh Public Schools | PeopleSoft HRMS 8.3<br>PeopleTools 8.10<br>PeopleSoft FSCM 8.4<br>PeopleTools 8.48 | TX 5-469-032<br>TX 5-266-221<br>TX 5-586-247<br>TX 7-092-819 | H831PPSM<br>H831PPS2<br>F842PPSM #1<br>F842PPSM #2 |
| Giant Cement | JD Edwards EnterpriseOne 8.10 | TX 6-541-038 | JGEHE5TSA1 |
| Novell | Siebel 7.7.1 | TX 6-941-993 | NOVELL-AP01<br>NOVELL-CLI |

As addressed in detail below, Rimini concedes in its opposition that it copied the identified copyrighted software programs to create the allegedly infringing development environments[4] on its company systems so that it could develop and test software updates for its customers. *See generally* Doc. #259. However, Rimini argues that its copying of the software was authorized (1) by the express language of Oracle's customer software licensing agreements, and/or (2) implicitly by Oracle's conduct and consent in shipping back-up copies of the licensed software's installation media to Rimini's facilities. The court shall address the parties' claims and affirmative defenses below.

---

[3] To reduce the number of copyright registrations at issue in this action, the parties have stipulated (and the court has so ordered) that the protected expression in later releases and versions of the PeopleSoft, J.D. Edwards, and Siebel-branded software programs includes the protected expression contained in earlier releases and versions of the software. *See* Doc. #149.

[4] In order to develop and test software updates for Enterprise Software, support service providers (like Oracle and Rimini) create development environments of the software. A development environment is a software environment that contains a copy of the software program which is then modified to develop and test software updates. Given the critical nature of Enterprise Software programs, updates to the software must be fully tested and verified in a development environment before they are provided to a customer.

**A.  Copyright Infringement (First Cause of Action)**

To establish a prima facie case of copyright infringement, Oracle must show (1) ownership of the relevant copyrights, and (2) copying of protected expression by Rimini. *Range Road Music, Inc. v. East Coast Foods, Inc.*, 668 F.3d 1148, 1153 (9th Cir. 2012); *Funky Films, Inc. v. Time Warner Entm't Co.*, 462 F.3d 1072, 1076 (9th Cir. 2006).

Here, it is undisputed that Oracle is the owner and/or exclusive licensee of the eight registered copyrights at issue in this motion. *See* Doc. #238, Adler Decl., Exhibits 1-9. Further, it is undisputed, and Rimini concedes in its opposition, that it copied Oracle's copyright protected software when it built development environments for the four customers at issue in this motion. *See generally* Doc. #259. Based on these undisputed facts, the court finds that Oracle has established a prima facie case of copyright infringement. *See e.g., Triad Sys. Corp. v. Southeastern Express Co.*, 64 F.3d 1330, 1335 (9th Cir. 1995) (prima facie case of copyright infringement found where defendant was "copying [plaintiff's] entire [computer] programs" in order to provide software and maintenance support); *MAI Sys. Corp. v. Peak Computer Corp.*, 991 F.2d 511, 517-519 (9th Cir. 1993) (affirming summary judgment on the claim of copyright infringement where defendant copied plaintiff's software onto its systems to provide competing software maintenance services).

However, Oracle's claim of copyright infringement is subject to Rimini's challenged affirmative defenses of express license, implied license, and consent. Therefore, the court must address each affirmative defense before determining whether Oracle is entitled to summary judgment on this claim.

**B.  Express License (Second Affirmative Defense)**

Express license is an affirmative defense. *Worldwide Church of God v. Philadelphia Church of God, Inc.*, 227 F.3d 1110, 1114 (9th Cir. 2000). As the party alleging the affirmative defense, Rimini has the initial burden to identify any license provision(s) that it believes excuses its infringement. *Michaels v. Internet Entm't Group, Inc.*, 5 F. Supp. 2d 823, 831 (C.D. Cal. 1998). If

1   Rimini identifies any relevant license provision, Oracle may overcome the defense of express

2   license by showing that Rimini's conduct exceeded the scope of that provision. *LGS Architects,*

3   *Inc. v. Concordia Homes*, 434 F.3d 1150, 1156 (9th Cir. 2006).

4          Construing the scope of a license is principally a matter of contract interpretation.[5] *S.O.S.,*

5   *Inc. v. Payday, Inc.*, 886 F.2d 1081, 1088 (9th Cir. 1989). The starting point for the interpretation

6   of any contract is the plain language of the contract. *Klamatch Water Users Protective Ass'n v.*

7   *Patterson*, 20 F.3d 1206, 1210 (9th Cir. 1999) ("Whenever possible, the plain language of the

8   contract should be considered first."). When a contract contains clear and unequivocal provisions,

9   those provisions shall be construed to their usual and ordinary meaning. *Id*. Then, using the plain

10  language of the contract, the court shall effectuate the intent of the parties. *Id*. at 1210 ("Contract

11  terms are to be given their ordinary meaning, and when the terms of a contract are clear, the intent

12  of the parties must be ascertained from the contract itself.").

13         However, if a contract term is ambiguous, the court may look beyond the plain language of

14  the contract to determine the intent of the parties. *See e.g., Foad Consulting Group, Inc. v.*

15  *Azzalino*, 270 F.3d 821, 828 (9th Cir. 2001) ("If a party's extrinsic evidence creates the possibility

16  of an ambiguity, a court may not rely on the text of the contract alone to determine the intent of the

17  parties."). A contract term is ambiguous if it is "reasonably susceptible to more than one

18  _____

19         [5] By their express terms, the PeopleSoft and Siebel-branded software licenses at issue in this action are
20  to be construed in accordance with the laws of the State of California. *See e.g.,* Doc. #242, Exhibit 10, City of
    Flint's Software Licensing Agreement, §15 ("This Agreement is made in and shall be governed by the laws of
21  the State of California."). The J.D. Edwards-branded software license at issue is to be construed in accordance
    with the laws of the State of Colorado. Doc. #242, Exhibit 16, Giant Cement's Software Licensing Agreement,
22  Art. XI, §2 ("All disputes arising out of or related to this Agreement shall be determined under the laws of the
    State of Colorado.").
23         When construing licenses under California law, "the exception to the parol evidence rule is broad -
    extrinsic evidence is admissible to demonstrate that there is an ambiguity in an instrument and for the purpose
24  of construing this ambiguity." *Adobe Sys., Inc. v. One Stop Micro, Inc.*, 84 F. Supp. 2d 1086, 1090 (N.D. Cal.
    2000). A court may consider extrinsic evidence of industry customs, course of dealing, and course of
25  performance. *Id*. Like California, Colorado also allows for consideration of extrinsic evidence to determine
    whether there is an ambiguity in the contract. *See Sola Salon Studios, LLC v. Heller*, Case No. 08-cv-1565-
26  PAB-BNB, 2012 U.S. Dist. LEXIS 36247, *6 (D. Colo. 2012).

interpretation." *Shelton v. Shelton*, 78 P.3d 507, 510 (Nev. 2003).

In this action, it is undisputed that Rimini does not have its own software license from Oracle for any of the identified Enterprise Software programs copied on its systems. Instead, Rimini contends that Oracle's software licensing agreements with the four customers at issue in this motion expressly authorize it to copy, keep, and maintain copies of the copyrighted software on its company systems and under its control in order to provide contracted software support services to those customers. *See* Doc. #259, p.8. As each customer's software licensing agreement is different, the court must evaluate Rimini's express license affirmative defenses separately for each customer at issue in this motion.

**1. City of Flint**

Oracle has identified five development environments on Rimini's systems associated with the City of Flint which contain copies of Oracle's copyrighted PeopleSoft-branded software. These development environments are identified on Rimini's systems as H751COFO #1, H751COFO #2, H751COF2, H751DEVO, and H751AUC.

In its motion, Oracle contends that Rimini cannot meet its burden of identifying a relevant software license excusing its infringement of Oracle's copyrighted software. *See e.g., Michaels*, 5 F. Supp. 2d at 831 (holding that to establish the affirmative defense of express license, defendant must identify a license that authorized it to copy the protected work). Initially, Oracle argues that Rimini cannot assert the City of Flint's software licensing agreement[6] as a defense in this action because Rimini cannot prove that the City of Flint's software installation media (the installation disc provided by Oracle for the licensed software) was used to build the development environments

---

[6] A full and complete copy of the City of Flint's Software License and Service Agreement is attached as Exhibit 10 to Oracle's Appendix of Exhibits Cited in Support of Oracle's Motion for Partial Summary Judgment. Doc. #242, Exhibit 10.

associated with the City of Flint.[7] *See* Doc. #237, p.18-19.

Oracle's initial argument is premised on the flawed assumption that the rights to use and install the licensed software are restricted and tied solely to the specific software installation media delivered by Oracle, and is in direct contention with the express language of the City of Flint's license as well as federal copyright law. In the City of Flint's license, Oracle granted the City of Flint "a perpetual, non-exclusive, non-transferable license to use the licensed Software." Doc. #242, Exhibit 10, §1.1. "Software" is defined as "all or any portion of the then commercially available global version(s) of the binary computer software programs." *Id*. at §16. Nowhere does the licensing agreement require the City of Flint to install the licensed software from the specific installation media provided by Oracle.[8] Rather, the license grants the City of Flint the right to install and use "version(s)" of the licensed software.[9] This is separate from, and in contrast to, a right to install and use *only* the provided software installation media. Other provisions of the City of Flint's license are in accord; differentiating between the licensed software and the provided installation media. *See e.g.*, Doc. #242, Exhibit 10, § 4 (stating that Oracle "retains title to all portions of the Software," but "[t]itle to the physical media for the Software vests in [the City of Flint] upon delivery").

---

[7] It is undisputed in this action that Rimini does not know which, if any, of its customer's software installation media was used to build the development environments associated with the City of Flint. In particular, Rimini admits that it does not know the exact source of the PeopleSoft-branded software that was used to build development environments H751DEVO, H751AUD, and H751COFO #1. Doc. #242, Exhibit 25, p.3. H751COFO #2 is a cloned copy of H751COFO #1, so its origins are also unknown. *Id.*

Further, although Rimini states that development environment H751COF2 was built directly from a customer's software installation media, Rimini admits that it cannot identify the customer whose installation media was used to build that environment. Doc. #242, Exhibit 24, p.30:22-23 ("Rimini does not have records from which it can identify all of the local PeopleSoft environments created from the stored installation media.").

[8] The court notes that although the easiest way to install the licensed software is through a customer's provided installation media, it is not the *only* way to install the licensed software. For example, the licensed software could be downloaded from Oracle to a customer's system.

[9] It is undisputed that the development environments associated with the City of Flint contain copies of the versions of the PeopleSoft-branded software licensed by the City of Flint.

Additionally, under federal law, software installation media is not protected under federal copyrights. This is because software copyrights are separate and distinct from the physical objects on which they may be embodied. *Harris v. Emus Records Corp.*, 734 F.2d 1329, 1336 (9th Cir. 1984) ("The ownership of the copyright is separate and independent from ownership of the material object in which it is embodied."); *see also Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437, 449 (2007) (holding that copyrighted software "is an idea without physical embodiment"). Consistent with this authority, the court finds that the rights granted by the City of Flint's software licensing agreement are not limited or restricted to any specific physical embodiment of the software, like Oracle's provided software installation media.

Therefore, the court finds that the rights contained in the City of Flint's license apply equally to the copies of the copyrighted software maintained on Rimini's systems regardless of whether Rimini used the specific installation media provided by Oracle to make those copies. As such, Rimini's failure to prove that the City of Flint's software installation media was used to create the identified development environments is not determinative to Rimini's affirmative defense, and Rimini may assert the City of Flint's software license as a defense to Oracle's claim of copyright infringement.

As the court has found that Rimini may assert the City of Flint's license in this action, Rimini must now identify those license provisions, if any, that expressly authorize its copying of Oracle's copyrighted PeopleSoft-branded software. *Michaels*, 5 F. Supp. 2d at 831. In support of its affirmative defense, Rimini identifies three license provisions: (1) Section 1.2(b) permitting copying of the software; (2) Section 1.2(c) permitting modification of the software; and (3) Section 14.2 permitting access to and use of the software to third parties that provide services to the City of Flint. *See* Doc. #259, p.10-12. Each provision is discussed below.

### a.  Section 1.2(b)

Section 1.2(b) of the City of Flint's license states in pertinent part that "[the City of Flint] may [] make a reasonable number of copies of the Software solely for: (i) use in accordance with

the terms set forth herein . . . ; (ii) archive or emergency back-up purposes; and/or (iii) disaster recovery testing purposes." Doc. #242, Exhibit 10, §1.2(b). Rimini contends that this provision expressly authorizes it to make "a reasonable number of copies" of the licensed software on its own systems and under its control in order to provide contracted software support services to the City of Flint. *See* Doc. #259, p.10.

The court has reviewed the documents and pleadings on file in this matter and finds that the plain, unambiguous language of Section 1.2(b) does not expressly authorize Rimini to make copies of the licensed software. First, the plain language of Section 1.2(b) provides that *only* the City of Flint may make copies of the software. *Id*. ("[the City of Flint] may [] make a reasonable number of copies . . ."). Nowhere does this provision authorize Rimini, as a third-party, to make a copy of the licensed software.

Second, Section 1.2(b) authorizes copying of the software only for three very limited bases: (1) a use in accordance with the terms of the license; (2) archival and back-up purposes; and (3) disaster recovery testing purposes. *Id*. Upon review of Rimini's use of the development environments associated with the City of Flint, the court finds that none of the environments were created for archival, emergency back-up, and/or disaster recovery purposes. Rather, the undisputed evidence establishes that these development environments were used to develop and test software updates for the City of Flint and other Rimini customers with similar software licenses. *See* Doc. #242, Exhibit 50, Lester Depo., p.207:17-201:25; Exhibit 62, Williams Depo., p.9:22-10:6. Further, a development environment - which is a modifiable (or already modified) copy of the software used to develop and test software updates - is in complete contrast to an archival or back-up copy of the software - which is inherently an unmodified copy of the software for use in the event that the production copy of the software (the copy used on a customer's systems) is corrupted or lost. Thus, the court finds that Rimini's use of the copyrighted PeopleSoft-branded software is outside the scope of Sections 1.2(b)(ii) and (iii).

///

11

1    Third, although Rimini argues extensively that its copying of Oracle's copyrighted software

2 was a "use in accordance with the terms [of the license]" under Section 1.2(b)(i), the court finds

3 that Rimini's copying of the copyrighted software on its company systems is also a use outside the

4 scope of this provision. In its motion for summary judgment, Oracle asserts, and the court agrees,

5 that Section 1.2(b)(i), which authorizes a reasonable number of copies for "use in accordance with

6 the terms set forth herein" is subject to the licensing restrictions outlined in Section 1.1 of the City

7 of Flint's license. A "use in accordance with the terms set forth herein" necessarily means that use

8 of the licensed software under this provision is subject to all other licensing restrictions identified

9 in the same main section, in this case Section 1 of the City of Flint's license. *See e.g., Threlkeld v.*

10 *Ranger Ins. Co.*, 202 Cal. Rptr. 529, 532 (Cal. App. 1984) (interpreting the phrase "in accordance

11 with" a set of regulations as incorporating those regulations by reference).

12    Section 1.1 of the license grants the City of Flint a "license to use the licensed Software,

13 solely for [the City of Flint's] *internal data processing operations at its facilities* in the [United

14 States]." Doc. #242, Exhibit 10, § 1.1 (emphasis added). This license provision expressly limits use

15 of the software (1) to the City of Flint's facilities and (2) for the City of Flint's internal data

16 processing operations (i.e. normal use of the software). The court finds incorporating the

17 restrictions of Section 1.1 into Section 1.2(b)(i)'s "use in accordance with" language,

18 Section 1.2(b)(i) expressly limits copying the licensed software to *only* the City of Flint's

19 facilities.[10] The court's interpretation of the license is appropriate as the law requires a contractual

20 interpretation that gives effect to every provision of the license. *See Boghos v. Certain*

21 *Underwriters at Lloyd's of London*, 115 P.3d 68, 72 (Cal. 2005) (holding that a court must "give

22 effect to every part [of a contract], if reasonably practicable, each clause helping to interpret the

23 other"). Moreover, the court's interpretation of the City of Flint's license is confirmed by

24 Section 1.2(a) which authorizes a backup copy of the software outside the City of Flint's facilities.

25 _____

26    [10] Here, it is undisputed that Rimini's copies of the licensed PeopleSoft-branded software are kept on
Rimini's systems at its facilities and outside the control of the City of Flint.

*See* Doc. #242, Exhibit 10, §1.2(a) ("[The City of Flint] may . . . in the event that a Server at its facility is inoperable, use the Software temporarily on a back-up server, which may be at a third-party site provided that the back-up Server is under the sole control of [the City of Flint] . . ."). Recognizing that Section 1.2(a) specifically authorizes a back-up copy of the licensed software at an off-site location, the court finds that Section 1.2(b)(i), which does not contain any similar off-site language, does not authorize Rimini's off-site copies of the licensed software.

Additionally, it is undisputed that the development environments associated with the City of Flint were not used solely for the City of Flint's internal data processing operations. Instead, the development environments were used to develop and test software updates for the City of Flint and other Rimini customers with similar software licenses. *See* Doc. #242, Exhibit 50, Lester Depo., p.207:17-201:25; Exhibit 62, Williams Depo., p.9:22-10:6. Therefore, the court finds that Rimini's copying of the copyrighted software is outside the scope of Section 1.2(b)(i). Accordingly, and consistent with the court's rulings above, the court finds that Section 1.2(b) does not expressly authorize Rimini's copying of Oracle's copyrighted PeopleSoft-branded software as a matter of law.

**b. Section 1.2(c)**

Rimini also asserts Section 1.2(c) of the City of Flint's license, in support of its affirmative defense. Section 1.2(c) states that "[the City of Flint] may [] modify or merge the Software with other software." Doc. #242, Exhibit 10, §1.2(c). Rimini argues that because Section 1.2(c) allows for the City of Flint to modify the software, this provision necessarily authorizes Rimini to make a number of copies of the software to facilitate such modifications as a "use in accordance with the terms" of the license under Section 1.2(b)(i). *See* Doc. #259, p.10-11.

However, the court finds that the right to modify the software pursuant to Section 1.2(c) does not authorize Rimini to make copies of the software. First, the court notes, once again, that the right to modify the software is granted solely to the City of Flint, and not to any third-party. *Id*. ("[the City of Flint] may [] modify . . . the software . . ."). Second, the right to modify the software

is a separate and distinct right from from the right to reproduce the software. *See SQL Solutions v. Oracle Corp.*, Case no. C-91-1079 MHP, 1991 U.S. Dist. LEXIS 21097, *13 (N.D. Cal. 1991) (citing *S.O.S., Inc. v. Payday, Inc.*, 886 F.2d 1081, 1088 n.8 (9th Cir. 1989)) (distinguishing the right to modification of copyrighted software as legally distinct from the rights to possess, use, or reproduce the software). Thus, a grant of the right to modify the software does not automatically grant a right to reproduce that software. *See e.g., Stewart v. Abend*, 495 U.S. 207, 222-24 (1990) (holding that a licensed derivative work could not be reproduced or distributed absent rights to reproduce and distribute the portions of the pre-existing work that were incorporated into the derivative work). Moreover, the word "copy" is conspicuously absent from Section 1.2(c).

Finally, as addressed above, a copy of the software under Section 1.2(b)(i) is subject to the facilities restrictions of Section 1.1. *See supra*, §III(B)(1)(a). Thus, Rimini is still not authorized to have a copy of the licensed software on its own systems. Therefore, the court finds that the plain, unambiguous language of Section 1.2(c) does not authorize Rimini to make copies of the licensed PeopleSoft-branded software as a matter of law.

### c.  Section 14.2

The last provision Rimini asserts in support of its express license affirmative defense is Section 14.2 of the City of Flint's license. Section 14.2 states in pertinent part that: "[the City of Flint] may provide access to and use of the Software *only* to those third parties that: (i) provide services to [the City of Flint] concerning [the City of Flint's] use of the Software; (ii) have a need to use and access the Software; and (iii) have agreed to substantially similar non-disclosure obligations . . . as those contained herein." Doc. #242, Exhibit 10, §14.2 (emphasis added).

Rimini argues that Section 14.2 expressly authorizes third-party software support service providers, like itself, to make copies of the licensed software on its systems in order to carry out contracted support services with the City of Flint. *See* Doc. #259, p.11-12. The court disagrees.

First, the plain, unambiguous language of Section 14.2 only allows for the City of Flint to provide "access to and use of the Software." Doc. #242, Exhibit 10, §14.2. The right to access and

14

use the licensed software is separate from a right to reproduce or copy the software, and there is no

evidence before the court that Rimini, as a third party service provider, cannot perform its

contracted services without having its own copy of the software on its own systems. Further, unlike

other license provisions, the word "copy" is not found anywhere in Section 14.2. Therefore, the

court finds that the plain language of Section 14.2 does not authorize copying of the licensed

software.

Second, even if Section 14.2 authorized copying of the licensed software, Rimini has failed

to satisfy the third condition for having "access to and use of" the software under Section 14.2.

Specifically, Rimini has proffered no admissible evidence that it has agreed to certain non-

disclosure obligations as required by Section 14.2.[11] Thus, Rimini's copies of the software are

outside the scope of this provision because Rimini has not "agreed to substantially similar non-

disclosure obligations." *See* Doc. #242, Exhibit 10, §14.2(iii). Therefore, the court finds that

Section 14.2 does not expressly authorize Rimini's copying of Oracle's copyrighted PeopleSoft-

branded software in this action.

### d.  Conclusion

Based on the court's rulings above, none of Rimini's asserted license provisions

(Sections 1.2(b), 1.2(c), or 14.2) expressly authorize Rimini's copying of Oracle's copyrighted

PeopleSoft-branded software as a matter of law. Therefore, the court finds that Oracle is entitled to

summary judgment on Rimini's express license affirmative defense as it relates to the City of Flint,

and the court shall grant Oracle's motion accordingly.

///

---

[11] The court notes that, as part of its opposition to Oracle's motion for summary judgment, Rimini did submit an alleged copy of an agreement between itself and the City of Flint which allegedly contained similar non-disclosure language. *See* Doc. #261, Exhibit 9. However, Oracle filed a motion to strike the document as unsigned and unauthenticated (Doc. #283), which was granted by the court (Doc. #471). In that order, the court found that the evidence was not admissible because the document did not constitute an original writing under Rule 1002 of the Federal Rules of Evidence. *See* Doc. #471, p.5. Thus, there is currently no evidence before the court that Rimini agreed to similar non-disclosure obligations as those outlined in the City of Flint's license.

**2. Pittsburgh Public Schools**

Oracle has identified four development environments on Rimini's systems associated with the Pittsburgh Public Schools which contain copies of Oracle's copyrighted PeopleSoft-branded software. These development environments are identified on Rimini's systems as H831PPSM, H831PPS2, F842PPSM #1, and F842PPSM #2.

As with the City of Flint, Oracle initially argues that Rimini cannot assert the Pittsburgh Public Schools' license[12] as a defense in this action because Rimini did not use the Pittsburgh Public Schools' provided software installation media to build the identified development environments.[13] However, as addressed with the City of Flint, Rimini's failure to use the Pittsburgh Public Schools' provided software installation media does not in and of itself preclude Rimini from asserting the Pittsburgh Public Schools' license in this action. *See supra*, §III(B)(1). Rather, the issue is whether the rights granted by the license are restricted and tied solely to the specific software installation media provided by Oracle.

Here, the court finds that the Pittsburgh Public Schools' license contains language similar to the City of Flint's license. For example, Oracle granted the Pittsburgh Public Schools "a nonexclusive, nontransferable license to make and run copies of the Software." Doc. #242, Exhibit

---

[12] A full and complete copy of the Pittsburgh Public Schools' Software License and Service Agreement is attached as Exhibit 11 to Oracle's Appendix of Exhibits Cited in Support of Oracle's Motion for Partial Summary Judgment. Doc. #242, Exhibit 11.

[13] The undisputed evidence in this action establishes that the four development environments associated with the Pittsburgh Public Schools were part of a chain of cloning that leads back to a development environment built with the City of Des Moines, Iowa's ("City of Des Moines") software installation media. In particular, Rimini admits that the original build source for development environment H831PPSM was development environment H831CODM associated with the City of Des Moines and built from the City of Des Moines's software installation media. Doc. #242, Exhibit 25, p.3,8. Development environment H831PPS2 was built from H831PPSM, so its origins are also the City of Des Moines's software installation media. *Id*. at p.8.

Similarly, Rimini admits that the build source for development environment F842PPSM #1 was development environment F842CODM associated with the City of Des Moines and built from the City of Des Moines's software installation media. *Id*. F842PPSM #2 is a clone of F842PPSM #1 so its origins are also the City of Des Moines's installation media. *Id*. at p.8. Thus, all of the software development environments associated with the Pittsburgh Public Schools were built, at least in part, from the City of Des Moines's software installation media, and not from the Pittsburgh Public Schools' software installation media.

11, §1.1. Software under the license is defined as "all or any portion of the applicable Version for the Territory of the binary computer software and related source code." *Id* at §15. As with the City of Flint, nowhere does this license require the Pittsburgh Public Schools to install the licensed software from the specific installation media provided by Oracle. Rather, the license grants the Pittsburgh Public Schools the right to install and use "the applicable Version" of the licensed software.[14] Therefore, as with the City of Flint, the court finds that Rimini may assert the Pittsburgh Public Schools' license as a defense to Oracle's claim of copyright infringement.

In support of its affirmative defense, Rimini identifies three license provisions that it argues expressly authorize copying of Oracle's copyrighted PeopleSoft-branded software: (1) Section 1.1 permitting copying of the software; (2) Section 1.2 permitting modification of the software; and (3) Section 10.2 permitting access to and use of the software to third parties that provide services to the Pittsburgh Public Schools.[15]  *See* Doc. #259, p.18-20. Each provision is discussed below.

**a.   Section 1.1**

In Section 1.1 of the Pittsburgh Public Schools' license, Oracle granted "[the Pittsburgh Public Schools] a nonexclusive, nontransferable license to make and run copies of the Software . . . for access by Employees and Designates on one or more servers and/or workstations located at facilities owned or leased by [the Pittsburgh Public Schools] . . ." Doc. #242, Exhibit 11, §1.1.

---

[14] It is undisputed that the development environments associated with the Pittsburgh Public Schools contain copies of the same versions of the PeopleSoft-branded software licensed by the Pittsburgh Public Schools.

[15] Along with the Pittsburgh Public Schools' license, Rimini also asserts the City of Des Moines's license as a defense to Oracle's claim of copyright infringement. A copy of the City of Des Moines's Software License and Service Agreement is attached as Exhibit 12 to Oracle's Appendix of Exhibits Cited in Support of Oracle's Motion for Partial Summary Judgment. Doc. #242, Exhibit 12.

The court notes that the City of Des Moines's license mirrors the City of Flint's license (except for the identification of the parties), and Rimini has asserted the same license provisions (Sections 1.2(b), 1.2(c), and 14.2) to support its affirmative defense. *See* Doc. #242, Exhibit 12, §§ 1.2(b), 1.2(c), 14.2. As such, the court's rulings regarding the City of Flint's license apply with equal effect to the City of Des Moines's license. Therefore, the court finds that the City of Des Moines's software licensing agreement does not expressly authorize Rimini's copying of Oracle's copyrighted PeopleSoft and PeopleTools software as a matter of law. *See supra*, §III(B)(1)(a)-(d).

Rimini contends that Section 1.1 expressly authorizes it to make copies of the licensed software on its systems and under its control in order to provide contracted software support services to the Pittsburgh Public Schools. *See* Doc. #259, p.18. The court disagrees.

First, the plain, unambiguous language of Section 1.1 expressly provides that *only* the Pittsburgh Public Schools may make copies of the software. *See* Doc. #242, Exhibit 11, §1.1 (granting the Pittsburgh Public Schools the right "to make or run copies of Software . . ."). Nowhere does this license provision authorize Rimini, or any other third-party, to make copies of the licensed software.

Second, Section 1.1 of the Pittsburgh Public School's license limits both the copying and use of the licensed software to "facilities owned or leased by [the Pittsburgh Public Schools]." Doc. #242, Exhibit 11, §1.1. Here, it is undisputed that Rimini made copies of the licensed software at its own facilities and outside the control of the Pittsburgh Public Schools. As such, Rimini's copying of the licensed software on its own systems is outside the scope of Section 1.1.

Finally, Section 1.1 further precludes the right of third-parties to copy the software. Specifically, Section 1.1 contains the term "Designate." *See* Doc. #242, Exhibit 11, §1.1. "Designate" is defined as "[the Pittsburgh Public Schools'] customers, suppliers, vendors, benefits providers and other such external parties providing goods or services to [the Pittsburgh Public Schools] that [the Pittsburgh Public Schools] may provide with a right to access the Software consistent with the terms of this Agreement." *See* Doc. #242, Exhibit 11, §15. However, the Pittsburgh Public Schools' license limits the rights that can be granted to Designates,[16] including limitations that "[i]n no event shall a Designate have the right to (i) *install* the Software on a server, workstation or other computer, (ii) *access the source code for the Software*; or (iii) undertake any of the actions listed in Section 2" (which includes copying the software). *Id*. (emphasis added). Thus, reading the limitations defined under "Designate" into the license,

---

[16] Both parties agree that Rimini constitutes a "Designate" under the license.

Section 1.1 provides that "[i]n no event" shall a Designate, like Rimini, have a right to install or copy the licensed software on its own systems. Therefore, the court finds that Section 1.1 does not authorize Rimini's copying of Oracle's copyrighted software as a matter of law.

### b. Section 1.2

In support of its affirmative defense, Rimini also asserts Section 1.2 of the Pittsburgh Public Schools' license. Under Section 1.2, Oracle granted the Pittsburgh Public Schools "a nonexclusive, nontransferable license to modify the Software . . ." Doc. #242, Exhibit 11, §1.2.

Rimini argues that because Section 1.2 allows the Pittsburgh Public Schools to modify the software, this provision necessarily authorizes Rimini to make copies of the software to facilitate such modifications. *See* Doc. #259, p.18. However, as addressed at length with the City of Flint, the right to modify the software does not expressly authorize Rimini to make copies of the software on its own systems. *See supra*, §III(B)(1)(b) (citing *SQL Solutions*, 1991 U.S. Dist. LEXIS 21097; *Stewart*, 495 U.S. 207). Further, the word "copy" is absent from this provision. Therefore, consistent with the court's previous ruling, the court finds that the plain, unambiguous language of Section 1.2 does not authorize Rimini to make copies of the licensed software as a matter of law.

### c. Section 10.2

The last provision Rimini asserts in support of its express license affirmative defense is Section 10.2 of the Pittsburgh Public Schools' license. Section 10.2 states in pertinent part that: "[the Pittsburgh Public Schools] may provide access to and use of the [software] *only* to those third parties that: (a) provide services to [the Pittsburgh Public Schools] concerning [the Pittsburgh Public Schools'] use of the Software . . .; (b) have a need to use and access the Software . . .; and (c) have agreed to substantially similar non-disclosure obligations as those contained herein." Doc. #242, Exhibit 11, §10.2 (emphasis added).

Rimini argues that Section 10.2 expressly authorizes third-party software support service providers, like itself, to make copies of the licensed software in order to carry out contracted support services with the Pittsburgh Public Schools. *See* Doc. #259, p.19. The court disagrees.

19

First, the plain, unambiguous language of Section 10.2 allows for the Pittsburgh Public Schools to provide "access to and use of the Software." *See* Doc. #242, Exhibit 11, §10.2. As addressed above with the City of Flint, the right to access and use the licensed software is a separate right from the right to copy or reproduce the software. *See supra*, §III(B)(1)(c). Further, unlike other license provisions, the word "copy" is not found anywhere in Section 10.2. Therefore, the court finds that the Section 10.2 does not permit or authorize copying of the licensed software.

Second, Rimini has failed to satisfy the third condition for having "access to and use of" the software under Section 10.2. Specifically, Rimini has proffered no admissible evidence that it has "agreed to substantially similar non-disclosure obligations" as required by Section 10.2.[17] *See* Doc. #242, Exhibit 11, §10.2(iii). Thus, even if Section 10.2 authorized copying of the licensed software, Rimini's copies are outside the scope of this provision. Therefore, the court finds that Section 10.2 does not expressly authorize Rimini's copying of Oracle's copyrighted software.

### d.  Conclusion

Based on the rulings above, the court finds that none of Rimini's asserted license provisions (Sections 1.1, 1.2, or 10.2) expressly authorize Rimini's copying of Oracle's copyrighted PeopleSoft-branded software as a matter of law. Therefore, the court finds that Oracle is entitled to summary judgment on Rimini's express license affirmative defense as it relates to the Pittsburgh Public Schools, and the court shall grant Oracle's motion accordingly.

### 3.  Giant Cement

In its motion for summary judgment, Oracle identifies only a single development

---

[17] Similar to the City of Flint, the court notes that as part of its opposition to Oracle's motion for summary judgment, Rimini did submit an alleged copy of an agreement between itself and the Pittsburgh Public Schools. *See* Doc. #261, Exhibit 30. However, Oracle filed a motion to strike the document as unsigned and unauthenticated (Doc. #283) which was granted by the court (Doc. #471). In the court's order, the court found that the evidence was not admissible because the document did not constitute an original writing under Rule 1002 of the Federal Rules of Evidence. *See* Doc. #471, p.5. Thus, there is currently no evidence before the court that Rimini agreed to similar non-disclosure obligations as those outlined in the Pittsburgh Public Schools' license.

environment on Rimini's systems associated with Giant Cement, development environment

JGEHE5TSA1, which contains a copy of Oracle's copyrighted J.D. Edwards-branded software.

In support of its affirmative defense, Rimini asserts Giant Cement's software licensing

agreement[18] as a defense to Oracle's claim of copyright infringement relating to the development

environment associated with Giant Cement and specifically identifies Article II, Section 7(iii) as

the provision that expressly authorizes its copying of Oracle's copyrighted software. *See*

Doc. #259, p. 21-22.

Article II, Section 7 of Giant Cement's license provides that "[Giant Cement] shall not, or

cause anyone else to: (iii) copy the Documentation or Software except to the extent necessary for

[Giant Cement's] archival needs and to support the Users." Doc. #242, Exhibit 16, Article 2 -

License Restrictions, §7(iii). Rimini argues that the plain language of this provision expressly

authorizes Rimini to make a copy of the licensed software on its own systems to support Giant

Cement's archival needs. *See* Doc. #259, p.22.

In opposition, Oracle argues that regardless of Section 7(iii)'s express language authorizing

third-party copies of the licensed software for archival purposes, Giant Cement's license does not

allow Rimini to copy the software on its own systems because Giant Cement's license restricts

third parties to only "screen access" of the software and does not grant them permission to copy or

have access to the software's source code. *See* Doc. #237, p.24-25. Article II - under the heading

License Restrictions - identifies who may access the software. Under Article II, access to the

software is limited to (1) Giant Cement's employees; (2) independent contractors engaged by Giant

Cement who require access to the software to perform their tasks; and (3) distributors, vendors, and

---

[18] In contrast to the two previously addressed customers - the City of Flint and the Pittsburgh Public Schools - Rimini has established that the development environment associated with Giant Cement was built directly from Giant Cement's provided software installation media. *See* Doc. #242, Exhibit 16. As such, the parties agree that Rimini may assert Giant Cement's license as a defense in this action.

A full and complete copy of Giant Cement's Software License and Service Agreement is attached as Exhibit 16 to Oracle's Appendix of Exhibits Cited in Support of Oracle's Motion for Partial Summary Judgment. Doc. #242, Exhibit 16.

customers of Giant Cement. Doc. #242, Exhibit 15, Article II - License Restrictions, §1. Further,

under Article II, the scope of access for non-employees is limited solely to screen access.

Doc. #242, Exhibit 16, Article II - License Restrictions, §3 ("For any access to the software other

than by an employee of customer, customer shall not provide access to source code and all

provided access shall be restricted to screen access for the functions required."). Thus, Oracle

argues that Article II does not authorize Rimini to install a copy of the J.D. Edwards-branded

software on its systems, because a copy of the software necessarily includes access to the

software's source code.

        The court has reviewed the documents and pleadings on file in this matter and finds that

there are disputed issues of material fact which preclude summary judgment on this issue.

Although the court agrees that Article II does not permit Rimini to access the software's source

code to carry out development and testing of software updates, the court finds that having a copy of

the software on Rimini's systems for archival purposes does not violate this license restriction so

long as Rimini does not access the software's source code. In its motion for summary judgment,

Oracle has failed to proffer any evidence that Rimini accessed the software's source code while

providing archival support to Giant Cement. In contrast, Rimini has proffered evidence that the

development environment associated with Giant Cement is used solely for archival purposes as

authorized by Section 7(iii). *See* Doc. #261, Exhibit 6, Grigsby Depo., p. 13:7-15 (stating that

Rimini had not used Giant Cement's development environment for any software update

development or testing); p. 28:15-29:1 ("Q. Okay. Going back to my question. Were any of the

[J.D. Edwards software] environments at [Rimini] ever used for any purpose, research, fix

delivery, et cetera? A. Again, from my research in talking to everyone that I could in my team and

people there that could represent what was done prior to me coming on board, no, those local

environments were not used. All access to those customers who are still with us is done on their in-

house machine."). Based on this record, the court finds that there are disputed issues of material

fact as to whether Rimini's use of the development environment associated with Giant Cement was

for archival purposes or whether Rimini accessed the software's source code. Accordingly, the court shall deny Oracle's motion for summary judgment on Rimini's express license affirmative defense as it relates to Giant Cement.

### 4. Novell

The final customer at issue in Oracle's motion for summary judgment is Novell. Oracle has identified two development environments on Rimini's systems associated with Novell which contain copies of Oracle's copyrighted Siebel-branded software. These development environments are identified on Rimini's systems as NOVELL-AP01 and NOVELL-CLI.

In support of its affirmative defense, Rimini asserts Novell's software licensing agreement[19] as a defense to Oracle's claim of copyright infringement for the development environments associated with Novell and specifically identifies two license provisions it argues expressly excuses its infringement: (1) Section 2.1(iv); and (2) Section 2.1(viii). *See* Doc. #259, p.24-25.

Under Section 2.1(iv), Oracle granted Novell the right "[t]o reproduce, exactly as provided by [Oracle], a reasonable number of copies of the [software] solely for archive or emergency back-up purposes or disaster recovery and related testing . . ." Doc. #242, Exhibit 17, §2.1(iv). Under Section 2.1(viii) Oracle granted Novell the right "[t]o have third parties install, integrate, and otherwise implement the [software]." Doc. #242, Exhibit 17, §2.1(viii).

Rimini argues that reading these two provisions together, Novell's license allows a third-party to install a copy of the software on its own systems for archival or emergency back-up purposes. *See* Doc. #259, p.25.

In opposition, Oracle argues that Novell's license does not authorize Rimini to have an installed copy of the licensed software on its systems for any purpose. *See* Doc. #237, p.25-26. In

---

[19] Rimini has established that both development environments associated with Novell were built from Novell's provided software installation media. *See* Doc. #242, Exhibit 27, p.3. As with Giant Cement, the parties do not dispute that Rimini may assert Novell's license as a defense in this action.

A full and complete copy of Novell's Software License and Service Agreement is attached as Exhibit 17 to Oracle's Appendix of Exhibits Cited in Support of Oracle's Motion for Partial Summary Judgment. Doc. #242, Exhibit 17.

particular, Oracle argues that Section 2.1(i) of Novell's license grants Novell the right "to use the programs on the designated systems or on a backup system if the designated system is inoperative." Doc. #242, Exhibit 17, §2.1(i). "Designated Systems" is defined as a "customer's user and server system(s) designated in the order form(s)." Doc. #242, Exhibit 17, §1.5. The user system in turn, is defined as "the computer hardware and operating systems operated by users in the course of their employment with [Novell], including notebook and portable computers." Doc. #242, Exhibit 17, §1.21. Finally, the server system is defined as "the server hardware and operating system(s) of [Novell] designated on the Order form(s)." Doc. #242, Exhibit 17, §1.15. Reading all of these definitions together, Oracle argues that Section 2.1(i) limits the use of the program to only Novell's systems. Therefore, Oracle argues that Novell's license does not authorize Rimini to have any copies of the licensed software on its own systems. The court disagrees.

First, the court finds that the plain language of Section 2.1(iv) authorizes Novell to make archival, emergency backup, or disaster-recovery testing copies. Further, the court finds that the plain language of Section 2.1(viii) permits Novell to allow Rimini, or another third-party, to install the software for archival, emergency back-up, or disaster recovery purposes. When read in conjunction, Sections 2.1(iv) and (viii) authorize Novell to allow Rimini to make a reasonable number of copies of the licensed Siebel software on Rimini's system for archival and back-up purposes.[20] Second, Oracle's argument concerning Section 2.1(i), refers only to Novell's use of the licensed software and not to any other rights granted under the license. Therefore the court finds that Novell's license allows for archival and/or back-up copies of the software on a third-party system. Accordingly, the court shall deny Oracle's motion for summary judgment on Rimini's express license affirmative defense as it relates to Novell.

///

---

[20] Rimini has proffered evidence that the development environments associated with Novell are used exclusively for archival and back-up purposes, and related testing, as directly contemplated by Section 2.1(iv). *See* Doc. #261, Exhibit 11, Slepko Depo. 2010, p.62:5-15 (noting that Siebel environments are not used for development).

**C.  Implied License and Consent (Third and Sixth Affirmative Defenses)**

In the present motion, Oracle also moves for summary judgment on Rimini's third affirmative defense for consent of use and sixth affirmative defense for implied license. *See* Doc. #237. Iimplied license and consent of use are legally duplicative affirmative defenses and shall be addressed together. *See e.g., Peter Letterese & Assocs., Inc. v. World Inst. of Scientology Enters.*, 533 F.3d 1287, 1308-09 (11th Cir. 2008) (equating a consent defense to that of implied license and applying the same standard); *I.A.E., Inc. v. Shaver*, 74 F.3d 768, 775-76 (7th Cir. 1996) (holding that consent is equivalent to nonexclusive license defense).

"An implied license can be found where the copyright holder engages in conduct 'from which [the] other [party] may properly infer that the owner consents to his use." *Field v. Google, Inc.*, 412 F. Supp. 2d 1106, 1116 (D. Nev. 2006). "Consent to use the copyrighted work need not be manifested verbally and may be inferred based on silence where the copyright holder knows of the use and encourages it." *Id*.

In its affirmative defense, Rimini argues that for years Oracle shipped back-up copies of its customer's software installation media to Rimini's facilities with full knowledge that the installation media were not only being shipped to Rimini's facilities, but that Rimini was using the installation media to create copies of the software on its own systems to provide support services to Oracle's customers. *See* Doc. #259, p.26-29.

The court has reviewed the documents and pleadings on file in this matter and finds that the evidence before the court does not support Rimini's affirmative defenses of implied license and consent of use. The undisputed evidence in this action establishes that between 2007 and 2009, Oracle shipped at least 90 back-up copies of licensed software installation media to Rimini's facilities for different Oracle customers. Doc. #261, Exhibit 15, p.8-9 (recognizing that Oracle shipped software installation media to Rimini for approximately 90 customers from 2007 to 2009). Further, at the time it shipped the installation media, Oracle had been tracking Rimini's business activities. *See* Doc. #261, Exhibit 20 (E-mail to Oracle executives regarding Rimini dated May 1,

2006 ); Exhibit 21 (E-mail to Oracle executive concerning Rimini dated April 24, 2006);

Exhibit 23 (E-mails reflecting Oracle's Vice President of Competitive Intelligence's tracking of

Rimini dated March 2007).

Based on this limited evidence, Rimini argues that Oracle not only knew that Rimini was

providing software support services to Oracle customers, but, by extension, also knew that Rimini

was using the back-up copies of the software installation media to create copies of the software on

Rimini's systems to service those customers. As such, Rimini argues that Oracle necessarily

consented to Rimini's use of the software as it continued to ship Rimini back-up copies of the

licensed software, and thus, there can be no copyright infringement. However, Rimini's assumption

of Oracle's knowledge that the back-up copies of the installation media were being used to make

copies of the licensed software on Rimini's systems is not supported by the evidence.

First, other evidence before the court establishes that these back-up copies, although

ultimately shipped to Rimini, were shipped after Oracle's customers submitted requests to Oracle

describing Rimini's address as the customers' "secondary offsite backup location."[21] *See*

Doc. #242, Exhibit 33, Rimini's Second Amended Responses to Oracle's Third Set of Requests for

Admission, Request #26 ("[A]dmit that more than 50% of the requests asked Oracle to ship the

software to an 'offsite backup location.'" "Admitted"); Request #28 ("Admit that, at least 25 times,

You instructed a [Rimini] customer or prospective [Rimini] customer to state that software was to

be shipped to an "offsite backup location" when that customer or prospective customer requested

that Oracle ship software to a [Rimini] address." "Admitted.").

Second, Rimini admits that the purpose behind the obfuscated shipping requests was to

allow Rimini to create development environments to service Rimini's customers without Oracle's

knowledge. *See* Doc. #242, Exhibit 31, Corpuz Depo., p.160 ("Q. It's true, isn't it, that the reason

---

[21] An offsite backup location is one where the software installation media can be held in safety, so that the installation media could be easily retrieved and provided to the customer in the event that the customer's copy of the installation media was lost or destroyed.

for the request was for [Rimini] to build an environment on [Rimini's] premises for tax

development work? A. I believe so, yes."). Thus, the evidence does not support Rimini's argument

that Oracle knew that it was shipping back-up copies of the software installation media to Rimini's

facilities.

Additionally, there is no evidence that Oracle knew of Rimini's use of the shipped

installation media to create copies of the software on Rimini's systems. Rimini admits that the

shipping requests were designed so that Oracle would not know that Rimini was using these back-

up copies of the licensed software. *See* Doc. #242, Exhibit 33, Rimini's Second Amended

Responses to Oracle's Third Set of Requests for Admission, Request #30 ("Rimini responds that,

having investigated, it is not aware of any requests to Oracle for shipment of Oracle Enterprise

Software to a [Rimini] address which expressly stated that the software shipped to a [Rimini]

address would be used by [Rimini] to install software on [Rimini's] computers."). Further, there is

no evidence that Oracle consented to or encouraged Rimini to use the shipped installation media to

make copies of the software on Rimini's systems. In fact, Rimini fails to present any evidence that

Oracle knew that Rimini was copying the software onto Rimini's systems during the relevant time

period. Based on the evidence before the court, the court finds that no reasonable jury could

conclude from Oracle's shipments of the installation media to a location described as a "secondary

offsite backup location" that Oracle then authorized Rimini to copy that software onto Rimini's

systems. Therefore, the court finds that the evidence in this action does not support Rimini's claims

for an implied license or consent of use. *See Field*, 412 F. Supp. 2d at 1116 (stating that the

copyright holder must both know of the infringing use and encourage that use for the court to find

an implied license). Accordingly, the court shall grant Oracle's motion for summary judgment as to

these affirmative defenses.

### D. Conclusion

In conclusion, the court finds, consistent with the rulings above, that Oracle has established

a prima facie case of copyright infringement as it relates to the four customers at issue in this

action: the City of Flint, the Pittsburgh Public Schools, Giant Cement, and Novell. *See supra*,
§III(A). Further, the court finds that, Oracle is entitled to summary judgment on Rimini's second
affirmative defense of express license as it relates to the City of Flint and the Pittsburgh Public
Schools. *See supra*, §§III(B)(1) and (2). However, Oracle is not entitled to summary judgment on
Rimini's second affirmative defense of express license as it relates to Giant Cement and Novell.
*See supra*, §§III(B)(3) and (4). Finally, the court finds that Oracle is entitled to summary judgment
on Rimini's third affirmative defense for consent of use and sixth affirmative defense for implied
license. *See supra*, §III(C). Accordingly, the court shall grant in-part and deny in-part Oracle's
present motion for partial summary judgment in accordance with these findings.

**IV.     Oracle's Motion for a Case Management Conference (Doc. #473)**

Also before the court is Oracle's motion for a case management conference to discuss
setting a trial schedule, Doc. #473, filed on January 10, 2014. The court has reviewed the motion
and finds that a case management conference to set a trial schedule would not be productive as
there is still a second motion for summary judgment pending before the court. *See* Doc. #405.  This
is a complex case with briefing upon summary judgment motions of approximately 200 pages, with
over 2,700 pages of exhibits, before a heavily burdened court in which three of the total of seven
active judgeships in this district have been vacant and unfilled during much of the pendency of
these motions for summary judgment.  Following decision upon the remaining motion for summary
judgment, the parties will be required to submit a proposed joint pre-trial order in accordance with
Local Rules 16-3 and 16-4. The proposed order will require that the parties submit a list of three
agreed upon trial dates. If they are unable to agree upon proposed trial dates, or desire a case
management conference to set a trial or motion schedule following the submission and acceptance
of the proposed joint pre-trial order, the court will schedule such a conference at that time.

IT IS THEREFORE ORDERED that plaintiffs' motion for partial summary judgment
(Doc. #237) is GRANTED in-part and DENIED in-part in accordance with this order.

IT IS FURTHER ORDERED that the clerk of court shall enter judgment in favor of

28

plaintiffs Oracle USA, Inc.; Oracle America, Inc.; and Oracle International Corporation, and against defendant Rimini Street, Inc. on plaintiffs' first cause of action for copyright infringement as it relates to the identified development environments associated with the City of Flint and the Pittsburgh Public Schools.

IT IS FURTHER ORDERED that the clerk of court shall enter judgment in favor of plaintiffs Oracle USA, Inc.; Oracle America, Inc.; and Oracle International Corporation, and against defendant Rimini Street, Inc. on defendant's second affirmative defense for express license as it relates to plaintiffs' claim for copyright infringement relating to the City of Flint and the Pittsburgh Public Schools.

IT IS FURTHER ORDERED that the clerk of court shall enter judgment in favor of plaintiffs Oracle USA, Inc.; Oracle America, Inc.; and Oracle International Corporation, and against defendant Rimini Street, Inc. on defendant's third affirmative defense for consent of use and sixth affirmative defense for implied license.

IT IS FURTHER ORDERED that plaintiffs' unopposed motion for a case management conference (Doc. #473) is DENIED.

IT IS SO ORDERED.

DATED this 13th day of February, 2014.

_____
LARRY R. HICKS
UNITED STATES DISTRICT JUDGE