1
2
3
4
5
6                      UNITED STATES DISTRICT COURT

7                           DISTRICT OF NEVADA

8                                   * * *

9    ORACLE USA, INC.; *et al.*,            )
                                            )
10              Plaintiffs,                  )          2:10-CV-00106-LRH-PAL
                                            )
11   v.                                      )
                                            )          <u>ORDER</u>
12   RIMINI STREET, INC., a Nevada           )
     corporation; SETH RAVIN, an individual; )
13                                           )
                Defendants.                  )
14   _____)

15          Before the court is plaintiffs Oracle USA, Inc.; Oracle America, Inc.; and Oracle

16   International Corporation's (collectively "Oracle") second motion for partial summary judgment

17   addressing their first cause of action for copyright infringement; defendant Rimini Street, Inc.'s

18   ("Rimini") second, eighth, and ninth affirmative defenses; and Rimini's first and third

19   counterclaims. Doc. #405.[1] Defendant Rimini filed an opposition to the motion (Doc. #436), to

20   which Oracle replied (Doc. #450).

21   **I.      Facts and Procedural History**

22          Oracle develops, manufacturers, and licenses computer software, including Enterprise

23   Software platforms.[2] Oracle is the current owner and/or exclusive licensee for various PeopleSoft,

24   _____

25          [1] Refers to the court's docket entry number.

26          [2] Enterprise Software is a type of computer software program that enables core operational tasks - like payroll, human resource tasking, and inventory management - across an entire organization. Instead of being

J.D. Edwards, and Siebel-branded Enterprise Software products. Oracle's Enterprise Software platforms have both an installed database component and an installed application component. The database component provides a foundation for the application software which then uses, stores, and retrieves data in the database for use across an entire organization. Oracle's Enterprise Software application programs - including its PeopleSoft, J.D. Edwards, and Siebel-branded products - are run on Oracle's Relational Database Management Software ("Oracle Database") as the database component for the programs.

Rather than sell Oracle Database outright, Oracle licenses the use of the database software to customers through software licensing agreements - known as Oracle License and Service Agreements ("OLSAs") - and to other software developers through a Developer License. Oracle also provides support services to its customers through separate software support service contracts.

Defendant Rimini is a company that provides similar software support services to customers licensing Oracle's Enterprise Software programs and competes directly with Oracle to provide these services.

On January 25, 2010, Oracle filed a complaint alleging that Rimini copied several of Oracle's copyright-protected software programs onto its own computer systems in order to provide software support services to its customers. In its complaint, Oracle alleged thirteen causes of action against Rimini: (1) copyright infringement; (2) violation of the Federal Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. §§ 1030(a)(2)(C), (a)(4), & (a)(5); (3) violation of the California Computer Data Access and Fraud Act ("CDAFA"), Cal. Penal Code § 502; (4) violation of Nevada Revised Statutes ("NRS") § 205.4765; (5) breach of contract; (6) inducement of breach of contract;

_____

tied to a specific computer, Enterprise Software is hosted on a server and provides simultaneous access and service to a large number of users over a computer network. These features and functions are in contrast to typical computer software, which is generally a single-user application executed on a user's personal computer.

A key feature of Enterprise Software is the ability to modify and customize the software for an entity's specific needs and to support the software through periodic software and regulatory updates to maintain the software's continuing functionality.

(7) intentional interference with prospective economic advantage; (8) negligent interference with prospective economic advantage; (9) unfair competition; (10) trespass to chattels; (11) unjust enrichment; (12) unfair practices; and (13) accounting. Doc. #1.

On March 29, 2010, Rimini filed an answer contesting Oracle's claims and alleging three counterclaims: (1) defamation, business disparagement, and trade libel; (2) copyright misuse; and (3) unfair competition in violation of California Business and Professional Code, Cal. BPC. § 17200. Doc. #30. Rimini also raised eleven affirmative defenses to Oracle's claims: (1) invalid copyrights; (2) express license; (3) consent of use; (4) copyright misuse; (5) improper registration; (6) implied license; (7) merger; (8) statute of limitations; (9) laches; (10) fair use; and (11) limitations on exclusive rights of computer programs under 17 U.S.C. § 117. *Id*.

In April 2010, Oracle filed an amended complaint (Doc. #36) to which Rimini filed an amended answer (Doc. #46) and a motion to dismiss (Doc. #48). On August 13, 2010, the court granted in-part and denied in-part Rimini's motion, dismissing Oracle's eighth cause of action for negligent interference with prospective economic advantage. Doc. #78.

In response to Rimini's amended answer, Oracle filed a motion to dismiss Rimini's counterclaims and affirmative defenses. Doc. #67. On October 29, 2010, the court granted in-part and denied in-part Oracle's motion, dismissing several defamation allegations from Rimini's first counterclaim for defamation, and dismissing the entirety of Rimini's second counterclaim and fourth affirmative defense for copyright misuse. Doc. #111.

In June 2011, Oracle filed a second amended complaint. Doc. #146. In response, Rimini filed its second amended answer raising six additional affirmative defenses: (12) contract defense; (13) privilege; (14) economic interest; (15) consent; (16) preemption; (17) lack of contract; and (18) mitigation of damages. Doc. #153. After the filing of Rimini's second amended answer Oracle filed its initial motion for partial summary judgment addressing its first cause of action for copyright infringement as it related to Oracle's PeopleSoft, J.D. Edwards, and Siebel-branded Enterprise Software programs; and on Rimini's second, third, and sixth affirmative defenses.

Doc. #237. On February 13, 2014, the court granted in-part and denied in-part Oracle's initial motion for partial summary judgment. *See* Doc. #474.

Subsequently, Oracle filed the present second motion for partial summary judgment addressing its first cause of action for copyright infringement; Rimini's second, eighth, and ninth affirmative defenses; and Rimini's first and third counterclaims. Doc. #405.

## II.    Legal Standard

Summary judgment is appropriate only when the pleadings, depositions, answers to interrogatories, affidavits or declarations, stipulations, admissions, and other materials in the record show that "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In assessing a motion for summary judgment, the evidence, together with all inferences that can reasonably be drawn therefrom, must be read in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Cnty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1154 (9th Cir. 2001).

The moving party bears the initial burden of informing the court of the basis for its motion, along with evidence showing the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). On those issues for which it bears the burden of proof, the moving party must make a showing that is "sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986); *see also Idema v. Dreamworks, Inc.*, 162 F. Supp. 2d 1129, 1141 (C.D. Cal. 2001).

To successfully rebut a motion for summary judgment, the non-moving party must point to facts supported by the record which demonstrate a genuine issue of material fact. *Reese v. Jefferson Sch. Dist. No. 14J*, 208 F.3d 736, 738 (9th Cir. 2000). A "material fact" is a fact "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Where reasonable minds could differ on the material facts at issue, summary judgment is not appropriate. *See v. Durang*, 711 F.2d 141, 143 (9th Cir. 1983). A dispute regarding a

material fact is considered genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248. The mere existence of a scintilla of evidence in support of the party's position is insufficient to establish a genuine dispute; there must be evidence on which a jury could reasonably find for the party. *See id.* at 252.

**III.    Discussion**

This motion concerns Oracle's first cause of action for copyright infringement as it relates to defendant Rimini's alleged copying of Oracle Database. *See* Doc. #405. This motion also concerns Rimini's second affirmative defense for express license as it relates to Oracle Database; eighth affirmative defense for statute of limitations; ninth affirmative defense for laches; first counterclaim for defamation, business disparagement and trade libel; and third counterclaim for unfair competition in violation of California Business and Professional Code, Cal. BPC § 17200. *Id*. The court shall address each issue separately below.

**A.  Copyright Infringement (First Cause of Action)**

To establish a *prima facie* case of copyright infringement, Oracle must show (1) ownership of the relevant copyrights, and (2) copying of protected expression by Rimini. *Range Road Music, Inc. v. East Coast Foods, Inc.*, 668 F.3d 1148, 1153 (9th Cir. 2012); *Funky Films, Inc. v. Time Warner Entm't Co.*, 462 F.3d 1072, 1076 (9th Cir. 2006).

Oracle's claim for copyright infringement, as it relates to the present motion, arises from Rimini's copying and use of six copyrighted versions of Oracle Database. It is undisputed that Oracle owns all six copyrights at issue. *See* Doc. #400, Amended Stipulation Re: Copyright Registration and Copies, ¶8 ("For the purposes of this action, [Rimini] will not dispute that [Oracle] is the owner or exclusive licensee of the 100 registered works listed in Exhibit A); Exhibit A (listing TX 5-222-106 (Oracle 8i Enterprise: Edition Release 2 (8.1.6)), TX 5-673-282 (Oracle 9i Database Enterprise Edition, Release 2), TX 6-938-648 (Oracle Database 10g: Release 1), TX 6-942-003 (Oracle Database 10g: Release 2), TX 7-324-157 (Oracle Database 11g: Release 1), and TX 7-324-158 (Oracle Database 11g: Release 2)). Further, it is undisputed that

1   Rimini copied Oracle's copyright protected software when it built development, or non-production,

2   environments for a number of Rimini customers using Oracle Database.[3] *See e.g.,* Doc. #411,

3   Exhibit 25, Attachment B to Rimini's First Supp. Response to Interrogatory 18 (identifying twenty-

4   five (25) separate copies of Oracle Database on Rimini's servers). Based on these undisputed facts,

5   the court finds that Oracle has established a *prima facie* case of copyright infringement. *See e.g.,*

6   *Triad Sys. Corp. v. Se. Express Co.*, 64 F.3d 1330, 1335 (9th Cir. 1995) (*prima facie* case of

7   copyright infringement found where defendant was "copying [plaintiff's] entire [computer]

8   programs" in order to provide software and maintenance support); *MAI Sys. Corp. v. Peak*

9   *Computer Corp.*, 991 F.2d 511, 517-19 (9th Cir. 1993) (affirming summary judgment on the claim

10  of copyright infringement where defendant copied plaintiff's software onto its systems to provide

11  competing software maintenance services).

12          However, Oracle's claim of copyright infringement is subject to Rimini's challenged

13  affirmative defense of express license. Therefore, the court must address this affirmative defense

14  before determining whether Oracle is entitled to summary judgment on this claim.

15      **B.  Express License (Second Affirmative Defense)**

16          Express license is an affirmative defense. *Worldwide Church of God v. Phila. Church of*

17  *God, Inc.*, 227 F.3d 1110, 1114 (9th Cir. 2000). As the party alleging the affirmative defense,

18  Rimini has the initial burden to identify any license provision(s) that it believes excuses its

19  infringement. *Michaels v. Internet Entm't Group, Inc.*, 5 F. Supp. 2d 823, 831 (C.D. Cal. 1998). If

20  _____

21          [3] As several Rimini clients use Oracle Database as part of their licensed Enterprise Software platforms,
    Rimini creates instances of Oracle Database on its own servers (known as environments) to support these

22  clients. Generally speaking, Rimini uses Oracle Database to support its clients in two different ways. First,
    Rimini uses Oracle Database for development of updates to all clients running a particular version of the

23  database software. Second, Rimini uses Oracle Database to address technical and support issues unique to a
    particular client by creating a non-production environment of the entire software program that mirrors the

24  client's production environment (the copy of the licensed software used by the client on its own system). These
    non-production environments, which include both the application component (like Oracle's PeopleSoft,

25  J.D. Edwards, and Siebel-branded programs) and database component (Oracle Database), are then used to
    replicate support issues and test potential fixes specific to that client without impacting the client's production

26  environment.

1  Rimini identifies any relevant license provision, Oracle may overcome the defense of express

2  license by showing that Rimini's conduct exceeded the scope of that provision. *LGS Architects,*

3  *Inc. v. Concordia Homes*, 434 F.3d 1150, 1156 (9th Cir. 2006).

4  Construing the scope of a license is principally a matter of contract interpretation. *S.O.S.,*

5  *Inc. v. Payday, Inc.*, 886 F.2d 1081, 1088 (9th Cir. 1989). The starting point for the interpretation

6  of any contract is the plain language of the contract. *Klamatch Water Users Protective Ass'n v.*

7  *Patterson*, 20 F.3d 1206, 1210 (9th Cir. 1999) ("Whenever possible, the plain language of the

8  contract should be considered first."). When a contract contains clear and unequivocal provisions,

9  those provisions shall be construed according to their usual and ordinary meaning. *Id*. Then, using

10  the plain language of the contract, the court shall effectuate the intent of the parties. *Id*. at 1210

11  ("Contract terms are to be given their ordinary meaning, and when the terms of a contract are clear,

12  the intent of the parties must be ascertained from the contract itself."). However, if a contract term

13  is ambiguous, the court may look beyond the plain language of the contract to determine the intent

14  of the parties. *See e.g., Foad Consulting Grp., Inc. v. Azzalino*, 270 F.3d 821, 828 (9th Cir. 2001)

15  ("If a party's extrinsic evidence creates the possibility of an ambiguity, a court may not rely on the

16  text of the contract alone to determine the intent of the parties."). A contract term is ambiguous if it

17  is "reasonably susceptible to more than one interpretation." *Shelton v. Shelton*, 78 P.3d 507, 510

18  (Nev. 2003).

19  In its express license affirmative defense, Rimini asserts that its copying of Oracle Database

20  was expressly authorized by both the Developer License and its own clients' OLSAs. As each

21  license is different in scope and application, the court shall address each license separately.

22      **1.  Developer License**

23  As part of its business model, Oracle makes copies of Oracle Database available for

24  download from the Oracle Technology Network website ("OTN"). These copies of Oracle

25  Database are provided free of charge to software developers to facilitate the development of new

26  software applications that will run on Oracle Database as the database component. The obvious and

—

undisputed purpose of offering Oracle Database free of charge to software developers is to

encourage those developers to create new software applications that run on Oracle Database so that

when those new applications are commercialized, they will drive additional licensing of Oracle

Database.

In order to download a free "developer" copy of Oracle Database through OTN, a developer

must agree to the terms of the Developer License.[4] The Developer License provides in relevant part

that:

> [Oracle] grant[s] you a nonexclusive, nontransferable limited license to use [Oracle
> Database] only for the purpose of developing, testing, prototyping and demonstrating
> your application, and not for any other purposes. If you use the application you develop
> under this license for any internal data processing or for any commercial or production
> purposes, or you want to use [Oracle Database] for any purpose other than as permitted
> under this agreement, you must obtain a production release version of [Oracle Database]
> . . . to obtain the appropriate license.
> . . .
> [Oracle Database] may be installed on one computer only, and used by one person
> in the operating environment identified by us. You may make one copy of the programs
> for backup purposes.
> . . .
> You may not: [] use [Oracle Database] for your own internal data processing or for
> any commercial or production purposes, or use [Oracle Database] for any purpose except
> the development of a single prototype of your application; [] use the application you
> develop with [Oracle Database] for any internal data processing or commercial or
> production purposes without securing an appropriate license from us; [or] continue to
> develop your application after you have used it for any internal data processing,
> commercial or production purpose without securing an appropriate license from us . . . .

Doc. #411, Exhibit 4, p.1.

In its affirmative defense, Rimini argues that the Developer License expressly authorizes it

to copy and use Oracle Database to develop and test software updates and bug fixes on its own

systems in order to provide contracted software support services to its clients. *See* Doc. #436, p.9-

12. Rimini further contends that the Developer License expressly authorizes Rimini's

commercialization of all the updates and fixes it develops using those copies of Oracle Database.

*Id*.

---

[4] A full and complete copy of the January 24, 2006 Developer License (the parties' agreed upon
operative license) is attached as Exhibit 4 to Oracle's Appendix of Exhibits provided in support of Oracle's
second motion for partial summary judgment. Doc. #411, Exhibit 4.

The court has reviewed the documents and pleadings on file in this matter and finds that the plain, unambiguous language of the Developer License does not expressly authorize Rimini to make unlimited copies of Oracle Database on its own systems or use those copies of Oracle Database to create commercial support services for its clients - including software updates and bug fixes. First, the plain language of the Developer License provides that only a single copy of Oracle Database may be downloaded and used by a developer to develop its application. *See* Doc. #411, Exhibit 4 ("[Oracle Database] may be installed on *one computer only*, and used by one person in the operating environment identified by us.") (emphasis added). Here, it is undisputed that Rimini downloaded twenty-five (25) distinct instances of Oracle Database and that its servers contain over two hundred (200) copies of Oracle Database in various clients' non-production environments, well above the single copy authorized by the Developer License. *See* Doc. #411, Exhibit 25.

Second, the Developer License authorizes only the development, testing, prototyping, and demonstration of the developer's own software application. Doc. #411, Exhibit 4 ("[Oracle] grant[s] you a nonexclusive, nontransferable limited license to use [Oracle Database] only for the purpose of developing, testing, prototyping and demonstrating your application, and not for any other purposes."). The record in this action establishes that Rimini did not create or develop a separate software application within the meaning of the Developer License. Rather, it is undisputed that Rimini used the copies of Oracle Database on its servers solely to create updates and software fixes for other software applications like Oracle's PeopleSoft, J.D. Edwards, and Siebel-branded Enterprise Software programs.

The ordinary definition of "application" in the computer software context is a complete, self-contained computer program that performs a specific function or operation for an end user.[5] *See e.g.,* Business Dictionary, http://www.businessdictionary.com/definition/application-

---

[5] Examples of applications include company accounting and human resource programs like Oracle's PeopleSoft, J.D. Edwards, and Siebel-branded programs; spreadsheet programs like Microsoft Excel; word processing programs like Microsoft Word; and illustration programs like Adobe Photoshop.

software.html (last visited July 16, 2014) (defining "application software" as a "[c]omplete, self-contained computer program (usually a commercially produced, shrink-wrapped software) that performs a specific useful task, other than system maintenance functions (which are performed by utility programs)."); Techterms, http://www.techterms.com/definition/application (last visited July 16, 2014) ("An application, or application program, is a software program that runs on your computer. Web browsers, e-mail programs, word processors, games, and utilities are all applications. The word "application" is used because each program has a specific application for the user."); Technopedia, http://www.techopedia.com/definition/4224/application-software (last visited July 16, 2014) (defining "application software" as "a program or group of programs designed for end users. The programs are divided into two classes: system software and application software. While system software consists of low-level programs that interact with computers at a basic level, application software resides above system software and includes database programs, word processors, spreadsheets, etc. . . . . Application software may simply be referred to as an application.").

In contrast, an "update" (or patch, bug fix, etc.) is a developer-created modification to an already existing application designed to address and fix technical problems or make functional changes to the application. *See e.g.*, Microsoft Support, http://support.microsoft.com/kb/824684 (last visited July 16, 2014) (defining "update" as "[a] widely released fix for a specific problem"); *What is the Difference Between a Software Upgrade and a Software Update?*, About.com, http://financialsoft.about.com/od/softwaretitle1/f/upgradevupdate.htm (last visited July 16, 2014) ("A software update provides bug fixes for features that aren't working quite right and minor software enhancements, and sometimes include new drivers to support printers or DVD drivers. A software update is sometimes called a patch because it is installed over software you're already using and isn't a full software package installation.").

The evidence in this action supports the court's construction of "application" and "update." For example, Oracle's technical expert, Dr. Randall Davis ("Dr. Davis"), recognized the inherent

1   difference between an update and an application. In his expert report, Dr. Davis stated that

2   "updates are crucial to the correct operation of applications like PeopleSoft." Doc. #436, Exhibit

3   11, Expert Report of Dr. Randall Davis, p.13. He further noted that many applications - like

4   Oracle's Enterprise Software platforms - "automate processes relevant to the various tax and

5   regulatory regimes [and] must be updated continually as a consequence of these changes." *Id*. This

6   expert opinion testimony supports the court's conclusion that Rimini's developed updates are

7   separate from and distinct to an application. Therefore, Rimini's use of Oracle Database to create

8   updates and fixes for Oracle's Enterprise Software programs, rather than for the development of its

9   own applications, is outside the scope of the Developer License.

10          Finally, the court finds that the Developer License also precludes Rimini's use of Oracle

11   Database for commercial purposes. In particular, the Developer License expressly states that: "You

12   may not: [] use [Oracle Database] . . . for any commercial or production purposes . . . without

13   securing an appropriate license from us; [or] continue to develop your application after your have

14   used it for any . . . commercial or production purpose without securing an appropriate license from

15   us." Doc. #411, Exhibit 4, p.1. The scope of this license provision authorizes the use of Oracle

16   Database *only* for the initial stages of developing an application. *Id*. (stating that a licensee may use

17   Oracle Database only "for the purpose of developing, testing, prototyping, and demonstrating your

18   application, and not for any other purpose."). In fact, the plain language of this provision

19   specifically precludes the use of Oracle Database for any commercial purpose absent securing an

20   appropriate license from Oracle.[6] Here, it is undisputed that Rimini used Oracle Database for

21   commercial purposes when it provided its developed updates and bug fixes to its software support

22   services clients for a fee. *See e.g.*, Doc. #412, Exhibit 38, Chris Limburg March 9, 2010 e-mail

23   ("Also, something to be aware of that we are using development oracle software that I don't think

24   is licensed. Just don't want that to fall back on us if we get audited. Cause you can download oracle

25

26          [6] It is undisputed that Rimini did not acquire its own appropriate license for commercial use of Oracle Database.

11

1    software from there [sic] site but not make money and were [sic] making a crap load of money

2    from there [sic] free stuff :) "). Therefore, the court finds that Rimini's commercialized use of the

3    updates it creates with Oracle Database is not authorized by the Developer License. Accordingly,

4    the court finds that Rimini's express license defense relating to the Developer License fails as a

5    matter of law.

6            **2.  Oracle License and Service Agreement**

7            Oracle also licenses Oracle Database to its Enterprise Software customers through OLSAs.

8    The OLSAs permit Oracle's licensed customers to use Oracle Database subject to certain licensing

9    restrictions.[7] In its affirmative defense, Rimini argues that its clients' OLSAs expressly authorize

10   its copying and use of Oracle Database on its own systems and for its development of updates in

11   order to provide contracted software support services to those clients. In support of its affirmative

12   defense, Rimini identifies two license provisions: (1) Section C permitting use of Oracle Database

13   to agents and contractors that provide services to the licensee; and (2) Section D permitting

14   copying of the software. *See* Doc. #436, p.12-16.

15           Initially, Oracle argues that Rimini may not assert its clients' OLSAs in its express license

16   affirmative defense because Rimini did not obtain copies of Oracle Database from its clients.

17   Rather, Rimini obtained its copies of Oracle Database from the OTN and, as such, its use of Oracle

18   Database is restricted solely to the provisions of the Developer License. The court agrees.

19           As part of its affirmative defense, Rimini has the burden of identifying a relevant software

20   license excusing its infringement of Oracle's copyrighted Oracle Database software. *See e.g.,*

21   *Michaels*, 5 F. Supp. 2d at 831 (holding that to establish the affirmative defense of express license,

22   a defendant must identify a license that authorized it to copy the protected work). The court finds

23   that Rimini cannot meet this burden and, thereby, cannot invoke the OLSAs in this action because

24   Rimini did not obtain its copies of Oracle Database from clients who had an OLSA for Oracle

25

26           [7] A full and complete copy of Oracle's standard OLSA is attached as Exhibit 2 to Oracle's Appendix
     of Exhibits provided in support of Oracle's second motion for partial summary judgment. Doc. #411, Exhibit 2.

Database. It is undisputed that Rimini obtained its copies of Oracle Database only by downloading these copies from the OTN. Doc. #411, Exhibit 7, Lester Depo., p.79:16-80:8 ("Q. Where did Rimini obtain the database software that ended up in the "For Development Use Only" folder? A. I believe it was obtained from OTN. Q. Are you speaking of the Oracle technology network? A. That's correct."); p.84:1-85:1 ("Q. When Rimini downloaded Oracle database software from OTN, did Rimini use customer credentials to perform the download? A. I don't believe that they did. [] Q. And you don't need the install media for Oracle database because you already have obtained the database software library from OTN; is that correct? A. Correct.").

In order to download Oracle Database from OTN, a developer is required to agree to the terms and conditions of the Developer License. The Developer License states that "you are bound by the Oracle Technology Network (OTN) License agreement terms" and that "[w]e are willing to license the programs to you only upon the condition that you accept all of the terms contained in *this* agreement." Doc. #411, Exhibit 4, p.1 (emphasis added). Further, the Developer License provides that "[i]f you are not willing to be bound by these terms, select the 'Decline License Agreement' button and the registration process will not continue." *Id*. Finally, the Developer License states that "this agreement is the complete agreement for the programs and licenses, and this agreement supersedes all prior or contemporaneous agreements or reproductions." *Id*., p.2. Thus, by downloading all copies of Oracle Database from OTN, Rimini expressly agreed that its use of Oracle Database would be governed only by the Developer License and not by any other agreement. Therefore, because Rimini received its copies of Oracle Database only by downloading them from OTN, the court finds that Rimini may not assert its clients' OLSAs as part of its express license defense.

However, even if Rimini was allowed to assert its clients' OLSAs in this action, the court finds that, as addressed below, the OLSAs do not expressly authorize Rimini's accused conduct.

///

///

13

### a.  Section C

Section C of the OLSAs states in pertinent part that the licensee has "the limited right to use [Oracle Database] and receive any service [the licensee] ordered solely for [the licensee's] internal business operations. [The licensee] may allow [its] agents and contractors to use [Oracle Database] for this purpose . . . ." Doc. #411, Exhibit 2, Section C. Rimini contends that this provision expressly authorizes it to use Oracle Database on its own systems and under its control in order to provide contracted software support services to its clients. *See* Doc. #436, p.13-14.

The court has reviewed the documents and pleadings on file in this matter and finds that the plain, unambiguous language of Section C does not expressly authorize Rimini to make copies of the licensed software. First, Section C authorizes "use" of the software. The right to use the licensed software is separate from a right to reproduce or copy the software, and there is no evidence before the court that Rimini, as a third-party service provider, cannot perform its contracted services without having its own copy of the software on its own systems. Further, unlike other license provisions, the word "copy" is not found anywhere in Section C. *See, e.g.,* Doc. #411, Exhibit 2, Section D (stating that licensee may make copies of the software). Therefore, the court finds that the plain language of Section C does not authorize Rimini's copying of the database software.

Second, Section C authorizes use of the software only for the licensee's "internal business operations." Doc. #411, Exhibit 2, Section C. Upon review of Rimini's use of Oracle Database, the court finds that none of the non-production environments were used for the licensee's internal business operations. Rather, the undisputed evidence establishes that Rimini used Oracle Database to develop and test updates for its clients. Further, it is undisputed that Rimini used Oracle Database to create updates for all clients using a particular version of a copyrighted software program. Rimini's use of Oracle Database to support multiple customers is also outside the scope of this license provision. Therefore, the court finds that Section C does not expressly authorize Rimini's copying and use of Oracle Database.

14

### b. Section D

Section D of the OLSAs states in pertinent part that the licensee "may make a sufficient number of copies of each program for [the licensee's] license use . . . ." Doc. #411, Exhibit 2, Section D. Rimini contends that this provision also expressly authorizes it to copy and use Oracle Database on its own systems in order to provide contracted software support services to its clients. *See* Doc. #436, pp.13-14.

The court finds that the plain, unambiguous language of Section D does not expressly authorize Rimini to make copies of the licensed software. First, the plain language of Section D provides that *only* the licensee may make copies of the software. Doc. #411, Exhibit 2, Section D ("[The licensee] may make a sufficient number of copies . . ."). Nowhere does this provision authorize Rimini, as a third party, to make a copy of the licensed software.

Second, Section D authorizes copying of the software only for the licensee's "licensed use." Oracle argues, and the court agrees, that the "sufficient number of copies" provision is subject to the licensing restrictions outlined in Section C of the OLSAs. Section D's "licensed use" language necessarily means that use of any copies of the database software are subject to all other licensing restrictions identified in the license. *See e.g., Threlkeld v. Ranger Ins. Co.*, 202 Cal. Rptr. 529, 532 (Cal. App. 1984) (interpreting the phrase "in accordance with" a set of regulations as incorporating those regulations by reference). As addressed above, the court finds that none of the copies were used for Rimini's clients' internal business operations as required by Section C. *See supra,* §III (B)(2)(a). Rather, the undisputed evidence established that these copies of Oracle Database were used to develop and test software updates for Rimini. Accordingly, the court finds that Rimini's copying and use of Oracle Database is outside the scope of Section D.

### 3. Conclusion

Based on the court's rulings above, neither of Rimini's asserted licenses (the Developer License or its clients' OLSAs) expressly authorize its copying of Oracle's copyrighted Oracle Database software as a matter of law. Therefore, the court finds that Oracle is entitled to summary

judgment on both its claim of copyright infringement as it relates to Oracle Database and Rimini's second affirmative defense for express license as it relates to Oracle Database. Accordingly, the court shall grant Oracle's second motion for partial summary judgment on these issues.

### C.  Statute of Limitations (Eighth Affirmative Defense)[8]

Copyright infringement actions must be filed "within three years after the claim accrued." 17 U.S.C. § 507(b); *Roley v. New World Pictures*, 19 F.3d 479, 481 (9th Cir. 1994). A copyright claim accrues "when one has knowledge of a violation or is chargeable with such knowledge." *Roley*, 19 F.3d at 481. One is chargeable with knowledge of a copyright violation if it could have been reasonably discovered. *See Polar Bear Prods. v. Times Corp.*, 384 F.3d 700, 706 (9th Cir. 2004). Thus, "[a] claim for copyright infringement accrues on the date that a reasonable investigation would have put the rights holder on notice that potentially infringing conduct has occurred." *In re Napster, Inc. Copyright Litig.*, 2005 WL 289977, *4 (N.D. Cal. 2005).

Oracle filed the underlying copyright infringement action on January 25, 2010. *See* Doc. #1. Based on the three-year limitations period set forth in 17 U.S.C. § 507(b), Rimini contends in its affirmative defense that Oracle's copyright claims are untimely with respect to any acts or conduct that occurred prior to January 25, 2007.[9] *See* Doc. #436, pp.16-20. However, as the statute of limitations does not begin to run until the claim accrues, Rimini must establish that Oracle knew or should have known of Rimini's underlying acts or conduct which constitute Oracle's copyright infringement claims prior to January 25, 2007. *See Roley*, 19 F.3d at 481.

///

---

[8] The court notes that Rimini's eighth affirmative defense based on the statute of limitations is raised against all of Oracle's claims for copyright infringement - including Oracle's copyright infringement claims raised in its initial motion for partial summary judgment (Doc. #237) - and not just Oracle's copyright infringement claim related to Oracle Database. Thus, the court's analysis of this affirmative defense encompasses Oracle's entire copyright infringement claim and will refer to infringement issues addressed previously in the court's order granting in-part and denying in-part Oracle's first motion for partial summary judgment (Doc. #474).

[9] It is undisputed that Oracle's claims are timely for all acts of copyright infringement that occurred after January 25, 2007.

In support of its affirmative defense, Rimini argues that Oracle knew or should have known of its infringement prior to January 25, 2007, for two reasons.[10] First, Rimini contends that a series of correspondence between itself and Siebel Systems ("Siebel") (Oracle's predecessor in interest for the Siebel-branded software) in September/October 2005, put Siebel - and thereby Oracle[11] - on notice at that time that Rimini was going to engage in the underlying conduct of copying Oracle's copyrighted Enterprise Software programs on its own servers and under its own control in order to provide contracted software support services for its clients - conduct which the court has determined constitutes copyright infringement. *See* Doc. #474. Second, Rimini contends that Oracle itself was put on notice of Rimini's conduct of copying Oracle's software when it began shipping its customers' Enterprise Software back-up installation media to Rimini's facilities in 2006. Based solely on these two references, Rimini argues that Oracle is chargeable with knowledge that Rimini was engaged in conduct constituting copyright infringement prior to January 25, 2007, and therefore, the statute of limitations bars any claim for conduct that occurred before that date. The court shall address each argument below.

### 1. 2005 Correspondence

Rimini launched its business in late 2005, by offering support for Siebel-branded software programs which it later expanded to include Oracle's J.D. Edwards and PeopleSoft-branded software programs in 2006. Doc. #153, ¶21 ("[Rimini] began operations in September 2005, offering a competitive after-market support offering for Siebel software products."); ¶23 ("[Rimini]

---

[10] In its affirmative defense, Rimini argues that Oracle had actual knowledge of the underlying conduct constituting copyright infringement prior to January 25, 2007. *See* Doc. #436. However, the court has reviewed the evidence proffered in this action and finds that there is no evidence that Oracle actually knew, prior to January 25, 2007, that Rimini was copying its Enterprise Software programs onto Rimini's servers. In fact, Rimini has failed to proffer any evidence from Oracle concerning Oracle's knowledge in 2005 and 2006. Therefore, the court finds that Rimini's eighth affirmative defense based on the statute of limitations fails as it relates to Oracle's actual knowledge prior to January 25, 2007. Accordingly, the court shall only address Rimini's arguments that Oracle is chargeable with knowledge of Rimini's conduct in analyzing its eighth affirmative defense.

[11] Oracle acquired Siebel in 2006.

17

added support offerings for Oracle's PeopleSoft products in April 2006 and Oracle's JD Edwards

products in September 2006."). Rimini began advertising its services in early September 2005.

On September 26, 2005, before Rimini had signed up a single customer, Siebel sent a letter

to Rimini addressing Rimini's purported ability to offer maintenance and support services for

Siebel's software programs without violating Siebel's intellectual property rights. Doc. #413,

Exhibit 57. Siebel's letter stated in pertinent part:

> "As discussed herein, [Siebel] believes that various statements made by [Rimini] are false and/or misleading, and we hereby demand that Rimini immediately cease its wrongful activities.
> . . .
> By this letter, we hereby ask [Rimini] to explain in detail how it intends to fulfill the promises it is making to potential customers on its website and in its public comments. Specifically, please advise how [Rimini] intends to provide 'complete maintenance and support services' without access to [Siebel's] source code, programs or confidential, proprietary or trade secret information."

Doc. #413, Exhibit 57.

On October 6, 2005, Rimini responded and assured Siebel that Rimini would be providing

independent consulting services to the extent permitted by law and in accordance with any relevant

software license agreements while still respecting Siebel's intellectual property rights. Doc. #413,

Exhibit 58. Rimini's response letter stated in pertinent part:

> "[Rimini] respects the intellectual property rights of software providers. [Rimini] intends to achieve quality service and customer satisfaction by providing independent consulting services to its clients *to the extent permitted by law, and in accordance with the terms of any relevant software license agreement* in effect with each [Rimini] client.
> . . .
> [Rimini's] proposed maintenance and support consulting services . . . require the same software program access as other independent consulting services procured by [Siebel] licensees on a regular basis. . . .
> . . .
> [Rimini's] alternative maintenance and support services will only provide [Rimini] clients with source code remediation and updates created by [Rimini] as independent consultant projects developed at the request of and on behalf of its . . . clients.
> . . .
> Updates made by [Rimini] to available [Siebel] software source code will be *in accordance with the individual scope, nature, rights, and terms of the Siebel system license agreements* executed between [Siebel] and each [Rimini] client."

Doc. #413, Exhibit 58 (emphasis added).

Rimini argues that this exchange of letters put Oracle, as Siebel's successor, on notice of Rimini's intention to offer software support services to Oracle's Enterprise Software customers by copying Oracle's copyrighted software onto its own servers. The court disagrees. The court has reviewed the correspondence and finds that Rimini's 2005 letter is insufficient to charge Oracle with knowledge that Rimini intended to copy Oracle's copyrighted works on its own servers and outside the licensee's control.

First, the court finds that Rimini expressly assured Oracle that it would "provid[e] independent consulting services . . . to the extent permitted by law, and in accordance with the terms of any relevant software license agreement[.]" *Id*. Where a defendant expressly assures competitors that it is not violating the competitor's intellectual property rights, a plaintiff cannot be charged with knowledge of the infringing conduct. *See e.g., William A. Graham Co. v. Haughey*, 568 F.3d 425, 439-41 (3d Cir. 2009) (finding that despite "storm warnings" that defendant was a competitor and was in possession of copyrighted material, it was reasonable for plaintiff to delay filing suit because defendant had "repeatedly agreed to respect [plaintiff's] rights to its intellectual property."). Similarly, mere general knowledge that a competitor is going to enter the market and compete is also insufficient to put a party on notice of copyright infringement. *See Garcia v. Coleman*, 2008 WL 4166854, *7 n.2 (N.D. Cal. 2008) (stating that mere participation in an industry by a competitor is "not enough to establish chargeable knowledge"). Thus, based on the specific assurances by Rimini that it was going to abide by Oracle's intellectual property rights, the court finds that Oracle is not chargeable with knowledge that Rimini was engaging in infringing conduct in late 2005.

Second, even if Rimini had not assured Oracle that it would respect its intellectual property rights and not infringe its copyrights, Rimini's statute of limitations defense would still fail because nowhere in its letter does Rimini state that it planned to copy any copyrighted software onto its own computer systems (as opposed to accessing software on its clients' systems) - the conduct the court has concluded constitutes copyright infringement. The letter repeatedly

19

references Rimini's planned "access" to its clients' software. Such references cannot put Oracle on notice that Rimini intended to copy the software onto its own computers. Indeed, Rimini employees, including Rimini CEO Seth Ravin, have confirmed that the term "access" was used to describe Rimini working with the licensed software on its clients' systems. *See e.g.*, Doc. #452, Exhibit M, Ravin Depo., pp.476:3-476:9 ("Q. In use of the term, "access" is intended to indicate that [Rimini] will not have a local copy of the software on its systems, but will access the software as it resides on the customer systems? A. That is correct. Remote access is what we refer to."). The distinction between Rimini "accessing" the software on its clients' systems (subject to the terms of those clients' licenses with Oracle) and Rimini installing and copying software on its own systems is plain on its face. And Rimini's continuing reference to "access" cannot have put Oracle on notice that Rimini was engaging in conduct, like copying, not contemplated or mentioned by the letter. Therefore, the court finds that the letter failed to put Oracle on notice of Rimini's conduct, and as such, Oracle is not chargeable with knowledge that Rimini was engaging in copyright infringement in late 2005.

### 2.  Shipment of Back-up Installation Media

In its affirmative defense, Rimini also argues that knowledge of its infringing conduct should be imputed to Oracle because, beginning in 2006, Oracle shipped back-up copies of its customers' Enterprise Software installation media to Rimini's facilities with full knowledge that Rimini was using the installation media to create copies of the software on its own systems to provide support services to its clients. *See* Doc. #436, pp.17-20. Thus, Rimini argues that Oracle should have known, and is chargeable with knowledge, that Rimini was engaging in conduct which constituted copyright infringement as early as 2006.

The court has reviewed the documents and pleadings on file in this matter and finds that the evidence before the court does not support Rimini's argument. The undisputed evidence in this action establishes that between 2006 and 2009, Oracle shipped at least 90 back-up copies of licensed software installation media to Rimini's facilities for different Oracle Enterprise Software

customers. Doc. #261, Exhibit 15, pp.8-9 (recognizing that Oracle shipped software installation media to Rimini for approximately 90 customers from 2006 to 2009). Further, it is undisputed that at the time it shipped the installation media, Oracle had been tracking Rimini's business activities. *See* Doc. #261, Exhibit 20 (e-mail to Oracle executives regarding Rimini dated May 1, 2006); Exhibit 21 (e-mail to Oracle executive concerning Rimini dated April 24, 2006); Exhibit 23 (e-mails reflecting Oracle's Vice President of Competitive Intelligence's tracking of Rimini dated March 2007). Based on this limited evidence, Rimini argues that Oracle not only knew that Rimini was providing software support services to Oracle customers, but, by extension, also knew that Rimini was engaging in copyright infringement by using the back-up copies of the software installation media to create copies of the software on Rimini's systems to service those customers. However, Rimini's assumption of Oracle's knowledge that the back-up copies of the installation media were being used to make copies of the licensed software is not supported by the evidence, and thus, Oracle cannot be charged with knowledge of Rimini's infringing conduct in 2006.

First, other evidence before the court establishes that these back-up copies, although ultimately shipped to Rimini, were shipped only after Oracle's customers submitted requests to Oracle describing Rimini's address as the customers' "secondary offsite backup location."[12] *See* Doc. #242, Exhibit 33, Rimini's Second Amended Responses to Oracle's Third Set of Requests for Admission, Request #26 ("[A]dmit that more than 50% of the requests asked Oracle to ship the software to an 'offsite backup location.'" "Admitted"); Request #28 ("Admit that, at least 25 times, You instructed a [Rimini] customer or prospective [Rimini] customer to state that software was to be shipped to an "offsite backup location" when that customer or prospective customer requested that Oracle ship software to a [Rimini] address." "Admitted."). In fact, the evidence establishes that Rimini intentionally concealed its identity in these shipping requests by omitting any reference to Rimini on the shipping requests and using only the customer's business name.

---

[12] An offsite backup location is one where the software installation media can be held in safety, so that the installation media could be easily retrieved and provided to the customer in the event that the customer's copy of the installation media was lost or destroyed.

Second, Rimini admits that the purpose behind the obfuscated shipping requests was to allow Rimini to create development environments to service Rimini's customers without Oracle's knowledge. *See* Doc. #242, Exhibit 31, Corpuz Depo., p.160 ("Q. It's true, isn't it, that the reason for the request was for [Rimini] to build an environment on [Rimini's] premises for tax development work? A. I believe so, yes."). Thus, the evidence does not support Rimini's assumption that Oracle knew that it was shipping back-up copies of the software installation media to Rimini's facilities in 2006.

Additionally, there is no evidence that Oracle knew of Rimini's use of the shipped installation media to create copies of the software on Rimini's systems. Rimini admits that the shipping requests were designed so that Oracle would not know that Rimini was using these back up copies of the licensed software. *See* Doc. #242, Exhibit 33, Rimini's Second Amended Responses to Oracle's Third Set of Requests for Admission, Request #30 ("Rimini responds that, having investigated, it is not aware of any requests to Oracle for shipment of Oracle Enterprise Software to a [Rimini] address which expressly stated that the software shipped to a [Rimini] address would be used by [Rimini] to install software on [Rimini's] computers."). Further, Rimini fails to present any evidence that Oracle knew that Rimini was copying the software onto Rimini's systems prior to January 25, 2007. Based on the evidence before the court, the court finds that no reasonable jury could conclude from Oracle's shipments of the installation media to a location described as a "secondary offsite backup location" that Oracle should have had knowledge of Rimini's infringing conduct sufficient for a copyright infringement claim to accrue, and the statute of limitations to begin to run, in 2006.

### 3.  Conclusion

As addressed above, there is no evidence to support the conclusion that Oracle had knowledge that Rimini was engaging in copyright infringement prior to January 25, 2007. Further, the evidence does not support Rimini's argument that Oracle should be charged with knowledge of its infringement prior to January 25, 2007, based either on the 2005 correspondence with Siebel or

from Oracle's shipment of back-up installation media to Rimini's facilities. Therefore, the court finds that all of Oracle's claims for copyright infringement are timely. Accordingly, the court shall grant Oracle's motion for summary judgment as to this affirmative defense.

### D. Laches (Ninth Affirmative Defense)[13]

Rimini's ninth affirmative defense alleges that Oracle's copyright claims are barred by the doctrine of laches based on Oracle's unreasonable failure to timely file this action. *See* Doc. #436.

To establish a laches defense in a copyright infringement action, a defendant must show that "(1) the plaintiff delayed in initiating the lawsuit; (2) the delay was unreasonable; and (3) the delay resulted in prejudice." *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 695 F.3d 946, 949 (9th Cir. 2012). Delay is measured from when "the plaintiff knew (or should have known) of the allegedly infringing conduct, until the initiation of the lawsuit." *Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 952 (9th Cir. 2001). In determining the reasonableness of the delay, courts look to the cause of the delay. *Id*. at 954. Prejudice can exist where "during the delay, [defendant] invested money to expand its business or entered into business transactions based on [its] presumed rights." *Petrella*, 695 F.3d at 953.

In the present motion, Oracle argues that summary judgment is appropriate on Rimini's laches defense because it did not delay in filing suit. *See* Doc. #405, pp.21-23. The court agrees.

When a claim for copyright infringement is brought within the statute of limitations period, there is a strong presumption that there is no unreasonable delay. *See Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 997 (9th Cir. 2006) (holding that if a plaintiff "files suit within the applicable period of limitations for his claim, there is a strong presumption that laches does not bar the claims"); *Novell, Inc. v. Unicom Sales, Inc.*, 2004 WL 1839117, *5-7 (N.D. Cal. 2004) (applying the "strong presumption" that laches does not apply to a copyright claim filed within the

---

[13] Similar to Rimini's eighth affirmative defense for the statute of limitations, Rimini's ninth affirmative defense for laches is raised against all of Oracle's copyright infringement claims and not just the claim related to Oracle Database addressed in this motion. Accordingly, the court shall consider the affirmative defense in its entirety as to all copyright infringement claims.

applicable limitations period). Only in unusual circumstances will an action filed within the statutory period be considered a sufficiently unreasonable delay to permit a laches defense. *See Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 950-54 (9th Cir. 2001) (finding that laches defense applied when re-released DVD material was identical in nature to an original infringing work and that although the statute of limitations would permit the lawsuit, the thirty-six year time lapse from the initial infringement was an unreasonable delay sufficient to support a laches defense).

Here, as addressed above, the court finds that Oracle did not have knowledge, nor is Oracle chargeable with knowledge, of Rimini's conduct prior to January 25, 2007. *See supra,* § III(C). As such, there is a strong presumption that Oracle did not delay in filing this action. Further, there are no unusual circumstances that would overcome the strong presumption that there is no delay. Finally, Rimini has failed to establish that it was prejudiced by Oracle's alleged delay. Thus, as the period for both the equitable and statutory periods accrued at the same time, the court finds that it would be inequitable to bar Oracle's claims for copyright infringement that were brought within the statutory period. Accordingly, the court shall grant Oracle's motion as to this affirmative defense.

**E.  Defamation (First Counterclaim) and Unfair Competition (Third Counterclaim)**

Finally, Oracle moves for summary judgment on Rimini's two remaining counterclaims for defamation, business disparagement and trade libel; and unfair competition pursuant to Cal. BPC § 17200.[14]

To establish a claim for defamation, Rimini must establish: (1) a false and defamatory statement by Oracle concerning Rimini; (2) an unprivileged publication to a third person; (3) fault,

---

[14] California's unfair competition statute prohibits any unfair competition, which is defined as "any unlawful, unfair, or fraudulent business practice or act." Cal BPC §§ 17200, *et seq.* In its counterclaim, Rimini alleges that Oracle engaged in fraudulent business practices by making defamatory statements that have harmed Rimini's business activities. *See* Doc. #153.

This claim is derivative of Rimini's counterclaim for defamation. As such, the court's ruling on Rimini's defamation counterclaim applies with equal force and weight to Rimini's unfair competition counterclaim and, therefore, the court shall limit its discussion solely to the defamation counterclaim.

amounting to at least negligence; and (4) actual or presumed damages. *Wynn v. Smith*, 16 P.3d 424, 427 (Nev. 2001). A statement may be defamatory only if it contains a factual assertion that can be proven false. *See Flowers v. Carville*, 112 F. Supp. 2d 1202, 1210 (D. Nev. 2000). The determination of whether a statement contains a defamatory factual assertion is a question of law. *Rodriguez v. Panayiotou*, 314 F.3d 979, 985 (9th Cir. 2002); *see also Branda v. Sanford*, 637 P.2d 1223, 1225-26 (Nev. 1981).

In its affirmative defense, Rimini alleges three separate statements made by Oracle representatives between March 2009 and March 2010 to potential customers of Rimini and members of the press were defamatory in nature and harmed Rimini's business. The alleged defamatory statements are as follows:

- Statement #1: Rimini alleges that in March 2009, an unidentified Oracle employee made unspecified statements to industry analyst Pat Phelan of Gartner Research insinuating that Rimini's business practices were illegal. *See* Doc. #413, Exhibit 68.

- Statement #2: Rimini alleges that on March 29, 2010, Oracle spokesperson Deborah Hellinger ("Hellinger") made statements to the press in response to the filing of Rimini's answer and counterclaims in this action in which Hellinger stated that Rimini had engaged in "massive theft" of Oracle's intellectual property. *See* Doc. #413, Exhibit 68, Rimini's First Supplemental Response to Interrogatory 16 ("Oracle spokesperson Deborah Hellinger publically accused [Rimini] on March 29, 2010 of engaging in 'massive theft' of Oracle's intellectual property.").

- Statement #3: Rimini alleges that on January 30, 2010, Oracle Regional Services Sales Manager James McLeod ("McLeod") sent an email forwarding an article from *Information Week* to the Vice President of Liz Claiborne, Inc., a Rimini customer. The article allegedly contained Oracle's allegations from this lawsuit including allegations of Rimini's "massive theft" of Oracle's intellectual property. *See* Doc. #413, Exhibit 68, Rimini's First Supplemental Response to Interrogatory 16 ("Further, on January 30,

2010, James McLeod, a Regional Services Sales Manager for Oracle, sent an e-mail to Kerry Fogarty, a Vice President at Liz Claiborne, Inc., containing statements that [Rimini] had obtained 'Oracle's software and related support materials through an illegal business model,' including 'massive theft.'").

In its motion, Oracle raises four arguments for why it is entitled to summary judgment on Rimini's defamation counterclaim. Specifically, Oracle argues that: (1) Rimini, as a limited purpose public figure, has failed to proffer any evidence that the alleged statements were made with actual malice, as opposed to mere negligence; (2) the alleged defamatory statements are true; (3) McLeod's statements are additionally protected by the fair reporting privilege; and (4) with respect to Rimini's trade libel claim, Rimini has failed to proffer any evidence of special damages. *See* Doc. #405. The court shall address each argument below.

**1.   Malice**

In its motion, Oracle contends that Rimini is a limited purpose public figure and must therefore establish actual malice on the part of Hellinger and McLeod[15] in making the allegedly defamatory statements.

The determination of whether a party is a public figure, or a limited purpose public figure, is an issue of law to be decided by the court. *See Tavoulareas v. Piro*, 817 F.2d 762, 772 (D.C. Cir. 1987) ("Whether (and to what extent) a person is a public figure is a matter of law for the court to decide."). A person or company may become "a general purpose public figure only if he [] is 'a well-known celebrity, his name a household word.'" *Id*. (quoting *Waldbaum v. Fairchild Publ'ns, Inc.*, 627 F.2d 1287, 1294 (D.C. Cir. 1980). "Although few persons obtain the level of notoriety to be public figures in all contexts, individuals may be public figures for the more limited purpose of certain issues or situations." *Id*. A person or company can be a limited purpose public figure when

---

[15] In its opposition to Oracle's second motion for partial summary judgment, Rimini states that it has elected not to rely on the statements made to Pat Phelan to support its claim for defamation. *See* Doc. #436, p.7. Accordingly, the court shall grant Oracle's motion as to this statement.

three factors are met. *Id.* "First, there must be a public controversy, which means the issue was debated publicly and had foreseeable and substantial ramifications for nonparticipants." *Medifast, Inc. v. Minkow*, 2011 U.S. Dist. LEXIS 33412, *12 (S.D. Cal. 2011). Second, the person's role in the controversy must be more than "trivial or tangential." *Tavoulareas*, 817 F.2d at 773 (citing *Waldbaum*, 627 F.2d at 1297). This factor requires the person to "have undertaken some voluntary act through which he or she sought to influence resolution of the public issue." *Medifast*, 2011 U.S. Dist. LEXIS 33412, *12. However, an individual does not become a limited purpose public figure "merely by stating a position on a controversial issue if he or she is not a principal participant in the debate or is unlikely to have much effect on its resolution." *Tavoulareas*, 817 F.2d at 773. Finally, the alleged defamation must be germane to the person's participation in the controversy. *Id.*; *Medifast*, 2011 U.S. Dist. LEXIS 33412, *12.

The court has reviewed the documents and pleadings on file in this matter and finds that Rimini is not a limited purpose public figure as it relates to Oracle's allegedly defamatory statements. First, the court finds that there was not a sufficiently public controversy over which Rimini expressed its opinions. In its motion, Oracle identifies the public controversy as the legality of third-party support services to Oracle's Enterprise Software programs arising out of Oracle's lawsuit against non-party SAP, *Oracle v. SAP AG*, Case no. 07-01658 (N.D. Cal.). Initially, the court notes that this controversy was not widely publicized or addressed in the public sphere such that it created a public controversy. Rather, the controversy took place within the confines of the litigation and attracted sparse media attention. Further, the business methods addressed by the lawsuit were specific to SAP and not to Rimini or other third-party developers, and Oracle has conceded generally that third-party software support services are permissible in the market. Thus, the court finds that the controversy identified by Oracle was not likely to have "foreseeable and substantial ramifications for nonparticipants" sufficient to create a public controversy. *See Medifast*, 2011 U.S. Dist. LEXIS 33412, *12.

///

Second, the court finds that even if the *SAP* litigation could constitute a public controversy, Rimini's limited statements were not likely to have an effect on the controversy. Rimini's limited comments are summarized as follows:

- Comment #1: On May 17, 2006, Rimini sent an email to Vauhini Vara from the Wall Street Journal in which Rimini stated that: "Siebel Agreements generally allow third party access rights and modification rights to provide source code, BUT ALSO seem to have specific terms to exclude 'access rights' for those parties who are also 'direct competitors' like SAP - especially SAP . . . the clearest definition of a 'direct competitor' for Siebel/Oracle. . . . [Rimini] is clearly not a 'direct competitor' any more than the thousands of other independent consultants and firms who provide services to Siebel clients. We are not a software manufacturer, and do not directly compete in the software vendor arena. We provide services to clients in order to make their Siebel/Oracle software work properly and smoothly. . . . Therefore, as a specialized consulting firm, [Rimini] has clear competitive advantage in serving the entire Siebel client base without the sales and market challenges faced by SAP/TomorrowNow." Doc. #414, Exhibit 79.

- Comment #2: On March 23, 2007, Rimini CEO Ravin is quoted as providing insight into the lawsuit and differentiating Rimini's practices in an article entitled "Solution Providers: Oracle Suing SAP Over Standard Industry Practice." Doc. #414, Exhibit 80.

- Comment #3: On March 27, 2007, Rimini CEO Ravin is quoted as saying that "Oracle's lawsuit is not about [SAP] offering third party support" in an article appearing in *The Enterprise Spectator* entitled "Oracle/SAP lawsuit: view from Rimini Street." Doc. #414, Exhibit 81.

- Comment #4: On July 12, 2007, Rimini Vice President of Global Marketing and Alliances, David Rowe ("Rowe"), offered his opinion on the *SAP* litigation and Rimini's options of working with SAP in the future in an article appearing on *eWeek*

28

entitled "Oracle Suit Against SAP Raises Customer Concerns." Doc. #414, Exhibit 82.

- Comment #5: On April 25, 2008, Rowe was quoted as stating that "[Rimini], as we have commented previously, has safeguards in place to keep such issues from occurring in its operations" in an article in *CIO* entitled "Oracle v. SAP Legal Fight Gets Messier, Raises Tough Questions About Third-Party Maintenance." Doc. #414, Exhibit 83.

The court finds that these comments were not directed at the public in order to influence resolution of the litigation or some broader issue about third-party software support, but were directed to increase Rimini's exposure and business. Rimini's limited and sporadic comments on the litigation in which Rimini primarily comments on its own business practices does not raise to the level of Rimini inserting itself into the controversy, and Rimini did not abuse its privilege when it simply stated why it believed its business model was legal in comparison to SAP's business practices. Thus, the court finds that Rimini is not a limited purpose public figure and therefore, Rimini does not have to establish actual malice by Hellinger and McLeod in making the allegedly defamatory statements.

## 2. Truth

In the alternative, Oracle argues that even if Rimini does not have to prove actual malice, the court should still grant summary judgment on Rimini's defamation counterclaim because the two allegedly defamatory statements are true. The court agrees.

Truth is an absolute defense to defamation. *See Flowers*, 112 F. Supp. 2d at 1210. Here, both statements (Hellinger's statement and McLeod's statement) that Rimini engaged in "massive theft" of Oracle's intellectual property are true. It is undisputed that Rimini engaged in theft of Oracle's intellectual property by repeatedly making multiple copies of Oracle's copyrighted Enterprise Software programs to support its software support service clients beginning in 2005.

Although Rimini argues in its opposition that theft and copyright infringement are different, the court finds that the semantic distinction between copyright infringement and theft does not matter in this instance. First, it is not the literal truth of "each word or detail used in a statement

which determines whether or not it is defamatory; rather, the determinative question is whether the 'gist or sting' of the statement is true or false." *Ringler Assocs. v. Maryland Cas. Co.*, 80 Cal. App. 4th 1165, 1180-82 (2000). Applying these principles, courts consistently hold that the imprecise use of legal terminology does not qualify as defamation when the terminology provides the gist of the actual claims. *Id*.

Second, there is no meaningful distinction between "theft" and "copyright infringement." One of the leading Ninth Circuit copyright infringement cases refers to the copyright infringement defendant as an "ordinary thief." *Polar Bear*, 384 F.3d at 709. Further, the Supreme Court has stated that "deliberate unlawful copying is no less an unlawful taking of property than garden-variety theft." *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Inc.*, 545 U.S. 913, 961 (2005). Therefore, because the court has found that Rimini has engaged in copyright infringement, it is true that Rimini has engaged in theft of Oracle's intellectual property. Therefore, the court shall grant Oracle's motion as to Rimini's defamation counterclaim.

### 3. Fair Reporting Privilege and Trade Libel

Because the court has found that the allegedly defamatory statements are true, and therefore, there is no defamation as a matter of law, the court finds that it is unnecessary to determine if McLeod's statement is also protected by the fair reporting privilege or address whether Rimini has proffered evidence of special damages sufficient to establish its claim for trade libel.

## IV. Conclusion

In conclusion, the court finds, consistent with the rulings above, that Oracle has established a *prima facie* case of copyright infringement as it relates to the identified copies of Oracle Database. *See supra*, § III(A). Further, the court finds that Oracle is entitled to summary judgment on Rimini's second affirmative defense of express license also as it relates to Oracle Database. *See supra*, §§ III(B)(1) & (2). The court also finds that Oracle is entitled to summary judgment on Rimini's eighth affirmative defense for statute of limitations and ninth affirmative defense for laches. *See supra*, §§ III(C) & (D). Finally, the court finds that Oracle is entitled to summary

judgment on Rimini's first counterclaim for defamation, business disparagement, and trade libel, as well as Rimini's third counterclaim for unfair competition. *See supra*, § III(E). Accordingly, the court shall grant Oracle's present motion for partial summary judgment in accordance with these findings.

Following entry of this order, the parties shall have sixty (60) days to submit a proposed joint pre-trial motion in accordance with Local Rules 16-3 and 16-4. In the proposed pre-trial order, the parties shall submit a list of three agreed-upon trial dates. If the parties are unable to agree upon proposed trial dates, or desire a case management conference to set a trial or motion schedule following the submission and acceptance of the proposed joint pre-trial order, the parties may seek such a conference at that time.


IT IS THEREFORE ORDERED that plaintiffs' motion for partial summary judgment (Doc. #405) is GRANTED in accordance with this order.

IT IS FURTHER ORDERED that the clerk of court shall enter judgment in favor of plaintiffs Oracle USA, Inc.; Oracle America, Inc.; and Oracle International Corporation; and against defendant Rimini Street, Inc., on plaintiffs' first cause of action for copyright infringement as it relates to Oracle Database.

IT IS FURTHER ORDERED that the clerk of court shall enter judgment in favor of plaintiffs Oracle USA, Inc.; Oracle America, Inc.; and Oracle International Corporation; and against defendant Rimini Street, Inc., on defendant's second affirmative defense for express license as it relates to plaintiffs' claim for copyright infringement arising from defendant's copying of Oracle Database.

///

///

///

///

IT IS FURTHER ORDERED that the clerk of court shall enter judgment in favor of plaintiffs Oracle USA, Inc.; Oracle America, Inc.; and Oracle International Corporation; and against defendant Rimini Street, Inc., on defendant's eighth affirmative defense for statute of limitations; ninth affirmative defense for laches; first counterclaim for defamation, business disparagement, and trade libel; and third counterclaim for unfair competition.

IT IS FURTHER ORDERED that the parties shall have sixty (60) days following entry of this order to submit a proposed joint pre-trial motion in accordance with both Local Rules 16-3 and 16-4.

IT IS SO ORDERED.

DATED this 12th day of August, 2014.

_____
LARRY R. HICKS
UNITED STATES DISTRICT JUDGE