# EXHIBIT 8

# ComputerWeekly.com

## Stuck between a rock and a hard place: How to renegotiate software contracts

As the latest ruling against support provider Rimini Street demonstrates, suppliers can – and will – exploit any doubt in a software contract.

It is really hard to sell software. The demos, tenders and proof of concepts are time-consuming and costly. According to industry estimates, software companies spend $0.70 for every dollar of licence revenue earned.

So once a product has been sold, the software provider needs to make its money back, which is why IT buyers pay a premium for annual maintenance – around 25% of the original licence cost per year. Some experts estimate there is a 95% margin on software sales.

Sales tactics, particularly at the time of renewal, can become adversarial. It is not uncommon for pushy sales executives to play the audit card, leaving buyers stuck between the proverbial rock and a hard place.

"Buy more licences," they will argue, "because it is better to be safe than sorry should an audit reveal that the business is under-licensed."

Given this reality, IT buyers are finding they need to defend their company's position in terms of licence usage rights.

### Third-party contracts are the front line

Oracle has gone after Rimini Street because, as a provider of software, it has a right to protect its intellectual property (IP). But there is more to this case than the issue of copyright theft.

In March 2014, a court ruling implied Rimini Street had gone against the terms of Oracle's licensing in a number of its support contracts. The case hinged on software misuse, focused on four Rimini Street clients, of which the City of Flint was one.

#### More articles on supplier management

- The wider implications of Oracle's Rimini licensing dispute
- Why digitisation transforms supplier relationships
- Supplier Profile: Oracle
- Finding the business value of supplier relationship management software
- The CIO supplier relationship: How to get the best from your suppliers

"Upon review of Rimini's use of the development environments associated with the City of Flint, the court finds that none of the environments were created for archival, emergency backup and/or disaster recovery purposes," the ruling stated.

Last week, the US District Court in Las Vegas ruled: "It is undisputed that Rimini engaged in theft of Oracle's intellectual property..."

In the case of the City of Flint, the ruling means that software it had bought in good faith could not be hosted by a third party.

Commenting on the ruling, Oracle attorney Geoff Howard said: "Rimini can no longer deny that it engaged in 'massive theft' of Oracle's intellectual property."

The court also found that Rimini Street infringed Oracle's copyrights.

But David Rowe, chief marketing officer at Rimini Street, said the company had changed the way it operates so its customers would not be affected.

"This ruling has no impact on our operations, and we disagree with the judge's characterisation that our licence dispute with Oracle equals theft," he said.

In a letter to its clients, Rimini Street said: "Because the court's rulings relate to processes and software no longer in use at Rimini Street, these rulings will not cause any interruptions to service for any client or any product line. No actions are required by any client."

When asked about the way third-party support is offered at Rimini Street, Rowe told Computer Weekly: "We don't have or need access to Oracle updates to provide support. Our model is built around experts that directly deliver the service. None of the business processes or software involved in the ruling are even in place at this time."

## Take caution with cloud contracts

Forrester analyst Duncan Jones said this case highlights the precarious relationship between IT buyers and software providers.

"The problem was that Rimini Street and its customers thought they could copy the software onto servers at Rimini Street's premises. Some contracts prohibit this, some don't. Rimini Street now only works on the customers' own servers, therefore avoiding this problem," he said.

"The rulings mean that all third-party hosters and cloud providers may, likewise, be guilty of theft. It was the off-site hosting that was in breach of the customer's agreement, not the provision of support services."

Jones warned that hosting companies and third-party cloud providers could find their businesses are under the watchful eye of the IP police, given the increased interest the major providers are beginning to show in cloud computing.

"There is tension because everyone wants to be top in cloud computing," he said.

For instance, SAP mentioned the word "cloud" 24 times in a recent press release.

At the same time, the major software companies want to grow legacy revenue, leading to conflict between the quotas set by regional software managers and the broader strategy of these major software firms.

## Software licensing by numbers

A closer look at Oracle's results reveals that while new software licence and maintenance revenue for the fourth quarter to 31 May was $8.4bn, representing the largest chunk of its earnings, growth in new software licences was 0%.

The figures also reveal that Oracle posted $450m in revenue from cloud and cloud infrastructure, showing that cloud has a relatively minor affect on overall licence revenue.

> Oracle is a loaded gun. Organisations should take steps to ensure they minimise their exposure to unplanned spend and audit penalties
>
> Mark Flynn, Campaign for Clear Licensing

While Oracle's intentions are clearly to shift away from software licensing to cloud subscriptions, the sales teams still earn their commission on legacy software licence sales.

According to Mark Flynn, managing director for the Campaign for Clear Licensing, from a licence compliance and risk perspective, "Oracle is a loaded gun".

"Organisations should take steps to ensure they minimise their exposure to unplanned spend and audit penalties," he said.

Fighting tit-for-tat over every software licence is not the answer. This is not a negotiation with an individual sales rep to meet quarterly numbers.

Some organisations have considered turning to smaller software suppliers to escape the software licensing complexities associated with the big suppliers, such as Oracle.

But, according to Forrester's Jones, small suppliers do not have the scale and open-source alternatives, and may therefore prove too big a shift for risk-adverse enterprises and government users.

Even in government, where the National Audit Office will scrutinise departments' expenditure for proof that they are delivering taxpayer value, the way to lower licence fees is to look at the bigger picture.

Jones advises taking a more strategic approach to negotiating contracts with big suppliers: "If you are arguing with the sales rep, you'll always lose. But if you talk strategically, then the negotiations escalate."

All Rights Reserved, Copyright 2000 - 2014 , TechTarget | Read our Privacy Statement