1   BOIES, SCHILLER & FLEXNER LLP
    RICHARD J. POCKER (NV Bar No. 3568)
2   300 South Fourth Street, Suite 800
    Las Vegas, NV 89101
3   TELEPHONE: (702) 382-7300
    FACSIMILE: (702) 382-2755
4   rpocker@bsfllp.com

5   BOIES, SCHILLER & FLEXNER LLP
    STEVEN C. HOLTZMAN (*pro hac vice*)
6   KIERAN P. RINGGENBERG (*pro hac vice*)
    1999 Harrison Street, Suite 900
7   Oakland, CA 94612
    TELEPHONE: (510) 874-1000
8   FACSIMILE: (510) 874-1460
    sholtzman@bsfllp.com
9   fnorton@bsfllp.com
    kringgenberg@bsfllp.com
10
    BINGHAM MCCUTCHEN LLP
11  GEOFFREY M. HOWARD (*pro hac vice*)
    THOMAS S. HIXSON (*pro hac vice*)
12  KRISTEN A. PALUMBO (*pro hac vice*)
    THREE EMBARCADERO CENTER
13  SAN FRANCISCO, CA  94111-4067
    Telephone:  415.393.2000
14  Facsimile:  415.393.2286
    geoff.howard@bingham.com
15  bree.hann@bingham.com
    thomas.hixson@bingham.com
16  kristen.palumbo@bingham.com

17  DORIAN DALEY (*pro hac vice*)
    DEBORAH K. MILLER (*pro hac vice*)
18  JAMES C. MAROULIS (*pro hac vice*)
    ORACLE CORPORATION
19  500 Oracle Parkway
    M/S 5op7
20  Redwood City, CA 94070
    Telephone:  650.506.4846
21  Facsimile:  650.506.7114
    dorian.daley@oracle.com
22  deborah.miller@oracle.com
    jim.maroulis@oracle.com
23
    Attorneys for Plaintiffs
24  Oracle USA, Inc., Oracle America, Inc., and
    Oracle International Corp.
25

26

27

28

SHOOK, HARDY & BACON LLP
B. Trent Webb (*pro hac vice*)
2555 Grand Boulevard
Kansas City, Missouri 64108-2613
Telephone: (816) 474-6550
Facsimile: (816) 421-5547
bwebb@shb.com

Robert H. Reckers (*pro hac vice*)
600 Travis Street, Suite 1600
Houston, Texas  77002
Telephone: (713) 227-8008
Facsimile: (713) 227-9508
rreckers@shb.com

LEWIS ROCA ROTHGERBER LLP
W. West Allen (Nevada Bar No. 5566)
3993 Howard Hughes Parkway, Suite 600
Las Vegas, Nevada 89169
Tel: (702) 949-8200
Fax: (702) 949-8398
WAllen@lrrlaw.com

GREENBERG TRAURIG
Mark G. Tratos (Nevada Bar No. 1086)
Brandon Roos (Nevada Bar No. 7888)
Leslie Godfrey (Nevada Bar No. 10229)
3773 Howard Hughes Parkway
Suite 400 North
Las Vegas, NV 89169
Telephone: (702) 792-3773
Facsimile: (702) 792-9002
tratosm@gtlaw.com
roosb@gtlaw.com
godfreyl@gtlaw.com

Attorneys for Defendants Rimini Street,
Inc., and Seth Ravin

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| ORACLE USA, INC., a Colorado corporation; ORACLE AMERICA, INC., A Delaware corporation; and ORACLE INTERNATIONAL CORPORATION, a California corporation,<br><br>               Plaintiffs,<br><br>     v.<br><br>RIMINI STREET, INC., a Nevada corporation; AND SETH RAVIN, an individual,<br><br>               Defendants. | Case No. 2:10-cv-0106-LRH-PAL<br><br>**JOINT REQUEST FOR CASE MANAGEMENT CONFERENCE**<br><br>**PUBLIC REDACTED VERSION** |

Pursuant to Civil Local Rule 16-2, Plaintiffs Oracle USA, Inc., Oracle America, Inc., and Oracle International Corp. (collectively, "Oracle"), and Defendants Rimini Street, Inc. and Seth Ravin (collectively, "Rimini") jointly submit this request for a Case Management Conference ("CMC") in either Las Vegas or Reno either before this Court or before Magistrate Judge Leen in Las Vegas at the earliest available opportunity for the purpose of discussing the scope of trial.

Pursuant to the Court's August 13, 2014 Order, the parties must submit a joint pre-trial motion on October 14, 2014. Dkt. 474. However, the parties have a fundamental disagreement over the scope of the issues to be decided and evidence to be presented. This disagreement affects the parties' pre-trial submission, the dates for trial, and whether the Court will allow further discovery prior to trial. Accordingly, the parties seek the Court's guidance in advance of the October 14 pre-trial motion deadline.

1

## DISPUTED ISSUES

2

3    **Issue 1:  The Impact of Changes to Rimini's Support Model on the Evidence that May be
         Presented at Trial.**

4

5    **Oracle's Position:**

6         In January 2014, Oracle requested a CMC to discuss trial scheduling, and the Court

7    denied the request, noting that "there is still a second motion for summary judgment pending

8    before the court."  Dkt. 474 at 28.  The Court also stated that after it ruled on Oracle's second

9    summary judgment motion, "the parties will be required to submit a proposed joint pre-trial

10   order in accordance with Local Rules 16-3 and 16-4," and that if disagreements arose between

11   the parties in connection with the pretrial motion, the Court could schedule a CMC to address

12   such issues.  *Id*.  The Court has since issued its ruling on the second motion for summary

13   judgment, and as noted, the parties have a fundamental disagreement over the scope of the trial

14   that affects their pre-trial submissions, necessitating the present request for a CMC.

15        ***The Court's Extensive Findings of Infringement.***  Fact discovery in this case closed in

16   December 2011.  In the 20-month discovery period, Oracle conducted extensive discovery

17   regarding Rimini's pre-December 2011 conduct.  In 2012, Oracle filed two summary judgment

18   motions based on that conduct.  Dkts. 237, 405.  In February and August 2014, the Court granted

19   in part those motions, (1) finding that Rimini had infringed Oracle's PeopleSoft and Database

20   product lines, and that Oracle had proved its prima facie infringement case as to the Siebel and

21   JD Edwards product lines, (2) finding against Rimini on several of its affirmative defenses, and

22   (3) dismissing Rimini's remaining counterclaims.

23        The Court's first summary judgment ruling made two key findings regarding Rimini's

24   infringement of Oracle's PeopleSoft software.  First, the Court found that Rimini committed

25   copyright infringement by copying software environments onto its systems when the software

26   was required to reside at the customer's facilities.  *E.g.*, Dkt. 474 at 12:2-4 ("Rimini's copying of

27   the copyrighted software on its company systems is also a use outside the scope of" the customer

28   license).  Second, the Court found that Rimini committed copyright infringement by using one

JOINT REQUEST FOR CASE MANAGEMENT CONFERENCE

1    customer's software environment for the support of Rimini's other customers.  *Id.* at 13:7-12

2    ("[I]t is undisputed that the development environments associated with the City of Flint were not

3    used solely for the City of Flint's internal data processing operations.  Instead, the development

4    environments were used to develop and test software updates for the City of Flint and other

5    Rimini customers with similar software licenses. . . .  Therefore, the court finds that Rimini's

6    copying of the copyrighted software is outside the scope of" the customer license.").  The Court

7    reiterated that finding again in its second summary judgment order holding that Rimini infringed

8    Oracle's Database software.  Dkt. 476 at 18-25 ("Section C authorizes use of the software only

9    for the licensee's 'internal business operations,'" but "it is undisputed that Rimini used Oracle

10   Database to create updates for all clients using a particular version of a copyrighted software

11   program.").  The Court's second summary judgment ruling – in dismissing Rimini's defamation

12   counterclaim – also found that it was true that Rimini had committed massive theft of Oracle's

13   intellectual property.  Dkts. 474, 476.  The Court also ordered the parties to file a joint pre-trial

14   motion by October 14, 2014, in which the parties are to propose a trial date and describe the

15   issues to be decided at trial.  Dkt. 476; Civil Local R. 16-3.

16            ***Rimini's Suspect Claim of a New Non-Infringing Support Model.***  During the parties'

17   discussion of pretrial issues, Rimini indicated its intent to vastly expand the scope of the issues to

18   be tried beyond those that were the subject of the 20 months of extensive discovery already

19   completed.  Rimini now proclaims that in 2014 – two years after the close of fact discovery – it

20   cleaned up its infringing business model with a new support process.  Rimini has communicated

21   its supposed new development process to Oracle's customers and the market generally as a way

22   to diffuse the impact of the Court's recent rulings.[1]  Before this week, Rimini had produced a

23   handful of documents generally describing how its alleged new support process operates. Two

24   days ago, Rimini produced over 100,000 documents concerning its alleged new support model

25   ───────────────────────

     [1] *See*

26   http://www.theregister.co.uk/2014/08/15/rimini_business_as_usual_oracle_defamation_judgmen

27   t/(after the Court's August 13, 2014 Order, Rimini claimed that the Court's findings of
     infringement "relate to processes and Oracle software no longer in use at Rimini Street").

28

1    and says more is to come.

2         Rimini's statements and the documents Rimini produced before this week raise

3    significant suspicions that Rimini's "new" support model involves all the same infringing acts as

4    the "old" support model that the Court has already ruled was copyright infringement.  For

5    example, a provisional patent application about Rimini's new support model states that: ███

6    ████████████████████████████████████████████████████████████████

7    ████████████████████████████████████████████████████████

8    ████████████████████         Declaration of Nitin Jindal in Support of Joint Request for Case

9    Management Conference ("Jindal Decl."), Ex. A at RSI06806791-92.  In addition, it does not

10   appear that Rimini has fixed anything by adopting a "remote" service model.  Flow charts

11   concerning Rimini's new support model suggest Rimini continues to use copies of PeopleSoft

12   software not located on the customer's facilities and which were then cross-used to develop

13   updates given to multiple customers – the exact conduct that was subject of this Court's Order.

14   Dkt. 474.  The only apparent difference between the "new" and the "old" does not appear to be a

15   change in the development process, but that Rimini's conduct takes place in the cloud, i.e., on

16   servers owned by Amazon web services or Windstream.  But Amazon and Windstream's servers

17   still are not the customers' facilities, and cross-using the software is still infringement no matter

18   where that happens.

19        ***Extensive Discovery Would Be Required to Test Rimini's Claim of a Non-Infringing***

20   ***Business Model.***  In a sense, Rimini's position is a repeat of what happened at the start of this

21   case:  Initially, Rimini adamantly denied that it misused Oracle's copyrighted software.  Rimini

22   claimed in its Answer, in its communications with customers, and in a press release, that "each

23   client is assigned a separate data 'silo' where Oracle Software and Support Materials for only

24   that client are maintained."  Dkt. 153 (Answer) at 3; *see also* March 29, 2010 Rimini Press

25   Release (available at http://www.riministreet.com/news/press-releases/03292010); Jindal Decl.,

26   Ex. B at RSI02125339 (August 4, 2009 Rimini statement to customer telling it that Rimini "is

27   precluded from [providing the customer with] any updates from other clients because Oracle's

28   license terms prohibit the use in such fashion").

JOINT REQUEST FOR CASE MANAGEMENT CONFERENCE

1    After 20 months of discovery during which the parties deposed over 50 witnesses,

2    produced documents from over 100 custodians, exchanged hundreds of pages of written

3    discovery, conducted significant forensic analysis, and spent thousands on hours of expert

4    analysis,[2] Oracle eventually proved that Rimini's story was false, as the Court found in its

5    February 13, 2014 Order granting in part Oracle's first summary judgment motion.  The Court

6    found it was "undisputed" that Rimini did not "silo" its customers' software, but instead used

7    software it obtained from certain customers to "develop and test software updates for . . . other

8    Rimini customers with similar software licenses."  Dkt. 474 at 12.[3]

9    Rimini now repeats the claim it made about its old process – that Rimini's "improved

10   development processes" do "not copy any Oracle software from one customer to another."

11   Oracle does not believe Rimini's new representations any more than it believed the old, but has

12   not had the opportunity to rebut or disprove them via the extensive additional discovery and

13   expert analysis that would be required.  Moreover, the discovery and expert analysis that would

14   be necessary for Oracle to test Rimini's assertions about its new support model would be

15   extensive and is incompatible with a prompt trial in this case, which has already been pending

16   for four and a half years.

17   Given the massive effort it took to uncover Rimini's prior false statements during fact

18   discovery, and the strong indications that Rimini's false statements continue, Rimini's claim that

19   a few depositions are sufficient for Oracle to explore Rimini's new support model should not be

20

21   [2] One of Oracle's technical experts, Dr. Randall Davis of MIT, analyzed software code and other
     information produced by Rimini in fact discovery to draft an expert report that catalogued
22   Rimini's massive cross-use of Oracle's software in violation (as the Court has ruled) of license
     restrictions providing that each customer's software is licensed only for the internal business
23   operations of that particular customer.

24   [3] Similarly, in a prior ruling in March of 2013, the Court found that despite Rimini's repeated
     assertions in its pleadings that a co-mingled software library "never existed" at Rimini, Rimini
25   was later forced to admit to maintaining such a co-mingled software library.  Dkt. 466 at 6, 17.
     The Court also found that Rimini intentionally deleted this software library well after Rimini was
26   on notice of potential litigation and aware that the co-mingled software library was potentially
     relevant evidence.  *Id.* at 17.  The Court sanctioned Rimini for destroying this evidence two
27   months before it filed its Answer denying that the library existed.

28

1  credited.  With six months to a year of intensive discovery, Oracle is confident it could show that

2  Rimini's new support process is old wine in a new bottle and every bit as infringing as the old

3  process.[4]  But actually being able to prove this would require numerous custodian productions,

4  multiple depositions, and significant data analysis.  For example, Oracle would need access to

5  Rimini's DevTrak database that records the steps in Rimini's fix development process; the

6  patches delivered to customers under the new process to perform code comparisons and other

7  analysis; logs of Rimini activity accessing customer remote environments to show that software

8  updates were not developed on a customer by customer basis; and emails and instant messages

9  from the personnel on Rimini's development team, which previously belied Rimini's false story

10  to the Court about how its "old" development process worked; as well as other categories of

11  data.  Once this data is obtained, Oracle would need time to analyze it, depose relevant

12  witnesses, and prepare updated expert reports.

13       On September 15, 2014 – just before this filing and less than a month before the pretrial

14  filing deadline – Rimini produced over 100,000 documents related to its purported new

15  development process.  Rimini says it will dump more documents on Oracle, and that it will seek

16  to introduce this evidence at trial.  During meet and confer, Rimini says its document and data

17  dump is not a problem because Oracle and the Court should agree to delay trial and related

18  pretrial deadlines even further to accommodate this additional discovery – a convenient position

19  for a defendant that, of course, does not want to go to trial at all.  And if Rimini is permitted to

20  introduce evidence of that conduct at trial, Oracle would first need to conduct significant

21  additional discovery in order to be prepared to challenge at trial Rimini's contentions that it is no

22  longer infringing.  That discovery would take a significant amount of time to complete, at

23  substantial expense, and would result in an unnecessary delay of trial.

24       ***Trial Should Be Limited to Rimini's Old Support Model.***  Throughout this case

25  [4] Completing discovery during this time would require Rimini to provide Oracle with relevant
26  discovery faster than it has to date.  For example, it has been over 7 months since Oracle began
   discussing updating discovery with Rimini, and Rimini still has not provided Oracle with an
27  accurate list of customers Rimini has gained since the close of discovery.

28

1    Magistrate Judge Leen has emphasized that "the objective of the Court is to get a manageable

2    case to trial in a manageable period of time."  May 17, 2011 Tr. at 14:11-13.  "The parties may

3    have future disputes, but there's got to be some time in which the pleadings in this case close so

4    that this case can be presented to the trier of fact and a reasonable resolution reached."  *Id*. at

5    14:13-17.  "What I'm trying to do is tie up loose ends so that we absolutely have an end to fact

6    discovery."  Jan. 24, 2012 at 6:7-8.  Magistrate Leen made these comments partially in the

7    context of Oracle attempting to bring new claims (which she denied).  They apply equally three

8    years later as Rimini tries to introduce new defenses.

9        The Court should limit the trial to Rimini's old support model so that the parties can

10   efficiently proceed to trial, as the new support model Rimini adopted in 2014 is the exact type of

11   "future dispute" Magistrate Leen decided should not further delay this case.  Contrary to

12   Rimini's claim, Rimini's new support process is not relevant to liability or damages in a trial on

13   Rimini's "old" infringing support model.[5]  First, as an accommodation to make clear that

14   Rimini's "new" support model is irrelevant, Oracle is willing not to claim damages at the

15   upcoming trial for the period after February 13, 2014, the date of the Court's first summary

16   judgment order, and the date Rimini claims it began to implement its alleged new support model.

17   Instead, consistent with Magistrate Leen's prior ruling, Oracle is willing to stipulate with Rimini

18   that any damages related to Rimini's continued infringement after that date would be sought in a

19   separate lawsuit.[6]

20       Second, Rimini's new support model is also not relevant to the opinions of Rimini's

21   damages expert, Scott Hampton.  Most of Hampton's opinions relate to Oracle's lost profits and

22   infringer's profits damages claims, i.e., the damages amounts that have nothing to do with the

23   time frame in which Rimini used its new development process.  Hampton does have an ancillary

---

24   [5] Some subset of this discovery may be necessary after trial so the Court can fashion appropriate

25   injunctive relief.

26   [6] Similarly, after Magistrate Leen's ruling, the parties stipulated that "claims relating to
     Defendants' use of Oracle's E-Business software and their support of customers on Oracle

27   Database are outside the scope of this action."  Dkt. 230.

28

JOINT REQUEST FOR CASE MANAGEMENT CONFERENCE

1    opinion that Oracle's hypothetical license damages should be limited to the amount Rimini

2    supposedly could have spent on additional resources so that it could "operate in a non-accused

3    manner," which he opines is $7.6 million (Rimini's so-called "avoided labor costs").[7]   Jindal

4    Decl., Ex. C ¶¶ 163-168.  He claims this represents the "value of use" of Oracle's copyrighted

5    software, which he says is a valid measure of damages under *Polar Bear Productions, Inc. v.*

6    *Timex Corporation*, 384 F.3d 700 (9th. 2004).

7          A "value of use" measure of copyright damages must approximate "the amount a willing

8    buyer would have been reasonably required to pay a willing seller [in a hypothetical negotiation]

9    *at the time of infringement* for the actual use made by [the infringer] of the plaintiff's work."

10   *Oracle v. SAP AG*, __ F.3d __, No. 12-16944, 2014 WL 4251570, at *3 (9th Cir. Aug. 29, 2014)

11   (emphasis supplied); *Wall Data Ins. v. L.A. Cnty. Sheriff's Dep't*, 447 F.3d 769, 786 (9th Cir.

12   2006*); see also Oracle America, Inc. v. Google Inc.*, 847 F. Supp. 2d 1178, 1182 (N.D. Cal.

13   2012).  This hypothetical negotiation focuses on the expectations of the parties at the time of *first*

14   infringement.  *Mackie v. Rieser*, 296 F.3d 909, 917 (9th Cir. 2002); *Oracle America*, 847 F.

15   Supp. 2d at 1182.

16         Hampton's opinion is not admissible, in part, because no copyright case has held that

17   avoided labor costs are a proper measure of the "value of use."  Indeed, there is no "value of use"

18   damage measure, avoided labor costs or otherwise, that differs from a hypothetical negotiation,

19   and Hampton explicitly states that his "value of use measure" did not represent "what a willing

20   buyer and a willing seller would have agreed" to in a "hypothetical negotiation."  Jindal Decl.,

21   Ex. D (Hampton Depo.) at 55:8-14.  Copyright law further establishes that Rimini cannot ignore

22   reality and limit damages based on a self-serving claim that it would not have infringed in the

23   first place because it supposedly would have pursued a cheaper non-infringing alternative.

24   Damages must be assessed on Rimini's decision to infringe.[8]  *Deltak, Inc. v. Advanced Sys. Inc.,*

---

25   

26   [7] Hampton's "avoided labor costs" calculation includes, besides just employee salaries, the purported costs of renting office space and related overhead expenses.

27   [8] Rimini "is wrong as a matter of law to claim that reasonable royalty damages are capped at the cost of implementing the cheapest available, acceptable, non-infringing alternative."  *Mars, Inc.*

28                                       (Footnote Continued on Next Page.)

1   767 F.2d 357, 363 n.4 (7th Cir. 1985) ("[T]he fact that [defendant] could have acted [] in ways

2   other than the way it did act illegally should not be used by it as a reason to defeat recovery of

3   damages caused by the illegal way in which it did act.").

4        But even if Hampton's opinions were admissible (they are not), Rimini's new

5   development process still would not be relevant to Hampton's opinion.  Rimini states that it

6   began using its new support model in 2014, which was after Hampton wrote his report (March

7   30, 2012) and after he was deposed (May 25, 2012).  That is why Hampton's report never refers

8   to it – it did not exist at the time to form a basis for his opinions.

9        Third, as a legal matter, events that happen years after the fact cannot be teleported back

10  in time to support a value of use calculation.  The hypothetical negotiation focuses on the

11  expectations of the parties at the time of *first* infringement.  *Mackie v. Rieser*, 296 F.3d 909, 917

12  (9th Cir. 2002); *Oracle America*, 847 F. Supp. 2d at 1182; *LaserDynamics, Inc. v. Quanta*

13  *Computer Inc.*, 694 F.3d 51, 75 (Fed. Cir. 2012) (reversing damages award based on the wrong

14  hypothetical negotiation date); *Jarvis v. K2, Inc.*, 486 F.3d 526, 535 n.9 (9th Cir. 2007) (finding

15  emphasis on "post-infringement damages rather than the pre-infringement fair market value" to

16  be "legally defective"); *Boston Scientific Corp. v. Cordis Corp.*, 777 F. Supp. 2d 783, 795 (D.

17  Del. 2011) (excluding hypothetical license damages testimony based on the wrong negotiation

18  _____
    (Footnote Continued from Previous Page.)

19  *v. Coin Acceptors, Inc.*, 527 F. 3d 1359, 1373 (Fed. Cir. 2008), *recalled on other grounds*, 557
20  F.3d 1377 (Fed. Cir. 2009); *Gaylord v. U.S.*, 678 F.3d 1339, 1343 (Fed. Cir. 2012) (holding that
    it is "incorrect in a hypothetical negotiation inquiry . . . to limit [the] analysis to only one side of
21  the negotiating table" and rejecting damage award based solely on the infringer's perspective);
    *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1555 (Fed. Cir. 1995) ("What an infringer would
22  prefer to pay is not the test for damages.").

23  This makes sense because the licensor in the negotiation may expect to suffer losses that far
    exceed what the infringer claims he should pay.  For example, if granting Rimini a license would
24  cause Oracle to lose over $100 million in profits, but Rimini claims the license is only worth $5
    million to it, a $5 million license would not compensate Oracle for its actual damage, and Oracle
25  as a "willing licensor" would not rationally accept $5 million.  The law does not expect
    otherwise.  *See* 4 Nimmer on Copyright § 14.01 (2012) ("actual damages . . . compensate the
26  copyright owner for [its] losses from the infringement"); *Oracle*, 2014 WL 4251570, at *5 ("Fair
    market value in a voluntary licensing transaction between arms-length parties ordinarily lies
27  somewhere between the two poles of cost to the seller and the benefit to the buyer.").

28

1    date).  Rimini's conduct in 2014 is <u>eight years</u> after Rimini's first infringement in 2006, making

2    it entirely irrelevant to Hampton's opinions or any measure of damages in this case.  For

3    example, documents Rimini has produced to date indicate that Rimini's new support process

4    involves committing the copyright infringement on servers owned by Amazon Web Services or

5    Windstream, cloud-based services that were not available years ago when Rimini started its

6    infringing business model, along with use of other technologies and know-how that simply did

7    not exist when Rimini first started infringing eight years earlier.

8            Rimini notes, correctly, that remote support in the time period prior to 2012 was a subject

9    of discovery.  Indeed, the evidence shows that, several years after Rimini began infringing in

10   2006, Rimini experimented with remote support.  To the extent remote support is relevant at

11   trial, evidence about Rimini's experience with it during the discovery period meets any need for

12   Rimini's defense.  Rimini may prefer to tell the jury about what supposedly happened in 2014

13   rather than in years past because the evidence unearthed in discovery shows that Rimini

14   engineers fought tooth and nail against using remote support more broadly because of

15   innumerable technical, logistical and customer-service issues.  For example, in 2009, a Rimini

16   engineer wrote that it was "insane and defies our business model to offer to support remote

17   environments."  Jindal Decl., Ex. E (Depo. Ex. 517).  And in response to "problems with remote

18   environments," a Rimini senior executive also wrote in 2009 that, "We have instructed the Sales

19   team to push as hard as possible back on any Prospects that want to consider remote and are

20   trying to take it away completely as an option."  Jindal Dec., Ex. F (Depo Ex. 544).

21           To the extent remote support is relevant at all, the developed record about Rimini's

22   remote support experience during the discovery in this case, already subject to document and

23   data productions and tested by to expert analysis, is far closer in time and thus far more probative

24   of what negotiations in 2006 would have yielded that Rimini's supposedly new process allegedly

25   implemented in 2014.

26           Moreover, even if there were some marginal theory of Rimini's new support model's

27   relevance, that would require a massive sideshow into the nature of the new process, whether or

28   not it is lawful, and whether or not it was possible to implement years earlier.  There is no good

JOINT REQUEST FOR CASE MANAGEMENT CONFERENCE

1   reason to delay this case further to allow the extensive discovery required for a fair trial of that

2   unnecessary sideshow, if it were tried at all.  Further, if pretrial deadlines and trial were delayed

3   to conduct discovery into Rimini's claimed new development process, and Oracle proves that

4   this "new" process is a sham that continues to infringe, Rimini could announce on the eve of the

5   postponed trial that it has supposedly cleaned up its business model – starting the cycle all over

6   again.  By contrast, if the trial is properly limited to issues covered by the existing record, trial

7   can proceed expeditiously.

8

9   **Rimini's Position:**

10      The parties dispute the impact of Rimini's implementation of a non-infringing remote

11   service model on the scope of supplemental discovery they have already completed and are

12   presently conducting, as well as the evidence that will be permitted at trial.  Because evidence

13   relating to Rimini's non-infringing remote service model is unquestionably relevant to disputed

14   issues already before the Court, the parties should continue with their focused supplemental

15   discovery regarding Rimini's remote service model so this evidence may be properly considered

16   at trial.

17      *Rimini's Remote Service Model Has Always Been Within the Scope of this Litigation.*

18   Oracle's assertion that the idea of remote service model is somehow new is simply wrong.  Even

19   before this litigation began, Rimini provided support to certain of its clients using a "remote

20   service model."  During fact discovery, Oracle gathered extensive evidence relating to Rimini

21   Street's remote service model in document requests, interrogatories, and depositions.

22      Further, evidence relating to the implementation of a non-infringing remote service

23   model alternative is and has been an integral part of the damage analysis contained in the long-

24   filed reports of both parties' experts.  As is typical in intellectual property infringement cases, the

25   parties conducted extensive discovery on non-infringing alternatives to the challenged practices.

26   Notably, Oracle admitted during fact discovery that a remote service model, such as

27   implemented by one of Rimini's competitors, *does not* give rise to the infringement issues raised

28   in the present suit.  Dykal Decl., Ex. A (Oracle's Supplemental Response to Rimini's

12

1    Interrogatory No. 35 (February 10, 2012)).  Oracle even took the deposition of Rimini's head of

2    software development to understand the manner by which Rimini would implement a non-

3    infringing remote service model.  Dykal Decl., Ex. B (Excerpt from Benge Deposition

4    Transcript).

5            ***Rimini Street Implements Non-Infringing Remote Service Model for All Clients.***  In its

6    February 2014 order on Oracle's first partial motion for summary judgment, the Court found

7    Rimini was not permitted to maintain certain copies of Oracle's PeopleSoft software on Rimini's

8    own servers. (*See* Dkts. 474 and 476.)  In response to the Court's ruling, Rimini rapidly

9    conformed its practices, migrating all of its clients to a non-infringing "remote service model."

10   Rimini's remote service model does not infringe because (a) copies of Oracle software only

11   reside on *clients'* server facilities and (b) Rimini Street does not copy any Oracle software to

12   Rimini Street's servers or between customers.  Rimini's support professionals now provide

13   software support only by *remotely* accessing Oracle software maintained by each Rimini client

14   on that client's own systems, and using improved development processes that do not copy any

15   Oracle software from one customer to another.

16           As noted above, evidence of a non-infringing alternative has been in this case from the

17   outset.  The non-infringing alternative will provide direct evidence of (1) the cessation of

18   Rimini's infringement, and (2) the costs associated with implementing a non-infringing

19   alternative, a well-recognized objective measure of damages in intellectual property cases.

20           ***Applicable Law Supports the Relevance of Non-Infringing Alternatives.***  By statute,

21   "The copyright owner is entitled to recover the actual damages suffered by him or her as a result

22   of the infringement . . ." 17 U.S.C. § 504(b).  "'Actual damages are usually determined by the

23   loss in the *fair market value* of the copyright, measured by the profits lost due to the

24   infringement or by the value of the use of the copyrighted work to the infringer.'" *Polar Bear*

25   *Productions, Inc. v. Timex, Corp.,* 384 F. 3d 700, 708 (9th Cir. 2004) (emphasis added) citing

26

27

28

JOINT REQUEST FOR CASE MANAGEMENT CONFERENCE

1    *McRoberts Software, Inc. v. Media 100, Inc.,* 329 F.3d 557, 566 (7th Cir.2003).[9]

2          "Fair market value in a voluntary licensing transaction between arms-length parties

3    ordinarily lies somewhere between the two poles of cost to the seller and the benefit to the buyer.

4    That is, the seller will not ordinarily charge less for a license than its anticipated cost, and the

5    buyer will not ordinarily pay more for a license than its anticipated benefit." *Oracle v. SAP AG*,

6    __ F.3d __, No. 12-16944, 2014 WL 4251570, at *5 (9th Cir. Aug. 29, 2014).

7          Case law regarding patent infringement damages is helpful to an understanding of

8    infringement damages for the fair market value of use.[10]  Damages for infringement, including

9    the fair market value of use, must take into account alternative actions the infringer foreseeably

10   would have undertaken had he not infringed. "Without the infringing product, a rational would-

11   be infringer is likely to offer an acceptable noninfringing alternative, if available, to compete

12   with the patent owner rather than leave the market altogether." *Grain Processing Corp. v.*

13   *American Maize-Products, Co.,* 185 F.2d 1341, 1350-51 (Fed. Cir. 1999).[11]

14         Logically, an infringer will turn to the least expensive non-infringing alternative rather

15   than infringe.  Damages for fair market value of use are thus capped at the cost of the non-

16   infringing alternative.  *Grain Processing Corp. v. Am. Maize-Prods. Co.*, 185 F.3d 1341, 1347

17   (Fed. Cir. 1999) (noting the district court's conclusion that a patent infringer would not pay more

18   _____

19   [9]      *See also Mackie v. Rieser,* 296 F.3d 909, 914 (9th Cir. 2002) (approving of recovery of
20   reasonable license fee).
     [10]     4 Melville B. Nimmer & David Nimmer, NIMMER ON COPYRIGHT § 14.02[B][1] at 14-22
21   (Matthew Bender Rev. Ed. 2014) (noting the similarities between a reasonable royalty
     measurement of patent infringement damages and the value of use measurement of copyright
22   infringement damages).

23   [11]     Citing *inter alia,* ROBERT P. MERGES, PATENT LAW 1080 (2d Ed.1997) ("[T]he
24   infringer should have a chance to argue what he or she might have done in the absence of
     infringement. Obviously, if the defendant is not permitted to present evidence of this ilk, the
25   analysis is quite skewed: only the patentee's 'best case' scenario is presented, rather than a more
     realistic scenario."); JOHN W. SCHLICHER, PATENT LAW: LEGAL AND ECONOMIC
26   PRINCIPLES § 9.05[2][l] (1997) ("unless the law wishes to systematically overreward patented
     inventions, it is necessary to inquire about the nature and value of the product that the infringer
27   could have made had he not infringed.").

28

1  for a hypothetical license than the cost to instead produce a non-infringing alternative).

2        ***Evidence of Rimini's Non-Infringing Remote Support Model is Relevant to this Case.***

3  Given the above authority, Rimini's remote, non-infringing alternative model is clearly relevant

4  to the present litigation.

5        First, evidence of the remote service model points to the end of both the infringing

6  conduct and Oracle's alleged damages.  Oracle's proposal to cut-off damages effective in early

7  2014 tells only half the story.  The jury is entitled to know *why* Oracle's damages terminated in

8  addition to *when.* The fact that Rimini ceased using processes immediately after the Court found

9  that such processes were infringing and completed implementation of its non-infringing remote

10  model is directly relevant to *why* Oracle is not entitled to damages after Rimini ceased using the

11  processes found to be infringing.

12        Second, the evidence of a non-infringing alternative is and has been an integral part of the

13  damage analysis contained in the long-filed reports of both parties' experts.  When considering a

14  hypothetical license, it is well settled that an accused infringer would not pay more for a

15  hypothetical license than the cost to instead produce a non-infringing alternative. *Wall Data Inc.*

16  *v. L.A. Cnty. Sheriff's Dep't*,  447 F.3d 769, 786 (9th Cir. 2006). That is, if Oracle would have

17  licensed its copyrighted works to Rimini for $10 million but it would have only cost Rimini $5

18  million to implement a non-infringing alternative, Rimini (or any other rational market

19  participant, for that matter) would have chosen the less expensive non-infringing alternative.

20        By this example, the value of Rimini's use of Oracle's copyrighted works is therefore $5

21  million, because at that price, Rimini would not have needed the license. *See Polar Bear*, 384

22  F.3d at 708; *Jarvis v. K2, Inc.*, 486 F.3d 526, 533 (9th Cir. 2007) quoting *Frank Music Corp. v.*

23  *Metro-Goldwyn-Mayer, Inc.*, 772 F.2d 505, 512 (9th Cir. 1985).

24        Applying this established rule, Rimini's damages expert considered the cost of fully

25  implementing a non-infringing remote model (as compared to Rimini's then-existing model) and

26  concluded that the fair market value of the hypothetical license in this case is not more than the

27  cost of implementing the non-infringing, remote alternative.   Because Rimini's actual

28  implementation of the remote service model demonstrates both the technical and financial

1    feasibility of the remote service model, admission of this evidence will promote a full and fair

2    resolution of the issue at trial.  *See Oracle*, 2014 WL 4251570, at *5 (affirming district court's

3    finding that Oracle's claim for hypothetical license damages evidence was too speculative;

4    reversing jury award).  Were this evidence excluded, the jury's consideration of this alternative

5    would be impermissibly hampered.[12]

6        In short, evidence of the cost of a non-infringing alternative is proper and necessary when

7    considering a hypothetical license.  Now that Rimini has fully implemented a non-infringing

8    alternative model, Rimini submits that the parties should continue with targeted supplemental

9    discovery regarding Rimini's remote service model to allow the parties a fair opportunity to

10   present evidence to the jury regarding this model.

11       ***Rimini's Non-Infringing Remote Support Model Alternative was Always Available.***  In

12   *Grain Processing,* the Federal Circuit found a non-infringing alternative was "available" when

13   the infringer had all of the necessary equipment, know-how, and experience to make the

14   substitution at that time of infringement.  *Grain Processing,*  185 F.3d at 1354.  While Rimini's

15   full implementation of the improved non-infringing "remote service model" occurred after and in

16   response to the Court's February 13, 2014 Opinion, the underlying concept of remote software

17   support is not new and Rimini had the necessary equipment, know-how and experience to

18   implement the non-infringing alternative at the onset of the infringement.  *Id.* Thus, the non-

19   infringing alternative was available and the parties conducted extensive discovery regarding this

20   remote model during fact discovery.

21       Disputes about Rimini's factual claims that the remote service model was an available,

22   non-infringing alternative should be disposed of by the jury, and not based on Oracle's

23   _____

    [12]      *Jarvis*, 486 F.3d at 534 (upholding damages award because "the district court properly
24   based its calculations on objective considerations of market value," including the infringer's
    financial perspective); *Grain Processing*, 185 F.3d at 1351 ("[A]n accurate reconstruction of the
25   hypothetical 'but for' market takes into account any alternatives available to the infringer."); *see
    also* Robert P. Merges, Patent Law 1080 (2d Ed. 1997) ("[T]he infringer should have a chance to
26   argue what he or she might have done in the absence of infringement. Obviously, if the
    defendant is not permitted to present evidence of this ilk, the analysis is quite skewed:  only the
27   patentee's 'best case' scenario is presented, rather than a more realistic scenario.").

28

1  conjecture.  In any event, Oracle's assertions about Rimini's non-infringing remote service

2  model are incorrect:

3  - Rimini does not require the use of "cloud" providers such as Amazon or Windstream as

4    Oracle asserts.  Rimini's clients, not Rimini, choose where to deploy their Oracle

5    software, and certain clients choose to have their software stored on popular cloud

6    providers, such as Amazon and Windstream.

7

8  - No Oracle software used to support Oracle clients resides on Rimini owned or controlled

9    servers.  Rimini is provided access by its clients as a remote user to its client's servers,

10   and Rimini Street does not copy any Oracle software to its own servers or between

11   clients.

12  ***Supplemental Discovery on Rimini's Remote Support Model is Necessary, Timely and Will***

13  ***Not Create Undue Pre-Trial Delay.***  Discovery in this case long ago confirmed that Rimini has

14  always serviced a portion of its clients using a remote service model, and Rimini's expert

15  witnesses concluded that Rimini could convert to a non-infringing remote model with only

16  modest additional costs.  In contrast, Oracle's experts challenged the technical and financial

17  feasibility of supporting all Rimini clients by implementing a non-infringing remote service

18  model. As a consequence, the parties' technical and damage experts opined at length on the

19  technical and financial feasibility of implementing a non-infringing remote model as a part of the

20  damage issues in this case.

21  For example, in her January 17, 2012 report, Oracle's damages expert opined that,

22  Oracle's actual damages are most appropriately measured by Rimini Street's "Value of Use" of

23  the Copyrighted Software and Support Materials. Dykal Decl., Ex. C (Dean Report, p. 29, ¶44)

24  Then, confirming the viability of a non-infringing remote service model by relying on Oracle's

25  own technical expert, Oracle's own damages expert, Ms. Dean, stated:

26     If the third-party provider wants to provide support for a customer who no
       longer has access rights to Oracle's updated support services and materials
27     at a level "comparable" or "superior" to support provided by Oracle at
       50% of Oracle's prices, it would require the third-party support provider to

28

JOINT REQUEST FOR CASE MANAGEMENT CONFERENCE

either have a license to Oracle's intellectual property or ***invest a significant amounts* [sic] *of time and resources***.

Dykal Decl., Ex. D (Dean Report, p. 148-49, ¶293) (emphasis added, internal citations omitted)

In responding to Ms. Dean's report on March 30, 2012, Rimini's expert criticized Ms. Dean's failure to consider non-infringing alternatives by observing that,

> **Ms. Dean failed to consider Rimini Street's alternatives to infringement**. She assumed, without bases or support, that but for its alleged infringement of Oracle's copyrighted works and other alleged wrongful acts, Rimini Street could not legally provide support services, which is not the case.

Dykal Decl., Ex. E (Hampton Report, p. 43, ¶70) (emphasis added).

Rimini's damages expert, Mr. Hampton, then went on to put non-infringing alternatives squarely in issue, stating:

> Based on my conversations with Rimini Street's management and Rimini Street's technical expert, Mr. Brooks Hilliard, and my examination of Rimini Street's financial records, in my opinion Rimini Street was financially capable of providing support services to its clients without allegedly infringing Oracle's copyrighted works. **It is my understanding that Rimini Street can avoid liability by not hosting accused computer environments on its own computers**; by not using crawlers to download Oracle files; and by not sharing fixes, patches, and tax and regulatory updates among its customers. I understand that Oracle's license agreements allow licensees' to access and use the copyrighted works. It is also my understanding that infringement does not occur if third-party support consultants access Oracle's copyrighted works through the licensees' computer environment. **I understand that third-party support consultants, including Rimini Street, can remotely access Oracle's software without infringement**, as long as the access is through the licensee's computer system. . . . Dykal Decl., Ex. F (Hampton Report, p. 44, ¶73) (emphasis added).

> The appropriate value-of-use metric to calculate Rimini Street's unjust enrichment is the amount Rimini Street reduced its labor costs through efficiencies it gained by its alleged infringement of Oracle's copyrighted works, and other alleged wrongful acts. Dykal Decl., Ex. G (Hampton Report, p. 88, ¶163) (quoting Ms. Dean's report, pp. 148-49).

> **The additional investment of time and resources that Rimini Street would have needed to invest to avoid the wrongful acts claimed by Oracle is the correct measure of Rimini Street's use of the copyrighted**

**works**. Dykal Decl., Ex. G (Hampton Report, p. 88, ¶164) (emphasis added).

In other words, Rimini Street's value of use is the sum of labor costs it avoided by allegedly infringing Oracle's copyrighted works. Avoided cost is the correct and most fitting measure of damages because Rimini Street would have attracted its support customers without its alleged wrongful actions.  Dykal Decl., Ex. G (Hampton Report, p. 88, ¶165) (internal citations omitted).

Based on conversations with Rimini Street's management and its technical expert, Mr. Hilliard, and on my examination of Rimini Street's expected and actual operating results, in my opinion, **Rimini Street was financially capable of operating in a non-infringing remote-only manner without infringing Oracle's copyrighted works.**  Dykal Decl., Ex. H (Hampton Report, p. 89, ¶166) (internal citations omitted) (emphasis added).

Thus, contrary to the picture Oracle paints, there is no doubt that the issue of a non-infringing remote service alternative and  its relevance to Oracle's "value of use" damages theory was a central issue during the discovery phase of this case.

***Oracle Demanded and Received Evidence on Rimini's Non-Infringing Remote Service Model, and Now Wants to Exclude It From Evidence.***  Immediately after the Court's February 13, 2014 Opinion granting in part Oracle's motion for partial summary judgment, Oracle demanded supplemental discovery.  As part of supplemental discovery agreed to by the parties and ongoing since that time, Rimini Street has produced evidence responsive to Oracle's demands for information regarding Rimini's remote processes.  For instance, Oracle requested (and Rimini produced) the software underlying the remote access framework and other technical specifications describing its development process.  After reviewing these disclosures, Oracle requested and has received extensive additional data from Rimini's system specific to Rimini's implementation of the non-infringing remote service model Dykal Decl., Ex. I (*See*, March 14, 2014 Letter from Howard to Reckers).  Rimini also agreed to Oracle's demand to provide the employee serving as its development lead for a Rule 30(b)(6) deposition regarding the remote service model. Rimini is also willing to make other Rimini technical personnel available for depositions.  The discovery Oracle has requested – including the evidence already received -

1   affords Oracle a complete picture of the technical details of Rimini's remote service model.

2        As Rimini has already produced responsive supplemental discovery, the remaining

3   discovery needed on the remote model is limited and, accordingly, will be complete in a

4   relatively short period of time with minimal, if any, delay to the pre-trial preparations.

5   Supplemental discovery delay is warranted and reasonable given the importance of the remote

6   service model to the existing damages issues in the case, as well as in the context of the broader

7   dispute between the parties regarding the legality of Rimini's business model.

8        Oracle's procedural and substantive challenges to such evidence lack merit, and Rimini

9   respectfully submits that the parties should continue to exchange supplemental discovery

10   regarding Rimini's implementation of a non-infringing remote service model.  Therefore, Rimini

11   should be permitted to present evidence at trial showing that the noninfringing remote model

12   discussed hypothetically in Rimini's expert reports has been implemented by Rimini *in fact*.

13   Challenges to the credibility of that assertion should be resolved by the jury, not by Oracle's

14   unfounded and incorrect assertions.

15

16       **Issue 2:  Rimini's Request for Supplemental Discovery Regarding Oracle's Suit Against CedarCrestone.**

17   <u>**Rimini's Position**</u>**:**

18        Rimini requests limited supplemental discovery regarding Oracle's suit and settlement

19   with CedarCrestone, a Rimini and Oracle competitor that provided similar services to those

20   offered by Rimini Street for the PeopleSoft products at here.  During discovery, Rimini pointed

21   to CedarCrestone as an alternative third-party support provider for Oracle products, and both

22   Oracle and Rimini noticed and conducted a deposition of CedarCrestone.  In that deposition, the

23   parties exploring the services provided by CedarCrestone and the legal basis under which those

24   services were provided.  Further, CedarCrestone was referenced by the parties in their summary

25   judgment briefing, as well as in the parties' expert reports.

26        *Oracle Sued and Settled with CedarCrestone Over Its Alternative Maintenance*

27   *Offering After Discovery Closed in this Litigation.*  After the close of discovery, Oracle filed a

28

JOINT REQUEST FOR CASE MANAGEMENT CONFERENCE

1   Complaint against CedarCrestone in the Northern District of California, alleging infringement of

2   the same Oracle copyrights at issue here.[13]  Mirroring Oracle's allegations against Rimini,

3   Oracle's Complaint alleged that CedarCrestone illegally made and maintained copies of Oracle's

4   PeopleSoft software on CedarCrestone's own servers and that Cedarcrestone committed acts of

5   infringement when developing updates to the PeopleSoft software. Though CedarCrestone

6   initially denied Oracle's allegations, the parties filed a Stipulated Dismissal with Prejudice on

7   August 13, 2013 after reaching a settlement.

8   ██████████████████████████████████████████████

9   ██████████████████████████████████████████

10  ██████████████████████████████████████████

11  ████████████████████████████████.[14]

12          ***Rimini is Entitled to Production of the CedarCrestone Settlement Agreement as***

13  ***Supplemental Discovery.***  Rimini has requested supplemental discovery on the settlement of the

14  CedarCrestone litigation, but Oracle has refused on the grounds that the settlement agreement is

15  "confidential" and "fact discovery closed long ago."[15]  Oracle's objection rings hollow and is

16  self-serving.  Oracle selectively agreed to produce the "Settlement Affidavit" with the

17  recantment of CedarCrestone's sworn testimony that is favorable to Oracle.  At the same time,

18  Oracle refuses to disclose other information relating to the settlement that could provide Rimini

19  and the Court all the facts surrounding the settlement agreement.  Oracle should have timely

20  produced all CedarCrestone-related documentation in accordance with its duty to supplement

21  discovery responses.[16]

22  ─────────────────────

23  [13]    *Oracle America, Inc., et al vs. CedarCrestone, Inc.*, Case No. 12-cv-04626-NC (N.D. Cal., filed September 5, 2012) (hereinafter "*Oracle v. CedarCrestone*").

24  [14]    Dykal Decl., Ex. J August 13, 2013 ████████████████████████.

25  [15]    Dykal Decl., Ex. K  July 24, 2014 letter from Mr. Hixson to Mr. Reckers.

26  [16]    Fed. R. Civ. P. 26(e). The information was requested during discovery and Oracle is under a duty to supplement.  *See* Dykal Decl., Ex. L Rimini's Second Set of Requests for

27  Production of Documents to Plaintiffs (May 13, 2010) at Nos. 21 ("All documents relating to the purchase or transfer of any rights to the copyrighted work at issue in this litigation, including

28                                               (Footnote Continued on Next Page.)

1    The settlement agreement is discoverable to test Oracle's assertions of relevance, if

2    nothing else.  Oracle's refusal to produce this relevant CedarCrestone evidence is nothing more

3    than gamesmanship:  Oracle seeks to reduce the sting of adverse evidence through the untimely

4    production of a settlement-coerced, self-serving affidavit that attempts to controvert sworn

5    testimony, while thwarting Rimini's effort to obtain impeachment evidence.  Oracle's recent

6    attempt at selectively supplementing post-discovery materials relating to CedarCrestone (*i.e.*, by

7    disclosing the ▮▮▮▮▮▮▮ but not the settlement agreement) is clearly an attempt to use Rule 26

8    as a "loophole" for its own advantage, which is not permitted. *Luke v. Family Care and Urgent*

9    *Medical Clinics*, 323 Fed. Appx. 496, 2009 WL 886350, *3 (9th Cir. 2009). Allowing Oracle to

10   use such materials, but denying Rimini the opportunity to explore their basis, would be unfair

11   and highly prejudicial.

12   Rimini therefore asks for limited additional discovery to allow inquiry into Oracle's

13   settlement with CedarCrestone and regarding the reasons for CedarCrestone's decision to recant

14   its sworn deposition testimony.

15   In addition it is well-settled that settlement agreements in intellectual property cases are

16   relevant to determining the amount of damages owed for infringement. *E.g.*, *ResQNet.com, Inc.*

17   *v. Lansa, Inc.*, 594 F.3d 860, 872 (Fed. Cir. 2010) ("This court observes as well that the most

18   reliable license in this record arose out of litigation.").  The legal support for Oracle's argument

19   is simply outdated.  Note that Oracle's case citations are all to District Court or Federal Circuit

20   opinions that pre-date the Federal Circuit's opinion in *ResQNet.com, Inc. v. Lansa, Inc.*

21   _____

22   (Footnote Continued from Previous Page.)

23   without limitation any transfer agreements, contracts, payments, receipts, or licensing
     agreements."); 23 ("All documents relating to any legal or administrative proceedings
24   concerning any of the copyrighted works at issue in this litigation, including without limitation,
     documents, pleadings, deposition transcripts, hearing transcripts, orders, settlement documents,
25   written discovery, expert reports, declarations, any supporting papers and documents offered or
     admitted in such proceedings."); and 24 ("All documents relating to any interest that any person
26   has in any of the copyrighted works or the present litigation and any communications between
     Oracle and any such person.").
27

28

1     In light of *ResQNet*, the Cedarcrestone settlement agreement and related materials are

2  undoubtedly discoverable.  Oracle's allegations against CedarCrestone closely mirrored its

3  claims against Rimini, alleging infringement of the same copyrights by offering similar services.

4  On these facts, Oracle cannot credibly deny that the CedarCrestone settlement is at least

5  probative of what Rimini might owe for any alleged infringement, and numerous courts have

6  required discovery regarding settlement agreements in circumstances similar to the present.

7  Indeed, any damages award is likely to be too speculative were this information not admitted.[17]

8       ***The Court Should Re-Open Discovery to Allow Rimini to Take Depositions and Serve***

9  ***Written Discovery Requests Related to the*** ███████████████.  Given the

10  unquestionable relevance of the settlement agreement between Oracle and CedarCrestone to the

11  damages issues in this case, Rimini submits there is good cause to reopen limited discovery to

12  allow Rimini to obtain relevant evidence of the settlement agreement.

13     Unless discovery is reopened for limited purposes, Rimini will be foreclosed from (1)

14  accessing a benchmark agreement relevant to damages, and (2) taking discovery regarding the

15  ████████████████████████████████████████████████████

16  ███████████  Rimini and the Court are not obligated to take Oracle's word regarding the

17  relevance of the CedarCrestone agreement.  Rimini should be afforded an opportunity to see the

18  agreement to make its own assessment.  It would also be unfair and unduly prejudicial for Oracle

19  to ███████████ against Rimini without providing Rimini the ability to explore how it

20  came about.  Indeed, Rimini should be permitted to explore the circumstances underlying

21  CedarCrestone's sudden reversal of positions with a limited number of depositions and written

22  discovery requests.  *See* Fed. R. Evid. 408(b) (settlement offers and negotiations admissible to

23  _____

24  [17]    *See Oracle*, 2014 WL 4251570, at *10 ("Although a copyright plaintiff need not
demonstrate that it would have reached a licensing agreement with the infringer or present
25  evidence of 'benchmark' agreements in order to recover hypothetical-license damages, it may be
difficult for a plaintiff to establish the amount of such damages without undue speculation in the
26  absence of such evidence. Here, because Oracle has no history of granting similar licenses, and
has not presented evidence of 'benchmark' licenses in the industry approximating the
27  hypothetical license in question here, Oracle faced an uphill battle.").

28

1    show a witness's bias).  Accordingly, Rimini should be allowed to conduct discovery on

2    CedarCrestone and Oracle, limited to issues relating to their post-discovery litigation and

3    settlement, to be completed within 45 days.

4

5    **Oracle's Position:**

6          As the parties prepare for trial, Rimini is requesting that the Court re-open fact discovery

7    in this case for significant further discovery on a collateral issue with no relevance to anything

8    that will be tried in this case.  Whether there should be discovery into Oracle's settlement with

9    CedarCrestone in unrelated litigation – and there should not – has no effect on the scheduling of

10   trial.  It is a pure discovery matter that the Court should refer to the magistrate judge.  To the

11   extent the Court is inclined to hear argument on that issue, below Oracle explains why this

12   discovery is inappropriate.

13         *Rimini is not entitled to production of the CedarCrestone settlement agreement as*

14   *supplemental discovery.*  Fact discovery in this case closed on December 19, 2011.  Oracle sued

15   CedarCrestone in 2012, and settled that lawsuit in August 2013.  Rimini now claims that it is

16   entitled to the settlement agreement between Oracle and CedarCrestone.  As a preliminary

17   matter, even if the settlement agreement were relevant to some issue in the case, the agreement

18   contains a confidentiality provision that prevents Oracle from producing it to anyone absent a

19   court order.  Further, even if Oracle could produce the settlement agreement, the agreement is

20   not relevant to any issue in this case, nor is it responsive to any of Rimini's discovery requests

21   that Rimini pursued during fact discovery.

22         In its argument, Rimini refers to its discovery *requests* concerning settlement agreements

23   and licenses.  Rimini served its Second Set of Requests for Production on May 13, 2010.

24   Request No. 21 sought "[a]ll documents relating to the purchase or transfer of any rights to the

25   copyrighted work at issue in this litigation, including without limitation any transfer agreements,

26   contracts, payments, receipts, or licensing agreements."  Request No. 23 sought "[a]ll documents

27   relating to any legal or administrative proceedings concerning any of the copyrighted works at

28   issue in this litigation, including without limitation, documents, pleadings, deposition transcripts,

JOINT REQUEST FOR CASE MANAGEMENT CONFERENCE

1   hearing transcripts, orders, settlement documents, written discovery, expert reports, declarations,

2   any supporting papers and documents offered or admitted in such proceedings." Request No. 24

3   sought "[a]ll documents relating to any interest that any person has in any of the copyrighted

4   works or the present litigation and any communications between Oracle and any such person."

5       Rimini omits to mention that Oracle objected to these requests and Rimini did not move

6   to compel.  Oracle served its response to these requests on April 6, 2011, stating, "Oracle will

7   not produce documents in response to [Request Nos. 21, 23, and 24] as framed, but will meet and

8   confer with Defendant regarding means to clarify and narrow the Request."  In subsequent meet

9   and confer discussions Oracle did not agree to produce settlement documents or licensing

10  agreements, i.e., the type of thing Rimini is now requesting.  Rimini never moved to compel.

11  Thus, the entire subject of other settlement agreements or licenses is something Oracle never

12  agreed to produce, and was never ordered to.  Rimini's attempt to reframe the issue in terms of

13  Oracle having a duty to "supplement" its document production is therefore misleading because

14  there is no category of documents to "supplement."  If the settlement agreement with

15  CedarCrestone had happened during fact discovery, Oracle would not have produced it then

16  either, consistent with the objections it served on Rimini.

17      In any event, the agreement is irrelevant.  Rimini argues that the settlement agreement is

18  relevant to this case, apparently on the grounds that (1) the conduct alleged by Oracle in its

19  lawsuit against CedarCrestone was similar to the conduct alleged by Oracle in this lawsuit

20  against Rimini, and therefore (2) Rimini speculates that a settlement agreement might include a

21  license for conduct that will be at issue at trial.  However, it does not.  Without disclosing the

22  contents of the confidential settlement, Oracle can state definitively that the settlement

23  agreement contains no license permitting anything similar to Rimini's old support model or its

24  purported new, "non-infringing" support model. ███████████████████████

25  ██████████████████████████████████████████

26  ███████████████████████████████████████████

27  ████████████████████████████████████

28  ████████████████████████████  *See* Dykal Declaration, Ex. 10, ¶¶ 14-16.  The

1    settlement agreement between Oracle and CedarCrestone is irrelevant and the Court should not

2    re-open discovery to compel production of the agreement.

3          Rimini also argues that the settlement agreement would be "at least probative of what

4    Rimini might owe for any alleged infringement."  As discussed, that is not true.  But even if the

5    settlement agreement did contain a license permitting conduct similar to Rimini's business

6    model, it is settled law that license agreements entered into "under the cloud of threatened or

7    actual litigation" are not relevant.  *Honeywell Inc. v. Victor Co. of Japan, Ltd.*, *2003 U.S. Dist.*

8    *LEXIS 27873*, at *4 (D. Minn. 2003); *see also Kowalski v. Mommy Gina Tuna Resources*, 574 F.

9    Supp.2d 1160, 1164 (D. Hawaii 2008) ("rates negotiated in the context of litigation are

10   inapplicable to the reasonable rate determination"); *Micro Chemical, Inc. v. Lextron, Inc.*, 161 F.

11   Supp.2d 1187, 1208 (D. Colo. 2001), *re'd in part, vacated in part & remanded*, 318 F.3d 1119

12   (Fed. Cir. 2003) ("Several courts have decided that royalties paid as a result of settlement

13   negotiations do not accurately reflect what a willing licensee would pay in an arms-length

14   negotiation, and, as a result, have viewed settlement agreements with caution and commonly

15   have excluded them altogether."); *Medtronic, Inc. v. Boston Scientific Corp.*, 2002 U.S. Dist.

16   LEXIS 28355, at *87 (D. Minn. 2002) (finding "no relevance of the settlement negotiations to a

17   damages analysis" and that "minimal probative value is outweighed by the potential for needless

18   distractions"); *General Electric Co. v. Dr Systems*, 2007 U.S. Dist. LEXIS 44644, at *6 (E.D.

19   N.Y. 2007) ("settlement agreements reached to resolve litigation or threatened litigation are

20   generally not relevant to the issue of what may constitute a reasonable royalty").  These cases

21   foreclose Rimini's argument.

22         Rimini relies on *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 872 (Fed. Cir. 2010) for

23   the statement that "the most reliable license in this record arose out of litigation."  But the court

24   made this statement after overturning the district court's reliance on five other benchmark

25   licenses.  It did not find that the litigation license was relevant or could be the basis for a damage

26   award.  To the contrary, in the very next sentence, the court stated that litigation licenses could

27   not be the basis for a damage award because they are negotiated after litigation: "the hypothetical

28   reasonable royalty calculation occurs before litigation and that litigation itself can skew the

1   results." *Id.*  Moreover, the court pointed with approval to its earlier holding that settlement

2   offers "made after the infringement had begun and litigation was threatened or probable . . .

3   should not be considered evidence of an 'established royalty.'" *Id.* (quotes *Hanson v. Alpine*

4   *Valley Ski Area, Inc.,* 718 F.2d 1075, 1078–79 (Fed.Cir.1983)).  This is in accordance with the

5   cases Oracle cites above.

6         Finally, even if the settlement agreement were probative of what Rimini owes for its

7   infringement, the agreement is not admissible or reasonably likely to lead to the discovery of

8   admissible evidence because the Ninth Circuit has definitely held that it would be inadmissible

9   under Fed. R. Evid. 408.  *See Hudspeth v. C.I.R.*, 914 F.2d 1207, 1213 (9th Cir. 1990) (holding

10  that Rule 408 *does* apply to situations where the party seeking to introduce evidence of a

11  compromise was not involved in the original compromise); *Pharmastem Therapeutics, Inc. v.*

12  *Viacell, Inc.*, 2003 U.S. Dist. LEXIS 27869, at *6-7 (D. Del. Oct. 7, 2003) ("notwithstanding

13  their relevance to a reasonable royalty calculation . . . a license agreement may be excluded from

14  evidence under Rule 408 where it (1) was reached under a threat of litigation").

15        ***The Court should not re-open discovery to allow Rimini to take depositions and serve***

16  ***written discovery requests related to the*** ███████████.  After the Court issued its

17  ruling on Oracle's first motion for summary judgment on February 13, 2014, the parties met and

18  conferred regarding additional discovery.  In those negotiations, each party requested certain

19  information, and each party agreed to provide certain information.  In response, Oracle produced

20  a █████████████████████████████████████████████████████████████

21  ███████████████████████████████  Rimini now requests that the Court re-

22  open discovery to allow Rimini to take discovery to "explore" how the ███████ came about

23  via "a limited number of depositions and written discovery requests."

24        This is a transparent attempt to take discovery into the settlement negotiations between

25  Oracle and CedarCrestone, which based on the authorities cited above, is not permissible, and is

26  part of a larger topic – settlement agreements concerning the licensing of Oracle's software – on

27  which Rimini took no discovery at all during the fact discovery part of the case.  Rimini says it

28  also seeks to "conduct discovery on . . . Oracle . . . limited to issues relating to their post-

JOINT REQUEST FOR CASE MANAGEMENT CONFERENCE

1   discovery litigation and settlement." Obviously Oracle's litigation and settlement strategy is

2   attorney-client privileged and attorney work product. Therefore, it is unclear what Rimini could

3   hope to achieve by pursuing this discovery other than to harass Oracle.

4        There is no basis to now expand discovery more broadly than the scope it had during fact

5   discovery. Rimini argues that it needs further discovery to "explore" "recanted prior sworn

6   testimony" outlined in the ███████. Rimini is apparently referring to the ███████████

7   statements about CedarCrestone's own software license. However the Court appears to have

8   resolved the license provisions in question when it issued its Order granting in part Oracle's

9   Motion for Partial Summary Judgment. Dkt. 474. Specifically,

10   • ████████████████████████████████████

11     ██████████████████████████████████

12     ███████████████ Dykal Declaration, Ex. 10, ¶¶ 10-11. The Court confirmed

13     this interpretation for a similar license in its Order granting in part Oracle's

14     Motion for Partial Summary Judgment. Dkt. 474 at 8-15.

15

16   • ███████████████████████████████████

17     ███████████████████████████████████

18     ██████ Dykal Declaration, Ex. 10, ¶ 12. Again, the Court confirmed this

19     interpretation for a similar license in its Order on summary judgment. Dkt. 474 at

20     8-15.

21        To the extent testimony about these license provisions remains relevant, Rimini can

22   cross-examine CedarCrestone at trial on ███████████ and prior testimony. Whether the issues

23   remain live or not, there is no justification for the Court to grant Rimini's request to reopen

24   discovery and revisit license interpretation issues.

25

26

27

28

JOINT REQUEST FOR CASE MANAGEMENT CONFERENCE

1    DATED:  September 17, 2014

2    BINGHAM McCUTCHEN LLP                    SHOOK, HARDY & BACON LLP

3    By: /s/ Geoffrey M. Howard               By: /s/ Peter E. Strand

4         Geoffrey M. Howard (*pro hac vice*)       Peter E. Strand (*pro hac vice*)
          Three Embarcadero Center                  2555 Grand Blvd.
5         San Francisco, CA 94111-4067              Kansas City, MO 64108
          Telephone:    415.393.2000               Telephone: (816) 559-0401
6         Facsimile:    415.393.2286               Facsimile: (816) 421-5547
          geoff.howard@bingham.com                  rreckers@shb.com
7
8         *Attorneys for Plaintiffs*                *Attorneys for Defendants*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

JOINT REQUEST FOR CASE MANAGEMENT CONFERENCE

1

**ATTESTATION OF FILER**

2      The signatories to this document are myself and Peter Strand and I have obtained Mr.

3   Strand's concurrence to file this document on his behalf.

4

5   DATED:  September 17, 2014                    BINGHAM McCUTCHEN LLP

6                                                 By: /s/ Geoffrey M. Howard

7                                                     Geoffrey M. Howard (*pro hac vice*)
                                                      Three Embarcadero Center
8                                                     San Francisco, CA 94111-4067
                                                      Telephone:    415.393.2000
9                                                     Facsimile:    415.393.2286
                                                      geoff.howard@bingham.com
10

11                                                    *Attorneys for Plaintiffs*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

JOINT REQUEST FOR CASE MANAGEMENT CONFERENCE