BOIES, SCHILLER & FLEXNER LLP
RICHARD J. POCKER (NV Bar No. 3568)
300 South Fourth Street, Suite 800
Las Vegas, NV 89101
TELEPHONE: (702) 382-7300
FACSIMILE: (702) 382-2755
rpocker@bsfllp.com

BOIES, SCHILLER & FLEXNER LLP
STEVEN C. HOLTZMAN (*pro hac vice*)
KIERAN P. RINGGENBERG (*pro hac vice*)
1999 Harrison Street, Suite 900
Oakland, CA 94612
TELEPHONE: (510) 874-1000
FACSIMILE: (510) 874-1460
sholtzman@bsfllp.com
fnorton@bsfllp.com
kringgenberg@bsfllp.com

BINGHAM MCCUTCHEN LLP
GEOFFREY M. HOWARD (*pro hac vice*)
THOMAS S. HIXSON (*pro hac vice*)
KRISTEN A. PALUMBO (*pro hac vice*)
THREE EMBARCADERO CENTER
SAN FRANCISCO, CA  94111-4067
Telephone:  415.393.2000
Facsimile:  415.393.2286
geoff.howard@bingham.com
bree.hann@bingham.com
thomas.hixson@bingham.com
kristen.palumbo@bingham.com

DORIAN DALEY (*pro hac vice*)
DEBORAH K. MILLER (*pro hac vice*)
JAMES C. MAROULIS (*pro hac vice*)
ORACLE CORPORATION
500 Oracle Parkway
M/S 5op7
Redwood City, CA 94070
Telephone:  650.506.4846
Facsimile:  650.506.7114
dorian.daley@oracle.com
deborah.miller@oracle.com
jim.maroulis@oracle.com

Attorneys for Plaintiffs
Oracle USA, Inc., Oracle America, Inc., and
Oracle International Corp.

SHOOK, HARDY & BACON LLP
B. Trent Webb (*pro hac vice*)
2555 Grand Boulevard
Kansas City, Missouri 64108-2613
Telephone: (816) 474-6550
Facsimile: (816) 421-5547
bwebb@shb.com

Robert H. Reckers (*pro hac vice*)
600 Travis Street, Suite 3400
Houston, Texas  77002
Telephone: (713) 227-8008
Facsimile: (713) 227-9508
rreckers@shb.com

LEWIS ROCA ROTHGERBER LLP
W. West Allen (Nevada Bar No. 5566)
3993 Howard Hughes Parkway, Suite 600
Las Vegas, Nevada 89169
Tel: (702) 949-8200
Fax: (702) 949-8398
WAllen@lrrlaw.com

GREENBERG TRAURIG
Mark G. Tratos (Nevada Bar No. 1086)
Brandon Roos (Nevada Bar No. 7888)
Leslie Godfrey (Nevada Bar No. 10229)
3773 Howard Hughes Parkway
Suite 400 North
Las Vegas, NV 89169
Telephone: (702) 792-3773
Facsimile: (702) 792-9002
tratosm@gtlaw.com
roosb@gtlaw.com
godfreyl@gtlaw.com

Attorneys for Defendants Rimini Street,
Inc., and Seth Ravin

---

JOINT PRETRIAL ORDER

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| ORACLE USA, INC., a Colorado corporation; ORACLE AMERICA, INC., A Delaware corporation; and ORACLE INTERNATIONAL CORPORATION, a California corporation, | Case No. 2:10-cv-0106-LRH-PAL **JOINT PRETRIAL ORDER** |
| Plaintiffs, | |
| v. | |
| RIMINI STREET, INC., a Nevada corporation; AND SETH RAVIN, an individual, | |
| Defendants. | |

I.    **NATURE OF THE ACTION AND THE CONTENTIONS OF THE PARTIES**

A.    **Oracle's Contentions**

This case is about how Seth Ravin and Rimini Street Inc. built a business on the back of

their massive theft of Oracle's copyrighted software and support materials, and the resulting

harm to Oracle.  Oracle will prove that Rimini's business model was based on the pervasive,

undisputed, and unauthorized downloading and other copying of millions of files of Oracle's

PeopleSoft, J.D. Edwards, Siebel, and Database software and support materials.  Rimini provided

cut-rate support at 50% of Oracle's cost by using hundreds of unlicensed copies of Oracle's

software in the form of local software "environments" on Rimini's systems and by engaging in

"cross-use," i.e., the use of one customer's licensed software to support other customers.

Rimini's copyright infringement can no longer be disputed.  The Court's summary

judgment rulings established that Rimini infringed Oracle's copyrights based on Rimini's

copying and use of Oracle's Database software and Oracle's PeopleSoft software for certain

customers, and Rimini has indicated it will finally concede it has no defense to Oracle's claim

that Rimini's entire PeopleSoft development process was infringing.[1]

[1] Nonetheless, Rimini refuses to stipulate to liability for the additional PeopleSoft copyright registrations it has infringed.  As described below in Oracle's proposed length of trial, Rimini's

(Footnote Continued on Next Page.)

1 ████████████████████████, and those customers were the most important and

2 valuable customers for Rimini's business.  The Court also ruled that Rimini infringed Oracle's

3 J.D. Edwards and Siebel copyrights, but left open the question of whether Rimini's use of this

4 software was limited to archival and backup copies, the only use permitted under Rimini's

5 license defense.

6 　　　　As part of its efforts to lure customers away from Oracle, Rimini also concealed and

7 made false statements regarding its improper and unauthorized conduct.  For example, Rimini

8 repeatedly told customers that it did not cross-use any software.  Rimini also made similar

9 statements to this Court, claiming that Oracle's software and support materials were stored in

10 client-specific "data silos," and that a co-mingled software library "never existed" at Rimini.

11 The Court found these statements were false.  The Court also sanctioned Rimini for deleting a

12 co-mingled library of Oracle's software in anticipation of that library being discovered in

13 litigation.

14 　　　　Rimini has no defense for its infringement of Oracle's PeopleSoft and Database software,

15 and only Oracle's damages need to be decided.  Rimini's conduct also makes it liable for twelve

16 additional claims: (1) violation of the Federal Computer Fraud and Abuse Act, 18 U.S.C.

17 §§ 1030(a)(2)(C), (a)(4), & (a)(5) (the "CFAA"); (2) violation of the California Computer Data

18 Access and Fraud Act, Cal. Penal Code § 502; (3) violation of Nevada Revised Statutes

19 § 205.4765; (4) breach of contract; (5) inducement of breach of contract; (6) intentional

20 interference with prospective economic advantage; (7) negligent interference with prospective

21 economic advantage; (8) unfair competition; (9) trespass to chattels; (10) unjust enrichment; (11)

22 unfair practices; and (12) an accounting.  Rimini's wrongful conduct also entitles Oracle to

23 punitive damages.  As the founder and CEO of Rimini, and as the person who designed and had

24 policy and operational control over the company, Seth Ravin is also personally liable for these

25 claims.  This is not new for him.  Prior to founding Rimini, Ravin was the President of

26 _____
(Footnote Continued from Previous Page.)

27 refusal to stipulate that the conduct determined by the Court on summary judgment to constitute

28 copyright infringement will needlessly complicate and lengthen trial.

1    TomorrowNow, a company who committed criminal copyright infringement and violated the

2    CFAA by unlawfully downloading materials and making and using thousands of copies of

3    Oracle's copyrighted software pursuant to a support model Ravin claimed to have created and

4    then mimicked at Rimini.

5            From day one, Ravin and Rimini's scheme has been to build a business through

6    indiscriminate infringement and unauthorized downloads, hide what it has been doing, and avoid

7    paying for the full extent of the harm it caused Oracle if it was ever caught.  But the damage to

8    Oracle has been extensive and is undeniable.  For the 364 customers Rimini took from Oracle

9    through December 2011, Oracle has suffered $193.4 million in lost profits through December

10   2012, with additional losses since.  Oracle was also deprived of $17.9 million in licensee fees

11   due to Rimini's extensive infringement of Oracle's Database software.  In fact, the fair market

12   value of a license for Rimini's use of Oracle's PeopleSoft, J.D. Edwards, and Siebel would have

13   been a combined $210.0 million.

14           **B.      Rimini's Contentions**

15           While Oracle attempts to paint Rimini as a corrupt and criminal operation, the reality is

16   that Rimini is the leading global provider of independent enterprise software support services

17   with operations in the US, Canada, Brazil, UK, Germany, India, Australia and Japan.  In fact,

18   Rimini has more than 400 global employees, has signed support agreements with nearly 900

19   clients– including more than 100 Fortune 500 and Fortune Global 100 largest companies in the

20   world.  As these clients understand, Rimini has a right to offer independent support services to

21   Oracle licensees, and Oracle licensees have a legal right to purchase independent support

22   services from Rimini instead of purchasing support services from Oracle.  This case is primarily

23   about the specific processes Rimini previously used to support a portion of its Oracle PeopleSoft,

24   JD Edwards and Siebel support clients between 2006 and February of 2014.

25           With respect to the challenged processes, the Court, in its Order of February 13, 2014,

26   analyzed various PeopleSoft, J.D. Edwards, and Seibel license agreements for Rimini's clients

27   and held that the rights granted by Oracle's licensing agreements "are not limited or restricted to

28   any specific physical embodiment of the software, like Oracle's provided software installation

media." (Doc. No. 474 at 10, 16). Rather, the rights contained in Oracle's license agreement "apply equally to the copies of the copyrighted software maintained on Rimini's systems regardless of whether Rimini used the specific installation media provided by Oracle to make those copies." *Id.* at 10. As a result, the Court held that Rimini may assert its customers' software license as a defense to Oracle's claims of copyright infringement in this action" and analyzed various PeopleSoft, J.D. Edwards, and Seibel license agreements for Rimini's customers. *Id.* at 10 and 16.

Though the Court denied Oracle's motion for summary judgment as to Rimini's J.D. Edwards, and Seibel clients, Court found that certain practices by Rimini were not authorized by the PeopleSoft license agreements and, thus, constituted copyright infringement. In light of these findings, the parties are presently conferring regarding a proposed PeopleSoft license stipulation that will address Rimini's express license defense for its past conduct relating to PeopleSoft software[2] and installation media.[3] From Rimini's perspective, the proposed PeopleSoft license stipulation will greatly simplify the trial in this matter as to PeopleSoft software.

With respect to the copyright claims not adjudicated on summary judgment, Rimini will present evidence based on Oracle license agreements in support of Rimini's express license defense to copyright infringement allegations regarding:

- Oracle's infringement claims based on Rimini's copying of J.D. Edwards software and documentation;

- Oracle's infringement claims based on Rimini's copying of Siebel software and

---

[2] Despite Oracle's success on summary judgment, Oracle now seeks to "pile on" and indicates that it intends to present substantial liability evidence of copyright infringement for claims already addressed by the Court's summary judgment opinion. If permitted, such a presentation will serve only to "needlessly complicate and lengthen trial." Further, Rimini submits that the streamlining of the trial can only be accomplished if Oracle elects to reasonably pare down its dozen overlapping causes of action.

[3] Notwithstanding the forgoing, Rimini reserves the right to refer to the *PeopleSoft* license agreements in the defense of Oracle's damages claims. Further, Rimini reserves the right to introduce evidence based on Oracle license agreements to the extent evidence introduced by Oracle makes such evidence relevant.

1    documentation;

2    • Oracle's infringement claims based on Rimini's copying of documentation for

3    PeopleSoft.

4    Because the express terms of the underlying licenses authorized copying of Oracle

5    software by Rimini on behalf of its clients, Oracle's infringement claims fail with respect to: J.D.

6    Edwards software and documentation; Siebel software and documentation and PeopleSoft

7    documentation.

8    With respect to damages, Oracle's claims are unsupported, unduly speculative and

9    excessive in light of the actual evidence.  While Oracle's damage demand approaches twice

10   Rimini's total revenue, Rimini certainly did not cause Oracle's dissatisfied customers to leave

11   Oracle support for Rimini support.  In fact, Rimini accounts for only a fraction of the Oracle

12   customer defections, and a portion of Oracle's customers leave every year in favor of other

13   support options, such as self-support and other independent support providers.  Put simply, there

14   is no causal link between any infringement by Rimini and clients choosing to switch from Oracle

15   support to Rimini support.

16   Further, there can be no question that the challenged practices provided little, if any

17   value, to Rimini, and the evidence in this case establishes that Rimini could have implemented a

18   non-infringing support models with minimal additional costs.  The cost to implement such a non-

19   infringing model is the true "value of use" attributable to the alleged infringement, and, thus, the

20   evidence in this case does not support any damage award in excess of  10 million dollars.

21   **II.    THE COURT'S JURISDICTION**

22   This Court has subject matter jurisdiction over Oracle's copyright infringement claim, 17

23   U.S.C. §§ 101 *et seq.*, and Computer Fraud and Abuse Act claim, 18 U.S.C. §§ 1030 *et seq.*  This

24   Court has supplemental subject matter jurisdiction over Oracle's state law claims under 28

25   U.S.C. § 1367, because these claims are so related to Oracle's claims under federal law that they

26   form part of the same case or controversy and derive from a common nucleus of operative facts.

27   This Court also has original subject matter jurisdiction over the state law claims under 28 U.S.C.

28   § 1332 because there is a complete diversity of citizenship between Oracle and Rimini, and the

1    amount in controversy exceeds $75,000.

2

3    **III.     UNCONTESTED FACTS AS AGREED TO BY THE PARTIES**

4            The following facts are undisputed, and the Parties will stipulate to them for

5    incorporation into the trial record without the necessity of supporting testimony or exhibits,

6    subject to the Court's rulings, motions in limine, anticipated Daubert motions and other pretrial

7    issues.

8            1.      On February 15, 2010, Plaintiff Oracle USA, Inc., a Colorado corporation,

9    merged with and into Sun Microsystems, Inc. Sun Microsystems, Inc., the surviving corporation,

10   was then renamed "Oracle America, Inc." ("Oracle America").

11           2.      Plaintiff Oracle America is a Delaware corporation, with its principal place of

12   business in Redwood City, California.

13           3.      Oracle America develops and licenses certain intellectual property, including

14   copyrighted enterprise software programs, and provides related services.

15           4.      Oracle America is the successor in interest to Oracle USA, and through Oracle

16   USA is the successor to PeopleSoft USA, Inc. and a successor in interest to certain PeopleSoft,

17   JDE, and Siebel entities.  Hereinafter, Oracle USA, Inc. and Oracle America, Inc. are referred to

18   collectively as "Oracle America."

19           5.      Plaintiff Oracle International Company ("OIC," and together with Oracle

20   America, "Oracle") is a California corporation, with its principal place of business in Redwood

21   City, California. OIC owns and licenses certain intellectual property, including copyrighted

22   enterprise software programs used around the world.

23           6.      Intellectual property rights formerly held by certain PeopleSoft, JDE, and Siebel

24   entities were transferred to OIC as part of the acquisitions of PeopleSoft and Siebel by Oracle.

25           7.      As is typical in the enterprise software industry, Oracle does not sell ownership

26   rights to this software or the related support products Oracle provides to its paying customers.

27           8.      Instead, Oracle's customers purchase licenses that grant them limited rights to use

28   specific Oracle software programs.

9.      Separate from the license to the underlying software, Oracle also enters into support contracts with its customers, which entitled them to receive, for an annual maintenance fee, software upgrades and software support, including fixes, patches and updates typically made available for download from Oracle's password-protected websites.

10.     Oracle's predecessors also sold both software licenses and support contracts for PeopleSoft, J.D. Edwards, and Siebel enterprise software.

11.     Defendant Rimini Street, Inc. is a company that provides similar software support services to licensees of Oracle's PeopleSoft, J.D. Edwards and/or Siebel software.

12.     Rimini competes directly with Oracle to provide these services.

13.     Rimini launched its operations in September 2005, offering support services for Oracle's Siebel software.

14.     Rimini expanded its support offering to Oracle's PeopleSoft products in April 2006 and to Oracle's JD Edwards products in September 2006.

15.     Rimini contracted with 364 customers to provide support for PeopleSoft, J.D. Edwards, and/or Siebel enterprise software between 2006 and November 2011.

16.     Each of Rimini's PeopleSoft, J.D. Edwards, and/or Siebel customers licensed PeopleSoft, J.D. Edwards and/or Siebel enterprise software from Oracle.

17.     Defendants identified 364 customers that received support service from Rimini Street for PeopleSoft, J.D. Edwards and Siebel applications between 2006 and November 2011.

18.     The following chart lists all of the customers for whom Defendants contracted with for the support of  PeopleSoft, J.D. Edwards, or Siebel software since Defendants' inception through November 2011:

| Rimini Customer Name | Product Type | Rimini Start Date |
|---|---|---|
| ███████████████ | ████ | ██████ |
| ██████████ | ████ | ██████ |
| ██████████████ | ███ | ██████ |
| █████████████████ | ███ | ██████ |
| ██████████████ | ███ | ██████ |
| ███████████ | ████ | █████ |
| ██████████████ | ████ | ██████ |

JOINT PRETRIAL ORDER

| Rimini Customer Name | Product Type | Rimini Start Date |
|---|---|---|
| ███████████ | ███ | ███████ |
| ████████████ | ██ | ██████ |
| ██████████████ | ██ | █████ |
| ███████████████████ | ██ | █████ |
| ██████████████ | ██ | ██████ |
| ████████████████ | ██ | ███████ |
| █████████████████ | ██ | ██████ |
| ███████████████████ | █ | ██████ |
| ████ | ██ | █████ |
| █████████████████ | ██ | ██████ |
| █████████████████ | ██ | ██████ |
| ████████████████ | ██ | ██████ |
| ████████████ | █ | █████ |
| █████████████████ | ██ | ██████ |
| ███████████████████ | █ | ██████ |
| █████████ | ██ | █████ |
| ███████████████████ | ██ | ██████ |
| ████████████████ | █ | ██████ |
| █████████████ | ██ | ██████ |
| ████████ | ██ | █████ |
| ███████████ | ██ | █████ |
| ████████████ | ██ | ██████ |
| █████████████████ | █ | █████ |
| ███████████████ | █ | █████ |
| ██ | | ██████ |
| █████████ | ██ | ██████ |
| ███████████ | ██ | ██████ |
| ████████████ | ██ | ██████ |
| ██████████ | ██ | ██████ |
| ███████████████████ | ██ | ██████ |
| ██████████████ | █ | █████ |
| █████████████ | ██ | █████ |
| █████████ | ██ | ██████ |
| ███████████████████ | ██ | █████ |
| ████ | | |
| ████████████ | ██ | ██████ |

9

JOINT PRETRIAL ORDER

| Rimini Customer Name | Product Type | Rimini Start Date |
|---|---|---|
| ██████████████ | ██ | ███████ |
| ███████ | ██ | ███████ |
| █████████████ | ██ | ███████ |
| ███████████ | ██ | ███████ |
| ██████ | ██ | █████ |
| █████████████ | ██ | ███████ |
| ███████ | ██ | ███████ |
| █████████ | ██ | ████████ |
| ███████ | ██ | ██████ |
| ██████ | ██ | ██████ |
| ███████████ | ██ | █████████ |
| ████ | ██ | ████████ |
| ██████████ | ██ | █████████ |
| █████████████ | ██ | ██████ |
| █ | ██ | |
| ████████ | ██ | ███████ |
| ████████ | ██ | ███████ |
| ██████ | ██ | ████████ |
| █████████ | ██ | ███████ |
| █████████ | ██ | ████████ |
| ███████████ | ██ | █████████ |
| ██████████ | ██ | ██████ |
| ██████ | ██ | █████████ |
| ████████ | ██ | █████████ |
| ██████████ | ██ | ████████ |
| ████████████ | ██ | ██████ |
| ██████████ | ██ | ███████ |
| ████████ | ██ | ████████ |
| █████████ | ██ | █████████ |
| ███████ | ██ | ██████ |
| █████████ | ███ | ████████ |
| ████ | | ███████ |
| ████ | ██ | █████████ |
| ████ | ██ | █████████ |
| ███████ | ██ | ██████ |
| ████████████ | ██ | ██████ |

JOINT PRETRIAL ORDER

| Rimini Customer Name | Product Type | Rimini Start Date |
|---|---|---|
| ███████ | ██ | ████ |
| █████████ | █ | ████ |
| ███████████ | █ | ████ |
| █████████ | █ | ████ |
| ██████████ | █ | █████ |
| ████ | █ | ████ |
| ████ | █ | ████ |
| █████ | █ | ████ |
| █████████████ | █ | ████ |
| █████████ | █ | ████ |
| ████████████ | █ | ████ |
| ████████████ | █ | ███ |
| ██ | | | |
| ████████████ | █ | ████ |
| █████████ | █ | ████ |
| ████████████ | █ | ███ |
| ██████████ | █ | ████ |
| ████ | | ████ |
| █████████ | █ | █████ |
| ████ | █ | ███ |
| █████████ | █ | █████ |
| ███████ | █ | █████ |
| █████████ | █ | ████ |
| ██████████ | █ | ████ |
| ███████ | █ | ███ |
| ██████████ | █ | ████ |
| █████████ | █ | ████ |
| ██████████████ | █ | █████ |
| ████████████ | █ | ████ |
| ████████████ | █ | ████ |
| ██████ | █ | ████ |
| ████████ | █ | ████ |
| █████████ | █ | ████ |
| █████████ | █ | ████ |
| ████████ | █ | ████ |
| ██████████ | █ | ████ |
| ██████ | █ | █████ |
| ████████████ | █ | ████ |

JOINT PRETRIAL ORDER

| Rimini Customer Name | Product Type | Rimini Start Date |
|---|---|---|
| ███████████████ | ███ | ██████ |
| ██ | ██████ | | |
| ██████ | ████ | █████ |
| ██████████ | ████ | █████ |
| ████ | ████ | █████ |
| ███████ | ████ | █████ |
| ███████ | ████ | █████ |
| ███████ | ████ | █████ |
| █████ | ████ | █████ |
| ██████ | ████ | ███ |
| ██████████ | ████ | █████ |
| █ | | | |
| █████████████ | ████ | █████ |
| █ | | | |
| ██████ | ████ | ██████ |
| ███████ | ████ | █████ |
| █████████ | ████ | █████ |
| █████ | ████ | █████ |
| ███████ | ████ | █████ |
| ███████ | ████ | ███ |
| █████ | ████ | █████ |
| ████████ | ████ | ███ |
| █████████ | ████ | █████ |
| ██████ | ████ | ██████ |
| ██████ | ████ | ██ |
| ███ | ████ | ████ |
| █████ | ████ | |
| ███████ | ████ | █████ |
| ████████ | ████ | ██████ |
| █████ | ████ | ██ |
| █████████ | ████ | █████ |
| ██████████ | ████ | █████ |
| ███████ | ████ | █████ |
| █████ | ████ | █████ |
| █████████ | ████ | █████ |
| █████████████ | ████ | █████ |
| ██████ | ████ | █████ |
| ███████ | ████ | █████ |

JOINT PRETRIAL ORDER

A/76550040.2   11/21/14

| Rimini Customer Name | Product Type | Rimini Start Date |
|---|---|---|
| ██████████████ | ██ | ████ |
| ███████████ | ██ | ████ |
| █████ | ██ | ████ |
| ██████████ | ██ | ████ |
| ███ | | |
| ███████████ | ██ | ███ |
| █████████████ | ██ | ████ |
| ██████ | ██ | |
| █████████ | ██ | █████ |
| █ | ██ | ████ |
| █████████ | ██ | ███ |
| ██████████ | ██ | █████ |
| ████████████ | ██ | █████ |
| ███████ | ██ | █████ |
| ██████████ | ██ | ███ |
| ████████████ | ██ | █████ |
| █████████████ | ██ | █████ |
| █████████ | ██ | ███ |
| █████████████ | ██ | ██████ |
| █████████████ | ██ | ███ |
| ████████████ | ██ | ████ |
| ███████████ | ██ | █████ |
| ███████ | ██ | ████ |
| ██████████ | ██ | █████ |
| ██████████ | ██ | █████ |
| █████████████ | ██ | █████ |
| ████████████ | ██ | █████ |
| █████████ | ██ | █████ |
| ██████ | ██ | █████ |
| █████ | █ | █████ |
| ██████ | ██ | █████ |
| █████████ | ██ | █████ |
| █████████ | ██ | █████ |
| ████████████ | ██ | █████ |
| ██ | | |
| ████████████ | ██ | ███ |
| █████ | | |
| ████████████ | ██ | █████ |
| ██████ | | |

JOINT PRETRIAL ORDER

A/76550040.2                                                                                11/21/14

| Rimini Customer Name | Product Type | Rimini Start Date |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

14

JOINT PRETRIAL ORDER

| Rimini Customer Name | Product Type | Rimini Start Date |
|---|---|---|
| ████ | ██ | ██ |
| ███ | ██ | ████ |
| ████ | ██ | ████ |
| ███████ | ██ | ███ |
| █████ | ██ | ███ |
| ▪ | ██ | ████ |
| ██ | ██ | ████ |
| ████ | ██ | ███ |
| ██████ | ██ | ████ |
| ██████ | ██ | ████ |
| ███ | ██ | ███ |
| █████ | ██ | ████ |
| ██████████ | ██ | ████ |
| ██████████ | ██ | ████ |
| ███ | ██ | ███ |
| ██ | ██ | ████ |
| ██ | ██ | ████ |
| ████ | ██ | ████ |
| ████ | ██ | ████ |
| ███ | ██ | ████ |
| ██████ | ██ | ████ |
| ███████ | ██ | ████ |
| ███ | ██ | ███ |
| ████ | ██ | ████ |
| ██████ | ██ | ████ |
| ████ | ██ | ████ |
| ██ | ██ | ████ |
| ████ | ██ | ████ |
| ██ | ██ | ████ |
| ██████ | ██ | ████ |
| ████████ | ██ | ████ |
| ████ | ██ | ████ |
| ██████ | ██ | ████ |
| ███████ | ██ | ████ |
| ████ | ██ | ████ |
| ██ | ██ | ████ |

15

JOINT PRETRIAL ORDER

| Rimini Customer Name | Product Type | Rimini Start Date |
|---|---|---|
| ██████████ | ████ | ██████ |
| ███████████████ | ████ | ██████ |
| ████████████ | ███ | ██████ |
| ██████████████ | ████ | ██████ |
| █████████████████████ | ████ | ██████ |
| ████████████ | ████ | ███████ |
| ███████████████ | ███ | ██████ |
| ████████████████ | ████ | █████ |
| █████████████████ | ████ | █████ |
| █████████████ | ████ | ██████ |
| ███████████████████ | ████ | ██████ |
| ██████ | ████ | ████ |
| ████████ | ████ | ████ |
| █████████████ | ████ | ██████ |
| █████████████ | ████ | ██████ |
| ████████ | ████ | ██████ |
| █████ | ████ | ████ |
| ███████ | ████ | ████ |
| ███████ | ████ | █████ |
| ████████████ | ████ | ██████ |
| ███████████████ | ████ | ██████ |
| ████████████ | ████ | █████ |
| ██████████████ | ████ | ██████ |
| █████████████ | ████ | ██████ |
| █████████ | ███ | ██████ |
| ███████████ | ███ | ███████ |
| ██████ | ███ | ██████ |
| ████████ | ███ | ██████ |
| ██████████████ | ███ | █████ |
| ████████████████ | ███ | ██████ |
| ███████████ | ███ | █████ |
| ██████████████████ | ███ | █████ |
| █████████████████ | ████ | █████ |
| ████████ | ████ | ████ |
| ████████████████████ | ████ | ██████ |
| ████████ | ████ | ███████ |
| ██████████████████ | ████ | ██████ |
| ████████ | ████ | ███████ |
| █████████ | ████ | ██████ |

JOINT PRETRIAL ORDER

| Rimini Customer Name | Product Type | Rimini Start Date |
|---|---|---|
| ███████ | ██ | ███ |
| ██████████ | ██ | █████ |
| █ | ██ | ████ |
| ███████████ | ██ | ████ |
| ██████████ | ██ | ████ |
| ██████ | █ | █████ |
| ██████ | ██ | ███ |
| ███████ | ██ | ████ |
| █████ | ██ | ████ |
| █████████ | ██ | ████ |
| ███████ | ██ | ████ |
| ████ | ██ | ████ |
| ███████ | ██ | ████ |
| ██████████ | ██ | ████ |
| ████████ | ██ | ████ |
| ███████ | ██ | █████ |
| ████ | ██ | ████ |
| ████████ | ██ | ████ |
| ██████ | ██ | ████ |
| ████████ | ██ | ████ |
| ████████ | ██ | ████ |
| ███████ | ██ | ████ |
| ████ | ██ | ████ |
| █████ | ██ | ███ |
| ████████ | ██ | ████ |
| ██████████ | ██ | ████ |
| ███████████ | ██ | ████ |
| ███ | ██ | █████ |

19. Rimini stored 18 copies of Oracle Database installation media on its local systems as detailed on Exhibit B.

20. Each environment on Rimini's local systems constitutes a reproduction of one or more of the copyrighted works listed in Exhibit A.

21. Rimini reproduced copyrighted PeopleSoft works listed in Exhibit C by copying or installing the listed environments on its local systems.

17

JOINT PRETRIAL ORDER

22. Rimini reproduced copyrighted Siebel works listed in Exhibit E by copying or installing the listed environments on its local systems.

23. Rimini reproduced copyrighted J.D. Edwards works listed in Exhibit D by copying or installing the listed environments on its local systems.

24. Each of the 463 PeopleSoft, J.D. Edwards, and Siebel environments listed as items 1-280, 282-285, 287-322, 324-333, 335-336, 338-468 in the second column of Exhibit F embodies a substantial portion of the protected expression of the corresponding registered copyright(s) listed in the fourth column of Exhibit F.

25. Rimini has at least 216 environments on its servers that contain installed copies of Oracle Database.

26. Rimini reproduced at least 191 copies of copyrighted Oracle Database works to support local environments on its computer systems, as listed in Exhibit G.

27. To access certain portions of the Oracle's protected computers, Oracle provided a unique username and password ("login credentials") to licensed customers with active support contracts that were used for certain websites.

28. On or before October 26, 2006, Rimini created an automation script that used DownLoadThemAll to download PeopleSoft materials.

29. On average, over 95% of Oracle's support customers renew support with Oracle every year.

30. Oracle America received the fees that customers paid Oracle for support.

31. OIC derives revenue from inter-company sublicense fees received from other Oracle entities in accordance with Oracle inter-company distribution agreements.

32. Between 2006 to 2011, Oracle America paid OIC a sublicense fee of 39% on support revenue.

33. In June 2006, Oracle implemented a standard 3% annual inflationary support fee increase for its PeopleSoft, J.D. Edwards and Siebel support contracts. Under this policy, Oracle increased its support fees by 3% every year.

34. Oracle support annual revenue attrition rates in 2006 to 2011 ranged from 3% to

1  6% for PeopleSoft support, 4% to 9% for J.D. Edwards support, and 4% to 8% for Siebel

2  support.

3      35.    Between 2006 to 2011, Oracle America's annual incremental profit margins on

4  software license updates and software support revenue ranged from 91% to 94%.

5      36.    Between 2006 to 2011, OIC's annual incremental profit margins on software

6  license updates and software support revenue ranged from 89% to 96%.

7      37.    Defendants identified 72 customers and 174 local environments for which Rimini

8  used Oracle Database through November 2011.

9      38.    Rimini conducted a pilot launch of its Siebel support in January 2006 and

10  acquired its first Siebel customer in February 2006.

11      39.    In January 2006, Oracle acquired Siebel, including the Siebel copyrighted

12  materials in suit, for $6.1 billion.

13      40.    OIC is the owner or exclusive licensee for each of the 100 registered works listed

14  in Exhibit A.

15      41.    OIC has a valid copyright registration for each of the 100 registered works listed

16  in Exhibit A.

17      42.    Many of Rimini's fixes for PeopleSoft software involved files that contained

18  modified versions of Oracle's source code.

19

20  **IV.    DISPUTED FACTS AS AGREED TO BY THE PARTIES**

21      **A.    Oracle's Separate Statement**

22      On October 2, 2014, Oracle presented Rimini with 339 facts which Oracle believed to be

23  undisputed and material to its 13 causes of action, including facts relevant to the jury's

24  calculation of damages.  Since then, Rimini has agreed that some are undisputed and specifically

25  disputed others.  But for 292 of them, Rimini told Oracle that Oracle's facts are either "disputed"

26  or "immaterial" and Rimini has refused to tell Oracle which facts fall into which category.

27  Rimini claims that Oracle has not identified the "the truly material facts supporting its claims,"

28  but Rimini ignores the vast scope of its wrongdoing.  Rather, Rimini's complaints reflect its

1   refusal to admit to any of its improper conduct, regardless of whether it will dispute those facts at

2   trial.  For example, Rimini will not say whether it will dispute facts that are at the core of

3   Rimini's PeopleSoft infringement.  *See* Oracle Separate Statement of Fact # 321 ("Of the 321

4   [local PeopleSoft] environments [that resided on Rimini's local systems], 104 were created by

5   copying an existing environment ostensibly maintained on behalf of one customer in order to use

6   the copy to support a different customer.").  The result is that the parties have not meaningfully

7   narrowed the issues to be decided at trial even after the Court's clear rulings about Rimini's

8   conduct.  Because Rimini will not state whether they specifically "dispute" these facts, even

9   though many of them come from Rimini's discovery responses, Oracle lists them below in

10  Oracle's Separate Statement of Issues of Fact and Law below.

11         Rimini has told Oracle that it disputes the following facts proposed by Oracle:

12         1.     Defendants downloaded software and documentation from Oracle websites

13  including Customer Connection, E-Delivery, Siebel SupportWeb, My Oracle Support, and

14  Oracle Technology Network to Rimini's local computer systems.

15         2.     Oracle's computer systems accessed by Defendants to download to their own

16  computers were protected computers within the meaning of 18 U.S.C. § 1030(e)(2).

17         3.     To access and copy content from Oracle's protected computers, Defendants  used

18  commercially available applications Black Widow, Offline Explorer, FlashGot, Wget, and

19  DownLoadThemAll.

20         4.     To access and copy content from Oracle's protected computers, Defendants  used

21  applications that they developed known as Continuing Documentation, Solutions, Updates and

22  Fixes, Client Cases, Roadmaps and Schedules, Patches and Downloads, and Update Center.

23         5.     Since Ravin launched Rimini's support services in 2005, Rimini and Ravin have

24  marketed Rimini's support services as providing vendor replacement-level support that meets or

25  exceeds the level of support provided by Oracle, at a significant price discount (50% or more)

26  from Oracle's price.

27         **B.     Rimini's Separate Statement**

28         Rimini fundamentally disagrees with Oracle's attempts to include more than 25 pages of

---

20

JOINT PRETRIAL ORDER

1   almost 300 proposed "material facts" in this Order.  From Rimini's perspective, Oracle has not

2   even attempted to identify the truly material facts supporting its claims, instead submitting a

3   laundry list of the evidence Oracle hopes to present at trial.  Such a list is not properly included

4   in a pretrial order, and Oracle's submission fails to provide guidance as to the truly material

5   issues of fact.  In contrast, Rimini offers a focused list of material facts that support Rimini's

6   defenses and damages contentions in this case, as set forth below as Defendants' Separate

7   Statement of Issues of Fact and Law.

8

9   **V.   CONTESTED ISSUES OF LAW AS AGREED TO BY THE**
        **PARTIES**
10

11      The Parties agree that there will be a number of discrete points of law in dispute at or

12  before trial, including for example legal disputes as to the admissibility of certain evidence.

13  Given the number of customer licenses and website terms of use that are potentially relevant to

14  Oracle's various claims, the parties are continuing to meet and confer regarding an appropriate

15  mechanism and process by which to efficiently inform the jury of the meaning and application of

16  relevant provisions.  The parties hope to use the Court's prior summary judgment ruling to

17  stipulate to the meaning of relevant license provision.  However, in the event there are disputes

18  regarding the meaning of specific provisions, the parties may propose a pre-trial hearing to gain

19  the Court's ruling on the license interpretation issues and the application of the Court's summary

20  judgment ruling to similar licenses.

21      Although additional issues may arise, the Parties have endeavored to identify below the

22  additional key issues of law to be tried and determined upon trial.

23      1.   Whether Oracle is entitled to injunctive relief and the scope of such relief.

24      2.   Whether to enter an order impounding or requiring destruction of all infringing

25  materials pursuant to 17 U.S.C. § 503.

26      3.   Whether Oracle is entitled to restitution under California's unfair business

27  practices statute and the amount of such restitution.

28      4.   Whether to enter an order finding a constructive trust for Oracle's benefit.

5.      Whether Oracle is entitled to an accounting and any relief in connection with Oracle's accounting claim.

6.      The amount of statutory damages pursuant to 17 U.S.C. § 504 upon a finding of infringement if Oracle elects to recover statutory damages.

7.      The appropriate calculation of any prejudgment interest.

8.      Whether Oracle is entitled to an award of attorney's fees and costs and the amount of the attorney's fees and costs.

## VI.   ORACLE'S SEPARATE STATEMENT OF ISSUES OF FACT AND LAW

Oracle contends the following facts are material to its thirteen causes of action.  Rimini has not stated whether they will dispute any of them.

1.      Oracle spends several billions of dollars each year in overall research and development, a significant portion of which is dedicated to the products at issue in this case.

2.      Oracle's intellectual property development has enabled it to become one of the largest software companies in the world, with over 100,000 employees.

3.      Defendant Seth Ravin is the founder, president and CEO of Rimini, as well as the former President of TomorrowNow, Inc., a subsidiary of SAP AG ("Tomorrow Now").

4.      Defendants were aware that each of Rimini's PeopleSoft, J.D. Edwards, and/or Siebel customers was a current or former customer of Oracle and/or its predecessors.

5.      At all times since the founding of Rimini, through his ownership of Rimini and his role as CEO and President, Ravin has had both the right and the authority to control, and has had a direct financial interest in, the actions of the corporation.

6.      Ravin has been personally and directly involved in marketing Rimini's services, in Rimini's responses to requests for proposals, and in negotiating Rimini's contracts with customers.

7.      Ravin also approved Rimini's contracts with its customers, including any changes, prior to their execution.

8.      Since Rimini's founding, Ravin has policy and operational control over Rimini.

9.      Since Rimini's founding, Ravin has been Rimini's largest shareholder.

22

A/76550040.2                                                                                      11/21/14

1    10.    Since Rimini's founding, Ravin has maintained operational control over the

2    company.

3    11.    Ravin personally controlled and was an active participant in Rimini's

4    downloading activities.

5    12.    Ravin personally logged into Oracle's technical support websites and downloaded

6    thousands of files, many of which were not licensed by Rimini or by the customer on whose

7    behalf Ravin purported to act.

8    13.    Prior to founding Rimini, Ravin was the President of TomorrowNow, and helped

9    create TomorrowNow's illegal business model of making and using thousands of copies of

10    Oracle's copyrighted software applications.

11    14.    Ravin admitted that: "There's no way to separate [TomorrowNow and Rimini ].

12    We look a lot alike in areas because I did both. … I designed the TomorrowNow service. I

13    evolved it and created a better service with Rimini Street."

14    15.    Ravin designed TomorrowNow's support model.

15    16.    Ravin designed Rimini's support model.

16    17.    TomorrowNow has admitted that, during the time that Ravin was managing

17    TomorrowNow, TomorrowNow violated Oracle's copyrights, committed criminal copyright

18    infringement, and pled guilty to the unauthorized access to a protected computer with intent to

19    defraud.

20    18.    Defendants engaged in "massive theft" of Oracle's intellectual property.

21    19.    Defendants engaged in theft of Oracle's intellectual property by repeatedly

22    making multiple copies of Oracle's copyrighted Enterprise Software programs to support their

23    software support service clients beginning in 2005.

24    20.    Defendants downloaded software and documentation from Oracle websites

25    including Customer Connection, E-Delivery, Siebel SupportWeb, My Oracle Support, and

26    Oracle Technology Network to Rimini's local computer systems.

27    21.    Each download of Oracle software and support materials, including bundles,

28    patches, or updates to Oracle software and Oracle documentation is a reproduction of Oracle's

JOINT PRETRIAL ORDER

1  copyrighted works.

2          22.      Defendants downloaded software and support materials from Oracle websites on

3  multiple occasions.

4          23.      Each and every such download by Defendants constituted a reproduction of one

5  or more of Oracle's copyrighted works.

6          24.      Defendants on numerous occasions used a specific customer's credentials to

7  download software and support materials from Oracle websites to which that customer was not

8  entitled.

9          25.      Defendants on numerous occasions used a specific customer's credentials to

10  download Oracle software and support materials from Oracle websites for the benefit of some

11  other customer.

12          26.      Each download by Rimini of Oracle software and support materials constituted a

13  reproduction of one or more of Oracle's copyrighted works.

14          27.      Defendants on several occasions downloaded software and support materials from

15  Oracle websites when Defendants had not yet contracted to support any customer on software

16  related to those materials.

17          28.      Defendants maintained copies of software and support materials from Oracle

18  websites on individual developers' machines.

19          29.      Each and every copy of physical media such as CDs, DVDs and hard drives that

20  contained copies of Oracle's copyrighted works constituted a reproduction of one or more of

21  Oracle's copyrighted works.

22          30.      Creating a complete copy of Oracle installation media such as a CD, DVD, or

23  hard drive creates at least one copy of any and all code objects present on that installation media.

24          31.      Completely copying installation media from one physical location or device to a

25  second physical location or device creates at least one complete copy of that installation media.

26          32.      Defendants have infringed Oracle's exclusive right to reproduce Oracle's

27  copyrighted works by copying physical media that contained Oracle's copyrighted works.

28          33.      Defendants had a complete copy of each of Oracle's 100 registered works listed

JOINT PRETRIAL ORDER

1  on Exhibit A in their deleted software library folder.

2  34.  Defendants breached their duty to preserve relevant evidence when they deleted

3  the software library in January 2010, knowing that Oracle was likely to file a lawsuit against

4  them based on claims that Defendants were impermissively using Oracle's registered copyright

5  software and knowing that the software library contained evidence potentially relevant to

6  Oracle's anticipated lawsuit.

7  35.  Defendants infringed Oracle's exclusive right to reproduce the copyrighted

8  PeopleSoft, Siebel, and J.D. Edwards works listed in Exhibit A by creating and copying

9  installations of Oracle software, referred to as "environments," on Defendants computer systems.

10  36.  Regardless of the method employed, Defendants copied Oracle's protected

11  expression when building an environment.

12  37.  Defendants copied Oracle's copyright protected software when they built

13  development, or non-production, environments for a number of Defendants' customers using

14  Oracle Database.

15  38.  Defendants built many of their environments ostensibly associated with one

16  customer using software from a non-customer-specific software library.

17  39.  In 2007-2009, at least 90% of the Oracle Software and Support Material stored at

18  \\rsidata01\share\software, \\rsi-clsvr01\client_software\PeopleSoft, and

19  \\rsiclsvr01\internal_software that was used to build local Environments created by Defendants

20  was not located in client-specific folders.

21  40.  In 2007-2009, Defendants used the Oracle software and support materials stored

22  in the identified file locations to build support environments for Defendants' customers that were

23  licensed by Oracle with respect to said software and support material.

24  41.  Until as late as January 2010, Rimini's general practice was to build PeopleSoft

25  environments using installation media, patches and updates from a non-customer-specific

26  software library.

27  42.  On multiple occasions, Defendants cloned an existing environment ostensibly

28  associated with one customer as part of the process of creating an environment ostensibly

JOINT PRETRIAL ORDER

1   associated with a second customer.

2       43.     Exhibit C lists 321 PeopleSoft environments created on Defendants' local

3   systems.

4       44.     Exhibit C also shows the build source for each of the 321 PeopleSoft

5   environments.

6       45.     Of the 321 environments listed on Exhibit C, 104 were created by copying an

7   existing environment ostensibly maintained on behalf of one customer in order to use the copy to

8   support a different customer.

9       46.     Defendants cannot identify the sources of bundles, patches, upgrades, and other

10  software and support materials other than installation media used in building each of their

11  environments.

12      47.     Any environment ostensibly associated with one customer may have been built, at

13  least in part, using software and support materials ostensibly maintained on behalf of another

14  customer (or using materials not associated with any customer).

15      48.     On multiple occasions Defendants created environments not associated with any

16  of Defendants' customers.

17      49.     Defendants created numerous development environments, which are

18  environments used for development, testing, and packaging updates to PeopleSoft software for

19  multiple customers.

20      50.     On multiple occasions, Defendants created environments without keeping track

21  (and, at least sometimes, without knowledge) of the source of the pre-existing environments,

22  environment components, or updates and patches used to create those environments.

23      51.     Defendants infringed Oracle's exclusive right to reproduce Oracle's copyrighted

24  works by backing up and restoring environments to or from Rimini's computer systems.

25      52.     Each backup and each restore resulted in a reproduction of one or more of

26  Oracle's copyrighted works.

27      53.     Creating tape backups of software and support materials, which included weekly

28  and monthly full backups and daily incremental backups of Defendants' computer network,

A/76550040.2                                                                11/21/14

1   including the environments and stand-alone installations of PeopleTools listed on Exhibits C, D,

2   and E, the copies of installation media on Defendants' local systems, and the installations of and

3   install media for Oracle Database on Defendants' local systems.

4   54.   Considering just the monthly backups and just the backups of PeopleSoft

5   environments that Defendants kept indefinitely, by January 1, 2012, Defendants created more

6   than 3,500 permanent copies of any Oracle copyrighted works contained in those environments.

7   55.   Defendants' restored backups of substantial portions of PeopleSoft environments,

8   including the PS_HOME folder and the database, on an ongoing basis.

9   56.   Defendants infringed Oracle's exclusive rights to reproduce Oracle's copyrighted

10   works through Defendants' regular use of environments located on Defendants' systems.

11   57.   Defendants installed Oracle software environments on virtual machine servers.

12   58.   Defendants loaded or started Oracle software environments present on these

13   virtual machines for various purposes, including to create updates for PeopleSoft software.

14   59.   Loading a computer program into RAM, or loading a virtual machine operating a

15   computer program, creates a partial copy of that program.

16   60.   A portion of an environment is loaded into a computer's RAM when that

17   environment is loaded for use.

18   61.   Rimini activated virtual machines containing environments (which had been

19   deactivated or not yet activated following a rebooting of the virtual machine servers), resulting in

20   the copying of contents of the environments within the affected virtual machines.

21   62.   Defendants regularly ran PeopleTools executable files, which required loading

22   substantial portions of PeopleTools into RAM.

23   63.   Each occasion on which more than a *de minimis* portion (let alone a substantial

24   portion) of copyrighted Oracle software was loaded into RAM was an infringing reproduction of

25   one or more Oracle copyrighted works.

26   64.   Defendants sometimes made RAM copies of an environment ostensibly

27   associated with one customer when using that environment for the benefit of different customers.

28   65.   Defendants infringed Oracle's exclusive right to reproduce Oracle's copyrighted

A/76550040.2

1  works by copying individual files that embodied more than a *de minimis* portion of an Oracle

2  copyrighted work within Defendants' computer systems.

3      66.    Each and every such copy reproduced a substantial amount of protected

4  expression from one or more of Oracle's copyrighted works.

5      67.    Defendants copied documentation and software from one of Defendants'

6  computer system to another, such as copying from the Client Archive in Progress folder to the

7  final client archive location.

8      68.    Each restored backup infringed Oracle's exclusive right of reproduction in its

9  copyrighted works, including as to registered works associated with the software and

10  documentation copied.

11      69.    Defendants regularly opened files that contained Oracle's source code or

12  documentation for review in a software application or text editor.

13      70.    Each display of a file on a computer by Defendants resulted in copying of more

14  than a *de minimis* amount of protected expression from the source code or documentation into

15  RAM.

16      71.    Each instance where Defendants opened Oracle's software or support materials in

17  a software application or text editor infringed Oracle's exclusive right of reproduction in its

18  copyrighted works, including as to registered works associated with the software and

19  documentation copied.

20      72.    Rimini creates derivative works from Oracle's copyrighted works by creating

21  fixes and updates to Oracle's software.

22      73.    Each update generated by Defendants was intended to extend or modify the

23  features or functionality of Oracle software.

24      74.    Defendants created thousands of fixes and updates for Oracle's software.

25      75.    Defendants advised their customers on more than one occasion that Rimini's

26  updates to Oracle software were derivative works that constituted Oracle's intellectual property.

27      76.    When developing a PeopleSoft update, Defendants would copy files containing

28  portions of Oracle source code and of Oracle's PeopleSoft-specific database schema between

1    local environments, network shares, developers' machines, and Defendants' FTP server.

2         77.    As part of the development process, copies of code were sent via e-mail or instant

3    message between Defendants' employees.

4         78.    Defendants performed this copying dozens or hundreds of times per fix, for

5    hundreds or thousands of fixes.

6         79.    Defendants developed updates for Oracle software using one customer's

7    environment and distributed those fixes to other customers.

8         80.    On multiple occasions, Defendants used a small number of PeopleSoft

9    environments to develop updates (including projects, data changes, and batch object changes)

10   and such updates were ultimately distributed to multiple Rimini customers.

11        81.    Certain environments on Defendants' local systems were used multiple times to

12   develop a portion of an update that was provided to customers other than and/or in addition to

13   the customer for which the environment was ostensibly maintained.

14        82.    Defendants delivered a total of 2,093 fixes to their PeopleSoft customers from

15   their inception of business until April 27, 2011.

16        83.    All of the fixes, when applied to a PeopleSoft environment, would result in a

17   nontrivial change to that environment.

18        84.    59% of the fixes were developed using an environment identified by Defendants'

19   personnel and documents as a development environment.

20        85.    84% of the fixes were delivered to customers other than the customer licensed for

21   the installation media for the environment in which the fix was developed or tested.

22        86.    For 69% of the fixes, some portion of the fix was packaged using a development

23   environment into a consolidated file for delivery.

24        87.    68% of the fixes involving batch objects (a type of file used in PeopleSoft) were

25   delivered to customers other than those licensed for copies of the installation media for the

26   environment in which the fix was developed.

27        88.    85% of the fixes involving online objects (a type of file used in PeopleSoft) were

28   delivered to customers other than those in whose environment they were developed.

JOINT PRETRIAL ORDER

89.     91% of the 57 fixes involving DAT files (a type of file used in PeopleSoft) containing table data were delivered to more customers than the customers associated with the environments used to create those DAT files.

90.     96% of the fixes involving batch objects (a type of file used in PeopleSoft) contain more than *de minimis* protectable expression from an Oracle copyrighted work.

91.     Most of Defendants' fixes for JD Edwards software contained modified Oracle source code or instructions for modification of Oracle's source code that contained modified versions of Oracle's source code.

92.     Each such fix is an infringing derivative work based upon Oracle software and support materials.

93.     Creation of each such fix violated Oracle's exclusive derivative work right in Copyrighted Works.

94.     All of Defendants' fixes for PeopleSoft software and for JD Edwards software, when applied, changed some aspect of the features or functionality of a PeopleSoft or JD Edwards environment.

95.     Every time a fix was applied to an environment it extended or modified the features or functionality of the Oracle software in the environment.

96.     Application of any fix generated by Defendants violated Oracle's exclusive derivative work right in its copyrighted works.

97.     Defendants infringed Oracle's exclusive right to distribute Oracle's copyrighted works by distributing updates to Oracle's enterprise software.

98.     Updates distributed by Defendants contained protected expression from one or more of Oracle's registered works.

99.     Defendants distributed thousands of fixes for Oracle's enterprise software to individual customers or to dozens of customers; most of these fixes violated Oracle's exclusive rights in its copyrighted works, including its registered works.

100.    Defendants infringed Oracle's exclusive right to distribute Oracle's copyrighted works by publicly displaying Oracle's enterprise software on at least one occasion.

JOINT PRETRIAL ORDER

1         101.    In October 2009, Defendants performed a demonstration for Bausch & Lomb

2  using a copy of H890BAU2, an HRMS 8.9 + PeopleTools 8.48.10 + Oracle Database 10g,

3  release 2 development environment.

4         102.    This conduct violated Oracle's exclusive right of reproduction in Oracle's

5  copyrighted works.

6         103.    Defendants' wrongful conduct described above was copyright infringement.  In

7  addition, or in the alternative, by this conduct, Defendants also induced their customers to breach

8  the terms of their license agreements.

9         104.    Defendants downloaded and copied software and support materials from Oracle

10  websites, including Customer Connection, E-Delivery, Siebel SupportWeb, My Oracle Support,

11  and Oracle Technology Network, to Rimini's local computer systems.

12         105.    Oracle's computer systems accessed by Defendants to download to their own

13  computers were protected computers within the meaning of 18 U.S.C. § 1030(e)(2).

14         106.    Oracle owned all of the computer hardware associated with the operation of the

15  Oracle websites accessed by Defendants, including Customer Connection, E-Delivery, Siebel

16  SupportWeb, My Oracle Support, and Oracle Technology Network.

17         107.    Oracle owned or had exclusive rights to all of the materials available for

18  download from the Oracle websites, including updates and support materials that resided on

19  those computers.

20         108.    By obtaining login credentials and/or logging into and using Oracle's protected

21  computers with valid login credentials, users agreed to Terms of Use which were displayed,

22  agreed to, and/or available for review.

23         109.    The Terms of Use governed who was authorized access Oracle's protected

24  computers and the manner in which they were authorized to access Oracle's protected

25  computers.

26         110.    The Terms of Use limited authorization to access and use of Oracle's protected

27  computers.

28         111.    The Terms of Use limited authorization to access and use the materials that were

1   made available on Oracle's protected computers.

2         112.    Defendants agreed to the Terms of Use when they accessed Oracle's protected

3   computers.

4         113.    Defendants knew about Oracle's Terms of Use, but Defendants accessed Oracle's

5   protected computers and download materials from Oracle's protected computers without regard

6   for and in violation of those Terms of Use.

7         114.    In violation of the Terms of Use, Defendants used a variety of automated tools,

8   crawlers, and scrapers to access and copy content from Oracle's protected computers.

9         115.    Defendants, in competition with Oracle, used information downloaded from

10   Oracle's protected computers to help support customers.

11         116.    As early as June 29, 2006, Defendants were putting the "infrastructure in place"

12   to download all of the Siebel materials available from Oracle's protected computers to a non-

13   customer-specific, centralized repository at Rimini referred to as the "full local library."

14         117.    Starting as early as June 22, 2006, and continuing through at least January 24,

15   2007, Defendants implemented a "daily crawl" using an unauthorized automated downloading

16   tool, Offline Explorer, to access Oracle's protected computers and capture Siebel support

17   materials, even for customers with expired Oracle credentials.

18         118.    The materials from these unauthorized crawls by Defendants, along with a base

19   extract created using the login and password from, among others, Leads Customers Growth and

20   Brandes, were provided to customers as the "Siebel SupportWeb extract."

21         119.    From at least October 5, 2006, Defendants set up Offline Explorer to run a weekly

22   crawl of the Oracle E-Delivery website and obtain materials from Oracle's protected computers.

23         120.    Defendants continued to use the unauthorized tool Offline Explorer to download

24   Siebel materials from Oracle's protected computers at least through October 4, 2007.

25         121.    On or before September 22, 2006, which was before Defendants had contracted

26   with any customers licensed to use PeopleSoft software, Defendants used Offline Explorer to

27   download massive amounts of PeopleSoft materials from Oracle's protected computers through

28   Oracle's Customer Connection website.

JOINT PRETRIAL ORDER

1     122.    The tools used by Defendants downloaded materials indiscriminately, including

2     PeopleSoft and J.D. Edwards knowledge-base materials.

3     123.    Defendants used these Defendant-created unauthorized downloading tools,

4     including Continuing Documentation, Solutions, Updates & Fixes, Client Cases, Patches &

5     Downloads, and Roadmaps & Schedules, to download PeopleSoft materials from Oracle's

6     protected computers through Oracle's websites beginning on or before October 23, 2006 and

7     lasting through at least January 12, 2009.

8     124.    Defendants used these automated tools to run mass downloads from Oracle's

9     protected computers on multiple virtual machines simultaneously.

10    125.    On June 6, 2007, Defendant Seth Ravin wrote an email stating that Rimini would

11    "continue to utilize automation in its downloading and archiving processes" and that it would

12    primarily run these programs on nights and weekends.

13    126.    Defendants also developed customized automated downloading tools for J.D.

14    Edwards software, such as Update Center, Solutions, and Client Cases, and used these to run

15    mass downloads from Oracle's protected computers between at least May 9, 2008 and December

16    9, 2008.

17    127.    On or about September 4, 2008, Defendants' employees began development of

18    automated tools to download knowledge-base materials from Oracle's protected computers

19    through Oracle's MetaLink 3 website.

20    128.    Lasting until April 19, 2009, Defendants utilized these new tools, referred to as

21    the "Knowledge Base Scan" and the "brute force method" to indiscriminately download

22    materials from Oracle's protected computers.

23    129.    Based on the use of these tools, in and after October 2008, and continuing in

24    2009, there occurred unusually heavy download activity on Oracle's password-protected

25    Technical Support website.

26    130.    Thousands of these downloads were made to servers associated with the IP

27    addresses █████████████████████████

28    131.    Those IP addresses are owned or assigned to Defendants.

---

33

JOINT PRETRIAL ORDER

1   132.    Between November 18, 2008 and November 24, 2008, Defendants accessed

2   Oracle's protected computers using an automated crawler in an attempt to download more than

3   800,000 files from Oracle's websites, resulting in approximately 120,000 successful downloads

4   to the server associated with the IP address ████████.

5   133.    On November 21 and 24, 2008, Oracle provided specific notice that Defendants'

6   automated downloading was negatively affecting Oracle's protected computer systems, that

7   corrective action must be taken, and that Oracle may need to block the IP addresses used for

8   automated downloading in order to protect Oracle's systems.  Defendants' received these notices

9   on or about November 21 and 24, 2008.

10   134.    On December 3, 2008, Oracle provided further notice that Defendants' automated

11   downloading was negatively affecting Oracle's protected computer systems, that Defendants'

12   automated downloading was not authorized by, and was prohibited by, applicable Terms of Use,

13   that Oracle had blocked a number of IP addresses used for automated downloading, and that the

14   improper access must stop.  Defendants received this notice on or about December 3, 2008.

15   135.    Defendants undertook a series of steps to continue automated downloading

16   despite Oracle's technological measures to prevent it, including using employees' residential

17   internet access for downloading and frequently changing IP addresses in order to avoid detection

18   and blocking.

19   136.    In November 2008, Defendant employee Dennis Chiu stated in writing that

20   Defendants' use of such crawlers "creates issues with CPU utilization on Oracle's servers."

21   137.    Between December 10, 2008 and December 18, 2008, a user credential ending

22   with "@riministreet.com" accessed Oracle's protected computers and downloaded more than

23   100,000 files to the server associated with IP address 71.5.6.23.

24   138.    Even after Defendants claim they stopped use of these automated tools in January

25   2009, Defendants' unauthorized downloading continued.

26   139.    Defendants used crawlers to access Oracle's protected computers and download

27   content from Oracle's websites up until at least February 2009.

28   140.    Including but not limited to during March 18-23 and April 13-19, 2009, using

JOINT PRETRIAL ORDER

1   customer credentials for First Service Networks and Marshall Erdman & Associates, Defendants

2   conducted indiscriminate downloads of Siebel software and support materials from Oracle's

3   protected computers.

4       141.    Further, between April 20, 2009 and May 1, 2009, a user credential ending with

5   "@riministreet.com" accessed Oracle's protected computers and downloaded several thousand

6   files to the server associated with the IP address ███████.

7       142.    Defendants downloaded from Oracle's protected computers at least 966,511

8   copies of Oracle's copyright support materials.

9       143.    Defendants' use of automated download tools to access Oracle's protected

10   computers violated access restrictions in Oracle's Terms of Use.

11       144.    These activities represent Defendants' illegal access to Oracle's protected

12   computers, without authorization, in excess of authorization, or in an unauthorized manner.

13       145.    Defendants' large-scale, unauthorized downloading damaged Oracle's protected

14   computers.

15       146.    Defendants' large-scale, unauthorized downloading caused Oracle's websites to

16   freeze, slow down, or become temporarily non-operational due to the scope of the downloading.

17       147.    Defendants' large-scale, unauthorized downloading impeded the functioning of

18   Oracle's business, increased costs to Oracle of maintaining and repairing the protected

19   computers, and disrupted Oracle's ability to provide service to its customers.

20       148.    Defendants' unauthorized accesses and access exceeding authorization of

21   Oracle's protected computers triggered a large number of database deadlocks.

22       149.    For a period of time in January 2009, access to the entire Oracle Knowledge

23   Management database was disabled for all users as a result of a Defendant crawl.

24       150.    In each instance, Defendants downloaded materials from Oracle's protected

25   computers that either they were not licensed to use or the customer they were allegedly

26   downloading for was not licensed to use and/or violated or exceeded applicable terms of use

27   when accessing and/or downloading materials from the Oracle websites.

28       151.    In each instance, Defendants either accessed Oracle's computers without

JOINT PRETRIAL ORDER

1 authorization or in a manner that exceeded their authorization.

2      152.    Oracle America and OIC were in economic relationships with their customers that

3 would have resulted in an economic benefits to Oracle America and OIC.

4      153.    Oracle's past and existing licensing and support relationships with customers

5 yield future economic benefit through ongoing sales of both software licenses and support

6 contracts.

7      154.    Defendants' customers previously entered into support contracts with Oracle to

8 receive support services.

9      155.    While some of Oracle's customers cease to purchase software support, these

10 customers can choose to return to Oracle support at any time.

11      156.    Defendants' knew of the existence of Oracle's relationships with its customers.

12      157.    Defendants were aware that each of Defendants' potential PeopleSoft, J.D.

13 Edwards, and/or Siebel customers was a current or former customer of Oracle or of Oracle's

14 predecessors.

15      158.     Defendants separate Oracle from its licensees by denying Oracle recurring

16 support revenue.

17      159.    By denying Oracle of support revenue, Defendants harm Oracle.

18      160.    Defendants competed for support contracts for PeopleSoft, J.D. Edwards, or

19 Siebel enterprise software directly with Oracle.

20      161.    Defendants' business model is premised on convincing customers to purchase

21 support from Defendants instead of from Oracle.

22      162.    Defendants recruited customers to sign support contracts with Defendants instead

23 of with Oracle.

24      163.    Defendants engaged in wrongful conduct in order to sign customers at Oracle's

25 expense.

26      164.    The software support for PeopleSoft, J.D. Edwards, and Siebel that Defendants

27 offered to their customers was predicated on the following conduct:

28         a.    On numerous occasions, Defendants accessed Oracle's systems, including

1    Oracle's password-protected customer support websites, without authorization.

2    b.   For example, Defendants logged into Oracle's support website using one

3         customer's credentials to access the site on behalf of another customer, or for

4         Defendants' general activities.

5    c.   Defendants also used expired credentials to access Oracle's support website.

6    d.   Defendants also used credentials from prospective customers that had not signed,

7         and in some cases never signed, contracts with Defendants.

8    e.    Defendants also violated Oracle's various Terms of Use through their use of

9         automated tools when downloading software and support materials.

10   f.   Defendants also violated Oracle's Technology Network Developer License and its

11        E-Delivery terms of use and trial license agreement when accessing and using

12        information from Oracle's websites.

13   g.   Defendants used information they obtained through this access to Oracle's

14        systems to provide support services to Defendants' customers.

15   h.   Defendants logged into Oracle's customer support website and used the website

16        to train their personnel, and generally develop a knowledge base that allowed

17        Defendants to advertise their services and recruit customers.

18   i.   Defendants provided false or misleading information to Oracle, including causing

19        customers to provide misinformation about the locations where customers were

20        requesting software shipped.

21   j.   Defendants provided below-cost support services as loss leaders.

22   165.   Defendants made false statements publicly and to individual current or

23   prospective customers regarding how Defendants provided support services, Defendants'

24   compliance with the terms of their customers' licenses with Oracle, and Defendants' ability

25   and/or authority to offer their services legally or without otherwise breaching any duty to Oracle.

26   166.   Defendants did not tell customers that Defendants' services were not compliant

27   with the customers' software licenses.

28   167.   Defendants did not tell customers that Defendants cross-used software.

JOINT PRETRIAL ORDER

168.  Defendants did not tell customers that Defendants were not entitled to maintain copies of Oracle's software on Defendants systems.

169.  Defendants did not tell customer that Defendants did not develop, test, and deliver unique and customer-specific regulatory and tax updates.

170.  Defendants also provided false information to their existing customers that was then relayed by them in false or misleading references to prospective customers.

171.  Defendants offered financial incentives to their customers in exchange for favorable references even though Defendants told prospective customers to whom the references were being provided that Defendants did not do so.

172.  Defendants also made false representations regarding Oracle's lawsuit against SAP AG and TomorrowNow, Inc., Oracle's lawsuit against Defendants, and the similarities and/or alleged differences between Defendants and TomorrowNow.

173.  Defendants also entered into a support contract with Leads Customer Growth, never provided it with support, but then used their relationship with that customer to acquire other Oracle customers without telling those other customers that Defendants were not providing Leads Customer Growth with support.

174.  Defendants knew their statements to customers and the market were false, and that their failure to provide customers with accurate information was misleading.  At the very least, Defendants did not have a sufficient basis to make these representations.

175.  Defendants also knew that much of their conduct was unauthorized.

176.  Defendants' false and misleading statements, and their unauthorized support activities caused customers to sign support contracts with Defendants.

177.  Because they purchased support services from Defendants, Defendants' customers cancelled their support contracts with Oracle, did not renew support services with Oracle, or chose not to repurchase support services from Oracle

178.  Defendants' conduct also caused Oracle to lose revenues and profits from Defendants' failure to pay Oracle for their access to and use of Oracle's Database software.

179.  Defendants' conduct also allowed Defendants to benefit financially from their

JOINT PRETRIAL ORDER

1   interference and disruption with Oracle's customer relationships.

2          180.    Oracle is also entitled to punitive damages, which Oracle intends to pursue.

3   Oracle also intends to recover its attorneys' fees and other costs.

4          181.    Oracle requires individuals who access certain websites to agree to certain terms

5   of use, including Oracle's Metalink 3 Terms of Use, E-Delivery Terms of Use, Oracle

6   Technology Network Terms of Use, Customer Connection Terms of Use, SupportWeb Terms of

7   Use, My Oracle Support Terms of Use, and Oracle.com Terms of Use (collectively, "Terms of

8   Use").

9          182.    Rimini accessed various Oracle websites and also downloaded software and

10  support materials from those websites, and as a result agreed to be bound by Oracle's Terms of

11  Use.

12         183.    Oracle has performed all conditions, covenants, and promises required on its part

13  to be performed in accordance with Oracle's Terms of Use.

14         184.    Defendants used automated download tools to acquire software and support

15  materials from Oracle's support websites, in violation of provisions of the Terms of Use that

16  prohibit the use of automated download tools.  Defendants downloaded software and support

17  materials from Oracle's customer support websites using user credentials for customers that were

18  not authorized to obtain some of those software and support materials, in violation of provisions

19  of the Terms of Use.

20         185.    Defendants used, reproduced, and copied software and support materials

21  downloaded from Oracle's customer support websites for purposes other than for the support of

22  the customer whose login identification and password were used to access the website, in

23  violation of provisions of the Terms of Use.

24         186.    Defendants used, reproduced, and copied software and support materials

25  downloaded from Oracle's customer support websites for purposes other than for the support of

26  the authorized use of Oracle programs for the customer who held a supported license from

27  Oracle without the prior written permission of Oracle, in violation of provisions of the Terms of

28  Use.

JOINT PRETRIAL ORDER

187.    Defendants breached Oracle's E-Delivery Terms of Use and Trial License Agreement by downloading and use of software from Oracle's E-Delivery website.

188.    Defendants also used Oracle's Database software outside the scope permitted by the Oracle Technology Network Developer License Agreement.

189.    Defendants' breach of Oracle's Terms of Use caused harm to Oracle.

190.    Each of Defendants' PeopleSoft, J.D. Edwards, and Siebel customers licensed PeopleSoft, J.D. Edwards, Siebel enterprise software from Oracle or from Oracle's predecessors.

191.    Defendants knew of the existence of Oracle's relationships with its customers.

192.    As described above, through Defendants' support activities, Defendants caused PeopleSoft, J.D. Edwards, and Siebel licensees to be in breach of their contracts with Oracle.

193.    Defendants' conduct, by inducing the breach of their customers' software licenses, harmed Oracle.

194.    Oracle has performed all conditions, covenants, and promises required on its part to be performed in accordance with the terms and conditions of Oracle's PeopleSoft, J.D. Edwards, and Siebel licenses.

195.    Defendants committed the above-described conduct to gain a competitive advantage over Oracle in the form of, for example, better publicity, better revenue stream, and the devaluation of Oracle's software brands.

196.    The above-described conduct harmed Oracle.  Among other things, Defendants' conduct damaged Oracle's relationship with its customers, caused Oracle to lose support and license revenue, harmed Oracle's reputation, and caused Oracle to incur expenses to further compete against Rimini.

197.    Defendants recruited Oracle customers and acquired support fees from those customers based on the above-described conduct.

198.    Defendants sold their services at a price that was below cost.

███████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████

JOINT PRETRIAL ORDER

1  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

2  200.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

3  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

4  201.  Defendants sold their services below cost with a desire to harm Oracle.

5  202.  The sale of Defendants' services at below cost caused harm in the form of lost

6  support fees.

7  203.  As described above, Defendants misappropriated Oracle's property.

8  204.  Defendants used Oracle's property to receive money properly due and owed to

9  Oracle.

10  205.  The total amount of money due from Defendants to Oracle is unknown to Oracle

11  and cannot be fully ascertained without an accounting of the income Defendants have obtained

12  through their wrongful and unlawful conduct of obtaining and using Oracle's property.

13  206.  Defendants' ability to offer vendor replacement-level support at significant

14  discounts relied upon the misuse of Oracle's copyrighted software and support materials.

15  207.  Offering vendor replacement-level support at the cost savings offered by

16  Defendants was a significant factor or primary driver in Defendants' customers' decision to

17  cancel their support contracts with Oracle and turn to Defendants for support of their Siebel,

18  PeopleSoft and/or J.D. Edwards applications.

19  208.  Defendants' copyright infringement and other wrongful acts contributed

20  significantly to customers' decision to cancel their support contracts with Oracle and/or purchase

21  support from Defendants.

22  209.  At all times, Oracle had the capacity to service the customers that switched to

23  Defendants.

24  210.  Defendants are Oracle's primary competition for after-market support.

25  211.  Throughout the entire time period that Defendants provided third party vendor-

26  level support for PeopleSoft, J.D. Edwards and Siebel products, the market for credible non-

27  infringing support providers of these products was primarily a two supplier market consisting of

28  Defendants and Oracle.

1    212.    Most of the other third party service providers for the relevant products who

2    operated at any time Defendants did are no longer in business or only offer consulting services

3    that differ from the level of support that Oracle or Defendants provided.

4    213.    Defendants' customers did not know of and/or did not seriously consider leaving

5    Oracle support for any other third party support provider other than Defendants when they left

6    for Defendants.

7    214.    Self-support was rarely an option considered or used by customers leaving Oracle

8    support.

9    215.    Defendants' recruitment of customers away from Oracle caused Oracle to lose

10   support revenue for those customers.

11   216.    Had they not signed with Defendants, Defendants' customers would have signed

12   with Oracle in proportion to and consistent with Oracle's historical attrition rates.

13   217.    Oracle has suffered lost profit damages beginning on the date that each relevant

14   customer cancelled its Oracle contract, or contracts, related to the products for which it received

15   support services from Defendants.

16   218.    Once a customer was dislodged from Oracle by Defendants, it usually resulted in

17   a permanent or long term support revenue loss to Oracle because of financial and political

18   obstacles for that customer to return to Oracle for support.

19   219.    Oracle suffered lost profits from these customers in the amount they would have

20   paid Oracle for support had they not cancelled and/or purchased support from Defendants.

21   220.    As a result of Defendants' wrongful acts, OIC suffered $76.0 million in lost

22   profits through December 2012, for customers who signed contracts with Defendants before

23   December 2011, from revenue related to the support of Oracle's PeopleSoft, J.D. Edwards and

24   Siebel software.

25   221.    As a result of Defendants' continuing wrongful acts, OIC suffered additional lost

26   profits after December 2012.

27   222.    As a result of Defendants' wrongful acts, Oracle America has suffered $115.2

28   million in lost profits through December 2012, for customers who signed contracts with

1   Defendants before December 2011, from revenue related to the support of Oracle's PeopleSoft,

2   J.D. Edwards and Siebel software.

3       223.    As a result of Defendants' continuing wrongful acts, Oracle America suffered

4   additional lost profits after December 2012.

5       224.    The copyrighted software and support materials obtained by Defendants and used

6   to build local environments included the installation of Oracle's Database software.

7       225.    As it relates to Defendants' misuse of Oracle's copyrighted Oracle Database

8   software Support and Materials, Oracle lost license fees at least as great as those fees it would

9   have charged a licensee for each Defendant "internal business operation" that benefitted from the

10  use of the Oracle Database environments.

11      226.    Oracle's publicly listed license fees for Oracle Database are based on the number

12  of processors (or cores on each processor) on the servers where the Oracle Database(s) are

13  installed.

14      227.    Prior to December 18, 2009, Oracle's list price for a basic Enterprise Edition

15  license to use Oracle Database for an "internal business operation" was $40,000 per processor.

16      228.    After that date, the price increased to $47,500 per processor.

17      229.    During the damage period, Oracle charged its Oracle Database customers 22% of

18  the Oracle Database license fee per year for support.

19      230.    Oracle would have incurred incremental costs of no more than 5% of Oracle

20  Database revenue to achieve the lost Oracle Database license revenue.

21      231.    Oracle lost license fees in the amount of $17.9 million due to Defendant''

22  infringement of Oracle's Database software and Defendants' failure to purchase the required

23  license.

24      232.    After Oracle acquired Siebel in January 2006, Oracle implemented a policy to

25  apply a 4% to 5% annual inflationary increase to its Siebel support contracts, instead of using its

26  customary 3% annual inflationary increase.

27      233.    In October 2009, competition from Defendants caused Oracle to discontinue its

28  incremental 1% to 2% inflationary adjustment it had applied to Siebel support contracts.

43

JOINT PRETRIAL ORDER

1    234.   Absent Defendants' wrongful conduct, Oracle would have earned an incremental

2  1% to 2% inflationary adjustment on certain Siebel support contracts.

3    235.   Oracle would have incurred no incremental costs associated with generating these

4  additional revenues.

5    236.   OIC's lost profits for these lost Siebel support revenues through December 2012

6  is $2.2 million.

7    237.   Oracle's $6.1 billion purchase price was an approximate 4 times multiple of

8  Siebel's total revenue based on Siebel's 2005 operating results.

9    238.   In its acquisition of Siebel, Oracle recognized intangible assets of Goodwill at

10  $2.5 billion, and other intangible assets of $1.6 billion, including $808 million of Software

11  Support Agreements and Related Customer Relationships.

12    239.   At the time of Oracle's acquisition of Siebel, approximately 4,000 customers were

13  under support contracts with Siebel.

14    240.   Oracle's "Project Sierra" operating model provides Oracle's forward-looking

15  expectations of the Siebel product line's financial performance at the time of the acquisition of

16  Siebel.

17    241.   Duff & Phelps, which was retained by Oracle to allocate the $6.1 billion

18  acquisition price for financial reporting purposes, valued the acquired Siebel Software Support

19  Agreements and Related Customer Relationships based on a discounted cash flow approach that

20  considered projections of support revenues and costs through May 31, 2016.

21    242.   At the time of its acquisition of Siebel, Oracle anticipated a 90% or greater

22  renewal rate on its Siebel support contracts.

23    243.   Duff & Phelps projected Oracle's gross margin on Siebel Maintenance

24  Agreements and Related Customer Relationships of 89.5%.

25    244.   Duff & Phelps projected Oracle's sales and marketing costs related to Siebel

26  Maintenance Agreements and Related Customer Relationships of 5%.

27    245.   Duff & Phelps applied a 10% discount rate in its valuation of Siebel's "Existing

28  Technology – License" and "Maintenance Agreements and Related Customer Relationships."

1   246.   ███████████████████████████████████████████████████

2   ███████████████████████

3   247.   Defendants typically marketed their Siebel support service at 50% off of Oracle's

4   price to potential Siebel customers.

5   248.   ███████████████████████████████████████████████████

6   ████████████████████

7   249.   ███████████████████████████████████████████

8   250.   ███████████████████████████████████████████████████

9   ███████████████████████████████████████████████

10   251.   ███████████████████████████████████████████████████

11   ███████

12   252.   ███████████████████████████████████████████████████

13   ███████████████████████████████████████████████████████

14   ████████

15   253.   There are no agreements where Oracle receives license fees or royalties for

16   licensing the Siebel copyrighted materials in suit that would provide an established royalty for a

17   license for Defendants' use in this case.

18   254.   There were no license fees paid by Defendants for the use of copyrighted material

19   that is comparable to Defendants' use of Oracle's Siebel copyrighted materials in this case.

20   255.   During the term of the hypothetical license, Oracle and Defendants would have

21   considered themselves to be direct competitors for Siebel support services.

22   256.   The fair market value of a hypothetical license for Rimini's infringement of

23   Oracle's Siebel software is $60.0 million.

24   257.   Defendants conducted a pilot launch of their PeopleSoft support in April 2006 and

25   acquired their first PeopleSoft customer in September 2006.  Defendants conducted a pilot

26   launch of their J.D. Edwards support in September 2006 and acquired their first J.D. Edwards

27   customer in April 2008.

28   258.   In December 2004, Oracle acquired PeopleSoft, including the PeopleSoft

JOINT PRETRIAL ORDER

1   copyrighted materials in suit related to PeopleSoft Enterprise, J.D. Edwards Enterprise One and

2   J.D. Edwards World, for $11.1 billion.

3       259.    Oracle's $11.1 billion purchase price was an approximate 4 times multiple of

4   PeopleSoft's total revenue based on PeopleSoft's 2004 operating results.

5       260.    In its acquisition of PeopleSoft, Oracle recognized intangible assets of Goodwill

6   at $6.5 billion, and other intangible assets of $3.4 billion, including $2.1 billion of Maintenance

7   Agreements and Customer Relationships.

8       261.    At the time of Oracle's acquisition, approximately 9,920 customers were under

9   support contracts with PeopleSoft.

10      262.    Oracle's "Project Spice" operating model provides Oracle's forward-looking

11  expectations of the PeopleSoft and J.D. Edwards' product lines' financial performance at the

12  time of the acquisition of PeopleSoft, including expected attrition rates and average annual

13  service revenues per customer.

14      263.    Standard & Poor's (S&P), which was retained by Oracle to allocate the $11.1

15  billion acquisition price for financial reporting purposes, valued the acquired PeopleSoft

16  Maintenance Agreements and Customer Relationships based on a discounted cash flow approach

17  that considered projections of support revenues and costs through May 31, 2015.

18      264.    In its valuation of PeopleSoft's Maintenance Agreements and Customer

19  Relationships, S&P projected a 96.5% renewal rate on PeopleSoft and J.D. Edwards support

20  contracts.

21      265.    At the time of its acquisition of PeopleSoft, Oracle anticipated average annual

22  service revenues per PeopleSoft/J.D. Edwards customer of $130,000.

23      266.    S&P projected Oracle's gross profit on PeopleSoft Maintenance Agreements and

24  Related Customer Relationships of 85%.

25      267.    S&P projected Oracle's sales and marketing costs related to PeopleSoft

26  Maintenance Agreements and Related Customer Relationships of approximately 5%.

27      268.    S&P applied a 10% discount rate in its valuation of PeopleSoft's "Existing

28  Technology – License" and "Maintenance Agreements and Related Customer Relationships."

1   269.   Defendants believed their market opportunity for support of Oracle products was

2   5% to 20% of Oracle's customer base.

3   270.   Defendants typically marketed their PeopleSoft and J.D. Edwards support

4   services at 50% off of Oracle's price to potential PeopleSoft and J.D. Edwards customers.

5   271.   ████████████████████████████████████████

6   ████████████████

7   272.   ███████████████████████████████████████

8   273.   ████████████████████████████████████████

9   █████████████████████████████████████████████

10   274.   ███████████████████████████████████████

11   ███████████████████████

12   275.   ███████████████████████████████████████

13   █████████████████████████████████████████████

14   276.   There are no agreements where Oracle receives license fees or royalties for

15   licensing the PeopleSoft and J.D. Edwards copyrighted materials in suit that would provide an

16   established royalty for a license for Defendants' use in this case.

17   277.   There were no license fees paid by Defendants for the use of copyrighted material

18   that is comparable to Defendants' use of Oracle's PeopleSoft and J.D. Edwards copyrighted

19   materials in this case.

20   278.   During the term of the hypothetical license, Oracle and Defendants would have

21   considered themselves to be direct competitors for PeopleSoft and J.D. Edwards support

22   services.

23   279.   The fair market value of a hypothetical license for Defendants' infringement of

24   Oracle's Siebel software is $150.0 million.

25   280.   ███████████████████████████████████████

26   █████████████████████████████████████████████

27   ███████████████████████████

28   281.   ███████████████████████████████████████

JOINT PRETRIAL ORDER

1 ████████████████████████████████████████

2    282.    Defendants have also been unjustly enriched by avoiding licensing and support

3 fees related to their unlicensed use of Oracle's Database software (see above).

4    283.  ████████████████████████████████

5 ████████████████████████████████████████

6 ███████████████████████

7    284.  ████████████████████████████████

8 ██████████████████████████████

9    285.  ██████████████████████████████████

10    286.    Oracle incurred personnel time and expense related to its investigation of and

11 response to three specific incidents related to Defendants' automated downloading and searching

12 activity.

13    287.    Based on Oracle's estimates of the number of hours spent by specific personnel

14 related to these incidents, and the salary costs of those individuals, Oracle incurred at least

15 $26,689 of personnel expense related to the investigation of and response to Defendants' alleged

16 activity.

17    288.    Oracle has incurred significant ongoing legal expenses related to this matter

18 including attorney's fees, costs and other recoverable legal expenses.

19    289.    These fees and costs are not yet quantified because they continue to mount.

20    290.    As a result of Defendants' illegal conduct, Oracle has also suffered irreparable

21 injury and, unless Defendants are enjoined, will continue to suffer irreparable injury, whereby

22 Oracle has no adequate remedy at law.

23    291.    Defendants' conduct, described above, was malicious, oppressive or in reckless

24 disregard of Oracle's rights.  For example:

25    a.    Defendants' continued to provide support services to customers and grow

26        Rimini's support business, even encouraging customers to serve as references for

27        one another, with knowledge that their support model relied on violation of those

28        customers' license agreements with Oracle.

JOINT PRETRIAL ORDER

1    b. Defendants continued to make and use illegal copies of Oracle software even after

2      the start of this litigation.

3    c. Defendants knowingly destroyed or altered evidence important to Oracle's proof

4      of Rimini's illegal conduct.

5    d. Defendants knowingly continued their infringing and wrongful conduct, even

6      after that same conduct by SAP TomorrowNow was found to be criminal

7      copyright infringement and the unauthorized access to a protected computer with

8      intent to defraud.

9   292. Defendants' conduct, described above, was accompanied by ill will, or spite, or

10 undertaken for the purpose of injuring Oracle.

11   If the parties are not able to agree to the proper interpretation of relevant licenses of

12 website terms of use, Oracle contends these additional questions of law must be resolved at trial.

13   1. Whether PeopleSoft software license agreements specifying that the license is

14 "solely for Licensee's internal data processing operations," or similar terms  authorized Rimini's

15 use of the software for anything other than the licensee's internal data processing operations,

16 including whether those agreements authorized:

17    a. copies of software used to develop, package, or test software updates provided to

18      Rimini customers other than the licensee;

19    b. copies of software used to research and troubleshoot problems for Rimini

20      customers other than the licensee;

21    c. copies of software used to create software environments designed for Rimini

22      customers other than the licensee; and

23    d. copies of software used for Rimini's internal purposes and not for any particular

24      licensee.

25   2. Whether PeopleSoft software license agreements specifying that the license is

26 "solely for Licensee's internal data processing operations at its facilities" or similar terms

27 authorized use of the software for any purpose at Rimini's facilities or any other facilities not

28 owned or leased by the licensee.

JOINT PRETRIAL ORDER

1        3.      Whether J.D. Edwards software license agreements specifying that the licensed

2  products were "not to be copied by Customer or used by others without the written permission of

3  JDE except for Customer's production, backup, archival, and disaster recovery purposes, (or

4  similar terms, contained in every relevant J.D. Edwards license) authorized use of the software

5  licensed to a customer for anything other than that customer's production, backup, archival, and

6  disaster recovery purposes without the written permission of the licensor (J.D. Edwards and then

7  Oracle), including whether the agreements authorized:

8            a.  copies of software used to develop or test software updates;

9            b.  copies of software used to research or troubleshoot problems; and

10          c.  copies of software used for Rimini's internal purposes and not for any specific

11               licensee.

12        4.      Whether J.D. Edwards software licensing agreements authorized Rimini to (i)

13  access the software code to carry out development and testing of software updates or (ii) to have

14  a copy of the software on Rimini's system of than for archival purposes without accessing the

15  software's source code.

16        5.      Whether Siebel software licensing agreements stating that the license "may be

17  exercised solely in connection with Customer's own internal business operations" (or similar

18  terms contained in every relevant Siebel license) authorized Rimini's use of the software

19  licensed to a customer for anything other than that customer's internal business operations,

20  including whether the agreements authorized:

21            a.  copies of software used to research or troubleshoot problems for Rimini clients

22               other than the licensee; and

23            b.  copies of the software used for Rimini's internal business purposes and not for

24               any specific licensee.

25        6.      Whether Siebel software licensing agreements limiting the licensee's right to copy

26  the software "solely for archive or emergency backup purposes or disaster recovery and related

27  testing" or similar terms contained authorized Rimini to create copies of or install the software

28

JOINT PRETRIAL ORDER

A/76550040.2                                  11/21/14

1  on its own systems other than for archival, emergency backup, or disaster-recovery testing

2  purposes, including whether the agreements authorized:

3      a. Copies of software used to research or troubleshoot problems for Rimini clients

4        other than the licensee; and

5      b. Copies of the software used for Rimini's internal business purposes and not for

6        any specific licensee.

7      7.    Whether the terms of use for Oracle's MetaLink 3, My Oracle Support, and

8  Oracle's Customer Connection (the "Oracle Support Websites") during the January 1, 2006

9  through December 31, 2011 time period:

10      a. were agreed to upon use of the Oracle Support Websites;

11      b. prohibited the use, reproduction, and copying of all materials from any Oracle

12        Support Website for any purpose other than for support of the customer whose

13        login identification and password were used to access the Oracle Support

14        Website;

15      c. prohibited the use, reproduction, and copying of all materials from any Oracle

16        Support Website for any purpose other than for support of the authorized use of

17        Oracle programs for the customer who held a supported license from Oracle

18        without the prior written permission of Oracle;

19      d. on and after February 19, 2007, prohibited access to or use of Oracle Support

20        Websites in any manner that could damage, disable, overburden, impair, or

21        otherwise result in unauthorized access to or interference with, the proper

22        functioning of any Oracle accounts, systems, or networks;

23      e. on and after February 19, 2007, prohibited access to Oracle Support Websites

24        using software routines commonly known as robots, spiders, and scrapers, or any

25        other automated means;

26      f. until March 1, 2008, prohibited sharing materials from Oracle Support Websites

27        with third parties or access to materials from Oracle Support Websites by third

28

JOINT PRETRIAL ORDER

1   parties unless specifically provided for in the customer's agreement with Siebel or

2   Oracle; and

3       g.   on and after March 1, 2008, prohibited sharing materials from Oracle Support

4           Websites with third parties or access to materials from Oracle Support Websites

5           by third parties unless specifically provided for in the customer's agreement with

6           Siebel or Oracle except third parties acting as the customer's agents or contractors

7           acting on the customer's behalf solely for the customer's internal business

8           operations.

9       8.    Whether the Oracle.com terms of use during the January 1, 2006 through

10   December 31, 2011 time period:

11       a.   were agreed to upon use of the Oracle.com website;

12       b.   were incorporated into the terms of use for the Oracle Support Websites;

13       c.   limited the use of any software and documentation downloaded from the Oracle

14           Support Websites based on the terms of the agreement or agreements applicable

15           to the customer whose login identification and password were used to access the

16           Oracle Support Website;

17       d.   on and after May 2, 2007, prohibited access to or use of the Oracle Support

18           Websites in any manner that could damage, disable, overburden, impair, or

19           otherwise result in unauthorized access to or interference with, the proper

20           functioning of any Oracle accounts, systems, or networks; and

21       e.   on and after May 2, 2007, prohibited access to Oracle Support Websites using

22           software routines commonly known as robots, spiders, and scrapers, or any other

23           automated means without Oracle's express written permission.

24       9.    Whether the Oracle terms of use for the Oracle Electronic or E-Delivery website

25   during the January 1, 2006 through December 31, 2011 time period required users to agree that

26   they either (i) had already obtained a license from Oracle or an Oracle partner that would govern

27   their use of any software from the website or (ii) would comply with a trial license agreement

28   that, among other things, limited any use to evaluation and testing and not for production.

JOINT PRETRIAL ORDER

10.   Whether the terms of use for the Seibel SupportWeb website from February 20, 2006 through the migration to Oracle's systems in January 2008:

    a.   were agreed to upon use of the Seibel SupportWeb website;

    b.   prohibited the use, reproduction, and copying of all materials from the Siebel SupportWeb website for any purpose other than for support of the customer whose login identification and password were used to access the Siebel SupportWeb website;

    c.   prohibited the use, reproduction, and copying of all materials from any the Siebel SupportWeb website for any purpose other than for support of the authorized use of Oracle programs for the customer who held a supported license from Oracle without the prior written permission of Oracle;

    d.   prohibited sharing materials from the Siebel SupportWeb website with third parties or access to materials from the Siebel SupportWeb website by third parties unless specifically provided for in the customer's agreement with Siebel or Oracle;

    e.   on and after February 19, 2007, prohibited access to or use of the Siebel SupportWeb website in any manner that could damage, disable, overburden, impair, or otherwise result in unauthorized access to or interference with, the proper functioning of any Oracle accounts, systems, or networks; and

    f.   on and after February 19, 2007, prohibited access to the Siebel SupportWeb website using software routines commonly known as robots, spiders, and scrapers, or any other automated means.

## VII.   DEFENDANTS' SEPARATE STATEMENT OF ISSUES OF FACT AND LAW

Rimini submits that the legal question of whether Oracle's state law claims are preempted by the Copyright Act will determined at trial.  In addition, Rimini submits the following list of material issues of facts:

1. Licensees of Oracle software are entitled to contract with third party consultants to receive support for their software.

2. All Rimini clients are licensed to the software for which they have contracted support from Rimini.

3. Rimini's PeopleSoft customers were authorized under their license agreements with Oracle to make a reasonable number of copies of documentation.

4. Rimini's PeopleSoft customers authorized Rimini to make copies of PeopleSoft documentation on their behalf.

5. Rimini's J.D. Edwards customers were authorized under their license agreements with Oracle to provide their contractors and vendors access to their J.D. Edwards software.

6. Rimini's J.D. Edwards customers were authorized under their license agreements with Oracle to copy J.D. Edwards software and documentation to the extent necessary for the customer's archival needs and to support users of the software.

7. Rimini's J.D. Edwards customers were authorized under their license agreements with Oracle to obtain consulting services from third parties.

8. Rimini's J.D. Edwards customers were authorized under their license agreements with Oracle to modify their J.D. Edwards software.

9. Rimini's J.D. Edwards customers authorized Rimini to make archival copies of J.D. Edwards software on their behalf and to provide other support services.

10. Rimini's Siebel customers were authorized under their license agreements with Oracle to create and use support copies of Siebel software and documentation.

11. Rimini's Siebel customers were authorized under their license agreements with Oracle to create and use support copies of Siebel software and documentation.

12. Rimini's Siebel customers authorized Rimini to make support copies of Siebel on their behalf and to provide other support services.

13. Rimini has had a consistent company policy of protecting Oracle's intellectual property by enforcing a set of procedures designed to ensure that Rimini clients do not receive the benefit of any Oracle software or other intellectual property to which they are not entitled.

14. Rimini uses the term "on-boarding" to refer to the process of transitioning a client from whatever support provider it had been using previously (often Oracle support) onto Rimini support services.

15. Rimini's downloading, done separately for and on behalf of each client, reflects the often voluminous set of the materials corresponding to the software the client has licensed from Oracle.

54

16. After receiving express authorization from a new client, a common initial step is for Rimini to take delivery of the client's software and support materials for archival purposes.

17. Rimini has consistently performed its J.D. Edwards development remotely on its clients' systems.

18. Rimini did not copy of J.D. Edwards fixes from one remote client environment to another.

19. Rimini's clients contracted Rimini to support their ERP software because Rimini offered them — and delivered — a better value proposition than Oracle: service of equal or better quality at a significant savings.

20. Rimini would not have needed a separate instance of the Database software for every client that used it.

21. Oracle's Database software is designed such that one instance of the software (even an instance running on a single processor) is capable of accessing and updating multiple databases.

22. Rimini's maintenance of environments on behalf of its J.D. Edwards customers was for archival purposes.

23. Consistent with typical J.D. Edwards licensing provisions, Rimini was allowed to maintain copies of J.D. Edwards software on its clients behalf because it (i) needed its clients J.D. Edwards software to assist them in exercising its rights under the agreement (e.g., making archival copies); (ii) was instructed not to disclose the information; and (iii) executed a confidentiality or nondisclosure agreement with respect to the software.

24. Consistent with Siebel licensing provisions, Rimini was allowed to maintain copies of Siebel software on its clients behalf because the Siebel environments maintained by Rimini were used for archival and back-up purposes, as well as for testing.

25. Rimini's standard agreement provides that the client designates Rimini as an "authorized, designated Oracle support contact" and expressly permits Rimini to "access Oracle Corporation's customer web site" to obtain software and support materials.

26. The rights to use and install the Oracle software at issue in this case were not restricted and tied solely to the specific software installation media delivered by Oracle.

27. Software copyrights are separate and distinct from the physical objects (e. g. installation media) on which they may be embodied.

28. The rights granted by Oracle to its customers under the Oracle license agreements are not limited or restricted to any specific physical embodiment of the software, like Oracle's provided software installation media.

29. The rights contained in Oracle's license agreements with its licensees applied equally to the copies of the copyrighted software maintained on Rimini's systems regardless of

whether Rimini used the specific installation media provided by Oracle to make those copies.

30. Rimini Street caters to customers who have stable legacy systems and no immediate desire to upgrade

31. Rimini Street's support program includes premium services that are not part of standard vendor support, such as a dedicated Primary Support Engineer for each account, guaranteed 30-minute response time, and support for customizations, interoperability, and performance tuning of client's software.

32. Other third-party vendors provide certain support and consulting services for PeopleSoft, J.D. Edwards and Siebel software.

33. Rimini competes with other third-party vendors that provide support and consulting services for PeopleSoft, J.D. Edwards and Siebel software.

34. Rimini Street is capable of servicing its customers remotely.

35. Rimini Street provides many support services to its customers that do not infringe Oracle's copyrighted works.

36. For many of Rimini Street's customers, Rimini Street did not influence the decision to leave Oracle support.

37. Many of Rimini Street's customers considered other third-party support providers besides Rimini Street, as well as self-support.

38. For many of Rimini Street's customers, the decision to leave Oracle support was driven by dissatisfaction with the service and/or value provided by Oracle support.

39. Price was not the sole reason, or even the most important reason, why certain Rimini customers left Oracle for third-party support.

40. According to certain Rimini customers, Rimini Street's support services were better and faster than Oracle's support services.

41. Rimini Street is financially capable of operating in a remote-only model with only modest additional labor costs.

42. Of Oracle support's cancellations, third-party support competition caused only a small fraction of the cancellations.

43. Oracle customers are not required to purchase support services from Oracle after the initial support term that is included with the purchase of the customers' software licenses; it is at their option.

44. Certain Oracle customers considered self-supporting their licensed software or using third-party consultants as viable alternatives to Oracle software support.

JOINT PRETRIAL ORDER

45. Some Oracle customers believed that they did not receive value from their money spent on Oracle support services.

46. Oracle did not substantially vary its pricing based on the differing site restrictions appearing in the PeopleSoft licenses-at-issue.

47. Rimini believed that its practices with respect to Oracle's intellectual property were authorized by its license agreements and/or the license agreements of its customers.

48. Rimini Street performs a download of Oracle Software and Support Materials from Oracle's web sites on behalf of each of its clients who: (a) requests and authorizes Rimini Street to download from Oracle on their behalf a unique set of Oracle Software and Support Materials the customer is entitled to use based on their licensed products and Oracle Annual Support product coverage; and (b) represents they are presently an Oracle Annual Support customer whose Oracle Annual Support period has not expired.

49. Oracle's support websites repeatedly recommends using an "automated means" known as a "download manager" to download files from Oracle's website.

50. Rimini's automated tools were developed to include filtering features that were designed to limit the search results returned.

51. The majority of the tools used by Rimini were written in the AutoIT3 scripting language and used a standard Internet browser and a standard download manager.

52. AutoIT3 uses a combination of simulated user movement (keystrokes, mouse movements, and window/control) in order to automate tasks generally performed by a user.

53. Rimini's AutoIT3 scripts did not bypass Oracle security, and Rimini's AutoIT3 scripts used a standard download manager.

54. Oracle expressly allows for the use of such download managers, even going so far as to "highly recommend" their use.

55. Oracle documentation makes clear that (1) pre- and post- requisites must be applied for the Oracle software to operate properly and (2) that such requisites may be associated with Oracle products for which the customer is not licensed.

56. Oracle advises that these required updates selected by Oracle's Change Assistant do not always match the customer's licensed products.

57. There is no evidence of a negative effect on Oracle's system as a direct result of Rimini's activities.

58. Oracle created its own deadlock problems by unnecessarily programming a database "delete" of queued download requests to require exclusive access.

59. Oracle's deadlock logs reported the deadlock "is not an ORACLE [database] error. It is a deadlock due to user error in the design of an application or from issuing incorrect ad-hoc SQL."

60. There was no physical damage to Oracle's servers as a result of Rimini's alleged activities.

61. There was no physical impairment to Oracle's servers as a result of Rimini's alleged activities.

62. There were no reports from customers to Oracle of slowdowns or impairments to Oracle's support websites during the timeframe of Rimini's alleged activities.

63. Mr. Seth Ravin did not personally download material from Oracle's website.


## VIII.   EXHIBIT LISTS AND DEPOSITION DESIGNATIONS

Appendix A is Oracle's Exhibit List, along with Rimini's preliminary objections to Oracle's exhibits.

Appendix B is Rimini's Exhibit list, along with Oracle's preliminary objections to Rimini's exhibits.

Appendix C is a list of Oracle's deposition designations, along with Rimini's preliminary objections to Oracle's designations.

Appendix D is a list of Rimini's deposition designations, along with Oracle's preliminary objections to Rimini's designations.

The parties agree that the documents included in Appendices A and B, for which no objection is currently listed, can be admitted at trial subject to appropriate foundation being provided.[4]  The parties further agree that they can remove exhibits from their exhibit list throughout the pretrial meet and confer process, and in response to the Court's rulings regarding the scope of trial.

───────────────────────

[4] Both parties made modifications to their exhibit lists on the date of this filing.  Rimini added approximately 2,500 exhibits to its Exhibit List.  Rimini states that all but three of these were contract documents that also appear on Oracle's exhibit list.  Rimini has not previously produced and has yet to provide Oracle with two Rule 1006 summaries it added to its list.  Oracle also has not had the time to confirm Rimini's representation regarding its additions, if the additions impact other issues addressed in the pre-trial motion, or whether Oracle needs to add additional documents in response.  Oracle removed certain exhibits, reordered a portion of its list, and added "reserved" placeholders to give it the option to further reorder its list.  The parties reserve all rights with respect to the each other's changes, they agree that Oracle may later provide Rimini with its objections to Rimini's additions, and the parties continue to confer regarding the exhibit lists.

A/76550040.2                                                                                                          11/21/14

1    The parties also reserve the right to supplement and amend their objections, including for

2    documents for which no objection is currently listed, throughout the pretrial meet and confer

3    process and at trial, in response to motions in limine, *Daubert* motions, Court rulings, and the

4    context within which the evidence is presented.

5    **IX.    WITNESS LISTS**

6    The parties submit the following lists of witnesses that may be called at trial either live or

7    by deposition other than solely for impeachment or rebuttal purposes:

8    Appendix E -- Oracle's Proposed Witness List;

9    Appendix F -- Rimini's Proposed Witness List.

10    The parties reserve the right to call additional witnesses for purposes of impeachment or

11    rebuttal at trial.  The parties also reserve the right to call any witness, either live or by deposition,

12    identified on the opposing party's witness list.

13    The parties reserve the right to narrow or amend the witness lists to account for court

14    rulings, further proceedings, further stipulations, or further meeting and conferring.

15    **X.    PROPOSED TRIAL DATES & LENGTH OF TRIAL**

16    **<u>Oracle Statement Regarding the Length of Trial</u>**

17    Oracle expected that the Court's summary judgment rulings would provide sufficient

18    guidance regarding the conduct at the heart of Oracle's claims that the parties would be able to

19    stipulate to many otherwise contested facts and license interpretations issues.  Oracle believes it

20    can reduce the trial time needed to prove its claims with an order establishing copyright liability

21    for the facts Rimini no longer disputes and the license interpretations the court ordered.  Such an

22    order would also simplify the issues to be decided by the jury.  However, as explained above,

23    Rimini refuses to stipulate to virtually all facts regarding its conduct on which the Court ruled or

24    to the impact of the Court's license ruling.

25    For example, Rimini has stated it does not dispute that it had 321 local PeopleSoft

26    environments on its systems.  *See* Undisputed Fact # 43.   Under the Court's first motion for

27    summary judgment order, these copies are prima facie copyright infringement.  Dkt. 474 at

28    6. Rimini has also indicated it will waive its express license defense for these copies and has no

JOINT PRETRIAL ORDER

1   defense remaining.  *See* Rimini's Contentions.  But Rimini will not stipulate to liability for

2   copyright infringement for the relevant registrations, software copies, and associated

3   customers.  Even though Rimini is not disputing (and cannot dispute) that these copies constitute

4   copyright infringement, Rimini claims an express finding of liability for them is "unneeded" or

5   "cumulative."  Rimini is wrong.  The scope of Rimini's liability is directly relevant to Oracle's

6   damages.

7          With a ruling from the court establishing Rimini's copyright liability for the full scope of

8   its undisputed conduct, and with their agreement regarding the meaning of relevant license and

9   terms of use provisions, Oracle estimates that the trial herein will take a total of 15 days.

10   **<u>Rimini's Statement Regarding the Length of Trial</u>**

11

12          Like Oracle, Rimini believes that the trial in this case will take approximately 15 trial

13   days.  However, Rimini, respectfully requests that the Court set aside at least 5 weeks and no

14   more than 7 weeks for this trial for reasons explained below.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

JOINT PRETRIAL ORDER

1    **<u>Trial Dates</u>**

2          Despite their best efforts, the parties' calendars do not align for a joint proposal regarding

3    potential trial dates in the near-term.

4          Based on a three-week trial following a motion procedure to establish the reach of the

5    Court's summary judgment rulings, Oracle proposes the following three trial dates:

6          April 22-May 13, 2015

7          June 17-July 13, 2015

8          January 2016

9          Regarding the timing of trial, Rimini proposes that trial be conducted in September,

10   October or November of 2015.  Rimini's lead counsel and its expert witnesses are all generally

11   available during this three month window.    Rimini's lead counsel and its expert witnesses are

12   also generally available after April in 2016.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

JOINT PRETRIAL ORDER

A/76550040.2                                                                    11/21/14

1
2   DATED:  November 21, 2014

3   BINGHAM McCUTCHEN LLP                SHOOK, HARDY & BACON LLP

4   By: /s/ Geoffrey M. Howard            By: /s/ Peter E. Strand
        Geoffrey M. Howard (*pro hac vice*)      Peter E. Strand (*pro hac vice*)
5       Three Embarcadero Center                 2555 Grand Blvd.
        San Francisco, CA 94111-4067             Kansas City, MO 64108
6       Telephone:     415.393.2000              Telephone: (816) 559-0401
        Facsimile:     415.393.2286              Facsimile: (816) 421-5547
7       geoff.howard@bingham.com                 rreckers@shb.com

8       *Attorneys for Plaintiffs*               *Attorneys for Defendants*

9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

JOINT PRETRIAL ORDER

A/76550040.2                                                          11/21/14

1

## ATTESTATION OF FILER

2     The signatories to this document are myself and Peter Strand and I have obtained Mr.

3  Strand's concurrence to file this document on his behalf.

4

5  DATED:  November 21, 2014                    BINGHAM McCUTCHEN LLP

6                                                By:  /s/ Geoffrey M. Howard

7                                                     Geoffrey M. Howard (*pro hac vice*)
                                                      Three Embarcadero Center
8                                                     San Francisco, CA 94111-4067
                                                      Telephone:    415.393.2000
9                                                     Facsimile:    415.393.2286
                                                      geoff.howard@bingham.com
10

11                                                    *Attorneys for Plaintiffs*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

JOINT PRETRIAL ORDER

A/76550040.2                                                                        11/21/14