# EXHIBIT E

1  BINGHAM McCUTCHEN LLP
CHRISTOPHER B. HOCKETT (SBN 121539)
2  GEOFFREY M. HOWARD (SBN 157468)
HOLLY A. HOUSE (SBN 136045)
3  ZACHARY J. ALINDER (SBN 209009)
BREE HANN (SBN 215695)
4  Three Embarcadero Center
San Francisco, CA  94111-4067
5  Telephone:  (415) 393-2000
Facsimile:  (415) 393-2286
6  chris.hockett@bingham.com
geoff.howard@bingham.com
7  holly.house@bingham.com
zachary.alinder@bingham.com
8  bree.hann@bingham.com

9  DORIAN DALEY (SBN 129049)
JEFFREY S. ROSS (SBN 138172)
10  500 Oracle Parkway
M/S 5op7
11  Redwood City, CA  94070
Telephone:  (650) 506-4846
12  Facsimile:  (650) 506-7114
dorian.daley@oracle.com
13  jeff.ross@oracle.com

14  Attorneys for Plaintiffs
Oracle Corporation, Oracle USA, Inc.,
15  and Oracle International Corporation

16

17                    UNITED STATES DISTRICT COURT

18                  NORTHERN DISTRICT OF CALIFORNIA

19                     SAN FRANCISCO DIVISION

20

| | |
|---|---|
| 21  ORACLE CORPORATION, a Delaware corporation, ORACLE USA, INC., a Colorado corporation, and ORACLE INTERNATIONAL CORPORATION, a California corporation, | CASE NO.  07-CV-01658 (MJJ) |
| 22 | FIRST AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF FOR: |
| 23                    Plaintiffs, | |
| 24          v. | (1) COPYRIGHT INFRINGEMENT; (2) VIOLATIONS OF THE COMPUTER FRAUD AND ABUSE ACT; |
| 25  SAP AG, a German corporation, SAP AMERICA, INC., a Delaware corporation, TOMORROWNOW, INC., a Texas corporation, and DOES 1-50, inclusive, | (3) VIOLATIONS OF THE COMPUTER DATA ACCESS AND FRAUD ACT; (4) BREACH OF CONTRACT; |
| 26 | (5) INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE; |
| 27                    Defendants. | |
| 28 | |

(6) NEGLIGENT INTERFERENCE WITH
PROSPECTIVE ECONOMIC
ADVANTAGE;
(7) UNFAIR COMPETITION;
(8) TRESPASS TO CHATTELS;
(9) UNJUST ENRICHMENT /
RESTITUTION; and,
(10) AN ACCOUNTING.

DEMAND FOR JURY TRIAL

Plaintiffs Oracle Corporation, Oracle USA, Inc. ("Oracle USA"), and Oracle International Corporation ("OIC") (together "Oracle" or "Plaintiffs") for their Complaint against Defendants SAP AG ("SAP AG"), SAP America, Inc. ("SAP America"), TomorrowNow, Inc. ("SAP TN"), and Does 1 through 50 (collectively referred to as "SAP" or "Defendants"), allege as follows based on their personal knowledge as for themselves, and on information and belief as to the acts of others:

## I.  INTRODUCTION

1.  This case is about corporate theft on a grand scale, committed by the largest German software company – a conglomerate known as SAP.  Oracle is a leading developer of database and applications software, and SAP is Oracle's largest enterprise applications software competitor.

2.  Oracle brings this lawsuit after discovering that SAP is engaged in systematic, illegal access to – and taking from – Oracle's computerized customer support systems.  Through this scheme, SAP has stolen thousands of proprietary, copyrighted software products and other confidential materials that Oracle developed to service its own support customers.  SAP gained repeated and unauthorized access, in many cases by use of pretextual customer log-in credentials, to Oracle's proprietary, password-protected customer support website.  From that website, SAP has copied and swept thousands of copyrighted Oracle software products and other proprietary and confidential materials onto its own servers.  As a

result, SAP has compiled an illegal library of Oracle's copyrighted software code and other materials. This storehouse of stolen Oracle intellectual property enables SAP to offer cut rate support services to customers who use Oracle software, and to attempt to lure them to SAP's applications software platform and away from Oracle's. Through this Complaint, Oracle seeks to stop SAP's illegal intrusions and theft, to prevent SAP from using the materials it has illegally acquired to compete with Oracle, and to recover damages and attorneys' fees.

3. In late November 2006, there occurred unusually heavy download activity on Oracle's password-protected customer support website for its PeopleSoft and J.D. Edwards ("JDE") product lines. That website, called Customer Connection, permits licensed Oracle customers with active support agreements to download a wide array of copyrighted, proprietary software programs and other support materials. Oracle has invested billions of dollars in research, development, and engineering to create these materials, which include program updates, software updates, bug fixes, patches, custom solutions, and instructional documents – all copyrighted by Oracle – across the entire PeopleSoft and JDE family of software products (the "Software and Support Materials"). Customers who have contracted for support with Oracle have log-in credentials to access Customer Connection and download Software and Support Materials. However, Oracle's support contracts limit customers' access and download rights to Software and Support Materials pertaining to the customers' licensed products. Customers have no contractual right to download Software and Support Materials relating to software programs they have not licensed from Oracle, or for which the customers did not purchase support rights.

4. The Software and Support Materials are a subset of the technical support services that Oracle makes available to its customers that have licensed Oracle software programs and purchased the right to receive technical support services related to them. The full suite of technical support services (also known as "support" or "maintenance") generally includes three types of offerings that Oracle, like most other enterprise software vendors, makes available to its licensed customers: (i) telephone or email access to Oracle's support technicians regarding the operation of Oracle's software; (ii) software program code for the customers'

1  licensed software programs which adds new functionality or features to the software (generally

2  referred to as "software updates"), or that addresses errors or "bugs" in the software program

3  (generally referred to as "software patches"); and (iii) "knowledge management" articles that

4  help with problem solving and provide suggestions relating to the customer's use of licensed

5  software programs.  Because of the complexity of enterprise software applications and the

6  business environments in which they run, regular software updates and patches and knowledge

7  management articles are critical components of a software maker's support offering.  For

8  purposes of this case, Oracle's claims against SAP only concern Oracle's Software and Support

9  Materials, and not Oracle's provision of telephone or email assistance from Oracle support

10  technicians in response to a customer's individual support queries.

11            5.        The access and download activity Oracle observed on its systems in late

12  November and December 2006 did not resemble the authorized, limited access to which its

13  customers were entitled.  Instead, SAP employees using the log-in credentials of Oracle

14  customers with expired or soon-to-expire support rights had, in a matter of a few days or less,

15  accessed and copied thousands of individual Software and Support Materials.  For a significant

16  number of these mass downloads, the users lacked any contractual right even to access, let alone

17  copy, the Software and Support Materials.  The downloads spanned every library in the

18  Customer Connection support website.  For example, using one customer's credentials, SAP

19  suddenly downloaded an average of over 1,800 items per day for four days straight (compared to

20  that customer's normal downloads averaging 20 per month).  Other purported customers hit the

21  Oracle site and harvested Software and Support Materials after they had cancelled all support

22  with Oracle in favor of SAP TN.  Moreover, these mass downloads captured Software and

23  Support Materials that were clearly of no legitimate use to the "customers" in whose names they

24  were taken.  Indeed, the materials copied not only related to unlicensed products, but to entire

25  Oracle product families that the customers had not licensed.

26            6.        For example, in January 2007, a user on an SAP TN computer signed in

27  as Oracle customer Honeywell International, Inc., a Fortune 100 technology and manufacturing

28  company, to access Oracle's support system and copy literally thousands of Oracle's Software

1 and Support Materials in virtually every product library in every line of business. This copying

2 went well beyond the products that Honeywell had licensed and to which it had authorized

3 access. In other examples, users from SAP TN logged in using the credentials of recently

4 departed customers, like Metro Machine Corp., and downloaded Software and Support Materials

5 even after the customers had dropped their support rights with Oracle.

6         7.        Oracle has found many examples of similar activity. Across its entire

7 library of Software and Support Materials in Customer Connection, Oracle to date has identified

8 more than 10,000 unauthorized downloads of Software and Support Materials relating to

9 hundreds of different software programs.

10         8.        This systematic theft of Oracle's Software and Support Materials did not

11 originate from any actual customer location. Rather, the access originated from an internet

12 protocol (IP) address in Bryan, Texas, an SAP America branch office location and home of its

13 wholly-owned subsidiary SAP TN. SAP TN is a company that purports to provide technical

14 support services on certain versions of Oracle's PeopleSoft and JDE software programs. The

15 Bryan, Texas IP address used to access and download Oracle's Software and Support Materials

16 is connected directly to SAP's computer network. Indeed, Oracle's server logs have recorded

17 access through this same IP address by computers labeled with SAP identifiers using SAP IP

18 addresses.

19         9.        In many instances, including the ones described above, SAP employees

20 used the log-in IDs of multiple customers, combined with phony user log-in information, to gain

21 access to Oracle's system under false pretexts. Employing these techniques, SAP users

22 effectively swept much of the contents of Oracle's system onto SAP's servers. These "customer

23 users" supplied user information (such as user name, email address, and phone number) that did

24 not match the customer at all. In some cases, this user information did not match anything: it

25 was fake. For example, some users logged in with the user names of "xx" "ss" "User" and

26 "NULL." Others used phony email addresses like "test@testyomama.com" and fake phone

27 numbers such as "7777777777" and "123 456 7897." In other cases, SAP blended log-in

28 information from multiple customers with fake information. For example, one user name

1  connected to an SAP IP address appears to have logged in using the credentials of *seven* different

2  customers in a span of just 15 days – all from SAP computers in Bryan, Texas.  **All of these**

3  **customers whose IDs SAP appropriated had one critical fact in common:  they were, or**

4  **were just about to become, new customers of SAP TN – SAP AG's and SAP America's**

5  **software support subsidiary whose sole purpose is to compete with Oracle.**

6  　　　　　10.　　　As a result of this illegal activity, SAP apparently has now copied and

7  warehoused an extensive library of Oracle's proprietary, copyrighted Software and Support

8  Materials.  As explained below, this theft appears to be an essential – and illegal – part of SAP's

9  competitive strategy against Oracle.

10  　　　　　*　　　　　　　　　　*　　　　　　　　　　*

11  　　　　　11.　　　In the world of enterprise software applications, revenue comes from

12  three basic activities:  (a) licenses of the underlying software, (b) consulting relating to the

13  implementation and operation of the software, and (c) support contracts to keep the software

14  updated and upgraded.  In January 2005, through SAP America, SAP AG acquired SAP TN, an

15  independent software support company founded by former PeopleSoft software engineers,

16  developers, and support technicians.  Not by coincidence, Oracle had previously announced that

17  in January 2005 it would complete its acquisition of PeopleSoft, increasing Oracle's potency as a

18  competitor to SAP AG for enterprise applications software, consulting, and support.

19  　　　　　12.　　　Industry observers noted this fundamental shift in the competitive

20  landscape.  One industry analyst stated that, "Oracle Corp. is developing a 'super set' of

21  applications, combining features from the PeopleSoft and JDE[1] software and its CEO Larry

22  Ellison has been vocal about his intentions to take market share away from SAP.  Oracle said it

23  has thousands of developers building the new application suite, called Project Fusion, aimed at

24  taking market share from No. 1 ranked SAP."  Another mused, "After the acquisition of

25  PeopleSoft earlier this year, Oracle officially became a player on SAP's turf."

26  _____

27  [1]　　　"JDE" refers to J.D. Edwards World Solutions, a software company acquired by
   PeopleSoft, Inc. in 2003.

28

13.     SAP AG's hasty acquisition of SAP TN was widely perceived as a response to the new competitive threat from Oracle.  SAP's own statements confirmed it.  SAP AG spokesman Bill Wohl vowed that SAP AG would use SAP TN to "keep the pressure on Oracle" by exploiting legacy PeopleSoft customers' perceived unease about Oracle's commitment to support legacy PeopleSoft software.  Publicly, SAP advertised this strategy as its "Safe Passage" program, explicitly designed to transition customers away from Oracle products and onto the SAP software platform.  As reported in industry publications, SAP TN's services "form[ed] the basis of [SAP AG's] Safe Passage initiative, a program aimed at siphoning off valuable software maintenance revenue from Oracle and persuading Oracle customers to switch software products [to SAP]."  Although SAP America President and CEO, Bill McDermott, committed to throw "a lot of additional resources" behind SAP TN (which consisted of only 37 employees in total), SAP appeared to focus more on growing the SAP TN sales force rather than investing in or expanding SAP TN's tiny development team.  Indeed, SAP TN did not appear to have the development capability to meet the support commitments advertised in the "Safe Passage" brochures at any price, much less the 50% discount promoted by SAP.  It certainly did not match Oracle's investment in development resources, or even come close to it.  These facts raised questions about how SAP could offer the type of comprehensive technical support services on Oracle programs that customers of enterprise applications typically require.

14.     Nevertheless, industry observers deemed the "Safe Passage" program "measurably more aggressive," and a sign that "SAP has taken the gloves off."  In connection with the SAP TN acquisition, SAP America's CEO, Bill McDermott, crowed "There's nothing that I love more than to win."  But win at what cost?  SAP appears to have taken a short cut to equip itself to support Oracle's software programs at half Oracle's price.  SAP stole much of the Software and Support Materials directly from Oracle.

15.     SAP's unlawful copying and theft includes, by way of example, the following:

FIRST AMENDED COMPLAINT

1       • More than 10,000 illicit downloads from Customer Connection between

2           September 2006 and January 2007, with indications that this number may

3           go significantly higher if traced further back in time.

4       • A systematic pattern of "sweeping" Oracle's Customer Connection

5           support website from SAP TN servers just days before, or the day of, the

6           expiration of a new SAP TN customer's support contract with Oracle, or

7           in some cases on behalf of former Oracle customers with no access rights

8           to Oracle's Software and Support Materials whatsoever.

9       • On multiple occasions, the indiscriminate, wholesale copying of vast

10          libraries of available Software and Support Materials from Oracle's

11          Customer Connection support website through downloads too rapid to

12          permit any real-time use of the downloaded Software and Support

13          Materials.

14       • The improper access to, and theft of, clearly-marked internal proprietary

15          Oracle support documents not available even to licensed, authorized

16          customers or through normal access to Oracle's Customer Connection

17          system.

18       • Accessing and downloading Software and Support Materials across

19          multiple product lines in multiple lines of business available on the

20          Customer Connection support website, in the purported name of

21          customers that had never licensed those products and had no legal access

22          to them.

23      16.      In short, to try to "keep the pressure on Oracle," SAP has been engaged in

24 a systematic program of unfair, unlawful, and deceptive business practices that continues to this

25 day. Through its illegitimate and illegal business practices and copyright infringement, SAP has

26 copied Oracle's Software and Support Materials and apparently used them to insinuate itself into

27 Oracle's customer base, and to attempt to convert these customers to SAP software applications.

28 Oracle also has concerns that SAP may have enhanced or improved its own software applications

offerings using information gleaned from Oracle's unlawfully copied Software and Support Materials. SAP's infringement and other illegal, wrongful, and unfair business practices threaten to cause irreparable harm to Oracle, its many employees, and its customers. Oracle has no adequate remedy at law for the harm threatened and caused by these acts.

## II.    THE PARTIES

17.    Oracle Corporation is a Delaware corporation with its principal place of business in Redwood City, County of San Mateo, State of California. Directly and through its subsidiaries, Oracle Corporation develops and licenses database and applications software programs and provides related services around the world.

18.    Oracle USA is a Colorado corporation duly authorized to do business in the State of California, with its principal place of business in Redwood City, County of San Mateo, State of California. Oracle USA develops and licenses database and applications software programs and provides related services. Oracle USA is the successor to PeopleSoft USA, Inc. ("PeopleSoft") and JDE.

19.    OIC is a California corporation duly authorized to do business in the State of California, with its only place of business in Redwood City, County of San Mateo, State of California.

20.    OIC is the owner of the copyrights at issue in this action. Oracle Corporation and Oracle USA are licensees of the copyrights at issue in this action. Oracle Corporation and Oracle USA are authorized to license to end users the copyrighted computer software programs and other works at issue in this action.

21.    SAP AG is a German corporation with its principal place of business in Walldorf, Germany.

22.    SAP America is a Delaware corporation with its principal place of business in Newtown Square, Pennsylvania. SAP America is a wholly-owned subsidiary of SAP AG.

23. SAP TN is a Texas corporation with its principal place of business in Bryan, Texas. SAP TN is a wholly-owned subsidiary of SAP America. The corporate relationship of the three named defendants is set forth in the chart below.



24. Oracle is currently unaware of the true names and capacities of Does 1 through 50, inclusive, whether individual, partnership, corporation, unincorporated association, or otherwise, and therefore sues these defendants by such fictitious names. Due to the surreptitious nature of Defendants' actions, and the complicated nature of their scheme, the identities of the Doe Defendants have been concealed from Oracle, preventing Oracle from identifying these Defendants by name. After discovery, which is necessary to ascertain the true names and capacities of these Defendants, Oracle will amend its complaint to allege the necessary identifying details.

25. Defendants all are doing business in and/or have directed their activities at California, and specifically this judicial district. By way of example only, SAP America and SAP TN advertise, promote, sell, license, service, and support customers in California and in this judicial district. SAP AG negotiates and enters into software license and support agreements directly within the United States and, specifically in this judicial district, negotiates certain software-related contracts directly with Oracle that contain provisions by which SAP AG consents to the jurisdiction of California courts and the application of California law. SAP AG also holds an annual meeting of its Board of Directors in Palo Alto, California, and finances the

9

1  sales and promotional activities of both SAP America and SAP TN throughout the United States

2  and in California.

3          26.     At all material times, through its 100% ownership of both SAP America

4  and SAP TN, SAP AG had both the right and the authority to control the actions of both

5  corporations.  Similarly, at all material times, through its 100% ownership of SAP TN, SAP

6  America had both the right and authority to control the actions of SAP TN.

7          27.     At all material times, each of the Defendants, including Does 1 through

8  50, was the agent, servant, employee, partner, joint venturer, representative, subsidiary, parent,

9  affiliate, alter ego, or co-conspirator of the others, had full knowledge of and gave substantial

10  assistance to the alleged activities, and in doing the things alleged, each was acting within the

11  scope of such agency, service, employment, partnership, joint venture, representation, affiliation,

12  or conspiracy, and each is legally responsible for the acts and omissions of the others.

13  **III.    JURISDICTION**

14          28.     Oracle's first cause of action arises under the Federal Copyright Act, 17

15  U.S.C. §§ 101 *et seq.*, and its second cause of action arises under the Computer Fraud and Abuse

16  Act, 18 U.S.C. §§ 1030 *et seq.*  Accordingly, this Court has subject-matter jurisdiction over this

17  action pursuant to 18 U.S.C. § 1030(g), 28 U.S.C. § 1331, and 28 U.S.C. § 1338.

18          29.     This Court has supplemental subject matter jurisdiction over the pendent

19  state law claims under 28 U.S.C. § 1367, because these claims are so related to Oracle's claims

20  under federal law that they form part of the same case or controversy and derive from a common

21  nucleus of operative facts.

22  **IV.    VENUE**

23          30.     Venue in this district is appropriate, pursuant to 28 U.S.C. § 1391,

24  because a substantial part of the events giving rise to the dispute occurred in this district, a

25  substantial part of the property that is the subject of the action is situated in this district, and the

26  Court has personal jurisdiction over each of the parties as alleged throughout this Complaint.

27

28

31.     Assignment is proper in this division under Civil L.R. 3-2 (c) and (d),
because a substantial part of the events giving rise to the claims occurred in San Mateo County
and a substantial part of the property that is the subject of the action is situated in San Mateo
County.

## VI.    FACTUAL ALLEGATIONS

### A.    Oracle's Software And Support Materials

32.     Oracle is the world's largest enterprise software company, and the first to
receive J.D. Power & Associates' global certification for outstanding service and support based
on measuring customer satisfaction worldwide.  Oracle develops, manufactures, markets,
distributes, and services software designed to help its customers manage and grow their business
operations.  Oracle's software offerings include database, middleware, and applications software
programs.

33.     As is typical in the enterprise software industry, Oracle does not sell
ownership rights to its software or related support products to its customers.  Instead, Oracle's
customers purchase licenses that grant them limited rights to use specific Oracle software
programs with Oracle retaining all copyright and other intellectual property rights in these works.
In addition, licensed customers can, and typically do, purchase some set of technical support
services that include the right to obtain upgraded products such as updates, bug fixes, or patches
to those software programs the customers have expressly licensed from Oracle and have the right
to use for purposes authorized by Oracle.

34.     Oracle's license agreements with its customers may vary according to the
products licensed, including because the customers originally contracted with PeopleSoft and/or
JDE, but all of the relevant license agreements for what is now Oracle software set comparable
rules for access to, and use of, that software.  Among other things, those rules prohibit access to,
or use of, any portion of the software not expressly licensed and paid for by the licensee, and any
sublicense, disclosure, use, rent, or lease of the software to third parties.

35. Oracle's license agreements define Oracle's confidential information to include, without limitation, Oracle's software, its object and source code, and any associated documentation or service offerings. Licensees may designate third parties to help maintain Oracle's software, but only subject to the terms of the relevant license agreement between the licensee and Oracle. Those agreements generally preclude the third party from installing the software on a server, or accessing the source code of the software. As defined in one illustrative license agreement, "software" specifically includes the update products made available to customers as part of the support contracts that customers purchased from Oracle.

36. Through its terms of use, Oracle also restricts access to the Customer Connection technical support website used by Oracle customers and/or their authorized agents to access and download JDE and PeopleSoft Software and Support Materials licensed to Oracle customers:

> You agree that access to Customer Connection…will be granted only to your designated Oracle technical support contacts and that the Materials [on the support website] may be used solely in support of your authorized use of the Oracle Programs for which you hold a supported license from Oracle. Unless specifically provided in your licensing or distribution agreement with Oracle, the Materials may not be used to provide services for or to third parties and may not be shared with or accessed by third parties.

37. The Terms of Use explicitly describe the confidential nature of the material on Customer Connection: "the information contained in the Materials [available through Customer Connection] is the confidential proprietary information of Oracle. ***You may not use, disclose, reproduce, transmit, or otherwise copy in any form or by any means the information contained in the Materials for any purpose***, other than to support your authorized use of the Oracle Programs for which you hold a supported license from Oracle, without the prior written permission of Oracle." (emphasis supplied).

38. Access to the secured areas of Customer Connection is also governed by Special Terms of Use. By using the secured website, the user agrees to accept and comply with these Special Terms of Use. The Special Terms of Use provide that access is only permitted via the user's "personal username and password" and that all materials on the secured website are

12

confidential and proprietary.  The Special Terms of Use clearly provide that:  Use of such

CONFIDENTIAL and PROPRIETARY information and materials for any other purpose is

strictly prohibited."

39.     Prior to downloading Software and Support Materials from Oracle's

support websites, a user must also specifically agree to additional terms of use and restrictions

specified in Oracle's Legal Download Agreement:

> Your username and password are provided to you for your sole use
> in accessing this Server and are confidential information subject to
> your existing confidentiality agreement with Oracle / PeopleSoft /
> JDEdwards.  If you do not have a confidentiality agreement in
> effect with Oracle / PeopleSoft / JDEdwards, you are hereby
> notified that your username and password are confidential
> information and may only be distributed to persons within your
> organization who have a legitimate business purpose for accessing
> the materials contained on this server in furtherance of your
> relationship with Oracle / PeopleSoft / JDEdwards.

40.     The Legal Download Agreement also puts the user on notice as to the

confidential, proprietary and copyrighted nature of the Software and Support Materials available

for download:

> Any software that is made available to download from this server
> ("Software") is the copyrighted work of Oracle / PeopleSoft /
> JDEdwards and/or its affiliates or suppliers.  All Software is
> confidential information of Oracle / PeopleSoft / JDEdwards and
> its use and distribution is governed by the terms of the software
> license agreement that is in effect between you and Oracle /
> PeopleSoft / JDEdwards ("License Agreement").  The Software is
> part of the Licensed Products under the License Agreement and
> may only be downloaded if a valid License Agreement is in place
> between you and Oracle / PeopleSoft / JDEdwards.  The Software
> is made available for downloading solely for use by licensed end
> users according to the License Agreement and any reproduction or
> redistribution of the Software not in accordance with the License
> Agreement is expressly prohibited.  WITHOUT LIMITING THE
> FOREGOING, COPYING OR REPRODUCTION OF THE
> SOFTWARE TO ANY OTHER SERVER OR LOCATION FOR
> FURTHER REPRODUCTION OR REDISTRIBUTION IS
> EXPRESSLY PROHIBITED.

41.     The Legal Download Agreement further restricts use of documents

downloaded from the website:

FIRST AMENDED COMPLAINT

Permission to use Documents (such as white papers, press releases, product or upgrade announcements, software action requests, datasheets and FAQs) from this server ("Server") is granted, provided that (1) the below copyright notice appears in all copies and that both the copyright notice and this permission notice appear, (2) use of such Documents from this Server is for informational and non-commercial or personal use only and will not be copied or posted on any network computer or broadcast in any media, and (3) no modifications of any Documents are made. Use for any other purpose is expressly prohibited.

42.     In addition, users accessing specific materials, such as a Software Application Request ("SAR") through the SAR Search Web Application, agree to additional legal restrictions.  These terms notify the user that the software available to download from Oracle is Oracle's copyrighted material.  The terms further provide that the "software is part of the Licensed Products under the License Agreement" and "is made available for downloading solely for use by licensed end users according to the License Agreement.  Any reproduction or redistribution of the Software not in accordance with the License Agreement is expressly prohibited."  To download a SAR, the user must click on a button indicating that it accepts these terms.

**B.     Oracle Threatens To Unseat SAP**

43.     On January 7, 2005, Oracle completed its acquisition of PeopleSoft to emerge as the second-largest provider of business software applications in the world and the first to rival SAP AG in market share, size, and geographic and product scope.  As SAP America's Vice President of Operations, Richard Knowles, testified on June 23, 2004 at the trial on the Department of Justice's unsuccessful effort to block Oracle's acquisition of PeopleSoft, the combination revitalized Oracle overnight as a competitor in the business software applications business.  SAP AG suddenly found itself in a far different competitive environment than the one in which it had grown comfortable.  As SAP AG reeled, events unfolded at a rapid pace:  eleven days after its announcement, Oracle launched the newly-united company and unveiled, at its headquarters with more than 48,000 people joining by Webcast and phone, how the nearly 50,000-strong combined workforce of Oracle and PeopleSoft would provide unparalleled innovation and support to 23,000 business applications software customers throughout the world.

FIRST AMENDED COMPLAINT

44. SAP AG's top executives publicly downplayed the threat that a combined Oracle and PeopleSoft entity would pose to its competitive position for business software applications. SAP AG CEO Henning Kagermann claimed that even with PeopleSoft, Oracle would "not [be] a competitor which could really hurt us." After the merger, he even claimed to wish Oracle "good luck" in competing with SAP AG.

45. But SAP AG had no answer for the business proposition the new Oracle offered. Not only do many SAP AG customers use Oracle's superior database software programs, but now Oracle offered a deeper, broader product line of enterprise applications software programs to compete against SAP AG.

46. Rather than improve its own products and offerings, SAP AG instead considered how to undermine Oracle. One way was to hit at Oracle's customer base – and potentially increase its own – by acquiring and bankrolling a company that claimed the ability to compete with Oracle support and maintenance services on Oracle's own software products, despite not owning any of the software code for, or intellectual property rights to, these same products.

### C. SAP TN

47. In December 2004, SAP TN was a small software services company, headquartered in Bryan, Texas and founded by former PeopleSoft employees. It claimed to compete with PeopleSoft, JDE, and later, Oracle, by providing low-cost maintenance and support services to PeopleSoft and JDE customers running assorted versions of these software programs. SAP TN claimed that it could cut customer maintenance and support bills in half and give customers a reprieve from software upgrade cycles by allowing customers to remain on older, often outdated, versions of PeopleSoft or JDE software rather than moving to later versions by implementing upgrades that the customers would receive by paying for support services from the software vendors themselves. As one industry journalist explained, SAP TN promised to offer such cheap support "because it is not investing millions of dollars in research and development for future versions of the software; it instead focuses on simply keeping the software up and running for an annual fee."

Case No. 07-CV-01658 (MJJ)

### FIRST AMENDED COMPLAINT

48.    As described in a glossy spread in a leading industry publication, in December 2004, just weeks before Oracle would close the PeopleSoft acquisition, SAP TN president Andrew Nelson got "the magic phone call" from Jim Mackey, SAP AG's "front man for SAP AG's mergers and acquisitions strategy." Mackey made Nelson an offer "he couldn't refuse."

49.    To retain full control over every detail of its scheme to lure away customers from Oracle, and to use SAP TN to do it, SAP AG proposed to buy SAP TN outright and make it a wholly-owned – and wholly-beholden – subsidiary. Acquiring SAP TN was not a mere investment by SAP AG, but a calculated competitive move. As one industry observer put it, SAP AG bought "another arrow in its quiver to hunt after Oracle's customers." Aligning with SAP AG made little sense for SAP TN, however, because to the extent SAP AG successfully undermined Oracle by having its customers move from Oracle's software to SAP AG's software, SAP TN would eventually lose its customer base. So SAP AG had to make the price right. SAP AG has refused to disclose the terms of its SAP TN purchase, but – with the Oracle/PeopleSoft deal about to close – the "magic phone call" conveyed terms rich enough that, in barely a month, SAP TN agreed to the deal and cast its lot with SAP AG.

50.    On January 19, 2005, SAP AG's top executives unveiled SAP AG's acquisition of SAP TN as the centerpiece of its new "Safe Passage" scheme. SAP AG's CEO, Henning Kagermann, identified SAP TN as instrumental to the parent company's "Safe Passage" program, publicly indicating that SAP TN was authorized and intended to implement SAP AG's goals. SAP America's CEO, Bill McDermott, publicly vowed to bankroll this effort to undermine Oracle by putting "a lot of additional resources into TomorrowNow." The Senior Vice President and Chief Operating Officer of SAP Asia Pacific, Colin Sampson, admitted that the SAP TN acquisition was "an integral part" of SAP's Safe Passage program, which in turn was part of SAP's "ongoing strategy to compete with Oracle." And SAP TN certainly knew its role was to achieve SAP AG's ends: as SAP TN's CEO, Andrew Nelson, stated, "We're owned by SAP. We want them to be successful."

51.     After the acquisition, SAP TN's new parent companies directed it to begin to implement a two-phase plan to increase SAP's enterprise application market share. First, to lure the support business over from Oracle, SAP would offer cut-rate pricing combined with the promise of essentially unlimited future support to former PeopleSoft and JDE support customers. Second, in connection with converting Oracle customers to SAP support (via SAP TN), SAP would aggressively campaign to migrate those customers to an SAP enterprise software platform. As SAP AG Managing Director Alan Sedghi admitted, SAP AG would try to use SAP TN as a means of "speeding-up" the migration of PeopleSoft and JDE users to SAP platforms.

52.     The CEOs stated the proposition more bluntly. In April 2005, SAP America CEO Bill McDermott claimed "The SAP Safe Passage offering gives companies an affordable way to protect their current investments, ease integration with SAP NetWeaver(TM) and begin the process of innovating their businesses today." A month later, at the SAP AG annual meeting, SAP AG CEO Henning Kagermann confirmed: "We worked with [SAP TN] to very quickly set up a comprehensive program for SAP customers running PeopleSoft and JD Edwards solutions."

53.     SAP implemented Phase One immediately. As reflected on SAP AG's website: "SAP offers Safe Passage for PeopleSoft, JD Edwards, and Siebel customers – If Oracle's options have you worried, consider another option: SAP. SAP provides solutions, technology *and maintenance services*." (emphasis supplied) SAP America's website promises that "SAP and TomorrowNow can cut your maintenance costs by as much as 50% through 2015," and elsewhere says that "Safe Passage maintenance and support are delivered worldwide through TomorrowNow." SAP TN's website confirms its acceptance and undertaking of the SAP-controlled Safe Passage program: "TomorrowNow can also provide our support services as part of the SAP Safe Passage Program."

54.     Beginning in January 2005, SAP sales representatives unleashed a torrent of marketing materials designed to exacerbate and leverage perceived, albeit unfounded, PeopleSoft and JDE customer uncertainty about the prospects for long-term, quality support

from Oracle. An April 2005 SAP AG press release apparently aimed to increase perceived doubt among Oracle customers by announcing a "second wave" of "Safe Passage." To exploit the fear it intended to create, SAP AG's "second wave" included "an intensive customer recruitment campaign, offering significantly lower cost maintenance alternatives to Oracle customers running PSFT/JDE solutions" through 70,000 direct mail solicitations to Oracle customers. These lower cost alternatives advertised by SAP AG were to come directly through SAP TN.

55. To implement Phase Two of its plan (luring Oracle customers to the SAP enterprise software platform), SAP AG did not simply sit back and leave the recruiting of potential Safe Passage customers to SAP TN's sales force. Instead, it took a hands-on approach. It deployed its salespeople to contact potential customers and push them to switch to SAP TN's services. If customers declined to convert to SAP TN, the SAP AG sales personnel would pressure the customers to drop Oracle products outright in favor of SAP AG's suite. To give teeth to these commingled sales efforts, SAP AG offered maintenance support through SAP TN, officially "bundled" with SAP AG enterprise software as a centerpiece of the Safe Passage program.

56. SAP executives touted the Safe Passage program's limited success in its first year. SAP AG's CEO, Henning Kagermann, promised SAP AG would use SAP TN and the Safe Passage program to "fight for" more customers. By March 2006, SAP AG boasted in a press release that more than 200 customers had signed up for Safe Passage, the program it implemented partly through SAP TN, and which it claimed "offers companies SAP solutions, technology, maintenance services, investment protection and a clear road map to the next generation of business software."

57. However, as Oracle continued to take market share and expand its product offerings, including through its September 12, 2005 announcement that it would acquire Siebel Systems, SAP grew more desperate, and more aggressive. In October 2005, SAP announced it would extend its Safe Passage program to Siebel customers, including apparently instantaneous round the clock support from SAP TN – whose engineers at that time presumably had spent virtually no time to develop Siebel support software products. As reported on

FIRST AMENDED COMPLAINT

1   Forbes.com after Oracle's announcement of its impending Siebel acquisition, "SAP AG plans to
2   announce . . . that it will offer technical support for more of rival software maker Oracle Corp.'s
3   own products [the Siebel products] for a far cheaper price." SAP's "cheaper price" (referred to
4   elsewhere as "cut rate" support) continued at "50 cents on the dollar for maintenance fees," but
5   its services were expanded to support more Oracle product lines and a wider range of customers.
6   SAP America President and CEO, Bill McDermott, confirmed that SAP intended to use the
7   Siebel acquisition as another opportunity to lure Oracle customers to SAP stating that SAP is
8   "not distracted by the challenges of integrating multiple code bases, companies and corporate
9   cultures." How SAP could offer instantaneous, round the clock Siebel code support within a few
10  weeks of Oracle's acquisition announcement remained a mystery.

11          58.     By July 2006, SAP AG CEO Henning Kagermann conceded that SAP
12  had lost as much as 2% market share to Oracle. At the same time, curiously, SAP AG continued
13  to tout the success of Safe Passage. In a July 2006 earnings call, SAP AG's President of
14  Customer Solutions and Operations, Léo Apotheker, boasted that Safe Passage "continues to do
15  really well," including because SAP AG "extended the program in order to offer it as well to
16  Siebel customers." By extending the Safe Passage program to Siebel customers, and in
17  conjunction with opening new SAP TN offices around the world, Apotheker claimed that SAP
18  now had "a global network of [SAP TN] capabilities" – enough to "gain[] significant traction."

19          59.     SAP's April 2007 Annual Report further confirms that SAP has used SAP
20  TN as a tool to try to convert Oracle customers to SAP's software platform. As reflected on
21  pages 187-190 of the Annual Report, SAP TN loses money in every region in which it operates.
22  SAP has no business incentive to tolerate substantial operating losses in its subsidiary without
23  SAP TN providing a significant off-setting benefit. Here, that takes the form of enhanced
24  opportunities for SAP to sell its enterprise software applications to support customers attracted to
25  SAP TN's discount pricing – which is made possible through the theft and use of Oracle's
26  intellectual property.

27

28

60.	Although SAP put a brave face on its ability to compete with the increasingly potent Oracle applications offerings, some industry analysts wondered whether a small company like SAP TN, even after having expanded its ranks to 150 employees, could actually develop and offer the hundreds of regulatory updates, bug fixes, patches, and other labor-intensive support items that a customer would need to maintain useful, optimally functioning Oracle software, without infringing on Oracle's intellectual property.  Oracle, by comparison, maintains a development force of more than 15,000 software and support engineers to create and help implement the code fixes, patches, and updates that comprise the advanced support services required by Oracle's licensed customers.

61.	It was not clear how SAP TN could offer, as it did on its website and its other materials, "customized ongoing tax and regulatory updates," "fixes for serious issues," "full upgrade script support," and, most remarkably, "30-minute response time, 24x7x365" on software programs for which it had no intellectual property rights.  To compound the puzzle, SAP continued to offer this comprehensive support to hundreds of customers at the "cut rate" of 50 cents on the dollar, and purported to add full support for an entirely different product line – Siebel – with a wave of its hand.  The economics, and the logic, simply did not add up.

62.	Oracle has now solved this puzzle.  To stave off the mounting competitive threat from Oracle and to do so without making the requisite investment, SAP unlawfully accessed, copied, and wrongfully used Oracle's Software and Support Materials.

F.	The SAP Solution: Stolen Passage

1.	Oracle Finds A Suspicious Pattern

63.	To analyze and improve on its industry leading support services, Oracle asks each customer searching for a solution on Oracle's Customer Connection website to click on a button after each search to indicate whether or not a particular search result helped solve the customer's problem.  If the customer selects the "No, continue search" option, the support system responds by offering the customer further options.  Oracle regularly compiles this data to

assess whether its system helped customers resolve their support issues, with the aim of continually improving the support system for customers.

64.     In late 2006, Oracle noticed huge, unexplained spikes in the number of customers on the online support website who had clicked the "No, continue search" option. These clicks numbered in the thousands for several customers, and Oracle discovered that each response – each answer by users pretending to be the customer – occurred in a matter of seconds or less.  Given the extreme speed at which the activity occurred, these clicks could not reflect real responses from any human customers actually reading the solutions they had accessed. Instead, these click patterns showed that the users had employed an automated process to move with lightning speed through the entire library of Software and Support Materials on the Customer Connection website.  And, apparently, to make a copy of them all.

65.     Indeed, Oracle soon discovered that many of these "customers" had taken massive quantities of Software and Support Materials beyond their license rights, over and over again.  Oracle also discovered that the downloaded Software and Support Materials included *internal* documents not available even to licensed customers and not available through normal, authorized use of Customer Connection.

### 2.     Oracle Discovers The SAP Link

66.     Oracle embarked on a time-consuming and costly investigation to assess the damage done to its customer response database and fully understand the sources of the unauthorized downloads.  In the course of this investigation, Oracle discovered a pattern. Frequently, in the month before a customer's Oracle support expired, a user purporting to be that customer, employing the customer's log-in credentials, would access Oracle's system and download large quantities of Software and Support Materials, including dozens, hundreds, or thousands of products beyond the scope of the specific customer's licensed products and permitted access.  Some of these apparent customer users even downloaded materials after their contractual support rights had expired.

67.     Several of these apparent customer users supplied misleading identification information as part of the log-in process to Oracle's systems.  The users

FIRST AMENDED COMPLAINT

presumably intended this misinformation, which included false names and phone numbers, to

mask from Oracle their true identity and the fact of their improper access to the Software and

Support Materials. Despite this subterfuge, Oracle has traced the illegal download activity to

computers using an SAP IP address. When Oracle first noticed that the unlawful access and

downloads originated almost exclusively from one IP address in Bryan, Texas, Oracle shut down

access to that IP address. If the access and downloads had been legitimate, the customer or

vendor would have called in right away to get its access reinstated. Instead, a new IP address,

also linked to SAP, sprouted up almost immediately and the unlawful access and downloading

resumed.

68. Although it is now clear that the customers initially identified by Oracle

as engaged in the illegal downloads are SAP TN customers, those customers do not appear to

have themselves directly engaged in the download activity; rather, the unlawful download

activity observed by Oracle and described here originates directly from SAP's computer

networks. Oracle's support servers have even received hits from URL addresses in the course of

these unlawful downloads with SAP TN directly in the name (e.g.

*http://hqitpc01.tomorrownow.com*). Indeed, for many of these downloads, Oracle noticed that

SAP TN did not even bother to change the false user information from customer to customer

when it logged in.

69. The wholesale nature of this unlawful access and downloading was

extreme. SAP TN appears to have downloaded virtually *every* file, in *every* library that it could

find.

### 3. SAP TN's Access Was Unauthorized

70. SAP TN's unauthorized access to, copying of, and use of Software and

Support Materials from Oracle's system violated the terms of the Oracle customers' License

Agreements, the Customer Connection Terms of Use, the Customer Connection Special Terms

of Use, the Legal Download Agreement, and the SAR legal restrictions. These terms included

agreements:

FIRST AMENDED COMPLAINT

- Not to access or use any portion of the Software, including updates, not expressly licensed and paid for by the Licensee;

- Not to directly or indirectly, sublicense, relicense, distribute, disclose, use, rent, or lease the Software or Documentation, or any portion thereof, for third party use, or third party training;

- Not to access the customer support system if not the customer's authorized and designated Oracle technical support contact;

- Not to use the Materials on the support website except in support of the customer's authorized use of the Oracle Programs for which the customer holds a supported license from Oracle;

- That the customer username and password are for the customer's sole use in accessing this support server;

- That the customer username and password may only be distributed to or used by persons in the customer's organization who have _a legitimate business purpose for accessing the materials contained on the support server in furtherance of the customer's relationship with Oracle_;

- That the Materials on the support website are confidential information subject to existing confidentiality agreements.

71.     SAP TN has intimate familiarity with these important restrictions and conditions relating to Oracle's Software and Support Materials. SAP TN's management, and a significant number of its employees, formerly worked at PeopleSoft and JDE. Of SAP TN's ten-member management team, six list prior employment experience with PeopleSoft, JDE, or Oracle, including: (1) Andrew Nelson, President and CEO; (2) Bob Geib, V.P. North American Sales; (3) Laura Sweetman, V.P. Global J.D. Edwards Support; (4) Mel Gadd, V.P. Quality; (5) Nigel Pullan, V.P. International Sales; and (6) Shelley Nelson, V.P. Global PeopleSoft Support. In addition, former PeopleSoft employees who work for SAP, such as Wade Walden, who is reflected as the person performing many of the downloads at issue, appear to have applied their

FIRST AMENDED COMPLAINT

familiarity with the Customer Connection website to directly participate in and perfect the illegal downloading scheme. Consistent with this evidence, SAP TN's Vice President, Nigel Pullan, recently suggested that SAP intentionally targets Oracle's employees to extract their knowledge of Oracle's new products: "As new releases start to come out, the people that we hire, we make sure that they have skillsets in those new releases." In short, SAP TN cannot credibly claim ignorance of Oracle's access rules.

72. Notwithstanding SAP TN's knowledge of Oracle's license agreements with its customers, the support website terms of use, and the confidential, proprietary, and copyrighted nature of Oracle's Software and Support Materials, Oracle has learned that SAP TN accessed and downloaded the Software and Support Materials when it either had no legitimate basis to access Oracle's restricted website, or in a way that grossly violated the limited access rights it did have. Further, during the period of time between when the customer's support license lapsed and when Oracle decommissioned the customer's password credentials, SAP TN *still* accessed and downloaded Software and Support Materials using the old customer passwords. SAP TN did so despite its knowledge that it had no legal right or legitimate purpose to access Oracle's system *at all* after the customer's support license lapsed.

73. SAP TN did not innocently download the Software and Support Materials – the obvious purpose was to copy them from Oracle's Customer Connection support website and store them on SAP TN's servers for later use in marketing and providing support services to Oracle customers. The rate that SAP TN accessed many of these materials – at intervals of just seconds or less – shows that no one reviewed them in real time. Further, the scope of the downloaded Software and Support Materials – across *multiple* libraries in *multiple* lines of business – for customers that had no license to take, or need for, those products, suggests that SAP TN took the Software and Support Materials to stockpile a library to support its present and prospective customers.

74. SAP TN conducted these high-tech raids as SAP AG's agent and instrumentality and as the cornerstone strategy of SAP AG's highly-publicized Safe Passage program. Further, to the extent SAP TN had any legitimate basis to access Oracle's site as a

1   contract consultant for a customer with current licensed support rights, SAP TN committed to

2   abide by the same license obligations and usage terms and conditions described above applicable

3   to licensed customers. Indeed, *anyone* accessing such Software and Support Materials on the

4   Oracle support website must agree to Oracle's terms and conditions, which restrict access to

5   support only for products that a company has licensed, and impose strict confidentiality

6   requirements. SAP TN reviewed and agreed to the terms and conditions on Oracle's support

7   website before proceeding, and therefore committed its theft knowingly and intentionally, and in

8   conscious disregard of Oracle's copyrights and other protected intellectual property, contractual

9   restrictions on the use of its intellectual property, and the integrity of its computer systems.

10            **4.**     **Specific Examples Of SAP TN's Unlawful Customer Downloads**

11          75.     SAP TN's improper access to, and taking from, Oracle's Customer

12   Connection website is too pervasive, and covers too many individual violations, to

13   comprehensively detail here. Oracle has uncovered unlicensed downloads linked to SAP TN on

14   behalf of numerous customers, including without limitation, Abbott Laboratories, Abitibi-

15   Consolidated, Inc., Bear, Stearns & Co., Berri Limited, Border Foods, Caterpillar Elphinstone,

16   Distribution & Auto Service, Fuelserv Limited, Grupo Costamex, Helzberg Diamonds, Herbert

17   Waldman, Honeywell International, Interbrew UK, Laird Plastics, Merck & Co., Metro Machine

18   Corp., Mortice Kern Systems, Inc., National Manufacturing, NGC Management Limited, OCE

19   Technologies, B.V., Ronis, S.A., Smithfield Foods, SPX Corporation, Stora Enso, Texas

20   Association of School Boards, VSM Group AB, and Yazaki North America. By way of example

21   of the nature and extent of SAP's theft, Oracle sets forth below illustrative instances of SAP

22   TN's illegal conduct regarding several of its customers.

23          76.     **Honeywell.** Honeywell International ("Honeywell") is listed on SAP

24   TN's website as a client. In the approximately three and a half year period before Honeywell

25   switched to SAP TN, it averaged just over 20 downloads of Software and Support Materials per

26   month. Then, after switching to SAP TN, a user employing Honeywell's log-in ID downloaded

27   at least 7,000 Software and Support Materials in less than two weeks in January 2007. Most of

28   these excessive downloads came during the course of *four days*, during which "Honeywell" was

downloading almost *1800 solutions per day*. At least 2,000 of the Software and Support

Materials taken in this period were solutions that Honeywell was not licensed to take at all. In

one specific library containing solutions for Enterprise One software, "Honeywell" downloaded

at least 450 distinct unlicensed solutions on January 16, 2007 and nearly 400 more the next day.

These downloads spanned virtually every library in every line of business – far beyond the

products to which Honeywell had authorized access as an Oracle customer. This unlawful

downloading even stretched across product families. Honeywell used and licensed PeopleSoft

software applications, but Oracle discovered users downloading JDE products with Honeywell's

credentials. Oracle subsequently connected many of the illegal downloads to an SAP TN IP

address and to SAP TN's employee, Wade Walden – a former PeopleSoft employee now

employed by SAP.

77. **Merck.** Merck & Company, Inc. ("Merck"), one of the largest

pharmaceutical companies in the world, licenses and receives support for many Oracle software

products. Merck's support rights for its JDE software products expired on January 1, 2007. In

the three months prior to that date, users purporting to be "Merck" logged into the Oracle support

system and downloaded at least 6,500 distinct Software and Support Materials for JDE software.

At least 3,800 of these downloads related to JDE software products for which Merck had no

license. But, the unauthorized downloads did not stop there. Users logging into Oracle's support

system with Merck's credentials continued to download Software and Support Materials into

March 2007. Many of these "Merck" downloads came directly from an IP address in Bryan,

Texas that belongs to SAP TN, and some were traced to a computer with SAP TN's initials in

the title, "TN-DL03." In many cases, SAP TN users employed fake identification information to

download the Software and Support Materials, using names such as "xx" "ss" and "NULL," and

phone numbers such as "4444444444" and "999 999 9999." Neither Merck nor SAP TN had

any license, authorization or other right to access and download the 3,800-plus unlicensed

Software and Support Materials from Oracle.

78. **OCE.** OCE-Technologies B.V. ("OCE") is located in the Netherlands

and appears as a customer on SAP TN's website. In the months leading up to the expiration of

1  OCE's support rights for its Oracle products, users employing OCE's credentials downloaded a

2  large number of Oracle products relating to US Payroll, Canadian Payroll, Homebuilder

3  Management, and Real Estate Management – none of which make sense for a European

4  customer supporting its European business. From December of 2006 to January of 2007, SAP

5  TN users logged into Oracle's support system using OCE's credentials (and, in some cases, false

6  user names) and downloaded at least 5,600 distinct Software and Support Materials. These

7  downloads included at least 1,800 distinct items for which OCE had no license. There is little

8  chance that SAP TN intended OCE as the beneficiary of these massive sweeps, since OCE does

9  not run many of the software programs to which these downloads relate, and neither OCE nor

10  SAP TN have any license, authorization, or other right to access and download these Software

11  and Support Materials. Like the other companies, these illegal downloads are associated with the

12  same IP address belonging to SAP TN in Bryan, Texas, including specifically to a computer with

13  SAP TN's initials in the title, "TNL-02." Similar to the other customer examples, many of these

14  "OCE" users entered phony identification information, such as the name "user" and phone

15  numbers such as "123 456 7897," "9999999999," and even "xxx xxx xxxx." This systematic

16  sweep of products across numerous licensed and unlicensed Oracle product lines and libraries

17  dramatically exceeded the access for which OCE (and SAP TN acting on its behalf) had any

18  right or authority, and could serve no legitimate or lawful business purpose.

19          79.  **SPX.**  SPX Corporation ("SPX") dropped all Oracle support on

20  December 10, 2006 and became an SAP TN customer, listed on SAP TN's website. For the nine

21  month period prior to October 2006, SPX averaged approximately eleven downloads per month

22  from Oracle's support system. Then, between October and December 2006, users purporting to

23  represent SPX accessed and downloaded at least 9,000 distinct Oracle Software and Support

24  Materials (far more than SPX could legitimately access or use). These SPX downloads included

25  at least 1,500 distinct Software and Support Materials for which SPX had no license. At least

26  200 distinct downloads just on November 30, 2006 were Software and Support Materials related

27  to unlicensed Payroll software. In some cases, these users logged in using SPX credentials, but

28  used fake identification information like the name "NULL" and phone numbers like

1  7777777777" and "999 999 9999." Many of these SPX downloads, like the others, originated

2  from the same IP address belonging to SAP TN, and some were traced to a computer with SAP

3  TN's initials in the title, "tn-wts01."

4          80.    **Metro Machine.** Metro Machine Corp. ("Metro Machine") dropped all

5  Oracle support effective on January 1, 2007 and switched to SAP TN, as reflected on SAP TN's

6  website. In the month before Metro Machine dropped its support rights with Oracle, users

7  purporting to represent Metro Machine logged onto Oracle's support servers and downloaded at

8  least 600 distinct Software and Support Materials. At least 50 of those downloads related to

9  software programs that Metro Machine had not licensed from Oracle. In addition, users logging

10  into Oracle's support system with Metro Machine's credentials continued to download Software

11  and Support Materials into March 2007. Oracle has traced these illegal and unauthorized

12  downloads to the same SAP TN IP address employed for the other downloads described above.

13          81.    **Yazaki.** Yazaki North America, Inc. ("Yazaki") is a large supplier of

14  automotive products headquartered in Michigan. It dropped all Oracle support effective on

15  January 3, 2007. In the month leading up to the expiration of Yazaki's support rights for its

16  Oracle products, users employing Yazaki's credentials downloaded an enormous number of

17  Oracle Software and Support Materials relating to Canadian Payroll, Homebuilder Management,

18  and Real Estate Management, and many other software products, which make no sense for a U.S.

19  automotive supply company supporting its U.S. business. In two weeks, from December 15,

20  2006 to December 28, 2006, SAP TN users logged into Oracle's support system using Yazaki's

21  credentials and downloaded at least 11,000 distinct Software and Support Materials. These

22  downloads included at least 1,500 distinct items for which Yazaki had no license. There is little

23  chance that SAP TN intended Yazaki as the beneficiary of these massive sweeps, since Yazaki

24  does not run many of the software programs to which these downloads relate, and neither Yazaki

25  nor SAP TN has any license, authorization, or other right to access and download these Software

26  and Support Materials. Like the other companies, these illegal downloads are associated with the

27  same IP address belonging to SAP TN in Bryan, Texas. Similar to the other cases, "Yazaki"

28  users entered phony identification information, such as mixing the user ID "Joel_Joyce" with a

different user name "Jeff Livermore" and an email address related to a different customer, SPX, "rosbie@spxmks.com," and a phony phone number "4444444444."  This systematic sweep of products across numerous licensed and unlicensed Oracle product lines and libraries substantially exceeded the access for which Yazaki (and SAP TN acting on its behalf) had any right or authority, and could serve no legitimate or lawful business purpose.

### G. Oracle's Software And Support Materials Are Registered With The Copyright Office.

82.     The Software and Support Materials that SAP TN downloaded from Oracle's systems included numerous works that are protected under the Federal Copyright Act, 17 U.S.C. §§ 101 *et seq.*  These protected works are original works of authorship, owned by Oracle.  Defendants' acts violated Oracle's exclusive rights to reproduce, create derivative works, publish, publicly display, offer for sale, and distribute these works.  Defendants' acts were willful and intentional and constitute both direct and indirect copyright infringement under the Federal Copyright Act, 17 U.S.C. §§ 101 *et seq.*

83.     **The Copyright Registrations.**  With literally thousands of software programs available for licensing, Oracle does not typically obtain copyright registrations on all programs or related Software and Support Materials as it generally does not find itself in the position of having to enforce its copyrights to stop infringement.  However, upon discovering Defendants' mass downloading, Oracle registered copyrights on the Software and Support Materials taken and infringed by SAP TN.

84.     The massive nature of the illicit downloads by SAP TN make it impossible to detail comprehensively each copyright violation in this Complaint.  However, Oracle has now obtained from the Register of Copyrights over 40 certificates of registration that cover a wide range of Software and Support Materials taken by SAP TN.  These include registrations of a number of Oracle knowledge management solutions, numerous versions of Oracle's JDE software applications, service packs of JDE updates, and specific unlicensed Software and Support Materials taken by SAP TN.  Collectively, these registrations cover thousands of unlicensed Software and Support materials unlawfully copied by SAP TN.

85.     Examples of SAP's infringement of registered copyrights include the following.  On December 5, 2006, SAP TN used SPX's log-in ID to download a Payroll ESU, JJ13072, for EnterpriseOne software version 8.11 SP1.  Oracle registered this ESU with the United States Copyright Office, *See* Registration No. TX 6-541-027.  SAP TN used the log-in ID of another customer, Merck, to download an EnterpriseOne 8.12 Blend Management ESU, JK10093, on December 13, 2006.  Oracle also registered this ESU with the Copyright Office. *See* Registration No. TX 6-541-045.   Further, SAP TN logged in on December 18, 2006 using the log-in credentials of Yazaki and downloaded a Customer Relationship Management ESU, PH11676, for EnterpriseOne software version 8.11, which is now registered with the Copyright Office.  *See* Registration No. TX 6-541-035.  SAP TN also used the log-in ID of OCE to download a payroll update for World Software version A7.3, A738217431, on December 21, 2006.  Oracle registered this update with the Copyright Office as well.  *See* Registration No. TX 6-541-043.   None of these customers was licensed to copy these works.  Nor was SAP licensed to copy them in the names of those customers.

86.     **The DST Solution.**  In at least one instance, SAP TN has also, publicly displayed, distributed, and thereby profited from Oracle's copyrighted Software and Support Materials.  In December 2006, Oracle developed a knowledge solution related to the recent early change to Daylight Savings Time (the "DST Solution"). The DST Solution is a narrative document with specific instructions for how to conform certain Oracle software to the new Daylight Savings Time change.  Oracle fielded more than a thousand service requests from its customers related to the Daylight Savings Time change, and its DST Solution helped resolve more than 750 of them.

87.     Oracle traced downloads of the DST Solution to SAP TN's IP address on January 8, 2007 and January 15, 2007.  Oracle also noticed that SAP TN posted a "PeopleSoft Daylight Savings Time solution" on its website.  SAP TN's "solution" is substantially similar in total–and in large part appears to be copied identically from–Oracle's DST Solution.  SAP TN's copied version even includes minor errors in the original DST Solution that Oracle later

1  corrected. SAP TN's version also substitutes an SAP TN logo in place of the original Oracle

2  logo and copyright notice.

3       88.    Oracle has registered the downloaded version of its DST Solution that

4  SAP TN copied and created derivative works from, and later distributed and publicly displayed,

5  as well as a later version that SAP TN also downloaded shortly before Oracle filed its original

6  Complaint, Registration Nos. TX 6-541-019 and TX 6-541-018. No customer is licensed to

7  create derivative works from, distribute or publicly display Oracle's Software and Support

8  Materials, and neither is SAP.

9      **H.**    **SAP Adds The Ill-Gotten Gains To Its Coffers**

10       89.    SAP TN now claims to have delivered thousands of fixes and more than

11  1000 tax and regulatory updates to Oracle's former customers. Not coincidentally, SAP TN has

12  illegally downloaded thousands of fixes and updates from Oracle's restricted customer support

13  website. SAP AG and SAP America directed this download scheme, ratified it, never disavowed

14  it, and financially benefited from it. SAP subsequently has used Oracle's stolen intellectual

15  property to provide maintenance services and unfairly compete against Oracle, has illegally won

16  business and a number of customers from Oracle, and has artificially inflated its market share.

17      **I.**    **The SAP Defendants Conspired With And Aided And Abetted Each Other**

18       90.    Defendants willfully, intentionally, and knowingly agreed and conspired

19  with each other to engage in the alleged wrongful conduct, including Defendants' interference

20  with Oracle's business relationships and other unfair business practices, as well as Defendants'

21  trespass on, and computer fraud concerning the Software and Support Materials.

22       91.    Defendants did the acts alleged pursuant to, and in furtherance of, that

23  agreement and/or furthered the conspiracy by cooperating, encouraging, ratifying, or adopting

24  the acts of the others.

25       92.    As a direct and proximate result of the acts in furtherance of the

26  conspiracy, Oracle has suffered injury, damage, loss, and harm, including, but not limited to, loss

27  of profits from sales to current and potential customers of Oracle support services and licenses

28

1   for Oracle's software programs. The wrongful conduct committed pursuant to the conspiracy

2   was a substantial factor in causing this harm.

3            93.     Defendants also had full knowledge of or should have reasonably known

4   of the true nature of the wrongful conduct of each other Defendant, and aided and abetted such

5   wrongful conduct, including interference with Oracle's business relationships and other unfair

6   business practices, as well as Defendants' trespass on, and computer fraud concerning the

7   copyrighted Software and Support Materials, by providing substantial assistance and/or

8   encouraging the others to act.

9            94.     Defendants also aided and abetted the described wrongful conduct of the

10   other Defendants by giving substantial assistance and/or encouragement that, separately

11   considered, was wrongful in and of itself.

12            95.     As a direct and proximate result of the aiding and abetting of these acts,

13   Oracle has suffered injury, damage, loss, and harm, including, but not limited to, loss of profits

14   from sales to current and potential customers of Oracle support services and licenses to Oracle

15   software programs. The wrongful conduct aided and abetted by the Defendants was a substantial

16   factor in causing this harm.

17            96.     Defendants' intentional agreement to commit, and commission of, these

18   wrongful acts, and aiding and abetting of these wrongful acts, was willful, malicious, oppressive,

19   and in conscious disregard of Oracle's rights, and Oracle is therefore entitled to an award of

20   punitive damages to punish their wrongful conduct and deter future wrongful conduct.

21                          **First Claim for Relief**

22                          **Copyright Infringement**

23                       (By Oracle Against All Defendants)

24            97.     Oracle incorporates by reference each of the allegations in the preceding

25   paragraphs of this Complaint as though fully set forth here.

26            98.     Oracle owns a valid and enforceable copyright in all of its Software and

27   Support Materials, which are creative works of original authorship by Oracle.

28

FIRST AMENDED COMPLAINT

1   99.    Oracle has complied in all respects with the copyright laws and is the

2 exclusive owner of the copyrights to its Software and Support Materials, including the rights

3 infringed by Defendants.  Oracle has obtained from the Register of Copyrights Certificates of

4 Registration that cover many of the Software and Support Materials taken by SAP TN.  These

5 certificates are identified, dated and numbered as follows:

6

| Title of Work | Date of Registration | Registration Number |
|---|---|---|
| Initial release of JD Edwards EnterpriseOne XE | April 26, 2007 | TX 6-541-033 |
| Current development environment for JD Edwards EnterpriseOne Xe | April 26, 2007 | TXu1-345-109 |
| ESU for JD Edwards EnterpriseOne Xe | May 3, 2007 | TX 6-541-051 |
| Cumulative Update 8 for JD Edwards EnterpriseOne Xe | April 26, 2007 | TX 6-541-048 |
| Initial release of JD Edwards EnterpriseOne 8.0 | April 26, 2007 | TX 6-541-050 |
| Current development environment for JD Edwards EnterpriseOne 8.0 | April 26, 2007 | TXu1-345-111 |
| ESU for JD Edwards EnterpriseOne 8.0 | April 26, 2007 | TX 6-541-046 |
| Cumulative Update 1 for JD Edwards EnterpriseOne 8.0 | April 26, 2007 | TX 6-541-034 |
| Initial release of JD Edwards EnterpriseOne 8.9 | April 26, 2007 | TX 6-541-049 |
| Current development environment for JD Edwards EnterpriseOne 8.9 | April 26, 2007 | TXu1-345-112 |
| ESU for JD Edwards EnterpriseOne 8.9 | April 26, 2007 | TX 6-541-036 |
| Initial release of JD Edwards EnterpriseOne 8.10 | April 26, 2007 | TX 6-541-038 |
| Current development environment for JD Edwards EnterpriseOne 8.10 | April 26, 2007 | TXu1-345-113 |
| ESU for JD Edwards EnterpriseOne 8.10 | April 26, 2007 | TX 6-541-037 |
| Cumulative Update 2 for JD Edwards EnterpriseOne 8.10 | April 26, 2007 | TX 6-541-032 |
| Initial release of JD Edwards EnterpriseOne 8.11 | April 26, 2007 | TX 6-541-028 |
| Current development environment for JD Edwards EnterpriseOne 8.11 | April 26, 2007 | TXu1-345-114 |
| ESU for JD Edwards EnterpriseOne 8.11 | April 26, 2007 | TX 6-541-035 |
| Initial release of JD Edwards EnterpriseOne 8.11 SP1 | April 26, 2007 | TX 6-541-040 |
| Current development environment for JD Edwards EnterpriseOne 8.11 SP1 | April 26, 2007 | TXu1-345-115 |
| ESU for JD Edwards EnterpriseOne 8.11 SP1 | April 26, 2007 | TX 6-541-027 |
| Cumulative Update 1 for JD Edwards EnterpriseOne 8.11 SP1 | April 26, 2007 | TX 6-541-039 |
| Initial release of JD Edwards EnterpriseOne 8.12 | April 26, 2007 | TX 6-541-041 |
| Current development environment for JD Edwards EnterpriseOne 8.12 | April 26, 2007 | TXu1-346-350 |
| ESU for JD Edwards EnterpriseOne 8.12 | April 26, 2007 | TX 6-541-045 |

FIRST AMENDED COMPLAINT

| | April 26, 2007 | TX 6-541-042 |
|---|---|---|
| Cumulative Update 1 for JD Edwards EnterpriseOne 8.12 | April 26, 2007 | TX 6-541-042 |
| Initial release of JD Edwards World A7.3 | April 26, 2007 | TX 6-541-029 |
| Current development environment for JD Edwards World A7.3 | April 26, 2007 | TXu1-345-110 |
| Code Change for JD Edwards World A7.3 | April 26, 2007 | TX 6-541-043 |
| Cumulative Update 16 for JD Edwards World A7.3 | April 26, 2007 | TX 6-541-031 |
| Initial release of JD Edwards World A8.1 | April 26, 2007 | TX 6-541-047 |
| Current development environment for JD Edwards World A8.1 | May 1, 2007 | TX 6-545-422 |
| Code Change for JD Edwards World A8.1 | April 26, 2007 | TX 6-541-044 |
| Cumulative Update 6 for JD Edwards World A8.1 | May 1, 2007 | TX 6-545-421 |
| Initial release of JD Edwards World A9.1 | April 26, 2007 | TX 6-541-030 |
| ECRM89: Common Errors on Mobile Sales | April 26, 2007 | TX 6-541-020 |
| EAP WTHD06: 1099 IRS changes for the year 2006 | April 26, 2007 | TX 6-541-023 |
| JD Edwards World -- 1099 Changes for Tax Year 2006 | April 26, 2007 | TX 6-541-026 |
| E1: 1099: Year 2006 1099 ESUs | April 26, 2007 | TX 6-541-024 |
| Changes to Daylight Savings Time for 2007 (DST) | April 26, 2007 | TX 6-541-025 |
| E1: 07/77: Quantum for Payroll Tax v.280 | April 26, 2007 | TX 6-541-022 |
| GM--Grants issues resolved by FMS ESA 8.9 Bundle #10-653723 (Oct 06) | April 26, 2007 | TX 6-541-021 |
| PeopleTools Third Party Daylight Saving Time Required Modifications | April 26, 2007 | TX 6-541-019 |
| PeopleTools Third Party Daylight Saving Time Required Modifications (Revised) | April 26, 2007 | TX 6-541-018 |

100.    These registrations generally cover, but are not limited to, numerous

versions of Oracle software, including the updates, patches and fixes incorporated in each

relevant version, service packs of Oracle updates, patches and fixes, and individual exemplar

Software and Support Materials, including certain Oracle knowledge management solutions and

certain Oracle updates, patches and fixes, all of which SAP TN copied without a license.

101.    Through the acts alleged above, Defendants have violated Oracle's

exclusive right to reproduce and make copies of its copyrighted support materials by

downloading Oracle's copyrighted Software and Support Materials onto its computers in

violation of 17 U.S.C. § 106.

102.    Defendants have also violated Oracle's right to control the distribution,

creation of derivative works and public display of its copyrighted works by downloading,

1   copying, creating derivative works from and/or and distributing Oracle's Software and Support

2   Materials and/or derivative works to Defendants' customers, via posting to its website or

3   otherwise, including at least Oracle's DST Solution, in violation of 17 U.S.C. § 106.

4           103.     Defendants were not authorized to copy, download, reproduce, create

5   derivative works from, distribute, or publicly display Oracle's copyrighted Software and Support

6   Materials except as authorized by and in support of a specific licensed customer, using only that

7   licensed customer's log in credentials, and with respect only to Software and Support Materials

8   for which that customer had a current right to have and use.

9           104.     In addition to directly infringing Oracle's copyrights, Defendants have

10   contributorily and/or vicariously infringed Oracle's copyrights in its Software and Support

11   Materials by controlling, directing, inducing or materially contributing to the copying,

12   distribution, publicly display or creation of derivative works from Oracle's copyrighted Software

13   and Support Materials. Defendants also obtained a direct financial benefit from the above

14   alleged infringing activities.

15           105.     Defendants knew or should have known that copying, distributing, public

16   display of, and creating derivative works from Oracle's Software and Support Materials, which

17   Defendants copied in the name of customers who had no license to copy, distribute, publicly

18   display or create derivative works from those materials infringed Oracle's copyrights in those

19   materials.

20           106.     Oracle is entitled to damages in an amount to be proven at trial, including

21   profits attributable to the infringement not taken into account in computing actual damages under

22   17 U.S.C. § 504.

23           107.     Defendants' infringement of Oracle's copyrights has also caused Oracle

24   irreparable injury. Unless restrained and enjoined, Defendants will continue to commit such

25   acts. Oracle's remedy at law is not adequate to compensate it for these inflicted and threatened

26   injuries, entitling Oracle to remedies including injunctive relief as provided by 17 U.S.C. § 502,

27   and an order impounding or destroying any and all infringing materials pursuant to

28   17 U.S.C. § 503.

FIRST AMENDED COMPLAINT

<u>Second Claim for Relief</u>

## Violation of Federal Computer Fraud and Abuse Act

### (18 U.S.C. §§ 1030(a)(2)(C), (a)(4) & (a)(5))

(By Oracle Against All Defendants)

108.    Oracle incorporates by reference each of the allegations in the preceding paragraphs of this Complaint as though fully set forth here.

109.    Defendants have violated the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(2)(C), by intentionally accessing a computer used for interstate commerce or communication, without authorization or by exceeding authorized access to such a computer, and by obtaining information from such a protected computer.

110.    Defendants have violated the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(4), by knowingly, and with intent to defraud Oracle, accessing a protected computer, without authorization or by exceeding authorized access to such a computer, and by means of such conduct furthered the intended fraud and obtained one or more things of value, including but not limited to Oracle's Software and Support Materials.

111.    Defendants have violated the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(5)(A)(i), by knowingly causing the transmission of a program, information, code, or command and as a result intentionally causing damage without authorization to a protected computer owned by Oracle.

112.    Defendants have violated the Computer Fraud and Abuse Act, 18 U.S.C. §§ 1030(a)(5)(A)(ii) and (iii) by intentionally accessing a protected computer without authorization, causing damage to Oracle, recklessly or without due regard for their actions.

113.    The computer system or systems that Defendants accessed as described above constitute a "protected computer" within the meaning of 18 U.S.C. § 1030(e)(2).

114.    Oracle has suffered damage and loss by reason of these violations, including, without limitation, harm to Oracle's data, programs, and computer systems and other losses and damage in an amount to be proved at trial, but, in any event, in an amount well over $5000 aggregated over a one-year period.

115. Defendants' unlawful access to and theft from Oracle's computers also have caused Oracle irreparable injury. Unless restrained and enjoined, Defendants will continue to commit such acts. Oracle's remedy at law is not adequate to compensate it for these inflicted and threatened injuries, entitling Oracle to remedies including injunctive relief as provided by 18 U.S.C. § 1030(g).

### **Third Claim for Relief**

**Computer Data Access and Fraud Act - Cal. Penal Code § 502**

(By Oracle Against All Defendants)

116. Oracle incorporates by reference the allegations of paragraphs 1 through 81, 89 through 96, and 108 through 115 of this Complaint as though fully set forth here.

117. Defendants have violated California Penal Code § 502(c)(2) by knowingly and fraudulently, and without permission, accessing, taking, copying, and making use of programs, data, and files from Oracle's computers, computer system, and/or computer network.

118. Defendants have violated California Penal Code § 502(c)(3) by knowingly, fraudulently, and without permission accessing and using Oracle's computer services.

119. Defendants have violated California Penal Code § 502(c)(6) by knowingly, fraudulently, and without permission providing, or assisting in providing, a means of accessing Oracle's computers, computer system, and/or computer network.

120. Defendants have violated California Penal Code § 502(c)(7) by knowingly, fraudulently, and without permission accessing, or causing to be accessed, Oracle's computers, computer system, and/or computer network.

121. Oracle owns the data that comprises the Software and Support Materials obtained by Defendants as alleged above.

122. As a direct and proximate result of Defendants' unlawful conduct within the meaning of California Penal Code § 502, Defendants have caused damage to Oracle in an

FIRST AMENDED COMPLAINT

amount to be proven at trial. Oracle is also entitled to recover its reasonable attorneys' fees pursuant to California Penal Code § 502(e).

123.    Oracle is informed and believes that the aforementioned acts of the Defendants were willful and malicious in that Defendants' acts described above were done with the deliberate intent to injure Oracle's business and improve its own. Oracle is therefore entitled to punitive damages.

124.    Oracle has also suffered irreparable injury from these acts, and due to the continuing threat of such injury, has no adequate remedy at law, entitling Oracle to injunctive relief.

**Fourth Claim for Relief**

**Breach of Contract**

(By Oracle Against All Defendants)

125.    Oracle incorporates by reference the allegations of paragraphs 1 through 81, 89 through 96, and 108 through 124 of this Complaint as though fully set forth here.

126.    Defendants agreed to be bound by the Customer Connection Terms of Use, the Special Terms of Use, the SAR legal restrictions, and/or the Legal Download Agreement when Defendants accessed or downloaded Software and Support Materials from Customer Connection.

127.    Oracle has performed all conditions, covenants, and promises required on its part to be performed in accordance with the terms and conditions of the Customer Connection Terms of Use, the Special Terms of Use, the SAR legal restrictions, and the Legal Download Agreement.

128.    Defendants have breached the Customer Connection Terms of Use, the Special Terms of Use, the SAR legal restrictions, and/or the Legal Download Agreement by, among other things:

- Accessing or using portions of the Software and Support Materials, not expressly licensed to and/or paid for by Defendants or the

38

FIRST AMENDED COMPLAINT

customers in whose name Defendants accessed Customer Connection and took the Software and Support Materials;

- Accessing the content available through Customer Connection, in the form of the Software and Support Materials, without being an authorized and designated Oracle technical support contact;

- Using the Software and Support Materials other than in support of a customer's authorized use of Oracle software for which a customer holds a supported license from Oracle;

- Using the Software and Support Materials without a legitimate business purpose; and,

- Using the Software and Support Materials in ways other than the furtherance of a relationship with Oracle.

129. As a result of Defendants' breach of the Customer Connection Terms of Use, the Special Terms of Use, the SAR legal restrictions, and the Legal Download Agreement, Defendants have caused damage to Oracle in an amount to be proven at trial.

## **Fifth Claim for Relief**

### **Intentional Interference With Prospective Economic Advantage**

(By Oracle Against All Defendants)

130. Oracle incorporates by reference the allegations of paragraphs 1 through 81, 89 through 96, and 108 through 129 of this Complaint as though fully set forth here.

131. Oracle has and had an expectancy in continuing and advantageous economic relationships with current and prospective purchasers and licensees of Oracle's support services and software.

132. These relationships contained the probability of future economic benefit in the form of profitable support service contracts and software licenses. Had Defendants refrained from engaging in the unlawful and wrongful conduct described in this complaint, there is a substantial probability that Oracle support customers would have initiated, renewed, or expanded support contracts and software licenses with Oracle rather than Defendants.

133. Defendants were aware of these economic relationships and intended to interfere with and disrupt them by wrongfully:

- gaining unauthorized access to Oracle's computer systems through Oracle's password-protected Customer Connection support website in violation of the agreements governing such access;

- gaining unauthorized access to the Software and Support Materials available on Oracle's computer systems through Customer Connection, in violation of the agreements governing such access, including by using log in credentials of customers with no right or license to the Software and Support Materials taken by Defendants;

- breaching the agreements governing access to, and use of, the website and the Software and Support Materials available through it,

- luring Oracle's current and prospective customers by making promotional and marketing statements regarding Defendants' ability to provide support services for Oracle software that were only possible because of Defendants' improper access to, and taking from, Oracle's computer systems through Customer Connection; and,

- using information learned through the improper access to, and taking from, Oracle's computer systems through Customer Connection to provide support services to SAP TN customers.

134. Defendants' conduct was wrongful by a measure beyond the fact of the interference itself. Defendants gained unauthorized access to Oracle's computer systems through Oracle's password-protected Customer Connection support website, breached the agreements governing access to, and use of, Customer Connection and the Software and Support Materials available through it, and wrongfully used the property that they found there to advertise their services, and otherwise obtain and retain Oracle's current and prospective clients.

135. This conduct, as alleged above, constitutes violations of numerous state and federal statutes and codes, including, but not limited to, violation of the Federal Computer

Fraud and Abuse Act, 18 U.S.C. § 1030 *et seq.*, receipt of stolen property, Cal. Penal Code § 496, unauthorized access to computers, Cal. Penal Code § 502, wire fraud, 18 U.S.C. § 1343, violation of RICO, 18 U.S.C. § 1962, fraud and related activity in connection with an access device, 18 U.S.C. § 1029, and violation of the Stored Communications Act, 18 U.S.C. §§ 2701-11. Defendants' conduct also constitutes trespass to chattels, breach of contract, and unjust enrichment.

136. As a result of Defendants' acts, the above-described relationships have been actually disrupted, causing certain current and prospective support clients to contract with Defendants instead of Oracle for their software support and maintenance and, in some cases, for their enterprise software.

137. As a direct and proximate result of Defendants' actions, Oracle has suffered economic harm, including, but not limited to, loss of profits from sales or licenses to current and potential customers of Oracle support services and enterprise software programs. Defendants' wrongful conduct was a substantial factor in causing this harm.

138. Unless Defendants are restrained by appropriate injunctive relief, their actions are likely to recur and will cause Oracle irreparable injury for which there is no adequate remedy at law.

139. Defendants' interference with Oracle's prospective economic advantage with its current and future customers, as described above, was willful, malicious, oppressive, and in conscious disregard of Oracle's rights, and Oracle is therefore entitled to an award of punitive damages to punish their wrongful conduct and deter future wrongful conduct.

**Sixth Claim for Relief**

**Negligent Interference With Prospective Economic Advantage**

(By Oracle Against All Defendants)

140. Oracle incorporates by reference the allegations of paragraphs 1 through 81, 89 through 96, and 108 through 139 of this Complaint as though fully set forth here.

1  141.   Oracle has and had an expectancy in continuing and advantageous

2  economic relationships with current and prospective purchasers and licensees of Oracle's support

3  services and software.

4  142.   These relationships contained the probability of future economic benefit

5  in the form of profitable support service contracts and enterprise software licenses.  Had

6  Defendants refrained from engaging in the unlawful and wrongful conduct described in this

7  complaint, there is a substantial probability that Oracle support customers would have initiated,

8  renewed, or expanded support contracts and enterprise software licenses with Oracle rather than

9  Defendants.

10  143.   Defendants knew or should have known about the economic relationship,

11  described above, and knew or should have known that these relationships would be interfered

12  with and disrupted if Defendants failed to act with reasonable care in their access of Customer

13  Connection and use of Oracle's Software and Support Materials.  Defendants failed to act with

14  reasonable care.  Instead, they:

15  • gained unauthorized access to Oracle's computer systems through

16  Oracle's password-protected Customer Connection support website in

17  violation of the agreements governing such access;

18  • gained unauthorized access to the Software and Support Materials

19  available on Oracle's computer systems through Customer Connection, in

20  violation of the agreements governing such access, including by using log

21  in credentials of customers with no right or license to the Software and

22  Support Materials taken by Defendants;

23  • breached the agreements governing access to, and use of, the website and

24  the Software and Support Materials available through it;

25  • lured Oracle's current and prospective customers by making promotional

26  and marketing statements regarding Defendants' ability to provide

27  support services for Oracle software that were only possible because of

28

Defendants' improper access to, and taking from, Oracle's computer
systems through Customer Connection; and,

- used information learned through the improper access to, and taking
  from, Oracle's computer systems through Customer Connection to
  provide support services to SAP TN customers.

144. Defendants' conduct was wrongful by a measure beyond the fact of the interference itself. Defendants gained unauthorized access to Oracle's computer systems through Oracle's password-protected Customer Connection support website, breached the agreements governing access to, and use of, Customer Connection and the Software and Support Materials available through it, and wrongfully used the property that they found there to advertise their services, and otherwise obtain and retain Oracle's current and prospective clients.

145. This conduct, as alleged above, constitutes violations of numerous state and federal statutes and codes, including, but not limited to, violation of the Federal Computer Fraud and Abuse Act, 18 U.S.C. § 1030 *et seq*., receipt of stolen property, Cal. Penal Code § 496, unauthorized access to computers, Cal. Penal Code § 502, wire fraud, 18 U.S.C. § 1343, violation of RICO, 18 U.S.C. § 1962, fraud and related activity in connection with an access device, 18 U.S.C. § 1029, and violation of the Stored Communications Act, 18 U.S.C. §§ 2701-11. Defendants' conduct also constitutes trespass to chattels, breach of contract, and unjust enrichment.

146. As a result of Defendants' acts, the above-described relationships have been actually disrupted, causing certain current and prospective support clients to contract with Defendants instead of Oracle for their software support and maintenance and, in some cases, for their enterprise software.

147. As a direct and proximate result of Defendants' actions, Oracle has suffered economic harm, including, but not limited to, loss of profits from sales or licenses to current and potential customers of Oracle support services and enterprise software programs. Defendants' wrongful conduct was a substantial factor in causing this harm.

1  148.  Unless Defendants are restrained by appropriate injunctive relief, their

2  actions are likely to recur and will cause Oracle irreparable injury for which there is no adequate

3  remedy at law.

**<u>Seventh Claim for Relief</u>**

**Unfair Competition - Cal. Bus. & Prof. Code § 17200**

(By Oracle Against All Defendants)

149.  Oracle incorporates by reference the allegations of paragraphs 1 through

81, 89 through 96, and 108 through 148 of this Complaint as though fully set forth here.

150.  Defendants have engaged in unlawful business acts or practices by

committing acts including computer fraud, trespass, breach of contract, interference with

business relationships, and other illegal acts and practices as alleged above, all in an effort to

gain unfair competitive advantage over Oracle.

151.  These unlawful business acts or practices were committed pursuant to

business activity related to providing business applications software and related support and

maintenance for that software.

152.  The acts and conduct of Defendants constitute fraudulent, unlawful, and

unfair competition as defined by California Bus. & Prof. Code §§ 17200, *et seq*.

153.  Defendants' conduct constitutes violations of numerous state and federal

statutes and codes, including, but not limited to, violation of the Computer Fraud and Abuse Act,

18 U.S.C. §§ 1030 *et seq*., receipt of stolen property, Cal. Penal Code § 496, unauthorized access

to computers, Cal. Penal Code § 502, wire fraud, 18 U.S.C. § 1343, violation of RICO, 18 U.S.C.

§ 1962, fraud and related activity in connection with an access device, 18 U.S.C. § 1029, and

violation of the Stored Communications Act, 18 U.S.C. §§ 2701-11.  Defendants' conduct also

constitutes trespass to chattels, intentional interference with prospective economic advantage,

negligent interference with prospective economic advantage, and unjust enrichment.

154.  Defendants have improperly and unlawfully taken commercial advantage

of Oracle's investment in its confidential, proprietary, and copyrighted Software and Support

1 | Materials. In light of Defendants' conduct, it would be inequitable to allow Defendants to retain

2 | the benefit of the funds obtained though the unauthorized and unlawful use of Oracle's property.

3 | 155. Defendants' unfair business practices have unjustly minimized Oracle's

4 | competitive advantage and have caused and are causing Oracle to suffer damages.

5 | 156. As a result of such unfair competition, Oracle has also suffered

6 | irreparable injury and, unless Defendants are enjoined from such unfair competition, will

7 | continue to suffer irreparable injury, whereby Oracle has no adequate remedy at law.

8 | 157. Defendants should be compelled to disgorge and/or restore any and all

9 | revenues, earnings, profits, compensation, and benefits they may have obtained in violation of

10 | California Business & Professions Code § 17200 *et seq*., including, but not limited to, returning

11 | the  any revenue earned from the unlawful and unfair use of Oracle's stolen property, and should

12 | be enjoined from further unlawful, unfair, and deceptive business practices.

13 | **Eighth Claim for Relief**

14 | **Trespass To Chattels**

15 | (By Oracle Against All Defendants)

16 | 158. Oracle incorporates by reference the allegations of paragraphs 1 through

17 | 81, 89 through 96, and 108 through 157 of this Complaint as though fully set forth here.

18 | 159. At all times mentioned in this Complaint, Oracle had legal title to and

19 | actual possession of Customer Connection, its access-restricted internet-based support system,

20 | and the Software and Support Materials on that support system, as described above.

21 | 160. Defendants intentionally interfered with Oracle's use or possession of

22 | both Customer Connection and Oracle's related internal databases and systems, and the Software

23 | and Support Materials housed for licensed access through Customer Connection.

24 | 161. Defendants' trespass and interference proximately caused damage to

25 | Oracle, including, but not limited to, damage to the functionality of Oracle's computer system

26 | and data, damage to Oracle's rights to dominion and control over its property, and damage to the

27 | confidential nature of the information on Oracle's website. As a result, Defendants caused

28 |

1 Oracle's property to greatly diminish in value and deprived Oracle of the intended use of its

2 computer systems.

3        162.     Oracle is entitled to recover any and all damages it sustained as a result of

4 such trespass, in an amount to be determined at trial.

5        163.     Defendants' trespass interfered with, and damaged, the integrity and

6 functionality of Oracle's computer system and data. Defendants will continue to commit such

7 acts and other competitors will be encouraged to sweep Oracle's website, potentially to the point

8 of denying effective access to Oracle's customers and preventing Oracle from using its systems

9 and data for their intended purpose. Defendants' trespass therefore threatens to cause irreparable

10 harm to Oracle, for which Oracle's remedy at law is not adequate to compensate it for the

11 injuries inflicted and threatened.

12 **Ninth Claim for Relief**

13 **Unjust Enrichment/Restitution**

14 (By Oracle Against All Defendants)

15        164.     Oracle incorporates by reference the allegations of paragraphs 1 through

16 81, 89 through 96, and 108 through 163 of this Complaint as though fully set forth here.

17        165.     Defendants unjustly received benefits at the expense of Oracle through

18 their wrongful conduct, including Defendants' breach of the agreements governing access to and

19 use of Customer Connection, interference with Oracle's business relationships and other unfair

20 business practices, as well as Defendants' trespass on, and computer fraud concerning the

21 Software and Support Materials, which took substantial time and money for Oracle to develop.

22 Defendants continue to unjustly retain these benefits at the expense of Oracle. It would be unjust

23 for Defendants to retain any value they obtained as a result of their wrongful conduct.

24        166.     Oracle is accordingly entitled to full restitution of all amounts in which

25 Defendants have been unjustly enriched at Oracle's expense.

26

27

28

**An Accounting**

(By Oracle Against All Defendants)

167. Oracle incorporates by reference the allegations of paragraphs 1 through 81, 89 through 96, and 108 through 166 of this Complaint as though fully set forth here.

168. Since at least September 2006, Defendants have obtained business through the use of unlawful conduct including, but not limited to:

(a) Breaching the agreements governing access to or use of Customer Connection;

(b) Intentionally and/or negligently interfering with Oracle's prospective economic advantage with its existing and potential customers;

(c) Improperly, willfully, and unlawfully taking commercial advantage of Oracle's investment in its Software and Support Materials, for the purpose of sabotaging Oracle's ability to do business and compete in the market; and

(d) Fraudulently accessing and intentionally trespassing on Oracle's password-protected Customer Connection website, without authorization or consent, in furtherance of their unlawful and deceptive scheme as described above.

169. Defendants have received money as a result of their misconduct, at Oracle's expense, and that some or all of such money is rightfully due to Oracle.

170. The amount of money due from Defendants to Oracle is unknown to Oracle and cannot be ascertained without an accounting of the income and gross profits Defendants have obtained through their wrongful and unlawful conduct. Oracle is entitled, therefore, to a full accounting.

**Prayer For Relief**

WHEREFORE, Oracle respectfully prays for the following:

A. For a preliminary and permanent injunction restraining Defendants, their officers, agents, servants, employees, and attorneys, and those in active concert or participation with any of them, from the following:

1        (1)    Downloading, distributing or using any Oracle Software

2    and Support Materials Defendants except as authorized by and in support of a specific licensed

3    customer, using only that licensed customer's log in credentials, and with respect only to

4    Software and Support Materials for which that customer has a current right to have and use;

5        (2)    Distributing any Software and Support Materials to any

6    person or entity without keeping records to show accurately what was transferred, when, and to

7    whom;

8        (3)    Downloading Oracle Software and Support Materials from

9    Oracle without keeping records to show accurately what was downloaded, when, using what log

10    in credentials, and for whom;

11        (4)    Commingling Oracle Software and Support Materials

12    downloaded for different customers;

13        (5)    Using Oracle Software and Support Materials to train

14    employees or generate derived works; and,

15        (6)    Otherwise engaging in acts of unfair competition, copyright

16    infringement, trespass, computer fraud, and interference with Oracle's business relationships;

17        B.    That the Court order Defendants to file with the Court and serve on

18    Oracle within thirty (30) days after the service on Defendants of such injunction a report in

19    writing, under oath, setting forth in detail the manner and form in which Defendants have

20    complied with the injunction;

21        C.    For an Order directing Defendants to return Oracle's property,

22    including, without limitation, Oracle's confidential, proprietary, and copyrighted Software and

23    Support Materials, including data, internal documents, and valuable updates, patches, fixes, and

24    other computer code, that Defendants took from Oracle, as set forth in this Complaint;

25        D.    For an order impounding or destroying any and all infringing

26    materials pursuant to 17 U.S.C. § 503;

27        E.    For an Order awarding Oracle punitive damages in a sum to be

28    determined at trial, on the basis of Defendants' willful and deliberate unauthorized computer

FIRST AMENDED COMPLAINT

2    abetting and conspiracy;

3              F.    For restitution and disgorgement of all ill-gotten gains unjustly

4    obtained and retained by Defendants through the acts complained of here;

5              G.    For damages to be proven at trial;

6              H.    For prejudgment interest;

7              I.    For an accounting;

8              J.    For an Order awarding Oracle its attorneys' fees and costs; and,

9              K.    For an Order awarding Oracle such other and further relief as the

10   Court deems just and proper.
     DATED:  June 1, 2007
11
                                    BINGHAM McCUTCHEN LLP
12

13
                              By: _____
14
                                    Christopher B. Hockett
15                                  Attorneys for Plaintiffs
                                    Oracle Corporation, Oracle USA, Inc., and
16                                  Oracle International Corporation

17

18

19

20

21

22

23

24

25

26

27

28

2          In accordance with Fed. R. Civ. P. 38(b), Plaintiffs Oracle Corporation, Oracle

3  International Corporation and Oracle USA, Inc. demand a trial by jury on all issues triable by a

4  jury.

5

DATED: June 1, 2007

6                                  BINGHAM McCUTCHEN LLP

7

8                          By:_____

9                                   Christopher B. Hockett

10                                Attorneys for Plaintiffs
                              Oracle Corporation, Oracle USA, Inc., and

11                                Oracle International Corporation

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                             50                Case No. 07-CV-01658 (MJJ)