BOIES, SCHILLER & FLEXNER LLP
RICHARD J. POCKER (NV Bar No. 3568)
300 South Fourth Street, Suite 800
Las Vegas, NV 89101
Telephone: (702) 382-7300
Facsimile: (702) 382-2755
rpocker@bsfllp.com

BOIES, SCHILLER & FLEXNER LLP
WILLIAM ISAACSON (*pro hac vice*)
KAREN DUNN (*pro hac vice*)
5301 Wisconsin Ave, NW
Washington, DC 20015
Telephone: (202) 237-2727
Facsimile: (202) 237-6131
wisaacson@bsfllp.com
kdunn@bsfllp.com

BOIES, SCHILLER & FLEXNER LLP
STEVEN C. HOLTZMAN (*pro hac vice*)
KIERAN P. RINGGENBERG (*pro hac vice*)
1999 Harrison Street, Suite 900
Oakland, CA 94612
Telephone: (510) 874-1000
Facsimile: (510) 874-1460
sholtzman@bsfllp.com
kringgenberg@bsfllp.com

MORGAN, LEWIS & BOCKIUS LLP
THOMAS S. HIXSON (*pro hac vice*)
KRISTEN A. PALUMBO (*pro hac vice*)
One Market, Spear Street Tower
San Francisco, CA  94105
Telephone:  415.442.1000
Facsimile:  415.442.1001
thomas.hixson@morganlewis.com
kristen.palumbo@morganlewis.com

DORIAN DALEY (*pro hac vice*)
DEBORAH K. MILLER (*pro hac vice*)
JAMES C. MAROULIS (*pro hac vice*)
ORACLE CORPORATION
500 Oracle Parkway, M/S 5op7
Redwood City, CA 94070
Telephone:  650.506.4846
Facsimile:  650.506.7114
dorian.daley@oracle.com
deborah.miller@oracle.com
jim.maroulis@oracle.com

Attorneys for Plaintiffs
Oracle USA, Inc., Oracle America, Inc., and
Oracle International Corp.

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| ORACLE USA, INC., a Colorado corporation; ORACLE AMERICA, INC., a Delaware corporation; and ORACLE INTERNATIONAL CORPORATION, a California corporation, | Case No. 2:10-cv-0106-LRH-PAL |
| Plaintiffs, v. | **ORACLE'S OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE EXPERT TESTIMONY OF ELIZABETH A. DEAN** |
| RIMINI STREET, INC., a Nevada corporation; AND SETH RAVIN, an individual, | **PUBLIC REDACTED VERSION** |
| Defendants. | |

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ......................................................................................... 1

II.    DEAN'S COPYRIGHT DAMAGES OPINIONS ............................................. 2

    A.     Oracle's Lost Support Profits from Rimini's PeopleSoft, J.D. Edwards, and Siebel Customers ................................................................ 3

    B.     Oracle's Database Damages ............................................................ 7

    C.     Siebel IAR Lost Profits .................................................................... 8

III.   LEGAL STANDARD .................................................................................... 9

IV.    DEAN'S LOST PROFITS DAMAGES OPINIONS ARE ADMISSIBLE ............ 10

    A.     Dean's Lost Profits Opinions Are Admissible and Are Supported by Analysis and Evidence on Causation ......................................... 10

    B.     Rimini's Challenges Rely on Mischaracterizations of Dean's Opinions and the Relevance of Facts That, at Best, Go to the Weight of Her Opinions .......... 15

    C.     Dean's Database and Siebel IAR Lost Profits Opinions Are Admissible ........... 18

V.     DEAN'S DATABASE VALUE OF USE DAMAGES OPINION IS ADMISSIBLE ............ 18

VI.    CONCLUSION .......................................................................................... 19

## TABLE OF AUTHORITIES

<u>Page(s)</u>

**Cases**

*Dash v. Mayweather*,
    731 F.3d 303 (4th Cir. 2013)....................................................................... 14, 15, 17

*Data General Corp. v. Grumman Sys. Support Corp.*,
    36 F.3d 1147 (1st Cir. 1994) ............................................................................... 14

*Daubert v. Merrell Dow Pharm., Inc.*,
    509 U.S. 579 (1993) .......................................................................... 1, 9, 11, 18

*DSU Med. CO/po v. JMS Co., Ltd.*,
    296 F. Supp. 2d 1140 (N.D. Cal. 2003) .............................................................. 16

*Fresenius Med. Care Holdings, Inc. v. Baxter Int'l, Inc.*,
    No. C 03-1431 SBA, 2006 WL 1390416, at *3 (N.D. Cal. May 18, 2006)............................ 10

*Gutierrez v. Wells Fargo & Co.*,
    No. C07-05923 WHA, 2010 WL 1233810 (N.D. Cal. Mar. 26, 2010) ................................. 10

*Harper & Row, Publishers, Inc. v. Nation Enters.*,
    471 U.S. 539 (1985) .................................................................................. 10, 11, 13

*i4i Ltd. P'ship v. Microsoft Corp.*,
    598 F.3d 831 (Fed. Cir. 2010), *aff'd on other grounds*, 131 S. Ct. 2238 (2011) ........ 10, 14, 15

*IGT v. Alliance Gaming Corp.*,
    No. 2:04-1676-RCJ-RJJ, 2008 WL 7084605 (D. Nev. 2008)....................................... 11

*Kennedy v. Collagen Carp.*,
    161 F.3d 1226 (9th Cir. 1998).................................................................... 9, 10, 16

*On Davis v. The Gap Inc.*,
    246 F.3d 152 (2d Cir. 2001)........................................................................... 11

*Oracle Corp. v. SAP AG*,
    765 F.3d 1081 (9th Cir. 2014)...................................................................... 13, 14

*Pall Corp. v. Micron Separations*,
    66 F.3d 1211 (Fed. Cir. 1995)........................................................................... 7

*Pierson v. Ford Motor Co.*,
    No. C 06-6503 PJH, 2008 WL 7084522 (N.D. Cal. Aug. 1, 2008) ................................. 1, 11

*Polar Bear Prods. v. Timex Corp.*,
    384 F.3d 700 (9th Cir. 2004)....................................................................... 10, 17

1

**TABLE OF AUTHORITIES**
(continued)

2

3

*Polaroid Corp. v. Eastman Kodak Co.*,
    No. 76-1634-MA, 1990 WL 324105 (D. Mass. Oct. 12, 1990) *amended*, No.

4

    CIV.A. 76-1634-MA, 1991 WL 4087 (D. Mass. Jan. 11, 1991) .............................................. 7

5

*State Indus., Inc. v. Mor-Flo Indus., Inc.*,

6

    883 F.2d 1573 (Fed. Cir. 1989).............................................................................................. 7

7

*Stevens Linen Assocs., Inc. v. Mastercraft Corp.*,

    656 F.2d 11 (2nd Cir. 1981)................................................................................................. 11

8

*Sun Microsystems, Inc. v. Hynix Semiconductor, Inc.*,

9

    608 F. Supp. 2d 1166 (N.D. Cal. 2009) .............................................................................. 15

10

**Statutes**

11

17 U.S.C. 504(b) .................................................................................................... 3, 10, 17

12

**Other Authorities**

13

Federal Rule of Evidence 702 ...................................................................................... 9

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# I.      INTRODUCTION

Rimini's motion to exclude the expert testimony of Elizabeth A. Dean ("motion") does not challenge her qualifications or the appropriateness of the accepted damages methodologies she applies.  Rather, Rimini hopes to prevent the jury from considering Oracle's primary damages claims by mischaracterizing her analyses and disputing the evidence that underlies Dean's calculations and expert opinions.

Despite Rimini's repeated assertion that infringement is only "alleged," a substantial amount of Rimini's infringement will be undisputed at trial.  Rimini has waived its last defense to Rimini's extensive PeopleSoft infringement (Dkt. 599; Dkt. 527 at 59:25-60:1), which infected Rimini's largest and most profitable business line.  Rimini's widespread infringement of Oracle's Database software is also established.  Dkt. 476 at 9:9-11, 31:18-22 (detailing over 200 infringing copies of Oracle Database that Rimini used to service customers).  As to this undisputed infringement, all that remains is to decide the damages.

The Court should reject Rimini's motion to exclude Dean's lost profit opinions for Rimini's disputed or undisputed copyright infringement liability.  Under the guise of a *Daubert* challenge, Rimini seeks a ruling that Oracle cannot prove causation, as a matter of law.  Defendants' Motion to Exclude Expert Testimony of Elizabeth A. Dean ("Mot.") 1:16-17, 3:19-20, 15:14-19:4.  This is improper.  *See Pierson v. Ford Motor Co.*, No. C 06-6503 PJH, 2008 WL 7084522, at *3 (N.D. Cal. Aug. 1, 2008) ("[t]he ultimate issue of causation is not appropriate for determination in a motion to exclude evidence").  Contrary to Rimini's assertions, extensive evidence establishes that Rimini's infringement *caused* Oracle to suffer the significant lost profits that Dean describes in her report.  Oracle will present that evidence at trial, including through Dean's testimony.

Rimini's attack on Oracle's copyright lost profits mischaracterizes Dean's opinions.  Rimini attacks a straw-man by claiming that Dean included *every* Rimini customer in her copyright lost profits measurement.  That is false.  Dean used Rimini's customer list as a starting point for calculating Oracle's lost profits, but removed customers to account for the customers that would have left Oracle for reasons unrelated to Rimini's infringement.  Dean

1    employed an exhaustive causation analysis consistent with methodologies accepted by

2    numerous courts.

3          Rimini broadly seeks to exclude "Dean's opinions on Oracle's lost profits" in the

4    amount of $96.1 million (Mot. 1:16-18, 19:6-8), but ignores that her lost profits opinions

5    include three distinct components: (1) $76 million in lost support profits related to PeopleSoft,

6    J.D. Edwards, and Siebel customers who signed with Rimini; (2) $17.9 million in Database lost

7    profits for Rimini's failure to pay Oracle for the Database software that Rimini infringed; and

8    (3) $2.2 million in lost profits due to discounts that Oracle gave customers to prevent further

9    defections to Rimini.  Rimini offers *no argument* why the latter two lost profits measures

10   should be excluded.  Instead, it tries to sweep them in with its misguided attacks on Dean's

11   largest copyright lost-profits opinion.  Rimini will have an opportunity to challenge the weight

12   of Dean's lost profits damages opinions at trial, but there is no proper legal basis to exclude

13   them altogether.

14         Rimini also challenges Dean's application of income method and hypothetical license

15   negotiation analyses to quantify the fair market value of the copyrighted PeopleSoft, J.D.

16   Edwards, and Siebel materials that Rimini has infringed.  Mot. 5:15-23.  To streamline the

17   issues for trial, Oracle has elected not to present these two damage opinions at trial (with the

18   exception of Oracle Database damages discussed below).  The issues raised by these opinions

19   are thus moot.

20   **II.    DEAN'S COPYRIGHT DAMAGES OPINIONS**

21         Rimini does not dispute Dean's qualifications to provide the opinions she has disclosed.

22   Dean has a degree in Mathematics and Economics from Claremont McKenna College.

23   Declaration of Nitin Jindal in Support of Oracle's Opposition to Defendants' Motion to Exclude

24   Expert Testimony of Elizabeth A. Dean ("Jindal Decl."), Ex. B (Dean Schedule 1).  She is a

25   Certified Public Accountant, Certified Management Accountant, and Certified Licensing

26   Professional.  *Id.*  She also is certified in Financial Forensics.  *Id.*  Dean has over 20 years of

27   experience consulting on damages issues in a wide range of industries.  *Id.*  She has analyzed lost

28   profits in over 100 cases and been accepted by numerous federal and state courts as a testifying

ORACLE'S OPPOSITION TO DEFENDANTS' MOTION
TO EXCLUDE EXPERT TESTIMONY OF ELIZABETH A. DEAN

1  expert on intellectual property damages issues.  *Id.*

2       In her 190-page expert report, Dean presents opinions regarding:  (1) Oracle's claim for

3  copyright infringer's profits; (2) violation of the federal Computer Fraud and Abuse Act; (3)

4  violation of the California Computer Data Access and Fraud Act; (4) violation of Nevada

5  Revised Statutes § 205.4765; (5) breach of contract; (6) inducement of breach of contract; (7)

6  intentional interference with prospective economic advantage; (8) negligent interference with

7  prospective economic advantage; (9) unfair competition; (10) trespass to chattels; and (11) unjust

8  enrichment.  Jindal Decl., Ex. A (Dean Rpt)., Tbl. 5.  *None* of those eleven damages measures is

9  the subject of Rimini's motion.

10       Dean also provides two alternative measures of Oracle's "actual damages" that resulted

11  from Rimini's copyright infringement.  17 U.S.C. § 504(b).  She measures Oracle's "actual

12  damages" in the form of both Oracle's lost profits and a hypothetical license (which Oracle no

13  longer is pursuing).  Dean determines that Oracle suffered at least three forms of lost support

14  profits as a result of Rimini's copyright infringement:  $76.0 million in lost support profits

15  related to PeopleSoft, J.D. Edwards, and Siebel customers who signed with Rimini; $17.9

16  million in Database lost profits for Rimini's failure to pay Oracle for the Database software

17  Rimini infringed; and $2.2 million in discounts Oracle gave to prevent further defections to

18  Rimini ("Siebel IAR" lost profits).  Jindal Decl., Ex. A (Dean Rpt)., Tbl. 5.

19      **A.**    **Oracle's Lost Support Profits from Rimini's PeopleSoft, J.D. Edwards, and**

20             **Siebel Customers**

21       Dean performs a comprehensive analysis of the lost support profits that Oracle suffered

22  due to Rimini's copyright infringement.  She individually analyzes each of Rimini's 364

23  customers to determine the dates they started with Rimini, the products Rimini serviced, the

24  dates they cancelled Oracle support, and how much each customer had paid Oracle for support

25  of the same product.  Jindal Decl., Ex. A (Dean Rpt.) ¶¶ 78-80.  As described below, she then

26  excludes 108 customers due to her determination that either Oracle did not suffer any lost

27  support revenues related to them, or Oracle's copyright owner did not directly receive revenues

28  related to their support contracts.  Oracle's potential lost revenues are the amounts that each of

ORACLE'S OPPOSITION TO DEFENDANTS' MOTION
TO EXCLUDE EXPERT TESTIMONY OF ELIZABETH A. DEAN

1    the remaining 256 customers would have paid Oracle to support their PeopleSoft, J.D. Edwards,

2    and/or Siebel products had they never left for Rimini.

3         Dean then conducts an exhaustive causation analysis to determine what portion of

4    Oracle's lost revenues was due to Rimini's copyright infringement.  She considers how

5    Rimini's infringement contributed to customers signing with Rimini.  Specifically, Dean

6    considers that Rimini "

7

8

9                                                                                           ."

10   *Id.* ¶ 46.  She also considers the analysis and opinion of Oracle's technical expert, Dr. Randall

11   Davis, who concluded that

12

13

14                    ."  *Id.*  Thus, Dean opines that "

15

16            "  *Id.* ¶ 56.

17                                                                                      . *Id.*

18   ¶¶ 56-58.  Based on her analysis of Rimini's financial position during the relevant years, Dean

19   opines that

20

21                                    "  *Id.* ¶ 138.

22                                                            . *Id.* ¶ 61.[1]

23         Dean then opines what these customers would have done absent Rimini's infringement.

24

25   [1] This conclusion is also supported by the customer analysis and opinions of Oracle industry
     expert Edward Yourdon.  Jindal Decl., Ex. D (Yourdon Rpt.) ¶ 17 (Yourdon's Summary of
     Opinions).  It is also supported by extensive evidence, including from the customers themselves.

26   *E.g.*, *id.*, Ex. L (PTX 795) at 7 (

27            ); Ex. P (customer          Dep.) 19:3-21:2.

28

ORACLE'S OPPOSITION TO DEFENDANTS' MOTION
TO EXCLUDE EXPERT TESTIMONY OF ELIZABETH A. DEAN

1    As an initial step, Dean eliminates customers from the potential pool of lost customers if she

2    determines that (a) Oracle's copyright plaintiff, Oracle International Corporation, would not

3    have directly received a portion of the support revenues that the customer would have paid

4    Oracle (these tended to be international customers), (b) the customer was paying Oracle for

5    support at the same time period when it was with Rimini (i.e., the customer never cancelled

6    Oracle support), or (c) the customer returned to Oracle support, in which case Dean assumes

7    that, as part of the reinstatement with Oracle, the customer would have paid Oracle support

8    fees for the time it was gone (this was a conservative assumption as customers did not always

9    pay Oracle the full amount of back support).  Jindal Decl., Ex. A (Dean Rpt.) ¶ 84.  This results

10   in the removal of 108 of the 364 potential lost profits customers.  Jindal Decl., Ex. C (Dean

11   Schedule 9).[2]

12           Dean then analyzes the other options that were available to customers besides Oracle

13   and Rimini.  Evidence from Rimini, Oracle, and the customers themselves shows that ████

14   ████████████████████████████████████████.  Jindal Decl., Ex. A (Dean Rpt.)

15   ¶¶ 62-70.[3]  Dean also determines that a ████████████████████████████████

16   ████████████████████████████████████████████████████████████████

17   ████████████████████████████████████████████████████████████████

18   ████████████████████████.  Jindal Decl., Ex. G (Dean Dep. Ex. 5) at 4 ("

19   ████████████████████████████████████████████.");  see also id. at 4-9

20   (explaining the basis for Dean's opinion that ████████████████████████████████

21   ████).

22   _____

23   [2] The 108 excluded customers are those where the "Damage Category" on Dean's Schedule 9 is
     other than "Lost OKI" or "Lost Legacy," in addition to those customers who only received
24   Rimini support for Oracle's JDE World software.

25   [3] This conclusion is also supported by the opinions of Oracle industry expert Edward Yourdon.
     Jindal Decl., Ex. D (Yourdon Rpt.) ¶ 17 (Yourdon's Summary of Opinions).  It is also supported
26   by extensive evidence, including from the customers themselves.  E.g., id., Ex. M (Davichick
     Dep.) 50:17-20 ██████████████████████████████████████████████████████
27   ████████████████████████████ Ex. Q (customer Blue Cross and Blue
     Shield of Kansas City Dep.) 18:10-12.

28

ORACLE'S OPPOSITION TO DEFENDANTS' MOTION
TO EXCLUDE EXPERT TESTIMONY OF ELIZABETH A. DEAN

1    With that background, Dean further reduces Oracle's potential lost copyright profits by

2    Oracle's historical attrition rate to account for ordinary loss of customers.  Jindal Decl., Ex. A

3    (Dean Rpt.) ¶¶ 91-93.  Oracle's historic attrition rate measures the customers that leave Oracle

4    support every year, *for any reason*.  Reasons customers leave Oracle support include because

5    they no longer use the software (e.g., they have transitioned to SAP), they go bankrupt, they

6    purchase support from Rimini or others, and other reasons.  Jindal Decl., Ex. O (Catz Dep.)

7    44:22-45:8.  For example, a 10% attrition rate means that in a given year, customers

8    representing 10% of Oracle's support revenue cancel support for any reason.[4]  Continuing with

9    that example, if in 2009, Oracle lost $50 million in support revenues for customers that

10   cancelled Oracle support and went to Rimini, and Oracle's attrition rate was 10% for that year,

11   Dean reduces the $50 million in lost revenues by $5 million (10% of $50 million).  The

12   remaining $45 million would be reduced again in 2010 by Oracle's 2010 attrition rate (after

13   accounting for additional losses from that year), and so on.

14   Applying the attrition rate in this manner has the effect of removing customers from

15   Dean's lost profits measurement.  It represents her opinion that, even if the customers at issue

16   did not leave Oracle for an infringing Rimini in the but-for world, most would have stayed with

17   Oracle, but some still would have left Oracle each year at rates consistent with Oracle's entire

18   customer base.  *Id*. ¶¶ 91-93.[5]

19   Dean determines that applying these attrition rates to account for lost customers in this

20   context is conservative, as using Oracle's historic attrition rate likely overstates the proportion

21   of Rimini customers that should not be included in her lost-profits calculations.  For example, it

22   includes customers who left for Rimini and TomorrowNow, another infringer that was in the

23   market at the time.  *Id*. ¶ 93.  A true attrition rate for a world without infringement would not

24

25   ———————————————

[4] Over the relevant time period, Oracle's annual attrition rate for PeopleSoft, J.D. Edwards, and
26   Siebel ranged from 3% to 9%.  Dkt. 523 (Pretrial Order) at Undisputed Fact ¶ 34.

27   [5] This conclusion is also supported by the opinions of Oracle industry expert Edward Yourdon.
     Jindal Decl., Ex. D (Yourdon Rpt.) ¶ 17 (Yourdon's Summary of Opinions).

28

1   include such losses.[6]  The attrition rate also includes losses of customers that exhibited

2   characteristics unshared by Rimini's customers.  For example, it includes losses of customers

3   who stopped using Oracle's software.  Jindal Decl., Ex. O (Catz Dep.) 44:22-45:8.  An attrition

4   rate more tailored to Rimini's customer base would not have included such losses.

5          As a final step, Dean determines which portion of each customer's revenues lost to

6   Oracle would have been received by the Oracle entity that owns Oracle's copyrighted software.

7   Jindal Decl., Ex. A (Dean Rpt.) ¶¶ 101-103, 108-11.  That entity, Oracle International

8   Corporation, receives 39% of each support dollar Oracle earns.  *Id.*  Thus, Dean reduces

9   Oracle's claimed lost revenues by 61%.  *Id.*  She then applies Oracle International

10  Corporation's profit margin to her measurement of relevant lost revenues, and determines that

11  Rimini's copyright infringement caused Oracle $76 million in lost profits related to Rimini's

12  PeopleSoft, J.D. Edwards, and Siebel customers.  *Id.*; *see also* Jindal Decl., Ex. F (Dean Dep.)

13  at 96:16-23 (█████████████████████████████████████████████

14  ██████████████████████████████████████").

15         **B.      Oracle's Database Damages**

16         For actual copyright damages related to Rimini's infringement of Oracle Database, Dean

17  bases her calculation of Oracle's lost profits on the public list price that Oracle uses for

18  customers who wish to purchase a standard Database license.  Jindal Decl., Ex. A (Dean Rpt.)

19  ¶¶ 117-119.  Rimini's damages expert, Scott Hampton, also ████████████████████████

20  ███████████████████.  Jindal Decl., Ex. E (Hampton Rpt.) ¶¶ 153-154.

21         Oracle's list price depends on the number of processors in the servers the customer uses

22

23  _____

[6] *See Polaroid Corp. v. Eastman Kodak Co.*, No. 76-1634-MA, 1990 WL 324105, at *13 (D.
24  Mass. Oct. 12, 1990) *amended*, No. CIV.A. 76-1634-MA, 1991 WL 4087 (D. Mass. Jan. 11,
    1991) (when calculating lost profits, "[t]he inquiry [into substitutes] is quite narrow; acceptable
25  substitutes are those products which offer the key advantages of the patented device *but do not
    infringe*") (emphasis supplied); *State Indus., Inc. v. Mor-Flo Indus., Inc.*, 883 F.2d 1573, 1578
26  (Fed. Cir. 1989) (if the other suppliers "were likely infringers," patent holder would have been
    entitled to their shares of the market in determining damages based on lost sales); *cf. Pall Corp.
27  v. Micron Separations*, 66 F.3d 1211, 1222 (Fed. Cir. 1995) (a "voluntary settlement of litigation
    does not retrospectively transform an accused infringing product into a 'noninfringing
    substitute'" that is relevant to lost profits).

28

ORACLE'S OPPOSITION TO DEFENDANTS' MOTION
TO EXCLUDE EXPERT TESTIMONY OF ELIZABETH A. DEAN

1    with the software.  Jindal Decl., Ex. A (Dean Rpt.) ¶¶ 117-119.  For example, starting in

2    December 2008, Oracle's list price for a Database Enterprise Edition license was $47,500 per

3    processor.  *Id.*  A customer must purchase a separate license for each "business operation" that

4    benefits from use of the software.  *Id.* ████████████████████████████████████████████

5    ████████████████████████████████████████████████████████████████████████

6    ████████████ *Id.*[7] ████████████████████████████████████████████████████████

7    ████████████████████████████████████████████████████████████████████

8    ████████████████████████████████  *Id.*  After she adds fees for Oracle support and deducts 5%

9    for the costs Oracle would incur to sell Rimini the licenses, Dean determines that Rimini would

10   have paid Oracle $17.9 million in total Database license fees based on its actual use of the

11   software.  *Id.* ¶ 121.

12        Alternatively, Dean measures Oracle's actual copyright damages for infringement of

13   Oracle Database by determining *the value of Rimini's use* of Oracle's copyrighted database

14   materials.  Jindal Decl., Ex. A (Dean Rpt.) ¶ 377.  She uses Oracle's standard database license,

15   discussed above, as the relevant "benchmark license" that would be used in a hypothetical

16   negotiation to license Rimini's infringing conduct from the date of its first infringement (Oct.

17   2006) through 2012.  *Id.* ¶¶ 352, 360-363, 372-375.  Dean's hypothetical license negotiation

18   analysis values Rimini's use of Oracle Database at $17.9 million:  the same amount as Oracle's

19   Database lost profits.  *Id.* ¶ 380.

20        **C.**    **Siebel IAR Lost Profits**

21        Dean also calculates lost profits that Oracle suffered with respect to customers that never

22   left Oracle to join Rimini.  Oracle's policy is to increase its customers' support fees every year

23   by an inflationary adjustment of 3%.  Jindal Decl., Ex. A (Dean Rpt.) ¶ 123.  After Oracle

24   acquired Siebel Systems, Inc. in 2006, Oracle decided to increase Siebel support customer fees

25   by 4-5%, depending on whether the Siebel support contract was for gold or standard support.

26   ────────────────────

[7] ████████████████████████████████████████████████████████████

27   ███████████████████████████████████  Jindal Decl., Ex. E (Hampton Rpt.) ¶ 154.

28

ORACLE'S OPPOSITION TO DEFENDANTS' MOTION
TO EXCLUDE EXPERT TESTIMONY OF ELIZABETH A. DEAN

1   *Id.* ¶ 124.  The increased adjustment was to account for the fact that Siebel's support contracts

2   were priced at 15.8% and 17.5% of the initial license price, whereas Oracle's policy was to price

3   support at 22% of license price.  *Id.* ¶ 123.

4          In October 2009, Rimini's infringement caused Oracle to reduce its Siebel 4-5%

5   inflationary increases to 3%.  *Id.*; Jindal Decl., Ex. K (PTX 769) (October 2009 Oracle email

6   chain describing decision to reduce inflationary increase in response to Rimini).  Specifically,

7   Rimini's 50% price on Siebel support, which was made possible by Rimini's infringement (as

8   described above), caused Oracle to reduce the increase it had employed for three years to avoid

9   losing additional customers to Rimini.  *Id.*  Dean calculates the amount of this decrease and

10  determines that Oracle lost an additional $2.2 million in profits as a result.  Jindal Decl., Ex. A

11  (Dean Rpt.) ¶¶ 126-128.

12  **III.    LEGAL STANDARD**

13         Under Federal Rule of Evidence 702, a qualified expert may testify in order to assist the

14  trier of fact to understand the evidence or to determine a fact in issue if (i) the testimony is

15  based on sufficient facts or data, (ii) the testimony is the product of reliable principles and

16  methods, and (iii) the witness has applied the principles and methods reliably to the facts of the

17  case.  The Supreme Court established a framework for the admissibility of expert testimony

18  under Federal Rule of Evidence 702 in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579

19  (1993).  The Supreme Court listed four factors that courts may consider in determining whether

20  expert testimony is admissible: (1) whether the method has gained general acceptance in the

21  relevant scientific community; (2) whether the method has been peer-reviewed; (3) whether the

22  method "can be (and has been) tested;" and (4) whether there is a "known or potential rate of

23  error."  *Daubert*, 509 U.S. at 593-94.

24         When evaluating the admissibility of expert testimony, the overarching concern is

25  whether it is relevant and reliable.  *Daubert*, 509 U.S. at 594-95.  Reliability is determined

26  based on the soundness of the methodology, not the expert's ultimate conclusions.  *Kennedy v.*

27  *Collagen Carp.*, 161 F.3d 1226, 1230-31 (9th Cir. 1998) (courts should not exclude expert

28  testimony because they disagree with their conclusions).  When the threshold for admissibility

1   is met, differences in the experts' opinions go to weight, not admissibility. *Id.* "[T]he rules of

2   evidence do not demand perfection. Rather, a court need only determine whether the reasoning

3   and methods underlying the expert testimony are reliable, and whether they have been properly

4   applied to the facts." *Gutierrez v. Wells Fargo & Co.*, No. C07-05923 WHA, 2010 WL

5   1233810, at *11 (N.D. Cal. Mar. 26, 2010). "When the methodology is sound, and the evidence

6   relied upon sufficiently related to the case at hand, disputes about the degree of relevance or

7   accuracy (above this minimum threshold) may go to the testimony's weight, but not its

8   admissibility." *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 852 (Fed. Cir. 2010), *aff'd on*

9   *other grounds*, 131 S. Ct. 2238 (2011). "Only if the expert's opinion is so fundamentally

10  unsupported that it can offer no assistance to the jury must such testimony be excluded."

11  *Fresenius Med. Care Holdings, Inc. v. Baxter Int'l, Inc.*, No. C 03-1431 SBA, 2006 WL

12  1390416, at *3 (N.D. Cal. May 18, 2006).

13  **IV.   DEAN'S LOST PROFITS DAMAGES OPINIONS ARE ADMISSIBLE.**

14          Rimini claims that Dean's copyright lost profits opinion should be excluded because she

15  "fails to establish any 'causal link'" between Rimini's infringement and her lost profits

16  calculations. Mot. 3:19-20. Rimini ignores the extensive analysis Dean completed, ignores the

17  substantial evidence supporting her opinion, relies on gross mischaracterizations of her analysis,

18  and argues about specific facts that go to the weight, not admissibility, of her opinions. Further,

19  Rimini does not even attempt to explain why Dean's Database and Siebel IAR lost profits

20  opinions should be excluded.

21          **A.   Dean's Lost Profits Opinions Are Admissible and Are Supported by Analysis**
22              **and Evidence on Causation.**

23          It is Oracle's burden only to prove the lost profits it suffered "as a result of the

24  infringement." 17 U.S.C. § 504(b); *Polar Bear Prods. v. Timex Corp.*, 384 F.3d 700, 708 (9th

25  Cir. 2004). Oracle must prove "with reasonable probability the existence of [a] causal

26  connection between the infringement and a loss of revenue." *Harper & Row, Publishers, Inc. v.*

27  *Nation Enters.*, 471 U.S. 539, 567 (1985). The burden then "properly shifts to the infringer to

28  show that this damage would have occurred had there been no taking of copyrighted

ORACLE'S OPPOSITION TO DEFENDANTS' MOTION
TO EXCLUDE EXPERT TESTIMONY OF ELIZABETH A. DEAN

1 expression." *Id.*; *see also Stevens Linen Assocs., Inc. v. Mastercraft Corp.*, 656 F.2d 11, 15

2 (2nd Cir. 1981) (where plaintiff lost sales to infringer, "once [plaintiff] established that it had

3 been damaged, and that its customers purchased both the infringed and infringing products, the

4 burden shifted to the infringer . . . to prove that the customers . . . to whom it sold would not

5 have acquired from [plaintiff] alone [the products at issue] had there been no infringement").[8]

6 "Courts and commentators agree [that the term 'actual damages'] should be broadly construed

7 to favor victims of infringement." *On Davis v. The Gap Inc.*, 246 F.3d 152, 164 (2d Cir. 2001)

8 (citing sources); *Stevens Linen Assocs.*, 656 F.2d at 15 (where two measures of actual damages

9 were available, district court instructed to "award [plaintiff] whatever sum proves to be

10 greater").

11     Rimini takes no issue with Dean's methodology under *Daubert*, nor could it.  Instead,

12 Rimini improperly seeks a determination of the ultimate factual issue of causation.  *See*

13 *Pierson*, 2008 WL 7084522, at *3 (rejecting motion seeking to exclude expert testimony based

14 on a claim that expert did not satisfy plaintiff's causation burden: "[t]he ultimate issue of

15 causation is not appropriate for determination in a motion to exclude evidence"); *IGT v.*

16 *Alliance Gaming Corp.*, No. 2:04-1676-RCJ-RJJ, 2008 WL 7084605, at *9 (D. Nev. 2008) (it is

17 "inappropriate for a motion *in limine*" to decide "questions of fact").  Rimini's motion should

18 be denied on that basis alone, as the relevant question is whether Dean's opinion is admissible

19 to help Oracle meet its burden of proof, not whether Oracle has already met it before trial even

20 begins.

21     Rimini also ignores that Dean completes a comprehensive lost profits <u>and</u> causation

22 analysis.  Specifically, Dean opines that the customers at issue – which provide the starting

23 point for her lost profits analysis – needed a provider to provide support services for the

24 copyrighted software, as evidenced by their purchase of support services from Rimini.  Jindal

25 ─────────────────

26 [8] Rimini wrongly implies that Oracle's burden is to provide a lost profit calculation that satisfies
a "but for" test, but the error is of no consequence to Rimini's motion.  Dean analyzes Oracle's
lost profits from both perspectives.  *See also* Section II(A); *see also* Jindal Decl., Ex. F (Dean Dep.)
27 93:3-9 ("it is my opinion that [the lost profits she calculated] are the amount of revenues that
Oracle would have made, but for Rimini's infringement").

28

ORACLE'S OPPOSITION TO DEFENDANTS' MOTION
TO EXCLUDE EXPERT TESTIMONY OF ELIZABETH A. DEAN

1  Decl., Ex. A (Dean Rpt.) ¶ 70.  She then analyzes evidence showing that Rimini's infringement

2  was extensive, necessary for Rimini's support offering, provided Rimini with significant

3  efficiencies, and allowed Rimini to offer Oracle's customers the same service as Oracle at 50%

4  of Oracle's price.  *See* Section II(A) (summarizing Dean's lost profits analysis).

5        Rimini also disregards the fact that Oracle will present substantial evidence at trial to

6  support these bases of Dean's opinion.  The analysis of Oracle's technical experts, Christian

7  Hicks and Dr. Randall Davis, establishes that Rimini's infringement was extensive.  Jindal

8  Decl., Ex. A (Dean Rpt.) ¶ 46.  Documents and testimony confirm that Rimini's ███████

9  ████████████████████████████████████████████████████████████████████████████

10  For example, Rimini has stated that it "████████████████████████████████████████

11  ████████████████████████████████"  Jindal Decl., Ex. H (PTX 11).

12                                                                            *Id.*  Rimini

13  also considered it "█████████████

14                                          Jindal Decl., Ex. I (PTX 60).

15  Substantial evidence will prove that ████████████████████████████████████████

16  ████████████████████████████████████████████████████████████

17  ██████████████████████████████████████████████  Jindal Decl., Ex. J (PTX 740) at

18  2; *see also id.*, Ex. R (customer CKE Dep.) 46:16-24 (CKE evaluated whether Rimini could

19  provide tax updates when deciding whether to sign with them); Ex. S (customer Hastings Dep.)

20  79:15-21 (customer could not self-support because creating updates was "beyond [its]

21  expertise").  Dean similarly relies on Oracle's technical and industry experts' analysis, plus

22  Rimini documents and testimony, to confirm the █████████████████████████████████

23  ████████████████████████████████████████████████████

24  ████████  Jindal Decl., Ex. A (Dean Rpt.) ¶¶ 56-58, 61, 138 (citing discussions with Dr. Davis and

25  Mr. Yourdon, internal Rimini communications and presentations, and Rimini executives'

26  deposition testimony).  Rimini's Senior Vice President of Global Sales identified Rimini's "████

27  ████████████████████████████████"  as one of Rimini's "██████████████████████████

28  ████████████████████████████████████████."  Jindal Decl., Ex. N (Maddock Dep.)

ORACLE'S OPPOSITION TO DEFENDANTS' MOTION
TO EXCLUDE EXPERT TESTIMONY OF ELIZABETH A. DEAN

1    13:16-22, 14:20-15:2.  The Court has already confirmed the service they stayed for was

2    infringing.  Dkts. 474, 476.  Dean's extensive analysis and the supporting evidence at trial will

3    thus establish "with reasonable probability the existence of [a] causal connection between

4    [Rimini's] infringement and a loss of [Oracle] revenue."  *Harper*, 471 U.S. at 567.

5          Dean goes even further, and analyzes Rimini's burden on causation:  whether Oracle's

6    losses "would have occurred had there been no taking of copyrighted expression."  *Id.*  Here,

7    she again relies on significant evidence showing what Rimini's customers would have done

8    absent Rimini's infringement.  She examines the availability of non-infringing substitutes, and

9    determines ████████████████████████████████████████████████████████████.

10   *See* Section II(A) (discussing Dean Rpt. ¶¶ 62-70).  In addition to internal Rimini documents

11   and third-party analyst reports, Dean cites customer testimony that confirms "████████████

12   ████████████████████████████████████████████" and that customer "████████

13   ████████████████."  Jindal Decl., Ex. A (Dean Rpt.) ¶¶ 66, 70 (citing deposition testimony

14   from customers Blue Cross and Blue Shield of Kansas City, Bausch & Lomb, CKE, and

15   SonicWall).  As described in Section II(A), Dean also uses Oracle's attrition rate to reduce

16   Oracle's potential lost profits to account for the fact that, each year when a customer's support

17   contract was up for renewal, a percentage of those customers would have chosen not to

18   purchase support from Oracle (including because of potential non-infringing alternatives).

19   Dean confirms that Oracle had the capacity to provide support services to these customers.

20   Jindal Decl., Ex. A (Dean Rpt.) ¶ 76 (noting that Oracle previously supported the customers at

21   issue, the size of Oracle's large customer base and high retention rates, and Oracle's continuous

22   investments in its support infrastructure).  Finally, Dean calculates the amount of the lost profits

23   associated with these customers.  *See* Section II(A).

24         Circuit courts have upheld damages awards based on lost profits opinions that closely

25   resembled Dean's lost profits analysis.  In *Oracle Corp. v. SAP AG*, 765 F.3d 1081 (9th Cir.

26   2014), the Ninth Circuit held that the district court abused its discretion when it set a remittitur

27   amount using the lower of two lost-profits figures that Oracle's expert presented.  *Id.* at 1094-

28   95.  The Ninth Circuit held that the district court should have selected a remittitur amount based

ORACLE'S OPPOSITION TO DEFENDANTS' MOTION
TO EXCLUDE EXPERT TESTIMONY OF ELIZABETH A. DEAN

1   on "the highest lost-profits . . . estimate[] sustainable by the proof." *Id*. at 1095.  Like Dean's,

2   that lost-profits opinion embraced by the Ninth Circuit was based on Oracle's expert's valuation

3   of customer support revenues that Oracle lost due to a competitor's widespread copyright

4   infringement, which had enabled that competitor to offer competitive support offerings to

5   customers at 50% of Oracle's price.  Jindal Decl., Ex. U (*Oracle v. SAP* Joint Trial Exhibit 3,

6   detailing scope of infringement); Ex. V (*Oracle v. SAP* Trial Tr.) at 1053:7-1054:4, 1054:17-23,

7   1055:7-1056:5, 1058:25-1059:5, 1059:13-1060:7 (describing that both parties' experts

8   measured lost profits based on customers lost from Oracle to infringer), 1105:23-1106:7

9   (summarizing business model that led to Oracle lost profits).

10          Similarly, in *Data General Corp. v. Grumman Sys. Support Corp.*, 36 F.3d 1147 (1st

11  Cir. 1994), the plaintiff's lost profits were based on the "loss of a reasonably verifiable number

12  of customers" who, as here, purchased infringing services from defendant instead of plaintiff.

13  *Id*. at 1173.  The customers "may have switched to [defendant] in search of lower prices and

14  better service," but there was evidence that defendant's drawing power was due to

15  infringement.  *Id.*  The customers had a "limited and predictable set of service needs and a

16  demonstrated tendency to satisfy those needs by turning to" defendant for their service.  *Id.*

17  Although the defendant offered non-infringing services as well, the infringement "was the

18  critical attribute" of the service.  *Id*. at 1172.  Like Dean, the expert in *Data General* "did not

19  presume that customers would be entirely insensitive to issues of price and quality.  In

20  calculating [plaintiff's] lost profits, he reduced the figure by an estimate of the business [the

21  plaintiff] would itself have lost to competition" from other third party providers.  *Id*. at 1173.

22          Like the lost profits opinions upheld in *Oracle v. SAP* and *Data General*, Dean's

23  opinion is admissible and sufficient to support a damage award.[9]  *i4i Ltd. P'ship*, 598 F.3d at

24  _____

[9] Rimini likens Dean's causation analysis to a damages opinion that was rejected in *Dash v.*
25  *Mayweather*, 731 F.3d 303 (4th Cir. 2013), but *Dash* is not even a lost profits case, and the
    damages opinion was rejected for a reason unrelated to causation.  In *Dash*, the expert opined
26  that the plaintiff was entitled to "actual damages" in the form of a lost license fee for use of the
    plaintiff's copyrighted song at two professional wresting events.  The expert opined that, based
27  on "what a willing buyer would have been reasonably required to pay to a willing seller for [the]
    plaintiffs' work," plaintiff was entitled to a $3,000 license fee.  *Id*. at 314.  The Fourth Circuit

28                                                      (Footnote Continued on Next Page.)

ORACLE'S OPPOSITION TO DEFENDANTS' MOTION
TO EXCLUDE EXPERT TESTIMONY OF ELIZABETH A. DEAN

1   852 ("When the methodology is sound, and the evidence relied upon sufficiently related to the

2   case at hand, disputes about the degree of relevance or accuracy (above this minimum

3   threshold) may go to the testimony's weight, but not its admissibility.").

**B.      Rimini's Challenges Rely on Mischaracterizations of Dean's Opinions and the Relevance of Facts That, at Best, Go to the Weight of Her Opinions.**

6         Rimini's argument that there is no causal connection between Rimini's infringement and

Dean's measured damages relies on a mischaracterization of Dean's lost profits opinion and

complaints about disputed facts.  Rimini wrongly claims that Dean's "fundamental underlying

assumption concerning causation [is] that any lost customer is attributable to infringement."

Mot. 19:1-2.  This argument is unsupported.

11        Dean does *not* opine that Oracle is entitled to lost profits for every Rimini customer.  To

the contrary, she appropriately accounts for customers that might have left Oracle irrespective

of Rimini's infringement.  As described in Section II(A), Dean uses Oracle's attrition rate to

effectively remove customers from her lost profits measurement and account for customers that

would have left Oracle for reasons unrelated to infringement.  If anything, Dean's use of the

Oracle's historic attrition rates overestimates what those losses would have been, resulting in a

damages number that is lower than Oracle's actual lost profits.   In any case, any complaints

about the attrition rate that Dean used go to the weight of her opinion.  *Sun Microsystems, Inc.*

*v. Hynix Semiconductor, Inc.*, 608 F. Supp. 2d 1166, 1208-09 (N.D. Cal. 2009) ("to the extent

that defendants challenge the accuracy or propriety of [inputs in the expert's model], it is an

issue that goes to the weight, rather than the admissibility").  And even if the jury finds any of

Rimini's fact-based challenges persuasive and that the scope or impact of Rimini's

infringement differs from Dean's stated assumptions, Dean's comprehensive schedules and

analysis make it possible to apportion Oracle's claimed damages based on applicable product

25   (Footnote Continued from Previous Page.)

26   affirmed the district court's ruling on summary judgment that plaintiff was not entitled to the fee,
as a matter of law, because there no evidence that "that the thing taken had a fair market value."

27   *Id.* at 318.  The plaintiff had never "sold or otherwise garnered some market value for the use of
his music."  *Id* at 319.

28

1   lines, years, or customers.

2       Rimini also argues that Dean's "assumptions are also flatly contradicted by the

3   evidence" because Rimini thinks testimony from customers Pitney Bowes and Bausch & Lomb

4   show they should not have been included in any lost profits claim.  Mot. 18:15-26.  First,

5   Rimini ignores other contrary testimony from these customers.  Pitney Bowes testified that it

6   ████████████████████████████████████████████████████████████████████

7   ████████████████████████████████████████████████████████████████████

8   ████████████████████████████████████████████████████████████████

9   ████████████████████████████████████████  " Jindal Decl., Ex. T (Pitney Bowes Dep.) 15:8-16:19.

10  Moreover, Pitney Bowes and Bausch & Lomb's choice to purchase support from Rimini shows

11  they wanted a support provider.  Finally, Dean's use of Oracle's attrition rate accounts for

12  customers that might not have stayed with Oracle absent Rimini's infringement.  Rimini's

13  complaints "go to the *weight*, not the admissibility" of Dean's opinion.  *Kennedy v. Collagen*

14  *Corp.*, 161 F.3d at 1230-31; *DSU Med. CO/po v. JMS Co., Ltd.*, 296 F. Supp. 2d 1140, 1147-48

15  (N.D. Cal. 2003) ("it is not the role of the trial court to evaluate the correctness of facts

16  underlying one expert's testimony," "an expert may testify on his party's version of the disputed

17  facts," and the proper way to address factual disputes is through cross-examination).

18      Rimini misstates Dean's opinion by claiming that she "acknowledges that she cannot

19  determine which of Oracle's lost revenues are due to infringement."  Mot. 17:17-19.  Rimini

20  cites to Dean's report where she states that "[d]ue to the difficulty (or inability) in determining

21  *every instance* where Rimini Street's actions have caused customers to not license products or

22  buy support or other services from Oracle, or have otherwise caused Oracle harm, the 'Value of

23  Use' measurement provides a more complete remedy for Oracle in this case."  Jindal Decl.,

24  Ex. A (Dean Rpt.) ¶ 44 (emphasis supplied).  In that paragraph, Dean explains that Oracle has

25  incurred losses *beyond* what she has calculated as lost profits, and that it is not possible to

26  calculate all other forms of Oracle's losses.  Dean even provides examples of the losses that she

27  did not quantify, and therefore, did not include in her damages analysis.  *Id.* ¶¶ 71-75 (Dean's

28  lost profits measure is "conservative" because she did not measure lost profits resulting from

1   damaged customer relationships or discounts given to customers to prevent additional customer

2   defections).  Her inability to calculate *every instance* of profits Oracle lost is the reason she

3   opined that her hypothetical license analysis provided Oracle with a "more complete remedy."

4   *Id.* ¶ 44.  She never said that the lost profits *she did measure* were not the result of Rimini's

5   infringement; she said the opposite.  Jindal Decl., Ex. F (Dean Dep.) at 93:3-9 ("████

6   █████████████████████████████████████████████████████████████

7   ████████████████████████").

8           Rimini's two other arguments have no bearing on the admissibility of Dean's lost profits

9   opinions.  First, Rimini repeatedly tries to confuse Oracle's claim for lost profits with a claim

10   for infringer's profits under 17 U.S.C. 504(b),[10] asserting Oracle must prove "a causal link

11   between the alleged infringement and the enhancement of any revenue stream."  Mot. 15:24-27

12   (quoting *Dash*, 731 F.3d at 309).  *Dash* was describing the standard for claiming an *infringer's*

13   profits, not a plaintiff's *lost* profits.  Rimini also makes this mistake with factual arguments, as

14   it claims that the amount of money *Rimini made* is somehow relevant to *Oracle's losses*.

15   Specifically, Rimini claims that Dean's lost profits opinion wrongly "assumes that any revenue

16   Rimini Street made, or projected it would make, is 100% attributable to infringing activities."

17   Mot. 16:12-14; *see also id.* at 18:7-9 (Dean's "inclusion of all Rimini Street revenues could

18   withstand the causation standard identified above only if all of Rimini Street's support services

19   were infringing.").[11]  Rimini also argues that "the majority of Oracle's non-renewing customers

20

_____

21   [10] *See also Polar Bear*, 384 F.3d at 707-8 ("Congress explicitly provides for two distinct
    monetary remedies—actual damages and recovery of wrongful profits.  These remedies are two

22   sides of the damages coin—the copyright holder's losses and the infringer's gains.  Actual
    damages are usually determined by the loss in the fair market value of the copyright, measured

23   by the profits lost due to the infringement or by the value of the use of the copyrighted work to
    the infringer.  To take away incentives for would-be infringers and to prevent the infringer from

24   unfairly benefitting from a wrongful act, the statute also provides for the recovery of wrongfully
    obtained profits resulting from the infringement.") (internal quotations and citations omitted).

25

    [11] Notably, in estimating Rimini's infringer's profits, ████████████████████████

26   ██████████████████████████████████████████████████████████████

27   █████████████████████████████████████████████████████.
    Jindal Decl., Ex. E (Hampton Rpt.) ¶¶ 247-260.

28

ORACLE'S OPPOSITION TO DEFENDANTS' MOTION
TO EXCLUDE EXPERT TESTIMONY OF ELIZABETH A. DEAN

1   left for reasons entirely unrelated to Rimini," based on the fact that ████████████████

2   ████████████████████████, whereas Oracle's revenue attrition totaled $357 million during

3   that period.  Mot. 17:5-13.  The revenues that Rimini made from its infringement are not the

4   same as Oracle's claim for lost profits, particularly because Rimini's primary selling point is

5   that it offers support for ████████ less than Oracle charges.  For example, the profits Rimini

6   caused Oracle to lose would be the same if Rimini charged the same price as Oracle, 50% of

7   Oracle's price, or if Rimini gave away its infringing service for free.  Any arguments regarding

8   Rimini's revenues are irrelevant to the admissibility of Dean's lost profits analysis.

9        Second, Rimini argues that Oracle's attrition rates improved after Rimini entered the

10   market, as if Rimini *helped* Oracle's business.  Mot. 16:16-17:4.  Rimini ignores that without its

11   infringing service in the market, Oracle's attrition rates would have been even lower than they

12   were from 2006-2011.  Rimini can advance fact-based criticisms through "[v]igorous cross-

13   examination, presentation of contrary evidence, and careful instruction on the burden of proof,"

14   *Daubert*, 509 U.S. at 596, but it does not render Dean's lost profits opinions inadmissible.

15        **C.    Dean's Database and Siebel IAR Lost Profits Opinions Are Admissible.**

16        Although Rimini broadly seeks to exclude all of Dean's lost profits opinions, Rimini

17   makes no specific claim, and presents no arguments, that Dean's Database and Siebel IAR lost

18   profits opinions should be excluded for any reason.  Both are admissible.  *See* Sections II(B)-

19   (C) (describing Dean's methodology and evidence supporting how Rimini's infringement

20   caused claimed damage).

21   **V.    DEAN'S DATABASE VALUE OF USE DAMAGES OPINION IS ADMISSIBLE.**

22        Rimini claims that Dean's fair market value opinions for the infringed PeopleSoft, J.D.

23   Edwards, and Siebel materials are speculative and unreliable, but Rimini's motion offers no basis

24   to exclude Dean's value of use opinion related to Rimini's infringement of Oracle Database.

25   Mot. 5:15-21; Mot. Sections III(A)-(D).  Rimini's motion literally does not discuss Dean's

26   Database value-of-use opinion at all.

27        Rimini challenges Dean's hypothetical license calculations with respect to PeopleSoft,

28   J.D. Edwards, and Siebel as unduly speculative because she does not rely on applicable

1   benchmark licenses. Mot. 5:24-8:6 (citing *Oracle Corp. v. SAP AG*, 765 F.3d 1081 (9th Cir.

2   2014)).  Whatever the merits of this argument, the lack of benchmark licenses clearly does not

3   apply to Dean's Database opinion, and Rimini is silent concerning this benchmark.  Dean

4   identifies Oracle's standard Database license fee (as set forth in Oracle's price list) as the

5   applicable "benchmark license," and she uses it as the foundation of Oracle and Rimini's

6   hypothetical license negotiation. *See* Section II(B).  Rimini neither acknowledges nor disputes

7   this in its motion.  Nor does Rimini challenge the reliability of that license fee as a relevant

8   benchmark.  Rimini's own damages expert ███████████████████████████████████

9   ████████████████████████████████████████████████  Jindal Decl., Ex. E

10  (Hampton Rpt.) ¶ 154.  Even if Rimini's motion could be read to include a challenge to Dean's

11  Database value of use opinion, Dean's hypothetical license negotiation analysis is based on an

12  objective, non-speculative benchmark license.

13  **VI.   CONCLUSION**

14        For the reasons stated above, Rimini's motion to exclude the expert testimony of

15  Elizabeth A. Dean should be denied.

16  DATED:  June 22, 2015

17                                                MORGAN, LEWIS & BOCKIUS LLP

18                                                By:   _____/s/ Thomas S. Hixson_____
                                                          Thomas S. Hixson
19                                                      Attorneys for Plaintiffs
                                                  Oracle USA, Inc., Oracle America, Inc.
20                                                and Oracle International Corporation

21

22

23

24

25

26

27

28

ORACLE'S OPPOSITION TO DEFENDANTS' MOTION
TO EXCLUDE EXPERT TESTIMONY OF ELIZABETH A. DEAN