1

```
 1                    UNITED STATES DISTRICT COURT
                          DISTRICT OF NEVADA
 2          BEFORE THE HONORABLE LARRY R. HICKS, DISTRICT JUDGE


 3

 4   ORACLE USA, INC., a Colorado      :
     corporation; ORACLE AMERICA,      :
 5   INC., a Delaware corporation;     :
     and ORACLE INTERNATIONAL          :No. 2:10-cv-0106-LRH-PAL
 6   CORPORATION, a California         :
     corporation,                      :
 7                                     :
            Plaintiffs,                :
 8                                     :
        vs.                            :
 9                                     :
     RIMINI STREET, INC., a Nevada     :
10   corporation; and SETH RAVIN,      :
     an individual,                    :
11                                     :
            Defendants.                :
12   _____    :

13

14

                   TRANSCRIPT OF JURY TRIAL - DAY 1
15                     (Pages 1 through 39)

16

17                       September 14, 2015

18

                         Las Vegas, Nevada
19

20

21

22

     Court Reporter:        Donna Davidson, RDR, CRR, CCR 318
23                          Certified Realtime Reporter
                            400 South Virginia Street
24                          Reno, Nevada  89501
                            (775) 329-0132
25
```

2

```
 1                        A P P E A R A N C E S

 2     FOR THE PLAINTIFFS:

 3     BOIES, SCHILLER & FLEXNER LLP
       KIERAN P. RINGGENBERG
 4     1999 Harrison Street, Suite 900
       Oakland, California 94612
 5     (510) 874-1000
       Fax: (510) 874-1460
 6     kringgenberg@bsfllp.com

 7     BOIES, SCHILLER & FLEXNER LLP
       RICHARD J. POCKER
 8     300 South Fourth Street, Suite 800
       Las Vegas, Nevada 89101
 9     (702) 382-7300
       Fax: (702) 382-2755
10     rpocker@bsfllp.com

11     BOIES, SCHILLER & FLEXNER LLP
       WILLIAM A. ISAACSON
12     KAREN L. DUNN
       5301 Wisconsin Avenue, NW
13     Washington, DC  20015
       (202) 237-2727
14     Fax:  (202) 237-6131
       wisaacson@bsfllp.com
15     kdunn@bsfllp.com

16     MORGAN LEWIS & BOCKIUS LLP
       THOMAS S. HIXSON
17     NITIN JINDAL
       JOHN A. POLITO
18     One Market, Spear Street Tower
       San Francisco, California 94105
19     (415) 442-1000
       Fax:  (415) 442-1001
20     thomas.hixson@morganlewis.com
       nitin.jindal@morganlewis.com
21     john.polito@morganlewis.com

22     JAMES C. MAROULIS
       DORIAN E. DALEY
23     Oracle Corporation
       500 Oracle Parkway
24     Redwood City, California 94070
       (650) 506-4846
25     jim.maroulis@oracle.com
       dorian.daley@oracle.com
```

1                A P P E A R A N C E S (Continued)

2    FOR THE DEFENDANTS:

3    SHOOK, HARDY & BACON LLP
     PETER E. STRAND
4    B. TRENT WEBB
     2555 Grand Boulevard
5    Kansas City, Missouri 64108
     (816) 474-6550
6    Fax: (816) 421-5547
     pstrand@shb.com
7    bwebb@shb.com

8    SHOOK, HARDY & BACON LLP
     ROBERT H. RECKERS
9    600 Travis Street, Suite 3400
     Houston, Texas 77002
10   (713) 227-8008
     Fax: (713) 227-9508
11   rreckers@shb.com

12   LEWIS ROCA ROTHGERBER LLP
     W. WEST ALLEN
13   3993 Howard Hughes Parkway, Suite 600
     Las Vegas, Nevada 89169
14   (702) 949-8230
     Fax: (702) 949-8364
15   wallen@lrrlaw.com

16

17

18

19

20

21

22

23

24

25

**4**

1          LAS VEGAS, NEVADA, SEPTEMBER 14, 2015, 12:56 P.M.

2                              --oOo--

3                     P R O C E E D I N G S

4

5               COURTROOM ADMINISTRATOR:  Please rise.

6               THE COURT:  Good afternoon.  Please be seated.

7               COURTROOM ADMINISTRATOR:  Today is the date and

8     time for jury trial in civil case 2:10-cv-106-LRH-PAL,

9     Oracle USA, Incorporated, and others, versus Rimini Street,

10    Incorporated, and others.

11              Counsel, can you please state your appearances

12    for the record.

13              MR. ISAACSON:  Your Honor, it's Bill Isaacson

14    from Boies, Schiller & Flexner.  With me is Karen Dunn from

15    Boise, Schiller.

16              MS. DUNN:  Good morning, Your Honor.

17              MR. HIXSON:  Good morning, Your Honor.  Tom

18    Hixson with Morgan, Lewis & Bockius, and with me is John

19    Polito, also with Morgan, Lewis & Bockius for plaintiffs.

20              THE COURT:  All right.

21              MR. HIXSON:  Also, Dorian Daley from Oracle.

22              THE COURT:  All right.

23              MR. WEBB:  Good afternoon, Your Honor.  Trent

24    Webb, Shook, Hardy & Bacon, for the defendants.  With me is

25    Chris Dominek who is assisting us this afternoon.  Beside

1    him is Seth Ravin, a defendant in the case, Mr. Strand with

2    my office, Peter Strand.

3               MR. STRAND:  Good afternoon.

4               MR. WEBB:  Mr. Rob Reckers.

5               MR. RECKERS:  Good afternoon, Your Honor.

6               MR. WEBB:  And Mr. West Allen.

7               THE COURT:  Good afternoon.  Welcome to all of

8    you.  The assembly here may rival the jury panel, I'm not

9    sure.

10              A couple of things.  First of all, it strikes me

11   that with so many counsel appearing in this matter that we

12   will not need to go through the introduction process when

13   the Court reconvenes, although I will have you do that, of

14   course, as we are selecting the jury.

15              And the only thing I would ask is that if you're

16   going to change the role of counsel as a result of a new

17   witness, or a new issue, or whatever, that you give me a

18   little bit of a heads up on that.  But I'm sure we can work

19   with it, whatever the case.

20              I have reviewed the preliminary instructions

21   which were proposed by counsel, and they pretty much

22   followed what I normally give as preliminary instructions.

23   I went through the ones that I felt there was no dispute

24   about.  I added some that I normally give, and I have

25   provided counsel with copies of all of that.

1            If there should be an objection to something,

2    that can certainly be raised after we have gone through

3    jury selection and before those instructions might be read.

4            It is not my practice to deliver those as

5    written instructions to the jury panel, rather just to read

6    them from the bench after the jury has been selected.

7            The one most important matter that concerned me,

8    though, was obviously the time that this trial is expected

9    to take because I'm going to have to address that with the

10   jury clearly in voir dire.

11           So let me start with plaintiff's counsel or

12   counsel jointly.  What's your final best assessment?

13           MR. ISAACSON:  Jointly, still at three weeks.

14           THE COURT:  Pardon?

15           MR. ISAACSON:  Three weeks, Your Honor.

16           MR. WEBB:  The one caveat, Your Honor, obviously

17   we're not sure exactly what the case will look like, so we

18   may actually have another day or two depending on how it

19   goes.  But right now, based upon what we think is going to

20   happen, we think three weeks is a pretty good bet.

21           THE COURT:  So in outlining the expected

22   duration of the trial, I will say estimated range of three

23   to four weeks and hopefully within the three-week period.

24   Okay.

25           All right.  Are there any last questions or

7

1      any -- I know there's a couple of motions that came in on

2      the -- rather late.  I had a chance to look at them, but

3      that's basically it.

4              Is there anything else that -- and I would hope

5      to be able to give you rulings on those, and if I felt that

6      some argument on it was necessary, I would let you know,

7      but we would do that at a later time.

8              Is there anything else that counsel would like

9      to raise at this time?

10             MR. ISAACSON:  I think the only thing that would

11     be helpful to get a ruling on, because it affects a slight

12     piece of opening statements, is the joint submission that

13     was made to Your Honor as to questions that were put to

14     customers.  And counsel are prepared to argue it if you

15     want to hear argument at some point.

16             THE COURT:  Okay.

17             MR. ISAACSON:  But it was a -- I think a short

18     and sweet argument, depending on which side you want to --

19             MR. WEBB:  Sweet or not.

20             THE COURT:  Well, let's -- I'm not really

21     prepared to hear that now.  I'd like to get on with jury

22     selection.

23             Well, let's see how much time it takes for jury

24     selection.  If we have some time after that's been

25     completed, that's obviously a good time to address that

8

1    issue, even if I haven't had a chance to look closely at

2    what's been presented.

3              MR. ISAACSON:  I think the only things were --

4              MR. WEBB:  Your Honor, maybe you told us this

5    before, but we're not sure how many peremptories.

6              THE COURT:  Well, the rules provide for three

7    per side.  I haven't received a request for any additional

8    peremptories, and so that's what I assumed we would do, and

9    then I propose to seat nine jurors as we had mentioned

10   before, and I haven't heard any disagreement with that from

11   anyone.

12             MR. ISAACSON:  I think that's all.

13             MR. WEBB:  I think so.  Thank you, Judge.

14             THE COURT:  Okay.  So then we will -- maybe a

15   couple of housekeeping matters too before we start on jury

16   selection.

17             First of all, insofar as if you're not at the

18   podium, you need to speak directly into your microphones at

19   counsel table as my court reporter just kindly pointed out.

20             And insofar as opening statements are concerned,

21   I expect counsel to remain at the podium, speak into the

22   microphone.  The same applies with regard to calling

23   witnesses and questioning witnesses.  And when you raise

24   objections, you need to be careful to kind of bend over and

25   speak into the microphone as well.

9

1          So I think that covers what we need to cover at

2   this juncture.  So why don't we take a short recess while

3   the jury panel is brought up.  Thank you.

4          (Recess from 1:04 p.m. until 1:14 p.m.)

5          (In the presence of the panel of prospective

6          jurors.)

7              THE COURT:  Good afternoon.  Please be seated.

8              COURTROOM ADMINISTRATOR:  Today is the date and

9   time for a jury trial in civil case 2:10-cv-106-LRH-PAL,

10  Oracle USA, Incorporated, and others, versus Rimini Street,

11  Incorporated, and others.

12             Counsel, can you please state your appearances

13  for the record.

14             MR. ISAACSON:  Bill Isaacson, Boies, Schiller &

15  Flexner, Your Honor, for the plaintiff, Oracle.

16             MS. DUNN:  Karen Dunn, Your Honor, also for

17  Oracle, also from Boies, Schiller & Flexner.

18             MR. HIXSON:  Tom Hixson, Your Honor, from

19  Morgan, Lewis & Bockius, for Oracle as well.

20             MS. DALEY:  Dorian Daley for Oracle Corporation.

21             MR. POCKER:  Richard Pocker, Boies, Schiller &

22  Flexner, also for Oracle.

23             MR. MAROULIS:  Jim Maroulis, Oracle.

24             MR. POLITO:  John Polito, Morgan Lewis, for

25  Oracle.

10

1              THE COURT:  All right.  Defense counsel?

2              MR. WEBB:  Trent Webb, Shook, Hardy & Bacon, for

3      the defendants, Your Honor.

4              MR. STRAND:  Good afternoon, Your Honor.  Peter

5      Strand, Shook, Hardy & Bacon, for the defense.

6              MR. RECKERS:  Your Honor, Rob Reckers, Shook,

7      Hardy & Bacon, for the defense as well.

8              MR. ALLEN:  Your Honor, West Allen, from Lewis,

9      Roca, Rothgerber, on behalf of Rimini Street.

10             THE COURT:  All right.  Thank all of you.

11             Ladies and gentlemen who have been summoned here

12     as prospective jurors, I extend my early thanks to you in

13     appreciation for your being here.

14             First of all, I'm Judge Larry Hicks, and I'm the

15     presiding judge in this courtroom for this trial.  We are

16     in courtroom 4B of the federal courthouse here in

17     Las Vegas.

18             And I like to explain to jurors why they're

19     here, and it isn't just in this case, which I think most of

20     you must sense that this is a complex case which is going

21     to take an extended period of time, but I like to give this

22     explanation in every case because I find that people kind

23     of take for granted why they are here as jurors.

24             I'll be asking you some questions in a little

25     bit about your qualifications to sit as jurors, but I'd

1    like to go to those reasons why you're here.  This all goes

2    back to over 225 years ago to an event no less than the

3    founding of our Republic.

4            As you will recall from your history lessons,

5    our forefathers who lived on this side of the Atlantic

6    Ocean in the 1770s, were citizens of Great Britain.  They

7    had come to populate the king's 13 colonies, and by 1776,

8    the colonists felt that they were being smothered under the

9    rule of England by such things as taxation without

10   representation, limitations upon them, and other laws which

11   were imposed on them by the English parliament.

12           The Declaration of Independence was signed on

13   July the 4th, 1776, and the 4th of July has come to be

14   recognized as the birth date of our country.

15           But the Declaration of Independence was followed

16   by eight years of war.  The War for Independence was fought

17   and won, but afterwards our ancestors, now citizens of 13

18   states independent from Great Britain, were isolated from

19   the rest of the world and from each other as well.

20           Imagine what it was like back then, no

21   television, no radio, limited newspapers, no effective

22   source of communication, and the citizens of these 13

23   states had precious little binding them together in any

24   semblance of the nation.

25           Something had to be done that would be dramatic

1    that would hold these 13 states together as a nation and

2    protect them from being absorbed by the powers of Europe,

3    European countries which were just waiting for the 13

4    states to fall apart.

5              It was in this atmosphere, in the summer of

6    1887, that some outstanding leaders of the time, the

7    Washingtons, Jeffersons, Madisons, Hamiltons, even Benjamin

8    Franklin and others, met in Philadelphia, Pennsylvania,

9    over the summer of 1787, and over the course of nearly

10   three months and with numerous revisions, extensive debate,

11   and final decision, they drafted our Constitution, the

12   Constitution of the United States.

13             And if you've read and reviewed this outstanding

14   document, you will see that nowhere in the Constitution is

15   there a word about what would be the rights of the citizens

16   under this new, united government.

17             There was nothing about freedom of speech,

18   nothing about freedom of religion, nothing about protection

19   from unreasonable searches and seizures, nothing about a

20   right to due process of law, and nothing about the right to

21   a trial by jury.

22             It's the mark of the trust of the leaders of the

23   time, because they persuaded their fellow citizens that if

24   they would ratify this constitution, that the very first

25   work of the new Congress would be to pass a list of the

1     rights of citizens and submit them to the citizens for

2     approval.

3               The ratification of the constitution required 11

4     of the 13 states.  And with the promises of this first work

5     by the new Congress which would be created, the

6     Constitution was ratified unanimously by all 13 states.

7               And, as promised, our first Congress met and

8     drafted what we commonly call our Bill of Rights.  The Bill

9     of Rights became the first 10 amendments to our

10    constitution, and included within those 10 amendments are

11    our rights to freedom of religion, freedom of speech, due

12    process of law, other valuable rights, and, of course, the

13    very reason why you've been summoned here today, the right

14    to a trial by jury.

15              The Seventh Amendment provides that if private

16    citizens have a dispute, that they will have the right to

17    come into court and have their dispute heard and resolved

18    by a jury of their fellow citizens.  That is the right that

19    each one of you ladies and gentlemen will have in the event

20    that you're chosen to serve as a juror on this case.

21              The democratic form of government created by our

22    constitution has been a resounding success.  Our

23    constitution today stands as the model of its kind over 225

24    years after its creation.

25              Countries which have gained independence over

1    the past two centuries have realized they had to forge some

2    document of self-government, and the first place they have

3    looked to is our constitution because it is the best

4    constitution ever written by the hand of man.  It has

5    worked better and lasted longer than any before or since.

6              In 1900, there were only 10 countries with

7    democratic forms of government.  By 2015, there are roughly

8    120, all of them having followed in some fashion our

9    constitutional form of government.

10             And that's why you're here today, because you

11   are citizens of Nevada and ultimately will compose a fair

12   and impartial jury to decide this case.

13             This is a civil case.  There will be nine of you

14   who are selected.  In the federal court we do not have

15   alternate jurors on civil cases so the nine of you who are

16   selected will be the jury who will decide this case.

17             Of course, there will have to be some questions

18   that are asked of you, which I will ask, to determine

19   that whoever is selected can be completely fair and

20   impartial.

21             I'm not going to pry into any personalities or

22   rattle anyone's cages, but I'm sure you understand that

23   there are some questions that we must ask just to ensure

24   that each side will have a completely fair and impartial

25   jury decide their case.

1          We need the information from these questions in

2     order to come to a mutual decision that, yes, it would be

3     fair to ask you to sit on this case, and it would be fair

4     to the parties and to yourselves to make a commitment to

5     serve on this jury and decide this case as fairly as you

6     can.

7          I'm going to ask at this time for all of our

8     prospective jurors to please stand and raise your right

9     hands and be sworn for purposes of our questioning.

10          COURTROOM ADMINISTRATOR:  Do you, and each of

11     you, solemnly swear that you will well and truly answer all

12     questions put to you touching on your qualifications to

13     serve as a trial juror in the case now pending before this

14     Court, so help you God?

15          (The Prospective jurors responded

16          affirmatively.)

17          COURTROOM ADMINISTRATOR:  Thank you.  Please be

18     seated.

19          THE COURT:  Ladies and gentlemen, I also would

20     point out that -- and I know this from having presided over

21     many jury trials, there are many of you who have limited

22     opportunity to provide public service.  It's just not in

23     the nature of your employment, your occupations or what you

24     may be doing in your lives.  And I can tell you that jury

25     service is one of the most valuable forms of public service

1    known in our country.

2            Our system of justice depends upon good jurors.

3    And I know that if any one of you were a party to a case in

4    this or any other court, you would want your case decided

5    by a jury compromised of citizens much like yourselves.

6            In earlier times we used to roll a wheel with

7    everyone's names in it and pull their names out and have

8    them seated in the jury box.

9            The reason we will seat some of you in the jury

10   box is to establish our initial panel.  This panel will

11   undoubtedly change.  Some of you who aren't called may be

12   called as other prospective jurors may be excused from the

13   jury box.

14           But the point of my comment is that your names

15   have been selected randomly by computer.  We don't roll the

16   wheel anymore, we just call up your names, and I'll direct

17   you where you should be seated, and please rest assured

18   that your names have been selected randomly.

19           (Jury empaneled and sworn.)

20           COURTROOM ADMINISTRATOR:  Thank you.  Please be

21   seated.

22           THE COURT:  Ladies and gentlemen, I'm about to

23   excuse you for the evening, but I'll give you a little bit

24   of an outline of what you can expect tomorrow.

25           As I said, we'll start promptly at 8:00 in the

1    morning.  And I will have some preliminary instructions for

2    you that will just give you a little bit of a roadmap

3    concerning how the law applies to evidence but -- not

4    specifically so much to this case but to every case.

5            And following that, the attorneys will present

6    their opening statements in which they timeline what they

7    expect their evidence will be in the case.

8            The plaintiff goes first, Oracle, because Oracle

9    carries the burden of proof as plaintiff.  The defense

10    could give its opening statement then, or they could wait

11    until the conclusion of Oracle's evidence and then give it.

12            After the opening statement or statements have

13    been given, we will then proceed with the witnesses who are

14    called on behalf of Oracle.

15            And when the Oracle evidence is -- and witnesses

16    have all been called and presented, then the defense, of

17    course, would have an opportunity to present its evidence

18    and call its witnesses and offer its exhibits.

19            So I think we're in good shape to release you

20    for the evening.  I thank you very much for your

21    straightforward answers, your cooperation here this

22    afternoon throughout these proceedings, and I look forward

23    to being the presiding judge in the trial with jurors such

24    as you.

25            So at this time, I will excuse you, and you may

1      go ahead and step down.

2              Oh, and let me tell you.  In the morning -- we

3      should cover that.  What I'll do is I'll take a recess

4      right now so that my court clerk Dionna can show you where

5      you will go in the morning and orient you a little bit with

6      regard to that.

7              One other thing I like to mention to you, and I

8      should have probably said it before now, and that is please

9      take no offense if you pass one of the attorneys or a party

10     in this case in the hallway and they say something to you.

11             They all know that the rules of professional

12     conduct say that they are not to have any kind of a

13     communication or exchange with any juror.  So please take

14     no insult from that whatsoever.  Expect that to be the

15     case.

16             And I need to give you the admonishment not to

17     discuss this case in any way.  It would be a violation of

18     your oath as jurors to be discussing this case with anyone,

19     and that includes family and friends.  I know it's

20     difficult, it's one of the sacrifices that you take on in

21     giving your oath as jurors in this case.

22             So please do not discuss the case.  Please don't

23     allow anyone to discuss it in your presence.  Remove

24     yourself if you see that that is happening.

25             And we will take a brief recess so that Madam

1    Clerk can show you where you go tomorrow.  And we look

2    forward to seeing you in the morning.  There will be

3    refreshments in the jury room, coffee, donuts, and some

4    limited beverages I believe too.

5              So at this time let's take our brief recess.

6    And, Counsel, I'll meet with you in open court in

7    approximately five to ten minutes.

8              (Jurors exit courtroom at 4:28 p.m.)

9              (Recess from 4:28 p.m. until 4:47 p.m.)

10             (Outside the presence of the jury.)

11             THE COURT:  All right.  Have a seat, please.

12             Okay.  The record will show that we're convened

13   in open court.  The parties and counsel are present.  The

14   jury is not present.

15             Counsel, I don't know if you have any other

16   questions.  I know that two motions are pending in front of

17   me, the one that concerns the motion to compel witness's

18   appearance, and the other one concerning the form of the

19   questions on the certain witnesses.

20             Which one of those would you like to address

21   first?  I'll give the option to defense.

22             MR. RECKERS:  It would make sense to take up the

23   customer depo motion.

24             THE COURT:  All right.

25             MR. RECKERS:  Your Honor, Rob Reckers for the

1    defense.

2            The issue here is one that we've tried to put in

3    before Your Honor in a condensed manner.  There's 11

4    depositions that sort of ask the same question, where the

5    same outline was used.  And I'll go through the outline

6    quickly.  And this is in our section of the brief, the

7    joint filing on page 9.

8            The questions were along the lines of:  Would

9    the client have switched to Rimini Street if the client

10   knew that Rimini was breaking the law, that Rimini was

11   doing something unauthorized, was doing something outside

12   the license, was a copyright infringer?

13           We have these series of questions that suggest,

14   Your Honor -- these are loaded questions that actually

15   don't elicit any real evidence.

16           Of course, no one is going to say that, yes, we

17   would infringe a copyright, that we would go with an

18   infringer.  All we've shown is for the common sense -- the

19   common sense response from these witnesses that they would

20   say they're not going to break the law.

21           And that gets to my second point is these

22   questions don't go to the specific issues of causation.  I

23   read plaintiffs' arguments in response.  They talk about a

24   lot of different evidence.  They talk about evidence going

25   to specific statements, statements regarding the alleged

1    infringement, the cross-use, the local copy.

2           Those are the proper questions.  And those are

3    the questions that may have -- speak to the issue, and

4    that's the evidence from which this can be potentially

5    decided, not open ended, I would suggest, trick-loaded

6    questions.

7           Which gets to, I think, the last point -- I'll

8    try to be brief, because I know we've been here all day --

9    which is the 602/701 issue.

10          But these are incomplete hypotheticals.  You're

11   just saying in the abstract:  Would you go with someone who

12   is infringing?  Would you go with someone who is violating

13   a license?

14          In the real world we know that people are

15   accused of infringement and are found to infringe patents

16   and copyrights all the time.

17          I have a smartphone.  I know the smartphone I

18   have has been accused of violating patents in many

19   instances.  Are you asking me is that a good thing to

20   infringe a patent?  Of course not.  But we still buy these

21   smartphones.

22          And in this case, even for these clients, after

23   the judgment in this case, or after Your Honor's first

24   summary judgment, most of them are -- still stayed with

25   Rimini Street, which just shows the unfairness of the

1    question that when you put a hypothetical like that out,

2    it's not really probative or appropriate as to what

3    actually happened in the real world.

4            In here we have a finding of infringement.

5    We've had a finding of infringement since February 2014.

6    But yet this testimony suggests that these customers would

7    have left Rimini or never gone to Rimini.  And so I would

8    suggest that just the questions themselves are improper,

9    both under 401, 403, 602, and 701.

10           Happy to address any of Your Honor's questions.

11           THE COURT:  All right.  No.  I understand your

12   argument.  Thank you very much, Mr. Reckers.

13           MR. HIXSON:  Good afternoon, Your Honor.  Tom

14   Hixson for Oracle.

15           Oracle deposed a number of customers in this

16   case, Rule 30(b)(6) depositions, concerning their decision

17   to terminate support with Oracle and go to Rimini.

18           The witnesses were by and large people in the

19   procurement departments at the customers who have

20   responsibility for making the decision to go with Rimini

21   for support.  They were on the receiving end of

22   communications, communications that Oracle contends were

23   misrepresentations about Rimini's support.  They were the

24   individuals who were either the decision makers or who made

25   recommendations to the decision makers concerning that

1      decision to leave Oracle for Rimini.

2              And so we posed to those witnesses a variety of

3      different questions:  If you had known X.  For each witness

4      we had to tailor what X was so that it matched the specific

5      evidence that we had concerning that customer.

6              For example, if the proof showed that Rimini

7      Street had used that customer software to make an

8      unlicensed local copy we would ask:  Would you have

9      recommended switching to Rimini Street for support if you

10     had known that Rimini would make a copy unlicensed by your

11     software license?  Or if they had been on the receiving end

12     of a patch that was developed through cross-use, then we

13     might phrase the question:  Would you have gone to Rimini

14     or recommended going if you had known that their support

15     made improper use of intellectual property?

16             So we framed our hypotheticals in terms of the

17     evidence that we knew to be true.

18             And so that gets to why this evidence should be

19     admitted as it goes to the key issue of causation.  We have

20     sued them for tortious interference and other claims saying

21     that these misrepresentations about the business model were

22     a significant factor in causing the customers to leave

23     Oracle for Rimini.

24             In the joint pretrial order Rimini states flat

25     out that their biggest defense is causation.  And

1    Mr. Reckers echoed that here today.  You heard him say that

2    Oracle can't show that these events were causally related.

3              And so we offer the testimony of the individuals

4    who made these decisions or who recommended making these

5    decisions who had seen these representations for Rimini.

6    And we asked, "If you had known what was true, what would

7    you have done?"

8              And we cited to Your Honor the case of *United*

9    *States v. Cuti* saying in this type of situation, where that

10   person was involved in that decision and they were on the

11   receiving end of misrepresentations, that comes in lay

12   witness testimony, it's lay opinion testimony that is

13   valid.

14             And then we went further in the brief to Your

15   Honor to show that we understand the question, "If you had

16   known Rimini were run by space aliens, would you have gone

17   with them" would have a problem, right, because of a space

18   alien problem.

19             So we cited in this brief the broad evidence

20   showing that Rimini had a pattern and practice of

21   misrepresenting the nature of its infringing services by

22   not disclosing and by affirmatively misrepresenting it.

23             And then we went further and showed Your Honor

24   in our filing specific evidence for these particular

25   customers evidence at issue showing that they also received

1    those misrepresentations.

2          And then we cited for Your Honor specific

3    evidence showing that those customers Rimini committed

4    infringement under the terms of Your Honor's orders for

5    those particular customers as well as the Court's more

6    general finding that Rimini has committed infringement

7    across the board with respect to Database and that with

8    respect to PeopleSoft as well.

9          So when we asked, "If you had known X," we made

10   sure X was true.  And the Court's orders later confirmed

11   that X was true.  And we were taking depositions of people

12   who were involved, who were percipient, who had been

13   receiving those communications, and who were in as good a

14   position as anybody to say what they would have recommended

15   or what that customer would have done based on having this

16   newly acquired information available to it.

17          There's nothing wrong with that hypothetical

18   question as long as you're asking a person who was

19   percipient and involved and you're asking a hypothetical

20   that's realistic.

21          And we show in our submission that we were

22   asking percipient people questions that were grounded in

23   fact and that we have shown to be true and that Your

24   Honor's summary judgment orders have borne out to be true.

25          And, again, if Rimini is going to dispute

1    causation and say that we haven't proven it, then it seems

2    difficult for them to protest some of the best evidence

3    showing causation, which is the actual decision makers, or

4    people recommending decisions, saying that they would not

5    have contracted with Rimini if they had known the facts

6    which have now been established through the Court's orders

7    that have been proven to be true.

8              And so we submit that this evidence is relevant

9    to the element of causation and, indeed, is highly

10   probative of that, some of the most probative evidence,

11   because it's the testimony of the decision makers or those

12   who made the recommendations that were then adopted by the

13   decision makers.

14             And so we flesh it out more fully in the

15   submission to the Court.  But that is the essence of our

16   argument.

17             And I'm happy to answer any additional questions

18   the Court has.

19             THE COURT:  No, I don't have any.

20             MR. HIXSON:  Thank you, Your Honor.

21             THE COURT:  Thank you very much, Mr. Hixson.

22             Mr. Reckers, is there anything further that

23   you'd like to reply?

24             MR. RECKERS:  Yes.  Briefly, Your Honor.

25             And Mr. Hixson is right, there is further

1     evidence in the case about what the acts were that are

2     accused that may have some bearing on this.

3              Respectfully, if you look at the question that

4     they actually asked, there isn't that nexus that we have

5     this sort of straw man, this simple question, breaking the

6     law, doing things that are unauthorized and infringing.

7              The question -- I'll read it from Wendy's, which

8     is one example.  Excuse me.  I'll start with the BlueCross

9     and BlueShield:  Would you have allowed Rimini to install

10    software on its computers if you knew it was not proper

11    under the Oracle license?

12              And, of course, they say, no, they wouldn't.

13              Is it important to BlueCross and BlueShield to

14    comply with the contracts and to comply with the law?

15              Is that probative, it's important to the

16    witness's answers -- is it important to comply with the

17    contracts and to comply with the law?

18              In fact, do you have a code of conduct at

19    BlueCross BlueShield requiring you to comply with the law?

20              Yes.

21              And so I don't think that these actually get to

22    the questions that Mr. Hixson is asking about but rather

23    they are abstract questions about a company's preference to

24    follow the law, which, of course, always they are going to

25    say they are.  And that's my only point, Your Honor.

1            THE COURT:  Okay.  All right.  Well, I've looked

2     at it.  I've considered it.  I appreciate each party's

3     arguments.  I -- it is relevant to causation.  It obviously

4     raises chicken-and-egg questions that arise on almost every

5     case.

6            But the Court's ruling is that the -- the

7     questions as formed are admissible, but they invite a

8     limiting instruction from the Court.  And I would envision

9     a short limiting instruction.  And I encourage both parties

10    to submit a proposed limiting instruction to the Court that

11    I would so instruct the jury at the time any such evidence

12    is presented.

13           The bottom line is I think it's relevant to

14    causation.  My understanding of the case is I believe that

15    there will be evidence from which plaintiffs would be able

16    to argue that the question was an appropriate question.  I

17    haven't seen and heard that evidence yet.  Some of it bears

18    directly or indirectly upon some rulings of the Court.

19           But the fact is the Court's understanding of the

20    case is that it is likely that there will be evidence from

21    which plaintiff could have -- plaintiffs could have based

22    that question.  And for that reason I'm going to allow the

23    questions.  But I will give an appropriate limiting

24    instruction.

25           That's not to say that I will give either one of

1       the ones submitted by counsel, but hopefully those will

2       give me some direction, if they're not acceptable, on what

3       would be susceptible.

4              And needless to say if at the end of the case

5       the evidence turns out not to have supported at all a

6       reasonable inference that would have allowed the

7       question -- the nature of the questions being asked, the

8       Court would consider a motion to strike at that time.

9              But, again, it's not my understanding of the

10      case that that evidence would not be presented.  That's not

11      to say the Court would find in favor of it one way or the

12      other or I expect the jury would one way or the other.  But

13      I believe there's evidence from which a reasonable

14      inference could be drawn by plaintiffs that would support

15      the question posed.  So that will be the ruling of the

16      Court.

17             I'd like to have that proposed limiting

18      instruction -- well, I just -- I need it with sufficient

19      time to consider it before the evidence is presented.  I

20      don't think that my ruling is going to affect your ability

21      in opening statements.  So perhaps you can give me some

22      insight on when such a proposed limiting instruction should

23      be submitted.  Mr. Isaacson?

24             MR. ISAACSON:  Sure.  And in opening -- we can

25      get that to you very promptly, whenever you want it.  But

1    we had intended in opening statement just to show one

2    example of one customer with one of those questions and to

3    say it related to the issue of causation.  And so that's

4    what -- all we intended to do with it in the opening.

5             THE COURT:  Okay.  Well, I'm not going to be

6    giving limiting instructions in the course of counsel's

7    opening statements.  I would give it in the course of the

8    presentation of evidence.  And obviously I expect the good

9    faith of counsel in the manner in which the question or

10   questions are handled in the course of opening statement.

11            MR. ISAACSON:  And your -- your -- in terms of a

12   limiting instruction, do I understand the Court to be

13   saying the limiting instruction along the lines that this

14   evidence, if you accept it, is relevant to the issue of

15   causation and not other issues?

16            THE COURT:  Yes.  But it -- the question also

17   assumes certain conclusions.  And I think the limiting

18   nature of the instruction should be directed at that as

19   well.

20            MR. ISAACSON:  Okay.  We should be able to work

21   on that together.

22            THE COURT:  All right.  The other motion

23   concerns the witness.

24            Do you want to address that motion at this time?

25            MR. RINGGENBERG:  Yes, Your Honor.  Please.  So

1    I think both parties can make plans accordingly.

2              Mr. Kevin Maddock is senior vice-president in

3    sales at Rimini Street.  He's the number three man in the

4    company based on his compensation as disclosed in their SEC

5    filings.

6              Rule 45 allows enforcement of a subpoena where

7    the individual, even if they reside elsewhere, is employed

8    or regularly transacts business in person in the

9    jurisdiction.  Rimini's headquarters is a few miles from

10   this building.  Mr. Maddock admits that he's traveled to

11   that location approximately 20 times in the course of the

12   discovery in this case.

13             We suggest the evidence submits a larger

14   inference, but that's what he's admitted to.  And given his

15   role as a senior officer of a company headquartered here

16   with duties to the company, we think that's a more than

17   sufficient basis for the Court to conclude that he meets

18   the requirements of the subpoena.

19             His testimony is significant.  It relates to the

20   issue of causation.  Mr. Maddock was produced as a 30(b)(6)

21   witness on Rimini's representations to their customers

22   about their intellectual property practices.  And in the

23   course of that, he admitted Rimini's practice of making

24   representations that we contend, and we believe the Court

25   has already found, were false.

1            We believe the jury should hear that live.  We

2    believe it's important.  And the jury would prefer it.  And

3    the rules allow it.  The only other argument they have made

4    is that he hasn't been served with a subpoena, which is

5    true.

6            If the Court were to rule that if he was served

7    with a subpoena he would be required to appear, I'm quite

8    certain Mr. Maddock would prefer not to have a process

9    server on his doorstep and that we could arrange a mutually

10   agreeable date for his appearance, which is why we haven't

11   issue one because we didn't know what date would be a good

12   date for him.  But as soon as we do, we would be happy to

13   out Mr. Maddock's appearance, which we've explained to

14   Rimini Street.

15            The last thing I would point out is until a few

16   weeks before trial he was on both sides' witness list.  So

17   it really wasn't until the 24th that he -- Rimini Street

18   told us they would not be producing him, at which the

19   parties promptly agreed to submit this issue to the Court

20   so we could all make plans accordingly.  Thank you.

21            MR. RECKERS:  Your Honor, Rob Reckers again for

22   the defendant.  Quickly -- I know we filed briefs on this.

23            Mr. Maddock does personally conduct business in

24   Las Vegas on a regular basis.  I believe our submission

25   said he comes here two to three times a year.  It's true

1     that Rimini has an office here.  Mr. Maddock lives in

2     California, lives in the Bay area, works in the Bay area

3     there.

4             He travels extensively for work.  He does come

5     to Las Vegas, again, two to three times a year.  It's in

6     our evidence.  We submitted a declaration from Mr. Maddock.

7             I would submit that that doesn't qualify him as

8     someone within the subpoena jurisdiction of the court.  And

9     that's really the end of the story with that.

10            The other issues aside, he was put up for

11    deposition twice.  He had his 30(b)(6) deposition, a

12    personal depo.  They've got two full days of deposition

13    with Mr. Maddock.

14            In working to avoid having to bring this to your

15    attention, Your Honor, we've put up -- we've offered to

16    Oracle for their case in chief Rimini's next most senior

17    salesperson, someone named Michael Davichick, also a

18    vice-president who has been with the company longer.

19            Mr. Maddock -- or Mr. Davichick would be

20    available to address most of the same subject matter as

21    Mr. Maddock.  Really the reason why we've tried to put

22    Mr. Davichick in for Mr. Maddock, even if it were

23    appropriate to call Mr. Maddock, is that this is the end of

24    the sales quarter for Rimini Street.

25            Mr. Maddock is extremely busy professionally.

1   He has prearranged business travel over the next few weeks.

2   And he is, you know, the most -- one of the most senior

3   people in the company trying to get to the end of this

4   sales quarter, which is traditionally a busy sales quarter

5   for Rimini Street.

6           So for those reasons we submit that Mr. Maddock

7   need not be and should not be compelled to testify live in

8   this trial.

9           THE COURT:  All right.  Any reply on behalf of

10  plaintiff?

11          MR. RINGGENBERG:  Yes, Your Honor.  Just very

12  briefly.

13          I'm sure Mr. Maddock is busy.  The Oracle

14  executives who will be testifying in trial here are very

15  busy.  Oracle's CEO is in the courtroom.

16          This trial is very important to both companies.

17  That Mr. Maddock couldn't clear a day or two to come to Las

18  Vegas for a trial, which Rimini has represented is about

19  the future of the company, I think is unrealistic.

20          Mr. Maddock admitted in his deposition the

21  pattern and practice that is the basis for our claims.  And

22  we want him to explain that to the jury.  It's very

23  straightforward, Your Honor.  Thank you.

24          THE COURT:  It's not clear to me, and I'll allow

25  both sides to comment on this, what is his actual title and

```
1    position, and why is it that you make -- made the statement

2    that he's essentially number 3 in the company?

3              MR. RINGGENBERG:  I think Mr. Reckers agreed

4    with me on that.  Our basis is their SEC filing in which

5    they listed the executives of the company and how they're

6    compensated.  He's number 3 on that list.  And I think

7    Mr. Reckers agrees.

8              You could probably come up with different

9    rankings of the officer, but that's the specific basis

10   we've cited.  And I don't -- have not heard them

11   specifically disagree with it.  His title is senior

12   vice-president of sales.

13             MR. RECKERS:  Your Honor, he's the head of

14   sales.  And so there's different ways to think about the

15   company.  And I believe they're right about the SEC filing.

16   He's the head sales person at the company -- or maybe not

17   person -- he runs the sales department at the company, has

18   done so since about 2009.

19             THE COURT:  All right.  It strikes me that

20   there's no prejudice here by virtue of his being called

21   because he's been listed by both sides throughout the case.

22   And he's beyond the subpoena reach of the Court.  And

23   that's a significant factor to the Court.  And there's also

24   some indication that there was expectation that he would be

25   testifying.
```

1          So the thing I look at the most is his role and

2     position in the company.  And the fact is if he's a senior

3     vice-president and he's in charge of all sales, I'm of the

4     view that he should -- he should testify.  I'm of the view

5     that the motion should be granted.

6          But in granting it, I would expect that

7     plaintiffs' counsel would work as well as they could with

8     defense counsel to minimize the time for his appearance and

9     schedule it in such a way that there's minimal

10    inconvenience to him because there's obviously some

11    inconvenience.

12         And I recognize that September is the end of the

13    quarter.  And I assume that's an important time for the

14    company.  I don't have any reason to question that.

15         So the fact is he's so highly placed in the

16    company and the Court sees such a lack of prejudice to

17    either side by virtue of his attending to testify that -

18    Rimini, being the defendant in this case, one of the

19    defendants in this case, that he should be here.

20         MR. RINGGENBERG:  Thank you, Your Honor.  We

21    will work with them to find a date that works.

22         THE COURT:  Thank you very much.

23         Is there anything else that we need to address

24    at this time?

25         I did -- I think at calendar call we discussed

1   that the exclusion of witnesses was in force and in effect.

2   I just wanted to reaffirm that with counsel.

3           MR. ISAACSON:  Yes, Your Honor.  We talked about

4   it amongst ourselves.  And I wouldn't call it an exception.

5   Both sides were okay if witnesses were present during

6   opening statement.  But otherwise they would be sequestered

7   until they testified.

8           And I guess the other, you could call it,

9   exception is we would be calling Mr. Ravin in our case.

10  And while he's on the stand we would not expect counsel to

11  be talking to them -- talking to Mr. Ravin.

12          But they may call him back in their case.  And

13  we don't have any objection if the lawyers do work with

14  Mr. Ravin in between testimony 1, testimony 2, if there is

15  a testimony 2.

16          THE COURT:  All right.

17          Mr. Webb?

18          MR. WEBB:  Your Honor, we agree with that

19  approach.

20          THE COURT:  All right.  Both sides agreeing to

21  it, it's acceptable to me as well.

22          So the Rule of Exclusion during opening -- is

23  not applied during opening statements, will be afterwards.

24  Is that correct?

25          MR. ISAACSON:  And we understand the Rule of

1     Exclusion to be talking about fact witnesses, not expert

2     witnesses.

3                    THE COURT:  Yes.  Yes.  Okay.

4                    And let's see.  There was also an issue my clerk

5     mentioned, that there still was not a stipulation

6     concerning exhibits?  Or it hadn't been completed.

7                    MR. ISAACSON:  Yes.  It's imminent.  I think the

8     *Is* are being dotted and *T*s being crossed.  But there are a

9     large number of exhibits of which the parties have agreed

10    may be preadmitted.  So there will be a likely stipulation.

11                   THE COURT:  All right.  Good.

12                   And I gave you a copy of those preliminary

13    instructions.  Are there any objections to what the Court

14    proposes to give?

15                   MR. WEBB:  Not from the defendants, Your Honor.

16                   MR. ISAACSON:  And not from Oracle.

17                   THE COURT:  Okay.  And then a one-hour cap on

18    opening statements.

19                   And I think that should cover everything I need

20    to cover at this time.  All right.

21                   I appreciate the professionalism I've seen.  I'm

22    pleased that we were able to seat a jury this afternoon.

23    And we'll get started promptly at 8:00 in the morning.

24         (The proceedings adjourned at 5:13 p.m.)

25                              *   *   *

39

1                              -o0o-

2          I certify that the foregoing is a correct

3      transcript from the record of proceedings

4      in the above-entitled matter.

5

6      _____        9/15/15

7      Donna Davidson, RDR, CRR, CCR #318        Date
       Official Reporter

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25