```
 1                  UNITED STATES DISTRICT COURT
                        DISTRICT OF NEVADA
 2           BEFORE THE HONORABLE LARRY R. HICKS, DISTRICT JUDGE

 3

 4   ORACLE USA, INC., a Colorado      :
     corporation; ORACLE AMERICA,      :
 5   INC., a Delaware corporation;     :
     and ORACLE INTERNATIONAL          :No. 2:10-cv-0106-LRH-PAL
 6   CORPORATION, a California         :
     corporation,                      :
 7                                     :
            Plaintiffs,                :
 8                                     :
          vs.                          :
 9                                     :
     RIMINI STREET, INC., a Nevada     :
10   corporation; and SETH RAVIN,      :
     an individual,                    :
11                                     :
            Defendants.                :
12   _____    :

13

14

                  TRANSCRIPT OF JURY TRIAL – DAY 3
15                   (Pages 264 through 491)

16

17                      September 16, 2015

18

                         Las Vegas, Nevada
19

20

21

22

     Court Reporter:        Donna Davidson, RDR, CRR, CCR 318
23                          Certified Realtime Reporter
                            400 South Virginia Street
24                          Reno, Nevada  89501
                            (775) 329-0132
25
```

1                    A P P E A R A N C E S

2     FOR THE PLAINTIFFS:

3     BOIES, SCHILLER & FLEXNER LLP
      KIERAN P. RINGGENBERG
4     1999 Harrison Street, Suite 900
      Oakland, California 94612
5     (510) 874-1000
      Fax: (510) 874-1460
6     kringgenberg@bsfllp.com

7     BOIES, SCHILLER & FLEXNER LLP
      RICHARD J. POCKER
8     300 South Fourth Street, Suite 800
      Las Vegas, Nevada 89101
9     (702) 382-7300
      Fax: (702) 382-2755
10    rpocker@bsfllp.com

11    BOIES, SCHILLER & FLEXNER LLP
      WILLIAM A. ISAACSON
12    KAREN L. DUNN
      5301 Wisconsin Avenue, NW
13    Washington, DC  20015
      (202) 237-2727
14    Fax:  (202) 237-6131
      wisaacson@bsfllp.com
15    kdunn@bsfllp.com

16    MORGAN LEWIS & BOCKIUS LLP
      THOMAS S. HIXSON
17    NITIN JINDAL
      JOHN A. POLITO
18    One Market, Spear Street Tower
      San Francisco, California 94105
19    (415) 442-1000
      Fax:  (415) 442-1001
20    thomas.hixson@morganlewis.com
      nitin.jindal@morganlewis.com
21    john.polito@morganlewis.com

22    JAMES C. MAROULIS
      DORIAN E. DALEY
23    Oracle Corporation
      500 Oracle Parkway
24    Redwood City, California 94070
      (650) 506-4846
25    jim.maroulis@oracle.com
      dorian.daley@oracle.com

```
 1                A P P E A R A N C E S  (Continued)

 2    FOR THE DEFENDANTS:

 3    SHOOK, HARDY & BACON LLP
      PETER E. STRAND
 4    B. TRENT WEBB
      2555 Grand Boulevard
 5    Kansas City, Missouri 64108
      (816) 474-6550
 6    Fax: (816) 421-5547
      pstrand@shb.com
 7    bwebb@shb.com

 8    SHOOK, HARDY & BACON LLP
      ROBERT H. RECKERS
 9    600 Travis Street, Suite 3400
      Houston, Texas 77002
10    (713) 227-8008
      Fax: (713) 227-9508
11    rreckers@shb.com

12    LEWIS ROCA ROTHGERBER LLP
      W. WEST ALLEN
13    3993 Howard Hughes Parkway, Suite 600
      Las Vegas, Nevada 89169
14    (702) 949-8230
      Fax: (702) 949-8364
15    wallen@lrrlaw.com

16

17

18

19

20

21

22

23

24

25
```

```
 1              LAS VEGAS, NEVADA, SEPTEMBER 16, 2015, 8:01 A.M.

 2                                --oOo--

 3                      P R O C E E D I N G S

 4

 5           (Outside the presence of the jury.)

 6                COURTROOM ADMINISTRATOR:  Please rise.

 7                THE COURT:  Good morning.  Have a seat, please.

 8                The record will show that we're in open court,

 9      and the parties and counsel are present and prepared to go

10      forward.  We do not have the jury present.

11                I did want to inform counsel concerning the

12      objection raised to paragraph 34 of the answer to the

13      second amended complaint, which I construed essentially as

14      an objection based upon context, I do feel that paragraph

15      33 would also be material and relevant to the issue and

16      certainly to the examination of Mr. Ravin, and I leave it

17      to counsel as to how they want to approach that.

18                The exhibit that was used showed 34.  If either

19      party desires to -- plaintiff wants to substitute that with

20      an exhibit that shows 33 and 34, or if they just want to

21      leave 34 stand as it is, and defense can develop 33 as a

22      separate and independent paragraph, but I would allow it

23      either way.  It's up to counsel.

24                MR. ISAACSON:  We'll save one piece of paper and

25      substitute and put them both together, Your Honor.
```

```
 1                    THE COURT:  All right.
 2                    MR. ISAACSON:  So we'll substitute for 5332.
 3                    And then you may recall that yesterday I showed
 4          him the same paragraph from about a year later, that was
 5          PTX 1482D.  I didn't move to admit that, but I would move
 6          to admit it and, again, add paragraph 33 to that, which --
 7                    THE COURT:  I would grant that.
 8                    MR. ISAACSON:  -- we've identified other than
 9          the date.
10                    MR. STRAND:  Your Honor --
11                    THE COURT:  Yes.
12                    MR. STRAND:  At the risk of treading where I
13          shouldn't --
14                    THE COURT:  No.
15                    MR. STRAND:  Yesterday we had also suggested
16          that paragraph 60 out of the corresponding allegation of
17          the complaint was also relevant for context.  Has Your
18          Honor had an opportunity to look at that?
19                    THE COURT:  I didn't look at it.  I reviewed it
20          quickly, but I didn't look at it with the thought in mind
21          should this go in as well.  So I'll do that.
22                    MR. STRAND:  Okay.  Thank you very much, Your
23          Honor.  We'll get you that -- we'll get you that pulled out
24          of the complaint and get that to you today.
25                    THE COURT:  I have it in my chambers.
```

```
 1              COURTROOM ADMINISTRATOR:  So for clarification

 2   of the clerk, what number exhibit will that be?

 3              MR. ISAACSON:  I would appreciate if Your Honor

 4   would look at that paragraph because we don't think it adds

 5   to the context.

 6              THE COURT:  I will look at it.  I'll let you

 7   know.

 8              All right.  Let's -- Madam Clerk, you had a

 9   question.

10              COURTROOM ADMINISTRATOR:  Yeah, I just need to

11   know which --

12              MR. ISAACSON:  It will be their exhibit number

13   so I don't know.

14              So for ours, the two exhibits, we're going to

15   substitute for 5332, and we've moved for 1482D, and we'll

16   give a correct copy.

17              And they've moved for paragraph 60 of their

18   complaint, and that would be their exhibit number.  So I

19   don't know what exhibit number that would be.

20              MR. WEBB:  3011, I believe.  Is that right?

21   3011 for --

22              MR. ISAACSON:  And, Your Honor, just before the

23   jury comes in, at some point during this examination we're

24   going to want to start talking about TomorrowNow issues.

25   And in talking to defense counsel, we thought it might be
```

1    more efficient if we took that up with Your Honor at the

2    first break as opposed to me beginning some questions,

3    objections, and going to sidebar.

4              THE COURT:  That sounds like it works to me.

5              Mr. Webb?

6              MR. WEBB:  Yes, that's what we would like.

7              THE COURT:  All right.

8              MR. WEBB:  Thank you.

9              THE COURT:  All right.  That will be the plan.

10             That being stated, let's bring in the jury,

11   please.

12             COURTROOM ADMINISTRATOR:  Yes, Your Honor.

13        (Jurors enter the courtroom at 8:06 a.m.)

14             THE COURT:  Good morning.  Have a seat, please.

15             All right.  Ladies and gentlemen, we just had a

16   brief matter I needed to address with counsel which is why

17   it took a couple minutes to bring you in.

18             The record will show we're in open court.  The

19   parties and counsel are present, the jury is present.  I

20   welcome you here this morning and hope you had a restful

21   night.

22             And we're in the course of direct examination of

23   Mr. Ravin.  And, Mr. Isaacson, you can continue.

24             MR. ISAACSON:  Thank you, Your Honor.

25             I decided to start out easily for Matt, PTX

1    No. 1, which will be the first exhibit in your binder.

2    It's also going on your screen.  It's also been preadmitted

3    so we can see it on the screen.

4          And, Matt, can you blow up the middle so we can

5    see that email there.

6                        SETH RAVIN

7          recalled as a witness on behalf of the

8          Plaintiffs, having been previously sworn,

9          was examined and testified as follows:

10                 DIRECT EXAMINATION RESUMED

11   BY MR. ISAACSON:

12   Q.    This email is very small print for who it's from and

13   to, but this is an email from that vice-president,

14   Mr. Chiu, to you, Mr. Ravin.  This is on March 30th, 2006.

15          Mr. Chiu writes to you, "Yes.  Dan's the man" --

16   that's Dan Slarve; is that right?

17   A.    Yes.

18   Q.    One of your vice-presidents?

19   A.    Yes.

20   Q.    And he found the most "recent development," and he

21   cites a website, edelivery.oracle.com.

22          And he says, "They'll start putting any

23   available patches that come out on that public portal for

24   download.  The portal asks for some basic information?"

25          He says what that is, and then goes on to say,

1    "It does not 'check' the info entered against any license

2    agreement.  So basically it's an open door to their

3    software."

4              Now, that's referring to Oracle software; right?

5    A.    That would be correct, yes.

6    Q.    All right.  Now, on top of that, he says in the next

7    paragraph, "Dan found that they have also made license keys

8    available for Siebel, PeopleSoft and JD Edwards software."

9              "License keys" refers to keys that are necessary

10   to -- in order to access certain software; correct?

11   A.    Yes.

12   Q.    Okay.  And so without those keys for some of the

13   Siebel, PeopleSoft, and JD Edwards software, you wouldn't

14   have access to that; correct?

15   A.    Yes.

16   Q.    And he says, "Sounds to me like they just said" --

17   "they" refers to Oracle; right?

18   A.    In this context, yes.

19   Q.    All right.  "'Help yourself to the buffet.'"

20             The "buffet" refers to all of the software and

21   keys that are available on eDelivery, the Oracle website;

22   right?

23   A.    Yes, it seems that Dennis Chiu was --

24   Q.    All right?

25   A.    -- referencing that, yes.

1    Q.    Okay.  And then at the top you reply to Mr. Chiu,

2    talking about this is an "interesting strategy."

3              And you go on to say, "We will keep downloading

4    new copies for our own files."

5              That's referring to copying Oracle software for

6    your own files from eDelivery; right?

7    A.    Yes, the installation media.

8    Q.    All right.  And then you say, in big capital

9    letters, "So they can continue to get updates to their

10   software."

11             You're going to get the updates, not just the

12   installation media; right?

13   A.    That's what it says.

14   Q.    Right.  And then you're saying, in big capital

15   letters, "Without being on Siebel/Oracle support."

16             So you're going to get all of this software

17   without having a customer who has to have a license for the

18   software; right?

19   A.    Not without having a license, no.

20   Q.    Well, if you're not on Siebel and Oracle support,

21   you don't have a license, do you, sir?

22   A.    That's not true.

23   Q.    Okay.  How do you -- which license are you referring

24   to when you don't have the support?

25   A.    The license and the support are two different

1    things.

2    Q.    All right.  Oh, so you're saying that there are

3    customers that had continuing licenses for Siebel and

4    Oracle without being on support?

5    A.    Yes, there are unsupported customers who have

6    perpetual license and not carrying Oracle support.

7         MR. ISAACSON:  All right.  Now, let's look at

8    Plaintiffs' Exhibit 2.  This is the same date, March 30th,

9    2006.  This is Mr. Slarve at the bottom.

10        There's a bottom email there, Matt, on the first

11   page.  I'm sorry.  Up.

12        Let's go -- actually, let's go to page 2 at the

13   bottom.  Let's go through the whole thing.  There we go.

14   BY MR. ISAACSON:

15   Q.    Now, you're eventually going to be copied on this,

16   but Mr. Chiu at the bottom is talking to Mr. Davichick, and

17   he says, "I just wanted to let you know that Siebel has

18   uploaded" -- and he talks about some patch software to

19   their FTP site for download now.

20        "I've notified Dan," referring to Mr. Slarve,

21   "of its availability, and he's begun kicking off the

22   download of the software into the RSI lab."

23        That's the same download we were just talking

24   about from PTX 1 that you were talking about on that day of

25   March 30th, 2006; right?

1   A.    It appears so, yes.

2   Q.    All right.  And the RSI lab is a lab that you had

3   that just -- that had Siebel software in it so that you

4   could look at it and figure out how it worked?

5   A.    No, we knew how it worked.

6   Q.    All right.  But you had a lab so you could keep

7   examining it; right?

8   A.    We apparently -- this said that we were going to

9   download it, yes.

10   Q.    Okay.  I was asking you about the lab, sir.  You had

11   a lab that was not customer specific so that your people

12   could work with the Siebel software?

13   A.    Yeah, and I can only go by what it says.

14        MR. ISAACSON:  All right.  Let's move on up,

15   then, to -- Matt, you did get it right, on the first page,

16   that lower email.

17   BY MR. ISAACSON:

18   Q.    Now, Mr. Slarve is writing directly to you on that

19   same day.

20        MR. ISAACSON:  Thanks, Matt.  You've got -- it

21   carries over on page 2, so Matt has put it all together

22   there.

23   BY MR. ISAACSON:

24   Q.    And he's saying, "Pretty cool - so they're actually

25   posting" -- and he talks about a specific update.

1              "This has huge implications if you're saying

2    that someone like Beekley" -- that's a customer of yours;

3    right?

4    A.    Yes.

5    Q.    -- "and use it under their current license without

6    having to have Siebel support in place...."

7              Right?

8    A.    Yes.  I think it's speculating whether or not that's

9    true or not.  That's why there's a question mark.

10   Q.    Okay.  Now, you're telling me now that you think

11   it's speculating.  You didn't say at the time, "Gee, you're

12   speculating, stop that downloading"; right?

13   A.    Well, I think if you look at the context of the

14   email.

15   Q.    My question, sir, was did you say, "You're just

16   speculating here, stop that downloading"?

17   A.    Well, again, I think if you look at what it says

18   with the question marks, it's clear that we're trying to

19   figure out why Oracle changed where it's posting things.

20   Q.    Did you say "stop the downloading"?

21   A.    No.  I think I said if we look at the context that,

22   in fact, we're trying to figure out why these changes took

23   place from Oracle.

24   Q.    Okay.  So you don't say "stop the downloading"?

25              And, then -- oh, and, by the way, Beekley, this

1    is March 30, 2006.  You've got two customers at this point;

2    right?  You've got LCG run by your grade school

3    acquaintance Mr. Leake, and you've got Beekley; right?

4    A.    I'm not sure exactly, but it sounds about right.

5    Q.    And Beekley at this point hired you for a 24-hour

6    period on an hourly basis; right?

7    A.    That I don't recollect.

8    Q.    Okay.  The -- now, Mr. Slarve writes to you in the

9    above mail that, "It's definitely an option; there's still

10   a license agreement though, which I haven't reviewed."

11            Do you see that?

12            MR. ISAACSON:  And let's make sure we can show

13   that to the jury.  Let me slow down here.  "Which I haven't

14   reviewed," Matt.  All right.

15   BY MR. ISAACSON:

16   Q.    Now, that's referring to a license agreement for the

17   eDelivery website; right?

18   A.    Appears to be, from this note.

19   Q.    All right.  So there was a license agreement -- it

20   was reported to you that there was a license agreement for

21   that site and you had downloading going on at that time;

22   right?

23   A.    Yes, but it said for the customer.

24   Q.    All right.  You didn't say "stop the downloading,

25   let's read this license agreement," did you?

1    A.    I don't see that in this email.

2    Q.    Okay.  And then Mr. Slarve goes on, "By going with

3    the 'open keys' approach with full access to software from

4    Oracle, the toothpaste is out of the tube."

5          That's referring to all of the Oracle software

6    now becoming available to you; right?

7    A.    Yes.  This is referring to Oracle putting all of its

8    software available to the public.

9    Q.    Right.  Putting it on a website with a license

10   agreement that you hadn't reviewed; right?

11   A.    I don't know that for a fact because I didn't look

12   at it myself.

13   Q.    All right.  Let's talk about that.

14         All right.  So your people are saying -- you're

15   the CEO of the company, you're a small company, got a few

16   vice-presidents working, you've only got two customers.

17         Your people are saying, "We're going -- the

18   toothpaste is out of the tube."

19         It says at the end of this paragraph, "The door

20   has just tripled in size and it's wide open for support."

21         You're looking at growing your business.  You

22   know there's a license agreement for this website, and you

23   tell me you don't know for a fact that there was a license

24   because you didn't look at it yourself; right?

25   A.    I'm only reading what you have in the email here.

1    Q.    Well, I'm talking about your testimony, sir.

2          You just told me, "I don't know that for a fact

3    because I didn't look at it myself."

4          All this -- you're downloading software from a

5    website, it's -- your company is starting, there's a

6    license agreement, and you didn't look at it yourself?

7    A.    My understanding is the customers were fully

8    licensed for the software.

9    Q.    That wasn't my question, sir.  All right?

10         There was a license for the website, you're

11   downloading, and you didn't know for a fact anything about

12   that license, you left that to other people?

13   A.    Yes.

14   Q.    And it says -- one more line there in the email,

15   "outside of making the software 'gnu freeware'," that

16   means -- GNU freeware refers to open source software that

17   would be available to anyone without a license; right?

18   A.    Under the GNU, which is a global license --

19   Q.    Right.

20   A.    For freeware, yes.

21   Q.    All right.

22         "I don't think we could ask for a better

23   scenario for enabling us to grow our customer base."

24         That's what Mr. Slarve said to you on

25   March 30th; right?

1    A.    That's what it says in the email, yes.

2    Q.    Okay.  Now, I'm going to ask you to look at

3    Exhibit 222, which is farther ahead in the same binder.

4    A.    I'm there.

5    Q.    All right.  This is an email at the bottom between

6    Mr. Slarve, Mr. Chiu, and Bola Ola.  Bola Ola was your one

7    engineer at this point who was providing support, who would

8    be the lead engineer for support to your customers; right?

9    A.    I believe that's accurate.

10   Q.    All right.  And you'll see at the bottom of the

11   first page, "I noticed on the Oracle eDelivery site" --

12   222?  Yes.

13          "I noticed on the Oracle eDelivery site," that's

14   the same site that we were discussing; right?

15   A.    Yes.

16   Q.    All right.  "That every time they make" -- and this

17   is -- I'm sorry, May 31st, a couple months later, "that

18   every time they make a new patch available," okay, so you

19   are now pulling off patches from that website; right?

20   A.    Yes, it says patches.

21   Q.    All right.  And we agreed yesterday that patches

22   were not installation media; right?

23   A.    Generally not.

24   Q.    All right.  "So it will be good" -- and from the

25   second paragraph, "So it will be good to ensure that we

1    download all the available media that is currently

2    available, to avoid having the client request it should

3    they be on" an older release.  "Would you be able to enable

4    a convenient location so that Bola could help us download

5    all the patches for now."

6              You were downloading all of the patches that

7    were available on this website by the end -- starting by

8    the end of May 2006; right?

9    A.    Yes.  I don't know whether it actually happened or

10   not, though.

11   Q.    Why don't you know whether it happened?

12   A.    I don't recollect and don't know whether it

13   happened.

14   Q.    All right.  Your business started, and you're

15   downloading patches, all the available patches from Oracle,

16   off of a website, and you've got a small company, a few

17   people working, and you don't know whether that happened?

18   A.    Well, again, my focus was around whether the

19   customers had a license and the rights to certain software

20   that they got, and we made sure that they didn't get it.

21   Q.    Are you telling me that all you did was sit around

22   all day and say "my only concern is" -- I lost my realtime.

23              You say your focus was around whether the

24   customer has licenses.  Is that all you thought about all

25   day?  You didn't look at what people were downloading?  You

1    didn't try to understand what software was coming in, what

2    patches you had?

3    A.    Well, again, my belief was, as long as the customers

4    were fully licensed and had the rights to the software, we

5    made sure they didn't get anything they weren't entitled

6    to.

7    Q.    I didn't ask you that, sir.  I asked you what you

8    were actually doing, okay?

9            I was asking you, did you know what software you

10   were downloading, what patches you were downloading, what

11   your people were doing?

12   A.    Not on an hour-by-hour, day-by-day basis.  I was

13   focused on selling and building a business.

14   Q.    I didn't ask you hour-by-hour, day-by-day.

15           You've got all this Oracle software, all these

16   patches, and you don't know whether you have them or not?

17   A.    I didn't know at that level of detail, no.

18   Q.    Okay.  Let's look at -- oh, in the next paragraph --

19   well, I'll skip that.  Let's look at number 6.

20           COURTROOM ADMINISTRATOR:  What number, Counsel?

21           MR. ISAACSON:  PTX 6.  And this is again

22   preadmitted, so we're putting this on the screen.

23   BY MR. ISAACSON:

24   Q.    The front email is from Mr. Slarve to Susan -- is it

25   Tahtaras?

1    A.    Yes, Tahtaras, yes.

2    Q.    Thank you.

3          And it says, "Hey, folks, attached is a

4    spreadsheet that has all the Siebel application media that

5    is available on the Oracle eDelivery website."

6          That's that same website we've been discussing;

7    right?

8    A.    Yes.

9    Q.    "We currently don't have the capacity to store it

10   all, but will soon."  It's going to be up to -- "just the

11   ENU versions make up three terabytes.  Once we have the

12   infrastructure in place," and we put "it all down so that

13   we have a full library."

14         And then there's an attachment listing media,

15   page after page after page.

16         Did you know this was going on?

17   A.    I don't recollect exactly, but, again, it wasn't an

18   area that I was concerned about.

19   Q.    Okay.  Did you know that all of this Siebel

20   application media was being taken from the Oracle eDelivery

21   website, over 3 terabytes of information, that you didn't

22   have the infrastructure in place, but you were getting

23   enough hardware or whatever you needed to store all this,

24   did you know anything about that?

25   A.    I don't know that it actually took place.

284

1    Q.    Did you know -- do you know now?

2    A.    No, I don't.

3    Q.    Who does?

4    A.    It would be an engineering team.

5    Q.    Did you talk to any of them about this?

6    A.    No, because, again, we were focused on whether

7    clients got the software that they were licensed for.  So

8    that was my focus.

9    Q.    But you didn't look at what software you were

10   taking.  You didn't know anything about what software your

11   company was downloading; is that right?

12   A.    I wasn't involved in the day-to-day file downloads,

13   no.

14   Q.    All right.  So when you had this belief that you're

15   talking about, that you were entitled to the software, you

16   didn't actually know what software you had?

17   A.    Well, again, I was focused on building the business

18   and had engineering people to focus on that.

19   Q.    Exactly.  You were focused on building the business.

20   You had a new business, it's 2006, you weren't looking at

21   what you were downloading, what you were taking from

22   Oracle, you just had this belief that you must have been

23   entitled to do it even though you didn't know what you had.

24   That was the situation; right?

25   A.    Again, I was focused on building the business.

```
 1                MR. ISAACSON:  All right.  Let's look at

 2     Plaintiffs' Exhibit 223.  All right.  Let's go to -- this

 3     is preadmitted, so let's go to page 2 of this.

 4     BY MR. ISAACSON:

 5     Q.    This is Mr. Whittenbarger.  Is he one of your

 6     engineers, or is he a vice-president?

 7     A.    Whittenbarger I don't believe was a vice-president.

 8     Q.    Okay.  But he's writing to one of your

 9     vice-presidents, Mr. Chiu?

10     A.    That's correct.

11     Q.    And he says, "Offline Explorer is now set up to

12     download content of the Oracle eDelivery website on a

13     weekly basis."

14                By this point in the fall of 2006, this is

15     October 5th, you were downloading from this website on a

16     weekly basis; right?

17     A.    Yes.

18     Q.    All right.  And you were -- and it goes on to say,

19     "In addition to the Siebel keys," you're also downloading

20     PeopleSoft and JD Edwards keys; right?

21     A.    That's what it says, yes.

22     Q.    All right.  You didn't have a single JD Edwards

23     customer at this point, did you?

24     A.    That I don't recollect by date.

25     Q.    This is fall of 2006.  You didn't get your first JD
```

286

1    Edwards customer until years later, did you?

2    A.    I didn't believe it was until early 2007.

3    Q.    Okay.  The -- at this point you've got no JD Edwards

4    customers and you're downloading the JD Edwards keys

5    necessary to unlock some versions of the JD Edwards

6    software; right?

7    A.    That's what it says in the email.

8    Q.    Right.  And you were not entitled at this point to

9    get those keys from your customers, were you?  Isn't that

10   correct?

11   A.    Again, I don't know the exact combination of

12   software, and I don't know what was actually downloaded.

13   Q.    Okay.  And you weren't checking on that at the time,

14   you were focused on building your business?

15   A.    Yeah, I was working on what the archive

16   methodologies were which was related to that special point

17   I talked about yesterday on Siebel.

18   Q.    Okay.  And at this point, on page 1, Dennis Chiu is

19   responding, "This is great, John.  Thanks so much for doing

20   this."  "It'll be a big help to help us capture any deltas

21   on that website," because now you're going to do it weekly.

22         And then he says, "Thanks much for adding this

23   to the library, John."

24         By this point your folks are calling this the

25   library; right?

1    A.    Yes.  Again, it should be installation media.

2    Q.    But at this point your library is full of patches as

3    well; right?

4    A.    Well, again, as you look at the different product

5    lines, Siebel used different terminology than PeopleSoft,

6    JD Edwards, they all used different methodologies.

7    Q.    That wasn't my question, sir.  My question was the

8    library was full of patches at this point also; right?

9    A.    That's what it's saying, that there are patches a

10   part of it.

11   Q.    All right.  So after you got Siebel software in the

12   library, you then were also putting PeopleSoft software in

13   the library; right?

14   A.    That's what it seemed to say.

15   Q.    Okay.  Now, you have called PeopleSoft the

16   Rolls-Royce of HR systems in finance; right?

17   A.    I think it still is, yes.

18   Q.    Okay.  And your PeopleSoft -- the PeopleSoft -- the

19   software in the library for PeopleSoft was not for any

20   specific customer.  You didn't have a PeopleSoft customer

21   at this point, did you?

22   A.    I'm sorry, I don't know which -- what are you

23   referring to.

24   Q.    Well, let's say by the end of July 2006, you were

25   loading software into the library for PeopleSoft, and you

1    didn't have a PeopleSoft customer; correct?

2    A.    Again, I don't know when the first exact date was

3    for the first PeopleSoft customer.

4    Q.    Well, let's look at -- and now you'll have to look

5    in the second binder in front of you.  All right.  1543?

6    A.    1543.

7              MR. ISAACSON:  Yes.

8              Oh, I'm sorry.  Don't put it on the screen

9    though.

10             Oh, let's start with -- I'm sorry.  I'll do that

11   second.  Let's do a preadmitted one, Exhibit 4.  Sorry to

12   do that to you.  That would be found in the first binder.

13             THE WITNESS:  Okay.

14   BY MR. ISAACSON:

15   Q.    All right.  And we looked at this yesterday.  And

16   just go to the last page.  We talked about this exhibit

17   yesterday.

18             This is where Susan Tahtaras has just started to

19   work, and she's going to start downloading PeopleSoft

20   software from eDelivery.

21             And at the bottom of that -- of the second to

22   last paragraph on page 4, "The intent is to familiarize her

23   with our lab process" -- and that's that lab we were

24   discussing; right?

25   A.    Uh-huh.

1    Q.    You have to say --

2    A.    Yes.  I'm sorry.

3    Q.    All right.  "-- as well as having environments on

4    hand when we confirm a PeopleSoft client."

5          You were doing the downloading of PeopleSoft

6    software into the library before you had a client; right?

7    A.    Yes, that's what the email says.

8    Q.    All right.  And, in fact, your first PeopleSoft

9    customer was the City of Flint later in 2006; right?

10   A.    Sounds familiar, yes.

11   Q.    Okay.  Now, PeopleSoft software, in addition to

12   being the Rolls-Royce, as you said, is also technically

13   very complicated.  It's difficult and complex because the

14   tax and regulatory rules change constantly and in short

15   timeframes; is that correct?

16   A.    That's true for every payroll system.

17   Q.    All right.  Now, you've got the -- let's look at how

18   you got the PeopleSoft software.

19         Now, in addition to eDelivery, you also started

20   to use an Oracle website called Customer Connection; right?

21   A.    Yes.

22   Q.    All right.  Let's look at Exhibit 8.

23   A.    Yes, I'm there.

24         MR. ISAACSON:  All right.  This is preadmitted,

25   so we'll put it on the screen.

1    BY MR. ISAACSON:

2    Q.    Let's start at the very top so we can see what this

3    is.

4              This is an instant message that produced in

5    discovery.  And you would agree with me this is -- the two

6    people talking on this instant message format are Susan

7    Tahtaras and Mr. Chiu, your vice-president?

8    A.    Yes.

9    Q.    All right.  And then towards the middle of the --

10   Mr. Chiu says at -- it has the timestamp 20:21:17,

11   two-thirds of the way down, "That's all right.  Dan also

12   will be helping us with the major download from Customer

13   Connection in the days ahead.  So we will eventually have

14   all of this inhouse and at our disposal.  Glad this key

15   piece is available to us now as well.  Another big win for

16   us."

17             That's referring to a major download of People

18   software -- PeopleSoft software from Customer Connection,

19   an Oracle website; correct?

20   A.    Based on the context, that seems to be accurate.

21   Q.    Right.  He says -- and Ms. Tahtaras says, "Yes, I'm

22   surprised Raj was able to get that."

23             Who is Raj?

24   A.    I believe he was another engineer we had hired.

25   Q.    All right.  "And all the people I know guard that

1    info with their life," exclamation point.

2            She goes on to say, "I can get them to get info

3    from Customer Connection for me, but they never give up the

4    ID/password."

5            Mr. Chiu says, "Well, I run into the same

6    problem with people who are still with Siebel/Oracle.  They

7    would rather give me their firstborn than ID.  But Raj's

8    connections from outside of PeopleSoft, outside

9    consultants, seem to have less issue with things like

10   that."

11           One of your engineers got the ID password for

12   this website and -- got it from an outside consultant, and

13   you began a major download from Customer Connection; right?

14   A.    I see what it says.  I don't know whether it ever

15   happened.  It's clearly wrong.

16   Q.    What do you mean it's clearly wrong?

17   A.    It's clearly wrong.  They should never ever have

18   tried to get a password from someone outside.  That's --

19   that's not right.

20   Q.    All right.  But that's what they did, and you did a

21   major download at your company, didn't you?

22   A.    I don't know that that download ever actually took

23   place.  I only see that they talked about it.

24   Q.    All right.  We're seeing a lot of -- it's kind of

25   early in the day, but we've seen several documents about

1    major downloads going on, but you just never know whether

2    that is happening.  Is that your testimony, sir?

3    A.    On these particular items, I do not know personally.

4    Q.    Right.  Because you were just focused on growing the

5    business?

6    A.    That's correct.

7    Q.    All right.  Let's look at Exhibit 9.

8              This is September 22nd, 2006.  At the top,

9    Mr. Whittenbarger and Mr. Chiu again.  Susan Tahtaras and

10   Mr. Slarve are cc'd on it.

11             And they say -- Mr. Whittenbarger says, "Here's

12   a spreadsheet with the progress to date on the subject

13   extract.  About 20 gigabytes of content has been extracted

14   so far."

15             And it goes down to say -- he goes down to say,

16   "Raj, Susan," in the middle, "See the email thread below

17   for further background information on this effort.  We are

18   using" -- I believe that's a virtual machine, "to

19   centralize the support website extraction creation and

20   maintenance processes for Siebel and PeopleSoft."

21             This was part of the downloading that was

22   actually going on; right?

23   A.    Yes, it appears so.

24             MR. ISAACSON:  Okay.  And if we could go to page

25   5, there's an attachment referring to information on

```
 1    Customer Connection.

 2              Let's make the -- get that top part as easy to

 3    read as we can, Matt, the implementation guide.

 4    BY MR. ISAACSON:

 5    Q.    All right.  And there's a couple pages in this

 6    exhibit, page 9, of things being listed, and these include

 7    manuals; right?  Oracle manuals?

 8    A.    Sorry.  I can't see the -- can you blow that up a

 9    little bit?

10              MR. ISAACSON:  PTX 9.  Make it as big as you

11    can, page 5, Matt.

12              THE WITNESS:  Yes, it looks like these are the

13    documentation that goes with the software.

14    BY MR. ISAACSON:

15    Q.    Right, including for JDE; right?

16    A.    That's one of the line items, yes.

17    Q.    Okay.  Let's look at Plaintiffs' Exhibit 10.

18              All right.  Let's start at page 3, the end of

19    this email chain.

20              Mr. Baron, at the bottom, where it says "George

21    and Dennis" -- all right.  He says -- Mr. Baron, he's one

22    of your engineers; right?

23    A.    Yes, he is.

24    Q.    And he ultimately becomes in charge of your

25    automated downloading; right?
```

1    A.    He was an engineer who worked on one of the

2    automation tools, yes.

3    Q.    Some people describe that as his passion?

4    A.    That I wouldn't know.

5    Q.    Okay.  He says, "George and Dennis, I completed a

6    larger download test with my script."

7              So he's talking about a download.

8              So let's go to page 2 where Mr. Chiu responds,

9    "Hi, Doug," talking to Mr. Baron.  Thank you "for your

10   continued focus on improving the download tool.  I am

11   looking to have a complete library of the content that is

12   available from Customer Connection.  With the considerable

13   progress you've already made significant strides on

14   procuring the Continuing Documentation" on Supported

15   Platforms -- I'm sorry, "Continuing Documentation,

16   Supported Platforms, Solutions, and now the updates and

17   fixes for Financial Expenses 8.4, I think we should

18   proactively download all the available content available."

19             Now, at this point you have downloaded

20   documentation into the library; right?

21   A.    Yes, the installation media library looks like

22   they're adding a bunch of things to it, yes.

23   Q.    Documentation is not installation media, is it?

24   A.    No, actually it is.

25   Q.    Okay.  So your testimony is that documentation is

1    installation media?

2    A.    Sure.  It comes with the product.

3    Q.    Supported platforms, is that installation media?

4    A.    I'm not exactly sure what that document is or -- at

5    this point.

6    Q.    Solutions, is that installation media?

7    A.    That seems to be related more to support.

8    Q.    Yes.  Updates and fixes, that's not installation

9    media, is it?

10   A.    That's correct.

11   Q.    Okay.  You said yesterday the library was only

12   installation media.  Your lawyer, undoubtedly after talking

13   to you, said the same thing in opening statement.

14             It is not correct, is it, that the library only

15   had installation media, it had patches, it had fixes, it

16   had updates?

17   A.    I do not know that those items were actually

18   downloaded so I can't answer that question.

19   Q.    Wait a second.  You testified yesterday, and your

20   lawyer said in open court, that that library only had

21   installation media.  But you don't know whether that's true

22   or not?  Is that your testimony?

23   A.    I'm saying that I don't know that these items were

24   ever actually downloaded.

25   Q.    That's not exactly my question, okay?

 1              You have made the representation that the
 2    library only included installation media.  Your lawyer has
 3    repeated that.  You don't know whether that representation
 4    is true or not; correct?
 5    A.    To my understanding, it's true.
 6    Q.    But you're -- you're giving an understanding, sir,
 7    without actually knowing what was downloaded; correct?
 8    A.    Yes, I do not know whether these items were
 9    downloaded.
10    Q.    Okay.  And the document says they were downloaded,
11    doesn't it?
12    A.    I don't think it says that they were.  It says that
13    they -- it says that they're requesting that they be
14    downloaded.
15    Q.    Let's look at it again, sir.
16              "With the considerable progress you've already
17    made significant strides on procuring the" documentations,
18    the platforms, solutions, and now the updates and fixes?
19    A.    Yes, that's correct.
20    Q.    Okay.  It had started.  You had those downloads;
21    right?
22    A.    That's what it says, yes.
23    Q.    You're not -- when you say this library was confined
24    to installation media, you're just wrong, aren't you?
25    A.    I don't know that I am, no.

1    Q.    All right.  So you made the statement under oath

2    that the library only included installation media, and you

3    didn't know whether it was true; correct?

4    A.    To the best of my knowledge, it's true.

5    Q.    When you say to the best of your knowledge, you're

6    saying it without actually having any knowledge.  Isn't

7    that your testimony?

8    A.    I don't have the detailed knowledge because I did

9    not look myself, no.

10   Q.    You're making statements under oath in court that

11   certain things happened and certain things true -- are true

12   without having any actual knowledge about it.  Isn't that

13   what you're telling us?

14   A.    It's my understanding that that is the truth, that

15   it only contained the installation media.

16   Q.    But you're telling us you're having understanding

17   without actually knowing the facts.  Isn't that what you're

18   telling us?

19   A.    I'm saying that if the facts are different, then I'm

20   not aware of them.

21   Q.    Mr. Chiu goes on to say in the next paragraph, "I

22   believe it's in our best interest to capture all the

23   updates and fixes available to us.  Because we wouldn't

24   want to risk waiting to take delivery if there may be any

25   changes to Customer Connection."

298

1          He goes on to say, "I'd like to plan on pulling

2    down as much of the content as possible, but if it might

3    make more sense to house all that content on a large

4    centralized server, we can work on that over the course of

5    next week."

6          When you were bringing in new hardware, spending

7    money on servers to store all this information, is it your

8    testimony you didn't know that was going on?

9    A.    I'm not sure that that server was ever bought, and

10   I'm not sure that that ever took place.

11   Q.    The -- on the first page, Mr. Baron is now

12   responding to Mr. Chiu's email, and at the bottom he says,

13   "I tried to prioritize the tasks as follows.  Please let me

14   know if I need to change the order.  Finish downloading all

15   release 8 fixes."  And he goes on to explain the order of

16   downloading.

17         It's your testimony you don't know what happened

18   next; is that right?

19   A.    Yeah, I'm not sure.  I can't recollect exactly.

20         MR. ISAACSON:  Okay.  Can we throw up the slide

21   of 3510, Matt?  Do you have that handy?

22         There's a slide of PTX 3510.  There we go.  This

23   has been shown to the jury before.

24   BY MR. ISAACSON:

25   Q.    This is your library.  Is it -- this is the

```
 1    directories that you disclosed in discovery of what your
 2    libraries -- of the address listings for your archive --
 3    for your library; right?
 4    A.    Yes, I remember that from the presentation.
 5    Q.    Okay.  And it's a fact, in that item number 1,
 6    client-software/PeopleSoft, you don't know what patches
 7    were in there, what updates were in there, what fixes were
 8    in there.  You don't know what downloading went into that;
 9    correct?
10    A.    No, that's correct, yes.
11    Q.    All right.  447, this is now June 2009?
12    A.    I'm sorry.  Which document are we looking at?
13    Q.    PTX 447.  We move forward from 2006 and 2007 to
14    2009?
15    A.    Okay.
16    Q.    And on page 1 at the bottom, Krista Williams is
17    talking.  She's your senior PeopleSoft manager; correct?
18    A.    Environments manager, yes.
19    Q.    Right.  She's in charge of the PeopleSoft
20    environments that we've been talking about in this case?
21    A.    Yes.
22    Q.    And she says the software is now in, she identifies
23    the drive.  "Under there is PeopleSoft with all of the
24    install media for PeopleSoft," and, "There is another
25    directory for development use which holds the Oracle,
```

1    Microsoft, and IBM software which we need.  Is that what

2    you need in one of those locations?"

3              That Oracle software for development use, that's

4    referring to Oracle Database software; right?

5    A.    I think that's accurate.

6    Q.    All right.  So for general development purposes, you

7    were putting Oracle Database software in the library;

8    correct?

9    A.    It looked like there was a directory of Oracle

10   Database software.

11   Q.    Okay.  Let's back -- let's turn one tab to 448.

12   We're going back in time to January 2008?

13   A.    Okay, I'm there.

14   Q.    At the bottom Mr. Baron and Mr. Slarve are talking

15   by email on January 28, 2008.

16             He says, "Guys, we're running real low on space

17   on rsi-data datastore drive.  This is where we keep the

18   PeopleSoft software library."  Right?

19   A.    Yes, I see it.

20   Q.    This library, in 2008, was continuing to grow, and

21   you were running out of space?

22   A.    Yes, apparently so.

23   Q.    All right.  But you were not aware of that; is that

24   your testimony?

25   A.    I don't recollect whether I was aware or not.  I was

1   involved in, obviously, certain things, but I don't

2   remember this one particularly.

3   Q.   All right.  And then let's talk about that eDelivery

4   website.  We'll go back to that.  That license you never

5   looked at.

6         Could you look at -- don't put on the screen --

7   PTX 649.

8         Sir, this is a --

9   A.   Wait a second.  I'm still trying to find it here.

10  Q.   If you want to look at them together --

11  A.   I've got it here.

12  Q.   -- 649 is a page where you enter the Oracle

13  eDelivery website, and 650, which is the next tab over, is

14  the electronic delivery trial license agreement.

15        All right?  Do you see that?

16  A.   Yes.

17  Q.   All right.  Now, it -- the -- when you enter the

18  Oracle eDelivery website, it said, "By accessing the

19  software on this website, you agree that (1) you have

20  already obtained a license from Oracle, or an Oracle

21  partner, for your use of the software," and it goes on to

22  talk about that license.

23        "Or (2) if you have not already obtained a

24  license from Oracle or an Oracle partner for your use of

25  the software, the Oracle Electronic Delivery Trial License

1    Agreement on this website governs your use of the

2    software."

3             You did not have a license with Oracle; correct?

4    A.    That's correct.

5    Q.    Okay.  And you see that there was a trial license,

6    that's at 650, that says this gives you a temporary right

7    to use the programs for evaluation purposes on a single

8    computer designated by you, and it tells you the term of

9    the license is 30 days.  All right?

10             Have you ever reviewed this license before?

11   A.    This particular one, I don't remember, no.

12   Q.    And it's fair to say that all of that software that

13   you've downloaded from eDelivery you kept for more than 30

14   days and you didn't just look at it on a single computer?

15   A.    Again, I don't know how it was used, and I don't

16   know if it was kept longer than we had actual customers who

17   had the same licenses.

18   Q.    That wasn't my question, sir.  You kept it a lot

19   longer than 30 days; right?

20   A.    Again, I don't know what was downloaded under it,

21   but my assumption would be you're probably correct, right.

22   Q.    And I would be correct to say your people weren't

23   looking at it on just one, stand-alone computer; correct?

24   A.    Well, my guess is it was probably on one server

25   based on what I saw.

1     Q.    Now, you used -- your people used all of the

2     software, PeopleSoft software, Oracle Database software,

3     Siebel software, JDE software, you used that in connection

4     with your work for customers; correct?

5     A.    Yes.

6     Q.    And the library, in addition to PeopleSoft and

7     Siebel, also included JDE install media; correct?

8     A.    I'm sorry.  Can you say that again?

9     Q.    Sure.  We talked about the library having Siebel and

10    PeopleSoft.  It also included JD Edwards installation

11    media; correct?

12    A.    That's my understanding, yes.

13          MR. ISAACSON:  All right.  And let's go back

14    to -- oh, let's look at 35 -- PTX 3511 at 4.  This is a

15    response to an interrogatory, interrogatory number 25.  Do

16    you have any objection to me showing it on the screen?

17          COURTROOM ADMINISTRATOR:  It's not admitted.

18          MR. ISAACSON:  It's not admitted.

19          COURTROOM ADMINISTRATOR:  No.

20          MR. ISAACSON:  Correct, it's not admitted.  I'm

21    asking if he has -- if I have his permission.

22          THE COURT:  Oh.

23          MR. ISAACSON:  Oh, please take -- I'm sorry, I

24    didn't see it was on the screen yet.

25          THE WITNESS:  I'm sorry.  Which number is that?

1                MR. ISAACSON:  3511.

2                I'm sorry.  We made it a separate handout.  If I

3      could approach, Your Honor?

4                THE COURT:  Just give it to my court clerk,

5      Mr. Isaacson.

6                MR. WEBB:  Your Honor, before we do that, can we

7      approach on this?

8                THE COURT:  Yes.

9           (Sidebar conference held as follows:)

10               MR. ISAACSON:  That would be the end of

11     interrogatory 24.

12               MR. WEBB:  So this is a partial.

13               MR. ISAACSON:  All of interrogatory 25 and the

14     answer to interrogatory 25.

15               MR. WEBB:  No objection.  Sorry.

16               THE COURT:  All right.

17          (Sidebar conference concluded.)

18     BY MR. ISAACSON:

19      Q.   I'd like you to look at page 4 of this.

20               MR. ISAACSON:  Do you have any objection to

21     showing page 4 on the screen?

22               MR. WEBB:  No.

23               MR. ISAACSON:  I'd like to move to admit it.

24               THE COURT:  It's admitted.

25

1          (Plaintiffs' Exhibit 3511 received into

2          evidence.)

3     BY MR. ISAACSON:

4     Q.     Could we look at page 4?

5     A.     Sorry.  I don't seem to have page 4 in the handout.

6              Sorry.  Okay.

7     Q.     All right.  You'll see on page 4 there's that same

8     listing of library directories we looked at before that was

9     part of 3510, and so --

10    A.     Yes.

11    Q.     So what happened here was you -- you and your

12    company answered in the interrogatory a question we asked

13    in the discovery, you gave us this information, it was

14    later put into a stipulation, and about that first

15    direct -- about that first library -- and this is a library

16    that no longer exists; right?

17    A.     But my understanding is these are part of the

18    documents that were deleted prior to the litigation.

19    Q.     Right.  In January of 2010, right, that first

20    directory?

21    A.     That's my understanding.

22    Q.     And the -- you say about that directory, that first

23    directory, that it included materials relating to

24    PeopleSoft software, and you say about the second one that

25    it included materials related to PeopleSoft software and

1    Oracle Database software; correct?

2    A.    I see that in the document, yes.

3    Q.    All right.  You never disclosed that these libraries

4    also had material for JD Edwards and Siebel; correct?

5    A.    I don't see it listed in these particular name

6    directories.

7    Q.    In fact, you said under oath yesterday that the

8    library did not include Siebel software; right?

9    A.    I don't remember saying that.

10   Q.    Well, "Did you have a library of Siebel software and

11   documentation at Rimini Street?

12           "No."

13           Do you remember saying that yesterday?

14   A.    Again, you're talking about -- you were asking me

15   about what the allegation was versus what I said the

16   installation media --

17   Q.    I just read you the complete question.  "Did you

18   have a library of Siebel software and documentation at

19   Rimini Street?

20           "ANSWER:  No."

21           Do you remember giving that testimony?

22   A.    No, I don't remember it in that context, no.

23   Q.    Okay.  You did have a library of Siebel software and

24   documentation; correct?

25   A.    Based on the documents we reviewed and

1    understanding, it would be yes, of the installation media.

2    Q.    All right.  Let's look at Exhibit 204, which will be

3    back in your first binder.

4             COURTROOM ADMINISTRATOR:  That's not admitted

5    either.

6             MR. ISAACSON:  Yes, it is not admitted.  I would

7    move to admit it.  I'm not sure why there's an objection.

8             MR. WEBB:  No objections, Your Honor.

9             THE COURT:  All right.  It is admitted.

10            (Plaintiffs' Exhibit 204 received into

11            evidence.)

12   BY MR. ISAACSON:

13   Q.    All right.  If we can look at Exhibit 204 on the

14   screen, the first page.

15            This is December 19th, 2005.  Your company has

16   just started, you don't have a customer yet, and you're

17   trying to get up and running; right?

18   A.    Yes.

19   Q.    And Mr. Chiu is the number two person in the company

20   at this point, other -- well, I don't know how you count

21   your cofounder.  He's the number two or number three person

22   in the company at this point; correct?

23   A.    That's correct.

24   Q.    Okay.  And he's talking to Victor Shu.  And he was

25   some sort of consultant that was working with your company;

1    correct?

2    A.    I believe so.

3    Q.    And Mr. -- in the middle you can see that Mr. Shu is

4    working on a demo.  And what you're working on here is a

5    demo for Siebel; right?  You can see up above the

6    references to Siebel software?

7    A.    Yes, that appears to be correct.

8    Q.    All right.  And he's saying to the consultant, "If

9    you might be able to help me with access, I can drive the

10   rest of the demo."  Right?

11   A.    Yes.

12   Q.    So you don't have access to the Siebel software?

13   A.    Apparently not, not at this point.

14   Q.    Okay.  And Mr. Shu says to you, "I don't know what

15   to say" -- I'm sorry, to -- Mr. Shu says to Mr. Chiu, "I

16   don't know what to say in terms of access.  I think we are

17   in the same situation, i.e., I will need access to a demo.

18          "I would think you would have taken out a

19   contract with Siebel by now.  It's my mistake if I had that

20   incorrect assumption.  I don't know you can continue

21   operation without a contract, but that's just my personal

22   observation - sort of thinking aloud."

23          At the very beginning of the company, you had a

24   consultant telling your number two or number three

25   executive that you don't actually have a license agreement

1    with Siebel, how are you going to continue operation.

2    That's what was happening; right?

3    A.    That seemed to be their discussion.

4    Q.    Okay.  And, in fact, throughout the history of the

5    company, Rimini Street has never had a license agreement

6    with Oracle?

7    A.    Are you talking about all products?  We do have

8    license agreements with Oracle on some products.

9    Q.    All right.  You've never -- for the products at

10   issue in this case, you never had a license; correct?

11   A.    That's correct.

12   Q.    All right.  And for the products at issue in this

13   case, you've never paid a penny to Oracle for the use of

14   the Oracle software; right?

15   A.    That's correct.

16             MR. ISAACSON:  All right.  Now, let's look at

17   554.  This has not been admitted.  I would ask counsel if

18   there's any objection to admitting it.

19             MR. WEBB:  What number is it?

20             MR. ISAACSON:  554.  This is an email between

21   Mr. Ravin and Mr. Slepko and a few other people.

22             THE WITNESS:  Yes, I'm on 554.

23             MR. ISAACSON:  I'm waiting for a response from

24   your counsel.

25             MR. WEBB:  No objection.

1           THE COURT:  It is admitted.

2           (Plaintiffs' Exhibit 554 received into

3           evidence.)

4    BY MR. ISAACSON:

5    Q.    Let's look at page 3.  You are writing to Walter --

6    is it Hakenewert?

7    A.    Hakenewert.

8    Q.    Hakenewert.  And what's his position with the

9    company?

10   A.    Sales rep.

11   Q.    Sales rep.

12          So you're writing to a sales rep in October

13   2008, and you're having a problem with a customer.

14          You say, "I read this as they are NOT," all

15   capitals, "comfortable going third party at this time -

16   they want the savings...but were clearly not 'fully on

17   board' with the model.  The fact that they note concerns

18   over license rights and future product interests - these

19   are all clearly the foundation of the deal that was not

20   solid."

21          And so when you're referring to license rights,

22   you're referring to your -- your license rights, your

23   rights to use the Oracle software to support the customer;

24   correct?

25   A.    License rights of the customer to use an independent

1    maintenance option, yes.

2    Q.    Correct.  And the independent maintenance option is

3    just a long way of saying support for the customer; right?

4    A.    Yes, some support option other than Oracle.

5    Q.    All right.  Now, let's go to page 1.

6    A.    Okay.

7    Q.    You write to your sales rep -- so you're losing this

8    customer -- at the bottom, "We have all lost here."

9         And then you say in the middle of the paragraph,

10   of the next paragraph, you say, "Somebody planted this fear

11   in them," about the license rights, "and it wouldn't matter

12   if we had the best JDE resources in the world if we don't

13   resolve the foundation issues."

14        And the foundation issues are whether the

15   customer license agreements give you permission to do your

16   work; correct?

17   A.    That's what the reference is here, yes.

18   Q.    All right.  And you say, "A client first and

19   foremost must believe they have the right to be with us and

20   use their software...or the rest is just noise."

21        If the clients don't believe and didn't believe

22   that you had the rights to copy Oracle software and use it

23   for support, you weren't going to have any customers;

24   right?

25   A.    This actually says that if we -- essentially similar

1    but not exactly that.

2    Q.    Right.  Everything else other than those license

3    rights is just noise.  You're not going to have customers

4    unless your customers believe you have those rights;

5    correct?

6    A.    They have to believe they have the right to get a

7    third party to do their maintenance for them, yes.

8    Q.    And it was important for you to -- for them to

9    believe they had those rights; correct?

10   A.    Yes.

11   Q.    Because even if you had the best resources in the

12   world, without those rights you were not going to have any

13   customers?

14   A.    Yes.  The client has to have the option to have a

15   choice, yes.

16   Q.    Now, in terms of those license rights, those ones

17   that you say you believe you had, with respect to the

18   customer licenses, I want to ask you about Siebel.

19            What rights in the customer Siebel licenses did

20   you believe you had during these years, 2006, 2007, 2008?

21   A.    Well, when Siebel wrote us and said that they didn't

22   believe that we had the right to offer it, our lawyers

23   responded appropriately to every point.

24   Q.    That wasn't my question, sir.

25            You have told this Court that you believed you

1    had the right -- you've said this several times -- to do

2    what you had to do.

3              And now I'm asking you just about Siebel.  I'm

4    not asking you about PeopleSoft.  All right?

5              What license provision of a Siebel license did

6    you ever point to or review that you thought gave you those

7    rights?

8    A.    Well, actually, every customer license has key

9    points, one of them being the license right for the

10   software, to give a third party the right to stand in their

11   shoes, yes.

12   Q.    Why do you say you know what every license agreement

13   says?  Did you see every license agreement?  And now I'm

14   just talking about Siebel.  Did you see every Siebel

15   license agreement?

16   A.    Well, Siebel provided us a copy of a license to

17   review, yes.

18   Q.    So you looked at one license agreement given to you

19   by Siebel, and that's what you relied on?

20   A.    Well, Siebel gave it to us so we could rely on it,

21   yes.

22   Q.    All right.  And so if we wanted to know what you

23   relied on, we would look at that license agreement that was

24   given to you?

25   A.    Yes.

1    Q.    Okay.  The -- I want to talk about something else

2    that happened early in your company history.  You heard me

3    talk about this in opening statement, the Siebel

4    SupportWeb, another Oracle website.

5              And now, but before we talk about that, I think

6    you have said that you had a golden rule, every customer's

7    downloads are kept separate; right?

8    A.    Yes, by the time we talked about that in my

9    deposition, yes.

10   Q.    Okay.  And that was a golden rule within your

11   company, keep every customer's download separate?

12   A.    Yes, relating, again, to the downloads, not the

13   installation media.

14   Q.    And the term silos has been used.  You keep

15   everything in separate silos for different customers;

16   correct?

17   A.    For the downloads at the time we did the deposition,

18   yes.

19   Q.    And you said the same thing to the Court, you have

20   said that each client is assigned a separate silo, and all

21   the information you maintain is in those separate silos;

22   correct?

23   A.    Yes, again, for the individual downloads by the time

24   we did the depositions, yes.

25   Q.    Right.  And you talked about -- let me ask you about

```
 1    318.
 2    A.    Yes, I'm there.
 3    Q.    All right.  This has been --
 4          MR. WEBB:  Objection, Your Honor.  Could we
 5    approach?
 6          THE COURT:  318 is not in evidence at this
 7    point?
 8          MR. ISAACSON:  It's not admitted at this point.
 9          THE COURT:  All right.  You may approach.
10        (Sidebar conference held as follows:)
11          THE COURT:  All right.  Go ahead.
12          MR. WEBB:  I thought we had an understanding
13    we're not going to get into the TomorrowNow issues until
14    the break.  But this is relating to the lawsuit with
15    TomorrowNow, something we need to address after --
16          MR. ISAACSON:  I'll deal with it without putting
17    it on the screen.  I wasn't actually coming to that part of
18    it right now, so I'll just read him parts of it and deal
19    with the TomorrowNow stuff later.  I will not move to admit
20    it, but I'll move to admit it later.
21          THE COURT:  All right.  So you're referring to
22    what part?
23          MR. ISAACSON:  So in the last page, beginning
24    with "when we set up our internal VM environment."
25          THE COURT:  I'm not seeing that.
```

1              MR. ISAACSON:  So below page 3.

2              MR. WEBB:  There it is.

3              MR. ISAACSON:  318.  Yes.  So page 3 of 3.  So

4    this, that paragraph, and then I'm going to go to the first

5    page.

6              So there's just one reference to Oracle lawsuit,

7    and I'm not going to mention that, and I'll move to admit

8    this and the judge can rule on it later.

9              THE COURT:  Do you have an objection to that?

10             MR. WEBB:  You're going to read the paragraph

11   right after the --

12             MR. ISAACSON:  Uh-huh, uh-huh.

13             MR. WEBB:  I don't see how you can do that

14   without having the contextual issue right in the middle of

15   that.

16             MR. ISAACSON:  This is a clearly relevant

17   document, and you're making a fine argument for admitting

18   the TomorrowNow evidence, but I'm trying to make it easier

19   for you now.

20             MR. WEBB:  I appreciate that, Bill.  But I

21   thought TomorrowNow was something we did address.

22             MR. ISAACSON:  I wasn't going to -- I didn't

23   know that was there because I wasn't going to talk about

24   it.

25             MR. WEBB:  All right.  Fine.

1              THE COURT:  All right.

2         (Sidebar conference concluded.)

3              THE COURT:  Go ahead, please, Mr. Isaacson.

4    BY MR. ISAACSON:

5     Q.    Do you have Exhibit 318 in the front of you?

6              THE COURT:  Pardon?

7              MR. ISAACSON:  I was asking the witness.

8    BY MR. ISAACSON:

9     Q.    Do you have 318 in front of you?

10    A.    Yes, I do.

11    Q.    All right.  Let's look at page 3 but not on the

12   screen.

13              I just want to get some context here.  "When we

14   set up" -- you're talking about a question.

15   Mr. Whittenbarger is talking about a question.

16              "When we set up our internal VM environment for

17   a customer," which is virtual machine, "are we assuming

18   they are giving us one or more of their Siebel licenses to

19   set this up at our site?"

20              And then let's go to -- I wanted you to have

21   that for context.  Let's look at page 1.

22    A.    Yes, I see it.

23              MR. ISAACSON:  All right.  Now, counsel has

24   given me permission to put the first page of this document

25   on the screen, Your Honor.  So if we can put the first page

1     of 318 on the screen, and this --

2             THE COURT:  The first page of 318 is admitted.

3             (Plaintiffs' Exhibit 318, page 1 received

4             into evidence.)

5     BY MR. ISAACSON:

6     Q.    Mr. Chiu, again that vice-president in your company,

7     this is March 2007, is responding to Mr. Whittenbarger.

8             He says, "Great question and I'm glad you asked.

9             "Our clients can extend their software licenses

10    to us for testing and development purposes, much like they

11    would extend them to a consultant they hire to perform

12    development or testing -- exactly what our virtual

13    environments are for and exactly what we do."

14            So at this point, Mr. Chiu was saying internally

15    in the company that the Siebel licenses could be extended

16    for testing and development purposes, and he was saying

17    that to your environmental engineers; correct?

18    A.    Yes, that's accurate.

19    Q.    And he was saying that that's exactly what your

20    Siebel environments were doing, testing and development;

21    right?

22    A.    That's what they were designed for, yes.

23    Q.    And what we've been saying about separate silos and

24    your golden rule about keeping things separately, you told

25    that to customers also; right?

1    A.    Yes, we told them that we indeed made sure that,

2    again, overall, customers didn't get anything that they

3    didn't pay for through silos, yes.

4    Q.    All right.  And that was standard messaging for your

5    sales force; correct?

6    A.    Yes.  I believe that they took that and used that in

7    the sales process to -- again, the whole idea was to make

8    sure customers knew they wouldn't get something that wasn't

9    theirs.

10   Q.    And you had standard messaging tools for your sales

11   force, such as responses to frequently asked questions,

12   that had those messages so your sales force would spread

13   that to your customers and potential customers; correct?

14   A.    Yes.

15   Q.    And you had, as you grew, a growing sales force;

16   correct?

17   A.    Yes.

18   Q.    You spent a lot of money over the years on sales and

19   marketing?

20   A.    Yes.

21   Q.    You spent -- between 2006 and 2010, you probably

22   spent close to $20 million on sales and marketing; is that

23   right?

24   A.    I'm sorry.  I don't know the number offhand.

25   Q.    Are you comfortable saying it was over $10 million?

1    A.    I'd actually have to look at the numbers.

2    Q.    Okay.  In actuality, though, at Rimini you were

3    using copies of customers' licensed Oracle software to

4    serve multiple clients; right?

5    A.    We were using the generic version of a release to

6    serve as multiple clients that had the same, yes, the

7    reuse.

8    Q.    Okay.  Let's talk about that, using the generic

9    version of a release.

10           Now, a generic version of a release, you mean by

11   Oracle software that requires a license; right?

12   A.    Yes.

13   Q.    Okay.  And you would get that release from a

14   customer and put it into a general testing and development

15   environment; correct?

16   A.    Yes.  It was a general development test environment

17   that originally sourced from some particular customer's

18   media, yes.

19   Q.    And you did that for PeopleSoft; correct?

20   A.    Yes.

21   Q.    You did that for Siebel; correct?

22   A.    For a few environments.  I think it was eight to

23   ten, something like that, early years.

24   Q.    And in the early years you also did that for JD

25   Edwards; correct?

1    A.    I think we did a few environments in the early years

2    for JDE, yes.

3    Q.    Specifically for these testing and development

4    purposes; correct?

5    A.    Yes, they were for testing and development, but I

6    don't know how the Siebel or JD Edwards were actually used.

7    Q.    All right.  The -- and so with respect to these

8    general environments, you were taking customer software,

9    putting it into a general environment, and then using it

10   for multiple customers; right?

11   A.    These were all clients who had licensed the same

12   product from Oracle, yes.

13   Q.    Well, that -- I'm not sure what you're saying yes

14   to, sir, because you didn't start off by answering my

15   question.

16         You were taking customer specific software, I

17   guess from one of those silos, and putting it into a

18   general environment, and using that for multiple customers;

19   right?

20   A.    No, this is back to the -- I'm sorry.  If I can

21   explain.

22         It's the installation media we would use to

23   build an environment that a customer would have provided

24   the original source.  But, again, this is a single version

25   of the software that would then be used for reuse with

1    customers that had the same exact licenses.

2    Q.    You were taking it out of the silo and using it for

3    general customer purposes; right?

4    A.    No.

5    Q.    Well, let's go over that one more time then.  Maybe

6    you and I have a different idea about what a silo is.

7              But you were taking software out of a silo and

8    putting it in a general environment; right?

9    A.    No, this is the installation media that's used to

10   build environments.  So the installation media we've

11   already said was not part of these individual silos because

12   it was common media across multiple clients.

13   Q.    You took -- so the installation media, which

14   would -- by installation media, you're including everything

15   you took off -- you took from downloads from websites;

16   right?

17   A.    We took from -- no.  A lot of it was loaded up by

18   DVDs again provided from the clients for particular

19   licenses.

20   Q.    Some of it was DVDs, some of it was downloads from

21   the Oracle websites; right?

22   A.    That, I don't remember the exact source of each

23   environment, but it's possible it came from one or the

24   other.  I think we saw it in the slide yesterday from your

25   expert, yes.

1    Q.    And we looked at all that library -- I thought I was

2    finished with the library, but we looked at all the library

3    and saw all of that installation media in there as well as

4    the patches, et cetera; right?  All of that was being used

5    to set up general environments; right?

6    A.    I would say yes.

7              Again, as your expert showed, some of it

8    probably came from -- it looked like he had done the

9    research on that, and it looked like it either came from

10   Oracle's website or customers.

11             But, again, we used the customers' media to

12   build these environments.

13   Q.    All right.  And you never told your customers that,

14   "By the way, we told you they're separate silos, but what

15   we're really doing is taking installation media and using

16   it for general purposes for whatever -- for multiple

17   customers"?  You never told them that; right?

18   A.    Well, again, you're talking -- you're talking about

19   the fact that we did talk to customers and told them we do

20   not give them software that's not their licensed rights,

21   yes.

22   Q.    I'm talking about the silos, sir.  We'll get back to

23   how you told customers that they were within their licensed

24   rights.  I'll talk about that later.

25             With respect to these silos, you never told the

324

```
 1   customers that you were actually taking installation media

 2   out of the silos and using it for general development

 3   purposes?

 4   A.   We didn't take them out of the silos.

 5   Q.   Okay.  The -- so let's look at Plaintiffs'

 6   Exhibit 219.

 7   A.   Okay.  I'm there.

 8        MR. ISAACSON:  Hopefully this is pretty easy.

 9   This is very early history, September 2006.  It's

10   preadmitted, so you can put this on the screen.

11        And blow up the top of it.

12   BY MR. ISAACSON:

13   Q.   And this is a list, as of September 2006, of your

14   first customers, with the exception of Leads Customers

15   Growth; correct?

16   A.   Looks fairly accurate, yes.

17   Q.   Okay.  It has start dates, and these are all Siebel

18   customers with the exception of FileNet and City of Flint,

19   and City of Flint has a start date of September 13, 2006.

20   That's your first PeopleSoft customer; right?

21   A.   Yes, it sounds right.

22        MR. ISAACSON:  Now, can we -- Matt, can we put

23   up Ravin Exhibit 1, the slide?

24   BY MR. ISAACSON:

25   Q.   You were here when I showed the jury this in opening
```

1   statement?

2   A.    Yes.

3   Q.    Okay.  So we have recreated the clients on

4   Exhibit 219 except we've added Leads Customer Growth.  All

5   right?  Do you see that?

6   A.    Yes, I see that.

7   Q.    All right.  Now, you were building environments at

8   this point.  Now, according to what you have stipulated to,

9   and what Professor Davis has testified to --

10           MR. ISAACSON:  Can we put up the environments,

11  Matt?

12  BY MR. ISAACSON:

13  Q.    All right.  These were your first customers, and

14  they had Siebel environments; right?

15  A.    If that's what we stipulated to, yes.

16  Q.    Yes.  And those are environments with copied Oracle

17  software on them; right?

18  A.    That would be an environment, yes.

19  Q.    Okay.  Let me talk about -- I'll come back to this

20  slide later.

21           I want to talk about that SupportWeb.  In

22  February 2006, you directed that -- a project to begin to

23  download extracts from Siebel SupportWeb from customers;

24  right?

25  A.    I'm sorry.  Are we on a particular exhibit?

1    Q.    All right.  Let's look at Exhibit 206.

2              MR. ISAACSON:  All right.  And this has been

3    preadmitted.

4              So let's go to page 4 and 5.  Well, actually, I

5    think -- this is not an email, so actually we have to start

6    with page 1.  Sorry, Matt.

7    BY MR. ISAACSON:

8    Q.    This is December 16th, 2005.  This is you, Mr. Shay,

9    and Mr. Chiu?

10   A.    Yes.

11   Q.    It's the beginning of the company, you don't have

12   any customers yet, these are the three top people in the

13   company; right?

14   A.    That's correct.

15   Q.    Okay.  And Mr. Chiu says, "I've put together a

16   summary that details the background of Siebel's SupportWeb

17   knowledgebase, and what we're faced with, in order to

18   enable the same level of self-service to our customers."

19              Now, "self-service to our customers" refers to

20   customers being able to access documentation and support

21   materials on the web so they can answer their own

22   questions; correct?

23   A.    Yes.  Only the materials they're entitled to see, of

24   course.

25   Q.    I'm just -- well, that, I guess, might be what this

1    case is about.

2            But just in terms of answering my actual

3    question about what self-service means, I have that right,

4    don't I, that self-service is when I -- for when IT

5    professionals at companies, or specialized business people

6    who understand these materials, go online and work with

7    materials to help them with their software; right?

8    A.    Yes, this refers to customers being able to access

9    the materials they're entitled to and utilize them, yes.

10   Q.    And the -- if we can go to page 3.  Go down to

11   Objective.

12           "OBJECTIVE:  Rimini Street customers are trained

13   Siebel IT professionals who demand a self-service

14   mechanism, and rely on accessible information to resolve as

15   many issues independently as they would by engaging

16   technical support."

17           That's what we were just talking about; right?

18           Your customers are trained professionals who

19   need this support materials on the web to access to answer

20   their own questions?

21   A.    Well, they need access to them, whether it's on the

22   web or locally, they need to be able to access them, yes.

23   Q.    All right.  And it says at the bottom -- now, you're

24   talking about -- and what you're talking about here is

25   Siebel SupportWeb which was Oracle's website providing that

1    knowledge and information; right?

2    A.    The Siebel SupportWeb was Siebel's independent

3    website before it was merged into Oracle's website, yes.

4    Q.    Right.  And you say at -- and it says at the bottom

5    of page 3, "While this can be a very manual download

6    process of sequentially pulling each and every knowledge

7    item, we can develop an automated script or program that

8    can systematically execute a pdf download of all TechNotes,

9    Alerts, FAQs, Troubleshooting Guides, Rimini Street can

10   help archive and catalog those knowledge items for each

11   customer account."

12            So you're talking about creating -- it's going

13   to be too hard to pull down -- there's so much information

14   on the SupportWeb, it's going to be hard to pull it down

15   manually, so you're going to do it on an automated basis.

16   That's what you're talking about; right?

17   A.    Yes.  Each customer is entitled to a lot of

18   information, yes.

19   Q.    And so going to page 4, the -- at the bottom it

20   says, "Siebel SupportWeb contains a huge repository of

21   publicly visible Service Request descriptions and

22   resolutions, and serves as an established self-service

23   tool."

24            That's correct; right?

25   A.    Yes, I believe that was true with the Siebel

1    SupportWeb format, yes.

2    Q.    And you say above that, "These documents should be

3    reviewed and rewritten/edited by our Support Consultants

4    for applicability to customers and archived in a Rimini

5    Street database."

6              Right?

7              So what you were going to do is take all of

8    these Oracle support documents, review and rewrite or edit

9    them, and put them in a Rimini Street database; correct?

10   A.    It looked like that was Dennis Chiu's proposal, but

11   that didn't happen.

12   Q.    All right.  Well, we'll come to that.

13             He says on the next page, "We will initiate a

14   project effort to automate the replication of publicly

15   visible Service Request postings that meet Rimini Street's

16   format and content types.  This process will entail

17   extensive efforts to simulate a searchable tool."

18             Now, you say this didn't happen.  That's sort of

19   interesting because you've been telling me all these other

20   things you didn't know whether they happened or not.  Why

21   do you say this didn't happen?

22   A.    Well, I told you I know about some things and I

23   don't know about others.  This one I know because the

24   customers -- we never had a place where we were rewriting

25   stuff.

1    Q.    Well, I'm talking about downloading from Siebel
2  SupportWeb?
3    A.    Right.  But I think you're confusing that between
4  downloading and what the second -- you just asked me about
5  whether we were rewriting documents, and that's something
6  that -- this one is about downloading.
7              Yes, of course, we built a tool to download from
8  Siebel SupportWeb.
9    Q.    Okay.  Thank you for clarifying that.
10             So let's just get this straight as to what you
11  agree to and what you don't agree to.
12             You agree that there was downloading on an
13  automated basis from Siebel SupportWeb of the Oracle
14  documentation.  You disagree that you then went about
15  rewriting or editing those documents for your customers?
16    A.    That's correct.
17             MR. ISAACSON:  Okay.  And the -- can we look at
18  210.  This has been preadmitted.
19  BY MR. ISAACSON:
20    Q.    So we can look at page 1, and let's look at the
21  bottom of that.
22             This is Mr. Chiu writing to Mr. Whittenbarger
23  and Ms. Bola, and it says at the bottom, "Dan has created a
24  methodology" -- and this is in June 2006 now?
25    A.    Yes.

1    Q.    "Dan has created the methodology and framework for

2    the SupportWeb extract process, including the process to

3    capture daily incrementals from SupportWeb which will then

4    be integrated into the extract database."

5              At this point you're doing daily downloads from

6    the Siebel SupportWeb and putting it into your database;

7    right?

8    A.    That's correct.  And goes back to what we talked

9    about as Siebel having a very unique structure in the way

10   that its systems worked, and we went from weekly downloads

11   to daily downloads, yes.

12   Q.    Right.  And he then says, "In parallel, he's

13   prototyping the design documentation."

14             That's the Oracle design documentation; right?

15   A.    I'm sorry, where is --

16   Q.    "In parallel, he's prototyping the design

17   documentation."

18             That's the Oracle design documentation; correct?

19   A.    I think that's relating to something else.  I don't

20   think that's Oracle.

21   Q.    He says, "The design documentation will then be

22   passed to John."  Is that Mr. Whittenbarger?

23   A.    This looks more like this relates to customizations

24   that we do for Siebel.

25   Q.    My question is really easy.

1                Is John Mr. Whittenbarger?

2      A.     John is Mr. Whittenbarger, yes.

3      Q.     And so this design documentation was going to be

4      passed to Mr. Whittenbarger "for reviews, updates and

5      edits," so it could be made into a user guide document;

6      right?

7      A.     Yes.

8      Q.     Okay.

9      A.     That's what it says.

10     Q.     All right.  And so let's look at Plaintiffs'

11     Exhibit 5 which has been preadmitted.

12     A.     Yes, I'm there.

13     Q.     Now, this is now again in June 2006, this same

14     period of time, this is June 28th, and -- all right.  And

15     we might even have looked at this yesterday, but I want to

16     look at another part of it, page 4.  Okay?

17     A.     Yes, I'm there.

18     Q.     The "sounds good paragraph" at the top.

19                Okay.  This is Mr. Chiu writing to you.

20                "Sounds good.  We're getting the wheels rolling

21     on some of the tasks for them already."

22                And he talks about, of course, the creation and

23     delivering of the SupportWeb extract DVD?

24     A.     Yes.

25     Q.     Now, that DVD refers you're downloading from Siebel

1    SupportWeb, and you're putting it on to DVDs; right?

2    A.    Yes.  For the customers we would put the files

3    they're entitled to onto a DVD and then ship it to the

4    customer.

5    Q.    So in this case, you're creating one DVD, and as he

6    says in the next paragraph, "Once packaged, we use that

7    extract as the basis of the DVD for Albridge, Brandes,

8    Caterpillar and now FileNet."

9          Right?  So you're doing an extract, you're

10   creating one DVD, and you're giving copies of the same

11   things to multiple customers; correct?

12   A.    Yes, all of them were entitled to the same files.

13   Q.    All right.  And that's because -- and you say that,

14   these are all Siebel licensees, and you're saying that they

15   were entitled to this under the Siebel license.  Is that

16   your testimony?

17   A.    Yes, because they were all on support and ended

18   support around the same time.  So all the files that were

19   available up to that time were then put on that DVD and

20   shared with all --

21   Q.    Right.  But you would use one customer log-in to the

22   Siebel SupportWeb, download, and then give it to multiple

23   customers; right?

24   A.    Yes, in this particular design early on in the

25   company, that's why I mentioned this was different than as

334

```
1    it evolved over time, because we did use one company's

2    log-in -- all of them had log-ins, but it used one to do

3    this extract for all of them, yes.

4    Q.    All right.  In fact, let's look at Exhibit 7.

5    A.    Uh-huh.

6    Q.    Which has been preadmitted, so we can look at this

7    on the screen.

8              Let's start at the back of this email, page 2.

9    It takes a little bit of work, but be patient with me.

10             This is Mr. Whittenbarger with Mr. Chiu and

11   Mr. Slarve.  Do you see that?

12   A.    Yes.

13   Q.    It says July 10, 2006, a little bit after late June.

14             And he's saying -- he's talking about the

15   SupportWeb extract and how it's scheduled and running each

16   day.  Do you see that?

17   A.    Yes.

18   Q.    And you're using the Brandes user name and password;

19   right?

20   A.    That's what it says.

21   Q.    Okay.  And he says, "Just curious what our policy is

22   for using user name/password of client whose support has

23   expired.  Should I leave it running under their username

24   for now?"

25             So the Brandes password had expired; correct?
```

1     A.     That's what it says, yes.

2     Q.     So what Mr. -- I believe it's Mr. Whittenbarger, and

3     Mr. Slarve responds, he gives the Leads Customer Growth

4     password; right?

5     A.     Yes, that's what it says, that they -- apparently

6     they decided not to use the Brandes and switched to another

7     password for a customer who has live support.

8     Q.     And Leads Customer Growth at this point wasn't even

9     operating the Siebel software, were they?

10    A.     No, but they were a licensee, and they did have

11    support they had paid for.

12    Q.     All right.  So you are using the Leads Customer

13    Growth password to access the Siebel support website and

14    download all of those support materials so that you could

15    hand them to multiple customers.  That's correct, isn't it?

16    A.     Yes.

17    Q.     All right.  And it's your understanding that if a

18    customer's log-in credential is used to download materials

19    that that customer was not licensed to, that would be

20    improper; right?

21    A.     Yes.  But, again, coming back to -- specifically to

22    the way the Siebel website worked in those early years, we

23    had only one methodology to get that information.

24    Q.     All right.  And, for example, if we can look at 214.

25                   COURTROOM ADMINISTRATOR:  It's not admitted.

```
 1              MR. ISAACSON:  Not admitted.

 2              Do we have an objection?

 3              MR. WEBB:  No objection, Your Honor.

 4              THE COURT:  It is admitted.

 5          (Plaintiffs' Exhibit 214 received into

 6          evidence.)

 7              MR. ISAACSON:  So please put this on the screen.

 8     BY MR. ISAACSON:

 9     Q.    Now, I'm going to go to page 5 of 6.  And just

10     looking at this, this -- what you're discussing here is

11     just basically what the package is going to look like when

12     you give the customers the Siebel SupportWeb DVD; right?

13     A.    Yes, apparently.

14     Q.    And on page 5 --

15              MR. ISAACSON:  You can blow up that part in the

16     middle.

17     BY MR. ISAACSON:

18     Q.    This is what you're going to tell -- this is

19     actually what you're going to give the customer.  It's

20     going to be on top of the DVD or attached to the DVD

21     somehow, or CD.

22              "This CD gains an archive of data available to

23     Oracle/Siebel Support Services customers for their use and

24     download on Oracle's Siebel SupportWeb website as of" -- a

25     certain date.  "The data has been extracted and placed on
```

1    the media by Rimini Street, Inc., at the request of Siebel

2    licensee and Rimini Street client FileNet corporation."

3             This is specifically for FileNet, but you would

4    give this same -- for Albridge, you would say at the

5    request of Albridge; right?

6    A.    Yes.  FileNet's IBM.  Yes.

7    Q.    But you weren't actually -- when you -- when you

8    went and got the DVD information, you weren't actually

9    using FileNet's user name or passwords; right?  You were

10   using, like, Leads Customer Growth?

11   A.    Apparently so, yes.

12   Q.    And you told customers, because you agreed, that the

13   entire contents of this media are the intellectual and

14   copyrighted property of Oracle Corporation?

15   A.    Yes, I believe there's several discussions around

16   the fact that we wanted to make sure that Oracle's

17   intellectual property copyright was carried.

18             MR. ISAACSON:  All right.  Can we go back to

19   Ravin 1 in that slide.  And put the environments in there,

20   Matt.

21             We've also listed who got these DVDs from your

22   first customers.  Would you put those in there.

23        (Off the record.)

24             THE COURT REPORTER:  Your Honor, could we have a

25   short break?

1          THE COURT:  Well, I'm sure there's others who

2    having a similar thought.

3          We'll take a short break, ladies and gentlemen,

4    approximately -- 10 to 20 minutes, depending on when you

5    are ready.

6          The usual admonition not to discuss the case, or

7    allow it to be discussed in your presence applies, and keep

8    an open mind as we go through the testimony and evidence.

9          We'll take our recess.  Please let my court

10   clerk Dionna know when you're ready to return, and that's

11   what we'll do.  You may step down.  Thank you.

12          COURTROOM ADMINISTRATOR:  Please rise.

13          (Jurors exit courtroom at 9:44 a.m.)

14          (Recess from 9:44 a.m. until 9:59 a.m.)

15          (Jurors enter courtroom at 9:59 a.m.)

16          COURTROOM ADMINISTRATOR:  Court is again in

17   session.

18          THE COURT:  All right.  Have a seat, please.

19          The record will show we concluded the first

20   morning break.  The jury's all present.  Counsel and

21   parties are present.  We're in open court.

22          And, Mr. Isaacson, you may continue with your

23   cross-examination of Mr. Ravin.

24          MR. ISAACSON:  Thank you, Your Honor.

25          Can we get Ravin Exhibit 1 up there again?  We

1    have the environments, we have the DVDs.

2              All right.  There's the customers, early

3    customers who got those DVDs.

4    BY MR. ISAACSON:

5     Q.    And you also had the library in existence during

6    this period; right?

7              MR. ISAACSON:  Matt, can you put that up?

8    BY MR. ISAACSON:

9     Q.    Correct?

10    A.    Excuse me?

11    Q.    You had that library we've been discussing, the

12    Siebel software, during this period; right?

13    A.    Again, I don't know exactly what we had in the

14    repository for the installation media.

15    Q.    Okay.  The -- let's talk about those two clients

16    there, LCG and Beekley.

17              Oh, before that, I just want to finish one

18    thing.  448, PTX 448, which has been preadmitted so it can

19    go right on the screen.

20              January -- I'm sorry, my page flipped here.  I'm

21    going to ask you to look at 744.

22    A.    Seven --

23              COURTROOM ADMINISTRATOR:  744.

24              MR. ISAACSON:  Yes.  Which has also been

25    preadmitted.

```
 1                  THE WITNESS:  I'm sorry.  You said 77 --
 2                  MR. ISAACSON:  744.  It's in your second binder.
 3                  THE WITNESS:  I have 726 to 789.
 4                  COURTROOM ADMINISTRATOR:  744.
 5                  MR. ISAACSON:  All right.  Will someone get me a
 6     744, and I'll come back to that, sir.  Will someone get me
 7     multiple copies of 744.  I'll come back to that.
 8     BY MR. ISAACSON:
 9     Q.    Let's talk about that first customer, Leads Customer
10     Growth.
11     A.    Yes.
12     Q.    Now, Mr. William Leake was the CEO of Leads Customer
13     Growth?
14     A.    Yes, he was.
15     Q.    He -- you knew him, I believe, since the third
16     grade?
17     A.    Yes, indeed.
18     Q.    He was the first customer of Rimini Street?
19     A.    Yeah, he did agree to be our first customer.
20     Q.    All right.  And it's hard to get your first
21     customer.  That's your view; right?
22     A.    I think anyone who has ever started a business would
23     agree that getting the first customer is the most difficult
24     thing you can do.
25     Q.    And Leads Customer Growth was in the business of
```

1    Internet marketing services; right?

2    A.    Yes.

3    Q.    And they wanted you to pay for their services?

4    A.    Yes.

5    Q.    Okay.  And you wanted a first customer?

6    A.    Yes.  It was a good marriage, yes.

7    Q.    All right.  So what happened was you agreed to pay

8    LCG, and they agreed to go on Siebel support?

9    A.    Well, they were looking for a new CRM system, so it

10   looked like a good opportunity to get them on Siebel and

11   take the support and have a first referenceable customer,

12   yes.

13   Q.    Was that a yes, sir?

14   A.    I'm sorry.  First referenceable customer, yes.

15   Q.    Was that a yes, sir?  You agreed to pay them and

16   they agreed to pay you?

17   A.    Yes.

18   Q.    All right.  And they were not on Siebel software at

19   this time.  They didn't have any Siebel software, they

20   didn't have a Siebel license, they weren't using it.  It

21   was your idea that they go get Siebel; right?

22   A.    Well, I think we talked about it, and they agreed

23   that if we helped them with the -- afford the software and

24   helped them with the service, yes, that they could afford

25   to do this.

1    Q.    Was that a yes?  That was your idea that they go get

2    Siebel software?

3    A.    Yes.

4    Q.    Okay.  You weren't offering them 50 percent off of

5    something, they weren't even paying for it?

6    A.    No, they wanted to put in a CRM system so we worked

7    an arrangement, yes.

8    Q.    It was your idea that they get the Siebel; right?

9    A.    Actually, I don't remember if it was exactly my

10   idea, but I know we came up with it together, so I

11   certainly was part of that, yes.

12   Q.    And what happened was that had you agreed that they

13   would -- you agreed with them that they would purchase

14   Siebel software, but you would, in effect, be paying for it

15   because you would be buying their marketing services.

16   That's what happened; right?

17   A.    Yes.

18   Q.    And what happened then was that you said your

19   company set up a conference call with Siebel in which your

20   people were going to pretend that they were working for

21   Siebel -- for Leads Customer Growth?

22   A.    Not pretend, they were acting as consultants as part

23   of our overall implementation plan, yes.

24   Q.    But they were going to pretend that LCG was actually

25   interested in getting a license; right?

1    A.    Well, they were interested in getting a license and

2    ready to buy one, yes.

3    Q.    Well, they weren't interested in getting a license,

4    they were interested in having you pay for their marketing

5    services, and you said, well, fine, go get a Siebel license

6    and we'll work that out; right?

7    A.    No, that's not true.

8              MR. ISAACSON:  All right.  Let's look at 537.

9              This has been preadmitted so we can put this on

10   the screen.

11             All right.  And can we blow up --

12             THE WITNESS:  One second, please.

13             MR. ISAACSON:  Blow up the top of it.  It's

14   right behind -- right behind 497.

15             THE WITNESS:  Got it.  Thank you.

16   BY MR. ISAACSON:

17   Q.    All right.  So let's go to the bottom, "Laurent."

18   Mr. Lee is writing to someone at Siebel.

19   A.    Yes, I see that.

20   Q.    And he says, "I'll have a senior" -- and he's

21   talking about a phone call.  Do you see that?

22   A.    Yes.

23   Q.    "I'll have a senior member of my technical team

24   there, as well as someone who has installed Siebel at other

25   companies before."

344

```
 1              All right?  The senior member of his technical
 2   team was someone from your company; right?
 3   A.    That's correct.
 4   Q.    All right.  And then Mr. Shay -- that's one of your
 5   cofounders; right?
 6   A.    Yes.
 7   Q.    This is January 2006 -- says,
 8              "Can we have a call with the Siebel sales guy
 9   and Bill Leake at LCGrowth to get prices for Siebel...."
10              "We're going to say that LCGrowth is interested
11   in getting a license.  Bill is the CEO of LCGrowth, I will
12   be on his tech staff.  You will be the one doing the
13   implementation as a consultant."
14              He's actually going to say that he's on the
15   technical staff of LCGrowth; right?
16   A.    Yes, which was true.
17   Q.    Okay.  He's not on the technical staff of LCGrowth.
18   He doesn't work for LCGrowth, does he?
19   A.    He doesn't have to, he's acting as a consultant.
20   Q.    I see.  So you're going to tell them that he works
21   for LCG -- that he's on the tech staff of LCGrowth, but
22   you're not going to say this is for outside support; right?
23   A.    Well, I don't know why we would do that.  They're
24   simply working to get a license put in place.
25   Q.    All right.  And let's look at 538, the next tab.
```

1                Now, what happened, what we saw in the previous

2    email, is that -- that Mr. -- that Laurent had been copied

3    on that email where you said we're going to say that

4    LCGrowth is interested and I will be on his tech staff.

5    Right?

6    A.    Laurent being the Oracle sales rep, yes.

7    Q.    Right.  Right.

8                So what happened was Mr. Shay said this, and he

9    accidentally copied someone from Oracle; right?

10   A.    Yes.

11   Q.    And you weren't happy about that.  You did not want

12   Oracle to know what Mr. Shay told you.  You didn't want

13   Oracle to know that you were -- that you're going to say

14   that LCGrowth is interested in getting the license.  You

15   did not want him to -- Oracle to know that Mr. Shay was

16   not -- was going to say I'm on his tech staff; right?

17   A.    No, the client didn't want to disclose that Rimini

18   Street was involved in the transaction because they were

19   afraid that Oracle wouldn't sell them the license.

20   Q.    Right.  The client.  You're referring to your

21   friend, Mr. Leake?

22   A.    Yes.  Well, we weren't that close.  He was the guy

23   they chased around the schoolyard instead of me, so it was

24   good.

25   Q.    All right.  So on 538 you said, "I'm not happy.  Tom

346

1       knows.  These kinds of errors are serious stuff."

2               You didn't want Oracle to know what you were up

3       to; right?

4       A.    The client didn't want Oracle to know that Rimini

5       Street was involved.

6       Q.    All right.  And let's look at 539, on this subject,

7       what the client wanted.

8               So this is between Mr. Leake and you at the

9       beginning of January 2006.  All right?

10              He's saying at the bottom -- and this is

11      actually February 1st, 2006, I'm guessing, because it's

12      February 2nd up above.  But, in any event, it's in the

13      beginning of 2006.

14              "If you aren't disclosing your customer name,

15      should I go ahead and sign the Rimini agreement tonight

16      even ahead of purchasing the actual licenses?"

17              And what you're talking about here is you're not

18      going to disclose LCGrowth as a customer of Rimini Street,

19      announce that you have your first customers.

20              You're not going to do that because you want to

21      go ahead and -- but you're not going to do that, but you're

22      going to go ahead and sign the agreement with Rimini;

23      right?

24      A.    Yes, that's what it says, to sign the agreement with

25      Rimini Street first before they got their Oracle license

1    done.

2    Q.    Right.  You were trying to keep it under wraps that

3    you had this customer until they got their Oracle license?

4    A.    That was the -- seems to be the -- what was written,

5    yes.

6    Q.    And then 5355, which would be in your second binder?

7    A.    Did you say 5 --

8    Q.    5355.

9            COURTROOM ADMINISTRATOR:  It's not admitted.

10           MR. ISAACSON:  It's not admitted.  I'm going to

11   ask -- can I have a minute to talk to --

12           THE COURT:  Yes.

13           MR. WEBB:  I'm sorry, Judge, can we approach?

14           THE COURT:  Yes.

15        (Sidebar conference held as follows:)

16           MR. WEBB:  This is related a little bit to

17   TomorrowNow.  To be clear, we have no problem with them

18   saying that TomorrowNow was on the market and it was a

19   competitor.  Our problem becomes the lawsuit, the

20   concession of infringement --

21           MR. ISAACSON:  I'm not going beyond that right

22   now.

23           MR. WEBB:  So if you're good with that.  If

24   you're good with that, I'm good with that.

25           THE COURT:  All right.  I understand.

1          MR. WEBB:  Thank you.

2       (Sidebar conference concluded.)

3          MR. ISAACSON:  Move to admit 5355.

4          MR. WEBB:  No objection, Your Honor.

5          THE COURT:  It's admitted.

6       (Plaintiffs' Exhibit 5355 received into

7       evidence.)

8          MR. ISAACSON:  Let's put this on the screen.

9   BY MR. ISAACSON:

10   Q.   This is February 3rd, 2006, another day later.

11       All right.  Mr. Shay is asking you to -- asking

12   you, is this support deal, referring to the one with

13   LCGrowth, one we want to advertise, or should we wait for a

14   bigger real customer; right?

15   A.   Yes, that's what it says.

16   Q.   He knew he didn't have a real customer yet; right?

17   A.   Well, a real customer means we sign an agreement, we

18   get paid.  So it wasn't the best customer we'd like, but

19   it's a start.

20   Q.   Well, you weren't getting paid.  Money was just

21   changing hands; right?  You were giving to them, they were

22   giving money back.  It wasn't a real customer?

23   A.   It's not uncommon in the software industry.

24          MR. ISAACSON:  I object.  I would ask that the

25   answer be stricken on the grounds of foundation and --

```
 1              THE COURT:  It will be stricken and the jury
 2    admonished to disregard it.
 3              MR. ISAACSON:  All right.
 4    BY MR. ISAACSON:
 5    Q.    Just with respect to you, all that -- they weren't
 6    actually paying you.  The money was just going back and
 7    forth, and there was no net payment to your company; right?
 8    A.    Well, I do believe they wrote us checks and paid for
 9    the services, yes.
10    Q.    Did you hear my question, sir?
11              Okay.  I asked you about net payments.  In other
12    words, the money -- the same amount of money was going back
13    and forth, or, in fact, more money was going in the
14    direction of LCGrowth than was coming back to you; right?
15    A.    That I don't know how much changed hands from one
16    way or the other.  They billed us for marketing services
17    which they delivered, and we delivered service to them,
18    yes.
19    Q.    Right.  We'll come back to whether you delivered
20    service to them.  But no net amount of money was coming
21    your way from this customer; right?
22    A.    I don't know that to be true.
23    Q.    This customer had zero-dollar value to Rimini
24    Street; right?
25    A.    I don't know that for a fact.
```

1    Q.    How many -- you don't know that for a fact?  It's

2    your first customer?

3    A.    Well --

4    Q.    You don't know for a fact whether that customer had

5    zero-dollar value?

6    A.    No.  We billed them for services, they billed us for

7    services.  I don't know what that net was.

8    Q.    The actual deal that was happening here, though, you

9    agree with me on this, is that Rimini Street was in effect

10   indirectly paying Leads Customer Growth to purchase Siebel

11   software?

12   A.    We were reimbursing them for the costs, uh-huh.

13   Q.    Now, going back to 5355?

14   A.    Uh-huh.

15   Q.    Okay.  Mr. Shay asks you should you wait for a

16   bigger real customer, and one of the concerns you had about

17   disclosing publicly LCG as a customer is that there was

18   another company in the marketplace, TN, that's TomorrowNow;

19   right?

20   A.    Yes.

21   Q.    Okay.  And that's a company you know well because

22   you were the former CEO of that company; right?

23   A.    No, I was never the CEO.

24   Q.    You were the former head of support for that

25   company?

1    A.    No, I wasn't.

2    Q.    Tell me your title with TomorrowNow.

3    A.    I was president.

4    Q.    President.  Sorry.

5          And you were one of the founders of support at

6    TomorrowNow?

7    A.    Yes, for PeopleSoft and JD Edwards, yes.

8    Q.    I'm sorry.  You weren't one of the founders, you

9    were the founder of support at TomorrowNow?

10   A.    No, I actually had a partner, 50 percent, yes.

11   Q.    All right.  So you know folks at TomorrowNow, and

12   so your concern -- and Mr. Shay is telling you they're

13   going to know that LCG is not a real customer?

14   A.    Well, he's going to know that it's not IBM.

15   Q.    Okay.  That's not what Mr. Shay said; right?

16   They're going to actually know -- they're going to look up

17   who this is.  They're going to figure out this is not a

18   real customer.

19   A.    They're going to figure out, it's a very small

20   company, that's for sure.

21   Q.    Okay.  The -- now, before the Siebel license was

22   entered, you were the one actually acting as a business

23   advisor to LCGrowth about those license terms; right?

24   A.    I don't recollect exactly, but I assume so.

25   Q.    Okay.  And in terms of the marketing agreement that

1    you entered -- I'm sorry, not the marketing agreement, in

2    terms of the support agreement you entered with LCG, the

3    total amount that LCG agreed to pay Rimini Street was $100

4    a month for a year, $1200; right?

5    A.    I don't remember the exact terms, but that sounds

6    about right.

7              MR. ISAACSON:  Okay.  I guess to save time, you

8    can respond to this later, I'll move to admit PTX 863 which

9    is that contract.

10   BY MR. ISAACSON:

11   Q.    Then as we said --

12             THE COURT:  Wait a minute.

13             MR. WEBB:  Give me a few seconds to get there.

14             MR. ISAACSON:  I'm not going to ask you any

15   questions about it, sir.

16             THE COURT:  Is there any objection to 863?

17             MR. ISAACSON:  I don't have it on my list as

18   preadmitted, so I don't know.

19             COURTROOM ADMINISTRATOR:  I have it withdrawn

20   from --

21             MR. WEBB:  That's what we have too.

22             MR. ISAACSON:  Oh, I'm withdrawing it because --

23   we can take that up later, Your Honor.

24   BY MR. ISAACSON:

25   Q.    Now, LCG actually had no use for the Siebel software

1    because it did not implement the software; right?

2    A.    That's incorrect.

3    Q.    Are you saying that LCG Growth would have had a use

4    for the software?

5    A.    Yes.  They were a business, and they wanted to build

6    a CRM system, but they didn't implement Siebel because it

7    was too expensive in the end, and they bought a competing

8    product.

9    Q.    The -- so it's your testimony that LCG Growth would

10   have had a use for the Siebel software; is that right?

11   A.    Yes.  Every business has to care for its customers

12   and keep track of its contracts, and LCG was a business.

13            MR. ISAACSON:  All right.  I need to -- the

14   depositions.

15            Your Honor, I don't know if you've got copies of

16   the depositions, the deposition for November 18th of 2011.

17            COURTROOM ADMINISTRATOR:  Of who?

18            MR. ISAACSON:  Mr. Ravin.

19            Your Honor, at page 428, beginning at line 18,

20   we would like to play this for the witness, running through

21   line 6 of the following page.

22            THE COURT:  You may do so.

23            MR. ISAACSON:  All right.  Matt.

24   BY MR. ISAACSON:

25   Q.    Now, you -- this is more for the jury than you, but

1    you were deposed in this case, and you were deposed under

2    oath, and you gave testimony under oath; correct?

3    A.    That's correct.  Several times.

4          MR. ISAACSON:  Matt, go ahead and display.

5          (Videotape deposition of Seth Ravin played.)

6    BY MR. ISAACSON:

7    Q.    And you testified previously under oath, you said

8    you didn't -- you wouldn't be able to say what LCG Growth

9    would have any use for.

10         Today you know -- your testimony is you do know

11   what they had use for; is that right?

12   A.    No, I think you're misunderstanding.

13         I said that they are a small business, and every

14   business has to take care of its customers.

15         I was referring specifically of the question of

16   what would LCG use the software for day to day.

17         I was talking generally.  Any business needs to

18   take care of its customers.

19   Q.    All right.  So when you testified under oath

20   previously, you couldn't say what LCG Growth would have --

21   how it would use the implemented software.

22         Today you're saying but generally they would

23   have used it?

24   A.    Yes.  Every business has to care for its customers

25   to keep track of records.

1    Q.    So previously, specifically you didn't know what

2    they would use it for, but today generally they would have

3    had a use for it?

4    A.    It's CRM software which is designed to take care of

5    customers.  Yes.

6    Q.    Okay.  Plaintiffs' Exhibit -- now, LCG Growth never

7    implemented the Siebel software; right?

8    A.    That's correct.  They implemented competitor

9    software.

10   Q.    And you don't recall Rimini ever providing any

11   support services to LCG Growth; right?

12   A.    Actually, we worked with them to design an

13   implementation plan, and we were going to implement that

14   software for them, but they ran out of money and couldn't

15   afford it, it was too expensive.

16   Q.    Did Rimini Street support LCG Growth on its software

17   after May 2006?

18   A.    I don't remember the exact date, but they never

19   implemented the software.

20   Q.    All right.  Well, for the exact date let's look at

21   Plaintiffs' Exhibit 218.

22   A.    I'm sorry.  Which number was that?

23   Q.    218, which has been preadmitted.

24   A.    Yes, I'm there.

25   Q.    All right.  And does this tell you that by May 2nd,

```
 1    2006, that LCG Growth had decided not to proceed with the
 2    implementation?
 3    A.    Yes, that's what it says in my email.
 4    Q.    All right.  And after that, Rimini Street kept a
 5    copy of LCG's Siebel software on the Rimini systems; right?
 6    A.    According to whatever our decommissioning plan was,
 7    yes.
 8    Q.    And LCG -- Rimini used LCG's name then to attend --
 9    to register as representatives of LCG at Oracle events;
10    right?
11    A.    I don't remember exactly, but it wouldn't be
12    uncommon to use a customer's credentials to enter an event,
13    yes.
14    Q.    All right.  And these are events where you get
15    information about what Oracle's doing and to help you with
16    your business and supporting software; right?
17    A.    Yes.  I mean, they're general events that customers
18    are allowed to bring their support to, yes.
19    Q.    And LCG Growth never used Rimini Street support, but
20    it provided your first references; right?
21    A.    Provided us references for being a great company and
22    for being a worthy partner, yes.
23    Q.    Okay.  Let me get that straight.
24          So they recommended you as a great company and a
25    worthy partner.
```

```
 1              This was a customer, a customer, who never used
 2   the Siebel software, who never got support for the Siebel
 3   software, and who you were paying to be a customer.
 4              That was your first references who told other
 5   companies for you that you are a great -- a great company,
 6   and --
 7   A.    Great business partner.
 8   Q.    -- and a great partner.  That's what happened?
 9   A.    Sure.  Yeah.
10   Q.    Okay.
11   A.    I mean, that's the first customer.  You do what you
12   have to to get a first customer going.
13   Q.    And what you had -- no, sir.  You don't always do
14   what you have to do.  You can be honest about it, can't
15   you?
16              You don't pay people to be your first customer
17   and then have them go tell other people that you're a great
18   company and a great partner and they're your customer?
19   A.    Well, Oracle put out a piece as well.
20              MR. ISAACSON:  Your Honor, my question is about
21   this company.
22              THE COURT:  The response will be stricken.
23   BY MR. ISAACSON:
24   Q.    Okay.  What you did was dishonest, sir, wasn't it?
25              You paid someone to say they were your first
```

1    customer, and they went out and gave your first references

2    and said you were a great company and a great partner.

3    A.    That is not a way to characterize it in my opinion.

4    Q.    All right.  You do agree that they gave you your

5    first references?

6    A.    Yes.

7    Q.    They gave you your references, for example, for

8    Albridge Solutions; right?

9    A.    If that was the second customer, then I bet we used

10   them to help us close that deal.

11   Q.    Well, I think they were third and fourth.  Your

12   second customer was Beekley.  We'll come back to that.

13   A.    Yes.

14   Q.    By the way, in terms of how much you paid LCG

15   Growth, did you pay him more than a million dollars?

16   A.    Pay him more than a million dollars?  No.

17   Q.    You're sure of that?

18   A.    That I'm pretty sure of.  We didn't have that kind

19   of money.

20            MR. ISAACSON:  Okay.  I would like to show him

21   from his deposition page 419, the same, November 18th, '11,

22   beginning at -- I don't have the video cut so I would show

23   him the transcript, line 6 through line 15.

24            COURTROOM ADMINISTRATOR:  Which page is that,

25   Counsel?

1              MR. ISAACSON:  Page 419.

2              COURTROOM ADMINISTRATOR:  Thank you.

3              THE COURT:  You may do so.

4    BY MR. ISAACSON:

5    Q.    All right.  Do you have page 419 in front of you,

6    sir?

7    A.    Yes, I do.

8    Q.    You were asked the question,

9              "How much has Rimini Street paid Mr. Leake and

10   his company from the inception of the relationship?

11             "ANSWER:  I wouldn't know.

12             "QUESTION:  Approximately?

13             "ANSWER:  I wouldn't know.

14             "QUESTION:  Is it more than $100,000?

15             "ANSWER:  I wouldn't know.

16             "QUESTION:  Is it more than a million dollars?

17             "ANSWER:  I wouldn't know."

18             You said under oath that you didn't even know

19   whether you paid him more than a million dollars; right?

20   A.    No.  I don't know.

21   Q.    And those customers like Albridge who got references

22   from LCG Growth, you never told them that you were paying

23   this customer to be your first customer.  You never told

24   them that, did you?

25   A.    That's your characterization, not mine.

1    Q.    I'm asking you what you told your customers, the

2    customers who got references from LCGrowth.  You never told

3    them that you were paying LCGrowth, did you?

4    A.    We didn't pay LCG Growth.  We worked out an

5    arrangement, and they went ahead and gave us the reference

6    that they felt comfortable giving.

7    Q.    I understand they felt comfortable giving it, but

8    you are putting money in their -- you just said we weren't

9    paying them.  You put money in their pocket, sir, didn't

10   you?

11   A.    We were a customer of LCG for many, many years, yes.

12   Q.    And you didn't tell the customers who were getting

13   references that they -- that you were paying LCG Growth

14   money.  You didn't tell them that, did you?

15   A.    As far as the fact that they were a vendor of ours

16   as well?  No, I'm not sure whether I did or didn't tell

17   them that.

18   Q.    All right.  And you actually had Mr. Leake speak to

19   the press for you, didn't you?

20   A.    Again, I don't recollect, but it wouldn't surprise

21   me.

22   Q.    Do you recall that in August 2006 that he said in an

23   article -- this is months after he's not implementing the

24   Siebel system, that he retained Rimini Street for

25   maintenance believing his support will help him stretch the

1    life of the application for five to ten years.

2              Do you remember him making statements like that?

3    A.    Don't remember it specifically.

4              MR. ISAACSON:  All right.  Let's look -- is 1431

5    in the binder?  I think that's separate, right.

6    BY MR. ISAACSON:

7    Q.    By the way, while we're getting that, Mr. Leake is

8    now a vice-president at Rimini Street; right?

9    A.    Actually, I don't know his current title.  He is --

10   I think he's reduced to a part-time basis at this point.

11   Q.    He has been a vice-president at Rimini Street;

12   right?

13   A.    Yes.  He joined us a couple years ago, yes.

14   Q.    And he's still working on a part-time basis for you?

15   A.    I believe that's his status, yes.

16   Q.    All right.  And after -- and after he -- the

17   decision was made in May 2006 that LCG Growth was not

18   implementing the Siebel software, you kept Siebel -- you

19   kept LCG Growth on your customer list that you shared with

20   other customers?

21   A.    Sure.  It was a signed contract.

22   Q.    All right.  So after May 2006, they don't have

23   Siebel software, you're not providing them any services,

24   and you have a customer list that you're sharing with other

25   customers, and they're on it?

1    A.    Yes.

2    Q.    And you also kept them on your website.  You had a

3    website that would -- you sort of scroll through customers,

4    and LCG Growth was one of them?

5    A.    Yes.

6              MR. ISAACSON:  Okay.  Do we have --

7              COURTROOM ADMINISTRATOR:  It's been withdrawn on

8    the list.

9              MR. ISAACSON:  I'm not seeing to admit it, I'm

10   going to show it to -- well, I'll come back to that.

11   BY MR. ISAACSON:

12   Q.    Let me do the -- let's talk about those local

13   environments on the Rimini system some more.

14              Now, I think we've agreed that you had those

15   environments for your first customers, and they had Oracle

16   software, copies of Oracle software on them; right?

17   A.    We agreed on that for JD Edwards and Siebel, we had

18   for the early customers.  But PeopleSoft we kept all the

19   way until we stopped using environments locally on our

20   systems in July of '14.

21   Q.    Now, during this time in your early years, and

22   actually 2006 through 2011, when you had customers, you

23   would give them backups of their software; right?

24   A.    I'm sorry.  Can you explain what you mean by that?

25   Q.    So you would give them backup copies of their

```
 1   software so they could have a safe backup so they could
 2   store that in a safe place; right?
 3   A.    No, we did not provide backups to the customers.
 4   Q.    All right.  Did you provide any kind of archives to
 5   the customers?
 6   A.    Yes, we gave them copies of their download archives
 7   which we packaged up and delivered to them, yes.
 8   Q.    And you would ship those on USB drives?
 9   A.    I think they were DVDs in the early days and
10   probably switched to USB as technology changed, yes.
11   Q.    All right.  And you would then keep your own backups
12   with an offsite storage company; right?
13   A.    I don't think those went to an offsite storage.
14         Are you talking about the physical software that
15   Oracle shipped us?
16   Q.    No, I'm talking about you maintained backups of your
17   local environments in a tape format; right?
18   A.    Oh, yes, our own backups of our systems, yes.  They
19   were stored onsite, and then, because there's so many of
20   them, they would be shipped to an offsite storage, a
21   special protection unit, yes.
22   Q.    In a tape format?
23   A.    I believe they were tape format.
24   Q.    And then you would keep the functioning local
25   environments on your system separate from those tapes that
```

1    you sent other places?

2    A.    Yes, on our own servers and our data center, yes.

3    Q.    All right.  And those -- the environments that you

4    were using at Rimini were used in order to support

5    customers; right?

6    A.    That was their full design and purpose, yes.

7    Q.    All right.  And that included troubleshooting for

8    customers?

9    A.    Yes.

10   Q.    Okay.  And specifically for Siebel customers, you

11   used Siebel environments for troubleshooting; correct?

12   A.    That was their design, but I don't know actually how

13   they were used day to day, yes.

14   Q.    All right.  Well, let's talk about the design first,

15   and then we'll talk about the day to day.

16             Now, by, troubleshooting in layman's terms, that

17   means that you have an environment that's separate from the

18   operating system and so you can look at it and say why is

19   the operating system having troubles, I'll look at this

20   other copy of it and work with it and see if I can figure

21   out what the trouble is over there.

22             Is that a fair summary?

23   A.    Well, a little bit different.

24             Essentially, yes, you're taking the software,

25   you're playing with it to see if you can figure out what's

```
 1    going wrong, what the customer had called in and reported,
 2    yes.
 3    Q.    Right.  Exactly.  You're playing with it.
 4            And once you play with that software, that's not
 5    software that you would use for a backup purpose in case
 6    there's a hurricane or a disaster.
 7            You need a pure backup, and once you've played
 8    with that software, that's not good for that backup
 9    purpose; right?
10    A.    No, I wouldn't agree with that.
11    Q.    And once you've played with it, you've altered it,
12    and it's no longer pristine; right?
13    A.    No.  You don't necessarily make any changes to the
14    software in order to do a diagnostic with it.  You could
15    literally just be looking at it, operating it.  It doesn't
16    necessarily change any of the data.
17    Q.    It doesn't necessarily.  Sometimes it does; right?
18    A.    It could, depending on what process you run or what
19    you're looking at, yes.
20    Q.    And once you've played with it, you don't always
21    know whether you have changed it, so you don't use that
22    type of software as a backup in case of emergencies; right?
23    A.    Well, again, you have to look at the different types
24    of software.  Siebel, very different than a PeopleSoft than
25    a JD Edward.  They're very different products and
```

1     technologies here.

2     Q.    Right.  I'm talking about -- I'm probably talking

3     about any type of software.

4            But in terms of these types of software for your

5     emergency backup when you need a pristine copy that you

6     know has not been altered, you don't use software that

7     someone's been playing with; right?

8     A.    No, I don't necessarily agree with that.

9     Q.    All right.  So let's look at Exhibit 310.

10    A.    Yes, I'm there.

11    Q.    Okay.  All right.  And this is talking about your

12    customer --

13            MR. ISAACSON:  This is preadmitted, yes.

14    BY MR. ISAACSON:

15    Q.    So this is your customer, XO Communications; right?

16    A.    Yes.

17    Q.    And Mr. Whittenbarger, on the first page, is talking

18    about,

19            "One of the initial tasks we perform with new

20    clients is setting up an environment dedicated to that

21    client prior to any issues being reported, so that we are

22    already prepared once a client calls on us to troubleshoot

23    a problem."

24            That's your plan for the Siebel environments;

25    right?

1    A.    Yes, for this client, yes.

2    Q.    Okay.  And then -- so -- and what you were doing

3    here with these troubleshooting environments is you were

4    using one customer's environment to research or

5    troubleshoot problems for different customers; right?

6    A.    Well, as I said before, we would use a generic

7    environment for a particular release of the product that

8    other multiple customers would have the same license, yes.

9    Q.    All right.  And just to be clear, you would use the

10   Siebel environment, if there's trouble, someone would play

11   with it, maybe altering the system, maybe not, trying to

12   figure out what the trouble is, and you would use that

13   environment to check out troubles for a customer that had

14   software of one customer, and you would be doing that for a

15   customer -- for a different customer.

16             I'm not sure that came out good?

17   A.    Say that again, please.

18   Q.    Sure.  You had an environment for troubleshooting

19   that had a customer's software on it, call it Customer A,

20   and that would be used for troubleshooting, played around

21   with, to see what troubles Customer B was having; right?

22   A.    If they were on the same release and the same

23   license, yes.

24   Q.    Okay.  And you also installed copies of the Siebel

25   environment to learn about it, to evaluate it, to see how

1    it worked, not just for clients; right?

2    A.    Well, Dennis Chiu was head of all support for

3    Siebel, so we didn't need to learn about Siebel.  We knew

4    Siebel.  Yes.

5    Q.    All right.  You had engineers who used those

6    environments to evaluate the latest versions of Siebel

7    software, didn't you?

8    A.    Well, again, as customers would come on, they would

9    learn the software, yes.  Standard.

10   Q.    All right.  And -- but they were using it to learn

11   about the new software to help them with other customers,

12   weren't they?

13   A.    Sure.  They would use the environments that

14   customers, again, that were licensed for.  But, yeah, they

15   learned about the software.

16   Q.    And when you installed Siebel software environments

17   for those early customers such as Albridge and Brandes, you

18   told them in their contracts that they were going to have

19   development and test environments, didn't you?

20   A.    I think it was a standard part of our agreements

21   from the first contracts we ever wrote, yes.

22   Q.    Exactly.  So a standard provision of the Siebel

23   contracts, your contracts with your customers, said that

24   you would be setting up general testing and development

25   environments to support them?

1   A.    We said that we would be setting up environments,

2   yes, to support their software, yes.

3   Q.    And you specifically told them you would be using it

4   for development and testing; right?

5   A.    Yes.  That is the way it's written into the

6   contract, yes.

7   Q.    All right.

8   A.    Development, testing, and troubleshooting -- I'm

9   sorry, if it's okay for me to explain.

10  Q.    Actually, I'm going -- it's a good point, but let me

11  ask the questions.

12        We talked about troubleshooting.  Now, we're

13  talking about development and testing.

14        Testing is where you actually test and update

15  for a fix before putting it onto the actual client's

16  system; right?

17  A.    In general, yes.

18  Q.    And when you test it on one environment, you

19  potentially alter that environment, it no longer becomes a

20  pristine copy; correct?

21  A.    This is why it's unfortunately a little more

22  complicated, because Siebel -- we never delivered any code

23  updates because it's a different kind of product.  So I

24  just want to make sure we're clear.

25  Q.    But I think we agree on testing.

1           And you would test, in Siebel environments,

2    using software of customer A, whether it would work for

3    customer B who was running the same software; right?

4    A.    If you are referring to PeopleSoft, yes.  Siebel,

5    no.

6    Q.    The development is when you actually developed

7    upgrades in the environment; right?

8    A.    Well, a development environment is used actually

9    where you make changes to the code.  And, again, Siebel, we

10   didn't actually create any code, it was a different kind of

11   product.

12   Q.    So -- and -- so you develop -- I think I said

13   upgrades, I probably should have said updates.  You develop

14   updates in that environment using code?

15   A.    Yeah, or a fix if the customer -- but, again,

16   Siebel, different product.

17   Q.    All right.  So we've got troubleshooting, we've got

18   testing, and then we've got development.

19           And you told the Siebel customers in their

20   contracts, in the standard form, you were going to be doing

21   all of those in the Siebel environments; right?

22   A.    Yes, I believe so.

23   Q.    All right.  Now, you heard Professor Davis talking

24   about how Rimini would clone one customer's environment to

25   another; right?

1     A.    We would actually use a base copy of a license for

2     one customer to create environments or that generic

3     development environment for customers who had the same

4     similar license, yes.

5     Q.    Right.  You would copy the environment for customer

6     A and re-create it for customer B?

7     A.    Yes.

8     Q.    And that's cloning?

9     A.    That's cloning, yes.

10    Q.    So I won't spend much time on cloning, but let's

11    look at 58.

12          MR. ISAACSON:  All right.  I want to -- this has

13    been preadmitted.

14    BY MR. ISAACSON:

15    Q.    So this is Mr. Slepko and Mr. Chiu in 2009 talking

16    about environmental builds, and down below they're talking

17    about some specific builds, and specifically here it talks

18    about how you -- that one of your clients in Oklahoma was a

19    clone of Abilene School District?

20    A.    Yes, just as your expert testified to the way that

21    worked.

22    Q.    Right.  And that's actually on page 2.

23          And the reason we're bringing that up is

24    because -- and you saw me show a document in opening where

25    you told the Abilene School District that they were only --

1    you were only going to use their environment for them.  Do

2    you remember seeing that?

3    A.    Yes, I see that.

4    Q.    Okay.  So what happened was you told Abilene School

5    District you were only going to use their environment for

6    them, and you cloned their environment for another

7    customer; right?

8    A.    Again, these are same licensed software.

9          You're talking about the way that the software

10   is licensed versus what you're calling customer software.

11   We don't agree with that.

12   Q.    Sir, my question was, you told Abilene School

13   District that you were only going to use their software for

14   them, and then you cloned their software for another

15   client.  That's what happened; right?

16   A.    No.

17   Q.    The -- can we look at the pilot -- Ravin 2.  It's

18   going to be on the screen.  I'm sorry, it's not a PTX.

19   A.    Okay.

20   Q.    It's a slide.  Sorry.

21         All right.  I want to look -- the exhibit you

22   can look at is PTX 4896.

23         COURTROOM ADMINISTRATOR:  It's not admitted.

24         MR. ISAACSON:  Because it's large -- I'm going

25   to hand it up.  It was kind of large so we didn't want to

1    put it into the binder.

2              COURTROOM ADMINISTRATOR:  But it's on the

3    screen.  It's not admitted.

4              MR. ISAACSON:  This is a demonstrative that's

5    not been objected to.  This is not the actual exhibit.

6              THE WITNESS:  I'm on 4896.

7    BY MR. ISAACSON:

8    Q.    Okay.  Now, you would advertise and market to

9    clients who your major first clients were; right?

10   A.    Sure, as much as possible.

11   Q.    You would use the term pilot clients.  Do you

12   recognize that term?

13   A.    Yes.

14   Q.    Okay.  And this is -- this is a group of pilot

15   clients that you promoted in -- to other clients; right?

16   A.    They all look familiar, yes.

17   Q.    Okay.  The -- they had local environments, didn't

18   they, with copies of Oracle software?

19   A.    I'm not sure which ones had environments or didn't.

20   Q.    Well, we tracked it from what's been stipulated to,

21   all right?  A lot of your pilot clients had those local

22   environments with copied Oracle software, didn't they?

23   A.    Yes.  It looks like not all of them on here.

24   Q.    All right.  And then there was the Oracle library.

25   You had the Oracle library operating during this time,

1    other than when you had Beekley and Caterpillar and

2    Brandes; right?

3    A.    Yes, installation media, yes.

4    Q.    Okay.  And you had the DV -- some of these customers

5    got those DVDs from Oracle SupportWeb; right?

6    A.    That looks right, if that's what you guys found.

7    Q.    Okay.  And you heard Professor Davis talk about

8    cross-uses of fixes.  These clients were getting those

9    cross-use fixes, right, several of them?

10   A.    If they were on the same release and entitled to

11   them, yes.

12   Q.    Okay.  And you were cloning for these clients,

13   right, for several of them?

14   A.    Again, cloning was a part of our methodology,

15   certainly.

16   Q.    Okay.  What about your public clients?  Let's look

17   at Ravin 3.

18         These were your first three public clients;

19   right?  And by public I mean in the government sector.

20   A.    I thought we had one in Washington that was our

21   first -- or in the first, but if you say these are, I'll go

22   with that.

23   Q.    You called them the magical 3; right?

24   A.    Yes.  In the public sector, a lot of RFPs require

25   you have three references in order to go forward to

1    hopefully win a bid.

2    Q.    So what that means -- an RFP is a request for

3    proposal; right?

4    A.    Right.

5    Q.    So a public sector client, they need to get multiple

6    bids or offers, so they put out a request for proposal, and

7    they typically require three references?

8    A.    Yes, they look for three people who can say that the

9    service or the people or the partners are good, yes.

10    Q.    And these first three references are very important

11    because then they give you the opportunity to bid.  You

12    don't have the opportunity to go after these clients, at

13    least most of them, until you have those three references?

14    A.    Yes, but they have to be good references.

15    Q.    Okay.  And just to go over with these three, your

16    magic 3, let's look at the local environments.

17           All right.  All three had local environments

18    with copied Oracle software; right?

19    A.    Again, I don't know for a fact, but if you say so.

20    Q.    Okay.  The -- they were all -- your library with

21    people -- with Oracle software was in existence when you

22    were getting these clients; right?

23    A.    Again, I'll go with your -- if you say that's in the

24    stipulation.

25    Q.    Right.  And you actually told the City of Flint that

376

```
1   you were only going to use their Oracle software for them;

2   right?

3   A.    Well, again, only use the software that they were

4   licensed for for them, yes.

5   Q.    In fact, that was a standard message to clients;

6   correct?

7   A.    Yes.

8   Q.    And cross-uses of fixes, Professor Davis, all three

9   of them got that; right?

10  A.    If that's what it says, yes.

11  Q.    And then cloning.

12        Okay.  All three had cloning, but all three were

13  told we're only going to use your software for you?

14  A.    Yes.  The software that they're licensed for, that's

15  correct.

16  Q.    And then you cloned it for someone else?

17  A.    Well, again, this -- we may be going through

18  semantics here, but from our perspective, it was Oracle

19  licensed software that they all had the same license to,

20  yes.

21  Q.    So from your perspective, it was okay to clone even

22  when you were telling these clients across the board we're

23  only going to use your software for yourself, that it was

24  okay to use it for someone else?

25  A.    There's no inconsistency there.  They had the same
```

1     license.  So we did not use anything particular to that

2     client for another client that wasn't licensed for the same

3     software.

4     Q.    You didn't use it, you actually took the City of

5     Flint's software, copied it and cloned it for someone else;

6     right?

7     A.    That's not the City of Flint's software, it's

8     Oracle's software.

9     Q.    Okay.  You took the City of Flint's licensed

10    software that you got from the City of Flint and cloned it

11    for someone else; right?

12    A.    We cloned it.  But, again, this was the same license

13    that every other client with the same license had.

14    Q.    All right.  Let me make sure we've nailed down this

15    point.  You would tell this customer -- so City of Flint

16    would get its software from Oracle, either directly or

17    through you; right?

18    A.    They would take delivery of it through a DVD,

19    download, et cetera, yes.

20    Q.    And then you said we're only going to use this for

21    you; right?

22    A.    We said that we're only going to use the software

23    you're licensed for for you.  We will not give you license

24    to things that you are not entitled to.

25    Q.    And then you took their software, and you put it in

```
 1   testing, development, and troubleshooting environments;
 2   right?
 3   A.    We put a copy of the same license, yes.  It may not
 4   have been direct media from that customer, but it was the
 5   same license, yes.
 6   Q.    But -- and then you copied the -- you took an exact
 7   clone or copy of the City of Flint's system that was only
 8   going to be used for them, and you gave it to other
 9   customers; right?
10   A.    Well, we're coming back to the same point.
11         And, again, to explain, it's not the customer's
12   license.
13   Q.    Did you do that?  Did you physically do that?
14   A.    We physically made copies of the same license of
15   software, but it's not the customer's software.
16   Q.    Now, you told me which Siebel licenses that you
17   were -- that you looked to earlier today to say that you
18   thought it was okay to operate -- to rely on that license.
19   I'm going to ask you about JDE.
20   A.    Yes.
21   Q.    You believed your actions for JDE clients were
22   authorized by JDE customer licenses; is that right?
23   A.    Yes.
24   Q.    All right.  And which JDE licenses would you point
25   to?
```

1    A.    Whichever ones that I was aware of and we had seen
2    in the public market.  We had pulled down some publicly
3    available licenses since they're available for public
4    companies and took a look at them.
5    Q.    And is there any one that you can recall looking at?
6    A.    Not at this time, no.
7    Q.    Okay.  And you said you reviewed, I think, or -- I'm
8    sorry, you didn't say, your lawyer said in opening
9    statement that you reviewed PeopleSoft licenses when you
10   worked at PeopleSoft?
11   A.    Yes.
12   Q.    And you left PeopleSoft when?
13   A.    In 2001.
14   Q.    And after that, that's when you went to TomorrowNow?
15   A.    No, not for another year -- I'm sorry.  Probably
16   over a year later, yes.
17   Q.    So 2001, you're at PeopleSoft.  A year or so later,
18   2002, 2003, you're at TomorrowNow?
19   A.    I think it was May -- March to May of 2002.
20   Q.    And 2005, fall of 2005, you started Rimini Street?
21   A.    In September of 2005, correct.
22   Q.    The licenses that you saw at PeopleSoft were from
23   2001 and before?
24   A.    Yes, I was very familiar with those.
25   Q.    Right.  And you started at Rimini Street in

1    September 2005?

2    A.    Yes.

3    Q.    Okay.  And when you said that you thought you were

4    acting properly under the PeopleSoft licenses, were you

5    relying on the licenses that you saw in 2001 and before, or

6    some other PeopleSoft license?

7    A.    Well, certainly the ones in 2001 and before, and I'm

8    sure along the way customers had shared with us some of

9    their license agreements along the way.

10   Q.    When you say "I'm sure," you said I'm sure about

11   various things and then it turned out you weren't so sure

12   or it wasn't true.  Okay.

13         Can you tell me any customer that gave you a

14   PeopleSoft license, and then you said, "Oh, I'm going to

15   rely on this to conclude what I'm doing is okay"?

16   A.    I know for a fact that I did review license

17   agreements, and I believe Brazoria County was one of them.

18   Q.    Okay.  You specifically remember the Brazoria County

19   license?

20   A.    Yes.

21   Q.    Okay.  The -- and at that time that you were

22   concluding in your own head that it was okay to do what you

23   were doing based on the customer licenses, you did not know

24   what software was in the library of Rimini Street or how it

25   was being used; is that right?

1    A.    That's correct, at a detailed level, yes.

2    Q.    Okay.  You added "at a detailed level."  Did you at

3    a general level have an idea of what was in that library?

4    A.    Yes; installation media.

5    Q.    Okay.  And we've already found out that there was

6    much more than installation media in there; right?

7    A.    It seemed from the e-mails, but I don't know that

8    those things were actually ever downloaded or put in those

9    installation media.

10   Q.    Okay.  Even when -- and those are e-mails from the

11   beginning of your company -- so that the first year in the

12   company, how many people were working there?

13   A.    I think two or three of us scrambling around all the

14   time, yes.

15   Q.    All right.  So during this period of time where you

16   said you didn't know what was going on about downloading,

17   there was only two or three of you at the company?

18   A.    Yes, that's why I hired some engineers to do that

19   work so I could go out and sell and make the money and pay

20   the bills.

21   Q.    Now, did you rely on your customers to determine on

22   their own what was in their licenses?

23   A.    Yes.  We had many large Fortune 500 companies that

24   all reviewed it and gave their legal approval to the

25   contracts, yes.

1    Q.    Did you have a practice to obtain the license

2    agreements between the customers at Oracle when you brought

3    on new customers?

4    A.    No.  Customers were responsible to make sure as --

5    we're only service providers, so they had to make sure that

6    they were -- and they signed on the contract that they

7    didn't require anyone else's authorization.

8    Q.    Did you rely on customers to tell you what the terms

9    of their contracts were?

10   A.    Yes, several companies would come to us and, if they

11   had questions, we would try to respond and give them our

12   opinion.  But otherwise they would make their own

13   decisions, yes.

14   Q.    Did you ask customers if they had restrictions in

15   their contracts on where the software could be located,

16   whether it could be located at Rimini or on the customer

17   side?

18   A.    Well, our contract specified that they would either

19   give us access remotely or give us the software to put in

20   the center, and they made that decision.

21   Q.    That wasn't my question, sir.

22         Did you ask customers -- well, for the -- let's

23   talk about the customers who made -- you say the customer

24   made the decision as to whether you were going to op -- the

25   environment would operate on the Rimini system or on the

1  customer system; right?

2  A.    Yes.

3  Q.    Customers made that decision, not Rimini Street?

4  A.    That's right.  We would influence them because our

5  preference would be that it would be in our data center.

6  That would be our preference, yes.

7  Q.    All right.  We'll come back to that influence and

8  that preference.

9       The -- did you ask customers before they put it

10  on -- before you put it on your system if there were

11  restrictions on the -- in the licenses of having the

12  software on your system?  Did you ask them that?

13  A.    No, not specifically, no.

14  Q.    All right.  And, in fact, it was your position that

15  it's the customer's responsibility to know their own

16  license rights and capabilities, it wasn't yours?

17  A.    Yes.

18  Q.    Okay.  This was -- if there was a violation of the

19  license agreements, it was your position with customers

20  that was their problem, not yours?

21  A.    Well, again, they're the licensee who signed the

22  contract with Oracle, and they know their license.

23  Sometimes they would share it with us and ask us questions,

24  we would give them an opinion on it.

25  Q.    I would like you to answer the question, sir.  Okay?

1       It was your position that it was the -- it was

2   your position that it was -- if there was a violation of

3   the license agreement, that it was the customer's problem

4   and not yours; right?

5   A.    No, of course it's our problem.  But it was their

6   responsibility to make sure that their license was not

7   violated by the work we were doing.

8   Q.    It was your position that it was the customer's

9   responsibility to know whether the license agreement was

10  being followed and not yours?

11  A.    Yes, we relied on the customer to help us.  If they

12  felt that there was a -- something we were asking in the

13  contract that was contrary to their license, we would

14  certainly expect them to address it.

15  Q.    All right.  So you were building a business based on

16  your belief that you were following the customer licenses,

17  but you were holding the customers responsible for whether

18  you were actually following the customer licenses; right?

19  A.    We were responsible for managing our contract.

20  They're responsible to make sure that their license

21  agreement was not contrary to the services we were signing

22  for, yes.

23  Q.    You did not have responsibility, in your mind, as to

24  whether that license agreement was being followed and

25  whether you were violating or whether you were committing

1   copyright infringement because you're putting that on the

2   customer; right?

3   A.    The license agreement -- our contract actually says

4   in the contract that you agree that you don't have any

5   requirements from any third party in order to enter into

6   this contract with us.

7   Q.    You did not have to know whether you were committing

8   copyright infringement.  That was the customer's

9   responsibility; right?

10  A.    No, I wouldn't put it so caviler.  I mean, we

11  absolutely weren't caviler.

12              It's the customer's legal liability from our

13  perspective, but we certainly wanted to make sure that we

14  were following the license agreement and doing the right

15  thing.

16  Q.    You said from your perspective it was the customer's

17  legal liability.  It was their legal liability, in your

18  mind, and not yours, for copyright infringement; is that

19  right?

20  A.    We're responsible for following through on the

21  execution of the contract we agreed.  Customers signed the

22  contract with Oracle.  We didn't have access to all that

23  information.  They had to take responsibility.

24  Q.    I don't know why it's so difficult to answer that

25  question yes or no.  I would like a yes or no, sir.

1              From your perspective, it was the customer's

2    legal liability, it was their legal liability in your mind,

3    and not yours, for copyright infringement; is that right?

4    A.    I think you're oversimplifying it.

5    Q.    Can I have a yes or no answer?

6    A.    I don't understand your question exactly.

7    Q.    Well, let me repeat it for you, sir.

8              In your mind, when you were operating this

9    business, if there was legal liability for copyright

10   infringement, that was on the customer, not you?

11   A.    No, that's not what I said.

12             We take responsibility for our actions.  For

13   anything that we have violated the law on we're

14   responsible.

15             But the customer had to have responsibility in

16   making sure that when we entered into a contract that they

17   knew that their license agreement would allow the services

18   that they were signing up and paying for from us.

19   Q.    And you actually told me, though, it was the

20   customer's legal liability from your perspective that was

21   at issue for copyright infringement; right?

22   A.    To the extent of, again, of what Your Honor has

23   ruled relating to infringement on our side --

24   Q.    I'm not talking about -- I'm not talking about the

25   Court's ruling, sir.  I'm talking about what you were

1    thinking about.

2              And you've said on -- you've said on the record

3    it was -- it's the customer's legal liability from our

4    perspective.

5    A.    Yes.  When you enter into a contract with the

6    customer, the customer -- and you don't know what their

7    contract is with other parties, we do rely on making sure

8    that the customer's ready to enter into that contract.

9    Q.    And you were putting that legal -- from your

10   perspective, that legal liability for copyright

11   infringement was on them and not on you?

12   A.    For our actions, we are responsible.  For anything

13   that they didn't tell us, if they were in violation of

14   their agreement, then, yes, we didn't know about that.

15   Q.    But you were plunging ahead and copying Oracle

16   software unless they told you otherwise; right?

17   A.    Yes.  They signed a contract and said here's what we

18   want you to do for us, and that's what we did.

19   Q.    So if they said nothing, if they just were silent

20   about this whole issue, you just plunged ahead and you

21   copied Oracle software for them?

22   A.    Well, remember, they signed a very detailed

23   contract.

24   Q.    Is that a yes or a no, sir?

25   A.    We signed a contract with the customer that outlined

1    what it was we would do for the customer, how much they

2    would pay us.  All these details were in the contract.

3    Q.    Sir, I'm looking for some answers to my questions.

4          If the client was silent about the issue of

5    their licenses, you just plunged ahead and started copying

6    Oracle software; right?

7    A.    Disagree with your characterization.

8    Q.    Okay.  Is that when the customer was silent about

9    the license or any license rights, you proceeded to copy

10   Oracle's software and provide them support; correct?

11   A.    The contract laid out what services we would

12   provide.

13         If the customer agreed with them, and they would

14   have their lawyers review these documents, and when we

15   executed, our expectation was that, on their side of the

16   bargain, they had already reviewed it and made sure they

17   were in compliance with their license agreement.

18         MR. ISAACSON:  I would ask that the witness be

19   directed to answer the question, Your Honor.

20         THE COURT:  Answer the question, Mr. Ravin.

21         THE WITNESS:  I'm sorry, could I have the

22   question again, please?

23         THE COURT:  Madam recorder, would you repeat the

24   question.

25

1              (The question was read by the court

2         reporter.)

3              THE WITNESS:  I just don't agree with -- the

4    question's lumped together.  I don't know how to answer

5    that question.

6    BY MR. ISAACSON:

7    Q.    Well, let's try and help you out.

8              You had some customers who you didn't discuss

9    their license rights with; right?

10   A.    That's correct.

11   Q.    So there were customers that were silent about what

12   their license contained and their license rights; correct?

13   A.    That's correct.

14   Q.    Okay.  And for those customers, you proceeded to

15   copy Oracle's software and provide them support; correct?

16   A.    I'm not sure whether in a particular customer we

17   copied software on their behalf or not.  Some customers

18   came over with no archive requirements, no environment, so

19   I can't say that that's a hundred percent true.

20   Q.    Okay.  You can't say it's a hundred percent true,

21   but it's a lot true, isn't it?  There were a lot of

22   customers who were silent about their license rights, and

23   you proceeded to copy Oracle software for them?

24   A.    I would say that's a fair statement.

25              MR. ISAACSON:  Okay.  Your Honor, we have that

1      other issue that we wanted to take up with you.  And this

2      might be a good time to do that.

3                  THE COURT:  All right.  We do have an issue that

4      needs to be raised with the Court, ladies and gentlemen.

5                  And I would tell you, and counsel have been good

6      about this, we -- from time to time we have issues arise,

7      and we try to deal with them when it doesn't delay you.

8                  We're a little earlier for our next break, but

9      we'll go ahead and take a break at this time, you can treat

10     it as your third break, so to speak, and take a little more

11     time, because I have to hear from the lawyers and an

12     argument.

13                 And then we will return in no more than half an

14     hour, but I'm thinking 20 minutes with some success.

15                 So that being the case, I'll remind you of the

16     admonitions.  We'll take a break at this time, and,

17     counsel, the Court will take a break for 5 to 10 minutes

18     and return.

19                 COURTROOM ADMINISTRATOR:  Please rise.

20                 THE COURT:  You may step down, ladies and

21     gentlemen.

22             (Recess from 11:15 a.m. until 11:32 a.m.)

23             (Outside the presence of the jury.)

24                 COURTROOM ADMINISTRATOR:  Court is again in

25     session.

1                    THE COURT:  Have a seat, please.

2                    Do we have a preliminary matter?

3                    MR. WEBB:  We do.  There's a dispute as to

4      whether Mr. Ravin can be in the courtroom during the

5      discussion about the admissibility of TomorrowNow evidence.

6                    Mr. Isaacson requests that he not be here.  We

7      believe, as a named defendant, he has a right to be in all

8      proceedings in this case.

9                    THE COURT:  As a named defendant, he does,

10     Mr. Isaacson.

11                   If you have an argument that you think would

12     overcome that, I'll hear it and allow you to make it for

13     the record, but any party would have the right to be

14     present.

15                   MR. ISAACSON:  I won't take the Court's time

16     with it.

17                   THE COURT:  All right.

18                   All right.  So at this time, Mr. Isaacson -- do

19     we have Mr. Ravin present?

20                   COURTROOM ADMINISTRATOR:  Not yet.

21                   THE COURT:  All right.  Mr. Ravin, you can just

22     be seated at counsel table.

23                   Mr. Isaacson, go ahead.

24                   MR. ISAACSON:  Sure, Your Honor.

25                   So at this point, there's a couple issues that

1    the TomorrowNow -- evidence related to TomorrowNow is going

2    to relate to, and I'll take a couple minutes to walk you

3    through that.

4              It's obviously become clear that the good faith

5    beliefs of Mr. Ravin have been put at issue in this case.

6              In opening statement, counsel's indicated

7    Mr. Ravin was careful, he was confident what he could do

8    was legitimate.  He knew those contracts.  He worked with

9    those contracts.  He understood those contracts.

10             He also said in opening statement other

11   companies, other third parties, were operating this

12   business, and he understood so long as he kind of stayed

13   with what they were doing, he would be fine.

14             He said that PeopleSoft, back when Mr. Ravin was

15   there, never once objected to a third party providing

16   maintenance.

17             He said it wasn't intentional.  Mr. Ravin

18   honestly believed that line was there.

19             He said that being wrong does not make you a

20   liar, referring to the Court's findings of infringement in

21   this case, and that Mr. Ravin could not have possibly

22   understood where the lines were.

23             Now, obviously in testimony, I lost count as to

24   how many times Mr. Ravin has talked about his good faith

25   beliefs, and there's already been some examination of that.

1          So with respect to that, there are specific

2     documents that would test that proposition.  One of them is

3     PTX 30, and I've got one extra copy here, but if you --

4          THE COURT:  If it's convenient to bring it up on

5     the screen and highlight the portions you're concerned

6     about, that may speed it up for all of us.

7          MR. ISAACSON:  Let me walk you through this.  At

8     the top, this is Mr. Ravin talking to a customer, I believe

9     he's with the Pittsburgh public schools, and he says --

10     Seth Ravin says at the top, "The concerns for TomorrowNow

11     customers go beyond the lawsuit," referring to the Oracle

12     lawsuit.

13          And then he moves down to a paragraph that says,

14     "What is happening is that SAP, TomorrowNow's parent

15     company, has decreed that TomorrowNow shall no longer be

16     allowed to be in possession of, or touch, Oracle owned

17     software.  This has huge service implications for

18     TomorrowNow."

19          Now, what he is saying here to a customer is

20     Oracle sued TomorrowNow, his former company, that

21     TomorrowNow in response has decreed that it's no longer

22     going to touch Oracle software.

23          And that specifically means, in the next

24     paragraph, "So TomorrowNow has sent notice to every client

25     telling them that TomorrowNow will no longer host copies of

1    the client's test environments used by TomorrowNow to

2    diagnose issues and build tax updates."

3            So that the former CEO of TomorrowNow, in

4    September 2007, has knowledge that due to the Oracle

5    lawsuit against TomorrowNow, that TomorrowNow has made the

6    decision, a decision that Mr. Ravin did not make, to end

7    the local environments, and, in fact, he is now using

8    TomorrowNow's decision to not use Oracle software as a

9    competitive advantage.  He is using that to say "we can

10   provide you those environments and those people over in

11   TomorrowNow will not."

12           So I would then -- so that's one document I

13   would like to go over with Mr. Ravin.

14           MR. WEBB:  Can I respond to that, one at a time?

15           THE COURT:  Yeah.  We can.  The number on that

16   again was what?

17           MR. ISAACSON:  Thirty.

18           THE COURT:  Three --

19           MR. ISAACSON:  Thirty, three zero.

20           THE COURT:  And the portions in question?

21           MR. ISAACSON:  Are on the first page.

22           THE COURT:  All right.

23           MR. ISAACSON:  And, Your Honor, I should point

24   out, because my colleagues have pointed this out, he goes

25   on to say,

1          "Rimini Street has no such conflicts and no such

2     ridiculous policies.  We will be taking over TomorrowNow's

3     clients and hosting testing environments so those clients

4     can avoid the chaos, cost and soured relationship with

5     TomorrowNow.

6              THE COURT:  All right.

7              Mr. Webb?

8              MR. WEBB:  To be honest, Judge, that part in the

9     abstract doesn't bother us, because that's not what we're

10    concerned with.

11             We're concerned with the litigation with SAP and

12    the concession of liability, the verdict, the criminal

13    plea, all happening years after Mr. Ravin left the company.

14    That's the concern.

15             If that stuff comes into evidence, we are

16    hopelessly prejudiced.  That's not going to be a bell that

17    we can possibly unring.

18             So they can talk about how TomorrowNow is on the

19    market.  I just said that at a sidebar.  We have no problem

20    with that.

21             They can talk about TomorrowNow as a competitive

22    option.  Fine.  We're not going to say they're not

23    infringing option, we never have.

24             But when they invoke this lawsuit and actions

25    taken by SAP in response to that lawsuit, we will be

1    hopelessly prejudiced.  It will be game over.

2             We know this to be true because the jury's going

3    to conclude that there was a finding of liability when

4    there was not.

5             SAP decided to pull the plug on TomorrowNow for

6    reasons that none of us know.  We do know they're a vendor

7    who was challenged by third-party maintenance as well.

8    That is just as likely as a finding or concern of

9    infringement.  We don't know.

10            That type of supposition has no place in the

11   courtroom, especially when the impact to this case and the

12   fairness of this proceeding to Rimini Street and Mr. Ravin

13   will be devastating.

14            So if he wants to talk about that, divorced from

15   the lawsuit, that's fine.  The lawsuit, the finding of

16   liability, or the admission of liability, the verdict,

17   anything in the litigation or the criminal plea, that's

18   where we draw the line.

19            MR. ISAACSON:  All right.  So let's take it in

20   stages.  At this stage we're just talking about the

21   lawsuit.  I'll talk about the other things separately.

22            But PTX 30 clearly puts into play that

23   TomorrowNow, with Mr. Ravin's knowledge, in response to the

24   lawsuit, stopped doing exactly what we're accusing them of,

25   violating the copyright laws, doing.

1          And he and his counsel have put into issue his

2     good faith belief.  We didn't make that decision.

3          We will be prejudiced if he gets to say on the

4     stand "I honestly believed this," when we can point to his

5     former company who, after we sued them, took the exact

6     different action that he did, and he did it to gain a

7     competitive advantage against that former company.

8          This is direct -- this makes the lawsuit

9     directly relevant.  It will also be separately relevant

10    when we point out statements, and Your Honor looked at this

11    in a motion in limine that after the lawsuit was filed that

12    they made statements saying we're different from

13    TomorrowNow, we're not doing what they were doing.

14         All right.  And we should be able to put that in

15    this, as well, that that was the other thing they were

16    doing after the lawsuit, both to make misrepresentations to

17    customers and to gain a competitive advantage in the

18    marketplace.

19         MR. WEBB:  Listen, if they don't want to allege

20    willfulness, we won't inject Mr. Ravin's good faith.  It's

21    not our issue.  They raised willfulness.  We have an

22    obligation, a right to bring into play his state of mind in

23    good faith.

24         They can't allege willfulness and then use that

25    as a hook to get in this highly prejudicial information.

1               First of all, Judge, there's no evidence that

2       the TomorrowNow process and the process in this case are

3       the same or even similar.

4               We do know that Mr. Ravin left two years before

5       that lawsuit was even filed, and we know nothing as to why

6       SAP pulled the plug on anything.  As to why it's relevant

7       to this case, I have no idea.

8               TomorrowNow was in the marketplace.  Rimini

9       Street did position itself against TomorrowNow as a

10      competitor distinguishing what they did over what

11      TomorrowNow did.

12              They're trying to combine the two of them just

13      so they can get in this type of evidence which, again, if

14      that comes in, this trial might as well be done, it's over,

15      because we know the impact the jury will have.

16              They're going to say, oh, wow, another judge has

17      already found this to be infringing, and Seth Ravin did

18      both systems.

19              There's a line to be drawn here, Judge.  I think

20      we're trying to be fair.  I think they're taking it way,

21      way, way too far.  If that happens, it is what it is.

22              MR. ISAACSON:  We're mushing together several

23      things right now.  I'm going to go to the next steps in the

24      line.

25              But at this point I'm talking about the fact

1    that we filed a lawsuit against TomorrowNow, and

2    TomorrowNow took certain actions, and Mr. Ravin discussed

3    that lawsuit with customers.  So that's step 1.

4            Step 2 will be the liability issue, and I'll

5    talk about that separately.

6            MR. WEBB:  Step one, he has already then

7    polluted the jury, because he said you were the founder,

8    you were the president, blah, blah, blah, you were in

9    control of this.

10           And now all of a sudden the jury is going to

11   hear that SAP was sued and then basically TomorrowNow was

12   shut down.  I think -- your Honor, I think the inference is

13   more than clear as to where that would be going.

14           MR. ISAACSON:  This goes directly to his state

15   of mind.

16           It is absolutely absurd for this man to be on

17   the stand saying "I didn't know any" -- "I didn't know I

18   was doing anything wrong with these environments," when he

19   knows that after his former -- and he's paying attention to

20   his former company.

21           He was the president.  He's looking at it.  They

22   get sued.  He looks at it.  And he says, "Look what they

23   did, they stopped -- they stopped these environments, and

24   we're going to continue on, and we're going to take

25   advantage of this."

```
 1              And that goes directly to the state of mind
 2    that's been put in issue.
 3              And, no, we are not withdrawing our willfulness
 4    contentions.  We are allowed to do that as well as ask
 5    for punitive damages.
 6              MR. WEBB:  So the --
 7              THE COURT:  Give me some chronology here.  When
 8    were the environments stopped by TomorrowNow?
 9              MR. WEBB:  2008, I believe, Judge.
10              MR. ISAACSON:  According to Exhibit 30, 2007.
11              MR. WEBB:  They were sued in 2007, I believe;
12    right?
13              MR. ISAACSON:  Exhibit 30 is dated November
14    16th, 2007, and Mr. Ravin is announcing that TomorrowNow
15    has sent notice to every client telling them TomorrowNow
16    would no longer host copies of the client's test
17    environments.
18              MR. WEBB:  All right.  So let's take that a
19    piece at a time, Judge.
20              THE COURT:  Okay.  Give me when the TomorrowNow
21    suit was brought.
22              MR. WEBB:  All right.  Just a timeline, Judge.
23              Mr. Ravin left PeopleSoft in 2001.  Starting --
24    he joined the company, TomorrowNow, was cofounder with
25    respect to this business in 2002.
```

         1              He left the -- actually SAP acquired TomorrowNow

         2    in 2005.  Mr. Ravin left two months later, in 2005.

         3              The lawsuit filed by SAP happened two years

         4    after Mr. Ravin left SAP, in early 2007.

         5              So there's a gap of about two years between the

         6    time Mr. Ravin left TomorrowNow and the time the lawsuit

         7    was filed by Oracle against SAP.

         8              And there's no foundation that the process used

         9    by TomorrowNow is the same as the process used by Rimini

        10    Street.

        11              And, again, I'll reiterate, if Mr. Isaacson

        12    wants to talk about a decision by SAP to drop local

        13    hosting, and Mr. Ravin's saying we're going to use that to

        14    our advantage, that is fine, we have no objection to that.

        15              But if he wants to take it to the next step and

        16    say they decided to pull the plug on the local hosting

        17    because of a lawsuit and an admission of infringement,

        18    that's where -- that's where we draw the line.

        19              MR. ISAACSON:  This is not the admission of

        20    infringement yet.  I will get to that next.  But -- I will

        21    defend the admission of infringement as a point of

        22    examination, but we're not there yet.

        23              This is -- there was a lawsuit, they reacted to

        24    it, they said things to customers, and they knew -- it's

        25    important that it's his former company because that means

1     he's going to pay attention.  That goes to his state of

2     mind.  And they made the opposite decision that he did.

3                 THE COURT:  All right.

4                 MR. WEBB:  The problem is, Judge, we don't know

5     why they made the decision, and we don't know if the

6     systems were the same.

7                 The fact that he was involved in one company and

8     then was a founder and began a brand-new company, that does

9     not mean that the decision made by SAP for whatever reason

10    to stop providing these services means that there's

11    something implicating his services for his new company.

12    That's our problem with that.

13                MR. ISAACSON:  When you put into issue good

14    faith belief, red flags -- and this is one big red flapping

15    flag -- is -- causes you to say, gee, I have this belief, I

16    should be looking into this, and I'm entitled to examine

17    him about this when he knows about it --

18                THE COURT:  All right.  I think I've heard

19    enough.

20                I feel that you're entitled to examine into his

21    awareness of the challenge to the process that was common

22    between TomorrowNow and when he was there, and what was

23    being done in connection with this particular litigation.

24                But I am of the view that taking it further and

25    to identify the result of the lawsuit, the criminal issue

1    and actions taken in subsequent years by SAP related to

2    that TomorrowNow history, one, is obviously highly

3    prejudicial, and, secondly, it's confusing and opens up

4    issues in this case that Rule 403 are expressly designed to

5    avoid.

6         So I will allow you to cross-examine him about

7    his awareness to the challenge that may have existed up and

8    to --- during the period of time in question, but I'm not

9    going to allow evidence of the result of the lawsuit,

10    actions taken by SAP when he was no longer with SAP -- or,

11    excuse me, with TomorrowNow, and the findings resulting

12    from any of that litigation.

13         MR. ISAACSON:  Okay.  So what's -- so to help me

14    follow what the Court wants me to do, Plaintiffs'

15    Exhibit 30, am I permitted to examine him based on this?

16         THE COURT:  I would -- let me look at it again.

17         All right.  I'm of the view that you can

18    cross-examine him with regard to Exhibit 30.

19         MR. WEBB:  Just for clarity, Your Honor, does

20    that mean Mr. Isaacson gets to mention the lawsuit between

21    Oracle and SAP regarding TomorrowNow's business activities?

22         THE COURT:  Well, the lawsuit is obviously the

23    subject of the memo and was obviously something that

24    Mr. Ravin was aware of at that time, the challenge that was

25    involved in that lawsuit.

1           I will allow cross-examination into his

2     awareness of the challenge to the practices that are in

3     common with this case, but that's as far as it goes.

4           MR. WEBB:  And nothing about the admission by

5     SAP or TomorrowNow of infringement?

6           THE COURT:  That's right.

7           MR. WEBB:  Okay.  And may I have just a

8     continuing objection to this, Your Honor?

9           THE COURT:  Yes.

10          MR. WEBB:  Okay.  Thank you, Your Honor.

11          MR. ISAACSON:  Your Honor, I would like, before

12    you finish your ruling on this, there's three levels of

13    admission -- or three levels of liability, there's the

14    criminal findings, there's the jury verdict, and then

15    there's the stipulation of liability.

16          And the stipulation of liability, I would

17    actually ask you to look at because I believe it's in 2010,

18    which is still in the period where we're claiming lost

19    customers and which he's claiming a good faith belief --

20          THE COURT:  But he's not a party to that

21    stipulation.

22          MR. ISAACSON:  No, but what I want to point you

23    to is that, again, in terms of him being on notice, is

24    overlapping conduct, because that stipulation talks about

25    TomorrowNow having those environments --

```
 1              THE COURT:  I'm not going to allow the admission
 2    of a third party to be used against Mr. Ravin in this case
 3    because it's going to open up just too many issues.  It
 4    tends to be too prejudicial, and I'm not going to do that.
 5              MR. ISAACSON:  And just so I'm clear, I'm not
 6    seeking admission of this, all right, but --
 7              THE COURT:  I understand.
 8              MR. ISAACSON:  -- as clearance for
 9    cross-examination.  Okay.
10              THE COURT:  I don't want you to include in your
11    cross-examination any suggestion of what the results were
12    in the litigation.
13              MR. WEBB:  Thank you, Your Honor.
14              MR. ISAACSON:  All right.  And just as one last
15    final point, we will -- we think that there could be other
16    stages at this trial where this issue may come up again as
17    doors --
18              THE COURT:  I would tell you that this is a
19    preliminary ruling, and I would consider other stages and
20    other complexions in which it might arise.
21              But I think I've given you a pretty good
22    indication of where I'm headed on this, and so if you sense
23    that that sensitive issue is about to come up again, give
24    me a heads-up so we don't get involved with it in front of
25    the jury, and we will deal with it at that time.
```

1          MR. ISAACSON:  Yeah, we will do that.

2          COURTROOM ADMINISTRATOR:  All right.  So PTX 30

3     will be admitted at this time?

4          THE COURT:  PTX 30 will be admitted subject to

5     the continuing objection imposed by the defense.

6          MR. WEBB:  Thank you, Your Honor.

7          (Plaintiffs' Exhibit 30 received into

8          evidence.)

9          THE COURT:  All right.  Let's bring the jury in

10    this, please.

11         COURTROOM ADMINISTRATOR:  Yes, Your Honor.

12         (Jurors enter courtroom at 11:55 a.m.)

13         THE COURT:  All right.  Have a seat, please.

14         The record will show that we are in open court.

15    The jury is all present.  The parties and counsel are

16    present.

17         And we may continue after the break with the

18    continued cross-examination by Mr. Isaacson.

19         MR. ISAACSON:  Thank you, your Honor.

20    BY MR. ISAACSON:

21    Q.   One point I wanted to clean up, I said I would come

22    back to PTX 744.  If you could look at that, Mr. Ravin.  It

23    should be in your second binder.

24         This is May 1st --

25    A.   I'm sorry, if you could wait just one second,

```
 1   please.
 2   Q.    744?
 3   A.    I don't think I have a 744 unless I'm missing it
 4   here.  I have 726 to --
 5             MR. ISAACSON:  I'm sorry.  This is my fault.  It
 6   wasn't there.  So I've got to hand it up.  Sorry.
 7             THE WITNESS:  Thank you.
 8             COURTROOM ADMINISTRATOR:  You're welcome.
 9             THE WITNESS:  Should I just add this to the
10   binder?
11             COURTROOM ADMINISTRATOR:  I'll do that.
12             MR. ISAACSON:  No, don't.
13   BY MR. ISAACSON:
14   Q.    744, this is back in May of 2006 when you're working
15   with Dennis Chiu, he's writing to you, the company's small,
16   it's you, Mr. Chiu, maybe Susan Tahtaras and Ola Bola.
17             On page 2, Mr. Chiu writes to you, can we --
18   this has been preadmitted, I believe.
19             COURTROOM ADMINISTRATOR:  Yes, it's admitted.
20             MR. ISAACSON:  Move to page 2 and put it on the
21   screen.
22   BY MR. ISAACSON:
23   Q.    And this is Mr. Chiu writing to you, and the last --
24   in the last -- towards the bottom it says -- the paragraph
25   begins,
```

1              "As a backup strategy, I've asked Bola to

2    install the vanilla Siebel 7.04 and Siebel 6.01 software on

3    her laptop to better support Beekley and Galileo.  Granted

4    it's not working under the lab model, but we can then be in

5    a better position to perform all the same work."

6              So what's happening here is one of your labs

7    wasn't working, so you were having Ms. Bola install the

8    software actually on her own laptops at this point; right?

9    A.    That's what it looks like.

10   Q.    Okay.  And you indicated Mr. Leake is now working

11   part-time, and on your website, one of my colleagues

12   pointed out to me, that Mr. Leake "oversees all global

13   digital marketing, marketing communications, client

14   marketing, digital and rich media content creation, social

15   media and media analysis relations for Rimini Street.  He

16   leads all aspects of ideation and execution for marketing

17   communications and digital media worldwide."

18              Is that accurate?

19   A.    Not any more.  That actually changed several months

20   ago when he moved to part-time status and took a different

21   role.

22   Q.    But that was true up until a few months ago?

23   A.    Yes, he was head of digital marketing, yes.

24   Q.    Now, we talked a little bit about how you were the

25   former president of TomorrowNow?

1    A.    Yes.

2    Q.    And were you the 50 percent owner of TomorrowNow?

3    A.    Yes, I owned 50 percent of the shares.

4    Q.    And after you bought 50 percent of the TomorrowNow,

5    you changed their business to provide third-party support?

6    And by third-party support I mean support for enterprise

7    software.

8    A.    Yes.  Independent maintenance, yes.

9    Q.    All right.  And you're the one who made the decision

10   to change TomorrowNow's business model to compete with

11   PeopleSoft for support; right?

12   A.    Well, in conjunction with my business partners as we

13   were 50-50 partners.

14   Q.    Okay.  But the business model was your idea?

15   A.    Yes, based on my work at PeopleSoft and my

16   understanding of what the industry opportunity was.

17   Q.    And you said publicly that you had designed the

18   TomorrowNow service; right?

19   A.    Yes.

20   Q.    And your responsibilities included designing

21   TomorrowNow services offerings; right?

22   A.    Yes.  The actual services that we would provide

23   customers, not the back end, how it gets delivered, yes.

24   Q.    Well, but -- and you said what you would do is you

25   would negotiate and sell TomorrowNow service, support

1    services, to customers?

2    A.    Yes, I would sell the support contracts.

3    Q.    All right.  And Doug Baron, who is the Rimini

4    employee we talked about is in charge of automated

5    downloading, he was at TomorrowNow; right?

6    A.    That's my understanding, yes.

7    Q.    You've got at least 10 employees, former employees

8    of TomorrowNow at Rimini Street; is that right?

9    A.    I think it's more like 20 plus.

10   Q.    And you have publicly said that Rimini's support

11   model didn't change much from the model that you built at

12   TomorrowNow; right?

13   A.    Relating to what the core services were.  We added

14   many new services that weren't available at TomorrowNow.

15   Q.    Okay.  And, in fact, you have said publicly the --

16   these are two companies you founded.  You've said publicly

17   their histories have run together and there's no way to

18   separate those two companies.

19   A.    Well, I use the example, I think, of Mr. Wynn who

20   designed the Bellagio and then designed The Wynn, you see

21   the same design elements, yes.

22   Q.    Exactly.  You've said that publicly before, and

23   you've said that now.

24         TomorrowNow and Rimini Street, as you said, were

25   like the Bellagio or the Wynn, they have their differences,

```
 1    but when you walk in, it might have the same feel.
 2    A.    No, the new one is better always than the one
 3    before, yes.  We added a whole bunch of new features, yes.
 4    Q.    All right.  Yours was the more modern version.
 5          The -- and the -- counsel called you, I think, a
 6    pioneer, in opening statement, and when your company has
 7    marketed you as a pioneer, you would include as part of
 8    that story your PeopleSoft, your TomorrowNow, and then your
 9    Rimini Street experience?
10    A.    The pioneer, I believe, in the sense that we were
11    creating this new idea of package services for these
12    products, yes.
13    Q.    Right.  But when you -- when your marketing people
14    call you a pioneer, or at least they used to, they were
15    including TomorrowNow as part of that?
16    A.    Certainly.
17    Q.    Okay.  Now, let me ask you to look at Plaintiffs'
18    Exhibit 30.  You are familiar with this exhibit, aren't
19    you, sir?
20    A.    Yes, it looks familiar.
21    Q.    Okay.  Permission to put this on the screen.  It's
22    on the screen.  It's been admitted.
23          At the top, you're writing in November 2007 to
24    Pittsburgh public schools; right?
25    A.    Yes.  They became the client, yes.
```

412

1    Q.    Now, at this point you're telling the Court and the

2    jury that you had a good faith belief that it was okay to

3    have these environments on the Rimini system with lots of

4    Oracle copies?

5    A.    Yes.

6    Q.    And what you learned in November 2007, or by

7    November 2007, you learned that Oracle filed a lawsuit

8    against TomorrowNow accusing them of copyright

9    infringement?

10   A.    Yes, years after I left.

11   Q.    Years after you left.

12          And -- but as the former founder of

13   TomorrowNow -- I'm sorry.  At this point Rimini Street is

14   competing against TomorrowNow; right?

15   A.    Yes, fiercely.  We sold them, yes.

16   Q.    You're paying close attention to TomorrowNow, it's

17   your former company, you're competing against them, and so

18   it's big news to you when Oracle files a lawsuit saying

19   TomorrowNow committed copyright infringement?

20   A.    Yes.

21   Q.    And so you pay attention to what you read about that

22   lawsuit?

23   A.    In the media, yes.

24   Q.    And you talked to customers about it?

25   A.    Yes, we had discussions with customers who we were

1     competing with against my former company to try to win the

2     business, yes.

3     Q.    Right.  And this is an -- in this case you're

4     talking to the Pittsburgh public schools, and you're

5     talking about how, in the second sentence, "The concerns

6     for TomorrowNow customers go beyond the lawsuit."

7              The -- and moving down now, you say what is

8     happening.  "What is happening is that SAP" -- that's

9     TomorrowNow's parent company; right?

10    A.    Right.  We had sold TomorrowNow to SAP, Oracle's

11    primary competitor in applications, yes.

12    Q.    And they decreed "that TomorrowNow shall no longer

13    be allowed to be in possession of or touch Oracle-owned

14    software."

15             And going down to the next paragraph,

16             "So, TomorrowNow has sent notice to every client

17    telling them that TomorrowNow will no longer host copies of

18    the client's test environments used by TomorrowNow to

19    diagnose issues and build tax updates."

20             So what you knew now was that after Oracle said

21    to TomorrowNow in court that we think you committed

22    copyright infringement by having these environments, you

23    now know that TomorrowNow has made a decision that they're

24    not going to have those environments any more and they're

25    not going to possess or touch the Oracle-owned software;

414

1    right?

2    A.    Yes.  And that's why the next line said it's

3    ridiculous.

4    Q.    We'll get to that.  Okay.

5          But at this point you know that your former

6    company has said "we're no longer going to be doing these

7    environments, or touching the Oracle software," but you

8    decide to keep doing it; right?

9    A.    Yes.  That was SAP's decision.

10   Q.    And you didn't consider this a big red flag that

11   maybe you shouldn't be going down this road, that you've

12   got problems with the customer licenses.

13   A.    Not at all.

14   Q.    And at this point, and this is the same period of

15   time where you're relying on customers to tell you if

16   there's any license issues; right?

17   A.    Yes, hundreds of customers, yes.

18   Q.    So TomorrowNow is making its own decision to do

19   this, but you're relying on your customers and saying we're

20   not going down that road?

21   A.    Well, my understanding was it was SAP, the parent

22   company, made that decision.  It was a primary competitor

23   to Oracle, yes.

24   Q.    Fair enough, the parent company, the big boss makes

25   that decision.

1            But they make the decision to stop doing the

2    local environments after Oracle says you're infringing our

3    copyrights.  But you say "I'm going to keep going forward

4    and I'm going to keep relying on my clients to tell me if I

5    have a problem."

6    A.    Yeah, and my knowledge of the industry.  I felt it

7    was perfectly fine.

8    Q.    Okay.  And the -- now, the point where you say it's

9    ridiculous, the next -- now, let's stick with this

10   paragraph.

11           You say,

12           "Instead, every client will now be responsible

13   for setting up their own environments for use by

14   TomorrowNow, and have to procure all hardware and software

15   at their own expense.  These clients never agreed to such

16   costs."

17           Now, what you're saying is "we now have a

18   competitive advantage against TomorrowNow.  They've gotten

19   rid of these environments, and we aren't.  We are better

20   for you, the customer," in this case the Pittsburgh public

21   schools, "because we're willing to keep doing these

22   environments."

23   A.    Yes, we believed it was perfectly fine.

24   Q.    All right.  And so you actually now are saying,

25   "gee, we're going to get more business because of this.

1    TomorrowNow, our competitor, has said we're not going to

2    have these environments with Oracle copies on it, we'll

3    keep having them, and we'll get more clients."

4    A.    Yes, I think we brought over 80 customers from

5    TomorrowNow.

6    Q.    All right.  And -- well, that was later; right?

7             You -- but let's look at Rimini -- the next

8    paragraph that you pointed to.

9             "Rimini Street has no such conflicts and no such

10   ridiculous policies."

11            You are saying that what TomorrowNow is doing in

12   no longer having remote environments with Oracle software

13   on them is ridiculous, and you're going to be "taking over

14   TomorrowNow's clients and hosted testing environments so

15   these clients can avoid the chaos, cost, and soured

16   relationships with TomorrowNow."

17            Right?

18   A.    Yes, yes.

19   Q.    All right.  Let me ask you to look at --

20            All right.  Now, you told customers after this

21   lawsuit was filed that you were not -- you didn't have the

22   same issues as TomorrowNow with respect to copyright

23   infringement; right?

24   A.    I'm sure I did.

25   Q.    Okay.  Let's look at 49 --

|     |                                                              |
| --- | ------------------------------------------------------------ |
| 1   | THE COURT:  Mr. Isaacson, let me interrupt you               |
| 2   | for a second.  I see what appears possibly as a recording    |
| 3   | device in the courtroom that's operating; is that correct?   |
| 4   | Why is that on, can you tell me?                             |
| 5   | UNIDENTIFIED SPEAKER:  It's wi-fi, Your Honor.              |
| 6   | THE COURT:  All right.  I would caution everyone            |
| 7   | in the courtroom that external recording devices are         |
| 8   | absolutely prohibited in the courtroom.                      |
| 9   | All right.  I'm sorry.  Go ahead, Mr. Isaacson.            |
| 10  | MR. ISAACSON:  Completely understandable, your             |
| 11  | Honor.  You have a better view than I do.                    |
| 12  | 4937, which would be in your second binder.                 |
| 13  | COURTROOM ADMINISTRATOR:  What number did you              |
| 14  | say, Counsel?                                                |
| 15  | MR. ISAACSON:  4937.                                       |
| 16  | COURTROOM ADMINISTRATOR:  4937.  Thank you.               |
| 17  | MR. ISAACSON:  4937 has not been admitted.  I             |
| 18  | would move to admit it.                                     |
| 19  | THE WITNESS:  Okay.  4937.                                 |
| 20  | MR. WEBB:  For the reasons we already stated,              |
| 21  | Your Honor, we object to this exhibit.                       |
| 22  | THE COURT:  I need to see a copy of the exhibit.           |
| 23  | I don't have it.                                             |
| 24  | MR. ISAACSON:  Maybe I could offer some -- quick           |
| 25  | sidebar?                                                     |

```
 1              THE COURT:  Quick sidebar.  Let me look at it
 2    first.  Do you have an extra copy?
 3              MR. ISAACSON:  Yes.
 4              THE COURT:  I'll speak with you at sidebar, but
 5    I'm going to review this.
 6         (Sidebar conference held as follows:)
 7              THE COURT:  All right.  Counsel, go ahead,
 8    please.
 9              MR. ISAACSON:  So to disclose to what I'm doing,
10    this will be the first of a series of documents where
11    Rimini or Mr. Ravin are talking to customers about why they
12    are different from TomorrowNow following the lawsuit.
13              The documents will not refer to the stipulation
14    of liability, the criminal thing, or the jury verdict.  And
15    so I feel this is the same thing as PTX 30, and we would
16    have a continuing objection to that.
17              THE COURT:  Go ahead.
18              MR. WEBB:  I mean, I think, Your Honor -- this
19    is where I stand on this.  I think this is just a slippery
20    slope.  It's going to be really hard to keep the jury from
21    taking that next step to thinking that there was some
22    finding of liability.  So that's why I object.
23              THE COURT:  All right.
24              MR. ISAACSON:  And we view these as
25    misrepresentations based on the record that's been made to
```

1    this point.

2              THE COURT:  Okay.  Say that again.  I'm not sure

3    that my reporter would have gotten that.

4              MR. ISAACSON:  Sure.  We view these as

5    misrepresentations made to clients based on the record

6    that's been at this point.

7              For example, I will review for him how they say

8    unlike TomorrowNow, they're using a very controlled, proven

9    process that assures the types of unacceptable issues that

10   happened at TomorrowNow can't happen at Rimini Street, and

11   there's a series of documents that make similar assurances.

12             Again, I understand the Court's ruling.

13             THE COURT:  All right.

14             MR. ISAACSON:  No mention of --

15             THE COURT:  Okay.  I'm going to overrule the

16   objection.  We obviously reach a point where references to

17   the litigation will have to cease.

18             But this is relevant to the state of mind of

19   Mr. Ravin, and I'm going to admit it on that particular

20   ground.

21             MR. WEBB:  Understood, your Honor.

22             THE COURT:  And your objection is preserved.

23             MR. WEBB:  Thank you.

24        (Sidebar conference concluded.)

25             THE COURT:  Go ahead, please.

1    BY MR. ISAACSON:

2    Q.    Do you have 4937, Mr. Ravin?

3    A.    Yes, I do.

4    Q.    Thank you.  This is an email exchange between

5    Mr. Davichick, who is the -- is he the head of marketing

6    and sales for you?

7    A.    I think at that time he may be the only sales.

8    Q.    All right.  So this is August of 2007, and he's

9    e-mailing with -- this is the Santa Fe --

10   A.    Santa Fe Natural Tobacco, now part of Reynolds

11   Tobacco.

12   Q.    Santa Fe Tobacco Company.

13         And they are again -- and he's talking to the

14   customer about the fact that Oracle's filed a lawsuit

15   against TomorrowNow.

16         And at the bottom of the first page he's talking

17   about -- he's criticizing TomorrowNow, and continuing on

18   the second page he says,

19         "Rimini Street downloads the software from

20   Customer Connection that Oracle does not make available

21   through physical or package delivery."

22         Customer connection was that website that we

23   were talking about where you were building up the

24   PeopleSoft library; right?

25   A.    Yes, I think that was before they changed the name

1    to Metalink.  They kept changing the name.

2    Q.    "Rimini Street does the down-" -- what you told this

3    customer was, "Rimini Street does the downloading at its

4    own site using a very controlled, proven process that

5    assures the type of unacceptable issues that happened at

6    TomorrowNow can't happen at Rimini Street."

7              Right?

8    A.    Yes.

9    Q.    And you told them that you had a very controlled,

10   proven process, you were saying you knew what you were

11   downloading and for who; right?

12   A.    Yes, because we actually went through, used the

13   tool, we had very specific process, yes.

14   Q.    But you didn't know what was in the library, did

15   you?

16   A.    Well, I didn't say that I personally, this was not

17   written by me.

18   Q.    You didn't have any audit or any -- you didn't have

19   any audit of what was in the library, did you?

20   A.    Not that I'm aware of.

21   Q.    All right.  When you were talking about a

22   controlled, proven process, you were talking about what you

23   were taking from the client, you aren't talking about what

24   you put in the library?

25   A.    I think this email specifically refers to the

1    download that we would do for the customers.

2    Q.    Exactly.  So it was very common for -- after the

3    TomorrowNow lawsuit for you to tell customers "we're

4    different from TomorrowNow because we have a controlled

5    process that we audit," and that related to the download

6    for the customer, what you were taking for the customer;

7    right?

8    A.    Yes, what the customer had authorized us to download

9    on their behalf.

10   Q.    It didn't refer to what you put in the library or

11   what you took out of the library?

12   A.    The installation media, et cetera, yes.

13   Q.    So it -- nobody today, in fact, could actually say

14   everything you put in the library and everything you took

15   out or when that happened?

16   A.    Are you talking about the library part that we're

17   talking about that got deleted before the litigation?

18   Q.    Yes?

19   A.    Yes.  We actually have a picture that we presented

20   in the opening.

21   Q.    You have a picture of some file names.  You don't

22   have any records of all the software, the patches, the

23   fixes, the updates that went into the library, or what

24   people took out, and when, when they took it out, what they

25   used it for, you didn't audit any of that, did you?

1    A.    I didn't personally audit it, no.

2    Q.    You're not aware of anybody else auditing it, are

3    you?

4    A.    Not that I'm aware of, no.

5    Q.    Okay.  And so when you were talking about these

6    carefully controlled processes, all were you talking about

7    is when you were taking stuff for the client, not what you

8    were doing with it once you had it at the company; right?

9    A.    I don't think that's an accurate statement.

10   Q.    Okay.  Well, you just -- you don't have any audit

11   records of what you did with this software when it was at

12   the company, do you?

13   A.    I think we have pretty good records of what we did

14   for customers and each of the deliverables that we

15   provided.  That was all turned over in discovery.

16   Q.    That wasn't my question, was it, sir?

17         In this terms of what you were using -- okay,

18   you have a record of what you took from the customer, or

19   took for the customer, and what you gave to the customer.

20         But in terms of what you were actually using at

21   the company, the libraries, the general remote

22   environments, you don't have any audit records of what

23   software was going in those and what was coming out, do

24   you?

25   A.    I think we had some records, but I'm not sure that

1   all of it was complete.

2   Q.    You didn't have a carefully controlled process, an

3   audit trail of what was going into the libraries in the

4   general remote environments, did you?

5   A.    Into the general remote environments, I think we

6   could easily trace them back.  I think as your expert went

7   through, they were all coded with special names and numbers

8   so that they could be traced back, yes.

9   Q.    We had to go through with an expert to do that.  You

10  weren't doing that, were you?

11  A.    Well, clearly we knew where they came from, that's

12  how the designations were derived; right.

13  Q.    What the expert found was you were moving fixes

14  around from clients, you were cloning.  But the point is,

15  you weren't doing any auditing of your environments or your

16  libraries, right, of what was going in or what was coming

17  out?

18  A.    Well, I mean, we were ISO process certified

19  eventually, so I think there was clearly process and audit

20  associated with it.

21  Q.    All right.  When were you ISO process certified?

22  A.    Our ISO quality processes I believe were put in 2009

23  or '10.

24  Q.    2009 or '10.  So from -- and did your ISO process

25  certification, the ISO group, did they look at the

1    libraries?

2    A.    I don't know the exact detail, but there are

3    detailed diagrams that are part of every process in the

4    company and --

5    Q.    Yes or no, sir, did they look at the libraries?

6    A.    That I really don't know offhand.

7    Q.    Did they look at your general testing and

8    development environments?

9    A.    Well, they wouldn't have gone into the detail.  They

10   would have looked at the way that they're set up, and they

11   would have looked at the flows, yes.

12   Q.    ISO auditing has nothing to with the libraries and

13   the testing and development department stuff?

14   A.    Well, it does have to do with our processes and how

15   we move things around within the organization, yes.

16   Q.    All right.  But it doesn't say no one's auditing as

17   to what's going in the environments and what's coming out,

18   nobody's auditing what's going in the library and what's

19   coming out?

20   A.    No.  Again, I don't know the details on this, quote,

21   installation media library.

22   Q.    You don't know the details, but you're telling

23   customers that you have a careful controlled process and do

24   you know the process; right?

25   A.    Well, this email specifically talks about the

```
1    downloads that we were going to do for the customer, so,
2    yes, it's accurate.
3    Q.    Let's look at 1587, please.
4              THE COURT:  Did you offer 4937?
5              MR. ISAACSON:  I would move to admit 4937.
6              THE COURT:  It will be admitted.
7         (Plaintiffs' Exhibit 4937 received into
8         evidence.)
9              MR. ISAACSON:  This is 1587.  This has not been
10   admitted.  I would move to admit it subject to the existing
11   objection.
12             THE COURT:  Are there any additional objections
13   to that, Mr. Webb?
14             MR. WEBB:  None other than as previously stated,
15   Your Honor.
16             THE COURT:  All right.  It will be admitted
17   subject, of course, to the previous objection.
18        (Plaintiff's Exhibit 1587 received into
19        evidence.)
20   BY MR. ISAACSON:
21   Q.    All right.  This is you talking to Mr. Chiu in
22   August 30th, 2007.  Do you see that?
23   A.    Yes.
24   Q.    And you say, "Here is a copy of what we told that
25   Santa Fe Tobacco Company about the differences in
```

1    onboarding processes between us and TomorrowNow."

2            Right?

3    A.    Yes.

4    Q.    Okay.  And you're actually being careful here.  When

5    you tell customers what you're doing, you're only telling

6    them about the onboarding process, when you take in the

7    software.  You're not talking to them about the libraries

8    and the general testing environments; right?

9    A.    Again, didn't see a need to.

10   Q.    And the -- and you are reassuring this customer that

11   you are different from TomorrowNow, and you say in the

12   paragraphs, "Rimini Street starts by helping you ordering

13   delivery"?

14   A.    Yes.

15   Q.    Okay.  That's the onboarding process; right?

16   A.    Yes.  When we bring a new client, when they sign a

17   new contract, or right before we -- there's a lot of steps

18   they need to do to get ready for service from us.

19   Q.    And you told customers that Rimini Street does the

20   downloading, in the middle paragraph, at it's own site

21   using a very controlled, proven process that assures the

22   type of unacceptable issues that happened at TomorrowNow

23   can't happen at Rimini Street ever."

24            That's what you were telling clients?

25   A.    Yes.

1    Q.    All right.  And at this point or shortly after this,

2    I think when we looked at PTX 30, you learned that

3    TomorrowNow had remote testing -- not remote

4    environments -- let me start over.

5               You learned that TomorrowNow had general testing

6    and development environments, and they were halting those,

7    they weren't going to touch the Oracle software anymore?

8    A.    Correct.  That's what their parent company

9    apparently told them that we had heard, yes.

10              MR. ISAACSON:  Can we look at 619.  This was --

11   I move to admit 619 subject to the same objection.

12              THE COURT:  All right.  Are there any additional

13   objections on behalf of the defense.

14              MR. WEBB:  None other than previously stated,

15   Your Honor.

16              THE COURT:  All right.  It will be admitted.

17         (Plaintiffs' Exhibit 619 received into

18         evidence.)

19   BY MR. ISAACSON:

20   Q.    Now, Mr. Ravin, this is an email you wrote in

21   June 2008 internally into your company about what you had

22   told a company called Acushnet; right?

23   A.    Yes, the golf company, yes.

24   Q.    And that customer's biggest challenge was her

25   understanding why Rimini Street would not end up in the

```
 1    same boat as TomorrowNow, and you said, "I explained what
 2    allegedly got TomorrowNow into trouble and our extreme
 3    rigor to insure that never happens here."
 4              Right?
 5    A.    Yes.
 6    Q.    Okay.  You were assuring them that you were rigorous
 7    and TomorrowNow was not?
 8    A.    Yes, that from what we had read, that our process
 9    was different and we were very confident in it.
10              MR. ISAACSON:  Okay.  Looking at three -- move
11    to -- I guess that was admitted.
12              396 I would move to admit subject to the same
13    objection.
14              THE COURT:  Any further objection?
15              MR. WEBB:  I'm sorry, Bill, what was the number?
16              MR. ISAACSON:  396.
17              THE WITNESS:  Okay.  I'm there.
18              MR. WEBB:  Just the same objections, Your Honor.
19              THE COURT:  All right.  The objection is
20    preserved and overruled.  The exhibit is admitted.
21         (Plaintiffs' Exhibit 396 received into
22         evidence.)
23    BY MR. ISAACSON:
24    Q.    Exhibit 396, now you're talking to -- about what
25    messages you're giving to Wendy's; right?
```

430

1   A.    I'm sorry.  I'm just reading this a second, please.

2   Q.    Do I have this right, this is about your

3   communications with Wendy's?

4   A.    Yes.

5   Q.    And on the first page you write to one of your

6   salespeople, whose name I mispronounced before, Hakenewert?

7   A.    Hakenewert, yes.

8   Q.    Hakenewert.  I give up.

9         "Rimini Street uses detailed log files and

10  security precautions to assure that such activities are

11  carefully monitored, detailed, controlled, and audited for

12  accuracy."

13        And you were talking about TomorrowNow after the

14  lawsuit.  You were saying "we're different from

15  TomorrowNow, we're careful, we're auditing."

16  A.    Yes.  Every download, we took precautions with the

17  log-in ID that was authorized and making sure it was turned

18  off after and keeping a log of all the files downloaded.

19  Q.    It's clear this was a generalized message that you

20  were giving the clients; right?

21  A.    Yes, as of that date, yes.

22  Q.    All right.  It would be hard to estimate how many

23  clients you gave this message to?

24  A.    I hope we gave it to a lot of prospects, yes.

25        MR. ISAACSON:  All right.  I'll ask you to look

1    at 5457.  Now, 5457, I don't have a note -- I don't think

2    it's been admitted.

3              COURTROOM ADMINISTRATOR:  No, it's not.

4              THE WITNESS:  Yes, I'm on 5455.

5              COURTROOM ADMINISTRATOR:  5457.

6              THE WITNESS:  5457.  That would help.

7              MR. WEBB:  Your Honor, without reading this

8    closely, I can't determine if I need to make my previous

9    objections.

10             MR. ISAACSON:  You don't need to.

11             THE COURT:  I think it's in evidence.

12             COURTROOM ADMINISTRATOR:  No.

13             THE COURT:  Is this a new subject matter?

14             COURTROOM ADMINISTRATOR:  It's new.

15   BY MR. ISAACSON:

16   Q.    5457, the -- here you're talking to a customer

17   called -- talking about your discussions with Correctional

18   Medical and their legal team; right?

19   A.    It appears so, right.

20   Q.    All right.  This is March 26, 2007.  And you're

21   talking to Mr. Davichick about this; right?  About

22   Correctional Medical?

23   A.    Yes.

24   Q.    Okay.  And going to the bottom of the first page,

25   all right, you say, "They're forwarding what the legal

1    people from Correctional Medical are saying," and there's

2    an item 5D?

3    A.    Yes.

4    Q.    So the legal people from one of your customers are

5    saying, "As I understand, we wouldn't need to provide a

6    copy of the software to Rimini Street.  Also, I don't

7    believe Oracle/PeopleSoft would allow us to provide a copy

8    of the software."

9            You had a customer's legal department telling

10   you that they didn't believe they were allowed to give you

11   copies of the software; right?

12   A.    Yes, we'd had several customers say that over the

13   years.

14   Q.    Right.  You had several customers, including lawyers

15   from those customers, tell you you shouldn't be taking

16   copies of the software?

17   A.    They weren't sure that there was a right to give it

18   to us, that's correct.

19   Q.    Well, it was stronger than that, wasn't it, sir?

20   They told you they didn't think you had the right to do

21   what you were doing?

22   A.    Right.  And for those customers who made that

23   choice, we did remote support.

24   Q.    So if a customer said to you "we think what you're

25   doing is illegal," we wouldn't have copies on the Rimini

1    system, you would just have copies on the customer system.

2    But unless a customer said that, you would put the copies

3    on the Rimini system?

4    A.    Well, sure.  As we've talked about earlier, if a

5    customer said that they didn't believe their contract had

6    the right for it, then we said, "Fine, we will work with

7    you the way your contract says it should be worked with."

8    Q.    Let's look at 5459?

9    A.    Uh-huh, I'm at 5459.

10   Q.    All right.  This is on the same day.  Again, March

11   26 -- I'm sorry, not the same day.

12          COURTROOM ADMINISTRATOR:  That's not admitted.

13          MR. ISAACSON:  Right.  I move to admit 5459.

14          MR. WEBB:  No objection, Your Honor.

15          THE COURT:  It's admitted.

16       (Plaintiffs' Exhibit 5459 received into

17       evidence.)

18   BY MR. ISAACSON:

19   Q.    I guess, ironically, this is on March 26, exactly

20   one year later, and now you're talking about a SonicWall.

21          And SonicWall is writing to you giving you

22   comments from their legal department in the middle of the

23   first page; right?

24   A.    Correct.

25   Q.    And they say,

434

1              "The programs that execute the mirror

2      environment are protected by copyright.  The license

3      agreements under which we obtain the programs carry a

4      prohibition against copying.  My understanding of this

5      document is that Rimini Street wants us to copy these

6      programs and give them so they can provide support to us.

7      That is a big problem since we would need the consent of

8      each of the licensors to make those copies."

9      A.    Yes, that's what it says.

10     Q.    You had more legal warnings from clients with legal

11     departments that what you were doing was copyright

12     infringement.

13             But unless the customer told you not to --

14     unless the customer told you they only wanted remote

15     environments, that is, environments on their system, you

16     went ahead with the general environments on the Rimini

17     system; right?

18     A.    I wouldn't agree with that broad statement.

19             This is a customer telling us they believe their

20     specific contract doesn't allow it, and so we would work

21     with that.

22     Q.    Well, when you say you would work with that, what

23     you mean is that if a customer said what you're doing is

24     illegal, you would say, "fine, we'll put it on your

25     system."

```
 1              But for the other customers who didn't say that,
 2   you would put the copies on the Rimini system; right?
 3   A.     If we didn't have a reason from a customer raised
 4   that they believed that there was an issue with us, then,
 5   no, we believed that the standard license agreement allowed
 6   for us to have a copy.
 7   Q.     Even when customers were telling you, and their
 8   legal departments were telling you, that what you were
 9   doing was illegal?
10   A.     Well, they said we couldn't do it within the
11   confines of the contract we were proposing with that
12   customer, and we would accommodate that.
13   Q.     I'd like to get an answer to my question, sir.
14              Even when customers were telling you, and their
15   legal departments, that what you were doing was illegal,
16   you continued to build the environments on the Rimini
17   system?
18   A.     That's not true.
19   Q.     Well, let's find out what part of that wasn't true.
20              You had customers telling you what you were
21   doing was illegal; right?
22   A.     They had us -- telling us that they didn't believe
23   that the contract terms we proposed were acceptable under
24   their license agreement.
25   Q.     They told you -- we just looked at a customer who
```

1    told you what you were doing was illegal, SonicWall?

2    A.    Didn't say that.  It says that based on their

3    license agreement, it says that their license agreement

4    doesn't permit it.

5    Q.    Oh, so you would just assume their license agreement

6    was different from everybody else's?  Is that what you're

7    saying?

8    A.    I've negotiated enough license agreements to know,

9    yes, license agreements do vary.

10   Q.    So you didn't -- so your view, when you thought you

11   were covered by the license agreements, was that the

12   license agreements had a lot of variations; is that right?

13   A.    But standard provisions that always allow the third

14   party to do work on behalf of the customer, yes.

15   Q.    Okay.  Let's break that down.

16         You thought there was a standard provision that

17   allowed for third parties to work, but then there were

18   additional restrictions that might stop a third party from

19   working in some of the licenses.  Is that what you thought

20   was going on?

21   A.    If those license agreement negotiations included

22   such provisions that were negotiated.

23   Q.    Right.  And so when you say that you had a belief

24   that what you were doing was legal, you didn't have any

25   information unless the client happened to tell you about

1    the variations in the licenses?

2    A.    That's my prior testimony, yes.

3    Q.    And, in fact, you didn't know -- if you were relying

4    on that one general provision that you say was in there,

5    you didn't even know if the restrictions on putting copies

6    on your system were common through the license agreements.

7    You didn't know whether that was a standard provision;

8    right?

9    A.    Well, I didn't expect it to be a standard provision,

10   again, based on my experience in the industry of 30 years,

11   yes.

12   Q.    Your experience in the industry of 30 years was

13   PeopleSoft licenses in 2001 and before; right?

14   A.    And other licenses that customers had presented or

15   we'd seen online for publicly available documents, yes.

16   Q.    Now, and just looking at 5459, this client was

17   telling you that you were going to be violating Oracle's

18   copyrights; right?

19   A.    This is from their legal department reading their

20   contract, and they said that based on what we were asking

21   them to do in the contract, that they believed there was a

22   conflict.

23   Q.    All right.  And you just assumed that for other

24   customers that wouldn't be the case; is that right?

25   A.    Yes.  When you're serving IBM and many other large

1      companies, yes, you know that they do look at their license

2      agreements carefully.

3      Q.    All right.  Let's look at PTX 495.  This has been

4      preadmitted.

5             This is Beth Lester who is an executive with

6             Rimini Street; right?

7      A.    Yes, she's been on leave for a couple years from

8      Rimini.

9      Q.    And she's talking to Mr. Davichick who was either

10     the head of sales, or the head of sales because he was the

11     only one in sales, in March -- in April 2007; right?

12     A.    Yeah.  I think he was the only one in sales.

13     Q.    Okay?

14     A.    Actually, I'm sorry, there were actually two sales

15     reps at that point.  Rich Hughes had joined us.

16     Q.    All right.  And what she writes, Beth Lester writes,

17             "No more" -- in the middle of the page, "no more

18     options for customized tax and regs per prior discussion

19     with Seth.  I brought it up during our kickoff call because

20     we offered this to them prior.  Notice how I steered them

21     into vanilla."

22             Some new terms?

23     A.    Yes.

24     Q.    So customize -- well, vanilla means it's an

25     unmodified environment, it's just plain vanilla.  You've

```
 1    got the software, you're not making any tweaks or

 2    customizations to it.  Is that generally right?

 3    A.    Yes.  A vanilla environment means it's as was

 4    delivered from Oracle, so no customization to it.  It's

 5    exactly what vanilla means, yes.

 6    Q.    And what she's saying is we don't -- she had talked

 7    to you, and you weren't going to be doing any

 8    customizations for tax and regulations.  That would be for

 9    PeopleSoft; right?

10    A.    Yes.  It requires a little explanation though.

11    Q.    So she's steering the customers towards vanilla

12    environments.  Don't use the customizations, use the

13    vanilla environments; right?

14    A.    Yes.

15          MR. ISAACSON:  Okay.  Now, let's look at 2159.

16    2159 has been preadmitted.

17          THE WITNESS:  All right.  I'm at 2159.

18    BY MR. ISAACSON:

19    Q.    This is August 2008.  This is from Mr. Chiu, and

20    he's writing to, among others, Beth Lester, Brian Slepko,

21    George Lester, Mr. -- is it Benge?

22    A.    Yes, Jim Benge.

23    Q.    All right.  These are some of the most senior people

24    at Rimini Street at the time other than you; right?

25    A.    Yes.
```

440

1    Q.    And he says,

2          "I'd like to gather everyone's" -- in the second

3    paragraph, "I'd like to gather everyone's input regarding

4    the topic of selling/supporting our message."

5          All right.  And he goes on to say,

6          "While we've always 'sold' the benefit of having

7    a copy of the client's production database for our tax

8    development work, it's also been positioned as a benefit to

9    the client to better support their customizations."

10         What he's saying there is one of your sales

11   messages is "we want these general testing and development

12   environments so that we can offer you customization of your

13   environments and not just plain vanilla environments."

14         Is that right?

15   A.    I'd say it differently.  Could I explain?

16   Q.    I'm sure you would say a lot of things differently,

17   but I would like a yes or no answer?

18   A.    That's not an accurate description.

19   Q.    Okay.  The -- he is talking about that, as part of

20   your general sales pitch, that you say to the clients "we

21   will support customization."

22   A.    That's not what he's referring to.

23   Q.    Okay.  That is part of your sales pitch, isn't it?

24   A.    Yes, we support all customizations that a client

25   makes to their environment.

1    Q.    And you use the -- your testing and development

2    environments to support those customizations, isn't that

3    right?

4    A.    Depends on the customization, yes.

5    Q.    So you use the testing developments to support

6    customizations though you also use other things; is that

7    fair?

8    A.    That would be fair, yes.

9    Q.    And Mr. Chiu says,

10        "The underlying truth is we aren't truly

11   leveraging their environments in such a fashion.  It's

12   primarily purpose is that of a working, up-to-date

13   environment that's required for development of tax updates,

14   particularly in the absence of a viable, fix-master demo."

15        You're not actually using environments in that

16   fashion.

17        And then,

18        "To truly support our clients' ongoing

19   customization means regular synchronization of the clients

20   code changes, and possibly database refreshes over time,

21   resulting in significant overhead downstream challenges of

22   reconciling environmental discrepancies beyond our

23   infrastructure and team capabilities."

24        He is saying there that you are telling the

25   clients that you can support customizations with these

442

1    environments when that's not true; correct?

2    A.    No, you're completely wrong in the way that you

3    understand this document.

4    Q.    All right.  He is saying that to truly support our

5    clients' ongoing customization means regular

6    synchronization, database refreshing over time, significant

7    overhead and downstream challenges, and that's beyond our

8    infrastructure and team capabilities; correct?

9    A.    That's what he's saying, but your interpretation is

10    completely wrong.

11    Q.    The --

12    A.    I'm happy to explain to the jury if you want me to.

13    Q.    No, I'll let your counsel -- I think it says what it

14    says.

15          And one topic I didn't cover with you.  We've

16    talked about how you are the CEO of Rimini Street.  You

17    also own roughly 70 percent of the company, right, of the

18    active shares?

19    A.    Probably somewhere around that, yes.

20    Q.    Okay.  And back in November 2011 you put a value on

21    your stock holdings in Rimini Street of between 30 and 40

22    million; is that right?

23    A.    Yes.

24    Q.    Okay.  And that's most of your net worth?

25    A.    That's correct.

1    Q.    And you also have family members who are invested in

2    the company; right?

3    A.    Yes.

4    Q.    Okay.  And, now, one of your goals for the company

5    in making it valuable is something you call scalability;

6    right?

7    A.    Yes, which means to be able to serve more and more

8    customers more efficiently over time.

9    Q.    All right.  To have -- to have fewer people or the

10   same amount of people serve more customers?

11   A.    Yes, essentially that would be -- that would be a

12   correct way to look at it, although you're adding people

13   all the time, yes.

14   Q.    And you have actually said to people about the value

15   of your company that it should be given a valuation that's

16   similar to a software company because of that scalability;

17   right?

18   A.    Yes.  A software company gets highly valued because

19   of the concept of building one piece of software and being

20   able to sell it multiple times, yes, at low cost.

21              MR. ISAACSON:  All right.  Let's look at PTX 12

22   which has been preadmitted.

23              THE WITNESS:  Give me a second.  I'm drowning in

24   binders.

25              Okay.  I'm at PTX 12.

1   BY MR. ISAACSON:

2   Q.    And you're talking to someone in this email named

3   Scott.  Is he -- from El Dorado.  Is he a potential

4   investor?  Who is he?

5   A.    Yeah, that's El Dorado Capital.  They're a Silicon

6   Valley investor that puts money in technology companies.

7   Q.    All right.  And what you argue to him on the first

8   page in point one is you're talking about the valuation for

9   your revenue.

10  A.    Yes.

11  Q.    And you expect a 3 to 4X with the same type of

12  business, because he had been saying I think it should only

13  be 1 to 2X.

14        And you see scalability closer to a software

15  company than a consulting company.  You wanted to get the

16  same type of valuation as a company that makes software

17  without producing any software?

18  A.    Well, I think as we said closer to.  You can't get a

19  software valuation being a services company.

20  Q.    All right.  You want to get something closer to a

21  software company without actually having to make the

22  software.

23  A.    Right.

24  Q.    And to do that, you built a business -- you had your

25  business model, and you saw me show this in opening

1    statement, said that your business focuses on the most

2    profitable component of software business, annual

3    maintenance fees, without any of the capital investment

4    required to develop software.  That is accurate, was it?

5    That's your goal?

6    A.    Yes.

7    Q.    Okay.  And at this point, as I understand it,

8    there's also a concept in your business of a backlog of

9    bookings?

10   A.    Yes, this is like aircraft orders that the customer

11   can cancel, they're not really committed, but they give you

12   an idea of the future, yes.

13   Q.    Right.  And by the -- so by the end of 2011, 2012,

14   do you remember what your backlog of bookings were?

15   A.    Sorry, not offhand.

16   Q.    Okay.  Today can you measure them?

17   A.    Today I know what they are, yes.

18   Q.    What are they?

19   A.    About one point -- I think they're 1.6 billion.

20   Q.    The -- your -- your -- your counsel talked about the

21   term forced upgrades in opening statement, and that's

22   referring to new upgrades to new versions of the software;

23   right?

24   A.    Yes, that a vendor requires that a customer install

25   in order to be eligible to continue support.

1    Q.    All right.  And Rimini Street, at least until -- at

2    least through 2011, as I understand it, did not provide any

3    security updates to its clients; right?

4    A.    That's correct.

5    Q.    And, in fact, you actually told customers that they

6    weren't necessary, and they -- you told them they weren't

7    necessary; right?

8    A.    Yes, because it's an outdated model relative to what

9    we call holistic security today.

10   Q.    Yeah.  All right.  Holistic security means don't put

11   security in the software, just put it in the firewall at

12   your place of business; right?

13   A.    It's actually the most innovative version available

14   today for security people, yes.

15   Q.    All right.  But it involves not putting any security

16   updates in the software to deal with hackers; right?

17   A.    Right.  It's called virtual patching and firewall

18   systems, yes.

19   Q.    Right.  And the firewall systems are systems that

20   are maintained by the client, the customer, not by Rimini

21   Street for the customer; right?

22   A.    That's correct.  They're responsible for their own

23   firewalls and their own security protections.

24   Q.    You tell them, "gee, the way it should work is you

25   should upgrade your firewalls, you should protect yourself,

```
1     and we don't need to put any security in our -- security

2     updates in the software."

3              Right?

4     A.    Yes, that's the -- if you go out and look at the

5     white papers, that's security patching and holistic

6     security, yes.

7     Q.    All right.  That was part of your sales

8     presentations, wasn't it?

9     A.    I'm sure it was because, again, we can't provide

10    security patches because we don't have those parts of

11    source code for Oracle products.

12    Q.    Let's look at example 5433 -- I'm sorry, 5455.

13    A.    Okay.  I'm on 5455.

14    Q.    All right.  And the -- this is an email from Krista

15    Williams talking about how to talk to customers.  Do you

16    see that?

17    A.    Yes.

18    Q.    All right.  And it says -- this is July 2009 --

19             MR. ISAACSON:  Do I need to move to admit this?

20    Yeah, I move to admit 5455, your Honor.

21             MR. WEBB:  No objection, Your Honor.

22             THE COURT:  It's admitted.

23          (Plaintiffs' Exhibit 5455 received into

24          evidence.)

25
```

1     BY MR. ISAACSON:

2     Q.    All right.  In the middle, the question is asked,

3           "Are security patches part of the maintenance

4     agreement similar to tax and regulatory updates?"

5           "Answer, the biggest security threat is

6     unauthorized access to a client's network."

7           And it concludes a little farther down, "The

8     strategy that we recommend" --

9           MR. ISAACSON:  Right above the paragraph --

10    right above that, Matt.  There we go.

11    BY MR. ISAACSON:

12    Q.    "The strategy that we recommend to our clients is to

13    shore up all other aspects of security such as user

14    accounts, network access, firewall rules and system

15    architecture."

16          You recommend that they handle the security and

17    that you not worry about security upgrades for the

18    software; right?

19    A.    That's absolutely correct.  That's the holistic

20    security model, yes.

21    Q.    All right.  And when -- another term, you said --

22    well, we're talking about upgrades, we're talking about new

23    versions of the software; right?

24    A.    Yes.  Again, there's always semantics, but

25    essentially it means a big version, a next big release that

1      requires a lot of labor to install, yes.

2      Q.    And that's -- Rimini Street doesn't provide any of

3      those new versions?

4      A.    Not at all.  We keep their existing software

5      licenses working, yes.

6      Q.    And you don't provide any of the security updates.

7      A.    No, but we do provide security guidance.  We have a

8      security team called Global Security, yes.

9      Q.    You have guidance so you tell the customer what they

10     should be doing with their systems?

11     A.    That's correct.

12     Q.    Okay.  And you're charging generally 50 percent off

13     support of what Oracle is, charging but you're doing that

14     without providing the upgrades to the new versions, without

15     the security updates, and you are projecting 50 percent

16     margins for that; right?

17     A.    Yes.  We provide a different set of services.  It's

18     a competing offer that's not one-to-one.  Oracle does some

19     things we can't, and we provide some services that Oracle

20     doesn't.

21              MR. ISAACSON:  The -- I'm going to go back to

22     how you built your business.  We talked some about

23     references.

24              Can we look at 245.  245 has been preadmitted.

25              THE WITNESS:  Okay.  I'm there.

1    BY MR. ISAACSON:

2    Q.    This is you writing to someone, Andrew Neville, in

3    August 2008, as well as to Mr. Davichick.

4    A.    Both salespeople.  Yes.

5    Q.    You say,

6            "Ahhh...we have built a business on

7    nickel-and-dime clients.  While nickel-and-dime clients

8    don't provide much revenue, they usually more than make up

9    for it in fantastic references and a willingness to

10   participate in media events that other Fortune 500s often

11   will not do due to publicity restrictions."

12           So references were how you built your business;

13   right?

14   A.    References get you the account, but if you don't

15   deliver, they're gone, yes.

16   Q.    Okay.  And you had a whole internal infrastructure

17   to track references that you -- you tracked who was giving

18   you references, you tracked who was likely to give you

19   references, you tracked who your top reference clients

20   were?

21   A.    Yes, absolutely.

22           MR. ISAACSON:  Okay.  And let's look at 428

23   which has been preadmitted.

24            MR. ISAACSON:  This is sort of small print, but

25   Matt will make it bigger for you.

1   BY MR. ISAACSON:

2   Q.    And this is in 2010, you're tracking who is giving

3   you the most -- which of your customers are giving you the

4   most number of references for JDE, PeopleSoft, and Siebel,

5   as well as SAP which we won't talk about?

6   A.    Yes.

7         MR. ISAACSON:  All right.  Can we look at some

8   slides here.  Let's look at the top, Siebel references.

9   BY MR. ISAACSON:

10  Q.    All right.  We've put -- we took the top Siebel

11  references, XO, Epicor, Wenger, Novell and Enable, and put

12  them around the circle from that 428.  Do you see that?

13  A.    Yes.

14  Q.    All right.  And we also made a note here, for

15  Enable, you got references from FileNet, Beekley, and

16  Orbitz; right?

17        You got references -- in order to get Enable,

18  you got references from some earlier customers, FileNet,

19  Beekley, Orbitz.  Does that sound right?

20  A.    I don't remember.  I think it was in a prior

21  document we looked at.

22  Q.    Okay.  And Enable gave a reference, in fact, to

23  Novell?

24  A.    Are you asking me to confirm that?

25  Q.    Do you remember?

452

1    A.    I have no recollection.

2    Q.    The -- several of these reference customers had the

3    environments; right?

4    A.    If you're telling me that's what it is.

5    Q.    This is part of the stipulation, four out of the

6    five, and then you had the Oracle library during this

7    period; right?

8    A.    You're putting it up there.

9    Q.    Yeah.  And then you had two of these companies who

10   received those DVDs of Oracle SupportWeb that you took

11   using one customer's sign-in and then distributing them to

12   other customers?

13   A.    Yes.  Again, all of them entitled to the same

14   material.

15   Q.    So if these are the companies that you're building

16   your ongoing Siebel business from, and they have -- and

17   they all have these practices that we've been talking

18   about; right?

19   A.    I assume -- you want me to confirm what's on your

20   screen?

21   Q.    Does it sound right to you?

22   A.    Again, I don't independently remember.

23   Q.    Okay.  How about the JDE references?

24         All right.  We got JDE references with

25   environments, and the library was in existence with JDE

1   material; right?

2   A.    I'll go with the stipulation that you've said.

3   Q.    All right.  Let's look at PeopleSoft.  You listed

4   your top PeopleSoft references?

5   A.    By the way, Yum Foods, for people who don't know, is

6   Taco Bell, KFC and Pizza Hut.

7   Q.    The -- you had these -- your top PeopleSoft

8   references, all but one have the environments.  You had the

9   Oracle library with the PeopleSoft.

10          You had all of them with cross-use of fixes

11  according to Professor Davis, and then cloning for all but

12  one.

13          Does that all sound to you consistent with the

14  facts?

15  A.    Again, I can't independently say.

16  Q.    All right.  Now, the reason that you had these --

17  well, let's actually ask -- I want to ask you about those

18  JDE environments.

19          Sorry, I lost my place.

20          Let's talk again about what you were telling the

21  customers.  I think we -- are we in agreement that as part

22  of your standard messaging you told customers they would

23  not be violating their customer license agreements?

24  A.    That was our belief, unless they gave us information

25  to the contrary that we just didn't take into account.

454

1    Q.    You told them more than your belief, you told them

2    we fully comply with your license agreement; right?

3    A.    Yes.

4    Q.    All right.  And you told them that you respected

5    Oracle's intellectual property in ensuring that their

6    rights under each of the software license agreements are

7    enforced; right?

8    A.    Yes.

9    Q.    That was standard messaging by your company; right?

10   A.    Yes.

11   Q.    In fact, counsel, at the opening statement, held

12   up -- had a slide with shoes on it that you stood in the

13   shoes, that was a line you used to customers, that you

14   stood in their shoes?

15   A.    Yes, we believed we stood in the shoes of the

16   customer in their license agreement.

17   Q.    In fact, you told customers you had a zero tolerance

18   policy for inappropriate conduct related to intellectual

19   properties?

20   A.    Yes, any violation of intellectual property would be

21   dealt with.

22   Q.    And when customers told you they had concerns that

23   you -- that there would be violations of the license

24   agreements, you tried to tell them not to be concerned;

25   right?

1    A.    Yes.  Well, if they wrote me back and said they

2    weren't sure whether their license agreement allowed, for

3    example, for us to have copies, I would write back and say

4    to my knowledge, yes, based on my experience, I believe

5    that is correct, unless they give me information to the

6    contrary.

7    Q.    All right.  Well, let's talk about that.  Unless

8    they give you information to the contrary.

9              MR. ISAACSON:  Let's look at 4936, which I need

10   to admit, and I move to admit.

11             THE COURT:  Let me interject.  Ladies and

12   gentlemen, we've gone off a little bit of our regular

13   schedule with breaks.

14             Are there any of you who would like to take a

15   short break?

16             It appears that we're all right.  Let's go

17   forward.

18             MR. ISAACSON:  I've never seen a jury say that.

19             THE COURT:  Well, it only takes one hand.

20             MR. ISAACSON:  All right.  Do you have 4936?

21             THE WITNESS:  Yes, I do, sir.

22             MR. ISAACSON:  May I admit it?

23             MR. WEBB:  No objection, Your Honor.

24             THE COURT:  It's admitted.

25

1             (Plaintiffs' Exhibit 4936 received into

2        evidence.)

3    BY MR. ISAACSON:

4    Q.     These are notes you're responding to a customer,

5    Correctional Medical; right?

6    A.     That's what it appears, yes.

7    Q.     And you tell them in section 5D -- you're answering

8    their question.  They say,

9             "As I understand we wouldn't need to provide a

10   copy of the software to Rimini Street.  Also, I don't

11   believe Oracle/PeopleSoft would allow us to provide a copy

12   of the software."

13            And in response you say,

14            "Rimini Street needs copy of software we help

15   you place with Oracle like all other clients to build test

16   and development environments for updates.  This is offsite

17   test/dev environment, and you are okay to have as many as

18   necessary just like outsourcers or hosted environments."

19            So they told you that they didn't believe they

20   were allowed to give you copies, and you said, "it's okay

21   for us to get as many as possible," and you didn't say

22   anything like "unless you tell us otherwise," or "go read

23   your license agreement," or anything like that, you just

24   said, "it's okay to have as many as necessary."  Right?

25   A.     Yes, this is exactly the response that we gave them.

1    Q.    All right.  And that was your typical response.

2    Customers would say, "gee" -- if a customer said, "gee, we

3    don't think we're allowed to do this," you would say "it's

4    okay, you can give us as many copies as you want."

5    A.    I don't think that's what it actually says there.

6    It says we can create as many test and development

7    environments as necessary.

8    Q.    Okay.  Well, thanks.

9          So you would -- if a client said "we don't think

10   we're allowed to do this under our agreement," you would

11   say "we are allowed to have as many test and development

12   environments as you want."

13   A.    Yes, unless they say that their license agreement

14   reads otherwise.

15   Q.    Well, you didn't say anything about unless your

16   agreement says otherwise; right?

17   A.    Not in this particular document, no.

18   Q.    All right.  Are you aware -- well, I will look

19   forward to the documents that do have that, where you say

20   "unless your agreement says otherwise."

21   A.    Well, I think if you look, most of these documents

22   that we are talking to are lawyers, are people in

23   procurement who have expertise in contracts.

24   Q.    Okay.  If there are any documents where you said

25   "unless your contract says otherwise," I will look forward

1     to seeing them.

2             They -- let's look at 23.  You mentioned

3     Brazoria County before?

4     A.    I'm sorry, is that PTX 23?

5     Q.    Yes.

6             COURTROOM ADMINISTRATOR:  It's not admitted yet.

7             MR. ISAACSON:  It's not?  No, it's not.  I don't

8     know why not.

9             MR. WEBB:  No objections, Your Honor.

10            THE COURT:  All right.  It's admitted.

11        (Plaintiffs' Exhibit 23 received into

12        evidence.)

13    BY MR. ISAACSON:

14    Q.    All right.  You're copied at the top of 23 on a

15    discussion -- on a message that's been sent to you from an

16    attorney for Brazoria County in Texas?

17    A.    Yes, who is the district attorney for Brazoria

18    County.

19    Q.    This is on the second page, the message is coming

20    from Trey Picard, Assistant District Attorney, Brazoria

21    County in Texas?

22    A.    That's our client.

23    Q.    He writes to you on the first page, or writes to

24    your company,

25            "Our office is reducing Rimini Street, Inc.'s,

1    proposed contract with Brazoria County."

2              He says, "While our review of your company's

3    terms is ongoing, we have one initial concern about whether

4    your company's business model for providing support

5    services (i.e., the copying or downloading of the support

6    reference materials from PeopleSoft or Oracle using the

7    county's online support account access code) would violate

8    the terms of the county's initial license agreement with

9    PeopleSoft."

10             And he actually refers to specific sections.

11             Now, in response to him, you wrote him

12   Plaintiffs' Exhibit 24 which has been preadmitted, and your

13   response is on page 2?

14   A.    Yes.

15   Q.    All right.  And you were writing to Brazoria County

16   now, and it's being written on your behalf, but you're the

17   one who drafted this; right?

18   A.    Yes, I drafted the response.

19   Q.    All right.  And you talk, just like your counsel did

20   in opening statement, about your background with

21   PeopleSoft, Background and Qualifications of Reviewer?

22   A.    Yes.

23   Q.    All right.  And after you do those background and

24   qualifications, you do Findings and Opinion?

25   A.    Yes.

1    Q.    All right.  And you say at the top of Findings and

2    Opinion,

3                "Best practices for all PeopleSoft releases

4    include the use of at least two test and development

5    environments."

6                All right?  One of which is for demo, one of

7    which is that vanilla environment you were talking about?

8    A.    Yes.

9    Q.    So you're saying that's what best practices is?

10   A.    Yes, as from PeopleSoft, yes.

11   Q.    And at the bottom of that paragraph, you say,

12   "Because of these realities of need," that's the need to

13   have the environments; right?

14   A.    It's the need to have a wider amount of testing

15   environments due to the PIA architecture, which more

16   pieces, more levels, yes.

17   Q.    The need refers to your need to have those testing

18   and development environments; right?

19   A.    No, I believe the need refers back to the change in

20   the PIA architecture.

21   Q.    Okay.  But you had a need for those environments,

22   didn't you?

23   A.    Well, certainly.  Anyone providing support needs

24   test and development environments, whether they're local to

25   us or whether remote to a customer.

1    Q.   And so you say, continuing,

2              "Because of these realities and need, we never

3    counted actual test and development systems, but instead

4    focused on license compliance for production systems only."

5              So what you're saying to Brazoria is, because of

6    the realities and need, you never counted the test -- you

7    never applied the actual test and development systems to

8    the issues of license compliance.  For that, you look to

9    the production systems only.  Right?

10   A.   That's correct.  PIA architecture required

11   production system accounting but not tested development

12   systems.

13   Q.   So that's another new term, production systems.

14             Production systems is when I actually sit in my

15   office and have the software and work with it; right?

16   That's what the customer's using on a daily basis?

17   A.   It's the piece of software that's actually running,

18   so the one that's calculating payroll or calculating the

19   finances.

20   Q.   It's not the testing, it's not the development, it's

21   not the troubleshooting, it's not any of that, it's the

22   actual thing --

23   A.   It's the sacred production system that nobody should

24   touch unless they know what they're doing, yes.

25   Q.   And so you're telling Brazoria County that you

```
 1    focused -- you focused whether there was license compliance
 2    only on one of these production systems and not with the
 3    test and development systems; right?
 4    A.    Yes.  I wrote most of those agreements for many
 5    customers, so, yes.
 6    Q.    Have you seen a single license agreement with Siebel
 7    that uses the term --
 8    A.    This is --
 9    Q.    -- production system?
10    A.    This is PeopleSoft.
11    Q.    I know.  I'm going to go through each one.
12          Have you seen a single license agreement with
13    Siebel that uses the term production system or production
14    environment?
15    A.    No, I'm not sure it does.
16    Q.    How about PeopleSoft?
17    A.    Yes, PeopleSoft does have production limitations,
18    yes.
19    Q.    Okay.  But do they have any -- have you seen any
20    agreement that says this license agreement only applies to
21    production systems and doesn't apply to testing and
22    development environments?  Have you ever seen that?
23    A.    Well, yes, the agreements that I wrote with
24    PeopleSoft have separate from, they list out production,
25    how many production copies you're licensed for, the
```

1    geography you can run it in, and talking about your ability

2    to use test and development systems as needed.

3    Q.    Right.  They say -- apparently you're referring to

4    some agreement that says if it exists?

5    A.    These are part of the license agreement.  They're

6    amendments to the core agreements written before 1999.

7    Q.    So is it your testimony that there are license

8    agreements that say our licensing restrictions only apply

9    to production environments, they don't apply to testing and

10   development environments?

11   A.    No, you're reading too broadly.

12   Q.    Okay.  So you are unaware of any license agreements,

13   Siebel, PeopleSoft, JD Edwards, that says that the

14   licensing restrictions apply only to production

15   environments and don't apply to testing and development

16   environments?

17   A.    No, generally in a licensing agreement --

18   Q.    Are you aware of any?

19   A.    Oh, yes.

20   Q.    Are you aware of any license agreements from those

21   three -- for those three types of software that say the

22   license restrictions apply only to production and not to

23   testing and development?

24   A.    They do not say that related to the other terms.

25   They do call out production separate from test and

1    development.

2    Q.    Okay.  And because of this, your analysis of

3    production, you say in your conclusion to Brazoria County,

4         "In conclusion, it is our opinion based on

5    experience and industry knowledge that Rimini Street's

6    services do not violate the intent of the collective

7    provisions of Sections 2.1, 4.2 and 14.2 of the agreement."

8         All right?  You didn't say to them -- and at

9    this point -- this wasn't -- this is after they gave you

10   the agreement; right?

11   A.    Yes.  I'm having a dialog with the district attorney

12   of Brazoria County, yes, a lawyer, yes.

13   Q.    And you gave him your opinion of the intent of the

14   provisions based on this notion that the licensing

15   compliance applied to production systems only; right?

16   A.    That's not what this actually says.

17   Q.    But you said you would -- you focused at the top on

18   license compliance for production systems only; right?

19   That's what you wrote?

20   A.    Yes, sir, but that's only relating to test and

21   development systems, not the general full license of the

22   product.

23   Q.    And in response to that, Brazoria County had you

24   enter a contract which said that if you were sued -- they

25   were sued for copyright violations, you would have to

```
 1    provide them indemnification, meaning you would cover the
 2    costs and any damages associated with that; right?
 3    A.    That's true in every single contract we signed, yes.
 4    Q.    Okay.  Now, Brazoria County was not the only one
 5    that you told the license applied only to production
 6    systems; right?
 7    A.    I'm sorry, you'll need to clarify that question.
 8    Q.    Let's look at 604 which, with any luck, is the first
 9    exhibit -- one of the first or second exhibits in your
10    binder.
11              COURTROOM ADMINISTRATOR:  It's not admitted yet.
12              MR. ISAACSON:  It's not admitted.  I would move
13    to admit it.  Oh, I have a note it's preadmitted.
14              THE WITNESS:  I'm at 604.
15              MR. WEBB:  Either way, we don't object, Your
16    Honor.
17              THE COURT:  It is admitted.
18              (Plaintiffs' Exhibit 604 received into
19              evidence.)
20    BY MR. ISAACSON:
21    Q.    All right.  Here you are talking about your
22    conversations with a customer named Spherion; right?
23    A.    Yes.
24    Q.    All right.  And going to page 4 of 5, Spherion
25    writes to you --
```

1              MR. ISAACSON:  Pull that up there on number one.

2     BY MR. ISAACSON:

3     Q.    "I have received our legal team's review of the

4     Rimini Street agreement.  Please address the following

5     concerns:

6              "One, intellectual property infringement - we

7     are concerned that the remedies Rimini offers (amount of

8     liability accepted) for potential infringement do not cover

9     the likely associated damages.  This concern rises from the

10    TomorrowNow lawsuit as well as the potential use of

11    underlying Oracle software to perform Rimini support

12    services."

13             In this response to that, on page 1, you write

14    to the salesperson,

15             "Here is our response to the licensing concern -

16    please deliver this ASAP to Spherion.

17             "Section 2 of the Software End User License

18    Agreement and Services Agreements governs the restrictions

19    on transfer of title or 'lending' the software for 'use' by

20    others (in a production capacity)."

21             Put in parentheses "in a production capacity."

22             Essentially, this means -- "the license

23    agreement means that the software cannot be 'used' in

24    production by any other entity other than the licensee.  As

25    Rimini Street is a third-party service outsourcer/provider

1    who is not operating the software in production and is not

2    'using' the software for Rimini Street's own internal

3    processing, this section has no impact on licensees right."

4            So to boil this the down, what you told them was

5    that this provision of the license agreement only applied

6    to systems that were used in production and didn't apply to

7    any of the other types of environments?

8    A.    Yes, for that particular clause, yes.

9    Q.    All right.  And so when the clients wrote to you and

10   said "we want to talk to you about intellectual property

11   infringement and our concerns about that," you would push

12   back and you would say that the licensing provisions only

13   apply to production systems?

14   A.    No, that's not an accurate statement.

15   Q.    Well, that's what you wrote there, wasn't it?  You

16   wrote --

17   A.    In this particular email.  That's not a general

18   statement.

19   Q.    Okay.  Well, we've seen it a couple times.  Let's

20   look at -- well, let's look at what you said to Wendy's,

21   Plaintiffs' Exhibit 465.  No, let's go to 35.

22   A.    I'm sorry.  Is that PTX 35?

23   Q.    Well, I think -- let's start with 465.  465 is

24   Wendy's concern.

25            COURTROOM ADMINISTRATOR:  It's not yet admitted.

```
 1              MR. ISAACSON:  I would move to admit 465.

 2              THE WITNESS:  Okay.  I'm at 465.

 3              MR. ISAACSON:  465, Mr. Ward from Wendy's is

 4    writing Mr. Davichick on August 18th, 2008.

 5              "Michael, here's our preliminary first" --

 6              THE COURT:  Wait a minute.  I still haven't

 7    ruled on its admission.  I'm waiting for Mr. Webb.

 8              MR. ISAACSON:  I'm sorry.

 9              MR. WEBB:  Objection, hearsay, Your Honor.

10              MR. ISAACSON:  It's not being admitted for the

11    truth, Your Honor.

12              THE COURT:  This is Exhibit 0465; is that

13    correct?

14              MR. ISAACSON:  Yes.

15              The relevant language would be on the first

16    page.

17              THE COURT:  The first page is admissible, maybe

18    that alleviates the objection concern.

19              MR. WEBB:  Objection.  I'm sorry, Your Honor,

20    the objection concerns the attachment to this document.

21    It's an out-of-court statement from an unidentified party.

22              MR. ISAACSON:  It's a draft contract, Your

23    Honor.  There's no such -- there's no -- draft contracts

24    are not admitted for the truth, they're just admitted for

25    being drafts of contracts.
```

```
 1                  THE COURT:  Overruled.  I don't see that -- it's

 2       not objectionable on a hearsay basis.  It's a letter

 3       seeking a response on behalf of Rimini Street.

 4                  MR. ISAACSON:  All right.

 5             (Plaintiffs' Exhibit 465 received into

 6             evidence.)

 7                  MR. ISAACSON:  Can we put the first page of 465

 8       on the screen?

 9                  COURTROOM ADMINISTRATOR:  The whole document's

10       admitted, Your Honor?

11                  THE COURT:  The entire document is admitted.

12       BY MR. ISAACSON:

13       Q.    "Michael, here is our preliminary first round

14       changes to the contract that I spoke about.  I'm very

15       concerned with the wording in our Oracle contract that

16       states -- Wendy's may not make the programs or materials

17       resulting from services available in any manner to any

18       third party for use in the third party's business or

19       operations.  How are you dealing with other clients for

20       this appears to be pretty much boilerplate verbiage in the

21       Oracle contract."

22                  So you had Wendy's telling you that there was

23       this boilerplate language that said you weren't supposed to

24       put things on a third -- you were not supposed to use this

25       material for use in a third party's business operations.
```

```
 1              And then -- now let's look at your response,

 2    which I believe would be Exhibit 35.

 3              So Exhibit 35 is the response to that question

 4    that you drafted; correct?

 5    A.    That seems to be, yes.

 6              MR. ISAACSON:  This has been preadmitted.

 7    BY MR. ISAACSON:

 8    Q.    And you say, "In response to Jim Ward's question

 9    about the following license language."

10              And you again refer, as your counsel did in

11    opening statement to your previous capacity at PeopleSoft

12    as a vice-president, and you say, "This particular language

13    is common in PeopleSoft license agreements."

14              Right?

15    A.    That's correct.

16    Q.    You agree that this is a standard provision of the

17    PeopleSoft agreements?

18    A.    Yes.

19    Q.    Right?

20              And you say,

21              "The meaning of this term is that" -- "is that

22    no third party business can use the software to 'run their

23    business operations,' as in the production use of the

24    software."

25              It's -- the way -- you tell them that what this
```

1    means is that Rimini Street can't take it and run

2    PeopleSoft to run -- run its own business, meaning

3    literally your employees, your salaries and all that.

4    A.    That's correct.  That's accurate.

5    Q.    Right.  And you say in the last paragraph,

6              "Rimini Street only uses its client's licensed

7    software as development and test (non-production)

8    environments to design, develop, and support Wendy's

9    production software.  Therefore, there is no use by Rimini

10   Street to run its own business operations.  Our 'business'

11   is supporting Wendy's PeopleSoft system."

12             So you were going ahead and advising clients

13   about what these contracts meant; right?

14   A.    Yes.  Giving them my opinion, yes.

15   Q.    The other thing you told Wendy's in 35 was that --

16   just to make clear, is that you only use the client's

17   licensed software as development and test environments, to

18   design, develop and support Wendy's production software.

19   You don't use it to support others.

20   A.    I'm sorry, is there a question?

21   Q.    That was also a representation you were making to

22   Wendy's?

23   A.    Yes.

24   Q.    Okay.  And I think we've touched on this before.

25   You would tell clients as part of your standard messaging

472

1    "we're only going to use your environments for your --

2    for -- to support you."

3    A.    Software that you're entitled to to support you,

4    yes.

5    Q.    Right.  And, in fact, what we learned from Professor

6    Davis is that you, for example, used the Wendy's

7    environment to create fixes for other clients.  You were

8    using environments that you told clients were only being

9    used for them to create fixes for other clients; right?

10   A.    I think we've been through this a few times, but I

11   disagree with your characterization.

12   Q.    Okay.  Well, you were -- let's find out why.

13           You were using client environments to create

14   fixes for other clients; right?

15   A.    We were creating using a generic environment on the

16   software, the same version and release to support multiple

17   customers on the same release.  Yes.

18   Q.    I'll try it again.  You were using client

19   environments to create fixes for other clients; correct?

20   A.    No, I again would disagree with you.

21   Q.    So you were not -- at Rimini Street, is it your

22   testimony, using the environment of Client A to create

23   fixes that you then distributed to Client B or C?

24   A.    If we had, again, across the generic -- I'm sorry.

25           If we had the same core software release, we

1    would use that, reuse that for customers who are on the

2    same exact license.

3              Customers who had their own customizations were

4    in their own individual silos, they were not allowed to be

5    used for other customers because they had different license

6    rights.

7              MR. ISAACSON:  Your Honor, I would ask you to

8    direct him to answer the question, I'd like to repeat the

9    question.

10             THE COURT:  Repeat the question.

11   BY MR. ISAACSON:

12   Q.    So at Rimini Street you were using the environments

13   of Client A to create fixes that you then distributed to

14   Client B and C; correct?

15   A.    No.

16             MR. ISAACSON:  And -- PTX 15.  All right.  This

17   is April 2007.  This has been preadmitted.

18   BY MR. ISAACSON:

19   Q.    So let's put it on the screen.

20             Mr. Chiu is talking about one of your early

21   clients, Moraine Park Technical College.  Do you see that?

22   A.    Yes.

23   Q.    All right.  And he says,

24             "We had our call," and referring to Moraine

25   Park.  "When I informed him that we would really would want

474

```
1    to have an in-house environment that we can perform our

2    proactive development on, David" -- David is with Moraine

3    park; right?

4    A.    Yes.

5    Q.    Okay.  " -- was still firm in his perception that

6    they can't extend their software for use outside of their

7    location."

8              So what you're talking about here with the

9    client is saying you want to put their software on your

10   system, Rimini's system, and he was firm in his perception

11   that they can't extend their software for use outside of

12   their location?

13   A.    Right.  So we did a remote access to them, we didn't

14   take their software.

15   Q.    But first you pushed back; right?

16   A.    Sure.

17   Q.    You said -- Mr. Chiu said,

18             "I tried to clarify for him that this is simply

19   another development environment they are entitled to have,

20   but he viewed this as a legal requirement in their

21   agreement that limits the use of the software outside of

22   their location."

23             The provision that Mr. Chiu is referring to

24   there that limits the use of software outside of their

25   location, that was another standard provision of the
```

1    PeopleSoft agreements; right?

2    A.    There was a term in there called facility which we

3    interpreted to be a much wider -- including all of the

4    service providers in their systems.

5    Q.    All right.  And it was a standard provision; right?

6    A.    I believe most contracts had that kind of language.

7    I didn't remember it early on, but, yes.

8    Q.    It's a standard provision in the Siebel contracts

9    too, right, that you -- that -- a legal requirement that

10   limited the use of the software outside of the customer's

11   location?

12   A.    I don't believe so.

13   Q.    Okay.  It was a standard provision in the JDE

14   contracts, wasn't it?

15   A.    I don't believe so that I remember.

16   Q.    The Abilene School District, Plaintiffs' Exhibit 29?

17   A.    I'm at 29.

18   Q.    All right.  This is you writing to one of your

19   clients at the Abilene School District, and you say that --

20   ah, there we are.

21              "We help you order" -- maybe you remember seeing

22   this in opening statement.

23              "We help you order two copies of the current

24   release of products, one for your archives and one you can

25   ship to your selected support vendor to build a test and

1    development environment just for Abilene," the independent

2    school district.

3              Now, you built a test and development

4    environment for Abilene Independent School District; right?

5    A.    If they had customizations, we probably did.

6    Q.    You didn't just use it for them, did you, you cloned

7    it for other people?

8    A.    I think we've already established that we cloned as

9    a part of our process when we created new environments,

10   yes.

11   Q.    Now, in opening statement, your counsel talked about

12   a letter you received in September 2005 from Oracle that

13   said "we hereby" -- from Siebel that said "we hereby demand

14   that Rimini Street immediately cease its wrongful

15   activities."

16             Do you remember that?

17   A.    It was about a five-page letter.  I'm happy to go

18   through it, yes.

19   Q.    Right.  Well, I mean, he put it up on the screen and

20   highlighted the sentence, "we hereby demand that Rimini

21   Street immediately cease it's wrongful activities," do you

22   remember that?

23   A.    Yes, except we hadn't started anything yet.

24   Q.    Now, after that, you told customers -- after you got

25   that letter, you told customers that you didn't think you

1      faced any threat of litigation from Oracle; right?

2      A.    We responded to the letter, our lawyers responded to

3      each point in the letter in detail.

4      Q.    I'm not asking about your response to the letter.

5      Let me ask the question again.

6            After you got that letter from Siebel that your

7      counsel showed to everybody, you talked to customers about

8      whether Oracle was threatening lawsuits against you; right?

9      A.    Yeah, there was no threat of a lawsuit that I

10     recollect.

11     Q.    Right.  So when you got the letter in September 2005

12     that said "we hereby the demand that Rimini Street

13     immediately cease its wrongful activities," you didn't

14     consider that a threat of a lawsuit from Oracle; right?

15     A.    No.  We responded to every point in the letter in

16     detail.

17     Q.    And you told -- so you -- so after that letter you

18     didn't feel like there was any threat of a lawsuit from

19     Oracle, you were comfortable about that?

20     A.    Well, one, we hadn't done anything so we --

21     Q.    I'm just --

22     A.    So, no, we did not feel there was a threat at that

23     moment that I recollect.

24     Q.    And you told customers that Rimini did not face any

25     threat of litigation from Oracle and, in particular, after

1    that TomorrowNow lawsuit was filed by Oracle?

2    A.    Well, you're talking about a four year difference

3    between the start of the company and I believe that lawsuit

4    was starting with TomorrowNow.

5    Q.    Correct.  Let me put the question better.

6          After Oracle filed the suit against TomorrowNow,

7    some of your customers asked have they threatened any

8    lawsuit against you?

9    A.    And the answer was no, we did not feel that there

10   was a threat.  Yes.

11   Q.    Right.  So, in fact, you said we -- you told, for

12   example, customers such as Young who you talked to the jury

13   about, we have never been threatened by Oracle for the work

14   we do?

15   A.    That's correct.  There was no threat of litigation

16   that had come our way, just a bunch of letters back and

17   forth and sparing.

18   Q.    All that happened was there was a bunch of letters,

19   and you never felt any actual threat from Oracle.  Is that

20   right?

21   A.    We're talking years and years of letters.  So, no,

22   it just seemed to be part of the landscape for us.

23   Q.    Okay.  We talked -- there's been talk in this case

24   about automated downloading.  Automated downloading are

25   automated tools that Rimini has employed over time to

1    download from Oracle's website; right?

2    A.    Yes.

3    Q.    And you used automated downloading tools with some

4    of the first clients you signed?

5    A.    We used it -- again, if you want to be more precise

6    between Siebel, PeopleSoft, JD Edwards, they were different

7    methodologies.

8          We started with Siebel product, then added

9    PeopleSoft and JD Edwards a year later.

10         So, yes, each one of those had their own

11   automated process for downloading.

12   Q.    All right.  And it was you who made the decision it

13   was okay to log on to and download from Oracle websites

14   using automated tools; right?

15   A.    Yes.

16   Q.    And you made the decision to approve the use of

17   automated tools to download materials from Oracle's

18   website?

19   A.    Yes.

20   Q.    All right.  And you, in fact, sometimes as you

21   passed screens, computer screens in the office, you could

22   see employees running automated downloading tools on Oracle

23   websites?

24   A.    Yes, as I passed by, yes.  I didn't do it myself.

25   Q.    Okay.  And some of the -- some of the automated

1   downloading was used -- was done with the user name Seth

2   plus Ravin.  Are you aware of that?

3   A.    No, I heard about it in the litigation.  I guess

4   somebody used my name in downloading, yes.

5   Q.    Okay.  So -- and is it your testimony that you had

6   no knowledge that your name was being used as a user name

7   for this?

8   A.    No, they would pick user names.  I don't know why

9   they picked my name.

10  Q.    And then there came a time when you learned that

11  Oracle had changed the terms of use for Customer

12  Connection, the website that we talked about.

13  A.    Yes, right after the TomorrowNow lawsuit was

14  launched, yes.

15  Q.    Well, your counsel said in opening statement that

16  the terms of use were changed because of what Rimini Street

17  was doing.

18        You would agree with me that the terms of use

19  were changed because of what TomorrowNow was doing;

20  correct?

21  A.    I don't know for a fact why Oracle changed it.  I

22  just simply said they changed after the litigation began

23  with TomorrowNow.

24  Q.    Right.  So while the statement was made that we --

25  that Oracle changed its terms of use in order to do

481

```
 1   something to Rimini, the terms of use were changed right
 2   after the TomorrowNow lawsuit was filed; is that right?
 3   A.    Yes.  I did get a letter back from Oracle relating
 4   to it, so I do have insight as to what Oracle said the
 5   reason was.
 6   Q.    All right.  Let's look at Exhibit 20?
 7   A.    Okay.  I'm there.
 8   Q.    This is an email from Mr. Chiu, and he says down
 9   below, "Seth left me a voicemail that he's reviewing and
10   will get back to us."
11         And then what were you reviewing?  We turn the
12   page.  On the next page, very small print, make that
13   bigger.
14         "Oracle has updated their terms of use for
15   Customer Connection, please reference the third paragraph
16   in the introduction paragraph below."
17         So let's go to the next page and go to the third
18   paragraph.
19         MR. ISAACSON:  It's the third paragraph on the
20   introduction, Matt.
21         THE WITNESS:  Yes.
22         MR. ISAACSON:  Make it bigger.
23   BY MR. ISAACSON:
24   Q.    All right.  And it says halfway through, "You will
25   agree" -- wait.  No.  Yes.
```

1              "You agree that you will not access or use

2    Customer Connection in any manner that could damage,

3    disable, overburden, impair or otherwise result in

4    unauthorized access to, or interference with, the proper

5    functioning of any Oracle accounts, systems, or networks."

6              And then it says,

7              "For example, you may not use any software

8    routines commonly known as robots, spiders, scrapers, or

9    any other automated means, to access Customer Connection,

10   or any other Oracle accounts, systems or networks."

11             Now, at the time these terms of use came into

12   existence, you were using automated means to download

13   material from Customer Connection; correct?

14   A.    Yes.

15   Q.    And after you learned of these terms of use, you

16   continued to authorize automated downloading from Customer

17   Connection; right?

18   A.    Yes, I made the decision to continue to use the

19   automated terms despite those changes.

20   Q.    Right.  And you knew it was against the rules that

21   had been set forth in the terms of use, but, as you said,

22   you continued to do it.

23             And you -- you also increased the amount of

24   automated downloading, didn't you, using many -- several

25   multiple -- several virtual machines at the same time using

1    software tools to download from Customer Connection; right?

2    A.    Well, we had so many new customers coming over that,

3    yes, we had set up multiple machines to do the download.

4    So, yes, the volume would have naturally increased with the

5    number of customers coming over.

6    Q.    Right.  And did you see the chart I showed in

7    opening statement to track what was happening at one of the

8    sites, and how your automatic search requests were higher

9    than all the other requests by all the other Oracle

10   customers combined?

11          That was you who authorized that; right?

12          There it is.  Thank you, Matt.

13   A.    Yes.  We had a lot of customers who were coming over

14   to Rimini Street, and that was a lot of files they were

15   entitled to.

16   Q.    And the reason that you wanted these automated

17   downloads is because manual downloads weren't going to get

18   the job done for you; right?

19   A.    Well, we actually switched to manual downloading.

20   So we did switch that, yes.

21   Q.    You weren't going to be able to run your business

22   during this time period with manual downloading; right?

23   A.    Well, that's what we thought, but when you switch to

24   manual and once we figured out how to do it with larger

25   volumes of people, yes.

1               MR. ISAACSON:  My question was about what was

2   happening at the time so I would move to strike the answer

3   about what comes later, Your Honor.

4               THE COURT:  The answer is nonresponsive and will

5   be stricken.

6               MR. ISAACSON:  Would you please look at 454, PTX

7   454, which is preadmitted.

8               THE WITNESS:  Yes, I'm at 454.

9   BY MR. ISAACSON:

10  Q.    All right.  And you're copied on this email in

11  June 2007.  It's about manual download time?

12  A.    Yes.

13  Q.    And if we go to the chart down at the bottom?

14  A.    Yes.

15  Q.    "Seth, this table helps identify how long it would

16  take to manually download all updates and fixes a client is

17  licensed for."

18             And then you have in the right column work days

19  to complete download manually?

20  A.    Yes.

21  Q.    And you can see for each of these clients 53 days,

22  12 days, 81, 115.  All of those days would be required if

23  you shifted to manual downloading.  That's why you were

24  using the automated downloading; right?

25  A.    Yes.  It was going to be much more time consuming in

1    this terms of labor to do it manually.

2    Q.    And, in fact, it's a little bit more than that,

3    wasn't it?

4         MR. ISAACSON:  Plaintiffs' Exhibit 21, which has

5    been preadmitted.

6    BY MR. ISAACSON:

7    Q.    If we can look at -- on page 3.

8         This is Mr. Lester talking to Mr. Shay, your

9    cofounder.  Mr. Shay is saying to Mr. Lester in point 4.

10   He says in the middle,

11        "Essentially, with 96 to 112 labor hours

12   required for the bare minimum basics, it would seem

13   physically impracticable, if time cost-prohibitive to use

14   manual methods to download 'all available and properly

15   licensed fixes and updates' that a licensed client is

16   legally entitled to receive."

17        Internally you were saying this wasn't just

18   expensive, it was physically impractical and was cost

19   prohibitive?

20   A.    Yes, and that's why we didn't get everything for our

21   client because, using a manual process, there's just no way

22   to get everything.  It's far too time consuming and costly.

23   Q.    All right.  And you gave at 27, Plaintiffs'

24   Exhibit 27 -- Plaintiffs' Exhibit 27 is the direction from

25   you.  At the bottom, you're writing to Mr. Chiu in

486

```
 1    July 5th, 2007.
 2              You say,
 3              "Please use our automation tools to complete the
 4    downloads as it is not feasible to complete the entire
 5    downloads without such tools and processes."
 6              You said it wasn't feasible to do this manually
 7    and so you directed that these automation tools be applied
 8    against the Oracle websites; right?
 9    A.   Yes.  And at the time, because of where we were, we
10    hadn't yet developed the manual process.
11              MR. ISAACSON:  I would move to strike the back
12    half of his answer after yes, Your Honor.
13              THE COURT:  The motion will be granted and the
14    jury will be instructed to disregard the nonresponsive
15    portion of the answer.
16    BY MR. ISAACSON:
17    Q.   All right.  And Mr. Chiu responded, "we'll get the
18    ball rolling right away," and you went forward with the
19    automated downloading?
20    A.   Yes.
21              MR. ISAACSON:  So, Your Honor, at this point,
22    I've got some left, not a great deal.  I would benefit by a
23    break for the afternoon if that's fine so that I can just
24    organize the remaining materials and move through it
25    efficiently.
```

 1              THE COURT:  Well, we're very close to our day

 2     end, and that's a reasonable request which I will agree to.

 3              Ladies and gentlemen, that will conclude our

 4     testimony and evidence for today.

 5              Once again, I'm going to go through the

 6     admonishments with you, because I'm sure you can sense that

 7     it's so important that the jury respect and honor these

 8     admonishments because there is obviously a great amount of

 9     everything that goes into these trials, and I know it's

10     obvious to you.  So please bear with me while I do it

11     again.

12              I remind you that during the recess, you're not

13     to discuss the case with anyone or permit anyone to discuss

14     it with you or in if your presence.

15              This caution includes not discussing the case

16     over the Internet or any form of digital or electronic

17     means, text messaging, e-mails, et cetera.

18              You are not to do any personal research or make

19     any independent investigation concerning this case on your

20     own.  That includes not consulting dictionaries, searching

21     the Internet, performing Google searches or anything that

22     would be comparable.

23              It's absolutely important that when the jury

24     decides this case that you all decide it based on the

25     evidence which you all heard in this courtroom.

1          With regard to any notes that you've taken, your

2     notes must be left in the jury room, and I'm sure you've

3     seen that they are protected for your benefit.

4          We'll start tomorrow morning at eight o'clock.

5     And I really do appreciate everyone's timeliness and

6     cooperation.  We're moving well.

7          And I thank you for your attention and wish you

8     a pleasant evening.  You may step down.

9          COURTROOM ADMINISTRATOR:  Please rise.

10         (Jurors exit courtroom at 1:52 p.m.)

11         THE COURT:  You can go ahead and step down.

12         Have a seat.  Mr. Ravin, you may return to

13    counsel table.

14         THE WITNESS:  Thank you.

15         THE COURT:  Let's see.  I'm probably overlooking

16    something, but I know I still have before me the issue

17    concerning paragraph 60 in plaintiffs' amended complaint as

18    it may have related to paragraph 33 and 34, and the answer

19    filed on behalf of defendants.

20         I think it's clearly germane to 33 and 34, and I

21    have no problem whatsoever with that being referred to as

22    an exhibit, but I leave it in the discretion of counsel

23    regarding how they would want to approach that.

24         I'm not thinking of anything else that I need to

25    address.  Is there anything?

1          MR. WEBB:  Your Honor, I think on that topic,

2     those specific paragraphs respond to another paragraph

3     where they specifically respond to allegations of the

4     paragraph referring to, for example, such a library.

5          So I think for completeness, we need to have the

6     initial paragraph and the two responding paragraphs.

7          MR. STRAND:  I think he just said you got that.

8          THE COURT:  You win again.

9          I do appreciate counsel's cooperation.  We are

10    moving along well, and I appreciate the professionalism

11    that I see in the courtroom, and I want to thank you for

12    that, and we'll continue on.  I'll see you tomorrow

13    morning.  I wish you a pleasant evening as well.

14          COURTROOM ADMINISTRATOR:  Please rise.

15       (The proceedings adjourned at 1:55 p.m.)

16                    *    *    *

17

18

19

20

21

22

23

24

25

490

1                              -o0o-

2          I certify that the foregoing is a correct

3      transcript from the record of proceedings

4      in the above-entitled matter.

5

6      _____        9/17/15

7      Donna Davidson, RDR, CRR, CCR #318       Date
       Official Reporter

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

491

1                          I N D E X

2   PLAINTIFF'S WITNESSES:                           PAGE
    SETH RAVIN
3        Direct Examination resumed                   271
         By Mr. Isaacson

4

5                       E X H I B I T S

6
    PLAINTIFF'S                                  ADMITTED
7   23                                              458
    30                                              406
8   204                                             307
    214                                             336
9   318, page 1                                     318
    396                                             429
10  465                                             469
    554                                             310
11  604                                             465
    619                                             428
12  1587                                            426
    3511                                            305
13  4936                                            456
    4937                                            426
14  5355                                            348
    5455                                            447
15  5459                                            433

16

17

18

19

20

21

22

23

24

25