1               UNITED STATES DISTRICT COURT
                     DISTRICT OF NEVADA
2        BEFORE THE HONORABLE LARRY R. HICKS, DISTRICT JUDGE

3

4   ORACLE USA, INC., a Colorado    :
    corporation; ORACLE AMERICA,    :
5   INC., a Delaware corporation;   :
    and ORACLE INTERNATIONAL        :No. 2:10-cv-0106-LRH-PAL
6   CORPORATION, a California       :
    corporation,                    :
7                                   :
            Plaintiffs,             :
8                                   :
        vs.                         :
9                                   :
    RIMINI STREET, INC., a Nevada   :
10  corporation; and SETH RAVIN,    :
    an individual,                  :
11                                  :
            Defendants.             :
12  _____:

13

14

                TRANSCRIPT OF JURY TRIAL - DAY 4
15                 (Pages 492 through 740)

16

17                    September 17, 2015

18

                      Las Vegas, Nevada
19

20

21

22

    Court Reporter:        Donna Davidson, RDR, CRR, CCR 318
23                         Certified Realtime Reporter
                           400 South Virginia Street
24                         Reno, Nevada  89501
                           (775) 329-0132
25

493

1                    A P P E A R A N C E S

2     FOR THE PLAINTIFFS:

3     BOIES, SCHILLER & FLEXNER LLP
      KIERAN P. RINGGENBERG
4     1999 Harrison Street, Suite 900
      Oakland, California 94612
5     (510) 874-1000
      Fax: (510) 874-1460
6     kringgenberg@bsfllp.com

7     BOIES, SCHILLER & FLEXNER LLP
      RICHARD J. POCKER
8     300 South Fourth Street, Suite 800
      Las Vegas, Nevada 89101
9     (702) 382-7300
      Fax: (702) 382-2755
10    rpocker@bsfllp.com

11    BOIES, SCHILLER & FLEXNER LLP
      WILLIAM A. ISAACSON
12    KAREN L. DUNN
      5301 Wisconsin Avenue, NW
13    Washington, DC  20015
      (202) 237-2727
14    Fax:  (202) 237-6131
      wisaacson@bsfllp.com
15    kdunn@bsfllp.com

16    MORGAN LEWIS & BOCKIUS LLP
      THOMAS S. HIXSON
17    NITIN JINDAL
      JOHN A. POLITO
18    One Market, Spear Street Tower
      San Francisco, California 94105
19    (415) 442-1000
      Fax:  (415) 442-1001
20    thomas.hixson@morganlewis.com
      nitin.jindal@morganlewis.com
21    john.polito@morganlewis.com

22    JAMES C. MAROULIS
      DORIAN E. Daley
23    Oracle Corporation
      500 Oracle Parkway
24    Redwood City, California 94070
      (650) 506-4846
25    jim.maroulis@oracle.com
      dorian.daley@oracle.com

494

1                    A P P E A R A N C E S (Continued)

2    FOR THE DEFENDANTS:

3    SHOOK, HARDY & BACON LLP
     PETER E. STRAND
4    B. TRENT WEBB
     2555 Grand Boulevard
5    Kansas City, Missouri 64108
     (816) 474-6550
6    Fax: (816) 421-5547
     pstrand@shb.com
7    bwebb@shb.com

8    SHOOK, HARDY & BACON LLP
     ROBERT H. Reckers
9    600 Travis Street, Suite 3400
     Houston, Texas 77002
10   (713) 227-8008
     Fax: (713) 227-9508
11   rreckers@shb.com

12   LEWIS ROCA ROTHGERBER LLP
     W. WEST ALLEN
13   3993 Howard Hughes Parkway, Suite 600
     Las Vegas, Nevada 89169
14   (702) 949-8230
     Fax: (702) 949-8364
15   wallen@lrrlaw.com

16

17

18

19

20

21

22

23

24

25

```
 1              LAS VEGAS, NEVADA, SEPTEMBER 17, 2015, 8:04 A.M.

 2                               --oOo--

 3                      P R O C E E D I N G S

 4

 5          (Outside the presence of the jury.)

 6              COURTROOM ADMINISTRATOR:  Please rise.

 7              THE COURT:  Good morning.  Have a seat, please.

 8              The record will show we're convened in open

 9     court with the parties and counsel present but the jury is

10     not present.

11              Mr. Isaacson?

12              MR. ISAACSON:  Yes, Your Honor.  We've given you

13     a short submission with regards to PTX 2140 which would be

14     part of the examination of Mr. Ravin that I'd like to

15     complete before the next break.

16              THE COURT:  Okay.  And --

17              MR. ISAACSON:  I could walk you through that if

18     you want.  We've attached --

19              THE COURT:  Why don't you.

20              MR. ISAACSON:  Sure.

21              THE COURT:  And let's do this quickly.  I really

22     have a problem with holding up the jury on this, but I

23     appreciate the heads-up.

24              MR. ISAACSON:  All right.  So you'll recall that

25     PTX 30 yesterday was the document where Mr. Ravin --
```

496

1          THE COURT:  I need to see 30 again.  Madam

2     Clerk --

3          MR. ISAACSON:  PTX 30, yes.  And it's on your

4     screen too.

5          This was the document we discussed yesterday,

6     and you admitted, about -- it refers to the lawsuit and how

7     TomorrowNow and SAP made the decision to shut down their

8     environments but Mr. Ravin and Rimini Street were going

9     forward with the environments.

10          Well, a couple weeks before that, in an RFP,

11     they did a comparison of themselves to TomorrowNow, and

12     that's what PTX 2140 is.

13          And the page, the relevant page is page 46 which

14     is attached to the file, and then the highlighted provision

15     is what's at issue here.

16          It says -- now, this is 2007, and it's before

17     any finding of -- this is not the stipulation of liability,

18     this is not the jury verdict, this is not the criminal

19     finding.

20          It says, "In July of 2007" -- this is Rimini

21     Street writing this to a customer.

22          "In July of 2007, SAP AG CEO admitted wrongdoing

23     by TomorrowNow, demoted CEO and launched internal

24     investigation alongside DOJ probe."

25          We have proposed to redact "alongside DOJ

```
 1     probe."  But we believe it is relevant that during this
 2     period in which he knows and has testified about
 3     TomorrowNow shutting down its environments and that he's
 4     not going to do that, that he is aware in telling customers
 5     that SAP has admitted wrongdoing and taken action of
 6     demoting its CEO and launching an investigation.
 7               And so that then --
 8               THE COURT:  So you would propose to offer the
 9     entire document with redaction of the words "alongside DOJ
10     probe."
11               MR. ISAACSON:  On the following page, I'm not
12     going to examine him on that language, there's also a
13     reference to the DOJ investigation which we would redact.
14               I'm happy to -- I'm not going to examine him on
15     it, I'm happy to redact that entire paragraph on the
16     following page.
17               THE COURT:  You would redact the entire
18     paragraph?
19               MR. ISAACSON:  Sure.
20               THE COURT:  Let me hear from Mr. Webb.
21               MR. WEBB:  Excuse me, Your Honor.
22               Your Honor, we would propose that the entire
23     highlighted portion on page 2 and page 3 be redacted.
24               I think more and more discussion about ongoing
25     investigations and prosecutions I think is a slippery slope
```

1    that will eventually confuse the jury and prejudice my

2    client.

3             I would propose that the entire paragraph

4    beginning "in July 2007," and the entire paragraph on page

5    3 beginning "other terminations and suspensions," both of

6    those be redacted in their entirety.

7             THE COURT:  How do you establish the date on

8    this document?

9             MR. ISAACSON:  There's no dispute about the

10   date.  It's -- the full date is -- it's a long document so

11   we didn't give you the whole thing.

12            It's a response to request for proposal dated

13   October 25th, 2007, to the Abilene Independent School

14   District from Rimini Street.

15            MR. WEBB:  We don't dispute the date, Your

16   Honor.

17            THE COURT:  I see.

18            MR. WEBB:  We just believe that a partial

19   redaction raises more questions than it answers, especially

20   given its content.

21            MR. ISAACSON:  All right.  And it was

22   November 16th, the following month, that -- PTX 30, they

23   were telling customers that TomorrowNow is ridiculous for

24   shutting down the remote environments.

25            I'm sorry, their home -- not their remote

1    environments for shutting down, their environments at

2    Rimini.

3          MR. WEBB:  And I think, Judge, you read that,

4    not to belabor the point, but I think plaintiffs are going

5    to try to, as best they can, link up TomorrowNow and Rimini

6    Street and basically tar Rimini Street with whatever

7    happened with TomorrowNow.

8          Our position is this:  Your ruling stands from

9    yesterday, it should apply here as well.  We are willing to

10   live with that and we'll proceed and everything will be

11   fine.

12         I do think, though, that we start partially

13   redacting some sentences, the jury's going to wonder what's

14   going on, what else was going on, and I think that

15   confusion will prejudice my client.

16         MR. ISAACSON:  And, actually, we thought about

17   that.  We think we can use whiteout with respect to the DOJ

18   probe as opposed to some big black probe -- redact.

19         MR. WEBB:  I think taking the whole thing out

20   would be much better, Your Honor, and would avoid the

21   potential prejudice to my client.

22         MR. ISAACSON:  All right.  We think -- once he

23   put his state of mind at issue, and where they are telling

24   customers that SAP's CEO has admitted wrongdoing, and that

25   then they shut down their environments on their system with

1    the Oracle copies, and Rimini decided not to do the same,

2    when they know that there's been admitted wrongdoing, and

3    they're telling customers both of those facts, that that

4    goes directly to the state of mind of Mr. Ravin which is at

5    issue.

6              MR. WEBB:  Your Honor, a couple things.  This

7    goes back to the admission of liability that --

8              MR. ISAACSON:  No, this is --

9              MR. WEBB:  Let me finish.

10             This is admitted wrongdoing.  We don't know what

11   wrongdoing they're admitting to, and we certainly don't

12   know if it's the same activity or conduct that Rimini

13   Street is engaging in.

14             Once again, this is about admissions of

15   wrongdoing which is admissions of infringement in the case.

16   The jury's going to see that and think, "well, gosh, it's

17   so bad, they admitted that they were wrong and they fired

18   their CEO" or demoted them.

19             This is what they're trying to do, Your Honor.

20   They're trying again to use whatever happened in that case

21   to tar my client here when those -- my client had no

22   involvement in that litigation.

23             We have no idea what wrongdoing was admitted,

24   why they conceded infringement, why the jury found the way

25   they found.

1        It has no place in this courtroom, otherwise we

2   will have to explain to the jury as best we can what

3   happened in that case without having full knowledge of that

4   case.

5        We are already running long.  This is going to

6   lengthen it even further on an unnecessary detail.

7        MR. ISAACSON:  This is a one -- I'm going to

8   examine him about the one paragraph.  There's going to be

9   no more linkage to TomorrowNow.

10       And, to be clear, Mr. Ravin is telling this jury

11  that "I had no reason to believe we were doing anything

12  wrong," and the documents show that clearly he had a basis

13  for knowing what he was doing wrong, and that was in 2007.

14       MR. WEBB:  Whatever happened in that case,

15  unless there's linkage between the process involved and my

16  client's process, nothing in that case bears relevance to

17  what my client was doing at the time.

18       Besides, the issue of his state of mind is only

19  relevant because they've raised willfulness.  They can't

20  raise willfulness as a sword and then come after this

21  irrelevant, highly prejudicial evidence.

22       THE COURT:  Okay.  My ruling's going to be that

23  the deletions of the entire paragraphs will be necessary,

24  but the document may be admitted with those deletions in

25  whiteout.

1              So I realize that you would like to have some

2       part of the deleted portion included, Mr. Isaacson, but I'm

3       of the view that that creates some issues under Rule 403

4       that I alluded to yesterday, and I incorporate my remarks

5       with regard to that.

6              MR. WEBB:  Thank you, Your Honor.

7              THE COURT:  That will be the Court's ruling, and

8       I hope that you have that document ready because I would

9       like to get going.

10             MR. ISAACSON:  Yes.  If I can just -- overnight

11      we agreed on some exhibits that can be admitted and that

12      therefore I won't have to spend time with Mr. Ravin on,

13      streamlining what we're doing here.

14             THE COURT:  All right.

15             MR. ISAACSON:  So if I can just read those into

16      the record.

17             THE COURT:  All right.

18             MR. ISAACSON:  PTX 241, which would be subject

19      to the objection from yesterday about references to the

20      TomorrowNow lawsuit.

21             PTX 4896, PTX 5052, PTX 5083, PTX 5304, and PTX

22      5352 with agreed redactions.

23             And then also DTX, that's defense, DTX 1940 and

24      now PTX 2140 with redactions subject to our request being

25      denied.

503

1           THE COURT:  All right.  And I will approve that.

2           (Plaintiff's Exhibits 241, 4896, 5052, 5083,

3           5304, 5352, 2140 received into evidence.)

4           (Defendants' Exhibit 194 received into

5           evidence.)

6           THE COURT:  And, you know, we've dealt with so

7    many exhibits here that are preadmitted, and I am candid to

8    admit I blanketly have approved those because counsel on

9    both sides have obviously agreed.

10          But I would say this, that if something arises

11   as to any one of those documents that counsel would wish to

12   raise as a new objection, I would entertain it, but that's

13   with the caveat that I don't want to be wasting time in

14   front of the jury either.

15          But I will approve the admission of those, and I

16   appreciate your working together to get that done.  That's

17   the best way to move this trial along.

18          So let's bring in the jury, please.

19          COURTROOM ADMINISTRATOR:  Yes, Your Honor.

20          (Jurors enter courtroom at 8:16 a.m.)

21          THE COURT:  Good morning.  Have a seat, please.

22          Ladies and gentlemen, a brief delay this morning

23   that I apologize for, but what I would tell you, when I do

24   delay your coming into the courtroom, it's because we're

25   working on something that should help to move the trial

504

1    along.

2            As you've seen, we've had any number of

3    preadmitted exhibits in this case, and in some trials the

4    attorneys don't agree to preadmit and that just creates a

5    real wheel-spinning waste of time experience for the jury,

6    and so I appreciate that counsel have been able to do that

7    in this case.

8            But still, from time to time issues arise

9    concerning everything from exhibits to trial lawyer -- to

10   any number of questions.

11           I just want you to know that when you're in that

12   jury room and you're thinking "they asked us to be here at

13   8:00, and it's 8:15 and we're not in the court," something

14   is happening that's material, and I'd just like you to know

15   that.  And I also try and avoid that as much as I can.

16           So, all of that stated, I welcome you here this

17   morning.  And the record will show that we're in open

18   court, and all of you are present, and counsel and parties

19   are present.

20           And, Mr. Isaacson, you may complete your

21   cross-examination of Mr. Ravin.

22           MR. ISAACSON:  Thank you, Your Honor.  Good

23   morning.

24

25

```
 1                          SETH RAVIN
 2                  recalled as a witness on behalf of the
 3                  Plaintiffs, having been previously sworn,
 4                  was examined and testified as follows:
 5                     DIRECT EXAMINATION RESUMED
 6     BY MR. ISAACSON:
 7     Q.    Mr. Ravin, we were talking about automated
 8     downloading when we finished last night, and we looked at a
 9     document that said that you had seen how Oracle had changed
10     its terms of use, and that was May 31st, 2007.
11               So with that date in mind, we've given you a
12     smaller binder today, that's in front of you.  Could you
13     look at 621.
14               MR. ISAACSON:  And I would move to admit 621.
15               MR. WEBB:  No objection, Your Honor.
16               THE COURT:  It's admitted.
17          (Plaintiffs' Exhibit 621 received into
18          evidence.)
19               THE WITNESS:  Yes, I'm at 621.
20     BY MR. ISAACSON:
21     Q.    This is dated June 6, 2007, which is -- so this is
22     about a week after May 31st.
23               And you can see at the bottom of page 1, you are
24     writing to your team saying you believe you've taken
25     "adequate and reasonable care in protecting the
```

1    intellectual property of Oracle and others," but you're

2    going to continue to refine your Oracle website downloading

3    and archiving protocols.

4              And on the next page, you have Website Download

5    Procedures, and you're proposing, I guess, some

6    modifications to your website procedures that would apply

7    to automated downloading.

8              Is that generally what's happening here?

9    A.    Yes.  That's accurate.

10   Q.    Okay.  And now, Mr. Slarve, on the first page at the

11   top, responds to you.  Now, he's one of your

12   vice-presidents; right?

13   A.    Yes, now deceased unfortunately.

14   Q.    Right.

15             He says, "Sounds quite similar to the current

16   processes," referring to what you're proposing, "and I'm

17   unclear as to what differentiation this approach from a,

18   quote, 'legal', end quote, approach.  Seems like we're

19   either pregnant or not."

20             He then talks about a delta approach and acts

21   versus entitlements.

22             And then he says, "The 'act' is where all the

23   accusations occur, flares are fired, and auditing occurs."

24             He's referring to the automated downloading

25   there; right?

1    A.    He's referring specifically, I believe, to Siebel

2    downloading which is his area of expertise, not related to

3    PeopleSoft or any other.

4    Q.    And he says, "Seems to me that, assuming there's no

5    budging on the 'mechanics'," that means you're not going to

6    change the automated downloading; right?

7    A.    He's referring, again, specifically to a change we

8    made to the Siebel downloading process.

9    Q.    Well, he's saying assuming we're not going to

10   change -- we're not going to budge on our Siebel

11   downloading, flying lower on the radar may be the better

12   solution.

13             He's saying, "Let's figure out a way that Oracle

14   won't notice us."  Isn't that what he's saying?

15   A.    Well, I don't know exactly what his thoughts were

16   since they're his words, but I think the general gist here

17   is that the more downloading we do, the more -- the more we

18   get into it with Oracle.

19   Q.    Okay.  And he's suggesting let's figure out a way to

20   fly under the radar?

21   A.    Well, again, my interpretation of what I read, and

22   relative to my recollection of the discussion, was that,

23   again, he's suggesting that we do less downloading in order

24   to keep Oracle -- the battle with Oracle from blowing up

25   further.

1   Q.    Okay.  So then a year later --

2            MR. ISAACSON:  Let's look at PTX 42, which has

3   been preadmitted so it can go on the screen.  All right?

4   BY MR. ISAACSON:

5   Q.    And at the top, Mr. Whittenbarger is writing to

6   Mr. Chiu, your vice-president, copying another

7   vice-president, Mr. Slepko, and he says,

8            "Thanks, Dennis.  It seems they're onto us from

9   massive download volumes."

10           He's referring to Oracle noticing high amounts

11  of downloading on their site by your company; right?

12  A.    Yes.  He's referring to the fact that, again, our

13  continual sparring with Oracle over downloading, yes.

14  Q.    And he's saying -- and then -- this is on

15  November 21st.  If we turn to Exhibit 43, which has been --

16  which I need to admit.  Would you take a look at that.

17           MR. WEBB:  No objection, Your Honor.

18           THE COURT:  It's admitted.

19        (Plaintiffs' Exhibit 43 received into

20        evidence.)

21  BY MR. ISAACSON:

22  Q.    This is a couple days later, November 25th.  Let's

23  start on the last page.  I'm sorry, page 2.

24           You're getting an e-mail from -- your company is

25  getting an e-mail from one of your customers, XO

1    Communications; right?

2    A.    Yes.

3    Q.    All right.  And if we go on to page 3, XO

4    Communications has gotten a notice, at the bottom, from a

5    technical department at Oracle --

6            MR. ISAACSON:  Way at the bottom, Matt, the

7    signature.

8    BY MR. ISAACSON:

9    Q.    -- from Mr. Marandola of Oracle, a manager for

10   vulnerability and threat management.

11           And at the top he's giving notice that Oracle

12   USA has detected improper activity on its website, and

13   talks about in the second paragraph, that, "given the

14   activity and its effect on the Oracle networks," the last

15   sentence, "Oracle has been forced to block this IP

16   address."

17           So then returning to page 2, XO forwards this to

18   you, that is, Rimini Street, and says, "Is that you

19   downloading from MetaLink?"

20           Now, MetaLink was an Oracle website that was a

21   successor to Customer Connection; correct?

22   A.    Yes, that was the new name for it.

23   Q.    Right.  And he told you, "Apparently this is

24   illegal."

25           And then on the first page, Mr. Whittenbarger

1    says that -- forwards the e-mail thread, and then at the

2    top he says to XO Communication he will call to discuss.

3            So with this point you had a client telling you

4    that apparently what you were doing was illegal.

5            MR. WEBB:  Objection, Your Honor.

6            I'm going to object to counsel's repeated

7    referring to our conduct as illegal.  This is not a

8    criminal proceeding, the witness has not been charged with

9    a crime, yet he continues to call this activity illegal.

10           THE COURT:  The objection will be overruled

11   because the question's obviously based on the content of

12   the exhibit which would permit that type of a question to

13   be asked.

14   BY MR. ISAACSON:

15   Q.    Do you remember the question, Mr. Ravin?

16   A.    No, I'm sorry, could you repeat the question?

17   Q.    At this point you had a client telling you that

18   apparently what you were doing, your automated downloading,

19   was illegal, and that was referring to the Oracle's terms

20   of use for its website; is that correct?

21   A.    I believe that the client was referring to the

22   notice they got from Oracle.

23           MR. ISAACSON:  Okay.  And the -- then if we go

24   to the Exhibit 482 --

25           COURTROOM ADMINISTRATOR:  Which exhibit is that?

```
 1              MR. ISAACSON:  482, which I would move to admit.

 2              MR. WEBB:  No objection, Your Honor.

 3              THE COURT:  It's admitted.

 4         (Plaintiffs' Exhibit 482 received into

 5         evidence.)

 6    BY MR. ISAACSON:

 7    Q.    All right.  If you look on page 2 at the top, you'll

 8    see there's an e-mail chain going on eventually in which

 9    you were copied.  Do you see this?

10    A.    Yes.

11    Q.    Okay.  Now, if we can look at page 3.

12              Mr. Chiu, your vice-president, is writing back

13    to Mr. Marandola at Oracle.  This is the same day, that

14    same day, November 25th, 2008.

15              And he says in the second paragraph, second full

16    paragraph -- I'm sorry, that would be the third -- third

17    paragraph, sorry.

18              "Because we are trying to complete all of the

19    archive items for XO Communications ahead of a strict

20    deadline within their support maintenance window, a manual

21    methodology is not feasible."

22              So he told Oracle we have to do this -- we have

23    to do this on an -- in an automated basis, we can't do it

24    manually; right?

25    A.    That's what his letter says.
```

512

1   Q.    Okay.  And then he said -- well, it's more than

2   that.  Okay.  This was a letter you saw and approved;

3   right?

4   A.    I don't believe I actually saw this or approved it

5   before it was sent back.

6   Q.    Well, you did see it -- well, did you see it after

7   the fact?

8   A.    Not until this litigation.

9   Q.    But you were copied on it.  Do you remember on page

10  2 you were copied in the e-mail chain?

11  A.    Yes, but that was after the letter was sent.

12  Correct?

13  Q.    Yeah.

14  A.    Yes, but I don't recollect it at the moment exactly

15  what was in it, no.

16  Q.    Okay.  Were you paying attention to this when it was

17  happening?

18  A.    Certainly.  I was working with XO's legal counsel at

19  the time, yes.

20  Q.    And so you were paying attention to what your

21  vice-president was writing to Oracle; right?

22  A.    Yes, though I didn't agree with some of the things

23  he said in this note.

24  Q.    And so is it your testimony that after he sent this

25  note you told him that he did something wrong?

513

```
 1    A.    Actually, we worked with XO's legal counsel who did

 2   send the note, yes.

 3    Q.    That's not my question.  Okay.  I didn't ask you

 4   about XO Communication, I asked you about your

 5   communications with Mr. Chiu.

 6          After Mr. Chiu sent this e-mail, did you tell

 7   him he did something wrong?

 8    A.    Yes, I believe we had a discussion about it.

 9    Q.    Okay.  The -- because he then said,

10          "I understand our current methodology creates

11   issues with CPU utilization on Oracle's servers."

12          He knew you were having an effect on Oracle's

13   servers, slowing things down; right?

14    A.    Actually, I don't believe he had the knowledge to

15   say that, and that was part of what we discussed.

16    Q.    All right.  So, now this Mr. Chiu at one point was

17   the number two person in your company; correct?  Number

18   two --

19    A.    He was number two or number three.

20    Q.    He was number two or number three depending on how

21   you rank your cofounder; correct?

22    A.    Yes.

23    Q.    He was the number one executive in your company;

24   correct?

25    A.    Number two, yes.
```

1    Q.    Okay.  And you relied on him because he knew what he

2    was doing for years; right?

3    A.    Yes.  I didn't believe he did anything wrong here.

4    Q.    Okay.  Yesterday we talked a lot about the library.

5          I want to show you something that your counsel

6    showed in opening statement which would be the slide for

7    the snapshot of deleted files.

8          All right.  You remember seeing this in opening

9    statement, and you've referred to it as a directory that

10   was disclosed?

11   A.    Yes.

12   Q.    All right.  And these are file names for directories

13   that were deleted in January 2010; correct?

14   A.    Again, I don't have enough personal knowledge, but

15   if you tell me that is, yes, it's from our file.

16   Q.    All right.  And if we look up at the address, all

17   right --

18          MR. ISAACSON:  And make that bigger so everybody

19   can see it -- no, the address at the top.  There.

20          So we've got RSI -- even bigger with the

21   address, Matt, the highlighted part.  There we go.

22   BY MR. ISAACSON:

23   Q.    RSI, and then you get /client software/PeopleSoft.

24   So that's the file directory we're looking at.

25          So let's scroll down that directory until we get

1    to FSMC 8.4, SP2.  Okay.  Let's highlight that.

2            All right.  Now, let's see if we can hang onto

3    that and look at Plaintiffs' Exhibit 173 which has been

4    preadmitted.

5            This is an e-mail on October 25th, 2007, and on

6    page 2 it includes a partial snapshot of a library.

7            And you'll see at the top of 173, we're looking

8    at that same RSI-date01, and moving down we'll see it's

9    slash -- there's a software and PeopleSoft.

10            So we're looking at the same directory.  Do you

11   see that, sir?

12   A.    Yes.

13   Q.    And then we see FCM 8.4 SP2.  Do you see that?

14   A.    Yes, I see that.

15   Q.    All right.  And then below that you'll see a number

16   of MP designations, 1 through 6.  That's a reference to

17   maintenance packs; right?

18   A.    I'm not sure.

19   Q.    Maintenance packs are service packs that include

20   software; correct?

21   A.    Yes, I believe the maintenance packs are roll-ups of

22   larger groups of updates, yes.

23   Q.    Right.  And FSCM, that's Financial and Supply Chain

24   Management, that's PeopleSoft software; correct?

25   A.    Yes, appears to be.

1    Q.    Right.  So these are service packs for software --
2    for Oracle software.  That's what we're looking at with the
3    MP1 through 6; correct?
4    A.    Yes.  They would have been shipped off as
5    installation media, yes.
6    Q.    All right.  Now, let's go back to the opening
7    exhibit, and blow up FCM 8.4 SP2.  Make it bigger.  And
8    let's look what's below it.
9          All right.  You don't see those maintenance
10   packs anymore, do you?
11   A.    I don't see them visible on the screen, no.
12   Q.    Right.  What you turned over as the directories --
13   so, in 2010, okay, your counsel said we have a screenshot
14   of what used to exist.
15         We're looking at file directories in 2007 that
16   were part of that same directory, and they're not part of
17   what was turned over in 2010.
18         Is it fair to say that with respect to these
19   directories, we don't know what was in them because they
20   were deleted?
21   A.    I don't have enough information to even answer that
22   question.
23   Q.    It's not something you've ever looked into?
24   A.    No, not at that level of detail, no.
25   Q.    All right.  Yesterday I asked you about Mr. Leake,

1    and at one point I asked you if he had spoken to the press

2    and said he was going to keep working with your company for

3    five to ten years after he had already decided not to use

4    the Siebel software, and I think you said you didn't recall

5    something like that.

6          You did recall that he would speak to the press

7    on your behalf; right?

8    A.   No, I believe I said I didn't remember whether or

9    not he spoke to the press.  He would have had the right to

10   though.

11   Q.   Okay.  Well, let me -- I don't want this put on the

12   screen.  I want to see if this helps your memory, though.

13          MR. ISAACSON:  If we can look at PTX 1431.

14          THE WITNESS:  Okay.  I'm at PTX 1431.

15   BY MR. ISAACSON:

16   Q.   All right.  And this is a copy of an article that

17   was produced by one of your customers, they had it in their

18   files, and there's an article by David Carr.  Do you know

19   who he is?

20   A.   No, I don't recollect right away.

21   Q.   And it's an article about software maintenance.

22          And if you look on the second page, it says in

23   this article that,

24          "Bill Leake, president of Austin, Texas-based

25   Internet marketing firm LC Growth says that's a risk,"

1    referring to support, "he's willing to take.  LC Growth

2    purchased Siebel sales force automation software earlier

3    this year and is still covered by the vendor maintenance

4    contract which was included" within -- "with the initial

5    purchase.  But Leake retained Rimini Street for maintenance

6    believing it's support will help him stretch the life of

7    the application over five to ten years."

8              Now, do you remember reading Mr. Leake saying to

9    the press in August 2006, three months after the decision

10   had been made that he was not even going to use the Siebel

11   software, that he was going to be working with Rimini

12   Street for five to ten years?

13   A.    I see what he -- apparently this is what he said.

14   Q.    All right.  Do you remember him saying that?

15   A.    Not that I could recollect, no.

16   Q.    All right.  Doesn't this seem remarkable to you,

17   that you have your first customer saying to the press

18   something completely false, that he'd already decided not

19   to use the Siebel software, and he's saying to the press

20   that he's going to work with your company for five to ten

21   years, and you've never heard anything about this

22   statement?

23   A.    Yes, but, again, he has the right to change his

24   mind.  So, from my perspective, I don't see anything wrong

25   with this.

1    Q.    All right.  Do you -- from your perspective, you

2    don't see anything wrong with Mr. Leake saying publicly,

3    where your potential customers can hear it, that he thinks

4    your support will help him stretch the life of the

5    application over five to ten years when he is not going to

6    even use the application?

7    A.    Yes.  Well, he bought the application, he paid us

8    for support, and he could change his mind if he'd gotten

9    additional funding or had it right.

10          Just because he said at the time that he wasn't

11   going to implement doesn't mean that's a permanent

12   decision.

13   Q.    That doesn't strike you as at all misleading for him

14   to say after -- in May that they're not implementing the

15   Siebel software, to tell people that working with you is

16   going to stretch the life of that software for five to ten

17   years, software he's not even implementing?  That doesn't

18   strike you as misleading?

19   A.    No, because he could implement it several months

20   later, even a year later, two years later, five years

21   later, and still get value out of it.

22          MR. ISAACSON:  All right.  We talked some about

23   cloning yesterday.

24          I'd like to ask you to look at PTX 342, which

25   has been preadmitted, so you can put it on the screen.

1          This is another one of those instant messages.

2          THE WITNESS:  Okay.  I'm at 314.

3   BY MR. ISAACSON:

4   Q.   All right.  We don't know the date of this, but

5   maybe you can help me with that.

6          C_Limburg, that's Chris Limburg, one of your

7   engineers; right?

8   A.   Yes, Chris Limburg was an engineer with us.

9   Q.   And kpedn, am I right, that's Krista Williams who we

10  discussed yesterday?

11  A.   I have no idea.

12  Q.   All right.  So -- and counsel can tell me if I'm

13  wrong, we think it is, but we'd like to get it right as to

14  who it is.

15          But kpedn says, "The software that we do have is

16  from another customer and we want to be careful to not

17  share software, part of the reason we no longer clone

18  environments."

19          Limburg says, "Gotcha."

20          Were you aware that there came a time in the

21  company where you decided to stop cloning, and part of the

22  reason for that was that you -- you wanted to be careful

23  not to share software from one customer to another?

24  A.   We made a decision, again as we evolved our

25  processes, to -- we decided to stop the cloning and

1    actually go through the process of installing every DVD

2    manually.

3    Q.    All right.  Before that, you were sharing software

4    from one customer to another?

5    A.    Well, again, we were using our generic development

6    environments, right, which was the one release of the same

7    software that we were reusing for multiple customers who

8    had the same license.

9            This -- we decided we would just start doing

10   everything manually just as we switched downloads to

11   manual, yes.

12   Q.    All right.  Your engineers thought it was a lot

13   simpler than all the words you just used.  They thought you

14   were sharing software from one customer to another; right?

15   A.    No.  This was just an evolution.

16           And, again, I don't know who this person is on

17   the other end of this receipt.

18           MR. ISAACSON:  All right.  Let's look at -- we

19   also talked yesterday about those environments.  Let's talk

20   a little bit about that.

21           PTX 11.  This has been preadmitted, so we can

22   put this on the screen.  It has been preadmitted, so let's

23   start on page 3.

24   BY MR. ISAACSON:

25   Q.    Now, on page 3, Dennis Chiu, your vice-president, is

```
1    writing to one of your clients, the Birdville Independent

2    School District; right?

3    A.    Yes, it appears to be.

4    Q.    All right.  In the third paragraph he says,

5              "As George Lester had mentioned in the call, we

6    will wish to initiate steps towards setting up a fix-master

7    demo environment for your PeopleSoft release, which will be

8    used for developing future tax and regulatory updates for

9    Birdville Independent School Direct."

10             So that's referring to one of these testing and

11   developing environments that we've been talking about;

12   right?

13   A.    Yes, what's required to build the updates.

14   Q.    Right.  And then you have an internal discussion --

15   there's an internal discussion about that on page 2.

16             Mr. Lester, who is the vice-president for

17   information and technology, that's right below his name,

18   that's who he -- that was -- that's -- he was the

19   vice-president for information and technology; right?

20   A.    Yes.

21   Q.    He writes back to Mr. Chiu -- and Mr. Chiu is

22   actually at this point the vice-president for support

23   services.  He's your lead executive for support; right?

24   A.    I'm sorry, for who?

25   Q.    Mr. Chiu is the vice-president for support services,
```

1    your lead executive for support?

2    A.    Yes.

3    Q.    All right.  And so your lead executive for

4    information technology writes to your lead executive for

5    support services and says, "The client archive is really

6    more for our use internally than for the customer"; right?

7    A.    Yes, referring to the engineers.  Yes.

8    Q.    Yes.  The engineers -- it's more for the use of the

9    engineers at Rimini than it is for any specific customer;

10   correct?

11   A.    Yes, because we're doing all the support for the

12   customer.  So our engineers should be the ones that would

13   utilize those resources.

14   Q.    Right.  And that was something you didn't want the

15   customers to know; right?

16   A.    No, I disagree with that.

17   Q.    Well, let's look at page 1.

18          Mr. Chiu, who is the head of support services,

19   he regularly deals with customers; right?

20   A.    Yes.

21   Q.    Okay.  And he says at the bottom, "Hi, George,"

22   that's Mr. Lester, the head of -- the vice-president for

23   information technology, and he says,

24          "I understand the importance and value of

25   obtaining the extract for internal use in support of the

1    client.  I'm just trying to see how best to word it so we

2    can make it a requirement without making it sound like we

3    rely on it.  I'm just concerned the clients may interpret

4    that request as something we can't do it without.  Perhaps

5    we can draft up some verbiage that I can adopt into the

6    script that accomplishes the same thing but doesn't convey

7    the same undertone."

8              You didn't want to let the customers know that

9    you were actually relying on these environments to provide

10   support?

11   A.    No.  Actually, this refers to the extract.

12            And Dennis Chiu was correct.  We had -- a good

13   number of our customers we had no extract for because we

14   don't require it so we didn't want customers to think that

15   it's a requirement for support because many customers

16   didn't have extracts.

17   Q.    All right.  I think we looked at yesterday -- we'll

18   see if this is about extracts, but I think we looked at

19   yesterday the extracts were actually essential to support;

20   right?

21   A.    No, they're actually not.  We had many customers

22   without extracts.

23   Q.    All right.  The -- Mr. Lester responds at the top.

24            "We can't deliver regulatory updates without a

25   support environment to create the update."

1              Right?

2    A.    That's what he says in the first line, yes.

3    Q.    That was correct, wasn't it?

4    A.    Well, you have to have -- you have to have

5    environments to build and test updates, of course, which is

6    separate from the extract wording and the discussion below.

7    Q.    He says, "For payroll support this would be a show

8    stopper."

9              They're talking about the support environments;

10   right?

11   A.    Yes, which, again, different than the extracts and

12   follow it.

13   Q.    Well, Mr. Lester -- when Mr. Chiu writes to him, you

14   say that's about the extracts and not the environments, but

15   Mr. Lester is talking to him about the environments; right?

16   A.    Yes.  They're actually talking two different pieces.

17             If you look, it says down below, "Hi, George,"

18   about obtaining the extracts.  So, yes, it's about

19   extracts.

20   Q.    All right.  The -- by the way, the environments were

21   in data centers you had in California and North Carolina.

22   Am right about that?

23   A.    Yes, we had two data centers in Southern California

24   and in North Carolina which has now moved to Las Vegas,

25   yes.

1    Q.    Okay.  There was a term about the environments you

2    talked about yesterday that we haven't gone through, remote

3    environments.

4              And maybe we should show the slide from opening,

5    the three aspects slides.

6              You saw your counsel put this up, remote versus

7    local hosting.

8              Now, remote or remote environments, that means

9    it's actually at the customer site, it's at the customer?

10   A.    That's right.  The environments are not on Rimini

11   Street's data center or computers, they're on the

12   customer's.

13   Q.    And local means that it's on the Rimini -- it's on

14   the Rimini system?

15   A.    Yes.

16   Q.    Okay.  Now, is it your testimony that it's more

17   difficult to work with customer environments remotely than

18   on the Rimini system?

19   A.    Yes, the difference being that it takes more labor

20   because you're connecting to their computers through

21   firewalls and security and it's slower.  So slower means

22   more labor, yes.

23   Q.    All right.  And is it your testimony that the more

24   labor would be twice as much labor?

25   A.    You know, it actually -- twice as much was my

1   estimate.  Those estimates have changed over time.

2   Q.    Have they increased?

3   A.    Actually, no, they've gone down.

4   Q.    All right.  Let's talk about whether it's worse than

5   you described.

6           Let me look at Plaintiffs' Exhibit 48, which has

7   been preadmitted.  This is an instant message --

8           COURTROOM ADMINISTRATOR:  I don't have it as

9   preadmitted.  It's not on the stipulation.  Forty-eight;

10  correct?

11          MR. ISAACSON:  Yes.

12          MR. WEBB:  No objection, Your Honor.

13  BY MR. ISAACSON:

14  Q.    This is another one of those instant message

15  exchanges.  This is between Mr. Limburg and kpedn, and in

16  the middle kpedn says --

17          THE COURT:  It's not admitted.  I didn't say

18  admitted.

19          MR. ISAACSON:  I'm sorry.

20          THE COURT:  I didn't say admitted.  Let me step

21  back.  I thought you stated an objection, Mr. Webb.

22          MR. WEBB:  I'm sorry, Your Honor, I said no

23  objection.  I apologize.

24          THE COURT:  I misheard you.

25          It is admitted.  I'm sorry to stop you,

528

1    Mr. Isaacson.

2            MR. ISAACSON:  No, it's my fault.

3            (Plaintiffs' Exhibit 48 received into

4            evidence.)

5    BY MR. ISAACSON:

6    Q.    Kpedn says, "stupid remote customers making us look

7    bad."

8            Mr. Limburg, one of your engineers, says, "You

9    know, I really hate working with them."

10           Kpedn says, "I thought we hated them worse."

11           You had a lot of complaints amongst your

12   engineers when they had to work with a remote environment;

13   right?

14   A.    Well, nobody likes to do more work and get slowed

15   down.  So, yes, the engineers did not like remote

16   environments given an option.

17           MR. ISAACSON:  All right.  Let's turn to tab 50

18   which, according to my notes, has been preadmitted.  PTX

19   50.

20   BY MR. ISAACSON:

21   Q.    All right.  And this is a discussion between Krista

22   Williams and Jeff Allen; right?

23   A.    It appears to be, yes.

24   Q.    And Krista Williams, is -- is she your senior

25   PeopleSoft engineer?

```
1    A.    No, she was an environments engineer.
2    Q.    I'm sorry, yes, your senior environments engineer
3  for PeopleSoft; is that correct?
4    A.    Yes, she ran the environments group, yes.
5    Q.    And Jeff Allen was also an engineer?
6    A.    Yes.
7    Q.    All right.  And he was a senior PeopleSoft support
8  developer; correct?
9    A.    I'm not sure exactly what his full role was.
10   Q.    Well, look at page 2.
11   A.    Uh-huh.
12   Q.    Under his signature block.
13   A.    Yes, it says Senior PeopleSoft Support Developer.
14   Q.    All right.  And then the back on page 1 -- well,
15 just to be clear, on page 2 they are talking about their
16 dislike of the remote environments?
17   A.    I'm sure.
18   Q.    Okay.  So on page 1 there's a list.  "Perhaps I can
19 be of assistance."  Mr. Allen is writing.
20              "How's this for a start?"
21              He says, "Control issues."  He lists how you
22 can't fix problems directly, no ability to predict system
23 availability, multiple gatekeepers.
24              And then he has something called the "Building a
25 ship in a bottle, in a bottle, in a bottle."
```

1           And what he's referring to there is when you're

2     going into these remote environments and through all these

3     different levels that you have to go through when you're in

4     the customer system, security systems, other barriers, that

5     it's not just like trying to build a ship in a bottle where

6     you put something through the front of the bottle and try

7     to build a ship inside, it's like trying to build a ship in

8     a bottle inside another bottle inside another bottle.

9           That's what he's saying; right?

10    A.    Yes, he's saying that we don't like doing it.

11    Q.    He's being a lot stronger than that, don't you

12    think?

13          I mean, you've got your senior -- a senior

14    engineer saying it's so difficult that it's like doing

15    something -- it's like building a ship in three different

16    bottles, something don't even know how anybody could

17    accomplish.

18          That's what he's saying; right?

19    A.    Yes, he's saying that, but, of course, we did it for

20    years and continue to do it.

21          MR. ISAACSON:  All right.  And then, if we can

22    turn to tab 50 -- PTX 52, which has been preadmitted, I

23    believe.

24          COURTROOM ADMINISTRATOR:  Yes.

25          MR. ISAACSON:  Thank you.

```
 1    BY MR. ISAACSON:

 2    Q.    This is now Mr. Slepko.  He's one of your

 3    vice-presidents; right?

 4    A.    Actually, senior vice-president, yes.

 5    Q.    Senior vice-president, talking to Susan Tahtaras

 6    about the remote environments, and to Mr. Chiu.  Do you see

 7    that?  As well as to Mr. Allen?

 8    A.    Yes.

 9    Q.    "Jeff," referring to Mr. Allen, "just wanted to let

10    you know I read your status and appreciate the excellent

11    discussion points on the problems with remote environments.

12    Really helped me understand better some of the frustration

13    we're feeling with these.

14              "We have instructed the sales team to push as

15    hard as possible back on any prospects that want to

16    consider remote and are trying to take it away completely

17    as an option."

18              That was the business decision that had been

19    made based on what the technical people were telling you;

20    right?

21    A.    Yes, we wanted to discourage remote environments as

22    much as possible and use the local ones which were faster

23    and easier, yes.

24    Q.    You wanted to take it away completely as an option

25    because the problems were so severe; correct?
```

532

1    A.    No, we just, again, instructed the sales team to try

2    and convince customers to use the local environments.

3    Q.    Well, you say try to convince them.  You were going

4    to try to -- to push as hard as possible back so that you

5    would take it away completely as an option; isn't that

6    right?

7    A.    And are trying to, but that's not what we said.  We

8    did not take them away; in fact, we expanded usage.

9          MR. ISAACSON:  All right.  Now, Mr. Slepko was

10   referring to a report from Mr. Allen.  Let's go to PTX 51.

11   BY MR. ISAACSON:

12   Q.    Okay.  We're moving now from February 14th, 2009, to

13   a weekly report from Mr. Allen dated February 8th, 2009?

14   A.    Yes, I'm at 51.

15   Q.    All right.  And here is Mr. Allen's concerns about

16   the topic of remote environments on the first page.  All

17   right.  This is the report he gave to Mr. Slepko; right?

18   And to Susan Tahtaras?

19   A.    It appears that it went to Susan, yes.

20   Q.    All right.  And he again refers to the building the

21   ship in a bottle in a bottle, up to four layers of remote

22   hosting; right?

23   A.    Yes; clearly was not a fan.

24          MR. ISAACSON:  All right.  The tab --

25   Plaintiffs' Exhibit 60 which has been preadmitted.

533

1          THE WITNESS:  Yes, I'm there.

2     BY MR. ISAACSON:

3     Q.    All right.  This is again in 2009.  Mr. Benge, on

4     the first page, is talking to Mr. Freeman.  Mr. Freeman's

5     one of your senior support engineers; correct?

6     A.    Yes, he was.

7     Q.    Okay.  And Mr. Benge is a vice-president?

8     A.    Yes, vice president of PeopleSoft development.

9     Q.    Right.  And he's saying -- Mr. Benge says, "This is

10    why we love in-house environments."

11          And Mr. Freeman responds at the top, "No, this

12    is why it's insane.  It defies our business model to offer

13    to support remote environments."

14          You actually had your engineers saying it was

15    insane to support these, and it was against your business

16    model, correct?

17    A.    That was his opinion.

18    Q.    All right.  And I gather you don't have any

19    technical basis to say he was wrong?

20    A.    No, the fact that we not only offered the remote

21    environments, but expanded usage and lowered the amount of

22    labor, yes, I do have a basis.

23    Q.    The people who were doing the work described it as a

24    ship in a ship in a bottle and insane; right?

25    A.    That doesn't mean anything, that's simply an

```
1    engineer's commentary.

2             MR. ISAACSON:  All right.  2148 which has not

3    been admitted.

4             MR. WEBB:  Bill, you're trying to use this

5    exhibit?

6             MR. ISAACSON:  Oh, I do have it preadmitted, I'm

7    sorry.

8             MR. WEBB:  Is it preadmitted?

9             COURTROOM ADMINISTRATOR:  2148, yes, it is.

10            MR. ISAACSON:  If we could put that on the

11   screen.  This is another weekly status report from

12   Mr. Allen.

13            THE WITNESS:  What's that number again?

14            MR. ISAACSON:  2148.

15            THE WITNESS:  I'm sorry.  Okay.  Got it.

16   BY MR. ISAACSON:

17   Q.   All right.  In 2010, Mr. Allen was reporting in the

18   miscellaneous section, he starts with some humor.

19            "Humorous observation of the week.  I've

20   determined that working on remotes has something in common

21   with the old, wild, wild west.  The 'law' is different in

22   every town, and you never know if it's good, bad or

23   effectively non-existent."

24            He then goes to his nonhumorous observations and

25   says at the bottom,
```

535

1            "My point here is that disproportionally,

2    difficulties in documenting, supporting and managing the

3    state of remote environments consume huge amounts of our

4    resources, and with rising demands caused by larger number

5    of clients, they more and more, materially interfere with

6    our ability to produce updates."

7            You weren't able to produce your services when

8    you were doing the remote environments and you were

9    learning that from your engineers; right?

10   A.   That's not what he says.

11           THE COURT REPORTER:  Mr. Isaacson, I'm so sorry,

12   you're reading really fast.

13           MR. ISAACSON:  Yeah, I am.  I'm sorry.

14           All right.  Let's look at --

15           THE COURT REPORTER:  Would you repeat -- just

16   the last part.

17   BY MR. ISAACSON:

18   Q.   Let me put it this way.  Your engineers were telling

19   you this remote -- these remote environments weren't

20   working and were consuming enormous amounts of resources;

21   right?

22   A.   No, that's not what he says.

23           MR. ISAACSON:  Plaintiffs' Exhibit 236, which

24   has been preadmitted.

25

1    BY MR. ISAACSON:

2    Q.    This is back in October 2006.  On the first page,

3    there's a -- at the bottom, Mr. Chiu is being sent a Siebel

4    alert about an update; is that correct?

5    A.    That's what it seems to be, yes.

6    Q.    All right.  And Mr. Chiu, at the top, instructs

7    Mr. Whittenbarger to send it to one of your clients,

8    Medpro, but says, "Yes, we do need to rephrase before

9    delivery to Medpro such that it's not verbatim."

10          That's what you were doing, isn't it?  You were

11   taking Oracle alerts, that is, Siebel alerts, and

12   rephrasing them so that they weren't verbatim?

13   A.    I really don't recollect anything relative to this.

14          MR. ISAACSON:  All right.  Plaintiffs'

15   Exhibit 2155, which I would move to admit.

16          MR. WEBB:  No objection, Your Honor.

17          THE COURT:  It's admitted.

18          (Plaintiffs' Exhibit 2155 received into

19          evidence.)

20   BY MR. ISAACSON:

21   Q.    This is back at the beginning of your company, sir,

22   March -- towards the beginning of your company, March 2006.

23   Do you see that?

24   A.    Yes.

25   Q.    And then at page -- so let's look at page 4 of that

1    document.

2            You've written the message here, and you talked

3    about at the top, "We're making great strides in building

4    the business, including having our first client agree to

5    take reference calls now from other prospective clients."

6            That's referring to Mr. Leake; right?

7    A.    I would assume so.

8    Q.    All right.  And at the bottom you say,

9            "We get to the "nice to haves" soon enough, but

10   this is the stretch where we go from a couple referenceable

11   clients to 4, and then we have a business core and we have

12   a business."

13           The core of your business from the very

14   beginning was depending on those first clients and the

15   references; is that fair?

16   A.    Well, I think any time you build a business you

17   start with your first clients, and they become the

18   references over time for your next set, yes.

19   Q.    And your second client, Beekley, I asked you

20   yesterday if they were a 24-hour client initially, and at

21   this time --

22           MR. ISAACSON:  If you look at Plaintiffs'

23   Exhibit 243 which I would move to admit.

24           THE WITNESS:  Okay.  I'm there.

25           MR. WEBB:  No objection, Your Honor.

1        THE COURT:  It's admitted.

2        (Plaintiffs' Exhibit 243 received into

3        evidence.)

4    BY MR. ISAACSON:

5    Q.    All right.  Just to look at page 2 in the middle,

6    this is Mr. Chiu writing -- no, you're writing to Mr. Chiu.

7        "Now, the Beekley agreement is a small contract

8    to start with.  We've been authorized to spend up to 24

9    labor hours."

10       So your first contract with Beekley was a

11   24-hour contract; right?

12   A.    Yes, but it sounded like you were talking about it

13   was a one-day contract.  It was 24 labor hours they were

14   paying for, yes.

15   Q.    All right.  Twenty-four hours over however long that

16   would take.

17       The Plaintiffs' Exhibit -- oh, by the way, you

18   would give clients significant discounts or even, in some

19   cases, very significant discounts if they were willing to

20   give you references; right?

21   A.    Yes, in the early days, you know, as you would with

22   any new product, new company, yeah, we gave some

23   significant discounts to some of the first customers, some

24   of them money-losing for sure.

25   Q.    Right.  And those clients, when they gave those

539

```
 1   references, weren't disclosing that they were getting these

 2   discounts for -- from you in order to provide the

 3   references, correct?

 4   A.    Well, we didn't sit on the reference call so we

 5   really wouldn't know what they had provided.

 6   Q.    All right.  Now, we talked about your auditing

 7   process yesterday and whether it was careful or not.

 8              MR. ISAACSON:  Let's look at Exhibit 45, which

 9   has been preadmitted.

10   BY MR. ISAACSON:

11   Q.    All right.  And on page 3, Mr. Chiu is talking to

12   Mr. Slepko, and you're talking about the onboarding

13   process, the downloading of files for XO Communication; is

14   that correct?  Or for -- I'm sorry, clients after XO

15   Communication?

16   A.    Seems to be, yes.

17   Q.    On page 2, Mr. Slepko, your senior vice-president,

18   writes to Mr. Chiu,

19              "I'm still confused however.  I realize the

20   process evolves but every time we discuss" it "seems like

21   it changes or has changed and I keep giving Seth a

22   different story."

23              He's talking about your auditing process for

24   onboarding; correct?

25   A.    Actually, I'm not sure.
```

1    Q.    "At one point we discussed archiving all and

2    throwing stuff away that client were not allowed to have.

3    That doesn't seem to be the case with the process defined

4    below.  I think it will help if we understand the process

5    based on being pre or post MetaLink," that's that site we

6    discussed, "and how it's evolved over time.

7              "I think we're going to have to go to the next

8    level of detail with this analysis and actually document

9    exactly what we downloaded for each client below and

10   exactly what we delivered to them on the archive.  All the

11   way down to the individual document level."

12             This document is dated January 19th, 2009.  As

13   of this date, you were not actually documenting down to the

14   individual document level what you were downloading from

15   Oracle; right?

16   A.    Well, I only know what he actually says here, and it

17   looks like he's proposing that we audit and actually keep

18   even more detailed records, yes.

19   Q.    To the individual document level.  Before this you

20   were not keeping track of the individual documents you were

21   taking from Oracle?

22   A.    I don't know what the actual documentation was prior

23   to this, no.

24   Q.    Now, one of the things that your client said -- your

25   lawyer said in opening statement was that you had offered

541

1    to work with Oracle and had been turned aside in effect,

2    and I think you've said something like that in your

3    testimony?

4    A.    Yes.

5    Q.    All right.  Now, in February 2009 --

6              MR. WEBB:  I'm sorry, Your Honor, may we

7    approach?

8              (Sidebar conference held as follows:)

9              MR. WEBB:  There was a time when my client was

10   subpoenaed to testify in connection with -- to be deposed

11   in the SAP case.  He refused, there was a subpoena, a

12   motion to enforce the subpoena.  He did ultimately appear

13   for his deposition.  I just want to make sure that's not

14   where we're heading here.

15             MR. ISAACSON:  I wasn't quite there yet, but,

16   yes, I was going to get there.

17             And there's also the additional that his client

18   agreed to accept a contempt finding in order to not answer

19   questions that Oracle wants to ask -- wanted to ask.

20             They are arguing that they were offering to tell

21   us what they were doing and that we are, you know, a bad

22   company because we didn't come back and work with them.

23             And we subpoenaed him, asked him questions, he

24   said no.  He was ordered by a court to answer the

25   questions, and he agreed to accept a contempt finding

1      rather than answer those questions immediately.

2                  And so I think I'm allowed to say that given the

3      position they're taking.

4                  MR. WEBB:  Being dragged into a case where he is

5      not a party is not the same as offering to sit down and

6      discuss his business within the context of letters.

7                  MR. ISAACSON:  I think it's very important if

8      someone's willing to -- they're saying he's willing to

9      say -- tell us what's going on, and what actually happened

10     is he wouldn't do it under oath.

11                 MR. WEBB:  That's not at all what happened.

12                 Judge, this is the same thing, he's trying to

13     get to bring this SAP litigation into this case --

14                 MR. ISAACSON:  I'm not even going to mention the

15     SAP litigation.

16                 MR. WEBB:  How --

17                 THE COURT:  Let me cut you off.  I'm going to --

18     it's admissible in my view.

19                 This directly concerns Seth Ravin and Oracle

20     over issues that are comparable to what -- and included

21     within what's involved here, and I think it's fair

22     examination of an adverse witness, and I'll allow it.

23                 And you can cross-examine in your

24     cross-examination and provide the explanations that

25     apparently are there.  I don't know what the testimony will

1    be.

2                 MR. WEBB:  Okay.  Thank you, Your Honor.

3           (Sidebar conference concluded.)

4    BY MR. ISAACSON:

5    Q.    Mr. Ravin, in February 2009, there was a phone call

6    between lawyers from Oracle and Rimini, and are you aware

7    that Rimini lawyers told Oracle that you keep separate

8    silos for every client and only did downloads for

9    authorized work by clients?

10   A.    I believe there was an affidavit filed by the

11   lawyers about what took place on that call.

12   Q.    Right.  So there was a conversation between Oracle

13   and Rimini, which Rimini represented, like you've

14   represented to customers, that you keep separate silos for

15   every client, and that you only do downloads for authorized

16   work for clients, and you only do downloads relating to

17   each client relative to their licensed products?

18   A.    Yes, at the date of February 2009, yes.

19   Q.    Now, after that, Oracle subpoenaed you to testify

20   under oath; correct?

21   A.    Yes, I was subpoenaed for a different case, yes.

22   Q.    And you appeared for a deposition to testify under

23   oath; correct?

24   A.    Yes.

25   Q.    And you declined to answer questions about what

1    Rimini Street was doing.  You declined to do that under

2    oath; correct?

3    A.    Yes.

4    Q.    And then a court ordered you to answer those

5    questions; correct?

6    A.    That is correct.

7    Q.    And then you agreed to accept a finding that you

8    were in contempt of court because you did not want to

9    answer questions from Oracle about what Rimini Street was

10   doing?

11   A.    Well, again, I think it was a little more

12   complicated than that.

13   Q.    Well, let's find out if it was.

14          Am I not being precisely correct that after

15   you -- after the court ordered you to answer those

16   questions, you agreed to be found in contempt of court

17   rather than answering those questions?

18   A.    It was a negotiation between us, Oracle, and the

19   judge, yes.

20   Q.    Right.  And in that negotiation you agreed to be

21   found in contempt of court?

22   A.    Yes, in order for us to be able to file an appeal.

23   That's how the process worked in the courts.

24   Q.    And ultimately you did appear for deposition, and

25   then Oracle filed this lawsuit.  That's what happened

1    chronologically; correct?

2    A.    Yes, actually over a period of time, yes.

3    Q.    All right.  One last topic.

4          The -- now, part of your business model is

5    separating Oracle from its licensees and denying Oracle

6    ongoing revenue; correct?

7    A.    Fancy way of saying we compete, yes.

8          MR. ISAACSON:  All right.  Well, let me ask

9    about the fancy way.  Plaintiffs' Exhibit 3, I move to

10   admit.

11         THE WITNESS:  Yes, I'm there.

12         MR. WEBB:  No objection, Your Honor.

13         THE COURT:  It's admitted.

14         (Plaintiffs' Exhibit 3 received into

15         evidence.)

16   BY MR. ISAACSON:

17   Q.    Plaintiffs' Exhibit 3 is a document you sent to an

18   investor with a hope that they would invest in your company

19   in 2006, is that fair?

20   A.    Yes.

21   Q.    All right.  And you say down in the strategic

22   section where you're talking about your company,

23         "For investors who are direct competitors of

24   Oracle, or who otherwise benefit from Oracle customer loss,

25   Rimini separates Oracle from its acquired licensees denying

1   Oracle recurring revenue"; right?

2   A.    Yes, that's what it says.

3   Q.    And that was accurate?

4   A.    Yes.

5   Q.    And the interesting part about this to me is you

6   say, "for investors who are direct competitors of Oracle,

7   or who otherwise benefit from Oracle customer loss."

8         You were actually soliciting investors saying,

9   "hey, this will be a good investment if you are direct

10  competitors of Oracle where you're going to benefit from

11  Oracle losing customers."

12        That's what you were doing; right?

13  A.    Absolutely, yes.

14  Q.    Okay.  Then Plaintiffs' Exhibit 65, you saw this in

15  opening statement.

16        Mr. Limburg, in 2010, he's a senior PeopleSoft

17  environments engineer; right?  Show that at the bottom.

18        And he says in the middle,

19        "Also, something to be aware of that we are

20  using development Oracle software that I don't think is

21  licensed."

22        He was correct; right?

23  A.    No, it was licensed.  We -- but according to the

24  judge's ruling, we were outside the scope of the license,

25  yes.

1    Q.    "Just don't want that to fall back on us if we get

2    audited.  Cause you can download Oracle software from their

3    site but not to make money and we're making a crap load of

4    money from their free stuff."

5              Your senior engineers knew you were making -- I

6    won't say it again -- a load of money because they were

7    downloading stuff from the Oracle site without a license?

8    A.    This was relating specifically to the development

9    database that, again, the Court has already ruled on, that

10   we were outside the scope of our license on.

11   Q.    And you were making a load of money for what you

12   were doing; right?

13   A.    Well, that was his interpretation of saying we were

14   using -- we were using the developer's database, and we

15   were charging customers for our service.  But we never sold

16   or resold Oracle product.

17             MR. ISAACSON:  All right.  Could you turn to PTX

18   1556, which has not been admitted to evidence, which I'm

19   not moving into evidence and we're not putting on the

20   screen.

21             THE WITNESS:  Yes, I'm at 1556.

22   BY MR. ISAACSON:

23   Q.    So if we can look -- so what this is is an FAQ

24   document.  This is a standard sales document to tell your

25   salespeople how to answer questions; right?

1   A.    It appears to be, yes.

2   Q.    All right.  Let's look at page 11.  And it's fair to

3   say at page 11 you're complaining about the fact that

4   Oracle sued you in this lawsuit?

5   A.    I'm sorry.  Which line and which section again?

6   Q.    Page -- the section -- the section that begins at

7   the bottom of the page 10 and continues at the top of page

8   11.  You're talking about the fact that Oracle sued you in

9   this case that we're in court about today.

10  A.    I'm sorry.  I need to see the date of this document.

11  Q.    You'll see at the bottom of page 10 it refers to

12  this lawsuit, okay, and one of the points you're telling

13  your salespeople --

14  A.    Yes.

15  Q.    -- is that Rimini Street had taken over -- this is

16  the top of page 11, that Rimini Street had taken over

17  $300 million in contracts from Oracle?

18  A.    Yes, that's what it says with our growth of 270

19  percent, yes.

20  Q.    All right.  That was something your salespeople were

21  telling customers; correct?

22  A.    Well, it sounds like that was a calculation, yes.

23  Q.    All right?

24  A.    In terms of the amount that -- all the contracts,

25  yes.

1    Q.    All right.  And that was a correct calculation,

2    wasn't it?

3    A.    Again, I don't know where the number was calculated

4    from, but I would assume they'd done some work to calculate

5    it.

6    Q.    Okay.  And it was something you were telling your

7    customers -- it was something your salespeople were told to

8    tell your customers, that you had taken $300 million of

9    contracts from Oracle?

10   A.    These would have been the customers that moved to

11   Rimini Street, yes.

12             MR. ISAACSON:  All right.  I have no further

13   questions.

14             THE COURT:  All right.

15             Cross-examination?

16                       CROSS-EXAMINATION

17   BY MR. WEBB:

18   Q.    Mr. Ravin, good morning?

19   A.    Good morning.

20   Q.    We have not spoken for a few days.

21             Just to clear a few things up before we begin,

22   have you ever testified in front of a jury before?

23   A.    Just once before.

24   Q.    It's fair to say that you're not in your comfort

25   zone?

550

1    A.     No, I'm -- no.

2    Q.     And you just experienced somewhat of an unusual

3    situation because, even though you're my client,

4    Mr. Isaacson got to ask you questions first.  He gets to

5    try to prove his case before we get to talk.  So let me see

6    if I can clear the underbrush to begin with.

7              During Mr. Isaacson's cross-examination which

8    began on Tuesday and completed just now, did he ask you one

9    time about the contractual right for Rimini Street to be in

10   business?

11   A.     Not that I recollect.

12   Q.     It's fair to say that's fairly important to your

13   company?

14   A.     Yes.

15   Q.     And you were sitting right here during opening

16   statements.  Do you remember that?

17   A.     Yes.

18   Q.     First thing I wrote up on the board was what?

19   A.     The different choices that a customer has after the

20   first year of maintenance is included with the contract.

21   Q.     And how many times did Mr. Isaacson talk about that

22   over the last three days?

23   A.     None that I could recollect.

24   Q.     Let's start by trying to clear some things up,

25   because the last few days it appeared that you all were

1   talking past each other.

2           Let me first talk about this.  You don't deny,

3   do you, that Rimini Street has copies of Oracle's software

4   on their servers?

5   A.    No.  A lot of it, yes.

6   Q.    A lot of copies?

7   A.    Yes.

8   Q.    And you don't deny that?

9   A.    No.

10  Q.    And you were sitting here beside me when Professor

11  Davis testified, and he said you had thousands and

12  thousands of copies?

13  A.    That's correct.

14  Q.    And to this jury, you're not denying that, are you?

15  A.    No.  It looked pretty accurate to me.

16  Q.    So that's clear.  You admit that you have Oracle

17  software on your servers?

18  A.    Yes.

19  Q.    All right.  This idea of taking a vanilla version

20  and using it for other clients with the same version, they

21  call that cloning?  Do you remember that?

22  A.    Yes.

23  Q.    Do you deny that Rimini Street has cloned Oracle

24  software?

25  A.    No.

552

1    Q.    What about this.  Taking an update that you created,

2    your engineers created, and then using that update for

3    other clients with the same version of contract or license,

4    do you deny that you all have done that?

5    A.    No.  We reused it all the time.  Yes.

6    Q.    So you admit all that stuff?

7    A.    Yes.

8    Q.    Now, let's talk about a library.  A library would be

9    Oracle software?

10   A.    Yes, the installation media, yes.

11   Q.    And you've already admitted that you had Oracle

12   software on your servers?

13   A.    Yes.

14   Q.    To be honest, the jury may conclude that you're

15   splitting hairs when you're talking about a library.  Do

16   you understand that?

17   A.    Well, it's complicated because everyone's using a

18   different definition.  Yes.

19   Q.    Okay.  Let's take a few minutes to see if we can

20   sort it out.

21          You mentioned something about installation

22   media.  What is that?

23   A.    Well, that's the base software.  I guess the best

24   way to put it is, if you were buying Microsoft Office, and

25   you get a box of DVDs, it would be the DVDs you get from

1    the store that you load, the generic, the base.

2    Q.    Sort of like these?

3    A.    Yes.

4    Q.    So when a client signs up for PeopleSoft or Oracle

5    software, they're sent a bunch of these?

6    A.    They used to.

7    Q.    This is back in the day when you were doing this,

8    you got DVDs?

9    A.    Yes.

10   Q.    And then what would you do with the DVDs?

11            Well, let's take a step back.  Why do you need

12   these?

13   A.    Well, that's the actual base of the program.  So if

14   you were going to install it, just like you would Microsoft

15   Office, you need to install the base software.

16   Q.    So that would be the first step, to install?

17   A.    Yes.

18   Q.    So take these DVDs -- and let's give an order of

19   magnitude to the jury.  About how many DVDs would typically

20   be associated with an install for an Oracle client?

21   A.    Well, unlike Microsoft Office, which might be three

22   or four, you're talking about a few hundred DVDs.

23   Q.    And where would they go?

24   A.    They get loaded onto a server, onto a computer, and

25   put into a file directory, yes.

554

1   Q.    Okay.  That's my depiction of a couple of servers.

2   So these would be loaded onto the servers?

3   A.    Correct.

4   Q.    And after they're loaded, what do you call what you

5   have there?

6   A.    That's basically the installation media.

7   Q.    Installation media?

8   A.    Yes.

9   Q.    Now, is it possible that you would have two clients

10  that would send you the exact same DVDs for the exact same

11  version?

12  A.    Yes.

13  Q.    What would you call those DVDs, if they have two

14  with the exact same version?  Do they have the same license

15  rights?

16  A.    Well, they're actually -- I guess the term would be

17  that they are nonexclusive license.

18  Q.    Okay.  What would be the next step after you've

19  loaded all the DVDs onto your servers, the installation

20  media onto your servers?

21  A.    Well, then you would actually take the -- and,

22  again, it depends on the product for between Siebel,

23  PeopleSoft, JD Edwards, but essentially you would run the

24  installation program to make the software configured to

25  actually be used.

1   Q.    At this time have you done anything with the Oracle

2   website?

3   A.    No.

4   Q.    All right.  When does that come into play?

5   A.    Well, after you -- after you load up the software,

6   very much like a Microsoft Office, you may remember that it

7   automatically connects to Microsoft's site and brings down

8   all these new files and updates that have been done since

9   the base media came out, right?

10          Same process for the big software except it

11  doesn't automatically come down, you have to go get it, and

12  it could be tens of thousands of files.

13  Q.    Now, is this the download stuff that we've been

14  talking about?

15  A.    Yes, this is the downloads and the archives.

16  Q.    And that's basically where you get it on the Oracle

17  website on the Internet, and then you download files onto

18  your servers that already have the installation media on

19  them?

20  A.    Yes.  But it's only really after the installation

21  media's set up for each configuration, yes.

22  Q.    So you install it and set it up.  That's one

23  process?

24  A.    Yes.

25  Q.    Then you go to the website and download all the

1   files for that client?

2   A.    Yes.

3   Q.    What makes you think the client is entitled to those

4   files?

5   A.    Well, as part of their maintenance agreement with

6   Oracle, which is active at the time, because, again, we

7   don't go up if they're not active, but you would go up

8   there, you would put in the products and the releases that

9   they're entitled to, and create a -- basically a pick list

10  like you would in a warehouse and go get those files.

11  Q.    And what would those files be?  What kind of files

12  are they?

13  A.    Well, they vary.  I mean, they could be everything

14  from updates to the program, to new documentation fixes, to

15  all sorts of updates.

16  Q.    And so you download all that stuff for the client?

17  A.    Correct.

18  Q.    You mentioned something about siloing.  The

19  materials you download for the client from the Oracle

20  website, are they siloed?

21  A.    Yes.  And originally we used operational siloing,

22  which meant, again, we have to focus on the fact no

23  customer should get files they're not entitled to, or

24  that's the goal.

25            And so we moved to physical siloing when we had

557

1    more and more customers, right?  Because we had to keep

2    track of it all.

3    Q.    Just to be clear about siloing, what exactly do you

4    mean when you say siloing?

5    A.    Siloing literally means the idea that you keep track

6    of what a customer is entitled to, because Customer A and

7    Customer B might be entitled to different files depending

8    on what they licensed and when they left Oracle support.

9    Q.    Okay.  Now, you've downloaded all the files the

10   client's entitled to.  What do you do then with the

11   materials you downloaded?

12   A.    Well, we would then put them into a directory.

13   Q.    Into a directory.

14         Would any of the materials that you downloaded

15   be applied to the environment that you're creating?

16   A.    No, those are kept separate, the installation media.

17   Q.    Okay.  So what's the last step again?

18   A.    Well, the last step is bringing together the

19   installation media and all those updates that a client is

20   entitled to.

21   Q.    So you combine this with this onto the servers?

22   A.    Yes.

23   Q.    Once you've done all that, what do you call the

24   thing that you've created?

25   A.    Well, then we have an environment.

558

1    Q.    Okay.   Let's explain again to the jury exactly what
2    is an environment?
3    A.    So an environment would be a copy of what the
4    customer has in terms of the software that they're running.
5          They're running the production system, and they
6    may have all sorts of tests and development, because,
7    again, you never touch the production system.
8          We would have -- we need test and development
9    systems so that we can change code and then test it and
10   then send it to the customer so they can apply it to their
11   system.
12   Q.    Let's go back to the library.
13         You don't deny that there was a directory of
14   software at Rimini Street that people used to clone
15   environments?
16   A.    That's correct and sometimes from other directories
17   as well, yes.
18   Q.    So you do not deny that there was a directory of
19   software that people would use to clone another environment
20   for someone else?
21   A.    Yes.   And I think we even looked at some of the --
22   we had special clone sheets that talked about what
23   environment was going to be cloned to what.   I mean, it was
24   very detailed.
25   Q.    Then why were you arguing so much with Mr. Isaacson

1    about whether you had a library or not?

2        A.    Well, because I felt he was trying to put words in

3    my mouth about what our version is versus what they want it

4    to be.

5        Q.    But, Mr. Ravin, there are people at Rimini Street

6    that refer to that directory of software as a library?

7        A.    Yes, but that's still different than the wording and

8    the description that Oracle is attempting to use.

9                MR. WEBB:  Could you pull up Exhibit 3011,

10   please.  Actually, Marie, go to the second page.

11               THE WITNESS:  I'm there.

12               MR. WEBB:  The second paragraph, paragraph 34.

13               COURTROOM ADMINISTRATOR:  I don't have that on

14   my list.  Is it --

15               MR. WEBB:  It was newly added in --

16               COURTROOM ADMINISTRATOR:  I need to have copies

17   of it then.

18               MR. ISAACSON:  I'm not sure I have it.  We

19   agreed it was admitted pursuant to your previous order.

20               COURTROOM ADMINISTRATOR:  So are you offering

21   this?

22               MR. WEBB:  Yes, I'm offering it into evidence.

23               At this time we offer Exhibit 3011.

24               THE COURT:  It's admitted.

25

1           (Plaintiffs' Exhibit 3011 received into

2           evidence.)

3     BY MR. WEBB:

4     Q.     Mr. Ravin, I believe you were shown this early on in

5     Mr. Isaacson's cross-examination.  Do you remember this?

6     A.     Yes.

7     Q.     Let's look at the last sentence.  And just to put it

8     in context, this is from the answer that Rimini Street

9     filed in connection to the complaint filed by Rimini

10    Street?

11    A.     Yes.

12    Q.     And just, again, context, a lawsuit's filed, the

13    complaint is filed making certain allegations?

14    A.     Yes.

15    Q.     And then defendants respond to those allegations.

16    Is that your understanding?

17    A.     Yes.

18    Q.     All right.  So this is from Rimini's response to

19    Oracle's allegation.  Read the last sentence of this

20    paragraph?

21    A.     I'm sorry, number 34.

22    Q.     Number 34?

23    A.     "Such a library has never existed at Rimini Street,

24    and Oracle is aware of that fact and could have easily

25    confirmed it by simply accepting Rimini Street's offer of

561

1       third-party verification."

2       Q.    Okay.  We'll get back to the library, but let's talk

3       first about this offer of third-party verification.  What

4       did you mean by that?

5       A.    Well, we had offered to Oracle over the years to

6       spend time to try and figure out what the issues were and

7       resolve them, as well as the discussion earlier about a

8       February 2009 meeting between our lawyers and Oracle's

9       lawyers where we had made offers.

10      Q.    What about a third-party verification?

11      A.    We had offered during the call to let Oracle use a

12      third-party independent to come in and verify and look over

13      Rimini's systems and processes and deliverables to validate

14      whether or not there was an issue.

15      Q.    Did they accept that offer?

16      A.    We never heard back.

17      Q.    Okay.  Now, let's talk about such a library has

18      never existed.  Are you going to stand by that statement,

19      Mr. Ravin?

20      A.    Yes.

21      Q.    Fair enough.  Let's go to the paragraph that that

22      responds to on page 1.

23            Let's start about the third line on the far

24      right, "Rimini."

25            It says,

1          "Rimini Street accessed and downloaded the

2     software and support materials when it either had no

3     legitimate basis to access Oracle's restricted website, or

4     in a way that grossly violated the limited access rights it

5     did have."

6          It goes on.  "Further, the scope of the

7     downloaded software and support materials across multiple

8     libraries and multiple lines of business for customers that

9     had no license to take or need those products suggest that

10    Rimini Street took the software support materials to

11    stockpile a library to support its present and prospective

12    customers."

13         Is that true, Mr. Ravin?

14    A.    This is what it says, but it's not true.  We did not

15    do that.

16    Q.    And when they're talking about downloading materials

17    to create a stockpile or a library, which part of this

18    process are they referring to?

19    A.    The second part, the downloads.

20    Q.    The second part right here.

21         And when you download those materials, did you

22    ever use those materials for anyone other than the client

23    that you were downloading them for?

24    A.    No, customers only had access to and use of the

25    software that they were entitled to.

563

1    Q.    But Mr. Isaacson didn't show you this paragraph when

2    he cross-examined you, did he?

3    A.    No.

4    Q.    All right.  So in this installation media piece,

5    just walk again for the jury exactly step by step, how

6    would you even get those DVDs?

7    A.    Well, the DVDs, when a customer signed the contract,

8    they had to do one of two things, give us access remotely

9    to an environment, to the test and development

10   environments, or they had to give us the software so that

11   we could build it locally in our environment, right, on our

12   systems.  So it was either local or remote.

13          And if the customer was having us build this on

14   our systems, they had to get us the software.  So the

15   customer either had to ship us the software, or they

16   ordered it from Oracle and had Oracle ship us the software

17   directly.

18   Q.    Okay.  So you've got one client's DVDs, a whole

19   bunch of them, and you upload them onto your servers until

20   you've completed the process?

21   A.    Right.

22   Q.    Let's say the next day another customer sends you

23   another box of DVDs just like these and ask you also to

24   install those as well.

25          What if you've already got the exact version the

1    client sent you, what would you do?

2      A.    Well, what we did was that's where we created the

3    installation media, which is we left it on the computer

4    because we get the same DVDs again and again from the

5    customers.

6              So it can take a week to load 200 plus DVDs.

7    It's not a short process.  So, you know, for efficiency, we

8    just would say we already have these 200 DVDs loaded, let's

9    just use the ones already on the computer and skip the load

10   step.

11     Q.    But you still required the client to ship you the

12   DVDs?

13     A.    Yes, we still required it, because the customer

14   signed in their contract what products they were licensed

15   for from Oracle, and then they had to make the software

16   available to us in order for us to be able to build the

17   environment, yes.

18     Q.    So you made sure you had the DVDs before you cloned

19   an environment to replicate that?

20     A.    That was our process, yes.

21     Q.    And then what would you do with the DVDs that they

22   sent you?

23     A.    Then they would be packaged up, inventoried, and

24   those DVDs would be shipped to a storage area where we had

25   hundreds of boxes of Oracle software, yes.

1  Q.    Okay.  So now you've said that you've already put

2  the DVDs on your server, and you've already got a version

3  of that on your server.  So when another one comes in with

4  the same DVDs, sometimes would you make a clone of that?

5  A.    That's correct.

6  Q.    All right.  Now, over time you had multiple versions

7  of software that you had loaded onto your servers?

8  A.    That's correct.

9  Q.    Okay.  Now, isn't that a library?

10  A.    No.  Again, we had lots of installation media from a

11  lot of different products and releases.

12  Q.    Could someone come into the directory of these

13  versions and take software whenever it wanted?

14  A.    No, customers had no access, and our people were not

15  allowed to move software that customers were not entitled

16  to into any other directory and make it available to a

17  customer.

18  Q.    Let's say I'm a Rimini Street engineer, and I'm

19  working on a project, and I'm working on a project, and I

20  go, "wow, it would be nice to have that version I know is

21  over here on this directory, why don't I just go over and

22  just get some of that."  Is that possible?

23  A.    Well, we kept -- we kept close tabs on access to

24  those directories and eventually even put in security

25  mechanisms requiring that access be granted, yes.

1    Q.    All right.  Now, let's talk a little more about the

2    download piece.

3              What do we see on the screen here, Mr. Ravin?

4    A.    This appears to be a graphic relating to what

5    happens after the first year of maintenance when that

6    customer has a choice and selects Rimini Street.

7    Q.    Okay.  Let's go back to that.  Talk about that

8    one-year period of time --

9    A.    Sorry.

10   Q.    -- during which the customer has Oracle support?

11   A.    Yes.

12   Q.    What is -- what's that based on?

13   A.    When a customer signs a new license agreement,

14   generally it requires that they pay for at least the first

15   year, and then they get the option of choosing what to do

16   after that first year.

17   Q.    Does Rimini enter an agreement with the client

18   before or after that one-year term expires?

19   A.    Well, we actually -- if the customer's made the

20   decision to move to Rimini Street, whether it's the first

21   year or whether they've been with Oracle for five years,

22   ten years, it doesn't matter.

23              But after that period of time, if they're going

24   to move to Rimini Street, they sign with us before the

25   Oracle maintenance is over so that we have a window of time

1    to gather all the information that they're entitled to and

2    deliver it to the customer before their maintenance end

3    date.

4    Q.    All right.  And why is that important to get that

5    done before the maintenance end date?

6    A.    Because once a customer passes the maintenance end

7    date, they're no longer under contract with Oracle support

8    and therefore no longer entitled to access their websites

9    or get delivery of any materials.

10   Q.    So all of these steps happen before the maintenance

11   end date?

12   A.    Yes, at least the making sure the software is

13   ordered and delivered and making sure that the archives,

14   the downloads, are done from the website, yes.

15   Q.    Okay.  So after the maintenance end date, do Rimini

16   Street engineers ever access the Oracle website again for

17   that customer?

18   A.    No, for that customer, they should be done, and, in

19   fact, later procedures included even disabling those

20   log-ins so that nobody could even accidentally go into the

21   Oracle website for a customer.

22   Q.    Okay.  You said earlier that when you're downloading

23   materials on behalf of a client, there's like a check box

24   sequence to determine what you're downloading for them.

25   A.    Yes.  It's a really quite complicated process for

568

1     any customer, and we actually are pretty good at it.

2              But think the fact you're dealing with

3     potentially thousands of files, and you've got to figure

4     out which ones go with the product.  So it's a big,

5     complicated process.

6              And you create a -- you generally create a pick

7     list, again, just like a warehouse, an inventory, and then

8     you go and you download that inventory.

9              MR. WEBB:  My clicker is not working.  Could we

10    get that next screen?

11    BY MR. WEBB:

12    Q.   And after the maintenance end date, Mr. Ravin, when

13    you're creating updates for your clients, where is that

14    work coming from?  Who generates that work?

15    A.   The updates?  The updates are generated by our team.

16    After the end of Oracle's maintenance, we take over all

17    work.

18    Q.   And so when you generate an update for a client, or

19    a fix, it's Rimini's engineers' work?

20    A.   Yes.

21    Q.   All right.  Let's talk more about environments, and

22    Mr. Isaacson asked you a few questions about environments

23    and about remote hosting.  Do you remember that?

24    A.   Yes.

25    Q.   Let's start off with local hosting.  What is shown

1    on this screen?

2    A.    This appears to show what -- a test and development

3    environment on Rimini Street, a local environment.

4    Q.    Okay.  So when you're talking about those testing

5    and development environments, you're talking about what is

6    produced from this process on servers?

7    A.    That's correct.  That creates the test environment,

8    development environment, yes.

9    Q.    What are those used for?

10   A.    Test and development environments are primarily used

11   to develop tax, legal and regulatory updates like a payroll

12   update that has to be built and then tested and then

13   packaged and shipped over to a customer.

14   Q.    Why is that important?

15   A.    Why is it important to --

16   Q.    Why is it important to test it before you send it to

17   a client?

18   A.    Well, this is mission critical software.  If we make

19   a mistake, that means payroll is wrong or taxes are filed

20   wrong, it's obviously a very serious situation.  So you

21   have to test it, yes.

22   Q.    So in one of these environments, you develop the

23   update or the fix, and then you take whatever you developed

24   and you test it in another environment which is an exact

25   replica of what's running at the client's facilities?

570

1    A.    Often close, but you can never fully replicate an

2    environment because of all the parameters, but it's a close

3    replica.

4    Q.    And then if everything works out, you then apply it

5    to the client's actual version running in their facilities?

6    A.    We ship it to the client.  The client does one last

7    test in their own test and development environments

8    because, again, this is very important that nothing happen

9    and that it really work in their particulars, and then they

10   will apply it into their production environment and it

11   becomes a live change.

12              MR. WEBB:  Okay.  Let's go back one slide,

13   Marie, please.

14   BY MR. WEBB:

15   Q.    All right.  Now, when it's local, when these

16   environments are local environments, where do they reside?

17   A.    When they're local, they reside on Rimini Street's

18   servers in our data center.

19   Q.    So when we say local, they are local to Rimini

20   Street?

21   A.    Yes.

22   Q.    They're on Rimini Street's servers?

23   A.    Yes.

24              MR. WEBB:  All right.  Then let's go to the next

25   slide, Marie.

1    BY MR. WEBB:

2      Q.    What are remote servers, remote environments, then,

3    Mr. Ravin?

4      A.    Well, the only difference, and not to get too

5    technical, you guys probably have heard of IP addresses, I

6    know at least a few of you know what that means, but

7    essentially that's an address, it's a computer address.  If

8    you type in that number, it connects you to a computer

9    anywhere.

10            And the difference between our local environment

11   and a customer's environment literally is a different IP

12   address.  It's on their servers instead of our servers.

13     Q.    Okay.  And then how would you actually access the

14   testing and development environments if they're on the

15   client's servers?

16     A.    We type in a different IP address than we would use

17   if it was on our servers.

18            And we have to go through the customer's

19   security and firewalls and things like that to protect

20   their systems generally.

21     Q.    We just saw some documents, some Rimini documents,

22   where your engineers were complaining quite a bit about

23   having to do remote hosting.

24     A.    Oh, yes.  There was definitely some good whining

25   that was going on about the extra work of connecting

1    through the firewalls and security protocols of customers

2    in order to access environments behind their security, yes.

3    Q.    And despite those complaints, who chooses where the

4    environments are, the client or Rimini Street?

5    A.    The client ultimately decided whether we would have

6    a local copy or whether they would provide us remote

7    access.

8    Q.    And how early in Rimini Street's existence were you

9    engaged in remote hosting on the client's servers?

10   A.    Very early.

11   Q.    And when you remote hosted, when you spent the extra

12   time and effort and paying to do these remote hostings, did

13   you change the pricing of your services for that client who

14   wanted the environments on their computers?

15   A.    No.  We charged the same whether a customer wanted

16   it on our servers or whether they wanted it on their

17   servers.  It didn't change our pricing at all.

18   Q.    And what about the pricing -- or what about the

19   services actually provided, who determined that?

20   A.    In terms -- I'm sorry.

21   Q.    I'm sorry.  In terms of the pricing, whether it's

22   remote or local, how did the pricing differ?

23   A.    There was no difference in pricing, just a

24   difference in our cost, it was a little higher on the

25   remote.

573

1    Q.    So there was a change in the pricing, the cost it

2    would take to provide the services on behalf of Rimini?

3    A.    Yes, it was more expensive as we talked about, the

4    labor was more because it was slower and there were a

5    couple more steps, but we didn't charge differently for the

6    service.

7    Q.    And as far as the client is concerned, did they

8    perceive any difference in service in terms of what they

9    got from Rimini Street in terms --

10              MR. ISAACSON:  Objection, Your Honor.

11              THE COURT:  Sustained.  Rephrase your question,

12   please.

13   BY MR. WEBB:

14   Q.    Do you have an understanding, based upon your

15   exposure to your clients, as to whether they perceived a

16   different level of service whether it was remote or local?

17   A.    No.

18   Q.    Now, what do you see on your screen now, Mr. Ravin?

19   A.    It looks like just a comparison between local and

20   remote access to the environments.

21   Q.    Okay.  And you mentioned earlier something about an

22   IP address.  Explain to the jury in the context of this

23   visual what you're talking about.

24   A.    Well, this is just demonstrating that for an

25   engineer who is working on the system, it's, for the most

574

1    part, transparent except for that extra going through the

2    firewalls and security.

3              They're doing the same thing.  They're just

4    connecting to a different computer and a different IP

5    address, whether it was on our servers or whether it was on

6    the customer's.

7    Q.    Okay.  Now, when we're talking about Rimini Street's

8    servers, are they physically in the same building as your

9    engineers?

10   A.    No.

11   Q.    So your servers are not in your building?

12   A.    No.

13   Q.    Where are they?

14   A.    Well, they were in northern California in a data

15   center, and also in Charlotte, North Carolina, in a data

16   center.

17   Q.    And could there -- could they be in the same

18   location, physical location, as client servers?

19   A.    They could be -- a client server could -- because we

20   don't know where the client -- when we talk about the

21   client's data center, we have no idea where their servers

22   are.

23             Again, it's an IP address.  So it could be

24   around the world, it could be next door, it could be in the

25   same facility as our computers, yes.

1    Q.   All right.  All these documents that Mr. Isaacson

2    has been showing you the last three days, all these Rimini

3    documents, how did he get those?

4    A.   We provided those through discovery.  We turned over

5    all these documents.

6    Q.   Do you have an idea about how many documents Rimini

7    Street has turned over to Oracle in this case?

8    A.   I would bet it's in the millions.

9    Q.   Mr. Ravin, did any Rimini customer receive software

10   they weren't entitled to receive?

11   A.   No.

12   Q.   Did Rimini Street ever give a client any software

13   that they had not already paid Oracle for?

14   A.   No.

15   Q.   Has Rimini Street ever sold Oracle software to

16   anyone else?

17   A.   No.

18   Q.   Now, you also mentioned a few times in the last few

19   days about versions of software.  Do you remember that?

20   A.   Yes.

21   Q.   Explain to the jury what you mean by versions of

22   software?

23   A.   Well, you'll hear often versions, release, and these

24   are different -- again, it's for the different products.

25   Some companies, some people refer to it as different

576

1    releases which are major changes between the versions.  So

2    they're interchangeable often, yes.

3    Q.    And you also mentioned vanilla versus custom code.

4    Do you remember that?

5    A.    Yes.

6    Q.    Explain to the jury what you meant between vanilla

7    versus custom code?

8    A.    As we talked about before, vanilla is what the

9    software looks like as it's delivered from the software

10   vendor without any changes to it, and customized means that

11   we have made changes to the underlying code of the

12   applications, yes.

13   Q.    And so at this stage, whenever you have installed

14   this software under the servers, would you characterize

15   that as vanilla at that point?

16   A.    Yes, that's directly off the vendor's software

17   disks, yes.

18   Q.    So if you had a lot of clients with the same disks,

19   they would have the same -- essentially the same vanilla

20   environment on these servers?

21   A.    Yes, the DVDs are identical.

22   Q.    So you've got the DVDs and you've got the version on

23   the server that's actually the same for all those clients?

24   A.    Yes.

25   Q.    Now, once you've actually done this process and

577

1    downloaded files that that client's entitled to under their

2    agreement with Oracle, and you apply the patches and fixes

3    and updates that you obtain for the client to the

4    environment, at that time is that still a vanilla

5    environment?

6    A.    Yes, because there's nothing specific for the

7    customer at this point.

8              But, again, each customer's environment could

9    have different sets of updates and fixes which makes them

10   different.

11   Q.    So when is a code customized?

12   A.    A code is customized when we have to change

13   something that's specific to a customer's environment.

14   Q.    And why would the customer have customized code?

15   A.    Well, most -- most customers of this size have

16   significant amounts of customization because these are --

17   you know, these are the systems running in IBM or ToysRUs

18   Worldwide, these are huge systems so they do have large

19   parts customized.

20   Q.    Mr. Ravin, the Court has made some decisions prior

21   to trial in this case.  Do you understand that?

22   A.    Yes.

23   Q.    And the Court has found that in certain instances

24   Rimini Street has exceeded the scope of the licenses that

25   it operated under with its clients.

1          MR. ISAACSON:  Your Honor, I don't think it's

2    counsel's role to give instructions on the law.  I think

3    that's the Court's role.

4          THE COURT:  Sustained.  The subject matter is

5    obviously a matter which is present before the Court and

6    the jury in this matter for that -- as to where one ends

7    and the other begins.

8          You shouldn't be characterizing your questions

9    in terms of a legal perspective, a legal conclusion.  I

10   just state that as a caveat, not necessarily as a ruling on

11   an objection.

12         MR. WEBB:  Understood, Your Honor.

13   BY MR. WEBB:

14   Q.   Mr. Ravin, had you known in 2005 that you could not

15   operate your business using a local environment at all,

16   what would you have done?

17   A.   We would have done a hundred percent remote

18   environments.

19   Q.   And what impact would that have had on your

20   operations?

21   A.   It would have cost us more money.

22   Q.   And what impact would that have on the services that

23   you would provide to your clients?

24   A.   It wouldn't have had any impact on the services we

25   provide.  We just would have had to spend more to do the

1    remote environments.

2    Q.    And had you known when you started your business

3    back in 2005 that you couldn't clone environments, you

4    could not take one version and clone it for another client,

5    what would you have done?

6    A.    We would have done what we eventually did which was

7    load all the DVDs manually for each customer.

8    Q.    And what impact would that have had on Rimini

9    Street's operations?

10   A.    It would have cost us more money.

11   Q.    And how would that impact the service you provide

12   for your clients?

13   A.    It would have no impact on the service.

14   Q.    And what impact would that have on the price that

15   you charged your clients?

16   A.    We wouldn't have charged any different.

17   Q.    Now, from the beginning, did you, in fact, offer

18   remote hosting?

19   A.    Yes.  I think as we reviewed, several customers that

20   said they wanted remote, they felt that's what they needed,

21   and we did that.

22   Q.    From the beginning for certain clients like with

23   customized code, did you manually load DVDs for that

24   client?

25   A.    Yes.

580

1    Q.    And had you known back in 2005 when you started your

2    business that you could not reuse updates, the tax and

3    regulatory update that you created for one client and use

4    it with another client, what would you have done?

5    A.    Well, then we would have -- we would have rebuilt

6    each update for each customer instead of reusing code that

7    the cross people had the same license.

8    Q.    What impact would that have on Rimini Street's

9    operations?

10   A.    Again, it would have just meant a bit little more

11   money we would have had to spend because it's more labor.

12   Q.    And how would that impact the pricing for Rimini

13   Street?

14   A.    We wouldn't have changed our pricing.

15   Q.    Mr. Ravin, do you still use -- do you still use

16   local hosting?

17   A.    No.

18            MR. ISAACSON:  Objection, Your Honor.  I move to

19   strike.  This is the subject of your previous ruling about

20   their current -- what's going on currently as opposed to

21   what's going on at issue in this lawsuit.

22            MR. WEBB:  I disagree, Your Honor.

23            May we approach?

24            THE COURT:  Yes.  Let's discuss this.

25         (Sidebar conference held as follows:)

581

1          MR. WEBB:  I'm not going to mention a word about

2     what we currently do, but the jury is entitled to know, in

3     view of the willfulness allegations, that we no longer do

4     the things the Court found to be improper, that's all we're

5     going to do.

6          MR. ISAACSON:  That's what they currently do.  I

7     mean, he just said he's not going to say what they

8     currently do, but he wants to say what we currently do.

9          MR. WEBB:  Say we don't do those anymore.

10         MR. ISAACSON:  That's current.

11         MR. WEBB:  Then you got into willfulness.  The

12    jury's going to be thinking that we're still doing this.

13         MR. ISAACSON:  It's already been ruled on.

14         MR. WEBB:  The ruling was we couldn't talk about

15    2.0, and we don't plan to.  That's for another day.  But

16    the jury is entitled to know that we no longer do those

17    things.

18         MR. ISAACSON:  It's the same -- it's the same

19    issue, because we haven't taken any discovery about what

20    they currently do.

21         We don't -- when he says something about what

22    they're currently doing or not doing, that's part of the

23    Rimini 2.  We haven't had discovery there, so we don't have

24    discovery to test what he's saying.

25         MR. WEBB:  Disagree.

582

1           THE COURT:  We have a timeline in this case that

2    covers this case versus the second case.  What's that

3    cutoff date?

4           MR. WEBB:  It's the 14th.  2014.  February 2014.

5           MR. ISAACSON:  Right.

6           THE COURT:  I don't think -- in light of that

7    and those two cases being separate, I don't think that

8    anything after that date generally speaking is properly

9    before this jury.

10          MR. ISAACSON:  And let's be clear about the

11   timelines.  Help me if I'm getting this wrong.

12          It's the damages run through February 2014 for

13   customers through September, October, 2012.

14          So we calculate the damages for those customers,

15   but the cutoff for customers is September or October 2012,

16   and the facts discovery was cut off as of, thank you very

17   much, December 2011.

18          THE COURT:  All right.  That's the Court's

19   ruling.  We need to stay within the timeframe of this

20   lawsuit, and so I -- I think that's irrelevant, and I will

21   enter an order striking it.

22          MR. WEBB:  Just to be clear, the cloning stopped

23   in 2009.

24          THE COURT:  Well, that's -- that's a fair

25   subject matter and that can be established.

1              MR. ISAACSON:  Anything that happened before

2    December 2011 I won't be objecting to.

3              MR. WEBB:  Okay.

4              THE COURT:  Okay.  All right.

5              MR. WEBB:  All right.

6              THE COURT:  Thank you.

7              MR. WEBB:  That will be my next question.

8         (Sidebar conference concluded.)

9              THE COURT:  Ladies and gentlemen, I would tell

10   you that the matter of concern raised before the Court

11   concerns the timeframe of this lawsuit and the period of

12   time that it covers.

13             And essentially what this lawsuit concerns is

14   actions, conduct, activities as may be reflected by the

15   evidence basically through the end of the year 2011.

16             So I've sustained the objection that was raised,

17   and we'll strike the testimony with regard to matters that

18   may have occurred after December of 2011.

19   BY MR. WEBB:

20   Q.    Mr. Ravin, as of 2009, did Rimini Street still

21   engage in cloning of environments for its clients?

22   A.    As of 2009, no, we stopped doing cloning, yes.

23   Q.    And this automated downloading using automated tools

24   as of 2009, did Rimini Street continue to do that?

25   A.    No.  We had stopped doing automated downloads as

584

1    well.

2    Q.    Mr. Ravin, you have -- you know, of course, that

3    Oracle alleges that Rimini Street has willfully infringed

4    their copyrights?

5    A.    Yes.

6    Q.    Are they correct in that regard?

7    A.    No.

8              MR. ISAACSON:   Objection, Your Honor, calls for

9    a legal conclusion.

10             THE COURT:   It is such a broad question, I'm

11   going to strike the question.   The objection's sustained.

12   BY MR. WEBB:

13   Q.    All right.   Mr. Ravin, did you personally

14   intentionally try to violate any of Oracle's rights?

15   A.    No.

16   Q.    What makes you say that?

17   A.    Well, I think that if you look at all the steps we

18   took to respect intellectual property, the number of

19   discussions we had trying to figure out what the right

20   thing to do was, what we felt was the right thing, we took

21   a great amount of steps to do things in a -- I would call

22   it the -- not necessarily the most efficient way but the

23   way that we felt was the legal, right way to do it.

24   Q.    What role, if any, in your belief, did the contracts

25   between Oracle and its customers come into play?

1    A.    A great deal.

2    Q.    And explain what you mean by that?

3    A.    Well, that the contracts have in them the right for

4    a third party to help with a customer who asks for

5    assistance from a third party.

6          These are very large systems, and they hire many

7    people to work on them, and we were just one of them.

8    Q.    And, again, what is the basis, in your belief, for

9    Rimini Street to operate in its capacity as a third-party

10   maintenance provider?

11   A.    Well, three things.  I mean, one, the customer's

12   right to choose who does their maintenance work.  They

13   could, again, choose to do it themselves, continue to pay

14   Oracle, use Rimini Street, switch to another software

15   product.  So that was fundamental number one.

16         Number two, the fact that third parties have the

17   right to work on these systems when asked for by the

18   customer.

19         You know, and, three, you know, believing that

20   we stand in the customer's shoes, that when a customer has

21   license rights and they hire an independent, someone to

22   work on their behalf, that we have the right to carry out

23   those tasks on behalf of the customer.

24         MR. ISAACSON:  Is the PT or DT?  No objection,

25   Your Honor.

1          MR. WEBB:  Your Honor, at this time I would

2    admit PTX 3726.

3          THE COURT:  It's admitted.

4       (Plaintiffs' Exhibit 3726 received into

5       evidence.)

6    BY MR. WEBB:

7    Q.   Mr. Ravin, I'm going to pull up on the screen PTX

8    3726.

9          THE COURT:  Actually, I'm thinking, Counsel,

10   we're due probably for a morning break, ladies and

11   gentlemen.

12         So what we'll do is take a short morning break

13   at this time.  It will probably be anywhere from 10 to 15

14   minutes or thereabout, depending on when the jury is ready

15   to come back into the courtroom.

16         And, ladies and gentlemen, of course, the

17   admonishments continue.  And we'll take a break and

18   reconvene in a little bit.  Thank you.

19         COURTROOM ADMINISTRATOR:  Please rise.

20         THE COURT:  You may step down.

21       (Recess from 10:04 a.m. until 10:25 a.m.)

22       (Jurors enter courtroom at 10:25 a.m.)

23         COURTROOM ADMINISTRATOR:  Court is again in

24   session.

25         THE COURT:  All right.  Have a seat, please.

```
 1              The record will show we're in open court.  The

 2     parties and counsel are present.  The jury is all present.

 3              And, Mr. Webb, you may resume your

 4     cross-examination of Mr. Ravin.

 5              MR. WEBB:  Thank you, Your Honor.

 6     BY MR. WEBB:

 7     Q.    Mr. Ravin, did there come a time that you ever

 8     worked at PeopleSoft?

 9     A.    Yes.

10     Q.    When was that?

11     A.    I started in 1996 and ended in 2001.

12     Q.    When you were at PeopleSoft, did you have occasion

13     to see contracts between PeopleSoft and its customers?

14     A.    Yes.

15     Q.    Describe for the jury how frequently you would

16     actually see those contracts.

17     A.    I would interact with those contracts pretty much

18     every day.

19     Q.    And as a result of your interaction and knowledge of

20     these contracts, did you have a good feel as to what some

21     of the standards terms would be?

22     A.    Yes.

23     Q.    In front of you, you have a contract entered into in

24     19 -- I'm sorry -- 98 between PeopleSoft and Brazoria

25     County.  Do you see that?
```

588

1      A.    Yes, but I can't read the screen.

2                MR. WEBB:  That makes two of us.  All right.

3      That's better.  Marie, can we go to 14.2?

4                COURTROOM ADMINISTRATOR:  Is this that exhibit?

5                MR. WEBB:  This is the one we just entered, I'm

6      sorry, 3726.

7                THE COURT:  Do you have it listed as admitted,

8      Dionna?

9                COURTROOM ADMINISTRATOR:  Yes, I do, Your Honor.

10               THE COURT:  Yes.  All right.  Fine.

11               MR. WEBB:  I apologize.

12     BY MR. WEBB:

13     Q.    All right.  Mr. Ravin, I want you to focus in at

14     14.2 of this agreement between PeopleSoft and Brazoria

15     County, Texas.

16               Look in 14.2 about five lines down where it says

17     licensee may.  Do you see that?

18     A.    Yes.

19     Q.    Let's just go down -- read starting with "licensee

20     may."

21     A.    "Licensee may provide access to and use of the

22     software only to those third parties that:  (i) provide

23     services to licensee concerning licensee's use of the

24     software; (ii) have a need to use and access the software;

25     and (iii) have agreed to substantially similar

589

```
 1    nondisclosure obligations imposed by licensee as those
 2    contained herein."
 3    Q.    All right.  Now, how often did you see this term in
 4    the agreements that you saw at PeopleSoft while you were
 5    there?
 6    A.    I think this is a pretty standard term.
 7    Q.    Did you see agreements where it wasn't a part of the
 8    agreement?
 9    A.    Not that I remember.
10    Q.    All right.  Now, in connection with Rimini Street's
11    business, do you provide services to your clients regarding
12    their use of the software?
13    A.    Yes.
14    Q.    And do they have a need -- I'm sorry, do you have a
15    need to use and access that same software?
16    A.    Yes, to provide services, yes.
17    Q.    And in connection with your contract with your
18    client, does Rimini Street agree to conditions of
19    confidentiality when working on that software?
20    A.    Yes, in every contract.
21    Q.    Okay.  Do you remember yesterday when Mr. Isaacson
22    was asking you questions about a Brazoria County District
23    Attorney and e-mails you were exchanging?
24    A.    Yes.
25              MR. WEBB:  Can we please pull up PTX 498.  It's
```

1    been previously admitted.

2              THE WITNESS:  That's not in my notebook.

3              MR. WEBB:  I will pull it up on the screen for

4    you.

5              COURTROOM ADMINISTRATOR:  498?

6              MR. WEBB:  498.  PTX.  P as in Paul TX.

7              COURTROOM ADMINISTRATOR:  I don't have 498

8    previously admitted.  Was it in the stipulation?

9              MR. WEBB:  I believe so.  Mr. Isaacson used it

10   yesterday, maybe a different number.  We have two numbers

11   in the same exhibit.

12             In any event, at this time I'd offer into

13   evidence PTX 498.

14             MR. ISAACSON:  Yeah, I used a different version

15   of this, but no objection.

16             THE COURT:  It's admitted.

17         (Plaintiffs' Exhibit 498 received into

18         evidence.)

19   BY MR. WEBB:

20   Q.    Okay.  Now, Mr. Ravin, I want to focus on this

21   e-mail for a minute.  Do you recall sending this to Rich

22   Hughes?  I'm sorry.  Do you recall sending this to

23   Mr. Hughes?

24   A.    Yes.

25   Q.    And he, in turn, was going to forward this on to the

1    Brazoria County attorney.

2    A.    That's my understanding, yes.

3            MR. WEBB:  Okay.  I want to focus down a little

4    bit farther to the bottom of the first page, "starting

5    today."

6            The very last line, Marie.

7            Yeah, let's look at this paragraph.  The last

8    sentence, if you could, Marie.  And then let's go on to the

9    next paragraph.

10   BY MR. WEBB:

11   Q.    In this e-mail you state,

12           "Today, licensees can choose from amongst a near

13   limitless number of outsourcers such as AT&T, IBM, EDS,

14   Accenture, and a host of offshore providers and smaller

15   players as well."

16           Do you see that?

17   A.    Yes.

18   Q.    What were you referring to at that time?

19   A.    Well, we, again, were just one of many, many

20   companies that needed to have access to the software to do

21   the work that we did.

22           And we're talking about all these folks need to

23   build environments, they need to use the software.  Many of

24   them have -- any outsourcer has copies of the software,

25   hosting providers have copies of the software, and we just

592

1      were requiring to work with the software the same as all

2      these other companies.

3      Q.     And how did that inform your belief as to whether or

4      not Rimini Street could operate its business?

5      A.     Well, this, plus what we just looked at in terms of

6      the rights of third parties to be able to work with

7      software at the customer's request, we saw that we had no

8      different rights or needs than any of these other providers

9      that do this every day.

10     Q.     Okay.  Let's go to the next paragraph.

11            Now, you're referring to the contract between

12     Brazoria County and Oracle, the one we just looked at, and

13     it looks to me like you're discussing it with the client.

14            It says, "Given the above operating facts, the

15     interpretation of sections 2.1 and 4.2 of the agreement can

16     be consistently interpreted over the years to define usage

17     of the software outside the scope of personal usage of the

18     client in a way that deprives the software vendor from

19     license fees for new clients due to software piracy or

20     using one copy of the software to serve multiple other

21     clients."

22            Do you see that?

23     A.     Yes.

24     Q.     What were you trying to get across with that

25     statement?

593

1    A.    That the license terms are designed to make sure

2    that third parties can work on behalf of a customer, but

3    they can't take the software and use it to run their own

4    operations.

5               We couldn't take a customer's license of the

6    payroll product and use it to process Rimini Street

7    payroll.

8    Q.    Mr. Ravin, do you know who -- which software

9    providers Rimini Street actually uses in its own business?

10   A.    Yeah, we use Microsoft.

11   Q.    You use Microsoft instead of Oracle?

12   A.    Correct.

13   Q.    So you don't use Oracle products for your own

14   business operations?

15   A.    No.  We only used one that was acquired by Oracle at

16   some point, and we switched off that to another vendor.

17   Q.    So when you obtain software from clients, you aren't

18   actually using it for your own business?

19   A.    Not at all.

20   Q.    And was this -- did this concern get raised

21   occasionally by clients as to whether or not this provision

22   would prevent you from doing your job?

23   A.    Yes, several times.

24   Q.    And how would you explain the resolution of that?

25   A.    Just as I did here to the district attorney in

1    Texas, yes.

2    Q.    Okay.  Let's go down to the next paragraph.

3          It says, "Likewise, section 14.2 merely seeks to

4    assure that the licensed software is protected by assuring

5    that it is not provided to parties without proper

6    authorization and the same level of guaranteed

7    confidentiality to protect the" access.

8          All right.  I'm sorry, "asset."

9          Is that relating to the confidentiality

10   provision that we just discussed, Mr. Ravin?

11   A.    Yeah, this is just saying that we're looking to make

12   sure in the rights of the third party to do work on behalf

13   of the customer that they're not taking the software and

14   giving it away to other people who could then get it

15   without actually paying Oracle for a license.

16   Q.    And did you ever provide software -- has Rimini

17   Street ever provided software to someone who had not

18   already paid Oracle for the license?

19   A.    No.

20   Q.    And let's take a step back here.  We're using the

21   word "always" and "never" a lot.  Is Rimini Street perfect?

22   A.    No.  Clearly, we've made mistakes as we've already

23   seen here in the Court.

24   Q.    Can you rule out the possibility that sometime

25   someone received a file they weren't legally entitled to?

1    A.    Well, it's possible in some of the downloads that --

2    because, again, you're talking about tens of thousands of

3    files, that there could be disagreement or maybe there were

4    a file downloaded that wasn't exact or right for a

5    particular product.

6          But it's like getting car parts for a car that

7    you don't own.  They don't provide any value.  It's not

8    software you can use or turn on.  They're just parts.

9    Q.    Now, Mr. Isaacson showed you a number of client

10   e-mails raising questions about the scope of the license

11   and whether you could do your job.  I'd like to talk about

12   just a few more.

13          MR. WEBB:  At this time I'd like to introduce

14   PTX 0446.

15          COURTROOM ADMINISTRATOR:  It's not admitted yet.

16          MR. ISAACSON:  No objection, Your Honor.

17          THE COURT:  It's admitted.

18          (Plaintiffs' Exhibit 446 received into

19          evidence.)

20          MR. WEBB:  Okay, Marie, can you pull that up.

21          Let's go down to the -- I guess the third to the

22   last paragraph, please, Marie, the one that begins "the

23   client raised a few concerns."  Yeah, perfect.

24   BY MR. WEBB:

25   Q.    First of all, Mr. Ravin, before we get to that, can

1    we go to the top and identify who this is from.

2              All right.  So, Mr. Ravin, tell the jury who

3    this e-mail is from and to?

4    A.    It seems to be an e-mail from Dennis Chiu to George

5    Lester and copied to Beth Lester.

6    Q.    And what is this e-mail pertaining to?

7    A.    The subject says it's notes regarding the kickoff

8    meeting, which would be our first, again, kickoff with this

9    new client, Correctional Medical Services.

10   Q.    All right.  Let's go down to the paragraph we were

11   at second ago.

12             It says, "The client raised a few concerns about

13   our intent to set up an in-house environment using their

14   software because they were unclear as to why we couldn't

15   simply develop using other environments we had for other

16   clients."

17             Do you see that, Mr. Ravin?

18   A.    Yes.

19   Q.    Can you explain to the jury what is meant by that?

20   A.    Well, the -- this, again, just from what it says, it

21   looks like the client wanted us to use something for

22   another client specifically for their environments.

23   Q.    So they wanted you to cross-use?

24   A.    Well, I think, again, they wanted us to use

25   something that we weren't entitled to use for that

1    customer.

2    Q.    Okay.  So let's look at the next sentence.  It says,

3    "It was reiterated to them that we create unique and

4    independent environments for each client and in accordance

5    with the terms of the software license agreement."

6              Do you see that?

7    A.    Yes.

8    Q.    Is that a true statement, Mr. Ravin?

9    A.    Yes.  I mean, this -- this relates to the custom

10   environments that we had for people with customized code,

11   yes.

12   Q.    Well, we've heard a lot in your cross about sharing

13   software and documents saying that clearly Rimini Street's

14   sharing software.  How can you reconcile that with

15   statements like this?

16   A.    Well, again, you have your base software

17   environments which were the -- we call them for reuse,

18   which were the individual releases that everyone had.

19              And then we had customized environments that

20   were used for things that were particular to a customer

21   that were unique to them.

22   Q.    So is it your testimony that you can both share

23   software and not share software in your business?

24   A.    Yes.  I know it's complicated because there's

25   different pieces, but, yes, that's correct.

1    Q.    And so when this client was told, reiterated that

2    "Rimini Street creates unique and independent environments

3    for each client in accordance with their license

4    agreement," it's your testimony that's actually accurate?

5    A.    Yes, because we would never give customers a piece

6    of software that they're not entitled to, yes.

7              MR. WEBB:  Thank you.

8              Let's pull up PTX -- actually, don't pull it up

9    yet, Marie.

10             I'd like to introduce, Your Honor, PTX 59.  I

11   don't believe it's objected to, it's a plaintiffs' --

12             COURTROOM ADMINISTRATOR:  That one was

13   previously admitted.

14             MR. WEBB:  Okay, thank you.

15             COURTROOM ADMINISTRATOR:  In the stipulation.

16             MR. WEBB:  Thank you.

17             THE COURT:  It's admitted.  Go ahead.

18         (Plaintiffs' Exhibit 59 received into

19         evidence.)

20             MR. WEBB:  Can you pull that up, Marie.

21   BY MR. WEBB:

22   Q.    Again, let's do this again with this e-mail.  Tell

23   the jury who this is from and to whom and what date?

24   A.    It's from Dennis Chiu to some representative of -- I

25   think CKR is probably CKE, Carl Karcher Enterprises,

 1     Carl's, Jr.

 2                 MR. WEBB:  Let's go to the second page, Marie,

 3     the very top.

 4     BY MR. WEBB:

 5     Q.    This is Kim Cabada with Carl Karcher, or CKE, to

 6     Dennis Chiu.  Again, who is Dennis Chiu?

 7     A.    At that time Dennis Chiu was the head of support for

 8     Rimini Street.

 9     Q.    Okay.  She says, "Dennis, we have always utilized

10     the vanilla tax updates from PeopleSoft."

11                 Let me stop there.

12                 Mr. Ravin, do you know if PeopleSoft also had

13     vanilla updates?

14     A.    Yes, they were provided -- the way customers would

15     receive it from the software vendor is they would get the

16     same deliverable, everybody would get the same and then

17     have to customize it to their customized environment.

18     Q.    Okay.  She goes on,

19                 "One would think the in order for you to catch

20     up to the release we are on, you could apply ones you

21     already have."

22                 Do you see that?

23     A.    Yes.

24     Q.    She goes on.  "I am hard-pressed to understand the

25     fact that you wouldn't have them."

1              Stop there.

2              Do you have an understanding as to what is being

3    said there?

4    A.    Yes.

5    Q.    And what is it?

6    A.    The customer's simply saying -- again, that there

7    are parts in order to build environments that you have to

8    add in all these other updates, and she's saying, "well, if

9    you clearly already have copies of these updates for other

10   customers, why don't you just put them in our environment

11   and be done with it," and we're saying, "no, that's not the

12   case."

13   Q.    Let's go on to the next sentence.  Ms. Cabada goes

14   on to say,

15              "Maybe I am mistaken, however wouldn't Rimini

16   Street create a tax update that can be shared by other

17   customers who have vanilla instances."

18              Do you see that?

19   A.    Yes.

20   Q.    Now, we already talked about Rimini's process of

21   taking an update and using it for other clients?

22   A.    Yes.

23   Q.    Do you understand that she is asking if, in fact,

24   you can do that?

25   A.    Well, I think what she's asking for is, in order to

1    have those types of updates, you have to be entitled to it.

2    If an Oracle customer wasn't entitled to that, even though

3    another Oracle customer of ours was, they would not get

4    access to that update.

5    Q.    Mr. Ravin, are you familiar that some of these

6    agreements require that the software be used only at the

7    customer's facilities?

8    A.    The language is in the agreement, but that's not our

9    interpretation of --

10   Q.    I want to talk about your state of mind.

11           When you started this business and had local

12   environments, what made you think that you could actually

13   have software on Rimini servers when the agreement said

14   that the software had to be on the facilities of the

15   client?

16   A.    Well, I've been using, writing, interpreting,

17   executing contracts for PeopleSoft for the five, six years

18   I was there and reading them for many years after.

19           The interpretation of facility, my state of

20   mind, and based on all my years of experience was we always

21   extended facilities to include beyond the customer's

22   physical facilities to anyone who was doing service for

23   them like a service bureau, an outsourcer.  We never

24   contested that under my watch.

25   Q.    All right.  So, again, remind the jury where

602

1     Rimini's servers are right now?

2     A.    Right today.

3     Q.    Yes?

4     A.    Today those servers are in Las Vegas and in

5     Charlotte, North Carolina.

6     Q.    They are not in Pleasanton, California?

7     A.    No.

8     Q.    Would you consider those -- the location of those

9     servers to be still your facilities?

10    A.    Yes.

11          MR. WEBB:  All right.  Now, let's go to your

12    background a little more.

13          Marie, could you pull up the first slide.  We're

14    having some technical issues.  I apologize.

15    BY MR. WEBB:

16    Q.    Before we get into your work history -- I'm sorry.

17          Before we get into your work history, I want to

18    clarify the timeline of your employment.  I think we were

19    kind of bouncing around a little bit in the last few days.

20    I want to go through PeopleSoft all the way up to the

21    filing of this lawsuit.  Is that okay?

22    A.    That's fine.

23    Q.    All right.  Tell the jury again when you joined

24    PeopleSoft?

25    A.    I joined in April of 1996.

1    Q.    And when did you leave PeopleSoft?

2    A.    In April of 2001.

3    Q.    All right.  And then when did you join TomorrowNow?

4    A.    I joined TomorrowNow in -- I think it was March or

5    April of 2002.

6    Q.    Okay.  And then how long were you technically with

7    TomorrowNow?

8    A.    With TomorrowNow, up until January of 2005.

9    Q.    And what happened then?

10   A.    Then we sold the company to SAP.

11   Q.    And how long were you still at SAP after that

12   acquisition?

13   A.    I resigned three months later.

14   Q.    So you left three months after the acquisition?

15   A.    Yes.

16   Q.    And then when did you start Rimini Street?

17   A.    In September of 2005.

18   Q.    Okay.  And we've heard a little bit about a lawsuit

19   involving your former company TomorrowNow.  Do you know

20   when that took place?

21   A.    I believe it was filed in March of 2007.

22   Q.    Okay.  So was there an overlap between the lawsuit

23   and when you were with still -- still with SAP?

24   A.    No.  It came years afterwards.

25   Q.    Okay.  And so you left SAP and you started Rimini

1    Street, and then 2007 is the lawsuit between Oracle and

2    SAP?

3    A.    Yes.

4    Q.    When was this lawsuit filed?

5    A.    The lawsuit between us and Oracle was in

6    January 2010.

7             MR. WEBB:  All right.  Thanks.  Marie, can we go

8    to the next one?

9    BY MR. WEBB:

10   Q.    When you joined PeopleSoft, what was your job?

11   A.    My first role at PeopleSoft was the manager of

12   installation services.

13   Q.    And in that capacity what did you do for PeopleSoft?

14   A.    My role was to oversee a team of people around the

15   world who literally went out to install all those DVDs we

16   talked about and get the software just up and running,

17   which can take a couple weeks given the size of the

18   project.

19   Q.    Take a few minutes and explain to the jury exactly

20   what goes into installing a new software product like

21   PeopleSoft?

22   A.    Well, it's actually a lot more complicated than

23   throwing a few DVDs in on a Microsoft Office.

24             You literally have to set up and configure a

25   server.  Then you have to load all those DVDs we talked

1    about, potentially hundreds of them, and then you download

2    the fixes just as we would do to create an environment, and

3    bring up a customer's environment, so basically a lot of

4    the same exact steps that we did in installing the products

5    for our environments.

6    Q.    In that role, did you have occasion ever to speak to

7    clients of PeopleSoft?

8    A.    Yes, all the time.

9    Q.    And when you spoke to them, what did you discuss?

10   A.    Are you talking about specifically about the

11   installation?

12   Q.    Or just in general.  When you're talking to them

13   about the product and the installation and using the

14   product, what other things did you guys talk about?

15   A.    I'm sorry, I don't understand.

16   Q.    That was a terrible question.

17         Did you ever talk to them about their

18   satisfaction with the product?

19   A.    Yes.  I mean, they were very satisfied with the

20   product, yes.

21   Q.    What about the service that they were receiving from

22   PeopleSoft?

23         MR. ISAACSON:  Objection, Your Honor, to the

24   extent this is calling for statements that other people

25   have said as opposed to what Mr. Ravin says to them.

1              THE COURT:  Sustained.

2    BY MR. WEBB:

3    Q.    Did you ever talk to them about their satisfaction

4    with the service they were receiving from PeopleSoft?

5    A.    Yes, and, of course, that was Oracle by this time.

6    Q.    Okay.

7    A.    As the owner of PeopleSoft.

8              But the -- yes.  I mean, they would talk about

9    the frustration --

10             MR. ISAACSON:  Objection, objection, Your Honor.

11             THE COURT:  Sustained, I've ruled on that.

12             MR. WEBB:  We can't talk about what the

13   customers told you.  Okay?

14   BY MR. WEBB:

15   Q.    All right.  So how long did you have that current

16   job at PeopleSoft after you joined?

17   A.    I had that about a year.

18   Q.    Okay.  Then what happened?

19   A.    Then I was promoted to worldwide account management

20   which included about 500 account managers around the world

21   that were customer service representatives essentially for

22   the product.

23   Q.    And what did you do in that role?

24   A.    In that role I would develop programs, work with

25   customers to resolve issues, to make them happier with the

1    software and the services being provided by PeopleSoft.

2    Q.    And how long did you have that job?

3    A.    I had that job for, I think, a year to two years.

4    Q.    And then what job did you get after that?

5    A.    Then, as we approached Y2K, I was asked by the CEO

6    and the executive committee to take over preparations for

7    all customers for Y2K, which everyone may remember was a

8    rather big deal in 1999 and coming up to it, to make sure

9    that software was ready, customers were ready.  So it was

10   responsible for all Y2K readiness of all customers.

11             It also included release support policy, so how

12   long a particular release would be supported by the company

13   before we would force customers to upgrade.

14             It included all those components.

15   Q.    Just take a short bit of time and tell the jury

16   again what this Y2K issue was?

17   A.    The Y2K issue was that certain software wasn't ready

18   to roll over to the year 2000, that it would cause

19   calculation problems in things like payroll or financial

20   systems where it measured one date against another to

21   determine how long it was.

22             So it was fairly complicated, and we had several

23   releases that weren't ready for Y2K that I had to navigate

24   customers through.

25   Q.    Were you promoted again at PeopleSoft?

1    A.     Yes, following our successful, thank goodness, move

2    through Y2K for all customers, yes, I was promoted to

3    vice-president of client services, yes.

4    Q.     Are you familiar with the client advisory board?

5    A.     Yes.

6    Q.     What is the client advisory board?

7    A.     Part of my role in the late '90s was overseeing

8    essentially the liaison to the client advisory board which

9    were a grouping of PeopleSoft's clients from around the

10   world, some very large, some smaller, who wanted input on

11   the company's direction, wanted to be able to help resolve

12   issues, bring issues to the forefront, and I represented

13   the company's executive team in our response in working

14   with those customers.

15   Q.     So you got to work with customers in that capacity

16   on the client advisory board?

17   A.     Yes.  I wasn't on the board, I was the liaison to

18   the board, yes.

19   Q.     But you would receive feedback from the clients in

20   that capacity?

21   A.     Yes.

22   Q.     You mentioned something about the policy regarding

23   support and release.  What is that?

24   A.     Well, as with any software company, you decide how

25   long a release is going to be considered a working or

1    supported release.

2              So my responsibility included deciding how long

3    those releases would be supported by PeopleSoft before a

4    customer had to move forward to a new release in order to

5    get support.  So those policies were under my direction in

6    the late '90s.

7    Q.   All right.  You just introduced a new term, release.

8    How does a release compare to a version of software?

9    A.   All right.  We had a little discussion about that

10   version, release.  Every company uses different terms.  So

11   version and release are the same in this instance.

12   Q.   And so were you in charge of determining how long an

13   existing version would be in place before you upgraded?

14   A.   Yes, in the late '90s, yes.

15   Q.   And what sort of things did you look at in making

16   that decision?

17   A.   Well, a lot of that had to do with the maturity of

18   the product.

19             There were decisions made about moving customers

20   forward so that they would buy additional product that was

21   related to the new versions.  So there were revenue

22   decisions.

23             There were technical decisions such as Y2K where

24   we had some releases we did not want customers on due to

25   some of the complexity and issues with them.

610

1              So all of those things came into play in making

2     those decisions.

3     Q.    Did you have any involvement in the maintenance

4     business of PeopleSoft around that time?

5     A.    Yes.

6     Q.    Explain to the jury that involvement.

7     A.    Well, with my promotion to the customer sales

8     division with a few of us, we were responsible for the

9     worldwide maintenance renewals for PeopleSoft as well as

10    building out -- one of my roles was to build out a

11    telesales organization, which was brand-new to PeopleSoft,

12    to be able to sell additional products and services to

13    existing customers.

14    Q.    All right.  Now, I just want to take a step back and

15    do a little vocabulary here.

16              When you say update, is that the same as an

17    upgrade?

18    A.    No.  And I know it gets so confusing.

19              An update would tend to be a smaller package

20    of -- whether it's some functionality, some fixes.

21              There are things that could take, for example, a

22    few days to maybe a week or two weeks to install, which is

23    still a lot, but compared to an upgrade, customers could

24    spend several years actually completing a full upgrade for

25    a major corporation.

1    Q.    So, again, shifting back to Rimini Street, when you

2    guys do updates, what are they?

3    A.    Well, we would put up updates and fixes, and they

4    would be, again, smaller bundles and smaller packages of,

5    again, of potentially new functionality but generally more

6    likely to be fixes.

7    Q.    Does Rimini Street offer upgrades?

8    A.    Rimini Street does not offer any upgrades.  What a

9    customer has in their software license what they're

10   entitled to, that's all they're going to get, yeah.

11   Q.    Okay.  Now, let's talk about -- what are patches?

12   A.    Patches, again, are different terminology.  A fix, a

13   patch, you'll hear those being interchanged all the time.

14   Q.    Okay.  Now, let's go back to our diagram earlier

15   when we talked about downloading.  That second phase, you

16   know, you've got the installation media first, and then you

17   download, you said you're downloading files and patches and

18   fixes.  Explain to the jury what that is?

19   A.    The items, as we said, once you have your DVDs and

20   your installation media, and then you're downloading the

21   things that are published after that, the updates, fixes,

22   potentially by the thousands, and that will include

23   patches, updates, so it will have some functionality

24   pieces, some improvements, and it will have some fixes and

25   it will have some documentation updates, all sorts of

1    different types of things.

2    Q.    All right.  Thank you.

3          Let's go back to PeopleSoft.  Now, in your

4    capacity as vice-president, did you have an understanding

5    as to the basic business model used by PeopleSoft in

6    connection with the software?

7    A.    I'm sorry, could you repeat the question?

8    Q.    Did you have knowledge of the business model used by

9    PeopleSoft?

10   A.    Yes.

11         MR. WEBB:  Marie, can you pull up the slide?

12         I apologize again.  There we go.

13   BY MR. WEBB:

14   Q.    Let's talk about the first step when a customer gets

15   access to the software.  Tell the jury how that happens?

16   A.    Well, a customer and the software vendor will

17   negotiate a license agreement.  Since you don't buy the

18   software, you license it, and so you will pay the vendor

19   for a license, just like you would pay for a Microsoft

20   Office license.

21   Q.    And the license would be like this Brazoria County

22   license that we just talked about earlier?

23   A.    Yes, something like that.

24   Q.    And a client would obviously pay for that?

25   A.    Yes.

1    Q.    You mentioned this earlier about a license.

2          How long of a license in terms of years does a

3    client get when they license software from PeopleSoft?

4    A.    Well, we would sell what they call a perpetual

5    license, which means once you buy the license, it goes on

6    in perpetuity, it goes on forever, yes.

7    Q.    Is that exclusive to that client?

8    A.    Yes.

9    Q.    Is it exclusive to that client?  Is it an exclusive

10   license?

11   A.    Oh, no, the license itself is a nonexclusive

12   license, which means that they can sell the same software

13   to thousands of the same people that can all get the same

14   DVDs, can run the same.

15         Just as there's millions of people who run

16   Microsoft Office, you pay for your license, but it's

17   nonexclusive, you're not the only one who has one.

18   Q.    Okay.  Is there a warranty or warranty like

19   component to these agreements?

20   A.    Well, there's a -- there's actually what they call a

21   warranty, and then there's the support, and the support is

22   basically included for a year.

23         You have to buy the first year.  You actually

24   pay for it.  But when you license the software, you were

25   generally required to buy the first year of support.

614

1    Q.    Now, during that first year, if something goes wrong

2    with the software, if it breaks down, what would a client

3    do?

4    A.    A client would call Oracle, or, at that point

5    PeopleSoft, it depends on which company, and ask for

6    support, or they would get online and put in a ticket and

7    request for help.

8    Q.    And when they get this license, what -- are they

9    licensing multiple versions and upgrades of that software?

10   A.    Well, generally once you're -- you're on support for

11   a period of time, and so everything that becomes available

12   for your software, any updates and even an upgrade to a new

13   version or a new release, if it comes out during the time

14   you're paying for maintenance, you've now paid for it and

15   you're entitled to take delivery on it.

16   Q.    And if someone's entitled to all that material,

17   updates and fixes, how would they go about getting it?

18   A.    Well, they would log on to the website using, you

19   know, log-in and password that they got from Oracle for

20   themselves, and they would go up to the website, and they

21   would access and figure out what it is they're supposed to

22   get, and take delivery of it, download it.

23   Q.    Mr. Ravin, what is the maintenance -- what does

24   maintenance end date mean?

25   A.    Well, the maintenance end date, the way that we use

1    it is, that's literally the Oracle maintenance end date.

2    That's the last day of support that they paid for and that

3    they're entitled to access websites and take delivery of

4    materials that are available.

5    Q.    After the expiration of the maintenance end date,

6    that one-year period, can a customer access Oracle content

7    on the website?

8    A.    Well, no, they're not supposed to.  Unfortunately, a

9    lot of times the log-ins are left on, all right, but

10   they're not supposed to.

11   Q.    After the expiration of that one year, what do they

12   do for service?

13   A.    After the one year, you have to make up your mind

14   whether you are renewing software support with the vendor,

15   which, you know, a good number of customers do.

16         Another group of customers decide to try to

17   support it themselves and don't take out a service

18   contract.  They just decide to use their own resources,

19   their own people.

20         And another group will decide to hire a third

21   party such as Rimini Street or another consulting group to

22   service that product.

23         Some group will just decide to change to a

24   different software product.

25   Q.    And we saw this earlier, but what is the basis for a

616

```
 1    PeopleSoft customer using a third party?  Where do they get
 2    that right?
 3    A.    That's in the license agreement where it says third
 4    parties can't be used by a customer for those purposes we
 5    outlined.
 6    Q.    And this is all governed by the agreement between
 7    PeopleSoft and the client?
 8    A.    Yes.
 9    Q.    Let's talk about if they go back to PeopleSoft for
10    additional maintenance.  The one year has expired, and they
11    want to go back to PeopleSoft to get another year.
12          Do you have an understanding of the pricing that
13    would take to actually let that happen?
14    A.    Well, again, pricing differs by software vendors,
15    companies and time.
16          Maintenance used to be 18 percent of a license
17    fee that you paid.  So you pay 18 percent every year, then
18    it went up to 20 percent, then 22 percent.
19          And so it's -- when a customer negotiates that
20    next year, like anything else, the price can change.  It
21    can get increased due to cost of living.
22          It's a negotiation, yes.
23    Q.    Are you familiar with the phrase forced upgrades?
24    A.    Yes.
25    Q.    What does that mean?
```

617

1    A.    Well, again, even when I ran the support policy at

2    PeopleSoft, a forced upgrade means that there's a deadline

3    that a customer can continue to utilize a current release

4    or a version, then they must be upgraded to a new version.

5              Just like you're told you have to be on the new

6    version of Microsoft operating system today, a new version

7    of Windows.  They stop supporting an old version.  If you

8    don't move forward to a new version by that date, then you

9    won't be eligible to receive support on your system.

10   Q.    And if you -- you have an upgrade that you have to

11   make, do you have to pay for it?

12   A.    Well, the upgraded software could be included with

13   the maintenance, but the cost of actually doing the upgrade

14   can be tremendous.

15   Q.    And then you would have to continue to pay

16   maintenance to stay with PeopleSoft at the time thereafter?

17   A.    Yes.

18   Q.    While you were at PeopleSoft, did they have forced

19   upgrades?

20   A.    Yes, we did.

21   Q.    And in your interaction with customers and clients

22   on a daily basis, do you have an understanding as to the

23   reception of the clients to forced upgrades?

24   A.    Well, it had changed over time.

25             In the mid '90s, coming into the year 2000, a

1    lot of the software was more immature.  It lacked key

2    functionality.  And so we had frequent upgrades, and we had

3    frequent forced upgrades for customers.

4              It was very time-consuming, but there was real

5    change with those releases.

6              Over time customers started to look at it and

7    say that they didn't want the upgrades, they didn't need

8    them that often, they didn't need the cost associated, and

9    they didn't want to move it.

10             Just as you may have said five releases of

11   Microsoft Office ago, that you're using the same

12   functionality as you used five years ago, and you just keep

13   getting forced to new versions, and changing the buttons

14   around, and changing the screens, and you don't really want

15   it, and the same thing was true with customers.

16   Q.    Do you have any specific instance that you can think

17   of where a customer had a bad experience with an upgrade?

18   A.    I worked on many such projects that were near

19   disasters while at PeopleSoft, yes.

20   Q.    Did you do anything at PeopleSoft to address the

21   concern about forced upgrades?

22   A.    Yes.

23   Q.    What did you do?

24   A.    Well, part of my year 2000 programs was the fact

25   that there were certain customers, very large customers, JC

1    Penney, the State of New York, that could not move off

2    older releases of the software, it was too big a project,

3    and they had to find a way to continue support, even though

4    our forced upgrade policy said they had to get off these

5    releases.

6              I created a special support program that was

7    parallel to the regular support for customers where they

8    could get all these updates and fixes and continue to get

9    support at a much more focused level and continue on this

10   special support program.

11   Q.    And how was the special support program received?

12   A.    By the customers, very, very well.  By management,

13   not so -- not so well.

14   Q.    Okay.  Did you do anything --

15              MR. ISAACSON:  Objection, and move to strike the

16   statement about customers, Your Honor.

17              THE COURT:  I'll allow it, but I think it should

18   be limited pretty much to that question and the answer.

19              MR. WEBB:  Thank you, Your Honor.

20   BY MR. WEBB:

21   Q.    Did you do anything else about your perception of

22   the forced upgrade issue?

23   A.    Yes, actually I did have a conversation where I --

24   again, my job was customer service.  My job was driving

25   client satisfaction and resolving issues.  And I did go to

```
 1    management about changes that I would like to have seen in
 2    the maintenance program.
 3    Q.    Were the changes that you would like to have seen
 4    made actually implemented by PeopleSoft?
 5    A.    No.
 6    Q.    What happened to your special services platform that
 7    you had created while at PeopleSoft?
 8    A.    In the first part of 2000 -- the first part of 2001,
 9    the CEO made the decision to terminate the program.
10    Q.    Do you have an understanding as to the reason for
11    the termination of that program?
12    A.    Yes.
13    Q.    And what is your understanding?
14    A.    I was told that the program was gaining so much
15    success that they decided to cut the program because it was
16    interfering with the consulting business who wanted to --
17    we made a lot of money off selling services to help
18    customers upgrade.
19          And since customers were not upgrading under my
20    other program, it was cutting off the revenue for all the
21    consulting work that was scheduled to be done.
22    Q.    When you learned the business was not going to make
23    any changes based upon the concerns that you expressed, and
24    when you learned about them terminating the special
25    services platform, did you do anything?
```

1    A.    Well, I was pretty disappointed, and decided it was

2    time to leave.

3    Q.    So you left PeopleSoft?

4    A.    Yes.

5    Q.    All right.  Now, when you left PeopleSoft, did you

6    take any customer lists with you?

7    A.    No.

8    Q.    Did you take any confidential information with you?

9    A.    No, we weren't allowed.  We signed documents to that

10   effect.

11   Q.    No trade secrets, no marketing materials?

12   A.    No.

13   Q.    All right.  So you left PeopleSoft.  What did you do

14   then?

15   A.    I joined a company called Saba Software.

16   Q.    And what business was Saba in?

17   A.    Saba was in the e-learning business.

18   Q.    And what does that mean?

19   A.    Well, essentially it was the most boring product I

20   could imagine unfortunately.

21        But it was essentially software that keeps track

22   of employee training requirements, for example.  If you're

23   working in pharmaceuticals, you needed to be able to prove

24   that certain employees had certain training guaranteed.

25        So, yeah, it was very -- I guess unfairly

1   boring.

2       Q.    What did you do for them?

3       A.    I was asked to come in and build out the telesales

4   operation similar to what I built out for PeopleSoft.

5       Q.    And how long did you work at Saba?

6       A.    I was there one year, I think, exactly.

7       Q.    What was your title again?

8       A.    I was vice-president of sales.

9       Q.    Did you ultimately leave Saba?

10      A.    Yes.  I could not take it after more than a year.  I

11  was so bored, I had to get back to more mission critical --

12      Q.    So what did you do?

13      A.    So I left Saba and connected up with an old employee

14  of mine at PeopleSoft who was actually passionate about

15  client service, and he had started a small business, and we

16  talked about building a new business together.

17      Q.    So he had a preexisting business that you joined?

18      A.    Yes.  I think he had started it in 1998, and I came

19  into the picture in 2002 after leaving Saba.

20      Q.    And what was the name of the company?

21      A.    That was TomorrowNow.

22      Q.    And what was the name of the gentleman that you

23  joined?

24      A.    That was Andrew Nelson.

25      Q.    And he previously worked for you while he was at

1    PeopleSoft?

2    A.    Yes.

3    Q.    So I think you said that you incorporated some new

4    business services with TomorrowNow?

5    A.    Yes.  He had built out -- he had gone out on his own

6    to offer technical services to PeopleSoft customers, again,

7    an independent consultant, helping them with more of the

8    technical servers and infrastructure and operating systems,

9    databases.

10            And we talked about building an independent

11   maintenance business to focus on servicing the applications

12   at half the price of PeopleSoft.

13   Q.    Okay.  Let's try that again.

14            This new service, was it going to be in the

15   maintenance business?

16   A.    Yes.

17   Q.    And maintaining what type of software?

18   A.    The PeopleSoft software.

19   Q.    So you were going to bring into that new business a

20   new sort of operational approach that you would actually

21   deal with maintaining the software, not just technical

22   service?

23   A.    Right.  In fact, it was getting rid of the technical

24   services to focus in on competing in the maintenance

25   business.

1    Q.    What made you think that that would be a good idea
2    to do that?
3    A.    Well, all my years at PeopleSoft told me that there
4    were many, many customers that would likely jump to an
5    opportunity to have choice on picking a service that
6    provided much better service overall at a much better
7    price.
8    Q.    Did you have any involvement in the technical setup
9    of that operation?
10   A.    No, I actually was sales and marketing, developing
11   the service.  Because, again, coming from my background at
12   PeopleSoft, that's what I did for customers was figure out
13   what services they needed, what they wanted, and that was
14   my area of the business.
15   Q.    Did you write any software code for the company?
16   A.    No.
17   Q.    Did you have any technical role with the engineers
18   in setting up the technical piece of the business?
19   A.    No, my partner handled all the technical side.  I
20   was sales, marketing and going out and finding the
21   customers.
22   Q.    All right.  So you joined TomorrowNow.  What did you
23   do now that you joined TomorrowNow?
24   A.    So I was at TomorrowNow for several years out
25   selling and building a customer base and then eventually

1    selling the company.

2    Q.    Who did you sell the company to?

3    A.    To SAP of Germany, yes.

4    Q.    Okay.  Explain to the jury who was SAP?

5    A.    SAP is Oracle's largest competitor in applications.

6          While Oracle has technical services and products

7    that are different than SAP, they do compete at the

8    application level for big companies for things like payroll

9    and for financials, manufacturing.

10   Q.    What made you want to sell TomorrowNow to SAP?

11   A.    Well, actually, originally I did not want to.  They

12   came knocking in December of 2004, very aggressively

13   wanting to buy the company.

14         We spent time together, quick -- let's call it

15   quick dating over two to three weeks back with a lot of

16   meetings, and they really wanted to buy the company.

17         And the -- who was going to be the new CEO of

18   SAP and I spent a lot of time, and we were going to go and

19   actually do some great things together around the world.

20   After the acquisition it was going to be a standalone

21   division.

22   Q.    So that was my next question.  What was your

23   understanding as to what would TomorrowNow be after the

24   acquisition?

25   A.    The understanding was that it was going to be a

1    standalone division.  I actually was not going to be an

2    employee of TomorrowNow as a standalone division.  I was

3    switched over postacquisition to being a vice-president of

4    SAP.

5    Q.    Why were you initially reluctant to sell TomorrowNow

6    to SAP?

7    A.    Well, my reluctance was the fact that it was a young

8    company.  I mean, we literally only had, I think, a hundred

9    customers, which was great, but it was still very early.

10   We were still small.  We had 30 employees.

11          So, you know, I really wanted to grow it much

12   bigger, but SAP made a very compelling argument.  I mean,

13   you know, it was great on the money side.  But this was

14   much bigger.

15          This was about -- they wanted to take my skills

16   and use them on a much bigger global basis for SAP, and I

17   thought that was extremely exciting.

18   Q.    At the time of the transaction, what was your

19   percentage ownership of TomorrowNow?

20   A.    Fifty percent.

21   Q.    And what was the selling price to SAP?

22   A.    Overall was 10 million.

23   Q.    All right.  So now you are vice-president of SAP

24   postacquisition.

25   A.    Yes.

1    Q.    Tell the jury about your first few days at SAP?

2    A.    Pretty miserable.

3    Q.    How so?

4    A.    Everything they had promised about being a separate,

5    standalone division went out the window, I think, within 48

6    hours after the acquisition when they sent in people to

7    measure all the offices and cubicles and decide which

8    cubicles were too big or too small, which employees could

9    have a window seat, who couldn't.  All that began almost

10   immediately after the acquisition.

11   Q.    After you went to SAP, did you have an understanding

12   or come to an understanding as to the purpose of the

13   acquisition?

14   A.    Yes.

15   Q.    What was the true purpose of that acquisition?

16            MR. ISAACSON:  Objection, Your Honor, if he's

17   talking about someone --

18            MR. WEBB:  Let me rephrase it.

19   BY MR. WEBB:

20   Q.    What was your understanding of the purpose of that

21   acquisition?

22   A.    To provide to obviously grow the business, to move

23   more customers over and win the business from Oracle and

24   show that a third party could actually provide better

25   service than Oracle could for its own customers and

1    products, and eventually get those customers to be so

2    excited by the relationship with SAP that they would decide

3    to switch their products over to running SAP products

4    instead of just servicing Oracle products.

5    Q.    And how did that measure up to your expectations as

6    to the overall plan for TomorrowNow?

7    A.    Well, it became far different.  And, again, in the

8    first few days it became clear that SAP was much more

9    obsessed with converting those clients to SAP software than

10   really servicing the existing customer base of Oracle.

11   Q.    So what, if anything, did you decide to do?

12   A.    Well, after three months of fairly close misery, I

13   decided to leave SAP and resign.

14   Q.    So you resigned your job at SAP?

15   A.    Yes.

16   Q.    What did you do after you left SAP?

17         I'm sorry.  When did this happen?  When did you

18   leave SAP?

19   A.    I left in March.  I believe it was March, or

20   April 1st, even, of 2005.

21   Q.    Okay.  So you left in 2005?

22   A.    Sold the company January 2005, left by April 1st of

23   2005.

24   Q.    Now, at that time had Oracle sued SAP for anything?

25   A.    Well, I don't know about anything.  Not related --

1    not that I was aware of related to anything that I was

2    involved in TomorrowNow.

3    Q.    After you left SAP, do you have any information

4    about the process that was ultimately used by TomorrowNow

5    to provide service?

6    A.    We had gotten some info from the people that talked

7    about engineer-to-engineer, or we heard about in the press

8    or media.  Other than that it was from customers.  Some

9    customers relayed data.  But that was it unofficially.

10   Q.    But you had no role in actually executing the way

11   they do business at TomorrowNow?

12   A.    No, not even in the time I was there.  I was

13   completely separated out from -- that was part of my

14   problem was I literally didn't have any control of

15   TomorrowNow at all anymore once I was vice-president of

16   SAP.

17   Q.    Okay.  So now, it's March, April 2005.  You've left

18   your job at SAP.  What did you do next?

19   A.    Well, I went home and sat around the house for six

20   months contemplating what I was going to do next and how I

21   wanted to spend time; so pretty much just doing a lot of

22   thinking.

23   Q.    Did there come a time when you decided that you

24   wanted to do something else?

25   A.    Yes.

630

```
1    Q.    What time was that?  Explain to the jury when that
2    happened.
3    A.    It was about six months later when I just couldn't
4    stand being around the house anymore, I'm not used to it,
5    and I was antsy to get into another business, and so I saw
6    an opportunity in September of 2005.
7    Q.    And what was that opportunity?
8    A.    Well, we had just seen that Oracle had made an
9    announcement that they were going to buy Siebel, and at
10   TomorrowNow we had only serviced PeopleSoft and JD Edwards
11   product.
12         So I saw an opportunity for a brand-new product
13   line for a new company and to build on what I had started
14   with TomorrowNow and build an even better company and
15   launch a new one, yeah.
16   Q.    And did you ultimately open a new company?
17   A.    Yes.
18   Q.    And what was the name of that company?
19   A.    That's Rimini Street.
20   Q.    Did you have a vision for Rimini Street when you
21   started it?
22   A.    Yes.
23   Q.    And what was the vision?
24   A.    Well, the vision was to, again, build on a better
25   company than we had done in the design of TomorrowNow, a
```

1    more sophisticated company that offered even more services

2    to customers, that provided even better overall service

3    with more service level guarantees, basically everything

4    better than what we had envisioned in the first company.

5    Q.    What was the advantage of actually starting a new

6    business from the ground up rather than joining a

7    preexisting company?

8    A.    Well, the difference was I didn't have a partner at

9    50-50, and anyone who has ever been in a partnership, knows

10   it's like marriage, it has its good days and its bad days

11   and it's tough.  You have to make compromises about what

12   you want to do, and this was an opportunity for me to call

13   all those shots from day one.

14   Q.    Where did you get the funding when you started

15   Rimini Street?

16   A.    Rimini Street -- the first funding came from me.  I

17   had all the savings I had left and threw it into -- into

18   the new business.

19   Q.    Did you get any more money from any other

20   individuals to start the business?

21   A.    Yes, I had a gentleman who I had known since high

22   school -- as you can tell, I stay close to a lot of

23   friends -- who had been at Sun Microsystems, had retired.

24        He put in his life savings, and we went around

25   to friends and family and collected up money, and told them

1    we're going to create a great company, and we got money

2    from friends and family to help start too.

3    Q.    When you were talking to your friends and family

4    about investing in this new company, what was the vision

5    that you told them about why this was going to be a good

6    idea to be a part of this business?

7    A.    Well, again, you know, from my reputation and from

8    years of work, obviously they had trust that I understood

9    the market, and the -- you know, the opportunity was so big

10   because of everything that we knew about the industry from

11   all these years was that there were a good number of

12   customers, we thought, would look at a different choice

13   with a different value proposition, different services.

14           There were always things that Oracle could

15   provide that we couldn't, and there were things that we

16   could provide that Oracle wasn't, and it was a market

17   choice.  People would be able to choose what service works

18   best for them.

19   Q.    So the focus of this service would be to provide

20   maintenance on software that was sold by another company?

21   A.    That's right.  We're just a service department, just

22   like a Jiffy Lube services your car.  They don't build

23   cars, they just service them, yes.

24   Q.    What led you to believe that this was going to be a

25   business that you could properly operate?

1    A.    Well, again, the understanding of the license

2    agreements from working with these agreements -- and, by

3    the way, at PeopleSoft I also had one other title that I

4    had left out, which was I was overseeing -- I was

5    vice-president of extended enterprise licensing.  I know a

6    big mouthful of terms.

7              What it meant was that I helped renegotiate

8    license agreements for -- what was responsible for huge

9    numbers of customers starting in 1999.

10   Q.    So how did that information inform you as to the

11   priority of starting this new business?

12   A.    Yes, I had every belief that everything that we were

13   doing from the business itself, to the way that we were

14   structuring operations, to the way that we were using

15   software, because everyone, again, was a fully-licensed

16   customer, I felt that there was -- everything we were doing

17   was completely within the license agreements.

18   Q.    Did you have an understanding as to how the industry

19   handled maintenance by third parties?

20   A.    Yes.

21   Q.    And how did that, if at all, inform you about the

22   propriety of this new business?

23   A.    Well, again, coming back to the license agreements,

24   third parties had the rights, from all my experience, and

25   actually telling customers this for years in my role at

1    PeopleSoft, that customers can stand in the shoes of the

2    licensee to do the things that they're licensed to do;

3    nothing more, but within the license agreement.

4    Q.    While you were at PeopleSoft, are you personally

5    aware of any instance where PeopleSoft objected to a third

6    party providing maintenance?

7    A.    No.  I often -- I often worked with customers on

8    third parties who were hosted, managed service, outsourced.

9    I worked with these licenses on a regular basis and never,

10   ever interfered with any of that.

11   Q.    This again is a slide from the Brazoria license

12   agreement that we talked about earlier, and this is 14.2

13   that we discussed.

14              Is this the provision that you were talking

15   about that you felt gave you the right to provide

16   third-party maintenance as Rimini Street?

17   A.    Yes.  This one, and in the course, you know, these

18   things get negotiated a little bit, but they all

19   essentially had the same component.  Third parties are

20   allowed to be hired and can work on product.

21   Q.    Let's talk about that.  I think you testified about

22   this yesterday, that some terms of these contracts are

23   negotiated, some terms change from contract to contract.

24   Do you remember that?

25   A.    Yes.

1   Q.    Explain that a little bit more to the jury how that

2   would work?

3   A.    You have a -- as in anything else, you have a

4   boilerplate agreement, and the lawyers from one side

5   generally negotiate with the lawyers from the other, and

6   they come to agreement on terms.

7             Sometimes wording is different, sometimes rights

8   are changed a little bit.  But essentially the concepts

9   stay within the license that are the same.

10  Q.    Have you ever heard of a site restriction in a

11  PeopleSoft license?

12  A.    Sure.

13  Q.    What's a site restriction?

14  A.    Well, site restrictions can be -- again, as part of

15  a license, can refer to certain limitations within that

16  license.  A license has limitations and rights.

17            And, in this case, a site restriction can be a

18  geography, it can be a single building, it can be a state.

19            And so over time -- I mean, we watched a lot of

20  these geographies because it could be connected often to

21  the price.

22            If someone wants to be able to use a software on

23  a worldwide basis, they generally could get more than

24  someone who wants to use it just in the United States, and

25  they would tend to pay more money for it.

636

1              So sites were used to help determine a lot of

2     time the fees.

3     Q.    And that would be for the use of the software?

4     A.    That's correct, for the use of the software.

5     Q.    The actual business use of the software?

6     A.    Right, running the software, correct.

7     Q.    Like you use the Microsoft software at Rimini Street

8     to actually run your business?

9     A.    Correct.

10    Q.    Let's talk about a few things that Rimini Street

11    doesn't do, and I hate to be repetitive on this, Mr. Ravin,

12    I just want to make sure there's absolute clarity.

13              Does Rimini Street sell Oracle software to

14    anyone?

15    A.    Never.

16    Q.    What does it actually do to Oracle software?

17    A.    We literally service Oracle software that other

18    people have licensed.

19    Q.    Are Rimini clients given access to versions or

20    releases that they haven't licensed already from Oracle?

21    A.    No, nothing that they're not entitled to use.

22    Q.    We've heard this a few times, including from me,

23    about how every client has already paid for a license.  Can

24    you explain that to the jury?

25    A.    Well, we're the service arm.  So it's like Jiffy

1    Lube, everyone who has a car that gets repaired, you bring

2    in your car.

3              We're the service arm for Oracle software.  So

4    We don't build software, we don't resell software.

5    Customers bring us their software to repair and provide

6    updates such as tax, legal, and regulatory updates.  So

7    that's all we do.

8    Q.    And no Rimini client gets anything they are not

9    entitled to receive.  Do you see that?

10   A.    That's correct.

11   Q.    And what does that mean?

12   A.    Well, if we -- let's just say we have two customers

13   who have the same licensed product.  One leaves Oracle a

14   year before the second one leaves Oracle to come to Rimini

15   Street.

16             So Customer A missed out on -- let's just call

17   it update 1.  Customer B was at Oracle long enough so when

18   update 1 came out, they received it.

19             We would never allow customer -- this customer

20   to take their update that they got and use it for someone

21   who wasn't entitled.  The customer that left a year earlier

22   is not entitled to the Oracle materials that came out after

23   they left Oracle.  That's something that only the second

24   customer has a right to.

25             So we have to manage to make sure that one

638

1    customer doesn't get the software that another customer is

2    entitled to.

3              That's all part of -- when we talked about

4    siloing, right, whether operationally or physically,

5    everything is about making sure that no customer gets

6    something from Oracle that they didn't pay Oracle for; very

7    important.

8    Q.   Okay.  Now, Mr. Ravin, it's true, isn't it, though,

9    that Rimini Street doesn't actually have a contract with

10   Oracle to do this work?

11   A.   No, we have no contract with Oracle.

12   Q.   How is it, then, that Rimini Street can be, in your

13   mind, permitted to do this work?

14   A.   Well, again, under the license agreements, customers

15   are allowed to hire people to do work on their behalf.  We

16   are just one of those companies.

17   Q.   Does Rimini Street have contracts with its

18   customers?

19   A.   Yes, we have detailed contracts with our customers.

20             MR. WEBB:  I'd like to offer into evidence DTX

21   2246.

22             MR. ISAACSON:  No objection, Your Honor.

23             THE COURT:  It's admitted.

24         (Defendants' Exhibit 2246 received into

25         evidence.)

```
 1                 THE WITNESS:  I'm sorry.  Is this something
 2       that's supposed to be in my binder?
 3                 MR. WEBB:  I don't know.  I'll pull it up on the
 4       screen.
 5                 THE WITNESS:  Okay.
 6                 MR. WEBB:  All right.  Can you enlarge that top
 7       part first, Marie?
 8       BY MR. WEBB:
 9       Q.    Mr. Ravin, could you identify for the jury what
10       we're looking at here, Exhibit DTX 2246?
11       A.    Yes, this is a support agreement for PeopleSoft
12       Products between Rimini Street and Brazoria County, Texas.
13       Q.    So Brazoria County, Texas, that's the company we
14       talked about earlier with the e-mail?
15       A.    Yes, the government agency, yes.
16       Q.    The same company that entered into the 1998
17       agreement with PeopleSoft?
18       A.    I'm sorry.
19       Q.    We talked about earlier, Exhibit PTX --
20       A.    If it said 1998, I assume that's right.
21       Q.    So we have the contract between Brazoria and
22       PeopleSoft.
23                 Then we have the e-mail where you're discussing
24       with them the business model and the fact that the terms
25       mean certain things, and now they've actually signed up
```

1    with you at this stage; right?

2    A.    Yes.

3              MR. WEBB:  All right.  I want to talk about a

4    few terms of this agreement.  First of all, let's just go

5    to heading number one, Marie, under Services.

6    BY MR. WEBB:

7    Q.    Do you see that, Mr. Ravin?

8    A.    Yes.

9    Q.    Explain to the jury why Rimini Street sets forth so

10   much detail about its services that it will provide to the

11   client under the agreement?

12   A.    Well, one of my lessons from all my years in this

13   business was that the software vendors tend to include a

14   very, very limited amount of description of what's

15   included.

16             It pretty much says you get support, we'll

17   figure out what it is, you'll get whatever we put out, but

18   it's very nondescript generally in terms of what's

19   included.

20             One of the ways that we wanted to be a better

21   competitor was to be very explicit about what a client can

22   actually expect for all the money they pay us.  They're

23   paying us a lot of money in some cases.  Some customers pay

24   over a million dollar a year.

25             So when you think about that, you want to make

1    sure that they know what they're buying, so we have details

2    about it, and then we have details that actually list

3    what's not included, yes.

4    Q.    All right.  You mentioned money, and I'm going to

5    jump way ahead in my outline because I have to address

6    something.

7         Yesterday Mr. Isaacson talked about contract

8    backlogs.  Do you remember that?

9    A.    Yes.

10   Q.    Do you remember the amount of money that you gave

11   him that corresponds to the Rimini contract backlog?

12   A.    Yes.  It's the uncommitted amount, 1.6 billion.

13   Q.    All right.  Does Rimini Street have $1.6 billion in

14   the bank?

15   A.    No.

16   Q.    Does Rimini Street have a guarantee of making

17   $1.6 billion?

18   A.    No.  As I said, these are not -- these are not

19   committed amounts.

20        These are future -- it's like aircraft orders,

21   it's what people tell us they think they could potentially

22   buy, all of our customers together, over the next 10, 15

23   years.

24        So, yeah, that amount doesn't mean anything on

25   itself.  It's not guaranteed money or anything for Rimini

1    Street.

2        Q.    Okay.  I just want to be clear about that.

3              So in the history of Rimini Street, from

4    September 2005 when you opened the doors to this business,

5    through February 2014, do you have an understanding as to

6    the total revenue earned by the company?

7              MR. ISAACSON:  Objection, Your Honor, to the end

8    date.  I think we've established --

9              MR. WEBB:  You want to do '11?

10             MR. ISAACSON:  Yeah.

11             MR. WEBB:  Let's do '11.

12   BY MR. WEBB:

13       Q.    Mr. Ravin, as you sit here today, what is your best

14   knowledge of the total amount of money, revenue earned by

15   Rimini Street from September 2005 to the end of 2011?

16       A.    You know, I'd probably need to see it written out.

17   I mean, it's only a few million dollars, it's not -- it's

18   nothing huge.

19       Q.    Would it be a hundred million dollars more or less?

20       A.    Oh, I'm sure probably less than that.

21       Q.    So you're telling this jury that even though you

22   have a backlog of $1.6 billion as Mr. Isaacson told them

23   yesterday, the whole company, through 2011, made less than

24   a hundred million?

25       A.    Yes.

643

1    Q.    Now, that's revenue, that's not profit; right?

2    A.    That would just be gross revenue, yes.

3    Q.    That's before you pay salaries; right?

4    A.    Yes.

5    Q.    Before you pay the light bill?

6    A.    Correct.

7    Q.    Before you pay the rent?

8    A.    Yes.

9    Q.    Before you pay insurance for your employees?

10   A.    Yes.

11   Q.    So it's not any sort of whatever's left, it's the

12   top line?

13   A.    Yeah, I mean, we've lost money every year.  We've

14   never made money, yes.

15   Q.    Let's talk about that.  Has Rimini made a profit?

16   Again, focusing on the timeframe, from 2005 to the end of

17   2011, did Rimini make a profit?

18   A.    No, we've lost money every year.

19   Q.    How is it that you can stay in business if you've

20   lost money every single year?

21   A.    Well, I mean, it's what we call paper money, right?

22   I mean, you have depreciation, we have these things that

23   are noncash items.

24          So on the financial -- for those of you who I

25   know have done some books, you have all these noncash

1    items.  So you can lose money on paper.  What's important

2    is cash flow, how much cash do you bring in and how much do

3    you spend.

4              Rimini Street, because we raised a total of 12

5    and a half million, including all investors, that went into

6    the business to help us pay bills and to grow, and we took

7    in customer money, so that's all the money that comes in,

8    along with a loan that we did, I think, for 10 million.

9    That's all the money that comes into the pot.

10             And then you've got to pay out all the salaries

11   and all costs and everything else, and from that

12   perspective, we've been able to pay our bills, yes.

13   Q.    All right.  Now, you mentioned something else.

14   Because you started off, it was you and your high school

15   friend and some of your family and friends contributed the

16   money to start the business?

17   A.    The first two and a half million, yes.

18   Q.    Was there another investor down the road?

19   A.    Yes, in 2009.

20   Q.    In 2009.  So someone else invested money at that

21   time?

22   A.    Yes.

23   Q.    About how much?

24   A.    That was a $10 million investment.

25   Q.    All right.  So just to be perfectly clear in terms

```
1    of your total revenue that you've earned during the
2    relevant period in this case, it's a hundred million or
3    less?
4    A.    Yes.
5    Q.    Top line?
6    A.    Yes.
7    Q.    Okay.  Back where we were.
8          In your contract, let's turn to paragraph 3.
9    This is the service level agreement.  Do you see that,
10   Mr. Ravin?
11   A.    Yes.
12   Q.    Is this sometimes referred to as the SLA?
13   A.    Yes.
14   Q.    What is an SLA?
15   A.    Which, by the way, don't confuse, but sometimes you
16   see SLA meaning the software license agreement.  But in
17   terms of our contracts, it's the service level agreement.
18          THE COURT:  What's the exhibit number, here,
19   Mr. Webb?
20          MR. WEBB:  I'm sorry, this is 2246, Your Honor,
21   DTX 2246.
22          THE COURT:  All right.  Thank you.
23          MR. WEBB:  I apologize.
24   BY MR. WEBB:
25   Q.    So Mr. Ravin, explain to the jury what a service
```

1    level agreement does, what it means?

2    A.    This is our commitment to the client about how we

3    will respond to their service requests.

4    Q.    And it's right there in the agreement?

5    A.    Yes.  And that's, again, part of what we do.  We put

6    in the service level agreements so the client knows, for

7    example, in this one, our standard 24 hours a day, 7 days a

8    week, if they have an urgent issue, they get a resolution

9    in 30 minutes.  They get someone to call them back in 30

10   minutes, and it's not just someone saying, hi, I got your

11   message, it's a senior engineer to work the issue within 30

12   minutes.

13   Q.    Let's break that apart a little bit.

14         So in the agreement they sign with Rimini

15   Street, from day one they are guaranteed a response time in

16   30 minutes?

17   A.    Yes.

18   Q.    I also want to focus on this second paragraph,

19   Mr. Ravin.  It says, "Further, Rimini Street will provide

20   client with one named primary support engineer."

21         Do you see that?

22   A.    Yes.

23   Q.    Is the primary support engineer sometimes referred

24   to as the PSE?

25   A.    Yes.

647

1    Q.    What does a PSE do?

2    A.    Lots of acronyms, I know; not easy.

3          The PSE -- the difference between the standard

4    approach from a software company, or from most, you guys

5    are familiar, I'm sure, with the idea of a call center

6    where you call in, and the first level you talk to says did

7    you plug in your computer, did you remember to turn it on,

8    and, you know, you go through those steps, and if that

9    doesn't solve it, they move you up to the next level, and

10   you fight your way up, and hopefully you'd get to talk to

11   someone who is an expert and can help you solve your

12   problem.

13         Rimini Street's model is completely different.

14   We have no call centers.  What we do is we actually assign

15   senior engineers with an average plus of 10 years of

16   experience to every single client.

17         So they get the name of a primary support

18   engineer who is responsible for them as a customer.  They

19   literally can call that person night or day to get their

20   cell number.  It's like having a personal concierge level

21   of service.

22   Q.    Is there a benefit to having a single person always

23   associated with a client?

24   A.    Well, the benefit is that, unlike a call center

25   where the person you're talking to may not know you,

1    doesn't know your systems, and these are huge, complex

2    systems, the Rimini Street model means that the engineer is

3    already familiar with the customer and their system.

4            So when they get on the phone with the customer,

5    they already know all about the system, they already know

6    all about the customer, and they can begin solving the

7    issue right away without having to wait and ask the basic

8    questions, you know, what are you running, tell me about

9    your system, we don't have to do that.

10   Q.   When you were setting up the company, why is it that

11   you decided to do this, to assign a primary support

12   engineer to clients individually?  What made do you that?

13   A.   Well, this was, again, based on my experience when I

14   built that special support operation at PeopleSoft that

15   they eventually killed.

16           My experience was that customers loved the idea

17   of the concierge service, they loved the idea of named

18   personnel instead of call centers, and that was where I

19   started and got the idea that this is the kind of model

20   that customers could really benefit from.

21           MR. WEBB:  Marie, can we go to page 4, paragraph

22   5D.

23   BY MR. WEBB:

24   Q.   Mr. Ravin, this is under the part of the agreement

25   called Client Obligations.  I want to refer you to page 4,

1    paragraph D, Copies of software.  Do you see that?

2    A.    Yes.

3    Q.    I want you to read this.  Could you read the first

4    sentence to the jury.

5    A.    "Client acknowledges that Rimini Street might need

6    to work with, configure, test, and possibly modify certain

7    PeopleSoft products licensed to the client in order to

8    render services pursuant to this agreement."

9    Q.    All right.  What's the purpose of that clause in

10   this agreement, Mr. Ravin?

11   A.    Sorry.  I'm going between two mics here.

12         The purpose of that was to make sure that us and

13   the client fully understand that in order to, as we say,

14   service the car, we need access to the car in order to work

15   on it, and we're going to potentially make changes to that

16   software.

17   Q.    Okay.  Let's go to the next sentence, Mr. Ravin.

18   Would you continue to read through subparagraph (a)?

19   A.    "Accordingly, client will either (a) provide Rimini

20   Street copies of the PeopleSoft products, including any

21   required license codes, required for proper operation of

22   the products listed in Exhibit A in a nonproduction

23   development and test environment."

24   Q.    Okay.  And, Mr. Ravin, in this contract between

25   Rimini Street and the client, what is the purpose of that

1    provision?

2    A.    Well, this is -- this is designed so that we,

3    again -- we're saying we need you to give us a copy of the

4    software to work on and build test and development

5    environments.

6    Q.    And these are the -- the development and testing

7    environments that we talked about earlier on the flip

8    chart; right?

9    A.    Correct.

10   Q.    Under this term of this agreement, the client agrees

11   that it's -- it will provide Rimini Street copies of its

12   software so that Rimini Street can build these

13   environments?

14   A.    That's correct, on our systems, yes.

15   Q.    So this would be for a local environment?

16   A.    For a local environment or Rimini Street systems,

17   yes.

18   Q.    Okay.  Let's go to part (b).  Can you read that for

19   the jury?

20   A.    "Or (b) configure and prepare persistent remote

21   access to client's test and development database

22   environments via the Internet.

23   Q.    What is meant by that provision?

24   A.    That's the remote support that we said customers

25   have a choice whether they want us to -- they want to give

1    us the software and we build it in our environment, or they

2    give us remote access to test and development systems in

3    their environment wherever their computers might be

4    located.

5    Q.    So the client chooses whether, A, Rimini has their

6    software on Rimini's computers, or, B, Rimini has to access

7    the client's computers to get to their software?

8    A.    Yes.

9    Q.    And under the terms of this agreement, who makes

10   that decision as to whether it would be local or remote?

11   A.    The client.

12   Q.    Well, again, we heard earlier about how Rimini

13   Street had a preference?

14   A.    A clear preference.  The engineers definitely

15   preferred to have local environments.

16   Q.    But was -- if the client said we want to do it

17   remotely, what would you do?

18   A.    If they insisted on remote, then we would do remote.

19            MR. WEBB:  Okay.  Let's go to 10C, Marie, page

20   8.

21   BY MR. WEBB:

22   Q.    Paragraph 10 begins a series of paragraphs about

23   confidentiality, and paragraph C relates to nondisclosure.

24   Do you see that, Mr. Ravin?

25   A.    Yes.

1    Q.    The first sentence I would like you to read to the

2    jury?

3    A.    "Each party agrees that it shall not use or permit

4    the use of any confidential information of the other party

5    except for purposes of this agreement, nor disclose or

6    permit to be disclosed the confidential information of the

7    other party to any person or entity (other than its own

8    employees, agents, representatives, or affiliated entities

9    having a reasonable need for such information in order to

10   provide the materials)...."

11   Q.    That's probably enough for now.

12         So do you have an understanding as to the

13   purpose of that provision in this agreement between Rimini

14   Street and Brazoria County?

15   A.    Yes.  I mean, we're supporting systems for these

16   customers.  They could be human resource systems, financial

17   systems.  We have an obligation to protect their

18   confidentiality and their data, plus, of course, we also

19   have a duty to protect the confidentiality related to their

20   software license agreement.

21         MR. WEBB:  Marie, can you pull up previously

22   admitted PTX 3726, and go to page 3, paragraph 14.2.

23         COURTROOM ADMINISTRATOR:  I don't have that

24   admitted.

25         MR. WEBB:  I'm sorry, I think we admitted it a

1    while ago.

2              COURTROOM ADMINISTRATOR:  I'm sorry, you're

3    right.

4              MR. WEBB:  Sorry about that.

5              Marie, can we go to the fifth line again.  Can

6    you all see that?  There we go.  Is there an A on your

7    screen?

8              Marie, let's start with "licensee" and highlight

9    it for the jury all the way down to "herein."  Keep going

10   down.

11   BY MR. WEBB:

12   Q.    All right.  Mr. Ravin, look at that part where we

13   are highlighting.  That, again, is the 14.2 provision about

14   third parties.  Look at paragraph sub (iii).  Do you see

15   that?

16   A.    Yes.

17   Q.    Can you read that for the jury?

18   A.    You want me to read the highlighted?

19   Q.    No, the paragraph (iii) below?

20   A.    Oh, okay.

21              It says, "have agreed to substantially similar

22   nondisclosure obligations imposed by licensee as those

23   contained herein."

24   Q.    Okay.  So this is the provision of the agreement

25   between PeopleSoft and Brazoria saying you can use a third

```
1   party, provided these things, including there's an
2   agreement of confidentiality?
3   A.    Yes.
4             MR. WEBB:  All right.  I'm sorry to bounce
5   around, Marie, but can we go back to the other agreement
6   now, DTX 2246.
7             And now, Marie, can we go to page 10, paragraph
8   12 A.  Just A would be fine.  Thank you.
9   BY MR. WEBB:
10  Q.    Mr. Ravin, do you see this provision?
11  A.    Yes.
12  Q.    All right.  Sorry to keep bouncing around.
13            Now, we're back to the agreement between Rimini
14  Street and Brazoria.  Do you have an understanding as to
15  the purpose of this provision, Mr. Ravin?
16  A.    Yes, this is a standard warranty, like if you were
17  buying a product or a service, where we are warranting that
18  certain things are true.
19            MR. WEBB:  Let's go to the -- actually the
20  second paragraph there, Marie, starting "client warrants,"
21  second sentence of the first paragraph.
22  BY MR. WEBB:
23  Q.    Do you see that, Mr. Ravin?
24  A.    The highlighted portion?
25  Q.    Correct.
```

1    A.    Yes.

2    Q.    I would like to have you read that again for the

3    jury?

4    A.    "Client warrants that it has full legal authority to

5    enter into this agreement and perform its obligations

6    hereunder, and that no third-party rights or permissions

7    are required in order for it to do so."

8    Q.    Why did you include this provision in your agreement

9    with the client?

10   A.    Well, this was included because we needed -- we

11   talked earlier in my testimony about the idea that

12   customers have some responsibility to make sure that when

13   they enter into an agreement with us that everything we're

14   agreeing to do for the customer is all right under their

15   agreements and that they don't require any other company's

16   permission to do these things.

17   Q.    And so it's not unusual in your experience to

18   require that the client confirm that they have the right to

19   enter into agreements like this?

20   A.    Yes.

21   Q.    And it's not unusual, based upon your experience, to

22   see situations where an outside provider will require the

23   vendor to do their own due diligence before they enter into

24   an agreement?

25   A.    Yes.  I mean, we're not -- most of these companies

656

1    we're dealing with are large sophisticated entities.

2    Q.    For example, Oracle.  It would not be surprising to

3    you if they also required that their clients do their own

4    due diligence to ensure that they don't violate the terms

5    of an agreement?

6              MR. ISAACSON:  Objection, Your Honor.

7              MR. WEBB:  Can I respond, Your Honor?

8              THE COURT:  Just a minute.  Let me take a look

9    at the question.  Sorry, I missed it.

10             The objection is sustained.  He shouldn't be

11   speaking for anyone other than himself.

12   BY MR. WEBB:

13   Q.    Okay, Mr. Ravin.  Let's talk specifically now about

14   what Rimini Street does after the client is signed up.

15             Okay.  First of all, once the client has signed

16   the agreement, how do you determine when the end date is

17   for their maintenance with Oracle?

18   A.    Well, in the contract and in the discussions, the

19   client provides us two things, a full listing of the

20   products that we are going to cover, that they're licensed

21   for, which is included as an exhibit in the contract so

22   that there's perfect clarity.

23             And the second thing is they provide us their

24   maintenance end date which is critical, because if we're

25   going to do the archiving for them and get their software,

657

1    we have to know the end date for their Oracle license --

2    I'm sorry, their Oracle support agreement.

3    Q.    So once they've provided that to you, what do you do

4    then?

5    A.    Well, once they provide that to us, then we begin

6    the onboarding process, which essentially means we're

7    moving the customer from their current Oracle support to

8    Rimini Street support.

9    Q.    What did you call that again?

10   A.    Onboarding.

11   Q.    Okay.  That's another new term.  Onboarding, is

12   that -- well, what does that mean?

13   A.    Onboarding literally means getting them onboard to

14   Rimini Street, and then offboarding means they're leaving

15   Rimini Street.

16   Q.    Describe for the jury what is involved when you

17   onboard a new client?

18   A.    It's a pretty involved process because, again, the

19   customer is moving from one software support provider to

20   another.

21            So we need to create archives for them.  We need

22   to get their software and build environments.  We need to

23   exchange information so they know who their engineers are

24   going to be and how they reach them.

25            So we go through a whole education process of

658

1     how do they call in, how do they get support, you know,

2     which phone call do they place, how do they access our

3     website to report problems for their products.

4               All those things are part of this standard

5     onboarding process.

6     Q.    Explain the role of any of the installation media to

7     the onboarding process.

8     A.    The installation media, again, is part of the

9     software that we will take delivery of in order to begin

10    the development of environments.

11    Q.    And as we talked about earlier, sometimes the

12    installation of these media is done manually through DVDs,

13    like this?

14    A.    Yes, starting in 2009, it was all done manually,

15    yes.

16    Q.    Okay.  So now you've got the installation media

17    installed, then what do you do?

18    A.    Then we get the archives, we build then environments

19    and we prepare to support the client going forward.

20    Q.    So you go to the website and you download all the

21    materials the client's entitled to?

22    A.    Yes.  If the customer -- sometimes the customer

23    comes to us after their Oracle maintenance is already

24    expired which means they get no archives, they get nothing.

25    They literally bring their software to us as it is.

1    Q.    And let's talk about that instance.

2          So if what you're saying is this, that sometimes

3    the one-year period is already expired, and the client's

4    operating without any maintenance provider, other than

5    themselves maybe, sometimes they'll come to you after that

6    and want you to do support?

7    A.    Yes, or they've been with another independent

8    maintenance provider and they want to move over to Rimini

9    Street.  So they're not coming from Oracle, right.

10   Q.    So you're allowed -- or you can do your job without

11   this piece?

12   A.    Yes, there are many customers who don't have that,

13   don't have an archive.

14   Q.    But for those that you actually have the archive,

15   you will download it and apply all the patches and fixes

16   that we've already talked about?

17   A.    We'll use them, yes, if necessary.  I mean, it's

18   great if they have it, but it's not necessary to keep the

19   system running, yes.

20          MR. WEBB:  Okay.  Your Honor, I am sort of at a

21   new chapter point.  I'd be happy to continue or -- it's

22   your decision, obviously.

23          THE COURT:  I'd like you to continue.  We'll

24   take a break sometime around 12:20, 12:30.

25          MR. WEBB:  Thank you, Your Honor.

660

1    BY MR. WEBB:

2    Q.    All right.  Mr. Ravin, are you familiar with this?

3    A.    Yes.

4    Q.    What is this?

5    A.    This is our services wheel that describes the

6    services that a client gets and some other components of

7    how we deliver service to clients.

8    Q.    Okay.  Now, the client is fully onboarded, they're

9    now on Rimini's service, I want to go piece by piece as to

10   what Rimini Street will actually do for one of these

11   clients.

12         Let's first talk about the centerpiece.  What is

13   this concierge service?

14   A.    This is our service model.  This is our primary

15   support engineer model instead of a call center.  This is

16   our guaranteed service level, 30-minute callback.

17         This is -- all rolls into what we consider the

18   concierge service for the company.

19   Q.    And within the scope of everything that Rimini

20   Street does, how important is it, in your opinion, that the

21   service piece be involved?

22   A.    I think this is everything that we do.  The quality

23   of deliverables are important, but service is everything.

24   I mean, this is our reputation.

25   Q.    And why is that so important?

1    A.    Because it doesn't matter, for example, what

2    references you get to get a client.  As I think everybody

3    knows, it's the service you provide, and we've provided 10

4    years of it now, that earns your reputation in the

5    industry, and that's what brings clients to our door and

6    keeps clients coming back.

7    Q.    How does this concept of customer service impact

8    your compensation model at Rimini Street?

9    A.    You mean in terms of the compensation for all the

10   people?

11   Q.    Sure?

12   A.    Well, the way that we work at Rimini Street is,

13   because client satisfaction is everything for us, the

14   quality is everything, we look at these as the most

15   important items.

16         We compensate everyone who is involved in the

17   company except sales and some part of marketing where

18   they're based on actually selling deals.

19         Other than that, everybody else, all the way up

20   to me, is compensated based on our quality and our client

21   satisfaction numbers.

22   Q.    All right.  We're going to take this wheel and go

23   one spoke at a time, and I want you to take some time to

24   explain to the jury what exactly is involved with that

25   specific wheel, okay?

1    A.    Okay.

2    Q.    Let's start at the top.  Product support.  Tell the

3    jury what product support would entail?

4    A.    Well, product support can be any questions that you

5    would think about picking up a phone and calling in.

6          You could be reporting that something's not

7    printing right, or something's not right on your screen,

8    something's not calculating right.  So these would be

9    literally product support calls.

10          Or they could be a how-to.  How do I add a new

11    employee and pay them in Arizona?  That's also part of

12    product support.

13    Q.    And shown on the screen now is a diagram.  Can you

14    explain to the jury what this is.

15    A.    This is the fact that the primary support

16    engineer -- when we actually work on these kinds of

17    diagnostics, generally we connect into the customer's

18    either production system or their own test system.  That's

19    where we're looking in to see where the issues are at and

20    see if we can offer a resolution.

21    Q.    Now, in connection with this piece, does this

22    involve cloning environments at all?

23    A.    No.

24    Q.    Does this involve creating tax or regulatory

25    updates?

663

1    A.    No.

2    Q.    Does this involve hosting -- can this involve remote

3    or local?

4    A.    This is -- we primarily do it on the remote.

5    Q.    Do you need access to testing or development

6    environments to provide support like this?

7    A.    Not to ones on our site, no.

8    Q.    Okay.  Let's move over to the second piece.  What is

9    the second spoke of the wheel, Mr. Ravin?

10   A.    So this relates to our rather large operation on

11   tax, legal, and regulatory updates.

12   Q.    What does that mean?

13   A.    Well, as you probably well understand, in terms of

14   things like payroll, there's 50,000 jurisdictions just in

15   the United States, let alone other countries.

16        So Rimini Street has its own research department

17   that does research on its own to figure out the tax, legal,

18   and regulatory changes for I think up to 90 countries right

19   now, and we work on that, along with we get information

20   from other sources that we also pay and bring the data

21   together.

22        We figure out what the tax changes are.  We

23   figure out then how it applies to different customers and

24   products.  We design those changes.  We develop those

25   changes for each customer.

1          We then test everything and package it and

2     deliver it to all our customers.

3     Q.    All right.  Now, another diagram is on your screen

4     now.  If I can get the animation to work -- or not.  Tell

5     the jury what you see here.

6     A.    This is a -- looks like a graphic of the process by

7     which we build and develop and deliver tax updates, tax,

8     legal, and regulatory updates.

9     Q.    On the very far --

10         MR. WEBB:  Marie, can we go to the next slide?

11    BY MR. WEBB:

12    Q.    What do you see on this screen, Mr. Ravin?

13    A.    This appears to be the first step where we actually

14    collect data.  You have to figure out what's actually

15    changed, and so we have systems that scour 26,000 sources,

16    I guess, in 200 countries looking for tax, legal, and

17    regulatory changes.

18         We have a proprietary system that does this.  We

19    also talked about the other sources that we pay for, other

20    well-known sources, then bring that all together in terms

21    of understanding what's changed in the world.

22         MR. WEBB:  Can we go to the next slide, Marie?

23         All right.  This is not -- can you all see this

24    very well?  I'm sorry again for the technical difficulties.

25

1    BY MR. WEBB:

2    Q.    So Mr. Ravin, your research team discovers there's a

3    change in the tax law in some case, let's say California.

4    What do they do once they've seen that?

5    A.    One they -- once they see the -- once they have a

6    list of the changes, then they figure out whether any of

7    those particular changes affect customers.

8              For example, if it's a payroll change for New

9    Jersey.  They will look at all of our customers that have

10   payroll running for New Jersey, determine who's impacted,

11   which software products and releases are impacted, and then

12   figure out what kinds of changes we need to make.

13   Q.    Okay.  So they determine there's a change in the

14   law, they determine there's a certain number of your

15   clients that are impacted by that change, what do they do

16   about it?

17   A.    Well, then we actually design -- we go into scoping.

18   We have a business analyst role that will take that

19   information and convert it from -- let's say the payroll

20   rate changes 8 percent in New Jersey, they will figure out

21   what needs to change in the software in order to effect

22   that change.

23   Q.    And when they figure out the change in the software,

24   how do they actually implement that change in the client's

25   software?

1    A.    Well, they'll actually develop an update based on

2    the software, the changes, test it, package it up and send

3    it to the client for installation.

4    Q.    When you're talking about an update, do they

5    actually create software code to that update?

6    A.    Yes, you have to change code or tables.  There's

7    several different areas that have to be updated, depending

8    on what the change is.

9          If it's a new calculation, a new way that

10   they're calculating the tax, could be a big section of code

11   that has to be rewritten.

12         If they're just changing something from a table

13   from 7 percent to 8 percent, it could be a smaller, minor

14   change, yes.

15   Q.    And so they will actually make that change in the

16   code?

17   A.    Yes, or in a configuration file, yes.

18   Q.    And then what do they do once they have the change?

19   A.    Then they will package it up for each of the

20   customers, test it, and send it out.

21   Q.    How would they test it?

22   A.    Well, they'll test it by -- again, if it's a local

23   environment, they'll try and run it in the environment to

24   see if the calculation looks right, if the change makes

25   sense, and if it's doing everything it's supposed to do, or

1    they'll ship it to a customer and they'll use it on the

2    remote systems and test development.

3    Q.    So if they develop the change in one of these

4    environments, then they test it to make sure it works in

5    the other, then they'll send it to the client for the

6    client's production version?

7    A.    Yes, the client will generally test at least once

8    given the importance of these things themselves before --

9    Q.    And based upon that, the client then issues

10   paychecks in the right amount?

11   A.    Correct.

12   Q.    That sounds like a pretty big operation, Mr. Ravin.

13   About how many folks do this for you guys?

14   A.    I think, again, involved in development overall for

15   the tax, legal, and reg's across all products, several

16   hundred people.

17   Q.    Again, how big is your company?  How many employees

18   do you guys have today?

19   A.    About 650 employees.

20   Q.    Okay.  The next spoke on the wheel is called product

21   fixes.  Mr. Ravin, do you have an understanding as to what

22   product fixes is?

23   A.    Yes.

24   Q.    And what is that?

25   A.    These are -- when we move beyond just support, when

1     something actually has to be changed, when a new piece of

2     code is required, so someone calls in a support call,

3     something's not working right, if the answer turns out to

4     be that code needs to be changed, not just, you know,

5     telling them that, oh, you need to switch a configuration,

6     change this, go into this screen and change this yes to a

7     no, if it actually requires physical code changing, then we

8     will create a fix.

9     Q.    Are you familiar with the phrase break fix?

10    A.    Yes.

11    Q.    What is break fix?

12    A.    Literally what it sounds like, it's broken, you need

13    a fix.  So break fix means something is broken and it needs

14    a fix.

15    Q.    How would Rimini Street engineers go about fixing

16    something that's broken?

17    A.    Again, different products have different types of

18    technology, but essentially the common thread is they would

19    go into the source code, which is the code of the

20    application, figure out what's wrong, design a change

21    create a fix, right, in other words, change the code, test

22    it to make sure that it solves the problem, and then let

23    the customer know they've got a fix ready.

24    Q.    Are you familiar with the phrase replicating the

25    problem?

1    A.    Yes.

2    Q.    And does that apply to this?

3    A.    Well, replicating the problem would be more of a --

4    it's a diagnostic point.  You would have that actually

5    really more with the previous slide where something is not

6    seeming to work right, and if we can't figure it out, then

7    we would want to replicate the problem by running it and

8    seeing if we can duplicate the issue so we can figure out

9    what's wrong.

10   Q.    So replicating the issue is really for product

11   support.  Now we're on break fix, and that's something

12   else?

13   A.    Yes.

14   Q.    Let's go to the next spoke, installation support.

15   Do you see that?

16   A.    Yes.

17   Q.    Do you have an understanding as to what installation

18   support is?

19   A.    Well, you go back to all those DVDs, and we talked

20   about when I ran installation services at PeopleSoft, these

21   are not easy products to install.

22         We think about installation being an hour

23   process rather than two weeks of loading DVDs and

24   configuration.  It's a big effort for these large

25   enterprise systems.

670

1          If your system goes down and it gets corrupted,

2     and we probably all have dealt with a corruption on our

3     hard disk, imagine what it is to reinstall that product.

4     It is a lot of work.

5          And so as part of our service, we guarantee the

6     customer that if they have to reinstall the software, which

7     again, a multi-week process potentially, we will make sure

8     that that gets done, we will help them through that

9     process.

10    Q.    And again, looking back to our diagram, what

11    department at Rimini Street handles this piece?

12    A.    It would be the primary support engineers.

13    Q.    So they would walk them through the installation

14    services support?

15    A.    Yes.

16    Q.    All right.  Now, the next spoke, around seven

17    o'clock on the clock, is performance tuning support.

18          Mr. Ravin, do you know what that is?

19    A.    Yes.  This is a lot like you would want to fine tune

20    or tune up your car.

21          When the systems get really large, imagine

22    having millions of paychecks stored in the history.  You

23    may have seen this on your own computers.  When the data

24    starts stacking up and gets large, it can slow a system

25    down.

671

1            And so we will have to help customers to manage

2      the issues with large amounts of the data.  The system

3      starts getting slower, we need to find ways to get it

4      running fast again.

5            And so we will tune the system through a variety

6      of parameters, knobs, and dials, and our people are experts

7      at making that happen.

8      Q.    And what part of the Rimini Street floor does this?

9      A.    That's going to be the PSEs again.  And there's also

10     what we call DBAs as well.

11     Q.    What with DBAs?

12     A.    Database administrators.  They're experts at working

13     different parts of the technology.

14     Q.    Okay.  Now, the interoperability support, what does

15     that pertain to, Mr. Ravin?

16     A.    This is one of the most complicated areas of the

17     business.

18            This relates to -- the best way to describe it,

19     if you've ever bought a computer and tried to make it work

20     with a printer or some other piece of equipment you had

21     bought or software, and you were frustrated because you

22     couldn't get it to work right, the printer wasn't talking

23     to the computer, you updated to a new version of Word and

24     now it won't work with the computer, all of that we refer

25     to as interoperability.  It's making everything work with

672

1    everything else.

2                And we live in a pretty complex world of all

3    these pieces.  So imagine in these large systems you could

4    literally have hundreds of pieces of software that you

5    needed to connect to.  You need to make these pieces work

6    together, hardware, software.

7                Rimini Street has a team of people who are

8    specialists at making things work together.  We call them

9    technology services.  And their job is helping customers

10   make the software work.

11               So imagine five years from now a customer's

12   running an older release of product that came out before

13   that new printer ever even existed, and now you need to

14   make the new printer work with the old software.

15               Our team helps customers make that happen.

16   Q.   Okay.  I'm going to try to speed this up.  We have

17   two more spokes, I think, or maybe one.

18               Upgrade process support.  Mr. Ravin, what is

19   that?

20   A.   Well, just like we had the installation service help

21   if we have to help them reinstall, if a customer has the

22   right to an upgrade, and remember, they may not of done it

23   but they paid for it so it sits on their shelf.

24               Let's say they're on version 8 today, and a new

25   release 9 came out.  They took delivery of it when we

673

1    archived because it was available and they paid for it,

2    they just haven't done it yet.

3              So next year they decide they want to move

4    forward and install and use version 9 that they paid for.

5    We will help support the upgrade process to make sure --

6    they have to do the upgrade, but we will support it and

7    make sure that they're successful.

8    Q.    And back to the overall service.  How does Rimini

9    Street track customer satisfaction?

10   A.    Well, we -- at the end of every service call,

11   anything filed by a customer, they get a survey which asks

12   everything from how do you like your engineer, do they

13   answer the question, what was the quality of the service,

14   were you satisfied with the timeliness of the response, a

15   lot of different questions.

16             We also, at the end of -- for example,

17   onboarding, when we finish major events like onboarding,

18   they get a survey.  It asks them how did we do, did we meet

19   your anticipations, did we live up to your expectations,

20   were you satisfied, would you refer another client to

21   Rimini Street based on your experience; key data for us.

22   Q.    And does Rimini Street track that data?

23   A.    Yes, we have a quality assurance organization, a

24   quality systems organization that tracks all the data and

25   reports back, and, again, we use that in compensation all

674

1    the way up.

2    Q.    So you have a department within Rimini Street that

3    is responsible for tracking customer satisfaction?

4    A.    Yes, the quality group, yes.

5    Q.    And do you know what the average score is for the

6    surveys when they're sent back?

7              MR. ISAACSON:  Objection, Your Honor.  There's

8    been no foundation laid for the accuracy of these surveys.

9              MR. WEBB:  I'm asking if he knows.

10             THE COURT:  Overruled.  I'll allow him to

11   testify as to his opinion on that.

12             MR. ISAACSON:  Can we -- I would like to make it

13   clear, though, that he should not be -- that in order to

14   respond to this question, that he should not be giving the

15   average scores.  The question is do you know it.

16             THE COURT:  That's reasonable.  I agree.

17   BY MR. WEBB:

18   Q.    Do you know the average score for these customer

19   satisfaction surveys, Mr. Ravin?

20   A.    Yes.

21   Q.    All right.  Let's go to the ring around the service

22   wheel.  Let's go to the left side first, this ISO 27001,

23   global security certification.  Do you know what that is,

24   Mr. Ravin?

25   A.    Yes.

1    Q.    What is it?

2    A.    So part of the outside of the key processes and

3    guidelines for Rimini, this is one of them.

4          This is an international -- this is the

5    internationally recognized standard for global security.

6    It's an extremely high level.  There are a small percentage

7    of companies in the world that qualify for ISO 27000, have

8    been certified.  So we are one of them.

9    Q.    And what does it take for a company to become

10   certified under the ISO?

11   A.    You have to develop rigorous process documentation.

12         This is global security.  So, as you know,

13   security is a very, very hot topic.  People are very

14   concerned.

15         We serve some of the largest companies in the

16   world.  We have to make sure that as our systems connect to

17   theirs, that people cannot find their way from an -- into

18   Rimini Street and then from Rimini Street to our clients.

19         So we do have a global security organization

20   which oversees the ISO 27000 certification.

21   Q.    But Rimini Street doesn't actually provide security

22   updates to the software it services?

23   A.    No.  We don't provide -- we don't provide security

24   updates.  We do assist with security issues and cases, and

25   our global security services organization does provide

1    guidance and strategic support to customers about how to

2    build these new holistic security models.

3    Q.    And why is it that Rimini Street doesn't provide

4    security updates for Oracle software?

5    A.    Well, one, we simply don't have access to the source

6    code for the database product, which is primary, or some of

7    the areas within the Oracle product.  There's no source

8    code available to Rimini Street, only Oracle has that.

9              So we can't create updates to those areas.

10   That's number one, technological.

11             Two, the world has moved to a different security

12   modeling, and that's the one that Rimini Street works with

13   its customers and creates white papers and employs some of

14   the top security people, we believe, in the world.

15   Q.    The top right ring, ISO 9001, global quality

16   certification.  Do you see that, Mr. Ravin?

17   A.    Yes.

18   Q.    What is that?

19   A.    Just like the other ISO standard, this one is a

20   global quality certification which means that everything in

21   Rimini Street, every department around the world has

22   detailed documentation about its processes, procedures.

23             Every document meets certain standards, every

24   training requirement to the company is managed so that

25   everyone who has to have certain training is stored in the

677

1    HR systems.

2             So it is extremely detailed, and that, again, is

3    a certification we've had for several years.

4    Q.    As a part of being ISO certified, is Rimini Street

5    ever audited?

6    A.    Yes.

7    Q.    Tell the jury what that means.

8    A.    At least once a year auditors come -- ours are from

9    Europe.  They come in, they're ISO certified auditors who

10   come into the operation, randomly check different parts of

11   the documentation.

12            They look at our quality system.  They look at

13   our security components.  And they test to see whether or

14   not Rimini Street is living up to all of its detailed

15   process requirements, all of its documentation requirement.

16   They check training records.

17            They look at everything to see whether we are

18   complying with all of our own process documentation, if the

19   system is working.

20   Q.    And as a result of those audits, do you know what

21   Rimini's average score has been?

22   A.    Yes.

23   Q.    What is it?

24   A.    Rimini Street has had zero nonconformities both in

25   the global security audits as well as the quality system

678

1    audits since the inceptions of all those systems.

2    Q.    Okay.  Now, the last piece, the proprietary

3    technology.  Do you know what that means?

4    A.    Yes.

5    Q.    What is it?

6    A.    These are tools and technologies that Rimini Street

7    has developed itself or has purchased or owns the license

8    to -- or rights to.  We have filed patents on these

9    processes and tools.

10   Q.    Okay.  And, Mr. Ravin, when did Rimini Street

11   officially open its doors for business?

12   A.    In September of 2005 we filed our documents.

13   Q.    Did there come a time when you received

14   communication from Siebel after you opened your doors?

15   A.    I think pretty shortly after we made the

16   announcement through the Wall Street Journal.

17   Q.    Let's talk about the announcement.  Tell the jury

18   how you announced the opening of Rimini Street?

19   A.    Well --

20           THE COURT:  All right.  We're going into a new

21   subject matter area here.  I think this would be an

22   appropriate time to take our second and final break for the

23   day, and we'll resume with this upon completion of the

24   break.

25           Ladies and gentlemen, my usual admonishments

1    apply, and we'll start promptly when you are ready,

2    hopefully 10 to 20 minutes at the most, and you may step

3    down.

4              COURTROOM ADMINISTRATOR:  Please rise.

5          (Recess from 12:25 p.m. until 12:51 p.m.)

6              COURTROOM ADMINISTRATOR:  Please rise.  Court is

7    again in the session.

8              THE COURT:  All right.  Have a seat.  The record

9    will show that we're outside the presence of the jury in

10   open court.

11             Mr. Webb, go ahead.

12             MR. WEBB:  I have one issue that's confidential

13   that I would raise at sidebar with Mr. Isaacson and another

14   issue about the admissibility of an exhibit.  Which order

15   would you like me to take those?

16             THE COURT:  Well, let's take the first one

17   first.

18             MR. WEBB:  All right.

19         (Sidebar conference held as follows:)

20             MR. WEBB:  This is not that big of a deal.

21   Mr. Ravin has a treatment today and he has to again leave

22   promptly at 2:00.

23             Also, physically he's not doing great today so I

24   think we can make it without a break between now and then,

25   but I just wanted to let both of you know that was ongoing.

1              If the Court will indulgence us, we'd like to --

2              THE COURT:  All right.  I would tell you if he

3     gives you the signal he needs a break, I'm very sympathetic

4     to that.

5              MR. WEBB:  Thank you.

6              THE COURT:  And I'll certainly take a break.

7              So that's all we have to cover right now.

8              MR. ISAACSON:  And if I'm examining him, you

9     better tell me if he's giving you the signal.

10            (Sidebar conference concluded.)

11             THE COURT:  All right.  Matter two?

12             MR. WEBB:  Matter two, Your Honor, pertains to a

13    letter authored by Snell & Wilmer, counsel for Rimini

14    Street.  This letter was sent in response to the letter

15    that Rimini Street received from Siebel that we just

16    mentioned before we took the break.

17             We feel it goes to -- a couple things.  In the

18    letter there are a number of anticompetitive allegations

19    made by Snell & Wilmer to Siebel.  We are more than happy

20    to redact all of those.

21             Once those are redacted, we believe the rest of

22    the letter informs Mr. Ravin's state of mind as to the

23    priority of his activities at Rimini Street.

24             Opposing counsel disagrees, but from our

25    perspective, if it's redacted to remove any allegations of

1    anticompetitive activity leaving only the substance of the

2    allegations, we think it is admissible as it pertains to

3    Mr. Ravin's state of mind.

4              THE COURT:  Mr. Isaacson?

5              MR. ISAACSON:  Yes, Your Honor.  So as counsel

6    said, this is a letter, a multipage, single-spaced letter

7    from counsel for Rimini Street responding to one of our

8    letters arguing their case, making a number of self-serving

9    statements and assertions in addition to the

10   anticompetitive assertions that he would redact.

11             This is classic hearsay, and this is just an

12   attempt to put in front of the jury a document they can

13   read that would be setting forth their case as argued by

14   lawyers in 2005.

15             MR. WEBB:  Your Honor, as it pertains to

16   Mr. Ravin's state of mind, again, a lot of this stuff is

17   brought on because they have alleged willful infringement.

18   We have to defend ourselves, and it goes to Mr. Ravin's

19   state of mind.

20             This was absolutely part of him forming his

21   belief that the activities of Rimini Street were perfectly

22   legitimate at this time.

23             MR. ISAACSON:  This letter is full of -- as a

24   well written lawyer letter should be, full of arguments,

25   references to hearsay.

1          THE COURT:  Let me just tell you where I am on

2     it.  I mean, to me it's so classically hearsay that I

3     have -- I would have to review it carefully and have you

4     point out significant parts that you felt would somehow

5     overcome the hearsay objection.

6               You can certainly ask him about his intention,

7     and that's certainly been implicit and explicit in some of

8     his testimony, but --

9          MR. WEBB:  Understood, Your Honor.  I tell you

10    what we'll do --

11         THE COURT:  That will be the Court's ruling, but

12    I'll certainly review it.

13         MR. WEBB:  We appreciate that, Your Honor.

14              What we might do is we might internally discuss

15    an approach, maybe -- if it's warranted, maybe approach

16    Your Honor with maybe a brief on this issue or other

17    otherwise, but we won't take any more of the Court's time

18    this afternoon.

19         THE COURT:  All right.  I appreciate that.  I'd

20    like to bring in the jury.

21         COURTROOM ADMINISTRATOR:  Does that have an

22    exhibit number on it?

23         MR. WEBB:  It does.

24              And, Your Honor, also we will probably make an

25    offer of proof on our ability to provide testimony about

1    Rimini Street ceasing the activities found by the Court to

2    be outside the scope of the license.  Would Your Honor

3    prefer us to do that orally or in a written argument?

4              THE COURT:  Do it orally -- I mean, excuse me,

5    in a written document.  There's so much that we're doing --

6              MR. WEBB:  Thank you, Your Honor.  Happy to.

7              This document is DTX 384.

8              COURTROOM ADMINISTRATOR:  384.

9              MR. WEBB:  DTX 384.

10             COURTROOM ADMINISTRATOR:  Thank you.

11             THE COURT:  All right.  Let's bring in the jury,

12   please.

13             COURTROOM ADMINISTRATOR:  Yes, Your Honor.

14          (Jurors enter courtroom at 12:57 p.m.)

15             THE COURT:  All right.  Have a seat, please.

16             The record will show we're convened in open

17   court.  The jury is all present.  Parties and counsel are

18   present.

19             Mr. Webb, you may continue your

20   cross-examination of Mr. Ravin.

21             MR. WEBB:  Thank you, Your Honor.

22   BY MR. WEBB:

23   Q.    Good afternoon, Mr. Ravin.

24   A.    Good afternoon.

25   Q.    I apologize, but I neglected to ask you a question

684

1    earlier.  Where did you come up with the name Rimini Street

2    for your company?

3    A.    Rimini Street was named after the Rimini, it was the

4    street I lived on in Centennial in Vegas.

5    Q.    Thank you.

6          All right.  Back to where we were.  We were

7    talking about when you opened your doors for your company

8    for business, and I believe you testified you received a

9    letter from Siebel.  I would like to offer into evidence

10   Exhibit DTX 380.

11              THE COURT:  Mr. Isaacson?

12              MR. ISAACSON:  No objection, Your Honor.

13              THE COURT:  It's admitted.

14          (Defendants' Exhibit 380 received into

15          evidence.)

16              MR. WEBB:  Marie, could you pull that up for us.

17   BY MR. WEBB:

18   Q.    Mr. Ravin, can you see this?  Is it blurry for you

19   to see on your screen?

20   A.    I can see it now.

21              MR. WEBB:  Okay.  Marie, take that first

22   paragraph and enlarge it for us, please.

23   BY MR. WEBB:

24   Q.    All right.  Now, let's set the stage here,

25   Mr. Ravin.

1          You'd been open for business for about a week,

2     and you receive this letter.  What was your response -- how

3     did you -- how did you react to this letter?

4     A.    First, I was surprised.  We hadn't even started the

5     business yet so I was surprised to see a letter.

6          Two, you know, disappointed that we were

7     starting to battle before we even had a chance to get our

8     service up and running.

9     Q.    Let's talk about specifically what this letter says,

10    and we'll move on as quickly as we can, but let's read that

11    first sentence.  I'll read it for you.

12          "I write on behalf of Siebel Systems concerning

13    various statements that you or your company, Rimini Street,

14    have recently made regarding Rimini Street's purported

15    ability to offer maintenance and support services to Siebel

16    Street [sic] customers."

17          Do you see that?

18    A.    Yes.

19    Q.    Mr. Ravin, why is it that you believed that you

20    could actually provide maintenance service to these

21    customers?

22    A.    Well, again, based on my understanding of the years

23    in the industry and having worked with software, enterprise

24    software licenses for so many years, I was sure knowing

25    that Siebel has third-party companies that do provide and

1    offer service for Siebel products.

2           Siebel offered training to independent

3    consultants to get certified and to attend and learn how to

4    service these systems so that they could go out and work

5    for customers, and we are just an independent provider of

6    service, so I saw no reason we would be different.

7    Q.    Let's talk about the next sentence.  It says,

8           "As discussed herein, Siebel Systems believes

9    that various statements made by Rimini Street are false

10   and/or misleading, and we hereby demand that Rimini Street

11   immediately cease its wrongful activities."

12          At the date of this letter, Mr. Ravin, which is

13   September 26th, 2005, did Rimini Street have any clients?

14   A.    No.  We had literally just announced the company.

15   Q.    Had Rimini Street engaged in any business operations

16   at all?

17   A.    No.

18   Q.    What, if anything, did you do in response to this

19   letter?

20   A.    Well, first thing was we responded back to Siebel

21   legal -- which again became Oracle legal eventually with

22   the acquisition -- the Siebel legal department.

23          And I responded and said, "Hey, if you think I'm

24   doing something wrong on the license, let's talk about it,

25   and can you send me a copy of your license so that we can

1    have a dialog about it."

2    Q.    Did you personally respond to this letter?

3    A.    Yes, originally I did.

4    Q.    Did you ever engage lawyers to respond on your

5    behalf?

6    A.    Yes, eventually.

7    Q.    And did Siebel ever respond to either your letter or

8    the lawyer's letter?

9    A.    Yes.

10            MR. WEBB:  Marie, could you pull up Exhibit DTX

11   381.

12            MR. ISAACSON:  No objection, Your Honor.

13            THE COURT:  It's admitted.

14            MR. WEBB:  I would offer that into evidence.

15        (Defendants' Exhibit 381 received into

16        evidence.)

17            MR. WEBB:  Marie, let's go to the back page of

18   the letter.  Could you blow up the first paragraph, Marie.

19   BY MR. WEBB:

20   Q.    The second sentence says,

21            "Siebel's concerns have been explained in

22   previous correspondence, and Siebel is under no obligation

23   to advise your client in even more detail what it must do

24   to avoid engaging in unlawful conduct."

25            Do you see that, Mr. Ravin?

1    A.    Yes.

2    Q.    As of November 11, 2005, did you have any customers?

3    A.    No, none.

4    Q.    Were you engaged in any business operations?

5    A.    None.

6    Q.    What was your --

7    A.    Just obviously building the design of the business,

8    but no customers.

9    Q.    How did you react to this letter?

10   A.    Well, again, turned it over to all the lawyers we

11   hired to respond.

12   Q.    Would you have opened Rimini Street if you thought

13   it could not operate lawfully?

14   A.    No.

15   Q.    Why not?

16   A.    Well, besides putting all of my money into it and

17   all of my friends' and family money, there's no reason in

18   the world we would open a business just to not be able to

19   provide a service.

20   Q.    Was this the end of the letter writing?

21   A.    No.

22   Q.    What happened next?

23   A.    The letter writing went on for years.

24   Q.    At any time did you ever offer to Oracle to allow

25   them to have a third party inspect your operations?

1    A.    Yes, in the -- excuse me.  In the February 2009 --

2    by the time we got to February 2009 when our lawyers and

3    Oracle lawyers had a phone call.

4    Q.    And do you remember the details of that offer?

5    A.    Just what was relayed to me.  I believe there was an

6    affidavit, again, filed in this matter from the lawyers.

7    But, yes, they did tell me what they talked about.

8    Q.    All right.  So how would you characterize the early

9    days of Rimini Street internally, operationally?

10    A.    Well, I think as we've seen through some of the

11    discussion was the early days, you have two, three people

12    running around trying to figure out how to build a business

13    and put things in place, everybody wearing multiple hats.

14           I was doing sales, I was doing marketing, I was,

15    you know, busy trying to build a company and get out there

16    and let everyone know we exist and try to get some

17    contracts going.

18    Q.    Now, earlier in this trial on cross-examination, you

19    said you were very focused on growing the business.  Do you

20    remember that?

21    A.    Yes.

22    Q.    What is entailed by trying to grow a new business

23    like this?

24    A.    Well, you have to design a service, you have to

25    figure out how you're going to deliver it, how you're going

1    to market it, how you're going to sell it.

2              You have to set up accounting.  You have to

3    figure out how you're going to pay people, which is always

4    something people enjoy.  So you have to make sure you

5    figure out payroll and you can afford to buy the things you

6    need to buy.

7              Yeah, it's a pretty busy process building a

8    company from one person.

9    Q.    You said there were only a handful of folks early on

10   with your business?

11   A.    Yes.  I think in the first months there was just

12   myself and Thomas Shay, and we brought over Dennis Chiu as

13   the first operations person.

14   Q.    And soon you had -- in addition to those folks, you

15   had George Lester?

16   A.    We added I think George and Beth I think sometime in

17   2006.

18   Q.    And Doug Baron?

19   A.    Doug Baron, yes.

20   Q.    And Mr. Whittenburg?

21   A.    Yes, Whittenbarger, yes.

22   Q.    And Dan Slarve?

23   A.    Yes.

24   Q.    Is it fair to say they were probably the first few

25   people employed with Rimini Street in that first year or

691

1    so?

2    A.    Yeah, that sounds about right, along with Beth

3    Lester and a couple others, yeah.

4    Q.    So you were talking -- testifying earlier about a

5    small company and doing a lot of things, and there were

6    things that you didn't know about what your coworkers were

7    doing.  Do you remember that?

8    A.    Yes, we were dividing and conquering and trying to

9    cover a lot of ground with just a few people, yes.

10   Q.    So even though it's a small company, you didn't have

11   the day-to-day knowledge of what other people might have

12   been doing?

13   A.    No, we had people who were working on different

14   things, and I would get involved if they would ask me

15   questions or needed guidance, but there was plenty for us

16   to divide to do amongst the few of us.

17   Q.    At that time, though, for example, Dennis Chiu was

18   in Pleasant, California?

19   A.    Actually, we started off in San Mateo, California,

20   closer to San Francisco.

21   Q.    All right.  So he was in San Mateo?

22   A.    Yes.

23   Q.    George Lester was across the country in Charlotte,

24   North Carolina?

25   A.    Yes.

1    Q.    Where was Doug Baron?

2    A.    Washington, DC, area.

3    Q.    So you've got two in California, you've got Lester

4    out in North Carolina, and you've got Baron in DC?

5    A.    Yes.

6    Q.    Where was Mr. Whittenburg?

7    A.    Whittenbarger, John Whittenbarger, was in Chicago.

8    Q.    So he's in yet another state.  So you've got

9    Chicago, DC, North Carolina and California.  You guys are

10   not actually having brown-bag lunches every day?

11   A.    No.

12   Q.    All right.  So understandably you may not actually

13   see what they're doing day to day?

14   A.    No, we weren't all huddled in an office where we

15   were working together, no.

16   Q.    So let's talk about how you actually got some of

17   your early customers.  Describe for the jury some of the

18   challenges that you faced in getting new customers to come

19   to your new business?

20   A.    Well, again, we weren't just offering some small

21   service.  I mean, this is enterprise-level,

22   mission-critical service.

23          And we had to build a company off my reputation

24   as a key because people had to trust us based on our

25   reputation in the industry, number one.

693

```
 1                They wanted to trust the company, the provider,
 2     is going to take care of.  If we make a mistake, then
 3     payroll doesn't get out the door, taxes, there's fines.  So
 4     this is very serious support.
 5                So, number one, trusting us.
 6                Number two, trusting that we can actually
 7     deliver the service that we commit to.
 8                So we have to go out there -- and it's very,
 9     very tough to take a customer and say trust us.
10                We're not the vendor, we're a different service
11     provider, we're going to give you what we hope is better
12     service, and we're committing to it by contract.
13                We're giving you some services you don't get
14     from the vendor, and you're going to have to trust that we
15     actually can deliver exactly what our contract says we can
16     deliver to you.
17                So, no, not an easy task to get your first
18     customers.
19     Q.   You've mentioned something, Mr. Ravin, that I want
20     to come back to, and that is your reputation.
21                Tell the jury the role that your reputation
22     placed when you started the company.
23     A.   Sure.  The reputation was everything.  I mean, the
24     only thing that a customer could really rely on was due
25     diligence of who I was, what my history and track record
```

694

1    was, you know, at that time, 20 years -- and I can't

2    believe we're 10 years old already, but 20 years in the

3    industry that they could actually trust when they signed a

4    contract.

5              When a CIO or CFO or CEO signs that contract

6    with us, they're putting their job on the line and their

7    own reputation for making the decision to put all of that

8    responsibility into my hands.

9    Q.   Early on you -- we heard testimony that you had to

10   discount some of your fees?

11   A.   I think that's probably an understatement.  For some

12   of the first customers we really had to offer some very

13   good sweetheart deals in order to get customers to make the

14   jump and give us a try.

15   Q.   What was so important about getting that first

16   opportunity, the first several opportunities to do your

17   work?

18   A.   Well, again, the -- you know, you make these

19   sweetheart deals to get your first customers onboard, but

20   then you have to deliver the service or they're not going

21   to stay and there won't be references for others.

22             It's all about -- reference and reputation are

23   everything in this industry, and that's what you build a

24   company on, is what everybody sees, not only when they walk

25   in the door to get them to sign the contract, but if you

1    don't deliver, they will not stay, they will not be

2    references, and you will lose your reputation in the

3    industry.

4    Q.    Mr. Ravin, the jury might be wondering why it is

5    that you were a PeopleSoft employee but the first product

6    you serviced at Rimini Street was actually Siebel.  Can you

7    help them understand why that is?

8    A.    Sure.  Twofold.  The first one was it was an

9    opportunity.  It was when Oracle decided to buy Siebel.

10          I knew that immediately there were going to be

11   customers who wouldn't necessarily want to become Oracle

12   customers.  So I thought that was a great opportunity to

13   potentially get some first customers for the new product

14   line.

15          Second, because of the sale of TomorrowNow to

16   SAP, I was under a noncompete agreement for one year after

17   I left SAP.  I was under the contract terms I had with

18   them, that I could not offer service for PeopleSoft or JD

19   Edwards which were the two product lines that TomorrowNow

20   serviced of Oracle's.

21          So I had no choice but to find a different

22   product line to launch Rimini Street with until my

23   noncompete expired in -- I think it was March of 2006.

24   Q.    Okay.  Let's talk about Siebel.

25          During your cross-examination over the last

696

1    several days, you made several comments about how Siebel is

2    different in several ways from PeopleSoft in terms of what

3    it does and how you service and maintain it.

4              Now, let's do this a piece at a time.  But tell

5    the jury just basically first what is the difference

6    between servicing a PeopleSoft client and servicing a

7    Siebel client?

8    A.    Well, in the Siebel world, we offer the same

9    services no matter what the product line.  You get break

10   fix, you get tax, legal and regs, all those things, except

11   then you have to look at the individual type of software.

12             Well, Siebel was what we call CRM, customer

13   relationship management.  Customer relationship management

14   doesn't have tax, legal and regs updates, regulation

15   updates, for example.

16   Q.    Let's stop there for a second.  So consumer

17   relationship management doesn't have tax and regulatory

18   update needs?

19   A.    That's correct, because there's no taxation.  You're

20   not calculating anything.

21   Q.    So that piece of your business where you actually

22   find the changes in the law and make the changes to the

23   code and then incorporate into the product, that doesn't

24   apply to Siebel?

25   A.    That's correct.

1    Q.    So that business about taking one update and reusing

2    it for other clients, that's not implicated with a Siebel

3    client?

4    A.    No, we actually created no code updates for Siebel.

5    That was another difference.  There wasn't -- you didn't go

6    in and make changes to the code.

7                Siebel was a very different kind of product.

8    And, again, I hate to get so technical, but it had what we

9    call the Siebel repository which is a -- basically it's an

10   Excel file where you make changes to the updates, and

11   that's how a product worked, and so we literally wouldn't

12   provide any code.

13   Q.    You're giving the information in the fire hose

14   again.  Let's go back.  Let's talk about that piece.

15                Explain again what that was, the thing you just

16   said?

17   A.    The Siebel repository.

18   Q.    What is that again?

19   A.    So in Siebel's world, everything was about

20   configuration, not changing the source code.

21                And so you would literally change values in an

22   Excel spreadsheet, and you would tell the customer go into

23   your Excel spreadsheet and change this value to this and

24   this value to that, and that's how you actually delivered a

25   fix, a, quote, fix to a Siebel customer.  There was no code

1    that actually moved.

2    Q.    All right.  So what exactly did Rimini then do for a

3    Siebel client if it didn't do tax and regulatory updates.

4    What did you do?

5    A.    All the other services, the break fix.  If something

6    breaks, we would tell them how to change their

7    configuration.  So all the other services were still

8    provided.

9    Q.    So how did Rimini Street do the downloads for Siebel

10   customers at the beginning?

11   A.    That's another complicated difference, right?

12   Q.    Let's do one little piece at a time and we'll get

13   through it?

14   A.    So Siebel, when it was a separate company, and I

15   think for 18 months after Oracle finished acquiring them,

16   had its own website and its own design, and it was very

17   different than the technology used by Oracle.

18          And because of that, the way in which we did

19   downloads was very different because it had some very

20   unique properties to it.

21   Q.    Okay.  For example, what is one of the unique

22   properties that you encountered in using the Siebel website

23   early on?

24   A.    Well, remember how what we talked about what was

25   important was getting for a customer everything they had

699

1    paid for and were entitled to take and, you know, because

2    they were licensed for it, right, they paid for this

3    material.

4              Well, in the Siebel system, what they called the

5    SupportWeb, used what they called a natural language

6    interface.  I'm sorry we're hitting you with so many terms

7    here.

8              But the natural language interface did not allow

9    a Siebel customer to say what am I entitled to?  Can you

10   show me everything that I have been paid for and am

11   entitled to take?

12             Instead, it would ask you a question about a

13   topic, and you would have to put in -- let's say I want to

14   know about customer training for -- you know, a training

15   record for a customer.

16             It would give you information about what pieces

17   of product are available just for that topic.  You could

18   never actually get a list of all the things that you're

19   entitled to.  Imagine that, you could never figure that

20   out.

21             We figured out to how force the system, we

22   called it brute force.  We figured out how to force the

23   system to show us all the things a customer's entitled to.

24   Q.   So we had the natural language barrier, the problem.

25   What other challenges did you encounter in using that

1      Siebel website earlier on?

2      A.    Well, again, because of the natural language

3      interface and the way that it was structured, we had to

4      create a special download process for that.

5      Q.    All right.  On a very basic level, I want you to

6      describe for the jury the download process.

7      A.    Sure.  The download process was -- we figured out

8      that everything at Siebel was sequentially numbered.  So

9      the first fix that they ever put online started at 1.  The

10     second fix they put into their system was number 2.

11            And so the only way that we figured out how a

12     customer could possibly get the materials was you have to

13     download numbers 1 to the end, then you can look at it and

14     evaluate the information to figure out exactly what a

15     customer is entitled to as a second phase.

16            But first you had to have it all in order to

17     look at it and determine which parts a customer was

18     entitled to.

19            So it was a two-step process, and we designed it

20     to bring down the information, look at it for each

21     customer, and figure out what each customer was entitled

22     to, and then only give that amount to the customer.

23     Q.    Mr. Ravin, I think you testified on

24     cross-examination about incremental downloads or updates?

25     A.    Yes.

1    Q.    Is that applicable to this?

2    A.    Yes.  Because, again, the sequentially numbering,

3    every week Siebel would add new fixes and updates; right?

4    And they were time stamped by the day that they were

5    answered.

6              So if you had a customer who left Oracle, let's

7    say, on the 1st of January, they would be entitled to

8    everything up through the prior December 31st.

9              So we knew from the data, we would have the date

10   that it was put into the file, we would have the

11   information, and we would be able to make -- based on

12   having the data, we would be able to cut off for our

13   customer, and every day we would take the new

14   incremental -- that's what they called the incremental.

15             So let's say that Siebel posted 10 new entries

16   that day, the next day we would take those 10 and add it to

17   our information so we could figure out what customers were

18   owed.

19   Q.    All right.  Now, how would you be able to know that

20   these customers -- using that process, these customers were

21   still only getting what they're entitled to have under

22   their agreement with Siebel or Oracle?

23   A.    Well, twofold.  One, every customer listed in their

24   contract exactly what products they had licensed.  So they

25   certified to us these are the products that we are licensed

1    for from Siebel and eventually Oracle.  So that's number

2    one.

3           So we knew the scope.  And they also told us

4    what releases they wanted information on.  So all of that

5    was in our contract.

6           And the second thing is, is the maintenance end

7    date.  So they would provide us the maintenance end date.

8           So the combination of here's the products that

9    I'm licensed for, here's the date by which I'm not allowed

10   to have anything further, with that information, we could

11   figure out what a customer was entitled to.

12   Q.    Now, when Mr. Isaacson was asking you questions, I

13   think he pointed out to an instance or two where you were

14   using one client's credentials to download information for

15   another client.  Do you remember that discussion with

16   Mr. Isaacson?

17   A.    Yes.

18   Q.    Would you care to explain what, how, why you did

19   that?

20   A.    Well, we just talked about this process where we

21   have to download everything in order to look at it and then

22   be able to figure out what a customer's entitled to.  It

23   would be the log-in that was used by the automated system

24   to go into the Siebel web and pull it down.

25           So it was only using one log-in.  That's the way

1    the system was designed, versus ideally it would have gone

2    in and done it separately for every client, again,

3    something we changed over time.

4    Q.    Speaking of changing over time, how would you

5    describe the sophistication of the process at Rimini Street

6    in 2005 and '6 versus 2011?

7    A.    Very extensively different.

8    Q.    In what way?

9    A.    Well, even on the Siebel side, because of the

10   fact -- and really because Oracle changed the technology.

11         When they moved off this Siebel technology and

12   moved it into Oracle's technology, it became possible to

13   just search for and download the items that a customer was

14   actually licensed for.

15         So because of that technology change, we didn't

16   need that old Siebel process anymore.

17   Q.    Is it your testimony that the downloads, even early

18   on with Siebel, that those downloads were, in fact, siloed

19   for your customers?

20   A.    Well, it was actually -- as I was talking about this

21   two-step process, it would actually come down as one big

22   file, and then you had to look through it, then you had to

23   sort it out in order to figure out what a customer had.

24         So, no, in the early days -- I mean, we siloed

25   by what a customer -- when we divided it into here's what a

704

1     customer is entitled to, you had to keep track of that,

2     right?  In order to be able to create the DVDs that we

3     would send customers.

4              So alternates where it was actually siloed

5     operationally.

6     Q.    Let's shift gears now, Mr. Ravin.

7              Do you have -- do you know how important

8     referrals are to Rimini's business?

9     A.    Without referrals, we don't -- we wouldn't have a

10    business.  Our reputation is based on referrals and client

11    satisfaction.

12    Q.    When we're talking about referrals, what

13    specifically are we talking about?

14    A.    We're talking about clients who get on the phone and

15    literally spend probably 45 minutes to an hour, from what I

16    hear from my clients, that they will spend that kind of

17    time talking to prospective clients about our service.

18             Some prospects will actually fly out and meet

19    with our current clients because they want to meet face to

20    face and talk to their teams about whether we can do

21    everything we say we do, and do we deliver, and can they

22    trust us.

23    Q.    Now, are those clients that give referrals to other

24    clients, are those clients required to say nice things

25    about you guys?

1  A.   No.  They're not required to even take reference

2  calls.

3       Some clients will agree that they will

4  participate in marketing activities to help us if -- you

5  know, and maybe sometimes in exchange for different pricing

6  or special deals, but those things do never ever require a

7  client to say anything in particular.

8       If they're not comfortable taking a reference,

9  if they're not comfortable saying anything, they are not in

10 any way obligated to say anything other than the truth and

11 what they believe is accurate.

12 Q.   How often do client referrals come into play on

13 landing a new account?

14 A.   I would say there's hardly an account we get that

15 doesn't talk to multiple references.

16      Again, we're talking about mission-critical

17 services here.  This is not something a company, a large

18 company especially, you know, if you're someone who is a

19 Fortune 500 company with billions of dollars of

20 transactions, you don't take this kind of change lightly at

21 all.  You do a lot of diligence.

22 Q.   Okay.  So let's take these big, sophisticated

23 companies and put them over here for a second.  I want to

24 talk about the small companies.

25      Describe for the jury how small companies have

1    played out in the history of Rimini Street?

2    A.    We refer to small companies as -- we call them

3    nickel-and-dime contracts a lot because they're 5,000,

4    $10,000 type contracts.

5              Rimini Street had quite a few of those in the

6    early days.  We talked earlier about Beekley which was --

7    you know, literally we signed a contract for 24 hours worth

8    of labor because they didn't trust us and they couldn't

9    afford more, and we said fine, let's have you buy what you

10   can afford and we'll service you.

11             They played a huge role in the early days

12   because they were companies that Oracle just generally

13   didn't spend a lot of time on because Oracle serves a lot

14   of very large companies.

15             These were companies that came to us, told us

16   that they didn't feel that they were getting all the

17   attention they wanted being a small company.  They couldn't

18   really afford the fees.  They couldn't really afford the

19   forced upgrades.  They just wanted to get great service at

20   a price they could afford, and Rimini Street provided that

21   service, and they were a very great customer.

22   Q.    Okay.  That's small companies.

23             We've seen a lot of documents involving school

24   districts.  What role did they play in the history of

25   Rimini Street?

1    A.    We have many school districts, many government

2    entities, yes.

3    Q.    Why would they be interested in Rimini's services?

4    A.    Well, the -- again, government has some very unique

5    challenges, not a lot of budget and can't afford to do

6    upgrades all the time.

7          And so we -- we service a lot of government

8    entities throughout the history of Rimini Street, whether

9    it's school districts, counties, states.  We handle all of

10   them.

11   Q.    Have you been quoted as saying small companies are

12   the lifeblood of the company?

13   A.    Yes, I have, yes.

14   Q.    Okay.  Now, shifting gears again.  Let's talk about

15   Rimini's pricing.

16   A.    Can I add one thing on small companies?

17   Q.    Certainly?

18   A.    The other huge advantage for us with small companies

19   is that large companies have a very difficult time getting

20   approval for saying things publicly.

21          They have public relations departments, they

22   have lawyers and -- not to disparage lawyers, but they

23   control a lot of what a company's allowed to say publicly.

24          And small companies don't have those barriers.

25   It might be the CEO is the same as the CFO, and the only

708

1     person they need to ask is themselves.

2            So they would be able to -- if they were happy

3     with our service, they enjoyed being quoted in newspapers

4     and magazines, and they get their name out there.

5            So we used a lot of small companies to advertise

6     the company, get references in the press and media which

7     would bring big customers to us.

8            So they were very, very important in the history

9     and the growth of the company.

10    Q.    All right.  Now, to pricing.  How does Rimini price

11    for its services?

12    A.    General pricing is around 50 percent of whatever

13    Oracle was charging on an annual fee basis.

14    Q.    So you would go to the company and say what did

15    Oracle charge you, all right, we'll charge you half of

16    that.  Is that basically it?

17    A.    Yes.

18    Q.    How is it that you can provide these services, the

19    tax and regulatory updates, the support, the break fix, all

20    the installation and upgrade and interoperability,

21    functionality, for half the price of Oracle?

22    A.    The cost of providing those services is roughly --

23    if we were to compare it to our pricing, about 50 percent.

24    So the service cost was about 50 percent of what we were

25    charging which is again about 25 percent -- because if you

1    think we were charging half of Oracle's annual fee, all

2    right, so half of a half, so roughly 25 percent of what

3    Oracle was charging is what our costs would be.

4    Q.    What is your target profit margin for your business?

5    A.    What we call the gross margin which is the -- take

6    the total fees we charge a customer, subtract out the

7    direct expenses for providing that service, the engineers,

8    the tax updates, what it would cost to deliver all those,

9    taking that out, we would look to have a 40 to 50 percent

10   type profit.

11   Q.    And do you have an understanding as to what Oracle's

12   profit margin is on their maintenance business?

13             MR. ISAACSON:  Objection, Your Honor.

14             THE COURT:  Sustained.

15   BY MR. WEBB:

16   Q.    Let's talk about what's covered by that 50 percent.

17             If a customer comes to you and they have heavily

18   customized code -- let's stop there.  Customized code.

19   Remind the jury what that is.

20   A.    That would be all the source code around these

21   applications, not the vanilla, but all the changes that a

22   customer makes are considered customization for that

23   customer.

24   Q.    All right.  If a customer comes to you and they have

25   customized code, do you charge them extra to work on that

1    code?

2    A.    No.  Rimini Street covers all the vanilla code that

3    the -- that Oracle provides, and every change that a

4    customer makes to its application, all that customization

5    is covered at no additional cost to the customer.

6    Q.    How does that compare to other vendors in the

7    industry?

8    A.    Other vendors?  The standard support agreements say

9    that they do not cover customizations.  If a customer

10   changes the code, it's outside the scope of support.

11   Q.    So the typical approach in the industry is that if

12   you have customized your code and something goes wrong with

13   it, that's outside the warranty, you've got to go to

14   someone else or pay us extra?

15   A.    Yes.  It would be -- generally the software vendor

16   would refer you to some of their consulting services to

17   charge you by the hour above your support contract, or you

18   could fix it yourself, or, again, hire another third party

19   to come in and fix that customized component of the code.

20   Q.    So let's say you have a deal with your vendor to pay

21   22 percent per year to get extended maintenance, and

22   something about your customized code goes wrong.  It's not

23   covered?

24   A.    No, this is -- these contracts are a lot like -- if

25   you're familiar with a homeowners insurance policy, you

1    know, people have become skeptical because, of course, the

2    one thing that happens at your house is the one thing not

3    covered under your insurance policy.

4            These contracts are complicated that way.  There

5    are requirements, for example, you have to be able to prove

6    that the issue is related to the base code, the vanilla

7    code that's provided to you by the vendor, and that's

8    something you've done.

9            So there's a whole bunch of requirements in

10   order to utilize this issue policy that you pay for, of

11   course.

12   Q.    Do you have an understanding as to the various

13   classifications of Oracle maintenance?

14   A.    Yes.

15   Q.    And on the screen here what do you see?

16            MR. ISAACSON:  Objection, your Honor.  I don't

17   think that established a foundation.

18            THE COURT:  Sustained.  I'm having a problem

19   with relevancy as well.

20   BY MR. WEBB:

21   Q.    Mr. Ravin, as a part of your business, do you --

22            MR. ISAACSON:  Can we take down the slide until

23   there's been grounds --

24            MR. WEBB:  You didn't object to it earlier.

25            All right.

1    BY MR. WEBB:

2    Q.    So, Mr. Ravin, as a part of your job, do you deal

3    with customers currently on Oracle service?

4    A.    Yes.

5    Q.    And when you actually contract with customers, they

6    are on Oracle service?

7    A.    The majority of them, yes.

8    Q.    The majority of them.  And as a result, do you have

9    an understanding as to the various features and functions

10   of the service that they're on?

11   A.    Yes.

12   Q.    Now, when you're doing that, are certain customers,

13   are they under different classifications for service?

14   A.    Yes.  Oracle offers various levels of service, yes.

15   Q.    And what kind of -- what do you mean by that?

16   A.    Well, a customer is -- you know, different schemes

17   for different approaches.  But for Oracle, they have

18   multiple levels of service offering.

19         There's a basic offering, a standard.  There's a

20   premium offering, and there's also differences depending on

21   the lifespan of the product.

22         So as a release moves from being new to a few

23   years old to being retired, there are different -- there

24   are different classifications.

25         MR. WEBB:  May I publish the demonstrative now?

```
 1              MR. ISAACSON:  Yes.  No objection.
 2   BY MR. WEBB:
 3     Q.    Now, Mr. Ravin, let's talk about that first five
 4   years, this premier.  Do you understand what that is?
 5     A.    Yes.
 6     Q.    What is that?
 7     A.    That's essentially the standard support for the
 8   first five years of a release's life or a version's life.
 9     Q.    So it's like when you buy a new car, it's the first
10   five years of ownership?
11     A.    Yes.
12     Q.    And during that time, what types of services will a
13   customer receive from Oracle?
14     A.    They'll receive the comprehensive services, the
15   break fix just like we offer.  They'll receive tax, legal,
16   and regulatory if it's appropriate for the products, and
17   the -- you know, again, most of the services that we would
18   expect.
19     Q.    What about the next phase, this extended phase, do
20   you have an understanding as to what that would include?
21     A.    Yes, after a release reaches -- and, again, this is
22   based on that support policies change and there's always
23   exceptions made, so we should note that, but generally, you
24   know, starting in year six of the life of a release, you
25   move into the extended support phase.
```

714

1          And the extended support phase starts to take

2     away some of the services and raises the price.  There's

3     additional premium.

4     Q.     So as your product gets older, you have to pay a

5     little bit more for the service?

6     A.     If you don't upgrade to a new version.

7     Q.     And you get a little bit less features?

8     A.     Yes.

9     Q.     Let's talk about the sustaining phase.  Do you have

10    an understanding what's included there?

11    A.     Yes, the sustaining phase is where you literally

12    will get -- they won't fix anything new for you.  You can

13    have access to all the existing fixes, you have access to

14    all the existing updates, basically the kind of thing that

15    we archive in download for the customer, but you're not

16    going to get new tax, legal, and regulatory, you're not

17    going to get new fixes, and you're going to pay a decent

18    amount of money for getting much lower services.

19    Q.     So with these sustaining companies, and they've had

20    their existing version for nine or more years, they're

21    continuing to pay the 20 percent or so, and now they're not

22    getting updates and new fixes?

23    A.     Right.

24    Q.     To what extent within that group, to what extent do

25    they appear to be opportunities for Rimini Street?

715

1   A.    Well, they're great opportunities because they're

2   paying a lot of money and getting no new fixes, no new tax

3   and regulatory.

4           In fact, if you're a payroll customer and you're

5   with finance and you need to update 1099s or tax forms,

6   you're not going to get those regulatory updates under

7   sustaining maintenance so Rimini Street would absolutely

8   provide those to you.  So there's excellent customers for

9   us.

10  Q.    And you would still charge half of what they were

11  paying Oracle?

12  A.    Yes, that's our policy.

13  Q.    But you would give them tax, regulatory updates?

14  A.    Yes.

15  Q.    You would give them new fixes?

16  A.    Yes.

17  Q.    And break fix?

18  A.    Yes, and guarantee that that would be available for

19  15 years from the day that they come to Rimini Street.

20  Q.    So if a customer comes to you and they've been

21  running the same version of their software for 10 years,

22  they haven't upgraded forever, you're saying that you would

23  allow them to keep that same software running for another

24  15 years?

25  A.    Yes.  We have many clients who run software that was

1    released in 1996, so almost 20 years already.

2    Q.    Now, just to clear up one thing.  We've been talking

3    a lot about Oracle products for good reason.  Does Rimini

4    Street provide maintenance services for any other software

5    companies?

6    A.    Yes.

7    Q.    Who is that?

8    A.    For SAP's suite of products.

9    Q.    So the German company that had purchased

10   TomorrowNow?

11   A.    Yes.

12   Q.    You guys actually provide maintenance service for

13   their products too?

14   A.    Yes.

15   Q.    Mr. Ravin, have you personally been involved in

16   sales meetings?

17   A.    Yes.

18   Q.    About how frequently are you involved in the sales

19   process for your company?

20   A.    Not as much of as I used to.  We have a lot of

21   people now so --

22   Q.    Let's focus on the relevant timeframe between 2005

23   and the end of 2011.  How often were you involved in the

24   sales process?

25   A.    Back then, quite a bit.

1    Q.    Okay.  Why is that?

2    A.    We were small.

3    Q.    Mr. Ravin, on the stand under oath, do you recall

4    any instances where you told something to a customer that

5    wasn't truthful in your opinion?

6    A.    No.

7    Q.    Did you tell any customers prior to 2011 and before,

8    did you tell anyone that you were cloning environments?

9    A.    I don't recollect.

10   Q.    Well, is that something that you would expect them

11   to ask about?

12   A.    No, because that's down to the operational detail of

13   especially internal operations.  No, that's not something

14   we would normally discuss.

15   Q.    Why didn't you feel it was necessary and important

16   to tell them about that?

17   A.    Because I didn't feel there was anything that we

18   were doing that we weren't entitled to do, so there was no

19   reason to discuss it.

20   Q.    Did you conceal the fact you were locally hosting

21   software for some companies?

22   A.    I don't know how we could conceal it.  It's in our

23   contracts.  So, no, there was no concealment at all.

24   Q.    So you put in the contract that this customer could

25   choose local or remote, and if they chose local, you would

1    do it?

2    A.    Yes.

3    Q.    Did you ever think it was important to tell

4    customers that sometimes you would create a tax or

5    regulatory update and then reuse it for another customer

6    with the exact same rights to the exact same version?

7    A.    If they asked about it, we would talk about it,

8    certainly.

9    Q.    But didn't you feel compelled to tell them this is

10   how we do things sometimes?

11   A.    No, it's like the sausage factory.  If they want the

12   sausage, we don't necessarily talk about the factory unless

13   they ask specific questions about it.

14   Q.    Were you hiding that fact?

15   A.    No.  There was nothing.  If they asked about it, we

16   talked about it.

17   Q.    How frequently would Rimini Street actually remote

18   host these products?

19   A.    A lot more than our engineers would have liked, and

20   that only grew over time, yes.

21   Q.    Well, let's talk about that, because obviously this

22   morning we heard about how engineers thought it was a train

23   wreck to do remotes and building a bottle in a ship and a

24   ship in a bottle?  Why is it you didn't say, fine, we won't

25   do that anymore?

1    A.    Well, again, we're a company built on client

2    satisfaction, choice, and delivering great service.

3            If a customer feels that they wanted it to be

4    remote hosted, if they wanted us to connect to their

5    environments, if that was their choice, then that's what we

6    were going to do.

7    Q.    Now, we've seen documents in this case, and you saw

8    documents on that stand, where there was Rimini folks

9    saying to clients that we don't share your software with

10   anyone else.  Do you remember seeing those?

11   A.    Yes.

12   Q.    I mean, how can you square that with cloning

13   environments and reusing updates?

14   A.    Well, again, if you look at the documents and you

15   look at the full set of those documents, you find that, in

16   fact, what we're saying to the customer is we will not take

17   software that you are licensed for that another client is

18   not licensed to have and give it to them and vice versa.

19           If you think -- and you saw some of those

20   comments, if you think that you're not entitled to

21   something, we're not giving it to you either.  We're not

22   going to take it from another client and make it available

23   to you.

24           And you see a lot of those back and forths.

25   We're very strict about that.

1    Q.   Well, I have to raise one document with you,

2    Mr. Ravin, that I think was used a couple of times

3    including in opening statement by Mr. Isaacson.  It's

4    preadmitted, PTX 1.

5              MR. WEBB:  Can you pull that up?

6              And it's previously admitted.

7              COURTROOM ADMINISTRATOR:  Yes, 1 is.

8              THE COURT:  Yes, you may.

9              MR. WEBB:  Marie, I want to focus on the part

10   that has been highlighted repeatedly in this case at the

11   very bottom.

12   BY MR. WEBB:

13   Q.   At the very bottom it says, "sounds to me like they

14   just said help yourself to the buffet."

15              Do you remember that document, Mr. Ravin?

16   A.   Yes.

17   Q.   You have to admit that sounds pretty bad?

18   A.   Well, again, I think if you look at the context of

19   it -- I mean, what happened was --

20   Q.   Hold on.  We'll get to that in a minute.  "Help

21   yourself to the buffet," Mr. Ravin?  I mean, how can that

22   not be wrong?

23   A.   Well, again, the context that I'm seeing this in was

24   simply saying if they're going to put this stuff in the

25   public, does that mean that everyone can help themselves to

1    it.

2              MR. WEBB:  Let's go to the previous page, Marie.

3    The one right before that.  Let's go to the -- okay.  We're

4    on page 2 -- we'll get this figured out by tomorrow,

5    promise.

6              All right.  So can we go to page 2?  You see the

7    top part where it says, "of course," Marie?

8    BY MR. WEBB:

9    Q.    This is a part of the e-mail from Dennis Chiu

10   saying, "Of course, they might spring a gotcha when anyone

11   wants support on what they pull down.  So no license equals

12   no Siebel support that is unless they come to us."

13             Does that help you understand the context of

14   what this is all about, Mr. Ravin?

15   A.    Well, yes.  Again, this is -- Oracle had changed

16   where they were putting the software, and there was items

17   that used to be behind the firewall, it used to be you had

18   to go in with passwords to get it, and now it was moved to

19   a new area, and it was available to the public.

20             So you're seeing a dialog between Dennis Chiu,

21   myself, and others trying to figure out what exactly is the

22   meaning of these changes because no document was published

23   that said here's why we're change things.

24             So you really saw -- again, this is just an

25   internal back and forth trying to figure out what do they

1    mean about this?  Does this mean everyone can now access

2    it?  Is it specially controlled and protected?

3                 And you're watching an internal dialog trying to

4    figure that out.

5    Q.    You mentioned something yesterday about some

6    software code being publicly available for download.  Do

7    you remember that?

8    A.    Yes.

9    Q.    Is this what you're talking about?

10   A.    Yes, because it was moved and put in an area where

11   anyone could access it, and we were trying to figure out

12   why did Oracle change this, why did they make this publicly

13   available.  Does this mean everyone can access it, or no

14   one can?  No one understood what the meaning was.

15   Q.    And so they had previously kept this stuff behind a

16   locked door?

17   A.    Yes.

18   Q.    And you had to have a code to unlock the door to get

19   to it?

20   A.    Yes.

21   Q.    And now they just put it out in the open?

22   A.    Yes, they basically made it directly available, and

23   so people were trying to figure out what does it mean.

24   Q.    And so that's why Mr. Chiu said "sounds to me like

25   they just said help themselves to the buffet"?

1                    MR. ISAACSON:  Objection, Your Honor.

2                    THE WITNESS:  Well, he's saying that is this --

3     he is really asking the question, is this what they're

4     meaning, and what does this mean for us as support

5     providers.  Does this mean that a client is entitled --

6                    THE COURT:  Wait a minute, I did have an

7     objection there.  I didn't hear you, Mr. Isaacson.

8                    MR. ISAACSON:  Objection, your Honor.

9                    THE COURT:  It's sustained.  It's calling for

10    speculation on behalf of another party, and it's improper.

11

12                    MR. WEBB:  Okay.

13    BY MR. WEBB:

14    Q.    Mr. Ravin, explain to the jury how the Siebel

15    extract disk worked?

16    A.    The extract disk that we provided clients?

17    Q.    Yes?

18    A.    So after we would figure out what a client is owed

19    for Siebel from the downloaded material, it would get

20    placed on a disk, a DVD.

21                    That DVD would then get sent to the client, and

22    the DVD could then be accessed and utilized for research

23    for the client.  It's their material that they had a

24    licensed right to.

25                    So they could then use a search tool like a

724

1    Google tool and find the materials that they wanted.  The

2    same with Rimini Street's engineers could do the same.

3    BY MR. WEBB:

4    Q.    Thank you.  Let's now talk about automated tools.

5    We've heard quite a bit about that in this case.  What are

6    automated download tools?

7    A.    Well, the automated download tools which you hear

8    with terms like crawlers, things like that, sound really --

9    sounds really interesting.

10          These tools were literally designed to help

11   download large amounts of material from these websites

12   because, again, you've got a client who may be entitled to

13   ten or 20,000 files.  You can imagine what that takes to

14   download manually one by one, click, click, click, and so

15   these tools are designed to help you do that in a more

16   efficient way.

17   Q.    Did Rimini Street use automated tools when it was

18   downloading for its clients?

19   A.    Yes, up until a certain time.

20   Q.    And do you know the certain time that it stopped

21   using automated tools?

22   A.    I think it was early 2009.

23   Q.    Early 2009.  And once you couldn't download with

24   these automated tools to get all these files for your

25   clients, how in the world did you get that content?

1    A.    Well, we had to make two decisions.  One, we had to

2    go to manual, which meant literally click, click, click,

3    click.  We had to hire a lot of people to do that work.

4              And, because it's so much material, we had to

5    make a decision with the customers to narrow the scope.

6              So customers, although they're entitled to

7    potentially tens of thousands of files, there are thousands

8    of files, I think, on average, that we leave behind for

9    clients that we just don't have enough time and manpower to

10   get for them, and that's just an agreement we reach with

11   the clients.

12   Q.    So you stopped sometime in 2009 -- early 2009.  Did

13   there come a time before then that Oracle said you can't

14   use automated tools?

15   A.    Yes, I believe there was a time, yes.

16   Q.    Okay.  So we'll talk about that in a minute.  But

17   before that time, were automated tools permitted?

18   A.    To our knowledge, there was no prohibition to it.

19   Q.    Certainly at one point Oracle said no more automated

20   tools?

21   A.    Yes, they changed their terms of use for the

22   website.

23   Q.    How did you -- how did you react to that?

24   A.    I was pretty surprised at the change for a number of

25   reasons.

726

1    Q.    Explain to the jury a few of those reasons.

2    A.    Well, first, again, these are extremely large

3    systems and require huge amounts of downloads for fixes and

4    updates if a client wants to take delivery of the items

5    that they're owed.  So the volumes alone is why these tools

6    were used.

7              Two, Oracle had recommended to use these tools.

8    They actually put in their support guides that if you're

9    downloading a lot of material, be sure to use a download

10   tool to help you deal with the volume.  So they recommended

11   themselves as a best practice to use download tools.

12             Three, the fact is that when customers sign

13   license agreements and they get the idea of what their

14   service is going to look like going forward, a lot of them

15   have provisions that say that the vendor can change the

16   terms of service, but whatever those changes are not

17   allowed to reduce the rights under the agreement, and I

18   felt that the change of terms violated that license part of

19   the agreement.

20   Q.    But you knew they had changed the rules?

21   A.    Yes.

22   Q.    But you didn't stop using automated tools?

23   A.    No, because I felt it was a violation of the license

24   agreements with the customers and therefore invalid.

25   Q.    But you eventually did stop using them?

1    A.    Yes, eventually.

2    Q.    Now, we saw some documents in this case about how

3    people thought it would be not feasible to do what you do

4    without automated tools.  Do you remember seeing those?

5    A.    Yes.

6    Q.    But in 2009, you stopped using automated tools?

7    A.    Yes.

8    Q.    Were you still able to provide the service to your

9    clients?

10   A.    Yes.  Well, I think that the comments you saw

11   related to the fact that we -- in order to get everything,

12   and it said all materials, it would be really very costly.

13          We didn't have at that time the manpower, we

14   didn't have the resources to get all materials in a manual

15   way, but we did figure out how to do a subset of that and

16   to do it manually.

17          MR. WEBB:  Your Honor, I'm about ready to shift

18   gears.  I can go another five minutes if you'd like.

19          THE COURT:  Well, we're going -- as agreed, we

20   would finish today by 2:00.

21          MR. WEBB:  Okay.

22          THE COURT:  If you can finish by 2:00, that's

23   acceptable.

24          MR. WEBB:  Certainly.

25

728

1    BY MR. WEBB:

2    Q.    You've seen Dr. Davis testify in this case; right?

3    A.    Yes.

4    Q.    And you saw his charts with the -- with lots of

5    copies and files illustrated on the charts?

6    A.    Yes.

7    Q.    Let's talk about -- just getting some orders of

8    magnitude, when you are -- okay.  So you've gone through

9    the process of installing the installation media on the

10   servers, now you're moving to the second step of

11   downloading.

12          When your folks are downloading for -- again,

13   before the maintenance end date, when they're downloading

14   those files for that client, how many files will they

15   download for just one client on average?

16   A.    In the thousands.

17   Q.    So just for one client you may have thousands of

18   files for that one client?

19   A.    Yes.

20   Q.    And it's your belief that the client is entitled to

21   have those files?

22   A.    Yes.

23   Q.    And if you are hosting this client locally on Rimini

24   Street's servers, those files would go down to Rimini's

25   computers?

729

1    A.    Originally, yes.

2    Q.    If you're doing it for the client, it would go to

3    their computers?

4    A.    Yes.  It depends.  Sometimes it would be to Rimini

5    and then moved over to that client's computers, yes.

6    Q.    But in any event we're talking about a whole lot of

7    files for even one client?

8    A.    Yes.

9    Q.    Now, there are 300 some clients at issue in this

10   case.  If we -- if you downloaded 10,000, 20,000 files for

11   each of those clients, it would get up to a large number?

12   A.    Yes.

13   Q.    I want to talk briefly about backup.  Tell the jury

14   what the backup tapes are?

15   A.    Pretty much like it says, that once a -- when you

16   have data and material on your computer, just like your

17   home computer, you never want to risk having your hard

18   drives freezes up or losing the data so you make backups.

19   Q.    And how often does Rimini Street make backups for

20   its clients?

21   A.    Well, given the importance of the data on our

22   systems, we were daily.

23   Q.    Daily backups.  And help the jury understand that --

24   what's involved in making a backup tape?

25   A.    Well, we have these giant tape units with these high

1    density tapes look like old VCR tapes in many ways, and

2    these tapes would be put into the machine, many of them,

3    and the systems would run.

4            I mean, these were big, specialized backup

5    systems because we have so much data, and they would run

6    automated every day.

7            And then the tapes are taken out.  The tapes are

8    rotated through -- again, part of these quality processes,

9    the tapes are taken out, placed offsite to another location

10   in case there's a fire or any problem at the computer

11   center, And they're rotated.

12           There's a whole process for rotating through

13   them as Oracle's witness talked about.

14   Q.    Now, in your belief, is the act of making backup

15   tapes within the scope of rights that the client has with

16   Oracle?

17   A.    Yes, of course.  I mean, customers have to make

18   backups of their systems.  These are complex

19   mission-critical systems.

20   Q.    In the industry, software industry, is it common to

21   make backup tapes?

22   A.    Yes.

23   Q.    And in your business with just the 364, 46 clients,

24   whatever the case may be, if we look just at the number of

25   copies of software on the backup tapes, what would we be

1     looking at?

2     A.    I would imagine thousands have copies based on

3     daily, weekly, monthly, annual.  We have a whole scheme of

4     backup tapes.

5     Q.    Now, those backup tapes, are they shared between

6     clients?

7     A.    Oh, no, they're just done for Rimini Street's

8     emergency backup systems.

9     Q.    And does Rimini Street charge extra for providing

10    backup tapes to its clients?

11    A.    No, it's an expected part of running -- if you have

12    computers, they expect them to be backed up, certainly.

13    Q.    In terms of the services that are provided by Rimini

14    Street and the services covered within the pricing, we've

15    already talked a little bit about service on customized

16    code that vendors typically do not cover.

17          Can you think of any other services offered by

18    Rimini Street under its one price that typically customers

19    have to pay extra for with other vendors?

20    A.    The interoperability support, for example, is

21    certainly one that we provide which would be considered

22    additional consulting under other support agreements.

23    Q.    And you mentioned earlier something about the

24    complexity of the interoperability support piece?

25    A.    Right.  Well, that's what I was talking about, our

1      team, our technology services organization.

2      Q.    And can you think of anything else that would be

3      outside the scope of typical vendor contracts?

4      A.    Well, as we talked about earlier, the support for

5      customized code is huge, yes.

6      Q.    Before we leave that topic, the installation

7      support -- I'm sorry, the upgrade support, I thought you

8      testified earlier that Rimini Street doesn't do upgrades.

9      A.    No, we don't do the physical labor for an upgrade

10     which I talked about could take a large company several

11     years.

12           We literally just provide support to the team of

13     people that they hire or their own staff who are going to

14     do the upgrade themselves.

15           THE COURT:  All right.  Mr. Webb, I think we're

16     going to have to close it down.  If you have one or two

17     more questions, I'll allow you to do that.

18           MR. WEBB:  All right.  I think I can't get into

19     a new area for just a couple of -- I'm afraid I'm probably

20     not wasting the time on that one.

21           THE COURT:  All right.

22           Ladies and gentlemen, what that means is we've

23     completed today's session.

24           A little bit of a word.  Remember we change our

25     schedule on Fridays and Mondays.  So tomorrow we'll start

1    promptly at 8:00 in the morning, and we had planned to go

2    through until noon, but I'm going to shorten that to 11:30.

3    That's because my entire team has to catch flights at

4    McCarran, and McCarran this week issued a notice that

5    because of increased security that earlier arrival will be

6    necessary for flights.

7            So tomorrow we'll finish by 11:30, and then on

8    Monday we will not be starting until 1:00.  That time is a

9    firm time, so for the benefit of making your own plans,

10   that's where we are.

11           And then on Monday we will go through until five

12   o'clock.

13           And, let's see.  Do we have the snack tray

14   coming in tomorrow, Dionna, do you know?  Donuts tomorrow.

15   You'll also have the same type of refreshments on Monday

16   before you get here, and whatever you've saved in the

17   refrigerator.

18           So, ladies and gentlemen, I remind you of the

19   admonishment not to converse among yourself or anyone else

20   on any subject connected with the trial.

21           I haven't mentioned before because I had not

22   seen any indication that anything pertaining to this trial

23   is being covered in any newspapers or television, radio,

24   that type of thing.  But, as you can imagine, the

25   admonition certainly applies to that.

734

1              If there was anything like that of any kind, it

2       would be totally improper to read, watch, or listen to any

3       report or commentary that might pertain to this case

4       through any form or medium, And that certainly covers

5       newspaper, television, radio, and the Internet.

6              And I remind you very important to keep an open

7       be mind until you've heard all the witnesses, seen all the

8       evidence, and heard the final arguments from counsel, and

9       the instructions of law that will be given by the Court,

10      and then you'll be able to deliberate and take advantage of

11      what you've been able to keep an open mind about.

12             So I thank you again for a day when you people

13      have been just so cooperative.  I wish you a pleasant

14      evening, and I wish that to everyone in the courtroom.

15             And at this time Court will be adjourned, and

16      you may step down.  Thank you.

17             COURTROOM ADMINISTRATOR:  Please rise.

18          (The proceedings adjourned at 2:05 p.m.)

19             MR. ISAACSON:  Your Honor, may I ask something

20      outside the presence of the jury?

21             THE COURT:  Sure.

22             MR. ISAACSON:  I'll take one more run at

23      Plaintiffs' Exhibit 2140, all the language we looked at at

24      the beginning of the day.

25             THE COURT:  All right.  Go ahead, please.

1              MR. ISAACSON:  Specifically the concession from

2     the head of SAP that TomorrowNow had done something wrong.

3              Now Mr. Ravin has been asked the additional

4     question since we last spoke, if -- if he had -- if he had

5     known he was violating the copyright laws or something like

6     that, would he have done remote environments from the

7     beginning, and he was asked a hypothetical along those

8     lines.

9              Now, you'll remember that PTX 30 is where

10    TomorrowNow says we're stopping local environments and

11    we're going all remote, and Mr. Ravin says that's

12    ridiculous.

13             PTX 2140 establishes in connection with that

14    that TomorrowNow had acknowledged that -- I mean, that SAP

15    had acknowledged that TomorrowNow had engaged in

16    wrongdoing.

17             I think that is relevant to what has now been

18    additionally put into issue by Mr. Ravin.  So I wanted to

19    make that argument and suggest that that -- that part of

20    that first paragraph should come in.

21             MR. WEBB:  Your Honor, the questions -- they

22    alleged that this business could never have gotten off the

23    ground without infringement, that from day one we were

24    willfully violating those rights.

25             I asked Mr. Ravin, when you started your

1    company, if you knew you couldn't do this, what would you

2    have done.  That's entirely different.

3              This is just another run at trying to get some

4    incriminating evidence against my client when they have no

5    basis for it.  There's nothing different.

6              I said that in opening, I said that in opening.

7    This is just a pretext to try to find a way to get this

8    highly prejudicial evidence in front of the jury.  Nothing

9    has changed.

10             MR. ISAACSON:  It's not a -- the man's on the

11   stand and his answer's the same, and this is 2007.  This is

12   at the beginning, and he gets this information, and he

13   doesn't do what his counsel asked him that he said he would

14   do.

15             And it's directly relevant to take on the

16   testimony that he has given to this jury, that he would

17   have done something different.

18             And the fact is that after learning that

19   TomorrowNow had admitted wrongdoing, that SAP had admitted

20   wrongdoing and went from a local environments to remote

21   environments, he said that was ridiculous, and I can't

22   imagine a stronger rebuttal or critique of that man's

23   testimony, and he's going to get away with it if what he

24   wrote -- what his company wrote is not put in front of him.

25             MR. WEBB:  Mr. Isaacson's imagination aside, the

1    fact is this says in 2007 SAP AG CEO admitted wrongdoing by

2    TomorrowNow.

3              What the heck does that mean?  Admitted

4    wrongdoing by TomorrowNow.

5              Okay.  Let's assume that we could imagine what

6    that means.  They then have to connect it to Mr. Ravin,

7    then they have to connect it to what he said at trial today

8    that in 2005 when he was starting his company that if he

9    knew he couldn't locally host, would he be able to be in

10   business, which is their argument, that we could never have

11   gotten it off the ground without getting --

12             THE COURT:  We can cut to the quick on this.  I

13   am of the view that Mr. Ravin has clearly opened the door

14   by the course -- as a result of his testimony here today.

15             When I earlier ruled on this this morning, the

16   issue of -- the issues that are involved here were

17   standalone in many ways.  But certainly throughout the

18   testimony that's been presented today, there's been any

19   number of references which would invite fair

20   cross-examination that's related to the subject matter

21   that's at hand here.

22             The Court will admit 2140 with the inclusion of

23   the portion that was earlier going to be admitted, and I

24   will allow cross-examination on that, and my ruling would

25   remain the same as to the second omission.

738

1             MR. WEBB:  There's still the DOJ piece.

2             MR. ISAACSON:  I'm not asking for that.  That's

3    out.

4             THE COURT:  I assumed that the DOJ piece was

5    out.

6         (Plaintiffs' Exhibit 2140 received into

7         evidence.)

8             THE COURT:  And that will be the ruling of the

9    Court.

10        (The proceedings adjourned at 2:11 p.m.)

11                       *   *   *

12

13

14

15

16

17

18

19

20

21

22

23

24

25

739

1                              -o0o-

2          I certify that the foregoing is a correct

3          transcript from the record of proceedings

4          in the above-entitled matter.

5

6          _____     9/17/15

7          Donna Davidson, RDR, CRR, CCR #318        Date
           Official Reporter

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

740

1                              I N D E X

2   PLAINTIFFS' WITNESSES:                        PAGE
    SETH RAVIN
3        Direct Examination Resumed               505
         By Mr. Isaacson
4        Cross-Examination By Mr. Webb            549

5

6                          E X H I B I T S

7   PLAINTIFFS'                                ADMITTED
    3                                              545
8   43                                             508
    48                                             528
9   59                                             598
    241, 4896, 5052, 5083, 5304, 5352, 2140       503
10  243                                            538
    446                                            595
11  482                                            511
    498                                            590
12  621                                            505
    2140                                           738
13  2155                                           536
    3011                                           560
14  3726                                           586

15  DEFENDANTS'                                ADMITTED
    194                                            503
16  380                                            684
    381                                            687
17  2246                                           638

18

19

20

21

22

23

24

25