1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF NEVADA
2            BEFORE THE HONORABLE LARRY R. HICKS, DISTRICT JUDGE

3

4  ORACLE USA, INC., a Colorado      :
   corporation; ORACLE AMERICA,      :
5  INC., a Delaware corporation;     :
   and ORACLE INTERNATIONAL          :No. 2:10-cv-0106-LRH-PAL
6  CORPORATION, a California         :
   corporation,                      :
7                                    :
            Plaintiffs,              :
8                                    :
        vs.                          :
9                                    :
   RIMINI STREET, INC., a Nevada     :
10 corporation; and SETH RAVIN,      :
   an individual,                    :
11                                   :
            Defendants.              :
12 _____  :

13

14

                  TRANSCRIPT OF JURY TRIAL - DAY 5
15                   (Pages 741 through 889)

16

17                     September 18, 2015

18

                       Las Vegas, Nevada
19

20

21

22

   Court Reporter:        Donna Davidson, RDR, CRR, CCR 318
23                        Certified Realtime Reporter
                          400 South Virginia Street
24                        Reno, Nevada  89501
                          (775) 329-0132
25

742

1                    A P P E A R A N C E S

2      FOR THE PLAINTIFFS:

3      BOIES, SCHILLER & FLEXNER LLP
       KIERAN P. RINGGENBERG
4      1999 Harrison Street, Suite 900
       Oakland, California 94612
5      (510) 874-1000
       Fax: (510) 874-1460
6      kringgenberg@bsfllp.com

7      BOIES, SCHILLER & FLEXNER LLP
       RICHARD just. POCKER
8      300 South Fourth Street, Suite 800
       Las Vegas, Nevada 89101
9      (702) 382-7300
       Fax: (702) 382-2755
10     rpocker@bsfllp.com

11     BOIES, SCHILLER & FLEXNER LLP
       WILLIAM A. ISAACSON
12     KAREN L. DUNN
       5301 Wisconsin Avenue, NW
13     Washington, DC  20015
       (202) 237-2727
14     Fax:  (202) 237-6131
       wisaacson@bsfllp.com
15     kdunn@bsfllp.com

16     MORGAN LEWIS & BOCKIUS LLP
       THOMAS S. HIXSON
17     NITIN JINDAL
       JOHN A. POLITO
18     One Market, Spear Street Tower
       San Francisco, California 94105
19     (415) 442-1000
       Fax:  (415) 442-1001
20     thomas.hixson@morganlewis.com
       nitin.jindal@morganlewis.com
21     john.polito@morganlewis.com

22     JAMES C. MAROULIS
       DORIAN E. Daley
23     Oracle Corporation
       500 Oracle Parkway
24     Redwood City, California 94070
       (650) 506-4846
25     jim.maroulis@oracle.com
       dorian.daley@oracle.com

743

1                A P P E A R A N C E S (Continued)

2    FOR THE DEFENDANTS:

3    SHOOK, HARDY & BACON LLP
     PETER E. STRAND
4    B. TRENT WEBB
     2555 Grand Boulevard
5    Kansas City, Missouri 64108
     (816) 474-6550
6    Fax: (816) 421-5547
     pstrand@shb.com
7    bwebb@shb.com

8    SHOOK, HARDY & BACON LLP
     ROBERT H. Reckers
9    600 Travis Street, Suite 3400
     Houston, Texas 77002
10   (713) 227-8008
     Fax: (713) 227-9508
11   rreckers@shb.com

12   LEWIS ROCA ROTHGERBER LLP
     W. WEST ALLEN
13   3993 Howard Hughes Parkway, Suite 600
     Las Vegas, Nevada 89169
14   (702) 949-8230
     Fax: (702) 949-8364
15   wallen@lrrlaw.com

16

17

18

19

20

21

22

23

24

25

```
 1              LAS VEGAS, NEVADA, SEPTEMBER 18, 2015, 8:08 A.M.

 2                              --oOo--

 3                     P R O C E E D I N G S

 4

 5          (Outside the presence of the jury.)

 6               COURTROOM ADMINISTRATOR:  Please rise.

 7               THE COURT:  All right.  Have a seat, please.

 8               The record will show that we're in open court.

 9     The jury is not present.  Counsel and parties are present.

10               I've received a defense motion for

11     reconsideration of the Court's evidentiary rulings.

12               I'm familiar with what's been alleged here, and

13     I understand your argument.  I think, in the interest of

14     time, I'd rather hear the response by Mr. Isaacson, and

15     then I'll give you an opportunity to respond to that,

16     Mr. Webb.

17               MR. WEBB:  Thank you, Your Honor.

18               MR. ISAACSON:  So, Your Honor, with respect to

19     the first point, as to whether the door has been opened, I

20     don't think the motion for reconsideration even deals with

21     that issue.  In fact, it just provides citations for how

22     the door was opened by putting -- he put his testimony --

23     his testimony put his state of mind at issue.

24               His testimony said he would have done things

25     differently if he had known.  The -- PTX 30 says that he
```

1    knew that his former company had decided to do things

2    differently, specifically with respect to what was --

3    what's at issue in this case, the remote versus the local

4    environments.

5           They decided to stop touching the Oracle

6    software and to only have the environments at the customer

7    and not at TomorrowNow, and that was after the lawsuit.

8    And all this is in evidence already.  The -- and at that

9    point he said that was ridiculous.

10          Two weeks -- what's at issue now is that two

11   weeks before that relating to that decision, he knew that

12   TomorrowNow had announced -- I'm sorry, that SAP had

13   announced that TomorrowNow had engaged in wrongdoing, which

14   goes directly to his state of mind when he's saying that's

15   ridiculous.

16          And in terms of shifting to those environments,

17   he's trying to take a competitive advantage instead of

18   reacting to the risks of the violations that are going on.

19          And, as well, it's absolutely -- it makes no

20   sense for him to be saying that if he had known

21   differently, he would have changed, because he's looking at

22   his former company that did change with respect to this,

23   and he sees there's evidence of wrongdoing, and instead of

24   saying "gee, we've got to take a look at this, I'm going to

25   think this through," he just says "that's ridiculous, let's

1    make more money by taking the TomorrowNow customers."

2           Now, the second issue raised in the letter is,

3    then, well, okay, even if we've opened the door, let's put

4    our lawyer letter in.

5           Now, the lawyer letter is from October 6th,

6    2005 --

7           THE COURT:  All right.

8           MR. ISAACSON:  So this is two years before the

9    document that we're going to seek to examine Mr. Ravin on

10   today.

11          In addition, all right -- and what they say

12   about this letter is that Mr. Ravin consulted counsel and

13   was advised at length that no wrongdoing had -- wrongdoing

14   had occurred.

15          There is no advice-of-counsel defense in this

16   case.  There has not been one that has been raised

17   previously.

18          We have a privilege log.  We have privilege --

19   and on that privilege log are documents relating

20   specifically to this letter.

21          And so it is -- it would be completely improper

22   for an argument to begin at this point that in 2005 he was

23   relying on counsel and that also then somehow related to

24   what he was thinking in 2007.

25          In addition, if you look at the 2005 letter, it

1    does not mention a single contract clause at issue in this

2    case, not a single one that the gentleman has been asked

3    about, not a single one that the Court has interpreted, and

4    not a single one that we've been -- that we're arguing

5    about whether he has good faith about.

6            It relates to another -- the only -- the only

7    Siebel contract provision mentioned in this letter relates

8    to restrictions on sharing with competitors which has not

9    been an issue that has been raised in this trial.

10           So 14.2, which has been framed for the jury, not

11   mentioned in this letter, no other provisions.

12           And then there's an array of other allegations

13   not at issue in this case which are discussed in this, and,

14   again, as we discussed yesterday, it's pure hearsay, it's

15   just lawyers making legal points, and they are irrelevant

16   legal points to this trial.

17           So what would happen if this were admitted is

18   you would have pure hearsay, a letter waved around saying

19   "our lawyer said things were okay."

20           And we would actually need extensive legal

21   instructions explaining to the jury why the legal issues in

22   this letter are not the legal issues in this case, because

23   it would only introduce legal confusion to raise these

24   issues and to try and suggest to the jury that they have

25   something to do with this case.

1              As to the post-2011 conduct, apparently they

2    want Mr. Ravin to say "we stopped doing this."  We don't

3    believe that they stopped violating our copyrights.

4              There's been no discovery after 2011, and so the

5    Court has appropriately drawn the line as to when -- as to

6    what the subject matter of this lawsuit is.

7              They simply want the opportunity to say things

8    that we don't have discovery on and so that we can't test

9    them.  And I don't think his state of mind in 2011 goes to

10   this issue as to 2007.

11             THE COURT:  All right.

12             Mr. Webb?

13             MR. WEBB:  First of all, Judge, I've gone

14   through my remaining outline and whittled it from 16 pages

15   to 5, so I'm hoping to move things along.  I know we're

16   bogged down.  And we're going to hustle as best we can.

17             So hopefully that will give us a little time to

18   think about this.  Because we talked, the team, last night,

19   and we're afraid this is really, really important.

20             Let me just give you a flavor of this, Judge.

21             First of all, the brief mentioned the one letter

22   we talked about yesterday, but you should know there were

23   multiple letters that went from Rimini Street to Oracle,

24   including Defendants' Exhibits 378, 379, 380, 381, 382,

25   383, 384, 385, 386, 387, 388.

1            There were letters being exchanged between the

2     parties for a very long time, Judge.

3            They alleged willfulness.  They're the ones who

4     put my client's state of mind into play.  We should be

5     allowed to respond and say that his state of mind was

6     informed by these letters.

7            And about this advice-of-counsel business, these

8     aren't internal documents, these are documents sent to

9     Oracle.  They are public documents.  There's no privilege

10    to be waived.

11            There's no advice-of-counsel defense, and we're

12    not alleging an advice-of-counsel defense.

13            We're saying that among the things Mr. Ravin

14    considered in determining to continue were these letters

15    written by lawyers to Oracle addressing their allegations.

16            The other thing, Judge, the instructions don't

17    have to be crazy complicated.  They are what was his state

18    of mind, and this goes to his state of mind.

19            The document at issue talks about wrongdoing,

20    and we have no idea what that is, and I made those

21    arguments yesterday, Judge, I'm not going to make them

22    again.

23            The nebulous nature of what is wrongdoing will

24    only put the jury's minds into bad places including

25    confusion and sinister thoughts about my client.

1               What we do know is this.  Now that this cat is

2     out of the bag, TomorrowNow is going to be center stage for

3     their case from this point forward.  There's a certain

4     amount of that we can't undo, but these letters will at

5     least us give a fighting chance to explain why we continued

6     down this the path.

7               So these -- all of the letters, not just the

8     one, we think, go to this point.

9               Now, if Mr. Ravin were allowed to testify, he

10    would say he relied on those, he was aware of those, he

11    tracked the letters going back and forth, and he had a good

12    faith belief going forward.

13              If these letters -- and I don't have them in

14    front of me here, Judge, but if the letters talk about

15    contracts or don't, that would be perfect fodder for

16    Mr. Isaacson to cross the witness.

17              And to the extent that these letters have

18    allegations about antitrust or anticompetitive conduct,

19    we'd agree to redact those pursuant to the Court's prior --

20    prior ruling.

21              The bottom line is this.  We can't be forced to

22    fight this with one hand tied behind our back.  If they're

23    going to say "bad guy, evil guy, willful, willful,

24    willful," we should be able to say, "actually, my state of

25    mind was this, this is what I believed, and maybe I was

1    wrong, but whether I was wrong or not does not go to my

2    good faith."

3            And his good faith is centrally at issue, not

4    just with their claim of willfulness, but punitive damages.

5    There's a lot of line here, Judge.  We should be allowed a

6    fair fight.

7            As it pertains to the post-2001 conduct, as the

8    jury understands it right now, as far as they know, we are

9    continuing to do exactly what you said was improper.

10           And, listen, when you sent your order out, even

11   though we disagreed with it, we immediately took steps to

12   stop.  And it was not easy, but we did that in respect to

13   the Court's decision.

14           THE COURT:  And the date of the decision?

15           MR. WEBB:  The 2014 decision, Judge.

16           THE COURT:  All right.

17           MR. WEBB:  And I know that -- we talked

18   yesterday about this.  I understand your position.

19           And we're not -- we're not about to say here's

20   what we do now, and we've got this new thing that we've

21   sued Oracle on we're so confident in it that it doesn't

22   infringe.  We'd love to say that.

23           That ruling has already been made.  We're not

24   asking any reconsideration of that.  We're not going to say

25   "we've got a new process, we filed a patent on it, we've

 1    sued Oracle because we think we don't infringe," none of

 2    that.

 3            We just want to say "the things that you said

 4    were improper we don't do anymore."

 5            We think that also goes to the willfulness and

 6    the punitives issues.

 7            There are -- there are serious risks here that

 8    this jury is going to be going to places that the evidence

 9    would keep them from going to.

10            So I don't want to belabor the point, Judge, and

11    I don't want to waste any time, but this is one of those

12    really, really important things.  I'm afraid if that bell's

13    rung, I mean, there's only so much we can do at that point.

14            THE COURT:  All right.  Okay.  Let me retract

15    your arguments, and I'll --

16            First of all, I'm going to sustain my ruling

17    with regard to the TomorrowNow issue.

18            I felt that this was placed in front of the jury

19    in the course of direct examination.  He testified at

20    length about how he was the founder of the company, he was

21    a 50 percent owner, and it was essentially his business

22    plan, development plan, and that he simply wanted to

23    operate with more freedom without a partner in his

24    successive creation of Rimini Street.

25            I think, under all those circumstances, the

753

1    Court -- the Court's feeling was that the issue was clearly

2    relevant.

3            Now, that's not to say -- there's obviously some

4    403 issues with regard to TomorrowNow that the Court

5    doesn't have in front of it right now, but, certainly,

6    cross-examination as to the TomorrowNow history, as it

7    relates to the defendant's mental state and intention, has

8    been put at issue here, I feel, by his direct examination,

9    and I'm comfortable that -- for the reasons argued

10   yesterday, that that is admissible.

11           With regard to the attorney letters, I'm not

12   going to admit those.  They're pure hearsay.  They're

13   passed back and forth.

14           There's been no discovery.  There hasn't been an

15   advice-of-counsel defense asserted here.  There's been no

16   discovery on -- you would have completely opened up

17   discovery of all attorney communications with client and

18   client's communications with attorneys were you to start to

19   explore this.

20           The bottom line is it hasn't been discovered, it

21   hasn't been a subject matter of discovery, and it shouldn't

22   be an issue in front of this jury.

23           The Court would have great reluctance to allow

24   penetration of the attorney-client privilege under any

25   circumstances.

1          I think he's free to testify that he -- he was

2    also relying on his attorney's advice.  But as to going

3    into what that advice was and what the history was and

4    characteristics, the Court is not going to allow that and

5    views that as improper in this case.

6          The -- with regard to the timing issue, the

7    Court's instructions will clearly cover that this case does

8    not extend past 2011.

9          And, frankly, I'm unimpressed that he changes

10   his business practice after the Court has ruled that he's

11   committed copyright infringement in various ways, that he's

12   following the order of the Court, essentially, at the time

13   he does that.

14         That's doesn't belong in front of this jury, and

15   particularly in light of the fact that it comes some three,

16   almost three and a half years later, after the time period

17   in question which is present here.

18         So that essentially is going to be the Court's

19   ruling on those issues.  I'm going to sustain my rulings as

20   of yesterday.

21         I've provided some amplification of the reasons

22   for those rulings.  I've looked at your arguments, which

23   are fundamentally expansions upon the same arguments that

24   were raised yesterday, and I think we leave it at that.

25         MR. ISAACSON:  I'm sorry to revisit something,

1    Your Honor.

2              I believe you said that he could say "I relied

3    on the advice of my lawyers," which would be an

4    advice-of-counsel defense, even if he doesn't get into the

5    details of what that advice is.

6              And we were denied -- because they've maintained

7    the privilege, we don't -- and we don't have the documents

8    to be able to show that that's false, that the advice was

9    different or he dictated the letters or anything like that.

10             So, with respect, I don't think, in the -- when

11   there is no advice-of-counsel defense, I don't think he can

12   say "I relied on advice of counsel."

13             THE COURT:  I will allow him to go that far, not

14   beyond that.

15             It's for that same reason -- well, essentially

16   we're dealing with state-of-mind relevancy here.  That's

17   relevant to his state of mind.

18             I'm not going to go into it, though.  And I

19   would instruct the jury that they could not -- well, I

20   don't want to get in -- go down that road, frankly.  I

21   would expect that you not go any further.

22             MR. WEBB:  Understood.  To be perfectly clear, I

23   can say -- I'll ask him "To what extent did the letter sent

24   to Oracle inform your belief as to whether you could go

25   forward" --

1            THE COURT:  No, no.  I just said we're not going

2   into the letters.

3            MR. WEBB:  Okay.  I'm sorry.  I'm sorry.  Okay.

4   I misunderstood.  I'm glad I asked.

5            I just want to be clear that he can -- actually,

6   can you just rephrase, Your Honor?  I want to make sure

7   I'm --

8            THE COURT:  He can testify that he was

9   represented by counsel, he consulted with his counsel, he

10   felt that -- as a result of that consultation, he felt that

11   what he was doing was acceptable.

12            MR. WEBB:  All right.  That's as far as I'll go.

13   Consulted with lawyers at the time, and did you rely on

14   that -- I just -- I want to be very clear here, Judge.  I

15   just don't want to -- I don't want to cross any lines.

16            THE COURT:  All right.  He can testify that --

17   well, it's a slippery slope.  I'm uneasy about it.

18            Mr. Isaacson, I'll hear from you briefly.

19            MR. ISAACSON:  I just think once he says advice

20   of counsel, it's advice of counsel.  So once you go beyond

21   that he had lawyers and spoke to lawyers, that you're in to

22   advice-of-counsel defense.

23            THE COURT:  I will allow him to testify -- that

24   he can -- he relied in part upon advice of counsel, and

25   that's as far as it goes.

1           MR. ISAACSON:  We do think this is a serious

2    legal issue, Your Honor.  Because as soon as -- whether

3    it's in part or in whole -- that he says he relied on

4    counsel, it's a new defense for which we've been denied

5    discovery.

6           THE COURT:  Well, it is.  That's why I'm

7    uncomfortable about it because there's been no briefing of

8    this, and you're seeking an order from the Court as I sit

9    here without having fleshed this out myself.

10          Under those circumstances, what I'm going to do

11   is -- you will not be able to ask him that question.

12          You can re-call him if the Court -- I want some

13   points and authorities on this.  You have some weekend time

14   to do it.  And so I would expect to have points and

15   authorities on Monday.  That will give us an opportunity to

16   flesh it out ourselves.  And I'll give you a ruling, but

17   stay away from it today.

18          MR. WEBB:  Won't touch it, Judge.

19          THE COURT:  All right.  I think we've covered

20   everything I need to cover.  Let's bring in the jury.

21          (Jurors enter courtroom at 8:29 a.m.)

22          THE COURT:  Good morning.  Have a seat, please.

23          Ladies and gentlemen, again, my apologies for

24   the late start.

25          We attempt to avoid these in every way that we

1    can.  We spend time after you leave in the afternoon and

2    time in the morning before you're supposed to start, and

3    yet we still -- particularly in the early stages of a

4    complex trial such as this one, things can take a little

5    longer than anticipated.

6              But I can assure you that everyone's working

7    while you're waiting, and we're working as fast as we can

8    so that you're not delayed.

9              All of that stated, we're ready to go.

10             The record will show the jury is present.

11   Counsel and parties are present.

12             And, Mr. Webb, you may go forward, please.

13             MR. WEBB:  Thank you, your Honor.

14                       SETH RAVIN

15             recalled as a witness on behalf of the

16               Plaintiffs, having been previously sworn,

17               was examined and testified as follows:

18                  CROSS EXAMINATION RESUMED

19   BY MR. WEBB:

20   Q.   Good morning, Mr. Ravin.

21   A.   Good morning.

22   Q.   Welcome back.

23             Prior to 2012, did Rimini Street have copies of

24   Siebel software on its servers?

25   A.   Yes.

1  Q.    And what were those copies used for?

2  A.    Well, they're designed to -- according to the

3  contracts, to, again, help us provide support to Siebel

4  customers.

5  Q.    Were they used for tax and regulatory updates?

6  A.    No.

7  Q.    So those Siebel copies that you had were not used

8  for that part of the business where you see a change in the

9  law and you modify the code?

10  A.    No, because it's CRM software, so it's not a tax and

11  regulatory product.

12  Q.    Okay.  So, again, what does CRM mean?

13  A.    Client relationship management or customer

14  relationship management.

15  Q.    So remind the jury again why you wouldn't need tax

16  and regulatory updates for that type of a product?

17  A.    Well, that's primarily storing data about customers

18  and prospects, so it doesn't -- there's nothing you're

19  calculating.  It's not like a paycheck.

20  Q.    So when you're talking about the paycheck piece, the

21  HR, we're talking about what product?

22  A.    That would be payroll; payroll product.

23  Q.    And would that be a PeopleSoft product?

24  A.    Yes.  Of these product lines, it would be

25  PeopleSoft, yes.

1   Q.    Okay.  Now, I want to turn the page and talk about

2   JDE, JD Edwards.  Again, remind the jury what that software

3   product does.

4   A.    Well, JD Edwards software was another brand of --

5   and they had payroll and human resources, just like the

6   PeopleSoft side, and financials, manufacturing, all those

7   same types of products.

8   Q.    So prior to 2012, did Rimini Street have copies of

9   JD Edwards software on its servers?

10  A.    Yes.

11  Q.    You're not denying that.

12  A.    No.

13  Q.    And what were those copies used for?

14  A.    Those copies were, again, used for diagnostics and

15  support.

16  Q.    Were they used for archiving?

17  A.    Were they used for --

18  Q.    Archiving?

19  A.    You mean in terms of creating archives?  Yes, they

20  would have been.

21  Q.    Were they -- were they -- in terms of the copies of

22  JD Edwards, were they on your servers or were they on the

23  client servers?

24  A.    Well, I -- we had some copies on our system.

25  Q.    Now, when you're actually using the JD Edwards

```
1     software, is that a local or remote operation?
2     A.    I'm sorry, can you rephrase that?
3     Q.    When you were performing services on JD Edwards
4     software, were you accessing the software locally or
5     remotely?
6     A.    My understanding is that we were accessing it
7     remotely.
8     Q.    So, okay, I'm a little confused.
9           So you're using a remote process with the
10    software on the client servers?
11    A.    Yes.  I mean, we had some software locally as well
12    in the early years, yes.
13    Q.    In the early years?
14    A.    Yes.
15    Q.    Okay.  Now, but later you didn't have copies of JD
16    Edwards or your software.
17          MR. ISAACSON:  Your Honor, objection, leading.
18    There's been a lot of that, but I think we've got to let
19    the witness testify.
20          THE COURT:  Rephrase the question, please.
21    BY MR. WEBB:
22    Q.    If you have a remote operation, why would you have
23    software on your servers?
24    A.    Well, in the early years we were setting up
25    environments like we did for the PeopleSoft product, but
```

1    found that it was actually not very worthwhile to have the

2    local environment, so we just started doing all remote.

3    Q.    Does Rimini use the JD Edwards software for tax and

4    regulatory development?

5    A.    There -- there was some tax and regulatory

6    development in the financials area where 1099s were done.

7    But that was done remotely for customers.

8    Q.    Was there cross-use using JD Edwards software?

9    A.    In terms of JD Edwards software?  No.

10   Q.    So the concept of cloning environments did not

11   happen with JD Edwards?

12   A.    Not that I'm aware of, no.

13   Q.    And the taking one update and reusing it for others?

14   A.    Not that I'm aware of, no.

15   Q.    Again, we talked about this yesterday at the close

16   of your testimony, and, again, Mr. Ravin, just real

17   briefly, tell the jury what we're looking at.

18   A.    This was laying out Oracle's three programs of

19   premier, extended, sustained, of what happens to a release

20   over its lifecycle, how it ages and what kind of support is

21   generally available, and as I noted yesterday, Oracle has

22   exceptions to those policies as well.

23   Q.    And we talked about sustaining classification?

24   A.    Yes.

25   Q.    And remind the jury, again, what type of customers

1    fall within that classification?

2    A.    Well, again, these are older releases that, once a

3    customer reaches a certain age of the release, they have to

4    upgrade to a new version, or they wind up with a support

5    level of sustaining which means they don't get any new

6    fixes, they don't get any new updates, they only get what's

7    available already for a fee.

8    Q.    I believe you testified yesterday that there were

9    some customers, some clients, who came to you not directly

10   from Oracle.

11   A.    That's correct.

12   Q.    Explain to the jury if you would download anything

13   for those customers.

14   A.    No.  I mean, if a customer comes to us from another

15   support provider or they were doing service themselves, and

16   then they decided, you know, they didn't want to or they

17   decided to give it to Rimini Street, those customers --

18   there would be no archiving done because they weren't

19   coming from Oracle.

20          So they had already -- they were already off of

21   Oracle maintenance, and so there would be no archive done

22   for them.

23   Q.    If they were off Oracle maintenance, would they be

24   still paying Oracle?

25   A.    No.

1    Q.    Now, for those clients that you obtain that you

2    don't download anything for, can you still provide all the

3    services that you provide for your other clients?

4    A.    Yes.  We provide all the same services.

5          We would generally change the contract, and the

6    way we would change it is we would take off the area where

7    it says we'll do an archive for you because there's no

8    archive to be done.

9    Q.    And why is it that you can't archive those clients?

10   A.    Well, they're not on Oracle maintenance so we have

11   no rights to access Oracle or provide them materials that

12   they didn't already have in their possession.

13   Q.    Now, several times yesterday, and maybe even today

14   you've said "always" and "never."  Is it your testimony

15   that your processes are perfect?

16   A.    No, not at all.  I mean, we work hard to be as

17   perfect as possible, but no.

18   Q.    Okay.  Let's shift gears here now and talk about

19   something new.  Are you familiar with the phrase gap

20   support or transition support?

21   A.    Yes.

22   Q.    Explain to the jury what that is.

23   A.    Well, we think of support customers in sort of two

24   categories.  One are short-term customers.

25          They come to us because maybe they're switching

1    from Oracle to the SAP products, and it's going to take

2    them two years to get that project completed.  Meanwhile

3    they move their support to us for their Oracle products

4    while they're transitioning so that they can save money and

5    get our service and use that money actually to help pay for

6    some of the conversion.

7    Q.    So are these customers planning to stay with you

8    long-term?

9    A.    No.  Often -- I mean, they could go from a few

10   months to -- to, you know, a short year or two years,

11   something like that.

12   Q.    And when they leave you, where would they go?

13   A.    Well, they'll go be at another software product,

14   either -- and sometimes it's even between Oracle products,

15   but often it's between different manufacturers.

16   Q.    And so during this transition period, are they

17   basically ramping up on something else, something new at

18   the time?

19   A.    Yes.

20   Q.    Do you ever have occasion where people use you for

21   transition or gap support to prolong the time before they

22   get an update for Oracle?

23   A.    I'm sorry, could you rephrase the question?

24   Q.    Poor question.  Let me try again.

25         Do you ever have an occasion where you're doing

```
 1    gap support for someone while they wait to get an upgrade

 2    from Oracle?

 3    A.    I'm not sure I still understand the question, I'm

 4    sorry.

 5    Q.    I'm not sure I understand it either.  Let's move on.

 6          But for those clients, when they sign on, you

 7    know that they're not going to be there long-term.

 8    A.    No, they're short-term, and that's why we call them

 9    gap, because they're using us to gap a timeframe between an

10    old system and a new system, yes.

11    Q.    Fair enough.

12          I now want to talk about a company called XO.

13    Are you familiar with a company called XO?

14    A.    XO Communications, yes.

15    Q.    Who is XO Communications?

16    A.    They're a fairly large telecommunications company.

17    Q.    And did there come a time where they became a client

18    of Rimini Street?

19    A.    Yes.

20    Q.    About what timeframe did that happen?

21    A.    In late 2008.

22    Q.    And do you recall the onboarding project for XO?

23    A.    Yes.

24    Q.    How is it that you recall that project?

25    A.    Well, I think it was the project that officially
```

1    ignited this legal battle between us and Oracle.

2    Q.    What makes you say that?

3    A.    Well, because at the time we were doing the archive

4    is when Oracle began shutting off our log-ins to do the

5    archiving, and that led to a whole explosion and eventually

6    the legal discussion between their lawyers and our lawyers.

7    Q.    And so you think that was the critical event?

8    A.    Yes, I do.

9    Q.    Mr. Ravin, Mr. Isaacson showed you a document during

10   cross-examination over one of the three days you were on

11   the stand with him, PTX 0482.

12              MR. WEBB:  Would you pull that up, please,

13   Marie?

14              THE WITNESS:  I'm sorry, is that in my binder?

15              MR. WEBB:  We'll have it on the screen for you

16   in a minute, Mr. Ravin.

17              THE WITNESS:  Okay.

18              MR. WEBB:  Can you go to page 3, and the second

19   paragraph, right there.

20   BY MR. WEBB:

21   Q.    Now, Mr. Ravin, do you recall discussing this

22   paragraph with Mr. Isaacson on cross-examination?

23   A.    Yes.

24              MR. WEBB:  Okay.  I want to show you something

25   that he didn't show you.  Let's go to the very next

1    paragraph, Marie.

2    BY MR. WEBB:

3    Q.    Tell the jury what this says.

4    A.    I'm sorry, you want me to read this?

5    Q.    Yeah, please read the first two sentences.

6    A.    "Therefore, we would appreciate your help to provide

7    a solution with Oracle related to downloads not only for

8    XO, but for our other client projects as well.  The intent

9    is not to create undue burden on your servers, but to

10   provide Oracle customers with a simpler mechanism to obtain

11   all the online content they are entitled to for their

12   licensed products."

13   Q.    This was an e-mail from one of your employees to

14   Oracle?

15   A.    Yes.  We were in communications with Oracle.

16   Q.    Was this an isolated event?

17   A.    No.  I mean, we had -- we had been in

18   communications, we had been ordering software, working with

19   the software fulfillment group at Oracle to get customer

20   software delivered, all those types of things.

21   Q.    At this time in 2008, had Oracle changed the rules

22   on its website to prohibit the use of automated means?

23   A.    Yes, back in 2007, yes.

24   Q.    And before we get into this more, was this like some

25   sort of a public announcement about the change in the use

1    of the automated tools?

2    A.    No, it was just in the online -- you know, click,

3    look up the documentation type of legalese, yes.

4    Q.    So when you access the website, it's in some of the

5    terms and conditions, and it said no more automated tools?

6    A.    Yes.

7    Q.    Okay.  So this is happening after that?

8    A.    Yes.

9    Q.    At this time with XO, are you using automated tools?

10   A.    Yes.

11   Q.    And do you remember the chart that Mr. Isaacson

12   showed with the spikes in activity?  Do you remember that?

13   A.    Yes.

14   Q.    Does that at all relate to this?

15   A.    I don't remember what the timeframe was that their

16   expert showed, but I just -- I just do remember that there

17   were spikes, yes.

18   Q.    And describe for the jury the extent of the

19   downloading being done for XO at this time.

20   A.    XO was a huge Siebel customer, and it was a large

21   amount of archive files for them.

22   Q.    And so there was a lot of downloading activity?

23   A.    Yes.

24   Q.    Using the automated tools?

25   A.    Yes.

1    Q.    And what did Oracle do in response to that activity?

2    A.    Well, as we saw in that document yesterday, they

3    started shutting off log-in IDs for us in the middle of

4    trying to download this huge amount of files and sent notes

5    to the customer saying that you've got some kind of illegal

6    activity going on.

7    Q.    And this e-mail was sent to Oracle in response to

8    them blocking your access?

9    A.    Yes.

10   Q.    And it says, "We would appreciate your help to

11   provide a solution with Oracle related downloads."

12   A.    Yes.

13   Q.    You were asking Oracle to help you find a solution?

14   A.    Yes.  We were hoping to work as business partners;

15   they provide the license to the customer, and we're

16   providing the service.

17   Q.    And it says for XO, but also for your "other client

18   projects, as well."  Do you see that in this document?

19   A.    Yes.

20   Q.    So at that time you were working for clients in

21   addition to XO?

22   A.    Yes, we had many clients coming to Rimini Street.

23   Q.    Then it goes on to say, "The intent is not to create

24   undue burden on your servers."  Do you see that?

25   A.    Yes.

1    Q.    Is that accurate?

2    A.    Yes.

3    Q.    What sort of steps did you take to make sure that

4    you're not going to overburden Oracle's servers?

5    A.    Well, we had made all sorts of arrangements.  Again,

6    we had many customers coming over, so we had a lot of

7    archiving projects underway.

8              And we had taken steps to purposely slow down

9    the archive so that they would not put so much pressure on

10   Oracle's computer systems, but we still had to get the

11   material the customers were entitled to.  So we actually

12   implemented purposeful slowdowns built into the process.

13             I also instructed the team to work on nights and

14   weekends around sort of the peak periods when we felt the

15   server pressure would be the most on Oracle from other

16   customers.

17             So we were trying to work around that, again,

18   all trying to minimize the impact on Oracle servers.

19   Q.    And in the event that your downloading would have

20   crashed the servers or harmed them, how could you have

21   finished your job?

22   A.    Well, we couldn't have.  There was no benefit for us

23   to crash a server we're trying to get information from.

24             So we took as many steps as we felt we could to

25   minimize, but we still -- these customers had a right to

1     the material.

2              And we had a window.  We had to get it done

3     before their maintenance end date.

4              So we had to balance getting the information the

5     customers were entitled to -- this was the only way Oracle

6     was giving us as a method to download all these files, and

7     so we had to do that.

8     Q.    In addition to contacting Oracle and requesting

9     their assistance, did you do anything else?

10    A.    In terms of -- I'm sorry?

11    Q.    In terms of contacting anyone about this issue.

12    A.    Well, we actually -- we contacted the customer and

13    asked for their help.

14    Q.    And the customer again is who?

15    A.    XO Communications.

16    Q.    Do you know if they did anything?

17    A.    Yes.  XO was very upset that Oracle was interfering

18    with our ability to download the software per their

19    rights --

20              MR. ISAACSON:  Objection, Your Honor, hearsay.

21              THE COURT:  Sustained.

22    BY MR. WEBB:

23    Q.    Mr. Ravin, did Oracle ultimately allow Rimini Street

24    to complete the project?

25    A.    Yes.

1    Q.    I'm going to bring back up the PeopleSoft contract

2    with Brazoria County that we talked about yesterday, it's

3    PTX 3726.

4              I won't belabor this very long, Mr. Ravin, but

5    there are a couple of other provisions I'd like to talk

6    about as they pertain to your understanding at the time.

7              MR. WEBB:  First one, Marie, would be 1.2c.

8    It's on the first page.

9    BY MR. WEBB:

10    Q.    Again, just to set the stage here, Mr. Ravin, this

11    is the agreement between PeopleSoft and Brazoria County in

12    1998, and section 1.2c says,

13              "The licensee may:  Modify or merge the software

14    with other software, with the understanding that any

15    modifications, however extensive, shall not diminish

16    PeopleSoft's title or interest in the software."

17              Do you see that?

18    A.    Yes.

19    Q.    To what extent, if any, did that provision provide

20    any basis for your belief that what you were doing was

21    permissible?

22    A.    Well, this -- it was fairly standard contract terms

23    from my memory and work all the years at PeopleSoft and my

24    negotiations, and this was the provision we gave customers

25    to allow them to make modifications and customize their

774

```
 1    software, change configurations, do whatever they want to

 2    the software with the source code, with the understanding

 3    no matter how you change it, it still belongs to PeopleSoft

 4    or now Oracle.

 5    Q.    When this software is shipped to the client, is it

 6    capable of being modified?

 7    A.    Yes.  There are parts that come with source code,

 8    which is the code that you can make changes to.

 9              And there are parts that come with areas that

10    can't be changed, like we talked about some of the security

11    areas where there's no ability for us to make a change

12    because only Oracle can.

13    Q.    When this software shipped, does Oracle provide any

14    tools the client can use to make changes to the software?

15    A.    Yes.  The products -- and, again, different -- by

16    different products.  But, for example, PeopleSoft comes

17    with an entire toolkit designed to help people make changes

18    to the software, yes.

19    Q.    In your experience in this industry, can you make

20    changes or modifications to software when it's running, as

21    a production company?

22    A.    Well, you can, but you'd never want to do that.

23    Q.    Why?

24    A.    Well, because, again, it's like servicing a car

25    while it's running at 60 miles an hour.  You wouldn't do
```

1     that because you have to be very, very careful.

2              The production system is what's actually

3     running, and in these large corporations they could be

4     doing thousands of transactions a hour.

5              So if you mess something up, you could have a

6     real problem.  You could idle, you know, thousands of

7     workers around the world who can't do their job when the

8     computer goes down.

9              So everything has to be done in test systems,

10    development systems, and rigorous -- most companies have

11    very, very rigorous schedules for how production changes

12    are made.  They're actually scheduled because it's a very

13    big deal to change a production system.

14             MR. WEBB:  Now, let's go to -- towards the end

15    of the document.  Marie, it's paragraph 16 under the

16    heading Definition in the second column for "Software."

17             On the right-hand side there.  We just need the

18    first half, Marie.  That's fine.

19    BY MR. WEBB:

20    Q.   All right.  It says here, again in the definitions,

21    when this agreement talks about software, it defines it as,

22             "'Software' means all or any portion of the then

23    commercially available global version," apostrophe S close

24    parentheses -- I'm sorry, parentheses close parentheses --

25    "of the binary computer software programs and enhancements

776

1    thereto."

2          Do you see that?

3    A.    Yes.

4    Q.    To what extent did that provision, if at all, inform

5    your belief that what you were doing was proper as it

6    pertains to the word "version"?

7    A.    Well, this, again -- I mean, no matter -- no matter

8    what product the customer is licensed for, then they get

9    license to particular versions.

10          And, again, when we talk about making sure a

11   customer doesn't get access to something that they're not

12   entitled to, this is going to be important because, if a

13   customer, for example, was still on maintenance when an 8.1

14   was available but not 8.2, they don't get 8.2.

15          Even if another customer joins us a year later

16   and has 8.2, the old customer that left earlier doesn't get

17   that.

18   Q.    Okay.  We're going to go to a new topic, Mr. Ravin,

19   the deletion of the software library.

20          Do you remember talking about that with

21   Mr. Isaacson?

22   A.    Yes.

23   Q.    All right.  You don't dispute that you had -- that

24   Rimini Street had Oracle software on their servers.

25   A.    No, not at all.

777

1    Q.    So I'd like to add some clarity to the dust-up you

2    had with Mr. Isaacson on this.

3              In your mind, when they accused you of

4    stockpiling software to create the library, what did you

5    think the library meant?

6    A.    You mean from their allegations?

7    Q.    Yes?

8    A.    I think their allegation was that we were

9    downloading all sorts of software in order to be able to

10   hand it out to customers who weren't entitled to it.

11   Q.    So when you think of the word library in that

12   context, what comes to your mind?

13   A.    I'm sorry.  Can you rephrase it?

14   Q.    When you think of the word library in that context,

15   what comes to your mind?

16   A.    Well, I think that's -- in my mind, the way that

17   they were saying it, it was sort of like we were creating a

18   free-for-all that, handing out of the back of a trunk,

19   anyone who wanted Oracle software didn't pay for it.

20   Q.    And is that in truth what happens at Rimini Street?

21   A.    Not at all.

22   Q.    But there was a directory that had software that was

23   used to clone environments?

24   A.    Yes, there was, indeed.

25   Q.    Describe the process someone had to go through to

1    actually get access to that software in that directory.

2    A.    Well, they had to be at Rimini Street, they had to

3    be key engineers.

4              They had to make sure that a customer was

5    licensed for certain products that we build into those

6    environments.

7              These were all -- and, again, over time we

8    created even more security mechanisms in terms of those

9    items, and then eventually, of course, stopped using it

10   altogether in terms of any of those directories.

11             MR. WEBB:  I'm going to show on the screen,

12   Mr. Ravin, PTX 63, which I believe is preadmitted.

13             COURTROOM ADMINISTRATOR:  Yes.

14             MR. WEBB:  Marie, could you pull up PTX 63.

15             Okay.  Let's go on the back of that page, page

16   2.

17   BY MR. WEBB:

18   Q.    All right.  So this is an e-mail to Dennis Chiu from

19   Krista Williams.  Again, remind the jury who Dennis Chiu

20   is.

21   A.    Dennis Chiu was a vice-president running support.

22   Q.    And who is Krista Williams?

23   A.    She was in charge of the environments, client

24   environments.

25   Q.    And this is dated January 12, 2010.  Had the lawsuit

1    been filed, this lawsuit, by January 12, 2010?

2    A.    Yes, a couple years already.

3    Q.    No, no.  Had this lawsuit been filed January 12,

4    2010?

5    A.    This lawsuit was filed January 2010, yes.

6    Q.    Was this e-mail before or after the filing of the

7    lawsuit, Mr. Ravin?

8    A.    I'm sorry, I can't see the date.

9    Q.    It's on the other page, January 12, 2010.

10   A.    I'm sorry, I can't read it.  I'm sorry, I don't know

11   the exact date that the litigation was filed.

12   Q.    We can bring that to you later, but let's go ahead

13   and talk about this document?

14   A.    Yes.

15   Q.    She says,

16             "Dennis, as I was looking for the Liz Claiborne

17   updates, I found this repository of software.  Back when we

18   were cloning environments, this served as a sort of

19   software media library."

20             Do you see that?

21   A.    Yes.

22   Q.    Then she goes on,

23             "So long as the customer was licensed, it was

24   okay to use this media from here without necessarily

25   copying the customer media around the network for the

1    build."

2     A.     Yes.

3     Q.     So at that time, in January of 2010, Rimini Street

4    was no longer cloning.

5     A.     That's correct.  We had stopped that a while back

6    and were using and reinstalling all those DVDs each

7    separate time.

8     Q.     And she says back when that was happening, "this

9    served as a sort of software media library."

10          Do you see that?

11    A.     Yes.

12    Q.     So clearly at least some people called this

13   directory a library?

14    A.     Yes.

15    Q.     But not the library in your terms of how you think

16   of a library.

17    A.     Correct, not the way it was alleged in Oracle's

18   complaint.

19    Q.     She goes on,

20          "So long as the customer was licensed, it was

21   okay to use this media here without necessarily copying the

22   customer media."

23    A.     Yes, that's what cloning was all about.

24    Q.     So it's consistent with your understanding of the

25   practice that used to be done at Rimini Street called

1   cloning?

2   A.   Yes.

3   Q.   And this would be the software directory that had

4   the software that would be cloned?

5   A.   Right, yes.

6   Q.   Okay.  Then at the end she says,

7           "Should I ask IT to clear it out to help reclaim

8   space for the ftp folders?"

9           Do you see that?

10  A.   Yes.

11  Q.   What are ftp folders?

12  A.   Well, these were areas where we would be

13  communicating back and forth and moving files to customers,

14  those things that we talked about in terms of deliverables,

15  in order for the customer to take it and apply it to their

16  production systems.

17          So the ftp was how we -- file transfer protocol,

18  sorry for another jargon here.

19          But essentially that's the place we would --

20  directories we would move things back and forth to

21  customers.

22  Q.   She says to clear it out to reclaim space.  Space

23  where?

24  A.   That would be space on our servers.

25  Q.   Why is that such a big deal?

1    A.    Space is very expensive.  I think, as anyone who has

2   probably ever ran out of space on their iPhone or

3   otherwise, knows, if you run out of space, you can't store

4   anything.

5           So -- and when we're talking about taking up

6   large amounts of space for customer's files and

7   environments, you definitely do not want to have things on

8   the system that you don't need.

9    Q.    At this time was Rimini Street using that directory

10   of software?

11   A.    No.  I think as she points out, we had stopped using

12   that a long time ago.

13          MR. WEBB:  Okay.  Marie, can you now pull up DTX

14   407.

15          COURTROOM ADMINISTRATOR:  407?

16          MR. WEBB:  407.  I believe it's preadmitted.

17          I'm sorry, DTX 407.

18          COURTROOM ADMINISTRATOR:  I have it as

19   withdrawn.  I'm sorry.  Excuse me.  DTX.

20          MR. WEBB:  Mr. Ravin, you see on the screen

21   before you Defendants' Exhibit DTX 407.

22          Can you blow that up a little bit, Marie.

23   BY MR. WEBB:

24   Q.    Tell the jury what we're looking at here.

25   A.    This appears to be a picture of the directories that

1    were deleted.

2    Q.    Okay.  So in response to the e-mail from

3    Ms. Williams, the directory of software was, in fact,

4    deleted.

5    A.    That's my understanding, yes.

6    Q.    And why do we have this?

7    A.    I guess before they deleted it, they took a picture

8    of it so that they would know what was in the files.

9    Q.    And --

10             MR. ISAACSON:  Your Honor, I move to strike

11   guesswork.

12             MR. WEBB:  Let me rephrase the question, your

13   Honor.

14             THE COURT:  The objection is sustained.  The

15   jury will disregard the testimony.

16   BY MR. WEBB:

17   Q.    Mr. Ravin, do you know what this is?

18   A.    Yes, this is the picture of the directories that

19   were deleted.

20             MR. WEBB:  Marie, could you pull up DTX 400.

21             COURTROOM ADMINISTRATOR:  It's preadmitted.

22             MR. WEBB:  Thank you.

23   BY MR. WEBB:

24   Q.    Mr. Ravin, at the bottom of that e-mail --

25             MR. WEBB:  Could you highlight that, Marie.

1    BY MR. WEBB:

2    Q.    This is on the same date.  It says, "Krista, I think

3    you forgot to attach the picture.  Chris Galzote."

4              Who is Chris Galzote?

5    A.    Chris Galzote is one of our IT engineers who

6    oversees the servers.

7              MR. WEBB:  Let's go to the top of the document.

8              Would you highlight that.  Thank you.

9    BY MR. WEBB:

10   Q.    In response to Chris saying where's the picture,

11   Krista responds on the 13th,

12              "Weird.  I attached the picture before I typed

13   the details into the window.  Here's a copy.  Sorry for the

14   trouble."

15              Do you see that, Mr. Ravin?

16   A.    Yes.

17   Q.    And this directory was the subject of the Court's

18   order regarding maintaining evidence; correct?

19   A.    Yes.  This should have been maintained.

20   Q.    All right.  Let's talk about that.  Did Rimini

21   Street do anything prior to this lawsuit being filed to

22   preserve documents?

23   A.    Yes.

24   Q.    What did you do?

25   A.    Well, we talked about before that, as things seemed

1    to be heating up with Oracle, we put in place a litigation

2    hold which essentially told the company do not delete

3    anything that might be relevant in discovery.  If we get

4    into a legal battle with Oracle, we're going to be

5    obligated to turn over documents, and they'll turn

6    documents over to us.  That's the legal process for

7    discovery.

8              So we have an obligation to preserve material

9    that could be relevant in helping a court and a jury figure

10   out what actually happened and make decisions.

11             So we were supposed to preserve anything

12   relevant.

13   Q.    And so there was a mistake made on this.

14   A.    Definitely, yes.

15             MR. ISAACSON:  Objection, foundation, Your

16   Honor.

17             THE COURT:  Sustained.

18   BY MR. WEBB:

19   Q.    Do you understand as to whether or not this

20   directory should have been deleted before this litigation

21   was filed?

22   A.    Based on the relevance, no -- it shouldn't have been

23   deleted.

24   Q.    And how did these documents that we just discussed

25   get into the hands of Oracle?

1     A.      We provided those documents to Oracle.

2     Q.      Mr. Ravin, are you aware of any evidence or

3     documents or statements or information that a customer

4     signed up with Rimini Street because it locally hosted

5     environments?

6     A.      No.

7     Q.      Are you aware of any evidence, statements,

8     information of any kind that a customer signed up with

9     Rimini Street because it cloned environments?

10    A.      No.

11    Q.      Are you aware of any information, statements,

12    documents, anything, that a Rimini Street customer signed

13    up with Rimini Street because you would use one tax update

14    for another client?

15    A.      No.

16    Q.      During cross-examination with Mr. Isaacson over the

17    last several days, did you see any document saying a

18    customer joined your company because of any of those

19    processes?

20              MR. ISAACSON:  Objection, Your Honor.

21              THE COURT:  Sustained.

22    BY MR. WEBB:

23    Q.      Are you aware of any evidence, documents, statement,

24    or information of any kind, that any of Rimini Street's

25    clients would have stayed with Oracle if Rimini Street

1    didn't exist?

2     A.    No.

3            MR. WEBB:  That's all the questions I have for

4    this witness, Your Honor.  Thank you very much.

5            THE COURT:  All right.  Thank you.

6            Redirect examination.

7                    REDIRECT EXAMINATION

8    BY MR. ISAACSON:

9     Q.    Good morning.

10    A.    Good morning.

11    Q.    Mr. Ravin, you said during your testimony with your

12   counsel that Rimini assigns a primary support engineer to

13   each of your customers; is that right?

14    A.    Yes.

15    Q.    That's the correct term, primary support engineer?

16    A.    Yes.

17    Q.    All right.  If we can look at PTX 1432, which is in

18   your binder.  That's also been preadmitted, and it will be

19   on your screen as well, Mr. Ravin.

20           This is a document back from September 21st,

21   2006 --

22           COURTROOM ADMINISTRATOR:  I don't have that

23   preadmitted.

24           MR. ISAACSON:  Well, I move to admit 1432, just

25   in case.

```
 1                 COURTROOM ADMINISTRATOR:  1432?

 2                 MR. ISAACSON:  Yes, 1432.

 3                 COURTROOM ADMINISTRATOR:  I'm sorry.  1432.

 4     Okay.

 5                 MR. ISAACSON:  Yes, it is preadmitted?

 6                 COURTROOM ADMINISTRATOR:  Yes, it is.

 7     BY MR. ISAACSON:

 8     Q.    So the relevant date here is September 21st, 2006,

 9     and you're about a year old at this point; right?

10     A.    Yes, right about a year.

11     Q.    Okay.  And if we look at the second page, there's a

12     list of your accounts.  There's five of them listed.

13     You're not listing Leads Customer Growth at this point

14     because they're not receiving any service; right?

15     A.    Yes, since they hadn't moved forward with their

16     implementation.

17                 MR. WEBB:  Your Honor, I'm going to object.

18     This witness neither offered nor received this document.

19                 MR. ISAACSON:  I don't have a question pending.

20     BY MR. ISAACSON:

21     Q.    You'll see on page 2 there's a list of these five

22     clients, and there's a list for the primary support

23     engineer for each of those clients?

24     A.    Yes, I see that column.

25     Q.    And you'll see that for four of them there's one
```

```
 1   person, Ola Bola whose name we've mentioned before, and for

 2   one of the clients it's John Whittenbarger.  Is that

 3   correct information?

 4   A.    I wouldn't recollect whether that was correct or

 5   not.  I just see what's on the page.

 6   Q.    Okay.  Now, at the very -- in your first year of

 7   operation, it is correct that Ola Bola was the primary

 8   engineer for all but one of your clients; correct?

 9   A.    For the Siebel, I would imagine so.  She was a

10   Siebel engineer.

11   Q.    Right.  And she was the one who we saw had Siebel

12   software on her laptop so she could support these

13   customers; right?

14   A.    I think we had seen that in a document where it said

15   that, yes.

16   Q.    Okay.  Now, let's move forward to March of 2007.

17   Let's look at PTX 1460.

18   A.    Okay.  I'm there.

19              COURTROOM ADMINISTRATOR:  Previously admitted.

20              MR. ISAACSON:  Yes.

21   BY MR. ISAACSON:

22   Q.    So this is an e-mail exchange between you and

23   Mr. Lester with copies to some of your other folks.  Do you

24   see that?

25   A.    Yes.
```

1    Q.    All right.  And at the bottom of the first page you

2    say to Mr. Lester -- again this is March of 2007, we were

3    just looking at September of 2006, so we're moving forward

4    about six months.

5              And you say, "George, I need to spend a few

6    minutes with you and some other folks to understand the

7    scaling model for PeopleSoft tech engineers."

8              Scaling model refers to how many support

9    engineers you're going to have for each one of your

10   PeopleSoft customers; correct?

11   A.    Actually, the opposite.

12   Q.    Oh, okay.

13   A.    How many -- how many customers each engineer would

14   be supporting.

15   Q.    Yes.  Right.  Yes, thank you.

16             And you say, "Our goal on the PeopleSoft

17   functional side will be at least 10-to-1 ratio of clients

18   to engineers."

19             Your goal is going to have one primary support

20   engineer servicing 10 customers, right?

21   A.    Yes, that was the goal early on.

22   Q.    Mr. Lester responds to you at the top, he says --

23   you don't just have clients, you have clients with multiple

24   environments.

25             He says,

1          "Since clients can have many environments," and

2     he lists them, "I recommend we derive a support ratio based

3     on engagements per engineer to better reflect the

4     workload."

5          And he talks about,

6          "We have an engagement to PeopleSoft Tech

7     Support Engineer ratio of 10-to-3, or really a 10-to-2

8     ratio as I am trying to focus more of on my time on IT."

9          That was a correct statement of your ratios

10    then; right?

11    A.   I don't recollect exactly, but I'm sure George knew

12    at the time.

13    Q.   Right.  And he goes on to say,

14         "A PeopleSoft technology support engineer could

15    support 50 names.  I have seen the ratio as high as

16    89-to-1, but that was really pushing it."

17         He was saying that you should be moving towards

18    a ratio of engagements or environments to engineers of

19    50-to-1; right?

20    A.   Yeah, 50 engagements he says, yes.

21    Q.   Right.  And he says, and if you need engineers to

22    build environments for $60,000, we won't find them in the

23    United States, but we can find them overseas?

24    A.   Yes, that's what he says.

25    Q.   All right.  And then if we move to -- let's move

1   forward to the next year, April 2008, Plaintiffs'

2   Exhibit 33.

3              So we've looked at 2006, 2007, 2000 -- and now

4   we're in April 2008.  This has been preadmitted.

5              COURTROOM ADMINISTRATOR:  Which number?  I'm

6   sorry.

7              MR. ISAACSON:  This is 33.

8              COURTROOM ADMINISTRATOR:  Thirty-three.

9   BY MR. ISAACSON:

10  Q.   And here, in Plaintiffs' Exhibit 33, Mr. Chiu is

11  talking about Medtronic, your first JDE client; right?

12  A.   Actually, I don't recollect whether that was our

13  first client or not.

14  Q.   Okay.  Well, I think your lawyers will tell you they

15  are, but it doesn't matter for this purpose.

16             The -- on page 1 at the bottom, Mr. Chiu says to

17  Mr. Davichick, who is the head of sales -- oh, and he says

18  it to you as well, all right?  He's writing to you.

19             "The other topic of importance was our bench

20  strength.  She," referring to Medtronic, "asked me how many

21  other people would be part of their support team, leading

22  me to tap dance by telling her how important it was to have

23  Barb as the primary, but that she could call upon the

24  others on the team for subject matter expertise.  She might

25  have sensed I hedged at any firm numbers, but emphasized

1    that her director felt it was important to know how much

2    bench strength we had to support them.  I told her I

3    understood and we'd make sure they had all the help they'd

4    needed from us, since this was the million dollar question

5    that I didn't have the answer to."

6              At this point you were -- Mr. Chiu, your

7    vice-president, was not comfortable telling clients the

8    depth of your engineer support team; right?

9    A.    Well, sounds like we were still pretty shy in doing

10   a tap dance because we're a small, young company trying to

11   win a big account.

12   Q.    Right.  At this time, you're about two years old;

13   right?

14   A.    But you said this was our first JDE client, and Barb

15   was the JDE resource, so we may have been very small in

16   JDE.

17   Q.    Right.  And you are not telling them what your bench

18   strength is, and you don't want the client to know, and

19   that's being reported to you, right?

20   A.    No, it sounds like, again, a small company trying to

21   win a big account, and we're going to tap dance trying to

22   look bigger than we are.

23   Q.    All right.  Let's look at, later in 2008, PTX 1599.

24              All right.  This is now July 18th, 2008, and

25   this is an e-mail you're writing to the senior executives

1    and your co founder of Rimini Street; right?

2              I mean, not a letter, an e-mail.

3    A.    Yes, I see that.

4    Q.    Okay.  And you say,

5              "We have developed a resource allocation

6    challenge with technical PeopleSoft resources."

7              You're now talking about PeopleSoft; right?

8    A.    Yes.

9    Q.    All right.  And you say,

10             "All the great PS tech resources we have are now

11   allocated to Environment Build Group or IT."

12             The environmental build group is the group

13   that's building the environments, and IT is IT; right?

14   A.    That's a good way to put it, yes.

15   Q.    And you say that's,

16             "Leaving us no PeopleSoft techs to work cases

17   with the PeopleSoft engineers" -- I'm sorry, "the primary

18   support engineers."

19             So the primary support engineers are not having

20   PeopleSoft techs to work with them, is that what you're

21   saying?

22   A.    Yes, saying we're resource constrained, we're

23   growing and need more people.

24   Q.    Well, actually, you say something kind of different

25   than that, don't you, sir, because at the bottom you say,

1              "Hiring is always the easy answer, but we have

2      to limit headcount to get scale and profitability."

3              In fact, you're trying to develop a strategy

4      where you can handle all this work without actually

5      increasing your hiring; correct?

6      A.    That's what scaling means, without doing hiring.  It

7      just means trying to get both, yes.

8              MR. ISAACSON:  5356 which has -- please don't

9      show it on the screen.  I would move to admit PTX 5356.

10             MR. WEBB:  No objection, Your Honor.

11             THE COURT:  It's admitted.

12         (Plaintiffs' Exhibit 5356 received into

13         evidence.)

14     BY MR. ISAACSON:

15     Q.    This is one of those instant messages.  Now we're

16     into 2009, November 16, 2009.  It's between Tim Conley and

17     someone unknown.

18             Tim Conley was the head of the PeopleSoft

19     development team; correct?

20     A.    No, I don't believe so.

21     Q.    All right.  What do you think he was?

22     A.    I think he was just a developer on the PeopleSoft

23     team.

24             MR. ISAACSON:  The "unknown" in the middle of

25     the page says, "The cases just keep on coming."  Can you

1    find that, Matt?  23 -- 23:44 time signature.  There we go.

2    BY MR. ISAACSON:

3    Q.    "The cases just keep on coming." "Not sure what to

4    do."

5              Mr. Conley says, "Tell you" -- "Tell you manager

6    that the feel the caseload is too great for one person.

7    Tell her you don't think that one person can adequately

8    represent RSI to JBH."

9              It goes on, Tim Conley,

10             "You need to make it formal."

11             "It needs to move up the chain.  Someone higher

12   up needs to know about this."

13             And Unknown responds, "It just feels like I'm in

14   had a no win situation."

15             Conley says, "Blow the whistle.  They can't keep

16   this hidden any longer. "

17             Are you aware of the issue that was being raised

18   by Mr. Conley with this unknown individual?

19   A.    I don't know who unknown is, so, number one, I can't

20   answer that.

21             But, two, we had constraints --

22   Q.    That's not my question, sir.

23             THE COURT:  Mr. Ravin, you need to listen to the

24   question and just answer the question.  You seem to be

25   giving explanations that go well beyond the answer called

1   for, and I'm going to limit you to responding to the

2   question.

3               THE WITNESS:  Yes, sir.

4   BY MR. ISAACSON:

5   Q.    My question was, are you aware of the issues in this

6   instant message, and specifically Mr. Conley talking to

7   someone about blowing the whistle about the case loads

8   being too great?

9   A.    No.

10  Q.    Okay.  Now, you talked about you produced documents

11  in discovery to Oracle.  Now, that's -- in this lawsuit.

12  Now, that's because Oracle gave you written discovery

13  requests, and if you didn't comply with them, you would be

14  potentially ordered by the Court to produce them; correct?

15  A.    Yes.

16  Q.    This is one of those documents; correct?

17  A.    My understanding is this was produced, yes.

18  Q.    All right.  And this document talks -- you've got an

19  engineer, who we believe to be a team head, but you just

20  believe to be an engineer, who is talking about telling

21  someone to blow the whistle, they can't keep this hidden

22  any longer, he's talking about this to someone unknown.

23               Have you or anyone looked into who this unknown

24  person was or followed up on this issue?

25  A.    I have not.

1    Q.    Let's look a little later.  That's actually that

2    same month in 2009, Plaintiffs' Exhibit 605.

3                COURTROOM ADMINISTRATOR:  Preadmitted?

4                MR. ISAACSON:  Yes.  This has been admitted.

5    I'm sorry for not saying that.

6    BY MR. ISAACSON:

7    Q.    This is the same month as that instant message.

8                Now, we have Mr. Benge and Mr. Slepko, who are

9    two senior executives with your company; correct?

10   A.    Yes.

11   Q.    All right.  And Mr. Benge is writing to Mr. Slepko

12   on November 18th, 2009, at the top.

13                "As a confidential side note, when I pinged Ed

14   Freeman about this issue earlier today" -- he is one of

15   your engineers, correct, Mr. Freeman?

16   A.    Yes.

17   Q.    "He said he was working a couple other cases and

18   doing two builds.  Quote:  'We need more staff'" quote,

19   "and," quote, "'seeing that we've got a security team the

20   same size as the PeopleSoft's environmental team made me

21   laugh/cry.'"

22                All right.  Your lack of resources to support

23   these customers continued into late 2009; right?

24   A.    Yes.

25   Q.    The remote environments, you talked about the remote

1    environments which are the customer and the local

2    environments which are at Rimini.

3              Now, from 2006 to 2011, I believe it's your

4    testimony that you had remote environments; correct?

5    A.    Yes.

6    Q.    You had general testing and development environments

7    at Rimini?

8    A.    Yes.

9    Q.    And you created updates for one client and gave it

10   to other clients you believed had the same license, and you

11   did that from environments at Rimini?

12   A.    Yes.

13   Q.    And, specifically, one customer software environment

14   at Rimini was used to development a fix or update that was

15   ultimately delivered to a different customer; correct?

16   A.    Yes.

17   Q.    Now, in fact, when you had remote environments and

18   environments at Rimini providing updates, your remote

19   clients are not supported in a completely remote manner.

20   You create updates centrally at Rimini, and then you

21   deliver them to the remote environments; correct?

22   A.    Yes.

23   Q.    Now, about these remote environments.  Would you

24   look at PTX 495.

25              PTX 495 is dated April 11th, 2007.  It's between

1      Ms. Lester and Mr. Davichick.  So this is one of your

2      executives talking to your head of sales; right?

3      A.    Yes, that's true.

4      Q.    All right.  And if we go to page 2 -- all right.

5      Well, let's actually start at page 3 so we understand the

6      full context.

7              Beth Lester writes at the top,

8              "While it's still unclear to me where Moraine

9      got the idea that remote development is one of our service

10     options, I understand the need to make this work and am

11     committed to guiding the team through successful deliveries

12     in this manner."

13             Then on the next page you reply to Beth Lester;

14     right?

15     A.    I'm sorry.  Can you highlight the area?

16     Q.    On page 2, you reply to Beth Lester?

17     A.    Yes.

18     Q.    Okay.  And now, at this point, I think it was your

19     testimony to your counsel that this -- whether you were

20     going to go remote or on the Rimini environment, that was a

21     client option, and you might urge them a little bit, but it

22     was ultimately a client option.

23             Is that a summary of your testimony?

24     A.    Yes.

25     Q.    Okay.  Now, what you wrote here to Beth Lester is

1    that -- at the top,

2              "The remote dev/test system option is neither

3    ideal, pushed as preference, or to be promoted as a

4    'whatever you want to do' option to clients."

5              Okay?

6              You are instructing Beth Lester, and then your

7    head of sales, that you are not to promote remote

8    environments as a "whatever you want to do" option to

9    clients; correct?

10   A.    That's what it says, yes.

11   Q.    Okay.  And moving down to where it says, "This

12   remote deal is NOT," in all capital letters?

13             Now, this is talking about this customer,

14   Moraine, who is indicating an interest in remote, you say,

15             "This remote deal is NOT," all capital letters,

16   "intended to be any kind of strategic change of model, but

17   is a one-off project that we will try to minimize as a last

18   resort for other client opportunities."

19             That was your business model, remote

20   environments were a last resort, and that was the

21   instruction to the sales team, correct?

22   A.    Yes, that's what I wrote.

23   Q.    Okay.  And in terms of how you were going to go

24   about doing this, let's move down to the next paragraph.

25   In the middle, "Rich, Mike, and I."

802

```
 1              So Mike is Mike Davichick.  Who is Rich?  Who is

 2    Rich in this --

 3    A.    Oh, I'm sorry.

 4    Q.    "Rich, Mike and I."  So that's Mike Davichick, you

 5    and --

 6    A.    Rich Hughes, which was a sales rep.

 7    Q.    So the three of you,

 8              "Will look to convince them," Moraine, "that

 9    their license does not have these location restrictions and

10    ultimately (hopefully) prevail on them for a change to our

11    preferred model."

12              So you were telling customers, in order to

13    convince them to bring their -- to bring the Oracle

14    software onto the Rimini system, that there was no location

15    restriction in the license; correct?

16    A.    Related to Moraine Park, yes.

17    Q.    Okay.  The -- well, let's talk about that.

18              Well, actually, one thing before we do that.

19              Now, you have said -- you said yesterday, and

20    you just said to me now, that you have -- that you take

21    updates that you -- that you create at Rimini, and then you

22    use those updates for other clients.

23              And that's what you said yesterday, is we reused

24    those fixes and updates all the time.  That was your

25    testimony yesterday; right?
```

803

```
1    A.    I don't remember what I said all the time, but it
2    was fairly frequent, yes.
3    Q.    Okay.  Well, the transcript says that your counsel
4    asked this question.
5              "Taking an update that you created, your
6    engineers created, and then using that update for other
7    clients with the same version of contract or license, do
8    you deny that you have done all that?
9              "No.  We reused it all the time, yes."
10             You reused it all the time, right, the fixes and
11   updates?
12   A.    As needed and appropriate, yes.
13   Q.    Now, sir, that is the first time that you have
14   admitted that under oath, isn't it?  You have previously
15   denied that under oath.
16   A.    No.
17   Q.    Okay.  At your deposition in 2010, do you recall
18   that you denied that there was any use of software
19   environments to develop a fix or update that was ultimately
20   delivered to a different customer?
21   A.    And I said no.
22   Q.    That's right.  Now, so in 2010, under oath, you were
23   asked,
24             "Has it ever occurred that one customer's
25   software environment has been used to develop a fix or
```

1    update that was ultimately delivered to a different

2    customer?"

3             And, as you said, you said no.

4             Now, you're saying it happened all the time;

5    right?

6    A.    No.

7    Q.    Okay.  You just told me a few moments ago that you

8    used one customer's software environment to develop a fix

9    or update that was ultimately delivered to a different

10    customer.  You said that two minutes ago.

11    A.    Right.  We're talking about, again, the difference

12    between the vanilla environments and custom environments.

13             MR. ISAACSON:  All right.  I'd like to play the

14    deposition testimony so that the jury can see it, Your

15    Honor.  It's at the July 21st, 2010, deposition at 303,

16    beginning at line 9.

17             THE COURT:  You may do so.

18         (Videotape deposition of Seth Ravin played

19         PAGE 303:09 TO 303:17 RUNNING 00:00:28.961)

20         "MR. HOWARD:  Q.  Does Rimini Street ever

21      use software that was originally obtained from one

22      customer to assist in supporting a different

23      customer?

24        "A.    No.

25        "Q.    Has it ever occurred that one

1        customer's software environment has been used to

2        develop a fix or update that was ultimately delivered

3        to a different customer?

4        (PAGE 303:19 TO 303:19 RUNNING 00:00:01.054)

5           "THE WITNESS:    No."

6   BY MR. ISAACSON:

7   Q.    All right.  You didn't say it happened with

8   customized environments and not vanilla environments or

9   vice versa.  You were asked, has it ever occurred, and

10  under oath you said no.

11          And beginning yesterday, you said it happened

12  all the time.  That's what's going on here.  Isn't it?

13  A.    No.

14  Q.    Now, two days ago, Wednesday, I asked you the

15  question,

16          "At Rimini Street, were you using the

17  environments of Client A to create fixes that you then

18  distributed to Client B and C?"

19          And I asked Judge Hicks to instruct you to

20  answer that question, and he asked me to repeat the

21  question, and I did.

22          And in response to the question, "So at Rimini

23  Street, you were using the environments of Client A to

24  create fixes that you then distributed to Client B and C,"

25  you said no, the same thing you said in your deposition in

1    2010.

2              Thursday, yesterday, in response to questions

3    from your client, is the first time that you have disclosed

4    and admitted that you were using fixes and updates and

5    creating them at Rimini and using them for other clients;

6    right?

7    A.    No.  Again, if I'm permitted to answer in a wider

8    way?

9    Q.    I'll let your counsel do that with you.

10             Now, your counsel showed you a number of awards

11   that your company has won and used that in opening

12   statement, I believe.

13             Do you remember seeing that?

14   A.    Actually, I don't remember the slide.

15   Q.    The -- then let me move on to the license agreement.

16   3726.  I spent some time on this with your counsel.

17             You and your counsel talked about this as the

18   Brazoria license; right?

19   A.    Yes, this looks to be -- yes, it looks to be.

20   Q.    Right.  It's the exact document that your counsel --

21   that you were testifying about with your counsel.  You said

22   this is the Brazoria agreement?

23   A.    Yes.

24   Q.    All right.  So page 3, 14.2, I just want to point

25   you to some language here.  This has been shown in opening

1    and shown multiple times to you.

2                "Licensee may provide access to and use of the

3    software."

4                Now, it's the Court's responsibility to instruct

5    on the law and the license agreement and what that means.

6    So I'm not going to talk about that.

7                But you have said what you think these things

8    mean.  So I'm just going to talk to you about what you

9    thought these things meant back then.

10               And you said -- there's the term there "access

11   to and use of."  But that provision doesn't mention

12   copying, does it?

13   A.    Does not explicitly say the word copy.

14   Q.    And when you say it does not explicitly say it, that

15   means it doesn't say it?

16   A.    Yes.

17   Q.    All right.  Let's go to page --

18   A.    Yes, I'm sorry.

19   Q.    Let's go to page 1, section 2, License Exclusions.

20               "Except as expressly authorized herein,

21   licensee" -- now, that would be Brazoria.  Licensee is

22   Brazoria; right?

23   A.    Yes.

24   Q.    That's the one you say you stand in the shoes of?

25   A.    Yes.

1   Q.   Okay.  "Licensee shall not, A, copy the software."

2   Right?  So unless you've got express permission to copy the

3   software, you can't copy the software.

4   A.   That's what the wording says.

5   Q.   All right.  And then it says in C, "distribute," and

6   then a number of other things, but let's just focus on

7   distribute, "the software or the documentation."

8            So the licensee, Brazoria, can't distribute the

9   software or the documentation as -- except as expressly

10  authorized; correct?

11  A.   That's what the wording says, yes.

12  Q.   And you understood that at the time?

13  A.   Yes, I had an understanding.

14  Q.   Okay.  And your counsel looked at the definition of

15  software on page 4 -- have you look at that.  And just to

16  be clear, software, the definition, includes documentation;

17  correct?

18  A.   Yes.

19  Q.   You knew that at that time.

20  A.   That software includes documentation, yes.  I can

21  read it.

22  Q.   All right.  Let's go back to page 1, paragraph 1.1.

23            This is the first paragraph of the agreement.

24  "PeopleSoft grants licensee," that's Brazoria; right?

25  A.   Yes.

809

1    Q.    That perpetual, nonexclusive, nontransferable

2    license that's been discussed, to use the licensed number

3    of copies of software.

4              All right.  Then there's a phrase, "solely for

5    licensee's," that's Brazoria's, "internal data processing

6    operations."

7              MR. ISAACSON:  I'd like to write that down.

8    Actually, it would be great if you wrote it down, Zach,

9    because your handwriting is going to be better than mine.

10             Would you write down "solely for licensee's

11   internal data processing operations."

12             All right.  Thanks a lot, Zach.

13   BY MR. ISAACSON:

14   Q.    So the licensee is Brazoria; right?

15   A.    Yes.

16   Q.    And internal data processing, this is a PeopleSoft

17   contract; right?

18   A.    Yes.

19   Q.    So internal data processing operations refer to the

20   operations using the PeopleSoft software, is that fair?

21   A.    That's correct.

22   Q.    The -- when you distributed fixes made for one

23   client to another client, you used copies of PeopleSoft

24   software for the internal data operations of customers that

25   were not Brazoria County; correct?

1    A.    That's correct.

2    Q.    So -- and you knew that from the very beginning.

3          You knew that you were using copies of

4    PeopleSoft software for internal data processing operations

5    for customers other than the licensee, other than Brazoria?

6    A.    Yes.

7    Q.    The -- now, and you're also aware that Professor

8    Davis has said that the cloning that took place, that

9    Brazoria County's environments, was cloned from Dave and

10   Buster's, and then was taken and cloned from Abilene,

11   Knoxville, and I'm going to mispronounce this, Yavapai

12   college, you know that that cloning was going on; right?

13   A.    Yes, we were definitely cloning.

14   Q.    All right.  Let's go back to 3726, and let's pick up

15   the next -- we've looked solely for licensee's internal

16   data operations.  All right?

17          Okay.  It next says,

18          "On the corresponding number of servers located

19   at the sites specified in the schedules."

20          Now, that's what you refer to as the site

21   restriction; correct?

22   A.    Yes, that would be site and server restrictions.

23   Q.    Okay.  Now, when you look -- the sites that you're

24   allowed to are specified in schedules of the contract;

25   right?

1    A.    Yes, often.

2    Q.    Okay.  And if you look at 3726 in your book, it

3    doesn't have the schedules, does it?

4    A.    Not that I see in this document.

5    Q.    Okay.  This is -- 3726 is not a complete and correct

6    copy of the contract, is it?

7    A.    Yes.  I don't know whether there's amendments,

8    schedules, et cetera.

9    Q.    Well, let's -- let's go find that schedule at

10   Plaintiffs' Exhibit 23 which is in your book.  We looked at

11   this together before.

12          Plaintiffs' Exhibit 23 is where Brazoria County

13   sent you their contract; correct?

14   A.    Yes, appears to be.

15   Q.    All right.  And if we go to page 8 of 15, just at

16   the top, you'll see here's the schedule.  Right?  Do you

17   see that?

18          And then if we go to page schedule -- there's a

19   couple pages, then we go to page 10 of 15, there's item 4,

20   Designated Initial Software Support Sites.

21          That is -- when it says in the contract at the

22   site in schedule 1, this is the site; right?

23   A.    Yes, it appears to be.

24   Q.    And the site is -- it says the Support Site,

25   Associated Countries/Regions, Brazoria County, Texas;

1   correct?

2   A.    Yes, that's what it says.

3   Q.    Now, your testimony yesterday was that the

4   interpretation of facility, the interpretation of this site

5   restriction, based on your state of mind, based on your

6   years of experience, that you always extended facilities to

7   include beyond the customer's physical facilities to anyone

8   who was doing service, and that you never contested that

9   under your watch.

10            That was your testimony; right?

11  A.    That's correct.

12  Q.    So when the contract said -- let's go back to

13  paragraph 1 of the --

14            MR. ISAACSON:  And you can pick that up in this

15  agreement, Matt, at page 4 of 15, section 1.1.

16  BY MR. ISAACSON:

17  Q.    When it says, "On the servers located at the sites

18  specified in the schedules," your state of mind in 2007,

19  2006, 2005, that that meant you could use the software

20  outside of Texas, outside of Brazoria County, you could use

21  it anywhere; right?

22  A.    For our test and development systems, yes.

23  Q.    All right.  It says that the site is Brazoria

24  County, Texas.

25            I mean, how hard is this?  You're telling the

1    jury that you had a good faith belief standing in the shoes

2    of the licensee that you were complying with the license

3    agreement, and it said use this only in Brazoria County,

4    Texas, and based on your years of experience and your state

5    of mind, you said I can go anywhere with this?

6    A.    Yes.

7    Q.    And it didn't matter what the site restriction said,

8    it didn't matter what state, what county, you would use it

9    anywhere.

10              So if it said Georgia, you would use it in

11   California.  If it had said Texas, would you use it in

12   California.  It didn't matter, did it?

13   A.    Actually, the answer is no.

14   Q.    Okay.  Well, in this case.  With this Brazoria

15   County contract that we're talking about, it said Texas,

16   and you thought it was okay to use it in California;

17   correct?

18   A.    Yes.

19   Q.    Okay.  Because that's where -- that's where you were

20   remotely hosting this software -- not -- locally hosting

21   this software?

22   A.    Yes.

23   Q.    Now, yesterday we looked -- not yesterday, but

24   previously I had looked at PTX 30 with you, which is again

25   in your binder, and we talked about this before.  I'm just

1    giving this to you again so you have some context.

2             It's dated November 17th, 2007, and this was the

3    document where you're talking about -- with one of the

4    customers about the Pittsburgh -- the Pittsburgh public

5    schools, about how TomorrowNow had decided, after being

6    sued by Oracle, to no longer host copies of the client's

7    test environments used by TomorrowNow to diagnose issues

8    and build tax updates, and how you thought that decision

9    was ridiculous, and you were going to continue to offer

10   those environments on the Rimini system.

11            Do you remember that?

12   A.    Yes.

13            MR. WEBB:  I'm sorry, Your Honor, I don't mean

14   to interrupt, Bill.  Could we approach just for one second,

15   Your Honor?

16            THE COURT:  Actually, it's probably a good time

17   to take our morning break.  I will allow it.  We'll discuss

18   it as soon as the jury is excused.

19            Ladies and gentlemen, we'll take a fairly brief

20   morning break.  We will be breaking today at 11:30, or

21   perhaps shortly before.

22            Same admonitions apply, and we'll be back in

23   court just as soon as you're ready.

24            COURTROOM ADMINISTRATOR:  Please rise.

25        (Jurors exit courtroom at 9:46 a.m.)

| | |
|---|---|
| 1 | THE COURT:  Have a seat, please. |
| 2 | All right.  Mr. Webb? |
| 3 | MR. WEBB:  Yeah, I'm sorry, Your Honor. |
| 4 | Yesterday, I believe, when this was raised, I |
| 5 | objected, and I was overruled, and I was permitted to have |
| 6 | a continuing objection without having to -- is that still |
| 7 | okay? |
| 8 | MR. ISAACSON:  Yeah. |
| 9 | THE COURT:  Yes. |
| 10 | MR. WEBB:  I'm sorry.  I just wanted to clarify. |
| 11 | That's all I had. |
| 12 | THE COURT:  Okay.  For the benefit of the |
| 13 | record, the issues concerning TomorrowNow will all carry a |
| 14 | continuing objection by the defense to reference in |
| 15 | questioning concerning those. |
| 16 | MR. WEBB:  Thank you, Judge. |
| 17 | THE COURT:  All right.  Thank you. |
| 18 | Now, I will say this, Mr. Webb, that if you feel |
| 19 | that a new and major expansion or change in the context in |
| 20 | which we've been discussing all of this has arisen, please |
| 21 | stand up, make your objection so that I can give it some |
| 22 | thought. |
| 23 | But, for the benefit of the record, you do have |
| 24 | a continuing objection. |
| 25 | MR. WEBB:  I'll do that, Judge.  Thank you. |

```
 1              THE COURT:  All right.  Thank you.  We'll take a

 2   short recess.

 3              COURTROOM ADMINISTRATOR:  Please rise.

 4         (Recess from 9:48 a.m. until 10:07 a.m.)

 5         (Jurors enter courtroom at 10:07 a.m.)

 6              COURTROOM ADMINISTRATOR:  Court is again in

 7   session.

 8              THE COURT:  Have a seat, please.

 9              The record will show we're in open court.  The

10   jury's all present.  Counsel and parties are present.

11              You may go ahead, Mr. Isaacson.

12              MR. ISAACSON:  Thank you, Your Honor.

13   BY MR. ISAACSON:

14   Q.    So before our break we had revisited PTX 30 which

15   had been talking about your decision to continue with the

16   environments on your system after TomorrowNow had decided

17   not to.

18              Let's look at -- and now we're talking again

19   about your state of mind during that period of time.

20              Let's look at PTX 2140, which is in your binder.

21              And just looking at the first page as to what

22   this is, this is a response to a request for a proposal and

23   RFP.  It's to the Abilene Independent School District,

24   October 25th, 2007.

25              So at this point you're competing for the
```

817

1     Abilene School District's business; correct?

2     A.    Yes.

3     Q.    And this has been admitted.  So let's look at page

4     46.

5           Let's look at the top.  "Comparison:  Rimini

6     Street versus TomorrowNow."  Right?

7           For purposes of competing against TomorrowNow,

8     you were giving this potential customer your views of

9     Rimini Street versus TomorrowNow; correct?

10    A.    Yes, that's accurate.

11    Q.    Right.  And there's a table doing comparisons on a

12    number of criteria.  There's several pages of tables.

13          On the second one, there's Software Vendor

14    Affiliation.  Now, this is under TomorrowNow.  This is what

15    you're telling the customer; right?

16    A.    That's correct.  A prospect, right.

17    Q.    "TomorrowNow is a wholly-owned subsidiary of SAP."

18          And then it says -- it has asterisks, and it's

19    in bold letters.  TomorrowNow -- and it --

20          In fact, in all the tables of your comparisons,

21    you can look through the pages, this is the only thing you

22    bolded; right?

23    A.    Seems to be accurate.

24    Q.    All right.  So, "TomorrowNow/SAP has been sued in a

25    recent lawsuit filed by Oracle."

```
 1              It talks about what the lawsuit alleges, and
 2   that's the same lawsuit you were talking about a couple
 3   weeks later in PTX 30 when TomorrowNow shut down its
 4   environments with Oracle copies on its systems.
 5              That's the same lawsuit; right?
 6   A.    Yes.
 7   Q.    Okay.  And in this you say, "In July 2007, SAP AG
 8   CEO," this is the CEO of SAP in Germany; correct?
 9   A.    Yes.
10   Q.    He admitted -- you told the customer that he
11   admitted -- if it's a he -- admitted wrongdoing by
12   TomorrowNow and demoted the CEO of TomorrowNow; correct?
13   A.    Yes.
14   Q.    And you were trying to give the customer truthful
15   information; correct?
16   A.    Yes.
17   Q.    All right.  And so at the time, a few weeks later,
18   when you're telling another customer that it's ridiculous
19   that TomorrowNow is shutting down the environments on its
20   system with Oracle copies, you knew that SAP's CEO had
21   admitted wrongdoing by TomorrowNow and had actually demoted
22   the CEO.  You knew that?
23   A.    Yes.
24   Q.    And when you said to your counsel -- your counsel
25   asked you the question, if you had known -- if you had the
```

1    information that you had now about copyright violations

2    that -- what would you have done, and you said I would have

3    gone all remote.  Do you remember that?

4    A.    Yes.

5    Q.    It's a fact, isn't it, that in 2007 you knew that

6    your former company, TomorrowNow, after having been accused

7    of copyright infringement by Oracle, after -- after the --

8    having their parent company admit wrongdoing and demoting

9    the CEO, and after that company, TomorrowNow, shut down

10   those local systems, that you said "that's ridiculous,

11   we're not doing that."

12   A.    Yes, that's what I said.

13   Q.    Okay.  You were never going to move away from your

14   business model, were you?

15         You had information about copyright violations

16   being alleged, you had information about what TomorrowNow

17   was doing, but you still were moving forward; correct?

18   A.    Yes, we did not change our business model.

19   Q.    Okay.  The other thing you did after this was,

20   sometime in the next year, you started to edit your

21   biography online with Rimini Street and that you would give

22   the customer, to remove your prior work experience with

23   TomorrowNow, correct?

24   A.    I don't remember that exactly.  I think it did have

25   it on there.

820

```
 1    Q.    All right.  Let me ask you to look at PTX 618.

 2             COURTROOM ADMINISTRATOR:  It's not admitted yet.

 3             MR. ISAACSON:  I need to admit this.

 4             MR. WEBB:  Objection on authenticity,

 5    foundation, and hearsay, Your Honor.

 6             MR. ISAACSON:  It's an e-mail to Seth Ravin and

 7    written by Seth Ravin.

 8             MR. WEBB:  What was the number?

 9             MR. ISAACSON:  618.

10             MR. WEBB:  We have the wrong exhibit, Your

11    Honor.  We apologize.

12             THE COURT:  Is there an objection?

13             MR. WEBB:  No objections, Your Honor.

14             THE COURT:  All right.  It's admitted.

15        (Plaintiffs' Exhibit 618 received into

16        evidence.)

17    BY MR. ISAACSON:

18    Q.    All right.  This is September of 2008, and you see

19    how you're writing an e-mail that's in the middle of the

20    first page?

21    A.    Yes, I see that.

22    Q.    All right.  And in the middle it talks about your

23    website references?

24    A.    Yes.

25    Q.    Okay.  It says,
```

1           "All other website references to TN,

2    TomorrowNow, as a competitor or of historical significance

3    to Rimini Street (including any exec bios) need to be

4    reviewed and maybe minimized as less important to the

5    future client wins for Rimini Street?"

6           After that you edited your bio to remove the

7    information that you were the former president and CEO of

8    TomorrowNow, didn't you?

9    A.    That I don't recollect.  It's possible.

10   Q.    Let me see if I can help your memory on this.

11         Would you look at 5416.

12         MR. ISAACSON:  No need to put it on the screen,

13   Matt.

14   BY MR. ISAACSON:

15   Q.    5416 in your binder.  And I'll represent to you we

16   went to this marvelous device called the Way-Back Machine,

17   which I think you're probably familiar with, and pulled up

18   one of your bios from September 2008, and you'll see there

19   how it says you cofounded TomorrowNow?

20   A.    Yes, I see that.

21   Q.    And if you turn the page to October 2008, there's no

22   longer any mention of TomorrowNow, is there?

23   A.    I'm sorry.  I --

24   Q.    I'm sorry.  Turn to 5417.

25   A.    Okay.  I'm there.

822

1    Q.    All right.  Online you edited your bio to remove the

2    TomorrowNow story from your biography for portraying you as

3    a visionary.  You removed the TomorrowNow references,

4    right?

5    A.    I don't see any TomorrowNow reference in this

6    version.

7    Q.    And you did the same thing with customers.  Your

8    customer pitches, you stopped putting in those pitches that

9    you had ever had anything to do with TomorrowNow; right?

10   A.    That's possible.

11   Q.    Okay.  Two minor points.  When you were -- just to

12   be very clear, when you were at PeopleSoft, Oracle did not

13   own PeopleSoft then; correct?

14   A.    That's correct.

15   Q.    And you spent a lot of time talking about the ISO,

16   that certification, Rimini Street got that for the first

17   time in September 2011; is that correct?

18   A.    I don't remember the exact date for each of the

19   certifications.

20   Q.    All right.  Do you remember that it happened towards

21   the end of 2011?

22   A.    Actually, I don't remember which the first year was

23   or when it first started, no.

24   Q.    Okay.  You don't remember if it was during any

25   period relevant to this case?

1      A.     Don't remember, sorry.

2      Q.     Okay.  Now, you said to your counsel yesterday -- he

3   asked you this question.

4             "Certainly at one point Oracle said no more

5   automated tools.

6             "ANSWER:  Yes.  They changed their terms of use

7   for the website.

8             "How did you react to that?

9             "ANSWER:  I was pretty surprised at the change

10  for a number of reasons."

11            Do you remember that testimony?

12     A.     Yes.

13     Q.     Now, at your deposition, you were asked if you

14  recalled reading Oracle's terms of use.  Do you recall

15  testifying that you didn't read that part, and, in fact,

16  that you interpreted it as not prohibiting automated

17  downloading?

18     A.     I'm sorry.  Could you rephrase for me?

19     Q.     Do you recall saying at your deposition that you

20  didn't read that part of the terms of use, and, in fact,

21  you interpreted the changes as not precluding automatic

22  downloading?

23     A.     I'm sorry.  I don't recollect.

24            MR. ISAACSON:  Your Honor, I would like

25  permission to show him his deposition from 11/17/11

```
1    beginning at page 297, beginning at line 18.

2              THE COURT:  You may do so.

3              COURTROOM ADMINISTRATOR:  11/17/11?

4         (Discussion held off the record.)

5              MR. ISAACSON:  Yes.  He tells me I'm reading the

6    incorrect cite, but he's got the correct video.

7              THE COURT:  Do we have the correct cite number?

8         (Videotape deposition of Seth Ravin played

9         PAGE 428:18 TO 429:06 RUNNING 00:00:37.296.)

10             "Q.    And you, as we saw earlier, used LC

11             Growth's login credential to download

12        materials from the Oracle website?

13             "A.    Well, again, from -- again, from the

14        contract perspective we were authorized by the

15        client, LC Growth.  They had access and rights

16        to the website because they had paid for

17        support.  And so we believe they acted fully

18        within their license rights.

19             "Q.    You would agree with me that LC Growth

20        had no use for those materials because it had not,

21        itself, implemented the software, right?

22             "A.    Well, I won't say what LC Growth would or

23        wouldn't have use for.")

24   BY MR. ISAACSON:

25    Q.    Yesterday you told your counsel that you did see
```

1     that language, you did understand it as precluding

2     automatic downloading, and you were surprised by that at

3     the time and dismayed.

4              In your deposition under oath, you said that you

5     didn't read it that way, and you didn't believe automated

6     downloading was precluded by that change.

7              Isn't that what's happened here?

8     A.    Well, I did read and I did see that the -- that the

9     words were in there, and per my deposition testimony, I did

10    not change the way that we were doing downloading.

11    Q.    But yesterday you told your counsel you knew that

12    the changes prohibited automated downloading and that you

13    were dismayed by that at the time.

14             And, in your deposition, you said, "I didn't

15    interpret it that way."  Correct?

16    A.    Yes, that's correct.

17             MR. ISAACSON:  All right.  I have no further

18    questions.

19             THE COURT:  Recross-examination examination,

20    Mr. Webb?

21             MR. WEBB:  I just have a few minutes, Your

22    Honor.

23                         RECROSS-EXAMINATION

24    BY MR. WEBB:

25    Q.    Mr. Ravin, earlier in Mr. Isaacson's

1    cross-examination, he referenced some deposition testimony

2    about you saying that you didn't use one client's software

3    for another client, something to that effect.  Do you

4    remember that?

5    A.    Yes.

6    Q.    And then he referenced my question to you yesterday,

7    which I was able to pull up real quickly, and let me read

8    you what I said.

9              I said, "What about this.  Taking an update that

10   you created, your engineers created, and then using that

11   update for other clients with the same version of contract

12   or license, do you deny that you all have done that?"

13             Your answer, "No, we reused it all the time,

14   yes."

15             Do you remember that?

16   A.    Yes.

17   Q.    How can you square what you said in your deposition

18   with what you said just yesterday in this court?

19   A.    Well, exactly.  I mean, I wasn't asked for the

20   detail.  No one asked me, just simply said did you do this,

21   and the answer was no.

22             Because that was the base software.  That was

23   the vanilla code, not the individual, customized components

24   relative to when we did development for customizations.

25             We did not give customers access to code that

1    was for other customers.

2    Q.    And so when I asked you that question yesterday,

3    what about my question was different from the question that

4    you were just played on the video?

5    A.    Well, because, again, that was -- I'm sorry, the

6    video that we just saw?

7    Q.    Yeah, the one where they talked about your

8    deposition.

9    A.    I'm sorry.  Again, the difference was, I wasn't

10   asked the detail.  It was just simply a question.

11   Q.    What was the detail?

12   A.    The detail was about whether or not we were talking

13   about the vanilla environments, and we were talking about

14   where we're reusing code that people on the same version of

15   release or customized components.

16            MR. WEBB:  That's all the questions I have, Your

17   Honor.  Thank you.

18            THE COURT:  All right.

19            MR. ISAACSON:  No further questions, Your Honor.

20            THE COURT:  All right.  Mr. Ravin, that will

21   complete your testimony at this time, and you may step

22   down.

23            THE WITNESS:  Thank you, your Honor.

24            Plaintiffs' next witness, please.

25            MR. HIXSON:  Your Honor, Oracle calls Richard

1    Allison to the stand.  I'm going to go grab him in the

2    hallway.

3              COURTROOM ADMINISTRATOR:  Please raise your

4    right hand.

5              You do solemnly swear that the testimony you

6    shall give in the cause now before the Court shall be the

7    truth, the whole truth, and nothing but the truth, so help

8    you God?

9              COURTROOM ADMINISTRATOR:  Please be seated.

10             Please state your name and spell your last name

11   for the record.

12             THE WITNESS:  Yes, it's Richard Allison;

13   A-l-l-i-s-o-n.

14             COURTROOM ADMINISTRATOR:  Please tell us your

15   city and state of residence.

16             THE WITNESS:  Belmont, California.

17             THE COURT:  Mr. Strand?

18             MR. STRAND:  Your Honor, I'm going to be

19   handling this witness just so the Court is clear who the

20   cast of players is.

21             THE COURT:  All right.  Ladies and gentlemen, we

22   do have no cast of players, so to speak, as identified by

23   Mr. Strand, but Mr. Hixson was previously introduced to you

24   when we started the case, and Mr. Strand was identified as

25   representing the defense.

```
 1              And, Mr. Hixson, you're welcome to go forward
 2    with your examination of Mr. Allison.
 3              MR. HIXSON:  Great.  Thank you, your Honor.
 4                        RICHARD ALLISON
 5              called as a witness on behalf of the
 6        Plaintiffs, was examined and testified as follows:
 7                      DIRECT EXAMINATION
 8    BY MR. HIXSON:
 9    Q.    Hello, Mr. Allison.
10    A.    Good morning.
11    Q.    Where do you work?
12    A.    I work at Oracle.
13    Q.    What is your current position at Oracle?
14    A.    I'm senior vice-president of global practices.
15    Q.    And who do you report to?
16    A.    I report to Safra Catz.
17    Q.    How long have you been working at Oracle?
18    A.    It will be 22 years this October.
19    Q.    And can you describe your job responsibilities at
20    Oracle.
21    A.    Sure.  About five different teams are reporting to
22    me.
23              The first is global practices, and they handle
24    the standard -- creation of standard contracts and business
25    practices for the company.
```

830

1          The second is a pricing team that handles all

2     the standard pricing for products and services.

3          The next one is HQ approvals which handles

4     nonstandard discounts or nonstandard terms that would go to

5     the CEO's office for escalation.

6          Another is risk management, which I know it

7     sounds like insurance, but it's not, it's actually

8     consulting bid review.

9          And the last is license management services.

10    Q.   All right.  Sir, it might be easier for the jury to

11    hear you if you spoke more closely to the microphone.

12    A.   Sure.

13    Q.   Thank you.  Has your work at Oracle involved

14    software licenses in any way over the years?

15    A.   It has.

16    Q.   And how did your work at Oracle first involve

17    software licenses?

18    A.   When I started at the company, my first position was

19    a contract specialist, and I drafted ordering documents and

20    customer agreements for licenses.

21    Q.   In recent years, how did your work at Oracle involve

22    software licenses?

23    A.   Well, now at this point the teams actually create

24    the standard license agreements, the standard ordering

25    documents, most of the business terms that we use with our

1    customers is actually drafted by my team.

2    Q.    And how long have you been managing that team?

3    A.    For fifteen years.

4    Q.    And I believe earlier that you referred to one of

5    your job responsibilities as being HQ Apps.  Can you

6    explain what HQ Apps stands for?

7    A.    Stands for headquarters approvals.

8    Q.    And what are your responsibilities as the head of HQ

9    Apps?

10   A.    Well, I have a team of people that review the

11   transactions that have a certain threshold of discounts or

12   business terms that would require escalation up to CEO or

13   the president's office with the company.

14   Q.    And can you describe your responsibilities as head

15   of the pricing team.

16   A.    Again, my team would work with the development and

17   services organization in establishing standard pricing for

18   all of our products and services.

19   Q.    This morning I'm going to be asking you about

20   several different topics, and the first one is about

21   Oracle's license agreements.

22         Do Oracle's license agreements help protect its

23   intellectual property?

24   A.    They do.  That's the intent of the agreement.

25   Q.    Okay.  And can you describe more generally how they

1    do that.

2    A.    Sure.  With respect to intellectual property, our

3    software is kind of the intangible thing.  We don't sell a

4    widget or a device to somebody and grant them ownership of

5    it, we actually give them the right to use -- we give them

6    the right to use the software, and so the license grants

7    them the right to use while we maintain ownership of this

8    intellectual property or the software.

9    Q.    Did your job responsibilities require you to become

10   familiar with the PeopleSoft, JD Edwards and Siebel license

11   agreements?

12   A.    It did.

13   Q.    And how did they require you to become familiar with

14   those?

15   A.    My teams work on the acquisition and integration of

16   many of the companies we've acquired, including the ones

17   you mentioned.

18          And as part of that process, we review their

19   standard agreements, and we continue to use those

20   agreements for many of the transactions of the companies.

21   Q.    Okay.  And did Oracle honor the existing contractual

22   agreements between PeopleSoft, JD Edwards, Siebel, and

23   their customers?

24   A.    Yeah, we did, and we continue to.

25   Q.    And are many of those PeopleSoft, JD Edwards, and

833

1    Siebel licenses from before the acquisition still in effect

2    today?

3    A.    They are.  Many of those were perpetual agreements

4    and so they still are an agreement between the two parties.

5    Q.    And do your job responsibilities require you to

6    continue to deal with these license agreements that Oracle

7    became a party to because of these acquisitions?

8    A.    It does, because we continue to transact against

9    many of them.

10   Q.    Okay.  I move to admit PTX 5328 to which I

11   understand there's no objection.

12           MR. STRAND:  That's correct, Your Honor.

13           THE COURT:  It is admitted.

14       (Plaintiffs' Exhibit 5328 received into

15       evidence.)

16   BY MR. HIXSON:

17   Q.    Well, sir, do you understand that there have been

18   certain stipulations between the parties in this action?

19   A.    I do.

20   Q.    Paragraph 1 states,

21           "For purposes of this action the parties agreed

22   and stipulate that the PeopleSoft license agreements for

23   all of Rimini's PeopleSoft customers have identical or

24   similar language to the PeopleSoft license agreements for

25   City of Flint and School District of Pittsburgh construed

1    by the Court in its February 13th, 2014 order."

2                Mr. Allison, what do you understand this

3    agreement to mean?

4    A.    Well, it means that the PeopleSoft agreements that

5    were part of the case here with the customers of Rimini's

6    are all similar or identical to the two mentioned, the City

7    of Flint agreement and the School District of Pittsburgh

8    agreement.

9                MR. HIXSON:  Let's turn to the first of those,

10   the City of Flint agreement.  I move to admit PTX 698.

11               MR. STRAND:  No objection, Your Honor.

12               THE COURT:  It is admitted, and I would assume

13   699 will be the next one, and that will be offered as well.

14               MR. HIXSON:  That's right.

15               THE COURT:  And I assume there's no objection?

16               MR. STRAND:  No objection, Your Honor.

17               THE COURT:  Both of those will be admitted and

18   you may proceed directly to them, Mr. Hixson.

19   BY MR. HIXSON:

20   Q.    Can you please tell the jury what PTX 698 is?

21   A.    Yes, it's a PeopleSoft software license and services

22   agreement between PeopleSoft and the City of Flint.

23   Q.    And are you familiar with this particular license?

24   A.    I am.  I have reviewed it.

25   Q.    And in general, what is the purpose of a license

1  agreement like this one?

2  A.    The purpose is that it grants the customer the

3  ability to use the software.

4  Q.    Okay.  Please turn to section 1.1 of this agreement.

5  Is this a license grant?

6  A.    It is.

7  Q.    What is a license grant?

8  A.    Again, it's the grant for the right to use the

9  software.

10  Q.    Okay.  Does this license grant restrict where the

11  customer software can be located?

12        MR. STRAND:  Your Honor, I object to the extent

13  it calls for a legal conclusion.

14        As long as he states it's his opinion, but it's

15  for the Court to instruct the jury on what the law of the

16  case is.

17        MR. HIXSON:  We're offering this to rebut

18  Mr. Ravin's assertion of good faith.  The witness is giving

19  his lay opinion, not legal testimony.

20        THE COURT:  All right.  Ladies and gentlemen,

21  Mr. Allison can testify to -- as a person obviously

22  involved in these contracts, can testify to his

23  understanding of the terminology and requirements of the

24  license, and it's his understanding that's involved here.

25

836

1    BY MR. HIXSON:

2    Q.    All right.  I'll repeat the question, then.

3              Does the license grant restrict where the

4    customer software can be located?

5    A.    It does.

6    Q.    And can you identify the language that does that?

7    A.    Sure.  It says, "Solely for licensee's internal data

8    processing operations at its facilities in the territory."

9    Q.    When it says "its facilities," whose facilities is

10   it talking about?

11   A.    The licensee or the customer.

12   Q.    And who would that be in this case?

13   A.    The City of Flint.

14   Q.    Does this license allow Rimini to have a copy of the

15   customer software at Rimini's facilities?

16   A.    It does not.

17   Q.    Please turn to section 2 which is called License

18   Exclusions.  What does license exclusions mean?

19   A.    These are things that the licensee shall not do with

20   the software.

21   Q.    Please turn to section 2.1c.  Does this license

22   allow the customer to distribute or transfer the software

23   to a third party like Rimini?

24   A.    It does not.

25   Q.    All right.  Mr. Ravin has testified that during his

837

1    time at PeopleSoft the licenses allowed customers to have

2    their software at service bureaus or outsourcers.  What

3    does this license say about that?

4    A.    It says,

5              "Licensee shall not distribute, disclose,

6    market, rent, lease, or transfer to any third party, any

7    portion of the software, including PeopleTools, or the

8    documentation, or use the software or documentation in any

9    service bureau arrangement, facility management or third

10   party training."

11   Q.    And so, to your understanding, does this license

12   authorize the customer to distribute the software to a

13   service bureau or outsourcers?

14   A.    Absolutely not.

15   Q.    Turning back to section 1.1 of this license, does it

16   say anything about for whose benefit the software can be

17   used?

18   A.    It does.

19   Q.    And what is that language?

20   A.    It states that it's "solely for licensee's internal

21   data processing operations."

22   Q.    And based on your experience, can you give us a real

23   world example of a customer using the software for its

24   internal data processing operations?

25   A.    Sure.  I'll give you an example for PeopleSoft as

1    they sell human resources or HR software, and internal use

2    would be processing their HR data or their employees data

3    in the system.

4    Q.   Does this license allow Rimini to use the City of

5    Flint software to support other customers?

6    A.   It does not.

7    Q.   Does it allow Rimini to use the City of Flint

8    software to develop and test fixes and updates to provide

9    to other customers?

10   A.   It does not.

11   Q.   Please turn to the third page of this document

12   section 14, entitled Nondisclosure Obligation.

13          Is a nondisclosure obligation different from a

14   license grant?

15   A.   It is.  It handles the confidentiality of

16   information between the two parties, what they can and

17   cannot disclose outside the two parties.

18   Q.   Okay.  Please turn to section 14.2 of this license

19   under the nondisclosure obligation.

20          Mr. Ravin has given some testimony concerning

21   the second sentence which states,

22          "Licensee may provide access to and use of the

23   software only to those third parties that:  (i) provide

24   services to licensee concerning licensee's use of the

25   software; (ii) have a need to use and access the software;

1    and (iii) have agreed to substantially similar

2    nondisclosure obligations imposed by licensee as those

3    contained herein."

4            Under that sentence, what does it mean for a

5    customer to provide access to and use of the software to a

6    third party?

7    A.    Well, I think it grants them ability to access and

8    use the software.  I think those statements are pretty

9    straightforward.

10   Q.    Can the third party come to the customer's facility

11   and access and use the software there?

12   A.    I believe they could.

13   Q.    Can the third party dial in remotely to the

14   customer's facility and access and use the software that

15   way?

16   A.    Yes, I believe that would fall under access and use.

17   Q.    Can the third party install the software on its own

18   computers?

19   A.    No.  When you go back to the license grant in the

20   first section we talked about, it limits the operations of

21   the processing at the customer's facilities, not at a third

22   party facility.

23   Q.    Okay.  Except for Rimini in this lawsuit, have you

24   ever encountered a situation in which a customer contended

25   that section 14.2 allows for a third party to have copies

1     not at the customer's facilities?

2     A.    I have not.

3     Q.    Mr. Ravin testified that he was at PeopleSoft from

4     1996 to 2001.  What is the date of this license agreement?

5     A.    September 22nd, 1997.

6     Q.    Thank you.  And I have to detour before I get to

7     699.  It is PTX 2088 which I move to admit.

8          MR. STRAND:  Defendants have no objection to

9     that exhibit, Your Honor.

10         THE COURT:  It's admitted.

11         (Plaintiffs' Exhibit 2088 received into

12         evidence.)

13    BY MR. HIXSON:

14    Q.    Please tell the jury what PTX 2088 is.

15    A.    It's schedule 1 to the software license and services

16    agreement between PeopleSoft and the City of Flint.

17    Q.    So is this a schedule to the license we just looked

18    at?

19    A.    It is.  It actually has the same date as well.

20    Q.    And is this schedule part of the license agreement

21    we just saw?

22    A.    It is.  It actually states in the second sentence

23    this schedule is part of the software license and service

24    agreement between the parties.

25    Q.    What does the schedule identify?

1    A.    It identifies the programs which are the customer

2    licensed under the software license and services agreement.

3    Q.    Looking at this schedule, what does the reference to

4    production copies and test and development copies mean?

5    A.    It's the number of copies of software the customer

6    can make, or that are provided to them.

7    Q.    What is a production copy?  What does that term

8    mean?

9    A.    Production means using the software for its intended

10   use, so in my example earlier of using an HR system, it's

11   running the HR program for your business.

12   Q.    What is a test and development copy?  What does that

13   mean?

14   A.    Well, they may have a separate system for testing

15   and development of a system or staging.

16   Q.    Okay.  Please turn to footnote 1.  Is there any

17   restriction on where the production copy can be located?

18   A.    It does.  The second sentence, it says,

19          "Licensees license includes the right to make as

20   many production copies on one or more servers at licensee's

21   sites."

22   Q.    And please turn to page 3, bullet point number 4 of

23   the schedule.  Does this identify where the licensee's site

24   is?

25   A.    It identifies it as the City of Flint in Michigan.

1    Q.    And so can Rimini have a copy of this production

2    copy on its servers?

3    A.    No.

4    Q.    Turning to footnote 2 in this schedule, is there any

5    restriction on where the test and development copy can be

6    located?

7    A.    Yes.

8    Q.    And is that the same site, the City of Flint?

9    A.    It is.  It is one or more servers at licensee's

10   site.

11   Q.    Does this mean the software actually has to be at

12   the City of Flint?

13   A.    It does.

14   Q.    Does this license allow Rimini to have test and

15   development environments on its own system for this

16   customer?

17   A.    No, it does not.

18   Q.    Again, Mr. Ravin testified that he was at PeopleSoft

19   from 1996 to 2001.  What is the date of this schedule?

20   A.    September 22nd, 1997.

21   Q.    Let's turn to PTX 699.

22   A.    Okay.

23   Q.    And can you tell the jury what this is.

24   A.    It's a software license and services agreement

25   between PeopleSoft and Pittsburgh Public Schools.

1    Q.    Is this the other license that the parties agreed

2    are representative of all of Rimini's customers, PeopleSoft

3    licenses?

4    A.    Yes, this was the other one named in the

5    stipulation.

6    Q.    Okay.  And are you familiar with this particular

7    license?

8    A.    I am.  I have reviewed it.

9    Q.    Please turn to section 1.1 of this license.  Is this

10   the license grant section?

11   A.    It is.

12   Q.    And as with the City of Flint license, does this

13   license grant restrict where this software can be?

14   A.    It does.

15   Q.    And can you point us to that language.

16   A.    Well, it starts in the first sentence,

17         "PeopleSoft grants licensee a nonexclusive,

18   nontransferable license to make and run copies of the

19   software and third-party software for access by employees

20   and designates on one or more servers and/or workstations

21   located at facilities owned or leased by licensee," meaning

22   the customer.

23   Q.    And so does this license allow Rimini to have the

24   software on Rimini's servers?

25   A.    It does not.

844

1    Q.    Please turn to section 2.2 of this license on the

2    second page of this document.

3              Does this license say for whose benefit the

4    software can be used?

5    A.    It does.

6    Q.    And can you identify that language for us?

7    A.    Sure.  I think you need to read the whole section to

8    understand it.

9              "Licensee may not directly or indirectly

10   sublicense, relicense, use, rent, or lease the software,

11   third-party software or tools, or any portion thereof, for

12   any" -- excuse me, "for third-party use, training,

13   facilities management, time-sharing, or service bureau use,

14   or to process data for anyone other than licensee in the

15   conduct of its internal business."

16   Q.    Can Rimini clone or use Pittsburgh software for the

17   benefit of other customers?

18   A.    No, this is limited to the licensee's or the

19   customer's internal business only.

20   Q.    Please turn back to section 2 on the first page of

21   this document.  Is this a list of limitations on license?

22   A.    It is.

23   Q.    And what does that mean?

24   A.    It states things that the licensee or customer shall

25   not do with the customer.

1    Q.    What does section 2.1d restrict?

2    A.    It says, "Licensee shall not distribute, disclose,

3    market, rent, lease, license, or transfer to any third

4    party any portion of the licensed rights, or use the

5    licensed rights other than to process licensee's internal

6    data for licensee's business."

7    Q.    So can the customer give Rimini the software under

8    this license?

9    A.    There's no right to distribute the software under

10   this agreement.

11   Q.    Okay.  Please look at section 10 of this license

12   starting on page 4.

13              And again we see this is entitled a

14   Nondisclosure Obligation.  Can you remind us what the

15   purpose of that is?

16   A.    Yes, it states the confidentiality between the two

17   parties, what they can or cannot share amongst each other

18   or not amongst each other.

19   Q.    And, again, let's look now at section 10.2, and this

20   has language that's familiar from 14.2 in the other

21   license.

22              The second sentence says,

23              "Licensee may provide access to and use of the

24   licensed rights only to those third parties that:  (a)

25   provide services to the licensee concerning licensee's use

1    of the software, tools, third-party software or

2    documentation; (b) have a need to use and access the

3    software, tools, third-party software or documentation; and

4    (c) have agreed to substantially similar nondisclosure

5    obligations as those contained herein."

6              In plain English, what does this provision allow

7    a third party to do?

8    A.    It allows them limited cases when there's a

9    nondisclosure agreement between two parties to provide

10   third-party access and use.

11   Q.    And so can the third party go to the customer's site

12   and access and use the software there?

13   A.    I believe so.

14   Q.    And could the third party access the software in the

15   customer's facilities remotely?

16   A.    Yes, I think so.

17   Q.    Can the third party like Rimini install the software

18   on its own systems?

19   A.    This section doesn't grant them that right, and if

20   you go back to the license grant itself, it limits the use

21   at the location of customer's facilities.

22   Q.    Please turn to the definition of designates in

23   section 15 of this document.

24              Is a service provider that has access to the

25   customer software a designate under this definition?

1    A.    I believe they could be, yes.

2    Q.    Can a third-party designate copy the software to its

3    own servers?

4    A.    No.  The second sentence states specifically,

5          "In no event shall a designate have the right to

6    install the software on a server, workstation or other

7    computer, access the source code for the software, or

8    undertake any of the actions listed in section 2."

9    Q.    Well, but suppose it's just doing it for test and

10   development purposes.  Does this license allow a designate

11   to install a copy for test and development purposes on its

12   systems?

13   A.    No.  It's pretty clear, "in no event shall they have

14   the right."

15   Q.    And, again, Mr. Ravin has testified that he worked

16   at PeopleSoft from 1996 to 2001.  What is the year of this

17   license agreement?

18   A.    December 27, 2000.

19   Q.    Now, you've seen the stipulation between the parties

20   saying that these two license agreements are representative

21   of all of the PeopleSoft licenses for Rimini's customers.

22          Leaving aside that stipulation, during the

23   course of your job responsibilities, have you had the

24   occasion to review PeopleSoft licenses from before the

25   acquisition?

1   A.    I have, and I have been involved in PeopleSoft

2   licensing for over 10 years.

3   Q.    And are you aware of any PeopleSoft license that

4   would allow Rimini to have copies of the software on its

5   systems or to cross-use software for the benefit of all

6   their customers?

7   A.    No.

8   Q.    Now, I'm going to ask you about the Siebel and JD

9   Edwards licenses.

10        In this lawsuit, did Oracle provide Rimini with

11  the Siebel and JD Edwards software licenses for Rimini's

12  customers?

13  A.    We did.

14  Q.    Was Oracle able to locate all of the Siebel and JD

15  Edwards license agreements for Rimini's customers?

16  A.    I believe we were able to locate most but not all.

17  Q.    Okay.  To prepare for trial, did you personally

18  review every Siebel and JD Edwards license for Rimini's

19  customers that Oracle was able to locate?

20  A.    I did.

21  Q.    When you did that review, what types of provisions

22  did you focus on?

23  A.    I focused on license grants, license restrictions,

24  license locations, things of that nature.

25  Q.    Did you review all of the many ordering documents

849

1      and schedules to those licenses?

2      A.    I did not.

3      Q.    Are the provisions that your review focused on

4      typically modified in a particular way in the order of

5      documents and schedules?

6      A.    They are not.

7                MR. HIXSON:  I move to admit PTX 705.

8                MR. STRAND:  No objection from defendants, Your

9      Honor.

10               THE COURT:  It's admitted.

11          (Plaintiffs' Exhibit 705 received into

12          evidence.)

13     BY MR. HIXSON:

14     Q.    Do you have that in front of you?

15     A.    I do.

16     Q.    Can you please identify what PTX 705 is?

17     A.    Yes, it's a software license and services agreement

18     between Siebel systems and Novell.

19     Q.    And can you describe in general what this document

20     is for.

21     A.    Similar to the ones we previously reviewed, it's the

22     license grant of the use of the software.

23     Q.    Okay.  Please turn to section 2.1, license grant.

24               Does this Siebel license include an internal use

25     restriction?

1    A.    It does.

2    Q.    And can you point us to the particular language that

3    has that?

4    A.    It's in the first sentence, and it says,

5          "That may be exercised solely in connection with

6    the customer's own internal business operations."

7    Q.    Okay.  And can you explain what that means.

8    A.    They can use the software only to run their

9    business.

10   Q.    Okay.  Can you give us a real world example of using

11   the software for the customer's internal business

12   operations.

13   A.    Sure.  In the case of Siebel, they sell sales

14   software that sales people can use to track their customers

15   and to make sales to customers.  So they could use it for

16   their sales organization or for the purposes of sales to

17   their customers, but they can't use it to process or

18   function the sales of a third-party company.

19   Q.    Can Rimini use Novell's Siebel software for the

20   benefit of other customers?

21   A.    They cannot.

22   Q.    How many of the Siebel licenses that were produced

23   for Rimini's customers contain this type of internal

24   business operations restriction?

25   A.    All of them.

1    Q.    Does section 2.1 of this license contain a

2    restriction concerning where the software can be used?

3    A.    It does.

4    Q.    And can you point us to the language that says that.

5    A.    It says,

6              "To use the programs on the designated systems,

7    or on a backup system if the designated system is

8    inoperative," and designated system is a definition in this

9    case because it's capitalized.

10   Q.    And can you turn to section 1 of the license and

11   point us to the definition of designated system?

12   A.    Yes, 1.5.

13             "Designated systems shall mean customer's user

14   and server systems designated on the order forms."

15   Q.    Does this license allow Rimini to use the Siebel

16   software on Rimini's computers?

17   A.    It does not.

18   Q.    And to be clear, can Rimini use Novell's Siebel

19   software on Rimini's servers to do troubleshooting or other

20   support for the customer?

21   A.    On Rimini's systems?

22   Q.    Right.

23   A.    Absolutely not.

24   Q.    How many of the Siebel licenses that were produced

25   for Rimini's customers had a restriction that the software

1    could only be used on the customer's system or as deployed

2    by the customer?

3    A.    Almost all of them.

4    Q.    Turning to section 2.1, subsection 4, does this

5    allow Novell to make archival or emergency backup copies?

6    A.    Yes, it states,

7            "To reproduce exactly as provided by Siebel a

8    reasonable number of copies of the programs and the

9    ancillary programs solely for archive or emergency backup

10   purposes or disaster recovery and related testing."

11   Q.    Does this reference to archive or emergency backup

12   copies mean that Rimini can use the Siebel software on

13   Rimini servers?

14   A.    It does not.

15   Q.    Can you explain how using the software is different

16   from having an archived or emergency backup?

17   A.    Sure.  In the production use of the software for its

18   intended use, as opposed to a backup copy that you maintain

19   if your system goes down.

20           So one system you use, the other one you put to

21   the side in case there's an issue where you can reload the

22   software to run it again.

23   Q.    Okay.  How many of the Siebel licenses that were

24   produced for Rimini's customers authorize archival or

25   backup copies using language similar to this?

853

1      A.    Almost all of them.

2            MR. HIXSON:  Okay.  I realize this may be

3   getting tedious because the licenses are similar.  But now

4   let's look at a JD Edwards license.

5            I would offer PTX 704 into evidence.

6            MR. STRAND:  No objection, Your Honor.

7            THE COURT:  It's admitted.

8         (Plaintiffs' Exhibit 704 received into

9         evidence.)

10           THE WITNESS:  The font keeps getting smaller.

11           MR. HIXSON:  We'll just blow them up even

12  larger.

13  BY MR. HIXSON:

14     Q.    Can you identify what PTX 704 is?

15     A.    Yes, it's the software license, services and

16  maintenance agreement between JD Edwards and Giant Cement

17  Holdings.

18     Q.    Please turn to article 2, section 1.  Does this

19  license contain an internal use restriction?

20     A.    It does.

21     Q.    And can you direct us to the language that says

22  that?

23     A.    Yes.  It states in number one,

24           "JD Edwards grants a customer" -- excuse me,

25  grants to customer a nonexclusive, nontransferable limited

854

1   license to use the software and documentation on the

2   customer systems for customer's internal business

3   operations."

4   Q.   So can Rimini use this customer's software to

5   benefit other customers?

6   A.   They cannot.

7   Q.   Okay.  How many of the JD Edwards licenses that were

8   produced for Rimini's customers contain this type of

9   internal use restriction?

10  A.   All of them.

11  Q.   Does section -- article 2, section 1 restrict where

12  the software can be used?

13  A.   It does.  It's clear it's on the customer's systems.

14  Q.   All right.  Can Rimini use this JD Edwards software

15  on its own servers to support their customers?

16  A.   They cannot.

17  Q.   How many JD Edwards licenses that were produced for

18  Rimini's customers have similar language restricting use of

19  the software to the customer's system?

20  A.   Almost all of them.

21  Q.   Please turn to article 2, section 7 subsection 3.

22       It says, "Customer shall not, or cause anyone

23  else to:  Copy the documentation or software except to the

24  extent necessary for customer's archival needs and to

25  support the users."

1               What does that mean?

2       A.    It means that they can't make any copies or cause

3    anyone else to use other than for the purposes.

4               So customer shall not cause anyone else to, copy

5    the software, except to the extent mentioned, for archival

6    purposes.

7       Q.    Does that language allow Rimini to use the software

8    on its servers?

9       A.    It does not.

10      Q.    And, again, how is using the software different from

11   having an archival copy?

12      A.    Again, use of the software is for its intended use,

13   running the programs to run your business.  The archive or

14   backup copy would be just that, it's a backup that you

15   maintain in case your other system goes down.

16      Q.    How many of the JD Edwards licenses that were

17   produced for Rimini's customers authorized archival copies

18   using similar language?

19      A.    Almost all of them.

20      Q.    All right.  Do you have in your binder a

21   demonstrative that summarizes your review of the Siebel and

22   JD Edwards licenses?

23      A.    I do.  It's PTX 5466.

24      Q.    Let's put up the demonstrative.

25               Now, have you personally reviewed every Siebel

1    and JD Edwards license in this summary to determine if this

2    demonstrative is accurate?

3    A.    I have.

4    Q.    Does this compilation summarize voluminous

5    information that would otherwise be difficult to show to

6    the jury?

7    A.    It does.  It summarizes over a hundred agreements.

8    Q.    And have the underlying license agreements that are

9    summarized here been provided to the defendants?

10   A.    They have.

11   Q.    Okay.  What does the first page of this

12   demonstrative show?

13   A.    It shows the number of customers with license

14   agreements.

15   Q.    You mean with respect to Siebel software?

16   A.    I'm sorry.  Yes, it shows the licenses for Siebel

17   software.

18   Q.    And what does the first column identify on the left?

19   A.    It identifies the number of customers with license

20   agreements, 36.

21   Q.    Okay.  And what is identified in footnote 1?

22   A.    It identifies that there are 48 customers that were

23   part of this case.  Twelve of them we couldn't locate the

24   agreements, and those are listed below.

25   Q.    What is described in the second column on this page?

1           THE COURT:  Excuse me a moment, Mr. Hixson.

2    This has not been admitted and yet it's being been

3    displayed.  Is it your intention to offer it?

4           MR. HIXSON:  I do intend.  I was going to walk

5    him through it, but I'm happy to move it into evidence now.

6           THE COURT:  Mr. Strand?

7           MR. STRAND:  Your Honor, we have no objection to

8    it, and we had gone through it last evening, but thank you

9    for raising that.

10           THE COURT:  All right.  It's admitted.

11        (Plaintiffs' Exhibit 5466 received into

12        evidence.)

13    BY MR. HIXSON:

14    Q.    And so turning to the second column, can you

15    describe what information is there.

16    A.    It is any limitations regarding customers' business

17    operations.

18    Q.    Okay.  And how many of the 36 customers had their

19    internal business operations language going in their Siebel

20    licenses?

21    A.    All the 36.

22    Q.    Okay.  And so for those customers, could Rimini use

23    one customer Siebel software to benefit other customers?

24    A.    No, again the limitation was to the customer's

25    business operations.

1    Q.    Okay.  And what does the third column describe in

2    this chart?

3    A.    It describes any limitations regarding use in the

4    customer systems only.

5    Q.    Okay.  And how many of the Siebel licenses had that

6    restriction?

7    A.    33 of the 36.

8    Q.    And what does the fourth column on this chart

9    describe?

10   A.    Limitations that were in those agreements regarding

11   any offsite copies.

12   Q.    And how many of the Siebel licenses had those

13   limitations?

14   A.    33 out of the 36.

15   Q.    And, sir, just to be clear, so the jury understands,

16   these 36 license agreements, are these for the Siebel

17   customers that Oracle lost to Rimini Street?

18   A.    They are.

19   Q.    What does the second page of this exhibit show?

20   A.    It's the license agreement summary for the JD

21   Edwards software customers.

22   Q.    And are these the JD Edwards software customers that

23   Oracle lost to Rimini Street?

24   A.    They are.

25   Q.    Okay.  What does the first column identify?

1    A.    The number of customers with license agreements.

2  There are 69.

3    Q.    Okay.  And what is identified in footnote 4?

4    A.    It identifies that there are actually 71 customers,

5  but two of those agreements could not be located.

6    Q.    What is described in the second column of this

7  chart?

8    A.    Any limitations regarding use other than for

9  customer's business operations.

10   Q.    And how many of these JD Edwards licenses had the

11 customer business operations restriction?

12   A.    All of the 69.

13   Q.    Okay.  What does the second column in the chart

14 describe?

15   A.    You mean the third?

16   Q.    Sorry, the third, yes.

17   A.    Limitations regarding use to customer systems only.

18   Q.    And how many of the JD Edwards licenses restricted

19 use to the customer system only?

20   A.    66 out of the 69.

21   Q.    And what does the final column on this chart show?

22   A.    The number of agreements that had limitations

23 regarding offsite copies.

24   Q.    And did 61 of the 69 have -- limit offsite copies to

25 archive, backup and disaster recovery copies?

```
1    A.    They did.

2    Q.    And did six allow no offsite copies at all?

3    A.    Yes, that's correct.

4          (Discussion held off the record.)

5              THE COURT:  Ladies and gentlemen, from time to

6    time, I'm sure we have to reboot these systems, and that's

7    what we need to do now for our reporting equipment.

8          (Discussion held off the record.)

9    BY MR. HIXSON:

10   Q.    I'm now going to turn to a different topic which is

11   Oracle's ban on automated downloading.  First, are you

12   familiar with My Oracle Support?

13   A.    I am.

14   Q.    What is My Oracle Support?

15   A.    It's a website where we provide technical support

16   services to customers.

17   Q.    Okay.  Since 2005, have there been any other support

18   sites where customers could access Oracle software and

19   support materials?

20   A.    There have been.

21   Q.    Okay.  And did those support sites also provide

22   access to software and support materials for PeopleSoft, JD

23   Edwards, and Siebel?

24   A.    They do.

25   Q.    Were there any limitations on who could access those
```

1    support sites?

2    A.    There were under the terms of use.

3    Q.    Okay.  Did customers have to have a valid support

4    contract to get onto the support sites?

5    A.    Yes, you couldn't access the site to obtain support

6    without having a support contract agreement with Oracle.

7    Q.    Okay.  I'd like to focus on the support sites that

8    Oracle had during the 2005 to 2011 time period that's

9    relevant for this lawsuit.

10           During that time, did Oracle have terms of use

11   that governed the access to their support sites?

12   A.    We did for all the sites.

13   Q.    Okay.  In general terms, what are terms of use?

14   A.    They're terms that govern the person who is

15   accessing the site's use of that site and the materials on

16   that site.

17   Q.    Do your job responsibilities require you to be

18   familiar with Oracle's terms of use for the Oracle support

19   sites?

20   A.    They do.

21   Q.    And can you explain how so.

22   A.    Sure.  One of the groups that reports to me, as I

23   mentioned earlier, was global practices, and they actually

24   work on the terms of use that's actually placed on those

25   sites.

1    Q.    And how long have you supervised that group?

2    A.    For over fifteen years.

3    Q.    All right.  Are terms of use common in the software

4    industry?

5    A.    They are.  If you're going to access anybody's

6    technical support site, they're going to have terms that

7    apply to your use of those systems.

8    Q.    How do you know that?

9    A.    Well, since 2005, we've acquired close to a hundred

10   companies, and most of those companies, when they had a

11   site, had terms of use that governed use of those sites.

12   Q.    After Oracle acquired PeopleSoft and Siebel, did you

13   become familiar with the terms of use governing the

14   websites with PeopleSoft, JD Edwards, and Siebel software

15   and support materials?

16   A.    I did.

17   Q.    How so?

18   A.    As part of the integration process when we acquired

19   those companies, we reviewed all the agreement terms.  So

20   the software license agreements we mentioned earlier, also

21   any terms of use for any websites they had, including those

22   for technical support.

23   Q.    Why did Oracle have terms of use for its support

24   sites?

25   A.    Just like the license agreement where it protects

1    our intellectual property, which is our software and

2    basically the value of our company, the terms of use in

3    those sites, also there's distribution of software that

4    occurs on those sites; and so, again, it's very important

5    to protect that and have agreement in terms that govern

6    that use.

7    Q.    Who did the terms of use apply to?

8    A.    They apply to the person who is accessing the site

9    and then agrees to those terms.

10   Q.    And then for customers that had a valid support

11   contract, what information did they need to provide to gain

12   access to the support sites?

13   A.    They had to obtain, once they had gotten the support

14   contract, a user ID and a log-in password to those systems.

15   Q.    Okay.  During the 2005 to 2011 time period, were the

16   software and support materials on Oracle support sites

17   password protected?

18   A.    They were.

19   Q.    And in that same timeframe, did users have to agree

20   to the website terms of use?

21   A.    They did.

22   Q.    Can you explain how they would agree to them?

23   A.    When they -- to obtain their user ID and their

24   log-in, they had to agree to the terms of use, they had to

25   check that they actually agreed that this is how I can use

1    this system.

2              In addition, every time you log on to the site,

3    the terms of use are also made available to you and applied

4    to you there also.

5    Q.    Okay.  And is there a link on the website every time

6    you log on where we can click to see the terms of use?

7    A.    There is, and it says the use of the systems are

8    subject to that agreement.

9    Q.    Okay.  Let's take a look at PTX 19, which I believe

10   has been preadmitted.

11             Can you identify what PTX 19 is?

12   A.    Yes.  It's the Customer Connection terms of use for

13   the Customer Connection support website.

14   Q.    What was Customer Connection?

15   A.    It was the PeopleSoft, JD Edwards technical support

16   site.

17   Q.    All right.  Is Customer Connection still an active

18   support site today?

19   A.    No.  They've been migrated to the My Oracle Support

20   site, which provides support for all of the Oracle

21   software.

22   Q.    Are the terms of use for My Oracle Support largely

23   the same as they were for Customer Connection?

24   A.    They are.

25   Q.    Did Oracle also have a support site for Siebel in

1    the 2005 and later time period?

2    A.    We did.

3    Q.    And were the terms of use for the Siebel support

4    site largely the same as those for Customer Connection?

5    A.    They were.

6    Q.    All right.  When a customer logs on to an Oracle

7    support site, are they restricted to seeing only what they

8    have licenses for?

9    A.    Oracle's technical support sites has access to all

10   the programs you could potentially get support for, but it

11   makes it clear you can only download those programs for

12   which you have a license.

13   Q.    All right.  But why does Oracle provide that broad

14   access?

15   A.    Well, I think it's for ease of use for the customer.

16   Often, you know, these are mission-critical systems where

17   the customer needed to get access to the information, and

18   so we need to make that easy for our technical support

19   customers who actually acquire a contract and pay for the

20   services.

21   Q.    Okay.  The first sentence of the terms of use says,

22           "By using the Oracle Customer Connection

23   web-based technical support service, customer agrees to the

24   following terms and conditions."

25           Can you explain what that means?

1    A.    Well, I think it basically says by using the system

2    you agree to these terms.

3    Q.    Why does the terms of use use the word "customer" to

4    refer to the person logging on?

5    A.    The whole point is that a customer is a person who

6    has a technical support contract, and that you only get

7    access if you do it, so you're a customer of Oracle's, but

8    it does state, obviously, hereinafter you.

9    Q.    Okay.  Could customers have consultants access the

10   website on their behalf?

11   A.    They could if they provide them access if the

12   agreement allows.

13   Q.    Okay.  Could those consultants just download

14   whatever they wanted to?

15   A.    No, they would still be subject to the -- what the

16   customer had a license for.

17   Q.    Okay.  Let's turn down to the third paragraph.

18         The first sentence says,

19         "You agree to access to Customer Connection,

20   including access to the support case function, will be

21   granted only to be your designated Oracle technical support

22   contacts, and that the materials may be used only in

23   support of your authorized use of the Oracle programs for

24   which you hold a supported license from Oracle."

25         Can you explain what that means?

1    A.    Sure.  And this is what you alluded to earlier, is

2    that there may be many programs that are available on the

3    site, but you are only authorized to use the programs for

4    which you have a supported license.

5    Q.    Okay.  The third sentence of this paragraph says,

6              "You agree that you will not access or use

7    Customer Connection in any manner that could damage,

8    disable, overburden, impair, or otherwise result in

9    unauthorized access to or interference with the proper

10   functioning of any Oracle accounts, systems, or networks."

11             Can you explain what that means?

12   A.    Sure.  It states that when you're accessing the

13   system, you can't do harm to the system, and it gives

14   examples of things that you could actually do to do that.

15   Q.    Okay.  The next sentence says,

16             "For example, you may not use any software

17   routines commonly known as robots, spiders, scrapers, or

18   any other automated means to access Customer Connection or

19   any other Oracle accounts, systems or networks."

20             Can you explain what that means?

21   A.    Sure.  We -- the intent when you have as a technical

22   support site is you have a problem, or you have a patch or

23   a fix you want to get.  You go there, you download the

24   patch or fix, you apply it to your system.

25             And we became aware of Mr. Ravin's former

868

1    company, TomorrowNow, using tools that did not go and

2    target single programs, it was using scrapers and pulling

3    down large numbers of programs, hundreds of programs down

4    at one time.

5           And the problem with that is it could overburden

6    the system, it could slow it down, it can bring it down,

7    and that can affect all the other technical support

8    customers that we have.

9           So other people who have paid for the services,

10   and have a right to use the service, could be impacted.  So

11   the idea here is we didn't expect anybody would do this, lo

12   and behold they did it, it affected the system, and we had

13   to overtly tell them don't do this because it actually

14   could harm the systems.

15   Q.    Okay.  And does this then prohibit that type of

16   automated downloading?

17   A.    It clearly does.

18   Q.    Okay.  What is the date of this version of the

19   Customer Connection terms of use?

20   A.    It is February 19th, 2007.

21   Q.    And how can you tell that?

22   A.    If you go to the footer at the bottom of the page,

23   we use version numbers that actually include the date, so

24   you can see v021907.

25   Q.    When did Oracle first include the language

869

```
1    prohibiting the use of automated downloading on the

2    Customer Connection support site?

3    A.    We did it on this date.

4    Q.    Okay.  Now, you said that Customer Connection was

5    for PeopleSoft and JD Edwards.  Did Oracle also ban

6    automated downloading on its support site for Siebel

7    software as well?

8    A.    We did.

9    Q.    And on what date did that happen?

10   A.    On the same date.

11   Q.    Since around February of 2007, have Oracle's terms

12   of use for all of its support sites for PeopleSoft, Siebel,

13   and JD Edwards, contained this ban on automated

14   downloading?

15   A.    They have.

16   Q.    Now I'm going to switch to a different topic, which

17   is about the e-delivery website.

18         First, I'd like to show you PTX 1, which has

19   been preadmitted.  On the first page at the bottom there's

20   an e-mail from Mr. Dennis Chiu at Rimini Street.  And you

21   can see at the end he says, "Sounds to me like they just

22   said help yourself to the buffet."

23         On this same screen at the top of his e-mail, he

24   says, "Dan's the man who found that recent development,"

25   and then there's a reference to you,
```

1    http://edelivery.oracle.com.

2              Mr. Allison, do you recognize that website?

3    A.    I do.  That's our electronic delivery system.

4    Q.    Okay.  And is that referred to as e-Delivery?

5    A.    It is.

6    Q.    What is e-Delivery?

7    A.    E-Delivery is the site that we provide to our

8    licensed customers to be able to download versions of the

9    programs.

10   Q.    How is e-Delivery different from My Oracle Support?

11   A.    E-Delivery is the delivery vehicle for the programs

12   themselves, whereas My Oracle Support is typically to

13   provide support services which would be patches and fixes,

14   things of that nature.

15   Q.    In the olden days, before Oracle delivered software

16   programs online, how did Oracle deliver software to the

17   customers?

18   A.    We delivered CDs, DVDs, and sometimes pallets of

19   them.

20   Q.    And did e-Delivery replace CDs or DVDs?

21   A.    They did, almost entirely.

22              MR. HIXSON:  Okay.  I offer PTX 649 in evidence.

23              MR. STRAND:  No objection, Your Honor.

24              THE COURT:  It's admitted.

25

1          (Plaintiffs' Exhibit 649 received into

2          evidence.)

3     BY MR. HIXSON:

4     Q.    Can you identify what PTX 649 is?

5     A.    Yes, this is the screen you will land on when you

6     get to the e-Delivery website.

7     Q.    Okay.  From 2005 through 2011, in order to download

8     software from e-Delivery, was it necessary to first click

9     through a screen like this?

10    A.    It was.

11    Q.    What information did the customer have to provide to

12    Oracle to obtain software from e-Delivery?

13    A.    They had to provide their full name, the company

14    name, e-mail address, and the country to which they were

15    downloading the software, as well as they had to agree to

16    some information down below.

17    Q.    Now, I'd like to ask you about that.  What does

18    someone have to agree to in order to obtain software from

19    e-Delivery?

20    A.    So if you go to the notice section, it says,

21          "By the software on this website, you agree that

22    you have already obtained a license from Oracle.

23          "Or, if you have not already obtained a license

24    from Oracle, or an Oracle partner for use of the software,

25    the electronic delivery trial license agreement on this

872

1   website governs your use of the software for the time

2   specified in such agreement."

3   Q.    So the user is agreeing that either he already has a

4   license he bought from Oracle, or he's agreeing to the

5   trial license; is that right?

6   A.    That's correct.  You have to actually affirmatively

7   check that at the bottom until you proceed to the download.

8   Q.    Okay.  And is that a box that the user has to

9   physically check to get the software?

10  A.    It is.  At the bottom portion of the screen, you

11  could say, "yes, I accept the trial terms," or "I have

12  already obtained a license from Oracle which governs my

13  use."

14  Q.    If Rimini accessed e-Delivery without having

15  purchased a license from Oracle for that software, what

16  license applied to Rimini?

17  A.    By default, the trial license applies.

18  Q.    Okay.  Let's talk about the trial license.  Why does

19  Oracle give trial licenses to people who haven't purchased

20  a software license?

21  A.    Well, it's not all that different than a lot of

22  software companies.

23        Before a customer buys they also -- they often

24  want to try or evaluate the software, you know, get a look

25  at what the user interface looks like, see what it looks

1    like and evaluate it before they actually make a decision

2    to buy.

3    Q.    Is it common in the software industry to have a

4    trial license like this?

5    A.    It's very common.

6    Q.    How do you know that?

7    A.    Well, again, we've acquired upward of a hundred

8    companies, so in addition to our own, many of the companies

9    we acquired also have trial software, and I think -- I

10   think many people are probably familiar from doing that in

11   a consumer basis as well.

12          MR. HIXSON:  I offer PTX 650 in evidence.

13          MR. STRAND:  No objection, Your Honor.

14          THE COURT:  It's admitted.

15       (Plaintiffs' Exhibit 650 received into

16       evidence.)

17   BY MR. HIXSON:

18   Q.    Can you identify what PTX 650 is?

19   A.    Yes, this is the electronic trial delivery license

20   agreement that would apply to you if you did not have a

21   license for the software.

22          So on the e-Delivery page, if you didn't have a

23   license, these are the terms you would be agreeing to.

24   Q.    And were the terms of the e-Delivery trial license

25   largely the same from 2005 to 2011?

874

1    A.    They were.

2    Q.    And does this exhibit reflect those terms?

3    A.    Yes, it does.

4    Q.    What does the license grant in section 1 allow the

5    user to do?

6    A.    The second sentence states,

7          "This agreement grants you the temporary right

8    to use the programs for evaluation purposes on the single

9    computer designated by you.  These rights are granted only

10   to you and may not be assigned or transferred to another

11   party."

12   Q.    Can you describe what "evaluation purposes" means.

13   A.    Sure.  Evaluation is, you know, similar to a trial.

14   It's to take a look at the software, decide if you want to

15   take it for a spin, see if you want to use the software and

16   you want to buy it or not.

17   Q.    Okay.  How long does the customer have this

18   temporary right to use the programs for evaluation

19   purposes?

20   A.    In the general information box that's highlighted at

21   the top of the screen, it states,

22         "The trial terms shall be 30 days from the date

23   of your acceptance of the terms and conditions of this

24   agreement."

25         So it's a 30-day trial only.

875

1    Q.    And so could someone use the program they get under

2    the trial license to run its business or support other

3    businesses under this license?

4    A.    No, and I think in the license grant section it goes

5    on to state,

6            "You must enter into a separate agreement to

7    obtain production license and technical support for the

8    programs."

9    Q.    Okay.  What does the termination provision in

10   section 2 provide for?

11   A.    It states what happens at the end of the trial term.

12           So if you do not obtain a program license --

13   excuse me, if you do not obtain a program use license at

14   the end of the trial term, at the end of the 30 days,

15           "You shall, A, cease using the programs, and, B,

16   certify to Oracle that you've destroyed or returned to

17   Oracle the programs and all copies."

18   Q.    All right.  Did the e-Delivery trial license

19   authorize Rimini to download software applications from

20   e-Delivery and build a software library to support its

21   customers?

22   A.    Absolutely not.

23   Q.    And why do you say that?

24   A.    It's for trial purposes only, and after 30 days it

25   has to destroy the software.

1           MR. HIXSON:  Your Honor, I have one topic left

2   for the witness.  I might go a few minutes past 11:30, but

3   it might be convenient to wrap his direct up today.

4           THE COURT:  All right.  You may do so.

5   BY MR. HIXSON:

6   Q.   Okay.  The last topic I'm going to ask you about,

7   Mr. Allison, is the method for determining damages from

8   infringement of Oracle Database.

9           First, does your responsibility for the pricing

10  of Oracle's licenses include pricing for Oracle's database

11  software?

12  A.   It does.

13          MR. HIXSON:  Okay.  Matt, I'd like to put on the

14  screen stipulation 25 from the joint pretrial order.

15  BY MR. HIXSON:

16  Q.   Mr. Allison, do you understand the parties have

17  entered into certain stipulations or agreements in this

18  case?

19  A.   I do.

20  Q.   And do you understand that one of them is that

21  Rimini has admitted to making copies of Oracle's database

22  software?

23  A.   Yes, I'm aware of that.

24  Q.   Okay.  Here we put up here that Rimini has at least

25  216 environments on its servers that contain installed

1   copies of Oracle Database.

2   A.    It does state that, yes.

3   Q.    Are there fees that Oracle normally charges for

4   people to use it's database software and to get updated

5   versions of the database software?

6   A.    There is.  There is a standard commercial price list

7   that we have that states the pricing for all of our

8   software as well as the cost or price for the technical

9   support services for that software.

10  Q.    So does the license fee include support?

11  A.    It does not.  It's a separate charge.

12  Q.    Okay.  How are support fees priced?

13  A.    They're generally priced at 22 percent of the net

14  license fee.  So if we charged $100 for the license, it

15  would be $22 annually for the support.

16  Q.    And was the support pricing Oracle's standard

17  practice during the 2005 to 2011 time period?

18  A.    It was, and it continues to be.

19  Q.    Let me ask you now what the license is.  Could

20  Rimini have bought one license from Oracle to allow it to

21  use Oracle Database to support multiple customers?

22  A.    Absolutely not.

23  Q.    And why do you say that?

24  A.    It's not a license grant, and the way we price our

25  software is on a per customer basis.

```
 1    Q.    Okay.  During the 2005 to 2011 time period, did

 2   Oracle have a standard agreement that it used to license

 3   Oracle Database?

 4    A.    We did.

 5    Q.    What was it called?

 6    A.    It was an Oracle license and services agreement,

 7   very similar to the software agreements we mentioned

 8   earlier.

 9              MR. HIXSON:  Okay.  I offer PTX 651.

10              MR. STRAND:  No objection, Your Honor.

11              THE COURT:  It's admitted.

12         (Plaintiffs' Exhibit 651 received into

13         evidence.)

14   BY MR. HIXSON:

15    Q.    And can you identify what PTX 651 is.

16    A.    Yes, it's an example of a Oracle license and

17   services agreement.

18              MR. HIXSON:  Okay.  Matt, can you enlarge

19   section C on the first page.

20   BY MR. HIXSON:

21    Q.    And, Mr. Allison, can you explain what rights this

22   license grants to the customer.

23    A.    Starting with the first sentence, it states,

24         "Upon Oracle's acceptance of your order, you

25   have the nonexclusive, nonassignable, royalty free
```

1   perpetual, unless others specified in the ordering

2   document, limited right to use the programs and receive any

3   services you ordered solely for your internal business

4   operations."

5   Q.    Can you give us a real world example of how someone

6   would use Oracle Database for its internal operations.

7   A.    Sure.  And the database is not usually used

8   independent of an application.  The database throws the

9   data and the application sits on top of that.  It's the --

10  the database is the data store.

11           So, you know, if you go to the PeopleSoft

12  example, if they are running an HR application, the HR

13  application actually sits on top of the Oracle Database,

14  and the information and the application is stored in the

15  Oracle Database.

16  Q.    Why does Oracle have this restriction limited use to

17  the customer's internal business operations?

18  A.    Well, again, our software is priced on a license and

19  a sale to a customer for their use only.  It's not a

20  multi-customer use license.

21  Q.    Okay.  Can you tell the date of this particular

22  version of the Oracle license and software agreement?

23  A.    I can.  In the footer, similar to the other

24  agreements, there's -- the version number is actually a

25  date.  So in this case it's December 15th, 2010, v121510.

1    Q.    Has this language limiting the license to the

2    customer's internal use been in all versions of the Oracle

3    license and services agreement from 2005 through at least

4    2011?

5    A.    It has.

6    Q.    Okay.  Is restricting an end user to only internal

7    use unusual in your experience?

8    A.    No, it's an industry standard term.

9    Q.    Could Rimini have purchased one of these licenses

10   for Oracle Database and used it to support numerous

11   customers?

12   A.    Absolutely not.

13   Q.    Can you explain how Rimini's using Oracle Database

14   to provide external support to its customers is different

15   than the internal use contemplated here?

16   A.    Sure.  It's not solely in the support of the

17   licensee or the person who actually licensed the software.

18   Q.    Okay.  Does Rimini's use of Oracle Database or --

19   during the 2005 to 2011 time period, did Rimini's use of

20   database to provide external support to customers affect

21   Oracle?

22   A.    Sure.  If Rimini didn't use our software, they

23   wouldn't be able to provide the type of support they

24   provided to their customers and therefore it wouldn't have

25   been able to take the customers from Oracle.

1    Q.    And so if a single license wouldn't allow Rimini to

2    support multiple customers, what would Rimini have needed

3    to purchase?

4    A.    Well, hypothetically, if it were to provide a

5    license to them, you would have to acquire a license for

6    each customer.

7    Q.    And you're referring to each customer for whose

8    benefit Rimini used the database software?

9    A.    Yes.

10   Q.    Does Oracle have standard pricing for a license for

11   Oracle Database?

12   A.    We do.

13   Q.    Is server information relevant to pricing for

14   database?

15   A.    It is.  The pricing's based on the size of the

16   server.

17   Q.    Okay.  And is that an industry standard for pricing

18   database software?

19   A.    It is.  The major players in database use a similar

20   pricing methodology.

21   Q.    If Oracle were to have given Rimini a license for

22   its use of database to support customers, would Oracle have

23   approved a discount from its list price?

24   A.    Well, first, I'm not sure I provide a license.

25        But for to provide a license, I don't think we

882

```
 1    provide a discount.  I'm not sure even it would be the
 2    standard price.
 3    Q.    And why would you not provide a discount to a
 4    technical support competitor?
 5    A.    Well, we're providing a license to replace a license
 6    we would normally sell to a customer.  Without that
 7    license, they would not be able to provide the service
 8    they're providing.
 9    Q.    Okay.  Now, if a customer pays a license fee to use
10    one version of Oracle Database, is the customer allowed to
11    download updated versions of database and use those as
12    well?
13    A.    Only if they have and maintain a technical support
14    contract which entitles them to updates.
15    Q.    Okay.  So is it the support contract that gives the
16    customer access and entitlement to updated versions of the
17    database?
18    A.    Correct.
19    Q.    Why isn't support included in the license fee for
20    database?
21    A.    Well, technical support, you have to realize when
22    you talk about updates or fixes or patches, things like
23    that, that involves tens of thousands of developers at our
24    company.
25              We spend a lot on our R&D, or research and
```

1    development, hundreds of millions of dollars on building

2    the next version or release of the programs, updates and

3    fixes, and it's on an ongoing basis.

4              So it's kind of like a subscription for the

5    ability to continue to get those updates and fixes in the

6    future.  When we provide those as part of the service, as

7    opposed to having to buy an update as an item, we provide

8    that as part of the technical support services.

9    Q.    Did you have an opportunity to talk to Oracle's

10   damages expert about the database licenses damages in this

11   case?

12   A.    I did.

13   Q.    And approximately how many times did you speak with

14   her?

15   A.    At least two times.

16   Q.    When you first spoke with Oracle's damages expert,

17   what did you talk about?

18   A.    I explained how our price list worked and the

19   standard methodology for pricing.

20   Q.    And in your second conversation with Oracle's

21   damages expert, what did you discuss?

22   A.    I reviewed the methodology she used to price the

23   damages.

24   Q.    And did her methodology and her approach seem

25   accurate and reasonable to you?

1    A.    They did.   It was based on server information

2    actually provided by Rimini.   I think it's rather

3    conservative, actually.

4                 MR. HIXSON:   Okay.   That's all I have, Your

5    Honor.

6                 THE COURT:   All right.   That will take us to our

7    conclusion today, ladies and gentlemen.

8                 I'm going to go through the full admonition to

9    you because we're going into a weekend period here so bear

10   with me but listen closely.

11                First, I remind you that during this recess,

12   you're not to discuss this the case with anyone or permit

13   anyone to discuss it with you or in your presence.

14                This caution includes not discussing the case

15   over any kind of electronic media, iPhones, Internet, et

16   cetera, iPads, certainly not anything through e-mails or

17   text messaging.   Simply stated, no communication is

18   allowed.

19                I don't expect that there's any coverage on any

20   newspapers or television or radio, but if there was, you

21   would certainly need to avoid that completely.   That

22   applies to the Internet as well.

23                Very important, I've mentioned before, please do

24   not do any kind of independent research or inquiry into

25   anything that may involve this case.   You must not consult

1    dictionaries, search the Internet, perform Google searches

2    or make any other investigation about the case on your own.

3              When this case is finally submitted, it is

4    absolutely imperative that all the jurors are deciding this

5    case based on the evidence presented in the courtroom that

6    all of you have heard.

7              Finally, keep an open mind until all the

8    witnesses have testified and all the evidence has been

9    presented and you've heard the Court's instructions on the

10   law which will be given at the close of the case, and also

11   the arguments by the counsel on behalf of their respective

12   clients.

13             Please leave your notes in the jury room.  They

14   will be protected over the weekend.

15             And we will start promptly 1:00.  I ask you to

16   please be here before that.  I'm going to have a session

17   with the attorneys before that so that we don't run into a

18   delay past the 1:00 hour.

19             And I wish you a pleasant and an enjoyable

20   weekend.  Football season has started, other things are

21   starting, so enjoy those to the max.  Have a very nice

22   weekend.  And you may go ahead and step down.

23             COURTROOM ADMINISTRATOR:  Please rise.

24        (Jurors exit courtroom at 11:35 a.m.)

25             THE COURT:  Have a seat, please.

1              Counsel, I've encouraged you, if you so choose,

2    to file points and authorities with the Court concerning

3    the issues concerning counsel advice that were previously

4    referenced.

5              I would want to have those authorities filed and

6    served by -- electronically by 5:00 on Sunday evening, and

7    we will meet in court at 12:30 to revisit that issue, as

8    well as others that may need to be revisited.

9              If there's anything new to be raised, I would

10   also want a heads-up on that before 5:00 on Sunday, again,

11   electronically.  If there's any question how to get that to

12   the Court, please check with my court clerk, Dionna

13   Negrete.

14             All right.  That should cover us for the time

15   being.  Is there a question?

16             MR. ISAACSON:  No, one housekeeping matter.  I

17   didn't read into the record that that last deposition

18   excerpt was the November 18th, 2011, deposition of

19   Mr. Ravin, page 347, line 14, through 348, line 9.

20             And we have the theory you've got a shadow jury

21   in the room?

22             MR. STRAND:  You may theorize all you want.

23             MR. ISAACSON:  Right.  We think that we've got a

24   group of people here who are intended to -- who are working

25   for counsel and who are, you know, supposed to mirror the

887

1    jury.  And we think it would be prudent if the Court

2    instructed them that they were to behave as counsel has to

3    do in the hallways in terms of not smiling or being on the

4    elevators with juries -- with the real jurors.

5              THE COURT:  Well, what I would do is admonish

6    counsel that if they are having any service such as that

7    with anyone, that they very carefully admonish any such

8    persons concerning the professional rules which would apply

9    here.

10             And I'm sure that everyone has a good sense of

11   what those are anyway, if there is anyone in the courtroom

12   who falls in that category.

13             Everyone obviously needs to appreciate the

14   sensitivities which are involved in putting a case like

15   this to trial with so many counsel, so many witnesses, and

16   jurors' time, court time and everyone involved.  So I can't

17   emphasize it enough.

18             That being the case, the Court, I think, can now

19   adjourn.  I'll wish you all a pleasant weekend, and see you

20   on Monday.

21             COURTROOM ADMINISTRATOR:  Please rise.

22        (The proceedings adjourned at 11:39 a.m.)

23                  *    *    *

24

25

888

1                              -o0o-

2          I certify that the foregoing is a correct

3      transcript from the record of proceedings

4      in the above-entitled matter.

5

6      _____        9/19/15

7      Donna Davidson, RDR, CRR, CCR #318        Date
       Official Reporter

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

889

1                               I N D E X

2    PLAINTIFFS' WITNESSES:                        PAGE
     SETH RAVIN
3        Cross Examination resumed By Mr. Webb        758
         Redirect Examination By Mr. Isaacson         787
4        Recross-Examination By Mr. Webb              825
     RICHARD ALLISON
5        Direct Examination By Mr. Hixson             829

6

7                             E X H I B I T S

8    PLAINTIFFS'                                   ADMITTED
     618                                              820
9    649                                              871
     650                                              873
10   651                                              878
     704                                              853
11   705                                              849
     2088                                             840
12   5328                                             833
     5356                                             795
13   5466                                             857

14

15

16

17

18

19

20

21

22

23

24

25