2010 WL 3629688
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,
S.D. New York.

ARISTA RECORDS LLC, et al., Plaintiffs,
v.
USENET.COM, INC., et al., Defendants.

No. 07 Civ. 8822(HB)(THK).    |    Feb. 2, 2010.

**AMENDED [1] REPORT AND RECOMMENDATION (PRO SE)**

THEODORE H. KATZ, United States Magistrate Judge.

*\*1* TO: HON. HAROLD BAER, JR., UNITED STATES DISTRICT JUDGE

FROM: THEODORE H. KATZ, UNITED STATES MAGISTRATE JUDGE.

On October 12, 2007, Plaintiffs Arista Records LLC, Atlantic Recording Corporation, BMG Music, Capital Records, Inc., Caroline Records, Inc., Elektra Entertainment Group, Inc., Interscope Records, LaFace Records LLC, Maverick Recording Company, Sony BMG Music Entertainment, UMG Recordings, Inc., Virgin Records America, Inc., Warner Brothers Records, Inc., and Zomba Recording LLC (collectively, "Plaintiffs") commenced this copyright infringement action against Defendants Usenet.com, Inc. ("UCI"), Sierra Corporate Design, Inc. ("Sierra"), and Gerald Reynolds ("Reynolds," collectively, "Defendants"), seeking damages and injunctive relief. (*See* Complaint ("Compl."), dated Oct. 12, 2007; *see also* First Amended Complaint ("Am.Compl."), dated Sept. 17, 2008.) Plaintiffs alleged widespread infringement of their copyrights in sound recordings, vis-a-vis a network of computers called the USENET.[2] According to Plaintiffs, Defendants UCI and Sierra, led by their director and sole shareholder, Defendant Reynolds, provided access to the USENET for a fee, where subscribers to Defendants' services could freely access "millions of copyrighted sound recordings," without authorization from the copyright owners; subscribers were, in fact, encouraged and enticed to download Plaintiffs' works. (*See* Am. Compl. ¶¶ 2–3.)

This case was previously referred to this Court for general pretrial supervision. Throughout the course of discovery, Defendants' conduct was dilatory, at best, if not entirely evasive. As a result, this Court sanctioned Defendants for spoliation of certain relevant evidence. *See Arista Records, LLC v. Usenet.com, Inc.,* 608 F.Supp.2d 409, 442–43 (S.D.N.Y.2009). Thereafter, Plaintiffs moved for summary judgment and terminating sanctions, premised on additional discovery misconduct by Defendants. Defendants cross-moved for summary judgment based on their affirmative defense of protection under the Digital Millennium Copyright Act's ("DMCA") safe harbor provision.

By Opinion and Order, dated June 30, 2009, District Judge Harold Baer, Jr. granted Plaintiffs' summary judgment motion in its entirety, granted Plaintiffs' terminating sanctions motion in part, and dismissed Defendants' cross-motion as moot. *See Arista Records, LLC v. Usenet.com, Inc.,* 633 F.Supp.2d 124, 129 (S.D.N.Y.2009). Specifically, Judge Baer concluded that there was no material issue of fact as to Defendants' joint and several liability for (1) direct infringement of Plaintiffs' exclusive right of distribution, under 17 U.S.C. § 106(3); (2) inducement of copyright infringement; (3) contributory copyright infringement; and (4) vicarious copyright infringement. *See id.* at 159. In addition, Judge Baer "preclude[d] Defendants from asserting their affirmative defense of protection under the DMCA's safe harbor provision." *Id.* at 142. The latter conclusion rendered Defendants' cross-motion moot. The action was then referred to this Court for an inquest on damages. (*See* Order, dated June 30, 2009; Order, dated Dec. 15, 2009.)[3]

*\*2* In their pre-inquest submissions, Plaintiffs contend that they "simply have no principled basis to seek any amount less than the maximum award per work and therefore ask that the Court enter an award of $131,700,000." (*See* Plaintiffs' Proposed Findings of Fact and Conclusions of Law, dated Sept. 11, 2009 ("Pls.' Damages Mem."), at 4; *see also* Plaintiffs' Reply Memorandum of Law in Support of Their Proposed Findings of Fact and Conclusions of Law, dated Oct. 13, 2009 ("Pls.' Reply Mem."), at 2.) They arrive at this amount by multiplying the number of works owned by Plaintiffs that they allege Defendants to have infringed (878), by the maximum amount of statutory damages available for willful infringement ($150,000).

In response, Defendant Reynolds does not dispute Plaintiffs' ownership of these works or the number of works infringed, but instead suggests that the Court should award the minimum amount of statutory damages available for innocent infringement ($200). [4] (*See* Defendant's Reply to Plaintiffs' Proposed Findings of Fact and Conclusions of Law, dated Oct. 15, 2009 ("Def.'s Damages Mem."), at 13.)

For the reasons that follow, this Court recommends that Plaintiffs be awarded statutory damages in the amount of $7,500 per work, for a total damages award of $6,585,000.

**DISCUSSION**

**I. Calculation of Statutory Damages Under the Copyright Act**

Under the Copyright Act, "an infringer of copyright is liable for either (1) the copyright owner's actual damages and any additional profits of the infringer ...; or (2) statutory damages." 17 U.S.C. § 504(a). Here, Plaintiffs have elected to receive statutory damages as compensation for Defendants' infringing activities. (*See* Pls.' Damages Mem. at 1.)

Section 504(c) of the Copyright Act provides, in relevant part, that the owner may recover "statutory damages for all infringements involved in the action, with respect to any one work, ... in a sum of not less than $750 or more than $30,000 as the court considers just." 17 U.S.C. § 504(c)(1); *see also Island Software & Computer Serv., Inc. v. Microsoft Corp.,* 413 F.3d 257, 262–63 (2d Cir.2005). If a court determines that the infringement was willful, however, it may award up to $150,000 per infringement. *See* 17 U.S.C. § 504(c)(2); *Island Software,* 413 F.3d at 263. Conversely, if a defendant "was not aware and had no reason to believe that his or her acts constituted an infringement of copyright, the court in its discretion may reduce the award of statutory damages to a sum of not less than $200." 17 U.S.C. § 504(c)(2).

Statutory damages under the Copyright Act are calculated based on the number of works infringed, not the number of times a defendant infringed each work. *See WB Music Corp. v. RTV Commc'n Group, Inc. .,* 445 F.3d 538, 540 (2d Cir.2006); *Twin Peaks Prods., Inc. v. Publ'ns Int'l. Ltd.,* 996 F.2d 1366, 1381 (2d Cir.1993); *U2 Home Entm't, Inc. v. Hong Wei Int'l Trading, Inc.,* No. 04 Civ. 6189(JFK), 2008 WL 3906889, at *11 (S.D.N.Y. Aug.21, 2008); *Smith v. NBC Universal,* No. 06 Civ. 5350(SAS), 2008 WL 612696, at *1 (S.D.N.Y. Feb.28, 2008).

**A.** *The Number of Works Infringed*

***3** Plaintiffs seek damages for the infringement of 878 separate works. To reach this number, Plaintiffs include each of the 683 works that they submitted in connection with their summary judgment motion as indisputably owned by Plaintiffs and infringed by Defendants, as well as an additional 195 works identified via Plaintiffs' expert report. (*See* Pls.' Damages Mem. at 8–10.) Defendants do not dispute Plaintiffs' ownership of these works, nor do they dispute Plaintiffs' count. Nevertheless, for the sake of completeness, the Court will briefly outline the evidence and methodology by which Plaintiffs reached this number.

Plaintiffs demonstrated in their motion for summary judgment that Defendants infringed 683 works by submitting a limited set of log data showing (1) downloads by Defendants' subscribers; (2) downloads by Defendants' former employees; and (3) downloads by Plaintiffs' forensic investigators. (*See* Pls.' Damages Mem. at 9.) Judge Baer accepted Plaintiffs' submissions as "uncontroverted evidence of unauthorized reproduction of [Plaintiffs'] works." *Arista Records, LLC,* 633 F.Supp.2d at 149.

To support their damages claim for an additional 195 works, Plaintiffs resubmit the expert report of Dr. Richard Waterman —previously submitted to Judge Baer to determine liability. (*See* Declaration of Dr. Richard Waterman, dated Feb. 19, 2009 ("Waterman Decl.").) Dr. Waterman conducted a statistical analysis of the content previously offered for download to Defendants' subscribers. (*See id.* ¶ 3.) Although the crux of his analysis was to show the percentage of music files available for download that were not authorized for free distribution—a staggering 94.17 percent —his work uncovered an additional 195 works owned by Plaintiffs. (*See id.* ¶¶ 11–13 & Ex. 4.) Judge Baer accepted Dr. Waterman's testimony as "reliable and relevant, and admissible for purposes of the [summary judgment] motion." *Arista Records, LLC,* 633 F.Supp.2d at 145. Plaintiffs now submit the declarations of several record label representatives attesting to Plaintiffs' ownership in these 195 works. (*See* Declaration of JoAn Cho, dated Sept. 10, 2009 ("Cho Decl."); Declaration of Wade Leak, dated Sept. 10, 2009 ("Leak Decl."); Declaration of Alasdair McMullan, dated Sept. 10, 2009 ("McMullan Decl."); Declaration of Silda Palerm, dated Sept. 9, 2009 ("Palerm Decl.").)

In light of Plaintiffs' uncontroverted submissions and Judge Baer's prior determination that this evidence is relevant,

reliable and admissible, the Court concludes that Plaintiffs have established entitlement to statutory damages for the infringement of 878 works. [5]

**B.** *Amount of Damages for Each Infringed Work*
Plaintiffs request $150,000 for each of the 878 infringed works. (*See* Pls.' Mem. at 7–8.) Plaintiffs argue that Defendants' conduct was willful and egregious, and thus, damages should be set at the statutory maximum. While the Court does not disagree that Defendants' conduct was willful, for the reasons explained below, an award of $7,500 for each infringed work—a total damages amount of $6,585,000—is sufficient.

**\*4** A court has broad discretion to determine the specific amount of statutory damages to be awarded under 17 U.S.C. § 504(c). *See Island Software,* 413 F.3d at 265; *Fitzgerald Publ'g Co. v. Baylor Publ'g,* 807 F.2d 1110, 1116 (2d Cir.1986). In exercising this discretion, a court should consider (1) the expenses saved and profits earned by the infringer; (2) the revenues lost by the plaintiff; (3) the value of the copyright to the plaintiff; (4) the deterrent effect of the award on those other than the infringer; (5) the willfulness of the infringer's conduct; (6) whether the infringer cooperated in providing records to assess the value of the material infringed; and (7) the likelihood the award will discourage the defendant from repeating its infringement. *See Fitzgerald,* 807 F.2d at 1117; *U2 Home Entm't,* 2008 WL 3906889, at \*11; *Arclightz Films Pvt. Ltd. v. Video Palace Inc.,* 303 F.Supp.2d 356, 362 (S.D.N.Y.2003).

**1.** *Defendants' Profits*
Defendants generated revenues by charging their customers a monthly fee, based on the volume of data a subscriber downloaded. Subscribers who paid monthly fees of either $4.95, $7.95, or $11.95, could download up to two, ten, or twenty gigabytes of data, respectively; for $18.95 per month, subscribers could download an unlimited amount of data. (*See* Declaration of Gerald Reynolds, dated Sept. 30, 2009 ("Reynolds Decl."), Ex. K.) In the years 2008 and 2009, Defendants had 16,301 and 15,100 subscribers, respectively. (*See id.,* Ex. J.) By this Court's calculations, these subscribers were the source of gross monthly revenues to Defendants of somewhere between $100,000 and $200,000. Assuming these subscribers paid their monthly fees for the entirety of the year (and such an assumption is not unreasonable given the relatively consistent subscriber numbers across the two years), Defendants earned between $1.2 and $2.4 million during each of 2008 and 2009. Further, although subscriber data has only been provided for 2008 and 2009, Defendants operated their business for ten years prior to this litigation. (*See* Pls.' Damages Mem. at 19.) In addition, Plaintiffs demonstrated that approximately 42 percent of Defendants' subscribers used their services primarily to download music, and approximately 94 percent of all music files available for download consisted of infringing or highly likely to be infringing material. *See Arista Records LLC,* 633 F.Supp.2d at 131–33; *see also id.* at 157 (stating that "there is no doubt that infringement constitutes a draw for users of Defendants' service").

During the course of this litigation, Defendants have also produced annual balance sheets, which show gross income of $1.1, $1.2, and $1.3 million for each of 2005, 2006, and 2007. (*See* Declaration of Gianni P. Servodidio, dated Sept. 11, 2009 ("Servodidio Decl."), Ex. 3.) Defendants' gross income is therefore relatively consistent with the subscriber data outlined above. Defendants, however, list their net income for each of those years as approximately $57,000 in 2005, $195,000 in 2006, and a loss of $51,000 in 2007. The Court cannot accept these bottom-line numbers as accurate for several reasons. First, Defendants inexplicably deduct upwards of $1 million from each year's gross income for what they label "Cost of Goods Sold/Service Fee." (*See id.*) Defendants offer no explanation for this behemoth expense, which reduces their profits by approximately 75 to 85 percent. Further, Defendants deduct legal expenses for each of 2005, 2006, and 2007 in the amount of $80,000, $85,000, and $256,000, respectively. (*See id.*) The substantial increase in legal expenses for 2007 is in all likelihood related directly to this litigation, filed in the same year. Defendants may not deflate their profits based on the money spent defending this action, in order to reduce their damages. Thus, while the Court cannot identify with exact certainty Defendants' profits, it is clear that Defendants consistently profited from their business, potentially earning more than $1 million per year from their infringing activities. [6] Plaintiffs have also submitted evidence that Defendant Reynolds is taking steps to dissipate his assets. (*See* Servodidio Decl. ¶ 5 (indicating that Plaintiffs' investigation of Reynolds has revealed that he transferred assets to his wife and moved to a large residence in Florida, unencumbered by any mortgages and protected from liens by Florida law).)

**2.** *Revenues Lost by Plaintiffs*

**\*5** With respect to their lost revenues, Plaintiffs argue that "the unauthorized availability of the plaintiffs' copyrighted works online directly [sic] has impacted the legitimate, authorized digital market for those works, as those legitimate markets cannot compete with the unlimited unauthorized downloads that [Defendants] facilitated." (Pls.' Damages Mem. at 20.) Defendants, on the other hand, contend that Plaintiffs "did not even attempt to offer evidence of their actual injuries, seeking, instead, an award of statutory damages entirely for purposes of punishment and deterrence ." (Def.'s Damages Mem. at 19.)

As an initial matter, Plaintiffs are not required to prove any actual damages upon electing to receive statutory damages. *See* 17 U.S.C. § 504(c)(1) ("the copyright owner may elect, at any time before final judgment is rendered, to recover, *instead of actual damages and profits,* an award of statutory damages") (emphasis added). In any event, Plaintiffs have established direct harm to their business by Defendants' infringing conduct—even if such harm is not easily quantified. Plaintiffs have demonstrated that over 94 percent of the content files in Defendants' music newsgroups were either infringing or highly likely to be infringing. *See Arista Records LLC,* 633 F.Supp.2d at 131–33. In the course of their limited discovery—impeded by Defendants' flagrant discovery abuses—Plaintiffs still managed to uncover 878 songs that Defendants made freely available to their subscribers. Had those subscribers who downloaded these songs purchased the same through legitimate channels of commerce, Plaintiffs would have certainly received revenues. The Court recognizes that subscribers might not necessarily have purchased *every* song that they otherwise downloaded for free. Nonetheless, there is no question that the some 15,000 subscribers with an appetite for downloading multiple gigabytes of data per month would have likely made purchases.

Defendants contend that because Plaintiffs typically sell each of these 878 songs for $1.29 per download, via services such as Apple's iTunes, Plaintiffs' lost revenues are de minimis. (*See* Def.'s Damages Mem. at 18.) Defendants ignore the fact that they operated their business for ten years, and, at times, had over 15,000 subscribers. Thus, while each song may have cost only $1.29 on iTunes, Plaintiffs could have lost as much as $20,000 in revenues per song, depending on the number of subscribers who downloaded each song.

### 3. *The Value of Plaintiffs' Copyrights*

It is undisputed that Plaintiffs' copyrights hold great value. The list of 878 works infringed by Defendants "are some of the most popular sound recordings for nationally and internationally known recording artists, grossing hundreds of millions of dollars in sales." (Pls.' Damages Mem. at 22.) The list includes songs by Van Halen, the Spice Girls, Guns N'Roses, and Aerosmith, to name a few. (*See id.*)

### 4. *Deterrent Effect of the Award*

**\*6** Next, the Court must consider the deterrent effect on both other potential infringers as well Defendants themselves. *See Fitzgerald,* 807 F.2d at 1117. It is well documented that Defendants are not alone in their pursuit to make Plaintiffs' works freely available via internet downloads. *See Universal City Studios, Inc. v. Reimerdes,* 111 F.Supp.2d 294, 335 (S.D.N.Y.2000) ("Copyright, and more broadly, intellectual property piracy are endemic[.]"); *see also* H.R.Rep. No. 106–216 (1999) ("[C]opyright piracy of intellectual property flourishes, assisted in large part by today's world of advanced technologies."). The need to deter future infringers is therefore great.

Similarly, Defendants' conduct has been nothing short of egregious, and it seems that only a significant damages award will curb their abusive practices. They not only disregarded Plaintiffs' exclusive rights to distribution and reproduction of their protected works, but they also defied the judicial process with their discovery misconduct, resulting in sanctions by this Court and Judge Baer. *See Arista Records LLC,* 633 F.Supp.2d at 142; *Arista Records LLC,* 608 F.Supp.2d at 441–43.

### 5. *Defendants' Cooperation in Providing Records to Assess the Value of the Material Infringed*

One need not look further than the prior decisions in this action to learn of Defendants' lack of cooperation. *See, e.g., Arista Records LLC,* 633 F.Supp.2d at 139–42 (sanctioning Defendants for, *inter alia,* "wiping" seven hard drives of data, sending potentially key witnesses on all-expense paid trips to Europe to avoid depositions, and providing false sworn responses to interrogatories); *Arista Records LLC,* 608 F.Supp.2d at 429–43 (sanctioning Defendants for, *inter alia,* spoliation of relevant server data and destruction of "highly incriminating promotional materials"). Their misconduct has unquestionably prejudiced Plaintiffs. Despite the fact that 42 percent of Defendants' subscribers used their services primarily to download music—94 percent of which consisted of infringing or highly likely to be infringing material—

Plaintiffs could only uncover 878 works that Defendants infringed due to Defendants' destruction and concealment of relevant evidence.

#### 6. *Defendants' Willful Infringement*

Finally, and perhaps most significantly, the Court must consider the willful nature of Defendants' conduct. An infringement is willful if "the defendant had knowledge that its conduct represented infringement or perhaps recklessly disregarded that possibility." *Hamil America, Inc. v. GFI,* 193 F.3d 92, 97 (2d Cir.1999); *accord Twin Peaks,* 996 F.2d at 1382. "Willfulness in this context means that the defendant recklessly disregarded the possibility that its conduct represented infringement. A plaintiff is not required to show that the defendant had knowledge that its actions constituted an infringement." *Yurman Design, Inc. v. PAJ, Inc.,* 262 F.3d 101, 112 (2d Cir.2001) (internal quotation marks and citations omitted).

**\*7** Plaintiffs argue that Defendants "intentionally engaged in, fostered and facilitated widespread copyright infringement for [their] personal financial benefit." (Pls.' Damages Mem. at 15.) As support, they point to Defendants' destruction or concealment of "the very server log records that would have demonstrated widespread direct infringement" (*see id.* at 16), as well as Judge Baer's conclusions that Defendants were "active participants in the process of copyright infringement" with "an intent to foster infringement by their users." *Arista Records LLC,* 633 F.Supp.2d at 148, 153.

Defendants, however, contend that they "had no reason to believe that [their conduct] constituted an infringement of copyright." (Def.'s Damages Mem. at 8.) Defendants maintain that they are "innocent" infringers, their actions are protected under the DMCA's safe harbor, that counsel advised them of the same, and that because the USENET is also "capable of substantial noninfringing use," Defendants cannot be held liable in accordance with *Sony Corp. Of Am. v. Universal City Studios, Inc.,* 464 U.S. 417, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984). (*See* Def.'s Damages Mem. at 1–6.) [7]

Notwithstanding Defendants' newly minted advice of counsel argument, all of Defendants' other arguments were previously rejected by Judge Baer. *See Arista Records LLC,* 633 F.Supp.2d at 153 (concluding that Defendants evinced an "intent to foster copyright infringement by their users"); *id.* at 142 (precluding "Defendants from asserting their affirmative defense of protection under the DMCA's safe harbor provision" as a sanction for discovery abuses); *id.* at 156 (rejecting Defendants' reliance on *Sony* due to the fact that "the noninfringing uses for Defendants' service are immaterial").

Defendants' remaining argument—advice of counsel—is also without merit. Defendants have not previously asserted an advice of counsel defense. To the contrary, Defendants have declined to produce the communications that might support this position, on the basis of attorney-client privilege. (*See* Pls.' Reply Mem. at 5–6 .) Defendants may not use the privilege as a both a shield and a sword, protecting the very documents from disclosure that they claim support their "innocence" of copyright infringement. *See UMG Recordings, Inc. v. MP3.com, Inc.,* No. 00 Civ. 472(JSR), 2000 WL 1262568, at \*4 (S.D.N.Y. Sept.6, 2000). Further, Defendants' alleged reliance on counsel is premised on a letter written by their attorneys to Plaintiffs. (*See* Def.'s Damages Mem. at 2–5.) As Plaintiffs correctly point out, an advocacy letter is insufficient to support Defendants' purported defense of reliance on counsel. *See, e.g., Wildlife Exp. Corp. v. Carol Wright Sales, Inc.,* No. IP–89–844–C, 1992 WL 597841, at \*5 (S.D.Ind. Aug.13, 1992) (noting that "advice of counsel is proved by the letter counsel sends his client, not the letter counsel sends his adversary").

**\*8** The Court has little difficulty concluding that Defendants' conduct was willful. Indeed, copyright infringement "formed the backbone of [Defendants'] business model." *Arista Records LLC,* 633 F.Supp.2d at 153. Defendants' "intent to induce or foster infringement ... was unmistakable, and no reasonable factfinder could conclude otherwise." *Id.* at 154. Defendants had the "unfettered ability to control access to newsgroups on the USENET," but declined to do so in a way that would curb infringement. *Id.* at 157. [8]

#### 7. *Application*

In light of the multiple factors that a court must consider, it is not surprising that courts have issued awards across the entire spectrum of statutory damages. That said, in file sharing cases, the results have been somewhat more consistent. In cases of individuals who download music for their own private enjoyment, and default or lose on summary judgment, plaintiffs typically seek, and courts award, the statutory minimum of $750 per work. *See, e.g., Sony BMG Music Entm't v. Thurmond,* No. 06 Civ. 1230(DGT), WL 4110292, at \*1 (E.D.N.Y. Nov. 24, 2009) (imposing statutory damages

of $750 per infringement where individual downloaded and then distributed copyrighted recordings); *UMG Recordings, Inc. v. Francis,* No. 06 Civ. 4435(LTS)(THK), 2007 WL 2438421, at *3 (S.D .N.Y. Aug. 28, 2007) (same). On the other hand, those individuals who have chosen to take more aggressive litigation strategies and proceed to trial, have faced stiffer awards. *See, e.g., Capitol Records Inc. v. Thomas–Rasset,* Civil No. 06–1497, WL 291763, at *9 (D.Minn. Jan. 22, 2010) (after four years of litigation and a full trial, judge awarded three times the statutory minimum, $2,250 per infringement; this was reduced from $80,000 per work that the jury previously awarded); *Sony BMG Music Entm't v. Tenenbaum,* No. 07cv11446–NG, 2009 WL 4547019, at *17 (D.Mass. Dec.7, 2009) (rejecting defendant's eleventh hour fair use defense, after jury previously awarded $22,500 per work).

In cases of defendants who are the owners or operators of businesses or services that facilitate or induce infringement, awards are even larger. *See, e.g., UMG Recordings, Inc.,* 2000 WL 1262568, at *6 (concluding that defendants, who operated an internet service that facilitated digital music downloads, would be held liable for $25,000 per CD [9] for which plaintiffs prove infringement); *see also BMG Music v. Pena,* No. 05 CV 2310, 2007 WL 2089367, at *4 (E.D.N.Y. July 19, 2007) (awarding $35,000 per work against owners of a retail store selling copyrighted recordings without authority to do so). In addition, many cases against internet businesses alleged to have induced infringement settle out of court for sizeable amounts. *See* Jeremy W. Peters, *Kazaa Said to Pay $10 Million in Settlement, N.Y. Times,* Nov. 1, 2006 (Kazaa agrees to pay $10 million to record labels and motion picture studios, in addition to $115 million pledged in an earlier agreement); Jeff Leeds, *Grokster Calls it Quits on Sharing Music Files, N.Y. Times,* Nov. 8, 2005 (Grokster agrees to pay up to $50 million in damages); Matt Richtel, *Songwriters and Publishers Reach a Deal with Napster, N.Y. Times,* Sept. 25, 2001 (Napster agrees to pay $36 million to settle copyright lawsuits).

 ***9** Taking into consideration all of the foregoing factors and the evidence presented to the Court, particularly Defendants' egregious conduct, their handsome profits, and the objective of deterrence, the Court concludes that an award of $7,500 per infringed song, for a total of $6,585,000, adequately serves the purposes of statutory damages. Defendants' gross income—not net profits—for the years 2005 through 2007 exceeded $1 million per year, and, thus, the total damages award is, in part, reflective of that amount. Although far from the amount requested by Plaintiffs—$150,000 per song—an award of $7,500 per song is ten times the statutory minimum. This is sufficient to deter not only Defendants, but other potential infringers. The Court is mindful of the fact that the corporate Defendants previously filed for bankruptcy. However, the automatic stay has been lifted, and a judgment may be entered against them. In addition, Defendant Reynolds, despite his claims to the contrary, appears to have at least some resources to satisfy a monetary judgment. In fact, evidence has been presented to the Court that Reynolds is actively concealing his assets, leading the District Court to appoint a receiver and enter an order enforcing his compliance with a Preliminary Injunction Order. (*See* Servodidio Decl. Exs. 11 & 12.)

Finally, the Court rejects Defendants' argument that a large damages award would offend due process. (*See* Def.'s Damages Mem. at 20–24.) The Second Circuit has pondered the question of whether statutory damages could raise due process concerns. *See Parker v. Time Warner Entm't Co., L.P.,* 331 F.3d 13, 22 (2d Cir.2003). In that case, the Second Circuit considered, in dicta, the hypothetical question of whether the recovery of statutory damages by each individual plaintiff in a class action could result in a "devastatingly large damages award, out of all reasonable proportion to the actual harm suffered by members of the plaintiff class." *Id.* The instant case is not a class action, and thus, does not raise the same concerns. As Plaintiffs note, Defendants have cited "no case where a court has found a statutory damages award *within* the range prescribed by Congress to be unconstitutional." (*See* Pls.' Reply Mem. at 8.) Further, and as discussed above, the Court has carefully considered all of the relevant factors in fashioning its award, including Defendants' profits and Plaintiffs' lost revenues. Accordingly, Defendants' due process argument is without merit.

**CONCLUSION**

For the reasons set forth above, this Court respectfully recommends that a judgment be entered against Defendants, jointly and severally, for statutory damages in the amount of $6,585,000. [10]

Pursuant to 28 U.S.C. § 636(b)(1)(c) and Rule 72 of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this report to file written objections. *See also* Fed.R.Civ.P. 6(a) and (e). Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Harold

Baer, Jr., United States District Judge, 500 Pearl Street, New York, N.Y. 10007, and to the chambers of the undersigned, Room 1660, 500 Pearl Street. Any requests for an extension of time for filing objections must be directed to Judge Baer. Failure to file objections will result in a waiver of those objections for purposes of appeal. *See Thomas v. Arn,* 474 U.S. 140, 147–48, 106 S.Ct. 466, 471, 88 L.Ed.2d 435 (1985); *Mario v. P & C Food Mkts., Inc.,* 313 F.3d 758, 766 (2d Cir.2002); *Spence v. Superintendent,* 219 F.3d 162, 174 (2d Cir.2000); *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15, 16 (2d Cir.1989) (per curiam).

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 3629688

## Footnotes

1. This Amended Report and Recommendation corrects a reference to the entry of a default judgment made on page 22 of the original Report and Recommendation. It is otherwise identical.
2. Despite the similarity between the name of Defendant Usenet.com, Inc. and the network to which it provides access (the USENET), the two are indeed distinct. Defendant UCI is one of a number of websites through which one can gain access to the USENET. To avoid any confusion, the network will be referred to as the "USENET," and Defendant Usenet.com, Inc. will be referred to as "UCI."
3. Defendants Sierra and UCI have each filed for bankruptcy in the District of North Dakota. On November 3, 2009, the United States Bankruptcy Court for the District of North Dakota lifted the automatic stay with respect to both corporate Defendants. Thus, Judge Baer's Summary Judgment Order and this Court's determination of damages applies with equal force as against all Defendants. (*See* Order, dated Dec. 11, 2009.) The Court will refer to the Defendants collectively throughout this Report and Recommendation. All parties have consented to a determination of damages by this Court, rather than a jury. (*See* Stipulation, dated July 16, 2009; Stipulation, dated Dec. 28, 2009.)
4. In light of the automatic stay imposed by the Bankruptcy Court at the time of the pre-inquest submissions with respect to Defendants UCI and Sierra, only Defendant Reynolds submitted briefing on the issue of damages. He did so *in propria persona,* although he was represented by counsel for the majority of the proceedings in this case, including the summary judgment motions. All Defendants have since consented to this Court's determination of damages based on the brief filed by Defendant Reynolds. (*See* Stipulation, dated Dec. 28, 2009.)
5. While 878 is not an insubstantial number, Plaintiffs likely could have proven a significantly larger number of infringements but for Defendants' misconduct in discovery. Indeed, the bulk of Plaintiffs' numbers (683) are based on what they uncovered prior to Defendants' spoliation of relevant evidence. And Dr. Waterman's report, uncovering an additional 195 works, was based on only a sampling of 1,800 music files, culled down from over five million files previously available to Defendants' subscribers. (*See* Waterman Decl. ¶ 4.)
6. Defendants argue that an alleged infringer who charges a monthly fee for access to the USENET has not derived "a financial benefit directly attributable to the infringing activity." (*See* Def.'s Damages Mem. at 7–8 (citing *Religious Tech. Ctr. v. Netcom On-line Commc'n Servs., Inc.,* 907 F.Supp. 1361, 1366–67 (N.D.Cal.1995)).) Judge Baer has already considered and rejected this argument. *See Arista Records LLC,* 633 F.Supp.2d at 156 ("Here, it is apparent from the record that Defendants earn a direct financial benefit from infringement.").
7. Defendants have also argued that their conduct is not willful according to standards set forth in several bankruptcy cases. (*See* Def.'s Damages Mem. at 13–14.) Those cases bear no relevance here.
8. Defendant Reynolds also argues—as he did before Judge Baer—that he cannot be held personally liable for the actions of the corporate Defendants. (*See* Def.'s Damages Mem. at 13.) This argument is also without merit. Reynolds, the director and sole shareholder of both companies, played a "ubiquitous role" in the activities of the corporate Defendants, and was "personally and intimately involved in many of the activities that form the basis of Defendants' copyright liability." *Arista Records LLC,* 633 F.Supp.2d at 158.
9. Although it appears that this case ultimately settled, Judge Rakoff later entered a final judgment against the defendants in the amount of $53,400,000 in statutory damages. *See* Docket Entry 162, *UMG Recordings, Inc. v. MP3.com, Inc.,* No. 00 Civ. 0472(JSR) (entered Nov. 14, 2000).
10. In a prior submission to the Court, Plaintiffs indicated that they were deferring any request for attorneys' fees. (*See* Order, dated Sept. 8, 2009.)