890

```
                    UNITED STATES DISTRICT COURT
                         DISTRICT OF NEVADA
          BEFORE THE HONORABLE LARRY R. HICKS, DISTRICT JUDGE
```

ORACLE USA, INC., a Colorado        :
corporation; ORACLE AMERICA,        :
INC., a Delaware corporation;       :
and ORACLE INTERNATIONAL            :No. 2:10-cv-0106-LRH-PAL
CORPORATION, a California           :
corporation,                        :
                                    :
        Plaintiffs,                 :
                                    :
    vs.                             :
                                    :
RIMINI STREET, INC., a Nevada       :
corporation; and SETH RAVIN,        :
an individual,                      :
                                    :
        Defendants.                 :
_____ :


                TRANSCRIPT OF JURY TRIAL - DAY 6
                    (Pages 890 through 1082)


                      September 21, 2015


                      Las Vegas, Nevada


Court Reporter:         Donna Davidson, RDR, CRR, CCR 318
                        Certified Realtime Reporter
                        400 South Virginia Street
                        Reno, Nevada  89501
                        (775) 329-0132
```

1                    A P P E A R A N C E S

2    FOR THE PLAINTIFFS:

3    BOIES, SCHILLER & FLEXNER LLP
     KIERAN P. RINGGENBERG
4    1999 Harrison Street, Suite 900
     Oakland, California 94612
5    (510) 874-1000
     Fax: (510) 874-1460
6    kringgenberg@bsfllp.com

7    BOIES, SCHILLER & FLEXNER LLP
     RICHARD J. POCKER
8    300 South Fourth Street, Suite 800
     Las Vegas, Nevada 89101
9    (702) 382-7300
     Fax: (702) 382-2755
10   rpocker@bsfllp.com

11   BOIES, SCHILLER & FLEXNER LLP
     WILLIAM A. ISAACSON
12   KAREN L. DUNN
     5301 Wisconsin Avenue, NW
13   Washington, DC  20015
     (202) 237-2727
14   Fax:  (202) 237-6131
     wisaacson@bsfllp.com
15   kdunn@bsfllp.com

16   MORGAN LEWIS & BOCKIUS LLP
     THOMAS S. HIXSON
17   NITIN JINDAL
     JOHN A. POLITO
18   One Market, Spear Street Tower
     San Francisco, California 94105
19   (415) 442-1000
     Fax:  (415) 442-1001
20   thomas.hixson@morganlewis.com
     nitin.jindal@morganlewis.com
21   john.polito@morganlewis.com

22   JAMES C. MAROULIS
     DORIAN E. Daley
23   Oracle Corporation
     500 Oracle Parkway
24   Redwood City, California 94070
     (650) 506-4846
25   jim.maroulis@oracle.com
     dorian.daley@oracle.com

892

1                    A P P E A R A N C E S (Continued)

2    FOR THE DEFENDANTS:

3    SHOOK, HARDY & BACON LLP
     PETER E. STRAND
4    B. TRENT WEBB
     2555 Grand Boulevard
5    Kansas City, Missouri 64108
     (816) 474-6550
6    Fax: (816) 421-5547
     pstrand@shb.com
7    bwebb@shb.com

8    SHOOK, HARDY & BACON LLP
     ROBERT H. Reckers
9    600 Travis Street, Suite 3400
     Houston, Texas 77002
10   (713) 227-8008
     Fax: (713) 227-9508
11   rreckers@shb.com

12   LEWIS ROCA ROTHGERBER LLP
     W. WEST ALLEN
13   3993 Howard Hughes Parkway, Suite 600
     Las Vegas, Nevada 89169
14   (702) 949-8230
     Fax: (702) 949-8364
15   wallen@lrrlaw.com

16

17

18

19

20

21

22

23

24

25

```
 1              LAS VEGAS, NEVADA, SEPTEMBER 21, 2015, 12:30 P.M.

 2                               --oOo--

 3                       P R O C E E D I N G S

 4

 5              (Outside the presence of the jury.)

 6                   COURTROOM ADMINISTRATOR:  Please rise.

 7                   THE COURT:  Have a seat, please.

 8                   I hope everyone had a nice weekend to rest and

 9    regroup a little bit.

10                   The record will show we're in open court, the

11    jury's not present, counsel and the parties are.

12                   Several matters.  First of all, it appears that

13    there's a stipulation and no problem with having Oracle's

14    next witness testify now and reserving the testimony of --

15    or I should say cross-examination of Mr. Allison until

16    afterwards; is that correct?

17                   All right.  That's acceptable to the Court.

18                   The other issue, of course, is -- most

19    significant issue is the advice-of-counsel issue.  I'll --

20    because I've allowed additional points and authorities on

21    this, I'll allow a brief argument on behalf of both sides.

22                   So, Mr. Webb, if you'd like to go forward,

23    please do so.

24                   MR. WEBB:  Good afternoon, Your Honor.

25                   This is a rare instance where the lawyers aren't
```

1      going to spend a lot of time arguing.  I think the briefs

2      really set out the issues pretty well.

3              I tried to think of a way to explain our

4      position as best I could in addition to the briefing, and

5      the best I could come up with was this:  Instead of

6      Mr. Ravin's own lawyers sending these letters back and

7      forth, let's say it was another company like his involved

8      in a dispute with Oracle, and they were exchanging letters

9      back and forth, and he had access to seeing every single

10     one of those letters even though they didn't directly

11     implicate Rimini Street.

12             That's the type of scenario that we see being

13     relevant here.  It isn't necessarily that he spoke to his

14     lawyers and understood the rationale behind all the things

15     they said in their letters, it's the fact that these

16     letters were sent, and he saw them, and that informed his

17     belief.

18             And that's basically the best that I can come up

19     with to try to explain to you as best I can that this is

20     what we're trying to get at rather than the underlying

21     privilege issue.

22             This is not an advice-of-counsel defense, we've

23     never asserted that, and it would be incumbent upon us to

24     make sure that we don't go beyond that and waive privilege.

25             And that is all I have for Your Honor.  If you

1    have any questions, I'd be happy to answer them.

2              THE COURT:  No, I don't.  And I appreciate your

3    candor.

4              Let me hear from Mr. Isaacson with response to

5    that.

6              MR. ISAACSON:  Your Honor, if it's helpful, I

7    can explain the key cases to you.  I think the cases are on

8    point in our favor and draw the line at -- the line at a

9    place that they want to cross, that in saying that

10   Mr. Ravin would like to testify, that he relied on the

11   letters that were exchanged.

12             The cases that we have cited said that you can't

13   do that, that -- the *Lime Group* case says -- where a

14   witness wanted to say, and these are both copyright cases

15   on willfulness issue -- where the witness wanted to say

16   they acted in good faith and hired a law firm to assist

17   him, that was going too far and would waive the privilege.

18             And the *Usenet* case talked expressly about what

19   Mr. Webb just talked about, they wanted to use

20   nonprivileged letters between adversaries, advocacy

21   letters, to say I will -- I relied on the information in

22   those letters.

23             And that case, the *Usenet* case, said no, you

24   can't do that where you -- unless you've waived the

25   attorney-client privilege and produced the

1    behind-the-scenes documents because you don't know that

2    those advocacy letters are reliable or in fact being relied

3    on when you don't have the actual behind-the-scenes

4    communications.

5              And, in fact, *Usenet* says expressly, quote,

6              "An advocacy letter is insufficient to support

7    defendant's purported defense of reliance on counsel."

8              So I think the case law has said that Mr. Ravin

9    has gone as far as he can go.  He has said that there was

10   an exchange of letters, and there's two letters that have

11   come in, and that's as far as you can go without waiving

12   the privilege.

13             And it's also not correct to say that they have

14   never asserted a reliance-on-counsel defense because their

15   motion for reconsideration expressly uses that term.

16             It's true that that would be the first time that

17   they asserted such a thing, but it would also be the case

18   that if this testimony that they seek to admit were

19   admitted, that would be a reliance-on-counsel defense.

20             Now, the only other thing I would say, Your

21   Honor, is they've now expanded the group of exhibits of the

22   lawyers' letters that they would wish to be exchanged --

23   wish to be admitted that were exchanged over the years, and

24   they deal with a variety of topics none of which have to do

25   with what's at issue in this case.

1          So if the Court wants me to, I can walk you

2     through and explain why those letters aren't addressing the

3     issues in this case and would have no relevancy as to his

4     state of mind.

5          Many of them talk about allegations of

6     anticompetitive conduct, some of them are about issues like

7     the Micro Focus COBOL which isn't a term that's being used

8     in this case.  Another one is about an accusation that they

9     were saying they had a client when they didn't, and none of

10    it has to do with the contract clauses or the license --

11    the contract clauses of the license agreements that

12    Mr. Ravin has said that in good faith he relied on.

13         So the actual exchange of letters that Mr. Ravin

14    said -- would like to say he relied on actually don't have

15    anything to do with the issues of this case, and if the

16    Court wanted me to spend the time on it, I would walk you

17    through each one.

18         THE COURT:  No, I don't.  I'm prepared to rule

19    on this, and my ruling is in favor of Oracle.

20         This isn't a -- there isn't really a question in

21    this case concerning whether there's an advice-of-counsel

22    defense on the table because everyone concedes that there

23    is not.

24         Everyone concedes that there has been no

25    discussion -- or, excuse me, no discovery of any kind into

898

1    anything that was asserted to be attorney-client privilege,

2    and we, frankly, just don't have that issue before us.

3         I don't find that this horse is of any different

4    color than that.  The fact is that the advice-of-counsel

5    defense has been waived in the Court's view by virtue of

6    the undisputed history in this particular case, the

7    undisputed agreement between both sides that's not present

8    and before the Court, and the proffered testimony bears

9    purely upon intent keyed to advice of counsel through the

10   proposed letters.

11        So the Court's not going to allow it.  The

12   letters will not be admissible.  They're also just --

13   they're rank hearsay, and if we started opening up the

14   doors to evidence of the exchange which goes between

15   counsel in the course of any complex and major litigation

16   that's generally irrelevant to the true evidentiary issues

17   in the case, we'd be here forever.

18        So the letters are not admissible, they are

19   hearsay, and Mr. Ravin will not be able to testify to

20   relying upon advice of counsel.

21        MR. ISAACSON:  There's one other issue, Your

22   Honor, that Mr. Hixson will address.  There's an exhibit at

23   issue that the parties were negotiating about after

24   5:00 p.m. last night.  So he can tell you what those issues

25   are.

1              THE COURT:  All right.

2              Mr. Hixson?

3              MR. HIXSON:  There are a number of exhibits that

4    defendants have sought preadmission of that Oracle has

5    disagreed with because they contain within them customer

6    hearsay, and this relates to the motion in limine that we

7    filed dealing with the at-risk reports, that while the

8    report itself may be a business record, the hearsay

9    embedded within it is inadmissible, second-level hearsay.

10             And the Court, under motion in limine, ruled

11   that direct quotations of customers would be inadmissible

12   hearsay but that Oracle's analysis of the situation would

13   not be inadmissible hearsay.

14             Then the Court said that for that large category

15   in the middle, the Court would have to take those items on

16   a document-by-document basis, and here we are, I'm afraid

17   to say.

18             We are now in a situation where defendants are

19   seeking to use certain exhibits that contain paraphrases,

20   an Oracle employee filling out a spreadsheet listing notes

21   in a renewal call will put down reasons the customer might

22   give for being dissatisfied or what the customer is saying

23   about reasons for wanting to terminate support.

24             And we have now proposed to redact those on the

25   grounds that those are simply customer hearsay, and the

1    line that we have tried to draw in our redactions is that

2    when the Oracle employee is simply transcribing information

3    provided by the customer, or where it appears from the

4    document that's the case, then we would propose to redact

5    that.

6              But then, separately, when an Oracle employee

7    proposes an action plan, or an analysis, or a way to

8    respond, then we have agreed not to redact that because

9    those would be mere presence sense impressions and

10   statements by Oracle employees.

11             There are a number of specific exhibits where

12   this issue has arisen.  I'm happy to walk the Court through

13   our proposed redactions if that is helpful, but in general

14   that's the line that we've drawn is that paraphrasing of

15   reasons that the customers have supplied for why they are

16   unhappy or whether they want to terminate support is where

17   we have proposed redactions.

18             And beyond that I would have to just hand the

19   Court up proposed redactions and march through them which I

20   realize might be somewhat tedious but to get into any more

21   level of specificity.

22             THE COURT:  Well, this is a new issue to the

23   Court, and I need to switch my gears obviously to that, and

24   I would need to take a look at the exhibits, and I

25   obviously need to hear from Mr. Webb or whoever is going to

1    be arguing on behalf of Rimini, which I would.

2              Why don't you -- if you have copies of those,

3    why don't you give them -- how soon do you anticipate

4    getting to this issue with the next witness?

5              MR. HIXSON:  I will have to defer to Rimini.

6              MR. WEBB:  That's where we come in here, Judge.

7              We're not going to use these today.  I don't

8    know if we have reached bottom on our negotiations, I think

9    we're still talking as recently as last night.

10             My proposal is this.  Why don't we see where

11   we're disagreeing, and when we're ready, we come back and

12   show you exactly where the disagreements are so we can all

13   kind of talk about the same thing at the same time.

14             But it won't be today.  We're not going to use

15   them today, Your Honor.

16             THE COURT:  All right.  And if you provide a set

17   of copies over the subject matter exhibits, that would help

18   me too in the off hours.

19             MR. WEBB:  We'll do that.

20             MR. HIXSON:  Thank you, Your Honor.  We thought

21   they might use them today which is why we brought them to

22   the Court's attention.  But that clarification is helpful

23   for us.

24             THE COURT:  All right.  Thank you.

25             Is there anything further that -- I know that

1    you had also raised reconsideration on behalf of Rimini to

2    the timeframes that the Court had limited evidence to, the

3    timeframe of this suit versus changes in procedure which

4    occurred in subsequent years.

5              MR. WEBB:  I believe, if I'm not mistaken, not

6    having the motion in front of me, I believe our -- that

7    part of the motion dealt with our ability to say we no

8    longer do those things Your Honor found to be outside the

9    scope of the licenses.  Is that --

10             THE COURT:  Yes, that was the issue.  I'm still

11   tied to the timeframes in this case and to the evidence,

12   and so I'm going to stand by my previous ruling on that.

13             MR. WEBB:  Understood, Your Honor.  Thank you.

14             I believe that's it.

15             THE COURT:  All right.  Well, good.  So we've

16   covered everything that we need to cover right now?

17             MR. WEBB:  I think so, Your Honor.

18             THE COURT:  Good.  As soon as we have our jury

19   here, we'll get started.  We may even be able to start a

20   little before 1:00 hopefully.

21             All right.  Thank you very much.  The Court will

22   be adjourned.

23             COURTROOM ADMINISTRATOR:  Please rise.

24             (Recess from 12:44 p.m. until 12:57 p.m.)

25             (Outside the presence of the jury.)

1          COURTROOM ADMINISTRATOR:  Please rise.

2          THE COURT:  All right.  Have a seat, please.

3          The record will show that we're in open court,

4     the parties and counsel present.  The jury is not present.

5          Mr. Webb?

6          MR. WEBB:  I neglected to raise this earlier,

7     Your Honor.

8          There is an agreement of the parties to call

9     Ms. Catz out of order.  We were hoping Your Honor could

10    explain to the jury this is done for scheduling issues,

11    it's very common.  We just don't want the jury to think

12    there's something unusual about this without getting into

13    the specifics --

14         THE COURT:  No, no, I appreciate that, and I

15    would have done that.

16         MR. WEBB:  Okay.  Thank you, Your Honor.

17         THE COURT:  Thank you.

18         All right.  You may go ahead and get the jury.

19         COURTROOM ADMINISTRATOR:  Yes, Your Honor.

20         THE COURT:  May I have her full name, please?

21         MS. DUNN:  Safra Catz; S-a-f-r-a, C-a-t-z.

22         THE COURT:  All right.  Thank you very much.

23      (Jurors enter courtroom at 12:59 p.m.)

24         THE COURT:  Have a seat, please.

25         Sometimes it's nice to say good afternoon

1    instead of good morning.

2              I hope everyone had a pleasant weekend, and

3    everyone's on board, and I appreciate the continued

4    interest and timeliness that I see from all of you; very

5    much appreciate it.

6              The record will show that we are in open court,

7    and the parties and counsel are present, and the jury is

8    all present.

9              Ladies and gentlemen, one development is

10   Mr. Allison was testifying on behalf of Oracle on Friday,

11   and we finished with his direct examination and which would

12   have then led to his cross-examination.

13             But due to scheduling, the parties have agreed

14   that they will continue his cross-examination to after we

15   finish with our next witness who will be Ms. Safra Catz

16   from Oracle.

17             That's done as an accomodation.  Sometimes we

18   have to bring in this one witness at one time and resume

19   with another at another time, and that's what this is, and

20   I appreciate that the parties worked together on it.

21             So at this time, who will -- yes, Ms. Dunn,

22   you'll be questioning Ms. Catz, and you may go ahead and

23   call your next witness.

24             MS. DUNN:  Thank you, Your Honor.

25             Oracle calls Ms. Safra Catz.

1            COURTROOM ADMINISTRATOR:  Please raise your

2      right hand.

3            You do solemnly swear that the testimony you

4      shall give in the cause now before the Court shall be the

5      truth, the whole truth, and nothing but the truth, so help

6      you God?

7            THE WITNESS:  I do.

8            COURTROOM ADMINISTRATOR:  Please be seated.

9            Please state your name for the record and spell

10     your last name.

11           THE WITNESS:  My name is Safra Catz; S-a-f-r-a,

12     C-a-t-z.

13           COURTROOM ADMINISTRATOR:  Please tell us your

14     city and state of residence.

15           THE WITNESS:  I live in Los Altos Hills,

16     California.

17           THE COURT:  All right.  Ms. Dunn, go ahead,

18     please.

19           MS. DUNN:  Thank you.

20                         SAFRA CATZ

21              called as a witness on behalf of the

22          Plaintiffs, was examined and testified as follows:

23                      DIRECT EXAMINATION

24     BY MS. DUNN:

25     Q.   Good afternoon, Ms. Catz.  Please tell the jury

1    where you work?

2    A.    I work at Oracle Corporation.

3    Q.    And what's your position at Oracle?

4    A.    I am chief executive officer.  That's called CEO.

5    Q.    How long have you been CEO of Oracle?

6    A.    For about a year.

7    Q.    And how long in total have you been at Oracle?

8    A.    I'm in my seventeenth year.

9    Q.    Can you please tell the jury your jobs from the time

10   that you started 17 years ago until present when you were

11   CEO?

12   A.    Sure.  I started in 1999 as a senior vice-president.

13   I was brought in to help in the transformation, a business

14   transformation of Oracle.  That went very well.

15           I became an executive vice-president, and I was

16   also elected to the board of directors in 2001.

17           In 2004, I became president, and last year I was

18   promoted to CEO.  Intermittently I was also chief financial

19   officer three different times in between others, and I

20   remain the principal financial officer of the company.

21   Q.    Okay.  And if you could also tell the jury about

22   your educational background before you started working?

23   A.    Sure.  I grew up in Boston, and I went to Brookline

24   Public High School, and from there I went to the University

25   of Pennsylvania where I got a business degree.

1              And then I started law school, and I went for

2      two years there, and finished up at Harvard Law School, and

3      then I started working.

4      Q.    Did you ever practice law?

5      A.    No, no.

6      Q.    So, Ms. Catz, your background is very impressive,

7      and I know you may not want to do this, but I'm going to

8      ask you anyway, if you could brag a little bit about

9      yourself and tell the jury what you're most proud of?

10     A.    Well, what I'm most proud of is my two sons and how

11     nicely they've grown up, but I'm sure that's not what you

12     mean.

13             As far as what we've done at Oracle, I'm

14     actually incredibly proud to be part of the team that does

15     so much that has worked so well with our customers.

16             No matter where I go around the world, visiting

17     Oracle customers or Oracle facilities, you can really see

18     that we've worked very, very hard, and it's a great -- it's

19     really a great privilege to be part of it.

20     Q.    And do you have any professional activities that you

21     engage in aside from Oracle?

22     A.    A few.  I'm -- I teach a class at Stanford

23     University's Business School.  In fact, class starts

24     next -- this Friday actually.  I teach a class in mergers

25     and acquisitions in the finance group.

1          And I'm also chairman of our charitable

2    foundation which is called the Oracle Education Foundation.

3    Q.    And what does the Oracle Education Foundation do?

4    A.    Oh, it's something we started a long time ago that

5    focuses on helping educate high school teachers and also

6    focuses on underprivileged areas focusing on teaching math

7    and technology skills.

8          And right now we're building a high school on

9    Oracle's campus, a public high school on Oracle's campus,

10   which I can see right outside my window actually.

11   Q.    So let's start from the beginning.  What is Oracle?

12   A.    Well, we're a technology company.  We make software

13   and hardware.

14         And basically we focus on solving really hard

15   business type problems that you would use a computer for

16   that, if you didn't, you probably couldn't solve them

17   without it.

18   Q.    Okay.  And can you give us some examples of what

19   that means?

20   A.    Well, like routing every telephone call around the

21   world, keeping track of medical records, making sure

22   payroll systems are working correctly.  So all those little

23   calculations with all of that is done by computer these

24   days, and that's the kind of thing we do.

25   Q.    Okay.  And so the jury has already heard a little

1    bit about enterprise software, but just briefly is what

2    you're talking about the kind of thing that enterprise

3    software would help with?

4    A.    Yeah.   It's software that either a business or a

5    government or a school or a hospital would use.

6    Q.    And also it would be helpful if you could give the

7    jury some examples of your customers, what kind of

8    customers Oracle has?

9    A.    Oh, we have all kinds of customers.   It can go big

10   companies like General Motors, little companies like Mama

11   Lucia's, pretty much every casino here in Vegas, the Air

12   Force.   You name it, they're probably -- they've been a

13   customer of ours.

14   Q.    And as the CEO, to what extent do you have any

15   interaction with your customers?

16   A.    Oh, I have quite a bit of interaction actually.

17   It's the best part, because I get to see our software in

18   action.

19   Q.    And as CEO, can you just explain what -- whether

20   Oracle has some sort of general philosophy when it comes to

21   how it deals with its customers?

22   A.    Because you can't see our software in any direct

23   way, it's really -- the software really expresses itself

24   when our customers use it, and so we can only be successful

25   when our customers are successful.

1    Q.    And Oracle's in California; is that right?

2    A.    Yes, we're in Silicon Valley.

3    Q.    So getting to where -- the issues in this case, this

4    is a copyright case primarily.  Generally speaking, what do

5    copyrights protect?

6    A.    Well, copyrights --

7              MR. WEBB:  Calls for a legal conclusion, Your

8    Honor.

9              THE COURT:  The Court will allow her to testify

10   to her understanding.  It's not being offered as a legal

11   definition.

12             THE WITNESS:  What copyrights protect is

13   creative works.  Whether it's a book or a movie or software

14   it -- it basically controls how other people -- whether

15   others can copy your software or not.

16             So you build it.  Let's say you have computer

17   programmers and they build it.  A copyright protects that

18   innovation and the right of the person who created it to

19   decide how they distribute it.

20   Q.    And what is your view about the importance of

21   copyrights to the software industry generally?

22   A.    Copyrights are absolutely central to the software

23   industry because it's extremely expensive and hard to build

24   the software.  You spend lots of money building it, lots of

25   time, lots of people's lives, basically, and it's

```
1    incredibly easy to just take a free copy, to just take a
2    copy of it.
3              So you have to be able to control what you've
4    built or the whole industry won't exist.
5    Q.    In -- do copyrights also allow Oracle to make money
6    as a business?
7    A.    Yes, but that's very important for us to be able to
8    continue to invest in our whole business.  So it's critical
9    because we get to license our software to others for use
10   and still keep it, still own it.
11   Q.    Is that because you own the copyright?
12   A.    Yes, that's exactly why.
13   Q.    Taking you back a little bit in time, what was
14   Oracle's first product?
15   A.    Oracle's first product was the Oracle Database.
16   Q.    And what's a database?
17   A.    Well, in order not to belabor it, let me simplify
18   it.  You should think about it as a of bunch spreadsheets
19   which are rows and columns, lie them all down, pile them on
20   each other, and then connect them in all these different
21   ways.
22              And in all those rows and columns and all those
23   little spaces are little pieces of information, and that's
24   what it is.  It's where information, data is stored.
25   That's why it's called a database.
```

1    Q.    And when did Oracle invent the Oracle Database?

2    A.    Oh, in the 1970s.

3    Q.    And do you know how it was invented?

4    A.    Four crazy guys got together and thought they could

5    build something better, and they did.  They started with

6    one customer, and they built a product.

7    Q.    All right.  So I'm going to show you a picture on

8    the screen which I think the jury already knows is

9    something called the Oracle stack.

10          And I want you to just -- I don't want to go

11   into these in great depth, but I wanted you to describe to

12   the jury, if you would, what each of these things are, and

13   if you could start with everything below the database

14   level.

15   A.    Okay.  So at the bottom two levels is hardware.  So

16   it's actually either computers or storage systems that are

17   where the data is ultimately put.  So that's the bottom

18   layer.  Server means computer, basically, and storage.

19          And then above it, let's just skip one to the

20   operating system.  This directs how the hardware works and

21   how the software may work with the hardware.

22          Virtual machine allows you to do many things on

23   the computers simultaneously.  So that's really the bottom

24   four boxes generally speaking.

25   Q.    Got it.  And so then if you could explain how the

1    database works in the stack?  That would be helpful too.

2    A.    As I mentioned, the database is where the data, the

3    information, is ultimately stored.  It's the -- it's

4    basically that.

5    Q.    Okay.  And what does middleware do?

6    A.    Middleware is a word that -- very, very broad word,

7    and it covers everything from tools that make the -- that

8    allow you to build the applications, which is the box above

9    it, all the way to things that make applications work

10   better with the database, as well as reporting systems and

11   other related pieces that are neither database nor

12   applications.  Those are called middleware.

13   Q.    And applications, what do they do?

14   A.    Applications -- well, they can do a very broad range

15   of things, but it's pretty much what the user will see.

16         When you go to work and you punch in that you're

17   in, or you're -- or when you go to a bank machine and you

18   actually see exactly how much money there is in your

19   account and all that, that's an application.

20         When you work at a call center, the screen that

21   comes up would be an example of an application.

22         Pretty much most of the things a user, an end

23   user, uses, those are applications.

24   Q.    All right.  So the jury has already heard in this

25   case about three applications, Siebel, JD Edwards, and

1    PeopleSoft, and the names of these things are kind of

2    weird, so if you can explain where they came from, that

3    would be great.

4    A.    Sure.  PeopleSoft started as being software to

5    manage people, like payroll, human resources, so they

6    called it PeopleSoft.

7              JD Edwards, which PeopleSoft had bought, was

8    started by, like, Jack, Dan, and Ed, something like that,

9    so JD Edwards.  And then Siebel was started by a guy named

10   Tom Siebel, so he named it after himself.

11   Q.    How many Oracle employees work on developing this

12   kind of software?

13   A.    Oh, thousands, thousands.

14   Q.    And I believe you said before that Oracle owns

15   copyrights generally for its products, specifically

16   PeopleSoft, JD Edwards, and Siebel.  Does Oracle own those

17   copyrights?

18   A.    Yes, all of them.

19   Q.    And how did Oracle come to own the copyrights for

20   those products?

21   A.    Well, first we acquired those companies when they

22   owned all the copyrights and so we owned them because we

23   bought them.

24             And then we continued to invest in those

25   products, and so we registered all those copyrights after

1    our continued investments in those products.

2    Q.    And you testified earlier that customers license

3    Oracle software.  So I want to talk a little bit about how

4    that works.

5              Is getting a license for software like walking

6    into a store and buying a product?

7    A.    No, it's nothing like that, actually.

8              See, when you get a license, when you -- there's

9    a process because we make a lot of different products, as

10   do our competitors.

11             The customer has to figure out what they need

12   first and what their needs are.  Then that has to be lined

13   up with the modules that we have.

14             And simultaneously while we're doing that, our

15   competitor's doing that with the same customer, and then we

16   also have to start negotiating price.  So it's nothing like

17   going to the supermarket.

18   Q.    What's the purpose of the license?

19   A.    The purpose of the license, you could consider it

20   the rules of the road.  It's the rules related to the use

21   of the software.

22   Q.    And generally speaking, what is support?

23   A.    Well, it would be great if you just bought software

24   and it was absolutely ideal and nothing changed in the

25   world.

916

1              But what support is, it's not a really good name

2    for it, frankly, but it's all the things that you need to

3    keep the software valuable for you, fitting your needs,

4    handling the changes in the environment in -- in whatever

5    your needs are.

6    Q.    And so if a customer wants a license and they want

7    support, would they pay separately for that?

8    A.    Yes, they would.

9    Q.    Are they required to buy support with the software?

10   A.    No, they're not.

11   Q.    So it's the customer's choice?

12   A.    Yes, the customer can choose whether to buy support

13   in year one or in every subsequent year afterwards.

14   Q.    And if you know, what choice do most customers make

15   in that situation?

16   A.    Oh, the vast majority of customers buy support the

17   first year and then continue to renew those support

18   contracts year after year.

19   Q.    Do you have any idea of why that is?

20            MR. WEBB:  Objection, calls for hearsay, Your

21   Honor.

22            THE COURT:  Sustained.

23            MS. DUNN:  Okay.  Thank you, Your Honor.

24   BY MS. DUNN:

25   Q.    How do the customer and Oracle decide on the price

1    of support?

2    A.    Oh, it's a very strict negotiation.

3    Q.    Can you explain a little bit?

4    A.    Well, our products have a list price which we

5    publish, and our competitors' products also have list

6    prices.

7          Now, depending on how much the customer wants to

8    buy, we negotiate a discount.

9          So let's say the list price is $2 million.  It's

10   a good-sized contract, $2 million, we view that as a lot of

11   money.  We'd probably give maybe a 50 percent discount on

12   that so the license would be a million dollars.

13         Simultaneously, they're negotiating with the

14   other -- with one of our competitors, maybe even two, and

15   to the extent that we can win that, we have to have a

16   product that meets their needs and a price that makes

17   sense.

18         So they get a 50 percent discount.  They may

19   pick us.  That would be good.

20   Q.    Does the discount happen at the time of the

21   licensing, or does it happen at the time that the customer

22   decides whether or not to renew support?

23   A.    Oh, as far as how support is priced, because the

24   customer has earned a 50 percent discount on the license,

25   they also get a 50 percent discount on support.

1              So as I said in my example, the net price, the
2      discounted price, is a million dollars.  So our support
3      price is usually 22 percent of that discounted price.  So
4      in that example, their support would be $220,000 a year,
5      and it would be that going forward.
6      Q.    Is the 22 percent standard?
7      A.    Yeah, it's industry standard.  Some of the folks in
8      the industry may do 24 percent, 25 percent.  22 percent is
9      fairly standard.
10     Q.    Okay.  And you mentioned that when you're
11     negotiating, that the customers may be negotiating with
12     others, your competitors.  Who are Oracle's competitors?
13     A.    IBM, Microsoft, Salesforce.com.  We have so many
14     competitors, I truly can't list them all here today.
15     Q.    And does the company have any philosophy towards
16     these competitors, towards competition?
17     A.    Yeah; bring it on.  The truth is competition makes
18     you better.  It keeps you very, very sharp.
19     Q.    What's the difference between those companies you
20     mentioned and Rimini Street?
21     A.    Well, they're honest competitors.  They play by the
22     rules.
23     Q.    All right.  So I'd like to show you another picture
24     that we've seen earlier, and this one is called Oracle
25     Support.

919

1                 So if you could actually walk the jury through

2     what they're seeing on this slide, the various components

3     of Oracle Support?

4     A.    Okay.  So this is a picture that's got a lot of

5     little -- a lot of pieces to it.  Let's start at the online

6     library on the top left.

7                 So we have a site that has pretty much

8     everything you would need to keep your software current,

9     and it's all in a library.

10                But in addition to the software, full product

11    lines, everything is in there, additionally there are

12    updates, there are instructional manuals, there's training,

13    there are videos, there's questions and answers.  There's

14    an area for customers to talk amongst themselves.  So

15    that's in the top left.

16                Then there's online support.  Online support is

17    really most of our customers are extremely technical, and

18    so they want to just go in and solve their own problem.

19    The bulk of -- the bulk of it is handled right there,

20    self-service.

21                Now, if they don't want to do that and they want

22    to call somebody, there's phone support, and they can

23    always reach someone, but they can also reach an expert in

24    their product.

25                If a problem is really significant and they

1    can't handle it themselves, we'll actually go onsite and

2    fix it for them and just go right to where they are.

3              On the bottom row, new software releases -- so

4    let's say they've -- they bought version 8 and they want

5    version 9, they can go to the next version without any

6    additional cost.  It's right there for them.

7              Updates are all sorts of additional enhancements

8    and product updates to keep the software current and -- you

9    know, for example, an update might be to allow some of the

10   software to be used on iPads.

11             Bug fixes are all sorts of errors that may be in

12   the code, or things where the software doesn't work as

13   intended because something in the operating system, which

14   may not be ours or may be ours, does not work well, so it's

15   a change.

16             And then, of course, security updates and fixes.

17   This is a very, very hot area just because all of these

18   systems are doing very complicated, very important stuff,

19   and they are subject to a lot of hacking and attacking, and

20   so this is constantly evolving area.

21             MS. DUNN:  I'd like to focus for just a second

22   on the new software releases which are also called

23   upgrades.  There's another demonstrative here if we can go

24   to the next slide, Matt.

25   BY MS. DUNN:

1    Q.    All right.  So this is a slide that Rimini Street's

2    lawyer showed during his opening statement, and he said if

3    you want the new version, the upgrade, you've got to pay

4    more money, and then you've got to pay the maintenance fees

5    on top of that going forward; is that correct?

6    A.    No, it's completely wrong.  If you're paying

7    support, you get all the upgrades at no charge.  You can go

8    from version 1 to 2 to 3.  I have customers who started in

9    version 5 and are now on version 12.  They've never bought

10   a license for that product again, they've just paid

11   support.

12   Q.    Does Oracle force customers to upgrade?

13   A.    No.  We have lifetime support.

14   Q.    Please explain what that means?

15   A.    It means that a customer can continue to use the

16   software and can continue to have access to all the things

17   that were on the previous demonstrative, the previous

18   slide, and they can use any of that indefinitely.  There it

19   is; yes.

20   Q.    How many people does Oracle employee to provide

21   support?

22   A.    Well, the -- the R&D group that actually builds a

23   lot of these bug fixes and updates and new releases is

24   about 38 ,000, and then the whole support organization,

25   including some of the onsite people and the trainers and

1    all of that is nearly 20,000.

2    Q.    You also mentioned earlier that sometimes you go to

3    the customer's site if they're having a particular bad

4    problem.  Do you have any examples of when that happened?

5    A.    I have a few examples, yes.

6    Q.    How about just one?

7    A.    Sure.  Okay.

8          Very recently Kaiser, which is a big hospital,

9    it's really a hospital system in California and a few

10   states on the east coast, and it's hospitals, pharmacies,

11   doctors' offices, et cetera, all in one bundle, they -- all

12   of a sudden -- they had a system that was supposed to be

13   for ordering all of their medical supplies, including

14   pharmaceuticals, which is really important, and all of the

15   surgery equipment, and surgery -- all the little things

16   that are needed in surgery.

17         That system stopped working -- well, it started

18   to slow down, and then on Friday it just fell over dead,

19   basically, and so they called us.

20         We actually had a person onsite there, and about

21   24 people from around the world focused in on that over the

22   weekend, which was great because that system works Monday

23   through Friday because that's when they can contact their

24   suppliers and all that.

25         We worked 24/7, and got them up and running by

1    Monday morning.

2    Q.    Did you figure out what caused the problem?

3    A.    Yes, it was some third-party consultant had built

4    some code in the system, and the way they built it was not

5    correct.  So we fixed it.

6    Q.    And I'm sure people are wondering whether Kaiser had

7    to pay extra money for all that work?

8    A.    No, no, they didn't.  They didn't have to pay extra.

9    We just fixed it.

10   Q.    Does Oracle track how many customers stay on Oracle

11   Support?

12   A.    Yes, that's called our renewal rates.  Yes.

13         MS. DUNN:  Okay.  So if we could go to the next

14   slide.

15   BY MS. DUNN:

16   Q.    And this slide is called Customers Valued Oracle

17   Maintenance and Support, and it talks about renewal rates.

18   Please explain to the jury what they're seeing here?

19   A.    This is the percentage of the contracts in dollars

20   that were available for us to renew that were in fact

21   renewed.

22         So if you look at 2011, 97 percent renewed for

23   PeopleSoft.  For JD Edwards it was 95 percent.  For Siebel

24   it was 92 percent.

25   Q.    Those numbers seem really high.  Had Oracle's

1    renewal rates gone up over time?

2    A.    Yes, especially with these products because we

3    invested massively.  PeopleSoft we bought in 2005, and JD

4    Edwards.  Siebel we bought in early 2006, and then we went

5    ahead and we invested enormously into those product lines.

6    Q.    I want to ask you again about something Rimini's

7    lawyer said in his opening statement.

8              So he said the customer attrition for Oracle was

9    higher before Rimini Street came on the market than it is

10   now, and he said that this is evidence that Oracle has not

11   been harmed because the maintenance revenue for Oracle has

12   gone up since Rimini Street hit the market; is that

13   correct?

14   A.    No.  It's not correct.  It's only half the puzzle.

15   You see, these renewal rates would have been even higher

16   but for Rimini Street.

17   Q.    And are you happy with these rates?

18   A.    Yes, I'm happy with these rates, but I don't like to

19   lose even one customer, frankly.

20   Q.    How long, generally speaking, will customers stay

21   with Oracle Support?

22   A.    Well, customers usually stay with Oracle for 10

23   years, really, as long as they're using the software they

24   generally stay with us.  We have customers who have been

25   using the software for 20 years, they're still with us.

1    Q.    And if you know, has Oracle received any recognition

2    for the quality of its support?

3    A.    We've received a lot of recognition.  We were

4    actually the first company to receive a JD Power and

5    Associates' stamp of quality in 2006, and --

6    Q.    Is that like in the car commercial?

7    A.    Yeah, it's just like that, actually.  We were the

8    very first one to receive it, and we've gotten a major

9    award every single year.  We actually have a whole glass

10   thing in our conference center showing all of these off.

11   We're very proud of them.

12   Q.    And I presume that people also would wonder, if

13   Oracle is not requiring the customers buy support from

14   Oracle, why would customers choose to go to Oracle rather

15   than a third party?

16   A.    Well, they trust us.  I mean, they chose us to begin

17   with.  They chose our product.

18         They've had good experience with us, and they in

19   general know that when they have a problem, we're the ones

20   who can fix it for them, and we keep giving them upgrades

21   and updates to keep the software current.

22   Q.    You mentioned earlier something called R&D, and I

23   think it would help if you explain what you mean by R&D.

24   What's that?

25   A.    Yes.  Okay.  R&D is basically research and

1    development focused on the development which is thousands

2    of men and women working on computers, building software,

3    and creating more and more and better software.

4            We spend about 5, 5 and a half billion dollars a

5    year on R&D actually.

6    Q.    And what do you spend that money on?

7    A.    Salaries, it's all those people.

8    Q.    And where does the money for R&D come from?

9    A.    It comes from our customers in licenses and support

10   payments because we build it, we license it, and support,

11   and we put it back in, then we grow the R&D group, build

12   more, improve it.  That's how it works.

13   Q.    Okay.  So you have a binder in front of you, and I'd

14   like for you to look in there at Defense Exhibit 23, which

15   has not been admitted so we don't need to put it up.  So I

16   would like to ask you just a couple questions about it.

17           So do you have it there?

18   A.    I do.

19   Q.    Great.  So Defendants' Exhibit 23 is a blog post

20   from September 25th, 2008.  In it you explain that Oracle

21   gets to keep virtually all the money that customers pay for

22   maintenance/support.  What did you mean by that?

23   A.    Yes.  When they pay, we get to invest it back into

24   the business.  It's -- it's how it works in the software

25   industry.

 1          Another customer comes, they contribute it, we
 2    expand our development organization, we expand our
 3    business, we build better products.  It's just this
 4    constant cycle.
 5    Q.    You also say that this is like customers sending you
 6    money for something you're doing anyway.  What does that
 7    mean?
 8    A.    Yes.  We're going to build the new products,
 9    assuming we can afford it, and make the products better.
10    We get another customer, they contribute in, we can
11    actually invest even more.
12          We started with four crazy guys, we got 38,000
13    now.  It started with one customer, now we have hundreds of
14    thousands.
15    Q.    You also testified when we talked about support that
16    many customers prefer online support using access to
17    Oracle's online websites.
18          So I want to take a couple minutes just to walk
19    the jury through the process by which a customer would
20    access support.  Is that okay?
21    A.    Sure.
22    Q.    Can we do that?
23    A.    Yeah.  Okay.
24    Q.    So to begin with, what kinds of things do customers
25    access through the support website?

1    A.    Well, they -- they access all the things we just

2    talked about, downloads, online support, et cetera.  Help,

3    the community.  They can register issues and things like

4    that.

5    Q.    Okay.  And what are we seeing here on the screen?

6    A.    Okay.  What you're seeing here is what's called the

7    log-in script.  It's actually -- when you first type in the

8    very first time support.Oracle.com, when you want to log

9    on, you're going to see this first page.

10         If you don't have an account, you go to the

11   right side, and that says create an account.  When you

12   license your software and purchase a support contract, you

13   get special credentials that allow you to create an

14   account.

15         We're not going to do that right now, so we're

16   just going to jump over as if we already have our user name

17   and/or password.

18         So we're going to type in a user name right

19   here.  It's usually your e-mail address and then the

20   password you chose, and then you click sign in.

21         Okay.  Now, since this is our first time, you're

22   going to see this blue bar across the top which volunteers

23   to like show you a video or a tutorial.

24         Right in the blue bar you can already do a

25   download, but we're not going to do that for a moment.

1          When you go down to the first big blue arrow, I
2     guess, you can type in a question or something like that.
3     That's if you want to ask a question -- if you're looking
4     for something in our knowledge base.
5          When you go further down, you can also type in a
6     service request.  A service request is you're requesting
7     help.  There's a little box right next -- right there that
8     says create SR.  That's a service request.
9          We're not going to do either of those two
10    things.  We're going to go up to the tabs at the top.
11    Okay?
12         The first one is this dashboard, the second is
13    knowledge base, the third is service request.  We're
14    actually going to go to patches and updates, and we're
15    going to click on that.  Boom, click.
16         Now, when we do that --
17         THE COURT:  Ms. Catz, let me interrupt one
18    moment.  I recall something I needed to get out of my
19    office.  I'll just be a minute.  Everyone can just remain
20    where they are, and I will be right back.
21         (Pause in the proceedings.)
22         THE COURT:  You can remain seated.
23         Please have a seat.
24         I'm sorry.  The record will show that we're
25    reconvened with everyone present.

1              I apologize.  Ladies and gentlemen, as you can

2    imagine, I have any number of cases going on at one time,

3    and sometimes they need some attention while I'm sitting on

4    another, and I forgot my iPad.

5              So that being the case, that's the computer

6    world today, I guess.

7              Let's resume, please, and excuse the

8    interruption.

9              MS. DUNN:  Thank you, your Honor.

10   BY MS. DUNN:

11   Q.    Ms. Catz, please continue wherever you were?

12   A.    Sure.  So in patches and updates, we're in that tab,

13   and you go down here to this box that says patch search --

14   no, right over there.  Yeah.

15             And here, since this is a case about PeopleSoft,

16   we're going to put in -- you actually start typing, and it

17   fills it in for you.  You start writing PeopleSoft

18   enterprise, and it will give you all your choices, and then

19   PeopleSoft 8.0.

20             And then you can be more specific, but this

21   particular search, this very simple search without even

22   mentioning anything else, you click search, and this is

23   what pops up.

24             I actually did this search last week, and you

25   can't see it on this slide, but 1300 different patches

1     popped up at that point.

2     Q.    So we're -- it seems like there's a lot of stuff on

3     this screen.

4           So I want to ask you whether -- when a customer

5     logs in to My Oracle Support whether they're restricted to

6     seeing only what they're licensed for or whether they can

7     see other things too?

8     A.    No, they can see absolutely everything because when

9     they're logging on, we don't want to put up in any walls

10    between them and getting what -- the fix they need, if --

11    because we don't want to have an administrative error on

12    our part, slow them down.

13          Some of these systems are running ultra critical

14    things, and we don't want to slow them down one second,

15    frankly, so we put it all out there.  But they don't take

16    it unless they're licensed for it.

17    Q.    So we just talked about My Oracle Support.  Let's

18    talk also about Oracle's eDelivery website which the jury

19    has already heard a little bit about.

20          First of all, what's the difference between My

21    Oracle Support and eDelivery?

22    A.    eDelivery allows you to take down whole products.

23          So if you're just getting started, you may go to

24    eDelivery for an easy download of the entire product.  You

25    would need a license, or you would be working under a trial

1    license, but it's available.

2    Q.    Okay.  So I may be getting this wrong, but so

3    eDelivery is that software, and My Oracle Support is

4    support, or is there a cross-pollination?

5    A.    No.  So eDelivery has full products, full downloads.

6    My Oracle Support also has full products, full downloads

7    and all sorts of additional things.

8           So you can actually get a full download of a

9    product on either, but on My Oracle Support, you can also

10   get little pieces and patches and things like that.

11   Q.    Okay.  So for both those things you need a license?

12   A.    Yes, you need a license.

13   Q.    Okay.  So I'd like to put up on the screen

14   Plaintiff's Exhibit 1 which has already been admitted, and

15   we talked about this a little bit the other day during the

16   my cocounsel's examination of Mr. Ravin.

17          So if you look at the top, you can see that this

18   e-mail refers to eDelivery, the website that we just

19   discussed.

20          And a little lower down -- this is an internal

21   Rimini Street e-mail.  A little lower down it says,

22   "Basically it's an open door to their software."

23          On Thursday, Mr. Ravin, the defendant, was asked

24   about the last quote that you see here which says,

25          "Sounds to me like they just said, 'Help

1    yourself to the buffet.'"

2            And Mr. Ravin's lawyer asked him, you have to

3    admit this looks pretty bad.  Ms. Catz, do you agree that

4    this looks pretty bad?

5    A.    Yes, it looks terrible.

6    Q.    Why?

7    A.    Because you actually have to have a license to take

8    these down.  It's like going to the supermarket or to

9    Kohl's or JC Penney's, the stuff is all out there, but

10   you're not supposed to just take it without paying for it.

11   Everyone knows that.

12   Q.    In response his lawyer's question how can it not be

13   wrong, Mr. Ravin said,

14            "The context that I'm seeing this in was simply

15   saying if they're going to put all of this stuff in public,

16   does that mean that everyone can help themselves to it."

17   A.    No, of course, not.  You have to have a license.

18   Just like when you go to a store, you have to actually pay

19   for what you take.

20   Q.    All right.  Let's move on to Defendants' Exhibit 146

21   which has been preadmitted, and it should be in your

22   binder?

23   A.    I have it.

24   Q.    Great.  I just need to get there.

25            So what is this, if you recognize it?

934

1    A.    It's an analysis of third-party support providers

2    done by the support organization.

3    Q.    And this is a multipage presentation from

4    April 2009.  I'm not going to ask you to walk through the

5    whole thing, I just want to look at one page.

6              COURTROOM ADMINISTRATOR:  Ms. Dunn, I'm sorry.

7    I don't see that admitted.  146?

8              MR. WEBB:  No objection, Your Honor.

9              MS. DUNN:  Thank you.  No, that's okay.

10             THE COURT:  All right.  No objection to

11   admission or no objection to referring to it on the chart?

12             MR. WEBB:  No objection to the -- well, either.

13             THE COURT:  All right.  It's admitted.

14             MS. DUNN:   We move to admit.

15         (Defendants' Exhibit 146 received into

16         evidence.)

17             MS. DUNN:  Thank you.

18   BY MS. DUNN:

19   Q.    If we can just look at page 3.  This is part of this

20   presentation from April  of 2009, and the heading on this

21   page says "The Myth of Third-Party Support."

22             And then it says,

23             "Third-party support claims to provide up to 50

24   percent cheaper than Oracle Support, but, in reality, you

25   only get a small fraction of the value."

1              What does this mean?

2    A.     Well, they are offering at a 50 percent price of

3    ours, so in our example this would be $500,000, and they're

4    saying that they do more than what we do, that they're

5    better than what we do at Oracle for half the price.

6              But, in fact, they can't possibly do what we do,

7    they don't have access to the source code, they simply

8    couldn't really help in a true emergency.  They couldn't

9    really do it.  So, really, 50 percent is an overcharge,

10   it's not a bargain.

11   Q.     And what does a promise like this mean for Oracle?

12   A.     Well, when they come to our customers, our customers

13   wonder all of a sudden whether we are overcharging them.

14             It really breaks the bonds and the trust that we

15   have with our customers.  We've negotiated a price with

16   them.  All of a sudden, they're wondering whether we've

17   treated them fairly.

18   Q.     What does it mean for the customer then?

19   A.     Well, for a customer I could see how it's tempting

20   to pay half price, but it gives them a false sense of

21   security.

22             Maybe they don't want to upgrade today.  Let's

23   say they just upgraded, they don't have any upgrade plans

24   tomorrow or even next year, but another year from now they

25   won't be able to.

936

1           They don't have the new software that they may

2      need for security issues.  It just gives them a complete

3      false sense of security, freezes them in time.

4      Q.   And speaking of security, what, then, is the

5      problem?  What do you mean a false sense of security?

6      A.   Well, I don't think these customers realize the

7      danger they were putting themselves in, because there are

8      constantly evolving threats, and they won't -- they can't

9      possibly handle them.  They don't have the source code.

10          And, in addition, to the extent that they do

11     ever want to upgrade, now they can't.

12     Q.   Ms. Catz, are you the person who made the final

13     decision to file this lawsuit?

14     A.   Yes, I am.

15     Q.   I'd like to show you what's been marked as

16     Plaintiffs' Exhibit 5465, and that should be in your

17     binder.

18     A.   I don't think so.

19          Oh, I'm sorry.  I apologize.  It's here.

20     Q.   Do you recognize what that is?

21     A.   Yes.

22     Q.   Okay.  What is it?

23     A.   This is an e-mail I got from Rich Allison about

24     Rimini Street support.

25     Q.   What's the date on the e-mail?

1    A.    It's September 2006.

2              MS. DUNN:  Your Honor, Oracle moves to admit PTX

3    5465 and show it to the jury.

4              MR. WEBB:  Objection; hearsay, Your Honor.

5              THE COURT:  Sustained.  Also, there's an

6    insufficient foundation.

7              MS. DUNN:  Okay.

8    BY MS. DUNN:

9    Q.    Okay.  Ms. Catz, is this an e-mail that you

10   received?

11   A.    Yes, this is an e-mail I received telling me

12   about --

13   Q.    Before you get to the content of it, is this an

14   e-mail that you received?

15   A.    Yes, it's an e-mail I received from Rich Allison.

16   Q.    Okay.  And Rich Allison works with you?

17   A.    Rich Allison reports directly to me.

18   Q.    Do you keep e-mails in the ordinary course of your

19   work?  Does Oracle maintain its e-mails?

20   A.    Yes.

21             MS. DUNN:  Your Honor, we move 5465 as a

22   business record.

23             MR. WEBB:  Objection; hearsay, Your Honor.

24             THE COURT:  Well, once again, I need further

25   foundation on it in light of the objection.

1           MS. DUNN:  Your Honor, we're also happy to admit

2      this not for the truth of the matter asserted if that

3      would --

4           THE COURT:  Well, that may be, but I -- the fact

5      is the exhibit needs to be identified and explained before

6      it's going to be admissible.

7           MS. DUNN:  Okay.

8      BY MS. DUNN:

9      Q.   Ms. Catz, can you explain what this e-mail is and

10     the context in which you received it?

11     A.   Yes.  Rimini Street made an announcement of their

12     existence, and this was talking to me about the fact that

13     the person that started Rimini Street had founded

14     TomorrowNow, and he was the one that had sold it to SAP.

15          MS. DUNN:  Your Honor --

16          THE COURT:  All right.  The Court will admit the

17     exhibit at this time.

18          Ladies and gentlemen, when a foundation needs to

19     be shown for an exhibit, it needs to be shown that it's

20     relevant and competent to the case.

21          The attorneys have been able to agree on many of

22     the exhibits in this case, and we've moved along well.  But

23     on occasion there'll be an exhibit, I'm sure, where they

24     are not in complete agreement.

25          This exhibit is being admitted not for the truth

1    of what it says but for the witness to explain how and why

2    she acted at a particular point of time.  That's evident to

3    me from having looked at it, and with the foundation that's

4    now been given, I will admit it.

5              (Defendants' Exhibit 5465 received into

6              evidence.)

7              MS. DUNN:  Thanks, Matt.  If we can blow up and

8    actually look -- see the whole thing, if we could, the top

9    also, that would be great.

10   BY MS. DUNN:

11   Q.    So, Ms. Catz, this is the e-mail from Rich Allison

12   to you in September of 2006?

13   A.    Yes.  It's from Rich telling me -- just pointing out

14   that the person who founded TomorrowNow had now just

15   founded another company.

16   Q.    And was that your impression of what this meant when

17   it says, "Son of TomorrowNow"?

18   A.    Yes, of course, it's the follow-on to TomorrowNow.

19   Q.    And when it says in the e-mail, "The guy who runs

20   this started TomorrowNow," who did you understand that to

21   refer to?

22   A.    The defendant.

23   Q.    What was TomorrowNow?

24   A.    TomorrowNow was a company that also offered

25   third-party support, but in their case also, they

1    downloaded our software, they made software libraries, and

2    they made many --

3              MR. WEBB:  Objection, Your Honor.  May we

4    approach?

5              THE COURT:  You may approach.

6         (Sidebar conference held as follows:)

7              MR. WEBB:  That testimony has stepped way over

8    the line of what Your Honor said is permissible.

9              There was a discussion that was TomorrowNow, and

10   the fact that TomorrowNow existed and Mr. Ravin was

11   associated with it.

12             Now, this witness is going through all the

13   things, all the acts that are not into evidence about

14   TomorrowNow trying to connect the two, one to the other.

15             This is far beyond the scope of what was

16   permitted earlier by Your Honor's rulings, and this is

17   extremely prejudicial because what they're trying to do now

18   through this witness with that knowledge, going through

19   trying to link up everything that happened at TomorrowNow

20   with what is alleged in this case.

21             That's been their plan all along, and now that

22   just happened.

23             MS. DUNN:  To be entirely clear, this respects

24   the line that you specifically drew which is you identified

25   your line as misstatement of facts, no criminal plea and no

1    result of the litigation.

2              This witness has been specifically instructed

3    not to cross over the line.

4              In addition, we looked back at Mr. Ravin's

5    testimony, and he discussed the model of TomorrowNow, the

6    fact that he founded TomorrowNow, and also already in

7    evidence is the fact that SAP shut down the processes at

8    TomorrowNow.  We will not go beyond that with this witness.

9              Your Honor, if that issue comes up, it will be

10   adjudicated by Your Honor when it does come up.

11             But we have done everything to specifically

12   request -- respect the line that Mr. Webb himself outlined,

13   and this witness has not gone beyond that.

14             In addition, she is the person who made the

15   decision to sue TomorrowNow and made the decision to sue

16   Rimini Street.

17             So it is impossible for her to discuss her

18   recollections of that time without discussing TomorrowNow

19   and her impression of what was going on at the time.

20             THE COURT:  I've heard enough.

21             It's obviously a sensitive subject matter, and

22   it also has some bearing and relevancy to this case.

23             I will allow her to testify that she was very

24   concerned about TomorrowNow, that it had become a problem.

25             I'm not going to allow her to go through the

1    specific problems with TomorrowNow or the outcome of what

2    became of litigation or challenges to TomorrowNow or even

3    her decision to bring the suit against TomorrowNow.

4              But I will allow her to place this lawsuit in

5    some context of being partially a result of her concern

6    over what had happened in connection with TomorrowNow.

7    That's relevant.

8              MS. DUNN:  Two questions, Your Honor.  One is,

9    I'd like to ask her why she authorized the suit of

10   TomorrowNow.

11             But the second thing, everyone knows already

12   that Oracle sued TomorrowNow, and defense counsel has made

13   a big deal of saying that defendant left TomorrowNow before

14   that lawsuit happened, but the conduct at issue in the

15   lawsuit well predates Mr. Ravin's departure from

16   TomorrowNow.  So it is --

17             MR. WEBB:  Sooner or later I get a chance --

18             MS. DUNN:  What?

19             MR. WEBB:  Sooner or later I get a chance to

20   respond.

21             First of all, the only thing the jury knows is

22   TomorrowNow was sued --

23        (Simultaneous indecipherable conversation.)

24             MS. DUNN:  -- that's okay.

25             MR. WEBB:  -- and they changed no longer local

1    hosting.  That's what they know.

2          The witness just went down a litany of

3    downloading and all that stuff which I'm going to move to

4    strike.

5          The other thing is, Your Honor, I mean, you've

6    said this, she can talk about this, she was concerned about

7    TomorrowNow, that's why she authorized the lawsuit.  She

8    also authorized this lawsuit.

9          The jury has no idea -- and Mr. Ravin testified

10   he didn't know the technical processes used by TomorrowNow.

11   That's not in the case.  His testimony was he did not know

12   the process that was used.

13         THE COURT:  Now, wait a minute.  I've heard

14   enough argument.  I've made my ruling.

15         I'll allow her to testify that she was concerned

16   about TomorrowNow, that she authorized the suit against

17   TomorrowNow, and now she was concerned about this one for

18   many of the same reasons, and I don't want to go into

19   TomorrowNow beyond that.

20         MS. DUNN:  Your Honor, if you'll permit me, we

21   do want to establish the date of conduct in response to the

22   fact that they have made the point over and over by this

23   point that Mr. Ravin left --

24         THE COURT:  Well, the dates, the dates are

25   relevant for context, and I'll allow that.

1           MR. WEBB:  I would move to strike her last few
2   sentences because they go into details beyond the Court's
3   guidance.

4           THE COURT:  All right.

5           MS. DUNN:  I'm not sure about that.  I think we
6   need to look at the realtime, because based on what Your
7   Honor just said, I actually think her answer was within the
8   bounds.

9           Not only that, the fact that TomorrowNow was
10  doing automated downloading and that that's why Oracle
11  changed its process is already in evidence.

12          So in part, Your Honor just said that she can
13  testify to the fact that she was concerned, brought suit
14  for similar reasons.  That's why we're happy to stay with
15  that and establish the date.

16          That is all I will elicit with this witness, and
17  I want to assure Your Honor she has been preinstructed not
18  to cross the line that Mr. Webb articulated.

19          THE COURT:  All right.  I will allow that and
20  build a cautionary instruction, if you would like it, with
21  regard to her previous answer with regard to TomorrowNow.

22          MR. WEBB:  I would, thank you.  Your Honor.

23          MS. DUNN:  Thank you.

24          THE COURT:  All right.

25       (Sidebar conference concluded.)

1        THE COURT:  And, ladies and gentlemen, the

2   discussion with counsel concerned a reference in the

3   testimony by Ms. Catz concerning the other company that's

4   been referred to on occasion throughout this case,

5   TomorrowNow.

6        I would caution you as jurors that Ms. Catz'

7   explanations as to why she authorized litigation in this

8   matter are relevant to this case, but they are only offered

9   to show why she acted as she did, not for the truth of the

10   matter asserted as to the conduct by another company or the

11   conduct by a defendant in this case.

12        I realize this is a little bit confusing.  I

13   just want you to understand that the witness can only

14   testify as to her personal reasons for bringing this

15   particular -- authorizing this particular lawsuit, and I

16   would caution you to consider her testimony only in that

17   respect.

18        Ms. Dunn, you may go ahead, please.

19        MS. DUNN:  Thank you, your Honor.

20   BY MS. DUNN:

21   Q.    So to reorient everybody, Ms. Catz, you testified

22   that you participated in making the final decision in

23   bringing this lawsuit against Rimini Street; is that right?

24   A.    Yes.

25   Q.    Okay.  And the jury has already heard that Oracle

1    previously sued a company called TomorrowNow.  Do you

2    understand that?

3    A.    Yes.

4    Q.    And as you've testified, that that was -- that "Son

5    of TomorrowNow" in this e-mail referred to Mr. Ravin, the

6    defendant?

7    A.    Yes.

8    Q.    And that he was also the founder of TomorrowNow.

9    You understand that?

10   A.    Yes.

11   Q.    Okay.  When we took a break, you were explaining

12   what TomorrowNow was.

13            When you brought suit against TomorrowNow, when

14   Oracle brought suit, was it concerned about TomorrowNow's

15   conduct for similar reasons to the reasons in this case?

16   A.    Yes.

17   Q.    Okay.  When did you bring suit against TomorrowNow?

18   A.    2007.

19   Q.    And if you remember, what was the time period at

20   issue in that lawsuit?

21   A.    From the end of 2002 until then.

22   Q.    The jury has also already heard in this case that

23   SAP, who had acquired TomorrowNow, had admitted to some

24   wrongdoing in 2007.  Is that something that you remember?

25   A.    Yes.

1    Q.    The jury has also heard that SAP decided to shut

2    down the relevant programs at TomorrowNow.  Is that

3    something that you know about?

4    A.    Yes, they shut down TomorrowNow.

5              MR. WEBB:  Your Honor, may we approach?

6              THE COURT:  No, not at this time.

7              If you have an objection to a specific question

8    beyond this one, I'll entertain it, and perhaps we'll have

9    a sidebar.  I'll deny your objection as it applies to this

10   question.

11   BY MS. DUNN:

12   Q.    If you know, what happened to TomorrowNow's

13   customers?

14   A.    Some came to Oracle and some went on to Rimini

15   Street.

16   Q.    Okay.  Returning now to this lawsuit, when was this

17   lawsuit filed?

18   A.    2010.

19   Q.    And if you remember, what specifically triggered the

20   filing of this lawsuit in 2010?

21   A.    Well, we saw massive unauthorized downloading, and

22   we learned some other things related to that.

23   Q.    Did Rimini ever pay Oracle for any license for

24   PeopleSoft software?

25   A.    No.

1   Q.    Did Rimini ever pay Oracle for any license for JD

2   Edwards software?

3   A.    No.

4   Q.    Did Rimini ever pay Oracle for any license for

5   Siebel software?

6   A.    No.

7   Q.    Did Rimini ever pay Oracle for any license for

8   database software?

9   A.    No.

10  Q.    Did Rimini ever pay Oracle for a license permitting

11  Rimini to have copies of Oracle software on its computers?

12  A.    No.

13  Q.    And did Rimini ever pay Oracle for a license

14  permitting Rimini to use Oracle software to support

15  multiple customers?

16  A.    No.

17  Q.    What impact, if any, has Rimini Street's conduct had

18  on Oracle?

19  A.    Well, first of all, we've lost hundreds of

20  customers, and we've lost the revenue associated with their

21  support.

22        Like I mentioned, a $1 million contract, 10

23  years of that, minimal, which is what we generally use when

24  we're making projections just to be conservative, so that

25  would be $10 million for that $1 million customer example I

1    gave.

2              So we lost 300 customers plus.  We lost an

3    opportunity to get their support revenues.  But we also

4    ended up having to work extra hard to keep the customers we

5    have.

6              But for the customers we lost, it totally broke

7    the relationship, and they would be much less likely to buy

8    additional software modules from us.

9    Q.   So someone might say to you, okay, you know, what's

10   one customer or 300 something customers.

11   A.   Every customer matters to us.  Every single one of

12   them.  We want to keep all of them.

13   Q.   Based on your experience as CEO of Oracle, do you

14   think that Rimini's customers would have stayed with Oracle

15   but for Rimini Street's conduct?

16   A.   The vast majority of our customers stay with us if

17   they're using the software.  If they go bankrupt,

18   obviously, then, they go away.

19             But for Rimini, since Rimini Street, all those

20   customers are still using our software, I believe that we

21   would have been able to have them all stay with us but for

22   Rimini's behavior.

23   Q.   Thank you, Ms. Catz.  I just have one last question

24   for you.  How do you feel to be in litigation over these

25   issues?

```
 1    A.    I wish I wasn't here.  I wish -- I bet all of us

 2   wish we weren't here, but this is just too important to let

 3   go by.

 4             This is an absolute critical foundation of the

 5   software industry, investing, then licensing and protecting

 6   copyrights.

 7             If we don't protect our rights, we don't have

 8   any rights.  If we don't protect our rights, the whole

 9   software industry doesn't exist and innovation we take for

10   granted wouldn't even exist.

11             MS. DUNN:  Thank you, Ms. Catz.

12             Your Honor, I have no further questions at this

13   time.

14             THE COURT:  All right.

15             Cross-examination?

16             MR. WEBB:  Just a few minutes, your Honor.

17             May it please the Court.

18             THE COURT:  Oh, yes, go ahead, please.

19                      CROSS-EXAMINATION

20   BY MR. WEBB:

21    Q.    Good afternoon, Ms. Catz.  We have not met before.

22   My name is Trent Webb.  I have a few questions for you this

23   afternoon.

24             Have you ever testified before in trial like

25   this?
```

1    A.    Yes.

2    Q.    How many total times have you testified in front of

3    a jury?

4    A.    I think four times?  This is my fourth time, I

5    think.

6    Q.    You are the CEO of Oracle?

7    A.    I am.

8    Q.    And your company has annual revenues of about 38

9    billion?

10   A.    Yes.

11   Q.    And over 130,000 employees worldwide?

12   A.    Yes.

13   Q.    And about 110 billion in assets?

14   A.    In total assets?  Yes.

15   Q.    And it is a publicly traded company; correct?

16   A.    Yes.

17   Q.    And as CEO, your public statements are very

18   important?

19   A.    Yes, they are.

20   Q.    It's essential that you're truthful when you make

21   statements about the company?

22   A.    Very much so.

23   Q.    Now, your compensation is tied to the performance of

24   the company; correct?

25   A.    Yes, it is.

1    Q.    And according to your public filings, every year

2    since 2010 you've made at least $36 million in

3    compensation, is that accurate?

4    A.    I have --

5                 MS. DUNN:  Objection, Your Honor.

6                 THE COURT:  Pardon?

7                 MS. DUNN:  Objection, Your Honor, foundation.

8                 THE COURT:  There is some ambiguity in the

9    question.  I'll allow you to rephrase the question,

10   Mr. Webb, and I'm sure the witness is competent to testify.

11                MS. DUNN:  Your Honor, may we approach?

12                THE COURT:  Yes.

13           (Sidebar conference held as follows:)

14                THE COURT:  All right.  Your objection?

15                MS. DUNN:  My objection is on foundation basis

16   which is I presume that you're headed towards a bias line

17   of questioning, and there's been no foundation laid for

18   that at all.

19                MR. WEBB:  Your Honor, we addressed this in the

20   motion in limine that you denied.

21                You said,

22                "The Court has reviewed this motion on the issue

23   and finds that Oracle's overall company wealth and

24   financial issues are relevant as Oracle has put its wealth

25   and financial condition at issue in this case."

1          And you went on to talk about,

2          "Similarly, as to the financial condition of

3    Oracle's officers or employees, the Court finds this

4    evidence may be relevant in examining the witness's bias if

5    any."

6          Her compensation is tied to the stock.  If it

7    goes up, she gets more money.  If it goes down, she

8    doesn't.

9          MS. DUNN:  That's fine.  No foundation has been

10   laid.

11         You've only asked about, you know, the

12   company's, basically, size and financial situation and

13   whether it's important for her to make accurate and

14   truthful statements in the 10Ks.

15         But as to bias and as to this witness, no

16   foundation has been laid.

17         THE COURT:  I'll cut it off there.  This is

18   cross-examination.

19         I view monetary consequences to the witness as a

20   proper subject matter for cross-examination, and I think

21   it's an appropriate question.  The objection's overruled.

22         MS. DUNN:  I want to be clear, though.  I'm not

23   objecting on that basis.  I'm objecting to foundation with

24   this witness, no foundation has been laid as to her

25   connection.

1           So I think --

2           THE COURT:  Her personal income is all -- she's

3   financially attached to the company, and what happens with

4   the company has a financial significance to her.  I think

5   it's appropriate.

6           MS. DUNN:  Okay.

7       (Sidebar conference concluded.)

8   BY MR. WEBB:

9   Q.    I'm sorry.  Ms. Catz, since 2010, you have made at

10  lease $36 million every year from Oracle?

11  A.    Yes.

12  Q.    And much of your compensation is in stock, is it

13  not?

14  A.    It's historically been in the options.

15  Q.    And if the value of the stock goes up, the value of

16  your stock holds or options also would go up?

17  A.    Yes.

18  Q.    And early this year you exercised some of those

19  options, did you not?

20  A.    Yes, they were about to expire.

21  Q.    And the amount that you exercised or sold those

22  options for were about 150 million, give or take?

23  A.    Yes.

24  Q.    Now, the flip side if your company does poorly it

25  could impact your personal income?

1      A.     Yes.

2      Q.     Because ultimately the performance of the company is

3   something you're accountable for?

4      A.     Yes, that's my job.

5      Q.     And a major component of Oracle's financial

6   performance is this maintenance business we've been talking

7   about, true?

8      A.     Yes.

9      Q.     And it's true, isn't it, that the maintenance

10  revenues account for nearly half of the revenue company?

11     A.     Yes.

12     Q.     And without this money, Oracle really couldn't do

13  anything?

14     A.     Yeah.  It's critical to us.

15     Q.     And without the maintenance revenue Oracle, as a

16  large company, would not be profitable, would it?

17     A.     It wouldn't be able to make the investments we make

18  and we wouldn't last for long, that's right.

19     Q.     I want to talk about how Oracle got into the

20  PeopleSoft business.  You mentioned that earlier but I want

21  to get into it a little bit more.  When Oracle approached

22  PeopleSoft it did not want to be purchased, did it?

23     A.     The management team did not want to sell the

24  company.

25     Q.     But you proceeded with your purchase?

```
 1    A.    Yes, we did.

 2    Q.    Is there a name for something like that?

 3    A.    It's called an unsolicited tender over.

 4    Q.    Is it also called a hostile takeover?

 5    A.    Yes.

 6    Q.    And were you the architect of that --

 7            THE COURT:  What relevancy does this line have,

 8    Counsel?

 9            MR. WEBB:  Your Honor, it goes to --

10            THE COURT:  You've taken one part that the

11    Court's allowed you and you're stretching it out into

12    something that's clearly improper.

13            MR. WEBB:  I'll move on, Your Honor.

14            THE COURT:  Please move on to another subject

15    matter.

16    BY MR. WEBB:

17    Q.    As a result of the process that you used to acquire

18    this company, you did not have access to all of their

19    internal documentation, did you?

20    A.    We got access to it when they agreed to be acquired

21    in December.

22    Q.    But in terms of the confidential documents at the

23    beginning you couldn't see those; correct?

24    A.    No, we could only see the public documents.

25    Q.    And because of that, you didn't have access to all
```

1    their confidential documents and agreements with all of

2    their -- all the customers; right?

3    A.    Well, we did get access at some time.

4    Q.    And because of that, you tried to estimate from

5    public documents how the business would work; correct?

6    A.    Yes, because we're in the software business

7    ourselves.

8    Q.    So, again, when you're going through the process of

9    trying to buy this company, as opposed to other

10   transactions where you have full access to everything, you

11   only had partial access to the documents that you wanted to

12   see when you wanted to determine how you would operate the

13   business; correct?

14   A.    That's correct.

15   Q.    Now, you ultimately purchased PeopleSoft for

16   $11 billion; right?

17   A.    A little bit less -- a little bit more, excuse me.

18   Q.    And when you acquired PeopleSoft you also acquired

19   JD Edwards; correct?

20   A.    It was already owned by PeopleSoft.  They had bought

21   it during the previous year.  So we got them both for the

22   11.1 billion.

23   Q.    So you got both JD Edwards and PeopleSoft for that

24   transaction; correct?

25   A.    That's right.

1   Q.    And you later purchased Siebel corporation?

2   A.    Yes.

3   Q.    And the purchase price for that company was six

4   billion; correct?

5   A.    Yes.

6   Q.    And by purchasing PeopleSoft, JD Edwards, and

7   Oracle, you were able -- I'm sorry you're shaking your

8   head.  Let me try again.

9         By purchasing PeopleSoft, JD Edwards, and

10  Siebel, Oracle's able to acquire 14,000 customers, true?

11  A.    Yes.  A little bit more.  But basically right.

12  Q.    So let's go one at a time.  For PeopleSoft it

13  already had the PeopleSoft software product; correct?

14  A.    I'm sorry.  Are you asking if we had it before we

15  bought it?

16  Q.    No, I'm talking about -- PeopleSoft already had a

17  software, ERP product that it was licensing when you

18  purchased the company?

19  A.    Yes.  That's right.

20  Q.    It was a preexisting product?

21  A.    Correct.

22  Q.    And you didn't have to spend R&D to develop that

23  preexisting product, did you?

24  A.    No, it was acquired R&D with the 11 billion plus.

25  Q.    Same thing with JD Edwards, it was a preexisting

959

1    product that you didn't have to spend R&D to develop?

2    A.    Not when we received it.  It was developed.  We just

3    invested more into it the moment we got it.

4    Q.    And that's the same thing for Siebel; correct?

5    A.    Correct.  We acquired it and then we invested more

6    into it.

7    Q.    The total investment price for all three products,

8    the two companies you purchased, was around 17 billion;

9    correct?

10   A.    Yes, the purchase price in 2005, 11.1, and then

11   2006, 6 billion, yes.

12   Q.    And since the purchase of those companies in 2005 or

13   2006, Oracle has made maintenance revenue far in excess of

14   the 17 billion you spent to buy the companies, true?

15   A.    So I have to do the math.  So a billion 2 is

16   PeopleSoft annually, about 500 million is Siebel, and

17   then -- so that was mostly, you know, nearly every year,

18   but we also invested extensively into those product lines.

19   But correct.

20   Q.    Okay.  That was my question.

21           A big part of the motivation to buy these

22   companies was to acquire the 14,000 customers, true?

23   A.    That's correct.

24   Q.    And those customers came with the companies when you

25   bought them; right?

1    A.    Yes, sir.

2    Q.    So you didn't have to invest in establishing those

3    business relationships, those customer relationships before

4    the acquisition?

5    A.    No, we spent for it in the acquisition.

6    Q.    And when you purchased the customer base, you also

7    purchased the contracts, the maintenance contracts they had

8    with PeopleSoft at the time; right?

9    A.    Yes, that's correct.

10   Q.    And these maintenance documents were some of the

11   documents you couldn't see when you were serving

12   PeopleSoft; correct?

13   A.    That's correct.

14   Q.    At the time of the acquisition, you didn't think

15   about whether Oracle would be the exclusive option for

16   maintenance, did you?

17   A.    I'm not exactly sure what you're asking me.  I

18   expected us to be the ones doing the maintenance.  I did

19   expect that.  It was in our models.

20   Q.    But did you not think about whether Oracle would be

21   the exclusive option for maintenance; right?

22   A.    I -- I didn't consider anybody else doing it.

23   Q.    Because, in fact, you didn't -- you don't remember

24   thinking about third-party support at all when you acquired

25   PeopleSoft, true?

961

1     A.     That's correct.

2     Q.     As it turns out Oracle customers are not, in fact,

3     required to use Oracle for support, are they?

4     A.     No, they have a choice.

5     Q.     And when you acquired those PeopleSoft customers

6     they too had an option to use someone other than Oracle

7     post-acquisition?

8     A.     Yes, they had that option.

9     Q.     And so even now customers are free to use someone

10    other than Oracle for their maintenance and support, true?

11    A.     Yes.

12    Q.     And one of these third party support providers can

13    be one of those options; isn't that correct?

14    A.     Yes.  As long as they abide by the license terms.

15    Q.     And if they abide by the license terms they, in

16    fact, can be an option for these customers for software

17    support and maintenance?

18    A.     It is the customer's choice.

19    Q.     And if they charge less than Oracle, that's okay

20    too?

21    A.     They can charge whatever they want as long as they

22    abide by the license.

23    Q.     Because as you said earlier competition makes you

24    better; right?

25    A.     That is right.

1    Q.    Now, you helped to build the model showing that when

2    you acquired PeopleSoft it would improve the profitability

3    of Oracle; correct?

4    A.    Yes.

5    Q.    And when Oracle made the decision to buy these

6    companies you expected Oracle products to increase?

7    A.    Yes.

8    Q.    And you were right, Oracle's products have increased

9    every year since you purchased those companies, true?

10   A.    Our profits have increased, yes.

11   Q.    Isn't it true the incremental profit margin on

12   maintenance business is over 90 percent?

13   A.    Yes, that's right.

14   Q.    As a matter of fact, your expert in this case,

15   Ms. Dean, will testify that it's 94 percent, true?

16   A.    I haven't been permitted to see her report.  But it

17   is true.

18   Q.    Now, when we talked about profit, just to be

19   perfectly clear, because I'm not a business guy, obviously,

20   the top line is overall revenue.  That's all the money that

21   comes in; right?

22   A.    Yes.

23   Q.    And these tracked expenses, and that's what you

24   spend to actually do what you do for the customer?

25   A.    Yes, it's what we spend overall and also invest in.

1    It includes our R&D that we talked about before.

2    Q.    And then what's left, after you have all the revenue

3    coming in and then the expenses, that's the profit that's

4    left over?

5    A.    Yes.

6    Q.    And in this business, the profit is 94 percent?

7    A.    Oh, you're talking about support only now.

8    Q.    Support only, yes.

9    A.    Yes, the incremental profit on a customer is about

10   94 percent.

11   Q.    And the incremental margin or profit on additional

12   customers approaches 100 percent, true?

13   A.    Yes, because the investment is made, but we use that

14   money, of course.

15   Q.    Again, as CEO you sometimes make statements to

16   financial analysts; right?

17   A.    Yes.

18   Q.    Again, that's important to be truthful and honest

19   when you do that; right?

20   A.    Absolutely.

21   Q.    Because financial markets are listening to what you

22   say?

23   A.    Yes.

24          MR. WEBB:  Now, your counsel put in the front of

25   you DTX 0023.

1              Marie, I'd like to pull that up, but not for the

2      jury.  Just for the witness.  Can you do that?

3              You have it in front of you.  The print is very

4      small.  I apologize, Ms. Catz.

5              THE WITNESS:  I have it, though.  I have it in

6      this one.  Yeah, he put it in the big binder.

7      BY MR. WEBB:

8      Q.    Do you see it?

9      A.    I do.

10     Q.    All right.  Your lawyer asked a few questions about

11     this, but I want to ask you questions about parts she

12     didn't cover.

13             I believe you said earlier that it's important

14     to have this money because it allows you to reinvest in the

15     company?

16     A.    That's right.

17     Q.    Let's go to the last line of that third paragraph.

18     It's a quote attributable to you, saying,

19             "'When many customers just send you money for

20     something you're doing anyway, you literally can't help

21     [but increase profits].'"

22             Do you see that?

23     A.    Yes, but I didn't say "but increase profits," I

24     think the reporter added it.

25     Q.    Do you remember saying this?

<sup>1</sup> A.    Saying this?  Yes.

<sup>2</sup> Q.    Okay.  I want to raise another exhibit for you, 173.

<sup>3</sup> It's actually in your book.  We're not going to publish it

<sup>4</sup> for the jury.

<sup>5</sup>         Have you seen DTX 173 before, Ms. Catz?

<sup>6</sup> A.    I'm just getting to it.  This is really big.

<sup>7</sup> Q.    I apologize.  Take your time?

<sup>8</sup> A.    It's all the way in the back.

<sup>9</sup>         I see it.

<sup>10</sup> Q.    All right.  This pertains to a January 2009 meeting

<sup>11</sup> with some more financial analysts.  I'm going to refer you

<sup>12</sup> to the second page which at the bottom is 106, the last

<sup>13</sup> three numbers.  There's a picture of Mr. Phillips on the

<sup>14</sup> right.

<sup>15</sup> A.    We didn't have an analyst meeting on January -- in

<sup>16</sup> January 20 anything 2009.

<sup>17</sup> Q.    I'm sorry.

<sup>18</sup>         Have you seen this document before?

<sup>19</sup> A.    Yes, I have seen it.

<sup>20</sup> Q.    Okay.  I want to focus on the statement to the left

<sup>21</sup> of Mr. Phillips' face there.

<sup>22</sup>         It says,

<sup>23</sup>         "Maintenance, continue to be a 'very profitable

<sup>24</sup> part of our business, and as the number gets bigger and

<sup>25</sup> bigger it's really impossible for us to actually spend our

1    way through it, and so in general that's the sort of

2    overriding thing that guides our margins.'"

3             Ms. Catz, do you remember saying that?

4    A.    Yes.

5    Q.    And do you agree with that?

6    A.    Yes, that maintenance is absolutely critical to

7    improving our business and our profitability margins.  It's

8    absolutely critical.  It's the only way that we're able to

9    afford to invest in our products, in our company.

10   Q.    You talked earlier about your customers and the

11   relationship that Oracle has with their customers.  Do you

12   remember that?

13   A.    Yes.

14   Q.    Is it reasonable to conclude that customers may not

15   be happy with statements like this?

16   A.    Well, I think customers actually want us to be very

17   successful because their success is tied in with our

18   success and our ability to continue to grow, and it shows

19   them they've made the right choice, and we can continue to

20   invest.

21   Q.    We'll get to that in a minute.  First of all,

22   Oracle's policy is that that 22 percent is nonnegotiable;

23   right?

24   A.    Yes, it's 22 percent of a negotiated number.  So the

25   license is negotiated, and then automatically it's 22

967

1   percent.

2   Q.    And so for each year after that when a customer

3   wants to renew, and they come back to you, it's 22 percent,

4   and that's not going to change?

5   A.    Yes, it's 22 percent.

6   Q.    And, in fact, you can't think of one discussion

7   where you've been a part of where Oracle has discussed

8   changing that price?

9   A.    No.

10  Q.    Now, in fact, many customers have, in fact, asked

11  Oracle to lower that 22 percent; right?

12  A.    Well, everybody wants to pay less, yes.  I'm sure.

13  Q.    School districts have made that request?

14  A.    Yes.

15  Q.    Small businesses have made that request?

16  A.    Most likely.  Most often it's the large businesses

17  actually.

18  Q.    But small businesses too have made that request?

19  A.    Probably.

20  Q.    Cities and towns have made that request?

21  A.    I can't think of any right now, but probably.

22  Q.    Companies who are struggling financially have made

23  that request?

24  A.    Yes.

25  Q.    And during the recession, many companies made that

1    request, didn't they?

2    A.    Well, some companies made that request because

3    companies like Rimini and TomorrowNow came to them and

4    said, "Hey, would you like everything I've got -- they've

5    got and more for 50 percent," so for 11 percent.

6              So all of a sudden folks thought we were

7    overcharging them a price they negotiated themselves.

8    Q.    All right.  Back to my question.

9              Companies during the recession came to Oracle

10   and said, "Can you give us a break on that 22 percent?"

11   Isn't that true?

12   A.    Yes, or we'll go to TomorrowNow.

13   Q.    And you refused?

14   A.    That's right.  It wouldn't be fair to our other

15   customers.

16   Q.    Well, let's talk about that.  Let's say a customer

17   actually leaves Oracle support?

18   A.    Okay.

19   Q.    They go self-support, or they go to a third party,

20   or they decide to go new software?

21   A.    That's fair.

22   Q.    But sometime in the future they say, "I'm going to

23   go back to Oracle," true?

24   A.    Sure.

25   Q.    Now, for the years that they are gone, Oracle

1    charges them for the support that they weren't getting;

2    right?

3    A.    Yes, because they want the new products that have

4    been invested in during that whole time period by all those

5    other companies that did keep paying.

6    Q.    So if I'm an Oracle customer on support paying

7    $100,000 because that's my 22 percent number, I leave to go

8    do self-support for three years, and then I decide I want

9    to go back to Oracle, you charge them $300,000 to get back

10   in the door; isn't that true?

11   A.    We charge them so that they're even with all the

12   other customers that continued to invest because they want

13   that exact new software that was created during that time

14   period.  So, yes, they're charged for it.

15   Q.    But that's not all, is it?

16   A.    Sometimes we charge a reinstatement fee also.

17   Q.    A reinstatement fee.  So on top of the $300,000,

18   they pay a reinstatement fee equal to 50 percent, true?

19   A.    They may.

20   Q.    Because that's what would be fair to your other

21   customers who stuck around and were loyal?

22   A.    Well, it's only fair that they pay -- that there's

23   not a gamble involved whether you'll need it or not.

24            It's like buying insurance after you've had an

25   accident.  It's not -- it's not fair to everybody else that

1     that's only then you pay your premium.  So, yeah, that's

2     how it works.

3     Q.    So it's your testimony that that 300,000 plus 50

4     percent is done for the benefit of your customers who did

5     not leave Oracle support?

6     A.    It's to make it fair for everybody else.  And the

7     customer always has the right, if they want, to relicense

8     the software if that's less expense.

9     Q.    And so you get that $300,000 plus 50 percent, and

10    then you distribute it to those customers who didn't leave;

11    right?

12    A.    We distribute it by investing it into the products.

13    Q.    Oh, so you don't actually pay that to the customers

14    who showed the loyalty to stay?

15    A.    We have a negotiated price with them.

16    Q.    Oracle keeps that money?

17    A.    Yes, we keep it to invest in our -- in the business.

18    Q.    Isn't it true that that policy really is a

19    disincentive for customers to leave?

20    A.    It may serve as a disincentive.

21    Q.    Yeah, your customers are very sophisticated

22    companies, true?

23    A.    Yes.

24    Q.    Some of the most sophisticated companies in the

25    world are Oracle customers; right?

1    A.    Yes.

2    Q.    But even sophisticated companies can disagree about

3    what a contract says, true?

4    A.    Yes.

5    Q.    They can disagree about the scope of a license;

6    right?

7    A.    Of course.

8    Q.    And because they disagree about a scope of a

9    license, that doesn't make one side acting in bad faith,

10   does it?

11              MS. DUNN:  Objection, Your Honor.

12              THE COURT:  Sustained.

13   BY MR. WEBB:

14   Q.    Ms. Catz, reasonable minds can differ about contract

15   interpretation, true?

16              MS. DUNN:  Objection, Your Honor.

17              THE COURT:  Sustained.

18   BY MR. WEBB:

19   Q.    Ms. Catz, you believe that it's a customer's

20   obligation not to use software that they're not licensed

21   for; correct?

22   A.    That's right.  No one should use software they're

23   not licensed for.

24   Q.    And it's the customer's responsibility to determine

25   whether their actions are permitted by their contracts;

1    correct?

2    A.    It's the customer's responsibility regarding their

3    actions.

4    Q.    And that's not unreasonable to require a customer

5    with that contract to make some decisions for itself, is

6    it?

7    A.    I'm not exactly sure what you're asking me.  Could

8    you ask me again?

9    Q.    Sure.  It's not unreasonable to have a client make

10   sure that what it's doing under its contract is okay?

11   A.    An Oracle client.

12   Q.    An Oracle client?

13   A.    There's a couple negatives in there, but we expect

14   our customers to follow the rules and do the right thing.

15   I hope that answers that.

16   Q.    That does.

17   A.    Okay.

18   Q.    And, generally speaking, you believe Oracle

19   customers act within the scope of their licenses?

20   A.    Yes, they do.  We trust our customers.

21   Q.    They do what they are lawfully entitled to do in

22   your opinion?

23   A.    I believe they want to do what they've licensed.

24   Q.    And you believe that your customers know their own

25   contracts very well?

1    A.    They negotiated them, and, so, yes, I expect them to

2    know them.

3    Q.    And you think it would be presumptuous of you to try

4    to remind them of what their contracts mean, true?

5    A.    No, I mean, I may remind them if I think there might

6    be an issue.

7    Q.    So, obviously, if these customers decide to let a

8    third party provide support for their software, you would

9    expect them to carefully consider whether that's going to

10   be permissible, true?

11   A.    Yes.

12   Q.    Because, again, they know their own contracts;

13   right?

14   A.    Yes.  But I don't know that they'd know what the

15   third party is doing.

16   Q.    And some of those companies have signed on with

17   Rimini Street; correct?

18   A.    Some customers, I think I've heard, I was allowed to

19   hear that 300 plus customers have signed up with Rimini

20   Street.

21   Q.    And you were here for my opening statement, weren't

22   you?

23   A.    Yes.

24   Q.    Sitting right over there?

25   A.    Yes.

1    Q.    And you heard me say that Rimini Street gives to its

2    customers the option of whether they have their software on

3    their servers or Rimini Street's servers.  You heard that?

4    A.    I don't remember you saying that, but I believe you.

5    Q.    Would it surprise you to know that the vast majority

6    of Rimini Street's clients ask Rimini Street to host their

7    software on Rimini's servers?

8              MS. DUNN:  Objection.

9              THE COURT:  Sustained.

10   BY MR. WEBB:

11   Q.    Ms. Catz, is it your position that when one of your

12   customers, clients, signs on with Rimini Street and has

13   them host the software on Rimini's servers, has that client

14   violated its agreement with Oracle?

15   A.    Well, I know that Rimini doesn't have a license to

16   do that.  That I know for sure.

17   Q.    You also agreed, though, earlier that the third

18   party could stand in the shoes of its customer and provide

19   services for the maintenance and support of software, true?

20   A.    I think that's what you said.

21   Q.    And you agreed with me, did you not?

22   A.    It depends on the contract.

23   Q.    But a third party can stand in the shoes of the

24   licensee and perform the acts the licensee is permitted to

25   perform under that contract?

    1    A.    Yes, as long as that's actually permitted in the

    2   license.

    3    Q.    But with respect to those companies that have gone

    4   to Rimini Street and asked Rimini Street to host their

    5   software on Rimini's own servers, you have not gone to them

    6   and said, "That's a problem, you're breaching your

    7   contract," have you?

    8             MS. DUNN:  Objection, Your Honor.

    9             THE COURT:  Sustained.

   10   BY MR. WEBB:

   11    Q.    Now, when a customer is on Oracle support, they're

   12   entitled to access Oracle's website and to obtain fixes,

   13   updates, and patches for their software, aren't they?

   14    A.    Yes, that's what I shared earlier.

   15    Q.    And that could be a substantial amount of material,

   16   true?

   17    A.    Yes, it is a substantial amount.

   18    Q.    It could be hundreds of files?

   19    A.    It can be.

   20    Q.    It could be thousands of files?

   21    A.    It absolutely can be.

   22    Q.    And the customer would be totally within its rights

   23   to download those materials; correct?

   24    A.    Yes, as long as they're licensed for them, they may

   25   download them during their support contract.

1    Q.    And customers may also have the right to customize

2    their software; isn't that true?

3    A.    It would depend.  As long as what their

4    customization, you know, was not a derivative work, it

5    would still belong actually to Oracle.

6    Q.    And if a customer who has customized their code goes

7    to Oracle to have that code serviced, Oracle can refuse to

8    do that, true?

9    A.    It would really depend on the situation.  As I

10   mentioned in the previous questions, customized code, we

11   may very well figure out how to help them anyway.

12   Q.    But if Oracle decides not to provide support on that

13   customized code, you would expect that customer to hire a

14   third party to do it, correct?

15   A.    Yes.  And if it's custom programming, a third party

16   did it to begin with, they would probably hire whoever did

17   it to change it.

18   Q.    And that would be perfectly within their rights,

19   true?

20   A.    That would be, sure.

21   Q.    All right.  You were here in the courtroom during my

22   opening statement, and I talked about Oracle's process not

23   actually financially harming Oracle.

24            Let me rephrase that.  I talked about how

25   Rimini's process did not actually financially harm Oracle.

1    Do you remember that?

2    A.    Yes.

3    Q.    Is it your view that whether the software's on a

4    local environment or remote of the clients, that actually

5    has harmed Oracle?

6    A.    Yes, it violates our contract.  It violates the

7    license.

8    Q.    No, I understand that.  I'm asking financial harm.

9    How is the location of that software financially harming

10   Oracle?

11   A.    Well, you see, when that original license was

12   negotiated, all those kinds of terms actually have

13   financial implications.

14             If you want to have additional rights and even

15   additional sites and things like that, depending on the

16   contract, we charge you a higher price for that.

17             So if you're doing it outside your license

18   agreement, you're actually not -- you are not paying us for

19   what you -- what you are actually doing.

20   Q.    So is it your testimony to this jury that the

21   location of that software financially damaged Oracle?

22   A.    Yes, it does.  It's part of the original license.

23   It's part of the original negotiation, and had they wanted

24   different rights, they would have cost more.

25             All the restrictions implicate financial

978

```
 1    results.  Expanding beyond those restrictions usually
 2    involves paying for those rights like other customers do.
 3    Q.    To be clear, you're telling the jury that the
 4    location of that software, whether it's on Rimini's servers
 5    or the client's servers, financially damaged Oracle?
 6    A.    Yes, the use of it beyond the license damages
 7    Oracle, that's right.
 8    Q.    And is it your view that whether Rimini Street
 9    reused tax and regulatory updates versus rebuilt them one
10    at a time, that created financial damage to Oracle?
11              MS. DUNN:  Objection, Your Honor.
12              THE COURT:  Sustained.
13    BY MR. WEBB:
14    Q.    Now, we saw a graph earlier about the attrition rate
15    of customers from Oracle.  Do you remember that?
16    A.    Yes.
17    Q.    It's in your binder.  Do you remember that graph?
18    A.    I do.  Do you want to tell me which number it is?
19    Q.    It was the chart used with your lawyer showing the
20    attrition rate on the chart.
21    A.    Yes.
22    Q.    Do you have that?  Would you pull it out?
23    A.    I have it in the binder that she gave me.  Is that
24    what you want?
25    Q.    Yes?
```

1    A.    Okay.  Just a second.

2          I have it.

3    Q.    Now, in 2006 -- in 2006, the renewal rate by Oracle

4    was 94 percent?

5    A.    Yes, this is right after we acquired PeopleSoft and

6    JD Edwards and Siebel.

7    Q.    And in 2011, the renewal rate is actually higher?

8    A.    Yes.  We're very proud of that.

9    Q.    So fewer people are leaving PeopleSoft support in

10   2011 as compared to 2006; right?

11   A.    Yes, because we made a massive, massive investment

12   into these product lines, including JD Edwards, where we

13   brought back a product that PeopleSoft had -- that JD

14   Edwards had obsoleted.

15   Q.    And it's your testimony that that would be even

16   higher if it wasn't for Rimini Street; correct?

17   A.    Absolutely.

18   Q.    But Oracle's making more money in 2011 on

19   maintenance than it did in 2006?

20   A.    Yes, because we invested immensely into these

21   product lines.

22   Q.    And Oracle's profits on maintenance have increased

23   since 2006?

24   A.    Yes.

25   Q.    And, in this case Oracle claims that it should be

1    entitled to money in the form of lost profits.  You

2    understand that?

3    A.    Yes.

4    Q.    And it's Oracle's position that customers left to go

5    to Rimini Street, and had they stayed, you would have

6    continued to make a 94 percent profit margin on those

7    clients?

8    A.    We would have, and I actually believe we would have

9    sold them more, so other products that aren't even part of

10   this case.

11   Q.    And in this case, among all the customers, it's

12   true, isn't it, that Oracle seeks those lost profit damages

13   on 229 customers.  Correct?

14   A.    You know what, I'd have to look exactly at the

15   numbers, but I think that's about right.

16   Q.    And Oracle seeks to obtain roughly $200 million in

17   lost profit damages for those customers; correct?

18   A.    Yeah.  I'd have to look at exactly the numbers

19   because we're asking for two kinds of damages.

20   Q.    But every year customers leave Oracle support?

21   A.    Yes, usually because they're not using the software

22   anymore.

23   Q.    Well, if these customers are already leaving Oracle,

24   you can't claim that those losses were caused by Rimini

25   Street, can you?

1    A.    Yes, I can, because most of the customers that are

2    leaving, the vast majority, the small percentages that do

3    leave, aren't using the product anymore.

4              When they go to Rimini Street, they are still

5    using the product.  So those guys generally stay with us --

6    Q.    We'll talk about -- we'll get to that in just a

7    minute, Ms. Catz.  I'm sorry.

8    A.    I'm sorry.

9    Q.    Customers left Oracle support before Rimini Street

10   came on the market, true?

11   A.    Yes.

12   Q.    Some leave because they don't want to upgrade;

13   right?

14   A.    I suppose.

15   Q.    Now, there's some, I guess, dispute earlier about

16   whether or not Oracle charges for upgrades.  Do you

17   remember that?

18   A.    Yes.  We don't charge a license fee for upgrades.

19   Q.    But isn't it true that you have a team of

20   consultants who work with the client to perform that

21   upgrade; correct?

22   A.    Well, we have a small group that does upgrades.

23   It's called implementation of the upgrades.

24              But the vast majority of upgrades that our

25   customers do are not done by us.  Probably 95 percent of

1    customer -- maybe more, of customers that upgrade do not

2    use our consulting organization at all.

3    Q.    Is it your testimony that customers do not leave

4    Oracle because they do not want to experience the cost of

5    an upgrade?

6    A.    They do not -- I'm sorry, I'm not sure --

7    Q.    That was a terrible question, Ms. Catz.

8          Do customers leave Oracle because they don't

9    want to incur the cost of an upgrade?

10   A.    Most of the customers -- my experience is that most

11   customers that do not renew support outside of the ones

12   that go to Rimini Street are no longer using the software

13   one way or another.

14   Q.    Now, in this case there will be depositions played

15   of some customers.  You're aware of that; right?

16   A.    Yes, I've heard of it, but I have not been permitted

17   to see them.

18   Q.    So if a customer comes in and says, either the

19   deposition or in that chair, that they left because they

20   did not want to incur the expense of upgrade, you would not

21   challenge that, would you?

22          MS. DUNN:  Objection, Your Honor.

23          THE WITNESS:  I'm not sure.  Oh, excuse me.

24          THE COURT:  Overruled.  It's a fair question.

25

1    BY MR. WEBB:

2      Q.    So let me try it again.

3            If deposition testimony is played of customers

4    in this trial, or if the customer takes that stand and says

5    they left Oracle because they did not --

6            THE COURT:  I don't want -- the question's

7    improper as phrased.  It's improper to ask a witness --

8            MR. WEBB:  I apologize, Your Honor.

9            THE COURT:  -- a witness's interpretation of

10   someone's testimony.

11   BY MR. WEBB:

12     Q.    Some leave Oracle Support because they're not

13   satisfied with Oracle's service, true?

14     A.    I suppose that's true.  I think it's very rare.

15     Q.    Some customers leave Oracle Support because they

16   cannot afford Oracle Support, true?

17     A.    That's probably true.  They are probably no longer

18   using the product.

19     Q.    And some customers leave Oracle Support because they

20   are going to self-support their own software, true?

21     A.    Yes, they're allowed to -- they can choose that.

22     Q.    What that means is, instead of going to Oracle or

23   Rimini Street, they fix their software themselves when it

24   breaks?

25     A.    Yeah.  That is a very, very small group.

984

1    Q.    Some leave to go to a third-party maintenance

2    provider other than Rimini Street; correct?

3    A.    I suppose, though I don't know of one other than

4    them right now.

5    Q.    And some change to a totally new software product,

6    true?

7    A.    Yes.  Those are ones who are no longer using the

8    software.  They choose something else.

9    Q.    Now, of those customers that leave every year, you

10   have no evidence, do you, that those folks were not going

11   to leave anyhow; right?

12   A.    Well, I don't know exactly what you mean by

13   evidence, but what I know is that other than going to

14   Rimini Street now, the vast majority of customers that

15   don't renew support are no longer using the software.

16   Q.    Now, in terms of providing concrete evidence to the

17   jury today, you don't have any, do you?

18              MS. DUNN:  Objection, Your Honor.

19              THE COURT:  Sustained.

20              MR. WEBB:  Your Honor, may I approach about one

21   thing?

22              THE COURT:  Pardon?

23              MR. WEBB:  May I approach before I ask my next

24   line of questioning?

25              THE COURT:  Yes, you may.

1                    Actually, ladies and gentlemen, we're at an
2       opportune time to take an afternoon break, so at this time
3       I'll remind you of the usual admonition not to discuss the
4       case at all or allow anyone to discuss in it your presence.
5                    And we'll take a break for approximately 15
6       minutes, and we will reconvene when you're ready.  You may
7       step down.
8              (Outside the presence of the jury.)
9                    THE COURT:  Have a seat, please.
10                   Go ahead, Mr. Webb.
11                   MR. WEBB:  The witness testified earlier
12      about -- actually, is this something -- I'm about ready to
13      talk about some questions I'm about ready to ask the
14      witness.  May she be excused, Your Honor?
15                   THE COURT:  Well, she represents a party.  I'm
16      not going to allow her to be excused.
17                   MR. WEBB:  Okay.  Before I even touch on
18      competition, I wanted to make sure I alerted the Court
19      before I did that.
20                   THE COURT:  And I appreciate that.
21                   MR. WEBB:  It would have fit in a lot earlier,
22      and the -- I hope you understand where I was going earlier
23      with the acquisition of PeopleSoft and how they didn't have
24      access.  That was my intent.  I wasn't intending to do
25      anything more than that.  But -- and I didn't really expect

1    that to be a problem.  This one I expect to be a problem.

2            The witness testified that when it comes to

3    competition, her approach is bring it on.  In other words,

4    they welcome competition, and she talked about fair

5    competition.

6            I would like to inquire of the witness of

7    instances where that has not been their approach, where

8    they were not willing to bring it on with other competitors

9    specifically as it pertains to a company called Workforce

10   and a program called TOTO which stands for Turn Off The

11   Oxygen.

12           I realize that is a potentially prejudicial

13   issue, therefore I wanted to raise it outside the jury to

14   get guidance from your Honor before I go any farther on

15   that issue or anything like it.

16           THE COURT:  Okay.  Well, it strikes me that it

17   invites some 403 problems, and I have no idea what you're

18   referring to.

19           Ms. Dunn, do you want to --

20           MS. DUNN:  Well, I presume this is so far out of

21   the bounds that I have no idea what he's referring to.

22           THE WITNESS:  I don't either.

23           MS. DUNN:  So it would help us make our argument

24   if we knew what you were talking about, which we do not.

25           MR. WEBB:  There's a -- from what I understand,

1    there is a program, informal program at Oracle dealing with

2    Workforce in a way that would substantially discount

3    prices, substantially increase certain commissions for

4    salespeople to directly attack the Workforce business.

5            And I would like to ask questions of the witness

6    as to whether or not that represents their welcome approach

7    to competition or not, and that's really where I am, Your

8    Honor.

9            THE COURT:  All right.

10           Ms. Dunn.

11           MR. WEBB:  I'm sorry.  Workday, I'm sorry.  I

12   misspoke.

13           MS. DUNN:  So in addition to the 403 problems

14   which I think are evident, this is not an issue in this

15   case, and it is not relevant.

16           We do appreciate defense counsel flagging this

17   because, in fact, we believe that this goes over the line,

18   and Your Honor was clear about the bounds in his ruling.

19           And there may be something that Mr. Webb can ask

20   Ms. Catz that is also within the scope of her direct

21   answer, but this is not it.

22           THE COURT:  Okay.  Well, it's -- in the Court's

23   view, this is a 403 issue.  I -- one, it tends to be

24   confusing; two, it's off the mark in this case.

25           This is a copyright infringement case, and I

| | |
|---|---|
| 1 | appreciate Rimini's right to cross-examine, Mr. Webb, but |
| 2 | this is going beyond the scope in the pale what the Court |
| 3 | views is appropriate and permissible in this action. |
| 4 | MR. WEBB:  Understood, Your Honor.  Thank you. |
| 5 | THE COURT:  And I appreciate the heads-up. |
| 6 | The Court will be in recess another 10 to 15 |
| 7 | minutes. |
| 8 | COURTROOM ADMINISTRATOR:  Please rise. |
| 9 | (Recess from 2:56 p.m. until 3:12 p.m.) |
| 10 | (Jurors enter courtroom at 3:12 p.m.) |
| 11 | THE COURT:  Have a seat, please. |
| 12 | The record will show we are in open court, the |
| 13 | parties and counsel are present.  The jury's all present. |
| 14 | And, Mr. Webb, you're welcome to go forward with |
| 15 | your cross-examination of Ms. Catz. |
| 16 | MR. WEBB:  Thank you, Your Honor. |
| 17 | BY MR. WEBB: |
| 18 | Q.   Ms. Catz, could you please turn to the binder your |
| 19 | lawyer used and look at DTX 146. |
| 20 | A.   I have it. |
| 21 | MR. WEBB:  And could we show that on the screen, |
| 22 | Marie. |
| 23 | BY MR. WEBB: |
| 24 | Q.   Just a real quick question.  Who is Gartner? |
| 25 | A.   Gartner is a consulting firm that helps customers |

1    and technology buyers understand the industry.

2    Q.    And Gartner's considered to be a fairly reputable

3    company in this industry?

4    A.    Oh, yes.

5    Q.    As a matter of fact, you're referring to Gartner in

6    Oracle's own Power Point; right?

7    A.    Yes, this is Oracle's PowerPoint, not mine, but it's

8    an Oracle PowerPoint.

9    Q.    And this slide talks about when analysts recommend

10   that a customer look at third-party support; correct?

11   A.    Yes.

12   Q.    The first bullet says, "Will stay on the current

13   application release for an extended period (five or more

14   years)."

15         Do you see that?

16   A.    Yes, I'm just going through the page you're on.  I

17   didn't have it before.

18   Q.    I'm sorry.  It's page 14.  Are you with me?

19   A.    Yes, I am now.

20   Q.    All right.  The first bullet, when analysts will

21   recommend that customers look at a third-party support,

22   when the customer "will stay on their current application

23   release for an extended period (five or more years)."

24         Do you see that?

25   A.    Yes.

1    Q.    And some customers want to keep their software for a
2    very long time; right?
3    A.    Yes.  Stay on their current version for a very long
4    time?
5    Q.    Yes?
6    A.    Actually, most customers do not want to stay on
7    their current version for many, many years because it
8    becomes clunky and not as good, but some customers do.
9    Q.    I'm not talking about the customers who want to
10   upgrade and get new releases.
11         This bullet point recognizes that some customers
12   will want to stay on their current release for an extended
13   period of time; correct?
14   A.    Yes, it's this small group, yes.
15   Q.    And their analysts would recommend they should look
16   at third-party support based upon this slide; right?
17   A.    I think it's all of these things.  I can -- I can
18   read through it just to make sure, but that's -- let me
19   just take one instant.
20         Yes, I think it's when they have all of these
21   things.
22   Q.    All right.  But -- and when Oracle has a customer
23   who keeps the release for a long period of time, the amount
24   of updates and fixes that they're entitled to is
25   diminished; right?

1    A.    Well, they would continue to get updates and fixes

2    on the version they're on.

3    Q.    But new updates and fixes would not be available to

4    that customer; right?

5    A.    If they're on Oracle support, they're available, of

6    course.

7    Q.    Are you familiar with sustaining support?

8    A.    Yes, I am.

9    Q.    And under sustaining support, those customers do not

10    get the same updates and fixes as someone on premier

11    support; correct?

12    A.    Yes.  Sustaining support is part of lifetime support

13    for very -- very, very old versions.  But they still get

14    all the updates -- well, they can get anything they want

15    actually.

16    Q.    But this bullet point here says that those customers

17    who should look at third-party support want to keep their

18    current release for a very long time; right?

19    A.    Yes, it's one of the factors.

20    Q.    And, number two, those customers have "no concrete

21    plans to upgrade to the vendor's new release, or plans to

22    migrate away from the current vendor at some point."

23    A.    Correct.  But that's very true except most of the

24    time, especially right after you've done a release, you

25    have no concrete plans to upgrade.

992

1    Q.    And, again, I realize that some people have every

2    interest in upgrading, but there's some customers who don't

3    have plans to upgrade, true?

4    A.    I -- I think so.

5    Q.    And according to this document, some analysts

6    recommend they should look at third-party support?

7    A.    Yes, I think so, as long as all of these things are

8    true.  It's not high availability, things like that.  They

9    don't need the break/fix assistance, things like that.

10   Q.    Another one might be they "anticipate minimal

11   implementation of additional license functionality that is

12   not currently being used."

13         Do you see that?

14   A.    Yes.

15   Q.    Now, you are aware of some customers not using all

16   the functionality of the software, true?

17   A.    Yes.  There are some at any one time that aren't

18   using all of the functionality.

19   Q.    Next bullet.  They "have a software installation

20   that operates at high availability and reliability with

21   little need for break/fix assistance."

22         Do you see that?

23   A.    Yeah.  That is a -- that may well have been what

24   Gartner was saying, but that is just horrible advice.  That

25   is dangerous advice actually.

1    Q.    But Mr. -- or the Gartner company is well respected

2    in this field?

3    A.    Yeah, but it doesn't mean they're always right.

4    Q.    Next bullet, "have product maintenance and support

5    fees that are high for the level of support received or

6    anticipated."

7            Do you see that?

8    A.    I see that.

9    Q.    And you don't deny that there are some customers of

10   Oracle who believe they're paying too much money for the

11   amount of service they're receiving, do you?

12   A.    I'm sure there are customers, especially after

13   they've been told that they could get everything and more

14   at half the price.

15   Q.    And the last bullet, "have located a third-party

16   provider that will meet their organization's requirements

17   because some third parties offer limited support."

18            Do you see that?

19   A.    Yes.

20   Q.    So if that company has found a third-party provider

21   that they like and will provide the needs that they have,

22   that's another reason they should look at third-party

23   support?

24   A.    Yes.  It -- I think so.

25   Q.    Now, I believe you testified earlier that Rimini's

```
 1    pricing at 50 percent off of Oracle's pricing is actually

 2    an overcharge?

 3    A.    Yes, it is.

 4    Q.    Is it your testimony to this jury that you believe

 5    Rimini's 50 percent off pricing represents an overcharge?

 6    A.    Yes, I think it's an overcharge for what that

 7    customer is receiving.

 8              MR. WEBB:  No further questions, Your Honor.

 9              THE COURT:  Redirect examination, Ms. Dunn?

10              MS. DUNN:  Yes, your Honor.  I don't think we'll

11    take too long.

12                      REDIRECT EXAMINATION

13    BY MS. DUNN:

14    Q.    Ms. Catz, defense counsel asked you a number of

15    questions about R&D and about the money that comes from

16    maintenance and support that is spent on R&D.  And I think

17    this is something that is very important for the jury to

18    understand, so I want to give you an opportunity to explain

19    to them how this works.

20    A.    Okay.  So generally, just like I said before, this

21    started with four guys developing software for one

22    customer.  Okay?  That was -- the R&D was that initial

23    investment.

24              They sold the product to one customer.  Then

25    they sold that same product to another customer, in fact,
```

1       and a third one.

2                   That allowed them to actually be able to

3       afford -- all that money came back -- to afford to get

4       actually at that point three more developers, and then six

5       more and 20 more.

6                   And that's how it works.  You get more

7       customers, then you invest more, and you build more

8       products, sometimes you acquire products with that profit,

9       and you make all those products work together.

10                  And, in fact, just in the tenure that I've

11      worked at Oracle, we've gone from spending $650 million on

12      R&D in 1999 to 5.5 billion from every year getting more

13      customers, having them pay license and support, and

14      expanding the R&D.  This is why our products keep getting

15      better.

16                  That initial product was the Oracle Database in

17      the '70s.  That Oracle Database is still the number one,

18      the leading database in the world, in competition with IBM

19      and Microsoft and a whole bunch of others, but it's because

20      of this constant investment in innovation.

21                  We never stop investing more and getting more

22      customers so we can invest more, and that's it.

23      Q.    And is that limited to Oracle or is that model seen

24      in other places?

25      A.    The entire industry.  All of the innovation we've

```
 1    gotten used to and we've all taken for granted is all

 2    because of that, build it, sell it, build some more, make

 3    it better, sell it to more customers.

 4              Whether it's the Oracle Database, or phone

 5    systems, or all those systems, they just improve every

 6    single year by more and more innovation and investment.

 7              Those license and maintenance fees are just

 8    plowed back into competitive innovation and investment.

 9    That's how the whole industry works.  That's actually why

10    I'm here.

11    Q.    Let's now look briefly at DTX 146.  It was the

12    presentation we were just looking at?

13    A.    Okay.

14    Q.    Do you have that in front of you?

15    A.    I do.

16    Q.    So defense counsel asked you a lot of questions on

17    this exhibit, and I think if we could put up page 8.

18              His questions to you were generally about

19    third-party support, not specifically about Rimini Street.

20    So let's talk generally, then, about third-party support.

21              This is one of the pages of that presentation,

22    and it looks to be a quote from a VP of sales for an actual

23    third-party vendor.

24              And he says, "Not every product can be supported

25    effectively by a third party.  From a support standpoint,
```

1    if you don't have access to the source code, it's really

2    hard to fix bugs and fix specific problems."

3            Can you explain what this is trying to say?

4    A.    Well, see, a customer at any point in time has no

5    idea what problems they are going to run into in the

6    future, and a third-party support -- a third-party support

7    organization never is permitted to have the actual source

8    code.  That's all the very complicated programming that

9    even customers don't get.  They get object code.

10           So if they don't have the source code, they may

11   not be able to fix the really hard problems, and that's

12   part of the reason I said 50 percent is an overcharge

13   because they don't even have the source code to fix the

14   really hard things.

15           And, by the way, the most likely really hard

16   things are security issues, because those are the ones that

17   prey on all sorts of tiny little issues in the code, in the

18   source code.

19   Q.    So you don't disagree that sometimes people will

20   choose third-party support, do you?

21   A.    No, they have.

22   Q.    And so it's important we make the distinction

23   between third-party support generally and the reason why

24   we're here, which is that this is a lawsuit specifically

25   about Rimini Street.  So can you explain that?

1    A.    Well, this is about the -- about third-party support

2    that violates our license agreement, that violates our

3    copyright rights.

4              We have third-party supporters.  They do it --

5    third-party support under license, they have special

6    licenses for which they are permitted to do that.  They pay

7    us directly for those rights.

8              They may do frontline support, or they may do

9    other parts of support, but they have licenses to actually

10   provide the support.

11   Q.    And you explained on direct that 50 percent is not a

12   discount, it's an overcharge, and I know that defense

13   counsel asked you specifically about customers who were

14   contending with an economic recession.

15             So what, if anything, is distressing about

16   making a promise like that that you can't keep in an

17   economic recession?

18   A.    Well, the problem is that when you are, I think,

19   being taken advantage of, or you're tempted to take a

20   cut-rate offer, maybe too-good-to-be-true offer, and then

21   you all of a sudden have real problems, then what do you

22   do?

23             You're now out of Oracle support.  We can't help

24   you unless you relicense or get back on.  You are now

25   exposed and vulnerable to real problems.

1              The issue in this case is this is software that

2     handles very important information.  It -- the PeopleSoft

3     is a lot of payroll information and HR.  These are

4     employees' social security numbers.  This is very serious.

5              So a customer would get a false sense of

6     security here, and then they'd be in real trouble if they

7     needed real help.

8     Q.    Defense counsel also asked you about circumstances

9     where people have customized code.  So without taking too

10    long on this, your Kaiser example, I think you mentioned,

11    had to do with a circumstance with customized code.  So can

12    you explain to the jury what that means?

13    A.    Well, customized code means code that someone has

14    changed, had added a piece to it, or has built it

15    themselves on top of the code.

16             Now, this is extremely common, and, in fact, I

17    feel like we spend an immense amount of our time diagnosing

18    custom code we didn't even write.

19             But we view it as part of our job to figure out

20    what's wrong, fix it, and also give advice, like we did

21    with Kaiser, actually, on what to avoid, when they're doing

22    some more customizations, what not to do.

23             So many customers have very customized systems.

24    Our job still is to figure out how to help them.

25    Q.    Defense counsel also said to you that it's your

```
 1    expectation that your customers will do what they're

 2    lawfully entitled to do.

 3              In your opinion, if your customers had known

 4    what Rimini Street was doing, would the customers have

 5    still gone with them?

 6    A.    No.

 7              MR. WEBB:  Objection; foundation, Your Honor.

 8              THE COURT:  Sustained.

 9    BY MS. DUNN:

10    Q.    Ms. Catz, defense counsel also asked you about the

11    concept of responsibility.  You're the CEO of the company,

12    and he asked you about whether you're responsible.

13              Are you responsible?

14    A.    I am.  I am responsible.  I'm the chief executive

15    officer.

16              These decisions, the decisions we make at

17    Oracle, those are my responsibility.  Ultimately it's up to

18    me, and it's my responsibility for every single customer.

19    Q.    Is that the job of a CEO?

20    A.    It is absolutely the job.  That is it.

21              MS. DUNN:  Thank you, Ms. Catz.  No further

22    questions.

23              THE COURT:  Recross-examination, Mr. Webb?

24

25
```

<div align="center">RECROSS-EXAMINATION</div>

BY MR. WEBB:

Q.   Ms. Catz, I just have a question or two to clear
something up.

I believe I heard you say just a few minutes ago
that some clients may have felt taken advantage of by
Rimini Street.  Did I get that wrong?

A.   I don't think that's what I said.

MS. DUNN:  Okay.  That was my concern.

I have no further questions, Your Honor.

THE COURT:  All right.  Thank you.

Ms. Catz, that will complete your testimony, and
you may step down.  Thank you.

THE WITNESS:  Thank you.

THE COURT:  Plaintiffs' next witness, please.

MR. HIXSON:  Actually, I think we're going to
proceed with our cross of Mr. Allison.

THE COURT:  All right.

Mr. Allison, we interrupted your testimony, and
we had just reached cross-examination on behalf of defense.
I would remind you, you continue under oath, of course.

And, Mr. Strand, you are defense counsel with
regard to Mr. Allison, and you're welcome to go forward.

MR. STRAND:  Thank you very much, your Honor.

1                        RICHARD ALLISON

2              recalled as a witness on behalf of the

3                Plaintiff, having been previously sworn,

4           was examined and testified further as follows:

5                      CROSS-EXAMINATION

6    BY MR. STRAND:

7    Q.    Mr. Allison, we haven't met.  My name is Peter

8    Strand.  I'm representing the defendants.  I appreciate

9    your breaking up your day, and I'm sure your boss

10   appreciates your breaking up your day, so that works out

11   well.

12            I don't want to go back over too much of what

13   you talked about with counsel last Friday, but let's kind

14   of set the scene.

15            You're the senior vice-president of Global

16   Practices for Oracle; correct?

17   A.    Correct.

18   Q.    And you've been in that spot about 15 years?

19   A.    I have.

20   Q.    As a part of your job, you're responsible for Oracle

21   customer licenses; correct?

22   A.    That's just one of the responsibilities.

23   Q.    Yeah, you have five groups, and I just want to focus

24   on that one group.

25            Which group is it that actually does the

1   licenses within the five groups that report to you?

2   A.    Yeah, we call it Global Practices.

3   Q.    Global Practices.  There was another group called

4   licenses, but that's something different?

5   A.    License management services, yes, that's something

6   different.

7   Q.    All right.  So we'll just talk about Global

8   Practices.  How many people in Global Practices,

9   Mr. Allison?

10  A.    I believe there's currently about 20 people.

11  Q.    All right.  So that 20 people headed by yourself,

12  they have responsibility for all the Oracle licenses that

13  we're talking about in this case; correct?

14  A.    They're responsible for the current license

15  agreements.  They didn't draft the PeopleSoft and JD

16  Edwards that we were discussing.

17  Q.    We've talked about that.  Oracle, a few years ago --

18  we may talk a little more in detail -- acquired PeopleSoft,

19  JD Edwards, and Siebel; correct?

20  A.    We did.

21  Q.    And so your team didn't have anything to do with

22  writing those licenses in the first place; correct?

23  A.    Not prior to 2005, no.

24  Q.    Right.  After 2005, yes; prior to 2005, no?

25  A.    Correct.

1004

1    Q.    All right.  Now, based on the last 15 years of your

2    experience with Oracle, you're very familiar with the

3    license terms; right?

4    A.    I am.

5    Q.    In fact, you and your team may be amongst the top

6    echelon of folks in the whole world that knows about the

7    Oracle license terms; right?

8    A.    That's actually a compliment, but, you know, we do

9    know what we're doing.

10    Q.    All right.  And you know, based upon that

11    experience -- you're not a lawyer, are you?

12    A.    I'm not.

13    Q.    But you know based upon that experience that the

14    words used in the license can be very important, can't

15    they?

16    A.    They can be, yes.

17    Q.    Words can be really important; right?

18    A.    Yes, words can be important.

19    Q.    And different words can mean different things;

20    right?

21    A.    Yes.

22    Q.    Now, during your direct examination you spoke at

23    some length about what the terms of various licenses meant.

24    Do you recall that?

25    A.    I do.

1    Q.    In fact, that was kind of the majority of your

2    testimony last Friday; correct?

3    A.    It was.

4    Q.    You started out when we spoke, you spoke at some

5    length about PeopleSoft and then you turned to Siebel and

6    JDE; correct?

7    A.    Correct.

8    Q.    And I don't want to retread all of that ground, but

9    I have some questions about that.

10            But before we get into that -- now, so you're

11   head of the Oracle Global Services?

12   A.    Global Practices.

13   Q.    Global Practices Group.  You spoke about the

14   licenses; right?

15   A.    I did.

16   Q.    And when you spoke about the licenses, you spoke as

17   Oracle; correct?

18            MR. HIXSON:  Objection, Your Honor.

19            MR. STRAND:  I'm just asking him.

20            THE COURT:  Well, you made a little bit of a

21   leap there.  I'll allow the question and caution you.

22            MR. STRAND:  It's all the further I'm leaping,

23   Your Honor.

24            THE COURT:  All right.

25

1006

1   BY MR. STRAND:

2   Q.    You spoke as Oracle; correct?

3   A.    I spoke as myself, and do for Oracle, yes.

4   Q.    There's nobody above you at Oracle, that talks about

5   the licenses, though, are there -- is there?

6   A.    That talks about the licenses?  I do work for Safra

7   Catz.

8   Q.    So Ms. Catz can talk about the licenses?

9   A.    Sure.

10  Q.    But she's not here.  She just left.

11        So tell us true, you know more about the

12  licenses than Ms. Catz, don't you?

13  A.    Well, she actually -- she went to law school, she's

14  an attorney, so I'm not going to make that statement.

15  Q.    Okay.  Well, I'll give you a freebie for that one.

16        And Mr. Ellison is above her; right?

17  A.    He is.

18  Q.    And he's not a license expert, is he?

19  A.    Again, he's been licensing software longer than I

20  have, since 1977.  I'm not going to state that one either.

21  Q.    You're a good employee, so we're not going to press

22  that one any further.

23        Now, I believe that Oracle purchased PeopleSoft

24  in 2005; correct?

25  A.    Yes, in that timeframe.

1007

1     Q.    And Siebel, 2006 timeframe; right?

2     A.    Yeah, right around that timeframe, yes.

3     Q.    Right around nine, ten years ago for those two

4     different companies?

5     A.    Yes.

6     Q.    As you sit here today, you cannot say with 100

7     percent certainty that the way Oracle interprets the

8     licenses today is exactly the same way that PeopleSoft and

9     Siebel interpreted those licenses nearly 10 years ago, can

10    you?

11    A.    Again, I can speak for my understanding of what the

12    agreements said.  I can't speak for PeopleSoft per se at

13    the time they did negotiate the contracts.

14    Q.    You didn't sit down with them 10 years ago and say

15    "how do you interpret these, what do you think?"

16    A.    No, let's be clear.  We did talk about their

17    agreements as part of the integration into the company and

18    what the terms of those agreements looked like, so we did

19    do that.

20    Q.    But you --

21    A.    I wasn't there -- excuse me -- for the negotiation

22    of some of the specific agreements that we're talking

23    about, but I'm pretty familiar with the agreements as they

24    were written.

25    Q.    So you can't say with 100 percent certainty whether

1   the way PeopleSoft was looking at it was the same way you

2   were looking at it last Friday, can you?

3   A.    No.

4   Q.    And by the same token, you can't say with a hundred

5   percent certainty that the way that Oracle's own customers

6   look at and interpret the license agreements from the time

7   period from 2005 through 2011 is exactly the same way you

8   interpreted it last Friday; correct?

9   A.    I can't speak for the customers, no, I can't.

10  Q.    Okay.  So that's your opinion speaking as a senior

11  guy at Oracle; correct?

12  A.    Yes, sir.

13  Q.    Now, you also did some testifying about how Oracle

14  protects its intellectual property rights through license

15  agreements; correct?

16  A.    I did.

17  Q.    And those license agreements are important to

18  Oracle; correct?

19  A.    Extremely important.

20  Q.    And when Oracle feels the need, it brings suit to

21  protect it's IP rights and license rights; correct?

22  A.    We will enforce our license rights, that's true.

23  Q.    And you're aware of those when that occurs given

24  your position; right?

25  A.    I'm aware of some of them, yes.

```
 1    Q.    Is it fair to say that Oracle vigorously enforces

 2    its IP and license rights?

 3    A.    Absolutely, much like any other intellectual

 4    property software-based company.

 5    Q.    Now, last Friday you testified that you had

 6    personally studied the various licenses that you and

 7    Mr. Hixson talked about.  Do you recall that testimony?

 8    A.    I did.

 9    Q.    And you studied them, correctly -- correct?

10    A.    I did.  I read through binders of agreements, yes.

11    Q.    And I'm sorry to make you do that, but thank you.

12          How long did it take you to read through all of

13    those?

14    A.    I couldn't tell you how many hours, but days.

15    Q.    Days and days?  Anyone on your staff help you?

16    A.    Help me read the agreement?

17    Q.    Right?

18    A.    No.

19    Q.    All right.  Now, based upon that study and your

20    testimony on Friday, I want to make crystal clear on one

21    thing, you've testified about every provision of the

22    license agreements that you say Rimini broke; right?

23                MR. HIXSON:  Objection, misstates testimony.

24                THE WITNESS:  No, we actually discussed specific

25    terms.
```

1    THE COURT:  We have an objection.

2    The form of the question was objectionable.  The

3    witness has answered it, and I'll allow it.

4    MR. STRAND:  May I ask why so I don't do it

5    again, Your Honor?

6    THE COURT:  Pardon?

7    MR. STRAND:  May I ask why it was objectionable

8    so I don't do it again?

9    THE COURT:  Because it misstated his testimony.

10   MR. STRAND:  I don't want to misstate his

11   testimony.  I won't do that again.

12   THE COURT:  All right.

13   BY MR. STRAND:

14   Q.   All right.  Let me ask you this.  During your

15   testimony last Friday -- I'm sorry -- the one-arm rule?

16   During your testimony last Friday, did you

17   provide us with an understanding of every provision in the

18   Oracle license that Oracle believes Rimini has violated?

19   A.   I did not.  We went -- excuse me.  We went through

20   specific terms and sections that were pointed out in the

21   agreement.  We did not go through the agreements in their

22   entirety.

23   There are plenty of other areas that maybe could

24   impact the trial, but we focused on the most important, I

25   believe, yes.

1    Q.    I'm a big believer in no gotchas.

2              So there's some other possible provisions of the

3    license that Rimini may be violating that you haven't told

4    us about?  Is that your testimony?

5    A.    No, what I'm saying is we went through not all the

6    terms but the majority of the terms that we felt impacted

7    that.

8    Q.    But listen to my question.  You didn't tell us about

9    every provision that Oracle thinks Rimini may be violating

10   last Friday; is that correct?

11   A.    I believe that's what we focused on.  We didn't

12   focus on everything in the agreements.  I'm sorry I

13   misstated that.

14   Q.    Can you tell me anything you didn't focus on that I

15   ought to go back to my client tonight and say, "watch out,

16   here comes another lawsuit"?

17              MR. HIXSON:  Objection, Your Honor.

18              THE COURT:  Sustained; improper question.

19   BY MR. STRAND:

20   Q.    Can you tell me any other provisions that you didn't

21   talk about on Friday?

22              MR. HIXSON:  Same objection.

23              THE WITNESS:  Off the top of my head, I cannot.

24   There's hundreds of agreements we're talking about here.

25

1   BY MR. STRAND:

2   Q.   Okay.  Let me parse that one a little bit, because

3   I'm not trying to be difficult, I'm just trying to

4   understand.

5        There's hundreds of agreements; right?

6   A.   Yes.

7   Q.   And each one of them was negotiated separately;

8   right?

9   A.   Correct.

10  Q.   And each one of them has different terms; correct?

11  A.   No, to be clear, they're very similar in nature, and

12  we discussed that on Friday, so I don't want to

13  mischaracterize that.

14       They're very similar agreements, and the terms

15  we talked about and were in the summary that we discussed,

16  those were most, if not all, the agreements.

17  Q.   Okay.  Let's just talk about similar terms for a

18  minute, all right?  I'll get back here so I don't get in

19  trouble.

20       Let's just talk about similar terms for a

21  minute.  Were there any other similar terms between the

22  agreements that you can think of here today that you and

23  Mr. Hixson didn't talk about last Friday that you believe

24  Oracle is -- Rimini is violating?

25  A.   Not off the top of my head I can't.

1013

1    Q.    Have you tried?

2    A.    Have I tried to what, sir?

3    Q.    Have you tried to think of any of those?

4    A.    Have I tried right now to think of them?

5    Q.    Have you tried over the last five years?

6    A.    I think we've pointed out what was relevant in the

7    discussion on Friday.

8    Q.    All right.  Let's start with something maybe we can

9    agree on.

10         You said last Friday that a third party can dial

11   in remotely to the customer's facility and access and use

12   the software that way.

13         Do you recall testifying to that?

14   A.    I do with respect to that specific agreement.

15   Q.    With that specific agreement?

16   A.    I do.

17   Q.    And that was the Flint agreement, I believe; right?

18   A.    If you want to point me to the agreement, I'll be

19   happy -- these are voluminous, so asking me off the top of

20   my head to quote something from an agreement is not

21   reasonable, sir.

22   Q.    You're absolutely right.  We're going to look

23   specifically at the agreements, but we'll do that in just a

24   moment.

25         So at least as to that specific agreement --

1014

```
 1    there may be specific agreements where a third-party

 2    service provider can provide services remotely over the

 3    Internet to a former customer of Oracle; correct?

 4    A.    I believe that's true from what we discussed on

 5    Friday.

 6    Q.    And that would be true for all three different

 7    brands of software, PeopleSoft, JD Edwards, and Siebel;

 8    correct?

 9    A.    I believe so.

10    Q.    Now, Oracle knows that its licensees use the

11    services of various consultants; right?

12    A.    Yes, and more.

13    Q.    For example, Accenture, you know that.  They use

14    Accenture, yes?

15    A.    I'm familiar with Accenture, yes.

16    Q.    And you know that Oracle licensees use the big

17    accounting firm whose name just went right out -- Deloitte;

18    right?

19    A.    Sure, I'm familiar with Deloitte.

20    Q.    And some of Oracle's licensees use Deloitte as a

21    consulting firm; correct?

22    A.    I believe so.

23    Q.    Now, but we can all agree that the consulting firms,

24    the third-party service providers needed to obey the rules

25    in the licenses; right?
```

1    A.    They do.

2    Q.    Now, before we launch into the Flint license, and I

3    promised you that, I have a few -- a few basic questions

4    that I want to be really clear on because I think they're

5    important.

6              First of all, the license that Oracle gives to

7    its customers is the right to use the software; correct?

8    A.    It is.

9    Q.    Under certain terms and conditions that need to be

10   complied with; correct?

11   A.    Correct.

12   Q.    The copyright is on the software; correct?

13   A.    We do copyright the software, true.

14   Q.    And the PeopleSoft, JDE, Siebel, and Oracle Database

15   software are all copyrighted; correct?

16   A.    They are.

17   Q.    Now, there's only one copyright for each work;

18   correct?

19   A.    I'm not an attorney.  I can't speak to the specific

20   copyrights that we have on those products.

21   Q.    But you do license the copyrights; correct?  That's

22   your job.

23   A.    We license the use of the products.  We own the

24   copyrights.

25   Q.    Correct.  But you license the copyright; right?

1  A.    No, we license the use of the software.  We do not

2  license the copyright.

3  Q.    So you license the use of the unpatented or

4  uncopyrighted portions of the software.  Is that your

5  testimony?

6  A.    That's not what you said.

7        We have patents and copyrights on the software.

8  We then -- which we own.  We own the software.

9        We then grant the customers the right to use the

10  software, but we maintain them with own the copyright.

11  Q.    Right.

12  A.    Do we license something that happens to be

13  copyrighted?  Absolutely.  But we do license them the

14  copyrights.

15        Speaking not as an attorney, sir.

16  Q.    We're talking past each other, and I didn't mean it

17  to be that difficult.

18        Oracle licenses the copyrights; right?

19        MR. HIXSON:  Objection, misstates testimony.

20        MR. STRAND:  Boy, I don't know what I'm missing.

21        THE COURT:  Rephrase your question.  The

22  question was objectionable.

23  BY MR. STRAND:

24  Q.    Let's move on from that.  Maybe we can get some

25  clarity to this.

1    There is no copyright on the disk that Oracle

2    gives to its customer; correct?

3    A.    There's no copyright on the disk.  There's -- well,

4    there's trademarks, patents, all kinds of things that exist

5    on the software.

6    The physical disk itself has copyrighted

7    software on it that we grant them the right to use.  We

8    don't grant them the copyright.

9    My understanding, again, not as an attorney,

10   that's my understanding.

11   Q.    You grant them the right to use the copyright on the

12   disk; correct?

13   MR. HIXSON:  Same objection, Your Honor.

14   THE COURT:  Sustained.

15   MR. STRAND:  I frankly don't understand.  What's

16   the objection?  What's the ground?

17   THE COURT:  I'm sorry.  Move on to your next

18   question.

19   BY MR. STRAND:

20   Q.    What I'm trying to get on to is you don't copyright

21   the disk itself -- let me ask it this way.

22   If there were no software on the disk, would you

23   license the disk?

24   A.    If there's no software on the disk, and we're

25   talking about a physical piece of blank media --

1018

1    Q.    Physical piece of plastic?

2    A.    Then no -- sorry.

3    Q.    Physical piece of plastic, there was no software on

4    the disk, would you license the disk?

5    A.    No.

6    Q.    Now, on Friday you said the purpose of the license

7    is to protect Oracle's IP; correct?

8    A.    That's one of the purposes, yes.

9    Q.    Okay.  What's the other purpose?

10   A.    The purpose of the license is to grant the customer

11   the use of the software.

12   Q.    All right.  And that includes the use of the

13   copyright; correct?

14             THE COURT:  Mr. Strand, this has been covered.

15             MR. STRAND:  I understand --

16             THE COURT:  I'm sorry, I asked you to move on to

17   your next question, and you've gone right back to the

18   question that three objections --

19             MR. STRAND:  I apologize, Your Honor.  I just --

20   it just dawned on me where I was misconnecting, and I'll

21   get back on track.

22   BY MR. STRAND:

23   Q.    Does Oracle own a copyright on maintenance and

24   support services?

25   A.    No.  I believe there's many companies that provide

1    maintenance and support services.

2              If you're talking about the distribution of

3    copyrighted software as part of maintenance and services,

4    then we own that piece.  For example, updates, fixes,

5    things along those lines, patches, those are all

6    copyrighted, and the copyrighted software.

7              So the technical support services include

8    copyrighted materials, but they also include phone support,

9    other things that I wouldn't necessarily consider

10   copyrighted per se.

11   Q.    All right.  So you don't copyright maintenance and

12   support service as a thing, it's bunches of pieces of it;

13   correct?

14   A.    I believe that's the case.

15   Q.    And Oracle doesn't hold a patent on maintenance and

16   support services, does it?

17   A.    No, I don't believe so.

18   Q.    So the licenses that we're talking about in this

19   case, and the purpose of the licenses that we're focused on

20   in this case, is to protect the copyright interests of

21   Oracle; correct?

22   A.    Again, the license helps -- we have a copyright, we

23   have a patent on the software including updates, fixes,

24   patches, things of those nature.

25              The license grants rights to use in a very

1020

```
 1    specific way the copyrighted materials.  So the licenses

 2    actually -- license agreement we're talking about actually

 3    covers technical support services as well.  It's a license

 4    and software and services agreement.

 5              So, you know, I don't want to -- I don't want to

 6    represent that that license agreement doesn't include some

 7    services component because it does, and it talks about

 8    updates and fixes being considered part of the programs

 9    which are part of the license in some cases.

10    Q.    I thought it was a pretty straightforward question.

11    Maybe I just missed the answer in there.

12              The license is to protect the copyright;

13    correct?

14    A.    You've asked me that three times.

15              What I'm telling you is the license does help

16    protect the copyright.  It also provides the customer the

17    right to use the software that is copyrighted.

18    Q.    I understand.  I wanted to get an answer to that

19    first question, and then I'll move from there.

20              The license is not designed to protect Oracle's

21    maintenance and support business, is it?

22    A.    Again, sir, the technical support services we

23    provide includes updates, fixes, and patches, copyrighted

24    items that could be provided as part of the technical

25    support services.  All right?
```

1    Q.    Protect the copyrights; right?

2    A.    That's not a complete question.

3              MR. STRAND:  We'll move on.  We'll move on.

4              Now, let's look at Oracle's interpretation of

5    the license agreement.  First, there was a stipulation that

6    is already in evidence, PTX 5328.  Can we bring that up?

7    BY MR. STRAND:

8    Q.    The first paragraph of that, you and Mr. Hixson

9    talked about.  I just want to get us focused again.

10             "For the purposes of this action, the parties

11   agree and stipulate that the PeopleSoft license agreements

12   for all of Rimini's PeopleSoft customers have identical or

13   similar language to the PeopleSoft license agreement for

14   City of Flint," refers to a trial exhibit, "and School

15   District of Pittsburgh."

16             You see those?

17   A.    I do see that.

18   Q.    All right.  And you talked at some length about

19   Flint and Pittsburgh, didn't you?

20   A.    I did.

21             MR. STRAND:  All right.  Now, first off, I don't

22   think you mentioned this on Friday.  Let's get Exhibit 698

23   in front of us, if we could.  That's already admitted as

24   well.  Let's just go to the very top portion of that top

25   paragraph.

1022

1            Now -- no, no, no, the very top, the software

2    license and services agreement.  Thank you.

3    BY MR. STRAND:

4    Q.    I just want to be clear on this, and I think we've

5    already crossed, but I want to make sure I'm clear.

6            This agreement is between what's called

7    PeopleSoft, Inc., and City of Flint; correct?

8    A.    It is.

9    Q.    An Oracle entity acquired PeopleSoft, Inc.; correct?

10   A.    Yes.

11   Q.    And that Oracle entity in this lawsuit is called

12   Oracle America Corp; correct?

13   A.    I'm not sure of the specific entity name they're

14   using in the particular case, I apologize, there's a couple

15   Oracle entities.  But, yeah, that sounds correct.

16   Q.    Okay.  There's an Oracle entity other than

17   PeopleSoft that acquired PeopleSoft, the contractor to

18   this -- that's on this license agreement; right?

19   A.    I'm sorry.  Can you ask the question again?

20   Q.    That was -- that was really bad.  Let me try again.

21           Let's go this way.  The Oracle entity that owns

22   the copyrights that we're here about today, that's not the

23   same entity that's a party to this license agreement;

24   correct?

25   A.    No.  PeopleSoft is the entity as part of this

1023

```
1    agreement, and we acquired that, that's correct.
2    Q.    And the Oracle entity that acquired PeopleSoft is
3    not the same entity that owns the copyrights we're here
4    about today; correct?
5    A.    I believe that's true.
6    Q.    Okay.  So we have the operating entity, and -- that
7    acquired PeopleSoft.  I think -- I call it OA, Oracle
8    America.  Does that sounds right?
9    A.    It does sound right.  It's not a -- it's an Oracle
10   entity, and I'm sure that's the one that's party to the
11   agreement we're talking about.
12   Q.    All right.  And the Oracle entity that owns the
13   copyright is called Oracle International Corp; correct?
14            MR. HIXSON:  Objection, beyond the scope of
15   direct.
16            THE COURT:  It is.  I'll sustain the objection.
17            MR. STRAND:  Let me just ask this.  And if it's
18   inappropriate, Your Honor, I'll back right off.
19   BY MR. STRAND:
20   Q.    Do you know, sir, if Oracle America, the company on
21   the contract, is asserting a copyright infringement case in
22   this case or not?
23   A.    Sir, the company in the contract is PeopleSoft.
24   Q.    The Oracle America successor in interest to
25   PeopleSoft, do you know if they're asserting a claim for
```

1   copyright infringement?

2   A.    I'm not sure which of the two legal entities are

3   actually the one that filed the claim, by name, that is.

4   Q.    Okay.  So let's go to the PeopleSoft license, 698.

5   This is one of the agreements you studied, binders and

6   binders?

7   A.    It is, sir.

8             MR. STRAND:  All right.  Let's look with me at

9   the third page of Exhibit 698, page 3 of 6.  Can we get

10  that up.  Just block that -- the top part of that page.

11  BY MR. STRAND:

12  Q.    That page is incorrectly inserted into this license

13  agreement, isn't it, Mr. Allison?

14  A.    I don't know what makes you say that, sir.

15  Q.    Well, it's -- let's just do this.  Let's go down to

16  the bottom of the second page, it says page 2 of 5.  Do you

17  see that?

18  A.    I do.

19  Q.    Let's go to that.  Go to the preceding page.  Go

20  down to the bottom right-hand corner?

21  A.    I see that.

22  Q.    Okay.  You see where it says page 2 of 5?

23  A.    I do.

24  Q.    Then let's go to the next page, the one I just had

25  in front of you.  Let's go down to the bottom right-hand

1    corner there.  It says page 3 of 3; correct?

2    A.    It does.

3    Q.    So page 3 of 3 is inadvertently inserted into this

4    license agreement, isn't it, Mr. Allison?

5    A.    I wouldn't say it was inadvertently included.  It

6    might have been the numbering and pagination that got off

7    when the agreement was actually put together, but I can't

8    say it was inadvertently inserted there.

9    Q.    You didn't notice that when you were studying the

10   agreements?

11   A.    No, I did not.

12   Q.    You didn't mention it on Friday?

13   A.    I didn't mention it.  I didn't notice it.

14   Q.    Okay.  Let's go to, then, the next page, just so I'm

15   clear what's in this contract.

16          We go to the next page, that's page 3 of 5;

17   correct?

18   A.    It is page 3 of 5, yes, it is, sir.

19   Q.    And in the normal course of the world, page 3 of 5

20   would follow page 2 of 5; correct?

21   A.    It would.

22   Q.    Thank you.  Now, Oracle licensees have a whole

23   variety of obligations under the license agreement;

24   correct?

25   A.    They do.

1026

1    Q.    And look with me at 14.1 on page 3 of 5 of

2    Exhibit 698, if you would, please, sir?

3    A.    14.1, 3 of 5.  Okay.

4    Q.    And let's just look at the very first sentence of

5    that paragraph.  That says,

6              "The terms and conditions, pricing, and any

7    other information clearly marked confidential under this

8    agreement, are confidential, and shall not be disclosed,

9    orally or in writing, by licensee to any third party

10   without the prior written consent of PeopleSoft."

11             Correct?

12   A.    I do read that, yes.

13   Q.    So Oracle's licensees could not show the license to

14   third parties; correct?

15   A.    It shows that the terms, conditions, pricing, and

16   the things marked confidential they could not provide to

17   them, yes.

18   Q.    And that would include third parties like Rimini

19   Street and Mr. Ravin; correct?

20   A.    According to this, they should not show them the

21   terms of this contract, that's correct.

22   Q.    All right.  And, in fact, do you know -- well,

23   strike that.

24             Now, if the licensee failed to live up to its

25   obligations under the license, the Flint license in

1027

```
 1    particular, there would be repercussions; correct?
 2    A.      There could be depending what the breach was, yes.
 3                 MR. STRAND:   Let's look at paragraph 6 on page 2
 4    of Plaintiff's Exhibit 698.   Right there on the right-hand
 5    side, Marie, that's perfect.
 6    BY MR. STRAND:
 7    Q.     All right.   So if they don't live up to their
 8    obligations, it's an event of default; correct?
 9    A.      Correct.
10    Q.     And here it says, "An event of default is a failure
11    by either party to comply with any material obligation
12    under this agreement."
13                 And then it goes on, remains uncured for 30
14    days.  Do you see that?
15    A.      I do.
16    Q.     And then 6.2, let's look at that.
17                 It says,
18                 "If an event of default occurs, the
19    nondefaulting party, in addition to other rights available
20    to it under law or equity, may terminate this agreement and
21    all licenses granted hereunder."
22                 Do you see that?
23    A.      I do.
24    Q.     That's pretty serious stuff in the license world,
25    isn't it?
```

1028

1    A.    It is.

2    Q.    And then let's go on to the third -- the final one,

3    6.3.  It says, "Within 15 days after termination" -- that's

4    what we just talked about; right?

5    A.    We did.

6    Q.    " -- of this agreement, licensee shall certify in

7    writing to PeopleSoft that all copies of the software in

8    any form, including partial copies" with modified --

9    "within modified versions have been destroyed or returned

10   to PeopleSoft."

11          Correct?

12   A.    Yes, it does say that.

13   Q.    So a licensee would think very long and very hard

14   about breaching the terms of this license agreement;

15   correct?

16   A.    Hopefully, yes.

17   Q.    That's your intent; right?

18   A.    The intent is to enforce agreement, absolutely.

19   Q.    Now, during opening statement and for several

20   witnesses there's been testimony that 364 former Oracle

21   customers left Oracle to go to Rimini during the time

22   period from 2006 to 2011.

23          Are you familiar with that number, 364?

24   A.    I'm generally familiar with that, yes.

25   Q.    Generally familiar?  Okay.

1    So that would mean that between 2006 and 2011,

2  there were 364 Oracle customers that left to go to Rimini.

3  Right?  And they breached.  Right?

4  A.    I can't say that they breached.  I don't know that

5  they shared the -- that they shared the confidential terms

6  with the customer actually.

7  Q.    Well, let's just go -- let's go big and broad,

8  everything you talked about with Mr. Hixson last Friday.

9    For those 364 customers, it's your

10  understanding, and Oracle's position, that they all

11  breached the terms of the license agreement; right?

12  A.    Actually, I think you're misstating.

13  Q.    I don't mean to do that?

14  A.    We were actually focusing on Rimini's action, not

15  the customers at that point we were discussing on Friday.

16  Q.    If Rimini is doing something outside the scope of

17  the license, that means the customer has breached its

18  license as well; correct?

19  A.    It's possible, but I think there's a lot of

20  different actions we're talking about.

21    For example, if Rimini went and downloaded the

22  software on its own, and it wasn't provided to them by the

23  customer, and the customer did not grant Rimini any rights

24  to do so, you know, it depends.

25  Q.    It depends?

1   A.   Yeah, absolutely.  There's a lot of different things

2   that could have occurred.

3   Q.   So to know what happened, we would have to go

4   customer by customer by customer; correct?

5   A.   Actually, it's simpler than that.  Rimini's the one

6   that had the software on their site, so that would be the

7   easier place to go than 364 customers initially.

8   Q.   Are you familiar with Rimini's agreement with its

9   customers?

10  A.   I couldn't say I've read the agreement.  I'm

11  familiar generally they provide technical support services.

12  Q.   Are you familiar with the fact that Rimini gives the

13  customer the option as to whether to host locally or

14  remotely, whether to host at Rimini or at the customer?

15  A.   Is that currently or in the past?

16  Q.   In the past?

17  A.   I'm not sure where exactly how they contracted for

18  it, so no.

19  Q.   So you don't know what the Rimini agreement says.

20  That's your testimony?

21  A.   Yes, I didn't focus on the Rimini agreement.

22  Q.   All right.  Regardless of breach or not, how many of

23  those 364 customers has Oracle sued in the last nine or ten

24  years?

25            MR. HIXSON:  Objection, outside the scope of

1031

1    direct.

2              THE COURT:  Sustained.

3    BY MR. STRAND:

4    Q.    Let's talk about the first clause that you and

5    Mr. Hixson talked about, the distribution clause.  It's

6    page 1 of the agreement, 2.1c.  Do you see that?

7    A.    I do.

8    Q.    Down there in the lower left-hand corner?

9              It says,

10             "The customer shall not distribute, disclose,

11   market, rent, lease, or transfer to any third party, any

12   portion of the software or the documentation, or use the

13   software or documentation in any service bureau

14   arrangement, facility management, or third-party training."

15             Do you see that?

16   A.    I do.

17   Q.    A service bureau is not a third-party maintenance

18   and support service provider, is it?

19   A.    Well, again, if somebody is using a software on the

20   behalf of somebody else for themselves, could it become --

21   could it be maintenance and support, I'm not sure.

22   Q.    So you don't know for sure.  Okay.

23   A.    I don't think it does include that necessarily, no.

24   Q.    All right.  Facility management company is not a

25   third-party maintenance and service provider, is it?

1032

1    A.    Normally I don't think so, no.

2    Q.    And third-party training is not a third-party

3    maintenance and support service provider, is it?

4    A.    Well, I mean, I don't know that a support service

5    provider could provide training, actually, as part of their

6    services.

7    Q.    But we haven't heard about that yet here today, and

8    I don't want to expand this lawsuit, so we'll just stay out

9    of that, okay?

10   A.    That's fine.

11   Q.    Let's look at the grant clause.  You talked about

12   that -- at some length about that.  That's 1.1, right?

13   A.    Yes.

14   Q.    Let's go up and highlight that.  We're going to come

15   back and forth to this a couple of times.

16              That says,

17              "PeopleSoft grants licensee a perpetual,

18   nonexclusive, nontransferable license to use the licensed

19   software, solely for licensee's internal data processing

20   operations at its facilities in the territory for the size

21   of the entity specified in the schedules."

22              Do you see that?

23   A.    I do.

24   Q.    That's what you and Mr. Hixson spent some time

25   talking about; right?

1    A.    We did.

2    Q.    Now, if a third party can dial in remotely to the

3    customer's facilities and access and use the software, then

4    it has to fall within paragraph 1.1; correct?

5    A.    Any use of the software has to fall --

6    Q.    Excuse me.  I didn't catch the last part of your

7    answer.

8    A.    Any use of the --

9              THE COURT REPORTER:  I didn't hear --

10             MR. STRAND:  Oh, well, then, I'll shut up.

11             THE WITNESS:  Any use of the software has to

12   comply with this license grant.

13   BY MR. STRAND:

14   Q.    Correct.  So if a third party dials in remotely to

15   the customer's facility and accesses and uses it as a

16   software, which you said it could do, then it has to fall

17   within the scope of this grant; right?

18   A.    It would.

19   Q.    It would fall within the scope --

20   A.    It would have to.

21   Q.    Have to fall.

22             And since you've said that can happen, then

23   doing those things can fall within the scope of the grant;

24   right?

25             Terrible question.  Let me try it again.

1              For example, if a third-party service provider

2    such as Rimini Street otherwise obeys the rules of the

3    agreement and dials in remotely, it is using the licensed

4    software; correct?

5    A.    If it's accessing the software, it's using it,

6    correct.

7    Q.    And it's using it solely for licensee's internal

8    data processing operations, it can do that; right?

9    A.    If that's what they're doing, yes.

10   Q.    And at the licensee's facilities in the territory;

11   correct?

12   A.    Correct.

13   Q.    Okay.  Now, similarly, an employee of a licensee

14   could dial in remotely and use the software; correct?

15   A.    Sure.

16   Q.    And that would fall within this grant; correct?

17   A.    I believe so.

18   Q.    All right.  Now, let's look closely at some of these

19   words.  We agreed that words matter.

20              Let's look at the first word there, use.  Do you

21   see that, use or use?  "To use the licensed software."  Do

22   you see that?

23   A.    I do.

24   Q.    All right.  Now, the word use is not a defined term

25   in this license agreement; correct?

```
 1    A.    It is not a defined term, no.

 2    Q.    All right.  I've just used a lawyer term.

 3          Do you understand what defined term means?

 4    A.    I do.

 5    Q.    Can you tell us what you understand defined term to

 6    mean?

 7    A.    Well, typically in a license agreement, or any other

 8    contractual document, defined term is typically a

 9    capitalized term which then has a definition somewhere else

10    within the agreement.

11    Q.    And for whatever reason, the person that drafted the

12    agreement thought it was important to tell us all what that

13    term meant; right?

14    A.    Yeah.  I mean, some terms are more obvious what the

15    intent means.  Some things they felt they need to define,

16    yes.

17    Q.    Right.  If it says Saturday, we don't need to define

18    that term?

19    A.    Yes.

20    Q.    So let's look at use.  Would you agree that someone

21    can use software without having a copy of the software;

22    correct?

23    A.    Well, we grant -- let's be clear.

24          We granted the licensee in this case, the

25    customer, the use of the software.
```

1          You mentioned that could Rimini use.  If the

2    agreement elsewhere gave them the ability to access and

3    use, they could.  This specific section specifically says

4    licensee.  It doesn't say anybody else can have access or

5    use.

6    Q.    And you're exactly right, and I need to be more

7    precise, and I apologize.  I want to ask this narrow

8    question.

9          Can the licensee use the software under this

10   grant clause without having a copy of the software?

11   A.    I'm not sure how the licensee could use the software

12   without a copy of the software.

13   Q.    Okay.  Well, we just had our guy at home remotely

14   accessing in.  Is he --

15   A.    Okay.

16   Q.    -- using the licensed software without having a copy

17   of the software?

18   A.    Yes, but you didn't say the guy that was dialing in.

19   You just generally said licensee, so I assumed you meant

20   the customer generally would --

21   Q.    That's fine.  So we've now defined terms that the

22   licensee's employee can use the software without actually

23   having a copy; right?

24   A.    That's possible for them to dial in, sure.

25   Q.    Sure.  And by the same token, one can use the

1037

1    software while having and running a copy; correct?

2    A.    That's true.

3    Q.    But there's nothing in this agreement, the Flint

4    agreement, that tells us which use it means, whether it's

5    use with a copy or use without a copy, does it -- is there?

6    A.    Yeah, I don't see how that's relevant, but --

7    Q.    I understand.  I'm just asking the questions here,

8    sir.

9              There's nothing in the agreement that tells us

10   whether use means with a copy or without a copy of the

11   software; correct?

12   A.    Well, it says that you can use it at its facilities,

13   the software, so the assumption is at the facilities you

14   have software and you could either access it at the

15   facility when you're there, or you can access it

16   potentially remotely.

17   Q.    Okay.  And we'll get there to the facilities.

18   That's a very, very good thought.  We'll get there.

19             Let's look at nonexclusive.  I kind of jumped

20   backwards there a little bit.  Nonexclusive.  Can you tell

21   us what nonexclusive means?

22   A.    I believe it means it's not a right solely for you.

23   Q.    Okay.  So I'm not the only one that can use the

24   software?

25   A.    We could have granted the right to other customers

1   as well, absolutely.

2   Q.    So, for example, in 2011 how many PeopleSoft

3   customers did Oracle have, rough numbers?

4   A.    Tens of thousands.  I couldn't give you the number.

5   Q.    JDE?

6   A.    Again, thousands.

7   Q.    And Siebel?

8   A.    In the thousands.

9   Q.    All right.  So many thousands of customers; correct?

10  A.    Correct.

11  Q.    And a nonexclusive license means that Oracle could

12  license any or all of those thousands of customers to the

13  same software, the same version of the software; correct?

14  A.    That's possible.

15  Q.    So that would -- that could mean that hundreds of

16  thousands of Oracle customers would have a license to the

17  exact same software; right?

18  A.    It is, yeah, it's possible.

19  Q.    Now, let's look at the next term, licensed software.

20  Do you see that?

21  A.    I do.

22  Q.    I notice that licensed is not a defined term but

23  software is.  Correct?

24  A.    Correct.

25            MR. STRAND:  Let's look at page 4 of 5 of

1    Exhibit 698.  They're on the lower right-hand side, Marie,

2    under software.

3              I'll just read the first -- well, you know what,

4    if we read the first sentence, that goes on for about a

5    mile.

6    BY MR. STRAND:

7    Q.    But that's the definition of software; right?

8    A.    That is the definition of software for this

9    particular agreement, yes.

10   Q.    Okay.  Now, looking at that definition, and we can

11   read it if you want, there's nothing in there that says

12   anything about the actual disk, is there?

13   A.    I can't see anything that mentions a disk, no.

14   Q.    So back in 1998, we can fairly assume that when

15   Rimini took possession of the Oracle software, it probably

16   got a lot of disks; right?

17             MR. HIXSON:  Objection.  There was no Rimini

18   then in 1998.

19             MR. STRAND:  I didn't catch that.

20             MR. HIXSON:  There was no Rimini then in 1998.

21             MR. STRAND:  Excuse me, I completely agree with

22   that.

23   BY MR. STRAND:

24   Q.    Back in 1998, when Flint took possession of the

25   software, it probably got a bunch of disks from Oracle;

1    correct?

2    A.    That's very likely, yes.

3    Q.    And those were the disks that Flint had; correct?

4    A.    The disks, if we gave disks, the disks Flint had?

5    Q.    They were Flint's disks; right?

6    A.    That makes sense, yes.

7    Q.    But the software on those disks was Oracle's

8    software, correct, Oracle's copyrighted software?

9    A.    It's our copyrighted software, yes.

10   Q.    And Flint may have had a license -- nonexclusive

11   license, as we just looked at, the exact same thing a bunch

12   of other Oracle customers had; correct?

13   A.    It's very possible, yes.

14   Q.    So the disk that contained the copyrighted software

15   really doesn't make a difference, does it?

16   A.    I don't understand the question.

17   Q.    So the disk that went to Oracle -- excuse me, to

18   Flint, really doesn't make a difference, it's the software,

19   isn't it?

20             MR. HIXSON:  Objection.

21             THE WITNESS:  It was the form of distribution of

22   the software at the time.  So, I mean, did it matter to

23   Flint?  Probably, because they couldn't have run the

24   software without it.

25             THE COURT:  There was an objection.  And I would

1041

1    caution both counsel, and you too, Mr. Allison, if an

2    objection is raised, you should stop so that I can hear the

3    objection.

4              THE WITNESS:  Sorry.

5    BY MR. STRAND:

6    Q.    Now, I want to look at the next phrase.  Let's go

7    back to 1.1 if we could, please.

8              Looking there, the next clause in there is

9    for -- we'll get back to solely, but for licensee's

10   internal data processing operations.  Do you see that?

11   A.    I do.

12   Q.    All right.  Now, will you agree with me that

13   maintenance and support is a part of normal internal data

14   processing operations under this license grant?

15   A.    Maintenance and support from whom?

16   Q.    Well, any maintenance and support.  Well -- good

17   question.

18             By the licensee.  If licensee is doing its

19   maintenance support, that's part of normal internal data

20   processing operations; correct?

21   A.    I'm not sure I follow the question, sorry.

22   Q.    Sure.  I'm just trying to define internal --

23   licensee's internal data processing operations.  Do you

24   have that in mind?

25   A.    I do.

1042

1     Q.    If the licensee is doing maintenance and support, is

2     the maintenance and support the licensee is doing a part of

3     licensee's internal data processing operations?

4     A.    So if the licensee is working on the software, is it

5     considered part of their internal business --

6     Q.    Yes.

7     A.    -- if they're working with the software?

8     Q.    Yes?

9     A.    Sure.

10    Q.    Sure.  That's all I wanted to get out.  Maintenance

11    and support can be a part of that?

12    A.    Well, again --

13    Q.    It's not excluded.  Go ahead.

14    A.    Well, I think it's very specific here as to

15    challenge.  You can just say maintenance and support is

16    part of that.  I mean, that's pretty broad.  It doesn't

17    speak about to who is doing the work or where they're doing

18    the work.

19    Q.    All right.  And I -- I want to be as precise as

20    possible, and I realize it's difficult and it's tedious.

21          Let me ask it this way.  Maintenance and support

22    can be a part of internal data processing operations;

23    correct?

24    A.    The licensee performing its own maintenance and

25    support in its systems for the programs could be included

1043

1   as part of the internal business, yes, it could.

2   Q.    Now, if a third party is providing maintenance and

3   support services remotely, can that fall within the ambit

4   of licensee's internal data processing operations?

5   A.    It may be able to.  I'm not -- again, in terms of

6   the agreement, regardless if this is the specific agreement

7   or another agreement, there could be some exclusions from

8   people to access and use.

9         But, generally, if it's a third party dialing in

10  and providing assistance, like Accenture or some of the

11  people you mentioned, do they dial in and help somebody

12  with their software and the use of the software?  That's

13  possible.

14  Q.    Now, what this means generally -- see if you agree

15  with this.  Generally what this means is that the licensee

16  can't go out and begin to perform PeopleSoft services for

17  others and thereby prevent Oracle from selling more

18  PeopleSoft software; correct?

19  A.    That's generally the intent, yes.

20  Q.    Now, do you know that Rimini did not use the

21  PeopleSoft software in this case, or any of the software in

22  this case, to run its own internal operations?

23  A.    I'm not sure I agree with that.

24  Q.    Okay.

25  A.    So Rimini's running the software, Rimini's in the

1    business of using the software and to create a commercial

2    practice.

3    Q.    Right.

4    A.    And they used a single version of the software for

5    multiple customers.

6          So, again, they sold services by using our

7    software that they did not have a copyright to, have

8    multiple customers that they're supporting with a single

9    version, distributing patches and updates, basing fixes

10   they did for software that they did not have a license for,

11   they did not have an agreement for.

12   Q.    All right.  Let me ask it this way.  Rimini was not

13   using PeopleSoft software to do its payroll, was it?

14   A.    I believe -- I don't know that for a fact, but I'm

15   assuming that's the case since that wasn't brought up in

16   the part of it, yes.

17   Q.    And you don't know that Rimini was using JDE or

18   Siebel to do its normal customer relations managements and

19   things like that; correct?

20   A.    Again, I'm not sure if there was that type of use,

21   but I assume there wasn't given that wasn't part of the

22   case.

23   Q.    Now, let's look at "solely for."  Do you see that?

24   A.    I do.

25   Q.    In 1.1?  "Solely for" is not defined in the license

1045

1    agreement either, is it?

2    A.    I'm not sure it's necessary.

3    Q.    Well, it's not defined in the license agreement

4    either, is it?

5    A.    Is solely defined in the license agreement?  No,

6    it's not.

7    Q.    "Solely for" defined in the license agreement?

8    A.    There's not a definition for "solely for" in this,

9    no, there isn't.

10   Q.    So let's understand --

11   A.    There's not a definition for "the" either.

12   Q.    Sir, we're going to -- it's late, this is tedious, I

13   don't want to quarrel with you.

14         There's not a capital S, capital F, "solely for"

15   definition in the license agreement, is there?

16   A.    No, there isn't.

17   Q.    Great.  And we're going to get along better if you

18   do that.  I'll try to be precise, you work with me.

19         Now, solely for, let's try to get a fix on that.

20   Remember we had our employee, we had an employee of the

21   licensee.  Got that in mind?

22   A.    I do.

23   Q.    That person has never worked with PeopleSoft before.

24   Got that in mind?

25   A.    Okay, if we can use that assumption.

1     Q.    That PeopleSoft person works for five years on

2     PeopleSoft at this employer and learns all about

3     PeopleSoft.  Got it?

4     A.    Sure.

5     Q.    IT, all the good stuff.

6           That person then leaves that first employer and

7     wants to go to a second employee.  Got it?

8     A.    Okay.

9     Q.    Can that person take the information that he learned

10    at his first employer about PeopleSoft and go to work on

11    the PeopleSoft product at the second employer without

12    breaching the "solely for" provision of 1.1?

13    A.    You're not talking about taking the license or the

14    software, you're talking about personal knowledge.  So if

15    somebody had something in their head, an understanding of

16    how to use PeopleSoft programs, I don't see that they're

17    precluded from being able to use their knowledge, no.

18    Q.    Now, would Oracle agree that Rimini can use what it

19    learns in providing services to one client and that's in

20    its head to provide services to other clients?

21           MR. HIXSON:  Objection, vague.

22           THE COURT:  Sustained.  Rephrase.

23    BY MR. STRAND:

24    Q.    All right.  So now we have the employee at the

25    licensee.  We went through that whole hypothetical.  I'm

1   not going to go through that one again, okay?

2   A.   Sure.

3   Q.   All right.  Now, I've got -- assuming everything

4   else is all okay, there's a Rimini employee.  The Rimini

5   employee learns something about PeopleSoft for Client A.

6   Got it?

7   A.   The Rimini employee learns -- so the example is the

8   Rimini employee dials into the customer's system and

9   learns --

10  Q.   Learns something about how PeopleSoft works?

11  A.   Sure.

12  Q.   Can that employee with that knowledge in his or her

13  mind then go and work for the second customer, Customer 2,

14  or is that a violation of "solely for"?

15           MR. HIXSON:  Objection, Your Honor.

16           THE WITNESS:  Again, what we're talking about --

17           THE COURT:  Wait.  We have an objection.  I'm

18  going to sustain the objection.

19  BY MR. STRAND:

20  Q.   Let me try this, and if it's objectionable, we'll

21  just move on.

22           Oracle is not saying that Rimini can do only one

23  task for one customer and never do that task for another

24  customer ever again, is it?

25           MR. HIXSON:  Objection.

 1                    THE COURT:  The objection is sustained.

 2                    MR. STRAND:  Then I'm moving on, Your Honor.

 3       BY MR. STRAND:

 4       Q.    Let's look at the phrase "territory."  Do you see

 5       that in 1.1 on the screen in front of you?

 6       A.    I do.

 7                    MR. STRAND:  Oops.  That was on the screen in

 8       front of you.

 9                    Yeah.  Right there.  That's right, Marie.

10       BY MR. STRAND:

11       Q.    Territory, about four lines down, capital T,

12       territory.  Do you see that?

13       A.    I do.

14       Q.    Mr. Allison, that means that territory is a defined

15       term; right?

16       A.    It is.

17       Q.    And then let's look back at page 4 of the agreement

18       where the defined terms are; right?

19       A.    I see that.

20                    MR. STRAND:  And down there at the bottom, let's

21       go to page 4, if we could, Marie, down there way at the

22       bottom, right -- there you go.  Last word.  Perfect.  There

23       you go.

24       BY MR. STRAND:

25       Q.    "Territory means the territory as specified on the

1049

1     applicable schedule in which licensee may use the

2     software."

3               Do you see that?

4     A.    I do.

5     Q.    All right.  Now, I don't believe that you and

6     Mr. Hixson discussed territory on Friday, did you?

7     A.    Well, we did read this section, but I don't know if

8     we specifically focused on that, no.

9     Q.    All right.  Well, let's look at schedule 1.  Let's

10    go back to 2088.  Do you have that in front of you?

11    Because this refers to the schedule; right?  So let's go

12    back to the schedule, 2088.

13    A.    Is that in the binder, sir?

14    Q.    I sure hope it is.  Yeah, it may be hidden a little

15    bit.

16    A.    Okay.  Okay.  I got it.

17    Q.    All right.  Let's look there in paragraph 1, if we

18    could, on page 3 of 2088.  That's the schedule 1 for the

19    Flint contract, correct, Mr. Allison?

20    A.    It is.

21    Q.    All right.  Let's look then at paragraph 1 on page

22    3.  It tells us what the territory is there, doesn't it?

23    A.    It does list the territory, yes.

24    Q.    And what is the territory for this license

25    agreement?

1050

```
1    A.    The territory for the purposes of that paragraph is

2    the United States.

3    Q.    Okay.

4    A.    To be clear, it's the customer's facilities in the

5    territory, not just the territory.

6    Q.    We'll talk about facilities, I promise you.  But

7    it's the territory as -- the defined term is the United

8    States; correct?

9    A.    It is.

10   Q.    All right.  Let's look back at 698, the actual

11   license agreement.

12         So looking back at that very first paragraph,

13   1.1, we could just substitute in the United States for

14   territory in that -- in that clause, couldn't we?

15   A.    That would be reasonable.

16   Q.    So we could say, "Solely for licensee's internal

17   data processing operations at its facilities in the United

18   States"; correct?

19   A.    Correct.

20   Q.    Now, let's talk about the word site.  Do you

21   remember discussing that with Mr. Hixson on Friday?

22   A.    I do.

23   Q.    Looking at paragraph 1.1, could you point out where

24   in that paragraph "site" appears, the word site?

25   A.    As far as site, the site is its facilities.  There's
```

1    no word site.

2    Q.    There's no word site.  The only word in there is its

3    facilities; right?

4    A.    Yeah.  Its facilities.

5    Q.    Okay.

6    A.    Licensee being it.

7    Q.    Its facilities.  Right.

8          Now, let's look at site though.  Let's look at

9    schedule 1, back to 2088.  And if you want to pull one of

10   these out, if it's easier, although it will kind of get

11   shredded I'm afraid.

12         Let's go back to 2088 and we'll look at what

13   site means.  And -- excuse me.  I apologize.  It is a

14   defined term.  Site is a defined term, right, Mr. Allison?

15   A.    Let me go back to the exhibit.

16   Q.    I apologize to everyone.  We're going to go back to

17   page 405, the definition section of 698, site.

18   A.    Page 4 of 5.  I see that, yes.

19   Q.    You see site right there?

20   A.    I do.

21   Q.    Site is a defined term.  That's the term that

22   doesn't appear in paragraph 1.1; right?

23   A.    It does not.

24   Q.    And that's one of the terms that you and Mr. Hixson

25   discussed; right?

1052

1    A.    We did.

2    Q.    Okay.  Site here means, "a specific physical

3    location of licensee's server as set forth in the

4    applicable schedule that shall be the one location to which

5    software support services are provided."

6              Do you see that?

7    A.    I do.

8              MR. STRAND:  All right.  Now, let's look at page

9    3, paragraph 9, of that same agreement, up there toward

10   the -- page 3.  One more over.  Yeah.  One more.  There you

11   go, page 9, right in the middle on the left-hand column.

12   Paragraph 9.

13   BY MR. STRAND:

14   Q.    All right.  Paragraph 9, let's read the first

15   sentence.  It says,

16              "Software support services, terms and

17   conditions."  It says, "for a period of one year,

18   commencing on the schedule effective date, PeopleSoft shall

19   provide licensee with one year of software support services

20   for a single production instance at a single site."

21              Right?

22   A.    I see that.

23   Q.    "Designated in the applicable schedule."

24   A.    Yes, I see that.

25   Q.    All right.  So the site that's referenced here talks

1053

1    about the provision of support services by Oracle to the

2    licensee; correct?

3    A.    It does.

4    Q.    Now, let's look down at the second to the last

5    sentence, about six lines up, starts with "unless" on the

6    right-hand side.

7              It says, "Unless licensee elects to purchase

8    software support services for more than one site, licensee

9    shall support all copies of the software licensed under

10   this agreement through one central point of support staffed

11   by licensee's employees."

12             Do you see that?

13   A.    I do.

14   Q.    So after an Oracle customer leaves Oracle and stops

15   paying maintenance and support fees, site is no longer

16   relevant, is it?

17   A.    No, it says, "unless they elect to purchase it."

18   Q.    "For more than one site, shall support all copies."

19             Let's go back to the top one.

20             "For a period of one year commencing on the

21   schedule effective date, PeopleSoft shall provide licensee

22   with one year of support site services for a single

23   production instance at a single site."

24             Right?

25   A.    Correct.

1054

1    Q.    And site refers -- as we've talked about, the site

2    is where this support -- the software support services are

3    provided; right?

4    A.    It's the physical location of licensee's servers --

5    Q.    And if --

6    A.    -- provided, yes.

7    Q.    Excuse me.

8    A.    No, go ahead, please.

9    Q.    And if the customer discontinues its support

10   maintenance services with Oracle, site is no longer

11   relevant because there is no support service coming from

12   Oracle; correct?

13   A.    Yeah, if we're not providing support, because the

14   site does refer to -- to which we provide support, then the

15   site definition wouldn't necessarily apply.

16   Q.    All right.  Then let's look at paragraph -- excuse

17   me, PTX 2088.

18   A.    Okay.

19   Q.    Let's look at paragraph 4, if we could, please, on

20   the third page of that document.

21         There it says, "Designated initial" support --

22   excuse me, "software support sites."  Do you see that?

23   A.    I do.

24   Q.    And it says,

25         "Licensee shall receive software support for a

1  single production system associated with the following

2  sites."

3          Right?

4  A.    Yes.

5  Q.    And the site is?

6  A.    I'm sorry.  I thought you were stating it.  It's a

7  question?

8  Q.    Oh, I'm sorry, yes.  The site is?

9  A.    City of Flint.

10 Q.    All right.  So that's where -- the one place that

11 the City of Flint is going to receive support services from

12 Oracle for one year is the City of Flint; correct?

13 A.    Correct.

14 Q.    Now, you'll agree with me, Mr. Allison, won't you,

15 that while Flint is in the United States, it is not the

16 entire United States; correct?

17 A.    Correct.

18 Q.    All right.  Now, you also talked with Mr. Hixson

19 about the footnotes on paragraphs -- excuse me, about

20 footnotes 1 and 2 on page 1 of Exhibit 2088.

21          Do you recall that testimony?

22 A.    I do.

23 Q.    Let's look at footnote 1.  It says -- it refers up

24 to the production copies.  It says,

25          "Indicates the number of physical copies to be

1   shipped to licensee.  Licensee's license includes the right

2   to make as many production copies on one or more servers at

3   licensee's sites as necessary to meet the needs upon which

4   licensee's license fee is based."

5            Correct?

6   A.     Yes, that's what it says.

7   Q.     And that's the paragraph that you talked about with

8   Mr. Hixson; right?

9   A.     It is.

10  Q.     And that's that same site, the site where Oracle

11  will provide service for one year; correct?

12  A.     No.  Is that the defined site here?  Is it

13  capitalized?  I don't think there is.

14  Q.     I'm a little confused.  So since it doesn't have a

15  capital I, it's not the support site site?

16  A.     If you go to the -- back to the actual agreement

17  where we started with this whole thing, in section 1.1, it

18  talks about at facilities -- at its facilities.  It's

19  customer's facilities.  I think that's pretty clear.

20  Licensee's facilities, customer's facilities and sites.

21            There's a term --

22  Q.     Whoa, whoa, whoa.  Okay.  Wait just a minute.

23            MR. HIXSON:  Objection.  He's interrupting the

24  witness.

25            MR. STRAND:  Well, can I ask a question?

1057

1    THE COURT:  No.

2    MR. STRAND:  All right.

3    THE COURT:  Let him finish his answer --

4    MR. STRAND:  Finish your answer.

5    THE COURT:  Let him finish his answer, and then

6    follow up as necessary.

7    Sorry, Donna.

8    THE WITNESS:  So I see where you're heading.

9    It's interesting.

10    We have a defined term of site for the purpose

11    of technical support services.  You're correct.  Capital S

12    site.  The contract specifies that site for the purpose of

13    technical support services, that's correct.

14    This isn't a capitalized S in this case.  It is

15    physical copies to licensee sites as necessary.

16    If we're not providing support, the customer

17    does not get unlimited copies of the software.  That's not

18    the intended.  That's not what it says.  It's not the same

19    site term that's capitalized.  No.

20    BY MR. STRAND:

21    Q.    Sir, and are you the only person in the world that

22    knows that?

23    A.    No, actually, it makes complete sense if you read it

24    in context.

25    Q.    Now, let's look at that sentence, though, that

1    second sentence.

2              It says,

3              "Licensee's license includes the right to make

4    as many production copies on one or more servers at

5    licensee's sites."

6              So now it's a small S sites, all right?  So it

7    includes the right -- includes is an expansive term, not a

8    narrowing term, isn't it?

9    A.    It is.

10   Q.    It doesn't say --

11   A.    It's granted them a right to -- it includes those

12   sites, correct.

13   Q.    Did it doesn't say can only be, or can only be at

14   the site, does it?

15   A.    Now, see, I think this is where -- software

16   licensing, it's interesting.  We own the software.  We

17   grant -- own the copyright.  We grant people rights to do

18   things with the software.

19              I don't say you can't use the software to kill

20   your mother.  What I grant, instead, is I say you can use

21   the software, you can make copies, you can do these things,

22   I don't have to exclude every single other thing you can't

23   do.

24              This is very clear, you have the right to make

25   copies, one production copy, one test and development copy

1059

```
 1    for your site, and it says "one or more servers at

 2    licensee's sites."

 3              I think it's pretty straightforward and clear.

 4    I don't think that we have to say, oh, by the way, you

 5    can't put it out to this other guy's site.  We're just

 6    being very clear that this is the number of copies for your

 7    site.

 8    Q.    All right.  Well, then, it says production copies,

 9    one, up above; right?

10    A.    It does.

11    Q.    So it says, "licensee's license includes the right

12    to make as many production copies," that's plural; right?

13    A.    It is.

14    Q.    And copies is more than one, plural is more than

15    one; right?

16    A.    Yes.

17    Q.    And one or more servers, "or more servers" is more

18    than one server; right?

19    A.    More servers is more than one, yes.

20    Q.    "At licensee's site" with an S, at more than one

21    site; right?

22    A.    Yes, licensee's site or sites, correct.

23    Q.    Okay.  So the -- Flint can make as many production

24    copies as it wants on one or -- pursuant to the terms of

25    this on one or more servers at one or more sites; right?
```

1    A.    Correct, to meet the needs for which the licensee's

2    license fees are based, correct.

3    Q.    Now, you've mentioned facilities a couple of times,

4    and facilities is in paragraph 1.1, isn't it?

5    A.    It is.

6              MR. STRAND:  Let's go back to facilities, if we

7    could please, Marie.

8    BY MR. STRAND:

9    Q.    There it is on the fourth line, "facilities in the

10   territory"; right?

11   A.    Yes.

12   Q.    Facilities is not defined in the agreement, is it?

13   A.    It's not.

14   Q.    Now, Oracle could have defined facilities with a

15   capital F and made a -- or PeopleSoft could have defined

16   it, but they didn't; right?

17   A.    They didn't.

18   Q.    All right.  Now, under the license Oracle

19   anticipates that a licensee will have more than one

20   facility; correct?

21   A.    It's possible.  I don't know if we anticipated it.

22   It does say facilities, so if you have more than one

23   facility you could -- yeah.

24   Q.    Because plural means more than one.

25   A.    It does.

1061

1    Q.   All right.  Now, today you're saying that the

2  facility is the same thing as a site?

3    A.   Well, a customer could have a site being a campus

4  that -- where they run their software.  Facility and site,

5  I think, are interchangeable in this case.

6    Q.   All right.  Well, let me ask you this question.

7  Remember our guy, the employee of the licensee, who goes

8  home and telecommutes, accesses remotely the licensee;

9  right?

10    A.   The customer, yes.

11    Q.   The customer.  And he's -- he's doing some work;

12  right?

13    A.   Okay.

14    Q.   He's -- it's Saturday morning, he's sitting there in

15  his jammies working from home.  Is he a facility of the

16  licensee?

17    A.   No, the interesting part is this -- it says solely

18  for licensee's internal processing at the facilities.  So

19  the software is not installed at the employee's house at

20  home.

21    Q.   I got it.

22    A.   He's dialing in to servers that house the software.

23  He's accessing and using it remotely, but the running of

24  the software, the copy of the software, that's all at the

25  customer's facility, and that's where it's actually being

1062

1    run.

2    Q.    He's not at the facility.  He's not at a building,

3    is he?  He's in his house?

4    A.    Sure.

5    Q.    Is that one of the licensee's facilities?

6    A.    No.

7    Q.    So is he breaching the terms of this agreement when

8    he's at home in his jammies telecommuting on Saturday

9    morning?

10   A.    No.  Again, the internal business operations at

11   customer's facilities means where the servers, where

12   they're installed and running the software.

13            This isn't something like Microsoft Windows

14   that, like, you install on your laptop and you take home

15   and work with you.

16            This is server-based software that you're going

17   to have a large server data center associated with it.

18   People don't put it on their laptops and take it home.

19            So they're going to dial in and access it

20   remotely, but they're not going to necessarily bring the

21   software home with them.

22            So there is use that's remote, and I think we

23   kind of mentioned on Friday that that use is okay and it

24   does occur.

25   Q.    Okay.  How about this?  Can an employee, an IT

1    employee at the licensee, physically put a development

2    environment on a laptop?

3    A.    You know, I'm not technical so -- with the

4    PeopleSoft applications and things of that nature, I'm not

5    sure you can install that on a laptop.

6    Q.    You don't know.  You just told us about how big this

7    is and it can't be on a server.  I just want to get focused

8    here for a minute.

9    A.    Sure.

10   Q.    Can an employee technically load a development

11   environment on a laptop?

12            MR. HIXSON:  Objection.

13   BY MR. STRAND:

14   Q.    If you don't know, just say you don't know.

15            MR. STRAND:  Excuse me, Your Honor.  I

16   apologize.

17            THE COURT:  All right.

18            I'll allow the question.

19            THE WITNESS:  I don't know either way whether a

20   person can take a -- or develop an application on their

21   laptop solely.  I do know that our applications in our

22   database tend to be server based, and not client based

23   though.

24   BY MR. STRAND:

25   Q.    Sure.

1    All right.  Now, you'll agree with me that a

2    facility can include, for example, the licensee's main

3    headquarters building; right?

4    A.    Sure, if that's the licensee's facility, sure.

5    Q.    Or a licensee's leased building; correct?

6    A.    Yeah, if they've leased the building, that could

7    potentially be a facility as well, sure.

8    Q.    Or a licensee's leased space in a building; correct?

9    A.    It's possible.

10   Q.    Or a licensee's leased space in Rimini's building;

11   correct?

12   A.    I didn't know Rimini was in the leasing business.

13   Q.    Listen to my question.

14   A.    I heard you.

15   Q.    Can a facility include a licensee's leased space in

16   a Rimini building?

17           MR. HIXSON:  Objection, foundation.

18           THE COURT:  Sustained.

19   BY MR. STRAND:

20   Q.    Now, the Flint agreement does not say that a copy of

21   the software cannot be maintained on one or more of the

22   facilities, does it?

23   A.    Could you rephrase that?

24   Q.    Sure.  The Flint agreement doesn't say that you

25   can't have a copy of the software on a facility like a

1   laptop, does it?

2   A.    Does it say they can have a copy in a facility?

3          What it says is they can have -- it can process

4   at their facilities.  So I'm not sure -- I'm not following.

5   Q.    Well, then, here's what I'm hanging up at.  Internal

6   data processing operations at its facilities.  If I'm

7   remoting in, I'm not at a facility, am I?

8   A.    No, the data is being run and processed at the

9   facility.

10  Q.    So the issue here is about where the data is being

11  run, correct, where the software's located?

12  A.    That's part of it, absolutely.  I mean, it's a grant

13  to a licensee, first, meaning the customer, it's one-to-one

14  in that case, and, secondarily, it's also in the customer's

15  facilities.  So those two things go together, yes.

16  Q.    Now, let's look at the stipulation once again, 5328,

17  if we could, please, that first paragraph, just so we get

18  refocused here, Mr. Allison.

19          That refers to two license agreements.  We just

20  finished a lot of discussion about Flint; right?

21  A.    Correct.

22  Q.    All right.  And there was another one, Pittsburgh;

23  right?

24  A.    Yes, the School District of Pittsburgh.

25  Q.    Okay.  This doesn't refer to a Brazoria County

1    license agreement, does it?

2    A.    It doesn't refer to what?  Excuse me?

3    Q.    It doesn't refer to a license agreement with an

4    outfit called Brazoria County, does it?

5    A.    No, it does not.

6    Q.    All right.  Now, and we talked about the Flint

7    license.  I think we agreed, maybe for a few moments, that

8    site equals Flint and territory equals the United States;

9    correct?

10   A.    It does.

11   Q.    Okay.  Capital S site?

12   A.    Correct.

13   Q.    Okay.  Thank you for correcting me.

14            Now, let's look at the PeopleSoft license for

15   Brazoria County, if we could, please.  That's PTX 00023,

16   and that has been previously admitted.  It's the second tab

17   of your notebook.  Do you have it there?

18   A.    I do.  I was looking at the e-mail.  I didn't

19   realize it was an agreement here.

20   Q.    Excuse me.  I'm sorry?

21   A.    I'm sorry.  I didn't realize it was an agreement.  I

22   just saw an e-mail on the first page.

23   Q.    There's two or three pages of the e-mail.  If you

24   would go down to page 4 of 15, Mr. Allison, then we'll all

25   be singing off the same sheet of music.

1   A.    Okay.

2   Q.    Got it?

3   A.    Yes.

4   Q.    That's the first page of a software license and

5   software agreement between PeopleSoft and Brazoria County;

6   right?

7   A.    It is.

8   Q.    And let's look down at paragraph 1.1 there, if we

9   could, please.  This is that paragraph, that same 1.1

10  language that's either identical or similar to; correct?

11  A.    Correct.

12  Q.    Let's read this.

13        "PeopleSoft grants licensee a perpetual,

14  nonexclusive, nontransferable license to use the licensed

15  number of copies of software solely for licensee's internal

16  data processing operation on the corresponding numbers of

17  servers located at the sites specified in the schedules."

18        Do you see that?

19  A.    I do.

20  Q.    Now, here sites is a defined term; correct?

21  A.    It is.  They use sites instead of facilities here.

22  Q.    And to review the bidding, facilities wasn't

23  defined, and sites wasn't in the Flint agreement at all;

24  right?

25  A.    Sites wasn't --

1    Q.    Wasn't in this grant clause in the --

2    A.    No, they used the word facility instead.

3    Q.    All right.  Now, and they defined sites, right, here

4    in this Brazoria agreement?  Let's look at page 7 of 15.

5              Site is up there on the upper right -- about a

6    third of the way down on the right-hand column.  Do you see

7    that?  "Site means a specific, physical location" --

8    A.    I'm sorry.  I'm sorry.  I don't see it.

9    Q.    I'm sorry?

10   A.    I'm trying to find it.

11   Q.    Can you find it?  It's page 7 of 15 in paragraph 16,

12   definitions?

13   A.    7 of 15.  I'm sorry, I don't see the numbering in

14   that manner here.

15   Q.    Oh, I'm sorry, look way down at the bottom in the

16   middle of the right -- in the middle of the page?

17   A.    Sorry, I thought you were talking about a term of

18   the agreement, not the PTX number.

19   Q.    Well, if you're really bad, I'll do page 4 of 4, the

20   Bates number and the page number, we can be here for a

21   week.

22              All right.  Let's look at site.  It says,

23              "Site means a specific physical location of

24   licensee's server as set forth in the applicable schedule."

25              Do you see that?

1   A.    I do.

2   Q.    That's a different definition of capital S site than

3   appears in the Flint agreement; correct?

4   A.    It is.  It refers to the location of the server as

5   opposed to the location of the server specific to the

6   support.

7   Q.    Now let's look at PTX 669.  That's the -- and it's

8   already been admitted.  That's the Pittsburgh agreement.

9   A.    Okay.

10  Q.    Look with me, if you would, please, sir, at

11  paragraph 1.1 of that.

12        Oh, and before we get there, let's go back up to

13  the top one.  What's the date of the Pittsburgh agreement,

14  Mr. Allison?

15  A.    The date it was signed was December 2000.

16  Q.    Okay.  And let's just -- we won't put it back up,

17  but let's look back at that Brazoria agreement, Exhibit 23.

18  What's the date of that agreement?

19  A.    The opening paragraph doesn't have the date.  The --

20  going to your PTX number instead of the contract number, it

21  just says the effective date is blank 1998.

22  Q.    So the closest we can get is 1998; right?

23  A.    Yes.  Let's see if there's anything else that has a

24  date on here.

25        That's the closest thing I can see, yes.

1070

1    Q.    Okay.  So the -- while we're here, the Flint

2    agreement, that's PTX 698, is dated September 1997;

3    correct?  698?

4    A.    698 is December 1997, correct.

5    Q.    Okay.  So just so we're clear on this, the earliest

6    agreement is Flint, 698, which is September of 1997;

7    correct?

8    A.    Yes.

9    Q.    And we just talked about the Brazoria agreement

10   which was sometime in 1998; correct?

11   A.    I believe so.

12   Q.    And now we're going to talk about the Pittsburgh

13   agreement, PTX 699, which is dated in 2000; correct?

14   A.    It is dated 2000.

15   Q.    And there the sentence reads,

16            "Peoplesoft grants licensee a nonexclusive,

17   nontransferable license to make and run copies of the

18   software and third party software for access by employees

19   and designates on one or more servers and/or workstation

20   located at facilities owned or leased by licensee in the

21   territory."

22            It goes on.

23            So by 2000, Pittsburgh agreement, site's not in

24   there anymore in the grant clause; right?

25   A.    Yes, instead of site, they use facility.

1   Q.   But it doesn't say that in any definition of that
2   term -- of that document, does it?
3   A.   It doesn't say that in the term --
4   Q.   Facility is not a defined term in the Pittsburgh
5   agreement, 699, is it?
6   A.   We did not define what customer facilities are, no.
7   Q.   But a couple years before you had defined what a
8   site was; correct?
9   A.   We did.  There must have been a change to the
10  agreement.
11  Q.   And a couple years before that you defined site in a
12  different way; correct?
13  A.   In these agreements, yes.
14  Q.   Okay.  So suffice it to say the Flint and Pittsburgh
15  agreements have different language; correct?
16  A.   They do but --
17  Q.   Than the --
18  A.   Excuse me.  You asked --
19  Q.   I'm sorry.  Let me get my whole sentence out.
20  A.   Sure.
21  Q.   The Flint and Pittsburgh agreements have different
22  licenses than the Brazoria agreement; correct?
23           MR. HIXSON:  Objection, this violates
24  the parties' stipulation.
25           THE WITNESS:  Again, I believe facilities and

1072

1     sites mean the same thing.

2                   THE COURT:  Wait, wait.

3                   THE WITNESS:  Sorry.

4                   THE COURT:  The objection is sustained.

5                   MR. STRAND:  That's not on -- okay.  We're out

6     of there.

7     BY MR. STRAND:

8     Q.    Now, one last term I'd like to talk to you about

9     here is copies.  Copies doesn't appear in the grant clause

10    on 6998, does it, in paragraph 1.1, 69 --

11    A.    698?

12    Q.    Excuse me, 698.  I apologize.  That was a curve

13    ball.

14    A.    Does copies occur where?

15    Q.    Let's look at paragraph 1.1.  We keep going back

16    there.  Copies isn't in that first paragraph; correct?

17    A.    Well, copies is actually in the 1.2B.

18    Q.    We're going to get there.  You're ahead of me

19    already.

20                   You agree with me that a -- that a customer of

21    Oracle needs to be able to make copies of the software in

22    order to use the software appropriately; correct?

23    A.    They needed to, yes.

24    Q.    They probably need to make a copy for a development

25    environment; correct?

1    A.    They may have to choose or maintain a development

2    environment.

3    Q.    And they may need to make a copy for a test

4    development -- a test environment; correct?

5    A.    That's possible as well.

6    Q.    And they may need to run a copy -- well, they do

7    need to run a copy for the actual production environment;

8    correct?

9    A.    Yes, that seems reasonable.

10   Q.    And Oracle anticipates that the licensee will make

11   copies; correct?

12   A.    I'd rather speak to the specific language in the

13   agreement if we can.

14   Q.    Okay.  So it's really difficult, isn't it, to speak

15   in generalities about these agreements?

16              MR. HIXSON:  Objection.

17              THE WITNESS:  Well, I think --

18              THE COURT:  Wait.

19              MR. STRAND:  I'm --

20              THE COURT:  Sustained as to the form of the

21   question.

22   BY MR. STRAND:

23   Q.    All right.  Let's look at 2.1 of that document.  I

24   think you referenced it just a moment ago, sir.  That says

25   license exclusions; right?

1074

1    A.    It does.

2    Q.    And it says -- 2.1 says,

3              "Except as expressly authorized herein licensee

4    shall not," and in paragraph A it says, "copy the

5    software."

6              Correct?

7    A.    It does.

8    Q.    All right.  Now, let's look up at paragraph 1.3,

9    right above that.

10   A.    I see that.

11   Q.    And it says down there in the fourth line beginning

12   in the middle, it says,

13             "Licensee may make a reasonable number of copies

14   of documentation and the software which shall be limited to

15   production use solely for licensee's internal use provided

16   all copyright and proprietary notices are reproduced."

17             Do you see that?

18   A.    I do.

19   Q.    So it says broadly no copies, and then it starts to

20   say where they can have copies; correct?

21   A.    Correct.  And in the exclusion section it says

22   expressly as -- "except as expressly authorized herein."

23   So here they're authorizing the use of copies.

24   Q.    Yeah.  You've got to read both of those to

25   understand that; right?

1075

1    A.    Yes.

2    Q.    Now, look with me at -- and don't show this on the

3    screen, please, because I don't believe it's been admitted.

4              Look with me, please, sir, Exhibit PTX 3657.  Do

5    you have that in front of you?

6    A.    I do.

7    Q.    Do you recognize that as the PeopleSoft agreement

8    with Bausch and Lomb?

9    A.    I do.

10              MR. STRAND:  I move the admission of PTX 3657,

11   Your Honor.

12              MR. HIXSON:  No objection.

13              THE COURT:  It's admitted.

14         (Plaintiffs' Exhibit 3657 received into

15         evidence.)

16              MR. STRAND:  All right.  Now you can show it on

17   the screen, please.

18   BY MR. STRAND:

19   Q.    Let's look there at 1.3, which is the same language

20   we just looked at in the Flint agreement.

21   A.    Okay.

22   Q.    She's working on it so we can all see it; 1.3.

23   A.    Okay.

24              MR. STRAND:  Is it cooperating, Marie?  There we

25   go.

1   BY MR. STRAND:

2   Q.    There it says in the middle,

3               "Licensee may make a reasonable number of copies

4   of the software and documentation solely for licensee's

5   internal use in accordance with the terms of this

6   agreement."

7               Do you see that?

8   A.    I do.

9   Q.    That's similar to but not identical to the language

10   we just read in the Flint agreement; correct?

11   A.    Correct.  They're similar.

12   Q.    But it can get a little confusing, can't it?

13               MR. HIXSON:  Objection.

14               THE COURT:  Sustained.

15   BY MR. STRAND:

16   Q.    Now, look with me at the fourth line.  It says,

17   "Licensee may make a reasonable number of copies."

18               Okay?  Got that?

19   A.    I see that.

20   Q.    And this is a Bausch and Lomb agreement; right?

21   A.    It is.

22   Q.    What's a "reasonable number of copies"?

23   A.    It's a reasonable number of copies for licensee's

24   internal use.

25   Q.    What's the number of the reasonable number of

1077

1    copies, Mr. Allison?

2    A.    I don't have the schedule to the agreement where

3    often a schedule, you might have seen in some of the other

4    ones, mentioned the number of copies.

5    Q.    Well, why don't you look at -- with me at the

6    schedule.  But we won't put it up just yet.  It's PTX 3658.

7              Does that have the reasonable number of copies

8    in it, sir?

9    A.    No.  And it's not a license schedule.  It's actually

10   an amendment or an addendum to the software license

11   agreement.  It actually goes on to modify terms in the

12   master agreement as opposed to being the specific license

13   for the software we're discussing.

14   Q.    Okay.  Let me ask it this way.  Is there anything in

15   Exhibit 3658 that refers to the number of reasonable

16   copies?

17   A.    I'm going to have to read the exhibit to be able to

18   tell you that.  Do you want me to guess?

19   Q.    No.  I absolutely don't want you to guess.

20   A.    It's four pages.  I can read it if you want.

21   Q.    Why don't you read it tonight.  We'll talk about it

22   tomorrow.  We'll move on.

23             Who decides what the reasonable number of copies

24   is, sir?

25   A.    It says reasonable number of copies for licensee's

1078

```
 1    use.  So in the example, you gave me a good example,

 2    production, test, and development, a copy for each of

 3    those.

 4    Q.    Who decides the reasonable number of copies, sir,

 5    the licensee, or Oracle, or somebody else?

 6    A.    I think it's a combination of the two.

 7              Like I had mentioned, the schedules as opposed

 8    to the amendments often state the number of copies, and

 9    they often refer to the number of copies needed on the

10    servers to run and operate the software.

11    Q.    Is that negotiated before the agreement is signed?

12    A.    Could be, but I think normally it just uses the

13    reasonableness standard to operate the software.

14    Q.    And who decides whether it's unreasonable?  Is that

15    up to Oracle?

16              MR. HIXSON:  Objection.

17              THE COURT:  I'll allow the question.

18              THE WITNESS:  I assume it would be the agreement

19    between the two parties.

20    BY MR. STRAND:

21    Q.    Well, my question was who decides if it's

22    unreasonable?  Is that Oracle?

23    A.    Again, it's a contract between the two parties.  So

24    I think the two parties would determine that.

25    Q.    If it's unreasonable?
```

1    **A.**    Sure.

2                    MR. STRAND:  Okay.  Your Honor, I'm about to

3    launch into JDE and Siebel, and scintillating as I know

4    you're finding this, I will do it happily or I will pick up

5    tomorrow morning.

6                    THE COURT:  It sounds like it's a perfect time

7    to take our evening break, I think everyone will agree.

8                    So, ladies and gentlemen, the same admonitions

9    apply.

10                    Please do not discuss this case in any way with

11   anyone, or allow anyone to discuss it in any way in your

12   presence.

13                    Please do not read, watch, or listen to any

14   report or commentary on this trial by any medium of

15   information, including classically today the Internet,

16   newspapers, television, or radio.

17                    And, finally, keep an open mind until all the

18   evidence has been presented, and until you've been able to

19   hear the Court's final instructions and the arguments of

20   counsel.

21                    So we'll break for this evening.  Tomorrow

22   morning we'll start promptly at 8:00, it will be an 8:00 to

23   2:00 schedule tomorrow.

24                    And I assume the refreshments are working all

25   right on those 8:00 to 2:00 schedules, is that correct?

1080

1    If they aren't for any reason, just let my court

2    clerk know and we'll tweak it as may be necessary.

3    So I'll excuse you for the evening.  I thank you

4    for your attention and wish you a pleasant evening at home.

5    COURTROOM ADMINISTRATOR:  Please rise.

6    THE COURT:  Court will be adjourned.

7    (The proceedings adjourned at 5:00 p.m.)

8    *    *    *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1081

1        -o0o-

2    I certify that the foregoing is a correct

3    transcript from the record of proceedings

4    in the above-entitled matter.

5

6    _____    9/22/15

7    Donna Davidson, RDR, CRR, CCR #318    Date
     Official Reporter

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1082

1                        I N D E X

2    PLAINTIFFS' WITNESSES:                        PAGE
     SAFRA CATZ
3        Direct Examination By Ms. Dunn             905
         Cross-Examination By Mr. Webb              950
4        Redirect Examination By Ms. Dunn           994
         Recross-Examination By Mr. Webb           1001
5    RICHARD ALLISON
         Cross-examination By Mr. Strand           1002
6


7                      E X H I B I T S

8    PLAINTIFFS'                                ADMITTED
9    3657                                          1075

10   DEFENDANTS'                                ADMITTED
     146                                            934
11   5465                                           939

12

13

14

15

16

17

18

19

20

21

22

23

24

25