1354

1    UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA
2    BEFORE THE HONORABLE LARRY R. HICKS, DISTRICT JUDGE

3

4  ORACLE USA, INC., a Colorado        :
corporation; ORACLE AMERICA,        :
5  INC., a Delaware corporation;       :
and ORACLE INTERNATIONAL             :No. 2:10-cv-0106-LRH-PAL
6  CORPORATION, a California           :
corporation,                         :
7                                      :
Plaintiffs,                :
8                                      :
vs.                             :
9                                      :
RIMINI STREET, INC., a Nevada       :
10  corporation; and SETH RAVIN,        :
an individual,                       :
11                                      :
Defendants.                :
12  _____ :

13

14

TRANSCRIPT OF JURY TRIAL - DAY 8
15            (Pages 1354 through 1638)

16

17                   September 23, 2015

18

Las Vegas, Nevada
19

20

21

22

Court Reporter:        Donna Davidson, RDR, CRR, CCR 318
23                        Certified Realtime Reporter
400 South Virginia Street
24                        Reno, Nevada  89501
(775) 329-0132
25

1355

```
 1                     A P P E A R A N C E S

 2    FOR THE PLAINTIFFS:

 3    BOIES, SCHILLER & FLEXNER LLP
      KIERAN P. RINGGENBERG
 4    1999 Harrison Street, Suite 900
      Oakland, California 94612
 5    (510) 874-1000
      Fax: (510) 874-1460
 6    kringgenberg@bsfllp.com

 7    BOIES, SCHILLER & FLEXNER LLP
      RICHARD J. POCKER
 8    300 South Fourth Street, Suite 800
      Las Vegas, Nevada 89101
 9    (702) 382-7300
      Fax: (702) 382-2755
10    rpocker@bsfllp.com

11    BOIES, SCHILLER & FLEXNER LLP
      WILLIAM A. ISAACSON
12    KAREN L. DUNN
      5301 Wisconsin Avenue, NW
13    Washington, DC  20015
      (202) 237-2727
14    Fax:  (202) 237-6131
      wisaacson@bsfllp.com
15    kdunn@bsfllp.com

16    MORGAN LEWIS & BOCKIUS LLP
      THOMAS S. HIXSON
17    NITIN JINDAL
      JOHN A. POLITO
18    One Market, Spear Street Tower
      San Francisco, California 94105
19    (415) 442-1000
      Fax:  (415) 442-1001
20    thomas.hixson@morganlewis.com
      nitin.jindal@morganlewis.com
21    john.polito@morganlewis.com

22    JAMES C. MAROULIS
      DORIAN E. DALEY
23    Oracle Corporation
      500 Oracle Parkway
24    Redwood City, California 94070
      (650) 506-4846
25    jim.maroulis@oracle.com
      dorian.daley@oracle.com
```

1356

1          A P P E A R A N C E S (Continued)

2    FOR THE DEFENDANTS:

3    SHOOK, HARDY & BACON LLP
     PETER E. STRAND
4    B. TRENT WEBB
     RYAN D. DYKAL
5    2555 Grand Boulevard
     Kansas City, Missouri 64108
6    (816) 474-6550
     Fax: (816) 421-5547
7    pstrand@shb.com
     bwebb@shb.com
8    rdykal@shb.com

9
     SHOOK, HARDY & BACON LLP
10   ROBERT H. RECKERS
     600 Travis Street, Suite 3400
11   Houston, Texas 77002
     (713) 227-8008
12   Fax: (713) 227-9508
     rreckers@shb.com
13
     SHOOK, HARDY & BACON LLP
14   ANNIE Y.S. CHUANG
     One Montgomery Tower, Suite 2700
15   San Francisco, California 94104-4505
     (415) 544-1900
16   achuang@shb.com

17
     LEWIS ROCA ROTHGERBER LLP
18   W. WEST ALLEN
     3993 Howard Hughes Parkway, Suite 600
19   Las Vegas, Nevada 89169
     (702) 949-8230
20   Fax: (702) 949-8364
     wallen@lrrlaw.com

21

22

23

24

25

1357

<pre>
 1              LAS VEGAS, NEVADA, SEPTEMBER 23, 2015, 7:54 A.M.

 2                              --oOo--

 3                      P R O C E E D I N G S

 4

 5          (Outside the presence of the jury.)

 6              THE COURT:  Have a seat, please.

 7              The record will show that we are convened in

 8   open court.  The jury is not present, counsel and parties

 9   are, and I'm advised that there was an issue that counsel

10   wanted to address.

11              Mr. Hixson, go ahead, please.

12              MR. HIXSON:  Good morning, Your Honor.

13              There are three issues that we would like to

14   bring to the Court's attention before the jury is brought

15   in today, one of which we ask for a ruling on as soon as

16   possible this morning, and the other two we would like to

17   bring to the Court's attention so that they can be

18   addressed at a time that's convenient for the Court today.

19              THE COURT:  Okay.

20              MR. HIXSON:  And the first, as the Court may

21   recall, a dispute between the parties concerning some

22   customer depositions where customers were asked if you had

23   known X, would you have contracted with Rimini for support,

24   and the Court ruled that those questions were admissible

25   but then invited the parties to submit a limiting
</pre>

1358

1    instruction to the Court.

2              The parties met and conferred --

3              THE COURT:  Let me cut to the chase.  I reviewed

4    all of that, and I will give the limiting instruction

5    substantially in the form submitted by plaintiffs.

6              MR. HIXSON:  Okay.  Thank you, Your Honor.

7              The other two issues, which don't need to be

8    resolved right now but sometime today, are defendants have

9    certain objections to deposition testimony by Rimini Street

10   employee Mr. Grigsby that Oracle wishes to play at some

11   point today, and so perhaps on a break, or over the

12   midmorning break, we could bring those to Your Honor's

13   attention and discuss the merits of those, because we would

14   like to play that deposition, but at some point later

15   today.

16             THE COURT:  We'll look for an opportunity on

17   that, and if I don't remember, remind me.

18             MR. HIXSON:  Sure thing.

19             And the last issue is that -- and this is not

20   something from our perspective needs to be resolved today,

21   and defendants can speak up if they disagree.

22             There are a number of exhibits where -- the

23   Court may recall the ruling on the motion in limine that

24   the at-risk reports where there were customer statements,

25   and Oracle has proposed certain redactions for statements

1    that we believe are either irrelevant or hearsay, and

2    Rimini disagrees with those.

3                 And so we've met and conferred, and the sides

4    have picked 12 exemplars each that -- rather than burden

5    the Court with hundreds of individual examples -- and we

6    would welcome the chance to discuss those with Your Honor

7    to receive guidance on those so that we could apply the

8    Court's ruling on other proposed redactions.

9                 And, again, I don't think that needs -- perhaps

10   after 2:00 today we could discuss those issues with the

11   Court.

12                THE COURT:  Okay.  Well, if each side could give

13   me their set of 12, or someone give me the set of 24 so

14   that I can take a look at those before we start argument

15   concerning that, that would be helpful.

16                MR. HIXSON:  Okay.  And we might want to submit

17   a short written statement --

18                THE COURT:  And that's fine.  Whatever you have.

19                And I don't know that I need all 24, just an

20   example of two or three on each side is really all I need.

21                MR. HIXSON:  We were suspecting that even two

22   dozen might be more than the Court might want, but --

23                MR. WEBB:  Hold on a second.  We have 12?

24                MR. HIXSON:  I thought you guys had 12 and we

25   had 12, exemplars, not total.  Some of ours were some of

1360

1    yours.

2              MR. WEBB:  Okay.  And then you're submitting a

3    written submission along with yours?

4              MR. HIXSON:  I think we can meet and confer and

5    have a joint submission where we each state our position,

6    if that's okay.

7              MR. WEBB:  You want to do that when, today?

8              MR. HIXSON:  You're proposing to use the

9    exhibits, not us.

10             MR. WEBB:  Let's see if we can get together at

11   the first break and do something.

12             MR. HIXSON:  Sure.  Thank you.

13             THE COURT:  Well, do your best on it, and, like

14   I say, still give me a sample of what you're talking about.

15             When you have a chance, just give it to Dionna,

16   and I'll take a look, hopefully have some sense of where

17   we're going with it, and I guess that's it.

18             MR. HIXSON:  Thank you.

19             THE COURT:  All right.  Okay.  I'll step out of

20   the courtroom because I need to pick up that cautionary

21   instruction.

22             MS. CHUANG:  Your Honor, I wanted to introduce

23   myself.

24             THE COURT:  I'm sorry.

25             MS. CHUANG:  My name is Annie Chuang, and I'll

1361

1    be doing some of the questioning today.

2                THE COURT:  Thank you for doing that.

3                MS. CHUANG:  Sure.

4                THE COURT:  I appreciate it.  Will you be doing

5    some of the questioning with the first witness?

6                MS. CHUANG:  I will.

7                THE COURT:  All right.  Thank you.

8                Court will be adjourned briefly.

9                COURTROOM ADMINISTRATOR:  Please rise.

10          (Recess from 7:58 a.m. until 8:05 a.m.)

11          (Jurors enter courtroom at 8:05 a.m.)

12               COURTROOM ADMINISTRATOR:  Court is in session.

13               THE COURT:  Good morning, everyone.  Have a

14   seat, please.  I welcome you here again this morning,

15   ladies and gentlemen.

16               The record will show that we are in open court,

17   the jury is all present, counsel and the parties are

18   present.  And, let's see, we're at plaintiffs' next

19   witness.

20               MR. RINGGENBERG:  Good morning, Your Honor.

21   We're going to begin with a couple of more video

22   depositions.

23               The next is the deposition of Ms. Krista

24   Williams, who was a Rimini Street engineer who has been the

25   subject of testimony.

1    There's a short list of documents I want to

2  cover and make sure we're all agreed that they're admitted.

3    THE COURT:  All right.

4    MR. RINGGENBERG:  The three that I believe were

5  previously admitted are Plaintiffs' 57, 50 -- Oops, sorry.

6    COURTROOM ADMINISTRATOR:  Yes.

7    MR. RINGGENBERG:  58 and 343.

8    COURTROOM ADMINISTRATOR:  Yes, by stipulation.

9    MR. RINGGENBERG:  And then we have two more to

10  move into evidence, and that's Plaintiffs' 324 and 345.

11    MR. RECKERS:  No objection, Your Honor.

12    THE COURT:  All right.  They are admitted.

13    (Plaintiff's Exhibits 324, 345 received into

14    evidence.)

15    MR. RINGGENBERG:  And this video is about 27

16  minutes long.

17    THE COURT:  All right.  Mr. Ringgenberg, would

18  you mind just advising the jury who is the individual in

19  this video and how she's related to defendants.

20    MR. RINGGENBERG:  You bet.  Ms. Williams,

21  Ms. Krista Williams, is a Rimini Street employee at the

22  time of the deposition, and she is a PeopleSoft

23  environments engineer.

24    And could we have the video --

25    THE COURT:  Thank you.  Go ahead, please.

1

2          (Videotape deposition of Krista Williams

3          played as follows:)

4          PAGE 7:06 TO 7:20 (RUNNING 00:00:38.316)

5           "BY MR. RINGGENBERG:

6          Q. Good morning, Ms. Williams.  Do you work

7          at Rimini Street?

8          A. Yes.

9          Q. How long have you worked there?

10         A. Since August 2007.

11         Q. And before that, did you work at

12         TomorrowNow/SAP?

13         A. Yes.

14         Q. How long did you work there?

15         A. I joined there in 2005.

16         PAGE 8:18 TO 8:22 (RUNNING 00:00:12.498)

17         Q. What positions have you had at Rimini

18         Street?

19         A. For a time I was the manager of the

20         PeopleSoft environment team.  And I am

21         currently a member of the PeopleSoft

22         environment team.

23          PAGE 9:03 TO 9:10 (RUNNING 00:00:20.178)

24         Q. And were you the manager of the PeopleSoft

25         environment at the time you joined in 2007?

1364

1    A. Yes.

2    Q. And when did you transition to your

3    current position?

4    A. 2010.  Beginning of 2010.  I'm not sure of

5    that date because I was not formally informed

6    of the transition.

7    PAGE 9:22 TO 10:13 (RUNNING 00:01:25.129)

8    Q. What does the PeopleSoft environment team

9    do?

10   A. We assist PeopleSoft support engineers

11   with technical questions which they field

12   from customers.  We build PeopleSoft

13   environments for the support of Rimini Street

14   PeopleSoft to development.  And we support

15   those environments should issues arise with

16   them during their use by PeopleSoft

17   development or PeopleSoft supporting

18   engineers or testing personnel or other

19   Rimini Street employee users.

20   Q. What is an environment, in that sense?

21   A. A colloquialism which we, I think, have

22   taken into use to mean a running or a

23   PeopleSoft application consisting of the file

24   system, PeopleSoft file system, and the

25   attendant database as well as supporting

1365

```
 1          third-party components required to make all

 2          of the pieces work together and talk

 3          together.

 4      PAGE 12:11 TO 12:25 (RUNNING 00:00:40.398)

 5      Q. But at Rimini Street, it's typical for the

 6          database software and the PeopleSoft software

 7          to reside on the same virtual machine; is

 8          that correct?

 9      A. In most cases, yes.

10      Q. Some -- but there are a variety of

11          database applications that are used for this

12          purpose; is that correct?

13      A. Yes.

14      Q. Oracle Database is used sometimes,

15          correct?

16      A. Yes.

17      Q. DB2 is used sometimes, correct?

18      A. Yes.

19      Q. Microsoft Sequel Server is used sometimes;

20          is that right?

21      A. Yes.

22      PAGE 17:01 TO 17:16 (RUNNING 00:01:01.348)

23      Q. How were the PeopleSoft environments at

24          Rimini Street built?

25      A. It would depend on the VM.  There were a
```

1366

1    number -- on a particular environment, there

2    were a number of ways for the individual --

3    for environments to be built.

4    Q. What are those different ways?

5    A. An environment could be -- could be -- we

6    call it could be cloned.  It would be built

7    from sort of see files from another existing

8    environment.  It could be reconfigured.  Or

9    it could be -- from an environment provided

10   to us in whole by a customer.  An environment

11   could be installed from installation.  It

12   could be built using installation media and

13   configured.  Ultimately, those are the three

14   primary ways.

15   PAGE 17:17 TO 18:17 (RUNNING "00:01:19.515)

16   Q. You could build it from installation

17   media.  Would that be a from-scratch install;

18   is that what you call it?

19   A. Yes.  I think that would be a fair

20   description.

21   Q. And you -- a customer might send you a

22   copy, an installed copy.  I think that was

23   the way number two you described?

24   A. Yes.  They could provide to -- typically

25   they would provide to Rimini Street the

1367

1        onboarding team.  Usually not me directly.

2        They would provide the files, a copy of the

3        database, a database export, and perhaps some

4        installation media, depending on the

5        particular circumstances.  But they would

6        provide an environment, provide a copy of

7        their running environment for us to

8        manipulate, reconfigure to work on our

9        server.

10       Q. For PeopleSoft applications, is the

11       primary file structure under the PS home

12       directory?

13       A. Yes.

14       Q. And when a customer would provide you with

15       an environment, would they typically provide

16       you with some archive copy of the PS home

17       folder?

18       A. By archive copy, do you mean a copy?

19       Q. Sure.

20       A. Yes.

21       PAGE 24:24 TO 25:14 (RUNNING 00:00:41.507)

22       Q. Well, when you started in 2007 what was

23       the method at that point?

24       A. At that point in time, there was a

25       collection -- the media was collected in a

1368

1    library of sorts.  A single location,

2    roughly.

3    Q. So there was a network share that was

4    referred to as a software library; is that

5    right?

6    A. Yes.

7    Q. And that soft -- that network share

8    contained copies of PeopleSoft installation

9    CDs or DVDs?

10   A. Yes.

11   Q. And those were used by builders to create

12   the environments that were built from

13   scratch; is that right?

14   A. Yes.

15    PAGE 25:15 TO 25:18 (RUNNING 00:00:16.091)

16   Q. And where were those files obtained?

17   A. Those files were obtained from customer

18   installation media provided by customer.

19   Customer, yeah.

20    PAGE 25:19 TO 25:20 (RUNNING 00:00:03.832)

21   Q. Were any of those files downloaded from

22   eDelivery?

23    PAGE 25:25 TO 26:01 (RUNNING 00:00:07.828)

24   THE WITNESS:  Sorry.  I -- I don't know where

25   they all came from.

1369

```
 1          PAGE 28:14 TO 29:05 (RUNNING 00:00:55.027)
 2      So starting in 2009 or 2010, a change was
 3      made, and at that point, environment builds
 4      were supposed to be built using only copies
 5      of the specific media that that particular
 6      client had provided; is that right?
 7      A. Yes.
 8      Q. But between 2007 when you joined Rimini
 9      Street in either 2009 or 2010 from build --
10      from-scratch builds used media provided by
11      whatever source that was found in the
12      software library; is that right?
13      A. No. It would be not accurate to say
14      whatever source was in there.  New customers
15      would have new requirements that media would
16      not be available in the that source.  So the
17      media from that customer would be -- we would
18      request that be loaded up so we could use it.
19       PAGE 29:06 TO 29:19 (RUNNING 00:00:40.992)
20      Q. So if a -- if a customer came on board and
21      the software they needed was not in the
22      library, you would get it from the customer
23      and put it in the library; is that right?
24      A. The software from the customer was
25      collected regardless of need.  So if there
```

```
 1            was a need, it would be copied to the network

 2            so it would be accessible.

 3            Q. Into the software library share?

 4            A. Yes.

 5            Q. And the next customer in line that needed

 6            the same software, you used what was in the

 7            library, right, rather than copy it over?

 8            A. Yes.  Rather than have it loaded from the

 9            storage, yes.

10             PAGE 33:02 TO 33:07 (RUNNING 00:00:27.188)

11            Q. To your recollection, when you came on

12            board in 2007, did the software library have

13            a generally complete collection of the

14            PeopleSoft Financials and PeopleSoft HR

15            software installation media that was then

16            available?

17            A. The applications, yes.

18             PAGE 33:08 TO 33:19 (RUNNING 00:00:25.277)

19            Q. When you say --

20            A. To the best of my recollection.

21            Q. When you say applications, are you -- what

22            are you distinguishing that from?

23            A. I remember there not being many

24            PeopleTools.  I remember us having to look

25            for the PeopleTools, those being the most
```

1371

1     frequent...

2     Q. Meaning if you had an installation and you

3     needed a particular PeopleTools version and

4     it wasn't in the library, you would have to

5     ask someone to go copy it over, right?

6     A. Yes.

7      PAGE 37:21 TO 38:02 (RUNNING 00:00:26.728)

8     Q. And in 2009, is it correct that the

9     software library was stored as a subfolder of

10    the internal software folder on Rimini

11    Street's server?

12    A. To the best of my recollection, that is

13    the path.  It mutated over time.  So it -- I

14    imagine in March of 2009, it stands to reason

15    that this was the repository location, the

16    library location.

17     PAGE 39:15 TO 39:21 (RUNNING 00:00:17.783)

18    Q. Sure.  So but does this process, that is,

19    where you look in the library and see what's

20    there, figure out what you need, and then ask

21    someone to load on anything that's not

22    already there that is needed for the build --

23    was that generally how the process worked

24    from 2007 through 2009?

25    A. Yes.

```
 1          PAGE 45:06 TO 45:23 (RUNNING 00:00:56.726)
 2       Q. I mean, is there any reason that people at
 3       Rimini Street would care whether it was
 4       obtained from eDelivery or copied from a CD
 5       provided by the client?
 6       A. The particular method would not matter to
 7       the environments team, so long as it was the
 8       customer's media in one form or another.
 9       Q. What do you mean by the customer's media?
10       A. The eDelivery would have been -- I guess
11       so long as it was downloaded on behalf of the
12       customer using the customer's permission, the
13       customer's ID, or if the CD came from the
14       customer.  And at that time, we wouldn't have
15       distinguished.  It would not have made a
16       difference.
17       Q. Then once it was in the library, it was
18       available for use for any client that had the
19       same media?
20       A. If the customer was licensed and had
21       provided a copy to us in storage, offsite
22       storage.
23          PAGE 54:03 TO 54:15 (RUNNING 00:00:45.426)
24       Q. So on this form, there's a box for
25       software media location.  And is that where
```

1373

1    you indicate to the builder where to get the

2    media for this environment to the extent it's

3    necessary?

4    A. Yes.

5    Q. And in this case, you're pointing the

6    builder to a file path that includes

7    internalsoftware/peoplesoft/FSCM8.9/8.9

8    application; is that right?

9    A. Yes.

10   Q. And that's the location that we discussed

11   earlier as referenced as the software

12   library, right?

13   A. Yes.

14    PAGE 55:13 TO 56:17 (RUNNING 00:01:33.454)

15   Q. So in order for -- if you built the VM and

16   you told them to look at that drive on the

17   VM, then you had to put the contents there;

18   is that right?

19   A. Yes.

20   Q. Where did you get the contents?

21   A. For their patches?

22   Q. Yes.

23   A. For this particular customer, I can't

24   remember.  The software -- the patches would

25   come from a customer-specific, I believe it

1374

```
 1            was -- at the time it was a client archive.
 2            I can't remember the file path, but it would
 3            come from a customer-specific download
 4            folder.
 5            Q. So in contrast to the install media, for
 6            patches you'd use client-specific downloads
 7            only?
 8            A. As a -- as a reflection of the acquisition
 9            method, yes.  They would be download.
10            Q. Why was that distinction made?  Why didn't
11            you have a central library for patches?
12            A. It would be hard to manage.  There would
13            be
14            too many patches.  We'd have to build a
15            library.  It would be easier to -- for each
16            customer to have their patches.  Each
17            customer would have different versions.
18            It would also protect against making sure
19            that only the right customer didn't receive
20            patches after they were supposed to, which
21            sometimes would be needed.  Problems would be
22            uncovered, patches needed.
23            It might be a problem if somebody downloaded
24            a patch or used a patch which was downloaded
25            sometimes.  So it was managed -- it was
```

1375

```
 1          easier managed.
 2           PAGE 57:06 TO 57:14 (RUNNING 00:00:26.527)
 3          Q. So is it correct that for -- from starting
 4          in 2007 when you joined, at least for some
 5          period of time, PeopleSoft maintenance packs
 6          were stored in the central non
 7          client-specific software library?
 8          A. Yes.
 9          Q. And they were used to build environments
10          without regard to the source, which customer
11          had provided that particular maintenance
12          pack?
13          A. Yes.
14           PAGE 57:15 TO 57:18 (RUNNING 00:00:09.682)
15          Q. And at some point, that changed so that
16          only client-specific locations were used for
17          maintenance pack sources?
18          A. Yes.
19           PAGE 127:16 TO 127:16 (RUNNING 00:00:03.283)
20          Q. (By Mr. Ringgenberg) I offer you
21           PAGE 127:17 TO 127:17 (RUNNING 00:00:09.045)
22          Exhibit 480.  Exhibit 480 is RSI-02681095
23          through 97.
24           PAGE 127:23 TO 128:09 (RUNNING 00:00:38.929)
25          Q. And Mr. Slepko asks you a question:
```

1376

```
 1              "Krista, I'd like to better understand the
 2         process we use for building environments.  Do
 3         you have any documentation you can send?  I
 4         think I have a high level of understanding
 5         and want to look at some other options for
 6         how we do things.  Specifically trying to
 7         understand how much more time it would take
 8         if we build each environment directly from
 9         the client's delivered software.  Is it an
10         extra day?  Five days?"
11         Is the answer you provide in this email, was
12         it accurate to the best of your understanding
13         at the time you wrote it?
14          PAGE 128:10 TO 128:10 (RUNNING 00:00:01.222)
15         A. One moment.  Yes.
16          PAGE 130:19 TO 131:18 (RUNNING 00:01:20.526)
17         Q. And does that accurately reflect kind of
18         the spread of what it took to build
19         environments; as few as two for an easy one
20         with a clone source and as many as 30 for a
21         difficult one with -- built from scratch?
22         A. The 30 days actually seems optimistic.  I
23         think it actually takes a little longer.
24         Four weeks, maybe five or six.
25         Q. For DB2 in particular?
```

1    A. Yes.

2    Q. So how about for, say, an Oracle, the

3    middle child, as you put it, an Oracle

4    Database platform, what would the build time

5    be for a, you know, from-scratch environment,

6    typically?

7    A. Week, two weeks.

8    Q. And if you were able to do a clone and

9    restore method, what would it typically take?

10   A. Oh, I beg your pardon.  I misunderstood

11   your question.  Your initial question was?

12   Q. So if you -- if you have an Oracle

13   Database platform and, you know, say,

14   PeopleSoft 8.81, what would that typically

15   take you to build from scratch, not using any

16   cloning?

17   A. Three to four weeks.

18   Q. And with the clone and restore method?

19   A. Week and a half.

20     PAGE 144:13 TO 144:17 (RUNNING 00:00:18.212)

21   Q. 487.  487 is RSI-04175953 through 55.  Is

22   KPEDN your Yahoo chat ID?

23   A. Yes.

24   Q. Can you tell me, what does that mean?

25   A. P-e-d-e-n, Peden, is my maiden name.

1378

```
1    PAGE 163:23 TO 164:05 (RUNNING 00:00:24.502)
2    Q. And do you -- if you -- if someone asked
3    you to do something, open an environment,
4    help them get access to an environment in a
5    way that you consider to be inconsistent with
6    the policies, what's your practice about what
7    you do?
8    A. My practice would be to correct them to --
9    or to seek further information to make a
10   determination or to ask for guidance.
11    PAGE 180:09 TO 180:11 (RUNNING 00:00:06.908)
12   Q. (By Mr. Ringgenberg) Can you help me
13   understand how those practices are consistent
14   with the stated policy of keeping client
15   media separated?
16    PAGE 180:14 TO 181:23 (RUNNING 00:01:48.165)
17   THE WITNESS:  The media that would be in
18   these indexes, each customer would have
19   different sets.  So if they were co -- if
20   they were merged into one location in support
21   of one customer, the second customer wouldn't
22   have access to information that they would
23   not have provided.
24   Keeping this separate makes sense with the
25   policy.  The centralized location, the
```

1379

1    customers themselves don't have access to

2    that information.  We manage the -- we

3    would manage the software ourselves for

4    support of that customer.  So long as the

5    customer proved to us or provided to us

6    copies of that media, we were looking to

7    manage space efficiently.

8    A customer -- or support of a customer would

9    not -- because it would have to come to there

10   and through the environments team, users

11   outside of that group would not have access

12   to -- in furtherance of one customer's needs

13   would not have access to another customer's

14   media in support.

15   Q. (By Mr. Ringgenberg) Was it your view at

16   the time that as long as the customer was

17   entitled to the file, it was okay to use it

18   to service that customer even if that

19   particular copy didn't come from that

20   particular customer?

21   A. That would -- my personal opinion?  That

22   may have been my personal opinion in the

23   past.

24   Q. And was that also your understanding of

25   how Rimini Street's policies operated as

```
 1            well, at least through, say, September of

 2            2009?

 3            A. That was my understanding.

 4             PAGE 185:20 TO 186:05 (RUNNING 00:00:31.781)

 5            Q. (By Mr. Ringgenberg) Would you agree with

 6            me that the use of the centralized software

 7            library and the use of cross-customer cloning

 8            is mixing or intermingling with Oracle's IP

 9            for Rimini Street clients?

10            A. In my personal opinion, no.

11            Q. Because why not?

12            A. The software was used for one customer --

13            was used for the customers.  Each customer

14            use was appropriate.  The customer proved

15            they had licenses for it.  But that's just my

16            personal opinion.

17             PAGE 192:14 TO 192:19 (RUNNING 00:00:54.097)

18            Q. My last question was whether you agree

19            with me that cloning environments from one

20            customer to another is in fact sharing

21            software from one customer to another.  Do

22            you agree with that?

23            A. I haven't thought about it that way

24            before.  I don't know.

25             PAGE 194:07 TO 194:12 (RUNNING 00:00:19.619)
```

1381

1    Q. In fact, you oversaw or personally

2    completed a large number of clones where you

3    used one customer's software -- one

4    customer's environment, from whatever

5    source it came from, and used that as the

6    foundation to build a different customer's

7    environment, correct?

8    A. Yes.

9     PAGE 194:15 TO 194:16 (RUNNING 00:00:04.130)

10    Q. (By Mr. Ringgenberg) Let me offer you

11    Exhibit 503.  503 is RSI-04807259 through

12    261.

13     PAGE 194:17 TO 195:05 (RUNNING 00:00:58.339)

14    Is this a ticket that you opened and that

15    email exchange you had with Chris Galzote

16    about it on January 13th, 2010?

17    A. It would appear so, yes.

18    Q. And based on the description, you --

19    you're following up on your statement to ask

20    you to take care of having what used to be

21    the internal software library deleted,

22    correct?

23    A. That appears to be the case.

24    Q. And you attached a screenshot that gave

25    directions to IT as to what was it that you

1382

1   wanted to delete it, right?

2   A. It looks like there's a file there.  Yep.

3   I described it, there being one.  So yes.

4    PAGE 199:13 TO 199:13 (RUNNING 00:00:04.248)

5   Q. (By Mr. Ringgenberg) Let me offer you an

6    PAGE 199:14 TO 199:14 (RUNNING 00:00:05.939)

7   exhibit formerly marked as Exhibit 276.  276

8   is

9   PAGE 199:21 TO 200:01 (RUNNING 00:00:10.870)

10  Q. Did you send this email to Mr. Hartson,

11  Mrs. Hartson?

12  A. The best I'm able to determine.

13  Q. And CKE is Carl Karcher Enterprises; is

14  that right?

15  A. Yes.

16   PAGE 201:02 TO 201:06 (RUNNING 00:00:09.294)

17  Q. Okay.  And you see the paragraph I just

18  read that says: "We do not share software.

19  To build Carl Karcher's support environments,

20  we used Carl Karcher's software."  Right?

21  A. Yes.

22   PAGE 201:07 TO 201:10 (RUNNING 00:00:12.610)

23  Q. If customers asked you, is that what you

24  told them at that time?

25  A. I can't recall each instance.  But it was

1383

```
1     unusual for a customer to request something

2     like that.

3      PAGE 201:11 TO 201:19 (RUNNING 00:00:17.317)

4     Q. Do you agree with me that that's an

5     inaccurate statement of what Rimini Street's

6     practice was in June of 2009?

7     A. To --

8     Q. That we don't share software, and to build

9     Carl Karcher's support environments, we use

10    Carl Karcher's software?

11    A. Yes.

12    Q. That is, you're agreeing it's inaccurate?

13     PAGE 202:05 TO 202:05 (RUNNING 00:00:31.381)

14    A. Inaccurate.  I would agree.

15     PAGE 207:13 TO 207:14 (RUNNING 00:00:02.322)

16    Q. (By Mr. Ringgenberg) Let me offer you

17    Exhibit 505.  Exhibit 505 is ROS -- I'm

18    sorry.  Long

19     PAGE 208:05 TO 208:09 (RUNNING 00:00:28.209)

20    Q. And Mr. Chiu gave you a Limited

21    password-protected -- or password and login

22    for MetaLink3; is that right?

23    A. That's what it looks like, yes.

24    Q. And you used that login to test Change

25     PAGE 208:10 TO 208:12 (RUNNING 00:00:07.172)
```

1    Assistant and how it operated, correct?

2    A. A Limited Change Assistant, according to

3    the subject line.

4     PAGE 209:10 TO 210:03 (RUNNING 00:00:49.107)

5    Q. Okay.  But in this case, the material you

6    were downloading, are you telling me that was

7    actually for Limited's archives, as opposed

8    to a task of Change Assistant to see how it

9    worked?

10   A. It would be a test on behalf of Limited.

11   I'm using Limited, and Limited -- I don't

12   know.  I don't recall the specific

13   conversation.

14   Q. Do you follow my question, that what I'm

15   suggesting -- you tell me if you think I'm

16   wrong.  But what I'm suggesting is that when

17   you were logging on and doing this work, you

18   weren't getting this material with any

19   expectation that Limited would get it;

20   rather, that you were testing Change

21   Assistant so that the next time Rimini Street

22   had to use it, it would know how.

23   Do you think that's right or do you think

24   that's wrong?

25   A. Given the nature of my technical bent,

1385

1    yes, I think that's right.

2    PAGE 210:13 TO 210:21 (RUNNING 00:00:24.580)

3    Q. And is this one you had in mind?

4    A. Nope.

5    Q. Did you -- a little further down, you say:

6    "Never been into MetaLink3. Been here since

7    early MetaLink for me."

8    Did you log onto MetaLink using that login?

9    A. No.

10   Q. How do you know that?

11   A. Because I've never been into MetaLink.

12   PAGE 228:01 TO 228:15 (RUNNING 00:01:33.319)

13   Q. (By Mr. Ringgenberg) Does Rimini Street

14   sometimes work with customers' environments

15   that are hosted on machines at its customers'

16   premises?

17   A. Yes.

18   Q. Do you call those remote environments?

19   A. Yes.

20   Q. And why does Rimini Street do that?

21   A. It could be a variety of reasons.  The

22   customer prefers it that way.  The customer

23   is not able to supply us with a copy of their

24   media in any form.  The best I can recall,

25   those two reasons.

1386

```
 1            Q. And are the remote environments used for
 2            the same purposes that Rimini Street local
 3            environments are used for?
 4            A. As best I know.
 5             PAGE 228:16 TO 229:14 (RUNNING 00:01:15.930)
 6            Q. Troubleshooting, testing, testing fixes,
 7            and updates, that's the kind of things that
 8            are done, right?
 9            A. Yes.
10            Q. And are the remote environments easier or
11            more difficult to work with than the local
12            environments?
13            A. They are more difficult to work with.
14            Q. And do you have responsibility for --
15            "you" meaning the environments team, have
16            responsibility for those environments in any
17            sense?
18            A. In some instances, yes.
19            Q. How so?
20            A. In some instances, by customers,
21            case-by-case basis, some customers do not
22            manage or care for, feed their systems to
23            which they give us access; in which case
24            we're left to administer the environment and
25            troubleshoot if the test or the support
```

1387

1     people have issues.

2         In other instances -- and this is really a

3         gamut -- the customer, the remote

4         environments are very tightly managed.  And

5         we may have to interact with the client

6         remote staff in order to have changes made or

7         to make requests.")

8         (Deposition ends.)

9             MR. RINGGENBERG:  Thank you.  Next we have a

10   very short deposition video of Mr. Ronald Higa of JALPAK,

11   which is a Rimini Street customer at issue in the case.

12             There's no exhibits.  This video is under three

13   minutes long.

14         (Videotape deposition of Ronald Higa played

15         as follows:)

16         PAGE 7:23 TO 8:03 (RUNNING 00:00:09.158)

17         "Q. Okay.  Mr. Higa, you work for JALPAK

18         Travel; is that correct?

19         A. That is correct.

20         Q. And the full name is Japan Pacific Travel

21         Services?

22         A. Yes, it is.

23          PAGE 8:09 TO 8:18 (RUNNING 00:00:24.166)

24          And what is your position at JALPAK?

25         A. I'm a supervisor there.

1388

1    Q. Could you describe your responsibilities?

2    A. Yeah.  I oversee the accounting -- the

3    corporate accounting and also the JD Edwards

4    software and operations.

5    Q. And how long have you been in that

6    position?

7    A. I have been in that position for almost --

8    well, about 14 and a half years.

9     PAGE 21:04 TO 21:23 (RUNNING 00:01:07.179)

10   Q. Was it important to JalPak to have a

11   vendor or a third party provide support for

12   your JD Edwards software?

13   A. Yes, it was.

14   Q. You did not -- did JalPak consider

15   supporting the software on its own?

16   A. No.

17   Q. And why is that?

18   A. Because it's too much of a gamble if

19   something goes wrong and we cannot recover.

20   We needed someone to support us.  And I did

21   not have the hundred percent ability to

22   handle the software.

23   Q. So is it a gamble because you -- is it a

24   gamble because without someone to provide

25   support, you would be nervous that if there

1389

```
 1            was a problem with your JD Edwards software,

 2            you might not be able to solve it?

 3            A. That's correct, and would cause problems

 4            maybe with the flow of the business.  We did

 5            not want that to happen.

 6             PAGE 49:15 TO 49:18 (RUNNING 00:00:08.519)

 7            If you had known that Rimini Street's

 8            business infringed Oracle's copyrights, would

 9            you have been willing to serve as a reference

10            for Rimini Street?

11             PAGE 49:21 TO 50:01 (RUNNING 00:00:24.049)

12            THE WITNESS:  Probably not.

13            BY MS. LOEB:

14            Q. And why is that?

15            A. Because JalPak is careful with its

16            corporate image and we don't -- we won't

17            tolerate illegal behavior or unethical

18            behavior.

19             PAGE 50:09 TO 50:14 (RUNNING 00:00:15.726)

20            BY MS. LOEB:

21            Q. And if you or if JALPAK Travel had known

22            that Rimini Street's business model involved

23            infringing Oracle's copyrights, would you

24            have contracted with Rimini Street in the

25            first place?
```

1    A.  No.")

2           (Deposition ends.)

3           THE COURT:  Ladies and gentlemen, I would

4    caution you with regard to the nature of the questions that

5    were just directed to Mr. Higa from JALPAK Travel.

6           When he is asked whether he would be willing to

7    contract for services with Rimini if that customer had

8    known certain information about Rimini's services or

9    conduct, you should not assume from the question that the

10   information about Rimini's services or conduct, which is

11   contained in the question, was true or not true.  That's

12   because that's a question for you to decide when this jury

13   finally deliberates its case.

14          So, for example, the words "copyright

15   infringement" was used in the question.  The question of

16   copyright infringement will be a question which is before

17   the jury.

18          So the question -- you will determine whether

19   the question was supported by the evidence in this case

20   when you decide whether there was a copyright infringement.

21          And the same instruction would apply to -- I

22   don't know what the next evidence is or may be, but if you

23   see that or hear that type of question raised again, you

24   should recall what I've just told you.

25          MR. ISAACSON:  We'll have a period again for

1    live witnesses, Your Honor.

2              Plaintiff calls Kevin Maddock of Rimini Street.

3              COURTROOM ADMINISTRATOR:  Please raise your

4    right hand.

5              You do solemnly swear that the testimony you

6    shall give in the cause now before the Court shall be the

7    truth, the whole truth, and nothing but the truth, so help

8    you God?

9              THE WITNESS:  I do.

10             COURTROOM ADMINISTRATOR:  Please be seated.

11             Please state your name for the record and spell

12   your name for the record.

13             THE WITNESS:  Kevin Maddock; K-e-v-i-n

14   M-a-d-d-o-c-k.

15             COURTROOM ADMINISTRATOR:  Please tell us your

16   city and state of residence.

17             THE WITNESS:  San Francisco, California.

18             THE COURT:  Mr. Isaacson, go ahead, please.

19                        KEVIN MADDOCK

20              called as a witness on behalf of the

21        Plaintiffs, was examined and testified as follows:

22                    DIRECT EXAMINATION

23   BY MR. ISAACSON:

24   Q.   Good morning.  Mr. Maddock, my name is Bill

25   Isaacson.  I represent Oracle.  I'll be asking you some

1392

1    questions this morning.

2    A.    Good morning.

3    Q.    All right.  You joined Rimini Street in

4    December 2008.  Do I have that right?

5    A.    Yes, I did.

6    Q.    And you joined Rimini Street as the senior

7    vice-president of global sales?

8    A.    That's correct.

9    Q.    Now, there was some testimony earlier in this trial,

10   I want to make sure I have this right, when you first

11   joined Rimini Street as the head of sales, you were the

12   only person in sales?

13   A.    That's not correct, no.

14   Q.    Okay.  How many people were in sales when you

15   joined, when you -- well, let me ask you this.

16         When you were senior vice-president of global

17   sales, you're the head of sales; is that right?

18   A.    That's correct.

19   Q.    Okay.  So when you first joined Rimini in

20   December 2008, how many people were in sales?

21   A.    There were four other individuals in the

22   organization.

23   Q.    All right.  And by the end the 2011, what was the

24   size of your sales department, if you can estimate that?

25   A.    I'd estimate it to be a little bit over 20

1393

| | |
|---|---|
| 1 | individuals at the end of 2011. |
| 2 | Q.    And during that period of time, you reported to Seth |
| 3 | Ravin; is that correct? |
| 4 | A.    That's correct, yes. |
| 5 | Q.    And you are the senior vice-president for global |
| 6 | sales, the head of sales at Rimini Street today; is that |
| 7 | correct? |
| 8 | A.    That's correct, yes. |
| 9 | Q.    I think we just heard you traveled from California |
| 10 | to be here.  Am I right that very few of Rimini's top |
| 11 | executives are actually based here in Las Vegas? |
| 12 | A.    That's correct, yes. |
| 13 | Q.    Now, as the senior vice-president of global sales, |
| 14 | your responsibilities include getting new customers for |
| 15 | Rimini Street? |
| 16 | A.    Overall I run the organization that does that, yes. |
| 17 | Q.    Okay.  You also call that the head of marketing? |
| 18 | A.    Is my role the head of marketing? |
| 19 | Q.    Yes? |
| 20 | A.    No, it's not. |
| 21 | Q.    All right.  Now, in addition to being the head of |
| 22 | sales for one deposition in this case, you were designated |
| 23 | as a corporate representative for Rimini on certain topics. |
| 24 | Do you remember that? |
| 25 | A.    I do, yes. |

1394

1     Q.     Now, for those -- so when you spoke as a corporate

2     representative for Rimini, you testified on behalf of

3     Rimini, not just about what you knew beginning December of

4     2008, but about some events before December 2008; is that

5     correct?

6     A.     I remember that, yes.

7     Q.     Okay.  And as part of your work as the head of

8     sales, are you involved with what goes on in the Rimini

9     website?

10    A.     No, I'm not.

11    Q.     All right.  Do you participate in press strategy?

12    A.     Not -- no, I don't.

13    Q.     Okay.  All right.  Now, when you spoke as a

14    corporate representative for Rimini Street before you were

15    deposed on certain topics, in order to prepare for that

16    deposition, you spoke to Mr. -- with Mr. Ravin?

17    A.     Yes, he was one of the individuals.

18    Q.     Okay.  And you remember that one of the topics of

19    that deposition in which you were speaking on behalf of

20    Rimini Street was Rimini's communications with customers

21    and prospective customers regarding such things as the

22    legality of Rimini's business practices, Rimini's policies

23    regarding Oracle's intellectual property, and the

24    compliance of Rimini Street's business practices with the

25    terms of license agreements with Oracle.

1      Do you remember that?

2  A.    Yes.

3  Q.    And you spoke to Mr. Ravin about those topics; isn't

4  that right?

5  A.    That's what I remember, yes.

6  Q.    And the reason you spoke to Mr. Ravin about those

7  topics is you were testifying under oath on behalf -- not

8  just yourself, but on behalf of the corporation, and you

9  wanted to get it right and testify correctly about those

10  topics?

11  A.    Yes.

12  Q.    Now, at a high level, part of your job is to ensure

13  that your sales team gives a customer certain standard

14  messaging; is that correct?

15  A.    That's correct, yes.

16  Q.    Okay.  And when you first started, I guess you would

17  have been one of five people actually delivering those

18  messages?

19  A.    That would be accurate, yes.

20  Q.    And you had a lot of contact with actual customers

21  beginning in -- since December 2008?

22  A.    My role tended to be more managing the sales

23  organization.  They were more on the front lines.  I tended

24  to manage their duties during the week.

25  Q.    And is it fair to say that at first you had more

1396

1    front-line contact with customers, and as your sales

2    department has grown, your emphasis on management has

3    increased?

4    A.    I'd say that's fair, yes.

5    Q.    Now, one of the ways that you ensure that your sales

6    department has -- provides consistent messaging to sales

7    prospects are sales FAQs, or frequently asked questions; is

8    that correct?

9    A.    That's correct, yes.

10   Q.    And sales FAQs are actually written documents where

11   you write out frequently asked questions, and then you

12   write out answers so that your salespeople can give

13   standard responses to those frequently asked questions?

14   A.    Correct, yes.

15   Q.    And you used those -- from 2008 to 2011, you used

16   sales FAQs across products lines, including Siebel,

17   PeopleSoft, and JD Edwards; correct?

18   A.    You said 2008 to 2011.  I would correct that to say

19   it was more like 2009 to 2011 after I started.

20   Q.    Okay.  Fair enough.  But from 2009 to 2011, you used

21   the same set of FAQs across those product lines?

22   A.    Well, the document evolved.  When you say the same

23   set, questions were added to it and responses evolved over

24   time.

25   Q.    Sure.  There was an evolving document, but my

1397

1    emphasis is on the same product line.  You didn't have a

2    different FAQ for JD Edwards, PeopleSoft, and Siebel at

3    least through 2011; correct?

4    A.    Not that I remember, no.

5    Q.    And the -- is there a marketing department?

6    A.    Yes, there is.

7    Q.    Okay.  So they -- they provide the initial draft of

8    the sales FAQs; is that right?

9    A.    They own the document.  They provide the initial

10   draft and the final draft.

11   Q.    All right.  So they own the document, and then the

12   sales department adds to it; is that correct?

13   A.    There's times that the sales department can add,

14   yes.

15   Q.    And Mr. Ravin is also involved in those FAQs?

16   A.    It's my understanding he has -- he reviews them,

17   yes.

18   Q.    Okay.  But he doesn't just review them, he gets

19   involved in actually drafting those, doesn't he?

20   A.    I believe he does.

21   Q.    All right.  So just to understand the process, you

22   have these sales FAQs which provide standard messaging to

23   clients, it begins in the marketing department, the sales

24   department can add to it from time to time, and Mr. Ravin

25   is also involved.  Is that a fair summary?

1398

1    A.    I think that's fair.

2    Q.    Okay.  And those FAQs are how you provide customers

3    with your standard messaging?

4    A.    Yes.  It's how our sales organization provides

5    customers with the standard --

6    Q.    Yes.  I'm sorry.  You, Rimini, the sales department?

7    A.    Yes.  Thank you.

8    Q.    And the FAQs, maybe this is self-evident, but it's

9    frequently asked questions, you're trying to decide in

10   advance what are the most common questions that are asked

11   by customers so that you can address them with standard

12   messages?

13   A.    I think that's accurate.

14   Q.    All right.  Now, your sales department -- let me

15   talk to you about the messaging.

16        Your sales department, again from 2008 through

17   the end of 2011, has told prospective customers that Rimini

18   did not share data between customers.

19   A.    That's correct.

20   Q.    Okay.  And your sales department also told

21   prospective customers that Rimini did not share software

22   between customers; is that correct?

23   A.    That's correct.

24   Q.    Okay.  And if a customer asked whether Rimini Street

25   might take a different client's software or support

1399

```
 1    materials and share that with another client, you would say

 2    no, you wouldn't disclose that you did that; correct?

 3    A.    We would not disclose that we did that because we

 4    were not aware that we did do that.

 5               In addition to saying no, we would say we only

 6    operate under the bounds of your contract, we only do what

 7    your license would entail or allow.

 8    Q.    Okay.  Let me break that down.

 9               Now, when you say -- now, we're talking about

10    the statement whether Rimini shared software between

11    customers; right?

12    A.    Yes.

13    Q.    And you said "we were not aware that we did that."

14    You're referring to this -- when you say "we" --

15    A.    The sales organization.

16    Q.    Right.

17               So from 2000 -- from the time you joined the

18    company, you and, to the best of your knowledge, the rest

19    of your sales department, had no knowledge that Rimini

20    Street was sharing software between customers during that

21    period?

22    A.    That's correct.

23    Q.    Do you have knowledge today that that was happening?

24    A.    I do have knowledge based on the Court ruling in

25    February 2014.
```

1   Q.    Do you have knowledge based on anything Mr. Ravin

2   has said?

3   A.    No.

4   Q.    All right.  Do you have any awareness that Mr. Ravin

5   has said that Rimini did share software between customers?

6   A.    No, I don't have that knowledge.

7   Q.    Okay.  Have you ever gone -- all right.

8          Now, the other thing you said, if I can get this

9   right, is you would tell customers that you were going to

10  abide by their agreement; is that correct?

11  A.    Yes.  Our standard messaging, which was part of the

12  FAQs, was that we have processes and controls in place to

13  ensure that customers don't receive anything to which

14  they're not -- to which their contract does not entitle

15  them.

16  Q.    All right.  Let me make sure I understand this.

17         So, first of all, it was standard messaging to

18  say that Rimini did not share software between customers;

19  right?

20  A.    That's correct.

21  Q.    Okay.  And you actually didn't know whether that was

22  true or not?

23  A.    I believed it to be true.

24  Q.    But you didn't know?

25  A.    When you phrase it like that, no, I didn't know 100

1401

```
 1    percent.  I believed the FAQs that were provided to me.

 2    Q.    And when you said you believed it was true, you were

 3    relying on Mr. Ravin?

 4    A.    I was relying on the document that was given to me

 5    by my marketing department, which was the FAQs.

 6    Q.    Well, did you think the marketing department knew

 7    whether it was true or not?

 8    A.    Ultimately, yes, I did.

 9    Q.    Okay.  You thought marketing had enough -- had

10    enough technical -- did you -- did you think Mr. Ravin knew

11    whether it was true or not?

12              MS. CHUANG:  Objection, calls for speculation.

13              THE COURT:  Sustained.

14    BY MR. ISAACSON:

15    Q.    You worked with Mr. Ravin on a daily basis; right?

16    A.    Yes.

17    Q.    Okay.  Mr. Ravin was the CEO and was the number one

18    person in the company; correct?

19    A.    Yes.

20    Q.    All right.  Did you have an understanding that he

21    had a very strong knowledge of what was going on in the

22    company?

23    A.    When you say what was going on in the company, at

24    what level?  The highest levels I would understand that.

25    Q.    Okay.
```

1402

1     A.    Or I would believe that he would have that

2     understanding.

3     Q.    All right.  Did you have an understanding or belief

4     that Mr. Ravin knew how your company was using the Oracle

5     software?

6     A.    I didn't have that understanding, no.

7     Q.    So you did not know one way or the other whether

8     Mr. Ravin had any understanding of how your company was

9     using Oracle software; is that correct?

10    A.    I did not have any understanding of that detail

11    level, no.

12    Q.    And you had no belief on that, that when you were

13    saying to customers that Rimini did not share software

14    between customers, you didn't have any belief one way or

15    the other as to whether Mr. Ravin would have thought that

16    was true?

17    A.    Based on the fact it was in our FAQs, which I

18    believe was ultimately approved by him, I would believe

19    that he felt that that was true, that they weren't sharing

20    data.

21    Q.    All right.  Were not.

22          Did you have any belief as to whether he would

23    have known one way or another whether it actually was true?

24    A.    In thinking back, my assumption was that he would

25    know that it was -- again, that the FAQs were true and

1403

1   accurate.

2   Q.   Now, in fact, the statement that you did not share

3   software between customers wasn't just standard messaging

4   to customers, it was something that you said under oath as

5   a corporate representative in a deposition; correct?

6   A.   That's correct.

7   Q.   Now, at that time you made that statement under

8   oath, did you know whether or not it was true?

9   A.   I believed it to be true.

10  Q.   I understand you believed it to be true, but that's

11  not quite my question, is it?

12       Did you -- when you said it under oath, did you

13  know whether it was true?

14  A.   I'm not sure I can answer that.  I mean, I believed

15  it to be true, so I felt that it was true.  I mean, did

16  I -- I'll stop there.

17  Q.   All right.  Well, when you said it to customers, I

18  think you've established that you didn't know whether it

19  was true or not.  When you said it under oath, were you

20  relying on other people when you gave that testimony?

21  A.   Yes, I was relying on what other people had told me.

22  Q.   All right.  And when you said that statement under

23  oath as the corporate representative of Rimini, was one of

24  the people you were relying on for that Mr. Ravin, who you

25  had spoken to before the deposition?

1404

1    A.    Yes.

2    Q.    And do you have any knowledge today that, in fact,

3    during 2006 to 2011, that Rimini Street was reusing fixes

4    and updates among clients all the time?

5    A.    I don't have knowledge that that was happening all

6    the time, no.

7    Q.    You were unaware of Mr. Ravin saying under oath that

8    your company reused fixes and updates all the time; is that

9    correct?

10   A.    I was unaware of that, yes.

11   Q.    As far as you know, at least through 2011 or even

12   2012, Rimini has never disclosed to its customers that it

13   developed fixes in one customer's environment and shared

14   them with other customers?

15   A.    Can you repeat that, please?

16   Q.    Sure.  As far as you know -- again, the time period

17   2006 to 2012.

18   A.    Okay.

19   Q.    Rimini has never disclosed to its customers that it

20   developed fixes in one customer's environment and shared

21   them with another customer?

22   A.    As far as I know, that's never been disclosed,

23   correct.

24   Q.    And isn't it a fact that Rimini downloaded Oracle

25   materials for different customers into one software library

1    for Rimini to use for customers generally?

2    A.    I was made aware of that after the Court ruled in

3    February 2014.

4    Q.    So you were not made aware of that before 2012;

5    correct?

6    A.    Not that I remember, no.

7    Q.    All right.  So when you were making -- when your

8    company had its standard messaging to customers, you were

9    unaware of any information that there was a software

10   library at Rimini at any period of time which was used for

11   customers generally; is that correct?

12   A.    That's correct.

13   Q.    And were you aware that Rimini had a PeopleSoft --

14   had PeopleSoft software in that library before it even had

15   one customer -- even had a PeopleSoft customer?

16   A.    No, I was not aware of that.

17   Q.    Okay.  And when you testified under oath as the

18   corporate representative for Rimini, you were unaware of

19   the existence of that library; is that correct?

20   A.    That's correct.

21   Q.    Now, I believe you said -- so just to review, the

22   standard messaging included that you don't share software

23   between customers, it included that you abide by the

24   customer's license agreement.

25              I believe you mentioned that it also included

1406

```
 1    strict processes to secure the client's software; is that

 2    correct?

 3    A.    I said we had strict processes in place to ensure

 4    that customers didn't receive any software to which they

 5    were not entitled.

 6    Q.    All right.  And so when you say "to which they were

 7    not entitled," you're referring to which they were not

 8    entitled --

 9    A.    Meaning licensed.

10    Q.    The license agreements.

11          And you would tell, as part of your standard

12    messaging, customers that you had procedures in place to

13    make sure that that happened, that you weren't -- that you

14    were complying with the license agreements; correct?

15    A.    Yes, that was part of our messaging.

16    Q.    Okay.  And, in fact -- and if a customer asked about

17    that, you would respond that you have those strict

18    methodologies and processes in place to ensure that the

19    license agreement is complied with; correct?

20    A.    At a high level, yes.

21    Q.    And you -- at least through 2012, you have -- to

22    your knowledge, Rimini Street has never told a customer

23    that you were doing anything that was not permitted by the

24    Oracle license agreements; correct?

25    A.    That's correct.
```

1    Q.    And at least through 2012, you never knew -- and, as

2    far as you know, the sales department did not know -- that

3    Rimini cloned one customer environment to another; is that

4    correct?

5    A.    That's correct as well.

6    Q.    And when you testified under oath as the corporate

7    representative of Rimini, you did not know that that

8    cloning was going on; correct?

9    A.    That's correct.

10   Q.    Okay.  And if you were asked about cloning, your

11   response to a customer would be that you would not allow a

12   customer to do anything beyond what their license permits;

13   right?

14   A.    That's correct.  And because I'm not a very

15   technical person, I -- if they had further questions, I

16   probably would have directed them to someone in my

17   technology group.

18   Q.    All right.  Well, let me ask you about that.

19         What's the technology group that you're

20   referring to?

21   A.    That's our delivery -- delivery organization.

22   Q.    Who is the head of that organization?  I'm sorry, I

23   don't know --

24   A.    Brian Slepko.

25   Q.    Okay.  So Mr. Slepko's organization.

1    Okay.  So did -- were there clients from time to

2  time who asked about your processes and whether they

3  complied with the license agreements that you referred to

4  Mr. Slepko?

5  A.    I'm sorry.  Can you repeat that?

6  Q.    Sure.  Were there clients from time to time who

7  asked about your procedures, how they worked and whether

8  they complied to the license agreements, that you referred

9  to Mr. Slepko or his department?

10  A.    Did that occur?

11  Q.    Yes.

12  A.    Yes.  I mean, it may have been someone in my

13  organization that did that, but, yes, that would happen,

14  they would have a technical discussion.

15  Q.    All right.  And would you follow up to find out what

16  Mr. Slepko was saying to the customers?

17  A.    I don't remember specifically following up myself,

18  but my sales reps would have been on those calls to listen

19  to them.

20  Q.    All right.  Until recently you had no idea that

21  cloning was part of the methods that you used for creating

22  environments at Rimini Street; is that correct?

23  A.    That's correct.

24  Q.    All right.  Another part of your standard messaging

25  had to do with environments, am I right, that you would not

1409

```
 1    use one customer's environment for another customer; is
 2    that correct?
 3    A.    I don't know if that was it.  I don't remember that
 4    being in our FAQs specifically about environments.
 5    Q.    All right.  Well, did you say that your -- did
 6    Rimini Street say that your environment -- your environment
 7    will be only used for you?
 8    A.    I believe I was shown some emails to that -- to that
 9    point in my -- during my depositions.
10          I don't recall ever saying that myself, or I
11    don't recall any instances where someone in my sales
12    organization did that.
13    Q.    All right.  And when you came onboard in
14    December 2008 through December 2012, you and, to the best
15    of your knowledge, your sales department had no information
16    or knowledge about general testing and development
17    environments at Rimini Street that were used for multiple
18    clients; correct?
19    A.    To the best of my knowledge, no, we did not have
20    that.
21    Q.    When you testified under oath as a Rimini Street
22    representative, and having talked to Mr. Ravin and others
23    at Rimini Street to prepare for that, you did not know
24    about the existence of those general testing and
25    development environments; right?
```

1410

1      A.    No.

2      Q.    Now, part of your standard messaging is also that --

3      well, let me put it differently.

4            Is it your understanding that Rimini leaves it

5      to the customer to determine what their rights are under

6      the license agreement?

7      A.    I'm sorry, can you repeat the first part, please.

8      Q.    Is it your understanding that Rimini Street

9      generally leaves it to the customer, and any customer's

10     lawyers, to determine what their rights are under the

11     Oracle license agreements?

12     A.    That's part of our standard messaging, yes.

13     Q.    All right.  So part of your standard messaging is

14     also to tell the customer "it's your job to determine

15     what" -- "it's your job to interpret the license agreement

16     with Oracle"?

17     A.    Yes.

18     Q.    Okay.  And if a customer asked if it's okay to share

19     software with Rimini Street, your typical response would be

20     "you need to look at your own contract and make your own

21     determination"?

22     A.    Yes, and -- yes.

23     Q.    All right.  So help me reconcile this.

24           You have two standard messages.  If a customer

25     asks are you sharing software amongst customers, one

1411

1    standard message is -- let me start that over.

2              If a customer asks, you know, "are you abiding

3    by the license agreement," you would say -- one standard

4    message is "you should look at the agreement yourself," and

5    the other standard messaging is "yes, we are"?

6    A.    We say "ultimately you need to determine what your

7    license and agreement entitles you to do, and we will not

8    provide anything to you that is outside your license

9    agreement."

10   Q.    All right.  So that last part -- okay.  The first

11   part is "you have to make up your own mind," and the second

12   part is "we will follow the license agreement.  We will

13   only provide you material consistent with the license

14   agreement"; is that correct?

15   A.    Yes.

16   Q.    Okay.  So you are both telling them "you need to

17   interpret the agreement yourself," and, "don't worry, we're

18   abiding by the license agreement"?

19   A.    In essence, yes.

20   Q.    Is Rimini's position -- between those two, is it

21   Rimini's position that ultimately it's up to the customer

22   to determine whether there's been a violation of the

23   agreement?

24   A.    I'm not sure what our position is on that --

25   Q.    So in looking at the two things, you're saying it's

1412

1    up to the customer, and we're obeying the agreement, you're

2    not sure what Rimini's position is as to which one's more

3    important or which one ranks higher?

4    A.    I don't know what the company's position is on that

5    particular question.

6    Q.    And when you tell customers, or you and your sales

7    department tell customers that Rimini is abiding by the

8    Oracle license agreements, the sales department doesn't

9    actually know the actual license terms; correct?

10   A.    That's correct.

11   Q.    Okay.  In fact, you may not be aware of this, your

12   counsel has been saying these agreements are confidential.

13         Did you have any knowledge of any of the Oracle

14   license agreements when you said -- or your sales

15   department said "we're obeying those Oracle license

16   agreements"?

17   A.    I'd like you to repeat that question again.  Because

18   when you say "you," are you talking to Kevin Maddock or my

19   overall organization?

20   Q.    You or your sales department.

21         Well, let me break it down.

22   A.    Okay.

23   Q.    Okay.  When your sales department -- and we're

24   talking this period of 2008 through, say, the end of 2011.

25   When your sales department would say to a customer, "Rimini

1413

```
1   Street is abiding by the Oracle license agreements," did
2   your sales department have any knowledge of what was in the
3   Oracle license agreements?
4   A.    Some of them may have because they had worked at
5   Oracle, but others may not have.
6   Q.    All right.  And do you know even whether the ones at
7   Oracle had knowledge of the license agreements that they
8   were dealing with customers about?
9   A.    In general, no.  There may have been some cases
10  where -- where the customer showed parts of the license,
11  but my salespeople shouldn't be making that determination.
12  Q.    When you say your salespeople should not be making
13  that determination, are you saying your salespeople should
14  not be making a determination as to whether the license
15  agreement was being obeyed?
16  A.    That's right, they should not be.  They're not
17  attorneys, and it's really up to the customer to do that.
18  Q.    Right.  Right.  So the salespeople should not be
19  making a determination as to whether Rimini is complying
20  with Oracle license agreements, but it should say -- the
21  salesperson should say as a standard message to the
22  customer, "Don't worry, Rimini is abiding by the Oracle
23  license agreements"; is that correct?
24  A.    Yes.
25  Q.    I didn't ask you about -- have you said to customers
```

1414

```
 1    that the -- that Rimini is abiding by or following the
 2    Oracle license agreements?
 3    A.    Yeah, I would have repeated our standard messaging
 4    saying that "we have methodologies in place to ensure that
 5    you don't receive anything outside your agreements."
 6    Q.    And how many times do you think you've said that to
 7    customers?
 8    A.    Probably fewer than ten.
 9    Q.    And when you said -- when you said those things, did
10    you actually have any knowledge of what was in those
11    customer's license agreements?
12    A.    Not in the specific agreements, no.
13    Q.    And is it fair to say that Rimini Street would offer
14    advice to clients about what was in the Oracle license
15    agreements without actually knowing what was in those
16    agreements?
17    A.    I'm not aware of that, no.
18    Q.    You're not aware of Rimini -- is it you're not aware
19    of Rimini offering advice to clients about what was in the
20    Oracle license agreements?
21    A.    I was made aware of some of them in the depositions,
22    but the question that I understood you to ask me was did
23    that happen without us knowing what was in the agreement.
24    Q.    Now, you mentioned how the FAQs evolved.  I would
25    like you to look at -- I would like you to look at in your
```

1415

```
1    binder, this has not been admitted, 5396.

2              Any objection to the admission of this?  I move

3    to admit.

4              MS. CHUANG:  No objection.

5              MR. ISAACSON:  Let's put it on the screen.

6              THE COURT:  It's admitted.

7         (Plaintiffs' Exhibit 5396 received into

8         evidence.)

9    BY MR. ISAACSON:

10   Q.   So you see your name on the second page, list of

11   sales FAQs doc?

12   A.   Yes.

13   Q.   And this is -- this is January 5th, 2009.  You

14   joined the company December 2008, so you're quickly getting

15   to work on the FAQs.  Is that what's happening here?

16   A.   Yeah, I quickly wanted to -- yes, the answer is yes.

17   Q.   And I think you wrote -- this is you writing on the

18   first page, you're writing to David Rowe in the marketing

19   department at the bottom; right?

20   A.   Yes.

21   Q.   And what you're writing in the second -- you say,

22   "Attached is the list of FAQs that I would like to have

23   answered."

24              So you haven't written out the answers, but

25   you've written out the questions?
```

1416

```
 1    A.    That's not completely correct.

 2          What I remember about this was there was a list

 3    of FAQs that had been put together prior to my arrival at

 4    the company which I had found, and I don't recall if there

 5    were answers for them or not.

 6          So I took that list, and I had my sales reps put

 7    together -- add some other questions to it.

 8    Q.    The list is attached.  We'll look at that in a

 9    second.

10    A.    Okay.

11    Q.    Just -- in terms of what you say to the marketing

12    department -- in terms of what you write to the marketing

13    department in the second paragraph,

14          "As we discussed, I would like to make answering

15    these a TOP," all capitals, "priority particularly given

16    the recent situation with Seth.  I believe you said you

17    would take the lead.  I'm happy to help however needed, and

18    I believe Brian is as well."

19          Brian is Brian Slepko?

20    A.    That's correct.

21    Q.    "My guess is that Seth should be fairly involved in

22    crafting responses to these to the extent that he is able."

23          Once you came into the job, these sales FAQs

24    were one of your top priorities; is that right?

25    A.    That's right.
```

1    Q.    Now, we go to page 3.  There's a list of questions,

2    General Questions, and then at the bottom, Ability to

3    Service Questions.

4              All right.  Now, so as I understand it, these

5    were questions not that you drafted but that you found, and

6    that you -- once you took the job and you were forwarding

7    to the marketing department?

8    A.    That's what I remember them to be, yes.

9    Q.    And in reviewing these, these seemed like questions

10   you wanted to be able to have your sales department be able

11   to answer, and so you were sending them to the marketing

12   department; is that correct?

13   A.    Yes.  Yes.

14   Q.    Okay.  Now, let's look at 241.  And if you can keep

15   a placeholder on that, because I'm going to ask you to look

16   at both these documents.

17   A.    241?

18   Q.    Right.

19   A.    Is that a tab or --

20   Q.    Yeah, it's a tab.

21             Sorry.  Keep your finger in 5396, that page, and

22   now we're looking at 241 which has been admitted into

23   evidence.

24             This is one month later, February.

25             All right.  And now you have a draft -- you have

1418

```
 1    draft 3 of the FAQs.  Do you see that?

 2    A.    Yes.

 3    Q.    And the -- if we -- and you're copied on that

 4    document.  You see that?

 5    A.    Yes.

 6    Q.    All right.  And then, if we turn to page 9, you'll

 7    see at the top Ability to Service Questions?

 8    A.    Yes.

 9    Q.    So that was what we saw on the previous document,

10    Ability to Service Questions?

11    A.    Yes.

12    Q.    Okay.  Now, let's see if we can do some flipping

13    back and forth with this.

14            So in January you had an ability to service

15    question, number 13, "How is Rimini Street different from

16    TomorrowNow?  Are you also in danger of being sued by

17    Oracle?"

18            And I see that you're answering that question in

19    February.  Do you see that?

20    A.    Yes, the answer under number 17?

21    Q.    Yes.  Exactly.  It's now number 17.

22    A.    Okay.  Yes, I see that.

23    Q.    Okay.  And the second question in January was, "Is

24    it legal for Rimini Street to provide support for software

25    vendor products?"
```

1    And you answer that in February in question 19.

2    A.    Yes.

3    Q.    And then you're asked in January, "Is Rimini Street

4    involved and at risk with the Oracle lawsuit?"

5    And you answer that in question 20.

6    A.    Yes.

7    Q.    In February.  You answer the patches and fixes

8    question.

9    And then 18, "Is it legal for a third-party

10   provider to mass download the contents of Customer

11   Connection"?

12   By February you decided not to answer that

13   question; right?

14   A.    I don't see it here.  When you say "you decided," I

15   didn't decide that, if that's what you're asking.  But I

16   don't see a response to that question in this document, no.

17   Q.    And in 19, there's actually discussion of, "Oracle

18   claiming you're illegally using Oracle intellectual

19   property downloaded from their customer portal.  Is this

20   true?"

21   And by February, you're not answering that

22   question; right?

23   A.    I don't see it here, no.

24   Q.    Now, while you've got that binder, let's turn to tab

25   56.

```
 1              56 has been admitted into evidence, so you can
 2       show it on the screen.
 3       A.    Is it in the binder?  I'm having trouble finding it.
 4       Q.    Yes, tab 56.
 5       A.    Five-six.  Here it is.
 6       Q.    Now, this is an email from Mr. Davichick.  He is in
 7       the sales department; am I right?
 8       A.    That's correct.
 9       Q.    And he is writing to Carl Karcher whose name we've
10       heard, they run Hardee's and other fast food
11       establishments; correct?
12       A.    Yes.
13       Q.    This is in May 2009, so you're working at the
14       company now?
15       A.    Yes.
16       Q.    And he says,
17              "Your license allows anyone to work on your
18       system as long as they stay compliant with your SLA from
19       the vendor."
20              SLA refers to the license agreement with Oracle,
21       right?
22       A.    Software license agreement, yes.
23       Q.    "We will deliver work product that was created in
24       your environments using your application source code."
25              One of the things that he was telling the
```

1421

1    customer was, what we are going to deliver to you is going

2    to come from your environment and not someone else's

3    environment; correct?

4    A.    Correct.

5    Q.    Okay.  And at the time the statement was made, you

6    don't know whether that was true or not; correct?

7    A.    I don't remember if I knew -- I mean, at the time

8    this statement was made, I would have relied on whatever

9    our FAQs were at the time, which I believe were saying that

10   we have processes and control in place to ensure that

11   nothing -- you don't receive anything outside your license

12   agreement.

13   Q.    And you would have understood the same thing about

14   Mr. Davichick, that he wouldn't have known the truth about

15   this one way or the other, he would have been relying on

16   the FAQs?

17             MS. CHUANG:  Objection, calls for speculation.

18             THE COURT:  Sustained.

19   BY MS. DUNN:

20   Q.    All right.  He writes, "We never share fixes or

21   deliverables between clients."

22             That was part of your standard messaging;

23   correct?

24   A.    Part of our standard messaging was that we don't

25   share software between clients.  So I think as part of that

1422

1    you could take that to say fixes and deliverables.

2    Q.    Right.  Because the fixes include software?

3    A.    Yes.

4    Q.    All right.

5              "And each client receives their own unique

6    deliverables that were created in their environment using

7    their source code."

8              That was also part of your standard messaging;

9    right?

10   A.    Yes.

11   Q.    Exhibit 59.  This is now a month later with Carl

12   Karcher.  This has been admitted.

13             All right.  And in the second paragraph it says,

14   "Rimini Street would not be legally able" -- well,

15   actually, let me make sure I identify the players.

16             This is from Mr. Chiu copying Mr. Davichick.

17   Mr. Chiu is a vice-president for onboarding.  He's not

18   involved in sales; correct?

19   A.    He's not part of the sales organization, correct.

20   Q.    And onboarding refers to bringing the client

21   onboard?

22   A.    Correct, getting the customer set up.

23   Q.    And that also involved -- since you're getting the

24   customer set up, you're also talking to customers?

25   A.    Could be, yes.

1423

1    Q.    And so Mr. Chiu is saying,

2              "Rimini Street would not be legally able to

3    extend the software licenses from one client to another."

4              All right?

5              So one of the reasons that you were telling

6    clients that you didn't share software from one client to

7    another was you had the understanding that Rimini Street

8    could not legally extend the software licenses of one

9    client to another client; is that correct?

10   A.    That, I believe, would have been Dennis'

11   understanding, yes.

12   Q.    All right.  And he once again says,

13             "We do, in fact, develop updates for each client

14   independently of all other clients."

15             That was part of the standard messaging; right?

16   A.    Yes.

17   Q.    And that standard messaging was used, to your

18   knowledge, not just by the sales department, but by the

19   onboarding department?

20   A.    I understand it should have been, yes.

21   Q.    And, actually, let me -- the FAQs went to the sales

22   department obviously.  Did they -- weren't they used by the

23   marketing department?

24   A.    They should have been.  I don't know if I can

25   specifically comment if the marketing group used them, but

1424

1    I think they should have.

2    Q.    To your knowledge, were they distributed to the

3    marketing department?

4    A.    I believe they would have been.

5    Q.    And were they distributed to the onboarding

6    department?

7    A.    I don't know.

8    Q.    Do you know any other departments they were

9    distributed to?

10   A.    I don't believe we had a customer care team at that

11   time so it wouldn't have been that.  So, to my knowledge,

12   it would have been sales and marketing.

13   Q.    All right.  If you could turn to tab 425.  This is

14   about the City of Flint.

15          MS. CHUANG:  Your Honor, may we approach before

16   he gets into this document?

17          THE COURT:  Yes.

18      (Sidebar conference held as follows:)

19          THE COURT:  All right.  Speak into the

20   microphone.

21          MS. CHUANG:  With respect to this document and

22   several documents within this --

23          THE COURT:  You can speak a little louder.

24          MS. CHUANG:  Okay.  Thank you, your Honor.

25          With respect to this document and several

1425

1    documents within this binder, as I flip through it, they

2    all predate the time since Mr. Maddock joined the company.

3    As you heard, he joined in December 2008.

4            There's several documents that are dated before

5    that time.  For instance, this 0245 is dated 10/16/2006.

6    Mr. Maddock is not copied.  Obviously he isn't there.

7            My objection to this line of questioning on

8    documents that weren't there -- that are in the binder that

9    wasn't -- that predate Mr. Maddock's employment, lack of

10   foundation, lack of personal knowledge.

11           THE COURT:  All right.

12           Mr. Isaacson?

13           MR. ISAACSON:  The witness was the 30(b)(6)

14   representative on this topic and testified about this

15   document as a 30(b)(6) representative at his deposition.

16   He is -- he spoke on behalf of the corporation.

17           MS. CHUANG:  Your Honor, there's case law

18   that -- there's case law that suggests a 30(b)(6)

19   designation is inapplicable to issues of a witness

20   testimony at trial, which I've brought to Your Honor.  It's

21   *Roundtree versus Chase Bank*.  It's a district court opinion

22   in the Ninth Circuit.

23           And there's also case law that suggests that

24   just because he's a 30(b)(6) designation doesn't erase the

25   fact that he lacks personal knowledge, and there needs to

1426

1   be personal knowledge.

2              MR. ISAACSON:  I would make clear that he lacks

3   personal knowledge, and that he started -- and as I was

4   about to tell him, this is before he joined the company.

5              But this was one of the topics that he spoke on

6   behalf of the company at the deposition.  He was deposed

7   about this specific document.  He gave testimony under

8   oath.

9              And it cannot possibly be that a corporation

10  nominates a representative who gives testimony under oath,

11  and then they can't be examined about it.

12             MS. CHUANG:  He was examined about it.  They

13  have a 30(b)(6) deposition.

14             The proper way to introduce a 30(b)(6)

15  deposition isn't compelling a witness to come on the stand

16  as this case suggests, but play the video deposition.

17             But I will tell you, as a corporate

18  representative, he was prepared on a very narrow issue, and

19  now they're trying to bring this to the case at issue.

20             MR. ISAACSON:  It's not a narrow issue.

21             THE COURT:  All right.  This is my question of

22  counsel.  Has this been clarified in his final deposition

23  that would have been signed off by him?

24             MR. ISAACSON:  I don't know what you mean by

25  clarified, Your Honor.

1   THE COURT:  Well, I assume that his deposition

2   was submitted to him for signature after it was prepared in

3   transcript form; is that correct?

4   MR. ISAACSON:  I assume that -- I'm sure that's

5   correct.  I don't have -- I haven't checked to see whether

6   he signed it.

7   MS. CHUANG:  I'm not sure.  I assume that was

8   correct as well.

9   THE COURT:  Okay.  I'm going to overrule the

10  objection because the topic matter was specifically covered

11  in his testimony as a 30(b)(6) witness.

12  This specific exhibit was identified, as I

13  understand counsel's representation.  The witness spoke

14  concerning the exhibit.

15  I'm going to assume that in the standard course

16  of things, he had an opportunity to review his deposition

17  and sign it or not sign it.

18  If there was an objection to it, or a

19  clarification, I would assume that could have been brought

20  to counsel's attention, certainly to the Court's attention

21  at this time.

22  This is a fair subject matter of

23  cross-examination -- examination of essentially an adverse

24  witness in this case.

25  MS. CHUANG:  And, Your Honor, just to be clear

1428

1    on your ruling, I want to make sure that there's

2    representation by plaintiffs' counsel about all of the

3    documents that predate Mr. Maddock's employment at Rimini

4    Street have been used with him, that he has seen them.

5            For instance, the one that's at issue right now,

6    PTX 0245, has an exhibit number from an O'Brien deposition.

7            MR. ISAACSON:  I have deposition testimony about

8    this document right in front of me.

9            MS. CHUANG:  Okay.  Good.

10           MR. ISAACSON:  And I won't make that

11   representation about everything in the binder, but as I go

12   through my examination, I'll keep an eye on this issue.

13           MS. CHUANG:  Thank you.

14           THE COURT:  All right.  That's the Court's

15   ruling.

16           MS. CHUANG:  Thank you.

17       (Sidebar conference concluded.)

18           THE COURT:  Go ahead, please, Mr. Isaacson.

19   BY MR. ISAACSON:

20   Q.   Plaintiffs' Exhibit 425 which has been -- I need to

21   move to admit this.

22           THE COURT:  There was an objection to 425, and

23   it is overruled.

24       (Plaintiffs' Exhibit 425 received into

25        evidence.)

DONNA DAVIDSON, RDR, CRR, CCR #318    (775) 329-0132

1    BY MR. ISAACSON:

2    Q.    Let's put this on the screen.  Let's click the email

3    at the top.

4           This is an email from Mr. Chiu to the City of

5    Flint.  We talked about Mr. Chiu.  This is back in 2006.

6    This is a couple years before you joined Rimini Street?

7    A.    That's correct, yes.

8    Q.    So you're not around during this period of time, but

9    you're familiar with this because you've reviewed -- you

10   went through this document when you were doing your work as

11   a corporate representative of Rimini Street in your

12   deposition; is that right?

13   A.    I recall that, yes.  I -- yes.

14   Q.    All right.  And so this would have been one of the

15   documents that, before you testified as a corporate

16   representative, you talked about at least in general terms

17   with other people at the company to make sure that you

18   could give testimony on behalf of the company; correct?

19   A.    Several years ago, but that sounds familiar, yes.

20   Q.    And what Mr. Chiu wrote -- and you knew that City of

21   Flint was -- even though you weren't around then, you

22   probably know historically that was Rimini Street's first

23   PeopleSoft client?

24   A.    I knew it was one of our early ones, yes.

25   Q.    And in the third paragraph, Mr. Chiu writes,

1430

1     "As discussed earlier, we wish to create a

2     replica of your test environment which will be used

3     exclusively with the support of your PeopleSoft application

4     and to enable us to perform the necessary development of

5     the tax and regulatory updates set forth in Rimini's

6     services."

7           Now, as of December 2008 through 2011, you

8     didn't know one way or another whether a statement like

9     that was true; is that correct?

10    A.    Let me read the statement again, please.

11    Q.    Sure.

12    A.    Your question again was in December of --

13    Q.    During the period you were actually working at the

14    company, you don't know whether a statement like this is

15    true one way or the other about the City of Flint; is that

16    correct?

17    A.    When you say a statement that this is true about the

18    City of Flint --

19    Q.    That they -- that Rimini Street created a replica of

20    your test environment which will be used exclusively for

21    the City of Flint?

22    A.    So if you're asking do I know what happened relative

23    to the City of Flint, the answer is no, I don't.

24    Q.    Okay.  And at the time of your deposition, you

25    didn't know whether this statement was true one way or the

1431

1     other; is that correct?

2     A.    I would have believed it to be true as it was

3     written here.  But, you know, did I check it myself, no, in

4     terms of checking their environment.

5     Q.    Right.  You believed it to be true, but you didn't

6     check it.  Is that what happened?

7     A.    The technical side of it.  I wouldn't even know what

8     to check.  I'm not a technical person.

9     Q.    All right.  And I understand that, but it's not that

10    technical to say -- you're technical enough to know whether

11    an environment is used exclusively for one customer as

12    opposed to another.  You can handle it at that level;

13    right?

14    A.    I'm not sure I can.

15    Q.    Okay.  And at your deposition you acknowledge that

16    Rimini Street told this customer that the company of the

17    customer's environment would be used exclusively to support

18    that customer; correct?

19    A.    That sounds familiar, yes.

20    Q.    All right.  And that was after you came onboard, it

21    became part of standard messaging to tell customers that

22    their environments would be used exclusively to support

23    that customer; correct?

24    A.    Yes, I think that's correct.

25    Q.    And you have no knowledge, is that correct, that the

1432

1    City of Flint's environment was then -- was then used at

2    Rimini Street as a general testing and development

3    environment; is that right?

4    A.    That's correct.  I have no knowledge of that.

5    Q.    Even today, you don't know whether Rimini Street for

6    years used the City of Flint environment as a general

7    testing and development environment; is that correct?

8    A.    That's correct, I have no knowledge of that.

9    Q.    If I could ask you to turn to the first tab in your

10   binder, number 17.

11            All right.  This is --

12            MS. CHUANG:  I'm sorry, Mr. Isaacson.  I have

13   the same objection to this document.  May I just have a

14   running objection?  Predates his employment.

15            THE COURT:  Yes, the objection is overruled and

16   will be recognized as a continuing objection as was voiced

17   earlier at sidebar.

18   BY MR. ISAACSON:

19   Q.    All right.  The -- now, this is Mr. Chiu writing to

20   Mr. Lester, April 10th, '07, copying Beth Lester.  This is

21   before you joined the company; correct?

22   A.    Correct.

23   Q.    And you recognize this document as, again, another

24   document you testified about as a corporate representative

25   for Rimini Street; correct?

1433

```
 1    A.    It looks familiar, yeah.  I'd have to read through
 2    the whole document, but it looks familiar.
 3    Q.    Well, I can represent to you that you were asked
 4    about this at your deposition.
 5    A.    Okay.
 6    Q.    And this was referring to a kickoff call with
 7    Correctional Medical Services.  Do you see that in the
 8    first sentence?
 9    A.    I do, yes.
10    Q.    And Correctional Medical Services was one of the
11    clients or customers of Rimini Street; correct?
12    A.    I believe they were, yes.
13    Q.    All right.  And if we go down to the second to last
14    full paragraph in the document, "The client raised a few
15    concerns"?
16    A.    Yes, I see that.
17    Q.    All right.
18          "Client raised a few concerns about our intent
19    to set up an in-house environment using their software."
20          And it goes on -- and it says, "because they
21    were unclear as to why we couldn't simply develop using
22    other environments we had for other clients."
23          I believe -- so the client was saying "why
24    couldn't you just use one customer's environment for
25    another?"
```

1434

1     And, "It was reiterated to them that we create

2  unique and independent environments for each client, in

3  accordance with the terms of the use of their software

4  license agreement."

5     Is that consistent with what became the

6  standard -- what you understood to become the standard

7  messaging of Rimini Street beginning in early 2009?

8  A.    Let me just read this before I answer, please.

9     Yes, I'd say that's correct.

10  Q.    And did you have -- did you have you -- when you --

11  well, then the next paragraph talks about questioning "our

12  need for their CC id."  That would be the Customer

13  Connection ID; correct?

14  A.    I don't know for sure, no.

15  Q.    All right.  Well, let's just assume it does?

16  A.    All right.

17  Q.    "And pressed" -- and it says,

18     "pressed us to use our own CC id, whereupon it

19  was again clarified our legal position in using their CC ID

20  exclusively to support them?"

21     Did it become part of standard messaging at

22  Rimini to tell customers that "when we access Oracle

23  websites for you, we will only use your ID or password"?

24  A.    I believe that was part of our messaging, yes.

25  Q.    And when you told Correctional -- when Rimini Street

1435

```
1    told Correctional Medical that they create unique and

2    independent environments for each client, in the previous

3    paragraph, they told Correctional Medical that's because

4    that was in accordance with the terms of use of their

5    software license agreement; is that correct?

6    A.    I don't know if I can say that's correct because I

7    don't know the terms of their software license agreement.

8    Q.    Right.  So you don't know whether there was any

9    basis for Rimini Street to tell this customer that they

10   were acting in accordance with their software license

11   agreement; is that correct?

12   A.    Yeah.  I mean, at the time this was written, again,

13   I wasn't there, so I don't know.

14   Q.    Right.  But even -- even when you were testifying as

15   a corporate representative, even after you talked to people

16   about what was going on in order so that you could testify

17   truthfully for the company, you didn't have any opinion one

18   way or the other as to whether these statements were true

19   or not; correct?

20   A.    I believed them to be true.

21   Q.    You believed them to be true, but you didn't -- you

22   didn't know one way or the other whether they were true;

23   correct?

24   A.    I did not go and check Medical Correction's IDs to

25   see if those were the ones that were used, no.
```

1436

1    Q.    Okay.  Let's look at Plaintiffs' Exhibit 36, which

2    has been admitted into evidence.

3              And this is another document that predates your

4    time at the company.  This is Mr. Davichick.  He's in the

5    sales department then.  You know that much; right?

6    A.    Yes.

7    Q.    Okay.  And he's writing to Wendy's.

8              And you recognize this as a document that was

9    discussed in your deposition when you were testifying as a

10   representative of Rimini Street; correct?

11   A.    Again, reading through it, it looks familiar, yes.

12   Q.    All right.  And it says at the bottom -- this is

13   Mr. Davichick writing,

14              "Rimini Street ONLY," all capitals, "uses its

15   client's licensed software as development and test

16   (non-production) environments to design, develop, and

17   support Wendy's production software."

18              Do you know what production and nonproduction

19   means?

20   A.    At a high level, I do.

21              Production, I believe, is what they're using to

22   run their business, and nonproduction, I believe, is what

23   they use for maybe future development.

24   Q.    Nonproduction would include what's called a testing

25   environment or develop environment?

1    A.    I've heard those terms.

2    Q.    All right.  And you would understand the testing and

3    development environment as being a nonproduction

4    environment?

5    A.    That's what my assumption would be, yes.

6    Q.    And so this statement, that Rimini Street only uses

7    its client's licensed software as develop and test

8    environments to design Wendy's production software, as

9    opposed to supporting another customer's software, you

10   don't -- you don't -- you did not know at the time of your

11   deposition whether that was true or not; right?

12   A.    Yeah.  Let me please just read this again.

13         That my answer would be similar to before.  I

14   believe this to be true.  Did I check Wendy's environment

15   or software myself, no, I didn't.

16   Q.    And when you say you didn't check, that includes you

17   didn't check when you testified under oath about what your

18   company was doing at a deposition as a corporate

19   representative; correct?

20   A.    That's correct.

21   Q.    The -- tab 4931.

22         This is Mr. Davichick again in 2007 before you

23   joined the company, and he's writing -- he has an exchange

24   with Mr. Ravin.

25         And you recognize that this is another document

1438

```
1    again that -- before you joined the company but you

2    discussed at your deposition as the corporate

3    representative; correct?

4    A.    Yes.

5    Q.    All right.  And Mr. Ravin actually is writing to

6    Mr. Davichick about what to say to a client named Dofasco?

7    A.    Yes.

8    Q.    And Mr. Ravin is personally writing at the bottom --

9          MR. ISAACSON:  I need to move to admit this.

10   Sorry.

11         THE COURT:  It will be admitted subject to the

12   continuing objection.

13         MS. CHUANG:  Thank you.

14       (Plaintiffs' Exhibit 4931 received into

15       evidence.)

16   BY MR. ISAACSON:

17   Q.    So let's put it on the screen.

18         There's Mr. Ravin at the bottom writing to

19   Mr. Davichick.  And you can see the name Dofasco.

20         And in that paragraph below it says that -- in

21   the -- in the second line,

22         "Rimini Street, as an independent contractor,

23   will manage additional test and development instances of

24   Dofasco's licensed products."

25         That's referring to Oracle licensed products;
```

1439

```
 1   right?
 2   A.    Yes.  I would imagine it to be, yes.
 3   Q.    "And will not use them" -- "will not be using them
 4   in production or live status."
 5              He goes on to say at the bottom,
 6              "Dofasco reserves its license right to build and
 7   utilize as many test and development instances as it deems
 8   necessary to fully support its production operations, and
 9   may deploy additional test and development instances in the
10   future."
11              He was telling Dofasco, as you understand it,
12   that Rimini could use general test -- could use testing and
13   development environments located at Rimini to support this
14   customer; correct?
15              MS. CHUANG:  Objection, Your Honor, the document
16   speaks for itself.
17              THE COURT:  Overruled in part.  He may inquire
18   in examination concerning the witness's understanding of
19   the statement.
20   BY MR. ISAACSON:
21   Q.    Okay.  It's your understanding that Mr. Ravin was
22   saying that Rimini could use testing and development
23   environments located at Rimini to support this customer;
24   correct?
25   A.    Let me read it one more time, please.
```

1             Yes, I think that's correct.

2     Q.    Now, when you joined the company, your belief, and

3     the belief of your company, was that Oracle itself was

4     endorsing third-party support; correct?

5     A.    When I joined the company, did I believe that

6     Oracle --

7     Q.    Yeah, once you started developing the FAQs?

8     A.    That was a couple weeks after I joined the company.

9     So when you say when I joined, I meant that to believe --

10    Q.    Yeah, I'm sorry.  A little bit afterwards.

11            When you were working on the FAQs, you reached

12    the understanding that Oracle's position was that it

13    actually endorsed third-party support; right?

14    A.    My understanding was that Oracle did not say

15    third-party support was illegal.  So that would be an

16    endorsement of it, I guess.

17    Q.    All right.  And when you joined the company, you

18    said you didn't work on the website.  Did you review what

19    was on the website from time to time?

20    A.    I may have.  I may have.  I'm sure I looked at it

21    once or twice in the early days.

22    Q.    All right.  Are you familiar with the Enterprise

23    Software Observer or J. Bruce Daley?

24    A.    I'm not, no.

25    Q.    Now, in your conversations -- have you -- you had

1441

1    conversations with Mr. Ravin about -- well, once you joined

2    the company -- before you joined the company, did you have

3    conversations with Mr. Ravin about the business plans and

4    goals of Rimini Street?

5    A.    While we were interviewing we would have had

6    conversations to that extent.

7    Q.    All right.  And after you joined the company, did

8    you continue to have conversations with Mr. Ravin about the

9    goals of Rimini Street, how big you would grow, how many

10   customers you would acquire, that sort of thing?

11   A.    We've always stated that -- yes.  The answer's yes.

12   Q.    All right.  During the period when you were

13   interviewing, or when you first joined the company and

14   through, say, 2011, at any point did you understand that

15   Mr. Ravin believed that Rimini could take somewhere between

16   5 and 10 percent of Oracle's customer base?

17             MS. CHUANG:  Objection, calls for speculation.

18             MR. ISAACSON:  I think I've established the

19   foundation, Your Honor.

20             THE COURT:  The objection is overruled.

21             THE WITNESS:  Can you repeat the question,

22   please?

23             MR. ISAACSON:  Sure.

24   BY MR. ISAACSON:

25   Q.    During the period when you were interviewing, or

1442

```
 1   when you first joined the company and through 2011, at any
 2   point did you understand that Mr. Ravin was saying that
 3   Rimini could take somewhere between 5 and 10 percent of
 4   Oracle's customer base?
 5   A.    Yes.
 6   Q.    And after a while Mr. Ravin thought you could do
 7   better, and that he was later estimating that you could
 8   take closer to 25 percent of Oracle's customer base;
 9   correct?
10   A.    I don't remember that figure, no.
11   Q.    Did you understand that he thought -- that after he
12   said 5 to 10 percent, that later he thought he could do
13   better than that; again, through 2011, 2012.  I'm not
14   asking about currently.
15   A.    I don't remember specifically, but, you know, we
16   wanted to grow a business.  We -- some conversations we
17   would state aggressive goals.
18   Q.    And he would describe this to you as a multi-billion
19   dollar opportunity; correct?
20   A.    The term we always used was a billion dollar
21   opportunity.
22   Q.    Okay.  Did you ever hear him talk about a bigger
23   opportunity than $1 billion?
24   A.    I may have.
25   Q.    As part of working with the sales team and the FAQs,
```

1443

1    you familiarized yourself with the competition that Rimini

2    Street faced in support; correct?

3    A.    Yes.

4    Q.    And you familiarized yourself with the competition

5    that Rimini Street faced because you were out selling

6    against other companies?

7    A.    That's correct.

8    Q.    And I would assume it's an important part of your

9    management position to keep up to date with how your

10   competitors are doing, to the best of your ability?

11   A.    In a perfect world, yes, you should keep up with

12   them.

13            THE COURT:  Mr. Isaacson, I'm going to stop you

14   here because it sounds as though you're going into another

15   subject matter.

16            MR. ISAACSON:  That's correct.

17            THE COURT:  We'll take our first break for the

18   morning, ladies and gentlemen, for approximately 15,

19   hopefully no more than 20 minutes.

20            I remind you of the admonitions.  And we'll

21   reconvene shortly.  Thank you.

22            COURTROOM ADMINISTRATOR:  Please rise.

23            THE COURT:  You may step down.

24       (Recess from 9:48 a.m. until 10:14 a.m.)

25       (Outside the presence of the jury.)

1444

1    COURTROOM ADMINISTRATOR:  Please rise.

2    THE COURT:  Have a seat, please.  We are out of

3  the presence of the jury in the open court.  Counsel and

4  parties are present.  And I'm advised counsel wanted to

5  address something.

6    I haven't had a chance to look at those

7  redaction issues that were described on customer responses.

8    MR. HIXSON:  Your Honor, and there is a dispute

9  about whether the documents that Rimini has provided to you

10  are the ones to look at.

11    There are -- the parties have identified some

12  exemplar, we proposed redactions that we are going to brief

13  to the Court later today or tonight.

14    Oracle's objection to what Rimini has given to

15  you is that the documents contain a number of redactions

16  but there's no visual indicator for Your Honor which ones

17  are the exemplars that the parties are going to ask you to

18  rule on.

19    So we're not -- we feel what you've been given

20  is confusing, and we're not sure what you would do with it

21  until somebody tells you what the exemplars are.

22    We would propose that there be some sort of

23  legend or annotation to point to you to -- this is the one

24  we want you to look at.

25    And our other objection is the excerpt of DTX

1445

1      154B.  The real document is a large spreadsheet that has a

2      number of columns, and we will argue that some of those

3      columns, including references to customer names, and a part

4      of the reason why the information is irrelevant, for

5      example, they're irrelevant customer names, Rimini has

6      removed all of those columns, and they've only put a

7      handful of cells on 154B or the excerpt they've given to

8      you, and we believe that's misleading and doesn't fairly

9      represent the document.

10             We believe when the parties submit their written

11     briefing, they should provide the documents as they exist,

12     as they're real, with a notation showing what are the

13     exemplars that we would like you to rule on, and that's

14     just not what has been provided for your Honor today.

15             MR. GRAY:  Your Honor, if I may?

16             THE COURT:  Yes.

17             MR. GRAY:  Michael Gray for Rimini Street.

18             Your Honor, first off this is the -- the

19     allegation that these are irrelevant is incorrect.  In Your

20     Honor's motion in limine ruling, Your Honor pointed out

21     that --

22             THE COURT:  Okay.  I don't need argument at this

23     point because I'm not going to give you any ruling.  I'm

24     just talking about the identification issue that's been

25     raised by Mr. Hixson.

1446

```
 1                    MR. GRAY:  Fair enough.  Okay, your Honor.

 2                    For DTX 154B, we provided Your Honor with the

 3          cells that Oracle would like to have redacted, the

 4          redaction, and the actual print.

 5                    MR. HIXSON:  You provided the ones you want

 6          redacted.  I mean --

 7                    MR. GRAY:  You are the only one who wants a

 8          redaction.  We don't want any redaction.

 9                    We provided four exemplar cells of what they

10          want to have redacted with the actual text and the

11          redaction.  Those are the ones that we thought were

12          exemplars and that Your Honor could use as a ruling.

13                    We did not include all the other cells because,

14          as Mr. Hixson admits, this is a very large document, and

15          the print is very small if we were to print the entire

16          thing out.

17                    We only did that as assistance to Your Honor,

18          and we disclosed exactly which cells to Oracle last night.

19                    THE COURT:  Okay.

20                    Mr. Hixson.

21                    MR. HIXSON:  We believe that when you take their

22          cells and compare them to other columns, it will

23          demonstrate, we will argue in our submission later today,

24          that this information is irrelevant in addition to being

25          admissible hearsay.
```

1447

1     Also, in 154B, Rimini picked a couple of

2  examples of redactions they want to challenge, and then we

3  picked a couple of examples.  Both sides picked 12

4  examples.

5     They included their examples but not ours, so we

6  will have to duplicate their submission later today with

7  our own excerpt of 154B which we believe is insufficient

8  and promotes confusion.

9     THE COURT:  Well, the one thing that's clear to

10  me is that it would be very helpful if the specific Oracle

11  exhibit that you're using as an example can be tabbed with

12  one color tab, and the similar exhibit from Rimini can be

13  tabbed with another colored tab.

14     Actually, you could use the same colors on one

15  and a different color or different number or something like

16  that on the other so that I can contrast one to the other.

17     I just need to have identified in such a way

18  that I can look at one proposal versus the other proposal.

19  So if somehow that could be done, it would assist me, but I

20  suspect I can tell where the parties are going just by

21  what's been presented too.

22     I'm not trying to create a mission that's going

23  to sidetrack the trial or counsel for that matter.

24     MR. HIXSON:  That's fine with Oracle.  Thank

25  you, Your Honor.

1    MR. GRAY:  And, Your Honor, I'd just like to say

2    one more time that this is the first I've heard that

3    there's an objection on relevance.  That's why those cells

4    were not included.

5    So Your Honor already found they are relevant,

6    but we will be happy to file later tonight supplemental

7    pdfs that will point Your Honor to the exact areas that

8    there are exemplars from Rimini Street and from Oracle.

9    THE COURT:  All right.  You can do that.

10    MR. HIXSON:  And the other issue is we had

11    previewed this morning that there were some objections to

12    testimony from Mr. Grigsby of Rimini Street, and we were

13    hoping that now would be a convenient time to argue

14    the merits of that.

15    THE COURT:  Okay.  Do you anticipate getting to

16    that before the next break?

17    MR. ISAACSON:  Not before the next break.

18    THE COURT:  Okay.  Well, let's reserve that one

19    for the next break because I've had some other matters I

20    had to address in chambers, and I'm really not prepared to

21    deal with that at this time.

22    Ms. Chuang, did you have something?

23    MS. CHUANG:  Thank you, Your Honor.

24    I just wanted to raise something outside the

25    presence of the jury.

1    At sidebar Your Honor overruled my objections to

2  the 30(b)(6) witness status of Mr. Maddock.

3    What I've seen from the questioning of

4  Mr. Isaacson is that the status of his 30(b)(6) designation

5  is being used in an improper way that leaves an impression

6  on the jury.

7    As I said at sidebar, he was designated as a

8  30(b)(6) witness to narrow topics, and I have the 30(b)(6)

9  designation notice.

10    He was designated on Rimini's practices for

11  providing references and Rimini's communications with

12  customers.  Those are the only two topics.

13    There were other technical topics in the

14  30(b)(6) notice that was not his charge at his particular

15  deposition.

16    Here the implications with the questions that

17  have been raised is here's a sales message, did you go to

18  the technical side, did you check with technical to see if

19  this was accurate, did you verify the accuracy of these

20  statements, which ultimately leaves an impression with the

21  jury that that was part of his job duty under the guise of

22  a 30(b)(6) witness.

23    There's nothing in his notice that is compelling

24  him to verify the accuracy of these statements, and many of

25  these statements, as you've seen, Your Honor, have been

1450

1    made prior to joining of Rimini Street.

2         So that's just an issue I wanted to bring to the

3    judge because of the impression that's being left.

4         THE COURT:  All right.

5         Mr. Isaacson?

6         MR. ISAACSON:  The actual 30(b)(6) topic that

7    we're discussing is Rimini's communications with customers

8    and prospective customers regarding:

9         A, the legality of Rimini's business practices;

10        B, Rimini's policies regarding Oracle's

11   intellectual property;

12        C, compliance of Rimini Street's business

13   practices with the terms of license agreements with Oracle;

14        Also, the Oracle versus SAP lawsuit in this

15   litigation which I did not address with him.

16        He testified that he recalled those were the

17   topics he was addressing.

18        Counsel seems to be making the unusual argument

19   that his only job at this deposition was to explain what

20   the company was saying and he had no responsibility for

21   understanding whether those statements were true or not in

22   a case about misrepresentations.

23        Now, I'm happy to address with the witness if he

24   thought that that was his province, that his only job was

25   to say what they say and not find out before the deposition

1451

1       whether they were true or not.

2               I believe that that's in effect what he has

3       said.  But there's absolutely nothing improper about this

4       line of testimony --

5               THE COURT:  I've heard enough.  I'll stand by my

6       ruling on this matter.  He was designated as a 30(b)(6)

7       witness.

8               It appears as though the subject matters which

9       were just identified certainly would fall within the scope

10      of the examination, both at the time of deposition and at

11      the time of this testimony, and I will allow reasonable

12      cross-examination into that.

13              So let's bring in the jury, please.

14              COURTROOM ADMINISTRATOR:  Yes, Your Honor.

15          (Jurors enter courtroom at 10:24 a.m.)

16              THE COURT:  All right.  Have a seat, please.

17              The record will show that we are in open court,

18      the jury is all present, Counsel and the parties are

19      present.

20              Ladies and gentlemen, I apologize for the

21      extension of the break, and all I can do is reaffirm to you

22      that I absolutely attempt to make those as minimal as

23      possible.

24              But inevitably, in every lengthier trial, there

25      are some issues that arise that need to be addressed by the

1452

```
 1    Court, and I do everything that I can to move that along

 2    quickly and also to do it before and after you're here, but

 3    still, there are occasions where I need to address

 4    something.

 5              And you should draw no inference from that

 6    whatsoever, one way or the other, it's just the way we have

 7    to do our trials.

 8              So at this time, we're in the course of the

 9    cross-examination of Mr. Maddock, and you may go forward,

10    Mr. Isaacson.

11              MR. ISAACSON:  Thank you, Your Honor.

12    BY MR. ISAACSON:

13    Q.    Mr. Maddock, we were talking about when you joined

14    the company, December of 2008, and how as part of your job

15    you paid attention to what the competition was doing.

16              When you were going through the interview

17    process, did you talk to Mr. Ravin about who the

18    competition was?

19    A.    I don't remember that, no.

20    Q.    And -- but as soon as you joined the company, one of

21    your focuses was to learn about your competition so that

22    you could deal with it from the perspective of the head of

23    sales?

24    A.    That would have been something that I would have

25    looked at, yes.
```

1453

1    Q.    Okay.  And one of the things that at some point you

2    must have quickly learned was that one of your competitors,

3    TomorrowNow, had closed in October 2008, a month or so

4    before you joined the company?

5    A.    Yes, I was aware of TomorrowNow.

6    Q.    Okay.  And so at the point when you joined the

7    company, and through -- through 2009, your view was for

8    third-party support, you didn't have any competition from

9    any other third-party support providers.  Your only

10   competition for Oracle support was Oracle?

11   A.    Through -- the date again on that?

12   Q.    From the time you joined the company through the end

13   of 2009?

14   A.    I don't recall.  I believe there were a couple other

15   small competitors.

16            MR. ISAACSON:  All right.  Well, let's look at

17   PTX 5350.  I'm not sure if that's been --

18            COURTROOM ADMINISTRATOR:  5350?

19            MR. ISAACSON:  Which I would move to admit.

20            MS. CHUANG:  No objection, Your Honor.

21            THE COURT:  It's admitted.

22        (Plaintiffs' Exhibit 5350 received into

23        evidence.)

24   BY MR. ISAACSON:

25   Q.    It has very small print, so Matt's going to help us

1454

1    out here.

2              Now, on the last page, the third page, Tim

3    Piechowski is writing to you.  Is he one of your

4    salespeople?

5    A.    He was, yes.

6    Q.    Okay.  And what he's talking about is what pricing

7    to offer a customer and whether you should go below your 50

8    percent model; correct?

9    A.    That's correct.

10             MR. ISAACSON:  Okay.  So let's go up to the

11   first page.  And make it bigger at the top, Matt.  Do

12   the -- yeah.

13   BY MR. ISAACSON:

14   Q.    Okay.  So this is you writing in December 2009;

15   correct?

16   A.    Correct.

17   Q.    It's right before the holidays, and you've been on

18   the job for about a year.  I've got that right?

19   A.    That's correct, yes.

20   Q.    Okay.  So given -- you write, "Given our 50 percent

21   off model" -- that's referring to 50 percent off of Oracle

22   support; right?

23   A.    Correct.

24   Q.    "I REALLY," all capital letters "hate discounting,"

25   and that's referring to discounting off of 50 percent off;

1455

1    correct?

2    A.    Yes.

3    Q.    And the reason you really hate discounting, you're

4    telling Mr. Piechowski, you hate discounting anything,

5    particularly when you have no competition.

6              And when you say "discounting anything," you

7    mean any amount below 50 percent; right?

8    A.    That would be correct, yes.

9    Q.    And what you're telling Mr. Piechowski is, at end of

10   2009, your view was you had no competition, and by that you

11   would have been referring to other third-party support?

12   A.    Yeah.  I mean, this email may have been referring to

13   competition on a particular deal, not just no competition

14   period.

15   Q.    Right.  But you weren't talking about competition --

16   you didn't make reference to no competition on a particular

17   deal, did you?  You said, "I hate discounting, particularly

18   when we have no competition."

19   A.    There's no reference in this email referencing other

20   competition on this deal, correct.

21   Q.    When you mentioned the possibility of minor

22   competitors, you had no major competitors in 2009; correct?

23   A.    No, not correct.

24   Q.    I'm sorry?

25   A.    I said not correct.  I don't agree with that.

1456

1      Q.    Who would you consider a major competitor in 2009

2      other than Oracle?

3      A.    There was a company named Spinnaker in 2009 that we

4      competed with.

5      Q.    Spinnaker was only JD Edwards; right?

6      A.    From what I remember at that time, yes.

7      Q.    And Spinnaker was JD Edwards only -- JD Edwards only

8      through 2009, 2010, 2011, 2012; correct?

9      A.    I don't remember the exact date that they started

10     bringing on other products, but certainly in 2009 they

11     would have been -- only have been JD Edwards.

12     Q.    Okay.  We'll go back over that a little bit later.

13            But so in 2009, you -- your view was you had no

14     competition with respect to support of PeopleSoft, correct,

15     other than Oracle?

16     A.    There was a company named CedarCrestone that I

17     believe was in the market in 2009.

18     Q.    All right.  Anybody else?

19     A.    There was a company named NetCustomer that I believe

20     said that they offered PeopleSoft.

21     Q.    Did they?

22     A.    We didn't see them in a lot of deals, so I don't

23     know.

24     Q.    So you didn't even know if NetCustomer was a

25     competitor in 2009; is that right?

1    A.    They were listed on our -- from what I recall, they

2    were listed on our FAQs as a competitor.

3    Q.    All right.  That wasn't my question.

4          In 2009, you didn't even actually know whether

5    they had any PeopleSoft customers or were actually

6    competing; correct?

7    A.    I don't remember if they had customers or not.

8    Q.    Okay.  And CedarCrestone, is it your memory that

9    they were a competitor in 2009?

10   A.    2009 -- certainly my early days at Rimini Street.

11   Q.    But you don't know whether in 2009?

12   A.    I seem to remember them being a competitor in 2009,

13   yes.

14   Q.    And you didn't consider them to be a major

15   competitor, did you?

16   A.    I wouldn't say a big competitor.  They showed up in

17   deals, some deals.

18   Q.    All right.  They were not a big competitor, they

19   were just a competitor that showed up in some deals.  Is

20   that an occasional deal?

21   A.    Yeah, I would say they showed up maybe 10 percent,

22   so not the majority.

23   Q.    So 90 percent of the time they were not showing up.

24         All right.  So let's talk about Spinnaker.  Now,

25   Spinnaker -- JDE was the only product line where -- at

1  least as of 2011, 2012, JD Edwards was the only product

2  line where Spinnaker offered Rimini any real competition;

3  correct?

4  A.    In 2011 and 2012 you said?

5  Q.    Through 2011 and 2012.

6  A.    That's my memory, yes.

7  Q.    Okay.  And so just to be clear, that meant they

8  offered third-party support for JD Edwards, but Spinnaker

9  did not offer third-party support for PeopleSoft or Siebel

10  through those years?

11  A.    That's correct.

12  Q.    So for customers leaving -- actually, let me -- and

13  at least as of 2009, Spinnaker itself was, in your view, a

14  weak competitor; correct?

15  A.    I don't know if I would agree they were a weak

16  competitor.  They showed up in many of our JD Edwards

17  deals, and they beat us on many.

18  Q.    Well, they were a very recent -- in the beginning of

19  2009, they were a new entrant or very recent entrant to

20  third-party support; correct?

21  A.    That's what I call it, yes.

22  Q.    And third-party support was not their main business.

23  Their main business was supply chain and system consulting?

24  A.    That was my understanding at the time, yes.

25  Q.    Okay.  And they had a -- they had an unproven track

1    record of support for this mission-critical software;

2    correct?

3    A.    In early 2009, I would agree with that.

4    Q.    Right.  And, in fact, you were aware of reports that

5    they were having a hiring freeze in 2009?

6    A.    I do remember reports to that effect, yes.

7    Q.    All right.  And it was your view in 2009 that this

8    was possibly a company that wasn't going to make it, they

9    weren't viable in the future?

10   A.    We did hear some reports to that extent.

11   Q.    Okay.  And those were reports that you repeated to

12   customers?

13   A.    That's correct.

14   Q.    Okay.  And that you told your salespeople to report

15   to customers.

16   A.    Yes.

17   Q.    And Spinnaker for the JD Edwards support charged a

18   premium, an amount above the 50 percent, for

19   customizations, interoperability and configuration;

20   correct?

21   A.    That's what I remember, yes.

22   Q.    All right.  So they were charging more than Rimini

23   Street; correct?

24   A.    For like-to-like services, yes.

25   Q.    All right.  And they would have escalation clauses

1460

1    in their contract -- in their multiple year contract so

2    that they could increase those prices, which is something

3    Rimini wasn't doing; correct?

4    A.    It's correct that Rimini was not doing that.  I

5    don't remember if JD -- or if Spinnaker was doing that at

6    that time.

7    Q.    And they had no track record of actually being able

8    to provide support for tax and regulatory updates; correct?

9    A.    Certainly on a global basis, I remember that being

10   the case.  In North America, I think they did provide tax

11   and regulatory updates.

12   Q.    Well, let me ask you -- all right.

13         The -- 5352, which has been admitted.  Could you

14   put this on the screen.

15         This is dated at the top April 14th, 2011, and

16   here do you see that there's a distribution going on of the

17   most recent FAQs?

18   A.    It looks that way, yes.

19   Q.    Okay.  And if we can go to page 5 of 20.  You see

20   sales FAQs.

21         All right.  So these are your FAQs as of the

22   time?

23   A.    They look that way, yes.

24   Q.    All right.  So now we're in 2011, not 2009.  And if

25   we go to page 12 of 20.  All right?  There's Spinnaker at

1461

1     the bottom, JD Edwards.

2              All right.  And it says the core business is

3     systems hosting and supply chain consulting.  That's what

4     we talked about before.  Support was not their core

5     business; correct?

6     A.    Yes.

7     Q.    Okay.  And the second bullet is about how they were

8     charging more than you do for the same services; right?

9     A.    Yes, that's correct.

10    Q.    And the third bullet is about how they were

11    increasing those prices over time?

12    A.    Yes.

13    Q.    All right.  And then the sixth bullet, the last one,

14    is flat or negative growth in JDE clients in the last year.

15    So the business between -- at least from 2010 into 2011

16    stopped growing; right?

17    A.    Based on what this says here, yes.

18    Q.    All right.  And that -- as far as you knew, those

19    were true statements; correct?

20    A.    Yeah, I would have believed them to be true.

21    Q.    Now, this is -- we talked before about things you

22    believed to be true versus what you knew to be true.

23              With respect to statements about your

24    competition, those are statements that you could

25    actually -- when you made these statements, these were

1462

```
 1     based on your own investigation, or your sales department
 2     or sales and marketing department's investigation?
 3     A.    Yes, marketing department's investigation.
 4     Q.    You actually had a firmer grasp about whether these
 5     statements are true than the ones we were talking about
 6     earlier today; correct?
 7     A.    I would agree with that, yes.
 8     Q.    All right.  The -- and by 2000 and -- so that's
 9     Spinnaker.  And they were your only competitor at the
10     beginning of 2000 -- only major competitor at the beginning
11     of 2009.  That's correct; right?
12     A.    It depends how you define major.  They were
13     certainly the strongest competitor.
14     Q.    The -- now, you also would tell customers that
15     compared to Spinnaker, Rimini had a stronger management
16     team; correct?
17     A.    That's correct.
18     Q.    You supported more customers; correct?
19     A.    Correct.
20     Q.    And that you supported customizations and
21     interoperability at no additional cost; correct?
22     A.    Yes, that's correct.
23     Q.    All right.  And you also -- it was the case that
24     Rimini, as Rimini has told the jury, had a third-party -- a
25     group within the company devoted to tax, legal, and
```

```
 1    regulatory research of its own, Spinnaker did not have
 2    that?
 3    A.    Are you looking at --
 4    Q.    No, I'm not looking at that document.
 5    A.    Okay.  Yeah, I remember that being part of our
 6    messaging, yes.
 7    Q.    Okay.  And you understood that to be true?
 8    A.    I did.
 9    Q.    Okay.  And tax and regulatory updates were important
10    to customers; right?
11    A.    Yes.
12    Q.    The -- and so just to make that clear, if you're not
13    providing tax and regulatory updates, you have the software
14    that's doing payroll and withholding, and it's not keeping
15    up with the current laws, so you could actually be getting
16    all of that wrong.
17    A.    That's what tax and regulatory updates do, yes.
18    Q.    Right.  And you also had the understanding and told
19    customers that Rimini was rated as a strong company by
20    major analysts, but Spinnaker had very little coverage by
21    any analysts?
22    A.    Yes, that was part of our message.
23    Q.    So in terms of analysts who were following the
24    industry, Rimini was a major company, and Spinnaker did not
25    have a following?
```

1464

1    A.    You're asking if I agree with that statement?

2    Q.    Yes?

3    A.    They had much less of a following than we did.

4    Q.    All right.  And Spinnaker at some point then started

5    losing key staff; correct?

6    A.    I remember that, yes.

7    Q.    Okay.  And then you would go out -- you and your

8    sales force would go out in the marketplace and tell

9    customers that Spinnaker was losing key staff?

10   A.    That did occur, yes.

11   Q.    So in terms of this 2009 to 2011 period, you know,

12   when a customer was choosing Rimini Street, it really

13   didn't have a choice of going to Spinnaker, did it, even

14   for JD Edwards?

15   A.    I don't agree with that, no.

16   Q.    Okay.  If it went to JD Edwards, it wasn't going to

17   have reliable tax and regulatory updates, it wasn't going

18   to have effective management, it was going to be joining a

19   company that was stagnant and who was laying off employees.

20   All of that is true; right?

21   A.    I agree with all -- I'm still not clear on the tax

22   and regulatory updates.  My understanding was that they did

23   have tax and regulatory updates, not as much of a dedicated

24   team that we had that you just brought up.

25   Q.    All right.  You believed and told customers that

1465

1    there was a risk that they had inaccurate tax and

2    regulatory updates; correct?

3    A.    I don't remember saying the terms inaccurate.  We

4    may very well have said ours was superior, or --

5    Q.    Well, when you talk about superior, I mean, tax and

6    regulatory, you either get it right or you get it wrong,

7    right?

8              I mean, you have to get the correct tax number

9    in -- tax number or tax rule in there or else you've got

10   wrong information, right?

11   A.    Yeah, if the information is not correct, it would be

12   wrong, yes, I agree with that.

13   Q.    Right.  So when you're saying specifically about tax

14   and regulatory updates, and when you're saying you've got

15   superior service, that might be a qualitative thing.

16             But when you're talking about tax and regulatory

17   updates, you're actually talking about this other company

18   getting it wrong; correct?

19   A.    I don't recall us talking about getting it wrong.

20   What I recall about us saying was that we had a more robust

21   group.

22   Q.    Would you -- would you say -- it is -- it is fair to

23   say that you were saying correctly and giving the

24   impression correctly that if you were working with an

25   inferior provider of tax and regulatory updates, that they

1466

1    could get it wrong?

2    A.    I would say that would be a way it could be

3    interpreted, yes.

4    Q.    Now, by early 2009, you and Mr. Ravin were also

5    talking about your opportunities to actually bury Spinnaker

6    and put them out of business?

7    A.    Yeah, I saw that email in my depositions, yes.

8    Q.    All right.  Well, let's look at 5432 which I would

9    move to admit.

10              MS. CHUANG:  No objection.

11              THE COURT:  It's admitted.

12         (Plaintiffs' Exhibit 5432 received into

13         evidence.)

14    BY MR. ISAACSON:

15    Q.    All right.  Let's look at the second page of the

16    email.

17              Now, eventually you are -- you're actually

18    copied on this email at the top, but this is Mr. Rowe from

19    the marketing department writing on the second page;

20    correct?

21    A.    Yes.

22    Q.    All right.  You can see Mr. Rowe, and then how

23    you're copied on that, and this is March 2009.  So you've

24    been on the job for three months or so?

25    A.    Approximately, yes.

1   Q.   All right.  And you're looking for the -- he's

2   looking for the Spinnaker link.  He says,

3            "It's still hard to find, had to search on

4   Spinnaker JDE support to get them to pop up, and then it's

5   called www.spinnakermanagement.com."

6            So he's saying it's not even easy to find them

7   on the -- through an Internet search?

8   A.   That's what it appears, yes.

9   Q.   All right.  Obviously still a consulting firm.

10  That's what we were talking about before, support is not

11  their principal business?

12  A.   That's what it refers to.

13  Q.   "Looks like support comes third to consulting and

14  execution.  They also don't have someone in exec staff that

15  runs the support business."

16            They don't even have an executive that runs the

17  support business.  That's what that's saying; right?

18  A.   That's what Dave's reporting there -- is that Dave

19  or Brian reporting that?

20  Q.   This is -- I believe it's Dave.

21            "Benson is listed as leading the support LOB on

22  an interim basis."

23            So the person leading the support is there only

24  on an interim basis, correct?

25  A.   I mean, I don't know who that individual is, but

1468

1    that's what this is stating, yes.

2    Q.    And what he's reporting is that, based on the

3    website, seems like this is a sidelight business for them

4    still."

5    A.    Yes.

6    Q.    All right.  Now, on the next page at the bottom,

7    Mr. Slepko is writing to Mr. Ravin and copying you.  This

8    is again March 20th.

9            And he's reporting that based on his analysis,

10   that Spinnaker's most likely losing money right now; right?

11   I'm sorry, this is Mr. Ravin writing?

12   A.    Yes, this is Seth writing.

13   Q.    This is Mr. Ravin writing to you and Mr. Slepko, as

14   well as his cofounder Mr. Shay, along with Mr. Rowe in

15   marketing, and he's saying Spinnaker's most likely losing

16   money right now; right?

17   A.    Yes.

18   Q.    Okay.  And he says -- his conclusion is,

19           "We need to bury them by taking away their

20   renewal business in the back half of 2009, pushing them

21   further into loss territory and maybe destroy them."

22           What's the renewal business?

23   A.    The renewal business would be the second year that

24   the clients come back on to buy another year of support.

25   Q.    All right.  So he is saying that what you need to do

1469

1    is to take away those renewals in the second year and

2    destroy them; right?

3    A.    Yes.

4    Q.    Okay.  And then you respond about his analysis of

5    whether they're making money.  You say,

6              "I would say breaking even is absolute best

7    case."

8    A.    That's correct.

9    Q.    And he then says,

10             "Absolutely.  If we take away a chunk of the

11   renewals and keep them from getting much new business, we

12   really put them in a world of hurt."

13             And that was the business plan right then for

14   Spinnaker; right?

15   A.    Well, that was what this email communication was.  I

16   don't recall if we actually put a full plan into place for

17   it.

18   Q.    Well, you agreed with Mr. Ravin that there was a

19   possibility that you could destroy Spinnaker at that point?

20   A.    I did.

21   Q.    In fact, you thought you could take the renewal

22   business away from them and just take the oxygen out of the

23   air and destroy them?

24   A.    I did, yes.

25   Q.    And that was your major competitor in 2009?

1    A.    Yes.

2    Q.    And then later in 2009 -- let's look at PTX 5471.

3              This is now an actual email from you in the

4    middle of 2009 following a -- so now you're on the job

5    about nine months; right?

6    A.    Yes.

7    Q.    Okay.  And you're talking about Spinnaker.

8              MR. ISAACSON:  And I need to move to admit.

9              MS. CHUANG:  No objection.

10             THE COURT:  It's admitted.

11        (Plaintiffs' Exhibit 5471 received into

12        evidence.)

13             MR. ISAACSON:  Let's put 5471 on the screen.

14   BY MR. ISAACSON:

15   Q.    All right.  Now, you're talking to -- I've

16   mispronounced this gentleman's name before, Walter

17   Hakenewert?

18   A.    Hakenewert, yes.

19   Q.    I'm getting better at that.

20             Is he in sales?

21   A.    He is, yes.

22   Q.    He reports to you?

23   A.    At this point in time he did, yes.

24   Q.    And he's saying,

25             "We absolutely need to beat Spinnaker on these

1    deals," referring to some JD Edwards' deals; right?

2    A.    Yes.

3    Q.    "Below are some points to use as a discussion about

4    FUD."

5              FUD is fear, uncertainty, and doubt; correct?

6    A.    That's correct.

7    Q.    And so what you're talking about here is how to

8    communicate to the customers that they should have fear,

9    uncertainty, and doubt about Spinnaker; correct?

10   A.    Correct.

11   Q.    All right.  And so what you say there are -- you

12   say,

13              "There are rumors surfacing that Spinnaker is

14   experiencing serious financial difficulties and had to make

15   cuts to employee compensation.  Many employees believe

16   Spinnaker will not be viable in the future.  Rimini Street

17   has received inquiries from Spinnaker employees seeking

18   alternative employment."

19              All right.  Those were -- that was information

20   that you then began to communicate to customers; correct?

21   A.    That's correct.

22   Q.    All right.  You say,

23              "It is our estimates that they are losing money

24   and did the salary cut as opposed to layoffs because

25   layoffs would have sent too negative a message to

1472

1    marketplace."

2            You also began to tell customers that as well;

3    right?

4    A.    We likely did, yes.

5    Q.    You say in the last paragraph,

6            "Additionally Rimini Street will shortly

7    announce the most extensive support and tax and reg support

8    available for JDE's products, and such global offering will

9    significantly eclipse Spinnaker's team and offerings to JDE

10   clients.  This expanded offering and service team will

11   remove any remaining services that Spinnaker offers today

12   that Rimini Street has not offered in the past and then

13   goes beyond Spinnaker's offering in every service feature."

14           That's how you described Spinnaker to your

15   customers; correct?

16   A.    As of August of 2009, yes.

17   Q.    Right.  And you thought -- you thought this was

18   correct and knew it to be correct?

19   A.    Yes.

20   Q.    All right.  And basically at this point Spinnaker's

21   cutting salaries, it's declining, and you're surprised

22   they're even still in business?

23   A.    We heard they were cutting salaries, I agree with

24   that.  We had heard that their sales may have been

25   declining.  I don't know if I can say I was surprised that

1    they were still in business.

2    Q.    Well, you thought that -- you were hearing comments

3    from people saying that people were surprised they were

4    still in business?

5    A.    Or that they were worried that they may not be in

6    business in the future.  I don't know if I specifically

7    remember the comment "surprised they're still in business."

8    Q.    "We thought they were a sinking ship," and people

9    were telling you that they were surprised Spinnaker was

10   still in business?

11   A.    That may have been.  I don't know if it was those

12   exact words.

13            MR. ISAACSON:  All right.  Well, let me see if I

14   can remind you.  This would be January 5th, 2012,

15   deposition, the individual deposition, at page 138, line

16   15, and I would propose to play 138, line 15, through 1396,

17   6.

18            COURTROOM ADMINISTRATOR:  Whose deposition is

19   this?

20            MR. ISAACSON:  This is Mr. Maddock's deposition,

21   his January 5th, 2012 deposition.

22            And we have extra transcripts.  If I may

23   approach and give one to the --

24            COURTROOM ADMINISTRATOR:  January 5th you said?

25            MR. ISAACSON:  Do you want me to give one to the

1474

```
 1    witness?
 2                THE COURT:  Just give it to Dionna.
 3                MS. CHUANG:  Your Honor, I'm unclear.  Is he
 4    just refreshing recollection?
 5                MR. ISAACSON:  Yes.
 6                So, Your Honor, page 138, beginning at line 15,
 7    through 139 at line 7 -- line 6, I'm sorry.
 8                THE COURT:  All right.  You may do so.
 9                MR. ISAACSON:  Matt, would you play that for the
10    witness.
11            (Videotape deposition of Kevin Maddock played
12             as follows:)
13         "Q.   And what did Mr. Slepko report?
14         "A.   Would you like me to read it?
15         "Q.   Sure.
16         "A.   "Sorry, Seth, I couldn't resist letting the
17         team know.  Just got off the phone with a guy that
18         is close to 5XTN folks that went over to
19         Spinnaker, and he shared some very interesting
20         intel.  Spinnaker just cut salaries by 10 percent
21         across the board.  Comments he is hearing from the
22         folks there.  Surprised Spinnaker is still in
23         business.  Believe they will go under.  Worried.
24         Just hanging on."
25         All in quotes.
```

1    "Q.   And what was your reaction to this

2    email?

3    "A.   I wrote, "Yup, this is the time the

4    investors would love to get out, if the ship is

5    sinking?"

6    BY MR. ISAACSON:

7    Q.   Does that help you remember that you were receiving

8    reports where people were saying that they were surprised

9    that Spinnaker was still in business, and you were

10   describing Spinnaker as a sinking ship?

11   A.   Yes, it does.

12   Q.   And the investors that would love to get out, were

13   those investors in Spinnaker?

14   A.   That's what I believe I was referring to, yes.

15   Q.   Now, it is the case, isn't it, that when an Oracle

16   customer chooses not to go to Rimini Street, in most cases

17   they stay with Oracle?

18   A.   That's correct, yes.

19   Q.   Okay.  In fact, your most frequent competitor in

20   support for Oracle software is Oracle?

21   A.   That's correct.

22   Q.   And since TomorrowNow closed and you joined Rimini

23   Street, your most frequent competitor is not Spinnaker,

24   it's not any other company, for Oracle support, it's

25   Oracle?

1476

1    A.    That's correct.

2    Q.    Now, it's your understanding, based on your

3    discussions with customers and your salespeople with

4    customers, that Oracle rarely charges reinstatement fees;

5    isn't that correct?

6    A.    That's what I understand, correct.

7    Q.    Let's go over what reinstatement fees are.

8          If a customer leaves Oracle -- the jury has

9    heard discussion in this case, you don't know this?

10   A.    Okay.

11   Q.    The jury's heard that if they want to come back to

12   Oracle, there could be a reinstatement fee, that you would

13   have to pay those past years that you were gone.

14         So if someone went to Rimini Street and then

15   decided, no, I don't like it there, I'm going back to

16   Oracle, they would be charged a reinstatement fee, and it's

17   your understanding that Oracle normally waived that fee and

18   rarely charged it, correct?

19   A.    That is my understanding, yes.

20   Q.    And you would actually tell customers that so that

21   they would have comfort that they could go back to Oracle?

22   A.    That's correct.

23   Q.    Now, you mentioned some other third-party support

24   companies.  Taking them all together, and during this

25   period 2009 through 2012, okay, Rimini Street was the only

1477

```
 1        third-party support company that supported more than one --
 2        that supported more than one product line; is that
 3        correct?
 4                   Oh, I'm sorry.  I misstated that.  Let me start
 5        over.
 6                   It generally was the case that the other
 7        third-party support companies would only support one
 8        product line, that is, only JDE, only Siebel, only
 9        PeopleSoft?
10        A.    I believe that's accurate, yes.
11        Q.    And Rimini has many more -- during that period had
12        many more customers for third-party support than any other
13        third-party support company you might happen to name;
14        right?
15        A.    I agree with that, yes.
16        Q.    All right.  And unlike those other third-party
17        support companies, you were the only one who was actually
18        dedicated to third-party support, the others all had other
19        businesses as well?
20        A.    Yes, that's correct.
21        Q.    For example, some of them were consulting -- offered
22        consulting services, and Rimini Street generally didn't do
23        that?
24        A.    Correct.
25        Q.    Okay.  You mentioned a company called NetCustomer.
```

1478

1     Now, in general, Rimini Street believed that

2  NetCustomer's business model was dead wrong and would fail;

3  is that fair?

4  A.   I think that's fair.

5  Q.   Okay.  Would you describe why?

6  A.   I believe because -- this goes back many years, but

7  I believe it was because they were an offshore model, and I

8  just don't remember us having a lot of understanding of

9  their model and seeing them in a lot of deals.

10  Q.   Now --

11  A.   I think they may -- I think they may have done

12  something where they reported to work with PeopleSoft

13  customers.  I don't recall the specifics.

14     But what I recollect about NetCustomer was that

15  they were an offshore model and didn't seem to have a lot

16  of customers.

17  Q.   Did you say didn't see a lot of customers?

18  A.   Didn't seem -- we didn't hear that they had a lot of

19  customers.

20  Q.   Okay.  So they didn't have a lot of customers as far

21  as you know; is that correct?

22  A.   That's correct, yes.

23  Q.   And by an offshore model, you mean they were -- 100

24  percent of their support people were located outside the

25  United States and were trying to support inside the United

1479

1    States?

2    A.    That's what an offshore model would be, yes.

3    Q.    And, in this case, you understood them to be fairly

4    far offshore, they were in India?

5    A.    That's what I remember, yes.

6    Q.    And your understanding and belief was they were not

7    succeeding with that model, trying to support US customers

8    100 percent from India?

9    A.    That's what I remember, yes.

10   Q.    All right.  They also -- in addition, NetCustomer

11   did not, as you understood it, have any extensive

12   experience with clients?

13   A.    Meaning that they didn't have a lot of clients?

14   Yes.

15   Q.    Right.  Or past experience with -- the people

16   working there didn't have any prior experience with

17   clients?

18   A.    I don't remember that specifically, but if I were to

19   look at the FAQs, my guess is that that would be there.

20   Q.    I don't want you guessing.  5352, which has been

21   admitted.  We looked at this before.  Let's go to page 12.

22         We looked at -- we looked at Spinnaker support

23   on here.  Let's look at NetCustomer.

24   A.    Okay.

25   Q.    All right.  Here are the points:

1     "Infrequently see NetCustomer in deals," you've
2   mentioned that?
3   A.    Yes.
4   Q.    You've mentioned "provides remote support from
5   India."
6   A.    Yes.
7   Q.    You've mentioned "does not appear to have extensive
8   experience or clients."
9   A.    Yes.
10  Q.    "Claims to have helped PeopleSoft directly with
11  support services in the past, but this was simply a
12  help-desk operation passing calls to technical resources at
13  PeopleSoft."
14        You understood that to be correct; right?
15  A.    I did.  And I -- I was trying to reference that
16  earlier when I said I recalled that they were doing
17  something with PeopleSoft.
18  Q.    Right.  When you say they were doing something with
19  PeopleSoft, they would answer the phone and then have you
20  talk directly to PeopleSoft, that is, Oracle?
21  A.    Yes.
22  Q.    Just a phone pass-through outfit?
23  A.    Yes.
24  Q.    You did not -- and then, "they had no credible
25  reference clients"; right?

1481

1    A.    Yes.

2    Q.    They didn't have any credible clients who would give

3    them a good referral?

4    A.    Not that our marketing group could find, no.

5    Q.    Okay.  You did not find them to be a viable

6    competitor?

7    A.    I did not, no.

8    Q.    Okay.  While we've got the document open, let's take

9    a look at CedarCrestone.

10            All right.  This is another company whose prior

11   business was consulting, not support; right?

12   A.    That's correct.

13   Q.    Okay.  "They provide alternative support behind the

14   scenes," you say because they didn't want to raise Oracle's

15   ire; right?

16   A.    Yes.

17   Q.    All right.  "They don't recommend to clients so that

18   they leave Oracle annual support."

19   A.    Yes.

20   Q.    So all they're doing is offering support on top of

21   Oracle's support; correct?

22   A.    That's what I remember it to be.

23   Q.    All right.  And they have less than 100 clients,

24   correct?

25   A.    Yes.

1482

1    Q.    Only PeopleSoft?

2    A.    Yes.

3    Q.    The majority of that is to one PeopleSoft product

4    HCM.  I'm sorry, no, I'm saying this wrong.

5          The majority of their resources are dedicated to

6    a consulting practice; right?

7    A.    That's right, yes.

8    Q.    Okay.  And they don't offer fixed fees, they go up

9    with inflation?

10   A.    Yes.

11   Q.    With the CPI?

12   A.    Yes.

13   Q.    Let's finish off this -- the other ones on the next

14   page.

15          Versytec and Abtech Support, you considered

16   those even less consequential competitors than the ones

17   we've been discussing; right?

18   A.    I wouldn't agree with that.

19   Q.    Okay.  Well, let's get your ranking of them.  I

20   gather -- you told me Spinnaker would have been your most

21   prominent competitor?

22   A.    Yes.

23   Q.    Who is second?

24   A.    CedarCrestone.

25   Q.    That's the one who has less than 100 customers and

1483

1     is offering client support on top of Oracle support;

2     correct?

3     A.     Yes.

4     Q.     All right.  And who is third?

5     A.     Third I would say is Versytec.

6     Q.     Then who is at the bottom, NetCustomer or Abtech

7     Support?

8     A.     NetCustomer.

9     Q.     Let's look at Versytec.

10               "Longtime niche vendor."  What does a niche

11    vendor mean?

12    A.     My understanding is that they would be focused on

13    one particular type product line.

14    Q.     Okay.  And what's that one product line here?

15    A.     JD Edwards.

16    Q.     All right.  And they appear to be a much smaller

17    player.  You've got them ranked fourth here.  They're a

18    smaller player than the other three?

19    A.     Yeah, that was my understanding.

20    Q.     And they'd had no new clients or updates on their

21    website since 2004.

22    A.     Yeah, that's what our marketing department reported.

23    Q.     And they were providing poor service; is that

24    correct?

25    A.     I recall us getting some reports from some of their

1484

1   clients saying they were providing poor service, yes.

2   Q.    Okay.  Now, there was one Siebel company.

3         Now, Abtech.  Abtech is the only company

4   providing Siebel support other than Rimini Street; correct?

5   A.    That's correct.

6   Q.    And, I'm sorry, you told me, I can't remember if you

7   had them below or above NetCustomer?

8   A.    I had them at number four.

9   Q.    "Little-known hardware and network support

10  organization."

11        It was an organization that had very little

12  presence in the marketplace; correct?

13  A.    Yes.

14  Q.    "Claims to provide support for Siebel."

15        But you didn't actually know whether they did?

16  A.    What I remember is we didn't know what customers

17  they may have had.

18  Q.    All right.  In fact, you say, "Rimini Street has

19  rarely seen Abtech in a deal."

20        You rarely went out to the market to talk about

21  a sale to a customer and have Abtech involved, correct?

22  A.    They did not show up in a lot of deals, yes, that's

23  correct.

24  Q.    Okay.  Now, I want to go back to CedarCrestone.

25  Okay?

```
 1              It was -- we talked about how they only offered
 2   support on top of Oracle support.  In fact, in the
 3   marketplace, they denied that they provided third-party
 4   support; correct?
 5   A.    I remember them denying that, yes.
 6              MR. ISAACSON:  All right.  Let's look at
 7   Plaintiffs' Exhibit 803, which I would request to admit.
 8              MS. CHUANG:  Subject to my earlier objection, I
 9   have no objection.
10              THE COURT:  All right.  Continuing objection
11   will be noted, and it will be admitted.
12         (Plaintiffs' Exhibit 803 received into
13         evidence.)
14   BY MR. ISAACSON:
15   Q.    All right.  Now, this is before you joined the
16   company so I'm just going to ask you whether you knew these
17   things to be true.
18              August 2008, Mr. Rowe is writing to Mr. Ravin.
19   So by the time you joined the company, was it your
20   understanding as stated here, that essentially
21   CedarCrestone is denying that they are in the third-party
22   support business?
23   A.    That was my understanding, yes.
24   Q.    Okay.  And then at the bottoms of the page, it says,
25   "RSI," meaning Rimini Street, "is the leader in our field,
```

1    and CedarCrestone is not."

2              Is that your view after you joined the company?

3    A.    Yes, it was.

4              MR. ISAACSON:  Then let's look at after you

5    joined the company, 1341, which I would move to admit.

6              MS. CHUANG:  No objection.

7              THE COURT:  It's admitted.

8         (Plaintiffs' Exhibit 1341 received into

9         evidence.)

10   BY MR. ISAACSON:

11   Q.    Now, this is an email from Mr. Ravin to you and

12   Mr. Hakenewert in the first month after you joined the

13   company; right?

14   A.    Yes, it looks to be.

15   Q.    And you're talking about a specific -- a potential

16   client deal.  Is that what's happening here?

17   A.    Yes, Alcatel-Lucent.

18   Q.    Right.  And now you're talking about CedarCrestone,

19   and Mr. Ravin is writing in the second paragraph,

20             "How they are a good company for implementation,

21   but third-party support is NOT," all capitals, "their core

22   business."

23             What's the implementation?

24   A.    Implementation is implementing the software,

25   installing the software after you purchase it.

1487

1    Q.    All right.  So they're not -- what he's saying is

2    they're a good company for installing your software, but

3    they're not providing -- providing ongoing support is not

4    their core business?

5    A.    That's correct.

6    Q.    And I think we saw this before, they don't even

7    feature support on their website.  That's something you

8    knew after you joined the company; right?

9    A.    Yes.

10   Q.    "Nowhere will you find them ever in an article

11   featuring a satisfied third-party maintenance client."

12   A.    That's correct.

13   Q.    And there's been testimony in this case, and I'm not

14   going to bother you much about that, about the importance

15   of referrals.  Satisfied clients providing referrals are a

16   big part of your business; correct?

17   A.    I would have to agree, yes.

18   Q.    All right.  And would have to be a big part of the

19   business of any other third-party support company that was

20   going to effectively compete against you?

21   A.    I think I can make that leap and agree with that,

22   yes.

23   Q.    So if one of your competitors doesn't have satisfied

24   customers out in the marketplace providing referrals,

25   you're not expecting them to be a strong competitor; is

1488

1    that fair?

2    A.    I think that's fair, yes.

3    Q.    Okay.  All right.  A little bit more on Versytec.

4    Versytec you never considered to be a major competitor;

5    correct?

6    A.    I agree with that, yes.

7    Q.    Okay.  And you can't actually -- you actually can't

8    recall today any customer you've ever lost -- I'm sorry.

9    We're cutting things off at 2012.

10             From 2012 and before, you wouldn't be able to

11   name any customer you lost to Versytec?

12   A.    I would not, no.

13   Q.    Now, there's another -- so we've been through the

14   competitive landscape.

15             The other topic that's come up is something

16   called self-support, and that's where the customer does

17   their own -- does the support for themselves, self-support;

18   right?

19   A.    Yes.

20   Q.    Okay.  Now, self-support, in your view, is risky.

21   It's like driving a car without insurance or not having

22   health insurance?

23   A.    That's correct, I do feel that way.

24   Q.    Okay.  And the reason is, is this is really

25   important software to a business, to its HR, to its

```
 1    accounting, to its finances, and if there's a problem with
 2    it, you need to have support available right away?
 3    A.    You're asking me if I agree with that?
 4    Q.    Yeah.
 5    A.    Yes, I do.
 6    Q.    In fact, that's what you tell customers; correct?
 7    A.    That's right.
 8    Q.    Okay.  And you actually have enough experience with
 9    customers who have -- if they have problems with the
10    software, to know that to be true, that it's actually
11    risky, very risky to go on self-support?
12    A.    I believe that, yes.
13    Q.    Okay.  You have enough experience in this field with
14    customers to actually -- because we've been talking about
15    believing versus knowing.  This one you actually know,
16    right?  You know that it's very risky for a customer to go
17    on self-support?
18    A.    Yes.
19          MR. ISAACSON:  Okay.  All right.  And let's look
20    at 5474, which I don't have a note on, so I'll move to
21    admit.
22          MS. CHUANG:  No objection.
23          THE COURT:  It's admitted.
24       (Plaintiffs' Exhibit 5474 received into
25       evidence.)
```

1   BY MR. ISAACSON:

2   Q.    This is a -- on the first page you'll see an email

3   in 2010, and it's from Mr. Davichick, who is in sales, to

4   Mr. Casey at Irish Permanent Life.  That's a customer;

5   right?

6   A.    It was a prospect.  I don't believe they ever came

7   onboard.

8   Q.    A prospect and copying you?

9   A.    That's right.

10  Q.    And there's sales marketing materials attached.  I

11  want to go to page 3, big letters, Why Not Self-Support?

12  A.    Okay.

13  Q.    All right.  And then here is, Why Companies Choose

14  Not to Self-Support Key Software Applications.

15        All right.  So there's some -- this is a sales

16  document, so I'm going to ask you about some of these terms

17  from the sales perspective.

18        "Not staffed sufficiently for tier 3 level

19  emergency response, diagnostics and fix design, development

20  testing and packaging."

21        What's that tier 3 level emergency response?

22  A.    Tier 3 would be a break/fix, so if there's a bug in

23  the software, being able to fix that bug.

24  Q.    All right.  And what you're saying, when not staffed

25  sufficiently, you're saying the customer is not going to be

1    staffed sufficiently if there is a break/fix, that is a bug

2    in the software, so that they can fix the bug; is that

3    right?

4    A.    That's correct.

5    Q.    Okay.  SOX risk mitigation and risk sharing.

6          Do you want to explain SOX or should I?

7    A.    I'd prefer you to.

8    Q.    Why don't you go ahead.  You're the witness.

9    A.    SOX risk, I believe there's various rules out there

10   for compliance that the government states that the -- the

11   financial rules that the government states companies need

12   to comply to.

13   Q.    Right.  And the auditors for the clients, that is,

14   the accountants that audit the customer, may decide that

15   running this software -- because it includes the accounting

16   software; right?

17   A.    Some of it does, yes.

18   Q.    All right.

19          "Without a strong external support contract for

20   key systems is a risk that needs to be publicly disclosed

21   for publicly-traded organizations."

22          So what that means is, if you're a company who

23   sells stock publicly on a public exchange like the New York

24   Stock Exchange, and you have to make certain disclosures on

25   a regular basis, that if you don't have strong external

1492

```
 1    support, that you might actually have to disclose to the
 2    public that you're running a risk, and that your auditors
 3    might require you to make that disclosure.
 4              That's what you're saying here?
 5    A.    That's correct.
 6    Q.    Okay.  And then the third thing is the changes in
 7    company's IT objectives or staffing can impact
 8    mission-critical support capabilities at any time.
 9              And do I understand this, is that when the IT
10    staff changes its objectives, or the staff changes, that
11    you might need support to help them adapt that software to
12    their new objectives or their new staff?
13    A.    I think it can mean that, or some employees may be
14    shifted within the organization to other capacities.
15    Q.    Okay.  I'll skip 4 because I really don't understand
16    that one, and I won't bother you with it.
17              Number 5, tax and regulatory complexities often
18    take up too many internal resources and hours.
19              And what that's referring to is, if you're on
20    self-support, and you're doing the tax and regulatory
21    updates, you have to have someone in your company figure
22    out the tax and regulation changes that affect your company
23    and make the appropriate changes in the software?
24    A.    That's right.
25    Q.    All right.  And all of these points were points that
```

1493

1    you made to customers as part of standard messaging;

2    correct?

3    A.    If they were considering self-support, yes.

4    Q.    Yes.  And all of these points were ones that you not

5    only believed to be true, but you had enough background in

6    the industry to know them to be true?

7    A.    Yes, I believe it.

8    Q.    All right.  And part of your background in the

9    industry was you would hear horror stories from customers

10   who tried self-support and failed?

11   A.    Some of my sales reps did, yes.

12   Q.    And they would report that to you?

13   A.    Yes.

14   Q.    And by "horror stories," we mean bad things that

15   happen to customers when they were trying to support the

16   software, and, all of a sudden, it didn't work, and the

17   problems they had at their company?

18   A.    Yes, that's correct.

19   Q.    There's another term that's been discussed in this

20   case: remote support.

21   A.    I'm sorry, I didn't hear the term.

22   Q.    Remote support.

23   A.    Remote support.

24   Q.    And, again, you know enough about that term from

25   sales to know that that means supporting an environment

1494

1    that's located on the customer's system; correct?

2    A.    I understand that, yes.

3    Q.    All right.  And you understood that within your --

4    after you joined the company, that the view of people in

5    your company was that supporting remote environments was an

6    insane business model.  You didn't want to do it?

7    A.    I'm not sure I agree with that, no, that I

8    understood enough to know that.

9    Q.    Well, let's look at Plaintiffs' Exhibit 60 which has

10   been previously admitted.  Let's look at the first page.

11             This is from Mr. Freeman.  Do you understand who

12   Mr. Freeman is?

13   A.    I don't.  No, I don't remember that name.

14   Q.    Do you know who Mr. Benge is?

15   A.    I do know Mr. Benge, yes.

16   Q.    Who is Mr. Benge?

17   A.    Mr. Benge is a Rimini Street employee that's

18   involved in our tax and regulatory update processes.

19   Q.    Okay.  So he's an engineer involved in tax and

20   regulatory.  And then there's copies to Mr. Chiu.  He's a

21   high-level vice-president; correct?

22   A.    Yes.

23   Q.    You, you're the head of sales; correct?

24   A.    Yes.

25   Q.    Krista Williams, who we met earlier today, she's the

1    head of environments; correct?

2    A.    I believe so.  I don't know her exact position.

3    Q.    Okay.  And Mr. Freeman, who is an internal support

4    engineer, says -- well, let's back down to what Mr. Benge

5    says so we get the context at the bottom.

6              "Thanks, Ed, this is why we love inhouse

7    environments," and a little smiley icon.

8              And Mr. Freeman says, "No, this is why it's

9    insane and defies our business model to offer to support

10   remote environments."

11   A.    Yes, I see that there.

12   Q.    You understood enough of the business model of

13   Rimini during this time period to know that Rimini's

14   business model -- that under your business model it was

15   insane to offer remote environments to your customers?

16   A.    I'm not going to agree I did understand enough to

17   think it was insane.  I was copied on this email.  I don't

18   remember seeing the email.

19   Q.    So you heard discussions along those lines, but you

20   didn't know one way or another whether it was true?

21   A.    Yeah.  I wouldn't -- I'm not technical enough to

22   understand that.

23   Q.    All right.  One last thing I want to ask you about.

24   We touched on references.

25              Rimini does offer its customers sometimes

1496

```
 1    special deals if they're willing to provide Rimini a

 2    reference; right?

 3    A.    That has happened in the past.

 4    Q.    Okay.  You also have a charter program where you

 5    offer 75 percent off if you provide a reference; is that

 6    right?

 7    A.    There was a charter program for new EBS customers

 8    and for SAP customers where we did that, yes.

 9    Q.    Okay.  And those are sometimes referred to as

10    sweetheart deals; right?

11    A.    I don't believe I've ever referred to that as a

12    sweetheart deal, but others may have.

13    Q.    Okay.  And you mentioned that there was some

14    references in the past -- I think you said there were four

15    historically that you knew about.  Those included the City

16    of Flint; right?

17    A.    What are you asking me on this?  There's four others

18    that did what?

19    Q.    When you referred to four others, did that include

20    the City of Flint?

21    A.    Four other customers that received discounts?

22    Q.    Yes, for references?

23    A.    That's my understanding, yes, City of Flint was one

24    of them.

25    Q.    And that's a direct monetary trade.  You say to the
```

1   client "I'll give you a discount if you provide me a good

2   reference"?

3   A.    That's part of the negotiation, yes.

4   Q.    Okay.  And City of Flint, I think as we established,

5   is one of your early PeopleSoft clients.  I think the

6   record will reflect that they were your first, but you

7   weren't around then.  But you were familiar that they were

8   one of the customers who gave you references most often?

9   A.    Yes.  They were a good reference customer for us,

10  yes.

11  Q.    Okay.  And then there was a company named Cowlitz

12  County.  Did you know about them?

13  A.    When you say did I know about them, please be more

14  specific.

15  Q.    Are you familiar with the customer --

16  A.    Yeah, I mean, I've heard of the customer.

17  Q.    And were you aware that they were given a special

18  price of $100 a year for three years in exchange for giving

19  Rimini references?

20  A.    I remember being made aware of that at my

21  depositions, I believe.  I did not know prior to that.

22         MR. ISAACSON:  I don't have any further

23  questions.

24         THE COURT:  All right.

25         Cross-examination?

1498

CROSS-EXAMINATION

BY MS. CHUANG:

Q.    Good morning, Mr. Maddock.

A.    Good morning.

Q.    Before we talk about some of the issues in this

case, I want to step back and give the jury a little bit of

background about you.

A.    Okay.

Q.    We're kind of in an unusual situation where I'm

asking you questions second, so I want to give the jury

that background.

First, have you ever testified in a jury trial?

A.    No, I never have.

Q.    And can you tell the jury briefly about your

educational background?

A.    Sure.  I went to University of Notre Dame for my

undergraduate degree.  I majored in finance.

Several years later, after about five years of

working, I went back to UCLA and got an MBA with a

concentration in general management.

Q.    And tell us what you did in those five years of

working.

A.    I worked at a company called Anderson Consulting,

which is now better known as Accenture, where I was

managing system implementations typically for large

1499

1    companies.

2    Q.    And when you say system implementations, can you

3    explain that a little bit to the jury?

4    A.    Yes.  So software implementation.  So more

5    specifically, the biggest project I worked on was for a

6    company named Pacific Bell, which is now part of AT&T.

7              And this is back in the late '80s when you may

8    remember phone systems were evolving, and they needed to --

9    some things like Caller ID, and they needed to create a

10   billing system for that.  So I served as part of the team

11   that helped design that and managed the overall project.

12   Q.    After you graduated UCLA with an MBA, what was your

13   first job?

14   A.    My job coming right out of MBA school was with

15   another consulting firm named KPMG.  I was in a strategy

16   and operations consulting role typically for financial

17   services companies.

18   Q.    And then what did you do after you left KPMG?

19   A.    When I left KPMG, I went to work at PeopleSoft.

20   Q.    And the jury's heard a little bit about PeopleSoft.

21   Can you tell the jury what years you worked at PeopleSoft,

22   please.

23   A.    Sure.  I was there from May of 1998 until September

24   of 2004.

25   Q.    And what was your job at PeopleSoft?

1500

1    A.    I was part of what we call the support sales

2    organization.  So initially I was an individual sales

3    representative whose job had a territory and whose job it

4    was to call our existing customers to ensure that they

5    renew their support contracts each year.

6              After a year I was asked to roll the group out

7    overseas, so I spent some time in Europe and South America

8    and Australia and Asia rolling that group out to set the

9    operations up.

10             And then when I came back, I was promoted to be

11   a vice-president, and I ran the overall global

12   organization.  So ultimately my job was to ensure that all

13   of PeopleSoft support revenue came into the company.

14   Q.    And when you say support revenue and support

15   renewals, can you define that for the jury?

16   A.    Sure.  So, as I think I stated earlier, when a

17   customer immediately interacts or purchases software

18   licenses from a software company, they pay typically a

19   license fee, and as part of their long-term agreement

20   there's an annual fee associated with that license fee.

21             It's typically based on a percentage of it.

22   That entitles the customer to receive support ongoing.  So

23   that would be for fixes, for future versions of the

24   software, maybe some account management services.

25             So it's an ongoing annual-type service that the

```
 1    customers have the option to renew or not to renew.  So it
 2    was my job to ultimately work with our customers to get
 3    them to renew each year.
 4    Q.    Is it fair to say that the majority of your
 5    responsibilities at PeopleSoft were on the sales and
 6    management side?
 7    A.    Yeah, I think that's very fair.
 8    Q.    And then what did you do after PeopleSoft?  Did you
 9    leave PeopleSoft?
10    A.    I'm sorry?
11    Q.    Did you leave PeopleSoft?
12    A.    Yes.
13    Q.    What did you do after that?
14    A.    I went to a smaller startup named Service Source,
15    and this would have been in October of 2004, where I was
16    recruited in to be their executive vice-president for their
17    inside sales and delivery organization.
18                And Service Source was an outsource sales
19    solution for support contract renewals for both hardware
20    and software companies.
21                So I was essentially taking the skills and
22    knowledge that I'd learned at PeopleSoft, in terms of
23    getting customers to renew support contracts, and taking
24    that into a new company where we did it for a variety and
25    multiple of technology companies.
```

1502

1    Q.    What were some of the companies?

2    A.    This is going back a few years now, but Juniper

3    Networks was one, Borland Software, Juniper -- I'm going

4    back -- Agile Software was one of them.  And then -- I

5    mean, there were several others.  I'm having a little

6    trouble remembering them all.

7    Q.    That's okay.  At some point you left Service Source;

8    correct?

9    A.    Yeah, I did, in March of 2008.

10   Q.    March of 2008.  And then we've heard from your

11   testimony today you joined Rimini Street in December of

12   2008?

13   A.    That's correct, yes.

14   Q.    What did you do during March of 2008 to December?

15   A.    Well, I took some time to relax with my wife and

16   son.  And we spent some time traveling, spent some time at

17   both of our family's homes, trying to do the things you

18   don't get to do when you're working long hours in demanding

19   jobs.

20   Q.    Prior to joining the company at Rimini Street, did

21   you do research on the company?

22   A.    On Rimini Street?

23   Q.    Yeah, sure?

24   A.    Yeah, sure, I did.

25   Q.    And why did you decide to take the job at Rimini

1503

1    Street?

2    A.    Well, I was thinking -- first of all, in terms of

3    the timeframe, this was in September-October of 2008, and

4    some of you may remember, it was a very bad time in the

5    economy, they were referring to it as the great recession,

6    and many companies were looking to cut costs.

7                 So I was thinking back to my days at PeopleSoft

8    when I was on the phone with many, many customers who were

9    questioning the value they received for their support, and

10   I thought it would be --

11                MR. ISAACSON:  Objection, Your Honor, move to

12   strike.  He's now injecting customer testimony.

13                THE COURT:  Okay.  Overruled.  I'll allow it to

14   stand as one of his thoughts as bearing upon his

15   qualification.

16                THE WITNESS:  So I remembered some of the

17   conversations that I had, and how customers were looking

18   for alternatives.

19                I felt that also -- this is four or five years

20   later, software had become much more mature, and I just

21   thought in a down economy, it would be a great opportunity

22   to be able to go into a market that I felt there would be

23   demand and need for.

24                I also checked back with several of my former

25   colleagues who were working in the software industry and

1504

1    asking if customers still felt that they were paying too

2    much for software --

3              MR. ISAACSON:  Objection, Your Honor.

4              THE COURT:  Yes, sustained.

5              MS. CHUANG:  We'll move on.

6              THE WITNESS:  Overall, I thought it would be a

7    great opportunity -- sorry.

8              MS. CHUANG:  That's okay.

9    BY MS. CHUANG:

10   Q.    We've heard that when you joined Rimini Street, you

11   joined as senior vice-president of global sales; correct?

12   A.    That's right, yes.

13   Q.    What were your job duties?

14   A.    Well, at a high level, my job duty was to ensure

15   that we hit our company number in terms of targets for

16   bringing in new customers and then also our company number

17   for targets for getting our existing customers to renew.

18   So it was at a high level.

19             I was also responsible for managing initially

20   the sales team of four that I had mentioned earlier.

21             I was in charge of setting quotas, developing

22   territories, hiring new individuals.  I was doing a lot of

23   interviewing and recruiting.

24             I was also working with our marketing group to

25   get tools set up with the sales forces, such as the FAQs

1   document, which we've referenced multiple times today.

2              I also served on the executive committee or

3   operating committee so I would attend those meetings, and

4   ultimately creating an environment that would be successful

5   for my sales force.

6              I also attended a lot of trade shows and

7   conferences to help get our word and message out.

8   Q.    So at this point in time when you joined Rimini

9   Street, there were, I think you said, four to five

10  salespeople?

11  A.    There were four when I joined, yes.

12  Q.    And under your watch at the end of 2011, you grew

13  that to 20?

14  A.    Yeah, 20 or -- roughly 20, maybe a few more.

15  Q.    You also said that you were developing territories.

16  What does that mean?

17  A.    Well, the way to run a proper sales organization

18  would be that each sales representative should have a

19  certain territory that he or she is responsible for.  It

20  could be by state or geography, it could be for a

21  particular industry, or what we call vertical, or it could

22  just be a set of accounts, based on size of accounts.

23              So it was my role to determine how we should

24  organize the sales force and what territories to give to

25  each sales representative.

1   Q.    I want to go to one of the topics that we ended

2   with, and that's competitors in the marketplace?

3   A.    Okay.

4   Q.    And there was a line of questioning about other

5   competitors in the marketplace, such as Spinnaker,

6   CedarCrestone.  You recall that?

7   A.    Yes, I do.

8   Q.    And we went through -- we went through some of the

9   criticisms of each of the competitor's services with

10  Oracle's counsel.  Do you remember that?

11  A.    Yes, I do.

12  Q.    When you were out selling Rimini Street services, do

13  you see these competitors competing with your business?

14  A.    In the 2009 and --

15  Q.    I'm sorry, yes, the 2009 to 2011 timeframe.

16  A.    Yes, their names definitely came up in the sales

17  process.

18  Q.    And in the 2009 to 2011 timeframe, has Rimini Street

19  lost a customer to one of these competitors or third

20  parties?

21  A.    Sure.  We did.

22  Q.    You also discussed self-support with Mr. Isaacson?

23  A.    Yes.

24  Q.    Customers can self-support at their own option;

25  correct?

1   A.    That's right, they can.

2   Q.    And in your -- based on your understanding of the

3   marketplace, has some clients been successful with

4   self-support?

5   A.    Some have, yes.

6   Q.    And has Rimini Street lost clients to self-support?

7   A.    Yes, we have.

8   Q.    And have you also had clients sign up with Rimini

9   Street after being on self-support or supporting

10  themselves?

11  A.    Yes, we have.

12  Q.    We've seen a lot of the frequently asked questions,

13  the FAQs, in this case.  And is it a practice for your

14  sales team to go through all of the issues outlined on the

15  frequently asked questions with each customer?

16  A.    No, it's not.

17  Q.    Why not?

18  A.    Because there's -- many of those questions don't

19  come up in every sales call or with each customer.

20          So those questions are geared towards the sales

21  force being able to respond should one or some of those

22  questions come up in any particular opportunity.

23  Q.    There was a line of questioning in the beginning of

24  your examination about certain sales messages that you

25  would -- that would -- that would be Rimini Street's sales

1    messages to consumers.  Do you recall that?

2    A.    Yes.

3    Q.    And some of the messages was that we wouldn't use

4    your custom environment, it would be used only for another

5    customer?

6    A.    Yes.

7    Q.    Messages like those?

8          Do you believe that the statements that you made

9    to clients between the time you joined the company to

10   December of 2011 were accurate when you made them?

11   A.    Yes, I absolutely do.

12   Q.    And from the time you started with Rimini to

13   December 2011, how frequent -- or can you estimate for us

14   how frequently a customer would raise a question about the

15   legality of a specific process of Rimini Street?

16         MR. ISAACSON:  Objection, Your Honor.  Is this

17   to him?

18         MS. CHUANG:  Yes.

19         MR. ISAACSON:  Then no objection.

20         THE WITNESS:  So can you repeat the question,

21   please.

22   BY MS. CHUANG:

23   Q.    Sure.  From the time that you started Rimini Street

24   until December of 2011, can you estimate for the jury how

25   many times or how frequently a customer would raise a

1   question about the legality of a specific process at Rimini

2   Street during a sales cycle?

3   A.    To me, Kevin Maddock?

4   Q.    Yes, to you, Kevin Maddock?

5   A.    Fewer than five times.

6   Q.    Is it part of your job duty as senior vice-president

7   of global sales to track the sales numbers, how much you're

8   selling?

9   A.    Yes, we have a variety of numbers.  But, yes.

10  Ultimately, yes.

11  Q.    And after this lawsuit was filed by Oracle in

12  January of 2010, what happened to Rimini Street's sales

13  numbers between January 2010 to the end of 2011?

14  A.    Well, January 2010, that would have been Q1 of that

15  year, they declined somewhat dramatically in that first

16  quarter.

17        Second quarter, they started to pick up

18  slightly.  By Q3 and Q4, we started growing again.  And I

19  think we've been growing at a 40 percent annual clip since

20  that point.

21  Q.    Let me see if I understand it.  In January 2010, Q1,

22  Q2 is the first half of the year?

23  A.    Yes.

24  Q.    It declined?

25  A.    Yes.

1   Q.    And then it started to pick up, you said Q3, Q4,

2   which is the end of --

3   A.    Q3, Q4, yeah, which is the second half of the year.

4   We're not based on a calendar year.

5   Q.    And then what about the year of 2011?

6   A.    2011, the sales picked up again.  From memory, I

7   think we grew over 40 percent that year.

8   Q.    There was a line of questioning early on about --

9   you testified about that the customer needs -- correct me

10   if I'm wrong, that the customer needs to review their own

11   license agreement.  Do you recall that?

12   A.    Yes, I do.

13   Q.    And that Rimini tells customers that we are abiding

14   by the customer agreement.  Do you recall that as well?

15   A.    Yes.

16   Q.    Would that be the actual language that you or your

17   salespeople would use?

18   A.    We would say that a customer needs to go back to the

19   legal group to make their own determination of whether

20   their contract allowed for what they were going to be going

21   into with us or not.

22   Q.    And would you also tell that customer using the

23   language we are abiding by their license agreement?

24   A.    We would tell them that we have processes and

25   methodologies and control that don't allow -- that would

1   protect the vendor's IP, and that don't allow any -- don't

2   allow you to receive anything that you won't receive as

3   part of your license, outside your license constraints or

4   rights.

5   Q.    And how frequently would it come up for you,

6   Mr. Maddock, in which you would say that we have strict

7   methodologies in place and you don't receive anything that

8   you're not entitled to?

9   A.    I'd say maybe 10 percent of the calls that I was on.

10  Q.    Let's talk a little bit about Rimini Street's sales

11  cycle.

12  A.    Okay.

13  Q.    First, how do you or your sales team identify a

14  potential customer?

15  A.    There's a variety of ways.  We go to tradeshows, we

16  go to conferences, we do webinars, we do email campaigns.

17  Some of it's just through cold calling, using our own

18  networks of people that we know in the industry to get our

19  initial phone calls.

20        We also have a business development or lead

21  business development or legion team that also does such --

22  much of that.

23  Q.    And once you have identified a potential customer,

24  can you briefly walk this jury or describe the process or

25  steps you take once you've contacted them?

1512

1     A.     Sure.   I mean, we typically would have an initial

2     call or presentation which we would present to them, going

3     through what our service offering is and the value that we

4     think we can provide to them.

5              After that call, we would ask to have a mutual

6     NDA in place, which is a nondisclosure agreement, which

7     protects the rights of both entities, stating that we'll

8     keep everything confidential, any communications that we

9     have.

10             After that point we would ask to see their

11    invoices and what products that they were looking to have

12    supported so that we could do some analysis to determine

13    that we could in fact support those problems.

14             We could also see what the price that they had

15    been paying was so that we could put together a proposal at

16    50 percent of that price.

17             Then we put together a proposal contract, which

18    we would send to them to review or have their legal teams

19    review.

20             And, at the same time, in many cases, we would

21    be conducting more technical discussions with them because

22    very often our customers would have technical questions

23    about our services and how we were going to provide the

24    support.  So those would be being held in parallel.

25             Once those questions were answered to a

1    prospect's sufficient needs, then we typically engage in

2    more of the legal view and discussion going through the

3    contracts.

4              And then, once we reached agreement, we would

5    have a signed contract and begin an onboarding period.

6    Q.    You said a lot.  I want to break out just a few

7    things.

8              At the initial call, you said that you tell the

9    prospective customer the value of your services.

10   A.    That's right.

11   Q.    What would your message be to that customer?  What's

12   the value of your services?

13   A.    So at high level, it's at least 50 percent of what

14   you've been paying to Oracle, it's a 50 percent cost

15   reduction with better support.

16             We have a named primary support engineer as

17   opposed to a call center, which is what many of the

18   software vendors use.

19             We provide 24-by-7, 30-minute response.  We were

20   averaging, I think, three and a half minutes at that time

21   in terms of response.

22             We support customizations.

23             We supply also an assigned account manager.

24             And we don't force customers to upgrade.  We let

25   them run their software at that point in time for at least

1514

1    10 years so they didn't have to pay more money to do

2    upgrades.

3    Q.    You also said that during these discussions -- or

4    during the sales cycle, technical questions may come up?

5    A.    Yes, that's right.

6    Q.    You've told this jury that that wasn't necessarily

7    your field, technical?

8    A.    No, I'm not a technical person.

9    Q.    So who would become involved if there were technical

10   questions that came up during the sales cycle?

11   A.    Well, it would depend on the product line, but it

12   would be someone in our delivery organization.

13         Very often the VP, or one of the people that was

14   actually doing -- the VP of the organization, or one of the

15   people who was actually doing the support, the technical

16   aspects of the support, would get on the phone and discuss

17   those complexities with the technical person at the

18   prospective customer.

19   Q.    Another thing you said that happened during the

20   sales cycle is there would be a legal review.  Can you tell

21   us a little bit more about that?

22   A.    A legal review, is that what you -

23   Q.    I wrote it down.  Did you say --

24   A.    I thought you said eagle review.

25   Q.    I'm sorry.  A legal review.

1    Can you explain to the jury what that entailed?

2    A.    Yeah.  I mean, it could be a variety of things, but

3    always it was a legal person on the customer side going

4    through our contract to determine that they agreed with the

5    terms in the contract and it was sufficient for them.

6    Also, as part of the legal review, they very

7    often were going through their own contracts to ensure that

8    their contracts entitled and enabled them to become a

9    customer of ours.

10   Q.    On average, how long does the process that you've

11   described to us take from the initial call with a client

12   until that client signs up with Rimini Street?

13   A.    It's somewhat product dependent, but I would say on

14   average three to six months.

15   Q.    And why does it take so long?

16   A.    Well, typically customers do a lot of due diligence,

17   and it's a long cycle.  They don't just sign a contract.  I

18   wish they did, but they don't.

19   And they ask a lot of questions and perform a

20   lot of due diligence.  And then the legal negotiations

21   often take multiple weeks as well.

22   Q.    You were asked by Oracle's counsel about your

23   understanding based on discussions with customers and your

24   salespeople that when customers don't choose Rimini, they

25   usually choose Oracle.  Do you recall that line of

1516

1    testimony?

2    A.    I do, yes.

3    Q.    Do you also have an understanding based on your

4    discussions with your customers and your salespeople why

5    people are choosing to leave Oracle?

6    A.    Sure.

7    Q.    And what is that understanding?

8         MR. ISAACSON:  Objection, Your Honor.

9         THE COURT:  Sustained.

10   BY MS. CHUANG:

11   Q.    During the sales process or the sales cycle we've

12   been talking about, if a customer asks whether a certain

13   practice is permissible under their license agreement with

14   Oracle, what would be your typical response?

15   A.    My typical response would be that they would have to

16   go back to their legal team to review their contract and

17   make that determination.

18   Q.    And have there been instances, after you were hired

19   until December of 2011, where you've seen that a client

20   asks for Rimini's opinion and Rimini has responded?

21   A.    I have seen that, yes.

22   Q.    Can you give the jury an estimate of how many times

23   that you've personally observed that happening from the

24   time you came onboard to the end of 2011?

25   A.    Where an opinion was given?

1517

1    Q.    Right.

2    A.    Less than 10.

3    Q.    Less than 10?

4    A.    Yes.

5    Q.    Have you ever personally advised a potential client

6    about any provision in their underlying contract with

7    Oracle?

8    A.    No, I have not.

9    Q.    As part of your duties as senior vice-president of

10   sales, would it be part of your responsibility to

11   understand why customers choose to come to Rimini?

12   A.    Sure.  I think that -- sure, yes.

13   Q.    And I think you testified that you need to

14   understand the competition; right?

15   A.    Yes.

16   Q.    Are you personally aware of any instances where a

17   customer has chose Rimini's services because Rimini hosted

18   that client's software on its servers?

19   A.    Can you repeat that again, please?

20   Q.    Sure.  Are you personally aware of any instances

21   where a customer signed on with Rimini, chose Rimini Street

22   because Rimini Street hosted that client's software on its

23   servers?

24            MR. ISAACSON:  Objection, Your Honor.

25            THE COURT:  Sustained.

1518

1   BY MS. CHUANG:

2   Q.    Based on your experience, Mr. Maddock, what are some

3   of the reasons that clients choose Rimini Street?

4           MR. ISAACSON:  Objection, Your Honor.

5           THE COURT:  Overruled.

6           THE WITNESS:  There's a variety of reasons.  I

7   mean, the cost savings is certainly one of them, also

8   dissatisfaction with the support levels that they're

9   receiving at Oracle, and, in many cases, we hear that they

10  don't like doing business with Oracle.  They don't like the

11  way that they've been treated.

12          MS. CHUANG:  No further questions.

13          THE COURT:  Redirect examination?

14                 REDIRECT EXAMINATION

15  BY MR. ISAACSON:

16  Q.    A couple minor points, Mr. Maddock.

17          I think you referred to an average

18  three-and-a-half-minute response time to phone calls for

19  service; is that right?

20  A.    That's what our delivery team was averaging,

21  certainly in the earlier years, from what I remember, yes.

22  Q.    All right.  And the vast majority of inquiries,

23  however, that you get for support are not through phone

24  calls, those would be -- those would come through email or

25  web requests; right?

1519

```
 1    A.     I actually don't know that for sure, no.

 2    Q.     You don't know one way or the other how -- whether

 3    customers are principally dealing with you for support

 4    through the phone or through the web?

 5    A.     No, I don't.

 6    Q.     Okay.  Now, you've talked with your counsel and you

 7    talked with me about when technical questions would come

 8    up, you would refer the customer to someone more technical.

 9    Do you remember that generally?

10    A.     Yes.

11    Q.     Okay.  Now, for Siebel during this 2008 through 2011

12    period, that would principally have been Mr. Chiu?

13    A.     That's correct, yes.

14    Q.     Dennis Chiu?

15    A.     Dennis Chiu, yes.

16    Q.     And for JD Edwards, that would be Mr. Grigsby?

17    A.     That's correct, or some -- or someone in his

18    organization.

19    Q.     All right.  And just in terms of your background, as

20    I understand it you actually managed software

21    implementation.  How many years did you do that?

22    A.     I was at Anderson for four or five years.  Five

23    years.

24    Q.     Did you manage software implementation in any other

25    part of your career?
```

1520

1    A.    No, I did not.

2    Q.    And after managing software implementation for four

3    or five years, I guess by 1998 you were talking to

4    PeopleSoft customers about support; is that right?

5    A.    I mean, that's what I did when I got to PeopleSoft.

6    That's where I learned the support business, yes.

7    Q.    Right.  And it is true that in terms -- during the

8    period you've been with the company, most inquiries from

9    customers go to your sales staff and not to you directly;

10   correct?

11   A.    Most inquiries during the sales process?

12   Q.    Yes, from customers?

13   A.    That's correct, yes.

14   Q.    Okay.  And when you write FAQs, those are for

15   frequently asked questions, not for infrequently asked

16   questions; correct?

17   A.    They are for questions that I would say come up in

18   10 percent of the conversations or more.

19   Q.    The actual title is Frequently Asked Questions;

20   right?

21   A.    That's correct.

22   Q.    And you're not aware of any document in this case

23   that says that the questions we are talking about says

24   these are infrequently asked?

25   A.    No, I'm not.

1521

1     Q.    Okay.  Your counsel asked you about how your sales

2     went up after Oracle filed this lawsuit in January of 2010.

3     Do you remember that?

4     A.    I remember -- yeah, I remember her asking what

5     happened to the numbers, yes.

6     Q.    Okay.  After Oracle filed this lawsuit, Rimini

7     continued to have as its standard messaging to clients that

8     Rimini did not share software between customers.  Isn't

9     that correct?

10    A.    Yes, it is.

11    Q.    Okay.  And after Oracle filed this lawsuit out there

12    in the marketplace, Rimini's standard messages continued to

13    be that they were obeying the customer's license agreement,

14    that they were abiding by it?

15    A.    Yes.

16    Q.    Okay.  And after Oracle filed this lawsuit, it

17    was -- Rimini's standard messaging continued to be that

18    they didn't use one customer's development environment for

19    another; correct?

20    A.    Yes.

21    Q.    Okay.  Sir -- and after this lawsuit was filed,

22    generally you kept saying that your business was legal and

23    you had not violated Oracle's copyrights; correct?

24    A.    That's correct.

25    Q.    And those frequently asked questions about your

1    practice became more frequent after the lawsuit was filed;

2    is that fair?

3    A.    I would say in 2010 that is fair.

4    Q.    Okay.  And am I correct that for the period that

5    you've been at the company, December 2008 through the end

6    of 2012, including after Oracle filed this lawsuit, that

7    you're not aware of a single customer of Rimini Street that

8    was told that Rimini Street reused fixes and updates all

9    the time, reused them from one customer to another?

10   A.    You're asking if I'm aware if that had happened?

11   No, I'm not aware that that was ever told to a customer.

12   Q.    As far as you know that during that time period,

13   zero customers were told that; correct?

14   A.    As far as I know, yes.

15   Q.    And during that period, 2008 to the end of 2012,

16   including after the filing of this lawsuit, as far as you

17   know, zero customers were told about a library of software

18   that was maintained at Rimini Street for -- to support

19   customers generally; correct?

20   A.    Correct.

21   Q.    Okay.  They weren't told that there was a software

22   library to build environments, were they?

23   A.    As far as I know, no.

24   Q.    And, in fact, to your knowledge, after this lawsuit

25   was filed, Rimini said to this Court that that library did

1523

1    not exist; correct?

2    A.    Could you repeat that again, please?

3    Q.    Okay.  Rimini denied -- after this lawsuit was

4    filed, to your knowledge, Rimini denied in court that the

5    library existed; correct?

6    A.    I'm not aware that that was denied in court, no.

7    Q.    Okay.  And from 2008 to the end of 2012, including

8    after this lawsuit was filed, to your knowledge, zero

9    customers were told about a practice at Rimini Street of

10   cloning one client's environment to create another;

11   correct?

12   A.    That's correct, yes.

13   Q.    And from 2008, during the period you were at the

14   company, the end of 2008, through 2012, including the

15   period after this lawsuit was filed, zero customers were

16   told, to your knowledge, that Rimini had general testing

17   and development environments full of Oracle software that

18   it was using to support multiple clients?

19   A.    To the best of my knowledge, no, no one was told

20   that, yes.

21             MR. ISAACSON:  I have no further questions.

22             THE COURT:  Recross-examination?

23             MS. CHUANG:  No, thank you, Your Honor.

24             THE COURT:  All right.  Mr. Maddock, that will

25   complete your testimony.  You may step down.  Thank you.

```
 1            MR. RINGGENBERG:  Your Honor, we have next two

 2    very short video depositions, both about five minutes each.

 3            Ladies and gentlemen, you'll next hear from

 4    Graham Carter of SonicWall.  He was a customer of Rimini

 5    Street's at issue in the case.  It's about five minutes.

 6            (Videotape deposition of Graham Carter played

 7            as follows:)

 8            "MR. HIXSON:  Good morning.  My name is

 9            Tom Hixson.  I represent Oracle in this

10            matter.  Would you please state your name for

11            the record.

12            A My name is Graham Carter.

13             PAGE 9:21 TO 10:08 (RUNNING 00:00:47.506)

14            Q How long have you worked at SonicWALL?

15            A Since February of 2006, so five years.

16            Q What is your current position at SonicWALL?

17            A I'm an IT director in charge of

18            applications.

19            Q Can you describe generally what your

20            responsibilities are as IT director?

21            A We provide -- specifically integration and

22            business analytics is my areas of expertise.

23            Q How long have you been in that position?

24            A Approximately two and a half years.

25            Q What position did you have before being the
```

1525

```
 1            IT director?
 2            A I was the CRM manager.
 3             PAGE 10:18 TO 10:23 (RUNNING 00:00:15.777)
 4            Q Do you recall generally what your
 5            responsibilities were at SonicWALL from the
 6            time that you started until you became CRM
 7            manager?
 8            A Yes, I was brought in to help implement a
 9            support -- support renewal application with a
10            third-party vendor.
11             PAGE 10:24 TO 11:09 (RUNNING 00:00:20.029)
12            Q Does SonicWALL use Siebel software?
13            A Yes.
14            Q Do you recall during what period of time
15            they did?
16            A No, certainly it was here when I arrived in
17            2006.
18            Q Does SonicWALL still use Siebel software?
19            A No.
20            Q Was this customer relationship management
21            software?
22            A Yes.
23             PAGE 12:03 TO 12:05 (RUNNING 00:00:11.237)
24            Q Do you recall when SonicWALL stopped using
25            Siebel?
```

1526

1      A February of 2009.

2        PAGE 16:22 TO 16:24 (RUNNING 00:00:06.009)

3      Q If Rimini Street support had cost as much

4      as Oracle's would SonicWALL have switched?

5      A No.

6        PAGE 19:07 TO 19:10 (RUNNING 00:00:09.981)

7      Q When SonicWALL was deciding to go to

8      Rimini, had SonicWALL already made the

9      decision that it was going to migrate off of

10      Siebel?

11      A Absolutely, yes.

12        PAGE 20:01 TO 20:03 (RUNNING 00:00:08.880)

13      Q Was it important to SonicWALL that Rimini

14      be able to provide service near the quality

15      of Oracle's?

16      A Yes.

17        PAGE 20:17 TO 21:02 (RUNNING 00:00:22.760)

18      Q Did SonicWALL consider going to any

19      third-party support providers other than

20      Rimini?

21      A No.

22      Q Did SonicWALL consider going to

23      self-support for Siebel?

24      A Yes.

25      Q Was there a decision made not to do

1527

1        self-support?

2        A Yes.

3        Q What were the reasons for that decision?

4        A Primary risk.

5         PAGE 21:03 TO 21:05 (RUNNING 00:00:05.934)

6        Q Meaning there was some risk to SonicWALL if

7        it went with self-support?

8        A Correct, yes.

9         PAGE 21:06 TO 21:15 (RUNNING 00:00:30.790)

10       Q Who within SonicWALL made the decision not

11       to do self-support?

12       A It was a joint decision between the CIO and

13       myself.

14       Q And you both agreed that self-support was

15       too risky; is that correct?

16       A Correct.

17       Q At the time were you aware of any

18       third-party support providers for Siebel

19       other than Rimini Street?

20       A No.

21        PAGE 21:20 TO 21:24 (RUNNING 00:00:11.068)

22       Q BY MR. HIXSON:  Can you remember that

23       Rimini was the only third-party support

24       provider that you gave serious consideration

25       to.

1528

```
1      Does that sound right?
2      A Yes.
3       PAGE 21:25 TO 22:03 (RUNNING 00:00:11.920)
4      Q Since dropping Oracle support has SonicWALL
5      ever considered going back to Oracle support
6      for CRM software?
7      A We no longer use Oracle CRM products, so,
8      no.
9       PAGE 42:21 TO 43:01 (RUNNING 00:00:22.817)
10     Q BY MR. HIXSON:  If SonicWALL had knowledge
11     at the time that it entered into the support
12     agreement with Rimini that Rimini had a
13     business model that involved the improper use
14     of intellectual property, would that factor
15     have made it less likely that SonicWALL would
16     have signed up for service with Rimini?
17      PAGE 43:05 TO 43:10 (RUNNING 00:00:22.878)
18     THE WITNESS:  Yes.
19     Q BY MR. HIXSON:  Is it fair to say that if
20     SonicWALL had knowledge at the time that it
21     entered into the support agreement with
22     Rimini, if Rimini business model involved
23     improper use of intellectual property that
24     SonicWALL would not have contracted with
25     Rimini?
```

1529

```
 1          PAGE 43:12 TO 43:12 (RUNNING 00:00:01.292)

 2          THE WITNESS:  Yes.

 3           PAGE 46:12 TO 46:22 (RUNNING 00:00:36.331)

 4          Q BY MS. REDMOND:  Okay.  When did you -- or

 5          when did SonicWALL enter agreement with

 6          Salesforce to purchase their software, do you

 7          recall?

 8          A 2006, yeah, that's right.

 9          Q 2006?

10          A Um-hum.

11          Q Okay.  My understanding from your testimony

12          is whether or not SonicWALL moved to Rimini

13          Street for support SonicWALL had made the

14          decision to purchase new software from

15          Salesforce.com; is that correct?

16          A Correct.")

17          (Deposition ends.)

18             MR. RINGGENBERG:  And we have another deposition

19   of Mr. James Ward of Wendy's, also about five minutes, and

20   that's also a customer of Rimini Street.

21          (Videotape deposition of James Ward played as

22          follows:)

23             PAGE 7:09 TO 7:12 (RUNNING 00:00:09.010)

24          "Q. Can you please state your name and

25          spell your last name for the record?
```

1530

```
 1              A. It's James K. Ward, and the last name is

 2              W-a-r-d. I go by the name of "Jim".

 3               PAGE 10:08 TO 10:19 (RUNNING 00:00:22.571)

 4              Q. Have you been designated by Wendy's

 5              to testify on the company's behalf with

 6              respect to these topics today?

 7              A. Yes.

 8              Q. Now, during today's deposition, I may ask

 9              -- phrase some of my questions in terms of

10              what Wendy's did or Wendy's said rather than

11              you personally.  Do you understand that the

12              reason I'm doing is because Wendy's has

13              designated you to testify on behalf of the

14              company with regard to these topics?

15              A. Yes.

16               PAGE 13:13 TO 14:06 (RUNNING 00:00:38.697)

17              Q. Okay.  Mr. Ward, how long have you worked

18              at Wendy's?

19              A. I've worked a total of just about 26

20              years.

21              Q. What is your current position there?

22              A. My current position is director of

23              solutions delivery for the information

24              technologies department.

25              Q. Could you just generally describe what
```

1531

```
 1          your job responsibilities are in that
 2          position?
 3          A. My current responsibilities reside in --
 4          over the store systems area for company-owned
 5          stores.  I'm in charge of the
 6          back office and the POS systems as well as
 7          our data warehousing that takes place along
 8          with business intelligence or more commonly
 9          known as "BI".
10           PAGE 15:13 TO 15:18 (RUNNING 00:00:08.055)
11          Q. Does Wendy's use PeopleSoft software
12          today?
13          A. They do not.
14          Q. Has Wendy's used PeopleSoft software in
15          the past?
16          A. Yes.
17           PAGE 17:22 TO 18:07 (RUNNING 00:00:33.769)
18          Q. Mr. Ward, generally, do you know what
19          PeopleSoft products or modules, people --
20          Wendy's used?
21          A. Yes.
22          Q. Which products were those?
23          A. It was 8.3 HMRS, which is the payroll and
24          HR module.
25          Q. Were there any other modules that Wendy's
```

1    used that were PeopleSoft software?

2    A. Yeah.  It was 8.4 finance.  Each one of

3    those areas included People Tools.

4     PAGE 30:07 TO 30:16 (RUNNING 00:00:26.023)

5    Q. You just mentioned that you had heard some

6    other parties' names, but you can't recall

7    them.  Did Wendy's consider going to any

8    other third-party support providers other

9    than Rimini Street at this time?

10   A. Well, we -- we looked at Oracle, as going

11   back to a support model as well as Rimini

12   Street.  And, again, there was -- there was a

13   couple more on the list, and I can't recall

14   what they are, so we looked at them briefly.

15    PAGE 32:04 TO 32:08 (RUNNING 00:00:07.963)

16   Q. Did Wendy's view self-support as risky

17   because they were unable to have --

18   A. Not so much.

19   Q. -- the capacity?

20   A. No.

21    PAGE 42:20 TO 43:07 (RUNNING 00:00:29.053)

22   Q. Generally, as you sit here today, do you

23   have an understanding of what sets Rimini

24   Street apart from TomorrowNow?

25   A. Yes.

1533

1    Q. And what is that?

2    A. Well, it's -- those business practices.

3       It's -- it's all I can state is the business

4       practices that took place with TomorrowNow

5       didn't exist with Rimini Street.

6    Q. All right.  Is that belief based on

7       representations that were made by Rimini

8       Street?

9    A. Yes.

10   PAGE 43:08 TO 43:10 (RUNNING 00:00:05.812)

11   Q. Do you remember specifically who made

12      those representations to you?

13   A. No.

14   PAGE 43:11 TO 43:21 (RUNNING 00:00:21.909)

15   Q. So at the time of this email, did Wendy's

16      believe that Rimini was using a different

17      support model than TomorrowNow?

18   A. Yes.

19   Q. Did Wendy's believe that Rimini's support

20      model was lawful?

21   A. Yes.

22   Q. And just to clarify, that was based on the

23      representations that were made by Rimini

24      Street; is that correct?

25   A. Yes.

1534

1        PAGE 46:01 TO 46:04 (RUNNING 00:00:08.644)

2    Q. Would Wendy's have switched to Rimini

3    Street for support if Wendy's believed that

4    Rimini Street provided support in any way

5        PAGE 46:06 TO 46:11 (RUNNING 00:00:08.866)

6    THE WITNESS:  No.

7    Q. Would Wendy's have switched to Rimini

8    Street for support if Wendy's believed that

9    Rimini Street provided support in a way that

10   went beyond the scope of their PeopleSoft

11   license agreement?

12   PAGE 46:13 TO 46:13 (RUNNING 00:00:01.808)

13   THE WITNESS:  No.

14   PAGE 75:01 TO 75:05 (RUNNING 00:00:08.746)

15   Q. If Wendy's believed that Rimini Street had

16   a business model that involved the improper

17   use of intellectual property, would Wendy's

18   have contracted with Rimini Street for

19   support?

20   PAGE 75:08 TO 75:13 (RUNNING 00:00:10.598)

21   THE WITNESS:  No.

22   Q. If Wendy's believed that Rimini had a

23   business model that involved the improper use

24   of intellectual property, would that have

25   made Wendy's less likely to provide

1535

1       references to other Rimini Street customers?

2       PAGE 75:15 TO 75:15 (RUNNING 00:00:00.716)

3       THE WITNESS:  Yes.

4       PAGE 79:14 TO 79:21 (RUNNING 00:00:18.166)

5       Q. And I believe you mentioned that

6       self-support -- you didn't do self-support

7       because of budget constraints?

8       A. Yeah.  It would take additional resources,

9       internal, and we were looking to reduce

10      internal resources at the time.

11      Q. Okay.  Could Wendy's have done

12      self-support if it had sufficient manpower?

13       PAGE 79:24 TO 79:24 (RUNNING 00:00:01.159)

14      THE WITNESS:  Yes.")

15      (Deposition ends.)

16          THE COURT:  All right.

17          MR. ISAACSON:  Your Honor, may I approach?

18          THE COURT:  Yes.

19      (Sidebar conference held as follows:)

20          MR. ISAACSON:  This is about the limiting

21  instruction which you gave earlier today.

22          The first video was about a JDE customer.  The

23  second video was about a Siebel customer.  Both of those

24  copyright liability remains contested.

25          This was a PeopleSoft customer for which the

1    Court has found liability.  In the limiting instruction

2    that the Court gave, you said determining copyright

3    liability is going to be your job, which I think could be

4    confusing to them.

5              And, in a nonprejudicial manner, I think you

6    should advise them that you've made a determination of

7    PeopleSoft -- while some -- they're going to be deciding

8    some issues of copyright liability, you've already made a

9    determination as to PeopleSoft liability.

10             MS. CHUANG:  I think they'll be instructed on

11   that at the end of the case.  What I suggest is that we do

12   not -- we -- obviously with the limiting instruction at

13   this point, but they'll be advised of that.

14             THE COURT:  All right.  I'm concerned that my

15   previous limiting instruction would be confusing so I'm

16   going to attempt a clarification.

17             MR. ISAACSON:  Okay.  Thank you.

18        (Sidebar conference concluded.)

19             THE COURT:  Ladies and gentlemen, you may recall

20   that I gave you a limiting instruction earlier with regard

21   to the nature of the questions being asked of customers

22   such as -- essentially, there have been I think three or

23   perhaps four different customers who have testified.

24             My limiting instruction would not apply to this

25   last witness for the reason that he, the representative of

1537

1    Wendy's -- which I'm sure everyone's familiar with

2    Wendy's -- Wendy's was a company which was using

3    PeopleSoft.

4             And the Court has previously made a

5    determination that there was an improper use of the

6    PeopleSoft software by Rimini Street in connection with

7    PeopleSoft.  So, for that reason, the limiting instruction

8    would not apply.

9             However, you should still consider the testimony

10   as you would with any other witness.  And I hope I've

11   clarified that sufficiently.

12            At this time, we will take our luncheon break,

13   and that will be approximately 20 minutes, give or take.

14   When you're ready, let us know.

15            All the admonitions apply.

16            COURTROOM ADMINISTRATOR:  Please rise.

17            THE COURT:  You may step down.

18        (Recess from 12:09 p.m. until 12:33 p.m.)

19            COURTROOM ADMINISTRATOR:  Court is again in

20   session.

21            THE COURT:  Have a seat, please.

22            The record will show that we are in open court.

23   The jury is all present.  Counsel and the parties are

24   present.

25            And I understand that plaintiffs have a witness

DONNA DAVIDSON, RDR, CRR, CCR #318    (775) 329-0132

1538

1    to call.  Is that correct, Ms. Dunn?

2              MS. DUNN:  Thank you, Your Honor.

3              Oracle calls Edward Screven.

4              COURTROOM ADMINISTRATOR:  Please raise your

5    right hand.

6              You do solemnly swear that the testimony you

7    shall give in the cause now before the Court shall be the

8    truth, the whole truth, and nothing but the truth, so help

9    you God?

10             THE WITNESS:  I do.

11             COURTROOM ADMINISTRATOR:  Please be seated.

12             Please state your name and spell your name for

13   the record.

14             THE WITNESS:  Yes, my name is Edward Screven;

15   that's E-d-w-a-r-d, S-c-r-e-v-e-n.

16             COURTROOM ADMINISTRATOR:  Please tell us your

17   city and state of residence.

18             THE WITNESS:  Yes, I live in Portola Valley,

19   California.

20             THE COURT:  All right.  Go ahead, please.

21

22

23

24

25

1539

EDWARD SCREVEN

called as a witness on behalf of the

Plaintiffs, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. DUNN:

Q.    Good afternoon, Mr. Screven.  How are you?

A.    Good.

Q.    Where do you work?

A.    I work for Oracle.

Q.    How long have you worked for Oracle?

A.    I joined Oracle in 1986, so almost 30 years.

Q.    And please tell the jury what you did before you
worked for Oracle?

A.    I was in college at Carnegie Mellon University.

Q.    Okay.  And in college what did you study?

A.    I studied applied mathematics and computer science.

Q.    Did you graduate from college?

A.    I did not.

Q.    Why not?

A.    Well, I got recruited by Oracle and decided to go
work for Oracle.

Q.    Okay.  How did that happen?

A.    Oracle came on campus recruiting folks, and my
résumé was in a résumé book.

            They called me up and asked me if I wanted to

1540

```
 1    come out and visit in California.  And being in Pittsburgh,
 2    that sounded like a pretty good idea.
 3              So I went there, I interviewed, they gave me a
 4    job offer before I left, and so I decided that is what I
 5    wanted to do.
 6    Q.    And you've been there ever since?
 7    A.    Ever since.
 8    Q.    Okay.  What was your job when you first started at
 9    Oracle in 1986?
10    A.    When I first started, I was a programmer in our
11    applications division.  So the company had just started
12    building business applications, and that was my first job.
13    Q.    You've been there for about 30 years.  Can you tell
14    the jury a little bit about how Oracle has changed since
15    you first got there?
16    A.    Yes.  When I first started at Oracle, Oracle was
17    small.  They were about 400 employees total in the world.
18              We had one real product, the Oracle Database.
19    And over the years we've started adding on to that set of
20    software that we built.
21              So we started building business applications.
22    We started building something called middleware, which is
23    how you actually make applications run on top of a
24    database.
25              We eventually acquired a company called Sun
```

1      Microsystems that made computers and storage.  So we began

2      to offer basically the complete stack of hardware and

3      software that customers need to run their enterprise,

4      whether they're governments or hospitals or businesses,

5      schools.

6              And today we actually have 130,000 employees

7      around the world.  So the company has grown a lot over 30

8      years.

9      Q.    And as someone who started out as a programmer, are

10     you proud of the company?

11     A.    I'm very proud of Oracle, yes.

12     Q.    Okay.  So let's talk about you.  How has your job

13     changed over the past 30 years?

14     A.    After I was a programmer in the applications

15     division, I moved over to start working on the tools that

16     are used to build applications.

17             I became a manager of programmers.  I went to

18     work for one of our founders in an advanced products group.

19             Then I started working for our CEO, Larry

20     Ellison, as a technical staff person, and that job

21     eventually grew into becoming what is my current role, my

22     current title, Chief Corporate Architect.

23     Q.    And Chief Corporate Architect, is that pretty high

24     up in the company?

25     A.    Yes, I report directly to our CEO.  I have about

1542

1    2,000 people reporting to me.

2    Q.    What do you do as Oracle's Chief Corporate

3    Architect?

4    A.    Well, my job is to make sure that our products and

5    technologies work together to help solve customer problems,

6    to help make sure that we can manage the information that

7    our customers have that is critical to their businesses.

8           So I make sure the groups can work together

9    well, I make sure that the technology choices that we're

10   making are reasonable and consistent.

11          I get involved in our mergers and acquisitions.

12   So if there's a company out there that we think may add to

13   our portfolio in a positive way, then we need to evaluate

14   the technology.

15          I'm also in charge of security at Oracle.  So

16   that includes physical security and information security

17   and something called product information assurance.

18   Q.    So primarily today I'm going to ask you questions

19   about security.  And you mentioned product assurance and

20   information security.  And I want you to just explain to

21   the jury in a little more detail what those two things are.

22   A.    So product information assurance is the set of

23   policies and procedures and processes that we have to make

24   sure that the products that we build and deliver to

25   customers are secure, that they don't have vulnerabilities,

1       that our customers can use them to create secure systems.

2                That group also deals with vulnerabilities.  So

3       sometimes vulnerabilities are discovered in our

4       technologies and we need to respond to them.

5                So we need to understand what the vulnerability

6       is.  We need to work with engineering to make sure they fix

7       the vulnerability, and then we need to deliver that fix to

8       the end customer.

9                The information security team is more inwardly

10      focused.  So what they do is they work to make sure that

11      our internal systems are actually secure; to make sure that

12      they're all patched and up to date; to make sure that

13      they've been configured in a way which protects them from

14      attack; and to make sure that the information that we store

15      about our business and also the information that we store

16      that belongs to our customers that we maintain is also

17      secure.

18      Q.    Okay.  So just to be completely clear, and I'll say

19      this simply, so tell me if I'm wrong, but the one kind of

20      security you're talking about is really security of

21      Oracle's servers and Oracle's information held at Oracle;

22      and the other kind of security has to do with how Oracle is

23      helping its customers secure their data?

24      A.    That's right.

25      Q.    Is that right?

1    A.    That's a very good summary.

2          So product information assurance is how we make

3    sure that our customers can secure their data using our

4    products, and then the information security team is about

5    how we secure our own systems that we use ourselves and

6    that we run on behalf of our customers.

7    Q.    Okay.  So, first, before we talk about security, you

8    had also said that you provide technical direction across

9    Oracle's products.

10         So the jury already knows by this point

11   extremely well that the products at issue in this case are

12   Database, Siebel, JD Edwards, and PeopleSoft.

13         What's your technical responsibility for those

14   products in particular?

15   A.    Well, as in general, I am responsible for making

16   sure that technology choices that are being made in terms

17   of how we build those products, how we maintain those

18   products and evolve them over time make sense; that they

19   are lined up with our company strategy; that they're

20   consistent with choices we're making in other product

21   areas; and that it's possible to integrate those

22   applications and those technologies with other applications

23   and other technologies that our customers may want to use.

24   Q.    What does it take to build an enterprise software

25   application from scratch?

1545

1    A.    Well, it's hard and long and expensive.

2              So enterprise applications need to address

3    complex requirements for lots of different kinds of

4    enterprises, so governments, you know, hospitals, schools,

5    companies, companies that are large, companies that are

6    small, companies that operate in the United States,

7    companies that operate in Brazil and other places.

8              And so understanding all of those requirements

9    is hard.  It takes a long time.

10             Designing, designing a database schema, the

11   structure that's used in the database to store all of the

12   data that you need in order to support the business

13   processes of those enterprises takes a very long time.

14             Writing all the code to manipulate the data and

15   present the data to the users and accept data from the

16   users is large.

17             So it's, you know, millions and millions of

18   lines of code for every application, and thousands,

19   literally thousands of programmers working on it to deliver

20   those applications.

21   Q.    And Oracle copyrights its software; right?

22   A.    Yes, we do.

23   Q.    Why does it do that?

24   A.    Well, if we did not copyright our software, then it

25   would mean that other parties could take our software and

1546

1   use it and sell it without paying us, and what that would

2   mean is that we could not then employ the thousands and

3   thousands of engineers that we have to employ to build that

4   software.

5   Q.   Does Oracle disclose that its software and support

6   materials are copyrighted?

7   A.   Yes, it's very, very easy to see that our software

8   is copyrighted.  So on websites you see copyright notices,

9   on screens of the applications themselves you see copyright

10  notices.

11          Within the documentation you see copyright

12  notices.

13          On the physical disks which are the installation

14  media you see copyright notices.

15          Within the source code files themselves -- so

16  the source code files are what programmers create in order

17  to actually generate the application.  Every single one has

18  at the top a copyright notice.

19          It's very, very plain to everyone that our

20  software is copyrighted.

21  Q.   All right.  So let's talk now about security.  Does

22  Oracle have a particular philosophy about security?

23  A.   Yes.  We believe in something called defense in

24  depth.  And what defenses in depth means is that you put

25  security layers at multiple places.

1547

1    So starting at the lowest level, you have

2    security in the database, that you use database features

3    that we've designed to lock down the data and make sure

4    that people who are not authorized to get the data or

5    change the data, that they cannot do that.

6    We put security functionality in our middleware.

7    The middleware, again, is the software that sits in between

8    the application and the database.  So there are security

9    features in our middleware to help protect the data.

10    In our applications themselves, there are

11    security features to make sure that only authenticated,

12    authorized users have access to the information that

13    they're supposed to have access to.

14    Q.    So with those two categories that we discussed,

15    securing the data and servers and everything at Oracle, and

16    then helping customers secure their data, let me first ask

17    you what steps Oracle takes to secure its own data and

18    information?

19    A.    Well, information that we use ourselves internally

20    inside the company, of course, we apply that defense in

21    depth technique.

22    I mean, for one thing, we use Oracle technology

23    for our own data, to manage our own data.  We use database

24    security features that protect the data.  We use middleware

25    security features.  We use application security features.

1548

1           We also use features in the environment like

2     firewalls and other mechanisms to help secure that data.

3           Now, we have to actively manage that environment

4     because, you know, there are threats that arise all the

5     time.  Hackers are very clever, they're very motivated,

6     they have a lot of resources.

7           So that means that we always have to be aware of

8     potential threats, potential new threats.  And when new

9     vulnerabilities are discovered, we have to immediately

10    repair them.  That means applying patches to the systems

11    that we run to store that data and make sure that those

12    vulnerabilities are closed off.

13    Q.   You mentioned hackers.  How do you stay ahead of the

14    hackers?

15    A.   Well, we have a large team that does a couple

16    things.  I mean, for one thing, they train themselves all

17    the time on techniques that are used by hackers in order to

18    break in the systems.  And that particular team is called

19    the ethical hacking team.

20          They're called ethical because, let's face it,

21    there are hackers out who are not ethical, okay, and they

22    like to distinguish themselves from that crowd.

23          Okay.  So what they do is they stay current on

24    the various kinds of tools and techniques that hackers use

25    to break into systems.

1    And they use their knowledge to do a couple of

2 things.  One is they communicate to the rest of Oracle's

3 engineering organization about the techniques that they

4 need to protect against.

5    The other thing that they do is they actually

6 try to break into our products.  They try to actually break

7 the security that's part of those products.

8    Sometimes they succeed.  When they succeed, we

9 know now there's a vulnerability that we have to close off.

10    Another important thing that we do with our

11 products is we use automated tools.  So both tools that

12 we've licensed and tools that we've built ourselves, we run

13 those tools against the software that we've built against

14 the systems that we have and try to break into them.

15    So doing things like opening a network

16 connection to the server and putting data into it that the

17 server didn't expect.  What happens?  Did the server

18 actually crash?  Did the server correctly close off that

19 connection?

20 Q.   All right.  So now let's talk about the security

21 that Oracle helps provide for its customers.  Is that

22 generally done in the form of security updates to Oracle's

23 applications?

24 A.   Yes.  For all of our software actually.

25    So what we do is every quarter, every three

1550

1    months, we release something called a critical patch

2    update.

3              A critical patch update is a collection of

4    patches to our software that closes off security

5    vulnerabilities that have been discovered, usually

6    discovered by Oracle itself, sometimes discovered by people

7    outside of Oracle.

8              So every three months we release a bundle of

9    fixes to all of our software.  Those bundles very often

10   include fixes to PeopleSoft -- JD Edwards and PeopleSoft.

11   Q.    What happens if there's some security issue that

12   doesn't wait for the three months?

13   A.    Yeah.  So every once in a while, and this is not

14   good when it happens, there is something called a zero day

15   threat.

16            A zero day threat means that there is a known

17   vulnerability that -- by known, I mean publicly known,

18   publicly understood, that is being actively exploited, and

19   so that means that we have to issue an emergency fix, what

20   we call -- at Oracle we call it a security alert.

21            So that is a patch that we issue for the

22   affected products that should be applied by our customers

23   immediately, without delay, without waiting for that

24   three-month cycle.

25   Q.    Why does Oracle issue these security updates?

1    A.    Well, if a customer does not apply security updates,

2    then their systems are vulnerable.

3            I mean, if -- if you do not patch the

4    vulnerabilities in the software, then hackers will

5    eventually, eventually find their way in to exploit that

6    vulnerability.

7            So one thing that happens is that when Oracle

8    releases a critical patch update or a security alert patch,

9    even though it's not publicly known at the time,

10   necessarily, about those vulnerabilities existing, people

11   out there in the world, they reverse engineer those

12   patches, they look at what we actually fixed.

13           And when they know what we fixed, then they know

14   what they can exploit.  And so it becomes essential for

15   customers to apply those patches on a regular basis.

16           That's why, in fact, we issue those critical

17   patch updates on a scheduled basis so you know one year in

18   advance when a given critical patch update is going to be

19   released, so therefore you can schedule the resources you

20   need to have your people ready to apply those fixes as soon

21   as we release them.

22   Q.    And you said you'd been at Oracle for about 30

23   years.  How long have you been working in security?

24   A.    It's about 20 years.  I got involved in security

25   actively at Oracle in the mid 1990s.

1    Q.    And are the security issues that you're dealing with

2    today essentially different or similar to the issues you

3    were dealing with 20 years ago?

4    A.    It's much worse today.  If you read the newspaper,

5    you read about, you know, really terrible breaches, you

6    know, that occur on a regular basis.

7           And the reason that happens is that, you know,

8    the number of people out there who are trying to break into

9    systems is higher, their motivation is much greater,

10   because hackers have figured out they can make money by

11   breaking into systems.

12          They steal credit card numbers and sell them.

13   They get sensitive company information and use it for

14   financial gain.

15          So hackers have better tools, there are more of

16   them, and they have financial motivation, and so the rate

17   at which attacks, at least attempted attacks, occur is much

18   higher than before, and the criticality of addressing

19   vulnerabilities is much higher than before.

20   Q.    Okay.  So you mentioned credit card numbers which

21   makes me want to ask whether there's some difference

22   between the security you need for enterprise software which

23   secures data that's personal to people like credit card

24   numbers, and personal software that you might have at home?

25   A.    Yes.  So a hacker, of course, they want the most

1  important information from their target.  You know, they

2  want the most sensitive information from their target, and

3  that more sensitive information is stored using enterprise

4  applications.

5          So, for example, you know, a company may have a

6  human resources application, and that human resources

7  application is going to store social security numbers of

8  all the employees.

9          They may -- they may have a payroll system.

10  Well, that payroll system has the financial records of all

11  of the employees, including their bank account numbers.

12          You know, they may have a customer relationship

13  management system which stores sensitive information about

14  all of the customers of a company.

15          But, actually, CRM is also used by governments.

16  So to the government, the citizens are customers, and so

17  they use CRM systems to actually store very sensitive

18  information about the citizens.

19          So enterprise applications store the most

20  sensitive, most critical data of large enterprises, and

21  small enterprises too, for that matter.

22  Q.    Do you have an example of a security update that

23  Oracle has issued in the past that you can tell us about?

24  A.    Sure.  So in about 2012 timeframe, a security

25  vulnerability was discovered in the Oracle Database.

1          So the database has something called a listener

2   which listens on networks for connections.

3          And a vulnerability was discovered that meant

4   that hackers could do something called the denial of

5   service attack.  They could cause the database to become

6   unavailable to regular users.

7          In other words, they could disrupt the business

8   operations enterprise, and so we had to fix that.

9          And that probably took us, you know, 30 people

10   in order to close off that vulnerability.

11          It's expensive to fix these vulnerabilities.

12   That's a reason why we spend a lot up front trying to avoid

13   having vulnerabilities to begin with.

14          So 30 people, that includes people to understand

15   what the vulnerability is, people to design a fix for the

16   vulnerability, people to code a fix for the vulnerability,

17   and people to test the fix.

18          So fixing vulnerabilities in software, you know,

19   it takes resources, it takes people, it takes time.

20   Q.    And once Oracle develops a security update, can it

21   refer a customer -- or because of a customer's problem, can

22   it then issue the update to other customers?

23   A.    Yes.  In fact, we do that all the time.

24          So if a customer reports to us a vulnerability

25   that they have discovered, then we produce a fix to that

1555

1    vulnerability, and, of course, we give it to all of our

2    customers.

3    Q.    All right.  So what would happen if a customer did

4    not update its software with a security update, or if they

5    chose a kind of support that didn't come with security

6    updates, what would happen then?

7    A.    Well, what will happen is over time, as more and

8    more vulnerabilities are discovered in the software they

9    have deployed, they would become more and more at risk of

10   being exploited, of having their most sensitive information

11   taken or having their databases corrupted by an attacker.

12            So it's almost as if, you know, their

13   installation of the software would basically just rot

14   because they would become more and more vulnerable over

15   time.

16   Q.    So even if on day one it was not apparent that they

17   were vulnerable, what you're saying is that over time the

18   situation would get worse?

19   A.    Yes, in fact, it really doesn't -- it would get

20   worse because the knowledge in the public domain about the

21   vulnerabilities of the software would go up.

22            And, actually, it doesn't actually take very

23   much time because, you know, every three months Oracle

24   issues critical patch updates.

25            So, in July, Oracle issued a critical patch

1556

```
 1    update which included fixes to vulnerabilities to

 2    PeopleSoft, JD Edwards, and Siebel.  So a customer that did

 3    not apply that patch is vulnerable today, right now.

 4             Over a year, the number of vulnerabilities they

 5    are exposed to is greater.  Over five years, the number of

 6    vulnerabilities that they are exposed to are far higher.

 7    Q.    All right.  So previously in this case the jury has

 8    heard a little bit about security.  So I'd like to talk to

 9    you about some of the things that happened before you got

10    here.

11             First, I'd like to show you an excerpt from

12    Mr. Ravin's testimony last week where he describes Rimini

13    Street's approach to security for customers, and he said it

14    was called something -- he said it was called holistic

15    security.

16             Have you ever heard of that?

17    A.    No, no.

18    Q.    Okay.  So let's just look at the transcript and go

19    through it together.

20             So if you look at the top on your screen, the

21    question was,

22             "Rimini Street, at least until -- at least

23    through 2011, did not provide any security updates to its

24    clients.

25             "That's correct."
```

1               The As are Mr. Ravin and the Qs are

2     Mr. Isaacson.

3               "And, in fact, you actually told customers that

4     they weren't necessary -- you told them they weren't

5     necessary."

6               And Mr. Ravin says, "Yes, that's because it's an

7     outdated model relative to what we call holistic security

8     today."

9               So let me ask you about that.  It sounds like

10    Mr. Ravin is saying that the security updates are an

11    outdated model.

12              Do you have any reaction to that?

13    A.    I do.  That's totally ridiculous.  It's completely

14    and totally ridiculous.

15    Q.    Why?

16    A.    Because you must patch software vulnerabilities in

17    order to avoid being vulnerable.  If all you do is you set

18    up firewalls around systems, you are making a grave, grave

19    mistake.

20              Hackers will and do on a regular basis penetrate

21    through firewalls.  They send people poison email messages

22    that set up relay stations that let them get into your

23    networks.

24              All you have to do is look at the news.  The

25    Federal Government, the Office of Personnel Management,

1     definitely firewalled, millions, millions of records stolen

2     from them by hackers.

3               Home Depot, millions of credit card numbers

4     stolen from them.  They definitely have firewalls.

5               You must -- you must patch your systems in order

6     to be secure.

7     Q.    All right.  So let's keep going.

8               The question Mr. Isaacson then asks is,

9     "Holistic security means don't put security in the

10    software, just put it in the firewall at your place of

11    business; right?"

12              Mr. Ravin says, "It's actually the most

13    innovative version available today for security people."

14              And then Mr. Isaacson says, "But it involves not

15    putting any security updates in the software to deal with

16    hackers."

17              And Mr. Ravin says, "It's called virtual

18    patching and firewall systems."

19              And then the question is, "And the firewall

20    systems are systems that are maintained by the client, the

21    customer, not by Rimini Street for the customer; right?"

22              And Mr. Ravin says, "That's correct.  They," the

23    customer, "are responsible for their own firewalls and

24    their own security protection."

25              What's your view, Mr. Screven, on whether having

1559

1   a customer be responsible for their own firewalls is

2   sufficient security protections for the data that you've

3   previously described?

4   A.    It is grossly insufficient.  Every single -- every

5   single customer that you -- that's out there has firewalls.

6            When you read the news and you read about

7   security incidents that have happened, all of those

8   incidents have happened despite firewalls.

9            Firewalls are necessary, but firewalls are not

10  sufficient.  You must protect your systems in every level

11  you can, and that definitely includes patching.

12           You know, people from the outside are not the

13  only possible attacker.  People come into enterprises.

14           I mean, here we are sitting in this courtroom.

15  This courtroom has a computer network.  There are employees

16  of companies, there are employees of governments.  All of

17  those people are potential threats.  It's sad to say, but

18  it's true.

19           You have to protect your data every possible way

20  you can, and definitely, absolutely, essentially, you must

21  patch your systems and stay up to date.

22  Q.    And in your -- from your perspective, is that part

23  of the responsibility of the person who's providing the

24  support for the software, or the company that's providing

25  the support for the software?

1560

```
 1    A.     I think that if you do not provide security fixes,

 2   security patches of software, you cannot possibly claim to

 3   be providing support.

 4              MS. DUNN:  All right.  Let's move to Plaintiffs'

 5   Exhibit 5455.  And this was something that we also saw on

 6   the screen the other day.  It's been preadmitted, or it's

 7   been admitted.

 8              And if we could just blow up the top of that

 9   email, that would be great.  Thank you.  Okay.

10   BY MS. DUNN:

11   Q.     All right.  So this was an email from Krista

12   Williams of the -- the jury saw her video this morning, and

13   the subject is security, security patches and updates.

14   Mr. Isaacson also asked Mr. Ravin about this email the

15   other day.

16              It contains a question that says, "Are security

17   patches part of the maintenance agreement?"

18              So this is a question being posed to Rimini

19   Street.  "Are security patches part of the maintenance

20   agreement?"

21              And the answer is, "No.  Rimini Street does not

22   have the ability to modify the binary code that comprises

23   the tools foundation, PeopleTools, WebLogic, thus we did

24   not provide updates that are equivalent to Oracle's

25   critical patch and security alerts."
```

1    So my question for you, Mr. Screven, is does

2    this surprise you?  Does it surprise you that Rimini Street

3    does not do this?

4    MR. RECKERS:  Objection, foundation.

5    THE COURT:  Overruled.

6    THE WITNESS:  Well, it does not surprise me that

7    they are not able to provide security patches and security

8    fixes.

9    BY MS. DUNN:

10   Q.    Why not?

11   A.    Well, they state it plainly right there for --

12   there's one of the reasons.  I mean, one of the reasons is

13   they don't actually have the source code for important

14   parts of the application, parts of the application which

15   are especially critical for security.

16   So programmers, as I mentioned before, they

17   create source code, you know, and that is then compiled

18   into the application.

19   So, you know, if I don't have the source code

20   then I cannot modify the application.  I have to have --

21   the way I actually create a security fix is I change the

22   source code and then generate the application.

23   If I don't have a source code to start with,

24   then I can't fix the security vulnerability.

25   I mean, yeah, so, yeah, I'm not surprised they

1562

1    can't do this.

2            The other reason I think it would be very hard

3    for them to produce a security fix is even if they had the

4    source code, is it takes a lot of expertise and

5    understanding of the underlying software in order to find

6    these security vulnerabilities and fix them.

7            I mean, the security vulnerabilities are in

8    there even though Oracle has applied massive amounts of

9    resources over time to develop the software, to test the

10   software, to look for security vulnerabilities.  We have

11   thousands of programmers working on these applications.

12           So without that sort of expertise and without

13   the kind of investment that Oracle has made, it's very hard

14   to find and fix security vulnerabilities.

15   Q.   All right.  And if you just go to the bottom of this

16   email, it says,

17           "The strategy we recommend to our clients is to

18   shore up all other aspects of security such as user

19   accounts, network access, firewall rules, and system

20   architecture."

21           Would your answer to this -- or reaction to this

22   be the same as what you have already said about relying on

23   the customer's firewall?

24   A.   Yes, it's the same, grossly insufficient.

25           MS. DUNN:  All right.  Let's look at another

1563

1    part of the transcript from the other day with Matt's

2    assistance.  Thank you.

3    BY MS. DUNN:

4    Q.    So last week Mr. Isaacson asked Mr. Ravin, if a

5    customer came to him,

6              "And they've been running the same version of

7    their software for 10 years, they haven't updated forever,

8    you're saying that you would allow them to keep that same

9    software running for another 15 years?"

10             So, in other words -- this isn't in the

11   transcript, but software today would run until the year

12   2030.

13             Mr. Ravin's response was,

14             "Yes, we have many clients who run software that

15   was released in 1996, so almost 20 years already."

16             Mr. Screven, what's your reaction to that?

17   A.    I seriously doubt that, that they are running

18   software today that you got a version of in 1996 and have

19   not patched it and updated, and upgraded it.

20             And the reason is as follows:  Your software

21   application depends on other things.  It runs on top of an

22   operating system, it runs on top of a server that then uses

23   storage and uses networking.

24             All of those other components, operating system,

25   servers, storage, networking, they are all changing over

1564

```
 1    time too.  I'm buying new servers, I have to apply updates

 2    to my operating systems, I have to update my storage.

 3            And so in order to keep using, you know, that

 4    newer hardware, that newer operating system software, very

 5    often the applications have to be modified.

 6            So very often I need to apply updates to my

 7    software in order to use the newer physical hardware and

 8    operating system that I'm using.

 9    Q.    All right.  Switching gears just a little bit.

10            The jury has heard Rimini Street obtained

11    something called an ISO certification or certifications.

12    Are you familiar with those?

13    A.    Yes.

14    Q.    Is Oracle ISO certified?

15    A.    We have several ISO certifications.

16    Q.    ISO?

17    A.    ISO.

18    Q.    Okay.  ISO.

19            Does ISO certification have anything to do with

20    whether a company has the technical expertise to provide

21    security to its customers for their software?

22    A.    It does not.

23            MR. RECKERS:  Objection, Your Honor, this is

24    expert opinion from a lay witness.

25            THE COURT:  I think some greater foundation is
```

1      necessary to show his qualification with regard to ISO.

2                  MS. DUNN:  No problem, Your Honor.

3      BY MS. DUNN:

4      Q.    Mr. Screven, in the 30 years that you've worked with

5      Oracle, the 20 years you've worked in security, and your

6      time as Chief Corporate Architect of Oracle, what is your

7      basis for your knowledge about ISO certifications, if you

8      would tell us?

9      A.    Well, many of our ISO certifications and the ones

10     that are relevant here, are related to information

11     security, and so it's my information security team that

12     actually guides and steers the process to get ISO

13     certification for our environments.

14     Q.    And you're not putting yourself out as an ISO

15     expert, are you?

16     A.    I'm not.  I can report our experiences and my

17     understanding of what Oracle has done to become ISO

18     certified.

19                  MS. DUNN:  Your Honor, may I proceed?

20                  THE COURT:  All right.  You may proceed.

21                  MS. DUNN:  Thank you.

22     BY MS. DUNN:

23     Q.    Okay.  So based on your experience and knowledge,

24     does ISO certification have anything to do with whether a

25     company has the technical expertise to provide security

1566

1    updates to its customers?

2    A.    No.  The ISO standards that are relevant to

3    security, they are in something called the ISO 27000

4    family, and those standards are all about the processes

5    that you use to secure your internal information systems.

6              So do you have security practices related to

7    managing those servers?  Do you have people whose job it is

8    to respond to threats to those servers?

9              It has nothing to do with writing software and

10   delivering it to customers, and, in fact, the people at

11   Oracle who design our ISO processes and that who actually

12   help us get certification are completely different than the

13   people who write the applications and fix security

14   vulnerabilities in those applications.

15   Q.    And do ISO certifications have anything to do with

16   helping customers who might be running on old or very old

17   software?

18   A.    No.  It's totally different.

19   Q.    All right.  So remembering back to last week, if

20   anyone can do that still, we heard a term called

21   installation media.

22              Mr. Screven, what is installation media?

23   A.    Installation media is something like a CD or a DVD

24   or, in the old days, tapes that contain bits that will be

25   copied onto servers as part of an installation.

1   Q.   And if contents of a CD are copied onto a computer,

2   is that installation media?

3   A.   Well, the installation is the physical disk.  The

4   copy on the computer after you install it is not

5   installation media.

6   Q.   Okay.  So I'm going to use this white board because

7   everyone else has used it but me, and I have to get it.

8   Hold on one second.

9            All right.  So I'm just going to ask you about a

10  few things, and just tell me whether they're installation

11  media.  Okay?

12           All right.  PeopleTools, installation media?

13  A.   No.

14  Q.   Software updates, is that installation media?

15  A.   No.

16  Q.   Okay.  Patches, software patches, is that

17  installation media?

18  A.   No.

19  Q.   Okay.  How about fixes, are they?

20  A.   No.

21  Q.   All right.  How about support documentation, is that

22  installation media?

23  A.   No.

24  Q.   All right.  And one more, kits, maintenance kits, is

25  that what they're called?  Is that installation media?

1568

1    A.    No.

2    Q.    Okay.  All right.  What's the difference between an

3    update and an upgrade?

4    A.    Well, it's a --

5    Q.    Oh, wait.  Before you go on, Mr. Isaacson wants for

6    you to explain why it's not, specifically for PeopleTools

7    and for kits?

8    A.    Well, installation media is a physical thing.  I

9    mean, it's a physical DVD, it's a physical CD-ROM.

10            Once I have copied whatever is on that CD or

11    DVD, whether it's PeopleTools or a kit or anything else,

12    once I have copied it onto a computer as part of

13    installation, I mean, the copy I made on the computer is no

14    longer the physical installation media, it's no longer the

15    physical thing.

16    Q.    I'll have to improve his handwriting.

17            All right.  How about PeopleSoft software?

18    A.    It's exactly the same thing.  As soon as I copy it

19    from the physical thing, then -- the installation media

20    onto computer, it's no longer installation media.

21            I mean, the thing I copied, the copy that's on

22    the computer is not the installation media, it's not the

23    disk.

24    Q.    What's the difference between an update and an

25    upgrade?

DONNA DAVIDSON, RDR, CRR, CCR #318    (775) 329-0132

1569

1      A.      In some ways, it's a matter of degree.  They are

2    both -- they are both -- they are both changes to an

3    existing version of software.

4              So an update tends to be smaller.  It contains

5    bug fixes, it contains maybe some very minor enhancements

6    like you might add a field to a screen, nothing significant

7    in terms of the functionality of the application.

8              An upgrade is significant new functionality, so

9    you know, new capabilities in the software that weren't

10   there before, maybe new screens.  People tend to think of

11   upgrades as being a new version of the software.

12   Q.    And can you just give me an example of an upgrade?

13   A.    Yes.  So an upgrade would be something like going

14   from, you know, Oracle Database version 11 to Oracle

15   Database version 12.

16   Q.    Prior Oracle witnesses have testified that Oracle

17   does not charge for upgrades.  From your technical

18   perspective, why, if at all, are upgrades valuable to

19   customers?

20   A.    Well, because upgrades incorporate valuable new

21   functionality, and that functionality may help you run your

22   enterprise better.

23             I mean, it may help you manage your employees

24   better.  It might mean that you have a better idea of what

25   your customers may want to buy.

1    If you're a government, it may mean that you do

2  a more effective job at targeting social resources to

3  people who need it.

4    But, more than that, the world we live in

5  changes.  You know, the technologies that people want to

6  use change over time.

7    So, I mean, today, of course, Internet

8  integration with applications is standard.  You know,

9  mobile integration is standard.  That was definitely not

10  true 10 years ago.

11    So upgrades are valuable to customers because it

12  helps them run their enterprise better, but also helps them

13  evolve with the evolving expectations and capabilities in

14  the world.

15  Q.    But what if I say I don't want any new

16  functionality?

17  A.    Well, you may not want it right now, but eventually

18  you're going to want it because you're going to want to be

19  able to provide better service to your customers, you're

20  going to want to be able to provide, you know, a better

21  experience to your employees.

22    You're going to want to be able to take

23  advantage of some new technology, some new way of accessing

24  the data which is stored within that -- that environment.

25  Q.    Does Oracle force customers to upgrade?

1571

1    A.    No, we don't force people to upgrade.

2    Q.    To what extent do customers choose to upgrade in

3    your experience?

4    A.    Well, in the long run they upgrade.

5          When I first joined Oracle, the current shipping

6    version of the database was Oracle version 5.  The current

7    shipping version of Oracle today is Oracle version 12.

8          You could find very, very few cases of customers

9    running a version of the database older than 10.  So over

10   those years, people have upgraded the database.

11   Q.    So what would you say to someone who says to you

12   that getting upgrades or new releases of something for no

13   additional cost is a bad thing?

14   A.    It's hard to understand how that could be a bad

15   thing.  So I'll give you an analogy.

16         So, I drive a car that was -- I bought in 2003.

17   I really like the car.  It's a stick shift sedan, if you

18   can believe it.  That's why I really like it.

19         Okay.  Now, I would still find it valuable if,

20   when I went to the dealer to have it serviced, he told me

21   that as long as I keep having it serviced with him, I could

22   get a new one whenever I wanted for no additional cost.

23         Now, I wouldn't actually get a new one because I

24   like the one I have, but eventually I'm going to want a new

25   car, and so I would like him to give me one for free.

1  Q.    All right.  So what would you think of a third-party

2  service provider who encourages people to stay on their

3  current release and tells them that the majority of

4  organizations are comfortable doing this?

5  A.    I just don't think that's true.  I think -- I think

6  the majority of organizations want to upgrade.  The

7  majority of organizations want to take advantage of new

8  functionality, and they want to be able to take advantage

9  of the new technologies that are going to matter to them

10  and their employees and to their customers.

11  Q.    All right.  So I'm really glad that you brought up

12  your car.  What's the difference between enterprise

13  software licensed by Oracle and cars?

14  A.    Well, you know, one important difference is, you

15  know, the roads, the gasoline, you know, traffic signals,

16  all of those things today are basically the same as they

17  were in 2003 when my car was made.  You know, I'm not being

18  forced by the environment of the roads and road system to

19  upgrade my car.

20        That's not the case in enterprise software.

21  Operating systems change, servers change, networks change,

22  storage change.

23        And, by the way, the physical things, the

24  servers, the storage, the networking, that stuff actually

25  breaks.  You cannot run it forever.  You have to buy new

1   servers, you have to buy new storage, you have to buy new

2   network.

3              And as those underlying technology components

4   change and evolve, you must also evolve and change the

5   software running on top of it including enterprise

6   applications like PeopleSoft, JD Edwards, and Siebel.

7   Q.   All right.  So you said you had a car from 2003.  Do

8   you have any software from 2003?

9   A.   No, I don't have any software from 2003.

10             MS. DUNN:  Your Honor, I have no further

11  questions at this time.

12             THE COURT:  All right.

13             Cross-examination?

14             MR. RECKERS:  Your Honor, I have no questions

15  for this witness.

16             THE COURT:  All right.  Mr. Screven, that will

17  complete your testimony in that case, and you may step

18  down.  Thank you.

19             THE WITNESS:  Okay.

20             THE COURT:  Ladies and gentlemen, I understand

21  from counsel that there's a matter that the Court needs to

22  address before we can proceed with some other evidence.

23             Is that correct?  Are we at that position where

24  we're coming up to that next issue?

25             MR. POLITO:  Yes, Your Honor.

1574

1           THE COURT:  Okay.  Actually, Counsel, can you

2   give me a sense of how long it will take in your view for

3   the Court to resolve this issue?

4           MR. POLITO:  Your Honor, I think it will take

5   about five minutes.

6           MR. DYKAL:  Yes, that's about right.

7           THE COURT:  All right.  With the

8   understanding -- I hear five minutes, that tells me 10 to

9   15, but even if it's 10 to 15, ladies and gentlemen, that's

10  still sufficient to keep you here and bring you back.

11          So I'm going to ask you if you would step out

12  just -- the admonitions apply, and I'll make this as brief

13  as I can.  It's just one of those housekeeping issues that

14  has to be addressed.  So if you'll step down at this time

15  I'll deal with it.

16          COURTROOM ADMINISTRATOR:  Please rise.

17      (Jurors exit courtroom at 1:22 p.m.)

18          THE COURT:  All right.  Mr. Polito, do you want

19  to give me the overview of what the issue is before the

20  Court and what you're seeking.

21          MR. POLITO:  Thank you, Your Honor.

22          We'd like to play the deposition testimony of

23  Mr. Grigsby.

24          As you may know, Your Honor ruled on defendants'

25  motion in limine number 8.  They had asked for certain

1575

1    portions of his testimony to be excluded which has to do

2    with taking documents from Oracle, bringing them to Rimini

3    Street, and using them at Rimini Street, including copying

4    them, creating derivative works, et cetera.

5         You denied their motion on grounds that his

6    testimony showed -- his character showed his bias.

7         And, Your Honor, we've heard testimony today

8    that said -- from Mr. Maddock saying when customers had

9    technical questions, that they spoke to the technical teams

10   including vice-presidents, and Mr. Grigsby was named.

11        So we think his credibility and his character

12   for truthfulness are important since part of our case is

13   that there were nontruthful statements that were being made

14   to prospective customers.  I think that's a summary.

15        THE COURT:  Okay.  Mr. Dykal, do you want to

16   give me the defense take on the issue?

17        MR. DYKAL:  Yes.

18        So when we moved in limine, we were very curious

19   about what they were going to use this testimony for and

20   the documents because the documents that were at issue have

21   never been in the case.

22        We specifically served an interrogatory asking

23   list your copyrights, list your registrations, tell us what

24   your allegations are, and, in response, Oracle gave us

25   dozens of copyright registrations, behaviors, acts.

1576

1        This particular piece of testimony and these

2   documents were not identified.  They were never identified.

3        So we moved with respect to trade secrets

4   because we thought this has no relevance to the case, maybe

5   Oracle would insinuate we're stealing trade secrets.

6        In their response they said that, no, this

7   relates to copyright infringement, and they identified a

8   copyright registration that they had never identified

9   before.

10       So the issue is very simple.  This is something

11  they should have disclosed long ago.  We don't know if it's

12  a valid copyright.  We were not permitted to explore who

13  actually owns it is, what the behavior was.

14       It's very prejudicial at this stage in the game

15  to try to lodge some brand-new facts that we were not

16  entitled to explore in discovery.

17       I mean, I can hand you, if you would like,

18  Interrogatory No. 17.  It's very specific.

19       "List your copyright registrations that you

20  allege we infringed and what the allegations are."

21       That was served so that we could explore it,

22  whether it was a valid copyright, whether Oracle actually

23  owns it.  They never gave it to us.

24       They didn't add it to their exhibit list until

25  just a few days before trial, and the hiding of the ball --

1    I don't know if that's their intent, but at this stage it's

2    very prejudicial to us.  We weren't allowed to explore it.

3             So that's defendants' position.

4             THE COURT:  Take me into the next step into the

5    Grigsby testimony.

6             MR. POLITO:  Sure.  Your Honor, we're not

7    planning to ask for damages for these copyrights.

8             It's true our scope of injunctive relief extends

9    to -- as the Ninth Circuit allows, to copyrights beyond

10   those identified in our complaint.

11            But these copyrights, we didn't have them at the

12   time that we responded to the discovery, Your Honor.  They

13   were applications that had not yet issued.  We didn't

14   produce them in discovery before the close of the case.

15            But this is not us saying we're now having 102

16   registrations on our complaint instead of 100.

17            So it is relevant to copyright, whether or not

18   those copyrights are in the case, and under *Amazon* in the

19   Ninth Circuit, that's -- can be a part of our injunctive

20   relief.

21            But, Your Honor, this is mostly about is this

22   man truthful.  In his testimony, he was the 30(b)(6)

23   representative for JD Edwards environments, JD Edwards

24   fixes, JD Edwards support.  I'm happy to read the topics to

25   you.

1    We showed him in his deposition sets of

2    documents showing there were additional JD Edwards

3    environments that Rimini did not agree existed.

4    We have his reactions, and part of the question

5    that his testimony presents is do we believe those

6    documents are not part of the contested portion of the

7    deposition, or do we believe his testimony that, no, those

8    weren't really environments.

9    This goes to show his character for

10   truthfulness.  He was put up as the corporate

11   representative for JD Edwards, your Honor -- I'm sorry, he

12   was put up as the corporate representative for how they

13   provide JD Edwards support, and he is taking Oracle

14   documentation and putting Rimini's name on it, JD Edwards

15   documentation.  It's very, very relevant, Your Honor.

16   THE COURT:  How long does it take to run the

17   Grigsby video deposition?

18   MR. POLITO:  So the video itself is just over 26

19   minutes.  I think the contested portion is about five

20   minutes.

21   MR. DYKAL:  If I could just respond to that very

22   briefly, Your Honor.

23   That's again the problem.  We don't know whether

24   or not he was being truthful.  Mr. Grigsby testified he had

25   the rights to use those copyrights.

1   And contrary to what Oracle counsel just said,

2   in the declaration to their motion in limine, they gave us

3   that copyright.  They had it.  They could have identified

4   it.  We were not permitted to explore it.

5   And with respect to his character for

6   truthfulness, whatever marginal relevance it might have is

7   far outweighed by the prejudice that could be created.

8   I guess that's where I would leave it.

9   MR. POLITO:  Your Honor, they're not disputing

10  they took our stuff --

11  THE COURT:  Well, let me stop you.

12  What I'm going to do, this requires greater

13  study by the Court than I'm going to hold this jury up for.

14  So what I'm going to do is call the jury back in

15  and excuse them until tomorrow morning, and then when we --

16  after they've been excused, I'll -- I want to see the

17  video, the Grigsby video, and I'll hear briefly from

18  counsel probably after that.

19  But I just need a better sense for this than I

20  have right now.

21  I do recall that -- the motion in limine, but I

22  haven't refreshed on it, and, of course, there were many in

23  this case.  So I need to do that.

24  I may or may not be able to give you a ruling

25  this afternoon.

1580

```
 1              So, Madam Clerk, would you bring the jury back

 2    in, please.

 3              MR. ISAACSON:  Your Honor, if I may.

 4              THE COURT:  Do you have another witness?

 5              MR. ISAACSON:  If we want to use some more of

 6    the day, we have an 11-minute video and a 12-minute video

 7    that we could use during this period, or we could use one

 8    of them.

 9              THE COURT:  All right.  Well, that was my next

10    question.  If plaintiffs have another witness or another

11    substitute, another video that would come in that's not the

12    subject matter of this issue, let's do that.

13              MR. ISAACSON:  Okay.

14              MR. DYKAL:  Thank you, Your Honor.

15              MR. ISAACSON:  We can do one of them or two of

16    them, depending on how you want to wrap up the day.

17              THE COURT:  Well, let's try and do as much as we

18    can.

19              MR. ISAACSON:  Okay.

20              MR. POLITO:  Thank you, Your Honor.

21              THE COURT:  Let's bring in the jury, please.

22              COURTROOM ADMINISTRATOR:  Yes, Your Honor.

23         (Jurors enter courtroom at 1:30 p.m.)

24              THE COURT:  All right.  Have a seat, please.

25              The record will show that the jury is present.
```

1    We are in open court.  The parties and counsel are present.

2             What we'll do at this point is proceed with the

3    next evidence then that we have just discussed.

4             Mr. Polito?

5             MR. POLITO:  Thank you, Your Honor.

6             We'll now play another deposition video of

7    Mr. George Lester.  At the time the video was filmed, he

8    was the vice-president of IT for Rimini Street.  It's about

9    12 and a half minutes.

10            COURTROOM ADMINISTRATOR:  Are there exhibits

11   related to this?

12            MR. POLITO:  I apologize.  So I have PTX 228,

13   which has been preadmitted.

14            I have PTX 456 which has been preadmitted.

15            And for PTX 457, there's no objection, and we

16   move it into evidence at this time.

17            MR. RECKERS:  No objection.

18            THE COURT:  It's admitted.

19            MR. POLITO:  Thank you.

20         (Plaintiffs' Exhibit 457 received into

21         evidence.)

22         (Videotape deposition of George Lester played

23         as follows:)

24             PAGE 4:08 TO 4:11 (RUNNING 00:00:03.639)

25             "BY MR. HIXSON:

1582

```
 1          Q. Will you please state your name for the

 2      record.

 3          A. George Lester.

 4       PAGE 5:16 TO 5:18 (RUNNING 00:00:15.061)

 5          Q. When did you begin working at Rimini

 6      Street?

 7          A. It was either late October or early

 8      November of 2006.

 9       PAGE 5:19 TO 6:06 (RUNNING 00:00:57.850)

10          Q. Where did you work before Rimini Street?

11          A. I worked at TomorrowNow.

12          Q. For how long?

13          A. I'm not exactly sure.  I think three

14      years.

15          Q. So approximately 2003 to 2006; is that

16      right?

17          A. I'm not sure.  I'm not sure.

18          Q. At least two years?

19          A. At least two years.

20          Q. In general terms, what was your

21      responsibilities at TomorrowNow?

22          A. At TomorrowNow I was in charge of the

23      environments, and I was in charge of the

24      technical PSEs.

25       PAGE 6:22 TO 8:14 (RUNNING 00:02:59.878)
```

1583

1    Q. Are there any people who are currently

2    working at Rimini Street who you worked with

3    when you were at TomorrowNow?

4    A. Yes.

5    Q. Who are they?

6    A. My wife, Beth Lester.  Krista Williams.

7    Doug Baron.  I'm sure there's others.  I'm

8    just not recalling who they all are.  I know

9    Seth was there too, but I didn't really know

10   Seth at TomorrowNow.

11   Q. Did anyone recruit you to come work at

12   Rimini Street?

13   A. No.

14   Q. How did you learn about Rimini Street?

15   A. Seth came and visited my wife, and I

16   inquired to Seth about opportunities at

17   Rimini Street.

18   Q. And did he describe for you what your role

19   could be at Rimini Street?

20   A. He did.

21   Q. And what did he describe it to you as?

22   A. Vice president of IT.

23   Q. And in general terms, what did he describe

24   that as being?  Like what would your

25   responsibilities be?

1584

```
 1            A. The infrastructure of the company.  The
 2            servers, the storage, the desktops and
 3            laptops that the company uses.
 4            Q. What is your job title now?
 5            A. Vice president of IT.
 6            Q. How long have you had that job title?
 7            A. July of 2010.
 8            Q. What was your title before then?
 9            A. It was group vice president of PeopleSoft,
10            development documentation and IT.
11            Q. For how long were you in that role?
12            A. 11 months.
13            Q. And prior to that role, what was your job
14            title?
15            A. Vice president of IT.
16            Q. And did you have that title from when you
17            started at Rimini Street until approximately
18            August 2009?
19            A. That is -- that is correct.  Actually, it
20            was -- yes, August of 2009.  Yes.
21             PAGE 14:20 TO 15:01 (RUNNING 00:00:20.088)
22            Q. Have you ever, during your time at Rimini
23            Street, had responsibility for seeing whether
24            software environments are being built or used
25            properly?
```

DONNA DAVIDSON, RDR, CRR, CCR #318    (775) 329-0132

1585

```
 1          A. Yes.

 2          Q. When did you have that responsibility?

 3          A. The first 8 to 12 weeks when I was

 4          managing the environments.

 5           PAGE 66:09 TO 66:22 (RUNNING 00:00:36.254)

 6          Q. At some point did you become aware of the

 7          existence of file share while you were at

 8          Rimini?

 9          A. Yes.

10          Q. Can you recall the earliest that you were

11          aware of it?

12          A. I would assume it would be the first time

13          that we installed an environment from media,

14          but I can't say for certain when that date

15          was.

16          Q. Can you say that by release 2007 you would

17          have been aware of the file share?

18          A. I believe.

19          Q. So do you think that by the end of 2006

20          you were aware of that file share?

21          A. I believe so, or possibly.

22           PAGE 67:09 TO 67:12 (RUNNING 00:00:14.893)

23          Q. If I use the term "software library"

24          during this deposition, will you understand

25          that I'm referring to the file share you just
```

1586

1          described?

2          A. Okay.

3           PAGE 67:19 TO 67:23 (RUNNING 00:00:17.314)

4          Q. Was the software library organized by

5          application and release?

6          A. I don't recall how it was organized.

7          Q. Okay.  Was it organized by customer?

8          A. No.

9           PAGE 170:23 TO 171:05 (RUNNING 00:00:20.312)

10         Q. All right.  I'd like to ask about a

11         different subject now, which is about

12         automated downloading.  At some point after

13         you arrived at Rimini Street, did Rimini use

14         automated tools to download a software from

15         Oracle support websites?

16         A. Yes.

17         Q. Who developed those tools?

18         A. Doug Baron.

19         PAGE 171:17 TO 172:05 (RUNNING 00:00:34.790)

20         Q. When Mr. Baron was developing these

21         automated tools to download software, did he

22         give you status updates and apprise you of

23         his progress on that effort?

24         A. He would send me updates.

25         Q. And do you recall that by the end of 2006,

1587

```
 1          he had developed certain scripts for

 2          automated downloading?

 3          A. By the end of 2006.  It was either the end

 4          of 2006 or beginning of 2007, around that

 5          time.

 6          Q. And did Rimini Street then use those tools

 7          to conduct automated downloading from Oracle

 8          support sites?

 9          A. I believe so.

10           PAGE 180:17 TO 180:21 (RUNNING 00:00:09.952)

11          Q. Do you understand that automated

12          downloading is faster than manual

13          downloading?

14          A. I do.

15          Q. That's why you automate; right?

16          A. Yes.  Otherwise, it would take a decade.

17           PAGE 183:03 TO 183:22 (RUNNING 00:01:46.860)

18          Q. In any event, after this change of the

19          terms of use came to your attention, Rimini

20          Street continued using its automated download

21          tools; is that correct?

22          A. This was in -- yes, we did continue.

23          Q. Who made the decision to continue?

24          A. It wasn't myself, but I don't recall a

25          specific conversation with someone who did
```

1588

```
1      confirm it.
2      Q. Did you talk with Seth Ravin about this
3       issue?
4       (The witness reviewed the document.)
5      THE WITNESS:  I believe I did.
6      BY MR. HIXSON:
7      Q. And can you recall the content of that
8      conversation?
9      A. I don't.
10     Q. Do you recall if Mr. Ravin expressed
11     agreement with your view that Rimini could
12     continue using automated downloads?
13     A. I don't recall that, but I know that if he
14     said, "Stop doing it," we would have stopped.
15      PAGE 196:02 TO 196:14 (RUNNING 00:00:39.647)
16     Q. Turning back under "Web Site Download
17     Procedures," if you look at that sentence
18     that we referred to, clients using automation
19     tools, the next sentence says, "It is
20     therefore proposed that Rimini Street
21     continue to utilize automation in its
22     downloading and archiving processes from
23     Oracle's web sites."  Does this help you to
24     recall that Mr. Ravin was the one who
25     proposed to continue using automation?
```

1589

1    A. This would be confirmation that he did

2    recommend that we continue, yes.

3    Q. Did Rimini Street in fact continue using

4    automated downloading tools?

5    A. I believe they did.

6     PAGE 206:10 TO 206:17 (RUNNING 00:00:27.974)

7    Q. Do you recall that Oracle blocked one or

8    more of Rimini Street's IP addresses when

9    Rimini was doing downloads for XO

10   communications?

11   A. I believe that is correct.

12   Q. Given your position as VP of IT, would a

13   blocking of a Rimini Street IP address

14   normally be reported to you?

15    A. It was reported to me.

16    PAGE 209:04 TO 209:04 (RUNNING 00:00:02.503)

17   MR. HIXSON:  Here is Exhibit 819.

18    PAGE 209:05 TO 209:07 (RUNNING 00:00:04.926)

19   Q. Is this an email between yourself, Brian

20    Slepko, and Chiu?

21   (The witness reviewed Exhibit 819.)

22    PAGE 209:08 TO 209:18 (RUNNING 00:00:44.314)

23   THE WITNESS:  Okay.  What is your question?

24   BY MR. HIXSON:

25   Q. Is this an email exchange between

1590

1       yourself, Dennis Chiu, and Brian Slepko?

2       A. It is.

3       Q. Let's go to the end and work backwards.

4       There's an email from you to Slepko and Chiu,

5       and you state that "Oracle has not yet

6       removed blocks on any of our IP's."  Do you

7       see that on the third page of this exhibit?

8       A. I do see that.

9        PAGE 209:19 TO 210:08 (RUNNING 00:00:44.605)

10       Q. The -- there's a list of two blocked IP,

11       71.5.6.20 and 71.5.6.24.  Were those Rimini

12       Street IP addresses?

13       A. Yes.

14       Q. And then there's a list of IPs that you

15       still have available for use, and it lists

16       71.5.6.23 and 71.5.6.28.  Were those also

17       Rimini's IPs?

18       A. Correct.

19       Q. And it says you're working with XO to

20       obtain more IPs.  XO was a customer of Rimini

21       Street; is that correct?

22       A. Correct.

23       Q. XO is also your Internet service provider;

24       right?

25       A. Correct.

```
 1            PAGE 210:24 TO 211:10 (RUNNING 00:00:40.887)
 2       Q. Why were you getting more IP addresses
 3       from XO?
 4       A. To continue the -- to allow on-boarding to
 5       continue their extract process while I
 6       believe Dennis Chiu was working to resolve
 7       why they were blocked.
 8       Q. So the purpose was to obtain more IPs so
 9       Rimini could use those in place of the ones
10       that had been blocked; is that right?
11       A. The ones that were blocked, while they
12       were resolved, we were.
13       Q. And was the plan to use the additional IP
14       addresses to perform automated downloading?
15            PAGE 211:13 TO 211:13 (RUNNING 00:00:02.063)
16       THE WITNESS:  I believe so, yes.
17            PAGE 215:11 TO 215:14 (RUNNING 00:00:09.228)
18       Q. And is Exhibit 820 an email exchange
19       between yourself, Brian Slepko, and then some
20       others at Rimini Street?
21       A. It is.
22            PAGE 216:01 TO 216:04 (RUNNING 00:00:13.239)
23       Q. Did you obtain 27 new IP addresses from
24       XO?
25       A. It appears that I did in the email.  I
```

1    don't recall specifically, but I believe that

2    to be accurate.")

3    (Deposition ends.)

4    THE COURT:  Thank you.  Mr. Polito.  Is there

5    another videotape?

6    MR. POLITO:  There is, Your Honor.

7    We would like to close today with another

8    customer video.  This one is of William Leake, who is the

9    representative for Leads Customers Growth, that first

10   customer of Rimini Street that you've heard about, and this

11   video is about 11 and a half minutes.

12   THE COURT:  All right.

13   MR. POLITO:  And for the exhibits, PTX 218 has

14   been admitted.

15   And then we would move for admission of PTX 541.

16   MR. RECKERS:  No objection.

17   MR. POLITO:  Thank you.

18   THE COURT:  It's admitted.

19   (Plaintiffs' Exhibit 541 received into

20   evidence.)

21   (Videotape deposition of William Leake played

22   as follows:

23   PAGE 9:04 TO 9:07 (RUNNING 00:00:09.359)

24   "Q. Very good.  What -- what is Leads

25   Customer Growth, LLC?

1    A. It is a Texas LLC primarily providing
2    marketing services.
3     PAGE 11:15 TO 11:20 (RUNNING 00:00:17.423)
4    Q. How do you know Seth Ravin?
5    A. How do I know Seth Ravin?  From elementary
6    school.
7    Q. And how long have you had a professional
8    relationship with him?
9    A. Since the mid part of this century.
10     PAGE 13:04 TO 13:25 (RUNNING 00:01:09.800)
11    Q. And you, through LC Growth, began to
12    perform marketing services for his new
13    company; is that right?
14    A. Yes.  LCG and Seth started talking about,
15    you know, what -- what kind of marketing
16    services he might need to get more visibility
17    in the space.  And that probably -- oh, I
18    don't remember when he started Rimini Street.
19    But it was fairly shortly afterwards.
20    Q. And what kind of services has LC Growth
21    performed for Rimini Street over the course
22    of time?
23    A. General online marketing.  Primarily SEO
24    and Adwords Management.
25    Q. And do you do any work for Ravin or Rimini

1594

```
 1         aside from the work that LC Growth does?  You
 2         personally?
 3         A. He has in the past written me some small
 4         checks to just rent my brain for a few hours
 5         here and there.  I'm not very good at billing
 6         him for those.  So I need to -- need to be
 7         better about that.
 8          PAGE 14:12 TO 14:17 (RUNNING 00:00:11.863)
 9         Q. Are you still doing work for Rimini
10         Street?
11         A. They are a current client of LCG.
12         Q. And is that online marketing work that
13         you're doing right now?
14         A. Uh-huh.
15          PAGE 15:25 TO 16:09 (RUNNING 00:00:25.408)
16         Did Rimini Street also perform any work
17         for LC Growth?
18         A. Yes.
19         Q. What did they do for you?
20         A. They helped us -- or were going to help us
21         through a Siebel implementation.
22         Q. You say they were going to?
23         A. We -- we ended up deciding it was more
24         work than -- than we'd anticipated and never
25         -- never fully got it implemented.
```

1595

1       PAGE 16:10 TO 17:24 (RUNNING 00:01:43.987)

2       Q. So tell me about what happened there.  You

3       thought you wanted to implement Siebel, but

4       then what happened?

5       A. Well, we -- as we were growing at the

6       time, we -- we outgrew our current CRM system

7       and we were looking for another one and the

8       -- and the obvious answer was Salesforce.com

9       and I was -- I'm generally not convinced that

10      the obvious answer is always the best answer.

11      And we started looking at Siebel and it

12      seemed like, you know, the five user -- or

13      whatever -- I'm not sure how many licenses we

14      got.  Five -- five is the number that sticks

15      in mind.  It may have been ten, it may have

16      been some -- something around it.  It seemed

17      like you buy it once and the data is on

18      servers that you control rather than in the

19      cloud, which was a lot more amorphous several

20      years ago than it is now.  And it seemed like

21      -- seemed like a good deal.  So we went down

22      the -- went down the path with -- with the

23      guys at Siebel.

24       Q. And you ultimately purchased a license to

25       Siebel software; is that correct?

DONNA DAVIDSON, RDR, CRR, CCR #318    (775) 329-0132

1596

1    A. I did.  I actually had -- had a couple of

2    friends who were working at Siebel at the

3    time.  I had -- one of the -- one's a VP over

4    there, another was a senior director.  And

5    they were -- one of my concern areas had

6    been, you know, is -- is the code basically

7    advanced or is it the end of life, what's

8    going on with that.  And they assured me

9    that, you know, it was continuing to advance;

10   it was probably a safe bet to go with.  I

11   think I figured out that our company's size

12   was sort of out of their sweet spot.  Once --

13   I should have known better.  Once something

14   gets purchased by a very large company,

15   typically they -- they rapidly move upscale,

16   move more to the enterprise sector.

17    PAGE 17:25 TO 18:16 (RUNNING 00:00:59.353)

18   Q. So between the time you purchased Siebel

19   license and a -- the time when you decided

20   not to pursue Siebel implementation, what

21   happened?

22   A. Several things.  And I'm -- I'm not sure

23   as to the exact order of it.  One, I was -- I

24   had a VP of sales who wasn't -- wasn't

25   thrilled that his CEO was making decisions

1597

1    about what software to use, and we had some

2    turmoil and transition in our IT department.

3    And I think when we unwrapped the Siebel

4    present we figured out that it wasn't -- it

5    didn't spring out of the box ready to go,

6    that it

7    required actually a fair amount of -- a lot

8    more tweaking than we had anticipated.

9    Q. Now --

10   A. And -- and that -- that meant cost and

11   complexity, and we weren't a big business.

12   PAGE 19:06 TO 19:25 (RUNNING 00:01:00.187)

13   Q. (BY MR. RIGGENBERG) What did you engage

14   Rimini Street to do?

15   A. To help in the configuration,

16   implementation and -- and, most importantly,

17   just ongoing support, to know that we would

18   have, you know, somebody who could keep the

19   system, once it was up and running, on

20   servers that would be up and live, and that

21   our data would be there as opposed to, you

22   know, Salesforce.com, which back then I think

23   was still having a fair amount of outages

24   that were being publicized.

25   Q. And after you decided not to pursue Siebel

1598

<pre>
 1          implementation, what -- what did Rimini

 2          Street do for you after that?

 3          A. I'm not sure exactly what they did for me

 4          at that point.  I -- you know, I could see if

 5          my IT department kept calling them, but there

 6          wouldn't be much reason to at that point.

 7          Q. They --

 8          A. We weren't really requiring support.

 9          PAGE 48:21 TO 48:23 (RUNNING 00:00:07.360)

10          Q. But Exhibit 1196 is the support agreement

11          between Siebel and LC Growth; is that right?

12          A. It appears to be.

13           PAGE 49:23 TO 50:11 (RUNNING 00:00:23.876)

14          Q. Right.  If you -- if you look at the

15          paragraph numbering in the document itself,

16          you'll see that it goes from Paragraph 5,

17          "Client Obligations," to Paragraph 7,

18          "Termination of Agreement."

19          A. Okay.

20          Q. And it was faxed.  So the fax machine

21          could have eaten the page or --

22          A. It looks like Section 11 is also missing.

23          Q. Right.  So to the best of your knowledge,

24          the agreement was complete and you -- when

25          you faxed it to him, you meant to send him
</pre>

1    all the pages; is that right?

2    A. That's correct.

3     PAGE 71:10 TO 72:02 (RUNNING 00:01:03.674)

4    Q. (BY MR. RIGGENBERG) Is Exhibit 1200 an

5    email between yourself and Seth Ravin from

6    February of 2006?

7    A. Okay.

8    Q. Do you have a reason to think this was not

9    an exchange you had Mr. -- with Mr. Ravin in

10   February of 2006?

11   A. Not at this point.  What is -- what is

12   this one about?

13   Q. Did -- there is an attachment to this

14   email record.  Bates number is RSI03046750

15   through 52.  The attachment says:  Siebel

16   eBusiness End User License and Services

17   Agreement.  Did you get a copy of this

18   agreement from the Siebel support rep and

19   forward it on to Mr. Ravin with a proposed

20   change?

21   A. Looks like I did.

22    PAGE 72:25 TO 74:04 (RUNNING 00:01:23.127)

23   Q. So let me just direct your attention to

24   the paragraph that says:  YOU MAY NOT.  And

25   there's a (c) subpoint.

```
 1            It says:  YOU MAY NOT (c) use the Programs or
 2       Ancillary Programs for any purpose other than
 3       to support your own internal business
 4       operations.
 5       Do you see that?
 6       A. The number (c)?
 7       Q. Yeah.
 8       A. Uh-huh.
 9       Q. And do you understand that that means that
10       LC Growth is not licensed to use the Siebel
11       support -- Siebel software for any purpose
12       other than to support LC Growth's internal
13       business operations?
14       A. That sounds correct to me.
15       Q. And that would be a common term in the
16       software industry, right?
17       A. Yeah.
18       Q. Did you ever authorize Rimini Street to
19       use the software for any purpose other than
20       to support LC Growth's business?
21       A. I authorized them to support my business
22       and try to get the software up and running
23       and implemented.
24       Q. Right.  And other than that, did you ever
25       authorize them to use software from Siebel
```

1601

1    for any other purpose?

2    A. I don't know.

3    PAGE 79:15 TO 79:15 (RUNNING 00:00:02.573)

4    Q. I'd offer you 1202.

5     PAGE 79:19 TO 80:07 (RUNNING 00:00:41.208)

6    Is this an email exchange you had with

7    Dennis Chiu at Rimini Street in March of

8    2006?

9    A. Looks like it.

10   Q. And you obtained, from Siebel, login

11   credentials for what was described as the

12   Siebel Technical Support Website; is that

13   correct?

14   A. It appears to.  It looks like I passed

15   them off to my consultant.

16   Q. Right.  And you -- and you -- and then

17   you sent those credentials on to Mr. Chiu at

18   Rimini Street, right?

19   A. Right.

20   Q. Is that correct?

21   A. Uh-huh.

22    PAGE 81:19 TO 82:08 (RUNNING 00:00:44.380)

23   Exhibit 235 is another email chain.  You're

24   -- you're not on it, but it -- there is an

25   email from Mr. Ravin, Dan Slarve, Dennis

1    Chiu, May 2nd, and he says:  I've had a few

2    conversations with Bill Leake, LC Growth's

3    CEO.  We discussed a review of the Siebel

4    system and they decided not to proceed with

5    an implementation at this time.  They decided

6    to continue looking at other SFA solutions in

7    the coming months.

8    Is that an accurate statement; that is, in

9    late April, early May 2006 you discussed the

10   issues with Mr. Ravin and decided not to

11   implement the Siebel system?

12   A. Sounds correct.

13    PAGE 83:19 TO 83:21 (RUNNING 00:00:05.065)

14   Do you have any reason to think that's

15   incorrect and you still harbored some thought

16   of proceeding with Siebel at that time?

17    PAGE 83:23 TO 84:04 (RUNNING 00:00:18.115)

18   A. Now, it -- reading this and thinking

19   through my thought process, I don't know that

20   we'd completely deep-sixed it.  I think it

21   was a "not at this time."  You know, I don't

22   know if this is a "other things on our

23   plate," or "too many balls in the air," or

24   "we just don't like Siebel anymore."

25    PAGE 87:23 TO 88:03 (RUNNING 00:00:19.854)

1    Q. The -- but my question is, did you

2    authorize Rimini Street to use your name and

3    password to -- to download material from the

4    Siebel technical support website after you

5    weren't using Siebel software and after you

6    weren't using Rimini for active support?

7     PAGE 88:06 TO 88:06 (RUNNING 00:00:01.158)

8    A. I don't recall.

9     PAGE 95:17 TO 95:24 (RUNNING 00:00:13.819)

10   Q. And so Mr. Ravin asked you to be a

11   reference for Rimini Street for Albridge

12   Solutions; is that right?

13   A. Uh-huh.

14   Q. And did you speak to someone from

15   Albridge?

16   A. Probably.  I don't remember, but probably.

17    PAGE 96:19 TO 96:23 (RUNNING 00:00:07.893)

18   Q. And had they not asked, you wouldn't have?

19   A. Had they not asked I would probably have

20   left it at, I've known Seth for years and

21   I've done business with him for years.")

22   (Deposition ends.)

23        MR. ISAACSON:  That is all we have for today,

24   Your Honor.

25        THE COURT:  All right.  Thank you.

1    Ladies and gentlemen, it looks like we're done
2    with today's evidence and testimony to be presented before
3    you.
4    And so I'm going to go through the long
5    admonition to remind you not to discuss the case with
6    anyone or permit anyone to discuss it in your presence.
7    That involves not discussing the case in any way,
8    electronically, over the Internet, through emails or text
9    messaging.
10   I caution you not to read, watch or listen to
11   any report or commentary that may concern this case in any
12   way regardless of whether that might appear on the
13   Internet, television, radio or in the newspaper.
14   I caution you not to do any research or conduct
15   any independent investigation on your own.  That includes
16   such things as consulting dictionaries, searching the
17   Internet, performing Google searches or making any other
18   investigation about the case on your own.
19   I remind you how important it is that all of you
20   decide this case at the end of the case based on the
21   evidence that was presented here in the courtroom in front
22   of every one of you.
23   Please leave your notes in the jury room as I've
24   instructed before.  We'll start promptly tomorrow morning
25   at 8:00 a.m.  At this time I'll wish you a pleasant evening

1    and excuse you and you may go ahead and step down.

2              COURTROOM ADMINISTRATOR:  Please rise.

3         (Jurors exit courtroom at 1:58 p.m.)

4              THE COURT:  The record will show the jury has

5    been excused.  We're in open court.  The parties and

6    counsel are present.

7              Ms. Dunn?

8              MS. DUNN:  Thank you, Your Honor.  We're hoping

9    to raise one item before tomorrow, which is we'll start to

10   put on our damages experts, so Mr. Yourdon and Ms. Dean are

11   going to testify.

12             And then we anticipate an issue which has also

13   been reflected in an objection to a demonstrative that we

14   sent to defense counsel, which is the issue of whether

15   certain other third-party support providers are

16   noninfringing or infringing alternatives.

17             And both Ms. Dean and Mr. Yourdon, in order to

18   testify, have to be able to say that certain of the

19   providers were infringing alternatives which is why they

20   didn't consider them to be an alternative.

21             Earlier in the trial defense counsel, Mr. Webb,

22   said that -- at least with regard to TomorrowNow, that they

23   did not plan to contest that TomorrowNow was an infringing

24   alternative.

25             But before we put Mr. Yourdon on the stand, and

1    then Ms. Dean, to talk about this, we wanted to raise this

2    issue with the Court to figure out, you know, what was

3    going to be permissible and to discuss in advance what is

4    going to be objected to or not objected to.

5            So our position is that it would be, frankly,

6    impossible for them to explain this piece of the damages

7    case without being able to say that TomorrowNow and

8    CedarCrestone are infringing alternatives.

9            THE COURT:  All right.

10            Mr. Webb?

11            MR. WEBB:  Your Honor, I believe the record is

12    very clear.  I said that we didn't intend to argue that

13    TomorrowNow was a noninfringing alternative.  That's a far

14    cry from having an expert saying the reason they excluded

15    them is because they're infringers.

16            This is exactly where we were going back when

17    TomorrowNow came into the case.  It has gradually gotten

18    bigger and bigger and bigger.  Now it's in all the videos

19    that we've seen.  It's going to be coming from every expert

20    that we hear from.

21            And now they're finally going to get that final

22    step which is "and in fact they are infringing," not just

23    with TomorrowNow, but also with CedarCrestone, and there's

24    no proof of either being infringing alternatives, Your

25    Honor.  There's no proof.

 1              In the SAP case, SAP voluntarily decided to shut

 2      down TomorrowNow, which is a separate issue we can talk

 3      about.  They admitted infringement.  There was no finding

 4      of infringement by a judge.

 5              And with CedarCrestone, it is black box.

 6      Something happened between Oracle and CedarCrestone, and we

 7      have no idea.  We've sought discovery and were denied.  So

 8      as far as CedarCrestone is concerned, we have no idea.  I

 9      mean, it truly is a black box.

10              And as TomorrowNow is concerned, we don't know

11      anything about that process, certainly nothing in this

12      trial.

13              And for them to say the reason they excluded

14      them is because they are infringing, I think it would be

15      unfairly prejudicial to the point of really denying us the

16      ability to really have a chance in this case.

17              THE COURT:  All right.

18              MS. DUNN:  Your Honor, we would just say a

19      couple things.

20              One is that we have to find a way to square this

21      circle because these are experts who did an analysis that

22      is not just relevant to, but integral to, the damages

23      question in this case.

24              And the reason they did not consider

25      CedarCrestone and TomorrowNow to be reliable alternatives

1    is because they were instructed or knew sufficiently to

2    consider them infringing alternatives.

3             I would say in each case there is evidence that

4    these are infringing alternatives, and would I not dismiss

5    the stipulation of facts as to TomorrowNow as being no

6    evidence or the criminal plea, neither of which we're

7    trying to get into evidence in this case in respect of Your

8    Honor's order.

9             But it is -- it is impossible for the damages

10   experts to explain their analysis when a pivotal question

11   is are there alternatives in the third-party support

12   market.

13            I will say for Mr. Yourdon in his report, there

14   are two things.  He does discuss TomorrowNow and what he

15   understands.

16            We would be happy to limit his testimony to "I

17   excluded them because I did not consider them a

18   noninfringing alternative" or "I considered them an

19   infringing alternative" and not go beyond that.

20            And with CedarCrestone, Mr. Yourdon was

21   instructed by counsel to consider them an infringing

22   alternative.  He does not need to testify about why unless,

23   of course, defense counsel opens the door to that.  I mean,

24   we're suggesting something quite limited.

25            This is -- you know, it's hard to believe we can

1    proceed without figuring this out.

2              THE COURT:  All right.

3              MR. WEBB:  So they want to be able to say that

4    it's an infringing alternative, but we're not allowed to

5    cross because it might open the door?  The door has been

6    kicked wide open already, Your Honor.

7              They have -- as soon as they tell the jury,

8    well, we can't consider them because they're infringing,

9    the basis for it, whether it was just being told by

10   counsel, or whether it was a result of a court hearing,

11   those nuances will be lost on the jury.  They will hear

12   infringing, and that's all.

13             Now, we've gone from TomorrowNow being a company

14   on the market to a company that stopped locally hosting, to

15   a company where there was one of the executives admitted

16   wrongdoing and was demoted, and now with Ms. Catz on the

17   stand saying they were shut down by SAP, and now the next

18   step they were shut down because they were infringing.

19             This started and has gotten incrementally bigger

20   and more of a problem every day, and now they want to take

21   this final point that these are -- and CedarCrestone again

22   is a black box.  Who the heck knows what they did?

23             So allowing us to cross on that and basically to

24   have a trial within a trial on each of those systems, and

25   there simply isn't enough information or evidence about

1       either.

2                   MS. DUNN:   Just to clarify a couple of things.

3                   One is we are not at all saying that defense

4       counsel cannot cross.  They're certainly welcome to cross

5       on this.

6                   The second thing is my understanding is that you

7       are privy to information about CedarCrestone in the form of

8       the Fees' declaration.  So if that's an open question, we

9       should discuss that.

10                  But it is hard to believe that -- I know that

11      defense counsel wants to make this seem of a piece with

12      other things.  It isn't.

13                  It's hard to understand how they thought we

14      could present a damages case without answering this

15      question when the question is also contained within the

16      experts' reports.

17                  So I am -- you know, we're open to Your Honor's

18      suggestions about how we can clarify this for the jury.  We

19      are not suggesting that we are putting on a full case about

20      TomorrowNow through our experts.  We would limit it in the

21      way that I discussed.

22                  MR. WEBB:   One other thing, Judge.

23                  The CedarCrestone declaration that counsel

24      referred to, it was in 2013.  We've heard all day about

25      stuff that happened in 2012 which is beyond the cutoff Your

```
1    Honor made very clear to everyone, yet we heard on

2    Mr. Maddock's examination 2012 coming up repeatedly.

3              So -- and now the CedarCrestone is 2013.

4              The point is --

5              THE COURT:  Fill me in on the declaration you're

6    talking about.  I'm not familiar with it.

7              MR. RECKERS:  Your Honor, I have more

8    information on that.

9              In this case, we have identified CedarCrestone

10   in a couple different ways, including as proof of industry

11   practice.

12             We submitted, if you recall, some material about

13   CedarCrestone in opposition to Oracle's first motion for

14   summary judgment.

15             What happened during discovery was both parties

16   took a deposition, one deposition conducted by Oracle's

17   counsel and myself where we asked questions about industry

18   practice.

19             As part of our case, our willfulness, in

20   particular with Mr. Hilliard, talked about what

21   CedarCrestone, who is Oracle's partner, was doing was

22   exactly the same as Rimini Street.

23             So we have that evidence.  It was approved by

24   Your Honor in connection with -- at least considered with

25   the first motion for summary judgment, and Mr. Hilliard
```

1612

```
 1    will be allowed to, pursuant to your Court's order, testify
 2    about industry practice.
 3             What happened was after the discovery closed
 4    CedarCrestone and -- Oracle sued CedarCrestone, the similar
 5    complaint as in this case.  They settled the case.
 6             On the same day at the settlement Mr. Fees, who
 7    is another executive at CedarCrestone, this is in 2013 now,
 8    signed a declaration basically recanting all the deposition
 9    testimony that we received in the case.
10             We moved to compel before Judge Leen the
11    information about that settlement and that declaration.  We
12    were told no, discovery is closed.
13             As part of Judge Leen's order, Judge Leen's
14    order setting the discovery cutoff that we've talked about,
15    the close of fact discovery, we were not permitted further
16    inquiry into TomorrowNow.
17             So from our position, the CedarCrestone position
18    should be frozen, like everything else in this case, as of
19    what we received in discovery.
20             The Fees' declaration, which is on Oracle's
21    exhibit list now, should not be entered into evidence.  It
22    is just outside the scope, like so much of the 2013, 2014
23    subject matter.
24             MS. DUNN:  Your Honor, this is what's known as a
25    red herring.
```

1613

1           We are not suggesting that we would enter the

2    declaration into evidence unless defense counsel decided on

3    their own to open the door.

4           The suggestion is that Mr. Yourdon will say he

5    was instructed by counsel, which is true, in the

6    preparation of his report for this case, which is well

7    within the ambit of what he should be allowed to testify

8    to, to consider CedarCrestone an infringing alternative.

9           Honestly, this is a reasonable proposal that we

10   thought out with respect to what the defense are now

11   raising.

12          And if they chose then to ask Mr. Yourdon, I'm

13   not sure why they would, but maybe they would, why he

14   decided to consider them an infringing alternative, that

15   would open the door.  But that is their decision, it is not

16   our decision.

17          One other thing is that we just learned that

18   they anticipate Mr. Hilliard to speak about CedarCrestone.

19          So these are issues that they have put

20   themselves before the jury.  With regard to TomorrowNow,

21   they've argued that the -- that a number of customers have

22   left Oracle and many of them went to TomorrowNow.

23          And so what they want is for the jury to assume

24   that TomorrowNow was a valid, competitive alternative when

25   we all know that they weren't.

```
 1              And, frankly, our proposal is quite conservative

 2    about a way to get from here to there and still be able to

 3    put on our damages case.

 4              I do have a copy of the Fees' declaration if

 5    that's interesting, but, again, it's not something that

 6    we're suggesting.

 7              THE COURT:  Summarize your proposal again,

 8    please.

 9              MS. DUNN:  Well, at least with regard to

10    Mr. Yourdon -- and I would like to let Mr. Isaacson speak

11    to Ms. Dean as she is his witness, and Mr. Yourdon is mine.

12              He is going to talk about the various

13    alternative third-party support providers.  Two of those

14    are TomorrowNow and CedarCrestone.

15              My plan is to ask him why he didn't consider

16    these among others to be viable alternatives or reliable

17    alternatives to Rimini Street, and the answer with regard

18    to CedarCrestone is, "I was instructed by counsel that

19    CedarCrestone was an infringing alternative."

20              And the answer with regard to TomorrowNow is the

21    same, although it's not -- I don't believe he was

22    instructed necessarily by counsel, but he did consider

23    them, based on what he knew, to be an infringing

24    alternative.

25              MR. ISAACSON:  We just have the same issue with
```

1    Elizabeth Dean, Your Honor, although she would talk about

2    some other issues with CedarCrestone.

3             But the -- you know, since the law says that you

4    have to have a noninfringing alternative, we have to -- as

5    Ms. Dunn said, we need guidance as to how to present it for

6    those two companies.

7             And Ms. Dunn has the declaration and can read

8    you the paragraphs that were made under oath.

9             MR. WEBB:  One thing, Judge --

10            THE COURT:  Excuse me.  Let me stay on that

11   subject for a minute.

12            And, Ms. Dunn, your reference there?

13            MS. DUNN:  I'm sorry.  I couldn't hear you.

14            THE COURT:  The declaration?

15            MS. DUNN:  Yes.  So I have it in front of me,

16   and I can either read you the part or I can pass it up,

17   Your Honor.

18            And it's Exhibit 5365 for anyone who might be

19   looking for it.

20            THE COURT:  All right.

21            Mr. Webb?

22            MR. WEBB:  We have no intention whatsoever of

23   referencing TomorrowNow or CedarCrestone as noninfringing

24   alternatives.  That's not going to happen.

25            The moment they say they're infringing, the jury

1    will assume there's been some judge or some jury somewhere

2    that found them to be infringing.

3              The nuance that counsel instructed me will be

4    totally lost, Judge.  They simply won't connect the dots

5    and conclude it's something less than a judicial finding of

6    infringement.

7              And at least as it pertains to TomorrowNow, they

8    will again connect the dots and say, well, okay, well, if

9    TomorrowNow has been found by a judge or a jury to

10   infringe, it must infringe here because Rimini Street

11   apparently is the same thing.

12             We are -- I don't want us to say, Judge -- I

13   don't think there's any way to thread the needle and call

14   these two different companies infringing without severely

15   and unfairly prejudicing my client.

16             THE COURT:  I'll give you a ruling in the

17   morning.

18             MR. WEBB:  Thank you, Judge.

19             MS. DUNN:  Thank you, Your Honor.

20             THE COURT:  All right.  Now, let's get back to

21   Mr. Grigsby.

22             MR. POLITO:  So I think Your Honor wanted to

23   review the video?

24             THE COURT:  Yes, please.

25             MR. POLITO:  And just to confirm, you want to

1617

1    view the whole thing?

2              THE COURT:  Pardon?

3              MR. POLITO:  My understanding is you want to

4    view the entirety of the video, or just the disputed

5    portion?

6              THE COURT:  How long does it take?

7              MR. POLITO:  Twenty-six minutes and a half.

8              THE COURT:  Well, is there a point in time where

9    you have covered everything that you think bears upon the

10   objections at issue and we can just cut it off at that

11   point?

12             MR. DYKAL:  Can I just say in the interest of

13   saving time, if the only reason counsel wants to bring this

14   in is to challenge Mr. Grigsby's character for

15   truthfulness, that's only appropriate if he puts his

16   character for truthfulness at issue.  That has not been

17   established.  It's irrelevant to this case.  It's

18   prejudicial.

19             THE COURT:  I don't want argument now.  I want

20   to hear -- I want to understand the issue.

21             MR. DYKAL:  Sure.  I'm sorry.

22             THE COURT:  My only question is can we play

23   something, play the video in some kind of a short fashion

24   so that I can at least develop a sense of what the dispute

25   is all about.

1    MR. POLITO:  The dispute basically is the end of

2    the video, and I think we can probably back it up a little

3    bit and play the last portion of the video.  I would guess

4    it's about 10 minutes.

5    Maybe Mr. Dykal and I can take two seconds and

6    agree on a starting point?  Is that all right with Your

7    Honor?

8    Is that all right?  Or we can watch the whole

9    thing.  It's up to you.

10    THE COURT:  Let's see if you can do that.

11    I need to alert you I've got another hearing at

12    three o'clock.  It will probably take a half hour.

13    Well, let me know as soon as you're ready on

14    this and I'll come back in and we'll get as far as we can.

15    MR. POLITO:  Your Honor, we think we can just --

16    we can start at -- right at the objectionable part, and

17    that will keep it nice and short, your Honor, or the part

18    to which they're objecting, I should say.

19    THE COURT:  All right.  But I want a little of

20    the beginning part just so I can have a personal sense of

21    where this witness comes into the case.

22    MS. DUNN:  Your Honor, for the purposes of

23    efficiency, I just wanted to ask you, I think you might

24    have wanted me to read part of the Fees' declaration into

25    the record, but to save you time, would you like me to hand

1    this up to you.  Is that helpful?

2              THE COURT:  Yes, uh-huh.

3              MS. DUNN:  Okay.

4              THE COURT:  Counsel, I also assume you must have

5    the text of this particular deposition testimony.  I would

6    appreciate a copy.

7              MR. POLITO:  We do, Your Honor.

8              THE COURT:  All right.  Go ahead.

9         (Videotape deposition of Ray Grigsby played

10         as follows:

11      PAGE 5:01 TO 5:03 (RUNNING 00:00:04.906)

12      "Would you please state your full name for the record.

13       A. Sure. Ray C. Grigsby, Jr.

14       PAGE 16:11 TO 16:21 (RUNNING 00:00:33.287)

15       Q. Now, you said all of these nine local copies of JD

16       Edwards software that are on Rimini systems were

17       created...

18       Q. When did you start at Rimini

19       Street?

20       A. I  was hired late September 2009.

21       Q. What was your job title at that

22       time?

23       A. Vice president of the JD Edwards practice.

24       Q. Has that changed since

25       September 2009?

1   A. No, sir.

2   Q. Who did you report to in September 2009?

3   A. I report to Brian Slepko, who's senior VP of global

4   operations.

5   Q. And you've reported to him since you started your

6   employment?

7   A. Yes, sir.

8   Q. Has your job description changed at all since you

9   started?

10  A. No.

11  Q. And what is your job description?

12  A. My job description is to manage the JDE practice,

13  working with sales and  marketing to grow the JD

14  Edwards practice globally. I'm also in charge of

15  trying to recruit and grow it internally in terms of

16  services we provide, ensuring that we have proper

17  methodologies and procedures in place, and basically

18  running the P&L to achieve margins.

19  PAGE 87:13 TO 87:20 (RUNNING 00:00:25.486)

20  Q. The first question is, looking at the first page of

21  Exhibit 180, can you explain why, if the Medtronic

22  environments were created in 2008 and not used, this

23  document is being created on what appears to be June

24  15, 2009?

25  Based on my investigation and research, no, I can't

1     explain that.

2     PAGE 119:21 TO 120:04 (RUNNING 00:00:17.298)

3      MR. HOWARD: Let's mark as Exhibit 185 an email chain

4       at the top from JR Corpuz to Dennis Chiu with a

5       copy to Michael Kerr and Bobby

6       Parmalee dated June 8, 2009.

7      (Whereupon, Grigsby-Exhibit 185,

8      email chain, Bates RSI00347464 to -481,

9      was marked for identification.)

10    PAGE 120:07 TO 120:12 (RUNNING 00:00:14.879)

11    Q. Let me direct you to the second page of Exhibit 185,

12    which is an email between Michael Kerr to Dennis Chiu,

13    with a copy to Lourdes Medina, dated June 8, 2009.

14    Do you see that?

15    A. Yes.

16    PAGE 120:16 TO 120:24 (RUNNING 00:00:19.137)

17    Q. He says: Dennis, I am planning a JDE install for

18    Medtronic support system contract compliance. I will

19    need some ISO CD images of their software.

20    He says: To start the process, can you get me a list of

21    all the CDs we have in archive for them?

22    Do you see that?

23    A. Yes, sir.

24     PAGE 121:23 TO 122:02 (RUNNING 00:00:09.182)

25    Q. Does it now appear to you that an additional

1     Medtronic environment was created in June of 2009?

2     A. Based on the information you provided me, yes.")

3          MR. POLITO:  And so, Your Honor, this deposition

4     goes on to talk about he was a 30(b)(6) and he couldn't

5     explain all of the evidence we had of additional JD Edwards

6     installations that Rimini Street hadn't admitted to or

7     agreed to.

8          So now we get -- even though he was up to

9     explain an agreed list of environments, he couldn't explain

10    where they were, where the ones that we kept finding but

11    they didn't admit to.

12         So now if we jump to the end, I think we have

13    enough context.

14         MR. DYKAL:  But, again, it's like this.  He

15    started 2009, he said I just don't know.  So just to

16    clarify.

17         THE COURT:  All right.

18       (Videotape deposition of Ray Grigsby played

19       as follows:

20       PAGE 291:14 TO 291:22 (RUNNING 00:00:09.772)

21    "Q. Mr. Grigsby, I'm going to mark as Exhibit 213 an

22       email from you to Brian Slepko dated October 10, 2009

23       attaching a sales presentation.

24       - - -

25       (Whereupon, Grigsby-Exhibit 213,

1623

1     email, with attachments, Bates

2      RSI03112035 to -290, was marked for

3     identification.)

4      PAGE 291:24 TO 294:23 (RUNNING 00:03:10.185)

5     Q. Mr. Grigsby, do you recognize what's been marked as

6     Exhibit 213?

7     A. Yes, I do.

8     Q. What is it?

9     A. It's a presentation that I gave to Brian when I

10    first came on board to help him understand the JDE

11    software just as he was understanding it. And this was

12    a sales presentation that they intended for me to give

13    as an introduction on what is JDE software.

14    Q. And is this a presentation that you prepared?

15    A. Yes, sir.

16    Q. Did you have any help preparing it?

17    A. If I remember back to 2009, I'm sure I did have help

18    from my team.

19    Q. Did you prepare it while you were at Rimini Street?

20    A. Yes, sir.

21    Q. How long after you began at the company did you send

22    this email to Mr. Slepko attaching this presentation?

23    A. I had joined the company in September. This was set

24    in October.

25    Q. How long did it take you to prepare this

1624

1     presentation?

2     A. I couldn't say, sir. I mean, there's a lot of

3     presentations I prepared for Mr. Slepko and the sales

4     team, but ...

5     Q. This is almost a hundred pages, right?

6     A. Yes.

7     Q. Did you agree, it has detailed technical information

8     in it?

9     A. Does it have detailed, technical information in it?

10    Q. Yes.

11    A. It has flow of all the modules.

12    Q. Did you use any sources in preparing this?

13    A. Could you clarify "sources"?  What do you mean?

14    Q. Any sources.

15    A. Yes, I used a lot of sources of things I got from

16    some of -- some of it was blogs, some of it was Qwest

17    presentations that I had from years past, some of it

18    was material that I had from other public

19    presentations.

20    Q. Did you write all of the content in these slides?

21    A. Did I write all the content?

22    Q. Yes.

23    A. I didn't create every slide, no, sir.

24    Q. Where did you get them if you didn't create them?

25    A. Like I said, there was many sources. Some are --

1    Andy Klee has a blog and a website. I've been to many,

2    many Qwest classes, collaborate classes. I actually

3    purchased Oracle Open World documents in my -- years

4    past. So it was all material that I either purchased or

5    got publicly off the web.

6    Q. How did you purchase Oracle Open World documents?

7    A. Years ago, when I was a business partner, I was

8    allowed to attend Oracle. And if you paid for Oracle

9    documents, you'd get presentations.

10   Q. Were you allowed to use those documents to compete

11   against Oracle with third-party providers?

12   PAGE 295:01 TO 295:17 (RUNNING 00:00:47.584)

13   A. No.

14   BY MR. HOWARD:

15   Q. But you nevertheless used those documents, in part,

16   to prepare this presentation, Exhibit 213?

17   A. I used public -- documents that were public that I

18   had in my domain, yes, sir.

19   Q. And, in fact, isn't it true that you simply copied

20   an Oracle document to create this presentation?

21   A. This was not an Oracle document. I've never had a

22   sign-on --

23   MR. HOWARD: Let's mark as Exhibit 214 a presentation

24   titled JD Edwards EnterpriseOne Process Models.

25   PAGE 295:19 TO 298:12 (RUNNING 00:02:19.371)

1626

```
 1          (Whereupon, Grigsby-Exhibit 214,

 2      JD Edwards EnterpriseOne Process Models,

 3      Bates RSI03118309 to -403, was marked

 4      for identification.)

 5      - - -

 6      BY MR. HOWARD:

 7      Q. Mr. Grigsby, do you recognize what's been marked as

 8      Exhibit 214?

 9      A. Yes, I do.

10      Q. What is it?

11      A. It looks like an Oracle presentation.

12      Q. From your files; is that correct?

13      A. From my files?

14      Q. Yes, sir.

15      A. You'd have to tell me if that came from my past hard

16      drive from another --

17      Q. It was produced from your files in this case.

18      A. Okay. Yes, then it is.

19      Q. Okay. And you agree that's an Oracle presentation?

20      A. Yes.

21      Q. Can you look at the first page of that presentation

22      and compare it to the second page of your presentation

23      --

24      A. Yes.

25      Q. -- that's Exhibit 213?
```

1627

1     A. Right.

2     Q. Do you agree that appears to be a copy across the

3     middle there?

4     A. Yes.

5     Q. Can you turn to the second page of Exhibit 214, the

6     Oracle document, and compare it to the third page of

7     your presentation at Exhibit 213. It would appear that

8     that's a copy across the middle.

9     A. Yes.

10    Q. And that the words "financial management" appear on

11    both slides?

12    A. Yes.

13    Q. And if you turn to the third  page of the Oracle

14    document, which is Exhibit 214, and compare it to the

15    fourth page of your document, do you agree that that's

16    an exact copy?

17    A. Yes.

18    Q. And did you, in fact, take the Oracle document,

19    remove the Oracle bar, and insert the Rimini Street

20    logo in your presentation that you gave to Mr. Slepko

21    on October 20th, 2009?

22    A. Yes.

23    Q. Why did you do that?

24    A. Number one, I thought I had rights to that

25    presentation because I purchased it. And, number two,

1628

```
1     it was a presentation for Mr. Slepko.

2     Q. Who did you buy this presentation from?

3     A. I don't remember that, sir.

4     Q. What proof do you have that you purchased this

5     presentation?

6     A. I don't know if I have any receipts that go back

7     that far, that many years.

8      Q. Do you understand that this is an Oracle

9     copyrighted document?

10    PAGE 298:15 TO 298:21 (RUNNING 00:00:17.698)

11    A. Yes, I see that. Yes, sir.

12    BY MR. HOWARD:

13    Q. Do you understand that it's improper and violates

14    Oracle's copyrights to copy its documents as part of a

15    sales presentation for a competitor to compete against

16    it?

17    PAGE 298:24 TO 299:18 (RUNNING 00:00:35.375)

18    A. Yes.

19    BY MR. HOWARD:

20    Q. And you knew that at the time that you did this; is

21    that true?

22    A. No.

23    Q. You know that now?

24    A. Yes.

25    Q. You have other documents from Oracle on your hard
```

1629

1      drive, do you not, sir?

2      A. Yes, I do.

3      Q. You took those documents with you from Oracle when

4      you left?

5      A. I never worked at Oracle, but I --

6      Q. You took documents from JD Edwards when you left JD

7      Edwards.

8      A. Yes.

9      Q. And you knew that you weren't supposed to do that at

10     the time.

11     PAGE 299:21 TO 300:16 (RUNNING 00:00:42.738)

12     A. No, I didn't know that at the time. I thought if I

13     owned the documents, I could use the documents.

14     BY MR. HOWARD:

15     Q. You signed an employment agreement with JD Edwards,

16     did you not, sir?

17     A. I'm sure I did, yes, sir.

18      Q. And that employment agreement contained language

19     regarding the confidentiality of documents that came

20     into your possession while working for JD Edwards?

21     A. Yes, sir.

22     Q. And it had restrictions on how you could use or

23     possess those confidential documents of JD Edwards;

24     isn't that true?

25     A. Yes.

1    Q. And so you knew when you left JD Edwards that it was

2    improper and in violation of your employment agreement

3    to take documents with you from JD Edwards, did you

4    not?

5    PAGE 300:18 TO 301:02 (RUNNING 00:00:21.499)

6    A. Yes.

7    BY MR. HOWARD:

8    Q. And you've used those documents since leaving JD

9    Edwards in various of your employments, including with

10   Rimini Street; isn't that true?

11   A. Yes.

12   Q. And in some cases, those documents are draft

13   documents that could not possibly be in the public

14   domain.

15   PAGE 301:05 TO 301:05 (RUNNING 00:00:02.398)

16   A. I'd say no to that.

17    PAGE 301:06 TO 301:13 (RUNNING 00:00:17.499)

18   MR. HOWARD: Let's mark as Exhibit 215 a document

19   copyright 2008, Oracle and its affiliates, with a

20   watermark draft stamp.

21   - - -

22   (Whereupon, Grigsby-Exhibit 215,

23   Oracle document, Bates RSI03107621 to

24   -736, was marked for identification.)

25    PAGE 301:16 TO 302:19 (RUNNING 00:01:18.298)

1     Q. Mr. Grigsby, can you explain how Exhibit 215 came to

2     be in your files?

3     A. I believe the way this was in my files is I have

4     another drive that I had to provide counsel that was a

5     backup drive.  And in my previous life with a business

6     partner, we had these documents for one of the business

7     partners I worked at. And as such, that was on my hard

8     drive -- or my external drive, which I made -- I gave

9     to the attorneys for disclosure.

10     Q. How did you get this document?

11     A. I get this document -- one of my previous jobs. I

12     either took a class or I had this document. I took many

13     JDE classes.  This specific document, I don't

14     recollect.

15     Q. Would it surprise you to know that there's

16     approximately 40,000 pages of Oracle documents in your

17     files produced in this case?

18     A. Based on my past employment and the fact that I use

19     that drive as a backup drive, no, it wouldn't surprise

20     me.

21     Q. How many of those 40,000 pages would you estimate

22     you took from JD Edwards with you when you left their

23     employment with them?

24     A. There's no way for me to estimate that.

25     PAGE 302:20 TO 303:09 (RUNNING 00:00:26.980)

1632

1    Q. Is it more than half?

2    A. No, sir, I would not say that.

3    Q. Would you say more than 10,000 pages?

4    A. I really don't know.

5    Q. Can you give me your best estimate?

6    A. No, because I haven't looked at it -- external

7    backup drive for literally years.

8    Q. Did you download those documents from a specific

9    location when you left JD Edwards to take with you?

10   A. Not to my recollection, no, sir.

11   PAGE 304:05 TO 304:24 (RUNNING 00:00:40.990)

12   Q. Do you from time to time go into your stash of

13   Oracle documents and use them as part of your job at

14   Rimini Street?

15   A. No, sir. That's a backup hard drive.

16   Q. Well, we know that you did in the case of the sales

17   presentation that you sent to Mr. Slepko; isn't that

18   right?

19   A. That is correct, yes, sir.

20   Q. All right. Are there other instances that you can

21   recall, as you sit here, under oath, that you have from

22   time to time used Oracle documents in the course of

23   your work at Rimini Street?

24   A. Being that I've been with JD Edwards so far -- so

25   long, I'd have to say yes, there probably was.

1      Q. You've done that from time to time?

2      A. Probably, yes, sir.")

3           MR. POLITO:  That's the video, Your Honor.

4           THE COURT:  All right.  And, Mr. Dykal, your

5      objections?

6           And can you direct me to the particular page

7      that you're referring to from the transcript?

8           MR. DYKAL:  Sure.  It starts on page 291 -- oh,

9      I'm sorry, page 7 of the document you have, Your Honor.

10          THE COURT:  All right.

11          MR. DYKAL:  Starting with, "Mr. Grigsby, do you

12     recognize what's been marked as Exhibit 213," and this is

13     the portion where he starts going into the sales

14     presentation that had the Rimini logo and then where it

15     came from.

16          And our base point is these documents were never

17     identified in our discovery response.  If they would have

18     been, we would have explored it.

19          As we saw, he said that he thought he had the

20     rights to it.  We don't know whether or not that's true.

21     Oracle had never identified that to us.

22          And, secondly, it's just not relevant to the

23     issues in this case.  It's obvious what's going on here.

24     They want to put that in, it looks awful.  You saw it.

25     It's very prejudicial to my client, but it has no bearing

```
 1    on the actual copyright issues in this case, and it's
 2    loaded with jargon.
 3              It says, "Do you realize this is copyright
 4    infringement?"  This guy is not a lawyer.  He insinuates he
 5    stole trade secrets, he signed confidentiality agreements
 6    at JD Edwards.  These are not in the case.
 7              It's just completely prejudicial.  They're
 8    trying to inflame the jury, and it just shouldn't belong
 9    here.
10              MR. POLITO:  And, Your Honor, Mr. Maddock said
11    that when he had technical questions he referred them to
12    Mr. Grigsby.  The clients -- the prospective clients who
13    were thinking of coming to Rimini Street, this is the
14    person who helped them decide whether to come.
15              So in addition to being part of the scope of
16    injunction for our --
17              THE COURT REPORTER:  I'm sorry.  I can't
18    understand you.
19              MR. POLITO:  I'm sorry.  I apologize.
20              So, in addition, it's related to the pattern and
21    practice of misrepresentation, Your Honor.
22              MR. DYKAL:  Your Honor, injunction is not a
23    question for the jury.  It just doesn't belong here.
24              THE COURT:  Okay.  I believe it's relevant.
25              I understand the defense concern, but I view it
```

1635

```
 1    simply as relevant evidence in this case, and relevant
 2    evidence tends to be admissible because it's damaging to
 3    the other side.
 4              And I appreciate Rimini's position here, but I
 5    simply see it as relevant and being sufficiently relevant
 6    that it wouldn't be properly -- it shouldn't be properly
 7    excluded under Rule 403.
 8              MR. DYKAL:  I understand, Your Honor --
 9              THE COURT:  I will admit it.  And your objection
10    will be noted for the record.
11              And does your objection apply to the particular
12    exhibits as well?
13              MR. DYKAL:  Yes, Your Honor.
14              And just for clarity, does --
15              MR. POLITO:  I'm sorry.  The exhibits are all
16    admitted, Your Honor.  They are preadmitted.
17              MR. DYKAL:  And for clarity, does that include
18    those questions, "Do you understand this constitutes
19    copyright infringement?"
20              "Do you understand you're violating your
21    employment agreement?"
22              The gentleman was not a lawyer.  There was no
23    evidence that there actually was an employment agreement.
24    There's no evidence that they do violate copyright.
25              So as to those specific questions, we would ask
```

1636

1    Your Honor to consider whether those should be excluded.

2              THE COURT:  My inclination is I would not

3    exclude them, but I will look at that more carefully this

4    evening.

5              MR. DYKAL:  Thank you, Your Honor.

6              MR. POLITO:  Thank you, Your Honor.

7              MS. DUNN:  Your Honor, one last thing, which is

8    that what we will endeavor to do tonight is to draft a

9    judicial instruction on the previous issue that I raised

10   and send it over to defense counsel.  I just wanted to let

11   you know that we were going to work on that.

12             THE COURT:  I appreciate that.

13             MS. DUNN:  Sure.

14             THE COURT:  All right.  Well, a long day.  I'm

15   sure everyone can use the break, And court will be

16   adjourned.  Thank you very much.

17             MS. DUNN:  Thank you.

18             MR. POLITO:  Thank you, Your Honor.

19             MR. DYKAL:  Thank you, Your Honor.

20        (The proceedings adjourned at 2:37 p.m.)

21                    *    *    *

22

23

24

25

1637

1          -o0o-

2      I certify that the foregoing is a correct

3      transcript from the record of proceedings

4      in the above-entitled matter.

5

6      _____        9/24/15

7      Donna Davidson, RDR, CRR, CCR #318        Date
       Official Reporter

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1638

1                        I N D E X

2  PLAINTIFFS' WITNESSES:                  PAGE
    KEVIN MADDOCK
3      Direct Examination By Mr. ISAACSON     1391
        Cross-Examination By Ms. Chuang       1498
4      Redirect Examination By Mr. Isaacson    1518
    EDWARD SCREVEN
5      Direct Examination By Ms. Dunn        1539

6

7                    E X H I B I T S

8  PLAINTIFFS'                    ADMITTED
    324, 345                    1362
9    425                     1428
    457                     1581
10   541                     1592
    803                     1485
11  1341                   1486
    4931                   1438
12  5350                   1453
    5432                   1466
13  5471                   1470
    5474                   1489
14
    DEFENDANTS'                    ADMITTED
15  5396                   1415

16

17

18

19

20

21

22

23

24

25