1639

1           UNITED STATES DISTRICT COURT
                    DISTRICT OF NEVADA
2         BEFORE THE HONORABLE LARRY R. HICKS, DISTRICT JUDGE

3

4    ORACLE USA, INC., a Colorado      :
     corporation; ORACLE AMERICA,      :
5    INC., a Delaware corporation;     :
     and ORACLE INTERNATIONAL          :No. 2:10-cv-0106-LRH-PAL
6    CORPORATION, a California         :
     corporation,                      :
7                                      :
             Plaintiffs,               :
8                                      :
         vs.                           :
9                                      :
     RIMINI STREET, INC., a Nevada     :
10   corporation; and SETH RAVIN,      :
     an individual,                    :
11                                     :
             Defendants.               :
12   _____    :

13

14

                 TRANSCRIPT OF JURY TRIAL - DAY 9
15                  (Pages 1639 through 1904)

16

17                     September 24, 2015

18

                       Las Vegas, Nevada
19

20

21

22

     Court Reporter:        Donna Davidson, RDR, CRR, CCR 318
23                          Certified Realtime Reporter
                            400 South Virginia Street
24                          Reno, Nevada  89501
                            (775) 329-0132
25

1640

1    A P P E A R A N C E S

2    FOR THE PLAINTIFFS:

3    BOIES, SCHILLER & FLEXNER LLP
     KIERAN P. RINGGENBERG
4    1999 Harrison Street, Suite 900
     Oakland, California 94612
5    (510) 874-1000
     Fax: (510) 874-1460
6    kringgenberg@bsfllp.com

7    BOIES, SCHILLER & FLEXNER LLP
     RICHARD J. POCKER
8    300 South Fourth Street, Suite 800
     Las Vegas, Nevada 89101
9    (702) 382-7300
     Fax: (702) 382-2755
10   rpocker@bsfllp.com

11   BOIES, SCHILLER & FLEXNER LLP
     WILLIAM A. ISAACSON
12   KAREN L. DUNN
     5301 Wisconsin Avenue, NW
13   Washington, DC  20015
     (202) 237-2727
14   Fax:  (202) 237-6131
     wisaacson@bsfllp.com
15   kdunn@bsfllp.com

16   MORGAN LEWIS & BOCKIUS LLP
     THOMAS S. HIXSON
17   NITIN JINDAL
     JOHN A. POLITO
18   One Market, Spear Street Tower
     San Francisco, California 94105
19   (415) 442-1000
     Fax:  (415) 442-1001
20   thomas.hixson@morganlewis.com
     nitin.jindal@morganlewis.com
21   john.polito@morganlewis.com

22   JAMES C. MAROULIS
     DORIAN E. DALEY
23   Oracle Corporation
     500 Oracle Parkway
24   Redwood City, California 94070
     (650) 506-4846
25   jim.maroulis@oracle.com
     dorian.daley@oracle.com

1641

```
 1              A P P E A R A N C E S (Continued)

 2     FOR THE DEFENDANTS:

 3     SHOOK, HARDY & BACON LLP
       PETER E. STRAND
 4     B. TRENT WEBB
       RYAN D. DYKAL
 5     2555 Grand Boulevard
       Kansas City, Missouri 64108
 6     (816) 474-6550
       Fax: (816) 421-5547
 7     pstrand@shb.com
       bwebb@shb.com
 8     rdykal@shb.com

 9
       SHOOK, HARDY & BACON LLP
10     ROBERT H. RECKERS
       600 Travis Street, Suite 3400
11     Houston, Texas 77002
       (713) 227-8008
12     Fax: (713) 227-9508
       rreckers@shb.com
13
       SHOOK, HARDY & BACON LLP
14     ANNIE Y.S. CHUANG
       One Montgomery Tower, Suite 2700
15     San Francisco, California 94104-4505
       (415) 544-1900
16     achuang@shb.com

17
       LEWIS ROCA ROTHGERBER LLP
18     W. WEST ALLEN
       3993 Howard Hughes Parkway, Suite 600
19     Las Vegas, Nevada 89169
       (702) 949-8230
20     Fax: (702) 949-8364
       wallen@lrrlaw.com

21

22

23

24

25
```

1642

<pre>
 1              LAS VEGAS, NEVADA, SEPTEMBER 24, 2015, 7:56 A.M.

 2                                --oOo--

 3                        P R O C E E D I N G S

 4

 5              COURTROOM ADMINISTRATOR:  Please rise.

 6          (Outside the presence of the jury.)

 7              THE COURT:  Good morning.  Have a seat, please.

 8              The record will show that we are convened in

 9    open court.  The parties and counsel are present.  The jury

10    is not present.

11              I have had an opportunity to review and consider

12    various matters that have been pending and addressed.

13              Dealing with the most recent, the video

14    testimony of -- video deposition testimony of Mr. Grigsby,

15    I have reviewed the transcript, and I am of the opinion

16    that the objection to the violation of the JD Edwards

17    employment agreement by Grigsby is not something that

18    should be admitted in this case.

19              I am of the opinion, however, that the

20    references related to Oracle and copyright issues should be

21    admissible because they directly concern the parties in

22    this action.

23              So that being the case, I'm looking at the

24    written transcript that was provided to me.  I believe that

25    the videotape should be -- should not include -- should be
</pre>

1    redacted however that is done mechanically.

2           The question and answers from -- I'm looking at

3    the lower right page number, page 10, referring to page 299

4    of his deposition, the lines starting with line 24,

5    through, on the next page, page 11, which would take it

6    through line number 5 from page 301.

7           So that the video would then pick up with line

8    6, "MR. HOWARD:  Let's mark as Exhibit 215," and that would

9    be admissible through the end.

10          I do not believe there's further reference to

11   the violation of the employment contract, questions that

12   were directed concerning JD Edwards and Mr. Grigsby.  I

13   don't think there's a further reference.  If there is, I'd

14   hear from counsel.

15          But in any event, the redacted portion,

16   referring to the deposition transcript, would be from page

17   299 at line 24 through page 301 at line 5.

18          With regard to the question concerning the

19   experts having not considered TomorrowNow and CedarCrestone

20   as noninfringing alternatives, I'm of the view that the

21   experts should be able to testify to that.

22          There is evidence before the Court, not before

23   the jury, with regard to CedarCrestone but certainly with

24   regard to TomorrowNow, that would permit inferences that

25   there would be reason that TomorrowNow should not be

1    considered as a noninfringing entity.

2              I'm not quite sure how to deal with

3    CedarCrestone because I just don't think there's evidence

4    in front of the jury concerning that.  But I'm also

5    recalling that CedarCrestone was a very insignificant

6    competitor regarding service.

7              So I believe the experts are entitled to

8    consider who they did not consider because they did not

9    feel they qualified as noninfringing alternatives.

10             The extent to which Rimini cares to

11   cross-examine that, of course, is completely up to counsel

12   for Rimini.

13             With regard to the redactions that have been at

14   issue concerning Defendants' Exhibits 152, 153, 154B 164A,

15   340, and 345, which are addressed in the recently filed

16   motion number 807 and related response by Oracle at 812, I

17   think the Court is just going to have to, at some point

18   when we have a break, go through the individual redactions.

19             I think there should be some redactions.

20   Generally speaking, I'm of the view that anything that's

21   clearly hearsay attributable to a customer's leaving,

22   hearsay comments by the customer's representative or what

23   would appear to be clearly founded upon hearsay comments,

24   is objectionable and should be redacted.

25             But I'm also of the opinion that the present

1645

```
 1   sense impressions of the Oracle employees as they may be
 2   reflected within the challenged portions should be
 3   admissible.
 4              So, again, we're going to -- perhaps as a
 5   guideline, counsel can agree on some of that, and as to the
 6   rest, we'll just have to forge through it at an opportune
 7   time.
 8              And I don't know how our timing works on any of
 9   that, but I just wanted to give counsel a heads up so that
10   you have a sense of where the Court is with regard to those
11   issues.
12              So I believe I've covered the issues that were
13   in front of me.  Are there any other issues that counsel
14   have in mind that you would like the Court to address?
15              MR. WEBB:  Good morning, Your Honor.
16              Up until a couple days ago, Oracle had Juan
17   Jones listed as a will call witness.  They've informed us
18   that they were no longer intending to call him.
19              I advised counsel this morning that we would
20   like to call him in our case.  They are considering that
21   request, and hopefully we'll have an answer some time very
22   soon.  I just wanted to alert the Court that this might be
23   an issue.
24              THE COURT:  All right.
25              MR. WEBB:  Thank you.
```

```
 1              THE COURT:  Will someone tell me who Juan Jones
 2    is?
 3              MR. WEBB:  He's a senior vice-president at
 4    Oracle, I believe, dealing with customer support.
 5              THE COURT:  All right.
 6              MR. WEBB:  Thank you, Judge.
 7              THE COURT:  All right.  Thank you.
 8              Okay.  Do we have our jury here, Dionna?
 9              COURTROOM ADMINISTRATOR:  I believe we do.
10              THE COURT:  Let's bring them in.
11              COURTROOM ADMINISTRATOR:  Yes, Your Honor.
12         (Jurors enter courtroom at 8:06 a.m.)
13              THE COURT:  Good morning.  Have a seat, please.
14              All right.  Day 11 begins.
15              The record will show the jury is present,
16    counsel and the parties are present.  We are in open court.
17              And I believe we were at plaintiffs' next
18    witness; is that correct?
19              Mr. Polito?
20              MR. POLITO:  Your Honor, good morning.
21              Ladies and gentlemen, we're going to play
22    another deposition video to start this morning.  We'll be
23    playing the video of Ray Grigsby.
24              Mr. Grigsby at the time of the video was
25    vice-president of JD Edwards practice at Rimini Street.
```

1    He was testifying in this video as a corporate

2    representative of Rimini Street on topics including JD

3    Edwards environment and JD Edwards support.

4    You've heard Mr. Grigsby's name in, for

5    instance, Mr. Maddock's testimony yesterday.

6    This runs about 25 minutes.  Thank you.

7    COURTROOM ADMINISTRATOR:  What about the

8    exhibits?

9    MR. POLITO:  Oh, sorry, the exhibits.  Thank

10   you.

11   So the previously admitted exhibits are PTX 181,

12   195, 199, 200, and 201.

13   And the exhibits to which there are no objection

14   and which we would move to admit are PTX 182, 186, 190, and

15   194.

16   MR. RECKERS:  No objection, Your Honor.

17   THE COURT:  All right.  They are admitted.

18   (Plaintiffs' Exhibits 182, 186, 190, 194

19   received into evidence.)

20   THE COURT:  And you may go ahead, Mr. Polito.

21   (Videotape deposition of Ray Grigsby played

22   as follows:)

23   PAGE 5:01 TO 5:03 (RUNNING 00:00:04.906)

24   "Would you please state your full name for

25   the record.

1648

1       A. Sure.  Ray C. Grigsby, Jr.

2        PAGE 16:11 TO 16:21 (RUNNING 00:00:33.287)

3       Q. Now, you said all of these nine local

4       copies of JD Edwards software that are on

5       Rimini systems were created before you joined

6       the company; is that correct?

7       A. That is correct, yes.  Approximate timing

8       was in mid-2008.

9       Q. That's the timing of when these copies

10      were created?

11      A. Yes.  The JDE practice actually started in

12      about 2008.  One of the first clients was

13      Medtronic.

14       PAGE 25:06 TO 25:11 (RUNNING 00:00:13.251)

15      Q. And the nine JD Edwards environments that

16      you've described, those are not behind a

17      lockdown procedure?

18      A. Well, okay.  They're not the same as an

19      archive, but they are locked-down VMs.

20       PAGE 25:12 TO 25:15 (RUNNING 00:00:09.414)

21      Q. What do you mean by that?

22      A. Again, we cannot access those without

23      going through Mr. Lester and opening an IT

24      help ticket to get to that VM.

25       PAGE 30:23 TO 31:16 (RUNNING 00:00:38.385)

1649

```
1      Q. Do you have contractual authorization from

2         each of the clients for whom you -- Rimini

3         has an in-house local JDE environment?

4      A. Would you repeat the question,

5         please?

6      Q. Yeah.  Do you have a document from the

7         client which says that it's okay for you to

8         have our software installed locally on your

9         machines at Rimini Street?

10     A. Okay.  So you're speaking of the nine

11        instances we talked about earlier.

12     Q. Yes.

13     A. From my understanding with Dennis Chiu,

14        and I -- I have not seen those contracts, but

15        it was written in the contract that we had

16        authorization from the client to load those

17        onto Rimini Street's local machines.

18      PAGE 32:16 TO 32:20 (RUNNING 00:00:10.707)

19     Q. Sure.  Is there anything in the Oracle

20        license agreement with those customers that

21        would allow Rimini to have the JDE software

22        installed locally on its local machines?

23      PAGE 33:02 TO 33:04 (RUNNING 00:00:05.344)

24     A. To the best of my knowledge and from my

25        research, I cannot answer yes or no to that
```

1650

1     question.

2      PAGE 33:06 TO 33:10 (RUNNING 00:00:08.381)

3     Q. Now, you were employed at JD Edwards at

4     one point, is that correct, Mr. Grigsby?

5     A. I worked for JD Edwards for over 18 years.

6      PAGE 36:12 TO 37:18 (RUNNING 00:01:03.025)

7     Q. When did you start at Rimini Street?

8     A. I was hired late September 2009.

9     Q. What was your job title at that time?

10    A. Vice president of the JD Edwards practice.

11    Q. Has that changed since September 2009?

12    A. No, sir.

13    Q. Who did you report to in September 2009?

14    A. I report to Brian Slepko, who's senior VP

15    of global operations.

16    Q. And you've reported to him since you

17    started your employment?

18    A. Yes, sir.

19    Q. Has your job description changed at all

20    since you started?

21    A. No.

22    Q. And what is your job description?

23    A. My job description is to manage the JDE

24    practice, working with sales and marketing to

25    grow the JD Edwards practice globally.  I'm

1651

1     also in charge of trying to recruit and grow

2     it internally in terms of services we

3     provide, ensuring that we have proper

4     methodologies and procedures in place,

5     and basically running the P&L to achieve

6     margins.

7      PAGE 87:13 TO 87:20 (RUNNING 00:00:25.486)

8     Q. The first question is, looking at the

9     first page of Exhibit 180, can you explain

10    why, if the Medtronic environments were

11    created in 2008 and not used, this document

12    is being created on what appears to be June

13    15, 2009?

14    A. Based on my investigation and research,

15    no, I can't explain that.

16     PAGE 119:21 TO 120:04 (RUNNING 00:00:17.298)

17    MR. HOWARD:  Let's mark as Exhibit 185 an

18    email chain at the top from JR Corpuz to

19    Dennis Chiu with a copy to Michael Kerr and

20    Bobby Parmalee dated June 8, 2009.

21     - - -

22     (Whereupon, Grigsby-Exhibit 185,

23      email chain, Bates RSI00347464 to -481,

24      was marked for identification.)

25     PAGE 120:07 TO 120:12 (RUNNING 00:00:14.879)

1   Q. Let me direct you to the second page of

2   Exhibit 185, which is an email between

3   Michael Kerr to Dennis Chiu, with a copy to

4   Lourdes Medina, dated June 8, 2009.

5   Do you see that?

6   A. Yes.

7    PAGE 120:16 TO 120:24 (RUNNING 00:00:19.137)

8   Q. He says:  Dennis, I am planning a JDE

9   install for Medtronic support system contract

10   compliance.  I will need some ISO CD images

11   of their software.

12   He says:  To start the process, can you get

13   me a list of all the CDs we have in archive

14   for them?

15   Do you see that?

16   A. Yes, sir.

17    PAGE 121:23 TO 122:02 (RUNNING 00:00:09.182)

18   Q. Does it now appear to you that an

19   additional Medtronic environment was created

20   in June of 2009?

21   A. Based on the information you provided me,

22   yes.

23    PAGE 161:22 TO 162:03 (RUNNING 00:00:25.859)

24   MR. HOWARD:  Let me mark as Exhibit 190 a

25   spreadsheet which is an excerpt of ticketing

1   requests from the document produced as RSI

2   00494805, which has been modified so that the

3   ID column appears at the left of every page.

4    PAGE 162:05 TO 162:20 (RUNNING 00:00:21.984)

5    (Whereupon, Grigsby-Exhibit 190,

6    Spreadsheet, Bates RSI00494805

7    (excerpted) - (nine pages), was marked

8    for identification.)

9    - - -

10  BY MR. HOWARD:

11  Q. Mr. Grigsby, do you recognize what's been

12  marked as Exhibit 190, or at least the

13  information that's contained within it?

14  A. I recognize the information in here.  I

15  don't work with this document.

16  Q. So let me ask you.  You recognize this to

17  be an excerpt of various ticketed requests

18  that are put into IT?

19  A. Yes.

20   PAGE 164:15 TO 164:20 (RUNNING 00:00:29.613)

21  Q. But do you agree that according to the

22  naming convention that we saw earlier, that

23  the first name listed here, JCOPE5TDE1, is a

24  JD Edwards EnterpriseOne 8.10 deployment

25  server on machine 1?  It's Exhibit 181, if

1654

1      you're looking for the naming convention.

2       PAGE 164:21 TO 165:23 (RUNNING 00:01:59.032)

3      A. Based on Exhibit 181, I'd have to agree,

4      yes, sir.

5      Q. And the second one there, JCOPE5TEN1 is a

6      JD Edwards EnterpriseOne 8.10 enterprise

7      server on machine 1?

8      A. What ID are you referencing?

9      Q. Still on 2700, just going down the list

10     there of the Detailed Description column, the

11     second name, JCOPE5TEN1 is a JD Edwards

12     EnterpriseOne 8.10 enterprise server?

13     A. Based on Exhibit 181, yes.

14     Q. And the next one below that, JCOPE5TWE1 is

15     a JD Edwards EnterpriseOne 8.10 web server?

16     A. Again, based on 181, yes.

17     Q. And the last two are JD Edwards

18     EnterpriseOne 8.10 clients, one on machine 1,

19     one on machine 2?

20     A. Yes.

21     Q. And this indicates that those were all

22     created on August 5th, 2009, at 8:37 a.m., is

23     that right, in the far right-hand column?

24     A. From the -- yes, sir.

25     Q. And modified on August 18th, 2009 at 5:33

1655

1      p.m.?

2      A. That's what's stated, yes.

3       PAGE 168:03 TO 168:12 (RUNNING 00:00:30.274)

4      Q. Well, they were being created, new

5      environments were being created.

6      A. Right.  And to your point, without further

7      discussions with George Lester, I don't know

8      why there would be a WE or a CL in -- unless

9      this was something -- because it -- clearly,

10      on Exhibit 182, he did not list it.  So my

11      question to Mr. Lester would be why on

12      Exhibit 190, which is an IT help ticket, does

13      it appear.

14       PAGE 170:22 TO 172:03 (RUNNING 00:02:07.825)

15      Q. Now, take a look, please, on that same

16      page, at ID No. 4616, creation date of

17      February 24th, 2010.  Do you see that?

18      A. Yes, sir.

19      Q. Could you read the description into the

20      record, please.

21      A. Please make a virtual machine from

22      JDESATemplate and call it JCOPE5TSA1.

23      Thanks, Tim.  My mistake.  It is

24      JDE810SATemplate.

25      Q. And the -- so you understand that the

1656

1   environment that's created on January 15th

2   called JDE810SATemplate is being used to

3   create the environment called JCOPE5TSA1 on

4   February 24th, 2010?

5   A. That's correct.  Yes, sir.

6   Q. Do you know whose software is used to

7   create JDE810SATemplate?

8   A. I do not.

9   Q. But it is then copied to create an

10  environment that has the client designation

11  of City of Overland Park; is that correct?

12  A. From reading line 4616, yes.

13  Q. In each case, the JDE810SATemplate and the

14  JCOPE5TSA1 copy of that environment, in each

15  case, those are installed copies of JD

16  Edwards software, is that correct, according

17  to the naming conventions?

18   A. According to the naming conventions, yes.

19   PAGE 237:25 TO 238:09 (RUNNING 00:00:15.059)

20  MR. HOWARD:  Okay.  Let's mark as Exhibit 200

21  an email from Ray Grigsby to Jim Egger at the

22  top dated October 29, 2009, attaching the

23  2009 JDE World 1099 TDD.

24   - - -

25   (Whereupon, Grigsby-Exhibit 200,

```
 1            email chain, with attachments, Bates
 2            RSI03097166 to -183, was marked for
 3            identification.)
 4        PAGE 238:12 TO 238:22 (RUNNING 00:00:30.067)
 5        Q. All right.  Mr. Grigsby, is Exhibit 200 an
 6        email exchange between you and Mr. Egger
 7        relating to the 2009 1099s?
 8        A. Yes, sir, it is.
 9        Q. And on page 2 of Exhibit 200, that's an
10        email from Mr. Egger to you?
11        A. Yes, sir, it is.
12        Q. And he's attaching the technical design
13        document for the 2009 JDE World and OneWorld
14        1099?
15        A. Yes, sir, it is.
16        PAGE 239:04 TO 241:04 (RUNNING 00:02:03.998)
17        Q. He says:  It is written at a high level as
18        not to ruffle any feathers with big O or
19        anyone else.
20        Do you understand him to be referring to
21        Oracle there?
22        A. Yes, sir, I do.
23        Q. And why would it be necessary to write it
24        at a high level so as not to ruffle Oracle's
25        feathers?
```

1658

1     A. I have no comment on that.  It wouldn't

2     ruffle Oracle's feathers.

3     Q. How do you know?

4     A. Well, as long as -- again, if I look at

5     the attachments to this, this is a basic

6     requirements document that is, again,

7     generic.  And he took this BRD to let me

8     review it, to see what changes are required

9     for 2009 1099s. And then he would take this,

10    a new one specific to each client.

11    So I think what he's trying to say, and not

12    politically in a good way, was that we don't

13    take code and just copy it, without naming it

14    for the client and having it specific for

15    each client.

16    Q. No. He just uses the code in one

17    environment, writes a detailed design

18    document to be used with other clients.

19    Right?

20     A. Well, again, we went over this early this

21    morning.  For year end, the changes are the

22    same for all clients for World and E1. So

23    there's a basic Word doc, if you will, and

24    his instructions of what he should do is take

25    that basic template and copy it and create an

1659

1       FDD and a TDD for each client as part of the

2       year-end process.

3       Q. He created this document from the Giant

4       Cement environment, right?

5       A. Yes, sir, he did.  And he showed me -- I

6       asked for an example of one, to see what they

7       look like.

8       Q. And you told him to keep it at a high

9       level?

10      A. Well, this is not a high level.  This is a

11      -- I believe it said TDD, did it not?

12      Q. Well, his email says it's written at a

13      high level, right?

14      A. It does say "high level," yes, sir.

15       PAGE 243:15 TO 243:21 (RUNNING 00:00:11.361)

16      Q. Yeah.  And there's nothing in here

17      specific to Giant Cement, is there, sir?

18      A. No, sir, not in this attachment.

19      Q. And we know that two days before, he went

20      in and did this fix in Giant Cement, right?

21       PAGE 243:24 TO 244:19 (RUNNING 00:01:03.315)

22      A. Yes, sir.

23      BY MR. HOWARD:

24      Q. On Exhibit 199, he says he's going to go

25      in and do this fix on Giant Cement and unit

1660

1           test it, right?

2           A. That's correct.  Yes, sir.

3           Q. And then two days later, he sends you a

4           document entitled 2009 JDE World 1099 TDD.

5           Right?

6           A. Yes, sir.  I'm trying to remember why he

7           did this.  And I think it was at my request,

8           to show me his first copy of the design

9           documents for the 1099, because I do not see

10          the name "Giant Cement" on here at all.

11          Q. And isn't it a fact that this document

12          which Mr. Egger prepared using the Giant

13          Cement environment was then used to do the

14          1099 2009 for all the other JD Edwards

15          clients?

16           PAGE 244:25 TO 245:13 (RUNNING 00:00:29.365)

17          A. If this was Mr. Egger's first client, he

18          probably produced this for Giant, as you

19          said.  And since, as I said, the changes for

20          1099s and W-2s are similar for all clients,

21          he probably took this format and then copied

22          it, the form, for other clients, and he

23          should have labeled that when he put it into

24          DevTrack.

25          BY MR. HOWARD:

1661

1       Q. But he didn't label it.  It's just one

2       document that's the 2009 1099 TDD, and it's

3       used for all clients; isn't that true?

4       A. Per this email, yes, sir.

5        PAGE 291:14 TO 291:22 (RUNNING 00:00:09.772)

6       Q. Mr. Grigsby, I'm going to mark as Exhibit

7       213 an email from you to Brian Slepko dated

8       October 10, 2009 attaching a sales

9       presentation.

10       - - -

11        (Whereupon, Grigsby-Exhibit 213,

12         email, with attachments, Bates

13         RSI03112035 to -290, was marked for

14         identification.)

15        PAGE 291:24 TO 294:23 (RUNNING 00:03:10.185)

16       Q. Mr. Grigsby, do you recognize what's been

17       marked as Exhibit 213?

18       A. Yes, I do.

19       Q. What is it?

20       A. It's a presentation that I gave to Brian

21       when I first came on board to help him

22       understand the JDE software just as he was

23       understanding it.  And this was a sales

24       presentation that they intended for me to

25       give as an introduction on what is JDE

1662

```
 1        software.
 2        Q. And is this a presentation that you
 3        prepared?
 4        A. Yes, sir.
 5        Q. Did you have any help preparing it?
 6        A. If I remember back to 2009, I'm sure I did
 7        have help from my team.
 8        Q. Did you prepare it while you were at
 9        Rimini Street?
10        A. Yes, sir.
11        Q. How long after you began at the company
12        did you send this email to Mr. Slepko
13        attaching this presentation?
14        A. I had joined the company in September.
15        This was set in October.
16        Q. How long did it take you to prepare this
17        presentation?
18        A. I couldn't say, sir.  I mean, there's a
19        lot of presentations I prepared for Mr.
20        Slepko and the sales team, but...
21        Q. This is almost a hundred pages, right?
22        A. Yes.
23        Q. Did you agree, it has detailed technical
24        information in it?
25        A. Does it have detailed, technical
```

1663

```
1     information in it?
2     Q. Yes.
3     A. It has flow of all the modules.
4     Q. Did you use any sources in preparing this?
5     A. Could you clarify "sources"?  What do you
6     mean?
7     Q. Any sources.
8     A. Yes, I used a lot of sources of things I
9     got from some of -- some of it was blogs,
10    some of it was Qwest presentations that I had
11    from years past, some of it was material that
12    I had from other public presentations.
13    Q. Did you write all of the content in these
14    slides?
15    A. Did I write all the content?
16    Q. Yes.
17    A. I didn't create every slide, no, sir.
18    Q. Where did you get them if you didn't
19    create them?
20    A. Like I said, there was many sources.  Some
21    are -- Andy Klee has a blog and a website.
22    I've been to many, many Qwest classes,
23    collaborate classes.  I actually purchased
24    Oracle Open World documents in my -- years
25    past.  So it was all material that I either
```

1664

```
1    purchased or got publicly off the web.
2    Q. How did you purchase Oracle Open World
3    documents?
4    A. Years ago, when I was a business partner,
5    I was allowed to attend Oracle.  And if you
6    paid for Oracle documents, you'd get
7    presentations.
8    Q. Were you allowed to use those documents to
9    compete against Oracle with third-party
10   providers?
11    PAGE 295:01 TO 295:17 (RUNNING 00:00:47.584)
12   A. No.
13   BY MR. HOWARD:
14   Q. But you nevertheless used those documents,
15   in part, to prepare this presentation,
16   Exhibit 213?
17   A. I used public -- documents that were
18   public that I had in my domain, yes, sir.
19   Q. And, in fact, isn't it true that you
20   simply copied an Oracle document to create
21   this presentation?
22   A. This was not an Oracle document.  I've
23   never had a sign-on --
24   MR. HOWARD:  Let's mark as Exhibit 214 a
25   presentation titled JD Edwards EnterpriseOne
```

1665

```
 1              Process Models.
 2               PAGE 295:19 TO 298:12 (RUNNING 00:02:19.371)
 3               (Whereupon, Grigsby-Exhibit 214,
 4               JD Edwards EnterpriseOne Process Models,
 5               Bates RSI03118309 to -403, was marked
 6               for identification.)
 7               - - -
 8          BY MR. HOWARD:
 9          Q. Mr. Grigsby, do you recognize what's been
10          marked as Exhibit 214?
11          A. Yes, I do.
12          Q. What is it?
13          A. It looks like an Oracle presentation.
14          Q. From your files; is that correct?
15          A. From my files?
16          Q. Yes, sir.
17          A. You'd have to tell me if that came from my
18          past hard drive from another --
19          Q. It was produced from your files in this
20          case.
21          A. Okay.  Yes, then it is.
22          Q. Okay.  And you agree that's an Oracle
23          presentation?
24          A. Yes.
25          Q. Can you look at the first page of that
```

1666

1   presentation and compare it to the second

2   page of your presentation --

3   A. Yes.

4   Q. -- that's Exhibit 213?

5   A. Right.

6   Q. Do you agree that appears to be a copy

7   across the middle there?

8   A. Yes.

9   Q. Can you turn to the second page of Exhibit

10   214, the Oracle document, and compare it to

11   the third page of your presentation at

12   Exhibit 213.  It would appear that that's a

13   copy across the middle.

14   A. Yes.

15   Q. And that the words "financial management"

16   appear on both slides?

17   A. Yes.

18   Q. And if you turn to the third page of the

19   Oracle document, which is Exhibit 214, and

20   compare it to the fourth page of your

21   document, do you agree that that's an exact

22   copy?

23   A. Yes.

24   Q. And did you, in fact, take the Oracle

25   document, remove the Oracle bar, and insert

1667

1    the Rimini Street logo in your presentation

2    that you gave to Mr. Slepko on October 20th,

3    2009?

4    A. Yes.

5    Q. Why did you do that?

6    A. Number one, I thought I had rights to that

7    presentation because I purchased it.  And,

8    number two, it was a presentation for Mr.

9    Slepko.

10   Q. Who did you buy this presentation from?

11   A. I don't remember that, sir.

12   Q. What proof do you have that you purchased

13   this presentation?

14   A. I don't know if I have any receipts that

15   go back that far, that many years.

16   Q. Do you understand that this is an Oracle

17   copyrighted document?

18    PAGE 298:15 TO 298:21 (RUNNING 00:00:17.698)

19   A. Yes, I see that.  Yes, sir.

20   BY MR. HOWARD:

21   Q. Do you understand that it's improper and

22   violates Oracle's copyrights to copy its

23   documents as part of a sales presentation for

24   a competitor to compete against it?

25    PAGE 298:24 TO 299:18 (RUNNING 00:00:35.375)

1668

1       A. Yes.

2       BY MR. HOWARD:

3       Q. And you knew that at the time that you did

4          this; is that true?

5       A. No.

6       Q. You know that now?

7       A. Yes.

8       Q. You have other documents from Oracle on

9          your hard drive, do you not, sir?

10      A. Yes, I do.

11      Q. You took those documents with you from

12         Oracle when you left?

13      A. I never worked at Oracle, but I --

14      Q. You took documents from JD Edwards when

15         you left JD Edwards.

16      A. Yes.

17      Q. And you knew that you weren't supposed to

18         do that at the time.

19        PAGE 299:21 TO 299:23 (RUNNING 00:00:06.891)

20      A. No, I didn't know that at the time.  I

21         thought if I owned the documents, I could use

22         the documents.

23        PAGE 301:06 TO 301:13 (RUNNING 00:00:17.499)

24      MR. HOWARD:  Let's mark as Exhibit 215 a

25         document copyright 2008, Oracle and its

1669

1        affiliates, with a watermark draft stamp.

2        - - -

3        (Whereupon, Grigsby-Exhibit 215,

4        Oracle document, Bates RSI03107621 to

5        -736, was marked for identification.)

6        PAGE 301:16 TO 302:19 (RUNNING 00:01:18.298)

7        Q. Mr. Grigsby, can you explain how Exhibit

8        215 came to be in your files?

9        A. I believe the way this was in my files is

10       I have another drive that I had to provide

11       counsel that was a backup drive.

12       And in my previous life with a business

13       partner, we had these documents for one of

14       the business partners I worked at.  And as

15       such, that was on my hard drive -- or my

16       external drive, which I made -- I gave to the

17       attorneys for disclosure.

18       Q. How did you get this document?

19       A. I get this document -- one of my previous

20       jobs.  I either took a class or I had this

21       document.  I took many JDE classes.  This

22       specific document, I don't recollect.

23       Q. Would it surprise you to know that there's

24       approximately 40,000 pages of Oracle

25       documents in your files produced in this

1670

1    case?

2    A. Based on my past employment and the fact

3    that I use that drive as a backup drive, no,

4    it wouldn't surprise me.

5    Q. How many of those 40,000 pages would you

6    estimate you took from JD Edwards with you

7    when you left their employment with them?

8    A. There's no way for me to estimate that.

9     PAGE 302:20 TO 303:09 (RUNNING 00:00:26.980)

10    Q. Is it more than half?

11    A. No, sir, I would not say that.

12    Q. Would you say more than 10,000 pages?

13    A. I really don't know.

14    Q. Can you give me your best estimate?

15    A. No, because I haven't looked at it --

16    external backup drive for literally years.

17    Q. Did you download those documents from a

18    specific location when you left JD Edwards to

19    take with you?

20    A. Not to my recollection, no, sir.

21     PAGE 304:05 TO 304:24 (RUNNING 00:00:40.990)

22    Q. Do you from time to time go into your

23    stash of Oracle documents and use them as

24    part of your job at Rimini Street?

25    A. No, sir.  That's a backup hard drive.

1671

1    Q. Well, we know that you did in the case of

2       the sales presentation that you sent to Mr.

3       Slepko; isn't that right?

4    A. That is correct, yes, sir.

5    Q. All right.  Are there other instances that

6       you can recall, as you sit here, under oath,

7       that you have from time to time used Oracle

8       documents in the course of your work at

9       Rimini Street?

10   A. Being that I've been with JD Edwards so

11      far -- so long, I'd have to say yes, there

12      probably was.

13   Q. You've done that from time to time?

14   A. Probably, yes, sir.

15       (End of deposition.)

16       THE COURT:  Oracle's next witness, please.

17       MR. POLITO:  Thank you, Your Honor.

18       We're going to play another videotaped

19   deposition from Beth Lester.  At the time of the video she

20   was the group vice-president for service strategy and

21   PeopleSoft business analysis and quality assurance.

22       Ms. Lester was also testifying as a corporate

23   representative on the topic of a few specific fixes for

24   PeopleSoft software.

25       And there are no exhibits for this video.

1672

1            THE COURT:  And she was testifying as a

2    corporate representative of which entity?

3            MR. POLITO:  Of Rimini Street.

4            THE COURT:  Thank you.

5            MR. POLITO:  Thank you, Your Honor.  It's under

6    three minutes.

7         (Videotape deposition of Beth Lester played

8         as follows:)

9         PAGE 8:01 TO 8:09 (RUNNING 00:00:18.290)

10         "Q. Would you please state your full name for

11         the record?

12         A. Beth Jedelsky Lester.

13         Q. Are you employed at Rimini Street?

14         A. I am.

15         Q. What's your current position?

16         A. I'm currently the group vice president of

17         service strategy and PeopleSoft business

18         analysis and quality assurance.

19         PAGE 73:24 TO 74:25 (RUNNING 00:01:00.683)

20         Q. Now, as part of the tax and regulatory

21         updates that Rimini delivers, does it also

22         deliver documentation in addition to

23         combinations of the various objects that

24         we've been looking at?

25         A. Yes.

1673

1    Q. What kind of documentation does it

2    deliver?

3    A. Documentation for the clients to help them

4    understand what is included in a particular

5    update.

6    Q. Does it deliver instructional

7    documentation?

8    A. Yes.

9    Q. Does that take the form of a Word

10   document?

11   A. Yes.

12   Q. Does it also deliver Excel documents?

13   A. Yes.

14   Q. What's in the Excel documents?

15   A. A listing of objects modified.

16   Q. With respect to the instructional

17   documentation, does Rimini use any portion of

18   documents previously prepared by Oracle or

19    PeopleSoft to generate that documentation?

20   A. Repeat the question, please?

21   Q. Sure.

22   Does Rimini Street use any portion of

23   documentation previously prepared by Oracle

24   or PeopleSoft to create its own documentation

25   that it sends out with its tax and regulatory

1674

1    updates?

2     PAGE 75:03 TO 75:03 (RUNNING 00:00:01.356)

3    THE WITNESS:  Yes.

4     PAGE 94:06 TO 94:17 (RUNNING 00:00:37.232)

5    Q. Are fixes sometimes tested in one

6    environment but not tested for each customer

7    that receives that fix?

8    A. Are you asking if we test a fix for every

9    client we are delivering the fix to?

10    Q. For -- yeah.

11    After the unit testing is done, and you're

12    doing individual testing, does it sometimes

13    happen that you would test once for a group

14    of customers but not for each of those

15    individual customers?

16    A. In the individual update testing phase,

17    that is correct.

18     PAGE 94:21 TO 94:25 (RUNNING 00:00:12.288)

19    Q. How do you determine where to test,

20    individually test that fix for a group of

21    customers?

22    A. You're not testing a fix for a group of

23    customers, you're testing a fix for a

24    particular client.

25     PAGE 95:02 TO 95:15 (RUNNING 00:00:39.545)

1675

1    And then you're sending that fix out to

2    additional customers without doing additional

3    individual testing in each of those

4    customers' environments; true?

5    A. It is possible that multiple customers may

6    be receiving the same developed code.  If

7    that is the case, the quality assurance team

8    makes a determination as to whether it's

9    necessary to test in each of those client

10   environments or just one, two, three, et

11   cetera.

12   Q. Right.

13   And that would be determined according to

14   whether those customers had similar code?

15   A. Yes."

16   (End of deposition.)

17          THE COURT:  Ms. Dunn, Oracle's next witness,

18   please.

19          MS. DUNN:  Thank you, Your Honor.  Oracle calls

20   Ed Yourdon.

21          COURTROOM ADMINISTRATOR:  Please raise your

22   right hand.

23          You do solemnly swear that the testimony you

24   shall give in the cause now before the Court shall be the

25   truth, the whole truth, and nothing but the truth, so help

1   you God?

2           THE WITNESS:  I do.

3           COURTROOM ADMINISTRATOR:  Please be seated.

4           Please state your name for the record and spell

5   your name for us.

6           THE WITNESS:  My name is Edward Yourdon;

7   Y-o-u-r-d-o-n.

8           COURTROOM ADMINISTRATOR:  Please tell us your

9   city and state of residence.

10          THE WITNESS:  My city and state of residence is

11  New York City, New York.

12                    EDWARD YOURDON

13          called as a witness on behalf of the

14      Plaintiffs, was examined and testified as follows:

15                   DIRECT EXAMINATION

16  BY MS. DUNN:

17   Q.    Mr. Yourdon, where do you work?

18   A.    I work for a technical consulting firm called

19  Nodrouy, Incorporated, in New York City.

20   Q.    Okay.  Where did you get the name Nodrouy?

21   A.    Nodrouy is the spelling of my own surname backwards.

22   Q.    And what does Nodrouy do?

23   A.    Nodrouy is a technical consulting firm that provides

24  guidance and advice for both technical and management

25  people in the IT department of medium- and large-size

1677

1    companies.

2    Q.    And what do you do for Nodrouy?  What are your

3    responsibilities?

4    A.    I am the chief technical officer.  I'm the one who

5    does the technical work associated with providing the

6    advice and guidance to our clients.

7    Q.    And please explain to the jury your educational

8    background.

9    A.    I received a bachelor's degree in applied

10   mathematics from MIT in 1965.

11          Subsequent to that, I carried out graduate

12   courses in both electrical engineering and computer science

13   at MIT and the Polytechnic Institute of New York.

14   Q.    And I know that you have a wealth of professional

15   experience.  Please take the time to describe that for the

16   jury.

17   A.    I began working in the computer field actually while

18   I was in college, so I've been in the computer field for a

19   little over 50 years at this point.

20          Along the way I've written some 28 textbooks and

21   a little under 600 computer-related articles.

22          And I've worked as a technical person initially

23   and then progressing up through the ranks of consulting and

24   management until my current position at Nodrouy,

25   Incorporated, which also includes roughly 12 years during

1678

```
 1    which I served as a member of the board of directors of an
 2    Indian outsourcing firm called IGATE.
 3    Q.    In the course of your work, what experience have you
 4    had specifically with enterprise software, which is what
 5    we're talking about in this case?
 6    A.    I've had a great deal of experience with enterprise
 7    software working with individual project managers who were
 8    developing or deploying an enterprise software system for
 9    one local area of their company, as well as providing
10    management guidance for the overall project management of
11    such projects, and also strategic management advice for
12    senior executives in companies who were looking to develop
13    and deploy these systems across the company or around the
14    world.
15    Q.    And when you give advice or act as a consultant,
16    what sorts of companies do you work for?
17    A.    Most of the companies that I work with are the
18    so-called blue-chip, Fortune 500 companies in the private
19    sector, you know, the aerospace companies, banks, insurance
20    companies and things of that nature, as well as the public
21    sector organizations at the state and federal level,
22    government agencies of many kinds.
23    Q.    So I want also to be clear, when you say consulting,
24    you don't mean what you're doing today as an expert, as a
25    litigation expert, you mean consulting giving advice.   I
```

1679

1    just want to make sure we're clear on the --

2    A.    Yes, yes, I do mean technical advice.

3              Initially it was for software developers who

4    wanted better ways of programming or designing their

5    software, I've written a number of books in that area.  And

6    subsequent to that, it was management local device --

7    advice, but not the sort that we're talking about here in

8    the courtroom.

9    Q.    All right.  Got it.

10             So when you act as a consultant, has any of that

11   work involved the specific software at issue in this case,

12   so, PeopleSoft, JD Edwards, Siebel, and Oracle Database?

13   A.    Yes.  Yes, it does.

14   Q.    And what other enterprise products have you

15   consulted about in addition to Oracle software?

16   A.    Well, I've consulted with companies on a number of

17   enterprise software products.

18             They usually are regard to this falling into two

19   categories or tiers.

20             The top tier, the largest ones, are the various

21   Oracle-related products that we've been hearing about, as

22   well as the products from SAP, the German software company.

23             More recently, most people feel that the

24   products from Salesforce, or salesforce.com, have entered

25   that top category.

1680

1    In addition to that, especially for the

2    medium-size companies, I've worked with enterprise software

3    products from companies such as Great Plains Software, a

4    company called that Mad Vision, and those first two are

5    actually part of Microsoft, as well as enterprise software

6    products from Lawson, L-a-w-s-o-n, and then there's one

7    other one, Baan, B-a-a-n, which, depending on your opinion,

8    is either in the first tier or the second tier.

9    Q.    And I know you said that you have professional

10   experience of 50 years.  How long have you been consulting

11   specifically about enterprise software?

12   A.    Approximately 25 years.

13   Q.    Have you ever advised one of your clients to select

14   Oracle or other enterprise software companies?

15   A.    Well, Oracle and its related companies, yes.  Yes.

16   Q.    Okay.  And about how often, in all your time as a

17   consultant, would you recommend Oracle as the software

18   vendor to select?

19   A.    Approximately half the time.

20   Q.    Okay.  Have you ever recommended to clients that

21   they switch away from Oracle to somebody else like SAP?

22   A.    For -- for the software itself?

23   Q.    Yes.

24   A.    Yes.  Occasionally.  Infrequently, but occasionally,

25   yes.

1681

1    Q.    And how about switching from another vendor to

2    Oracle?

3    A.    Yes, the same thing, it's infrequent and occasional,

4    but, yes.

5    Q.    Have you previously worked for Oracle as a

6    litigation consultant or as a testifying witness as you're

7    doing today?

8    A.    Yes, on two or three occasions, yes.

9    Q.    And have you ever worked for Oracle as an employee?

10   A.    No.  No, I have not.

11   Q.    Okay.  Do you have experience as an expert in other

12   cases that dealt with enterprise software?

13   A.    Yes, I do.

14   Q.    Can you just briefly describe that.

15   A.    I've been involved in a number of cases where the

16   disagreement between the parties involves the question of

17   whether the enterprise system was developed or deployed and

18   solved quickly enough within the appropriate budget,

19   whether it operated satisfactorily and other disagreements

20   of that sort.

21           That's been the majority of the cases that I've

22   been involved with.

23   Q.    Have you also consulted with companies about support

24   for enterprise software?

25   A.    Yes, I have.

1682

1    Q.    Okay.  And is that also the same amount of time,

2    about 25 years?

3    A.    Approximately the same time, perhaps a year or two

4    less since that decision is usually made a year or two

5    after they actually select their software.

6    Q.    Okay.  And what sort of support decisions have you

7    consulted with clients about?

8    A.    Well, the support decisions usually involve the

9    question of whether they should stay with the original

10   vendor from whom they acquired their software itself, or

11   whether they should consider an alternate service provider,

12   or, in the extreme case, whether they should consider

13   self-support.

14   Q.    And when you discuss support with your clients, what

15   are the key factors you discuss with them?

16   A.    The key factors are usually the cost and the

17   availability of a reliable service provider, whether it's

18   the same one they've been using or an alternate.

19   Q.    Why are those factors the primary factors?

20   A.    Well, those factors are the primary factors -- well,

21   partly because the amount of money involved in it from a

22   price perspective is usually fairly significant.

23           But the question of a reliable alternate service

24   provider is particularly important given the

25   mission-critical nature of these systems, the fact that

1683

1    they simply cannot live without them.

2    Q.    And is this idea of having a reliable alternative

3    provider sometimes called offering vendor-level support?

4    A.    Yes, it is.  The service provider that they may be

5    considering needs to provide the same kind of vendor-level

6    support that they've already been enjoying with the

7    enterprise software.

8    Q.    Okay.  And if you could explain in just a little

9    more detail what you mean by vendor-level support.  What

10   does that include generally?

11   A.    Well, vendor-level support is kind of a catchall

12   phrase that includes a number of activities.  I'm not sure

13   I'll be able to give you an exhaustive list.

14           But it involves such things as bug fixing,

15   security patches, updates for tax changes and regulatory

16   changes, updates to either refine or improve existing

17   features that the software product may have, and

18   ultimately, every couple of years, typically the release of

19   a completely new version of the software usually with major

20   new features and functions.

21   Q.    And in your experience, why, if at all, is

22   vendor-level support important to customers?

23   A.    The primary reason the vendor-level support is so

24   important is because of this point I mentioned a moment

25   ago, these are mission-critical applications without which

1684

```
 1    typically most of these businesses would grind to a halt

 2    and be unable to carry out their day-to-day business.

 3              MS. DUNN:  Your Honor, we request permission to

 4    proceed with Mr. Yourdon as an expert witness in enterprise

 5    software and support, along with customer decisionmaking

 6    about enterprise software and support.

 7              THE COURT:  You may proceed.

 8              MS. DUNN:  Thank you.

 9    BY MS. DUNN:

10    Q.    All right.  Mr. Yourdon, let's talk specifically

11    about the issues in this case.

12              Would you -- you were given an assignment in

13    this case.  How would you describe that general assignment?

14    A.    The assignment that I was given consisted of three

15    major questions to address.

16              The first one was to identify and prioritize the

17    criteria and factors the customers normally evaluate when

18    they are selecting a software support provider.

19              The second question that I investigated was to

20    determine why the customers of Rimini chose not to renew

21    the software support agreement that they typically had with

22    Oracle previously.

23              And the third one was to determine whether those

24    customers would have stayed with Oracle, or purchased

25    Oracle support, in the absence of Rimini's support
```

1685

1       offerings.

2       Q.    And before we talk about your findings, what

3       material did you review in the course of your work in this

4       case?

5       A.    I reviewed an enormous number of documents which, on

6       this particular slide, I've organized into four categories.

7             They were depositions, some of which we've

8       recently been seeing on video but which I reviewed on

9       paper, from employees of the parties, but they're also,

10      interestingly, from some of the customers, actual customers

11      who were using the software.

12            I reviewed a number of documents associated with

13      a much larger group of customers, not just the 17 who were

14      deposed, but roughly 200 customers, Oracle customers, who

15      were using Rimini support services.

16            I reviewed an enormous number of documents from

17      both Oracle and Rimini, emails, PowerPoints, internal

18      documents and so forth.

19            And, finally, I reviewed a little over a dozen

20      publications typically from some of the leading industry

21      analyst firms.

22      Q.    So that's a lot of materials.

23            As you reviewed them, was there something in

24      particular that you focused on?

25      A.    Well, the primary thing that I was doing with the

1686

```
1    review of all these documents was simply confirming the

2    experience that I have gained myself as a consultant

3    working with these companies out in the field over a period

4    of 50 years.

5              But, also, I was looking at them to see whether,

6    in fact, all these customers behaved in a similar fashion.

7    Q.    And when you say customers, customers involved in

8    this case?

9    A.    Yes, customers involved in this case, yes.

10   Q.    Okay.  In your experience, do customers generally

11   renew their support contracts with the original company

12   that sold them the software?

13   A.    Yes, that has been my experience predominantly.

14   Q.    And is the main reason for that -- well, what's the

15   main reason for that?

16   A.    Well, the main reason, as I've already testified, is

17   the need to have a reliable service provider who can keep

18   their mission-critical systems running in a reliable

19   fashion.

20   Q.    All right.  So I'd like to put up on the screen your

21   next slide.

22              Is this a slide that you prepared that reflected

23   the third-party support market as you understood it from

24   your work in this case?

25   A.    Yes, it is.
```

1687

1    Q.    Okay.  So we're going to talk about all of these

2    names that you see on the left, but the first thing is that

3    it seems that Rimini Street and TomorrowNow are in a

4    separate category.  Why did you do that?

5    A.    I separated them in a thick black line, as you can

6    see on this slide, because, unlike the others, they offered

7    services for all three of the Oracle products, that is,

8    PeopleSoft, JD Edwards, and Siebel, in contrast to the

9    others, and also because they were substantially larger

10   than the other support providers.

11             And, thirdly, because, unlike the other support

12   providers, they represented themselves and marketed

13   themselves as a replacement for the vendor, Oracle in

14   particular, as opposed to just being a consulting firm that

15   could help on some of the day-to-day activities.

16   Q.    So briefly before we talk about these in detail,

17   what is CedarCrestone?

18   A.    CedarCrestone was a company that provided consulting

19   support for PeopleSoft enterprise products.

20   Q.    And Spinnaker?

21   A.    Spinnaker was a -- is, I believe, a Denver-based

22   company that provides support primarily for JD Edwards

23   enterprise software products.

24   Q.    And NetCustomer?

25   A.    NetCustomer was a very small support provider that

1688

1     claimed to provide service for all three of the products

2     but, as I say, very small, only about five customers.

3     Q.    And in the course of your consulting work, were you

4     familiar with all of these companies?

5     A.    I was familiar with all but NetCustomer.  I had not

6     heard of them or worked with them previous to this case.

7     Q.    Are you now familiar with them after you -- after

8     all the review of the documents you did on this case?

9     A.    Yes, yes, I have become familiar, again, through

10    review of documents and searches on the Internet and so

11    forth.

12    Q.    Okay.  And are you aware of any other third-party

13    support options that are not listed on your chart?

14    A.    Yes, there are another five or six that are even

15    smaller than NetCustomer, Clay Associates, Abtech, which is

16    A-b-t-e-c-h, and a few others.

17    Q.    So one of the questions in this case that relates to

18    the question of damages is whether customers would have

19    gone to another third-party support provider if Rimini

20    Street did not exist.

21          And this is -- I know that the way you frame

22    this question is to ask whether any of these are a viable

23    alternative to Rimini Street.

24          So I just want to make clear, because we're sort

25    of switching topics a little bit in the case to damages,

1689

```
1   whether answering that question was part of your

2   assignment.

3   A.    Yes, it was.

4   Q.    Okay.  So you were tasked with figuring out are any

5   of these a viable alternative to Rimini Street if Rimini

6   Street didn't exist.

7   A.    Yes, that was part of my assignment.

8   Q.    Okay.  Did you draw a general conclusion as to that

9   question?

10  A.    My general conclusion was that none of the companies

11  that you see on this page -- taking out Rimini Street, you

12  know, for the purpose of this discussion, none of the

13  others represented a viable alternative.

14  Q.    Okay.  And is that what is reflected in the column

15  all the way on the right?

16  A.    Yes, that's why I put no for all of the entries in

17  the third column.

18  Q.    Okay.  So please explain to the jury generally how

19  you came to that conclusion.  What was the basis for your

20  opinion there?

21  A.    Okay.  I came to that conclusion because I concluded

22  that TomorrowNow was an infringing provider of support

23  services and therefore was not a viable alternative.

24        I came to that conclusion also because I was

25  instructed by counsel to consider CedarCrestone.
```

1   MR. RECKERS:  Objection, Your Honor.  Could we

2   approach?

3   THE COURT:  You may.

4   (Sidebar conference held as follows:)

5   THE COURT:  Mr. Reckers, go ahead.

6   Mr. RECKERS:  I believe the witness is about to

7   testify that he --

8   THE COURT:  You need to speak a little louder.

9   MR. RECKERS:  I believe the witness is about to

10  testify that he was told to consider CedarCrestone as an

11  infringer, infringing party.  I don't think that's proper,

12  I don't think that's consistent with Your Honor's

13  statements this morning.

14  If -- it seemed that Your Honor said that he

15  could say that he considered them.  That he did not

16  consider them to be noninfringing alternatives, I think, is

17  a far cry from saying that they are infringers.

18  THE COURT:  Okay.  He hasn't gotten to that

19  point.

20  Ms. Dunn, help me out.

21  MS. DUNN:  I thought the list was consistent

22  with your ruling this morning, Your Honor, which is to say

23  that -- which is the truth, he was instructed by counsel to

24  consider them an infringing alternative.

25  He was expressly instructed after Your Honor's

```
 1    ruling to stick to specifically what the Court had allowed,
 2    and that's what he's going to do.
 3                 THE COURT:  All right.  I'll expect that that
 4    will be what will occur.
 5                 I haven't heard a violation at this point with
 6    regard to TomorrowNow.  I would hope that his testimony not
 7    be significantly beyond the type of testimony that's been
 8    uttered so far with regard to TomorrowNow.
 9                 MS. DUNN:  I can assure the Court that he has
10    been so instructed.
11                 THE COURT:  All right.
12                 MS. DUNN:  If defense counsel decides to ask him
13    about it, he would say more.  But if they don't, this is
14    where they are.
15                 THE COURT:  All right.
16                 MR. RECKERS:  To be clear, your Honor, your
17    ruling is that he would be allowed to say that counsel
18    instructed him that CedarCrestone was infringing; is that
19    correct?
20                 THE COURT:  Yes, I would allow it to go that
21    far, and I don't want it to go any further.
22                 MR. RECKERS:  Your Honor, and I don't -- I don't
23    want to interrupt counsel's examination, but I also want to
24    make a record.  So I don't want to stand up and move to
25    strike when he says that.  Can I get a -- I don't know how
```

1    to do this procedurally, but --

2              MS. DUNN:  Well, it's possible the Court could

3    instruct the witness that the Court's understanding is that

4    he was instructed by counsel to consider them an infringing

5    alternative, and then the witness doesn't have to say any

6    more.  That would do it.

7              He was quite specifically instructed to say this

8    one sentence, which is what he was -- you know, how he was

9    advised by counsel in preparing his report.

10             So I can assure you, unless something totally

11   crazy is happening, that that's what's going to happen

12   here.

13             THE COURT:  Okay.  Two points here.

14             First of all, you do not need to move to strike,

15   unless you feel that I've clearly missed something.

16             I will -- if I feel that something is stated by

17   him that I felt went beyond what the Court's, frankly,

18   broad ruling was this morning, I'll step in and make an

19   appropriate statement.

20             And I -- I appreciate, Ms. Dunn, you being

21   mindful of that as well.

22             MR. RECKERS:  Thank you, Your Honor.

23             MS. DUNN:  Thank you.

24             THE COURT:  Thank you.

25         (Sidebar conference concluded.)

1693

1    THE COURT:  All right.  Go ahead, please,

2    Ms. Dunn.

3    MS. DUNN:  Thank you, Your Honor.

4    BY MS. DUNN:

5    Q.    Mr. Yourdon, I had asked you why you did not

6    consider CedarCrestone a viable alternative to Rimini

7    Street, and you were answering that question.

8    A.    Yes, I was instructed by counsel to consider

9    CedarCrestone to be an infringing provider and therefore

10   not viable.

11   Q.    Let's move on to Spinnaker.  What about Spinnaker?

12   A.    I considered Spinnaker not to be a viable

13   alternative partly because it supports only one of the JD

14   Edwards -- of the Oracle products, but also because it did

15   not satisfy the combination of factors that I consider

16   important for being viable, that is, a combination of

17   technical, business, and legal risks.

18   Q.    Since you mention the factors that you considered,

19   which are business risk, technical risk, and legal risk, is

20   that what you said?

21   A.    Yes.

22   Q.    Okay.  If you could briefly describe what you mean

23   by those to the jury.

24   A.    The question of technical risk is simply whether any

25   support provider can provide the necessary technical

1694

1    services to carry out all the activities I described a

2    little bit earlier, fixing bugs, adding new features as

3    necessary, carrying out tax and regulatory updates, et

4    cetera.

5              So a technical risk includes not only the

6    question of whether the vendor has the breadth and depth of

7    technical expertise to do that, but also, interestingly,

8    particularly for security patches, the question is whether

9    they have the source code, the actual programming code that

10   makes it possible for them to perform that technical

11   activity.

12             The business risks are primarily the question of

13   whether the company has a reasonable chance of surviving in

14   the marketplace and growing, or whether they run the risk

15   of disappearing and possibly going bankrupt.

16             And the legal risks include questions of whether

17   the service provider would be in compliance with the

18   copyrights and license agreements that the enterprise

19   software product owner might have, as well as being in

20   general compliance with any other regulations and laws that

21   they're required to adhere to.

22   Q.   Okay.  So we've already discussed TomorrowNow and

23   CedarCrestone and why you didn't consider them to be viable

24   alternatives.

25             Could you apply your -- the risk analysis you

1695

1    just discussed to Spinnaker and NetCustomer.

2    A.    In the case of Spinnaker, the technical risk again

3    was could they be expected to have the necessary depth and

4    breadth of technical expertise that might be required to

5    fix any problems that occurred.

6         Could they expected -- could they be expected to

7    have all of the source code necessary for security patches,

8    et cetera.

9         And, really, for me predominantly was the

10   business risk of whether one wants to entrust

11   mission-critical software to a vendor that at the time had

12   on the order of 100, maybe 120, customers, most of whom had

13   not been acquired through the normal growth of going out to

14   look for new customers by virtue of it being handed to them

15   when TomorrowNow discontinued its operations, as well as

16   essentially being handed to them through an acquisition

17   that had taken place.

18        So I considered Spinnaker not to be a viable

19   alternative from a business perspective primarily.

20        And to some extent the same is true for

21   NetCustomer, even more extremely so because, as I said

22   earlier, they only had a handful, about five customers,

23   which suggests obviously that they didn't have very much

24   technical depth or experience.

25        And as for the business risk, indeed, they

1    discontinued their operations in 2010 so that they were not

2    viable or nonviable, they simply didn't exist as an

3    alternative provider after that point.

4    Q.    And you had said before that Rimini Street and

5    TomorrowNow both marketed themselves as offering

6    replacement for vendor-level support.  Is that true of

7    CedarCrestone, Spinnaker, and NetCustomer?

8    A.    In my experience, no.  They marketed themselves

9    primarily as consultants, support people, with particular

10   expertise in certain areas of business such as supply

11   chain, but not as a replacement.

12              MS. DUNN:  Okay.  So I'd like to show you a

13   document which perhaps is in front of you.  There's only

14   one document, so you don't get a binder.  It's Plaintiffs'

15   Exhibit 1333.  And I believe this is preadmitted?

16              COURTROOM ADMINISTRATOR:  No.

17              MS. DUNN:  No.

18              MR. RECKERS:  No objection.

19              THE COURT:  It's admitted.

20              MS. DUNN:  Thank you, Your Honor.

21         (Plaintiffs' Exhibit 1333 received into

22         evidence.)

23   BY MS. DUNN:

24   Q.    Let's just take a look at Plaintiffs' Exhibit 1333.

25              Is this a document that you considered in

1697

```
 1   preparing your report?
 2   A.    Yes, it is.
 3   Q.    Okay.  So in this email it looks like a Rimini
 4   Street senior account executive is explaining the support
 5   services of Spinnaker and NetCustomer.
 6              So I'd like to go to the place on page 1 where
 7   it starts talking about NetCustomer, which I think may be
 8   lower than this.  Do you see that?
 9   A.    Yes, I do.
10   Q.    Okay.  So this says,
11              "You mentioned that you have already looked at
12   NetCustomer and Spinnaker."
13   A.    Yes.
14   Q.    "When the City of Eugene, Oregon selected Rimini
15   Street, they also looked at and rejected NetCustomer.
16   NetCustomer uses an offshore model with staff based in
17   India.  They do general consulting but don't offer a true,
18   well-defined maintenance service.  We've been unable to
19   determine whether they have ever actually developed and
20   delivered any tax and regulatory updates.  We seldom
21   encounter them.  It is important to note that all Rimini
22   staff is USA based.  We have staff in over half the
23   states."
24              Is this consistent with your experience and
25   opinion about NetCustomer?
```

1698

1    A.    It is.  And it illustrates one of the legal risks

2    that I talked about before in terms of general government

3    regulations.

4              It's common for there to be regulations against

5    carrying out support work involving sensitive employee

6    information offshore, outside the United States, and

7    NetCustomer was an India-based company.

8    Q.    All right.  So let's move on to Spinnaker which is

9    also discussed by a Rimini Street senior account executive

10   in this email.

11             So it says,

12             "Spinnaker is another story.  We see them

13   occasionally.  They put on an excellent marketing front.

14   They appear to have cloned from the Rimini Street program

15   for their marketing materials.  They write a clear and

16   compelling business proposal.  But, a company has to be

17   able to deliver on the proposal.  The difficulties with

18   them arise in the details, and they are twofold.  First

19   Spinnaker gained virtually all of its customer base from

20   TomorrowNow.  They did not grow organically."

21             And almost none of the senior management moved

22   with them.

23             And then I think we probably need to go to the

24   next page to figure out what the second issue is.

25             So it says,

1               "The maintenance business requires a discipline

2       and structure that takes years to develop.  Spinnaker is a

3       newborn in that critical area."

4               Is this consistent with what you found about

5       Spinnaker?

6               And lower down it actually says -- it identifies

7       the more significant problem with Spinnaker as being

8       long-term viability.

9       A.    Yes, it is.

10      Q.    Okay.  Please explain.

11      A.    Well, in -- as I suggested earlier, Spinnaker

12      acquired a significant number of its customers, about 75,

13      when TomorrowNow discontinued its operations and another 30

14      in an acquisition.

15              So the kind of organic growth that Mr. Potts is

16      referring to here of going out into the battlefield and

17      winning competitive competition for new customers had not

18      been carried out by Spinnaker.

19              And given the relatively small number of

20      companies, about a hundred or so, it would raise serious

21      questions in the mind of any customer considering them as

22      an alternative.

23      Q.    It also says, "As near as we can tell, Spinnaker

24      operates at a loss."  Would that be consistent with

25      something you might expect?

1    **A.**    Yes.  If they're operating at a loss, and if they're

2    a small company, having run a small consulting firm myself,

3    I know that this can raise some significant concerns about

4    long-term viability.

5    **Q.**    Okay.  Could customers in this case have supported

6    themselves, what's called self-support?

7    **A.**    In my experience, the realistic answer is no.  It is

8    sometimes considered, but it's -- I've never recommended

9    it, and it's almost never a viable option.

10   **Q.**    In your experience as a consultant, have you ever

11   recommended self-support?

12   **A.**    No, I never have recommended self-support for these

13   enterprise software products.

14   **Q.**    Why not?

15   **A.**    Because of the issues we've already talked about.

16          If the self-support is being carried out, as it

17   usually is, by just one or two people, almost by definition

18   they don't have the technical depth that a vendor with

19   thousands of people would have.

20          They don't usually have the access to the source

21   code.

22          And from a business risk perspective, of course,

23   you have to worry that they might disappear for any number

24   of personal reasons, including retirement and just not be

25   available.

1    Q.    Okay.  So we've just discussed your conclusion that

2    there were no viable alternatives in the third-party

3    support market to Rimini Street.

4              So, in your opinion, and based on your

5    experience, what would Oracle's customers have generally

6    done if Rimini Street had not existed?

7    A.    In my opinion, what they generally would have done

8    is renewed their support at the same kind of historical

9    renewal levels that Oracle had already been enjoying.

10   Q.    Okay.  So this is an important question, and I'd

11   like you to explain why you say that to the jury.

12   A.    Well, I say that because whatever other issues a

13   company might consider, at the end of the day they have to

14   ask is there anything else?

15              You know, it's fine to say I might be attracted

16   for this reason or that reason, but without a viable

17   alternative, you might stop the support if you're going

18   bankrupt or if you're being acquired by somebody else or

19   other external factors.

20              But in the absence of those external forces,

21   you're going to stay with the same enterprise support

22   provider.

23   Q.    Okay.  And is that consistent with your experience?

24   A.    Oh, it definitely is consistent with my experience

25   in the industry.

1     Q.     And are you generally familiar with Oracle's

2     retention rates for its support customers?

3     A.     Yes, I am generally familiar with it.  In fact, I

4     think we've seen one or two charts already which I had

5     seen.  It's above 90 percent, close to 95 percent.

6     Q.     Okay.  So you just testified that customers would

7     not have left Oracle for Rimini if Rimini didn't exist.

8            I want to ask you, since Rimini did exist, why

9     did the customers in this case choose to go to Rimini?  Did

10    you look at that question?

11    A.     I did look at that question, and I -- in my

12    experience, they decided to go with Rimini at the end of

13    the day for two primary reasons that we've summarized on

14    this demonstrative.

15           One was the promise of a significant price

16    discount, and the other was the promise made by Rimini of

17    vendor-level support.

18    Q.     And what -- when you say promise of vendor-level

19    support, are you familiar with what Rimini promised the

20    customers that they could do in comparison to what Oracle

21    did?

22    A.     My understanding is that there were one or two

23    issues such as security that they may not have talked about

24    very much at all, but fundamentally they promised

25    everything that Oracle did and more.

1  Q.    In this case there's already been a fair amount of

2  discussion about the 50 percent or less discount.  Just

3  take a second to explain why you've combined that here with

4  the promise of vendor-level support.  What's the importance

5  of that?

6  A.    I think we've heard throughout this case that these

7  enterprise software products are expensive, and the

8  maintenance and support is expensive, so that a marketing

9  presentation or proposal that involves saving a

10 considerable amount of money is enough to gain one's

11 attention.

12        But unless that's also combined with reliable

13 technical service, at the end of the day a company simply

14 cannot take the risk of switching.

15 Q.    Okay.  So that has to be also promised as well,

16 you're saying?

17 A.    The two together are important.

18        If you make a promise of vendor-level support at

19 the same price, it's certainly not going to gain a lot of

20 attention.  But if you offer a significant price discount

21 but don't provide the vendor-level support, then the

22 alternative really isn't there.

23 Q.    All right.  Let's move on to another topic, which is

24 one of Oracle's claims in this case is that Rimini Street

25 interfered with its customer relationships.

1       So returning to what we talked about at the

2   beginning, which is the process that customers go through

3   when deciding on support, when a customer is evaluating a

4   third-party support provider, what kinds of questions do

5   they ask?

6   A.    They ask a number of questions, the first two of

7   which are virtually the same as you saw in the previous

8   demonstrative.

9       But they want clarification and details in

10  writing to fully understand the pricing policies and the

11  technical capabilities they need.

12      The last three bullet points that you see on

13  this demonstrative are often regarded as due diligence.

14      They ask for references, they ask the vendor --

15  the potential third-party support provider whether the

16  support is in compliance with the software license

17  associated with the software product, and then they'll

18  generally ask whether the support and the overall business

19  model is legal.

20  Q.    So if a third party makes representations about the

21  legality of their business, do customers rely on those

22  representations from customers?

23      MR. RECKERS:  Objection.

24      THE WITNESS:  That certainly has been my

25  experience, especially if they --

1              MR. RECKERS:  Objection.  Beyond the scope of

2    the report and foundation.

3              MS. DUNN:  I believe this is covered in

4    paragraph 55 of the report.

5              THE COURT:  Based on that, I'll allow him to go

6    forward and would reconsider a motion to strike by

7    Mr. Reckers in the event that you feel that that has

8    occurred.

9              MR. RECKERS:  Thank you, Your Honor.

10   BY MS. DUNN:

11   Q.   Mr. Yourdon, if a third party makes representations

12   about the legality of their business, do customers rely on

13   such representations?

14   A.   That has been my experience, especially if the

15   representation comes from a senior executive of the firm,

16   and especially if it's in writing.

17   Q.   Okay.  And if the third-party support provider says,

18   "no, sorry, we can't provide the support legally," in your

19   opinion, would the customer move forward?

20   A.   No.  In my opinion, they would not.

21   Q.   In this case, are you aware whether customers asked

22   Rimini Street about the legality of their support services?

23   A.   Yes, I am.  In the deposition testimony that I

24   reviewed from 17 customers, it was a very common question.

25   Q.   Did you also see documents where Rimini Street

1706

1    provided assurances to customers that it was providing

2    support legally?

3    A.    Yes, I did.

4    Q.    Let's switch gears to this thing in the middle of

5    your slide about references.  How important are references

6    to customers?

7    A.    In my experience, they are extremely important for

8    companies that are considering a selection -- or a new

9    vendor, particularly, again, for mission-critical

10   applications.  It's not as if they can shrug and walk away

11   from it.

12   Q.    And in the course of your review, did you also see

13   evidence that providing references was part of Rimini

14   Street's practice for soliciting customers?

15   A.    Yes, I did.  Yes, I did.

16   Q.    Okay.  In your opinion, and based on your

17   experience, would these customers have provided references

18   if Rimini Street had told them that they were in violation

19   of copyright laws?

20   A.    No.  And, again, that was a question that was raised

21   and that I saw in the deposition testimony from the 17

22   customers.

23   Q.    All right.  So taking a look, then, at all these

24   questions on your list, if customers had asked a

25   combination of any of these questions, and in particular

1707

```
 1    the last three, and the answer had come back no, would they

 2    have gone to Rimini Street?

 3    A.    No, I believe they would not have.

 4              MS. DUNN:  Your Honor, I have no further

 5    questions for the witness at this time.

 6              THE COURT:  All right.

 7              Cross-examination?

 8                       CROSS-EXAMINATION

 9    BY MR. RECKERS:

10    Q.    Good morning, Mr. Yourdon.

11    A.    Good morning, counsel.

12    Q.    My name is Rob Reckers.  I've got a few questions

13    for you.

14              Before I get started, do you happen to have a

15    copy of your report?

16    A.    I don't have one with me.

17              MR. RECKERS:  With the judge's permission, I'd

18    like to pass up the witness a copy of his report because

19    I'll be asking questions out of it.

20              THE COURT:  All right.  Again, give that to my

21    court clerk, please.

22    BY MR. RECKERS:

23    Q.    Now, Mr. Yourdon, in your opinion, it was Rimini's

24    promise of vendor-level support at a significantly lower

25    price than Oracle that caused customers not to renew their
```

1    support with Oracle; correct?

2    A.    Yes, that's my opinion.

3    Q.    Okay.  And you hold yourself out as a professional

4    computer consultant, sir?

5    A.    Yes, I do.

6    Q.    And even though, as Ms. Dunn mentioned, that we've

7    moved on to generally the damages phase of the plaintiffs'

8    presentation, you, sir, don't hold yourself out as an

9    expert in finance or economics, do you, sir?

10    A.    No, I don't.

11    Q.    And though you're a technical consultant, and we've

12    heard some testimony in this case about Rimini's technical

13    operations, you've not offered opinions in this case as to

14    how Rimini's specific technical processes impact Rimini's

15    ability to offer 50 percent off Oracle's pricing; is that

16    correct?

17    A.    That's correct.

18    Q.    Okay.  Now, you mentioned in your direct testimony,

19    sir, that you reviewed several analyst reports for some

20    analyst firms; is that correct?

21    A.    Yes, that's correct.

22    Q.    And let me ask you about a couple of those.  Are you

23    familiar with the firm Gartner?

24    A.    Yes, I am.

25    Q.    And you agree with me that Gartner is one of the

1   largest and well-respected analyst firms in the country?

2   A.   Yes.

3   Q.   And did you review any Gartner reports in connection

4   with your expert testimony today?

5   A.   My recollection is that I did, yes.

6   Q.   Okay.  And same question for Forrester.

7   Forester's -- are you familiar with the Forrester Analyst

8   Group?

9   A.   Yes, I am.

10  Q.   And would you also agree that Forrester is one of

11  the largest and well-respected analyst firms in the

12  country?

13  A.   Yes, I would.

14  Q.   And, sir, did you review any Forrester industry

15  reports in connection with your testimony today?

16  A.   That's my recollection.  We would have to look at

17  the list of documents to see which ones, but I believe so.

18  Q.   Okay.  And another thing you looked at was 17

19  deposition transcripts from Rimini customers; correct?

20  A.   That's correct.

21  Q.   Those are your case study clients?

22  A.   That's correct.

23  Q.   Okay.  And you understood, sir, at the time of your

24  deposition at least, that Rimini had about 450 customers;

25  correct?

1  A.    I don't recall the precise number, but that sounds

2  to be a decent ballpark.

3  Q.    Okay.  And so do you have any reason to dispute that

4  when you were deposed in 2012 that Rimini had about 450

5  customers, to your knowledge?

6  A.    Again, I don't recall the precise number, but I

7  think that's the ballpark figure.

8  Q.    Okay.  So you looked at case studies, deposition

9  transcripts, for about 17 out of 450 customers; is that

10  fair?

11  A.    Assuming that the 450 number is correct.  It

12  certainly is fair and correct that I looked at only 17,

13  yes.

14  Q.    Okay.  And you didn't select those 17 customers from

15  Rimini's customer list, did you?

16  A.    No, I did not.

17  Q.    That's not a representative sample that you chose?

18  A.    No.

19  Q.    In fact, it was Oracle's attorneys that selected

20  those 17 customer deposition transcripts that you reviewed,

21  sir; isn't that correct?

22  A.    My understanding is that they gave me the

23  transcripts of all that they deposed, but I believe that

24  they were the ones who chose which customers they did

25  depose.

1    Q.    Right.  Oracle took the deposition and gave you the
2    transcripts for 17 customers; correct?
3    A.    Yes.
4    Q.    And you don't know -- at the time of your deposition
5    you didn't know how Oracle's counsel selected those 17
6    customers out of Rimini's 400 some customers; is that
7    correct?
8    A.    I don't recall.  I believe that I had some
9    discussion with them as to how they chose them or where
10   they came from, but I don't recall at this point.
11   Q.    Let me ask you about your opinion regarding
12   retention rates.
13            As I understood your testimony, sir, in your
14   opinion, about 95 percent of Rimini's customers would have
15   stayed with Oracle but for Rimini's promise of vendor-level
16   support at significant discount?
17   A.    I -- that's approximately what I testified, or at
18   least what I intended to testify.
19            I intended to convey the impression that the
20   renewal would have been at approximately the historic
21   renewal rate levels which were in the range of 95 percent.
22            They vary, as we've seen from some of the
23   charts, from year to year and product to product, but it
24   was in that general range.
25   Q.    Some years it's above 95 percent, some years it's

1712

1   below the historical rate; correct?

2   A.   That's correct.

3   Q.   Okay.  And so it would be fair to say, can we talk

4   about the historical rate as being about 95 percent?

5   A.   And that was the -- that's how I intended to convey

6   that, yes.

7   Q.   Yes, sir.

8        And so, just so we have a clear record, in your

9   opinion, about 95 percent of Rimini's customers would have

10  stayed with Oracle but for the promise of vendor-level

11  support at a significant discount by Rimini; correct?

12  A.   Well, again, precisely what I was saying was that I

13  felt that they would renew it at the historic renewal rates

14  which I tried to summarize or characterize succinctly as

15  approximately 95 percent.

16  Q.   Yes, sir.

17       In connection with that analysis, you did not

18  conduct any mathematical or statistical analysis regarding

19  whether Rimini's clients would have renewed at Oracle's

20  historical retention rate, did you?

21  A.   No, I did not.

22  Q.   Okay.  You will agree with me, sir, if the

23  historical retention rate is about 95 percent, that means

24  that 5 percent of the customers leave Oracle every year;

25  correct?

1    A.    Yes, from arithmetic, yes, I would agree with that.

2    Q.    All right.  So in the real world we know that

3    Rimini's customers are not part of the 95 percent that

4    stayed with Oracle, they're part of the 5 percent that

5    left; correct?

6    A.    Yes.

7    Q.    Okay.  So let's talk about that 5 percent that left,

8    or that historically leaves.

9          Would you agree with me, sir, that historically

10   customers with certain characteristics are more likely to

11   leave vendor support?

12   A.    No, I don't agree with that.

13   Q.    Well, let's talk about what you said in your report.

14         Your report lists factors that customers weigh

15   when considering to renew their maintenance agreements; is

16   that correct?

17   A.    Yes, it is.

18   Q.    And I'm referring specifically, sir, to page 31 of

19   your report, paragraph 59.

20   A.    Yes, I see that.

21   Q.    So you list about eight factors that customers

22   consider when making support decisions?

23   A.    Yes, that they consider or that they weigh.  That's

24   the word that I chose.  But, yes.

25   Q.    Okay.  We'll use your word, they weigh these factors

1714

1	when they're making their support decisions; correct?

2	A.	Yes.

3	Q.	All right.  Mr. Yourdon, we've got a slide, and

4	we're going to go through your different -- your factors

5	from your report.

6	        The first factor which I think you talked about

7	on direct was price.  So you agree with me, sir, that price

8	is a factor weighed when licensees consider whether to

9	renew their support decisions?

10	A.	Yes, I do.

11	Q.	Okay.  And, in fact, in your report you list several

12	Rimini customers that, from your review of the evidence,

13	weigh price; is that fair?

14	A.	Yes, that's fair.

15	Q.	Okay.  Now, the price isn't the only factor that you

16	wrote -- that you reflect in your report, is it, sir?

17	A.	No, it's not.

18	Q.	Okay.  So the next factor is the reliability -- or

19	the availability of reliable alternatives; is that right,

20	sir?

21	A.	Yes.

22	Q.	Okay.  And, again, this is a factor that is weighed

23	by licensees when considering whether to renew maintenance

24	agreements with their vendor; correct?

25	A.	That's correct.

1715

1    Q.    And one of the alternatives that at least some of

2    Rimini's customers considered was self-support; correct?

3    A.    Yes.

4    Q.    And we talked about self-support a little bit during

5    your direct; correct?

6    A.    That's correct.

7    Q.    And self-support, just to remind the jury, is when

8    the licensee does not have a vendor, they support it

9    themselves with their own personnel; correct?

10   A.    Basically that's correct, yes.

11   Q.    And so, for example, referring to your case study

12   clients, Pitney Bowes is one of the clients that did not

13   renew it's Oracle support contract and elected to proceed

14   with self-support before going to Rimini Street; is that

15   correct?

16         I'll give you the page if you like.

17   A.    Yes, please, if you could.

18   Q.    Yes.  It's page 70, it's paragraph 132.

19   A.    Yes, I see that.

20   Q.    So you agree with me that Pitney Bowes elected

21   self-support before going to Rimini Street?

22   A.    Well, certainly I see that they elected to proceed

23   with self-support.  I'm looking for the -- well, yes, in

24   the following paragraph, Pitney was unwilling to continue

25   running the risks associated with self-support and then

1     moved to Rimini.

2     Q.    Exactly.  They considered themselves lucky to be

3     able to have self-supported their product.  Is that what

4     you said in your report?

5     A.    They considered themselves lucky to have avoided the

6     consequences of the risks that they were experiencing with

7     self-support.

8     Q.    All right.  Nevertheless they self-supported

9     themselves in this case for about a year; is that right?

10    A.    Yes, that appears to be the case.

11    Q.    Okay.  So let's move on to your third bullet point,

12    sir, which is stability or stagnation of the existing ERP

13    system; is that right?

14    A.    Yes.  So we're back to the list in paragraph 59?

15    Q.    Yes.

16    A.    Yes.

17    Q.    And so the stability, stagnation of existing ERP

18    system is another factor that's weighed by licensees in

19    considering whether to renew maintenance agreements;

20    correct?

21    A.    Yes.

22    Q.    And there's evidence in this case that at least some

23    of the Rimini customers considered the stability or

24    stagnation of their existing system in making the decision

25    to leave Oracle support; correct?

1717

1    A.    Yes, they considered it.

2    Q.    Okay.  And the next factor, sir, is likelihood of

3    upgrading.  So, sir, you list likelihood of upgrading to a

4    newer version as a factor that customers weigh in

5    considering whether to renew maintenance agreements with

6    ERP vendors; is that correct?

7    A.    Yes, that's correct.

8    Q.    And, again, there's evidence in this case that at

9    least some of the Rimini customers considered this factor

10   when -- the likelihood of upgrading to a newer version in

11   making their support decisions; correct?

12   A.    Yes.

13   Q.    Again, referring you, sir, to footnote 42 on page

14   32, you cite -- I'm sorry, I'll let you get there.  Are you

15   there?

16   A.    Oh, yes, I'm on page 32, but I thought you were

17   going to cite a footnote.

18   Q.    It's footnote 42 on page 32.

19   A.    Oh, got it, yes.

20   Q.    Okay.  So in this case you cite Hastings

21   Entertainment, J-Pac Travel, JB Hunt, Koch Business

22   Solutions, Sunrise Medical, and YUM Brands as Rimini

23   clients that considered the likelihood of upgrading to a

24   newer version in connection with their support decisions;

25   correct?

1     A.    Yes, that's correct.

2           Although ultimately all customers, all

3    companies, in my experience, upgrade.  It's simply a

4    question of whether it's this year or next year, you know,

5    or a couple years further down the road.

6     Q.    Right.  In this case, these customers left Oracle

7    support with consideration to their upgrade plans; correct?

8     A.    Let's see.  We'll need to look at the footnotes to

9    see whether that --

10    Q.    Footnote 42, sir?

11    A.    Yeah, footnote 42 says that they considered this

12   factor.  I didn't see the closing of the loop, so to speak,

13   indicating that those companies had, in fact, gone to

14   Rimini because that -- that term had to be a determinative

15   factor.  I certainly agree that it was a factor that they

16   weighed.

17    Q.    Yes, sir.  And that was my question.

18          And so moving on to the next factor that you

19   list of the likelihood of moving to a different vendor.

20   Again, this is back on page 32, sir.

21    A.    Yes.

22    Q.    You list likelihood of moving to a different vendor

23   as a factor weighed in considering whether to renew

24   maintenance agreements with vendors; correct?

25    A.    Yes.

1    Q.    And, again, there's evidence in this case that some

2    of the Rimini customers considered the likelihood of moving

3    to a different vendor and making the decision to leave

4    Oracle support; correct?

5    A.    Yes.

6    Q.    In this case, on footnote 42, you cite the AGCO

7    Corporation, Koch Business Solutions, Pitney Bowes and

8    SonicWall as Rimini clients that considered a move to a

9    different vendor in connection with their support

10   decisions; correct?

11   A.    It's footnote 43, is it not?

12   Q.    That's correct.  Sorry if I --

13   A.    Yes, I did.

14   Q.    So the next factor you list is dissatisfaction with

15   the current vendor; correct?

16   A.    Yes.

17   Q.    And, again, you list dissatisfaction with the

18   quality of support from the vendor as a factor weighed in

19   considering whether to renew the maintenance agreement with

20   that vendor; correct?

21   A.    Yes.

22   Q.    And, again, there's evidence in this case that some

23   of the Rimini customers considered their dissatisfaction

24   with Oracle support in making the decision to leave Oracle;

25   correct?

1720

1    A.    Yes, that's correct.

2    Q.    And, for example, you cite dissatisfaction with the

3    existing vendor is a factor that the City of Flint, County

4    of Kent, SonicWall and Wendy's considered in connection

5    with their support decisions.

6    A.    Yes.

7    Q.    Is that correct, sir?

8    A.    Yes, yes.

9    Q.    Okay.  Now, the next factor you list is -- has to do

10   with sunsetting; is that correct?

11   A.    Yes, that's correct.

12   Q.    And sunsetting is a concern that the vendor may no

13   longer offer support for that client's release, the release

14   that they're running in production; correct?

15   A.    Yes.

16   Q.    And, in fact, there's evidence in this case that at

17   least some of the Rimini customers consider these sunset

18   concerns in making the decision to leave Oracle; correct?

19   A.    Yeah, they considered it, yes, in light of the

20   representations, as I understood it, that were made to them

21   by Rimini that, in fact, this sunsetting and stopping of

22   support was something that was a reality from Oracle when,

23   in fact, I believe that that turned out not to be true.

24   Q.    Do you know one way or the other as you sit here

25   today?

1721

1  A.    Yes, I do know that Oracle will continue supporting

2  the older systems.

3  Q.    Right.  They have something called sustaining

4  support?

5  A.    Yes, that's correct.

6  Q.    And those aren't for -- those aren't the -- those

7  aren't updates for -- directed specifically to the older

8  products; correct?

9  A.    I'm sorry.  Could you repeat that?

10  Q.    The sustaining support updates have to be

11  retrofitted to run with an older system, correct, sir?

12  A.    I'd have to review the documentation to determine

13  that.  I don't recall.

14  Q.    Sustaining support also costs 10 percent more, so

15  they're paying more?

16  A.    They are paying more.  I don't -- I don't know

17  whether the 10 percent figure is correct.

18  Q.    You cite Koch Business Solutions and Yum Brands as

19  Rimini clients that considered sunset concerns in making

20  their support decisions, sir?

21  A.    Yes, I did.

22  Q.    The last bullet point you have is the customization

23  issue.  So this is whether or not to the extent that a

24  client's system is customized; correct?

25  A.    Yes.

1722

1    Q.    And so, again, you list extensiveness of software

2    customization is a factor weighed in considering whether to

3    renew maintenance agreements with ERP vendors; correct?

4    A.    Yes.

5    Q.    And there's evidence in this case at least some of

6    the Rimini customers that you looked at considered the

7    software customizations in making their decisions to leave

8    Oracle; correct?

9    A.    Yes.

10   Q.    For example, you cite the Birdville Independent

11   School District as a Rimini client that considered the

12   extent of software customization in connection with their

13   support decision; correct?

14   A.    Yes.  Yes.  This factor, again, and all the others

15   that you've listed, are in the context of an alternative

16   vendor being available.

17           Had one not been available, then these may well

18   have been factors that they would identify and consider and

19   weigh but that would not have resulted in any movement or

20   switch.

21   Q.    Well, we know that historically 5 percent of

22   Oracle's customers leave every year regardless, before

23   Rimini and -- well, historically; correct?

24   A.    Yes, that's correct.  Roughly, yes.

25   Q.    And we know from the discussion we've had that every

1723

```
 1    client has different considerations or factors that they

 2    weigh in making their support decision; correct?

 3    A.     Again, within the context, the larger context of the

 4    availability of an alternative and the price.

 5    Q.     Again, every client is different.  Will you agree

 6    with me on that, sir?

 7    A.     No.  In fact, every client considers all of these

 8    factors.  Some may be more important this year than next

 9    year, but they are universal factors.

10           So in that sense, no, they are not different.

11    Q.     Different factors, different factors weigh more

12    heavily per client; correct?

13    A.     At a particular point in time, but over the period

14    of the five or six years in this case, I think all of the

15    factors apply to all of the customers.

16    Q.     And to understand why a particular client made a

17    support decision, you have to look at each client

18    individually and determine how each of these factors

19    weighed for those -- that client; correct?

20    A.     Only, again, within the context of whether there was

21    an alternative that was available.  With no alternative, to

22    some extent all of these factors are moot.

23           MR. RECKERS:  No further questions.  Thank you,

24    Your Honor.

25           THE COURT:  Okay.  Redirect examination?
```

1    MS. DUNN:  Yes, Your Honor, thank you.

2                    REDIRECT EXAMINATION

3    BY MS. DUNN:

4    Q.    Mr. Yourdon, defense counsel asked you some

5    questions about the depositions that you reviewed in this

6    case.  And you're aware Oracle deposed 17 customers; right?

7    A.    Yes, I know.

8    Q.    Okay.  Are you also aware that the way this works is

9    that Rimini could have deposed any of the 400-some

10   customers they mentioned if they so chose to do that?

11   A.    Not being a lawyer, I'm not familiar with the

12   protocol, but it certainly stands to reason.

13   Q.    Okay.  So in addition to the depositions that you

14   looked at, did you also look at written documents?

15   A.    Yes, I did.

16   Q.    Okay.  And you looked at written documents for about

17   200 customers, is that somewhere in the ballpark?

18   A.    Yes, that's approximately correct, yes.

19   Q.    Okay.  So, in your report you listed a number of

20   factors that customers might consider, but I want to not

21   obscure what I think is really at the heart of your

22   conclusion, which is also in your report.  So I'd ask you

23   to turn to page 37 of your report.

24   A.    Okay.

25   Q.    Okay.  And if you look at paragraph 67.  You say,

1    "While all of the risks and rewards discussed

2    above may be relevant, the single largest factor in

3    determining whether a customer actually does shift its ERP

4    maintenance contract to a different support provider is the

5    promise of significant cost savings."

6          And then you say,

7          "But even the lure of a deep discount is

8    typically not enough to persuade customers to switch

9    providers without the credible belief that they will

10   receive something approaching vendor-level support."

11         Now, I'd like for you to take the time to

12   explain that to the jury because I want to make sure

13   there's no confusion about your opinion on this.

14   A.    I agree with that, and that is what I wrote in this

15   paragraph of my report.

16         And that's what I was trying to convey a moment

17   ago, that there may be particular issues that they take

18   into consideration at any point in time such as

19   customization or any of the eight or nine on the list that

20   you saw.

21         But, at the end of the day, if they don't have

22   something approaching credible, reliable, vendor-level

23   support, then all of this is academic, all of it is moot.

24         You can be unhappy with all kinds of things in

25   your personal life, but if there's no alternative that's --

1726

1     that you can depend on, then it's a somewhat academic

2     discussion, and that's what I was trying to convey.

3     Q.    And it seems like also what you're saying is while

4     price is the single largest factor, without the appeal of

5     the promise of vendor-level support, they wouldn't go.  So

6     you really need both.

7     A.    You need both.  In my experience, it's the price

8     that often captures the attention of somebody.

9            But then the next serious question, especially,

10    again, for enterprise customers with mission-critical

11    systems where you can't just casually shrug and make a

12    decision, where you have to think long and hard before you

13    make a commitment, this vendor-level support is absolutely

14    crucial.

15    Q.    Counsel also asked you about a paragraph in your

16    report that talks about the period of time where Pitney

17    Bowes went on self-support, and I think it's important to

18    read the end of the sentence here.

19            So this is paragraph 133 of your report on page

20    71.

21            Defense counsel said to you that --

22            MR. RECKERS:  Your Honor, Your Honor, I'm sorry.

23    I object to the report being put on the screen.

24            THE COURT:  All right.

25            MS. DUNN:  That is fine.  We could do this

1    without that.

2    BY MS. DUNN:

3    Q.    So defense counsel said to you Pitney's management

4    considered themselves lucky to be on self-support.  Can you

5    read what that sentence actually says.

6    A.    "Pitney's management considered themselves lucky,

7    which I put in quotes here, "to have survived without any

8    negative consequences."

9    Q.    "Lucky to have survived"?

10   A.    That was the language I used, those were the words.

11   Q.    Okay.  So while we're on this topic, let's look

12   at -- we heard testimony yesterday from Kevin Maddock who

13   also talked a little bit about self-support.

14            I'd like to put up on the screen for you his

15   testimony at page 1349.

16            Okay.  So Mr. Maddock -- Mr. Isaacson says,

17            "Now self-support in your view is risky, it's

18   like driving a car without insurance or not having health

19   insurance."

20            And Mr. Maddock says, "That's correct, I do feel

21   that way."

22            And then later down he says:

23            "The reason is, this is really important

24   software to a business, to its HR, to its accounting, its

25   finances, and if there's a problem with it, you need to

1728

```
 1    have support available right away."
 2              That's Mr. Isaacson.
 3              And Mr. Maddock says -- he agrees with that.  He
 4    says, "Yes, I do."
 5              And Mr. Isaacson says, "In fact, that's what you
 6    tell customers; correct?"
 7              And Mr. Maddock says, "That's right."
 8              So is this testimony of Mr. Maddock, who is
 9    the -- I believe head of sales of Rimini Street, do you
10    agree with this?
11    A.    Yes, it's absolutely consistent with my experience
12    in the field.
13    Q.    One last thing also from Mr. Maddock's testimony.
14              Defense counsel discussed with you this question
15    of availability of alternative support providers.  And this
16    was addressed a little bit in Mr. Maddock's testimony
17    yesterday.
18              I'm looking at page 121 at 8.
19              MR. RECKERS:  Objection, Your Honor, scope.  I
20    did not ask about alternatives.
21              MS. DUNN:  Your Honor, defense counsel put on
22    the screen a slide where the second factor was alternative
23    support providers.
24              MR. RECKERS:  It is reliable alternatives, and
25    the only one I mentioned was self-support.
```

1729

1    MS. DUNN:  Your Honor, defense counsel quite

2 expressly asked Mr. Yourdon about the factors, one of which

3 was reliable alternatives, and this is specifically what

4 Mr. Maddock's testimony goes to.

5    THE COURT:  That is within the scope as the

6 Court understood it, and the objection is overruled.

7 BY MS. DUNN:

8 Q.   All right.  So looking at line 8, this is a question

9 by Mr. Isaacson.  He says to Mr. Maddock,

10    "In fact, your most frequent competitor in

11 support for Oracle software is Oracle."

12    And Mr. Maddock says, "That's correct."

13    And then Mr. Isaacson says,

14    "And since TomorrowNow closed and you joined

15 Rimini Street, your most frequent competitor is not

16 Spinnaker, it's not any other company for Oracle support,

17 it's Oracle."

18    And Mr. Maddock says, "That's correct."

19    Now, Mr. Yourdon, is that consistent with your

20 understanding?

21 A.   Yes, it is consistent with my understanding of how

22 the entire industry works.  We could have had the same

23 conversation about SAP or any other large enterprise

24 support company and software company, yes.

25    MS. DUNN:  Thank you, Your Honor.  I have no

1730

1     further questions.

2                THE COURT:  Recross-examination, Mr. Reckers?

3                MR. RECKERS:  No further questions, Your Honor.

4                THE COURT:  All right.  Mr. Yourdon, that will

5     complete your testimony, and you may step down.

6                Ladies and gentlemen, this is probably a good

7     opportunity to take our first break.

8                I'll remind you of all the admonitions, and

9     we'll return in approximately 15 minutes, assuming that

10    everyone's ready to go with that, and you may go ahead and

11    step down.

12           (Recess from 9:51 a.m. until 10:07 a.m.)

13           (Outside the presence of the jury.)

14                THE COURT:  All right.  Have a seat, please.

15                The record will show we're in open court but

16    outside the presence of the jury.  Let's see.

17                MR. STRAND:  Your Honor, two very --

18                THE COURT:  Just a moment, Mr. Strand.

19                I see I have in front of me a new stipulation

20    regarding exhibits, and I appreciate that counsel have

21    worked that out, and I am signing it at this time.  This is

22    document 817.

23                MR. POLITO:  Your Honor, thank you.  That's the

24    stipulation regarding copyright registrations.

25                THE COURT:  Right.  Okay.

1                    All right.  Mr. Strand?

2                    MR. STRAND:  Two short items, Your Honor.

3                    Over the break counsel and I discussed the

4    noninfringing alternative slide that was discussed first

5    during Mr. Yourdon's testimony.

6                    There is a similar slide that will come up

7    during Ms. Dean's testimony.  Counsel's got his words on

8    it.  I'm fine with the slide.

9                    But if we can proceed according to the same

10   ground rules that the Court set during the sidebar during

11   Mr. Yourdon's deposition, and subject to our same

12   objections, then we don't need to interrupt the witnesses'

13   testimony.

14                   MR. ISAACSON:  And to be clear in terms of

15   what's not on the slide, I would ask the leading question

16   "did you understand TomorrowNow to be an infringing

17   alternative," and I would ask the leading question "did you

18   understand CedarCrestone to be an infringing alternative,"

19   and that would be -- and the answers will be one-word

20   answers, and that will be the end of it --

21                   THE COURT:  All right.

22                   MR. ISAACSON:  -- assuming there's no

23   cross-examination on those points.

24                   THE COURT:  And I have no problem with that.  Do

25   you, Mr. Strand?

```
 1              MR. STRAND:  No, no, and I can assure you there
 2    will be no cross-examination on these points.
 3              THE COURT:  All right.
 4              MR. STRAND:  Second thing, your Honor, we had
 5    anticipated that perhaps there would be a ruling on the
 6    154B redaction issues this morning, but it's going on, and
 7    I recognize it's a huge job for the Court to get through
 8    all that.
 9              There is one entry in 154B that I may use in
10    cross-examination, and with the Court's leave, what I would
11    like to do is hand that up now, and then if the Court
12    wouldn't mind, perhaps at the next break, taking a quick
13    look at that and see where we are --
14              THE COURT:  All right.
15              MR. STRAND:  -- on that.
16              It is a document that was received by and
17    considered by Ms. Dean in her analysis in this case, and we
18    want to see if we can get that one resolved.
19              THE COURT:  All right.  You're welcome to do
20    that.  And I appreciate it.
21              MR. STRAND:  And, Your Honor, we're trying to
22    get coordinated with counsel because it's a nasty document.
23              If you wouldn't mind, I'll hand it up to you.
24    And I can give you a second copy if you want.  The actual
25    phraseology that I would raise is yellow highlighted there
```

1733

1      in 154B.

2                  THE COURT:  Okay.

3                  MR. STRAND:  I don't think we need my more

4      argument on it.  I think you've already heard this morning

5      what you want to hear.

6                  THE COURT:  I'll try and take a look at it as

7      I'm moving along, and hopefully in the next break we'll

8      address it.

9                  I assume from your comments that it's not going

10     to surface before the next break.

11                 MR. STRAND:  And if it does, Your Honor, we'll

12     approach the bench.

13                 THE COURT:  All right.  Let's bring in the jury,

14     please.

15                 COURTROOM ADMINISTRATOR:  Yes, Your Honor.

16          (Jurors enter courtroom at 10:13 a.m.)

17                 THE COURT:  All right.  Please have a seat.

18                 The record will show we're in open court.  The

19     jury is all present.  Counsel and parties are present.

20                 May we have plaintiffs' next witness, please.

21                 MR. POLITO:  Thank you, Your Honor.

22                 Next we'll play portions of the videotaped

23     deposition of Alecia Holmes.

24                 Ms. Holmes began as a primary support engineer,

25     so she was a point of customer contact at Rimini Street,

1734

1     and she moved on to be in a managerial role.  She became

2     the manager for support for financials and supply chain

3     management for PeopleSoft at Rimini Street.

4                 This is almost 11 minutes in length.  And we

5     have one exhibit to admit, which is PTX 589, to which I

6     understand there's no objection.

7                 THE COURT:  Is there any objection?

8                 MR. STRAND:  No objection, Your Honor.

9                 THE COURT:  All right.  It is admitted.

10            (Plaintiff's Exhibit 589 received into

11            evidence.)

12                 THE COURT:  You may go ahead, please,

13     Mr. Polito.

14                 MR. POLITO:  Thank you.

15            (Videotape deposition of Alecia Holmes played

16            as follows:)

17                 PAGE 12:13 TO 13:09 (RUNNING

18            00:00:44.281)

19            "Q. I'm sorry, Ms. Holmes.  Could you spell

20            your name for the record.

21            A. Sure.  A-l-e-c-i-a, last name H-o-l-m-e-s.

22            Q. Thank you.  Is your middle initial D?

23            A. Yes.

24            Q. I ask because you were at ADH

25            Consulting --

1735

1   A. Yes.

2   Q. Which I guess is your initials.

3   A. Yes.

4   Q. Let's back up.  Before that, you were at

5   PeopleSoft?

6   A. Yes.

7   Q. And approximately how long?

8   A. Few months short of five years.

9   Q. What did you do at PeopleSoft?

10   A. I was a PeopleSoft Principal Consultant.

11   Q. What does that mean?

12   A. Implement the PeopleSoft software and

13   supported after go live, if necessary.

14    PAGE 16:18 TO 16:23 (RUNNING 00:00:12.066)

15   Q. Had you had a computer science background

16   prior to that?

17   A. I worked with an ERP maintenance

18   manufacturing company prior to coming to work

19   for PeopleSoft.  So I had experience

20   implementing software prior to PeopleSoft.

21    PAGE 17:09 TO 17:11 (RUNNING 00:00:04.930)

22   Q. Got it.  Thank you.  You left PeopleSoft

23   around March 2005?

24   A. Sounds about right.

25    PAGE 17:25 TO 18:03 (RUNNING 00:00:07.395)

1736

1    Q. And what did you do next?

2    A. I became an independent consultant.

3    Q. Is that ADH Consulting?

4    A. Yes.

5     PAGE 18:08 TO 18:17 (RUNNING 00:00:36.350)

6    Q. What did you do as ADH Consulting?

7    A. I assisted -- the reason I went

8    independent, I went to work as an independent

9    consultant with Regions Bank out of Memphis.

10   And it was formerly -- I can't remember --

11   Planters Bank.  I can't remember the whole

12   name of it.  And they had been merged

13   recently with Regions, and they were in need

14   of someone to come in and help them merge the

15   data for Regions.

16    PAGE 36:22 TO 37:07 (RUNNING 00:00:27.016)

17   Q. Thank you.  Let's go back to your

18   employment at Rimini Street.  When you first

19   started at Rimini Street, what was your

20   title, if you can recall?

21   A. Primary Support Engineer.

22   Q. Is that PSE?

23   A. Yes.

24   Q. What were your duties as a Primary Support

25   Engineer?

1   A. To support the Financials and Supply Chain

2   clients for the PeopleSoft product.

3   PAGE 89:25 TO 90:03 (RUNNING 00:00:19.021)

4   Q. (By Mr. Polito) Ms. Holmes, can you

5   identify Exhibit 1438 for the record?

6   A. It appears to be an instant message

7   conversation between myself and Susan

8   Tahtaras.

9   PAGE 90:10 TO 91:19 (RUNNING 00:01:27.112)

10   Q. Starting at the third line of the

11   conversation, Ms. Tahtaras says she was

12   looking at that Birdville issue again.

13   There's some discussion of an issue.  Do you

14   see that?

15   A. I do.

16   Q. She asks were you able to find anything in

17   Customer Connection, and you say,

18   essentially, not yet, but you did search for

19   a few things; is that right?

20   A. It appears.  I don't remember doing

21   research.

22   Q. But that's what you said?

23   A. Yes.

24   Q. And you have no reason to think that you

25   would type something that wasn't true?

1738

1    A. No.

2    Q. And you say, but I'm really busy,

3    paraphrasing, and Ms. Tahtaras offers to

4    search Customer Connection.  Do you see that?

5    A. Yes.

6    Q. She asks for your login, and you reply

7    since Birdville is still on PeopleSoft

8    support, I guess we can use my personal login

9    until we get theirs.  Then, you provide the

10   following login, aholmes_ENSCO, with password

11   ensco2007?

12   A. Yes.

13   Q. Was that a Customer Connections login

14   credentials granted to you by ENSCO

15   International, as far as you recall?

16   A. I can't remember, but it looked like I

17   typed it.  So, most likely, it was at that

18   time.

19   Q. And did you on January 3rd, 2007 provide

20   those ENSCO credentials to Ms. Tahtaras for

21   use on behalf of customer Birdville?

22    PAGE 91:21 TO 91:23 (RUNNING 00:00:12.106)

23   A. It appears that I provided them to Susan

24   based upon the fact that Birdville was

25   licensed to the same information.

```
 1            PAGE 92:13 TO 92:14 (RUNNING 00:00:03.520)
 2        Q. Are you a lawyer, Ms. Holmes?
 3        A. No, I'm not.
 4            PAGE 92:15 TO 93:19 (RUNNING 00:01:31.273)
 5        Q. So, in your response saying that if you
 6        were licensed for even one module you could
 7        review information for any module, is that
 8        the answer of someone using Customer
 9        Connection rather than --
10        A. That's my -- yes, that's my experience as
11        being an employee at PeopleSoft, a consultant
12        at PeopleSoft, and having access to Customer
13        Connection for previous clients that you
14        couldn't look at, you know, multiple
15        releases.  That's my experience.  I can't say
16        that for sure, but that was my understanding
17        at that point.
18        Q. So, earlier, when you testified it appears
19        that I provided them to Susan based upon fact
20        that Birdville was licensed to the same
21        information as ENSCO, did you, in fact, mean
22        that you provided your ENSCO credentials to
23        Susan because she would be able to search the
24        same information that you believed that
25        Birdville would be able to search?
```

1    A. I did not believe that logging under those

2    credentials that Birdville would gain any --

3    looks like they would not gain any additional

4    information that they would have had by using

5    their own credentials.  That was my

6    experience with Customer Connection at that

7    time, that there was no difference.  I can't

8    say that that's the way it was structured.

9    That was my understanding.

10   PAGE 93:20 TO 93:25 (RUNNING 00:00:23.824)

11   Q. Regardless of your understanding of the

12   way that Customer Connection worked, did you

13   believe that it was appropriate to use

14   customer credentials, ENSCO's credentials,

15   for Customer Connection to support Birdville

16   on January 3rd, 2007?

17   PAGE 94:02 TO 94:13 (RUNNING 00:00:38.794)

18   A. Once again, I'm not a lawyer, and I'm not

19   aware of what was prohibited by using that.

20   Like I said, I clearly state here, since they

21   are still on PeopleSoft support and my

22   understanding was that the same information

23   would be available to both clients, that I

24   was not giving any benefit to Birdville by

25   using a credentials while we were waiting on

1741

1       the Birdville credentials.

2       Q. Based on your experience using one

3       customer's credentials for that customer's

4       own support prior to working at Rimini

5       Street?

6        PAGE 94:15 TO 94:17 (RUNNING 00:00:02.735)

7       Q. (By Mr. Polito) Let me ask that

8       differently.

9       A. Yes.

10       PAGE 94:18 TO 94:22 (RUNNING 00:00:06.732)

11       Q. Had you previously used one customer's

12       credentials to support a different

13       customer --

14       A. No.

15       Q. -- prior to being at Rimini Street?

16       A. No.

17       PAGE 94:23 TO 96:01 (RUNNING 00:01:28.562)

18       Q. So your prior understanding of Customer

19       Connection was based on using Customer A's

20       credentials to support Customer A?

21       A. Right, and also at PeopleSoft, as a

22       PeopleSoft consultant, I had PeopleSoft

23       credentials to Customer Connection.  I had

24       also worked with -- had seen, had had access

25       and experience, exposure, to Customer

1742

```
 1          Connections for five years and seen

 2          multiple -- and I knew how the searches

 3          worked.  And I had clients -- because

 4          especially doing upgrades, they could look

 5          back.  They would have a selection of early

 6          releases to early releases even if they were

 7          on a most current release.  So that's where I

 8          got my understanding that there was no -- it

 9          was not restricted.

10          Q. On January 3rd, 2007, did you have an

11          opinion about whether it was permissible to

12          use credentials for ENSCO to Customer

13          Connection to support Birdville?

14          A. Once again, I'm not a lawyer, so I can't

15          say whether or not it was legally -- like I

16          said, I base this just upon the fact that

17          they were both licensed.  You know, they were

18          both still paying Oracle for support.  They

19          both had valid credentials for Customer

20          Connection.  And I didn't think I was giving

21          Birdville any benefit by using ENSCO's

22          credentials.

23           PAGE 96:04 TO 96:08 (RUNNING 00:00:16.650)

24          Q. (By Mr. Polito) Ms. Holmes, did you have

25          an opinion on January 3rd, 2007 about whether
```

DONNA DAVIDSON, RDR, CRR, CCR #318    (775) 329-0132

1    it was permissible to use ENSCO's credentials

2    to Customer Connection to support Birdville?

3     PAGE 96:10 TO 96:17 (RUNNING 00:00:36.325)

4    A. Once again, I mean, you know, I guess I

5    didn't have -- I don't have a firm opinion

6    one way or the other.  Like I said, that was

7    just based upon my experience.  Like I said,

8    I guess we can use this.  I can't even say

9    whether this was even used, but, you know,

10   like I said, I -- that's the best answer I

11   can give you.

12    PAGE 96:18 TO 96:23 (RUNNING 00:00:10.546)

13   Q. Did you tell ENSCO International that you

14   were giving their credentials to other Rimini

15   Street employees, as best you can recall?

16   A. I do not remember having that

17   conversation, no.

18    PAGE 96:24 TO 97:09 (RUNNING 00:00:31.316)

19   Q. Is it likely that you would have told

20   them?

21   A. It's possible, but I can't -- I do not

22   remember having that conversation.

23   Q. Do you think it's more likely that you

24   didn't tell them?

25   A. Like I said, I don't remember having the

```
 1              conversation.  If we were talking about
 2              something, I may have brought it up, but I do
 3              not remember expressly calling them and
 4              asking them if it was okay.
 5               PAGE 120:04 TO 120:22 (RUNNING 00:00:43.179)
 6              Q. When you were an independent consultant at
 7              ADH Consulting, would you have copies of
 8              PeopleSoft software on a nonclient machine?
 9              A. No, I did not.
10              Q. How would you access the software,
11              generally speaking?
12              A. From the client's environment.
13              Q. Generally, you were on site?
14              A. Yes.
15              Q. And you would log in as the client would?
16              A. Right.  They granted me credentials to
17              their system, and I would --
18              Q. And that was consistent per your practice
19              as an independent consultant, so far as you
20              recall?
21              A. Right.  You're not going to get into a
22              client's system without them granting you."
23                  (End of deposition)
24                  THE COURT:  Plaintiffs' next witness?
25                  MR. POLITO:  Thank you, Your Honor.  We've done
```

```
 1    JDE, we've done PeopleSoft, now we're going to have a
 2    Siebel.
 3              This is the deposition of John Whittenbarger who
 4    was originally a primary support engineer for Siebel, and
 5    became the manager, and was also -- had some involvement
 6    with downloading.
 7              This is 15 minutes, 49 seconds, and there are a
 8    number of exhibits.
 9              The previously admitted exhibits are PTX 6, 9,
10    42, 223, and 310.
11              And then we'd move for admission of PTX 221,
12    306, and 314.
13              THE COURT:  All right.  So at the time of the
14    deposition, he was an employee of --
15              MR. POLITO:  Rimini Street.
16              THE COURT:  All right.  Thank you.
17              MR. RECKERS:  Your Honor, no objection.  He was
18    a former employee at the time of his deposition.
19              THE COURT:  All right.
20              COURTROOM ADMINISTRATOR:  Is there an objection
21    to the admission of the other exhibits?
22              MR. RECKERS:  No, ma'am.
23              THE COURT:  All right.  Those will be admitted.
24    And it is understood that he was a former employee at the
25    time of the deposition.
```

1    (Plaintiffs' Exhibits 221, 306 and 314

2    received into evidence.)

3         MR. POLITO:  And, Your Honor, I should then

4  clarify that Ms. Holmes was also a former employee at the

5  time of her deposition.

6         THE COURT:  All right.  Thank you.

7         MR. POLITO:  Thank you.

8    (Videotape deposition of John Whittenbarger

9    played as follows:)

10        PAGE 6:24 TO 7:03 (RUNNING 00:00:13.362)

11   "Q. When did you work for Rimini Street?

12   A. I believe June 2006 for about 2-1/2 years.

13   Q. Until roughly the end of '08?

14   A. Yeah, that's about right.

15    PAGE 9:01 TO 9:17 (RUNNING 00:01:05.541)

16   Q. In your time at Rimini Street, what --

17   what functions did you fill, what were your

18   roles?

19   A. I mean I was hired as a -- as a -- they

20   call it a primary support engineer.  So I

21   mean that was -- it was a very small -- I

22   think I was the number six employee at that

23   time.  So we kind of helped out wherever we

24   could or wherever was needed.  But I

25   primarily stayed within the Siebel space, you

1      know, anywhere from -- you know the

2      onboarding -- I'm sure you've heard that

3      term -- and the support of clients and you

4      know, just helping with business process

5      refinements and that sort of thing around the

6      Siebel support.

7      Q. And to whom did you report when you were

8      at Rimini Street?

9      A. Initially Dennis Chiu and then later Brian

10     Slepko.

11      PAGE 10:10 TO 10:18 (RUNNING 00:00:20.064)

12     Q. You mentioned onboarding.  What does that

13     mean?

14     A. That's transitioning a client, a new

15     client from vendor support to Rimini Street

16     support.

17     Q. And typically that was a transition from

18     support provided by Oracle to support

19     provided by Rimini Street, is that right?

20     A. Typically, yeah.

21      PAGE 10:25 TO 11:15 (RUNNING 00:00:55.749)

22     Q. Can you just generally describe the nature

23     of the services that Rimini Street provided

24     in your time there for Siebel customers?

25     A. I mean it was primarily, you know, kind of

```
 1              the third tier support for serious problems
 2              that they might have.  So it wasn't -- it
 3              wasn't a help desk or anything like that.  We
 4              kind of supported their -- you know, when
 5              their -- when their internal support people
 6              could not resolve an issue, they would call
 7              us.  And we also did help with upgrades on
 8              occasion and small projects, you know, that
 9              involved enhancements.
10              Q. That is someone wants some new
11              functionality and they're struggling and so
12              you help them figure out how to implement it?
13              A. Yeah, yeah.
14               PAGE 11:16 TO 11:22 (RUNNING 00:00:14.420)
15              Q. Was one of the services that Rimini Street
16              provided to prepare what was described as a
17              SupportWeb extract for some customers?
18              A. Yeah.
19              Q. And did you have a role in the provision
20              of that service?
21              A. Yeah, initially.
22               PAGE 12:13 TO 13:02 (RUNNING 00:00:33.685)
23              Q. So Oracle or Siebel had provided a website
24              known as Siebel SupportWeb, is that right?
25              A. Yeah.
```

1   Q. And it had -- what kind of information was

2   in it?

3   A. Troubleshooting, text, you know,

4   bulletins, alerts, service requests, that

5   sort of thing.

6   Q. And a SupportWeb extract downloaded a copy

7   of that information and then you put it on a

8   DVD and provided it to customers, is that

9   right?

10   A. Yeah.

11   Q. And SupportWeb was a password protected

12   website, is that right?

13   A. Yeah.

14    PAGE 16:02 TO 16:17 (RUNNING 00:00:34.089)

15   Q. Every customer that transitioned from

16   Oracle received a SupportWeb extract, is that

17   right?

18   A. Only if they had a valid login that was

19   still -- or valid support at the time of the

20   transition.  There were a couple that were no

21   longer on Oracle support, so they wouldn't

22   get anything like this.

23   Q. I understand.  So any customer that

24   still -- their maintenance end date hadn't

25   occurred yet by the time they signed up with

```
 1          Rimini Street would get a SupportWeb extract,
 2          is that right?
 3          A. Right.
 4          Q. I should say, just to be clear, that's for
 5          Siebel customers we're talking about, right?
 6          A. Right.
 7           PAGE 17:10 TO 17:13 (RUNNING 00:00:07.627)
 8          Q. So you used an application called Offline
 9          Explorer for this purpose to create the
10          download from the Siebel SupportWeb, right?
11          A. Uh-huh.
12           PAGE 45:02 TO 45:04 (RUNNING 00:00:02.498)
13          Q. Let me offer you Exhibit 240.
14           (Document marked previously as
15           Exhibit 240 was presented.)
16           PAGE 45:14 TO 46:12 (RUNNING 00:01:03.575)
17          Q. "OE is scheduled to run nightly.  I have
18          noticed it stops running the job on occasion
19          so I have to reset it from time to time.  I
20          try to check it every other week.  If it has
21          stopped running for more than a few days, I
22          have to modify the URL macro in the project
23          so it dates back far enough to capture the
24          missing data, run the one-off correction and
25          reset daily run.  The other maintenance as
```

1751

```
 1              part of my bi-weekly checkup is to confirm
 2              the login and password are valid so it can
 3              authenticate automatically."
 4              You were describing the process in place in
 5              December '06 for your maintenance of Offline
 6              Explorer, is that right?
 7              A. Yes.
 8              Q. And you were telling Mr. Slarve that one
 9              of the things you did every two weeks or so
10              was to look to see if the login and password
11              are valid, is that right?
12              A. It seems so, yeah.
13              Q. And if the login and password had expired,
14              then the solution would be to put in a new
15              client's login and password, right?
16              A. Yes.
17               PAGE 59:13 TO 60:02 (RUNNING 00:00:49.321)
18              Q. Were there any customers for whom you
19              didn't have a local environment to
20              troubleshoot with for Siebel?
21              A. I'm sure there were and we would remote
22              into their system.
23              Q. And how did remote access as a tool
24              compare to having a local VM, make it easier
25              or harder?
```

1   A. It depends on the issue.  I mean typically

2   it would make it -- it would make it easier,

3   a little more freedom to do what you needed

4   to do.  But then again, you don't -- you

5   don't have a full copy of their data, so

6   oftentimes it's better to have -- to have

7   that client data in there.

8    PAGE 60:07 TO 60:12 (RUNNING 00:00:12.487)

9   Q. So if -- for those customers where you had

10   a local environment and VPN access, would you

11   agree that's the optimal setup that gave you

12   the most tools to troubleshoot their problems

13   effectively?

14   A. Yes.

15    PAGE 60:15 TO 60:23 (RUNNING 00:00:22.963)

16   The process of setting up these environments

17   involved installing a lot of different

18   software, right?

19   A. Uh-huh.

20   Q. And is it a time consuming process?

21   A. Yeah.  I mean, it takes half a day.

22   Q. You have to install OS and a database and

23   the applications, configure it?

24   A. Right.

25    PAGE 60:24 TO 62:01 (RUNNING 00:01:03.472)

1    Q. And where did you get the software to use

2       to install those applications?

3    A. I think there was a common share with the

4       software.

5    Q. Is that called the software library, is

6       that how it was referred to?

7    A. Something like that.

8    Q. And do you know where that -- and what's

9       your recollection of how that was organized?

10   A. It was mainly by version, I believe.

11   Q. So you have a folder with Siebel and you

12      have different Siebel versions in it and the

13      install files for each?

14   A. Something like that, yeah.

15   Q. Do you know where that software came from?

16   A. You know, I think a lot of it came from --

17      I can't remember what Oracle calls it.  They

18      have a website where you can download

19      software.

20   Q. EDelivery?

21   A. Yeah.

22   Q. So a lot of it was downloaded from

23      eDelivery, is that right?

24   A. Uh-huh.

25   Q. And there's some patches and other items

1    that are not available on eDelivery, is that

2    correct?

3    A. Yeah.

     PAGE 62:02 TO 62:03 (RUNNING 00:00:05.510)

4

5    Q. Where do those come from?

6    A. The client would provide.

     PAGE 64:08 TO 64:14 (RUNNING 00:00:22.744)

7

8    Q. Do you recall whether there were any

9    Siebel environments at Rimini Street that

10   were not created for a particular customer

11   but were created for Rimini Street's internal

12   use?

13   A. I mean I'm sure we had an environment to

14   evaluate the latest version and to learn --

15   you know, learn about it.

     PAGE 68:07 TO 68:09 (RUNNING 00:00:03.057)

16

17   Let me offer you Exhibit 238.

18    (Document marked previously as

19    Exhibit 238 was presented.)

     PAGE 69:08 TO 69:12 (RUNNING 00:00:19.337)

20

21   Q. And was this intended to show the

22   categories of information on the PeopleSoft

23   Customer Connection website and your progress

24   so far in downloading it using Offline

25   Explorer?

```
 1          A. It seems -- seems to be, yes.
 2           PAGE 69:16 TO 69:18 (RUNNING 00:00:06.270)
 3          Q. Let me offer you Exhibit 224.
 4           (Document marked previously as
 5           Exhibit 244 was presented.)
 6           PAGE 70:01 TO 70:10 (RUNNING 00:00:29.373)
 7          Q. Now, Mr. Slarve says, "Attached is a
 8          spreadsheet that has all the Siebel
 9          application media that is available on the
10          Oracle eDelivery website.  We currently don't
11          have the capacity to store it but will soon.
12          Just the ENU versions make up 3 terabytes.
13          Once we have the infrastructure in place
14          we'll pull it all down so that we have a full
15          local library."
16          Is this the library that you referenced
17          earlier of data from the eDelivery website?
18           PAGE 70:13 TO 70:19 (RUNNING 00:00:18.297)
19          THE WITNESS:  I think so, yes.
20          BY MR. RINGGENBERG:
21          Q. And you used the data that was downloaded
22          from eDelivery to create the local
23          environments that you used to help support
24          customers, is that right?
25          A. Yes, uh-huh.
```

1756

```
 1          PAGE 70:20 TO 70:22 (RUNNING 00:00:04.072)
 2          Q. Let me offer you Exhibit 246.
 3           (Document marked previously as
 4           Exhibit 246 was presented.)
 5          PAGE 71:03 TO 72:02 (RUNNING 00:01:34.723)
 6          Q. Now, turning to the second page of the
 7          document, there's an email, appears to be
 8          from you to Mr. Chiu, October 5th.  It says,
 9          "Dennis, Offline Explorer is now set up to
10          download contents of the Oracle eDelivery
11          website on a weekly basis while preserving
12          all versions of the key files."
13          Did you set up Offline Explorer to do that?
14          A. I believe so, yes.
15          Q. And he replies, "Thanks much for adding
16          this to the library, John."  And you reply,
17          "No problem, Dennis.  The OE software makes
18          it easy."
19          Where was this information stored, do you
20          recall?
21          A. It was a share.
22          Q. A network share?
23          A. Yes.
24          Q. And on eDelivery there's available
25          PeopleSoft software, Oracle Database
```

1757

```
1       software, Siebel software, JD software,

2       correct?

3       A. Uh-huh, yes.

4       Q. And Rimini Street in your time there used

5       all of those -- all of that software in

6       connection with its work for customers,

7       right?

8       A. Uh-huh, yes.

9        PAGE 79:06 TO 79:08 (RUNNING 00:00:03.710)

10       Q. Let me offer you Exhibit 450.

11        (Document marked as Exhibit 450

12         for identification.)

13        PAGE 80:02 TO 80:17 (RUNNING 00:00:33.266)

14       Q. And he asks you, "How will you

15       troubleshoot an issue at your end when we

16       create ticket?  Typically Siebel will set up

17       one instance of our version and reproduce the

18       issue with our DBF file at their end.  Will

19       you follow the same steps or will you have a

20       different approach?"

21       And you reply, "We will also set up an

22       instance of your Siebel release SRF and DBF.

23       We use VMware internally so we can easily set

24       up environments to troubleshoot issues."

25       And that's a reference to what you described
```

1        before, which is you set up a local

2        environment to try to replicate what the

3        customer has so you can recreate their

4        problems, is that right?

5        A. Yes.

6         PAGE 80:18 TO 80:20 (RUNNING 00:00:05.899)

7        Q. And you understood that from XO's point of

8        view, the ability to do was an important part

9        of your service offering?

10         PAGE 80:23 TO 80:23 (RUNNING 00:00:01.333)

11        THE WITNESS:  Yeah, I think so.

12         PAGE 85:12 TO 85:14 (RUNNING 00:00:03.440)

13        Q. Let me offer you Exhibit 454.

14         (Document marked as Exhibit 454

15          for identification.)

16         PAGE 86:04 TO 86:22 (RUNNING 00:01:02.110)

17        Q. And the ticket description in there says,

18        "In the midst of onboarding archive for XO,

19        the IP address for the download machines were

20        blocked this morning from Metalink3. While we

21        can still get to other pages like

22        metalink.oracle.com, we can't get in from IP

23        71.5.6.20."

24        An email from Mr. Chiu and you write,

25        "Thanks, Dennis.  It seems they're onto us

```
 1              for massive download volumes."  What did you
 2              mean by that?
 3              A. Probably that Oracle noticed large
 4              downloads from their website.
 5              Q. And you were inferring that they
 6              blocked -- that Oracle blocked that IP
 7              address in response to the massive download
 8              volumes?
 9              A. Probably, yes.
10              Q. Did you later learn that Oracle, you know,
11              told Rimini Street that very directly?
12              A. Yes, I was aware of that.
13               PAGE 95:07 TO 95:09 (RUNNING 00:00:03.949)
14              Q. Let me offer you Exhibit 457.
15               (Document marked as Exhibit 457
16                for identification.)
17               PAGE 96:13 TO 97:05 (RUNNING 00:01:03.024)
18              Q. So if you go one email up the chain, this
19              appears you're forwarding this to Dan Slarve
20              and Bola Ola and you write, "FYI, below is a
21              new Siebel alert which I noticed this morning
22              and was published on SupportWeb five days
23              ago."
24              How did you -- is it correct that you learned
25              about this information that Siebel or Oracle
```

1    had distributed on SupportWeb?

2    A. I believe that would be correct.

3    Q. And you had noted that MedPro was no

4    longer on Siebel support, so that would mean

5    they would no longer have access to

6    SupportWeb, is that right?

7    A. That's correct.

8    Q. Does that mean you must have been using

9    someone else -- a different customer's login

10   on SupportWeb at that time?

11   A. Probably.

12    PAGE 97:06 TO 97:13 (RUNNING 00:00:41.436)

13   Q. And did you ultimately provide this

14   information to MedPro in an altered -- in a

15   non-verbatim way?

16   A. I don't know if I ended up communicating

17   it, but it seems like I executed what the

18   alert was referring to accidentally.

19   Q. And --

20   A. Or without knowing that it was an alert.

21    PAGE 98:17 TO 98:21 (RUNNING 00:00:07.724)

22   Q. So Mr. Chiu is telling you, hey, go on

23   SupportWeb and try to figure out what these

24   do so that we know for other clients that may

25   come in the door, right?

1761

1     A. Yes.

2      PAGE 98:22 TO 99:11 (RUNNING 00:00:53.398)

3     Q. Was it the case that from time to time

4     individuals at Rimini Street would make use

5     of access to SupportWeb or later MyOracle

6     Support to look for knowledge documents that

7     helped them perform services for clients

8     other than the clients who had provided the

9     login?

10    A. I don't know.  Typically we would try to

11    use the extract for that client.

12    Q. But in this case, it was the new

13    information, right, that only had come out?

14    A. Right, yeah.  That's correct.

15    Q. So that wouldn't be contained in the

16    customer's extract because it was newly

17    provided information in MyOracle, right?

18    A. Right.

19      (End of deposition.)

20         THE COURT:  All right.  Plaintiffs' next

21    witness.

22         MR. ISAACSON:  Yes, Your Honor.  Plaintiffs call

23    Elizabeth Dean.

24         COURTROOM ADMINISTRATOR:  Please raise your

25    right hand.

1    You do solemnly swear that the testimony you

2    shall give in the cause now before the Court shall be the

3    truth, the whole truth, and nothing but the truth, so help

4    you God?

5    THE WITNESS:  Yes, I do.

6    COURTROOM ADMINISTRATOR:  Please be seated.

7    Would you please state your name and spell your

8    name for the record.

9    THE WITNESS:  Elizabeth Dean; D-e-a-n.

10   COURTROOM ADMINISTRATOR:  Please tell us your

11   city and state of residence.

12   THE WITNESS:  Alameda, California.

13   MR. ISAACSON:  All right.  Your Honor, I should

14   have said this before making Ms. Dean walk up here.

15   There's several exhibits that would be referred

16   to in slides in her testimony that the other side -- that

17   defense counsel is aware of and does not have any objection

18   to.

19   So I'd just like to read into the record that I

20   would move to admit PTX 1960, PTX 789, PTX 775, PTX 3503,

21   PTX 3512, and then DTX 1947.

22   MR. STRAND:  We have no objections to those

23   documents, Your Honor.

24   THE COURT:  They are admitted.

25

1763

```
 1            (Plaintiffs' Exhibits 775, 789, 1960, 3503
 2            and 3512 received into evidence.)
 3            (Defendants' Exhibit 1947 received into
 4            evidence.)
 5                 MR. ISAACSON:  Sorry to start off on such a dull
 6     note.
 7                 THE COURT:  Go ahead, please, Mr. Isaacson.
 8                 MR. ISAACSON:  All right.
 9                           ELIZABETH DEAN
10               called as a witness on behalf of the
11          Plaintiffs, was examined and testified as follows:
12                        DIRECT EXAMINATION
13     BY MR. ISAACSON:
14     Q.    Good morning, Ms. Dean.  Could you introduce
15     yourself to the jury.
16     A.    So my name is Elizabeth Dean, and I'm a
17     vice-president at TM Financial Forensics.
18     Q.    All right.  And what do you do for a living?  You
19     mentioned TM Financial Forensics.
20     A.    I'm a certified public accountant, and I do a
21     specialty type of accounting, which is financial forensics.
22     Essentially we do investigations of accounting and
23     financial issues.
24     Q.    And you said TM Financial Forensics.  What is that
25     business?
```

1764

```
1    A.    We're a financial and business consulting firm.  We
2  have people that are MBAs, CPAs, and we're hired by clients
3  to review accounting documents for them or in litigations
4  like this for both parties.
5    Q.    And what's your position with TM Financial
6  Forensics?
7    A.    I'm a vice-president, and I cofounded the firm.
8    Q.    What are your responsibilities as a vice-president
9  since you founded the firm or helped found the firm?
10   A.    It's a small firm.  We have about 60 employees.  So
11 I have a lot of management responsibilities, but I spend
12 most of my time doing consulting and working with clients
13 on these kinds of engagements.
14   Q.    And then the field that you work in, as I understand
15 it, is the field of analyzing potential damages?
16   A.    That's correct.
17   Q.    How long have you been working in the field of
18 analyzing damages?
19   A.    I've worked on cases like these for about 25 years.
20   Q.    And in those 25 years, have you calculated damages
21 in cases involving copyright infringement claims or
22 interference claims?
23   A.    I have.
24   Q.    Okay.  What other areas have you estimated damages
25 in?
```

1   A.    Well, a large part of my work is breach of contract.

2   I also deal with a lot of interpretations of financial

3   provisions and accounting codes.

4            And then I also do a lot of intellectual

5   property work beyond copyrights, patents, trademarks, trade

6   secrets, those all come up in disputes quite a bit.

7   Q.    All right.  How many intellectual property related

8   cases have you worked on over your career relating, again,

9   to the issue of damages?

10   A.    I would estimate about a hundred.

11   Q.    Okay.  Now, you said copyrights or one type of

12   intellectual property that you've dealt with?

13   A.    That's right.

14   Q.    Okay.  How many intellectual property cases

15   involving copyrights have you worked on, again, relating to

16   the issue of damages?

17   A.    About a dozen.

18   Q.    And have you testified as an expert witness on

19   damages at trials before like -- such as this?

20   A.    I have.

21   Q.    About how many times?

22   A.    About half a dozen times that's actually gone all

23   the way to trial.

24   Q.    All right.  Tell the jury your educational

25   background.

1    A.    I have a bachelor in math and economics with a minor

2    in accounting.  That's from Claremont McKenna College which

3    is in Southern California.

4              And then I also attended a program on technology

5    transfer and licensing at the University of California at

6    Berkeley.

7    Q.    All right.  Now, returning to your field of damages,

8    what teaching have you done in that area?

9    A.    Well, often accountants and attorneys want to learn

10   more about this area, and they invite me to speak at

11   seminars, conferences, law schools.

12             For the last few years I've gone in and done

13   one-day seminars at Stanford or Santa Clara Law School or

14   UC Hastings.

15             I also serve on USC's planning committee.  They

16   put on a one-day conference covering all aspects of

17   intellectual property law, including damages.

18   Q.    All right.  And what professional licenses or

19   certificates do you have?

20   A.    For accounting there's a lot of choices, so I

21   actually have three right now.  I'm a certified public

22   accountant.  I'm also a certified management accountant.

23   And I'm certified in financial forensics, which is the area

24   most similarly aligned to what we're going to talk about

25   today.

1767

```
 1            And then people that work with intellectual
 2   property often get valuation licenses, so I also have a
 3   licensing professional certification.
 4   Q.   All right.  And what professional standards apply in
 5   your field?
 6   A.   Well, I consider myself an accountant, and so I
 7   prescribe to the rules of the American Institute of
 8   Certified Public Accountants.  They promulgate a lot of
 9   rules with respect to professional care and due diligence,
10   and, of course, I abide by those.
11            And then we also have practice aids and study
12   guides with respect to calculating damages in this type of
13   case and performing an appropriate investigation.
14   Q.   And did you follow those standards in this case?
15   A.   Yes, I did.
16   Q.   All right.  Now, when were you first retained by
17   counsel for Oracle?
18   A.   In July of 2011.
19   Q.   All right.  And with respect to your firm, TM
20   Financial Forensics, have you worked with anyone else on
21   this matter at that firm?
22   A.   Yes.  Over the years there have been a number of
23   different people that have been involved in this
24   engagement.
25   Q.   All right.  In terms of the people who have also
```

1    worked on this assignment, can you describe the main people

2    and their background?

3    A.    So, two of the people that have worked most closely

4    with me, another vice-president of our firm, Julie Knox,

5    she has a masters in finance and accounting.  She also has

6    a lot of accounting designations, all the same ones I have.

7    She's also a chartered financial analyst.

8              And then Karen Martinsen, she has worked out

9    extensively with respect to all the data that we're going

10   to talk about today.  We had to do quite a bit of SQL

11   programming in order to analyze all the data.  She

12   primarily took charge of that role.  And she has an MBA

13   from Kellogg.

14             MR. ISAACSON:  I tried to go the whole trial

15   without saying SQL programming, but --

16             Oh, at this point I would ask that Ms. Dean be

17   allowed to proceed as an expert in the field of estimating

18   damages.

19             THE COURT:  She may.

20   BY MR. ISAACSON:

21   Q.    All right.  Now, since July 2011, how many hours

22   have you personally spent on this matter?

23   A.    I have spent hundreds of hours on this matter.

24   Q.    All right.  Now, you've prepared some slides for --

25   in order to explain your work to the jury.  Let's start

1769

1     looking at those.

2               Let's look at slide one, your work steps.

3               Now, before you get to your actual calculations,

4     will you explain to the jury what you did to reach your

5     opinions in this case.

6     A.    Yes, I can.  This investigation on this case was

7     very similar to what I do on all my cases.

8               First, I have to understand what the allegations

9     are in the case.  That informs me about the kind of

10    information that I need to review.  Of course, I'm mostly

11    focused on the financial information.

12              And then I perform analyses with the information

13    that I've been provided, and ultimately I make a

14    determination as to whether or not there's been damages.

15    Q.    Okay.  Well, let's talk about that first step, the

16    information you reviewed.  Let's go to the next slide.

17              Would you explain to the jury what information

18    you reviewed in this case.

19    A.    Yes.  Based on what I was informed the allegations

20    in the case were, I was available -- it was made available

21    to me to look at Rimini's contracts which was very

22    important to determine the scope of the services that were

23    offered, the products that were covered by their support

24    contracts.

25              In corollary to that, I also received Oracle's

1770

```
 1    contract information, although, for the most part, I
 2    reviewed the data on that because it was so extensive.
 3            Then both companies had thousands of financial
 4    and management documents that were produced that I was able
 5    to look at to get more insight into their financial
 6    operations.
 7            You have seen many of these, but there were over
 8    a hundred depositions taken in the case, and all of those
 9    were made available to me.
10            I also looked at expert reports and deposition
11    testimony from other experts in the case such as
12    Mr. Yourdon that just testified.
13            Legal filings.
14            And then at times I did independent company and
15    industry research.
16            And then there were Oracle personnel that I
17    needed to speak with to understand, for example, some of
18    the data that I was provided, and those were interviews
19    that I took separate from the depositions.
20    Q.    All right.  So then -- once you've reviewed that
21    information, let's go to step two, analysis.
22            Would you explain to the jury what you -- how
23    you went about analyzing the information.
24    A.    So the analysis is directly related to the
25    allegations of wrongdoing.  So first I had to really
```

1    understand what the business models were and how those were

2    impacted by the items that are claimed to be improper.

3              That really had to do with support service, so I

4    had to collect what everything Rimini had on their support

5    service offerings and which clients they had serviced.

6              I worked with Oracle's database to find out what

7    those customers had been getting service for on the Oracle

8    side when they had been Oracle customers to determine the

9    lost support revenues.

10             Then on the database -- so that was all on the

11   application products.  And then on the database products I

12   had to do a separate evaluation and analysis of what Oracle

13   had for licensing terms and policies.

14             And, finally, I looked at both companies'

15   financial results overall.

16   Q.    All right.  So let's -- the first item there you

17   said was allegations of wrongdoing.  Let's look at slide 4,

18   Summary of Alleged Misconduct.

19             What's your understanding of what Oracle's

20   alleging Rimini did wrong?

21   A.    So what guided my work were three major areas.  The

22   first was the copyright infringement, PeopleSoft, JDE, and

23   Siebel software and support materials and then separately

24   the Oracle Database software.

25             Second, the claims of interference that

1772

1    essentially were allegations of wrongdoing with respect to

2    misrepresentations to the customers, and then using

3    improper means to access the support websites.

4    Q.    All right.  So -- I'm sorry, go ahead.

5    A.    And last was computer fraud which had to do with

6    downloading from those websites.

7    Q.    All right.  So let's be clear for the jury.  Are you

8    here to give opinions about whether this wrongdoing

9    actually happened?

10   A.    No.  No.

11   Q.    Okay.  What's your role in this case?

12   A.    My role is to look at the financial and economic

13   implications if the Court and the jury are to decide that

14   Oracle's allegations are correct.

15   Q.    So if the jury were to find these things happened,

16   you're here to estimate damages?

17   A.    That's right.

18   Q.    Okay.  Now you show two different companies on the

19   slide.  I see Oracle International Corporation, and I see

20   Oracle America.  Why do you show those two different

21   companies on this slide?

22   A.    So those two subsidiaries of Oracle Corporation

23   overall are the subsidiaries that were involved in this

24   case.

25              So Oracle International Corporation owns the

1773

1    copyrights, they're the copyright holder, and Oracle

2    America provides the direct support services to the

3    customers.

4    Q.   All right.  So now, once you've reviewed

5    information, done analysis, gotten an understanding of the

6    allegations, let's talk about your work steps in estimating

7    damages.

8          All right.  Now, would you explain in slide 5

9    what are the categories of damages that we are going to

10   discuss today?

11   A.   So, today we're going to discuss two.  There's

12   actual damages, those are measured as Oracle's losses, and

13   there's a number of categories there.

14         And then on the other side is infringer's

15   profits.  And those are the benefits that Rimini received

16   from their improper actions.

17   Q.   All right.  So let's start walking through these

18   categories of documents, and we'll come back to this slide

19   to remind people where we are.

20         Now, let's talk about slide 6.

21         Before we go through these step by step, is this

22   a summary of your -- of the damages that you're estimating

23   in this case?

24   A.   Yes.

25   Q.   Would you explain this briefly, because we'll be

1774

1     going through it in detail.

2     A.    Okay.  So, overall, if you took all the claims, and

3     Oracle's allegations were found to be all appropriate and

4     correct, the total damages would be 245.9 million.

5     Q.    All right.  And I see copyright infringement,

6     128.3 million, interference, 194.1 million, and computer

7     fraud, 14.4 to 34.9 million.

8              Now, if we add all those up, they add up to

9     more -- I don't have my calculator, but I can see that they

10    add up to more than 245.  Why is that?

11    A.    Well, that's calculating each of the allegations

12    just with respect to them individually.  So there are lost

13    support customers for which they're included in the

14    copyright infringement and the interference, for example.

15             So in order to avoid duplication, I can take

16    those out to get to the 245.9 million.

17    Q.    Okay.  So we'll talk later some more about how you

18    remove that duplication.

19             Slide 7.  This is the summary of the

20    interference damages?

21    A.    That's right.

22    Q.    All right.  And we'll go through this in detail.

23    But just explain to the jury in summary fashion what your

24    conclusions are here.

25    A.    So, with respect to the interference allegations,

1    they affect the PeopleSoft, JDE, and Siebel product lines

2    where my opinion is that Oracle lost customers in those

3    product lines.

4              And so you can see the amounts, for example,

5    PeopleSoft is 146 and a half million, by far the largest.

6    JDE is 12.7 million, and Siebel is 34.9 million.

7    Q.    All right.  Let's talk about those lost support

8    customers both for copyright and -- well, and interference.

9              What methodology did you use to measure Oracle's

10   lost profits from lost support customers?

11   A.    I used a standard methodology for calculating lost

12   profits and infringer's profits.

13   Q.    Would you explain that standard methodology.

14   A.    Well, the overview of it is to look at what actually

15   happened financially, determine what would have happened,

16   and the difference is the damages on the lost profit side.

17   Q.    Would you go through that one more time so that we

18   can -- so that we can understand it, the before and the

19   after.

20   A.    So with respect to what actually happened, Oracle

21   sells software licenses, and then they contract with

22   customers to provide support.

23              What actually happened was that at some point

24   Oracle's contracts ended, and then Rimini's contracts

25   started, and then from that point on Rimini takes over the

1776

1       support revenues from those contracts.

2                    In my opinion, what would have happened is that

3       the customers would have -- that some customers, at least,

4       would have stayed with Oracle, and that those contracts

5       would have continued over time, and so Oracle would have

6       made more revenues and more profits.

7       Q.    All right.  Well, let's talk about that analysis.

8       Let's look at slide 8.  Would you describe what this is

9       illustrating.

10      A.    So this is illustrating generally what I was talking

11      about.

12                   First, there's an upfront license fee.  That's

13      not at issue in this case with respect to the application

14      products.  What's at issue is the support revenues.

15                   The ongoing support Oracle had is demonstrated

16      in the first part of the bar, then there's an interruption

17      because of Rimini's actions, and the rest of the time

18      Rimini gets that money.

19                   That's the amount of lost profits after you

20      reprice it at Oracle's price and deduct costs.

21      Q.    Okay.  So we're going to be looking at that second

22      part of the arrow, what happened in terms of lost profits

23      from the support end.

24      A.    That's right.

25      Q.    Okay.  Let me ask you to look at slide 9 which is an

1      excerpt of PTX 3 which was admitted into evidence.

2                  And this is a Rimini Street investment fund --

3      first round investment funding document from 2006.

4                  "For investors who are direct competitors of

5      Oracle, or who otherwise benefit from Oracle customer loss,

6      Rimini Street separates Oracle from its acquired licensees

7      denying Oracle recurring revenue and creating new software

8      service sales opportunities in vulnerable accounts."

9                  How does this relate to what you were just

10     discussing?

11     A.    So, it's important for me to understand how Rimini's

12     business model works, and so this informed my opinion about

13     that, which is that Rimini is taking customers from Oracle.

14     That's how Rimini's business model works in terms of

15     finding support customers.

16     Q.    And when it says, "Rimini Street separates Oracle

17     from its acquired licensees," what did you understand that

18     to mean?

19     A.    The break in the support contract.

20     Q.    All right.  And what's your understanding of the

21     level of support that Rimini claims it could provide, the

22     level of support it provided to Oracle's former customers?

23     A.    My understanding is that they were providing or

24     claiming to provide vendor-level replacement services.

25     These customers stay on the Oracle software, they just get

1778

1    the support from Rimini.

2    Q.    All right.  Let's look at slide 10, and let's talk

3    about how you then did your calculation of lost profits.

4    Now, we're going to do the math.  So would you explain this

5    slide, slide 10.

6    A.    So this is the overall measurement.  It's fairly

7    straightforward.

8              We're going to talk a lot about point A which is

9    how you determine the Oracle support revenues that it would

10   have received but for the infringing acts.

11             B, you want to deduct the costs because there

12   are some costs that Oracle avoided because it didn't do

13   this business, and C is the difference.

14   Q.    Okay.  And the C will be the damages; is that right?

15   A.    That's right.

16   Q.    All right.  So let's look at step 1.

17             The -- I'm sorry.  Let's look at slide 11.  This

18   is how you went about identifying customers; right?

19   A.    That's right.

20   Q.    Okay.  So let's talk about the identification of

21   customers.  Please explain slide 11.

22   A.    So the purpose of slide 11 is to develop the

23   population of information that I was looking at.

24             So Rimini Street provided a document that

25   indicated that they had had, over the time period that I

1     analyzed, 364 customers for PeopleSoft, JD Edwards, or

2     Siebel support, and I, you know, do three steps to try to

3     develop the would-have-been revenue.

4              The first is, of those 364 customers, to

5     determine which ones would have stayed at Oracle.

6              Second, I price the amount they would have paid

7     Oracle on an annual basis.

8              And then, third, I apply that price for a

9     duration of time to represent the damages.

10    Q.    All right.  So just to go over the top part, the

11    first step, there were 364 Rimini Street support customers

12    that Rimini Street provided us that were on PeopleSoft, JDE

13    or Siebel; is that right?

14    A.    That's right.

15    Q.    All right.  So you started from there and decided

16    how much to reduce that?

17    A.    That's correct.

18    Q.    Okay.  The -- now, in step one, then, you had to

19    figure out which specific Siebel, JDE, and PeopleSoft

20    products they had?

21    A.    Yes.

22    Q.    Okay.  Let's look at slide 12, which is an excerpt

23    of DTX 1947 which has been admitted into evidence.

24              Would you explain what this is?

25    A.    So, the source that I used to determine what

1    products the customers were paying Rimini support for were

2    the Rimini contracts.  So this is an example of a Rimini

3    contract that I reviewed.

4    Q.   All right.  So let's -- this is an example of the

5    contract.

6             Let's look at slide 13.  Is this one the same --

7    this is Exhibit A to that same contract?

8    A.   That's right.  This is the School District of

9    Pittsburgh.

10            MR. ISAACSON:  Matt, can you make that bigger

11   for us?  Thanks.

12            There's the SQL thing again.

13   BY MR. ISAACSON:

14   Q.   So go ahead and explain how this schedule -- you

15   incorporated these schedules into your analysis.

16   A.   So, Exhibit A in Rimini's contracts listed the

17   covered products.

18            So, if you look in the far left-hand side, you

19   can see that this was a PeopleSoft customer, and they had a

20   variety of different releases and patch levels for the

21   actual products that Rimini was providing support on.  So I

22   created a database of this information.

23   Q.   All right.  So you created a database from Rimini's

24   actual contracts of what products they were supporting?

25   A.   That's correct.

1   Q.    All right.  Let's go to another part of the City of

2   Pittsburgh contract, which would be slide 14.

3             All right.  What does this show?

4   A.    The other piece of information that I needed to do

5   my analysis was the dates.  Not all of these contracts

6   started at the same time, they didn't all end at the same

7   time, so I had to look at every contract in order to

8   determine what period of time they were under contract with

9   Rimini.

10  Q.    So we've been dealing with -- we'll talk about the

11  specific time periods that you're dealing with, but we've

12  been dealing with a number of years beginning in 2006.  But

13  for each customer, you were identifying the specific period

14  they were at Rimini.  Do I have that right?

15  A.    That's correct.

16  Q.    And you created a database of that information?

17  A.    That's correct.

18            MR. ISAACSON:  All right.  Now, slide 15.  All

19  right.  This seems to be other data that you looked at.

20            Matt, maybe you can make it a little bigger.

21  BY MR. ISAACSON:

22  Q.    And can you explain what this is?

23  A.    So, as I mentioned before, Oracle's contracts with

24  these customers were voluminous.  They have lots of

25  products.

1   So what Oracle was able to provide to me was a

2   database they had already -- that they were already using,

3   the RDS database, and it has a number of columns which you

4   don't even see here.  It's very wide and very long.

5   And for every customer I identified every

6   product that correlated with the products that then Rimini

7   started offering service on.

8   This database also told me whether the contract

9   that Oracle had was active with that customer or had been

10  cancelled.

11  Q.   And so how did you use this data in your analysis?

12  A.   This data was used for two primary purposes.  The

13  first was to identify the customer had been an Oracle

14  customer to begin with, and, secondly, when that customer

15  left Oracle, when the customer's contract was cancelled,

16  what the last annual fees were that they were paying on the

17  products that now Rimini is supporting.

18  Q.   And so you started off with, I believe, 364

19  customers.  Did you look at all the Rimini contracts and

20  all the Oracle data for all 364 of those customers?

21  A.   I did.

22  Q.   All right.  So now let's look at slide 16.

23  Now, we're going back to -- we saw this before.

24  So now you've identified Oracle's lost support

25  customers, and you've done a review of Rimini and Oracle

1     contract data.  Are we now going to move to step two?

2     A.    Right.  There's -- so results of step one, then move

3     to step two.

4     Q.    So let's get the results of step one straight then.

5     Let's look at 17.  So this is in step one.

6                And we looked at 364 customers, and did you

7     consider all of those customers -- did you use all those

8     customers in your lost profits analysis?

9     A.    No, I did not.

10    Q.    Okay.  So you've excluded how many customers?

11    A.    In total, 135.

12    Q.    All right.  And you included in your lost profits

13    analysis how many of the 364?

14    A.    Well, 229.

15    Q.    And have you knocked that down one?

16    A.    Yes, less one, so 228 now.

17    Q.    Why did you go from 229 to 228?

18    A.    Because there was a customer, Leads Customers

19    Growth, that met all the same criteria that qualified them

20    to be in damages.

21                But then I was able to hear the testimony of

22    Mr. Ravin who described their -- that situation, and I came

23    to an understanding that the amounts paid that were listed

24    in the financial statements for that customer weren't

25    really for service, so I took that out.

1784

1    Q.    Leads Customers Growth, that's Mr. Leake's company,

2    the first customer of Rimini Street who we have alleged is

3    a -- through their emails is not a real customer and money

4    was just going back and forth?

5    A.    Right.  It was reported in the financials that I was

6    provided, that I've been reviewing for the last three or

7    four years, just like any other customer.

8              And so once I understood that they -- it was

9    really -- I think he described it as a circular

10   transaction, where he gave them money and they gave him

11   money, I just -- I took it out.  It's obviously not a

12   customer at issue in this case.

13   Q.    Okay.  All right.  So we have this pie chart.

14             Let's talk about who you excluded from the --

15   from your analysis of lost profits.

16             So the red piece of pie there, no Oracle

17   cancellation.  Can you explain that?

18   A.    So for 33 customers -- that's the number in the

19   bracket after each category, you can see the size of the

20   pie.

21             For 33 customers there were no -- there was no

22   evidence in the information that I was provided that they

23   cancelled their Oracle contract, and that could have been

24   for a variety of reasons.

25             It could be that the company, or the portion of

1785

1    the company that Rimini is servicing was just an arm and

2    Oracle actually was contracting with a bigger entity.

3              And so that fine level of detail just wasn't

4    provided, couldn't be tracked.  Or it could be.  There was

5    certainly some circumstances where it appeared that the

6    customer was paying both Rimini and Oracle for support.

7    Q.    All right.  For some of those customers, you might

8    have a very big corporation, and they would have a unit

9    that dropped Oracle and went to Rimini, but because you

10   can't tell what's going on in that big corporation, you

11   just excluded them from your analysis.

12   A.    That's right.  Both Oracle and Rimini may not have

13   contracted at the same level.  Many of these corporations

14   have dozens of different contracts, for example.

15   Q.    Right.  The green piece of pie, would you explain

16   that?

17   A.    So, there were 39 customers out of the 364 that have

18   actually returned to Oracle.  They have relicensed or they

19   have reinstated their old license.  So I took those out of

20   lost profits because Oracle is currently servicing those

21   customers.

22   Q.    An example of that would be Yum who we've heard

23   about?

24   A.    That's right.  Yum was a customer of Oracle's that

25   left and went to Rimini, and then it came back to Oracle.

1786

1    Q.    All right.  How about the purple pie slice?

2    A.    That's labeled Not Oracle America.  Oracle is

3    obviously a large corporation, international corporation.

4         Rimini had some customers that were not in the

5    United States.

6         And so for purposes of this calculation, I did

7    not include damages for lost profits for 24 of those

8    because those companies have a different relationship with

9    Oracle International Corp, the copyright holder, and just

10   to simplify things, I just did lost profits on companies

11   that were in the United States.

12   Q.    All right.  And then the -- I guess it's a gray

13   piece of pie, JDE World, what is that?

14   A.    Well, sometimes we're not as precise as we could be,

15   and there's been a lot of conversation about JDE in this

16   case, and PeopleSoft too.

17        But there are a lot of different products, and

18   JDE World is a certain product but it's not at issue in

19   this case, but Rimini does service it.

20        So I had to take out any customer that was only

21   under a contract for JDE World, and those customers --

22   they're not included in lost profits or the other bucket,

23   infringer's profits.

24   Q.    Okay.  When we were talking about JDE in this case,

25   as you say, we're mainly talking about JDE Enterprise, but

1787

1     we're not talking about JDE World; is that right?

2     A.    That's right.

3     Q.    Okay.  And then there's an orange piece of pie,

4     Other.  Would you explain that?

5     A.    So, the intent of the pie is to tie to the 364

6     customer names.  A couple of the pumpkin pie slice, Others,

7     are customers that just haven't started with Rimini.

8            Their names are on the list, but they have no

9     revenues.  Most of them, I think 10 of them in the Other

10    category, are companies that showed up on Rimini's list

11    that were the same company but with two different names.

12           So they're included in whichever Other category

13    they actually apply in, and then I just put the second name

14    in Other just so I would add up to 364 in the pie.

15    Q.    Is it your opinion with respect to those 135

16    customers that you've excluded, that there would be damages

17    that Oracle suffered for some of those 135 customers, but,

18    to be conservative, you've just excluded them?

19    A.    Yes, there would be lost profits for at least the

20    Not Oracle, likely to relicense, and reinstated, and

21    possibly the No Oracle cancellation.

22    Q.    And that brings us to 229 -- I should say 228

23    customers that you included in your lost profits analysis.

24    What time period does your damage analysis cover?

25    A.    So this is a tad bit confusing.  This happens a lot

1   on cases because discovery ends at a certain time.

2           These 364 customers started with Rimini in 2006

3   and were active through September 2011.

4           So that's how I get my base of 364, but the

5   damage period in the case actually comes forward for just

6   these customers through February of 2014.

7   Q.   All right.  So let's just say that one more time so

8   we have it.

9           The 364 customers are customers of Rimini Street

10  for Siebel, PeopleSoft, and JD Edwards from -- anywhere

11  from the period 2006 through September 2011; is that right?

12  A.   That's right.  They could have started at any time

13  in that period.

14  Q.   Right.  And for that set of customers, you have

15  calculated damages through February 2014?

16  A.   That's right.

17  Q.   All right.  You haven't calculated damages for lost

18  customers after September 2011?

19  A.   That's right.  Oracle, if they lost customers to

20  Rimini after that point in time, that's not in this

21  analysis.

22  Q.   All right.  The -- now, let's talk about what these

23  customers were -- what products these customers were using.

24  Slide 18.  Can you explain this chart?

25  A.   Yes.  So oftentimes in these cases we get a lot of

1    information, and especially when we have multiple products,

2    it's hard to focus on what the importance or where the big

3    dollars are coming from, so this is always something that I

4    want to look at.

5              So in this case, you can see the breakdown of

6    customers that were active in each of these years, and very

7    quickly after 2006 you see that the PeopleSoft product is

8    the primary product the customers are licensing --

9    supporting through Rimini.

10   Q.    All right.  So PeopleSoft is the blue part of the

11   bar; is that right?

12   A.    That's right.

13   Q.    So in 2006, Rimini Street is mainly a Siebel-based

14   business, but as it evolves, it becomes predominantly

15   PeopleSoft?  Is that what we're looking at with the blue,

16   red, and green?

17   A.    That's correct.

18   Q.    Okay.  And this chart stops in 2010, but your

19   analysis runs through September 2011.  Did you just skip

20   the last year because it's only a part of the year?

21   A.    Yes, the bar looks pretty much the same because

22   there's no -- there's not much difference.  It's not a full

23   year.

24   Q.    Okay.  Let's look at it one other way.

25             Slide 19.  Here's another pie chart.  Would you

1790

1     explain the -- what we're looking at here?

2     A.    So in addition to looking at it on a per-customer

3     basis, I wanted to find out on a revenue basis what was

4     driving the business of Rimini.

5           And you can see I've included, just for the 364

6     customers, there are PeopleSoft, JD Edwards, and Siebel

7     revenues, and PeopleSoft is again the vast majority.

8     Q.    All right.  Now, did you consider in your analysis

9     whether Oracle customers who left Oracle and left for

10    Rimini, if Rimini hadn't been around, whether they would

11    have gone to another third-party support provider?

12    A.    Yes, I did.

13    Q.    And what did you generally conclude about that?

14    A.    I generally concluded that there were very few, if

15    any, options for customers that were seeking vendor-level

16    replacement services.

17    Q.    All right.  Let's look at a chart about that, which

18    will be slide 20.

19          All right.  There's a number of companies listed

20    here.  Let's just dispense with one of them.

21          TomorrowNow was shut down in October 2008; is

22    that correct?

23    A.    That's my understanding, yes.

24    Q.    All right.  And is it your understanding that

25    TomorrowNow -- did you -- did you conclude that TomorrowNow

1791

1    was an infringing alternative?

2    A.    It was infringing.  I would say it's not acceptable

3    because it was infringing.

4    Q.    Okay.  So now let's talk about these other

5    companies.  There's a company column.  Are those the

6    third-party support -- some of the third-party support

7    companies?

8    A.    Yes.  These are some of the companies that I saw in

9    Rimini and Oracle's discovery with respect to customers

10   that -- I mean companies that might have claimed to offer

11   third-party support.

12   Q.    All right.  What's the second column, product lines?

13   A.    That again was information about what potential

14   products they were supporting.

15   Q.    So, for example, Spinnaker at the bottom, I think we

16   heard testimony about this, only supported JD Edwards

17   during the period we're talking about?

18   A.    That's correct.

19   Q.    Okay.  Now, so you have some descriptions and

20   Rimini's statements, and then you have acceptable and

21   noninfringing.  What's the fourth column?

22   A.    So the fourth column is my overall conclusion about

23   whether or not Rimini's customers would have gone to these

24   other entities but for Rimini -- I mean, Oracle's customers

25   would have gone to these other entities if Rimini weren't

1    available.

2    Q.    And when you say no in that column, what are you

3    conveying?

4    A.    That these were not acceptable and/or not infringing

5    alternatives.

6    Q.    Okay.  Now what materials did you review in order to

7    do this analysis?

8    A.    I was provided open discovery in the case, so I have

9    a tremendous amount of Oracle and Rimini documents.  That

10   was the primary information that I looked at.

11           There were also analyst reports.  And at times I

12   went online and looked at the companies' websites myself.

13   Q.    All right.  So let's look at NetCustomer.  Why did

14   you conclude no for NetCustomer?

15   A.    This was a company that was offshore, I think we

16   heard that from Mr. Yourdon this morning, which is not

17   considered to be an appropriate business model according to

18   Rimini.  They classify it as dead wrong.

19           But I was also provided additional information

20   that they never had more than five customers, and

21   ultimately they stopped providing any of these support

22   services in October of 2010.

23   Q.    All right.  What about Conexus Partners?  Why did

24   you say no about them?

25   A.    Well, they only offered JDE, and I think there was

1    some debate about whether they even offer EnterpriseOne.

2    They might offer primarily World.

3              But they were not offering a vendor replacement

4    service, they were consultants and affiliates that would

5    work with the company but didn't take over for the vendor.

6    Q.   All right.  What about your no for LegacyMode?  This

7    is another JDE only provider, I guess.

8    A.   That's right.  LegacyMode was very small, and even

9    before Rimini had many JDE customers, it was already out of

10   business.  It went out of business in July of 2007.

11   Q.   What about ContinuServe?

12   A.   ContinuServe was a PeopleSoft offering.  Again, it's

13   not clear that at any level 3 or vendor replacement service

14   intention because Rimini evaluated their service and

15   indicated that they didn't handle tax updates.

16             So with PeopleSoft product that's required.  So

17   it didn't -- it didn't do vendor-level replacement service

18   and wasn't very viable.

19   Q.   All right.  CedarCrestone.  Did you also consider

20   CedarCrestone to be unacceptable infringing alternative?

21   A.   That's right.  Because of the infringement, it was

22   unacceptable.

23   Q.   All right.  And then you also looked at some other

24   issues about CedarCrestone.  You had minor part of its

25   business.

1    Would you explain what you thought of

2    CedarCrestone -- what you concluded about CedarCrestone as

3    a business?

4    A.    There was information available from Rimini and from

5    CedarCrestone themselves, Mr. Simmons was deposed, and they

6    were very consistent in that they indicated that

7    CedarCrestone didn't market the service, they didn't

8    provide it to very many people.

9         There were people they were already providing

10   consultation services for, for the most part, and they

11   stopped doing it after a while.

12   Q.    All right.  Let's talk about the last one then,

13   Spinnaker.  Why do you have a no for Spinnaker?

14   A.    Well, again, this falls into the question of whether

15   it's unacceptable from the customer's perspective.

16        And one thing we've heard a lot about in this

17   trial is how important these systems are.

18        And the common indication that I saw in the

19   documents in the case is that Spinnaker just didn't have a

20   track record and doesn't have an acceptable level of

21   service for making companies feel that they have the trust

22   and the viability.

23        There were a lot of communications about how

24   they were downsizing, and they were having trouble holding

25   management.

1               There were conversations about how they mostly

2     got customers through acquisition, they weren't taking

3     customers away from Oracle directly but from acquiring

4     other companies or acquiring customers when their other

5     providers went out of business.

6     Q.   All right.  When you look at all these providers

7     together, NetCustomer, Conexus, LegacyMode -- oh, let me

8     ask you about -- there's a couple names that came up during

9     the trial, Versytec, Abtech, that didn't even make your

10    chart.  Why is that?

11    A.   Well, I didn't find any evidence that Abtech

12    actually offered this type of service.

13               When I did my research and when I looked at

14    information, it seemed to be only a consulting practice

15    and, in fact, had more to do with -- appeared more to do

16    with hardware than necessarily with offering support.

17               Versytec only supported JDE World, and they were

18    acquired by Spinnaker which, again, when we talk about the

19    number of customers, sometimes it's deceptive because

20    Spinnaker's JDE practice includes that World product which

21    is not at issue in this case.  It's not replacing any of

22    the support services for the customers that I analyzed.

23    Q.   All right.  And so based on your analysis and

24    excluding TomorrowNow for the moment, why do you say that

25    customers would have stayed with Oracle if Rimini Street

1     had not engaged in what we allege are copyright violations

2     and lies to customers?

3     A.     Because when the customer is trying to make an

4     evaluation of who they want to have offer their support,

5     they have to go with a customer that's trusted -- I mean, a

6     company that's trusted because these are very important

7     systems.

8              I think you've heard this a number of times, but

9     if you're running a company, and your payroll system fails,

10    or your inventory system fails, or your ordering system

11    fails, that's not acceptable to the business, it's not

12    acceptable to the company, and the company suffers, and

13    their customers aren't happy.

14    Q.     All right.  Let's look at just a little bit of your

15    analysis that the documents reviewed.  Can we look at slide

16    21.

17             Slide 21 is an excerpt from a document where

18    Mr. Ravin, in May 2006, is writing an email to someone from

19    the *Wall Street Journal*.

20             And he says,

21             "Although we talked extensively about the fierce

22    crosstown rivalry between two friends and former business

23    partners at the respective helms of Rimini Street and

24    SAP/TomorrowNow, and why we are -- we are the only two

25    credible, viable players in the space today."

1797

1    Why does that statement that "we are the only

2    two credible, viable players in space today" relate to your

3    analysis?

4    A.   That's consistent with the research I found that

5    these other customers that are mentioned sometimes

6    miscellaneously in various documents aren't perceived in

7    the market as being important companies that are taking

8    customers away from Oracle.

9    Q.   All right.  If we can look at slide 22, which is

10   from the same document.  Mr. Ravin's again talking to this

11   person from the *Wall Street Journal*.

12   He mentions Conexus Partners, their failure to

13   establish a proven infrastructure, their failure to gain

14   significant traction, their management team page has been

15   taken down.

16   He mentions LegacyMode, how they don't list any

17   management team or personnel, no clients are mentioned on

18   their website, not likely a stable or significant enough

19   infrastructure investment for serious customers to trust.

20   And then also, "We do not consider NetCustomer

21   or any of the smaller companies I mentioned to be serious

22   players, won't garner any significant market share."

23   How does this relate to your analysis?

24   A.   This was very consistent with the other information

25   that was relevant to Conexus, Legacy, and NetCustomer.  So

```
 1    in addition to other information that I looked at, that
 2    informed my opinion that they would not have been
 3    acceptable alternatives.
 4    Q.    All right.  Let's look at slide 23.  This is a
 5    Rimini Street Confidential Private Offering Memorandum,
 6    August 1st, 2007.  So it's a little later in time.
 7                What's a Confidential Private Offering
 8    Memorandum to your understanding?
 9    A.    So, Rimini Street's a private company, and in order
10    to raise funds they have to go to investors, and so they
11    write these offering memorandums essentially selling stock
12    in the company to raise money.
13                And during these documents they usually describe
14    their business model, their competition, their potential
15    success.
16    Q.    So Rimini Street tells potential investors in August
17    1st, 2002, according to industry analyst Forrester
18    Research, there are only two main competitors in the
19    market, Rimini Street and TomorrowNow.
20                That's the same point we were just making
21    earlier when Mr. Ravin was talking to the *Wall Street*
22    *Journal*?
23    A.    That's right.
24    Q.    And one more, slide 24.
25                Now, this document as I understand it, is
```

1799

```
 1    generic -- a general set of email language that was
 2    available to -- that was made available by Mr. Ravin to
 3    other people at Rimini Street.
 4              Is that your understanding of this?
 5    A.    Yes.
 6    Q.    And so there's a discussion of Spinnaker, and it
 7    says, "Well, we have the majority of" -- now, Spinnaker,
 8    again, was only JDE; right?
 9    A.    That's right.
10    Q.    So it says, "Well," we "have the majority of TN JDE
11    employees on a worldwide basis.  They have never been in
12    this business."
13              They're buying people and contracts.  Their
14    management team has zero years of experience.
15              They're counting on a team they brought over to
16    know what they're doing, but they don't even have a
17    vice-president leader.
18              They've got "all the Indians, no chief."
19              "This is a very serious risk for them because
20    they don't understand the nuances of the business."
21              I think it says at the bottom,
22              "Where Spinnaker is literally a 'brand new'
23    company in the market with no track record in this space."
24              Can you explain how this related to your
25    analysis of Spinnaker?
```

1    A.    So, again, this goes to the issue of whether or not

2    Spinnaker was viable in a trustworthy company that people

3    would have been willing to spend money to have support

4    their software when they don't appear to have a credible

5    offering.

6    Q.    All right.  So did you also give consideration to

7    whether, if these Oracle customers left for Rimini, if

8    Rimini had not done what we allege they had done, that they

9    would have said, okay, we'll do it ourselves, we'll go on

10   self-support?

11   A.    I did consider self-support.

12   Q.    And what conclusion did you reach from that?

13   A.    I concluded from looking at the information that was

14   made available to me that self-support was not a viable

15   option for these types of programs.

16   Q.    Why not?

17   A.    Well, the landslide of information in the case has

18   been that it's just too risky, that companies internally

19   don't have the depth of IT experience to manage these

20   programs and support these programs, and they don't --

21   they -- if they take that on themselves, they risk the

22   possibility that those employees might leave and -- or that

23   there may be a catastrophic problem that they can't recover

24   from.

25   Q.    All right.  Is slide 25 on the screen an example of

1801

1     the testimony you reviewed on this point?

2     A.    Yes.

3     Q.    All right.  And how does this testimony relate to

4     your conclusions?

5     A.    So, Hastings Entertainment did consider -- we talk

6     about that word consider a lot, a lot of people consider a

7     rot of things.

8           Hastings Entertainment considered self-support.

9     I'm sure they'd heard about it before, but with a

10    relatively quick evaluation, they realized this was just

11    too risky for them.

12    Q.    All right.  So going back to we have 228 customers.

13    You've talked about the alternatives.  Is it your opinion

14    that none of those 228 customers who -- would have left

15    Oracle but for what Rimini did?

16    A.    No.

17    Q.    Okay.  And why -- so how have -- what have you done

18    in your analysis to permit the conclusion that, yes, some

19    of them still would have left?

20    A.    So while I feel like it's reasonable to conclude

21    from the information that I've seen that none of these were

22    alternatives, I allowed for the possibility that some

23    proportion of them would have left in the same proportion

24    historically that left Oracle.  So I applied Oracle's

25    general attrition rate in all of my analyses.

1802

1    Q.    All right.  Now, let's look at slide 26.  Now, we're

2    back to our analysis.

3          And in the blue bar we've gone from 364 to -- it

4    says 229, it should be 228 customers.

5          So the next step is to determine the last annual

6    amount paid to Oracle.  Would you explain that step?

7    A.    Well, so, step two and three we kind of threw

8    together.

9          Step two is, again, just pulling from the Oracle

10   data what these customers, the 228 customers were paying

11   Oracle the last time they renewed their support, and then

12   we carry that over the period of time they were serviced by

13   Rimini.

14   Q.    All right.  And how did you determine the last

15   annual amount paid to Oracle?

16   A.    Oracle's contract database did have, for every

17   single line item, an amount that was included in their --

18   as their contract pricing.  So it's Oracle's actual last

19   fees paid by that customer.

20   Q.    And you're using that information -- you wanted to

21   use the actual information that the customer had been

22   paying Oracle, and so you went and found that information.

23   A.    That's right.  This is different from some cases.  I

24   don't have to estimate, I actually know what they paid

25   because they were actually Oracle customers.

1   Q.   All right.  Well, let's look on -- so then how you

2   do the calculation in slide 27.  Can you explain the

3   calculation on this slide?

4   A.   So, remember I mentioned earlier that Oracle America

5   provides support.  They do so through their access to

6   Oracle International Corporation's copyrights in this case.

7        So I start with Oracle America's lost support

8   revenue.  I apply the specific attrition for these

9   customers.  When they stopped using Rimini's support, I

10  assume they would have stopped using Oracle's support, and

11  then I further adjust that for the general attrition rate

12  that we've talked about.

13  Q.   Okay.  So let's stop with that first box.  Oracle

14  America lost support revenue, you have an asterisk there,

15  and it says Less Specific Attrition.

16        Okay.  What -- would you explain that to the

17  jury.

18  A.   So, we know something about these customers.  When

19  they stopped and cancelled their Oracle support, they did

20  not stop using their product.  We know exactly how long

21  they used the product because they were paying Rimini to

22  support the product.  So we know that they were using it.

23        But not all of these customers use the products

24  through February of 2014.  Many of them have shorter

25  periods of time.  They stopped using the Oracle product,

1804

1      they stopped getting support from Rimini, and if they had

2      the RP needs they must have changed vendors at that point.

3      Q.    All right.  So you removed customers who

4      specifically changed vendors; is that right?

5      A.    Yes.  I mean, I suppose there's some bankruptcies

6      and other things in there, but for the most part, these

7      were circumstances where we know the customer was using the

8      product up until they finally stopped paying Rimini, and

9      then they are no longer using the product.

10     Q.    All right.  So that specific attrition, what was the

11     effect of that.  Over the damages period, how much did that

12     reduce Oracle's lost revenues that you had been estimating?

13     A.    So if I had taken all of these same 228 customers

14     and priced out their lost support revenues to Oracle for

15     the whole period until February 14th for all of them, my

16     number would have been 25 percent higher than it actually

17     is by stopping them when they stopped their Rimini support.

18     Q.    All right.  So you've reduced the revenue base by

19     about 25 percent here, and now you're going to apply a

20     general retention rate.

21             Is that going to further reduce the revenue that

22     you're estimating Oracle lost?

23     A.    That's right.

24     Q.    Okay.  And what's the general retention rate?

25     A.    So, we know historically, we've talked about this

1805

1    number a lot, I've seen the numbers up on the screen.  It's

2    generally around 95 percent for these products.

3            So when customers decide to stop using the

4    product, they obviously stop their support, and that's what

5    that 5 percent is, the amount of time they stop using the

6    product.

7    Q.   All right.  That takes us to the blue box, Oracle

8    America Adjusted Lost Support Revenue.  You've reduced it

9    by specific attrition and by general attrition.  Explain

10   the blue box.

11   A.   So what's left is the amount of Oracle America

12   revenues that would have been generated through the damages

13   period.

14   Q.   All right.  And then I see that you moved that down

15   to the lower row.  Could you explain what you're doing on

16   the bottom half of this chart?

17   A.   So for the copyright infringement claim, I can only

18   calculate damages for the copyright holder.

19           So I have to look at the relationship between

20   Oracle America and Oracle International Corp who holds the

21   copyright, and they have a revenue sharing arrangement

22   between the two companies.

23           So it's 39 percent of Oracle America's revenue

24   is remitted to Oracle International Corp to pay for the

25   license to have the rights to offer services to its

1    customers.

2    Q.    All right.  So for copyright damages, you're taking

3    the total amount of adjusted lost revenue and only applying

4    39 percent of that; is that right?

5    A.    That's right, the share that the copyright holder

6    would have gotten.

7    Q.    All right.  Let's illustrate this for the jury in

8    slide 28.  Would you explain this illustration?

9    A.    So the two companies that we're concerned with here

10   are Oracle International, the copyright holder --

11   Q.    Say that again.  Oracle international is the --

12   A.    Copyright holder, sorry.

13        And then Oracle America who actually is on the

14   ground performing the service.

15        So if Oracle America has a support contract with

16   the customer that's worth a million dollars, the two

17   companies share that revenue.

18        Oracle America gets 61 percent -- this is the

19   way the contract is between these two companies -- and

20   Oracle International Corporation gets 39 percent as a

21   payment for the copyrights.

22   Q.    So if Oracle America for the support business gets a

23   million dollars, they pay 39 percent of that to Oracle

24   International for the copyrights?

25   A.    That's right.  Oracle International -- that's how

1807

1    Oracle International generates revenue, and so it would

2    recognize revenue of $398,000 on that contract.

3    Q.    All right.  So then let's look at how you calculated

4    the lost support revenue, slide 29.

5    A.    So here's where everyone's eyes glaze over because

6    it's a bunch of math.

7    Q.    Right.  There's a lot of numbers here.

8          Let's see if we can handle this.  Walk us

9    through this slide.

10   A.    So this is the lost support revenue.  It spans the

11   entire period.

12         There's categories down the left we can talk

13   about, and then the individual columns are the individual

14   application products.

15         So, for example, the lost support revenue that

16   was in the first box on the last slide for PeopleSoft is

17   $169 million for these 228 customers.

18         Then, when I take out general attrition, I take

19   out 5 percentish.  We'll see those exact numbers later, and

20   so I remove another $6.9 million from the lost support

21   revenue, and that becomes the base of what Oracle America

22   lost in revenues.  So for PeopleSoft, again, that's 163

23   million.

24   Q.    All right.  Let's just stop there.  This is just

25   what Oracle America lost; right?

1   A.     At that point, yes.

2   Q.     And the specific attrition is built into the first

3   line; correct?

4   A.     That's right.  It's already 25 percent lower than it

5   would be -- I could have made this slide more complicated

6   and started with the gross number.

7   Q.     All right.  And so take us from Oracle America now

8   to Oracle International.

9   A.     So, now here's where we see the revenue sharing.  So

10  the 163 million that Oracle America collects as revenue, it

11  remits 39 percent of that, so I multiply by 39 percent, and

12  the amount Oracle International Corp gets from PeopleSoft's

13  lost support revenue in this period of time is

14  63.6 million.

15           MR. ISAACSON:  All right.  I think, Your Honor,

16  given this is a summary exhibit, I'm told 6002

17  is available.  I'd like to move this into evidence -- this

18  slide as PTX 6002.

19           MR. STRAND:  Your Honor, I object.  It's just

20  expert opinion.  It's hearsay.  It doesn't qualify as

21  admissible evidence.

22           MR. ISAACSON:  Her opinion is admissible

23  evidence.  And if the slide expresses her opinion in a

24  complicated way, it's admissible as her opinion.

25           THE COURT:  A summary is generally admissible

1    when it serves a purpose of specifying and identifying

2    individual information, and I think that that criteria has

3    been met here.  I'm going to admit the exhibit.

4            (Plaintiff's Exhibit 6002 received into

5            evidence.)

6    BY MR. ISAACSON:

7    Q.    All right.  Now, let's go back to your A, B, and C,

8    slide 30.

9            So now for copyright, we finished A.  This is --

10   84.3 million was the number that we had for OIC lost

11   support revenue in the previous slide; right?

12   A.    That's right.  It was the number all the way on the

13   right in the total column.  So that's all three,

14   PeopleSoft, JDE, and Siebel products.

15   Q.    All right.  So this is just for Oracle

16   International.  So let's go to step B.

17           Now, you're going to subtract costs.  Let's look

18   at slide 31.  Explain how you went about subtracting costs,

19   and I should say incremental costs?

20   A.    So, for each Oracle entity they have their own

21   profit and loss statements, income statements, and so I was

22   able to get Oracle International Corporation's, and I

23   looked at their cost structure, and I worked with their

24   accountant to understand what the costs were that might

25   have varied.

1810

1     I don't think that many of these costs would

2   have varied, but in an abundance of caution, I used Oracle

3   International Corporation's actual cost structure and

4   deducted 2 to 13 percent from the damages for potentially

5   increased costs it would have had if Oracle America had

6   continued to service these same customers.

7   Q.    And once you have revenues, and you subtract costs,

8   then you have lost profits; is that right?

9   A.    That's right.

10   Q.    Okay.  Now, if Oracle International's incremental

11   costs are between 2 and 13 percent, does that mean its

12   profit margins were between 87 and 98 percent?

13   A.    Yes, at the gross profit level, that's true,

14   incremental profit level.

15   Q.    Right.  And when we say -- when we talk about

16   incremental costs and incremental profits, does that mean

17   Oracle just keeps all that money and doesn't do anything

18   with it?

19   A.    No.  I mean, one of the reasons why Oracle

20   International is the copyright holder is because they do --

21   Oracle Corporation does research and development.

22     So Oracle International Corp shares in the cost

23   of the massive research and development that builds new

24   products and that builds things like the support patches

25   too.

1    Q.    When you do a lost profits analysis and you look at

2    incremental costs and incremental revenues, you don't take

3    that into account; is that right?

4    A.    That's right.  Oracle Corporation has, you know,

5    16,000 customers on these products.  They're going to do

6    the research and development and the support.

7          These particular 228 customers don't cost Oracle

8    additional dollars in research and development beyond what

9    I've already included here if there were additional costs

10   at the support product line.

11   Q.    All right.  So let's look at slide 32 and sum up

12   Oracle International Corporation's -- the calculation.

13   A.    So we go back to that 84.3, that was the lost

14   revenue for Oracle International Corporation.  Their costs

15   work out for this period of time to be 7.8 million so the

16   damages for Oracle International Corporation for --

17   Q.    I think we have a typo here.  It should say 76.5

18   million at the bottom.  Sorry about that.

19   A.    Yeah, or we could just look at the previous slide,

20   31.

21   Q.    Right.  Right.

22          So the previous slide -- let's look at that, 31.

23          It's hard to go through a multiple-week trial

24   without at least $10 million typo.

25          The bottom line is 76.479 million in the lower

1812

1     right-hand corner; right?

2     A.    That's correct.

3     Q.    All right.  So what we just finished talking about

4     were lost profit damages for support customers for Siebel,

5     JDE, and PeopleSoft; right?

6     A.    Yes.

7     Q.    Okay.  Now, we're going to talk about Oracle

8     Database which is also part of this case because we allege

9     infringement of that.

10          Now, for Oracle Database, tell me what method

11    you used to determine Oracle's -- Oracle Database damages.

12    A.    So, again, this has to do with going back to

13    understanding the allegations and understanding how those

14    allegations affect the business model.

15          So for the applications, Rimini was actually

16    selling support services.  For the database, during this

17    period of time that I studied, Oracle wasn't -- I mean, I'm

18    sorry, Rimini wasn't selling database support to any

19    customers.

20          How they were using the copyrighted material in

21    their business model was that they couldn't actually offer

22    the PeopleSoft, JDE, and Siebel support without having

23    access to Oracle's database, because when they built the

24    local environments, they needed to replicate the whole

25    stack.  I think you guys looked at a chart earlier that

1     showed you that.

2              So they were using Oracle Database as a tool in

3     their ability to offer this separate service, but they

4     weren't charging separately for it.

5     Q.    All right.  And before -- we'll move from slide 32,

6     but before we do, we'll compliment Matt Spalding for

7     adjusting the numbers so quickly to 76.5 million.

8     A.    Thank you.

9     Q.    All right.  Let's move to slide 33 where we're

10    talking about Oracle Database.  Explain how you went about

11    calculating Oracle Database damages.

12    A.    So the losses to Oracle in this case are lost

13    licensing revenues because, as we've talked about, Oracle

14    licenses its customers to use the database.

15             So first they have to understand what price

16    Oracle charges and then how they calculate that price, and

17    there was a wealth of information.

18             Oracle has -- I think it's called the investment

19    summary that tells clients how they calculate prices for

20    these products, and then they have a price list.

21             So I looked at all that.  That got me down to

22    row 3 in terms of figuring out the number of customers

23    benefitting --

24    Q.    Okay.  Well, let's stop there and pick up the pieces

25    of that.

1814

1    Slide 34, this relates to Oracle Database's

2    actual pricing for its licenses; is that right?

3    A.    That's right.  Oracle has a global price list for

4    its products, and I turned to the page that had database

5    products on it.  This is a price list from December 14th,

6    2007.

7    I looked at the Oracle Database products, and I

8    highlighted enterprise edition as that's the product that

9    was being used by Rimini.

10   Q.    Okay.  Which one is the price there?

11   A.    So it's a little difficult to read, but they have

12   two pricing structures, an end user and a processor

13   license.

14   And my understanding from looking at the

15   investment guide was that this would be a processor

16   license.

17   These amounts in this processor license column

18   are actually dollars, so the 30,000 that I have highlighted

19   is the price per processor that a customer would pay to buy

20   Oracle Database.

21   Q.    So that was the price list on December 14th, 2007.

22   Let's look at slide 35 which is dated December 18th, 2008.

23   Did the price go up?

24   A.    Yes, for the duration of time that I looked at

25   Oracle's price list, this is the one time that I saw the

1815

1    price change.

2    Q.    All right.  And after December 18th, 2008, and

3    through the time period you were estimating damages, did

4    the price increase about 47,500 after that?

5    A.    No.

6    Q.    All right.  So now, you've got the price.  Let's

7    look at slide 36 which -- it looks very complicated.  Can

8    you explain how this fits your analysis.

9    A.    So when we talk about the price, that's the price

10   per processor because Oracle's practice is to price their

11   product based on the computing power that's using the

12   database.  So large customers that are using a lot more

13   computing power pay more for their Oracle Database license.

14   Q.    All right.  And how do you figure out from this how

15   to -- what the right price is?

16   A.    So for Rimini's actual installations of Oracle

17   Database, they provided me a lot of specific information.

18   They provided me every instance that they have available

19   that was associated with a customer.

20            So I can actually see the customer.  If you look

21   at that sort of top pulled-out section on the far

22   right-hand side, you can see that this is Bausch and Lomb,

23   and they have four Oracle Database environments for Bausch

24   and Lomb.

25            To figure out how to price it, I deal with the

1816

1    second line, the server configuration, the processor type,

2    the CPUs and cores, and that software investment guide gave

3    me a formula.

4              So essentially I apply that formula to this

5    information, and it tells me how many multiples to charge

6    of the 40,000 or the 47,500.

7    Q.    All right.  So let's go back to our chart, slide 37.

8    So now we've got step one, Oracle Database's license -- the

9    actual price list, and we have the hardware configuration,

10   and now we're moving to number 3, number of Rimini Street

11   customers benefitting.

12   A.    And so there were 72 customers that were in that

13   data that was provided me.

14   Q.    Now, when you say 72 customers, that's 72 different

15   customers who were on -- who had Rimini Street environments

16   running Oracle Database, and that was a stipulated number

17   amongst the parties?

18   A.    That's correct.

19   Q.    Okay.  And did some customers -- some of those 72

20   customers have more than one environment?

21   A.    Yes, like the example we saw, Bausch and Lomb had

22   four.  It wasn't that unusual to have multiple

23   environments.  I think there were over 180 on the list.

24   Q.    Okay.  Now, why did -- why did you use the Rimini

25   server configuration to price the license?  Why not use

1817

1     some other configuration?

2     A.    Well, what I've been trying to measure is the actual

3     damage, and that's based on the actual use.

4           So Oracle's policy is to price their database

5     license based on where the product is actually installed.

6     So this would be the same method that Oracle would use for

7     any customer.

8     Q.    Okay.  And why is there a license fee per customer?

9     Why not just one licensee fee to Rimini Street?

10    A.    Well, again, this goes to the Oracle pricing

11    guidelines.

12          If Oracle were just to allow a customer to pay

13    for one product, or one installation, and yet benefit

14    hundreds of other companies, then Oracle wouldn't have much

15    of a business model.

16          They need to charge a license for their software

17    to each customer that's going to gain a benefit from that

18    software.  So I used the 72.

19    Q.    So I'd have a pretty good business if there were

20    only -- if I could just take in thousands of customers and

21    just pay one license fee.

22    A.    That's right.  So this is the way in which Oracle

23    sort of meters it.  They meter it based on each company

24    paying for their company's use.

25    Q.    All right.  Did only 72 Rimini customers benefit

1   from Rimini's use of Oracle's database software?

2   A.    No, that's not my understanding.

3   Q.    Okay.  But did you determine a price or damages -- a

4   price of licenses or damages for any additional customers

5   other than those 72?

6   A.    No, I did not consider or try to determine a price

7   for customers that -- where environments, other customer's

8   environments were used for another customer's benefit.

9   Q.    All right.  So let's go to slide 38, and let's

10  calculate the Oracle Database damages.

11        We looked at the licenses, the 40,000 and

12  47,500.  Would you explain the support figure?

13  A.    Just like the applications that we talked about

14  before, when you have an Oracle Database license, you have

15  the ability to upgrade, to add patches, fixes, and that's

16  priced at 22 percent annually of the original license fee.

17  Q.    All right.  Would you explain item two, one to six

18  processors.

19  A.    So, again, that's based on the Rimini hardware

20  configuration for where these environments had actually

21  installed Oracle Database.

22        I took the largest installation, which is also

23  consistent with Oracle's practices when a company has

24  multiple installations.

25  Q.    All right.  We talked about the 72 customers.

1    So number 4, now you're subtracting, as I

2  understand it -- oh, no, I'm sorry, that's the lost

3  revenue, 20.2 million, and then you're going to subtract a

4  number to get to 19.2 million.  What happened there?

5  A.    Well, so just to clarify, so the 20.2 million is the

6  accumulation of the license revenue and the support revenue

7  for the period of time that the environment -- from the

8  time the environment was built until the customer stopped

9  getting the application support.

10    So very possibly Rimini still has that Oracle

11  Database environment, but I stopped the math, and that's

12  why it's 20.2 million, or it would be much, much larger at

13  the time when Oracle -- I mean, Rimini stopped collecting

14  application support revenues from these customers.

15    And then it drops from --

16  Q.    And just to interrupt you, you're saying you didn't

17  actually investigate whether Rimini still has this stuff or

18  how long they had the Oracle Database, you just stopped it

19  when they stopped using the related environment?

20  A.    I stopped it when they stopped receiving revenues

21  from customers on that application.

22  Q.    Right.

23  A.    So if Bausch and Lomb had stopped in 2010, I

24  wouldn't charge a database license support fee past that

25  time period.

1    Q.    Okay.  And then you subtracted a number to get to

2    19.2 million.  What did you do there?

3    A.    So, again, we're in Oracle International

4    Corporation.

5              I talked to Oracle personnel.  They said that

6    there would not have been any incremental costs to

7    licensing Rimini for this business.

8              But, again, in an abundance of caution, I put a

9    5 percent amount in.  So I took out 5 percent of the

10   revenues to cover any potential incremental costs.

11   Q.    All right.  Now, in your opinion, if Rimini and

12   Oracle had been required to negotiate the fair market value

13   of a license for Rimini's use of Oracle Database, if Rimini

14   had actually had to pay when Rimini first launched, what

15   amount would Rimini have paid to Oracle?

16   A.    So, if this were measured as a hypothetical license

17   between the two companies when they negotiated, I believe

18   that they would have negotiated for this amount, the

19   19.2 million.

20             And the reason that I believe that is because

21   Oracle's software investment guide and price list is there

22   for any customer to see and use, and this is exactly how

23   Oracle would price it.  So that's sort of Oracle's side of

24   the negotiation.

25             And then on the Rimini side of the negotiation,

1    I understand Mr. Ravin testified in his deposition that

2    if -- you know, if he's not covered by his claims in this

3    case or his defenses in this case, that he would pay the

4    commercial price that any customer would pay.

5                 MR. ISAACSON:  All right.  Your Honor, at this

6    point we're going to begin another calculation, if this

7    would be a good breaking point.

8                 THE COURT:  Good time for a break, and I have no

9    problem with that.

10                Ladies and gentlemen, we'll take our second

11   break, 15 to 20 minutes, again, depending on when you're

12   ready.

13                And same admonitions apply.

14                You may go ahead and step down.

15                COURTROOM ADMINISTRATOR:  Please rise.

16          (Recess from 11:57 a.m. until 12:23 p.m.)

17          (Jurors enter courtroom at 12:23 p.m.)

18                THE COURT:  Have a seat, please.

19                The record will show that we're reconvened

20   following the second break and in open court.  The jury's

21   all present.

22                And, Mr. Isaacson, go ahead, please.

23                MR. ISAACSON:  Good afternoon, Your Honor.

24   BY MR. ISAACSON:

25   Q.   Good afternoon, Ms. Dean.

1822

```
1              Let's explain where we were, the category of

2     damages.

3              So we looked at this before when we talked about

4     the category of damages.  Now, at this point, we've talked

5     about lost support customers and profits for Oracle

6     International and the lost database; correct?

7     A.    That's correct.

8     Q.    All right.  Let's move over to this category on the

9     right, Infringer's Profits, Revenue on Support Services.

10             What is -- and this is -- what is this last

11    element of Oracle's copyright infringement damages that you

12    have as infringer's profits based on revenues?

13    A.    So, in a copyright infringement claim there are a

14    number of different remedies available.

15             When I measure lost profits, that's, of course,

16    an available remedy.  If there are customers that Oracle

17    didn't experience lost profits for, or that I haven't

18    included in my measurement of lost profits, the law allows

19    the recovery of infringer's profits.

20    Q.    That's your understanding, in any event?

21    A.    Absolutely.  That's my understanding of why I would

22    do that calculation.

23    Q.    The -- now, in terms of the infringer's profits, we

24    talked about the 228 customers that you had lost profits

25    for.  Are you calculating infringer's profits for those
```

1823

1    customers?

2    A.    No.

3    Q.    Okay.  What set of customers are you calculating

4    infringer's profits for?

5    A.    So if we think back to the pie chart, there were

6    certain categories on the pie chart that would be

7    appropriate for infringer's profits.

8    Q.    Okay.  All right.  Now, let's look at how you went

9    about calculating the money that was earned by Rimini for

10   those other customers.

11         Can we look at slide 40.  All right.  Can you

12   explain to us what we're looking at?

13   A.    Yes.  Rimini made available to me during the

14   discovery of the case, I guess produced to all parties and

15   then sent to me, monthly revenue recognition accounting

16   documents, and they were laid out by customer.

17         So what I did was I took the customers that I

18   had included in infringer's profits, and I used this

19   document to accumulate all of the revenues that Rimini has

20   recognized for them from start of their service period

21   until it either ended or February of 2014.

22   Q.    All right.  So you added up the actual numbers

23   earned by Rimini according to their records for that other

24   group of customers.  Is that what you did?

25   A.    That's correct.

1824

1    Q.    All right.  So let's look at slide 41.

2              Here you've got the profits, revenues, customers

3    not -- for the customers not included in lost profits

4    broken down by category.  Would you explain this.

5    A.    Yes, and just to be clear, the segments of the pie

6    that weren't included in lost profits, Not Oracle America

7    Relicensed and No Oracle Cancellations are the categories

8    that go into infringer's profits.

9              I don't claim infringer's profits for JDE World

10   or for most of those others.  There were two small in

11   others that I kept in with the rest.  Remember, we talked

12   about, it was just a naming convention so they don't go

13   into this calculation.

14             So all I've done here is I've accumulated

15   Rimini's revenues for just that smaller group of customers

16   by product line.

17             MR. ISAACSON:  All right.  Your Honor, this

18   slide summarizes a large amount of underlying calculations.

19   I would move it in as PTX 603 as a summary of her opinion

20   with respect to -- 6003 with respect to her opinion.

21             THE COURT:  Mr. Strand?

22             MR. STRAND:  Same objection, Your Honor.

23             THE COURT:  All right.  The Court will make the

24   same ruling.  The summary is useful for purposes of

25   summarizing some rather complicated and complex basis.  It

1825

1       is admitted.

2               (Plaintiffs' Exhibit 6003 received into

3               evidence.)

4       BY MR. ISAACSON:

5        Q.    All right.  Let's look at slide 42.

6               So now we're to the point where we can give your

7       opinions about the copyright damages as a whole; is that

8       correct?

9        A.    That's correct.

10       Q.    Okay.  Would you explain slide 42.

11       A.    So on this slide and the next few slides we'll look

12      at, I've taken all the numbers that we've talked about and

13      I've just put them by product each on one page.

14              So this is PeopleSoft's damages.  The top row is

15      the actual damages, measured as the lost support customers,

16      $57.7 million.

17              And the second row is Rimini's infringer's

18      revenues for just those customers that have PeopleSoft that

19      aren't already claimed under the Oracle's lost profits.  So

20      that's 28.4 million.

21              The two together would be total damages for the

22      PeopleSoft product of 86.1 million.

23       Q.    Okay.  So like it says in the upper right-hand

24      corner, PeopleSoft, this is the copyright damages that you

25      estimate for just the infringement of the PeopleSoft

1826

1  copyrights.

2  A.  That's right.

3  Q.  All right.  The next slide says Oracle Database.

4  That's what we were looking at right before the break, the

5  19.2 million?

6  A.  That's right.

7  Q.  That's your estimate of the license that would have

8  been paid.

9  A.  Right, either measured as actual damages so a lost

10  license profit to Oracle International Corp, or measured in

11  this other hypothetical negotiation, either one, would be

12  19.2 million.

13  Q.  All right.  Then we -- the next slide is JD Edwards.

14  So this adds up to 7.1 million; is that correct?

15  A.  That's right.  JD Edwards was a much smaller part of

16  their business.

17  Q.  Okay.  And the next slide, slide 45, is Siebel, that

18  adds up to 15.9 million?

19  A.  That's right.

20  Q.  All right.  Then slide 46, this is your summary of

21  the copyright damages?

22  A.  Right.  So here, I've taken that information and

23  just put it on one page to make it easier, you can see how

24  it totals.  All the amounts are broken down, and then the

25  total for all these products is 128.3 million.

1827

```
 1              MR. ISAACSON:  All right.  I would move slide 46
 2   at PTX 6004 for the previously stated grounds.
 3              MR. STRAND:  Same objection.
 4              THE COURT:  Same ruling.  And the objection will
 5   be viewed as continuing.
 6              MR. STRAND:  Thank you, Your Honor.
 7          (Plaintiffs' Exhibit 6004 received into
 8          evidence.)
 9   BY MR. ISAACSON:
10   Q.   So now we've concluded the discussion of copyright
11   damages, so let's talk about interference damages.
12              Let's look at slide 47.  I think you've
13   previously said that you start with trying to understand
14   the allegations.
15              Can you give us your understanding of what
16   Oracle's alleged Rimini Street did as it relates to
17   interference with Oracle's customer relationships?
18   A.   Yes.  Just as a general matter, it was the
19   misrepresentations that Rimini Street made to its
20   customers, and then its improper access to Oracle's
21   websites.
22   Q.   And, again, you're not here as a damages expert to
23   give an opinion about whether those allegations are true,
24   you're here to assist the jury in the event that they
25   decide those allegations are true?
```

1828

1       A.      That's right.

2       Q.      All right.  So this one -- let's look at your method

3   for here, and let's look at something that looks familiar,

4   slide 48.

5       A.      Fortunately, we're getting to the repetitious part.

6   Because the wrongdoing also affected the same support

7   contracts, I used the same method.

8       Q.      All right.  Repetition is good.  That means we've

9   already done it.

10      A.      Yes.

11      Q.      All right.  So for calculating interference damages,

12  you're using the same method, but you're going to apply it

13  to the interference question; right?

14      A.      That's right.

15      Q.      Okay.  So let's look at slide 49.  We looked at this

16  before.  And explain how this relates to the interference

17  damages.

18      A.      So the interference damages are going to affect both

19  Oracle International and Oracle America because Oracle

20  America is a plaintiff in the claim for interference

21  damages.  They actually do the work related to the support

22  contract with the customer.

23              So in the interference damages with all the same

24  customers we talked about before, instead of just taking

25  the 39 percent, I get to take the whole calculation into

1829

1    account.

2    Q.    Okay.  So now we're going to look at both Oracle

3    America and Oracle International's damages for the

4    interference equation, and you said for the same customers.

5            For the interference estimates, did you look at

6    the same group of 228 customers reduced from 364?

7    A.    I did.

8    Q.    Okay.  All right.  So let's look at slide 50.  We

9    looked at this before, and it was admitted into evidence so

10   the jury would be able to see it.

11           And explain now how this relates to the

12   interference damages.

13   A.    So, when we do the same calculation that we talked

14   about before, the Oracle America revenues are now relevant.

15           Before we just used them as a tool to get to

16   Oracle International Corp's, but now we actually use the

17   Oracle America's revenues to calculate damages and the

18   Oracle International Corp's to calculate damages.

19   Q.    All right.  So which line has the interference

20   damages?

21   A.    So, the 216 million would be the total revenue that

22   both companies would benefit from.  They still have to

23   split it out because they have different cost structures,

24   so I have to deduct their costs separately in order to get

25   the real number we're looking for which is lost profits.

1    Q.    Okay.  And you have done that cost calculation and

2    reduced it for the costs; correct?

3    A.    That's right.

4    Q.    Okay.  So let's look at slide 51.  Is this a summary

5    of the interference damages that you have estimated?

6    A.    That's right.  So when I take the 216 million, and I

7    take out the costs for each company independently, it's

8    194.1 million, and you can see -- we've talked about this

9    slide before, you can see the breakdown of the three

10   application products.

11           MR. ISAACSON:  All right.  I would move slide 51

12   into evidence, as a summary of her opinion, as 6005 for the

13   grounds I stated before, Your Honor.

14           THE COURT:  All right.  It will be admitted, and

15   the objection will be.

16           COURTROOM ADMINISTRATOR:  Do you want it 4 or 5?

17           MR. ISAACSON:  Four is next?  Let's do it 6004.

18           (Plaintiffs' Exhibit 6005 received into

19           evidence.)

20   BY MR. ISAACSON:

21   Q.    All right.  Now, when we were talking about the

22   category of damages, there's something called computer

23   fraud, and we'll talk to the jury about that in closing

24   argument, but you estimated damages for that.

25           That relates to the automated downloading; is

1    that correct?

2    A.    That's correct.

3    Q.    Now, slide 52, would you explain what you did to

4    determine Oracle's damages related with computer fraud

5    allegations, and maybe start with the simple amount, the

6    27,000.

7    A.    The second line, Oracle's Investigation Costs?

8    Q.    Yes.

9    A.    Okay.  Those were calculated at 27,000 because those

10   are labor costs for actual Oracle employees for short

11   durations of time in November, December of 2008 and January

12   of 2009, when they were investigating why the computer

13   systems were stalling or deadlocking.

14   Q.    And you actually calculated that.  How did you do

15   that?

16   A.    I was provided information from Oracle as to the

17   individuals who were involved in the investigation, what

18   their salaries were, and how many hours they spent working

19   on the investigation.

20   Q.    People like Mr. Renshaw?

21   A.    Exactly.

22   Q.    All right.  Now, let's go up to the lost support

23   customers.  There's two numbers here.  What is the higher

24   number, 34.9 million?

25   A.    So, these are Oracle's losses from lost support

```
 1    customers for Siebel, and that's the total amount of lost

 2    profits for the Siebel customers that Rimini had under the

 3    assumption that the business model for Siebel was

 4    completely developed on the back of these automated

 5    downloads and the library and the mass downloading.

 6              So if the jury were to find that that's the

 7    conclusion as to what the computer fraud damages are, it

 8    would be 34.9 million.

 9    Q.    All right.  So if the evidence shows that the

10    automated downloading was the basis on which they built

11    their Siebel business, then your opinion would be the

12    $34.9 million would be appropriate?

13    A.    That's right.

14    Q.    Okay.  And are those the -- the Siebel customers,

15    those are the customers for Siebel that were included in

16    your previous calculations?

17    A.    That's right.

18    Q.    You used the same methods but just applied it to

19    just the Siebel?

20    A.    That's right.

21    Q.    Now, let me ask you about the 14.4 million, but let

22    me show you a piece of testimony.

23              Now, you were here when Christian Hicks

24    testified, I believe?

25    A.    Yes, I was.
```

1833

1    Q.   Now, he was the one who testified about the

2    automated downloading, and he was asked which customer IDs

3    were ultimately used as part of this KM crawl, that was the

4    crawl that he was discussing, and he listed the IDs for

5    specific customers.

6              And did you go to your lost profits calculations

7    and add up the lost profits that you estimated for those

8    specific customers?

9    A.   I did.   In some cases, they're not in the lost

10   profits so I didn't add anything, but in the instance that

11   I was already claiming lost profits for them, they

12   accumulate to that $14.4 million.

13   Q.   All right.   So that's how you got 14.4 million.

14             If the jury were to conclude that the

15   appropriate measure of damages for the automated

16   downloading would relate to the customers whose IDs were

17   used, your opinion would be the damages should be

18   14.4 million for that?

19   A.   That's correct.

20   Q.   Okay.   So let's summarize.   Slide 54.

21             We looked at this before at the beginning when

22   we started.   So can you summarize, having gone through the

23   analysis, what we're looking at here?

24   A.   Okay.   So it's probably best to start with the

25   middle of the document.   So the allegations are all laid

1834

```
 1    out, and the total amount of damages, both actual damages

 2    and infringer's profits, for example, for the copyright

 3    infringement claim are listed here.

 4              So for copyright infringement the total damages

 5    are 128.3 million, for interference, 194.1 million, and

 6    computer fraud either the 14.4 million or 34.9 million

 7    depending on what your assumptions are.

 8              Now, we talked about -- a little bit how many of

 9    these have the same lost support customers in them, so if

10    you clean all of them up, if you award all of them, then

11    you only want to maximize the award at 245.9 million or

12    else it would be too much money involved.

13    Q.   And explain why this duplication that you had to

14    weed out?

15    A.   So as we talked about the -- we used the same

16    customers for the copyright infringement, interference, and

17    for the portion of lost support in the computer fraud.

18    They're just different accumulations of those customers.

19              So once I take out any overlap of the customer,

20    so it only gets counted once, then it's 245.9.

21    Q.   All right.  And the computer fraud number, with the

22    exception of the $27,000, the 14.4 to 34.9 million, either

23    one of those numbers would duplicate figures that are in

24    the interference damages; is that right?

25    A.   That's right.  The same plaintiffs are for the
```

1835

1   computer fraud as the interference, so it's the same

2   calculation.

3   Q.    Right.  So if the jury were to conclude we're

4   entitled to interference damages and computer fraud

5   damages, we would not get both of those figures?

6   A.    That's right.

7   Q.    Okay.  Now, in addition to giving --

8         MR. ISAACSON:  I would move -- this slide 54 as

9   PTX 6005 for the previously stated reasons, and I imagine

10  subject to the same objection.

11        MR. STRAND:  Indeed.

12        COURTROOM ADMINISTRATOR:  There seems to be some

13  confusion.  So I have slide -- I apologize for this.  I

14  don't want to get too out of order.

15        MR. ISAACSON:  I'm sure it's our fault.  I'm

16  sure it's our fault.

17        COURTROOM ADMINISTRATOR:  Because they are not

18  marked.

19        MR. ISAACSON:  Right.

20        COURTROOM ADMINISTRATOR:  I have 51 as PTX 6004.

21        MR. ISAACSON:  Right.

22        COURTROOM ADMINISTRATOR:  And PTX 6003 is slide

23  41.

24        MR. ISAACSON:  Yes.

25        COURTROOM ADMINISTRATOR:  And 6002 is what

1836

1    slide?

2              MR. ISAACSON:  I believe it is -- I'm coming to

3    it; 29.  Yes, 29.

4              COURTROOM ADMINISTRATOR:  So those are the only

5    ones that have been admitted.

6              MR. ISAACSON:  Slide 46.  And then we should

7    make 46 -- slide 46 is 6004.

8              COURTROOM ADMINISTRATOR:  Okay.  So 46 is PTX

9    6004.

10             MR. ISAACSON:  Yes.

11             COURTROOM ADMINISTRATOR:  51 is 5.  And 54

12   should be 6.  Correct?

13             MR. ISAACSON:  Right.

14             COURTROOM ADMINISTRATOR:  I'm sorry, Your Honor.

15             THE COURT:  No problem.  I think we have it

16   straightened out.

17         (Plaintiff's Exhibit 6006 received into

18         evidence.)

19             MR. ISAACSON:  We appreciate that.

20   BY MR. ISAACSON:

21   Q.   Now, in addition to those calculations where you

22   added up all those damages, you did those same calculations

23   for copyright infringement and interference customer by

24   customer; isn't that right?

25   A.   That's right.

1837

```
 1    Q.    Hopefully you have PTX 5469 in your binder.
 2    A.    Yes, I do.
 3    Q.    All right.  Is this a schedule you prepared?
 4    A.    Yes.
 5    Q.    All right.  Is this based -- there's a number of
 6    columns here for lost -- copyright lost profits and
 7    interference lost profits and non-overlapping lost profits.
 8    Are those all taken from schedules to your report?
 9    A.    Yes, they are.
10    Q.    All right.  And does this summarize a great deal of
11    information that was analyzed and collected?
12    A.    Yes, it does.
13    Q.    All right.  And this represents the -- your -- this
14    is the same opinion on damages that you've been giving for
15    copyright and interference, but it's customer by customer
16    now; is that right?
17    A.    That's correct.
18          MR. ISAACSON:  All right.  I would move into
19    evidence PTX 5469.
20          MR. STRAND:  Same objection, Your Honor.
21          May I approach the bench?
22          THE COURT:  Yes.
23       (Sidebar conference held as follows:)
24          MR. STRAND:  Your Honor, I'm not going to
25    restate my objections to those.
```

1838

1           This gives the false appearance in detail which

2   does not actually exist.  These are just schedules out of

3   an expert witness report which are historically nothing but

4   hearsay and not admissible in evidence.

5           This gives the wrongful indication that she has

6   done a customer-by-customer analysis of causation.  She has

7   not.

8           So we have a great deal of detail here which

9   displays nothing.  I think it gives a false impression to

10  the jury, it's misleading, it's hearsay, it's 403, it ought

11  not to come in.

12          MR. ISAACSON:  That's inaccurate.

13          All right.  So, first of all, it's an accurate

14  summary of her opinions, and all this detail is taken off a

15  schedule to her report.

16          And this is her estimates for damages for each

17  of these customers, and our evidence and her opinion is

18  this business is entirely built from the beginning on

19  copyright infringement and lies, and that accounts for

20  every last one of these customers.

21          This business does not exist without what we

22  have shown has happened.

23          MR. STRAND:  Obviously we vigorously disagree

24  with that.  The bottom line, your Honor, is it's still her

25  opinion, it's still inadmissible hearsay.

1839

1        I've never ever been able to get an opinion in

2   from an expert witness.  This is just like putting in her

3   written opinion.  That's the basis of my objection.

4        We're way over the line already with the

5   previously admitted summary exhibits he's got in.  Now

6   we're getting into the actual, actual detailed schedules.

7        He says they're schedules.  That's a further

8   reason they ought not to be coming into evidence.

9        MR. ISAACSON:  Everything she says is an

10  opinion.  This is a summary exhibit of her opinions that

11  will be of assistance to the jury.

12       If they start to argue you shouldn't consider

13  this customer or this group of customers, the jury will

14  have in front of them her opinions on the lost profits

15  damages and the interference damages for customer by

16  customer.

17       MR. STRAND:  And what that does, Your Honor, is

18  subtly attempt to shift the burden of proof in this case.

19       It's critical that the Court understands that it

20  is their job to prove customer by customer for 364

21  customers that what they say is true that the infringement

22  caused that customer to leave, or the misrepresentation

23  caused that customer to leave, or that the database

24  abuse -- I mean, the website abuse caused that customer to

25  leave.

1       They simply cannot make that proof, and they are

2   trying to give the impression to the jury that they have.

3   They have not.

4           MR. ISAACSON:  We have resoundingly met that

5   burden of proof.  We have shown through the early

6   customers, the pilot customers, the referral customers,

7   that all of them are based on copyright infringements, and

8   we have shown that all of these lies were standard messages

9   to all of the customer's from the get-go.  This business

10  doesn't exist without it.

11          Now, if they want to start to pick off some of

12  those customers in their defense, this schedule will be of

13  assistance to the jury.

14          MR. STRAND:  And that's my whole argument on the

15  shifting of burden, Your Honor.  I think you probably heard

16  more than you want to hear.

17          THE COURT:  I have.  That I can tell you.

18          But I'm going to admit it and give a limiting

19  instruction.

20          MR. STRAND:  Thank you, Your Honor.

21      (Sidebar conference concluded.)

22          THE COURT:  Ladies and gentlemen, as you've

23  certainly been able to see during the course of Ms. Dean's

24  testimony, there's been several exhibits that the Court has

25  admitted as summaries.

1    When I admit these exhibits as summaries, they

2 are not being admitted for the truth -- what we call the

3 truth of the matter asserted.  In other words, they're

4 admitted to show what her calculations are and what they're

5 based on.

6    It will ultimately be up to the jury to reach

7 the factual determination what are the damages in this

8 case, what is involved that makes up those damages, and to

9 the extent that these charts or summaries assist you, that

10 is why they are being admitted.  But they are not

11 substantive evidence of the damage itself.

12    You're hearing the witness testify because of

13 her study and her qualification in this as you deem it --

14 let me step back a point.

15    You've heard several what we call expert

16 witnesses, and Ms. Dean is certainly such a witness.

17    You consider an expert witness's testimony under

18 the same criteria as you consider any other witness's

19 testimony.  And you'll have an instruction to that effect

20 at the end.

21    These exhibits are only admitted for the purpose

22 of assisting you in understanding her testimony.  They are

23 not proof that this event occurred or that event occurred.

24 They are only being offered as a summary to help show upon

25 which her opinion is based.

1842

```
 1              And you will decide concerning the evidence in

 2   this case and the evidence from each witness.  Those are

 3   functions that are exclusively reserved for the jury.

 4              So I am admitting this exhibit, Plaintiffs'

 5   5469, because it is such a summary.  It is not being

 6   admitted for the truth of the matter asserted.

 7              For example, if it states that X company

 8   suffered X amount of damage, that's only to explain why --

 9   how she reached these numbers she's presented to you.

10              Whether you make such a finding, or you feel

11   that those kind of numbers, or if there's liability or all

12   of the questions that are submitted to you at the end of

13   the case support that or don't support that, those are the

14   decisions that are ultimately made by the jury.

15              So I make these comments in the interest that it

16   helps to understand the summaries that have been admitted

17   into evidence, and we have -- this is the last of the

18   summaries, well, I don't know if it's the last --

19              MR. ISAACSON:  It's the second to last, Your

20   Honor.

21              THE COURT:  But I can tell you that we have --

22   this will be the sixth one that is admitted, and the

23   numbers from those I'm sure counsel will be referring to in

24   the course of the case and final statements, I would

25   assume.
```

1   So with that stated, Mr. Isaacson, you may go

2   forward.

3   MR. ISAACSON:  All right.  And then one last

4   exhibit.  Well, actually, yeah, let's show the jury what

5   this looks like.

6   BY MR. ISAACSON:

7   Q.   Again, this is a summary of your opinions; right?

8   A.   That's right.

9   MR. ISAACSON:  And at the top there's a column

10  for copyright lost profits.  Can you make that bigger,

11  Matt?  To pick up the customer names over on the left.

12  There you go.

13  BY MR. ISAACSON:

14  Q.   All right.  So customer by customer you've indicated

15  the product line and you've -- based on your opinions and

16  the analysis that you've described, this is the amount of

17  copyright lost profits for each customer, the interference

18  lost profits for each customer, and then the nonoverlapping

19  lost profits so that you don't have that duplication.

20  A.   That's correct.  That's how you would read across.

21  Q.   And this is just the same methods that you've been

22  talking but applied customer by customer.

23  A.   That's right.  I did the analysis customer by

24  customer, obviously, and in the presentation we build it

25  up.

1844

```
 1    Q.    All right.  PTX 5470, which should be in your
 2    binder --
 3    A.    Yes, it is.
 4    Q.    Is this a summary of your analysis of infringer
 5    revenues which you talked about, that other group of
 6    customers and the profits that Rimini earned customer by
 7    customer?
 8    A.    Yes, it is.
 9              MR. ISAACSON:  All right.  So I would move 5470
10    into evidence subject to the continuing objection.
11              MR. STRAND:  Subject to the same objection, Your
12    Honor.
13              THE COURT:  It is admitted, and my limiting
14    instruction would apply to this as well.
15              (Plaintiffs' Exhibit 5470 received into
16              evidence.)
17    BY MR. ISAACSON:
18    Q.    All right.  And so let's -- 5470, just so we
19    understand what it is, this is customer by customer, and
20    you have infringer revenues.
21              And let's pick up a little -- let's go down a
22    little farther so we get some of the -- there we go.
23              So over on the right you've got some zeros and
24    you've got some numbers, and just explain -- remind the
25    jury what you said about infringer revenues.
```

1   A.      So, in the instance that you award lost profits,

2   those customers get calculated in the lost profits Other

3   schedule that we just admitted.

4           In this schedule I've given you for each

5   customer their Rimini revenues, that's the infringer's

6   revenue column, the third column over, and then what amount

7   I included in the calculation of lost profits that I did.

8           So, for example, for Access Intelligence, it's a

9   JDE product line, Rimini made $78,775 off it, but there's

10  nothing in the last column because Access Intelligence is

11  already accounted for as a lost support customer for

12  Oracle.

13          So the way that you could use the schedule is

14  if, for some reason, you didn't think that Access

15  Intelligence should be in lost profits, then that 78,775

16  slides over into that excluded customer on this infringer's

17  profits.  They work together.

18          MR. ISAACSON:  Thank you.  I have no further

19  questions.

20          THE COURT:  All right.

21          0cross-examination.

22          MR. STRAND:  Thank you, Your Honor.  I'll get

23  organized.

24          May it please the Court?

25          THE COURT:  Yes, go ahead, please, Mr. Strand.

1846

CROSS-EXAMINATION

1   BY MR. STRAND:

2   Q.    Good afternoon, Ms. Dean.  How are you doing?

3   A.    Good, thanks.

4   Q.    It's been a while.  It's good to see you again.

5         I'd like to turn with you -- well, let's start

6   with this.  We talked a little bit with Mr. Isaacson about

7   the two plaintiffs in this case, Oracle America and Oracle

8   International Corp.  Right?

9   A.    Yes.

10  Q.    And if we call them OA and OIC, will that work for

11  you?

12  A.    Yes, you can call them that.  I'm probably going to

13  end up calling them the name just because that's how I've

14  been referring to them.

15  Q.    I learned OA.  You learned Oracle America.  We'll

16  sort it out.  I just don't want to confuse the jury.

17        Oracle America -- I'll try.  That company has

18  the actual contract with the customers in this case;

19  correct?

20  A.    That's the company that's providing support

21  services.

22  Q.    Right.  And they're the ones that are losing the

23  profits from the support services if that customer leaves

24  to go to Rimini or someplace else; correct?

1847

1    A.    Well, not the only company that's harmed by that.

2    Q.    In the first instance, they're losing the money.

3    A.    They're losing their ability to provide support

4    services to that customer, but Oracle International

5    Corporation is also losing money.

6    Q.    Right.  But, in the first instance, OIC, Oracle

7    International, doesn't get money either; correct?

8    A.    I don't know if that's correct, but in this

9    particular calculation, that's how the math is working out.

10   Q.    And Oracle America does not own the copyrights in

11   this case; correct?

12   A.    They license them, that's correct.

13   Q.    From Oracle International; correct?

14   A.    That's correct.  Oracle International is the

15   copyright owner.

16   Q.    And to be clear, Oracle America is not making a

17   copyright infringement claim in this case; correct?

18   A.    I think you may be asking me a legal question?

19   Q.    All right.  Then I'll withdraw that question.

20         To be clear, you're not calculating damages for

21   copyright infringement for Oracle America in this case;

22   correct?

23   A.    That's right.  They're only Oracle International

24   Corporation damages.

25   Q.    And then Oracle International Corp is the company

1848

```
 1    that actually owns the copyrights that we're here about

 2    today; correct?

 3    A.    Yes.

 4    Q.    And Oracle International Corporation does not have a

 5    contractual business relationship with the customers;

 6    correct?

 7    A.    I think you might be asking me a legal question.

 8    I'm not sure I know the answer to that.

 9    Q.    Okay.  They don't provide services to customers;

10    correct?

11    A.    For these particular customers, no, they don't.

12    Q.    Right.  So they don't provide the service and the

13    customer pays them direct, it comes through Oracle America;

14    correct?

15    A.    That's how the money flows, yes.

16    Q.    I think that's what you described earlier; right?

17    A.    That's how the money flows, yes.

18    Q.    Now, let me ask you a question.  Had Rimini Street

19    not infringed, would there be any interference damages in

20    this case, Ms. Dean?

21    A.    Well, I think Rimini's misrepresentations is a

22    separate claim.  So I think if Rimini could make

23    misrepresentations and create a business that could have

24    convinced these customers to take support from them, then

25    there likely would be a claim.
```

1     Q.     And all the misrepresentations were about the

2     copyright infringement; correct?

3     A.     I don't think that's correct.

4     Q.     Now, you've calculated lost profits for both Oracle

5     America and Oracle International Corp; correct?

6     A.     Yes.

7     Q.     And you agree that Oracle's actual damages relating

8     to Oracle's copyright infringement claim may be measured as

9     lost profits or, based on the facts of this case, a more

10    appropriate measure of damages may be Rimini Street's value

11    of use of the copyrighted software and support materials;

12    correct?

13    A.     It may be.

14    Q.     But you calculated damages in this case for JDE,

15    PeopleSoft, and Siebel based on lost profits and not value

16    of use; correct?

17    A.     That is not entirely correct.

18    Q.     Well, that's what you opined to the jury; correct?

19    A.     That's right.  The presentation to the jury was

20    about lost profits.

21    Q.     Okay.  And that's true even though you thought that

22    the value of Rimini's use was a more complete remedy for

23    Oracle in this case; correct?

24    A.     I believe in my report I say it may be a more

25    complete remedy.

1850

1   Q.    Now, let's look, if you would, please, at -- and I

2   don't have the number on it.  It's the but-for slide,

3   please.

4              You recall this in your -- I'm sorry.  Yeah,

5   that will be the best -- if you've got it in your notebook,

6   that's the best place to look at it or on the screen.

7   Either place.  Whatever you're more comfortable with.

8              This is -- and I don't have the numbers on my

9   slide, so if you want to take a moment to find it, that's

10  fine.

11             You talked here about Oracle lost profits on

12  lost support customers, the measurement.  This is your

13  basic calculation; right?

14  A.    That's right.

15  Q.    And I want to focus in on one phrase that you used

16  that I want to make sure I'm clear on.  But for.  You see

17  that?

18  A.    Yes.

19  Q.    In completing your work in this case, what

20  definition of "but for" did you use, Ms. Dean?

21  A.    Well, the purpose of the analysis is to determine

22  what Oracle's business would have looked like but for

23  Rimini's actions.  So that's what I did.

24  Q.    So how would Oracle have looked if Rimini hadn't

25  done what Oracle complains about in this case; correct?

1    A.    That's correct.

2    Q.    All right.  Thank you.

3          Now, I want to talk for just a moment about

4    automated downloads, I haven't seen you here every day.

5    Were you here -- I think you were here during Mr. Hick's

6    testimony?

7    A.    I was.

8    Q.    Okay.  Let's look just briefly at some of his

9    testimony just so we can kind of frame -- I'm going to talk

10   about automated downloads for a minute.

11         Do you remember -- let's look at 1194, 11 to 15.

12         Do you remember when Mr. Hicks was asked, "is it

13   correct that you have no evidence that Rimini Street was

14   running its knowledge base scan program other than in those

15   three months?"

16         And he answered, "I think that's right.

17   November through end of January.  I believe that's correct,

18   yes."

19         Do you recall him giving that testimony?

20   A.    Yes.

21   Q.    And you recall that the years he was referring to

22   were November of 2008 through January of 2009; correct?

23   A.    I believe that's correct.

24   Q.    Those three months; correct?

25   A.    Yes.

```
 1    Q.    Okay.  And then you recall that it went on, at 1194,

 2    16 through 23, the question was asked, "I'd like to make

 3    one thing clear.  You are not -- you don't have the opinion

 4    that Rimini caused physical harm to Oracle's servers; is

 5    that right?"

 6              And he said, "I don't."

 7              Do you recall that testimony?

 8    A.    Yes.

 9    Q.    And then on that same day Mr. Renshaw testified.

10    Let's look at 1128, 8 to 10.  Do recall Mr. Renshaw, he had

11    the lovely British accent?

12    A.    I'm not sure, I didn't see Mr. Renshaw in person.

13    Q.    Oh, you missed him.  Okay.

14              Let's look at 1211, 8-10 -- do have that?

15    A.    I'm sorry.  Is that an exhibit I'm supposed to be

16    looking for?

17    Q.    No, she's going to get it up on the screen in just a

18    moment.  We're looking at the trial transcript.  I can do

19    many things, but I can't get it in the notebook that fast.

20              And they asked Mr. Renshaw, Mr. Dykal, my

21    colleague, asked Mr. Renshaw, "Got it.  And for how long

22    was the system unavailable to anybody who wanted to access

23    it?"

24              Actually, I don't think it was Mr. Dykal, I

25    think it was Ms. Dunn.
```

1    But, in any event, the question was asked, "And

2  for how long was the system unavailable to anybody who

3  wanted to access it?"

4    And he said, "So probably about four and a half

5  hours."

6    Do you recall that?

7    Well, you've not seen that testimony, but we'll

8  recall it.

9    And then he went on at 1219 4-7, line 4, and

10  then the question was asked, "Just to clarify, there was no

11  permanent damage done to Oracle's servers by Rimini Street;

12  correct?"

13    And the answer, "There was no physical damage to

14  the servers."

15    You didn't see that, but now you've seen it.

16    Let me ask you a few questions.

17    In your analysis of the damages in this case,

18  you did not find that any customer left Oracle and went to

19  Rimini because Oracle's computer crashed; isn't that

20  correct?

21  A.    That was not an analysis I did.

22  Q.    You didn't do that?  So you don't have any opinion

23  on that?

24  A.    No.

25  Q.    You didn't talk to any customer that left or got

1854

```
1    unhappy or anything like that; correct?
2    A.    Are you talking about because of the --
3    Q.    Because of the crash.  Because of the crash.
4          Excuse me.  I apologize.
5          You didn't talk to any customer that left
6    because the computer crashed; correct?
7    A.    That's correct.
8    Q.    All right.  Now, reflecting on the testimony you
9    just gave, you said Oracle seeks $27,000 in investigation
10   costs; correct?
11   A.    That's correct.
12   Q.    And Oracle seeks between 14.4 million and
13   34.9 million in lost profits because the computer crashed
14   because of the downloads; correct?
15         Well, let me ask you this.  Is it downloads or
16   the computer crash?
17   A.    I don't think that's entirely correct.
18   Q.    All right.  Well, that's what I want to get clear.
19         You said they lost between 14.4 and
20   34.9 million?
21   A.    For the computer fraud claim, that's correct.
22   Q.    Okay.  What do you understand the computer fraud
23   claim to be?
24   A.    My understanding is that their -- the allegation is
25   that Rimini used automated tools to massively download from
```

1855

1     Oracle's servers and caused harms.

2     Q.    And the three months that Mr. Hicks and Mr. Renshaw

3     testified about were November of 2008 through January of

4     2009.  Correct?

5     A.    Yes.

6     Q.    Okay.  Now, if you would look for me, I don't have

7     it for a slide, and we can switch if you want, but if you

8     would look for me at the bar chart that you have in your

9     notebook that you went through with Mr. Isaacson just a few

10    moments ago, slide 18.

11              Now, as I understand this --

12              MR. STRAND:  Is there any way we can switch back

13    to Matt so we don't leave the jury behind?

14              Your Honor, if we could switch back.

15              Could you put up the bar chart slide?

16              Oh, she's going to switch.  Okay.  Thank you

17    very much.

18    BY MR. STRAND:

19    Q.    Now, you'll agree with me the red line represents

20    Siebel clients; correct?

21    A.    That's correct.

22    Q.    And there could have been no way that the Siebel

23    clients that Rimini obtained in 2006, 2007, and the first

24    10 months of 2008, could have related in any way to the

25    massive downloads that were made in November, December, and

```
1    January of 2008, 2009; correct?
2    A.    I'm not entirely sure that the massive downloads in
3    those three months are the only basis for the computer
4    fraud claim.
5    Q.    You don't know when the downloads were made, do you?
6    A.    That would be Mr. Hicks.
7    Q.    Okay.  And you don't know -- there were 11 people --
8    there were 11 customer IDs on that one slide that was in
9    the deck that you just referred to.  You don't know when
10   those 11 IDs were used, do you?
11   A.    I don't recall when -- if Mr. Hicks testified about
12   that.
13   Q.    Okay.  Now, let's talk a little bit about lost
14   profits.
15         Your opinion is that customers left Oracle and
16   became Rimini's clients because of Rimini's misconduct
17   alleged in this case; correct?
18   A.    That's correct.
19   Q.    And you conclude that but for Rimini's conduct,
20   applying the definition you gave, those customers would not
21   have left Oracle; correct?
22   A.    With the adjustments that I made for assumed
23   attrition, yes.
24   Q.    Sure.  Thus, had Rimini not engaged in the
25   misconduct, you believe Rimini's customers would have
```

1857

1     stayed at Oracle, continued to pay for maintenance and

2     support services provided by Oracle; correct?

3     A.    For the 228 customers less the general attrition,

4     that's correct.

5     Q.    Okay.  Now, let's look at the slide from your deck

6     that talks about your work steps.  Information reviewed.

7               MR. STRAND:  Oh, we have to switch back.  I

8     promise I won't do that very often.

9     BY MR. STRAND:

10    Q.    You recall this slide; right?

11    A.    Yes.

12    Q.    All right.  Now, the -- and I won't repeat all of

13    these.

14               There's one thing I noted when I looked at this

15    that isn't on there.  You never spoke to any former Oracle

16    customer about the work you did in this case; is that

17    correct?

18    A.    That's correct.

19    Q.    You read a lot of documents; correct?

20    A.    That's correct.

21    Q.    And some of those related to customers; correct?

22    A.    Documents and depositions, that's correct.

23    Q.    And the 17 depositions that Mr. Yourdon talked about

24    this morning?

25    A.    That's correct.

1858

1    Q.    Okay.  But you never talked to a flesh-and-blood

2    Rimini customer, any of those 364; right?

3    A.    That's correct.

4    Q.    Okay.  So why don't you get in front of me -- in

5    front of you your exhibit -- it's just introduced as a

6    summary Exhibit 5469.

7              MR. STRAND:  I promise only one more time,

8    Dionna.

9    BY MR. STRAND:

10   Q.    You remember this was just admitted into evidence?

11   A.    Yes.

12   Q.    All right.  And there are 229 customers on there,

13   but with the deletion that you made today, there are 228

14   that count in this case; correct?

15   A.    That's already adjusted for the 228.

16   Q.    Okay.  It's already adjusted.  I'm sorry.  I stand

17   corrected.  228 customers; right?

18   A.    Right.

19   Q.    And you didn't talk to any of them?

20   A.    That's right.

21   Q.    Okay.  So you don't know whether that customer ever

22   spoke to Rimini Street, correct, any of those 364

23   customers?

24   A.    I assume they had spoken to Rimini Street.

25   Q.    But you don't know as you sit here that those folks

1859

<pre>
 1    ever spoke to anybody at Rimini Street, do you?
 2    A.    I think it would be a reasonable conclusion given
 3    that they were licensed customers and Rimini Street was
 4    supporting them.
 5    Q.    You don't know whether the customer made its
 6    decision to leave Oracle before or after speaking to Rimini
 7    Street, do you?
 8    A.    Well, for the 17 customers, they clearly left due to
 9    Rimini Street and price.  So I don't have specific evidence
10    on the other 200 and -- whatever that would be.
11    Q.    228 less 17?  I hesitate to get into a mathematical
12    battle with a CPA so I'll just leave it at that.
13              The 17 that you're referring to are the folks
14    that you read their depositions; right?
15    A.    That's correct.
16    Q.    And it was your conclusion reading those depositions
17    they made the decision to leave Oracle after speaking to
18    Rimini; is that correct?
19    A.    Well, they would need a vendor to go to, so it's my
20    understanding that they made the decision to leave to go to
21    Rimini after they knew about Rimini.
22    Q.    Well, let me ask you about that.  Pitney Bowes was
23    mentioned earlier this morning in Mr. Yourdon's testimony.
24    Do you recall that?
25    A.    Yes.
</pre>

1860

1     Q.    And as I understand it, Pitney Bowes made the

2     decision to leave to do self-support for a year before

3     going to Rimini.  Do you recall that testimony?

4     A.    I do recall that.

5     Q.    So it's pretty clear that probably Pitney Bowes did

6     not talk to Rimini before leaving Oracle; correct?

7     A.    It is correct.

8     Q.    Okay.  And you don't know how many of the rest of

9     these 228 customers likewise talked to Oracle -- excuse me,

10    talked to Rimini after deciding to leave Oracle, do you?

11    A.    I don't know.  The -- in the case of Pitney Bowes,

12    the damages wouldn't start until they went to Rimini

13    though.

14    Q.    You don't know what the customer said to Rimini in

15    the course of any conversation that they have -- had, do

16    you?

17    A.    That's right, I haven't seen any evidence about that

18    in this case.

19    Q.    And you don't know what questions the customers

20    asked Rimini, do you?

21    A.    I depend on Ed Yourdon, for example, his testimony

22    was pretty clear about what customers consider.

23    Q.    What customers consider, but he didn't have any

24    direct evidence of what the customers asked other than the

25    17 depositions; correct?

1861

1   A.   I think that's correct.

2   Q.   And you don't know as you sit here today what Rimini

3   Street said to the customers, do you?

4   A.   I don't have specific communication, but, of course,

5   we listened to the testimony of Mr. Maddock who talked

6   about what Rimini's frequently asked questions responses

7   were, for example, and I saw many documents in the case

8   that had similar types of scripts like the one that was in

9   my testimony with respect to Mr. Ravin.

10  Q.   But as you sit here today, you don't know what was

11  said on what day to which customer, do you?

12  A.   That's correct.

13  Q.   You also don't know the factors that each of those

14  228 customers considered in making their decision to leave

15  Oracle and go to Rimini, do you?

16  A.   That's correct.

17  Q.   And, finally, you don't know the factors that those

18  228 customers actually concluded were the deciding factors

19  in making their decision to leave Oracle and go to Rimini,

20  correct, Ms. Dean?

21  A.   Yes.  If you're asking about each individual

22  customer, that evidence has not been provided in this case.

23  Q.   Now, look with me at Exhibit 5466, if you would,

24  please.

25          COURTROOM ADMINISTRATOR:  PTX?

1862

```
 1               MR. STRAND:  Excuse me.  PTX.  And we need to
 2     switch back.  PTX 5466.  It's the 1006 summary that was
 3     introduced through Mr. Allison.
 4               And could you switch us?
 5               And as soon as I say I won't do it again, I will
 6     so I'm not going to make any promises.
 7     BY MR. STRAND:
 8     Q.    All right.  Let's look at Mr. Allison.  Time flies.
 9     I think it was last Monday.  Friday or Monday.  Were you
10     here for his testimony, Ms. Dean?
11     A.    I believe some of it.
12     Q.    Okay.  Let's look footnote number 1 down there at
13     the bottom.  Do you remember his testimony that there were
14     12 Siebel customer licenses, and he lists the names, that
15     notwithstanding a diligent search, Oracle was unable to
16     locate?
17     A.    Yes.
18     Q.    Okay.  Now, it's correct, Ms. Dean, that you were --
19     that in your damage calculations you have calculated
20     damages for at least 10 of those customers on this page and
21     the next page of the document; correct?
22     A.    I'm not sure what you mean by this page and the next
23     page of the document.
24     Q.    Okay.  I'm sorry.  Show her page 2.  Fair question.
25               Second page is JD Edwards, first page is Siebel.
```

1863

```
 1    There are 12 people listed on the first page and two listed
 2    on the second page, and my question is this:
 3              Looking at those two pages, you're still
 4    calculating as part of your damage base damages for about
 5    10 of those customers; correct?
 6    A.    I don't know.
 7    Q.    Okay.  You don't know.  You have no reason to
 8    believe you're not doing that; correct?
 9    A.    Well, I could easily look.
10    Q.    I know, but we won't take everybody's time to do
11    that.  We'll work that out later.
12              Now, you watched customer videos, or -- did you
13    read the depositions or watch the videos or both?
14    A.    I've seen some videos here in the courtroom.
15    Q.    And did you read Mr. Yourdon's report?
16    A.    I did.
17    Q.    And you were here this morning for his testimony;
18    right?
19    A.    Yes.
20    Q.    Okay.  I want to talk a little bit about customer
21    attrition/retention, kind of two heads of the same coin.
22    A.    Okay.
23    Q.    Okay.  You'll agree with me that each year Oracle
24    loses some of its maintenance and support customers;
25    correct?
```

1    A.    I'll agree with that.

2    Q.    And I believe the number 95 percent, because it's

3    not absolutely precise for every product line for every

4    year, but 95 percent seems to be about the right number

5    that stay, and 5 percent leave every year; correct?

6    A.    Well, I would classify it as 95 stay and 5 cancel

7    their contracts.

8    Q.    Five cancel their contracts.  That's fine.

9          So every year -- and you're also aware that the

10   maintenance and support agreements between Oracle and its

11   customers renew each year; correct?

12   A.    In general.

13   Q.    Generally speaking.  About 16,000 customers --

14   14,000 customers; correct?

15   A.    About 14,000.  Well, I don't know.

16   Q.    Okay.

17   A.    Different amounts at different times.

18   Q.    All right.  I've heard 14,000, I've heard 10,000 for

19   PeopleSoft and JDE, but I'm trying to get -- about 5

20   percent of those cancel each year; correct?

21   A.    About 5 percent of them do not support -- do not

22   renew their support, that's right.

23   Q.    So every -- every year Oracle has to go out and

24   re-earn the right to continue to provide maintenance and

25   support service for those customers, correct?  Because they

1865

1    have the right to say thanks, we're done?

2    A.    Well, I would imagine they're living out the whole

3    year.  It's not like they just go out the last two days and

4    try to renew them.

5              But, yes, Oracle works throughout its year to

6    keep customers.

7    Q.    Keep customers.  But they've got to earn those

8    customers year after year after year, it's not a one-time

9    for-life kind of deal; correct?

10   A.    Yeah, Oracle's customers are not locked in for

11   support.

12   Q.    So there's no guarantees that those customers are

13   going to come back every year; correct?

14   A.    There is no guarantee.

15   Q.    Now, you did an analysis of Oracle's customer

16   retention from 2006 up to early 2014; correct?

17   A.    That's correct.

18             MR. STRAND:  All right.  And that one has been

19   in evidence or in front of the jury.  So let's pull that

20   one up, if we could, please, Marie.

21   BY MR. STRAND:

22   Q.    This looks a lot like a demonstrative based upon

23   your analysis, correct, Ms. Dean?

24   A.    It looks like it, yes.

25   Q.    Okay.  And while it says -- I thought I had your

1866

```
1    reference on it.  But this is the analysis that --
2    basically the results of the analysis that you did showing
3    what percentage of customers Oracle retained year over
4    year; correct?
5    A.    For support renewal, yes.
6              MR. STRAND:  Okay.  And then we could present it
7    another way.  It's been done another way.  Let's look at
8    that next slide.
9              Can we darken that up, or is that all we got?
10   BY MR. STRAND:
11   Q.    All right.  So about 94 to 96 percent stay, and
12   about 5 to 3 percent, 6 percent, cancel their contracts
13   ever year; correct?
14   A.    Is this a merge of all three products?
15   Q.    It's kind of a merge of all three products so it's
16   not so busy.
17   A.    Okay.
18   Q.    Does that look fair to you?
19   A.    I think that sounds fair.
20   Q.    All right.  Now, looking at this Rimini Street made
21   its first sale to a client in 2007; isn't that correct?
22   A.    I think -- did they have clients in 2006?  No, they
23   just announced in 2006.  You're right.  They don't have a
24   client until 2007.
25   Q.    Correct.
```

1    Okay.  As far as you know -- well, were you here

2    for Ms. Ransom's testimony on Tuesday?

3    A.    Some of it, yes.

4    Q.    All right.  Let's all get on the same page.  Let's

5    look at 1318 beginning at line 7.

6         I asked her, "Looking at this JD Edwards

7    attrition, this was calculated by an expert working with

8    Oracle," you didn't know you had already started in the

9    case, "JD Edwards' retention rate was from 91 percent up

10   through 96, 95 percent.  Do you see that?"

11        She says, "Yes, 91 percent in 2006."

12        Then it goes on, let's just go down to the next

13   Q and A.  Beginning at line 12.

14        "Has it been your experience that somewhere

15   about 95 percent of the people are retained, 95 percent of

16   the customers are retained every year going all the way

17   back to the mid-1990s?"

18        And her answer, "Yes, I would say so."

19        Do you see that?

20   A.    Yes, I do.

21   Q.    You don't have any reason to disagree that the

22   historical attrition rate has been in that 95 -- excuse me,

23   historical retention rate has been about in that 95 percent

24   range; correct?

25   A.    That's correct, although I would say one caveat, and

1    that's the information I was provided was based on revenue,

2    not a customer count.

3        Q.    Let's talk a little about that.  That's a good

4    point.

5              You did your analysis on how many dollars were

6    up for renewal and how many dollars cancelled; correct?

7        A.    That's right.  That was Oracle's methodology.

8        Q.    And that 95 percent that you come up with is the 95

9    percent of dollars that stayed rather than cancelled;

10   right?

11       A.    When they were up for renewal, that's right.

12       Q.    Right.  So that the numbers were dollars, not

13   people.

14       A.    Right.

15       Q.    But on average, on average you could equate the

16   retention rate in dollars to people, couldn't you, to

17   customers?

18       A.    Well, I think you would need to be careful that you

19   were -- I can understand the mathematical way that you

20   could do that, but I think you would need to be careful to

21   know what the average customer is for the amount that is

22   available to renew and the amount that chose to be cancel.

23       Q.    But you testified in your deposition, didn't you,

24   Ms. Dean, that you could equate the retention rate in

25   dollars to customers?

1    A.    I think you and I were discussing a hypothetical

2    circumstance where you told me to assume there were 10,000

3    customers, and couldn't I divide it, and I said yes.

4    Q.    Okay.  I'm going to do that now.  You're ahead of

5    me.  The witness is leading counsel.

6              If you have 10,000 JDE -- or, excuse me, JDE and

7    PeopleSoft customers, say just 10,000, you've heard that

8    number, I think it's in your report?

9    A.    No, that was the number that was disclosed in 2005

10   when --

11   Q.    When they were acquired.

12   A.    -- Oracle bought PeopleSoft.  But I don't know how

13   relevant that number is to any other period.

14   Q.    And it's probably pretty close to that in 2006,

15   wouldn't you think?

16   A.    I don't know.

17   Q.    Okay.  So if we take 6 percent of 10,000, how many

18   customers do we end up with?

19   A.    600.

20   Q.    Or 500 if we end up with 5 percent?

21   A.    Yes.

22   Q.    Okay.

23   A.    I'm not sure what you meant by how much do we end up

24   with, but applying the percentage against the total.

25   Q.    You can agree with me that there was no year that

1870

1    Rimini obtained so much as five or 600 PeopleSoft and JDE
2    customers; correct?
3    A.    Not during the time period that I was analyzing,
4    that's correct.
5    Q.    Now, just so we kind of set framework, again, you
6    talked about this with Mr. Isaacson, but the damages period
7    that you've calculated damages for begins in 2006; correct?
8    A.    For any customer that left to go to Rimini in this
9    2006 which we just decided didn't happen.
10   Q.    Didn't happen.
11         So we've got -- but it's 2006 to 2014 is the
12   damage period for activities that occurred between 2006 and
13   late 2011, early -- excuse me, late 2011; correct?
14   A.    That's right.
15   Q.    Okay.  Cool.
16         Now, you can't look at any information that you
17   have available to you from Oracle and determine how many of
18   the 6 percent of PeopleSoft customers who left Oracle in
19   any given year went to Rimini; correct?
20   A.    I'm not sure I'm following your question.
21   Q.    Sure.  Is there any information that you have that
22   you can look at and say that of the customers that left
23   Oracle in a given year, how many of the 6 percent that left
24   Oracle went to Rimini?
25   A.    Well, I know how many went to Rimini because I have

1871

1    that from Rimini's records.  I don't know how Oracle would

2    necessarily know that.

3    Q.    Okay.  What about the rest of the 6 percent of the

4    customers, 5 or 6 percent of the customers that would leave

5    Oracle, do you have any way of knowing where they went if

6    they didn't go to Rimini?

7    A.    Yes, I do.

8    Q.    Did you analyze that?

9    A.    Well, I saw evidence in the case with respect to

10   that.  The vast majority of them don't use the software.

11   They're not going anywhere.  They're cancelling support

12   because they're not using the licensed software.

13   Q.    The one thing we know, though, is that all customers

14   that left Oracle in a given year did not go to Rimini;

15   correct?

16   A.    They didn't go anywhere.  There were -- some

17   customers went to Rimini, some customers might have gone to

18   TomorrowNow or CedarCrestone that are not acceptable

19   alternatives.  But most of the customers don't go anywhere,

20   they just cancel support because they're not using the

21   software.

22   Q.    I don't want to parse words with you.  Not all of

23   the customers that cancel with Oracle sign a contract with

24   Rimini; correct?

25   A.    I would agree with that.

1872

1    Q.    And the ones that didn't just stop using the

2    software had to do something; correct?

3    A.    If there are customers that kept using the software,

4    they would have to do something.

5    Q.    And the software's been described as

6    mission-critical; correct?

7    A.    That's correct.

8    Q.    So a big company can't just wake up one morning and

9    say "we don't want to use enterprise resource planning

10   software today so we'll just shut off the switch."  They

11   can't do that; right?

12   A.    That's my understanding.

13   Q.    They have to make some kind of plan.

14   A.    That's my understanding.

15   Q.    And that's a fairly expensive and involved decision

16   process; correct?

17   A.    Yes.

18   Q.    And these companies that tend to use the ERP

19   software, many of them are very large and very

20   sophisticated; correct?

21   A.    Yes.  I would assume that customers of this would be

22   primarily large, but I've seen evidence in the record that

23   medium and even some small-sized companies may use it.  It

24   depends on what type of program they're using.

25   Q.    Right.  And, of course, if you're a smaller company,

1    it's a significant expenditure just as well, maybe smaller

2    dollars; right?

3    A.    As a proportion of the budget, I don't know.  I

4    heard Ms. Ransom testify that the ERP software isn't a

5    substantial portion of an IT budget.

6    Q.    Now, I want to talk a little bit about why do

7    customers go and where do they go.  How about that, okay?

8    A.    Okay.

9    Q.    Were you here for Ms. Catz's testimony on Monday

10   afternoon?

11   A.    Yes, I believe I was.

12   Q.    Okay.  Let's refresh our recollection a little on

13   that, 949, beginning at line 13, please.  And we'll just go

14   down to 18.

15         The question was asked of Ms. Catz -- you know

16   Ms. Catz; right?

17   A.    I do.

18   Q.    You met with her as a part of your interview process

19   in connection with the work you did in this case; correct?

20   A.    I did.

21   Q.    Okay.  So you know she's a CEO.

22   A.    I'm aware of that.

23   Q.    Okay.  So she was asked, "Based on your experience

24   as CEO of Oracle, do you think that Rimini's customers

25   would have stayed with Oracle but for Rimini Street's

```
 1    conduct?"
 2             Her answer, "The vast majority of our customers
 3    stay with us if they're using the software.  If they go
 4    bankrupt, obviously, then they go away."
 5             Do you recall her testifying to that?
 6    A.    Yes.
 7    Q.    Now, look with me, if you would, please, at
 8    Exhibit 161, DTX 161.  This was admitted during
 9    Ms. Ransom's testimony.
10             Do you have that in front of you?
11    A.    I do.
12    Q.    That's up on the board now in front of us.
13             I believe if I -- well, in your expert report,
14    let's go back there for a moment, you were kind enough to
15    provide a list of documents that you had considered in
16    connection with your work in this case; correct?
17    A.    Yes, that's correct.
18    Q.    And you considered a lot of documents; right?
19    A.    That's right.
20    Q.    All right.  And as I recall looking at your exhibit
21    to your report, and I've got it back here if you want to
22    look at it, it's way at the back, schedule 3, you -- you
23    received Exhibit DTX 161 from Oracle; correct?
24    A.    I'm not sure, but I would -- I would say yes because
25    I received all the depositions, and I can see there's a
```

1    stamp.  This was definitely shown to a couple of deponents.

2    Q.    Okay.  So you considered this then as a part of your

3    analysis of damages in this case; is that correct?

4    A.    Yes.

5    Q.    And it wasn't cited in your report, you didn't feel

6    it was important enough to cite in your report apparently;

7    correct?

8    A.    If you're representing to me it wasn't cited in my

9    report, I can understand that, but the report is 190 pages

10   long so I don't recall.

11   Q.    Okay.  Fair enough.  About 400 footnotes?

12   A.    That's correct.

13   Q.    Okay.  Let's look at Defendants' Exhibit -- DTX 161,

14   if we could, please.  Look with me at page 6 or slide 6 of

15   that exhibit.

16         Do you recall looking at this as a part of your

17   analysis, that list of true cancellation types?

18   A.    Not specifically, but this is not dissimilar to

19   other information that I looked at.

20   Q.    And I'm not going to go down all these.  But this

21   gives -- based upon all the documents that you looked at in

22   this case, this gives us a sense of all the various reasons

23   why Oracle customers might say they cancelled their Oracle

24   maintenance and support service; correct?

25   A.    I suppose it could fall under no customer response,

1876

1    but I seem to recall a lot of documents which just say

2    "unknown" at the bottom.

3    Q.    Sure.  Kind of miscellaneous.  We don't know why

4    they cancelled their service.

5    A.    That's right.  These cancellations depend on

6    communications from the customers.  So they may not have

7    any idea.

8    Q.    There's bankruptcy.  Why don't we highlight that.

9    Right in the middle, that Ms. Catz mentioned, if they went

10   bankrupt, obviously they cancel; right?

11   A.    I would assume so. I don't know.  Could be the

12   reason.

13   Q.    Yeah let's look at slide 9 of that document if we

14   could, please.

15            We had some conversation -- I had some

16   conversation with Ms. Ransom about this.  Were you here for

17   that?

18   A.    I think so.

19   Q.    And the NA column over there, three over from the

20   right, see that, that's North America, that's the one we're

21   focused on; right?

22   A.    That's right.

23   Q.    And the bankruptcy percentage in North America at

24   the time of this document which was in September of 2008

25   was how much?

1877

1     A.     This document shows 2.69 percent.

2     Q.     Let's look at Move to Support Competitor, up there

3     second from the top.  Do you see that?

4     A.     I do.

5     Q.     And what's the percentage that moved to a support

6     competitor?

7     A.     This is listed at 12.38 percent.

8     Q.     Right.  Let's look at DTX 164, which was also a

9     Ransom deposition exhibit and something we talked about

10    with Ms. Ransom on whatever day we talked to Ms. Ransom on

11    that first page.

12           Look down at the bottom.  You'll see the exhibit

13    sticker.  So you know from that that you received this

14    document and you considered it as part of your analysis of

15    damages' in this case; correct?

16    A.     That's correct.

17    Q.     All right.  Let's look at slide 4 of that document,

18    if you would, please, ma'am.  Do you have that in front of

19    you?

20    A.     I do.

21    Q.     And I apologize for the quality of the reproduction

22    of it, but it's about 4 or 5 generations old.

23           You see up there there's Q2 2009 on the

24    left-hand side?

25    A.     I see that.

1878

1    Q.    And looking down on the Q2 cancellation status code,

2    do you see what the percentage of bankruptcies was, people

3    who said they cancelled because of bankruptcy?

4    A.    It says 1 percent.

5    Q.    And looking over there at the -- or looking down at

6    the slice of pie that's at the bottom, it's very dark, can

7    you see how many moved to a support competitor?

8    A.    It says 9 percent.

9    Q.    Okay.  And then let's look at Q3 '09 cancellation

10   status code.  What's the percentage of bankruptcies?

11   A.    It says 1 percent.

12   Q.    And what's the percentage that moved to support

13   competitors?

14   A.    It says 10 percent.

15   Q.    So if we look at -- let's put up the next slide.

16   This is a graphic that appeared in my colleague's opening

17   statement.

18            Can you put that up?  Thanks.

19            So of the customers that leave -- that cancel --

20   they're getting me squared away -- their contracts with

21   Oracle, about 88 percent choose other options, and we've

22   just looked at what some of those options are, correct?

23   A.    Well, I think all we've done is look at the

24   bankruptcy option.  All of these pies have a lot of other

25   considerations.

1879

```
 1    Q.    Right.  And I'm trying to get done today.  I don't
 2   know if we're going to make it or not.
 3              But we can look around those and see what the
 4   other options were; correct?
 5    A.    That's right.
 6    Q.    And about 12 percent, 10 or 12 percent, appear to go
 7   to Rimini or someplace else for a third-party service
 8   provider; correct?
 9    A.    Well, I think that -- my review of these documents
10   and one reason that I don't deal with them in my analysis
11   is because those customers are primarily going to
12   TomorrowNow.
13    Q.    Even as late as 2009?
14    A.    They close in the October of '08, but fiscal year
15   '09 starts in '08.
16    Q.    So I believe that -- and the record will be clear, I
17   believe they were closed in the summer of 2008, and it's
18   your testimony they were continuing to go to TomorrowNow
19   after TomorrowNow was closed?
20              MR. ISAACSON:  Your Honor, objection, the record
21   is actually October 2008.
22              MR. STRAND:  October.  That's correct.  I was
23   going to get that slide.
24   BY MR. STRAND:
25    Q.    So your testimony is they continued to go to
```

1880

1    TomorrowNow up until the last moment, October of 2008?

2    A.    Well, I know that TomorrowNow had a lot of customers

3    and that customers were going with them because -- I don't

4    know if I can say this or not.

5    Q.    Okay.

6    A.    Probably not.

7    Q.    Okay.  Now, you'll agree with me that customers

8    decided to cancel their maintenance and support agreements

9    with Oracle for a variety of reasons; correct?

10   A.    I would agree with that.

11   Q.    Let's look at what Ms. Ransom told us on -- when she

12   testified, 1339, 19 through 21, please.

13         She said, "At the end of the day, each customer

14   that leaves Oracle leaves for a different reason; correct?"

15         And she said, "Yes."

16         Do you agree with that?

17   A.    Well, I doubt they all leave for completely

18   independent reasons.  I mean, you can make the pie chart.

19   There's about six reasons.

20         But I think the accumulation of evidence that

21   I've seen in the case is they stop renewing support

22   primarily, and you could add up a lot of these pies for

23   this position, which is they are not using the software.

24         Either they never implemented it to begin with,

25   they've decided to transition off, they were bought by a

1    bigger company that uses a different software, or they were

2    swept into that company's licensing, they went bankrupt.

3              The primary reason fundamentally that people

4    don't renew support with Oracle Corporation is because

5    they're not using Oracle's software.

6    Q.    All right.  So you heard Ms. Ransom testify that she

7    joined JDE in 1993; correct?

8    A.    Yes.

9    Q.    And she went through the acquisition by PeopleSoft;

10   correct?

11   A.    That's my understanding, yes.

12   Q.    And then she went through the acquisition by Oracle

13   International Corporation; correct?

14   A.    That's my understanding, correct.

15   Q.    And she's now a senior vice-president; correct?

16   A.    Yes.

17   Q.    And she said that at the end of the day, each

18   customer that leaves Oracle leaves for a different reason.

19   You don't have any reason to disagree with her about that,

20   do you?

21   A.    Well, what I said I didn't think was inconsistent

22   with her testimony either.

23   Q.    She just said yes, though; correct?

24   A.    That's right.

25   Q.    Now, not all customers who left Oracle were fully

1882

1    satisfied with -- who cancelled their Oracle support, were

2    not satisfied with Oracle; correct?

3    A.    That's a very summary statement.  I don't know if I

4    can agree or disagree with that.

5    Q.    All right.  And I've learned that from talking to

6    you before, so let's look at a document so we get it

7    straight.  Let's look at DTX 165 if we could, please.

8              This is a document, again, it's -- do you have

9    it in front of you?  Okay.

10             This is a document that was marked and talked

11   about in a deposition, it looks like Ms. Ransom's

12   deposition, and, again, based on that, you know you

13   received this and considered it as a part of your analysis

14   in reaching your opinions on damages in this case; correct?

15   A.    Yes.

16   Q.    Let's look at tab -- excuse me, slide 26 in that

17   document if we could, please, and I won't go into this in

18   detail.

19             You recall Ms.  Ransom and I discussed

20   improvement and the summary there?

21             I'm sorry.  I'll let you get there.

22   A.    I generally recall you two talking about this.

23   Q.    Yeah, and this was a document dated August of 2007;

24   right?

25   A.    That's correct.

1883

1    Q.    And Oracle was talking internally about areas for

2    improvement; correct?

3    A.    Yeah.   I would imagine Oracle was always trying to

4    improve.

5    Q.    And the second bullet point says -- or the first

6    bullet point says, "Customers are more likely to comment

7    about the analyst than anything else."

8              Do you see that?

9    A.    I see that.

10   Q.    And the second bullet point says, "The analyst

11   handling and time to solution are the three main areas

12   customers want to see improve"; correct?

13   A.    That's what this says.

14   Q.    And then let's look at DTX 160 which was admitted

15   during Ms. Ransom's testimony, defense Trial Exhibit 160,

16   Ms. Dean.

17             That's another one it looks like it was a

18   document marked as an exhibit, so you looked at that and

19   considered it as a part of your work in this case; correct?

20   A.    Correct.

21   Q.    Look at slide 3 for me.

22             Up there at the top it says, "JD Edwards E1

23   customers are showing consistently low levels of

24   satisfaction with Oracle products and services."

25             Do you see that?

1884

1    A.    I see it says that.

2    Q.    Did I read that correctly?

3    A.    I see it says that.

4    Q.    Did I read it correctly?

5    A.    Oh, I'm sorry.  Yes, you read it correctly.

6    Q.    Okay.  Sorry to get out of sync.

7              Let's look at page -- at tab 5 of that exhibit

8    if we can, please.

9              One more page, please.

10             There we have Key Target Areas to Improve there

11   toward the bottom.  Do you see that?

12             Ease of System Administration, Ease of Product

13   Installation, do you see all those?

14   A.    I do.

15   Q.    And then there are lines for PeopleSoft and E1 and

16   then Siebel there.  Do you see those?

17   A.    I do.

18   Q.    And the black numbers indicate above 50 percent, it

19   looks like, and the -- well, I'm not sure I know the

20   number -- what the black and white mean, but they've got

21   percentages in each one; correct?

22   A.    The squares seem to have percentages in them.

23   Q.    Percentages.

24             Now, and you considered this in forming your

25   conclusion that but for Rimini's conduct, the Oracle

1885

1   customers would not have cancelled their contracts with

2   Oracle and would have stayed with Oracle and paid for

3   Oracle maintenance and support; correct?

4   A.    I think I need to hear that question back again.

5   Q.    I think I'll ask her to read it again.

6         Well, would you like me to break it up?

7   A.    Sure.

8   Q.    That saves you.

9         You reviewed this document and the other

10  documents we're looking at; right?

11  A.    That's correct.

12  Q.    As a part of reaching your conclusion that but for

13  the misconduct that Rimini allegedly engaged in in this

14  case, the Oracle customers would have stayed at Oracle and

15  paid Oracle for maintenance and support; correct?

16  A.    I think what you're asking is did I review it, and

17  the answer is yes.

18  Q.    And it didn't -- it figured in your opinion?

19  A.    I don't know what you mean by figured in my opinion.

20  Would you like to know what I think about the document?

21  Q.    Excuse me.  Go ahead.

22  A.    Would you like to know what I think about this kind

23  of information?

24  Q.    We'll move forward.  Your counsel will ask, I'm

25  sure, if he thinks it's important.

1886

1    A.    Okay.

2    Q.    Let's look at slide 11 in that same deck if we

3    could, please, DTX 160.

4             MR. STRAND:  Did I make you go backwards?  No.

5    Okay.  Slide 11.  Don't worry about it.  I'll just work it

6    with her.  Oh, you got it.

7    BY MR. STRAND:

8    Q.    Let's look at -- this is called Root Cause Analysis.

9    Do you see that?

10   A.    I see those words.

11   Q.    Down at the bottom, let's read the bottom bullet

12   point.  It says, "Use of Oracle support system is weak and

13   customer voice is typically through user groups and

14   partners."

15            Do you see that?

16   A.    I do.

17   Q.    Okay.  That also appeared in this document that you

18   considered; correct?

19   A.    Yes, it also appears in this document.

20   Q.    All right.  Now, you talked -- we talked a little

21   bit about you reviewing the depositions taken of the 17

22   customers in this case.

23            Let me highlight excerpts that were shown in the

24   opening statement and either have been or will be shown, I

25   believe they will be shown, coming up?

1887

1          Let's go to the next slide.

2          Do you recall looking at or reading Mr. Brian

3     Baggett's deposition?

4     A.    Yes.

5     Q.    And he was the IT person at Bausch and Lomb, right?

6     A.    He was.

7     Q.    And they're the people that make the contact lens

8     solution and stuff like that, right?

9     A.    That's my understanding.

10    Q.    And he was asked, "And you -- but you ultimately

11    didn't keep support with HCM with Oracle; is that correct?"

12          Now, let me pause there.  HCM, that's a

13    PeopleSoft product?

14    A.    Right.  That's Human Capital Management.

15    Q.    All right.  And he says, "That's correct."

16          And the question was asked, "And what led" -- I

17    think it's led, not let, but, "What led to that decision?"

18          He said, "We felt Oracle was unreasonable."

19          Do you recall reading that in his deposition?

20    A.    Yes.

21    Q.    And then he went on, "Unreasonable.  Can you

22    describe?"

23          And his answer, "In every aspect of the

24    negotiation."

25          Let's look at Mr. Baggett's, the next slide of

1888

1     his testimony.

2                 Mr. Baggett was also asked that, "In terms of

3     other products in the future, is Oracle considered a viable

4     support option?"

5                 And his answer, "My personal opinion, and

6     speaking on behalf of the recommendations that I made with

7     Bausch and Lomb, they're our last choice."

8                 Did I read that correctly?

9     A.    You read that correctly.

10    Q.    And you considered the testimony of Mr. Baggett in

11    reaching your opinions in this case; correct?

12    A.    Yes.

13    Q.    Let's look at the next slide that appeared in the

14    opening statement and that the jury will be seeing the

15    video here next week.

16                Mr. Clark Strong of the Birdville Independent

17    School District, do you recall reading his deposition?

18    He's one of the 17, right?

19    A.    Yes, he is.

20    Q.    And he was asked, "And to what extent was that lower

21    price a deciding factor in the decision for Birdville to

22    contract with Rimini Street rather than renew with Oracle?"

23                His answer, "None."

24                "The price was no -- no -- no effect

25    whatsoever?"

1       "ANSWER:  No."

2       "So if it had been the same price, you still

3   would have contracted with Rimini Street?"

4       "ANSWER:  That's what I would have recommended."

5       Do you recall reading that?

6   A.   Yes.

7   Q.   So the price wasn't the only reason that people

8   decided to cancel their contract with Oracle and contract

9   with Rimini Street; correct?

10  A.   Yes.

11      And that's not my opinion.  I have the same

12  opinion Mr. Yourdon does, that it was the combination of

13  the cheaper price with the guaranteed vendor-level

14  replacement support.

15  Q.   All right.  And we'll talk about that in just a

16  moment.

17      Let's go to the next page.

18      And then he was further asked, "As we sit here

19  today, does Birdville have any plans to go back to Oracle

20  support?

21      "ANSWER:  I wouldn't recommend it.

22      "QUESTION:  And why not?

23      "Because of the support we get from Rimini

24  Street."

25      Do you recall reading that?

1890

1     A.    Yes.

2     Q.    Now, there's a bigger binder up there, don't put it

3     on the screen, there's a bigger binder up there called

4     Exhibit 154B.  Yeah, it's got a bunch -- it's got big long

5     spreadsheet kind of pages.

6     A.    Okay.

7     Q.    I'll represent to you, ma'am, that Exhibit 154B was

8     marked as an exhibit in Ms. Catz's deposition, so I believe

9     that you -- and it's also referenced on Exhibit 3 to your

10    report, the Catz deposition and all exhibits.

11          Do you recall reviewing Exhibit 154B as a part

12    of your work in this case?

13    A.    I may have seen it.

14    Q.    And you received that from Oracle; correct?

15    A.    If it was included in Ms. Catz's deposition.

16    Q.    And you reviewed that document as a part of your

17    work in this case?

18    A.    I'm not sure necessarily that I would have reviewed

19    it because it doesn't really have anything on it.

20    Q.    It doesn't have anything on it?

21    A.    Well, there's no title, no indication of what it is

22    at all.

23    Q.    Okay.  Take a moment and refresh your recollection

24    and look at it and so if you can recall -- well, let me ask

25    you this.

1       Did you personally review every single document

2   that you were given in this case, or did your two

3   assistants that -- or the two people, MBA and -- do they

4   review documents as well?

5   A.    People on my team would have reviewed documents as

6   well.

7   Q.    So either you or one of the people on your team

8   would have reviewed this document?

9   A.    If it was an exhibit to Ms. Catz's deposition, yes.

10  Q.    And it would have been somehow factored away, high

11  or low, in reaching your conclusion about causation in this

12  case; correct?

13  A.    Well, we don't necessarily factor everything, but my

14  guess is just looking at it, that it probably would have

15  been -- if it was considered, of low value --

16  Q.    Low value.

17  A.    -- since it's not clear what it is.

18  Q.    Yeah, because factoring something and saying it's

19  not worth anything is still factoring it; right?

20  A.    That's true.

21  Q.    All right.  Let's go to the next slide.

22       Do you recall this is a slide from the deck that

23  you and Mr. Isaacson just talked through in your direct

24  examination?

25  A.    Yes.

1    Q.    And this is a Mr. Hintz or Hintz from Hastings

2    Entertainment.  Do you recall that?

3    A.    Yes.

4    Q.    And you read his deposition; correct?

5    A.    Yes.

6    Q.    All right.  Look with me at the pulled-out or tabbed

7    portion of DTX 154B.  Do you see a reference there to --

8    A.    I'm sorry.  There are a few tabs here.  There are

9    two.

10   Q.    There are three tabs, one of them -- three blue

11   tabs.  One of them relates to Hastings.

12   A.    Is this like one document?

13   Q.    Do you have that in front of you?

14   A.    Yeah, it's a little hard because the titles are on

15   one page --

16   Q.    Okay.

17   A.    -- the information is on another.

18   Q.    And I apologize.  We were given it in native format

19   and I just printed it out, and that proves I'm not a

20   spreadsheet expert.

21          MR. STRAND:  Your Honor, it might be appropriate

22   to approach the bench right now before I ask my next

23   question.

24          THE COURT:  All right.

25          (Sidebar conference held as follows:)

1               THE COURT:  Go ahead.

2               MR. STRAND:  This is the one redaction that I

3     indicated to Your Honor I might be getting to during the

4     course of her cross-examination.

5               What I propose to do at this time is ask the

6     following two questions:

7               Is it your opinion that Hastings left Oracle due

8     to the misconduct of Rimini?

9               And her opinion will be yes because she's

10    already stated that.

11              Then I will ask the following question:  Did you

12    consider the following entry in PTX 154B in reaching your

13    opinions in this case, and I will read her the portions of

14    the entry of 154B that has -- that I've highlighted for the

15    Court.

16              MR. ISAACSON:  I don't think he should be able

17    to read what it says.

18              MR. HIXSON:  It's inadmissible hearsay.  There's

19    a statement here about the customer advised --

20              THE COURT REPORTER:  Who's speaking?

21              THE COURT:  This is Mr. Hixson speaking.

22              MR. HIXSON:  There are two statements here.  One

23    is about what the customer advised the Oracle employee, and

24    it goes on to state that.

25              And another line is about what the customer

1894

```
 1    stated, and those are recorded here, but these are clearly

 2    customer statements, it's third-party hearsay, and we

 3    object to reading it into the record in that fashion.

 4              MR. STRAND:  I offer it, your Honor, pursuant in

 5    cross-examination because it is one of the documents she

 6    considered.

 7              I offer it pursuant to Rule 703B -- excuse me,

 8    703, Rule of Evidence 703,

 9              "But if the facts or data would otherwise be

10    inadmissible, the proponent of the opinion may disclose

11    them to the jury only if their probative value in helping

12    the jury evaluate the opinion substantially outweighs their

13    prejudicial effect."

14              And I would also refer the Court to the advisory

15    committee notes that says that,

16              "Nothing in this rule restricts the presentation

17    of the underlying expert facts or data when offered by an

18    adverse party."

19              So I offer this under Rule 703 without regard to

20    whether it's hearsay, but to cross-examine this expert

21    based upon the bases for her opinion that she's just

22    rendered in this case.

23              MR. ISAACSON:  If I may, there's no foundation

24    that within this enormous document that this one panel here

25    had anything to do with her report.
```

1    I mean -- he's gotten from her that she or

2  someone may have looked at this because it was in the Catz

3  deposition.  That's it.

4    MR. STRAND:  Your Honor, she went on in her

5  opening -- in her direct -

6    THE COURT:  I don't need further argument.

7    This is cross-examination.  I think you're

8  entitled to ask it.

9    It may be hearsay, but she's at least indicated

10  that it may have been information she considered.  I think

11  you need to establish that first before you ask further

12  questions, and if it's not something she considered, I

13  don't think you should go into it.

14    MR. ISAACSON:  Okay.  And should he establish

15  that, I would ask for a limiting instruction telling the

16  jury that this is hearsay and not to be considered for the

17  truth.

18    MR. GRAY:  Actually, your Honor --

19    THE COURT:  Wait a minute.  I'm only going to

20  hear from two attorneys here.

21    MR. STRAND:  We're fine.

22    THE COURT:  All right.

23    (Sidebar conference concluded.)

24    MR. STRAND:  Thanks for your patience.

25

1    BY MR. STRAND:

2    Q.    We were looking at 154B, that large spreadsheet

3    exhibit.  It was an exhibit -- it was an exhibit to the

4    Catz deposition.  So would you look with me at the back of

5    the other exhibit volume I've got in front of you,

6    Ms. Dean, the white one.

7    A.    Do you want me to put this away?

8    Q.    No.  Leave it right there.  We're going to talk

9    about a couple other things first and then we're going to

10   get back to that.

11   A.    Okay.

12   Q.    Way at the back of that white volume there's

13   something that says Supplemental Schedules.  And if you

14   would look with me at schedule 3 which is actually not a

15   supplemental schedule, it's a schedule to your original

16   report.

17           Do you recognize schedule 3 to your original

18   report, ma'am?

19   A.    This is an excerpt from it.  But, yes.

20   Q.    Okay.  And there -- yeah.  It -- the first portion

21   of it are all the depositions you looked at; correct?

22   A.    Right.  It appears to be.

23   Q.    And your testimony has been that you reviewed those

24   depositions as a part of -- as a part of your work in this

25   case; correct?

1897

```
1    A.    That's correct.
2    Q.    And you reviewed all of the exhibits to those
3    depositions as a part of your work in this case; correct?
4    A.    Yes, if the entry says "and exhibits."
5    Q.    And I'll -- if you look there, deposition of Safra
6    Catz, taken on December 14th, 2011?
7    A.    I see that.
8    Q.    And exhibits?
9    A.    Yes.
10   Q.    I'll represent to you, Ms. Dean, that what we've
11   marked as Defendants' Exhibits 154B was an exhibit to
12   Ms. Catz's deposition.
13   A.    Okay.
14   Q.    If -- that is the case.  So either you or a member
15   of your team would have reviewed Exhibit 154B; correct?
16   A.    At least in some fashion.  It might have depended on
17   what the deponent said about the document.
18   Q.    Right.  And you may have concluded it was worthwhile
19   or not worth much; correct?
20   A.    That's correct.
21   Q.    But you considered it nonetheless; correct?
22   A.    Well, generally.  I mean, if -- there are times when
23   in a deposition a witness is shown a document and doesn't
24   know anything about it, so in those cases a lot of times I
25   won't look at it.
```

1    Q.    Is it your opinion that Hastings Entertainment, the

2    slide we were just looking at, cancelled its contract with

3    Oracle due to the misconduct of Rimini?

4    A.    I think they cancelled their contract to go to

5    Rimini, and the way Rimini was able to offer the service

6    that they offered was as a result of the misconduct.

7              MR. STRAND:  Your Honor, I would now like to

8    read that one provision.

9              MR. ISAACSON:  I don't think there's any

10   foundation for the provision.

11             THE COURT:  You can ask her if she read that and

12   took it into consideration.

13   BY MR. STRAND:

14   Q.    Did you -- if you -- when you received that

15   document, would you or a member of your staff have read the

16   entire document?

17   A.    I'm sorry.  What document are we referring to?

18   Q.    Excuse me.  Defendants' Exhibit 154B.

19   A.    I don't know.  I doubt it.

20   Q.    All right.  Knowing that Hastings was a customer of

21   Rimini, would that have focused your attention on that

22   particular entry?

23   A.    I wasn't even aware there was an entry for Hastings.

24   If you're representing there was --

25   Q.    So your testimony is you did not consider the entry

1899

1    of Hastings.

2    A.    Not that I recall.

3            MR. STRAND:  Your Honor, I offer to read the

4    entry based upon the fact that she didn't read it.

5            THE COURT:  I'll allow you to read the entry.

6            Ladies and gentlemen, I've reviewed it.  This

7    is -- he's entitled to question if she considered this

8    entry in the course of reaching her opinions, and he may

9    read it.

10   BY MR. STRAND:

11   Q.    Okay.  I'd like to read the entry there in front of

12   you, Ms. Dean.

13   A.    I'm sorry.  Can you just tell me where it is in this

14   big book?

15   Q.    Oh, absolutely.  Yeah, I can't come up and help.

16   A.    So it was --

17   Q.    To make sure we're all on the same page literally,

18   it says Hastings Entertainment, Incorporated.  Do you see

19   that?

20   A.    I do.

21   Q.    Okay.  And then there's a column over there in the

22   middle with comments.  Do you see that?

23   A.    Let me just check and see.  It says Original Notes

24   on the front page.

25   Q.    And I'm going to ask you -- I'm going to read -- I'm

```
 1    going to ask you did you consider the following entry in

 2    reaching your opinions in this case.  Okay?  I'm going to

 3    read the sentence that begins about seven lines down, 2-20

 4    colon.  Do you see that?

 5    A.    Yes.

 6    Q.    It says,

 7          "2-20:  Customer advised ASN Pam Riley that they

 8    have already selected another support vendor."

 9          And then I'm going to go down to 12-28 which

10    apparently precedes that date, and it reads,

11          "Customer stated primary reason for dropping

12    support as being that their software releases will no

13    longer be supported.  It appears they are on HRMS 8.3 and

14    FMS 8.2.  They would not want to purchase extended support

15    even if available.  They don't intend to update in near

16    future and starting to look at third-party vendors.

17    Submitted 90-day notification."

18          Did I read that correctly?

19    A.    You read the information in that cell correctly.

20    Q.    Did you consider that information in formulating

21    your opinions in this case?

22    A.    This isn't the kind of information that I would

23    consider because I have no basis for understanding about

24    what this information is.

25          MR. STRAND:  Thank you.
```

1        We'll move on, Your Honor.

2        Your Honor, I'm about to enter a new section.

3   I'm happy to go forward.  I wanted to get done, but I

4   didn't.  I'll go as long as you want.

5        THE COURT:  Well, I assume there's going to be

6   some redirect examination.  Is that correct, Mr. Isaacson?

7        MR. ISAACSON:  Yes, Your Honor.

8        THE COURT:  Given that, I think we should take

9   our break for the evening.

10       Ladies and gentlemen, we will break for the

11   evening at this time.

12       And I remind you of the same admonitions.  I'm

13   not going to go through them again.  You've certainly heard

14   that more than anything else.

15       With regard to tomorrow's schedule, we'll start

16   promptly at 8:00 in the morning, and we will break I

17   believe right around 11:45.  There's some still issues

18   concerning travel connections for any number of people, and

19   we'll break at 11:45.

20       And we'll be going into next week.  Essentially,

21   ladies and gentlemen, I see that we're pretty much on the

22   schedule that we talked about on this case.  I think we're

23   looking at next week and potentially into the week

24   following that.

25       I think it's very unlikely that we would go

1902

1    beyond that.  But because of this case being so complex,

2    it's difficult for me to really pin it down.  I also don't

3    know exactly, obviously, what counsel have planned, and I'm

4    sure their plans change from time to time as well, but I

5    think we're moving fairly well.

6              And I want to compliment you again.  You have

7    been here ready to go every time we've asked you to do it,

8    and I think that's outstanding.

9              Remember, this is a form of community and public

10   service, and you people have already earned my respect just

11   with the way I've seen you be here and be so attentive.

12             So with all that, I will excuse you for the

13   evening.  Please keep the admonitions in mind, and we will

14   start promptly in the morning at 8:00 a.m.

15             You may go ahead and step down.

16             COURTROOM ADMINISTRATOR:  Please rise.

17        (The proceedings adjourned at 2:04 p.m.)

18                       *    *    *

19

20

21

22

23

24

25

1903

1       -o0o-

2       I certify that the foregoing is a correct

3       transcript from the record of proceedings

4       in the above-entitled matter.

5

6    _____        9/25/15

7    Donna Davidson, RDR, CRR, CCR #318        Date
     Official Reporter

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1904

1                           I N D E X

2     PLAINTIFFS' WITNESSES:                        PAGE
      EDWARD YOURDON
3         Direct Examination By Ms. Dunn            1676
          Cross-Examination By Mr. Reckers          1707
4         Redirect Examination By Ms. Dunn          1724
      ELIZABETH DEAN
5         Direct Examination By Mr. Isaacson        1763
          Cross-Examination By Mr. Strand           1846
6

7                       E X H I B I T S

8     PLAINTIFFS'                                ADMITTED
9     182, 186, 190, 194                             1647
      221, 306 and 314                               1746
10    589                                            1734
      775, 789, 1960, 3503 and 3512                  1763
11    1333                                           1696
      5470                                           1844
12    6002                                           1809
      6003                                           1825
13    6004                                           1827
      6005                                           1830
14    6006                                           1836

15    DEFENDANTS'                                ADMITTED
      1947                                           1763
16

17

18

19

20

21

22

23

24

25