1905

1          UNITED STATES DISTRICT COURT
                 DISTRICT OF NEVADA
2      BEFORE THE HONORABLE LARRY R. HICKS, DISTRICT JUDGE

3

4   ORACLE USA, INC., a Colorado      :
    corporation; ORACLE AMERICA,      :
5   INC., a Delaware corporation;     :
    and Oracle International          :No. 2:10-cv-0106-LRH-PAL
6   CORPORATION, a California         :
    corporation,                      :
7                                     :
            Plaintiffs,               :
8                                     :
        vs.                           :
9                                     :
    RIMINI STREET, INC., a Nevada     :
10  corporation; and SETH RAVIN,      :
    an individual,                    :
11                                    :
            Defendants.               :
12  _____  :

13

14

                TRANSCRIPT OF JURY TRIAL - DAY 10
15                 (Pages 1905 through 2073)

16

17                    September 25, 2015

18

                     Las Vegas, Nevada
19

20

21

22

    Court Reporter:        Donna Davidson, RDR, CRR, CCR 318
23                         Certified Realtime Reporter
                           400 South Virginia Street
24                         Reno, Nevada  89501
                           (775) 329-0132
25

1906

1                     A P P E A R A N C E S

2  FOR THE PLAINTIFFS:

3  BOIES, SCHILLER & FLEXNER LLP
   KIERAN P. RINGGENBERG
4  1999 Harrison Street, Suite 900
   Oakland, California 94612
5  (510) 874-1000
   Fax: (510) 874-1460
6  kringgenberg@bsfllp.com

7  BOIES, SCHILLER & FLEXNER LLP
   RICHARD J. POCKER
8  300 South Fourth Street, Suite 800
   Las Vegas, Nevada 89101
9  (702) 382-7300
   Fax: (702) 382-2755
10 rpocker@bsfllp.com

11 BOIES, SCHILLER & FLEXNER LLP
   WILLIAM A. ISAACSON
12 KAREN L. DUNN
   5301 Wisconsin Avenue, NW
13 Washington, DC  20015
   (202) 237-2727
14 Fax:  (202) 237-6131
   wisaacson@bsfllp.com
15 kdunn@bsfllp.com

16 MORGAN LEWIS & BOCKIUS LLP
   THOMAS S. HIXSON
17 NITIN JINDAL
   JOHN A. POLITO
18 One Market, Spear Street Tower
   San Francisco, California 94105
19 (415) 442-1000
   Fax:  (415) 442-1001
20 thomas.hixson@morganlewis.com
   nitin.jindal@morganlewis.com
21 john.polito@morganlewis.com

22 JAMES C. MAROULIS
   DORIAN E. Daley
23 Oracle Corporation
   500 Oracle Parkway
24 Redwood City, California 94070
   (650) 506-4846
25 jim.maroulis@oracle.com
   dorian.daley@oracle.com

1907

```
 1              A P P E A R A N C E S (Continued)

 2   FOR THE DEFENDANTS:

 3   SHOOK, HARDY & BACON LLP
     PETER E. STRAND
 4   B. TRENT WEBB
     RYAN D. DYKAL
 5   2555 Grand Boulevard
     Kansas City, Missouri 64108
 6   (816) 474-6550
     Fax: (816) 421-5547
 7   pstrand@shb.com
     bwebb@shb.com
 8   rdykal@shb.com

 9
     SHOOK, HARDY & BACON LLP
10   ROBERT H. Reckers
     600 Travis Street, Suite 3400
11   Houston, Texas 77002
     (713) 227-8008
12   Fax: (713) 227-9508
     rreckers@shb.com
13
     SHOOK, HARDY & BACON LLP
14   ANNIE Y.S. CHUANG
     One Montgomery Tower, Suite 2700
15   San Francisco, California 94104-4505
     (415) 544-1900
16   achuang@shb.com

17
     LEWIS ROCA ROTHGERBER LLP
18   W. WEST ALLEN
     3993 Howard Hughes Parkway, Suite 600
19   Las Vegas, Nevada 89169
     (702) 949-8230
20   Fax: (702) 949-8364
     wallen@lrrlaw.com
21
     GIBSON, DUNN & CRUTCHER LLP
22   BLAINE H. EVANSON
     333 South Grand Avenue
23   Los Angeles, California 90071-3197
     (213) 229-7000
24   bevanson@gibsondunn.com

25
```

1908

                LAS VEGAS, NEVADA, SEPTEMBER 25, 2015, 8:02 A.M.

1

2                                  --oOo--

3                          P R O C E E D I N G S

4

5               (Jurors enter courtroom at 8:01 a.m.)

6                    THE COURT:  Good morning.  Have a seat, please.

7                    Well, day 10.  Welcome to the courtroom

8       everyone.

9                    The record will show that we're in open court,

10      and Ms. Dean continues as a witness.  The jury is all

11      present.

12                   Mr. Strand, you may proceed with your

13      cross-examination.

14                   MR. STRAND:  Thank you, Your Honor.

15                           ELIZABETH DEAN

16               recalled as a witness on behalf of the

17             Plaintiffs, having been previously sworn,

18               was examined and testified as follows:

19                   CROSS-EXAMINATION RESUMED

20      BY MR. STRAND:

21      Q.    Good morning, Ms. Dean.

22      A.    Good morning.

23      Q.    Ready to get started?

24      A.    Yes.

25      Q.    I promise to wrap up.

                DONNA DAVIDSON, RDR, CRR, CCR #318    (775) 329-0132

1       One moment of reset before we start the day.

2   You recall yesterday morning, or yesterday afternoon, right

3   off the bat we talked about but-for causation.  Do you

4   remember that?

5   A.    Yes.

6   Q.    And let's just put that up so we remember.

7       But-for causation is kind of a lawyer term.

8       And as I recall what you said but-for causation

9   was, was that how Oracle would have looked if Rimini hadn't

10  done what Oracle complains about in this case.  Correct?

11  A.    That sounds reasonable.

12  Q.    How Oracle would have looked.

13      And while we've been up and down and over and

14  around, all of our questions are basically going to answer

15  that question, how Oracle would have looked if Rimini

16  hadn't engaged in the acts that Oracle complains about;

17  correct?

18  A.    I'm not sure what you're referring to.  That's my

19  work effort, yes.

20  Q.    That's your work effort.  Yeah, that's what we're

21  talking about.  Correct?

22  A.    I assume so.

23  Q.    Okay.  What I want to talk a little bit -- is about

24  acceptable noninfringing alternatives.  And to set that,

25  let's get your exhibit up, Other Third-Party Entities.

1              MR. STRAND:  The chart from her slide deck.

2    Okay.  Thank you.

3    BY MR. STRAND:

4    Q.    You recall testifying about the -- I'm sorry.  There

5    you go.  I apologize again.  It's 20, Exhibit 20 in your

6    book, and it should be in front of you now if you want it.

7    A.    My screen doesn't have anything on it.

8              MR. STRAND:  Let's just go to 20.  You had it

9    up, Marie.

10             (Discussion held off the record.)

11   BY MR. STRAND:

12   Q.    Okay.  Well, look at Exhibit -- at slide 20 in the

13   deck that was in your notebook.  Do you recall?

14   A.    Yes.

15   Q.    And they'll keep working on trying to get that up.

16             That's entitled Other Third-Party Entities;

17   correct?

18   A.    That's correct.

19   Q.    And there were seven companies that you listed on

20   that exhibit; correct?

21   A.    That's correct.

22   Q.    And you talked about those companies and said that,

23   for whatever reason, none of them were available,

24   acceptable, noninfringing alternatives; correct?

25   A.    These and a couple more, I think, that we talked

1911

1    about.

2    Q.    Okay.  And that if none of those were available,

3    people couldn't have gone to Rimini, they would have had to

4    stick with Oracle; correct?

5    A.    I believe they would have stayed at Oracle, that's

6    correct.

7              MR. STRAND:  Okay.  Just can't get that up at

8    all, huh?  Okay.

9         (Discussion held off the record.)

10   BY MR. STRAND:

11   Q.    Okay.  This is what we were just talking about --

12   proving that lawyers who once used to be able to weave

13   pictures with words now need to have pictures to support

14   their words.  But here we are.

15             This is what you talked about; right?  I'd like

16   to probe in a little bit on that.

17             So is it your opinion, based upon your analysis,

18   that Oracle had no acceptable, noninfringing competitors

19   for maintenance and support services from 2006 to 2011;

20   correct?

21   A.    Yes.

22   Q.    Okay.  So there were no other places for Oracle

23   customers to go for maintenance and support services other

24   than Oracle; correct?

25   A.    Well, occasionally customers went to some of these

1912

```
 1    companies, but as to whether or not they were providing
 2    vendor-level replacement services at 50 percent off as a
 3    more or less corollary to what Rimini Street was offering,
 4    no.
 5    Q.    Okay.  Let's parse that a little bit.
 6          Could they leave at all?  Was there no
 7    alternative, or there wasn't vendor-level replacement
 8    services?
 9    A.    I don't think that there was acceptable vendor-level
10    replacement services.
11          But some customers did leave for some of these
12    companies.  That doesn't mean that the companies that left
13    to go to Rimini Street would have left for these companies.
14    Q.    Okay.  So that it was possible to leave, but your
15    testimony is it wasn't acceptable or likely; correct?
16    A.    I think there's a reasonable basis to believe that
17    those customers would have stayed with Oracle, that's
18    correct.
19    Q.    But it was possible to leave?
20    A.    Yes.  Oracle does not lock their customers in.
21    Q.    Now, I'd like to refer you to a statement that
22    Ms. Catz made during her direct examination.  You recall
23    her?
24          You said you were here for her statement.  Do
25    you recall the statement she made about competition?
```

1913

```
 1   A.    I'd like to see what you're referring to.

 2              MR. STRAND:  Sure.  Can we get 918, lines 15

 3   through 18 up?  Well, let me read it to you so we don't

 4   take the time.

 5   BY MR. STRAND:

 6   Q.    There was a question asked of Ms. Catz, and she

 7   said -- and the question was,

 8              "And does the company have any philosophy

 9     towards these competitors, towards competition?

10              Answer by Ms. Catz, "Yeah; bring it on.  The

11     truth is competition makes you better.  It keeps

12     you very, very sharp."

13              Do you recall her stating that?

14   A.    I do.

15              MR. STRAND:  All right.  Let's look at the

16   competition a little bit.  If we can, bring up DTX 145.  We

17   probably need to switch.  Okay.  Thank you.  You're ahead

18   of me.  That's been admitted into evidence.

19              THE WITNESS:  Is that something I have in a

20   binder?

21              MR. STRAND:  Yes.

22              THE WITNESS:  I'm sorry.  I didn't hear the

23   number.

24              MR. STRAND:  I'm sorry, DTX 145.  It should be

25   in order in the notebook.
```

1914

1       THE WITNESS:  Okay.  I have it.

2    BY MR. STRAND:

3      Q.    You have it there in front of you?

4      A.    I do.

5      Q.    That is a document that Ms. Ransom and I talked

6    about earlier this week.  It's dated October of 2007;

7    correct?  Second page?

8      A.    I was going to say mine doesn't have that page.

9      Q.    Yeah, second page.

10     A.    All right.  It is dated October 2007.

11     Q.    It's entitled Third Party SWAT Team - Behind Enemy

12   Lines.  Do you see that?

13     A.    Yes.

14     Q.    And it looks like it was marked as an exhibit during

15   Ms. Ransom's deposition there on the third page, so that

16   indicates that you received it and considered it as part of

17   your work in this case; correct?

18     A.    Yes.

19     Q.    Okay.  Let's look at slide 4.  There's reference

20   to -- did you get that in front of you?

21     A.    I do.

22     Q.    There's reference to Versytec there.

23     A.    Yes.

24     Q.    Do you see that right there in the middle?

25          That's not a company that you considered or that

1     you put on your chart that we just looked at; correct?

2     A.    I did consider it.  I did actually testify about it,

3     but it's not on the chart because it's JDE World only.

4     Q.    All right.  And Klee & Associates, that's another

5     company that did not appear on your chart; correct?

6     A.    Also for the same reasons.  I think I did testify

7     about it, and it also went out of business very early,

8     perhaps before they even offered JDE Service, so I didn't

9     put it on the chart.

10    Q.    And there's various statements made about the other

11    companies here.

12          But it says down at the very bottom in October

13    of '07,

14          "Smaller firms seem to exist but do not really

15    present any major challenges to Oracle support."

16          Do you see that?

17    A.    I do.

18    Q.    Did you ask anyone at Oracle why it was they felt

19    they needed to form a SWAT team for behind enemy lines in

20    October of 2007 if they felt like they had no major

21    challenges for Oracle support?

22    A.    Well, I'm not sure that that classifies what -- or

23    characterizes what this is saying.

24          I think Oracle did feel pressure from

25    TomorrowNow, for example, exactly squarely in this time,

```
 1    and I did have conversations with people at Oracle about

 2    how they addressed the service offering of TomorrowNow and

 3    Rimini Street.

 4    Q.    Did you talk to them about the SWAT team?

 5    A.    I don't know that we had a particular conversation

 6    just about whatever group that was, or whether there even

 7    was a group, but we talked about how Oracle was trying to

 8    address this problem.

 9    Q.    Okay.  And you heard Ms. Ransom testify that she

10    attended at least one meeting of the SWAT team?

11    A.    I know she went to a meeting.  I think -- I'm not

12    sure whether they officially called themselves the SWAT

13    team or not.

14    Q.    All right.  So we're a little hazy on that.

15            Let's look forward to DTX 146, the next tab in

16    your binder.

17            Do you see that?

18    A.    I do.

19            MR. STRAND:  Let's start with the first page,

20    Marie, if we could, please.  Page 1, the cover page.  Do

21    you have that?

22    BY MR. STRAND:

23    Q.    All right.  This is dated April 16th, 2009; correct?

24    A.    That's correct.

25    Q.    All right.  So a couple years later, roughly,
```

1917

1       there's an Oracle deck that says Third-Party Support

2       Providers Analysis.

3               Let me try that again.   There's a document that

4       says Third-Party Support Providers Analysis.   Correct?

5       A.    On the first page, that's what it says, yes.

6       Q.    And it looks like it was a deposition exhibit, so

7       you would have received and reviewed this document and

8       considered it as a part of your analysis in this case;

9       correct?

10      A.    I don't specifically recall a Taylor, but it's

11      possible.   We could look on my attachment 3.

12      Q.    Sure.   Let's look at page slide 6 of that document,

13      and this slide, in April of 2009, is characterized as

14      Competitive Landscape - Third-Party Support.

15              Do you see that on this Oracle document?

16      A.    I see that.

17      Q.    And let's go down that list real quick.

18              Abtech support was not listed on your chart;

19      correct?

20      A.    No, but I think we talked about it on direct.

21      Q.    Alui was not listed on your chart; correct?

22      A.    That's correct.   It seems to service Hyperion which

23      is not part of this case.

24      Q.    Ciber was not listed on your report; correct?

25      A.    That's correct.

1918

1    Q.    Versytec was not listed on your report; correct?

2    A.    We did just talk about that, Versytec was JDE World

3    only.

4    Q.    It was not listed on your report, however, was it?

5    A.    That's right, because JDE World is not part of this

6    case.

7    Q.    Summit Technology was not listed on your report;

8    correct?

9    A.    That's correct.

10   Q.    Hexaware was not listed on your report; correct?

11   A.    That's correct.

12   Q.    Citagus was not listed on your report; correct?

13   A.    That's correct.

14   Q.    Now, you have no opinion on whether Rimini could

15   have or did stop the activity Oracle accuses between 2006

16   and 2011; correct?

17   A.    I don't have an opinion about the activity.  From a

18   liability perspective, I assumed liability, that's correct.

19   Q.    You assumed that activity continued throughout the

20   2006 through 2011 time period?

21   A.    I have information available and the evidence in the

22   record as to different allegations.  Some of those

23   allegations, for example, like the automated tools, I

24   understand there was a point when they were not using them.

25   Q.    Okay.  But you don't have a technical opinion about

1919

1    whether Rimini could stop doing something that Oracle

2    complains about; correct?

3    A.    Well, I have read various pieces of information

4    about the effect on Rimini's business of doing the things

5    that Oracle complains about.  So I have an understanding of

6    what the effect would be on Rimini's business of not doing

7    those things.

8    Q.    Okay.  But you don't have a -- what I'm asking about

9    right now -- we'll talk about the money in a second.  You

10   don't have an opinion on the technical part of whether or

11   not Rimini could do or not do something; correct?

12   Technically?

13   A.    I have to say that I'm not exactly sure what you're

14   asking.  If you're asking for IT or computer engineering, I

15   would agree.

16   Q.    Okay.  That's all I'm -- I'm not trying to slip you

17   up.

18             You're not a technical expert, you're not

19   testifying about technically -- what Rimini could do

20   technically; correct?

21   A.    That's correct.

22   Q.    All right.  Did you do any analysis on a financial

23   perspective of what would have happened had Rimini ceased

24   doing certain of the technical things that Oracle complains

25   about during the course of time between 2006 and 2011?

1920

1     A.     I have done that analysis, that's correct.

2     Q.     And that's embedded in the analysis that you talked

3     about yesterday.  Is that your testimony?

4     A.     Yes.

5     Q.     Okay.  Now, your damages model is based on the

6     assumption that Rimini misled all 360 customers insofar as

7     it relates to the interference claim; correct?

8     A.     Well, the damage measurement is only on the 228

9     customers less deductions for attrition.

10    Q.     Okay.  Do you have any opinion or assumption that

11    you made regarding the difference between the 364 customers

12    and the 228 customers, whether they were misled or not?

13    A.     Well, my opinion is that Rimini's entire business

14    model was based on the allegations of wrongdoing from the

15    very first minute.  So all of the referrals, all of the

16    references, I think, infiltrated all the customers.

17    Q.     Do you have an opinion that -- well, you assumed in

18    doing your damages model, did you not, that Rimini misled

19    all of its customers; correct?

20    A.     I'd say that my opinion is that Rimini's entire

21    business model was based on the actions that are alleged to

22    be misrepresentations and copyright infringement.

23           So whether or not they had a direct

24    communication with one customer isn't relevant because the

25    entire business is operating in this fashion, interchanging

1921

```
1    and using, you know, the cross-use and the local
2    environments.  That's all benefitting the credibility of
3    the company overall.
4              So as they get each customer, that ultimately
5    leads to the success of the business.
6    Q.    So am I correct in my understanding is that you
7    don't know whether Rimini misled all 364 customers, or all
8    288 customers; correct?
9    A.    I think the entire business model being built on
10   these allegations of wrongdoing led to their success.
11   Q.    Okay.  Let's try to get -- 5469, this was introduced
12   yesterday during your direct examination.  Do you recall
13   this?
14   A.    Yes.
15             MR. STRAND:  Let's do the top little bit and the
16   column headers, if we could, please.  Can we blow that up
17   even more?  Is that as good as -- there we go.
18   BY MR. STRAND:
19   Q.    So the -- so I understand this, Ms. Dean, the first
20   company for which Oracle seeks damages is Access
21   Intelligence LLC; correct?
22   A.    That's correct.
23   Q.    All right.  Let me ask you some questions about
24   Access Intelligence.
25             One, why did the customer -- I'm going to write
```

1922

1     RSI since it's faster, Rimini Street, Incorporated -- over

2     Oracle support.

3                So if I ask that first question of you, why did

4     Access Intelligence LLC consider Rimini Street over Oracle

5     support, your answer is you don't know; correct?

6     A.    I think my answer is because Rimini Street was

7     offering everyone 50 percent, or more, of a discount and

8     guaranteeing that they were providing vendor-level support.

9     Q.    Do you know what the first customer considered --

10    why the first customer considered RSI over Oracle support

11    of your own personal knowledge or anything you've seen in

12    this case?

13    A.    Well, there wasn't discovery on every single 364

14    customer, but the foundation of damages in the case is how

15    Oracle was harmed by Rimini's actions overall, and how it

16    was harmed was because Rimini offered something that was

17    not proper.

18    Q.    But you haven't seen any evidence in this case as to

19    why Access Intelligence considered RSI over Oracle support?

20                I'm limiting it just to that question.  You

21    haven't seen any evidence as to why Access Intelligence,

22    that entity, considered RSI over Oracle support, have you?

23    A.    Access Intelligence has not provided any information

24    in this litigation.

25    Q.    Okay.  Second question.  What did Rimini say to

1     Access Intelligence?

2                 Now, I understand your position, and we can

3     quarrel about that, but I have a very narrow question.

4                 You haven't seen any evidence in this case about

5     what did RSI say to Access Intelligence, the customer;

6     correct?

7     A.    Well, except for Rimini's overall standard

8     messaging, no.

9     Q.    Third question.  What alternatives did the customer,

10    Access Intelligence, consider?

11                Again, I don't want to quarrel with you, but I

12    just want to talk about Access Intelligence, number one on

13    the list of 228.

14                What alternatives did the customer, Access

15    Intelligence, actually consider?

16                You haven't looked at any evidence in this case

17    about that, have you?

18    A.    That's right.  Access Intelligence did not get

19    deposed.  You guys didn't take discovery of them.  The

20    individual customers, some of them have evidence in the

21    record, but some of them don't.

22    Q.    Okay.  Did the customer -- did the customer, fourth

23    question.  Did the customer know about the alleged

24    infringement?

25                I have a confession to make.  There was a class

1924

```
 1    in college that you could learn how to write on the board,
 2    and I never took it.  Now I wish I would have.
 3              But did the customer in this case, Access
 4    Intelligence, know about the alleged infringement?
 5              Do you have any evidence that you've seen in
 6    this case that -- whether or not Access Intelligence knew
 7    about the alleged infringement by Rimini?
 8    A.    Well, I think I know that they didn't know because I
 9    think you've had Mr. Maddock and others testify that they
10    never told any customers that they were reusing the
11    software amongst customers, that they were doing massive
12    downloads from customer IDs they weren't entitled to.
13              I'm fairly certain, in all of the legal
14    questions that were in the frequently asked questions
15    sheet, that there was no acknowledgement from Rimini to any
16    customer that they were acting improperly.
17    Q.    Okay.  Let me ask you this.  Did Access Intelligence
18    know -- well, let's ask the predicate.
19              Was Access Intelligence a remotely hosted
20    customer or a locally hosted customer?  You haven't seen
21    any evidence on that, have you?
22    A.    I would say that's a better question for Dr. Davis.
23    Q.    You haven't seen any question on that -- you haven't
24    seen any evidence on that.  You didn't consider that in
25    your opinion?
```

1    A.    I did consider those factors in my opinion, yes.

2    Q.    Okay.  So if you considered them in your opinion,

3    help me understand.  Was Access Intelligence a locally

4    owned -- a locally owned customer -- excuse me, a locally

5    hosted customer or a remotely hosted customer?

6    A.    Well, it's my understanding from Oracle's

7    allegations in the case that even remotely serviced

8    customers benefited routinely from patches and fixes that

9    were made in central locations and from information in the

10   central library.

11              So remote versus local, that's a technical

12   question for Dr. Davis.

13              But my understanding is that there was pervasive

14   use of this material.  So whether or not a customer was

15   serviced remotely, they benefitted from the actions that

16   are alleged in the case.

17   Q.    Okay.  I understand.  I just have a very narrow

18   question I'd like an answer to if I could, please.

19              You don't know whether or not Access

20   Intelligence's test and development environments were

21   locally hosted at Rimini or were remotely hosted at Access

22   Intelligence, do you?

23   A.    That would be a question for Dr. Davis.

24   Q.    You don't know, do you?

25   A.    That's not my scope of my work, that's right.

1     Q.    And you can't answer that yes or no.  You don't

2  know, do you?

3     A.    I don't know.

4     Q.    Okay.  What about cloning?

5           You don't know whether or not any environment

6  for Access Intelligence was cloned out, or any environment

7  was cloned into Access Intelligence from any other Rimini

8  customer, do you?

9     A.    I would say the scope, as I understand it, is

10  pervasive.  But if you have specific questions about

11  specific customers, that would have been a question to ask

12  Dr. Davis, who actually studied all the computer data.

13     Q.    But you don't know as you sit here today opining on

14  the damages; correct?

15     A.    Well, because it's relevant to me that this was

16  pervasive and extreme.  So for an individual customer, I

17  did not ask Dr. Davis what he found in that respect.

18     Q.    And so I'm going to ask it because I just want to

19  make sure we're clear.

20           You don't know whether there was any cloning

21  activity related to Access Intelligence LLC; isn't that

22  correct?

23     A.    That's correct.  I don't know.

24     Q.    Cross-use.  You don't know whether or not there was

25  any cross-use activity relating to Access Intelligence LLC,

1927

1      do you?

2      A.    That's right, because the activities are pervasive

3      and they infiltrate the whole company.  So each individual

4      customer may or may not have evidence.

5            But Rimini Street wouldn't be a business model

6      if they hadn't have done what they did.

7            MR. STRAND:  I move to strike the last part of

8      the answer as nonresponsive, Your Honor.

9            THE COURT:  Overruled.  And I want you to move

10     on to another subject.  What you're doing is essentially

11     asking a damages expert questions about --

12            MR. STRAND:  I will move on.  I will move on.

13            THE COURT:  -- another expert's field of

14     expertise.

15            MR. STRAND:  Let me see if I've got any more on

16     this one, Your Honor.

17     BY MR. STRAND:

18     Q.    Well, suffice it to say we disagree on that.

19            Let me ask you this question.  I am not going to

20     go through 228 customers.

21            If I asked the same basic questions for the

22     remaining 228 customers, Ms. Dean, which I promise I won't,

23     would you and I have essentially the same colloquy?

24     A.    No.

25     Q.    Why is that?

DONNA DAVIDSON, RDR, CRR, CCR #318    (775) 329-0132

1    A.    Because I did talk to Dr. Davis, and I do understand

2    what Mr. Hicks did, and there are documents in the record

3    with respect to which customers had cloning and which

4    customers had cross-use.

5          So there would be specific answers to some of

6    those questions, but as a general matter, I focused on the

7    economics of the business.

8    Q.    Were you here during Dr. Davis's testimony?

9    A.    No, I was not.

10   Q.    Okay.  And were you here during Dr. Hicks'

11   testimony?

12   A.    Yes, I was for at least part of it.

13   Q.    All right.  And as the judge has encouraged me, we

14   won't go into that.

15         Let me ask about the depositions if we could.

16   We talked at some length about the depositions of the

17   customers yesterday.

18   A.    Yes.

19   Q.    Okay.  And since there were a number of them, I

20   thought it might be helpful if we just quickly, quickly

21   went through them.

22         You looked at all 17 depositions and read the

23   transcripts; right?

24   A.    At one time or another, yes.

25   Q.    Okay.  First of all, I've got in alphabetical order

1   Bausch & Lomb; right?  You reviewed that?

2   A.    I reviewed Bausch & Lomb.

3   Q.    Okay.  Do you know -- you were here on Wednesday

4   when some depositions of customers were shown to the jury.

5   Do you recall that?

6   A.    I definitely saw some of the depositions, but I

7   don't recall.

8   Q.    Do you know if Bausch & Lomb was shown to the jury?

9   A.    I don't recall.

10  Q.    Do you know if Bausch & Lomb -- in your report, you

11  did an analysis of where customers of Rimini had gone if

12  they left Rimini; correct?

13  A.    I don't know what you're referring to.

14  Q.    I believe it's Exhibit 9 where you tracked who was

15  where, or Exhibit 7 where you said who has returned to

16  Oracle?

17  A.    I only know in this case if a customer from Rimini

18  left and came back to Oracle.  I don't have any other

19  information about them.

20  Q.    That's fine.  That's a question I want to ask.

21        After the deposition, did Bausch & Lomb return

22  to Oracle?

23  A.    Not to my recollection.

24  Q.    Okay.  Let's go to JB Hunt.  You read that one;

25  right?

1930

1    A.    Yes.

2    Q.    Okay.  Do you know if, after the deposition, they

3    returned to Oracle?

4    A.    You know, if we're going to go through 17, then I'm

5    going to look at my schedule --

6    Q.    Oh, absolutely.  Absolutely.  Do you have that up

7    there?

8    A.    I have it up here.

9    Q.    Okay.  So -- I'm sorry, I didn't have 17 in my book,

10   but you've got it here.  That's fine.

11              Did Bausch & Lomb return to Oracle after the

12   deposition?

13   A.    Does it matter if I'm looking at Schedule 9 SU and

14   not 17?

15   Q.    I apologize.  Schedule 9 SU.

16   A.    No, they did not, they remained at Rimini Street.

17   Q.    Okay.  I'm going to put a little note, didn't

18   return.

19              JB Hunt, did they return?

20   A.    They did not return to Oracle.  Is that what you're

21   asking?

22   Q.    They did not return?

23   A.    No.

24   Q.    Okay.  How about Charles Karcher -- Karcher, did

25   they return after the deposition?

1931

1     A.     I think I stated on that last one that they stayed

2     with Rimini after the deposition, but I think JB Hunt went

3     off Rimini in 10,000 -- 10 -- 2010.

4              So I don't know if they actually had their

5     deposition when they were still at Rimini, but I'm not

6     sure.

7     Q.     Okay.  2010, question mark.

8              What about Charles Karcher, did they leave

9     Rimini and go back to Oracle after the deposition?

10    A.     No, they stayed at Rimini.

11    Q.     What about SonicWall?  I believe we saw that

12    deposition.  Did they leave Rimini and return to Oracle

13    after the deposition?

14    A.     Again, I don't know where there's -- SonicWall left

15    Rimini in 2009, so I assume the deposition was taken after

16    that since the case wasn't filed until 2010.

17    Q.     Okay.  What about JALPAK?  I think we saw that

18    deposition as well.  Did they leave and return to Oracle

19    after the deposition?

20    A.     JALPAK is JDE World.  JALPAK is JDE World, so that

21    wasn't one I followed.

22    Q.     Okay.  Hastings.  We talked a little bit about them

23    yesterday.  Did they leave and return to Oracle after the

24    deposition?

25    A.     It does not appear so.  They appear to still have

1    Rimini.

2    Q.   What about Brazoria County, did they leave and

3    return after the deposition and go back to Oracle?

4    A.   They did return to Oracle.

5    Q.   Okay.  So I'm going to put Oracle right here.  All

6    right?

7            What about Koch Supply, did they leave and

8    return to Oracle after the deposition?

9    A.   They never left Oracle.

10   Q.   Never left Oracle.  All right.

11           What about City of Flint, did they leave and

12   return to Oracle after the deposition?

13   A.   No, they did not.

14   Q.   Okay.  I'm going to go to 10 on the next page.

15   A.   While you're writing, maybe I can clarify one point.

16   Q.   Sure.

17   A.   When you put the zero that they don't return to

18   Oracle, if they don't -- if they're not on Rimini's service

19   today, then I would assume, then, they're not actually

20   using the software.

21   Q.   Well, we're under strict instructions to limit our

22   focus from 2006 to 2011.

23   A.   Well -- I'm sorry.  Yes, with that constraint.

24   But --

25   Q.   Your counsel can run the risk of going into that,

1933

1     I'm going to stay out of that.  I'm just going to ask my
2     narrow questions.
3     A.    Right.  But the question you're asking is if they
4     returned after the deposition.  And unless you give me a
5     date for the deposition, I won't know the right answer to
6     that exactly, but I will know whether or not they used the
7     software.  So that makes a little bit more sense to me to
8     answer it that way.
9     Q.    Most of these depositions occurred in 2011.  So
10    let's just keep that timeframe in mind, okay?
11    A.    Okay.  So those that left before 2011 From Rimini
12    Street, I assume they don't use the software.
13    Q.    Right.
14          Okay.  Let's look at number 10 was Kent County.
15    Did Kent County leave Rimini after the deposition and
16    return to Oracle?
17    A.    No, it looks like they're still a Rimini customer.
18    Q.    How about Blue Cross Blue Shield, did they leave
19    Rimini after the deposition?
20    A.    No, it appears they may still be a customer.  I keep
21    saying they may still be a customer because --
22    Q.    Yeah, I'm just --
23    A.    -- discovery doesn't coincide with today.
24    Q.    I understand.  I appreciate your making that clear.
25          What about Birdville?  Did Birdville leave

1934

1    Rimini and return to Oracle after the deposition?

2    A.    It looks like after the deposition they stopped

3    using the software.

4    Q.    Okay.  Did they return to Oracle?

5    A.    No.

6    Q.    Okay.  I'll just put stopped.

7          What about AGCO, A-G-C-O?  After the deposition,

8    did they return to Oracle?

9    A.    No, it looks like they're still -- they may still be

10   getting service from Rimini.

11   Q.    Okay.  What about Yum, after the deposition, did

12   they return to Oracle?

13   A.    Yes, they did.

14          And just to clarify, you wrote stop on one, but

15   many on the previous page would have had that same

16   circumstance.

17   Q.    They may have stopped, but they didn't return to

18   Oracle?

19   A.    They stopped using the software, that's right, so

20   they would not return to Oracle for support.

21   Q.    Okay.  Fifteen, Wendy's.  After the deposition, did

22   Wendy's return to Oracle?

23   A.    It looks like they stopped using the software.

24   Q.    Stopped.  So they didn't return to Oracle?

25   A.    That's right.  They didn't return to Oracle because

1935

1    they stopped using the software.

2    Q.    All right.  What about Pitney Bowes, after the

3    deposition, did Pitney Bowes return to Oracle?

4    A.    No, it looks like they may still be with Rimini.

5    Q.    Okay.  What about Sunrise Medical, after the

6    deposition, did they return to Oracle?

7    A.    They never left Oracle.

8    Q.    Never left.

9          Now, in formulating your -- I'm going to shift

10   gears.  Thank you for getting through that.  And we're

11   going to move on now quickly.

12         In formulating your opinion, did you calculate

13   damages based upon what you perceived were Rimini's

14   misleading statements about local versus remote hosting?

15   A.    I studied their whole business model so I don't have

16   a separate opinion about local versus remote hosting with

17   respect to certain customers.

18   Q.    Okay.  When you were doing your analysis of damages

19   in this case, did you assume that Rimini had misled its

20   customers about local versus remote hosting?

21   A.    Well, I mean, I don't know that I necessarily needed

22   to assume it, I saw evidence in the case with respect to

23   their misrepresentations.

24         MR. STRAND:  Let's look at Exhibit 2246, if we

25   can.  Exhibit 2246.  Excuse me, DTX.

1936

1    COURTROOM ADMINISTRATOR:  2246?

2    MR. STRAND:  And we can take down the big

3    document.

4    THE WITNESS:  I'm sorry.  Can you tell me that

5    number again?

6    MR. STRAND:  Sure.  DTX 24 -- excuse me, DTX

7    2246.

8    COURTROOM ADMINISTRATOR:  It's admitted already.

9    MR. STRAND:  Yes, it is admitted.  I'm sorry.

10   BY MR. STRAND:

11   Q.   You said in your direct examination, Ms. Dean, that

12   you had looked at a number of -- I think all of the Rimini

13   contracts with its customers; correct?

14   A.   I did.

15   Q.   And do you recognize this as an example of one of

16   those contracts insofar as it relates to PeopleSoft

17   products?

18   A.   Yes, this looks similar to what I would have

19   reviewed.

20   Q.   And then look with me at page 4 of that exhibit,

21   specifically paragraph D.

22   A.   I'm sorry, what paragraph?

23   Q.   Excuse me, paragraph capital D, begins "Copies of

24   Software."

25   A.   Yes.

1937

1    Q.    Let's highlight that and bring it up so we can see

2    it.

3              So let's look at D.  It says,

4              "Client acknowledges that Rimini Street might

5    need to work with, configure, test, and possibly modify

6    certain PeopleSoft clients licensed to client in order to

7    render services pursuant to this agreement.  Accordingly,

8    client will either (a) provide Rimini Street copies of the

9    PeopleSoft products, including any required license codes,

10   required for proper operation of the products listed in

11   Exhibit A in a non-production development and test

12   environment, or (b) configure and prepare persistent remote

13   access to client's test and development database

14   environments via the Internet."

15             Did I read that correctly?

16   A.    Yes.

17   Q.    Was it your experience that in reviewing the Rimini

18   contracts, all of the Rimini contracts with its customers,

19   language like that was in every contract?

20   A.    I can't say that.  I don't know.

21   Q.    All right.  To the extent that language was in the

22   contract, it disclosed to the customer that the customer

23   could either have the software remotely hosted at the

24   customer, or give a copy of the software to Rimini for

25   Rimini to locally host it; correct?

```
 1              MR. ISAACSON:  Objection, outside the scope and
 2    also misstates what that provision says.
 3              THE COURT:  Sustained.
 4              MR. STRAND:  I'll withdraw the question.
 5    BY MR. STRAND:
 6    Q.    In any event, we've heard testimony -- were you here
 7    for Mr. Allison?
 8    A.    I was.
 9    Q.    He testified that if a third party dialed in
10    remotely to the customer's facility and accessed and used
11    that software, he believed that would fall under access and
12    use.  Do you recall that testimony?
13              MR. ISAACSON:  Objection, outside the scope.
14              THE COURT:  Sustained.
15              MR. STRAND:  Fair enough.  I'll withdraw that
16    question.
17    BY MR. STRAND:
18    Q.    Now, in reaching your conclusion regarding causation
19    and damages, you relied, at least in part, on Mr. Yourdon's
20    testimony; correct?
21    A.    Mr. Yourdon's testimony was consistent with what I
22    saw, that's right.
23    Q.    You read his report?
24    A.    I did.
25    Q.    You found it credible?
```

1939

```
 1    A.    I did.
 2    Q.    And you heard his testimony yesterday; correct?
 3    A.    Yes.
 4    Q.    All right.  Did you hear Mr. Yourdon testify
 5    yesterday that -- well, the question was asked,
 6              "In your opinion, it was Rimini's promise of
 7         vendor-support at a significantly lower price than
 8         Oracle that caused customers not to renew their
 9         support with Oracle?"
10              MR. ISAACSON:  Can I have a page and line?
11              MR. STRAND:  I've only got the draft, but I'm
12    happy to give it to you.  It's page 67, line 11 through 15.
13              MR. ISAACSON:  I don't have the --
14              MR. STRAND:  It's yesterday's transcript.
15              MR. ISAACSON:  I don't have the draft.
16              MR. STRAND:  Here, I'll tell you what, I'll hold
17    it with you and I'll read it, and I'll talk up.
18    BY MR. STRAND:
19    Q.    Yesterday during the course of his testimony, it was
20    very early, he was asked the following question:
21              "Now, Mr. Yourdon, in your opinion, it was
22         Rimini's promise of vendor-level support at a
23         significantly lower price than Oracle that caused
24         customers not to renew their support with Oracle;
25         correct?"
```

1940

1         And he said, "Yes, that's my opinion."

2         Do you recall that testimony?

3    A.    Yes.

4    Q.    And you agree with that testimony; correct?

5    A.    I do.

6    Q.    All right.  So is it correct, then, to characterize

7    what caused customers to leave as the price for

8    vendor-level support; correct?

9    A.    Well, I don't think you can isolate the price in

10   that.  It's both.  It's offering a customer exactly what

11   they need from the vendor at half the price.

12   Q.    Okay.  But there was no mention in his opinion of

13   any misleading statements; correct?  The word misleading

14   was not used; correct?

15   A.    Well, the ability to offer that price and to offer

16   that vendor-level replacement service, I think, involved

17   their whole business model which was built on the copyright

18   infringement and the misleading statements.

19   Q.    From a financial perspective, you did not analyze

20   whether Rimini could provide a maintenance and support

21   service at vendor level without engaging in the acts Oracle

22   complains of, did you?

23   A.    I think what I stated was that their whole business

24   model was prefaced on the alleged wrongdoing.

25         So I don't think they could have had the

1941

```
 1    business model that they had if they hadn't done those

 2    things.  They couldn't offer a 50 percent vendor-level

 3    replacement service if they hadn't done those things.

 4    Q.    Let me ask the question again because I want to be

 5    clear.

 6               Assuming that Rimini could not infringe

 7    technically -- I don't want to ask technical questions.

 8               Assuming Rimini could not infringe technically,

 9    you did not analyze from a financial perspective whether

10    Rimini could be in business and not infringe, did you?

11               MR. ISAACSON:  Objection to form.

12               THE COURT:  Sustained.

13    BY MR. STRAND:

14    Q.    Did you analyze the cost to Rimini of doing business

15    without engaging in the acts that Oracle complains of in

16    this case?

17    A.    Well, the measurement that I have for that is

18    Oracle's costs which are, I think, you know, $16 billion or

19    whatever they spent to buy these companies.

20    Q.    Did you analyze the cost to Rimini of not

21    infringing?  That's my question.

22    A.    I think they couldn't have had a business, so it

23    would have cost them their entire business if they had

24    tried to do this without the things that they did.

25    Q.    So you didn't -- did you analyze and figure out how
```

1942

1    much it would cost Rimini?  You didn't do that, did you?

2    A.    If it was the sacrifice of the entire business.

3    Q.    An all-or-nothing proposition?

4    A.    I think that the way that they offered service from

5    the very beginning, to get referrals, to get credibility,

6    was all based on the alleged wrongdoing.

7    Q.    Let's move to my tab 24A, the -- all right.  You

8    remember this from yesterday?

9    A.    Yes.

10   Q.    I just want to be clear on this.  You calculated

11   Oracle's lost profits based on their lost incremental

12   profit; is that correct?

13   A.    That's the appropriate methodology, yes.

14   Q.    And that's what you did?

15   A.    Yes.

16   Q.    All right.  Let's look at your tab 6.1 if I could,

17   please, to your report.  It's both in your notebook and --

18   if you're more comfortable with your report, I'm certainly

19   happy with you looking at that.

20           And you analyzed the -- Oracle America's

21   incremental profit margin over the time period from 2006 to

22   2014; correct?

23   A.    That's correct.  And OIC, but just on this

24   schedule --

25   Q.    Yeah, I'm looking at your schedule, 6.1 SU --  and

1943

1    I'm only talking about Oracle Americas, Inc., right now;

2    right?

3    A.    Yes.

4    Q.    And the incremental profit for Oracle America over

5    that timeframe ranged between a low of 91 percent and a

6    high of 94 percent; correct?

7    A.    Yes.

8    Q.    And then let's look at your schedule 7 -- excuse me,

9    6.4 SU, which is the Oracle International Corporation

10   incremental profit margin.  Do you have that before you?

11   A.    I do.

12   Q.    And during the time period from 2006 to 2014, the

13   incremental profit margin for Oracle International

14   Corporation ranged from a low of 87 percent to a high of 98

15   percent in a partial year; correct?

16   A.    That incremental profit, yes.

17   Q.    Incremental profit.

18         If we take a full year, it ranged from 87

19   percent to 96 percent; correct?

20   A.    I'm not sure what you're asking if we take a full

21   year.

22   Q.    Okay.  I'm sorry.  2014 was a stub; right?

23              THE COURT REPORTER:  Excuse me.  A what --

24              THE WITNESS:  Yes.  For purposes of this

25   analysis --

1944

1        MR. STRAND:  Oh, I'm sorry.

2   BY MR. STRAND:

3   Q.    2014 was a stub year, just a couple of months;

4   right?

5   A.    For purposes of this, yes, because we were cutting

6   it off in February.

7   Q.    And on a full-year basis, the incremental profit for

8   Oracle International Corporation between 2006 and 2013

9   ranged from a low of 87 percent to a high of 96 percent;

10  correct?

11  A.    I think that's correct.

12  Q.    Okay.  If we could turn to the tab or the slide that

13  has the pie chart?

14        Now, if I understand your -- it's up in front of

15  you.

16        We've talked about lost profits, and I want to

17  shift a little bit to the infringer profits.  The infringer

18  profits come from these slices of pie, and I'm not going to

19  iterate it all, on the left-hand side.

20  A.    Not all of them, no.

21  Q.    Some of them?

22  A.    Some of them.

23  Q.    Most of them?

24  A.    Well, the three.  Not Oracle America, Relicensed,

25  Reinstated, and No Oracle Cancellation.

1945

1     Q.    Right around 90 customers, give or take?

2     A.    I think that's approximate.

3     Q.    Okay.  So you excluded it from lost profits, but

4   Oracle's seeking Rimini's profits on those customers;

5   right?

6     A.    That's right.

7     Q.    And you calculated the total profits on those, and

8   you gave your opinion about that yesterday; correct?

9     A.    I calculated the total revenues, yes.

10    Q.    That's the total revenues, that's top line revenues,

11  gross revenues; correct?

12    A.    They might be net of something, but not net of

13  costs.

14    Q.    Okay.  And if we take the costs out, it's true,

15  isn't it, that Rimini shows a net operating loss during the

16  period; correct?

17    A.    I don't know that that's true.

18    Q.    All right.  Well, let's look at your tab 5 to your

19  report -- excuse me, schedule 5.  You generated this

20  schedule; correct?

21    A.    I did.

22    Q.    And for the period from 2006 through 2011 -- well,

23  let me step back a moment.  This is entitled Consolidated

24  Statements of Income Summary For Rimini Street, Inc.;

25  correct?

1946

1   A.    That's correct.

2   Q.    And you prepared this; correct?

3   A.    Yes.

4   Q.    And for the time period from 2006 to 2010 when you

5   calculated this, you show net income of negative

6   $26,731,852; correct?

7   A.    That's correct, for the whole company.

8   Q.    Now, yesterday we heard from Mr. Screven -- excuse

9   me.  Wednesday we heard from Mr. Screven regarding software

10  security.  Were you here for his testimony?

11  A.    No, but I think I've read some of it.

12  Q.    Okay.  You're testifying as Oracle's damages expert

13  in this case; correct?

14  A.    Yes.

15  Q.    And as far as you know, you're the only Oracle

16  damages expert in this case; correct?

17  A.    Well, in terms of counting the money, yes.  But

18  Mr. Yourdon's opinions go to damages too.

19  Q.    Sure.  And insofar as your opinion is concerned, you

20  have no opinion regarding any damages associated with

21  software security, do you?

22  A.    I don't know what you're referring to.

23  Q.    Sure.  Do any of your opinions relate in any way to

24  software security, the issues that Mr. Screven discussed on

25  Wednesday?

1947

1    A.    I'm not sure what you're referring to.

2    Q.    Did you break out any separate damages opinion

3    relating to software security?

4    A.    You mean damages to Oracle from what allegation with

5    respect to security?

6    Q.    That's what I was getting at.  I tell you what.

7    Let's move on.  I want to wind this up.

8          You testified about damages arising from

9    Oracle's -- from Rimini's use of Oracle's database; is that

10   correct?

11   A.    Yes.

12   Q.    And I believe that was $19.2 million?

13   A.    That's correct.

14   Q.    All right.  Did you -- in analyzing damages, did you

15   consider alternatives to the Oracle Database that might

16   have been available to Rimini?

17   A.    No, it wasn't necessary to consider alternatives to

18   Oracle Database because they actually used Oracle Database.

19   Q.    You are aware from Mr. Allison's testimony that

20   Microsoft SQL was an alternative, as well as IBM DB2;

21   correct?

22   A.    Well, I think you're misaligning when you say

23   alternatives.  I don't think that's correct.

24          But there's competitors in the marketplace that

25   sell database, and that was the question that Richard

1948

1     Allison was answering, to my understanding.

2               But your questions with respect to alternatives

3     for Oracle's -- I'm sorry, for Rimini Street's use of

4     Oracle Database, that's a technical question.

5               And I think many Rimini witnesses testified in

6     deposition that the local environments had to be built

7     mirroring what the customer was using, and because it's the

8     stack of the application on top of the database, that's why

9     they used Oracle Database in those hundred -- eighty

10    instances.

11    Q.    All right.  And 72 customers?

12    A.    72 unique customers.

13    Q.    Okay.  And Rimini, then, had to have been using some

14    database for its other customers that it locally hosted;

15    correct?

16    A.    It's my understanding that they would have mirrored

17    what the customer had.  So if the customer was running

18    their production environment using a Microsoft database,

19    then the customer local environment would have been built

20    to mirror that.

21    Q.    All right.  Let's go on to the chart that you had in

22    your deck regarding the calculation of the Oracle Database

23    damages.

24              Do you recall that?  Had 22 percent maintenance

25    fee in it?  That's what I want to focus on.

1949

```
 1    A.    Is it important that I have it or not?

 2    Q.    Well, we're going to get it here real quick.  It's

 3    the tab -- tab 30 in our internal tabbing.

 4          Well, that's fine.

 5          You recall that in calculating damages for the

 6    Oracle Database piece of your damages calculation, up in

 7    the top line you said 22 percent maintenance fee.  Do you

 8    recall that?

 9    A.    Yes.

10    Q.    You realize that Rimini is a maintenance and service

11    support company; correct?

12    A.    I understand that's what they purport to do, yes.

13    Q.    And you assumed that they would pay a 22 percent

14    maintenance fee to Oracle for use of the Oracle Database;

15    correct?

16          There it is.

17    A.    Yes, they have to continue to mirror the client's

18    software so they have to have accessible to them the

19    patches, updates, fixes, that the database -- that the

20    client has, because the clients bought a license, and they

21    have to be able to mirror that on their side.

22    Q.    Now, looking at your agreement at a number of

23    places, if you want to look, paragraph 56 and 57 -- but let

24    me ask you the question --

25    A.    I'm sorry --
```

1950

```
 1    Q.    You're looking at your report, I'm sorry, paragraphs
 2    56 and 57 if you wish.
 3               You understand in drafting your report that
 4    Rimini experienced substantial efficiencies through its
 5    alleged improper use of Oracle's copyrighted software and
 6    support materials; correct?
 7    A.    Can you just wait until I get a copy of it open.
 8    Q.    Sure, sure.
 9    A.    Is it in the binder you gave me or --
10    Q.    Your new report is in the back of the white binder.
11    A.    I think I have a copy.
12    Q.    Whatever you're comfortable with, Ms. Dean.
13    A.    Okay.  I'm sorry.  You said 56, 57?
14    Q.    Paragraph 56.
15    A.    Can you repeat the question?
16    Q.    Sure.  And I'm going to just read it right out of
17    the report so we don't mess around.
18               Final sentence of that paragraph, it says,
19               "I understand that Rimini Street experienced
20    substantial efficiencies through its allegedly improper use
21    of Oracle's copyrighted software and support materials."
22               Did I read that correctly?
23    A.    You read that correctly.
24    Q.    You did not measure the value of the efficiencies
25    that Rimini experienced in a dollar basis, did you?
```

1    A.    Yes, I did.   The substantial efficiencies, like we

2    talked about, was the ability to have this business.   It's

3    all based on these actions.

4              This -- I understand that there's a dispute

5    between us about whether you agree with that.

6              But the substantial efficiencies, it's not just

7    a labor savings, there were plenty of emails in this record

8    about how remote service just wasn't feasible or how manual

9    downloading wasn't feasible, and they built the business

10   off of using this.

11             So that's the purpose of the substantial

12   efficiency statement in this text.

13   Q.    But you didn't analyze the dollar amount related to

14   those substantial efficiencies, did you?

15   A.    No.   That's incorrect.

16             MR. STRAND:   Thank you.   I have no further

17   questions.

18             THE COURT:   All right.

19             Redirect examination?

20                        REDIRECT EXAMINATION

21   BY MR. ISAACSON:

22   Q.    Ms. Dean, why did you just tell counsel that he was

23   incorrect that you did not measure the dollar volume of

24   the -- on the inefficiency issue?

25   A.    Well, because when I have to determine what Oracle's

1    harms are, if I think that Rimini could have stayed in

2    business and offered the same service, then I have to

3    calculate Oracle's damages differently.

4           So it's my opinion that all the substantial

5    efficiencies that were gained from all of the bad behavior

6    that led to referrals that were, you know, misleading to

7    other companies and ultimately grew the company into the

8    business that it became, that that all contributed to those

9    lost customers to Oracle, and that's why I measured

10   Oracle's harms in the way that I did.

11   Q.   All right.  This morning you were talking about some

12   of the smaller companies that did not provide full

13   vendor-level support, and you said some customers left for

14   those smaller companies.

15          How did you account for that in your analysis?

16   A.   So, I have two measures.  We talked about this on my

17   direct.

18          I stopped the damages for each individual

19   customer at the time they left Rimini.  So if those

20   customers left Rimini and went somewhere else, didn't go

21   off software, then that would be accounted for because I

22   didn't include any damages for that.

23          And then, in addition, I took all the customers

24   that I left in, the 228, and I reduced them all by Oracle's

25   natural attrition rate.

1953

```
 1            So just like any other customer of Oracle's,

 2   there's a possibility that they wouldn't have remained on

 3   service, and I used Oracle's actual attrition rates to

 4   reduce my damages.

 5   Q.    You were read the following testimony from Safra

 6   Catz, page 918, beginning at line 15.

 7            "Does the company have any philosophy

 8      towards these competitors, towards competition?

 9            "ANSWER:  Yeah; bring it on.  The truth is

10      competition makes you better.  It keeps you very,

11      very sharp."

12            Now, these competitors in the previous question

13   and answer, beginning at line 10 and what was not read to

14   you, the question was,

15            "And you mentioned that when you're

16      negotiating, that the customers may be negotiating

17      with others, your competitors.  Who are Oracle's

18      competitors?

19            "ANSWER:  IBM, Microsoft, Salesforce.com.

20      We have so many competitors, I truly can't list

21      them all here today."

22            How did you account for those competitors such

23   as SAP in your analysis?

24   A.    So those are competitors for other database

25   offerings, or other application offerings.
```

1       So what Oracle's business model is doing is it's

2  going to the customer, and the customer is assessing the

3  total cost of ownership for buying Oracle's ERP versus

4  somebody else's.

5       So when the company makes that decision -- and

6  they will revisit that decision over time as the company

7  changes.  As the company goes from, you know, 50 to 100 to

8  10,000 people, they're going to revisit whether or not they

9  have the right application software to do what they need.

10      So that is, I think, what we experience when we

11  see the 95 percent retention and that 5 percent leave.

12      The 5 percent that are leaving, obviously that's

13  affected a little bit by Rimini's and TomorrowNow's

14  actions.

15      But scoping that out for a second, let's say the

16  4 percent that leave for other reasons, they're leaving to

17  go to other software.

18      So they're revisiting that negotiation that you

19  just described, and that Safra described in her testimony,

20  and they're making a different decision about what ERP

21  vendor they want to use.

22      So when that happens, that's covered by my

23  general attrition.  That's a reason why I reduced my

24  number.

25  Q.   All right.  You were shown DTX 146 at page 6.

1    You were asked about Abtech and why you didn't

2  put them in your chart.  Why didn't you put Abtech in your

3  chart?

4  A.    Because when we did research on it, it didn't appear

5  that they had provided the support services.  I think they

6  provided some IT services, so more of, like, a hardware

7  infrastructure thing.

8  Q.    All right.  And you said why you -- I don't even

9  know how to pronounce this, Alui.  But say again why you

10 didn't put them on the chart.

11 A.    Because Hyperion is another product that Oracle

12 sells, but it's not a product in this case.

13 Q.    Okay.  Ciber, why didn't you put them in your chart?

14 A.    So Mr. Yourdon and I had a few conversations about

15 several of these, and most of these companies we couldn't

16 find much information at all with respect to whether or not

17 they actually provided service that was vendor replacement

18 support as opposed to consulting services.

19     So my recollection is that Ciber fell into the

20 category of a company that was providing consulting

21 services.

22 Q.    Is that also true for Citagus and Hexaware?

23 A.    I believe it was true for Citagus.

24     These are companies that offer, for example,

25 implementation or customization.

1    I think Ms. Ransom talked about how there are a

2    lot of companies out there that go help customers with this

3    software because it's complicated software, but they're not

4    providing updates, tax and regulatory updates and fixes.

5    Hexaware I recall being slightly different.  I

6    think they were another offshore company, and they tried to

7    get something going.

8    And my recollection is that they weren't of any

9    size, and then they stopped altogether, or perhaps they

10   were -- I remember they were being offshore.

11   I think they might have been literally like a

12   call center, and they weren't trying to replace vendor

13   support at level 3.

14   Q.   Okay.  What about -- you talked about in your

15   testimony NetCustomer and Spinnaker.  So let's go to Summit

16   Technology.  Why weren't they in your chart?

17   A.   So, similarly, I think they were offering -- my

18   recollection is they were offering consulting services and

19   not trying to replace the vendor.

20   Q.   All right.  You explained to counsel twice why

21   Versytec was not in your chart, but say it once more so we

22   have it clear.

23   A.   So Versytec -- my understanding is Versytec is just

24   like Alui, they're offering some service -- I don't know

25   it's support, but they're offering some service, but on a

1957

```
 1    product not part of this case.  Versytec's only product, as
 2    I understood it, was JDE World.
 3    Q.    All right.  The other list that you were shown was
 4    DTX 145 at page 4.
 5              There's four companies on this list.  You just
 6    talked about Versytec.  Then there's TomorrowNow and Rimini
 7    Street.
 8              So once we take Versytec out, the competitive
 9    landscape, which is the title of this slide, are these
10    three companies, TomorrowNow, Klee & Associates, and Rimini
11    Street.
12              And what do you have to say about Klee &
13    Associates?
14    A.    So my recollection was also -- on Klee & Associates,
15    that they were primarily focused on World.
16              I don't know if they offered any services on
17    EnterpriseOne which is the other -- which is the JDE
18    product that we care about in this case.
19              But my recollection is that they went out of
20    business.
21    Q.    All right.  Now, yesterday you were asked at the
22    beginning of the cross-examination about a statement that
23    you had made that a more appropriate measure of damages may
24    be Rimini's value of use and how that provides -- that may
25    provide a more complete remedy for Oracle in this case.
```

1           Would you explain what you meant by that?

2    A.    Yes.  So actual damages can be measured as lost

3    profits or as this other framework of a hypothetical

4    negotiation between the parties where they negotiate a

5    license for the infringer's actions.

6           Just to make it clear to everybody --

7    Q.    Why would it be more complete?

8    A.    Why would it be more complete?

9           So, in the hypothetical negotiations, this is a

10   fictitious circumstance, not like two people negotiating

11   today where they don't know what's in the mind of the other

12   side.

13          The law allows, in this fictitious negotiation,

14   for both parties to know everything about what the other

15   party knows.  It's called open book or book of wisdom.

16          So you can tell that in that circumstance that

17   if Oracle knew that Rimini was going to offer this service

18   to every single customer at 50 percent off and use Oracle's

19   materials to do so, that Oracle would have a reaction, and

20   likely a very strong reaction, to that and want to -- and

21   if they had to negotiate a contract in those circumstances,

22   they would want a lot of money because they just spent

23   $16 billion to buy the companies that have this technology

24   that allow them to sell these applications and sell these

25   support renewal services.

```
 1    Q.    Okay.  Let me ask you a very simple question, then,
 2    about that.
 3              You didn't testify about a value of use measure
 4    for Siebel, JDE, or PeopleSoft; correct?
 5    A.    No.
 6    Q.    If you had used that measure, would you have stated
 7    that the damages were higher or lower?
 8    A.    They would be much higher because they could
 9    incorporate things that the two companies would be thinking
10    about that lost profits can't.  Lost profits just measures
11    each company that Rimini actually took.
12    Q.    Okay.  Let me ask you about something else.
13              MR. ISAACSON:  Can we look at Hicks' slide 16.
14              THE WITNESS:  Do I have that?
15              MR. ISAACSON:  Yes.
16    BY MR. ISAACSON:
17    Q.    Now, you were asked a series of questions about
18    three months of -- a three-month period in which there was
19    automated downloading -- the KM downloading.
20              All right.  Now, Mr. Hicks testified about
21    automated downloading more than the KM downloading;
22    correct?
23    A.    Yes.
24    Q.    Okay.  And looking at his summary, the knowledge
25    based tool at the bottom, that's the KM downloading; right?
```

1    A.    That's my understanding, yes.

2    Q.    Right.  And when you measured -- when you estimated

3    the value of 14 lost customers, I believe it was

4    $14 million.  That was related to that time -- period of

5    time?

6    A.    Right.  Only related to those activities, that's

7    right.

8    Q.    Right.  And what counsel did not ask you about was

9    all the other automated downloading that Mr. Hicks

10   testified about that began as early as the beginning of

11   2007 and continued through the fall of 2008; correct?

12   A.    That's correct.

13   Q.    And then into the beginning of 2009.  He didn't ask

14   you about any of that.

15   A.    That's correct.

16   Q.    All right.  And then, if the Siebel business was

17   built upon that automated downloading, that's when you get

18   the higher damages number that you estimated, which I don't

19   have in front of me but was in the neighborhood of

20   $40 million?

21   A.    Yeah, I think it was 34.

22   Q.    34 million.  Thank you.

23         Okay.  So when counsel was asking you about the

24   automated downloading that Mr. Hicks has testified about,

25   was he even coming close to asking you about all the

1961

1     automated downloading that Mr. Hicks talked about in his

2     testimony?

3     A.    No.  I understood his questions to be focused just

4     on the knowledge management, November, December of 2008,

5     and January of 2009.

6     Q.    All right.  Let me -- counsel yesterday showed you a

7     chart about attrition rates.  Can we look at that?

8              Or cancellation rates.  But you had a long

9     discussion yesterday about cancellation rates.  And, in

10    your calculations, how did you account for cancellation

11    rates by Oracle customers?

12    A.    So, again, I take out everybody down to the 228.

13             I take out the damages only as long as they were

14    at Rimini, and I assumed if they had been at Oracle at that

15    time they would have cancelled, so that's a cancellation.

16             And then on top of that, for all those same

17    customers.  I also take out an amount equivalent to, you

18    know, the red bar area of this chart.

19    Q.    All right.  Now, he asked you -- he had you look at

20    these general cancellation rates, and then he showed you

21    some other cancellation rates.

22             Let's look at DTX 160, at page 3, 3 at the

23    bottom.

24             All right.  Do you remember looking at this with

25    counsel -- with defense counsel?

1      A.    Yes.

2      Q.    All right.  Now, this relates to cancellation rates.

3   How did you take into account these cancellation rates in

4   your analysis?

5      A.    So JD Edwards was obviously one of the product lines

6   that I studied, and the -- I used the actual historical

7   cancellation rates that were -- that we previously talked

8   about to reduce my damages for the customers that I

9   calculated lost profits on.

10     Q.    So you used the actual rates that are in this

11  document and the other documents that you saw to the extent

12  that these documents are accurate?

13     A.    Yes.  If this blends into the overall accounting,

14  that's what I used.

15     Q.    All right.  And it says,

16          "JD Edwards customers are showing consistently

17  low levels of satisfaction with Oracle products and

18  services."

19          And there's been testimony about -- from

20  Ms. Ransom about what they means by "consistently low

21  levels," whether that's a 6 or a 5, but whatever it is, you

22  took it into account?

23     A.    I did.

24     Q.    Okay.  Then you were also shown DTX 161 at page 7.

25  This was the JDE cancellation analysis.  This applied only

1963

1     to JDE; right?

2     A.    I'm sorry.  Yes, it does.

3     Q.    All right.  And then you were shown DTX 165 at page

4     28, and this is a JDE document?  If you look at --

5     A.    I can't see it on this page, but I have it open in

6     front of me, and the first page says Track and Analysis E1,

7     which is JDE EnterpriseOne.

8     Q.    Right.  And in terms of the importance of the JDE

9     attrition rates or cancellation rates, can we look at the

10    JDE slide that we used during the direct testimony, the

11    copyright infringement damages for JD Edwards?

12    A.    Yes.

13    Q.    All right.  This is fine.

14          Of the total copyright damages, JDE is

15    7.1 million of that; is that right?

16    A.    That's right.

17    Q.    All right.  You were asked a number of questions by

18    counsel today, and you talked about how, in your opinion,

19    that the business model of Rimini had been infiltrated by

20    the conduct we've alleged.

21          Can I ask you to look at slide --

22          MR. ISAACSON:  Matt, let's show slide 53.  No,

23    that's -- it's the first Siebel customer slide.  There we

24    go.  Fill it out.

25

1964

1    BY MR. ISAACSON:

2    Q.    You're familiar with the testimony of Mr. Ravin

3    where he was confronted with this evidence about what was

4    happening with the first Siebel customers in their first

5    year of business?

6    A.    I read that testimony.

7    Q.    And then can we look at the pilot clients' slide.

8          This is where they listed their early pilot

9    clients, their most important clients.  You were familiar

10   with that testimony?

11   A.    Yes, I read that as well.

12   Q.    And then the public clients, the first three public

13   clients?  These were the magic three that gave them other

14   references?

15   A.    I did read that as well.

16   Q.    All right.  And then speaking about reference, can

17   we look at the PeopleSoft references slide, which was also

18   discussed with Mr. Ravin.

19         Let's do JD Edwards first.  That's fine.

20         These were the top companies giving references

21   to Rimini Street for JD Edwards.

22         And then the next slide, PeopleSoft.

23         These were the top companies giving references

24   to Rimini Street for PeopleSoft?

25   A.    Yes, that's my understanding.

1    Q.    And then Siebel, these were their top Siebel

2    references.

3            All right.  Would you explain what we were just

4    looking at here, how that relates to your analysis of how

5    this business was built?

6    A.    And it's pictorial, but it's the evidence of how the

7    business all built on the bad acts.

8            So you saw how many customers benefitted.  Those

9    customers then gave referrals that brought new customers in

10   who also benefitted.

11           So the entire foundation of the company and its

12   ability to generate revenues, its ability to take away

13   Oracle's customers, is based on this foundation of exactly

14   the allegations that Oracle's put forth.

15   Q.    All right.  We went through a list of 17 customers.

16   The -- I'm going to show you some of their testimony.

17   Counsel showed you some of their testimony.  I'm now going

18   to show you some other testimony.

19           Let's start with Ms. Minks of Brazoria County.

20   This is from her deposition, page 60, line 22.

21           MR. STRAND:  Your Honor, excuse me.  May I

22   approach the bench?

23           THE COURT:  You may.

24       (Sidebar conference held as follows:)

25           MR. STRAND:  Your Honor, this is not in

1966

```
 1    evidence.  It hasn't been admitted.  It's hearsay.
 2              If you want to read her a part of it, fine, but
 3    I don't think we should show it to the jury, because you
 4    just don't show deposition transcripts to the jury.
 5              MR. ISAACSON:  These are all part of the
 6    designations that have been played or will be played.
 7              THE COURT:  The designations of what?
 8              MR. ISAACSON:  We played some customer videos.
 9    They're playing some customer videos.
10              MR. STRAND:  All right.  On your representation
11    they've all been designated and agreed to, they're not
12    objected to, because, believe me, you'll hear about it if
13    they're not.
14              MR. ISAACSON:  I'll be cautious.
15              MR. STRAND:  Okay.
16              THE COURT:  All right.  Thank you.
17         (Sidebar conference concluded.)
18    BY MR. ISAACSON:
19    Q.    You reviewed the 17 -- you were actually shown
20    yesterday testimony from some of the 17 customers that
21    counsel wanted you to see.  But you read the whole
22    depositions; right?
23    A.    I did.
24    Q.    All right.  Now, do you recall -- I'm going --
25    Ms. Minks from Brazoria County --
```

1          MR. ISAACSON:  Not on the screen, Matt.

2   BY MR. ISAACSON:

3     Q.   Question -- this is at page 60, line 22.

4          "If the use of Brazoria County's software to

5     create environments for other Rimini Street

6     customers was a violation of Brazoria County's

7     PeopleSoft license, would Brazoria County have

8     allowed Rimini Street to do that?

9          "No.  I mean, if it's a violation of a

10    license, I don't think they would have.

11         "QUESTION:  And if Brazoria County knew that

12    it was a violation of the PeopleSoft license and it

13    knew that Rimini Street would do that, would it

14    have contracted with Rimini Street?

15         "ANSWER:  I don't know.  I don't think you

16    want to -- I mean, if you're saying, 'Hey, somebody

17    is going to do something wrong; are you still going

18    to go with that?'  I mean, the common answer would

19    be, no, you're not going to want to do something

20    wrong."

21         You familiarized yourself with that testimony;

22   right?

23    A.   That's correct.

24    Q.   And Mr. Swanson of AGCO at his deposition, page 22

25   at line 11 was asked,

1           "Okay.  Is it your position -- is it AGCO's

2      position that it's okay to contract with a vendor

3      that breaks the law?

4           "ANSWER:  I believe that AGCO would not

5      contract with a vendor that it knew was knowingly

6      breaking the law."

7           You reviewed that testimony; right?

8   A.    Yes.

9   Q.    Mr. Hintz of Hastings Entertainment at page 44, line

10  20, was asked,

11          "If Hastings had known that Rimini Street

12      would use a copy of Hastings' PeopleSoft software

13      to serve other customers and Hastings had known

14      that doing so would exceed the scope of the license

15      that PeopleSoft had granted Hastings, would

16      Hastings have contracted with Rimini Street?

17          "ANSWER:  No."

18          And while I'm bothering you with all of this,

19  the jury has actually seen -- has seen some of this and

20  will see the rest of it, I believe.

21          Mr. Moore of Koch Industries, page 63, line 9.

22          "If you knew at the time you contracted with

23      Rimini that they intended to use Koch materials to

24      build environments for other Rimini customers,

25      would you have agreed to sign the contract with

1969

1    Rimini Street?

2            "I -- we -- had -- had we known that that

3    were the circumstance, no, we would not."

4            Thomas O'Brien of the City of Flint.

5            "If the City of Flint had been aware that

6    Rimini's business model involved the improper use

7    of Oracle's intellectual property, would the city

8    have contracted with support for Rimini?

9            "ANSWER:  If they were not in compliance

10   with our licensing agreements with those companies,

11   I would say that we probably could not have.

12           "And the thing you could not have done would

13   be to contract with support with Rimini?

14           "ANSWER:  Correct."

15           Clark Strong of Birdville.  You were shown other

16   testimony of his.  He was asked at page 19, line 18,

17           "If you had believed that Rimini Street was

18   going to use your software to support other

19   customers, would you still have signed with Rimini

20   Street?

21           "ANSWER:  I wouldn't have recommended it.

22           "QUESTION:  And if you had believed at that

23   time that Rimini Street's installing your software

24   on its systems was a violation of your license

25   agreement with Oracle, would you have signed with

1970

1      Rimini Street?

2              "ANSWER:  I wouldn't have recommended it."

3              Charles Tewell of YUM Brands, at page 34, line

4      19 of his deposition.

5              "QUESTION:  So let me ask a hypothetical

6      question, then:  If you had known that Rimini

7      Street was violating the law in terms of how it was

8      supporting YUM, would YUM still have been willing

9      to sign with Rimini Street?

10             "ANSWER:  I'd say absolutely not.  We would

11     not have -- not enter into any agreement with any

12     company that we knowingly knew was violating laws."

13             James Ward, Wendy's.  This was played in court.

14             "If Wendy's believed that Rimini Street had

15     a business model that involved the improper use of

16     intellectual property, would Wendy's have

17     contracted with Rimini Street for support?

18             "ANSWER:  No."

19             Kim Cabada of CKE Restaurants, at line 20 -- at

20     page 20, line 1.

21             "So if CKE had not been reassured that

22     Rimini's services were going to comply with

23     Oracle -- with CKE's licenses with Oracle, would

24     CKE have proceeded to sign a contract with Rimini

25     Street?

1     "ANSWER:  No."

2          You were shown testimony from Brian Baggett of

3     Bausch & Lomb.  He was asked this question and answered at

4     page 69, line 19.

5          MR. STRAND:  Your Honor, if we could get a

6     question mark at some point along in this?

7          MR. ISAACSON:  I've got one more -- or I've

8     got --

9          MR. STRAND:  Okay.  Fair enough, Counsel.  Okay.

10    Go ahead.

11         MR. ISAACSON:  I've got a couple more.  Then I'm

12    going to ask her if she reviewed all these.  I'd rather not

13    do it on each one.

14         MR. STRAND:  Go ahead.

15    BY MR. ISAACSON:

16    Q.    Question -- this is Bausch & Lomb whose testimony

17    was shown in opening statement and to this witness.

18         "And is it fair to say that Bausch & Lomb --

19    if Bausch & Lomb had knowledge at the time it

20    entered into the support agreement with Rimini that

21    Rimini's business model involved improper use of

22    intellectual property, that Bausch & Lomb would not

23    have contracted with Rimini?

24         "ANSWER:  That's correct?"

25         Barbara Shepard of Blue Cross Blue Shield, page

```
 1   24, line 22.
 2              "BlueCross BlueShield would not have gone to
 3       Rimini Street if it believed that Oracle's
 4       allegations were true?  Is that correct?
 5              "ANSWER:  I don't believe -- we wouldn't
 6       intentionally do business with them if we felt that
 7       they'd done something wrong."
 8              The County of Kent, Craig Paull,
 9              "Is it a general practice of Kent County to
10       not contract with companies that break the law?
11              "ANSWER:  Yes."
12              Mr. Higa's testimony has been played and was
13       shown in opening statement.  I won't bother you again with
14       that.
15              JB Hunt, whose name you were asked about.  Tracy
16       Black, page 62, line 22.
17              "So with the understanding that you don't
18       know for sure one way or another, I want to ask you
19       a hypothetical question -- or rather, two
20       hypothetical questions.  First of all, would -- if
21       JB Hunt knew that Rimini Street's business
22       infringed Oracle's copyrights would JB Hunt have
23       contracted with Rimini Street for support?
24              "ANSWER:  No."
25              Pitney Bowes, the deposition of Stephen
```

1973

1    Woodward, at page 31, line 16.

2              "If Rimini Street hadn't been able to

3         provide you with the reassurance" -- it wouldn't

4         have been more or less -- "would that have made it

5         more or less -- more or would it have made it less

6         likely for Pitney Bowes to enter into -- to enter

7         into an agreement with them?

8              "ANSWER:  Again, we want to make sure that

9         they are acting with integrity.  So if we felt they

10        weren't, we wouldn't have moved forward."

11             We played the testimony of Graham Carter of

12   SonicWall in court, but he was asked,

13             "Is it fair to say that if SonicWall had

14        knowledge at the time it entered into the support

15        agreement with Rimini, if Rimini business model

16        involved improper use of intellectual property that

17        SonicWall would not have contracted with Rimini?

18             "ANSWER:  Yes."

19             James Dorvee of Sunrise Medical, the final one.

20   Page 45, line 13.

21             "And if you learned that using your software

22        on Rimini's server was central to their business

23        model, and illegal, would you have signed the

24        contract with Rimini Street?

25             "ANSWER:  I actually would not have signed

1974

```
1       the contract."

2              Now, that was all 17 of the customers.  And I

3  apologize for reading all of those, but I thought it was

4  important.

5  BY MR. ISAACSON:

6  Q.    You took that into account in your analysis?  You

7  reviewed that?

8  A.    Yes.

9  Q.    Okay.  And how did that relate to your analysis?

10 A.    Well, a lot of those customers were the primary

11 customers that then, like City of Flint, provided a lot of

12 referrals.

13             So if they couldn't get those customers because

14 their messaging had been, you know, honest, rather than

15 what it was, then they couldn't have built a business

16 because they wouldn't have had the credibility to convince

17 other customers to go with them.

18 Q.    All right.  So I want to show you PTX 2155 which --

19             MR. ISAACSON:  I don't have a note as to whether

20 this has been admitted or not.  Before you put it on the

21 screen, do we know whether it's been admitted or not?

22             COURTROOM ADMINISTRATOR:  It is admitted.

23             MR. STRAND:  Do you have a copy of it, Counsel?

24             MR. ISAACSON:  Can we get them a copy of PTX

25 2155?  Let's get them 554 while we're at it.
```

1975

1            COURTROOM ADMINISTRATOR:  What was the other

2    one?

3            MR. STRAND:  You're going to start with which

4    one, Counsel?

5            MR. ISAACSON:  2155 at page 4.  And this is Seth

6    Ravin writing.

7            MR. STRAND:  I object, Your Honor, outside the

8    scope of the cross.

9            MR. ISAACSON:  This document is talking about

10   how Rimini built its business which was --

11           MR. STRAND:  I continue to object.  The document

12   was not discussed or offered during the cross.  I object.

13   It's outside the scope.

14           MR. ISAACSON:  He asked her the basis for her

15   opinions --

16           THE COURT:  I'm going to allow the question

17   because I feel that it's within the scope of the

18   cross-examination.

19   BY MR. ISAACSON:

20   Q.   Okay.  Now, this is Mr. Ravin writing in March 23rd,

21   2006.  This is right when they're starting to get

22   customers; right?

23   A.   Yes.

24   Q.   Okay.  And he writes to someone named Alma in the

25   first -- in the second large paragraph about how you build

1976

1    this business.

2           He says,

3           "We're making great strides in building the

4    business -including having our first client," who the

5    jury's heard about, "to take reference calls now from other

6    prospective clients."

7           'However, we are spending huge sums on

8    infrastructure and expansion, so, like every startup at

9    this 'gap' between heavy spend and the growth of

10   substantial cash flows, I need to make sure our spend on

11   everything is in the category of 'essential' to success."

12          He goes on to say, "We get to the 'nice to

13   have's'" -- he goes on to say, "We get to the 'nice to

14   have's' soon enough, but this is the stretch where we go

15   from a couple referenceable clients to four, and then we

16   have a business core and we have a business."

17          Would you explain how this relates to your

18   analysis?

19   A.    And so this is the kind of evidence that I looked

20   at, and this is one example.

21          But there were many documents in the case that

22   went to these same points, the key to having referral

23   clients builds additional business and additional

24   credibility.

25          The key to having the library and being able to

1    tell customers that you have all of the materials that they

2    would have if they were at Oracle was key to building that

3    credibility.

4            And the business stemmed from those actions.

5    Q.    All right.  And then if we could look at 554.

6            All right.  We've looked at this before with

7    Mr. Ravin.  This is now October 2008, a couple years later,

8    and he is -- and he is writing to Mr. Slepko and others.

9            At the bottom of the first -- right there.  "A

10   client" -- I'm sorry.

11           "It wouldn't matter if we had the best JDE

12   resources in the world if we don't resolve the foundation

13   issues.  A client first and foremost must believe they have

14   the right to be with us and use their software...or the

15   rest is just noise."

16           Would you explain how that relates to the

17   opinions that you were explaining to defense counsel?

18   A.    So that is the exact point about having the

19   credibility.  And the reason that the frequently asked

20   questions come up is that customers care about whether or

21   not they're in compliance with Oracle's license.

22           And when they get -- they ask those questions

23   and they're not answered properly, then they think that

24   they can go to Rimini, and they continue to tell other

25   customers this is okay to do when it's not.

1978

1    Q.    All right.  Just a couple more points.

2              Now, in your pie chart you had one piece of pie

3    that represented customers who returned to Oracle.  I

4    believe there were 39 of those; is that right?

5    A.    That's right.

6    Q.    By the way, about that returning to Oracle, you

7    said -- wait.  I'm sorry.  I'll start over.

8              So for those 39 customers, you calculated no

9    damages; correct?

10   A.    No lost profits damages, but they would be in

11   infringer's profits.

12   Q.    All right.  And you understand Rimini says that if

13   you come back to Oracle, that Oracle charges a

14   reinstatement fee and past -- along with past years of

15   money?

16   A.    That's a policy that Oracle has.

17   Q.    Right.  And to the extent that that's been

18   implemented and any money's been received because of that,

19   you didn't calculate any damages for that from those 39

20   customers, you excluded that from your analysis?

21   A.    Yeah, I assumed that the back support had been

22   charged.

23   Q.    All right.  But you didn't add it into your damages?

24   A.    I didn't add it into my damages.  If the back

25   support had been charged, then Oracle would be made whole

1979

1    on those contracts.

2    Q.    And if Oracle waived it, if Oracle waived that

3    amount about which there's been testimony, you didn't

4    include that amount in your damages?

5    A.    That's right.  I think for the most part, the

6    companies that I looked at, they relicensed so that's a

7    provision that a customer takes a new -- a brand-new

8    license and so they basically start over with Oracle.  And

9    when they do that, they do not have to pay the back

10   support.

11            And so there would be a gap of losses that I did

12   not include in my damages model for those customers.

13   Q.    All right.  And then you talked about your specific

14   attrition rate.

15            And over here counsel eventually started writing

16   some of these things saying stopped.

17   A.    Right.

18   Q.    How does your specific attrition rate take into

19   account the customers that stopped using the software?

20   A.    So I only calculate damages for Oracle for the

21   period of time that customer was at Rimini.

22            So I assume that if Oracle -- if a customer had

23   stayed with Oracle, it would have made the same decision it

24   made when it left Rimini, it obviously decided not to use

25   the software anymore.

1     So I assume that that same decision would have

2  occurred at Oracle, and I have no more damages after the

3  customer leaves Rimini Street.

4  Q.   And we don't, in fact, know that if they had stayed

5  with Oracle, maybe they wouldn't have stopped.

6  A.   That's right.  I mean, we -- I think we heard Safra

7  testify that -- and Ms. Ransom too, that they like to work

8  with their customers.

9     In fact, that's why we see all these documents

10  about testing customer satisfaction, because they want the

11  customers to be satisfied because customers are very, very

12  important to Oracle.

13     So they could have continued to work with a lot

14  of these customers and overcome some of the things like,

15  for example, the misimpression that they couldn't get

16  sustaining support and that their products were going to be

17  sunsetted.

18  Q.   All right.  And what was interfering with Oracle's

19  abilities to be able to talk to the customers about what we

20  would call the truth?

21  A.   Well, it was that they were no longer Oracle

22  customers because they had been separated from Oracle's

23  day-to-day activity with them by being replaced by Rimini

24  in the report -- in the support cycle.

25  Q.   All right.  And then finally, overall, I think you

                                                                    1981

 1     said that during your examination that you considered your

 2     damages estimates to be conservative.

 3               You had a long discussion with defense counsel.

 4     Is that still your opinion?

 5     A.    Yes, absolutely.

 6               MR. ISAACSON:  No further questions.

 7               MR. STRAND:  I just have a couple.

 8               THE COURT:  Recross examination.

 9               MR. STRAND:  Just a couple of follow-ups, Your

10     Honor.

11                          RECROSS-EXAMINATION

12     BY MR. STRAND:

13     Q.    Ms. Dean, just a few moments ago you looked at the

14     slides with the different clients, the referral clients,

15     the pilot clients.  Do you recall all those?

16     A.    Yes.

17     Q.    All right.  Beyond those slides and what's shown on

18     those slides, you didn't do any analysis of the referral

19     network for Rimini clients, did you?

20     A.    Well, I definitely saw evidence in the case that may

21     have gone beyond what was listed on the slides.

22     Q.    We haven't seen any of that evidence in this case,

23     have we?

24     A.    Well, I assume other witnesses have sponsored that.

25     Q.    Okay.  Let me -- I'm only going to ask about three

1982

```
 1    questions.
 2              MR. STRAND:  Let's go back to 5469, page 1, and
 3    Access Intelligence LLC.  I guess we need to switch.
 4    BY MR. STRAND:
 5    Q.    That very first client, remember we've talked about
 6    him or them quite a bit.  Access Intelligence, do you see
 7    that?
 8    A.    Yes.
 9    Q.    Do you have any knowledge about who referred -- who,
10    if anyone, referred Access Intelligence to Rimini?
11    A.    I don't know who did that.
12    Q.    And do you have any knowledge about who, if anyone,
13    Access Intelligence referred to Rimini?
14    A.    Well, personally, sitting up here, I don't.  There's
15    probably evidence in the case about both of those points.
16    Q.    And we could go through that whole list of 228
17    clients and your answer would be the same; correct?
18    A.    Right.  But there's likely a lot of evidence in the
19    case about that, but sitting up here right now, I can't
20    tell you.
21              MR. STRAND:  Thank you very much, Ms. Dean.  I
22    have no further questions.
23              THE COURT:  Any further questions, Mr. Isaacson?
24              MR. ISAACSON:  Nothing, Your Honor.
25              THE COURT:  All right.  Ms. Dean, that completes
```

1983

```
1    your testimony, and you may step down.  Thank you.
2               Ms. Dunn?
3               MS. DUNN:  Your Honor, Oracle rests its case.
4               THE COURT:  All right.  Ladies and gentlemen,
5    what that means is, is that the evidence being presented by
6    Plaintiffs Oracle has all now been presented to you.
7               That will take us to the defense case.  However,
8    I will need to take a break in light of this just because
9    of some of our housekeeping measures that we need to
10   address.
11              So we'll take our first break a little bit
12   early.  I'll remind you of all the admonitions.  I'm not
13   going to go through each and every one because I think you
14   could repeat them to me right now, but please be very
15   careful about honoring those.
16              We'll take a break.  I'm sure it will be at
17   least 10 or 15 minutes, but it could be a little bit
18   longer.  We'll get back just as soon as we can.  You may go
19   ahead and step down.
20              COURTROOM ADMINISTRATOR:  Please rise.
21          (Jurors exit courtroom at 9:36 a.m.)
22              THE COURT:  Have a seat, please.
23              Do I -- does counsel for Rimini desire to raise
24   any motions at this the time?
25              MR. EVANSON:  Your Honor, I should introduce
```

1984

```
 1    myself.  I've been on the bench throughout the trial.  I'm
 2    Blaine Evanson from Gibson, Dunn & Crutcher.
 3              And I just want to -- you know, we want to move
 4    for judgment as a matter of law under Rule 50(a), and just
 5    note that a brief will be forthcoming in a couple days that
 6    will articulate all the reasons -- all the pieces for that
 7    motion.
 8              THE COURT:  Okay.  And the record will show that
 9    you've made that motion.  The Court will allow you to file
10    a brief in support of your position, and your motion is
11    reserved pending that at this time.
12              Do we have a prospective timeframe for the
13    submission of such a brief?
14              MR. EVANSON:  A couple days.  I guess we could
15    do it early next week.  We'll plan on that.  Definitely
16    before the case goes to the jury.
17              THE COURT:  All right.  Okay.  Well, obviously
18    defendants would want an opportunity to respond, so I'm
19    going to have it -- request that you have it before 5:00 on
20    Monday.
21              MR. EVANSON:  Okay.  Understood.  Thank you,
22    Your Honor.
23              THE COURT:  And Oracle will have at least 24
24    hours to respond to it.
25              MR. EVANSON:  Thank you.
```

1985

```
 1              THE COURT:  All right.  Is there anything else

 2   you would like to raise at this time, Mr. Webb?

 3              MR. WEBB:  No, Your Honor.

 4              We have trimmed our case considerably.  It is

 5   our hope that we might be able to wrap up late Wednesday.

 6   Given kind of how things work, we might actually bleed into

 7   Thursday.  But we're fairly confident that our case will be

 8   in by middle of the day Thursday, just to give you an idea

 9   kind of what's coming up.

10              THE COURT:  Okay.  I appreciate that.

11              I also need to discuss schedule with you.

12              I have a matter that I have return to Reno for

13   on Wednesday afternoon.  So our session on Wednesday will

14   be -- will end probably at noon, and then our session on

15   Thursday will probably start at 9:00 rather than 8:00.

16              That is tentatively where I'm headed.

17              Now, if we are in an absolutely critical stage

18   of what's happening in this trial, I could cancel and

19   reschedule my plans, but it's very difficult to do so.

20              MR. WEBB:  We'll do our best to make sure we

21   don't have a problem with that schedule, Your Honor.

22              THE COURT:  All right.  Are there any scheduling

23   issues that concern the defense?

24              MR. ISAACSON:  Nothing from plaintiff, Your

25   Honor.
```

1986

```
 1                THE COURT:  Okay.  I might also give you a

 2    heads-up on what I'm envisioning with jury instructions.

 3                Of course, we're all painfully aware of the

 4    number of proposed instructions that have been submitted in

 5    this case and the issues that concern those instructions.

 6                It is my practice with regard to this settling

 7    of instructions to conduct a review of the proposed

 8    instructions ahead of time and to submit a working

 9    beginning of where the Court is on the instructions that

10    have been submitted.

11                Now, obviously in a case like this I anticipate

12    that there will be, as there always is in a complex case, a

13    series of instructions which I'm guessing in the

14    neighborhood of 10 to 20 that are going to be very

15    sensitive to both sides and will take a considerable amount

16    of time.

17                Bottom line is I'm thinking that it's going to

18    take a day to settle those instructions to be comfortable

19    with what the final set of instructions will be.

20                And so, on the conclusion of the case, I

21    anticipate excusing the jury for at least a period of a day

22    to have that session for settlement of jury instructions

23    and to bring the jury back the next day and start right in

24    with the reading of instructions and argument.

25                I'm also considering time limits on argument,
```

1987

```
 1    and what I'm looking at right now is an hour and a half per

 2    side, but I'm willing to listen to counsel if you're

 3    uncomfortable with that.

 4            So those are the issues that I see coming up as

 5    far as scheduling is concerned.

 6            Does anyone have any question about any of that?

 7            MR. ISAACSON:  Maybe I have the same question.

 8            So it sounds like with the slight -- with the

 9    loss of an hour or two on Wednesday or Thursday, if we're

10    going to be wrapping up sometime on Thursday, without using

11    the full day, would you anticipate then taking Friday --

12    giving the jury Friday off and then closings on Monday?  Do

13    you think that's where we're headed?

14            THE COURT:  If that's where we're headed, I

15    would prefer to give them the case on Monday because it --

16    I can tell you, I have to -- the one jurisdiction I don't

17    have a lot of control over is the General Services

18    Administration, and operating this building and having jury

19    deliberations over a weekend, is something that is pretty

20    much beyond my control, starting with the fact that we

21    don't have air conditioning;

22            So roughly it sounds like that may be where

23    we're headed.

24            MR. WEBB:  If we were to wrap Wednesday before

25    Your Honor has to leave, and we could have Thursday to do
```

1988

1    the instruction conference, would it be Your Honor's

2    preference to do closings then on Friday?

3              Is that at least a possibility in terms of when

4    we wrap up?

5              THE COURT:  Well, I want the jury to be able to

6    immediately resume deliberations upon the completion of

7    argument.

8              And with a complex case like this, that's the

9    problem that I see, if we basically consume a half a day or

10   more with closing arguments, and the jury goes out on a

11   Friday afternoon, it just doesn't make sense to start

12   deliberations at that time, which tells me we would start

13   closing statements on Monday morning.

14             MR. WEBB:  Understood, Your Honor.

15             THE COURT:  Okay.  Well, that's where we are.

16             Let's take a brief recess for the benefit of

17   everyone other than the jury, and we'll reconvene in

18   approximately 10 minutes.

19        (Recess from 9:43 a.m. until 10:01 a.m.)

20        (Jurors enter courtroom at 10:01 a.m.)

21             THE COURT:  Have a seat, please.

22             The record will show we are in open court.  The

23   parties and counsel are present, and the jury is all

24   present.

25             Ladies and gentlemen, Plaintiffs Oracle have

1989

1    rested their case.  Defendants Rimini may now present their

2    evidence and witnesses.

3              And you may go ahead.

4              MR. DYKAL:  Your Honor, the defense calls

5    Shelley Blackmarr.

6              THE COURT:  All right.

7              COURTROOM ADMINISTRATOR:  Please raise your

8    right hand.

9              You do solemnly swear that the testimony you

10   shall give in the cause now before the Court shall be the

11   truth, the whole truth, and nothing but the truth, so help

12   you God?

13             THE WITNESS:  I do.

14             COURTROOM ADMINISTRATOR:  Please be seated.

15             Please tell us your name and spell your name for

16   the record.

17             THE WITNESS:  Shelley Blackmarr; S-h-e-l-l-e-y,

18   B-l-a-c-k-m-a-r-r.

19             COURTROOM ADMINISTRATOR:  Please tell us your

20   city and state of residence.

21             THE WITNESS:  The city is Santa Rosa Beach,

22   Florida.

23

24

25

1990

                          SHELLEY BLACKMARR

 1                      called as a witness on behalf of the

 2           Defendants, was examined and testified as follows:

 3                             DIRECT EXAMINATION

 4    BY MR. DYKAL:

 5    Q.    Good morning, Ms. Blackmarr.

 6    A.    Good morning.

 7    Q.    First of all, have you ever testified in federal

 8    court before?

 9    A.    No, sir.

10    Q.    Is it fair to say you're a little nervous today?

11    A.    A little anxious.

12    Q.    Okay.  We'll try to get through this.

13          So you said you're from Santa Rosa Beach.  Could

14    you explain a little bit where that is?

15    A.    It's in the panhandle of Florida, small beach town

16    between Destin and Panama City.

17    Q.    Where did you go to school?

18    A.    In Hollywood, Florida, Florida Bible College.

19    Q.    Did you get a degree?

20    A.    Yes, I did.

21    Q.    And what is that degree?

22    A.    In Christian education and theology.

23    Q.    Do you have a technical degree?

24    A.    No, sir.

1991

1    Q.    Can I ask how you got into the computer industry?

2    A.    When I was at SunTrust Banks, they were implementing

3    PeopleSoft software, and I was asked to be on their

4    implementation team, and they sat me down in front of a

5    computer and said learn this so --

6    Q.    Where do you work today?

7    A.    With Rimini Street.

8    Q.    Does Rimini Street have an office in Santa Rosa

9    Beach?

10   A.    No, they do not.

11   Q.    So how do you do your job if they don't have an

12   office there?

13   A.    I work from my home office with the laptop they

14   provided.

15   Q.    And do you use the Internet?

16        THE COURT REPORTER:  Judge, could I have a

17   moment?

18        THE COURT:  Yes.

19        (Discussion held off the record.)

20        (Pause in the proceedings.)

21   BY MR. DYKAL:

22   Q.    So I believe we were talking about that you work at

23   Rimini Street; right?

24   A.    Yes.

25   Q.    Now, what brand of software do you work with at

1992

1    Rimini Street?

2    A.    PeopleSoft software.

3    Q.    I'd like to talk a little bit about your experience

4    with PeopleSoft software.  How long have you worked with

5    PeopleSoft software?

6    A.    Since 1995.

7    Q.    And how did it come to be that you began working

8    with PeopleSoft software?

9    A.    SunTrust had just purchased the software, an old

10   release, release 4.2, and I was invited to be on the

11   implementation team.

12   Q.    Now, we have heard a lot about implementation before

13   from Ms. Catz and others.  I'd like to talk a little bit

14   about your experience with implementation.

15              What does implementation mean?

16   A.    Well, they're switching over from the old software

17   to the new.

18   Q.    Can you talk a little bit about what that involves?

19   A.    Yes.  You take the earnings codes, the deduction

20   codes, your pay group information, your pay calendar

21   frequency so you can pay your -- all your employees on the

22   PeopleSoft software so you'll have a switch and cut-over.

23   Q.    Now, in switching from an old software to

24   PeopleSoft, that's implementation, is that a big job?

25   A.    Yes, it is.

1993

1    Q.    How many people were working on that implementation
2    at SunTrust Bank in '95?
3    A.    I would say approximately 30.
4    Q.    How long did it take to implement PeopleSoft?
5    A.    We took a while.  It took 18 months.
6    Q.    Did you work on PeopleSoft implementation the entire
7    time you were at SunTrust?
8    A.    No.
9    Q.    What else did you work on at SunTrust?
10   A.    Well, once we were live, I was a payroll manager
11   supporting payroll, making sure everyone gets their payroll
12   checks.
13   Q.    Can you mention a little bit about what it means to
14   support payroll?  What's that mean?
15   A.    Sure.  The day-to-day operations.  Our team would
16   enter human resource transactions, like you get hired, you
17   get a promotion, you get transferred to a different
18   department, a salary increase.
19   Q.    Were there any other projects you worked on at
20   SunTrust Bank?
21   A.    Later on we implemented -- excuse me, we upgraded
22   from 4.2 to release 7.
23   Q.    Now, we've also heard a little about upgrades in
24   this case.  Can you talk about what an upgrade is and how
25   that's different from implementation?

1994

1   A.    Yes.  You're actually improving the functionality

2   with new enhancements that the vendor has placed in the

3   later releases.

4   Q.    So you're moving from an older version to a newer

5   version of PeopleSoft, and that's an upgrade?

6   A.    Yes.

7   Q.    Why were you upgrading the software at SunTrust?

8   A.    Well, SunTrust Banks was paying more, like a

9   supplemental premium, to receive tax updates because we

10  were on an unsupported release.

11  Q.    So was SunTrust Bank using PeopleSoft for support

12  when you were there?

13  A.    Yes.

14  Q.    And do I understand you correctly that they were

15  paying more if they were on an older version?

16  A.    To receive the tax updates five, six per year.

17  Q.    And that's why they decided to upgrade?

18  A.    Yes.

19  Q.    Now, implementation, that sounded like a big

20  project.  Is upgrading an easier project?

21  A.    A little bit easier.

22  Q.    How many people were working on the upgrade project

23  at SunTrust?

24  A.    I would say approximately 20.

25  Q.    How long did it take to upgrade to a new version?

1995

1    A.    Perhaps 12 months.

2    Q.    Were all of those 20 people SunTrust employees

3    working on this upgrade?

4    A.    No.  We had hired some consultants.

5    Q.    So there were employees and consultants, 20 of them,

6    working to upgrade over the course of 12 months?

7    A.    Yes.

8    Q.    How long were you at SunTrust Bank?

9    A.    Approximately -- well, October '95 to January 1999.

10   Q.    Where did you go in January of 1999?

11   A.    I went to SAP Transchannel.

12   Q.    And -- I'm sorry, where did you go?

13   A.    SAP Transchannel.

14   Q.    Was SAP -- did they own Transchannel?

15   A.    Yes.

16   Q.    Now, what were you doing at Transchannel?

17   A.    We had several clients that were on PeopleSoft, and

18   Transchannel was an application service provider.

19   Q.    And so let's break that down a little bit.

20         Transchannel had clients that were using

21   PeopleSoft software?

22   A.    Correct.

23   Q.    And what were they doing for those clients?

24   A.    Well, we were hosting the PeopleSoft application on

25   our servers.

DONNA DAVIDSON, RDR, CRR, CCR #318    (775) 329-0132

1996

```
 1    Q.    And what were you doing with it?  I mean, what were
 2    you doing for the clients?
 3    A.    I was supporting the clients, Premier Technologies,
 4    Bausch & Lomb and -- in their day-to-day transactions and
 5    supporting PeopleSoft.
 6    Q.    So you were still working with PeopleSoft,
 7    supporting PeopleSoft clients, but this time you were a
 8    third party?
 9    A.    A consulting --
10    Q.    A consulting firm?
11    A.    -- type firm, yes.
12    Q.    How long were you with Transchannel?
13    A.    Only seven months.
14    Q.    Where did you go after that?
15    A.    I went to PeopleSoft.
16    Q.    Now, was this when Oracle owned PeopleSoft when you
17    went to PeopleSoft?
18    A.    No.
19    Q.    It was still independent?
20    A.    Correct.
21    Q.    How did you come to work at PeopleSoft?
22    A.    I had a colleague at SunTrust Bank.  She was at
23    PeopleSoft.  And she called me up and said, "Shelley,
24    PeopleSoft is hiring."  So I applied and was hired.
25    Q.    What job did you do at PeopleSoft?
```

1    A.    I was in the education and government practice

2    consulting, assisting clients with their implementations,

3    and later on upgrades.

4    Q.    So when you were assisting clients while you were at

5    PeopleSoft, what were you doing day to day?  Can you break

6    it down a little bit?

7    A.    Basically sitting elbow to elbow with payroll

8    managers, human resource information systems individuals,

9    helping them configure their system if they'd just

10   purchased PeopleSoft, again, with the configuration of

11   earnings codes, how they're taxed, how -- what the

12   multiplication factor is, does it add to gross, making sure

13   their paychecks are going to be correct.

14   Q.    So you were a PeopleSoft employee, and you were

15   going out to the client site to help them use PeopleSoft;

16   is that fair?

17   A.    Yes.

18   Q.    Now, was that a service that PeopleSoft provided for

19   free for those clients?

20   A.    No.

21   Q.    Do you have an understanding of how much they

22   charged for your services?

23   A.    Yes.  I believe they charged $250 an hour when I was

24   at a client site.

25   Q.    How long would you work with the clients at the

1998

1    client site?

2    A.    Well, implementations could last as long as 18

3    months and some as short as eight months.

4    Q.    How long were you at PeopleSoft?

5    A.    Four years.

6    Q.    Where did you go after that?

7    A.    I went to -- oh, excuse me.  I went to --

8    Q.    Well, let me ask you this.  What caused you to leave

9    PeopleSoft?

10   A.    The travel was extensive.

11   Q.    So there was a lot of travel involved when you were

12   there?

13   A.    Yes.  Yes.

14   Q.    Did you find a different opportunity that involved

15   less travel?

16   A.    Yes, I did.

17   Q.    And what was that?

18   A.    I believe it was with SAP Transchannel -- or, excuse

19   me, TomorrowNow, SAP TomorrowNow.

20   Q.    Before that, did you go to Florida State?

21   A.    Yes, I did.

22   Q.    So you left PeopleSoft, then you went to Florida

23   State; is that right?

24   A.    That's correct.

25   Q.    Now, what were you doing at Florida State?

1999

1    A.    Florida State had just purchased PeopleSoft 8.81,

2    and they were implementing, and I was invited to join the

3    implementation team.

4    Q.    So this was another one of those implementation

5    projects?

6    A.    Yes.

7    Q.    Was this another big project?

8    A.    Yes, it was.

9    Q.    How long did that one take at Florida State?

10   A.    Approximately 14 months.

11   Q.    And how many people were working on that?

12   A.    Approximately 30 people.

13   Q.    Did you do any other projects while you were at

14   Florida State other than implementation?

15   A.    Well, after we were live supporting the day-to-day

16   operations in payroll, then we upgraded to 8.9.

17   Q.    And do you know why Florida State was upgrading?

18   A.    Well, the release that we were on, 8.81, was about

19   to lose the support for the tax updates, so we had to

20   upgrade to 8.9.

21   Q.    And so Florida State was using Oracle support?

22   A.    Yes.

23   Q.    And then they needed to upgrade in order to continue

24   on the maintenance program they were on?

25   A.    Correct.

2000

1    Q.    How long were you at Florida State?

2    A.    Approximately two years and seven months.

3    Q.    Where did you go after Florida State?

4    A.    SAP TomorrowNow.

5    Q.    How long were you at TomorrowNow?

6    A.    Only 10 months.

7    Q.    Now, when you left TomorrowNow, did you have another

8    job lined up?

9    A.    No.

10   Q.    So can you talk a little bit about what you did at

11   that time?

12   A.    Yes.  I left voluntarily because the work conditions

13   were quite stressful, and I was talking to Microsoft

14   Corporation and to Rimini Street.

15   Q.    And did you ultimately choose to start with Rimini

16   Street?

17   A.    Yes, I did.

18   Q.    Why did you choose Rimini Street over Microsoft?

19   A.    There were colleagues at Rimini Street that I had

20   worked with when I was at PeopleSoft, and they were a great

21   group of people, and I wanted to work alongside with them.

22   Q.    Okay.  So we've talked a lot about your PeopleSoft

23   experience.  Were you working with PeopleSoft the whole

24   time in all those other jobs we've talked about?

25   A.    Yes.

2001

1    Q.    Okay.  So I'd like to talk a little about when you

2    joined Rimini Street.

3              Can you describe what sort of -- the size of the

4    company at the time?

5    A.    It was quite small.  It was just -- the PeopleSoft

6    practice had just begun.

7    Q.    What date did you start at Rimini Street, if you can

8    remember?

9    A.    February 20th, 2007.

10   Q.    When you started at Rimini Street, what was your job

11   title?

12   A.    Primary support engineer.

13   Q.    Is that also referred to as a PSE?

14   A.    Yes.

15   Q.    Can you explain to the jury what a primary support

16   engineer is at Rimini Street?

17   A.    Yes.  We are assigned a number of clients, and we

18   work day to day.

19              We're the only one they can reach out to and

20   email or call us if they have a question or if they have a

21   case with the PeopleSoft system that they're operating on.

22   Q.    Now, when you say they can call you, do they call

23   your office?

24   A.    I have an office line, but I also provide them my

25   cell phone.

DONNA DAVIDSON, RDR, CRR, CCR #318    (775) 329-0132

2002

1   Q.    Do clients ever call you on your cell phone as a

2   primary support engineer?

3   A.    Yes, they have.

4   Q.    What would cause a client to call you on your cell

5   phone as a primary support engineer?

6   A.    If it was during the work hours and it was an urgent

7   case, perhaps critical production down case.

8   Q.    What's critical production down mean?

9   A.    Perhaps it's payroll execution day, and they're

10  trying to get paychecks completed, and a program is not

11  working, so they're going to call.

12  Q.    Now, I'd like to talk a little bit about what

13  happens from a primary support engineer perspective when a

14  new client comes on.

15        Do you know what onboarding is?

16  A.    Yes.

17  Q.    What is that?

18  A.    Well, the new client would be introduced to the team

19  that's going to support them.  So we'll be on a call and

20  explain our experience and that we have a whole army to

21  support them.

22  Q.    Now, I'd like to refer you to an exhibit.  It's DTX

23  3016, and it has been preadmitted.

24            COURTROOM ADMINISTRATOR:  3015?

25            MR. DYKAL:  DTX 3016.

1              I believe we reached an agreement.  Can we move

2     them into evidence?

3              MR. ISAACSON:  Yes, there's no objection.

4              THE COURT:  It's admitted.

5              Is it one or two exhibits?

6              MR. DYKAL:  Just 3016 for now, your Honor.

7              THE COURT:  All right.  It's admitted.

8          (Defendants' Exhibit 3016 received into

9          evidence.)

10    BY MR. DYKAL:

11    Q.    Ms. Blackmarr, do you see Exhibit -- Defense

12    Exhibit 3016?

13    A.    I do.

14    Q.    What is this document?

15    A.    This is a document that we would create and send to

16    our new client so they can confirm the modules that they

17    have in PeopleSoft, the ones that they have licensed and

18    are in production.

19              And we send it to the client, and they confirm

20    or add to, and then send it back with a signature.

21    Q.    So let's break that down a little bit.

22              So at the top it says Human Capital Management

23    Applications Utilized By GMAC Insurance Holdings.  Do you

24    see that?

25    A.    Yes, I do.

2004

1    Q.    What is GMAC?

2    A.    I believe it was General Motors Acceptance

3    Corporation.

4    Q.    And they were a client who is coming onboard with

5    Rimini Street; is that right?

6    A.    Yes.

7    Q.    And if you look down a little further it says,

8    "Prepared by Shelley Blackmarr."  Do you see that?

9    A.    Yes, I do.

10   Q.    Did you prepare this document?

11   A.    I did.

12   Q.    That's June 18, 2007, so a few months after you

13   joined; is that right?

14   A.    Yes.

15   Q.    Now, if you look at the note, it says,

16         "Please validate the list of products marked

17   below for GMAC Insurance Holdings, Inc.  If you are

18   licensed for or utilize products other than the ones

19   indicated, place an X in the appropriate columns, and we

20   will update our records with this information."

21         Do you see that?

22   A.    I do.

23   Q.    And if you turn to the next page, it looks like

24   there's a list of PeopleSoft products, and then there's --

25   so there's four columns, PeopleSoft Products, Licensed For,

1   Production Environment Usage, and then Oracle Maintenance

2   End Date.

3           Do you see that?

4   A.    Yes, I do.

5   Q.    What's in that PeopleSoft products column?

6   A.    Well, a list of all kinds of modules.

7   Q.    And then if you look down, do you see that there's

8   an X by human resources and payroll for North America?

9   A.    Yes.

10  Q.    What does that indicate?

11  A.    That they have licensed and in production human

12  resources and payroll for North America.

13  Q.    And back up at the top there's a column that says

14  Oracle Maintenance End Date.  Do you see that?

15  A.    I do.

16  Q.    What does that mean?  What's Oracle Maintenance End

17  Date?

18  A.    That's when -- the end date is the last day that

19  they are covered by any maintenance from the vendor.

20  Q.    So I'd like to turn your attention to Defense

21  Exhibit 3015, and I believe this has been preadmitted?

22          COURTROOM ADMINISTRATOR:  It's not preadmitted.

23          MR. ISAACSON:  No objection, Your Honor.

24          THE COURT:  It is admitted.

25

1          (Defendants' Exhibit 3015 received into

2          evidence.)

3    BY MR. DYKAL:

4    Q.    So, Ms. Blackmarr, this document looks fairly

5    similar to that other one.  Can you explain if there are

6    any differences that you see?

7    A.    Well, this is the one that has been sent back to me

8    confirming the products and signed by the client.

9    Q.    So on that front page toward the bottom left it says

10   Completed By Scotty Tanner, Team Lead, GMAC Insurance

11   Personal Lines, and then date completed, July 9th, 2007.

12   Do you see that?

13   A.    I do.

14   Q.    Who is Scotty Tanner?

15   A.    That was the client.

16   Q.    And so what does this indicate to you?

17   A.    That they have affirmed the products in PeopleSoft

18   that are licensed and in production.

19   Q.    And if you turn to the next page, and we looked at

20   the version of this before, now, this one is a little bit

21   different.

22          Do you see up at the top there's some additional

23   check marks on the top row?  Do you see that?

24   A.    Yes, I do.

25   Q.    What does that indicate to you?

2007

1    A.    That Benefits Administration is licensed and in

2    production with eMaintenance end date.

3    Q.    And then in the maintenance end date column there's

4    some dates filled in there.  Do you see that?

5    A.    I do.

6    Q.    What does that indicate to you?

7    A.    That is the end of Oracle's maintenance,

8    September 27, 2007.

9    Q.    So let's make sure I understand this.  You sent a

10   version of this to General Motors; is that right?

11   A.    Yes.

12   Q.    And then they filled it out and added information

13   and sent it back?

14   A.    Correct.

15   Q.    And some of that information is the Oracle

16   maintenance end date; is that right?

17   A.    Yes.

18   Q.    And so is it correct to say that at this time, the

19   date of this document in July of 2007, they were

20   representing that they were still on Oracle support?

21   A.    Yes, they are.

22   Q.    So they were still on Oracle support through

23   September 27, 2007; is that right?

24   A.    Correct.

25   Q.    And just to be clear, they were a Rimini client but

1   they were still on Oracle support for a few more months?

2   A.    Yes.

3   Q.    Why would you need to know the Oracle maintenance

4   end date?

5   A.    So we are able to extract or receive all the media,

6   all the updates that they are eligible for through that end

7   date of September 27th and nothing thereafter.

8   Q.    And does Rimini Street have a policy with respect to

9   maintenance end dates that you're aware of?

10   A.    I'm not sure what you mean by that question.

11   Q.    It was a terrible question.  I'll move on.

12         Now, do you recall your first client when you

13   started as a primary support engineer?

14   A.    I believe it was Wisconsin Public Services.

15   Q.    Now, when Wisconsin Public Services was coming

16   onboard, what would you do to get ready?

17   A.    Well --

18   Q.    Just in general, what would you do to get ready for

19   a client coming onboard?

20   A.    Well, we would make sure we were able to answer

21   their questions perhaps about onboarding, what type of

22   support they're going to receive, what the SLA -- service

23   level agreements are going to be.  And I would be

24   introduced to them and provide them my contact information.

25   Q.    Do you recall approximately when Wisconsin Public

```
 1    Services was coming to Rimini Street?
 2              Maybe a document would help.  I would -- can I
 3    refer you to PTX 5478.
 4              MR. DYKAL:  And we've conferred.  I believe it's
 5    preadmitted.  There are no objections.
 6              MR. ISAACSON:  No objection, Your Honor.
 7              THE COURT:  It's admitted.
 8         (Plaintiffs' Exhibit 5478 received into
 9         evidence.)
10    BY MR. DYKAL:
11    Q.    Ms. Blackmarr, can you describe what this document
12    is?
13    A.    PTX 5478?
14    Q.    Yes.
15    A.    It appears to be some correspondence, emails between
16    a team member and myself.
17    Q.    And the first email is from Beth Lester; is that
18    right?  I think it's the very last one in the book.
19    A.    I believe --
20    Q.    Did I read the wrong tab?
21    A.    I believe --
22    Q.    I'm sorry.  It's PTX 1585.  I'm sorry, my fault.
23    A.    Okay.
24              MR. DYKAL:  So, Your Honor, we would move for
25    the admission of PTX 1585.
```

```
 1              COURTROOM ADMINISTRATOR:  That one is
 2     preadmitted.
 3              MR. DYKAL:  I believe that there's already an
 4     agreement.  This one is admitted.
 5              MR. ISAACSON:  No objection, Your Honor.
 6              THE COURT:  It's admitted.
 7          (Plaintiffs' Exhibit 1585 received into
 8          evidence.)
 9     BY MR. DYKAL:
10     Q.    So this is an email from Beth Lester.  Do you see
11     that?
12     A.    I do.
13     Q.    Who was Beth Lester?
14     A.    She was my manager at the time.
15     Q.    She writes,
16              "Shelley, thank you.  Can you search Customer
17     Connection to determine PeopleSoft/Oracle's stance on OSHA
18     and/or whether any updates were issued in the past.  We
19     don't have a CC ID for Wisconsin Public Services yet, but
20     the same search can be conducted on behalf of Birdville.
21     PeopleSoft clients should contain the ID and password."
22              Do you see that?
23     A.    Yes, I do.
24     Q.    And so what is Ms. Lester asking you to do?
25     A.    Well, to go to Customer Connection, which is an
```

1    information repository, and to see what type of updates

2    have been delivered in the past on the OSHA reporting,

3    which is Occupational Safety and Health for the employer to

4    list injuries and illnesses that are work related.

5    Q.    So you're going to go to the Oracle website and

6    check on some of the things that Wisconsin Public Services

7    needed; is that fair?

8    A.    Yes.

9    Q.    And then you respond at the top and you say,

10           "It will be interesting to know how WPS utilizes

11   this health and safety manual and some other things."

12           So do you know whether you logged into the

13   Oracle website to check on that information?

14   A.    Yes.

15   Q.    Now, at this time were you bringing Wisconsin Public

16   Services onboard at Rimini Street?

17   A.    Yes, we were.

18   Q.    And do you know whether Wisconsin Public Services

19   had their own login to Oracle's website?

20   A.    They did.

21   Q.    So why didn't you use Wisconsin Public Services'

22   login?

23   A.    In our haste to get some information, we used

24   another client's that had entrance to the same information.

25   Q.    Now, did you end up getting Wisconsin Public

2012

1    Services' login?

2    A.    A few days later.

3    Q.    Did you download anything from the Oracle website

4    for Wisconsin Public Services?

5    A.    Absolutely not.

6    Q.    Now, as far as you know, if you use a different

7    login, would you see something different on the Oracle

8    website?

9    A.    It would be the same information.

10   Q.    Okay.  So let me get this straight.  So you log in,

11   and you see the same thing regardless of which login you

12   use?

13   A.    That's correct.

14   Q.    And you were anxious to get started with this new

15   client, so you used Birdville's login instead of Wisconsin

16   Public Services?

17   A.    Yes.

18   Q.    And you did some poking around, and a few days later

19   you got Wisconsin Public Services' login?

20   A.    That is correct.

21   Q.    Does Rimini Street have a policy with respect to

22   which logins you use to log in to the Oracle website?

23   A.    Well, it's to use the client's login that's provided

24   by the client that we're onboarding.

25   Q.    How often would something like that happen where you

```
 1    log in to Oracle's website using a different client's

 2    credentials?

 3    A.    Very rarely; perhaps less than five.

 4    Q.    Less than five times that you can think of?

 5    A.    I would guess that.

 6    Q.    Do you recall any instances of working with

 7    Wisconsin Public Services after they came onboard when you

 8    were a primary support engineer?

 9    A.    Well, we would have typical cases that they would

10    call and report an issue, perhaps something was a bending

11    or they have a question.

12    Q.    You said a bending.  What does a bending mean?

13    A.    I beg your pardon.  When a program just does not

14    work.  It may run through several iterations of some code

15    and then it stops.

16    Q.    Can you name some of your other early clients when

17    you were a primary support engineer at Rimini Street?

18    A.    Yes.  That would be Dave and Buster's, Bayshore

19    Hospital, Correctional Medical Services, and Chipotle

20    Mexican Grill.

21    Q.    So I'd like to walk through the process a little bit

22    of what you would do as a primary support engineer when you

23    were helping these clients.

24          So as an example, let's use Chipotle.  What

25    would happen -- or can you give an example of what would
```

2014

```
 1    happen when Chipotle would be using your services as a
 2    primary support engineer?
 3              So would you get a call from Chipotle?
 4    A.    Yes, that's very possible.
 5    Q.    And what would Chipotle say?
 6    A.    They would describe their --
 7              MR. ISAACSON:  Objection to form, Your Honor.
 8              MR. DYKAL:  I'll rephrase.  I'll rephrase.
 9    BY MR. DYKAL:
10    Q.    So would you receive a call from someone like
11    Chipotle?
12    A.    Yes.
13    Q.    And would they describe a problem they were having
14    to you?
15              MR. ISAACSON:  Your Honor, these seem to be
16    hypothetical questions.
17              THE COURT:  Sustained.  She can testify what she
18    did as a result of speaking to Chipotle.
19    BY MR. DYKAL:
20    Q.    Okay.  Well, can you think of any specific
21    incidences where you received a call?
22    A.    From any one of my clients?
23    Q.    Yes.
24    A.    Oh, yes.  I believe Chipotle had a question about
25    EEO reporting that they received or should have received in
```

```
 1   2006 and perhaps did not apply, and it was already 2007,
 2   and that EEO report was due, I believe, in September.
 3   Q.    Let's break that down.  So Chipotle called you and
 4   said we're having a problem with our EEOC.  What is EEOC?
 5   A.    The EEO-1 is just a count of statistics of
 6   individuals that have been hired.
 7   Q.    Is it something that's used by the PeopleSoft
 8   software to calculate paychecks?
 9   A.    No, it is a human resource report that's regulated
10   by the Department of Labor.
11   Q.    Okay.  And so you received a call, and they
12   described a problem to you.  What did you do to solve that
13   problem?
14   A.    I perhaps would call on a colleague to look for the
15   information that they were missing in their system.
16   Q.    So is it the case that sometimes as a primary
17   support engineer, you would refer to a colleague to help
18   you solve a problem you couldn't solve?
19   A.    That's correct.
20   Q.    Are there other ways you would help solve problems?
21   A.    Well, if there was an issue with the calculation of
22   a paycheck, and, let's say perhaps the withholding tax is
23   not what they were expected, they would call me, and I
24   would try to re -- they would speak about the issue, and
25   then I would re-create the issue in the system that we had
```

1    on our servers.

2    Q.    Okay.  So that was a fairly complex -- I'm going to

3    break that down a little bit.

4             But, first, is it ever the case that you would

5    just sometimes know the answer?

6    A.    Oh, yes.

7    Q.    How often would you say that occurs?

8    A.    I would say more than 50 percent.

9    Q.    And then the other answer you were just talking

10   about, you said you would try to replicate the issue.

11            What would be -- so you hear a problem from

12   Chipotle.  What would be the first thing you would do if

13   you wanted to replicate that issue?

14   A.    Well, I would take down the information, or we would

15   perhaps be in a go-to meeting where I can look over their

16   shoulder on their system, and they would point out the

17   issue, and then I would take that information and try to

18   re-create it in the system that we have on our server.

19   Q.    So let's talk about recreating it in the system.

20   How would you physically go about starting that process?

21   A.    Well, I would open the PeopleSoft application for

22   Chipotle, or whichever client I was working on, and I would

23   enter the employee data and perhaps the salary they were

24   making, at the W-4 information, whether they were married

25   and had three allowances, and try to re-create that issue,

1    and then work backwards to see how we could correct it.

2    Q.    Okay.  Let's break that down.

3          So do you do that on your computer?

4    A.    Yes, I do.

5    Q.    Do you have a program on your computer that you

6    would use to do that?

7    A.    Yes.  There is a VMWare which is a virtual machine

8    where we would log in, and there's a list of -- inventory

9    of all our clients, and we would click on the link to take

10   us to that client, and we would work in their system.

11   Q.    I see.  So you open up your computer, and you click

12   on the program, and it opens up; is that right?

13   A.    Yes.

14   Q.    And then you see a list of folders for all the

15   different client software environments available; is that

16   right?

17   A.    Yes.

18   Q.    And then, if you were working on behalf of Chipotle,

19   how would you select which client environment to use?

20   A.    Well, I would select the client code for Chipotle

21   Mexican Grill, which was CMG, and that would take me into

22   the console, and then I would open up the Internet, the

23   PeopleSoft Internet Architecture, and proceed to work the

24   problem.

25   Q.    Okay.  So you've loaded up the problem, you saw the

2018

```
 1    directory of all the folders with the client names, and
 2    you've clicked on Chipotle, and that took you into
 3    Chipotle's PeopleSoft program.  Is that right?
 4    A.    Yes.
 5    Q.    Is there any reason why you would -- why would it
 6    make sense to use Chipotle's environment to help Chipotle
 7    out?
 8    A.    Well --
 9           MR. ISAACSON:  Objection, Your Honor.
10    Foundation.
11           MR. DYKAL:  I'll rephrase.
12           THE COURT:  All right.
13    BY MR. DYKAL:
14    Q.    Does it serve any practical purpose to use
15    Chipotle's client environment to help Chipotle?
16    A.    Well, we want to be in the same environment that our
17    client is working in, comparing apples to apples.
18    Q.    So is it the case that the environments set up that
19    you have access to try to match the ones out of the client
20    sites?
21    A.    Yes.
22    Q.    And that way, when you're trying to troubleshoot for
23    them, you can re-create the problem they're seeing?
24    A.    Yes.
25    Q.    I understand.
```

 1            How many times would you say you've logged in to

 2    a client environment over the course of your career at

 3    Rimini Street?

 4    A.    Over the course of eight and a half years, I would

 5    say thousands.

 6    Q.    How can you come up with a number like that?

 7    A.    An average of 12 times a day.

 8    Q.    Now, has it ever been the case one client

 9    environment was used to help troubleshoot for a different

10    client?

11    A.    Yes.

12    Q.    And why do you think it -- that it is that something

13    like that would happen?

14    A.    Well, if we had Client A up, and they were on a

15    release 8.0, and Client B calls and has a question or an

16    issue, I have Client A up, so instead of logging out of

17    Client A and going down to Client B, it's expeditious for

18    me to work in that system there.

19    Q.    So let me get this straight.  A colleague might call

20    you, and you're already working on something for a

21    different client, and they have a question?

22    A.    Yes.

23    Q.    And you might just tell them what you see right

24    there on your screen?

25    A.    Yes.

```
 1    Q.    How often would you say that happened?
 2    A.    Very rarely.  It is not the policy of Rimini Street.
 3    Q.    And it's just simpler than shutting that one down
 4    and loading up another one; is that what you said?
 5    A.    Yes, that is correct.
 6    Q.    Have you ever heard the term remote environment?
 7    A.    Yes.
 8    Q.    What is a remote environment?
 9    A.    Well, the remote environment is where PeopleSoft
10    application is hosted at the client's -- on the client's
11    server instead of on our server.
12    Q.    Now, you just walked us through that process where
13    you're going to access a client environment, and you see
14    the folder of all the clients, and you click on one so you
15    can replicate the issue.  Do you remember that?
16    A.    Yes.
17    Q.    What would happen if you had to access a remote
18    client environment?
19              MR. ISAACSON:  Objection, foundation.
20    BY MR. DYKAL:
21    Q.    Have you ever accessed a remote client environment?
22    A.    I have.
23    Q.    Can you tell us how you would go about doing that?
24    A.    I would log in to the VMWare, which is the virtual
25    machine, and the links would be there, the inventory of all
```

```
 1    of our clients, and if my client's Moraine Park, I would
 2    select that, my remote client, and it would take a few
 3    extra steps of logins and passwords to get to my remote
 4    client.
 5    Q.    So let me break that down.  It sounds like it's very
 6    similar.
 7              You click on that same VMWare program?
 8    A.    Correct.
 9    Q.    And you see that same list of client environments?
10    A.    Yes.
11    Q.    And you click on the remote one which is right there
12    next to the other ones?
13    A.    Yes.
14    Q.    And so if that client's remote, then what happens?
15    You have to do an extra login, is that what you said?
16    A.    It could be several logins.
17    Q.    So there might be several logins you have to do?
18    A.    Yes.
19    Q.    So is it a little slower to do that?
20    A.    Yes.
21    Q.    Have you supported remote clients whose software is
22    remote on their own sites?
23    A.    Oh, yes.
24    Q.    Have you ever -- can you think of an instance where
25    you were unable to do your job because the software was at
```

1    the client site instead of Rimini?

2    A.    No.

3    Q.    So I'd like to shift gears a little bit.

4          What would be the most common way a client would

5    contact you as a primary support engineer?

6    A.    The most common would probably be an email or a

7    phone call.

8    Q.    Now, why -- strike that.

9          If you received a phone call -- I'm going to

10   start over.

11         Earlier you were talking about a critical issue,

12   was that right?

13   A.    Yes.

14   Q.    What did you call it?

15   A.    A P1, critical production down.

16   Q.    And that's the severe issue that's impacting, let's

17   say, the client's ability to print paychecks; is that

18   right?

19   A.    Correct.

20   Q.    Are there other levels of severity?

21   A.    Yes.

22   Q.    What are some other levels of severity?

23   A.    P2 is production is affected but it is not stopping

24   their business for that day.

25         A P3 could be a general question about an

1     upcoming tax update, or a change for a state that they

2     operate in.

3     Q.    So it sounded like there's at least three levels of

4     severity of client problems.

5     A.    Yes.

6     Q.    That P1, that's the critical production down, is

7     that what you said?

8     A.    Yes.

9     Q.    Can you think of any instances of a time when a

10    client called you with a critical production down problem?

11    A.    There was a case when we were all out at Rimini's

12    office, and actually the primary support engineer received

13    the call, and it was escalated to myself to help that

14    client.

15    Q.    And so you had more expertise so you could help this

16    client, and so it came up to you, is that what you said?

17    A.    That is correct.

18    Q.    And were you out at a meeting at Rimini Street's

19    offices when that happened?

20    A.    Yes.

21    Q.    So did you start addressing the issue?  Or what

22    happened next?

23    A.    Well, I spoke with Dawn Rodney from Fairchild

24    Semiconductor, and she described the issue that they were

25    having.

2024

```
 1              There was an orphaned record, and they could not

 2     confirm their payroll, and that particular pay group, there

 3     were individuals that would not be paid in the system if we

 4     could not resolve this.

 5     Q.    All right.  So let me get this straight.  So

 6     Fairchild Semiconductor was a client of Rimini Street's?

 7     A.    Correct.

 8     Q.    Is that a big company?

 9     A.    Yes, they had about 9,000 employees.

10     Q.    And so they had a problem, and they called Rimini

11     Street, and you set out to work on it; is that right?

12     A.    Yes.

13     Q.    And the problem was they could not print their

14     paychecks?

15     A.    They could not confirm the paycheck in order to

16     print their paychecks.

17     Q.    And so people wouldn't get paid if this didn't get

18     fixed; is that right?

19     A.    Correct.

20     Q.    Was this an urgent issue?

21     A.    Yes, it was.

22     Q.    What happened next?

23     A.    Well, we were all leaving the office, and everyone

24     was going to dinner.  So actually I had my laptop with me,

25     and I sat outside of the restaurant and assisted that
```

2025

```
 1    client.
 2              We met, I identified the records where they had
 3    a field value that was deleted in error, and continued to
 4    work on the problem.
 5              And then, when everyone was done with their
 6    dinner, I actually picked up my laptop, and we completed
 7    our case.  They were able to calculate and confirm their
 8    paychecks, and we had success.
 9    Q.    What time of the night -- when did you complete the
10    fix, do you recall?
11    A.    A little bit before midnight.
12    Q.    Do you recall whether Fairchild Semiconductor was a
13    local or a remote client?
14    A.    They were remote.
15    Q.    Okay.  I'd like to shift gears a little bit to the
16    hiring practices for primary support engineers at Rimini
17    Street.
18    A.    Yes.
19    Q.    Does Rimini Street have a policy about hiring
20    primary support engineers?
21    A.    Yes, they do.
22    Q.    Can you tell me what Rimini Street looks for in
23    hiring primary support engineers?
24    A.    Well, there's a requirement for individuals who will
25    be -- they have to have 10 years or more experience with
```

2026

1   the product, PeopleSoft.

2   Q.    And that's not -- is that an average of 10 years?

3   A.    No, sir.

4   Q.    It's more than 10 years.

5   A.    Correct.

6   Q.    Why is that important?

7   A.    So we can be assigned our clients and quickly help

8   them and without any major ramp-up time.

9   Q.    Earlier you said the primary support engineers are

10  assigned to specific clients.  Do you recall that?

11  A.    Yes.

12  Q.    Does that have any impact on the service that's

13  provided?

14  A.    Well, we get to know our clients by first name.

15  We're familiar with their operations, the frequency of

16  their payroll, and we know the history of the issues that

17  they've had or questions that they've posed to us.  So

18  there's a lot of familiarity with the client and with their

19  system.

20  Q.    Do you know whether the primary support program, the

21  primary support engineer program at Rimini Street plays a

22  part at marketing for Rimini Street?

23  A.    I'm sure it does, yes.

24  Q.    Have you ever heard of a 24/7, 30-minute guaranteed

25  response time?

1    A.    Yes.

2    Q.    What is that?

3    A.    Well, any day of the week our client can reach out

4    to us through -- if it's after hours we encourage them to

5    call the hotline, and someone will call them back, it's

6    guaranteed that they'll be called back or contacted within

7    30 minutes.

8    Q.    Do you know whether Rimini Street has been able to

9    meet that 30-minute guaranteed response time?

10   A.    Far exceeded that.

11   Q.    Do you know what the average response time is?

12   A.    I believe three-and-a-half to four-minute response

13   time.

14   Q.    So are you on call 24 hours a day, 7 days a week?

15   A.    No.  Every PSE is assigned -- we rotate our weeks.

16   So if there's six PSEs, I will be on call for a week every

17   six weeks.

18   Q.    And then you'd get weeks off?

19   A.    Yes.

20   Q.    Could the client still get ahold of you when you're

21   not on call?

22   A.    Sure, if I'm not out on a PTO.

23   Q.    Do you know how primary support engineers are

24   compensated at Rimini Street?

25   A.    With a salary.

2028

1    Q.    Do they receive any bonuses?

2    A.    Yes.

3    Q.    What is the bonus based on for a primary support

4    engineer at Rimini Street?

5    A.    Our bonuses are based on company performance,

6    customer satisfaction, the return of those surveys that

7    they answer, and our quality.

8    Q.    And so let me make sure I understand.  So after an

9    event happens and you contact a client, is there a survey

10   that goes out?

11   A.    Yes.

12   Q.    And then that's factored into the bonus for the

13   primary support engineer?

14   A.    Yes, we invite our clients to complete that survey.

15   Q.    To your knowledge, does Oracle have a primary

16   support engineer program?

17   A.    I'm not aware of any program like that.

18   Q.    Do you have any firsthand experience with Oracle

19   support?

20   A.    Yes.  When I was at Florida State University in

21   2005, we had a program -- a COBOL program that was a

22   bending, it stopped, and so I offered to call PeopleSoft,

23   Oracle at that time, and present my case.

24   Q.    Was Oracle able to resolve your case?

25   A.    The individual I spoke to wanted query dumps,

1    queries sent to them of many basic setup tables, and we

2    believed that was going to take too long, so we put our

3    heads together and did some digging and resolved the issue

4    on our own.

5    Q.    Did you feel that it made sense to send query tables

6    to the Oracle person?

7    A.    No, because it was a program issue, a bending.   I

8    believe it was a unique constraint error where data could

9    not be posted on top of the first data.

10   Q.    So it sounds like you thought the problem was a

11   little different than what they thought it was?

12   A.    Yes.  They wanted to start at the base.

13   Q.    Start at the bottom?

14   A.    Yeah.

15   Q.    And were you able to solve that problem?

16   A.    Yes, we were.

17   Q.    Are you still a primary support engineer at Rimini

18   Street?

19   A.    No.

20   Q.    Why are you not a primary support engineer?

21   A.    I was promoted.

22   Q.    What's your position as of 2011 at Rimini Street?

23   A.    I manage the business analyst team.

24   Q.    Do you still work with primary support engineers as

25   the manager of the business analyst team?

1   A.    Oh, yes.  We meet every week to discuss client

2   cases, and I'll assist, or my team assists with looking

3   into tax calculations, whatever.

4   Q.    Do you ever miss being a primary support engineer?

5   A.    Yes and no.

6   Q.    Why do you say that?

7   A.    Well, I miss it, yes, because I miss the client

8   direct contact and that interaction with the client.

9             No, it's a very difficult job, long hours.

10            MR. DYKAL:  No further questions.

11            THE COURT:  Cross-examination?

12                      CROSS-EXAMINATION

13   BY MR. ISAACSON:

14   Q.    Hi, Ms. Blackmarr.  My name is Bill Isaacson.

15            Just let me clear up a few things with you.

16            When you were -- you've mentioned when you

17   worked at PeopleSoft before it was an Oracle company --

18   A.    Yes.

19   Q.    -- during that time you were a consultant for

20   PeopleSoft's education and government clients; is that

21   right?

22   A.    That is correct.

23   Q.    All right.  And then when you became a primary

24   support engineer for Rimini Street, how many years was that

25   that you were a PSE?

1    A.    Well, I left PeopleSoft August of 2003, and started

2    with Rimini Street February of 2007.

3    Q.    All right.  And then once you were at Rimini Street,

4    you were a primary support engineer, a PSE, beginning in

5    February 2007 for how long?

6    A.    Oh, excuse me.  Until approximately September 2009.

7    Q.    Okay.  Thank you.

8          And then your responsibilities as a primary

9    support engineer related to one PeopleSoft type of

10   software, as I understand it, HRMS; do I have that right?

11   A.    Yes.

12   Q.    That's payroll for North America?

13   A.    Yes.

14   Q.    All right.  Thank you.

15         And you mentioned calling other people when you

16   needed help.  When you needed solutions to technical

17   problems as a PSE, you would call in technical people for

18   help; is that right?

19   A.    That's correct.

20   Q.    Okay.  And I think we agree you haven't worked with

21   JDE or Siebel, you've only worked with PeopleSoft?

22   A.    Only PeopleSoft.

23   Q.    All right.  And at Rimini Street, if I understand it

24   correctly, if a client had multiple products, if it had

25   PeopleSoft and Siebel, for example, you would have multiple

1    PSEs, you would not be the PSE to meet all the clients'

2    needs?

3    A.    That is correct.

4    Q.    Now, you mentioned you work from home in Florida, I

5    think.  Do I have that right?

6    A.    Yes.

7    Q.    And you don't have -- and that's been true for your

8    entire career at Rimini Street?

9    A.    That is correct.

10   Q.    Okay.  And you don't have regular contact with, for

11   example, Mr. Ravin?

12   A.    No.

13   Q.    And, in fact, since February 2007, you may have

14   directly emailed Mr. Ravin three times?

15   A.    I don't recall the number, but it was very few.

16   Q.    Very few.  And the only time that you ever remember

17   him emailing you, accept maybe if you were on a cc, but the

18   only time he actually emailed you was when he was checking

19   on you during hurricane season in Florida?

20   A.    Yes, after a major storm passed, he wanted to make

21   sure I was okay.

22   Q.    All right.  And that's it in terms of your

23   involvement with Mr. Ravin?

24   A.    Direct contact, yes.

25   Q.    In fact, you've had only limited interaction with

1    Rimini Street executives; correct?

2    A.    Thomas Shay a few times about issues with phone when

3    I first joined, but very few, you're right.

4    Q.    Issues about your phone working?

5    A.    Well, no, when he issued -- when he procured a phone

6    for me.

7    Q.    All right.  So in this terms of dealing with upper

8    executives, basically your dealings were making sure you

9    were going to get a working phone as part of your job?

10   A.    Yes.

11            MR. ISAACSON:  Can we look at 1590 -- wait.

12   First of all I have a binder, and I need to give you one.

13            I'd like to show the witness the organization

14   chart at page 6 of 8 of PTX 1590.

15            And I move to admit 1590.

16            COURTROOM ADMINISTRATOR:  It's preadmitted.

17            MR. ISAACSON:  It's admitted?  All right.

18            THE COURT:  It's admitted.

19        (Plaintiffs' Exhibit 1590 received into

20        evidence.)

21   BY MR. ISAACSON:

22   Q.    All right.  This is not a document that you're

23   copied on.  I don't know if you've seen it before.

24            So if you can turn -- it's on your screen if

25   that helps you too.

1           This is an organization chart for Rimini Street

2    attached to an email in June 2008, and in June 2008 you're

3    still a PSE; right?

4    A.    Yes, I was.

5           MR. ISAACSON:  Okay.  And let's blow up the top

6    part of the management there, and then move on down, Matt.

7    BY MR. ISAACSON:

8    Q.    And then below Deborah Hill and below Travis Ormond,

9    there's a list of 5 HCM, that would be HCM PSEs, and then

10   you see your name?

11   A.    Yes, I see my name.

12   Q.    All right.  Does this seem like an accurate

13   description of where you were in the organization structure

14   of Rimini Street when you were a PSE?

15   A.    I was -- yes, directly underneath Beth.  She and I

16   would have -- she would email me about different things,

17   but I don't recall Deborah Hill.

18   Q.    Okay.  But you're underneath Beth.  You don't

19   remember Deborah Hill.  You're also underneath Travis

20   Ormond; is that right?

21   A.    Yes.

22   Q.    Okay.  The -- now, I want to -- you've talked about

23   what you did as a PSE for your clients.  I want to ask you

24   about that.

25           MR. ISAACSON:  Matt, could we pull up the slide

2035

1    from opening?

2    BY MR. ISAACSON:

3    Q.    I didn't see if you were here for opening statement.

4    Were you here for opening statement?

5    A.    No, sir.

6    Q.    And I'm not going to bother you much about this, but

7    there's five things on here I want to ask you about, one of

8    which is the library.

9         Now, is it the case that you did not know when

10   you were a PSE that Rimini had a library of PeopleSoft

11   documentation that was not customer specific?

12   A.    No, I was not aware.

13   Q.    You don't -- there's -- I'll tell you we've been

14   discussing a library of software in this case that included

15   PeopleSoft software.  You don't know anything about that

16   issue; is that right?

17   A.    No, sir, I don't.

18   Q.    Okay.  And then there's Rimini local environments.

19   Now, you've been talking about those.

20   A.    Yes.

21   Q.    Those are the environments on the Rimini system.

22        And you did know -- oh, actually I want to ask

23   you about the automated downloads first.  Now, you had no

24   responsibility for downloading at Rimini Street when you

25   were a PSE, that's right?

```
 1    A.    That is correct.

 2    Q.    Okay.  So -- and specifically you didn't have any

 3    responsibility for downloading material from Oracle

 4    websites?

 5    A.    That is correct.

 6    Q.    And, in fact, you don't recall ever having any

 7    credentials for an Oracle website?

 8    A.    I did not.

 9    Q.    Okay.  And it would have been a rare case where you

10    personally accessed Oracle's websites?

11    A.    That is correct.

12    Q.    Okay.  In fact, it's fair to say you could name some

13    of the websites, but you couldn't name all of them?

14    A.    That is correct.

15    Q.    Okay.  Now, you mentioned -- let's see if we can

16    look -- when you looked at DTX 3015 and 3016, pull just the

17    front of that up.

18          Okay.  Both those documents -- remember you

19    talked about those with your counsel.  This is in your

20    previous binder.  And it's on your screen.  This is the one

21    you talked about, General Motors, GMAC?

22    A.    Yes.

23    Q.    Yeah, you remember that.

24          And the -- you don't know what automated

25    downloading was going on for the GMAC client, do you?
```

2037

1    A.    No.

2              MR. ISAACSON:  Okay.  Can we look at PTX 27,

3    which has been previously admitted.  And let's blow this

4    up.

5    BY MR. ISAACSON:

6    Q.    All right.  Now, this is an email that you were not

7    copied on.  This is between Mr. Chiu and Mr. Ravin.  And

8    you see they're talking about the GMAC archives?

9    A.    Yes.

10   Q.    And do you see Mr. Ravin says at the bottom of an

11   email to Mr. Chiu,

12              "Please use our automation tools to complete the

13   downloads as it is not feasible to complete the entire

14   downloads with such tools or processes."

15              That's not something you knew anything about;

16   right?

17   A.    That is correct.

18   Q.    Okay.  Now, you mentioned the Wisconsin Public

19   Services client.  Do you remember that?

20   A.    Yes.

21   Q.    Okay.  And if I understand your testimony, was that

22   you went on -- you went onto a site before their -- before

23   you had their passwords?

24   A.    Yes.

25   Q.    All right.  So let me just get this straight.

 1              You need -- you used one client's credentials,

 2    one different from Wisconsin, and then you went on to --

 3    and then you went -- what did you use those credentials

 4    for?

 5    A.    To log on to Customer Connection.

 6    Q.    Right.  An Oracle website.

 7    A.    Yes.

 8    Q.    And now so you used one customer's credentials to

 9    log on to the website for another customer.

10              Now, you were deposed in this case a couple

11    weeks ago?

12    A.    Yes.

13    Q.    All right.  Now, at that deposition you did not

14    recall doing that, did you?

15    A.    No.  It had been a while.

16    Q.    Right.  And so then after the deposition, you met

17    with the lawyers, and you found out that you had done that.

18    Is that what happened?

19    A.    Well, at the deposition I believe I recalled that

20    incident.

21    Q.    Well, can we look at -- pull up -- just pull up the

22    transcript of the deposition at line -- page 37, line 14

23    through 18.

24              COURTROOM ADMINISTRATOR:  Do you want her to

25    have this?

1            MR. ISAACSON:  Yes, please.

2   BY MR. ISAACSON:

3   Q.    "So on March 6, 2007, did you use Birdville's

4   Customer Connection credentials to perform for -- research

5   for Wisconsin Public Services?"

6            And you said you didn't recall.

7   A.    I did not recall at that time, no.

8   Q.    And then you had the opportunity to talk with your

9   lawyers, and they helped you learn that you had in fact

10  done that.  Is that what happened?

11  A.    I believe Mr. Polito stated that Oracle knew that we

12  did not receive Wisconsin's login until several days later.

13  Q.    Right.  And then after the deposition, in preparing

14  for this testimony, you learned that Mr. Polito was right,

15  that you had done that?

16  A.    That's correct.

17  Q.    Okay.  On the subject of automated downloading, I'd

18  like you to look at Plaintiffs' Exhibit 106, which is in

19  the binder I've given you.

20            And I would move 106 into evidence.

21            I'm moving 106 into evidence.

22            COURTROOM ADMINISTRATOR:  106?

23            MR. ISAACSON:  PTX 106.  Thank you.

24            MR. DYKAL:  No objection.

25            THE COURT:  It's admitted.

1           (Plaintiffs' Exhibit 106 received into

2       evidence.)

3   BY MR. ISAACSON:

4   Q.    Now, this was an email you received in

5   February 20th, 2007.  So you had just started work?

6   A.    That was my first day.

7   Q.    Okay.  And on your first day you were told you were

8   going to be going over information on a conference call

9   about the Customer Connection's extract program.

10          MR. ISAACSON:  That's at the top, Matt.

11          THE WITNESS:  Yes.

12  BY MR. ISAACSON:

13  Q.    All right.  And then you talked about what those

14  programs were, three programs.

15          And it said, "These shortcuts automatically" --

16  down below, "these shortcuts automatically retrieve the

17  latest versions of each program before they are executed."

18          So that's your first day at work.  Did you hear

19  anything more about those automatic programs or shortcuts

20  after that?

21  A.    If I did, I do not recall.

22  Q.    Okay.  Now, let's look back, then, at that slide

23  from opening.

24          I've talked about the library, I've talked about

25  the automated downloads.

2041

1          Let's talk about the environments which you --

2     you do know about the PeopleSoft environments anyway?

3     A.    I do.

4     Q.    Okay.  But you've never built a PeopleSoft

5     environment?

6     A.    No.

7     Q.    Okay.  And you don't have -- when you were a

8     PeopleSoft employee, you weren't helping customers install

9     the software; correct?

10    A.    I was not.

11    Q.    And you haven't created backups of environments?

12    You ask other people to do that?

13    A.    That is correct.

14    Q.    And you don't restore backups, environments, you ask

15    other people to do that?

16    A.    That's correct.

17    Q.    Rimini Street has an IT department, and you ask them

18    to do that work?

19    A.    Yes.

20    Q.    Okay.  And, in fact, it is correct that you were

21    unaware up through at least your deposition a couple weeks

22    ago that Rimini Street had general development

23    environments; correct?

24    A.    I did not recall.

25    Q.    Okay.  So we've been talking about general

2042

```
 1    developments a lot in this case.  You don't know anything
 2    about that?
 3    A.    No, only what I heard.
 4    Q.    Okay.  And Krista Williams is the person who would
 5    know better than you how those environments were created;
 6    is that right?
 7    A.    Yes.
 8    Q.    By the way, do you know why she was demoted?
 9    A.    No, sir, I do not.
10    Q.    Okay.  And the people who would also know better
11    than you how those environments were used for development
12    would include Susan Tahtaras, Mr. Allen -- and I don't
13    remember Radtke's first name -- Mr. Radtke?
14          Those people would know more than you about
15    that?
16    A.    That is correct.
17    Q.    All right.  Let's go back to the slide.
18          Now, Oracle website extracts, that's a
19    discussion of Siebel.  So you definitely wouldn't know
20    anything about things coming off the Siebel website; right?
21    A.    No, I would not.
22    Q.    All right.  Now, cross-uses of fixes and updates.
23          Now, you're not a developer, and you basically
24    don't know how updates are created; right?
25    A.    I do not.
```

2043

1    Q.    And there are technical components to PeopleSoft

2    updates, and you've never developed any of those individual

3    technical components?

4    A.    No, sir.

5    Q.    Okay.  So I promised I wasn't going to do this, but

6    I'm going to break my promise.

7            There are things called SQR, SQC, COBOL, Online

8    Objects, DAT, and Project Files, all which are technical

9    components of a PeopleSoft update.

10            And you don't get involved in that, do you?

11    A.    No.

12    Q.    Now, as a quality assurance tester -- now, after you

13    were a PeopleSoft engineer, you did get involved in quality

14    assurance; is that right?

15    A.    Yes.

16    Q.    Okay.  And that's at Rimini?

17    A.    That is correct.

18    Q.    And that's where you would test fixes in one

19    customer's environment for other customers that would

20    receive that fix; right?

21    A.    I'm sorry.  Re-state your question.

22    Q.    Sure.  When you were doing quality assurance -- is

23    quality assurance your -- are you doing troubleshooting in

24    the environments?

25    A.    We are testing the developed program or the online

2044

1    fixes.

2    Q.    Okay.  So you're testing the fixes to see if they're

3    going to work before you send them to the client?

4    A.    That is correct.

5    Q.    And you would test fixes in one customer's

6    environment, and then another customer would receive the

7    fix?

8    A.    If they were binary equal, exactly the same code.

9    Q.    Right.  So if they have the same code, you would

10   test in one environment and send -- and you're not making

11   the decisions as to which customers to send it to.  That's

12   being handled by someone else.  You would just find out

13   what group of customers to send it to?

14   A.    I would test a group of customers.

15   Q.    All right.  And that was common at Rimini Street?

16   A.    To test client fixes, yes.

17   Q.    And it was common at Rimini Street to test client

18   fixes at one environment and then for the fix to be sent to

19   other clients?

20   A.    If they were binary equal, that means the same

21   release, and they were exactly the same.

22   Q.    Okay.  All right.

23              And -- now, you mentioned how you went about

24   your work.  And so I take it most of your contact with

25   customers was through email?

2045

1    A.    Email.

2    Q.    Okay.  And in general that's true of PSEs, to your

3    knowledge.  You're mostly dealing with clients through the

4    email?

5    A.    That is correct.

6    Q.    And I think you said that in terms of telephone

7    calls, you were not necessarily available to your customers

8    after regular business hours.  There's a hotline that

9    answers the phone after regular business hours?

10   A.    That is correct.

11   Q.    Okay.  And after business hours, the call goes to

12   the hotline, and the person answering the phone -- there

13   wasn't -- after hours you got voicemail; is that right?

14   A.    If they -- I'm sorry.  Re-state that.

15   Q.    If you called the hotline after normal business

16   hours, you would get voicemail, and then someone would pick

17   up the voicemail and hopefully call the customer back?

18   A.    We did.

19   Q.    All right.  All right.  So after the business hours,

20   you're calling into voicemail, and then somebody at Rimini

21   Street is listening to voicemails?

22   A.    We have a high alert, we're alerted, and we return

23   the call.

24   Q.    All right.  And you don't know -- and you don't --

25   you know, you talked about the phone calls you received.

2046

```
 1    You don't remember how many phone calls you were receiving

 2    per day or on a per-week basis; right?

 3    A.    No, sir, I do not recall the number.

 4    Q.    Okay.  All right.  Now, let's -- those updates,

 5    there's at least -- during the time you were a PSE, there's

 6    at least six bundles of updates each year; right?

 7    A.    Yes.

 8    Q.    And they tend to be in December and January because

 9    that's when the tax rules are changing or taking effect and

10    the regulations are being implemented.

11    A.    That is correct.

12    Q.    And so every year Rimini had to create a lot of

13    fixes for the December and January work that was going on?

14    A.    Yes.

15    Q.    That's your busiest time of year when you're a PSE?

16    A.    Yes.

17    Q.    And you're working much more than 40 hours a week

18    during that period?

19    A.    Yes.

20    Q.    And you mentioned the people you hire, that they

21    would have 10 years or more experience.  It's not easy to

22    find people like that, is it, 10 years of --

23    A.    They have been found.

24    Q.    Right.  It's not easy to find them?

25    A.    I did not go searching for them.  They would be
```

1    recommended to me.

2    Q.    All right.  It wouldn't be easy to double or triple

3    your workforce too quickly, would it?

4    A.    No.

5    Q.    And the reason that you want people with experience

6    is Rimini Street is not trying to engage in any training,

7    you want to get these people in there working immediately?

8    A.    Yes.

9    Q.    Is that right?

10         Now, you mentioned Moraine Park.  You said that

11   was a remote environment, meaning it was at the client site

12   at Moraine Park?

13   A.    Yes.

14   Q.    And that you would access that remote environment?

15   A.    Yes.

16   Q.    All right.  Now, that didn't work very well at

17   Moraine Park, did it?

18   A.    No.

19   Q.    All right.  In fact, that even made it up to upper

20   management that the remote environment at Moraine Park was

21   not working very well?

22   A.    I don't recall that.

23   Q.    All right.  The -- let's look at PTX 15 which has

24   been previously admitted.

25         All right.  Let's look at page 2.

```
 1              This is Dennis Chiu, vice-president at Rimini

 2   Street.  This isn't someone that you would regularly deal

 3   with, is it?

 4              MR. DYKAL:  I'm going to object as beyond the

 5   scope.  I don't even believe Ms. Blackmarr is copied on

 6   this email.  I don't know why she would be asked about it.

 7              MR. ISAACSON:  This is about the Moraine Park

 8   remote environments that he asked her about.

 9              THE COURT:  It's within the scope.  The

10   objection's overruled.

11   BY MR. ISAACSON:

12   Q.   You didn't have much direct contact with Mr. Chiu

13   when you were working as a PSE, did you?

14   A.   Only from time to time.

15   Q.   All right.  And he's writing to someone named Rich

16   Hughes.  Do you know who that is?  He says he's a senior

17   account executive.

18   A.   I don't recall Rich Hughes.

19   Q.   All right.  And the -- and he's talking about

20   Moraine Park and how their current thinking is,

21              "We're setting up VPN to their development

22   system for the purpose of support and tax development.  But

23   we would only want to set this up for support related

24   purposes and resume the task of onboarding an in-house

25   environment."
```

1               So do you understand that what they're

2    discussing here is that Rimini Street wants to have a

3    Moraine Park environment on their system?

4    A.    I understand.

5    Q.    Okay.  And then on the first page -- now, Mr. Chiu

6    is talking to Mr. Hughes again about Moraine Park Technical

7    College.

8               "We're going to have our discussion."

9               MR. ISAACSON:  Go ahead and pull it up.

10   BY MR. ISAACSON:

11   Q.    "We had our call to cover VPN access to their system

12   this morning."

13               "VPN access to their system" means the

14   connection to that remote environment; right?

15   A.    Yes.

16   Q.    Okay.  "And when I informed him we would really want

17   to have an in-house environment" -- that's referring to a

18   Rimini environment; right?

19   A.    Yes.

20   Q.    Okay.  " -- that we can perform our proactive

21   development on, David" -- that's someone from Moraine Park

22   Technical College, "was still firm in his perception that

23   they can't extend their software for use outside their

24   location.  I tried to clarify for him that this is simply

25   another development environment they are entitled to have,

2050

1    but he views this as a legal requirement in their

2    agreement."

3              Now, when there was discussion with the clients

4    about what was or was not allowed under the license

5    agreements, that was being handled by people other than

6    you; right?

7    A.    That's correct.

8    Q.    All right.  And the -- and were you aware of upper

9    management's desire that they have -- that they have an

10   environment on their system from Moraine Park?

11   A.    I read that, yes.

12   Q.    Okay.  But you didn't know about that at the time?

13   A.    No, I did not.

14   Q.    The -- if we can -- well, just to wrap it up, and

15   let's talk about your -- the process of getting back to

16   customers.  You mentioned the 30-minute response time?

17   A.    Yes.

18   Q.    Let me see if I can ask this question before I get

19   to the 30-minute response times.

20             About binary equals, the -- would you actually

21   check the code to see if they were binary equals, or were

22   you looking at they appeared to be the same product so you

23   would -- so that you would reach the conclusion that they

24   were binary equals?

25   A.    I did not.  Development did that for us and placed

1    them in a grouping.

2    Q.    All right.  Is binary equal a test for sameness?

3    A.    Yes.

4    Q.    Do you know?  You think it is?

5    A.    I believe it is.

6    Q.    Okay.  But maybe you're not technical enough to know

7    one way or the other?  Sort of like me.

8    A.    Well, I have an understanding that binary equal

9    means exactly the same code.

10   Q.    But you wouldn't be able to go in and check whether

11   it was the same?

12   A.    I have a tool called KDiff, I could actually perform

13   one, but it was not my responsibility to do so.

14   Q.    All right.  Let's get back to that 30-minute

15   response time.

16          You -- now, you -- if you got an email or a call

17   from a customer, you would try to respond within 30

18   minutes?

19   A.    Yes.

20   Q.    And that was your -- that was your policy; correct?

21   A.    Yes.

22   Q.    But you didn't keep any statistics as to whether you

23   were achieving that?

24   A.    No, I did not.

25   Q.    Okay.  And you are unaware of Rimini Street keeping

2052

```
 1   any statistics about whether they're meeting that 30-minute

 2   response time?

 3   A.    I'm sure they were, but I was not aware.

 4   Q.    Well, during the time you're a PSE, how would Rimini

 5   Street have any idea whether you're getting back to someone

 6   within 30 minutes if you're not keeping a record of it?

 7   A.    If -- perhaps --

 8   Q.    Don't guess.  Tell me -- I apologize for

 9   interrupting.

10   A.    That's quite all right.

11   Q.    But I think your counsel would agree with me that

12   you shouldn't be guessing.

13         Do you know whether Rimini Street had any way of

14   knowing whether you were getting back to your clients

15   within 30 minutes?

16   A.    No.

17   Q.    And the 30-minute response time is the first

18   contact, it's not resolving the problem?

19   A.    That is correct.

20   Q.    All right.  And so earlier in this trial Mr. Ravin,

21   at page 646, referred to "our standard 24-hour day,

22   7-day-a-week.  If they have an urgent issue, they get a

23   resolution in 30 minutes."

24         Your customers don't get resolutions in 30

25   minutes, do they?
```

```
 1    A.    They are contacted within the 30 minutes.

 2    Q.    In fact, it could take months to solve the client's

 3  questions?

 4    A.    It depends on the severity.

 5    Q.    Depends on the question?

 6    A.    I beg your pardon?

 7    Q.    It depends on the question?

 8    A.    Yes.

 9          MR. ISAACSON:  All right.  I have no further

10  questions.

11          THE COURT:  All right.

12          Redirect examination?

13          MR. DYKAL:  No questions.

14          THE COURT:  All right.  Ms. Blackmarr, that

15  completes your testimony.  You may step down.  Thank you.

16          THE WITNESS:  Thank you.

17          MR. WEBB:  Your Honor?

18          THE COURT:  Yes.

19      (Sidebar conference held as follows:)

20          MR. WEBB:  We have some videos to play, and we

21  can sort of pick and choose based upon when you want this

22  to end today.  So if you tell us when you want to be done,

23  we'll pick the videos to be done.

24          THE COURT:  I want to be done at 11:45.

25          MR. WEBB:  We will do that.  Thanks, Judge.
```

2054

```
 1              (Sidebar conference concluded.)
 2                   THE COURT:  Defense's next witness, please.
 3                   MR. RECKERS:  Your Honor, the defense calls
 4    Mr. Clark Strong by video deposition.
 5                   Mr. Strong was the designee for the Birdville
 6    Independent School District which was in Texas.  The
 7    video's about 16 minutes long.
 8                   There are no exhibits.
 9                   THE COURT:  All right.
10              (Videotape deposition of Clark Strong played
11              as follows:)
12                   "Q. Mr. Strong, could you please state
13              and spell your name for the record?
14              A. My -- Clark Strong, C-L-A-R-K,
15              S-T-R-O-N-G.
16              Q. And by whom are you employed?
17              A. Birdville ISD.
18              Q. And ISD stands for?
19              A. Independent School District.
20               PAGE 7:19 TO 7:25 (RUNNING 00:00:21.080)
21              Q. Okay.  Thank you, sir.  Now, is
22              Birdville Independent School District a
23              licensee of Oracle's PeopleSoft branded
24              software?
25              A. Yes.
```

1          Q. And in general terms, what software does

2          Birdville license from Oracle?

3          A. HR, payroll, and finance.

4           PAGE 8:01 TO 8:11 (RUNNING 00:00:28.825)

5          Q. And is Birdville also a customer of Rimini

6          Street?

7          A. Yes.

8          Q. And in general, again, what is it that

9          Birdville contracts for with Rimini Street?

10          A. Support for those products.

11          Q. Now, I believe you were involved in the

12          process by which Birdville decided to

13          contract with Rimini Street for support of

14          its PeopleSoft products?

15          A. Yes.

16           PAGE 8:22 TO 9:07 (RUNNING 00:00:27.993)

17          Q. And to what extent was that lower price

18          a deciding factor in the decision for

19          Birdville to contract with Rimini Street

20          rather than renew with Oracle?

21          A. None.

22          Q. The price was no -- no -- no effect

23          whatsoever?

24          A. No.

25          Q. So if it had been the same price, you

2056

1           still would have contracted with Rimini

2           Street?

3           A. That's what I would have recommended.

4            PAGE 9:08 TO 9:18 (RUNNING 00:00:24.838)

5           Q. All right.  And -- and were you the

6           decision maker?

7           A. No.

8           Q. Who was the decision maker?

9           A. I'm not sure.  The hierarchy is, you

10          know, I turn it over to my boss.  You know,

11          I'm -- ultimately the board.

12          Q. Okay.  All right.  And do you know to what

13          extent price was a factor in the board's

14          decision?

15          A. No, I don't know.

16           PAGE 9:19 TO 10:02 (RUNNING 00:00:25.200)

17          Q. Was price a factor -- was price something

18          that was part of your recommendation to the

19          board?

20          A. The price was in the recommendation.

21          Q. And was it identified as a reason to

22          contract with Rimini Street in your

23          recommendation?

24          A. I don't know.  Oh, in my recommendation?

25          Q. Yes.

1   A. No.

2    PAGE 10:03 TO 11:01 (RUNNING 00:00:56.893)

3   Q. But you don't know -- you don't -- you

4   don't know whether -- whether the board --

5   you don't know what weight the board placed

6   on price as part of its final decision?

7   A. I don't know what was said to the board.

8   Q. Okay.  And when you say you don't know

9   what was said to the board, whom are you

10  thinking of that would be doing the speaking?

11  A. I don't know who spoke.

12  Q. Okay.  To whom was your recommendation

13  made?

14  A. To my supervisor.

15  Q. And who was that?

16  A. Michael Depaola.

17  Q. And did Mr. Depaola convey to you any

18  details of what he communicated to the board?

19  A. No, he didn't, but he wouldn't have spoken

20  to the board either.

21  Q. Who would have spoken to the board?

22  A. I don't know.

23  Q. Okay.

24  A. I mean, there's several, you know, levels

25  above us, and I'm not sure who presented it

1          to the board.

2           PAGE 12:02 TO 13:01 (RUNNING 00:01:23.812)

3          Q. Okay.  Now, did you, as part of the

4          discussions with Rimini Street, evaluate the

5          extent to which Rimini Street could deliver

6          support of the same quality as Oracle?

7          A. Yes.

8          Q. And what determination did you make in

9          that regard?

10         A. That they could provide better support.

11         Q. Okay.  And what was the basis of that

12         determination?

13         A. They assign one person to us versus when

14         we call Oracle, you know, you get whoever

15         answers the phone, and we thought that

16         dealing with one person repeatedly, they

17         would understand our business better and

18         provide better support.

19         Q. And in -- prior to beginning to receive

20         support with Rimini Street, did you make an

21         evaluation as to whether the actual support,

22         for example, the tax and regulatory updates

23         you would be receiving would be of the same

24         quality that you would be getting from

25         Oracle?

2059

```
1              A. They said it would be.
2              Q. Okay.  And has that turned out to be the
3         case?
4              A. Yes.
5               PAGE 14:22 TO 14:25 (RUNNING 00:00:14.097)
6              If Rimini Street couldn't or said it couldn't
7         provide tax and regulatory updates at the
8         same quality as Oracle, would Birdville still
9         have contracted with Rimini Street for
10        support?
11              PAGE 15:02 TO 15:04 (RUNNING 00:00:12.740)
12             A. I'm not sure.  I think I would have
13        recommended to my supervisor that we -- that
14        we go forward with it.
15              PAGE 15:06 TO 15:09 (RUNNING 00:00:08.300)
16             Q. What would have been your solution to
17        getting tax and regulatory updates in that
18        event?
19             A. Would have done it ourselves.  We did it
20        in the past.
21              PAGE 15:10 TO 15:11 (RUNNING 00:00:11.386)
22             Q. When was that?  When did you do your own
23        tax and regulatory updates?
24              PAGE 15:12 TO 15:25 (RUNNING 00:00:35.924)
25             A. It would have been in the late '80s.
```

2060

```
1          Q. Was that on PeopleSoft software?

2          A. Oh, no.

3          Q. What software was that?

4          A. I don't recall the name of it.

5          Q. Did you evaluate the feasibility of doing

6          self support on PeopleSoft software at the

7          time that you were considering Rimini Street?

8          A. No.

9          Q. Did you consider any other support options

10         other than Oracle or Rimini Street at the

11         time that you were preparing to contract with

12         Rimini Street in this contract?

13         A. Yes.

14          PAGE 16:01 TO 16:05 (RUNNING 00:00:14.928)

15         Q. What other options were those?

16         A. We looked at other companies.

17         Q. Do you remember which ones?

18         A. EVerge and TomorrowNow are the two I

19         remember.

20          PAGE 17:22 TO 18:05 (RUNNING 00:00:19.523)

21         Q. Did you have any discussions with Rimini

22         Street about whether installing Birdville's

23         licensed software on its computers was

24         compliant or not with Birdville's license

25         agreement with Oracle?
```

```
 1            A. Yes.

 2            Q. What were those discussions?

 3            A. That it was.

 4            Q. Who said that it was?

 5            A. Rimini Street.

 6             PAGE 18:15 TO 18:19 (RUNNING 00:00:13.186)

 7            Q. Did you rely at all on -- on Rimini

 8            Street's assurance that it was not a

 9            violation of your license agreement with

10            Oracle in deciding to provide them with

11            Birdville's software?

12            A. Yes.

13             PAGE 18:20 TO 19:04 (RUNNING 00:00:21.535)

14            Q. Was there any discussion that you had with

15            Rimini Street in connection with this

16            agreement that -- as to how Birdville's

17            software would be used?

18            A. Yes.

19            Q. What was that discussion?

20            A. It would be used for working, doing work

21            for us and us only.

22            Q. And you remember that clearly?

23            A. Yes.

24             PAGE 19:10 TO 19:17 (RUNNING 00:00:26.623)

25            Q. Was it important to you to hear from
```

1          Rimini Street in making your decision to sign

2          with Rimini Street that they would use your

3          software to you and you only?

4          A. Oh, yes.

5          Q. Why was that important?

6          A. Because we have the contract with Oracle

7          or PeopleSoft, and that would violate that

8          contract.

9           PAGE 19:18 TO 19:21 (RUNNING 00:00:10.148)

10         Q. If you had believed that Rimini Street was

11         going to use your software to support other

12         customers, would you still have signed with

13         Rimini Street?

14          PAGE 19:23 TO 19:23 (RUNNING 00:00:02.084)

15         A. I wouldn't have recommended it.

16          PAGE 19:25 TO 20:05 (RUNNING 00:00:16.431)

17         Q. And if you had believed at the time that

18         Rimini Street's installing your software on

19         its systems was a violation of your license

20         agreement with Oracle, would you have signed

21         with Rimini Street?

22         I wouldn't have --

23          PAGE 20:07 TO 20:07 (RUNNING 00:00:05.911)

24         A. -- recommended it.

25          PAGE 20:09 TO 20:10 (RUNNING 00:00:02.727)

```
1          Q. You would not have recommended it, sir?

2          A. No.

3           PAGE 21:15 TO 21:18 (RUNNING 00:00:14.410)

4          Q. How important were the references in

5          forming your recommendation that the school

6          district sign with Rimini Street?

7          A. Important.

8           PAGE 24:17 TO 24:25 (RUNNING 00:00:25.720)

9          What's -- in a very general sense, what's the

10         nature of your job responsibilities with the

11         school district, or what was it back in this

12         time frame in the end of 2006?

13         A. Technical support for PeopleSoft.

14         Q. And are you generally familiar with the

15         PeopleSoft software as part of that job?

16         A. I'm one of the most familiar at the

17         school district, yes.

18          PAGE 30:24 TO 31:02 (RUNNING 00:00:11.464)

19         Q. Has there ever been a service request that

20         has been raised with Rimini Street that has

21         not been quickly resolved?

22         A. They have resolved every request.

23          PAGE 35:06 TO 35:14 (RUNNING 00:00:26.524)

24         Q. Okay.  Now, the article refers to the fact

25         that Birdville was on simultaneous support
```

2064

```
 1          with both Oracle and Rimini Street.
 2          A. Yes.
 3          Q. And that during that time, if an issue
 4          arose, you observed that you would get faster
 5          response sometimes from Rimini Street than
 6          from Oracle.
 7          A. Yes.
 8           PAGE 35:15 TO 35:21 (RUNNING 00:00:25.686)
 9          Q. Did you ever analyze why that was?  In
10          other words, how Rimini Street was able to do
11          that?
12          A. Analyze it?
13          Q. Yeah.  Maybe investigate is a better term.
14          Did you ever investigate how it was that
15          Rimini Street was able to provide support
16          more quickly than the vendor?
17           PAGE 35:22 TO 35:22 (RUNNING 00:00:02.159)
18          A. No.
19           PAGE 55:15 TO 55:19 (RUNNING 00:00:12.171)
20          Q. If you had known that Rimini Street was
21          going to use Birdville's software as one of
22          four development environments to develop
23          fixes to send to other customers, would you
24          have recommended that the school district
25          contract with them?
```

2065

```
 1          PAGE 55:20 TO 55:20 (RUNNING 00:00:00.934)
 2          A. No.
 3          PAGE 57:19 TO 57:23 (RUNNING 00:00:17.951)
 4          Q. Okay.  Putting aside the specific
 5          customers, would you have agreed to serve as
 6          a reference if you had known that Rimini
 7          Street was installing your software on its
 8          systems in violation of your license
 9          agreement with Oracle?
10          PAGE 58:01 TO 58:01 (RUNNING 00:00:03.441)
11          A. No.
12          PAGE 58:03 TO 58:07 (RUNNING 00:00:13.267)
13          Q. And would you have agreed to serve as a
14          reference and spoken with the folks that you
15          spoke with if you had known that Rimini
16          Street would use your software to provide
17          updates and fixes for other customers?
18          PAGE 58:09 TO 58:09 (RUNNING 00:00:01.542)
19          A. No.
20          PAGE 58:11 TO 58:15 (RUNNING 00:00:15.127)
21          Q. And would you have agreed to serve as a
22          reference for Rimini Street if you had known
23          that Rimini Street would have used the
24          Birdville log-in credential to the Oracle
25          website to download software that Birdville
```

1       wasn't licensed to?

2        PAGE 58:17 TO 58:17 (RUNNING 00:00:02.316)

3       A. I wouldn't have been a customer.

4        PAGE 58:19 TO 58:23 (RUNNING 00:00:16.274)

5       Q. And same question, would you have agreed

6       to be a reference or a customer if you had

7       known that Rimini Street would have taken

8       that log-in credential and used it to log in

9       to support other customers?

10       PAGE 58:25 TO 58:25 (RUNNING 00:00:00.838)

11      A. No.

12       PAGE 63:09 TO 63:15 (RUNNING 00:00:20.544)

13      Mr. Howard just presented, you know, a list

14      of customers that you may or may not have

15      been a reference for on behalf of Birdville.

16      Can you explain to me why you chose to

17      recommend Rimini Street to these customers?

18      A. Because of the good support we got from

19      them.

20       PAGE 71:02 TO 71:10 (RUNNING 00:00:23.471)

21      Q. Earlier today you testified that cost

22      wasn't the consideration in your

23      recommendation to Mike.

24      A. Correct.

25      Q. Is that correct?  What were the factors in

1               your decision to recommend Rimini Street?

2               A. I couldn't get my work done.

3               Q. Meaning you were involved in support

4               calls?

5                PAGE 71:12 TO 71:12 (RUNNING 00:00:02.146)

6               A. You want me to be very elaborate?

7                PAGE 71:14 TO 71:25 (RUNNING 00:00:48.203)

8               Q. Please.

9               A. PeopleSoft required us to -- if we placed

10              a call -- or on occasion when we would place

11              a call to get something fixed and they find

12              the problem and they would say it would be

13              fixed in bundle, you know, 4, bundle 7, you

14              know, and I don't remember the terminology

15              they use.  I wasn't doing the bundles.  I

16              didn't have time to install them, so they

17              would not provide us a fix until we got

18              current, and I was getting farther and

19              farther behind, and this was a solution on

20              getting out from under that problem.

21               PAGE 72:06 TO 72:18 (RUNNING 00:00:42.372)

22              Q. Let me rephrase.  Did you let Oracle know

23              that you would prefer not to receive bundled

24               patches and fixes?

25              A. I tried to get around the problem, yes.

2068

```
1        Q. And what was Oracle's response when you
2        made that known to them?
3        A. That the fix would be in that bundle, and
4        they couldn't provide me, you know, an
5        individual fix, that I had to get current.
6        Q. Were there any other considerations in
7        your decision to recommend Rimini Street to
8        Mike?
9        A. I mean, that's why I went looking for
10       another solution, and Rimini Street was the
11       best
12         PAGE 72:19 TO 72:23 (RUNNING 00:00:12.116)
13       solution I found.
14       Q. As we sit here today, does Birdville have
15       any plans to go back to Oracle support?
16       A. I wouldn't recommend it.
17       Q. And why not?
18         PAGE 72:24 TO 73:08 (RUNNING 00:00:32.529)
19       A. Because of the support we get from Rimini
20       Street.
21       Q. Earlier we discussed a time period in
22       which Birdville submitted support requests to
23       both Oracle and Rimini Street.
24       A. Yes.
25       Q. Correct?  Can you explain to us what you
```

1            learned from that experiment?

2            A. Rimini Street usually solved the problem

3            before I ever heard from Oracle.

4             PAGE 76:02 TO 76:08 (RUNNING 00:00:32.327)

5            Q. Now, counsel asked you whether you would

6            consider returning to Oracle.  My question

7            is, if the school district were to determine

8            that the support that it has received from

9            Rimini Street is not compliant with the

10           Oracle license agreement, who would make the

11           decision at that point whether or not to

12           continue with Rimini Street?"

13           (End of deposition.)

14                THE COURT:  All right.  Are we at the understood

15      point?

16                MR. WEBB:  I believe so, Your Honor.

17                THE COURT:  All right.  Ladies and gentlemen,

18      we've tried to time this in such a way that it would

19      coincide with being able to close today at 11:45.  So that

20      will complete the evidence to be presented today.

21                And I'm going to excuse you at this time.  But

22      because we have the whole weekend, I'm going to go through

23      the admonishment again.

24                I remind you that during the recess, you're not

25      to discuss the case with anyone or permit anyone to discuss

1       it with you or in your presence.

2               This caution includes not discussing the case

3       over the Internet, through emails or text messaging.

4               I caution you not to read, watch, or listen to

5       any report or commentary on this case through any medium of

6       information, and that certainly includes the Internet,

7       newspapers, television, and radio.

8               I caution you not to try to do any research or

9       make any independent investigation concerning this case on

10      your own.

11              You must not consult dictionaries, search the

12      Internet, perform Google searches or make any other

13      investigation about the case on your own.

14              When this case is finally submitted to you, it

15      is absolutely critical that the jury, each one of you, only

16      consider the evidence which has been presented to all of

17      the jurors within the four walls of this courtroom.

18              Finally, keep an open mind until all the

19      witnesses have testified and all the evidence has been

20      presented, until you've heard the Court's instructions on

21      the law, and until you've heard the final arguments of

22      counsel, and, for that matter, until you've heard and been

23      able to discuss the case with your fellow jurors following

24      those final statements when the jury is allowed to

25      deliberate the case.

2071

1              Please leave your notes in the jury room.  As

2     you know, they'll be there for you when you return.

3              And we will start on Monday at 1:00 p.m.

4     sharply.

5              And I'm working with our support people for

6     snacks for you and food.  I know that we've had kind of a

7     limited menu up to this point in time.

8              And most importantly, I wish you a pleasant and

9     a restful weekend, and I thank you for your continuing

10    interest, diligence, and dedication to this trial.

11             So have a pleasant weekend, and you may go ahead

12    and step down.

13             COURTROOM ADMINISTRATOR:  Please rise.

14        (Jurors exit courtroom at 11:43 a.m.)

15             THE COURT:  Everyone have a pleasant and a

16    restful weekend.  The message is to you too.

17        (The proceedings adjourned at 11:43 a.m.)

18                        *    *    *

19

20

21

22

23

24

25

2072

1                          -o0o-

2        I certify that the foregoing is a correct

3        transcript from the record of proceedings

4        in the above-entitled matter.

5

6        _____    9/26/15

7        Donna Davidson, RDR, CRR, CCR #318      Date
         Official Reporter

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

2073

1                          I N D E X

2   PLAINTIFFS' WITNESSES:                    PAGE
    ELIZABETH DEAN
3       Cross-examination Resumed              1908
        By Mr. STRAND
4       Redirect Examination By Mr. Isaacson   1951
        Recross-Examination By Mr. Strand      1981
5

6   DEFENDANTS' WITNESSES:                    PAGE
    SHELLEY BLACKMARR
7       Direct Examination By Mr. Dykal        1990
        Cross-Examination By Mr. Isaacson      2030
8

9                        E X H I B I T S

10  PLAINTIFFS'                              ADMITTED
    106                                        2040
11  1585                                       2010
    1590                                       2033
12  5478                                       2009

13  DEFENDANT'S                              ADMITTED
    3015                                       2006
14  3016                                       2003

15

16

17

18

19

20

21

22

23

24

25