2074

```
  1                    UNITED STATES DISTRICT COURT
                            DISTRICT OF NEVADA
  2            BEFORE THE HONORABLE LARRY R. HICKS, DISTRICT JUDGE


  3


  4   ORACLE USA, INC., a Colorado     :
      corporation; ORACLE AMERICA,     :
  5   INC., a Delaware corporation;    :
      and ORACLE INTERNATIONAL         :No. 2:10-cv-0106-LRH-PAL
  6   CORPORATION, a California        :
      corporation,                     :
  7                                    :
              Plaintiffs,              :
  8                                    :
         vs.                           :
  9                                    :
      RIMINI STREET, INC., a Nevada    :
 10   corporation; and SETH RAVIN,     :
      an individual,                   :
 11                                    :
              Defendants.              :
 12   _____ :


 13


 14


 15              TRANSCRIPT OF JURY TRIAL - DAY 11
                    (Pages 2074 through 2279)

 16


 17                     September 28, 2015


 18

                        Las Vegas, Nevada
 19


 20


 21


 22

      Court Reporter:         Donna Davidson, RDR, CRR, CCR 318
 23                           Certified Realtime Reporter
                              400 South Virginia Street
 24                           Reno, Nevada  89501
                              (775) 329-0132
 25
```

2075

1                    A P P E A R A N C E S

2     FOR THE PLAINTIFFS:

3     BOIES, SCHILLER & FLEXNER LLP
      KIERAN P. RINGGENBERG
4     1999 Harrison Street, Suite 900
      Oakland, California 94612
5     (510) 874-1000
      Fax: (510) 874-1460
6     kringgenberg@bsfllp.com

7     BOIES, SCHILLER & FLEXNER LLP
      RICHARD J. POCKER
8     300 South Fourth Street, Suite 800
      Las Vegas, Nevada 89101
9     (702) 382-7300
      Fax: (702) 382-2755
10    rpocker@bsfllp.com

11    BOIES, SCHILLER & FLEXNER LLP
      WILLIAM A. ISAACSON
12    KAREN L. DUNN
      5301 Wisconsin Avenue, NW
13    Washington, DC  20015
      (202) 237-2727
14    Fax:  (202) 237-6131
      wisaacson@bsfllp.com
15    kdunn@bsfllp.com

16    MORGAN LEWIS & BOCKIUS LLP
      THOMAS S. HIXSON
17    NITIN JINDAL
      JOHN A. POLITO
18    One Market, Spear Street Tower
      San Francisco, California 94105
19    (415) 442-1000
      Fax:  (415) 442-1001
20    thomas.hixson@morganlewis.com
      nitin.jindal@morganlewis.com
21    john.polito@morganlewis.com

22    JAMES C. MAROULIS
      DORIAN E. DALEY
23    Oracle Corporation
      500 Oracle Parkway
24    Redwood City, California 94070
      (650) 506-4846
25    jim.maroulis@oracle.com
      dorian.daley@oracle.com

2076

1                    A P P E A R A N C E S (Continued)

2    FOR THE DEFENDANTS:

3    SHOOK, HARDY & BACON LLP
     PETER E. STRAND
4    B. TRENT WEBB
     RYAN D. DYKAL
5    2555 Grand Boulevard
     Kansas City, Missouri 64108
6    (816) 474-6550
     Fax: (816) 421-5547
7    pstrand@shb.com
     bwebb@shb.com
8    rdykal@shb.com

9
     SHOOK, HARDY & BACON LLP
10   ROBERT H. RECKERS
     600 Travis Street, Suite 3400
11   Houston, Texas 77002
     (713) 227-8008
12   Fax: (713) 227-9508
     rreckers@shb.com
13
     SHOOK, HARDY & BACON LLP
14   ANNIE Y.S. CHUANG
     One Montgomery Tower, Suite 2700
15   San Francisco, California 94104-4505
     (415) 544-1900
16   achuang@shb.com

17
     LEWIS ROCA ROTHGERBER LLP
18   W. WEST ALLEN
     3993 Howard Hughes Parkway, Suite 600
19   Las Vegas, Nevada 89169
     (702) 949-8230
20   Fax: (702) 949-8364
     wallen@lrrlaw.com

21

22

23

24

25

2077

1          LAS VEGAS, NEVADA, SEPTEMBER 28, 2015, 12:40 P.M.

2                            --oOo--

3                    P R O C E E D I N G S

4

5          (Outside the presence of the jury.)

6               COURTROOM ADMINISTRATOR:  Please rise.

7               THE COURT:  Have a seat, please.

8               Good afternoon to everyone after the long

9     weekend, and I see that some people at least were busy on

10    this case over the weekend.

11              The record will show that we're in open court.

12    The jury's not present.

13              I have in front of me the issue raised by Oracle

14    in its pleading number 825 which was filed yesterday --

15    excuse me.  I may have those numbers mixed up.  No, that

16    appears to be wrong.

17              And a response filed on behalf of Rimini today,

18    and some additional authority that's also been filed on

19    behalf of Oracle.

20              So I assume that's why counsel have requested a

21    hearing before the jury's brought in; is that correct?

22              MR. RINGGENBERG:  Yes, Your Honor.  That's

23    correct.

24              THE COURT:  All right.  Let's try and move

25    through that as quickly as we can, please.  And you may do

1    so, Mr. Ringgenberg.

2                MR. RINGGENBERG:  Thank you, Your Honor.

3                There's two pieces of evidence that are at

4    issue.  One is the deposition, and the other is an expert's

5    testimony which we learned last evening is largely going to

6    attempt to convey the content of that deposition to the

7    jury along with a couple other points.

8                The deposition at issue is Mr. Simmons of

9    CedarCrestone.  In that deposition, Mr. Simmons revealed

10   that CedarCrestone had installed local copies of PeopleSoft

11   software on its system and had used those copies to service

12   multiple customers, which is the exact conduct this Court

13   found is not licensed under customer license agreements, on

14   summary judgment.

15               Mr. Simmons defended those practices as lawful

16   in much the same manner that Mr. Ravin has defended them.

17   He said they were consistent with industry practice and

18   authorized by the customer licenses.

19               That testimony, whether directly or through

20   Rimini's expert, is inadmissible for three reasons.  It's

21   irrelevant, it's prejudicial, and it's contrary at a

22   fundamental level to their position with regard to

23   TomorrowNow.

24               And it's irrelevant because there's no evidence

25   in the record that anyone at Rimini ever knew what

1    CedarCrestone was doing, or of their contentions that it

2    was lawful.

3             It therefore has no basis -- it's no basis for

4    Mr. Ravin or Rimini to claim it provided them a good faith

5    basis for what they did.

6             Rimini claims that it goes to willfulness

7    regardless of whether Rimini knew about it.

8             And on that point I can't think of better

9    authority than this Court's own *Whittemore* case decided

10   just a couple of years ago.  In that case, a criminal

11   defendant was charged with violating federal election law

12   by providing donations or campaign contributions in the

13   names of others.

14            The defendant wished to admit at trial two

15   things, a judicial opinion on the statute at issue that he

16   claims supported his interpretation claiming that a federal

17   judge has read the statute this way, therefore it must be

18   reasonable for me to read it this way, and the second is

19   the expert opinion of a linguist who was prepared to say

20   the same thing.

21            This Court rejected those admissions, including

22   because there was no evidence that the criminal defendant

23   knew about either of them and therefore they could not go

24   to that defendant's good faith.

25            The same is true in this case in exactly the

1    same way.  There's no evidence that anyone at Rimini knew

2    what CedarCrestone was doing or that they contended it was

3    lawful, and therefore it can't provide them a good faith

4    basis.

5           On this point, the primary authority that Rimini

6    has supported is the *Safeco* decision from the US Supreme

7    Court.  That decision held the conduct was not willful

8    because it was an objectively reasonable reading of the

9    statute at issue in that case.

10          There is no discussion in that case that the

11   conduct was not willful because someone else was doing it.

12   The Court held that in reviewing the language of the

13   statute, the statute was ambiguous and therefore it was

14   a -- it wasn't willful to do what they did since they could

15   have reasonably read it the other way.

16          That has nothing to do with this case where the

17   Court has held that the license terms are clear and

18   unambiguous and certainly has no basis for admitting what

19   someone else thought the license terms meant.

20          The best analogy maybe I can come up with, Your

21   Honor, is tax fraud.

22          Everyone pays taxes in this country.  Some

23   people make mistakes, and some people cheat, and there's

24   criminal prosecutions for the cheaters if they can prove

25   that they were knowingly violating the law.

2081

1          It is not a defense in those cases to claim that

2     other people also didn't pay their taxes unless you could

3     show specifically facts that the witness was -- the

4     defendant knew about and relied upon, and that's exactly

5     the same -- that's exactly the same line we think we should

6     draw in this case.

7          Now, the second point is it's prejudicial to

8     causation and damages.

9          I'll be very brief about this, which is, if

10    customers would have left Oracle to go to another

11    infringing competitor, that can't count against us on

12    damages.  There's settled law on that, and it's very sound,

13    and I think it's a very obvious principle that you can't

14    avoid the liability for your conduct by saying if I hadn't

15    done something illegal, someone else would have.

16          Rimini has said we will not argue to the jury

17    that CedarCrestone was a noninfringing alternative, but

18    they want to put evidence in front of the jury that

19    CedarCrestone was acting as it did and let the jury draw

20    that conclusion after asking the jury rhetorically in

21    opening argument where are these other customers going.

22          The third point, and perhaps most important, is

23    it's fundamentally inconsistent with their position on

24    TomorrowNow.

25          TomorrowNow pled guilty to criminal charges for

1    having local environments of PeopleSoft, JD Edwards, and

2    Siebel software on their systems.  They did so three months

3    before Mr. Simmons testified that his conduct was allowed.

4           Under the same licenses, many customers left

5    TomorrowNow and went to CedarCrestone which means that the

6    exact same licenses were at issue in both cases.

7           So what they want to do is tell the jury what we

8    were doing is fine, CedarCrestone thought it was fine,

9    while withholding from the jury evidence that someone else

10   in the industry not only did not think it's fine, but was

11   willing to plead them guilty to criminal charges for

12   exactly the same thing.

13          They have claimed there's no evidence that

14   TomorrowNow's practice is parallel, and there isn't in the

15   record, because we haven't admitted it because of the line

16   the Court has drawn, which we respect.  We are not asking

17   the Court to admit this evidence.  But it is there.  It's

18   in front of the Court.  The Court knows the conduct is

19   parallel.

20          So to allow them to introduce a different third

21   party with parallel conduct and their contentions of

22   legality, while withholding TomorrowNow's admission that

23   that same conduct was not only illegal but criminal, we

24   think would be fundamentally unfair.

25          I think the last point I would make, Your Honor,

1    is in the brief they filed this morning they suggested that

2    Mr. Ravin had testified specifically about reliance on

3    industry custom.

4            If you look at his testimony, he cites three

5    things.  He cites the terms of licenses, and that's the --

6    probably 90 percent of his testimony.

7            He cites a specific instance where he says I

8    knew Siebel was authorizing third parties to do some

9    maintenance -- or, pardon me, to do some level of customer

10   assistance.

11           And if Mr. Hilliard is going to testify that

12   that's true, that Siebel did authorize that, we have no

13   problem with that because Mr. Ravin has established a

14   specific factual basis, I knew about this fact, and I

15   relied upon that fact.  So if Mr. Hilliard wants to

16   corroborate that specific fact, we have no issue with that.

17           But there is no basis in Mr. Ravin's testimony

18   to say I knew about CedarCrestone or the other various

19   companies that Mr. Hilliard is prepared to testify about.

20           Let me mention -- let me just refer briefly to

21   that separate issue which is not CedarCrestone, it's three

22   other companies that are addressed in Mr. Hilliard's

23   testimony.  Those companies are Astute Labs, Summit

24   Technologies, and Hexaware.

25           And Mr. Hilliard wants to say those companies

2084

```
 1    were offering apparently similar services, and therefore

 2    what Mr. -- what Rimini was doing was consistent with

 3    industry practice.

 4             But those companies, all he has is websites,

 5    there's no actual evidence they did what they claimed they

 6    did, and all three of the websites were pulled in 2012.

 7             There's no evidence that anyone at Rimini knew

 8    of or could have known about those claimed facts which were

 9    after the close of discovery which means they're not

10    relevant to Rimini's good faith.

11             I tried to be brief.  Thank you.

12             THE COURT:  Thank you very much,

13    Mr. Ringgenberg.

14             Mr. Reckers.

15             MR. RECKERS:  Yes, Your Honor.

16             Let me just start by reframing what the evidence

17    will show in this case.

18             The evidence will show that there was publicly

19    available information regarding what Oracle's own partners,

20    in particular CedarCrestone, who was their largest

21    PeopleSoft dedicated supporting firm, they have over 400

22    PeopleSoft consultants, was -- had a very close

23    relationship with Oracle receiving their partnership awards

24    year after year, had the exact same practices as Rimini

25    Street.
```

1              This was publicly known.  Rimini Street knew of

2      it.  Rimini's original answer in this case listed

3      CedarCrestone as a basis for reliance on its license

4      interpretation.

5              Rimini had in its possession at that time

6      Defendants' Exhibit 22, which has been already admitted in

7      this case by stipulation.

8              In Defendants' Exhibit 22, we see CedarCrestone

9      say very clearly -- and this was a -- this was a response

10     to a request proposal obtained after an open information

11     request for Oklahoma City, that what CedarCrestone would do

12     is create an environment in CedarCrestone's own data center

13     and do development for them.

14             That's the conduct that's accused in this case.

15     That's the subject of Your Honor's original summary

16     judgment ruling.

17             Rimini was aware of this information, Rimini

18     relied on it, and it relied in part on the partnership

19     between Oracle and CedarCrestone, again, this large

20     consulting firm, this close partner, to inform its beliefs.

21             Mr. Rowe who will testify tomorrow or on

22     Wednesday, head of marketing at Rimini Street, he will

23     testify that Rimini kept competitive intelligence on other

24     industry players through research such as this, open

25     records requests, web searches, the exact same type of

1    information that Mr. Hilliard, our industry expert, looked

2    at when he asked the question, when I go out to investigate

3    and to research what other people did, what information is

4    available?

5              We find CedarCrestone material.  We find these

6    websites.  Time after time we find Oracle partners saying

7    that they will host Oracle software on their facilities.

8              We asked Oracle in discovery for the licenses

9    for these people.  We did not get them back.

10             We asked CedarCrestone, "Where's your license

11   for these services?"  They said, "We don't rely on those

12   licenses, we -- or special license with Oracle, we rely on

13   the customer license."

14             We heard from Ms. Catz last week Oracle has

15   licenses with its partners for support.  Okay?

16             We went to the most -- the largest PeopleSoft

17   vendor and asked for the license.  They said they didn't

18   have one.

19             That was consistent with Rimini's understanding,

20   as Mr. Rowe will testify, this is -- this is Rimini's

21   evidence of good faith.  This is our evidence that we

22   specifically relied on the things that Mr. Hilliard will

23   speak to the jury about, what Mr. Simmons testified to.

24             Mr. Simmons was a 20-year veteran of the

25   PeopleSoft consulting industry.  Mr. Simmons had 450

1    PeopleSoft consultants that worked for him.  He worked

2    closely with Oracle through the years.

3              Oracle, I'd submit, was involved -- and we'll

4    see in his testimony, involved with CedarCrestone's

5    practices.  It was reasonable for Rimini Street to rely on

6    what they learned publicly from CedarCrestone, what we

7    confirmed in Mr. Simmons' deposition, and that evidence is

8    our good faith.

9              Now, just to quickly hit on the cases that

10   counsel mentioned, the *Whittemore* case -- the *Whittemore*

11   case is distinguishable because in this case we will have

12   the testimony of -- from Rimini, again from our -- starting

13   from our answer throughout the case that we've relied on

14   CedarCrestone.

15             The *Safeco* case I would submit to Your Honor is

16   exactly on point.  It shows that a reasonable

17   interpretation based on evidence, again, here that we were

18   aware of, that Rimini Street was aware of, is a defense on

19   issues like this matter.

20             *Safeco* further confirms that this evidence is

21   relevant to punitive damages.  This is not intentional.

22             And the jury at this point has a view that

23   Rimini is this rogue organization doing things that no

24   reasonable company would do.  We have a longstanding,

25   decorated Oracle partner that did this same thing.

```
 1              This isn't a TomorrowNow situation.  This is a
 2   counterexample.  TomorrowNow is not relevant because of the
 3   tie to Mr. Ravin.  Mr. Ravin was the founder of
 4   TomorrowNow.  That relationship makes it -- for the
 5   criminal piece that isn't in yet, irrelevant under 403 as
 6   unfairly prejudicial.
 7              But this is a counterexample.  This shows that
 8   someone else was doing the same thing, someone that Oracle
 9   blessed.
10              And that's essentially my argument, Your Honor.
11   I'm happy to address any points that you have.
12              THE COURT:  Well, I -- this issue is -- carries
13   a number of considerations with it, not the least of which
14   is the fact that CedarCrestone's CEO, or chief operating
15   officer, later admitted that whatever we're doing was
16   clearly in violation.
17              MR. RECKERS:  Can I address that, Your Honor,
18   briefly?
19              THE COURT:  Yes.
20              MR. RECKERS:  Oracle, after discovery in the
21   case, sued CedarCrestone, and then there was a confidential
22   settlement.
23              THE COURT:  But I don't need to hear that.
24              MR. RECKERS:  The fact is I don't know -- I
25   don't know --
```

1              THE COURT:  I mean, TomorrowNow and

2      CedarCrestone are so commonly raised in this case that it

3      strikes the Court that if you're going to raise them, you

4      need to raise the whole picture, and pretty much left that

5      to the defense insofar as to -- I haven't ruled it

6      admissible, but I certainly recognize as the defense tends

7      to open these areas, the complete picture needs to be

8      developed.

9              I just give that to you as a warning.  I'm not

10     giving you that as a ruling at this time, and I'm not

11     ruling on the issue that's before the Court in that

12     respect.

13             But with regard to the issue before the Court,

14     the Court does not see -- I do not see evidence in front of

15     me at this time of knowledge and awareness on behalf of

16     defendants that would allow the Simmons' deposition,

17     30(b)(6) deposition, taken a number of years ago to be

18     admitted in this case.

19             I'm not saying it's not admissible, but what I

20     am saying is that some greater foundation needs to be shown

21     of knowledge and awareness on behalf of defendants and

22     Rimini Street.

23             I don't have that in front of me, and there

24     hasn't been a sufficient showing at this time, and I'm not

25     going to allow Rimini to present the 30(b)(6) deposition by

1    videotape of Simmons until such a showing has been made.

2              I give you the further notice that you need to

3    be aware that when you start probing into CedarCrestone and

4    you start probing into TomorrowNow, you're inviting an

5    opening of the door as to the very issues that you've been

6    so concerned about with regard to that evidence.

7              And I'm not ruling on it because I haven't heard

8    the evidence, I don't know what it is, but I -- I just see

9    this -- the potential for all of that developing.

10             MR. RECKERS:  I understand, Your Honor.

11             So that leaves me at a conundrum.  Our plan was

12   to present Mr. Hilliard today who relies on the

13   CedarCrestone material.

14             But -- and so Mr. Webb makes a suggestion, and

15   that is I can present half of Mr. Hilliard today, we can

16   present Mr. Rowe tomorrow, and then I would seek leave of

17   the Court to recall Mr. Hilliard to -- if my client

18   approves, to present his remaining two opinions that do

19   address industry practice.

20             I don't want to have some dead time because of

21   our plans in that regard.

22             THE COURT:  I appreciate that.  Let me hear a

23   response on behalf of plaintiffs to that proposal.

24             MR. RINGGENBERG:  What we would say, Your Honor,

25   is whatever Mr. Hilliard testifies about today, our

1    position is they have to have foundation for it, and we

2    think, other than a couple Oracle documents which we now

3    object to, there isn't any foundation for any of his

4    testimony about third-party -- about alleged third parties

5    that supposedly do these things of which Rimini was aware

6    and relied upon.

7         So while we focus on CedarCrestone, there's

8    others, and that presents the same issue as far as notice

9    and awareness by Rimini Street.  So I would raise that.

10        I think if the issue -- if the issue is just

11   calling him back now versus later, that's -- as an

12   evidentiary matter of calling the same witness twice,

13   that's not a problem for us.

14        But I do want to make sure the Court's clear

15   that we do not believe there's a foundation of any of his

16   testimony about industry practice other than the specific

17   testimony Mr. Ravin provided about what Siebel does, which,

18   frankly, is not in his report or any demonstratives they've

19   disclosed to us.  He doesn't want to testify about that as

20   far as we know.

21        That's our response, your Honor.

22        THE COURT:  All right.  I will allow

23   Mr. Hilliard to testify to the areas indicated, the subject

24   matters indicated, and we'll leave the disputed portion out

25   there for the time being.

2092

```
1              MR. RINGGENBERG:  Thank you, Your Honor.

2              THE COURT:  All right.  Okay.

3              Is there another issue counsel wanted to

4    address?

5              MR. RINGGENBERG:  No, Your Honor.  That's the

6    one that's ripe at this time.

7              MR. WEBB:  I think that's all, Your Honor.

8              THE COURT:  All right.  We'll take a brief

9    recess, and, Madam Clerk, let me know when the jury's here.

10             COURTROOM ADMINISTRATOR:  Yes, Your Honor.

11             Please rise.

12         (Recess from 1:00 p.m. until 1:08 p.m.)

13         (Jurors enter courtroom at 1:08 p.m.)

14             COURTROOM ADMINISTRATOR:  Court is again in

15   session.

16             THE COURT:  Good afternoon.  Have a seat,

17   please.

18             The record will show we are in the open court.

19   The parties and counsel are present.  The jury is all

20   present.

21             Ladies and gentlemen, I welcome you here, and I

22   hope you had a pleasant weekend.

23             We finished on Friday with presentation of the

24   early evidence on behalf of the defense.

25             And, Mr. Reckers, you may go forward at this
```

1    time.

2              MR. RECKERS:  Thank you, Your Honor.  The

3    defense calls Jim Benge.

4              COURTROOM ADMINISTRATOR:  Please raise your

5    right hand.

6              You do solemnly swear that the testimony you

7    shall give in the cause now before the Court shall be the

8    truth, the whole truth, and nothing but the truth, so help

9    you God?

10             THE WITNESS:  I do.

11             COURTROOM ADMINISTRATOR:  Please be seated.

12             Please state your name and spell your name for

13   the record.

14             THE WITNESS:  James Benge; J-a-m-e-s B-e-n-g-e.

15             COURTROOM ADMINISTRATOR:  Please tell us your

16   city and state of residence.

17             THE WITNESS:  Livermore, California.

18             COURTROOM ADMINISTRATOR:  Thank you.

19             All right.  Mr. Reckers, go ahead, please.

20                          JAMES BENGE

21               called as a witness on behalf of the

22          Defendants, was examined and testified as follows:

23                       DIRECT EXAMINATION

24   BY MR. RECKERS:

25   Q.   Mr. Benge, could you please introduce yourself to

1    the jury.

2    A.    Sure.  My name is Jim Benge.  I was born and raised

3    in San Diego, California, and that's where I met my wife

4    Gayla.  We've been married for 27 years, and we have three

5    sons and a daughter.

6              I volunteer in the Boy Scouts, and all three of

7    my sons are Eagle Scouts.  And I also spend a lot of time

8    with my daughter in her youth soccer league.

9              We moved up to northern California, Bay Area,

10   after graduating from college, for employment.  And my

11   wife's a music teacher, and I'm in the software field.

12   Q.    How long have you been in the software industry,

13   Mr. Benge?

14   A.    Nearly 30 years.

15   Q.    And so before we talk about -- well, let me ask you

16   this.  Where do you work?

17   A.    I work at Rimini Street.

18   Q.    What is your title at Rimini Street?

19   A.    Vice-president of PeopleSoft Development.

20   Q.    Okay.  Before we talk about your work at

21   PeopleSoft -- or on PeopleSoft Development at Rimini

22   Street, I want to ask you a little bit about your

23   background.

24              How did you get into computer programming?

25   A.    I became interested in it when I was in high school;

1    pretty young.  Personal computers were just coming out in

2    the early '80s, and our high school had just gotten a

3    couple of personal computers and offered the first computer

4    programming classes.  And took one of those and got hooked

5    on it, and then started taking some classes at a local

6    community college in it as well.

7    Q.    Did you go on to study computer programming in

8    college?

9    A.    I did.

10   Q.    And did you obtain any college degrees?

11   A.    Yes, a couple.  At community college I received an

12   associate's degree, a two-year degree in computer science,

13   and then I went on to earn a four-year degree in

14   information systems.

15   Q.    Did you ultimately decide to make a career out of

16   computer programming?

17   A.    I did.  It was something I wanted to work on very

18   early on.

19   Q.    What was your first job out of school?

20   A.    My first major job I got through the college

21   placement center after graduating, and landed a job at a

22   company called American Management Systems up in Silicon

23   Valley where a lot of startup companies were, high tech

24   companies.

25   Q.    What year was this?

1     A.     That was in 1988.

2     Q.     What were your responsibilities at American

3   Management Systems?

4     A.     I started out as a developer doing programming,

5   mostly for banking applications, banking software.

6     Q.     Were you promoted at American Management Systems?

7     A.     Yeah, I was.

8     Q.     And how long did you work at American Management

9   Systems?

10    A.     About five years.

11    Q.     So that takes us to about '93?

12    A.     Yes.

13    Q.     Okay.  So in '93 where did you go work for -- where

14   did you go work?

15    A.     That's when I went to work for PeopleSoft.

16    Q.     Okay.  So why did you decide to join PeopleSoft?

17    A.     Mostly because they were doing some pretty

18   cutting-edge stuff.

19             At American Management Systems the work I was

20   doing was all on old mainframe computers, and at PeopleSoft

21   they were doing something that was really new at the time,

22   client server architecture using smaller machines, not

23   using mainframes.  So it was interesting stuff to be

24   involved in.

25    Q.     And how long did you work for PeopleSoft?

2097

1    A.    I was there for a long stretch, 12 years at

2    PeopleSoft.  And then after the takeover by Oracle, I

3    stayed on an additional three years.

4    Q.    Now, when you joined PeopleSoft in '93, how big a

5    company was it?

6    A.    It was still relatively small.  They had just gone

7    public the year before.  We were still in a small office

8    building up in Walnut Creek.  I was employee number 340

9    when I started there.

10   Q.    What does it mean to be employee number 340?

11   A.    PeopleSoft made a big deal out of that.  When you

12   got hired, you actually got a T-shirt with your employee

13   number.  They just assigned them sequentially as people

14   were hired.

15         A few people had left, so by the time I joined,

16   there were probably fewer than 300 people total in the

17   company.

18   Q.    If you could describe for the jury the work that you

19   first did when you joined PeopleSoft.

20   A.    Yeah.  When I first started I was working on

21   utilities that helped clients upgrade from one release to

22   the next.  So when PeopleSoft would come out with a new

23   release, these upgrade utilities would be what they used to

24   help them make the transition from one release to another.

25   Q.    And at PeopleSoft were you promoted to any

2098

1      management positions?

2      A.    I was.

3      Q.    Can you give the jury a sense of your promotions at

4      PeopleSoft?

5      A.    It wasn't long after I was there, actually, I got

6      promoted to be development manager.  So I was development

7      manager over a couple of different functional areas in the

8      product.

9      Q.    Okay.  So what does it mean to be a development

10     manager?  Does that have to do with programming?

11     A.    I was still doing some programming, but I was also

12     leading a small team of developers, anywhere between 6 and

13     20 developers.

14     Q.    Okay.  And what kind of projects did you and your

15     development teams work at while you were at PeopleSoft?

16     A.    One of them was to upgrade utilities, which I

17     mentioned.

18            I also managed the security team that handled

19     the security functionality within the product for a couple

20     of years.

21            I was also involved in building our tool called

22     Application Designer.  It's kind of an integrated

23     development environment that the developers used to build

24     the applications we actually sold, the HR and financials

25     applications.

2099

1    Q.    Can you provide us a little more detail on your

2    contribution to PeopleSoft security features?

3    A.    Yeah.  In that role I was responsible for pretty

4    much all the aspects of security and the function --

5    security functionality, things like authentication.  So the

6    functionality having to do with, when a user logs in,

7    making sure that their password's validated and they're

8    actually supposed to be getting into the application.

9            The authorization and access control, once they

10   get into the application, what kind of things can they do,

11   what pages can they get to, what data can they pull up.

12           And then also the audit-type functionality.  So

13   once a user's in and accessing things, keeping a record of

14   the transactions that they're performing.

15   Q.    How many years did you spend at PeopleSoft

16   developing the PeopleSoft application?

17   A.    Twelve years.

18   Q.    Okay.  And over those 12 years were there any aspect

19   of the PeopleSoft program that you did not become familiar?

20   A.    No.  Twelve years working with a product, I pretty

21   much knew it inside and out.

22   Q.    Now, at PeopleSoft did you receive any recognitions

23   or awards for your work developing PeopleSoft software?

24   A.    I did, several.

25   Q.    And can you give the jury a sense of what those

1   recognitions were?

2   A.    Yeah.   I received a couple of PeopleSoft hero awards

3   they called them, one for release 7.5, one for release 8,

4   which was a major release where we Internet enabled the

5   software so it would work over the Internet.

6            I also received outstanding contributor award in

7   2003.

8   Q.    And how did PeopleSoft grow as a company from the

9   time that you started in '93 till the Oracle takeover in

10  2005?

11  A.    It was really explosive growth at the company.

12           We started out, again, being a small company on,

13  you know, one floor in a small office building in Walnut

14  Creek, and by the time of acquisition, of the takeover, we

15  were relocated down into Pleasanton and we had a sprawling

16  campus with multiple 5-story buildings full of people.

17  Q.    Did there come a time when you decided to leave

18  Oracle and join Rimini Street?

19  A.    Yes.

20  Q.    And about when was that?

21  A.    That was in 2008.

22  Q.    Okay.   And why did you apply for a position at

23  Rimini Street?

24  A.    Primarily because I wanted to get back to working on

25  the PeopleSoft product.

1              After the takeover, Oracle reassigned me to work

2    on the application technology group.  So I was working on a

3    totally different area.  I wasn't really thrilled about it.

4              I was pleased that I didn't get laid off because

5    a lot of the people after the takeover got laid off.  I got

6    kept.

7              But I wanted to keep working on the product that

8    I had had dozens of years of experience with, and I thought

9    that Rimini Street offered that opportunity.

10             And I knew that there were a lot of clients out

11   there that were going to continue running the software for

12   years to come.

13   Q.    How big a company was Rimini Street when you joined

14   in 2008?

15   A.    It was also quite small.  We were on one quarter of

16   one floor in an office building, maybe several dozen

17   employees at most.

18   Q.    What were you hired at Rimini Street to do?

19   A.    I was brought on as director of PeopleSoft

20   Development.  So in that role I was responsible for the

21   team that prepared the tax, legal, and regulatory updates

22   that we provide to our clients to keep them in -- to keep

23   the product in compliance with all the tax laws.

24   Q.    Does that scope of responsibility remain the same

25   today?

2102

1    A.    Yes, very similar.

2    Q.    Okay.  Now, one thing that we haven't touched on

3    much in this trial is what the people at Rimini Street

4    actually do.  So that's what we're going to talk to you

5    about today as the head of PeopleSoft Development.

6              So let's start with the developers.  Let me ask

7    you.  When Rimini hires developers, what characteristics

8    are you looking for in members of your development team?

9    A.    Well, we're looking for seasoned, experienced

10   people.  Generally the people we're hiring have, like, 10

11   years of experience working with this product.

12             They're people that have maybe been in the

13   consulting industry and consulting with clients on

14   PeopleSoft implementations.

15             In this type of role, we're not hiring people

16   straight out of college to help us.  We want people that

17   know the product and can jump in and work on it right away.

18   Q.    Okay.  So let's talk about what your team and what

19   your developers do to actually provide tax and regulatory

20   updates for clients.  Again, my questions are going to be

21   from before 2012.

22             And did you prepare a demonstrative to help

23   illustrate the overall PeopleSoft Development process?

24   A.    Yes.

25   Q.    Do we have on the screen the diagram you helped us

2103

1    put together in that regard?

2    A.    Yes.

3    Q.    Okay.  So let's -- and there's obviously a lot of

4    boxes here.

5              Can you give us sort of a high-level,

6    10,000-foot view of what we're looking at in the

7    demonstrative.

8    A.    Yeah.  It's kind of a flow chart of the overall

9    development process.  This is something that's pretty much

10   a standard in the industry.

11             You'll hear of the software development

12   lifecycle.  At the highest level, you're going through and

13   doing analysis, determining what you're going to need to

14   change, and then doing development, actually making the

15   changes, and then quality assurance, actually testing the

16   changes and making sure that they're doing what they're

17   supposed to do, and then packaging and delivering to the

18   client.

19   Q.    Okay.  So let's start at the beginning, and that is

20   this, how a development assignment comes into the process.

21             So how do you start a development project at

22   Rimini Street?

23   A.    There's really one of two ways.  Looking at this

24   diagram and starting at the upper left, one way that the

25   process starts is by a client calling their primary support

1    engineer and reporting a problem.

2              You know, maybe they're trying to do a payroll

3    run, trying to get paychecks cut, and the process has

4    crashed for some reason.  They call.

5              The support engineer determines it's a bug.  At

6    that point it would be passed to the development team for

7    us to begin work on.

8    Q.    Okay.  Let's stop there.  So we've heard that Rimini

9    has PSEs who take calls from clients when they're having a

10   problem; is that right?

11   A.    Yes.

12   Q.    And so one way the development project starts is

13   when the client's having a problem with their system that

14   needs development; is that right?

15   A.    That's correct.

16   Q.    Okay.  Now, what's the other way that's shown on

17   your demonstrative for a development project to start?

18   A.    Yeah, this is starting from the right-hand side

19   going left.  This is actually a far more common scenario.

20             This is where the group of individuals we have

21   that do tax and regulatory research latch onto some kind of

22   a change that's going to impact the product.

23             So they've identified -- you know, maybe they've

24   found something that says the California minimum wage is

25   going up to $10 an hour effective January 1st.

1           From that they would create a change memo, what

2     we call a change memo, with all the information about this

3     change and the source where they got the information from.

4     In that case, it would probably be from a California state

5     website.  And that change memo gets reviewed and approved,

6     and then ultimately passed along to the business analysts.

7     Q.    Okay.  Can you tell us a little bit more about the

8     research group that you mentioned.

9     A.    Yeah, it's just a team of individuals that are kind

10    of broken up by various countries, because we do tax and

11    regulatory updates for the world.

12          You know, we've got people doing tax and

13    regulatory research for Brazil and Australia and India.

14    PeopleSoft is mostly North American focused, but we do have

15    some global payroll clients.

16          That group does all that research.  Like I said,

17    those change memos get reviewed by some senior members of

18    that team and then passed into the development

19    organization.

20    Q.    Okay.  So when you have a change coming from your

21    research group, or from your primary support engineers,

22    they go to, on the screen, a business analysis function; is

23    that right?

24    A.    Yes, that's correct.

25    Q.    And what is the business analysis function at Rimini

1    Street?

2    A.    The business analyst is going to determine the

3    relevance to the various product lines we support, so not

4    only the PeopleSoft product line, but we also support and

5    provide maintenance for SAP, JD Edwards, Siebel, other

6    product lines.

7              They'll take a look at the change memo and

8    determine is this something that impacts the product.

9              So, in my case, they're going to be determining

10   for me if this is going to impact the PeopleSoft product.

11   Something like the minimum wage change would because

12   PeopleSoft supports that.

13             On the other hand, sometimes there's things like

14   local minimum wages, like San Francisco has a specific

15   minimum wage, that's something that the product, the

16   PeopleSoft product, at least, doesn't support.  Some of the

17   other product lines do.

18             So the business analyst is reviewing all these

19   change memos and just determining relevance to the product

20   line.

21   Q.    Okay.  So then after the business analysis, we go on

22   to the scoping function; right?

23   A.    Right.  That's where they're making a determination

24   about which clients are going to get this update.

25             One thing we do a little bit differently than

```
 1    Oracle is that we offer clients the choice of being able to
 2    just get updates for particular geographic regions.
 3               So, for example, we have some clients that are
 4    in Canada that only want the tax updates for the Canadian
 5    provinces.  They don't want all of the US-based stuff, all
 6    of the reports and tax tables.
 7               So, for example, the California minimum wage
 8    change that I just mentioned wouldn't be at all relevant to
 9    the clients that are in Canada only.
10    Q.    Okay.  So once the scoping is done, you move on to
11    the functional analysis; is that right?
12    A.    Yes, sir.
13    Q.    What is that?
14    A.    That's where the business analyst is putting
15    together a functional design for the changes that need to
16    be made.
17               The data changes are really simple.  Sometimes
18    it's far more complex.  I'm sure you guys have heard about
19    the Affordable Care Act, and that's a recent thing that
20    came in that had a big product impact.  There's a lot of
21    changes associated with that.  So the design for that
22    was quite lengthy.
23    Q.    Now, does there come a point in the development
24    process where the developers need to access the PeopleSoft
25    source code?
```

1    A.    Yes.

2    Q.    Okay.  And so how is it that the Rimini developers

3    are able to view the source code underlying PeopleSoft?

4    A.    So, one of the things that's unique about the

5    PeopleSoft product is that it's delivered -- the

6    application is delivered with the source code.

7            Most of you are probably familiar with

8    off-the-shelf commercial software where you just get the

9    program, and you can run the program, but you don't get the

10   source code that goes along with it.

11           With PeopleSoft, when you get the application,

12   you have the ability to customize it because you have the

13   source code, you can tailor it.

14           And that was a really big selling point for

15   PeopleSoft, because these large enterprises that have

16   really complex business processes could purchase the

17   software and then could go in, because they had the source,

18   they could change it, they could tailor it to their unique

19   business requirements.

20           MR. RECKERS:  Marie, could you pull up

21   Plaintiffs' Exhibit 286, and show Mr. Benge -- I believe

22   there's no objection, but I would move for admission of

23   Plaintiffs' Exhibit 286.

24           MS. DUNN:  No objection to the exhibit as

25   redacted.

1               THE COURT:  It is admitted.

2           (Plaintiffs' Exhibit 286 received into

3           evidence.)

4               MR. RECKERS:  Marie, if you could zoom in on the

5       front page, please.

6       BY MR. RECKERS:

7       Q.    Mr. Benge, do you recognize what's shown on the

8       screen, Plaintiffs' Exhibit 286?

9       A.    Yes.  This is a PeopleSoft program.  This particular

10      one is a program that generates a report and submits

11      electronically W-2 information.  You guys are probably all

12      used to getting a W-2 at the end of the year with your

13      earnings.

14               In many cases, employers are also required to

15      submit that information electronically to the state, and

16      that's what this program does is it produces the electronic

17      file with all of the employee information in it to

18      transmit.

19      Q.    So as we see on the screen, this is a 74-page

20      document.  We're looking at the first page.

21               And my question, Mr. Benge, is does PeopleSoft,

22      as an application, have a variety of programs such as this

23      exhibit to help -- to help the payroll system, the

24      PeopleSoft payroll system, submit information to, for

25      example, state governments for tax purposes?

1    A.    Yes, thousands of programs like this.

2    Q.    Okay.  And is one thing that your group does is

3    periodically update these programs within PeopleSoft to

4    help it run in compliance with updated tax -- or updated

5    laws and regulations?

6    A.    Exactly.

7    Q.    Okay.  So can you tell, Mr. Benge, how Rimini Street

8    updated this particular file?

9    A.    Yeah, the quickest and easiest way to determine

10   that, if you look at this exhibit here, there's a Rimini

11   Street modification log.

12          So you'll find a section here at the top of the

13   program, this is where we put comments in the program about

14   anything that we're going to change.

15   Q.    We're zooming in right on that.

16          So this is the Rimini Street modification log

17   that you mentioned, Mr. Benge?

18   A.    Yes, it is.

19   Q.    Okay.  And so the first change, or the change that

20   we see here listed, is from September 12, 2008.  Do you see

21   that?

22   A.    Yes.

23   Q.    And this change is designated RSI-HCM 100370?

24   A.    Yes.  That was the development tracking number.

25   Q.    What does that indicate?

2111

1     A.     Every change that we're going to make, so every one

2     of those changed memos that comes in that results in the

3     development team having to do some work, is assigned a

4     unique development tracking ID, and that ID is listed in

5     the code when we make the code changes.

6     Q.     And does Rimini make clear to its clients how Rimini

7     changed the code?

8     A.     Yes, very clear, through the modification log.  And

9     further down in the program you'll see around each of the

10    changes we make, we'll put markers around the changes that

11    we make.

12            MR. RECKERS:  So let's go to the next page,

13    Marie, please.

14            So you just mentioned markers.  So let's look at

15    the next page of this program.  Again, we skipped ahead to

16    page 26 of the exhibit.

17            And let's zoom in on -- let's zoom in, Marie, on

18    the marker that would be about eight lines down.  Says

19    begin RSI.  There you go.

20    BY MR. RECKERS:

21    Q.     So, Mr. Benge, you see on the screen text that says

22    begin RSI-HCM 100370.  Do you see that?

23    A.     Yes.

24    Q.     And what does that begin marker indicate to you?

25    A.     That marker indicates the beginning of the changes

1    that we had to insert into the program.

2              In this case it was because Idaho came out with

3    a new requirement.  They said when you send us this file

4    with all this W-2 information in it for each employee, we

5    want a total record at the bottom of the file that totals

6    up all of the entries that were in the file.

7              So we added a whole new procedure to compute all

8    of those totals and to write that record to the file for

9    Idaho.

10   Q.    Okay.  So Idaho changed its regulations as to how

11   payroll information was submitted for tax purposes;

12   correct?

13   A.    Yes.

14   Q.    And Rimini personnel came in and modified this

15   particular program to account for those changes; is that

16   right?

17   A.    Yes, it is.

18              MR. RECKERS:  So now, Marie, can we just scroll

19   down for the next three pages to see what the Rimini

20   personnel did.

21              THE WITNESS:  So lots of lines of code here just

22   computing all the totals, writing the record out to the

23   file.

24              MR. RECKERS:  And that's fine, Marie.

25

2113

1    BY MR. RECKERS:

2    Q.    And if you look just right at the top or right at

3    the top of page 9 -- 29, okay.  Now, do you see the

4    end-procedure tag, Mr. Benge?

5    A.    Yeah.  And then there's the exclamation mark, end

6    RSI HCM 100370, that's the marker indicating the end of our

7    changes in the program.

8    Q.    Okay.  So what was the three pages of text that we

9    just scrolled through?

10   A.    That was all of the code that the Rimini Street

11   developers had to write in order to fulfill the new

12   requirement from Idaho.

13   Q.    And then what is the result of Rimini's developer

14   making these changes designated as HCI HCM 100370?

15   A.    Well, without these changes, if an employer had ran

16   this program and tried to submit the file to the state of

17   Idaho, Idaho would have sent them back a rejection, so, you

18   know, the information wouldn't have been accepted, they

19   would have to redo it.

20        With these changes, it made it so that the file

21   would be accepted by the state.

22   Q.    Now, did Oracle also provide an equivalent update to

23   address this Idaho change?

24   A.    Yes, they would have had to.

25   Q.    Okay.  And did Rimini rely on the Oracle provided

1    update to generate the Rimini update?

2    A.    No, we did not.

3    Q.    How do you know that?

4    A.    Generally our bundles, our tax, legal, and

5    regulatory bundles, are delivered about a week prior to

6    Oracle's equivalent updates.

7    Q.    Okay.  Now, to make these changes -- well, okay.

8    So -- well, let me ask you this.

9            To make these changes, Rimini had to use a copy

10   of Oracle's software; correct?

11   A.    Yes.

12   Q.    PeopleSoft software?

13   A.    Yes.

14   Q.    And prior to 2012, did Rimini use development

15   environments?

16   A.    Yes, we did.

17   Q.    What are development environments?

18   A.    An environment where you go about making your

19   changes, keeping it completely separate from the production

20   system.

21            With a large enterprise application this

22   complex, you definitely don't want to be messing with your

23   production system while you're making changes.

24            So the development environment allows us to go

25   in there and make our modifications and make sure that

```
 1     everything's right before we move it into -- you know,
 2     before the client moves it into a production system.
 3     Q.    When did you first learn of the concept of
 4     development environments?
 5     A.    Right away when I started at PeopleSoft, and the
 6     first upgrade class I took they definitely talked about
 7     clients having multiple environments as part of the upgrade
 8     process, and migrating changes between environments as they
 9     go about completing an upgrade.
10     Q.    Now, prior to 2012, did Rimini have environments on
11     its own servers?
12     A.    Yes, we did.
13     Q.    And so -- and, again, prior to 2012, did Rimini have
14     environments that were hosted on its client servers?
15     A.    Yes, we did.
16     Q.    Okay.  So what percentage in that time period of the
17     clients had Rimini-hosted environments versus client-hosted
18     environments?
19     A.    About 80 percent, the majority, were in-house.  The
20     remaining percentage, about 20 percent, were client-hosted
21     environments.
22     Q.    And, again, in that timeframe, how did the
23     development process differ between the clients with and
24     without the Rimini-hosted environments?
25     A.    The development process was really very similar,
```

1   but, you know, there are some differences in terms of --

2   with the remote environments having to go through extra

3   steps to connect to the client machine, to log in to the

4   client machine, as opposed to having those environments on

5   site, but the process was very similar.

6       Q.   Okay.  And let's quickly talk about database.  Did

7   the development environments that Rimini had on its system

8   include databases?

9       A.   Yes, they did.

10      Q.   What --

11      A.   That was a requirement of the PeopleSoft product.

12      Q.   Excuse me.  What brands of database did Rimini use

13  with its environments?

14      A.   Multiple.  We -- we were using Microsoft SQL Server,

15  Oracle, IBM DB2 and Informix.  And PeopleSoft also

16  supported Cybase.

17      Q.   Okay.  And did the brand of database offer support

18  environment or development environment need to match the

19  brand of database in the client's production system?

20      A.   No, not necessarily.  In fact, we had a few clients

21  where it didn't match.

22      Q.   What do you mean it didn't match?

23      A.   Clients that were running Informix in production and

24  in development, we were developing their tax and regs

25  updates using Microsoft SQL Server.

```
 1              MR. RECKERS:  Let's go back to the process

 2   diagram, please, Marie.

 3   BY MR. RECKERS:

 4   Q.    So we've been talking about the blue development box

 5   there in the middle.  So once the developer has typed out

 6   the code like we saw on Plaintiffs' Exhibit 286, what comes

 7   next in the process?

 8   A.    Well, a developer has a few more steps there.

 9              The developer's got to go through unit testing,

10   and there's also a development review that takes place.

11              But after that, it gets handed off to the

12   quality assurance team, and that's a completely independent

13   team that does their own testing, they prepare a test plan,

14   and they do their own testing on the changes to verify that

15   they're working like they should.

16   Q.    Okay.  Could you give the jury a sense of what steps

17   Rimini takes to provide for quality assurance of its

18   updates?

19   A.    Yeah, it's pretty extensive.

20              Well, the data change that I mentioned, they're

21   definitely going to be going into the application and

22   pulling up the tax table and verifying that the minimum

23   wage was, in fact, entered with the new effective date.

24              Larger changes, like I mentioned with the

25   Affordable Care Act, they're going to be going through and
```

1    running processes, running payrolls, verifying that checks

2    are coming out as they should, that the withholdings are

3    happening the way that they should and everything is

4    computing properly.

5            They prepare a pretty thorough test plan.

6    Q.    Okay.  And then after the quality assurance we see

7    on the screen, the packaging and bundle testing, do you see

8    that?

9    A.    Yes.

10   Q.    And what does that refer to?

11   A.    So up to this point we've been working on individual

12   updates.  We don't release -- don't generally release all

13   the updates individually.  Rather, what we do is we collect

14   them into what we call bundles and release those.

15           So we package together anywhere between 50 and

16   100 individual updates into a bundle, and then the QA team

17   goes through another set of testing.  This is where they're

18   testing the full bundle with all these changes in it.

19           And then after that, it's packaged up for --

20   final packaging with the documentation for delivery.

21   Q.    So I think the last box that we have before delivery

22   is documentation.  And does Rimini produce its own

23   documentation?

24   A.    Yes, we do.

25   Q.    Can you explain what Rimini does in that regard?

1    A.    It's pretty extensive.

2              Along with each bundle that we release, there's

3    several documents that the clients get.

4              The biggest document is called the notes

5    summary, and that's the one that has the information in it.

6              Kind of from a functional perspective, it's the

7    document that would be geared towards like the payroll

8    manager, and it's going to describe to them all of the

9    updates that we're including in the product so that they

10   fully understand, you know, what this update's going to do

11   to their system when it gets installed.

12             And then there's also installation instructions

13   that are delivered.  The installation instructions are more

14   technical.  They're geared toward the technical staff that

15   are going to be applying the update to the environment.

16             And then we also include the list of all the

17   objects that have changed in the bundle, the batch objects,

18   the online objects, and so forth.

19   Q.    So we've just gone through the process from start to

20   finish.

21             Actually, let me ask you this.  For a given

22   update, are they interchangeable between clients?

23   A.    Only in certain circumstances, and this has to do

24   with the application release that the clients are on as

25   well as the last tax update that they received from Oracle.

1              So, for example, it's going to be like apples

2    and oranges, the update between a client that's on release

3    7.5 and a client that's on release 9.0.

4    Q.    Does Rimini tailor its updates to a particular

5    client's system?

6    A.    Yes, we do.

7    Q.    How does Rimini do that?

8    A.    Oh, in a number of different ways.

9              Earlier I mentioned the fact that we'll tailor

10   it based on geographic location.  So, for example, we have

11   clients that are in Texas that only want updates for Texas,

12   so the Affordable Care Act stuff would be applicable

13   because it's federal, but the California minimum wage would

14   not.

15   Q.    Does Rimini also tailor its updates on the basis of

16   whether the client has vanilla or custom code in its

17   production system?

18   A.    Yes, we do.  In some instances, we actually have

19   environments that clients have applied customizations to,

20   and when we provide our tax and regs updates, we will build

21   our changes on top of any customizations that they may have

22   in that environment.

23   Q.    Okay.  And just to remind the jury, what is vanilla

24   code?

25   A.    Vanilla code would be what the client received from

1    Oracle.  So Oracle is going to give them the vanilla

2    product.

3            When Oracle comes out with tax and regs updates,

4    the updates are always based on the vanilla product.  If

5    the client has customizations in their code, the client

6    would have to retrofit, they're going to have to take the

7    change from Oracle, and if it conflicted with the

8    customizations they had, they would need to merge that

9    together.

10           We'll do that for them if we have a copy of the

11   environment with the customizations in it.

12   Q.    Okay.  So, again, thinking back on this whole

13   process, how many updates does Rimini generate a year?

14   A.    There's between five and six major bundles, and, as

15   I said, each one of those bundles could contain 30 to 100

16   individual updates, times hundreds of clients, so we're

17   talking about literally thousands of updates a year.

18   Q.    And thinking back to 2011 timeframe, how many Rimini

19   employees were involved in the development process that we

20   see from start to finish?

21   A.    I think you can see from this process it's -- it's a

22   lot of work to prepare one of these updates.

23           From beginning to end there's in excess of 50

24   employees that have their hands in preparing one of these

25   updates, from the folks that are doing the research, to the

2122

```
1    folks that are doing the analysis, to the developers, to
2    the testers, to the technical writers that are writing the
3    doc, to the packaging and delivery team.
4    Q.    Have you heard of Rimini's development process
5    referred to as the factory floor?
6    A.    Yes, I have.
7    Q.    And why is that?
8    A.    In a lot of ways, this process is very much like an
9    assembly line with various individuals along the process
10   completing various tasks.
11   Q.    Okay.  So I'm going to switch gears a little bit and
12   talk about something called remote development.  Are you
13   familiar with remote development, Mr. Benge?
14   A.    Yes.
15   Q.    And you understand that one of the questions in this
16   case involves whether or not Rimini Street could have
17   implemented a purely remote model to deliver its tax and
18   regulatory updates?
19   A.    Yes.
20   Q.    And just to remind the jury, provide your view of
21   what remote-only model is?
22   A.    A remote-only model would be where we have no Oracle
23   software whatsoever installed on Rimini Street's systems.
24            So in a remote-only model, the PeopleSoft
25   software would all be client hosted.  The clients would
```

1    have it installed on their environments.  We would be

2    remotely accessing that.

3              So we use remote access technologies to get into

4    those environments, and all the work would be done within

5    those environments.

6    Q.    Now, as an alternative to the model that we just

7    discussed, could Rimini have, from the beginning,

8    implemented a remote-only model?

9    A.    Yes.

10   Q.    Why do you say that?

11   A.    Well, we had already had four years of experience in

12   working with 20 percent of our clients that were already

13   client hosted.  So we had quite a bit of experience already

14   in working with these client-hosted environments.

15   Q.    And, again, thinking back to 2011 and before, what

16   experience did you have as far as doing development

17   specifically for remote clients?

18   A.    Again, with 20 percent of the clients remote, we

19   were doing development for those clients.

20             The process that we were going through was

21   somewhat different than it would have to be in the pure

22   remote-only model, but, nonetheless, we were working with

23   those remote clients, testing was taking place in those

24   remote environments.

25   Q.    And what were those differences?

2124

1    A.    In our old remote model, we would go into the client

2    environments and retrieve the source files that we were

3    going to need to modify.

4              So if there were five or six programs we were

5    going to have to change, we would retrieve them to our

6    network so that the developers could edit them from their

7    local laptop machines, and then once they got all of their

8    changes incorporated, they would then transfer those

9    programs back to the remote environments.

10             In the remote-only model, again, everything

11   would have to be done inside that environment.

12   Q.    Now, Mr. Benge, prior to 2012, was break-fix -- some

13   of Rimini's break-fix done remotely by Rimini Street

14   personnel?

15   A.    Yes, it was.

16   Q.    And, again, prior to 2012, was some of Rimini's

17   development work done remotely by Rimini personnel?

18   A.    Yes, it was.

19   Q.    And prior to 2012, was some of the quality and

20   assurance testing done remotely by Rimini personnel?

21   A.    For the environments that were client hosted, all of

22   that testing was done in those client-hosted environments.

23   Q.    Okay.  Now, does the remote-only model require

24   additional labor?

25   A.    Yes.

2125

1    Q.    And why is that?

2    A.    Definitely some challenges associated with the

3    remote environments and extra effort associated with

4    working in them.

5    Q.    Okay.  And how much additional labor would be

6    required for development in a remote-only model?

7    A.    The consensus of the team was it could potentially

8    take double.  That's assuming -- that's kind of a worst

9    case scenario, assuming that we hadn't optimized for remote

10   development like we had for in-house.

11   Q.    Okay.  And how much additional labor would be

12   required in remote-only model for primary support

13   engineers?

14   A.    For the support engineers we estimated 25 percent

15   additional.

16   Q.    And why is that?

17   A.    The support engineers aren't using the environments

18   as extensively as the development and testing teams.

19          The support engineers would get calls from

20   clients and occasionally need to access the environments to

21   reproduce issues and so forth.

22          But a lot of times the support engineers were

23   just able to resolve problems by just talking with the

24   client or via remote meetings.

25   Q.    Okay.  In the remote-only model, how much additional

```
 1   labor would be necessary for onboarding, which would be the

 2   archiving and the environment creation?

 3   A.    We estimated double there as well.

 4   Q.    And why is that?

 5   A.    Things are -- would be different for them.  As

 6   opposed to spending a lot of their time and effort in

 7   setting up in-house environments, they would still have to

 8   be working with clients to establish the remote

 9   connectivity and make sure that the access to the remote

10   environments was functional for my team, for the

11   development team.

12   Q.    Okay.  Now, thinking back to 2012, did the

13   developers on your team express their views regarding

14   remote environments to you?

15   A.    Yes, they did.

16   Q.    Okay.  Let's look at an exhibit.  If we could pull

17   up, please, Plaintiffs' Exhibit 60.  It should be in your

18   binders, too, Jim.

19         All right.  So the jury's seen this email

20   before.

21         MR. RECKERS:  If we could, Marie, pull up the

22   second email on the page.  Actually, let's do the to/from

23   so we set the stage here.

24   BY MR. RECKERS:

25   Q.    So, Mr. Benge, do you recognize Plaintiffs'
```

1    Exhibit 60 as an email that you sent Mr. Freeman in October

2    of 2009?

3    A.    Yes, I do.

4    Q.    And this involves the Big Lots client?

5    A.    Yes.

6    Q.    And that was a remote client?

7    A.    It was.

8    Q.    So let's go down to your email, and it's actually on

9    the screen.

10             It says, "Thanks, Ed.  This is why we love

11   in-house environments," smiley face.

12             That's what you wrote to Mr. Freeman?

13   A.    Yes, it was.

14   Q.    Okay.  So let's see what Mr. Freeman's response was.

15             We go up to the later email in the thread.

16   Mr. Freeman's response to you of the same day, he says,

17   "No, this is why it's insane and defies our business model

18   to offer to support remote environments."  Smiley face.

19             Do you see that?

20   A.    Yes.

21   Q.    Do you agree with Mr. Freeman that in 2009 it was

22   insane and in defiance of Rimini's business model to offer

23   to support remote environments?

24   A.    No, I disagree with that.  There were definitely

25   challenges but not challenges we couldn't overcome.

```
 1              MR. RECKERS:  Let's pull up Plaintiffs'
 2   Exhibit 50, please.  I'm sorry, 51.  And let's zoom in on
 3   the header there.
 4   BY MR. RECKERS:
 5   Q.    Mr. Benge, do you recognize Plaintiffs' Exhibit 51
 6   as a status report from Jeff Allen?
 7   A.    Yes.  He was a developer on the dev team.
 8   Q.    Who -- okay.  And this is a status report from
 9   February 2009; correct?
10   A.    Yes.
11   Q.    And would you sometimes review your developers'
12   status reports?
13   A.    Yes, weekly.
14              MR. RECKERS:  So, Marie, again, the jury's seen
15   this one as well.  Let's go down to the Concerns window
16   which is -- yep, you got it.
17   BY MR. RECKERS:
18   Q.    And so performance issues, about two-thirds of the
19   way down, three-quarters of the way down, says the building
20   a ship in a bottle, in a bottle, in a bottle problem.  Do
21   you see that?
22   A.    Yes.
23   Q.    Do you recall what this particular problem was?
24   A.    I do.  I recall this is in conjunction with a
25   particular client of ours, a Canadian client, Metro
```

2129

1    Vancouver.

2    Q.    And what was the ship in a bottle, in a bottle, in a

3    bottle problem?

4    A.    It had to do with the way we had set up remote

5    access for this particular client.  We only had one that

6    was set up this way, but it was a really poor remote access

7    architecture where we were having to navigate through

8    multiple servers to finally get to their PeopleSoft

9    environment.

10            So you'd have a developer going from their

11   laptop to one of our virtual machines to the client's

12   virtual machine and then maybe their remote desktop to

13   another machine, and then finally logging in to another

14   box.

15            So it was just too many layers of access which

16   resulted in really poor performance trying to work with

17   that particular environment.

18   Q.    Now, prior to 2012, did you figure out a way to

19   solve the bottle, in a bottle, in a bottle problem?

20   A.    Yes.

21   Q.    And what did you do?

22   A.    Well, for a lot of our clients we set up secure

23   site-to-site tunnels.  So this is a different remote access

24   methodology where we have a persistent secure connection

25   between our network and the client's network so that we can

```
1    quickly from our network connect to the server in their
2    environment.
3              MR. RECKERS:  Okay.  So let's move on to another
4    email -- and, Marie, don't bring it up next -- which would
5    be Plaintiffs' Exhibit 62.
6              And I'd move for admission of Plaintiffs'
7    Exhibit 62.
8              MS. DUNN:  No objection.
9              THE COURT:  It is admitted.
10         (Plaintiffs' Exhibit 62 received into
11         evidence.)
12              MR. RECKERS:  Now, Marie, if we could zoom in on
13   the header for the middle email there.  Yep, right there.
14   Yep.
15   BY MR. RECKERS:
16   Q.    All right.  Mr. Benge, do you recognize Exhibit 62
17   as an email that you sent Mr. Slepko in November of 2009?
18   A.    Yes, that's right.
19   Q.    Mr. Slepko was your immediate supervisor at the
20   time?
21   A.    Yes, he was.
22   Q.    Okay.  So let's move down to the content of the
23   emails.  Actually before that, the title here is Remote
24   Versus Internal Environments; correct?
25   A.    Yes.
```

1    Q.    Okay.  So let's move down to the content of the

2    emails, and, in particular, draw your attention,

3    Mr. Benge -- here we go.

4            You wrote to Mr. Slepko in 2009, it says, "Here

5    are some of the key challenges associated with remote

6    development."

7            Do you see that?

8    A.    Yes, I do.

9    Q.    And then you list about eight challenges that you

10   were aware of at the time, 2009, with remote development?

11   A.    That's correct.

12   Q.    Okay.  So let's talk through these challenges to see

13   how they impact your views on a remote-only model.

14           The first challenge -- Marie will highlight

15   these -- relates to the starting and stopping of the client

16   environments or the client servers.

17           How, in a remote-only model, would you address

18   this particular first challenge?

19   A.    This is something where I think when new clients

20   were coming onboard we would work with them more closely to

21   make sure they understand the level of access we need to

22   their environment.

23           This is a matter of making sure that the client

24   empowers us so that we can start and stop the various

25   application servers and web servers so that we're not

2132

```
 1   having to rely on them or call them and say, hey, we need
 2   the server restarted.
 3   Q.    Okay.  So this email is written in 2009.  By the end
 4   of 2011, had you been able to address this particular
 5   problem for at least some clients?
 6   A.    Yes, we had.
 7   Q.    And what did you do in that regard?
 8   A.    As I mentioned, just working with a client to get
 9   them to give us the level of access we need within that
10   development or test environment.
11   Q.    The second challenge list is the coordination of
12   back up and restores.  How would you address this
13   coordination issue in a remote-only model?
14   A.    These aren't as time sensitive, so this might be
15   something where we could just set up a service level
16   agreement with the clients, basically something where we
17   say, hey, can we get a commitment that if we request a
18   backup or a restore of the database, that it will be taken
19   care of within 24 hours?
20          Or as an alternative, again, we could ask that
21   they provide us with that level of capability to do it
22   ourselves within the remote environment.
23   Q.    And had Rimini addressed the backup and restore
24   challenge at least for some clients prior to 2012?
25   A.    Yes, we had.
```

2133

1    Q.    Okay.  So the third challenge relates to the

2    database level access.  So my question is, how would you

3    address this database level access challenge in a

4    remote-only model?

5    A.    This wasn't a very common problem.

6          We actually had this level of access for the

7    vast majority of our clients, but for a few we didn't, and

8    we'd periodically encounter situations like where a

9    database ran out of space, and we would have to call the

10   client and get their database administrator to add the

11   space.

12         Again, this is something I think we could work

13   with the client to make sure that we have the necessary

14   access.

15   Q.    And had you in fact worked with some clients prior

16   to 2012 --

17   A.    Yes.

18   Q.    -- to address this challenge?

19   A.    The majority of the clients already had this.

20   Q.    Now, the fourth challenge we list is FTP access.

21   How would you address the FTP access challenge in a

22   remote-only model?

23   A.    Again, here, this is another one, if I recall

24   correctly, only affected one client that didn't have the

25   FTP access, but just working with the client to explain why

1    we need it.

2              Sometimes it's just a matter of sitting down

3    with them and getting them to understand why we need the

4    access so that they'll give it to us.

5              With the -- FTP stands for file transfer

6    protocol.  It allows us to move files.  So, for example, we

7    would write our documentation on our network but need to be

8    able to transfer the documentation to the client site, for

9    example.

10   Q.   And so it sounds like for the majority of your

11   clients, you had already addressed the FTP access challenge

12   prior to 2012?

13   A.   Yes.

14              MS. DUNN:  Objection, leading.

15              MR. RECKERS:  I can rephrase.

16              THE COURT:  I would just caution, Mr. Reckers,

17   to avoid the leading questions.

18              It is leading, but I'll allow the answer to

19   stand.

20   BY MR. RECKERS:

21   Q.   Now, Mr. Benge, the fifth challenge down is the

22   unique user identification challenge.  Do you see that?

23   A.   Yes.

24   Q.   How would you address the -- this particular

25   challenge in a remote-only model?

1  A.    With the remote-only model, we have to keep track of

2  a lot of login credentials for all these environments.

3  It's a lot easier for us if the clients will just set up

4  one shared login for the team to use, and some clients have

5  done that for us.

6         Others, due to their security policies, require

7  us to have named user accounts.  So each and every

8  individual user has to have their own login, and in those

9  cases, we just need to put in a better way administratively

10  of keeping track of all that, and the password policies.

11  Q.    Had Rimini addressed the user ID challenge for at

12  least some clients prior to 2012?

13  A.    Yes, we had.

14  Q.    And the sixth challenge addresses inconsistencies in

15  environments.  So how would you address that challenge in a

16  remote-only model?

17  A.    To the extent possible, we like to have consistency

18  in the remote environments, but that's not always going to

19  be possible.  I mean, each one of these clients are setting

20  up these environments.  There's going to be differences.

21         So I think we really just need a way of better

22  keeping track of the differences between clients, having a

23  repository or a document that describes the unique aspects

24  and the unique configuration and setup for each client.

25  Q.    Had Rimini addressed the consistency challenge for

1   at least some clients prior to 2012?

2   A.    Yes, we had.

3   Q.    Okay.  So the seventh challenge has to do with

4   automation.  And how would you address this particular

5   challenge in a remote-only model?

6   A.    Well, we had invested quite a bit of time and effort

7   in building utilities to help us work with our in-house

8   environment because that was the majority of our clients.

9   Eighty percent of our clients were in-house so we built the

10  utilities for that.

11             Moving forward, in a remote-only model, we would

12  definitely take the time and effort to build those

13  utilities to work in a distributed remote environment.

14  Q.    Okay.  So in your view, again, thinking back to

15  2012, or 2011, could Rimini have designed its tools to

16  operate in a remote-only model?

17  A.    Yes, we could have done that.

18  Q.    Okay.  And so the eighth challenge that we see

19  touches on what we talked about before with the bottle in a

20  bottle issue, performance.  How would you address the

21  performance issues in a remote-only model?

22  A.    Well, like I mentioned with Metro Vancouver, we kind

23  of learned a little bit about one way not to set up remote

24  access.

25             You know, we did learn that there were two or

2137

```
 1    three other good alternatives for how we could set up the

 2    remote access architecture and still get good performance

 3    for accessing those environments.

 4              And also with regard to performance, just

 5    working closely with the clients to make sure that the

 6    servers that they're setting up for us have adequate memory

 7    and CPUs so that they're going to perform adequately.

 8    Q.   Okay.  And so had Rimini addressed the performance

 9    challenges for at least some clients prior to 2012?

10              MS. DUNN:  Objection, leading.

11              THE COURT:  Same caution.  Try to avoid the

12    leading questions, Mr. Reckers.

13    BY MR. RECKERS:

14    Q.   Mr. Benge, had Rimini Street addressed the

15    performance challenge for some clients prior to 2012?

16    A.   Yes --

17              MS. DUNN:  Objection; same question.

18              THE COURT:  Sustained.  But I'll allow the

19    answer to stand.  Please move forward.

20    BY MR. RECKERS:

21    Q.   Mr. Benge, did you consider all of the challenges

22    that we just discussed when reaching your views on the

23    remote-only model?

24              MS. DUNN:  Objection, Your Honor, leading.

25              THE COURT:  Sustained.
```

2138

1    BY MR. RECKERS:

2    Q.    Mr. Benge, what challenges did you consider when

3    reaching your opinion regarding the remote-only model?

4    A.    Definitely all of these challenges.  These are the

5    key items that would have considered in terms of coming up

6    with an estimate.

7    Q.    Are there other challenges that aren't on our list

8    that you considered?

9    A.    No.  I've had plenty of time to think about this

10   further, and this was a comprehensive list.

11           MR. WEBB:  Okay.  So, Marie, let's move down to

12   the last paragraph of this particular exhibit.

13   BY MR. RECKERS:

14   Q.    When you say here -- and I refer you to the second

15   sentence, it says, "Keep in mind there are also some

16   advantages to remote environments."  Do you see that?

17   A.    Yes, I do.

18   Q.    Can you explain to the jury what you meant as far as

19   the advantages to remote environments?

20   A.    Well, there's a couple things.  The most obvious one

21   is that if the clients are going to host these

22   environments, we no longer have to have all of the hardware

23   to post all these environments in-house.

24           So all of the servers, all of the disk space,

25   all of that stuff that we had to purchase or lease for, you

1    know, our data center would no longer be necessary because

2    the clients are hosting it, so there would be a significant

3    cost savings there.

4         But in addition, by having the clients establish

5    these environments, it's possible that those environments

6    could more closely resemble their production environments

7    which would help with support.

8         So, you know, if support was trying to answer a

9    question, rather than us having maybe an in-house vanilla

10   demo environment, we might actually have something that was

11   an environment that more closely resembled what they were

12   actually running in production, and that would help in

13   diagnosing and solving problems.

14   Q.   Okay.  So let's leave the topic of remote

15   environments and move on to another topic the jury has

16   heard a bit about, and that is security.

17        Mr. Benge, does Rimini tell its clients to

18   ignore security?

19   A.   Absolutely not.  In these types of applications

20   where you're dealing with payroll for large enterprises and

21   large financial applications, security is very important.

22   Q.   And what does Rimini do to assist its clients in

23   maintaining the security of the supported applications?

24   A.   I guess the first level is with our primary support

25   engineers.  If clients have questions about how to set up

2140

```
 1    or configure the security, the support engineers are

 2    knowledgeable about that and can help them with it.

 3              The security setup in an application like this

 4    can be pretty complex.  It's a big application, a lot of

 5    aspects of security.

 6              So there's the support engineers, and, from time

 7    to time, we've also brought in our own company security

 8    team.

 9              So within our own company we have, in our IT

10    organization, security professionals that have been called

11    in to help clients that had security concerns.

12    Q.    And what experience do you personally have with

13    PeopleSoft's security mechanisms?

14    A.    Well, I managed the security team at PeopleSoft for

15    a couple of years so I know the security functionality

16    inside and out.

17    Q.    And what is holistic security?

18    A.    Holistic security is looking at all of the layers of

19    security, not just the application level security, you have

20    to think about the network security, the database security,

21    encryption.

22              And not even just that, it's about the people

23    and the processes too.  You can have the best security in

24    the world on your application, but if you've got a rogue

25    employee that's not being careful with it, you can have
```

1    problems.

2            I also like to think of holistic security --

3    think about a bank and all the layers of security they

4    have.  There might potentially be someone who could pick

5    the lock on a safety deposit box, but for them to be able

6    to get in there, they're going to have to get through a lot

7    of other layers.  There's the bank vault door, there's

8    security cameras, there's silent alarms, there's a lock on

9    the outside of the bank, potentially a guard.

10           So holistic security is looking at all of the

11   layers, not just looking at -- you know, in this case, not

12   just looking at the PeopleSoft application security but all

13   of the layers of security.

14   Q.   Now, is holistic security something that's known in

15   the industry?

16   A.   Yes, it is.

17   Q.   And in preparing for your testimony, did you

18   investigate whether or not Oracle had published articles on

19   holistic security?

20   A.   Yes, I did.

21   Q.   And what did you find in that regard?

22   A.   I just went out and did a --

23           MS. DUNN:  Objection, foundation.

24           THE COURT:  Sustained.

25           MR. RECKERS:  Let's turn to Plaintiffs'

2142

1    Exhibit 5455.  And this has been admitted already.

2              And so, if you would, Marie, let's look at the

3    top.

4    BY MR. RECKERS:

5    Q.   Mr. Benge, this is an email that was shown to the

6    jury last week from Krista Williams to someone named Linda

7    Roberts.  Do you see that?

8    A.   Yes, I do.

9              MR. RECKERS:  My question in particular is down

10   the page, start with paragraph 8, section B.  Right there,

11   Marie.

12   BY MR. RECKERS:

13   Q.   And so let me ask you this.  Mr. Benge, what does

14   Rimini Street tell its clients with respect to the security

15   that it could provide to the supported PeopleSoft

16   applications?

17   A.   Well, in our contracts we do --

18             MS. DUNN:  Objection, foundation.

19   BY MR. RECKERS:

20   Q.   Mr. Benge, are you familiar with what Rimini Street

21   tells its clients with respect to the security it can

22   provide?

23   A.   Yes.

24   Q.   And is the -- is the content of Rimini's disclosures

25   to its clients reflected on the screen?

2143

1    A.    Yes, it --

2              MS. DUNN:  Objection, Your Honor, foundation.

3    Foundation can't be established by looking at the screen.

4              MR. RECKERS:  I'm sorry.

5              THE COURT:  Sustained.  There's still a

6    foundational weakness here.  I think you need to lay some

7    greater foundation.

8    BY MR. RECKERS:

9    Q.    Mr. Benge, let me just ask it this way.  What does

10   Rimini tell its clients about its ability to provide fixes

11   and updates for --

12             MS. DUNN:  Objection, Your Honor, same basis.

13   BY MR. RECKERS:

14   Q.    Mr. Benge, are you aware of what Rimini tells its

15   clients with respect to how -- what technically it can

16   provide as far as updates for the PeopleSoft product?

17   A.    Yes.  Anything that's in the application layer, like

18   if a security issue --

19             MS. DUNN:  Objection, Your Honor, same basis.

20             MR. RECKERS:  I believe I've laid a foundation,

21   Your Honor.

22             THE COURT:  I'll allow him to go forward.

23             THE WITNESS:  So we can fix vulnerabilities in

24   the application layer.  The source codes all provide it.

25   If something was wrong there, we could correct it.

2144

1            However, PeopleSoft also includes a layer of

2    software called PeopleTools, which the source code is not

3    delivered for, and our license agreement with our clients

4    spells out the fact that if there are issues in that layer,

5    since we don't have the source code, we can't correct

6    problems at that level.

7            However, having said that, there are ways that

8    in many circumstances, if a problem was discovered at that

9    layer, we could still mitigate it through a work-around or

10   through addressing, like we've mentioned before, holistic

11   security.

12           If there's a problem with the lock on the safety

13   deposit box, well, let's make sure that the other layers of

14   security are fully in effect.

15   BY MR. RECKERS:

16   Q.    And has Rimini had the occasion to develop patches

17   to address security vulnerabilities for PeopleSoft?

18   A.    No, we really haven't.  There haven't been any

19   client cases where clients had problems in this regard.

20   It's a very stable product.

21   Q.    And what resources does Rimini have available to

22   address security concerns for clients?

23   A.    Well, certainly, we got our support engineers, our

24   development staff, you know, people with years of

25   experience working with security that could help address

2145

1    any security concerns.

2    Q.    Now, are you aware of any of Rimini's clients for

3    PeopleSoft applications having been hacked?

4    A.    No.

5    Q.    Okay.  Let's turn to the topic of Oracle's cross-use

6    allegations.

7            Prior to 2012, did Rimini develop updates in one

8    environment and distribute the resulting updates to

9    multiple clients?

10   A.    Yes, in certain circumstances.

11   Q.    In what instances?

12   A.    Situations where we had multiple clients that had

13   the same exact code to begin with.  So maybe two clients

14   like H&R Block and 3M Company that both left Oracle on

15   release 8.8 at the same last Oracle tax update, so the

16   before version of their code was identical.

17           So we would make our changes to one version of

18   the program and then deliver that to both clients.

19   Q.    In the instances that you just described, did Rimini

20   have any policies in place to ensure that clients did not

21   receive Oracle code beyond what they already had?

22   A.    Yes.

23   Q.    Please describe those policies.

24   A.    Well, certainly the policies were in place, but we

25   also had utilities that we would use to help us ensure that

1    the before code was the same before we started making

2    modifications to a single version and delivering it back to

3    that group of clients.

4    Q.    Now, did Rimini ever obtain ISO certifications for

5    its development process?

6    A.    Yes, we did.

7    Q.    And why did Rimini do that?

8    A.    I kind of like to almost think of it as a Good

9    Housekeeping seal of approval.

10            ISO stands for International Standards

11   Organization, and we receive a certification from an

12   independent auditor that's come in and reviews our

13   processes and makes sure that we're following well-defined

14   and well-documented process and procedure.

15   Q.    Do Rimini's ISO certifications relate to Rimini's

16   treatment of Oracle copyrighted software?

17   A.    Yes.

18   Q.    In what regard?

19   A.    Again, we've got a process that's well documented.

20   It's well defined how we do things, and the way that the

21   processes are defined respect Oracle's intellectual

22   property rights.

23   Q.    Are you aware of any instances where someone on your

24   development team intentionally distributed Oracle code to

25   someone who wasn't entitled to that code?

2147

1     A.     No, I'm not.

2     Q.     And are concerns like that raised from time to time?

3     A.     Yes, there have been some.

4     Q.     And what do you do when such concerns are raised?

5     A.     First and foremost would be to investigate it, see

6     if there was an issue; if there was, to get it corrected.

7            But training is also a big concern there, you

8     know, making sure that the employees understand proper

9     process and procedure.

10    Q.     Okay.  If you knew that Rimini's -- that the

11    Rimini-hosted environments that you discussed infringed

12    Oracle's copyrights at the time period between 2006 to

13    2011, would you have used those environments to support

14    Rimini's clients?

15    A.     No, we wouldn't have.

16    Q.     And so for my follow-up question I'm still going to

17    be referring to the time period between 2006 to 2011.  Do

18    you understand?

19    A.     Yes.

20    Q.     Okay.  Would you have used, instead of the

21    Rimini-hosted environments, alternatives if you had known

22    that the Rimini-hosted environments infringed?

23    A.     Yes, I believe we would have.

24    Q.     Now, talking about the reuse of code that we talked

25    about for the multiple clients, if you had known that

2148

```
1    Rimini's reuse of code infringed Oracle's intellectual
2    property or Oracle's copyrights, would you have used those
3    processes to support Rimini's clients?
4    A.    No, we wouldn't have.
5    Q.    Now, were there alternatives to code reuse that
6    Rimini could have used to support its clients in that
7    timeframe?
8    A.    Yes, there were.
9    Q.    If you had known that Rimini's code reuse infringed
10   Oracle's copyrights, would you have used the available
11   alternatives to provide support?
12   A.    Yes.
13   Q.    Now, referring to Oracle database, if you had known
14   that Rimini's use of Oracle Database infringed Oracle's
15   copyrights, would you have used that database to support
16   Rimini's clients?
17   A.    No.
18   Q.    Were there alternatives in that timeframe to the
19   Oracle Database that Rimini could have used to support its
20   clients?
21   A.    Yes, there were.
22   Q.    If you had known that Rimini's use of the Oracle
23   Database infringed Oracle's copyrights, would Rimini have
24   used those alternatives to support its clients?
25   A.    Yes, I'm sure we would have.
```

2149

1    Q.    Mr. Benge, do you believe that Rimini's processes

2    intentionally violated Oracle's intellectual property

3    rights?

4              MS. DUNN:  Objection, leading.

5              THE COURT:  Overruled.  I'll allow it.

6              THE WITNESS:  No, I feel like the development

7    team was very committed to respecting Oracle's IP rights.

8              We were very careful to make sure that clients

9    only received updates that they were entitled to.  We were

10   very careful to make sure that they didn't receive

11   something -- an update from Oracle that they didn't already

12   pay Oracle for.

13             You know, the team that we have puts a lot of

14   time and effort into building these tax, legal and

15   regulatory updates.  They're a hard-working, committed

16   group of professionals, and we pride ourselves on the

17   updates that we create and the value we give our customers.

18             MR. RECKERS:  No further questions at this time.

19             THE COURT:  All right.

20             Cross-examination?

21             Ms. Dunn, go ahead, please.

22             MS. DUNN:  Thank you, your Honor.

23                      CROSS-EXAMINATION

24   BY MS. DUNN:

25   Q.    Good afternoon, Mr. Benge.  How are you?

2150

1    A.    Good, thank you.

2    Q.    My name is Karen Dunn.  I'm an attorney for Oracle,

3    and I'm going to be asking you some questions.

4    A.    Okay.

5    Q.    Okay.  Before we begin, though, I want to make sure

6    that we understand the time period I'm asking you about

7    when I ask these questions.

8          So when I ask you about the facts of this case,

9    what I'm talking about is the time period between 2005 and

10   2011.  Do you understand that?

11   A.    Yes, I do.

12   Q.    Okay.  And you previously provided deposition

13   testimony in this case on June 21st, 2012.  Do you remember

14   that?

15   A.    Yes, I do.

16   Q.    Okay.  In March 2012 you provided an opinion to

17   Rimini's experts; right?

18   A.    Yes.

19   Q.    Okay.  So if I ask you questions about your role in

20   the litigation, you can talk about the time period up until

21   the date of deposition, June 21st of 2012, but I'm not

22   asking you about anything after that.  Do you understand?

23   A.    Understood.

24   Q.    Okay.  All right.  So you joined Rimini Street in

25   2008; right?

2151

1    A.    That's correct.

2    Q.    Okay.  And, in 2012, when you were deposed you were

3    the vice-president of PeopleSoft Development at Rimini

4    Street?

5    A.    Yes.

6    Q.    Okay.  And before Rimini, I think you said on

7    direct, you worked at PeopleSoft and then at Oracle?

8    A.    That's correct.

9    Q.    And at PeopleSoft you didn't gain any experience

10   working with either JD Edwards or Siebel --

11   A.    No.

12   Q.    -- right?

13         And at Oracle you didn't gain any experience

14   working with JD Edwards and Siebel; right?

15   A.    No, I did not.

16   Q.    Okay.  And any time up until you were deposed, you

17   still had no experience with either JD Edwards or Siebel?

18   A.    That's correct.

19   Q.    Okay.  So as you probably know, Oracle sued Rimini

20   Street in January of 2010, and that's when the litigation

21   began.

22         Your counsel referred several times to your

23   opinion, but he didn't really explain what that meant.  So

24   let's explain that.

25         You were asked by Rimini's lawyers to tell

2152

```
 1    Rimini's experts how many more employees Rimini Street
 2    would need to operate remote-only; is that right?
 3    A.    Not in terms of number of employees, but I did
 4    provide an estimate of double that we spoke about earlier.
 5    Q.    Okay.  So you provided a number, how many employees
 6    would be necessary hypothetically for Rimini to operate
 7    remote-only?
 8    A.    Yes.
 9    Q.    And you were asked that after Oracle filed its
10    lawsuit; right?
11    A.    That's correct.
12    Q.    And actually you were asked this sometime after
13    Oracle filed its lawsuit.  You were asked in March of 2012?
14    A.    That's right.
15    Q.    That's right?  Okay.
16          So to be very clear, this calculation that you
17    made, that your attorney referred to as your opinion, you
18    made for the purpose of litigation, not because Rimini had
19    actually adopted a full remote-only support process,
20    between the dates of 2006 to 2011?
21    A.    Right.
22    Q.    Okay.  And so you began to say but your number was
23    you would double the number of PeopleSoft developers, you
24    would double the number of PeopleSoft quality assurance
25    engineers, you'd double the number of remote environment
```

2153

```
1    support staff, you would double the number of onboarding

2    employees, and you would say that there's 25 percent more

3    PSEs; right?

4    A.    Yes.

5    Q.    Primary support engineers.

6            All right.  So the reason you were asked to

7    provide this number is so Rimini's damages expert could

8    determine a damages figure; right?

9    A.    Partially.

10   Q.    Were you aware that that was a reason you were

11   providing this information in March --

12   A.    Yes.

13   Q.    -- of 2012 when you provided it?

14   A.    Yes.

15   Q.    You understood at that time that the company's goal,

16   Rimini's goal, was to minimize its damages; right?

17   A.    I wasn't focusing on damages, I was just providing

18   an estimate for what I was requested to provide an estimate

19   for.

20   Q.    You said that you knew you were providing an

21   estimate to the damages expert; right?

22   A.    Yes, I knew that.

23   Q.    Right.  And you knew the company's goal was to keep

24   the damages estimate low?

25   A.    I suppose that may have been a goal, but I was
```

2154

```
 1   providing an estimate that I felt was one that was generous
 2   and one that I felt like --
 3   Q.    Before we get -- we're going to talk a lot actually
 4   about your calculation.  I'm just trying to understand.
 5   And I think that you said that you understood that this was
 6   the goal.
 7   A.    Yes.
 8   Q.    Yes.  Okay.
 9            So when we talk about the damages expert, we're
10   talking about Mr. Hampton.  The jury has not yet seen
11   Mr. Hampton, but we're going to talk about him.
12            So Mr. Hampton used what you told him to
13   determine how much money he thought Rimini would have to
14   pay in this case.  Do you understand that?
15   A.    Yes.
16   Q.    Okay.  And based on your number, that's how Rimini's
17   damages expert, Mr. Hampton, keeps his damages number under
18   $10 million; right?
19   A.    I know nothing about the actual numbers.
20   Q.    Nobody told you what the damages number is that
21   you're claiming?
22   A.    I've not been involved in that, no.
23   Q.    Okay.  Do you think Mr. Ravin knows that?
24   A.    I'm sure he does.
25   Q.    Okay.  So you spent an hour explaining your
```

2155

1    conclusions to Mr. Hampton, the damages expert; right?

2    A.    Yes.

3    Q.    He didn't give you any comments?  He didn't give you

4    any feedback?  That's fair?

5    A.    We had a couple of discussions that I recall.

6    Q.    Okay.  But as for comments or feedback, you don't

7    recall any?

8    A.    No.  I remember meeting with him and going over

9    this, yes.

10   Q.    And -- but just to be clear, so you answer my

11   question no comments, no feedback; right?

12   A.    Not that I recall.  It was quite sometime ago.  That

13   was in 2012.

14   Q.    That's right.

15         All right.  So he gave you no comments and

16   feedback, and you gave him no documents; right?

17   A.    No.  We just met and discussed it.

18   Q.    Okay.  So you didn't give him any documents, and

19   just two weeks after that Mr. Hampton issues his report.

20         The core conclusion is based on what you told

21   him; right?

22         THE COURT REPORTER:  I'm sorry.  The what

23   conclusion?

24         MS. DUNN:  The core conclusion.

25

2156

1   BY MS. DUNN:

2   Q.    So Mr. Hampton has concluded how much money he

3   thinks Rimini owes in this case --

4            MR. RECKERS:  Objection, foundation.

5            THE COURT:  Rephrase your question, please.

6   BY MS. DUNN:

7   Q.    Mr. Benge, two months after your discussion,

8   Mr. Hampton released his report?

9            MR. RECKERS:  Objection, foundation.

10           MS. DUNN:  I'll just tell him.

11           This is -- I believe, Your Honor, this is a

12   stipulated fact.

13           THE COURT:  That was my hesitance.  I'll allow

14   the question.

15   BY MS. DUNN:

16   Q.    Okay.  So you agree, then, that two weeks later,

17   after your conversation, Mr. Hampton issued his report;

18   right?

19   A.    I believe so.

20   Q.    Okay.  So two weeks for an expert analysis.  Do you

21   think maybe he had the number before you talked to him?

22   A.    I don't know.

23   Q.    Do you know that he didn't?

24   A.    I didn't know that, no.  I'm sure that he didn't

25   only speak to me.

DONNA DAVIDSON, RDR, CRR, CCR #318    (775) 329-0132

2157

1    Q.    Well, he placed you in the report, but his report

2    did come out mighty quickly.  So it's possible he might

3    have had the number before; right?

4              MR. RECKERS:  Objection, foundation.

5              THE COURT:  Sustained.  It calls for

6    speculation.

7    BY MS. DUNN:

8    Q.    All right.  Just based on your knowledge, do you

9    know that Mr. Hampton did not have the number before you

10   spoke to him?

11   A.    I didn't know that for sure, no.

12   Q.    Okay.  And you understand that this entire

13   conversation about what Rimini would need to do to have a

14   remote-only environment is so Rimini can avoid liability in

15   this case; right?

16   A.    Yes.

17             MR. RECKERS:  Objection, foundation.

18             THE COURT:  Overruled.

19   BY MS. DUNN:

20   Q.    Could you restate your answer?

21   A.    Could you restate the question?

22   Q.    Yes, I can.

23             You understand that this entire conversation

24   about what Rimini would do to accomplish remote-only

25   support is so Rimini can avoid liability in this case?

2158

1    A.    It's my understanding that we were discussing

2    alternatives that would be noninfringing.

3    Q.    All right.  Well, your previous answer, I think, was

4    yes.  Are you going to stick with yes?

5    A.    Yes.

6    Q.    Okay.  And was that something you understood when

7    you were asked to provide your estimate?

8    A.    Yes.

9    Q.    Your calculation?

10         All right.  Has Mr. Ravin ever told you that

11   this Court has already found that Rimini Street violated

12   PeopleSoft's -- Oracle's PeopleSoft copyrights?

13   A.    I've heard that, yes.

14   Q.    Did Mr. Ravin tell you or someone else?

15   A.    Someone else.

16   Q.    Okay.  And who was that?

17   A.    I'm trying to recall where I've heard it from, but I

18   definitely had heard that earlier --

19   Q.    But not Mr. Ravin?

20   A.    It may have been in a company communication.  I

21   don't recall.

22   Q.    So there could have been a communication to the

23   company that the Court had found that Oracle's copyrights

24   for PeopleSoft were violated?

25   A.    I think there may have been, yes.

1    Q.    Okay.  Do you remember anything about that company

2    communication?

3    A.    No.  It would have been very high-level.  Just

4    early, early decisions that had been made by the Court and

5    sharing that with the company, the status of the

6    litigation.

7    Q.    Okay.  And would Mr. Ravin have sent out such a

8    communication?

9    A.    He had provided some updates to the company how the

10   litigation was going in quarterly company calls, so forth.

11   Q.    Okay.  And you can't recall whether this one was one

12   of the updates he sent?

13   A.    No.

14   Q.    How about this, did he tell the company that the

15   Court has already found that Rimini violated Oracle's

16   database copyrights?

17          MR. RECKERS:  Your Honor, this is beyond the

18   timeframe.

19          MS. DUNN:  Your Honor, counsel asked this

20   witness many questions beginning with the words "if you had

21   known that."

22          THE COURT:  I don't consider this beyond the

23   scope of the timeframe that was opened by the direct

24   examination.  I'll allow the question.  I'm still mindful

25   of the issue however.

2160

1    BY MS. DUNN:

2    Q.    Okay.  So it's fair to say that you now know that

3    the Court has found these violations --

4    A.    Yes.

5    Q.    -- is it fair to say?

6    A.    Yes.

7    Q.    And that you knew that when counsel asked you that

8    series of questions beginning "if you had known that"?

9    A.    Yes.

10   Q.    So now you know; right?

11   A.    Yes, I do.

12   Q.    Does that change your answer to any of those

13   questions?

14   A.    No.

15   Q.    All right.  So in addition to speaking to

16   Mr. Hampton, you spoke to Mr. Hilliard, who is Rimini's

17   technical expert; right?

18   A.    Yes, that's correct.

19   Q.    Okay.  He may be here today, I'm not sure.

20         But he also gave you no comments on your

21   remote-only model; right?

22   A.    I don't recall.  First discussions with him were

23   mostly focused around our current process.

24   Q.    At your deposition you said he had no comments.  Is

25   that -- is that what you recall today too?

2161

1    A.    Yes.

2    Q.    Okay.  And Rimini's lawyers attended both these

3    meetings with Mr. Hilliard and Mr. Hampton with you; right?

4    A.    Yes.

5    Q.    All right.  So I know you wanted to talk about

6    the -- how you got to this number, so let's talk about that

7    a little bit.

8         When you calculated this number that you gave to

9    Mr. Hampton so he could calculate damages in this case, you

10   made the assumption that Rimini would keep all of its

11   customers if it went remote-only; right?

12   A.    Yes.

13   Q.    Yeah.  And Mr. Hampton relied on that?

14   A.    Okay.

15   Q.    And -- but you did no analysis to determine whether

16   that was the case; right?

17   A.    No.  I did make an assumption, though, that clients

18   would go along with moving to a remote-only model.

19   Q.    Right.  But not just that clients would go along,

20   that you would retain all of the customers, that Rimini

21   could retain all of the customers in a remote-only world;

22   right?

23   A.    Yes.

24   Q.    Okay.  And you made this assumption even though in

25   remote-only, customers would have to build the environments

2162

1      themselves; right?

2      A.    Most clients already have some that we might be able

3      to use.

4      Q.    Right.  But your assumption was that the customers

5      would have had to build them themselves; right?

6      A.    Potentially.

7      Q.    And you also -- you also made this assumption even

8      though the clients would have to use their own IT

9      resources; right?

10     A.    Yes.

11     Q.    Okay.  And clients would have to administer their

12     own environments; right?

13     A.    To some extent.  I mean, we would be using those

14     environments and doing a lot of the work in those

15     environments ourselves.

16     Q.    Okay.  So when you were deposed in this case, you

17     were asked this question, and you said that the clients

18     would ultimately be administering the environment.  Is that

19     true?

20     A.    Again, to a certain extent.  There's going to be

21     aspects of maintaining that environment that we can do

22     ourselves.

23          To a certain degree, it depends on how empowered

24     we are in that environment.  Some of the challenges that I

25     spoke to earlier can be mitigated by them giving us

1    adequate levels of access in the remote environment.

2    Q.    All right.  But we're talking in a remote-only

3    world; and, actually, also in your deposition, you said

4    that you had made no assumptions about whether Rimini would

5    still be building remote environments.

6          And your assumption was that the clients would

7    build them, that they would use their own IT resources, and

8    that they would administer the environment.  That was your

9    deposition testimony.

10   A.    Right, at the time.

11   Q.    Are you changing that today?

12   A.    No, at the time we did not know.

13   Q.    Right.  That was -- that was what you thought.

14   A.    Yes.

15   Q.    Okay.  You also assumed that you would keep all the

16   customers even though clients would have to do their own

17   backups?

18   A.    That's right.  I mean, they're used to doing

19   hundreds, if not thousands, of backups.  It's something

20   that's routine for an IT department to do.

21   Q.    Right.  And this is the same thing that we saw

22   earlier when Mr. Ravin commented about when TomorrowNow

23   changed to remote only, and he said,

24          "Every client will now be responsible for

25   setting up their own environments for use by TomorrowNow,

2164

```
 1    and they would have to procure all their own hardware and

 2    software at their own expense."

 3               Do you agree with that?

 4    A.    I'm not familiar with -- intimately familiar with

 5    that, but, yes.

 6    Q.    That's what Mr. Ravin said.  Would you agree with

 7    it?

 8    A.    Yes, in a client-hosted model, the client's going to

 9    be responsible for that.  It's going to be running on their

10    hardware.

11    Q.    That's right.

12               So you assume that Rimini Street would retain

13    all its customers even though customers would have to build

14    their own environments, they would have to administer the

15    environments, Rimini Street may not be building any

16    environments, and they'd have to create their own backups.

17    Is that right?

18    A.    Yes.

19    Q.    Okay.  And you made this assumption without

20    consulting a single customer; right?

21    A.    Well, I work day in and day out with hundreds of

22    customers.  I know the customers well.

23    Q.    When you made this decision and this number, which

24    is important to the damages number in this case --

25    A.    Yes.
```

2165

```
 1    Q.    -- you didn't talk to a single customer; right?
 2    A.    I have conversations with customers weekly and --
 3    Q.    Did you ask a single customer about this?
 4    A.    Specifically no.
 5    Q.    Okay.  And when you reviewed the depositions as part
 6    of this case, do you -- do you remember seeing a deposition
 7    from a representative of Carl Karcher, who is a Rimini
 8    Street customer?  This is the restaurant chain responsible
 9    for Carl's Jr., and Hardee's?
10    A.    I'm familiar with the client.  I don't know what
11    document you're referring to.
12    Q.    Okay.  I'm referring to the deposition.  So this is
13    a Rimini customer.  And what he said was that --
14              MR. RECKERS:  Objection, foundation, Your Honor.
15              THE COURT:  Overruled.
16    BY MS. DUNN:
17    Q.    So this Rimini Street customer who was deposed in
18    this case, so we know what they think, said if all Rimini
19    would do was have support on the customer system, then they
20    wouldn't have allowed it.
21              So you don't know as you sit here today, because
22    you didn't talk to a single customer about this, how many
23    customers share this view that they never would have
24    allowed, they never would have hired Rimini Street if
25    remote-only was the option; right?
```

1    A.    I feel like I had a pretty good feel for the fact

2    that clients would go along with remote-only development.

3    Q.    You just felt it?

4    A.    Yeah, from knowing them and speaking with clients,

5    yes.

6    Q.    So no survey --

7    A.    Some clients -- some clients actually wanted to go

8    that direction, and we steered them towards in-house.

9    Q.    Yeah, that's something that we will discuss.  I

10   agree with that.  You did steer them towards in-house.

11         But I'm talking about -- and this is why I set

12   out the time period for you, Mr. Benge, because it's very

13   important that we're clear about this.

14   A.    Yes.

15   Q.    When you formulated this number based on the

16   assumption that all your customers would stick with Rimini

17   Street and remote-only, you did not talk to a single

18   customer, you did not do a customer survey, you did not go

19   customer by customer; right?

20   A.    That's correct.

21   Q.    Okay.  So let's talk about your calculation then and

22   what led to this under $10 million conclusion by

23   Mr. Hampton.

24         You didn't produce any calculations that anyone

25   could check, did you?

2167

1    A.    No.  This wasn't a scientific calculation.

2    Q.    Right.  It wasn't a scientific calculation.

3    A.    No, it wasn't.

4    Q.    So there was no calculations and nothing written

5    down; right?  So there's nothing written down that anyone

6    could look at?

7    A.    It was based on four years of experience and working

8    with 20 percent of our clients that were remote.

9    Q.    Right.  I understand that.  But it's based on your

10   experience which we'll talk about.  I just want to know

11   whether there were any calculations written down?

12   A.    No, there was no formula for this.

13   Q.    Okay.  No study of hours; right?

14   A.    No.

15   Q.    You know what a margin of error is?

16   A.    Yes.

17   Q.    Okay.  You know that it's a statistical calculation;

18   right?

19   A.    Yes.

20   Q.    Okay.  And it requires that you do math to find a

21   margin of error?

22   A.    Yes.

23   Q.    All right.  So in your deposition you said in

24   addition to your feel, you added a margin of error; right?

25   A.    Uh-huh.

1    Q.    But you didn't do any statistical calculations?

2    A.    No.  That's correct.

3    Q.    In fact, you said a margin of error is not even a

4    hard and fast number, you just came up with it based on

5    what you saw?

6    A.    Again, I felt like I came up with an estimate that

7    was for the worst case scenario, assuming that we were

8    going to have to support these remote-only clients without

9    the use of a lot of utilities that we had developed and so

10   forth.

11   Q.    Well, I agree with you that Rimini Street did think

12   it was a worst case scenario.  I think that that was well

13   put.  But this number was based on your feelings; right?

14   A.    Not just feelings.  It's based on my experience.

15   Q.    Right.  But even by the time of your deposition in

16   2012, your experience was actually quite limited with

17   remote environments.  You said that --

18   A.    20 percent of our clients were remote so --

19   Q.    And you said that even at the time of your

20   deposition, which was in 2012 --

21   A.    Yes.

22   Q.    -- your counsel asked you a lot about 2012, you

23   said, "Our remotes are such a small percentage of our

24   client base."  Right?

25   A.    20 percent.  So we hadn't invested in utilities

1    because it was the minority.  It was just 20 percent.  But,

2    still, 20 percent is a large enough percentage that we were

3    able to gain experience with those clients.

4    Q.    Well, you used to describe it as a small percentage.

5    A.    20 percent --

6    Q.    You're going to stand by your deposition testimony

7    today --

8    A.    The numbers are what they are.  80 percent were

9    in-house, 20 percent were remote.  Whether you want to call

10   20 percent a small percent, it's certainly the minority.

11   Q.    I'd like to also return to one issue of timing.

12         So as we discussed, this litigation began in

13   January of 2010, and you were asked to give this number

14   about the additional employees in 2012.

15         So we've already talked about there's no

16   calculations, there's nothing written down, you didn't

17   account for any of these problems that customers might have

18   had in the additional burden for them.

19         Sir, this number didn't really come from you,

20   did it?

21   A.    Yes, it did come from me, and it was based on a very

22   thorough understanding of all of the challenges that we've

23   talked about with the remote environments.

24   Q.    Sir, this number came from Mr. Ravin; right?

25   A.    No.

2170

1    Q.    He provided this number a year earlier in his

2    deposition in November of 2011?

3    A.    Not that I'm aware of.

4    Q.    You didn't know that?

5    A.    No.

6    Q.    So this is a coincidence?

7    A.    The fact that the remote environments took double

8    the effort has been something that we've known about for a

9    long time.

10           If you were to go ask the QA engineers when

11   they're doing testing, you know, they would be able to test

12   for an in-house client in one day.

13           If they had to test for a remote client, they'd

14   always plan for two days.

15   Q.    Mr. Benge, you have already testified that this

16   number was based on your feel and your experience.

17           And now I'm telling you that Mr. Ravin came up

18   with this number a year before you did.  And you want this

19   jury to believe that your number, two weeks before the

20   expert report came out, has nothing to do with his number?

21   A.    Yes, I do.

22   Q.    All right.

23   A.    As I said, the fact that --

24           THE COURT:  I'm sorry to interrupt, but you're

25   going well beyond a response to the question in your

2171

```
 1    answers, and I need to caution you.  Listen to the

 2    question, just answer the question.

 3              THE WITNESS:  Yes, Your Honor.

 4    BY MS. DUNN:

 5    Q.    Mr. Benge, are you aware that last week Mr. Ravin

 6    referred to this as his estimate?

 7    A.    I have not been involved in any of the court

 8    proceedings.

 9    Q.    Nobody told you that?

10    A.    No.

11    Q.    Mr. Ravin came up with this number a year before you

12    claimed to come up with it because he knew it was necessary

13    to keep the damages number down; right?

14              MR. RECKERS:  Objection, foundation.

15              THE COURT:  Sustained.

16    BY MS. DUNN:

17    Q.    Mr. Benge, this is a made-up number.  It's not based

18    on anything; right?

19    A.    That's not true.  I disagree.

20    Q.    Possibly it's based on Mr. Ravin's deposition

21    testimony and his desire to keep the damages numbers down

22    in this case?

23              MR. RECKERS:  Objection, foundation.

24              THE COURT:  Overruled.

25              THE WITNESS:  Respectfully, I disagree.
```

2172

1    BY MS. DUNN:

2    Q.    Can you rule it out?

3    A.    I did not have discussions with Mr. Ravin about the

4    level of effort required for remote-only development, but I

5    did have a lot of discussions about it with --

6    Q.    So --

7    A.    -- our development manager.

8    Q.    So you wouldn't know either way?

9    A.    No.

10   Q.    Okay.  So we talked a little bit about how

11   remote-only environments were a small percentage even by

12   the time of your deposition in 2012.

13            You're aware, right, that even the small number

14   of remote environments that Rimini Street did weren't

15   entirely remote?  You know that; right?

16   A.    Yes, I do.  I discussed that in my direct.

17   Q.    So cross-use of fixes and updates means that you

18   couldn't be fully remote because the updates are created at

19   Rimini Street and then delivered to multiple customers?

20   A.    Yes, I agree.

21   Q.    We agree on that?

22            Okay.  So do you know that when he testified

23   last week, Mr. Ravin admitted for the first time in this

24   case that Rimini took an update and used the update for

25   other clients all the time?

2173

1    A.    Again, I haven't been involved in any of the court

2    proceedings, so I'm not aware of anything that's transpired

3    in court.

4    Q.    Okay.  Nobody told you that he said that Rimini did

5    this all the time?

6    A.    No.

7    Q.    You would know this, though, because of your

8    development background.  So with remote-only support, if

9    you don't have cross-use fixes all the time, you have to

10   develop updates for each individual customer from scratch;

11   right?

12            So if you're going to remote-only, you're going

13   from cross-use of fixes and updates all the time to

14   building each environment from scratch?

15   A.    Yes.

16   Q.    Okay.  That's an enormous change, isn't it, moving

17   from cross-use all the time to building environments and

18   updates individually from scratch?

19   A.    It is, which is why we estimated that it would take

20   double the amount of resources to do it.

21   Q.    You didn't account for that in your number,

22   Mr. Benge?

23   A.    Oh, absolutely we did.  I was absolutely counting on

24   the fact that we would have to do all the work within the

25   remote environments, that we wouldn't have access to

2174

```
 1    anything on the RSI or the Rimini Street network.
 2    Q.    But that's not something you had been doing; right?
 3    A.    But I understood what it would take to do it.
 4    Q.    Based on your feelings?
 5    A.    No, based on my experience and working with remote
 6    environments.
 7    Q.    Right.  Experience --
 8    A.    There had been some circumstances where we would go
 9    directly into remote environments and change code directly
10    there.
11    Q.    Right.  But you just testified that this is not
12    something that you did, that even remote environments were
13    not even entirely remote; right?
14    A.    That's true.
15    Q.    Okay.  So you didn't have experience with that?
16    A.    Minimal; yes, we did.
17    Q.    All right.  Part of your calculation we discussed
18    before was also doubling the number of employees in the
19    onboarding team?
20    A.    Yeah.
21    Q.    Right?  So the onboarding team deals with archives.
22          You didn't make any assumptions about whether
23    the onboarding team would still be building archives for
24    customers, did you?
25    A.    I figured that they would continue to do that.  I
```

1    didn't see any reason why they would stop doing that.  It

2    would just have to be done from the client's environment

3    rather than from our network.

4    Q.    Okay.  So again here in your deposition testimony,

5    you said you didn't make any assumptions about the

6    onboarding team.  So are you changing your testimony today?

7    A.    No.

8    Q.    You didn't make any assumption about the onboarding

9    team; right?

10   A.    I assumed that they would continue to do what they

11   had been doing.

12   Q.    That's an assumption.  In your deposition you said

13   you didn't make any of those.

14   A.    Okay.

15   Q.    Did you make any assumptions?

16   A.    Okay.

17   Q.    Well, did you?

18   A.    Again, I didn't think that they would be changing

19   anything other than they would be working in remote-only

20   environments.

21          If you call that an assumption, then, yes, I

22   guess I did make an assumption.

23   Q.    Well, then I'm really confused, because you think

24   that they need to be doubled, but you didn't think anything

25   would change.

1    A.    Well, obviously things would change.  We're going to

2    a remote-only model.  They're no longer going to be

3    building in-house environments.  Obviously, their roles are

4    changing.

5    Q.    All right.  First you said you didn't make any

6    assumptions, then you said, actually, you assume they would

7    keep doing the same thing, and now you're saying, well, I

8    assume that we would need to double them because they would

9    be doing different things.

10            Mr. Benge, this is very confusing to the jury.

11   A.    By doing the same thing, what I meant is they would

12   continue to do archives, but they would have to do them in

13   a different way.  They would no longer be doing it on the

14   in-house environment, they would have to be creating the

15   archives from the client-hosted system.

16   Q.    But you've also said that you don't know how Rimini

17   Street would create an archive in a remote-only model;

18   right?

19   A.    Again, it's getting a little out of my area of

20   expertise as well.  As VP of PeopleSoft Development, what

21   my team does is we prepare the tax and regs updates.  We

22   work on the environments once they're created.

23   Q.    Mr. Benge, this is not my question.

24            My question is that you previously said you

25   don't know how Rimini would create an archive in a

1    remote-only model.  That was the area of the onboarding

2    team, not you; right?

3    A.    That's correct.

4    Q.    Right.  But in giving this number to Mr. Hampton and

5    in formulating it, you didn't even ever talk to the

6    onboarding team; right?

7    A.    I certainly would have talked to environments and

8    onboarding, yes.

9    Q.    You talked to them about this number.  You talked to

10   them about this.

11            This is the same question I asked you when I

12   asked if you spoke to a single customer, and you tried not

13   to answer that question.  This is the same question.

14   A.    It' difficult to answer in that these are teams that

15   I interact with daily so --

16   Q.    Did you talk to them about this?

17            When you formulated this number that you gave to

18   Mr. Hampton that the damages number that he came up with

19   hinges on, did you talk to the onboarding team when you

20   decided they should be doubled?

21   A.    I'm sure I had some discussion with them about it,

22   yes.

23            MS. DUNN:  Your Honor, I'd like permission to

24   play Mr. Benge's deposition at page 80, line 11, to page

25   80, line 16.

2178

1          THE COURT:  All right.  You may do so.

2      (The videotaped deposition was played as

3      follows:)

4          "QUESTION:  Did you talk to the

5      on-boarding team about how they would create

6      archives when you were performing this

7      analysis?

8          "ANSWER:  No, but I don't see how it

9      would be very different, other than the

10     location where it was being performed from

11     would be different."

12         (End video.)

13  BY MS. DUNN:

14  Q.   Mr. Benge, in your deposition, this was a very easy

15  question for you to answer.  You said, "No."

16  A.   And I think my answer today was very similar in that

17  it would just be different where they created the archive

18  from, whether it would, you know, be done from our network

19  or from the client.

20         But with regard to discussion with the other

21  teams, you're right.  You know, that was how many years

22  ago?  That was in 2012.

23  Q.   Well, we're happy to help remind you, but the fact

24  is you didn't talk to a single customer, you didn't talk to

25  the onboarding team; right?

2179

1   A.    That's what I said in the deposition, yes.

2   Q.    Well, is that true, or is it what you said in your

3   deposition which was under oath, Mr. Benge?

4   A.    Like I said, I have conversations with these teams

5   on a daily basis.  But what I have said in my deposition

6   was I hadn't spoken with them about this, and that would

7   have been more recent in my mind.

8   Q.    I'm not asking you what you said in your deposition,

9   Mr. Benge.  I'm asking you what the answer is.  And this is

10  a yes-or-no question.

11          So in your deposition you answered it no.  Are

12  you changing that answer today?

13  A.    No, I'm not.

14          MS. DUNN:  Thank you.

15          THE COURT:  Ms. Dunn, this would be probably a

16  good time to take our first afternoon recess.

17          Ladies and gentlemen, we'll take a 15- to

18  20-minute recess depending on when you're ready.

19          I remind you about all the cautions that I've

20  gone through so many times with you; please not to discuss

21  the case with anyone or allow it to be discussed in the

22  your presence; please keep an open mind until you've heard

23  all the evidence.

24          And we'll take our break at this time.  You may

25  go ahead and step down.  Thank you.

```
 1              (Recess from 2:49 p.m. until 3:10 p.m.)

 2              (Jurors enter courtroom at 3:10 p.m.)

 3                   COURTROOM ADMINISTRATOR:  Court is again in

 4    session.

 5                   THE COURT:  Please have a seat.

 6                   The record will show that we're reconvened

 7    following the break.  We're in open court.  Jury is all

 8    present.  Counsel and parties are present.

 9                   Mr. Benge continues in cross-examination by

10    Ms. Dunn, and you're welcome to go forward, Ms. Dunn.

11                   MS. DUNN:  Thank you, Your Honor.

12    BY MS. DUNN:

13    Q.   Mr. Benge, so before we took a break, we were

14    talking about how, when you came up with your number for

15    Mr. Hampton, you had not taken into account that customers

16    had to do a lot of work and may not want to do the work for

17    the remote environments.

18                   You hadn't discussed your number with the

19    onboarding team when you concluded that their numbers

20    needed to be doubled.

21                   So I'm going to now ask you whether you made any

22    assumptions about how Rimini's pricing would need to change

23    after you doubled the employees.

24    A.   No.  I was not involved in that at all.

25    Q.   So if the experts, Mr. Hilliard or Mr. Hampton, made
```

```
 1   any assumptions, those didn't come from you about Rimini's
 2   pricing; right?
 3   A.    Right.
 4   Q.    Okay.  So the jury has heard a lot in this trial
 5   about how Rimini Street offers a replacement for
 6   vendor-level support at 50 percent off.
 7         Wouldn't the pricing have an effect on whether
 8   you could attract and retain customers?
 9   A.    I'm sure it would.
10   Q.    You're sure it would.
11         But you decided that all customers would be
12   retained, but you didn't make any assumptions about the
13   pricing?
14   A.    No.  In some regards, I suppose there could be some
15   savings to us in terms of --
16   Q.    I'm not asking what you suppose today.
17   A.    Sure.
18   Q.    Okay?  I'm asking you what you were assuming when
19   you gave this number to the damages expert, and you just
20   testified that you made no assumptions about what would
21   happen to Rimini's pricing, which obviously, and we know
22   from this trial, has an impact on attracting customers.
23         So you didn't make any assumptions about how it
24   would affect the pricing, and yet you decided all customers
25   would be retained; right?
```

```
 1    A.    Yes.

 2    Q.    Never looked into it?

 3    A.    I'm in development.  Pricing would not be my realm.

 4    Q.    That's right.

 5          Okay.  So you didn't even account for whether it

 6    would have been possible to double the employees; right?

 7    A.    I was just looking at what it would take for

 8    development.  I wasn't looking into whether or not we would

 9    be able to afford that, if you will.

10    Q.    So the question I asked you is a little different.

11          I asked you -- I said you didn't even account

12    for whether it would have been possible for Rimini Street

13    to double these employees; right?

14    A.    No, I think it would have been.

15    Q.    That's not what I'm asking you, Mr. Benge.  I am

16    asking whether you accounted for whether it would be

17    possible to double the employees.

18    A.    I accounted if it would be doubled?

19    Q.    That's --

20    A.    I don't think we would have had a problem doubling

21    the number of employees.

22    Q.    Let me put this a different way.

23    A.    Okay.

24    Q.    As it was, at times at Rimini Street you all had a

25    difficult time getting enough people to support the work
```

2183

1     that you were doing; right?

2     A.    Finding good people, finding good talent is always a

3     challenge, but always doable.

4     Q.    Well, let's see about that, okay?

5           So, in 2008, Rimini Street experienced a growth

6     spurt when it took on clients from TomorrowNow; right?

7     A.    Yes.

8     Q.    That was when TomorrowNow was shut down; right?

9     A.    Yes.

10    Q.    And, in 2009, Rimini Street continued to be

11    understaffed.  You would agree with that; right?

12    A.    We were always looking for good people.  We were

13    growing quickly.

14          MS. DUNN:  Okay.  Let's look, if we could, Matt,

15    at Plaintiffs' Exhibit 605.

16    BY MS. DUNN:

17    Q.    So, Mr. Benge, this is an email from you to Brian

18    Slepko.

19    A.    Yes.

20    Q.    Right?

21          And it says -- let's just go to the part of this

22    email where it says, quote, "We need more staff."

23    A.    Ed was talking about within his own team he needed

24    more staff, yes.

25    Q.    Well, Ed is not in that email -- or that's not what

2184

1    he's saying.  You're quoting Ed as saying, "We need more

2    staff."  Right?

3    A.    I'm rereading this.

4          Yes, this was Ed Freeman's quote.  I was quoting

5    what he had said.

6    Q.    Okay.  And what was Ed Freeman's team?

7    A.    He was in environments.

8    Q.    Right.  So is that part of the staff that you would

9    double?

10   A.    Yes.

11   Q.    Right.  And he's saying already "we need more

12   staff."

13   A.    Yeah.  That was his opinion, yep.

14   Q.    Right.  And I think it's also interesting to note

15   that he is saying that,

16          "Seeing that we've got a security team the same

17   size as the PS environment team made me laugh/cry."

18   A.    Yeah, I think he was a little jealous that we had

19   hired a few folks in the security team, and he felt like he

20   needed the resources within his team.

21   Q.    Right.  And he didn't have those resources.  He

22   said, "We need more staff."

23   A.    That was his opinion, yeah.

24   Q.    Does that help remind you whether there were parts

25   of Rimini Street that were understaffed in 2009?

```
 1    A.    As I said, we're always looking for good people, and
 2    we also looked at other potential sources of finding --
 3    Q.    Mr. Benge, I'm just asking you whether, in 2009,
 4    there were parts of Rimini Street, for example, what we've
 5    just discussed, development, where they were understaffed?
 6    A.    Yes.
 7    Q.    Yes.
 8          Okay.  Let's look also at Plaintiffs'
 9    Exhibit 5356.  This is an instant message exchange with
10    someone named Tim Conley.  Do you know who Tim Conley is?
11    A.    Yes, he's a developer on the PeopleSoft team.
12    Q.    Okay.  So he's also in development in PeopleSoft?
13    A.    Yes.
14    Q.    Okay.  Here he says -- Tim Conley is talking to
15    somebody unknown, and as you read this email, if you know
16    who unknown is, please let me know.
17          But Tim Conley says to unknown, "Tell your
18    manager you feel the caseload is too great for one person."
19    A.    This was definitely a conversation with a primary
20    support engineer.  I believe it was John Eberhart.
21    Q.    John --
22    A.    Eberhart.
23    Q.    Eberhart?
24    A.    Yes.
25    Q.    And he's a primary support engineer?
```

2186

1    A.    Yes, he was.

2    Q.    So the primary support engineers, just to remind the

3    jury, Mr. Benge suggested doubling a number of employees.

4    With primary support engineers he says 25 percent more

5    would be the additional number needed in a remote-only

6    environment; right?

7    A.    Yes.

8    Q.    Okay.  So he says,

9              "It just feels like I'm in a no-win situation,

10   down to 12 clients.  Everyone else has between 14 and 16.

11   I'm getting somewhat concerned."

12             And Tim says, "Sure.  You should be.  Tell

13   someone.  Blow the whistle.  They can't keep this hidden

14   any longer."

15             It sounds like the PSEs were also understaffed.

16   Would you agree with that?

17             MR. RECKERS:  Objection, foundation.

18             MS. DUNN:  Your Honor, the witness was able to

19   even identify who unknown is in this email.

20             THE COURT:  Overruled.

21             THE WITNESS:  So this particular PSE had a

22   client, JB Hunt, that was particularly needy, it was taking

23   a lot of that particular PSE's time.

24   BY MS. DUNN:

25   Q.    Right.  But he even, from this email you can tell,

1   has fewer clients than everyone else?

2   A.    Yes.  And that's what he was concerned about.  There

3   was a client that he was disappointed he didn't get because

4   it was a client he used to work for.

5   Q.    Did he end up blowing the whistle?

6   A.    I'm sure he -- I don't know for sure, but I'm

7   assuming that he would have spoken to Travis who managed

8   the support team.

9   Q.    Okay.  Were you aware that sometimes your colleagues

10  had to conceal from clients that Rimini was short staffed?

11  A.    Well, there's always situations within companies

12  where resources are thin, and obviously you're not going to

13  make that obvious to your clients.  You're going to do your

14  best to satisfy their needs.

15  Q.    So is your answer, yes, you were aware that

16  sometimes your colleagues concealed from clients that

17  Rimini was understaffed?

18  A.    That resources were tight?

19  Q.    Mr. Benge --

20  A.    Yes, yes.

21  Q.    Okay.  So your testimony is yes, you were aware that

22  sometimes your colleagues concealed from clients that they

23  were understaffed?

24  A.    Yes.

25  Q.    All right.  Let's look at Plaintiffs' Exhibit 1599.

1           This is an email from Seth Ravin to Beth Lester,

2    George Lester, and Dennis Chiu from July 18th of 2008.

3           Mr. Ravin says --

4           MS. DUNN:  If we could see part of the body of

5    this email.

6    BY MS. DUNN:

7    Q.    Mr. Ravin says, "We have developed a resource

8    allocation challenge with technical PS resources."

9           That's at the top, top line.

10          So "technical PS resources," I presume, stands

11   for technical PeopleSoft resources?

12   A.    Yes, PS is definitely PeopleSoft.

13   Q.    And these are some of the resources that you would

14   have suggested doubling, you suggested needed to be doubled

15   when you spoke to Mr. Hampton; right?

16   A.    Yes.

17   Q.    Okay.  Mr. Ravin, it appears from this email, did

18   not think that hiring more people was the answer.  In fact,

19   he says,

20          "Hiring is always the easy answer, but we have

21   to limit headcount to get scale and profitability."

22          Do you see where he says that?

23   A.    Yes.

24   Q.    And during this time period, it was also very

25   difficult to find employees with enough experience; right?

2189

```
 1    A.    Like I said, it's always a challenge to find good

 2    people, but they're out there.

 3    Q.    You said, I think, on direct that 50 people might

 4    have their hands on an update?

 5    A.    Yes.

 6    Q.    And you also said on direct that for primary support

 7    engineers, that they have to have 10 plus years of

 8    experience, at least 10; right?

 9    A.    Generally, yes, we're looking for very experienced

10    individuals.

11    Q.    And you said on direct that they had to be seasoned

12    and experienced?

13    A.    Correct.

14    Q.    And we've heard that before in this trial.

15          So we've also heard that one of the reasons that

16    you want to have experienced people so you avoid taking the

17    time to train them; right?

18    A.    It definitely lessens the ramp-up time.  I mean,

19    learning a product as expansive as this can take years.

20    Q.    Right.  So that's very difficult.  You need people

21    with 10 plus years of experience, 50 plus people might have

22    their hands on any one update.

23          Did you account for this when you came up with

24    your number that these employees would need to be doubled?

25    Did you account for the difficulty in finding staff?
```

2190

1    A.    I assumed that we would be able to find them.

2    Q.    You assumed you would be able to find them?

3    A.    Yes.

4    Q.    Even though Rimini Street, in 2009, not in a

5    remote-only world, in fact doing very little remote-only

6    work, was overstretched, understaffed, to the extent it was

7    misrepresenting to customers that it didn't have enough

8    staff to do the work?  That's what you're saying?

9    A.    Yes.  I think you're misrepresenting a little bit

10   what we would say to clients.

11   Q.    Well, you agreed with me --

12   A.    But, certainly, you know, situations where we're

13   stretched, and you wouldn't necessarily make that obvious

14   to a client.

15   Q.    Okay.  Let's look at PTX 33.

16         So this is an email from Dennis Chiu, he's the

17   vice-president of support services, high up in the company,

18   to Michael Davichick and Seth Ravin, cc to Brian Slepko.

19         If we look at the body of the email, he's

20   talking about his discussions with a prospective customer,

21   somebody that they're trying to get onboard.

22         And he says -- Dennis Chiu says to Seth Ravin

23   and others,

24         "The other topic of importance was our bench

25   strength.  She," the client, potential client, "asked me

1     how many other people would be part of their support team,

2     leading me to tap-dance by telling her how important it was

3     to have Barb as the primary."

4              "She might have sensed I hedged at any firm

5     numbers."

6              "I told her that I understood and we'd make sure

7     they had all the help they'd needed from us since this was

8     the million dollar question that I didn't have an answer

9     to."

10             Mr. Benge, hopefully that clarifies for you the

11    situation.

12    A.    This was in relation to JD Edwards, it looks like,

13    not the product line that I work in, but, yes.

14    Q.    Well, the question that I had asked you was

15    whether -- and you agreed, was whether sometimes your

16    colleagues had to misrepresent to clients, obscure for them

17    that you didn't have enough people to do the work.

18    A.    Okay.

19    Q.    Okay?  What does okay mean?

20    A.    Yes.

21    Q.    Does that mean yes?  Okay.

22             And so when you came up with your number for

23    remote-only support that you gave to Mr. Hampton that he

24    used and relied upon for his damages number, you didn't

25    account for the fact that even when Rimini Street was not

2192

1    doing remote-only, was doing something easier and more

2    efficient than remote-only, they couldn't find enough staff

3    always to do the work?  You didn't account for that?

4    A.    We had adequate staff to get our updates out on time

5    and on schedule; never missed a delivery date.

6    Q.    Mr. Benge, we just saw three exhibits demonstrating

7    that Rimini Street was understaffed, and you agreed with

8    that.

9    A.    Were there times when I put in 12-hour days?  Yes,

10   absolutely.

11            Were we stretched?  Yes.

12            Did we work hard to make our deadlines and get

13   things done?  Yes, we did.

14   Q.    That's right.  You were stretched, and doubling the

15   number of all of those employees, particularly because you

16   would have needed to find people with 10 plus years of

17   experience so you would not have to train them, would have

18   been very difficult.  Is that fair to say?

19   A.    Difficult but certainly not impossible.

20   Q.    You never looked at that question, Mr. Benge.  You

21   would not know if it was impossible or possible; right?

22   A.    I felt like we could hire the resources we needed.

23   Q.    You felt like that?

24   A.    Yes.

25   Q.    Your feelings?

1   A.    Yes.

2   Q.    You felt like that again; right?  You never

3   investigated this?  You never looked into it?

4   A.    The resources are out there.  There's plenty of

5   agencies that would help us find them if we needed them.

6   Q.    You never looked into it?  You never investigated

7   it; right?

8   A.    Correct.

9   Q.    Thank you.  Okay.  Speaking of agencies that helped

10  you, let's talk about this.

11          So you told Mr. Hampton, the damages expert, and

12  Mr. Hilliard, the technical expert, that Rimini Street

13  likely would go offshore to find additional people rather

14  than hire people in the United States; is that correct?

15  A.    Yes.

16  Q.    And the experts depended on this for their

17  conclusions.  Are you aware of that?

18  A.    Yes, I am.

19  Q.    Okay.  So they depended on you for your

20  representation that this labor, this pretty extreme

21  enhancement of labor, would be found offshore?

22  A.    Yes.

23  Q.    Okay.  So let's look at Plaintiffs' Exhibit 645.

24          COURTROOM ADMINISTRATOR:  This one's not in

25  evidence.

2194

```
1                  (Discussion held off the record.)

2                       MR. RECKERS:  No objection.

3                       THE COURT:  It's admitted.

4                  (Plaintiffs' Exhibit 645 received into

5             evidence.)

6                       MS. DUNN:  Thank you, Your Honor.

7      BY MS. DUNN:

8       Q.    All right.  So let's look up at the top.

9                  So this is an email from what looks like

10     April 8th of 2008 from Dennis Chiu, again, Dennis Chiu is

11     the vice-president of support services, to Thomas Shay, who

12     is one of the founders of Rimini Street, high up in the

13     company, cc Brian Slepko and George Lester, and the subject

14     is Prashant and Krishnakanth of Second Foundation.

15                 And so my understanding is that Second

16     Foundation was an agency that helped Rimini Street find

17     people to work for Rimini Street in India.  Am I right

18     about that?

19      A.    This email is from before when I started, but I am

20     aware of Second Foundation, and we did have people from

21     Second Foundation that worked for us, yes.

22      Q.    So I want to make sure when we talk about this we

23     all know what we're talking about when it says Second

24     Foundation.

25                 All right.  So if we could blow up this email.
```

1                This email is talking about one specific

2      employee who is working for Rimini Street in India, and the

3      employees name is Krishna, and it's talking about what

4      Rimini Street is going to pay Krishna.

5                And it says,

6                "The original rate of $26 an hour was based on

7      our original contract from June 2007.  Since then, the

8      competitive IT market in the offshore workforce has driven

9      wages up considerably such that candidates with even less

10     experience than Krishna's are commanding upwards of 29 to

11     $32 an hour."

12               Mr. Benge, when you told Mr. Hampton and

13     Mr. Hilliard that the additional employees would come from

14     India, were you accounting for the competitive IT market in

15     India?

16     A.   I wasn't thinking about salaries or wages at all.  I

17     was just -- I knew that we would utilize offshore resources

18     to the extent that we could.

19               The cost is obviously less, and we had been

20     having good experience with finding qualified candidates

21     there to help us.

22     Q.   So is the answer to my question, no, you did not

23     account for the competitive IT market?

24     A.   No.

25     Q.   All right.  So let's keep going.

1               "That's also led to larger gaps in qualified

2      candidates for this role, as well as retention of these

3      candidates, as we had seen with some prior candidates."

4               Did you account for the gaps in qualified

5      candidates?

6      A.    We haven't had an issue with finding qualified

7      candidates in Rimini Labs or offshore.

8      Q.    Mr. Benge, again, here, I'm just asking you whether

9      you accounted for this.

10              Did you account for it?  When you told

11     Mr. Hilliard and Mr. Hampton that the labor would come from

12     India, did you account for gaps in finding qualified

13     candidates, for how hard it would be to find qualified

14     candidates?

15     A.    No, I assumed we'd be able to get the candidates.

16     Q.    Okay.  Thank you.

17     A.    We would find qualified candidates.

18     Q.    Okay.  So then -- let's go to the paragraph that

19     says, "The concern I have."

20              "The concern I have is that if we make an

21     increase to the minimum market rate for offshore IT talent,

22     Krishna will not remain in his contract with us, leaving us

23     to seek other replacements, that will not be any cheaper or

24     will not be able to contribute to the same level of

25     performance due to their lack of experience that Krishna

1    already demonstrates."

2            Mr. Benge, this email is about one offshore

3    employee and how hard it would be to retain him and afford

4    others.  Do you agree with that?

5    A.    Yes.

6    Q.    So when you're talking about doubling PeopleSoft

7    developers, doubling quality assurance engineers, doubling

8    remote environment support staff, doubling the onboarding

9    staff, that's way more than just one person; right?

10   A.    Yes.

11   Q.    Okay.  But you didn't account for how competitive

12   the market was, you didn't account for the increased demand

13   in the market, you didn't account for the lack of qualified

14   candidates or the increase in their wages; right?

15   A.    I'm confident we could have found the resources, but

16   I didn't account for it.

17   Q.    You didn't account for that because this was based

18   again on your supposition, on your feeling; right?

19   A.    And experience and doing hires, yes.

20   Q.    Well, it turns out that Rimini Street's experience

21   is very different.  They were having a hard time retaining

22   and paying one individual.

23   A.    This was for a contract or another move we made

24   was -- this was before we had an actual operation in India

25   and were able to actually hire our own employees there.

1    Q.    Mr. Benge, the truth is, you don't have the

2    experience to have made this judgment.  That's the truth.

3    That's why you won't answer my question; right?

4    A.    I disagree with that.

5    Q.    Then answer my question.  Did you account for these

6    things?

7    A.    Based on my experience, I felt like we could find

8    the qualified candidates to double the staff.

9    Q.    This is something you looked into, you investigated

10   this before you gave your number to Mr. Hampton?

11   A.    Maybe not the level of investigation that you're

12   seeking, but, again, I felt like we would be able to find

13   the candidates to --

14   Q.    Mr. Benge, you already told me that you didn't

15   account for the competitive market.

16         You didn't account for the fact that it's hard

17   to find qualified candidates.

18         You didn't account for increased demand or how

19   hard it would be to pay these people.

20         You already testified to those things.

21   A.    Correct.

22   Q.    Right.

23         Okay.  All right.  So as you probably know,

24   Oracle is alleging that Rimini Street began building its

25   business through copyright violations beginning in 2006.

1          Before you talked to Mr. Hampton, you did not

2    analyze whether a remote-only model would have been

3    feasible in 2006 or 2007; right?

4    A.    My opinion was that it would have been feasible

5    based on my experience and having, again, worked with the

6    remote clients we had.

7    Q.    Mr. Benge, this might be a good time for me to

8    remind you that you're testifying under oath today.

9    A.    Yes, I understand that.

10   Q.    Okay.  And you know that in your deposition you also

11   testified under oath; right?

12   A.    Yes.

13   Q.    And you never discussed 2006 or 2007 with

14   Mr. Hampton, did you?

15   A.    No, and that's before I started at the company as

16   well.

17   Q.    That's right.  And you never discussed it.

18   A.    No.

19   Q.    Okay.  So if he's drawing any conclusions about 2006

20   and 2007, that's not based on information he got from you?

21   A.    No.  We would have had a very small -- I think we

22   only had one client in 2006.

23   Q.    We're going to talk about that too.

24          But I just want to make clear, if Mr. Hampton

25   has any information about 2006 or 2007, that did not come

2200

1    from you; right?

2    A.    Correct.

3    Q.    And at your deposition when you were asked about

4    this, you said that your conclusion about number of

5    employees was reached by focusing on the current situation;

6    right?

7    A.    Yes.

8    Q.    Okay.  And you were asked about actual numbers in

9    2009 during your deposition, and you said, "I was focused

10   on the current situation."  Right?

11   A.    Yes.

12   Q.    Okay.  And that meant 2012 when your deposition was

13   taken?

14   A.    Yes.

15   Q.    Right.  You were also asked whether your numbers --

16   you had given numbers about 2008.  Do you remember that?

17   A.    Yes.

18   Q.    And again there you said, "I was thinking about the

19   current situation."  Right?

20   A.    Yes.

21   Q.    Okay.  And, again, that meant 2012.

22   A.    Yes, I believe so.

23   Q.    Okay.  So when your counsel examined you today, and

24   he said you looked at this from the beginning, that wasn't

25   the case, was it?  You were focused on the current

```
 1    situation, which meant 2012; right?
 2    A.    I had a lot more clients in 2012 --
 3    Q.    Mr. Benge, I'm asking you, today when you said when
 4    you produced these numbers you were focused on from the
 5    beginning, that's not true because what you were focused on
 6    was the current situation, which is 2012.  From the
 7    beginning would have been 2006.  Is that right?
 8    A.    That's right.
 9    Q.    All right.  So we've covered 2008, 2009, 2006, 2007,
10    and we know that you didn't -- that you weren't looking at
11    those.  How about 2010?
12    A.    Again, my estimate on this was that it was going to
13    take double the resources for development --
14    Q.    I'm just asking you about 2010 --
15    A.    -- at this point in time.  Double the resources --
16    Q.    Is the answer to 2010 the same as the answer to
17    2006, 2007, 2008, and 2009?
18    A.    My answer would apply across the years.
19    Q.    Across all the years.  So that would include 2010
20    and 2011?
21    A.    Yes.
22    Q.    Right.  Okay.
23          All right.  So let's focus, then, a little bit
24    on 2006 and 2007.
25          The first time that you even considered that
```

2202

```
 1    question was in the middle of your deposition when you were
 2    asked about it; right?
 3    A.    Of level of effort it would take to get a
 4    remote-only model?  Obviously I put thought into it before
 5    the deposition.
 6    Q.    That's not what I'm asking.
 7          You were asked specifically about 2006 and 2007.
 8    You said you hadn't considered it.
 9    A.    Right.
10    Q.    Right.
11          Okay.  What you did say, though, is that in 2006
12    the City of Flint was the only client that Rimini had.  Do
13    you remember saying that?
14    A.    Yes.
15    Q.    And you said that again today.
16    A.    Correct.
17    Q.    Okay.  Mr. Benge, that is not true.  Let's look at
18    the demonstrative if we could.
19          So this is a list of the 13 customers who
20    started at Rimini in 2006 with local environments.  So
21    that's more than one; right?
22    A.    Yeah.  This is news to me.  And I see clients on
23    here that I don't recognize at all.  So it's possible -- I
24    don't know, maybe some of this was other product lines or
25    something.
```

1          It was my understanding that City of Flint was

2     the first PeopleSoft client we had in 2006.

3     Q.    Well, that's not true either, actually.  I think

4     it's called ENSCO is the first PeopleSoft customer, and

5     there are six PeopleSoft customers on this list.

6          So they're not customers out of your product

7     line, they're customers within your product line.

8     A.    Again, this is, you know, two years before I started

9     there.  But, you know, what I had heard was City of Flint

10    was the first that we had supported for PeopleSoft.

11    Q.    Okay.  So whoever told you that must have been

12    mistaken because obviously --

13    A.    Or this is inaccurate.  One of the two.  I can't

14    say.

15    Q.    Okay.  So let's put up 2007.

16         So here's the list of the 29 customers who

17    started at Rimini in 2007 with local environments, and here

18    there are 24 PeopleSoft customers in case you're curious

19    about that.

20         Do you know about this?

21    A.    This list?  I recognize many of the client names,

22    yes.

23    Q.    So I -- these lists, by the way, are stipulated to

24    by the parties.  That means that the parties agree --

25    A.    Okay.

1     Q.    -- that this is the case.  So do you also agree?

2     A.    Yes.

3           MR. RECKERS:  Objection.

4           THE WITNESS:  Like I said, I recognize many of

5     them here on this list, but this is getting closer to when

6     I started at the company.

7     BY MS. DUNN:

8     Q.    Okay.  So when you said that the City of Flint was

9     the only PeopleSoft customer, or the only customer Rimini

10    had in 2006, when you told the jury that today, that wasn't

11    true; right?

12    A.    I thought it was true.  You've just corrected me.

13    Q.    Right.  And when you, in your deposition, talked

14    about the fact that you based your thoughts and feelings

15    about 2006 on this assumption that you only had one

16    PeopleSoft customer, that was a bad assumption that you

17    made.  That was wrong; right?

18    A.    Based on --

19          MR. RECKERS:  Objection, foundation, Your Honor.

20    He doesn't know anything about these lists.  He's testified

21    to that.

22          MS. DUNN:  Your Honor, I'm asking --

23          THE COURT:  Overruled.  He's testified to that.

24    She's entitled to cross-examine his answer.

25

1    BY MS. DUNN:

2    Q.    Do you need to --

3    A.    The question again?

4    Q.    Yes.  So in your deposition, when you said that the

5    reason that part of your conclusions about 2006 and 2007

6    were based on the fact that you really didn't have many

7    customers then, and City of Flint was the only customer

8    Rimini had in 2006, that was incorrect; right?

9    A.    Yeah.  That is what I said in my deposition, I

10   believe, yes.

11   Q.    That City of Flint was the only Rimini Street

12   customer?

13   A.    Yes.

14   Q.    Right.  So any assumptions that you made or

15   conclusions would have been wrong?

16   A.    Again, I'm not intimately familiar with the client

17   list for the period prior to when I started.

18   Q.    Right.  You weren't familiar, so whatever

19   conclusions you drew based on that assumption would have

20   been wrong and based on a faulty assumption; right?

21   A.    For that period.

22         But, again, you know, I stick by my -- what I

23   said, that doubling of resources would have taken care of

24   it.

25   Q.    Right.  But, Mr. Benge, I think you'll appreciate,

1    and I'm sure the jury appreciates that your assumptions

2    that led to that conclusion are very important.

3    A.    Sure.

4    Q.    And so when we've discovered in your testimony

5    today, like right now, that they're faulty assumptions,

6    that matters.  Do you understand that?

7    A.    Yes.

8    Q.    Okay.  So, so far we've primarily been speaking

9    about the number that you gave Mr. Hampton so that he could

10   calculate that low damages number.

11           And I'd like to switch gears a little bit and

12   talk about what actually happened during 2006 to 2011.

13           So again here we're talking about what did

14   Rimini Street actually do between 2006 and 2011.  Okay?

15   I'm not asking you here what you knew in 2012.  Do you

16   understand that?

17   A.    Yes.

18           MS. DUNN:  Okay.  All right.  So let's put

19   Plaintiffs' Exhibit 62 on the screen, and if we could just

20   blow up the top so we can see what this is.  This is -- you

21   saw this on direct.  Your counsel asked you about this.

22           Oh, again.

23           Your Honor, I move to admit.  I understand

24   there's no objection.

25           COURTROOM ADMINISTRATOR:  It's in.

```
 1                MR. RECKERS:  No objection.

 2                MS. DUNN:  Thank you.

 3                Okay.  So I think -- let's go down to his email.

 4    BY MS. DUNN:

 5    Q.    So this is an email that you sent to Brian Slepko

 6    about remote versus internal environments.

 7    A.    Yes, that's correct.

 8    Q.    Right.  And so, actually, before you write your

 9    email, Slepko says,

10                "Jim," meaning you, "I'm having a heated

11    discussion with the JDE guys about remote versus internal

12    environments and I'm hoping you can provide a few bullet

13    points about why remote environments are a pain to work

14    with.  Nothing detailed."

15                You write, "Perfect timing.  Sara is stuck with

16    system testing on ConAgra Foods because we can't get into

17    their remote environment."

18                "It's going on three hours now and we haven't

19    reached out to the client yet."

20                I should also say this email is from November of

21    2009; right?

22    A.    Yes.

23    Q.    So at the time you got this email, you're in the

24    midst of having a problem with a remote environment.

25    A.    Correct.
```

2208

1    Q.    Not atypical; right?

2    A.    Not entirely uncommon, no.

3    Q.    Not uncommon.  And it was taking hours to resolve?

4    A.    Uh-huh.

5    Q.    And it says you hadn't even told the client yet,

6    even though the work is taking them -- the work for the

7    client is taking hours to resolve.

8          Were you keeping it from the client?

9    A.    No, none at all.  I think the issue here -- let me

10   read this again.

11         So Sara logged the high priority environment

12   ticket at 7:38.  Ed Freeman picked it up at 10:45.  Looks

13   like maybe Ed picked up the ticket but hadn't reached out

14   to the client to get it resolved yet.  He may have been

15   busy with another issue or something.

16         But, you know, these types of things, sometimes

17   they take time, a matter of getting ahold of the client

18   and getting --

19   Q.    Wait.  I'm sorry.  You said it's a matter of getting

20   ahold of the client?  Is that what's going on here?  I

21   don't see that.

22         This just said you hadn't even told the client

23   yet.  You haven't even reached out to the client.

24   A.    Yeah.

25   Q.    It wasn't a problem of getting ahold of the client,

1    you hadn't even tried to find the client.

2    A.    Yeah.  It sounds like Ed had picked it up, maybe it

3    got assigned to him, but he hadn't reached out to the

4    client yet, yeah.

5    Q.    Right.  So it wasn't -- you weren't having a problem

6    getting ahold of the client, you hadn't tried to tell the

7    client.

8    A.    Yeah, the same sort of issue could have happened

9    with an in-house issue.

10   Q.    All right.  Let's move on to some of the challenges

11   that you described.  I know you went through these with

12   your counsel, so we're not going to belabor them.

13        You also say these are the key challenges.

14   Presumably that means these aren't even all the challenges.

15        But one of the problems is you have to rely on

16   the client to start and stop the servers.  Right?

17        You have to coordinate backups and restores with

18   the clients.

19        Sometimes you can't even take care of simple

20   issues like extending the tablespace.  And I won't even ask

21   you what that is.

22        Sometimes the clients won't even give you access

23   that let you in and out of the environment.

24        There are security headaches, which we'll talk

25   about in a little bit.

1                    No two remote environments are alike, which is

2          very different from in-house environments when you can, you

3          know, clone and replicate.

4                    There are challenges with automation, and there

5          are performance issues.  Right?

6                    These are all the challenges.  These are just

7          some of the key challenges that you identified --

8          A.    Yes.

9          Q.    -- right?  Okay.

10                   Down here under Performance, you say,

11                   "With many of our remote environments, we've

12         experienced horrible performance (e.g., Metro Vancouver).

13         A.    Uh-huh.

14         Q.    And Metro Vancouver came up on direct also; right?

15         You remember your counsel asked you about this?

16                   And what you said is that -- while this email is

17         in November of 2009, you told your counsel that you had

18         been able to solve the problems with remote environments,

19         the ship in a bottle, in a bottle, in a bottle problem,

20         that you had been able to solve that by 2011; right?

21         That's what you told your counsel?

22         A.    I wouldn't say it was solved for all environments,

23         but, certainly, you know, we had determined better remote

24         access methodologies.

25                   And some clients we didn't have performance

2211

1    issues with.  Some remote clients we didn't have

2    performance issues with.

3    Q.    Okay.  When you say "some," what do you mean?  You

4    use the word "some" a lot, and it's not a specific number.

5    What does "some" mean?

6    A.    Well, I could probably count on one hand the number

7    of environments that we had really bad performance issues

8    with, Metro Vancouver being one of them.

9    Q.    Okay.  When you say, you know, "we didn't solve this

10   for all clients, we solved it for some clients," I --

11   A.    Some of them we didn't have the problem to begin

12   with, right?  Once it was -- when an environment came

13   onboard, it was fine from the get-go.

14   Q.    But, Mr. Benge, we're going to see a lot of

15   documents where Rimini Street employees are complaining

16   about having trouble with remote environments.  It's very

17   well established that they were difficult.

18   A.    Yes.

19   Q.    So what I'm asking you is something different, which

20   is you used the word "some."  And it would be good to know

21   when you say "some" whether you have an actual number in

22   mind.

23   A.    No.

24   Q.    No.  No mathematical calculations, just --

25   A.    No, I -- just -- if I was to throw a number out

2212

1    there, I would say, again, maybe we had performance issues

2    with, you know, less than 10 percent of the remotes.

3    Q.    Okay.  I don't -- we don't want you to throw any

4    numbers out.  I think --

5    A.    Well, I would have to sit down and go back and

6    analyze each and every one of our clients to give you a

7    concrete number, but we could come up with that.

8    Q.    So when you say "some," you don't really know;

9    right?  Is that --

10   A.    All I know is we definitely, definitely had remote

11   environments that we didn't have performance issues with.

12   Q.    As you sit here, when you say "some," you don't

13   really know what that means as far as numbers; right?

14   A.    Concrete number, no.

15   Q.    Right.  Okay.

16   A.    I don't have an exact count, no.

17   Q.    Let's talk about Metro Vancouver.

18         Metro Vancouver is creating horrible performance

19   problems in 2009, and you testified earlier that you solved

20   these problems for some clients by 2011.

21         So if we could look at --

22         MS. DUNN:  Has this been marked as an exhibit?

23         COURTROOM ADMINISTRATOR:  It says 5516 at the

24   bottom.

25         MS. DUNN:  All right.  Your Honor, we move to

2213

```
 1    admit Exhibit 5516.
 2              MR. RECKERS:  No objection.
 3              THE COURT:  It's admitted.
 4          (Plaintiffs' Exhibit 5516 received into
 5          evidence.)
 6    BY MS. DUNN:
 7    Q.    So, this is an IM exchange between somebody named
 8    Kimberly Martinez, Kimberly2299, and somebody unknown, who
 9    works in quality assurance.
10              And if you go several lines down from the top,
11    Kimberly2229 says,
12              "I haven't gotten very far yet.  Still working
13    on stupid MVC."
14              MVC stands for Metro Vancouver; right?
15    A.    That's correct.
16    Q.    Okay.  So this is email -- or this IM is from
17    October of 2010, and it sounds like the team had not gotten
18    very far in fixing the problem.
19    A.    We hadn't addressed it with Metro Vancouver.  They
20    ultimately went inactive.  They are no longer a current
21    client with us.
22    Q.    Okay.  So it wouldn't be your testimony, then, that
23    this problem had been solved by 2011; right?
24    A.    Not for that particular client, certainly.
25    Q.    Okay.  Let's talk, then, about -- you talked a lot
```

2214

1    about security in your direct examination.

2                One of the issues with remote environments and

3    security is that customer networks are configured

4    differently, and so remote access has to be configured

5    differently for different customers; right?

6    A.    Yes.

7    Q.    So you would say -- I presume one size does not fit

8    all.  Would you say that?

9    A.    That's true.  Different clients will use different

10   software packages, you know, from Sysco or Juniper

11   Networks, or, you know, multiple companies, multiple

12   different access methods.

13   Q.    Right.  And to have a remote environment, Rimini has

14   to go through a customer's firewall, is that --

15   A.    Yes.  And there's a couple of ways that that can be

16   accomplished.

17   Q.    Okay.  So if you go through the firewall, then

18   Rimini has access to customer data; right?

19   A.    Not -- not -- if they set things up properly, we

20   shouldn't have access to production, we should have access

21   to a portion of their network that's dedicated for the

22   environments that we're using for development and testing.

23   Q.    Okay.  But some customers limited access to Rimini

24   Street sometimes saying only one employee could have access

25   to an environment at a time or limiting to specific people,

1    right, for security reasons?

2    A.    Yes.

3    Q.    And sometimes Rimini Street didn't even have access

4    to the entire environment for these security reasons;

5    right?

6    A.    In some cases, yes.

7    Q.    Right.  And sometimes Rimini Street for security

8    reasons on the customer's behalf, customer said you can't

9    have any access at all; right?

10   A.    I can't think of any payroll clients that -- all

11   payroll clients that we've supported we have access either

12   to in-house or to a remote environment.

13   Q.    Right.  But I think even in your deposition you

14   acknowledge that some clients didn't want Rimini to have

15   access for security reasons?

16   A.    Are you referring to remote access?

17   Q.    Correct.

18   A.    Yes.

19   Q.    Yes.

20         Okay.  You talked, and your counsel asked you

21   about holistic security.  Mr. Ravin testified last week

22   also about this concept of holistic security.

23         And he agreed that holistic security means don't

24   put security in the software, just put it in the firewall

25   at your place of business.

2216

1          That was a question, and he said yes.  Do you

2    agree with that?

3    A.    I think holistic security, you have to have security

4    at every level.  I think that people and process are very

5    important, but obviously you wouldn't completely overlook

6    security at every layer, including the application.

7    Q.    I'm just asking whether you agree with what

8    Mr. Ravin agreed with, which is that holistic security

9    means don't put security in the software, put it in the

10   firewall at your place of business.

11          Do you agree with that?

12   A.    I disagree a little bit because you would have it in

13   both.  You'd want to put -- you'd definitely want to have

14   good firewall security, but you would still have

15   application level security.

16          There's no taking the application security out

17   of PeopleSoft.  It's built into it.  It's part and parcel.

18   It's there.

19   Q.    So was Mr. Ravin wrong when he said that?

20   A.    Maybe taken out of context, or words were

21   misconstrued.

22          But I think what he was probably trying to get

23   at was that, again, holistic security, you look at all of

24   the aspects of security.  One layer isn't all you look at.

25   You have to look at the big picture.

2217

1    Q.    We're just talking about two different things.

2          One is security in the software, and the other

3    is telling the customer that it's up to them in their

4    firewall, and Mr. Ravin said you tell them it's up to them

5    and their firewall.

6    A.    Not entirely.  That's one aspect of it.

7    Q.    Okay.  So it sounds like you might disagree with

8    him?

9    A.    Slightly.

10   Q.    Do you agree with him that Rimini Street cannot

11   provide security updates?  It's not possible for Rimini

12   Street to provide updates for Oracle software because they

13   don't have access to the source code?

14   A.    We can provide security updates to the PeopleSoft

15   application, not to the PeopleTools where we don't have the

16   source code.

17         But at the application layer, we can provide

18   security updates to things like -- you know, maybe there's

19   an issue on the pages related to user profiles or roles or

20   permission lists.  Those are things that we can address.

21   Q.    So Mr. Ravin was wrong when he said it's not

22   possible to provide security updates.

23   A.    He may have been referring to the PeopleTools layer,

24   not the application layer.

25   Q.    But between 2006 and 2011 Rimini did not offer

2218

1    security updates --

2    A.    We haven't had a client --

3    Q.    -- you would agree with that; right?

4    A.    True.  We haven't issued any security patches, we

5    haven't had clients that have reported security issues to

6    us.

7    Q.    Right.  So if Rimini Street says it provides a

8    replacement for vendor-level support, which usually

9    includes security updates, you would agree that Rimini

10   Street did not provide those?

11   A.    Not at the tools layer.

12         In our contract with our clients, it's very

13   clear that we can't provide updates to the tools layer

14   because we don't have the source code for that.

15   Q.    Mr. Benge, I'm not talking about the tools layer.

16   I'm talking about, between 2005 and 2011, Rimini Street did

17   not offer security updates.  The CEO of the company agreed

18   with that.  Do you disagree?

19   A.    If there had been an issue reported at the

20   application layer, we could have been able to address it.

21   Q.    Did Rimini Street offer security updates?

22   A.    We could at the application layer where we had the

23   source code, but not at the tools layer where we didn't

24   have the source code.

25   Q.    Okay.  What you could have done and what Rimini

2219

```
 1    Street offered to its customers, and what the CEO thinks it
 2    offered to its customers, is something different.  You
 3    didn't offer those security updates, Mr. Benge, did you?
 4    A.    Again, we didn't have occasion to.  But if a client
 5    called with an application security issue, we absolutely
 6    could have helped them with it, or at a minimum the support
 7    team can help mitigate issues, even --
 8    Q.    Mr. Benge, I really don't know why this is so
 9    difficult.  Did you offer the security updates?  Yes or no?
10    A.    If a client called and had an issue with the
11    application layer, we would have helped them with it, yes.
12    Q.    I understand you're saying you could have, but you
13    didn't, right?
14    A.    Because there was no request for that service.
15    Q.    Right.  You didn't do it.  Did you do it?
16    A.    Only -- the only reason I'm saying no is because
17    there wasn't a request from a client to do it.
18    Q.    Okay.
19            Okay.  So Jeff Allen is a senior PeopleSoft
20    developer; right?
21    A.    Yes.
22    Q.    Smart guy, generally?
23    A.    Eccentric, yes.
24    Q.    Is he also -- you respect him, he's intelligent?
25    A.    Yes.
```

1    Q.    Okay.  So, like you, Jeff Allen has been at Rimini

2    Street since 2008, he also used to work at PeopleSoft and

3    then at Oracle; right?

4    A.    I don't remember his previous employment.

5    Q.    Okay.  Fair enough.

6          Let's look at Plaintiffs' Exhibit 51, and this

7    is -- the jury has seen this a few times.  This is Jeff

8    Allen's weekly report about -- speaking about remote

9    environments.

10         And if we could just go to the part where he

11   says, "We really need to stop adding any new remotes and

12   wherever possible bring them in-house."

13         Do you see that?

14   A.    Yes.

15   Q.    Okay.  And then this is the part that is now

16   infamous in this case, the building a ship in a bottle, in

17   a bottle, in a bottle problem; right?

18   A.    Yes.

19   Q.    And he goes through, as you did, in that exhibit we

20   saw earlier, the numerous problems that Rimini Street

21   engineers and others had with remote support; right?

22   A.    Correct.

23   Q.    Okay.  So we've already been over that.  I won't go

24   over them again.

25         I would just draw your attention to his

1    conclusion at the bottom of this email, where -- sorry, at

2    the bottom of this report which says, "effort applied to

3    eliminate remotes."

4          So it seems like even at the date of this report

5    in 2009, people are talking about eliminating remotes.  Is

6    that fair?

7    A.    Yes.  We never did eliminate that as an option,

8    though, for our clients.

9    Q.    Right.  When Mr. Ravin was shown this document, and

10   he was asked about the ship in a bottle, in a bottle, in a

11   bottle problem, his response was that doesn't mean

12   anything, that's simply an engineer's commentary.

13         Mr. Ravin was pretty dismissive of that, wasn't

14   he?

15   A.    I think he was accurate.  I mean, it's a technical

16   problem that can be solved by technical people.  Get the

17   remote architect set up properly.  Essentially do it right

18   when the client comes onboard.

19   Q.    That's just what the engineers think.  That's the --

20   is that management's view?  That's just the engineers?

21   A.    Well, certainly, I think that the problem we had

22   with Metro Vancouver is a technical problem and one that

23   could be solved by the technical staff.

24   Q.    This is talking about more than Metro Vancouver, and

25   what I'm actually asking you about is the reaction to this,

```
 1    which is to take the engineers who worked on these things

 2    and who are raising concerns to management, and say, you

 3    know, that's just an engineer's commentary.

 4            Do you agree with that?

 5    A.    Some of this, yeah, this is just commentary.  I will

 6    admit that he was probably the squeakiest wheel on the team

 7    when it came to his frustration with remote environments.

 8    Q.    All right.  Let's go to page 2.

 9            So just -- Jeff Allen also says this, which you

10    might find very interesting.  He says,

11            "Time required by staff to complete the task on

12    a remote environment is generally three times that required

13    for one in-house."

14            So Jeff Allen is saying it takes three times to

15    do in remote environments what you do in in-house

16    environments.

17            He has just as much experience as you working

18    with the software, but you said two times; is that right?

19    A.    Yes.  That was his opinion at the time.  I also know

20    that we have another email from him where he said 10

21    percent more.  So --

22    Q.    Right.  Did you talk to him before you formulated

23    your number?

24    A.    Again, it's difficult to recall.  I talk with all

25    our developers on a daily basis, but, no, I don't think I
```

2223

1    sat down with him specifically when formulating the

2    estimate for --

3    Q.    Even though he was the squeakiest wheel?

4    A.    No, I had read all of his status reports.  I was

5    well aware of his opinions.

6    Q.    Yeah, and it turns out your number might not have

7    been so conservative; right?  Because he's saying three

8    times.

9    A.    The only place that I can think of where we have a

10   number like this is in this one exhibit.

11            I just said that the only place that I've seen

12   this three times estimate is in this one status report.

13   I've never seen that estimate anyplace else.

14   Q.    But Mr. Allen's number is from before this

15   litigation; right?

16   A.    It was.

17   Q.    Yeah, and it's not a product of conversations with

18   lawyers; right?

19   A.    It's one developer's opinion on a team, not in

20   management, not -- yes.

21   Q.    All right.  So we discussed just last week how

22   Mr. Ravin was dismissing these concerns as not meaning

23   anything, and you have agreed with that.

24            Let's look at Plaintiffs' Exhibit 478 which is

25   an email from you to Mr. Ravin, and, actually, if we can

2224

```
 1      start with Mr. Ravin's email to you on page 3.

 2                So he's saying -- starts with, "Hey, Jim."

 3                Mr. Ravin says,

 4                "I'm concerned about what seems to also be a

 5      growing number of quality assurance issues."

 6                He's raising this concern with you.

 7                You respond in an email, if we can go to page 2,

 8      to Mr. Ravin, and you say, "I'm sure you understand that

 9      we're stretched."

10                This is in 2008.

11                And a few paragraphs down you specifically

12      identify one of the reasons that you're stretched as being

13      remote environments, and you say,

14                "Remote development has been a thorn in our

15      side."

16      A.    I also go on to say, "Some remote development

17      environments are acceptable."

18      Q.    I understand that.  I'm asking you specifically

19      about this part where you say,

20                "It's not an efficient way to do development and

21      we lose consistency with all of these different remote

22      environments."

23                So now it's not Jeff Allen, an engineer, telling

24      Mr. Ravin about these problems, it's you --

25      A.    Yes.
```

2225

1    Q.    -- his vice-president for PeopleSoft Development,

2    part of management.  You're raising your concern.  Is that

3    fair?

4    A.    For some environments, yes.

5    Q.    Right.  All right.  So let's look at Mr. Ravin's

6    response to you.

7            He says he certainly appreciates the pressure

8    cooker you're in, and then in the next sentence he says

9    what I can only really summarize it saying suck it up.

10           He says, "As you know, all these issues are our

11   burden to bear."

12           And nowhere in his email does he address your

13   concern, a management concern, at going -- the engineer

14   concerns, about remote environments; right?  He doesn't

15   address that?

16   A.    We're all doing the best we can getting done what we

17   needed to do --

18   Q.    Mr. Benge, does he address your concern in the

19   email?

20   A.    He talks about get additional dev track licenses

21   approved.

22           "What else can we fast-track for you that will

23   help here?  Just name it and we'll get it."

24   Q.    Right.  No mention of remote environments.

25           All right.  So let's look at what you do with

1    this email.  You send it to Dennis Chiu.

2              "My exchange with Seth," dot dot dot.

3    A.    Yeah, just filling Dennis in on --

4    Q.    It doesn't sound like you found his response very

5    satisfying.

6    A.    Just informing him of the conversation that I had.

7    Q.    Right.

8              Okay.  All right.  So we saw earlier the email

9    from Ed Freeman where he says that remote environments are

10   insane and to fire up business models to offer them.

11             Let's look at Plaintiffs' Exhibit 18 which also

12   discusses Rimini Street's policy with regard to remote

13   environments, and if we could start with page 2.

14             COURTROOM ADMINISTRATOR:  That one is

15   preadmitted.

16   BY MS. DUNN:

17   Q.    Beth Lester is writing to Seth Ravin.

18             If we could go a little bit down,

19             "It's still unclear to me where Moraine," that

20   means Moraine Park, they're a customer, "got the idea that

21   remote development is one of our service options."

22             So remote wasn't supposed to be an option, and

23   this email -- basically what happened is the salespeople

24   messed up and they promised something they shouldn't have

25   promised.  Is that right?

2227

1           If you want to take a moment to look at it.

2     A.    I don't know if that's true or not.  Again, this is

3     from before I started at the company.  I haven't seen this

4     email before, so I don't know.

5     Q.    So Seth Ravin writes back cc'ing some of the folks

6     high up in the company.  He says,

7           "We have to resolve ignorance on these options

8     on the part of the sales team."

9           So the sales team obviously promised something

10    they shouldn't have promised.

11          But lower down he says,

12          "We'll do this because we must get a reference

13    from Moraine Park."

14          So the references were very important.  You know

15    about that; right?

16    A.    Sure.  Good references are an important --

17    Q.    So they're willing to make an exception because they

18    need the reference, and then Mr. Ravin articulates what the

19    policy of Rimini Street actually is.

20          "The remote deal," he says -- I think that's a

21    little farther down --

22          MR. RECKERS:  Objection, foundation, Your Honor.

23    He testified he has not seen this document.

24          THE COURT:  She hasn't asked the question yet.

25    I'll allow her to do that.

1          MS. DUNN:  One more paragraph down from where

2    you were, Matt.

3    BY MS. DUNN:

4     Q.    He says,

5              "The remote deal is not intended to be any kind

6    of strategic change of model but a one-off project that we

7    will try to minimize as a last resort for other client

8    opportunities."

9              Do you see that?

10    A.    Yes.

11    Q.    So the truth is Rimini wanted to take this away as

12    an option; right?

13             MR. RECKERS:  Same objection.

14             THE COURT:  Overruled.

15             THE WITNESS:  I wouldn't know.  Again, I wasn't

16    present at that time in the company.  I do know we added

17    remote clients later on when I was there.

18    BY MS. DUNN:

19    Q.    All right.  Let's go then to Plaintiffs' Exhibit 52,

20    which is from February of 2009 when you were there.

21    A.    Yes.

22    Q.    Right?  You were there in 2009?

23    A.    Yes.

24    Q.    Okay.  So here it says -- this is an email from

25    Brian Slepko.  Jeff Allen and Dennis Chiu are on this

1  email.

2          And then the second paragraph says,

3          "We have instructed the sales team to push as

4  hard as possible back on any prospects that want to

5  consider remote and are trying to take it away completely

6  as an option."

7          So this is from a time when you were there, and

8  this email is from Brian Slepko.

9  A.    Yes.

10  Q.    And he had a pretty high up position in the company,

11  didn't he?

12  A.    Yes.

13  Q.    What was his position?

14  A.    I think he was group vice-president?  I may be

15  wrong.  I'm sorry.  I don't recall.

16  Q.    Okay.  So when I ask you whether there were

17  conversations about taking this away as an option by

18  management --

19  A.    At the time it was Senior Vice-President Global

20  Operations.  It's right there.

21  Q.    Right.  So if I ask you whether at this time in 2009

22  there were discussions by management about taking this away

23  as an option, the answer would be yes; right?

24  A.    There were discussions.  It was never taken away as

25  an option.

1   Q.    Right.  But that was -- management was discussing.

2   A.    There were discussions, yes.

3   Q.    Okay.  So that makes it a little bit more than just

4   some engineer, just what some engineer thought; right?

5   A.    Sure.  I mean, there's discussions here about

6   potentially taking it away as an option.  We never did.

7         Part of the reason why we pushed back and

8   preferred the in-house environments was just that we were

9   more efficient and effective in development.

10  Q.    Okay.  So the engineers didn't like them, they

11  caused delays, there were security problems, they caused

12  performance problems, and you were there at Rimini Street

13  when TomorrowNow shut down; right?

14  A.    Yes, I was.

15  Q.    Okay.  So even when TomorrowNow had to continue --

16  discontinue local environments, Rimini Street decided to

17  keep them going; right?

18         We're talking about local environments; right?

19  A.    Yes.

20  Q.    TomorrowNow had to shut down its local environments,

21  and at that time in 2008 Rimini Street decided to keep them

22  going; is that right?

23  A.    Yes.

24  Q.    All right.  And if we can just put up Exhibit --

25  Plaintiffs' Exhibit 30.

2231

1            So here, Mr. Ravin is talking to a customer,

2    prospective customer, and he's telling this person that

3    TomorrowNow is moving to remote environments, and he makes

4    clear that this is a ridiculous policy, and that Rimini

5    Street is not going to do that.

6            Do you see that?

7    A.    Yes.

8    Q.    Okay.  All right.  Let's move quickly, then, to

9    Plaintiffs' Exhibit 286 as redacted.  This was the

10    exhibit -- one of the exhibits that your counsel asked you

11    about in direct.

12    A.    Yes.

13    Q.    Okay.  So this is -- this document that we're

14    looking at has been redacted because the larger document

15    contains Oracle's source code; is that right?

16    A.    Yes, this -- this paragraph was originally developed

17    by PeopleSoft --

18    Q.    I'm just asking you if the larger document from

19    which this is redacted contains Oracle's source code?

20    A.    Yes.

21    Q.    Okay.  And source code is Oracle's intellectual

22    property.  You would agree with that?

23    A.    Yes.

24    Q.    All right.  So Oracle's code is protected by

25    copyright; right?

2232

1      A.    Yes.

2      Q.    And you said on direct that at Rimini Street the

3      developers worked with Oracle's code; is that right?

4      A.    Absolutely, yes.

5      Q.    Right.  And you said that they changed it; right?

6      A.    Yes.

7      Q.    And so that means that Rimini Street changed

8      Oracle's copyrighted code; right?

9      A.    Correct.

10     Q.    Okay.  And in order to do that you said Rimini had

11     to use Oracle's software; right?

12     A.    Yes.

13     Q.    Okay.  And then after changing it, you distributed

14     it to Rimini Street's customers?

15     A.    Correct.

16     Q.    Right.

17            All right.  Can we look at this confidentiality

18     box?  Do you see where it says confidentiality information?

19            "This module contains confidential and

20     proprietary information of Oracle; it is not to be copied,

21     reproduced, or transmitted in any form, by any means, in

22     whole or in part, nor is it to be used for any purpose

23     other than that for which it is expressly provided under

24     the applicable license agreement.  Copyright 2008 Oracle.

25     All rights reserved."

2233

1          Do you see that?

2     A.   Yes, I do.

3     Q.   Okay.  So you just testified that after Rimini

4     Street modified Oracle's code, it then distributed it to

5     customers.

6          So on this document at the top there's a file

7     path name, and the jury already knows that these three

8     letter combinations are abbreviations for customers, for

9     Rimini Street customers.

10         So looking at this, can you tell whether this

11    was distributed to multiple customers?

12    A.   Yes, it was delivered to multiple customers that

13    were on the 8.3 code line that had the same before version

14    of this program.

15    Q.   Right.  So the same version of this program, that

16    started with Oracle software changed by Rimini Street

17    developers, was distributed to multiple customers; right?

18    A.   Yes.

19    Q.   It looks like there are seven of those; right?

20    A.   Yes.

21    Q.   Mr. Benge, you knew that Rimini Street was using one

22    customer's environment to support other customers; right?

23    A.   Yes.

24    Q.   Did you ever think to say, hey, maybe we shouldn't

25    do this?

2234

1    A.    My thought was that we were, again, never giving a

2    client something that they hadn't already paid Oracle for.

3              No client was ever getting, you know -- like

4    Client A, if Client A was on a more recent tax update and

5    had received updates more recently from Oracle, and we had

6    another client with an older last tax update, we never had

7    cross-use there.  The client never received anything that

8    they weren't already entitled to, that they already had

9    license for.

10   Q.    So we already talked about the fact that the Court

11   found that Oracle's copyrights have been violated with

12   regard to PeopleSoft and Database.  And all I'm asking you

13   is whether you ever thought to say, hey, maybe we shouldn't

14   be doing this?

15   A.    I think we were very cautious in our approach and

16   trying to be very mindful of Oracle's intellectual property

17   rights and trying to do the right thing.

18   Q.    Right.  But now you're mindful of the Court's

19   ruling, and I'm just asking you whether you ever thought to

20   say, hey, maybe we shouldn't do this?  Yes or no?

21   A.    There are definitely occasions when --

22             THE COURT:  Mr. Benge, would you answer the

23   question, please.

24             THE WITNESS:  Yes.

25

2235

1    BY MS. DUNN:

2    Q.    You thought maybe you shouldn't do it?

3    A.    No.

4    Q.    Okay.  Now, you've answered basically the same

5    question yes and no.

6    A.    I'm sorry, you'll have to --

7    Q.    Here's what I'm asking you.  You knew that Rimini

8    Street was cross-using; right?  You knew this?

9    A.    I hadn't even heard the term cross-use prior to this

10   litigation.

11   Q.    You knew that Rimini Street was using one customer's

12   environment to produce updates for other customers?

13   A.    Yes.

14   Q.    Distributing them.  We just talked about that.

15   A.    Yes.

16   Q.    Okay.  And then I asked you whether you ever thought

17   to say, hey, maybe we shouldn't do that?

18   A.    Did I think that that was wrong?  No.  No.  My

19   answer's no.

20   Q.    Your answer before, though, two minutes ago, was

21   yes.  Do you remember that?

22   A.    I was confused by the questioning.  I'm sorry.

23   Q.    Okay.  So pick one.

24   A.    No.

25            MS. DUNN:  Thank you very much, Mr. Benge.

2236

1          THE COURT:  Redirect examination?

2                  REDIRECT EXAMINATION

3   BY MR. RECKERS:

4   Q.    Mr. Benge, Ms. Dunn asked you about your testimony

5   as to the percent of remote environments that had certain

6   concerns in the 2006 to 2011 timeframe.  Do you remember

7   that?

8   A.    Yes.

9   Q.    It seemed like you want to say more about the

10  performance issues in particular in your discussion of

11  Metro Vancouver.  So my question is, what percent of the

12  remote environments had the performance issues?

13  A.    I think it was relatively small.  You know, two or

14  three of them come to mind as ones that were troublemakers

15  for us, Metro Vancouver being the top one.

16  Q.    And by the end of the 2011, how many of the remote

17  environments had the performance issues?

18  A.    We hadn't really been focusing on trying to correct

19  the problems at that time.  You know, Metro Vancouver

20  continued to be a problematic client until the point that

21  they went inactive.

22          You know, I think if we were to move to a model

23  that was remote only, we would have focused a lot more on

24  addressing some of those challenges.

25          We had that big list of challenges.  I think if

```
 1    that was going to be the larger percentage of our clients,

 2    we would have worked to address those challenges.  Being

 3    just 20 percent, it wasn't a priority.

 4    Q.    Okay.  Ms. Dunn also asked you about the question of

 5    holistic security.  Do you remember that?

 6    A.    Yes.

 7    Q.    She asked you some questions about whether or not

 8    Rimini could, indeed, provide application-level security

 9    despite the lack of some source code access.

10              Do you recall that?

11    A.    Yes.

12    Q.    Okay.  I'd like to pull up -- actually, I'd like to

13    move for admission of Defendants' Exhibit 3017, which I

14    don't believe there's an objection.

15              MS. DUNN:  There is an objection, Your Honor.

16    There's no foundation for this exhibit.  Same objection as

17    on direct.

18              MR. RECKERS:  Your Honor, this is an Oracle

19    document.  It provides a description of holistic security.

20              I'd like to ask the witness about the

21    requirements that Oracle provides as to holistic security

22    and whether Rimini can, in fact, provide what Oracle says

23    is holistic security.

24              THE COURT:  I'm sorry.  I don't have the

25    exhibit.
```

2238

```
 1              MR. RECKERS:  I've got one.

 2              THE COURT:  I'm not going to allow you to pull

 3     it up.  You can cross-examine concerning -- it's not

 4     admitted, but you can cross-examine on its basis -- excuse

 5     me, examine, your direct examination -- on the basis of

 6     that document.

 7     BY MR. RECKERS:

 8     Q.    Mr. Benge, in the context of holistic security are

 9     you aware of that there's often -- are you aware whether or

10     not there are environmental assessments that are performed

11     when evaluating security?

12     A.    Yes.

13     Q.    The jury can't see it, but I'll refer to -- well,

14     you have the exhibit in front of you.

15              I want to ask you, in the PeopleSoft -- in the

16     PeopleSoft program, does it already come with

17     authentication procedures?

18     A.    Yes.

19     Q.    Does it already come with --

20              MS. DUNN:  Objection, leading.

21              MR. RECKERS:  Well, let me ask this.

22     BY MR. RECKERS:

23     Q.    What security aspects already come with the

24     PeopleSoft program?

25     A.    Some of them I've already spoken about.
```

1          You know, there's extensive authentication

2     functionality having to do with what users are allowed to

3     get in; a lot to do with access control and authorization.

4     So once they get into the application, what can they do?

5     What pages can they pull up?  Whose data can they view?

6     You know, can you only view your own data?  Can you just

7     view your team's data?  Can you view every employee in the

8     company's data?

9          There's also extensive auditing functionality

10    within PeopleSoft.  So you can keep track of who's gotten

11    in and changed salaries and things of that nature.

12    Q.   And with respect to the security features in the

13    PeopleSoft application, to what extent can Rimini provide

14    security services with respect to those features?

15    A.   As I mentioned, anything in the application layer,

16    anything where we have the source code, if called upon, if

17    there was a problem found, we could address that.

18          Things -- excuse me.  Things in the tools layer

19    where we don't have access to the source code, those are

20    things that we wouldn't be able to change because we don't

21    have the source code, but there are ways that we could

22    mitigate those problems.

23          For example, let's say that it was discovered

24    that there was a fatal flaw in the authentication mechanism

25    of PeopleSoft.  We could suggest to our clients that they

2240

```
 1    bypass that and use the functionality that allows for

 2    external authentication.

 3              What that means is you could rely on, like,

 4    single sign-on where you sign on to your Windows machine,

 5    you know, when you sign on to Windows and you enter user ID

 6    and password, that information could be used to

 7    authenticate the user rather than relying on the core tools

 8    functionality should it have a security vulnerability in

 9    it.

10    Q.    Now, Ms. Dunn also asked you about whether or not

11    your opinions in this case were relied on specific

12    interactions with customers.  Do you recall that?

13    A.    Yes.

14    Q.    Could you explain to the jury how often you interact

15    with Rimini's --

16              MS. DUNN:  Objection.  Misstates my prior

17    question.  I asked whether his number that he produced to

18    Mr. Hampton relied on specific interactions with customers,

19    not whether his opinions in this case relied on specific

20    interactions with customers.

21              THE COURT:  Rephrase your question.  The

22    objection is sustained.

23              MR. RECKERS:  Yes, Your Honor.

24    BY MR. RECKERS:

25    Q.    Mr. Benge, how often do you interact with Rimini's
```

2241

1   customers?

2   A.     Almost daily.

3   Q.     And restricting my questions to before 2012, how

4   often did you interact with Rimini's customers that had

5   remote support?

6   A.     Well, it's a smaller percentage, so not daily, but

7   probably at least, you know, once a week I was dealing with

8   a client that was a remote client.

9   Q.     Did your interactions with customers influence your

10   opinions in this case?

11   A.     Certainly.

12   Q.     In what regard?

13   A.     Well, you know, I've had many interactions with

14   them, come to know the remote environments, the challenges

15   associated with them, come to know what -- how flexible

16   clients are going to be with our requests for making

17   changes in those environments.

18   Q.     And even -- well, with respect to clients that

19   Rimini supported with Rimini environments, did those

20   clients also typically have their own in-house

21   environments?

22   A.     Absolutely.  These clients, they like working with

23   us.  You know, we're -- we've formed strong partnerships

24   with a lot of them.  They're willing to work with us to

25   make changes in environments as needed.

1    Q.    And how would Rimini work with clients who had their

2    in-house environments?

3    A.    Well, I think that it would be easiest for new

4    clients, as they were coming onboard, that as a new client

5    came onboard, if we spelled out exactly what they needed, I

6    think we could get that; a little more challenge with the

7    clients we already have to go back to them and say, hey, we

8    want to change this, that, or the other thing.  But I think

9    because of the relationship we had with them, they would be

10   willing to do that.

11           We talk with these clients all the time.  We're

12   making requests on a very frequent basis, you know.  We get

13   to know them really well.

14           We call them up and say, hey, we're having a

15   problem with this server.  We work with their IT people, we

16   work with their functional people.  We have a relationship

17   with them, and they work with us.

18   Q.    Now, Ms. Dunn suggested that your testimony in this

19   case was influenced by Mr. Ravin's deposition testimony.

20   Do you recall that?

21   A.    Yes.

22   Q.    Had you reviewed or aware of the contents of

23   Mr. Ravin's deposition testimony before Ms. Dunn mentioned

24   it to you?

25   A.    No.

2243

1   Q.    Did Mr. Ravin's testimony, or even him personally,

2   influence your opinions in this case in any way?

3   A.    No.

4   Q.    What did influence your opinions, sir?

5   A.    My experience and working with the existing

6   client-hosted environments that we had.

7   Q.    And did communications with your team members also

8   influence your opinions?

9   A.    Yes, certainly.  You know, having read those weekly

10  status reports, working with the QA team, understanding

11  what their concerns and challenges were, those remotes,

12  that played into the estimates that I came up with.

13          MR. RECKERS:  Okay.  So if we could -- I don't

14  think we have it, but could we pull up Plaintiffs'

15  Exhibit 5516?  The one we just looked at?

16          And if we could zoom in on -- starting about

17  line where -- the timestamp 17:52:17 to -- going down to

18  about 17:52:53.  And if we could highlight the line at

19  17:52:26.

20  BY MR. RECKERS:

21  Q.    Mr. Benge, this is the exhibit that Ms. Dunn showed

22  you, the email exchange with Kim Martinez dated in October

23  of 2010.  Do you see that?

24  A.    Yes.

25  Q.    Do you see what she's mentioning here about how long

2244

1    it takes with -- to work with a remote, or as she says

2    "dang remote"?

3    A.    Yes.

4    Q.    What does she say?

5    A.    She says, "I think it takes twice as long as a

6    hosted one."

7    Q.    Is this comment from Ms. Martinez in 2010 consistent

8    with your opinion in this case?

9    A.    Yes.

10              MR. RECKERS:  No further questions.

11              THE COURT:  Recross, Ms. Dunn?

12              MS. DUNN:  Just very briefly, Your Honor.

13                     RECROSS-EXAMINATION

14   BY MS. DUNN:

15   Q.    Mr. Benge, so counsel just asked you about security

16   updates, and you said security updates that are in the

17   software that already come with PeopleSoft.  That means it

18   comes from Oracle; right?

19   A.    The core security functionality?  Yes.

20   Q.    Right.  So the security -- the code that you're

21   talking about for security that counsel was asking you

22   whether Rimini could provide, that comes from Oracle;

23   right?  That's not Rimini code.

24   A.    The PeopleSoft software, yes, it's Oracle's IP, yes.

25   Q.    Right.

2245

1           So let's look at Exhibit 5455, because we had

2    some disagreement about whether Rimini Street provides

3    security updates or provided security updates.  I think you

4    ultimately agreed with Mr. Ravin that that was not

5    possible.

6           But let's look at this email.  It's from Krista

7    Williams.  The jury met her the other day.

8           Incidentally, do you know why she was demoted?

9    A.    I'm not familiar with that.

10   Q.    Well, okay.

11          So she cites a question, "Are security patches

12   part of the maintenance agreement?"

13          And she says, "No.  Rimini Street does not have

14   the ability to modify the binary code that comprises the

15   tools foundation, thus we do not provide updates that are

16   equivalent to Oracle's critical patch security updates."

17   A.    Note that she's talking about the binary code and

18   the tools foundation, PeopleTools and WebLogic, she's not

19   talking about the PeopleSoft application.

20   Q.    Right.  But we've already discussed, and you've

21   agreed, that Rimini did not offer security updates?

22   A.    Not for the PeopleTools, no.

23   Q.    But we agreed generally, that was your testimony

24   when I cross-examined you just before, you said no?

25   A.    But we could provide them for the application.  We

2246

1    hadn't because we hadn't had client requests for it.

2    Q.    I understand that you would like to say more, but --

3    all I'm asking you was whether they did, and your answer

4    before was no.  Is that still your answer?

5    A.    Yes.

6    Q.    Great.  All right.  Just one last question.

7              So I just want to make clear that you're

8    expecting the jury to believe that this number that you

9    came up with based on no calculations, no discussion with

10   customers, no discussion with the onboarding team, no

11   discussion with various engineers, not accounting for what

12   it would take to get offshore labor that you say would

13   provide all these resources, not accounting for how

14   difficult it would be to staff or how overstaffed you were,

15   that this number that you just came up with two weeks

16   before Mr. Hampton's report was issued, that that's

17   something that you came up with, and the fact that it

18   matches what Mr. Ravin came up with the year before is a

19   coincidence, as you testified earlier.  I just want to

20   confirm that.

21   A.    Yes, and I think we saw other examples where other

22   people --

23   Q.    But your answer, Mr. Benge, to my question was it a

24   coincidence, would you like this jury to believe it was a

25   coincidence, your answer is yes?

2247

1    A.    Yes.

2              MS. DUNN:  All right.  Thank you very much.

3              Your Honor, we have no further questions.

4              THE COURT:  All right.

5              Mr. Reckers, anything further?

6              MR. RECKERS:  No, Your Honor.

7              THE COURT:  All right.

8              Mr. Benge, that will complete your testimony.

9    You may step down.  Thank you.

10             THE WITNESS:  Thank you.

11             THE COURT:  Defendants' next witness, please.

12             MR. RECKERS:  Your Honor, defense call by video

13   deposition Mr. Charles Phillips.  He's a former Oracle

14   executive.  It's about 10 minutes.

15             The exhibits are -- I believe there's no

16   objection, 303 and 336.

17             COURTROOM ADMINISTRATOR:  Are these DTX?  303

18   and 336?

19             MR. RECKERS:  That's correct.

20             THE COURT:  Are they admitted -- or there's no

21   objection?

22             MR. RECKERS:  I'd move for their admission.  I

23   don't believe they're objected to.

24             THE COURT:  All right.

25             MR. ISAACSON:  No objection, Your Honor.

```
 1            THE COURT:  They are admitted.
 2       (Defendants' Exhibits 303 and 336 received
 3       into evidence.)
 4       (Videotape deposition of Charles Phillips
 5       played as follows:)
 6          PAGE 7:13 TO 7:22 (RUNNING 00:00:21.150)
 7       "Q. Mr. Phillips, are you aware that
 8       Oracle has sued Rimini Street for copyright
 9       infringement, breach of contract, inducement
10       to breach of contract, Computer Fraud and
11       Abuse Act, and several other claims?
12       A. Yes.
13       Q. And that lawsuit was filed in January of
14       2010.  That was while you were president of
15       Oracle; is that correct?
16       A. Yes.
17        PAGE 17:18 TO 17:21 (RUNNING 00:00:09.524)
18       Q. While you were president of Oracle,
19       Oracle acquired the PeopleSoft, JD Edwards
20       and Siebel software platforms; right?
21       A. Yes.
22        PAGE 60:16 TO 60:22 (RUNNING 00:00:18.770)
23       Q. When you talk about funding the
24       development, does Oracle bucket the support?
25       In other words, do people who pay PeopleSoft
```

2249

```
1         support -- does that go directly to fund the

2         development of PeopleSoft applications, or

3         does the support money go to generally fund

4         all sorts of application development?

5          PAGE 60:23 TO 61:09 (RUNNING 00:00:36.337)

6         A. Well, the way you allocate resources for

7         developers is based on the revenue for that

8         product.  So you can't have a mishmash where

9         you have, you know, thousands of development

10        on a product that doesn't have much support

11        revenue to support it.  And so I can't say

12        it's a direct connection where dollar wired

13        to a specific account or something like that,

14        but certainly that's the way you make --

15        allocate budgets.  And based on the money

16        that product's generating, it can support a

17        certain number of developers.

18         PAGE 62:14 TO 62:21 (RUNNING 00:00:17.583)

19        Q. But at the end of the day, isn't it just

20        Oracle's -- it's just money Oracle's making

21        and it's allocated as Oracle sees fit.  Do

22        you agree with that?

23        A. Oracle does -- yeah, Oracle does allocate

24        it as it sees fit; but it sees fit to do so

25        relative to the money the product is making,
```

```
 1              like any other rational manager would do.
 2               PAGE 63:23 TO 64:07 (RUNNING 00:00:32.825)
 3              Q. Are there ever years where like for a
 4              given year, maybe PeopleSoft requires a lot
 5              of updates or a new version and maybe JD
 6              Edwards doesn't?
 7              A. Products that are that mature doesn't
 8              usually change that much.  You have a
 9              dedicated development organization.  And you
10              size that according to kind of the ongoing
11              revenue stream.  It may change a little bit,
12              but usually not dramatically.
13               PAGE 65:02 TO 65:18 (RUNNING 00:00:47.655)
14              Q. Do customers understand that they're -- by
15              paying support, they're just -- they're
16              actually providing capital for Oracle to do
17              research and development on versions?  Or do
18              they -- I mean, is that --
19              A. I think most people -- you know, Oracle
20              and others have said that for many years,
21              explaining why you pay support.  That's the
22              reason a bottle exists, that there's no way
23              to build it once and then update it forever
24              if I don't have any money coming in. And so
25              the whole concept around support is that --
```

```
 1            that there's ongoing requirement, both for

 2            bug-fixing patches, new versions, and it's

 3            got to be paid for somehow.  It's optional.

 4            If you don't care about that, you don't have

 5            to pay support.

 6             PAGE 77:23 TO 77:25 (RUNNING 00:00:07.215)

 7            Q. Did Oracle ever receive questions from

 8            licensees asking if it was permissible for

 9            them to maintain a development environment?

10             PAGE 78:02 TO 78:07 (RUNNING 00:00:11.482)

11            A. That's a common requirement for customers,

12            so I'm sure -- sure they did.

13            Q. When you say "a common requirement," what

14            do you mean?

15            A. A lot of customers have a separate

16            development environment.

17             PAGE 79:03 TO 79:06 (RUNNING 00:00:09.361)

18            Q. Okay.  So as long as the company has paid

19            for the right amount of licenses to support

20            its own business use of the software, then it

21            can maintain a development environment?

22             PAGE 79:08 TO 80:12 (RUNNING 00:01:07.032)

23            A. Yes.  If, that was in their license

24            agreement, that they negotiated that, then

25            yes.
```

2252

1          Q. If they negotiated what?

2          A. A development environment.  Some people

3      did that.

4          Q. What if they didn't negotiate for a

5      development environment?

6          A. I think it depends on, again, a lot of

7      circumstances, how it was licensed, what's in

8      the contract, because a lot of contracts were

9      different.

10         Q. Do you ever recall Oracle telling a

11     customer that they could not have a

12     development environment?

13         A. No. They -- no, I don't recall that.

14         Q. Is a test environment different than a

15     development environment to you?

16         A. Yes.

17         Q. Okay.  How is it different?

18         A. One's -- they're similar, but one's for

19     developing and things are under modification.

20     Another one is for, after you've made your

21     modification, testing it and seeing if it

22     works.

23         Q. So I'm going to ask you the same question

24     for a test environment.  Do you ever recall

25     Oracle receiving a question from a licensee

2253

```
 1              regarding whether or not they could have a

 2              test environment?

 3              A. Yes.

 4               PAGE 80:14 TO 80:21 (RUNNING 00:00:18.409)

 5              Q. And that was common just as it was for --

 6              as with development environment?

 7              A. I won't say it's common, but it was

 8              certainly something that some customers

 9              needed.

10              Q. Do you ever recall Oracle telling a

11              customer that they could not have a test

12              environment?

13              A. No.

14               PAGE 81:03 TO 81:12 (RUNNING 00:00:19.067)

15              Q. In other words, do you ever recall Oracle

16              telling a licensee, yes, you can have a test

17              environment?

18              A. Well, I don't remember us telling them

19              that, but most of them had it -- a lot of

20              them had it.  So I'm assuming at some point

21              along the way that conversation took place.

22              Q. And you were the head of global sales;

23              right?

24              A. Right.

25               PAGE 81:13 TO 81:17 (RUNNING 00:00:12.937)
```

2254

1      Q. Was that part of the sales force's -- was

2      that in your tool kit, so to speak, that if

3      customers had questions on whether or not

4      they could have test or development

5      environments, that the answer was yes?

6       PAGE 81:19 TO 82:22 (RUNNING 00:01:09.140)

7      A. I wouldn't necessarily say it was part of

8      the consulting organization would also be

9      involved -- one of the other -- and I

10     think -- I don't know if we had a standard

11     answer, but certainly they were used to

12     dealing with the question and probably was

13     unique to each customer depending on who's

14     maintaining, how many users, and all those

15     sorts of things.

16     Q. So is it your testimony that there wasn't

17     a set answer, that it depended on the

18     circumstances?

19     A. Not at my level.  I didn't focus on it.

20     There may have been -- down in the ranks

21     somewhere, we might have had a policy

22     somewhere, but it was never a big issue,

23     though.

24     Q. Why wasn't it a big issue to Oracle?

25     A. It got solved.  If you needed a test or

```
1          develop environment, somehow it got solved
2          and we accommodated that.
3          Q. You let them have the test or development
4          environment?
5          A. I won't --
6          MS. HANN:  Misstates testimony.
7          A. Yeah, I won't say we let them have it; but
8          certainly if it was -- again, all the license
9          agreements are different.  There may have
10         been a small fee in some cases, but it was
11         never a major concern.
12         Q. Do you ever recall after -- I'm
13          PAGE 82:23 TO 83:10 (RUNNING 00:00:27.061)
14         assumings these -- these discussions come up
15         after the license agreement's been signed and
16         we have a contract already.  Do you recall a
17         specific instance in which a customer paid a
18         small fee or any sort of a fee to get --
19         A. No.
20         Q. -- to be able to run a test environment?
21         A. No, most customers negotiate this stuff up
22         front.  If you need that, you already know
23         that.  So I'm assuming most customers are
24         smart enough to know, if they need a test or
25         development environment, it's included.
```

```
1               PAGE 83:21 TO 84:05 (RUNNING 00:00:23.902)
2          Q. I had asked those questions in the context
3          of PeopleSoft.  Is your answer different for
4          JD Edwards?
5          A. No.
6          Q. Is your answer different for Siebel?
7          A. No.
8          Q. What about backup copies of their
9          environment?  Did Oracle ever get questions
10         from licensees regarding whether or not they
11         could have a backup copy of their
12         environment?
13              PAGE 84:08 TO 84:10 (RUNNING 00:00:06.652)
14         A. I'm sure we did.  We have so many
15         customers.  But again, most of the time that
16         was contemplated up front.
17              PAGE 84:11 TO 84:18 (RUNNING 00:00:08.865)
18         Q. Okay.  Do you ever recall an instance in
19         which where Oracle told a customer they could
20         not have a backup copy of their environment?
21         A. No.
22         Q. For PeopleSoft, JD Edwards or Siebel?
23         A. No.
24              PAGE 93:16 TO 93:19 (RUNNING 00:00:12.474)
25         Q. For the customers that leave due to price,
```

2257

```
 1          is that typically those customers who do

 2          not need to keep updating their software,

 3          they're going to be on kind of a sustaining

 4          program?

 5           PAGE 93:22 TO 93:25 (RUNNING 00:00:09.901)

 6          A. So it -- it may be some of them believe

 7          that they don't need support and they don't

 8          really want any changes.  And maybe they have

 9          no choice, they just need to save money.

10           PAGE 96:04 TO 96:21 (RUNNING 00:00:53.890)

11          Q. So what is the -- the lifetime support

12          policy that Oracle instituted in 2006?

13          A. That was to say that even if you weren't

14          upgrading on a continuous basis, you're on a

15          very old version, you could pay a little bit

16          extra for sustaining support.

17          Q. Pay extra over the 22 percent --

18          A. Whatever --

19          Q. -- support fee?

20          A. -- it was that you were paying, it might

21          have been 22, to continue to have us do some

22          limited support on an old version.

23          Q. And that was for an extra fee?

24          A. Correct.

25          Q. Why did that require an extra fee?
```

1          A. Because it's expensive to support old

2          versions.  The more versions you're trying to

3          support, the more support cost you have.

4           PAGE 96:22 TO 96:24 (RUNNING 00:00:05.774)

5          Q. Do you ever recall a customer going off of

6          Oracle support because of quality concerns?

7           PAGE 97:01 TO 97:01 (RUNNING 00:00:01.770)

8          PAGE 97:02 TO 97:04 (RUNNING 00:00:07.000)

9          Q. Was there -- do you recall customers

10         complaining that Oracle's patches and updates

11         needed to be improved?

12          PAGE 97:06 TO 97:25 (RUNNING 00:00:40.926)

13         A. Yes.  Sometimes, yes.

14         Q. Okay.  Was that ever a reason for -- that

15         you recall as being given for going off of

16         Oracle support?

17         A. No.

18         Q. No. It was just a general fact that they

19         wished Oracle would improve?

20         A. Yes.

21         Q. And what was the concern -- if you recall,

22         what types of concerns did the customers

23         voice with respect to the quality of patches?

24         A. Usually it wasn't the quality.  It was

25         usually the complexity, just the multitude of

2259

1           patches and the sequence of patches.

2           Q. So multitude of patches, that means the

3           number of patches?

4           A. Right.

5           Q. Too many or too little?

6           A. Too many.

7            PAGE 153:05 TO 153:09 (RUNNING 00:00:15.055)

8           Assume that a customer -- even if a customer

9           was on Oracle support, if they chose to have

10          their servers off-site, in other words, not

11          in their building, was Oracle aware as to

12          whether customers did that generally?

13           PAGE 153:11 TO 153:19 (RUNNING 00:00:21.411)

14          A. Generally -- I can't say what percentage,

15          but generally, because most customers had

16          another building where the actual computers

17          were, actual headquarters building, that

18          wasn't uncommon.

19          Q. Okay.  And so from Oracle's perspective,

20          that was within the customer's right to be

21          able to do that?

22          A. Yes."

23          (End of deposition).

24              THE COURT:  All right.  Defendants' next

25      witness.

```
 1              MR. RECKERS:  Your Honor, we have another video
 2    deposition.  This one is of Mr. Cort Swanson who is the
 3    designee of AGCO Corporation which is a Rimini customer.
 4              In connection with this video I would move to
 5    admit Plaintiffs' Exhibit 532.
 6              COURTROOM ADMINISTRATOR:  Plaintiffs'?
 7              MR. RECKERS:  Yes, ma'am.  Plaintiffs'.
 8              MR. ISAACSON:  No objection, Your Honor.
 9              THE COURT:  It's admitted.
10         (Plaintiffs' Exhibit 532 received into
11         evidence.)
12              MR. RECKERS:  This is approximately 15 minutes.
13              THE COURT:  All right.
14         (Videotape deposition of Cort Swanson played
15         as follows:)
16              PAGE 5:13 TO 5:17 (RUNNING 00:00:12.315)
17         "Q. Sir, we just met off the record, but for
18         the record, would you please state your full
19         name.
20         A. Sure.  It's Cort Swanson.
21         Q. Would you please spell that.
22         A. C-o-r-t, S-w-a-n-s-o-n.
23          PAGE 10:16 TO 10:23 (RUNNING 00:00:15.763)
24         Q. Okay.  Do you understand that AGCO has
25         designated you as the corporate
```

1           representative in response to the subpoena?

2           A. Yes.

3           Q. Do you understand that that means that you

4           speak for the company on the subject matter

5           of these topics?

6           A. Yes.

7            PAGE 11:12 TO 11:18 (RUNNING 00:00:14.763)

8           Q. Mr. Swanson, who is your current employer?

9           A. AGCO Corporation.

10          Q. And what is your position?

11          A. I'm an IT manager for the North American

12          region.

13          Q. How long have you held that position?

14          A. Approximately two years.

15           PAGE 11:24 TO 11:25 (RUNNING 00:00:04.054)

16          Does AGCO use JD Edwards software?

17          A. Yes, it does.

18           PAGE 15:09 TO 15:17 (RUNNING 00:00:27.626)

19          Q. Okay.  Great.  Is a company outside of

20          AGCO currently supporting AGCO's JDE

21          software?

22          A. Yes, they are.

23          Q. What is that company?

24          A. Rimini Street.

25          Q. How long has Rimini Street been supporting

1            AGCO's JDE software?

2            A. The contractor with Rimini Street in

3            December of 2010.

4             PAGE 15:18 TO 16:01 (RUNNING 00:00:21.940)

5            Q. And before December 2010, who was

6            supporting it?  Was another company

7            supporting JDE's software?

8            A. Oracle was supporting our JD Edwards

9            software.

10            Q. And before Oracle supported AGCO's JD

11            Edwards software, was another company

12            supporting AGCO's JD Edwards software?

13            A. No.

14             PAGE 18:20 TO 18:22 (RUNNING 00:00:02.178)

15             (The Reporter marked the document

16             referred to as Deposition

17             Exhibit 1182 for identification.)

18             PAGE 19:03 TO 19:08 (RUNNING 00:00:15.941)

19            Q. What is this document?

20            A. This is an executive summary that was

21            prepared, I believe by Larry Maya,

22            accompanying the contracts for Rimini Street.

23            Q. Do you believe that because you've seen

24            this document before?

25             PAGE 19:09 TO 19:20 (RUNNING 00:00:39.518)

2263

1      A. I do not recall seeing this document, but

2      this is the format of the executive summary.

3      Q. Does that mean that AGCO regularly

4      prepares executive summary agreements?

5      A. Yes.

6      Q. And what is the purpose of an executive

7      summary?

8      A. The executive summary document often will

9      accompany the contract information so that an

10     executive can quickly read and pertain what

11     this agreement is without having to read

12     through the entire resulting documents.

13      PAGE 20:04 TO 20:13 (RUNNING 00:00:38.675)

14     Q. Why does AGCO prepare executive summaries?

15     A. I believe to give someone an initial

16     understanding of what the documents are that

17     accompany this are about.  I don't think that

18     the intent is that they just read the

19     executive summary.  I think the intent is to

20     give them an overview before they read the

21     entire document.

22     Q. Are the points raised in the executive

23     summary the points that are most important in

24     the agreement that accompanies the summary?

25      PAGE 20:14 TO 20:22 (RUNNING 00:00:28.905)

1      A. Generally, yes.

2      Q. I'd like you to read the last bullet under

3      "Business Driver/Need"?

4      A. "These agreements will continue to provide

5      software support for JD Edwards and

6      PeopleSoft applications on a global basis at

7      a 50% cost reduction."

8      Q. Was that the most important reason for the

9      attached agreement?

10      PAGE 20:25 TO 21:11 (RUNNING 00:00:37.917)

11      THE WITNESS:  I would say yes, it probably

12      was the most important reason.  It was not

13      the only reason, but it was the most

14      important.

15      BY MR. RODRIGUEZ:

16      Q. Okay.  Are any other reasons provided in

17      the executive summary?

18      A. No.

19      Q. So an executive who picked up the

20      executive summary in the contract would see

21      the price as the most important agreement --

22      as the most important reason?

23      A. I think that's correct.

24      PAGE 27:22 TO 27:25 (RUNNING 00:00:15.828)

25      Q. If I could prove to you and to the Court

1           that Rimini Street had engaged in large scale

2           and systematic illegal downloading of Oracle

3           materials, would AGCO have contracted with

4           Rimini Street?

5            PAGE 28:04 TO 28:06 (RUNNING 00:00:13.274)

6           THE WITNESS:  If Rimini Street was convicted

7           of illegal activity, I do not think AGCO --

8           AGCO would not do business with them.

9            PAGE 28:08 TO 28:11 (RUNNING 00:00:17.641)

10          Q. When you say, "convicted," do you mean if

11          it had been proven in a court of law that

12          Rimini Street engaged in illegal activities?

13          A. Yes.

14           PAGE 32:04 TO 32:05 (RUNNING 00:00:06.542)

15          Q. Is it important to you that Rimini Street

16          be able to at least match Oracle's support

17          level?

18           PAGE 32:06 TO 32:08 (RUNNING 00:00:07.312)

19          A. Our understanding and experience has been

20          that Rimini Street has surpassed Oracle's

21          support level.

22           PAGE 32:25 TO 33:06 (RUNNING 00:00:28.318)

23          Q. Okay.  Were there any other companies

24          besides Rimini Street and Oracle that AGCO

25          considered contracting with for JD Edwards

2266

1          support?

2          A. Not that I'm aware of.

3          Q. Are you aware of any companies besides

4          Rimini Street and Oracle that would be

5          capable of satisfying AGCO's need for JD

6          Edwards support?

7           PAGE 33:07 TO 33:08 (RUNNING 00:00:08.999)

8          A. I am not aware of any other companies that

9          provide that type of support for JD Edwards.

10         PAGE 33:09 TO 33:21 (RUNNING 00:01:02.471)

11         Q. If Rimini Street had not existed, would

12         AGCO still be on Oracle's support for JD

13         Edwards?

14         A. One of the things we were also considering

15         is completely dropping Oracle support for JD

16         Edwards.

17         Q. And what would AGCO have done in that

18         circumstance?

19         A. Supported the applications ourself.

20         Q. Okay.  Do you have a sense as to the

21         manpower that would be required for that?

22         A. We get very little support from Oracle

23         over the last several years.  We are not

24         upgrading our product that we had from them,

25         and we have had very few calls to their

2267

```
 1              support line that I'm aware of.
 2               PAGE 37:11 TO 37:14 (RUNNING 00:00:19.878)
 3              Q. When you said AGCO was considering self
 4              support, did AGCO consider the efforts
 5              required to monitor new legislation?
 6              A. Yes.
 7               PAGE 37:15 TO 38:02 (RUNNING 00:00:47.997)
 8              Q. Did AGCO have an estimate of what that
 9              would cost AGCO?
10              A. In North America, we looked at how we
11              would support our regulatory changes, yes.
12              Q. And did looking at how AGCO would support
13              regulatory changes involve estimating the
14              cost to AGCO of supporting those regulatory
15              changes?
16              A. Yes.
17              Q. What was that cost?
18              A. For North America, the cost would be
19              acquiring a third-party product to produce
20              1099 documents, which is relatively
21              inexpensive as compared to the amount we were
22              being charged by Oracle.
23               PAGE 38:03 TO 38:12 (RUNNING 00:00:41.640)
24              Q. And what about South America?
25              A. I have no knowledge of what their cost
```

```
 1            estimates were.
 2            Q. Does AGCO have JD Edwards installations in
 3            Europe?
 4            A. AGCO does have an older JD Edwards
 5            implementation in Europe.
 6            Q. Did AGCO consider the efforts involved in
 7            monitoring European legislation?
 8            A. I have no knowledge of the European
 9            efforts.
10             PAGE 46:01 TO 46:02 (RUNNING 00:00:06.156)
11            Q. As of 2007, was it AGCO's position that it
12            wanted to be on SAP by 2010?
13             PAGE 46:03 TO 46:07 (RUNNING 00:00:25.922)
14            A. My memory is that we had firm plans for
15            initial implementations.  After the initial
16            implementations, the plans were less
17            concrete.  But, yes, there was a desire to
18            move toward -- to SAP from the top of the
19            corporation.
20             PAGE 46:08 TO 46:17 (RUNNING 00:00:47.871)
21            Q. "From the top of the corporation."  Does
22            that mean that the plans are not coming from
23            technology people?
24            A. These can be business plans.  These were
25            largely driven by business plans that are
```

```
 1           seeking to have a unified software

 2           architecture.

 3           Q. Have those plans run into difficulties?

 4           A. Implementations are always difficult, so

 5           there have been difficulties.  Or they have

 6           been amended over time.

 7            PAGE 57:04 TO 57:10 (RUNNING 00:00:42.651)

 8           Q. In AGCO's experience, does Oracle

 9           negotiate on price?

10           A. Yes, except for maintenance.

11           Q. What do you mean, "except for

12           maintenance"?

13           A. We have tried in the past to reduce our

14           maintenance for our JD Edwards applications,

15           and I don't think we've had very good success

16           in that.

17            PAGE 59:19 TO 59:24 (RUNNING 00:00:23.081)

18           Q. Does AGCO today see a long-term future

19           with Oracle, with respect to any software,

20           not just JD Edwards?

21           A. With respect to any software?

22           Q. Any Oracle software.

23           A. I would say yes.

24            PAGE 63:13 TO 64:08 (RUNNING 00:01:16.013)

25           Q. All right.  Earlier opposing counsel asked
```

1    some questions about considerations that AGCO

2    made in determining to move from Oracle

3    support to Rimini Street support, one of

4    which was cost; is that correct?

5    A. Correct.

6    Q. What other considerations did AGCO weigh

7    when making a decision to switch to Rimini

8    Street?

9    A. One of the other big considerations is --

10   for us was cost avoidance of having to

11   upgrade our JD Edwards environments to still

12   maintain support from an outside party.

13   Q. And why -- if AGCO had stayed with Oracle,

14   why would AGCO have been forced to switch to

15   a newer software platform?

16   A. Oracle only provides support for -- it is

17   my understanding that Oracle only provides

18   support for older releases of software for a

19   certain period of time, and in order to still

20   be in a position to get support on those

21   applications, we feel forced to upgrade to

22   the next release.

23    PAGE 65:07 TO 65:19 (RUNNING 00:00:54.704)

24   Q. Sure.  Sure.  We were discussing cost and

25   quality of service and fit for situation as

```
1          reasons why AGCO chose Rimini Street.
2          A. Okay.  The fit for the situation was --
3          really describes the fact that we are at the
4          end of our -- the perceived end of our life
5          of these JD Edwards applications and really
6          are trying to extend that life while we are
7          rolling out the new SAP solution.  We would
8          ideally not like to go through the time and
9          effort to implement a new release to be able
10         to extend the life of our existing release of
11         the software, continuing to provide the same
12         functions that they are delivering in our
13         business.
14          PAGE 65:20 TO 66:22 (RUNNING 00:01:49.151)
15         Q. And has the Rimini Street support allowed
16         AGCO to extend the life of its JD Edwards
17         software?
18         A. Yes.
19         Q. And one of the other considerations you
20         mentioned was quality of service.  When you
21         compare the quality of support service
22         received from Oracle versus that of Rimini
23         Street, which is superior?
24         A. We have found that the -- for the issue
25         support that we receive, Rimini Street is
```

1          much superior.  We have a named software

2          engineer who contacts us within 30 minutes of

3          any problems.  We are able to self select the

4          seriousness of the issue, and if we have a

5          very high priority one, we can designate it

6          high priority.  And just three weeks ago we

7          had a situation where we had that issue, and

8          we had a Rimini Street person on the phone

9          with us at 9:00 o'clock at night within 30

10         minutes of calling the issue in, and he

11         stayed on the phone with us through almost

12         1:00 o'clock in the morning.  So that was

13         pretty good support.  Excellent support.

14         Q. And did you have a similar experience with

15         Oracle support?

16         A. Oracle support is -- was not nearly as

17         customer focused.  Oracle support only

18         supports their application, and if the

19         application is modified, they do not support

20         it.  So Rimini Street is willing to work with

21         us kind of where we are in the situation

22         22 that we're in."

23             (End of Deposition.)

24             THE COURT:  All right.  It's 5:00, ladies and

25     gentlemen.  I'm sure you're ready to go home.  We are all

1    are.

2              I will give you the cautionary instruction just

3    because it's been a while.

4              I remind you not to converse about the case with

5    anyone, or allow anyone to discuss it in your presence.

6              I remind you not to read, watch, or listen to

7    any report or commentary relative to this case in any way

8    in any medium, and that would include the Internet,

9    newspaper, radio, television, et cetera.

10             I caution you not to do any independent research

11   on your own of any kind with the interest that this jury

12   decide this case based on having heard all the same

13   evidence.

14             Please keep an open mind until all the witnesses

15   and evidence has been presented and you've heard the

16   Court's instructions on the law, you've heard the

17   attorneys' closing arguments, and the jury is finally able

18   to deliberate this case.

19             And if you've taken your notes, please leave

20   them in the jury room.

21             We'll start promptly in the morning at 8:00 a.m.

22             And I would tell you, I think we continue to be

23   moving along fairly well.  So I wish you a pleasant

24   evening.  Thank you very much, and you may step down.

25             COURTROOM ADMINISTRATOR:  Please rise.

1          (Jurors exit courtroom at 5:06 p.m.)

2               MR. ISAACSON:  Your Honor, nothing major.

3               During the last few minutes we've gotten a Rule

4     50 brief that's about 42 pages so then rather than tomorrow

5     night, we'd like until 8:00 a.m. the following day.

6               THE COURT:  Not a problem.

7               But that brings to mind another thought that I

8     had earlier today.  I anticipate that the briefing on the

9     Rule 50 is extensive, as you've just indicated, and I

10    haven't seen -- I haven't seen what has been filed on

11    behalf of defendants.

12              But it's entirely possible -- usually I -- if

13    the question is complex, if I feel that I need to review

14    evidence and -- it's just not a straightforward question, I

15    will frequently take those motions under consideration and

16    reserve ruling on them, and we'll go ahead and instruct and

17    go to the jury on the issues.

18              That brings to mind that I haven't received any

19    proposed verdict forms, and I'm sure that's not a pleasant

20    subject for anyone to deal with in a case like this, but it

21    needs to be dealt with.

22              So I'd like to have some proposed verdict forms.

23    I'm not really giving you a time limit on this, but it's in

24    our interest to get that underway.

25              MR. ISAACSON:  The parties have exchanged

1    proposed verdict forms.  I think we're only 999 pages apart

2    in length, but I think we're both in a position to submit

3    competing verdict forms.

4              THE COURT:  If you are, I would encourage you to

5    do that; the earlier the better.

6              MR. WEBB:  One more thing, Judge, and I haven't

7    had a chance to talk to Bill about this, but the way the

8    schedule has sort of fallen out, it looks like we may be

9    sort of done with the presentation of evidence Thursday, if

10   not Wednesday.

11             Rather than bringing the Court back on Friday,

12   one possibility would be for us to come up to Reno so your

13   staff doesn't have to come back down here after your

14   meeting on Thursday.

15             We're just trying to do the charge conference up

16   there in your court.  I just put that as a possibility.

17   I'm sure that Oracle wouldn't object, but it may save you

18   another trip back and forth.

19             THE COURT:  Say again.

20             MR. WEBB:  If we're doing the charge conference,

21   and you expect that it might be the better part of a full

22   day, if we wrap up early enough, it may prevent you all

23   from coming back down here because to finish up the rest of

24   the week because I know Your Honor has to go up to Reno --

25             THE COURT:  Well, that's unique to me, not to

1     the rest of my staff.  And if it happens, if we're at such

2     a critical stage that that is clearly going to interfere,

3     it's possible that I'll cancel that commitment, but it's

4     very difficult for me to do that.

5              So your best guess right now on where we are on

6     finishing the case is?

7              MR. WEBB:  Well, I sort -- we're a little

8     behind.  I didn't think today's witness presentation would

9     go on as long as it did, but I still think it's reasonable

10    to think that we could be done with our case by Wednesday.

11             Again, we have other witnesses, some evidentiary

12    issues that are outstanding, but I think that's still a

13    decent projection for our case.

14             It's might bleed over to Thursday.  Given what

15    happened today that's not unreasonable to expect, but

16    that's sort of how we -- and I don't know if they plan to

17    call rebuttal and, if so, what it will be.  But for our

18    case we think we'll be resting late Wednesday if not early

19    Thursday.

20             THE COURT:  Okay.

21             MR. ISAACSON:  That sounds about right.  I'm

22    suspecting there's going to be some bleed-over into

23    Thursday, but not a full day, and if we do something very

24    short in rebuttal, that will be part of that bleed-over.

25             THE COURT:  All right.  Well, let me keep all of

2277

1    that in mind.  It could be -- well, let me keep it in mind.

2    We'll be discussing it further as we move along.  I

3    appreciate your keeping me informed.

4              All right.  Thank you.  I'll wish you a pleasant

5    evening.

6              COURTROOM ADMINISTRATOR:  Please rise.

7         (THE proceedings adjourned at 5:10 p.m.)

8                        *    *    *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DONNA DAVIDSON, RDR, CRR, CCR #318     (775) 329-0132

2278

1                           -o0o-

2        I certify that the foregoing is a correct

3        transcript from the record of proceedings

4        in the above-entitled matter.

5

6        _____        9/28/15

7        Donna Davidson, RDR, CRR, CCR #318      Date
         Official Reporter

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

2279

1                        I N D E X

2    DEFENDANTS' WITNESSES:                        PAGE
     JAMES BENGE
3        Direct Examination By Mr. Reckers        2093
         Cross-Examination By Ms. Dunn            2149
4        Redirect Examination By Mr. Reckers      2236
         Recross-Examination By Ms. Dunn          2244
5

6                     E X H I B I T S

7    PLAINTIFFS'                                ADMITTED
     62                                             2130
8    286                                            2109
     532                                            2260
9    645                                            2194
     5516                                           2213
10
     DEFENDANTS'                                ADMITTED
11   303 and 336                                    2248

12

13

14

15

16

17

18

19

20

21

22

23

24

25