2280

1                    UNITED STATES DISTRICT COURT
                          DISTRICT OF NEVADA
2            BEFORE THE HONORABLE LARRY R. HICKS, DISTRICT JUDGE

3

4   ORACLE USA, INC., a Colorado      :
    corporation; ORACLE AMERICA,      :
5   INC., a Delaware corporation;     :
    and ORACLE INTERNATIONAL          :No. 2:10-cv-0106-LRH-PAL
6   CORPORATION, a California         :
    corporation,                      :
7                                     :
           Plaintiffs,                :
8                                     :
        vs.                           :
9                                     :
    RIMINI STREET, INC., a Nevada     :
10  corporation; and SETH RAVIN,      :
    an individual,                    :
11                                    :
           Defendants.                :
12  _____  :

13

14

                 TRANSCRIPT OF JURY TRIAL - DAY 12
15                  (Pages 2280 through 2590)

16

17                    September 29, 2015

18

                      Las Vegas, Nevada
19

20

21

22

    Court Reporter:        Donna Davidson, RDR, CRR, CCR 318
23                         Certified Realtime Reporter
                           400 South Virginia Street
24                         Reno, Nevada  89501
                           (775) 329-0132
25

2281

1                    A P P E A R A N C E S

2      FOR THE PLAINTIFFS:

3      BOIES, SCHILLER & FLEXNER LLP
       KIERAN P. RINGGENBERG
4      1999 Harrison Street, Suite 900
       Oakland, California 94612
5      (510) 874-1000
       Fax: (510) 874-1460
6      kringgenberg@bsfllp.com

7      BOIES, SCHILLER & FLEXNER LLP
       RICHARD J. POCKER
8      300 South Fourth Street, Suite 800
       Las Vegas, Nevada 89101
9      (702) 382-7300
       Fax: (702) 382-2755
10     rpocker@bsfllp.com

11     BOIES, SCHILLER & FLEXNER LLP
       WILLIAM A. ISAACSON
12     KAREN L. DUNN
       5301 Wisconsin Avenue, NW
13     Washington, DC  20015
       (202) 237-2727
14     Fax:  (202) 237-6131
       wisaacson@bsfllp.com
15     kdunn@bsfllp.com

16     MORGAN LEWIS & BOCKIUS LLP
       THOMAS S. HIXSON
17     NITIN JINDAL
       JOHN A. POLITO
18     One Market, Spear Street Tower
       San Francisco, California 94105
19     (415) 442-1000
       Fax:  (415) 442-1001
20     thomas.hixson@morganlewis.com
       nitin.jindal@morganlewis.com
21     john.polito@morganlewis.com

22     JAMES C. MAROULIS
       DORIAN E. DALEY
23     Oracle Corporation
       500 Oracle Parkway
24     Redwood City, California 94070
       (650) 506-4846
25     jim.maroulis@oracle.com
       dorian.daley@oracle.com

2282

```
 1              A P P E A R A N C E S (Continued)

 2   FOR THE DEFENDANTS:

 3   SHOOK, HARDY & BACON LLP
     PETER E. STRAND
 4   B. TRENT WEBB
     RYAN D. DYKAL
 5   2555 Grand Boulevard
     Kansas City, Missouri 64108
 6   (816) 474-6550
     Fax: (816) 421-5547
 7   pstrand@shb.com
     bwebb@shb.com
 8   rdykal@shb.com

 9

     SHOOK, HARDY & BACON LLP
10   ROBERT H. RECKERS
     600 Travis Street, Suite 3400
11   Houston, Texas 77002
     (713) 227-8008
12   Fax: (713) 227-9508
     rreckers@shb.com
13
     SHOOK, HARDY & BACON LLP
14   ANNIE Y.S. CHUANG
     One Montgomery Tower, Suite 2700
15   San Francisco, California 94104-4505
     (415) 544-1900
16   achuang@shb.com

17

     LEWIS ROCA ROTHGERBER LLP
18   W. WEST ALLEN
     3993 Howard Hughes Parkway, Suite 600
19   Las Vegas, Nevada 89169
     (702) 949-8230
20   Fax: (702) 949-8364
     wallen@lrrlaw.com
21

22

23

24

25
```

2283

          1            LAS VEGAS, NEVADA, SEPTEMBER 29, 2015, 8:02 A.M.

          2                          --oOo--

          3                    P R O C E E D I N G S

          4

          5            (Jurors enter courtroom at 8:02 a.m.)

          6                 COURTROOM ADMINISTRATOR:  Court is again in

          7    session.

          8                 THE COURT:  Good morning.  Have a seat, please.

          9                 The record will show that we're in open court.

         10    The parties and counsel are present.  The jury is all

         11    present.

         12                 And let's see.  I believe we're at defendants'

         13    next witness, please.

         14                 MR. DYKAL:  The defendants call David Klausner.

         15                 COURTROOM ADMINISTRATOR:  Please raise your

         16    right hand.

         17                 You do solemnly swear that the testimony you

         18    shall give in the cause now before the Court shall be the

         19    truth, the whole truth, and nothing but the truth, so help

         20    you God?

         21                 THE WITNESS:  I do.

         22                 COURTROOM ADMINISTRATOR:  Please be seated.

         23                 Can you please state your name and spell your

         24    name for the record.

         25                 THE WITNESS:  David Klausner; K-l-a-u-s-n-e-r.

```
 1              COURTROOM ADMINISTRATOR:  Please tell us your
 2    city and state of residence.
 3              THE WITNESS:  I live in Redwood City,
 4    California, in Silicon Valley.
 5              THE COURT:  All right, Mr. Dykal, go ahead,
 6    please.
 7              MR. DYKAL:  Thank you.
 8                        DAVID KLAUSNER
 9                called as a witness on behalf of the
10        Defendants, was examined and testified as follows:
11                       DIRECT EXAMINATION
12    BY MR. DYKAL:
13    Q.    Good morning, Mr. Klausner.
14    A.    Good morning.
15    Q.    Have you been retained by Rimini Street to testify
16    in this the case?
17    A.    Yes.
18    Q.    Could you give a very high-level overview of your
19    task?
20    A.    I was retained to take a look at the results that
21    Mr. Hicks testified about.
22    Q.    And Mr. Hicks was the gentleman with the glasses who
23    testified about the website activities?
24    A.    Yes.
25    Q.    Before we get into that, could you explain your
```

1    background a little bit to the jury.

2    A.    Yes.  I got a bachelor's in math from Brooklyn

3    College of the City University of New York, so my accent.

4    And I also received a master's degree in electrical

5    engineering from Polytechnic Institute of Brooklyn which

6    became New York University.  And I've been programming

7    computers pretty much for several decades.

8    Q.    Have you ever worked with software updates, patches,

9    or fixes?

10   A.    Yes.  I had a responsibility -- I've worked for many

11   large companies and startups, worked for IBM, worked for

12   the City University of New York.

13             During my time at IBM, I was responsible for

14   developing updates, patches, and fixes, and delivering them

15   to hundreds of thousands of customers of IBM compilers

16   because, while I was at IBM, I developed COBOL compilers,

17   as well as PL/1 compilers and basic compilers.

18             And so I and my group wrote updates, patches,

19   and fixes, and made sure that the customers were properly

20   handled.

21   Q.    Mr. Klausner, do you have any experience with

22   databases?

23   A.    Yes.  Also, while at IBM, I developed interfaces to

24   allow the COBOL programs to call IBM databases, and that

25   was -- those were relational databases similar to the

2286

```
 1   database at issue in this case, and that was before Oracle
 2   was founded.
 3   Q.    Have you ever taught any computer science courses?
 4   A.    I taught programming to undergraduates at the City
 5   University of New York, Brooklyn College, as a lecturer for
 6   several years.
 7   Q.    And have you ever done any work on behalf of the US
 8   Government?
 9   A.    Yes.
10   Q.    And could you talk a little bit about that.
11   A.    I was working for the government in -- well, two
12   situations.  One was I developed a particular COBOL
13   compiler for the Defense Intelligence Agency of the US
14   Government.
15         And I also worked for the government to try to
16   recover taxes from Microsoft Corporation who were making a
17   master -- DVD master overseas and attempting to avoid the
18   taxes that were due in the United States.
19   Q.    Mr. Klausner, were you here to hear the testimony of
20   Mr. Hicks?
21   A.    Yes.
22         MR. DYKAL:  Marie, could we bring up the first
23   slide.
24   BY MR. DYKAL:
25   Q.    Mr. Klausner, do you recall seeing this chart?
```

2287

1    A.    Yes.  This is Mr. Hicks' chart from his

2    demonstratives.

3    Q.    Now, have you had the opportunity to assess

4    Mr. Hicks' findings?

5    A.    Yes.

6    Q.    Have you made any findings with respect to the types

7    of searches that were being run?

8    A.    Yes.  And I think there's been some testimony here

9    already that there were different searches.  They weren't

10   all, as they're indicated, a single kind of search.

11   Q.    Did your analysis -- well, can you explain the

12   impact of your analysis of the two different kinds of

13   searches.

14   A.    Yes.  It's clear that -- two different kinds of

15   searches.  One is a text search.  And that is similar to

16   what you do in Google.  You type in something and you hit

17   search, and Google goes and looks at all of the files it

18   has crawled or scraped and gives you the answers about the

19   hits.

20         The second type, which is the majority of the

21   searches that Rimini performed, is a directed targeted

22   retrieval.  It's not a search.

23         In effect, it says, "I want a particular piece

24   of information, go get it," and the database responds with

25   that particular information.

1    Q.    And so, to be clear, are you saying that Rimini

2    Street was largely performing a different kind of search

3    than the other users?

4    A.    Correct.  And the directed search is much faster

5    than the search that's typically text and go and find it.

6    Q.    And have you prepared a slide to illustrate?

7    A.    Yes.  Please, let's --

8    Q.    And so what is this slide depicting?

9    A.    This is the -- a copy, essentially, of Mr. Hicks'

10   slide that shows the magnitude of the impact of what he

11   says are the searches performed by Rimini.

12             And now this slide shows the purple line is

13   still the basic search by non-Rimini users, but, in fact,

14   if one factors in these directed targeted retrievals, yet a

15   very different answer.  That's the purple -- I'm sorry,

16   that's the blue line.

17             So directed targeted retrievals will take

18   approximately one third the amount of resources.  To

19   directly get that information is much less than doing a

20   text search.

21   Q.    And so to be clear, are you -- are you saying that

22   Rimini was running a certain type of search that was using

23   one third the resources of the standard typical search?

24   A.    Exactly right.

25   Q.    Now, did you hear Mr. Hicks testify about impairment

2289

1     to Oracle's websites from Rimini Street's activities?

2     A.    Yes.

3     Q.    And did you have an opportunity to assess Mr. Hicks'

4     methodology in coming to those results?

5     A.    I did.

6     Q.    And have you prepared a slide to review that

7     methodology?

8     A.    Yes.

9                Next slide, please.

10               MR. DYKAL:  Is there a way to clear the marks?

11    Thank you.

12    BY MR. DYKAL:

13    Q.    Mr. Klausner, there's a slide on the board.  Can you

14    explain to the jury what we're looking at.

15    A.    Yes.  There were several problems with Mr. Hicks'

16    opinions and methods, and I've created a slide to tell the

17    jury about what those were.

18               And the first is an assumption that Mr. Hicks

19    made that he needed to use some statistical model in order

20    to determine what the impairment was on the server, or the

21    amount of time that a particular activity takes.  That

22    first assumption is not correct.

23    Q.    And can you explain your analysis of why that

24    assumption is incorrect?

25    A.    Yes.  It needlessly complicates the results of what

1    actually happened.

2                If one -- if -- when I went and heard that, in

3    fact -- well, when I heard that there were 20 seconds of

4    delay time for a typical user, and I looked at the data

5    that was actually provided by Oracle, it didn't seem to

6    make sense.

7                How could somebody be delayed 20 seconds, or

8    everybody being delayed 20 seconds when, in fact, the data

9    doesn't show that?

10               And so creating a time-weighted harmonic means

11   is counter to or against what the actual data shows.

12   Q.    Now, when you say "actual data," what are you

13   referring to?

14   A.    There are logs that were the basis of the

15   computations that Mr. Hicks started with and that I went

16   and tested, and those logs contain the actual times, not

17   some calculated statistic that somehow made it look

18   different, but literally the actual times that it took for

19   a user to start and end their activity.

20   Q.    And you found that those actual times did not show

21   average delays of 20 seconds?

22   A.    That's correct.

23               MR. DYKAL:  Okay.  Let's go to the second.

24   BY MR. DYKAL:

25   Q.    Mr. Klausner, could you explain what we're seeing

2291

1    now?

2    A.    The second assumption Mr. Hicks made in supporting

3    his opinion was that as soon as an activity starts on the

4    server, it takes 100 percent of all of the resources of the

5    server when it's running.  That assumption is not correct.

6              It's similar to when you go to a restaurant, for

7    example, and you sit down, and you're the only person in

8    the restaurant, you're not consuming 100 percent of the

9    resources of the restaurant.  There are multiple cooks,

10   there are multiple waiters, there are a lot of tables,

11   people at the bar.  So it makes no sense.

12             And from my experience in operating systems,

13   which I have used and examined and modified over the years

14   that I've been in this business of 49 years, that's not

15   true.  Operating systems don't work that way.  They do not

16   give any particular task 100 percent of its resources.

17   Q.    And there's a third assumption up there.  Can you

18   explain a little bit what we're seeing?

19   A.    The third assumption that was made by Mr. Hicks was

20   that the virtual machines, I think they were called

21   environments, were running all at the same time, 10 of

22   them, and that's also not true.

23             The period and the graph that you've seen from

24   Mr. Hicks shows that very few of the times were all of

25   these 10 working and doing activities at the same time.

1    Q.   And did you reach any conclusion after analyzing

2    these assumptions from Mr. Hicks?

3    A.   Yes.   The result that Mr. Hicks testified about was

4    a slowdown of 10 to 20 seconds, and that's just not true.

5    Q.   Now, after you assessed Mr. Hicks' findings, did you

6    perform your own analysis?

7    A.   Yes.

8    Q.   And I believe this slide is to assist in walking

9    through that.   Could you explain the first step that we're

10   seeing here?

11   A.   Yes.   I went back to the original server logs.

12   These are logs; in other words, it's a history of every

13   activity that occurs during the time at issue on the Oracle

14   servers.

15        And those logs show who it is that's searching,

16   what type of search they're doing, what type of retrieval

17   they're doing, and exactly how many milliseconds are taken

18   up by that particular activity on the Oracle server.

19        So going back to the logs and looking at the

20   actual response times is what I started with.

21   Q.   And what was the second step?

22   A.   Step 2 was to remove outliers.

23        As with any system in the world, there are

24   failures on the low side.   In other words, let's say I

25   start a search, and I've input invalid information.   The

1    search will immediately end.  And so it's not fair to count

2    those that appear in the log because that would weigh

3    towards Rimini improperly so I discarded those.

4              I also discarded things that take more than two

5    and a half minutes.  Why is that?

6              Because, for example, if you do a Google search,

7    and your partner sitting next to you does a Google search,

8    and their results come back in five seconds, and you're

9    still waiting two and a half minutes later, there's

10   something broken, and it isn't because of what you did,

11   it's because there's something wrong with the software.

12             Those are not properly included as well.  So

13   eliminate the big guys, eliminate the zero guys, and what's

14   left are the actual searches and retrievals and the amount

15   of time that they took.

16   Q.   What was the third part of your analysis?

17   A.   I calculated average response times from the actual

18   numbers.

19             Very simple; count up the total number of

20   responses -- total response time, divide it by the number

21   of times the activities occurred, you get an average.

22   That's the average response time.

23   Q.   And so that gives you the average response time

24   during periods when Rimini was not running these high

25   levels of searches; is that right?

2294

1     A.     Exactly.  So I took certain days when Rimini did not

2    have a lot of activity and counted up the research, the

3    response times for those days.

4            And then number 4, next step, I looked at the

5    average response times for the high days when Rimini was

6    involved and compared the two.

7     Q.    And then what was the fifth step?

8     A.    The fifth step, by doing a comparison of the two, it

9    showed me what the actual impact was, the so-called

10   impairment, to find out what that difference was.  I did

11   that measure, and I believe I have a slide to show that.

12    Q.    Okay.  Now, what are we seeing in this slide,

13   Mr. Klausner?

14    A.    On the left side are the three days that I chose

15   that have low Rimini activity.  In other words, Rimini was

16   not actively retrieving documents or searching for

17   documents on those days.

18           And on the right side, I used the days that

19   Mr. Hicks chose where he says that Rimini impaired or

20   impacted the server.

21    Q.    And did you find an average response time for that

22   period of low Rimini activity?

23    A.    Yes.  On the days that I measured the actual numbers

24   in the log, it showed there were about 6.4 seconds of

25   response time for a user on the server.

1    Q.    And did you find an average response time for the

2    alleged period of high Rimini activity?

3    A.    Yes.  And, in fact, it was very similar or exactly

4    the same.

5    Q.    Now, are you aware that Mr. Hicks issued a rebuttal

6    report in this case?

7    A.    Yes.  I understand that Mr. Hicks, once he saw my

8    measurements and my report that showed that there was no

9    impact in the response time, went ahead and did what I did.

10          He discarded his model, at least for the moment,

11   and went ahead and looked at the numbers literally out of

12   the log to see whatever he could find.

13   Q.    And do you recall Mr. Hicks' results with respect to

14   that analysis?

15          MR. RINGGENBERG:  Objection, Your Honor,

16   hearsay.

17          MR. DYKAL:  Your Honor, Mr. Hicks testified to

18   that in court, and Mr. Klausner was here.

19          THE COURT:  Overruled.

20          THE WITNESS:  The response time that Mr. Hicks

21   found by looking literally at the log, never mind the

22   time-weighted harmonic mean, was different between Rimini

23   days and non-Rimini days by only one to two and a half

24   seconds or so for a user.

25

1    BY MR. DYKAL:

2     Q.    And so, to wrap this up, have you reached any

3    ultimate opinions with respect to Mr. Hicks' testimony

4    regarding server impairment?

5     A.    Yes.

6     Q.    And what is that?

7     A.    I don't see that there's a server impairment.

8            In fact, if the difference between Rimini

9    operating on a given day and not operating on a given day

10   is between one and two and a half seconds, that's hardly

11   noticeable for a user.

12           MR. DYKAL:  Thank you, Mr. Hicks.

13           THE WITNESS:  Mr. Klausner.

14           MR. DYKAL:  I'm sorry, Mr. Klausner.

15           No further questions.

16           THE COURT:  Cross-examination?

17                   CROSS-EXAMINATION

18   BY MR. RINGGENBERG:

19    Q.    Good morning, Mr. Klausner.

20    A.    Good morning.

21    Q.    You provided a report in this case disclosing your

22   opinions?

23    A.    Yes.

24    Q.    And you submitted that report on March 30th, 2012;

25   is that right?

1    A.    Yes.

2    Q.    And you were deposed on June 15th, 2012, of the same

3    year?

4    A.    Yes.

5    Q.    At your deposition, you didn't know how many hours

6    you worked on this case; right?

7    A.    That's correct.

8    Q.    You didn't know whether it was 20 hours or hundreds

9    of hours; correct?

10   A.    Correct.

11   Q.    And you're getting paid $400 an hour, which means

12   you didn't know whether you had earned $8,000 or $80,000;

13   is that right?

14   A.    That's right.

15   Q.    You attached to your report an exhibit that listed

16   the materials you considered in preparing your report;

17   correct?

18   A.    Yes.

19   Q.    And you listed in that some of the depositions in

20   this case; is that right?

21   A.    Yes.

22   Q.    In fact, why don't you turn -- there's a binder for

23   you, it's Exhibit B to your report.  You might want to take

24   a look at that.

25   A.    I have it.

2298

1    Q.    Great.  You've listed some of the depositions in

2    this case but not all of them; is that correct?

3    A.    Yes.

4    Q.    And specifically you listed the depositions of nine

5    Rimini employees or former employees; is that correct?

6    A.    Oh, I see.  Thank you.

7          Yes, that's probably so.

8    Q.    You didn't list the deposition of Mr. Doug Baron

9    which the jury heard, did you?

10   A.    Yes.

11   Q.    That is correct, you did not list it?

12   A.    Well, where shall I look?  I'm --

13   Q.    It's Exhibit B to your report.

14   A.    Yes.

15   Q.    There's a list of depositions on the third page.

16   A.    Exhibit C did you say?

17   Q.    B as in boy.

18   A.    Thank you.

19   Q.    You bet.

20   A.    Correct.

21   Q.    But you did talk to Mr. Baron on the phone for what

22   may have been less than an hour; is that right?

23   A.    Yes.

24   Q.    And that conversation was in 2012, and you didn't

25   take any notes; right?

1    A.    That's right.

2    Q.    And Mr. Baron is the gentleman who designed the

3    tools that you're testifying about; right?  The automated

4    download tools that Rimini used, Mr. Baron is the guy who

5    wrote them; right?

6    A.    Yes.

7    Q.    Mr. Baron didn't explain to you why he developed

8    these tools?

9    A.    I don't know.

10   Q.    Mr. Baron didn't tell you whether he had been

11   directed by higher-ups at Rimini to develop the tools?

12   A.    I don't know.

13   Q.    Mr. Baron did not explain to you why they stopped

14   using automated tools; right?

15   A.    No.

16   Q.    You've never used the tools yourself?

17   A.    That's right.

18   Q.    And at your deposition, you didn't know if Mr. Ravin

19   directed employees at Rimini to use automated tools, and

20   you didn't discuss that with Mr. Ravin or Rimini employees?

21   A.    That's right.

22   Q.    You offered an opinion in your report that there was

23   no proof that Mr. Ravin directed the use of tools, but you

24   didn't ask him yourself whether he did?

25   A.    That's right.

2300

1    Q.    In preparation of your report, you also talked to

2    Dennis Chiu and Michael Kerr for what also may have been

3    less than an hour each; is that right?

4    A.    Correct.

5    Q.    The jury hasn't heard about Mr. Kerr.  Your

6    conversation with him is limited to JD Edwards; is that

7    correct?

8    A.    I don't remember specifically, but it's likely.

9    Q.    You also looked at some of the documents produced in

10   discovery in this case; correct?

11   A.    I'm sorry.  I didn't hear the question.

12   Q.    Sure.  You also looked at some of the documents

13   produced during discovery in this case; correct?

14   A.    Yes.

15   Q.    And those are listed in your report; correct?

16   A.    Yes.

17   Q.    And all told, you look at the 10 -- only 10

18   documents produced by Rimini Street; isn't that right?

19   A.    Yes.

20   Q.    And you didn't look at any of the logs that Rimini

21   created about their downloading; isn't that correct?

22   A.    Yes.

23   Q.    Mr. Hicks testified about the Karen's Directory

24   Printer data listing all the files on Rimini

25   Street's systems --

1    A.    I'm sorry, I missed the words.

2    Q.    Sure.  Mr. Hicks testified about the Karen's

3    Directory Printer data listing all the files on Rimini

4    Street's systems, and he considered those and spent some

5    time discussing those.  You didn't look at that data

6    either, did you?

7    A.    I don't remember that.

8    Q.    And you didn't look at any of the PeopleSoft, JD

9    Edwards, or Siebel license agreements that are at issue in

10   the case, did you?

11   A.    I don't know that that's true, but perhaps.

12   Q.    You testified that there was no impairment of the

13   operation of Rimini Street's -- of Oracle's servers from

14   Rimini's tools; is that correct?

15   A.    That's right.

16   Q.    You agree that database deadlocks occurred in

17   Oracle's knowledge database server between January 8th and

18   January 12, 2009; correct?

19   A.    Yes.

20   Q.    And you agreed that during that time period, at

21   least certain times, Rimini was active with at least 10

22   concurrent sessions; correct?

23   A.    I don't know.  We probably need to take a look at

24   that chart from Mr. Hicks.

25   Q.    Do you agree that in that time period, January 8th

2302

```
1    to January 12, 2009, Rimini sometimes had 18,000 requests

2    per hour?

3    A.    Yes.

4    Q.    And that was the same period that the deadlocks were

5    occurring; correct?

6    A.    Correct.

7    Q.    But your opinion is that Rimini Street is not to

8    blame for those database deadlocks because Oracle could

9    have designed its system differently; isn't that right?

10   A.    I'm not here to supply that opinion.

11   Q.    Didn't you just tell me you were offering the

12   opinion that Rimini didn't cause any impairment of Oracle's

13   servers?

14   A.    Correct.

15   Q.    So is it your opinion that the deadlocks did not

16   occur -- were not Rimini's fault, or is it your opinion

17   that they were Rimini's fault?

18              MR. DYKAL:  Objection, Your Honor.  This is

19   beyond the scope of what Mr. Klausner testified to.

20              THE COURT:  I believe it's within the scope of

21   the direct.  Overruled.

22              THE WITNESS:  Can I hear the question again?

23   BY MR. RINGGENBERG:

24   Q.    You agree that during a time when Rimini was sending

25   18,000 requests an hour to Oracle's system there were
```

1    deadlocks.  My question is, do you think the deadlocks were

2    Rimini's fault, or don't you?

3    A.    I think they were probably a combination of factors,

4    from my experience in databases and in operating systems,

5    and Rimini was one of the factors.

6    Q.    It's a yes or no question, sir.  Was it Rimini's

7    fault, or wasn't it?

8    A.    I think I just answered the question.

9    Q.    I don't think you did.

10   A.    I guess we'll let the jury decide.

11         It wasn't only Rimini, in other words.

12   Q.    I'm sorry.  Please repeat that, sir.

13   A.    It was not only Rimini.

14   Q.    And you're blaming Oracle in part; is that right?

15   A.    I'm not blaming anyone.  I'm not here to cast blame.

16         I'm here to examine, provide testimony on the

17   math that was done by Mr. Hicks' test, whether there, in

18   fact, were 20 seconds of delay.  That's why I'm here.

19   Q.    What is your opinion on the cause of the deadlocks

20   on Oracle's systems from January 12th to January 9th, 2009?

21   A.    They were a number of factors.  Rimini was certainly

22   a factor.  Oracle was a factor.

23   Q.    And the reason you say Oracle was a factor was

24   because you believe Oracle could have designed its systems

25   differently?

2304

1    A.    I think it's more specific than that, but definitely

2    Oracle contributed to it.

3    Q.    Oracle -- and it is your opinion, is it not, sir,

4    that the way in which Oracle contributed to this problem

5    was by not designing its system to accommodate the same

6    user sending 19,000 searches from more than one computer in

7    an hour at the same time?

8    A.    I don't understand the hypothetical, but Rimini was

9    responsible to some extent, and Oracle had some

10    responsibility as well.

11    Q.    Right.  And your opinion about Oracle's alleged

12    responsibility is because you believe Oracle should have

13    designed its system to accommodate a user logging on from

14    multiple computers and sending as many as 18,000 requests

15    in a single hour; is that right?

16    A.    Yes.

17    Q.    In fact, isn't it true that it's your opinion that

18    proof that Mr. Baron's tools caused Oracle's server to

19    crash might not be enough for you to conclude that

20    Mr. Baron's tools damaged or disabled Oracle's computers?

21    A.    I think there's an assumption there that there was

22    damage or impairment.  There was none.

23    Q.    Right.  And proof that Mr. Baron's tools crashed

24    Oracle's servers wouldn't be enough for you to conclude

25    that there was damage; isn't that right?

1    A.    There was no damage.  They rebooted the computer,

2    and it was fine after four and a half hours.  So in the

3    space of four and a half hours, the problem was gone.

4    Q.    That's not an impairment of the operation of the

5    system in your mind?

6    A.    There was no damage.

7          I've worked in computers for a long time.  I've

8    worked on hard drive development.  I've worked for

9    companies that produce the hardware.

10         I've computed.  I've programmed for years, and

11   I've put together computers myself, hundreds of them over

12   the years.

13         There's no impairment here.

14   Q.    So the fact that the server was unavailable to any

15   user for several hours, in your view, was not an impairment

16   of the system?

17   A.    I think it's certainly prevention for -- it prevents

18   people from using the computer while it's down.  But once

19   you reboot the computer, as I think everybody in this

20   courtroom probably has, based on the years of experience

21   that I've had with Windows and other systems, you reboot

22   it, you're fine, you move on.

23   Q.    And the four hours of downtime, not an impairment.

24   That's your opinion.

25   A.    Well, four and a half hours it was unavailable.

1              And I understand impairment to mean that some

2    damage was done.  There was no damage done.

3    Q.    So --

4    A.    Things worked just fine afterwards.

5    Q.    So in your testimony, when you offered the opinion

6    that there was no impairment of Oracle's systems, you meant

7    to exclude any time when the system was totally unavailable

8    because of Rimini's conduct; is that right?

9    A.    I'm sorry.  I don't understand.

10   Q.    When you testified to the jury that in your view

11   there was no impairment of the operation of Oracle's

12   system, you didn't include in that assessment four hours in

13   which the system was totally unavailable?

14   A.    During those four hours -- I did include it.  The

15   system was unavailable.  But that's different than impair.

16   When you reboot the system, it comes back up and everything

17   is okay.

18   Q.    Completely unavailable means it's different than

19   impaired?

20   A.    Yes, for four and a half hours, that's right.

21   Q.    So let's talk about your search time analysis.

22              Mr. Klausner, let me show you -- and not for the

23   jury at this point, Plaintiffs' Trial Exhibit 648A, which

24   should be in your binder.  Do you have that?

25   A.    I'm looking at this binder?  I don't see it.

```
 1                 COURTROOM ADMINISTRATOR:  640, Counsel?
 2                 MR. RINGGENBERG:  648.
 3                 THE WITNESS:  Yes, I have it.  Thank you.
 4      BY MR. RINGGENBERG:
 5       Q.    All right.  So the first page has a colored graph.
 6             Do you recall seeing this in your deposition and
 7      answering questions about it?
 8       A.    Yes.
 9                 MR. RINGGENBERG:  Your Honor, I'd like to
10      display Exhibit 648A just for the purpose of allowing the
11      jury to understand Mr. Klausner's deposition testimony but
12      not for the jury.
13                 THE COURT:  You may do so.
14      BY MR. RINGGENBERG:
15       Q.    It's a little hard to see.  Mr. Klausner, I have a
16      prettier version.  Would you mind if we use that?  It's the
17      same graph.  It's just a little clearer.
18             Would that be okay with you if we use that
19      instead?
20       A.    Yes.
21                 MR. RINGGENBERG:  Matt, could you put that up,
22      please.
23      BY MR. RINGGENBERG:
24       Q.    So you testified about this graph in your
25      deposition, and you were asked -- there's a pattern of five
```

```
 1    spikes and then a trough, five spikes and then a trough,
 2    and what that represents is the traffic on the five days of
 3    the workweek followed by the weekend; isn't that correct?
 4    A.    Yes.
 5    Q.    And there's always some traffic on Oracle's systems,
 6    because it's a global company, but the patterns show
 7    patterns based on the US workweek because Oracle has a
 8    large customer base in the US; isn't that right?
 9    A.    I think so.
10    Q.    And in your analysis, you compared the search time.
11          So just to be clear what we're talking about
12    here, Mr. Klausner, you see there are five -- let's see if
13    I can get a different color marker.
14          You see there are five peaks -- starting at the
15    left, there are five small peaks and then a valley.  That's
16    the valley we're talking about between the first two sets?
17    Kind of looks like hands sticking up.  Do you see what I'm
18    talking about?
19    A.    Yes.
20    Q.    Just to make sure we're on the same page.
21          So that's Monday, Tuesday, Wednesday, Thursday,
22    Friday, Saturday, Sunday.  Monday, Tuesday, Wednesday,
23    Thursday, Friday, Saturday, Sunday.  We agree on that;
24    right?
25    A.    Yes.
```

1    Q.    Thank you.  So what you did in your analysis is you

2    compared the search time for time periods when Rimini was

3    running its download utilities to search times when you

4    said there was little or no Rimini Street activity; is that

5    right?

6    A.    Yes.

7    Q.    And the idea was to find normal or baseline days and

8    compare them to when Rimini was downloading a lot and see

9    if the time was different.  That's your fundamental idea;

10   right?

11   A.    Yes.

12   Q.    And you talked about six specific days in your

13   direct testimony, but you actually analyzed a number of

14   other days in your report; isn't that right?

15   A.    Yes.

16   Q.    All right.  And what you produced with your report

17   was spreadsheets for particular days showing the searches

18   on those particular days; isn't that right?

19   A.    Yes.

20   Q.    And those spreadsheets were the basis for your

21   calculation about the average search times on those days;

22   isn't that right?

23   A.    On those days, yes.

24   Q.    And then you extrapolated from the days you

25   considered to the days that you didn't; isn't that right?

2310

1    A.    Yes, I think that's right.

2    Q.    You didn't create the spreadsheets that were the

3    basis of your calculations, in fact, you asked Mr. Reckers

4    to do that, didn't you?

5    A.    Yes.

6    Q.    And you didn't tell him which days to pick, did you?

7    A.    Correct.

8    Q.    So let's go back to the baseline days.  Those are

9    the regular days that you're trying to figure out what

10   Oracle's systems did when Rimini wasn't downloading a lot

11   of material; is that right?

12   A.    Yes.

13   Q.    And so the baseline days that you testified about on

14   direct were November 11, 12, and 13?

15   A.    Correct.

16   Q.    That's a Tuesday, a Wednesday, and a Thursday?

17   A.    Yes.

18          MR. RINGGENBERG:  So I would like to write those

19   down, but my handwriting's tough.  Matt, could you start

20   making a list for me.

21   BY MR. RINGGENBERG:

22   Q.    Just to be clear, my colleague has pointed something

23   out to me which I'd like to --

24          When you said Mr. Reckers created those

25   spreadsheets for you, that's Rimini's counsel; right?

2311

1    A.    Yes.

2    Q.    So you asked Rimini's lawyer to make some

3    spreadsheets that distinguished between Rimini and

4    non-Rimini, and that's the spreadsheets you used for your

5    analysis?

6    A.    Generally, yes.  Not quite, but generally, yes.

7    Q.    So -- okay.  So let's go back to the baseline days

8    and the non-baseline days, so you're comparing to see which

9    is which.

10         So the days that you said were regular days, or

11   the baseline days, were November 12 -- or 11, 12, and 13;

12   is that right?

13   A.    Yes.

14   Q.    Great.  So -- and that's a Tuesday, a Wednesday, and

15   a Thursday; right?

16   A.    Yes.

17   Q.    So let's write those down, November 11, 12, and 13.

18         And so -- and those are all days when, at least

19   in the US, most people are at work, sitting at their

20   computer, logged in if this is their job, maybe they're

21   logged on to Oracle's system; right?

22   A.    Yes.

23         MR. RINGGENBERG:  So, Matt, could you mark those

24   as workdays.  Great.  Thank you.

25

2312

1    BY MR. RINGGENBERG:

2    Q.    Now, you assumed at the time of your report that

3    those were days that Rimini downloaded approximately 4,000

4    files from Oracle; isn't that right?

5    A.    I think so.

6    Q.    Yes.  And in considering whether something was a

7    baseline day or Rimini crawl day, you applied a cutoff to

8    say, well, if it's more -- if the down -- if Rimini's

9    activity is more than three or four percent of the

10   activity, then I'll call that a crawl day.  But, if it's

11   less, it's a baseline day; is that right?

12   A.    Yes.

13   Q.    So these days were actually almost exactly 3

14   percent.  Rimini's conduct was 3 percent of the downloading

15   on that day; is that right?  These days?

16   A.    That's correct.

17   Q.    So they were right at the edge of what you

18   considered to be a baseline day.  If they'd had any more

19   Rimini crawl, you would actually consider them a Rimini

20   crawl day; is that right?

21   A.    Probably, yes.

22   Q.    Did you consistently apply that 3 to 4 percent

23   cutoff in determining whether days were Rimini crawl days

24   or Rimini noncrawl days?

25   A.    I don't recall.  But for these days, that was the

1   criteria that I chose.

2   Q.    For November 11, 12, and 13?

3   A.    Yes.

4   Q.    But for other days, you may have applied different

5   criteria?

6   A.    I don't remember about the other days, right.

7   Q.    Do you remember looking at December 21 and trying to

8   decide whether that was a crawl day or not a crawl day?

9   A.    That may be so.  I don't particularly remember, but,

10  right.

11  Q.    And so the statistical analysis you talked about,

12  you don't remember which category December 21 is in?

13  A.    I don't.

14  Q.    So the crawl days you testified about in your direct

15  were November 19, 20, and November 21; is that right?

16  A.    Yes.

17  Q.    And did you include all of the searches on those

18  days in your average?

19  A.    Yes.

20  Q.    Isn't it true, actually, you excluded a number of

21  hours during this time period when you said an Oracle

22  system was down?  Do you recall that?

23  A.    That may be so.

24  Q.    Let me ask you to turn to your report, page 55,

25  footnote 181.

2314

1      A.    Yes, I have it.

2      Q.    All right.  And that footnote says that during this

3      period you, quote, "excluded searches performed when

4      Oracle's system was down," and you cite for that

5      proposition a particular Oracle document; isn't that right?

6      A.    That's right.

7      Q.    Right.  Let me show you Plaintiffs' Trial

8      Exhibit 665 which has been previously admitted.  Do you

9      have that in your binder?

10     A.    I do.

11     Q.    So this is the document you cited in your report to

12     conclude you should exclude some time on November 20th from

13     your analysis; is that right?

14     A.    Yes.

15     Q.    Now, the jury has actually heard a little bit about

16     this document already, but let me ask you to turn to page 4

17     of the document.

18     A.    I have it.

19     Q.    Right.  And it says -- under Purpose, do you see

20     that?  It says,

21           "This document is provided to review processes

22     and responses on the Orion KM issues that occurred on

23     November 20th at 2:55 PT."

24           Do you see that?

25     A.    Yes.

1    Q.    And then under Issue and Impact down below, it says,

2          "System bounced OG daemon again on web IV

3    mid-tiers and that seem to help ML3 KM issues that were

4    cleared at 6:45 PT."

5          Which time period did you exclude?  Was that

6    between 2:55 and 6:45 Pacific time?

7    A.    I can't tell from this.

8    Q.    What would you need to tell what you did?

9    A.    I'd need to review the materials.

10   Q.    Which materials?

11   A.    The OCG log.

12   Q.    I see.

13   A.    These are the Oracle server logs.

14   Q.    Right.  But you agree with me that you excluded some

15   period of time for your analysis based on this document,

16   you just -- you don't know what period of time?

17   A.    May I have a moment to read these paragraphs?

18   Q.    Absolutely.

19   A.    Thanks.

20          Yes.  And the question?  I'm sorry?

21   Q.    You agree with me that based on this document, you

22   excluded some period of time addressed, but you don't know

23   exactly what period of time you excluded from your

24   analysis?

25   A.    Well, based on the footnote, I excluded abnormal

```
 1    times, times with zeros, times over two and a half seconds,
 2    because something's broken.
 3    Q.    We'll talk about your exclusion of outliers a little
 4    later.  But this is a different issue, isn't it?
 5    A.    I think it is different, yes.
 6    Q.    Right.  So there were some searches and there were
 7    response times that you excluded altogether, and this is
 8    the document you relied on to make that decision; right?
 9    A.    Yes.
10    Q.    And you just don't remember, and you can't tell from
11    the document, even though it's the one you cited, which
12    time periods you excluded; is that right?
13    A.    I understand from -- yes, I can tell.  It's the time
14    that the system was down the four and a half hours starting
15    at midnight to 4:00 a.m.
16    Q.    Thank you.  I appreciate that.
17          So let me ask you to turn to page 6 of that
18    document.
19    A.    I have it.
20    Q.    Okay.  So in the section Lessons Learned, do you see
21    that?
22          It says -- the very last sentence says,
23          "The ML3 issue was seen again the following day
24    and the cause tracked down to a user starting a large
25    number of queries against ML3 in a very short period of
```

2317

1    time."

2              Do you see that?

3    A.    Yes.

4    Q.    And did you see Mr. Renshaw testify in court, the

5    nice British man who didn't want to be here?

6    A.    Yes.

7    Q.    And he addressed the jury on this particular

8    document.  Do you recall that?

9    A.    I don't recall that, but it may be so.

10             MR. RINGGENBERG:  You don't recall that.

11             So, Matt, let me ask you to display the trial

12   transcript at page 1023 starting at line 25, where it says,

13   "Would you explain to the jury what happened."

14             THE WITNESS:  It's a little small for me.

15             MR. RINGGENBERG:  Yeah.  We're going to blow it

16   up in a second.  I think I got my cite wrong, but Matt's

17   going to help me out.

18   BY MR. RINGGENBERG:

19   Q.    So addressing this document, Mr. Renshaw says --

20             "Would you explain to the jury what happened?"

21             And Mr. Renshaw said,

22             "So basically we started to see a large number

23   of requests for documents which meant that it was putting a

24   lot of extra load on the system, and that's what was

25   causing the errors, people were saying, when they were

2318

1    trying to access the system.

2              "QUESTION:  When you say it put an extra load on

3    the system, what does that mean?

4              "ANSWER" -- I can't do a British accent.  I wish

5    I could.  "So because it was a fairly large number of

6    documents this particular session was trying to retrieve,

7    it meant that the system had to work a lot harder to try

8    and retrieve all those documents in a very short space of

9    time."

10             Do you recall that?

11   A.    Yes.

12   Q.    All right.  So Mr. Renshaw was saying that it was

13   Rimini's downloading that was causing the problems, but you

14   excluded that time period from your results as a so-called

15   system downtime; right?

16   A.    I did exclude the downtime that he's talking about.

17   I don't necessarily agree with his analysis, but I do agree

18   that I excluded that time.

19   Q.    All right.  Would you agree with me that if the jury

20   were to conclude that the downtime on that day for some

21   users was due to Rimini's activity, that your exclusion of

22   that time from your analysis would have been erroneous?

23   A.    No.

24   Q.    No.  So --

25   A.    Absolutely not.

2319

1   Q.    So if Rimini's downloading is causing searches to

2   take abnormally long, it's appropriate to exclude those

3   really long searches from your analysis?

4   A.    I think your hypothetical is absolutely wrong.

5   Q.    Right.  So you don't believe Mr. Renshaw when he

6   said that the problem addressed in this document was

7   because Mr. Corpuz was issuing hundreds of requests or

8   thousands of requests an hour?

9   A.    I think Rimini did cause the servers to go down, or

10  the server to go down, between midnight and 4:30,

11  absolutely, and that Oracle contributed to it, but I don't

12  think Mr. Renshaw fully explained the situation.

13  Q.    Right.  Was the system entirely down, or were users

14  just having abnormally long search times on these days in

15  November 2008?

16  A.    I think the system was broken, and people were not

17  able to search during that time.

18  Q.    All users, or only some users, sir?

19  A.    It's not clear.

20  Q.    Right.  So let me ask you to go back two pages --

21  A.    In other words, there's no proof it was all users,

22  or some users, or any particular user.

23  Q.    So, actually, let me ask you to turn to page 4 of

24  the document.

25  A.    I have it.

2320

1    Q.   Do you see the line entry that says 20 November 2008

2    at 3:20?

3              MR. RINGGENBERG:  Matt, can you blow that up?

4    It's the third line on the chart.

5              THE WITNESS:  I see it.

6    BY MR. RINGGENBERG:

7    Q.   It says,

8              "Support team notified of issues with KM in Orion

9    portal.  Not affecting all users."

10             Do you see that?

11   A.   Yes.

12   Q.   And this is a document you relied on to exclude this

13   time period from your analysis; right?

14   A.   This is a document I relied on, correct.

15   Q.   Right.  So what happened here is there was Rimini

16   activity that caused the system to result in abnormally

17   long search times for some users, and you excluded all of

18   that, and then, on the basis of that exclusion, testified

19   that Rimini didn't cause anyone's searches to be slower.

20   Isn't that right?

21   A.   No, I think it's much simpler than that.  I used the

22   actual response times except for the four and a half hours.

23             It's in the log.  The response times show that

24   while Rimini was doing other activity all during that day,

25   the responses were still 6.4 seconds plus or minus one or

2321

1    two and a half seconds.

2    Q.    If the users who were on the system at this time, on

3    November 20, 2008, were getting abnormally long search

4    times, you would have excluded that from your analysis

5    because you didn't look at -- you didn't include any of

6    these hours in your work; isn't that right?

7    A.    No.  If there were extraordinary long search times

8    outside of the four and a half hours, I would have included

9    them unless the system was broken for other reasons, which,

10   in fact, it also was.

11              MR. RINGGENBERG:  Move to strike as

12   nonresponsive.  And I'll ask the Court to please direct the

13   witness to answer my question.

14              THE COURT:  I will strike it as nonresponsive,

15   and I'll ask the court reporter to read the question again,

16   please.

17         (The question was read by the court

18         reporter.)

19              THE WITNESS:  Yes.  For the four and a half

20   hours I excluded those times.

21              MR. RINGGENBERG:  Okay.

22   BY MR. RINGGENBERG:

23   Q.    So let's talk about some other times in that window

24   of November 19, 20, 21, 2008.

25              Did you -- other than the four hours you

```
 1    excluded that Mr. Renshaw talked about being periods of

 2    heavy activity from Rimini Street, did you include every

 3    hour of the day other than that?

 4    A.    I think so.  The log begins at midnight and goes to

 5    about 11:00 p.m.

 6    Q.    All right.  So that means you included those time

 7    periods when Rimini wasn't actually crawling because Oracle

 8    had managed to block their IP address and bar their access

 9    to the system; isn't that right?

10    A.    I don't know that that's right.

11    Q.    You don't know if that's right.

12          So let's turn, please, to Plaintiffs' Trial

13    Exhibit 46, which was previously admitted.

14    A.    I have it.

15    Q.    Great.  So this was an exhibit to Mr. Baron's

16    deposition.  Do you know if you happened to see this

17    document before?

18    A.    May I take a moment?

19    Q.    Please.

20    A.    I don't remember --

21    Q.    Okay.

22    A.    -- seeing this.

23    Q.    So let me ask you to turn to page 3 -- well,

24    actually, first, let's start at the top.

25          So this is an email from Mr. Baron to Mr. Chiu.
```

2323

1    The subject line is XO Communications, audit archive

2    history.  And Mr. Baron writes,

3            "I updated the documents with all my comments and

4    additions.  Let me know if you have questions."

5            And then he's responding to an email from

6    Mr. Chiu down below which says, "Hi, Doug, I've

7    consolidated the details and timelines into this

8    document" --

9    A.    I'm sorry, I lost you.

10   Q.    I'm very sorry.  At the bottom of the page, same

11   page, page 1, there's an email from Mr. Chiu to Mr. Baron.

12           And he says,

13           "I've consolidated the details and timelines into

14   this document, and have incorporated additional context

15   around the overall onboarding pieces that went on around

16   the KB archive itself."

17           Do you see that?

18   A.    Yes.

19   Q.    Okay.  So turn to page 3, and there's an entry for

20   November 21, 2008.  Do you see that?

21   A.    Yes.

22   Q.    And that's one of the days that you analyzed, right,

23   19, 20, 21 of November; right?

24   A.    That's right.

25   Q.    So if you turn the page, it says "[KB]" in brackets.

1   It says, "XO Knowledge Base" --

2   A.   Can we slow down for a moment, sir?

3   Q.   Yes.  Why don't you read it, and then we'll discuss

4   it.  How about that?

5   A.   Thank you.

6        I'm on page 4.

7   Q.   Uh-huh.

8   A.   Yes, I'm ready.  Thanks.

9   Q.   So the second bullet point under November 21, 2008,

10  says,

11       "[KB] XO Knowledge Base Doc ID scan and download

12  initiated at 8am EST.  Scan was stopped at 3:30pm EST our

13  external IP address," and it lists the address "to

14  Metalink3 was blocked by Oracle, preventing access."

15       Do you see that?

16  A.   Yes.

17  Q.   So if there was -- the crawling on this day was

18  limited to 5:00 a.m. Pacific to 12:30 p.m. Pacific.  Do you

19  agree?

20  A.   Yes.

21  Q.   But you included the entire day in your analysis;

22  correct?

23  A.   Yes.

24  Q.   So all of those hours that Rimini wasn't downloading

25  because Oracle had managed to block their IP address, you

2325

```
 1    counted those in determining the average speed and
 2    concluding that actually Rimini's -- Oracle's system wasn't
 3    slowed; isn't that right?
 4    A.    For which days?
 5    Q.    November 21, 2008.
 6    A.    Yes, along with the 19th and the 20th, I think.
 7    Q.    Do you know for a fact that Rimini was downloading
 8    every hour of the day on November 19th and November 20th?
 9    A.    I don't know, but these were the days that Mr. Hicks
10    was talking about, so I analyzed them.
11    Q.    Uh-huh.  And we know on this day it wasn't the whole
12    day; correct?
13    A.    Yes.
14    Q.    Because Oracle managed to block their IP?
15    A.    Correct.
16    Q.    And Rimini hadn't figured out a way to get around
17    that yet?
18    A.    I don't know.
19    Q.    Right.  And do you know for a fact whether or not
20    every hour of the day of the other periods you considered
21    actually had Rimini activity, or whether it was only some
22    of the hours of the day?
23    A.    Of which days?  I'm sorry?
24    Q.    November 19th and November 20th, sir.
25    A.    I think there was Rimini activity on those days.
```

2326

1   Q.   Right.  That's not my question.

2        My question is whether -- do you know for a fact

3   whether there was Rimini activity every hour of the day, or

4   only part of the day, due to Oracle's blocking of Rimini's

5   IP and their efforts to circumvent that?

6   A.   I don't know.

7   Q.   Right.  But you included every hour of the day in

8   your analysis in determining your average response time;

9   right?

10  A.   Yes, because Mr. Hicks testified about that.  My job

11  was to take a look at his data and see what, in fact, was

12  true.

13  Q.   Uh-huh.  Well, but then you computed an average that

14  you think was the correct average, didn't you?  You told

15  the jury it was, at least.

16  A.   I'm sorry?

17  Q.   But you computed an average response time that you

18  represented to the jury was your view of the impact on

19  Oracle's systems; isn't that right?

20  A.   Yes.  The average response time was directly from

21  the data.

22  Q.   Right.  You analyzed other days other than

23  November 19, 20, and 21, that Rimini was active, didn't

24  you?

25  A.   Yes.

2327

```
 1    Q.    You analyzed November 27 and 28 as crawl days,
 2   didn't you?
 3    A.    I think so.
 4    Q.    Right.  That's Thanksgiving and the day after
 5   Thanksgiving 2008?
 6    A.    Yes.
 7    Q.    Not a lot of people at work on those days; right?
 8    A.    Well --
 9    Q.    In the US?
10    A.    Not in the US.
11    Q.    Right.  Which is --
12    A.    Right.
13    Q.    -- where Oracle's largest customer base is; correct?
14    A.    I don't know the size of the customer base.
15    Q.    Do you recall reading the chart with the five
16   chart -- the five spikes and then the valley, the five
17   spikes and the valley?
18    A.    Yes.
19    Q.    And those are the US workdays; right?
20    A.    Yes.
21    Q.    Right.  So -- but Thanksgiving is a day when the
22   traffic you would expect to be substantially lower because,
23   in fact, most Americans are home with their families;
24   right?
25    A.    I don't know the correlation.  I haven't done that
```

2328

1    examination between --

2    Q.    You're not prepared to make an assessment as to

3    whether traffic was slower on Oracle's systems as a general

4    matter on Thanksgiving?

5    A.    I don't know.  I haven't done that analysis.

6    Q.    You didn't do that analysis.

7    A.    What I do --

8    Q.    But you did analyze the average search times on

9    Thanksgiving; isn't that right, sir?

10   A.    Please let me finish my answer.

11   Q.    Please.

12   A.    I didn't do the analysis.  I'm here for testimony

13   about what I actually did and tested Mr. Hicks'

14   suppositions.

15   Q.    Right.

16   A.    I've told the jury that there was no impairment, the

17   systems came up after they were booted, at the average

18   times of 6.4 seconds.

19         You're asking me all kinds of questions about

20   what happened overseas, what happened in the US.  I didn't

21   do that analysis.  I don't know.

22   Q.    Right.  But you did compute an average search time

23   on November 27 and 28, 2008, didn't you?

24   A.    Correct.

25   Q.    You did.  That's Thanksgiving and the day after

2329

1    Thanksgiving; right?

2    A.    Correct.

3    Q.    And, in fact, what you found was that the response

4    time was slower on Thanksgiving than it was on your

5    so-called baseline days; isn't that right?

6    A.    That may be so.

7    Q.    But you didn't tell the jury that, did you?

8    A.    No, because I don't want to -- I don't want to --

9    I'm not here to impugn Oracle for the way that it programs,

10   or for the problems that it puts into its databases, the

11   random stuff that happens on the server.

12            I'm here to test what Mr. Hicks said to see if

13   it was correct, and why it doesn't seem to make any sense

14   that there was supposedly a 20-second response time when,

15   in fact, for the days that he testified, it's not that

16   long, it's between 6.4 and 7-point something.

17   Q.    But to do that, you computed averages on a number of

18   days; right?  And that was the basis for your testimony

19   that there was no slowdown on Oracle's systems; isn't that

20   right?

21   A.    I need to hear the question again.

22   Q.    Sure.  Your testimony, that there was no slowdown on

23   Oracle's systems, was based on average times you computed

24   on some but not all of the days in question; isn't that

25   correct?

1    A.    What do you mean by days in question?

2    Q.    So Rimini was -- well, how many days did you analyze

3    specifically in compute averages for, do you recall?

4    A.    I don't recall exactly.  I think there were probably

5    10, maybe more.

6    Q.    Uh-huh.  And those days when you told the jury "I

7    didn't see any slowdown in Oracle's systems," your basis

8    for saying that was the averages that you computed for

9    those days; right?

10   A.    I didn't tell the jury about -- my job was to look

11   at what Mr. Hicks said.  He testified about three days.  He

12   testified about the 19th, 20th, and 21st.  And I chose

13   three other days when there was very little traffic.

14             I didn't testify about what you're talking

15   about.

16   Q.    You don't have an opinion as to whether there was a

17   slowdown other than on November 19, 20, 21?  For all you

18   know, there could have been a slowdown on other days and

19   you don't know?

20   A.    No.  There is no impairment to the system or

21   slowdown --

22   Q.    On any day?

23   A.    -- that can be attributed to Rimini particularly

24   because of the way the systems work, the database, and the

25   operating system.

1   Q.    And you -- in order to reach that conclusion, you

2   computed averages on a number of days; right?  That's the

3   basis for your telling the jury there was no impairment;

4   isn't that right?

5   A.    I did.  Yes.

6   Q.    And one of the days you computed the averages on was

7   November 27th, November 28, 2008, which was Thanksgiving

8   and the day after Thanksgiving; isn't that right?

9   A.    I think that's true.

10  Q.    Right.  So when you stood in front of the jury, you

11  sat in front of the jury and said there was no slowdown,

12  you were basing that on the fact that on Thanksgiving the

13  slowdown wasn't as bad as you might have thought; isn't

14  that right?

15  A.    No.  I was basing it on what Mr. Hicks said.  He

16  said the 19th, 20th, and 21st were impairment days, and

17  they were slowdown days, and that's what I tested.

18  Q.    Why did you examine -- compute an average for

19  Thanksgiving?

20  A.    I don't -- I don't remember that I did or didn't.

21  Q.    You don't remember if you did or did not compute an

22  average on Thanksgiving?

23  A.    I don't remember.

24  Q.    So there's a tab in your binder which is called

25  Summary -- Statistic Summary.  Why don't you take a look at

2332

1    that.

2    A.    Is this tab -- I have it, yes.

3    Q.    This is something that you provided with your

4    report, was it not?

5    A.    Yes.

6    Q.    And it's the averages for each of the days you

7    considered; isn't that right?

8    A.    Yes.

9    Q.    Right.  And you picked some of the days, but not all

10   of the days, in November and December '08 and January '09;

11   right?

12   A.    Yes.

13   Q.    And one of the days that you analyzed was

14   November 27 and November 28.  That's the third page of the

15   chart; right?

16   A.    Yes, I have it.

17   Q.    And you told the jury that the average search time

18   and the baseline -- in the crawl period -- pardon me.

19          You told the jury that the average search time

20   for non-Rimini searches in the baseline was only six

21   seconds, isn't that right, on a workday?

22   A.    No.

23   Q.    That wasn't your direct testimony, sir?

24   A.    I told the jury about the particular days that

25   Mr. Hicks testified about.

2333

1   Q.   Right.  So on November 11, 12, 13, your baseline

2   days, right, which are workdays, the average search time is

3   6.4 seconds.  That's what you said; right?

4   A.   Yes.

5   Q.   Right.  And on Thanksgiving, which is the holiday

6   for everyone in the US, you concluded when Rimini was

7   crawling, that the search time was over a second and a half

8   longer; isn't that right?

9   A.   I'm sorry.  Can I hear that again?

10  Q.   Yes.  You concluded that on Thanksgiving, the search

11  time, average search time, was slower than on a workday

12  that Rimini wasn't crawling on; isn't that right?

13  A.   I don't know.  Can I have a moment to refresh my

14  memory?

15  Q.   You bet.  It's on page 3.

16  A.   I'm sorry?

17  Q.   It's page 3.  It's Thanksgiving.

18  A.   Okay.  And your question is?

19  Q.   Right.  So you told the jury the average search time

20  on workdays in early November, November 11, 12, 13, was 6.4

21  seconds; right?

22  A.   Yes.

23  Q.   And the average search time, as according to you, on

24  Thanksgiving, the holiday, was 7.3 seconds; isn't that

25  right?

2334

1          Middle column, mean, 7,372 milliseconds?

2     A.    Yes.

3     Q.    So -- and that's the day that Rimini was crawling;

4     right?

5     A.    Yes.

6     Q.    So do I have it correct that the average search time

7     when everyone in the US is on the system is 6.4, but the

8     average search time when Rimini was crawling on

9     Thanksgiving was more than a second longer; right?

10    A.    Correct.

11    Q.    According to you.

12          But you didn't tell the jury that in your direct

13    testimony, did you?

14    A.    That's right.

15    Q.    Mr. Klausner, let's talk about -- you also analyzed

16    some other baseline days, didn't you?

17    A.    Yes.

18    Q.    Days when Rimini wasn't searching; right?

19    A.    Yes.

20    Q.    According to you.

21          And you computed averages for those; right?

22    A.    Yes.

23    Q.    So if you turn to -- can you turn to the page of

24    your chart that's December 21.  Do you see that?

25    A.    I have it.

1    Q.   Right.  So you computed the average search time on

2  December 21 as a baseline day to determine whether Rimini

3  was resulting in searches that were longer than that;

4  correct?

5  A.   Yes.

6  Q.   And what you concluded for December 21 was that the

7  meantime was only three seconds; right?

8  A.   Correct.

9  Q.   So on a day when Rimini wasn't crawling, you found

10  that the average search time was only three seconds for

11  this particular day?

12  A.   Correct.

13  Q.   Right.  And you concluded that on the day when

14  Rimini wasn't searching -- was searching, searches took 6.4

15  seconds, and that's what you told the jury earlier; right?

16  A.   Yes.

17  Q.   Right.  But you still conclude there was no

18  impairment of Oracle's systems?

19  A.   Right.

20  Q.   December 30th, you looked at that as a baseline day

21  also, didn't you?

22  A.   Yes.

23  Q.   And you concluded on that day, when there was no

24  Rimini crawling, that the average search time was four

25  seconds, right, 4.1?

1    A.    I'm sorry, December 30?

2    Q.    Yeah.

3    A.    Yes.

4    Q.    But the average search time when Rimini was

5    crawling, according to you, was 6.4 seconds; right?  That's

6    what you told the jury earlier today in direct testimony?

7    A.    No.  This is December 30.  Every day is different.

8    Q.    Every day is different.

9    A.    Every day goes up and down.

10         But if we look at the numbers that you were

11   talking about and I've put in my report, we're all around

12   six seconds, five seconds, four seconds, three seconds, not

13   20.

14   Q.    Right.  But -- so every day is different, is that

15   your testimony, sir?

16   A.    Yes.  And every day is pretty much without an

17   impairment.

18   Q.    Pretty much?

19   A.    Without an impairment.

20   Q.    You also looked at February 5, didn't you?

21   A.    Yes.

22   Q.    And the average search time -- you considered that a

23   baseline day, there was no crawling on that day; right?

24   A.    Yes.

25   Q.    And the average, according to you, on that day was

1  3 seconds, 3.3 seconds?

2  A.    On February 5?

3  Q.    Yeah.

4  A.    Yes.

5  Q.    But you told the jury that the average time when

6  Rimini was searching was more than 6 seconds; right?

7  A.    No.

8  Q.    You didn't?

9  A.    I told the jury that on average between the days

10  November 11, 12, 13, and what Mr. Hicks talked about as 19,

11  20, 21, was relatively unchanged; pretty much the same.

12  Q.    But you agree that if you compare February 5 to

13  November, it shows that actually the searches caused the

14  search times to be twice as long; right?

15  A.    I'm sorry?

16  Q.    Right?

17  A.    What was your question?

18  Q.    So November 19, 20, 21, you computed the average

19  search time when Rimini was crawling, based on it was

20  crawling part of that time, setting aside the fact that you

21  excluded times of heavy Rimini activity, you computed the

22  average search time as 6.4 seconds for those days; right?

23  A.    For the days that I testified about, yes.

24  Q.    And another day you analyzed when Rimini wasn't

25  crawling, the times were twice as fast; isn't that right?

2338

1    A.    Yes.   There were days when it was three seconds --

2    Q.    Right.

3    A.    -- more.

4    Q.    And on February 11, that's another baseline day you

5    looked at; right?

6    A.    Correct.

7    Q.    And that's another day that was substantially faster

8    by your own analysis than the days in which Rimini was

9    crawling; isn't that right?

10   A.    I don't know about substantially faster.   The

11   difference between 3.8 seconds and 6.4 is --

12   Q.    It's almost twice as much, isn't it, sir?

13   A.    Well, two is twice as much as one.

14         But when we do a search on Google, we're willing

15   to wait 5 seconds, 10 seconds sometimes, for the results to

16   come back.   I don't know what you mean substantial, by what

17   metric.

18   Q.    You looked at April 18 through April 25 as another

19   baseline day, didn't you, sir, this baseline series of

20   days; right?

21   A.    I'm sorry.   You're talking too fast for me.   Can you

22   slow down a little?

23   Q.    Sure.   You also computed averages for April 18th

24   through April 25th, didn't you?

25   A.    Yes.

2339

1    Q.    And those were baseline days in your mind?

2    A.    Yes.

3    Q.    And the average you computed again was 3.4 seconds;

4    right?

5    A.    That's right.

6    Q.    So, once again, the days when Rimini wasn't

7    crawling, in your opinion, were almost twice as fast as the

8    days when Rimini was crawling; isn't that right?

9    A.    No.  On November 11, 12, and 13, Rimini was not

10   crawling, and the average was 6.4.

11   Q.    Uh-huh.  And on February -- April 18th, 19th, 20,

12   21, 22, 23, 24, 25, when Rimini wasn't crawling, the

13   average search time was 3.4 seconds, according to you?

14   A.    Correct.  I believe that's when Oracle put in new

15   hardware, which would make a difference.

16   Q.    But that was the baseline you chose; right?

17   A.    Yes.

18   Q.    So let's talk about -- we talked a little bit before

19   about December 28th.  Do you recall that?  I'm sorry,

20   December 21.  I apologize.

21   A.    I'm sorry, 21?

22   Q.    December 21.

23   A.    Yes, I have it.

24   Q.    And your chart doesn't list that as a baseline day,

25   does it?

2340

1    A.    That's correct.

2    Q.    Right.  Which means that you concluded that was a

3    Rimini crawl day?

4    A.    I don't remember.

5    Q.    You don't remember.

6          So, sir, the search time on that day was 3.09

7    seconds; right?  That was what you computed the average

8    search time to be?

9    A.    Yes.

10   Q.    Which is actually more than twice as fast as the day

11   that you computed when Rimini was crawling?

12   A.    More than twice as fast?

13   Q.    6.4 is more than twice as long as 3.01?

14   A.    Yes.

15   Q.    Right.  And, in fact, that was the day when -- that

16   was the day that you should have considered not a Rimini

17   crawl day; isn't that right?

18   A.    I just don't remember this day.

19   Q.    You don't remember.  You don't remember testifying

20   about this day at length in your deposition?

21   A.    I don't remember.

22   Q.    Isn't it a fact that there were only 38 accesses by

23   Rimini on this day?

24   A.    That may be so; I just don't remember.

25   Q.    Right.  And on that day, when there were only 38

2341

```
 1    accesses, that the search time was more than twice as fast
 2    as the day you computed as when Rimini was crawling; right?
 3    A.    This is -- this appears -- yes, it appears to be a
 4    day that is similar to the November 11, 12, and 13
 5    baseline.
 6    Q.    Right.
 7    A.    Which was 6.4.
 8    Q.    Would you agree with me that the centerpiece of your
 9    analysis is that November 19, 20, 21 days, because those
10    are the days that you really think are the best days to
11    look at?  Seems to be your testimony.
12    A.    November -- say it again.  November --
13    Q.    19, 20, 21, those crawl days, you think those are
14    the ones that the jury really ought to look at?
15    A.    I choose those days because that's what Mr. Hicks
16    chose.  I'm not here to make comments about other days
17    particularly.
18    Q.    Well, Mr. Hicks didn't just testify about those
19    days, did he?  He testified about a number of other days;
20    right?
21    A.    I don't remember that.
22    Q.    You don't remember that.
23          But you're saying, based on your analysis of
24    November 19, 20, 21, you're concluding there was no
25    impairment for the whole period; right?
```

2342

1    A.    Yes.   The computer was rebooted and came right back

2    up.

3    Q.    So one of the things you did was exclude all the

4    searches that took longer than two and a half minutes;

5    right?

6    A.    Yes.

7    Q.    Right.  And there were a number of searches on

8    November 19, 20, and 21, that took longer than two and a

9    half minutes; isn't that right?

10   A.    Yes.

11   Q.    So let me ask you to turn to Exhibit 5514.

12   A.    I have it.

13   Q.    So you looked at the Oracle server logs; right?

14   A.    Yes.

15   Q.    And you provided with your report a series of

16   spreadsheets that had entries from those logs; right?

17   A.    Yes.

18   Q.    And one of those spreadsheets is for November 19,

19   20, and 21?

20   A.    Yes.

21   Q.    And in those spreadsheets is a tab called Searches;

22   right?

23   A.    You mean in the electronic spreadsheets?

24   Q.    Correct.

25   A.    I think that's right.

2343

1    Q.    All right.  And do you recognize the information in

2    Exhibit 5514 as those entries, the types of entries that

3    you had in your spreadsheets?

4    A.    I'll take your word for it.

5    Q.    Okay.  So the first column has the date and time;

6    right?

7    A.    Yes.

8    Q.    And the fourth column has a user name which is an

9    email address; right?

10   A.    Yes.

11   Q.    And the fifth column has a number, and that's the

12   search time in milliseconds; right?

13   A.    Yes.

14   Q.    And then the last column has the text that was

15   searched upon; right?

16   A.    That's not true.

17   Q.    That's not true?  What is the last column, sir?

18   A.    The last column is a comment or a message that's

19   returned as a result of a query using the structured query

20   language.

21          And the database manager, in this case the

22   Oracle Database Manager, returns what it thinks happened,

23   and if there were any errors, it also indicates so in that

24   text area.  So it isn't what you're saying.

25   Q.    So, for example, if that last column has the words

2344

1    "freight handling code invalid," you don't think that's

2    what the user was searching for?

3    A.    Not necessarily.

4    Q.    But it might be?

5    A.    In some cases, it is.  In some cases it is a doc ID,

6    which is a document number, particular retrieval number --

7    Q.    So the third entry on that list -- I'm sorry.

8    Please continue.

9    A.    -- for a direct target retrieval.  In some cases,

10   it's text that they're searching for.

11   Q.    Right.  The third entry on the list says "MLDOCID"

12   and has a number.  Do you see that?

13   A.    Yes.

14   Q.    That's one of those doc ID searches you're talking

15   about; right?

16   A.    It's not a search.

17   Q.    I'm sorry, a doc ID retrieval you referenced; right?

18   A.    It's a retrieval.  There's no searching

19   particularly.  It says "go get that document."

20   Q.    Right.  And the reason you excluded all of the

21   searches that took longer than two and a half minutes was

22   that it was your assumption that those were not indicative

23   of true search activity; is that right?

24   A.    No, it's indicative of something broken on the

25   Oracle server.

2345

1    Q.    Let me ask you to turn to your report at page 53.

2    A.    I have 53.

3    Q.    Do you see paragraph L?

4    A.    Yes.

5    Q.    Do you see the sentence that's -- the clause that

6    starts, "I have removed all search times"?

7                It's the very last -- the next to last and last

8    line on the page.

9    A.    You mean it starts "To minimize the impact" --

10   Q.    Why don't you read that sentence aloud to the jury,

11   please.

12   A.    "To minimize the impact on these abnormal data

13   points, I have removed all search times over two and a half

14   minutes on the assumption that such data points are not

15   indicative of true searching."

16   Q.    That's what you did?

17   A.    Yes.

18   Q.    In fact, isn't what Exhibit 5514 is, a list of all

19   the searches on November 19, 20, and 21, you excluded on

20   the assumption they weren't true search activity?

21   A.    Well, as I look through this, it looks like these

22   are the five and a half percent of searches that were over

23   20 -- 20 seconds on that day.  I think they were about five

24   and a half percent that were over 20 percent, over 20

25   seconds.

2346

1    Q.    Right.  So, for example, about six items down, the

2    right column has the text,

3              "Is the PeopleSoft login user ID vulnerable to

4    cross-site scripting XSS," question mark; right?

5    A.    Yes.

6    Q.    And that search is attributed to Mr.

7    richard.knighton@inl.gov?  Do you see that?

8    A.    Yes.

9    Q.    Do you recognize that as the Idaho National Labs?

10   A.    No.

11   Q.    And according to the logs, that search took a

12   hundred and thirty-two -- 1.3 million milliseconds; isn't

13   that right?

14   A.    It took -- yes.

15   Q.    That's about 20 minutes; right?

16   A.    That is -- yes, about 20 minutes, over 20 minutes.

17   Q.    And you didn't include that search in your average

18   because you assumed it wasn't true search activity; right?

19   A.    Exactly.

20   Q.    And so if you go to four pages down, page 4, the

21   very last entry, do you see that?

22   A.    Please give me a moment.

23              Okay.  And the last entry on --

24   Q.    Page 4.

25   A.    Page 4.  I have it.

2347

```
 1    Q.    Right.  So the search text is,

 2               "Session warning.  The server you are trying to

 3    access is either busy or experiencing difficulties.  Please

 4    close the web browser, open a new browser window, and try

 5    logging in again."

 6               Do you see that?

 7    A.    Yes.

 8    Q.    And that's attributed to Mr. anil.fogat@

 9    cognizant.com?

10    A.    Yes.

11    Q.    And that took 300,000 milliseconds?

12    A.    It took about five minutes.

13    Q.    Right.  That's five minutes.

14               And you excluded that in computing your average

15    because you thought it wasn't indicative of a true search;

16    right?

17    A.    Exactly.  Searches should not take that long on any

18    server.

19    Q.    And so if Rimini's system is causing searches to

20    take longer than two and a half minutes, you excluded those

21    altogether from your analysis; right?

22    A.    No.

23    Q.    You didn't?

24    A.    No.

25    Q.    Didn't you disagree with me, you did exclude every
```

2348

1    single search over two and a half minutes?

2    A.    Yes.

3    Q.    And so if it is true that Rimini's activity caused a

4    particular search to go from under two and a half minutes

5    to over two and a half minutes, you wouldn't know that

6    because you didn't include it in your averages?

7    A.    No.

8    Q.    How is that not true, sir?

9    A.    Rimini did not cause those searches to go beyond.

10         One of the things that Mr. Hicks failed to do

11   was to take a look at the capacity of the servers.  What

12   are they really capable of.

13         Like in that restaurant example I gave you, if

14   there are 30 chairs, 30 tables in the restaurant, somebody

15   goes in and orders something, if half the tables are empty,

16   that next person isn't going to be burdened, isn't going to

17   be slowed down, isn't going to be impaired in their order

18   because there's more capacity in the restaurant, capacity

19   in the kitchen, capacity with waiters.

20         It's about capacity, and Mr. Hicks failed to

21   consider capacity.

22         The fact that these are slower doesn't mean that

23   the server was being burdened, it means that they're

24   slower, there's something broken in the database, there's

25   something broken with the search.

2349

```
 1    Q.    But your basis for saying the server wasn't broken
 2   was the search times, wasn't it, sir?
 3    A.    No, it's my knowledge of how servers work.
 4    Q.    Right.  But you sit in front of the jury -- sat in
 5   front of the jury and compared 6.4 seconds to 6.4 seconds;
 6   right?
 7    A.    Exactly.  I --
 8    Q.    Let me --
 9    A.    -- looked at the days --
10          (Simultaneous indecipherable conversation.)
11   BY MR. RINGGENBERG:
12    Q.    That's a yes or no question, sir.  Let's get
13   finished up, okay?
14    A.    I'm sorry.  I'm not used to being interrupted.
15    Q.    Me either.
16    A.    The data that Mr. Hicks presented is what I'm here
17   to test, and I tested that data, and I used a day as I told
18   the jury.
19          I have a lot of knowledge that I haven't told
20   the jury about, about the way servers work, the way the
21   unit servers work in particular, this is one of them, about
22   the fact that there are many other things going on in the
23   server that affect the time that it takes for something to
24   complete after it's started.
25          And you're trying to simplify a situation.  It's
```

2350

```
 1    not that simple.  Just because something happens to blame
 2    somebody for it, the fact is that many, many of these
 3    searches are broken, and they're broken not because the
 4    user decided to do a search, they're broken because of the
 5    way the search is being handled inside the server by
 6    Oracle.
 7              MR. RINGGENBERG:  Could you switch back to
 8    Marie, please?
 9              Marie, could you put up the demonstrative with
10    the two stop watches on it.
11              Matt's got it?  Never mind.  Thank you.  Thank
12    you, Matt.
13    BY MR. RINGGENBERG:
14    Q.    You talked to the jury about this; right?
15    A.    Yes.
16    Q.    Using actual data; right?  That's what you said?
17    A.    Correct.
18    Q.    Right.  And, in fact, you excluded from your average
19    hours when Mr. Renshaw testified were slower because of
20    Rimini's activity, didn't you?
21    A.    I'm sorry.  That was a bit fast.
22    Q.    You excluded from your average hours that
23    Mr. Renshaw specifically testified were slower because of
24    Rimini activity?
25    A.    I don't understand the question.
```

2351

1    Q.    Do you remember we looked at the hours you excluded

2    on November 20th because you said the system was down, and

3    we talked about that at length, sir?  Do you recall that?

4    A.    Oh, yes, midnight through 4:00 a.m. or so.

5    Q.    That's right.  So the hours that Mr. Renshaw

6    specifically said were slower due to Rimini's activity, you

7    didn't count those in your average of actual data; right?

8    A.    Right, because the machine was broken.

9    Q.    Right.  And machine was broken, Mr. Renshaw said,

10   because of what Rimini was doing; right?

11   A.    Well, I've explained to the jury there are other

12   factors.

13   Q.    Uh-huh.

14   A.    But Rimini's activity also triggered those factors.

15   Q.    You also excluded from -- you included in your

16   average 17 hours that Rimini wasn't crawling because Oracle

17   had managed to block their IP and they weren't accessing

18   the system; right?

19   A.    Seventeen hours?

20   Q.    Uh-huh.  You don't recall discussing that at length,

21   sir, with me?

22   A.    I don't -- I don't remember.

23   Q.    You don't remember.

24         You don't recall that Mr. Baron wrote in an email

25   that he was only able to search for seven hours on a

2352

1    particular day, on November 21?

2    A.    I don't -- you mean the email that you showed me?

3    Q.    Correct, sir.

4    A.    I'd never seen that before.

5    Q.    Right.  But Mr. Baron wrote that he wasn't able to

6    search for 17 hours on November 21 because of IP blocking,

7    didn't he?

8    A.    I don't know.

9    Q.    Because of -- well, let me just ask the question

10   again.

11             We've already covered that Mr. Baron wrote that

12   he was only able to search for a handful of hours, and then

13   he was blocked due to Rimini's IP, and yet you included the

14   whole day and called that actual data; right?

15   A.    I tested what Mr. Hicks claimed.

16   Q.    You testified to the jury that you were using actual

17   data to compute the averages, didn't you, sir?

18   A.    Exactly.

19   Q.    Right.  And what you said was actual data, you

20   excluded every single search over two and a half minutes;

21   isn't that right, sir?

22   A.    Yes, about 5.6 percent of the searches.

23   Q.    Including searches that took as long as 20 minutes

24   during the time that Rimini was crawling; right?

25   A.    Correct.

```
 1                    MR. RINGGENBERG:  I have no further questions.
 2                    THE COURT:  All right.
 3                    Redirect?
 4                    MR. DYKAL:  Could you pull up PTX 665.
 5                          REDIRECT EXAMINATION
 6    BY MR. DYKAL:
 7    Q.    Now, I'm going to try to clear up some confusion
 8    that may have been created over the last hour.
 9                    Do you recall being shown Plaintiffs'
10    Exhibit 665 and asked about a supposed outage that was
11    caused on that day?
12    A.    Yes.
13    Q.    And then do you recall some reference to the four
14    and a half hours of downtime that was allegedly caused by
15    Rimini?
16    A.    Yes.
17                    MR. DYKAL:  Do you have the trial transcript,
18    page 1194, starting at line 24?
19    BY MR. DYKAL:
20    Q.    And this is from the testimony of Mr. Hicks, and if
21    you look at line 24, do you see where it says,
22                    "Now, you did testify that there was an incident
23    in January 2009 that caused downtime; is that right?
24                    "ANSWER:  Yes.
25                    "That's the only instance you're aware of;
```

2354

1    correct?

2           "That's the only time I'm aware of the server

3    actually being completely down, yes."

4           Do you recall that testimony?

5    A.    Yes.

6    Q.    And so that 4.5 hours of downtime that you excluded,

7    was that in January?

8    A.    Yes.  Oh, yes, it was in January, not in November.

9    Q.    Thank you.

10   A.    Thanks.

11   Q.    Now, do you recall being asked questions about how

12   Oracle servers -- the search times got faster in April?

13   A.    Yes.

14   Q.    Now, this might help you, but on page 52 of your

15   report, paragraph J, do you recall discussing some changes

16   to the Oracle architecture?

17   A.    Yes.

18   Q.    And do you recall the basis -- how you knew about

19   those changes?

20   A.    Can I have a moment?

21   Q.    Yes, please.

22   A.    Yes.  And the question again?

23   Q.    Yeah.  Do you recall how you came to understand that

24   there were changes being made in that timeframe?

25   A.    Yes, it was from Mr. Renshaw's deposition.

1    Q.   And so I believe you said that the search times were

2    faster in April; is that right?

3    A.   Yes.

4    Q.   And do you have any opinion on why that might be?

5    A.   Yes.  The -- Oracle upgraded the server.  I think it

6    was in March that it was put online, and so the comparison

7    between the post -- after putting in the new server and

8    pre-putting in the new server are not apples and apples

9    comparisons.

10   Q.   And that was based on testimony from Mr. Renshaw,

11   the British man who didn't want to be here?

12   A.   Yes.

13   Q.   Now, there was also some discussion about your

14   decision to exclude outliers over two and a half minutes.

15   Do you recall that?

16   A.   Yes.

17   Q.   Did you exclude outliers over two and a half minutes

18   across the board or just during times when Rimini was

19   searching at a high level?

20   A.   No, it was across the board for all of the dates

21   that we've discussed.

22   Q.   So for all of the times, anything over two and a

23   half minutes was excluded?

24   A.   That's correct.

25   Q.   And just to be clear, the days of high Rimini

2356

```
1    activity that you assessed, that November -- was it 19, 20,
2    21, something like that, why did you select those days?
3    A.    Mr. Hicks testified about those days, and I tested
4    his results.
5    Q.    And all of this talk about your baseline days,
6    exclusion of outliers, all of that, are you aware that
7    Mr. Hicks disagreed with some of your methodologies?
8    A.    He did.
9    Q.    And then he testified that he made some corrections
10   to those methodologies that he saw fit.  Do you recall
11   that?
12   A.    Yes, I do.  It was after I published my rebuttal
13   report and Mr. Hicks had a chance to look at it, and he
14   decided to change his numbers.
15   Q.    And after Mr. Hicks fixed all those problems, do you
16   recall his results?
17   A.    He found that the supposed slowdown was between 1
18   and 2.4 seconds.
19              MR. DYKAL:  No further questions.
20              THE COURT:  Recross examination?
21                    RECROSS-EXAMINATION
22   BY MR. RINGGENBERG:
23   Q.    Did you or did you not exclude from your analysis
24   part of November 19, 20, and 21, because of an alleged
25   shutdown of Oracle systems?
```

2357

1   A.    What you're calling the shutdown, the outage, I

2   believe, was in January.

3   Q.    Is that a no, sir, you did not exclude any time from

4   your analysis in November based on a supposed shutdown?

5   A.    Yes.  I -- whenever the system went down is the date

6   that I excluded it, and I believe that's a January date.

7   Q.    So you're firm in your belief that your analysis did

8   not exclude any time in November based on a supposed

9   shutdown of Oracle systems?

10  A.    I am firm.

11  Q.    You're confident in that, sir --

12  A.    I'm sorry.  I'll let you finish.

13  Q.    I apologize for interrupting.

14        You're confident that's your answer?

15  A.    I'm confident that I didn't exclude any -- other

16  than the outliers for any dates where no shutdown occurred.

17  Q.    And the only shutdown you think happened was in

18  January, according to your report; is that right?

19  A.    That's what I understand.

20  Q.    Okay.  Sir, can you turn to your report at page 53?

21  A.    I have it.

22  Q.    Okay.  So see the text that corresponds to footnote

23  181?

24  A.    On 53?

25  Q.    Yeah.  I'm sorry, 54, paragraph N.  There's a

2358

1    footnote 181 in text before it.

2    A.    I see the footnote.

3              MR. RINGGENBERG:  Uh-huh.

4              Your Honor, could I have permission to display

5    this single page from his report?

6              THE COURT:  You may.

7              MR. RINGGENBERG:  Thank you.

8              Matt, can you put up page 54 and 55 of

9    Mr. Klausner's report?

10             THE WITNESS:  Is that one page or two pages?

11             MR. RINGGENBERG:  I'm sorry, Your Honor, may I

12   have the second page?

13             THE COURT:  The second page, you may.

14             MR. RINGGENBERG:  Thank you.

15   BY MR. RINGGENBERG:

16   Q.    Do you see the first sentence in paragraph N, sir?

17             MR. RINGGENBERG:  Matt, maybe you can blow it up

18   for me.

19             THE WITNESS:  Can I take a moment to look

20   through this?

21             MR. RINGGENBERG:  Absolutely.

22             THE WITNESS:  I've read it, yes.

23   BY MR. RINGGENBERG:

24   Q.    Did you or did you not exclude time periods from

25   your analysis on November 19, 20, and 21, because of an

```
1    alleged shutdown of Oracle systems?

2    A.    I believe this may be a mistake of mine in that if

3    the shutdown -- if the downtime of the server was in

4    January, then that's what I intended.

5              MR. RINGGENBERG:  Matt, could you display the

6    text of footnote 181 on the next -- actually, I'm sorry, go

7    back to that text that we just had.  I apologize.  Just to

8    be clear about this.

9    BY MR. RINGGENBERG:

10   Q.    The text to which footnote 181 attaches says,

11             "During periods in November with numerous

12   concurrent Rimini search threads, Mr. Hicks' exhibits

13   purport to show Oracle's system load on November 21 through

14   28."

15             That's what you wrote, sir; right?

16   A.    Yes.

17             MR. RINGGENBERG:  And then there's a footnote

18   181.  Can you put the footnote on the page, please, Matt.

19   BY MR. RINGGENBERG:

20   Q.    "Note, for this time period I excluded the searches

21   performed when Oracle's system was down."

22             And you cite the document by Bates number; isn't

23   that correct, sir?

24   A.    That's the citation.

25   Q.    Right.  And this period refers to November 19, 20,
```

2360

1    and 21, doesn't it?

2    A.    Yes, but I may have made a mistake in my report

3    about the dates.

4    Q.    Turn, please, to Plaintiffs' Exhibit 665.

5    A.    I have it.

6    Q.    That's the document you cited in your footnote,

7    isn't it, sir?

8    A.    Yes.

9    Q.    And that document is dated November 2008, isn't it,

10   sir?

11   A.    Yes.

12   Q.    You excluded, not in January, the time in November

13   that Mr. Renshaw said were suffering particular slowdowns

14   due to Rimini's activity; isn't that right?

15   A.    Yes.

16            MR. RINGGENBERG:  Thank you.  No further

17   questions.

18            MR. DYKAL:  No further questions.

19            THE COURT:  All right.  Mr. Klausner, that will

20   complete your testimony.  You may step down.

21            THE WITNESS:  Thank you, Your Honor.

22            THE COURT:  Thank you.

23            Defendants' next witness, please.

24            MS. CHUANG:  Your Honor, defendants call David

25   Rowe.

```
 1              COURTROOM ADMINISTRATOR:  Please raise your
 2    right hand.
 3              You do solemnly swear that the testimony you
 4    shall give in the cause now before the Court shall be the
 5    truth, the whole truth, and nothing but the truth, so help
 6    you God?
 7              THE WITNESS:  I do.
 8              COURTROOM ADMINISTRATOR:  Please be seated.
 9              Can you please state your name and spell your
10    name for the record.
11              THE WITNESS:  My name is David Rowe; D-a-v-i-d,
12    R-o-w-e.
13              COURTROOM ADMINISTRATOR:  Please tell us your
14    city and state of residence.
15              THE WITNESS:  Pleasanton, California.
16                        DAVID ROWE
17          called as a witness on behalf of the
18       Defendants, was examined and testified as follows:
19                     DIRECT EXAMINATION
20    BY MS. CHUANG:
21    Q.    Good morning, Mr. Rowe.
22    A.    Good morning.
23    Q.    Can you please introduce yourself to the jury.
24    A.    Good morning.  My name's David Rowe.
25    Q.    And, Mr. Rowe, where do you work?
```

2362

1    A.    At Rimini Street.

2    Q.    And how long have you worked at Rimini Street?

3    A.    For a little over nine years now.

4    Q.    When did you start working, what year?

5    A.    In 2006.

6    Q.    And, sir, what's your current position at Rimini

7    Street?

8    A.    My current position is senior vice-president and

9    chief marketing officer.

10   Q.    The jury has heard from Kevin Maddock, who is Rimini

11   Street's senior vice-president of sales.  Can you tell the

12   jury the difference between marketing and sales within

13   Rimini Street?

14   A.    Sure.  Absolutely.

15         Marketing's job is to educate the market, let

16   prospects know they have a choice of annual support at a

17   kind of a high level.

18         And then sales, the job of sales is to work with

19   individual prospects on their questions about particular

20   service issues or things like that, and hopefully bring

21   them on to be a customer of Rimini Street.

22   Q.    Let's talk a little bit about your background.  Can

23   you tell the jury where you were educated?

24   A.    Sure.  I have a BS in engineering from Harvey Mudd

25   College.

2363

1    Q.    And what was your first job after graduating Harvey

2    Mudd College?

3    A.    I was a consultant at Anderson Consulting.

4    Q.    And tell us about your position there.  What did you

5    do?

6    A.    Sure.  So, I started -- what Anderson Consulting

7    does is they're a consulting firm that develops and

8    installs large software systems for big companies.

9         So I started as a programmer and built software

10   for companies from scratch on projects where we built the

11   software to support company functions.

12   Q.    And can you tell us the dates that you were employed

13   with Anderson Consulting?

14   A.    I was at Anderson Consulting from 1988 to 1995.

15   Q.    And after Anderson Consulting, where did you go?

16   A.    After Anderson Consulting, I went to PeopleSoft.

17   Q.    Can you give the jury a general overview of your

18   responsibilities at PeopleSoft?

19   A.    Yes.  So when I started at PeopleSoft, I worked in

20   what we called the product strategy group.  And there was

21   kind of two basic functions for that.

22        One was defining the future products that we

23   were going to build, and the other was helping to market

24   those to the prospects that we had, so explaining what we

25   were doing and where we were going from a product strategy

2364

1      standpoint.

2      Q.     During your time at PeopleSoft, were you promoted?

3      A.     I was, yes.

4      Q.     And tell us about that.

5      A.     When I started at PeopleSoft, I was a manager within

6      product strategy and then eventually was promoted to

7      director of industry strategy and then director of the

8      Internet business unit at PeopleSoft.

9      Q.     And how long did you work at PeopleSoft?

10     A.     I was there from 1995 to '99.

11     Q.     So before you joined Rimini Street in 2006, in 1999,

12     what else did you do?

13     A.     I'm sorry.  After --

14     Q.     After -- yeah, after you left PeopleSoft in 1999 and

15     before you joined Rimini Street, what else did you do?

16     A.     I left PeopleSoft and went to an Internet startup

17     focused on the hospitality industry, which was popular at

18     the time, from the Internet time, and then I went through a

19     couple of different software companies like that, and then

20     to Rimini Street.

21     Q.     Prior to taking the job at Rimini Street, did you

22     already have some familiarity with the ERP or enterprise

23     resource planning software industry?

24     A.     Yes, I did.

25     Q.     And prior to joining Rimini Street, did you do any

2365

1    further research about the ERP industry?

2    A.    Yes, absolutely.

3    Q.    And what kind of research did you do about the

4    industry itself?

5    A.    Before starting at Rimini Street, I connected with

6    old friends that were still at some of the software

7    companies to talk about the state of the market.

8              I talked with industry analysts that follow the

9    market and are experts in what's happening from a strategy

10   perspective within ERP just to better understand if Rimini

11   Street was a good opportunity for me or not.

12   Q.    What are some of the reasons why you joined Rimini

13   Street?

14   A.    Well, I think overall there's a huge unmet need in

15   the market for alternative and choice for enterprise

16   software support, and there's a lot of companies out there

17   running the software, and I felt it would be a big business

18   opportunity.

19   Q.    Mr. Rowe, can you tell the jury what your

20   responsibilities include as senior vice-president and chief

21   marketing officer of Rimini Street?

22   A.    Sure.  Yeah.

23             So at a high level in marketing what we do is we

24   need to first understand the market.  So we do research, we

25   talk with the analysts, we work with prospects.

2366

1           And once you understand the market and what we

2      sell, you then create messages for the market, right, how

3      do you talk to prospects, what are the things you put in

4      sales tools to best message for prospects; right?  And so

5      we create sales tools, presentations, FAQs.

6           And then we also work and run campaigns and

7      demand gen to try to get prospects educated and to the

8      table, right?

9           And then the sales team does their job, and they

10     either win or lose some of those deals.  And then we spend

11     time trying to understand why we win or lose because that's

12     important to kind of come back around into our message,

13     right, and tune what we do.

14     Q.   You mentioned you worked closely with the sales

15     team.  Was it important for marketing to understand the

16     results of any sales pitches that they may have had?

17     A.   Yes, absolutely.

18     Q.   And why is that?

19     A.   Well, I think it's a very important part of the

20     process.

21     Q.   Can you explain to us why it would be an important

22     part of the process to do your job?

23     A.   For the sales tools?  I'm sorry.

24     Q.   Yeah.  Yeah, to understand the results of any sales

25     pitches?

1    A.    Sure.  Yeah, I think that you only have so much

2    sales bandwidth, sales team ability to talk with deals, and

3    you want to be as effective as you can in those activities.

4    So you want to arm them with the right messages to be

5    successful.

6              Plus, you want to take what you learn about why

7    people are buying or not buying your service so that you

8    can better message to your target market.

9              And you want to be able to understand if they

10   buy for a certain reason, or if they fit in a certain

11   category, those are the kinds of customers or prospects you

12   want to target because you don't have unlimited resources

13   to go and market, right?  So you want to tune what you're

14   doing.

15   Q.    In your job capacity, do you also work with

16   customers?

17   A.    I do, yes.

18   Q.    And what are some of the ways that you've interacted

19   with customers during your time at Rimini Street?

20   A.    Sure.  You know, I think that from a customer

21   standpoint, the marketing team works with customers to

22   understand how the service is working for them.

23             You know, we love when customers will work with

24   us on a success story, something that we can use to then

25   market to new prospects.

```
 1              And then, for a short period of time I was also
 2    in charge of our reference program which was primarily
 3    focused on gathering sales references that our sales team
 4    would use in their process.
 5    Q.    You mentioned you were in charge of the reference
 6    program.  What years was that?
 7    A.    That was about 2008 to '09, somewhere in there.
 8    Q.    For a couple of years?
 9    A.    Yes.
10    Q.    Is it also essential to your job duties to
11    understand who your clients are?
12    A.    Yes, absolutely.
13    Q.    Why is that?
14    A.    Well, it's important to understand the kinds of
15    companies coming to Rimini Street; right?  Because that's a
16    clue into who we should go market to.  That's a clue into
17    better using our marketing dollars and getting more value
18    out of those; right?
19    Q.    Can you describe for the jury the target audience
20    for Rimini's marketing?
21    A.    Sure, yeah.
22              At a high level we're targeting the companies
23    that are running the big ERP software that we support, in
24    this case, PeopleSoft, Siebel, and JD Edwards.
25              There's many of these companies, and we go to
```

2369

1    events, we run campaigns, to target these specific

2    organizations.

3    Q.    And are there certain individuals or departments

4    within these organizations who would usually be in charge

5    of evaluating services such as Rimini Street?

6    A.    Sure, yes.

7    Q.    Who would those individuals or departments be?

8    A.    Right.  Within an organization, there's usually an

9    IT group, an information technology group, and at the head

10   of that group is a CIO, chief information officer.  They're

11   going to make the decisions about what they want to do with

12   their annual support ultimately.

13        But there's also other important people that

14   work for the CIO, or, you know, most companies have a

15   procurement group that buy supplies and materials for

16   manufacturing or whatever, but there's also an IT

17   procurement group typically, and they're always looking for

18   savings and better ways to do business, and we talk with

19   them as well.

20   Q.    And, Mr. Rowe, you mentioned earlier that marketing

21   has put together some sales tools, such as presentations,

22   FAQs, to be used by your own sales presentations.

23        Why is it important for marketing to develop

24   these kinds of materials?

25   A.    Well, it's really important because, if you take all

1    this time to develop the message, you want the sales team

2    and the marketing teams to use the message that you

3    created, and you want it to be consistent and as good as

4    possible, otherwise they'll be all over the map doing

5    different things.

6    Q.    And, excuse me, what forms have these consistent or

7    standard messages taken on?

8    A.    Yeah, at the highest level, you know, there's

9    presentations that we would do on PowerPoint.

10              There's FAQs that we create for the frequently

11   asked questions that customers have or prospects have.

12              Those are kind of the top two, I guess.

13   Q.    And who would primarily use these presentations?

14   A.    Primarily the sales team but also the marketing

15   team.

16   Q.    That was my next question.  Would marketing use some

17   as well?

18   A.    Sure, yes.

19   Q.    Would the development of these presentations or

20   PowerPoints have been done under your supervision?

21   A.    Yes.

22   Q.    And are these types of presentations the usual

23   standard messages that Rimini uses to educate the consumer

24   about Rimini's services?

25   A.    Yes, they are, yes.

2371

1              MS. CHUANG:  So if we could pull up

2    demonstrative 1.

3              THE COURT:  Well, before we get started on

4    demonstratives, this may be a good time to take our morning

5    break, ladies and gentlemen, and so we will do that.

6              The admonitions certainly continue to apply, and

7    we'll take a break for 15 or 20 minutes, depending on when

8    you're ready.

9              And you may go ahead and step down.  Thank you.

10             (Recess from 9:47 a.m. until 10:09 a.m.)

11             (Jurors enter courtroom at 10:09 a.m.)

12             COURTROOM ADMINISTRATOR:  Court is again in

13    session.

14             THE COURT:  Have a seat, please.

15             The record will confirm that we're in open

16    court.  The jury is all present.  Parties and counsel are

17    present.

18             Ms. Chuang, you may go ahead, please.

19             MS. CHUANG:  Thank you, Your Honor.

20             Mr. Rowe, when we left off, I was going to put

21    up slide 1, if we could, Marie.

22    BY MS. CHUANG:

23    Q.   First of all, is this slide an example of one of the

24    standard presentations that we were just discussing before

25    the break?

DONNA DAVIDSON, RDR, CRR, CCR #318    (775) 329-0132

2372

1    A.    Yes.  Yes, it is.

2    Q.    And is this representative of the type of

3    information that Rimini would discuss during the sales

4    process or the marketing process?

5    A.    Yes.

6    Q.    Okay.  What's the purpose of this slide?

7    A.    This slide represents a discussion of the current

8    state of the enterprise software market and really what it

9    has evolved into over the last 25 or 30 years.

10   Q.    Okay.  And let's go through this, if we could, with

11   the jury.

12         In the top left corner, full-featured, stable

13   software.  What do you mean by that?

14   A.    What I mean by that is in the early days of

15   enterprise software, in the late '80s and early '90s, each

16   release or version that came out really went up quickly in

17   terms of new capabilities and new features.

18         But over time, now that we've gotten very mature

19   and stable in the software, each release has sort of

20   leveled out, and there's not as much new in each one.

21         For example, when I was at PeopleSoft in the

22   late '90s, customers had to upgrade to the new versions, so

23   they were constantly coming because we weren't done with

24   the software, we were still building it out.  It had bug

25   fixes and business processes that we were finishing.

1          Now, though, it's a very different story.  The

2    incremental upgrades are more limited in the value that

3    customers get out of them.

4    Q.    Let's turn to the second box, Costly Upgrades.  What

5    do you mean by that?

6    A.    What I mean by that is generally enterprise software

7    providers have a limited window that they provide full

8    support for that version of their software.

9          Ultimately there's a point at which it

10   transitions into a level of support that you don't get new

11   tax updates, you don't get new fixes, and you can't

12   compliantly run the business at that level.

13         And the customer, the enterprise software

14   customer, is forced to make a decision, am I going to

15   upgrade just to retain full support, which can be very

16   expensive, or am I going to look for other options

17   potentially?

18         It's like if you have a car, the car runs great,

19   and the warranty runs out, do you have to buy a new car or

20   could you maybe get an extended warranty?

21         Those are the sorts -- it's kind of similar to

22   the kind of decision that customers have to make, and it's

23   hard because there's not as much value in the new releases.

24   Q.    Well, why is it that a customer -- excuse me.  Why

25   is it that a customer is faced with the option of having no

2374

1    new service on their existing software?

2    A.    Well, the way it typically works is you end up --

3    there's usually service for five years, and it may be an

4    extended --

5                MR. ISAACSON:  Objection, Your Honor.

6                MS. CHUANG:  What's the grounds?

7                MR. ISAACSON:  Foundation.

8                THE COURT:  Sustained.

9    BY MS. CHUANG:

10   Q.    Okay.  Let's move on, and then we'll talk about this

11   in a later date.

12              Lack of Innovation From ERP.  Tell us about that.

13   A.    All this does and means is that because there's

14   fewer capabilities in the core software, and you go through

15   these upgrades, there's less and less innovation you have

16   that businesses need because you need innovative, new

17   software and capabilities related to the Internet or

18   analytics or something to help grow your business.

19              And it's really the smaller, more nimble

20   software providers that are out in front here, and that's

21   where the innovation is right now in the ERP industry.

22   Q.    Okay.  And, Mr. Rowe, tell the jury about what you

23   have here labeled Vendor Profits.  What is that?

24   A.    Sure.  What I mean by that is, despite the fact that

25   upgrades add less value, they're expensive, and you're not

2375

```
 1    necessarily getting the innovation, you know, maintenance
 2    fees for enterprise software are higher than they've ever
 3    been, and they're very expensive for companies.
 4              And it's sometimes -- well, put it this way.
 5    The six to ten cents of every support dollar is all that
 6    goes to support.
 7              So you're paying that money, yet the innovation
 8    you're getting doesn't feel very good to many customers,
 9    they don't feel like they're getting much for it --
10              MR. ISAACSON:  Objection, Your Honor, move to
11    strike.
12              THE COURT:  Sustained.
13              MS. CHUANG:  Is it just to the last part, Your
14    Honor, not to the --
15              THE COURT:  Yes.
16              MS. CHUANG:  Okay.
17    BY MS. CHUANG:
18    Q.   All right.  And so let's move on to Service
19    Irrelevance.  What do you mean by that?
20    A.   What I mean by that is now that the software is very
21    mature and stable, to the big ERP provider's credit, this
22    software works, it works well, it's very stable.  It
23    doesn't break much, actually.
24              It's funny, the part that breaks the most are
25    actually the changes the customers make to their own
```

2376

1      software, the customizations they make, because they have

2      to do that to make it fit their unique business needs

3      typically.  In fact, in Rimini Street's business, that's 60

4      to 70 percent of the issues is in the customized code.

5              Software vendors, in their standard support

6      programs, don't support issues in custom code, and that's a

7      big gap for many customers.

8      Q.    Okay.  And then the last box, Mr. Rowe, Service

9      Dissatisfaction.  What do you mean by that?

10     A.    All I mean by that is when you add all of this up,

11     it's -- it's what you run into is that some customers are

12     not satisfied --

13              MR. ISAACSON:  Objection, Your Honor.

14              THE COURT:  Sustained.

15              Ladies and gentlemen, I might comment.

16              The Court has issued several rulings here

17     concerning the testimony, and Mr. Rowe's entitled to

18     testify concerning what he does in the company and the

19     reasons for that.

20              But he's not qualified -- he hasn't been

21     qualified to testify to why customers do one thing or

22     customers do another, and that's why the Court has entered

23     those rulings that I've entered, and you should disregard

24     his testimony concerning -- along those lines.

25              Thank you.

1    BY MS. CHUANG:

2    Q.    Mr. Rowe, let's go back and talk about your job

3    responsibilities at the company.

4          One of the things you told us was that it was

5    your job as marketing to educate the -- understand the

6    market and educate the public; correct?

7    A.    Correct.

8    Q.    And was it important for you in performing those job

9    duties to understand who your customers were?

10   A.    Yes.

11   Q.    And are you in charge of keeping track of customer

12   metrics within your -- within Rimini Street?

13   A.    I am in part, yes.

14   Q.    And what kind of metrics would your department be

15   responsible for?

16   A.    We would track a variety of metrics; could include

17   things like how many customers we have and which product

18   lines, why customers come to us, why we win deals, why we

19   don't win deals, a variety of things like that, what

20   industry they're in.

21   Q.    And what would that information be used for as part

22   of your job responsibility?

23   A.    It's very simple, actually.  We use that information

24   to then go back and update our messaging and make sure

25   we're talking in the appropriate way to the prospects in a

2378

```
 1    way that matches what they're feeling, matches their
 2    issues, and we may even tune our service to fit their
 3    issues, and that's the best of both worlds, right,
 4    marketing plus the service.
 5    Q.    And based on your job responsibilities, what you've
 6    learned and your research while you're at the company, do
 7    you have an opinion about service dissatisfaction among the
 8    customer base in which you serve?
 9              MR. ISAACSON:  Objection, Your Honor.
10              THE COURT:  Overruled.  He can testify as to his
11    opinion of customer dissatisfaction as it may concern
12    customers he's dealing with.
13              MR. ISAACSON:  Your Honor, may I approach for a
14    minute?
15              THE COURT:  Yes.
16         (Sidebar conference held as follows:)
17              THE COURT:  Go ahead.
18              MR. ISAACSON:  The foundation that's been
19    attempted here is their internal metrics, which is survey
20    information which does not meet any of the grounds for
21    admissibility of survey or any basis for testimony on which
22    that can be relied.
23              So to use that as the foundation for him to give
24    testimony about customer opinions or customer satisfaction
25    is -- it just utterly fails.
```

2379

1          THE COURT:  Ms. Chuang?

2          MS. CHUANG:  Two things, Your Honor.

3          Number one, I've asked for his understanding

4    based on his job duties, his years of understanding the

5    market which are central and integral to performing his job

6    duties.

7          Number two, some of the research, and I can lay

8    the foundation now, of what he's looked at, the metrics

9    he's looked at, comes under business records.

10          What he's done is he's looked at the information

11    that has been tracked by the marketing department.  This

12    information has been regularly recorded in the records in

13    the ordinary course of business.

14          This information is used in the course of

15    employment with Rimini Street, and it's important to

16    perform his job duties.  So I can lay that foundation if

17    you'd like, Your Honor.

18          MR. ISAACSON:  As a business record, that just

19    makes it hearsay within hearsay.

20          The law is crystal clear, and I know your Honor

21    knows this, about when you admit a survey, there are

22    certain requirements about it, the reliable sample, that

23    there's been scientific methods applied, et cetera, et

24    cetera.  And just because a business record contains a

25    survey doesn't make the survey admissible.

2380

1              MS. CHUANG:  The hearsay exception is to test

2     whether this material is suspect or -- it's not here.  This

3     is information that is used to run Rimini Street

4     businesses.

5              It's recorded, it's routinely recorded per

6     Rimini protocols, and they were made at the time of the

7     events, and they were made with personal knowledge.  And so

8     it's to --

9              THE COURT:  All right.  Here's the --

10              (Simultaneous indecipherable conversation.)

11              THE COURT REPORTER:  I didn't hear what he just

12     said.

13              THE COURT:  That's all right, Donna.

14              I'm going to sustain the objection because I

15     feel that it -- that you are going into a subject matter

16     that's outside of this witness's certainly realm and

17     position and role with the company.

18              I'm not -- he can testify to surveys, but I have

19     a problem with him going through specific surveys and what

20     they are and what they show because once you do that,

21     you're offering him as a witness in support of inadmissible

22     evidence which would be in the form of survey results one

23     way or the other.

24              He can testify to what they did as a result of

25     surveys.

```
 1              MR. ISAACSON:  Right.  Then that's what's
 2    happened before is Mr. Maddock testified they did surveys
 3    and testified about how they used them.
 4              Ms. Ransom testified about Oracle surveys and
 5    how they used them.
 6              No one testified about the result of surveys.
 7              THE COURT:  And that's my view.
 8              MS. CHUANG:  Thank you, Your Honor.
 9              THE COURT:  Thank you.
10         (Sidebar conference concluded.)
11              THE COURT:  All right.  Go ahead, please,
12    Ms. Chuang.  The objection is sustained.
13    BY MS. CHUANG:
14    Q.    Okay.  Mr. Rowe, going back to the Service
15    Dissatisfaction, was this an issue that Rimini Street felt
16    was something you needed to address within the marketplace?
17    A.    Yes, definitely.
18    Q.    And when you talked to customers or marketed
19    Rimini's services, what did you tell customers specifically
20    about Oracle's support and the state of the enterprise
21    software of Oracle?
22    A.    Well, I think, as a large ERP provider, Oracle fits
23    into the same framework.  Their software works really well,
24    it's really mature, it's really stable.
25              My understanding from my experience is that the
```

2382

1    incremental releases does not add as much value as they

2    used to.

3              They do have the similar support window that

4    other software vendors do, and eventually you end up

5    without getting new updates for fixes and tax and

6    regulatory updates, you have an upgrade decision, and they

7    spend roughly about six cents of every dollar of support on

8    support.

9              MS. CHUANG:  Can we turn to slide 2, Marie?

10   BY MS. CHUANG:

11   Q.    Mr. Rowe, has the marketing department also

12   developed a standard message that helps educate Rimini

13   Street's support model?

14   A.    Yes.

15   Q.    And is this support model something that was

16   developed in response to what we just saw, the unmet needs

17   within the industry?

18   A.    Yes, it was.

19   Q.    And before we talk about this slide, would this also

20   be an example of a presentation that Rimini Street

21   salespeople or marketing would use?

22   A.    Yes, it is.

23   Q.    And let's see if we can break this down for the

24   jury, if we could.

25              First of all, tell us what this slide describes.

2383

1      A.     So, what this slide is, is based on that state of

2      the enterprise software market that we just looked at, this

3      is our view on the fact that the industry needs a new

4      model, something that's more focused on the services that

5      companies need, and is a better value so that they can save

6      money and spend it on more innovation that they need for

7      their business.  That's why we created this new model.

8      Q.     Okay.  So let's look at this new model.

9             Under Focus you have traditional is

10     vendor-centric, and then Rimini Street is client-centric.

11     What do you mean by that?

12     A.     What I mean by that is that, you know, we believe a

13     customer should receive personalized service.  When they

14     have an issue, they receive the fix for that issue.

15            And, in many cases, at enterprise software

16     companies, it's a one-to-many relationship where it's

17     generic fixes for all customers, not personalized.

18            Or the fix, if it's provided, might be in a

19     bundle of a hundred other fixes, and you have to apply them

20     all to get the one you want, and sometimes that's more

21     work, more effort, and breaks other things.

22            And we believe it should be one-to-one in terms

23     of the relationship, much more personalized.

24     Q.     Okay.  Cost Model.  We've already talked about the

25     90 percent plus margins.  What's Rimini Street's support

2384

1    model?

2    A.    Rimini Street's simple in terms of our pricing.

3    It's 50 percent of what the customer pays the software

4    vendor today.

5    Q.    And then Support Coverage, Vanilla Software Only,

6    and under Rimini Street support you have custom and

7    vanilla.  Can you tell us about that?

8    A.    Sure, yes.

9          I mean, we just talked about the custom

10   software, and that's where many or most, in our experience,

11   of the issues are in enterprise software.

12         We believe that the new model should support

13   both, custom -- issues in custom code and in vanilla code

14   that comes right from the software vendor.

15   Q.    Delivery Model.  Here, the traditional model,

16   book-trained help desk.  What is Rimini Street's support

17   model?

18   A.    Rimini Street's model is putting the expert on the

19   frontline working directly with the customer, rather than

20   having a help desk of generic folks that may not have the

21   same expertise and you have to go through escalations to

22   ever talk to an engineer.

23         MS. CHUANG:  Okay.  Can you flip to the next

24   slide, please, Marie?

25

2385

1    BY MS. CHUANG:

2    Q.    Okay.  And is this the model that Rimini Street

3    employs?

4    A.    It is, yes.

5    Q.    Okay.  So let's look at this.  Primary support

6    engineer, can you explain to us kind of the first two

7    columns, if you could.

8    A.    Yes.  So this slide represents really the core, the

9    essence of the Rimini Street model.  I mean, this is it.

10            It's about having a primary support engineer, we

11   call it the PSE, working directly with the client.  It's

12   the expert taking the phone call.

13            In fact, many of our customers have the mobile

14   phone of their expert engineer.  It's that sort of

15   relationship; right?

16            And it's more expensive because that's a very

17   expensive resource, but it's much more cost effective.  For

18   us, it's much more efficient because they're just better at

19   fixing issues.  You call the person, and they know it much

20   more quickly.

21            And because the expert's on the frontline,

22   that's how we can support customizations.  They get to know

23   the client's environment, and this is really the core of

24   our entire support model.

25   Q.    So, what's that -- you have a line also with a box.

2386

1      Explain that to the jury.

2      A.    Yes.  And this is also very, very important in our

3      support model.

4            The PSE is on the frontlines, the expert, but

5      these software systems are vast, both functionally in terms

6      of modules, as well as technically, lots of technologies

7      and things.

8            One person could not know everything.  So you

9      have an expert on the front, but you've got to have this

10     team behind you supporting you as a PSE across all the

11     technologies, across all the world, in fact, the

12     geographies we support.

13           And that's what this team do -- does across the

14     functionality, the business, the QA, everything; all right?

15     Very, very important in our model.

16     Q.    Mr. Rowe, the jury has heard from Shelley Blackmarr,

17     who is a Rimini Street primary support engineer, or PSE.

18           Based on your experience and observations, how

19     important is a PSE when you sell Rimini's services?

20     A.    In my opinion, this is the most important thing

21     about our software support model.  You know, the PSEs, like

22     Ms. Blackmarr that you just mentioned, get to know their

23     environments, fix the issues that customers have.

24           And it's interesting what happens.  In our

25     experience, when customers come onboard, their case volume

```
 1    goes up dramatically from their reported volume back at the

 2    software vendor.

 3              And what we find is, because we're actually

 4    responding and fixing their issues, they're asking a lot

 5    more questions, and they're just handing over all the

 6    issues that weren't resolved previously.

 7              Customers really like this relationship and the

 8    responsiveness of it.

 9              MR. ISAACSON:  Objection.  Move to strike the

10    last statement.

11              THE COURT:  Sustained.  The last statement is

12    stricken.

13              MS. CHUANG:  All right.  If we could go back,

14    Marie, to the previous slide.  Go back to the previous

15    slide.

16              Okay.  Thank you.

17    BY MS. CHUANG:

18    Q.    We left off at Upgrades.  Rimini's support model,

19    Upgrade When Ready.  What do you mean by that?

20    A.    What I mean by that is Rimini Street doesn't believe

21    in a short or a support window where you eventually may

22    lose access to new fixes and new tax and regulatory

23    updates.

24              We'll support customers for at least 15 plus

25    years from the time they sign up with us so they can get
```

2388

1    more miles out of that car; right?

2            But you can, as a customer, take possession of

3    an available software version, if it's available to you,

4    before you leave maintenance, save it for later and upgrade

5    when ready, if you want to.

6    Q.    Innovation.  We've already talked a little bit about

7    this.  You have vendor and leading-edge option.  Can you

8    explain that to the jury.

9    A.    Yes.  What I mean by this is we -- I talked earlier

10   about lack of innovation in core ERP earlier.

11           What many of Rimini Street clients want to do,

12   the goal is to shift funds from spending it on maintenance,

13   and use it to buy new software that does innovative things.

14           And this is the idea of freeing up money to get

15   some of those leading-edge options that are more

16   interesting.

17   Q.    Okay.  Does that feed into flexibility, keeping your

18   options open?

19   A.    Yes, it does, in part, in the sense that rather than

20   putting all your eggs in one basket and hoping your one big

21   ERP provider gives you all the innovation you need, this is

22   a strategy to try new innovation.

23           And if you like that better, and they develop --

24   that new system develops into the next leading system, you

25   have the flexibility to use it rather than being locked in.

                                                                    2389

 1                  MS. CHUANG:  Okay.  Next slide, please, Marie.

 2    BY MS. CHUANG:

 3    Q.    Let's spend some time talking about the actual

 4    service that Rimini Street provides to its customers.

 5    Okay?  What Rimini Street actually does.

 6                  As part of their service, does Rimini Street

 7    sell Oracle software to its customers?

 8    A.    No, we don't.

 9    Q.    So let's look at what they actually do.  And you're

10    looking at a demonstrative here.  Tell the jury what this

11    is.

12    A.    This is simply a list of the core support features

13    in our software support program.

14    Q.    And does Rimini Street charge separately for any of

15    these support features?

16    A.    No.  They're all included in the 50 percent off

17    pricing.

18    Q.    All right.  So let's kind of briefly go through this

19    list if we can.  Next slide.

20                  We've kind of broken it out, Mr. Rowe, so you

21    can discuss it, and I'm sure the jury will appreciate we're

22    not going line by line.

23                  Can you tell them what you mean by this group of

24    support features that Rimini provides?

25    A.    Yes.  So this first group of support features is

```
 1    really the set of features enabled by the PSE and that

 2    support team; right?

 3              You have the named engineer, and they have a

 4    30-minute or less service level requirement, which is to

 5    have an experienced engineer on the phone talking to you

 6    within 30 minutes.

 7              In the enterprise software industry, that's a

 8    big deal, right, to have that access.  And they provide the

 9    fixes, customizations, and all those things.  This -- I

10    mean, this is why we win awards for our support right here.

11    Q.    Let's look at the next group, if we could.

12              One, global tax, legal, and regulatory updates.

13    What do you mean by that?

14    A.    This is another important group or part of our

15    service.

16              Regulations change, pay rates change, you know,

17    federal regulations evolve over time, and we have to

18    provide the changes for the software so that companies can

19    remain compliant, or make sure you get your paycheck

20    correct on time.

21    Q.    Okay.  Next slide, please.

22              Okay.  This group that starts with

23    interoperability support, tell us about this.

24    A.    Sure.  And we designed our program to help companies

25    run and get more value out of their applications longer,
```

1    and this group of capabilities is really just for that.

2            Let's say you have a car, you like the car a

3    lot, you don't want to have to buy a new one, you want to

4    run it for 150,000 miles.

5            You would have special services.  You'd change

6    the oil, you'd do certain things to make sure it ran that

7    long for you reliably.

8            That's what this is for enterprise software.

9    For example, performance support.  As you run applications

10   longer, you get extra data that comes around, and things

11   get slowed down, they kind of get detuned, like your PC at

12   home, after a couple years it slows down.

13           We come in and help tune to make sure the apps

14   run effectively.  Okay?  And this is above and beyond

15   anything that you would get from a software vendor.  This

16   set of services is focused on helping you run your

17   applications longer and more effectively.

18   Q.    Why would customers choose to run their applications

19   longer than necessary?

20           MR. ISAACSON:  Objection.

21           THE COURT:  Sustained.

22   BY MS. CHUANG:

23   Q.    Based on your research and your understanding of

24   Rimini Street's services, why was this support system, what

25   you've just described, part of your business model?

1    A.    My understanding is that because the software

2    releases are so mature and stable and robust, they last and

3    support a business longer.  You don't need to upgrade to

4    support the business.

5              Back when I was at PeopleSoft, you needed new

6    upgrades just to get something that worked.  Very different

7    today.  So companies want to run their application releases

8    longer.

9              MR. ISAACSON:  Objection, move to strike the

10   last sentence.

11             THE COURT:  Sustained.  The last portion of the

12   response will be stricken.

13   BY MS. CHUANG:

14   Q.    Mr. Rowe, I want to focus on one of the lines here,

15   Security Advisory Services.  Do you see that?

16   A.    I do, yes.

17   Q.    What is this?

18   A.    That's a set of services we offer to help

19   companies -- to advise them essentially on how to set up

20   their infrastructure, what partners they might work with,

21   to better protect their entire ERP infrastructure and

22   systems, not just their core ERP, but the broader ecosystem

23   around it.

24   Q.    And does Rimini Street have either individuals or

25   teams of people who help customers with security?

2393

1    A.     We do, yes.

2    Q.     To your knowledge, has any one of your customers

3    ever had an issue with security since you joined the

4    company?

5    A.     Not to my knowledge, no.

6    Q.     Named Global Account Manager for each client.  Can

7    you tell the jury about that.

8    A.     Sure.  We -- in addition to the technical PSE, each

9    client is assigned a global account manager, someone that's

10   senior, just to ensure they're getting what they need,

11   they're getting their issues resolved and their strategy

12   is -- their application strategy is getting managed,

13   because we have a whole set of services that help them

14   there too.

15          So it's just someone to make sure they're

16   successful.

17   Q.     All right.  And the last one, Onboarding and

18   Archiving Services.  What is that?

19   A.     That's just simply the process of bringing on new

20   customers, making sure everything is set up appropriately

21   and they're ready for success.

22          MS. CHUANG:  Okay.  Thank you.  We can take that

23   down.

24   BY MS. CHUANG:

25   Q.     Let's talk briefly about the cost.

```
 1              Are there cost savings for customers in addition
 2    to the 50 -- initial 50 percent off that Rimini Street
 3    offers?
 4    A.    Yes, absolutely.
 5              MR. ISAACSON:   Objection, foundation.
 6              THE COURT:   Sustained.   Establish a foundation,
 7    please.
 8              MS. CHUANG:   Okay.
 9    BY MS. CHUANG:
10    Q.    Mr. Rowe, as part of -- as senior vice-president of
11    Rimini Street and part of the operating committee at Rimini
12    Street, are you familiar with the pricing structure at
13    Rimini Street?
14    A.    I am, yes.
15    Q.    And is pricing one of the issues in which you need
16    to know about in order to perform your duties of educating
17    the consumers about Rimini Street services?
18    A.    Yes, of course.
19    Q.    And are there individuals within Rimini Street that
20    you discuss the pricing and the cost savings with at Rimini
21    Street?
22    A.    Yes.
23    Q.    And who would those individuals be?
24    A.    Well, in Rimini Street?   I'm sorry?
25    Q.    Yes, in Rimini Street.
```

2395

1    A.    In Rimini Street, that would be a variety of people

2    in marketing, in sales, and the executive operating

3    committee, certainly.

4    Q.    And are you familiar with the cost savings above and

5    beyond the initial 50 percent off that Rimini Street offers

6    its customers?

7    A.    I am, yes.

8    Q.    And can you describe what these cost savings are for

9    customers that are in addition to the 50 percent off?

10            MR. ISAACSON:  Your Honor, our position would be

11   the foundation has not been established.  I don't know if

12   you want me to approach.

13            THE COURT:  All right.  I don't.

14            I'm going to overrule the objection.  I'll allow

15   him to testify as to what Rimini does.

16            MR. ISAACSON:  He's not testifying about what

17   Rimini does now.  He's about to testify about what he

18   believes to be customer savings.

19            THE COURT:  I'll allow him to testify as to what

20   Rimini does.  He's not qualified to testify as to his

21   opinion of customer savings outside of what Rimini offers.

22            MS. CHUANG:  Do you understand that?  Not about

23   customers.

24            So can I ask that question again?  Or, Madam

25   Court Reporter, can you read that question back?

1              (The question was read by the court

2          reporter.)

3              MR. ISAACSON:  And that question directly asks

4      for his opinion about customer cost savings.

5              MS. CHUANG:  I'll rephrase it, Your Honor.

6      BY MS. CHUANG:

7      Q.   In addition to the 50 percent off model of Rimini

8      Street, what is Rimini Street's model with respect to

9      saving customers more than 50 percent off for the lifetime

10     of when that customer is with you?

11             MR. ISAACSON:  Objection, form.

12             MS. CHUANG:  Let me try it this way, Your Honor.

13     BY MS. CHUANG:

14     Q.   What does Rimini Street tell its customers about the

15     additional savings that they could have in addition to that

16     initial 50 percent off?

17     A.   Well, we tell them that we've studied that, and when

18     customers -- we work with customers on case studies and

19     other things.  We actually work with them on how did they

20     do, how --

21             MR. ISAACSON:  Objection if he's going to

22     testify about case studies which are hearsay.

23             THE COURT:  That is sustained.

24             It's not clear from his answer that that's what

25     he was going to testify about, but I would admonish counsel

2397

```
 1    that he should not be testifying as to outside studies.
 2              MS. CHUANG:   Okay.
 3    BY MS. CHUANG:
 4    Q.    Without -- Mr. Rowe, without talking about what
 5    customers have said to you or outside studies, what does
 6    Rimini Street tell its customers about what additional
 7    savings they could have with the company?
 8    A.    There's really four standard categories of savings.
 9    The first is the annual support fee savings, 50 percent off
10    your annual support fees.
11              The second is that customers that come to Rimini
12    Street generally do not upgrade; right?  In fact, that's
13    one of the reasons they may come to Rimini Street.
14              Upgrades can be very expensive, and they usually
15    enjoy -- they usually use that savings for something else.
16    So that's one category, the second category of savings.
17              The third category of savings is customization
18    support.  It's included in our support.
19              In my experience, the cost of that support for
20    customers is --
21              MR. ISAACSON:  Objection, Your Honor.  He's
22    about to testify about his experience --
23              THE COURT:  Sustained.  I think -- the objection
24    is sustained.  Why don't you pick up with a question from
25    there, Ms. Chuang?
```

1           MS. CHUANG:   Okay.

2      BY MS. CHUANG:

3      Q.    Mr. Rowe, you were talking about the third category

4      of customization support, and you were explaining to the

5      jury that that is included in your support.

6                Do customers also have -- what's your message to

7      customers about whether they would save money if they came

8      to Rimini Street for this support?

9      A.    The message is that since we include it in our

10     service, they don't have to pay for it to somebody else for

11     that support, or hire someone to do that.  That's the third

12     category.

13     Q.    Okay.  And you mentioned there was a fourth

14     category.  Can you tell us about that category.

15     A.    Yes.  The fourth category is that because we do --

16     we provide individualized, one-to-one service, and we don't

17     provide bundles of hundreds of fixes, it's more efficient

18     to use Rimini Street's support, and that also results in

19     significant cost savings.

20     Q.    Based on your experience and research -- well, let

21     me strike that.

22                Does Rimini Street track internally customer

23     satisfaction?

24     A.    We do, yes.

25     Q.    And are you familiar with the process of how Rimini

1    Street tracks customer satisfaction?

2    A.    Yes, I am.

3    Q.    And tell us about that process, if you would.

4    A.    Sure.  It's very simple, actually.

5          Every time a customer issue or service request

6    is closed, they receive a survey from Rimini Street asking

7    them "Did we fix your issue?" and then give us a rating on

8    a 0-to-5 scale, 1-to-5 scale, and then comments related to

9    the issue.

10   Q.    And why is it important for the business to track

11   customer satisfaction?

12   A.    Well, it's very important; right?

13         If it were trending up or down, that would be

14   very important to understand as a part of the service team

15   doing its job well, is there anything that we need to do

16   better, or are there success stories that we need to go and

17   understand.

18   Q.    Were these customer satisfaction scores kept in the

19   course of Rimini's regularly-conducted business activities?

20   A.    Yes.

21   Q.    And were these records routinely made and kept in

22   the course of Rimini's business as a Rimini custom

23   practice?

24   A.    Yes.

25   Q.    And were these records made or near at the time of

2400

```
 1    the event that the record -- that the event occurred?
 2    A.    Yes.
 3    Q.    And were these records made by a person with
 4    knowledge and reported that knowledge in the regular course
 5    of business?
 6    A.    Correct, yes.
 7    Q.    Are these customer satisfaction scores reported to
 8    you?
 9    A.    They're reported to me, they're reported to the
10    operating committee certainly.
11    Q.    And is it important to you to understand customer
12    satisfaction as part of your role as the chief marketing
13    officer of Rimini Street?
14    A.    Yes, absolutely.
15    Q.    And why would it be necessary to the marketing
16    department to know the customer satisfaction ratings?
17    A.    Well, if it's good, we'd like to tell the market
18    about it so that they see that they can get good service
19    with Rimini Street.  It's really that simple.
20    Q.    And do you rely on the accuracy of this information?
21    A.    Absolutely.
22    Q.    And do you know -- please don't reveal it.  Do you
23    know what the average score is for the surveys when they
24    are sent back?
25    A.    I do, yes.
```

```
 1                 MS. CHUANG:  Okay.  Your Honor, I --
 2                 THE COURT:  He can testify to it.
 3                 MS. CHUANG:  Thank you, Your Honor.
 4    BY MS. CHUANG:
 5     Q.    And what is that score?
 6                 MR. ISAACSON:  Your Honor --
 7                 THE COURT:  He's a qualified witness to testify
 8    to their findings on customer satisfaction within Rimini.
 9                 MR. ISAACSON:  But the survey itself is
10    inadmissible because there are separate requirements for a
11    survey separate from --
12                 THE COURT:  That's true.  But he can testify as
13    to his understanding of the customer survey.
14    BY MS. CHUANG:
15     Q.    I'll ask that question again.
16                 What is the customer satisfaction score at
17    Rimini Street?
18     A.    It's about 4.8 out of 5.
19     Q.    Mr. Rowe, what is the marketing department's role in
20    getting or receiving awards or recognition?
21     A.    The marketing department will coordinate those
22    activities, work with customers if they're applying for an
23    award, or anyone internally that might be.
24                 And then we, of course, like to market the
25    awards that we receive to the prospects that are out there.
```

2402

1    Q.    And has Rimini Street won awards for their services?

2    A.    Yes, absolutely.

3    Q.    All right.  Let's take a look at some of these.  Do

4    you recognize this slide?

5    A.    I do, yes.

6    Q.    And we're not going to go through all of these.  And

7    these were awards that Rimini Street won or has been

8    awarded from December -- from 2006 until the end of

9    December 2011; correct?

10   A.    That's correct, yes.

11   Q.    Okay.  And without going through all of these, are

12   there any of these awards that you are especially proud of?

13   A.    There are a couple.

14   Q.    Okay.  Which ones?

15   A.    Well, first of all, I'm especially proud of the

16   second one on the left which is the IT Vendor of the Year

17   award from Hastings Entertainment.

18         To get an award from a customer where they call

19   you their IT vendor of the year is a really big deal, and

20   we're tremendously honored to get it.

21   Q.    Is there another one you're especially proud of?

22   A.    Sure.  Yes, it's the one actually just below that,

23   which is the Bay Area News Group Top Workplaces award.

24         That's an award voted on by employees, and what

25   that's saying is the people that are delivering the service

```
 1    love delivering the service and working together, and I
 2    think those two things really work well together.
 3    Q.    Okay.  Let's talk -- change directions for a bit,
 4    and let's talk a little bit about Rimini Street's customer
 5    base.  Okay?
 6    A.    Okay.
 7    Q.    And I think we've established, but let me ask you
 8    again, is it essential to your job duties to understand who
 9    your clients are?  Right?
10    A.    Yes.
11    Q.    And you've told this jury that you also work with
12    customers in some capacity; correct?
13    A.    Correct.
14    Q.    Okay.  And, again, your department -- would your
15    department be the department to track customer metrics?
16    A.    Yes.
17    Q.    And can you remind the jury -- we talked about it a
18    little earlier, can you remind the jury of what kind of
19    customer metrics that the marketing department tracks.
20    A.    Yeah.  We collect a variety of metrics from
21    throughout the company and from customers, things like, you
22    know, how many customers we have, which industries, why
23    they sign up with Rimini Street, why they leave the vendor.
24          And then, you know, obviously satisfaction we
25    talked about earlier comes to us, which is important just
```

2404

1    to do a good job in marketing.

2    Q.    And based on your experience and job

3    responsibilities as CMO of the company, what's your

4    understanding of the main reasons why people leave their

5    existing support vendor?

6    A.    There's a few core reasons, but I think that

7    organizations --

8              MR. ISAACSON:  Objection, Your Honor.

9              THE COURT:  Sustained.

10   BY MS. CHUANG:

11   Q.    Based on your understanding of why customers leave

12   their existing support vendor, what are some of the

13   messages that you would send to clients about what Rimini

14   Street could do for them?

15   A.    Well, at a high level, if -- we might want to try

16   and target the customers whose full support is ending, and

17   they might be faced with that decision about having to do a

18   big upgrade, and they might be considering other options.

19   That would certainly be one important one.

20   Q.    Is there another category of Rimini Street customers

21   in which Rimini Street would direct their marketing to?

22   A.    Sure, customers that are doing a transition from

23   Oracle applications to a new application are very likely to

24   be a good candidate for Rimini Street support because we

25   can help them, they can save money, and the money they

```
 1    would pay in maintenance is a product they wouldn't be

 2    using for the long-term, and so our value proposition would

 3    be really interesting for them.

 4    Q.    Okay.  Are there other reasons -- let me rephrase.

 5              Are there other groups of customers in which

 6    you -- Rimini Street, as you, in charge of the marketing

 7    department, would develop messaging for -- to attract those

 8    particular customers to come to you?

 9    A.    Yeah.  I mean, our core value proposition is cost

10    savings, right, the 50 percent off, and that's certainly

11    one of the prominent items that we market and, I think,

12    reasons that -- things that resonate.

13    Q.    Okay.  So I want to go back.  I wrote down what you

14    said.

15              One of the first target customers that you were

16    referring to were full support ending customers.  What does

17    this mean?

18    A.    It means that at a point in time the support will

19    change -- the support level changes to where a customer, if

20    they're on the same version, will not get some capabilities

21    from the software vendor, no new fixes, no new tax updates,

22    no new security CPU updates.  That's what I mean by that.

23    Q.    Okay.  Are you familiar with Oracle's level of

24    support?

25    A.    Yes.
```

```
 1    Q.    And is it central to your job responsibilities to
 2   understand who your competitors are?
 3    A.    Yes, it is.
 4    Q.    And is it central to your job responsibilities to
 5   understand what services your competitors do or don't
 6   provide for customers?
 7    A.    Yes.
 8    Q.    Why is that?
 9    A.    Because we're competing with them every day, so it's
10   important to understand what they do versus what Rimini
11   Street does.
12    Q.    And what are some of the ways in which you learn
13   about your competitors?
14    A.    Oh, it's a variety of things.
15          I mean, you learn about competitors when you're
16   selling against them.  You learn about them from industry
17   analysts.  You learn about them from all the information on
18   their websites or the Internet or things like that.
19          There's a host of ways in which you can get that
20   information.
21    Q.    Okay.  So if we could turn to -- it's in your
22   binders, DTX 3013.  If there's no objection?
23          MR. ISAACSON:  Yes, I object.
24          MS. CHUANG:  Your Honor, he just testified that
25   it's part of -- it's central to his job responsibility to
```

2407

1    understand the competitor.

2              He looks at literature, publicly available

3    literature.  This is -- and competitors' websites.  This is

4    directly from Oracle's website.

5              THE COURT:  He can testify what they do compared

6    to what he understands Oracle does.  He's qualified to

7    testify in that fashion.

8              MS. CHUANG:  Okay.

9    BY MS. CHUANG:

10   Q.    So we won't publish this, but will you take a look

11   at DTX 3013.  Do you see that?

12   A.    Yes.

13   Q.    And the title of this is Oracle Software Technical

14   Support Policies.  Do you see that?

15   A.    I do, yes.

16   Q.    Is this a document that you have reviewed in the

17   course of your employment at Rimini Street?

18   A.    Yes, definitely.

19   Q.    And why was it important for you to review this type

20   of document?

21   A.    This document outlines the support levels of Oracle.

22             And, again, we compete with Oracle from a

23   support program standpoint, and so it's a good starting

24   point for a comparison.

25   Q.    And if you turn to page 12, Mr. Rowe.

```
1              First of all, let me ask you this.  With respect
2    to this document, does it outline all of the support levels
3    of Oracle support that the jury has heard about --
4    A.    I believe --
5    Q.    I'm sorry.  Premier -- what other levels, premier --
6    A.    Extended.
7    Q.    Extended and sustaining; correct?
8    A.    Yes.
9    Q.    All right.  And I want to ask -- I want to focus on
10   Oracle's sustaining support which starts on page 12.
11             And in this document that outlines Oracle's
12   policies of tech support, do you see in the middle of the
13   paragraph where Oracle outlines what sustaining support
14   does not include?
15   A.    I do, yes.
16   Q.    I'd like you to compare and contrast Rimini Street's
17   services with what -- Oracle's sustaining support and what
18   they don't include.  How does Rimini Street fill in the
19   holes?
20   A.    As I mentioned earlier, Rimini Street provides 15
21   plus years of support, and that includes fixes and -- fixes
22   for bugs and tax and regulatory updates; right?
23             And so we end up supporting many releases of
24   Oracle's that are in sustaining support that don't provide
25   those two things.
```

2409

1    Q.    Is it your understanding based on your research of

2    what Oracle does or does not provide that they don't

3    provide new tax, legal, or regulatory updates to those

4    customers who are on the sustaining support level?

5    A.    That's correct.

6    Q.    And Rimini Street is able to provide that for

7    customers on the sustaining level?

8    A.    We don't have tiers within our support.  We just

9    provide the support at all times, including tax and

10   regulatory updates.

11   Q.    All right.  And is it your understanding based on

12   your research that Oracle's sustaining support level for

13   customers do not include new program updates, fixes,

14   security alerts or -- and critical patch updates?

15   A.    That's correct.

16   Q.    And in comparison, can you tell -- tell us what

17   Rimini Street does to fill in that hole?

18   A.    So, in comparison to that, Rimini Street does

19   provide new fixes for any new issues that come up.

20          And then we have -- we talked separately about a

21   security advisory service that provides advice, counsel,

22   and direction for companies to deal with security threats

23   at a broader level.

24   Q.    Based on your research, have you made a

25   determination whether customers who are on sustaining

DONNA DAVIDSON, RDR, CRR, CCR #318    (775) 329-0132

2410

```
 1    support with Oracle receives any new updates, fixes, or

 2    incremental patches with respect to security?

 3              MR. ISAACSON:  Objection, Your Honor.

 4              THE COURT:  Sustained.

 5    BY MS. CHUANG:

 6    Q.    Mr. Rowe, you also mentioned another group of

 7    customers and which you targeted for Rimini's services, and

 8    you called them transition customers?

 9    A.    I did, yes.

10    Q.    Can you tell the jury what you meant by that.

11    A.    What I meant by that is there are customers that

12    eventually decide they're going to stop using the current

13    system they have and go to a new system.

14              And it can be for a variety of reasons.  New

15    systems might have better functionality, the corporation

16    might be consolidating, who knows?  But there's many

17    transitions that take place.

18              And as I mentioned, we can offer good savings

19    during that time because the customer won't be using the

20    current software any longer, and they often don't want to

21    pay maintenance fees for that.

22    Q.    Do you have an example for the jury about a

23    transition customer?

24    A.    Yes, I do.

25    Q.    Can you share?
```

1                    MR. ISAACSON:  Objection, Your Honor.

2                    THE COURT:  Well, he can testify as to what

3       they've done with the customer.  He's not in a position to

4       testify concerning the customer itself from the customer's

5       personal perspective.

6       BY MS. CHUANG:

7       Q.    Sir, do you have an example for the jury of how

8       Rimini Street has helped a customer during a transition

9       period?

10      A.    Yes.

11      Q.    And can you tell that to the jury, please.

12      A.    Yeah.  So there's a -- one example is a customer

13      called Ceridian.  They're a Siebel customer.

14              They were going to stop using that system and

15      move to Microsoft Dynamics, which was a similar product but

16      different functionality, for whatever reason they were

17      making that move.

18              And so they were considering -- they sought out

19      for Rimini Street to evaluate support on their way to the

20      transition to Microsoft.

21              They ended up selecting us, and we provided

22      support for them for 12 months, and then they did not

23      renew.

24              Now, they weren't quite done with their

25      transition, and they ended up self-supporting in the

1    meantime until the transition was done.

2    Q.    And has Rimini Street helped a customer -- or do you

3    have an example for the jury of a situation in which Rimini

4    Street has helped a customer when their full support was

5    ending?

6    A.    Yes.

7    Q.    Okay.  Can you tell us about that?

8    A.    One such customer is City of Overland Park, Kansas.

9    They were running the JD Edwards 8.10 release.  And premier

10   support ended for that in the summer of 2009.  And there

11   was not extended support for that from Oracle so it went

12   right into sustaining support.

13        They came to us because they were concerned --

14   because they wanted new updates, they wanted tax and

15   regulatory updates.  They didn't want to be on partial

16   support.

17        And they ended up reviewing what we did and then

18   selecting us for their support.

19   Q.    All right.  And then one of the third categories you

20   mentioned was cost savings.

21   A.    Yes.

22   Q.    Can you give the jury, if you could, an example of

23   Rimini Street helping a client with cost savings.

24   A.    Yes.

25   Q.    Okay.  Please do.

2413

1    A.    You know, one example of many is Dana Limited,

2    they're an auto parts supplier, and during the recession

3    back in 2008, 2009, it was very hard for some manufacturing

4    companies like Dana, and they ended up going into

5    bankruptcy.

6              As they were emerging from bankruptcy, they had

7    to look at every cost very carefully, and one of those was

8    maintenance, and they ended up switching to Rimini Street

9    because of that.

10   Q.    Other than support ending, transition, and cost

11   savings, is there another group of customers in which

12   Rimini Street would be interested in marketing their

13   services to?

14   A.    Yeah, there's a category of customers that are

15   looking for options just based on the service itself and

16   the satisfaction.

17   Q.    All right.  We've talked a little bit about

18   competitors and other players in the ERP maintenance

19   support market.

20              Is it an essential part of your job

21   responsibility to identify the key support players in this

22   market that you're competing with?

23   A.    Yes, definitely.

24   Q.    And why is it important for you to identify who the

25   key support providers are out there?

2414

1    A.    Well, it's important because, if we're competing

2    with them frequently in the marketplace, we need to make

3    sure our sales team is armed with the proper tools to

4    hopefully win those deals, not lose those deals.

5    Q.    And what does Rimini Street do with the information,

6    once you gather it, about these other third-party

7    maintenance providers?

8    A.    We'll assimilate the information.  It may end up in

9    a frequently asked question to help organization -- or the

10   sales team message to prospects, and we might update our

11   overall messaging to include it.

12   Q.    And what are some of the ways in which the marketing

13   department tracks information about these competitors?

14   A.    Through a variety of means.  I mean, we -- we -- we

15   track it through one/loss reports, we track it through

16   conversations with industry analysts and do inquiries with

17   them, giving us information on who's winning, who's losing,

18   market share, a variety of different ways.

19   Q.    Do you also review publicly available literature?

20   A.    Yes.

21   Q.    I want to talk about a company called CedarCrestone.

22   Have you heard of this company?

23   A.    I have, yes.

24   Q.    Who are they?

25   A.    They are a consulting firm that at the time focused

2415

```
 1    on PeopleSoft consulting, implementations and upgrades for
 2    that product line, and they also did get into the
 3    maintenance support business as well.
 4    Q.    And because they were in the maintenance support
 5    business, was CedarCrestone a company that competed with
 6    Rimini Street in this area?
 7    A.    Yes, they did.
 8    Q.    And because CedarCrestone was a company in which you
 9    competed with in this area, was this a company that Rimini
10    Street tracked?
11    A.    Yes.
12    Q.    And was it a company that Rimini Street tried to
13    learn as much information as they could about?
14    A.    Yes, of course.
15    Q.    And what were some of the ways in which Rimini
16    Street received their information about CedarCrestone?
17    A.    You know, a variety of ways, you know, through
18    website, through won/loss reports and then we also did --
19    we were able to gather some sample proposals from them from
20    a Freedom of Information Act because they provided those
21    proposals to public entities.
22    Q.    What do you mean when you say you were able to
23    receive sample proposals?  What is that?
24    A.    We competed with them at a public sector customer,
25    and because sometimes proposals to a public sector entity
```

2416

1    are -- can be made public to -- if you request it in

2    certain cases, and that's what we did.

3    Q.    What kind of information would be contained in these

4    sample proposals?

5    A.    Well, the actual proposal would include everything

6    from description of their business, the service they are

7    offering, the pricing for it, and how they're positioning

8    it.  I mean, everything about that offer for the service.

9    Q.    Would it also include how a company would execute on

10   performing the services?

11   A.    Yes.

12           MS. CHUANG:  If we could, can we turn to DTX 22

13   which I believe has been preadmitted by stipulation.

14           COURTROOM ADMINISTRATOR:  Yes, it has.

15           MR. ISAACSON:  I think we -- I don't know that

16   this is preadmitted, but there have been objections since

17   then, Your Honor.

18           COURTROOM ADMINISTRATOR:  It's been admitted --

19           THE COURT:  Well, if it's admitted, it's

20   admitted.

21           COURTROOM ADMINISTRATOR:  It's in that original

22   stipulation.

23   BY MS. CHUANG:

24   Q.    Okay.  So do you have that in front of you,

25   Mr. Rowe?

2417

1    A.    I do, yes.

2    Q.    Okay.  Do you recognize this document?

3    A.    Yes, I do.

4    Q.    And what is this?

5    A.    It is a request for proposal filled out and created

6    by CedarCrestone for the Oklahoma City Municipal Facilities

7    Authority.

8    Q.    Okay.  And, again, can you explain -- let me ask you

9    this.  Do you regularly receive requests for proposals to a

10   customer from another competitor?

11   A.    No, not at all.

12   Q.    And so how were you able to receive this particular

13   request for proposal from CedarCrestone to Oklahoma City

14   Municipal?

15   A.    We were able to receive it because Oklahoma City's a

16   public entity, and because of the -- the ability -- you can

17   in that case sometimes request materials like this in an

18   RFP and receive them, anyone in the public could.

19   Q.    And once your company received a copy of this

20   request for proposal, was it a big deal to have a

21   competitor's essential outline of how they service their --

22   service a client?

23   A.    Sure, yeah.  I mean, it's a direct view into how

24   they're messaging, positioning, selling, and delivering the

25   service.

2418

1    Q.    At the time Rimini Street -- let me ask you this.

2          This is dated March 16th, 2010.  How soon after

3    2010 do you recall receiving a copy of this proposal?

4    A.    I think it was shortly thereafter.  I don't remember

5    exactly.

6    Q.    Okay.  And at the time Rimini Street received this

7    proposal, was this proposal, to your knowledge, shared with

8    the operating committee to which you're a member of?

9    A.    Yes, it was.

10   Q.    And who was part of the operating committee in 2010?

11   A.    The -- in 2010, it would be, on the service side,

12   Brian Slepko, of course, Seth Ravin, the CEO, Kevin Maddock

13   in sales.

14         It would also include in 2010 Nancy Lyskawa who

15   runs client care.  Who's missing?  Myself, obviously.

16   Q.    Okay.  So I've heard you have processes involved,

17   sales, customer-client relations, and the CEO, Mr. Ravin?

18   A.    Sure.

19   Q.    And what kinds of information from this report did

20   the operating committee focus on when they received this

21   proposal in 2010?

22   A.    Yeah, I think there were a few things.

23         I mean, for me, personally, and for the sales

24   team, it was really about how they're positioning

25   themselves, what words and phrases they're using, how

2419

1    they're pricing their service versus us, things like that.

2            I think, you know, at a broader level, you know,

3    their business model that they outline here, you know, the

4    specifics of how they deliver the service were interesting,

5    I think, to Brian Slepko, who runs our service

6    organization, and Seth Ravin, our CEO.

7    Q.    Did this information that was contained in this

8    request for proposal inform you of what CedarCrestone was

9    doing at the time?

10   A.    Yes.

11   Q.    And did this market intelligence that you received

12   when you received this request for proposal impact Rimini's

13   understanding of the market for third-party support?

14   A.    Yes, of course.

15   Q.    And based on your knowledge and research into

16   third-party competitors, did you have an understanding of

17   whether CedarCrestone had any affiliation with Oracle?

18   A.    They did, yes.

19   Q.    They did.  And --

20   A.    It's on the -- I'm sorry.

21   Q.    No, go ahead.  That was my next question.

22            How did you, based on your research, come to

23   understand that CedarCrestone had an affiliation with

24   Oracle?

25   A.    I mean, we knew generally because they marketed

1    themselves as an Oracle partner, and their logo's on the

2    front page of this RFP, the Oracle logo.

3    Q.    On the right side?

4    A.    Uh-huh.

5    Q.    And it says -- on top, Marie -- Oracle platinum

6    partner?

7    A.    Yes.

8    Q.    Okay.  And did CedarCrestone's partnership with

9    Oracle influence Rimini's views as to whether

10   CedarCrestone's support activities were permissible?

11   A.    Did it -- I'm sorry, can you --

12   Q.    Sure.  I'll repeat it.

13         Did the fact that CedarCrestone was partnered in

14   some fashion, or affiliated with Oracle, influence Rimini's

15   view of whether the activities that were described in this

16   RFP was permissible in the third-party market?

17              MR. ISAACSON:  Objection.

18              THE COURT:  Sustained.

19   BY MS. CHUANG:

20   Q.    How did the knowledge of CedarCrestone's partnership

21   with Oracle influence Rimini Street's view of the

22   permissibility of the activities that were described in

23   this request?

24              MR. ISAACSON:  Same objection.

25              THE COURT:  Overruled.  He can testify as to

1    Rimini's reaction.

2              THE WITNESS:  Our reaction was that these

3    processes must be appropriate.

4              MR. ISAACSON:  Your Honor, may I approach?

5              THE COURT:  You may.

6         (Sidebar conference held as follows:)

7              MR. ISAACSON:  I just want to make it clear for

8    the record that I think counsel is walking through the door

9    on CedarCrestone, and that based on the questioning which

10   I've objected to and counsel's proceeded, that I'm entitled

11   to cross-examine him about CedarCrestone's infringing

12   activities.

13             THE COURT:  All right.

14             MS. CHUANG:  Your Honor, I think this is --

15   before we take it up on cross-examination, I think

16   Mr. Reckers and others will have to speak to this, if I

17   could.  Could we take it up at a break?

18             THE COURT:  All right.  We will take it up at a

19   break.

20        (Sidebar conference concluded.)

21             MS. CHUANG:  Okay.  If we could look at DTX

22   3020.  Don't -- please don't put it on the screen, Marie.

23             Any objection?

24             MR. ISAACSON:  I do object to it until you've

25   gone farther.

2422

```
 1              MS. CHUANG:  Until I -- I'm sorry?

 2              MR. ISAACSON:  I do object to it.

 3   BY MS. CHUANG:

 4   Q.    Are you at DTX 3020, Mr. Rowe?

 5   A.    I am, yes.

 6   Q.    And we don't need to put this up on the screen, but

 7   can you tell us what this document is?

 8   A.    It's another request for proposal from CedarCrestone

 9   for the Tucson Unified School District.

10   Q.    And this was -- Tucson Unified was another public

11   entity?

12   A.    That's correct, yes.

13   Q.    And I assume you were able to get this Tucson

14   request for proposal because Tucson was a public entity?

15   A.    That's right, yes.

16   Q.    And what is this -- what is this document?

17              Oh, okay.  So you've testified that it's a

18   proposal from CedarCrestone to Tucson.  Is that similar to

19   the proposal that CedarCrestone made to Oklahoma City?

20   A.    Yes, it is.

21   Q.    Okay.  And, again, was this document -- what's the

22   date on this document?

23   A.    October 22nd, 2009.

24   Q.    Was it a big deal, again, to -- that Rimini Street

25   was able to get a copy of a CedarCrestone proposal for
```

2423

1    PeopleSoft maintenance and service?

2    A.    Yes.

3    Q.    And at the time that Rimini Street received this

4    proposal in 2009, was this proposal shared among your

5    operating committee?

6    A.    Yes.

7    Q.    Okay.  From 2005 or 2006, when you joined the

8    company, Oracle's damage expert has suggested that there

9    weren't any real choices for consumers other than Oracle

10   and other than Rimini Street.  Would you agree with that

11   statement?

12   A.    No, I would not.

13   Q.    Are there other choices for consumers other than

14   Oracle or Rimini?

15   A.    Yes, absolutely.

16          MS. CHUANG:  Okay.  If we could put up the

17   slide, Marie.

18   BY MS. CHUANG:

19   Q.    Based on your experience and your research, what are

20   some of the other choices that customers have to maintain

21   their Oracle software?

22   A.    There's three basic categories on this chart.

23          First, there's self-support.  Some companies

24   feel like they have the resources to provide support for

25   their own systems, almost like if you have -- know somebody

2424

```
 1    that works on their own car, right, and changes their own
 2    oil.  Some companies do the same thing for their enterprise
 3    software.
 4    Q.    And you have self-support on here.  Isn't it a risky
 5    business option for businesses?
 6    A.    I think it is, yes.  I think it can be risky for
 7    customers to do this, or -- because do you have all the
 8    skills, you know, our PSE that I talked about has all this
 9    team behind them, does a company have all that.  It can be
10    risky I believe.
11    Q.    Has Rimini Street seen examples of businesses who
12    have self-supported?
13    A.    Yes, definitely.
14    Q.    And has Rimini Street lost business, lost business
15    to companies that self-support?
16    A.    Yes, absolutely.
17    Q.    And how often, based on your metrics and tracking,
18    have you seen Rimini Street lose business to a company that
19    went to self-support?
20    A.    You know, I think overall it's probably, in the
21    deals we see self-support as an option, it's probably in
22    the 5 or 10 percent range.  I'm more concerned about the
23    customers that self-support and never talk to us, frankly.
24    Q.    And have customers come to Rimini Street after
25    self-support?
```

2425

1      A.    Yes, they have.

2      Q.    You've serviced those types of customers?

3      A.    Yes.

4      Q.    And then the second column, Consulting Firms, how

5      does that work?

6      A.    Well, there are many -- there's hundreds of

7      consulting firms that help companies upgrade or implement

8      or customize their software.

9            They, as you can imagine, have a lot of skills

10     in the applications, and sometimes they work with their

11     customers to provide the support and maintenance directly.

12           They don't often like to compete and do that

13     publicly because they're often partners with the software

14     vendors, but they have a relationship with customers, and

15     they do provide that support from time to time.

16     Q.    And how often does Rimini Street compete for the

17     business with the consulting firm?

18     A.    In terms of direct competition, you know, it's

19     probably 5 percent.  It's not a predominant, head-to-head

20     competition.

21           I think many of those -- those customers, what I

22     run into in the market is where companies have just used

23     their consulting firm directly, and they didn't go out to

24     any sort of process to evaluate options.

25     Q.    And so have you seen customers -- or have you,

2426

```
 1    Rimini Street, seen customers who have recently been
 2    serviced by a consulting firm but now have come to Rimini
 3    Street?
 4    A.    I have seen that, and I've seen the other direction
 5    as well.
 6    Q.    You've lost -- in the other direction, you've lost
 7    customers to consulting firms, is that what you're
 8    referring to?
 9    A.    That's correct, yes.
10    Q.    And then the third category here, third-party
11    providers, and these are what we've just talked about,
12    your -- the key support providers and the competitors that
13    Rimini Street sees in the marketplace; is that true?
14    A.    Yes.
15    Q.    Okay.  And based on your actual experience in the
16    field, when you're out in the field marketing Rimini's
17    services, did Rimini Street encounter some of these
18    companies who were doing maintenance support for the JD
19    Edwards, for the Siebel, and for the PeopleSoft software?
20    A.    Yes, we did.
21    Q.    And was it -- again, I think you told us, but remind
22    us, was it part of your job responsibilities to track where
23    customers went if Rimini Street lost an account?
24    A.    We did our very best to understand that, yes.
25    Q.    Okay.  And so let's, if we could, talk about
```

2427

1    Spinnaker.  Was this a company that Rimini Street saw when

2    they were out selling their services to customers?

3    A.    Yes, we did.  Spinnaker provided support for JD

4    Edwards products, and they were actually very successful

5    ultimately in doing that.

6            They, at the end of 2011, had roughly 130

7    customers overall across their business, which was actually

8    double the number of active JD Edwards customers we had.

9    Q.    Okay.  Let's break that down a little bit.

10           Spinnaker serviced JD Edwards software; right?

11           And when did they come onto the market, if you

12   know?

13   A.    It was in the 2008 timeframe.

14   Q.    Okay.  And so for our purposes, we'll talk about

15   2008 to the end of 2011.  Okay?

16           And by the -- between 2008 and the end of 2011,

17   can you estimate for us how many deals that Rimini Street

18   lost out to against Spinnaker?

19   A.    Our win rate versus Spinnaker was around 50 percent.

20   So it was about 50-50 roughly.

21   Q.    50-50.  So if there was a situation in which a

22   customer was looking for other third-party support options,

23   half the time they would choose Rimini Street, half the

24   time they would choose Spinnaker?

25   A.    Roughly, for JD Edwards.

2428

1    Q.    For JD Edwards.

2    A.    Yes.

3    Q.    Right.  And you mentioned this, but I want to be

4    clear.  How many JD Edwards customers did Spinnaker have

5    between 2008 and 2011?

6    A.    The reported numbers were around 130.

7    Q.    130?

8    A.    Uh-huh.

9    Q.    And how does that 130 JD Edwards customers compare

10   to the number of Rimini Street JD Edwards clients during

11   that same period of time?

12   A.    We had approximately 62 or so active clients at that

13   time.

14   Q.    Okay.  So they had more than -- more than double of

15   the clients in the marketplace that were on JD Edwards

16   software?

17   A.    In terms of active clients, yes.

18   Q.    Let's turn to NetCustomer.  What software did

19   NetCustomer support?

20   A.    NetCustomer focused on PeopleSoft.  They also

21   claimed to do JD Edwards, and they claimed on their

22   website, at least, to do Siebel, but we didn't see them in

23   any Siebel deals.

24   Q.    So you also say they claimed to do JD Edwards.  What

25   do you mean by that?

1    A.    We just didn't see them much at all, frankly.

2    Q.    Okay.  Did you see NetCustomer in some deals in

3    which you were competing for a client's maintenance support

4    for PeopleSoft software?

5    A.    We did, yes.

6    Q.    And when did they come on the market?

7    A.    I believe they were in the market when I started at

8    Rimini Street in 2006.

9    Q.    Okay.  And can you estimate for us how many deals

10   that you would likely see them in when you were pitching

11   clients for PeopleSoft software maintenance?

12   A.    Just a handful of deals.  I mean, I think overall

13   I'm only aware of one deal that we lost to them.

14   Q.    How about Versytec, what is that?

15   A.    Versytec is another support organization that was

16   focused primarily -- actually, exclusively on the JD

17   Edwards World product line.

18   Q.    Okay.  And I think the jury's heard about Versytec,

19   and JD Edwards World is not part of this particular case.

20          Was this, however, a third party provider that

21   you saw out in the marketplace when you were selling

22   Rimini's services?

23   A.    We saw them a little.  I think they had acquired

24   between 60 and 80 customers.  It appeared a lot of that was

25   pre-Rimini Street or certainly pre my time at Rimini

2430

1    Street.  We didn't see them in just but a handful of deals;

2    not much at all really.

3    Q.    And let's talk about LegacyMode.  Was this a

4    third-party provider in which you saw -- Rimini Street saw

5    when they were out competing for deals?

6    A.    Occasionally, yes.  LegacyMode, you know, marketed

7    themselves.  You know, they did events around the Oracle

8    Open World event.

9          They were trying to build that business.  We ran

10   into them in maybe two deals that I'm aware of.

11   Q.    And you said they marketed themselves.  What did you

12   mean by that?

13   A.    They ran -- I'm aware of at least one marketing

14   event they ran near the Oracle annual marketing event that

15   they hold.

16   Q.    And that was advertisement, advertising maintenance

17   services?

18   A.    Yes.  Yeah.

19   Q.    And what about Abtech, what software did they

20   support?

21   A.    Abtech supported the Siebel software.

22   Q.    And has Rimini Street lost deals to Abtech?

23   A.    I think that we've only lost one deal to Abtech that

24   I'm aware of.

25   Q.    Okay.  Even though you've only lost one deal to

2431

```
 1    Abtech, was this a company, or a third-party provider that
 2    you would see out in the marketplace when you were selling
 3    Rimini's services?
 4    A.    A little; not a dominant competitor or predominant
 5    one, no.
 6    Q.    But at least a competitor?
 7    A.    Yes.
 8              MS. CHUANG:   Okay.   No further questions.
 9              THE COURT:   Cross-examination?
10                      CROSS-EXAMINATION
11    BY MR. ISAACSON:
12    Q.    Good morning, Mr. Rowe.   Just a few points to
13    clarify about your background.
14              So when you joined Rimini Street in
15    September 2006, your responsibilities were to oversee
16    worldwide marketing, public relations, lead generation, and
17    strategic alliances; is that right?
18    A.    Correct.
19    Q.    And you are -- then you became the chief marketing
20    officer for Rimini Street; right?
21    A.    Yes, that's correct.
22    Q.    And you went through a number of slides with your
23    counsel, and I think you mentioned that these are slides
24    that you've used before.   This isn't the first time you've
25    done presentations based on those slides; right?
```

2432

1    A.    A couple times, yeah.

2    Q.    Those are marketing slides.

3    A.    We -- and sales, yes.

4    Q.    Marketing and sales.  Those are things you use with

5    your customers in order to gain customers?

6    A.    Correct.

7    Q.    It's your marketing pitch; right?

8    A.    Yeah.  It's how we communicate our message to the

9    market.

10   Q.    Right.  And it would be hard to count how many times

11   you've given that marketing pitch that you've given when

12   you went through all those slides.

13   A.    I've given it many, many times because it's our core

14   message.

15   Q.    All right.  Now, you report to Mr. Ravin, right, you

16   have since 2006?

17   A.    I used to.  Now, I actually report to Sebastian

18   Grady.

19   Q.    Okay.  Now, at one point you -- or perhaps now are a

20   member of the Rimini operating committee; right?

21   A.    Correct.

22   Q.    And that group reported to Mr. Ravin?

23   A.    There may -- for the most part, yes.

24   Q.    So you were on that operating committee at least in

25   2010; correct?

2433

1    A.    Correct.

2    Q.    All right.  And that operating -- these were the

3    highest executives of Rimini Street other than Mr. Ravin;

4    right?

5    A.    Yes.

6    Q.    And that included Mr. Slepko, someone named Peter

7    Vandenvorst, Mr. Maddock, who the jury has met, Mr. Shay,

8    who is one of the cofounders, and someone named Nancy

9    Lyskawa; is that right?

10   A.    Lyskawa, yes.

11   Q.    And you talked about sales and marketing.  It's fair

12   to say that you collaborate with Kevin Maddock who runs

13   sales and who the jury has met; right?

14   A.    Yeah, that's correct.

15   Q.    Okay.  Now, as part of your responsibilities for

16   marketing, public relations, et cetera, you have

17   responsibilities that include the Rimini Street website;

18   correct?

19   A.    Correct.

20   Q.    Okay.  You would oversee what goes on the website

21   and make sure that there's accurate material on the

22   website; correct?

23   A.    Yes, that's right.

24   Q.    That would include the executive biographies that

25   are on the website?

2434

1    A.    Yes.

2    Q.    Okay.  Now, do you recall that TomorrowNow closed in

3    October 2008?

4    A.    Yes, I do.

5    Q.    All right.  And around that period of time you

6    undertook an effort to edit the executive bios to remove

7    mention of TomorrowNow from those bios; isn't that correct?

8    A.    That is correct, yes.

9    Q.    Okay.  You knew that SAP had announced that

10   TomorrowNow's CEO had engaged in wrongdoing, you knew that

11   your -- that Mr. Ravin's background had until then been

12   pronouncing that he was a visionary in the industry

13   because -- which included his background in support at

14   TomorrowNow.

15           And so once you saw that trouble, you went into

16   the website and deleted the references to TomorrowNow from

17   his biography; right?

18   A.    We did do that.

19   Q.    Okay.  And you had other executives who came from

20   TomorrowNow.  You went into the website and you deleted the

21   references to their backgrounds at TomorrowNow; correct?

22   A.    Yes, that's right.

23   Q.    And you did that at the direction of Mr. Ravin;

24   correct?

25   A.    Yes.

```
 1    Q.    Okay.  And, now, you mentioned marketing material

 2   such as responses to requests for proposals.  You mentioned

 3   a lot of those, RFPs; right?

 4    A.    Yes.

 5    Q.    Okay.  And Rimini Street responds to a lot of those;

 6   right?

 7    A.    Yeah.  There's some percentage of deals where you

 8   have those, yes.

 9    Q.    Right.  And in those responses to RFPs, you explain

10   the backgrounds of your officers, correct, including

11   Mr. Ravin?

12    A.    There may be -- I'm not sure if there are in those

13   RFPs.

14    Q.    All right.  Well, let me show you an example.  We've

15   got a binder in front of you.  1418.

16            COURTROOM ADMINISTRATOR:  PTX?

17            MR. ISAACSON:  PTX 1418 which has not been

18   admitted, so please don't put it on the screen.

19            THE WITNESS:  It's in the large binder?

20            MR. ISAACSON:  It's in the large binder, yes.

21            MS. CHUANG:  Objection on foundation.

22   BY MR. ISAACSON:

23    Q.    All right.  Do you recognize this as a document that

24   was --

25            THE COURT:  Wait.  Wait a minute.  We do have an
```

2436

```
1    objection.  And I also need to see the exhibit.
2              MR. ISAACSON:  I'm sorry.
3    BY MR. ISAACSON:
4    Q.   All right.  This is a document that was produced by
5    Honeywell in this case.  Do you recognize this as a
6    document that Rimini Street prepared and submitted to
7    Honeywell?
8    A.   I don't see the Rimini Street logo on it.  Is it
9    later?
10   Q.   Right.  If you look through the pages praising
11   Rimini Street, does this appear to be a document that --
12   A.   Oh, it does, yes.  I see some slides that I
13   recognize.
14   Q.   And, specifically, do you recognize the slide on
15   page 7?
16   A.   Yes, I do.
17   Q.   All right.  And specifically this was a period of
18   time -- this is August 2008 -- in which, if you were
19   talking to customers, you would tell them that Mr. Ravin
20   was a cofounder of TomorrowNow support services.
21             All right.  That was standard messaging; right?
22   A.   What was the date on this again?  I'm sorry.
23   Q.   August 2008, you can see from the front cover.
24   A.   Yes.
25   Q.   And after October and November 2008, when you
```

2437

1    responded to RFPs, you had stopped explaining that

2    Mr. Ravin had been at TomorrowNow; isn't that right?

3    A.    Yes.

4    Q.    And then you also -- you mentioned the FAQs.  Those

5    were the -- one of the documents that the salespeople used

6    for standard messaging.

7              You went into those and edited them to remove any

8    mention of Mr. Ravin or any other executive of Rimini

9    Street having been at TomorrowNow; right?

10   A.    I believe that's the case, yes.

11             MR. ISAACSON:  Can we look at the award winning

12   service slide that Mr. Rowe was shown by counsel?  Do you

13   have that, Matt?

14   BY MR. ISAACSON:

15   Q.    This was a slide that you were shown by your

16   counsel.  Now, one easy thing is -- you've got the same --

17   you've got Inc on there twice, don't you?

18   A.    Yeah.  We won it multiple times, but the year should

19   be on there for clarity, yes.

20   Q.    That's on there twice.

21             You mentioned two as being the most important to

22   you, but let me just ask.  JMP Securities Hot 100 Software

23   Companies award.  Do you see that?

24   A.    I do, yes.

25   Q.    JMP Securities was your banker, right?  They were

2438

1      working on an IPO for you?

2      A.    We did work with them.  I'm not sure if it was the

3      IPO, or which part of it, yes.

4      Q.    But that's your banker giving you an award at the

5      same time they're doing business with you?

6      A.    I don't know if the times were exact, but it was

7      right in there somewhere.

8      Q.    All right.  And the Inc award, both of them, and the

9      San Francisco award, the Business Times award, are about

10     how fast you're growing; right?

11     A.    Correct, yes.

12     Q.    That's because you're gaining more and more Oracle

13     customers; correct?

14     A.    Correct.

15     Q.    All right.  The Hastings award, Hastings

16     Entertainment award, right, that was one of your customers

17     you indicated you were proud of; right?

18     A.    I was proud of the award, yes.

19     Q.    Now, are you aware that Rimini Street had an

20     environment, what we've called a local environment, on the

21     Rimini Street -- on the Rimini system with large amounts of

22     copies of Oracle software for Hastings?

23     A.    I'm not specifically aware of Hastings, but

24     generally aware of that.

25             MR. ISAACSON:  Okay.  Could you -- Matt, could

2439

```
 1   you put -- let's put a Hastings logo on the screen, if you
 2   can do that for me.
 3   BY MR. ISAACSON:
 4     Q.    All right.  There's that Rimini environment.
 5           Are you aware that the Hastings environment was
 6   cloned to two other customers, Birdville and Mckee?
 7     A.    Not specifically, no.
 8     Q.    All right.  PTX 3507 says that happened.
 9           Are you aware that our expert, Mr. Davis, has
10   testified that Hastings was -- that Rimini used cross-uses
11   of fixes with regards to Hastings?
12           MS. CHUANG:  Objection, Your Honor.
13           He obviously wasn't aware of anything that
14   happened at this trial, so I object to him just
15   publishing --
16           THE COURT:  Overruled.  It's cross-examination.
17           MR. ISAACSON:  All right.
18   BY MR. ISAACSON:
19     Q.    The -- are you -- now, I would like to look at PTX
20   230 -- show you PTX 237.  That's not in your binder --
21   so --
22           MR. ISAACSON:  I would move to admit PTX 237.
23           MS. CHUANG:  I have an objection as to
24   foundation, Your Honor.
25           MR. ISAACSON:  It's self-authenticating.
```

2440

```
 1              MS. CHUANG:  Okay.  Well, I have no objection to

 2     admission, but I do have an objection if he's going to use

 3     this document with Mr. Rowe.

 4              MR. ISAACSON:  My question will be on page --

 5     BY MR. ISAACSON:

 6     Q.    This is an email exchange between Mr. Chiu and

 7     Mr. Ravin in January of 2007.

 8              At page 5 is a discussion of Hastings

 9     Entertainment in which it is said that Dan -- do you know

10     who Dan is, sir?

11     A.    I'm sorry.  Where is it?

12     Q.    There's a Hastings Entertainment discussion at page

13     5 of 7.

14              MR. ISAACSON:  May I show this section on the

15     screen, Your Honor?

16              COURTROOM ADMINISTRATOR:  Is this admitted, Your

17     Honor?

18              THE COURT:  It's not admitted.  Is there an

19     objection?

20              MS. CHUANG:  I do not object to the admission.

21     I do object to him using this document with Mr. Rowe based

22     on foundation.  Mr. Rowe is nowhere to be found on this

23     document.

24              THE COURT:  All right.  The objection is

25     overruled.  I view it as self-authenticating, and it may be
```

2441

```
 1    shown, and Mr. Isaacson may question regarding it.
 2            (Plaintiff's Exhibit 237 received into
 3            evidence.)
 4    BY MR. ISAACSON:
 5    Q.    All right.  Let's blow up Hastings Entertainment.
 6    And you see there's a discussion of Todd Anderson and then
 7    Dan.  Do you know who Dan is?
 8    A.    I think I know who it is.
 9    Q.    Who do you think it is?
10    A.    Dan Slarve?
11    Q.    That's who I think it is too.
12            "Dan laid out how we manage each client's test
13    environment on a separate" virtual machine "VM for each
14    client."
15            Are you aware of representations being made to
16    this customer Hastings that their environment was -- that
17    each client's test environments were being maintained on
18    separate machines?
19    A.    No.
20    Q.    Are you aware that that representation would be
21    false, that Rimini had general testing and development
22    environments?
23    A.    I've been made aware more recently.
24    Q.    All right.  How recently is more recently?
25    A.    As a part of this litigation.
```

2442

1    Q.    Okay.  The -- let me ask you about -- oh, the other

2    one you were proud of was the Bay Area News Group Top

3    Workplaces.

4             Now, in order to qualify for that award, you had

5    to be headquartered in the Bay Area; right?

6    A.    I'm not sure about that.

7    Q.    Well, you would have made -- you would have been the

8    person responsible for making a submission for this award;

9    right?

10   A.    Someone who works for me, yes.

11   Q.    All right.  Could you just take a look at PTX 5460.

12   You'll see this is a -- do you see this as a document for

13   nominations for the San Francisco Business Time award that

14   we're discussing?

15             MS. CHUANG:  546?

16             MR. ISAACSON:  5460.

17             COURTROOM ADMINISTRATOR:  It's not admitted.

18             MR. ISAACSON:  And I'm not seeking to admit.

19   BY MR. ISAACSON:

20   Q.    Do you see that?

21   A.    I do, yes.

22   Q.    All right.  And on the second page you see

23   qualifications?

24   A.    I do see it, yes.

25   Q.    All right.  Do you see that to be qualified for this

DONNA DAVIDSON, RDR, CRR, CCR #318    (775) 329-0132

2443

1    award you have to be headquartered in the Bay Area?

2    A.    I do, yes.

3    Q.    All right.  Now, Rimini has said throughout this

4    trial that they're headquartered in Las Vegas.

5              You made a false submission to get this award.

6    Isn't that what happened?

7    A.    Yeah -- yes.

8    Q.    Let me ask you about another -- not quite an award.

9              Now, you're aware that the Rimini web page for --

10   describing Mr. Ravin makes reference to, in 2005, the

11   Enterprise Software Observer named Mr. Ravin one of the 25

12   next generation leaders of the enterprise software

13   industry.

14             You're familiar with that language; right?

15   A.    Yes.

16   Q.    Okay.  It's been on -- it's -- I think it's one of

17   the first sentences in his bio on the website and has been

18   since -- as long as you've been with the company?

19   A.    Yes.

20   Q.    In fact, there have been periods of time where it

21   says, not only was he named one of the 25 next generation

22   leaders of the enterprise industry, it's one of those

23   leaders who promises, quote, "to have an impact on the

24   industry as dramatic as an Ellison, a Gates, or a Premji.

25             Gates refers to Bill Gates of Microsoft; right?

2444

1    A.    Yes.

2    Q.    And you're familiar with this language, you've seen

3    it on the website for years; right?

4    A.    Correct.

5    Q.    Premji is the -- Azim Premji, the head of the IT

6    industry in India?

7    A.    Something like that.

8    Q.    Right, right, something like that.

9          Larry Ellison is, of course, from Oracle.

10         And so you've been putting for years on your

11   website that something called the Enterprise Software

12   Reserve -- Observer has said that Mr. Ravin promises to

13   have an impact on the industry as dramatic as those three

14   people.  That's been happening; correct?

15   A.    Correct.

16   Q.    Now, the Enterprise Software Observer is a blog run

17   by a man named by J. Bruce Daley; correct?

18   A.    I believe so, yes.

19   Q.    All right.  And you have met Mr. Daley; right?

20   A.    I have, yes.

21   Q.    All right.  And now Mr. Daley is with something

22   called the Siebel Hub; right?

23   A.    Correct.

24   Q.    All right.  And he -- and the Siebel Hub is

25   sponsored by Rimini Street and by Spinnaker; correct?

2445

1    A.    Correct.

2    Q.    The Siebel Hub says, "without them," referring to

3    Rimini Street and Spinnaker, "the Siebel Hub would not be

4    what it is today."

5          You're the two major sponsors of Mr. Daley's

6    website; right?

7    A.    We're two of them.  Yes, I believe we are.

8    Q.    All right.  In fact, you are the -- what is the term

9    here, the platinum sponsors; right?  The platinum sponsors

10   for that site?

11   A.    Correct.

12   Q.    For the man who -- for that same man who said this

13   stuff, compared Mr. Ravin to Bill Gates.  And you pay for

14   that platinum sponsorship; right?

15   A.    Yes.

16   Q.    All right.  And, in fact, you run programs together

17   with Mr. Daley; correct?

18   A.    From time to time, yes.

19   Q.    All right.  And his site has links where you can

20   click through automatically to sign up with Rimini Street;

21   right?

22   A.    Correct.

23   Q.    He's a marketing partner of yours; right?

24   A.    Yes.  Today he is, yes.

25   Q.    Right.  Has been for years; correct?

2446

1    A.     I have worked with him for years, yes.

2    Q.     As a marketing partner; correct?

3    A.     Yes.

4    Q.     All right.  Now, there's been a lot of talk about

5    your sales strength -- the FAQs and your sales force.

6           I think one piece I just wanted to make clear was

7    when your sales force is talking with potential customers,

8    they're mostly talking by phone; right?

9    A.     That was more true in the early days, and less true

10   today, but, yes.

11   Q.     But just speaking from 2011 to 2006, almost a

12   hundred percent of the time it was over the phone; right?

13   A.     I'm not sure that's true in 2011, but predominantly

14   true, yes.

15   Q.     All right.  Now, you started writing FAQs not that

16   long after you were at the company, at least by 2007;

17   right?

18   A.     I think there was some version of those, yes.

19          MR. ISAACSON:  Right.  Can you look at 5507 in

20   your book.  This has not been admitted.  I would move to

21   admit it.

22          MS. CHUANG:  No objection.

23          THE COURT:  5507 is admitted.

24      (Plaintiffs' Exhibits 5507 received into

25      evidence.)

                                                                    2447

         1              MR. ISAACSON:  So let's look at the first

         2    screen.  Make that bigger.

         3    BY MR. ISAACSON:

         4    Q.    So this is you, Mr. Rowe, writing May 31st, 2007,

         5    with an FAQs doc.  Do you see that?

         6    A.    I do, yes.

         7    Q.    All right.  And do you see the next three pages

         8    are your effort to draft at least part of an FAQ document?

         9    A.    Correct.

        10    Q.    Now, let me ask you about page 3 of 4, and 3(a),

        11    risky.

        12              "There are actually hundreds and hundreds of

        13    companies that are making the move to third party.  Big and

        14    small companies like IBM, AT&T, Caterpillar, and Pepsico

        15    are Rimini Street clients, for example."

        16              That was standard messaging you were using during

        17    this period of time; right?

        18    A.    Correct.

        19    Q.    And this was something you were getting into the

        20    hands of your marketing and sales folks so that they could

        21    point out to other customers that you had these four major

        22    companies as clients, IBM, AT&T, Caterpillar and Pepsico;

        23    right?

        24    A.    Correct.

        25    Q.    All right.  Now, let's talk about that.

2448

1           IBM -- IBM as a whole is not a customer of Rimini

2    Street.  There's a part of Rimini called FileNet that's the

3    customer; right?

4    A.    Yes, that's right.

5    Q.    FileNet is not a large customer of Rimini Street, is

6    it?  From 2006 to 2014, Rimini Street had revenues of

7    $126,000 from FileNet.  Does that sound right?

8    A.    I'm not -- I don't know.

9    Q.    Well, I'm drawing that off of revenue documents that

10   your own company has produced -- has produced in this case;

11   in fact, one of their exhibits, DTX 2788.

12          You know that FileNet is not a large customer of

13   Rimini Street; right?

14   A.    I think that's true, yes.

15   Q.    All right.  And you know that IBM as a whole is not

16   a customer of Rimini Street; right?

17   A.    Of course not.

18   Q.    Now, AT&T.  AT&T as a whole, that large phone

19   company, is not a customer of Rimini Street; correct?

20   A.    I don't remember the exact scope of that agreement.

21   Q.    Well, it's something called -- let me remind you.

22   AT&T Services, Inc., that's a part of AT&T, which is a

23   customer of Rimini; correct?

24   A.    It sounds right.

25   Q.    Right.  And that's a part of AT&T, the phone

2449

1    company, that has nothing to do with phone service, what it

2    does is Internet marketing; right?

3    A.    I believe so.

4    Q.    That's a -- and what happened was that AT&T Services

5    became a marketing partner of Rimini Street; right?

6    A.    Yes.

7    Q.    They would actually resell Rimini Street's services.

8    Correct?

9    A.    Correct, yes.

10   Q.    Right.  And then you declared AT&T as a whole to be

11   one of the customers of Rimini Street to the marketplace;

12   correct?

13   A.    We declared AT&T to be a customer, yes.

14   Q.    Right.  And you didn't say "there's this small piece

15   of AT&T that we have a marketing relationship with and

16   who -- where money is going back and forth between us," you

17   didn't say that, you said "AT&T as a whole is our

18   customer"; right?

19   A.    We said AT&T.

20   Q.    Caterpillar.  Caterpillar was -- from 2006 to 2014

21   was a $15,000 client of Rimini Street; right?

22   A.    That sounds about right.

23   Q.    You did hardly any work for Caterpillar, did you?

24   A.    I don't think so.

25   Q.    And yet you went out in the marketplace and said "A

2450

1       big company like Caterpillar is working with us"; correct?

2       A.    Correct.

3       Q.    Pepsico.  You weren't working with Pepsico as a

4       whole, were you?

5       A.    I don't remember the scope of that one either.

6       Q.    Wasn't the scope of it Quaker Oats?

7       A.    Oh, yes.  That's right.

8       Q.    And Quaker Oats, I learned this, is about 4 percent

9       of Pepsi; right?  Does that sounds right?

10      A.    I'm not sure.

11      Q.    Okay.  It's my oatmeal.  It has nothing to do with

12      this -- Pepsi sodas, the beverages, the other food

13      products; right?

14      A.    Quaker Oats does not, no.

15      Q.    And you had a deal with Quaker Oats, and you went

16      out to the marketplace and said, "We're working with

17      Pepsi"; right?

18      A.    Correct.

19      Q.    Right.  And when you listed four companies, the

20      four -- top four companies, big companies you were working

21      with in 2007, right, there wasn't a single one of them

22      where you were working with a -- with the central

23      headquarters of the company, or most of the company, or

24      even almost all of the company?  You were working with

25      small pieces of those companies; correct?

2451

1    A.    That's correct, yes.

2    Q.    Now, let me ask you about something else in that FAQ

3    you wrote, paragraph 1E on page 2.

4          All right.  This is the pioneer story that you

5    tell in the marketplace, isn't it, that,

6          "Our CEO, Seth Ravin, is really the pioneer in

7    the third-party support industry."

8          You used to tell the story of cofounding

9    TomorrowNow.

10          And says,

11          "Seth was the previous president of TomorrowNow

12    and eventually sold TomorrowNow to SAP to incorporate into

13    their Safe Passage program, and ultimately build a funnel

14    to SAP's long-term business.  But after seeing firsthand

15    the lack of independence and how it kept him from acting as

16    a trusted advisor to clients, Seth left SAP and then

17    eventually formed Rimini Street."

18          Now, the story that you were telling in the

19    marketplace, and Mr. Ravin said something very much like

20    this on the stand, was that Mr. Ravin joined TomorrowNow,

21    he was hoping that they would be interested in support

22    processes.

23          And he decided, "Oh, gee, they're not that

24    interested in support, they just want to move their

25    customers to SAP software."

2452

1      And he wanted customers to have a choice in

2   support so he left TomorrowNow.  That is your founding

3   story that you would tell the marketplace; right?

4   A.    That's correct.

5   Q.    And that's why you wrote that into this FAQ

6   information; correct?

7   A.    That's why it's here, yes.

8   Q.    Okay.  Now, you're aware that after Mr. Ravin left

9   TomorrowNow, formed Rimini Street in January -- in 2006, he

10  began discussions with SAP about having a marketing ally --

11  about having an alliance partnership.

12  A.    With SAP?

13  Q.    Yes.

14  A.    Not deeply aware.

15  Q.    Okay.  You knew that he had discussions with them

16  about where Rimini Street would work with SAP in an

17  alliance partnership where SAP would bring new customers on

18  the Siebel side, would gain customers on the Siebel side,

19  and Rimini Street would refer customers to TomorrowNow for

20  PeopleSoft and JD Edwards.

21      So Rimini Street would get Siebel customers from

22  SAP, TomorrowNow, and then TomorrowNow would get PeopleSoft

23  and JD Edwards customers from Rimini Street.

24      You knew about those discussions; right?

25  A.    I don't remember it in any detail.

2453

1    Q.    You knew about that -- at the general level that I'm

2    discussing, you knew that Mr. Ravin at Rimini Street went

3    into discussions with TomorrowNow and SAP such that Siebel

4    customers would come to Rimini Street, and he would send JD

5    Edwards and PeopleSoft customers to TomorrowNow?

6            MS. CHUANG:  Objection, asked and answered.

7            THE COURT:  Overruled.

8    BY MR. ISAACSON:

9    Q.    You knew that at the general level; right?

10   A.    Yes.

11   Q.    All right.  And so what was happening was that you

12   were out in the marketplace saying that Mr. Ravin has this

13   founding story of leaving TomorrowNow in order to help --

14   because he wanted customer choice, and as soon as he went

15   to Rimini Street, he started discussions with them about

16   referring PeopleSoft and JD Edwards customers to them where

17   they would be denied choice in exchange for Siebel

18   customers.

19           That's what happened, isn't it?

20   A.    Yes.

21   Q.    Now, let me ask you about something else in this

22   FAQ.  Go back to page 33B.

23           All right.  Now, you say companies are selecting

24   third-party support to achieve certain things, and then you

25   say,

1            "The risks are minimal, and, in most cases,

2    completely eliminated for organizations that don't consider

3    themselves on the cutting edge."

4            And when you're saying no -- that the risks are,

5    minimal, or in most cases completely eliminated, you're

6    including security risks; right?

7    A.    Sure.

8    Q.    So even though you're providing no security updates

9    during this period whatsoever, you're telling the customers

10   the risks are minimal or even completely eliminated; right?

11   A.    Yes.

12   Q.    All right.  You're providing no support of the

13   security, and you're telling them there's no risk; correct?

14   A.    Correct.

15   Q.    Okay.  And then you say "don't consider themselves

16   on the cutting edge."

17            You would actually tell companies that it was in

18   their interest not to be on the cutting edge; right?

19   A.    We did at this time, yes.

20   Q.    Right.  And you would tell them the risks are

21   minimal to your business, or there are even no risks to

22   your future business if you don't stay on the cutting edge

23   of technology.

24            That's what you would tell customers; right?

25   A.    Correct.

2455

1    Q.    Now, you talked about the value of customizations

2    and how you promote that to customers.

3              Can we look at, in your binder, PTX 2159.  This

4    has been previously admitted into evidence.

5              All right.  Now, this is August 2008.  Mr. Chiu

6    is writing to a series of high executives but not you.  And

7    he says in the second paragraph,

8              "I'd like to gather everyone's input regarding

9    the topic of selling/supporting our message about using the

10   client's copy of production db for our support

11   environments.  While we've always sold the benefit of

12   having a copy of the clients' production db," database,

13   "for our tax update development work, it's also been

14   positioned as a benefit to the client, to better support

15   their customizations."

16             You're aware of that messaging, right, that

17   Rimini would say to customers "we want a copy of your

18   environment so we can better support your customizations"?

19   A.    I'm not aware of that message, no.

20   Q.    Okay.  The -- Mr. Chiu says,

21             "The underlying truth is we aren't truly

22   leveraging their environments in such a fashion."

23             Let me ask you about this.  Mr. Chiu is head of

24   the onboarding team; right?

25   A.    At this time I believe that's true, yes.

2456

1    Q.    In the sequence of things, there's sales and

2    marketing trying to get customers, and after you get the

3    customers, the onboarding team talks to them; right?

4    A.    Sure.  Yes.

5    Q.    Right.  Because they're getting onboard.  You have

6    to talk to the customer; right?

7    A.    Correct.

8    Q.    And the onboarding team has your FAQs; right?

9    A.    The onboarding team has our FAQs.  They're primarily

10   directed at sales and marketing.

11   Q.    But you distribute copies to the onboarding team so

12   that they stay on message as well; correct?

13   A.    Probably, yes.

14   Q.    He says -- goes on to say,

15          "To truly support our clients' ongoing

16   customizations means regular synchronizations of the

17   client's code changes, and possibly database refreshes over

18   time, resulting in significant overhead and downstream

19   challenges of reconciling environmental discrepancies

20   beyond our infrastructure and team capabilities."

21          He says up above -- well, did you know about all

22   these difficulties with actually handling customer

23   customizations?

24   A.    Did I know?

25   Q.    Yes.

2457

1    A.    I did not, no.

2    Q.    All right.  The -- now, you said you talk to

3    customers a lot, I believe; correct?

4    A.    I do, yes.

5    Q.    And your marketing department talks to customers;

6    correct?

7    A.    Yes.

8    Q.    And from the time you joined the company, to the

9    best of your knowledge, did you or anybody in your

10   marketing department have knowledge that Rimini Street was

11   sharing software between -- Oracle software between

12   customers during that period?

13   A.    No.

14   Q.    Okay.  That wasn't something you knew about, that

15   wasn't something you talked to -- you shared with

16   customers; correct?

17   A.    No.

18   Q.    From 2006 to 2011, did you, or, to your knowledge,

19   your marketing department, know that Rimini Street was

20   reusing fixes and updates amongst clients all the time?

21   A.    No.

22   Q.    Okay.  Are you unaware that that practice -- that --

23   well, let me ask you this then.

24         Were you aware during that period of time that

25   Rimini had a software library with PeopleSoft software,

2458

1    Siebel software, or JD Edwards software?

2    A.    No.

3    Q.    Not something you talk -- you knew about or, to your

4    knowledge, that your marketing department knew about it?

5    A.    That's correct.

6    Q.    Okay.  Not something that you talked about with

7    customers; correct?

8    A.    That's correct.

9    Q.    Okay.  And did you know from 2006 to 2011, or, to

10   your knowledge did your marketing department know, that

11   your technology people were cloning customer environments?

12   A.    No.

13   Q.    Did you know that -- I think you already told me

14   that you didn't know and your marketing department wouldn't

15   have known about the general testing and development

16   environments; correct?

17   A.    That's correct.

18   Q.    And after this lawsuit was filed, that continued to

19   be correct, you still didn't know about that; right?

20   A.    That's correct.

21   Q.    And you still -- you continued to give the customers

22   their standard messaging.  After this lawsuit, the standard

23   messaging did not change.

24   A.    That's correct.

25   Q.    Okay.  Except for the fact that you had to use it

1    more often and say, in response to the lawsuit, that, in

2    fact, you were defending Oracle's -- that you were

3    defending -- that you were appropriately protecting

4    Oracle's copyrighted materials; correct?

5    A.    That's right, yes.

6    Q.    But you didn't actually know whether that was true

7    or not, did you?

8    A.    It was represented to me at the operating committee.

9    Q.    Okay.  Let's go over that.

10          You didn't know whether it was true or not;

11   correct?

12   A.    Correct.

13   Q.    Okay.  Who represented it to you at the operating

14   committee?

15   A.    It would have been Seth Ravin, our CEO, primarily.

16   Q.    Okay.  So you were out in the marketplace generating

17   sales messages for your sales and marketing department,

18   saying that you were not violating the copyrights of

19   Oracle, that you weren't sharing updates and fixes, that

20   you weren't using one customer's environment for another,

21   you were saying all those things based on the

22   representations of Mr. Ravin; is that correct?

23   A.    Yes, that's correct.

24          MR. ISAACSON:  Okay.  Your Honor, I'm going to

25   turn to a new topic if you want to take a break.

2460

```
 1                    THE COURT:  It is time for our second and final
 2      break of the day, and let's take it at this time.
 3                    Ladies and gentlemen, the same admonitions
 4      apply.
 5                    We'll take our break for 10 to 20 minutes,
 6      depending on when you're ready, and you may go ahead and
 7      step down.  Thank you.
 8                    COURTROOM ADMINISTRATOR:  Please rise.
 9              (Jurors exit courtroom at 12:08 p.m.)
10                    THE COURT:  I wanted to ask, is this an
11      opportune time to address that matter that we spoke to at
12      sidebar?
13                    We can also do it later if you don't think we'll
14      be getting to that today.
15                    MR. ISAACSON:  I'm hoping to get to it.
16                    THE COURT:  And, Mr. Rowe, you may step down.
17                    THE WITNESS:  Thank you.
18                    MR. ISAACSON:  So at this point, Your Honor, I
19      think Your Honor's familiar with the paragraphs of 5365,
20      but he has said that he has relied on these documents to
21      reach the conclusion that what the company was doing was
22      legal, and that they tried to get as much information as
23      they could about it.
24                    And so I think if we're going to do the full
25      picture, and it wasn't our choice for them to go into that,
```

2461

1    and that ultimately -- it is directly relevant to show that

2    this company admitted copyright infringement.  I mean,

3    that's what happened.

4            And it directly relates to the damages case as

5    well, because it goes to the issue of who are the

6    noninfringing and the infringing -- the noninfringing or

7    the infringing alternatives who may be considered.

8            And CedarCrestone has now been named as a

9    third-party support provider who was in the marketplace.

10           MR. RECKERS:  Your Honor, I'll address --

11           THE COURT:  Mr. Reckers, go ahead.

12           MR. RECKERS:  Yes.  Two things.

13           There's no evidence, no admissible evidence, as

14   to the -- what happened to CedarCrestone after discovery.

15           There's one declaration.  It's hearsay.  We were

16   denied discovery on it.  It happened outside of the

17   timeframe.

18           What the issue here is, and the question that

19   Mr. Rowe laid foundation was, what informed Rimini's belief

20   as to the legality of their processes between 2006 and

21   2011.

22           He's asked about a document from 2010.  He was

23   asked about another RFP response which I don't recall the

24   date of but from the time period.  So those are the

25   strictures.

DONNA DAVIDSON, RDR, CRR, CCR #318    (775) 329-0132

1          What happened with CedarCrestone in 2013 could

2    not have informed -- of course could not have informed

3    Rimini's state of mind between 2006 to 2011.  It hadn't

4    happened yet.

5          So it's irrelevant from that standpoint, which

6    is the only issue that would come into the case.

7          That issue aside, even if we were to say that

8    that was relevant, we have a document, we don't know

9    anything about it.  We asked for discovery.

10          We don't know why the CFO at CedarCrestone

11   changed their mind and went over the head of the technical

12   personnel who was deposed in late 2011.

13          I mean, we asked.  We asked for a deposition of

14   CedarCrestone.  We asked for discovery from Oracle.

15          There was a settlement agreement the same day in

16   2013 when this was signed.  Obviously, from our view, a

17   condition of settlement was to recant that testimony.

18          We can't just -- we can't just pull this

19   declaration out, this hearsay declaration, and say doesn't

20   this show something.

21          What does it show, that they have an agreement

22   that they're going to recant the testimony with their CFO?

23          It is highly prejudicial to take away the

24   discovery that we obtained legitimately in this case and

25   say, oh, we can undo it now with some side agreement three

2463

1    years later.

2              It is completely irrelevant to the issue of

3    Rimini's state of mind during the time period in question

4    in the case.

5              Now, as to the damages question, there's two

6    discrete models.  There's the lost profit model and then

7    there's the value of use.  That's the one that has the

8    noninfringing alternative.

9              We are not contesting that -- we have not said

10   that CedarCrestone was a noninfringing alternative.  But

11   what they are is another place for the first model, for the

12   lost profit model, that customers went to.

13             So the question in that piece of it is were

14   those customers -- was there straight causation between --

15   from Oracle to Rimini.

16             If they're going somewhere else, even if they're

17   going somewhere that's not appropriate and legal, then that

18   still breaks that cause of -- that -- and here's the

19   reason.

20             Say there was a settlement in the CedarCrestone

21   case.  Say CedarCrestone paid damages for those clients

22   going back.  So we now have this other question of where

23   does this come in.

24             And the answer is, Your Honor, it can't.  It is

25   not something that we opened the door to, and it is

1      inadmissible for any number of reasons.

2              MR. ISAACSON:  All right.  So counsel's leaving

3      one piece out of this, because he's arguing about

4      admissibility, and right now we're talking about

5      cross-examination.

6              All right.  This gentleman has said that he

7      tracks as much information as possible about CedarCrestone.

8      He has said that he relies on that information to make his

9      decisions.

10             I'm entitled to ask him, after receiving this

11     information in 2013, if he did receive it, and if he

12     didn't, that raises an issue to his credibility, as to

13     whether that changed his mind.  All right?

14             That answer bears directly on his credibility.

15             That doesn't mean the document gets separately

16     admitted, but it's fair grounds for cross-examination to

17     read the relevant paragraphs to him and to test -- and to

18     test his testimony.

19             With regards to the noninfringing alternatives,

20     I guess we want to have it both ways now.

21             The law that we've put into our -- to the briefs

22     to Your Honor says that, for purposes of causation,

23     infringing alternatives are irrelevant, and the jury should

24     be instructed to that.

25             You don't strike the causation link because

1      there's something else illegal going on out there.

2              So now that they've put in evidence through this

3      witness, and the record contains their arguments that

4      generally there are alternatives out there, and

5      CedarCrestone has been named, we have to say who are the

6      infringing alternatives, and those are TomorrowNow and

7      CedarCrestone.

8              And there's no basis for treating CedarCrestone

9      differently from TomorrowNow with respect to the damages

10     question.

11             THE COURT:  All right.  Well, first question is

12     easy.  The witness has testified about CedarCrestone, and

13     so Mr. Isaacson is, in fact, entitled to cross-examine

14     concerning the issues relevant to that.

15             I've certainly given plenty of warning to

16     counsel that if you're putting CedarCrestone on the table,

17     you're putting the whole package on the table, and so that

18     is going to be the Court's ruling with regard to the

19     cross-examination.

20             As to the remaining questions, I'll deal with

21     those as they arise in the interest of --

22             MR. RECKERS:  Your Honor, our next witness is

23     Mr. Hilliard, who we had a discussion about late yesterday

24     morning.

25             Would this be a convenient time to take up those

2466

```
 1     issues so we can see whether or not I can examine him on
 2     the industry practice opinion that he intends to offer?
 3               Our position would be that the foundation we
 4     discussed yesterday has now been laid by Mr. Rowe as we've
 5     been talking about.
 6               Rimini had this material, it was publicly
 7     available, and they relied on it.  That shows that this is,
 8     under the previous authority that we discussed yesterday, a
 9     proper basis for our expert to tell the jury about what was
10     customary practice in the industry and what informed was
11     reasonable for Rimini to do as a company, having direct
12     bearing on punitive damages and --
13               THE COURT:  I'd rather address -- one, I'm
14     concerned about extending this break longer than I've
15     indicated to the jury.
16               Before we call Mr. Hilliard, I'll excuse the
17     jury briefly, and we'll address this issue head on.
18               MR. RECKERS:  Your Honor, so we would like a
19     copy of the settlement agreement between CedarCrestone and
20     Oracle.
21               I think that we're entitled to at least see
22     what's in the settlement agreement if the declaration that
23     was signed the same day is going to be put even before the
24     witness in any way.
25               THE COURT:  Mr. Isaacson?
```

1              MR. ISAACSON:  I will ask the witness if he

2    reviewed the settlement -- if he reviewed any settlement

3    agreement.  If he says no, it's irrelevant.

4              Actually, he can ask him.

5              THE COURT:  I understand that doesn't respond to

6    what you're raising, Mr. Reckers.

7              MR. RECKERS:  I'll tell you this.  The

8    declaration that Mr. Isaacson says he's going to show

9    portions of is marked highly confidential.

10             I've never given it to my client.  So no there's

11   way that he's going to know anything about it other than in

12   a general sense.  So if we're going to show portions of it,

13   I think that's problematic.

14             MR. ISAACSON:  I'm not asking to show it on the

15   screen, but the -- I will read it to him and ask him --

16             MR. RECKERS:  Again, it depends on what's going

17   to be read.

18             MR. ISAACSON:  I'm going to read the parts where

19   they admit copyright infringement.

20             MR. RECKERS:  That's the problem here, Your

21   Honor.

22             THE COURT:  All right.  It's premature at this

23   time for the Court to decide that issue.  I need to hear

24   the cross-examination.

25             And we're going to be meeting again before

1    Mr. Hilliard testifies, and I'll address it at that time.

2    Thank you.

3                MR. RECKERS:  Thank you, Your Honor.

4                THE COURT:  Thank you.

5                COURTROOM ADMINISTRATOR:  Please rise.

6           (Recess from 12:19 p.m. until 12:36 p.m.)

7           (Jurors enter courtroom at 12:36 p.m.)

8                THE COURT:  Have a seat, please.

9                The record will show we're in open court.  The

10   jury's all present, as are the parties and counsel.

11               Mr. Isaacson, you may proceed with your

12   cross-examination of Mr. Rowe.

13   BY MR. ISAACSON:

14   Q.    Now, Mr. Rowe, when your counsel asked you

15   questions, you said you reviewed certain documents of

16   CedarCrestone.  And we'll take a look at those, but you

17   reviewed those documents, and you concluded that what your

18   company was doing was legal; correct?

19   A.    I didn't say that, did I?

20   Q.    Well, when you read those CedarCrestone documents,

21   did you conclude that you were not infringing Oracle's

22   copyrights?

23   A.    No.  I think it was informative for the operating

24   committee, especially, you know, Seth and the service team,

25   but I didn't make that determination.

1           MR. ISAACSON:  All right.  So, actually, I would

2    move to strike his testimony about what others concluded,

3    Your Honor.

4           THE COURT:  That will be stricken.  That was a

5    nonresponsive portion of the answer.

6    BY MR. ISAACSON:

7    Q.    All right.  So when you testified about reviewing

8    CedarCrestone materials, after you reviewed those

9    materials, you did not reach any conclusions yourself about

10   whether your company was violating Oracle copyrights;

11   correct?

12   A.    That's correct.

13   Q.    Okay.  And after you reviewed the CedarCrestone

14   materials, you did not reach any conclusions yourself as to

15   whether your company was behaving legally; correct?

16   A.    Correct.

17   Q.    Okay.  And, in fact, at the time that you were

18   reviewing the CedarCrestone materials, you didn't actually

19   know what your company was doing.

20           You didn't know that they were making common use

21   of cross-uses of fixes and updates, you didn't know about

22   general testing and development environments, you didn't

23   know about a library of software, you didn't know what your

24   company was doing; right?

25   A.    I did not, no.

2470

```
 1   Q.    All right.  And you thought it was -- well, let me
 2   ask you this then.
 3              Can you look at -- let me ask you about something
 4   you did know -- PTX 803 which is in your binder.
 5   A.    803?
 6   Q.    Yes, in the large binder.
 7              MR. ISAACSON:  And I don't know if 803 has been
 8   admitted.
 9              COURTROOM ADMINISTRATOR:  Yes, it has.
10              MR. ISAACSON:  Yes, thank you.
11              So can we put that on the screen?
12   BY MR. ISAACSON:
13   Q.    And at the top you'll see that there's an email
14   you've written to Mr. Ravin in August 2008; correct?
15   A.    I don't see that.  I'm sorry.
16   Q.    Do you have Exhibit 803?  We can also blow it up on
17   the screen for you, but the first page --
18   A.    I'm sorry.  I grabbed 802.  I'm sorry.  Go ahead.
19   Q.    Sure.  That's an email that you've written to
20   Mr. Ravin in August 2008; right?
21   A.    That's correct, yes.
22   Q.    And you are writing about CedarCrestone?  Correct?
23   A.    Correct, yes.
24   Q.    All right.  And what you're saying -- you say that
25   CedarCrestone is denying in the marketplace that they're in
```

2471

```
 1    the third-party support business; right?
 2               MR. ISAACSON:  Second line, Matt?
 3               THE WITNESS:  That's correct, yes.
 4    BY MR. ISAACSON:
 5    Q.    Essentially, CedarCrestone is denying they are in
 6    the third-party support business, and you're writing that
 7    CedarCrestone is saying in the marketplace that they want
 8    customers to stay on Oracle support; correct?
 9    A.    That's what they were saying, yes, that's what I
10    wrote.
11    Q.    And if we go down below, I think you've cut and
12    pasted some information from the web, isn't that what's
13    happening here in the middle?
14               MR. ISAACSON:  No, no, no, no, no, I'm sorry, in
15    the same -- keep it blown up, Matt.
16    BY MR. ISAACSON:
17    Q.    In the middle of that paragraph you've cut and
18    pasted something from the web.  Am I reading that right?
19    A.    That's correct, yes.
20    Q.    And somebody has written that,
21               "What that also means is they service customers
22    individually not in the scaleable model of a Rimini which
23    develops regulatory and other updates aimed at their
24    hundreds of customers."
25               You thought that they were a very different
```

2472

1    business from you; right?

2    A.    That's what this person wrote.

3    Q.    Right.

4    A.    From his conversation with them, yes.

5    Q.    And that's what you thought about them as well;

6    correct?

7    A.    In terms of serving customers individually?

8    Q.    Yes.

9    A.    I don't know how they delivered the service in

10   relation -- I'm not sure I understand the question.

11   Q.    All right.  You didn't know how -- you did not know

12   how CedarCrestone was delivering its services to customers;

13   is that correct?

14   A.    Not technically.

15   Q.    Okay.  The -- now, at the bottom, is that

16   Mr. Neville, a senior account executive writing to you in

17   the next email?

18   A.    That is Andrew Neville, yes.

19   Q.    All right.  Now --

20   A.    I'm sorry, he's not writing the email.

21   Q.    Who is -- and he's -- who is writing the next email?

22   A.    Seth Ravin.

23   Q.    Okay.  So Seth Ravin is writing Dennis, "very

24   interesting and amateurish sales technique," referring to

25   CedarCrestone; correct?

2473

1    A.    Yes.

2    Q.    Now, the sales technique he's talking about is on

3    the next page.

4              "Go to CedarCrestone's website" at the top "and

5    find where they advertise their 'third-party support'

6    offering.  They won't find it, because CedarCrestone

7    doesn't want" to know the -- "doesn't want the world to

8    know they are trying to be in this business.  They are

9    afraid if Oracle finds out, they will cut off their

10   implementation and upgrade business."

11             So let's -- oh, yes.  I see Mr. Ravin's name

12   down below.  Thank you.

13             So what Mr. Ravin is saying here is, in essence,

14   that CedarCrestone, who you said was an Oracle partner and

15   provides mostly consulting, that when CedarCrestone

16   provides any support business they're doing it -- they're

17   doing it in a way so that Oracle won't see them.  They

18   don't want Oracle to know what they're actually up to;

19   right?

20   A.    That's what this says, right.

21   Q.    And that was your understanding, wasn't it?

22   A.    At the time of this email, yes.

23   Q.    All right.  So at the time of this email, which is

24   2008, before you get any of those documents you said you

25   got, the -- what you understood was that CedarCrestone was

```
 1   operating, when they did support business, which was a
 2   small part of their business, was they were in essence
 3   operating a secret business; right?
 4   A.    They didn't, yeah, market it.
 5   Q.    That's right.  And when you gave Mr. Ravin RFPs from
 6   CedarCrestone, he had already told you that they -- that he
 7   thought CedarCrestone was operating a secret business that
 8   they did not want to know -- which they did not want Oracle
 9   to know about; correct?
10   A.    Correct.
11   Q.    So your view of what CedarCrestone was in the
12   marketplace, was they were up to something, something they
13   didn't want Oracle to know about; correct?
14   A.    Yes.
15   Q.    All right.  Now, can I ask you to look at -- not on
16   the -- your counsel gave you DTX 3020.  Do you still have
17   the binder that you had from your counsel?
18   A.    I do, yeah.
19   Q.    And you remember DTX 3020, this was an October 2009
20   response to an RFP by CedarCrestone; right?
21   A.    Yes, correct.
22   Q.    Okay.  The -- if you turn to page 14 of 71, do you
23   see something called Assumptions?
24   A.    Yes, I do.
25   Q.    And do you see it says,
```

                                                                2475

1           "CedarCrestone developed this response based on

2      the following general support assumptions."

3               Do you see that?

4      A.    Yes, I do.

5      Q.    All right.  And then if you go down a number of

6      bullets which begin with TUSD, it says,

7               "CedarCrestone's support will be provided on a

8      remote basis."

9               Do you see that?

10     A.    I do see that, yes.

11     Q.    That's not your business model at the time, is it?

12              You're -- for the vast majority of your clients,

13     you're using environments on the Rimini system and not

14     remote environments; correct?

15     A.    I'm not sure how -- that's what this means.

16     Q.    All right.  Well, okay.

17              So if you had this document at the time, and you

18     reviewed it, and you read "CedarCrestone's support will be

19     provided on a remote basis," you wouldn't have known what

20     it meant; is that fair?

21     A.    I think I know what it means.

22     Q.    Okay.  But at the time you wouldn't have known what

23     it meant; correct?

24     A.    Not technically.

25     Q.    Correct.  It's a technical -- we are having a

1    technical discussion between two relatively untechnical

2    people; right?

3           You wouldn't have known that what they're

4    describing -- you wouldn't have known what their business

5    model actually was as a technical matter; correct?

6    A.    Not as a technical matter, no.

7    Q.    All right.  And if you look at 22 -- DTX 22 in that

8    binder -- by the way, DTX 22, this is the request for

9    proposal from Oklahoma City Municipal Facilities Authority.

10          This document was not produced by your company in

11   discovery.  It was obtained from Oklahoma City?  From

12   Oklahoma City.  Were you aware of that?

13   A.    No.

14   Q.    Okay.  You testified that this was an important

15   document, something everybody was reviewing, everybody was

16   paying attention to, but you did not actually have a copy

17   of this document going into this lawsuit, did you?

18   A.    I thought I did, but I'm not sure.

19   Q.    Okay.  It hasn't been produced from your company's

20   files.  The only one who had a copy of it was this Oklahoma

21   City Authority.  Okay?

22          You don't know that you actually had a copy of

23   this document, do you?

24   A.    I believe I have it in email somewhere.

25   Q.    Okay.  Now, sir, I can promise you your e-mails have

2477

1   been canvassed for this litigation.

2            You can't look at this document from 2010 today,

3   knowing your company didn't produce it, and say, yes, I had

4   a copy of it?

5   A.    I cannot, no.

6   Q.    If we look at page 45B, Connectivity,

7            "CedarCrestone must have secure access to the

8   city's PeopleSoft environment in order to provide the

9   requested support."

10           You wouldn't technically understand what that

11  meant, would you?  You would not know how they were going

12  to provide the support?

13  A.    No, I would not.

14  Q.    Okay.  One way of reading that would be they're

15  going to provide it through -- to promote environments, but

16  you wouldn't be sure one way or the other; correct?

17  A.    Correct.

18  Q.    And down below in D, it says,

19           "CedarCrestone will not download any materials

20  from the Oracle website on the client's behalf."

21           That one's pretty clear.  You understand that

22  one; right?

23  A.    I do, yes.

24  Q.    Right.  And you understood that Rimini was the

25  opposite.  It would download materials from Oracle

2478

1    websites; correct?

2    A.    Correct.

3    Q.    All right.  Now -- all right.  Moving on.

4         Now, part of your -- what the marketing

5    department would do, and the sales department would do, is

6    it would tell customers that they should put in place

7    what's called a nondisclosure agreement so that they could

8    consider your services; right?

9    A.    That's correct, yes.

10   Q.    And so let's just explain that.

11        So your people on the phone, you actually would

12   have scripts for the callers that we were talking about.

13        And they would call customers, and they would

14   say, "Gee, to share information with you, let's enter into

15   an agreement where we agree to keep the information we

16   share confidential," what's called a nondisclosure

17   agreement; correct?

18   A.    Yes.

19   Q.    And that was standard messaging from Rimini Street?

20   A.    Yes, that's right.

21   Q.    And if we piled up all the nondisclosure agreements

22   they signed with customers or potential customers, it would

23   be quite a tall pile; right?

24   A.    Presumably, yes.

25   Q.    All right.  And you would communicate with customers

1    that a nondisclosure agreement, which would be mutual, both

2    sides agreeing to keep these things confidential, would it

3    allow you to share detailed information?  Correct?

4    A.    Correct, yes.

5    Q.    All right.  And specifically it would allow you to

6    share pricing information that -- how much Oracle was

7    charging that customer; correct?

8    A.    Yes, that's right.

9    Q.    And the reason you wanted to know that was so you

10   could charge 50 percent off of the Oracle price; right?

11   A.    Correct.

12   Q.    It's hard to charge 50 percent off the price if you

13   don't know the price.

14   A.    That's correct.

15   Q.    Right?

16          And you treated that as Oracle confidential

17   information, and so you said to the customers "we can share

18   that if we both agree to keep that information

19   confidential"; correct?

20   A.    Correct.

21   Q.    And your whole business model is built on charging

22   50 percent off, which is -- but the price that you're

23   charging 50 percent off is confidential information, so

24   you've built this information on these nondisclosure

25   agreements in order to get the price; right?

2480

```
1    A.     Yes, we use NDAs to get the price, yes.

2    Q.     All right.  And, in addition, you would use the

3    nondisclosure agreements to get confidential information

4    about how the Oracle software is being deployed into the

5    customer system; correct?

6    A.     Yes.

7    Q.     Okay.  And, in fact, you would tell customers "We

8    can't give you a price until you give us this confidential

9    Oracle pricing information which we'll do under a

10   nondisclosure agreement"; correct?

11   A.     That's right, yes.

12   Q.     Because you can't charge 50 percent off until you

13   know what the price is; right?

14   A.     That's right, yes.

15   Q.     Okay.  Now, the -- I want to ask you about 6 -- PTX

16   698 which has been admitted and shown to people in this

17   case.

18             This is a software license agreement, a

19   PeopleSoft software license agreement with the City of

20   Flint.

21             MS. CHUANG:  Objection, Your Honor, foundation.

22             MR. ISAACSON:  I haven't asked a question yet.

23             MS. CHUANG:  Well, may we approach on this

24   document?

25             THE COURT:  You may.
```

1              (Sidebar conference held as follows:)

2              MS. CHUANG:  Your Honor, my objection on

3    foundation is because this is a document that Mr. Rowe

4    clearly has never seen.

5              This is an Oracle-produced document that's AEO.

6    He's never seen this in litigation.

7              He can try and lay a foundation, I suppose, that

8    he's probably seen this, but, you know, there's -- even if

9    Mr. Rowe hasn't seen this, there still needs to be

10   foundation laid that he has.

11             MR. ISAACSON:  So earlier in the trial Rimini

12   has relied on this standard provision, 14.1, to say that

13   our terms and conditions of our agreement are confidential,

14   and that it was Rimini's understanding that customers were

15   not allowed to share those with them, and that's referring

16   to things like the license provisions we're talking about.

17             And what we're now learning is that Rimini --

18   this document they're referring to refers to conditions

19   pricing that Rimini felt free to ask clients for

20   confidential pricing information under the NDA.

21             Okay.  This has been put -- Rimini has been

22   putting this in front of witnesses.  It's fair

23   cross-examination to put this in front of the witness

24   because, as he said, this is their standard messaging as to

25   how they are getting clients onboard.

1           What we are currently showing is they're getting

2  clients' confidential information that they want, but

3  they're not asking for other information that they don't

4  want to know about.

5           MS. CHUANG:  May I respond?

6           THE COURT:  Go ahead.

7           MS. CHUANG:  If this has been shown to other

8  witnesses, perhaps that would be proper to ask those other

9  witnesses if he can lay the foundation.

10          This is absolutely a document that this

11 individual has never seen and wouldn't be able to -- and he

12 will testify, I'll represent to you, that he's never seen a

13 PeopleSoft contract --

14          MR. ISAACSON:  He's going to have some

15 understanding of this provision because these top

16 executives -- this used to be their favorite provision.

17 They've been testifying that based on this we weren't

18 allowed to have this information, and what we're finding

19 out is that's false.

20          THE COURT:  All right.  I have no way of knowing

21 what the witness's answers are going to be.

22          It strikes me that the questions are

23 permissible.  I'll allow you to ask the questions.  I'll be

24 listening closely to the answers.

25          If you feel that you have an objection to the

```
 1    content of the -- the line of questioning, you may raise
 2    it, and I don't anticipate we'll need a sidebar on it, but
 3    I'll be listening.
 4            MS. CHUANG:  If he asks the question "have you
 5    seen this," and he says "no," I'm going to stand up and
 6    object based on foundation again.
 7            THE COURT:  All right.  Well, your objection
 8    will be viewed as a continuing objection.  You don't need
 9    to stand up and do that.
10            My view is that the exhibit is in evidence, and
11    I think the question is permissible in light of the fact
12    that the exhibit is in evidence.
13            I am listening to hear what his response is.
14            MS. CHUANG:  Okay.  Thank you, Your Honor.
15        (Sidebar conference concluded.)
16    BY MR. ISAACSON:
17    Q.   Did you have a chance to look at 14.1 on page 4?  I
18    don't know if I asked you to do that.
19    A.   Sorry.
20    Q.   Okay.  Page 4 of 6 the exhibit, entitled
21    Nondisclosure Obligations.
22    A.   Yes.
23    Q.   Did you have the general understanding that the
24    Oracle license agreements with customers had nondisclosure
25    or confidentiality provisions?
```

2484

1    A.    I would make that assumption, yes.

2    Q.    And did you have the general understanding that that

3    included pricing?

4    A.    I would think so, yes.

5    Q.    Right.  And that's why you had -- that's why you

6    were offering customers nondisclosure agreements in order

7    to get -- in order to get the pricing information you

8    needed; correct?

9    A.    Correct.

10   Q.    Did you, as part of your work, ever see an Oracle

11   license agreement?

12   A.    No.

13   Q.    Did you, at the -- I'm forgetting the term, I'll

14   call it the executive committee -- what's the correct term?

15   A.    Operating committee.

16   Q.    Thank you.  The operating committee.

17         At any operating committee meeting that you ever

18   attended, did anybody -- any executive ever say, "Gee, we

19   can't learn what's in Oracle licenses because it has a

20   confidential provision"?

21   A.    No.

22   Q.    Okay.  And did you understand that the -- that the

23   Oracle licenses confidentiality provisions would not only

24   include pricing, but would also include the terms and

25   conditions of the agreement?

2485

1    A.    I would assume so, yes.

2    Q.    Okay.  And you assumed that during that time, 2006

3    to 2011?

4    A.    Yes.

5    Q.    All right.  And so your understanding was that if

6    you want -- that you could obtain any of the provisions of

7    the Oracle license agreements that were confidential but

8    only if you entered a nondisclosure agreement with the

9    customer; correct?

10   A.    That was our policy, yes.

11   Q.    Now, part of your standard messaging was also that

12   you don't operate an out-of-the-country support model;

13   correct?

14   A.    That's right.

15   Q.    Or an offshore support model as it's sometimes

16   called?

17   A.    Correct.

18   Q.    And, in fact, you would attack any competitor such

19   as NetCustomer who did have that model and say that that's

20   not a feasible model that would work within your industry;

21   correct?

22   A.    Yes, that's right.

23   Q.    Okay.  Now, in fact, you had customers who would not

24   accept any offshore services; correct?

25   A.    I believe that's true.

2486

```
 1    Q.    Right.  And you would see that in RFPs.

 2          Well, you were involved in drafting the responses

 3    to RFPs; right?

 4    A.    Generally not.

 5    Q.    Okay.  Was the marketing department involved?

 6    A.    Perhaps early in the process in the company's

 7    history, but later, no.

 8    Q.    Okay.  You certainly saw a lot of them.

 9    A.    A fair number, sure.

10    Q.    And a lot of your standard messaging went into the

11    responses to RFPs; right?

12    A.    Yes.

13    Q.    So, for example, if we can look at -- no, I need

14    that other binder here, the RFP binder.

15          MR. ISAACSON:  The RFPs are larger so I've put

16    them into a separate binder.

17          While we get that binder, I'll come back to

18    this.

19          Can we look -- Matt, can we look at the support

20    options for customers leaving Oracle support?

21          I'm told -- Christine is always well ahead of

22    me.  It's up there.  You have a separate binder up there

23    with requests -- with responses to RFPs.

24          Do you see binder 2?

25          Yes.  I thought we hadn't burdened you with that
```

2487

```
 1    yet.

 2                Can we look -- so, for example, look at 2143,

 3    which is a response to the Knoxville Utilities Board.  I

 4    would move to admit that.

 5                Oh, I'm sorry, it's the actual RFP from

 6    Knoxville.  But I would move to admit.

 7                MS. CHUANG:  No objection.

 8                THE COURT:  It's admitted.

 9           (Plaintiffs' Exhibit 2143 received into

10           evidence.)

11    BY MR. ISAACSON:

12    Q.    All right.  If you look at page 10, it says in the

13    middle of the page, underlined, bolded -- no, up above, "No

14    offshore services will be accepted."

15                That's the kind of thing customers would say;

16    right?

17                MS. CHUANG:  Your Honor, objection.  There's

18    been no foundation laid that this witness has seen it or

19    has personal knowledge.

20                MR. ISAACSON:  I just asked him if this is the

21    kind of thing customers say.

22                THE COURT:  Well, and it's in evidence.  I'm

23    going to allow you to ask that question.

24    BY MR. ISAACSON:

25    Q.    All right.  That's the kind of thing customers often
```

2488

```
 1    said; right?

 2    A.    Not often, no.

 3    Q.    All right.  Well, let me ask you about that.

 4          2140 in the binder.  2140 is admitted.

 5          This is your response to a request for proposal

 6    for the Abilene Independent School District; right?  Do you

 7    see that?

 8    A.    I do, yes.

 9    Q.    Okay.  Page 9.  Service Delivery Model, second

10    bullet.  No, second bullet.

11          "Any deliverable scoped, developed, tested, or

12    supported by offshore, outside North America resources?

13    Answer, no."

14          "All deliverable scoped, developed, tested, and

15    supported by North American-based resources."

16          That was standard language your company used;

17    right?

18    A.    Yes.

19    Q.    All right.  Let's look at another example, just to

20    show this is standard language.

21          PTX 2142.  It's not been admitted.  It's a

22    Rimini Street response to a request for proposal.

23          MS. CHUANG:  No objection.

24          MR. ISAACSON:  All right.  Please look at page

25    7.
```

2489

1          THE COURT:  It's admitted.

2          (Plaintiffs' Exhibit 2142 received into

3          evidence.)

4    BY MR. ISAACSON:

5    Q.    All right.  You see the second bullet?  It's

6    identical second bullet, identical language; right?

7    A.    Yes.

8    Q.    All right.  If we stacked up all the documents we

9    could find with that language being given to customers, it

10   would be a large stack, wouldn't it?

11   A.    I haven't seen that term a lot in RFPs.

12   Q.    All right.  It is standard messaging, right, that

13   all of your deliverables are developed, tested, or

14   supported in North America; right?

15   A.    At this time, yes.

16   Q.    Okay.  How long did -- this time is 2009.

17   A.    So the answer is yes.

18   Q.    All right.  And that continued for some years;

19   correct?

20   A.    Yes.

21   Q.    In fact, if we look at PTX 2158, which has not been

22   admitted, this is a response to a request for proposal for

23   the City of Overland Park, Kansas, which was one of the

24   ones you mentioned.  I think you talked about a customer

25   success story was Overland Park.

2490

1        MR. ISAACSON:  And I move to admit.

2        MS. CHUANG:  No objection.

3        THE COURT:  It's admitted.

4     (Plaintiffs' Exhibit 2158 received into

5     evidence.)

6  BY MR. ISAACSON:

7  Q.    Page 8.  This is now April 2010.  The only change is

8  now -- it is the -- it's still the second bullet.  Same

9  language.  Right?

10 A.    They are very similar.

11 Q.    All right.  Standard messaging year after year that

12 you're not going to be doing testing or development

13 overseas, and that was important to clients; right?

14 A.    Yes.

15 Q.    All right.  Now, let's -- if we can pull up the

16 support options for customers leaving Oracle support.

17        All right.  This is a slide you've been shown.

18 So self-support, I believe you said, is risky, and only 5

19 to 10 percent of customers would consider it or use it;

20 correct?

21 A.    I said that we compete with -- in our deals it's

22 about 5 or 10 percent that we would see self-support as an

23 option.

24 Q.    Right.  You said you compete, but you don't compete

25 much, it's only 5 or 10 percent --

2491

1    A.    That's right.  That's exactly right.

2    Q.    And consulting.  Now, consulting is hundreds of

3    companies, as you said, that that's hundreds of companies

4    who are offering consulting on top of support services.

5    It's an additional fee; right?

6    A.    Consulting is separate, yes.

7    Q.    All right.  And you're aware that hundreds of

8    consulting firms are licensed by Oracle; right?

9    A.    Yes.

10   Q.    All right.  And you don't consider them to be in

11   direct competition with you; correct?

12   A.    The consulting firms?

13   Q.    Consulting firms.

14   A.    We lose deals to them.

15   Q.    All right.  But less than 5 percent of the time.

16   A.    Yes.  In direct competition, yes.

17   Q.    All right.  Let's talk about that last group then,

18   third-party providers.

19          All right.  Now, you would agree with me that

20   your most frequent competitor for Oracle software support

21   is Oracle?

22   A.    Yes, I would.

23   Q.    All right.  And that competitors other than Oracle

24   are much, much smaller?

25   A.    Yes.

2492

1    Q.    Okay.  And before TomorrowNow shut down in

2    October 2008, Rimini and TomorrowNow were the only two

3    experienced, credible players in the third-party support

4    market other than Oracle?

5    A.    Yes.

6    Q.    Okay.  And then after Rimini -- I'm sorry, after

7    TomorrowNow closed in October 2008, the only competitor

8    that you lost more than one or two deals to was Spinnaker?

9    A.    That's right.

10   Q.    And Spinnaker you only lost deals to for JD Edwards;

11   correct?

12   A.    Yes, that's right.

13   Q.    And so to the extent that you know we're talking

14   about damages in this case from PeopleSoft software and

15   Siebel software, Spinnaker's got nothing to do with that;

16   right?

17   A.    Not PeopleSoft or Siebel.

18   Q.    All right.  And even with respect to -- even with

19   respect to JD Edwards, by 2009, your company was in a

20   position to bury Spinnaker because of the financial

21   problems they were having; right?

22   A.    We would have liked to, yes.

23   Q.    In fact, that's what you talked about and planned in

24   your operating committee meetings; right?

25   A.    Yes.

```
 1    Q.    All right.  And you also talked about how
 2   Spinnaker's core business was not support, its core
 3   business was consulting.  Correct?
 4    A.    That's right.
 5    Q.    All right.  And that it charged more money than you
 6   did for customizations, configuration, and other services;
 7   correct?
 8    A.    Correct.
 9    Q.    All right.  And they had no track record for
10   providing tax, legal, and regulatory updates; correct?
11    A.    Yes.
12    Q.    And by 2009, JD -- Spinnaker was not growing, it was
13   not gaining more JDE clients; correct?
14    A.    In 2009?
15    Q.    Yes.
16    A.    I think that's right, yes.
17    Q.    All right.  So you described to your counsel how
18   there was this period of time when it was about 50-50, but
19   by 2009 that stopped, their growth rate was flat; right?
20    A.    For 2009, yes.
21    Q.    All right.  Now, NetCustomer, you did not see them
22   much at all, they were only in a handful of deals; right?
23    A.    Correct.
24    Q.    There was only one deal lost to them; correct?
25    A.    That's right.
```

1    Q.    Versytec's got nothing to do with this case, you and

2    I agree about that because they support JDE World, and JDE

3    World is not a product in this case; right?

4    A.    That's my understanding, yes.

5    Q.    LegacyMode, you ran into them in two deals, but you

6    can't remember losing a deal to them; right?

7    A.    That's right.

8    Q.    All right.  So if we add up, so NetCustomer and

9    LegacyMode together, that's one deal you lost to them

10   together; right?

11   A.    I'm sorry, which two?

12   Q.    LegacyMode and NetCustomer.

13   A.    Correct.

14   Q.    In fact, LegacyMode went out of business in

15   July 2007; right?

16   A.    That sounds about right.

17   Q.    And they were JDE only; correct?

18   A.    No, PeopleSoft.

19   Q.    PeopleSoft only.

20         Okay.  So now we've got one deal between those

21   two companies you've lost.

22         Now, Abtech, you lost -- you can remember losing

23   one deal to?

24   A.    That's right.

25   Q.    So if we add up NetCustomer, Versytec, LegacyMode,

2495

```
 1    and Abtech, the total number of deals that you lost to
 2    those four companies from 2006 to 2011 that relate to
 3    products in this case are two?
 4    A.    That's right.
 5    Q.    All right.  Now, let me ask you about -- I lost my
 6    Post-It here.  Here we are.
 7          You mentioned two other success stories.  I think
 8    one of them was Overland.
 9    A.    I'm sorry, which one?
10    Q.    Overland.
11    A.    City of Overland Park.
12    Q.    Right.  City of Overland Park.
13    A.    Yes.
14    Q.    That was, in part, a PeopleSoft client; right?
15    A.    I can't remember right now.
16    Q.    Okay.  They had a local environment on the Rimini
17    system.  Did you know that?
18    A.    No.
19    Q.    Okay.  Did you know that cross-uses of fixes and
20    updates were being used in connection with that City of
21    Overland customer?
22    A.    No, I did not.
23    Q.    All right.  What about -- is it Dana Lim?
24    A.    Dana Limited.
25    Q.    Dana?
```

2496

1      A.    Dana, right.

2      Q.    Cross-uses and fixes and updates were also being

3   used in connection with that customer of yours.  Were you

4   aware of that?

5      A.    No, I was not.

6      Q.    Okay.  You're not technical, at least while you're

7   working at Rimini, and so you don't actually know what's

8   going on in the servicing of these customers; correct?

9      A.    That's right.

10     Q.    Okay.  But you're out there in the marketplace

11  telling people how these customers are being serviced, but

12  you don't actually technically know how it's being done?

13     A.    How at a high level, yes.

14     Q.    Right.  And the reason that you're doing that is

15  because you're relying on what Mr. Ravin has been telling

16  you about what's actually been happening?

17     A.    That's correct.

18            MR. ISAACSON:  I have no further questions.

19            THE COURT:  Redirect examination?

20            MS. CHUANG:  I have no questions, Your Honor.

21  Thank you.

22            THE COURT:  All right.  Okay.  Mr. Rowe, that

23  completes your testimony.  You may step down.  Thank you.

24            Are we at that point where I indicated I would

25  have a conference with counsel?

```
 1                    MS. CHUANG:  That's right, Your Honor.

 2                    THE COURT:  All right.  Ladies and gentlemen,

 3     we've been doing a pretty good job of trying to avoid

 4     disruptions of your time, but there is a matter that I need

 5     to address with counsel.

 6                    So I'm going to ask if you'll step outside.

 7     Please keep in mind the admonitions.  You may, of course,

 8     return to the jury room.  It will take a few minutes.

 9                    All the admonitions apply.  And I'll move this

10     along as quickly as I can.

11                    COURTROOM ADMINISTRATOR:  Please rise.

12           (Jurors exit courtroom at 1:14 p.m.)

13                    THE COURT:  All right.  Have a seat, please.

14                    Mr. Reckers, I think you were the lead person on

15     these issues, so I'll allow you to proceed, please.

16                    MR. RECKERS:  Yes, Your Honor.  Thank you.

17                    Could we put up my proposed PowerPoint?  I just

18     want to give Your Honor a sense of where I'm going and why

19     I think we have laid the foundation to the extent

20     foundation is even needed.

21                    This is the slide deck that's been at issue

22     between the parties and the opinions of Mr. Hilliard, and

23     they rely on large part on the video testimony of

24     Mr. Simmons.  I think we probably have the most

25     controversial part here.
```

So we'll show Your Honor what we're talking about. So just go back one, Marie, please.

So the first two opinions are the ones at issue. Opinion one is the custom in the software industry for consultants such as Rimini and CedarCrestone to maintain copies of the software. And the second one is related, it has to do with development processes.

So what the background -- moving forward, Marie -- is that we've taken from -- a figure from DTX 22, which is the one that already is in evidence, it talks about CedarCrestone how large they are, respected in the industry, an Oracle partner, and, on the basis of that partnership, the awards between the two companies for the support.

If we go forward a couple screens, Marie. The substance of the opinion -- keep going, Marie -- is basically that publicly available information such as contained in DTX 22 says that -- one more, Marie, please. One more.

Okay. So says that CedarCrestone does, in fact, maintain local copies for their clients, they do so in a data center, and, again, this was publicly available through information -- open records they request.

Mr. Simmons was the corporate designee for CedarCrestone in 2011. Some of the information about him

2499

1      is on the screen.  He basically has about 400 people

2      working for him on the PeopleSoft product.

3                  What he said in his deposition is -- if you go

4      to the next screen, please -- basically, as you see at the

5      bottom, it's typical in the industry for consulting

6      companies to keep copies of their software like Rimini

7      Street and CedarCrestone.

8                  Continuing to the next -- here's where I mention

9      the disclosure from the public document, that we will build

10     a copy of the city's PeopleSoft HCM demo environment within

11     our data center.  The environment will be used to create

12     and test the application revisions before we deliver them

13     to the city.

14                 That's the exact conduct that's accused in this

15     case.

16                 When asked whether or not CedarCrestone had a

17     license, a special license from Oracle, as Ms. Catz alluded

18     to, generally with respect to partners, he said, no, we are

19     relying -- we are relying on the partner's -- on the

20     client's license agreement, substantially the same position

21     that Rimini maintained all through the litigation.

22                 Moving forward, there's other examples of Oracle

23     partners that advertise this service.  This is one Astute

24     Labs, this is Summit.  They all say we will build your

25     software on our own systems, and then, obviously, you pay

1      them for that service.

2              So the opinion here is that it's customary in

3      the industry for these consultants to do that.

4              Again, going to the development process, same

5      thing.  This is the question of cross-use.

6              Mr. Simmons -- who, by the way, was adverse to

7      Rimini Street.  They weren't an Oracle partner, they were

8      adverse to us.  They didn't want to give us this deposition

9      for sure.

10             He says, though, candidly under oath, that it's

11     an industry practice to do what CedarCrestone and Rimini

12     did, cloning one copy of the software and giving it to all

13     the other ones, anyone who modifies software.  Again, they

14     relied on the customer's license agreement.

15             And so, Your Honor, and there's -- it follows,

16     but that's the substance of the testimony that we think the

17     jury should hear.

18             We heard from Mr. Rowe that Rimini Street had a

19     copy of documents such as Defense Exhibit 22.  We produced

20     some in discovery.  That's -- this particular document they

21     didn't receive until later, but it was in their possession

22     by 2011.

23             THE COURT:  What is the document again?  I'm

24     sorry.

25             MR. RECKERS:  There's two that have been

```
 1      discussed today.  One is the response by CedarCrestone to

 2      the City of Oklahoma's RFP, which is Defendants'

 3      Exhibit 22.  It's a -- it's a --

 4                THE COURT:  All right.  I --

 5                MR. RECKERS:  And there's another one I think

 6      from Tulsa.

 7                THE COURT:  I'm familiar with both.

 8                MR. RECKERS:  Okay.  So, again, we believe that

 9      foundation has been laid, if foundation is even necessary,

10      which we're contesting.

11                Mr. Rowe said the operating committee considered

12      information like this, including Mr. Ravin, and it informed

13      their views as to the legality of the practice.

14                We contest and we put in our submission

15      yesterday morning that such foundation is not necessary,

16      but even now we have it.

17                We think it's important for the jury to hear

18      that other people were doing the same thing in the same

19      timeframe.

20                In this case in particular our focus was

21      Oracle's own partners.  You saw the list that CedarCrestone

22      put out as their close relationship with Oracle.

23                The jury has the impression that Rimini Street

24      and Mr. Ravin are this rogue organization doing something

25      that no one would think is legal.
```

1            We believe that this evidence contradicts that,

2    rebuts that impression that the jury's left with, and that,

3    in fairness, we should be allowed to present them this

4    industry view that we have supported with evidence

5    developed in this case as to the permissibility of the

6    practice.

7            It's relevant to the question of punitive

8    damages and willfulness.

9            I'm happy to address any -- Your Honor,

10   especially I think these arguments, this is the core issue

11   for both the Simmons' testimony and for both of

12   Mr. Hilliard's first two opinions, the substance of which I

13   just went through with Your Honor.

14           THE COURT:  All right.  Quite candidly, I need

15   to see the Simmons' testimony.  How long does it take to

16   run the video?  I assumed it was on video.  Maybe it's not.

17   If you have a transcript, I'll look at that.

18           MR. RECKERS:  We probably have both.

19           THE COURT:  How long does it take?

20           MR. RECKERS:  Thirty minutes.

21           MS. DUNN:  Your Honor, I feel -- attached to our

22   motion I think there was a transcript or a chart, so maybe

23   that would assist the Court.

24           We anticipated this might be necessary and

25   pulled out the pieces of the Simmons' deposition that are

1     later recanted by the Fees' declaration.  So maybe while we

2     figure out the video piece, we can at least produce for

3     you --

4            THE COURT:  Well, if there's no dispute that

5     those are the sensitive issues in the deposition, I'll take

6     a look at that.  I'm just trying to get a sense for what

7     we're talking about here, a greater sense.

8            MR. RECKERS:  Your Honor, I can pass up the full

9     clip report.  It's about 30 minutes worth of --

10           THE COURT:  Okay.

11           MS. DUNN:  Your Honor, we would --

12           THE COURT:  What I'm uncomfortable about is that

13    we're going to take some time here, and the jury's going to

14    be excused at 2:00 anyway.  It's now 1:20.

15           Frankly, I'd like to see the video.  So, in

16    light of that, I'm going to call in the jury and excuse

17    them for the evening, and that way we won't be limited on

18    arguments and also the Court's consideration of the issue.

19           MS. DUNN:  Understanding that the Court will

20    give us the opportunity to argue the foundation.

21           THE COURT:  Absolutely.  That's what I'm

22    concerned about.

23           MS. DUNN:  Thank you, your Honor.  We appreciate

24    that.

25           MR. WEBB:  Your Honor, I don't mean to

```
 1    interrupt.  We do have two videos for customer -- if you
 2    want us to fill this time, I think we can do a good job of
 3    it.
 4              THE COURT:  You have something you can fill in
 5    here?
 6              No, I appreciate that.  I'd like to use the
 7    jury's time, and we'll address this after we excuse them.
 8    I appreciate the offer.
 9              MS. DUNN:  Thank you, Your Honor.
10              THE COURT:  All right.  Let's do that.  Let's
11    bring the jury back in, please.
12              COURTROOM ADMINISTRATOR:  Yes, Your Honor.
13          (Jurors enter courtroom at 1:24 p.m.)
14              THE COURT:  All right.  Have a seat, please.
15              The record will show the jury has returned.
16    We're in open court, and, Mr. Reckers, defendants' next
17    witness, please.
18              MR. RECKERS:  Yes, Your Honor.  Defendants' call
19    by video deposition Mr. Steve Woodward.  He was with a
20    Rimini customer Pitney Bowes.
21              It's about 11 minutes, and there are no
22    exhibits.
23          (Videotape deposition of Steve Woodward
24          played as follows:)
25          PAGE 8:14 TO 8:18 (RUNNING 00:00:15.414)
```

```
 1          "So Mr. Woodward, can you tell me what your

 2          position is at Pitney Bowes?

 3          A Sure.  My title is vice president of CRM

 4          and E-business technologies within the group

 5          we call Tech Central.

 6           PAGE 10:10 TO 10:19 (RUNNING 00:00:15.857)

 7          Q And when you say you don't have active

 8          maintenance on, what do you mean by that?

 9          A We don't have active maintenance with

10          Oracle.

11          Q Do you have maintenance through someone

12          else?

13          A Yes.

14          Q And who would that be?

15          A Rimini Street, both for Siebel and for

16          J.D. Edwards.

17           PAGE 12:21 TO 13:23 (RUNNING 00:01:21.033)

18          Q So having looked at this, can you tell me

19          what the -- what was the primary -- or what

20          was a -- whether cost savings was a reason

21          for the recommendation of switching to Rimini

22          Street for Siebel maintenance?

23          A It was one of the reasons.

24          Q Okay.  How important of a factor would you

25          say it was?
```

2506

```
1          A It was probably a secondary factor to the
2          primary reason that the committee was already
3          aware of.
4          Q Okay.  And what was the primary reason?
5          A The primary reason was that we had made
6          the decision to move away from Siebel
7          software in our IT -- on our IT road map.
8          Q Okay.
9          A We were moving to another product.  We were
10         on a very old version of Siebel.
11         Q Okay.
12         A Seven five three, which -- well, we were
13         on an older version with no intention to
14         upgrade.
15         Q And so you had made the decision, Pitney
16         Bowes made the decision to move away from
17         using Siebel as a product?
18         A Correct.
19         Q And that is why you made the decision to
20         stop using Oracle support?
21         A That was a -- a major consideration.
22          PAGE 14:17 TO 15:11 (RUNNING 00:01:06.388)
23         What about J.D. Edwards support, can you
24         tell me about the recommendation to select
25         Rimini as your service provider for J.D.
```

2507

1        Edwards?

2        A Sure.  One year earlier, approximately, we

3        had made the decision to move off of J.D.

4        Edwards on, again, on our road map, our

5        strategy.  And at that time we had dropped

6        maintenance through Oracle.

7        So we basically had been a year without

8        any type of vendor support on J.D. Edwards.

9        So in the process of evaluating Siebel

10       third-party support, we also thought that it

11       would be a proper thing to ensure we had

12       support for J.D. Edwards as well because it

13       had taken longer to get off it than we had

14       anticipated.  So that's why we added that.

15       Q While you were on -- so you had a year

16       between when you left Oracle for J.D. Edwards

17       and when you went to Rimini Street?

18       A Yeah.

19        PAGE 15:12 TO 16:07 (RUNNING 00:01:03.760)

20       Q So during that year you self-supported,

21       you didn't pay any outside --

22       A Correct.  And we were a bit lucky maybe.

23       Q Can you explain to me what you mean by

24       being a "bit lucky"?

25       A Well, I don't think internally we have the

2508

```
 1           capability, the real deep capability, to

 2           provide the level of support that a -- that

 3           true experts have.

 4           We are primarily -- our expertise is in

 5           configuring the package not in -- in -- in --

 6           in, you know, the real intricacies of how the

 7           package works.  So that's typically what we

 8           would turn to the vendor or a third party to

 9           help us with.

10           Q Okay.  So when you were planning on moving

11           away from Siebel and trying to decide what to

12           do with maintenance while you made that

13           transition, did Pitney Bowes ever seriously

14           consider going on to self support for Siebel?

15           A No.

16            PAGE 22:04 TO 23:09 (RUNNING 00:01:47.126)

17           Q Okay.  Can you read to me just the first --

18           starting after "Walter," the first, I guess,

19           just the entire body of the email?

20           A Sure.

21           Q Okay.

22           A "Walter, here are the criteria for setting

23           up reference calls with Rimini Street

24           customers.  Bullet one, Siebel version 7.53,

25           large multinational deployment, greater than
```

1          2500 users, using at least two of core Siebel
2          functions service call center sales.  Order
3          management configurator, version 7.53 or 77,
4          analytics.  All these don't have to be in
5          place with the same customer.  Loic Vienne,"
6          et cetera.
7     Q Okay.  So do you know how Mr. Vienne
8          selected the criteria that he's asking for in
9          references to Rimini Street?
10    A I don't know how he selected those, but
11         they would reflect a implementation similar
12         to ours.
13    Q Okay.  Is it -- does Pitney Bowes usually
14         ask for references when it's considering
15         switching vendors or going to a new vendor?
16    A We typically do reference checks on any
17         type of -- a purchase of this type, yes.  New
18         vendor or new software or whatever it is,
19         it's a common practice.
20    Q Do you know if anyone ever reached out --
21         whether Rimini Street ever provided Pitney
22         Bowes with references in response to this?
23    A They did.
24       PAGE 24:07 TO 24:11 (RUNNING 00:00:13.017)
25    Q If you asked Rimini Street for references

2510

```
 1              and they said we are sorry, we don't have any
 2              references to give you, would that have made
 3              it more or less likely that you would have
 4              selected Rimini Street as a vendor?
 5               PAGE 24:13 TO 24:15 (RUNNING 00:00:10.818)
 6              A It's one of the -- one of the decision
 7              points we'd look at.  Obviously, positive
 8              references are always in favor of the
 9              selection.
10               PAGE 24:17 TO 24:21 (RUNNING 00:00:14.460)
11              Q Okay.  Was it important to Pitney Bowes in
12              making its selection to go to Rimini Street
13              that Rimini Street was providing support to
14              other companies on Siebel products?
15              A Yes.
16               PAGE 31:16 TO 31:20 (RUNNING 00:00:12.560)
17              Q Okay.  Did they make representations to you
18              that they did ensure that material software
19              from one customer wouldn't be used or
20              provided to another customer?
21              A Yes.
22               PAGE 31:24 TO 32:05 (RUNNING 00:00:18.225)
23              A Yes.
24              They -- they -- I mean, we were obviously
25              very -- we are always concerned that our
```

1          vendors are, you know, have integrity and are

2          doing things right.  And yes, they did make

3          assurance that they -- they had a lot of

4          controls in place to separate the two.

5           PAGE 32:07 TO 32:11 (RUNNING 00:00:12.009)

6          Q If they -- if Rimini Street hadn't been

7          able to provide you with that reassurance,

8          would that have made it more or less -- more

9          or would it have made it less likely for

10         Pitney Bowes to enter into --

11          PAGE 32:15 TO 32:18 (RUNNING 00:00:12.161)

12         Q -- to enter into an agreement with them?

13         A Again, we want to make sure that they are

14         acting with integrity.  So if we felt they

15         weren't, we wouldn't have moved forward.

16          PAGE 34:04 TO 34:16 (RUNNING 00:00:47.445)

17         Q So Mr. Woodward, would you -- is it your

18         understanding that the description of

19         third-party intellectual property on this

20         document summarizes Pitney Bowes' policy

21         about the use of third-party intellectual

22         property?

23         A I don't know if it totally summarizes,

24         but it's consistent with the policy as I

25         understand it.

2512

1          Q Okay.  And based on this policy, would

2          Pitney Bowes ever authorize Rimini Street as

3          its vendor to do anything with either Siebel

4          or JDE software provided to it that would

5          violate their licensing agreements --

6           PAGE 34:19 TO 34:19 (RUNNING 00:00:01.301)

7          Q -- with Oracle?

8           PAGE 34:21 TO 34:21 (RUNNING 00:00:00.959)

9          A No.

10          PAGE 35:23 TO 36:17 (RUNNING 00:00:41.072)

11          Q First of all, I believe we had some

12          questions about the factors that Pitney Bowes

13          evaluated when they were determining whether

14          or not to renew Oracle support.

15          Is that correct?

16          A Yes.

17          Q And I believe two of those were cost and

18          moving off of the Siebel and JDE.

19          Is that correct?

20          A Correct.

21          Q Moving away from the software?

22          A Yes.

23          Q Can you remember any other factors that

24          Pitney Bowes evaluated during that time or

25          that factored into their decision?

2513

1          A Yes.

2          Q And what are those?

3          A There was -- you know, as a -- you know, as

4          a third category of factors being on an older

5          version of Siebel, the level of support we

6          were PAGE 36:18 TO 37:10 (RUNNING

7          00:01:11.938)

8          getting from Oracle was less than being on a

9          current version.  So their main motivation,

10         as any good software vendor, is to get you to

11         move up to a later version.

12         And for us that would have been very --

13         almost cost prohibitive for us to do that,

14         you know, due to the degree of modifications

15         we had done.  So we were looking for support

16         that was more focused on saying how could we

17         prolong the current version in our company

18         until we were fully off it.  So again, it

19         wasn't Oracle's primary goal to help us stay

20         on the old version.  But because Rimini

21         Street, you know, would have been motivated

22         to help us stay on -- stay on that version

23         longer and be productive on that version,

24         they were -- they were able to help us look

25         at strategy on how we would encapsulate that

2514

1      and isolate it from other changes that go on

2      in an environment.

3      PAGE 45:19 TO 46:04 (RUNNING 00:00:33.565)

4      Q Can you explain to me why self support

5      wasn't an option?

6      A Sure.  I think the first two almost were

7      the same.  We -- we did not prefer to self

8      support because we didn't have the level of

9      talent that we needed in-house, and to hire

10     that talent for the, you know, for the three

11     or four times a year you may need it, it's

12     not cost effective for us.  So we were

13     looking to an outside party to provide that

14     more efficiently than we could hire it and

15     maintain it internally.

16     PAGE 46:05 TO 46:16 (RUNNING 00:00:44.573)

17     Q Okay.  And another option was moving

18     software platforms entirely.

19     Is that correct?

20     A I -- I'm trying to recall how I phrased it

21     but the -- the option is ultimately getting

22     off the platform, that was -- the decision we

23     had made -- let me just restate in my words

24     so I stay focused.

25     The decision -- what I had discussed was

2515

1          that our decision and our strategic road map

2          for both J.D. Edwards and the Siebel was to

3          eventually move off of those platforms and

4          therefore not upgrade them further in-house.

5           PAGE 46:18 TO 46:24 (RUNNING 00:00:19.063)

6          A And given that, you know, we -- you know,

7          we were looking at the most cost effective

8          way of maintaining those applications until

9          we could, you know, fully get off.

10         Q Okay.

11         A You know, that was one of the -- cost

12         effective was one of the considerations.

13          PAGE 50:08 TO 50:12 (RUNNING 00:00:13.069)

14         Q Is Pitney Bowes still using the Siebel

15         products?

16         A We are -- yes.  We are still using them.

17         Not -- not, you know, the full number we were

18         at the time, but yes we are."

19           (End of videotape deposition.)

20              THE COURT:  All right.  Defendants' next

21     witness, please.

22              MR. RECKERS:  Yes, Your Honor.  Defendants have

23     another customer video.  We call John Hintz of Hastings

24     Entertainment.

25              It's about 15 minutes, and there are no

2516

1    exhibits.

2         (Videotape deposition of John Hintz played.)

3         PAGE 4:18 TO 4:23 (RUNNING 00:00:14.504)

4         "Q. Sir, we just met off the record, but for

5         the record, would you please state your full

6         name?

7         A. John Raymond Hintz.

8         Q. Would you please spell that?

9         A. John, J-o-h-n, Raymond, R-a-y-m-o-n-d,

10        Hintz, H-i-n-t-z.

11         PAGE 9:04 TO 9:10 (RUNNING 00:00:12.310)

12        Q. Do you understand that these are the

13        topics for which you've been designated by

14        Hastings to testify?

15        A. Yes.

16        Q. Do you understand that you bind Hastings

17        with respect to these topics?

18        A. Yes.

19         PAGE 10:01 TO 10:11 (RUNNING 00:00:33.086)

20        Q. Thank you.  Mr. Hintz, who's your current

21        employer?

22        A. Hastings Entertainment.

23        Q. How long have you been employed with

24        Hastings Entertainment?

25        A. Over 24 years.

2517

1      Q. What's your current position?

2      A. I am vice president of information

3      technology.

4      Q. How long have you held that position?

5      A. Since February of 2007.

6       PAGE 11:02 TO 11:05 (RUNNING 00:00:16.976)

7      Q. (BY MR. RODRIGUEZ) Since at least 2006,

8      have you had managerial responsibility for

9      PeopleSoft software?

10      A. I'm trying to put a timeline together.

11      That

12       PAGE 11:06 TO 11:10 (RUNNING 00:00:17.503)

13      is most likely true.  I definitely, for the

14      last half of 2006, was.  I don't -- there was

15      some personnel changes, and I don't recall

16      exactly when they happened.

17      Q. How about since August of 2006?

18      A. Yes.

19       PAGE 35:01 TO 35:14 (RUNNING 00:00:44.702)

20      Q. Was it important to Hastings that Rimini

21      Street keep the copy of PeopleSoft software

22      licensed to Hastings separate from copies

23      used to serve other Rimini Street customers?

24      A. Yes.

25      Q. Did Hastings authorize Rimini Street to

2518

1          use Hastings' software, PeopleSoft software,

2          to support customers other than Hastings?

3          A. No.

4          Q. Did Hastings authorize Rimini Street to

5          copy the environment that Rimini Street

6          created for Hastings to create an environment

7          to use for other Rimini Street customers?

8          A. No.

9           PAGE 44:20 TO 45:01 (RUNNING 00:00:25.060)

10          If Hastings had known that Rimini Street

11          would use a copy of Hastings' PeopleSoft

12          software to serve other customers and

13          Hastings had known that doing so would exceed

14          the scope of the license that PeopleSoft had

15          granted Hastings, would Hastings have

16          contracted with Rimini Street?

17          A. No.

18           PAGE 68:24 TO 69:02 (RUNNING 00:00:15.930)

19          If Hastings had known that Rimini Street had

20          exceeded the scope of Hastings' PeopleSoft

21          license in the course of providing Hastings

22          services, would Hastings have provided a

23          reference to Siemens?

24           PAGE 69:06 TO 69:08 (RUNNING 00:00:08.346)

25          A. If Rimini was violating our license

2519

1      agreement with Oracle, then, no, we would not

2      have provided a reference.

3       PAGE 69:09 TO 69:11 (RUNNING 00:00:11.680)

4      Q. (BY MR. RODRIGUEZ) Would Hastings have

5      provided any references to any customers if

6      Rimini were violating the scope of Hastings'

7      PeopleSoft license?

8       PAGE 69:15 TO 69:17 (RUNNING 00:00:09.761)

9      A. If, by scope, we mean violating our

10      license agreement, then, no, we would not

11      have done any references.

12       PAGE 75:08 TO 76:01 (RUNNING 00:01:05.263)

13      Q. Now, do you remember the factors that

14      Hastings considered when leaving Oracle

15      support?

16      A. Yes.

17      Q. Can you elaborate?

18      A. One was the cost savings, because the

19      Oracle support is extremely expensive.  And

20      then the other one was we were on an older

21      version and had no intention or plans to

22      upgrade our version of PeopleSoft.  And at

23      some point -- and I'm not clear if we had an

24      exact date at that point or not -- but at

25      some point Oracle, to my understanding, would

1        cease supporting us, as far as tax and

2        regulatory updates for that version.

3        And so those two things together -- if I were

4        weighing them, I would say cost was probably

5        the number one, but in the back it was also

6        part of our discussion as far as the support

7        of that version.

8        Q. Now, are you currently on the same version

9        of PeopleSoft that you were in 2006?

10       A. Yes, we are.

11        PAGE 79:15 TO 79:21 (RUNNING 00:00:19.420)

12       Q. Did Hastings ever consider self-supporting

13       their PeopleSoft?

14       A. No.

15       Q. And why is that?

16       A. That would be beyond our expertise,

17       particularly on the tax updates, the

18       regulatory updates.

19        PAGE 81:03 TO 81:08 (RUNNING 00:00:21.147)

20       Q. I just have some brief follow-up.  Was it

21       your testimony that cost was the number one

22       factor for going to Rimini Street?

23       A. Yes, I believe it was.  It's definitely

24       the number one factor that, I think, had us

25       looking at it initially.  So, yes, that's a

2521

```
1              true statement.
2               PAGE 81:14 TO 81:16 (RUNNING 00:00:07.510)
3               Q. If Rimini Street's support rate had not
4               been at least half off Oracle's rate, would
5               Hastings have moved to Rimini?
6               PAGE 81:19 TO 81:24 (RUNNING 00:00:23.773)
7               A. I think that we would have been looking at
8               that regardless at some point, because of the
9               regulatory dates.  I don't know whether we
10              would have done it right then, but we would
11              have been looking at it as something to
12              continue on after Oracle ceased support."
13              (End of videotape deposition.)
14                   THE COURT:  All right.  Mr. Reckers.
15                   MR. RECKERS:  Your Honor, another customer
16      video.  Rimini calls by deposition Ms. Barbara Shepard of
17      Blue Cross Blue Shield.
18                   It's about nine minutes, and there are no
19      exhibits.
20                   THE COURT:  All right.  Thank you.
21              (Videotape deposition of Barbara Shepard
22              played as follows:)
23                   PAGE 7:03 TO 7:04 (RUNNING 00:00:04.518)
24              "Could you please state your name for the
25              record.
```

2522

1           A Barbara Shepard.

2            PAGE 8:14 TO 8:19 (RUNNING 00:00:18.765)

3           Q Okay.  And just to be clear, you are

4           testifying on behalf of BlueCross BlueShield,

5           so I might phrase my questions to ask what

6           BlueCross or BlueShield's understanding was,

7           and that's just because you're designated to

8           testify on its behalf.  Is that clear?

9           A Yes.

10           PAGE 9:13 TO 10:23 (RUNNING 00:01:42.206)

11          Q Thank you.  Ms. Shepard, how long have you

12          worked at BlueCross BlueShield?

13          A Thirteen years.

14          Q Okay.  And what is your current position?

15          A I am a Director in Information Technology.

16          Q And how long have you been in that

17          position?

18          A Since April 1st of this year.

19          Q Okay.  And what was your previous position?

20          A Was the Director of the Project Management

21           Office.

22          Q And how long were you in that position?

23          A Seven years.

24          Q Okay.  Is BlueCross BlueShield a licensee

25          of

1          Oracle software?

2          A Yes.

3          Q And what software does BlueCross BlueShield

4          license?

5          A We license the financials, the HR, the

6          portal and what's the last one?  There's one

7          more.

8          Q Is it time and labor?

9          A We have time and labor also, yes.

10         Q And these are -- are these all within the

11         PeopleSoft family of products?

12         A Correct.

13         Q And is BlueCross BlueShield also a customer

14         of Rimini Street?

15         A Yes.

16         Q And what does Rimini Street provide for

17         BlueCross BlueShield?

18         A Basic support services.

19         Q And did BlueCross BlueShield previously

20         receive support from Oracle?

21         A Yes.

22         Q And when did BlueCross BlueShield switch

23         from Oracle support to Rimini Street support?

24         A Back in July of 2010.

25          PAGE 12:13 TO 13:01 (RUNNING 00:00:41.854)

2524

```
 1            Q And do you recall, in comparison to Oracle
 2              support, what -- how much Rimini support
 3              cost?
 4            A It was roughly 50 percent or more less than
 5              PeopleSoft.
 6            Q So Rimini's costs were approximately 50
 7              percent of Oracle's?
 8            A Uh-huh, yes.
 9            Q And did those savings influence the
10              decision to switch to Rimini?
11            A Yes.
12            Q Were they an important factor?
13            A Yes.
14            Q Would you say it was the main factor?
15            A Yes.
16             PAGE 14:21 TO 15:08 (RUNNING 00:00:33.143)
17            Q Uh-huh.  Did you also look at whether
18              Rimini
19              Street could deliver tax and regulatory
20              updates?
21            A Uh-huh, yes.
22            Q Was it important to you that Rimini Street
23              could deliver updates that were of the same
24              quality as Oracle?
25            A Yes.
```

2525

1       Q And did you conclude that that was the

2       case, that Rimini Street was able to --

3       A Yes.

4       Q And did that influence your decision to

5       switch to Rimini Street?

6       A They had to be able to provide that, yes.

7        PAGE 15:09 TO 15:11 (RUNNING 00:00:10.188)

8       Q Did you speak with references before

9       deciding to switch to Rimini Street?

10      A I believe we did.

11       PAGE 15:12 TO 15:13 (RUNNING 00:00:06.368)

12      Q I'd like to mark Exhibit 724.

13      (The reporter marked Exhibit No. 724.)

14       PAGE 15:14 TO 16:02 (RUNNING 00:00:47.681)

15      Q (By Ms. Loeb) And Ms. Shepard, can you

16      identify this document?

17      A Yes.  It's an email from Charles Kelly to

18      Lynn McMillian.

19      Q And Mr. Kelly, is he a Rimini Street

20      employee?

21      A Yes.

22      Q And there are -- and then the email

23      attaches two references; is that correct?

24      A Correct.

25      Q And who are the references?

2526

```
1          A H&R Block and Delta Dental of Michigan.

2          Q And did -- do you know whether BlueCross

3          BlueShield ended up contacting these

4          references?

5          A I would presume we did, but I don't recall

6          the

7           PAGE 16:03 TO 16:06 (RUNNING 00:00:05.781)

8          details.

9          Q Okay, I'd like to mark Exhibit 725.

10         (The reporter marked Exhibit No. 725.)

11         Q (By Ms. Loeb) And specifically I'd like to

12          PAGE 16:07 TO 16:21 (RUNNING 00:00:46.725)

13         draw your attention to the email, the second

14         email on the page, which is from Lynn

15         McMillian to Charles Kelly at Rimini Street.

16         Now, based on this email, do you believe that

17         BlueCross BlueShield contacted the

18         references?

19         A Yes.

20         Q And what was the -- were the references

21         positive?

22         A Yes.

23         Q And can you say whether that influenced the

24         decision to switch to Rimini?

25         A Yes.  I agree.
```

1      Q You wouldn't have gone to Rimini if you had

2      received negative reports from references?

3      A I would agree with that, yes.

4       PAGE 35:22 TO 35:24 (RUNNING 00:00:08.960)

5      Q (By Ms. Loeb) Would you have allowed Rimini

6      to install software on its computers if you

7      knew it was not proper under your Oracle

8      license?

9       PAGE 36:01 TO 36:10 (RUNNING 00:00:23.368)

10      A I don't think we would have knowingly

11      violated our agreement.

12      Q (By Ms. Loeb) Right.  Is it important to

13      BlueCross BlueShield to comply with its

14      contracts and to comply with the law?

15      A Uh-huh, yes.

16      Q And in fact, do you have a code of conduct

17      at BlueCross BlueShield requiring you to

18      comply with the lawsuit?

19      A Yes.

20       PAGE 51:18 TO 51:22 (RUNNING 00:00:10.019)

21      Q (By Ms. Loeb) If you had known that Rimini

22      Street would use your software to create

23      software for other customers, would you have

24      thought twice about working with them?

25      A Yeah, yes.

2528

```
 1            PAGE 54:14 TO 54:18 (RUNNING 00:00:15.001)
 2          You've had a lot of questions about price
 3          being a big component in your decision to
 4          come to Rimini Street.
 5          Were there other things you considered as far
 6          as what service you could get from Rimini
 7          Street in making your decision?
 8            PAGE 54:20 TO 55:20 (RUNNING 00:01:22.325)
 9          A Yes.
10          Q (By Ms. Redmond) And what were those
11          things?
12          A Wanted to make sure they could provide
13          similar or better level of service than what
14          Oracle could, and they could provide the tax
15          updates, that they were -- they were well
16          regarded in their industry.
17          Q Okay.  And you said similar or better
18          service.
19          What has been your experience with Rimini's
20          service to date?
21          A Very positive.
22          Q Okay.  Would you say it was more positive,
23          in fact, than your experience with Oracle?
24          A Yes.
25          Q Okay.  And why do you say that?
```

1          A They've just been willing to help us, I

2          mean, in anything that we do.  It's more

3          personal, so you had more human contact

4          versus website support, and they helped us

5          with a pretty big upgrade right after we

6          moved over to Rimini Street.  Their

7          technicians were on the phone with us for all

8          day Sunday trying to help us figure out what

9          was wrong --

10         Q Okay.

11         A -- with the install.

12         Q And do you have a person designated to help

13         BlueCross BlueShield with support issues at

14         Rimini Street?

15         A Yes.

16          PAGE 55:21 TO 56:03 (RUNNING 00:00:28.041)

17         Q Okay.  Do you know who that person --

18         A You know, I have -- I haven't been in

19         over -- I haven't had management

20         responsibility for that team since October or

21         so last year, so I don't know if it's

22         transitioned off.

23         Charles Kelly was our account exec, and Seth

24         was very much, Ravin, was very much involved.

25         I can't tell you if I know any other names.

```
 1            PAGE 56:04 TO 56:07 (RUNNING 00:00:06.387)
 2            Q Do you have a specific support person,
 3            though, that you can pick up the phone and
 4            call if you guys have an issue?
 5            A Yes, I believe they do.
 6            PAGE 56:08 TO 56:10 (RUNNING 00:00:06.345)
 7            Q And did you have a similar support person
 8            at Oracle that you could pick up the phone
 9            and just call, or was it a general support
10            line?
11            PAGE 56:12 TO 56:13 (RUNNING 00:00:04.966)
12            A Yeah, I don't think so. There wasn't one at
13            Oracle that I recall.
14            PAGE 56:14 TO 56:16 (RUNNING 00:00:13.064)
15            Q (By Ms. Redmond) Okay.  And did you have
16            any
17            technical issues during your time at Oracle
18            that Oracle was unable to resolve?
19            PAGE 56:18 TO 56:18 (RUNNING 00:00:02.322)
20            A Not that I can recall."
21            (End of videotape deposition.)
22                MR. RECKERS:  Your Honor, we have one more
23    video, another customer video, Ms. Rhonda Minks who is a
24    designee for Brazoria County, Texas.
25                I should say for the record all of these videos
```

1     are from 2011.  This video is about five minutes long, and

2     there are no exhibits.

3              THE COURT:  All right.  Thank you.

4         (Videotape deposition of Rhonda Minks

5         played.)

6              PAGE 7:13 TO 7:16 (RUNNING 00:00:09.859)

7         "Q. Ms. Minks, we met just before this

8         deposition started; but could you state and

9         spell your name for the record?

10        A. Rhonda Minks, R-H-O-N-D-A M-I-N-K-S.

11         PAGE 11:18 TO 11:24 (RUNNING 00:00:17.918)

12        Ms. Minks, what's your current job title at

13        Brazoria County?

14        A. I am in the information systems

15        department, and I'm a programmer analyst.

16        Q. And is that the same job title as you had

17        in 2007?

18        A. Yes.  It is.

19         PAGE 12:09 TO 12:18 (RUNNING 00:00:29.723)

20        Q. So what were your job responsibilities in

21        2007?

22        A. Back then, when we had PeopleSoft support,

23        it was more of a perpetual upgrading mode and

24        software support.

25        Q. Okay.  So Brazoria County uses PeopleSoft

2532

1          software.  Is that right?

2          A. We do.

3          Q. And you use Financials and HCM?

4          A. We do.

5           PAGE 13:23 TO 14:10 (RUNNING 00:00:45.409)

6          Q. Ms. Minks, at some point Brazoria County

7          decided to consider third-party support for

8          PeopleSoft.  Is that right?

9          A. Yes, it is.

10         Q. Did Brazoria County ever consider

11         self-supporting?

12         A. Yes.

13         Q. And why did it decide not to use

14         self-supporting?

15         A. Gene was our main programmer, Gene

16         Wittneben, and he never -- I couldn't say why

17         he decided, but he just took it into

18         consideration when he made his decision and,

19         I guess, won out with a third party.

20          PAGE 14:11 TO 14:21 (RUNNING 00:00:42.767)

21         Q. Does Brazoria County require tax and

22         regulatory updates?

23         A. We do, in both HR and Financials.

24         Q. Does Brazoria County have the expertise

25         and the resources to develop and research tax

2533

1      and regulatory updates?

2      A. We have not done that in the past, our

3      present staff.  Are we capable of it?  It

4      seems like it would be all-consuming, and

5      there is more to our job than that one thing;

6      so I feel that's why we went out to get

7      someone else to do it.

8       PAGE 14:22 TO 15:07 (RUNNING 00:00:30.663)

9      Q. And Brazoria County has never developed

10     its own tax and regulatory updates.  Is that

11     right?

12     A. I cannot swear to that because, prior to

13     my time, Gene was the main programmer and he

14     did a lot of the payroll stuff; so I wouldn't

15     put it past him back there.

16     But to answer yes or no, I don't know; and

17     he's not here to ask.

18     Q. And would that have been before Brazoria

19     County used PeopleSoft?

20     A. Yes, it would be.

21      PAGE 36:02 TO 36:14 (RUNNING 00:00:46.004)

22     Q. (By Mr. Hill) But it's not likely?

23     A. So you're saying if Oracle cost this much

24     and Rimini cost the exact same amount, would

25     we have switched?

2534

1      Q. That's right.

2      A. Back then, Gene was really upset because

3      we were having to repurchase a product that

4      we already purchased.  His being upset is

5      what caused us to even go look for a

6      third-party support; so in my opinion, we may

7      have switched, because it would have allowed

8      us not to have to do perpetual updates and

9      just to stay with what we had and let them do

10     our tax updates and we could continue with

11     the customizing product.

12      PAGE 60:22 TO 61:01 (RUNNING 00:00:17.849)

13     If the use of Brazoria County's software to

14     create environments for other Rimini Street

15     customers was a violation of Brazoria

16     County's PeopleSoft license, would Brazoria

17     County have allowed Rimini Street to do that?

18      PAGE 61:03 TO 61:08 (RUNNING 00:00:21.893)

19     A. No. I mean, if it's a violation of a

20     license, I don't think they would have.

21     Q. (By Mr. Hill) And if Brazoria County knew

22     that it was a violation of the PeopleSoft

23     license and it knew that Rimini Street would

24     do that, would it have contracted with Rimini

25     Street?

```
 1              PAGE 61:10 TO 61:14 (RUNNING 00:00:18.741)
 2         A. I don't know.  I don't think you want to
 3         -- I mean, if you're saying, "Hey, somebody
 4         is going to do something wrong; are you still
 5         going to go with that?"
 6         I mean, the common answer would be, no,
 7         you're not going to want to do something
 8         wrong.
 9              PAGE 65:18 TO 65:21 (RUNNING 00:00:10.740)
10         Q. Would Brazoria County have served as a
11         reference for Rimini Street if it wasn't
12         getting quality service?
13         A. No. We were tickled pink with our
14         services.
15              PAGE 67:15 TO 67:17 (RUNNING 00:00:11.312)
16         Q. Would you have recommended Rimini Street
17         if you knew that Rimini Street was infringing
18         Oracle's PeopleSoft copyrights?
19              PAGE 67:20 TO 67:21 (RUNNING 00:00:09.135)
20         A. If somebody was breaking the law, I would
21         not recommend them; but we didn't know that."
22         (End of videotape deposition.)
23              MR. RECKERS:  Your Honor, that would be all that
24    we have for today.
25              THE COURT:  All right.  And it's shortly before
```

2536

1     2:00, and I appreciate that we've been able to fill the

2     afternoon.

3                    Ladies and gentlemen, I'm going to excuse you

4     for your evening recess.

5                    I remind you of all of the admonitions, and I'm

6     not going to go through them again, you've heard them

7     enough, for now.

8                    But please remember how important those are.

9     You've seen what goes into a trial like this and how much

10    is involved and everyone's time and how important it is.

11    So I ask you to please keep those admonitions in mind at

12    all times.

13                   A couple of words for you.  We'll start tomorrow

14    morning at 8:00 as usual, but we will be finishing a little

15    bit early.  I anticipate closing down by 12:30 tomorrow.

16    It will be right around that time.

17                   And on the following morning, on Thursday

18    morning, we will probably not start until 9:00 a.m.  But I

19    can confirm that again with you when I excuse you tomorrow.

20    So if that affects your personal schedules at all, that's

21    why I like to let you know.

22                   So please remember the admonitions.

23                   You may go ahead and step down for the evening,

24    and I'll wish you a pleasant evening.

25                   COURTROOM ADMINISTRATOR:  Please rise.

```
1              (Jurors exit courtroom at 2:01 p.m.)

2                   THE COURT:  Have a seat.

3                   I'm actually going to take a brief recess, but

4      before we take the time to go through the video deposition

5      of Mr. Simmons -- isn't it -- I wanted to confirm that, in

6      fact, it's the intention of defendants to offer the

7      deposition -- the video deposition into evidence.  Is that

8      correct?

9                   MR. RECKERS:  Yes, Your Honor.

10                  And just to be clear, the version that you're

11     reviewing has both Rimini's designations and Oracle's

12     designations and basically everyone's counters and all.

13                  There is a -- further means of explanation,

14     there are some sections of that that have additional

15     objections beyond the overall relevance objection that I

16     think is a threshold issue for the clip that plaintiffs are

17     offering, and that if Your Honor overrules the relevancy

18     objection there are some, it's a small number, of

19     additional objections for really small passages.

20                  I think that's where we are.

21                  THE COURT:  Ms. Dunn, is there anything you

22     would like to offer too?

23                  MS. DUNN:  Yes.  We'd like to respond to the

24     foundation question based on Mr. Rowe's testimony.

25                  THE COURT:  I recognize that.
```

2538

1          I've cut short everyone's breaks today with

2     matters here in court, so what I want to do is we'll take a

3     break for approximately 15 minutes.  We'll come back in.  I

4     want to review the videotape, and then I'll hear argument.

5               MS. DUNN:  Thank you.

6          (Recess from 2:03 p.m. until 2:27 p.m.)

7          (Outside the presence of the jury.)

8               THE COURT:  All right.  Have a seat, please.

9               The record will show we're in open court with

10    parties and counsel.  The jury is not present.

11              And why don't we start with the running of the

12    Simmons videotape.

13         (Videotape deposition of Paul Simmons played

14         as follows:)

15              PAGE 8:19 TO 9:01 (RUNNING 00:00:18.625)

16         "Could you please state and spell your full

17         name for the record.

18         A My name is Paul Simmons, P-a-u-l,

19         S-i-m-m-o-n-s.

20         Q And you're employed by CedarCrestone?

21         A That is correct.

22         Q What is your position there?

23         A I'm an executive vice president.

24          PAGE 10:07 TO 10:09 (RUNNING 00:00:05.041)

25         Q And you're appearing as a corporate

1      representative of CedarCrestone; is that

2      right?

3      A Yes.

4       PAGE 13:13 TO 13:16 (RUNNING 00:00:11.663)

5      Q What is the scope of your responsibilities

6      at CedarCrestone currently?

7      A I currently manage our consulting services

8      group.

9       PAGE 14:09 TO 14:12 (RUNNING 00:00:10.081)

10     Q How long have you worked at CedarCrestone?

11     A I've worked -- I was originally employed by

12     Crestone International in 1996.

13      PAGE 20:21 TO 20:25 (RUNNING 00:00:12.312)

14     MR. HOWARD:  Let's mark as Exhibit 1302 a

15     document also titled "Statement of Rick

16     Riordan," dated December 1, 2009.

17     (Plaintiff's Exhibit No. 1302 was marked for

18     the record.)

19      PAGE 21:02 TO 21:13 (RUNNING 00:00:35.628)

20     Q Mr. Simmons, are you familiar with this

21     December 1, 2009 statement of Mr. Riordan?

22     A Yes.

23     Q And this was also provided in the course

24     of the Oracle SAP litigation; is that right?

25     A I believe so.

2540

```
 1          Q And Mr. Riordan is addressing the question
 2          of whether the maintain service that we've
 3          just been discussing is covered by a written
 4          agreement with Oracle; is that right?
 5          A That is correct.
 6          Q And is his statement here accurate?
 7           PAGE 21:14 TO 21:14 (RUNNING 00:00:01.432)
 8          A Yes.
 9           PAGE 21:15 TO 21:22 (RUNNING 00:00:17.802)
10          Q And his -- and specifically his statement
11          that "There's no written agreement between
12          Oracle and CedarCrestone that covers
13          CedarCrestone's provision of maintain
14          services"; is that an accurate statement?
15          A That is correct.
16          Q Now, CedarCrestone is an Oracle partner,
17          correct?
18          A That is correct.
19           PAGE 21:23 TO 22:06 (RUNNING 00:00:26.150)
20          Q And there are contractual documents that
21          relate to the partnership agreement between
22          Oracle and CedarCrestone?
23          A That is correct.
24          Q All right.  But nothing in those contracts
25          or agreements authorizes CedarCrestone to
```

2541

```
 1            provide the maintain services as they are
 2            described in Mr. Riordan's statements; is
 3            that correct?
 4            A Yes.
 5             PAGE 24:16 TO 24:22 (RUNNING 00:00:23.867)
 6            Q Let me ask it another way.  What -- what
 7            can you, in your view, what can you provide
 8            that customer, who is not paying Oracle
 9            support, in order to provide them with tax
10            and regulatory updates?
11            A We -- we can provide them with
12            independently generated solutions to their
13            tax and regulatory requirements.
14             PAGE 24:23 TO 25:06 (RUNNING 00:00:44.444)
15            Q Does CedarCrestone ever use one installed
16            PeopleSoft environment to generate updates
17            that then go to more than one customer?
18            A CedarCrestone would use one demo database
19            to more than one customer in the rare
20            instance when those customers were on the
21            same release, they drop support at the same
22            time and they signed up for our service at
23            that same time.  It's -- it's not a very
24            common occurrence.
25             PAGE 33:09 TO 34:08 (RUNNING 00:01:33.259)
```

2542

1          Q Mr. Simmons, do you recognize what's been
2     marked as Exhibit 1304?
3          A Yes.
4          Q Could you tell us what it is, please.
5          A It is the maintain services, extended tax
6     setup and methodology dated 2008.
7          Q Is this a document that's maintained in the
8     ordinary course of business at CedarCrestone?
9          A Yes.
10         Q And what's the purpose of the document?
11         A Well, one of the purposes of the document
12     is to keep track of all of the websites and
13     sources of the tax changes, which make up a
14     significant portion of the document.
15         Q And -- and does it also set forth the
16     methodology for providing the extended tax
17     support service?
18         A Yes.  It does explain the service and the
19     methods that we take to develop the service,
20     both in terms of the content included in the
21     service and then the actual development of
22     the changes.
23         Q Okay.  And is the methodology described
24     here generally the same methodology that's
25     followed today at CedarCrestone for the

2543

1          extended tax support?

2          A Yes.

3           PAGE 52:04 TO 52:09 (RUNNING 00:00:18.459)

4          Q I guess my question is:  Is it your view

5          that comparing one customer's code line to

6          another customer's code line would violate

7          the customer's license agreement even if

8          those customers were still on Oracle support?

9          A Yes, it would.

10          PAGE 53:17 TO 54:18 (RUNNING 00:01:55.016)

11          Q Sure what does CedarCrestone do, if

12          anything, to assure itself that it is legal

13          to have copies of the customer's software on

14          its systems as part of the maintain services

15          support?

16          A Okay.  In -- in the standard licensing

17          agreement from Oracle, it states that the

18          customer can use the software for their

19          internal business uses only, and that they

20          can allow or provide for agents or

21          outsourcers to support them, again, for their

22          internal business uses.  So we rely on -- on

23          the Oracle application contract when they

24          purchase the software for that.

25          Q But you -- you said that you don't review

1          that particular customer's license agreement?
2          A Again, the nondisclosure rules would --
3          would prohibit that.
4          Q How do you know that any particular
5          customer's license agreement comports with
6          your understanding of the standard license
7          agreement?
8          A We've seen a lot of Oracle license
9          agreements through the years, and there has
10         been some varying language through the years.
11         But the things that's been consistent, in all
12         of the contracts that we've seen, is that the
13         software is available for internal business
14         use of the client, and they are allowed
15         third-party agents to assist them in the use
16         of the software.
17          PAGE 68:16 TO 68:19 (RUNNING 00:00:12.861)
18         Q Are there clients who have said to
19         CedarCrestone that they don't believe that
20         they can provide their software to
21         CedarCrestone?
22         A I'm not aware of any.
23          PAGE 70:13 TO 70:16 (RUNNING 00:00:12.880)
24         Q I take it, then, that CedarCrestone does
25         download from Oracle patches and updates for

2545

```
 1            retro customers that maintain Oracle support?
 2            A That is correct.
 3             PAGE 71:18 TO 71:25 (RUNNING 00:00:39.293)
 4            Q So that was my question.  How do -- how do
 5            the employees obtain those login credentials?
 6            A They are designated by the customer to use
 7            those IDs on their behalf.
 8            Q Which customer?
 9            A Each customer in the statement of work
10            designates an individual to be able to access
11            Oracle on their behalf.
12             PAGE 82:19 TO 82:20 (RUNNING 00:00:08.349)
13            Q How -- how are updates or fixes distributed
14            to clients after they are created?
15             PAGE 82:21 TO 83:04 (RUNNING 00:00:26.534)
16            A On the extended tax service, the first
17            client is done, and then the client is
18            notified that it's completed and they
19            download that from an FTP site.
20            Q The client downloads it?
21            A The client downloads it.
22            Q From a CedarCrestone-hosted FTP site?
23            A Correct.  And then that process repeats
24            itself thereafter.
25             PAGE 95:19 TO 95:22 (RUNNING 00:00:12.768)
```

2546

```
 1          Q And we know that some customers are
 2          supported from a common local environment
 3          that's the same release and same maintenance
 4          end date, right?
 5          A Correct.
 6           PAGE 95:23 TO 96:02 (RUNNING 00:00:18.306)
 7          Q So can we conclude from the fact that there
 8          are Nike updates in the ADV folder, that this
 9          is an example where Nike and ADV are being
10          supported from a single local environment?
11          A I believe so.
12           PAGE 119:19 TO 119:21 (RUNNING 00:00:09.186)
13          Q Do you see the PeopleSoft copyright notice
14          at the top of that file?
15          A Yes.
16           PAGE 119:22 TO 120:06 (RUNNING 00:00:26.242)
17          Q And that notice says it's not to be copied,
18          reproduced or transmitted in any form other
19          than the purpose for which is provided under
20          the applicable license agreement?
21          A I see it and I understand what it means,
22          yes.
23          Q Okay.  And so if that file is taken from
24          one customer's software and modified by
25          CedarCrestone, is it okay to then distribute
```

2547

```
 1            copies of that file to other customers?
 2             PAGE 120:07 TO 120:19 (RUNNING 00:00:48.923)
 3            A I don't think your premise is correct.  Say
 4            that one more time.
 5            Q Sure.  You see the notice says it's not to
 6            be copied, reproduced or transmitted in any
 7            form other than for the purpose provided
 8            under the applicable license agreement,
 9            right?
10            A Right.
11            Q And so if that file is taken from one
12            customer's software, modified by
13            CedarCrestone and then distributed as a copy
14            to multiple other customers, is that okay, in
15            your view?
16            A Okay.  So these were cloned from
17            PSCVDIRT.CBL, so they are cloned copies, and
18            cloning
19             PAGE 120:20 TO 120:25 (RUNNING 00:00:17.957)
20            a table in a modification is common practice.
21            Q By who?
22            A By anyone who modifies software.
23            Q Anyone other than CedarCrestone, that
24            you're aware of --
25            A It's an industry practice.
```

DONNA DAVIDSON, RDR, CRR, CCR #318    (775) 329-0132

2548

```
1          PAGE 121:11 TO 122:05 (RUNNING 00:01:04.281)
2      Q Is it okay for CedarCrestone to take this
3      file from one customer's software, copy it,
4      clone it -- as you call it -- modify it and
5      provide that same file to multiple other
6      customers?
7      A If the base file is the same as what the
8      customer has, then it is -- it's -- it's not
9      infringing on that customer's right.
10     Q As long as -- as long as the receiving
11     customer has the same file in their software
12     as the source customer had from which the
13     file was taken to be modified?
14     A Yes.
15     Q And what's the basis of that understanding?
16     A I mean, it would go back to the customer's
17     license agreement.
18     Q The license agreement that says that the
19     software can only be used for that customer's
20     business purpose, right?
21     A Yes.
22         PAGE 165:20 TO 165:23 (RUNNING 00:00:11.466)
23     Q Are the hosting services that CedarCrestone
24     provides that are separate and apart from the
25     maintain services, is that done pursuant to
```

2549

1              any contract with Oracle?
2               PAGE 165:24 TO 166:16 (RUNNING 00:00:58.921)
3              A We do have contracts with Oracle in terms
4              of the database software that we use to
5              provide hosting services.
6              Q And how about the -- you also host
7              PeopleSoft application software for some
8              customers, right?
9              A Right.  We host PeopleSoft applications
10             using Oracle's database, and that was the
11             agreement I was referring to.
12             Q Right.  And does the -- does the agreement
13             permit CedarCrestone to host local copies of
14             customers' PeopleSoft software?
15             A No.
16             Q And is there any contract with Oracle that
17             permits CedarCrestone to host customers'
18             local copies of PeopleSoft software?
19             A There's no contract with Oracle that allows
20             that.
21              PAGE 167:03 TO 167:08 (RUNNING 00:00:15.548)
22             Q I think you mentioned that there were
23             600 -- did you say you had 600 customers that
24             were hosting their software with
25             CedarCrestone or 600 environments?

2550

1          A We have in excess of 600 environments in

2          our data center.

3          PAGE 172:15 TO 173:04 (RUNNING 00:01:14.302)

4          Q Thank you.  When did CedarCrestone start

5          offering its maintain package?

6          A CedarCrestone started in 2001 with retro

7          tax support.  In -- the first clients that we

8          offered that to, we basically were asked by

9          PeopleSoft sales reps to offer a retro tax

10         package to their customers.

11         These are customers that fell out of the

12         PeopleSoft tax window.  They were customers

13         that planned to upgrade their application,

14         and PeopleSoft wanted to keep them in the

15         Oracle ecosystem, and they saw us as an ally

16         in doing that.  And so they asked us to

17         provide retro tax support to those customers.

18         Q CedarCrestone continuously offered retro

19         tax support since 2001?

20         A We have.

21         PAGE 173:20 TO 173:24 (RUNNING 00:00:20.773)

22         Q Okay.  How about extended tax and

23         regulatory support, when did CedarCrestone

24         begin offering extended?

25         A The extended started in 2003, and it was at

2551

```
 1           the request of our customers that we provide
 2           tax
 3            PAGE 173:25 TO 174:03 (RUNNING 00:00:14.059)
 4           and regulatory support to them.
 5           Q Has CedarCrestone continuously, since 2003,
 6           offered extended tax regulatory product?
 7           A Yes.
 8            PAGE 177:17 TO 177:18 (RUNNING 00:00:03.525)
 9           Q Okay.  I'm handing you what's been marked
10           as Exhibit 3.  Sir, do you recognize this
11           document?
12            PAGE 177:19 TO 178:01 (RUNNING 00:00:26.689)
13           A I believe so.
14           Q Can you state for the record what this
15           document is?
16           A It's the Oklahoma City Municipal Facilities
17           Authority request for proposal for services
18           to provide software support and/or a fully
19           hosted solution for a PeopleSoft ERP system,
20           and it's our proposal response.
21            PAGE 178:13 TO 178:16 (RUNNING 00:00:08.545)
22           Q In fact, you generate the document to
23           respond to, in this case, a request for
24           proposal from a municipality?
25           A Yes.
```

2552

<pre>
 1          PAGE 178:25 TO 179:13 (RUNNING 00:00:45.194)

 2          Q If you look on the middle of Page 23

 3          below -- right before item 8, it says, "The

 4          CedarCrestone solution includes two major

 5          service offerings, tax and regulatory support

 6          and application break/fix support."

 7          Does that indicate to you that

 8          CedarCrestone's solution in this regard was

 9          for the tax and regulatory product, plus the

10          application break/fix support?

11          A Yes.

12          Q And we discussed earlier that, on occasion,

13          clients will opt to bundle tax and regulatory

14          support with application break/fix?

15          A That is correct.

16          PAGE 179:19 TO 179:24 (RUNNING 00:00:13.226)

17          Q Referring, again, to the bundled service,

18          are there other competitors, other

19          participants in the market that offer similar

20          services, that you're aware of?

21          A In terms of tax and regulatory?

22          Q Yes.

23          PAGE 180:02 TO 180:04 (RUNNING 00:00:05.375)

24          THE WITNESS:  Rimini is the primary other

25          provider in the market, that we're aware of.
</pre>

2553

```
 1        PAGE 180:06 TO 180:14 (RUNNING 00:00:35.617)
 2        Q Other than Rimini Street?
 3        A I'm sorry.  How do you say it again?
 4        Q Rimini Street.
 5        A Rimini.  Okay.  No, I'm not.  And just to
 6        make clear, in terms of -- we talked numbers
 7        of clients throughout the day, but just in
 8        terms of revenues, these services make up
 9        less than 1 percent of our revenues.  So we
10        do not spend a lot of time doing competitive
11        analysis in this space.
12        PAGE 180:24 TO 181:05 (RUNNING 00:00:15.615)
13        Q So other than Rimini Street, you're not
14        aware of any other --
15        A No, but I do know there are others out
16        there.
17        Q Can you provide any understanding that you
18        may have smaller companies than Rimini Street
19        or CedarCrestone?
20        PAGE 181:08 TO 181:11 (RUNNING 00:00:08.712)
21        THE WITNESS:  No. I mean, the two that I
22        would be aware of would be the history.  It
23        would be TomorrowNow and Rimini Street.
24        PAGE 182:06 TO 182:09 (RUNNING 00:00:10.722)
25        Q Do you know whether or not Rimini Street
```

2554

1       and CedarCrestone have gone head to head when

2       competing for a potential piece of business?

3       A Yes.

4        PAGE 182:10 TO 182:17 (RUNNING 00:00:16.760)

5       Q How many times has that happened, to the

6       best of your knowledge?

7       A I'm not sure.

8       Q Is it frequent with a piece of potential

9       business that Rimini Street, CedarCrestone

10      would compete?

11      A We don't propose this service, what I would

12      call frequently, so it would not be

13      frequently.

14       PAGE 183:05 TO 183:11 (RUNNING 00:00:17.183)

15      Q Do you understand that sometimes Rimini

16      Street and CedarCrestone are head to head,

17      that sometimes the client might go to Rimini

18      Street or vice versa, go to CedarCrestone?

19      A Certainly.

20      Q And so it's happened?

21      A I'm sure it has.

22       PAGE 187:20 TO 187:23 (RUNNING 00:00:11.624)

23      Q So CedarCrestone provides a choice to

24      clients in a situation like that for an

25      alternative to Oracle support, fair?

2555

1          A We provide an option.

2           PAGE 188:07 TO 188:23 (RUNNING 00:00:56.528)

3          Q I'm going to turn your attention to

4          Exhibit 3.  If you turn with me to Page 2, at

5          the bottom of Page 2, the last sentence,

6          there's a couple of statements along these

7          lines, which I'll read into the record, and

8          then I'll ask you a couple of follow-up

9          questions.

10         A Okay.

11         Q The statement reads, "The city can rest

12         assured that CedarCrestone provides all

13         services in a manner that is free of

14         intellectual property infringement."

15         And you'll see a similar statement on Page 6,

16         around the middle of the page, again, I'll

17         read it. "CedarCrestone's processes

18         facilitate the delivery of those services

19         free of intellectual property infringement."

20         And then again on Page 28, the

21          PAGE 188:24 TO 189:25 (RUNNING 00:01:30.379)

22         second-to-last row of the table says,

23         "Assurance that services are delivered free

24         of intellectual property infringement."

25         Now, do you agree that the services that

2556

```
 1              CedarCrestone provides are free of

 2         intellectual property infringement?

 3         A Yes.

 4         Q And what's the basis of that belief?

 5         A In how we -- if -- if a client does not

 6         have a maintenance agreement in place with

 7         Oracle, that we independently derive what tax

 8         changes and regulatory changes are required,

 9         and then we independently build those for

10         those customers.

11         Q Now, on Page 28, there's a reference in the

12         same row to the Oracle platinum partnership.

13         Do you see that?

14         A I do.

15         Q Does the -- does CedarCrestone's membership

16         or participation in the Oracle partnership

17         program provide any assurance that services

18         are delivered free of intellectual property

19         infringement?

20         A No. I mean, absolutely not.  It is

21         definitely true that CedarCrestone is an

22         Oracle platinum partner.  It is also true

23         that we provide our services delivered free

24         of intellectual property infringement, but

25         those two should have never been linked in a
```

1    box.
2     PAGE 190:05 TO 190:17 (RUNNING 00:00:53.902)
3    Q How does CedarCrestone determine whether or
4    not their processes are delivered free of
5    intellectual property infringement?
6    A We built the processes with the goal in
7    mind to not have any question about
8    intellectual property infringement.  And,
9    again, our relationship with Oracle is
10   extremely important.  We provide a lot of
11   services.  We do a lot of joint work
12   together.  We entered into this business at
13   the request of PeopleSoft, and, you know,
14   it's our goal to not have a conflict in this
15   area.
16   It's our goal to keep clients within the
17   Oracle ecosystem.
18    PAGE 191:16 TO 191:23 (RUNNING 00:00:23.670)
19   My question is:  What is the basis for
20   concluding that your processes -- whatever
21   they are -- are free of intellectual property
22   infringement?
23   A The processes were put in place with that
24   goal in mind, and they have been reviewed by
25   management to ensure that -- that we're

2558

1              following them.

2               PAGE 193:06 TO 193:08 (RUNNING 00:00:09.823)

3              Q Do your managers have any experience

4              evaluating IP infringement concerns which

5              they can provide the assurance, on Page 28?

6               PAGE 193:09 TO 193:19 (RUNNING 00:00:33.696)

7              A It is our belief that this is true.

8              Q Okay.  Your managers have experience in the

9              industry, correct?

10             A In which industry?

11             Q In the ERP software consulting industry?

12             A Yes.

13             Q Does that experience play any part in the

14             determination that CedarCrestone services are

15             delivered free of intellectual property

16             infringement?

17             A I mean, are -- yes, your experience does

18             play a roll.

19              PAGE 194:19 TO 194:21 (RUNNING 00:00:05.801)

20             Q And you have experience in the ERP

21             consulting space, correct?

22             A Yes.

23              PAGE 195:13 TO 196:08 (RUNNING 00:00:47.107)

24             Q When did you start working on the Oracle

25             software or PeopleSoft software?

2559

1          A 1994.

2          Q '94.  You've worked continuously on Oracle

3          software since '94?

4          A No.

5          Q There's a time period when you didn't work

6          on Oracle software?

7          A There was.  I did not work on Oracle

8          software from 2007 to 2009.

9          Q Okay.  Other than those few years, Oracle

10         software, in particular PeopleSoft, has been

11         your main focus?

12         A Yes.

13         Q You're the executive vice president of the

14         largest PeopleSoft consulting firm in the

15         country?

16         A I'm not sure that we're the largest, but it

17         depends on how you look at it.

18         Q One of the largest?

19         A One of the largest.

20          PAGE 196:16 TO 196:17 (RUNNING 00:00:03.658)

21         Q How many people -- how many PeopleSoft

22         consultants report to you?

23          PAGE 196:18 TO 196:18 (RUNNING 00:00:02.233)

24         A Approximately 400.

25          PAGE 198:22 TO 198:25 (RUNNING 00:00:12.002)

2560

1     Q And CedarCrestone's maintenance of that

2     environment and their own data center is

3     consistent with generally accepted industry

4     practices in the ERP consulting space, agree?

5      PAGE 199:03 TO 199:09 (RUNNING 00:00:16.131)

6     THE WITNESS:  Again, if we have a contract

7     with the client and we're providing a service

8     to the client and they've given us the right

9     to keep a copy of their database and use it

10     to deliver services to them in our

11     environment, then yes.

12      PAGE 199:11 TO 199:16 (RUNNING 00:00:16.886)

13     Q I understand CedarCrestone does that, but

14     is it acceptable, in your view, given your

15     experience, for other consulting companies to

16     do so as well?

17     A Other consulting companies do so.

18     Q Is that acceptable in the industry?

19      PAGE 199:19 TO 199:20 (RUNNING 00:00:05.069)

20     THE WITNESS:  Yes.  I'm not -- all I can say

21     is that it happens.

22      PAGE 199:22 TO 200:02 (RUNNING 00:00:07.891)

23     Q Okay.  Are there a lot of other companies

24     that do that?

25     A I believe there are.

2561

1          Q So it's at least typical in the industry,

2          based on your experience?

3          A Yes.

4           PAGE 203:20 TO 204:02 (RUNNING 00:00:15.436)

5          Q I understand that you do that.  My question

6          is:  Is that a general practice in the

7          consulting industry?

8          A I can't speak to what other companies do.

9          Q So you don't know if any other companies

10         have their employees modify the code files

11         and then provide back?

12         A I don't know.

13          PAGE 204:03 TO 204:04 (RUNNING 00:00:06.369)

14         Q If you look further up on Page 28 that's in

15         front of you on Exhibit 3, it says -- or it

16         makes

17          PAGE 204:05 TO 204:19 (RUNNING 00:00:47.478)

18         reference to CedarCrestone being the largest

19         dedicated Oracle consulting firm in the

20         world -- or in North America, excuse me.  Do

21         you see that?

22         A I do.

23         Q Is that -- there was some question earlier,

24         but is that an accurate statement?  Do you

25         agree that CedarCrestone is the largest

2562

```
 1              dedicated Oracle consulting firm in North

 2              America?

 3              A Yeah, and the keyword there is dedicated.

 4              I believe that there are Oracle firms that

 5              are bigger than CedarCrestone, but they do

 6              other things.

 7              Q Oh, I see.  But, nevertheless, you have a

 8              large Oracle consulting business?

 9              A Yes.

10              Q If you turn to Page 13 of this document.

11               PAGE 204:20 TO 204:20 (RUNNING 00:00:02.944)

12              I'm sorry.  15.

13               PAGE 204:24 TO 205:15 (RUNNING 00:00:50.274)

14              Q About one-third of the way down, there's a

15              statement that says: "In addition,

16              CedarCrestone is a recognized leader in

17              delivering Enterprise solutions by such

18              authorities as Gardner," and it lists a few

19              other organizations, including Oracle.

20              Do you see that sentence?

21              A Yes.

22              Q Do you agree that that CedarCrestone is a

23              recognized leader in the Enterprise solution

24              space?

25              A We like to think so, yes.
```

2563

1          Q In fact, CedarCrestone has won a number of

2          awards from Oracle and been recognized by

3          Oracle on a number of occasions?

4          A Yes.

5          Q And some of those awards are listed here

6          on Page 15?

7          A Yes.

8           PAGE 207:05 TO 207:07 (RUNNING 00:00:11.202)

9          Q And what is a Titan Award?

10          A Titan Award is an award given out annually

11          by Oracle in various categories.

12           PAGE 207:20 TO 208:24 (RUNNING 00:01:35.707)

13          Q So the best you know, the Titan Award is

14          the most prestigious award that an Oracle

15          partner could obtain?

16          A I believe so.

17          Q CedarCrestone has won Titan Awards or had

18          Titan recognition for at least its PeopleSoft

19          business for the last five years?  I don't

20          know if there's been a 2011 yet, but --

21          A Not every year.

22          Q 2005, you won a Titan recognition, correct?

23          A Yes.

24          Q 2007 you achieved two Titan recognitions,

25          correct?

2564

1    A Yes.

2    Q And 2010 another Titan recognition?

3    A Yes.

4    Q Has CedarCrestone achieved any Titan Awards

5    in 2011?

6    A I believe the answer is yes, but not in

7    relation to PeopleSoft.

8    Q Are there other awards from Oracle, that

9    you're aware of, that aren't reflected on the

10   list in Exhibit 4?

11   A No.

12   Q What does it mean to be a Oracle platinum

13   partner?

14   A Until recently, the platinum partner

15   designation was the highest partner

16   designation by Oracle.

17     PAGE 221:14 TO 221:17 (RUNNING 00:00:12.305)

18   Q Has Oracle ever expressed concerns to

19   CedarCrestone regarding infringement of

20   intellectual property?

21   A Not that I'm aware of.

22     PAGE 227:09 TO 227:25 (RUNNING 00:00:48.607)

23   Q Is there any writing, you're aware of, that

24   reflects PeopleSoft's requests that

25   CedarCrestone provide the retro tax service?

2565

```
1          A Not that I'm aware of.
2          Q Did -- and you've said that PeopleSoft did
3          not specify how it wished CedarCrestone to
4          provide that service, correct?
5          A Not to my knowledge.
6          Q And CedarCrestone didn't tell PeopleSoft
7          how it was going to provide that service,
8          right?
9          A Not to my knowledge.
10          Q All right.  And other than that
11          communication and the communications between
12          the sales reps, is there any other
13          communication you're aware of in which
14          CedarCrestone has communicated with Oracle
15          about the nature of its maintain services?
16          A Not that I'm aware of.
17           PAGE 238:03 TO 238:12 (RUNNING 00:00:31.700)
18          Q Has CedarCrestone done anything to educate
19          itself about the allegations that were made
20          in either the SAP litigation or the Rimini
21          Street litigation to assess how its services
22          may fall inside or outside of those same
23          types of allegations?
24          A I believe so, yes.
25          Q And has that -- is that a process that's
```

2566

1      concluded?

2          A It's a process that went on and concluded

3      and I'm -- it's an ongoing process."

4      (End of videotape deposition.)

5              THE COURT:  I'll hear argument.

6              Plaintiffs have objected to this, and so I'll

7  hear from plaintiffs first.

8              And it's also, of course, the subject of

9  Oracle's motion, document 825, to exclude deposition

10 testimony and testimony in part of Brooks Hilliard.

11             So, Ms. Dunn.

12             MS. DUNN:  Thank you, Your Honor.

13             It's hard to know, actually, where to begin.  We

14 did file a motion on this.

15             Before we began today, there was not sufficient

16 foundation for playing this video or for Mr. Hilliard's

17 testimony regarding industry practice.

18             Prior to Mr. Rowe's testimony, the Court put it

19 to the defense saying they needed to establish proper

20 foundation.

21             This question is actually very simple for the

22 Court even though there are a lot of complicated issues

23 swirling around.  Simply, the defendants failed to put on

24 the foundation required to play this video or present that

25 testimony.

1           And the ball today has not moved forward at all

2    from where it was before, and this is true for a number of

3    reasons that I will take the time to enumerate.

4           Based on Mr. Rowe's testimony it's clear that

5    Mr. Ravin did not conclude that Rimini Street was acting

6    legally and did not conclude that it was not violating

7    Oracle's copyrights.

8           There was reference to an Oklahoma City RFP

9    document.  That document, it was established, nobody had at

10   Rimini Street and Seth Ravin did not rely on it.

11          And my recollection is that the Court even

12   struck the answer that Mr. Rowe gave about the operating

13   committee which obviously Seth Ravin is a part of.

14          So no additional information about Mr. Ravin's

15   mindset was put forward today.

16          Mr. Rowe also did not advance any evidence about

17   his own mindset.  He said he did not reach any conclusions

18   based on the CedarCrestone documents whether Rimini Street

19   was acting legally.

20          Other evidence was presented that, in fact, to

21   the contrary, Rimini Street thought that CedarCrestone

22   denied they were in the third-party support business, that

23   they were hiding this from Oracle, and they operated a

24   secret business.

25          Mr. Rowe, in fact, did not even understand

2568

1    CedarCrestone's business model.  When asked about a

2    sentence in the RFP that this was remote services, he did

3    not even understand what that meant they were doing.

4              We learned that CedarCrestone would not download

5    from Oracle websites, and Rimini would, and, importantly,

6    we learned that Mr. Rowe did not actually know, like

7    Mr. Maddock, what Rimini Street was doing and therefore

8    could not rely.

9              There's no foundation at all here that

10   CedarCrestone had cross-used, that it had general test and

11   development environments, or that it had a software

12   library.

13             There's utterly no connection this afternoon,

14   just like there wasn't this morning, that links the

15   external facts to the defendants' state of mind.

16             Your Honor well knows the industry is not a

17   party in this lawsuit.  Foundation with views about what it

18   may have thought have no bearing on willingness.

19             Accordingly, not only do we seek to exclude both

20   Mr. Hilliard's testimony on industry practice and the

21   Simmons' deposition, but we also would move to strike

22   Mr. Rowe's testimony about CedarCrestone.

23             It's pretty clear at this point in the case that

24   what the defense is trying to do is create a general

25   impression of legality in the jury's mind.  So far the

1    Court has not allowed that, and we have respected that, and

2    it's in that spirit we ask for that testimony to be struck.

3              But I will tell you that after rewatching the

4    video in the court today, it is even clearer that that's

5    what the defendants want to do.

6              This witness we just listened to on this

7    videotape goes so far as to say that CedarCrestone provides

8    all services in a manner free from intellectual property

9    infringement.

10             He also goes so far as to say that Oracle did

11   not express any concerns to CedarCrestone.

12             So this is just what Your Honor has been talking

13   about this entire trial.  This would be incredibly

14   misleading to the jury when everyone in this courtroom

15   knows that ultimately this deposition was recanted.  These

16   statements are untrue.

17             The defense has propped this person up as an

18   Oracle partner, which is further misleading and begs the

19   question whether this was the strategy all along, to throw

20   out this question in opening, to limit our witnesses'

21   testimony when we presented evidence.

22             And now that it's the defense's turn to present

23   evidence, they would like to get admitted this prejudicial

24   and inadmissible foundationless testimony.  We think that

25   shouldn't be allowed.

1              And, frankly, because they haven't laid the

2    foundation, we think that actually the answer need not be

3    terribly complicated because legally it is not an option

4    available to them.

5              Your Honor, we appreciate your consideration of

6    this issue and your repeated consideration of basically the

7    same issue that has come up a number of times.

8              Thank you.

9              THE COURT:  All right.  Thank you.

10             Mr. Reckers?

11             MR. RECKERS:  Your Honor, I'll address the

12   foundational issue, though I don't believe it's dispositive

13   at all.

14             Mr. Rowe testified, it wasn't stricken, that

15   Rimini had the RFPs.  He testified that the operating

16   committee reviewed them, that they influenced the views of

17   the operating committee as to the third-party support

18   industry.

19             He did not have specific -- it's true that he

20   did not have specific conclusions himself, but I would

21   submit to Your Honor that that was sufficient foundation

22   when you look at the documents that we have.

23             And I will take exception.  We produced, Rimini

24   produced the Oklahoma agreement in 2011.  It was an open

25   records request that counsel made.

1          We produced some to Oracle, and we had some for

2   our client that was in the end of 2010, and early 2011 our

3   client would have had it as well.  That's after the email

4   sweeps for the production in the matter.

5          So I think Mr. Rowe's testimony is that they had

6   it, and counsel certainly had it as produced by counsel to

7   Oracle because we're the ones who got it from Oklahoma

8   City.

9          So I think his testimony is that he had it, and

10   that that's not reasonably rebutted.

11          What we see in these documents -- and, again,

12   the testimony is that they looked at them -- is time and

13   time again CedarCrestone saying they were doing the same

14   thing that Rimini had.

15          And so I would submit to Your Honor that that's

16   sufficient foundation, with Mr. Rowe's tying that there was

17   influence, and that is enough to speak to the subjective

18   prong of the willfulness analysis.

19          We don't even need to be tethered to the

20   subjective prong when there's still the objective inquiry

21   under the Supreme Court's *Safeco* case that says you look to

22   the objective reasonableness.

23          In this case, our expert, and, in fact, the

24   attorneys who were going out to take discovery in the case,

25   found the biggest PeopleSoft vendor.  We took discovery as

2572

1    to their view, their interpretations, in support of the

2    objective reasonableness of Rimini's positions.

3              Our position has been consistent the whole time.

4    Mr. Ravin's answer in this case said CedarCrestone was an

5    example of an industry player that did what they were

6    doing.

7              So we have documents, Defendants' Exhibit 320

8    and Defense Exhibit 22, that talk about downloading, local

9    environments, development processes.

10             These are the exact same processes, and they

11   were in Rimini's files and possession.  I don't think that

12   could be reasonably disputed.

13             So there is foundation for the subjective

14   attempt.  This is not -- this is not some after-the-fact

15   attempt to throw up a smokescreen like you see in the tax

16   evasion cases that plaintiffs have cited.  This is evidence

17   that, from the beginning, from the very first answer, has

18   been at issue.

19             I'll say this too, Your Honor.  There's more

20   than just willfulness in the case.  There's also the

21   question of punitive damages, and there's the question of

22   intent for the intentional torts, including allegations of

23   fraud.

24             When we tell our clients that we're not doing

25   things in a manner that violates Oracle's intellectual

2573

1   property rights, we should be able to show the jury that

2   there are other industry players that follow -- that have

3   the same position as us, and, in fact, close Oracle

4   partners who they work hand in hand with giving them their

5   highest honors.

6          Ms. Dunn says that we are trying to give the

7   general impression of legality.  The reality is that

8   there's this general impression of illegality, and that's

9   prejudicial to my client.

10         This is evidence that was discovered in

11  discovery, and, frankly, it's irrelevant that they got

12  someone to recant -- someone else in the company to recant

13  several years later.  We have no knowledge of what that is.

14         And I think it's still up to debate, or was up

15  to debate, and Your Honor has obviously ruled on it.

16         But there's, I think, a good faith basis for the

17  testimony that Mr. Simmons gave.  It's not like he was off

18  on his own, he was designated by the company, a large

19  company, with a very important relationship with Oracle.

20         So that's our position, Your Honor, it's

21  relevant, there's foundation laid, and -- even though

22  there's no foundation necessary for this.

23         THE COURT:  All right.

24         Ms. Dunn?

25         MS. DUNN:  Your Honor, just briefly.

2574

1          I welcome everybody to check the transcript from

2     today.  It is very clear that there is absolutely no

3     testimony in the record that Mr. Ravin relied on this

4     information about CedarCrestone.

5          There's just no link.  Mr. Rowe did not provide

6     that.  He provided nothing additional, and that's what the

7     testimony today reflects.

8          He was very clear.  He didn't even know he had

9     the document, and anything he initially said he ultimately

10    retracted on that point, or was struck by the Court.

11         So I'm happy -- we're happy to review the

12    transcript and invite Mr. Reckers to do the same, but the

13    fact remains the foundation is not here.

14         This issue -- I mean, there are a lot of

15    subissues lurking here, but the real question is, is there

16    foundation for this.

17         This is the question that the Court put to the

18    defense.  This is the question that they failed to answer

19    today.  And we can get into other things, but, frankly,

20    they don't matter if there isn't any foundation.

21         Defense counsel actually just stood here and

22    said no foundation is necessary.  Well, we disagree with

23    that.  We think foundation is necessary.  We think the

24    Court has advised foundation is necessary, and we think

25    that Mr. Rowe's testimony, if you look at it, and we were

1     all here for it, does not provide that foundation.

2              Separately, I will say on this issue of the

3     video, it is very surprising that the defendants are

4     seeking to put this video in given the posture that they

5     have struck in the beginning and throughout this case.

6              This person says things that are so obviously

7     designed to create a general impression in the jury's mind

8     and have utterly nothing to do with the state of mind of

9     the defendant or anything he could have relied on.  It

10    could not be plainer.

11             And I think that all we would need for this

12    argument, I think, is the foundation argument.  But I do

13    think that once you see the video, the reason this is being

14    pushed so hard is very clear, and it's inappropriate, and

15    it does cross the line that the Court has previously set

16    forth.

17             THE COURT:  All right.  Mr. Reckers, can you

18    identify the parts of the two RFP exhibits which you feel

19    give the notice, which is an issue the Court has been

20    concerned about, that you contend that they do?

21             MR. RECKERS:  Happy to, Your Honor.

22             THE COURT:  And what are the two exhibit numbers

23    again, please?

24             MR. RECKERS:  So the first one I'll read is

25    Defendants' Exhibit 22, and it's page -- the Bates number

2576

1    ends in 607.

2              THE COURT:  Go ahead.

3              MR. RECKERS:  Yes, your Honor.

4              On 22, 607, you'll see at the top there's a --

5              "Only those bug fixes, patches, updates, and

6    service packs to which the client has a legal right to and

7    has downloaded prior to their support expiration can be

8    applied by CedarCrestone."

9              And then so this talks about CedarCrestone

10   maintaining the material for Oracle, the support material

11   for -- on the client's behalf.

12             If you go down later on the page, and I think

13   this is probably the more telling one, it says,

14             "A part of CedarCrestone's Extended Tax

15   services" -- the paragraph -- the bottom two paragraphs,

16   please, Marie.

17             Your Honor, it's the first paragraph, the first

18   sentence,

19             "A part of the CedarCrestone's Extended Tax

20   services we will build a copy of the City's PeopleSoft

21   HCM," which is a PeopleSoft product, "demo environment

22   within our data center."

23             So this is disclosure of a local environment.

24             And then, "This environment will be used to

25   create and test the application revisions before we deliver

2577

1    them to the City."

2              So this is a discussion, Your Honor, of using

3    that environment for -- for development.

4              In the other exhibit, I think there's more in

5    the other exhibit, and this is the one that Rimini produced

6    earlier in the case, it's a 2009, RFP response, Defendants'

7    Exhibit 3020.

8              Could you bring that up, Marie, please?

9              And in particular, it's the 22nd page of the

10   document, and right under database installation.

11             And so in the first paragraph, Your Honor, the

12   last sentence says,

13             "The only time we would not create a new

14   database for each client is where we have more than one

15   client whose support termination dates are identical and

16   thus have identical demo databases in terms of pillar

17   functionality and patch level."

18             So, Your Honor, this is talking about where we

19   have two clients who have identical software, and what they

20   go on to say is they use the common development for both.

21             That's the exact same position that Rimini's

22   taken in this case, and that's the cross-use of the

23   development that Oracle has complained of.  So that's the

24   cross-use piece that was disclosed.

25             If you go to the next page, Marie, please, 23.

2578

```
 1              So if you go down, there's a list about halfway

 2     down, the third one down, the third one down is,

 3              "To download official documentation for items

 4     requiring change" --

 5              THE COURT:  I'm sorry -- okay.  I've got you.

 6              MR. RECKERS:  So this talks about downloading of

 7     documentation for a change.

 8              And then you go down two more, there's one that

 9     says, "Create or modify PeopleSoft objects in the

10     development HRMS database."  So, again, this is local

11     development by CedarCrestone.

12              And one more, Your Honor.  On page 25,

13     three-quarters of the way down.  There's a paragraph that

14     starts with "once."

15              Again this is referring to the development

16     process.  It says,

17              "Once testing is completed and the update is

18     packaged, it is loaded to a test database where it is

19     retested for errors, accuracy, and compliance.  If

20     corrections need to be made, they are done in the

21     development database, and the process once again performed

22     from development, packaging and then reloaded to test."

23              So I would submit that these are exemplary

24     disclosures from the two RFPs that show that CedarCrestone

25     was doing the downloading, they were doing the local
```

1    environments, and they were doing development in the same

2    manner that's accused in this case, and these documents

3    were in Rimini's possession and informed their views.

4           I disagree with the -- what was struck and

5    wasn't struck today.  At minimum, I think there was

6    evidence that these documents were in their possession and

7    they informed at some level the executive -- or the

8    operating committee's view on industry custom and practice.

9           THE COURT:  All right.  Thank you, Mr. Reckers.

10          Let me hear from Ms. Dunn.

11          MS. DUNN:  Your Honor, what Mr. Reckers just

12   said is flatly wrong.  There is no such evidence in the

13   record, and hopefully we can clear that up a little bit.  I

14   pulled up the transcript which I can read the Court.

15          But the first thing is, with regard to what

16   counsel just read from the screen, the witness didn't

17   testify to any of this, and there's no evidence that

18   anybody saw it or relied on it.

19          The only page that the witness spoke to was the

20   one Mr. Isaacson showed him, and, as to that, he said he

21   didn't even know what it was about.

22          So there couldn't be less evidence as to

23   anybody's awareness of, or informing anyone's state of mind

24   when it comes to these two exhibits, one of which is not

25   even admitted.

1              And so I'm not even sure why we're talking about

2       the RFPs because no one ever looked at them, and we know

3       that now from Mr. Rowe's testimony.

4              The issue of the operating committee.  So,

5       Mr. Isaacson says,

6              "Now, Mr. Rowe, when your counsel asked you

7       questions about the documents, you said you reviewed those

8       documents and concluded that what your company was doing

9       was legal; correct?

10             "I didn't say that, did I?

11             "Well, when you read the CedarCrestone

12      documents, did you conclude that you were not violating

13      Oracle's copyrights?

14             "No.  I think it was informative for the

15      operating committee, especially Seth and the service team,

16      but I didn't make that determination.

17             "All right.  So, actually, I would move to

18      strike his testimony about what others concluded, Your

19      Honor.

20             "THE COURT:  That will be stricken.  That was a

21      nonresponsive portion of the answer.

22             "So when you testified about reviewing

23      CedarCrestone materials after you reviewed them, you did

24      not reach any conclusions yourself about whether your

25      company was violating Oracle copyrights; correct?

1          "That's correct.

2          "And after you reviewed the CedarCrestone

3    materials, you did not reach any conclusions yourself as to

4    whether your company was behaving legally; correct?

5          "Correct.

6          "And, in fact, at the time that you were

7    reviewing the CedarCrestone materials, you didn't actually

8    know what your company was doing," and he goes on to

9    describe what the company was doing.

10          And the witness says, "I did not know."

11          So, again, Your Honor, no one disputes that

12   these documents exist in the world and that, you know,

13   people can read stuff in them, but the thing that matters

14   here is whether there's any witness testimony that these

15   documents were relied upon, and there just simply isn't,

16   not by this witness, and not by Mr. Ravin.

17          THE COURT:  I wanted to turn to the second part

18   of Oracle's motion, which was to exclude the deposition

19   testimony of -- not just Mr. Simmons, but testimony in part

20   of Brooks Hilliard.

21          Do you want to address that argument on behalf

22   of Oracle?

23          MS. DUNN:  Sure.

24          Essentially, Your Honor, this is largely the

25   same argument as to the video, which is, the law requires

2582

1    that there be some -- essentially, I guess, nonattenuation,

2    which is all we have in this case, between the defendants'

3    state of mind and the testimony about industry and

4    practice.

5           And so here there's absolutely no evidence that

6    ties Seth Ravin's state of mind to any industry and

7    practice.

8           In our motion, we say that -- we outline

9    specifically what Mr. Ravin testified to, and that would be

10   fine for Mr. Hilliard to talk about, and it has to do

11   specifically with Siebel having third-party companies that

12   provide an offer of service for Siebel products, and Siebel

13   offering training to independent consultants to get

14   certified.

15          These are the things, and only these things, are

16   what Mr. Ravin testified that he relied upon.

17          Without any connection between external facts

18   and the defendants' state of mind, the evidence of external

19   facts, for example, what Mr. Hilliard will testify to, is

20   irrelevant.

21          But it's really the same thing as the Simmons'

22   deposition, which is that there are two things at play, and

23   the first thing is this relevance issue and that there has

24   to be some tie to the defendants' state of mind, which

25   there simply isn't.

1               And the second thing is that it is prejudicial

2      to introduce abstract, attenuated, and, you know, just

3      general views about what the industry may or may not think.

4      The industry is not at issue.

5               Your Honor has previously adjudicated the idea

6      that there are two arguable bases for testimony from an

7      expert, and one would be with regard to the licenses which

8      the defense has said they're not offering, and Your Honor

9      has, I think, said wouldn't be included here.

10              So all we're talking about really is willfulness

11     and state of mind, and no connection has been established,

12     and it would dramatically confuse the jury for somebody to

13     get on the stand and speak generally about their views

14     about what was happening in the industry.

15              THE COURT:  Mr. Reckers?

16              MR. RECKERS:  Your Honor, to take Ms. Dunn's

17     last point first, we don't -- we are not going to offer

18     Mr. Hilliard to testify just in the industry generally.

19              We've taken two very specific topics, local

20     environments and reuse development, development for

21     multiple clients that have the same underlying code.  Those

22     are the two specific topics that he investigated and that

23     we intend to provide testimony on.

24              There is comments in Oracle documents that seem

25     to suggest that that's permissible.  Those are largely in

2584

1    evidence.  Obviously the Simmons' deposition that you just

2    read supports that, and the CedarCrestone documents support

3    that as well.

4              This is a narrow question of what's permissible

5    in the industry, and the jury should be able to hear that

6    there is a contrary view to Oracle's.

7              This is a case that involves allegations of

8    fraud, wrongful intent, willfulness, and punitives.

9              There is another side to this story.  They don't

10   want the jury to be confused because they want the jury

11   just to see their one side of it.  There is another side.

12             And we developed this evidence.  It's proper.

13             When Mr. Ravin was on the stand, Your Honor

14   already ruled on this.  They moved to exclude on these same

15   arguments pretrial.  Your Honor denied that *Daubert* motion,

16   said that this could come in.

17             We could have laid more foundation with

18   Mr. Ravin if that was part of the Court's ruling.

19             We would be willing to recall Mr. Ravin for this

20   limited purpose, but I don't think it's necessary because

21   we have foundation from Mr. Rowe, foundation from his

22   direct that wasn't stricken, that said the operating

23   committee looked at this and it informed their views.

24             And when you have -- so the documents in their

25   possession informing their views, we don't need to go

1    through the next step.  We have the foundation.

2              Like I said, we can recall Mr. Ravin.

3              The Court has already ruled on this, and that

4    was the law of the case when he was on the stand.

5              But my point is that the testimony of

6    Mr. Hilliard would be helpful to the jury and falls within

7    the relevance that we've been discussing with respect to

8    the Simmons testimony.

9              THE COURT:  All right.

10             MS. DUNN:  Your Honor, can I just clarify one

11   thing?

12             THE COURT:  Yes.

13             MS. DUNN:  Or two things actually.

14             First of all, Your Honor has not ruled on this

15   and denied our motion.  Your Honor said that at this point

16   the evidence had not -- at the time you ruled on the

17   motions in limine, the evidence had not been developed

18   sufficiently to make a decision.  So that is not the case.

19             But I think the problem with this is actually

20   very well put by what Mr. Reckers said, which is that their

21   goal is to convey to the jury that this is permissible, and

22   that is not what the expert is supposed to do.

23             There's only one purpose for this expert's

24   testimony.  It is not to tell the jury what is permissible

25   either in general or legally, which is clearly the

2586

```
 1   defendants' intent and the intent that they just candidly

 2   informed the Court, it is to speak to willfulness and the

 3   defendants' state of mind.

 4            So we already know what the boundaries are for

 5   that, and they are not the vastly expanded boundary of

 6   demonstrating to the jury that this is all permissible, and

 7   if that's what they intend for Mr. Hilliard to testify to,

 8   then that would be quite obviously objectionable.

 9            MR. RECKERS:  Real briefly, Your Honor.

10            The question is for the expert what the industry

11   and custom in the industry is for these discrete questions.

12            We're not saying that -- we're not here to say

13   that this wasn't infringement.  We want the jury to see

14   that there was an objectively reasonable basis for Rimini

15   to have done what it did, to make the copies that it did.

16            Right now the jury's left with the misimpression

17   that no one who is even close to operating ethically or

18   legally would do what Rimini did.

19            That evidence is rebutted by this industry

20   custom evidence, and they're certainly free to

21   cross-examination -- cross-examine Mr. Hilliard on it --

22   cross-examine Mr. Hilliard on it.

23            But the reality is they just want to tell a

24   one-sided story, and there is another side.

25            And that goes directly -- I'm not arguing that
```

2587

1       there's not infringement here.  Your Honor has ruled on

2       that by and large.  But the jury should see what our state

3       of mind is.  And the objective evidence regarding custom

4       and practice in the industry from their own partner, I

5       would submit, is relevant.

6              THE COURT:  Well, looking at this, I'm of the

7       view there has been no foundation laid that Defendant Seth

8       Ravin or Rimini were aware of or relied upon the essence of

9       the testimony provided by Mr. Simmons in his Rule 30(b)(6)

10      video deposition.  I'm therefore not going to admit that

11      video and deposition into evidence.

12             The further question with regard to taking it to

13      Mr. Hilliard, I'm not going to rule on at this moment.  I

14      will give you a ruling on that in the morning.  I, frankly,

15      need to refresh on some of the history in this case and

16      also the arguments of both sides.

17             So Simmons is excluded.  The extent to which

18      reference to him in Mr. Hilliard's testimony in general are

19      still on the table, and I'll let you know in the morning.

20             MS. DUNN:  One piece of relevant data for Your

21      Honor while you think about this is Mr. Hilliard -- as

22      Mr. Reckers just said, Mr. Hilliard relied on this

23      deposition testimony.  So it does pervade the report, and

24      it's hard to extricate these things, but we wanted Your

25      Honor just to be aware.

2588

1          THE COURT:  Well, I am aware of that, and I

2    appreciate it.

3          MS. DUNN:  Sure.  No problem.

4          THE COURT:  All right.  Why don't we reconvene

5    in the morning at quarter to 8:00, and I'll give you my

6    decision with regard to Mr. Hilliard.  Thank you.

7          COURTROOM ADMINISTRATOR:  Please rise.

8          (The proceedings adjourned at 3:32 p.m.)

9                    *   *   *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

2589

1                              -o0o-

2          I certify that the foregoing is a correct

3          transcript from the record of proceedings

4          in the above-entitled matter.

5

6          _____        9/30/15

7          Donna Davidson, RDR, CRR, CCR #318        Date
           Official Reporter
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

2590

1                            I N D E X

2    DEFENDANTS' WITNESSES:                        PAGE
     DAVID KLAUSNER
3        Direct Examination By Mr. Dykal          2284
         Cross-Examination By Mr. Ringgenberg     2296
4        Redirect Examination By Mr. Dykal        2353
         Recross-Examination By Mr. Ringgenberg   2356
5    DAVID ROWE
         Direct Examination By Ms. Chuang         2361
6        Cross-Examination By Mr. Isaacson        2431

7                          E X H I B I T S

8    PLAINTIFF'S                                ADMITTED
9    237                                            2441
     2142                                           2489
10   2143                                           2487
     2158                                           2490
11   5507                                           2446

12

13

14

15

16

17

18

19

20

21

22

23

24

25