2591

1                    UNITED STATES DISTRICT COURT
                          DISTRICT OF NEVADA
2           BEFORE THE HONORABLE LARRY R. HICKS, DISTRICT JUDGE

3

4   ORACLE USA, INC., a Colorado      :
    corporation; ORACLE AMERICA,      :
5   INC., a Delaware corporation;     :
    and ORACLE INTERNATIONAL          :No. 2:10-cv-0106-LRH-PAL
6   CORPORATION, a California         :
    corporation,                      :
7                                     :
             Plaintiffs,              :
8                                     :
         vs.                          :
9                                     :
    RIMINI STREET, INC., a Nevada     :
10  corporation; and SETH RAVIN,      :
    an individual,                    :
11                                    :
             Defendants.              :
12   _____ :

13

14

                    TRANSCRIPT OF JURY TRIAL - DAY 13
15                    (Pages 2591 through 2786)

16

17                       September 30, 2015

18

                         Las Vegas, Nevada
19

20

21

22

    Court Reporter:          Donna Davidson, RDR, CRR, CCR 318
23                           Certified Realtime Reporter
                             400 South Virginia Street
24                           Reno, Nevada  89501
                             (775) 329-0132
25

2592

1                    A P P E A R A N C E S

2    FOR THE PLAINTIFFS:

3    BOIES, SCHILLER & FLEXNER LLP
     KIERAN P. RINGGENBERG
4    1999 Harrison Street, Suite 900
     Oakland, California 94612
5    (510) 874-1000
     Fax: (510) 874-1460
6    kringgenberg@bsfllp.com

7    BOIES, SCHILLER & FLEXNER LLP
     RICHARD J. POCKER
8    300 South Fourth Street, Suite 800
     Las Vegas, Nevada 89101
9    (702) 382-7300
     Fax: (702) 382-2755
10   rpocker@bsfllp.com

11   BOIES, SCHILLER & FLEXNER LLP
     WILLIAM A. ISAACSON
12   KAREN L. DUNN
     5301 Wisconsin Avenue, NW
13   Washington, DC  20015
     (202) 237-2727
14   Fax:  (202) 237-6131
     wisaacson@bsfllp.com
15   kdunn@bsfllp.com

16   MORGAN LEWIS & BOCKIUS LLP
     THOMAS S. HIXSON
17   NITIN JINDAL
     JOHN A. POLITO
18   One Market, Spear Street Tower
     San Francisco, California 94105
19   (415) 442-1000
     Fax:  (415) 442-1001
20   thomas.hixson@morganlewis.com
     nitin.jindal@morganlewis.com
21   john.polito@morganlewis.com

22   JAMES C. MAROULIS
     DORIAN E. DALEY
23   Oracle Corporation
     500 Oracle Parkway
24   Redwood City, California 94070
     (650) 506-4846
25   jim.maroulis@oracle.com
     dorian.daley@oracle.com

2593

```
 1                 A P P E A R A N C E S (Continued)

 2    FOR THE DEFENDANTS:

 3    SHOOK, HARDY & BACON LLP
      PETER E. STRAND
 4    B. TRENT WEBB
      RYAN D. DYKAL
 5    2555 Grand Boulevard
      Kansas City, Missouri 64108
 6    (816) 474-6550
      Fax: (816) 421-5547
 7    pstrand@shb.com
      bwebb@shb.com
 8    rdykal@shb.com

 9
      SHOOK, HARDY & BACON LLP
10    ROBERT H. RECKERS
      600 Travis Street, Suite 3400
11    Houston, Texas 77002
      (713) 227-8008
12    Fax: (713) 227-9508
      rreckers@shb.com
13
      SHOOK, HARDY & BACON LLP
14    ANNIE Y.S. CHUANG
      One Montgomery Tower, Suite 2700
15    San Francisco, California 94104-4505
      (415) 544-1900
16    achuang@shb.com

17
      LEWIS ROCA ROTHGERBER LLP
18    W. WEST ALLEN
      3993 Howard Hughes Parkway, Suite 600
19    Las Vegas, Nevada 89169
      (702) 949-8230
20    Fax: (702) 949-8364
      wallen@lrrlaw.com
21

22

23

24

25
```

2594

```
 1              LAS VEGAS, NEVADA, SEPTEMBER 30, 2015, 8:01 A.M.

 2                              --oOo--

 3                    P R O C E E D I N G S

 4

 5         (Outside the presence of the jury.)

 6              COURTROOM ADMINISTRATOR:  Please rise.

 7              THE COURT:  Good morning.  Have a seat, please.

 8    The record will show we're in open court with parties and

 9    counsel present.  The jury is not present.

10              Following retirement of the jury yesterday

11    afternoon, the Court considered the video deposition of

12    Paul Simmons, a 30(b)(6) designated witness of nonparty

13    CedarCrestone, and determined that -- after reviewing the

14    video deposition and considering the arguments of the

15    parties and the law that the Court feels is applicable

16    here, determined that there lacked a sufficient foundation

17    to present the video for the jury, or the deposition for

18    that matter.

19              The Court held off on ruling on the Hilliard

20    testimony until I had an opportunity to review the briefs

21    and consider the law pertaining to this issue.

22              I have done that, and I've considered his

23    proposed testimony, and the Court will deny Oracle's

24    motion -- and I don't have it in front of me, I don't

25    recall whether it was to exclude him as a witness or to
```

1    exclude the subject matter of noninfringing determinations

2    as to CedarCrestone.

3            But, in any event, assuming that Mr. Hilliard is

4    shown to be a qualified witness to testify on the subject

5    matter of industry custom and practice, the Court is of the

6    view that he may testify to his opinions about the industry

7    and the basis for forming his opinion.

8            There is some concern about his reliance on the

9    Simmons deposition as he obviously reviewed the deposition

10   in forming his expert opinion on industry and practice

11   during the relevant timeframe.

12           To the extent that it would be proposed that he

13   recite specific deposition testimony by Simmons in the

14   course of his direct examination by defendants, the Court

15   finds that such testimony and recitation of specific

16   testimony by Simmons would not be admissible.

17           However, testimony reviewed by Hilliard to form

18   his opinion about what the industry custom and practice was

19   as to certain types of conduct during the relevant

20   timeframe may be addressed in a general fashion by

21   Hilliard.  However, he should not recite or quote specific

22   testimony by Simmons in doing so.

23           The Court will listen and carefully consider any

24   specific objections raised by counsel as to individual

25   questions or topics to be presented in the course of

2596

1    Hilliard's testimony.

2         But, in general, the Court feels that Hilliard's

3    testimony is relevant to some of the issues in this action

4    and, as such, assuming that he's qualified as a witness to

5    testify on such matters, that he should be allowed to

6    testify, and his testimony may include the evidence and

7    reference to the evidence he reviewed to come to his

8    ultimate opinion.

9         All of this being said, however, his proposed

10   testimony is subject to complete cross-examination by

11   Oracle on all topics raised in the course of his testimony,

12   and the Court has previously given counsel notice that

13   that's the Court's view on this, that it's an open matter

14   for cross-examination with regard to questions based

15   upon -- good faith questions asked in cross-examination.

16        That will be the ruling of the Court with regard

17   to the Hilliard testimony.  And is there anything further

18   that either party would like the Court to address at this

19   time?

20        Mr. Reckers?

21        MR. RECKERS:  Yes, Your Honor.  Thank you.

22        I understand Your Honor's ruling on this.  Let

23   me tell you where I think we are on the basis.

24        As plaintiffs' counsel mentioned yesterday, the

25   opinions rely so heavily on the Simmons deposition that our

2597

1    view is that we don't intend to go forward with

2    Mr. Hilliard's industry practice opinions.  Without the

3    proper evidentiary basis, it wouldn't serve my client's

4    interest to put him on for those particular opinions.  So

5    that's what we're going to do.

6            There's another piece of his testimony that was

7    not objected to.  It's fairly brief.  It involves the

8    question of database damages license.  And there's some

9    technical questions that he's opined on that -- in response

10   to Oracle's damage expert, Ms. Dean.

11           So we'd like to put up Mr. Hilliard for that

12   limited purpose of the database damages license, and then

13   all of the industry practice stuff, given the exclusion of

14   the -- Simmons, we would not seek to present him on.

15           THE COURT:  All right.  I appreciate the

16   heads-up on that, Mr. Reckers.

17           Yeah, Mr. Strand?

18           MR. STRAND:  One more heads-up, Your Honor.

19           MS. DUNN:  Are we switching topics?

20           MR. STRAND:  Yes.  Go ahead.

21           MS. DUNN:  Your Honor, just quickly before we

22   switch topics, I just wanted the Court to be aware that it

23   hadn't ruled on our motion yesterday to strike Mr. Rowe's

24   testimony apropos our argument yesterday, which is not to

25   say we're rearguing that, we just wanted the Court to be

2598

1    aware that there had been no ruling.

2                THE COURT:  Okay.  Refresh my recollection on

3    the specific issue that that concerned.

4                MS. DUNN:  So we had moved to strike Mr. Rowe's

5    testimony on CedarCrestone based on the same arguments we

6    made yesterday and the lack of foundation laid by the

7    defense.

8                And so the Court, during the course of the

9    testimony, did strike some commentary by Mr. Rowe, but the

10   concern would be that this concept has been now thrown out

11   to the jury, and there is some testimony in the record that

12   could be used later or relied upon later that may be

13   improper.

14               THE COURT:  Okay.  Well, my recollection is that

15   I ruled on the motions to strike as we moved along with his

16   testimony, and my view was that the information from the

17   municipal entities, or governmental entities, that had been

18   gathered through the Freedom of Information Act, and the

19   testimony by him was that those were reviewed by the

20   committee, was not stricken.

21               My recollection as I sit here is that there was

22   a reference to something having been considered or -- by

23   Mr. Ravin, and I believe I struck that, and if I didn't

24   strike that, I meant to strike that.

25               MS. DUNN:  Okay.  Thank you, Your Honor.

1          THE COURT:  All right.

2          Mr. Strand?

3          MR. STRAND:  Your Honor, one heads-up, and only

4   because we concluded it might come up as early as our

5   second witness today, but I think, in light of the time and

6   keeping the jury waiting, here's what I propose to do.

7          Mindful of the Court's order excluding evidence

8   post 12/31/2011, extremely mindful of that, Your Honor, we

9   would like the ask the witness the following three

10  questions.

11         THE COURT:  Which witness are you talking about?

12         MR. STRAND:  Well, I was thinking about as early

13  as our next witness, but, Your Honor, if it's more

14  convenient for the Court, we'll call another witness

15  tomorrow to do this.  It's just out of an efficiency that I

16  thought about doing it with the second witness today.

17         The three questions are this:

18         Does Rimini now operate using an all-remote

19  environment, which then goes after the 12/31/2011

20  timeframe.

21         When was that model fully implemented?  And the

22  answer would be August of 2014;

23         And then the final question -- and, Your Honor,

24  I'll leave it to you if you want to instruct on this -- but

25  why was that model implemented?  And the answer will be in

1     response to the Court's orders.

2              The reason we want to do that, Your Honor, is

3     because we believe the other side has opened the door to

4     that evidence, and there's confusion -- could be confusion

5     in the minds of the jury regarding whether or not Rimini is

6     still operating with local hosting as opposed to remote

7     hosting.

8              As the Court properly pointed out and as we're

9     very much aware, when the Court issues an order, one is

10    expected to comply with it promptly.  We have attempted to

11    do that, Your Honor.  And that's part of the second case,

12    and we won't start arguing that.

13             But we do want to let the jury know so that they

14    don't have a misimpression that we have attempted to follow

15    the Court's February 2014 order by implementing an

16    all-remote environment.

17             Oracle may disagree.  That's for the second

18    case.  But we don't want the jury left with the impression

19    that we are ignoring the Court's order because we are not

20    doing that.

21             So what I want to do, Your Honor, without

22    opening the door asunder, is ask those three questions,

23    that will be it, and then we can move on from there.

24             Because right now the jury knows there was an

25    order by this Court finding local hosting was infringing;

1    fair enough.

2              They know that Oracle's upset about that; fair

3    enough.

4              We just filed a motion on that, Your Honor, and

5    this is why -- I don't want to press the Court for a

6    decision before our second witness unless Your Honor is

7    just dying to get into this and argue about it, but I'll

8    hand up the motion --

9              THE COURT:  I can assure you I'm not.

10             MR. STRAND:  Kind of was my guess, Your Honor.

11             What I thought I might do for the benefit of the

12   Court and Counsel, while we're in court this morning, I'll

13   give up the few minutes of efficiency and we'll call the

14   witness tomorrow if the Court rules this way.

15             I will have -- there are various citations to

16   the transcript of the trial where we believe the door has

17   been opened.

18             This morning I'll have someone make copies of

19   that transcript, yellow highlight what our argument is,

20   then the Court can look at that over the evening, opposing

21   counsel can look at that over the evening, and we can take

22   it up before court tomorrow.

23             I'll have a witness ready to go.  It may be

24   recalling Mr. Benge, just giving you a heads-up on that, to

25   ask those three questions and only those three questions.

1              THE COURT:  Well, I appreciate the heads-up, and

2     I'll accept your proposal that you save it until tomorrow,

3     and we'll hear about it in the morning.

4              MR. STRAND:  Thank you.

5              THE COURT:  Or if we have another convenient

6     time.

7              But I would like to see what's been filed.  And,

8     of course, I recognize Oracle hasn't been able to --

9              MR. STRAND:  Right.

10             THE COURT:  -- prepare a response, and I

11    appreciate the position that that leaves Oracle in.  I may

12    wait until tomorrow morning.

13             MR. HIXSON:  Thank you, Your Honor.

14             We do oppose this motion.  There's been no

15    opening of the door.  The items referred to --

16             THE COURT:  No, no, I understand your position

17    completely --

18             MR. HIXSON:  Okay.

19             THE COURT:  -- and I want you to have an

20    opportunity to respond to it.

21             So just to put this on the table, I'd like to

22    see something filed by this evening before 6:00 in response

23    to the motion on behalf of Oracle, and we'll address this

24    tomorrow morning as soon as I arrive.  I have to fly in

25    from Reno tomorrow morning.

2603

1              MR. HIXSON:  Thank you, Your Honor.

2              THE COURT:  All right.  We should be ready to

3    bring in the jury.  Let's do that, please.

4              COURTROOM ADMINISTRATOR:  Yes, Your Honor.

5         (Jurors enter courtroom at 8:13 a.m.)

6              THE COURT:  Good morning.  Have a seat, please,

7    ladies and gentlemen.

8              I'd just like to give you a little bit of a

9    heads-up on where I see us heading.

10             We haven't been able to bring you in immediately

11   this morning because I needed to discuss some of these

12   issues with counsel, but it appears that we're on track on

13   this case.  And by on track, what I mean is I believe this

14   case will be completed as to all evidence and you will be

15   deciding this case next week.

16             How early in the week, I'm not sure yet, but I'd

17   say it's likely that it will be in the first half of the

18   week.  So for your personal calendars, this case should be

19   concluded completely, certainly, by the end of next week.

20             So I appreciate your being here and ready to go

21   this morning.  And we're ready to go.

22             So the record will show that we're in open

23   court.  The jury is all present.  Counsel and the parties

24   are present.

25             And, Mr. Reckers, may we have the next witness

2604

1    on behalf of defendants, please.

2              MR. RECKERS:  Yes, Your Honor.  Defendants call

3    Mr. Brooks Hilliard.

4              COURTROOM ADMINISTRATOR:  Please raise your

5    right hand.

6              You do solemnly swear that the testimony you

7    shall give in the cause now before the Court shall be the

8    truth, the whole truth, and nothing but the truth, so help

9    you God?

10             THE WITNESS:  I do.

11             COURTROOM ADMINISTRATOR:  Please be seated.

12             Please state your name for the record and spell

13   your name.

14             THE WITNESS:  Brooks Hilliard; B-r-o-o-k-s,

15   H-i-l-l-i-a-r-d.

16             COURTROOM ADMINISTRATOR:  Please tell us your

17   city and state of residence.

18             THE WITNESS:  I reside in the town of Paradise

19   Valley, Arizona.

20                       BROOKS HILLIARD

21             called as a witness on behalf of the

22       Defendants, was examined and testified as follows:

23                     DIRECT EXAMINATION

24   BY MR. RECKERS:

25   Q.   Good morning, Mr. Hilliard.

1    A.    Good morning.

2    Q.    Would you introduce yourself to the jury, please.

3    A.    I'm Brooks Hilliard, and I'm an independent

4    information technology and management consultant.

5    Q.    And why are you here today, Mr. Hilliard?

6    A.    I'm here to discuss some of the technical issues

7    related to Ms. Dean's analysis of what software licenses

8    would have been required for Rimini to use the Oracle

9    database had it licensed the database in 2006.

10   Q.    And Ms. Dean is -- was Oracle's damages expert who

11   gave testimony last week; correct?

12   A.    Yes, that's correct.

13   Q.    Okay.  Now, does your educational background relate

14   to the opinions that you're here to discuss?

15   A.    Yes, it does.

16   Q.    Please describe your education to the jury.

17   A.    I have a bachelor's in engineering from MIT, and I

18   have an MBA degree from the Harvard Business School.

19   Q.    Do you have any professional certifications?

20   A.    Yes, I do.

21   Q.    What are those?

22   A.    I'm a certified management consultant and a

23   certified computing professional.

24           THE COURT:  Excuse me, Mr. Hilliard, and also

25   Mr. Reckers.

1              Madam Reporter, my screen is not following the

2      realtime.

3              (Pause in the proceedings.)

4              THE COURT:  All right.  Problem solved.  Thank

5      you, Dionna, and also Donna.

6              Mr. Reckers, feel free to start the

7      qualification testimony again if you'd like.

8              MR. RECKERS:  Yes, Your Honor.  Thank you.

9      BY MR. RECKERS:

10     Q.   So, Mr. Hilliard, I had just asked you about your

11     professional certifications, and you had mentioned, I

12     believe, that you're a certified management consultant; is

13     that correct?

14     A.   That's correct.

15     Q.   And what is a certified management consultant?

16     A.   It's the only worldwide certification for

17     professional management consultants, with chapters in

18     countries throughout the world.

19              In order to become a CMC, one has to have a peer

20     review.  You have to have a -- at least 10 years as a

21     management consultant.  You have a client audit, you get

22     interviewed by other management consultants.

23              And then there are continuing education

24     requirements that I have to comply with and also a code of

25     ethics that I comply with.

2607

1    Q.    And, Mr. Hilliard, you mentioned that you're also a

2    certified computing professional?

3    A.    Yes, that's correct.

4    Q.    And what is that?

5    A.    Similar to the CMC, that's the largest independent

6    professional organization for computer consultants in the

7    world with chapters throughout the world.

8            It's sponsored by a number of different

9    professional societies, and it requires, in addition to

10    experience as a -- in the computing industry, it requires

11    a -- that I pass competency tests, and also there's a

12    continuing education requirement and a code of ethics.

13    Q.    Now, are there a lot of people with both this

14    certified management consultant certification and the

15    certified computing professional certification?

16    A.    I check that periodically.  I go through the rolls

17    of both organizations, and there are fewer than 15 of us in

18    the world that have both certifications.

19    Q.    Mr. Hilliard, how did you get your start in the

20    technology sector?

21    A.    Well, back when I was an undergraduate at MIT, I

22    started taking software courses.

23            And then I was able to secure a job summers and

24    part-time for one of the largest programming consulting

25    firms in the world at the time, and they -- when they hired

2608

1    me, I worked on several projects, including a moon mission,

2    a surveyor mission, and a Mars mission, Mariner Mars.  Both

3    my missions were successful.

4              I also did business programming.  Most of this

5    was very detailed, what they call assembly language

6    programming, but I also did business programming both at

7    Informatics, the consulting firm I was working for, and

8    when I was in the military.

9    Q.    Did you end up getting any degrees, sir?

10   A.    I got the bachelor's degree from MIT, and then went

11   straight to Harvard Business School to pursue the MBA

12   degree.

13   Q.    Okay.  After business school, what did you do?

14   A.    After business school -- while I was in business

15   school, I actually went into -- I joined the Coast Guard.

16   It was during the Vietnam War period.

17             I joined the Coast Guard, and I worked in the

18   computer field at Coast Guard headquarters in Washington,

19   DC.

20             Then, after graduating, I started working for

21   various computer companies in management and executive

22   positions.

23   Q.    When you worked for those computer companies, did

24   you negotiate contracts for license agreements?

25   A.    Yes, I did, much like Mr. Allison.

1    Q.    Okay.  Can you explain for the jury what you did in

2    that regard.

3    A.    I worked, as I say, as an executive.

4          One of -- most of my roles dealt with dealing

5    with customers.  As part of that, I went out and I

6    negotiated contracts for our products and services with

7    customers.

8          I also, in one startup company, I worked with

9    our lawyers to help them formulate the contracts that we

10   would use with customers.

11   Q.    Did there come a time in your career where you

12   decided to become a computer consultant?

13   A.    Yes.

14   Q.    And when was that?

15   A.    In 1980, I stopped working for computer companies,

16   and I formed my own firm business, Automation Associates,

17   in Phoenix, Arizona, and that's what I've been doing since.

18   Q.    Give the jury a sense of your consulting practice,

19   please.

20   A.    Initially, my consulting practice was almost

21   exclusively working with licensees for computer software

22   and buyers of computer systems -- buyers are the things

23   that aren't licensed -- helping them understand what it is

24   they need, helping them find products and systems that

25   would meet those needs, helping them determine which was

2610

1    the best of those products, negotiating, recommending to

2    them, and, after they made a decision, negotiating with the

3    companies that they had selected for -- to meet their

4    needs, and then following through afterwards to make sure

5    that the system came up and worked properly for them.

6    Q.    And obviously you do work with parties in

7    litigation; is that correct?

8    A.    That's true.  In the 19 -- actually, in -- very

9    early in the 1980s, a CPA I knew said that she had a client

10   that was considering suing their computer company, did I

11   think I could help.  And it sounded interesting.  I took

12   that engagement, and I wound up recommending that they not

13   sue.

14           But over the years I got a few more of those,

15   and then, in the mid '90s, I put up a website focused on

16   that effort, and over time I became known and started doing

17   expert witness engagements.

18   Q.    And have you taught or lectured about computers?

19   A.    I have.  Since I've been a consultant, I have done

20   seminars for the American Management Association.

21           I was a faculty associate at Arizona State

22   University teaching computer technology.

23           And I've also done professional speaking, mostly

24   to trade groups and conventions and so forth, about the use

25   of computers and computer and systems technology and

2611

1    software.

2    Q.    Have you written any books or publications about

3    computer systems?

4    A.    I did.  I wrote a book called -- sort of

5    capitalizing on both of my -- both my consulting experience

6    and my experience working for computer companies, I wrote a

7    book called *Buying A Computer For Your Growing Business:*

8    *An Insider's Guide*, which was published by Dow Jones.

9    Q.    And as a consultant, have you ever negotiated

10   contracts for business software licenses?

11   A.    Yes, hundreds of them; well over 100, probably over

12   200.

13             MR. RECKERS:  Your Honor, I'd like to proceed,

14   ask Mr. Hilliard about his opinions regarding database

15   damages in this case.

16             THE COURT:  All right.  You may do so.

17   BY MR. RECKERS:

18   Q.    So, Mr. Hilliard, you understand that we're at the

19   part of the trial where the defense will start putting on

20   its evidence regarding the damage questions in this case?

21   A.    Yes.

22   Q.    Okay.  And as part of that, you were asked to look

23   at some of these issues during discovery in this case;

24   correct?

25   A.    Yes, I was.

2612

1   Q.    Explain to the jury what your assignment was with

2   respect to the database damages questions.

3   A.    Yes.  I looked at the report of Ms. Dean, who

4   testified here I believe last week, and was asked to look

5   at the assumption -- the technical assumptions that she

6   used as a basis for some of her calculations, and to -- to

7   use my professional judgment as to whether those were

8   reasonable assumptions to use or not.

9   Q.    Can you be specific as to the technical assumptions

10  that you looked at?

11  A.    In particular, she had an opinion regarding the

12  number of database licenses that Rimini Street would have

13  had to have acquired from Oracle had it believed that a

14  database license was required and that it couldn't use

15  the -- its client's database licenses.

16  Q.    And just to give the jury a context to think about

17  this, are you familiar with the concept of a hypothetical

18  negotiation?

19  A.    Yes, I am.

20  Q.    And that's the type of analysis that Ms. Dean

21  presented for her database opinion?

22  A.    Yes.

23  Q.    So can you remind the jury or explain to the jury

24  what the hypothetical negotiation construct is?

25            MS. DUNN:  Objection, Your Honor.  This is not

1    in Mr. Hilliard's report.

2              MR. RECKERS:  Your Honor, he was responding to

3    the technical assumptions that Ms. Dean presented.  It's

4    directly on point.

5              THE COURT:  I will allow him to explain his

6    understanding of the hypothetical negotiation.

7              THE WITNESS:  As I understood what Ms. Dean

8    said, she said if Oracle and Rimini Street had agreed to

9    license the Oracle database software to Rimini Street in

10   2006, she hypothesized what the negotiation between Oracle

11   and Rimini Street would have been and what the result of

12   that would have been in terms of the number of licenses

13   that Rimini Street would have had to have paid for from

14   Oracle.

15   BY MR. RECKERS:

16   Q.    And do you recall what her conclusions were

17   generally?

18   A.    I believe -- yes, I do.

19              She said that, given her understanding, it would

20   have been 72 license fees for 72 copies of the license.

21   Q.    Do you recall what the basis for the number 72 was?

22   A.    I believe it was based on the fact that 72 copies of

23   the Oracle database were found on the Rimini servers by

24   Dr. Davis.

25   Q.    Do you agree with Ms. Davis -- I'm sorry, Ms. Dean's

2614

1    technical assumptions in that regard?

2    A.    I do not.

3    Q.    What is your opinion?

4    A.    My opinion is that only one, or perhaps two,

5    database licenses would have been required.

6    Q.    And what's your rationale for that opinion, sir?

7    A.    Well, I've actually done negotiations, and I'm

8    familiar with the capabilities of database software.

9           And the way database software is designed, and

10   this includes Oracle's database software, and its

11   competitors, Microsoft, IBM, Informix and others, is that

12   you can have one copy of the database software, and in

13   that -- and using that one copy, you can run several,

14   multiple, independent databases.

15          It's kind of like a cable TV subscription.  You

16   buy one cable TV subscription, and if you have two TVs, you

17   don't have to pay for a second subscription so that I can

18   watch football in one room and my wife can watch a movie in

19   the other room.  I pay for one cable TV subscription, and

20   that covers both, and if my kids have other TVs, and so

21   forth.

22   Q.    And do you have a demonstrative to explain your

23   opinion in this regard?

24   A.    Yes, I do.

25   Q.    And can you explain to the jury what's shown on the

2615

1    screen?

2    A.    Yes.  The screen illustrates a shared database

3    server where the copy of the database software would

4    reside, and it shows how that one server can, in fact,

5    serve multiple client environments and keep them separate

6    so they're all operating on a single server and -- and with

7    one database license.

8    Q.    Now, Mr. Hilliard, I believe you mentioned that

9    you've worked with clients in negotiating license

10   agreements; is that correct?

11   A.    That's correct.

12   Q.    Have you worked with clients in negotiating database

13   licenses?

14   A.    In many cases, yes.

15   Q.    And what is cost-effective licensing?

16          MS. DUNN:  Objection, Your Honor.  This is also

17   beyond the scope of the report.

18          MR. RECKERS:  Your Honor --

19          THE COURT:  I'll sustain it at this time.

20          MR. RECKERS:  Your Honor, I refer to page 61 of

21   the report.  I'm happy to pass it up.

22          THE COURT:  All right.  I do need a copy.

23          Do you have a particular portion of the page you

24   would like to direct my attention to?

25          MR. RECKERS:  Yes, Your Honor.  It's the last

2616

```
 1    paragraph of this first page and continues on to the next
 2    page, discusses ways to legitimately reduce the number of
 3    database, which, of course, is obviously a way to reduce
 4    the license fee.
 5              MS. DUNN:  Your Honor, this doesn't have to do
 6    with license fees or license terms.
 7              What Mr. Hilliard is talking about is about what
 8    technically could have been possible.  And I think he
 9    already testified to that.
10              THE COURT:  I'll sustain the objection.  But,
11    Mr. Reckers, my sense is that the subject matter is
12    essentially contained within the report that you're seeking
13    to develop, and I'll ask you to rephrase the question.
14              MR. RECKERS:  I absolutely can do so.
15    BY MR. RECKERS:
16    Q.    Mr. Hilliard, when you're working with clients, do
17    you look for ways to legitimately reduce the number of
18    licenses that they would need to purchase?
19    A.    Yes.
20    Q.    And how do you do that?
21    A.    We look at what is technically feasible.
22              We look at the basis on which the license fees
23    are calculated, whether it be a server basis or a user
24    basis, and whichever is the most advantageous or cost
25    effective would be what I would recommend.
```

2617

1    Q.    Okay.  And if you were working with Rimini Street at

2    the time of Ms. Dean's hypothetical negotiation in 2006,

3    what would you have recommended?

4    A.    I would have recommended that they set up a

5    configuration much like the one illustrated in the

6    illustration on the screen, and that since the database is

7    licensed on a server basis, that one license would be all

8    that was necessary.

9          Perhaps as they grew if, for throughput reasons,

10   they needed a separate server, an additional server, they

11   might have to get a second license for the second server.

12   Q.    All right.  So as we wrap up, can you provide the

13   jury your final conclusion regarding the database damage

14   questions that you addressed?

15   A.    Yes.  My conclusion was that the basis that Ms. Dean

16   used for her calculation of the cost -- of what the cost of

17   the databases would be to Rimini was based on a false

18   assumption, the assumption that it would require 72

19   licenses rather than one or, at the outside, perhaps two.

20             MR. RECKERS:  Thank you.

21             No further questions, Your Honor.

22             THE COURT:  All right.

23             Cross-examination?

24

25

                                                                    2618

1                            CROSS-EXAMINATION

2      BY MS. DUNN:

3       Q.    Good morning, Mr. Hilliard.  My name is Karen Dunn.

4      I'm an attorney for Oracle, and I'm just going to ask you a

5      few questions today.

6       A.    Good morning, Ms. Dunn.

7       Q.    So you talked a great deal -- much of your

8      testimony, actually, was about your consulting work, is

9      that right, just now?

10      A.    Yes.

11      Q.    But, actually, you spend about 80 percent of your

12     time doing litigation work; is that right?

13      A.    I'm fortunate that over the period of time there's

14     been a demand for that, and so it does take up the majority

15     of my time now, yes.

16      Q.    Right.  And I know you wouldn't want the jury to get

17     the wrong idea.  So I just think it's good to make clear

18     your consulting work is a much smaller portion of what you

19     do; right?

20      A.    Over the 30 years that I've been a consultant, it's

21     been about half and half.

22      Q.    Yeah, I'm talking about right now.

23      A.    The majority is the expert work, yes.

24      Q.    Right.  And your website is

25     computerexpertwitness.com?

2619

1    A.    Yes, ma'am.

2    Q.    And as a consultant, your experience is generally

3    limited dealing with clients who use third-party support;

4    is that right?

5    A.    No; not necessarily.

6    Q.    Okay.  But you've only had one client who has been

7    deciding about third-party support, that was a JD Edwards

8    client?

9    A.    I'm sorry.  Could you say that a little more slowly?

10   I'm not sure I understood your question.

11   Q.    Perhaps you'll recall at your deposition you were

12   asked about any clients that you could remember who had

13   decided about third-party support, and you could name only

14   one client who had used JD Edwards some time around the

15   year 2000.

16        Do you recall that from your deposition?

17   A.    I don't believe I've stated an opinion related to

18   that.

19   Q.    Do you recall saying that at your deposition,

20   Mr. Hilliard?

21   A.    At the time I recall stating that, yes.

22   Q.    Okay.  Thank you.

23        So you spoke today about Oracle Database, and

24   your opinion is that only one or two licenses would be

25   needed for Rimini's use of Oracle Database; is that right?

1    A.    That's correct.

2    Q.    Okay.  And your opinion is that there's no technical

3    reason why Rimini would have needed to maintain individual

4    copies of the Oracle Database software if it licensed the

5    software directly from Oracle?

6    A.    That's part of it, yes, but not the entire reason.

7    Q.    Right.  But that part -- I'm reading actually right

8    from your report.  So you agree that that's your opinion,

9    that there's no technical reason?

10   A.    There is no technical reason.

11   Q.    Okay.  Your opinion is based on what's technically

12   possible, not on what Rimini actually did.

13   A.    Well, my opinion is based on what's technically

14   possible and also my experience as a computer contract

15   negotiator from both sides of the table, both from the

16   supplier's side, when I worked for computer companies, and

17   from the customer side working as a consultant.

18             MS. DUNN:  Your Honor, I would ask you to direct

19   the witness to answer the question.

20   BY MS. DUNN:

21   Q.    What I asked was that your opinion is based on what

22   was technically possible, not on what Rimini actually did.

23   A.    In part.

24   Q.    Mr. Hilliard, you're not testifying today about what

25   Rimini actually did on this specific issue, the only issue

2621

1    your testimony covered, Oracle Database; is that correct?

2    A.    That's correct.

3    Q.    All right.  So -- and you're not here to testify

4    about how Oracle licenses Oracle Database; right?

5    A.    That's correct.

6    Q.    Right.  And you're not here to interpret specific

7    license terms; right?

8    A.    That's correct.

9    Q.    And you're not here to talk about how Oracle decides

10   pricing; right?

11   A.    That's correct.

12   Q.    Okay.  So, in reality, you're aware that Rimini had

13   more than two copies of Oracle Database; right?

14   A.    I heard --

15   Q.    I'm sorry, I misspoke.

16         You're aware that Rimini had more than two

17   copies of Oracle Database?

18   A.    I heard Dr. Dean's testimony to that effect, and

19   I've read his report.

20   Q.    Okay.  It's also in the joint pretrial order if you

21   read that.  But we agree, Rimini had more than two copies

22   of Oracle Database; right?

23   A.    Yes.

24   Q.    Right.  And are you aware that Rimini has admitted

25   to at least 216 environments on its servers that contain

1    installed copies of Oracle Database?

2    A.    I'm not aware of that.

3    Q.    Okay.  Are you aware that Rimini produced at least

4    191 copies of copyrighted Oracle Database works to support

5    local environments on its computer systems?  Are you aware

6    of that?

7    A.    I'm not aware of the specific details.

8    Q.    Okay.  And in preparing your report, you were not

9    aware of them either; right?

10   A.    In preparing my report, I don't recall at this time

11   if I knew the exact numbers.  I had seen Dr. Dean's report,

12   so I was aware of what was in Dr. Dean's report.

13   Q.    Okay.  This is what your client has admitted to, and

14   you said you weren't aware today, so presumably you also

15   weren't aware when you prepared your report?

16   A.    I don't recall today.

17          I may have been aware at the time I prepared my

18   report because I had read Dr. Dean's -- Dr. Dean's report.

19   I don't know whether I was aware at the time of specific

20   admissions.  I don't recall.

21   Q.    Okay.  So you may have been aware then but not now?

22   A.    I --

23   Q.    It's possible.

24   A.    I don't -- I don't recall the details of that as we

25   sit here today.

2623

1    Q.    Okay.  Are you aware -- has anyone told you that the

2    Court has found that every single copy of those Oracle

3    Database software was copyright infringement?  Has anyone

4    told you that?

5    A.    I believe I read the court order to that effect,

6    yes.

7    Q.    And you've been here in court; right?  You've been

8    here for testimony generally?

9    A.    Most of it, but not all.

10   Q.    And you're aware that the Court has also found that

11   Rimini Street had no license for those copies?

12   A.    Oh, yes.

13   Q.    You're aware of that?

14   A.    Yes.

15   Q.    And you don't dispute that those copies were

16   associated with at least 72 customers?

17   A.    I don't know the exact number, but I don't have any

18   reason to dispute that number.

19   Q.    Okay.  That number is also in your report in the

20   paragraph that Mr. Reckers cited.

21   A.    Okay.

22           MS. DUNN:  Thank you very much.  We have no

23   other further questions.

24           THE COURT:  Okay.

25           Redirect examination?

2624

1           MR. RECKERS:  Your Honor, we have no further

2  questions either.

3           THE COURT:  All right.  Mr. Hilliard, that

4  concludes your testimony, and you may step down.  Thank

5  you.

6           THE WITNESS:  Thank you, Your Honor.

7           MR. STRAND:  Your Honor, at this time,

8  defendants call Mr. Douglas Zorn.

9           THE COURT:  All right.

10           COURTROOM ADMINISTRATOR:  Please raise your

11  right hand.

12           You do solemnly swear that the testimony you

13  shall give in the cause now before the Court shall be the

14  truth, the whole truth, and nothing but the truth, so help

15  you God?

16           THE WITNESS:  I do.

17           COURTROOM ADMINISTRATOR:  Please be seated.

18           Please state your name for the record and spell

19  your name for the record.

20           THE WITNESS:  Douglas Zorn; Z-o-r-n.

21           COURTROOM ADMINISTRATOR:  Please tell us your

22  city and state of residence.

23           THE WITNESS:  I live in Bonita Springs, Florida.

24

25

2625

1                          DOUGLAS ZORN

2                  called as a witness on behalf of the

3           Defendants, was examined and testified as follows:

4                         DIRECT EXAMINATION

5      BY MR. STRAND:

6      Q.    Good morning.

7      A.    Good morning.

8      Q.    Would you please introduce yourself to the jury.

9      A.    My name is Doug Zorn; Z-o-r-n.

10     Q.    And by whom are you employed, Mr. Zorn?

11     A.    I'm employed by Rimini Street, Incorporated.

12     Q.    And what is your title there at Rimini?

13     A.    I'm CFO.

14     Q.    When did you -- chief financial officer?

15     A.    Correct.

16     Q.    When did you start with Rimini?

17     A.    I started in, I believe, November of '07.

18     Q.    And what was your title when you started with

19     Rimini?

20     A.    It was CFO.

21     Q.    Have you been the CFO of Rimini continuously from

22     '07 up to today?

23     A.    No, I have not.

24     Q.    Can you explain why not.

25     A.    Well, I'm at the retirement age, and I'm trying to

2626

1    be retired.  I come back to help when they ask me.

2    Q.    So you've been CFO and not CFO in between a couple

3    times?

4    A.    Yes.

5    Q.    All right.  But you've kept up on what's going on at

6    Rimini over the years?

7    A.    I have.

8    Q.    As CFO for Rimini, can you describe to us what your

9    day-to-day responsibilities are, Mr. Zorn?

10   A.    I'm responsible for all the financial and accounting

11   functions of the company.

12   Q.    And do you own stock in the company, Mr. Zorn?

13   A.    I do.

14   Q.    How many shares?

15   A.    About 3.6 million shares.

16   Q.    And about what is that worth, do you estimate?

17   A.    About $4 million.

18   Q.    Okay.  Now, let's talk a little bit, if we could,

19   about your educational background.  Do you hold a college

20   degree?

21   A.    I do.  I have a bachelor's degree from Baldwin

22   Wallace College in Berea, Ohio, and MBA from Santa Clara

23   University in Santa Clara, California.

24   Q.    And your bachelor's degree, in what major area was

25   that?

2627

1      A.    In accounting.

2      Q.    Let's talk briefly about your professional

3   background.  We don't need to go into great detail, but

4   just kind of let people know who you are.

5            Can you give us a brief description of your

6   professional career from the time you graduated from

7   college up to today?

8      A.    Sure.  For the first two years, I worked in public

9   accounting and got my CPA license.

10           After that I worked with a number of large

11  corporations, including White Motor Corporation and Gould.

12           After that I spent the last 25 to 30 years of my

13  career in Silicon Valley doing startup companies.

14     Q.    Mr. Zorn, do you hold any professional

15  certifications?

16     A.    I am a certified public accountant.

17     Q.    When did you become a CPA, at the risk of

18  embarrassing you?

19     A.    In 1977.

20     Q.    Are you still a CPA, sir?

21     A.    I am.

22     Q.    Let's talk a little bit about something you just

23  mentioned: startups.  Can you tell us what you mean by

24  startup?

25     A.    A startup company is a company that starts anew with

1      a business plan and with an idea.

2      Q.    And how many startups did you work with or have you

3      worked with over the 25 to 30 years that you were working

4      with startups in Silicon Valley?

5      A.    About seven startups.

6      Q.    Again, at the risk of embarrassing you, how many of

7      those startups have been successful, by your definition?

8      A.    Probably all but one.

9      Q.    Well, pick one that was successful.  Let's not talk

10     about bad things this early in the morning.

11            Just picking one of those, just give us a brief

12     description of your experience with that -- with one

13     startup?

14     A.    Well, the first startup that I was with was a

15     company called Centigram Communications, and you probably

16     all know it because the technology that we developed is

17     your voicemail system on all your phones today, it's

18     PC-based voice messaging systems.

19     Q.    And how long did it take for Centigram to become

20     profitable?

21     A.    About 10 years.

22     Q.    Why so long?

23     A.    It was a startup.  We had a lot -- it's typical for

24     startups to take a number of years to get profitable.  You

25     have to build your product, you have to introduce it into

2629

```
 1    the market, you have to build the sales of that product,
 2    and it can take a while.
 3    Q.    And I assume that during that 10-year period losses
 4    were going up?
 5    A.    Yes.
 6    Q.    How does a startup company fund losses?
 7    A.    Usually through investment of either equity
 8    investment, where we sell shares, or through debt
 9    instruments, where people or groups loan you money.
10    Q.    So either sell shares or get loans?
11    A.    Correct.
12    Q.    All right.  Now, I'd like to shift to Rimini Street,
13    if I could, please, what we're here about today.
14          You said you started with Rimini in late 2007?
15    A.    Correct.
16    Q.    And at that time how would you characterize Rimini
17    Street's state of development?
18    A.    It was a startup company.
19    Q.    And we talked a little bit just a moment ago about
20    startup companies getting financing through loans or sales
21    of shares.  Are you familiar with how Rimini got financing
22    for its operations?
23    A.    Yes, I am.
24    Q.    Generally, just at a 10,000-foot level -- we can go
25    deeper if we want -- how did Rimini go about getting
```

2630

1    financing for its operations?

2    A.    Well, initially the financing was friends and

3    families of Seth Ravin.  A lot of the money came from Seth.

4    That was, I think, about two and a half million.  I think

5    two million was equity, and about a half a million was

6    debt.

7              After that, we funded the company through a few

8    different debt instruments.  One was a term loan for about

9    two million, and the other was through accounts receivable

10   financing.

11   Q.    And accounts receivable financing, explain, how does

12   that work?

13   A.    A financial institution or maybe a bank loans you

14   money against the accounts receivable that you have from

15   your customers.

16   Q.    All right.  Now, the friends and family financing,

17   how much money do you recall that Mr. Ravin put into the

18   company?

19   A.    I don't recall exactly, but he was the largest part

20   of it, the majority of it.

21   Q.    Now, going back to the timeframe ending in 2011, I

22   don't want to go beyond that, as of the end of 2011, what

23   was the debt and financing structure of Rimini?  Can you

24   help us understand that?

25   A.    We did raise $10 million of equity financing from a

                                                                2631

 1    group called Adam Street Partners, and we had a bank line

 2    that grew to $15 million.

 3    Q.    And the bank line, is that -- that's just a loan?

 4    A.    Yes.

 5    Q.    Secured by accounts receivable?

 6    A.    Yes.

 7    Q.    All right.  Now, equity financing, did that mean

 8    then that Rimini had to give shares to Adam Street Bank, to

 9    Adam Street --

10    A.    Partners, yes.

11    Q.    Adam Street Partners?

12    A.    Yes.

13    Q.    How many shares did Rimini provide to Adam Street in

14    exchange for that $10 million line?

15    A.    I don't remember the exact number of shares, but it

16    was equivalent to 20 percent of the equity of the company.

17    Q.    All right.  And I don't want to use a bad term, but

18    is Adam Street what one might commonly refer to as a

19    venture capitalist?

20    A.    Yes, they are.

21    Q.    And they operate in Silicon Valley there?

22    A.    Silicon Valley is one of the places they operate.

23    Q.    Now, you've used a term a couple of times, and I

24    meant to get back to it, is accounts receivable.

25              In your world, in Rimini's world, what is an

2632

1    account receivable?

2    A.    That -- when you have customers and you bill them

3    for your product or services, they -- you do that on an

4    invoice which is recorded as an account receivable, and

5    it's just money that's owed you from the customer.

6    Q.    So when I get my light bill every month, the light

7    company has an account receivable for money I owe them?

8    A.    Yes, they do.

9    Q.    Now, there's been some discussion in this case,

10   Mr. Zorn, about contract backlogs?

11   A.    Yes.

12   Q.    Do you know what I'm talking about there?

13   A.    Yes.

14   Q.    Just tell us what we are, so you and I are on the

15   same page.  What's a contract backlog?  What does that

16   mean?

17   A.    For Rimini Street, a contract backlog is the amount

18   of -- the total amount in the contracts that we sign with

19   customers less any invoicing that we've already sent to the

20   customers.

21   Q.    And how long do those contracts go out?  What's the

22   longest one, for example?

23   A.    Typically 15 years.

24   Q.    All right.  Now, is a contract backlog the same

25   thing as an account receivable in your world?

2633

1    A.    No, it's not.

2    Q.    Could you explain the difference, please.

3    A.    A backlog typically is not recorded on your

4  financial statements anywhere.  It is what we call off

5  balance sheet, and when you invoice the customer, that's

6  the first time it shows up on your financial statements.

7    Q.    And you'll agree with me, and in trials like this,

8  we always save the really exciting stuff for last; correct?

9    A.    Okay.

10   Q.    Let's talk a little bit about how Rimini's financing

11 rounds compared with your previous experience with the

12 other six startup companies.

13         Was Rimini's financing about the same as the

14 other companies you'd worked with?

15   A.    It was very typical.

16   Q.    So let's talk a little bit about what Rimini did.

17         As part of the financing rounds that we've just

18 talked about, did Rimini have occasion to prepare materials

19 in order to solicit financing either in the form of loans

20 or equity investment from companies that it approached?

21   A.    Yes, we did.

22   Q.    And, generally, what were those materials?

23   A.    Generally we would prepare an executive summary that

24 talked about the company.  We would have a presentation

25 that we would present before the investor, and we would

2634

1    have a financial model.

2    Q.   Okay.  Let's focus on the financial model.  Can you

3    tell us what a financial model is, Mr. Zorn?

4    A.   Yes.  A financial model usually starts with a

5    historical financial statement of some sort, and then it

6    projects the future of the company off of that based upon a

7    set of assumptions.

8    Q.   All right.  When you say historical financial

9    statement, what do you mean by that?

10   A.   It would include the balance sheet, the income

11   statement, and a cash flow.

12   Q.   Okay.  Let's drill down a little bit more.

13            As an individual human being, would my personal

14   historical financial statement be what I spent and what I

15   made last year?

16   A.   Your financial statement would be what you're worth,

17   and your income statement would be what you made and what

18   you paid out.

19   Q.   All right.  No more teaching on financial

20   statements.

21   A.   Okay.

22   Q.   What was the purpose of Rimini preparing a financial

23   model in connection with its seeking investments?

24   A.   Well, it's -- there were several reasons.

25            Every company will have a projection, a model.

2635

1    That's what you build to.  That tells you where you're

2    going in the future and how you're going to get there.

3              It would be also required if you were raising

4    funds either in a debt or equity set.

5    Q.    And Rimini prepared such a model, I think you said.

6    A.    Yes, we did.

7    Q.    Who prepared that?

8    A.    In the early days, I prepared it.

9    Q.    And what software did you use to prepare that model?

10   A.    That was done in Excel, Microsoft Excel.

11   Q.    Do you still use that Excel software for your

12   financial model?

13   A.    No, the model got so complicated that it

14   outstretched the ability of Excel to handle the model so we

15   had to buy a third-party modeling system.

16   Q.    You went further down than rows that Excel had and

17   further over in columns that Excel had?

18   A.    It actually got to the point where there was so much

19   data that it was so slow that it was hard to use.

20   Q.    Okay.  So you got a new system in place today?

21   A.    Correct.

22   Q.    And what's the name of that?

23              Let me ask it this way.  Is it an Oracle

24   product?

25   A.    No, it's not.

2636

```
 1    Q.    All right.  Now, so that Excel spreadsheet is very

 2    big, the one you had from '06 to '11?

 3    A.    Yes.

 4    Q.    Look with me, please, sir, in your book, let's not

 5    put it up yet, at Defendants' Exhibit 399.  It's in your

 6    book.

 7    A.    Okay.

 8          MR. STRAND:  I don't believe there's an

 9    objection to this, but I don't believe it's been admitted.

10    So if I'm correct on both accounts, I will move to admit it

11    at this time.

12          MS. DUNN:  You're correct.

13          MR. STRAND:  Something good happens every

14    morning.

15          All right.  Let's put Exhibit 399 --

16          THE COURT:  Is there any objection?

17          MS. DUNN:  There's no objection.

18          THE COURT:  It is admitted.

19       (Defendants' Exhibit 399 received into

20       evidence.)

21          MR. STRAND:  Let's put DTX 399 up on the screen,

22    please.

23          All right.  Now, let's go up at the very top,

24    Marie.  Just highlight the title.

25          THE WITNESS:  The first one is an income
```

2637

1    statement.

2    BY MR. STRAND:

3    Q.   All right.  So that's an income statement.  In just

4    layman's terms, what's an income statement, Mr. Zorn?

5    A.   An income statement has your revenues and your

6    expenses and the difference between those.

7    Q.   All right.  And about when was this income statement

8    prepared -- excuse me, this sample prepared?

9    A.   This was very early on, probably in 2007 or 2008.

10   Q.   All right.  So let's go down to the bottom and that

11   Non-GAAP.  Well, no, the net income.  I'm sorry, net income

12   and Non-GAAP.

13        So early on, what was Rimini projecting in terms

14   of income and ultimately net profits?

15   A.   In the early years, we were projecting losses, and

16   then by 2010 we would expect it to be profitable.

17   Q.   Did this model that we're looking at, this example

18   of the model, Defendants' Exhibit 399, did that make

19   certain assumptions about the growth of the company?

20   A.   Yes.  Your model is built on assumptions totally.

21   Q.   And what were the assumptions underlying this early

22   model?

23   A.   The assumptions here were we were looking to grow

24   the company as -- at a quick pace, but we were also looking

25   to get to profitability rather quickly.

2638

1    Q.    So can you have a growth model or a profitability

2    model?

3    A.    Yes, you can.

4    Q.    And how would you characterize this one?

5    A.    This was kind of splitting the difference.

6    Q.    Okay.  With a growth model what are you trying to

7    do?

8    A.    With a growth model you are looking at the revenue

9    side, the top line as opposed to the bottom line, and your

10   first and most assumptions would be built on your top line.

11   Q.    And if you're in a profit model, what are you doing?

12   A.    Profit model, you're looking at the bottom line,

13   and, that is, you're concentrating on making as much as you

14   can with the revenues that you have.

15         MR. STRAND:  Now, I'm going to jump out of

16   order, which I love to do.

17         Let's look at that slide.  We've been using a

18   lot of accounting terms, and I think it will help us to

19   reset a little bit on that if it's okay.

20         Can you get that up?  There you go.

21   BY MR. STRAND:

22   Q.    Did you help me prepare this slide?

23   A.    Yes, I did.

24   Q.    And, in fact, did you lead me through it by my hand

25   so I could understand it?

2639

1    A.    Yes, I did.

2    Q.    Now, let's -- let's see if I can ask some questions

3    that will help us all understand what we mean when we look

4    at these numbers.

5              Can you walk us through this accounting

6    system -- how the accounting system profit and loss works

7    for Rimini?

8              Let's start, though, with this.  Exhibit 399,

9    which we just looked at, basically has this same structure,

10   correct, sir?

11   A.    For the income statement, yes.

12   Q.    And it's a projection of what Rimini hopes or thinks

13   or projects might happen?

14   A.    Correct.

15   Q.    Based upon certain assumptions?

16   A.    Yes.

17   Q.    So help us walk through how Rimini's accounting

18   system works.

19   A.    This is a typical accounting system.  It's like this

20   for most companies.

21              Your top line is your revenue, and that's what

22   you're getting from your customers for your product or

23   service.

24              Then the cost of goods would be next.  This is

25   what it costs you to build that product or to provide that

2640

1    service.

2           The difference between those is called a gross

3    profit margin, and from that gross profit margin you have

4    your operating expense or SG and A.

5           S -- sales and marketing would be one of those.

6    That's how you get your revenue.  Those are people that are

7    necessary to build that top line.  And you also have your

8    administrative assistants, things like accountants and

9    financials and things that I do for the company.

10          When you subtract that from your gross profit

11   margin, you get your operating profit, and from the

12   operating profit you have other income and expense which

13   could be interest or things like that.  Usually it's not a

14   huge number.

15          And then you must also record your taxes.  And

16   then, after that, the last line is called your profit or

17   loss.

18   Q.    That's the net profit or loss?

19   A.    That's the net profit or loss.

20   Q.    And that's at the bottom of the page; correct?

21   A.    We refer to it as the bottom line.

22   Q.    All right.  So we've just learned how to get from

23   the top line to the bottom line?

24   A.    Correct.

25   Q.    All right.  Thank you.

2641

1           Now, early on, I believe you said Rimini

2    predicted profits during the first five years of its

3    business; correct?

4    A.    Yes we did.

5    Q.    Did you have occasion to change the assumptions

6    about Rimini's model over time?

7    A.    We did.

8    Q.    Why did you do that?

9    A.    It was decided by management and investors that we

10   would switch our focus to primarily top line growth.  We

11   believed that was the best way to bring value to the

12   company.  So we switched to concentrating at the top line,

13   and therefore the bottom line losses grew.

14   Q.    So you switched to more of a growth model and less

15   of a profits model?

16   A.    Yes.

17   Q.    All right.  Now, how did your experience in

18   preparing Rimini's financial model compare with your past

19   experience with startups?

20   A.    Very, very similar.

21   Q.    And in your initial model, the one we looked at,

22   Defendants' Exhibit 399, did you include assumptions

23   regarding the prices Rimini would charge for its services?

24   A.    Yes, we did.

25   Q.    And what were those assumptions?

2642

```
1    A.    The assumption was simply that we would charge 50

2    percent for our services of whatever the vendor was

3    charging the customer.

4              In the early days it excluded shelfware, but

5    today it doesn't.

6    Q.    All right.  Now, I want to shift focus just slightly

7    again.

8              When you came to Rimini there in late 2007, did

9    it have a formal accounting system?

10   A.    No, it did not.

11   Q.    What was it using for an accounting system?

12   A.    It was using QuickBooks, and QuickBooks was being

13   recorded by a nonaccountant.

14   Q.    So, as an accountant, you were thrilled; right?

15   A.    Yeah, very much.

16   Q.    Okay.  Ultimately, did Rimini implement an

17   accounting system?

18   A.    Yes, we brought in an accounting package called

19   Peachtree, which is a smaller accounting package, and we

20   took the source documents for the company since day one and

21   entered them into a real accounting package and created

22   financial statements for all those periods.

23   Q.    And who did that work?

24   A.    I did it.

25   Q.    Is having an accounting system important for a
```

2643

1   startup like Rimini?

2   A.     Very much so.

3   Q.     Why is that?

4   A.     Well, it's kind of the scorecard for the company.

5   It tells you whether you're attaining your plans or you're

6   running off the track.  It's really how it's -- it really

7   tells you how you're doing.

8   Q.     Now, when you set up Rimini's accounting system, did

9   you use something called generally accepted accounting

10  principles?

11  A.     Yes, we did.

12  Q.     And is that sometimes referred to as GAAP?

13  A.     Yes, it is.

14  Q.     What's GAAP?

15  A.     Well, GAAP is generally accepted accounting

16  principles.  What happens is the accounting profession gets

17  together and decides on a set of rules that are for use in

18  all companies.

19  Q.     And who uses GAAP?

20  A.     All the American companies, all US companies do.

21  Q.     From the big, big guys?

22  A.     Absolutely.

23  Q.     All the way to the little guys?

24  A.     All the way to the little guys.

25  Q.     When you set up an accounting system, or when you

2644

1    have an accounting system, from your perspective as a CPA,

2    what's the most important thing for it to do?

3    A.    To record all of the financial data accurately and

4    fairly.

5    Q.    Now, are you able to generate reports from the

6    Rimini accounting system that you've described?

7    A.    Yes, we are.

8    Q.    And what are those reports called?  Can you just

9    give us a for-example?

10   A.    They're financial statements.

11   Q.    Okay.  And then are there some other ones, income

12   statements, is that a report you can generate?

13   A.    It includes an income statement, a balance sheet, a

14   cash flow.

15   Q.    And what -- I think I didn't ask this.  What

16   accounting system does Rimini use on its accounting system,

17   what software?

18   A.    Today?

19   Q.    Yes.

20   A.    Today --

21   Q.    Well, no, 2006 through 2011.

22   A.    We used a package called Peachtree software.

23   Q.    That's not an Oracle product, is it?

24   A.    It is not.

25   Q.    All right.  Now, have you also -- have you generated

1    reports for the entire company?  Correct?

2    A.    Correct.

3    Q.    And you can also generate reports for individual

4    product lines; correct?

5    A.    We can, except the financial statements for the

6    company are automatic from the system with the product line

7    information and product line P and Ls, we have to go in and

8    pull the data out.

9    Q.    Now, I'm going to shift gears just a little bit

10   again.

11          Are you familiar with the notion of auditing a

12   company's financial statements?

13   A.    Yes, I am.

14   Q.    That's sometimes called a financial audit?

15   A.    It is.

16   Q.    Can you tell us what a financial audit is, Mr. Zorn?

17   A.    A financial audit is done by independent,

18   third-party certified public accountants.

19   Q.    So you say independent.  For example, do you do

20   Rimini's financial audit?

21   A.    No.  I would have a conflict of interest.

22   Q.    So you have to get somebody outside Rimini?

23   A.    Somebody unrelated to the company that is a CPA.

24   Q.    Now, some of us may be familiar with another type of

25   audit, an IRS tax audit.

2646

1    A.    Yes.

2    Q.    Is a financial audit the same as a tax audit?

3    A.    Not at all.

4    Q.    Can you tell us how the two are different?

5    A.    CPAs are looking to make sure that the company is

6    using GAAP to record its financial statements, that they're

7    prepared fairly and consistently from year to year.

8          And a financial -- or a tax audit is just trying

9    to find out if you paid the proper amount of tax.

10   Q.    All right.  Well, we won't go down that path any

11   further.

12         How does a company -- why does a company have an

13   audit done?

14   A.    Well, it's good business practice.  But the other

15   reason you do is a lot of the financial institutions,

16   investors, banks, require audited financials if they're

17   going to either invest in the company or loan to the

18   company.

19   Q.    Have you ever conducted, yourself, a financial

20   audit?

21   A.    Years ago, yes, I have.

22   Q.    Can you just give us a thumbnail sketch of how a

23   financial audit is conducted?

24   A.    A financial audit would have a test of transactions

25   where the accountants would choose a certain number of

2647

```
 1   transactions to look at that gave them -- that would give
 2   them comfort that all of the other transactions are
 3   correct.
 4           And then you also have a balance sheet audit
 5   where they go through and make sure that the value of the
 6   assets on the books are fairly stated and that the
 7   liabilities are fairly stated.
 8           And then they will look at the P and L to make
 9   sure that the P and L is consistent.
10   Q.   Sounds like a lot of work.
11   A.   It is.
12   Q.   Is it expensive?
13   A.   It's very expensive.
14   Q.   Now, when the auditors are doing their work, do they
15   look for instances where money's being syphoned off or
16   stolen?
17   A.   Oh, absolutely.
18   Q.   They're supposed to find that?
19   A.   Yes.
20   Q.   Now, ultimately, when the audit's completed, what is
21   the result of the audit?
22   A.   At the end of the audit, if you're past the audit,
23   you will get a clean opinion on your financial statements
24   that will tell any users, third-party users, that these
25   have been audited by a CPA firm.
```

2648

```
1    Q.    And clean opinion is kind of a term of art in the
2    financial world?
3    A.    Yes.
4    Q.    All right.  Have Rimini's books ever been audited by
5    independent accountants?
6    A.    Yes, they have.
7    Q.    In which years, between 2006 and 2011, were Rimini's
8    books audited?
9    A.    They were audited for every period.
10   Q.    And why was that?
11   A.    Well, it was good practice, plus we were in the --
12   and we knew we would be in the market for equity and loans,
13   so we wanted to have a head start on it.
14   Q.    Now, who were the independent accountants that
15   audited Rimini's books?
16   A.    Well, when we were smaller at the beginning, we had
17   a local company out of Walnut Creek, California, called BBR
18   do the audit, and as we got -- as we grew and got larger,
19   we brought in BDO Seidman to do the audits.
20   Q.    And can you tell us, who is BDO Seidman?
21   A.    BDO Seidman is one of the large accounting firms.
22   It's right below the Big Four.
23   Q.    And why did -- did it cost more for Rimini to do its
24   annual audits using BDO Seidman as opposed to the more
25   local company?
```

2649

1    A.    Yes, it did.

2    Q.    So why did Rimini make that switch?

3    A.    The more prestigious groups that you have auditing

4    your books, the better it is in -- for use by third

5    parties.  They feel more comfortable.

6    Q.    Okay.  If I -- if you could, please, sir, would you

7    look with me -- we'll work backwards.  Let's start with

8    Defendants' Exhibit 3006.  It's in the book in front of

9    you.

10   A.    Okay.

11   Q.    Can you tell us what that is.

12             Don't put it up yet.

13             Okay.  Go ahead.

14   A.    That is an audited financial statement.

15             MR. STRAND:  And I'm going for two in a row.

16             I believe it's not objected to, and it's not

17   admitted, so I would seek the admission of Defendants'

18   Exhibit 3006.

19             MS. DUNN:  No objection.

20             MR. STRAND:  Your Honor, I move that admission.

21             THE COURT:  It is admitted.

22        (Defendants' Exhibit 3006 received into

23        evidence.)

24             MR. STRAND:  Thank you.  Let's put it up on the

25   screen.

```
1    BY MR. STRAND:

2    Q.   Can you tell the jury what this is that we're

3    looking at, Defendants' Exhibit 3006.

4    A.   Yes, this is an audited financial statement by BDO

5    Seidman for Rimini Street for the years 2010 and 2011.

6    Q.   And was that a clean opinion?

7    A.   Yes, it was.

8         MR. STRAND:  Let's look at Defendants'

9    Exhibit 3005.  And I believe that's not admitted, and I

10   believe it's not objected to, so I move the admission of

11   that exhibit.

12        MS. DUNN:  No objection.

13        THE COURT:  It's admitted.

14        (Defendants' Exhibit 3005 received into

15        evidence.)

16        MR. STRAND:  Could you put that up, please.

17   BY MR. STRAND:

18   Q.   Could you tell us what Defendants' Exhibit 3005 is,

19   sir?

20   A.   It is another audited statement of Rimini Street by

21   BDO Seidman for the years 2008 and 2009.

22   Q.   And was that a clean opinion?

23   A.   Yes, it was.

24        MR. STRAND:  Now, let's look at Defendants'

25   Exhibit 97.  Let's not put it up yet.
```

2651

1   BY MR. STRAND:

2   Q.    Can you tell us what -- do you have that in front of

3   you?

4   A.    Yes.

5   Q.    Can you just tell us what Defendants' Exhibit 97 is?

6   A.    This is another audited financial statement for the

7   years 2007, 2006 for Rimini Street, and it was performed by

8   BBR.

9           MR. STRAND:  I believe there were some

10  objections to that, but I will move the admission of it or

11  lay a foundation if you wish.

12          MS. DUNN:  No objection.

13          THE COURT:  It's admitted.

14      (Defendants' Exhibit 97 received into

15      evidence.)

16  BY MR. STRAND:

17  Q.    We won't go into detail on those, but was that also

18  a clean opinion from BBR for the 2006, 2007 time period?

19  A.    Yes, it was.

20  Q.    Now, were there ever any unresolved criticisms by

21  the auditors at the time of the audited financial

22  statements?

23  A.    In the accounting world, it's called disputes.  We

24  had no disputes at any time with our accountants.

25  Q.    Now, are financial statements sometimes restated?

2652

1    A.    They are.

2    Q.    In a nutshell, what does that mean, sir?

3    A.    Restated means an audited financial statement that

4  was presented in one period would be restated as to the

5  dollar amounts in those statements for some reason.

6    Q.    And were Rimini's financial statements ever

7  restated, sir?

8    A.    Yes, they were.

9    Q.    And can you tell us why?

10   A.    The restatement was associated with the valuing of a

11 derivative which happened to be, in this case, warrants.

12         And the value that we used when we were being

13 audited by BBR was in dispute by BDO when they began the

14 audit.  So the argument was between the two accountants,

15 and we decided that we would go with the opinion of BDO

16 because it was more conservative.

17   Q.    And is the valuing of derivatives a matter well

18 settled within the accounting community, based upon your

19 experience?

20   A.    It's been one of the least understood methodologies

21 in accounting.  It is often referred to as, you know, the

22 full employment act for accountants.

23   Q.    All right.  Now, was the restatement as a result of

24 any misconduct or wrongful conduct by Rimini?

25   A.    No, it was between the two auditors.

2653

1    Q.    And when the account -- when the statement -- when

2    the financial statements were restated, was there any

3    difference in the Rimini's profitability over time?

4    A.    In different periods the income of the company

5    sometimes increased, or the losses decreased, and, in some

6    cases, the losses got larger.

7    Q.    Okay.  Now, I'm going to shift gears one more time

8    to the books of account.

9          You mentioned that Rimini has significant

10   accounting records and books; correct?

11   A.    Correct.

12   Q.    Those are all maintained digitally?

13   A.    Yes, they are.

14   Q.    And are they voluminous?

15   A.    They are.

16   Q.    Were they produced to Oracle in this case?

17   A.    They were.

18   Q.    And based on Rimini's books of accounts, have you

19   created a summary of Rimini's profits and losses for the

20   entire business period from 2006 through February of 2012

21   for the entire company?

22   A.    Yes, we have.

23          MR. STRAND:  I move the admission of Defendants'

24   Exhibit 3019.

25          MS. DUNN:  No objection.

2654

1                THE COURT:  It's admitted.

2           (Defendants' Exhibit 3019 received into

3           evidence.)

4                MR. STRAND:  Let's put that up.

5      BY MR. STRAND:

6      Q.    And this one we can see on the top it's the Rimini

7      Street income statement for the time period January of '06

8      through February of 2012 -- 2014; correct?

9      A.    That's correct.

10     Q.    Let's look down at the bottom line that you just

11     taught us about.

12     A.    Yes.

13     Q.    And we won't go through each year, but let's go over

14     to the far right-hand column and blow that up.

15                For that entire time period, has Rimini Street

16     had a net profit or a net loss on its operations?

17     A.    We've had a net loss of 63 million.

18     Q.    Were you also -- did you also prepare for us, assist

19     in preparing for us, a summary of Rimini's income statement

20     for the three product lines at issue in this case?

21     A.    We have.

22     Q.    Without putting it up, would you please look with me

23     at Defendants' Exhibit 3018, Mr. Zorn.

24     A.    Okay.

25     Q.    Is that the summary that you just described?

2655

1     A.    Yes, it is.

2     Q.    For the three product lines in this case?

3     A.    Correct.

4           MR. STRAND:  I move the admission of Defendants'

5     Exhibit 3018.

6           MS. DUNN:  No objection.

7           THE COURT:  It's admitted.

8           (Defendants' Exhibit 3018 received into

9           evidence.)

10          MR. STRAND:  Let's put that up on the screen, if

11    we could, please.  So let's go up to the caption, Marie.

12    BY MR. STRAND:

13    Q.    So this is an income statement -- can that also be

14    called a profit and loss statement?

15    A.    Yes, it often is.

16    Q.    Okay.  So that's an income statement for PeopleSoft,

17    Siebel, and JDE only for Rimini; correct?

18    A.    Correct.

19    Q.    For the time period that we're interested in this

20    case?

21    A.    Correct.

22    Q.    All right.  Let's look down at the bottom line

23    again, and let's just go to that far right-hand corner.

24          So for the entire time period from 2006 through

25    early 2014, has Rimini experienced a profit or a loss on

2656

1    its operations from the three product lines at issue in

2    this case?

3    A.    We had a 23-and-a-half-million-dollar loss for those

4    three product lines.

5    Q.    Even though you projected that you were going to be

6    profitable after five years?

7    A.    That was a very early projection.

8    Q.    Okay.  Now, it's been -- well, let's just look at

9    the bottom line across the -- the line across -- the row

10   across on the profitability.

11          There's been some years where Rimini actually

12   experienced a profit; correct?

13   A.    That's correct.

14   Q.    And what two years were those?

15   A.    That would be 2012, 2013.

16   Q.    In your experience in dealing with startup

17   companies, is it normal for a company to have this type of

18   losses over an 8-year period of time?

19   A.    Yes, it's very common.

20   Q.    And why is that again, sir?

21   A.    Because you have losses while you're building a

22   business.  It is just the nature of it.

23   Q.    Now, let's look back at Defendants' Exhibit 399 for

24   just a moment.  You'll recall that that's the early-on

25   projection; right?

2657

1    A.    These were projections that were done early, yes.

2    Q.    And it projected a 44 percent profit margin by 2011;

3    correct?

4    A.    It did.

5    Q.    And then let's look back at what we just looked at a

6    minute ago, Exhibit 319.  And this is for the whole

7    company; right?

8    A.    That's correct.

9    Q.    And 319, the actual profit or loss for the company

10   in 2011 was how much?

11   A.    In 2011, it was about 12.2 million.

12   Q.    Okay.  Now, have you prepared a demonstrative slide

13   so we can get all those numbers in our mind?

14   A.    Yes.

15         MR. STRAND:  All right.  Let's put that other

16   demonstrative up, if we could, please, Marie.

17   BY MR. STRAND:

18   Q.    All right.  So this is what we just went through.

19   You had projected revenues and profits in 2011; correct?

20   A.    Correct.

21   Q.    And then you had an actual loss of $12.2 million;

22   correct?

23   A.    That's correct.

24   Q.    Now, why did that happen?

25   A.    The assumptions under which we ran the business

2658

1    changed.  There were several differences that happened

2    during that period of time.

3    Q.    And what were the -- give me the top two or three

4    biggest differences in what happened during that period of

5    time?

6    A.    One, we -- as a company, this is the period when we

7    decided that we were going to focus on the top line on the

8    revenue side and not on the profits of the company, and it

9    was also a very large change because of this lawsuit from

10   Oracle.

11   Q.    Okay.  What happened because of the lawsuit?

12   A.    Our growth rate was --

13            MS. DUNN:  Objection, Your Honor.

14            MR. STRAND:  I'll withdraw the question, Your

15   Honor.

16   BY MR. STRAND:

17   Q.    Let's see.  Let's shift gears one more time.

18            As a part of the accounting system, do you and

19   your team keep track of the employee census, the number of

20   people that Oracle -- excuse me, Rimini employs?

21   A.    We do.

22   Q.    And why do you do that?

23   A.    Well, for a couple of reasons.  One is that we have

24   to record those expenses in the books, but the second one

25   is we have to pay them through a payroll.

2659

```
 1     Q.    And do you use any Oracle product in keeping track

 2   of the payroll and things like that?

 3     A.    Not at Rimini Street, no.

 4     Q.    So you don't use PeopleSoft or JD Edwards?

 5     A.    No, we do not use Oracle products.

 6     Q.    Now, during the course of this litigation, did

 7   Mr. Hampton ask you for some information regarding the

 8   Rimini employee census?

 9     A.    Yes, he did.

10     Q.    And what did he ask for, can you tell us?

11     A.    He asked for the employees by function and

12   department and by salary.

13     Q.    And for what time period?

14     A.    For the time period -- at that time I believe it was

15   through 2010.

16     Q.    Have you supplemented that since then?

17     A.    Yes.

18     Q.    And do you know why he asked for that?

19     A.    I believe it's because he was creating his own

20   financial model to come up with damages for this case.

21     Q.    Now, during the course of your discussions -- did

22   you meet with Mr. Hampton in person or just by the phone?

23     A.    Just phone.

24     Q.    All right.  During the course of those discussions,

25   did he ask you about anything that Rimini was doing in
```

2660

1    India?

2    A.    Yes, he did.

3    Q.    And at that time did Rimini have any contacts with

4    employees or contractors in India?

5    A.    We had contractors in India, yes.

6    Q.    And did you provide Mr. Hampton with the information

7    that he requested?

8    A.    I did.

9    Q.    Were you able to find everything he was looking for?

10   A.    I believe so.

11   Q.    And you gave it to him?

12   A.    I did.

13   Q.    All right.  Now, final change in focus, I promise.

14         Oracle challenges some of the business processes

15   that Rimini uses, and I'd like to ask you just briefly

16   about those.

17         During the time period from '07 to 2011, when

18   you were working as CFO for Rimini, were you familiar with

19   something called local hosting?

20   A.    Yes, I was.

21   Q.    Can you just give us your understanding of what

22   local hosting was?

23   A.    When we -- we sold to customers and -- PeopleSoft

24   and several product lines, we offered them two services.

25         One is they could -- we could maintain them

2661

1    remotely if they had their maintenance system running on

2    their own computers, or we would take that and put it into

3    our own datacenter.

4    Q.    And when you put it in your own datacenter, that was

5    local hosting?

6    A.    That was local hosting.

7    Q.    Now, from an accountant's perspective, from the

8    CFO's perspective, were there costs associated with locally

9    hosting software that Rimini incurred during that time

10   period?

11   A.    Yes, substantial costs.

12   Q.    And what were those costs related to, Mr. Zorn?

13   A.    We had to buy the equipment, which was fairly

14   expensive.  We had to rent hardened facilities.  We had to

15   have a backup's facility in another state in case of the

16   disaster.

17        So there were -- and we had to man that and

18   provide those services.  So there were labor costs as well.

19   Q.    All right.  During that time that we just talked

20   about, did Rimini also remotely host some client software?

21   A.    Yes, we did.

22   Q.    And were there costs from a financial perspective

23   associated with remotely hosting client software?

24   A.    Yes, there was.

25   Q.    What did those costs relate to, sir?

2662

1    A.    Those costs related to more of the onboarding

2    process and the -- and the archiving process for the

3    customer.

4    Q.    Now, comparing the remotely-hosted costs on one hand

5    and the locally-hosted costs on the other hand, from your

6    perspective as CFO, which was more expensive?

7    A.    The locally-hosted.

8    Q.    Now, have you ever heard of the term automated

9    downloads?

10   A.    I have.

11   Q.    Can you tell us what your understanding is of

12   automated downloads?

13   A.    Well, one of the procedures that the company has to

14   do for every new customer is they have licensed certain

15   software from Oracle, and we assess what that is, and then

16   we download it from the Oracle website for that customer.

17         And in the early days we did it with a software

18   that we built that would go out and match up what the

19   customer owned to what was in the Oracle library and then

20   pull it down for that customer.

21   Q.    Do you know if Rimini stopped that automated

22   downloading practice?

23   A.    Yes, they did.

24   Q.    Do you recall when?

25   A.    I believe it was -- it was early on, 2007.  I don't

2663

1    remember.

2    Q.    You're not sure?

3    A.    I'm not sure.

4    Q.    All right.  Well, we won't commit you to something

5    you're not sure of.

6              After Rimini stopped the automated downloads, as

7    CFO, did you notice an increase in the cost to Rimini to

8    provide its services to clients?

9    A.    Yes, there were -- there was some costs.  We had to

10   hire some additional employees.

11   Q.    Now, when Rimini developed the financial model that

12   we talked about early on, I believe you testified that

13   price was a part of that model; correct?

14   A.    Yes, it was.

15   Q.    And that price was 50 percent of the vendor price?

16   A.    Fifty percent of the vendor price.

17   Q.    Was Rimini able to charge that amount and project

18   that it would still make a net profit?

19   A.    Yes.

20   Q.    How was it able to do that?

21   A.    Well, based upon our cost structure, we believed

22   that we would be profitable as we built the number of

23   customers for a product line, would be built to a steady

24   state, if you will, we would be profitable based on the

25   amount of cost.

2664

1   Q.    Now, we talked about local hosting.  Did Rimini's

2   local hosting of customer software allow Rimini to charge

3   50 percent less for its services?

4   A.    No, it actually made it more difficult.

5   Q.    Let me ask about automated downloads.  Did automated

6   downloads allow Rimini to charge less for its services?

7   A.    It wasn't responsible.  It was slightly less

8   expensive, yes.

9   Q.    So put it this way.  Did Rimini's use of the

10  automated download process alone allow Rimini to charge 50

11  percent off?

12  A.    No.

13  Q.    Combining automated downloads and local hosting, if

14  you combine those two, was Rimini able to charge 50 percent

15  off just because of those two?

16  A.    That was not the reason.

17  Q.    Now, I want to ask you a slightly -- I keep shifting

18  gears, but one more question on this.

19          Based upon your experience in raising capital

20  for Rimini from 2006 through 2011, could Rimini have raised

21  up to $14 million in additional capital by selling

22  equity --

23          THE COURT REPORTER:  I'm sorry?

24          MR. STRAND:  Oh, I'm sorry, and I'm reading.

25  Let me start over again.

2665

1    BY MR. STRAND:

2    Q.      Based on your experience raising capital for

3    Rimini from 2006 through 2011 --

4    A.      Yes.

5    Q.      -- could Rimini have raised up to $14 million in

6    additional capital by selling equity or taking out loans?

7    A.      Yes.

8              MS. DUNN:  Objection, Your Honor.

9              MR. STRAND:  Grounds?

10             MS. DUNN:  This is -- the question is aimed at

11   getting at a hypothetical which goes beyond the facts of

12   this case.

13             I'm happy to have this conversation at sidebar.

14             THE COURT:  Let's do.

15        (Sidebar conference held as follows:)

16             THE COURT:  Bring me up to speed.

17             MS. DUNN:  What I suspect that Mr. Strand is

18   doing is he's trying to establish that money could be

19   raised to support a remote-only world, which is a

20   hypothetical world that did not exist in Mr. Zorn's

21   experience at Rimini Street.

22             And so he's asking this fact witness to opine on

23   something that he can't opine on based on his experience.

24             The questions he's already answered extend the

25   length of his experience, and that's that they don't go

1    beyond.  After that, it's purely hypothetical based on

2    something he has no experience with.

3                   And I'll also remind you that, not only the

4    remote environment is such as small portion of what Rimini

5    did during the time of the facts in this case, but also

6    we've already established that they were not remote in the

7    sense that they would have to be remote in a remote-only

8    world, and that Rimini did create updates in local

9    environments and then distribute them to customers.

10                  THE COURT:  Mr. Strand?

11                  MR. STRAND:  Yeah.  This is my final question.

12   I won't go beyond this.

13                  The question has to do with whether they could

14   have raised additional capital from 2006 through 2011 in

15   the amount of $14 million.

16                  We're not talking about environments.  We're not

17   talking about anything else.

18                  We have obviously established that this witness,

19   probably better than any other witness in the world, has

20   the ability to speak to whether that could have been done.

21                  So I've asked for a lay opinion on that from the

22   witness who has -- we've laid the foundation, he has the

23   knowledge, and he's going to answer yes or no.  And that

24   will be the end of the examination, Your Honor.

25                  THE COURT:  All right.  I will allow that

2667

1    question with that understanding.

2              MS. DUNN:  Thank you, Your Honor.

3         (Sidebar conference concluded.)

4    BY MR. STRAND:

5     Q.    Let me try the question again and not ask it too

6    fast.

7              Based on your experience raising capital for

8    Rimini Street between 2006 and 2011, could Rimini have

9    raised up to $14 million in additional capital by selling

10   equity or taking out loans?

11             And if you could answer, sir, just yes or no.

12    A.    Yes.

13             MR. STRAND:  Thank you.

14             I have no further questions.

15             THE COURT:  All right.

16             Cross-examination?

17                     CROSS-EXAMINATION

18   BY MS. DUNN:

19    Q.    Hi, Mr. Zorn.  My name is Karen Dunn.  I'm an

20   attorney for Oracle.

21    A.    Hello.

22    Q.    I'm going to ask you some questions today.

23    A.    All right.

24    Q.    But, first, I'm going to go get that white board

25   because sometimes for me with math it helps to write it.

2668

1          All right.  Mr. Zorn, so you're the CFO of

2   Rimini Street?

3   A.    That's correct.

4   Q.    So chief financial officer?

5   A.    Yes.

6   Q.    And you testified at a deposition in this case in

7   September of 2011; right?

8   A.    Yes, I did.

9   Q.    Okay.  And you testified as the corporate

10  representative for Rimini Street?

11  A.    Yes, I did.

12  Q.    Which meant that you could speak on a number of

13  topics.

14          So you talked about Rimini's financial goals,

15  its budget projections, internal financial processes,

16  however Rimini determines pricing and its equity ownership

17  structure?

18  A.    That's correct.

19  Q.    Does that sound basically right?  Okay.

20          Throughout its existence, is it fair to say that

21  substantially all of Rimini's revenue is derived from

22  support services?

23  A.    Correct.

24  Q.    And if I said that that was 97, 98 percent, that

25  would be correct; right?

2669

1    A.    Sounds about right.

2    Q.    Okay.  And are you aware that in 2007 Rimini made a

3    statement to investors that Rimini's business model focuses

4    exclusively on the most profitable component of the

5    software business, annual maintenance fees, without any of

6    the capital investment required to develop software?

7    A.    Yes, I'm familiar.

8    Q.    Okay.  And by capital investment, that means the

9    investment required to develop the software as opposed to

10   selling support for the software; right?

11   A.    That's correct.

12   Q.    Okay.  So basically this is the business model.

13   We're not going to develop our own software, other

14   companies like Oracle do that, we're going to sell support,

15   and that's the most profitable part.  Does that sound

16   basically right?

17   A.    That sounds right.

18   Q.    Okay.  Are you also aware that in 2007 Mr. Ravin

19   told investors that Rimini would offer -- could offer three

20   times or four times revenue return because it had

21   scalability closer to a software company than a consulting

22   company?

23         Have you seen that before?

24   A.    No, I did not, not that I recall.

25         MS. DUNN:  Okay.  I think actually it's worth

1    putting up.  Let's put up PTX 12.  This has been admitted.

2              THE COURT:  Dionna, are you on?  Is it on for

3    transmission?

4              COURTROOM ADMINISTRATOR:  Excuse me.

5    BY MS. DUNN:

6    Q.    Okay.  This is an email from Seth Ravin to Tom Shay,

7    and he's writing to an investor or potential investor whose

8    first name is Scott.  And he said,

9              "Last exit was four times revenue valuation, and

10   I expect three times to four times for same type of

11   business.  The one time to two times valuation is for

12   consulting businesses that are more hourly in nature with

13   less leverage and scaling than we are able to achieve.  We

14   see scalability closer to a software company than a

15   consulting company."

16             So Mr. Ravin designed the business model to have

17   the profitability of a software firm, not like a consulting

18   company, and that would be more profitable.  Is that fair?

19   A.    I've never seen this.  I don't know what his intent

20   was.

21   Q.    Okay.  But you understand that three times to four

22   times is -- of revenue valuation is more than one time to

23   two times; right?

24   A.    Oh, yes.

25   Q.    Okay.  And that Mr. Ravin is saying that one time to

2671

1    two times is more like a consulting company, but we're

2    going to be more like a software company, more profitable.

3    A.    That's what I understand it to mean.

4    Q.    Okay.  All right.  Mr. Ravin also testified during

5    trial that Rimini has a 50 percent margin on Oracle

6    products.  Is that your understanding as well?  And he's

7    talking there about gross margin.

8    A.    In the early years, that was kind of the figure that

9    we thought possible, yes.

10   Q.    Okay.  So he said that -- and I think for the jury

11   we should explain.

12         So gross margin is defined as the amount of

13   money that Rimini takes in on the contracts, subtracting

14   the actual cost that Rimini is calculating to deliver the

15   service.  So this is gross margin.

16   A.    Yes.

17   Q.    And that's something that he said in trial testimony

18   last week, or, at this point, maybe two weeks ago, I sort

19   of lost track.

20         In 2011, he said that these were the gross

21   profit margins specifically, 49 percent gross margin on

22   PeopleSoft, 70 percent margin on Siebel, and 50 percent

23   profit margin on -- 50 percent profit margin on JD Edwards.

24         Are you aware of that?

25   A.    They sound about right, yes.

2672

```
 1    Q.    Okay.  So PeopleSoft, 49 percent, Siebel, 70

 2    percent, and JD Edwards, 50 percent.

 3              So we all agree with that.

 4              All right.  So these are the -- this is what

 5    Mr. Ravin said in 2011.  Is that --

 6    A.    They sound right, yes.

 7    Q.    Okay.  So -- well, actually, before we do the next

 8    thing, I'm going to talk about what happens to this money,

 9    this is all the percentages earned on these Oracle

10    products.

11              Before we do that, I want to show you

12    Plaintiffs' Exhibits 5527.

13              MS. DUNN:  And I'm not seeking to admit this,

14    Mr. Strand, but I would like to show it to the witness, and

15    if you don't object, I would put it on the screen as a

16    demonstrative.

17              MR. STRAND:  Well, I was told it was an excerpt

18    from a document, and I haven't seen the document it's

19    excerpted from yet.  If I could see that, I probably don't

20    have an objection.

21              MS. DUNN:  So it's excerpted from Defendants'

22    Exhibit 3010, which is an enormous spreadsheet with

23    multiple tabs.  So this is the first three tabs of that

24    through the relevant years of 2014.

25              MR. STRAND:  Rather than get into a debate about
```

1    it, Your Honor, I'll let her show it as a demonstrative.  I

2    may or may not have an objection to its admissibility, but

3    I haven't seen the underlying document yet.

4              So if you want to show it as a demonstrative,

5    that's fine.

6              MS. DUNN:  We don't need to admit it.

7              THE COURT:  You may show it as a demonstrative.

8    BY MS. DUNN:

9    Q.    Okay.  So, Mr. Zorn, this is an excerpt of a

10   spreadsheet that was produced to Oracle in this litigation

11   by Rimini attorneys in September of 2015.  So that is less

12   than two weeks before this trial began.  That's just for

13   your background.

14             It shows financial information from PeopleSoft,

15   JD Edwards, and Siebel, and you can see actually that

16   there's a column for what we just discussed.

17             MR. STRAND:  Your Honor, could we get a question

18   and answer going rather than just testimony by counsel?

19             MS. DUNN:  Your Honor, these exhibits have a lot

20   of numbers and a lot of entries, and I think it's

21   important, both because the witness may not have seen this

22   before and the jury hasn't seen it before, certainly, to

23   understand what it actually is.

24             THE COURT:  All right.  I'll allow you to

25   summarize briefly for purposes of your question because the

2674

1   demonstrative does show a lot more than what you're

2   directing your questions to.

3              MS. DUNN:  It also helps Matt figure out where

4   to go.

5   BY MS. DUNN:

6   Q.    All right.  So this is just the first page you see

7   on the screen which is for PeopleSoft, and there's a line

8   for gross margin which is the concept we just discussed.

9              Okay.  So below gross margin, if we could blow

10  up everything between gross margin and net income, that

11  would be helpful.

12             So there's a line for gross margin, and then

13  there's a number of costs listed, and then at the bottom

14  there you see a line that says net income.

15             The line that says net income is red.  Does that

16  mean negative?

17  A.    It means loss, yes.

18  Q.    Okay.  All right.  So now I'd like to show you

19  Plaintiffs' Exhibits 5526, which may or may not -- I don't

20  know --

21             MR. STRAND:  Is that in the book, Counsel?

22             MS. DUNN:  Do you have 5526?

23             COURTROOM ADMINISTRATOR:  I don't think it is in

24  the book.

25             MR. STRAND:  This is just 56, Counsel.

1          (Discussion held off the record.)

2               THE COURT:  Actually, I'd like to see counsel

3     review these exhibits to see if there's any real dispute

4     concerning them, and it's a good time to take our first

5     break of the morning anyway.

6               So we'll take our morning break at this time,

7     ladies and gentlemen.  The admonitions about not discussing

8     the case and keeping an open mind all apply.  And we'll

9     reconvene in approximately 15, maybe 20 minutes, depending

10    on when you're ready.

11              You may step down.

12              COURTROOM ADMINISTRATOR:  Please rise.

13         (Recess from 9:45 a.m. until 10:11 a.m.)

14         (In the presence of the jury.)

15              THE COURT:  All right.  Have a seat, please.

16              I understand the snacks are appreciated.  And a

17    well-fed jury is a happy jury.

18              The record will show that the jury is present.

19    We're in open court.  The parties and counsel are present.

20              And we continue with the examination of Mr. Zorn

21    by Mr. Strand -- or, excuse me, cross-examination of

22    Mr. Zorn by Ms. Dunn.

23              MS. DUNN:  Sometimes we get confused between

24    ourselves.

25              Thank you, Your Honor.

2676

1    BY MS. DUNN:

2    Q.    So just to reorient us a second, Mr. Zorn, we were

3    looking at an excerpt of a spreadsheet with various numbers

4    on it, including gross margin, and then we had just

5    discussed that the numbers on this spreadsheet for net

6    income are all in red with parentheticals suggesting that

7    that means negative.

8    A.    That's correct.

9    Q.    So I'd like for you to look at Exhibit PTX 5526,

10   which hopefully we have --

11              COURTROOM ADMINISTRATOR:  It's not admitted.

12              MS. DUNN:  It's not admitted, but I would like

13   to show it to the witness.

14              MR. STRAND:  I have not yet seen it.

15              MS. DUNN:  Here's a copy for you.

16              MR. STRAND:  Thank you.

17              MS. DUNN:  Does the witness have a copy?

18              THE WITNESS:  I do.

19              MS. DUNN:  Great.  So take a look at that.

20              The one we just looked at before with the red

21   numbers was given to us two weeks before trial.

22              COURTROOM ADMINISTRATOR:  It shouldn't be up on

23   the screen, though, because it's not admitted.

24              MS. DUNN:  Okay.  Matt, take it down unless --

25   Peter, are you comfortable with us using this just as a

2677

1    demonstrative?

2              MR. STRAND:  Well, having just seen it 20

3    seconds ago, I'd like a little foundation.  I don't know

4    what the document is and where it came from.

5              MS. DUNN:  This document was produced in

6    discovery.  It's part of a spreadsheet produced to Oracle

7    in discovery by Rimini Street a year ago on August 29th,

8    2014.

9              MR. STRAND:  Your Honor, I'm used to proceeding

10   on a Q and A basis, and while I'm certain counsel is right,

11   why don't we ask the witness questions and let him have

12   answers, and we can go from there.

13             THE COURT:  Well, the fact is we have allowed

14   counsel to work with these demonstratives.  And I had hoped

15   that that would be worked out over the break.

16             So you're going to have to do some foundational

17   questions, Ms. Dunn.

18             MS. DUNN:  That's fine, Your Honor.

19   BY MS. DUNN:

20   Q.    Mr. Zorn, do you see on this Exhibit 5526 that it

21   has the same numbers for gross margin and for most other

22   things as the exhibit you just looked at previously?

23   A.    Yes, they do.

24   Q.    Okay.  And do you see, sir, that where it says net

25   income on this document, the document that was produced a

2678

1    year ago, that the numbers for net income are in black, not

2    in red?

3    A.    Yes, I do.

4    Q.    Okay.  So it seems like the document produced to us

5    two weeks before trial changes the net income to negative,

6    whereas the document produced from Rimini a year ago had

7    net income in positive.

8          Do you know why right before trial this document

9    was changed to reflect a negative net income?

10   A.    Yes, I do.

11         The -- I saw this document, 5526, that had been

12   produced, and -- and for the first time when I came back,

13   and it is in error.  And the new document, the one what had

14   the net losses, was done so as to show the correct losses

15   of the company.

16         These -- this document, 5526, is not complete.

17   Q.    Okay.  And did you make those changes?

18   A.    I didn't.  My financial analyst did.

19   Q.    Okay.  All right.  Along similar lines, your counsel

20   showed you Exhibit 3019.  And that should be in the exhibit

21   binder that he gave you.

22   A.    Yes.

23   Q.    Did you prepare this document?

24   A.    No, I did not personally prepare this.

25   Q.    Okay.  Who prepared this document?

2679

1    A.    I believe it was done by the same accounting FP&A

2    Group for Rimini Street.

3    Q.    Okay.  So somebody who works for Rimini Street, not

4    somebody who works for you?

5    A.    Somebody that works for me at Rimini Street, yes.

6    Q.    Like one of your staff?

7    A.    Probably.

8    Q.    Okay.  Same question with the preceding exhibit,

9    3018, because I think when Mr. Strand put the question to

10   you, he said this is an exhibit that you prepared, and I

11   just want to be clear about who prepared it.

12          Is this the same -- prepared by the same person

13   on your staff who prepared 3019?

14   A.    Yes, they prepared it under my direction.

15   Q.    Okay.  All right.  Thank you.

16          Okay.  So let's get back to what we have over

17   here, which are these percentages.  We already talked about

18   Rimini's gross margins for specifically PeopleSoft, Siebel,

19   and JD Edwards.

20   A.    Yes.

21   Q.    I'd like to talk to you a little bit about what

22   happens to the money that you're taking in.

23          In 2007, you're aware that Mr. Ravin made the

24   decision to pursue growth over profitability; right?

25   A.    It would have been in that timeframe.  It would have

2680

1    been late 2007.

2    Q.    And hopefully you can help me clarify for the jury

3    what that means.

4              It means the company has a choice when it takes

5    in money whether it keeps the money as profit or whether it

6    reinvests it in the business so that the business can grow.

7    Does that sound fair?

8    A.    In this case, we were looking at spending money that

9    we weren't -- weren't coming in from customers in order to

10   accelerate the revenue growth of the company.

11   Q.    Right.  But it's fair to say growth was chosen over

12   profitability to grow the business; right?

13   A.    That's correct.

14   Q.    Okay.  And that that was Mr. Ravin's decision?

15   A.    It was his final decision, yes.

16   Q.    And that's the strategy that Rimini continued to

17   pursue after that decision was made in 2007?

18   A.    Yes.

19   Q.    And you described it similar to the way you

20   described it now, which is spending always ahead with the

21   anticipation of revenues.

22   A.    That's correct.

23   Q.    You also said that the prospective investors you

24   speak to are satisfied with this?

25   A.    And they encouraged it, yes.

2681

1    Q.    Because they're concerned more with growth than with

2    profitability?

3    A.    That would be my understanding, yes.

4    Q.    Right.

5          Okay.  So this is the same strategy that

6    famously -- you know the company Amazon?

7    A.    I do.

8    Q.    So Amazon also famously pursues this strategy, they

9    prioritize the growth of the company over profitability;

10   right?

11   A.    I'm not knowledgeable about Amazon, but I do know

12   the company.

13   Q.    Yeah.  This is sort of our hallmark when it comes to

14   business model.  They're -- you know, they take in money,

15   and then they use it to grow their business, and nobody

16   doubts that they're successful.  You wouldn't doubt that;

17   right?

18   A.    Not at all.

19   Q.    Me neither.

20         All right.  So in pursuing the strategy of

21   growth over profitability, Rimini budgeted more for things

22   like personnel and marketing cost; is that accurate?

23   A.    Yes.

24   Q.    Okay.  And so let's talk about some of the

25   investments that Rimini was making over the years.

2682

1          So in 2009, Rimini started offering support

2     services for SAP customers.

3     A.    That's correct.

4     Q.    Okay.  And so some of the money that Rimini was

5     making for support on Oracle products was invested into

6     launching an offering for SAP products?

7     A.    We spent money on SAP products, yes.

8     Q.    Right.  But that money came from the support that

9     Rimini was offering for Oracle products; right?

10    A.    In part, yes.

11    Q.    In part.

12    A.    It did.

13    Q.    You had said that Rimini chose to invest in these

14    new product lines knowing that would bring down the overall

15    profitability of the company; right?

16    A.    That's correct.

17    Q.    Because it would grow the business?

18    A.    Yes.

19    Q.    So other product lines were invested in at this

20    time, Oracle's eBusiness Suite, which is a product line

21    we're not talking about in this case, but it's another

22    product line, so you started to invest in that; right?

23    A.    That's correct.

24    Q.    Okay.  You launched support of Oracle's database

25    software also in that same year?

2683

1    A.    Yes, sounds right.

2    Q.    Okay.  You launched support for Oracle's Hyperion

3    software in 2012?

4    A.    I believe so, yes.

5    Q.    And there was also support for Oracle's retail

6    products in 2013, another product line we're not talking

7    about in this case.

8    A.    That's correct.

9    Q.    Okay.  And then you expanded; right?

10            Rimini expanded in 2006, which actually is

11   pretty early on.  You expanded and opened an office in

12   Asia.  Does that sound right?

13   A.    We did, yes.

14   Q.    Okay.  And then, in 2010, you continued that

15   expansion in Europe, the Middle East, Africa, and various

16   Asia-Pacific regions.

17   A.    Correct.

18   Q.    So now when we talked about where this money is

19   getting invested, I want to talk to you about this concept

20   you discussed on direct which is the concept of backlog.

21   A.    Yes.

22   Q.    So this is pretty basic math, but I'm going to still

23   write it down.  I think this was made for a tall person.

24            All right.  So Rimini signs multiple-year

25   contracts with customers.  And I think on direct you said

2684

1    those contracts could be 15 years long; right?

2    A.    That's correct.

3    Q.    So if a customer signs a million-dollar-a-year

4    contract with Rimini Street, and we'll just do 10 years

5    because, frankly, it's easier, okay?

6              So if there's a million-dollar contract for 10

7    years, that is a $10-million contract; fair to say?

8    A.    Correct.

9    Q.    Right?  So the customer has signed for 10 million

10   years -- for $10 million.  And then let's say two years

11   elapse, so they paid -- and you've invoiced them for

12   $2 million?

13   A.    Correct.

14   Q.    Right?

15             So $8 million would be the backlog, the amount

16   that you signed the contract for with the customer but has

17   not yet been invoiced or paid?

18   A.    Correct.

19   Q.    Because these eight years have not yet happened?

20   A.    That's right.

21   Q.    All right.  So Matt hopefully is going to help me

22   with the next phase so I don't have to keep writing things

23   down.

24             But let's talk a little bit about backlog

25   between the years 2009 through 2014.

                                                              2685

1    A.    Okay.

2    Q.    If you'd turn in your book to Plaintiffs'

3    Exhibits 4897.

4    A.    Okay.

5    Q.    Okay.  I just want you to look at this.  I'm not

6    seeking to admit it.

7              So on page 9 of this exhibit, which is an

8    April 2009 presentation for a call with Adam Street

9    Partners, do you recognize that?

10   A.    Yes.

11   Q.    If you look at page 9, it says there's a robust

12   backlog of contracts of 100 million as of May 31st, 2009.

13   Do you see that?

14   A.    Yes, I do.

15             MS. DUNN:  Okay.  So, Your Honor, with your

16   permission, I would like -- rather than write it on the

17   white board, if Matt could put it up on the screen?

18             THE COURT:  Is there any objection?

19             MR. STRAND:  I'm not sure -- instead of writing

20   on the white board?  Yeah, that's fine.

21             MS. DUNN:  Thank you.  I'm happy to do that, but

22   this seems much easier.

23             THE COURT:  All right.

24   BY MS. DUNN:

25   Q.    Okay.  So -- okay.  So now if you look at

2686

```
 1    Plaintiffs' Exhibits 2398, this is a press release, a
 2    Rimini Street press release, from January of 2011
 3    describing the 2010 yearend financial results.  Do you
 4    recognize that?
 5    A.    Yes.
 6    Q.    And in the press release it says,
 7              "Sales booking backlog increased from 149
 8    million to 220 million, a 47 percent increase on a
 9    year-over-year basis."
10              So that means that Rimini Street had 220 million
11    in signed contract value for customers signed before
12    December 31st of 2010; is that right?
13    A.    That's correct.
14    Q.    Okay.  So let's put that number up there.
15              And as of December 31st, you would agree that
16    the majority of Rimini's revenues were from PeopleSoft,
17    Siebel, and JD Edwards customers; right?
18    A.    That would be right, yes.
19    Q.    Okay.  All right.  So if you turn now to Plaintiffs'
20    Exhibits 2419.
21    A.    Okay.
22    Q.    This is essentially the same thing from the next
23    year, a Rimini Street press release from January 11th of
24    2012, describing the 2011 yearend financial results.
25              This time it says, "For the fiscal year, sales
```

2687

1   bookings backlog increased from 220 million to 394 million,

2   a 79 percent increase on a year-over-year basis."

3            So that means 394 million in signed contract

4   value for customers signed before December of 2011; is that

5   right?

6   A.   That's correct.

7   Q.   And, again here, the majority of those revenues were

8   from Siebel, PeopleSoft, and JD Edwards customers; right?

9   A.   At this time, yes.

10  Q.   At this time.  Okay.

11           All right.  So let's look at Plaintiffs'

12  Exhibits 2440, which is the same thing from the next year,

13  a Rimini Street press release announcing the 2012 yearend

14  financial results, "Sales bookings backlog increased from

15  394 million to 558 million, a 41 percent increase on a

16  year-over-year basis."

17           Do you see that?

18  A.   Yes.

19  Q.   Okay.  So those are contracts signed before

20  December 31 for $558 million in contract value, and again

21  here, would you agree that the majority of revenues came

22  from PeopleSoft, JD Edwards, and Siebel customers?

23  A.   It would be hard to tell here, but it would be a

24  good portion of it, yes.

25  Q.   Okay.  All right.

2688

1          Just one more, Plaintiffs' Exhibits 2458, which

2     you'll recognize as the Rimini press release from 2013

3     announcing financial results halfway through 2013.

4          And here it says, "Sales bookings backlog

5     increased from 472 million to 753 million, a 60 percent

6     increase on a year-over-year basis."

7          So let's just put that up.

8     A.    Yes.

9     Q.    All right.  So last week at trial Mr. Ravin said

10    that these numbers, based on Rimini's signed contracts,

11    don't mean anything.  Are you aware that he said that?

12         MR. STRAND:  Objection, I believe it misstates

13    the record.  If you've got it, fine, but let's not

14    paraphrase.  I object on that basis.

15         THE COURT:  All right.  The objection is

16    sustained with the request that, Ms. Dunn, you quote the

17    language of the answer you're referring to, please.

18         MS. DUNN:  Okay.  It says, "So, yeah, that

19    amount doesn't mean anything on itself."  That's the whole

20    sentence.

21    BY MS. DUNN:

22    Q.    All of those numbers that we just talked about came

23    from Rimini Street's own press releases, and one of them

24    from a presentation to investors; right?

25    A.    That's correct.

2689

1    Q.    Okay.  So Rimini announces those numbers to the

2    press, and press releases aren't just for the press, the

3    market sees them, customers see them.  These are

4    announcements to the world about Rimini's business; right?

5    A.    They are.

6    Q.    Right.  And Rimini wants to show with those numbers

7    that the business is strong; right?

8    A.    Correct.

9    Q.    Okay.  And I assume that you'll agree with me that

10   Rimini wouldn't put meaningless numbers in those press

11   releases and in those statements to investors; right?

12   A.    I would not think so.

13   Q.    Okay.  And I assume, as the CFO of the company, you

14   would also agree with me that Rimini wouldn't put out a

15   financial metric to the market and to the press and to

16   customers unless it reflected the performance of the

17   business accurately?

18   A.    That's correct.

19   Q.    Okay.  All right.

20         So, in this case, as I think you know, we're

21   talking not just about Rimini's gains, but also about

22   Oracle's losses.  So I'd like to switch gears a little bit

23   and show you Plaintiffs' Exhibits 3, which I believe has

24   been admitted.

25         COURTROOM ADMINISTRATOR:  Yes.

2690

1          MS. DUNN:  Matt, if you could look at the part

2     of this is --

3     BY MS. DUNN:

4     Q.    Mr. Zorn, do you recognize it to be a first-round

5     investment funding opportunity summary put out by Rimini

6     Street in 2006?

7     A.    It appears to be.

8     Q.    And if you look down on the page or at the screen,

9     it says,

10          "For investors who are direct competitors of

11    Oracle or who otherwise benefit from Oracle customer loss,

12    Rimini Street separates Oracle from its acquired licensees,

13    denying Oracle recurring revenue and creating new

14    software/service sales opportunities in vulnerable

15    accounts."

16          And you agree with me that its acquired

17    licensees essentially means customers; right?

18    A.    It would be customers.

19    Q.    Right.  So would -- this statement from Rimini to

20    investors says that "Rimini Street separates Oracle from

21    its customers denying Oracle recurring revenue."

22          This was Rimini's business model.  Are you aware

23    of that?

24    A.    In the early days, all the customers were former

25    Oracle customers.

2691

1    Q.    Right.  So Rimini didn't just want to succeed, its

2    stated goal is to separate Oracle from its customers and to

3    deny Oracle revenue.  And this is something that it was

4    candid with about -- when it put together this presentation

5    to investors; is that right?

6    A.    That's what it says.

7    Q.    All right.  So Mr. Ravin also has said that while he

8    initially believed Rimini would take somewhere between 5

9    and 10 percent of Oracle's customer base, he later decided

10   it was closer to 25 percent of Oracle's customers base.  Do

11   you know that he made that statement?

12   A.    I did not.

13   Q.    You know, he even estimated that Rimini had the

14   potential to obtain $8 billion of Oracle's money, but at 50

15   percent, he explained, that would be 4 billion to Rimini.

16           Did you know of those comments?

17   A.    We -- we've never talked those numbers, no.

18   Q.    Okay.  And no one told you he said that before you

19   came here today?

20   A.    No.

21   Q.    Okay.  He even said that from the beginning his goal

22   had always been a billion dollars plus.  That's not

23   something you've heard?

24   A.    I've heard that.

25   Q.    What did you hear?

1    A.    I've heard that billion dollar plus would be good,

2    yes.

3    Q.    A billion dollars would be good; right?

4    A.    I would think so.

5    Q.    Okay.  So Mr. Ravin has told investors what he has

6    not been willing to say here to the jury, which is that he

7    wants to take billions of dollars from Oracle and separate

8    Oracle from its customers.  Is that something you're aware

9    of?

10         MR. STRAND:  Objection to the argumentative

11   nature of the question, Your Honor.

12         MS. DUNN:  That's okay.  I'll withdraw it.

13   BY MS. DUNN:

14   Q.    Mr. Zorn, you know Rimini Street does not have a

15   formal price list; right?

16   A.    I'm aware of that, yes.

17   Q.    And its pricing is just based on Oracle's pricing.

18   So you look at Oracle's price, and then you say, okay, we

19   take this price, 50 percent off that, that's our price?

20   A.    That's correct.

21   Q.    And Mr. Ravin is the one that makes the final

22   pricing decisions; is that right?

23   A.    Yes.

24   Q.    And you're aware that sometimes Rimini offers

25   customers less than 50 percent off?

2693

1     A.    Yes.

2     Q.    All right.  So let's -- can we agree that we would

3  call that a discount, that kind of deal?  Do you want to

4  call it a deal?

5     A.    Well, yes, there were times it was a discount, and

6  there were times when they were part of a pilot program.

7     Q.    All right.  Okay.  So, but for ease, are you

8  comfortable calling it a discount or a deal?

9     A.    I am.  I am.

10    Q.    All right.  So we can all talk about the same stuff?

11    A.    Sure.

12    Q.    All right.  So Rimini has given these kinds of

13  discounts to customers in exchange for references to new

14  customers on occasion?

15    A.    On occasion.

16    Q.    And, for example, there's one customer, Cowlitz

17  County, where Rimini charged only $100 a year for three

18  years because Cowlitz County gave Rimini a lot of

19  references; right?

20    A.    That's my understanding.  That was very early on.

21    Q.    Yeah.  And that's a -- you would agree, right,

22  that's a considerable discount?

23    A.    It was, yes.

24    Q.    Yeah.  Because when they were paying for a full

25  service, that was $40,000 a year?

2694

1    A.    That's about right, yeah.

2    Q.    So even I know that's a discount of $39,900 off.

3          So you're aware that there were others besides

4    Cowlitz that did this; right?

5    A.    Not as deep as that, but, yes, there were others.

6    Q.    Okay.  Do you think that Rimini and Cowlitz told

7    customers when Cowlitz was giving the reference, that they

8    were getting this dramatic discount to give the reference?

9    A.    I have no idea.  We weren't involved with the

10   customer reference, what they were saying.

11   Q.    You wouldn't know that?

12   A.    Wouldn't know that.

13   Q.    All right.  So I just want to ask you a few

14   follow-up questions based on things that your counsel asked

15   you specifically.

16         You talked about remote hosting and cost to

17   Rimini Street.  You wouldn't be familiar with the costs

18   specifically borne by the customers, would you?

19   A.    I'm not sure I follow that.

20   Q.    Well, so with remote hosting --

21   A.    Yes.

22   Q.    -- there's costs that the customers bear?

23   A.    Yes.

24   Q.    They buy their own servers, they buy their own

25   hardware, they administer the environments, they have their

1    own IT.  There's a very long list of things that they must

2    do.

3    A.    That's correct.

4    Q.    You're not aware specifically of the costs that the

5    customers bear; right?  You were just speaking about

6    Rimini's costs.

7    A.    That's correct.

8    Q.    Okay.  You talked about audits.  BDOC did some

9    audits for you all?

10   A.    Yes.

11   Q.    Those are not legal audits, just to be clear, those

12   are financial audits?

13   A.    Those are typical financial audits that most

14   companies do, yeah.

15   Q.    Right.  We would agree on that.  But not legal

16   audits because we're -- this is -- we're talking --

17   A.    Not for purpose of legal, no.

18   Q.    Okay.  So you also said that at some point you did

19   the finances for the company on Excel; is that right?

20   A.    We did the modeling for the company, and we did

21   financial records on Excel.

22   Q.    Okay.  And even though you can't remember the name

23   of the program that you moved to, it's some kind of

24   enterprise software; right?

25   A.    It's a -- yeah, it's an enterprise software

1   specifically for modeling.

2   Q.    Okay.  Do you know what company makes that?

3   A.    I'm not remembering sitting here.

4   Q.    Okay.  Does it make your life better?

5   A.    It actually has the horsepower to keep track of all

6   the different stuff, yeah.

7   Q.    Yeah, that sounds very helpful.

8         You also mentioned at the beginning of Rimini

9   Street there was friends and family financing?

10  A.    Yes.

11  Q.    When you say that, you're talking about just about

12  Mr. Ravin's brother; right?

13  A.    No, there were other -- others at that time who were

14  friends and family.  It was more than just family.  It was

15  friends and family.

16  Q.    When you say family, you're talking Mr. Ravin's

17  brother?

18  A.    Well, I know that he was one that invested, yeah.

19        MS. DUNN:  Okay.  I have no further questions at

20  this time.

21        THE COURT:  All right.

22        MS. DUNN:  Thank you, Mr. Zorn.

23        THE COURT:  Redirect examination, Mr. Strand?

24        MR. STRAND:  Thank you.  Just a couple of

25  questions.

1          Could you get up the slide that you all created?

2    Yeah.

3                        REDIRECT EXAMINATION

4    BY MR. STRAND:

5    Q.    This is the Rimini Street backlog you were

6    testifying about, Mr. Zorn?

7    A.    Yes.

8    Q.    Has Rimini received this money?

9    A.    We've received parts of it.

10   Q.    How much?

11   A.    I don't know sitting here exactly how much.

12   Q.    Anywhere near the total of all those dollars?

13   A.    No.  A lot of the contracts were 10 or 15 years, and

14   the customers could opt out and terminate the contracts,

15   you know, after any agreed upon period.

16   Q.    And what -- the termination clause, what typically

17   is the termination clause?  How long is a customer

18   obligated to pay money to Rimini, if you know?

19   A.    That will vary between one year and five years.

20   Q.    Now -- and I don't want to go into deep detail on

21   this because we've heard enough about accounting for one

22   morning.

23          If you will look with me, please, at Plaintiffs'

24   Exhibits 5526 and 5527.

25   A.    Okay.

2698

1    Q.    You got those in front of you?

2    A.    Yes.

3    Q.    I believe you testified earlier there was an error

4    in 5526?

5    A.    That's correct.

6    Q.    Who found the error?

7    A.    I did.

8    Q.    When did you find it?

9    A.    I found it when we were discussing this at your

10   offices a month ago maybe.

11   Q.    And when was the error made?

12   A.    I'm not sure.  I wasn't at the company when this was

13   produced.

14   Q.    You were trying to retire?

15   A.    I was.

16             MR. STRAND:  Which will teach you.

17             Thank you.  I have no further questions.

18             MS. DUNN:  No recross, Your Honor.

19             THE COURT:  All right.  Mr. Zorn, that will

20   complete your testimony.  You may step down.  Thank you.

21             MR. STRAND:  Okay.  We're going to call

22   Mr. Scott Hampton now, Your Honor.

23             COURTROOM ADMINISTRATOR:  Please raise your

24   right hand.

25             You do solemnly swear that the testimony you

1    shall give in the cause now before the Court shall be the

2    truth, the whole truth, and nothing but the truth, so help

3    you God?

4              THE WITNESS:  I do.

5              COURTROOM ADMINISTRATOR:  Please be seated.

6              Please state your name and spell your name for

7    the record.

8              THE WITNESS:  Scott Dean Hampton; H-a-m-p-t-o-n.

9              COURTROOM ADMINISTRATOR:  Please tell us your

10   city and state of residence.

11             THE WITNESS:  I live in Kaysville, Utah.

12             THE COURT:  Go ahead, please, Mr. Strand.

13             MR. STRAND:  Mr. Hampton, excuse me just a

14   moment.  I'm getting organized.

15             All set?

16             THE WITNESS:  Yes.

17             MR. STRAND:  May it please the Court?

18             THE COURT:  Go ahead, please, Mr. Strand.

19                     SCOTT DEAN HAMPTON

20              called as a witness on behalf of the

21        Defendants, was examined and testified as follows:

22                     DIRECT EXAMINATION

23   BY MR. STRAND:

24   Q.   Good morning.  Would you please introduce yourself

25   to the jury, sir.

1    A.    Yes.  As I said, my name is Scott Hampton.  I live

2    in Kaysville, Utah.

3    Q.    And why are you here with us today, Mr. Hampton?

4    A.    I was engaged a few years ago, I think actually it

5    was 2012, maybe '11.  I was asked to review Ms. Dean's

6    reports, or I guess it was a report at that time, and

7    review her findings and report back, write a report of my

8    own as well as make calculations of my own.

9    Q.    I'd like to review your educational and professional

10   background a little bit.  And why don't we bring up slide

11   2.

12         Can you tell us a little bit about your

13   educational background, Mr. Hampton?

14   A.    Yes, I can.  I graduated from the University of

15   Utah, David Eccles School of Business, in 1986 with a

16   bachelor's degree.

17         I then went to work for KPMG Peat Marwick, one

18   of the Big Four, it was the Big Eight at that time,

19   national accounting firms.

20         I did audit work for a couple of years.  Then I

21   was invited or asked to join their consulting group, and --

22   would you like me just to go on through --

23   Q.    I don't want to garner an objection.  So I'll say

24   what did you do next?

25   A.    All right.  Thank you.

1              So I did audit for a couple of years in Salt

2    Lake City.  And then I was invited to join their forensic

3    or investigative accounting group, and I did that, I joined

4    that group, and that was a group of 15 people.

5              And most of the work that I did was outside of

6    Salt Lake.  I spent a year in Las Vegas calculating damages

7    arising from the Michael Spinks fight that didn't occur at

8    the Las Vegas Hilton, Hilton had a breach of contract

9    claim, and it was a large litigation, so I actually lived

10   in Las Vegas most of one year.

11   Q.    Did you live in any other exciting places during the

12   course of your professional career?

13   A.    I've enjoyed it a great deal.

14             I also worked quite extensively in Portland on

15   another large case dealing with a coal fire plant,

16   electrical plant, that had a breach of contract with its

17   coal supplier.

18             So most of what I did during that period of time

19   was large litigation in the western United States.

20   Q.    And then what was your next professional employment?

21   A.    In about 1989, after I married in '88, my wife

22   wanted to live in Seattle, so we moved to Seattle.  And I

23   was recruited by Arthur Andersen & Company.

24             This was about the time of the Exxon oil spill.

25   And so they were looking for investigative accountants, and

1    so I took a position.  I changed from KPMG to Arthur

2    Andersen & Company, and actually worked on the Exxon Valdez

3    oil spill the first year in Anchorage.

4                I actually lived in Anchorage and worked

5    directly with the fish processors and the fishermen and the

6    tender boats, helping them to calculate the amount that

7    they would have earned had they been able to fish that

8    year, and then processing payment to them for their claims.

9    Q.    Now, what did you do after working for Arthur

10   Andersen & Company, sir?

11   A.    After the Exxon Valdez oil spill litigation ended

12   quite abruptly, I did litigation consulting in Seattle.

13   And at that time I did, again, large litigation, large

14   claims.

15                I also did some consulting work with regards to

16   proficiencies and management.  So everything I did wasn't

17   related exclusively to investigative accounting.  I was

18   also doing consulting work at that time.

19                I did that for a few years.  And in 1994 I

20   wanted to specialize my efforts in the area of copyrights

21   and patents and trademarks, and Seattle was a very good

22   place to practice in that area.

23                So I couldn't do that at Arthur Andersen, they

24   already had people doing it, so I decided to leave.  And so

25   in 1994 I left public accounting after eight years and

1    started my own practice.

2    Q.    And what's that called?

3    A.    At that time it was Hampton Consulting.  It's now

4    Hampton IP & Economic Consulting.

5              But I started on my own in Seattle.  I

6    affiliated with a group from Los Angeles for a few years,

7    until about 1997.

8              While I was in Seattle, I presented damage

9    calculations for law firms, I presented at the bar

10    association, so I was starting to develop expertise in

11    intellectual property.

12              Around 1997 my wife and I decided we wanted to

13    move back to Utah, we got little tired of the rain,

14    although we liked Seattle a great deal, but I came back and

15    moved to Utah and started a practice there.

16              It was quite remarkable that the connections I

17    made in Seattle allowed me to develop a national practice

18    just because people move around.  So I have a national

19    practice.

20              Most of the work that I do comes off of the East

21    Coast, and so I spend part of my time in Washington, DC.  I

22    have an office there as well.

23              And it's going on too long.  I don't want to

24    raise an objection.

25    Q.    Let's shift gears for just a second.  Are you a CPA,

2704

1    sir?

2    A.    I am.

3    Q.    And let's look at the next slide.  What is -- what

4    is a CPA?

5    A.    A CPA is an accountant that's been certified and

6    licensed, licensed by the state and certified by a national

7    organization as well as state societies.

8    Q.    And are there certain ethical codes or principles

9    that you need to abide by?

10   A.    Well, you have to have a minimum education

11   requirement, and you have to work for a CPA for a number of

12   years, and then you have a three-day exam, very rigorous

13   examination you have to pass, and then you have continuing

14   education.

15            There's also the code of professional conduct

16   for certified public accountants which is an ethical code

17   that ensures that accountants present financial information

18   in a credible way that's subjective and pretty much

19   acknowledges the responsibility that accountants have to

20   the public to fairly present financial information.

21   Q.    And in performing your services in connection with

22   this case, have you been obligated to adhere to those

23   codes?

24   A.    Yes, I have.

25   Q.    And have you?

```
 1    A.    I did, yes.
 2    Q.    Okay.  And these codes are here on slides 3 and 4.
 3    They're in the kind of tear-out sections.
 4    A.    Yes.  That's part of the code of professional
 5    conduct that the AICPA creates.
 6    Q.    Have you analyzed copyright damages before today,
 7    before this case, Mr. Hampton?
 8    A.    I have.
 9          I've chaired the litigation committee for the
10    state society in Utah.  I also chaired the licensing
11    executive society's chapter in Utah.
12          I've been practicing in the area of intellectual
13    property since about 1994 when I left Arthur Andersen, and
14    in that time, I've done well over 180 intellectual property
15    related cases, and more than 45 of those deal with
16    copyrights.
17    Q.    So based on that experience, have you -- are you
18    aware of the methodologies and techniques of -- used in
19    analyzing the types of damages that we have in this case?
20    A.    Yes, I am.
21    Q.    And have you applied those methodologies and relied
22    on your experience in analyzing damages in this case?
23    A.    Yes, I have.
24          MR. STRAND:  Your Honor, may we proceed with
25    Mr. Hampton's expert testimony?
```

1          THE COURT:  You may.

2    BY MR. STRAND:

3      Q.    Now, what were you asked to do in this case,

4    Mr. Hampton?

5      A.    I was asked to review Ms. Dean's reports, as I

6    mentioned to you, and other information in the record, and

7    then write a report of my own responding to Ms. Dean's

8    calculation, and in that report also calculate what I think

9    is the amount that would compensate Oracle for the wrongful

10   acts that have been alleged, the misconduct that is

11   alleged.

12     Q.    Now, have you completed your assignment?

13     A.    Yes, I have.

14     Q.    Okay.  In a nutshell -- we're going to go into this

15   in detail, but, in a nutshell, can you summarize your

16   opinions for us.

17     A.    Yes, I can.

18          Based on my examination of Ms. Dean's report, I

19   think she's seriously overestimated -- her calculated

20   damages are too high because of some serious flaws in her

21   methodology.

22          I think the database damages range in the area

23   of $100,000 to 3 million.

24          I don't see that there's lost profits directly

25   associated with the wrongful acts, so I don't think that

2707

1    Oracle actually lost any clients or lost profit because of

2    the infringement or from the interference.

3              I've calculated damages based on the value or

4    the benefit that Rimini Street gained from its wrongful

5    acts, which is about $9.3 million.

6    Q.    Now, over the next little bit we'll spend some time

7    going into those.

8              Did you engage in a work plan or series of steps

9    to complete your assignment in this case to come to those

10   conclusions?

11   A.    Yes, I did.

12   Q.    Let's look at what the plan was.  So -- oh, here's a

13   summary.  I skipped ahead.

14              So is this a summary of your conclusions in a

15   chart?

16   A.    Yes, this is a schedule that more closely reflects

17   Ms. Dean's calculations and the way she presented them.

18   Q.    Okay.  But that same range of 9.4 to $17 million?

19   A.    Correct.

20   Q.    All right.  Now, let's go back to where I -- let's

21   go back to the work plan.  Did you develop a work plan?

22   A.    I did.

23   Q.    Can you just give us a brief overview of the steps

24   in that work plan?

25   A.    I familiarized myself with the issues, I read the

1    documents, then I analyzed the claims and what I thought

2    the damages were, then I responded in a report and

3    summarized my findings in that report.

4    Q.    Now, let's look at what -- what information did you

5    review, Mr. Hampton?

6    A.    Well, this is a large litigation, and I've been

7    involved in it since 2011 and 2012.  I think most of my

8    work was in -- started in 2012.  So it's been a few years

9    ago.

10              There's been a lot of documents produced.

11              I've read through the reports of Mr. Dean --

12    excuse me, Mr. Davis, as well as Ms. Dean.  I read over 50

13    depositions.

14              There were thousands of pages of documents that

15    have been provided by Rimini Street and Oracle in the

16    course of the litigation.  I had a chance to review those.

17              The pleadings and interrogatories and different

18    back and forth from the parties during the litigation I had

19    a chance to review, and I also did independent research of

20    my own.

21    Q.    Okay.  So you reviewed the record in the case?

22    A.    I reviewed the record, then I did independent

23    research, which was go out and look at documents that I

24    could find, as well as I had the opportunity to interview

25    people at Rimini Street.

1    Q.    Now, who selected what materials you would get to
2    review?
3    A.    Well, some of it just comes in the normal course,
4    like the complaint and the answer and the interrogatories
5    are generated as the case progresses and the attorneys are
6    exchanging information.  That comes to me.  I don't have to
7    ask for it.
8          I also identify information that I want to see,
9    and I make requests.  So some of the information I looked
10   at was something I actually requested.
11   Q.    And counsel provided that to you?
12   A.    Yes.
13   Q.    Did you get everything you asked for?
14   A.    I did.
15   Q.    And you had enough to complete your work in this
16   case?
17   A.    Yes.
18   Q.    Now, let's go to the next step of your analysis.  It
19   says you analyzed Oracle's alleged damages.  Can you tell
20   us what you did just generally?
21   A.    Just on a high level, I familiarized myself with the
22   claims that Oracle's making against Rimini Street and
23   looked at those in terms of what the appropriate remedy or
24   damage amount, damage calculation would be.
25   Q.    All right.  Well, let's look first at the remedies

2710

1   for copyright infringement.

2           What did you think about when you looked at the

3   remedies for copyright infringement?

4   A.    Well, first I tried to understand exactly what the

5   circumstances were of the actual infringement.

6           There's really an important distinction that I

7   had to make as to -- on the infringement, does this case

8   involve the actual sale of the copyrighted work, was Rimini

9   Street actually palming off or copying and selling the

10  software that Oracle owns, and I found that they hadn't.

11  Q.    Okay.  Go ahead.  Let's stop right there.

12          Did you find that Rimini was actually knocking

13  off and selling Oracle copyrighted software?

14  A.    I did not.  They are not selling software.

15  Q.    And what did you find?

16  A.    I found what Rimini sells is its services.  It has

17  an assembled workforce, which is probably its largest

18  asset, it's the people who do consulting work.  That's what

19  Rimini sells.  They don't sell software.

20          And the second bullet point on my slide here has

21  the direct/indirect.  That's the distinction that I had to

22  make.

23          Was this a direct infringement where they're

24  directly selling the software, palming it off, or is it one

25  in which they're selling another product but using also the

1    copyrighted work, and that's what I found.

2    Q.    And did you find this was indirect or direct

3    infringement?

4    A.    I found this was indirect.

5    Q.    All right.  So what types of remedies are available

6    in a situation where there's indirect infringement, based

7    upon your experience?

8    A.    Thank you.

9            There are a number of different ways you can

10   calculate damages for a copyright claim.  I think the most

11   appropriate to look at would be the lost profits, value of

12   use, which I hope I'll have a chance to explain a little

13   more, and also lost profits would be Oracle's -- anything

14   that Oracle lost.

15           The other side of that coin is how much did

16   Rimini make.  So that is the infringer's profit portion of

17   that slide.  Those are the types of damages that you can

18   calculate for this type of action.

19   Q.    So as you looked at all the materials in Ms. Dean's

20   reports, these are the types of methodologies and practices

21   that you had in mind; is that correct?

22   A.    After I had reviewed the record, looked at the

23   pleadings, and understood the case, I pursued them, yes.

24   Q.    Then did you look at remedies for interference in

25   this case?

2712

1    A.    Yes.

2    Q.    And what did you find?  Let's go to the next slide

3    on that.

4    A.    I reviewed the interference claims, and then I

5    decided that probably the best approach would be lost

6    profits, but there would be a link between whatever's

7    calculated and the actual wrongful acts.

8    Q.    Now, let's go to the next slide.

9          There's been a fair amount of discussion of

10   something called but-for causation.  Can you tell us, based

11   upon your experience as a damages expert, what is but-for

12   causation?

13   A.    Well, it's really a legal term, but what it means in

14   a practical sense is that a damage expert needs to look at

15   the evidence and draw a link or a causation link, if you

16   will, between the damage calculated and the wrongful acts.

17         And so that's typically done through a but-for

18   statement.  But for this particular act, what would have

19   occurred, what did occur?

20         And that way you're actually making sure that

21   what you're measuring is the wrongful act and not some

22   other element of the business.

23   Q.    Okay.

24   A.    That is the best I can do.

25   Q.    And -- that's fine.  We'll spend a little more time

2713

1    on that.

2    A.    It's a complicated concept, but in a nutshell.

3    Q.    Whose perspective is the but-for causation question

4    asked from?

5    A.    Well, to do an adequate job and do it correctly, it

6    really ought to consider the alternatives of both the

7    plaintiff in this case, Oracle, as well as Rimini Street,

8    the infringer.

9          So a true reconstruction of the market would

10   require looking at both alternatives and everything that

11   they did and would have done.

12         You really want a faithful re-creation of the

13   market, and you don't want to interject into the causation

14   calculation anything that isn't true or wouldn't have

15   happened.  So you have to be faithful to the facts.

16   Q.    And you've tried to do that in this case?

17   A.    Oh, yes, yeah.

18   Q.    All right.  Now, with that -- against that

19   background, are we prepared to actually analyze and respond

20   to Ms. Dean's report?

21   A.    Yes.

22   Q.    And where did you start?  Where are we going to

23   start that one today?

24   A.    So I guess you want to move on to the database.

25   Q.    Yes, I think so.  Are you ready?

2714

1    A.    Yes.

2    Q.    So let's get started with that.

3          So you did an analysis of Oracle's database

4    damages?

5    A.    Yes, I did.

6    Q.    Did you make assumptions regarding it?

7    A.    I did.

8    Q.    What was your assumption?

9    A.    Well, first of all, I assumed that the wrongful

10   acts -- and this is something that I have to do, and all

11   damages experts do, is you have to assume that the

12   allegations in the complaint are true, otherwise there

13   wouldn't be any damage.

14         So that's just a beginning point of any lost

15   profits calculation or any kind of economic remedy is --

16   the parties are contesting a lot of different things, so as

17   a damages expert, you have to assume that the plaintiff is

18   going to prevail on each point.

19         It doesn't mean okay.  They actually -- that you

20   have an opinion either way, you just make that assumption.

21   So I made those assumptions.

22   Q.    And it was easy to assume here because there's been

23   testimony the Court had ruled that the Oracle database

24   copyright had been infringed by Rimini; correct?

25   A.    Yes.  At some point I became aware of that.

1          When I first read the complaint, I wasn't aware

2    of that, but I did assume that they had actually infringed,

3    and then subsequently it was determined they had.

4    Q.    And then in looking at Ms. Dean's report, what kinds

5    of damages was she talking about in her report insofar as

6    they related to the Database?

7    A.    Ms. Dean did a value of use and a hypothetical

8    negotiation to calculate $19.2 million of what she says

9    Rimini Street would have been willing to pay for the

10   licenses that it took.

11   Q.    Did she also do a lost profits analysis and come up

12   with the same number?

13   A.    They're very closely related.  So one is just about

14   the same as the other in this instance.

15   Q.    Okay.  So what did you then -- after you looked at

16   Ms. Dean's opinions, what were your initial conclusions or

17   initial -- did you find any errors in her report?  Let's go

18   that way.

19   A.    Well, I was struck primarily by the fact that she

20   included maintenance fees in her calculations.  So -- there

21   were two other errors as well.

22          But what struck me right from the beginning was

23   Ms. Dean is assuming in her calculation, or she is assuming

24   Oracle and Rimini Street is going to come together and

25   negotiate a price for what was taken; that Rimini Street,

2716

1   who actually provides maintenance, would pay Oracle for

2   maintenance.

3             MR. STRAND:  Can we -- can I switch here, or do

4   we need -- to the -- there we go.

5   BY MR. STRAND:

6   Q.    You recall seeing this slide from Ms. Dean's -- from

7   Ms. Dean's testimony, Mr. Hampton?

8   A.    I do.

9   Q.    And right up here is that support maintenance that

10  she included in her -- in her report?

11  A.    That's correct.

12  Q.    And that's what you've just been referring to?

13  A.    That's what I was struck by when I initially read

14  through her report.  Excuse me.

15            MR. STRAND:  And, Dionna, if we could switch

16  back then.

17            THE WITNESS:  Because I don't think that that's

18  appropriate.  I don't think that Rimini Street would pay

19  for maintenance from Oracle.

20            It would be like your corner mechanic paying the

21  Ford dealership to work on his car, he can do it himself,

22  and Rimini Street has the capabilities to do it as well.

23            So I don't think -- I think that was an error in

24  her calculation.

25

2717

1    BY MS. DUNN:

2    Q.    What about the second error?  Tell us about that.

3    A.    I didn't see that she gave any consideration to the

4    alternatives to using the Oracle database.

5              There's a Microsoft product, IBM, and others

6    have other types of products that work as well, and I

7    didn't see that she gave sufficient consideration to the

8    alternatives.

9              If Rimini Street and Oracle were sitting in a

10   conference room negotiating what Rimini Street should pay

11   for these licenses, I don't think she considered that at

12   some point, if the price was too high, that Rimini Street

13   would just say, you know what, we'll use SQL Server of

14   Microsoft, we just can't afford you.  And she didn't

15   consider those alternatives.

16   Q.    And in thinking about that just recently, did you

17   recall Mr. Allison's testimony that there were database

18   products available on the market, including Microsoft SQL

19   and IBM DB2?

20   A.    That's where I became aware of it, as well as in my

21   initial work.

22   Q.    All right.  What was the third error?

23   A.    Well, I think we heard today that there's a

24   controversy of whether it would be two licenses that would

25   be required or 72.

1           This is a hypothetical negotiation, and so I

2    think if Rimini Street could operate with two, they would

3    be making a persuasive argument that they didn't need 72

4    licenses.  On the other hand, they actually used 72.

5           So I think it needs to be considered, and I

6    think ultimately the jury will decide which is the

7    appropriate number.  So I've made my calculation to include

8    both.

9    Q.    And the two licenses, is that based upon what you

10   talked to Mr. Klausner about a few years ago and then heard

11   him testify about this morning?

12   A.    Did you say Mr. Hilliard?

13   Q.    Excuse me.  Actually, Mr. Hilliard.  I got it wrong.

14   A.    That's okay.

15          Yes, it was Mr. Hilliard that I spoke with.

16   Q.    All right.  Have you done the calculation, then,

17   using what you've learned, the errors that you found, and

18   what you learned from Mr. Hilliard?

19   A.    Yes, sir.

20   Q.    All right.  Let's look at the next slide.  It's got

21   a lot on it.  So why don't you explain here what's going

22   on.

23   A.    Sure.  It looks busy, but it's not very difficult to

24   follow.

25          So the low end of the range that I calculated

1  assumes two licenses.  I assumed the same price that

2  Ms. Dean included in her calculation, and that was 47,500

3  per instance.  So that -- with two licenses, that would be

4  $95,000.

5           I also deducted the cost that Oracle would not

6  have to pay because they actually didn't sell the software,

7  and this -- I believe, again, Ms. Dean assumed 5 percent, I

8  followed her lead, so I deducted 5 percent.

9           So had the two parties come together and

10  negotiated, and they decided on two instances of license, I

11  think the appropriate amount would be $90,250.

12           On the other hand, at the high end of the range,

13  I did exactly the same thing except I assumed 72 separate

14  licenses, and that amount came to $2,964,000.

15  Q.    So the difference is between assuming two licenses

16  or 72 licenses.

17  A.    Correct.

18  Q.    Okay.  Done with the Oracle Database damages in your

19  opinion?

20  A.    Correct.

21  Q.    Let's move on to PeopleSoft, JD Edwards, and Siebel.

22  Okay?

23  A.    All right.

24           MR. STRAND:  Could we go to the next slide.

25

1    BY MR. STRAND:

2    Q.    So we're all the way to that fourth button.  Let's

3    go to the next slide.

4             When you looked at the PeopleSoft, JD Edwards,

5    and Siebel issue, alleged damages in this case, what did

6    you first look at?

7    A.    Well, again, I started with Ms. Dean's report.

8             She calculated $194 million is what she says

9    Oracle lost because of Rimini Street's wrongful actions,

10   which include the infringement claims as well as the

11   interference claims.

12   Q.    And those damages are in what form, sir?

13   A.    Well, this is a really important point.  They're in

14   the terms of lost customers.  So Ms. Dean's analysis

15   focuses almost exclusively on lost customers.

16   Q.    And the profits relating to sale that could have or

17   should have been made to those customers?

18   A.    Correct.  Well, it's the maintenance fees from those

19   customers.

20   Q.    Now, before you started your analysis of Ms. Dean's

21   damages opinion, did you make any assumptions, sir?

22   A.    Yes, the same assumptions I made at the beginning.

23   I'm assuming liability.  So I'm assuming that the

24   infringement actually occurred, I assumed that the

25   interference actually occurred.

2721

1    Q.    Now, did you start out by looking at Ms. Dean's

2    opinions?

3    A.    I did, yes.

4    Q.    And what did you note when you looked at Ms. Dean's

5    opinions?

6    A.    Well, principally and most importantly, she's

7    decided that she would calculate damages based on lost

8    customers, and I take exception to that.

9          And she assumes that 95 percent of Rimini's

10   customers would have stayed with Oracle but for the

11   wrongful acts.  And I think that's an error, principally

12   because she has an underlying assumption that she believes

13   that Rimini Street couldn't have existed without the

14   infringement or the interference, and I don't agree there

15   as well.

16         So I think the reason why her number is so large

17   is because she's assuming that Rimini's customers would be

18   Oracle's customers.  But there really isn't any evidence to

19   that effect.  She's just saying circumstances allow for

20   that, but I don't agree at all.

21         So she's essentially saying that Rimini Street

22   caused Oracle to lose customers.  What she really should be

23   saying, and I prepared slides on it so we can talk about it

24   later, is that she should be thinking about whether their

25   wrongful conduct caused Rimini's customers to leave or not.

1              She didn't isolate her calculation to just the

2     wrongful acts, she's looking at Rimini Street in its

3     entirety.

4     Q.    Now, did you prepare kind of an overview chart to

5     show what you did in analyzing those lost profits?

6     A.    I did.

7     Q.    Let's see if we can jump to that.  Perfect.

8              So this is the overview of what we're going to

9     talk about for the next little while; correct?

10    A.    Correct.

11    Q.    And why don't we not talk about what we're going to

12    talk about, let's just talk about what we're going to talk

13    about, okay?

14             Let's look at but-for causation.  You'll recall,

15    just so we can reset here --

16             MR. STRAND:  Dionna, if I could trouble you

17    again --

18    BY MR. STRAND:

19    Q.    You recall this is one of Ms. Dean's slides?

20    A.    Correct.

21    Q.    And she talked about Oracle's support revenue it

22    would have received but for the infringement/bad acts?

23    A.    Yes.

24    Q.    All right.  And you heard Ms. Dean testify -- let me

25    make sure I get it right, her but-for question was,

1          "So how would Oracle have looked" -- her answer

2     is, "How would Oracle have looked if Rimini hadn't done

3     what Oracle complains about in this case?"

4          That was her but-for statement.

5     A.    Yes.  And she states something similar here, I

6     believe.

7     Q.    Do you agree with that but-for statement?

8     A.    I agree with the statement, and I think it's really

9     important, it's a point that the jury needs to understand.

10         I hope I can communicate it well because this is

11    what damages experts do, we calculate damages, and so to do

12    that, we have to create the right but-for scenario and

13    re-create the market.

14         And so I agree that the correct measure of

15    damages would be what would Oracle look like but for Rimini

16    Street's wrongful acts.

17         And Ms. Dean talks about that, and she actually

18    wrote it in her report, but her schedules and the work that

19    she does doesn't follow that same but-for.

20         What she's following is but for Rimini, Oracle

21    would have looked like next.  So she's saying everything

22    that Rimini does is accused and wrong and it caused

23    Oracle's loss.

24         She should be looking at just the wrongful acts,

25    what was the impact of infringement, what was the impact of

2724

1    the interference.

2    Q.    Okay.  So it's but for Rimini, not right; but for

3    Rimini's wrongful acts, right?

4    A.    That's correct.

5              MR. STRAND:  Let's switch back, if we could,

6    please, Dionna.  I'm going to give you a workout, not too

7    much, I hope.

8    BY MR. STRAND:

9    Q.    And so in undertaking that analysis, now that we've

10   set on what but-for means, let's look at the next slide.

11   A.    Sure.

12   Q.    And you first started talking about customer

13   behavior; right?

14   A.    That's correct.

15   Q.    Now, in analyzing customer behavior, what behavior

16   of customers -- of Oracle customers did you specifically

17   consider?

18   A.    I was interested in whether Oracle lost more

19   customers during the period of time that Rimini was

20   operating.

21            And Oracle keeps very good records on the number

22   of its customers and the amount of revenue that it earns,

23   and it tracks how many of its maintenance customers leave

24   year by year.  So that information was available, and I

25   looked at it.

1    Q.    And this is the -- so can you -- this is a document

2    that the jury's already seen.  It's part of the pretrial

3    stipulation.  And I believe it comes from some of Ms.

4    Dean's work.

5              Can you tell us what this chart shows.

6    A.    Excuse me.  Yes, I can.

7              So, this chart shows years 2006 through 2011 on

8    the darkened row.  And then right below that it has three

9    rows, one for PeopleSoft, one for JD Edwards, one for

10   Siebel, and then it has ratios.

11             So if you look at the 2006 column in the

12   PeopleSoft row, you see 94 percent.  What that means is in

13   2006 Oracle kept 94 percent of its customers, which also

14   means that it lost 6 percent.

15             And this was the first year Rimini started.

16   Rimini had seven customers.

17             This -- and number of customers leaving Oracle

18   would be in the hundreds, because they had thousands of

19   customers.  So they were losing hundreds of customers in

20   2006 on PeopleSoft.

21   Q.    Did you create another graphic to show this in a

22   graphic way?

23   A.    If we could just stay here one second longer.

24   Q.    Sure.

25   A.    I'd like to move across the row on PeopleSoft.  And

1    you can do the same for the other two as well.

2              If you look at how many customers they lost in

3    2006, they lost 6 percent.  They kept 94, they lost 6.

4              If you look across the row and you get to 2011,

5    they're actually losing fewer customers during this period

6    of time, and this is the period of time that Rimini's

7    supposed to be taking customers away from them.  But in

8    reality they're holding on to more customers than they were

9    before Rimini started.

10   Q.    Okay.  And did you prepare a graphic of that?

11   A.    One has been prepared by the graphics people.

12   Q.    Is this basically the same data, just expressed with

13   a bar chart?

14   A.    It's more visual, but it's the same information.

15             It shows that the 94 percent in the gray, those

16   are the customers that stay, and then it has the customers

17   that leave in the red, and you can see over time that it

18   actually improves.

19             They're losing fewer customers during the time

20   that Rimini Street began operations, not more.

21   Q.    And do you recall Ms. Ransom's testimony about JDE

22   that this same 95 percent or so of the customers were

23   retained every year going all the way back to the mid '90s?

24   A.    And that's in support of my earlier testimony that

25   Oracle has kept these records very well back in time.  So

2727

1      you can go back and look back in time.

2                And they have had approximately 5 percent loss

3      of customer year after year after year based on the

4      records.

5      Q.    Now, let's look at one more graphic, one more way to

6      think about this.

7                So can you explain this to us?

8      A.    This is another visual.  It just makes it easier to

9      interpret-ate the ratio.

10               So what we have is a hundred different customers

11     on this spread -- not spreadsheet, but on the

12     demonstrative.

13               The ones in black are the ones that stay.  The

14     ones in red leave.  So if you assume this is 2006, in 2006,

15     all of the black customers in black ink, they stayed, the

16     ones in red ink are the ones that leave.

17               Every year they lose 6 for every hundred

18     customers they have, and that happens year after year.

19     It's called their churn, and they monitor it very closely.

20     Q.    All right.  Now, we've heard about deposition

21     testimony, and the jury has seen deposition testimony from

22     some of the 17 customers who were deposed, and you'll

23     recall that some of that testimony was along the lines, "If

24     you had known that Rimini Street was going to use

25     Birdville's software as one of four development

```
 1    environments to develop fixes to send to other customers,

 2    would you have recommended that the school district

 3    contract with them," the answer was "No."

 4              Doesn't that establish the causal link for

 5    damages in this case, Mr. Hampton?

 6              MR. ISAACSON:  Objection.  This is not in his

 7    report.

 8              MR. STRAND:  It was only introduced into

 9    evidence this week, Your Honor.

10              MR. ISAACSON:  It -- that does not matter.

11    We're entitled to disclosure.

12              THE COURT:  The objection is sustained.

13    BY MR. STRAND:

14    Q.   All right.  Let's move forward to the next slide,

15    29.  Based upon your look at the attrition of the customers

16    from Oracle, were you able to draw some conclusions?

17    A.   I was, yes.

18    Q.   And does this help you explain that to the jury?

19    A.   Yes, it does.

20    Q.   And please do that.

21    A.   Well, it's just one more picture of the same

22    information.  It shows the 94 or 95 percent people who stay

23    in gray and the 5 percent each year that leave.

24              What Ms. Dean has done in her calculation where

25    she's focused exclusively on customers is she's taking too
```

1    many of the customers out of the gray; in fact, probably

2    most of what she's doing is taking them from the gray.

3              She hasn't considered that they could all come

4    from the red, that the people that are leaving left and

5    they're using Rimini Street, but they could have gone

6    anyway.  She hasn't considered that.

7    Q.    All right.  Now, let's move on to the next point of

8    your analysis.  Did you look at customer dissatisfaction?

9    A.    I did.

10   Q.    And what did you find?

11   A.    Well, I think the record is very complete that there

12   were many customers --

13              MR. ISAACSON:  Objection, Your Honor.  His

14   report does not say this.

15   BY MR. STRAND:

16   Q.    Well, let's backtrack.  Let's not talk about record

17   complete.  I'll take it in little smaller steps.

18   A.    Sure.

19   Q.    Why is customer dissatisfaction important to your

20   opinions in this case?

21   A.    Because I think it defeats Ms. Dean's causation

22   argument where she's saying the customer would have stayed

23   with Oracle and not stayed with Rimini.

24   Q.    How so?

25   A.    Because many customers were dissatisfied --

```
 1              MR. ISAACSON:  Objection, Your Honor, move to
 2    strike.  It's not in his report.
 3              THE COURT:  Sustained.  And the response will be
 4    stricken.
 5    BY MR. STRAND:
 6    Q.    As a part of your analysis, Mr. Hampton, were you
 7    able to look at documents produced by Oracle in this case?
 8    A.    Yes.
 9    Q.    And do those documents relate to customer
10    dissatisfaction?
11    A.    Yes, they do.
12    Q.    Let's look at Defendants' Exhibit 278, which I
13    understand has been preadmitted.
14              COURTROOM ADMINISTRATOR:  Defendants?
15              MR. STRAND:  Yes, DTX 0278.
16              COURTROOM ADMINISTRATOR:  Yes, it's preadmitted
17    by stipulation.
18    BY MR. STRAND:
19    Q.    And you looked at Defendants' Exhibit 278 as part of
20    your work, right, Mr. Hampton?
21    A.    Yes, sir.
22              MR. ISAACSON:  I'll object, Your Honor.
23              There's a specific section of his report having
24    to do with dissatisfaction that discusses two customers.
25    It names the two customers, and that's all that's in the
```

1    report.

2              MR. STRAND:  Your Honor, he said customer

3    dissatisfaction was important.  He was deposed on it.

4    We're now just fleshing that out with documents in evidence

5    in this case.

6              MR. ISAACSON:  He's fleshing it out for the

7    first time.  What was fleshed out in his report was two

8    customers.

9              THE COURT:  All right.  The objection is

10   sustained.

11             MR. STRAND:  Your Honor, I refer the Court -- do

12   we have a copy -- is the report in the -- before we move on

13   from that, I would refer the Court to page 73 of

14   Mr. Hampton's original report, and it contains far more

15   than just two customers.  There at the top?

16             THE COURT:  I need -- which --

17             MR. STRAND:  Sure, it's paragraph 126.

18             THE COURT:  What's the exhibit number?

19             MR. STRAND:  It's at the back of the notebook,

20   Your Honor.  It begins on page 72 and carries over on top

21   of 73.

22             So far more than the two customers there at the

23   top of page 73.

24             In his report in 2012 Mr. Hampton says:  Oracle,

25   the most -- the most common objections customers give for

```
1     not renewing Oracle's support include -- contract support

2     include.  Then he gives five bullet points.  And it's not

3     limited to two customers.

4           MR. ISAACSON:  In his dissatisfaction section he

5     lists two customers.  Here he's discussing cancellation,

6     which is a separate topic.  There's a specific section on

7     dissatisfaction, Your Honor, which is --

8           MR. STRAND:  Well, Your Honor, I think it's

9     pretty clear in this case that dissatisfaction may lead to

10    cancellation.  Even Ms. Catz testified to that.

11          MR. ISAACSON:  It doesn't matter -- so in

12    paragraphs 140 to 145, you'll see the customer

13    dissatisfaction section.

14          THE COURT:  The objection is sustained.

15          And, ladies and gentlemen, to give you some

16    overview of this, obviously in long and complex litigation,

17    there's an extreme amount of documents that are exchanged

18    and information that is exchanged back and forth between

19    each side.  And some of that will be forwarded to the

20    expert witnesses.  And the expert witnesses will reach

21    their various opinions based upon those materials.

22          But, in such cases, reports are prepared by the

23    expert witnesses, and those reports set forth the

24    boundaries of the proposed witness's testimony.

25          And one of the Court's responsibilities is to
```

2733

1    ensure that the testimony being offered by the proposed

2    expert has been disclosed and is contained within those

3    reports.  And that can be a rather strict and also a

4    difficult ruling for the Court.

5              But it is my ruling here that this appears to be

6    something that's not included.  And it's not to say that

7    Mr. Hampton's trying to do an end run around the Court, or

8    that Mr. Strand is, it's just that the rules are that the

9    witnesses are required to stay within the confines of their

10   reports because that is what the other side, of course, has

11   based its case and is relying upon.

12             So the objection is sustained.

13             MR. STRAND:  All right.  Thank you, Your Honor.

14   BY MR. STRAND:

15   Q.   Let's look at -- let's get your report, Mr. Hampton,

16   specifically paragraph 140.  That's in the notebook.

17   A.   I'm sorry.  I was waiting for it to come up on the

18   screen.  I apologize.

19             COURTROOM ADMINISTRATOR:  Which one is that?

20             MR. STRAND:  It's just his report.  It hasn't

21   been marked as an exhibit, but since reference was made to

22   paragraph 140, I figured that would be the best place to

23   go.

24             THE WITNESS:  Did you say paragraph --

25             MR. STRAND:  Paragraph 140 on page 78 of your

2734

1    report.

2              THE WITNESS:  May I take a moment to look at

3    that?

4              MR. STRAND:  Sure.

5              THE WITNESS:  Thank you.

6    BY MR. STRAND:

7    Q.    In that portion of your report you refer to one

8    customer.  What is the name of that customer?

9    A.    XO Communications.

10   Q.    And based upon your review of the record, what was

11   your conclusion about whether or not XO Communication was

12   dissatisfied with Oracle?

13   A.    Based on my review, I believed that they were

14   dissatisfied.

15   Q.    And did you place reliance on a specific document in

16   reaching that conclusion there in footnote 301?

17   A.    Yes, it's document ORCLRS0252392.

18             MR. STRAND:  Could we bring up Exhibit 268, DTX

19   268, please?  Don't show it.

20             Has that one been admitted yet?

21             COURTROOM ADMINISTRATOR:  It was, by

22   stipulation.

23             MR. STRAND:  Okay.  So we can show that.  It has

24   been admitted?

25             COURTROOM ADMINISTRATOR:  Yes.

2735

1            MR. STRAND:  Okay.  Thank you.

2    BY MR. STRAND:

3    Q.    Looking down there, about two-thirds of the way down

4    the page on the right-hand side, it says Brief Background

5    at Oracle Account.

6    A.    I'm unable to read the document on the screen.

7            MR. STRAND:  I know.  We're working on it.

8            Down a little further, Marie.  Down a little

9    further.  Brief Background on Oracle Account.

10           Can you get that whole row for us, Marie?  One

11   down.  Brief Background on Oracle Account.  Perfect.

12   BY MR. STRAND:

13   Q.    All right.  This is something you cited in your

14   report, correct, Mr. Hampton?

15   A.    Yes, it's in the footnote you asked me to read.

16   Q.    Can you read that -- what Oracle says about its

17   relationship with XO?

18   A.    Yes.

19           "Since the Siebel and MetaSolv acquisitions, XO

20   has been decreasingly satisfied with what they feel is a

21   lack of value from their maintenance dollars.  Specifically

22   on the Siebel side, Oracle has tried to get XO to pay for

23   ACS to analyze the XO Siebel environment, and to date XO

24   has rejected the idea."

25           Do you want me to continue?

2736

1    Q.    Sure.

2    A.    "As a result, when they enter an SR that Oracle

3    feels is related to their environment, it gets either

4    rejected as 'not a problem' or changed to an enhancement.

5    Eventually these issues are escalated to Rob and when he

6    gets involved, we at Oracle scramble to get someone onsite

7    to take a look at the issue."

8    Q.    And did you -- later in that same document there's a

9    strategic information section.  Let's go down a page or

10   two.  Or, excuse me, I'll get you there.

11             It's a different document.  Let's just go to the

12   next page, page 293.

13             It says their CIO there, right -- virtually in

14   the middle in that paragraph?

15   A.    You'll have to blow it up a little bit larger.  This

16   monitor is a little fuzzy.

17   Q.    That first paragraph under Briefing Questions, on

18   the right-hand side, Strategic Information.  There, I found

19   it.

20             Can you read the Strategic Information section

21   that you included in your report regarding XO.

22   A.    Yes, I would be happy to.

23   Q.    Go ahead.

24   A.    "XO spends over $5.2 million annually in support.

25   They are the 20th largest Siebel customer in North America

1    and serve as a MetaSolv reference.  Below are specific

2    issues we have recently dealt with; however; the root of

3    the problem is more philosophical with regards to our

4    Siebel support model and approach to the strategic

5    partnership.  Their CIO, Rob Geller, feels like we are

6    'nickel and diming' him because every time they have an

7    urgent issue we tell them they need to pay for Expert

8    Services to diagnose and/or fix the problem.  It's not so

9    much the money for the ACS work that is the issue.  It's

10   the perception of bad customer service and support.  Rob

11   has requested a meeting with Juergen to present his views

12   on the situation."

13              MR. STRAND:  Let's go to the next page, 94,

14   dealing with XO in the same document; right?  Page 94.

15   There we go.  But four lines up on the right-hand side,

16   "The maintenance dollars."

17              Sorry, four lines up on the right-hand column.

18   It's right there.  There you go.  "The maintenance

19   dollars."

20              Can you get that one larger for us, Marie?

21   BY MR. STRAND:

22   Q.   Can you read that one for us as well out of this

23   same document, Oracle document.

24   A.   Just to make sure I'm reading the right portion --

25   Q.   You got it.

2738

1     A.     It starts with "the maintenance dollars for Seibel"?

2     Q.     Right.

3     A.     "The maintenance dollars for Siebel are at risk as

4     mentioned above.  Also, until the perception that XO has

5     about Oracle is changed, they are unlikely to spend any

6     additional dollars with Oracle for other products and

7     services."

8     Q.     Okay.  Now, did you also have occasion in your

9     report to discuss another company, looking at paragraph --

10           MR. ISAACSON:  Before we go to the next company,

11    may I approach, Your Honor?

12           THE COURT:  Yes, you may.

13           (Sidebar conference held as follows:)

14           THE COURT:  Go ahead.

15           MR. ISAACSON:  Counsel's had the expert read

16    hearsay statements from XO Communications into the record,

17    which -- and an expert is entitled under certain

18    circumstances to consider hearsay, so I'm not objecting to

19    that.

20           But I think it's appropriate to have a limiting

21    instruction at this juncture to say that you've heard

22    certain hearsay statements from XO Communications, that

23    those are not being admitted for the truth but to indicate

24    what this expert says he relied on.

25           MR. STRAND:  Well, I don't think a limiting

2739

1      instruction is appropriate, Your Honor.

2                  I'm certainly happy to ask him a question if he

3      relied on these statements in forming his conclusions.

4                  MR. ISAACSON:  But if we don't tell the jury

5      that this is not being admitted for the truth, they may

6      take it for the truth.

7                  THE COURT:  Well, first of all, let me step back

8      and make sure I understand.  Is this from an exhibit that

9      is in evidence?

10                 MR. STRAND:  Yes.

11                 MR. ISAACSON:  Well, it's preadmitted.  It's

12     being admitted for the first time.

13                 And, as Your Honor said, that doesn't make it

14     fair game for admission.  At this point all the fact

15     witnesses are gone so there's no one to talk about this.

16                 MR. STRAND:  It was admitted by stipulation.

17                 MR. ISAACSON:  Preadmitted, right.  I said that.

18                 MR. STRAND:  Ask Dionna.  It's in the record.

19                 MR. ISAACSON:  It's admitted evidence by

20     stipulation.  268.  No witnesses discussed this.

21                 COURTROOM ADMINISTRATOR:  They were all admitted

22     in that stipulation.

23                 MR. ISAACSON:  I understand.  We're talking the

24     same language.

25                 THE COURT:  All right.  Well, the exhibit is

2740

1    admitted.  It was admitted by stipulation.

2                I feel that the witness is competent to testify

3    on it.  I also would give a limiting instruction.

4                MR. STRAND:  Can't we just give that at the

5    close of the case, Your Honor?

6                Focusing on it right and undercutting, with the

7    Court's imprimatur, statements made by this witness from an

8    Oracle document seems to me to be unfair.

9                MR. ISAACSON:  What he wants is a lack of

10   context for the instruction.

11               THE COURT:  Well, I'm not concerned about what

12   anybody wants.

13               I think that the -- the issue is concerning --

14   concerns the basis upon which the expert has rendered his

15   opinion and not the truth of the matter asserted.

16               The Court will give a limiting instruction.  And

17   I say that, Mr. Strand, in fairness to you, because you've

18   asked the question.  So it's on the table.

19               MR. STRAND:  I understand.

20            (Sidebar conference concluded.)

21               THE COURT:  Ladies and gentlemen, just to

22   clarify one issue here, Mr. Hampton is entitled to testify

23   what he has based his opinions on.

24               And, for example, he has referred to a statement

25   from a representative of XO Communications.  He's entitled

1    to testify to that concerning what his opinion is based on.

2               But, by the same token, the statements from --

3    by someone from XO Communications are not as though you've

4    heard the witness testify here in the courtroom.

5               This is just information Mr. Hampton has relied

6    on, and that's the limited purpose for which it is

7    admitted.  So you are not to assume that this is testimony

8    presented from an XO Communication witness in the courtroom

9    before you.

10              Thank you.

11              MR. STRAND:  Thank you, Your Honor.

12   BY MR. STRAND:

13   Q.   Moving along, Mr. Hampton, if you look with me at

14   paragraph 144 of your report, you mentioned another

15   dissatisfied customer; correct?

16   A.   Yes.

17   Q.   And what's the name of that company, sir?

18   A.   Bausch & Lomb.

19   Q.   What do you understand Bausch & Lomb to be?

20   A.   Bausch & Lomb is a lens manufacturer and optics

21   company.

22   Q.   And looking at your report, 144, I'll give you a

23   moment if you wish, why did you conclude that Bausch & Lomb

24   was a dissatisfied customer?

25   A.   Based on the record that I saw, they were unhappy

2742

1    with Oracle, and I believe -- I'll just have to look at the

2    reference here.

3              I had the opportunity to review the deposition

4    transcript of the representative.

5    Q.    And who is the representative, sir?

6    A.    Mr. Baggett.

7    Q.    What was his first name?

8    A.    Brian.

9    Q.    Okay.  So you looked at Mr. Brian Baggett's

10   deposition in this case?

11   A.    That's one of the 53 depositions I had a chance to

12   read.

13   Q.    And what did you conclude based upon your review of

14   Mr. Baggett's deposition and other items relating to

15   Bausch & Lomb?

16   A.    In his deposition he was asked, if Rimini was not a

17   available support option, would Bausch & Lomb go back to

18   Oracle, and Mr. Baggett said it was unlikely.

19   Q.    Now, in your report, did you also reference a market

20   survey prepared regarding Oracle?

21   A.    I believe I did, yes.

22   Q.    And was that by an outfit called Piper Jaffray?

23   A.    Yes, I recall it.

24             MR. STRAND:  Let's get that up in front of the

25   witness, but not on the --

                                                                    2743

 1              MR. ISAACSON:  Could I have a --

 2              MR. STRAND:  I'm trying to get it here real

 3   quick.

 4   BY MR. STRAND:

 5   Q.    All right.  What is Piper -- I'm sorry, it's 2 --

 6   372, DTX 372.

 7              Looking at DTX -- don't put it on the screen,

 8   please.

 9              Looking at DTX 372, can you tell us who Piper

10   Jaffray is?

11   A.    Piper Jaffray is a market research company.

12   Q.    And are they a source to which you commonly refer in

13   doing your work on damages cases?

14   A.    They are a well-established and well-recognized

15   market research company.

16   Q.    And based upon your review of the Piper Jaffray --

17   well, what was that Piper Jaffray report?

18   A.    Piper Jaffray actually did a study of third-party

19   support for Oracle's maintenance.  It was the maintenance

20   portion.

21              So they did a study where they went out and

22   interviewed customers and asked questions about third-party

23   support companies like Rimini Street and how the market was

24   situated at that time.

25   Q.    And what was the date of that report?

                DONNA DAVIDSON, RDR, CRR, CCR #318     (775) 329-0132

2744

1    A.    You're testing my recollection.  I don't recall.

2    Q.    Well, and I don't mean to make this a memory test.

3          In your file, in your folder up there, your

4    book, is the Exhibit 278.  Because it has not been admitted

5    as evidence, we're not showing it to the jury.

6    A.    278?

7    Q.    278.  The Piper Jaffray report.  DTX 278.  Excuse

8    me.  I apologize.  372.

9    A.    372?

10         COURTROOM ADMINISTRATOR:  278 was preadmitted.

11         MR. STRAND:  By the stipulation.

12         COURTROOM ADMINISTRATOR:  372 is not.

13         MR. STRAND:  372 is not.  Okay.  So 372 is not

14   in.  I crossed up on my note.

15         THE WITNESS:  Should I be going to a particular

16   tab?

17         MR. STRAND:  Go to 372.  It's not admitted so

18   we're not going to put it on the screen.  This is the Piper

19   Jaffray report.

20         (Discussion held off the record.)

21         THE WITNESS:  You asked me the date?

22   BY MR. STRAND:

23   Q.    Yeah, what's the date of the Piper Jaffray report?

24   A.    July 2011.

25   Q.    And were there particular portions of this report

1    that you relied on in forming your conclusions that Oracle

2    customers were dissatisfied?

3    A.    Yes, I reviewed this document and looked at it.

4    Q.    Looking at the first bullet point, was there

5    anything in that -- on page 1 of that document, was there

6    anything that struck you as indicating that Oracle

7    customers were dissatisfied?

8    A.    Yes.

9    Q.    And what was that?

10          MR. ISAACSON:  Objection, Your Honor.  Which

11   book -- oh, you're on page 1 --

12          MR. STRAND:  Page 1, bullet point 1.

13          MR. ISAACSON:  Right.

14          Your Honor, if you look at page 29, paragraph 29

15   of his report, through -- paragraph 29 and 30, you will see

16   that the only part of this report that's in the

17   gentleman's -- that is in the expert report is page 3, it's

18   quoted verbatim, page 3 and 4, which is quoted verbatim

19   without any commentary.

20          It's also at page 44 -- paragraph 44 of the

21   expert report.  There's no discussion of page 1 in the

22   expert report.

23          MR. STRAND:  The report was disclosed to --

24   obviously, because it was in his report to Oracle, Your

25   Honor, and I think it's fair game.

2746

```
 1              MR. ISAACSON:  It would be entirely new

 2    analysis.

 3              THE COURT:  Mr. Strand, can you identify to me

 4    in his report where he refers to that.

 5              MR. STRAND:  He refers to that report, Your

 6    Honor, and quotes from it, beginning at page -- excuse me.

 7              MR. ISAACSON:  Page 21, paragraph 29.

 8              MR. STRAND:  Yes.

 9              MR. ISAACSON:  And the quotes that are on 29

10    appear on page 3 of the Piper Jaffray document.

11              THE COURT:  And the page in his report, again,

12    is what?

13              MR. STRAND:  Page 21, Your Honor, paragraph 29.

14              THE COURT:  And where within that paragraph?

15              MR. STRAND:  The report is quoted in the

16    italicized language beginning at the bottom of 29 and

17    carrying over throughout the remainder of page 22 and onto

18    the top of page 23.

19              It is not the precise portion I'm having him

20    look at here, Your Honor.  But my point is that the

21    document was fully disclosed to Oracle.  They had the

22    opportunity to depose the witness and inquire about the

23    document.

24              MR. ISAACSON:  There have been many documents

25    fully disclosed in discovery.  That doesn't mean they're
```

1    part of the expert report.

2              THE COURT:  I'm not going to get into the

3    debate.  It appears to me that this is going beyond the

4    report.  I'm going to sustain the objection.

5              Foundationally, if you want to go into it,

6    Mr. Strand, you need to identify the specific foundation

7    upon which you're relying in his report.

8              MR. STRAND:  Okay.  Thank you, Your Honor.

9    BY MR. STRAND:

10   Q.    Well, now, let's skip down to Customer Options if we

11   could, please.

12   A.    My monitor isn't --

13   Q.    Okay.  There we go.  Customer Options.

14             Did you consider the options that Oracle

15   customers had, sir?

16   A.    I did.

17   Q.    And how did you consider those?

18   A.    I looked at evidence in the record and looked at

19   what a customer that was leaving -- well, we know customers

20   were leaving because 5 percent left every year, so they had

21   to go somewhere, and they had been going somewhere for a

22   long time.

23             So I reviewed the evidence, looked at the

24   different reports and documents, and concluded that

25   certainly customers could self-support if they wished.

```
 1                  They could -- I think there's a slide, the next
 2      demonstrative.
 3      Q.    Let's go to the next -- what did Ms. Dean say, if
 4      anything, about customer options in her report?
 5      A.    Sure.  Ms. Dean said that a customer may hire a
 6      third-party servicer to provide consulting or support
 7      services to the extent permitted by the customer's license.
 8                  So Ms. Dean acknowledged that a customer could
 9      leave Oracle and use the third-party provider, consultant,
10      or a company like Rimini Street.
11      Q.    And have we developed a slide showing what some of
12      the support options for customers leaving Oracle might be?
13      A.    And this next slide will be what I was just saying,
14      that they could self-support if they wish.
15                  They could go to a consultant and use a
16      consultant to help them self-support, or they could use a
17      third-party provider.
18                  I don't mean these are the only options.  These
19      are three options, but there were three others.
20                  I guess I should wait for a question.
21      Q.    I ask the questions.  You don't get the chance.
22                  Now, then let's look at infringing versus
23      non-infringing conduct.  What do you mean by that, sir?
24      A.    Well, I think this is a really important point is,
25      when forming a damage calculation and doing the analytics
```

1    of what steps myself, or anyone who is calculating damages,

2    would do, is to make sure that what you're measuring is

3    what you intend to measure.

4              And this is where I think Ms. Dean and myself

5    part ways with regards to damages, is she's looking at the

6    wrongful acts, the infringement, the interference.

7              And she's saying that's their business model,

8    they couldn't exist without doing those things, but she

9    doesn't provide any evidence to that effect, she just says

10   it, when, in fact, I think the business model is more about

11   the people at Rimini Street.

12             Their greatest asset is their assembled workers,

13   their IT people.  People have more than 10 years of

14   experience, I think.  I was in the courtroom for the

15   testimony of the --

16             MR. ISAACSON:  Objection, Your Honor.

17             THE WITNESS:  -- PSEs -- I'm sorry.

18             MR. ISAACSON:  He's commenting on testimony.

19             MR. STRAND:  Let's not go --

20             THE WITNESS:  I'm sorry.

21   BY MR. STRAND:

22   Q.    Now -- and I neglected one slide.  It was out of

23   order.

24             Let's look at the responses to the first

25   interrogatories with regard to other options that Oracle

1    customers might have.

2    A.    Sure.

3    Q.    Do you recall considering Oracle's answer to one of

4    Rimini's interrogatories or questions to Oracle in the

5    litigation?

6    A.    I do.

7    Q.    And what did Oracle say there at -- beginning at

8    line 15 in its answer to an interrogatory?

9    A.    Starting with "accordingly"?

10   Q.    Yes.

11   A.    "Accordingly, based on this limited review, Oracle

12   believes that Spinnaker's current support practices for JD

13   Edwards customers are provided permissibly."

14   Q.    And I'm sorry to take that out of order, but I

15   didn't want to forget about it.

16           So you've got infringing versus non-infringing

17   conduct.  How did that affect Ms. Dean's valuation in your

18   opinion, sir?

19   A.    Well, it's an extremely important point.  What is

20   she is valuing?  She is valuing customers.

21           I think that's an inappropriate approach because

22   what she should be looking at, and what she said she was

23   going to look at in her but-for statement was the wrongful

24   acts, the infringement and the interference.

25           But customers don't go just for those features

2751

1    of Rimini Street.  They're there because there are

2    experienced people, PSEs and people who know those programs

3    because they're ex-PeopleSoft, Siebel, JD Edwards

4    technicians.  They've got years and years of experience.

5              Ms. Dean doesn't give any credit to the good

6    parts of Rimini Street.  She's focused almost entirely on

7    the bad.  Therefore her numbers are measuring the wrong

8    thing.

9              She's measuring the value of Rimini Street, the

10   value of Rimini Street customers, when she should be

11   focusing her analysis on what is the appropriate remedy for

12   the infringement and the interference, and she should have

13   isolated her calculations to just those items.

14             She shouldn't be measuring the assembled

15   workforce at Rimini Street because Rimini Street has a

16   right to compete, it has a right to hire employees that

17   were past PeopleSoft or JD Edwards employees, and that's

18   the business model that they employ.

19             That's why people go to Rimini Street is because

20   of that experience of its assembled workers.

21   Q.   All right.  So let's -- let's -- did you look at the

22   services that Rimini Street offers?

23   A.   I did.

24   Q.   Let's go to the next slide.

25             And is that an outline of what Rimini Street

2752

1    offers?

2    A.    Yes, it is.

3    Q.    And the concierge service, we've heard a lot about

4    here.

5    A.    We have.

6    Q.    And does that involve something called PSEs?

7    A.    Those are the primary support engineers.

8    Q.    And we've heard testimony about that, we won't

9    repeat it, but that's what we've got depicted on the next

10   page?

11   A.    Correct.

12   Q.    And have we met any primary support engineers during

13   the last couple weeks?

14   A.    I was in the courtroom for the testimony of Shelley

15   Black --

16            MR. ISAACSON:  Objection, Your Honor.

17            THE WITNESS:  Black -- I don't remember her

18   name.  She was from Florida.  I remember she was from

19   Florida.  And she testified --

20            MR. ISAACSON:  Objection, Your Honor.

21            THE WITNESS:  I'm sorry.  I can't do that.

22            MR. STRAND:  Just the name.

23            THE WITNESS:  I'm sorry.

24   BY MR. STRAND:

25   Q.    All right.  Moving on.

1           Now, you said also you considered relevant

2   economic factors including price and demand.  Can you tell

3   us about what you considered in reaching your conclusions

4   about economic factors and its effect on Ms. Dean's lost

5   profit analysis?

6   A.     Yes.  I think we all recall that in 2008 and '9

7   there was a large recession, probably the largest since

8   World War II.  Those were difficult times.

9           Many of Oracle's customers, as everyone else,

10   was suffering during 2008 and 2009, and were struggling to

11   stay profitable because the economy took a severe dip.

12           I didn't see that Ms. Dean really gave a lot of

13   consideration in her analysis to the fact that some

14   companies were financially strapped and having a hard time

15   making ends meet.

16   Q.     And did you -- strike that.

17           When you did your report, were you under -- what

18   was your impression regarding whether or not Oracle

19   discounted maintenance and support services?

20   A.     I recall reading the deposition transcripts, and I

21   gained the understanding that Oracle doesn't give any

22   discounts, they don't change the fees.

23           So if a program costs a million dollars, then

24   the maintenance fees would be 22 percent of that, over

25   $200,000 a year for maintenance, and so that's a large

2754

1    expenditure for a company, and that could be a small one.

2              So --

3    Q.    Now, were you able to conclude also where the Rimini

4    50 percent discount came from --

5    A.    Sure.

6    Q.    -- as a part of this economics?

7    A.    Yes.  I read Ms. Dean's report.  She claims that the

8    only way that Rimini Street could provide its price at 50

9    percent of the Oracle price was through the wrongful acts,

10   but she didn't provide any support for that.  It's just a

11   statement she claimed, but she didn't have any support or

12   backing for that.

13             I looked at what the amount of profit was

14   available to Rimini Street and whether or not they could

15   have been profitable in a non-accused way.

16             And what I found was -- the real important point

17   is that Oracle's charging profits of 95 percent, their

18   profit margin is 95 percent.  There's a lot of money in

19   their price.

20             And so Rimini Street can set its price at half

21   of Oracle's, and there's still a lot of profit, and they --

22   and that's why they're in the market.

23             And that's why the ex-employees are working for

24   Rimini Street is because they can provide the service, and

25   because Oracle's price is so high that they can discount

2755

1    their price to 50 percent and still make a healthy profit.

2    Q.    Now, based upon the analysis that we've talked about

3    for the last several minutes, Mr. Hampton, were you able to

4    form a conclusion regarding Oracle's lost profits damages?

5    A.    Yes.  I don't think that Oracle actually has lost

6    customers or profit.

7              I think Rimini Street has benefitted through its

8    use, but as far as Ms. Dean's calculation of damage, I

9    think that she's measuring the wrong thing.

10             She's measuring customers.  But those customers

11   wouldn't have gone back to Oracle, they would have stayed

12   at Rimini Street, and so that's a fundamental error in her

13   calculation.

14             She starts in the wrong direction.  She's

15   beginning her calculation looking strictly at customers,

16   and because she does that, she's picking up value for

17   Rimini Street's assembled workers, for the PSEs and all the

18   good that Rimini does, as well as bad, she's got in her

19   calculation.  That's why her calculation's wrong.

20   Q.    Okay.  And your conclusion is no lost profit

21   damages?

22   A.    I don't believe that Oracle lost profits because of

23   the infringement or the interference, and that's what I

24   focused on, is what I think we should focus on.

25   Q.    Other than lost profits, you mentioned early on

2756

1    possible value-of-use damages or damages based on Rimini's

2    profits.  Can we turn to Rimini's profits now for a few

3    minutes?

4    A.    Sure.

5    Q.    Can you explain the concept from the damages from

6    Rimini's perspective of the infringer's profits or Rimini's

7    profits based on your experience --

8              THE COURT REPORTER:  Excuse me --

9              MR. STRAND:  I'm sorry, I'll slow down.  I was

10   doing pretty well.  I'll try again.

11   BY MR. STRAND:

12   Q.    Based on your experience, Mr. Hampton, can you

13   explain what the concept of infringer's profits is as a

14   remedy in a copyright case?

15   A.    Yes.  It goes back to the copyright statute, which

16   is really the beginning point of calculating damages, like

17   it is with the Patent Act, if you're calculating patent

18   damages, start with the Patent Act.

19              The Copyright Act says that the copyright owner,

20   if there's actually infringement, is entitled to its own

21   lost profits.

22              We've identified that Oracle hasn't lost any

23   profits, they actually kept more employees -- or customers

24   during the infringement period than they were before.  So

25   there's no basis for a lost profits calculation.

2757

1          So the Copyright Act, from the perspective of a

2   damages expert and most of the people that do what I do,

3   have a different remedy as well.

4          There's -- the statute allows for a look at the

5   infringer.  So if you don't have lost profits for the

6   owner, then maybe you look at, well, how did the infringer

7   benefit, and that can be a remedy as well.

8          In this case, I think it's more appropriate than

9   lost profits because we can't establish that Oracle

10   actually lost any customers.

11          So it's the infringer -- an accounting of the

12   infringer's profit is what we're going to go over next.

13   Q.   All right.  So let's look at -- well, let's start

14   out with the slide we saw this morning from Mr. Zorn.  We

15   won't go through this.

16          MR. STRAND:  42.  There we go.

17   BY MR. STRAND:

18   Q.   We went through this with Mr. Zorn.  You were in the

19   courtroom.  Is this the way you get from gross revenue,

20   though, to net profits?

21   A.   Yes, sir, it is.

22   Q.   Okay.  And that's what you used in your analysis in

23   this case?

24   A.   I did an accounting.  I looked at the financial

25   records for Rimini Street --

2758

1    Q.    And did you look at --

2    A.    -- and what their benefit was.

3    Q.    Did you look at the financial accounting for the

4    whole company first?

5    A.    I did.

6    Q.    And let's look at the DTX 3019 which was admitted

7    this morning.  Can you explain -- this is the income

8    street -- Inc. -- income statement summary for January

9    through -- of 2006, through February 12, '14?

10   A.    Correct.

11   Q.    And based on that income statement, what was the

12   total profit or loss for Rimini for all product lines for

13   that time period?

14   A.    Over that time period, the company lost $63,159,855.

15   Q.    Did you also have occasion to look at Rimini's

16   profits or losses on just the three product lines at issue

17   in this case?

18   A.    Yes, sir, I did.

19   Q.    Let's look at DTX 3018, final column there.  This is

20   the income statement for those three profit lines -- three

21   product lines; correct?

22   A.    That's correct.

23   Q.    And what was your finding when you looked at that?

24   What was Rimini's profit or loss from the three product

25   lines at issue in this case during the relevant time

1    period?

2    A.    $23,529,448.

3    Q.    Loss or profit?

4    A.    That's a loss.

5    Q.    Did you do another calculation after looking at

6    these numbers, sir?

7    A.    Yes, I did.

8    Q.    And why did you do that?

9    A.    Well, going back to the patent statute and the

10   different remedies, we can look at Oracle's lost profits,

11   which there were none, and then we can look at the

12   infringer's profit.

13            Well, if the infringer doesn't make a profit,

14   bottom line, that can be overcome by just not deducting all

15   the costs.  All the costs don't have to be deducted in

16   order to calculate a remedy.

17            So I looked at the financial statements, and I

18   selected to not deduct the least direct cost, the overhead

19   costs, the IT costs, but I did deduct the direct labor, the

20   cost of providing the service, from their financial.

21            So, instead of a $23 million loss, if I don't

22   deduct some of their costs, I arrive at a profit, a gain.

23   Q.    So what is your opinion, sir, regarding whether or

24   not Rimini had a profit from the infringement in this case?

25   A.    Well, they didn't have any profit.  They were

2760

1   negative on net profit, so they weren't profitable.

2   Q.    Okay.  Now, you concluded Oracle didn't have lost

3   profits and that Rimini made no profits.  Is there any

4   other alternative remedy available to Oracle for Rimini's

5   infringement?

6   A.    Yes, there is.

7   Q.    And what's that called?

8   A.    That would be a value-of-use calculation.

9   Q.    And what do you mean when you say value of use, sir?

10  A.    This is another approach to calculating damages.

11  It's the third approach we discussed.

12        You can look at Oracle's lost profits.  They

13  weren't there.  You can then look at the infringing profits

14  which we've just done.

15        The next available approach would be the most

16  efficient to get to what exactly was the value of the

17  wrongful acts.

18        You can look specifically at what was the value

19  of the infringement and what was the value of the

20  interference and make a calculation.

21  Q.    And have you done that in this case?

22  A.    Yes, I have.

23  Q.    And let's -- tell us what this first slide is that

24  we've got in front of us.

25  A.    This is a step-by-step overview of the procedures

2761

1    that I went through in order to use the value-of-use

2    approach in this particular case.

3    Q.    So, first, did you isolate the accused infringing

4    acts?

5    A.    Yes, I did.

6    Q.    Let's look at the next slide.  And is this the

7    misconduct in this case that you identified, sir?

8    A.    It's also the wrongful acts from the beginning I

9    assume are true and -- are true and enforceable, I guess,

10   is the word I'm struggling to find.

11           So I assumed all of these actually occurred,

12   this underlying assumption, the blue misconduct column.

13   Q.    Now, did you also then look at whether there were

14   efficiencies from practicing those -- from engaging in the

15   misconduct?

16   A.    Yes.

17   Q.    And were you able to find anything in Ms. Dean's

18   report that talked about efficiencies?

19   A.    In multiple places in Ms. Dean's report she talked

20   about the efficiencies gained from the misconduct, and she

21   cited Dr. Davis.

22           Dr. Davis is the technical expert who testified

23   on behalf of Oracle, and he spoke also -- and I had a

24   chance to read this report.

25           In his report, he said that what was gained

2762

1     through the infringement, that Rimini was more efficient.

2                 MR. STRAND:  Now, let's look at a couple of

3     those slides, if we could, Marie.

4                 Let's go to the next slide.  We've already

5     looked at that one.  Let's go to 47.

6     BY MR. STRAND:

7     Q.    Is this an excerpt from Ms. Dean's report?

8     A.    Yes, it is.

9     Q.    And what does it say there?

10    A.    Would you like me to read the whole thing, or just

11    the underlined portion?

12    Q.    Whatever you think is relevant, sir.

13    A.    Well, just for the context.  It says,

14                "If the third-party provider wants to provide

15    support for a customer who no longer has access to Oracle's

16    updated support services and materials at a level

17    'comparable' or 'superior' to support provided by Oracle at

18    50 percent of Oracle's prices" -- and this is Ms. Dean in

19    her report saying, "-- it would require" that "the

20    third-party support provider to either have a license to

21    Oracle's intellectual property or," and this is the most

22    important part, "invest a significant amount of money" --

23    excuse me, "a significant" amount of -- "amounts of time

24    and resources."

25                Sorry I didn't read that more faithfully, but

2763

1   you can get the gist of it, I hope.

2   Q.    Did you also find -- you also mentioned a portion of

3   Ms. Dean's report dealing with efficiencies.

4           Let's look at the next slide.

5           Is that the portion of the report that you were

6   referencing, sir?

7   A.    Yes.  May I read it?

8   Q.    Sure.

9   A.    She says,

10          "I understand that Rimini Street experienced

11  substantial efficiencies through its alleged improper use

12  of Oracle's copyrighted software and support materials."

13          And then she footnotes back to Oracle's

14  technical expert, Dr. Davis, and he pretty much said the

15  same thing, that what was gained from the infringement were

16  efficiencies, it was less expensive to operate that way.

17  Q.    And, Mr. Hampton, did you undertake to value those

18  efficiencies?

19  A.    When I read --- I'm sorry.  When I read Dr. Davis'

20  report and I read Ms. Dean's report, it became clear to me

21  that the most appropriate way to measure just the wrongful

22  acts, just the interference, and just the infringement,

23  wasn't to value the customer, because then I would be

24  picking up all of the stuff that Oracle does that isn't

25  accused.

2764

1          So I decided here's the right approach.  Let's

2     look at what those efficiencies would be, calculate the

3     additional labor that Dr. Davis talks about, Ms. Dean spoke

4     of, and that is a closer representation of the true benefit

5     that was gained through the infringement rather than a

6     customer.

7     Q.    And is your -- a high-level overview of your work

8     set forth on slide 49 here in front of us?

9     A.    Correct.

10    Q.    Let's walk through that.  What did you do to

11    calculate the efficiencies in this case, Mr. Hampton?

12    A.    Well, I started with Dr. Davis' report and

13    Ms. Dean's report where they talked about labor

14    efficiencies.

15          So the next thing I did was I also -- I had the

16    chance to read deposition transcripts, and there was also

17    references to labor efficiencies there.

18          Seth Ravin had been asked about efficiencies,

19    and he said, well, if we were to do it in a non-accused way

20    that didn't infringe or interfere, it would take twice as

21    much labor.

22          I also had the opportunity to talk directly with

23    Mr. Zorn, who you heard from just before me.  He's their

24    chief financial officer.

25          So I spoke with Mr. Zorn, and I proposed, well,

2765

1    this is the right way to do this, let's calculate exactly

2    what the benefit was with the efficiencies from the

3    wrongful acts, and we'll have the best calculation

4    available.

5                    And I asked him if there was information

6    available that would allow us to do that.

7                    Mr. Zorn suggested, because he's the financial

8    person and not the production -- he's not the IT person,

9    that we should ask Mr. Benge to assist us in finding out

10   which people within Rimini Street would have to have

11   additional labor to perform their tasks in a non-accused

12   fashion.

13                   So I spoke with Mr. Zorn, and then he and I both

14   spoke with Mr. Benge, and Mr. Benge said that he would go

15   back and talk with his production people within the company

16   and come up with an estimate of which employees would have

17   to be doubled, because Seth Ravin testified that it would

18   take twice as much, there was talk of efficiencies.

19                   I thought doubling was a lot more than a

20   substantial efficiency, and so I decided that would be my

21   approach.

22   Q.   Now, is the number of employees, then, reflective of

23   your addition of employees to accommodate -- to accommodate

24   the not doing the wrongful acts here in your summary that

25   we've got in front of us?

1    A.    What I calculate is the amount of money that Rimini
2    Street would have to spend in order to operate legitimately
3    without any of the misconduct.
4    Q.    Okay.  And is that what's reflected on the exhibit
5    before us?
6    A.    It is, yes.
7    Q.    All right.  And what was the total amount that you
8    concluded Rimini would have to spend to not engage in the
9    misconduct?
10    A.    Well, my analysis started in 2006 and went through
11    February of 2014.
12            Because the financial records were not complete
13    in 2006 and 2007, I relied on the 2008 year.  That was the
14    year that Mr. Zorn went to the company and started really
15    putting their house in order with regards to their
16    financial records.
17            So I used the 2008 to make estimates about the
18    real beginning.  2006, there was only a handful of
19    customers, only a handful of employees.
20            And over this course of time, I have additional
21    employees, as you can see on this schedule just above the
22    dollar amounts, so I calculated it.
23            Over this period of time, Rimini Street would
24    have had to hire about 47 additional people in order to
25    operate in the non-accused fashion.

1          So if they weren't going to infringe and they

2     weren't going to interfere, then they would have had to

3     hire 47 more people, which, for some of these years, would

4     be like a 30 percent increase in their payroll overall, not

5     just for the production, it's really more doubling the

6     production.

7               I also, through the conversations I had with

8     management at Rimini Street, identified that it didn't make

9     a lot of sense to double the PSEs because you have a PSE

10    for each customer, and the customers is the same number of

11    customers.

12              So just as an efficiency, I increased the PSE by

13    a quarter.  So I assumed it would take -- out of every four

14    PSEs, they would hire one more.

15              What I came to, after I calculated where they'd

16    be -- also there's some underlying assumptions that where

17    these people would actually be would be in India because

18    it's less expensive to operate there, and they can speak

19    English, and they have the skill set, and other companies

20    do as well.

21              So assuming these new employees, at least the

22    production people, would be located in India, the PSEs, the

23    additional primary service engineers, I assumed would be in

24    the United States.

25              So I added an amount for overhead for this time

2768

```
 1   period of what it would cost to operate in India, which is
 2   the 99,000.
 3            I don't know if the jury can see the final
 4   number because it's cut off on my screen.  If it could just
 5   be shifted to the left a little bit, it would help.
 6            So --
 7            MR. STRAND:  Let's do this.  Your Honor --
 8   BY MR. STRAND:
 9   Q.    Is this a summary of your work?
10   A.    Yes, it is.
11   Q.    And it's -- all the work that you've just talked
12   about went into this summary; correct?
13   A.    This is the summary.  It's quite complex, but this
14   is the summary.
15            MR. STRAND:  Your Honor, I move the admission of
16   Defendants' Exhibit 3022 as a summary of Mr. Hampton's
17   work, what we've just been looking at on the screen.
18            THE COURT:  Any objection?
19            MR. ISAACSON:  No objection.
20            THE COURT:  It is admitted.
21       (Defendants' Exhibit 3022 received into
22       evidence.)
23   BY MR. STRAND:
24   Q.    All right.  So the total number you came up with
25   is --
```

DONNA DAVIDSON, RDR, CRR, CCR #318    (775) 329-0132

1                    THE COURT:  Let's establish a number for that.

2                    MR. STRAND:  Excuse me.  It's DTX 3022.  I went

3    out of order.  But I'm going to work back to 3011, I

4    promise.

5                    COURTROOM ADMINISTRATOR:  Do we have copies?

6                    MR. STRAND:  We will have copies almost

7    instantly.  But you will have a copy right now.  And I'll

8    get the electronic tab fixed on that.

9    BY MR. STRAND:

10    Q.    Now, based upon that $3 million number -- excuse me,

11    $9.3 million number, Mr. Hampton, then do you have a final

12    opinion about the appropriate amount of damages in this

13    case?

14    A.    I do.  What this schedule shows is that -- could we

15    go back --

16    Q.    Sure.  Sure.  We can go back.

17    A.    So over the period under review, which goes through

18    February of 2014, I've calculated if Rimini Street had not

19    infringed and didn't interfere, they would have to employ

20    approximately 47 more people.

21                    And I calculated the wages for those people,

22    with their overhead of space and phones and computers, and

23    I arrived at a number of $9,281,000.

24                    For that period of time, they would have to

25    spend almost $10 million in additional labor to work in a

1    non-accused fashion.

2    Q.    Now, and then have you -- going to the next slide,

3    where I got ahead of you, have you calculated total damages

4    in this case based upon everything we talked about today?

5    A.    Yes.

6    Q.    And what is that calculation, sir?

7    A.    This is summarized in the same fashion that Ms. Dean

8    had presented her damages.

9          So with regard to the lost profits for OIC, I

10   don't think there were any.  I don't think Oracle lost any

11   additional customers because of the infringement and

12   interference.

13   Q.    Okay.

14   A.    Also with Oracle America, I don't think Oracle

15   America has lost a customer due to the interference or the

16   infringement, and we shouldn't look at anything other than

17   that.

18         We don't want to measure the wrong thing.  We're

19   trying to measure just the impact of the wrongful acts.

20   Lost profits is an incorrect measure and arrives at a

21   windfall for Oracle.

22         With regards to the database --

23   Q.    Yes, sir.

24   A.    Thank you.

25         With regards to the database, if it's two

2771

1      instances, if they would have negotiated for two licenses,

2      it would have been about $100,000.  If they would have

3      licensed 72 copies, about 3 million.

4              So the best metric of the damages is what it

5      actually benefitted Rimini Street, and we just went through

6      that, it was $9.3 million.

7              That's the value -- that's the cost savings that

8      Dr. Dean talked about, those are the efficiencies,

9      9.3 million.  That has a direct link to the wrongful acts.

10     That's the appropriate remedy because it links directly to

11     wrongful acts.

12             The problem with Ms. Dean's calculation is it

13     doesn't have a direct link.  She has to make all sorts of

14     assumptions about Rimini couldn't exist, and it's too

15     speculative.

16     Q.    So -- go ahead.

17     A.    I'm sorry.

18     Q.    No, go ahead.

19     A.    With the 100,000 and 3 million on the database

20     license, adding that to the value of use, the range of

21     damages that I think is the appropriate amount that

22     compensates for this infringement and interference is

23     9.4 million to $17 million.

24     Q.    Now, have you summarized that all in the slide

25     that's before us?

2772

```
 1     A.    I didn't hear you.  I'm sorry.
 2     Q.    Have you summarized all of that that's in the slide
 3  before us?
 4     A.    Yes.
 5           MR. STRAND:  I move the admission of DTX 3021,
 6  Your Honor.
 7           MR. ISAACSON:  No objection.
 8           THE COURT:  All right.  It is admitted as a
 9  summary.
10        (Defendants' Exhibit 3021 received into
11        evidence.)
12           MR. STRAND:  Mr. Hampton, thank you.  I have no
13  further questions.
14           THE COURT:  All right.
15                    CROSS-EXAMINATION
16  BY MR. ISAACSON:
17     Q.    Mr. Hampton, we haven't met.  Good afternoon.  Bill
18  Isaacson.
19     A.    Hello.
20     Q.    Let's talk about the last subject you were talking
21  about, value of use, which you measure at $9.4 million.
22           Now, that -- that is one measure of plaintiffs'
23  copyright damages; right?
24           That's your opinion?
25     A.    I think that it also could be an appropriate remedy
```

2773

1    for the interference claims as well.

2              MR. ISAACSON:  Your Honor, I move to strike as

3    nonresponsive and outside of his report.

4              THE COURT:  The motion will be granted.  The

5    nonresponsive portion is stricken.

6              THE WITNESS:  I apologize.

7    BY MR. ISAACSON:

8    Q.    My question is, that's one measure of plaintiffs'

9    copyright damage; correct?

10   A.    Yes, sir.

11   Q.    Okay.  And let's understand what value of use is

12   because that kind of went by a little quickly.

13             Basically what you're saying is, and tell me if

14   I have this right, is that if Rimini had operated legally,

15   if it hadn't engaged in all these copyright violations, if

16   it had gone about it the right way, it could have run its

17   business, but the business would have been more expensive,

18   and that extra expense would have been about $9.4 million.

19   Do I have that right?

20   A.    Yes.

21   Q.    So what we're going to pretend for purposes of this

22   damage -- this damage model, is that Rimini is acting

23   legally, and you've estimated that behaving legally costs

24   $9.4 million; correct?

25   A.    I'm looking at a but-for scenario of with and

2774

1    without the accused actions and how much more profit Rimini

2    Street would have had.

3              Because if you avoid a cost, it falls to the

4    bottom line as additional profit.

5    Q.   All right.  And what you're principally looking at

6    is labor costs, that Rimini, in your opinion, was avoiding

7    labor costs by engaging in the infringement we have

8    alleged, otherwise they would have had to hire more people?

9    A.   Most of Rimini Street's costs are labor related.

10   Q.   All right.  Now, how many cases -- intellectual

11   property cases did you say you've testified in?  It was a

12   lot.

13   A.   I've been engaged in over 180 over the course of the

14   years since 1994 through today.

15   Q.   And there was a lot of those that were copyright

16   cases; right?

17   A.   Yes, there were.

18   Q.   All right.  And you don't remember a single one of

19   those cases in which you have measured or given opinion

20   that copyright infringement damages should be set at the

21   amount of the defendants' avoided costs; isn't that

22   correct?

23   A.   I think that's right.  I think this is the first

24   time that it's been -- the metric was avoided cost for the

25   value-of-use calculation.

2775

1    Q.    A hundred and eighty cases, and this is the first
2    time you've come up with it?
3    A.    Each case is unique, and so the application is --
4    the method is value of use.  Each case is unique as far as
5    fact pattern.
6    Q.    Are your methods unique in every case?
7    A.    The approach is not unique.
8    Q.    Right.
9    A.    The methods, I think they are unique.  I think each
10   case, you have to look at the facts for each particular
11   case, and they're going to differ.
12   Q.    Your approach in this case is unique, at least for
13   your career.  You've never done this method before in a
14   copyright case; correct?
15   A.    I don't recall ever using a value-of-use approach
16   using avoided cost, but I've certainly used the
17   value-of-use approach before.
18   Q.    But never in a copyright case?
19   A.    I'm not sure of your question.  Are you talking
20   about applying value of use --
21   Q.    Yes.
22   A.    -- or are you talking about avoided labor?
23   Q.    Value of use -- well, avoided labor.
24   A.    Sure, I think that's true.
25         This is an interesting case because --

2776

1    Q.    Sir --

2    A.    Oh, I'm sorry.

3    Q.    My question is what you've done in the past.

4    A.    I apologize.

5    Q.    I'm glad you think it's an interesting case.  So do

6    we.

7    A.    Could I ask -- am I too loud in this microphone?  Am

8    I hurting everybody's ears?  Okay.  I wanted to be sure.

9    Thank you.

10   Q.    I think you're okay.

11   A.    Thank you.

12   Q.    Now, in terms of these avoided labor costs, what you

13   assumed, if Rimini had not engaged in copyright violations,

14   if they hadn't done all this copying, you assumed that they

15   would have to double the amount of their developers and

16   their quality assurance engineers; isn't that right?  Do I

17   have that right?

18   A.    Well, what I asked Mr. Benge to do was go back and

19   talk with --

20   Q.    Sir --

21   A.    I was trying to answer.  I'm sorry.

22   Q.    We'll get to Mr. Benge.

23         My question is your assumption.  Did you assume

24   for purposes of your estimate of avoided labor costs that

25   you would have to have double the amount of PeopleSoft

2777

1    developers and quality assurance engineers?

2    A.    Among others, yes.

3    Q.    Okay.  And you assumed 25 percent more primary

4    support engineers?  Is that right?

5    A.    That's correct.

6    Q.    Okay.  And in terms of that remote -- and let's be

7    clear.  You also assumed that the business would be

8    entirely using remote environments; correct?

9    A.    You want a yes or no, or can I explain?

10   Q.    I would like a yes or a no.

11   A.    Yes.

12   Q.    Now -- and just to go back over that, I think we've

13   learned this at this point, but you're talking about --

14   when we talk about remote environments, you're talking

15   about environments on the client's system and not on the

16   Rimini system?

17   A.    Yes.

18   Q.    And in terms of your assumptions, you assumed that

19   all of the engineers servicing those remote environments

20   would be hired in India?

21   A.    Except for the PSEs, they would be hired in the

22   United States.  The primary contact, the primary support

23   engineer would be in the United States.

24   Q.    But those aren't the remote engineers.  The remote

25   engineers are the ones who work with the environments, and

2778

1     they would be entirely based in India; correct?

2     A.    I don't fully understand your question.

3     Q.    All right.  Do you know the --

4     A.    Technical area of --

5     Q.    You don't know what a remote engineer does versus

6     what a PSE does?

7     A.    I think I do.  It's not my area of expertise.  I

8     have a layperson's understanding.

9     Q.    All right.  You also assumed that they would have to

10    hire -- they would have to double their amount of

11    onboarding employees; right?

12    A.    Yes.

13    Q.    And those would come from India?

14    A.    Yes, they would.

15    Q.    You mentioned Mr. Benge.  So now let's talk about

16    that.

17          For your assumptions about the increased

18    employment that would be required, you didn't do any

19    analysis of your own, as you've said, you don't really have

20    that technical background, you relied on Mr. Benge;

21    correct?

22    A.    I think my testimony was I relied on Dr. Davis and

23    Ms. Dean's reports primarily.  That's where I understood

24    that there were efficiencies and labor savings, from them.

25    And then --

1    Q.    In terms of quantifying --

2    A.    -- I went to Mr. Benge for the metric or the

3    measure.

4    Q.    I'm asking you about your assumptions about the

5    doubling -- that it would be sufficient to double the

6    amount -- I'm asking you about your assumptions that all

7    that would be required would be to double the amount of

8    remote engineers, quality assurance engineers, 25 percent

9    more PSEs, those all came from Mr. Benge; right?

10   A.    Not entirely.

11   Q.    Okay.  You did talk to Mr. Zorn, but all that

12   Mr. Zorn gave you was some payroll information as to what

13   it would cost -- what it would take to hire those people;

14   correct?

15   A.    I don't know if it was limited to the way you say

16   it.  I got financial information from Mr. Zorn.

17   Q.    Is it correct that based on the assessment made by

18   Jim Benge and Doug Zorn, you understood that doubling the

19   amount of PeopleSoft developers and PeopleSoft quality

20   assurance engineers would be sufficient to perform their

21   duties in a remote-only manner?

22   A.    It wasn't limited to Mr. Benge and Mr. Zorn.

23   Q.    Can we look -- would you look at paragraph 169 of

24   your report.

25              I would ask permission to show this paragraph on

2780

1     the screen to assist the jury.

2     A.    I think I went to the wrong page.

3     Q.    Paragraph 169, page 90.

4     A.    Thank you.

5               MR. ISAACSON:  Any objection?

6               MR. STRAND:  No.

7               MR. ISAACSON:  Would you show paragraph 169.

8     BY MR. ISAACSON:

9     Q.    You wrote in your report,

10              "First, based on an assessment made by Jim Benge

11    and Doug Zorn, I understand that doubling the number of

12    PeopleSoft developers and PeopleSoft quality assurance

13    engineers would be sufficient to perform their duties in a

14    remote-only manner of operation for Rimini's current

15    PeopleSoft client base."

16              That is what you said in your report; right?

17    A.    That's correct.

18    Q.    Do you stand by it?

19    A.    Yes, I do.  I also had other sources, but I did

20    mention those two.

21    Q.    Well, you didn't mention the other sources when you

22    wrote that part of your report, did you?

23    A.    I didn't mean it to be exclusive.  I was just saying

24    that I did use those sources.

25    Q.    Let me ask you about Mr. Zorn.

2781

1          Then what Mr. Zorn did was limit it to

2    information regarding Rimini's actual staffing and salary

3    information for certain positions identified by Mr. Benge.

4    I have that correct, don't I?

5    A.    I think you read that correctly.

6    Q.    Okay.  Now, and that makes sense.  Mr. Zorn's in

7    finance, he's not going to give you a technical opinion

8    about how many engineers you need; is that fair?

9    A.    Yes.

10   Q.    Now, Mr. Benge told you that -- well, Mr. Benge gave

11   you this information, it was in a verbal conversation;

12   correct?

13   A.    He may have.  I also got it electronically as well.

14   Q.    All right.  But when he first -- well, when you say

15   you got it electronically, did you get electronic

16   calculations from Mr. Benge?

17   A.    No, they came through Mr. Zorn.

18   Q.    All right.  So Mr. Zorn gave you a calculation that

19   plugged in numbers that Mr. Benge gave him.

20   A.    I don't know that I can -- I don't know what you

21   mean by plugged in.

22   Q.    Well, I mean the number of employees.

23   A.    Could you restate your question?

24   Q.    Sure.  I think we're in agreement that you -- that

25   Mr. Benge gave you an estimate of how many additional

2782

1    engineers were needed, that that number of engineers did

2    not come from Mr. Zorn.

3              So when you received a spreadsheet or other

4    document with calculations from Mr. Zorn, were the numbers

5    of employees derived from what Mr. Benge said?

6    A.    Oh, absolutely, yes, that was the intent.

7    Q.    And you understood with respect to the intent that

8    Mr. Benge had prepared his estimate for purposes of this

9    litigation?

10   A.    Based on my request.

11   Q.    And you knew that Mr. Benge understood that the

12   purpose of his conversation with you was so that Rimini

13   could escape liability in this case?

14   A.    I didn't have that understanding.

15   Q.    All right.  Did Mr. Benge -- you knew that Mr. Benge

16   knew that the company's goal was to minimize their damages

17   in this case; correct?

18   A.    I'm not sure as a production person he was actually

19   thinking along those lines.  I'm not sure that he actually

20   understood my calculation or what I was doing.

21             I didn't tell him how I was going to calculate

22   damages.  I asked him to give me an estimate of how many of

23   the production people would have to be increased in order

24   to operate in a noninfringing, non-accused fashion.

25   Q.    Were you here in court when Mr. Benge said that he

2783

1    knew that the company's goal was to minimize damages when

2    he spoke to you?

3    A.    I wasn't present.

4    Q.    Now, Mr. Benge himself did not give you any

5    calculations that you could check; right?

6    A.    I understood that the numbers of the employees that

7    would need to be added came from Mr. Benge.

8              MR. ISAACSON:  All right.

9              THE COURT:  Mr. Isaacson, let me ask before you

10   go on to another topic here, would this be a good time to

11   take our break for the day?  We have to terminate early

12   today.

13             MR. ISAACSON:  That would be fine, Your Honor.

14             THE COURT:  All right.  Thank you.

15             Ladies and gentlemen, as I mentioned, we need to

16   close down a little bit early today, and so this is

17   obviously the time that appears to me to be the best time.

18             So I'm going to remind you of the cautions

19   because this will carry over to tomorrow, and I didn't go

20   through them at length yesterday.

21             I remind you that during the recess you're not

22   to discuss the case with anyone or permit anyone to discuss

23   it with you or in your presence.

24             This includes not discussing the case in any

25   kind of an electronic way, or inquiring in any kind of an

2784

1     electronic way, through the Internet, through emails,

2     through text messaging.

3             It's very important that you avoid any kind of

4     exposure of communication through radio, television,

5     Internet, or any other source.

6             It's very important also that no one conducts

7     any kind of research or makes independent inquiry or

8     analysis into anything pending in this case because it's so

9     critically important that every one of you will decide this

10    case based on the exact same evidence that was presented to

11    every one of you.

12            Keep an open mind until all the witnesses have

13    testified and you've heard the instructions on the law and,

14    in fact, have heard the opinions of your own jurors at such

15    time as you're able to discuss this case, which will be

16    when you deliberate the case.

17            And leave your notes in the jury room.

18            And we will start tomorrow morning at 9:00 a.m.

19    instead of 8:00 a.m.

20            And I think that covers what I need to cover.

21    So I'll wish you a pleasant afternoon and evening as well,

22    and we'll see you tomorrow morning.  Thank you.

23            COURTROOM ADMINISTRATOR:  Please rise.

24       (The proceedings adjourned at 12:27 p.m.)

25                         *    *    *

2785

1                                -o0o-

2          I certify that the foregoing is a correct

3          transcript from the record of proceedings

4          in the above-entitled matter.

5

6          _____    10/1/15

7          Donna Davidson, RDR, CRR, CCR #318        Date
           Official Reporter

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

2786

1                          I N D E X

2    DEFENDANTS' WITNESSES:                        PAGE
     BROOKS HILLIARD
3        Direct Examination By Mr. Reckers          2604
         Cross-Examination By MS. Dunn              2618
4    DOUGLAS ZORN
         Direct Examination By Mr. Strand           2625
5        Cross-Examination By Ms. Dunn              2667
         Redirect Examination By Mr. Strand         2697
6    SCOTT DEAN HAMPTON
         Direct Examination By Mr. Strand           2699
7        Cross-Examination By Mr. Isaacson          2772

8
                           E X H I B I T S
9

10   DEFENDANTS'                                  ADMITTED
     97                                            2651
11   399                                           2636
     3005                                          2650
12   3006                                          2649
     3018                                          2655
13   3019                                          2654
     3021                                          2772
14   3022                                          2768

15

16

17

18

19

20

21

22

23

24

25