2787

1                    UNITED STATES DISTRICT COURT
                         DISTRICT OF NEVADA
2          BEFORE THE HONORABLE LARRY R. HICKS, DISTRICT JUDGE

3

4    ORACLE USA, INC., a Colorado      :
     corporation; ORACLE AMERICA,      :
5    INC., a Delaware corporation;     :
     and ORACLE INTERNATIONAL          :No. 2:10-cv-0106-LRH-PAL
6    CORPORATION, a California         :
     corporation,                      :
7                                      :
             Plaintiffs,               :
8                                      :
         vs.                           :
9                                      :
     RIMINI STREET, INC., a Nevada     :
10   corporation; and SETH RAVIN,      :
     an individual,                    :
11                                     :
             Defendants.               :
12   _____:

13

14

                    TRANSCRIPT OF JURY TRIAL - DAY 14
15                    (Pages 2787 through 3059)

16

17                        October 1, 2015

18

                          Las Vegas, Nevada
19

20

21

22

     Court Reporter:        Donna Davidson, RDR, CRR, CCR 318
23                          Certified Realtime Reporter
                            400 South Virginia Street
24                          Reno, Nevada  89501
                            (775) 329-0132
25

2788

```
 1                    A P P E A R A N C E S

 2     FOR THE PLAINTIFFS:

 3     BOIES, SCHILLER & FLEXNER LLP
       KIERAN P. RINGGENBERG
 4     1999 Harrison Street, Suite 900
       Oakland, California 94612
 5     (510) 874-1000
       Fax: (510) 874-1460
 6     kringgenberg@bsfllp.com

 7     BOIES, SCHILLER & FLEXNER LLP
       RICHARD J. POCKER
 8     300 South Fourth Street, Suite 800
       Las Vegas, Nevada 89101
 9     (702) 382-7300
       Fax: (702) 382-2755
10     rpocker@bsfllp.com

11     BOIES, SCHILLER & FLEXNER LLP
       WILLIAM A. ISAACSON
12     KAREN L. DUNN
       5301 Wisconsin Avenue, NW
13     Washington, DC  20015
       (202) 237-2727
14     Fax:  (202) 237-6131
       wisaacson@bsfllp.com
15     kdunn@bsfllp.com

16     MORGAN LEWIS & BOCKIUS LLP
       THOMAS S. HIXSON
17     NITIN JINDAL
       JOHN A. POLITO
18     One Market, Spear Street Tower
       San Francisco, California 94105
19     (415) 442-1000
       Fax:  (415) 442-1001
20     thomas.hixson@morganlewis.com
       nitin.jindal@morganlewis.com
21     john.polito@morganlewis.com

22     JAMES C. MAROULIS
       DORIAN E. DALEY
23     Oracle Corporation
       500 Oracle Parkway
24     Redwood City, California 94070
       (650) 506-4846
25     jim.maroulis@oracle.com
       dorian.daley@oracle.com
```

                                                                2789

 1                 A P P E A R A N C E S (Continued)

 2   FOR THE DEFENDANTS:

 3   SHOOK, HARDY & BACON LLP
     PETER E. STRAND
 4   B. TRENT WEBB
     RYAN D. DYKAL
 5   2555 Grand Boulevard
     Kansas City, Missouri 64108
 6   (816) 474-6550
     Fax: (816) 421-5547
 7   pstrand@shb.com
     bwebb@shb.com
 8   rdykal@shb.com

 9
     SHOOK, HARDY & BACON LLP
10   ROBERT H. RECKERS
     600 Travis Street, Suite 3400
11   Houston, Texas 77002
     (713) 227-8008
12   Fax: (713) 227-9508
     rreckers@shb.com
13
     SHOOK, HARDY & BACON LLP
14   ANNIE Y.S. CHUANG
     One Montgomery Tower, Suite 2700
15   San Francisco, California 94104-4505
     (415) 544-1900
16   achuang@shb.com

17
     LEWIS ROCA ROTHGERBER LLP
18   W. WEST ALLEN
     3993 Howard Hughes Parkway, Suite 600
19   Las Vegas, Nevada 89169
     (702) 949-8230
20   Fax: (702) 949-8364
     wallen@lrrlaw.com

21

22

23

24

25

```
 1              LAS VEGAS, NEVADA, OCTOBER 1, 2015, 9:02 A.M.

 2                             --oOo--

 3              P R O C E E D I N G S

 4

 5         (Outside the presence of the jury.)

 6              COURTROOM ADMINISTRATOR:  Please rise.

 7              THE COURT:  Good morning.  Have a seat, please.

 8              The record will show we're in open court, but

 9    the jury is not present, counsel and parties are.

10              A couple of issues.  First of all, I've

11    considered everything that's been filed with regard to

12    Rimini's and Ravin's motion for a reconsideration of the

13    admissibility post-February 2014 conduct.

14              That motion will be denied.  I do not feel that

15    the door has been opened through the testimony of

16    Mr. Benge, and, more importantly, I think that that would

17    interject in this case colossal confusion and lack of

18    understanding by the jury even if it's accepted as true,

19    and I understand there's been no discovery concerning the

20    proposition on behalf of Oracle.  So the motion is denied.

21              I'm -- there was a request by someone whether we

22    could go until 3:00 today.  Can someone fill me in a little

23    more on that.

24              MR. WEBB:  We received a call from Oracle's

25    lawyers last night suggesting that they might be able to
```

```
 1    wrap up their rebuttal case quickly, and that if we had

 2    just a little more time today, we could basically be done

 3    with evidence today.

 4              We have no problem going a little longer.

 5              One of our witnesses today is a third party who

 6    has a flight to catch first thing tomorrow morning.  He

 7    just has to be done today.

 8              If we need to stay longer for the rebuttal case,

 9    which I understand is going to be brief, we have no

10    objection.  We think that makes a lot of sense to try to

11    get this thing done today.

12              So that's where we stand.

13              MR. ISAACSON:  That's the goal.

14              The only other -- so there's the

15    cross-examination of this gentleman, there's the

16    third-party witness, and then you have about an hour and a

17    half video.

18              MR. WEBB:  Well, we're trying to trim that down.

19              THE COURT:  Okay.  Well, my first concern is

20    obviously with the jury, and if no one has any objection,

21    I'll ask if my court clerk, Dionna, can step into the jury

22    room and just ask anyone if we're running longer today if

23    anyone would have a problem staying until 3:00.  And if

24    anyone does, I don't want to put them on the spot, we'll go

25    until 2:00 and that's it.
```

1               MR. ISAACSON:  That's up to them, and if it

2   helps, I'm sure we would be willing to have some sandwiches

3   that the Court could say the Court is providing the jury at

4   a break.

5               THE COURT:  We've got them covered.

6               MR. ISAACSON:  Okay.

7               THE COURT:  But there's no objection to doing

8   that through my court clerk?

9               MR. WEBB:  None, Your Honor.

10              We -- just to give you a clue, we have a

11  cross-examination which will be however long it is.  Then

12  we have a few videos that we're still trying to trim down

13  to compress to just what we need, and then we have that

14  last witness, Mr. Baggett, which I presume will be an hour,

15  maybe, or so.

16              So I think it's very achievable to get this

17  thing done today provided the rebuttal case isn't longer

18  than is represented.

19              THE COURT:  Okay.  All right.  Well, we'll keep

20  our tabs on all of that.

21              I would -- in going over instructions and

22  considering verdict forms, I see that Oracle has -- as I

23  understand it, is not going to pursue the trespass to

24  chattels and contract claim; is that correct?

25              MR. ISAACSON:  Correct.

```
 1              THE COURT:  And that -- I lost my train of

 2    thought.

 3              But, in any event, I would like to have proposed

 4    verdict forms submitted on behalf of everyone -- I do see I

 5    received some on behalf of Oracle -- by today at 5:00.

 6              And I think that's all we need to address right

 7    now.

 8              MR. WEBB:  Thank you, Your Honor.

 9              THE COURT:  Dionna, go ahead and speak to the

10    jury, and then bring them in, and just pass me a note if

11    there's a problem.

12         (Pause in the proceedings.)

13         (Jurors enter courtroom at 9:07 a.m.)

14              THE COURT:  Good morning.  Have a seat, please.

15              Ladies and gentlemen, as I was looking at my

16    notes as you were coming in, I see we started on

17    September 14th, and we're into October today.  It's the

18    first day of October.

19              But that also points out to me how much I

20    appreciate all of your being here so timely and being

21    prepared to go forward and the close attention I've seen

22    you pay to this trial.  I sincerely appreciate it, and I'm

23    sure I speak on behalf of everyone in this courtroom.

24              So, with that stated, the record will show that

25    we're in open court.  The jury's here, the parties and
```

2794

1   counsel are here.

2           And Mr. Hampton continues on the stand in

3   cross-examination by Mr. Isaacson.

4           Go ahead, please.

5           MR. ISAACSON:  Thank you.  Good morning,

6   everyone.

7                   SCOTT DEAN HAMPTON

8           recalled as a witness on behalf of the

9         Defendants, having been previously sworn,

10          was examined and testified as follows:

11               CROSS-EXAMINATION RESUMED

12  BY MR. ISAACSON:

13  Q.    Mr. Hampton, I want to ask you about some of your

14  calculations that are found in exhibits to your report.

15          You've got your report up there with you with

16  the exhibits?

17  A.    Yes, I do.

18  Q.    And you have the -- your second report, the

19  supplemental report where you updated some of your

20  calculations?

21          All right.  And you've got a tab E --

22  A.    I'm sorry, I can't hear you.

23  Q.    You've got a tab E or Exhibit E?

24  A.    Yes.

25  Q.    All right.  And there's an Exhibit E1.SU.  SU means

2795

1    it's your supplement?

2    A.    Correct.

3    Q.    All right.  I want to ask you about some of the

4    numbers on this.

5              MR. ISAACSON:  I think it will assist the jury

6    if we put this on the screen, if there's no objection.

7              MR. STRAND:  No objection.

8    BY MR. ISAACSON:

9    Q.    All right.  Now, this is one of several pages in E1.

10   You can see the E1 up in the upper right.

11             In E2, you have calculated Rimini Street's

12   estimated revenues and profits for its PeopleSoft, Siebel,

13   and JD Edwards support services; is that correct?

14   A.    Yes, I think that's correct.

15   Q.    All right.  And in -- and then what you've done in

16   your supplemental report -- you did it in your opening

17   report, and then you extended your calculation to some

18   additional years; correct?

19   A.    Yes, that's right.

20   Q.    All right.  And E1.SU is a chart you calculated?  Is

21   that right?

22   A.    Yes, sir.

23   Q.    Okay.  Is that -- when we say "you," is that you or

24   your staff?

25   A.    Under my direction my staff created this schedule.

                                                                2796

1      Q.    All right.  Now, can we look at -- can we look at

2   DTX 3019.

3             All right.  Now, were you here yesterday for --

4   when Mr. Zorn was testifying?

5      A.    I was.

6      Q.    All right.  And we can make this bigger.

7             Mr. Zorn testified that this document was

8   prepared by the accounting group for Rimini Street.  And if

9   you look at it, it's identical to your schedule E1.SU;

10  right?

11     A.    I believe it is, yes.

12     Q.    In fact, your schedule E1 was not prepared by you or

13  your staff, it was prepared by the accounting group at

14  Rimini; right?

15     A.    This particular spreadsheet that we're looking at --

16     Q.    Sir, would you answer the question.

17            Was your E1.SU in fact not prepared by your

18  staff or you, was it prepared by the accounting group at

19  Rimini?

20     A.    It was prepared by me.

21     Q.    It was prepared by you?

22     A.    The exhibit in my report at E1.SU was prepared by me

23  and my staff or my staff under my direction.

24     Q.    And what that means is that you took the identical

25  document, the identical fonts, the identical format, and

2797

1     you put into it your exhibit; right?

2      A.    No, these fonts and formats are mine.

3            The document that Mr. Ravin is talking about --

4     not Ravin, but Zorn, was the spreadsheet he created.

5            So my staff was taking the financial information

6     that was provided by Mr. Zorn and put it in this format.

7     He looked at it and saw the same close -- something so

8     close to the same format, and it's an Excel spreadsheet.

9            But -- so we're talking numbers from Rimini

10    Street's financial information that was in an Excel

11    spreadsheet that was given to us, and we put it into our

12    format for our report.

13           So the formatting is mine.  The numbers are

14    coming from Rimini Street.

15     Q.    The numbers in the document prepared by the Rimini

16    accounting staff -- let's look at DTX 3019.  All right.

17    And then let's look at your exhibit.

18           Every last one was identified; right?

19     A.    Because they're the same document.

20     Q.    All right.  And let's go to the bottom of 3019,

21    little asterisks, "may not foot due to rounding"; right?

22     A.    Correct.

23     Q.    Let's go to your exhibit.  Same footnote; correct?

24     A.    Because they're both my documents.

25     Q.    All right.  Let's look at footnote 1 of your

2798

1    document, as you say.

2              "For 2008 I have adjusted the amounts" -- "I

3    have adjusted the amounts of general and administrative

4    other income and taxes to reconcile with Rimini Street's

5    2008 audited financial statements."

6              Let's go up to the line for general and

7    administrative.  Highlight that line.

8              Let's look at DTX 3019 which is prepared by

9    Rimini's accounting department.

10             Those are identical numbers, aren't they, sir,

11   in the general and administrative line?

12   A.    They are.

13   Q.    All right.  When you said in your footnote that you

14   had made those adjustments, you had, in fact, made no

15   adjustments.  Those were adjustments made by the Rimini

16   accounting department; correct?

17   A.    No.

18   Q.    Okay.  When you said, "I have made adjustments,"

19   what you did was you took -- your staff took -- took the

20   exact same numbers as the Rimini accounting department and

21   made no changes, no adjustments to them; correct?

22   A.    No, you're wrong.

23   Q.    All right.  The -- let's look at Exhibit 2.SU.

24             I gather you say this was your work as well.

25             Oh, by the way, one change you are making in

2799

1     these, let's go to the bottom, is you're putting the

2     Hampton logo on these; right?

3     A.     No, I created the whole document.  My staff created

4     this in Excel.  Both documents were created by my staff.

5     Q.     All right.

6     A.     I think Mr. -- may I continue?  Or would you like me

7     to stop?

8     Q.     I just asked you --

9     A.     I can wait --

10    Q.     I just asked if you put the Hampton logo on it.

11    A.     I don't want to go too far so I'll just wait.

12    Q.     The E2.SU.  Okay.  Let's look at DTX 3018.

13           DTX 3018 Mr. Zorn said was prepared by the

14    Rimini accounting department.

15           Let's look at your exhibit.  Other than the

16    Hampton logo, it's identical; right?

17    A.     Because my staff created both documents.

18    Q.     The first document Mr. Zorn testified was created by

19    the Rimini accounting department.

20    A.     I think what he was saying was that the numbers were

21    generated by his accounting department.

22    Q.     No, that's not what he said, sir.

23    A.     Well, then, he misunderstood, and he thought they

24    had created this, but they didn't.  My staff created both

25    documents.

1    Q.    All right.  So what's going on here, sir?

2              Okay.  Rimini got on the stand yesterday and

3    talked about their financials that are produced in the

4    ordinary course of business by their accounting department,

5    and you're saying, no, they were using material prepared by

6    your staff?  Is that what you're saying happened?

7    A.    No, what I'm saying, they gave us the information in

8    the Excel spreadsheet in columns and rows, and then my

9    staff took that and input it into an Excel spreadsheet and

10   formatted it in this way.

11             Now, they look fairly similar so I think

12   Mr. Zorn was just confused and thought his staff had

13   created it.

14             But, in reality, both of these documents were

15   created by my staff under my direction, but --

16   Q.    Because they're --

17   A.    -- coming from the source documents, you can make a

18   mistake.

19   Q.    Now, your Exhibits F, G, H, all have that similar

20   foot format, and all have the asterisks saying "may not

21   foot due to rounding"; correct?

22   A.    That is my format for the way I generate a report,

23   and I put the "will not foot due to rounding" on every

24   schedule I create.

25             MR. ISAACSON:  Now, Your Honor, so that the jury

1    may compare DTX 3018 and 3019 in format, footnotes, and

2    numbers, I would move to admit, not for the truth, but for

3    that purpose so the jury can compare, Exhibit E1.SU to his

4    report as 6007, PTX 6007, and Exhibit E2.SU as PTX 6008.

5              MR. STRAND:  No objection.

6              THE COURT:  All right.  They will be admitted.

7              And, ladies and gentlemen, I would instruct you

8    that they're being admitted for purposes of comparison

9    only.

10             You still would consider the evidence based upon

11   what the qualified witnesses have actually testified.

12        (Plaintiff's Exhibits 6007 and 6008 received

13        into evidence.)

14             MR. ISAACSON:  All right.  I gave you the other

15   side of this demonstrative.  Did you have any objection to

16   this?

17             MR. STRAND:  No, we didn't.  I'm sorry.

18   BY MR. ISAACSON:

19   Q.    We prepared a little summary to see if we can

20   describe where we're at in this case.

21             The -- you recognize, until you get to the last

22   column, this was your chart from yesterday summarizing your

23   opinion of Oracle's -- of what you considered to be the

24   damages in this case.

25   A.    I'm not sure I understand what you just said.

2802

1    Q.    So the first two columns are a chart that you had

2    prepared yesterday.  See?

3    A.    Yes, I understand that.  Thank you.

4    Q.    Okay.  And we've added a third column so that

5    everybody can see what you say versus what Ms. Dean says.

6    All right?

7          And so your opinion, if I understand it, tell me

8    if I'm right, is if there is a determination of copyright

9    infringement by this -- for PeopleSoft, Siebel, and JD

10   Edwards, your opinion of the damages that should be awarded

11   is 9.3 million to 14 million; is that correct?

12   A.    That's correct.

13   Q.    Okay.  And the reason you say 9.3 to 14 million is

14   that's your value measure, the avoided labor costs?

15   A.    Well, some of that is the database portion.

16         I calculated the database based on two licenses

17   or the full 72 licenses, and the range is 100,000, if it

18   were two licenses --

19   Q.    Right, I'm sorry.

20   A.    -- and three million if it were the full 72

21   licenses.

22   Q.    That's absolutely right.

23         So up above you can see for database, 100,000 to

24   3 million, so that gets folded into the 9.3 to 14 million,

25   and the remainder is the avoided labor costs?

```
 1   A.    Yes.
 2   Q.    And the -- and what you're saying here, if I
 3   understand it, is if Rimini Street had operated with a new
 4   business model that had not infringed on Oracle's software,
 5   it would have incurred an additional amount of labor costs
 6   of about 9.3 million; correct?
 7   A.    No.
 8   Q.    Okay.  The -- well, the avoided labor costs are
 9   9.3 million; right?
10   A.    Yes, but it's not based on a different business
11   model, it's based on the same business model of the -- of
12   Rimini Street's assembled workers.
13   Q.    Well, wait, wait, wait, wait.
14   A.    So that's what we're dealing with.  The business
15   model --
16   Q.    You're talking about 100 percent remote business
17   model; correct?
18   A.    I'm talking about an assembled workforce of what the
19   business model is.  You want to say --
20   Q.    Would you --
21   A.    -- the business model is infringing.  I think that's
22   why your number is so large.
23   Q.    Try and answer the question, sir.
24   A.    I'm sorry.
25   Q.    You're talking about a 100 percent remote business
```

```
 1    model; right?
 2    A.    Yes.  It would be --
 3    Q.    Okay.
 4    A.    -- 100 percent remote.  So there wouldn't be any
 5    hosting at Rimini Street.
 6    Q.    Exactly.  And that was not true -- that was not
 7    Rimini's business model in 2006, was it?
 8    A.    It was a different procedure.  I'm not sure you
 9    could say it's a business model, but it would be a
10    different procedure.
11    Q.    It was -- Rimini was not 100 percent remote in 2006,
12    in fact, it only had a fraction of its business that was
13    remote; correct?
14    A.    That fraction I believe would be about one in five.
15    Q.    Okay.  Same thing in 2007?
16    A.    As far as I know, the remote portion was about 20
17    percent, or one in the five customers was dealt with in a
18    remote manner.
19    Q.    Same thing in 2008?
20    A.    As far as I know.  I'm sure it changed over time,
21    but the best I understand, it would be about one in five.
22    Q.    So 2006 to 2011, one in five.
23    A.    It might be somewhat different, but that's the best
24    ratio that I understand sitting here today.
25    Q.    And for your damages estimate, you're saying Rimini
```

1     would have had five out of five, all remote?

2     A.    That's correct.

3     Q.    Okay.  And, now, what is your opinion -- if there's

4     a finding of liability for only infringement of PeopleSoft

5     copyrights, what's the amount of damages?

6     A.    That would be about 75 percent of the total that

7     I've calculated.

8     Q.    Okay.  So when you calculated the avoided labor

9     costs of 9.3 million, did you calculate the avoided labor

10    costs for PeopleSoft, JDE, and Siebel separately?

11    A.    No.  I put them together in one spreadsheet to make

12    it more streamline, but I have separate calculations and I

13    can provide it if asked.

14    Q.    How much of the avoided labor costs in the

15    9.3 million was attributable to PeopleSoft?

16    A.    I believe it was 75 to 77 percent.

17    Q.    Okay.  How much was due to Siebel?

18    A.    I believe it was around 10 percent.

19    Q.    And how much to JDE?  That would leave the 15

20    percent?

21    A.    Yes, the remaining.

22    Q.    All right.  And, now, you also talked in your direct

23    about causation.

24          And so you have these zeros up above, and that's

25    because it's your opinion that the infringement here did

2806

1    not cause Oracle to lose a single dollar or even a single

2    customer; right?

3    A.    I don't think that the infringement and interference

4    caused Oracle to lose a customer.  I don't think that's a

5    proper measure.  I think it's so global that it picks up

6    all of the good and the bad --

7    Q.    Sir.  It was a simple question, okay?

8    A.    I'm sorry.

9    Q.    Okay.  Did you, in fact, reach the opinion that

10   Oracle did not lose a single customer or a single dollar

11   due to copyright infringement?

12   A.    I don't think that there's evidence in the record

13   that shows that a customer left because of the infringement

14   or the interference.

15   Q.    And that's true of PeopleSoft; correct?

16   A.    True.

17   Q.    That's correct -- that's your opinion for JD

18   Edwards; correct?

19   A.    Correct.

20   Q.    And that's your opinion for Siebel; correct?

21   A.    That's my opinion.

22        I don't believe that there's evidence that shows

23   that customers left because of the infringement or the

24   interference.  I think they left for other reasons.

25   Q.    Right.  And I think you've said it twice and you've

2807

1    said it in direct, but let's be clear about this.

2              The reason you're reaching this opinion about

3    zero is because you find there is no evidence; correct?

4    A.    Well, I think I -- in my direct said that it was the

5    wrong approach or --

6    Q.    You just told me --

7    A.    -- method to calculating damages.

8    Q.    You just told me twice it was because there was --

9    we're talking about causation now.

10   A.    And causation leads to method, and because there's

11   no evidence --

12   Q.    Right.

13   A.    -- of them leaving because of the -- just the

14   interference and the copyright infringement, that using a

15   calculation based solely on customer is the inappropriate

16   approach.

17             There's -- a better approach would be directly

18   what's the impact of those causation items.

19   Q.    But what you're saying is there's no evidence, and

20   that's your opinion after you review all the work that

21   Ms. Dean says, is you summarized that as that's not

22   evidence of any lost customers or any lost dollars;

23   correct?

24   A.    Well, I don't work in absolutes.  There may be

25   anecdotal evidence, but -- the preponderance -- but there's

2808

```
 1    not enough evidence to show that the lost profits approach
 2    would be the appropriate way to calculate damages because
 3    it includes all of Rimini Street, all of their efforts,
 4    their assembled workers.
 5    Q.    Right?
 6    A.    And so that's why I say it's the inappropriate
 7    approach.  I'm not saying there's no evidence, I'm saying
 8    there isn't sufficient evidence.
 9    Q.    Okay.  So now it's insufficient evidence.
10          So after reviewing Ms. Dean's report, it's not
11    that there's no evidence, it's insufficient evidence.  Is
12    that your view?
13    A.    Sure.  That's my view.  I think the right approach
14    would be the value of use for the reasons I stated.
15    Q.    I didn't ask you for the right approach.
16    A.    I apologize.
17    Q.    Okay.
18    A.    Sorry.
19    Q.    Now, let's see if we can break things down and
20    explain where we're at, okay, which is what I'm trying to
21    do now.  I'm just trying to define where we agree and where
22    we disagree.
23          So there's a couple steps we're going through in
24    this case.  One is liability.  And you're a damages expert,
25    you don't have any opinions on liability; correct?
```

1    A.    I have no opinions, but I make assumptions and I've

2    assumed those liability issues.

3    Q.    That's fair.  You assume that there is liability;

4    right?

5    A.    I make that assumption right at the beginning, yes.

6    Q.    Right.  Now, in order for damages to be awarded, the

7    next step is whether -- if the liability -- if there was

8    wrongful conduct, did that cause any damages, and that's

9    what you -- that's this term causation; right?

10   A.    That's not just if, but what is the best approach

11   for capturing it.

12   Q.    Right.  But when we're talking about -- we're

13   talking about causation, and you -- so you're saying there

14   is no causation here and so there's no lost profits and no

15   lost customers; correct?

16   A.    I'm saying that the right approach, it would be the

17   value of use because the evidence doesn't support the lost

18   profits because there's not enough evidence showing why the

19   customer decided to leave Oracle and go to Rimini Street.

20         And there's other reasons why they might do it.

21   They might do it because they have a relationship with

22   someone at Rimini Street, they've worked with them for

23   years and they want to work with them again.

24   Q.    Sir, I don't know why I'm asking yes or no questions

25   and getting speeches.

2810

1          All right.  You --

2     A.    I apologize, you're right.  I'll try to limit my

3     answer and wait for my chance to talk later.  I'm sorry.

4     Q.    The -- you're -- so, step one, liability, no

5     opinion, assumptions; step two, causation, your opinion,

6     insufficient evidence of causation.  Correct?

7     A.    And it would be the wrong approach.

8     Q.    And the wrong approach.

9          Okay.  Step 3 is, if there is liability, and if

10    there is, contrary to your opinions, causation, then you

11    quantify the damages, you do the calculation; right?

12         That would be the next step.

13    A.    Yes.

14    Q.    All right.  And if the jury finds causation, your

15    report did not include any opinions about Ms. Dean's

16    quantification of lost profits.  You didn't go into that

17    third step; correct?

18    A.    I thought I did.  I'm not quite -- maybe we're

19    misspeaking, but I critiqued Ms. Dean's report in my report

20    and went step by step why I thought that she was wrong --

21    Q.    Well, let me --

22    A.    -- and she was measuring the wrong thing.

23    Q.    Let me go over that for you.  Okay.

24         If you assume, and I know you disagree with this

25    assumption, but if you assume that the wrongful conduct

1    here caused lost profits and -- I mean, caused lost

2    customers to Oracle, right -- you did not review Ms. Dean's

3    methods for calculating lost profits from lost customers.

4    You didn't go there; right?

5    A.    I thought I had.  I would have to go back and look

6    at my report, but I certainly thought I had.

7    Q.    All right.  Now, if this jury were to find that the

8    company behind me, Rimini Street, beginning in 2006,

9    engaged in massive copying of Oracle's software in

10   violation of -- in violation of copyright laws, and that

11   remote environments were not feasible in 2006, that it

12   couldn't be done, you have not addressed that last issue of

13   quantification of damages; right?  You have not looked at

14   that question?

15   A.    I thought I had.

16          I think my report critiqued her calculation of

17   lost profits and why I thought that it was inappropriate

18   and wrong and that there wasn't sufficient evidence

19   customer by customer.

20          She groups all the customers together and uses

21   just one number.  She's not going back through and taking

22   customer by customer and saying here's the evidence that

23   shows that they were impacted by the infringement and they

24   went to Rimini Street solely because of the infringement or

25   the interference.  It's just not there.

1    Q.    Okay.  So your last critique, the critique you would

2    have of the quantification of damages, is whether Ms. Dean

3    calculated damages customer by customer; correct?

4    A.    I think if you were to take an approach of saying

5    customers, you would still be wrong, and I spoke to that in

6    my report as well.

7    Q.    Wait, wait, wait.

8    A.    But you have to follow the steps --

9    Q.    Did you just say --

10   A.    -- that Mr. Isaacson's just discussed.

11   Q.    Did you just say that if you take the approach --

12   that the problem with Ms. Dean's approach was that she

13   didn't go customer by customer, but if she did go customer

14   by customer, you would still disagree with her?

15   A.    Right.  Because if you take one customer at a time,

16   there still needs to be an apportionment between all the

17   good that Rimini Street does and the harmful acts, the

18   wrongful acts.

19          You can't -- you can't create damages for

20   copyright on noncopyrighted revenue of -- if Rimini Street

21   acts in a -- in a way in which they're providing a service,

22   some of the -- and I've assumed liability, some of the

23   revenue might be associated with the wrongful act, but it's

24   only a small portion.

25          They're providing the service, they're not

1   selling the copyrighted work.

2             Thank you for allowing me to talk.  I appreciate

3   it.

4   Q.    It seems inevitable at this point.

5   A.    I have a hard time stopping.  I'll do my best,

6   though, thank you.

7   Q.    I wish you would, sir.

8             The -- but if this jury were to conclude that

9   this business could not have gotten any customers beginning

10  in 2006 without copyright infringement, that they couldn't

11  have done it with remote environments, and that all of the

12  customers were due to copyright infringement, is it your

13  conclusion that no damages should be awarded?

14  A.    Not for copyright or interference.

15            If Rimini Street is out of business, they're out

16  of business, but I don't think that is the reality of it.

17            I think that the infringement and the

18  interference was only a portion of their business, it

19  wasn't the business.  They're not selling the copyrighted

20  work, they're selling services.

21  Q.    Sir, sir, if they're out of business, there is no

22  other portion of their business, is it -- is there?

23  A.    It's a hypothetical that doesn't make a lot of

24  sense, I agree.

25  Q.    Okay.  So -- you know, I'm going to go forward with

```
 1    this just in the case it's a hypothetical that's based on
 2    all the evidence that's been presented to this jury.
 3              All right.  If Rimini would not have been able
 4    to build this business, if it would not have been able to
 5    have any customers without copyright infringement, if it
 6    wouldn't have existed, your opinion is that no damages
 7    should be awarded because the other portion of their
 8    business that was providing services in a now nonexistent
 9    company would -- means that no damages should be awarded.
10    That's your opinion?
11    A.    Absolutely true, and for a variety of reasons.
12    Q.    I appreciate the "absolutely true."
13              Now, this term but-for causation, let's see if
14    we can help people out.
15              Now, but-for causation is a terrible phrase used
16    by mainly lawyers and experts, and what that means is but
17    for Rimini's wrongful conduct; right?
18    A.    I think I explained that.  The but-for causation
19    concept is --
20    Q.    Do you agree --
21    A.    -- to link damages --
22    Q.    Do you --
23    A.    -- to the numbers you create.
24    Q.    Do you agree with me --
25    A.    I'm sorry.
```

                                                                    2815

1    Q.    Do you agree with me that it would -- that but-for

2    causation here, put simply, means but for Rimini's wrongful

3    conduct?

4    A.    Well, in this instance, you could use it that way.

5    Q.    Thank you.

6    A.    You could create different but-for scenarios or

7    but-for statements with the purpose of connecting whatever

8    damage you calculate back to just the wrongful acts.

9    Q.    All right.  And so what we're talking about is what

10   if Rimini hadn't done anything wrong; correct?

11   A.    Yes.

12   Q.    Okay.

13   A.    The customers still would have left Oracle even if

14   Rimini Street hadn't existed.  That's the problem with your

15   hypothetical.

16   Q.    I'm not asking you any hypotheticals at this point.

17   A.    Oh, I'm sorry.

18   Q.    I'm just asking you about what your terms mean.

19         Now, so -- then we're saying the second part is,

20   so if Rimini had not done these wrongful things, what would

21   Oracle look like.  That's the second part of it.  Right?

22   A.    It could be, yes.

23   Q.    Okay.  And so putting it just simply, we're talking

24   about, if Rimini hadn't done all these things wrong, what

25   would Oracle look like, would they have more customers, or

2816

1      would they have the same amount of customers; right?

2      A.    Could you ask that -- did you say what would Rimini

3      look like or would Oracle look like?

4      Q.    I'll say it again in case I said Rimini.

5      A.    Did you --

6      Q.    I don't know.

7      A.    Maybe I misheard you.

8      Q.    It doesn't matter.  Right.

9            What we're talking about here is if Rimini

10     hadn't done all these wrongful things, what would Oracle

11     look like, would they have more customers, or would they

12     have the same amount of customers.  That's what we're

13     arguing about; right?

14     A.    You can, yes.

15     Q.    Okay.  Now, just to explain this but-for causation

16     concept, if you put this into another context, talk about

17     the oil spill in the gulf with BP, the way you would phrase

18     that is, suppose we're saying that was BP's fault, an oil

19     company's fault.

20           But for BP doing something wrong, say a

21     defective piece of equipment, a blowout preventer, what

22     would the gulf look like?  Would there have been an oil

23     spill?  That's how we -- that's how you look at the but-for

24     causation question; right?

25     A.    Yes, you can frame it that way, yes.

2817

1    Q.    Right.  You know, in another terrible event, if --

2    but for Bernie Madoff taking all that money from his

3    investors, what would the investors look like; would they

4    have their money back?

5    A.    Right.  And there would be a real question whether

6    they would have put their money -- if they hadn't given it

7    to Bernie, maybe they would have found another Bernie, I

8    don't know.

9    Q.    Right.  And so going over this, your value of use

10   opinion, right, the BP example, if -- suppose that blowout

11   preventer -- that there was a defective blowout preventer

12   in the Gulf that would have cost BP a thousand dollars to

13   fix it, that if they had acted legally, that it would have

14   cost a thousand dollars to fix that blowout preventer,

15   right, and that defective blowout preventer caused massive

16   damage in the Gulf.

17         Is it your opinion that the proper measure of

18   damages is the value of use, that is, the thousand dollars

19   to repair the blowout preventer?

20   A.    The circumstances are different and so there would

21   be a different method, and so I don't think there's a

22   direct parallel between an oil spill and copyright

23   infringement.

24   Q.    Right.  That would be ludicrous --

25   A.    It's very different --

2818

1    Q.    That would be ludicrous --

2    A.    -- types of things.

3    Q.    That would be ludicrous to say, that; right?

4    A.    I don't know.

5    Q.    To say that the cost of repairing a blowout

6    preventer should measure the damages when that defective

7    blowout preventer caused so much harm, that would be

8    ludicrous; right?

9    A.    I don't -- I haven't given it a great deal of

10   thought.  It doesn't make a lot of sense to me because

11   there's a great deal of difference between negligence of

12   drilling an oil -- drilling to an oil well and copyright

13   infringement and interference.

14            I think you're drawing a false analogy.  I don't

15   follow it.  I don't agree with it.

16   Q.    Well, let me try a different analogy.

17            What if the oil company had deliberately

18   violated the laws and knowingly installed a defective

19   blowout preventer.  You would not say that the measure of

20   damages should be what if the company had been able to

21   operate with a working blowout preventer.  You wouldn't say

22   that, would you?

23   A.    No, because it's not a copyright case.  I mean,

24   they're apples and oranges.

25   Q.    All right.  The -- this value of use measure, that's

2819

```
 1    not -- you mentioned the AICPA standards that guide you;

 2    right?

 3    A.    I have, yes.

 4    Q.    All right.  That value of use standard is not found

 5    in -- you didn't cite any AIPCA standard in your report

 6    regarding value of use; right?

 7    A.    No, it's not covered by the AICPA.

 8    Q.    All right.  You did not cite any accounting standard

 9    relating to value of use; right?

10    A.    I have not.

11    Q.    All right.  You did not cite anywhere any standard

12    from any organization saying that value of use is a proper

13    way of looking at damage; correct?

14    A.    In my testimony?

15    Q.    In your report.

16    A.    I may have cited the *Timex* case.

17    Q.    Okay.  A legal case.

18    A.    It's a legal case, it's a legal precedent that used

19    the value of use approach.

20    Q.    Okay.  So you looked at one legal case?

21    A.    No, I didn't look at one legal case.

22    Q.    For your report.

23    A.    You asked me what I cited.

24    Q.    Okay.  That's fair.

25          You cited one legal case to say value --
```

1    A.    I may have cited others, I can't recall.

2    Q.    All right.  And just to complete the picture, so we

3    make sure we understand what's happening here, you are

4    saying that but for Rimini's wrongful conduct, that you are

5    going to assume that they would have had different

6    environments, they would have been 100 percent remote;

7    right?

8    A.    I assumed that they would change their procedures so

9    they avoid the infringement and the interference.  So both

10   of them.

11   Q.    And in four out of five cases they would have had

12   brand-new environments that didn't exist; right?

13   A.    I don't know that that would be the case.

14         I think some of the clients hosted environments

15   themselves.  So if a client already had an environment

16   created, then it wouldn't have to be recreated.

17   Q.    I said four out of five.

18   A.    I'm talking about the four, not the fifth.

19         I'm talking about Rimini Street may have hosted

20   environment for, say, Bausch & Lomb, but Bausch & Lomb may

21   have already had the environment created because they

22   wanted to do it.

23   Q.    But you don't know that, do you?

24   A.    No, I don't know that.  But I have to assume that

25   some of them may have actually had their own --

2821

1    Q.    Why do you have to assume anything you don't know?

2    A.    I make assumptions constantly to calculate damages.

3    Q.    I gather.  But you don't actually have a single fact

4    about a single client who was in that group of four, the

5    four out of the five, that had their own environments;

6    correct?

7    A.    I'd have to go back and look at the record.  There's

8    probably records indicating just that, but I don't know

9    sitting here today.

10   Q.    And what you are doing is asking a purely

11   hypothetical question.  You are saying, what if Rimini had,

12   in 4 out of 5 cases, gone remote -- gone remote instead of

13   having those environments on their own system; correct?

14   A.    My calculation includes that.  It's more

15   comprehensive.

16          I'm assuming that Rimini Street would have

17   remained in the market, and they would have changed their

18   procedures so they could remain in the market in a

19   noninfringing way and a noninterference manner.

20   Q.    All right.  Sir, let's try and answer the question.

21   A.    I think I just did answer your question as far as I

22   know.  I was --

23          (Simultaneous indecipherable conversation.)

24          THE COURT REPORTER:  You need to speak one at a

25   time.

1    BY MR. ISAACSON:

2       Q.    My question was --

3       A.    We're talking over each other, and I apologize.

4    I'll try to keep it to yes or no.

5       Q.    My question is, you're saying what if Rimini, in 4

6    out of 5 cases, had gone remote, gone remote instead of

7    having those environments on their own system; correct?

8              That's your hypothetical.

9       A.    I'm not sure.  You're reading from my testimony?

10      Q.    No, I'm reading the question you didn't answer.

11      A.    Could you read it again.  I'm sorry.

12      Q.    All right.  Your hypothetical is that what if

13   Rimini, in 4 out of 5 cases, had gone remote, gone remote

14   instead of having those environments on their own system;

15   correct?

16      A.    That is what I asked.

17      Q.    All right.  And in terms of assumptions, you've

18   mentioned assumptions a lot, you are assuming that Rimini,

19   beginning in 2006, could have won its first customers, its

20   first references, and built a business from 2006 to 2012 of

21   the same size using remote environments from the beginning;

22   correct?

23      A.    Yes.

24             My -- my understanding and my assumption

25   is without -- but for the infringement and the

2823

```
 1    interference, that Rimini Street wouldn't have just stopped

 2    operations and walked away, they would persist and keep

 3    trying to compete.

 4    Q.    Now, talking about 2006 and 2007.  Mr. Benge did not

 5    discuss or provide you any information for 2006 and 2007;

 6    correct?

 7    A.    That's right.

 8    Q.    And Mr. Benge, in providing his estimate about what

 9    would be required to go all remote, and saying he thought

10    it would be feasible, he was looking only at the year 2012;

11    correct?

12    A.    You may be right, yes.

13          I think he was extrapolating, but I think he was

14    using some experience from that time period.

15    Q.    And based on what Mr. Benge told you in 2006, 2007,

16    2008, 2009, 2010, 2011, you don't know yourself if a remote

17    model would have worked?

18    A.    That's an underlying assumption that they would not

19    leave the market, they would persist and try to keep going

20    and compete.

21    Q.    But you don't know technically whether it would have

22    worked?

23    A.    I know that 20 percent or one in five of their

24    customers they were operating remotely.

25    Q.    But you don't --
```

2824

1    A.    So that's not an assumption, that's a fact, and I'm

2    assuming they could do it with all five.

3    Q.    But you don't have the technical ability or

4    background, and you have no information from Mr. Benge as

5    to whether they could have actually done that from 2006 to

6    2011; correct?

7    A.    I don't have the information because it is a

8    hypothetical, it is -- but for the wrongful acts, what

9    would Rimini Street have done.

10            So I mentioned in my direct you have to

11   reconstruct the market from both perspectives.  You're

12   looking at more Oracle's perspective.  From Rimini Street's

13   perspective --

14   Q.    Sir --

15   A.    I'm sorry.

16   Q.    I don't -- I've interrupted you more than I've

17   perhaps interrupted any other person, but --

18   A.    I'm terribly sorry.

19   Q.    -- I'm going to ask you to answer the questions.

20   A.    I am attempting to answer your question.  Thank you.

21   Q.    Now, when you made the assumption for 2012 that a

22   100 percent remote business would work, was technically

23   feasible, you were relying on Mr. Benge, or anyone else

24   from Rimini, that told you that; correct?

25   A.    No.  That's not correct.

2825

1    Q.    All right.  The -- let me ask you to look in your

2    binder at PTX 11.

3    A.    Which binder?  I have two up here.

4    Q.    There's a binder with PTX in it.  So it would be

5    that.

6         MR. STRAND:  PTX what number, Counsel?

7         THE WITNESS:  Did you say P or T?

8         MR. ISAACSON:  P; that means plaintiff.

9         MR. STRAND:  Is this admitted?

10        MR. ISAACSON:  Yes.

11        This has been admitted, so please put this on

12   the screen.

13        THE WITNESS:  And which number was it, sir?

14        MR. ISAACSON:  Eleven.

15        THE WITNESS:  It's the first -- second one.

16   BY MR. ISAACSON:

17   Q.    All right.  This is December 2006.  You know that

18   Mr. Chiu is a vice-president of Rimini Street; correct?

19   A.    Yes.

20   Q.    Was he still working at Rimini Street when you began

21   your work?

22   A.    I'm not sure.

23   Q.    He -- Mr. Lester, he's another senior person at

24   Rimini Street, you know that; correct?

25   A.    I had the opportunity to read his deposition.

1    Q.   All right.  And Mr. Lester says to Mr. Chiu,

2          "We can't deliver regulatory updates without a

3    support environment to create the update.  We can't create

4    a fix master support environment without the patches.  For

5    payroll support, this would be a showstopper."

6          Now, this is something that you assumed in 2006

7    was not true; correct?

8          You assumed that they could deliver regulatory

9    updates without a support environment; correct?

10   A.   I assumed that they would create the patches and

11   updates remotely on the client's environment.

12   Q.   Right.  You assumed that the opposite of what was

13   being written here was true; correct?

14   A.   Yes, I have.

15   Q.   Okay.

16   A.   Well, I don't know.  I haven't read the whole

17   document.  I would have to review it, but I do see the

18   attention that you're drawing with that document.

19   Q.   Now, this was -- there were only Siebel clients at

20   this point.  You know that; right?

21   A.   You're in 2006.

22   Q.   Yes.

23   A.   There may have been one PeopleSoft --

24   Q.   I'm sorry.  This is December.  It's mostly Siebel

25   clients; correct?

1    A.    I think that's right.

2    Q.    Okay.  And you never talked to Mr. Benge about the

3    feasibility of supporting the Siebel clients without the

4    environments on the Rimini system; correct?  You only

5    talked to him about PeopleSoft?

6    A.    Yeah, I didn't speak to him because I was talking to

7    the technical experts, which was Mr. Hilliard, and then I

8    had the opportunity to read the other technical expert,

9    Mr. Davis', report.

10   Q.    All right.  Well, let's go over that.  Let me see if

11   I can find that.  Well, I'll get that at the break.

12         Now, you don't know what Rimini -- what Rimini

13   was actually saying or doing, or what their views were in

14   this 2006, about whether they could -- whether they could

15   operate their businesses without the environments that were

16   on the Rimini system; right?

17   A.    May I hear the question again?

18   Q.    Sure.

19   A.    I don't really understand what you're asking.

20   Q.    You don't know what Rimini was actually saying or

21   doing or what their views were in 2006 on the issue of

22   whether they could operate their business without having

23   environments on the Rimini system; correct?

24   A.    Well, most of the work I did was in 2012.  I read 53

25   depositions.

1          And I did, as I said in my direct, develop my

2    own theory that the appropriate approach was looking at the

3    efficiencies because Dr. Dean said what was happening was

4    the copyright infringement and the interference allowed

5    them to be more efficient.

6          He didn't say allowed them to operate, he said

7    more efficient.  And you're asking me to remember 53

8    depositions that I read three years ago.  So I don't think

9    I could say yes to your query on that one.

10   Q.    All right.

11   A.    Or no.  I can't recall which way you were taking

12   that.

13   Q.    And when, as you say, you developed your own theory,

14   all right, you didn't ask Mr. Benge whether this was doable

15   in 2006; correct?

16   A.    I don't think Mr. Benge was with Rimini Street in

17   2006.  I think he started in 2008.

18          And I may have asked him, but it's just -- the

19   distance in time is so long, it's been a couple of years,

20   three years, so --

21   Q.    You didn't ask Mr. Hilliard whether it was doable in

22   2006, did you?

23   A.    I think I did.  I was certainly interested in the

24   2006 because that's the beginning of my damage period.

25   So --

1    Q.    You didn't put anything about that in your report;

2    correct?

3    A.    I have a full section in my report saying that I

4    believe that -- based on the evidence, that Rimini Street

5    could have operated --

6    Q.    But you didn't --

7    A.    -- without the infringement or the interference.

8    And I went --

9    Q.    But you made --

10   A.    -- point by point.

11   Q.    -- those statements without talking about any

12   specific years; correct?

13   A.    I already defined my period of review as 2006.  At

14   that time I think it went through 2012.  So I explicitly

15   said that those were the years I was looking at.

16   Q.    All right.  Now, let me ask you again about, as you

17   called it, my own theory.

18            Now, we've been talking about copyright

19   infringement.  Now, one of the other claims in this as

20   case, as you know, is interference with customer

21   regulations.  You know that; right?  We've called that the

22   interference claim.

23   A.    I'm aware of it, yes.

24   Q.    Now, avoided costs is not a proper measure of

25   damages if the damages are caused by lies.  Isn't that

1    correct?

2    A.    I don't know that that's correct.  I think that that

3    goes to the jury and what the jury decides.  So --

4    Q.    I'm not talking to the jury right now, I'm talking

5    to you.

6    A.    -- I'm talking about -- I've calculated what I think

7    the benefit is of the wrongful acts which includes

8    interference.

9             So if the jury decides that there has been

10   interference, I think that the $9.3 million certainly could

11   be the right remedy.

12   Q.    But you wouldn't say, sir, would you, that if Rimini

13   hadn't lied to all those customers, if they had told the

14   truth, and that telling the truth wasn't going to cost them

15   any more money, or it was going to cost them a hundred

16   dollars to tell the truth, you wouldn't say avoided costs

17   are a proper measure of damages for interference.

18            You wouldn't say that, would you?

19   A.    I would say that it would be -- as I said in my

20   deposition two years ago, that I think it would be a call

21   for the jury.

22   Q.    And so you're not reaching an opinion on that;

23   right?

24   A.    I did, and I told you that when I gave my

25   deposition.

2831

1    Q.    You just said it was for the jury.  I'm trying to
2    find out what you're saying, okay?
3              Would you say to this jury today that if all
4    this lying to customers caused lost customers, that the
5    proper measure of damages is to -- is to ask the
6    hypothetical, how much would it have cost Rimini to tell
7    the truth, that maybe -- and if that cost only a hundred
8    dollars, the proper measure of damages would be a hundred
9    dollars, would you say that to this jury?
10   A.    No, I don't think I would say a hundred dollars.  I
11   think you have to look at the totality of the case.
12             And, as I said in my deposition, if the jury
13   finds on the interference, then I think the $9.3 million is
14   a much better estimate for Rimini than 250 million.
15   Q.    Okay.  Let's talk about that.
16   A.    All right.  I'm sorry, I spoke the wrong number.
17   Q.    Your 9.3 million -- because that's not making sense
18   to me, sir.
19             Your $9.3 million is your estimate of avoided
20   labor costs if Rimini did not violate the copyrights.  It's
21   not your measure of avoided costs if Rimini wasn't lying to
22   the customers; correct?
23   A.    Well, I think they have been very closely linked.
24   Q.    I'm trying to -- it's a simple question.
25   A.    Sure.

1    Q.    It's your measure of what Rimini -- of a world where

2    Rimini doesn't engage in copyright infringement, it's not

3    your mixture of the cost of where Rimini does not engage in

4    lying; correct?

5    A.    That was a long question.  I think there was two of

6    them in there too.

7    Q.    Let me put it simply.  You didn't do a calculation

8    of avoided labor costs where you -- of -- where Rimini

9    doesn't lie?

10   A.    I did an analysis, and I didn't reach --

11   Q.    Did you hear --

12   A.    -- the same number as Ms. Dean because I felt she

13   hasn't gone client by client and established that they

14   heard the lie and that they left Oracle because of the lie.

15   So --

16   Q.    All right.  I'm going to ask you again, sir.

17         You didn't do a calculation of avoided labor

18   costs in a hypothetical where Rimini did not lie.  You

19   didn't do that, did you?

20   A.    Those were the causes of action that were listed in

21   the complaint, and I grouped those in my analysis.

22   Q.    Right.  But let's -- we'll get to that.  But let's

23   answer the question.  I'm going to try it a third time.

24   A.    Okay.

25   Q.    You didn't do a calculation of avoided labor costs

2833

1    in a situation where Rimini wasn't lying; correct?

2    A.    Not specifically.  I would -- just to end the

3    colloquy, yes, I would agree, yes.

4    Q.    Right.

5    A.    But --

6    Q.    What you --

7    A.    -- I did do a calculation.

8    Q.    What you just said was true before that, you lumped

9    them together, you just treated copyright infringement the

10   same as interference, and you actually said that in your

11   report, didn't you?

12          You said that -- that you estimated damages for

13   copyright infringement, and within copyright infringement

14   you include all of Oracle's causes of action.

15   A.    You can read it to me.  I don't recall.  But I'm

16   sure it's there if you say it is.

17   Q.    Well, look at paragraph 10 of your report.  This is

18   the opening report.

19   A.    So this is the introduction to my report?

20   Q.    It's paragraph 10, yes.

21   A.    Right.  This is a statement of opinions in my

22   report.

23   Q.    Right?

24   A.    Which there's multiple bullets.  Is there one you

25   want me to read from?

2834

1   Q.    And what you say at the very top is that you have

2   estimated damages for copyright infringement, and within

3   copyright infringement you include all of Oracle's causes

4   of action --

5   A.    I can't see where you're reading.

6   Q.    -- unless you state otherwise.

7   A.    Are you reading verbatim?  I didn't see that.

8   Q.    The words "include all of Oracle's causes of

9   action," yes.  Look at your paragraph 10.

10  A.    Yes, I think I see what you're saying.

11        So I say,

12        "Because Oracle is claiming such a large number

13  of cases of action in this litigation, for purposes of

14  brevity, my use of the term copyright infringement should

15  be understood to include all causes of action."

16        You're right, yes.

17  Q.    That's the lumping together.  You just threw

18  copyright infringement and all the causes of action

19  together and called them copyright infringement.

20        And when you calculated avoided labor costs, you

21  didn't do that for interference, you didn't do that for

22  damages to computers, you just did it for copyright

23  infringement; right?

24  A.    Well, primarily, but -- you're right.

25  Q.    I'll take --

1    A.    Yeah.

2    Q.    Now, let's go back to this PeopleSoft question.

3          When you talked about avoided costs for

4    PeopleSoft environments, and you've -- you were talking

5    primarily about PeopleSoft -- additional PeopleSoft

6    employees and engineers; right?

7    A.    I believe so.

8    Q.    Okay.

9    A.    I'm not quite sure what you're asking.

10   Q.    In fact, you did not make any determination about

11   whether additional employees would be required to support

12   JDE or Siebel?

13   A.    Most of my analysis was directed to PeopleSoft.

14         But when I asked for the additional employees,

15   when I asked Mr. Benge and Mr. Zorn to go back through the

16   production and calculate and understand how many additional

17   employees, it was for all three.

18   Q.    Okay.  That's false, sir, isn't it?

19         You've never even looked at the issue of how

20   many additional employees would be required for Siebel and

21   JDE; correct?

22   A.    No, I don't agree with you.

23         Because when I asked Mr. Zorn, I was including

24   all three, but most of the added employees were needed for

25   the PeopleSoft program.

2836

1    Q.    All right.  And when you talked to Mr. Benge, he did

2    not put -- are you telling me that when you talked to

3    Mr. Benge that you discussed with him how many additional

4    employees would be required to support JDE or Siebel?

5    A.    My recollection is that we were talking about all

6    three.

7    Q.    All right.

8    A.    I was.

9    Q.    All right.  Mr. Benge, at his deposition, page 81,

10   line 20 through 25, was asked the question,

11            "Did you make any determination about

12      whether additional employees would be required to

13      support JDE or Siebel?

14            "ANSWER:  No.

15            "QUESTION:  Is that an issue you looked at?

16            "ANSWER:  Not at all."

17            Okay.  When you were talking to Mr. Benge, he

18   had not done any consideration of how many additional

19   employees were necessary for JDE or Siebel.  Did you know

20   that?

21   A.    My understanding, when I asked him to identify the

22   additional employees, was for all three, and that's what I

23   thought he did.

24   Q.    All right.  I'm going to move to admit that excerpt

25   from the Benge deposition as PTX 6008.

```
 1              MR. WEBB:  Objection, Your Honor.
 2              MR. ISAACSON:  Or 6009?
 3              COURTROOM ADMINISTRATOR:  I was going to say,
 4    you just did 6008.  What is that?
 5              MR. ISAACSON:  6009.  Benge deposition, 81,
 6    lines 20 through 25, as a party admission.
 7              MR. STRAND:  I object, Your Honor.  I don't know
 8    that he was designated as a 30(b)(6) deposition.
 9              He was already here live to testify.  Counsel
10    could have asked him the question then.  Designating it as
11    an exhibit at this point is inappropriate.  He's read it
12    into the record.  That's more than enough.
13              THE COURT:  I'll reserve ruling on it.  I need
14    to review the actual portion myself.
15    BY MR. ISAACSON:
16    Q.   Now, when you did your value of use, and you were
17    trying to make assumptions about whether -- what would be
18    done in order for Rimini to behave legally with respect to
19    copyright infringement, we've covered that you assumed that
20    they would have 100 percent remote environments.
21              You also assumed they would not use crawlers to
22    download Oracle files; correct?
23    A.   I did.
24    Q.   All right.  And you also assumed they would not
25    share fixes, patches, and updates amongst customers;
```

2838

1    correct?

2    A.    That's right.

3    Q.    You did not make any assumptions about whether they

4    would maintain a library of Oracle software; right?

5    A.    I thought I had.

6          My understanding was I wanted to be

7    comprehensive, and so when I discussed how much more it

8    would cost to work in a noninfringing, noninterfering way,

9    I was trying to be expansive and capture all of the

10   wrongful acts that I was assuming occurred.

11         MR. ISAACSON:  All right.  Let's look at

12   paragraph 73 of your report.

13         I think it would help the jury if we put

14   paragraph 73 on the screen because there's a long sentence.

15         MR. STRAND:  No objection.

16   BY MR. ISAACSON:

17   Q.    I'm going to look at the second sentence there, "it

18   is my understanding."  Do you see that sentence, sir?

19   A.    I can see that, yes.

20   Q.    Okay.  What you wrote in your report is,

21         "It's my understanding that Rimini Street can

22   avoid liability by not hosting accused computer

23   environments on its own computers, by not using crawlers to

24   download Oracle files, and by not sharing fixes, patches,

25   and taxes and regulatory updates among its customers."

1          In your report, you did not make any assumptions

2     as to whether or not Rimini Street maintained -- continued

3     to maintain a library; correct?

4     A.    It says that in the report, but my calculation, when

5     I asked for the additional labor, was how much it would --

6     how much more labor to avoid the causes of action and to

7     work in a noninfringing, noninterfering way.

8          So the report -- I'm trying to explain what I

9     did.  I was not being comprehensive when I wrote the

10    sentence, but I don't think the sentence meant that I was

11    excluding the other issues, it's just I'm summarizing and

12    I'm not listing to all of them in that instance.

13         But at the beginning of my report I do list each

14    of them, and I'm saying that I'm assuming each of them are

15    right, or that they're true allegations.

16    Q.    All right.  In fact, at the time of your report, you

17    didn't know one way or the other whether you were assuming

18    a library of PeopleSoft, JDE, and Siebel software continued

19    to -- would have existed on the Rimini system; correct?

20    You didn't know one way or the other?

21    A.    That's -- I'm not quite sure that's true.

22         What I was assuming, that there had been

23    copying, and so my understanding -- and I have to go back

24    and look at the list because the list is so long.

25         So if I try to tell you everything that I was

2840

```
 1    working on right at this time, I would have a difficult
 2    time listing them all.
 3             My understanding is they used automated
 4    crawlers, they created environments --
 5    Q.    I'm talking about the library --
 6    A.    -- they copied --
 7    Q.    I'm talking not about the crawlers, I'm talking
 8    about the library.  Okay?
 9    A.    Okay.
10    Q.    In the remote-only model, you did not know in your
11    hypothetical whether Rimini would continue to have archives
12    of software updates and support materials on Rimini's
13    computer systems; correct?
14    A.    When I discussed the approach of using the value of
15    use with Mr. Hilliard and Mr. Zorn and Mr. Benge, I was
16    more comprehensive.
17             I was saying I need to know the amount of labor
18    that would allow them to work in a nonaccused,
19    noninfringing manner.  Those were my exact words.
20             I didn't go through and list every one of these
21    because I'm talking to the technical people.
22             And so from an accounting perspective, I said
23    how much more would it cost to operate without infringing
24    or interfering with Oracle.
25    Q.    I'd like to get a yes -- I'd like to get an answer
```

2841

1    to this question.

2    A.    I'm trying my best, I'm sorry.

3    Q.    In the remote-only model, you didn't know whether

4    Rimini would continue to have customer archives of software

5    updates and support materials on Rimini's computer systems;

6    correct?

7    A.    My assumption was that they would work in a

8    nonaccused manner.

9    Q.    Is that yes or no?

10   A.    That's a no -- or a yes.  I did assume those things,

11   all of it.

12        I was -- my underlying assumption is whatever

13   they're doing that is wrong, let's stop, and how much more

14   would it cost.

15   Q.    Your answer to that question is yes.

16        I would like to show you your deposition, line

17   63 -- I mean, page 63, lines 1 through 9 where the same

18   question was asked.

19   A.    Okay.  Is it in the book?

20   Q.    You're about to see it on your screen.

21   A.    Okay.

22        (Videotape deposition of Scott Hampton played

23        as follows:)

24        "Q.    In the remote-only model, do you know

25        if Rimini will continue to have customer

2842

```
 1            archives of software updates and support

 2            materials on Rimini's computer systems?

 3                 "A.   No, I don't know.  It's my

 4            understanding is  they would operate in a

 5            non-infringing manner, so I'm relying on others

 6            to understand the technical aspects of -- of the

 7            case. I'm not opining on it myself."

 8    BY MR. ISAACSON:

 9    Q.    I want to ask you about an exhibit in your book.

10    A.    I couldn't hear you, I'm sorry.

11    Q.    I want to ask you about an exhibit in the book, PTX

12    5529.

13                 MR. ISAACSON:  Don't show this on the screen

14    because it's not admitted.

15                 MR. STRAND:  5529?

16                 MR. ISAACSON:  Yes.

17                 THE COURT:  For the benefit of the record,

18    Mr. Isaacson, I think you need to ask him whether that was

19    his testimony in that deposition.

20    BY MR. ISAACSON:

21    Q.    That was your testimony in that deposition; correct?

22    That video I just showed you?

23    A.    You're asking me was it consistent with what I just

24    told you --

25    Q.    No, I'm asking you was that -- I'll let the jury
```

2843

1    decide whether it's consistent.

2    A.    Sure.

3    Q.    I'm asking you was that your testimony at your

4    deposition?

5    A.    Yes, it was.

6    Q.    So PTX 5529.

7    A.    PTX 5529.

8    Q.    So it's going to be towards the back.  It's a bigger

9    number.

10          Now, yesterday you told me that you had received

11    an electronic report from Mr. Zorn with a calculation of

12    labor costs.  Do you remember that?

13    A.    Yes.

14    Q.    Okay.  And it was a large electronic file; correct?

15    A.    Which file are you talking about?

16    Q.    What Mr. Zorn gave you.

17    A.    I received thousands of files.  Well, not files,

18    thousands of pages, probably hundreds of files.

19    Q.    But do you remember being given -- I'm talking about

20    that electronic file he gave you.  I was asking you what

21    you received from Mr. Benge and Mr. Zorn, and you said

22    yesterday you got an electronic file.

23          And I think it was shown to you at your

24    deposition because it's so large, and I believe what you

25    said was that you reviewed those calculations but you

2844

1    didn't use them.

2              Does any of that ring a bell?

3    A.    Not entirely, no.  And I received so many files that

4    I'm not sure which one you're talking about.

5    Q.    All right.  Well, just to -- okay.  Let me come back

6    to that.  I'll get you the deposition pages, and I'll

7    remind you of that after the next break.

8    A.    Okay, great.

9    Q.    Now, going back to what Mr. -- going back to your

10   value of use.

11             Now, another phrase, I'm afraid, that's been

12   used during this trial is a hypothetical license measure of

13   damages, and both you and Ms. Dean have used that for

14   Oracle's database, although you have very different results

15   from that analysis; correct?

16   A.    Yes.

17   Q.    And you're familiar with hypothetical negotiations

18   being a potential measure of damages in an intellectual

19   property case; right?

20   A.    I am.

21   Q.    Okay.  And you used that measure of damages before;

22   correct?

23   A.    Yes, probably more than 80 times on different cases.

24   Q.    And the -- in the hypothetical negotiation, you're

25   assuming there's a willing buyer and a willing seller;

2845

1    right?

2    A.    Yes.

3    Q.    And here Rimini would be the willing buyer and

4    Oracle would be the willing seller; correct?

5    A.    You're talking about the database; right?

6    Q.    Yes.

7    A.    Yes.  Okay.

8    Q.    And if you apply -- now, you didn't do -- your value

9    of use measure of damages is not a hypothetical license

10   assessment for PeopleSoft, Siebel, or JD Edwards; correct?

11   A.    No, it is a -- the benefit derived or the profit

12   that Rimini gained through it's wrongful actions.

13   Q.    So -- and I may have done a double negative here,

14   but I think we're in agreement, so I'll say it one more

15   time.

16          You're not giving a hypothetical license opinion

17   for PeopleSoft, JD Edwards, or Siebel; correct?

18   A.    Well, it's been a few years since I wrote that

19   report.  I'd probably have to go back and look.

20          I -- you could touch on it in --

21   Q.    During your testimony you didn't; correct?

22   A.    I didn't mention it that I recall.

23   Q.    All right.  You have not in court given a

24   hypothetical license opinion about PeopleSoft, JD Edwards,

25   and Siebel; correct?

2846

1    A.    I'm sorry, I don't understand your question, because

2    those aren't products that were actually sold by Rimini

3    Street.  So I'm confused by --

4    Q.    I'm just trying to define what you have and haven't

5    done.

6    A.    Fair.  And I just want to make sure I answer --

7    Q.    In your testimony in court, you did a hypothetical

8    license measurement for Oracle database.  You did not do

9    one for PeopleSoft, JD Edwards, and Siebel; correct?

10   A.    In my testimony I think that's right.  In my report,

11   I'd have to go back and --

12   Q.    I'm just asking you about your testimony.

13   A.    Sure.

14   Q.    And for PeopleSoft, JD Edwards, and Siebel, in your

15   testimony, you didn't look at -- you didn't look at any

16   comparable licenses that might have influenced your

17   opinion; correct?

18   A.    I'm not sure of the question.

19          So you're asking for the copyright infringement

20   claims other than the database, whether I looked at

21   comparable licenses.

22   Q.    Right.  Because you weren't doing a hypothetical

23   license, you didn't need to look at comparable licenses;

24   right?

25   A.    Boy, it is a big report.  So that's hard to say.

2847

1    Q.    In your testimony --

2    A.    There were a lot of licenses so you're asking about

3    comparable licenses.  I don't have an opinion without going

4    back and looking.

5    Q.    Okay.  I'm talking about your testimony in court,

6    not your report.

7    A.    I'm sorry.

8    Q.    In your testimony in court, you weren't relying on

9    any comparable licenses to support an opinion; correct?

10   Excluding Oracle Database.

11   A.    That's a very good question.  I have to think about

12   it for a minute.

13         Certainly I was aware of the contracts, the

14   underlying contracts.

15   Q.    I'm talking about --

16   A.    You're asking just about what I said in my

17   deposition or in my trial testimony?

18   Q.    Right.

19   A.    I don't remember mentioning it.

20   Q.    Okay.  And there's -- I'm not even going to explain

21   this to the jury, sorry, but there's something in a

22   hypothetical license format called the *Georgia-Pacific*

23   factors.  You did not apply *Georgia-Pacific* here; correct?

24   A.    Well, that's a very difficult question to answer.

25   Q.    In your trial testimony?

2848

1    A.    Also difficult to answer.

2              The 13 *Georgia-Pacific* factors that he's

3    referencing are very comprehensive.  They're the things you

4    would look at if you were calculating damages in a patent

5    case.

6              So there's -- almost everything's involved in

7    the *Georgia-Pacific* factors so it would be hard to answer

8    that with --

9    Q.    But you weren't going through the *Georgia-Pacific*

10   factors in your trial testimony; correct?

11   A.    I didn't walk through the factors, no.

12   Q.    Okay.  Now, you have been an expert in copyright

13   cases, you've said before.  One of them was called *Ajaxo*

14   *versus Bank of America Technology and Operations.*  Do you

15   remember that?

16   A.    That was, what, eight years ago, ten years ago?

17   It's been a long time.  I don't remember -- I remember the

18   case but not the specifics of it.

19   Q.    All right.  It's actually -- let's see.  How long

20   ago was that?  2008.

21              And you've listed it in your report in this case

22   as one of the copyright cases that you've done before.  Do

23   you remember that?

24   A.    Yes.

25   Q.    All right.  And that -- to explain that, one of the

2849

```
1    things you do in your report is you attach, you know,

2    recent cases -- cases within relatively recent years that

3    you've worked on, and we list them so that we know what the

4    cases are.  And one of them was the Ajaxo case; right?

5    A.    Yes.

6    Q.    Now, Ajaxo was a copyright case; right?

7    A.    To the best of my recollection.  That, and may have

8    had other causes of action, just like this case has

9    multiple --

10   Q.    Well, you can look at your opinion or your report,

11   5510.  That's in the binder.  And if you look at paragraph

12   9, you'll see,

13          "I was asked to provide an opinion on damages

14   related to Bank of America's alleged copyright

15   infringement."

16   A.    Yes.

17   Q.    All right.  So in that case, you were in a slightly

18   different position, you were working with the plaintiff who

19   was seeking instead of the defendant who was opposing

20   damages; right?

21   A.    You know, I don't even remember it's been so many

22   years ago.

23   Q.    Look at paragraph 1 of the report.

24   A.    Yes.  And I have to look at who the plaintiff was,

25   yes.  Ajaxo was the plaintiff.  Okay.
```

1    Q.    So, in that case, you're working for the plaintiff

2    who is seeking damages and not the defendant who is

3    opposing damages; correct?

4    A.    I believe you're right, yes.

5    Q.    Right.  And the defendant's expert, you remember,

6    was a Mr. Cox?

7    A.    I don't remember.

8    Q.    All right.  Well, let's look at PTX 5509.

9          Now, this is an excerpt that was available in

10   Westlaw of a portion of your deposition in that case.  And

11   do you see on page 6 of 10 the discussion where you're

12   being asked questions about what Dr. Cox did?

13   A.    Did you say page 6?

14   Q.    Yeah, page 6 of 10, at the bottom.

15   A.    Okay.

16   Q.    All right.  And so take a look at that.  Refresh

17   your memory.

18          Remember that you were giving opinions that were

19   disagreeing with Mr. Cox in that case.

20   A.    So it's talking about statutory damages at the

21   beginning.  That's the correct page, 6 of 10, right?

22   Q.    At the bottom.

23   A.    I'm sorry.

24   Q.    Is it your understanding that Dr. Cox -- so the

25   expert on the other side was Dr. Cox?

                                                                    2851

 1     A.    Can I take a minute to absorb what is being said and

 2     what the context is?

 3              I'm not recalling the details of the case, I'm

 4     sorry.

 5     Q.    You can see that there was a Dr. Cox whose opinion

 6     you were disagreeing with; correct?

 7     A.    I do see that, yes.

 8     Q.    And you were asked,

 9              "Is it your understanding that Dr. Cox came up

10     with that number," referring to a damages number, "at least

11     in part based on his opinion that the bank would not have

12     paid more for royalty than it would have cost the bank to

13     create the applications itself?"

14              You answered, "Yes."

15              And what's happening there is that the expert,

16     who you were disagreeing with, estimated damages based on

17     what it would have cost the bank to create the application

18     that it had used in -- to create the application itself,

19     one that it had taken from someone else in violation of

20     copyrights.

21              That's what's happening there; right?

22     A.    I don't recall.

23              So Dr. Cox would have been the defense expert.

24     Q.    Right.

25     A.    I really don't recall all my specifics, so --

2852

1      Q.    That case involved the accusation that the Bank of

2      America had taken the software application in violation of

3      Ajaxo's copyrights.

4      A.    I think you're right.  That does refresh my memory a

5      little bit.  I think it was a bank merger, and they were

6      combining the two banks, if I recall.

7      Q.    And the other side's expert said the proper measure

8      of damages is how much would it have cost the bank to build

9      that software itself rather than taking it; correct?

10     A.    Yeah.  You're testing my memory, but --

11     Q.    That's what --

12     A.    I mean, we can read this, but I don't know if I can

13     read in as much as -- I mean, it doesn't say that here.  I

14     mean, obviously, you've researched this more than I have.

15     Q.    But what it says is that Dr. Cox based his opinion

16     in part on whether the bank -- based on whether it would

17     cost -- how much it would have cost the bank to create the

18     application itself.

19     A.    Right.  And this could be in the context of a

20     hypothetical.  I'd have to read --

21     Q.    I believe it is in the context of a hypothetical

22     negotiation.

23     A.    You do?

24     Q.    Yes.

25     A.    Okay.

2853

```
 1    Q.    And you were asked do you agree with that, and you

 2    answered "No."  Do you see that?

 3    A.    It says,

 4          "Okay.  Is it your understanding that Dr. Cox

 5    came up with that number at least in part based on his

 6    opinion that the bank would not have paid more for a

 7    royalty than it would have cost the bank to create the

 8    application itself."

 9    Q.    Right.

10    A.    I said, "Yes."

11    Q.    Right.  And then you were asked whether you agreed

12    with Dr. Cox, and you said, "No."  Do you see that?

13    A.    Yeah.  I was wondering why I said yes and then no,

14    because this is the progression of the answers --

15    Q.    Because --

16    A.    He's asking if I read it correctly or something.

17    Q.    The first question is was it your understanding that

18    Dr. Cox said something.  You said "Yes."  And then you were

19    asked did you agree with Dr. Cox, and you said "No."

20    A.    Okay.

21    Q.    Okay?  So let's look at the next page in the middle.

22          Now, do you see the question,

23          "But you still think the bank would pay some

24    extraordinary amount?"

25          In the middle of the page?
```

2854

```
1    A.    Yes.
2    Q.    Why don't you read those next couple of questions
3    and answers.
4    A.    "But you still think that the bank" --
5    Q.    No.  I'm sorry.  You don't -- you can read it to
6    yourself.  I'll ask you some questions.
7    A.    I wouldn't mind reading it out loud.
8          Okay.
9    Q.    Okay.  Now, the debate that's going on there between
10   you and Dr. Cox is Dr. Cox is saying that the proper
11   measure of damages is what would it have cost the bank to
12   create that software it took itself, if it just developed
13   the software itself, what would that have cost.
14         And you're saying, no, they should pay more than
15   that; correct?
16   A.    I think this is in the context of a hypothetical.
17   Q.    In the context of a hypothetical negotiation,
18   Dr. Cox is saying that the -- that the bank should not have
19   to pay any more than what it would have cost to be
20   noninfringing to develop the software itself; correct?
21   A.    I don't remember all the circumstances, but this
22   part of the deposition, yes, I agree with you.
23   Q.    And in that part of the deposition, you're saying I
24   disagree with Dr. Cox, they should -- the bank should have
25   to pay more than what it would have cost to be
```

1    noninfringing, correct, in the context of a hypothetical

2    negotiation?

3    A.    Yes.  And I think the context was is that this

4    software was a very short bit of code that Mr. Ajaxo

5    created that allowed the bank to make its two databases for

6    the merger appear as just one.

7           So the interface -- when the user logged into

8    the bank's website, even though the banks had two separate

9    databases, two separate systems, they would only see one,

10   and it would make it transparent.

11   Q.    And for the reasons you're saying that, in that

12   case, as the plaintiff expert, you said the proper measure

13   of damages was not what it would have cost to be

14   noninfringing for purposes of a hypothetical negotiation,

15   the proper number was six times that cost; right?

16   A.    I don't remember any of the numbers or any of the

17   amounts.

18   Q.    Well, do you see that's what you said in answer to

19   the questions in front of you?  Right where you were

20   reading.

21           You were asked,

22           "QUESTION:  Why do you think the bank would

23        pay six times more according to your

24        calculations to license software that it could

25        just create itself?"

2856

```
 1    A.     I'm seeing "extraordinary amount," so did you move?
 2            I'm seeing what you say, but -- too bad it's not
 3    a numbered page.
 4            I see, "But you still think the bank would pay
 5    some extraordinary amount."
 6    Q.     Right.  Keep reading.
 7    A.     And the next one is "extraordinary."
 8            Oh, I see.  Down the page further.
 9    Q.     Right.  You were giving the opinion that it should
10    be six times the cost of noninfringement for purposes of a
11    hypothetical negotiation; right?
12    A.     And you're testing my recollection going back that
13    far.  It was a hypothetical license negotiation.
14    Q.     Right.
15    A.     And I think -- well, my testimony is what it is, but
16    I don't remember all the context of it.
17    Q.     But your testimony that you're looking at said you
18    were multiplying the costs by six; correct?
19    A.     It doesn't say cost, it says six times.  I'm not
20    sure what they're multiplying, or I was at that point in
21    time.
22    Q.     Well, it was six times what Dr. Cox had estimated;
23    right?
24    A.     That might be true, and I don't remember what his
25    basis was.
```

2857

1    Q.    Well, you can read his basis, didn't you?  That

2    Dr. Cox was basing his estimates on what it would cost to

3    create the software in a noninfringing manner; correct?

4    A.    I don't know that.  I would have to go back and

5    look.

6              You say that.  Maybe you've researched it.  I

7    could agree with you, but I don't know that.  I mean, I

8    could agree that you probably know it.

9    Q.    Well, you understand -- so the question -- you were

10   asked the question,

11              "You still think the bank would pay some

12   extraordinary amount of money to license software that it

13   could just recreate even according to your calculations for

14   significantly less?"

15              And you answered, "I think you mischaracterized

16   my testimony."

17              The question was, "How so?

18              "Well, I'm not saying they would pay an

19   extraordinary amount, I'm saying they would pay the value

20   of the copyrighted works.

21              "QUESTION:  Why do you think the bank would pay

22   six times more, according to your calculations, to license

23   software that it could just create itself?"

24              You were measuring damages based on six times

25   what it would cost the bank to create the software itself

2858

1   in a noninfringing manner; correct?

2   A.    I don't have that recollection.  I mean, we've read

3   a small excerpt.

4            I think, if I recall, this wasn't a hypothetical

5   license negotiation, and I don't recall whether it was a

6   value of use, but it may be the value of use, what's the

7   value to the bank type of calculation, not what's it cost

8   to create the software.

9            That might have been where we were differing at

10  this point in the deposition.  I don't really recall,

11  though.

12  Q.    But the -- as you read that deposition testimony,

13  I've got it correct, don't I, that there you were

14  multiplying the cost by six, whether it was for

15  hypothetical negotiation or not.

16  A.    I'm not sure it was the cost, because it doesn't say

17  the cost.

18  Q.    You multiplied --

19  A.    I didn't remember it did.

20  Q.    Six times more.

21  A.    Yes.  And it doesn't say what the more is, and I

22  don't remember at this point.

23  Q.    But it does say what it's more.  More -- six times

24  more to license the software than it could just create

25  itself.

2859

1    A.    Okay.  So it's probably a value of use in a

2    hypothetical setting, cost X to write the software, just

3    write the code, but what is the value of use.

4    Q.    Right.  So for your value of use calculation in that

5    case, you were multiplying the cost of being noninfringing

6    by six, and, in this case, you're just taking the actual

7    cost of being noninfringing.  That's what's happening here;

8    right?

9    A.    No.

10   Q.    Okay.  Here in this case, your estimate of damages

11   is based on the actual cost of noninfringement; correct?

12   That would be the avoided labor costs?

13   A.    But there's no parallel to it because I'm basing my

14   calculation --

15   Q.    I didn't ask you about the parallel, okay?

16         I think you actually would agree with me that I

17   have this right, that, in this case, you are basing your

18   estimate of damages on the actual avoided labor costs,

19   you're not multiplying them by 2, 3, 4, 5, or 6; correct?

20   A.    That's correct.  I'm calculating the benefit based

21   on Dr. Davis.

22   Q.    And in the *Ajaxo* case, okay, you took the cost that

23   would -- of what it would take for the bank to create the

24   noninfringing software itself, and you multiplied that by

25   six; correct?

2860

1    A.    I don't recall.  Today I don't remember the

2    circumstances of that case, and I don't remember the

3    portion of this deposition.  So I just can't answer that.

4    Q.    I think you agree with me, and you did agree with

5    me, that that's what the deposition in front of you says;

6    correct?

7    A.    It appears to from that portion, but I -- I don't

8    have a recollection.  I would like to read the whole

9    deposition.

10   Q.    All right.  And it's pretty simple math; right?

11   Isn't it?  If you multiply 9.3 or 9.4 by 6, now the damage

12   calculation is $56 million; correct?

13   A.    I wouldn't suggest that we do that unless we know

14   more about what the other case was about and what the

15   circumstances were.

16   Q.    Okay.  And the --

17   A.    I would agree with you that this case is about the

18   efficiencies as Dr. Davis defined them.

19   Q.    And the other differences between the two cases is

20   that in *Ajaxo* you were testifying for the plaintiff and

21   seeking damages, and here you're testifying for the

22   defendant who doesn't want to pay much damages; correct?

23   A.    Well, that's a very loaded question.

24   Q.    It is --

25   A.    But I agree that --

2861

<pre>
 1    Q.    It is factually correct what I just said; right?
 2    A.    I calculated the efficiencies in this case.
 3    Q.    Was it --
 4    A.    I didn't have a preconceived notion to come up with
 5    the damage number.  I followed the evidence as best I
 6    could.
 7    Q.    All right.  Did I have it factually correct that in
 8    Ajaxo you were testifying for a plaintiff seeking damages,
 9    and in this case you're testifying for a defendant who
10    doesn't want to pay much damages?
11              Do I have that right?
12    A.    Yes, you have the sides of the case right, yes.
13              MR. ISAACSON:  Okay.  Can we -- I want to move
14    to a new topic here, Your Honor.  I don't know when you
15    want -- or if you tell me when you want me to --
16              THE COURT:  I would normally take our break in
17    about 10 minutes.
18              MR. ISAACSON:  Okay.  Can we look at Hampton
19    demo 3 and 4.  This is from their presentation.
20    BY MR. ISAACSON:
21    Q.    All right.  These were slides that you went over in
22    your direct.  Do you recognize these?
23    A.    Yes, I do.
24    Q.    So over there it says AICPA.  That's the American
25    Institute of CPAs, and they have rules of conduct, and
</pre>

2862

1    we've shown them to the jury.

2              And it says that you should exercise sensitive,

3    professional, and moral judgments in all their activities.

4              And then on the next page there's an integrity

5    principle,

6              "To maintain and broaden public confidence.

7    Members should perform all professional responsibilities

8    with the highest sentence of integrity."

9              Then there's an objectivity and independence

10   principle.

11             "A member should maintain objectivity and be

12   free of conflicts of interest in discharging professional

13   responsibilities."

14             Those are all from the AICPA code or rules of

15   professional conduct; right?

16   A.    Correct.

17   Q.    All right.  And there's also an AICPA code of

18   professional conduct rule that says that,

19             "Members, in performing professional services,

20   shall not subordinate his or her judgment to others."

21             You're familiar with that?

22   A.    I'm not sure what you're reading from, what

23   document.

24   Q.    All right.  So let's look at -- I don't know if we

25   have -- do we have those rules --

2863

1              (Discussion held off the record.)

2              MR. ISAACSON:  Do you mind if I show a rule of

3    professional conduct on the screen?

4              MR. STRAND:  That's fine.

5              MR. ISAACSON:  Matt, maybe you can show Rule

6    100.001.  And there's an objectivity rule.

7    BY MR. ISAACSON:

8    Q.    Do you recognize this as one of the other AICPA

9    rules?

10   A.    Yes.  Now I understand where you're reading from.

11   Q.    Right.

12              "In the performance of any professional service,

13   a member shall maintain objectivity and integrity, shall be

14   free of conflicts of interest, and shall not knowingly

15   misrepresent facts or subordinate his or her judgment to

16   others."

17              You're familiar with that; right?

18   A.    I am.

19   Q.    And the AICPA also has guidelines and practice aids

20   that talk about how you handle client-supplied information.

21   You're familiar with those?

22   A.    There are quite a number of practice aids.  I've

23   actually been involved in writing some of them but years

24   ago.

25   Q.    I was asking you about ones that specifically deal

2864

1     with client-supplied information.

2     A.    You would have to identify the practice aid.

3     There's so many of them.

4     Q.    All right.  Would you agree with me that,

5           "While a damages expert may rely on a client's

6     representations and information as part of the normal

7     delivery of professional services, it should not be done

8     without appropriate consideration"?

9     A.    I would agree with that completely.

10    Q.    And that goes back to that principle about

11    subordinating your judgment to others.

12          If a client gives you -- I think we're okay --

13    if a client gives you information, you don't simply accept

14    it or subordinate your judgment to them, you give your own

15    consideration to those materials; is that fair?

16    A.    That's absolutely correct.

17    Q.    Okay.  And the -- and, in fact, when you use

18    management-supplied information or projections that rest on

19    assumptions that are tested, you should -- would you agree

20    with me that you should use information that's testable?

21    Meaning you can corroborate it or test it?

22    A.    Yes, I would agree with you.

23    Q.    Okay.  Would you agree with me that when you get

24    information from management of a company -- of your client,

25    that it should come from qualified people at the company?

2865

1    A.    Yes, I think the source of information is important.

2    Q.    Okay.  Would you agree with me that the information

3    should be corroborated?

4    A.    It would depend on the circumstances, but I think

5    that's a good rule of thumb, yeah.  That's a good

6    procedure.

7    Q.    And should you also take into account whether the

8    information was provided for a litigation purpose as

9    opposed to something that was done in the regular course of

10   business?

11   A.    Yes.

12   Q.    Okay.  Now, let's go back to Mr. Benge and Mr. Zorn.

13         The -- your head count estimates, meaning your

14   personnel -- how many extra people would have to be hired,

15   we talked about the doubled employees, the doubled remote

16   engineers, 25 percent more PSEs, those head count numbers

17   came from Mr. Zorn and Mr. Benge; correct?

18   A.    And I understand that Mr. Benge, when I spoke with

19   him, that he was going to go back and talk with his

20   production people and come up with the estimate of how many

21   hours -- or, excuse me, how many people it would take for

22   Rimini Street to operate in a nonaccused fashion.

23   Q.    Okay.  I'm going to come back and get an answer to

24   my question, but let me ask you about that.

25   A.    Okay.  I thought I did.

2866

1    Q.    You understood that when Mr. Benge gave you head

2    count numbers, that he went and talked to other people in

3    order to corroborate and confirm that the numbers he was

4    going to give you were accurate?

5    A.    That's my understanding, yes.

6    Q.    Okay.  And were you here when Mr. Benge testified in

7    court?

8    A.    No, I was not present.

9    Q.    Have you reviewed his testimony?

10   A.    I have, yes.

11   Q.    Okay.  And were you aware that he said that he did

12   not discuss his estimate with engineers in onboarding?

13   A.    Yeah, I saw that.

14   Q.    Were you aware that he said that he didn't provide

15   you a scientific calculation, there was nothing written

16   down, there was no formula, and there was no study of the

17   hours?

18   A.    Well, I think that -- I read that transcript.

19         He said that he spoke with people, and then I

20   think Ms. Dunn characterized it differently and he agreed.

21         But I would say that he did do a study, he

22   just --

23   Q.    Whoa, whoa, whoa, whoa, whoa.

24   A.    -- doesn't see it as the same kind of study.

25         He went back and spoke with his production

2867

1    people.  To me, that's an investigation.

2            If you want to call it a study, if you don't

3    want to, you don't have to, but that's what I asked him to

4    do.

5    Q.    Did you just say that Ms. Dunn characterized it

6    differently, Mr. Benge agreed under oath, but you would not

7    accept Mr. Benge's testimony under oath?

8            That's what you just told us; right?

9    A.    I did not tell you that.

10   Q.    Okay.  Do you accept the truth of what Mr. Benge

11   said under oath?

12   A.    I heard what -- I read what he said, but I didn't

13   think that -- I think he was a little confused.  I think he

14   could have just as easily said that he went back and talked

15   with people, he could have characterized that as a study,

16   but he didn't.

17   Q.    Is the answer to my question no, that you don't

18   accept what he said under oath because you thought he was

19   confused?

20   A.    No, I accept what he said under oath, but it wasn't

21   in conflict with what I understood that he did.

22   Q.    Now, is it your testimony that you talked about --

23   that you got the head count estimates from anyone other

24   than Mr. Zorn and Mr. Benge?

25   A.    My understanding is, is that he went back and spoke

2868

1    with his production people.

2    Q.    I'm talking about who you got -- we're done with the

3    production people.  Mr. Benge said what he said.

4          What I'm asking you now is who you got the

5    information from.

6    A.    Oh, I'm sorry.

7    Q.    The -- did you have other sources for your

8    assessment -- we talked yesterday, I showed you language

9    from your report about how your estimate was based on an

10   assessment by Mr. Benge and Douglas Zorn, and you told me

11   you had other sources.  Do you remember that?

12   A.    I don't remember the context.  Was it --

13   Q.    I showed you a part of your report that said based

14   on an assessment by Jim Benge and Douglas Zorn, and you

15   said I know --

16   A.    I do recall that.  I was thinking of Dr. Davis.  I

17   was thinking of Ms. Dean and Mr. Ravin, I think, when I

18   answered that question.

19   Q.    We're talking about head counts for a 100 percent

20   remote environment model.  Mr. Davis didn't do an estimate

21   of the head count for that; right?

22   A.    Well, we may have been talking past each other.  I

23   may have misunderstood.  I thought -- and we can look at

24   the transcript and --

25   Q.    Well, let's --

2869

```
 1    A.    -- I could have been confused.

 2          But I got the head count from Mr. Benge and

 3    Mr. Zorn.  I got the theory of -- this is the right

 4    approach from Dr. Davis who said the infringement and the

 5    interference allowed them to work more efficiently.

 6    Q.    All right.  Let's look at the paragraph again,

 7    paragraph 169 of your report.

 8          MR. ISAACSON:  And I'd like to put that on the

 9    screen.

10          MR. STRAND:  No objection.

11          THE COURT:  You may do so.

12    BY MR. ISAACSON:

13    Q.    I think we looked at it on the screen yesterday.

14    The second sentence.

15          "First, based on an assessment made by Jim Benge

16    and Doug Zorn, I understand that doubling" -- and you go on

17    to talk about how that would be sufficient to perform

18    duties in a remote-only manner.

19          Remember, we looked at this yesterday?

20    A.    I do.

21    Q.    Okay.  And I asked you wasn't this information --

22    wasn't your assumption based on assessment by Jim Benge and

23    Doug Zorn, and I thought you told me it was based -- you

24    had other sources.

25    A.    Yes, and I recall now.
```

1    Q.    Okay.  And your other -- now, Dr. Davis did not

2    estimate -- our expert did not estimate how many PeopleSoft

3    developers and engineers would be necessary in a

4    remote-only manner; right?

5    A.    I think that's right.  He --

6    Q.    And Elizabeth Dean did not do an estimate that it

7    would require doubling the amount of developers in a

8    remote-only environment; correct?

9    A.    No, I don't think she did.

10   Q.    Okay.  Now, do you have other sources other than the

11   assessment made by Jim Benge and Doug Zorn that -- on which

12   you base your assumption of the appropriate number of

13   developers and engineers for a remote-only operation?

14   A.    No, it was Dr. -- or, excuse me, Mr. Benge and

15   Mr. Zorn was the source of the information for the head

16   count.

17   Q.    All right.  It was only the management of Rimini

18   that you relied on for the assessment that twice -- that

19   all that would be required would be doubling the number of

20   PeopleSoft developers; correct?

21   A.    That's true.

22   Q.    Okay.

23   A.    Yes.

24   Q.    And you had no way to corroborate that; correct?

25   A.    I looked at it for reasonableness.

2871

1          So when I got the numbers, I looked at how many

2     employees are we adding relative to the size of the

3     company, and it was, I thought, substantial, to --

4     Q.    You --

5     A.    -- to the production of people was about a third,

6     and I thought that was a major increase.

7     Q.    You looked at it for reasonableness, but you have no

8     technical ability to know how many engineers would be

9     required to operate in a remote-only environment; correct?

10    A.    No, I was relying on Mr. Benge and Mr. Zorn and the

11    deposition testimony, I think, of Mr. Ravin as well.

12    Q.    All right.  Now, you don't mention Mr. Ravin's

13    deposition testimony, but -- all right.  We'll add him in.

14          So you're relying on -- and I think you

15    testified yesterday, Mr. Zorn does finance, he's not

16    technical.

17          He can tell you the salaries of the developers,

18    but he can't estimate how many developers would be needed

19    in these environments; correct?

20    A.    I think Mr. Zorn has a pretty good understanding of

21    the company, but he wanted to consult and talk with

22    Mr. Benge as well.

23    Q.    Okay.  So Mr. Benge and Mr. Ravin were the people

24    who told you, and who you believe had the technical ability

25    to tell you, how many PeopleSoft developers would be needed

2872

1    such as the doubling?

2    A.    Mr. Ravin wasn't involved.  I had read his

3    deposition that he had given, I think, in 2011, and so I

4    didn't consult with him.

5              I was working just with Mr. Zorn, the

6    financial -- the chief financial officer, and then to get

7    the production side, we spoke with Mr. Benge, and then I

8    understand Mr. Benge went to the people within the

9    production department and made the estimate.

10   Q.    I was hoping to get an answer to the question before

11   the break.

12             For your estimate that doubling the amount of

13   engineers would be required, you relied on Mr. Benge in

14   terms of whether -- the technical truth of that, whether

15   that was -- whether -- as a matter of looking at the

16   technology, how many extra developers would be required,

17   you relied on Mr. Benge and the deposition of Mr. Ravin;

18   correct?

19   A.    Well, for the numbers, it would just be the

20   testimony or the -- I relied on Mr. Benge, Mr. Zorn.

21   Q.    But Mr. Zorn, I think you -- and you told me

22   yesterday you agreed, did not have the technical ability to

23   say we'd need twice as much engineers in order to be remote

24   only.

25   A.    I think -- I think he has a lot of knowledge, but he

2873

1     relied on Mr. Benge as well.

2     Q.    All right.  So I don't know why this is so hard.

3           In order to make the technical assessment of how

4     many additional engineers would be required, you relied on

5     Mr. Benge, and you also looked at the deposition testimony

6     of Mr. Ravin.  I have that right; correct?

7     A.    Yes.

8     Q.    Okay.  And that number was created for litigation;

9     correct?

10    A.    That number was created within the context of the

11    litigation.  It wasn't contemporaneous before the accused

12    acts, that's right.

13    Q.    And you saw Mr. Benge testify that that number was

14    created for litigation; correct?

15    A.    I didn't see it.  I read his trial transcript, and I

16    saw that he said -- and what he was saying was it was

17    created after the litigation was filed.

18    Q.    Right.  Well, he said it was for purposes of the

19    litigation.  You read that, didn't you?

20    A.    I think he might have characterized it that way,

21    yes.

22    Q.    Yeah.  You couldn't test that number because you

23    don't have the technical background to test whether twice

24    as many engineers would be all that would be required to

25    operate a 100 percent remote business; correct?

2874

1    A.    No, I'm relying on Dr. Davis, Dr. Hilliard, and my

2    reasonableness test, that this would be about a 30 percent

3    increase for the company overall.

4    Q.    Okay.  Now, you're throwing out more names.

5          We agreed that Dr. Davis, who is our expert,

6    didn't estimate how many engineers would be required to

7    operate in a 100 percent remote environment; correct?

8    A.    No, but I was struck by the fact that he said the

9    infringement created efficiencies.  So I --

10   Q.    Efficiencies.  That doesn't tell you a number, that

11   doesn't tell you whether it's 2, 3, 4, 5, or 6 times as

12   many engineers --

13   A.    It gives me a magnitude, though.

14   Q.    Just the word efficiency gives you a magnitude?

15   A.    Well, if somebody -- if something is more efficient,

16   then I think that that is not doubling, even, I think that

17   was conservative, because.

18   Q.    Do you --

19   A.    -- efficiency to me is -- says -- if he would have

20   said they made a great deal of money, that would be

21   different.  But he couldn't go there.

22          And he also didn't say they couldn't have worked

23   without these things.  He characterized it as an

24   efficiency.  That's the beginning of my analysis.

25   Q.    So the beginning of your analysis is you take the

2875

1  word efficient and says, well, that couldn't be more than

2  double.

3  A.    I think doubling was sufficient based on my read of

4  Ms. Dean's characterizations of it in her report and

5  Dr. Davis, that the wrongful acts, the infringement and

6  tortious interference allowed them to work more

7  efficiently.

8  Q.    All right.  And you --

9  A.    That's the way he characterized it, and that did

10 influence me.

11 Q.    And now you mentioned Mr. Hilliard.  He did not give

12 you any information about head counts for a remote-only

13 model; correct?

14 A.    No.  I relied on him as to the fact that it could be

15 done.

16 Q.    But he didn't tell you anything about how many

17 people it would take to get it done; correct?

18 A.    I went back and spoke with him, after I got the

19 numbers from Mr. Benge, and said, "Does this look

20 reasonable?"  He thought it did.

21 Q.    All right.  I would like to show you --

22         THE COURT:  Well, let's take our break.

23         MR. ISAACSON:  Could I -- it's on this exact

24 point, and then I'm done.

25         THE COURT:  All right.

2876

```
 1                   MR. ISAACSON:  It's four lines.  Page 73 of your
 2        deposition, lines 12 through 16.
 3                   THE WITNESS:  Are you going to put that on the
 4        screen or is that in the binder?
 5                   MR. ISAACSON:  It's going to play right for you.
 6                   THE WITNESS:  Okay.
 7                (Videotape deposition of Scott Hampton played
 8                 as follows:)
 9                   "Q.   Was Mr. Hilliard one of the people
10                that provided you a head count estimate for
11                the remote-only model?
12                   "A. No, I got that information from Doug
13                Zorn and Jim Benge."
14        BY MR. ISAACSON:
15        Q.   That was your testimony at your deposition, wasn't
16        it, sir?
17        A.   Yes.  I got the actual numbers from Mr. Zorn and
18        Mr. Benge, and that's what I just told you a few minutes
19        ago.
20                   MR. ISAACSON:  All right.
21                   Thank you, Your Honor.
22                   THE COURT:  Thank you.
23                   Ladies and gentlemen, we'll take our first break
24        of the day, and I remind you not to converse among
25        yourselves or with anyone else on any subject connected
```

2877

```
 1    with the trial, or allow yourselves to be confronted by
 2    anyone who may be speaking about the case.
 3              Keep an open mind.
 4              And we'll take a break for approximately 15
 5    minutes and reconvene at that time.  Let us know when
 6    you're ready.  You may step down.
 7              COURTROOM ADMINISTRATOR:  Please rise.
 8         (Recess from 10:49 a.m. until 11:11 a.m.)
 9         (In the presence of the jury.)
10              COURTROOM ADMINISTRATOR:  Court is again in
11    session.
12              THE COURT:  Have a seat, please.
13              The record will show the jury is present,
14    parties and counsel are present.  We're in open court.
15              Mr. Isaacson, you may pick up with your
16    cross-examination, please.
17              MR. ISAACSON:  Thank you, Your Honor.
18    BY MR. ISAACSON:
19    Q.   Before the break -- and I think you said, and I
20    think it's in your report, that the -- Mr. Benge's numbers
21    about head counts, the doubling of engineers, was
22    consistent with Seth Ravin's deposition testimony.
23    A.   Yes.
24    Q.   All right.  And it's your understanding that
25    Mr. Benge's estimate was discussed with Mr. Ravin; correct?
```

2878

1    A.    No.

2    Q.    Now, you met Mr. Benge two weeks before your report

3    was due; correct?

4    A.    My recollection is I spoke with him prior to that.

5          I was in Salt Lake City, they were in

6    San Francisco, so I was on the phone, and then I did have a

7    meeting in San Francisco two weeks before the report was

8    written or issued.  It had been in the process of being

9    written for quite a while.

10   Q.    And it was at that meeting that Mr. Benge gave you

11   the head count numbers, including the doubling figures?

12   A.    I don't recall it that way.

13   Q.    Okay.  That's what Mr. Benge testified to.  You read

14   that; right?

15   A.    I don't -- I did read his transcript.  I guess I

16   just wasn't focusing on that issue.

17         As I said, my best recollection is I got the

18   head count through Mr. Zorn.

19         So we may have discussed where we were going,

20   how things were going when I met with him, but I don't --

21   Mr. Benge never handed me a piece of paper with the head

22   count, or at least I have no recollection of that.

23   Q.    But he told you at the meeting twice as many

24   environment engineers, 25 percent more PSEs, and the

25   other -- the other relevant figures for head counts in your

2879

1    report; correct?

2    A.    I think we discussed it.  I don't recall specific

3    conversations this many years past.

4    Q.    Well, we'll rely on what Mr. Benge said.

5              Now, at that point, when you talked to

6    Mr. Benge, you knew that Seth Ravin had already testified

7    that remote development would require twice as much labor

8    to operate; correct?

9    A.    I believe that deposition was given in 2011, so I

10   was aware of it, and that factored into my conclusion that

11   the best approach would be -- based on Dr. Davis and

12   Ms. Dean's report of there being efficiencies, well, how do

13   we capture that.

14   Q.    So when you walked into the meeting with Mr. Benge,

15   you already had in your head from Mr. Ravin it would take

16   twice as many people, and then Mr. Benge said to you it

17   will take twice as many people.  That's what happened;

18   right?

19   A.    I think you've got it a little bit wrong.  What

20   happened was I read Dr. Davis' report about efficiencies

21   and Ms. Dean's --

22   Q.    Dr. Davis didn't mention doubling; right?

23   A.    I'd be happy to answer your question if you allow me

24   to tell you.

25   Q.    I'm asking you about doubling, so I would like you

2880

1    to answer my question.

2    A.    I'll be happy to do it if you would let me speak.

3    Q.    When you walked into the meeting with Mr. Benge, you

4    already had in your head from Mr. Ravin's deposition that

5    this all-remote business would take twice as many people,

6    and then Mr. Benge said to you it will take twice as many

7    people.

8          That's what happened; right?

9    A.    No.

10   Q.    Okay.

11   A.    What happened is I told Mr. Benge -- or I asked

12   Mr. Benge, I said, "This is what I want to do, I want to

13   find out who needs to be replicated, who needs to be

14   doubled.  Find me the positions that we're going to

15   double."

16         Based on me telling him this is my approach,

17   we're talking about efficiencies, we've got additional

18   employees, let's see who would have to be replicated in

19   order to work in a nonaccused fashion.

20   Q.    And he told you that he -- you would need to double

21   the amount of employees, and you said, well, probably not

22   the PSEs; right?  And then you had a discussion about PSEs?

23   A.    I had asked him to give me the list of people that

24   would be replicated or the people that would be doubled.

25         So my instructions to him was my theory is is

```
1    there would have to be more people, and so -- and I assumed
2    that there would have to be twice as many people in certain
3    categories of production of the people doing the work.
4             Tell me who those people would be, and then I'm
5    going to look at what they were actually paid, and I'm
6    going to calculate how much more it would cost based on
7    real people.
8             So I was asking him which people would have to
9    be doubled in a sense.  So he wasn't telling me it was
10   going to be doubled.  I asked him, give me the head count
11   of the people we would be doubling.
12            So that's how it worked out.
13   Q.   Okay.  So before that meeting, you read Mr. Ravin
14   say that in order to do a remote-only business, it would
15   take twice as many people.
16            So you went into the meeting, and you said to
17   Mr. Benge, "Which categories of people are we talking
18   about, which ones do you need twice as many?"
19            Is that what happened?
20   A.   No.  It was because I had spoken to him over the
21   phone, and I had already explained my approach and how I
22   wanted to capture the efficiencies.
23            And so he wasn't telling me let's double, and I
24   wasn't telling him let's double, the point was, who do we
25   need to replicate, or what positions would be doubled in
```

2882

1    order to work in a nonaccused fashion?

2    Q.    But going into that meeting, you would have already

3    assumed there would have to be twice as many people in

4    certain categories; correct?

5    A.    Yes, that was the underlying assumption.

6    Q.    Right.  That was your underlying assumption.

7          And you had already read that Mr. Ravin had said

8    it would take twice as many people; correct?

9    A.    Well, that was absolutely correct.

10         And then I spoke with Dr. Hilliard and asked

11   does this seem like a reasonable approach.

12   Q.    Sir, we just played you your deposition where you

13   said you never talked to Dr. Hilliard about head counts.

14   A.    I didn't say I didn't talk with Dr. Hilliard.  He

15   didn't come up in that conversation.  I was asking where I

16   got the head count, not the idea to do it.

17   Q.    The head count --

18   A.    So that's the difference.

19   Q.    Okay.  So you're saying -- when we're talking about

20   doubling, we're talking about doubling the head counts;

21   right?

22   A.    Absolutely.

23   Q.    Right.  And you were asked, "Did you talk to

24   Dr. Hilliard about head counts?"  And you said, "No";

25   right?

1    A.    I spoke with him about doubling, not who would be

2    replicated.   So I spoke with him about is it reasonable to

3    take this approach.

4               And we didn't talk about who would we -- be

5    doubled.   So --

6               MR. ISAACSON:   Your Honor, I would ask this

7    answer --

8               THE WITNESS:   -- we're talking past each other.

9               MR. ISAACSON:   I ask this answer be struck and

10   he be instructed to answer the question.

11              THE COURT:   I'd rather just move on,

12   Mr. Isaacson.

13   BY MR. ISAACSON:

14   Q.    Okay.  You said under oath in your deposition, you

15   were asked, "Did you talk about head counts with

16   Dr. Hilliard?"  And you said under oath "No"; correct?

17   A.    It wasn't about head counts, it was about the theory

18   of doubling, but we weren't talking about how many.   So

19   head count is how many.

20   Q.    Right.  So doubling --

21   A.    -- the theory of how to do it.

22   Q.    Let me get this straight.

23              Doubling is not the same as head counts, but

24   when we're talking about doubling, we're talking about

25   doubling the head counts.  Do I have that right?

2884

```
 1    A.    You're trying to confuse it quite well.

 2             And what the point was how many people do we

 3    head count --

 4             THE COURT:  Mr. Hampton --

 5             THE WITNESS:  I'm sorry.

 6             THE COURT:  -- you need to listen to the

 7    question, answer the question, and wait for the next

 8    question.

 9             THE WITNESS:  Yes, sir.

10    BY MR. ISAACSON:

11    Q.    Do I understand your testimony correctly doubling is

12    not the same as head counts, but when we're talking about

13    doubling, we're talking about doubling the head counts; is

14    that right?

15    A.    We're talking about the approach.

16    Q.    Am I right?  Am I right that your testimony is that

17    doubling is not the same as head counts, but when you're

18    talking about doubling, you're talking about doubling the

19    head counts?

20    A.    I'm talking about the approach versus the actual

21    number of people.

22    Q.    Why won't you answer --

23    A.    I'm trying to answer your question.

24    Q.    Can you give me a yes or no?

25    A.    It isn't a yes or no question that I can quite
```

1    understand it that way.

2    Q.    Okay.

3    A.    I'm sorry.  I would if I could.

4    Q.    All right.  I'll let the jury evaluate that.  I'll

5    move on.

6              Now, in terms of going back to talking to --

7    talking to Mr. Ravin, separate from reading his deposition,

8    you also had conversations with Mr. Ravin; right?

9    A.    Yes, I did.

10   Q.    Okay.  And did you talk to him about the doubling

11   issue or the head count issue?

12   A.    I don't recall discussing that issue with him.  I

13   was talking to him about another issue.

14   Q.    All right.  You knew that -- it was your

15   understanding that Mr. Ravin was -- that Mr. Ravin knew

16   that you were talking to Mr. Benge about the doubling

17   issue; correct?

18   A.    No, I'm not sure that he was aware that I was

19   talking -- he may have been, but I wouldn't know if he had.

20   Q.    Right.  And you talked with Mr. Benge, didn't you,

21   about doubling being a concept talked about in Mr. Ravin's

22   deposition; correct?

23   A.    Probably not.

24              I didn't tell him what I was doing.  I just

25   asked for --

1    Q.    All right.

2    A.    -- how many people would we have to duplicate, which

3    people -- in fact, I was asking which people would we have

4    to duplicate to work in a noninfringed manner.

5              I didn't tell him about what I was going to use

6    it for.  I didn't tell Mr. Zorn what I was going to use it

7    for.

8    Q.    So -- but when you go into this meeting, and you say

9    "I want to talk about doubling, which categories of

10   employees to double," and Mr. Benge tells you which

11   categories of employees to double, you never mentioned, you

12   know, funny coincidence here, this doubling we're talking

13   about, that's exactly what Mr. Ravin said was necessary in

14   his deposition.

15             Never talked about that with Mr. Benge?

16   A.    Well I don't think the conversation went that way.

17             I don't think it makes a difference.  But in

18   that -- you keep characterizing this discussion that we had

19   differently than how it went.

20             I had asked Mr. Zorn for how many employees we'd

21   have to duplicate and -- not how many, but specifically

22   which employees would be duplicated, and then he went to

23   Mr. Zorn and asked that.

24             When I met with Mr. Zorn and Mr. Benge in

25   San Francisco, he didn't give me the head count at that

```
 1    time.  I got it through an electronic file, as I said, from
 2    the beginning.  So I got it through Mr. Zorn.
 3    Q.    Well, let's talk about that electronic file.  We
 4    were talking about this PTX 5529.  And do we have that
 5    deposition --
 6              COURTROOM ADMINISTRATOR:  5529 is not admitted.
 7              MR. ISAACSON:  You're going to have to give him
 8    the transcripts so -- to refresh his recollection.  I know
 9    it's not in.
10              COURTROOM ADMINISTRATOR:  Okay.
11              MR. ISAACSON:  So I'll come back to that.
12    BY MR. ISAACSON:
13    Q.    Now, in terms of setting up this remote-only
14    business in India, your assumption was that there would not
15    have to be much effort or planning in order to do that;
16    right?
17    A.    I think, if I recall, that they were already working
18    with consultants in India, and that would be -- that make
19    it easier to set up an Indian office and hire people.
20    Q.    Right.  You assumed it would be easy to set up
21    because they were already working with consultants in
22    India.
23              Was Rimini working with any consultants in India
24    in 2006?
25    A.    I don't know exactly that timeframe.  I would have
```

2888

1    to look.

2    Q.    Okay.  They weren't, were they?  They weren't

3    working with them in 2006 or 2007 or even 2008?

4    A.    I don't know.  That's very possible that they

5    weren't.

6    Q.    You never investigated -- when you said I assumed

7    that not much planning would be necessary because they were

8    already working with consultants in India, you didn't go

9    back and look as to whether that was going to be true from

10   the start of the company; correct?

11   A.    No, not specifically to that answer.

12   Q.    Okay.  Now, if you can look at 5529, and then I'm

13   going to have you look at your deposition just to see if I

14   can help your memory out here.

15   A.    5529?

16   Q.    Yes.

17   A.    Okay.  Thank you.

18   Q.    And then we're going to look at page 92 of your

19   deposition.

20   A.    Is that in one of these binders?

21          COURTROOM ADMINISTRATOR:  It's the one I just

22   gave you.

23          THE WITNESS:  I've got it.  I see it.  Thank

24   you.

25          Could you give me the page number again?

```
 1              MR. ISAACSON:  92.

 2   BY MR. ISAACSON:

 3   Q.    And you can see there that you were discussing

 4   calculations that were given to you by Mr. Zorn.

 5              And if you remember, my colleague, Mr. Hixson,

 6   because these are so voluminous, he showed them to you

 7   electronically so you could look at them on the screen.

 8              Okay?  And then at lines 12 through 17, you said

 9   you remembered reviewing them but you didn't use them in

10   your report.  Right?

11              Is this coming back to you, that -- this large

12   amount of information you got from Mr. Zorn that you looked

13   at but didn't use?

14   A.    This is the electronic file where I said that he

15   gave me the people that we would replicate.

16              That's what I was waiting for.  We had been

17   waiting a number of weeks for it, and then about two weeks

18   before the report was issued, I finally got what I had been

19   asking for.

20              And it came through this electronic file, and

21   what I was looking for was which people in the organization

22   would have to be replicated or doubled in order to work in

23   a noninfringing manner.

24   Q.    Right.  And he gave you a lot more than you asked

25   for.  It was this really large file?
```

2890

1    A.    Yeah.  I was surprised, he gave me an Excel

2    spreadsheet that had 20 tabs and was full of financial

3    results of Rimini Street over eight years or so.

4    Q.    Right.  Okay.  We're talking --

5    A.    It may not have been quite eight years --

6    Q.    We're talking about --

7    A.    -- but a number of years.

8    Q.    We're talking about the same thing.

9          All right.  So that's the electronic file I'm

10   talking about, and somewhere in that electronic file there

11   were head count numbers that you used.

12   A.    There were.  There were actually just not the head

13   count, but the actual employee that they were assuming

14   would have to be doubled.

15   Q.    Right.  And other than the head count numbers, you

16   didn't use what Mr. Zorn gave you?

17   A.    I didn't look elsewhere in the spreadsheet.

18         So I was -- I already had my own model created,

19   and I needed to know which people were going to be doubled,

20   and that's what I was looking for, and that's what I took

21   out of it.

22   Q.    And your understanding of what Mr. Zorn gave you was

23   a model where the additional employees would be hired in

24   the United States and not India?

25   A.    I'm sorry, could you ask that question again?

2891

1   Q.    Sure.  So you're assuming a 100 percent remote

2   business where all the engineers providing environmental

3   support are in India; right?

4   A.    I think we're agreeing, yes.

5            The production people, as I think I

6   characterized them, would be in India, yes, except for the

7   PSEs.

8   Q.    And the people in India in your -- when you do your

9   calculations, have lower salaries than if you hire people

10  in the United States to do the same work; correct?

11  A.    Yes.

12  Q.    Okay.  And what Mr. Zorn gave you in that file was

13  here's what it will cost if we hire all these people in the

14  United States; right?

15  A.    No.  At the time I got the spreadsheet, I didn't

16  even look, and I wasn't aware of the fact that he had given

17  me more until my deposition.

18  Q.    All right.

19  A.    I just looked at the head count and the position.

20           I was unaware that there was another tab in that

21  file where Mr. Zorn had gone further than what I asked him

22  to do.

23  Q.    All right.

24  A.    So he calculated what it cost to work in India.

25           MR. ISAACSON:  Matt, can you play lines 12

```
 1     through 21, page 92.  Do you have it cut that way?
 2              (Videotape deposition of Scott Hampton played
 3               as follows.)
 4              "Q.   And what, if anything, did you do with
 5          the projections for the cost of the remote-only
 6          model that Mr. Zorn had included in that
 7          planning document?
 8              "A.   I remember reviewing them, but I didn't
 9          use them in my report that I recall."
10              MR. ISAACSON:  Okay.  And keep going down to
11     line 6 on the next page.
12              (Videotape deposition of Scott Hampton played
13               as follows:)
14              "Q.   Why is that?
15              "A.   Because I was trying to identify the
16          cost in India of using additional employees,
17          rather than in the United States.
18              "Q.   Sure.  You understand that Mr.
19          Zorn's planning document also made an attempt at
20          estimating cost in India?
21              "A.   No, I'm not familiar with that.  I
22          think his estimate would be in the United
23          States."
24     BY MR. ISAACSON:
25          Q.   All right.  So what Mr. Zorn gave you, and you've
```

2893

1    remembered at the time of your deposition, was that he gave

2    you an estimate for what it would cost to do this model in

3    the United States, and you discarded that in favor of doing

4    it with engineers from India.

5              That's what happened; right?

6    A.    No.

7    Q.    It is the case that the report he gave you used

8    additional employees in the United States and not India;

9    correct?

10   A.    At the time I was testifying, I got his spreadsheet

11   and I looked at the portion that had the employees, and

12   that was in the United States.

13             What I wasn't aware of was in another tab

14   elsewhere in the spreadsheet, he'd calculated what it would

15   cost in India.

16             I didn't know that at the time I was testifying

17   here but subsequently became aware of it during the

18   deposition.

19   Q.    All right.  So we'll go over that.

20             So at the time -- at the time period when you

21   received the report from Mr. Zorn, you understood it was an

22   estimate only of what it would cost if you did this in the

23   United States.  You didn't know it said anything about

24   India; correct?

25   A.    I didn't know the spreadsheet had anything about

2894

1    India, and what it had was head count for the United

2    States.

3    Q.    Right.  And so you discarded it thinking,

4    incorrectly, that it was only about the United States, and

5    did your own estimate of what it would cost to do this in

6    India; correct?

7    A.    Almost.  I didn't discard anything.

8          I just took the people that had said -- that

9    Mr. Benge had said needed to be doubled, and then I took

10   those people and put them into my model, and I didn't use

11   any of the rest of his spreadsheet.

12   Q.    Right.  So --

13   A.    Because that wasn't what I --

14   Q.    I guess you don't like the word discard, but you

15   decided not to use it because it was United States only;

16   right?

17   A.    Not at all.  I used -- his summary -- actually, what

18   he did was he took his --

19   Q.    Sir --

20   A.    -- the reason the document was so big is because it

21   was everything that Rimini had ever done over -- since its

22   existence.

23   Q.    Right.  But you decided not to use his estimates and

24   not rely on them because you thought, incorrectly, that

25   they were relying on US employees; correct?

2895

1    A.    No, you've got it wrong still.

2              What he was talking about, and what I'm talking

3    about in my deposition, was the US portion of what actually

4    occurred, and it was identifying the people that we were

5    going to replicate, and I just took the people out of the

6    spreadsheet.

7              I didn't need the US portion, and I was unaware

8    that he'd even calculated anything for India.

9              So all I was asking for was who are the people

10   that we need to replicate, and then I took those and put

11   them into my model.

12             I didn't need to discard anything because all I

13   had asked for was give me the people that would have to be

14   replicated.

15   Q.    All right.  When you received Mr. Zorn's document,

16   you thought his estimate was only for the United States;

17   correct?

18   A.    Well, his --

19   Q.    Yes or no, sir.

20   A.    What he had was he had the actual results in the

21   United States, and then he had highlighted the people that

22   needed to be replicated.

23   Q.    Sir.

24   A.    Yes.

25   Q.    Yes or no.  You thought his estimate when you

2896

1    received it was only for the United States?

2    A.    There wasn't an estimate.  It was the actual results

3    and then just a highlight of the people that needed to be

4    replicated.

5    Q.    Sir, I just played you your deposition testimony.

6    It's right in front of you.  Where you said I think his

7    estimate would be in the United States.

8              It's right in front of you, page 92.

9    A.    Of the head count, of the people.

10   Q.    Right.  That's what we're talking about?

11   A.    Because they did operate in the United States.

12   Q.    You thought --

13   A.    I asked him which people would have to be

14   duplicated, and that's what he gave me.

15   Q.    You thought -- you thought his estimate of head

16   counts was only for the United States; correct?

17   A.    It was only for the United States because we were

18   duplicating actual people who worked in the United States.

19   Q.    And then you didn't use that part of his report

20   because you were trying to identify the cost in India of

21   using additional employees rather than in the United

22   States; correct?

23   A.    Right.  These weren't estimates, this was the actual

24   employment wages for these people.

25              So that's what -- we're looking at a payroll

2897

1    tab, and this was the list of employees and what they

2    actually made in the United States.

3    Q.    Let's --

4    A.    That's what we're dealing with.

5          And I just took those and took the people, and

6    then I assumed they actually worked in India, so I had to

7    calculate a wage in India.

8    Q.    All right.  Let's look at 5529.  This is the summary

9    tab from that document.  Do you recognize this?

10   A.    You're going to have to give me a moment.  5529?

11   Q.    Yes.

12   A.    Okay.

13         MR. ISAACSON:  All right.  5529 has been

14   produced by the other side as the document that we've been

15   discussing.

16         All right.  I would move 5529 -- sorry, as one

17   tab of the document because the document is quite

18   voluminous.

19         MR. STRAND:  On the understanding it's one tab

20   of a voluminous document, Your Honor, we have no objection.

21         THE COURT:  All right.  It's admitted as to the

22   one tab.

23         (Plaintiffs' Exhibit 5529 received into

24         evidence.)

25         MR. ISAACSON:  All right.  There's a number of

2898

1    trees now grateful for not putting in the other tabs.

2    BY MR. ISAACSON:

3    Q.    This is the summary of what Mr. Zorn did, not what

4    you did, and if you look at page 2 up at the top, do you

5    see additional costs?  And there's total additional costs?

6    A.    Yes, I see that.

7    Q.    All right.  Now, this is Mr. Zorn estimating total

8    additional costs of being remote only if you use US-based

9    engineers.  You understand that; right?

10   A.    No, you're wrong.  This is India.

11   Q.    Well, no, let's --

12   A.    At least if it's the right tab -- you haven't said

13   what tab this is.

14   Q.    I believe it's tab A, the summary.

15            I'll help you out here.  Look down below.  You

16   see Total Cost Reductions Offshoring with much lower

17   numbers?

18   A.    Okay.  So I was unaware that he had the US in this

19   tab.  Okay.

20   Q.    Okay.  So the total additional costs that's at the

21   top, that's assuming US engineers, and down below we'll get

22   to what it would cost if you did it in India.  Do you

23   recognize that?

24   A.    I don't.  I'm not sure that's what it is.

25   Q.    All right.  The total additional -- I think if you

1    review the document, you will understand that that's what

2    it is.

3              But the total additional cost in the United

4    States is only for four years, 2008 through 2012.  Do you

5    see that?

6    A.    If that's what it is.  I mean, you represent it to

7    be that.  It's a column of numbers, but --

8    Q.    I have it right that those numbers apply only to

9    2008 to 2012?

10   A.    That's what it appears to do, yes.

11   Q.    Right.  And I'm going to ask you to trust me on

12   this that those -- I'm sorry, that's five years, that those

13   five years add up to about 25.3 million.

14             You're more than good enough with numbers to see

15   that I'm probably about right.

16   A.    You may be correct, yeah.

17   Q.    Right.  So we're missing 2006, 2007, as well as 2013

18   and 2014, which are part of your analysis.

19             If you used US-based engineers, would you agree

20   with me that, based on what Mr. Zorn was telling you, that

21   the remote-only model would cost about -- would cost in

22   excess of $40 million?

23   A.    I don't know.  I'd have to review.  It's a huge

24   spreadsheet with numbers coming in from many different

25   tabs.

1       So I'm not sure you're correct.  I would have to

2   look.

3   Q.    Does it seem reasonable to you that when five of the

4   nine years are 25.3, that if you did all nine years, that

5   the number would be $40 million or greater?

6   A.    I don't know.  I haven't actually looked to see what

7   the cost would be in the United States.  I assume the

8   employees would be in India.

9   Q.    All right.  And then let's go down to -- and so what

10  happened here was that for just four, five years, Mr. Zorn

11  gave you an estimate of what it would take to run this

12  business in the United States.

13      For those five years it added up to $25 million,

14  and you said, okay, but we're not doing it that way, so I'm

15  not going to use that, we're going to go to India only, and

16  then you did your own estimates of that?

17  A.    I was unaware that I even received this, because I

18  was looking at the payroll tab, and this was a separate tab

19  with 20 tabs across the bottom of the page.

20      So, as I testified in my deposition, I didn't

21  know that he'd actually made a calculation.  I just asked

22  him for the people to be replicated.

23      I was unaware that he'd actually gone forward

24  and made a calculation of his own.

25  Q.    You knew he had done an estimate was what you said

1    in your deposition; right?

2    A.    I was unaware of this tab when I gave my deposition.

3    Q.    All right.  Then the -- if you go down to the

4    off-shoring, remind me, is this a 90 percent reduction?

5          What Mr. Zorn did was take the above numbers for

6    the United States and reduce them by -- I can't remember if

7    it's by 80 percent or 90 percent.  Maybe you can tell me.

8    But he just took a percentage reduction to estimate India.

9    A.    He took 90 percent.  I spoke with him about this

10   after the fact.

11   Q.    Thank you for reminding me.

12         So he took the US numbers and reduced them by 90

13   percent, and that's not the method you used, but that's the

14   method he was using; right?

15   A.    He took that approach and came up with a number of

16   about 6.5 million if I read his schedule properly.

17   Q.    Right.  I counted it 6.4.  Now, that was for five of

18   the nine years.

19   A.    And I was unaware that he had actually assumed that

20   the top portion was the US because I think that 90 percent

21   number comes from the payroll tab.

22         So I didn't know he characterized that as the

23   US.

24   Q.    So, right.  So the -- that's what he's reducing by

25   90 percent, he's reducing the US salaries by 90 percent.

1    A.    He is doing that.  That's my understanding.  Yes.

2    Q.    And for India, for five of the nine years we're

3    talking about, as you said, he estimated 6.5, and for all

4    nine years you've estimated 9.4; right?

5    A.    Approximately, yes.

6    Q.    So what's happening here is that Rimini gave you a

7    model which you say you didn't use --

8    A.    I wasn't even aware that it existed at the time.

9    Q.    That you say you didn't know existed and -- by the

10   way, was this given to your staff?

11   A.    We had been using this document for weeks.  He added

12   the tab.  We didn't look at it again that comprehensively,

13   so --

14   Q.    But your staff had the electronic document; correct?

15   A.    Sure, yeah.

16   Q.    Okay.  And what happened was, was Rimini gave you an

17   electronic document with an estimate that said for five of

18   the nine years, it would be 6.4 million, and that, in this

19   litigation, you've come up with a very similar number;

20   right?

21   A.    My number's higher.

22   Q.    Higher for nine years, about the same if --

23   A.    Well, if you consider 6.4 similar to this 8.6, then,

24   yeah.  There's quite a difference.

25   Q.    You both came up with the number -- you both came up

1    with a number under 10 million.  That's fair isn't it?

2    A.    I calculated the amount that it would have cost

3    Rimini Street to operate in a nonaccused fashion from 2006

4    through 2014, at least February of 2014.

5    Q.    Right.  Rimini gave you very clear information that

6    they wanted this damage number under $10 million; right?

7    A.    That's not true.

8    Q.    Okay.  The -- now, when you said -- assumed that

9    Rimini could hire double the amount of its employees, you

10   were talking about people with 10 years of experience in

11   the relevant software, PeopleSoft, Siebel, JDE; right?

12   A.    Could I hear the question again, please?

13   Q.    Sure.  When you assumed doubling the head counts of

14   certain categories, such as the people providing support

15   for the environments, you assumed that those people would

16   have at least 10 years of experience in the relevant

17   software, whether it's PeopleSoft or Siebel, et cetera?

18   A.    My best recollection is I just asked who would have

19   to be replicated in order to work in a nonaccused fashion,

20   and so I was assuming the people would have enough

21   experience to be able to do whatever task they were asked

22   to do.

23   Q.    All right.  But in reading the transcripts, you've

24   seen Rimini Street saying, you know, we hire people who

25   have at least 10 years of experience.

1              Is that an assumption that you made in this

2    performing your calculations?

3    A.    I disagree with your statement.  They hire some

4    people with 10 years appearance, but that doesn't mean all

5    people have 10 years experience.

6    Q.    Now, you've read Rimini suffered from shortages of

7    personnel in 2009, they were having difficulties hiring

8    enough people in 2009.

9              What makes you think they could -- when they

10   were unable to overcome that shortage of people, that they

11   would be able to actually double their employees in that

12   year?

13   A.    You're making the assumption because they don't have

14   employees on staff that they -- and I think it was

15   difficult to get really experienced people.

16             Not minimizing that, but for a small startup, I

17   think there's always going to be labor shortages where you

18   are working on a short staff because you -- every dollar is

19   essentially borrowed, so you're going to be extremely

20   frugal.

21             So you're saying because they had people who

22   were complaining about not having enough people, that there

23   were not enough people available.

24             I don't know that's the case.  I think it may be

25   they're trying to keep the staff very thin to keep the

2905

1     costs down.

2     Q.    Now, but you assumed that they would be able to hire

3     the number of qualified people they needed; right?

4     A.    That is an assumption that I make is that the people

5     could be found.

6     Q.    All right.  And you know that had -- and you were

7     relying on Mr. Benge for that; right?

8     A.    Not entirely, no.

9     Q.    Okay.  Now, you reviewed Mr. Benge's testimony, you

10    know that he has testified that in saying that you would be

11    able to hire those number of people, that he didn't account

12    for the competitive market for engineers.

13              You read that; right?

14    A.    I read his deposition -- or his trial transcript and

15    saw that, yes.

16    Q.    You read that he testified that he did not account

17    for any difficulties in finding qualified candidates.  You

18    read that; right?

19    A.    I remember something to that effect, yes.  I'm not

20    sure you characterized it exactly as it's said, but, yeah,

21    I think he said that.

22    Q.    Well, it's for those who want to know, it's

23    transcript 2198, lines 14 through 21.

24              You assumed that when Rimini went 100 percent

25    remote from India that it was going to keep all but a few

2906

1    of its customers; right?

2    A.    I assumed that they might lose some and they may

3    gain some, but they would have approximately the same.

4    Q.    Approximately the same.

5                And they would have a net loss of, at most, a

6    few customers?

7    A.    I'm not sure they would lose any customers at all in

8    total.  They may lose a few, but they may gain a few.

9                My underlying assumption is that the number of

10   customers would remain the same even though there may be

11   some that wouldn't have come on as a customer, and then

12   others may have because they're now working in a nonaccused

13   fashion.

14   Q.    And you did not do any survey of customers to

15   determine their willingness to work with a company that was

16   operating 100 percent remote from India; right?

17   A.    I did not perform a survey.

18   Q.    And you thought that that would be acceptable to

19   customers based on the information you received from

20   Mr. Benge; right?

21   A.    Not solely.

22   Q.    Who else?

23   A.    In fact, I'm not sure that I discussed that issue

24   with Mr. Benge at all.  I was talking about head count with

25   Mr. Benge and who would have to be replicated.

1    Q.    All right.  You didn't discuss with anyone whether

2    Rimini's customer base would find it acceptable to be --

3    for Rimini to be operating 100 percent remotely from India;

4    correct?

5    A.    The only other person I can think of that I may have

6    had a conversation with would be the technical expert,

7    Mr. Hilliard.

8    Q.    You say you may have had that conversation.  You

9    don't know that you had that conversation; right?

10   A.    If I had that conversation, it was three years ago.

11   Q.    You don't remember any --

12   A.    I don't recall.  I don't recall sitting here today,

13   it's true.

14   Q.    All right.  It's a fact, sir, that you have assumed

15   that -- that customers would find it acceptable to work

16   with Rimini from India 100 percent remotely, and did you

17   not -- you don't recall talking to anybody about that

18   assumption?

19   A.    That wasn't my testimony.

20   Q.    I asked you if that's true.

21   A.    Oh.

22   Q.    It's true, sir --

23   A.    I don't recall sitting here today -- I did an

24   investigation of what it would take to work in India.  So I

25   did go online, I looked at who operated in India as far as

2908

1    companies that were already there, I looked at the wages

2    that --

3    Q.    Sir, listen to my question.

4    A.    Sorry.

5    Q.    You have assumed that customers would -- customers

6    would find it acceptable to work with Rimini from India 100

7    percent remotely, and you don't recall talking to anybody

8    about that assumption; correct?

9    A.    No, I don't.

10   Q.    Okay.

11   A.    Not sitting here today.

12   Q.    Now, you knew that some customers of Rimini viewed

13   the fact that Rimini had local environments on the Rimini

14   system as a key selling point of Rimini's services;

15   correct?

16   A.    I think there may be documents to that effect, yes.

17   Q.    In fact, you are aware that some of Rimini's

18   customers regard it as a key selling point of Rimini's

19   services that Rimini would have a local environment on its

20   system for that customer.  You are aware of that; right?

21   A.    As I said, I believe I did see documents to that

22   effect, yes.

23   Q.    Okay.  And -- now, you understand that in order to

24   have a remote environment, that the clients have to build

25   those remote environments, that they have to use their own

1    IT resources and they have to administer that environment?

2    A.    Yes.  We spoke of that earlier today.

3    Q.    Right.  So when the environment is on the Rimini

4    system, Rimini builds it.  They use their IT people, they

5    use their resources, and they administer the environment.

6          And when it's on the customer system, the

7    customer has to build it, use their own IT resources, and

8    administer the environment.  You understand that; right?

9    A.    I understand that's possible, and probably the

10   majority, in most cases that's true, yes.

11   Q.    And you made the assumption that customers would be

12   willing to do that?

13   A.    I made the assumption that they wouldn't lose any

14   customers in total.  I assumed that there would be some who

15   would be unhappy with that situation.

16         But I also assumed that if other companies

17   aren't using Rimini Street because they think that -- they

18   don't like what they were doing, and if they stopped the

19   bad acts, that there would be additional customers.

20         So rather than go either way, I just kept it

21   static, the same number of customers.

22   Q.    You assumed that enough customers would be willing

23   to do that so that Rimini would, on a net basis, be able to

24   maintain their customer base; correct?

25   A.    I did.

```
1    Q.    Okay.  And so can we look at PTX 30.  That's in your

2    binder.

3    A.    I'm sorry.

4    Q.    It's also going to go on your screen?

5    A.    Did you say D or T?

6    Q.    P, plaintiff.  We only have Ps and Ds so far, no Ts.

7    A.    What was the number again?

8    Q.    30, 3-0.

9          Now, this is an email from Mr. Ravin in 2007

10   discussing how TomorrowNow is going to a business with 100

11   percent remote environments.

12          And so in the middle it says,

13          "So, TN has sent notice to every client telling

14   them that TN will no long host copies of the client's test

15   environments used by TomorrowNow to diagnose issues and

16   build tax updates."

17          You understand that Mr. Ravin is discussing the

18   business model that you're talking about, 100 percent

19   remote, although not from India?

20   A.    Did he say business model?  Could you show me that?

21   Q.    Sure.  Do you see that TN has sent notice, and you

22   can read the previous paragraph that says the same thing,

23   and the testimony has been that what I'm telling you is

24   correct, that,

25          "TomorrowNow has sent notice to every client
```

```
 1    telling them that TomorrowNow will no longer host copies of
 2    the client's test environments used by TomorrowNow to
 3    diagnose issues and build tax updates."
 4              They were getting rid of the local environments
 5    in TomorrowNow and going remote only.  Were you aware of
 6    that?
 7    A.    Yes, I was aware of that.  I wasn't aware of the
 8    business model part that you mentioned.  I don't see it
 9    here.
10    Q.    All right.  The -- and he says,
11              "Instead, every client will now be responsible
12    for setting up their own environments for use by
13    TomorrowNow, and have to procure all hardware and software
14    at their own expense.  These clients never agreed to such
15    costs as part of their contracts, and why they are very
16    upset over the attempt by TomorrowNow to force this" --
17              He says, "Rimini Street has no such conflicts
18    and no such ridiculous policies."
19              Okay?
20              What you're saying in your damages world is that
21    Rimini would go to what Mr. Ravin characterized as
22    "ridiculous policies" and they'd be from India.
23    A.    Yes, that was the understanding that I had.
24    Q.    And did you see Krista Williams' deposition
25    testimony, which was part of the record in this trial, that
```

2912

1    says it takes two to six weeks to build an environment

2    depending on complexity?

3    A.    I do think I've seen that document, yes.

4    Q.    And that's something you assumed the customers were

5    willing to do?

6    A.    I assumed that they would lose some customers that

7    would be unwilling, but I also assumed that there were

8    customers, potential customers, that were worried about the

9    wrongful acts and didn't come onboard.

10           And so I'm just assuming that as many had a

11   problem with going to the remote environment would leave,

12   that there would be equal number that would come onboard

13   because all of the wrongful acts are now taken care of.

14   There's no litigation.

15           And, so, yeah, I'm making that assumption that

16   it's zero.

17   Q.    You're making that assumption, and you don't recall

18   discussing that assumption with anybody; correct?

19   A.    I don't recall a conversation sitting here today.

20           But I didn't do this in a day or even a week.

21   It took months to do the calculation.

22   Q.    All right.  Let me ask you about your 2006 and 2007

23   head counts.  Let's look at Exhibit D1.SU, which I think we

24   looked at before.  That's the one we started off the day

25   with.

2913

```
 1    A.    Let's see.  So could you give me the reference
 2   again?
 3    Q.    Your Exhibit D to your supplemental report, and
 4   actually we looked at number 2 and number 3.  We're going
 5   to look at number 1, and this will be --
 6    A.    Maybe I'm mishearing you.  You're saying D?
 7    Q.    Yes, Exhibit D to your supplement report.
 8    A.    So it would be D1.SU?
 9    Q.    Yes.
10    A.    Okay.
11          MR. ISAACSON:  Any objection to putting this on
12   the screen?
13          MR. STRAND:  No, go ahead.
14   BY MR. ISAACSON:
15    Q.    All right.  Now, you see the numbers across the
16   page.  These are your estimates of salaries and related
17   costs if you hire all these -- for your remote-only model;
18   right?
19    A.    Yes.
20    Q.    Okay.  And you'll see that you've got numbers at the
21   top for 2008 through 2013, but you have no numbers -- 2006
22   and 2007 are blank until you get down to the totals.
23    A.    That's correct.
24    Q.    All right.  And the reason for that is, is you
25   didn't discuss with Rimini whether -- what number of
```

2914

1    additional employees they would need in 2006 and 2007 to

2    avoid infringement; correct?

3    A.    No.

4    Q.    And Mr. Benge -- Mr. Benge did not tell you that

5    Rimini would need to add employees in 2006 and 2007;

6    correct?

7    A.    I think you've got it a little bit wrong.

8    Q.    Well, he didn't discuss 2006 and 2007 head counts

9    with you, did he?

10   A.    Mr. Benge and Mr. Zorn weren't at Rimini Street, and

11   principally Mr. Zorn wasn't there, so the accounting

12   records were real spotty in those two years.

13        Mr. Zorn came onboard in the 2008.  So we're

14   getting good information in 2008.

15        So for 2006 and 2007, I used 2008 to estimate

16   those two years.

17   Q.    I'm going to get to that.

18        But I'm just trying to simply say, Mr. Benge

19   didn't give you any numbers for 2006 and 2007 because he

20   wasn't there and they had spotty records?

21   A.    That's right.  He wasn't there.

22   Q.    All right.  So you did your own calculation because

23   you have totals at the bottom, and you did that based on a

24   ratio from 2008 back to 2007 and 2006; is that fair?

25   A.    That's true.

1    Q.    And you did not corroborate that method or that

2    ratio with anyone; correct?

3    A.    I worked it out with my staff.  We decided what are

4    we going to do, the accounting information is spotty, you

5    know, they started in 2006.

6          And so we discussed it and decided that we could

7    look at 2008 and use a proportion of their costs going back

8    to '6 and '7, and that would be the best available

9    information to make the estimate.

10   Q.    All right.  So the only people you talked to about

11   using that ratio to plug in numbers for the totals for 2006

12   and 2007 were your staff; correct?

13   A.    I believe you're right.

14   Q.    Okay.  Now -- we're done with that exhibit.

15         All right.  Now, your damage estimate was 9.4 to

16   14 point million dollars based on value of use, and that

17   would require Rimini to have 9.4 to $14 million in order to

18   fund that; correct?

19   A.    Or be able to get it.

20   Q.    Right.  And the -- and they would need that money

21   beginning in 2006; correct?

22   A.    Well, they wouldn't need very much because they only

23   had, I think, just a handful of employees and just a

24   handful of people.

25         So they would need the amount of money that I

1    have.  You've taken it down and I could look at it.

2              They would have had -- would have needed in 2006

3    an additional $116,000.

4    Q.    All right.  And that's based on those ratios that

5    you plugged in?

6    A.    That's based on 2008 looking backwards based on the

7    growth of the company.

8    Q.    All right.  And so were you assuming -- now, you

9    assumed that they would be able to get enough financing;

10   correct?

11   A.    I spoke with Mr. Ravin and Mr. Zorn and asked about

12   where --

13   Q.    I just want to --

14   A.    -- this money would come from.

15   Q.    I just want to know if you assumed they would be

16   able to get enough financing.  I'll get to who you talked

17   to in a minute.

18   A.    Well, I just didn't do what you're suggesting, that

19   I just assumed.  I went and spoke with the financial people

20   at Rimini Street and asked where it would come from.

21   Q.    You assumed that they would be able to raise 9.4 to

22   $14 million, but you had a basis for that assumption.  Do

23   you agree with that?

24   A.    That's correct.  I had a basis for it.

25   Q.    All right.  And when you made that assumption, did

1    you assume that they would be going out for financing in

2    every year, or how was it going to work?

3    A.    My underlying assumption is they would get the money

4    as needed, or they could get it in a lump sum.  It would

5    depend.

6          I just asked was there additional financing

7    available in 2006 through 2012 at that point, could you

8    have gotten the money either through borrowing it or

9    through equity.

10   Q.    All right.  And as you said, you had a basis for

11   that assumption.

12         You got -- your basis for that assumption, that

13   they would be able to raise 9.4 to $14 million over that

14   period of time, was conversations with Doug Zorn and Seth

15   Ravin; right?

16   A.    True.

17   Q.    And when you talked to them, they were not specific

18   about what sources would be -- would lend them that money;

19   correct?

20   A.    No, not specific to what source, just that it -- the

21   money could have been gathered and found.  They could have

22   borrowed it or they would find additional investors.

23   Q.    They just said they had sources of funding, but they

24   didn't tell you what those sources of funding were?

25   A.    Not entirely.  My recollection of the conversation I

```
 1    had with Mr. Ravin is he discussed their financing and what

 2    parties the money could come from.

 3              But I didn't ask him to pin it down to a

 4    particular party because I thought what good would it do.

 5              I mean, we're talking hypothetical whether the

 6    money was available, and I didn't feel the need to go any

 7    further with it.

 8              I was satisfied that rather than go out of

 9    business or for them to stop, they would be able to find

10    the money.

11    Q.    They did not identify to you any potential lenders;

12    right?

13    A.    No, we discussed the lenders and the people that

14    were investing.  I discussed those sources with Mr. Ravin.

15    Q.    Did they identify for you any potential lenders for

16    that additional money?

17    A.    I think we spoke of the different lenders.  Well, I

18    could actually remember more the different investors.  We

19    spoke of them, but I didn't -- I didn't list them in the

20    report.

21    Q.    I understand that.  But did they identify for you

22    any potential lenders?

23    A.    Oh, I see.

24              I think I was already aware of their line of

25    credit, and I think they did have a line.  They may not
```

1    have in the beginning of 2006, though, so --

2    Q.    The line of credit was not for $14 million; right?

3    A.    No, but they don't have to get all 14 at that point,

4    sir.

5    Q.    So let's get an answer to the question.  Did they

6    identify for you any potential lenders?

7    A.    I guess they did, because I had the financial

8    statements and it listed the lenders.

9    Q.    All right.  Can we show him his deposition, page 77,

10   lines 3 through 5.

11         (Videotape deposition of Scott Hampton played

12         as follows:)

13             "Q.  Did they identify for you any potential

14         lenders?

15             "A.  No, no one specific."

16   BY MR. ISAACSON:

17   Q.    That was your testimony under oath at the

18   deposition, wasn't it, sir?

19   A.    Yes.

20   Q.    Now, in saying that you made an assumption they

21   could raise the money, you're not offering an opinion that

22   they would have been able to raise the money; correct?

23   A.    No, I didn't go back and make an analysis of -- and

24   talk to the lenders or talk to the investors.  I assumed

25   that they would be able to raise that amount of money to

1    operate the business.

2    Q.    Exactly.  You assumed it, but you haven't given an

3    opinion, you haven't done any analysis, and you haven't

4    spoken with any investors; correct?

5    A.    That's absolutely correct, yes.

6    Q.    Okay.  And, in fact, you were relying upon Mr. Ravin

7    and Mr. Zorn to substantiate at this trial that funding was

8    available; correct?

9    A.    I wasn't thinking about the trial at that time, I

10   was doing a damage calculation, and I was trying to satisfy

11   myself as to whether I believed that Rimini Street could

12   have gotten the money to operate in a noninfringing manner

13   and nonaccused manner.

14   Q.    Right.  But you were expecting Mr. Ravin and

15   Mr. Zorn to be the ones to substantiate that assumption;

16   correct?

17   A.    I really didn't have any other sources that I could

18   identify.

19   Q.    All right.

20   A.    What would have happened in 2006 if they would have

21   needed an additional $116,000, I assume they could have

22   gotten it at that point.

23   Q.    All right.  Now, in arriving at your opinions about

24   Rimini's support of PeopleSoft customers, that Rimini would

25   be able to do this remotely from India, you -- there's been

1   a lot of documents produced in this case, maybe over a

2   million, don't tell me, the -- other than deposition

3   exhibits, for your first report you only relied on six

4   documents that Rimini produced; correct?

5   A.    Doesn't sound right to me, because I reviewed 53

6   depositions and thousands of pages.

7   Q.    All right.

8   A.    I guess it depends on your definition of rely.

9   Q.    Okay.  Let's look at your report, Exhibit C.  I'd

10  like to show page 1 and 2 on the screen.

11           MR. STRAND:  Of Exhibit C?

12           MR. ISAACSON:  Yes.

13           MR. STRAND:  Fine.  I have no objection.

14  BY MR. ISAACSON:

15  Q.    All right.  Now, this is something you attached to

16  your report called Documents Relied on.

17  A.    Yes, that's true.

18  Q.    Okay.  And on the first page you talk about core

19  pleadings in the case, other expert reports, and then

20  deposition transcripts.

21           Can we get that on the screen?

22           All right.  Down below deposition -- so

23  Documents Relied on at the top, and then deposition

24  transcripts, and these deposition transcripts often or even

25  usually have documents attached to them.

1    A.    Yes.

2    Q.    That were discussed in the deposition.  And you

3    would have reviewed those documents.

4    A.    I reviewed probably thousands of pages of documents

5    associated with the depositions as exhibits to the

6    depositions.

7    Q.    And other than the deposition exhibits -- let's look

8    at the next page.  In terms of documents provided by

9    Rimini, Bates stamped documents -- all right, now, the

10   Rimini documents are the RSI documents; right?

11   A.    Yes.

12   Q.    Okay.  So there were, at the time of your report,

13   other than the deposition exhibits, five Rimini documents

14   that you relied on.  Right?

15   A.    But when it says relied on, it's cited in the

16   report.  So these are documents that were cited as

17   footnotes in the report.

18   Q.    Okay.  The -- now, let's look at PTX 2152.  That's

19   in the PTX binder you have.

20   A.    I'm sorry.  I was waiting for it to come up on the

21   screen.

22   Q.    You can wait for it to come up on the screen.  That

23   works too.  I just don't want to --

24            MR. ISAACSON:  PTX 2152 is not admitted.  Any

25   objection?

```
 1                MR. STRAND:  Counsel, I don't have a copy of it.

 2                MR. ISAACSON:  It should be in the witness

 3      binder.

 4                MR. STRAND:  That's what I'm looking for; 02 --

 5                MR. ISAACSON:  2152.

 6                MR. STRAND:  Yes, I object, Your Honor.

 7                It's hearsay to this witness and lacks

 8      foundation.  Unless he can lay a foundation with this

 9      witness, we object.

10                MR. ISAACSON:  It's a Rimini Street document

11      produced in discovery so it's self-authenticating, Your

12      Honor.

13                MR. STRAND:  There's no foundation.

14                THE COURT:  You certainly may ask him about it

15      at this point in time.  I'll reserve ruling on the

16      admission.

17                MR. ISAACSON:  All right.

18      BY MR. ISAACSON:

19      Q.    You see at the bottom of page 1 --

20      A.    I'm still looking for the document.

21                MR. ISAACSON:  2152.

22                THE WITNESS:  I'm not hearing you; 152?

23                MR. ISAACSON:  2152.

24                COURTROOM ADMINISTRATOR:  2152.

25
```

2924

1    BY MR. ISAACSON:

2    Q.    All right.  And then if you look at page 2, you see

3    Dennis Chiu is talking, in April 2007, about Moraine Park

4    Technical --

5              MR. STRAND:  Your Honor, excuse me, I object,

6    unless we lay a foundation before we start describing the

7    document and talking about what's in it.

8              That's my objection, there's no foundation that

9    this witness has ever seen this document.

10             MR. ISAACSON:  Well, that's relevant as to

11   whether -- to an expert opinion that if he testifies he

12   hasn't seen it, that's important information.

13             THE COURT:  Bring the loop together for me, if

14   you would, Mr. Isaacson.

15   BY MR. ISAACSON:

16   Q.    Have you seen the statement there that,

17             "Seth," referring to Mr. Ravin, "and Rich are

18   well aware that developing tax and regs remotely on their

19   system isn't viable"?

20             THE COURT:  I'll allow the question.

21             THE WITNESS:  Yes.  I can read that.

22   BY MR. ISAACSON:

23   Q.    Did you see that as part of your preparation of your

24   reports in this litigation?

25   A.    I'm not sure.  I saw so many documents, that I'm

1    unsure three years ago -- I think I've either seen this or

2    heard reference to it.

3    Q.    You've seen documents from 2006 and 2007 that says

4    doing remote environments is not -- was not viable;

5    correct?

6    A.    I'm not quite sure what they're talking about.  It

7    says remote is not viable, but that's not my understanding.

8    So I don't know if there's more to it than what we have

9    here on the page.

10   Q.    What about PTX 60, which we'll put on the screen

11   because that's been admitted into evidence.

12         You've seen this before in this trial?

13   A.    This is PTX 2160?

14   Q.    No, six zero.

15   A.    Oh, clear back in the front?  Okay.

16   Q.    This is going to go up on the screen for you.

17         This is where Mr. Freeman says to Mr. Benge,

18   "It's insane and defies our business model to offer to

19   support remote environments."

20         This is in 2009.

21         Did Mr. Benge ever tell you that in 2009 they

22   thought it was insane to support remote environments?

23   A.    I didn't have that conversation with Mr. Benge.  I

24   was asking him who could be replicated in order to work in

25   a noninfringing manner.  I don't have a recollection of

1    that conversation.

2    Q.    Well, when you or your staff saw this document, did

3    you go back and say to Mr. Benge why are you telling us

4    that you could have done this business all remotely in 2009

5    when we're reading that that would be insane?

6    A.    No, I didn't.  In fact, I -- I don't remember seeing

7    this document in that context, because my understanding was

8    they were actually working in a remote manner.

9          So this doesn't -- if this is specific to just

10   working remotely, I think there's an added element to it.

11   Q.    Okay.  And you have resisted the term business model

12   to referring to remote environments versus local

13   environments, but you understand that Rimini referred to

14   this as a business model, a business model where they

15   did -- where they wanted to use remote environments only as

16   a last resort.  You knew that; right?

17   A.    Well, I have the document.  I would still resist

18   characterizing Rimini Street's business model as infringing

19   or the wrongful acts defined in it.

20   Q.    Well, I would also characterize Rimini's business

21   model as infringing and having wrongful acts, but --

22   A.    We differ on that point.

23   Q.    Let's look at PTX 50, which has been admitted.

24         And maybe you've seen discussion of this.

25         This is Jeff Allen, a senior PeopleSoft

1    developer at Rimini Street who at the bottom talks about

2    the ship in a bottle, in a bottle problem.

3                 And then goes on to the next page that says,

4                 "The time required by staff to complete a task

5    on a remote environment is generally three times that

6    required for one in-house."

7                 Now, you were assuming doubling of certain

8    categories.  You never assumed tripling any of the

9    categories; correct?

10   A.    I didn't assume three times.  I assumed doubling.

11   Q.    All right.  And you and your staff, when you saw

12   Mr. Allen say this, didn't go back to Mr. Benge and -- or

13   Mr. Ravin and say, "Why are you saying doubling?  Your

14   senior PeopleSoft developer in 2009 is saying it would

15   require three times as much"?

16                You didn't have that conversation, did you?

17   A.    No, as I mentioned, Mr. Hilliard was the source for

18   the technical issues with regards to the case.

19   Q.    All right.  And you never said to Mr. Hilliard,

20   "What are you talking about, sir?  Internally they're

21   saying three times"?

22   A.    Right.  But I don't know who this person was, and I

23   don't know what was happening in the context.

24                If they had a difficult client, and maybe they

25   were having issues with the client that were more difficult

2928

1    than what the general difficulty would be.

2    Q.    Well --

3    A.    So I am assuming a doubling, and that that level of

4    effort would allow them to work in a noninfringing manner.

5    Q.    Exactly.  You don't know who this individual is.

6          Let's go back to Exhibit C of your report, the

7    deposition transcripts?

8          Now, Mr. Allen was deposed in this case.  He's

9    not one of the deposition -- he's not one of the

10   depositions that you relied on; right?

11   A.    This isn't a complete list because I think there was

12   a supplemental report, and I think there was another

13   schedule C, and, if I remember right, it's been a couple

14   years, a revision --

15   Q.    Sir -- go ahead.

16   A.    I think when I counted up, there was more than 50

17   depositions that we received.

18   Q.    Well, let's look at the supplemental list because

19   you only added three depositions there.

20   A.    And do you happen to recollect that there was a

21   revision to C?

22   Q.    The revision is in the first report, you can see at

23   the top, it says Amended Exhibit C.

24   A.    Mine doesn't say that, so I'm not looking at the

25   right document.  Mine just says Exhibit C.  So I must not

```
 1    be at the same place you are.  I'm sorry.

 2    Q.    What we're showing you on the screen, shown at the

 3    top is Amended Exhibit C.

 4              No, we're showing Exhibit C.  I'm looking at

 5    Amended Exhibit C, and I can tell you Jeff Allen's not on

 6    it.

 7    A.    Okay.

 8    Q.    All right?  The supplement added three depositions.

 9    A.    Okay.

10    Q.    Okay?

11    A.    I think the revision may have more, but I remember

12    50 plus depositions, and they're not listed here, so we

13    must have something going on.

14              MR. ISAACSON:  May I hand him the amended

15    Exhibit C?

16              THE COURT:  Give it to my court clerk.

17              MR. ISAACSON:  I just want to reassure you,

18    sir --

19              THE WITNESS:  Okay.  Thank you.

20              MR. ISAACSON:  -- that you're looking at the

21    right document.

22              THE WITNESS:  All right.  Thank you.  Thank you.

23    The amended doesn't list them either.

24    BY MR. ISAACSON:

25    Q.    All right.  And it doesn't list Mr. Allen; right?
```

2930

1      A.    Correct.  Well, I guess I should look at it.

2            Allen.  Yeah, you're correct.  It doesn't have

3      Mr. Allen.

4      Q.    Now, in terms of hiring these engineers from India,

5      you did not assume they would have any specific numbers of

6      years of experience; correct?

7      A.    No, I assumed only that they would have enough

8      background to be able to do the work.

9      Q.    All right.

10     A.    I would assume for some tasks, like downloading from

11     the Internet, that you wouldn't need a lot of experience to

12     do that.  Someone with just a few years could probably

13     handle it.

14     Q.    All right.  Now, let's look at DTX 3004.

15           COURTROOM ADMINISTRATOR:  I don't believe that's

16     in evidence.

17           MR. STRAND:  3004?

18           MR. ISAACSON:  Yes.

19           MR. STRAND:  DTX?

20           MR. ISAACSON:  Yes.  And I want the 2013 tab and

21     the 2014 tab, Matt.

22           THE WITNESS:  3004?

23           MR. ISAACSON:  Yeah.  It's probably going to be

24     easier if I put it on the screen for you.

25           THE WITNESS:  Because I'm not seeing it in the

1    binder.

2              COURTROOM ADMINISTRATOR:  It's in the binder.

3              MR. STRAND:  Is it admitted?

4              COURTROOM ADMINISTRATOR:  It's in this binder.

5          (Discussion held off the record.)

6              MR. ISAACSON:  Can we show the 2013 tab?

7              MR. STRAND:  Just a moment.  If it's not

8    admitted, unless there's a foundation laid with this

9    witness, I object.

10             MR. ISAACSON:  This has been represented to us

11   to be the schedule of current salaries that he looked at

12   and reviewed.  And, in any event, it's a DTX, so there's no

13   objection to it, and I move to admit it.

14             MR. STRAND:  I just want a foundation laid that

15   this witness has ever seen it before we admit it.  That's

16   all I'm asking for.

17             THE COURT:  The objection is sustained.

18             MR. ISAACSON:  Okay.

19             THE COURT:  But I expect counsel to work these

20   things out because it takes so much of our time when we

21   have to go back and forth and foundation has not been

22   shown.

23   BY MR. ISAACSON:

24   Q.   Would you look at DTX 3004, sir.  Would you look at

25   it in your binder.

1    A.    Yes.

2    Q.    All right.  Do you recognize this as a schedule of

3    salaries, bonuses, total compensation, and overhead costs

4    that you looked at in preparing your supplemental report

5    for 2013?

6    A.    No, I don't recognize this document.

7    Q.    Did you look at actual salary information that

8    Rimini Street provided for India -- for engineers in India

9    for 2013 and 2014?

10   A.    2013 and '14?

11   Q.    Yes.  Because, remember, in your supplemental

12   report, you expanded the years that you were covering from

13   2012 to 2013 to 2014?  Do you remember that?

14   A.    I do recall that, yes.

15   Q.    Okay.  And in looking at that work, did you look at

16   any actual salaries of Indian employees of Rimini?

17            MR. STRAND:  Your Honor, excuse me, can we

18   approach the bench?  I don't want to create a problem.

19            THE COURT:  All right.

20            (Discussion off the record.)

21            THE WITNESS:  Your Honor, could we take a break?

22            THE COURT:  Yeah, we can take a brief break.

23            At this time there's a couple of issues that are

24   on the table, and, ladies and gentlemen, we'll take a short

25   break, all the admonitions continue, and we'll resume just

1    as quickly as we can.  Thank you.

2              THE COURT:  You may step down, Mr. Hampton.

3              MR. STRAND:  We'll get it sorted out, Your

4    Honor.

5              THE COURT:  Yeah, but I reserved ruling on the

6    admission of an exhibit, and I wanted to make sure I

7    understood what that was.

8              MR. ISAACSON:  This is one of the documents he

9    considered for his supplemental report.

10             THE COURT:  And what was the document number?

11             MR. ISAACSON:  DTX 3004.

12             MR. STRAND:  Is it listed as considered on the

13   supplemental report?  Then we don't have an objection to

14   it.  I just hadn't seen it until that moment.

15             THE COURT:  Okay.  So we have it worked out?

16             MR. STRAND:  Yes.

17             MR. ISAACSON:  Yes, sir.

18             COURTROOM ADMINISTRATOR:  So that one is

19   admitted, DTX 3004?

20             THE COURT:  It is admitted, yes.

21        (Defendants' Exhibit 3004 received into

22        evidence.)

23             MR. STRAND:  I'll work out with him the other

24   issue, and if we can't get it sorted out, then we'll bother

25   you.

2934

1        MR. WEBB:  Judge, I'm sorry to bother you.  We

2   have a couple of outstanding deposition issues that we need

3   to address.

4        We'd like to be able to play something today,

5   and so maybe on the way back in before the jury comes in if

6   we could discuss that.

7        MS. DUNN:  Yeah.  We should do that.  But the

8   other thing is that if Mr. Baggett has to make his plane

9   tomorrow, we may need to work out an accommodation where he

10  precedes the video.

11        MR. WEBB:  Mr. Baggett is a third party, he has

12  a plane at 7:00 tomorrow.  He can't be on tomorrow.  So if

13  need be, we'll call him first, but, I mean --

14        MR. ISAACSON:  The videos need to go last

15  because in order to get to Mr. Baggett by 1:15, I'm going

16  to finish, and that allows you to do your direct and a

17  cross, and if there's any time left, then the video.

18        MR. WEBB:  I'm not entirely comfortable having

19  to pinch my witness because his cross-examination has been

20  going on for four hours, to be perfectly honest.

21        MR. ISAACSON:  I've got a witness who won't

22  answer questions.

23        MR. WEBB:  Either way, if we have a third party

24  who can't stay tomorrow --

25        MR. ISAACSON:  Right.  We're not trying to pinch

1      him, we're trying to pinch the videos.

2                THE COURT:  Well, we can also break up the

3      Hampton testimony and let you proceed.

4                MR. ISAACSON:  That would be fine too.

5                MR. STRAND:  After four hours, Your Honor,

6      there's -- I know there's no rule, but he was on for less

7      than an hour and a half, we've now been going four.

8                THE COURT:  And most of it's because of him.

9                MR. STRAND:  I understand, Your Honor, that's

10     why I hesitated to raise it.  But we've taken detours of

11     every document relied on, other cases that the witness

12     didn't recall.

13               I mean, counsel's doing a great job, he's made

14     his points, can't he just wrap it up?

15               THE COURT:  I'm not going to limit him on his

16     cross-examination when I haven't heard an objection that

17     relates to his cross-examination, and can't think of one as

18     I sit here that would be sustained.

19               So if you're concerned about getting this

20     witness in, I would allow continuing the Hampton testimony

21     to tomorrow or later today, whatever the case may be, so

22     that you can get your witness on.

23               I don't know what the issue is concerning the

24     videos, but it sounds like that's something the Court's

25     going to have to take a fairly careful look at.  I'm

1     willing to do that at a time that is not going to interfere

2     with jury time.

3                MR. WEBB:  Counsel will try to get done by 1:15.

4     We'll put on Mr. Baggett then.

5                MR. ISAACSON:  I think it would be prudent to

6     put Mr. Baggett on, and then we will get to Mr. Hampton

7     later today, and I will endeavor to finish, but he's a

8     problem.

9                MR. WEBB:  Your Honor, may we just tell

10    Mr. Hampton to be more direct with his answers.  We have

11    not been able to speak to him.

12               MR. ISAACSON:  I have no problem with counsel

13    giving him that instruction.

14               THE COURT:  All right.  You certainly may do

15    that.

16               And, I mean, the simple fact is he needs to

17    answer the question and wait for the next question.

18               And I've -- I hate to interrupt an expert

19    witness in his testimony because I recognize the importance

20    to either side, but this witness is just not getting the

21    clue.

22               MR. WEBB:  Understood, Your Honor.

23               THE COURT:  And you may speak to him.

24               MR. ISAACSON:  I would like Mr. Baggett to go

25    next to make sure that I'm able to complete his

```
 1    cross-examination because I can't count on him obeying this
 2    instruction.
 3              THE COURT:  Okay.  Well, if you have to get on
 4    Mr. Baggett, which it sounds like you do -- do you have a
 5    breakoff point with Mr. Hampton that --
 6              MR. ISAACSON:  This is a fine breakoff point.
 7              THE COURT:  All right.  I'll explain it to the
 8    jury in a very objective fashion, I think, that we're just
 9    trying to work out witness scheduling, and we'll return to
10    Mr. Hampton at an opportune time.
11              MR. WEBB:  So is it Your Honor's preference that
12    we put Mr. Baggett on the stand right after break?
13              THE COURT:  Yes, yes.
14              MR. STRAND:  Can we inquire of counsel how much
15    longer?
16              Because we've got these -- we promised the Court
17    and the jury that we would try to get done today.
18    Obviously that's not going to happen.
19              So can we inquire?  And I know there's no --
20    nothing pure about it.  How much longer on the
21    cross-examination?
22              MR. ISAACSON:  I would like to think that I will
23    finish today if he's answering questions, but there are
24    other topics that were addressed in his --
25              THE COURT:  That's a guideline.
```

2938

1              Looking at the scheduling issue, the jury has

2      stated that they would be able to stay until 3:00 today.

3              But if we're not -- if that's not going to

4      accomplish a meaningful purpose in terms of this scheduling

5      and so forth, in light of the issues that are still

6      pending, and I need to review videotapes and hear arguments

7      about that, it seems to me it may be more prudent to let

8      the jury go at 2:00, as scheduled, we'll bring them back

9      tomorrow morning, and complete the remaining testimony.

10              And hopefully Mr. Baggett will be on and

11      completed, and the cross-examination of Mr. Hampton can be

12      sped up somewhat through his cooperation, as well as

13      counsel's consideration, and we'll take it from there.

14              MR. ISAACSON:  I do think the extra hour will

15      make the day a lot easier on the jury.

16              I think -- I will endeavor to finish, but at a

17      minimum I won't have much for tomorrow, and that would just

18      leave any reduced videos and a very short rebuttal case,

19      less than a half hour, at least on our part, and so --

20      which would give the Court more time on jury instructions.

21              THE COURT:  I have no problem with going until

22      3:00.  The jury's indicated they can do that, and we'll do

23      it.

24              MS. DUNN:  Thank you.

25          (Recess from 12:29 p.m. until 12:47 p.m.)

1            (Outside the presence of the jury.)

2                 THE COURT:  All right.  The jury's coming in.

3     But what are we doing?  To ask the obvious.

4                 MR. WEBB:  We'll call Brian Baggett.

5                 THE COURT:  All right.

6            (Jurors enter courtroom at 12:47 p.m.)

7                 THE COURT:  Okay.  Have a seat, please.

8                 The record will show that the jury is all

9     present.  Counsel and the parties are present.

10                Ladies and gentlemen, as I think you know, I

11    like to keep jurors informed concerning schedule and what's

12    happening to the extent that I can discuss that.

13                And we've had some delay here because, one, we

14    had to straighten out the equipment for the sidebar, but

15    we're also trying to manage time.  That's why earlier today

16    we asked if you would be able to stay until 3:00, and

17    you've indicated that you could.

18                We may well be going to 3:00.  But part of the

19    issue has been witness scheduling.

20                The defense has a witness available who needs to

21    be on and off today due to his travel commitments, and what

22    we've discussed is to bring that witness in at this time

23    and interrupt the cross-examination of Mr. Hampton, and

24    both sides have agreed to that, and I appreciate that very

25    much.

2940

1             So, what we'll do at this time, we'll basically

2     put a hold on the cross-examination of Mr. Hampton, the

3     witness who has been on the stand.

4             He will come back for the completion of that

5     cross-examination after we've gotten through the --

6     certainly the next witness, and I'd say the chances are

7     pretty good that we'll be going until 3:00 today, and if

8     anyone has a problem with that, please give a note to

9     Dionna and let her know.

10            So all of that stated, we're ready to go.

11            And, Mr. Webb, with that understanding, the

12    defendant's next witness is?

13            MR. WEBB:  Thank you, Your Honor.  Defendant's

14    next witness is Brian Baggett.

15            THE COURT:  All right.

16            COURTROOM ADMINISTRATOR:  Please raise your

17    right hand.

18            You do solemnly swear that the testimony you

19    shall give in the cause now before the Court shall be the

20    truth, the whole truth, and nothing but the truth, so help

21    you God?

22            THE WITNESS:  I do:

23            COURTROOM ADMINISTRATOR:  Please be seated.

24            Please state your name and spell your name for

25    the record.

```
 1              THE WITNESS:  Sure.  My name is Brian Baggett;

 2   last name B-a-g-g-e-t-t.

 3              COURTROOM ADMINISTRATOR:  And can you please

 4   tell us your city and state of residence.

 5              THE WITNESS:  Rochester, New York.

 6              THE COURT:  Go ahead, Mr. Dunn.

 7                       BRIAN BAGGETT

 8          called as a witness on behalf of the

 9       Defendants, was examined and testified as follows:

10                     DIRECT EXAMINATION

11   BY MR. WEBB:

12   Q.    Good afternoon.

13   A.    Hi.

14   Q.    Again, please tell the jury your name.

15   A.    Hi.  I'm Brian Baggett.

16   Q.    Mr. Baggett, where do you work?

17   A.    I work at Carestream.

18   Q.    And where is Carestream located?

19   A.    Carestream is in Rochester, New York.

20   Q.    What do you do for Carestream?

21   A.    I'm the director of application services, so I take

22   care of software.

23   Q.    Mr. Baggett, are you employed by either party in

24   this case?

25   A.    I'm not.
```

```
 1    Q.    Do I or my law firm represent you in this case?
 2    A.    No.
 3    Q.    Do Oracle's lawyers represent you?
 4    A.    No.
 5    Q.    Are you being compensated for your time in this
 6   trial today?
 7    A.    No, just travel expenses.
 8    Q.    So other than being paid for your travel expenses,
 9   are you being compensated in any way in connection with
10   this trial?
11    A.    No.
12    Q.    Mr. Baggett, when did we first meet?
13    A.    Tuesday.
14    Q.    Did you meet with other folks on my team prior to
15   that?
16    A.    I did.  I met with two attorneys in the weeks
17   leading up to today.
18    Q.    How many times?
19    A.    Twice.
20    Q.    Are you missing work to attend trial today?
21    A.    I am.
22    Q.    Let's go back to your current position.
23          What are your responsibilities at Carestream
24   today?
25    A.    My responsibilities at Carestream, I take care of
```

1     the big software packages, the ERPs, so basically the

2     software that runs the company, financials, HR, purchasing,

3     procurement, manufacturing; the software pieces.

4     Q.    Are you involved in the support and maintenance of

5     the software at Carestream?

6     A.    I am.

7     Q.    Is it Oracle software?

8     A.    We run Oracle Databases, but it's an SAP software.

9     Q.    Does Rimini Street provide support for Carestream?

10    A.    They do not.

11    Q.    How long have you been working at Carestream?

12    A.    Just about a year.

13    Q.    Prior to that, did you ever have occasion to work at

14    a company called PeopleSoft?

15    A.    I did.

16    Q.    When did you work at PeopleSoft?

17    A.    I worked at PeopleSoft in 1997, '98, '99.

18    Q.    Let's start at the beginning.  What did you do when

19    you first started working at PeopleSoft?

20    A.    I worked in the consulting group so I was a

21    consultant.  I would go around to different client sites

22    and implement software packages.

23    Q.    And what did you do after that?

24    A.    That was about my duration there.  I did about three

25    years of implementations.

2944

1    Q.    Three years of implementations.  What was your last

2    job at -- oh, you're currently at Carestream?

3    A.    Yes.

4    Q.    Any job -- any responsibilities before that?

5    A.    Before I worked at Carestream, I worked at Delaware

6    North Corporation.

7    Q.    And what'd you do there?

8    A.    Roughly the same job, it was director of application

9    delivery.

10   Q.    Did there come a time that you worked at a company

11   called Bausch & Lomb?

12   A.    Yes, before Delaware North I worked at Bausch &

13   Lomb.

14   Q.    When did you work at Bausch & Lomb?

15   A.    I started in 1999, and I worked there through 2013

16   so --

17   Q.    Just take a few minutes and walk through your -- the

18   various jobs that you've had while you were at Bausch &

19   Lomb?

20   A.    Sure.  So, I was there for about 13 years.  I did

21   have a number of jobs.

22         I started as a manager in the IT group and

23   worked my way up through -- to become a director.  And I

24   started by supporting or helping out with the financial

25   pieces of software, and then eventually grew to things,

2945

```
 1    again, like HR and business intelligence and supply chain,
 2    the different components of ERP.
 3    Q.    What ERP software did Bausch & Lomb use?
 4    A.    PeopleSoft.
 5    Q.    Now, back when you worked at PeopleSoft, did you
 6    work with software?
 7    A.    I did.  I was part of the implementation team, yes.
 8    Q.    Okay.  So what software did you work with while you
 9    were at PeopleSoft?
10    A.    PeopleSoft.
11    Q.    And so PeopleSoft software also was running at
12    Bausch & Lomb?
13    A.    That's correct.
14    Q.    What was your last position at Bausch & Lomb?
15    A.    Director of business technologies.
16    Q.    And what were your responsibilities in that
17    capacity?
18    A.    Again, I was responsible for the ownership of the
19    ERP, the support, maintenance of all the commercial
20    software that we ran in the company, at least the bigger
21    stuff, the enterprise stuff.
22    Q.    When did Bausch & Lomb first start using PeopleSoft?
23    A.    May of 1999.
24    Q.    And did Bausch & Lomb enter into a license agreement
25    with PeopleSoft to use that software?
```

2946

1    A.    They did.

2    Q.    Were you involved in those negotiations?

3    A.    I wasn't.

4    Q.    Did Bausch & Lomb pay PeopleSoft a fee for a license

5    to use that software?

6    A.    They did.

7    Q.    And how many products, how many PeopleSoft products

8    did Bausch & Lomb use?

9    A.    There were a number of modules, but they were

10   comprised into what's described as four verticals or four

11   pillars.

12             So one would be human resources, another was

13   financial management, a third was customer relationship

14   management, and then the fourth was called enterprise

15   performance manager -- management, which are the four large

16   pieces that we ran there.

17   Q.    When you first installed PeopleSoft software, who

18   provided the maintenance for it?

19   A.    Originally it was PeopleSoft.

20   Q.    Did that change at the time?

21   A.    Yeah, I think in roughly 2003 or 2004 PeopleSoft was

22   acquired by Oracle, and at that time the support shifted

23   from PeopleSoft to the new company, Oracle.

24   Q.    So after the acquisition, Oracle took over providing

25   support and maintenance for Bausch & Lomb's PeopleSoft

2947

1    products?

2    A.    That's correct.

3    Q.    Did there come a time when Bausch & Lomb made a

4    decision to move away from Oracle software?

5    A.    Yeah, in about 2008, we'd been running software for

6    almost nine -- nine years.

7              We had originally purchased the software with

8    the idea that as Bausch & Lomb grew, we would -- we would

9    need more functionality in the software, and PeopleSoft had

10   a good roadmap to do that.

11             Over time we found, when Oracle acquired

12   PeopleSoft, that they didn't have the same vision for

13   the -- the future vision for the software that PeopleSoft

14   originally did, so it wasn't a good strategic fit for us

15   anymore.

16             So we knew in 2008 that we didn't -- we knew

17   that our future of our ERP was not going to be PeopleSoft,

18   we were going to go with a different package.

19   Q.    So you made that decision to move away from Oracle

20   software to some other vendor?

21   A.    That's correct.

22   Q.    And were you involved in that decision?

23   A.    I had input, but ultimately it was the

24   vice-presidents in the company that made the decision.

25   Q.    And once that decision was made, what was your role?

2948

1    A.    Well, they understood that implementing a new ERP

2    package takes, in a company Bausch & Lomb's size, a number

3    of years.  So it's not a quick thing.

4              So even though you make the decision, you now

5    have this lag of three to four to five years where you have

6    to figure out how to get to the new package and how to put

7    it in.

8              So after the decision was made, they came back

9    to me and said, "hey, Brian, you've got to figure out a way

10   to keep the software running."

11             And basically the whole company runs on it, so

12   when you take orders, it all comes through the software.

13   So it's critical to our company.  We can't run without the

14   software.

15             So the piece they asked me to do is they said

16   you've got to make sure the software is always up, it's

17   always running, and you got to find a way to do that until

18   we have time to move to a new ERP.

19   Q.    So the decision to move away from Oracle was made,

20   but you still had Oracle software running?

21   A.    That's correct.

22   Q.    And it was your job to figure out how the

23   maintenance and support would go forward until you

24   transitioned to a new vendor?

25   A.    That's correct.

1    Q.    Did there come a time when a decision was made to

2    move away from Oracle support on the new software?

3    A.    Yeah.  So we didn't -- once Oracle acquired

4    PeopleSoft, we found that our -- the level of support

5    tailed off quite a bit, so we weren't -- we didn't believe

6    we were getting the value out of the support dollars we

7    were paying Oracle.

8              We paid roughly -- I think it was 2.2 million a

9    year, and we just didn't feel we were getting value out of

10   that, we weren't getting the help we needed from Oracle

11   when things would break.

12             So we knew we wanted to do something different,

13   and for a number of years we weren't quite sure what.

14             When the decision was made to move away from the

15   software, and we knew we were going to pick a new ERP, that

16   gave me much more flexibility on my side to determine how

17   to support it.

18             So, you know, I had a firm recommendation in my

19   mind, probably by December of 2008 leading into January of

20   2009, I knew that we -- I had researched a bunch of options

21   and knew that we were going to move away from Oracle.

22   Q.    So at that point you had made the decision to move

23   away from Oracle support?

24   A.    I had.  I knew that my recommendation would not be

25   to stay with Oracle.

1    Q.    All right.  Did Rimini Street cause you to make that

2    decision?

3    A.    No.  We knew we had -- again, we weren't -- we

4    didn't feel we were getting value out of the money we were

5    paying Oracle.

6              $2.2 million is a lot of money for a company the

7    size of Bausch & Lomb, so we knew we were going to move on

8    and do something else.

9              We knew we had options.  We knew Rimini was one

10   of the options, but we hadn't decided firmly on which

11   option we were going to go with yet.

12   Q.    Okay.  You mentioned value several times.  Explain

13   to the jury what you mean by not getting value for your

14   2.2 million.

15   A.    Yeah, so, I don't want you guys to think Bausch &

16   Lomb is cheap.  It's not.

17             And we -- we at Bausch & Lomb, we would always

18   pay for what we used and what we felt there was value to,

19   and we treated the money just like it was our own in our

20   own house.

21             So when we spent it, we always made sure that

22   whatever we spent it on, we felt it was helping the

23   business at least that much.

24             So, you know, to spend $2.2 million, we're happy

25   to do it if it provided that much benefit back to the

1    company.  So it wasn't exactly the dollar amount that was

2    the problem, it was that we were spending the money and not

3    getting a lot of value out of that.

4    Q.    Mr. Baggett, in your job at Bausch & Lomb, did you

5    have occasion to firsthand witness the service provided by

6    Oracle for your company?

7    A.    Yes.  That was part of my job.

8    Q.    Please take a few minutes and describe to the jury

9    the type of service you received from Oracle.

10    A.    So, this is -- I don't know how much you guys know

11    about this, but basically when you have software running,

12    things don't always run the way you want them to and

13    sometimes things break.

14          So the first step in the process is to call

15    whoever the software provider is, the vendor and say, hey,

16    I've got a problem, I need help.

17          And with PeopleSoft, that had always worked

18    pretty well.  We'd call somebody, and there would be

19    somebody knowledgeable on the phone who could actually help

20    us with our problem.

21          They'd say, oh, yeah, we know what that is,

22    okay, let's work on that and we'll figure it out, and

23    they'd work through a solution.

24          What we found with Oracle is it was a very rigid

25    process.  We would log a ticket and say we have a problem,

1    and we'd get a call back from someone at Oracle and Oracle

2    support.

3              But what we found was over time the calls that

4    we were getting back were not from people who understood

5    the software or understood the different aspects or

6    components of what could be broken.

7              So basically people would call us back, but it

8    was just like -- it was just more of a courtesy callback

9    just to say, yeah, we know you -- and we just want to let

10   you know we know that you've logged a problem, and we'll

11   have our engineers look at it.

12             Okay.  And then we'd go through a process of

13   they'd say, hey, can you please upload the log files where

14   there's an error.  Sure.  So, you know, we'd send them some

15   information, and we'd wait.

16             And then we'd ping them and say, you know, have

17   you guys made any progress, and then they would come back

18   with more questions.  Well, can you send us information on

19   this or on this other piece.  And a lot of times the

20   information they were asking for wasn't relevant at all to

21   what was broken.

22             So I was finding that my guys were spending a

23   lot of time -- what I would describe as just wasting their

24   time, and it wasn't -- and it was time that was not

25   actually moving towards a fix to the problem.

1          And what everybody needs to understand is while

2     it's broken, that's causing -- that's something that Bausch

3     & Lomb can't do.

4          So whether it's something on the financial side,

5     or whether it's taking orders, that whole time that the

6     product isn't functioning, Bausch & Lomb is losing money.

7     So time's important.

8          And we found that there was a lot of back and

9     forth, and, in the end, in many cases, we wound up just

10    fixing it ourselves.

11         So, I had development staff there, and we

12    couldn't let it be broken any more, so, you know, I'd get

13    my guys together and say you've got to figure it out,

14    you've got to fix it.

15         So they would dig into the code, and they would

16    see what was broken, and then they would come back and say,

17    hey, we could do this or that to fix it, and, great, they'd

18    fix it.

19         And then we would actually provide that fix back

20    to Oracle, and say, hey, you know, that case we have

21    opened, here's our fix, here's what we did.

22         We would send it back to them with the hope that

23    they would include it in future releases so that when --

24    it's a circle, so when it comes back to us in a patch, it

25    doesn't re-break what was already broken the first time.

2954

1    So that was fairly consistent.

2    Q.    Did you ever have an occasion to call the Oracle

3    help desk?

4    A.    Well, we did it via phone, or sometimes it was

5    through their portal where you would actually log a ticket.

6    Q.    Understood.  And in either respect, did you find

7    that Oracle's responsiveness was at a high level?

8    A.    So the responsiveness -- and this is a tricky thing.

9    You could argue that in one aspect they were responsive.

10   So when we log a ticket, they would call you back, but the

11   call-back wasn't a fix, it was just a -- they would call

12   back to acknowledge that we have your ticket and we'll work

13   on it.

14          So, in that sense, did they call back?  Yes, but

15   they weren't responsive in fixing problems.  So the

16   problems would just linger.

17   Q.    How did this impact your team and the resources at

18   your disposal?

19   A.    So it was problematic for my team.

20          I had about 40 people working on my team.  We

21   had only slated 20 of them to help support PeopleSoft.  The

22   other 20 were supposed to be off doing other projects.

23          But because we weren't getting the support we

24   needed from Oracle, we had to pull a lot of those back in

25   to support the platform.

1          And basically what we wound up doing for the

2     other projects was going out to a vendor and paying a

3     consultant to come in and do that work instead of having my

4     guys do the work because my guys were busy back supporting

5     the PeopleSoft environment which was never the plan.

6     Q.    So you would log a problem with Oracle, and they

7     would not fix it in a timely fashion, so your folks would

8     have to do the fixing for you?

9     A.    Yes.

10    Q.    When you contacted Oracle with a problem, describe

11    for the jury the level of experience of the person who

12    answered the phone.

13    A.    Yeah.  The level of experience deteriorated over

14    time.

15          So at the point of acquisition where PeopleSoft

16    was doing the support, in the beginning, it was the same

17    people we were talking to, and they were fairly

18    knowledgeable.

19          What we found over time was we were being -- we

20    were talking to people who had very little experience with

21    the software.

22          And to give you an example, we'd have a problem

23    in our accounts payable software, and -- which sits in the

24    financial suite.  So we'd call and say, hey, here's the

25    problem, it's in accounts payable.

1          And then we would get questions back like, okay,

2     well, which vertical is that, is that in HR?  No, it's not

3     in HR, it's your product, and you should know that, it's in

4     the financial suite.

5          So it was clear from the questions we were

6     getting back that the people we were talking to didn't have

7     a lot of experience.  They were, I would argue, not well

8     trained.

9     Q.   What would you have to do to actually get and reach

10    someone that you felt was sufficiently experienced to help?

11    A.   We escalated.  So we had an account manager that we

12    would call, especially when the problem was really causing

13    us an issue.

14         We just -- we'd log the ticket, and this became

15    routine.  And we would call up the account manager, and

16    we'd say, hey, you got to help us here, you got to reach

17    back into Oracle.  We're dealing with the first level of

18    support, but can you reach out and get somebody deeper in

19    second or third level of support, someone who has the kind

20    of experience that can fix this for us.

21    Q.   Now, the jury has heard from Oracle executives that

22    Oracle provides excellent service.  Is that consistent with

23    your experience?

24    A.   No, it was certainly not consistent with mine.

25    Q.   Okay.  Now, you mentioned earlier that the reason

1    you decided to move off of Oracle was that you were not

2    getting good value for $2.2 million you were paying Oracle?

3    A.    Yeah.   So, there's two pieces to that support

4    payment that we make, and one piece certainly is the

5    support that we're talking about.   When something breaks,

6    we need it fixed.

7              But the other piece is that 2.2 million gave us

8    rights to all the future software that we were licensed for

9    that Oracle was developing.

10             So it's kind of like a new release of Windows,

11   you know, when you're going from 7 to 8 to 9 to 10,

12   whatever, you have rights to that because you cut them a

13   check every year.

14             So that was a big piece of the value that we

15   were interested in was the new features and functions that

16   were going to come as part of the PeopleSoft software.

17             So over time, you know, as Bausch & Lomb grew,

18   we would have an ERP that would have more functionality and

19   more capabilities.

20             And we found that when Oracle acquired

21   PeopleSoft, that that wasn't happening anymore.   It seemed

22   like their strategy was moving in a different direction.

23   They talked about a product called Fusion.

24             They couldn't describe it, they didn't know

25   exactly what it was going to look like, but they just

1    painted this picture that was very different from the one

2    that we had -- that we knew when we had purchased the

3    software from PeopleSoft.

4            So it was clear to our executives at Bausch &

5    Lomb that the strategy that Oracle was taking and where

6    they were moving their product was not at all in alignment

7    with what PeopleSoft was going to do and where we were

8    trying to be.

9            So, you know, we knew that that didn't have

10   value to us.  Maybe it had value to other customers, but it

11   didn't have value to us, and it wasn't going to help Bausch

12   & Lomb.  So that's what I mean by no value or limited

13   value.

14   Q.    You mentioned price.  Was price the reason that

15   Bausch & Lomb decided to move away from Oracle support?

16   A.    Again, price but in the context of value.

17           We would have happily continued to pay the

18   2.2 million if the value was there.

19           On the flip side, we would have -- for less

20   service, if the agreement was going to change and say, hey,

21   instead of the service you were getting before, now you're

22   going to get less service, and we're going to charge you

23   less, and the price was less, you know, that would have

24   been okay too.

25           But there needs to be a match between the

2959

1    service that you're getting and the money that you're

2    paying.  You can't pay this much and only get this much

3    service back.

4    Q.    Mr. Baggett, I'm going to ask you an important

5    question.

6              If you were getting excellent service from

7    Oracle, would you have decided to go off Oracle support?

8    A.    No, no, we would have stayed with Oracle.

9    Q.    Mr. Baggett, what's a request for quote?

10   A.    When you decide that you're going to do something

11   new, you're either going to purchase a new software package

12   or you're going to get a new service, it's important to

13   help the -- companies that you're going to buy that service

14   from, it's important to help them understand what it is

15   you're asking for.

16             So a request for quote is exactly that, where

17   you outline to potential bidders or vendors, hey, here's

18   what we need, you know, we need tires, we need a car seat,

19   we need steering wheels, and it needs to be leather and it

20   needs to be blue.

21             So you outline what you need, and you put that

22   in a document that's called a request for quote, or an RFQ,

23   and you send it out, and basically you're saying just give

24   me a price.  So here's what I need, and tell me what it's

25   going to cost or what you would charge me if we went with

2960

1    you.

2    Q.    Mr. Baggett, did there come a time when Bausch &

3    Lomb sent out a request for quote for its support services?

4    A.    We did.  It was in early 2009.

5    Q.    Mr. Baggett, in front of you is a notebook of

6    potential exhibits that we might talk about today, and

7    maybe opposing counsel might talk about as well.

8          So I'd like you first to open that up and turn

9    to tab 435.

10   A.    I'm sorry, 435?

11   Q.    435.

12   A.    435.  Okay.

13          MR. WEBB:  At this time I would offer into

14   evidence PTX 435.

15          MS. DUNN:  No objection.

16          THE COURT:  It is admitted.

17          (Plaintiffs' Exhibit 435 received into

18          evidence.)

19   BY MR. WEBB:

20   Q.    All right.  And Mr. Baggett I'm just going to have a

21   few questions about this.

22          What is this exhibit that we're looking at?

23   A.    It looks like an email chain that contains the

24   request for quote.

25   Q.    All right.  Now, let's flip back a few pages to page

2961

1    6.

2    A.    Okay.

3    Q.    Do you see that?

4    A.    I do.

5    Q.    And what do we see here?

6    A.    Well, this is -- this is the request for quote that

7    I described.

8    Q.    All right.  So this is the document that you sent

9    out to companies asking for them to bid on your support

10   work.

11   A.    Yes.

12   Q.    Mr. Baggett, who did you send this to?

13   A.    We sent it to three companies.  We sent it to

14   Oracle, we sent it to Rimini, and, I apologize, I don't

15   recall the name of the third company.  I think it was

16   either Systems Efficiency or Transchannel, but it was

17   another support firm.

18   Q.    So another third-party support company?

19   A.    Yes.

20   Q.    In 2009?

21   A.    Yes.

22   Q.    Mr. Baggett, you sent this to Oracle?

23   A.    We did.

24   Q.    I thought you just told the jury that you didn't

25   have a stellar experience with them.

2962

1    A.    We didn't.

2              And -- so one of the things that Bausch & Lomb

3    valued was partnerships.  We didn't feel we did business

4    with vendors, we felt -- we always tried to do business

5    with partners.

6              And so we -- whenever things weren't going well,

7    we always tried to reconcile a relationship as best we

8    could because it's always -- in the long run, if you can

9    get it to work, it's always less expensive to get it to

10   work with what you have than try to go out and do new

11   things.

12             So although we had made a number of calls into

13   Oracle, and we had complained numerous times, we didn't

14   feel we were getting any response.

15             So our hope was -- this was kind of last-ditch

16   effort that if we included Oracle in a request for quote,

17   first, they would understand that we were at a point where

18   this is serious, we were looking to dissolve the

19   relationship.

20             And it was our hope -- we knew it was a long

21   shot, but it was our hope that they would come back and

22   work with us in a way that would be agreeable or at least

23   better.

24   Q.    And is that how they reacted?

25   A.    No.  They were very -- they were very -- I don't

1      know what the word -- unhappy with the request for quote.

2      I think they realized at that time that we had made

3      decisions and that we were ready to move on.

4                They were aggressive and, at points, hostile in

5      the conversations back or as we tried to take the

6      discussion forward.

7      Q.    Okay.  So just to lay the land, you were personally

8      involved in these negotiations with Oracle?

9      A.    Oh, I was.

10     Q.    And how frequently did you interact with them in

11     this process?

12     A.    It varied.  When we first sent the RFQ there were a

13     number of phone calls that went back and forth, and

14     certainly I wasn't alone in it.  There was a person in

15     purchasing named Brian Schankat.

16               So we were on a number of calls with Oracle

17     early on when they got the request for quote because,

18     again, at first I think they were a little confused as

19     to -- they said, "Hey, we already have a contract, you

20     can't ask us to quote it out again.  So you have a

21     contract, just pay your maintenance, and we don't

22     understand this."

23               And we went through and we explained that -- you

24     know, we -- we resaid -- we repeated everything we had said

25     and all the complaints we had made, "we're not getting good

2964

```
 1    service, we're not happy with where the software is going

 2    from a strategy standpoint, it's not helping us, the

 3    arrangement isn't working.  So it's far too much money for

 4    far too little benefit to Bausch & Lomb and we need to do

 5    something different."

 6              And it was at that point that -- with some

 7    silence back, I think there was a week or two where we

 8    didn't hear anything back, and then there was some

 9    engagement, and then there were a number of calls again,

10    and then -- you know, so it was on and off.

11    Q.    You mentioned that you had a hope that when they

12    realized that the relationship was nearing an end, they

13    would become flexible on pricing.

14    A.    Yes.

15    Q.    Did you actually see any flexibility in pricing?

16    A.    No, there was no flexibility offered.

17    Q.    In your 20 years in the software business, have you

18    been involved in negotiations like this before?

19    A.    Many.

20    Q.    In terms of -- how would you characterize this

21    experience with Oracle relative to the other negotiations

22    that you'd been involved in?

23    A.    Yeah.  So it's been my experience in working with

24    other companies that, you know, it's business, and

25    everybody understands sometimes companies just have
```

1     different agendas or strategies or what they're trying to

2     do.  So, you know, relationships come and go, and that's

3     okay.

4              So in most of my dealings, what I've found is

5     companies are okay with that.  We sit down, we have a

6     pretty good conversation on the phone, or we meet in

7     person, and we talk about what we need and what they need,

8     and where the two don't meet, you just go, well, that's

9     okay, and you shake hands and you walk away.

10             And you try to keep -- you always try to keep a

11    good relationship up because you never know when maybe

12    things will change and you'll be back doing business with

13    them again.

14             So that's the normal, and that's the

15    expectation, especially with the bigger players because

16    they work in so many different spaces.

17             So that certainly was our expectation going into

18    this was, you know, even if Oracle wouldn't work with us on

19    price or flexibility, or -- that it would be okay, you

20    know, we would shake hands, we'd walk away, and at some

21    point in the future, you know, maybe we'd be back with them

22    again.

23             That wasn't at all how it played out.  Again, I

24    don't know how to describe the discussions other than

25    just -- just hostile.

```
1              And, you know, Oracle made it very clear that
2    should we continue to pursue this path of walking away from
3    them, I believe the word one of the reps used was regret,
4    that we would -- it was a stupid decision, we would regret
5    the decision.
6              And that's just not -- not common in business
7    dealings like that.  So it was an exception, and it stood
8    out.
9              MS. DUNN:  Objection, Your Honor.  A portion of
10   the last answer was hearsay.  Move to strike that portion.
11             MR. WEBB:  Present sense impression, Your Honor.
12             THE COURT:  The objection is overruled.  I think
13   the answer is --
14   BY MR. WEBB:
15   Q.   Let's shift away from that piece of the experience,
16   Mr. Baggett.
17             But before we leave, did Oracle ever tell you at
18   that time that Rimini was doing something wrong?
19   A.   No.
20   Q.   Did they ever tell you at that time don't go to
21   Rimini because they're infringing our copyright?
22   A.   No.  Again, at that time it had very little to do
23   with Rimini, and the conversations with Oracle were more
24   about the fact that we were leaving Oracle.
25   Q.   All right.  So did you ultimately make a decision
```

1    about who to give the work to for Bausch & Lomb support?

2    A.    We did.  We made the decision to go with Rimini.

3    Q.    All right.  Let's talk about the Rimini negotiations

4    for a minute.  So you sent the request for quote to Rimini?

5    A.    Yes.

6    Q.    And did they respond?

7    A.    They did.  They responded with, as I would expect,

8    they had a number of questions and clarifications, you

9    know, hey, you said you wanted a blue car but is it baby

10   blue or navy blue.  You really have to hone in on what

11   exactly you mean.

12   Q.    Once those questions were answered, did they

13   formally submit a response?

14   A.    They did, yes.

15   Q.    You have a notebook right in front of you.  Let's

16   look at PTX 436.

17              MR. WEBB:  This is a plaintiffs' exhibit.

18              MS. DUNN:  No objection.

19              MR. WEBB:  Your Honor, I move for admission of

20   Plaintiffs' Exhibit 436.

21              THE COURT:  It is admitted.

22         (Plaintiffs' Exhibit 436 received into

23         evidence.)

24   BY MR. WEBB:

25   Q.    All right.  Mr. Baggett, what do we see here?

1    A.    It looks like it's an email chain with Rimini's

2    response to the RFQ.

3    Q.    All right.  Let's look at page 3 of Plaintiffs'

4    Exhibit 436.

5    A.    Okay.

6    Q.    And what do we see here?

7    A.    This is Rimini's formal response to the RFQ.  So I'm

8    sure there's a lot of detail in it explaining their pricing

9    and what services they would provide.

10   Q.    Let's talk about pricing real quick.  Tell the jury

11   how Rimini prices its services.

12   A.    I can only speak to our specific case at Bausch &

13   Lomb.

14         So Rimini made a request to price it based on 50

15   percent of what we were paying Oracle.  That wasn't how we

16   wanted it to be priced so --

17   Q.    Let me stop there.  Why is that?

18   A.    Sure.  Well, our feeling all along, and we had done

19   some estimates internally, and we had determined that we

20   thought the whole application could be supported for about

21   $325,000, or at least in that range, annually.

22         So our thought was if you -- if you don't start

23   with any price point at all, and you just tell somebody,

24   hey, this is what we need, that you'll get a fair price

25   back based on the work that you're asking them to do rather

1      than doing a calculation off of what we considered

2      something that was not relevant.

3                So that was important to Bausch & Lomb, that we

4      were going to get a fair agreement, that we would offer,

5      hey, we need this much work done, and Rimini would say --

6      or, you know, who was ever responding to the quote, okay,

7      here's what it would cost for us to do that amount of work.

8      Q.    All right.  So Rimini would ask for what did Oracle

9      charge you, we'll charge you half, and you said we're not

10     going to tell you what Oracle charged us?

11     A.    Correct.

12     Q.    All right.  Is there a standard process at Bausch &

13     Lomb by which you review vendor submissions like this?

14     A.    We do.  I don't know that it was officially a

15     procedure, but we went through a pretty basic process, the

16     same way I would go through purchasing something at home,

17     which is, you know, we -- we gather all the pricing for the

18     different alternatives that we have, and then we look at

19     what do you get for that price.

20                So, hey, you can get a blue Ford Escort, and

21     it's 16,000, and you can get a green -- whatever, Saturn,

22     and it's 18,000, and what are the pros and cons of that.

23                So you go through the whole exercise of

24     understanding each one of them.  And we bring in our

25     procurement team, and we bring in our legal team, and make

1    sure that everybody understands all the different features

2    and functions and price points and any long-term

3    commitments we're making, so anything you could think of

4    around those alternatives.

5              And then we weigh them all, what's important to

6    us, and what makes the most sense.  And then in the end,

7    it's pretty easy.  You pick one.

8              The recommendation -- the recommendation team

9    chooses one.  We weren't the ultimate deciders.  We just --

10   we just had a recommendation that we then forwarded on to

11   the people who actually would make the decisions, the

12   vice-presidents.

13   Q.    You mentioned the legal department was involved in

14   this process?

15   A.    They were.

16   Q.    Did they raise concerns to you at any time?

17   A.    No.

18   Q.    Let's talk about your HR group.  Did your HR group

19   raise any concerns about hiring Rimini?

20   A.    Absolutely.  So our HR group -- and this is a

21   sticking point in this type of thing.

22              So we -- one of the functions we ran at Bausch &

23   Lomb through the software was payroll.  So we actually paid

24   our employees out of this software.

25              And there are government changes to payroll

2971

1    taxes all the time, you know, either a state can change it,

2    or a federal government can -- you know, you pay 1.5

3    percent Social Security tax, well, that's going to go up to

4    2 percent, and the software has to be updated to make sure

5    that it's in line with whatever the state or government

6    laws are.

7    Q.    How did Rimini Street address those concerns?

8    A.    So we got our HR team on a call with Rimini, and we

9    started with some basic questions of, hey, you know, how do

10   you guys do it, how do you know when -- when a law has

11   changed and payroll needs to be updated, and they explained

12   it.

13              And I said, okay, once you know, how do you do

14   it, and they explained how they did it.  All right.

15              And the big one was how quickly after a law

16   changes do you get those updates to your customer, and they

17   described it.

18              But the thing that was convincing to us is they

19   actually showed us in previous changes, when the state

20   regulations changed, they showed us the date that the

21   regulation changed, and they showed us the date -- I

22   wouldn't call it a fix, but the date they provided a change

23   in the software to match what the new law was.

24              And that's what convinced the HR department, was

25   they looked at the timing of it and went that's excellent,

1    and it meets all our needs.

2              So that was what got HR over its concerns about

3    the tax updates.

4    Q.   So Rimini Street could demonstrate they could make

5    those updates in a very timely fashion?

6    A.   Yes, they did.

7    Q.   Did there come a time when you actually signed an

8    agreement with Rimini Street to provide those support

9    services?

10   A.   We did.

11   Q.   Now, why don't you turn to PTX 437.  Do you see it?

12   A.   I do, yes.  Thank you.

13             MR. WEBB:  At this time I'd offer into

14   evidence --

15             MS. DUNN:  No objection.

16             MR. WEBB:  -- 437.

17             THE COURT:  It's admitted.

18        (Plaintiffs' Exhibit 437 received into

19        evidence.)

20   BY MR. WEBB:

21   Q.   All right.  Now, tell the jury what you're looking

22   at here, Mr. Baggett.

23   A.   It looks like an outline of what support services

24   Rimini would provide to Bausch & Lomb under the contract.

25   Q.   All right.  So this is the contract under which they

1    provide the support services to your company?

2    A.    Yes.

3    Q.    Okay.  Earlier we talked a little bit about pricing,

4    and I asked you if Rimini Street does the half off of the

5    vendor pricing, how can they do that if you don't tell them

6    the vendor price.  Do you remember that?

7    A.    Yes.

8    Q.    And you think you mentioned something about your own

9    team doing an internal projection as to what you really

10   should be paying for this?

11   A.    Yes.

12   Q.    And tell the jury a little bit more about that.

13   A.    Yeah.  So we had looked -- again, since we were

14   doing part of the support ourselves, or we really had been

15   supporting the application ourselves for a while, it gave

16   us a good idea as to how much time and effort it took to

17   support it.

18              So we weren't a hundred percent sure on

19   our calculations -- you're guessing a little bit, you're

20   making assumptions, sorry.

21              But with all of our assumptions, we came back,

22   and we thought it made sense that, you know, $325,000 a

23   year seemed to be about the number, but it could have been

24   a little less or a little more.

25              But that was one of the purposes of sending out

2974

```
 1    the request for quote was to see what other people would
 2    think it would take to support our environment.  So that
 3    was a big part of it too.
 4    Q.    Did you communicate to any of the companies that
 5    received the RFQ that you thought 325 was about the right
 6    number?
 7    A.    No, no, that was all internal.
 8              MR. WEBB:  Okay.  Let's go to page 3 -- actually
 9    let's go to page 2, Marie.
10    BY MR. WEBB:
11    Q.    At the bottom under Fees, Payment and Expenses, tell
12    the jury what we're seeing there.
13    A.    It was ultimately the support fee that we agreed on,
14    which was $315,000.
15    Q.    So this is Rimini Street's quote to do the work for
16    you?
17    A.    That's correct.  Well, it's the final, agreed upon
18    price.
19    Q.    Was there an earlier quote?
20    A.    Yeah, I think it started around $350,000, and we
21    talked to them and understood -- I think there was some
22    things they thought we were asking for that we really
23    didn't need, and so we horse-traded a little bit and ended
24    up on 315.
25    Q.    Did Rimini Street ever tell you there was certain
```

1   things they could not do on your software?

2   A.    They were very open about it.

3           So Rimini Street -- when we talked to their --

4   I'll call it their technical specialist, outlined a number

5   of areas where, again, I don't know whether it was couldn't

6   or wouldn't or what word was used, but basically they said

7   we're not going to provide services in these particular

8   areas.

9           And, again, they alluded to some contractual

10  contract language as to -- as to what they were allowed to

11  touch and what they weren't allowed to touch.

12  Q.    Okay.  Did any of that -- the stuff they weren't

13  allowed to touch deal with lockdown code?

14  A.    Yeah.  If I remember it, a lot of the examples that

15  we walked through were around what I would describe as

16  compiled code.

17          It's code you write, but a machine can't execute

18  it like that, it has to actually go through a process to

19  put it all together and translate it into something a

20  machine can run.

21          So anything that was -- I don't know if it was

22  lockdown or what I would describe -- anything that's

23  compiled and it's put together in this bundle and goes

24  through this translation process seemed to be an area where

25  Rimini said we're not going to touch that.

2976

1    Q.    All right.  And do you know what PeopleTools is,

2    are?

3    A.    I do.

4    Q.    What is that?

5    A.    So PeopleTools are the -- my layman's terms,

6    PeopleTools are the fundamental -- fundamental

7    underpinnings of the software itself.

8             So it's -- PeopleTools go across all the

9    different functions.  So in the software itself, you have,

10   like, HR and things that do payroll, and PeopleTools

11   supports that.  It's like the foundation of it that -- the

12   engine that allows the software to run.

13   Q.    And Rimini was open about their inability to do work

14   in that area.

15   A.    Yes.

16             MR. WEBB:  Let's turn to page 6 of the contract,

17   Marie, paragraph B.  Let's highlight the second sentence.

18             And again in the contract between Bausch & Lomb

19   and Rimini Street here it says,

20             "However, client understands and acknowledges

21   that Rimini Street is not able and will not provide any

22   fixes or updates for PeopleSoft PeopleTools product or any

23   third party, non-PeopleSoft products used with, embedded,

24   integrated, or bundled with the covered products since

25   client does not have the source code for these products."

1            Do you see that?

2    A.    Yes.

3    Q.    And that would cover the bundled software that you

4    were just talking about?

5    A.    Yes.

6    Q.    Mr. Baggett, do you understand that is where the

7    security updates are for PeopleSoft?

8    A.    Yes.

9    Q.    Did you have any other questions of Rimini Street

10   during the negotiations?

11   A.    Yeah.  I mean, there were a number of questions that

12   we went through.  I don't remember them all.

13            It was over the course of, I think, several

14   weeks.  So there were, I don't know, 10, 15 phone calls.

15   Sometimes they were an hour, sometimes they were two hours.

16   We covered a lot of material.

17   Q.    And during these negotiations, did Rimini Street

18   ever fail to answer those questions?

19   A.    No.

20   Q.    And during these negotiations, did you at any time

21   feel that Rimini Street was misleading you?

22   A.    No.  They were -- they were very open and

23   forthcoming about what they could do and couldn't do.

24   Q.    And over the course of your relationship between

25   Bausch & Lomb and Rimini, did they ever fail to deliver on

2978

1    any promise?

2    A.    No, they did exactly what they said they were going

3    to do.

4    Q.    What were some of the factors that led you to choose

5    Rimini Street over the other options?

6    A.    You know, without a doubt -- so, again, one of the

7    options that -- an alternative was to go back to Oracle if

8    they would be flexible, and they weren't.

9              So Oracle made it clear right up front that they

10   weren't interested in changing the arrangement or making

11   any adjustments.  So, you know, we knew Oracle was not

12   going to be an option.

13             The other third party we were talking to, the

14   thing that I wasn't comfortable about was they were getting

15   their taxes -- these tax updates, they were talking about

16   getting them from yet another company, CedarCrestone.

17             And I wasn't a hundred percent confident in the

18   answers I was getting back.  My confidence level wasn't

19   high that this was an arrangement that they had thought

20   through, that they had done before.

21             So I didn't feel comfortable putting something

22   that valuable in the hands of an organization that didn't

23   quite seem to have it nailed down.

24             There seemed to be just too many questions.  And

25   when I asked them a question, they would say I don't know,

1    we've got to get back to you, and my assumption was they

2    were making calls to CedarCrestone, and I didn't like that

3    two-deep relationship.  I like working with the company

4    you're working with and having direct answers.

5    Q.    Did Rimini Street promise you a named product

6    support engineer?

7    A.    Yes.

8    Q.    And to what extent did that play a role in your

9    decision to go with Rimini Street?

10   A.    That was a big one.  One of the things that we were

11   looking for, again, was expertise in each of the areas.

12             So when we talked to Rimini, we actually asked

13   to see résumés of the kinds of people that would be

14   supporting our environment.  That's important to us.

15             And we had the opportunity to talk to a couple

16   of them on the phone, and each one of them knew their

17   subject areas very, very well.  So that played a huge role.

18             When we looked at the pros and cons, we knew if

19   we went with Rimini, we would get talented people who could

20   fix our problems.

21   Q.    Now, did you have an understanding as to whether or

22   not Rimini Street would host the software on their

23   computers or your computers?

24   A.    Yeah, I thought we had a very firm understanding of

25   what was going to remain on our servers and what Rimini was

2980

1    going to spin up.

2    Q.    And did you send installation media to Rimini Street

3    to build an environment?

4    A.    We did.  We did.

5    Q.    Did that concern you?

6    A.    No.  So the things that are important to us --

7    again, when you deal with an ERP, and you actually buy the

8    ERP, there's this kind of misunderstanding, you think that

9    you just buy a piece of software that you can just run as

10   it is, and it's not the case.

11         When you buy the software, an ERP, a big

12   software like that, it's like a library with no books in

13   it.  So just imagine an empty library, it's all the

14   structure and shelving but there's nothing in it, so you

15   can't run it right then.

16         So we worked with Accenture and other partners

17   for the better part of a year or two to author all that

18   content, you know, to write all the code and the

19   customizations and the configurations and everything that

20   would make the software -- the PeopleSoft software work at

21   Bausch & Lomb.

22         So we -- to us, that was proprietary.  That's

23   confidential.  That's proprietary.  That's what gave us a

24   competitive advantage over other customers or other

25   companies that did the same thing.

1              So we never let any of that leave the Bausch &
2     Lomb environments.  That stayed with us.
3              So the only thing that Rimini had was just
4     the -- what I would call a demo environment or vanilla.
5     It's just this empty shell which is generic to anybody.
6              It didn't have --
7              MS. DUNN:  Objection, Your Honor, foundation.
8              THE COURT:  Sustained.  That portion of the
9     response is stricken.
10              MS. DUNN:  Thank you.
11    BY MR. WEBB:
12    Q.    So, Mr. Baggett, were you concerned about Rimini
13    Street having these vanilla environments for your company
14    on their servers?
15    A.    No.
16    Q.    If that would have been a problem for some reason,
17    what would you have done?
18    A.    We would have either left them on our servers or we
19    would come up with an alternative arrangement depending on
20    exactly what the issue was.
21    Q.    Were you aware that Rimini Street used Bausch & Lomb
22    credentials to download content from the Oracle website?
23    A.    I don't know that I was directly aware of it, but it
24    doesn't surprise me.
25    Q.    Did you know at the time of the agreement that

1    Rimini Street would at times use a vanilla environment and

2    then replicate it for another client with the same license

3    rights?

4    A.    Again, I had no direct knowledge of that; but,

5    again, it doesn't surprise me.

6    Q.    Would you consider that to be a problem for your

7    software?

8    A.    No.

9          Again, when you say our software, the Bausch &

10   Lomb software, the stuff we had, all our customizations, we

11   never gave that away.  We had that.

12         So, no.

13   Q.    Okay.  So when you're talking about your software,

14   you're talking about the proprietary, customized software

15   that you had on your computers?

16   A.    That's correct.

17   Q.    Not the stuff that Rimini Street had on their

18   computers?

19   A.    Yeah.

20   Q.    Did you know at the time of the agreement that

21   Rimini Street would at times make a tax or regulatory

22   update on one of the environments on its servers and then

23   reuse that update for other clients with the same license

24   rights?

25   A.    Sure.  So that was never discussed.  But, again, I

2983

1    never asked the question because it doesn't concern me.

2    It's not -- no, it wasn't a concern to me.

3    Q.    Would that have bothered you if you had known it at

4    the time?

5    A.    No, I would have expected it.

6    Q.    Your deposition was taken in this case?

7    A.    In 2011.

8    Q.    In the deposition, the Oracle lawyers asked you a

9    lot of questions?

10   A.    They did.

11   Q.    Talked a lot about the allegations in this lawsuit?

12   A.    They did, yes.

13   Q.    After the deposition, did Bausch & Lomb terminate

14   its agreement with Rimini?

15   A.    No.

16   Q.    All right.  Did Rimini ever tell you they could

17   provide security updates?

18   A.    No.

19   Q.    And, Mr. Baggett, during your deposition, you were

20   asked if you would have gone with Rimini Street if you

21   thought they were infringing.

22   A.    I believe I was asked that, yes.

23   Q.    And what was your answer?

24   A.    No.

25   Q.    All right.  So the signed agreement is now done,

2984

1    Rimini Street is now providing support services for Bausch

2    & Lomb.

3              Who was in charge of the relationship internally

4    at Bausch & Lomb with Rimini?

5    A.    I was.  I was in charge of it.

6    Q.    And did you have occasion to witness firsthand the

7    service they provided your company?

8    A.    I did.

9    Q.    And describe for the jury how you would characterize

10   the level of their service?

11   A.    The level of service was good.  Again, they lived up

12   to -- they exceeded what we thought they could do.

13             They did have very talented people that -- they

14   worked just as an extension of our team.  So when we would

15   have an issue, we'd call them up, we'd tell them what it

16   is, they would remotely access into our environment, and

17   they'd figure it out.

18             The -- there were some -- the great thing about

19   it for us, and specifically for me, is, you know, after

20   they delivered a couple of fixes, you know, we had a very

21   level of high confidence that when they said they've got

22   it -- you know, we'd say, hey, we've got this issue.

23             And we'd be talking to them, and they would take

24   a look at it, and they'd say we've got it.  I knew when

25   they said that, they had it, and it wasn't going to be an

2985

1     issue for us.

2             So we had a lot of favorable experiences with

3     them where not only would they fix things, but oftentimes

4     they would call me back and say, hey, listen, I can fix

5     this one of three ways.  If I fix it this way, here are the

6     pros and cons, if I fix it -- you know, option B, here are

7     the pros and cons.  What works best for Bausch & Lomb.

8             And we would talk about it, and they would apply

9     the fix that suited us.  So, you know, that was a new

10    experience.  That was something I didn't even get out of my

11    own people.  Typically, when they looked at something, they

12    just went here's a way to fix it, and they fixed it.

13            So it was a very positive experience.  I was

14    very pleased with the service, and they delivered

15    everything they said they were going to, plus they

16    delivered even -- even value beyond that.

17    Q.    I want to talk about the speed of responsiveness for

18    both contact and repair.  Describe for the jury your

19    experience in those regards with Rimini.

20    A.    Again, very positive.

21            So when either myself or one of my developers,

22    somebody on my team would call, they were actually calling

23    that -- the person who was going to fix it directly.

24            So there was nobody in the middle, there was no

25    logging a ticket.  There was no -- they just picked up the

2986

1    phone and they would talk to the particular person who

2    worked in that space at Rimini.

3              They would have a quick conversation.  That

4    person would log in.  And for minor issues, we typically

5    had it fixed in a couple of hours.

6              For issues that were more complicated, they

7    would come back, and they would just tell us, they'd say,

8    okay, we know what it is, we know it's broken, but it's

9    going to take us a day to fix this.

10             And then, you know, they would go and they would

11   work on it, and they were very good at whatever they

12   estimated, they delivered that.

13             There were some rare cases where they called

14   back and said, hey, this is really, really, really

15   complicated, we're going to need time.

16             I think there were even one or two cases where

17   they reached out to somebody else in their own company for

18   additional expertise in different areas to come back.

19             But it was -- the responsiveness and speed was

20   exceptional.  It was basically like I had walked down the

21   hall and talked to one of my own guys and said, hey, this

22   is important, I need it fixed, and they dropped everything

23   else they were doing and they just worked on it until they

24   fixed it.

25   Q.    All right, Mr. Baggett, did you have occasion to

2987

1   provide any references to other companies for Rimini?

2   A.    Sure, I provided a number of references.

3   Q.    And when you provide a reference, do you only tell

4   companies positive things?

5   A.    No.

6         So a reference is a courtesy to the other

7   company that's considering a purchase.  And I'm often in

8   that spot, as well, where I'm actually asking for a

9   reference from another director of IT in another shop.

10        So there's -- you know, the ethical component

11  that I'm having a conversation with somebody else, one of

12  my counterparts at another company, I tell them the good,

13  the bad, the ugly, here's what works, here's what doesn't

14  work, and here's what's going to get you into trouble.

15        And it's not fluff.  It's -- it's important that

16  I do that for other people because I need to do that -- I

17  need them to pay that back to me when I call them and ask

18  them, hey, you're running this software over here, how does

19  it work for you guys.

20        And then we talk about the particular situation

21  that the company's in and try to figure out if that would

22  work for them.

23  Q.    All right.  Mr. Baggett, we're on the homestretch.

24        Back when Bausch & Lomb was considering options

25  for software support, if Rimini Street was not available as

2988

1    an option for whatever reason, would Bausch & Lomb have

2    gone back to Oracle for support?

3    A.    No.

4    Q.    What would you have done?

5    A.    We had already kicked around a number of other

6    options.

7          Although we knew we couldn't support the

8    application itself in its entirety, again, in areas like

9    the payroll fixes, my guys just weren't experts in that,

10   and so at no point did we ever think we were going to do it

11   all ourselves.

12         But outside of HR, we knew we could support the

13   rest of it pretty well, so our plan B or C or D was, if

14   none of these alternatives panned out with Rimini or with

15   the other third party, we were going to support part of the

16   application ourselves, and then, for the HR piece, we were

17   either going to replace it with another piece of software,

18   or we were just going to outsource it to a company like ADP

19   where, you know, they just do the payroll for you.

20         So that was what we had thought through.

21   Q.    Now, in assessing the various options that you had

22   considered at the time, where would Oracle rank on the list

23   of options for continuing support?

24   A.    Yeah, I -- certainly -- certainly last.

25         And I say that -- I can't imagine a situation

```
 1    where at that point we would have gone back to Oracle.

 2              We tried so many times over the years, and we

 3    just couldn't reach an agreement with Oracle, which is

 4    fine, that's fine.  It just -- it just wasn't going to

 5    work.

 6              So for us, we had a number of other options.

 7    Every option would have failed, and I don't see that as a

 8    reality.

 9              MR. WEBB:  All right.  Thank you very much,

10    Mr. Baggett.

11              Those are all the questions I have, Your Honor.

12              THE COURT:  Thank you.

13              Cross-examination?

14                      CROSS-EXAMINATION

15    BY MS. DUNN:

16    Q.    Hi, Mr. Baggett.  Good afternoon.

17    A.    Hi.

18    Q.    My name is Karen Dunn, and I'm a lawyer for Oracle,

19    and I'm just going to ask you some questions today.

20    A.    Sure.

21    Q.    So just to clarify, you're testifying about your

22    experience at Bausch & Lomb?

23    A.    That's correct.

24    Q.    You're not currently employed there; right?

25    A.    I'm not.
```

2990

```
 1    Q.    Okay.  You work at a company called Carestream?

 2    A.    I do.

 3    Q.    Do I have that right?

 4          And Carestream does health imaging and IT,

 5    things like that?

 6    A.    Yeah, we do, x-ray machines, that kind of thing.

 7    Q.    Okay.  And you know that Carestream is an Oracle

 8    customer?

 9    A.    Sure.

10    Q.    And I think Carestream is even partnered with

11    Oracle.  Are you aware of that?

12    A.    I'm not, but I'd believe it.

13    Q.    Yeah.

14          Okay.  So let's go back to your history.  You

15    left Bausch & Lomb in 2013?

16    A.    Yes.

17    Q.    Did you leave on your own accord?

18    A.    No.  Bausch & Lomb was purchased by Valiant, it was

19    acquired by another company.  There was already a director

20    of IT there, and they don't need two of us.

21    Q.    And when was the last time you spoke to the folks at

22    Bausch & Lomb?

23    A.    It varies.  I stay in touch with some of the folks.

24    They're not all still at Bausch & Lomb.  Many of us left

25    and went different places; so, occasionally.
```

2991

1    Q.    When was the last, do you remember?

2    A.    Sure.  I had lunch with one of the developers last

3    week.

4    Q.    Okay.  And does Bausch & Lomb management know that

5    you're here to testify today?

6    A.    I -- I'm -- so I don't know.  I don't know that

7    Bausch & Lomb -- it's Valiant now, so it's a different

8    company.  I don't know what they know.

9    Q.    Did you tell the company that you were going to

10   testify today?

11   A.    No.

12   Q.    Okay.  So when I heard you were coming, I did look

13   you up on Rimini Street's website, and they have a

14   testimonial up there from you, and it identifies you as

15   Bausch & Lomb Director of Business Technologies.

16          It doesn't say former.  So it suggests that you

17   still work there.  Did you know about that?

18   A.    I gave the testimonial, yes.  I wasn't aware that

19   it's currently up there.

20   Q.    Okay.  Do you know whether it's been up there since

21   you left the company in 2013?  Do you have any idea?

22   A.    I don't know.

23   Q.    That's up to the folks at Rimini Street?

24   A.    Yes.

25   Q.    So the website quotes you as saying -- and I think

2992

```
1    actually you said this on direct, that over time you came
2    to support the platform yourself at Bausch & Lomb, but in
3    your deposition you said that Bausch & Lomb never
4    considered supporting PeopleSoft itself, that it was too
5    risky.  I just want to clarify which of those is the case.
6    A.    The tax updates were too risky, yes.
7    Q.    Okay.  And so you didn't support them?
8    A.    No.
9    Q.    The tax updates?
10   A.    No, absolutely not.
11   Q.    Okay.  So defense counsel also talked to you a
12   little bit about the circumstances of your coming here, and
13   he said they're not your lawyers and we're not your
14   lawyers.
15         But just so there's no confusion, you know
16   you're here today because Rimini Street called you as their
17   witness; right?
18   A.    Yes.
19   Q.    Okay.  And you've never met me before?
20   A.    I have not.
21   Q.    I'm new to you?
22   A.    Yes.
23   Q.    And Mr. Isaacson, I presume, is also new to you?
24   A.    Yes.
25   Q.    And you said that Rimini paid for your travel here
```

2993

1    to Las Vegas from Rochester, New York?

2    A.    They did.

3    Q.    And did they also put you up in a hotel?

4    A.    They did.

5    Q.    Okay.  And you came here Thursday -- or Tuesday, I

6    think?

7    A.    Tuesday.

8    Q.    Sometimes I forget what day it is.  I'm sure

9    everyone in this courtroom has this problem.

10              So Tuesday in the morning?

11   A.    I flew out around 10:00, I think I arrived here

12   around 3:00.

13   Q.    Okay.  So you've been here for a few days?

14   A.    Yes.

15   Q.    And you've been working presumably with Rimini's

16   lawyers on your testimony today?

17   A.    Most of my time has been trying to do my Carestream

18   job.

19   Q.    Okay.  So -- but to be clear, you did meet to

20   prepare your testimony; right?

21   A.    I met with them twice, yes.

22   Q.    Okay.  And the purpose was to go over the testimony

23   that you were going to give today; right?

24   A.    Yes.

25   Q.    You also were deposed in 2011, I think you said?

2994

1    A.    I was.

2    Q.    And so Rimini Street's counsel was there with you

3    for that as well; right?

4    A.    There was counsel from all parties, including Bausch

5    & Lomb, yes.

6    Q.    Right.  But Rimini was defending your deposition?

7    A.    No.

8    Q.    No?

9    A.    No.

10   Q.    But they attended?

11   A.    They attended.

12   Q.    And we asked you questions?

13   A.    Yeah, I believe it was Oracle's deposition as I

14   understand it.

15   Q.    Right.  We were asking you questions?

16   A.    Yes.

17   Q.    So have you ever met Mr. Ravin?

18   A.    I believe we've spoken on the phone.

19   Q.    Okay.  When was that?

20   A.    Years ago.

21   Q.    So did you have a chance to talk with him at all

22   this week?

23   A.    No.

24   Q.    And have you spoken with him since you left Bausch &

25   Lomb?

2995

1    A.    No.

2    Q.    How about Mr. Hampton?  He's the expert that

3    testified right before you.

4    A.    I'm sorry.  His name's not familiar.  I don't

5    believe I've ever spoken to him.

6    Q.    Okay.  So I will say to you that -- so I'm a

7    representative of Oracle, and I know that Oracle takes very

8    seriously the loss of every customer, so I'm sure that they

9    were disappointed to hear about your personal experience.

10             Do you remember who your contact was at Oracle?

11   A.    I don't.  We had several.

12   Q.    Okay.  Because I'm sure they would want to follow up

13   even though it was a long time ago.  So if you remember,

14   feel free at any time to let us know.

15             You also said on direct that you wouldn't have

16   gone back to Oracle at Bausch & Lomb; right?

17   A.    It was very unlikely.

18   Q.    Right.  But Bausch & Lomb actually continued to use

19   Oracle products; right?  You continued to use Oracle

20   Database?

21   A.    Absolutely.  My answers are only in the scope of the

22   software, yes.

23   Q.    Just for PeopleSoft?

24   A.    Sure, yeah.

25   Q.    And when you were discussing pricing with Rimini

```
1    Street, they offered you 55 percent off of what you were
2    spending at Oracle; right?
3    A.     They did.
4    Q.     And when they asked about Oracle pricing, one of
5    your colleagues said it would be considered unethical to
6    share the cost arrangement; right?
7    A.     They did, yes.
8    Q.     Okay.  And I know you testified to this.  Counsel
9    asked you about it.  I know that price was important to
10   you; right?
11           And that the promise also of support that would
12   be comparable or better than what Oracle offered was also
13   important to you; right?
14   A.     Yes.
15   Q.     All right.  So when someone offered you what Oracle
16   could do and more or better at 50 percent of the price, did
17   you ever stop to think how are they possibly doing that?
18   A.     Sure.
19   Q.     It was a question; right?  Anyone would have
20   wondered that.
21   A.     But, again, it was a different scope of service.
22           You know, we understood that there were things
23   Rimini couldn't do, Rimini wasn't writing any future
24   updates or future versions of the software.
25   Q.     That's right.
```

1    A.    We knew that.

2    Q.    But I think any normal person would ask themselves

3    that question.  So if you asked that question, I think it

4    would be understandable.

5    A.    Sure.

6    Q.    Okay.  One other thing I want to clarify.

7          So on your direct you said that you decided to

8    leave Oracle before you considered Rimini Street, but you

9    also said you sent a request for quote to Rimini and Oracle

10   at the same time.

11   A.    Yes.

12   Q.    Which one of those is the case?

13   A.    So it was our thought -- and when I say decision or

14   recommendation, that we didn't believe -- we understood

15   there was a possibility that Oracle would come back and

16   say, hey, look, we get it, you're not getting any value out

17   of our releases, new updates, we'll exclude that from the

18   contract.

19         Our hope and our specific ask of Oracle was will

20   you please unbundle the contracts.

21   Q.    Sir, I'm sorry.  Let me clarify.  I know you have a

22   plane to catch tomorrow, and we want to get you done today,

23   so let me rephrase the question or repeat the question just

24   because it's very specific.

25         On direct you said that you decided to leave

1     Oracle before you considered Rimini Street, but then you

2     also said that you simultaneously, at the same time, you

3     sent a request to Rimini Street and Oracle.

4     A.    Yes.

5     Q.    So which of these things is true?  Did you consider

6     them -- did you decide to leave Oracle and then go to

7     Rimini Street, or did you send out requests to both?

8     A.    They're both true because you're talking about two

9     different things.

10          There's the Oracle software package which we

11    knew we were weren't going to stay with PeopleSoft, and

12    then there's the actual support services.

13          So the decision was made that we were not going

14    to stay with PeopleSoft long-term from the software

15    standpoint, but the support --

16    Q.    I see.  You were going off the software?

17    A.    We started with the decision to go off the software.

18    Q.    Got it.  Thank you.

19    A.    Which --

20    Q.    No, that's very helpful.  So you were going off the

21    software.  Got it.

22          All right.  So you were deposed in 2011, and I

23    want to bring us back to that time a little bit and ask you

24    some questions about things you talked about then.

25    A.    Sure.

```
 1    Q.    So at your deposition you recall that part of the
 2   agreement with Rimini Street was that Bausch & Lomb would
 3   provide them with Bausch & Lomb's Oracle software?
 4    A.    Yes.
 5    Q.    Okay.  And you said at your deposition that when you
 6   contracted with Rimini Street, you did not authorize them
 7   to make copies of your software?
 8    A.    I believe that's true, yes.
 9    Q.    That's what you said at your deposition?
10    A.    Yes.
11    Q.    Because it's not what you just said on direct, so I
12   want to make completely sure that --
13              MR. WEBB:  Objection, Your Honor.
14   Mischaracterizing the witness's testimony.  The record
15   speaks for itself.
16              MS. DUNN:  We can go back, and I can read the
17   witness his testimony.
18              THE COURT:  We're not going to do that.  I'll
19   allow the testimony.  I feel it's in the frame of the
20   testimony.
21              MS. DUNN:  Thank you, Your Honor.
22   BY MS. DUNN:
23    Q.    So just to be clear what I'm asking, on direct I
24   heard you say that you had authorized Rimini Street to copy
25   your software, but in your deposition you said "we did not
```

1    authorize them to make copies."

2    A.    Yeah, I don't believe I said that we authorized them

3    to make copies.  I don't believe I said that here today.

4    Q.    Okay.

5    A.    It's not true, we didn't.

6    Q.    Okay.  So your testimony today is you did not

7    authorize them to make copies?

8    A.    No, we sent them media to build an environment which

9    is different than making copies.

10   Q.    Yes, I agree.

11          Okay.  Also at your deposition you said if you

12   had known that allowing Rimini Street to have local copies

13   of Bausch & Lomb software at its facilities was in

14   violation of Bausch & Lomb's Oracle license, you would not

15   have approved?

16   A.    That's correct.

17   Q.    Okay.  All right.

18          So, in fact, Rimini Street had at least three

19   Bausch & Lomb environments on its system, local

20   environments.  Do you know about that?

21   A.    I don't know the specific number, but yes, I knew

22   they had demo environments, sure.

23   Q.    All right.  So I'm going to show you Plaintiffs'

24   Exhibit 3507, which has been admitted.

25   A.    I'm sorry.  Am I opening the book?

```
 1              MS. DUNN:  No, you don't need the book.  We're
 2   all about the screen.
 3              All right.  So, Matt, I think, will help us find
 4   out of this spreadsheet what we're looking for, which is
 5   the three Bausch & Lomb local environments on Rimini's
 6   system.
 7   BY MS. DUNN:
 8   Q.    Do you see that?
 9   A.    I do.
10   Q.    Right in front of you?
11              So BAU stands for Bausch & Lomb.
12   A.    Okay.
13   Q.    Okay.  And, actually, we can also tell from this
14   that at least one of these environments came from something
15   with the acronym KCB, and so KCB stands for the Kansas City
16   School Board.
17              Were you aware of that?  Did you know that?
18   A.    No.
19   Q.    Okay.  All right.  So let's go, then, to an
20   exhibit I think you may have seen before, which is
21   Plaintiffs' Exhibit 439.
22              All right.  So this is -- it's also been
23   admitted, this is one of Rimini Street's build request
24   forms.  This is a request that when they wanted an
25   environment built, it would be a build request.
```

1            And if you go to this category -- so it's --

2    sorry, up at the top it says customer name.  So that's you

3    guys, Bausch & Lomb; right?  Or your former company, Bausch

4    & Lomb?

5    A.    Yes.

6    Q.    And then here it says clone source over here, and it

7    shows that the Bausch & Lomb environment is cloned from

8    Kansas City School Board.

9            During the time that you worked at Bausch & Lomb

10   and you were dealing with Rimini Street, did you know that

11   they were cloning your environment from the Kansas City

12   School Board?

13   A.    No.

14   Q.    And you learned about this, I think, for the first

15   time at your deposition?

16   A.    That's correct.

17   Q.    Okay.  But you did know about it, then, before today

18   when you came to testify; right?

19   A.    Yes.

20   Q.    But during your deposition you said that if you had

21   known this, you would not have approved of Bausch & Lomb

22   using Rimini Street; is that right?

23   A.    I'm sorry.  Can you read back what I said in the

24   deposition?

25   Q.    Sure.  Do you want me to play it for you?

1    A.    Yes, please.

2            MS. DUNN:  Matt, can you play, let's see,

3    line --

4            THE WITNESS:  You can just read it.

5            MS. DUNN:  55-8 through 55-22.  And this

6    deposition testimony, just in the interest of time, refers

7    to the same build form we just looked at.

8         (Videotape deposition of Brian Baggett played

9          as follows:)

10         "Q.  Now, going back to Exhibit 319, could

11        you look at page M13?  And looking down closer

12        to the end do you see Kansas City Board of

13        Public Utilities as a customer?

14         "A.  I do.

15         "Q.  And do you see the name of its

16        environments, and do they match with the clone

17        source you just listed?

18         "A.  It does.

19         "Q.  And so if you had known that Rimini was

20        going to use a different customer's software to

21        create an environment for Bausch & Lomb, would

22        you have approved?

23         "MS. REDMOND:  Objection to form.

24         "A.  No."

25

1    BY MS. DUNN:

2    Q.    Thank you.

3          Mr. Baggett, does that refresh your

4    recollection?

5    A.    It absolutely does, thank you.

6    Q.    So and you -- but you found out at your deposition

7    that, in fact, they had cloned the environment, and at that

8    deposition you said that you wouldn't have approved of

9    using Rimini Street if you had known that; right?

10   A.    Okay.

11   Q.    I think you have to say yes or no.

12   A.    I'm sorry.  Yes.  Okay.

13   Q.    But you knew this before you came to testify today;

14   right?

15   A.    Yes.

16   Q.    And you stand by your answer that you would not have

17   approved of Rimini Street if you had known what you learned

18   at your deposition?

19   A.    I stand by what I said in the deposition.  Okay.

20   Q.    And I just want to make clear that since you knew

21   about it at your deposition, you also knew about it before

22   you came to court to testify today on behalf of Rimini

23   Street?

24   A.    Yeah.  I think that's a little unfair in the

25   statement.

```
 1              So there were a lot of things that were put in
 2   front of me in the deposition.  They weren't -- they
 3   weren't explained.  They were -- they appeared to be
 4   allegations.
 5              There was no admittance from anybody.  I didn't
 6   talk to the Rimini guys, and they didn't say they actually
 7   did it.
 8              So what I understood in deposition is, there
 9   were a bunch of hypotheticals that were put in front of me
10   that didn't necessarily represent truth, they were just
11   allegations or hypotheticals.
12   Q.   Right.  So I think that's fair, and we'll get to the
13   admissions later.
14   A.   Okay.
15   Q.   But I just want to make clear that since you're
16   testifying today, not just at your deposition, that you
17   stand by the statement you made at your deposition --
18   A.   I do.
19   Q.   -- that you would not have approved if you knew this
20   was the case?
21   A.   Okay.
22   Q.   Yes or no?
23   A.   Yeah, I -- so the difficulty in this is I know
24   things now that I didn't know during the deposition.  And I
25   think you can see how long I paused in that answer.
```

1          Because there are so many different flavors of

2     it, and I only imagine I was thinking through then what

3     I -- what I'm thinking through now, which is the

4     question -- I said it earlier, we wouldn't -- we didn't

5     give away any of the Bausch & Lomb customizations,

6     configurations, anything that made it unique to Bausch &

7     Lomb.

8          So while you offer that a shell environment was

9     created, my answer was specific to if I had known that --

10    and I think this is what you want, if I had known that

11    Rimini had somehow taken one of our environments, what I

12    consider our environments, customized, and they had cloned

13    another environment, not only would we have not gone with

14    them, we would have terminated our agreement with them, and

15    it would have been pretty ugly.

16         But that couldn't happen because we didn't give

17    that to them.

18    Q.   Let me stop you there.  That's exactly the answer --

19    you're correct, that is the answer to the question that I

20    was asking.

21    A.   Okay.

22    Q.   So I appreciate that.

23         And you said in your conversations with the

24    Rimini guys, I sort of lost the thread on that, but when

25    you talked to the Rimini guys at any point, did they tell

1   you they didn't do this?

2    A.    No.

3    Q.    Okay.  All right.  So we just saw an example of

4   Rimini Street cloning your environment, Bausch & Lomb's

5   environment.

6              Turns out they also used one of your

7   environments to develop fixes and updates for other

8   customers.

9              So I'd like to show you an exhibit that is not

10  admitted, it's Plaintiffs' Exhibit 440, and we requested

11  preadmission of this, so hopefully counsel has it.

12             MR. WEBB:  Objection, hearsay and lack of

13  foundation.  I'm sorry.

14             MS. DUNN:  Your Honor, this is a business

15  record, and I am unclear as to the basis for your

16  objection, truly.

17             MR. WEBB:  I don't think you can establish a

18  business record with this witness to begin with.

19             MS. DUNN:  Well, I'm happy just to show it to

20  him.  I don't need to admit it.  Any objection to using it

21  as a demonstrative?

22             MR. WEBB:  If you want to just show it to him

23  and not publish it to the jury, I'm fine.

24             MS. DUNN:  I would like to publish it as a

25  demonstrative then so we don't need to admit it.

1                    MR. WEBB:  Well, it's not a demonstrative,

2        you're just trying to make it evidence.

3                    Here's the deal.  If you want to ask him

4        questions about it, if he knows, if you can establish he's

5        ever seen it before, I'm fine.

6                    The problem is I don't think you'll be able to

7        do that, and it's not evidence, and you shouldn't be able

8        to publish it to the jury.

9                    MS. DUNN:  I'm only asking for the same rule

10       that applies to this exhibit as has applied to many other

11       exhibits in this case.

12                   THE COURT:  These are the rules, if it hasn't

13       been agreed to on admission and the witness isn't familiar

14       with the document, he's not going to be the witness who can

15       admit the document, but he is a witness you can ask about

16       the document and the information that may be contained

17       within it.

18                   MS. DUNN:  I think the dispute is whether or not

19       we can put it on the screen as a demonstrative.

20                   It's not the kind of thing I can easily

21       replicate on the white board since it includes a file path

22       name.  I'm happy to attempt this, but, frankly, for ease

23       and clarity, we're just seeking to show it as a

24       demonstrative.

25                   THE COURT:  Well, I can't allow it to be shown

1    as a demonstrative if it's not admitted into evidence.  You

2    can show him the exhibit.

3              MS. DUNN:  Okay.  That's fine.

4    BY MS. DUNN:

5    Q.    Do you have Plaintiffs' Exhibit 440 in front of you?

6    You have to look in the binder.

7    A.    Yes.

8    Q.    All right.  So this is a DAT file that was produced

9    by Rimini Street.  Do you recognize this?

10   A.    Is this the one that was shown to me in the

11   deposition?

12   Q.    It was shown to you at the deposition.

13   A.    Okay.

14   Q.    Can you generally describe what it is.

15   A.    DAT files are typically output from a data mover

16   script.  I'm not sure what you're looking for me to

17   characterize here.

18   Q.    I think we're just looking for you to be able to say

19   whether or not you've seen this before, which you just said

20   you did, and whether you can tell what it is.

21   A.    This looks like -- I don't know for sure, but this

22   looks like the one that was shown to me in my deposition.

23   Q.    Right.

24   A.    Okay.

25   Q.    I think it even has the deposition sticker on it.

1    A.    Okay.

2              MS. DUNN:  Your Honor, I don't know if it

3    changes the Court's ruling, that this witness has seen this

4    already and testified about it in his deposition.

5              MR. WEBB:  It still doesn't make it not hearsay,

6    Your Honor.

7              THE COURT:  Well, it doesn't affect your ability

8    to ask him questions that would have been asked in the

9    deposition, I assume, and that you can ask now.

10             I still haven't heard sufficient foundational

11   evidence that would make it admissible.  And that's not to

12   say that you couldn't admit it at a later time through a

13   qualified witness.

14             But insofar as the witness is concerned, the

15   most you could do at this point in time, I believe, would

16   just be to show it to him and ask him about it.

17             MS. DUNN:  Okay.  That's fair.

18   BY MS. DUNN:

19   Q.    So, on page 1 of this the exhibit, and all we'll

20   need is page 1, it's actually a very long exhibit filled

21   with lots of letters, do you see the name Liz Claiborne in

22   the header?

23   A.    I do.

24   Q.    Okay.  And is that contained more broadly speaking

25   in a longer file name that ends in DAT?

1   A.    I'm sorry.  You're referring to -- the first line at

2   the top?

3   Q.    I'm just looking at the file name at the top where

4   it says Liz Claiborne.

5   A.    Yes, it does.

6   Q.    So you first saw this at your deposition, and you

7   were told that this was a DAT file delivered to the company

8   Liz Claiborne.  Do you remember that?

9   A.    I -- if you say you did, I believe it.

10  Q.    Okay.  And that it was delivered around July 25th,

11  2011, part of the Rimini Street bundle.

12          MR. WEBB:  Objection, lack of foundation, Your

13  Honor.

14          THE COURT:  Sustained.  That's not a question

15  that the witness would be qualified to answer.

16          MS. DUNN:  All right.

17  BY MS. DUNN:

18  Q.    So I'm trying to help you, Mr. Baggett, to remember

19  this part of your deposition where you discussed this exact

20  exhibit.

21          Do you see on this exhibit the -- on the first

22  page also, a few lines down from where it says -- four

23  lines down where it says -- hold on.  Four lines down where

24  it says a name containing BAU?

25  A.    Yes, I see that.

1    Q.    Okay.  You previously testified that you understand

2    BAU to stand for Bausch & Lomb; right?

3    A.    No, I previously testified that you told me it did.

4    I have no idea how Rimini named their environments.

5    Q.    But you agree it says BAU?

6    A.    I agree, it says BAU.

7    Q.    And you saw this in your deposition, and after you

8    saw this, do you recall being asked whether you would have

9    recommended that Bausch & Lomb receive support from Rimini

10   Street had you known that Rimini was going to use a copy of

11   your environment to support other customers?  Specifically

12   the question was regarding Liz Claiborne.

13        Do you remember being asked that?

14   A.    I don't specifically recall it, but, yes, if you're

15   telling me I was asked that, I believe it.

16   Q.    Okay.  Well, let me ask you this.

17        If you had known -- and we'll just talk about at

18   the time of your deposition.  If you had known that Rimini

19   Street was using a copy of your environment to support

20   other customers, would you have recommended Bausch &

21   Lomb -- or would you have recommended Rimini Street to

22   Bausch & Lomb?

23   A.    I would not have, no.

24   Q.    All right.  Let's look at Plaintiffs' Exhibit 65,

25   which should be easier since it's been admitted.

 1              I think you also saw this at your deposition.

 2    Do you recognize it?

 3    A.    I don't specifically recognize it, but I saw a lot

 4    of stuff in 2011.

 5    Q.    That's fair.  That's fair.

 6              So this email is from somebody named Chris

 7    Limburg, who is a senior PeopleSoft environments engineer

 8    at Rimini Street.  Do you see that?

 9    A.    Sure, yes.

10    Q.    And it says,

11              "Could you go back and check with Onboarding and

12    get the Finance 8.8 whatever Bausch & Lomb is using and get

13    the ML CDs for this?  I only have the English one can't

14    build the DB out and apply ML patches to a db that doesn't

15    have ML coding in it?  Also, something to be aware of that

16    we are using development Oracle software that I don't think

17    is licensed.  Just don't want that to fall back on us if we

18    get audited.  Cause you can download Oracle software from

19    their site but not to make money and were making a crap

20    load of money from their free stuff."

21              Is this something you ever discussed with the

22    folks at Rimini Street?

23    A.    No.

24    Q.    Okay.  Did you see this in your deposition?  And

25    this email is from a year after Bausch & Lomb became a

3014

1       Rimini Street support customer; is that right?

2       A.    Okay.

3       Q.    Okay.  So you would agree, based on the plain

4       language of this email, that this seems to suggest Rimini

5       Street is using Oracle software in a way that this person,

6       Chris Limburg, believes may not be licensed?

7                   MR. WEBB:  Objection, lack of foundation.

8                   THE COURT:  Overruled.

9                   THE WITNESS:  I'm sorry.  I don't understand

10      what you're asking me.

11      BY MS. DUNN:

12      Q.    I'm asking if you would agree that based on the

13      plain language of this email that this seems to suggest

14      that Rimini Street is using Oracle software in a way that

15      this person, Chris Limburg, who is writing this email,

16      believes may not be licensed.

17      A.    That's what he says.

18      Q.    Okay.  And do you have any reaction to this email?

19      A.    I think it's unfortunate.

20      Q.    And after you saw this email at your deposition, did

21      you ask the guys at Rimini Street what -- were you -- were

22      you using our software in a way that was unlicensed?

23      A.    No, because I know they couldn't be using our

24      software.

25      Q.    Right.  Did you ask them whether, as it says here,

```
 1    after you saw this email, whether they were using Oracle

 2    software in a way that wasn't licensed?  Did you ask?

 3    A.    No, I did not.

 4    Q.    Did they ever tell you that they were?  Did they

 5    assure you that they were?

 6    A.    Yes, absolutely, as part of the negotiations --

 7    Q.    Mr. Baggett, I just need a yes or no.

 8    A.    Yes.

 9    Q.    You didn't ask the question, but they assured you

10    that they were using Oracle software in a way that was

11    licensed?

12    A.    Yes.

13    Q.    Okay.  Great.  So you said that references were very

14    important when picking a third-party support provider, or

15    picking any support provider; is that fair?

16    A.    Yes.

17    Q.    Okay.  And you would not have chosen Rimini Street

18    if they hadn't provided references to you; right?

19    A.    Correct.

20    Q.    Okay.  And Rimini provided references to you -- I

21    don't know if you remember this, from Santa Fe Natural

22    Tobacco and from the City of Des Moines?

23    A.    Sounds familiar, yes.

24    Q.    Okay.  At the time that those references were

25    provided to you, did you know that Rimini Street had local
```

3016

```
 1   environments for the City of Des Moines on its own system,

 2   on Rimini's system?

 3   A.    Did I specifically know that?  No.

 4   Q.    Were you aware that Rimini had cloned the City of

 5   Des Moines environments for other customers; for example,

 6   the City of Eugene?  Did you know that?

 7   A.    I did not know that, no.

 8   Q.    Okay.  Were you aware of the fact that Rimini had a

 9   software library that contained City of Des Moines

10   software, and I'm talking about specifically the software

11   library, parts of which were destroyed before this

12   litigation?  Did you know that?

13   A.    I did not, no.

14   Q.    Okay.  Were you aware of the fact that Bausch & Lomb

15   cross-used -- when we say cross-use, we mean share from one

16   customer and then distribute to other customers.

17         Were you aware that the City of Des Moines had

18   received updates developed or tested in environments that

19   were associated with other customers?

20   A.    No.

21   Q.    Okay.  So at the time you got your reference from

22   the City of Des Moines, you didn't know any of that?

23   A.    Correct.

24   Q.    Got it.

25         So you said earlier there's just a difference
```

1    between what you might have known at your deposition and

2    what you know today about the -- and we're talking here

3    specifically about what you know today about the time

4    period between 2006 and 2011.

5    A.    Okay.

6    Q.    Okay?  And you said that there may have been -- you

7    referenced the word admission, there might be admissions,

8    and at the time of your deposition you were unaware of

9    admissions?

10   A.    Okay.

11   Q.    Okay.  So I'm going to just ask you about some

12   admissions that have happened during the course of this

13   trial.

14          So, Mr. Ravin testified a couple weeks ago, and

15   he admitted that Rimini Street had copies of Oracle

16   software on their servers, he said a lot of copies,

17   thousands, thousands.

18          Were you aware of this before you were deposed

19   in 2007?

20   A.    Not specifically, no.

21   Q.    Okay.  And before you came to court today to

22   testify, either during the time you met with Rimini lawyers

23   or otherwise, did anyone make you aware that this was how

24   Rimini Street operated between 2006 and 2011?

25   A.    The -- the one specific piece around cloning

```
 1    download environments, yes, they made me aware of that.

 2    Q.    Okay.  But the specific piece about local copies on

 3    Rimini's systems --

 4    A.    Yes, they made me aware that there was -- well, I

 5    always knew there would be a demo copy on Rimini's servers.

 6    I knew that from day one.  That was part of --

 7    Q.    Got it.

 8    A.    Okay.

 9    Q.    As far as this part, this thousands and thousands of

10    copies on their system, did anyone make you aware of that?

11    A.    No.

12    Q.    All right.  So, Mr. Ravin also admitted that Rimini

13    would copy one environment and recreate it for other

14    customers.  So that's called cloning.

15          And I think you just said that they did tell you

16    that he admitted to that.

17    A.    Yes.

18    Q.    Okay.  He also admitted that Rimini used a generic

19    version of a release to serve multiple customers.  In other

20    words, they would take an update for one customer and use

21    it for other clients, and then he said they did it all the

22    time.

23          Were you aware that -- did anybody make you

24    aware of that before you came to testify today?

25    A.    Yes.
```

1    Q.    All right.  And Mr. Ravin also admitted that after

2    Oracle changed its terms of use to prohibit downloading by

3    automated means, he decided that Rimini Street would

4    continue to use automated tools.

5              At the time of your deposition, were you aware

6    of that?

7    A.    No.

8    Q.    Did anybody tell you before you came to testify

9    today that Mr. Ravin had decided to continue using

10   automated tools even after Oracle's terms of use prohibited

11   it?

12   A.    They described that they had used automated tools,

13   but they certainly didn't frame it up the way you did.

14   Q.    So they said that they had used automated tools.  Is

15   that what -- I just couldn't hear you.

16   A.    Yes.  So they made me aware that they had used

17   automated tools.

18   Q.    Right.

19   A.    But there was no discussion around timeline the way

20   you defined it as before, it was -- when it was okay or

21   when it wasn't okay.  It was my understanding it was all

22   done while it was still okay.

23   Q.    Okay.  Were you told that Oracle had prohibited it?

24   A.    I was aware that Oracle prohibited it at some point,

25   yes.

1    Q.    Okay.  But you were not told, it sounds like, that

2    even after that Mr. Ravin decided to continue.

3    A.    I don't believe so, no.

4    Q.    Okay.  All right.  Do you know who Kevin Maddock is,

5    he's the vice-president of global sales for Rimini Street?

6    A.    I'm sorry.  The name sounds familiar, but I don't

7    know him, no.

8    Q.    Okay.  So he testified too.  He testified, I think,

9    last week, and he told the jury that the sales department

10   told prospective customers that Rimini did not share

11   software between customers, and that even if a customer

12   asked whether Rimini might share software or support

13   materials among customers, they, the sales department,

14   would tell the customers no.  So let me just break this

15   down a little, which is that this thing that you were told,

16   that Rimini did share software among customers, Kevin

17   Maddock told the jury that the sales department told

18   customers they didn't do that.

19             MR. WEBB:  Objection, foundation, Your Honor.

20   This witness was not aware --

21             MS. DUNN:  Before you became --

22             MR. WEBB:  -- testimony.

23             THE COURT:  Well, she didn't finish the question

24   so the objection is premature.  It's overruled for that

25   ground.

1          But the dealing with it, I would request that

2     you rephrase your question, Ms. Dunn, so that we can --

3     BY MS. DUNN:

4     Q.    At the time you were deposed, were you aware that

5     this is what Rimini Street was telling customers, that they

6     did not share software across customers at the time you

7     were deposed?

8     A.    You know, I don't recall them specifically telling

9     me that so it's -- it's hard to answer definitively yes or

10    no, but it was certainly my -- definitively I don't recall

11    them telling me that, no.

12    Q.    And were you made aware of this testimony before you

13    came to court to testify today?

14    A.    I'm sorry, Kevin -- Kevin's testimony's --

15    Q.    Did anybody tell you that the head of sales had

16    testified that they told customers they didn't share

17    software among customers?

18    A.    No.

19    Q.    He also said that this was part of their standard

20    messaging.

21          Based on your last answer, I'm going to conclude

22    that also, before you came to court to testify today,

23    nobody told you that this was part of the standard

24    messaging at Rimini Street; is that correct?

25          MR. WEBB:  Objection, Your Honor, to this line

3022

1    of questioning.  This witness has been under the

2    exclusionary rule, and counsel has been prohibited from

3    discussing any testimony in this trial with him.

4                 THE COURT:  Sustained.

5    BY MS. DUNN:

6    Q.    All right.  So, Mr. Baggett, you agreed to serve as

7    a reference for Rimini Street; is that right?

8    A.    I did.

9    Q.    Do you remember how many references for Rimini

10   Street that you gave?

11   A.    I don't.

12   Q.    Do you recall who asked you to give a reference?

13   A.    Rimini Street asked me.  I don't recall an

14   individual's name, no.

15   Q.    Just Rimini Street generally?

16   A.    I believe it was our account manager at the time.  I

17   just don't recall his name.

18   Q.    Okay.  So, in your deposition you said you would not

19   have agreed to serve as a reference if you had known that

20   Rimini Street was installing Bausch & Lomb software on the

21   Rimini system in violation of Bausch & Lomb's license with

22   Oracle and if you had known that Rimini Street would use

23   Bausch & Lomb's software to provide updates for other

24   customers.

25                 Do you remember that you said that?

1    A.    That's correct.  Yeah.  I stand behind it.

2    Q.    You stand by that today?

3    A.    Absolutely.

4          MS. DUNN:  All right.  Your Honor, I have no

5    further questions for this witness.

6          THE COURT:  Redirect?

7                    REDIRECT EXAMINATION

8    BY MR. WEBB:

9    Q.    Mr. Baggett, I think a useful exercise would be to

10   help add some clarity to what's going on here because it

11   sounds like you're saying two different things, and I know

12   you're not.  So let's see if we can provide some clarity to

13   these folks over here.

14   A.    Sure.

15   Q.    When you refer to Bausch & Lomb's software --

16   A.    Yes.

17   Q.    -- what are you referring to?

18   A.    I'm referring to all the environments -- when I

19   talked earlier about the empty library with nothing in it,

20   that's the demo environment, and we don't consider that --

21   it doesn't have anything Bausch & Lomb in it, it's just

22   empty.

23          So, again, as I said, you know, we spent about a

24   year with Accenture building out customizations,

25   configurations, the code line, everything that made it run

```
 1   for Bausch & Lomb, you know, we have a pharmaceutical

 2   division, and you code all that in there so that you can

 3   take orders and pricing, all that stuff which is all of

 4   Bausch & Lomb's.

 5              So when I refer to Bausch & Lomb's stuff, or our

 6   environments, those are our environments, and they stayed

 7   on our servers, and we never -- we had a wall around those.

 8   Those were confidential.  They were proprietary.

 9              They were not -- we didn't make copies of it, we

10   didn't send it out to anybody.

11   Q.    Let's stop.  Let's break that apart a little bit.

12   A.    Sure.

13   Q.    So this is the software that's been heavily

14   customized specifically for your business?

15   A.    That's correct.

16   Q.    And this software is located where?

17   A.    On Bausch & Lomb's servers.

18   Q.    So these aren't at Rimini Street's servers, are

19   they?

20   A.    No, no.

21   Q.    Can Rimini Street get them and copy them when

22   they're on your servers?

23   A.    No.

24   Q.    So you have these customized environments that you

25   consider proprietary?
```

1    A.    Yes.

2    Q.    Would you ever agree to let anyone share that with

3    anyone else?

4    A.    No, absolutely not.

5    Q.    All right.  Let's talk about what's on Rimini's

6    servers.  How did they get the software to put on those

7    servers?

8    A.    We basically sent them the media which is --

9    Q.    Hold on.  You sent them the media?

10   A.    Yes.

11   Q.    So you knew they were going to be putting software

12   on their servers?

13   A.    Yes, the demo environments, yes.

14   Q.    But you signed the agreement anyhow to be -- to join

15   with Rimini Street for support?

16   A.    Yes.

17   Q.    And you knew that when you provided references to

18   others?

19   A.    That's correct.

20   Q.    That they had your software on their server?

21   A.    They didn't have our software.

22   Q.    They had --

23   A.    They had an Oracle download environment.  That is

24   not Bausch & Lomb's.  They never had Bausch & Lomb's

25   software.

3026

1    Q.    So the demos are vanilla environments --

2    A.    Empty shells.

3    Q.    So if they were to take what you had sent them and

4    clone it for someone else, would you have a problem with

5    that?

6    A.    No, because it's not Bausch & Lomb's.  It's just --

7    when you describe cloning it, it's the same thing as

8    installing it for me, it's an empty template, and so

9    it's -- it doesn't have any of the Bausch stuff in it.  We

10   would never let any of the Bausch stuff out.

11   Q.    So had you known that Rimini Street would take the

12   disks that you sent them, create an environment on their

13   servers and then use that environment to clone for someone

14   else with the same license rights, would you have objected?

15   A.    No, as long as they were licensed for it, it's the

16   same software.

17   Q.    If you knew that, would you still sign the agreement

18   to have them be your service providers?

19   A.    Yes.

20   Q.    And if you knew that, would you allow them to use

21   you as a reference for someone else?

22   A.    Certainly.

23   Q.    All right.  Let's talk about something else.

24         They've got that environment on their servers,

25   that vanilla environment.  Let's say they use it to make a

3027

1    tax and regulatory update, and they take that update and

2    reuse it with another client with the same license rights,

3    would you object to that?

4    A.    No --

5               MS. DUNN:  Objection, Your Honor, leading.

6               THE COURT:  Sustained as to further questions,

7    but I'll allow that question and answer to stand.

8               THE WITNESS:  I'm sorry, what was the question

9    again?

10   BY MR. WEBB:

11   Q.    Would you object to that?

12   A.    Would I have objected to them for a tax update?

13              THE COURT:  Rephrase the question.  I thought he

14   had answered it.

15   BY MR. WEBB:

16   Q.    Let me start all over.

17   A.    Sorry.

18   Q.    Rimini has that vanilla environment that they

19   created from the CDs you sent them?

20   A.    Yes.

21   Q.    If they were to take a -- use that environment to

22   create a tax and regulatory update and then share that

23   update to another client with the same license rights,

24   would that be a problem?

25   A.    No, because it's generic.

DONNA DAVIDSON, RDR, CRR, CCR #318     (775) 329-0132

1              So it doesn't work the way you guys are kind of

2    describing it where you can just write a piece of code in a

3    generic shell environment and then just apply it to all the

4    customer's environments.

5              Our environment is customized.  It's ours.  It's

6    configured.  So that's not how it works.

7              They develop a generic -- I don't care what the

8    tax update is, to match.  The Social Security tax went up

9    one percent, great, they code it, but that doesn't work in

10   our environment.

11             So what happens is they have to actually take

12   that code, and then they go into our development

13   environment.

14             So they go into a Bausch & Lomb development

15   environment, and then they apply the code, and then they

16   look at the customizations that we have, and they try to

17   figure out how they can fit that in to make it work for our

18   environment.

19             So it's not -- it's not -- it doesn't work the

20   way it's been described.

21   Q.   Good.  I'm glad I'm getting some clarity here.

22             Now, when they're -- you have these customized

23   environments running on your servers, these very

24   proprietary, customized environments --

25   A.   Yes.

```
 1                    MS. DUNN:  Objection, leading.

 2                    THE COURT:  Sustained.

 3      BY MR. WEBB:

 4      Q.    So the environments on your servers that you just

 5      described, how would Rimini Street apply an update to those

 6      environments if they're on your servers?

 7      A.    Well, they had to remote in to our development

 8      environments because, again, it was on our server.  So we

 9      gave them remote access where an engineer would log in and

10      they --

11                    MS. DUNN:  Objection, Your Honor, beyond the

12      scope of the cross.

13                    THE COURT:  Overruled.

14                    THE WITNESS:  So they would log in to our

15      environments and then look at the code that they had

16      developed in their vanilla environment, and then look at

17      our code in the custom environment, and figure out how to

18      marry the two up, and then they would apply that.

19      BY MR. WEBB:

20      Q.    Mr. Baggett, if you would have known that Rimini

21      Street would have those vanilla environments on their

22      servers, would you have gone back to Oracle for support?

23      A.    No.

24      Q.    If you had known that Rimini Street would on

25      occasion use one of those vanilla environments and clone it
```

3030

```
 1    for another client with the same license rights, would you

 2    have gone back to Oracle for support?

 3    A.    As long as it was licensed, no, it's not an issue.

 4    Q.    And the same question with updates.  If you had

 5    known that, would you have gone back to Oracle?

 6    A.    No.

 7              MR. WEBB:  Mr. Baggett, thank you very much for

 8    your time here.

 9              No further questions.

10              THE WITNESS:  Sure.

11              THE COURT:  Recross-examination?

12                       RECROSS-EXAMINATION

13    BY MS. DUNN:

14    Q.    I only have a couple questions, Mr. Baggett.

15    A.    Sure.

16    Q.    So just to be totally clear, you gave Rimini Street

17    Oracle software, right, not Bausch & Lomb software?  That's

18    what we're actually talking about?

19    A.    Correct.

20    Q.    And if Rimini Street had told you that they were

21    violating Oracle's copyrights on a massive basis, you would

22    have gotten rid of them; right?

23    A.    Yes.

24              MS. DUNN:  Thank you.

25              That's all, Your Honor.
```

```
 1                    Thanks, Mr. Baggett.
 2                    THE WITNESS:  Sure.
 3                    MR. WEBB:  Thank you very much for coming,
 4        Mr. Baggett.
 5                    No questions, Your Honor.
 6                    THE COURT:  Mr. Baggett, that will complete your
 7        testimony.  You may step down.
 8                    THE WITNESS:  Thank you, sir.
 9                    THE COURT:  Thank you.
10                    Are we going to resume the cross-examination of
11        Mr. Hampton at this time, Mr. Isaacson?
12                    MR. ISAACSON:  If the Court and the jury has
13        patience, I will do that until 3:00.
14                             SCOTT DEAN HAMPTON
15                    recalled as a witness on behalf of the
16                  Defendants, having been previously sworn,
17                    was examined and testified as follows:
18                         CROSS-EXAMINATION RESUMED
19        BY MR. ISAACSON:
20        Q.   Good afternoon, Mr. Hampton.
21                    Now, with respect to the costs that you were
22        estimating for Rimini operating 100 percent remote, your
23        understanding was that the increased labor needs relating
24        to Siebel would be minor in a remote-only model; right?
25        A.   Yes.
```

1   Q.    Okay.  And can we look at -- and that -- and the

2   reason that was your understanding was because you thought

3   Siebel in-house environments were used in only a small

4   percentage of support cases; correct?

5   A.    I think that and other reasons, yes.

6   Q.    And also you thought they were of limited value;

7   correct?

8   A.    I don't recall saying that they were limited value.

9   Q.    Well, look at your report at paragraph 171.

10  A.    Which report, the first one or second one?

11  Q.    Yeah, 171, that means it's your first report.

12  A.    Page?

13  Q.    It just has a paragraph number, 171.

14  A.    Okay.

15  Q.    All right.  Those are your exact words, that Siebel

16  in-house environments are of limited value; correct?

17  A.    So I'm a little confused as to whether I'm

18  addressing the Siebel or the environment.

19  Q.    Well, you can see the first paragraph, the first

20  sentence refers to -- talking about Siebel.

21  A.    It's definitely Siebel.  I agree with you.

22  Q.    All right.  And you said that -- and when you said

23  that the Siebel environments were of limited value and were

24  used in only a small percentage of support cases, you were

25  talking about 2012, weren't you?

3033

1    A.    I don't remember having a specific timeframe in

2    mind.

3    Q.    Okay.  What you just said -- what you said in your

4    report about them being of limited value and not -- and

5    being used in a small percentage of support cases, that was

6    not true at the beginning of the company in 2006, was it?

7    A.    I don't know why it would change.  So I would have

8    to give it some thought.  I'm sorry.

9    Q.    All right.  I'll ask you to look at PTX 1461.

10   A.    I found a 61.

11   Q.    1461.

12   A.    Okay.

13   Q.    This has been admitted in evidence.  We're going to

14   put it on the screen for you, if that's of any help.

15   A.    Good.  Thank you.

16   Q.    This is back in September of 2006.  This is

17   Mr. Chiu.

18          Mr. Chiu is writing to Mr. Davichick, Mr. Ravin,

19   his cofounder, Mr. Shay, talking about Siebel environments.

20   Do you see that?

21   A.    Yes.

22   Q.    Okay.  And in the middle of the first paragraph they

23   talk about a conference call they had in September of 2006

24   with the team from Accenture.  That's the consulting group;

25   right?

1    A.    I'm aware of them, yes.

2    Q.    And they said,

3          "We reclarified how our support model," "our

4    support model is based on building up an in-house lab

5    environment with a vanilla fix master and a customized

6    replica of their dev/test environment which would enable us

7    to maximize our responsiveness to them."

8          In 2006, this company's support model was built

9    on using in-house environments, lab environments, at Rimini

10   to support Siebel customers.

11   A.    Is there a question?

12   Q.    You knew that, didn't you?

13   A.    I guess I did, I mean, if the document was in the

14   file.

15   Q.    Right.  But in your report you just said that the

16   Siebel environments were of limited value because you were

17   talking about in later years; isn't that right?

18   A.    No, that's not my recollection.

19          My recollection is they didn't have the source

20   code for Siebel, so that's why I thought that it was used

21   less --

22   Q.    And --

23   A.    -- was the basis for it.

24   Q.    And you didn't talk --

25   A.    I don't remember having a timeframe in mind.

1    Q.    Exactly.  You did not have a timeframe in mind, and

2    you didn't talk to anybody that you recall at Rimini about

3    how the business was actually being run in 2006 with Siebel

4    environments; right?

5    A.    Other than the deposition transcripts that I was --

6    had available.

7    Q.    Okay.  Now, you also said in that same paragraph of

8    your report that the JDE support -- that Rimini Street

9    would not require any significant additional labor relating

10   to its JD Edwards practice in a remote-only model.

11   A.    I see that, yes.  I did.

12   Q.    And, in fact, when you estimated the additional

13   labor costs for the remote -- all-remote model, you only

14   looked at PeopleSoft engineers.

15   A.    I didn't direct my inquiry to just PeopleSoft, I

16   spoke with Mr. Zorn and Mr. Benge.

17        I explained that I wanted to calculate the

18   amount of labor it would require to -- for Rimini Street to

19   have operated in a noninfringing manner.

20        So I didn't intentionally limit it to

21   PeopleSoft, but I understand that the majority of the

22   costs, 75 to 77 percent, was in the PeopleSoft area.

23   Q.    Okay.  Let's go over that.

24        Now, did you discuss what additional costs for

25   JDE or Siebel would be required with Mr. Hilliard?

3036

1    A.    I just spoke with Mr. Hilliard on a more of a

2    reasonable check and just kind of walking through what I

3    was doing and asked him --

4    Q.    I've got a more specific question.  Okay?

5          My question was, did you discuss what additional

6    costs were required for JDE or Siebel with Mr. Hilliard?

7    A.    I don't remember specific references to those two.

8    Q.    Right.

9    A.    I think I was more general.

10   Q.    And you understand that Mr. Benge has testified that

11   he did not make any determinations as to how many

12   additional employees would be required to support JDE or

13   Siebel.  You know that; right?

14   A.    For the first two years, 2006, 2007?

15   Q.    No, for any years.

16   A.    I didn't -- if he said it in his direct -- or his

17   trial testimony, I read the testimony.  I was probably just

18   not thinking in the same course that you are.

19   Q.    Yeah.

20   A.    So if he said that, then he did.

21   Q.    All right.  Then Exhibit D2.6 -- D2.2, so of your

22   original report.

23          MR. ISAACSON:  Oh, do you have any objection to

24   me showing --

25          MR. STRAND:  No objection.

3037

1          THE COURT:  All right.

2   BY MR. ISAACSON:

3   Q.    All right.  Now, this is a schedule, and it says

4   2008, says Rimini Street's Avoided Labor Costs, you or your

5   staff prepared one of these schedules for every year;

6   right?

7          I'm sorry.  I have to wait for you to get to

8   that page.  It's on the screen too.

9   A.    Thank you.  Okay.  Sorry it took me so long.

10  Q.    No, it takes a while to get to those pages.

11         So this is a schedule you or your staff

12  prepared, this says 2008, because you prepared one for

13  every year, and where you were explaining your backup for

14  how you were estimating avoided labor costs?

15  A.    Yes.

16  Q.    And if we can make it a little bigger, there's lists

17  of actual names; right?  And those were the names that

18  Mr. Benge gave you.

19  A.    Actually, I received them from Mr. Zorn in that

20  spreadsheet that we've discussed.

21  Q.    Right.  And you were aware that every one -- so the

22  first two people, Corpuz and Pamalee are onboarding

23  engineers, and that every one of those engineers that's

24  listed here is a PeopleSoft engineer, or a tax and

25  regulations engineer?

1    A.    Yes.

2    Q.    Okay.  And then when you add them all up on the next

3    page, page 2 of 2, you're doing total PSE PeopleSoft

4    employees?

5    A.    Yes.

6    Q.    All right.  You didn't add up any employees for

7    Siebel or JD Edwards?

8    A.    No.

9    Q.    Okay.  Let me -- I'm not sure if we did a double

10   negative.  Did you add up any employees for JDE or Siebel?

11   A.    I just took the employees from Mr. Zorn's

12   spreadsheet because I had asked which employees need to be

13   duplicated, and these are the ones they gave me.

14          And I was aware that they were PeopleSoft, so I

15   assumed that to work in the JD Edwards there would be no

16   additional staff.

17   Q.    All right.  You assumed no additional staff and

18   no -- for Siebel or -- for JD Edwards or Siebel.

19   A.    I understood there was a difference between the

20   programs, between PeopleSoft and JD Edwards and Siebel

21   having to do with the availability of source code.

22   Q.    Right.  But no one told you, you don't recall anyone

23   telling you that "if we had to operate remotely for JDE or

24   Siebel, that we wouldn't require any more employees?"  No

25   one told you that?

3039

1    A.    No, I don't recall that, that anyone did.

2    Q.    All right.  And now I think you said that you -- you

3    did an allocation of 75 percent of the labor cost to

4    PeopleSoft.  Do you remember that?

5    A.    Well, I wasn't doing -- I guess, in effect, I was

6    doing PeopleSoft.  I was doing the total that you've

7    identified.  They are PeopleSoft, right.

8    Q.    Right.  So when we were talking earlier today you

9    told me, when I asked you these questions about whether you

10   had taken into account Siebel and JDE, you said "Yes."

11         You said, "I did 75 percent PeopleSoft."  You

12   said, "I did 15 percent JDE, and I did 10 percent Siebel."

13   And that was just plain wrong; right?

14   A.    No.  You'll see that we already discussed in 2006

15   we've got, was it 116,000 in additional labor.  And 2007

16   has 297.  I believe in 2006 that was almost all Siebel.

17   Q.    Right.  But in 2007 -- I'm sorry, 2008, 2009, 2010,

18   and forward, it's all PeopleSoft; right?

19   A.    True, yes.

20   Q.    Right.  And when you did 2006 and 2007, you did an

21   extrapolation from all PeopleSoft; correct?

22   A.    Right.

23   Q.    And you never did what you said -- what you said

24   today, that -- an allocation of 75 percent, 15 percent, and

25   10 percent, that never happened; right?

1    A.    I made that allocation.  I know the ratios.  I'm

2    trying to think what document I was using to do that.

3    Q.    You didn't have one.  You didn't do it, did you?

4    A.    Well, I had the ratios.  So I did look at the

5    proportion of the business between the three.

6          But I will agree with you that the calculation's

7    based on PeopleSoft.  But when I made the extrapolation

8    back to 2006 and 2007, that would have picked up some

9    Siebel for those first two years.

10   Q.    But when you estimated the additional labor costs,

11   you didn't do an -- it was 100 percent PeopleSoft, you

12   didn't do that 75-15-10 thing you talked about; right?

13   A.    The ratios are based on the number of customers and

14   the type of customers that Rimini Street had each year.

15   Q.    Yes.  But that -- we're not talking about the number

16   of customers, we're talking about the added labor costs.

17         And so I will ask you again, that when you

18   estimated additional labor costs, it was 100 PeopleSoft,

19   and what you told me earlier today about allocating 75

20   percent, 15 percent, and 10 percent, was just plain wrong?

21   A.    If you don't like the calculation, I guess that's

22   right.  That's based on the number of customers for each

23   type.

24   Q.    I'm not talking about liking the calculation.  I'm

25   talking about you said -- you said you did a calculation,

1    and you didn't.

2              When you did the additional labor cost, you did

3    not do a calculation of 75 percent PeopleSoft, 15 percent

4    JD Edwards, 10 percent Siebel, you did 100 percent

5    PeopleSoft; correct?

6    A.    I think we've already identified that I have

7    $116,000 in 2006 as additional labor, and there were, if

8    anything, maybe one PeopleSoft, and it was all Siebel, so,

9    no, you're not absolutely correct.

10   Q.    All right.  You didn't do an allocation of labor

11   cost of 75 percent PeopleSoft, 15 percent JD Edwards, 10

12   percent Siebel, did you?

13   A.    That would be based on the number of customers.

14   Q.    You didn't do it, did you?

15   A.    I have done it.  I can tell you the ratios.  It's

16   based on the number of customers.

17   Q.    Right.  But we -- you testified -- you're changing

18   the language to customers, and we are talking about

19   additional labor costs.  You know that?

20   A.    Yes.

21   Q.    Okay.  And when you talked this morning, you -- we

22   were talking about additional labor costs, and you told me

23   you did an allocation of additional labor costs on that

24   basis, 75 percent, 10 percent, 15 percent.

25              Now you want to talk about customers.  But that

1    allocation of additional labor cost you did not do;

2    correct?

3    A.    I think I see the confusion is you asked me how --

4    if I --

5              MR. ISAACSON:  I'd like the witness to be

6    directed to answer the question.

7              THE COURT:  Madam Reporter, would you read the

8    question again.  And, Mr. Hampton, please answer the

9    question.

10             THE WITNESS:  Sure.

11         (The question was read by the court

12         reporter.)

13             THE WITNESS:  I don't know how to answer your

14   question yes or no.

15             MR. ISAACSON:  All right.  I'll move on.

16   BY MR. ISAACSON:

17   Q.    Now, you talked -- we talked earlier about whether

18   customers would have accepted third-party -- third-party

19   support from India.

20             Now, in -- we talked about how you didn't do any

21   customer surveys.  You also did not review any Rimini

22   marketing materials about whether that would be acceptable

23   to customers; right?

24   A.    I didn't catch the thread of your long question.  Do

25   you think you could just shorten it just a little bit so I

3043

1   can understand?

2   Q.    Sure.  Now, I'm changing topics.  Okay?  And now

3   we're going to talk about the acceptability to Rimini

4   customers of providing support from India, okay?

5   A.    Right.

6   Q.    Okay.  Did you review any Rimini marketing materials

7   that discussed that subject?

8   A.    I looked at the marketing materials.  I don't recall

9   seeing that subject.

10  Q.    Were you unaware of -- you were -- let me start

11  over.

12          From 2006 to 2011 -- and let me stop there and

13  say I'm going to be talking to you about 2006 to 2011.

14  I'll try to say that each time, but if I don't, I'm still

15  talking about 2006 to 2011.  Okay?

16  A.    Fine.

17  Q.    Okay.  Now, from 2006 to 2011, you were unaware of

18  any customers who would have opposed receiving offshore

19  support for their -- from India.

20  A.    I don't know that I was unaware of it.  I assumed

21  that there would be -- I didn't expect this to be easy.  I

22  thought that it would be hard because it was a major change

23  in their policy.  So I didn't make assumptions that

24  everybody was going to be happy about it, no.

25  Q.    Your understanding was that customers had not

3044

<pre>
 1    expressed any views about offshore support; correct?
 2    A.    I'm not sure I had that understanding at that time.
 3              MR. ISAACSON:  Okay.  Well, can we show him his
 4    deposition page 140, beginning at line 25, through 141,
 5    line 10.
 6    A.    Are you going to put it on the screen, because --
 7    Q.    Yes.
 8          (Videotape deposition of Scott Hampton played
 9          as follows:)
10          "Q.  Are you aware that any of Rimini's
11          customers expressed that view?
12          "A.   That they didn't want to have support
13          offshore?
14          "Q.   Correct.
15          "THE WITNESS:  No, that runs contrary to my
16          understanding.  My understanding is that Oracle
17          was moving to that type of a operation.  They
18          were employing more engineers in India, so, no,
19          I am not familiar with that."
20    BY MR. ISAACSON:
21    Q.    So at the time of your deposition, you were unaware,
22    and it was contrary to your understanding, that any Rimini
23    customers had expressed the view that they didn't want to
24    have support offshore; correct?
25    A.    You're taking me back three or four years, and I've
</pre>

1     heard the testimony --

2     Q.    Isn't that what you just --

3     A.    I would agree with you, yes.  I think.  I mean, I

4     think it's more complicated than that, but to move things

5     along, let's go with it.

6     Q.    All right.  During the -- have you -- I can't

7     remember, did you review Mr. Rowe's testimony?

8     A.    No, I don't think I have.  I may have because there

9     was some testimony that I looked at that I'm not recalling

10    all the names.  So I did read the trial transcripts for

11    certain days.  So -- I may have forgotten his name.

12    Q.    I'll try not to go through these documents again.

13    They've been admitted into evidence.

14          But I showed Mr. Rowe responses to requests for

15    proposal from Rimini Street to various clients of Rimini in

16    which the standard language was used and repeated, "any

17    deliverable scoped, developed, tested, or supported by

18    offshore (outside North America) resources.  If so, please

19    describe details."

20          And Rimini would say, "No.  All deliverable

21    scoped, developed, tested, and supported by North American

22    based resources."

23          That was in PTX 2140, PTX 2142, and PTX 2158.

24          And Mr. Rowe said it was part of Rimini's

25    standard messaging -- again, 2006 to 2011, that all of your

                                                              3046

 1    deliverables are developed, tested or supported in North

 2    America.  Are you aware of that?

 3    A.    I think so.  It was my understanding that that was

 4    their approach that -- I think they had some consultants in

 5    India, but everything else, I think, was done in the United

 6    States.

 7    Q.    I'm not talking about just what they were doing, I'm

 8    talking about what they were telling customers and what

 9    customers were expecting.

10    A.    I was aware of it, yes.

11    Q.    And Mr. Rowe said that standard message was

12    important to clients.  Did you know that?

13    A.    I don't recall it, but I would not doubt it.

14    Q.    All right.  And were you aware of requests for

15    proposals from customers that said "we won't work with

16    anybody who's using offshore resources for support"?

17    A.    I may have been because I did form an opinion that I

18    thought some people would fall off, but other people would

19    like the new procedures; so I assumed you would lose some,

20    gain some.

21    Q.    Right.  And that was an assumption.  You didn't

22    quantify it, you didn't say how many would go down, how

23    many would go up, it was just an assumption?

24    A.    True, yes.

25    Q.    And in your model you assumed that Rimini would pay

```
 1    a total of about 16,720 for each additional employee based
 2    in India.  We were just looking at that in D2.2.  Does that
 3    ring a bell?
 4    A.    Yes.
 5    Q.    And then for each subsequent year you assumed an
 6    increase in salary each year until it went up to around a
 7    little over 19,000.  Does that ring a bell?
 8    A.    Yes, it does.
 9    Q.    Okay.  And you've got that salary information from
10    India from a website called payscale.com.
11    A.    That's right.
12    Q.    And the -- now, when you talked to Mr. Zorn, you
13    talked to him about the consultants in India that they used
14    in 2007 and 2009; right?
15    A.    I believe I did.  It's been a few years ago, but I
16    think I did.
17    Q.    Okay.  And do you remember reviewing documents
18    indicating that in 2007 Rimini Street was paying $26 an
19    hour for a PeopleSoft engineer in India?
20    A.    A PeopleSoft consultant, I believe.  I don't think
21    it was -- this person wasn't an employee of Rimini Street.
22    Q.    A consultant, but an engineer.
23    A.    An engineer, yes.
24    Q.    Let's look at 2146.
25              COURTROOM ADMINISTRATOR:  PTX?
```

 1                    MR. ISAACSON:  PTX, which has not been admitted.

 2     I would move to admit.

 3                    MR. STRAND:  Is this on his documents-relied-on

 4     list?

 5                    MR. ISAACSON:  I know he's been deposed about

 6     it.  This is the Indian consultant issue.

 7                    MR. STRAND:  I'll object to it unless there's a

 8     foundation laid.

 9                    MR. ISAACSON:  All right.

10     BY MR. ISAACSON:

11     Q.   In the meantime, I'll ask you to look at page 9.

12     A.   I went to PTX 2146.

13     Q.   So 2146.  Yes, and look at page 9 of 10 at the

14     bottom.

15          All right.  And you see Dennis Chiu is writing

16     to Seth Ravin?

17     A.   I'll take your word for it.  It says, "Hi, Seth."  I

18     don't see.

19     Q.   Look on the next page.

20     A.   Yes.

21     Q.   Okay.  And do you see in the first sentence they're

22     talking about viable offshore resources to help with the

23     PeopleSoft lab environments?

24     A.   Are you in the first paragraph?

25     Q.   Yes.  Do you see that?

3049

1    A.    I'm reading it.

2          I see it, yes.

3    Q.    Okay.  And you see, just for purpose of context,

4    they're talking about a technical person who might be

5    available who has background with PeopleSoft?  That's in

6    the second paragraph.

7    A.    Yes.  I do see it, yes.

8    Q.    All right.  And do you see then there's two numbered

9    items, and the second is competitive rate, and the

10   competitive rate which is described as very cost effective

11   was for a consultant name Krishna, his rate is $26 per

12   hour?

13   A.    Right.  I see that.

14   Q.    And you were familiar with Rimini paying that amount

15   to consultants in India to support PeopleSoft Lab

16   environments in 2007; correct?

17   A.    As a consulting fee they paid, yes.

18   Q.    And that amount, $26 an hour -- and then later on --

19   by 2009, that same person was getting $36 an hour; right?

20   A.    That's a consulting fee, not a wage.

21   Q.    And $36 an hour, that's about -- if you -- that's

22   74,880 per year, right?  75,000?

23   A.    What rate did you say?  I'm sorry.

24   Q.    $36 an hour, at 40 hours a week, 52 weeks a year,

25   you get a little under $75,000?

3050

1    A.    Yes.

2    Q.    And you're assuming salaries in 2009 of about

3    19,000; right?

4    A.    For an employee and not necessarily the same number

5    of years of experience.

6    Q.    Well, are you assuming that -- you say not the same

7    levels of experience.  Are you assuming in your model that

8    you're hiring people who have just a few years experience?

9    A.    No.  I remember -- I think you asked, or Mr. Hixson

10   asked in the deposition, I assumed, I think -- best

11   recollection, I would assume that you would need somebody

12   with about five years of experience.

13   Q.    Okay.  And we were talking about one consultant.

14   From your review of the record, you saw other consultants

15   in 2009 who were being paid about the same rate as a

16   consultant as Krishna.

17   A.    In this document you just --

18   Q.    That and other documents you reviewed.  You're aware

19   of that; right?

20   A.    I read the Second Foundation documents.  It might be

21   what you're talking about.

22   Q.    Right.  And so the point being Krishna was not the

23   only consultant getting $36 an hour.  There were others in

24   that neighborhood.

25   A.    I would have to go back and look.  I don't recall.

1    Q.    All right.  Well, take a look at -- just refresh

2    your memory here, 2153.

3              COURTROOM ADMINISTRATOR:  PTX; right?

4              MR. ISAACSON:  PTX 2153.

5    BY MR. ISAACSON:

6    Q.    And just look at the first page.

7    A.    Yes, these are consulting rates.

8    Q.    Right.

9    A.    $36 -- excuse me --

10   Q.    Right.  You see Krishna --

11   A.    -- $31 an hour.

12   Q.    You see Krishna is at $36 an hour, Guna is at $31 an

13   hour, and Venkata is at $36 an hour; right?

14   A.    Yes.

15   Q.    And on the top of the next page, that's described as

16   the market rate for comparable skills in both the domestic

17   and international market.

18   A.    Right.  But these aren't wages.  These are

19   consulting fees for a company that's hired --

20   Q.    And you didn't --

21   A.    -- the employee, then using them as consultants.

22   Q.    Right.  Well, the consultant will have some overhead

23   built in; correct?

24   A.    Yes, that's true.

25   Q.    About 20 percent?

1    A.    No.

2    Q.    Is it 80 percent overhead?

3    A.    When I started in public accounting --

4    Q.    Is it 80 overhead, sir?

5    A.    80 percent overhead would not be unusual, yes.

6    Q.    Okay.  80 percent overhead is normal?

7    A.    Right.

8    Q.    Is it your view that regardless of the size of the

9    company purchasing the service, consulting would always be

10   cheaper than support?

11   A.    Consulting would always be cheaper than support?  I

12   don't understand --

13   Q.    I'm sorry.  Cheaper -- in other words, employees

14   providing support?

15   A.    I'm sorry.  You're going to have to slow down and

16   bring me along a little bit.

17   Q.    Sure.  Is it your view that regardless of the size

18   of the company, purchasing the service through consulting

19   would always be cheaper than direct employment?

20   A.    No, it doesn't sound right to me.  You're saying

21   that consultants are cheaper than wages?

22   Q.    All right.  Or would they be always -- have you done

23   any study as to whether hiring an employee, which comes

24   with overhead in your company, is always as -- cheaper or

25   more expensive than hiring a consultant?

1    A.    Well, I am a consultant.  I've been a consultant a

2    long time.  And I will tell you that it's more expensive to

3    hire a consultant than an employee.

4              MR. ISAACSON:  All right.  I think this would be

5    a good time to break, Your Honor.

6              THE COURT:  All right.  Ladies and gentlemen, I

7    thank you for the extra time today, and we were moving

8    along with regard to some of the evidence.

9              I'll give you the usual admonition.  I gave it

10   to you at length yesterday so I'm not going to give it to

11   you at length tonight, but I remind you, just don't be

12   discussing the case or allow it to be discussed around you,

13   and certainly don't allow yourself to be exposed to

14   anything on the Internet, on television, on radio,

15   newspapers, any other kind of medium, and, most

16   importantly, keep an open mind until you've heard all the

17   evidence, heard the instructions on law, and can finally go

18   in and deliberate this case.

19             We'll start tomorrow morning promptly at 8:00

20   a.m.

21             And we'll go through until -- well, I'm not sure

22   where we are, but with regard to the Court's availability,

23   I would say 12:30.

24             COURTROOM ADMINISTRATOR:  Please rise.

25             THE COURT:  You may go ahead and step down.

3054

1          (Jurors exit courtroom at 3:05 p.m.)

2              MR. ISAACSON:  Your Honor, we've got some

3     questions about schedule.  Sorry.

4              THE COURT:  You may step down, Mr. Hampton.

5              Have a seat, everyone.

6              MR. ISAACSON:  I'm still -- I'm hoping to

7     complete with this witness in 30 minutes tomorrow.

8          (Discussion off the record.)

9              THE COURT:  Donna, why don't we put this on the

10    record so that everyone knows what the guidelines are.

11             What I'm hearing -- the record will show that

12    we've just had a brief discussion concerning final

13    scheduling on witnesses and evidence and resolution of some

14    pending objections.  And the Court is going to review,

15    during the recess, the objection areas.  And I don't need

16    argument from counsel on those, and, if I do, I'll let

17    counsel know.

18             But it sounds to me that we will finish all

19    evidence tomorrow.

20             We will not be able to resolve instructions

21    tomorrow because certainly all of my staff -- and you may

22    be experiencing this too, the problem is that on Friday out

23    of Las Vegas virtually every flight is full so you have no

24    real opportunity to reschedule transportation.

25             So what that tells me is we'll finish evidence

1    today.  I'll have a package of proposed final instructions

2    for you probably in the morning.

3              As I've mentioned before, this is the Court's

4    proposed and not the -- they obviously require review and

5    consult with the parties and an opportunity for counsel to

6    object or point out anything that the Court may have

7    overlooked with regard to those instructions.

8              That session with the number of instructions we

9    have is going to take time that we don't have tomorrow for

10   sure.  So I'm looking at doing this on Monday.  And I want

11   to get it finished Monday and go to the jury on Tuesday.

12             So we don't -- we won't have the jury here.  So

13   we should be able to start early on Monday morning, I would

14   say 9:00.

15             MR. ISAACSON:  All right.  That's fine, Your

16   Honor.

17             Then just to tell the Court what we're doing,

18   tonight, or when we get back, we're going to file a motion

19   to exclude Mr. Hampton's value of use opinion.

20             We had previous *Daubert* briefing on that, and

21   the Court ruled it could come in because it was relevant to

22   hypothetical license negotiation, which is what the Court

23   said in its opinion.

24             He has testified that he's not using it as

25   relevant to hypothetical license negotiation.  He's not

1    doing -- and I'm talking about PeopleSoft, JDE, and Siebel,

2    and not Oracle Database, that he's not using it for that.

3            It's what he considers a separate way to measure

4    damages, and we don't think that's a separate way to

5    measure damages in the case law, so we will file some

6    papers on that.

7            THE COURT:  And those will be filed --

8            MR. ISAACSON:  Today.

9            THE COURT:  -- today.  And I'll give defendants

10   until tomorrow evening to respond.  Let's set a time, 6:00.

11   And we'll bring that up on Monday.

12           I've also given thought to closing statements,

13   and I would set a timeframe of two hours per side.  And

14   plaintiffs can divide that time as they see fit between

15   reply and opening argument.

16           MR. ISAACSON:  All right.  Thank you, Your

17   Honor.

18           And I guess their evidence is not closed, but

19   it's very likely that at the close of their evidence that

20   as to some discrete issues in the case that we think that

21   those issues should not go to the jury, similar to the way

22   the PeopleSoft software liability issue doesn't go to the

23   jury, and we'll file a Rule 50 motion on that at the close

24   of the evidence.

25           Assuming you don't fix it before then.

1            THE COURT:  File what you need to file.  I mean,

2  we have so much pending, the Court's rulings on those

3  matters are likely to be taken under submission and dealt

4  with as necessary later.

5            All right.  Well, those are guidelines.  And

6  I'll see you all in the morning.

7            MR. ISAACSON:  What time Monday?

8            THE COURT:  Monday morning at 9:00 a.m.

9            MR. WEBB:  And that will be the charge

10  conference?

11            THE COURT:  Pardon?

12            MR. WEBB:  That will be the instruction

13  conference?

14            THE COURT:  Yes.

15            MR. WEBB:  All right.  Thank you, Judge.

16        (The proceedings adjourned at 3:13 p.m.)

17                      *    *    *

18

19

20

21

22

23

24

25

3058

1                              -o0o-

2          I certify that the foregoing is a correct

3          transcript from the record of proceedings

4          in the above-entitled matter.

5

6          _____        10/2/15

7          Donna Davidson, RDR, CRR, CCR #318        Date
           Official Reporter

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3059

1                          I N D E X

2    DEFENDANTS' WITNESSES:                        PAGE
     SCOTT DEAN HAMPTON
3        Cross-Examination Resumed                 2794
         By Mr. Isaacson
4    BRIAN BAGGETT
         Direct Examination By Mr. Webb            2941
5        Cross-Examination By Ms. Dunn             2989
         Redirect Examination By Mr. Webb          3023
6        Recross-Examination By Ms. Dunn           3030
     SCOTT DEAN HAMPTON
7        Cross-Examination Resumed                 3031
         By Mr. Isaacson
8

9                        E X H I B I T S

10   PLAINTIFFS'                                ADMITTED
     435                                            2960
11   436                                            2967
     437                                            2972
12   5529                                           2897
     6007 and 6008                                  2801
13
     DEFENDANTS'                                ADMITTED
14   3004                                           2933

15

16

17

18

19

20

21

22

23

24

25