3060

1                    UNITED STATES DISTRICT COURT
                          DISTRICT OF NEVADA
2          BEFORE THE HONORABLE LARRY R. HICKS, DISTRICT JUDGE

3

4    ORACLE USA, INC., a Colorado      :
     corporation; ORACLE AMERICA,      :
5    INC., a Delaware corporation;     :
     and ORACLE INTERNATIONAL          :No. 2:10-cv-0106-LRH-PAL
6    CORPORATION, a California         :
     corporation,                      :
7                                      :
             Plaintiffs,               :
8                                      :
         vs.                           :
9                                      :
     RIMINI STREET, INC., a Nevada     :
10   corporation; and SETH RAVIN,      :
     an individual,                    :
11                                     :
             Defendants.               :
12   _____  :

13

14

                  TRANSCRIPT OF JURY TRIAL - DAY 15
15                   (Pages 3060 through 3198)

16

17                        October 2, 2015

18

                          Las Vegas, Nevada
19

20

21

22

     Court Reporter:          Donna Davidson, RDR, CRR, CCR 318
23                            Certified Realtime Reporter
                              400 South Virginia Street
24                            Reno, Nevada  89501
                              (775) 329-0132
25

3061

```
 1                    A P P E A R A N C E S

 2    FOR THE PLAINTIFFS:

 3    BOIES, SCHILLER & FLEXNER LLP
      KIERAN P. RINGGENBERG
 4    1999 Harrison Street, Suite 900
      Oakland, California 94612
 5    (510) 874-1000
      Fax: (510) 874-1460
 6    kringgenberg@bsfllp.com

 7    BOIES, SCHILLER & FLEXNER LLP
      RICHARD J. POCKER
 8    300 South Fourth Street, Suite 800
      Las Vegas, Nevada 89101
 9    (702) 382-7300
      Fax: (702) 382-2755
10    rpocker@bsfllp.com

11    BOIES, SCHILLER & FLEXNER LLP
      WILLIAM A. ISAACSON
12    KAREN L. DUNN
      5301 Wisconsin Avenue, NW
13    Washington, DC  20015
      (202) 237-2727
14    Fax:  (202) 237-6131
      wisaacson@bsfllp.com
15    kdunn@bsfllp.com

16    MORGAN LEWIS & BOCKIUS LLP
      THOMAS S. HIXSON
17    NITIN JINDAL
      JOHN A. POLITO
18    One Market, Spear Street Tower
      San Francisco, California 94105
19    (415) 442-1000
      Fax:  (415) 442-1001
20    thomas.hixson@morganlewis.com
      nitin.jindal@morganlewis.com
21    john.polito@morganlewis.com

22    JAMES C. MAROULIS
      DORIAN E. DALEY
23    Oracle Corporation
      500 Oracle Parkway
24    Redwood City, California 94070
      (650) 506-4846
25    jim.maroulis@oracle.com
      dorian.daley@oracle.com
```

3062

```
 1                 A P P E A R A N C E S  (Continued)

 2    FOR THE DEFENDANTS:

 3    SHOOK, HARDY & BACON LLP
      PETER E. STRAND
 4    B. TRENT WEBB
      RYAN D. DYKAL
 5    2555 Grand Boulevard
      Kansas City, Missouri 64108
 6    (816) 474-6550
      Fax: (816) 421-5547
 7    pstrand@shb.com
      bwebb@shb.com
 8    rdykal@shb.com

 9
      SHOOK, HARDY & BACON LLP
10    ROBERT H. RECKERS
      600 Travis Street, Suite 3400
11    Houston, Texas 77002
      (713) 227-8008
12    Fax: (713) 227-9508
      rreckers@shb.com
13
      SHOOK, HARDY & BACON LLP
14    ANNIE Y.S. CHUANG
      One Montgomery Tower, Suite 2700
15    San Francisco, California 94104-4505
      (415) 544-1900
16    achuang@shb.com

17
      LEWIS ROCA ROTHGERBER LLP
18    W. WEST ALLEN
      3993 Howard Hughes Parkway, Suite 600
19    Las Vegas, Nevada 89169
      (702) 949-8230
20    Fax: (702) 949-8364
      wallen@lrrlaw.com
21

22

23

24

25
```

```
 1              LAS VEGAS, NEVADA, OCTOBER 2, 2015, 7:58 A.M.

 2                             --oOo--

 3                       P R O C E E D I N G S

 4

 5          (Outside the presence of the jury.)

 6              THE COURT:  Have a seat, please.

 7              The record will show that we're in open court,

 8     but the jury is not present.  Parties and counsel are

 9     present.

10              I understand that you have resolved the issues

11     concerning Mr. Hampton.  Is that correct, Counsel?

12              MR. ISAACSON:  I guess so because I don't even

13     remember what the issue was.

14              THE COURT:  All right.  Okay.

15              But we still have this issue concerning the

16     videotape deposition of -- was it Mr. Cummins?

17              MR. HIXSON:  Yes, that's correct, Your Honor.

18              THE COURT:  Okay.  I've reviewed the objection

19     areas, and I'm -- you know, my overall impression is -- I

20     want to hear counsel with regard to what you feel is the

21     403 issue.  But I would tell you as a preface to that, that

22     I do think that essentially when we review this customer

23     complaint history and how it's treated within Oracle, I

24     have been of the view -- and, as we know from last week, I

25     requested counsel to try and resolve that one exhibit that
```

1     concerns the -- I forget the number.  It starts with the

2     top 25 candidates.

3             I had hoped that you had resolved redactions

4     with regard to hearsay comments by customers which should

5     be excluded.

6             I am of the view that hearsay -- comments from

7     customers that are described within the notes in the record

8     are hearsay and should be excluded.

9             I'm of the further view, however, that present

10    sense impressions of Oracle employees would be admissible,

11    and so that effectively, in my view, required counsel to go

12    through all the various comments that are contained within

13    the exhibit.

14            And for the benefit of the record, let's

15    identify that exhibit number.  Who can give that to me?

16            MR. GRAY:  Your Honor, there are four exhibits

17    that we gave to you.  That is Defense Exhibit DTX 345 --

18            THE COURT:  Well, the first one I'm talking

19    about is the transcript of Cummins directly.

20            Well, no, for clarification it was -- I'm

21    looking at Exhibit C that I think was attached to Oracle's

22    filings on that last week which -- well, I don't have the

23    document number, but I believe it's the same document

24    that's referred to in the Cummins video deposition that's

25    been identified as DTX 290A.

1           MR. GRAY:  Yes, 290A.  It was Cummins depo --

2           THE COURT:  All right.

3           COURTROOM ADMINISTRATOR:  298?

4           MR. GRAY:  Yes, 290A as in alpha.

5           THE COURT:  Right.  So, Counsel, fill me in on

6     where you are with regard -- whether there's been any

7     resolution of that particular exhibit with regard to

8     redactions agreed upon by the parties.

9           MR. HIXSON:  Sure, Your Honor.

10           There are a couple of exhibits, three of them to

11    the Cummins deposition and one to Mr. Jones' deposition,

12    and then a bunch of testimony from Mr. Cummins.  And there

13    are two issues that the parties disagree on.

14           One is customer comments from a customer that

15    has nothing to do with this lawsuit.  The customer never

16    went to Rimini Street.

17           And that's what a lot -- that's what our 402 and

18    403 objections are to the Cummins testimony; for example,

19    testimony about E&J Gallo which never went to Rimini.

20           And we feel that if the jurors hear testimony

21    about why -- they hear a customer name and they hear

22    hearsay statements about why that customer left Oracle, the

23    jurors will assume that must be a customer that's relevant

24    to the lawsuit.  But if the customer never went to Rimini

25    Street, then we think that is confusing and prejudicial.

1           So our 402 and 403 objections are all about

2   customers that have nothing to do with the case.

3           And the remainder, the 802 objections, the

4   hearsay ones, are all ones where we have followed the

5   Court's guidance to the best of our ability and tried to

6   redact hearsay customer statements that were simply

7   transcribed in the notes field, and when it came to

8   analysis or impressions by Oracle assessing that customer

9   relationship, we left those in.

10          I will be candid that there were judgment calls

11  to be made because some of these spreadsheets were quite

12  large.  That was -- we were trying to follow the Court's

13  guidance as best as possible.

14          But those are the two issues, the 402 and 403,

15  we feel that when a customer name is mentioned, the jury

16  might be confused into thinking it has something to do with

17  this lawsuit when actually it's totally irrelevant to the

18  case.

19          And then the hearsay ones are where it was a

20  transcribed customer statement or a paraphrase of a

21  customer statement.

22          But that's where we disagree.

23          THE COURT:  Okay.  So with regard to DTX 280A --

24          MR. GRAY:  290A, Your Honor?

25          THE COURT:  Well, no, this is a question.

1              Have you agreed upon an exhibit that is redacted

2      that's mutually acceptable to both sides?

3              MR. HIXSON:  We have not.  And yesterday we

4      submitted the parties' competing views.

5              Defendants disagree with all of Oracle's

6      redactions, and so that is what we have put forward, Your

7      Honor.

8              We have one version that we submitted that has

9      Oracle's redactions, and then defendants have submitted one

10     that has no redactions, and that's their position.

11             THE COURT:  All right.

12             Mr. Gray.

13             MR. GRAY:  First as to the 402 and 403

14     objections, Your Honor, there was testimony from Ms. Catz

15     and from Ms. Ransom that said all of Oracle customers love

16     us, they're happy with us, and we feel like that put in

17     play, and so every one of these statements that even if

18     it's a customer that did not go to Rimini Street, then it

19     is relevant to rebut the testimony of Ms. Catz and

20     Ms. Ransom.

21             As to the hearsay objections, we feel like the

22     Court meant that -- if something was a direct quote from a

23     customer, that's fine, it's hearsay, we're not arguing

24     that.

25             But almost every entry is just a paraphrase, and

1    you can tell from the language in it, it's a present sense

2    impression from the Oracle employee who is writing it in.

3              If it's a direct quote, we're not arguing that;

4    but if it's not a direct quote, then we feel like that's

5    present sense impression.

6              THE COURT:  Okay.  Do you have one of those

7    exhibits that's identical to 280A that -- let me make sure

8    I have the correct number.  290A, I'm sorry.

9              Do you have one of those which -- maybe I should

10   state it another way.

11             So do I understand that the impasse between the

12   parties is still the way it was last week, where I had the

13   one -- you're looking at the same one I was referring to

14   earlier, Mr. Hixson, which was Exhibit C to Oracle's

15   filing.

16             MR. HIXSON:  Yes, Your Honor.

17             We had, in our filing, each side had picked a

18   half dozen examples to propose to Your Honor.

19             This was our attempt to narrow the dispute

20   rather than burdening the Court with hundreds of redactions

21   to look at, which we feel isn't feasible, and so that's

22   what we attempted to do in the motion, and that's where we

23   do stand.

24             But I am sorry that we haven't made further

25   progress, but we are at this impasse where we have a number

1    of redactions Oracle has proposed, and defendants have

2    rejected all of them.

3              THE COURT:  Okay.  Well, I am willing to look at

4    that between now and when this case is submitted to the

5    jury and give you a ruling on it, but if you've done that

6    and presented it to me with six good examples of the issue,

7    I haven't been able to review that and consider that.

8              I have looked over the 290A exhibit, and I have

9    seen where the objections were posed.  So I have a sense

10   where you should be going on it, but I'd like to see what

11   your actual -- if you can give me six good examples, I can

12   give you a ruling on that.

13             MR. HIXSON:  I believe that our written briefing

14   that we submitted on the -- defendants' filed a motion to

15   admit four examples without redaction, and they submitted

16   written briefing and our opposition.

17             We discussed each one of the examples in our

18   written -- our briefing that we submitted last week.

19             THE COURT:  Do you have the filing numbers on

20   those?  Just the identification of the pleading.

21             MR. HIXSON:  I have the under seal versions.

22   Unfortunately, I don't have the docket number in front of

23   me.  Ours was filed on September 24th, 2015.

24             THE COURT:  And entitled?

25             MR. HIXSON:  Oracle's Opposition to Rimini

1    Street's and Seth Ravin's Motion to Admit DTX 152, 153,

2    154B, 164A, 340 and 345 Without Redactions.

3              THE COURT:  All right.

4              And, Mr. Gray, can you identify Oracle's for

5    me -- I'm sorry, Rimini's?

6              MR. HIXSON:  And counsel has advised me that

7    it's dockets 806 and 811.

8              THE COURT:  Okay.  All right.

9              Now, but that takes us then to the dilemma

10   concerning the proposed Cummins depo testimony, but we have

11   to have some resolution on Cummins because it concerns the

12   same exhibit, and there's references --

13             MR. GRAY:  Your Honor, we'd like to make a

14   suggestion.

15             Regarding the deposition exhibits that are in

16   the Cummins video, if it's acceptable to Oracle, what we

17   would propose to give Your Honor time to rule on it, we

18   could not include those actual exhibits as part of the

19   video, but we would like to play the video today.

20             So we would agree to defer a ruling on the

21   actual exhibits if you can tell us -- Oracle still has

22   actual objections with inside the Cummins depo.  If you

23   can -- and we do want to play that today.

24             I don't know if Your Honor had a chance to look

25   at the --

```
 1              THE COURT:  No, I have --
 2              MR. GRAY:  If we could get a resolution on that,
 3    if you're willing to let us play the video without the
 4    disputed exhibits, and then we can work together on what
 5    actually goes to the jury after His Honor can look at that,
 6    then that would be fair with us.
 7              MR. HIXSON:  That would be fine with Oracle if
 8    the exhibits aren't shown to the jury.
 9              THE COURT:  Mr. Gray, would you touch again on
10    your response to the 403 and 402 arguments -- or 404,
11    whatever it was?
12              MR. GRAY:  Yes, Your Honor.
13              The way I understand Oracle's objection is that
14    a customer that is in this list that did not go to Rimini
15    Street, for example, E&J Gallo, they feel like that's not
16    relevant.
17              Whereas Ms. Catz testified that all the
18    customers loved them, the only customers that would leave
19    them are customers that went bankrupt.  And Ms. Ransom
20    testified that Oracle customers love us, and when she was
21    asked by their counsel, have you ever had a customer leave
22    for bad service, she didn't even directly answer that
23    question.
24              So we feel like they have put out to the jury
25    that all customers love Oracle.  And the present sense
```

1    impression of the Oracle employees in this document rebuts

2    that testimony.  And so we feel like it is relevant in this

3    case.  It at least goes to the credibility of the two

4    witnesses, Ms. Catz and Ms. Ransom.

5              MR. HIXSON:  And Your Honor, just to respond

6    briefly.  If the jury is never told that these customers

7    didn't go to Rimini Street and have nothing to do with the

8    case, they will likely naturally assume that they were

9    Rimini customers which we feel would be confusing to them.

10             MR. GRAY:  And to -- actually, Your Honor, the

11   exhibit here, the 290A, actually has from Oracle which

12   third party the customer went to.  So it says which ones

13   went to Rimini Street, it says which ones went to Versytec,

14   it says which ones went to TomorrowNow, so the jury will

15   see that.

16             Plus, I would imagine in both Hampton and Dean

17   testimony and exhibits, there is a full list.  Certainly

18   the jury will know which customers are in this case from at

19   least the experts, if not the verdict form or other

20   documents.

21             THE COURT:  Mr. Hixson, did you have a final

22   response?

23             MR. HIXSON:  That's a lot of information to

24   expect the jurors to go through, if they're only being

25   shown videotaped testimony, to ask them to read through a

1      hundred page spreadsheet and look at columns and rows to

2      see which third party they went to.

3              If they didn't go to Rimini, they're just not

4      relevant to the case.

5              THE COURT:  All right.  Going through it -- I'm

6      just going to start on page 93, which is where I have the

7      first objection.  This one's to 298, though -- 290A, excuse

8      me, so I don't think I need to give you direction on that.

9              Going to page 96.  I think that's clear hearsay.

10             Page 97 -- and so when I say that, I'm looking

11     at the copy I've been provided that's been marked in green.

12     I think that's the proposed testimony by Rimini.  That

13     would be page 96, lines 10 to 13.  That should be out.

14             I agree with the arguments I've heard in favor

15     of Oracle on the 402, 403 objections.  If, in fact, the

16     customer has left for -- and didn't go to Rimini, I think

17     that that is a valid 403 objection.

18             And to put that in context, it -- you know,

19     referring directly to 403, the probative value is

20     outweighed by the danger of confusion and misleading the

21     jury or considerations of confusion and cumulativeness.

22             And I say that because I think there is evidence

23     replete throughout the course of the trial, but there

24     certainly have been a certain number of customers, we know

25     that there were 5 percent who left on an annual basis,

1    generally speaking, and that from the testimony that's been

2    previously admitted in this case, there would be a variety

3    of reasons why some of those left, starting with bankruptcy

4    going on up to self-support to just being directly unhappy

5    with Oracle.

6              I think that evidence is in front of the jury.

7    I don't think that what you're talking about here in the

8    Cummins deposition is -- fills a missing link in any way,

9    so to speak, and for that reason I think it should be

10   excluded to customers who left without going to Rimini.

11             So I would rule in favor of Oracle on page 97 as

12   to the lines 8 through 11 and 20 through 25.

13             Is that the same case with Burlington Resources

14   Oil and Gas on page 103?

15             MR. HIXSON:  Yes, Your Honor.

16             THE COURT:  Same ruling.

17             And I'm on -- and that goes over -- essentially

18   that goes from page 103, line 9, through 104, line 3.

19             104, lines 16 through 19, would be hearsay and

20   is excluded.

21             Page 106, ProQuest, is this another client that

22   did not go to Rimini?

23             MR. HIXSON:  Yes, Your Honor.

24             THE COURT:  Same ruling.  There's also some

25   hearsay in there.  That would follow through specifically

1   page 106 and 107, lines 19 through line 2.

2            And page 108, that appears to the Court to be

3   virtually the entire page, but it would be lines 4 through

4   21, specifically on grounds of hearsay and with 403

5   considerations.

6            Page 109, lines 4 to 11, again, hearsay and out.

7            Lines 14 through 20, hearsay and out.  Well, no,

8   it would be through line 17.

9            Same ruling with regard to page 110, lines 11 to

10  15.  Those will be out.

11           Page 111, line 11, through page 112, line 17,

12  that would be out.

13           Page 112, lines 19 through 23, those would be

14  in.  Those are not excludable based on hearsay.

15           Page 113, that appears to refer to the exhibit,

16  and I'm reserving ruling on that.

17           Page 118, Academy Limited, is that also a

18  customer that did not go to Rimini?

19           MR. HIXSON:  Yes, Your Honor.

20           THE COURT:  I'm going to stand by that 403

21  ruling I've made so far, and that would specifically cover

22  page 118, lines 7 through 14.

23           I assume that page 118, line 24, through 119, 3,

24  are referring to the Academy Limited customer; is that

25  correct?

1              MR. HIXSON:  Yes, Your Honor.

2              THE COURT:  That would, therefore, be out under

3    the same rulings and also hearsay.

4              Page 119 -- is that again referring to Academy?

5              MR. HIXSON:  I believe so, Your Honor.

6              THE COURT:  119, lines 21 through 25, would be

7    excluded.

8              Page 120, I think that's admissible.  I don't

9    think it's sufficiently hearsay to be excluded.  I think it

10   reflects a present sense impression of what they do within

11   Oracle.  So 120, lines 1 through 8, would be admissible.

12             Now, going over to page 128, hearsay objection

13   by Oracle.  Lines 23 through 25 reflect what I consider to

14   be a present sense impression and are therefore admissible.

15             Page 129, lines 1 through 22, those appear to me

16   to be referring to present sense impressions, not hearsay,

17   and admissible.

18             Now, going over to the next objection on page

19   152, that would all be hearsay and excluded, from lines 10

20   through 25.

21             MR. HIXSON:  Thank you, Your Honor.  I believe

22   those were the objections.

23             THE COURT:  Pardon?

24             MR. HIXSON:  I believe those were the

25   objections.

1                THE COURT:  Is that the end of it?

2                MR. HIXSON:  Yes.

3                THE COURT:  All right.  Thank you.

4                So does that require some prep time to prepare

5      your video, or can we move right along?

6                MR. GRAY:  I think what we should do is

7      Mr. Hixson and I can go off and take care of finalizing the

8      clip report while Mr. Hampton is on the stand, and

9      hopefully that will give us enough time to cut the video

10     and not delay anything.

11               THE COURT:  All right.  Okay.  Good.  So that's

12     what we need to cover right now.

13               MR. STRAND:  Not to expand the cross-examination

14     to allow them enough time.

15               THE COURT:  All right.  Take it step by step.

16               Okay.  Let's bring in the jury, please.

17               MR. ISAACSON:  Your Honor, I could move a couple

18     exhibits that are not opposed, cleaning up the record from

19     yesterday.

20               THE COURT:  All right.  Go ahead.  Let's bring

21     the jury in.  You can do that as soon as they're here.

22          (Jurors enter courtroom at 8:24 a.m.)

23               THE COURT:  Have a seat, please.

24               Good morning, to you, ladies and gentlemen.  I

25     appreciate your being here, and I appreciate your waiting.

1                But I have to add that the delay incurred by you

2      in waiting until we get started is actually because we're

3      trying to get this case finished and cut down on evidence

4      that may serve no real purpose to the jury.  And we've been

5      successful in that, but it's taken a little bit of time.

6                So bottom line, you're cooling your heels out

7      there, but we're going to be moving through the evidence

8      and testimony in a faster fashion without delay.

9                So all of that stated, the record will show that

10     we are in open court.  Counsel and the parties are present.

11     The jury is all present.

12                And Mr. Hampton continues under cross-

13     examination by Mr. Isaacson.

14                Mr. Isaacson, you're welcome to go forward.

15                MR. ISAACSON:  Good morning, Your Honor.

16                Just cleaning up the record from yesterday,

17     plaintiffs have moved into evidence PTX 6009 and 6010, as

18     well as 2146 and 2153, all which are moved without

19     objection after conferring with the defense counsel.

20                MR. STRAND:  Correct, Your Honor.  No objection.

21                THE COURT:  All right.  Thank you, Mr. Strand.

22                Those are admitted.

23            (Plaintiffs' Exhibits 6009, 6010, 2146 and

24            2153 received into evidence.)

25

1                          SCOTT DEAN HAMPTON

2                  recalled as a witness on behalf of the

3                  Defendants, having been previously sworn,

4                  was examined and testified as follows:

5                      CROSS-EXAMINATION RESUMED

6    BY MR. ISAACSON:

7      Q.    Good morning.

8            Mr. Hampton, we spent a little bit of time

9    yesterday talking about four out of five of -- the

10   environments at Rimini, 2006 to 2011, we talked about how

11   four out of five were on the Rimini system and one out of

12   five were remote.

13           So just coming back to that, I want to talk to

14   you about the one out of five.

15           Now, the Rimini environments that -- the

16   so-called remote environments, during the time -- not the

17   hypothetical environments, but the actual Rimini remote

18   environments, those were not purely remote environments,

19   were they?

20           They were receiving fixes and updates from

21   general -- from general environments on the Rimini system.

22     A.    That's my understanding, yes.

23     Q.    All right.  Right.  And you've seen the testimony

24   about that from the Rimini witnesses?

25     A.    Yes.

1    Q.    All right.  So when we're talking about going 100

2    percent remote from India, and comparing that to what

3    Rimini was doing before, it's the case that what Rimini was

4    actually doing was never one out of five, one out of six,

5    it was never anything where it was 100 percent remote?

6    A.    That's correct.

7    Q.    Now, I want to ask you about automated downloading.

8          Now, you've assumed, for purposes of your

9    hypothetical world where Rimini goes to a 100 percent

10   remote model, that they're also not doing any automated

11   downloading using crawlers; right?

12   A.    I assumed that it would be manual.

13   Q.    That would be manual.  Thank you.

14         And you assumed it would be feasible in 2006 and

15   2007 for Rimini to operate its business using manual

16   downloading?

17   A.    Yes.  And then I assumed that they would operate in

18   a nonaccused fashion.

19   Q.    All right.  And if we could look at PTX 27, which

20   should still be in those binders you have.

21         All right.  This has been admitted into

22   evidence.  This is an e-mail exchange between Mr. Chiu and

23   Mr. Ravin.

24         At the bottom of page 1, Mr. Ravin writes to

25   Mr. Chiu ending with,

1                 "Please use our automation tools to complete the

2       downloads as it is not feasible to complete the entire

3       downloads without such tools or processes."

4                 Did you assume that Rimini was not going to be

5       able to complete the entire downloads that it was doing in

6       2006 and 2007 manually?

7       A.    That's correct.

8       Q.    Okay.  So you -- the business that you're describing

9       would not be able to download -- to do as much downloading

10      as what Rimini was actually doing; is that correct?

11      A.    I assumed that they would have to do it manually,

12      and I added additional labor.

13                Are you talking specifically the 2006, 2007?

14      Q.    Yes.

15      A.    So I think it was 100,000 to 4- or $500,000 for that

16      time period.

17      Q.    Right.  Mr. Ravin isn't saying we can get this done

18      for an extra hundred thousand dollars, he's saying we can't

19      get it done; right?

20      A.    I believe he is, yes.

21      Q.    Okay.  The -- can you look at Exhibit 454, which has

22      been admitted into evidence.

23                And this is a report to Mr. Ravin with a table.

24      This is again in 2007, and George Lester is writing to

25      Mr. Ravin,

3082

1          "Seth, this table helps identify how long it

2     would take to manually download all updates and fixes a

3     client is licensed for."

4          And then you can see in the right-hand column

5     workdays to complete download manually.

6     A.    Yes.

7     Q.    And this is for one, two, three, four, five, six,

8     seven, eight, nine clients.

9          And are you saying that if you take all of those

10    workdays that are required for manual downloading and

11    expand them over the entire client base of Rimini during

12    this period, that that would cost Rimini an extra 100,000

13    to $500,000?

14    A.    That's implicit in the calculation, yes.

15    Q.    Okay.  And if you look at PTX 21, which has also

16    been admitted into evidence, the second page, on the second

17    page --

18    A.    Did you say PTX 21?

19    Q.    21, 2-1, 3 times 7.

20         All right.  This is an e-mail to Mr. Ravin,

21    again from Mr. Lester, and he says in the middle paragraph

22    that begins, "You are correct."

23         "It would be impossible for one person to

24    download all the individual fixes manually in less than a

25    month.  My initial estimates indicate it would take several

1      months to accomplish this task manually."

2              Is that something that you took into account

3      when you made your assumptions about this costing only

4      additional 100,000 to $500,000 to do the manual updates

5      during the period we're discussing?

6      A.     It's been a few years, but I think I had this

7      document.

8      Q.     Okay.  Now, you -- it's your understanding that

9      Oracle Database was necessary to support the Rimini

10     customers and that Rimini has admitted that; correct?

11     A.     I have a different understanding.

12     Q.     All right.  Is it your understanding that in order

13     to support the Rimini's customers it's necessary to have an

14     installed instance of the Oracle Database that you can

15     re-create their environment for, for purposes of generating

16     code that you send them?

17     A.     It's my understanding that there were alternatives,

18     Microsoft and IBM and other databases, that would also

19     work.

20             MR. ISAACSON:  All right.  Can we play

21     Mr. Ravin's deposition, November 18th, 2011, page 448,

22     lines 17 through 24.

23             THE COURT:  Go ahead.

24         (Videotape deposition of Seth Ravin played as

25         follows:)

3084

<pre>
 1              "Q.   And so in order to support those
 2          customers, it's necessary to have an installed
 3          instance of the Oracle database that you can
 4          recreate their environment for purposes of
 5          generating code deliverables that you send
 6          them?
 7              "A.   Yes, and we get that either from
 8          the customer under their license, or we get --
 9          use a developer license, it seems."
10    BY MR. ISAACSON:
11    Q.    All right.  Your understanding is different from
12    Mr. Ravin's; is that correct?
13    A.    It would appear so, yes.
14    Q.    All right.  Now, if Rimini Street were, in fact, not
15    using Oracle Database properly, if they were violating
16    Oracle's copyrights, is it your understanding that Rimini
17    Street would be willing to pay whatever the commercial
18    amount would normally be for that license just like any
19    other customer?
20    A.    Yes, that's what I included in my calculation is the
21    price that they charged.
22    Q.    All right.  So let's -- just to make -- I'm going
23    to -- this is slightly repetitive, but to be clear, your
24    understanding is that if Rimini was violating the Oracle
25    Database copyrights, they would be willing to pay the same
</pre>

3085

1     rate for a license for that as any other customer of

2     Oracle?

3     A.    You're talking from Rimini Street's perspective?

4     Q.    Yes.

5     A.    Yes.  Yes, sir.

6     Q.    Okay.  Now, in this case, you based your estimate of

7     how much Rimini would pay for a license based on -- well,

8     it would -- two servers; is that right?

9     A.    I had a range.  I have two at the minimum and 72 at

10    the maximum.

11    Q.    Right.  Okay.  Let's talk about the minimum one now.

12          So two licenses for two servers; right?

13    A.    Yes, sir.

14    Q.    Okay.  Now, remember in -- you have in other

15    copyright cases measured the price for copyrighted work

16    based on the number of servers, right, that were actually

17    used?

18    A.    You're talking about the *Ajaxo* case?

19    Q.    That would be one, yes.

20    A.    I don't have a direct recollection.  This is 2008.

21    But I assume that you're right.

22    Q.    Okay.  Let's go over this just for clarity purposes.

23          When you say two servers, that's not the number

24    of servers that Oracle Database was actually on at -- at

25    Rimini; correct?

3086

1    A.    You're right.

2    Q.    Right.  And there were, in fact, a hundred and --

3    216 environments on its servers that contained installed

4    copies of Oracle Database; correct?

5    A.    I believe you're right, yes.

6    Q.    And that was used to serve 72 customers; correct?

7    A.    Yes.

8    Q.    Okay.  And what you're saying is -- and this goes

9    back to when Mr. Hilliard was here -- people may not be

10   sure why he was here -- Mr. Hilliard said that, as a matter

11   of technology, you could have put all -- you could have put

12   those copies of Oracle Database on the two servers, and if

13   you -- that that was technically possible.

14         And you're saying since that's technically

15   possible, then you would only have to have a license for

16   two servers.  That's what's going on here; right?

17   A.    That low end of my range would be if the jury

18   decides that two licenses are appropriate, then the damage

19   number was 90,000, and then I also calculated for all 72

20   customers as well.

21   Q.    Right.  And so -- and so the decision point is

22   between how many servers that Rimini actually had Oracle

23   Database on and what they technically could have done;

24   right?

25   A.    How many they would have purchased, correct.

3087

1    Q.    And when you talk about the two, putting it on two

2    servers, we're saying that a company like Rimini could have

3    put Oracle Database on two servers and then served at least

4    72 customers, and then they would only have had to pay for

5    two licenses; right?

6    A.    That's the low end of the range I calculated, yes.

7    Q.    Right.  And the two licenses then would cost only

8    $95,000?

9    A.    I believe that's the price that Oracle charged.

10   Q.    Right.  And now, do you -- is it your -- is it your

11   opinion that Oracle actually permits a company to put

12   Oracle Database on one server and then use that for as many

13   customers as that company wants?

14   A.    That would be a technical question that I don't have

15   an opinion on.

16   Q.    No, I'm not asking you a technical question.  So let

17   me get this straight.

18   A.    I'm sorry.

19   Q.    I'm asking you about Oracle's pricing policies.  All

20   right?

21         I mean, if a company could put Oracle Database

22   on one server and then service a thousand customers, that

23   was technically possible, right, would Oracle's pricing

24   policy permit that, or would Oracle say you've got a

25   thousand customers, we charge for each customer?

```
 1                    MR. STRAND:  Objection, foundation, speculation.
 2                    THE COURT:  Overruled.
 3                    THE WITNESS:  I'm sorry.  I didn't hear the
 4       question.
 5       BY MR. ISAACSON:
 6       Q.    I'm asking you about your understanding of how
 7       Oracle prices, okay?
 8       A.    It's my understanding, based on Mr. Hilliard, that
 9       the pricing was consistent with Ms. Dean's prices that she
10       had.
11                    As far as their policy of allowing the customer
12       to use it for multiple customers, I don't know.
13       Q.    Mr. Hilliard is a technology expert.  He didn't
14       testify to this jury about Oracle's pricing policies.
15       Okay?  He just said how much stuff you can put on a
16       computer.  Okay?
17                    I'm asking you about Oracle's actual pricing
18       policies.  Okay?
19                    Does Oracle actually permit someone to say look
20       how much -- I can put this all on one computer and then I
21       can take a thousand of your customers?
22                    Or does Oracle say, no, that's a thousand
23       customers, we're going to charge you per customer?
24       A.    And is there a question?
25       Q.    Yes.  Which is -- what is your understanding --
```

3089

1    A.    I don't have an understanding of Oracle's policy

2    with regards to whether they would allow two licenses to

3    service 72 customers.

4    Q.    Okay.  Thanks.

5         So when you're -- so when you're talking about

6    your low end, the two -- the two -- just the two licenses,

7    you're just -- you're offering that to the jury as an

8    option, but you don't know what Oracle's pricing policy is?

9    A.    No, I would have to go investigate because I

10   haven't.  I just assumed that they would.

11   Q.    Okay.  And when you estimated what it would cost for

12   72 licenses for 72 customers, you also, again, didn't

13   investigate what Oracle's pricing policy were?

14   A.    I took the 72 -- I got the number from Ms. Dean's

15   report, and I applied the price.  And you're right, I

16   didn't investigate the pricing policy.

17   Q.    Okay.  And it's your understanding that Rimini would

18   have been willing to pay a license for Oracle Database

19   based on standard Oracle pricing policies, the same prices

20   as paid by other customers?

21   A.    Yes.

22        MR. ISAACSON:  Okay.  Can we look at -- it was

23   slide 34 from his presentation.

24   BY MR. ISAACSON:

25   Q.    Now, this was not a slide that you prepared, was it,

1    that we saw this first with Mr. Rowe?

2    A.    I believe the demonstrative company created it.

3    Q.    Okay.

4    A.    The consultants.

5    Q.    All right.  Now, we saw this with Mr. Rowe.

6          And in terms of self-support, you would rely on

7    the testimony of Rimini witnesses as to when and how often

8    that was an available option; is that correct?

9    A.    I -- it's been three years ago, but when I made the

10   calculation, I thought I made it based on the deposition

11   testimony that I read and the record.

12   Q.    That would have been the deposition testimony of the

13   Rimini witnesses?

14   A.    No, it would have been deposition testimony of

15   Oracle witnesses and Rimini witnesses.

16   Q.    Okay.  That's fair.

17          The -- and have you -- in reviewing any of the

18   testimony of the Rimini witnesses at trial about

19   self-support, have you reviewed any testimony you disagreed

20   with?

21   A.    I'm not sure I understand your question.

22   Q.    You mentioned that you've been reviewing the trial

23   transcript, I guess, as it's been going along?

24   A.    Not all of it.

25   Q.    But some of it?

1   A.    I had the opportunity to read Ms. Dean's transcript

2   and Mr. Ravin's, but not all of it.  I haven't read every

3   day.

4   Q.    You've been reading her work product.

5   A.    I have.

6   Q.    And you've been doing that back in your office, and

7   you've been reading some of it.

8         And so my question is, have you read any of the

9   testimony of the Rimini witnesses about self-support that

10  you've disagreed with?

11  A.    I can't think of any, no.

12  Q.    Consulting firms.  Now, it's your understanding that

13  they were in direct competition with Rimini with respect to

14  support less than 5 percent of the time; correct?

15  A.    I'm not sure of the question.  You're asking about

16  consultants?

17  Q.    Well, it says the title of the support -- the title

18  of the slide is Support Options For Customers Leaving

19  Oracle Support.  There's one, self-support, two, consulting

20  firms.

21  A.    Yes.

22  Q.    So is it your understanding that those consulting

23  firms that were in the slide that you were -- that we're

24  showing the jury, that they were in direct competition with

25  Rimini for Oracle support less than 5 percent of the time?

1    A.    No, I can't recall forming that opinion.

2    Q.    Okay.  Did you have -- do you have any understanding

3    as to what percent of the time consulting firms were in

4    direct competition with Rimini for providing Oracle

5    support?

6    A.    I suspect it would depend on which program,

7    PeopleSoft, Siebel, JD Edwards.

8          It's my understanding that these consultants are

9    ex-employees of those three companies, and that there

10   are -- my understanding was that there were hundreds of

11   them, and that they do consulting on a small basis as sole

12   proprietorships.  They're individuals in many instances.

13   Q.    Right.  I asked you what percent of the time.  I

14   didn't hear a percentage in your answer.

15   A.    I'm sorry.  Then I'll try to be brief.

16         I would think they're in competition all the

17   time because they're available.

18   Q.    Okay.  And in terms of being in direct competition

19   with Rimini for third-party support, your position would

20   be, or opinion would be, that those consulting firms are in

21   competition with Rimini 100 percent of the time, direct

22   competition?

23   A.    I believe that they are direct competitors by

24   platform.  They may not support all three programs, but if

25   you have a Siebel program, and you're an ex-Oracle

```
 1    customer, then they're available to consult on Siebel, and
 2    they would be available at any time.
 3    Q.    Now, Mr. Rowe, you understand, is the head of
 4    marketing at Rimini and has been for some time?
 5    A.    Yes.
 6    Q.    You understand that he's knowledgeable about the
 7    competition that Rimini faces?
 8    A.    I would think he would be, yes.
 9    Q.    Right.  Much more knowledgeable than you are; right?
10    A.    Yes.
11    Q.    Okay.  And he has testified in this court that they
12    were in direct competition with these consultants less than
13    5 percent of the time.  That's directly contrary to your
14    assumptions; right?
15    A.    I'm not sure that's directly contrary.  I'm not
16    quite sure what it means to be in competition only 5
17    percent of the time.
18    Q.    Okay.  Third-party providers.  Now, with -- let me
19    ask you some things about the third-party providers.
20          Now, at the time that Rimini got its first
21    customers in 2006, there were no alternative third-party
22    support providers; correct?
23    A.    In 2006.
24    Q.    Yes.
25    A.    It's my understanding that there were third-party
```

```
 1    providers in that year.  That was my understanding.

 2    Q.   Okay.  The -- oh, I'm -- but in 2006, the first

 3    customers were all Siebel; right?

 4    A.   There may have been one PeopleSoft, but you're

 5    right, the majority were Siebel.

 6    Q.   They had no competition for Siebel support, correct,

 7    other than Oracle?

 8    A.   I would think that they would be competing with the

 9    self-support and the consulting firms as well as third

10    party providers that support.

11    Q.   All right.  Can we play Mr. Ravin's deposition

12    November 17th, 2011, line -- page 94, lines 4 through 13.

13              THE COURT:  You may.

14         (Videotape deposition of Seth Ravin played as

15          follows:)

16             "Q. And as of the time Rimini Street launched

17          its first support offering, TomorrowNow is its

18          only credible competitor in the third-party

19          support space?

20             "A. Well, again, we were the only Siebel

21          provider initially.

22             "Q. So there was -- at that point, there was

23          no credible alternative competitor to Rimini

24          Street at the time that it launched Siebel?

25             "A. That's correct."
```

1    BY MR. ISAACSON:

2    Q.    That, what Mr. Ravin said, was contrary to what you

3    assumed; correct?

4    A.    It does, yes.

5    Q.    And then once you're going into PeopleSoft at the

6    beginning of the business, Rimini Street's only credible

7    competitor for third-party support was that company called

8    TomorrowNow; correct?

9    A.    You have to -- I mean, it's qualified as credible.

10   Q.    Yes.

11   A.    And so you have to define credible, but I would

12   agree, yes.

13   Q.    Okay.  And as of February 2007, early 2007,

14   TomorrowNow was the only credible support competitor to

15   Rimini; right?

16   A.    Yes.

17   Q.    Other companies had tried to enter the market but

18   had failed; correct?

19   A.    I believe he's talking about companies that are

20   similar to Rimini Street.

21   Q.    Right.  And they failed?

22   A.    Yes.

23   Q.    And throughout the period 2006, 2011, it's correct

24   that the most frequent competition for Rimini for Oracle

25   support was Oracle?

1    A.    I didn't quite hear the first part of your question.

2    Could you ask again?  I'm sorry.

3    Q.    For 2006 to 2011, the most frequent competition

4    Rimini faced for Oracle support was from Oracle?

5    A.    Most frequent, yes.

6    Q.    Now, after TomorrowNow shut down, now we're

7    toward -- now we're to October, November, 2008, Rimini had

8    only much smaller competitors; correct?

9    A.    Correct.

10   Q.    And going down the list that we see here, we see

11   Spinnaker.  Now, Spinnaker, by 2009, was not growing, it

12   had flattened out in terms of the number of customers it

13   was acquiring; correct?

14   A.    I think that's correct, yes.

15   Q.    Okay.  And Spinnaker only provided support --

16   A.    Excuse me.

17   Q.    Are you okay?

18   A.    I apologize.

19   Q.    Don't apologize for coughing.

20         Spinnaker only provided support for JDE; right?

21   A.    I believe you're right, yes.

22   Q.    So Spinnaker is not a competitor for Siebel or

23   PeopleSoft?

24   A.    Correct, it's a different program or --

25   Q.    So once TomorrowNow goes out of business, the only

1    potential competitors for the other -- for PeopleSoft and

2    Siebel are the other four companies that you listed there;

3    right?

4    A.    Those -- there may be some smaller ones, but these

5    were the larger ones.  So, yes, you're right.

6    Q.    Okay.  So what did you -- what did you assume about

7    the ability of these four companies to compete for Siebel

8    and PeopleSoft products and JDE products that are at issue

9    in this case?

10   A.    I was aware of the fact that they were struggling,

11   and so I considered them, but I had that in mind.

12   Q.    Okay.  When you say you considered them, that's

13   fine, but I want to know what you assumed about their

14   ability to compete for Siebel, PeopleSoft, and JDE after

15   TomorrowNow shuts down?

16   A.    I understand they had limited customers, so they

17   would have been competition but not at the same level as

18   Rimini Street.

19   Q.    Okay.  What was your assumption about the number of

20   customers they had?

21   A.    They were not anywhere near the number that Rimini

22   Street had.

23   Q.    Okay.  Can you tell me what that means?  What's your

24   estimate of the number of customers they had?

25   A.    Oh, it's been a couple years.  I would have to go

1    back and look.  I really don't recall.  But it would be

2    under a hundred, would be my best guess sitting here today.

3    Q.    And collectively how many customers did these four

4    companies win in competition versus Rimini?

5    A.    I don't know.  They're in the market, they're

6    providing services, they didn't have a lot of customers, so

7    it would be commensurate with the environment.

8    Q.    Well, what would be your estimate of -- taking all

9    four of them together, of the number of customers they took

10   from Rimini for the products at issue in this case,

11   PeopleSoft, the JDE product at issue in this case, and

12   Siebel?

13   A.    I don't have a number in my head.  I don't have an

14   opinion.

15   Q.    Do you know Mr. Rowe said the number was two?

16   A.    No, I wasn't aware of that.

17   Q.    Versytec, what product do they make?

18   A.    Which product do they support?

19   Q.    Yes.

20   A.    I don't recall.

21   Q.    Okay.  Do they -- why do you have them on this

22   chart?

23   A.    I didn't put them on the chart.  This chart was

24   prepared by the demonstrative company.

25           If they're in my report, then they're in the

3099

1    report.  I generated the report, not the exhibit.

2    Q.    This is slide 34 from the presentation during your

3    direct.

4    A.    Yes, it is.

5    Q.    Right.  You testified about this slide.  Why did you

6    testify about a slide with Versytec on it?

7    A.    Because I understand that Versytec was a competitor.

8    Q.    A competitor for what?

9    A.    Three years after the fact, I just don't recall.

10   Q.    Okay.  You know, it's been -- are you aware that the

11   Rimini witnesses have said that Versytec supported JDE

12   World, which is not a product in this case?

13   A.    I wasn't aware of that.

14   Q.    They're completely -- Versytec's completely

15   irrelevant to this case, and you didn't know that?

16   A.    I would have to go back and look at my report.  I

17   wrote the report three years ago.  So, I'm sorry, I don't

18   know sitting here today.

19            MR. ISAACSON:  All right.  I don't have any

20   further questions.

21            THE COURT:  Redirect examination?

22            MR. STRAND:  Thank you, Your Honor.

23            THE COURT:  Mr. Strand.

24

25

                    REDIRECT EXAMINATION

1

2    BY MR. STRAND:

3    Q.    Good morning, Mr. Hampton.  I just have a couple or

4    three questions.

5              Yesterday you and Mr. Isaacson talked at some

6    length about your calculation as to the value of Rimini's

7    use of Oracle's copyrighted material.  Do you recall that

8    series of questions?

9    A.    Yes.

10   Q.    And you also testified at some length regarding

11   Rimini's profits from that infringing use.  Do you recall

12   that series of questions?

13   A.    Yes, I do.

14   Q.    Would you look with me, please, at your supplemental

15   report.  It's in the back of your white notebook there.  Do

16   you have that in front of you?

17   A.    Yes, I do.

18   Q.    The September of 2015 report?

19   A.    I have the report.

20   Q.    Okay.  Would you look with me, please, sir, at

21   paragraph 6 of that report here on page 2, carryover on top

22   of page 6 -- 7.

23   A.    Paragraph 6?

24   Q.    Yes.

25   A.    May I take just a moment to look at it?

3101

1    Q.    Sure.   Please do.

2    A.    Okay.   Thank you.

3    Q.    You've read that paragraph?

4    A.    I have.

5    Q.    Okay.   Tell me, following up on your conversations

6    with Mr. Isaacson yesterday, is there a relationship

7    between Rimini's value of use of Oracle's copyrighted

8    materials and Rimini's profits from the use of those

9    copyrighted materials?

10   A.    Yes, there are.

11   Q.    What is that relationship?

12   A.    Well, the calculation's based on avoided cost.   So

13   if you avoid a cost, you gain more profit.

14          So it's really -- another way to look at it

15   would be the additional profit which Rimini made due to the

16   efficiencies that they gained from their wrongful acts.

17   Q.    And so the avoided costs that you testified to was

18   what amount?

19   A.    $9.3 million.

20   Q.    And the additional profits that Rimini would have

21   obtained based upon those avoided costs would be in what

22   amount?

23   A.    $9.3 million.

24          MR. STRAND:   Thank you.   I have no further

25   questions.

1               MR. ISAACSON:  Nothing further, Your Honor.

2               THE COURT:  All right.  Mr. Hampton, that will

3     complete your testimony.  You may step down.  Thank you.

4               MR. STRAND:  Your Honor, I think we've

5     coordinated so that we're ready for the depositions.

6               THE COURT:  All right.

7               Mr. Gray, would you explain to the jury what the

8     prospective video deposition is.

9               MR. GRAY:  Yes, sir.  Rimini Street next calls

10    by video deposition Mr. Richard Cummins, vice-president of

11    sales support North America from Oracle.  And the time is

12    about 20 minutes.

13              And we also move into evidence DTX 270, DTX 161,

14    DTX 280, DTX 282, DTX 284, DTX 288, DTX 277, and, subject

15    to the Court's ruling, DTX 274, DTX 290A and DTX 292.

16              MR. HIXSON:  Oracle maintains its objections to

17    DTX 274, DTX 290A, and DTX 292.

18              As to the others, I believe they're either

19    preadmitted or there's no objection.

20              THE COURT:  Okay.  And the last three will not

21    be necessary for purposes of the video, which has been

22    reviewed and discussed by the Court, so I'll reserve ruling

23    on those.  And the others are admitted.

24              (Defendants' Exhibits 270, 161, 280, 282,

25              284, 288, 277 received into evidence.)

```
 1          (Videotape deposition of Richard Cummins
 2          played as follows:)
 3             PAGE 5:23 TO 6:01 (RUNNING 00:00:07.887)
 4          "Can you just state your name and address for
 5          the record.
 6          A. Yes.  It's Rick -- Richard Cummins, Jr.,
 7          Highlands Ranch, Colorado.
 8           PAGE 6:05 TO 6:06 (RUNNING 00:00:04.576)
 9          Q. Thank you.  And where do you work at?
10          A. Oracle Corporation.
11           PAGE 35:19 TO 35:20 (RUNNING 00:00:03.712)
12          Q. BY MS. REDMOND:  Sure.  Does Oracle
13          compete on price for support?
14           PAGE 35:22 TO 35:25 (RUNNING 00:00:10.575)
15          THE WITNESS:  In my job role we don't
16          negotiate the price for support.  So, you
17          know, we certainly sell the value of support,
18          but we don't negotiate the price.
19           PAGE 93:08 TO 93:15 (RUNNING 00:00:20.351)
20          Q. BY MS. REDMOND:  All right.  The court
21          reporter has marked and handed you what's
22          been marked as Deposition Exhibit 1.
23          Do you recognize Deposition Exhibit 1?  Take
24          a moment to look at it.
25          A. I do.
```

3104

1          Q. And what is Exhibit 1?

2          A. Actually, let me look at this.  This isn't

3           PAGE 93:16 TO 93:17 (RUNNING 00:00:03.073)

4          what I thought it was.

5          Q. Sure.

6           PAGE 93:18 TO 94:06 (RUNNING 00:00:48.345)

7          A. I believe this is -- this isn't a

8          spreadsheet that I recall keeping.  What I

9          believe it is is a list of customers that had

10         left, and the top 25 are customers that we

11         are targeting to bring back to support.

12         Q. Okay.  What I've done, just so the record

13         is clear, this is Oracle Number 0273695, and

14         it was produced in its native form.  So we've

15         printed it out, and then just for your

16         convenience, I've attached tabs on the side

17         with numbers on them.

18         A. Okay.

19         Q. And so I'm going to give you a pen, so as

20         we go through I'll ask you to mark a

21         particular number -- page and number so the

22         record will be clear.

23         A. Okay.

24          PAGE 98:01 TO 98:09 (RUNNING 00:00:16.593)

25         Q. Okay.

1          A. Again, I don't know specifically who put

2          this together.

3          Q. Okay.

4          A. So, you know, these are notes from either

5          the rep or whoever put it together.  So I'm

6          simply reading from the notes here.

7          Q. Okay.  And are these spreadsheets, are

8          these from the OKS system?

9           PAGE 98:11 TO 98:14 (RUNNING 00:00:11.243)

10          THE WITNESS:  Again, it's not my document.

11          You know, I would speculate that it was like

12          the at risk report where data was just given

13          to someone and they put it in a spreadsheet.

14           PAGE 109:18 TO 109:20 (RUNNING 00:00:07.207)

15          Q. BY MS. REDMOND:  Did Oracle ever cut its

16          prices to try to compete for that business on

17          a price standpoint?

18           PAGE 109:22 TO 109:23 (RUNNING 00:00:05.195)

19          THE WITNESS:  I'm not aware of Oracle

20          competing on price with third-party support.

21           PAGE 110:15 TO 110:15 (RUNNING 00:00:02.717)

22          What does way below TC mean?

23           PAGE 110:17 TO 110:22 (RUNNING 00:00:15.065)

24          THE WITNESS:  PeopleSoft had a term called

25          then current pricing.

```
1          Q. BY MS. REDMOND:  Okay.
2          A. And so TC refers to then current pricing.
3          Q. So if a customer actually was going to
4          drop products, why would that not save the
5          customer money?
6           PAGE 110:24 TO 111:10 (RUNNING 00:00:41.220)
7          THE WITNESS:  The concept is that a customer
8          gets discounts on the initial license sale,
9          and support is a -- is connected to the
10         original license.  So if a customer, say,
11         gets a, you know, hypothetical 90 percent
12         discount on licenses, then they're paying
13         much less for support than a customer who got
14         a lower discount on the license.
15         Q. BY MS. REDMOND:  Okay.
16         A. So once a customer decides they want to
17         drop some application or functionality, then
18         it gets repriced at a standard discount, so
19         it sets more of a level playing field.
20          PAGE 112:19 TO 112:23 (RUNNING 00:00:11.371)
21         THE WITNESS:  In my experience Oracle's very
22         consistent in the way we handle customer
23         requests.
24         Q. BY MS. REDMOND:  And how is it consistent?
25         A. Consistent in that we don't discount the
```

1        cost of support.

2         PAGE 112:25 TO 113:09 (RUNNING 00:00:29.480)

3        A. As a point of clarification on this

4        document, you know, none of these customers

5        you've asked me about, when I first became

6        part of Oracle, I had all the PeopleSoft, JD

7        Edwards customers for the first year.

8        Q. Okay.

9        A. You can see dates in here that are 2006,

10       2007.  After that first year, then we had an

11       integrated model.  So, you know, for the very

12       first year I still dealt with the PeopleSoft,

13       JD Edwards.  After that, those people were

14       spread across, you know, multiple managers.

15        PAGE 113:15 TO 113:17 (RUNNING 00:00:13.011)

16       Q. BY MS. REDMOND:  All right.  You have what

17       the court reporter's marked as Exhibit 2, and

18       just for the record that's been Bates labeled

19       Oracle 0261152.

20        PAGE 113:23 TO 114:07 (RUNNING 00:00:28.049)

21       Q. Have you ever -- do you recognize this

22       document?

23       A. I -- it appears to be a cancellation

24       report.

25       Q. Okay.

3108

1         A. Or a cancellation spreadsheet.

2         Q. And what's a cancellation spreadsheet?

3         A. When Oracle -- when PeopleSoft first moved

4         into Oracle, I tracked cancellations

5         manually, so I -- to better understand why

6         our customers were cancelling support.

7          PAGE 120:01 TO 120:03 (RUNNING 00:00:07.671)

8         Q. In your experience have any customers

9         indicated that they are heavily customized

10        and unable to use support or upgrade their

11        software?

12         PAGE 120:05 TO 120:10 (RUNNING 00:00:19.031)

13        THE WITNESS:  I've had customers indicate

14        that they're heavily customized and they

15        don't get the value out of support.  But even

16        if a customer's heavily customized, they

17        still have the rights to upgrade.

18        Q. BY MS. REDMOND:  If a client is heavily

19        customized, is upgrade always possible?

20         PAGE 120:12 TO 120:12 (RUNNING 00:00:02.425)

21        THE WITNESS:  Upgrade's always possible.

22         PAGE 122:05 TO 122:06 (RUNNING 00:00:05.854)

23        Q. BY MS. REDMOND:  How do customizations

24        impact Oracle's ability to support customers?

25         PAGE 122:09 TO 122:19 (RUNNING 00:00:36.088)

1          THE WITNESS:  Customizations make it more

2     challenging because, you know, we develop an

3     application, and that application has very

4     specific functionality in it.  And because we

5     developed it, we're also able to support it,

6     and we understand what's in the application.

7     Like anything, if I change something and only

8     I know those changes, naturally it's going to

9     make it more challenging because Oracle

10    didn't make those changes.

11         Q. BY MS. REDMOND:  For the changes Oracle

12    didn't make, are supporting those changes

13    included in the support contract?

14          PAGE 122:21 TO 123:04 (RUNNING 00:00:27.765)

15         THE WITNESS:  Oracle typically does anything

16    we can to support customers, so, you know, we

17    -- I'm not aware of us saying, "You

18    customized, so we don't support you."  I

19    think we would make best efforts to do that,

20    but, again, it's more challenging, because

21    for us to support something we didn't develop

22    is logically difficult.

23         Q. BY MS. REDMOND:  Would it be more costly

24    for a customer to support a program that's

25    highly customized?

3110

```
1           PAGE 123:06 TO 123:14 (RUNNING 00:00:23.499)

2           THE WITNESS:  It could be.

3           Q. BY MS. REDMOND:  And how could it be?

4           A. They could require consulting resources or

5           they could require ACS services, but it

6           doesn't -- you know, it's not a

7           black-and-white thing where they customize

8           and all of the sudden it's more expensive.

9           It could or couldn't.

10          Q. Okay.  And when do consulting services get

11          involved?

12           PAGE 123:17 TO 123:21 (RUNNING 00:00:13.638)

13          THE WITNESS:  There's not a black-and-white

14          magic line where they get involved, but it's

15          an option for customers to use if they feel

16          that, you know, they've not been able to get

17          what they needed from Oracle support.  It's

18          just one other option for them.

19           PAGE 123:22 TO 124:01 (RUNNING 00:00:11.111)

20          Q. BY MS. REDMOND:  Is there a point for a

21          customer that Oracle support says, "We've

22          done everything we can to help you, and

23          there's nothing further we can do."  Is

24          that -- at any time does Oracle communicate

25          that to customers?
```

3111

```
 1          PAGE 124:03 TO 124:05 (RUNNING 00:00:09.521)
 2          THE WITNESS:  There can be situations where
 3          Oracle says, "Our standard support is not
 4          going to be able to support your
 5          customizations."
 6          PAGE 128:23 TO 129:06 (RUNNING 00:00:24.504)
 7          Q. BY MS. REDMOND:  And if you look down at
 8          row 106, it indicates, "Customer needed to
 9          cut cost and no feasible options available to
10          reduce support fees."
11          Do you see that?
12          A. I do.
13          Q. In your experience interacting with
14          customers have you ever had a situation where
15          the customer needed to cut costs and in your
16          opinion there was no feasible options
17          available to reduce support fees?
18          PAGE 129:08 TO 129:12 (RUNNING 00:00:18.737)
19          THE WITNESS:  I mean, in my experience we
20          handle customers very consistently.  And as
21          we talked before, we will offer them caps or
22          the opportunity to downsize a license.  And
23          if those result in no savings, then we don't
24          have options to reduce support fees.
25          PAGE 129:13 TO 129:22 (RUNNING 00:00:22.536)
```

3112

```
 1              Q. BY MS. REDMOND:  Okay.  And if you'll go
 2         to Tab 5 of Exhibit 2 and mark it with a 5.
 3         A. (Witness complies.)
 4         Q. And I think if you'll look at row 33 --
 5         133.
 6         I'm sorry.
 7         A. Okay.
 8         Q. It talks about, "Corporate funding issues.
 9         Supporting inhouse."
10         Do you see that?
11         A. I do.
12          PAGE 150:21 TO 151:02 (RUNNING 00:00:17.256)
13         Q. BY MS. REDMOND:  All right.  Mr. Cummins,
14         the court reporter has handed you what's been
15         marked as Deposition Exhibit 4.
16         Do you recognize Deposition Exhibit 4?
17         A. Yes.  It's similar to the prior exhibit we
18         just looked at.
19         Q. Which exhibit is it similar to?
20          PAGE 151:03 TO 151:09 (RUNNING 00:00:17.994)
21         A. Exhibit 3.
22         Q. Okay.  Do you know who generates
23         Deposition Exhibit 4?
24         A. The operations team, Patricia Murguia.
25         Q. Okay.  And do you provide information
```

3113

1           that's included on Exhibit 4?

2           A. Yes.

3            PAGE 151:23 TO 152:01 (RUNNING 00:00:12.793)

4           Q. Okay.  On page 2 of Exhibit 4 in the

5           bottom table it talks about -- I believe that

6           table refers to top cancellations?

7           A. Yes.

8            PAGE 156:07 TO 156:19 (RUNNING 00:00:25.823)

9           Q. BY MS. REDMOND:  The court reporter has

10          just handed you what's been marked as

11          Deposition Exhibit Number 5.

12          Do you recognize Deposition Exhibit 5?

13          A. Yes.

14          Q. And what is Deposition Exhibit 5?

15          A. It's a survey that was put together.

16          Q. And who was the survey put together by?

17          A. I don't remember.

18          Q. Did you prepare this document?

19          A. No.

20          Q. Do you know who prepared this document?

21          A. I believe it was the marketing team.

22           PAGE 156:20 TO 156:22 (RUNNING 00:00:03.833)

23          Q. Do you know who on the marketing prepared

24          this document?

25          A. I don't.

3114

```
 1          PAGE 156:23 TO 157:05 (RUNNING 00:00:14.837)
 2       Q. And do you know what the survey was?
 3       A. I don't.  What the survey --
 4       Q. Do you know -- let's take a step back.  Do
 5          you know who conducted the survey?
 6       A. No.
 7       Q. Do you know what customers were asked in
 8          connection with the survey?
 9       A. I'm not sure this was even customers.
10          PAGE 157:06 TO 157:23 (RUNNING 00:00:43.237)
11       Q. Okay.  Do you know who was surveyed?
12       A. The second sheet says it was five renewal
13          managers.
14       Q. Okay.
15       A. So those are the phone interviews.
16       Q. Okay.  Do you know why the survey was
17          conducted?
18       A. It was conducted to get a feel for what
19          these managers were seeing in their renewals.
20       Q. Okay.  Do you recall ever seeing this
21          document?
22       A. Yes.
23       Q. Okay.  Did you use this document in
24          connection with your job duties?
25       A. Yes.
```

1    Q. And what did you use it for?

2    A. It's -- it was an indicator of what our

3    managers were seeing as they talked with

4    customers.

5     PAGE 158:15 TO 158:15 (RUNNING 00:00:09.288)

6    Q. Okay.  And on page, of Exhibit 5, 254349,

7    I

8     PAGE 158:16 TO 159:04 (RUNNING 00:00:48.060)

9    believe it -- the question is: "What do you

10   anticipate to be your greatest challenge in

11   closing support renewals," and it's H2 FY09.

12   What's H2 refer to there?

13   A. The second half.

14   Q. Okay.  So Quarters 3 and 4?

15   A. Yes.

16   Q. Okay.  And I believe the first highlight

17   was -- discusses customer budget constraints.

18   Do you see that?

19   A. Yes.

20   Q. Is that consistent with what you

21   experienced in the market at that time, that

22   was a challenge?

23   A. Budget constraints in the midst of the

24   economic recession, yes, definitely a

25   challenge.

3116

```
 1          PAGE 159:05 TO 159:13 (RUNNING 00:00:18.372)
 2      Q. Okay.  And it says, "Justifying a 3
 3      percent increase in this economy is going to
 4      be very tough."
 5      Do you see that?
 6      A. Yes.
 7      Q. Did you have any customers that agreed to
 8      a 3 percent increase in the year of 2009?
 9      A. Yes.
10      Q. Okay.  How many customers agreed to that?
11      A. I don't know the number.
12          PAGE 182:07 TO 182:09 (RUNNING 00:00:05.419)
13      Q. BY MS. REDMOND:  All right.  The court
14      reporter has just handed you what's been
15      marked as Deposition Exhibit 10.
16          PAGE 182:10 TO 182:16 (RUNNING 00:00:25.379)
17      Do you recognize that exhibit?
18      A. Yes.
19      Q. And what is that exhibit?
20      A. It's an e-mail from Juan Jones to Buffy
21      Ransom on cancellation analysis for the JD
22      Edwards product line.
23      Q. Is this a cancellation analysis you
24      prepared?
25      A. Yes.
```

```
 1              PAGE 183:07 TO 183:12 (RUNNING 00:00:15.903)
 2          Q. Okay.  And on slide number 207959 there
 3          has -- there's a list of true cancellation
 4          types.  Do you see that?
 5          A. Yes.
 6          Q. Is that a true and accurate list of the
 7          reasons customers cancel their Oracle
 8          support?
 9              PAGE 183:14 TO 183:16 (RUNNING 00:00:08.048)
10          THE WITNESS:  I think these are many reasons.
11          I -- there could be others I'm sure, but
12          these are many of the reasons.
13              PAGE 183:23 TO 184:03 (RUNNING 00:00:21.497)
14          Q. Would third party also be included in the
15          category move to support competitor?
16          A. It could be.
17          Q. What else would be included in the
18          category of move to support competitor?
19          A. That's probably primarily third party.
20              PAGE 193:19 TO 194:05 (RUNNING 00:00:20.897)
21          Q. BY MS. REDMOND:  The court reporter has
22          handed you what's been marked as Deposition
23          Exhibit 13.  Have you ever seen Deposition
24          Exhibit 13?
25          A. I have.
```

3118

1     Q. All right.  Did you assist in preparing

2     Deposition Exhibit 13?

3     A. No.

4     Q. Do you know who prepared Deposition

5     Exhibit 13?

6     A. I believe it was Nancy Lyskawa.

7     Q. Okay.

8     A. Or Nancy's team.

9      PAGE 196:01 TO 196:11 (RUNNING 00:00:32.279)

10     Q. BY MS. REDMOND:  The court reporter's

11     handed you what's been marked as Deposition

12     Exhibit 14.

13     Have you ever seen Deposition Exhibit 14?

14     A. Yes.

15     Q. Where have you seen Deposition Exhibit 14?

16     A. Where?

17     Q. Uh-huh.

18     A. It was given to my team from, again, Nancy

19     Lyskawa's team.

20     Q. Okay.  Have you seen an updated

21     third-party competitive matrix recently in

22     the last four years?

23      PAGE 196:13 TO 196:15 (RUNNING 00:00:10.876)

24     THE WITNESS:  No, I haven't.

25     Q. BY MS. REDMOND:  Was this matrix ever used

3119

1          by you in connection with your sales

2          activities?

3           PAGE 196:17 TO 196:21 (RUNNING 00:00:14.616)

4          THE WITNESS:  Yes.

5          Q. BY MS. REDMOND:  And how was it used?

6          A. It was used to help my sales team

7          understand who at the -- who at the time was

8          offering third-party support.

9           PAGE 197:09 TO 197:21 (RUNNING 00:00:35.706)

10          Q. Okay.  So -- and you said you don't have a

11          similar document as we sit here today?

12          A. Today I do not.

13          Q. Okay.  And why do you not have a similar

14          document?

15          A. Again, this was produced by marketing.

16          Q. Okay.

17          A. So I don't know if they are -- why I don't

18          have it.  You know, from my standpoint, the

19          reason I don't have it put together is the

20          primary third-party competitor we see now is

21          Rimini -- or Rimini.  So, you know, I don't

22          see a bunch of different third-party

23          competitors.

24           PAGE 197:24 TO 198:05 (RUNNING 00:00:14.458)

25          Q. BY MS. REDMOND:  The court reporter has

3120

1          handed you what's been marked as Deposition

2          Exhibit 15.

3          Do you recognize Deposition Exhibit 15?

4          A. Yes.

5          Q. And what is it?

6          A. It's a -- another document that was put

7          together by the marketing team under Nancy

8          Lyskawa.

9           PAGE 198:18 TO 198:23 (RUNNING 00:00:18.572)

10          Q. Okay.  The section on page 270892 of

11          Exhibit 15, that first page, there is some

12          intellectual property and confidentiality

13          issues listed there.  There are some

14          questions.

15          Do you see that?

16          A. Yes.

17           PAGE 199:04 TO 199:10 (RUNNING 00:00:14.686)

18          Q. BY MS. REDMOND:  So what was the purpose

19          of this section?

20          A. The purpose was -- again, the document's

21          purpose was to equipment our internal sales

22          team, so I'm not aware of them giving these

23          questions to customers.

24          Q. Okay.  So what would they have used these

25          questions for, then?

1          PAGE 199:12 TO 199:19 (RUNNING 00:00:17.636)

2          THE WITNESS:  They would have encouraged

3          customers to ask these questions when they're

4          talking with a third-party support provider.

5          Q. BY MS. REDMOND:  Okay.  And to your

6          knowledge, did they actually use these

7          questions and encourage customers to ask

8          these questions of third-party support

9          providers?

10         A. On occasion I believe they did.

11          PAGE 200:04 TO 200:06 (RUNNING 00:00:06.634)

12         Q. BY MS. REDMOND:  The court reporter has

13         handed you what's been marked as Deposition

14         Exhibit 16.

15         Do you recognize that document?

16          PAGE 200:07 TO 200:10 (RUNNING 00:00:07.286)

17         A. Yes.

18         Q. And what is that document?

19         A. This is an additional document that was

20         put together by Nancy Lyskawa's team.

21          PAGE 200:24 TO 201:10 (RUNNING 00:00:31.201)

22         Q. Okay.  It indicates in this document that

23         you were driving the third-party swat team

24         initiative?

25         A. Yes.

3122

1          Q. Is that true?

2          A. It was actually Rob Lachs who was on my

3          team, but it ultimately rolled up to me.

4          Q. Okay.  And it indicates that there's a

5          website and portals.  Do you see that?

6          A. Yes.

7          Q. And are there any websites or portals

8          regarding competitive intelligence about

9          third-party support providers, as you sit

10         here today?

11          PAGE 201:13 TO 201:14 (RUNNING 00:00:02.747)

12         THE WITNESS:  As of today, I don't believe

13         there are.

14          PAGE 206:13 TO 206:16 (RUNNING 00:00:12.220)

15         Q. BY MS. REDMOND:  For customers who have

16         left Oracle support and want to come back to

17         Oracle for support, is there any cost

18         associated with that customer coming back to

19         Oracle?

20          PAGE 206:18 TO 207:04 (RUNNING 00:00:33.803)

21         THE WITNESS:  Is there a cost was the

22         question?

23         Q. BY MS. REDMOND:  Yes.

24         A. We -- customers have to pay back support,

25         which means they pay for support from the

3123

1           time they left to the time they return.  And

2           the reason for that is Oracle's continuing to

3           develop the software, so it wouldn't make

4           sense for a customer to leave and the rest of

5           the customer base to pay for the ongoing

6           development and then a customer to come back

7           having not paid for any of that and get the

8           benefits of that development.

9           Q. Okay.  Is back support ever waived?

10           PAGE 207:06 TO 207:22 (RUNNING 00:00:40.020)

11           THE WITNESS:  I'm not aware of situations

12           where it's been waived.

13           Q. BY MS. REDMOND:  How about reduced, has

14           back support ever been reduced, to your

15           knowledge?

16           A. To my knowledge, it has not been.

17           Q. Okay.  Is there any penalty associated

18           with a customer who wants to come back to

19           Oracle?

20           A. There is a penalty associated.

21           Q. Okay.  What is that penalty?

22           A. It's 50 percent of the back support.  And

23           that's often the piece that we negotiate.

24           Q. Okay.  Is that fee ever -- is the penalty

25           ever waived?

3124

1          A. Sometimes it is.

2          Q. Okay.  Is the penalty ever reduced?

3          A. Sometimes.

4          Q. How often is it reduced?

5           PAGE 207:24 TO 207:25 (RUNNING 00:00:08.733)

6          THE WITNESS:  In my space I would say that

7          quite a bit of the time it's reduced.

8           PAGE 212:08 TO 212:10 (RUNNING 00:00:05.998)

9          Q. BY MS. REDMOND:  Sure.  Has Oracle had to

10         reduce its prices to compete with third-party

11         competitors?

12          PAGE 212:12 TO 212:15 (RUNNING 00:00:10.468)

13         THE WITNESS:  Oracle doesn't reduce its

14         prices to win customers back whether it's

15         with third parties or whatever reason the

16         customer leaves.  Just as a policy, we cannot

17         do that.

18          PAGE 212:16 TO 213:07 (RUNNING 00:00:54.689)

19         Q. BY MS. REDMOND:  Okay.  If one of your

20         customers decides paying for Oracle support

21         is too expensive for their circumstances,

22         what are the options for that customer?

23         A. Several of the things we've already gone

24         over, so they can -- we'll look at

25         contractual caps, which could impact the

1        amount of increase they have in any given

2        year.  We can look at how they were licensed.

3        We can look at their initial discount on the

4        license.

5        They may have been -- again, support is a

6        function of that original license deal, so if

7        they received a substantial discount on a

8        license, their support could be substantially

9        less than a customer who's similarly

10       licensed.  So we look at that side of it.  We

11       look at, you know, are they fully utilizing

12       support.  So there may be more value we can

13       give them for what they're paying.

14         PAGE 213:14 TO 213:23 (RUNNING 00:00:28.554)

15       Q. BY MS. REDMOND:  Outside of Oracle.  Any

16       customer that comes to you, what are their

17       options?

18       A. They could stay with Oracle and, you know,

19       go through some of the things we just

20       discussed.  They could choose to support

21       inhouse.  Or they could choose to work with

22       the independent contractor or, you know,

23       something that's a customizable-type

24       solution.

25       Q. Is third-party support a choice for those

3126

1          customers?

2          A. It is a choice.

3           PAGE 214:20 TO 215:06 (RUNNING 00:00:26.013)

4          Q. BY MS. REDMOND:  The court reporter has

5          handed you what has been marked as Deposition

6          Exhibit 18.

7          Have you ever seen this document before?

8          A. I have.

9          Q. And where have you seen this document?

10         A. This is a document prepared by Rob Lachs

11         who reported to me during this time frame.

12         The document's dated 2007.

13         Q. Okay.  Did you assist in preparing this

14         document?

15         A. I reviewed the document.  I didn't assist

16         in preparing it, but I reviewed it after Rob

17         prepared it."

18         (End of videotape deposition.)

19              MR. GRAY:  Rimini Street next calls by video

20    deposition Mr. Juan Jones, senior vice-president of Oracle.

21    The video is 20 Minutes.

22              Rimini Street moves DTX 20, DTX 315, DTX 341,

23    DTX 342, DTX 105, DTX 276, DTX 345, which is subject to the

24    Court's ruling, and all of those are either admitted or

25    agreed to be admitted except for 345.

1           MR. HIXSON:  Oracle reserves its objection to

2    345, as previously noted, but does not object to the

3    others.

4           THE COURT:  All right.  Those may all be used

5    with the exception of the one upon which the Court's

6    reserving rulings.

7           (Defendants' Exhibits 20, 315, 341, 342, 105,

8           276 received into evidence.)

9           (Videotape deposition of Juan Jones played as

10          follows:)

11          PAGE 6:09 TO 6:17 (RUNNING 00:00:19.064)

12          "Q Will you please state your name and

13          address for the record?

14          A Yes, Juan Carlos Jones, 415 Cranleigh

15          Court, San Ramon, California 94583.

16          Q Okay.

17          And who are you presently employed by?

18          A Oracle.

19          Q And what is your current title?

20          A Senior Vice President.

21          PAGE 12:24 TO 13:16 (RUNNING 00:00:47.737)

22          Are customers required to purchase support

23          from Oracle?

24          A Customers are not required to purchase

25          support from Oracle.  It's at their option.

3128

1          Q What other choices do customers have other

2          than purchasing their support from Oracle?

3          A Well, they certainly have the -- you know,

4          they certainly have the choice of having

5          their folks in-house sort of, you know, do

6          their maintenance.

7          But we think we offer a tremendous amount of

8          value in the support that we provide.

9          Q Okay.

10          Any other options for customers other than

11          doing in-house?

12          A Predominantly in-house.  They can look to,

13          you know, maybe bring someone on board or

14          maybe have someone that helps them with --

15          maintain their systems.

16           PAGE 13:17 TO 13:24 (RUNNING 00:00:13.900)

17          Q Okay.

18          Is that person an employee of the company

19          or are you referring to some sort of third

20          party?

21          A Usually, it's some sort of, you know,

22          employee.

23          Q Okay.

24          Can customers use third-party support

25          maintenance providers?

```
 1           PAGE 14:02 TO 14:06 (RUNNING 00:00:08.412)

 2           THE WITNESS:  Well, we -- we provide the

 3           software and we have the intellectual

 4           property to service it, so it would typically

 5           be us.

 6           BY MS. REDMOND:

 7           Q Okay.

 8           PAGE 14:07 TO 14:11 (RUNNING 00:00:10.392)

 9           How about an independent consultant?

10           Could a customer hire some sort of

11           independent consultant to consult with them

12           to help them support their software?

13           A They could, yes.

14           PAGE 14:18 TO 14:20 (RUNNING 00:00:09.545)

15           And what does Oracle charge for support?

16           A Typically, we charge 22 percent of the net

17           license fee.

18           PAGE 14:21 TO 15:11 (RUNNING 00:00:44.078)

19           Q Okay.

20           Is that amount negotiable?

21           A Well, there is a negotiation that takes

22           place when the customer licenses the

23           software, because it's 22 percent of the net

24           fee, typically.

25           That is where the -- you know, that is where
```

3130

1          the negotiation or the negotiable piece of it

2          happens.

3          And obviously, customers are looking at sort

4          of the total cost of ownership.  Typically,

5          when they license software, they look at some

6          horizon and then they come up with a business

7          case that makes sense for their company.

8          And that's where companies are competing for

9          the license, as well as the support that they

10         provide, and so there is a negotiation that

11         takes place there, yes.

12          PAGE 15:12 TO 16:05 (RUNNING 00:00:44.808)

13         Q How about after a customer has purchased

14         support and now -- or I'm sorry, after the

15         customer has purchased the software and say

16         you're in year three and they are looking to

17         renew their support.

18         Can they negotiate the price at that time?

19         A Well, as you sort of commented, they are

20         looking to renew, we've pretty much set the

21         price once it's agreed with the customer at

22         the point of licensing the software.  That's

23         when the agreement takes place.

24         And so, in fact, what we do and what my

25         organization does is continue to renew, and

1           that's why we refer to it as support renewal

2           sales, renew the agreement that's been put in

3           place.

4           Q Sure.

5           But in the process of renewing that

6           agreement, does Oracle negotiate on price for

7           customers?

8           A Typically do not.

9            PAGE 16:07 TO 16:13 (RUNNING 00:00:17.879)

10          Is there any discounts Oracle can provide

11          when you're in the renewal process?

12          A Typically not.

13          Q Is there any situations where you can

14          recall a discount was provided?

15          A There isn't a situation I can recall off

16          the top of my head.

17           PAGE 16:17 TO 16:22 (RUNNING 00:00:15.238)

18          What about customers who are having financial

19          pressure to reduce costs?  Is there any

20          situation you can recall where Oracle

21          actually was willing to reduce the price of

22          their support renewal in that situation?

23          A Typically not.

24           PAGE 21:11 TO 21:18 (RUNNING 00:00:25.523)

25          Q Do you know what your cancellization rate

1          was for your PeopleSoft products for 2011?

2          A I don't know per product line, per se, but

3          I know our general cancellation rates in the

4          aggregate, yes.

5          Q What is the aggregate?

6          A They tend to range between 3 and 4 percent

7          of our contract base.

8           PAGE 24:21 TO 25:02 (RUNNING 00:00:25.287)

9          And as you sit here today -- I think it's

10         2012 now -- who are the third-party support

11         providers who are competing against Oracle,

12         to your knowledge?

13         A Well, Rimini Street; I believe there is a

14         company called Spinnaker.  Those are two

15         significant ones that come to mind.

16          PAGE 25:22 TO 26:22 (RUNNING 00:01:00.895)

17         Let's start with Spinnaker.  When did you

18         first learn of Spinnaker?

19         A A few years ago, I would say.

20         Q Okay.

21         Before -- like around when you started in

22         your present role in 2005?

23         A No, maybe -- maybe -- I'm going to say four

24         years ago.

25         Q Okay.

1           And to your knowledge, what services does

2        Spinnaker provide?

3        A I understand they provide some third-party

4        support services, but I think they are mostly

5        consulting oriented, I believe.

6        Q Okay.

7           And do you know what products they support?

8        A I don't.

9        Q In what context did you learn about

10        Spinnaker?

11        A I think I just heard about them internally

12        in discussions with my team with some of the

13        competitors that are out in the marketplace.

14        Q Were they competing against Oracle for a

15        particular client, to your recollection?

16        A I don't recall exactly, but I assume so.

17         PAGE 32:20 TO 33:19 (RUNNING 00:01:08.966)

18        So I think we've been talking quite a bit

19        about third-party support as a competitive

20        pressure that you experience in the renewal

21        support market.

22        What other competitive pressures do you

23        encounter?

24        A I think we encounter, you know, competitive

25        pressures of moving to other products or

3134

```
 1          licensing other products.  So there is
 2          intense competition from a customer looking
 3          at a different solution, if you will.
 4          Q Is that a different solution at Oracle or
 5          a different solution from a completely
 6          separate company?
 7          A A different solution from a completely
 8          separate company.
 9          Q Okay.
10          Would you say that competitive pressure is
11          greater or less than third-party support
12          pressure?
13          A I would say that's greater.
14          Q Okay.
15          And any other competitive pressures that you
16          encounter in the renewal support market?
17          A I think we encounter the competitive
18          pressure of sort of this idea of
19          self-maintaining, if you will.
20           PAGE 33:25 TO 34:01 (RUNNING 00:00:03.871)
21          Q Anything else you can recall?  Any other
22          competitive pressures you encounter?
23           PAGE 34:02 TO 34:05 (RUNNING 00:00:11.248)
24          A I guess the other area would be where a
25          customer has software and they are not using
```

1          it.  It creates -- again, it's a form of

2          inertia, but it creates its own competitive

3          dynamic.

4           PAGE 34:06 TO 34:18 (RUNNING 00:00:39.234)

5          Q Explain to me how that situation arises.

6          A Well, if you -- if you license a

7          significant collection of software, maybe you

8          put together a transaction that makes

9          excellent financial sense for you and your

10         company and then it's important to get that

11         software deployed.

12         Well, deployment and implementation of

13         software takes time, as you know, and if you

14         don't have all of the software sort of

15         deployed and, therefore, consumed yet, you

16         can sort of come back to the table and have

17         conversations about the software that you

18         haven't deployed if it's a large bundle and

19         want to have a conversation about that.

20          PAGE 52:16 TO 53:03 (RUNNING 00:00:31.098)

21         During your time at Oracle, are you aware of

22         Oracle ever granting a license to a third

23         party for the purposes of providing of

24         support for PeopleSoft products?

25         A I am not.

3136

1    Q Okay.

2    And during your time at Oracle, are you aware

3    of Oracle ever having granted a license to a

4    third party for the purposes of providing

5    support for JDE?

6    A I am not.

7    Q Same question with respect to Siebel.

8    A I am not.

9    PAGE 57:08 TO 57:17 (RUNNING 00:00:25.363)

10   To your knowledge, has Oracle ever informed

11   any of its licensees that that licensee

12   was -- excuse me -- breaching a license

13   solely by getting support from Rimini Street?

14   A Not that I'm aware of.

15   Q Have you ever told a customer that you

16   believe Rimini Street's business practices

17   are illegal?

18   A No.

19   Q Okay.

20   PAGE 57:18 TO 57:22 (RUNNING 00:00:10.734)

21   To your knowledge, has Oracle ever

22   communicated to a licensee that it was

23   breaching the license by going to a

24   third-party support provider?

25   A Not that I'm aware of.

1           Q Okay.
2            PAGE 57:23 TO 57:25 (RUNNING 00:00:07.709)
3           Does Oracle take any actions to monitor or
4           restrict materials on Oracle's support
5           website?
6           A No, we don't.
7            PAGE 58:02 TO 58:14 (RUNNING 00:00:40.823)
8           In your role, you have had experiences where
9           customers have decided not to renew their
10           support with Oracle; is that correct?
11          A Yes.
12          Q Okay.
13          For customers who have elected not to support
14          renewal, what are the primary reasons?
15          A The -- the -- I believe the biggest reason
16          is sort of the licenses are no longer used,
17          it's software that they are just simply no
18          longer using.
19          The second one would probably be that they
20          moved to a -- another software competitor's
21          software or package.
22           PAGE 58:15 TO 59:05 (RUNNING 00:00:41.828)
23          Q Okay.
24          A Third one would be that they have somehow
25          moved to third-party support.

3138

1           Q Okay.

2           A Those are some of the big ones that come to

3           mind.

4           Q Okay.

5           How about have you heard of any concerns with

6           a cutoff date for support for older versions

7           of software?  Is that a reason?

8           A I've not heard of it in that way, no.

9           Q Okay.

10          How about poor service?  Have you ever heard

11          of that as a reason customers have left

12          Oracle?

13          A Not typically, no.

14           PAGE 59:06 TO 59:08 (RUNNING 00:00:04.570)

15          Q Okay.

16          Have you ever heard it, though?

17          A I'm sure I've heard it at some point, yes.

18           PAGE 59:14 TO 59:20 (RUNNING 00:00:14.810)

19          How about the customer has no intention to

20          upgrade?

21          A I do hear that.

22          Q Okay.

23          How frequently do you hear that?

24          A Not that often, but I hear it occasionally.

25           PAGE 59:21 TO 60:18 (RUNNING 00:00:58.459)

1          Q If a customer leaves Oracle support but

2          wants to return, will Oracle take them back

3          as a customer?

4          A Absolutely.

5          Q Okay.

6          Must the customer pay back -- or pay any fees

7          in connection with becoming a customer of

8          Oracle again?

9          A They would have to pay back support, which

10         is support during the period in which they

11         were not a customer, and then possibly

12         reinstatement fees.

13         Q Okay.

14         Let's start with back support.  Is that what

15         you call it?

16         A Yes.

17         Q Okay.

18         Is that a negotiable fee?

19         A Typically, no.

20         Q Okay.

21         And how is that fee calculated?

22         A I believe it's simply the -- what the

23         support would have been for the license set

24         over the period in which the customer was

25         away.

3140

```
 1          PAGE 61:01 TO 61:12 (RUNNING 00:00:34.998)

 2          Q Okay.

 3          And why is --

 4          Why is back support charged?

 5          A Well, my understanding, it's -- I believe

 6          there are some revenue recognition issues

 7          with the idea of having -- having software

 8          and then licensing it and paying support and

 9          going off of it and then sort of reappearing

10          a year later or something like that.  I think

11          there is some accounting issues with the

12          value of the software and that.  I'm not

13          intimately familiar with those, but I think

14          that's a big piece of it.

15          PAGE 61:14 TO 61:17 (RUNNING 00:00:14.819)

16          How about the reinstatement fee you

17          mentioned?  What is a reinstatement fee?

18          A Reinstatement fee is an additional fee to

19          the back support.  That's what that is.

20          PAGE 61:18 TO 62:01 (RUNNING 00:00:32.777)

21          Q Okay.

22          And why is this fee charged?

23          A That fee, I believe, is -- is charged with

24          the idea that, you know, our -- our -- we

25          don't want to disadvantage customers that
```

3141

1       have been paying us all along for support.

2       You know, there is a cost of money and other

3       things associated with not paying support and

4       retaining that money, and so I think it's

5       charged in that spirit.

6        PAGE 62:05 TO 62:09 (RUNNING 00:00:10.042)

7       Q And is the reinstatement fee negotiable?

8       A Yes.

9       Q Any other fees you charge if a customer

10      decides to come back?

11      A No.

12       PAGE 64:02 TO 64:05 (RUNNING 00:00:07.532)

13      And do you have any nicknames for Rimini

14      Street?

15      A I referred to them once as "Rickety

16      Street."

17       PAGE 64:06 TO 65:06 (RUNNING 00:01:08.084)

18      Q Why did you refer to them as "Rickety

19      Street"?

20      A I referred to them as "Rickety Street"

21      because they -- I think it was when I had

22      been told they had just started and we

23      were -- my people were reeling, sort of, from

24      the TomorrowNow and third-party competition.

25      And to sort of rally them, if you will, I

1           used "Rickety Street" because -- and I don't

2           think I'm even pronouncing Rimini, I think

3           it's Rimini (pronounced differently),

4           whatever the case may be, properly -- but

5           just around the idea that it hadn't -- if

6           it's a startup, it's a brand-new company.

7           And so that was my reference.

8           Q Okay.

9           Any other nicknames that you have used to

10          refer to Rimini Street?

11          A No.

12          Q Okay.

13          Do you dislike Rimini Street?

14          A I don't know Rimini Street, per se.  I

15          mean, it's a company, so it's a competitor.

16          Q So you have no negative feelings toward

17          Rimini Street?

18          A Well, I would say my feelings are that they

19          are a competitor.

20           PAGE 67:06 TO 67:17 (RUNNING 00:00:32.272)

21          Q Mr. Jones, are you familiar with what's

22          been marked as Deposition Exhibit 2?

23          A Yes.

24          Q And what is Deposition Exhibit 2?

25          A It's a presentation that I gave at the TSIA

3143

1        conference.

2        Q And what does that stand for?  What --

3        A Technology Services Industry Association.

4        Q Okay.

5        Is that a conference you frequently attend?

6        A Yes.

7         PAGE 67:23 TO 68:06 (RUNNING 00:00:20.243)

8        Q Okay.

9        How about for other organizations?  Do you

10       give presentations similar to this for other

11       organizations?

12       A No.

13       Q Okay.

14       And what was the purpose of your talk?

15       A The purpose of my talk was to share some

16       best practices with industry colleagues.  I

17       was

18        PAGE 75:12 TO 75:15 (RUNNING 00:00:08.490)

19       Q You currently in the marketplace believe

20       that third-party support providers are a

21       limited threat?

22       A No, I don't.

23        PAGE 75:16 TO 75:21 (RUNNING 00:00:16.466)

24       Q Okay.

25       How big a threat are third-party support

3144

1          providers?

2          A I think they are a threat with every

3          renewal that's based on products where they

4          are offering a service.

5           PAGE 76:06 TO 76:14 (RUNNING 00:00:19.480)

6          Q Mr. Jones, the court reporter has just

7          handed you what's been marked as Deposition

8          Exhibit 4.  It appears to be an e-mail from

9          you to Paul Duggan.

10          Do you see that?

11          A Yes, I do.

12          Q Who is Mr. Duggan?

13          A He's one of my support renewal sales

14          directors.

15           PAGE 76:22 TO 77:06 (RUNNING 00:00:22.709)

16          Q It appears that on the bottom of page 1 of

17          Deposition Exhibit 4, there is an e-mail from

18          Mr. Duggan to you and some other folks

19          indicating that:

20          "A good analysis below -- a

21           good analysis below of the

22           competitive threat on Siebel

23           business from Rimini Street."

24          Do you see that?

25          A Yes.

3145

```
 1              PAGE 83:12 TO 84:07 (RUNNING 00:00:52.149)
 2         Q Mr. Jones, the court reporter has just
 3         passed you what's been marked as Deposition
 4         Exhibit 7.  It's an e-mail from you to
 5         Mr. Cummins dated October 11th, 2005.  I
 6         believe this is -- we talked about this
 7         earlier -- this is the e-mail where you
 8         referred to Rimini as "Rickety Street."
 9         A Yes.
10         Q All right.
11         In the third e-mail down, you say: "F Seth
12         and his 'Rickety Street'..."?
13         A Yes.
14         Q What are you referring to when you say "F
15         Seth"?
16         A Well, regrettably, the "F" would refer to,
17         "Fuck Seth and his 'Rickety Street....'"
18         Q Okay.
19         Were you unhappy with Mr. Ravin at this
20         point?
21         A Only in the sense that it's a new
22         competitor in the marketplace.
23              PAGE 84:08 TO 84:11 (RUNNING 00:00:09.366)
24         Q Okay.
25         A Unfortunately, that's not the -- I regret
```

3146

1          using that type of vocabulary, regardless of

2          not writing it out here, but that's what I

3          meant.

4           PAGE 84:17 TO 85:02 (RUNNING 00:00:26.867)

5          The court reporter has just been -- handed

6          you what's been marked as Deposition Exhibit

7          8, and it's an e-mail from you to, I believe,

8          Nancy Lyskawa dated May 30th, 2007.

9          Do you see that?

10         A Yes, I do.

11         Q Okay.

12         Why did you send this e-mail chain to

13         Ms. Lyskawa?  And take a moment if you need

14         to read it.

15         A Yes.  Thank you.

16          PAGE 85:03 TO 85:03 (RUNNING 00:00:07.953)

17         I sent it because it describes a -- had an

18          PAGE 85:04 TO 85:05 (RUNNING 00:00:09.453)

19         article from CBS MarketWatch, I think,

20         describing, I guess, a win that Rimini Street

21         had.  And she was in.

22            PAGE 85:06 TO 85:13 (RUNNING

23         00:00:23.566)

24         marketing and I wanted her to be aware of it.

25         Q Okay.

3147

1            And I think one e-mail down, Mr. Duggan

2            comments to you that the -- "That this is

3            considered news" -- excuse me, "That this is

4            considered news is laughable."

5            Do you see that?

6            A Yes, I do.

7             PAGE 85:14 TO 85:19 (RUNNING 00:00:19.260)

8            Q Do you agree with Mr. Duggan's comments

9            there?

10           A Well, I don't know that I agree with his

11           comment, but he's pointing out that -- I

12           guess it's a -- he's making the point that

13           it's a relatively small renewal.

14            PAGE 89:21 TO 90:01 (RUNNING 00:00:18.635)

15           Q Do you recognize Deposition Exhibit 10?

16           A Yes.

17           Q And what is Deposition Exhibit 10?

18           A It's a Pareto analysis on cancellations for

19           North America for the first quarter of Fiscal

20           Year '10.

21            PAGE 90:18 TO 90:21 (RUNNING 00:00:04.423)

22           And do you typically receive copies of these

23           documents?

24           A Yes.

25           Q Okay.  All right.

```
 1          PAGE 90:22 TO 91:02 (RUNNING 00:00:14.640)
 2          And if you'll turn to the third page of that
 3          document, you'll see in the left corner kind
 4          of on the side there is a Bates number, and
 5          that's Bates numbered -707439.
 6          A Yes.
 7          Q And what is this graph depicting?
 8          PAGE 91:03 TO 91:05 (RUNNING 00:00:13.772)
 9          A It's depicting the backlog in cancellation
10          rates for a period of time from the second
11          quarter of 2007 to the second quarter of
12          2010.
13          PAGE 103:12 TO 103:23 (RUNNING 00:00:38.233)
14          Mr. Jones, the court reporter has handed you
15          what's been marked in this case as Deposition
16          Exhibit 15, but in the prior case involving
17          Oracle and SAP it was marked as Deposition
18          Exhibit 367.
19          Mr. Jones, this appears to be an e-mail from
20          you to Chris Madsen and others dated August
21          29th, 2006.
22          A Yes.
23          Q And in your e-mail -- I believe it's Point
24          Number 3 -- you talk about a support-only
25          option.
```

3149

1          Do you see that?

2          A Yes.

3           PAGE 104:01 TO 104:05 (RUNNING 00:00:19.934)

4          What are you referring to when you say

5          "support-only option"?

6          A This was an idea that we would somehow have

7          an offering that did not include

8          update/upgrade rights; in other words,

9          break-fix only.

10           PAGE 104:15 TO 104:18 (RUNNING 00:00:10.458)

11          And I take it from your e-mail you didn't

12          agree with the providing -- or offering a

13          support-only option?

14          A That's correct.

15           PAGE 104:19 TO 105:03 (RUNNING 00:00:30.110)

16          Q And why didn't you agree with that?

17          A Well, I think fundamentally it's an

18          incomplete part of our value proposition,

19          which included the three pieces I had spoken

20          of earlier, with update/upgrade rights in our

21          core IP as you receive that business

22          functionality, the ability to use our

23          knowledge bases and everything else, as well

24          as the maintenance or break-fix part of

25          reactive support.

3150

1       Q Okay.

2        PAGE 105:04 TO 105:09 (RUNNING 00:00:09.424)

3       I believe here, you refer to it carries a

4       significant financial risk.

5       Do you see that?

6       A Yes.

7       Q What were you referring to when you said

8       it's a significant financial risk?

9        PAGE 105:10 TO 105:13 (RUNNING 00:00:15.888)

10      A Well, it would -- it would -- it could

11      possibly reduce our support business

12      dramatically if we had only priced a subset

13      of that and made it available to the

14      marketplace.

15       PAGE 106:06 TO 106:19 (RUNNING 00:00:42.410)

16      Mr. Jones, the court reporter has just marked

17      to you what's been labeled as Deposition

18      Exhibit 16.  I believe it's an e-mail from

19      you to a whole bunch of folks dated September

20      19th, 2005.

21      Do you see that?

22      A Yes.

23      Q And in the --

24      In that e-mail, you refer to, I believe,

25      Rimini Street and -- or I believe you're

3151

1          referring to Rimini Street as "gnats."

2          Is that true?

3          A I'm referring to sort of the aggregate of

4          third-party competitors, which I believe

5          would have been TomorrowNow and Rimini

6          Street, as "gnats," yes.

7           PAGE 106:24 TO 107:17 (RUNNING 00:00:47.191)

8          BY MR. HOWARD:

9          Q Mr. Jones, do you recall that counsel

10         asked you if Oracle would license its

11         software to Rimini Street?  Do you remember

12         that question?

13         A Yes, I do.

14         Q Do you remember you prefaced your answer by

15         saying that issue is not in your scope?

16         A Yes, I did.

17         Q What did you mean when you said that issue

18         is not in your scope?

19         A Well, that's -- it's -- I meant that that's

20         not in my area of responsibility whatsoever,

21         that that's something that is outside of

22         anything that I do on a day-to-day basis or

23         where I make decisions.  So it's someone

24         else's responsibility.

25         Q And do you know what criteria or what

3152

```
1          decision that someone else would make if

2          faced with that issue?

3          A I do not.

4           PAGE 107:18 TO 108:25 (RUNNING 00:01:38.159)

5          Q You were also asked whether Oracle monitors

6          or restricts materials on its website and you

7          said, "No, we don't."

8          Do you recall that question and answer?

9          A Correct, I recall that.

10         Q What did you have in mind when you gave

11         that answer?

12         A Well, when you are -- when you have a

13         credential to go into our website, a customer

14         support identifier, which we refer to as a

15         CSI, we don't sort of monitor and track where

16         you are within the website or what you're

17         doing within it, as long as you enter it

18         through your credentials.

19         Q How does a customer get a CSI?

20         A A CSI is the customer support identifier

21         and it's associated with a contract,

22         therefore, which is associated with licensing

23         the product.  So you would license the

24         products, put them on support, and you would

25         get your CSI.
```

```
 1          Q And so is the CSI subject to terms of the
 2          license?
 3          A Correct.  I mean, the CSI and being able to
 4          get access to the system would be subject to
 5          all the terms and conditions in the
 6          licensing.
 7          Q Do you have an understanding as to whether
 8          the access with that CSI is also subject to
 9          terms of use on the website?
10          A Yes, it is subject to that, correct.
11          Q So when you gave your answer, were you
12          assuming that a customer already had the CSI
13          that was subject to the license terms and
14          would also be subject to the terms of use on
15          the website?
16          A Yes, that is correct."
17          (End of videotape deposition.)
18          MR. GRAY:  Rimini Street next calls by video
19   deposition Mr. Jason Taylor, vice-president of Oracle.  The
20   video is 11 minutes.
21          And Rimini Street moves into evidence DTX 146,
22   DTX 148, DTX 255, all of which have either been admitted or
23   agreed to as preadmission.
24          MR. HIXSON:  No objection.
25          THE COURT:  They are admitted.
```

3154

```
 1              (Defendants' Exhibits 146, 148 and 225
 2              received into evidence.)
 3              (Videotape deposition of Jason Taylor played
 4              as follows:)
 5                 PAGE 5:23 TO 6:01 (RUNNING 00:00:06.630)
 6              "Will you please state your name and address
 7              for the record.
 8              A. Jason Taylor, 10 Bracken Road, Shrewsbury,
 9              Massachusetts.
10               PAGE 7:04 TO 7:15 (RUNNING 00:00:28.639)
11              Q. All right.  So how long have you worked
12              for Oracle?
13              A. 13 years.
14              Q. Okay.  And can you go through your work
15              history for me, please?
16              A. I started off as a support sales
17              representative in the Reston, Virginia office
18              in 1998.  After a year of that I became a
19              field support sales rep for another year or
20              two.  And then I went into management,
21              becoming a regional manager and then moving
22              on to a director, a senior director and to a
23              vice president.
24               PAGE 8:06 TO 8:09 (RUNNING 00:00:13.472)
25              Q. And what currently are your duties?
```

3155

1        A. Today I manage Oracle's top 50 customers

2        in North America.  I am responsible for the

3        maintenance streams of software renewals and

4        hardware renewals.

5         PAGE 9:11 TO 12:11 (RUNNING 00:03:18.331)

6        Q. All right.  We'll talk a little bit about

7        what types of support services or products

8        you offer your customers.

9        So are there different levels of support you

10       offer your customers?

11       A. There is a premier level of support that

12       we offer our customers.  There is additional

13       support that customers can purchase but

14       that's not sold by my team.

15       Q. Okay.  And what are you referring to when

16       you say "additional levels of support"?

17       A. There's advanced customer support.

18       Q. Okay.  Anything else?

19       A. No.

20       Q. Okay.  And so the only thing you-all sell

21       is premier?

22       A. Correct.

23       Q. I've heard things called extended support.

24       Is that something else you sell?

25       A. Yes.  I apologize, I classify that in the

1          premier bucket so extended support is

2          something that a customer can purchase on top

3          of premier support.

4          But it's not necessarily a better offering,

5          if you will.

6          Q. What does extended support offer your

7          customers?

8          A. If a -- when a software product becomes

9          end of life, so to speak, Oracle no longer

10         provides bug fixes or patches for that

11         software.  We make available in certain

12         instances extended support for those

13         products.  And customers would, if they

14         choose

15         to purchase it, would pay a premium on top of

16         their normal premier support spend to receive

17         those bug support fixes and updates.

18         Q. What is the life cycle of software at

19         Oracle?

20         A. A product is released and it is generally

21         available to the public for five years.  Then

22         after that five-year period Oracle may or may

23         not offer extended support for that product

24         for an additional three years.

25         Q. Okay.

1        A. After that three-year period it goes into

2        sustaining mode where Oracle no longer

3        provides additional support for that product

4        but any legacy knowledge or support that had

5        been previously published is available to the

6        customer for the life of the time that they

7        own a contract for support.

8        Q. What do you mean no additional support is

9        offered?  Can you explain that to me?

10       A. It's not that there is no additional

11       support that is offered.  It is more so that

12       a

13       customer can go back into our archives and

14       research it themselves, get the answers that

15       they need, call up Oracle for support on that

16       product and if we have the answer readily

17       available, we'll give it to them.

18       If we don't have that answer for a problem,

19       there is nothing that we can do to help them

20       except to tell them to update to the latest

21       version of the software, to a supported

22       version, and then we can help them.

23       Q. And is the sustaining mode, say, more

24       expensive than just premier support for

25       that --

3158

1       A. Sustaining support?

2       Q. Yes.

3       A. Sustaining is no additional fee.

4       Q. No additional fee.

5       So it's the same price as the premier?

6       A. Correct.  It's part of your premier

7       offering.

8       Q. How much does the extended support

9       typically run customers?

10      A. For the first year it is an additional 30

11      percent.  The subsequent two years would be

12      20 percent of net.  Excuse me.  20 percent of

13      the premier support spend, the net support

14      spend.

15       PAGE 12:21 TO 13:14 (RUNNING 00:00:46.029)

16      How about sustaining, do you know if there's

17      any customers of yours that are on

18      sustaining?

19      A. Customers that are on sustaining support

20      don't have to necessarily do anything to get

21      sustaining support.  So there are some

22      customers that are running 15 different

23      variations of the product and some of those

24      products may be in sustaining mode.

25      I really don't know unless I went into the

```
 1            contracts and looked specifically at what
 2            versions they were running.  I imagine that a
 3            good -- a fair amount of my customers have at
 4            least one or two products in sustaining mode
 5            but, again, that's not indicative of the fact
 6            most of the customers are on the latest
 7            version of the software running supported
 8            versions.
 9            It's very rare that they would have a
10            production system that is on sustaining mode.
11            They may have some test systems in a
12            non-production environment that are in
13            sustaining mode.
14             PAGE 36:05 TO 36:08 (RUNNING 00:00:05.807)
15              (Exhibit 1 marked)
16            Q. BY MS. REDMOND:  Mr. Taylor, have you ever
17            seen what has been marked as Taylor
18            Deposition Exhibit 1?
19             PAGE 36:09 TO 36:22 (RUNNING 00:00:37.527)
20            A. I believe I have.  I may have, yeah.
21            Q. Okay.  And where have you seen Deposition
22            Exhibit 1?
23            A. I can't be sure but I imagine it was
24            e-mailed to me and it may be collateral that
25            we make available to our software reps -- our
```

3160

1      service renewal reps when encountering

2      third-party opposition in the market.

3      Q. Where would you advise your reps to look

4      for this information at Oracle?

5      A. We have an internal website where reps can

6      go to download information or to get

7      competitive analysis information about

8      products, et cetera, et cetera.

9       PAGE 97:14 TO 97:19 (RUNNING 00:00:06.368)

10       (Exhibit 10 marked)

11      Q. BY MS. REDMOND:  The court reporter has

12      handed you what has been marked as Deposition

13      Exhibit 10.

14      Do you recognize Deposition Exhibit 10?

15      A. Yes.

16       PAGE 97:20 TO 98:16 (RUNNING 00:01:09.550)

17      Q. And what is this document?

18      A. Back in 2009, after we had closed the FY

19      '09 fiscal year, we did a year-over-year

20      analysis into the cancellation rate.  As I

21      mentioned earlier, this is something that we

22      do as a business practice to determine where

23      we have risk, where we see trends in the

24      market so that we can accurately forecast

25      what is going to happen in the future.

1    Q. Okay.  And what were you communicating?

2    A. It was an analysis of the cancellation

3    rate, digging into the details as to where

4    the cancellations were coming from, what the

5    rates were as a compare year over year, and

6    my projection for what would happen in the

7    next fiscal.

8    Q. And what was your projection for what

9    would happen in the next fiscal year?

10   A. My projection at that time, as I read

11   this, was that we thought that things had

12   stabilized somewhat and the cancellation rate

13   for bankruptcies -- this was during the tough

14   economic climate that the global economy has

15   since recovered somewhat and stabilized the

16   cancellation rate a bit.

17    PAGE 98:17 TO 99:01 (RUNNING 00:00:29.622)

18   Q. So based on your experience, did you note

19   that in the 2009 time frame bankruptcies had

20   a large impact on the cancellation rate?

21   A. Yes.

22   Q. Okay.  How about today, how are

23   bankruptcies impacting the cancellation rate?

24   A. For my space?

25   Q. For your space.

3162

1          A. For my space in the top accounts, it's no

2          longer a large concern or a bigger issue.

3           PAGE 99:09 TO 99:21 (RUNNING 00:00:29.620)

4          Q. Okay.  And I believe on the third bullet

5          point you state that:

6          "Given the current economic environment we

7          wanted to see if we were losing customers to

8          low-cost competitors for service, Rimini

9          Street, for example, or to other software

10         companies in replacing Oracle/SAP/IBM."  And

11         you state:

12         "We are finding that is not necessarily the

13         case."

14         Do you see that?

15         A. Yes.

16         Q. Do you think that was accurate?

17         A. Yes.

18          PAGE 99:22 TO 99:23 (RUNNING 00:00:03.535)

19         Q. Do you think that statement would be

20         accurate, as you sit here today?

21          PAGE 99:25 TO 100:14 (RUNNING 00:00:24.575)

22         THE WITNESS:  I would assume that that's the

23         case without direct knowledge.

24         Q. BY MS. REDMOND:  Okay.  How would you get

25         direct knowledge?

3163

```
 1            A. I would have to do this analysis all over
 2            again for the entire contract base for this
 3            last fiscal year.
 4            Q. Okay.  And have you done this analysis for
 5            the last fiscal contract year yet?
 6            A. No.
 7            Q. Do you intend to?
 8            A. No.
 9            Q. Why is that?
10            A. That's the operations group's
11            responsibility.
12             PAGE 129:03 TO 131:25 (RUNNING 00:03:35.465)
13            Q. BY MS. REDMOND:  The court reporter has
14            handed you what has been marked as Deposition
15            Exhibit 18.
16            Have you seen Deposition Exhibit 18 before?
17            A. Yes.
18            Q. And what is Deposition Exhibit 18?
19            A. It is an e-mail thread describing some of
20            the problems that XO was running into related
21            to the software and their concerns.
22            Q. Okay.  And on the second page of
23            Deposition Exhibit 18 which, for the record,
24            is 152546, I believe it is an e-mail from you
25            to your boss?
```

3164

1     A. Yes.

2     Q. In part.

3     And I see Alison Taylor copied on this.

4     Was she a manager?

5     A. Yes, she was the manager who worked for

6     me.

7     Q. And then the second paragraph from the

8     bottom, you say, the third sentence in:

9     "It seemed crazy that we don't provide

10    customer support to XO over something like

11    this.  Rob feels like we are nickel and

12    diming him and I don't disagree."

13    Do you see that?

14    A. Yes.

15    Q. Do you agree with that statement?

16    A. Yes.

17    Q. And what were you referring to there?

18    A. I was referring to a situation they were

19    having where they were running into a problem

20    that they weren't sure was an Oracle-related

21    problem or a problem with how they set up the

22    software.

23    The solution was we could send a service

24    person out for a cost of somewhere around

25    $2,000 a day.  And Rob's position was it

3165

```
 1            seems kind of crazy that we spend two and a
 2            half million dollars and you are going to
 3            send someone out here for $2,000 a day to
 4            potentially find a problem that is wrong with
 5            your software.  And I didn't disagree with
 6            him.
 7       Q. You go on to say:
 8            "It's the perception of awful customer
 9            service and support."
10            Do you see that?
11       A. Yes.
12       Q. Do you agree with that sentiment?
13       A. Well, this was Rob's perspective.  Rob in
14            XO perceived that they were receiving awful
15            customer service and support.  That wasn't
16            necessarily my opinion.
17            Like I said, I thought that he had a point
18            regarding the $2,000 a day for service, but
19            in terms of the support and service he was
20            getting, I actually think we went above and
21            beyond in his situation.  So I certainly
22            didn't think he was getting bad customer
23            service and support.
24       Q. Have you ever had an instance in your
25            experience where you have believed a customer
```

3166

1          has had bad support and service from Oracle?

2          A. Yes.

3          Q. And what customer was that for?

4          A. Off the top of my head, Siemens comes to

5          mind.  There were a few instances where

6          customers received poor support from Oracle.

7          It happens.

8          Q. What happened in the Siemens situation?

9          A. In that situation specifically the

10         customer was logging service requests that

11         were at severity 1 levels and it was taking

12         Oracle an inexcusable amount of time to get

13         back to them and help resolve their issues.

14         It required escalation on our part to get

15         them the service that they needed.

16         Q. Okay.  Any other examples that come to

17         mind?

18         A. Not specific ones, no."

19         (End of videotape deposition.)

20              MR. WEBB:  Good morning, Your Honor.

21              THE COURT:  Mr. Webb?

22              MR. WEBB:  At this time defendants rest.  Thank

23    you.

24              THE COURT:  Thank you.

25              Do the Plaintiffs Oracle have any rebuttal

1     evidence or intend to offer any rebuttal evidence?

2             MR. ISAACSON:  We'll be filing our Rule 50

3     motion to you directly, Your Honor, as to certain issues

4     that we think should be foreclosed at this point.

5             But we have a short video we'd like to play in

6     rebuttal.  There's some disputes about that.  Perhaps this

7     would be a good time to have a break and we can resolve

8     that and then show a very short video.

9             THE COURT:  All right.

10            Ladies and gentlemen, what that all means is

11    that Plaintiffs Oracle presented all of their evidence in

12    support of their case.  Now defendants have presented all

13    their evidence in support of their defense in their case.

14            And now Plaintiffs Oracle have a final and last

15    opportunity to offer what sounds to be a fairly short

16    video.  And upon conclusion of that, you're going to have

17    all the evidence in the case.

18            But to give you a little bit of a heads-up, what

19    that means is that we're going to finish with the evidence

20    today, but they're still are major issues that the Court

21    has to deal with because I, of course, will be giving you

22    instructions on the law before you go in and decide this

23    case.

24            And after I've given you those instructions on

25    the law, you'll hear the closing statements of the -- each

3168

1    side, and at that time you'll be able to go in and decide

2    and discuss the case for the first time and reach your

3    verdict.

4            But what that also means is that we're still

5    quite a ways away from when you're going to have those

6    instructions on the law and be able to deliberate and hear

7    the arguments of counsel.

8            By the time we do the instructions on the law

9    and the arguments of counsel, that's going to consume most

10   of the day.

11           And what needs to be done between now and then

12   will be for the Court to finalize all of the instructions

13   on the law which will be given to you.

14           Those aren't just automatic because I need to

15   hear from both sides regarding those instructions on the

16   law.  We need to make sure that everyone understands what

17   the instructions are that I'm giving and that I've

18   considered the input of both parties.

19           So what it means is I will be returning here on

20   Monday to have that session with the counsel and the

21   attorneys.  I don't know how long it will take, but I will

22   not bring you in on Monday just because I don't want you

23   sitting out before we're ready to go and then have you

24   going in for deliberations on a very major, complex case

25   with a limited amount of time.

1           So what I'm going to be doing is releasing you

2    until Tuesday morning.  And on Tuesday morning you will be

3    coming in at 8:00, and we will start with reading the

4    Court's instructions on the law to you, and then the

5    attorneys will be arguing their respective cases to you.

6    And then at the end of that, then you will be convened to

7    deliberate and decide this case.

8           So just to give you a sense, it looks like we're

9    going certainly into the middle of next week to get this

10   case finally resolved.  But you will not have to be back

11   here until Tuesday morning.

12          But we'll have this final piece of evidence

13   being presented by Plaintiffs Oracle, and then I'm going to

14   release you for the day, and, of course, go through the

15   admonition very carefully.

16          So we will take a recess at this time, and we'll

17   give you 15 or 20 minutes until you're ready.  And, of

18   course, all the admonitions continue to apply and do apply.

19          And you may go ahead and step down.

20          COURTROOM ADMINISTRATOR:  Please rise.

21          (Recess from 10:04 a.m. until 10:26 a.m.)

22          (Jurors enter courtroom at 10:26 a.m.)

23          COURTROOM ADMINISTRATOR:  Court is again in

24   session.

25          THE COURT:  Have a seat, please.

1          MR. ISAACSON:  We've worked out any final

2     issues, Your Honor, and so Mr. Ringgenburg will take us

3     through the final steps.

4          THE COURT:  Thank you very much, Mr. Isaacson.

5          For the record, the jury is all present.  We're

6     in open court.  The parties and counsel are present.

7          And, Mr. Ringgenburg, would you give us the

8     short description of what's coming up.

9          MR. RINGGENBURG:  You bet, Your Honor.

10         We do have a few exhibits that we would like to

11    admit, since some of them were referenced in the

12    deposition.  And I believe there's no objection to these.

13         So those are, for the record, Exhibits 606 --

14    Plaintiffs' Trial Exhibit 606, 607, 609, 610, 611, 623,

15    638, 3389, 3402, and 3404.

16         And I believe there's no objection except to

17    609, which is subject to a continuing objection that the

18    Court has referenced already.

19         THE COURT:  Has it been previously admitted?

20         MR. RINGGENBURG:  It has not been, Your Honor.

21         THE COURT:  All right.  Okay.

22         MR. RECKERS:  No objection, Your Honor, subject

23    to the objection.

24         THE COURT:  All right.  All of those will be

25    admitted with the exception of 609, upon which the Court

1    will take under submission.

2           (Plaintiffs' Exhibits 606, 607, 610, 611,

3           623, 638, 3389, 3402, 3404 received into

4           evidence.)

5           MR. RINGGENBURG:  Ladies and gentlemen, we have

6    the deposition video of Mr. Brian Slepko.

7           Mr. Slepko has been referenced a few times in

8    testimony.  He's a senior vice-president of global

9    operations at Rimini Street.  And it's about 15 minutes.

10   Thank you.

11          (Videotape deposition of Brian Slepko played

12          as follows:)

13          PAGE 8:16 TO 8:23 (RUNNING 00:00:10.595)

14          "Q What's your title?

15          A My title is senior vice president global

16          operations.

17          Q How long have you been there?

18          A Almost three years now.

19          Q Has your title been the same the whole

20          time?

21          A It has.

22           PAGE 9:05 TO 9:10 (RUNNING 00:00:15.076)

23          Q And can you describe, in general terms,

24          what your current responsibilities are?

25          A My current responsibilities with Rimini

3172

```
 1          Street are to provide the service for our

 2          clients, including, support, development and

 3          tax and regulatory scoping.

 4           PAGE 9:14 TO 9:16 (RUNNING 00:00:03.114)

 5          Q You report in turn to Mr. Ravin.  Is that

 6          right?

 7          A That's correct.

 8           PAGE 10:02 TO 10:10 (RUNNING 00:00:38.063)

 9          Q Thank you.  Let me offer you what has

10          previously been marked as Exhibit 1, and I'll

11          ask you to refer to the page that's numbered

12          2.   There's a list of topics, 1 through 3.  I

13          won't read them out loud, but please take a

14          second to read them to yourself.  And my

15          question is do you understand that you're

16          here today to address those topics on behalf

17          of Rimini Street, Incorporated?

18          A I do.

19           PAGE 52:10 TO 52:21 (RUNNING 00:00:42.445)

20          Q Does Rimini Street have its own knowledge

21          base of information that support engineers

22          use, you know, they figured out a smart way

23          to fix a problem, they write it down

24          somewhere?

25          A We do not.
```

3173

1     Q So for a customer that is coming in after

2     their support contract with Oracle is

3     provided, what resources does the support

4     engineer have to try to figure out how to fix

5     a problem?

6     A Well, they rely on their own knowledge.

7     We hire very experienced people that have

8     been working with the applications for a long

9     time.

10     PAGE 52:22 TO 53:01 (RUNNING 00:00:12.987)

11     Q But Rimini Street has not ever set out to

12     develop a centralized repository of knowledge

13     its individual support engineers have created

14     or figured out over time?

15     A We have not.

16     PAGE 76:04 TO 76:10 (RUNNING 00:00:22.579)

17     Q So I take it from your statement that all

18     the development is done for a particular

19     customer in that customer's environment using

20     that customer's files?

21     A That's correct.

22     Q And then is that work repeated for each

23     customer for whom that work is applicable?

24     PAGE 76:12 TO 76:12 (RUNNING 00:00:01.983)

25     THE WITNESS:  Yes.

3174

```
 1        PAGE 82:09 TO 82:15 (RUNNING 00:00:22.618)
 2        Q So my question is, is it your understanding
 3        that Rimini Street has never done anything to
 4        try to automate the process of spreading
 5        updates from -- developed from one client
 6        into the others that is it's incumbent on the
 7        developer to just repeat exactly the steps it
 8        took the first time for each of the other
 9        customers?
10        PAGE 82:17 TO 82:18 (RUNNING 00:00:02.759)
11        THE WITNESS:  That is our process.  That's
12        my understanding.
13        PAGE 95:20 TO 96:09 (RUNNING 00:00:45.027)
14        Q And with regard to development of
15        PeopleSoft updates and fixes, we spoke at
16        length about the process for developing tax
17        and regulatory updates.  Is it also the case
18        that from time to time other fixes are
19        developed by Rimini Street for PeopleSoft?
20        A Yes.
21        Q Is the development process the same as for
22        tax and regulatory updates?
23        A It is similar, yes.
24        Q That is the -- what you're saying is
25        development is done for -- on a particular
```

3175

1        customer's environment and then one at a time

2        across customers?

3        A That's correct.

4         PAGE 97:09 TO 97:20 (RUNNING 00:00:40.305)

5        Q You're saying if they did development work,

6        the process is they're not supposed to take

7        the revised code and share it from one client

8        to another.  They may share the know-how

9        about how it's created?

10       A They may share the discovery of the issue

11       and what the issue is, yes.

12       Q Other than that possible exception, are you

13       aware of any other exceptions to the

14       established process for developing PeopleSoft

15       software?

16       A To the best of my recollection, I don't

17       know of any others.

18        PAGE 10:01 TO 10:04 (RUNNING 00:00:08.043)

19       So you mentioned you worked for a short time

20       for TomorrowNow.  How did you come to work at

21       TomorrowNow?

22       A. Seth recruited me.

23        PAGE 31:07 TO 31:12 (RUNNING 00:00:17.126)

24       Q. Are you aware of any instance in which a

25       customer has been told that their tax and

3176

```
 1            regulatory updates were created using a

 2            different customer's environment?

 3            A. I don't recall a specific instance at this

 4            time.

 5             PAGE 81:08 TO 81:16 (RUNNING 00:00:25.837)

 6            Q. If a customer raises a concern that says,

 7            oh, my Oracle license doesn't allow me to do

 8            what you want to do, how could Rimini Street

 9            respond to that if they didn't have the

10            license to look at?

11            A. You're right, we don't have a license to

12            look at, but we all have extensive experience

13            in the industry so that we have had

14            experience and know the generalities of what

15            a typical license -- we don't provide legal

16            guidance to clients, just our past

17            experience.

18             PAGE 107:24 TO 108:05 (RUNNING 00:00:15.669)

19            Q. Mr. Benge forwards you an e-mail exchange

20            and writes the e-mail that we see on that

21            page?

22            A. Right.

23            Q. Is it fair to say that he was strident in

24            his view that remote development was a

25            challenge for his team?
```

1        A. Yes.

2         PAGE 117:19 TO 118:03 (RUNNING 00:00:32.256)

3        Q. You write, "Process audit," question mark,

4        "Den, have we ever done an audit on our

5        procedures around adhering to the Oracle

6        rules about downloads, et cetera?  This is

7        something that's keeping me up at night, et

8        cetera."

9         as there ever any audit?

10       A. I don't recall that there was.

11       Q. Was any work done in this time period to

12       examine whether what Rimini Street was doing

13       was consistent with the Oracle terms of use

14       or other rules?

15        PAGE 118:06 TO 118:10 (RUNNING 00:00:12.595)

16       Q. BY MR. RINGGENBURG:  To your knowledge.

17       A. To my knowledge, I don't know.

18       Q. Do you recall anything about what became

19       of your concern to -- as expressed to Mr.

20       Chiu?

21       A. I don't recall.

22        PAGE 119:16 TO 120:10 (RUNNING 00:00:54.528)

23       "For example, you may not use any software

24       routines commonly known as robots, spiders,

25       scrapers or any other automated means to

3178

1          access Customer Connection or any other

2          Oracle account systems or networks."

3          Were you aware at any time that the terms of

4          use contained that provision or any provision

5          similar to it?

6          A. I've read the terms.  I don't recall

7          specifically calling that out.

8          Q. At least through January of 2009, it is

9          true that Rimini Street, as a matter of

10          course, used automated tools to download

11          material from Customer Connection and other

12          Oracle systems; is that fair?

13          A. We did use some tools, yes.

14          Q. And do you disagree that calling them

15          automated tools -- I mean, they were

16          automated tools; correct?

17          A. They were tools.

18          Q. You don't agree they were automated?

19          A. They were tools.  I don't know the

20          specifics.

21           PAGE 123:22 TO 123:25 (RUNNING 00:00:11.246)

22          Q. Did you come to learn that previously

23          Rimini Street had used an application called

24          Offline Explorer to download material from

25          Siebel Support Web?

3179

1           A. I don't recall the Offline Explorer.

2            PAGE 144:04 TO 144:15 (RUNNING 00:00:41.637)

3           Q. He identifies two things.  The first thing

4           is, quote: "We were using the Download Them

5           All Firefox add-on to download doc IDs from

6           the knowledge base area.

7           Since we didn't know which doc IDs existed

8           and which did not, we created URLs for every

9           possible doc ID, 1 through 999,999."  And

10          he's got examples. "If a doc ID existed for

11          that number, it was downloaded.  If it did

12          not exist, we would get this error."

13          Did you understand that methodology at the

14          time?

15          A. I don't know that I completely understood

16          it, no.

17           PAGE 144:16 TO 144:24 (RUNNING 00:00:25.586)

18          Q. Do you see that what he's saying is they

19          issued downloaded requests for a million

20          different or 999,998 URLs and downloaded

21          whatever ones came back with a file?

22          A. That would appear to be what he's saying.

23          Q. Do you think it's a fair characterization

24          to say that that's anything other than an

25          automated download process?

3180

1       A. I can't answer that.

2        PAGE 152:09 TO 152:13 (RUNNING 00:00:09.488)

3       Q. Do you agree that there were at least a

4       certain number of clients for whom the

5       knowledge based material was an important

6       part of Rimini Street's service offering?

7       A. They wanted it, yes.

8        PAGE 152:14 TO 153:02 (RUNNING 00:00:28.824)

9       Q. During this time period in November

10      through -- November '08 through January '09,

11      what was Mr. Ravin's involvement in

12      discussions about what to do, whether to keep

13      downloading, what to say to Oracle and so

14      forth?

15      A. He was fairly involved, as you can see

16      from these emails.

17      Q. Yeah.  And he was the ultimate decision

18      maker on those issues; is that right?

19      A. He's the ultimate decision maker in the

20      company, yes.

21      Q. And he was -- but he was personally making

22      decisions on this set of issues; is that

23      right?

24      A. As you can see in the emails.

25       PAGE 216:07 TO 217:03 (RUNNING 00:00:48.164)

3181

1           Other than CedarCrestone, are you aware of

2           any firm that offers what you would consider

3           to be competitive services for PeopleSoft

4           support?

5           A. I'm not aware of any.

6           Q. And it continues, "Net Customer, Versytec

7           and Spinnaker for JDE."

8           Other than those three customers, are you

9           aware of any firms that offer services that

10          you consider to be competitive for JDE

11          support?

12          A. I'm not aware of any.

13          Q. And are you aware of whether Net Customer

14          is still around or not?

15          A. I don't know.

16          Q. And is your -- is it your understanding

17          that Versytec offers only World support and

18          does not offer EnterpriseOne support?

19          A. I don't know the answer to that.

20          Q. And then he says, "And just vendor for

21          Siebel and SAP."

22          Are you aware of any firm that offers support

23          competitive to Rimini Street for Siebel

24          support services?

25          A. I'm not aware of any.

3182

1              PAGE 6:06 TO 6:14 (RUNNING 00:00:27.927)

2          Q. Very good.  So probably a good place to

3          start is Topic 2 says: "Rimini's written and

4          unwritten policies regarding Oracle's

5          intellectual property including," and there's

6          a set of topics listed.

7          Who is responsible for setting Rimini

8          Street's policies with regard to Oracle's

9          intellectual property?

10         A. That really comes from the top from Seth

11         Ravin.

12             PAGE 7:06 TO 7:09 (RUNNING 00:00:08.935)

13         Q. Is there any written document that sets

14         out what the policies are?

15         A. There is no single written document that

16         sets out those policies.

17             PAGE 7:16 TO 7:20 (RUNNING 00:00:14.744)

18         Q. Do you feel that they're all written

19         somewhere, if you looked, or are some aspects

20         of the policy explained orally?

21         A. Primarily orally and then documented in

22         various places, once again.

23             PAGE 11:20 TO 12:01 (RUNNING 00:00:14.415)

24         Q. And what does Rimini Street do, if

25         anything, to ensure that whatever those other

3183

1          terms and conditions are in the licenses,

2          that Rimini Street's complying with them?

3          A. We will work with the client to work with

4          their understanding of what their agreement

5          is with Oracle.

6           PAGE 13:06 TO 13:10 (RUNNING 00:00:18.014)

7          Does Rimini Street do anything to determine

8          whether a particular customer's license

9          authorizes copying of their software at

10         locations other than the customer's premises?

11         A. We will rely on their representation.

12          PAGE 16:10 TO 16:16 (RUNNING 00:00:18.639)

13         Q. But so far as you know and as far as your

14         investigation leading up to this deposition

15         revealed, there's never been an effort to

16         study the actual license agreements of Rimini

17         Street's customers to determine whether

18         Rimini Street's processes are in compliance

19         with them?

20         A. I am not aware of that.

21          PAGE 43:16 TO 43:23 (RUNNING 00:00:33.530)

22         Q. If the client that had asked for the

23         update, Shaw Industries, had the same scope

24         of license as another client for the same

25         software, would it be inconsistent with

3184

```
 1          Rimini Street's policies, to your
 2          understanding, that provide Shaw Industries
 3          with a tax update developed in another
 4          client's environment?
 5          A. I don't -- I can't speculate about this
 6          particular situation.  I don't know anything
 7          about it.
 8           PAGE 46:05 TO 46:15 (RUNNING 00:00:34.476)
 9          Q. Fair enough.  Has it -- what has Rimini
10          Street's policy been with regard to
11          determining whether a particular client's
12          license authorized the use of software at
13          Rimini Street's location as opposed to only
14          the client's location?
15          A. We rely on the client to make that
16          determination.
17          Q. Is it correct that if neither you --
18          Rimini Street's nor the client addresses that
19          issue specifically, Rimini Street assumes
20          that it's authorized?
21          A. Correct.
22           PAGE 51:14 TO 51:17 (RUNNING 00:00:07.778)
23          Q. Is it Rimini Street's practice to refer
24          customers to their legal department?
25          A. We will provide opinions, and it's up to
```

```
 1              them whether they take that to legal.
 2              Oracle v Rimini St TRIAL
 3               PAGE 55:03 TO 55:10 (RUNNING 00:00:33.216)
 4              Q. BY MR. RINGGENBURG:  Since Spinnaker and
 5              TomorrowNow both evidently concluded that it
 6              was preferable to not maintain any Oracle
 7              software on its systems, and you've had at
 8              least some clients communicate to you that
 9              those restrictions are in place, tell me how
10              it is that Rimini Street has decided it's
11              nonetheless permissible for it under client
12              licenses to maintain Oracle information on
13              its systems.
14               PAGE 55:12 TO 55:13 (RUNNING 00:00:02.739)
15              THE WITNESS:  Yeah, I can't answer that
16              question.
17               PAGE 59:05 TO 59:14 (RUNNING 00:00:26.259)
18              Q. If a Rimini Street employee has a question
19              about whether something's permissible with
20              regard to Rimini Street's policies as
21              pertains to Oracle's intellectual property,
22              what are they supposed to do to find an
23              answer to their question?
24              A. They would take that to the manager.
25              Q. And then if the manager was unclear,
```

3186

1          presumably it would go up the chain of

2          command all the way to Seth Ravin if it

3          needed to?

4          A. That's correct.

5           PAGE 62:14 TO 62:18 (RUNNING 00:00:19.042)

6          Q. How about with regard to JD Edwards, what

7          did you ascertain about the way Oracle

8          software and support material is used to help

9          support clients?

10          A. The JD Edwards support engineers will use

11          the archives much like the PeopleSoft

12          engineers will.

13           PAGE 63:11 TO 63:23 (RUNNING 00:00:29.398)

14          Q. How about Siebel; what have you learned

15          about how Rimini Street's engineers use

16          Oracle software and support material in

17          serving Siebel customers?

18          A. From the archive perspective, it's very

19          similar to the JD Edwards and PeopleSoft.

20          Q. And there have been Siebel local

21          environments at times at Rimini Street; is

22          that right?

23          A. There have.

24          Q. And have they been used to assist clients

25          and their problems?

3187

1          A. They have.

2          Q. And do they continue to be used to this

3       day?

4          A. We will use them as needed.

5           PAGE 69:14 TO 70:11 (RUNNING 00:01:05.979)

6          Is it correct that Rimini Street's sales

7       people have from time to time used having a

8       local environment for troubleshooting as a

9       major selling point?

10         A. I believe they may have used that as a

11      selling point at one time.

12         Q. Do they no longer do so?

13         A. I don't know the status of that right now.

14         Q. It's still the practice at Rimini Street

15      to create a local environment for customers

16      if the customers don't specify otherwise; is

17      that right?

18         A. We will create -- yeah, we will create an

19      environment if we can.

20         Q. Any reason to believe that the sales folks

21      have had a change in practice with regard to

22      offering the benefits of having a local

23      environment for troubleshooting purposes?

24         A. I really can't answer that.  As part of

25      the investigation, I didn't look at the sales

3188

1           side.

2           Q. Well, from your knowledge of the company,

3           do you have any reason to believe they would

4           have pulled back on them?

5           A. Well, we certainly asked them and told

6           them that our preference would be to have a

7           local environment."

8           (End of videotape deposition.)

9                MR. ISAACSON:  That completes the presentation

10   and the evidence in the case, Your Honor.

11                THE COURT:  All right.

12                Is there any surrebuttal on behalf of

13   defendants?

14                MR. WEBB:  No, Your Honor.  We rest.

15                THE COURT:  All right.  Ladies and gentlemen,

16   that means that all evidence is in, with the exception of a

17   couple of rulings that need to be resolved by the Court as

18   to some of the documentary exhibits which will be resolved

19   before you receive the case, obviously.

20                I'm going to release you, as I indicated, for

21   the weekend and to come back on Tuesday morning.

22                But the admonitions are more important than

23   ever, obviously, so I'm going to go through them, all of

24   them.

25                I remind you that during the recess you are not

3189

1      to discuss the case with anyone or permit anyone to discuss

2      it with you or in your presence.  This includes fellow

3      jurors, members of your family, people involved in the

4      trial, friends, and everyone else.

5             This caution includes not discussing the case

6      over the Internet, through text messaging or through

7      e-mails.

8             Secondly, you're not to read, watch, or listen

9      to any report or commentary on this case by any medium of

10     information, and that certainly includes the Internet,

11     newspapers, radio, and television.

12            Third, do not try to do any research or make any

13     independent investigation concerning this case on your own.

14     You must not consult dictionaries, search the Internet,

15     perform Google searches, or make any other investigation

16     about this case on your own.

17            When this case is finally submitted to you on

18     Tuesday, it is very important and critical that the jury

19     has only considered the evidence which each one of you have

20     seen presented in this courtroom by the parties.

21            Finally, keep an open mind still until all the

22     instructions have been provided to you on the law, which I

23     will give you on Tuesday morning, you've heard the closing

24     statements of the attorneys, which you will hear on

25     Tuesday, and at that time you'll be able to convene in the

1    jury room and deliberate this case and discuss it fully

2    between you; and at that time, of course, I'm sure you'll

3    consider the views of your fellow jurors.

4              If you've taken any notes, of course, leave

5    those in the jury room.

6              And remember that these admonishments continue

7    throughout the weekend and until you arrive for

8    deliberations sometime on Tuesday afternoon.

9              So with that, I'll wish you a pleasant weekend,

10   a restful weekend, a day off on Monday, and we'll see you

11   on Tuesday morning at 8:00 a.m.

12             Thank you very much.  You may step down.  Have a

13   nice weekend.

14        (Jurors exit courtroom at 10:49 a.m.)

15             THE COURT:  All right.  Have a seat.  Just a

16   little bit of housekeeping.

17             All right.  Well, Mr. Webb, you stepped up, so

18   let me hear from you.

19             MR. WEBB:  I apologize for jumping the gun.

20             We were thinking, Your Honor, in order to

21   expedite the process on Monday, we would like to propose

22   that once we get Your Honor's proposed instructions, the

23   parties are given a time by which to file any objections,

24   and maybe winnow down the number of things we need to cover

25   on Monday and highlight those issues that are most

1    important.

2            We're concerned that if we wait until we

3    actually show up on Monday morning, unless we have all the

4    cards on the table for Your Honor, it might be less

5    efficient and take longer than necessary.

6            So we'd like to propose some sort of a mechanism

7    that works for Your Honor to give you a heads-up as to all

8    the objections and the important issues so that when we

9    come in on Monday, we can hit the ground running.

10           THE COURT:  Okay.  That's a reasonable request.

11   And I assume that there's no objection to that on behalf --

12           MR. ISAACSON:  We agree with it and assume we

13   would have done it.

14           THE COURT:  Okay.  I will have a set of those

15   proposed instructions to you by 5:00 today.

16           I would like to have all objections to those

17   instructions filed by 5:00 tomorrow.  I don't want --

18   replies will not be necessary.  I'd encourage both sides to

19   be as brief, concise, and direct as possible.

20           And with that, there should be no surprises on

21   Monday morning.

22           With regard to the Court's proposed set of

23   instructions, sometimes someone will just pick up a simple

24   edit, maybe something has been capitalized in one

25   instruction, not in another, sometimes it's a missing word

1    or confused word, and then, of course, the substantive

2    objections which need to be outlined.  But I encourage all

3    of that because it's all helpful in giving the jury a

4    package that they will appreciate.

5              What's the status on this jury notebook?

6    There's been reference to it in various pleadings so far,

7    but I haven't seen anything that's being proposed.

8              So, Mr. Reckers, you've stepped forward.  Fill

9    me in.

10             MR. RECKERS:  Yes, Your Honor.  I have the jury

11   notebook.  We have just one copy.

12             With Oracle's permission, I can hand it up to

13   the Court.

14             THE COURT:  No, that's fine.

15             And this is, again, a proposed jury notebook

16   that's acceptable to both sides; is that correct?

17             MR. RINGGENBURG:  That's correct, Your Honor.

18             It just has the stipulated facts that the

19   parties agreed on in the pretrial order and then the

20   specific facts that Judge Leen included in her spoliation

21   order that would be established, presented in a neutral

22   way.

23             THE COURT:  All right.  Thank you.

24             I will look at that.  And if I have a problem

25   with it, I will attempt to alert counsel of that problem

1    prior to the time that we convene on Monday.

2            Give me a laundry list of what you view as still

3    pending before the Court in terms of rulings as far as

4    exhibits are concerned.

5            MR. WEBB:  Well, I'm not the person to give you

6    this, Judge, but I'll try.

7            We filed a couple of offers of proof this

8    morning.  I don't know if there needs to be any action by

9    Your Honor on that.

10           MR. RECKERS:  The exhibits, redactions that we

11   discussed this morning.  But I believe as far as

12   evidentiary issues, that's it.

13           THE COURT:  You what?

14           MR. RECKERS:  I believe as far as evidentiary

15   issues, what we talked about this morning with the

16   redactions is the only remaining issue, at least that I can

17   recall.

18           THE COURT:  Okay.  Well, that concerned those

19   exhibits that were related to the Cummins video deposition;

20   is that correct?

21           MR. GRAY:  The Cummins video, and one exhibit,

22   DTX 345 for the Jones deposition, Your Honor.

23           THE COURT:  Okay.  And has there been any

24   further resolution -- well, let's see.  I assume there's

25   been no further progress since we spoke about it this

1     morning; is that correct --

2               MR. GRAY:  That is correct, Your Honor.

3               THE COURT:  -- with regard to that one?

4               All right.  Okay.

5               Anything else?

6               MR. ISAACSON:  I think one question we had, Your

7     Honor, just for schedule for next week, once the jury

8     begins to deliberate, what hours do you contemplate that

9     they would be here deliberating?

10              THE COURT:  I -- well, that's a good question.

11    I hadn't really thought about it.  We've been operating on

12    this 8:00 to 2:00 schedule, and I would propose to continue

13    that as a guideline.  If anyone requests additional time,

14    particularly from the jury, I certainly would consider it.

15              I think that because they're accustomed to that,

16    and we are providing them with snacks that they seem to

17    like, what we'll do is just go straight through without

18    releasing them for luncheon breaks, and they will just

19    deliberate the case and decide it on that 8:00 to 2:00

20    schedule, unless they request some additional time.

21              So if they want to go until 3:00 or 4:00, I

22    don't see a problem with that.

23              MR. ISAACSON:  Right.  Maybe you should -- maybe

24    the best thing is to ask them, because I have been involved

25    in trials like this with this schedule where then the jury

```
 1    requests to deliberate from 9:00 to 5:00.  And I don't know
 2    the lives that they're leading right now, so --
 3               THE COURT:  Right.  Well, I'm open to that, and
 4    certainly would discuss it as long as it's within the hours
 5    that our courthouse can accommodate.
 6               MR. WEBB:  Just one last thing from us, Your
 7    Honor.
 8               In discussing the closing situation, is it my
 9    understanding that Mr. Isaacson can divide up his in any
10    proportion he wants before and after me?
11               THE COURT:  Yes.
12               MR. WEBB:  And then will I get a surrebuttal
13    reply after his second --
14               THE COURT:  No.
15               MR. WEBB:  Okay.  He gets as much time here --
16    he gets to divide it however he wants, and I have no
17    further chance to speak after I'm done?
18               THE COURT:  That's right.
19               MR. WEBB:  Okay.
20               THE COURT:  Okay.  Anything else?
21               MR. ISAACSON:  In case the Court's interested,
22    Ms. Dunn and I will be dividing the closing, so it won't be
23    just me.
24               THE COURT:  All right.
25               And Mr. Webb?
```

```
 1              MR. WEBB:  I think I'm flying solo on this one,
 2    Judge.
 3              THE COURT:  Okay.
 4              MR. WEBB:  Nothing further from us, Your Honor.
 5              THE COURT:  All right.
 6              Okay.  So I appreciate the notebook.  And we'll
 7    get those instructions to you sometime this afternoon --
 8    well, if I can do it before 5:00, we'll do it, but I'm not
 9    sure that we can.
10              So thank you very much for moving this case
11    along as well as everyone has.  I truly appreciate the
12    cooperation that has occurred with the exhibits and the
13    expertise.
14              I want to compliment both sides with regard to
15    their technical support.  This is as good as I've seen in
16    any trial I've had.  And I appreciate the professionalism
17    between counsel.
18              So I'll wish you all a pleasant weekend, and
19    we'll see you on Monday morning.  We should start promptly
20    at 9:00.  And that will be the plan.  Thank you.
21              MR. WEBB:  Thanks, Judge.
22              COURTROOM ADMINISTRATOR:  Please rise.
23         (The proceedings adjourned at 10:58 a.m.)
24                         *    *    *
25
```

3197

1                              -o0o-

2        I certify that the foregoing is a correct

3        transcript from the record of proceedings

4        in the above-entitled matter.

5

6        _____    10/3/15

7        Donna Davidson, RDR, CRR, CCR #318      Date
         Official Reporter

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3198

1                          I N D E X

2    DEFENDANTS' WITNESSES:                         PAGE
     SCOTT DEAN HAMPTON
3        Cross-Examination Resumed                  3079
         By Mr. Isaacson
4        Redirect Examination By Mr. Strand         3100

5
                        E X H I B I T S
6
     PLAINTIFFS'                               ADMITTED
7    606, 607, 610, 611, 623, 638, 3389, 3402,      3171
     3404
8    6009, 6010, 2146 and 2153                      3078

9    DEFENDANTS'                              ADMITTED
     20, 315, 341, 342, 105, 276                    3127
10   146, 148 and 225                               3154
     270, 161, 280, 282, 284, 288, 277             3102
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25