1                    UNITED STATES DISTRICT COURT
                         DISTRICT OF NEVADA
2          BEFORE THE HONORABLE LARRY R. HICKS, DISTRICT JUDGE

3

4    ORACLE USA, INC., a Colorado      :
     corporation; ORACLE AMERICA,      :
5    INC., a Delaware corporation;     :
     and ORACLE INTERNATIONAL          :No. 2:10-cv-0106-LRH-PAL
6    CORPORATION, a California         :
     corporation,                      :
7                                      :
              Plaintiffs,              :
8                                      :
          vs.                          :
9                                      :
     RIMINI STREET, INC., a Nevada     :
10   corporation; and SETH RAVIN,      :
     an individual,                    :
11                                     :
              Defendants.              :
12   _____    :

13

14

                  TRANSCRIPT OF JURY TRIAL - DAY 16
15                  (Pages 3199 through 3337)

16

17                      October 5, 2015

18

                       Las Vegas, Nevada
19

20

21

22

     Court Reporter:        Donna Davidson, RDR, CRR, CCR 318
23                          Certified Realtime Reporter
                            400 South Virginia Street
24                          Reno, Nevada  89501
                            (775) 329-0132
25

3200

```
 1                    A P P E A R A N C E S

 2     FOR THE PLAINTIFFS:

 3     BOIES, SCHILLER & FLEXNER LLP
       KIERAN P. RINGGENBERG
 4     1999 Harrison Street, Suite 900
       Oakland, California 94612
 5     (510) 874-1000
       Fax: (510) 874-1460
 6     kringgenberg@bsfllp.com

 7     BOIES, SCHILLER & FLEXNER LLP
       RICHARD J. POCKER
 8     300 South Fourth Street, Suite 800
       Las Vegas, Nevada 89101
 9     (702) 382-7300
       Fax: (702) 382-2755
10     rpocker@bsfllp.com

11     BOIES, SCHILLER & FLEXNER LLP
       WILLIAM A. ISAACSON
12     KAREN L. DUNN
       5301 Wisconsin Avenue, NW
13     Washington, DC  20015
       (202) 237-2727
14     Fax:  (202) 237-6131
       wisaacson@bsfllp.com
15     kdunn@bsfllp.com

16     MORGAN LEWIS & BOCKIUS LLP
       THOMAS S. HIXSON
17     NITIN JINDAL
       JOHN A. POLITO
18     One Market, Spear Street Tower
       San Francisco, California 94105
19     (415) 442-1000
       Fax:  (415) 442-1001
20     thomas.hixson@morganlewis.com
       nitin.jindal@morganlewis.com
21     john.polito@morganlewis.com

22     JAMES C. MAROULIS
       DORIAN E. DALEY
23     Oracle Corporation
       500 Oracle Parkway
24     Redwood City, California 94070
       (650) 506-4846
25     jim.maroulis@oracle.com
       dorian.daley@oracle.com
```

3201

```
 1                  A P P E A R A N C E S (Continued)

 2      FOR THE DEFENDANTS:

 3      SHOOK, HARDY & BACON LLP
        PETER E. STRAND
 4      B. TRENT WEBB
        RYAN D. DYKAL
 5      2555 Grand Boulevard
        Kansas City, Missouri 64108
 6      (816) 474-6550
        Fax: (816) 421-5547
 7      pstrand@shb.com
        bwebb@shb.com
 8      rdykal@shb.com

 9      SHOOK, HARDY & BACON LLP
        ROBERT H. RECKERS
10      600 Travis Street, Suite 3400
        Houston, Texas 77002
11      (713) 227-8008
        Fax: (713) 227-9508
12      rreckers@shb.com

13      SHOOK, HARDY & BACON LLP
        ANNIE Y.S. CHUANG
14      One Montgomery Tower, Suite 2700
        San Francisco, California 94104-4505
15      (415) 544-1900
        achuang@shb.com
16
        LEWIS ROCA ROTHGERBER LLP
17      W. WEST ALLEN
        3993 Howard Hughes Parkway, Suite 600
18      Las Vegas, Nevada 89169
        (702) 949-8230
19      Fax: (702) 949-8364
        wallen@lrrlaw.com
20
        JOSEPH A. GORMAN
21      GIBSON DUNN & CRUTCHER
        555 Mission Street
22      San Francisco, California 94105
        jgorman@gibsondunn.com
23
        BLAINE H. EVANSON
24      GIBSON DUNN & CRUTCHER
        333 S. Grand Avenue, 47th Floor
25      Los Angeles, California 90071
        bevanson@gibsondunn.com
```

3202

```
 1              LAS VEGAS, NEVADA, OCTOBER 5, 2015, 9:12 A.M.

 2                              --oOo--

 3                      P R O C E E D I N G S

 4

 5         (Outside the presence of the jury.)

 6              THE COURT:  Good morning.   Have a seat, please.

 7              All right.  Well, week four.

 8              I see we have some new faces out there.  So,

 9    counsel, why don't you introduce yourselves for me.

10              Not you, Mr. Isaacson.  You can hide under your

11    desk if you'd like.

12              MR. EVANSON:  Your Honor, Blaine Evanson, from

13    Gibson Dunn on behalf of the defendants.

14              MR. GORMAN:  Good morning, Your Honor.  Joseph

15    Gorman from Gibson Dunn on behalf of defendants.

16              THE COURT:  All right.  And plaintiffs' side.

17              MR. MAROULIS:  Good morning, your Honor.  James

18    Maroulis from Oracle for Oracle.

19              THE COURT:  How do I spell your last name?

20              MR. MAROULIS:  M, as in Mary, a-r-o-u-l-i-s, as

21    in Sam.

22              THE COURT:  M-a-r-o-u-l-s?

23              MR. MAROULIS:  -l-i-s.

24              THE COURT:  Okay.  I know everyone else.

25              All right.  Well, for the benefit of the record,
```

 1     we're in open court.  The jury will not be coming in today,

 2     and they're excused pending a resolution of instructions

 3     and proposed verdict form.

 4              I've received various filings by the parties

 5     concerning objections to instructions that are

 6     self-explanatory, and I understand that there are some --

 7     and obviously I've reviewed the filings, and I can see some

 8     that are much more substantive than others.

 9              But I think probably the easiest thing for me to

10     do is to go through the instructions one by one, ask you if

11     you have any objections or simple knits or suggestions.

12              And if you see one that you believe involves

13     substantive argument along the lines as you've indicated,

14     we'll list them probably in the same order that you gave

15     me.  But at least that will keep us on one chronological

16     flow that I can relate to.

17              Some of this is pretty simple stuff, but I still

18     like to have a record that everyone agreed or didn't agree

19     on a particular instruction.

20              So I appreciate the binder that has been given

21     to me this morning because, of course, it starts off with

22     the instructions that the Court had provided counsel with

23     Friday afternoon.

24              And that package represented, for the benefit of

25     the record, the Court's first cut, so to speak, of --

1    through the combined instructions which were offered by

2    both sides.  Some were adopted, some were not, others were

3    actually redrafted or supplemented or otherwise proposed by

4    the Court.

5              So, as I understand it, in the upper left-hand

6    corner of instructions that were jointly submitted by the

7    parties, we -- those were identified with a J with their

8    chronological number following.

9              I understand that there are some objections

10   posed, at least by Rimini, to some of the earlier jointly

11   proposed instructions.  And we'll deal with that.

12             But other instructions were identified with a D,

13   which represented defense, and a P, which represented

14   plaintiff.

15             And the Court-drafted instructions were not

16   numbered but indicated that they were prepared by the Court

17   or otherwise modified.

18             So all of that stated, the first proposed

19   instruction was J-12, Duty of Jurors at page 5 of the --

20   or, excuse me -- page 5 of the binder, yes.

21             Is there any objection to this instruction?

22             MR. EVANSON:  None from defendants.

23             MR. RINGGENBERG:  No, Your Honor.

24             THE COURT:  All right.  The second instruction

25   is P-9, Oracle Entities and Claims.  This was modified

```
1    somewhat by the Court, originally proposed by plaintiff.

2               Is there any objection to that?

3               MR. EVANSON:  No, Your Honor.

4               MR. RINGGENBERG:  No, Your Honor.

5               THE COURT:  The next one is P-7, Corporate

6    Parties, with some modifications that were made by the

7    Court.

8               Any objection?

9               MR. EVANSON:  No, Your Honor.

10              MR. RINGGENBERG:  No, Your Honor.

11              THE COURT:  Okay.  The next one is a stock

12   instruction, J-14, What is Evidence.

13              Any objections?

14              MR. EVANSON:  No, Your Honor.

15              MR. RINGGENBERG:  No, Your Honor.

16              THE COURT:  The next one is another stock

17   instruction, J-16, What is Not Evidence.

18              Any objection?

19              MR. EVANSON:  No, Your Honor.

20              MR. RINGGENBERG:  None here either, Your Honor.

21              THE COURT:  The next one, a stock, J-18, Direct

22   and Circumstantial Evidence.

23              Any objection?

24              MR. EVANSON:  No objection.

25              MR. RINGGENBERG:  None, Your Honor.
```

1          THE COURT:  Next one is Deposition in Lieu of

2     Live Testimony.  This was based on a model instruction with

3     some modifications by the Court.

4          Any objection?

5          MR. EVANSON:  No objection, Your Honor.

6          On this one we just caught a few little knits

7     that we proposed.

8          THE COURT:  And where are -- tell me if you see

9     the knits.

10          MR. EVANSON:  First sentence, the second

11     paragraph, it says "your" and it should be "you."

12          THE COURT:  Yes.

13          Any others?

14          MR. EVANSON:  No.

15          THE COURT:  Okay.  So there's no objection to

16     that instruction?

17          MR. EVANSON:  No objection.

18          MR. RINGGENBERG:  Correct, Your Honor.

19          THE COURT:  Another stock instruction, J-15,

20     Evidence for a Limited Purpose.

21          Any objection?

22          MR. EVANSON:  No objection.

23          MR. RINGGENBERG:  None, Your Honor.

24          THE COURT:  The next one, J-17, Ruling on

25     Objections.

1          Any objection?

2          MR. EVANSON:  No objection.

3          MR. RINGGENBERG:  None, Your Honor.

4          THE COURT:  Okay.  The next one, J-24,

5     Credibility of Witnesses, a stock instruction.

6          Any objection?

7          MR. EVANSON:  No objection.

8          MR. RINGGENBERG:  None, Your Honor.

9          THE COURT:  The next one, I know there was some

10    objection concerning this, Expert Opinion, J-25.

11          Do the parties want to argue this or just --

12          MR. EVANSON:  I think our written objections are

13    pretty self-explanatory, Your Honor.  It's mostly just for

14    clarification.  I don't know that we need --

15          THE COURT:  All right.

16          MR. EVANSON:  -- extended argument.

17          THE COURT:  So basically what I'll do is take it

18    under submission and issue whatever I feel is appropriate.

19          MR. EVANSON:  Thank you.

20          THE COURT:  I appreciate your deference to that.

21          Next instruction, J-27, Stipulations of Facts.

22          I did review the jury notebook proposal with

23    regarding the facts, and that was satisfactory to the

24    Court.

25          Is there any objection to this instruction?

3208

1               MR. EVANSON:  No objection.

2               MR. RINGGENBERG:  No, Your Honor.

3               THE COURT:  The next one, J-19, Charts and

4      Summaries Not Received in Evidence.

5               Any objection?

6               MR. EVANSON:  No objection.

7               MR. RINGGENBERG:  None, Your Honor.

8               THE COURT:  Okay.  The next one, J-20, Charts

9      and Summaries in Evidence.

10              Any objection?

11              MR. EVANSON:  No objection.

12              MR. RINGGENBERG:  None, Your Honor.

13              THE COURT:  The next one, J-21, Use of

14     Interrogatories of a Party.

15              Any objection?

16              MR. EVANSON:  No objection.

17              MR. RINGGENBERG:  No, Your Honor.

18              THE COURT:  The next one, a stock essentially,

19     Redacted Documents.

20              Any objection?

21              MR. EVANSON:  No objection.

22              MR. RINGGENBERG:  No, Your Honor.

23              THE COURT:  The next one, a stock instruction on

24     burden of proof.

25              Any objection?

```
1              MR. EVANSON:  Your Honor, we propose just adding

2      a clarifying sentence, but --

3              THE COURT:  Take it under submission?

4              MR. EVANSON:  Thank you.

5              THE COURT:  Okay.  I will do that.

6              The next one, J-13, Burden of Proof - Clear and

7      Convincing Evidence.

8              MR. EVANSON:  No objection.

9              MR. RINGGENBERG:  No objection.

10             THE COURT:  Okay.  The next one, joint

11     instruction, Spoliation of Evidence.

12             MR. EVANSON:  No objection.

13             MR. RINGGENBERG:  No objection.

14             THE COURT:  The next one TomorrowNow Evidence

15     with modifications, Plaintiffs' 10-B.

16             MR. EVANSON:  Your Honor, we proposed adding two

17     sentences at the end based on the statement that Oracle

18     made in its opposition to our Rule 50(a) motion that they

19     were not relying on the TomorrowNow evidence for punitive

20     damages.

21             I'm not sure that -- I think our suggestion is

22     pretty self-explanatory.

23             THE COURT:  Okay.  I'll take that under

24     submission.

25             Customer Surveys, P-53.
```

1          MR. EVANSON:  We proposed striking this, this

2     instruction, Your Honor, because the discussion was not --

3     or the case law cited and the discussion was not about the

4     actual -- the actual surveys were not admitted at trial, it

5     was only testimony about the surveys.

6          And Your Honor mentioned in the sidebar

7     discussions that the discussion about the surveys was fully

8     admissible, and so we thought that this instruction just

9     may add confusion.  But we can stand on what's in the

10    papers.

11         MR. ISAACSON:  Your Honor will recall that one

12    witness from Rimini was allowed to testify as to the actual

13    level of satisfaction of the surveys, which is what's

14    caused the need for this instruction.

15         THE COURT:  Okay.  I understand the arguments.

16    I have reviewed the filings, and I'll make a decision

17    without having to make further argument.

18         Next instruction, P-11, Copyright - Introduction

19    and Definitions.

20         MR. EVANSON:  We proposed a few changes, Your

21    Honor, but we'll stand on our written objections.

22         THE COURT:  Okay.  And plaintiff?

23         MR. RINGGENBERG:  No objections on these, Your

24    Honor.

25         THE COURT:  Okay.  As you can see from the

3211

1    Court's overview instruction, I that felt it was critical

2    that we have an instruction in here that gave the jury a

3    sense of their overall charge in this case, and this is

4    what I offered, and I know that there's been comment both

5    ways.

6              Is this something you'd like to have oral

7    argument on?

8              MR. EVANSON:  Not defendants, Your Honor.

9              MR. HIXSON:  No, Your Honor.

10             THE COURT:  Okay.

11             So it's considered acceptable by both sides?

12             MR. EVANSON:  We proposed a few modifications in

13   writing, but I don't think anything --

14             THE COURT:  Okay.

15             MR. EVANSON:  -- that we need to take the

16   Court's time with.

17             THE COURT:  Okay.  The next one, D-8,

18   Copyright - Direct Infringement.  Modifications were made

19   by the Court.

20             What's the parties view with regard to this one?

21             MR. HIXSON:  Your Honor, Oracle has submitted an

22   objection to D-8 to clarify which product lines are still

23   in dispute for the jury; namely, JD Edwards, Siebel, and

24   PeopleSoft documentation.

25             We think our written objections adequately set

1    forth the basis of our objection.

2              THE COURT:  Okay.  I will take that under

3    submission.

4              Page 33, Copyright - Express License.  This was

5    a Court-proposed instruction.  I know I've received -- this

6    is one you want to have oral argument on; right?  Or not?

7              MR. EVANSON:  I believe so.  Mr. Reckers is --

8              MR. RECKERS:  Yes, Your Honor.

9              THE COURT:  Okay.  We'll come back to that one.

10             MR. RECKERS:  Okay.

11             THE COURT:  All right.  The next one, P-15,

12   License Interpretation - Parol Evidence.

13             MR. EVANSON:  Our suggestion, Your Honor, was

14   that this instruction not be given because the motivation

15   for it, at least in the motions in limine, was defendants'

16   industry custom and practice evidence that plaintiffs were

17   worried would encourage the jury to rely on for

18   interpretation of the licenses, and since that evidence

19   didn't come in, we don't think this instruction is

20   necessary.

21             THE COURT:  All right.

22             MR. HIXSON:  And, Your Honor, Oracle disagrees

23   because there's been testimony by Mr. Ravin and others

24   about what they believed the licenses mean as distinct from

25   what they may actually have meant, and we think this would

```
 1   help clarify that that "believe" evidence should not be
 2   taken into account in determining the meaning of the
 3   licenses.
 4           THE COURT:  Okay.  All right.  Your comment
 5   triggered my recollection on what I'd read.  And I'll take
 6   that under submission and give you a ruling on it.
 7           The next one, P-16, Copyright - Contributory
 8   Infringement.
 9           MR. EVANSON:  We had a few written suggestions,
10   Your Honor, and we'll stand on what's in our papers.
11           THE COURT:  Plaintiffs?
12           MR. HIXSON:  No objection, Your Honor.
13           THE COURT:  Okay.  The one next one, P-17,
14   Copyright - Vicarious Infringement.
15           MR. EVANSON:  Same thing there, Your Honor.  We
16   had a few written suggestions, but we'll stand on what's in
17   our papers.
18           THE COURT:  Okay.
19           MR. HIXSON:  And, again, plaintiff has no
20   objection to the Court's proposed instruction here.
21           THE COURT:  The next one, Copyright Damages -
22   Introduction.  This was an instruction proposed by the
23   Court.
24           MR. GORMAN:  We had just a few suggested
25   modifications, Your Honor, but we agree with the
```

1    instruction in substance.

2              THE COURT:  All right.

3              MR. RINGGENBERG:  And for the plaintiffs, Your

4    Honor, we have an overarching issue about whether the fair

5    market value theory is presented to the jury, which is

6    addressed by a number of instructions in the section.

7              But other than that, we don't have an objection

8    on this particular instruction.

9              THE COURT:  Okay.  Well, I'll include it in that

10   group that concerned that question, because we will have

11   oral argument on that.

12             Is that agreed upon by everyone on that issue

13   that you've just identified?

14             MR. RINGGENBERG:  Yes, Your Honor.

15             THE COURT:  Mr. Ringgenberg?

16             MR. RINGGENBERG:  Would you like to hear that

17   now or later, Your Honor?

18             THE COURT:  Well, let's identify the ones we

19   have for -- that concern sufficient issues for oral

20   argument.

21             All right.  The next one, Copyright

22   Infringement -- and I'm going to call this last category,

23   for everyone's benefit, argument number two.

24             I listed the first one as argument number one

25   based on that argument number one concerned copyright

```
 1    express license.  Argument number two will involve, in this
 2    case, Copyright Damages - Introduction.
 3              But what's the better topic for this argument,
 4    Mr. Ringgenberg?
 5              MR. RINGGENBERG:  I would say fair market value,
 6    theory of damages.
 7              THE COURT:  And the next one, Copyright
 8    Infringement - Actual Damages.
 9              MR. EVANSON:  Defendants' have just a few
10    proposed modifications, but we don't need argument on it,
11    Your Honor.
12              THE COURT:  Okay.
13              MR. RINGGENBERG:  No objections from plaintiffs,
14    Your Honor.
15              THE COURT:  The next one, P-18, Copyright
16    Damages - Causation.
17              MR. EVANSON:  Your Honor, defendants suggest
18    striking this instruction because causation is dealt with
19    in the other instructions, and so we didn't think this one
20    was necessary.
21              THE COURT:  Okay.  I'll take that under
22    submission.  I recall that argument.
23              MR. RINGGENBERG:  And we have no objection to
24    that instruction, Your Honor.
25              THE COURT:  All right.  The next one, Copyright
```

3216

1   Damages - Lost Profits.

2            MR. EVANSON:  Defendants have just a few --

3   well, one knit in the first sentence.  "Your" should be

4   "you."

5            THE COURT:  Okay.

6            MR. EVANSON:  And then the other suggestion to

7   refer, when talking about causation, to the causation

8   instruction that follows.

9            MR. RINGGENBERG:  And from the plaintiffs' side,

10  Your Honor, we have the other side of the coin, which is

11  there's two competing instructions on causation, and we

12  think the other one is more accurate.

13            THE COURT:  Okay.  Let's list that as argument

14  three.

15            Give me a good mutual acceptable description of

16  that argument.

17            MR. RINGGENBERG:  Lost profits causation.

18            MR. EVANSON:  That's exactly what I was going to

19  say, Your Honor.

20            THE COURT:  Okay.  Argument three will concern

21  lost profit causation.

22            The next one, Copyright Damages - Oracle's Lost

23  Profits - Causation.

24            Same thing?

25            MR. EVANSON:  We have no objection to this one.

1                    MR. RINGGENBERG:  It's the same issue, Your

2      Honor.

3                    THE COURT:  Okay.  That will be A-3.

4                    The next one, Copyright Damages - Defendants'

5      Profits.

6                    MR. EVANSON:  Defendants had a few suggestions,

7      but we'll stand on our papers.

8                    THE COURT:  Okay.

9                    MR. RINGGENBERG:  And from our point of view,

10     this addresses argument A-2, Your Honor.

11                   THE COURT:  Okay.  The next one, Copyright

12     Damages - Fair Market Value License.

13                   MR. EVANSON:  Defendants' had just a few, again,

14     suggestions, and we rest on our papers.

15                   MR. RINGGENBERG:  Your Honor, I think I

16     misspoke.  I flipped a page too aggressively.

17                   This is the one that relates to argument A-2.

18     We don't have any objection to -- we did make an objection

19     on the previous instruction, Defendants' Profits, but we're

20     happy to stand on our papers on that.

21                   I apologize for that confusion.

22                   THE COURT:  Okay.  So it's not an A-2 argument,

23     it's just the objection noted in your papers; right?

24                   MR. RINGGENBERG:  Correct, Your Honor.

25                   THE COURT:  Okay.  So the next one is the A-2

1    argument; is that right?

2              MR. RINGGENBERG:  Yes, Your Honor.

3              THE COURT:  Okay.

4              All right.  The next one, Copyright Damages -

5    Statutory Damages.

6              MR. EVANSON:  Defendants' propose just a few

7    extra sentences to explain the calculation of statutory

8    damages to the jury.  But we'll rest on our papers.

9              THE COURT:  All right.

10             Oracle?

11             MR. HIXSON:  Oracle does not object to the

12   Court's proposed instruction.

13             THE COURT:  Okay.  The next one, Copyright

14   Damages - Innocent Infringement.

15             MR. EVANSON:  No objection.

16             MR. HIXSON:  No objection.

17             THE COURT:  The next one, Copyright Damages -

18   Willful Infringement.

19             MR. EVANSON:  No objection.

20             MR. HIXSON:  No objection.

21             THE COURT:  The next one, Inducing Breach of

22   Contract.

23             MR. EVANSON:   We propose some edits to this

24   instruction, Your Honor, for clarification.

25             I believe Oracle wants argument on this one.  We

```
 1   would -- and if that's true, then we will argue it as well.

 2   If not, then we will rest on our papers.

 3                 THE COURT:  Okay.

 4                 MR. RINGGENBERG:  That's correct, Your Honor.

 5   We would like to address this.  I think a good way to

 6   describe it is the elements of our tort claims.

 7                 THE COURT:  Okay.  And the best description for

 8   this is our new A-4?

 9                 MR. RINGGENBERG:  Yes, Your Honor.

10                 THE COURT:  What would you give me for -- breach

11   of contracts?

12                 MR. RINGGENBERG:  Elements of our -- of Oracle's

13   tort claims.

14                 THE COURT:  Elements for Oracle's tort claims.

15   Okay.  All right.  That will be A-4.

16                 Next instruction, Intentional Interference with

17   Prospective Economic Advantage.

18                 MR. EVANSON:  I believe this is the same one as

19   the last one, Your Honor.  I think we both want to hear --

20   we want argument on it.

21                 MR. RINGGENBERG:  Correct, Your Honor.

22                 THE COURT:  Okay.  And this we'll just call

23   economic advantage?

24                 MR. RINGGENBERG:  Correct, Your Honor.

25                 THE COURT:  A-5.
```

```
 1              MR. RINGGENBERG:  It's really the same issue as
 2   A-4, Your Honor.
 3              THE COURT:  Okay.  The next one is Intentional
 4   Interference - Existence of Relationship?
 5              MR. EVANSON:  Defendants had a few proposed
 6   modifications, but we will rest on our papers.
 7              MR. RINGGENBERG:  No objections from Oracle,
 8   Your Honor.
 9              THE COURT:  Okay.  That will go under
10   submission.
11              Next one is Inducing Breach of Contract and
12   Intentional Interference - Knowledge.
13              MR. EVANSON:  Same thing here, Your Honor.  We
14   will rest on our papers.
15              MR. RINGGENBERG:  No objection, Your Honor.
16              THE COURT:  Okay.
17              The next one is Inducing Breach of Contract and
18   Intentional Interference.
19              MR. EVANSON:  This one too, Your Honor, we
20   proposed a few modifications, and we'll rest on our papers.
21              MR. RINGGENBERG:  No objections, Your Honor.
22              THE COURT:  All right.  The next one is Inducing
23   Breach of Contract and Intentional Interference -
24   Causation.
25              MR. EVANSON:  No objection, Your Honor.
```

 1                    MR. RINGGENBERG:  No objection.

 2                    THE COURT:  The next one is Intentional

 3      Interference with Prospective Economic Advantage.

 4                    MR. EVANSON:  No objection.

 5                    MR. RINGGENBERG:  No objection.

 6                    THE COURT:  The next one is Inducing Breach of

 7      Contract and Intentional Interference.

 8                    MR. EVANSON:  We proposed some edits to this

 9      one, Your Honor, but we will rest on our papers.

10                    MR. RINGGENBERG:  No objection.

11                    THE COURT:  The next one is Federal Computer

12      Fraud and Abuse Act - Introduction.

13                    MR. EVANSON:  On this one, Your Honor, and there

14      are about -- I think there are about 15 instructions on the

15      computer hacking claims.  We would request arguments.  It's

16      on just a couple issues that apply across all of them.

17                    THE COURT:  Okay.  So that will be a new

18      category, A-5, and we'll call it -- give me a good short

19      title for that, Counsel.

20                    MR. EVANSON:  Computer access claims.

21                    MR. HIXSON:  And there's no objection from

22      Oracle to these computer claim proposed instructions.

23                    THE COURT:  Okay.  So that -- A-5 would cover

24      the next instruction as well; is that correct?

25                    MR. EVANSON:  Correct, Your Honor.

```
 1              THE COURT:  Is there anything in it besides
 2    those objections?
 3              MR. EVANSON:  No, Your Honor.
 4              THE COURT:  Okay.  And no objection from Oracle;
 5    is that correct?
 6              MR. HIXSON:  Correct, Your Honor.
 7              THE COURT:  Then P-31, Federal Computer Fraud
 8    and Abuse Act, same thing, no objection from Oracle and
 9    we'll argue under A-5?
10              MR. EVANSON:  Correct.
11              MR. HIXSON:  Correct, Your Honor.
12              THE COURT:  P-32, Federal Computer Fraud and
13    Abuse Act - Intentional Damage to Computer.
14              Same thing?
15              MR. EVANSON:  Same thing, Your Honor.
16              MR. HIXSON:  Same thing, Your Honor.
17              THE COURT:  That will be A-5.
18              Federal Computer Fraud and Abuse Act - Reckless
19    Damage to Computer, A-5; is that correct?
20              MR. EVANSON:  That's correct, Your Honor.
21              THE COURT:  Any objection from Oracle?
22              MR. HIXSON:  No, Your Honor.
23              THE COURT:  The next one, Federal Computer Fraud
24    and Abuse Act - Damages, that's an A-5 argument; is that
25    right?
```

 1                    MR. EVANSON:  This one, actually, Your Honor, we

 2     proposed just one modification, and we're happy to rest on

 3     our papers on that one.  It doesn't have the same issue as

 4     the other instructions we --

 5                    THE COURT:  Okay.

 6                    MR. HIXSON:  No objection from Oracle as to this

 7     proposed instruction.

 8                    THE COURT:  The next one, California Computer

 9     Data Access and Fraud Act.  Is this an A-5?

10                    MR. EVANSON:  This one we don't need argument,

11     Your Honor.  It's just a minor modification, correction.

12                    THE COURT:  No objection from Oracle?

13                    MR. HIXSON:  There isn't.  Oracle concurs in the

14     modification, which is to change the word three to the word

15     two.

16                    THE COURT:  So both sides agree on the change on

17     this; is that right?

18                    MR. HIXSON:  I believe so.

19                    MR. EVANSON:  Yes, Your Honor.

20                    THE COURT:  All right.  And that will be done,

21     I'm sure.  But I'll take a look at it.

22                    California Computer Data Access and Fraud Act.

23     Is this an A-5?

24                    MR. EVANSON:  Your Honor, we have no objection

25     to this instruction.

3224

```
 1                 THE COURT:  Okay.

 2                 MR. HIXSON:  Neither does Oracle.

 3                 THE COURT:  All right.  Thank you.

 4                 The next one, California Computer Data Access

 5     and Fraud Act - Section 2.

 6                 MR. EVANSON:  This is A-5, Your Honor.

 7                 THE COURT:  Okay.

 8                 MR. HIXSON:  No objection from Oracle.

 9                 THE COURT:  The next one is California Computer

10     Data Access and Fraud Act - Section 3.

11                 MR. EVANSON:  This is an A-5 instruction, Your

12     Honor.

13                 THE COURT:  All right.

14                 MR. HIXSON:  No objection from Oracle.

15                 THE COURT:  The next one is California Computer

16     Data Access and Fraud Act - Assisting, Aiding and Abetting.

17     A-5?

18                 MR. EVANSON:  A-5, Your Honor.

19                 MR. HIXSON:  No objection from Oracle to the

20     instruction.

21                 THE COURT:  The next one is California Computer

22     Data Access and Fraud Act - Damages.

23                 MR. EVANSON:  No objection to this one, Your

24     Honor.

25                 MR. HIXSON:  No objections.
```

```
 1                 THE COURT:  Okay.  The next one, Nevada Computer
 2     Crimes Act -- or Crimes Law.
 3                 MR. EVANSON:  No objections, Your Honor.
 4                 MR. HIXSON:  No objections.
 5                 THE COURT:  The next one, Nevada Computer Crimes
 6     Law - Definitions.
 7                 MR. EVANSON:  This is an A-5, Your Honor.
 8                 MR. HIXSON:  No objections from Oracle.
 9                 THE COURT:  The next one, Nevada Computer Crimes
10     Law - Section 1.
11                 MR. EVANSON:  This would fall under A-5, Your
12     Honor.
13                 THE COURT:  Okay.
14                 MR. HIXSON:  No objections from Oracle.
15                 THE COURT:  The next one is Nevada Computer
16     Crimes Law - Section 3.  A-5?
17                 No objection from Oracle?
18                 MR. EVANSON:  Correct, Your Honor.
19                 MR. HIXSON:  Correct.
20                 THE COURT:  The same would be with the next one,
21     Nevada Computer Crimes Law - Damages?
22                 MR. EVANSON:  We have no objection to this one,
23     Your Honor.
24                 THE COURT:  Okay.
25                 MR. HIXSON:  No objection by Oracle.
```

```
 1              THE COURT:  All right.  The next one is Damages,
 2   Punitive Damages - Liability.
 3              MR. EVANSON:  On this one, Your Honor, we have
 4   just a minor modification, and we can rest on our papers.
 5   But we'd like to have argument on punitive damages,
 6   generally, some additional -- the additional instructions
 7   that we've proposed.
 8              THE COURT:  Okay.
 9              MR. EVANSON:  That would be A-6, punitive
10   damages.
11              THE COURT:  All right.
12              MR. HIXSON:  And there's no objection from
13   Oracle on the Court's punitive damages instructions.
14              THE COURT:  Okay.  The next one is -- well,
15   let's see.  Should that -- should those additional ones be
16   listed as an argument item?
17              MR. EVANSON:  The additional punitive damages
18   instruction should, Your Honor, yes.
19              THE COURT:  All right.  We'll call that A-6.
20              Punitive Damages - Officer, Director, or
21   Managing Agent.
22              MR. EVANSON:  No objection to this one, Your
23   Honor.
24              MR. HIXSON:  No objection, Your Honor.
25              THE COURT:  The next one, Return of Verdict.
```

```
 1              MR. EVANSON:  No objection, Your Honor.

 2              MR. HIXSON:  No objection.

 3              THE COURT:  The next one, Duplicative Damages,

 4    with Modifications.

 5              MR. EVANSON:  No objection.

 6              MR. HIXSON:  No objection.

 7              THE COURT:  The next one, Communication with the

 8    Court.

 9              MR. EVANSON:  No objection.

10              MR. HIXSON:  No objection.

11              THE COURT:  The next one, Duty to Deliberate.

12              MR. GORMAN:  No objection.

13              MR. HIXSON:  No objection.

14              THE COURT:  Okay.  All right.  So we have six

15    different topics for argument items.

16              Why don't we just stick with the chronological

17    order that we placed those in.

18              MR. RINGGENBERG:  Your Honor, can I raise one

19    additional point, please, which is there's one additional

20    instruction we asked the Court to provide the jury with

21    respect to how TomorrowNow and CedarCrestone fit into the

22    damages issues.

23              THE COURT:  Okay.  We'll call that CedarCrestone

24    and TomorrowNow.

25              MR. RINGGENBERG:  Thank you, Your Honor.
```

3228

1           THE COURT:  And that will be an argument item?

2           MR. RINGGENBERG:  Yes, please, Your Honor.

3           THE COURT:  So that will be A-7.

4           Okay.  So going back to the first one, Copyright

5    and Express License, Court instruction.  I didn't make a

6    note concerning who was the most objecting party here.

7    Perhaps you're in agreement as to who the most objecting

8    party is, and I'll let them go first.

9           MR. RECKERS:  Well, I think Oracle has the most

10   substantive additions to this, though I'm happy to go

11   first.

12          THE COURT:  Okay.  Let's go -- let's start with

13   plaintiff then.

14          MR. ISAACSON:  So, Your Honor, with respect to

15   the express license instruction, we're talking about

16   PeopleSoft, JDE, and Siebel.

17          Now, with respect to -- let's start with

18   PeopleSoft.

19          THE COURT:  Wait a minute.  Let me -- I'm going

20   to find your objections on this in the binder.

21          Which number is it in -- the section under

22   Oracle in the binder?

23          MR. ISAACSON:  This is express license court

24   instruction, which would be --

25          THE COURT:  It's at page 4.  I see it.

1          Okay.  Go ahead, Mr. Isaacson.

2          MR. ISAACSON:  All right.  Now, with respect to

3    PeopleSoft, the Court has proposed instructing that as a

4    matter of law the defendant, Rimini Street, engaged in

5    copyright infringement of PeopleSoft software.

6          Now, we have the issue, of course, of PeopleSoft

7    documentation, but separately from that the -- there has

8    been a great deal of testimony in the case about the

9    meaning and interpretation of the actual PeopleSoft

10   licenses, and including things like 14.2, which talks about

11   access and use, rather than copying, and which the Court

12   already held on summary judgment is basically irrelevant to

13   the copyright issue.

14         And the jury has seen the provisions of the

15   PeopleSoft contract shown to them by both sides, first by

16   Rimini, and then a reply by Oracle, with respect to the

17   location of the software, and then the restriction that it

18   be used for the internal operations.

19         And so we proposed a paragraph -- a paragraph

20   that explained what the Court had ruled before.

21         Now, in looking at that paragraph, brevity is

22   always better, and we think our paragraph is too long, and,

23   in fact, all that would be necessary would be the second

24   sentence of our proposed paragraph.

25         And if you have -- I don't know if you have the

3230

1    red-lined paragraph in front of you, which is page 7 of our

2    proposed --

3              THE COURT:  Blue-lined, but go ahead.

4              MR. ISAACSON:  Proposed changes, it's at the

5    second tab in the binder.  So what we would propose is the

6    second sentence there.

7              "The PeopleSoft software licenses prohibited

8    Rimini Street from copying, preparing derivative works

9    from, or distributing PeopleSoft software other than to

10   support the specific licensee's own internal data

11   processing operations on the licensee's own computer

12   systems."

13             That would give clear and precise instruction as

14   to the meaning of the PeopleSoft licenses as opposed to an

15   instruction that just says there was copyright infringement

16   without explanation.

17             So that's what we're proposing there.

18             Now, in addition, in the following two

19   paragraphs, and it's helpful to look at the red-line at

20   this point, which would be page 8 of the red-line where

21   we're talking about PeopleSoft documentation.

22             So those paragraphs are now addressing the

23   PeopleSoft documentation issue, and it only picked -- the

24   Court's instruction only picked up one of the two license

25   restrictions, internal use, and we have added in red-line

3231

1     "and at the customer's facilities," because that's a proper

2     interpretation of the licenses.

3               And so we've done that in the next two

4     paragraphs on that page.  You can see that red line.

5               So that would conform the PeopleSoft

6     documentation instruction to the Court's prior orders.

7               We are unclear at this point as to what actual

8     license defense there is for the PeopleSoft documentation

9     given the Court's prior summary judgment order.

10              There's been no identification of any other

11    provision that would protect the documentation as opposed

12    to the software distinguishing the two somehow.

13              And so, you know, as part of -- right now, I

14    don't know why they don't -- there's not just a ruling as a

15    matter of law on the documentation or what provision

16    they're intending to rely on.

17              But if we're going to be putting in the

18    PeopleSoft license on the documentation issue, it should

19    obviously include both of the restrictions.

20              THE COURT:  All right.

21              Okay.  Mr. Reckers?

22              MR. RECKERS:  Your Honor, our objections to

23    these additions largely flow from the fact that they seek

24    to expand what the judge -- what Your Honor actually ruled

25    in your February 2014 order.

3232

1              The issue in that particular order was the local

2      copying of the PeopleSoft programs.  They moved on certain

3      software environments that were on Rimini's system, and the

4      Court held as a matter of law, using section 1.1 of the

5      license agreements, that the local copying, the copies on

6      Rimini servers, were -- constitute infringement.

7              What defendants have proposed now is -- I'm

8      sorry, what plaintiffs now propose is expanding that ruling

9      to cover things such as derivative works, distributions

10     from the update process, that simply were not part of the

11     Court's order.

12             From Rimini's perspective, the Court's order was

13     dispositive on all of the issues of copying, and so the

14     jury does not need to be instructed, and it would be

15     actually confusing to hear about things such as derivative

16     works and distributions, simply wasn't part of the Court's

17     order, and so it's not necessarily a basis that -- for

18     instruction at this point.

19             The jury should be told is what's elsewise in

20     the instruction what the judge actually -- what Your Honor

21     actually said earlier in the case.  The Court's order was

22     that there was infringement.  That's all they need to know.

23     They don't need to get into the nuances of some of the

24     other infringement theories that weren't actually -- didn't

25     need to be litigated at this trial.

```
 1              On the documentation, Rimini's position is that

 2    the Court's original construction -- instruction was

 3    correct, and the facilities language is not appropriate.

 4              If you look at the license agreements for

 5    PeopleSoft, and we cite Your Honor specifically to

 6    Plaintiffs' Exhibit 698, which is the City of Flint license

 7    which is one of the exemplary ones that the parties have

 8    agreed to, you'll see that it treats documentation

 9    separately at section 1.3 from the software.

10              If Rimini's -- with respect to the proper

11    interpretations license, is to continue to divide out

12    software and documentation.  I recognize that the

13    definition of software in the license agreement includes

14    documentation.

15              I further recognize that the Court held in the

16    summary judgment order that section 1.1 covers the universe

17    of the grant, basically, that everything falls under 1.1.

18              Respectfully, Rimini disagrees with that

19    reading, and we would submit that section 1.3, it's on page

20    1 of Plaintiffs' Exhibit 698, is a separate, independent

21    grant.  That grant breaks up documentation separately and

22    allows for -- and does not include the facilities

23    limitation that plaintiffs are suggesting we add in.

24              THE COURT:  All right.  I will take a look at

25    that.
```

1            MR. ISAACSON:  May I say one more thing, Your

2    Honor?

3            THE COURT:  Yes.

4            MR. ISAACSON:  Because counsel is leaving me

5    puzzled as to what we're doing with PeopleSoft other than

6    the software in this case.

7            We agree that the Court in its summary judgment

8    decision did not reach beyond the software.  All right.

9    That doesn't mean that the Court didn't interpret the

10   license agreement.

11           And unless you put forward some provision of the

12   license agreement that would treat derivative works or

13   distribution or, for that matter, documentation, this issue

14   should not -- none of those issues should go to the jury,

15   and the jury should be so instructed.

16           Now, specifically with respect to the City of

17   Flint license, section 1.1, which is what the Court

18   interpreted, expresses restrictions on the licensee on how

19   they use the software.

20           And then there is, as counsel acknowledged, a

21   definition of software that includes the term

22   documentation.

23           So when the Court ruled on software, while it

24   didn't -- you know, it didn't have the issue of

25   documentation technically before it, within the definition

3235

1    of software in the license agreement, it says software

2    includes documentation.

3              So there really isn't an argument that 1.1

4    wouldn't apply to documentation.  So I'm not -- and I'm not

5    even hearing what's going to be -- and I'm somewhat

6    concerned about this because I'm not hearing what's going

7    to be said in closing argument.

8              And we do have some concerns, you know, like any

9    counsel, I don't like objecting during closing argument.  I

10   would not like to hear legal arguments that have been

11   foreclosed in closing argument about, for example,

12   documentation, and I have no understanding at this point as

13   to what their defense is on documentation.

14             MR. RECKERS:  I'm happy to respond to that, Your

15   Honor.

16             I think Mr. Isaacson and I have both identified

17   the legal dispute.  I think we've both pointed to the

18   provisions.

19             I cited 1.3 in support of my client's position,

20   and, obviously, if we get closing tomorrow, you know,

21   however Your Honor rules on this instruction, we'll abide

22   by it.

23             So if Your Honor includes the facility

24   limitations, we will not make this argument.  If Your Honor

25   doesn't, then we'll make the argument that I'm suggesting,

1      that documentation is treated differently.

2                So I think it's teed up before Your Honor now,

3      which I think solves Mr. Isaacson's question about closing

4      and would avoid the instruction.

5                My client's position is that documentation was

6      not covered by the Court's order, and if the Court seeks to

7      extend its order, then, so be it.

8                But, as it stands now, we don't believe that

9      documentation was raised in the summary judgment, we don't

10     believe that's, respectfully, a proper interpretation of

11     1.1, its applicability to the further language in the

12     question; but, obviously, we'll abide by whatever Your

13     Honor's guidance on this question is.

14               THE COURT:  Okay.  What I intend to do is I want

15     to hear from you on these arguments, and then I'll take

16     them under submission, and we'll run a proposed final set

17     that I'll get to you at a time when I can see that we'll

18     have a chance, one, for you to digest what we've done, and,

19     two, give you a final opportunity and -- if you think that

20     we've missed something.

21               MR. ISAACSON:  So just to be clear as to

22     plaintiffs' position at this point -- and I appreciate

23     counsel clarifying.

24               They're making quite clear that their only

25     argument in closing would be to argue a section of the

1     license agreement, 1.3, which we think is foreclosed by the

2     license agreement itself which has been interpreted by the

3     Court; agreed, not with documentation.  This is the first

4     time the Court will interpret it.

5          But the interpretation that's put forward is

6     untenable under the license agreement and inconsistent with

7     the Court's ruling with respect to software, so this issue

8     should not go to the jury.

9          The Court's instruction with regards to

10    PeopleSoft software should be -- should now say "and

11    documentation," and the documentation issue should not be

12    submitted to the jury.

13          THE COURT:  All right.  Well, your respective

14    arguments remind me of why I felt that this instruction was

15    necessary, because I -- as I heard the evidence start to be

16    presented and was mindful of my earlier summary judgment

17    motion, I was concerned about software versus documentation

18    and where that all fell into the picture.  But I'll take a

19    look at it and let you know.

20          MR. RECKERS:  And, Your Honor, Rimini had

21    several fairly minor additions that I'm happy to address

22    with Your Honor quickly.

23          THE COURT:  Okay.

24          MR. RECKERS:  And those actually related to the

25    JD Edwards and the Siebel portions.

3238

1          THE COURT:  All right.  Let me get down to --

2     what page on your objections in the binder are we looking

3     at?

4          MR. RECKERS:  We'll be starting at page 9 of

5     Rimini's objections, the red lines that go on 9 and 10.

6          THE COURT:  Okay.  All right.

7          MR. RECKERS:  And, Your Honor, there's really

8     just two issues.

9          We had added -- so to start with the JD Edwards,

10    we added the context of the engagement of the support

11    provider into the license -- or into the license

12    instruction.

13         And the point here, and this was an issue in the

14    summary judgment, we think it's proper for the jury to be

15    instructed that the licenses did allow for the support

16    provider to make the copies on their system.

17         That was consistent with Your Honor's denial of

18    Oracle's summary judgment request for this particular --

19    for these two particular pieces of software.

20         And in particular, for example, the service or

21    the support aspect of it, it's also reflected in the

22    pertinent license agreement in the -- for example, in the

23    JDE agreement that's before the Court.

24         THE COURT:  What is the exhibit on that?

25         MR. RECKERS:  It's Plaintiffs' Exhibit 704, Your

1   Honor.

2                    THE COURT:  Okay.  Go ahead.

3                    MR. RECKERS:  And I'll cite you to -- it's on

4   the first page.  It's Article VII, subpart Roman numeral

5   III.

6                    So this has to do with copying the

7   documentation.  It's allowed to the extent necessary for

8   customers' archival needs and to support the user.

9                    So we had suggested adding the portion regarding

10  support because it is expressly in the license agreement.

11                   And the second point, again, this is

12  consistent -- this is throughout -- this is applicable to

13  both Siebel and JD Edwards, is the Court's proposed

14  definition of archival copy.

15                   From Rimini's perspective, the definition's

16  unnecessary.  It does not -- such a definition does not

17  appear in the license agreement themselves.

18                   And it's a bit confusing.  It uses the term

19  "unmodified copy."  And as we heard in trial from many

20  witnesses on both sides, this software actually is heavily

21  modified, and obviously you'd need to keep for your

22  production system a backup of the modified version of the

23  changes.

24                   So we would submit that the definition is not

25  consistent with the evidence.  The archival definition is

1    not consistent with the evidence.

2           The unmodified copy actually wouldn't be that

3    helpful because you have to modify this software, and we

4    believe the evidence supports that Rimini kept archival

5    copies that were modified in support of its users in case

6    there were -- was a need to go to the backup to do things

7    like fix bugs in the program, or to restore the client's

8    own production system.

9           So we would suggest removal of the archival copy

10   definition from Your Honor's instruction.

11           THE COURT:  Okay.

12           All right.  The Oracle response to that?

13           MR. ISAACSON:  So, we're again getting to an

14   issue as to the intersection of the jury instructions, the

15   case, and what's going to be argued in closing argument.

16           The -- as Your Honor noted, this -- this has

17   been, frankly, a puzzling trial given the lack -- the utter

18   lack of attention given to Your Honor's summary judgment

19   order.

20           Your Honor sent the JDE and Siebel cases to

21   trial based on whether they were archival backups,

22   emergency backups, and noted that there was evidence that

23   said -- on both JDE and Siebel, where the defendant was

24   saying we don't use these things, so maybe these were just

25   backups.

3241

1          Now, as the evidence has developed at trial,

2      they said we do use these, both the Siebel and the JDE

3      environments.

4          And everybody's agreed what was in the summary

5      judgment order, that a backup is an unmodified copy, it's

6      something you put on the shelf for safekeeping, and that

7      this definition of a customized backup is clearly not what

8      the license is talking about because you're talking about a

9      backup of our software.

10         If you accept that they're customizing it,

11     they're no longer backing it up.  The most that he can be

12     talking about is they also had some backups of their

13     customizations, which is completely irrelevant.

14         They don't have a defense of -- there's no

15     defense in the license agreement or backups of

16     customizations.

17         Now, the Giant Cement license, as Mr. Reckers

18     says, they are relying on the provision of 7.3, and they

19     are arguing an interpretation that's inconsistent with the

20     summary judgment decision, because the language that

21     they're hanging their hat on says archival needs and to

22     support the users.

23         They want it to be "or."  They want to be able

24     to just say to support the users.

25         All right?  It's not a disputed -- the only

3242

1    issue -- and as the Court identified in the summary

2    judgment order -- that goes to the jury is whether they --

3    these are being used to meet archival needs, which all the

4    evidence says that it's not, is not happening.

5             And then, obviously, the Court has

6    interpreted -- and, obviously, the Giant Cement license

7    also has the provisions about, you know, having to be on

8    the system and being for internal use only.

9             But with regard to that one provision, the Court

10   has said what we're going to have a trial about is whether

11   these are backups or archives.

12            The most I'm hearing from Mr. Reckers is we're

13   going to come up with a new definition of archives that's

14   fundamentally different from the Court's summary judgment

15   order, and that's the language they want stricken.

16            All right?  They don't want backups to mean

17   backups anymore.  From what I'm hearing, they want it to --

18   they don't want it to mean backups of Oracle software, they

19   want it to mean backups of customizations, right, which by

20   definition is not a backup of Oracle software.

21            This is -- I don't actually -- we said this in

22   our Rule 50 motion, but I don't understand why the JD

23   Edwards issue is going to -- on liability, or the Siebel

24   issue, is going to the jury, because they are no longer --

25   they are not making the argument they made on summary

1    judgment.

2              In summary judgment they made the argument there

3    was a deposition saying -- reference that the Court cited

4    in both respect to JDE and Siebel saying we don't use these

5    things.  All right?

6              Mr. Ravin has said they used them.  Other

7    witnesses said that they use them.  They use the

8    environments for support, which means they're no longer

9    unmodified copies.

10             Both sides, people are testifying that's not a

11   backup, you put the backup tapes on a shelf, leave it pure

12   and simple so that it's not tampered with.

13             And so I don't think that what they're asking

14   you to do is consistent with the Court's order, and that's

15   why they need that language stricken.  They're trying to

16   change the definition of backup from the Court's order, and

17   that's specifically document 474 at 22.

18             On a more minor note, with respect to the actual

19   instruction, we had one suggestion that's not in our papers

20   that's probably not substantive for the jury.

21             But if you look at the second paragraph of the

22   Court's proposed JD Edwards software license agreements

23   instruction -- well, actually, I was going to make a

24   scrivener's point.  I'll leave it alone.

25             THE COURT:  Okay.

3244

1              MR. RECKERS:  Your Honor, may I?

2              THE COURT:  Yes, Mr. Reckers.

3              MR. RECKERS:  It's probably helpful, Your Honor,

4    to now break these two apart because there are differences

5    between the two software -- two pieces of software and how

6    they're used at Rimini Street, and obviously the licenses

7    have differences that were noted on the summary judgment.

8              So to start with JD Edwards -- and, again, this

9    is -- the license that we've been discussing is Plaintiffs'

10   Exhibit 704.

11             The provision that we're relying on, you know,

12   says archival needs in support of the users, and what the

13   testimony has been is that Rimini keeps -- they even call

14   it an archive, an archive of software and support material

15   to support the users.

16             And they don't necessarily use it for disaster

17   recovery.  What they use it for is to support the user,

18   say, when a bug arises, and they look in their archive, and

19   they see if they have a copy of the bug fix.

20             I would submit that the jury can apply the

21   license agreement and say is that an archive to support the

22   users, and then that's appropriate under Your Honor's

23   previous construction in the summary judgment order.

24             The partner support is that this is not

25   necessarily just unmodified code for disaster recovery.  If

3245

1    you look at the license agreement, there's a separate

2    provision for disaster recovery, and that's section 5 on

3    the same page, number 5 of article 2.

4              So just up the page a little bit, it says the

5    customer may provide for disaster recovery services on a

6    computer, so on and so forth, and there's some provisions

7    about disaster recovery.

8              So I would submit to Your Honor that the license

9    itself allows for archival use to support users consistent

10   with the evidence in this case for JD Edwards, and that's

11   what -- that's the point of both of our modifications, and

12   that's what we intend to argue if Your Honor -- unless Your

13   Honor rules otherwise.

14             Siebel's different.  Siebel, number one, you

15   can't modify the software.  So that's not an issue with

16   Siebel.  It is locked down like Office, like Microsoft

17   Office or Word.

18             So we're not talking about modifying here.  The

19   testimony has been that Rimini does use the Siebel

20   environments to test fixes.  So if the software breaks,

21   they go to the one -- the copy that they have and they

22   test.

23             And that's fully consistent with the grants in

24   this particular license, which is the Novell license which

25   is Plaintiffs' Exhibit 705 at page 3, section 2.1,

1    subsection 4, talks about archiving emergency backup,

2    disaster recovery, and related testing.

3              So I would submit to Your Honor that the

4    evidence before the Court on Siebel is the use of testing

5    when the thing is broken, archival copy or even, in this

6    case, disaster recovery copy, to fix, to test the fix, is

7    consistent with this license grant.

8              And that's why that particular license supports

9    a license defense consistent with the evidence that's

10   presented in this case.

11             THE COURT:  All right.  Thank you, Mr. Reckers.

12             MR. ISAACSON:  I believe what you're hearing on

13   JDE is that -- I don't understand the difference between

14   their definition of archive and any copy.

15             I mean, they're literally defining archive as a

16   copy for support, which is inconsistent with the Court's

17   interpretation of the JDE provision which limited it to the

18   purposes that we have described.  The actual provision

19   would not make any sense if you interpreted it that way.

20             The Siebel license -- the Siebel agreement,

21   which is the Novell agreement, talks specifically -- it

22   specifically talks about emergency backup for disaster

23   recovery, and the Court has interpreted that provision.

24             And they're now advancing a factual case on

25   Siebel that is directly contrary to what they said on

1    summary judgment.

2              So at docket 474, page 24, when the Court ruled

3    on the Novell license, the Court interpreted the archival

4    emergency backup or disaster recovery purposes language and

5    said that, in footnote 20,

6              "Rimini has proffered evidence that the

7    development environments associated with Novell are used

8    exclusively for archival and backup purposes and related

9    testing," citing Brian Slepko, noting that Siebel

10   environments are not used for development.

11             That is no longer the case.  All right.  They

12   expressly talk about how they are used for testing, there's

13   actually evidence that they're used for development, and

14   that they're used for support of clients.

15             I don't actually think that they are presenting

16   a case that's consistent with what the Court's guidelines

17   for the case to be provided to the jury on this.

18             And clear guidance is going to be important so

19   I'm not leaping up during the closing argument and making

20   objections.

21             MR. RECKERS:  Your Honor, I just have one quick

22   point, and that would be that you can't develop on Siebel.

23   Like I said, it's completely locked down.  So it's just not

24   a thing.  And so our arguments are fully consistent with

25   the Court's summary judgment ruling.

1           THE COURT:  All right.  I will take a look at

2    all of this.

3           All right.  Have we exhausted what I started

4    with as argument one?

5           MR. ISAACSON:  Yes, Your Honor.

6           THE COURT:  Okay.  Argument two concerns the

7    fair market value and instructions and damages.

8           So I think this is an Oracle argument.  So I'll

9    hear from Oracle.

10           MR. RINGGENBERG:  Thank you, Your Honor.

11           There's a great difference in the proof in this

12    case between Oracle Database on one hand and the other

13    three products, PeopleSoft, Siebel, and JDE on the other.

14           For Oracle Database, there's testimony about

15    Oracle's standard pricing for a license, and for Mr. Ravin

16    about what he would have agreed to if he had to buy a

17    license, and that evidence relates to the time period at

18    which infringement began.

19           So the jury has before it an adequate factual

20    basis to find a fair market value measure of damages for

21    Database.  So we believe that ought to be presented to the

22    jury, and I don't think there's any disagreement between

23    the parties about that.

24           On the other hand, as to Siebel, JD Edwards, and

25    PeopleSoft, there is no factual basis for the jury to reach

3249

1    a conclusion and calculate damages based on fair market

2    value as the Court's instructions provide, and there's two

3    reasons for that.

4            The first is this, was something Mr. Hampton was

5    going to testify to, and he disclaimed it on the stand.  He

6    said expressly, "I did not calculate a hypothetical license

7    assessment for PeopleSoft, JDE, or Siebel.

8            "QUESTION:  In your testimony, did you -- you

9    did a hypothetical license for Database.  You did not do

10   one for PeopleSoft, JDE, or Siebel; correct?

11           "In my testimony, I think that's right."

12           That's what he said.  That's at transcript 2846,

13   7 to 13.

14           So the jury doesn't have before it anyone who is

15   advocating what that measure should be.  Mr. Hampton's

16   testimony is limited to what he called the benefit to

17   Rimini, but that's not what the fair market value asks.

18           And, as a legal matter, there's at least three

19   reasons why his testimony is not sufficient.  It doesn't

20   address Oracle's side of the negotiation at all, it's not

21   based on the time period when the negotiation would have

22   occurred, and there's no benchmark, there's no comparable

23   that the jury would be allowed to reference.

24           So from our point of view, the jury should be

25   instructed to calculate database damages, and however the

1    jury picks between the two methods, that's fine, lost

2    profits or hypo license.  But on PeopleSoft, JDE or,

3    Siebel, the only method that the jury has sufficient

4    evidence in front of it is on lost profits.

5           And if Your Honor -- Your Honor, if the jury

6    concludes we didn't have any lost profits, I guess we'll

7    get zero.  We don't think that's going to happen, but

8    that's for the jury to decide.  But they should not be

9    instructed on hypo license.

10          The one other point I'll add is Rimini's

11   proposed changes to the Court's jury instructions walk away

12   from the measure of damages that they asked the jury to

13   instruct on in the first place.

14          The new Rimini theory on these damages is that

15   hypo license is just one measure of value of use and that

16   there are others unspecified to the jury what they are or

17   how they should be calculated, which we think exemplifies

18   why the jury should not be invited to speculate as to what

19   this measure of damages should be.

20          I think we'll stop there.  Thank you, Your

21   Honor.

22          THE COURT:  All right.

23          Mr. Gorman?

24          MR. GORMAN:  Thank you, Your Honor.

25          The Court's instructions on fair market value of

3251

1    use on their face are absolutely correct.  The fact that

2    Oracle did not present evidence of a hypothetical license

3    does not mean that Rimini does not get an instruction on

4    it.

5            Oracle's argument is largely a criticism of

6    Mr. Hampton's testimony.  They're free to present this

7    criticism during their closing argument, but as this Court

8    held in denying Oracle's Daubert motion, Mr. Hampton's

9    testimony is relevant to the value of the hypothetical

10   license to Rimini.

11           Oracle is the plaintiff.  It was their burden to

12   present evidence concerning the value of the hypothetical

13   license to Oracle.  It's not Rimini's burden to demonstrate

14   the value of that license to Oracle.

15           For whatever reason, Oracle failed to present

16   this evidence.  Instead of responding to Rimini's Daubert

17   motion, they withdrew Ms. Dean's testimony on hypothetical

18   license damages award, and the consequence of that decision

19   is that they have no evidence in this case on the value of

20   the hypothetical license to them.

21           As I stated before, Oracle's objection is

22   largely a criticism of Mr. Hampton's report, but looking at

23   the actual instructions that we're talking about here,

24   they're on their face entirely proper.

25           There's three instructions that this Court put

3252

1     forward that concern fair market value of use.

2              The first is entitled Copyright Infringement

3     Damages - Introduction.  That instruction correctly informs

4     the jury that it may award damages in the form of lost

5     profits or fair market value of use.  There's no dispute

6     about that.

7              In fact, both Rimini Street and Oracle presented

8     fair market value of use theories during the trial.  Rimini

9     Street presented a fair market value of use theory as to

10    all of the alleged infringement, and Oracle presented it

11    only as to the Oracle Database.  Oracle also presented a

12    lost profits theory as to all the infringement.

13             So the jury will be faced with these two

14    measures of actual damages, and, as the Court's instruction

15    provides, it should be told that it may award either one.

16             The next instruction on fair market value comes

17    right after that introduction.  It's entitled Copyright

18    Infringement - Actual Damages.  It properly informs the

19    jury that there is no precise formula for determining

20    actual damages.  This instruction is also proper.

21             Oracle argues that there are only two ways to

22    measure actual damages, lost profits or hypothetical

23    license.  That is wrong.  We cited many cases stating that

24    there are a variety of ways to demonstrate fair market

25    value of use.

1           We cite *Polar Bear* and *Dash v Mayweather* in our

2   jury instruction brief, and we've cited many other cases in

3   our prior briefing.

4           Most notably in *Wall Data*, the Ninth Circuit

5   stated,

6           "It is not improper for a jury to consider

7   either a hypothetical lost license fee, or the value of the

8   infringing use to the infringer."

9           Mr. Hampton testified about the value of the

10  infringing use to the infringer, and that's an entirely

11  appropriate measure of copyright actual damages.

12          *Polar Bear* reiterated this point, stating actual

13  damages can be measured by the value of use to the

14  copyrighted work to the infringer.  We've cited that *Polar

15  Bear Productions* and *Wall Data* discussion several times,

16  and Oracle has not responded to it.

17          The third instruction is also proper, that is,

18  Copyright Damages - Fair Market Value.  It explains how the

19  jury is supposed to determine a hypothetical license.

20          Oracle agrees that hypothetical licenses are at

21  issue in this case.  They presented a hypothetical license

22  theory as to Oracle Database, and Rimini has presented a

23  hypothetical license theory as to all of the infringement.

24          As I stated before, it is not Rimini's burden to

25  put forth the value of the hypothetical license to Oracle.

1    That was Oracle's burden, and the fact that they failed to

2    do so does not mean that Rimini doesn't get an instruction

3    on that.

4              That's all for now, Your Honor.  Thank you.

5              THE COURT:  All right.  Thank you.

6              Mr. Ringgenberg, do you want to respond to that?

7              MR. RINGGENBERG:  Sure, Your Honor.

8              Two quick points.  I think the answer to both of

9    the questions raised by Rimini's counsel is found in *Oracle*

10   *versus SAP*.  I think we all have to agree that's the case

11   that has the most closely analogous facts.  It's the same

12   software at issue, it's very similar conduct of

13   infringement, very similar testimony on damages.

14             In that case, both hypo license and lost profits

15   were presented to the jury.  The district court judge after

16   trial, and the Ninth Circuit on appeal, found that the hypo

17   license evidence was lacking, insufficient as a matter of

18   law.

19             If Mr. Gorman's argument were accepted, it seems

20   that the outcome of that case should be, even though the

21   jury found that hypo license was a better measure, and it

22   supported zero dollars in damages, that Oracle should have

23   walked away with nothing in that case.

24             If Mr. Gorman's argument were correct, that

25   would have been the outcome, but that's not what the Ninth

1    Circuit said.

2              The Ninth Circuit accepted and did not reverse

3    that jury's finding that hypo license was a better measure,

4    but nonetheless increased the amount of damages awarded to

5    Oracle on a lost profits theory, $327 million, because that

6    was the -- that was an adequate measure of actual damages.

7              The jury does not need to get instructed on a

8    theory of damages for which there is inadequate proof.

9    It's confusing, it's distracting, and it only raises issues

10   that we'll have to deal with after trial if the jury were

11   to somehow decide to apply that measure even though there's

12   a lack of adequate evidence before it.

13             The second point, which is whether or not the

14   value of use solely to the infringer is an adequate measure

15   of damages.  *SAP* argues this point specifically and says

16   that the value of use as referred to in the Ninth Circuit

17   cases is the hypothetical license value.  The statutory

18   term is actual damages.

19             The benefit to Rimini doesn't have any -- it may

20   be relevant to but is not determinative of Oracle's actual

21   damages.  It's only actual damages if that's the fee that

22   Oracle is missing in this case because the parties would

23   have agreed.

24             For example, you know, if Oracle and Rimini had

25   agreed on $100 million license fee, and they didn't get

1    that fee because it wasn't paid, Oracle's actual damages

2    are $100 million.  That would make sense.

3              But that's not what Mr. Hampton is doing and

4    that's not what Rimini wants the jury to do.  All they want

5    to do is solely measure the value to Rimini, not the loss

6    to Oracle.

7              And so the citations to *Wall Data* or to *Polar*

8    *Bear* do not suggest the Ninth Circuit has ever upheld that

9    you can look solely to the benefit to the infringer.  You

10   have to look at the loss to the copyright holder.

11             And on that point I would point the Court back

12   to the specific language in *Oracle versus SAP*, which says

13   normally the value of the hypo license is between the

14   benefit to the infringer and the cost of the licensee.

15             You have a negotiation.  One side wants to pay

16   little, one side wants a lot.  Normally they meet in the

17   middle.  And that's why Mr. Hampton's calculation, which

18   only looks at Rimini's point of view, is missing half the

19   equation.

20             And -- thank you, Your Honor.

21             THE COURT:  All right.  Thank you.  Okay.

22             MR. GORMAN:  Just a quick response to that, Your

23   Honor.

24             THE COURT:  All right.

25             Mr. Gorman?

```
 1              MR. GORMAN:  Mr. Hampton's calculation is the
 2    amount that Rimini would pay as a rational economic actor,
 3    and any price more than that Rimini would walk away from in
 4    a hypothetical negotiation.
 5              Oracle was free to put forth evidence of the
 6    value of the hypothetical license to Oracle, but it chose
 7    not to do so.
 8              And just to point out in Oracle v SAP, Oracle
 9    was the plaintiff as they are here, and the award that the
10    jury -- the jury's damages award was based on Oracle's
11    evidence that the Ninth Circuit and the District Court
12    found insufficient as a matter of law.
13              But the Ninth Circuit did not hold that the
14    plaintiff must demonstrate the value of the hypothetical
15    license to -- or that the defendant must demonstrate the
16    value of the hypothetical license to the plaintiff.
17              Thank you, Your Honor.
18              THE COURT:  All right.  Thank you.
19              All right.  That will take us to argument number
20    3, lost profits causation.
21              MR. RINGGENBERG:  I'm afraid I'm going to
22    overstay my welcome, Your Honor, so I'll be very brief.
23              There's two instructions on causation for lost
24    profits.  There's one that Oracle proposed and one that
25    Rimini proposed, and they're both found in the Court's
```

3258

1    proposed instructions.

2            And I think both parties agree we don't need

3    them both, and the question is which one makes more sense,

4    and on that I would say just point to the source.

5            Oracle's proposed instructions is taken from

6    CACI, the California standard jury instructions, on

7    causation in a tort case, because the Ninth Circuit has

8    held that causation in a copyright case is derived from

9    basic tort principles.

10           It outlines that substantial factor causation

11   and specifically says that if the losses would have

12   happened but for the infringing conduct, we don't get lost

13   profits.  That's their argument.  They're free to argue

14   that to the jury.

15           Rimini's instruction goes further and is a

16   one-sided, stilted statement of the law derived entirely

17   from their own making without a clear basis.

18           And while it could -- all except the last

19   paragraph, all except the last sentence, could be -- you

20   know, perhaps is an accurate, if one-sided, statement of

21   the law, the better approach is to take the model

22   instruction we have proposed.

23           I do want to talk, Your Honor, about the last

24   sentence in Rimini's proposed instruction which suggests to

25   the jury that we have to separately prove causation for

1    every single customer.

2              And it's true that we don't dispute that if the

3    jury were to conclude that some customers would have left

4    Oracle but for the infringement, that we can't get damages

5    on those.  We don't dispute that, and the jury will sort

6    that out.

7              But what this instruction suggests is that

8    Oracle had to take a deposition of every single customer,

9    and absent that specific testimony from every single

10   customer, we can't fail to meet our burden of proof.

11             I'm predicting that their closing, if this

12   instruction is granted, is going to put this instruction on

13   the scene -- on the screen and tell the jury that Oracle

14   did not take the deposition of every one of 300 customers,

15   and therefore they haven't met their burden of proof.

16             And on that point I would like to point the

17   Court to something Rimini said in litigating this case.  We

18   were litigating before Judge Leen the question of how many

19   depositions of customers we need to take.  We wanted a lot,

20   they didn't want any.

21             And here's what they told Judge Leen.

22             "Oracle could depose two customers for each of

23   their relevant product lines.  Any further customer

24   depositions would, by definition, be cumulative and

25   duplicative.  Oracle does not need and should not be

1    allowed to seek the same information from multiple

2    third-party witnesses."

3              They continued,

4              "Oracle appears to be on a crusade to burden

5    every single one of Rimini's customers even though they all

6    have essentially the same information."

7              So for Rimini to claim to the jury that there's

8    a failure because we didn't take enough depositions after

9    arguing to Judge Leen that one or two would be enough

10   because they're all going to say the same thing, we think,

11   is reason enough to accept our proposed instruction.

12             Thank you.

13             THE COURT:  All right.

14             Mr. Evanson?

15             MR. EVANSON:  Your Honor, a few points in

16   response.

17             The first is that I think the best source for

18   this instruction is the Ninth Circuit's recent and very

19   definitive copyright damages case, it's the *Polar Bear* case

20   and *Oracle versus SAP*.

21             And if you read those cases, there is -- they

22   say over and over and over again that the danger in

23   copyright damages, and lost profits in particular, is

24   allowing a damages award that's based on speculation.

25             The risk of speculation is -- runs throughout

1    those cases, and the antidote for speculation in copyright

2    damages is this causal nexus requirement that both cases

3    stress so strongly.

4            So when we're talking about jury instructions, I

5    think the question has to be how do we guide the jury in a

6    way that its decision is not based on speculation.

7            And that's why we think this last sentence in

8    this instruction is so important, because our view is that

9    there is no way for the jury to come to a lost profits

10   damages award in this case other than looking at every

11   single customer, otherwise it will be based on speculation.

12           And Mr. Ringgenberg said, you know, the jury

13   will sort that out, and I don't know how they will, Your

14   Honor.

15           There's -- they had a copyright expert -- I'm

16   sorry, a causation expert, and you'll remember that he said

17   that without Rimini on the market, every customer would

18   have gone to Oracle because Oracle was the only one in the

19   market that provided vendor-level support.

20           So that's how they get from, if Rimini's not

21   infringing, or Rimini's not in the market, all the

22   customers go to Oracle.

23           But that's the link, that there's no -- there's

24   no evidence in the case that every customer wanted

25   vendor-level support.  There's not common proof, there's

1    not individual proof.

2              There's no way for the jury to determine which

3    customers -- on a common basis, which customers needed or

4    wanted vendor-level support and, therefore, which of the

5    customers fall under this model.

6              So we submit, Your Honor, that unless the jury's

7    told that it has to look at every single customer, it will

8    necessarily engage in speculation.

9              I just wanted to highlight a few examples

10   because I think these examples disprove the model.  Right?

11             We heard from AGCO and SonicWall, both customers

12   who were migrating to another software from Oracle.  They

13   both wanted -- they didn't want Oracle upgrades, they

14   didn't want any of the vendor-level support, all they

15   wanted was a couple years of the gap measure.  They wanted

16   to extend the Oracle software, and that's why they went to

17   Rimini.

18             Pitney Bowes was on self-support when they went

19   to Rimini.  They didn't even come from Oracle.

20             And then you heard Mr. Baggett testify that he

21   had decided to leave Oracle before he even talked to

22   Rimini, that he was not going back to Oracle, and it was

23   based on reasons having nothing to do with the

24   infringement.

25             And all four of these customers are included in

1      the damages model.  And I don't say that -- you know,

2      Mr. Ringgenberg mentioned, and, you know, it's been said

3      earlier in the case that we're free to -- Rimini Street is

4      free to pick up the customers that don't -- you know, that

5      are included and show how, you know, individual customers

6      weren't -- shouldn't be in the case, shouldn't be part of

7      the damages model.

8              But the burden is on the plaintiff to come -- to

9      put forth a model for the jury -- from which the jury can

10     determine without speculating which customers were lost as

11     a result of the infringement, and our position, Your Honor,

12     is that the only way to do that in this case is by looking

13     at every single customer, and that's why we think that

14     language in the instruction is accurate and important.

15             THE COURT:  Okay.  Thank you, Mr. Evanson.

16             The obvious question is how do you square that

17     proposition with the position Rimini took in front of Judge

18     Leen?

19             MR. EVANSON:  Yes.  Sorry, Your Honor.  I should

20     have addressed that.  So a few points.

21             First of all, I believe -- and Mr. Reckers will

22     correct me, but they subpoenaed every customer.  It wasn't

23     just these 17.  So they sent out subpoenas -- is that

24     right?

25             MR. RECKERS:  Yeah, they sent out either

1    subpoenas or open record requests to every single customer

2    of Rimini Street for documents.

3         MR. EVANSON:  So they asked for all this

4    information and sent it out to everybody.

5         And the point is not that -- the point is not

6    that every single customer has to be deposed, it's that

7    there has to be a model, there has to be a model for

8    getting from the acts of infringement or the misstatements

9    to a damages award, and that model does not exist based on

10   common proof in this case.  And I think that's our

11   response.

12        MR. RINGGENBERG:  Your Honor, I would only say

13   that if what they're saying is the testimony from Oracle's

14   witnesses isn't to be believed because it's inadequate or

15   lacks adequate foundation, that's a great closing argument

16   to make, but it doesn't have to do with instructing the

17   jury on something that's not an accurate statement of the

18   law.

19        THE COURT:  Okay.  All right.

20        A-4, the tort claim elements argument.

21        MR. RINGGENBERG:  There's two issues, Your

22   Honor, with respect to these that we'd like to raise.

23        The first is whether -- is how the jury should

24   be instructed on the fraud claim, the fraud theory that

25   underlies both of these tort claims.

1            I think both the parties agree that the jury

2     needs to have some instruction that's specific that says

3     here's what that means, here's what you've got to prove to

4     prove up the tort claim underlying -- or the fraud

5     underlying these tort claims.

6            And, you know, Rimini proposed a paragraph in

7     their instructions on that point, and we think that's not

8     an accurate statement.

9            We have proposed two separate instructions which

10    we think ours are more accurate and fair and they're taken

11    from a common model that describes what a tort claim is.

12           And the principal difference between the two is

13    that Rimini's fraud instruction says the fraud has to be

14    aimed to induce damage in the third party, in the customer.

15    We think that's clearly wrong.

16           Our theory in this case is that Rimini and

17    Mr. Ravin lied to customers to harm Oracle, and that's

18    clearly a cognizable legal theory.  If you lie to my

19    customers to get my customers to switch from me to you,

20    that's a fraud claim.

21           And so that's why their instruction -- which

22    specifically limits the damage to the third party, to the

23    customer, rather than to Oracle.

24           So I would point Your Honor to the last two

25    pages in your binder in Oracle's section which have our

3266

1   proposed instructions which are based on common models for

2   what fraud requires.

3           And I don't really think there's anything more

4   to it than that.

5           The second point is whether, on tortious

6   interference, we can rely on the violation of the computer

7   statutes as a predicate.

8           We have proposed to the Court that our tortious

9   interference claim can be based either on fraud, or it can

10  be based on violation of these statutes which in some cases

11  are criminal in nature.

12          And we cited to the Court the *Restatement* which

13  says if something is independently unlawful, it can provide

14  a basis for tortious interference, the *Korea Supply* case

15  from California which says that expressly.

16          And then there's a Nevada case as well, which

17  I've now forgotten the name of, which provides that there's

18  a -- there is a tort claim under -- the underlying basis of

19  which was a violation of a realtor's duty under the statute

20  applicable to realtors.

21          So we think there's more than a clear basis to

22  include in the tortious interference claim those as

23  predicates as well.

24          And I would say I'm not clear on Rimini's

25  argument against that, what's the -- I'm not clear on what

1    the problem is from their point of view with including

2    those as predicates.

3            Obviously, they don't think they're proved, but

4    that's for the jury to decide.

5            Thank you, Your Honor.

6            THE COURT:  Thank you, Mr. Ringgenberg.

7            MR. EVANSON:  Your Honor, let me first just make

8    one point.  I'm sorry I don't know the discovery record

9    better, but just to make clear that Oracle asked for 20

10   depositions, and Mr. Reckers made clear to me that they did

11   get all 20 depositions that they asked for.

12          So even though there was some pushback that

13   Mr. Ringgenberg mentioned, they did get all 20 depositions

14   that we heard from.

15          On the induced breach point -- well, first,

16   taking up Mr. Ringgenberg's first point, the two

17   instructions that they propose on misrepresentation, the

18   first on misrepresentation, the second on concealment, the

19   misrepresentation instruction omits nearly half of the

20   elements of the model instruction.

21          The model, the CACI 1900, requires knowledge of

22   falsity or reckless disregard of falsity by Rimini that

23   reliance by customers on Rimini's false statements be

24   reasonable, that the customers were harmed, that the

25   reliance was a substantial factor in causing the harm to

3268

1    the customers.

2              So there are more elements to the instruction

3    than are in Oracle's proposed instruction.

4              Our counterproposal was just to make it into the

5    intentional tort instructions.  We don't have a problem

6    breaking that out into another instruction.

7              But if that instruction's going to be given, it

8    needs to include all the elements of the misrepresentation

9    claim that plaintiffs are required to prove.

10             And on the concealment claim, I think this is

11   the first time that we've heard concealment as a separate

12   basis for fraud, and I don't think it was pleaded, and we

13   haven't heard it before.

14             And Oracle's proposed instruction on

15   misrepresentation by concealment also omits several of the

16   elements.  There has to be an intent to deceive, an actual

17   reliance, harm to the third party, a causal nexus between

18   the concealment and the harm.

19             So all of these elements need to be in the

20   instruction.  Again, if we're going to break it out into a

21   separate instruction, those all need to be in there.

22             And then the second point Mr. Ringgenberg

23   mentioned on adding computer hacking claims as predicate

24   acts for the intentional interference claim, there are some

25   serious or real problems with this, Your Honor.

1              The first is that the computer hacking claims

2      are very messy, and I'm sure Your Honor has read the *Nosal*

3      case that we cited in the our briefs, and all the

4      constitutional concerns raised there applying a computer

5      hacking statute to a claim that a person violated the terms

6      of use of a website.

7              And all those constitutional terms in the *Nosal*

8      case are heightened immeasurably if it is not only a

9      standalone claim, but a way for expanding it into an

10     interference claim.  We think that's taking a

11     constitutionally suspect statute and putting a magnifying

12     glass on it.

13             And because -- and the other problem, Your

14     Honor, is that because we don't think these claims will

15     survive, even if the jury comes back and finds Rimini

16     liable on them, because we don't think that they'll survive

17     a Rule 50(b), it would create real problems sending them to

18     the jury intertwined with the interference claims.

19             Because I -- you know, I understand Your Honor's

20     position you want to deal with the 50(a) motions on the

21     back end, and we respect that, but it will be difficult to

22     carve out the hacking claims from the interference claims

23     if they're intertwined with the interference claims along

24     with other predicate acts.

25             And so our position -- you know, we obviously

1    argue in Rule 50 that the computer hacking claims should

2    not go to the jury, but we think it's especially important

3    they don't go to the jury as predicates for interference

4    claims because that will make a real mess of it.

5              THE COURT:  Okay.  I understand your argument.

6              MR. RINGGENBERG:  Two quick points, Your Honor,

7    please.

8              THE COURT:  Mr. Ringgenberg?

9              MR. RINGGENBERG:  Thank you.

10             So the case that I was trying to remember

11   before, but I couldn't, from this great state is *Davis v*

12   *Beling* which relied on the statutory duty of a realtor to

13   -- as a basis for a tort claim which is cited in our

14   papers.

15             On our proposed instruction about what's an

16   actual misrepresentation, I disagree with counsel that

17   reliance isn't stated.  For example, the element three is

18   it did cause reliance.

19             If it's not clear enough to the Court that the

20   instruction is limited to knowingly false representations,

21   we would have no objection to adding the word "knowingly

22   false" to the instruction, but we think it's clear enough

23   as it stands given there's intentionality required.

24             And with regard to the constitutional concerns,

25   either we've pled the claim or we haven't, and if -- either

3271

1  we've stated the claim or we haven't, the constitutional

2  concerns go to what the law is, that's not for the jury to

3  sort out.

4          If this theory is going to be presented to the

5  theory -- to the jury on -- as a standalone claim, there's

6  no reason why we can't also include it in this.  It's

7  either fish or fowl, Your Honor, one way or the other.

8  Thank you.

9          THE COURT:  All right.  Thank you,

10  Mr. Ringgenberg.

11          Okay.  Let's go to A-5, the computer access

12  issue.  Mr. Evanson.

13          MR. EVANSON:  There's really one point, Your

14  Honor, that we want to discuss on the computer access

15  claims, and that's the definition of without authorization.

16          Our argument is pretty straightforward.  The

17  Ninth Circuit interpreted this language in the *Nosal* case

18  and held that a defendant does not act without -- does not

19  act without authorization if it uses a third party's

20  credentials, a third party who has access, who has proper

21  access to the system, to access the system.  That is not

22  acting without authorization.

23          And that was a square and clear holding in the

24  *Nosal* case, and we think it applies squarely to the facts

25  of this case because it's undisputed that every time Rimini

3272

1     accessed Oracle's database -- or Oracle's website, it was

2     doing so with credentials it was provided by Oracle's

3     clients.

4              And so we're just asking that that definition of

5     "with authorization" be put into the instructions because

6     it was -- it's sort of so clearly a holding of the *Nosal*

7     case.

8              THE COURT:  Okay.  All right.  Thank you very

9     much.

10             Mr. Hixson?

11             MR. HIXSON:  Your Honor, with respect to the

12    definitions for the computer access ones, these were

13    jointly proposed, and so I'm now in the odd position of

14    defending something that Rimini has previously agreed to it

15    is now backing away from.

16             With respect to the "without authorization,"

17    there isn't a definition within the statute itself about

18    what that term means.

19             And so what the parties originally did in coming

20    up with that defined term was to turn to the Ninth

21    Circuit's decision in *LVRC Holdings v Brekka*, the 2009

22    opinion, and to take the language that the Ninth Circuit

23    used to describe the term "without authorization."

24             They described it as a person who accesses a

25    computer without authorization, accesses a computer without

3273

1    any permission at all.

2            That was the language from the Court's opinion,

3    and that was what the parties in the original joint

4    proposal had submitted.  And we think that is a concise

5    explanation that captures the meaning of that term, which

6    is not otherwise defined in the statute.

7            Rimini's additions are -- string a couple of

8    different sentences together, but there's no one place or

9    one case that you could look for that.

10           They argue that *Nosal* concerned the issue of

11   authorization by a third party, but Rimini's proposed

12   instruction doesn't quote exact language from the *Nosal*

13   opinion, it's a construct.

14           We also think that the existing definition which

15   says, "without authorization means without any permission

16   at all," fairly embraces the question of whether a third

17   party granted access.  Obviously, if they didn't, then

18   there isn't any permission at all.

19           And so we think that the Court should stick with

20   the previously-agreed instruction as quoted from the Ninth

21   Circuit's decision.

22           Another problem we have with Rimini's new

23   proposed definition is that it introduces the word hacker.

24   They want to say that someone accessed without

25   authorization -- if they don't have any authorization for

3274

1      any purpose such as when a hacker accesses someone's

2      computer without any permission.

3              We think the word hacker is problematic for a

4      number of reasons.  First, as the Ninth Circuit explained

5      in the *Nosal* decision, hacker is a colloquialism that

6      refers to a person who accesses without authorization or in

7      excess of authorization.

8              The Court's existing instructions explain those

9      legal terms to the members of the jury.  Introducing the

10     colloquialism hacker, without an explanation of what that

11     means, puts an undefined term in front of the jury and

12     doesn't tell them that they don't need to think about it

13     because the Court's other instructions already capture the

14     essence of the CFAA violation.

15             I would also note that the Court issued an order

16     in limine preventing Oracle from using pejorative terms to

17     describe Rimini during the trial.  The three specific ones

18     were pirate, thief and the word steal.

19             I acknowledged that the word hacker wasn't among

20     them, but it seemed strange after the Court issued that

21     order to then put in the jury instruction a pejorative term

22     that doesn't appear in the statute that's really a

23     colloquialism for terms that are in the statute, and that

24     threatens to introduce more confusion to the jury than any

25     benefit.

1                Thank you.

2                THE COURT:  Mr. Evanson?

3                MR. EVANSON:  A few quick points, Your Honor.

4           We heard testimony of Mr. -- I forget his name,

5     the Oracle architect, there's been too many witnesses, I'm

6     sorry -- all about hacking.

7                And it's important -- I mean, you read the *Nosal*

8     opinion, Your Honor, and the core holding of the en banc

9     Ninth Circuit is that these statutes are limited to

10    hacking.

11               They are not -- they cannot constitutionally be

12    applied to violating the website's terms of use, and we

13    think, you know, the added language construction is just

14    meant to communicate that caution from the en banc Ninth

15    Circuit to the finder of fact that these are not to be

16    broadly read to encompass any time you access a computer in

17    a way the computer owner doesn't like.

18               Finally, one point I forgot to mention, *Nosal*

19    was obviously only dealing with the federal statute, but

20    every one of these statutes that Oracle is asserting have

21    the same "without authorization" limit in it.  So it's

22    without authorization or without permission.

23               And because what motivated *Nosal* was the

24    constitutional concerns, with reading it more broadly, we

25    think the holding applies just the same to the California

1    and Nevada statutes.

2              Thank you.

3              THE COURT:  Thank you.

4              MR. HIXSON:  Two points, Your Honor.

5              First, to respond briefly on hacking, it remains

6    the case, and counsel for Rimini did not dispute, that the

7    word hacking is a colloquialism, and the Ninth Circuit did

8    explain that it's a shorthand for accessing without

9    authorization or in excess of authorization.

10             The Court's existing instructions explain those

11   elements of these causes of action to the jury, but

12   introducing a pejorative term hacking that is not defined,

13   and without explaining to the jury that that really just

14   means what you've already told them in the other

15   instructions is confusing and unhelpful.

16             And, second, to counsel's other point where he

17   states that the state claims, the California Penal Code and

18   the Nevada statute, he argues that their definition of

19   without authorization should be imported into those as

20   well.

21             We disagree with that based on the Ninth

22   Circuit's recent decision in *United States v Christiansen*

23   where the Ninth Circuit said that the California Penal Code

24   is not similar to the CFAA.  And specifically with regard

25   to access and authorization, the Ninth Circuit said the two

3277

1      statutes were quite different.

2              With respect to the CFAA, the Court confirmed

3      that that's principally an access statute, but with respect

4      to the California statute, the Ninth Circuit said that the

5      focus of that is not on access but on taking, what somebody

6      does, what they obtain, what they get from the website.

7              And so Rimini's proposed definition of without

8      authorization focuses on access which is a CFAA concern,

9      but the different language in the California and the Nevada

10     statutes is focused more on taking the materials on the

11     website.

12             And so importing that definition into those

13     other statutes wouldn't make sense and would contravene the

14     Ninth Circuit's recent recognition that the California

15     statute is different materially from the federal one.

16             THE COURT:  All right.  Thank you, Mr. Hixson.

17             Okay.  We're up to A-6 concerning punitive

18     damages instructions.

19             MR. EVANSON:  Your Honor, our objections to

20     punitive damages instructions is not to the instruction

21     that Your Honor has proposed, it's to the additional

22     instructions that Rimini Street proposed that were not

23     included in the Court's set.

24             And we're not sure whether the concern relates

25     to the merits or with -- or whether they're appropriate in

1    this first phase of trial, and so I'm addressing the second

2    point first, Your Honor.

3            The -- this often comes up in punitive damages

4    cases, that there's a question of whether -- how many

5    instructions go in the second phase if punitive damages is

6    found to be available, and how many go in the first phase.

7            And the *Philip Morris versus Williams* case made

8    clear that the limits that the Supreme Court has imposed on

9    punitive damages are not just limits that can be imposed

10   through the Court's de novo review of the amount of the

11   award post-trial or post-judgment, they also are

12   necessarily -- or they are -- the protections also must

13   necessarily come in the form of jury instructions that help

14   ensure that the jury does not impose a punitive damages

15   award unlawfully and unconstitutionally.

16           That was the square holdings of the *Philip*

17   *Morris* case which reversed for a new trial when a

18   defendants' instruction was denied that the Supreme Court

19   found was important to protect against the risk of

20   unconstitutional punishment.

21           So it's clear that jury instructions directed to

22   important limits on the scope of punitive damages must be

23   given.  *Philip Morris* uses that word "must."

24           And the second point, Your Honor, is I want to

25   direct the Court to the *Holdgrafer* case that we've cited in

3279

1     our papers.  That's a California Court of Appeal case where

2     the trial court gave the -- it was an instruction similar

3     to in *Philip Morris versus Williams*.

4              The Court gave that instruction at the end of

5     phase two, but had not given it at the end of phase one

6     when the jury was faced with the decision whether to impose

7     punitive damages liability at all.

8              And the Court of Appeal reversed because those

9     instructions are necessary not only to cabining the amount

10    of punitive damages that the jury imposes, but cabining the

11    jury's imposition of punitive damages at all.

12             And there are lots of reasons for this, Your

13    Honor, and I'll mention one, and it's the one that Justice

14    O'Connor identified in the *Haslip* case that there is a

15    stigma that attaches to a company that is -- that is hit

16    with a punitive damages award, regardless of the amount and

17    regardless of whether it can ultimately be fixed in

18    post-trial motions on appeal through the Court's de novo

19    review.

20             So we think it's very important that the

21    limit -- that the jury be instructed on the limits that

22    exist as to the availability of punitive damages, not just

23    to the amount in phase two.

24             Thank you.

25             THE COURT:  All right.  Thank you.

3280

1          MR. HIXSON:  Your Honor, Oracle objects to the

2     inappropriate piling on of multiple and redundant

3     instructions concerning punitive damages.

4          This Court has confirmed in a prior ruling that

5     Nevada law will be used to determine the ability to assess

6     punitive damages.

7          And so, in that light, Oracle took the Nevada

8     model instruction, number 12-PD.1 and provided and adapted

9     that model as P-46, the punitive damages instruction, which

10    is the Court's tentative instruction.

11         This adequately covers the entitlement of

12    punitive damages and provides adequate protection to Rimini

13    Street.

14         Rimini's proposed -- their five additionally

15    proposed instructions are either entirely duplicative of

16    the existing one or have no basis at all.

17         For example, their proposed D-42 about the

18    purpose of punitive damages is already covered by the

19    existing instruction which states the purpose.

20         Their D-44, which concerns specific harm to the

21    plaintiff, is already addressed by the existing instruction

22    which directs the jury to consider the harm to Oracle.

23         Their D-45 is again addressed by the existing

24    instruction which discusses the standards for applying

25    punitive damages.

1          Their D-46, concerning industry standards, is
2     irrelevant as Rimini elected not to put on evidence of
3     industry standards at trial.
4          And their D-47, fair notice concerning a change
5     of law, is baseless as there is no relevant change of law
6     here.
7          But beyond that, the cumulative effect of all
8     these instructions would mislead the jury.  For example,
9     Rimini's proposed instructions 45, 46, and 47, begin with
10    the words, "even if you find that punitive damages might be
11    available," and then they go on to put another condition
12    that the jury shouldn't award that punitive damages.
13         What that would mean is that there would be one
14    instruction following the model that says you look at
15    oppressive malice, you look at all the relevant standards,
16    and then, if the jury finds that, then they would be
17    confronted by a further instruction that says even if you
18    found that Rimini's conduct satisfied these standards,
19    there's another box to check, and then after that another
20    one, even if you find that.
21         It's like a six-part checklist where the jury
22    has to go through every last hurdle before they can assess
23    punitive damages, and that's not the law.
24         The first instruction, which is adapted from the
25    Nevada model, that's the law.  That's the checklist the

1    jury has to apply.  There aren't other ones in addition to

2    that, and that's the way that Rimini's instructions are

3    phrased.

4            I'm reminded of a quote that we cited in our

5    brief, Your Honor, from a practice group guide that says,

6    "jury instructions should provide the relevant rules of law

7    generally and avoid singling out or stressing particular

8    evidentiary items or legal theories, otherwise the court's

9    emphasis of certain facts or issues may cause a juror to

10   attach undue importance or credibility to the selected

11   matters."

12           That's what Rimini is trying to do here by

13   having more instructions about punitive damages than about

14   licenses, which are the heart of this copyright

15   infringement case.

16           The existing model that we've provided and the

17   Court has in its tentative instruction is appropriate, it's

18   adapted from the Nevada model, and it accurately captures

19   the law that the jury is to apply in punitive damages.

20           Rimini's suggestion there should be additional

21   boxes to check is contrary to the law and would mislead and

22   confuse the jury.

23           THE COURT:  Thank you, Mr. Hixson.

24           Mr. Evanson?

25           MR. EVANSON:  Just a few points, Your Honor.

1          The model instructions are great for most -- in

2     most instances.  In punitive damages, the model

3     instructions are not sufficient.  And that's what happened

4     in *Williams*, that's what happened in *Holdgrafer*.

5          Many courts have held and reversed where -- or

6     ordered new trials on post-trial motions because punitive

7     damages pose such an acute risk of the arbitrary

8     deprivation of private property.

9          That's the Supreme Court's language, and in a

10    series of decisions the Supreme Court has stressed the

11    importance of this, culminating in *Williams*, which required

12    that the jury be instructed, when there is a substantive

13    constitutional limit, on the extent -- on the punitive

14    damages that can be awarded.

15         And so it's -- the model instructions are not

16    sufficient, Your Honor.  And if the -- if the issue is

17    there are too many instruction, you know, there were

18    three -- there was an instruction on objectively reasonable

19    conduct, industry custom and practice, and fair notice.

20    Those could be combined into one.

21         But our concern is the jury has to be told that

22    these are not permissible bases for punitive damages.

23         And a few -- you know, Mr. Hixson mentioned that

24    there's no fair notice issue.  This case involves alleged

25    infringement, willful infringement, and malicious conduct

3284

1    based on misstatements that were made, infringement that

2    occurred, that three, five years later was deemed to be

3    infringement.

4              So all the conduct in this case preceded the

5    Court's ruling on infringement by three years.

6              The jury has to know that unless we had reason

7    to believe that the Court was going to rule in 2014 that

8    there was infringement, statements in 2009, 2010, about the

9    interpretation of the licenses are not a permissible basis

10   for imposing punishment if there was no fair notice.

11             That is a central limit on the application of

12   punitive damages in this case.

13             One other -- one other point, Your Honor.  We

14   propose making clear to the jury in the instruction that

15   punitive damages are not available for copyright

16   infringement.

17             We think that's important because this case is

18   mostly about copyright infringement, and punitive damages,

19   obviously, there's no dispute, can't be based on

20   infringement alone, and so just specifying that for the

21   jury we think is important.

22             Thank you.

23             THE COURT:  Thank you.

24             MR. HIXSON:  Your Honor, a few brief points.

25             Counsel for Rimini has argued that there was not

3285

1    fair notice because their conduct occurred before the Court

2    had occasion to issue summary judgment rulings.

3              I would submit that's true in all lawsuits where

4    conduct occurs, then there's a lawsuit, and then there are

5    rulings.  That doesn't mean that the defendant was not on

6    fair notice.

7              Our interference claim, in addition to relying

8    on the computer statutes, relies on fraud.  And lies are

9    always wrong, and if the jury concludes that Rimini was

10   lying, they -- Rimini didn't need further notice than

11   simply to know that it's wrong to lie to people.

12             With respect to the model instruction, counsel

13   for Rimini has argued that in some cases the models aren't

14   appropriate.

15             What Rimini hasn't done, either in its briefing

16   or today in argument, is to say what's missing or wrong

17   with the model.

18             The model carefully goes through and explains

19   the standards of malice and oppression and despicable

20   conduct and fraud.  It's strong language.  It provides

21   strong guidance to the jury about the factors they are to

22   consider.

23             So there's no substantive problem with the model

24   instruction that Rimini has identified.

25             As to their last point about clarifying that

```
1     punitive damages are not available for copyright

2     infringement, we're fine with that modification.  That is

3     true, they're not available for copyright infringement.

4     And we're seeking them on our other claims.

5             But beyond that, Rimini's proposed piling on of

6     additional instructions is unwarranted when the model

7     accurately captures the governing legal standard, and

8     adding additional instructions would wrongly suggest to the

9     jury that after they've applied the governing standard,

10    there are other boxes they also have to check beyond that

11    when that's not actually the case.

12             THE COURT:  All right.

13             Mr. Evanson, one last point.

14             MR. EVANSON:  One last point, Your Honor, I

15    apologize.

16             The lie alleged in this case, the principal lie

17    alleged in this case is saying that we didn't infringe,

18    right, that we were telling customers before 2011 that we

19    didn't infringe.

20             The infringement -- the Court's ruling on

21    infringement didn't occur for five years later, and so that

22    is only a false statement when viewed in hindsight.  And I

23    think the jury needs to be told that if we didn't have fair

24    notice in 2009 that a judge -- or a court five years later

25    was going to deem our conduct infringing, then that cannot
```

1      be a basis for punitive damages, Your Honor.

2                  That's all.  Thank you.

3                  THE COURT:  All right.  Thank you.

4                  Okay.  That takes us to our last -- oh, no.

5      Yeah, A-7 is the last of the issues for argument, and that

6      concerns an instruction including reference to

7      CedarCrestone and TomorrowNow.

8                  MR. RINGGENBERG:  Thank you, Your Honor.

9                  During the first two years or so of Rimini's

10     operation, TomorrowNow was Rimini's primary competitor

11     other than Oracle.  It's the only competitor Rimini had

12     with a substantial customer base.

13                 Rimini has made a centerpiece of its damages and

14     causation argument.  The question, once customers leave

15     Oracle, where are they going, citing opening statement,

16     page 120, line 19 to 21.

17                 As the record stands, the jury doesn't know that

18     TomorrowNow was an infringer.  The jury does know that some

19     customers left Oracle for TomorrowNow.

20                 And as far as the record and the instructions as

21     currently composed would allow, the jury may well conclude

22     that but for Rimini's infringement, some customers would

23     have left Oracle and gone to TomorrowNow instead, and

24     therefore we don't get damages on them.  And if the jury

25     were to reach that conclusion, it would be contrary to law.

3288

1        The Court knows that Rimini was an infringer

2   because they pled guilty to criminal copyright

3   infringement, and they stipulated to civil liability for

4   the exact same conduct at issue in this case, at least very

5   similar conduct.

6        That's been kept from the jury for reasons we

7   respect.  We understand the Court's ruling on that, and

8   we're not asking to revisit that.

9        But in light of that circumstance where there's

10  an admitted infringer who took some of Oracle's customers,

11  and Rimini is raising the question of where would the

12  customers have gone but for Rimini Street and their

13  infringement, the jury needs to be told that they cannot

14  count against Oracle any customers that might have gone to

15  TomorrowNow instead of Rimini Street.

16       It's settled on the patent context, and I think

17  not disputed here, that if you would have lost a customer

18  to a different infringer, that doesn't count against you on

19  lost profits.  And we cite a number of cases on that point.

20  I don't think Rimini really disagrees with that.

21       So that's the thrust of the argument, Your

22  Honor.

23       I would add that Rimini told the Court

24  repeatedly that they would not claim TomorrowNow was a

25  noninfringing alternative.  And I haven't heard them say

1    that expressly, but what they have said is 5 percent of

2    Oracle's customers leave every year; where are they going?

3              Well, the reality is a goodly number of the ones

4    at issue went to TomorrowNow in this case, at least in the

5    early period.  And to allow the jury to infer that,

6    therefore, Oracle should have reduced damages would be

7    inappropriate.

8              One last point, which is one of the things that

9    we expect to see in closing, is Rimini's argument that

10   after Rimini came on the scene fewer customers left Oracle

11   than in the period before.

12             One of the reasons that's true is because the

13   period right before Rimini came on the scene, TomorrowNow

14   was illegally taking numerous Oracle customers, and that

15   conduct stopped after we sued them.

16             And so that's another instance of they haven't

17   said expressly that TomorrowNow was an infringer, but

18   they're putting before the jury facts on which really

19   that's the basis.

20             And so we would ask the Court to instruct the

21   jury, without talking about TomorrowNow as an infringer,

22   saying anything about only that, if you conclude that some

23   customers would have left for TomorrowNow, you shouldn't

24   take those into account as contrary to Oracle's damages.

25             And ultimately the same issue applies to

1    CedarCrestone.  I'll concede that it's a less significant

2    issue because CedarCrestone was a less significant

3    competitor.  But ultimately the issue is exactly the same.

4              Thank you, Your Honor.

5              THE COURT:  All right. Thank you,

6    Mr. Ringgenberg.

7              Mr. Gorman?

8              MR. GORMAN:  Thank you, Your Honor.

9              Most of this instruction is unnecessary filler.

10   The first five sentences simply restate the parties'

11   arguments as Oracle would describe them, but they don't

12   contain any instruction on the law.

13             The final sentence, which is the only sentence

14   that Oracle actually defends in its brief, is entirely

15   improper.

16             It states that,

17             "The jury must not consider TomorrowNow and

18   CedarCrestone as available third-party supporters that

19   customers might have chosen instead of Rimini Street."

20             Oracle's brief contains no explanation or

21   definition of the word available, and neither does the jury

22   instruction that they've proposed.

23             I think what Oracle really means is that

24   TomorrowNow and CedarCrestone are not noninfringing

25   alternatives.

1           The patent cases that Oracle cites clearly state

2       that whether a competitor is a noninfringing alternative is

3       a question of fact, and they also state that the burden is

4       on the plaintiff to demonstrate the absence of

5       noninfringing alternatives.

6           Oracle has not met its burden in this case.

7           The arguments that were just made were based on

8       evidence that has not been presented in this case.

9           In Oracle's brief, they cite to evidence that

10      they say is before this Court that supports the

11      instruction, but they only cite sidebar conversations with

12      the judge.

13          They cite PTX 1483, 1489, 1487.  Those were not

14      admitted at trial.  They cite the Fees' declaration, that

15      was also not admitted at trial.

16          Oracle's experts testified that they were

17      instructed by their attorneys to assume that TomorrowNow

18      and CedarCrestone were infringing alternatives, but they

19      didn't form an opinion on that.  In fact, Oracle's counsel

20      informed the Court that the experts would not testify that

21      they formed an opinion on that.

22          It is not true that the Court could determine as

23      a matter of law that TomorrowNow and CedarCrestone were

24      infringing during the entire time at issue in this lawsuit

25      based on the evidence that Oracle's presented.

3292

1          The fact that TomorrowNow or CedarCrestone may

2    have stipulated to wrongful acts, or even infringement at a

3    certain place in time, does not mean that they were

4    infringing during the entire time period at issue in this

5    lawsuit, and for the judge to instruct the jury on that

6    would be to act as a fact finder based on evidence that is

7    not before the jury and not before the Court.

8               MR. RINGGENBERG:  Two points, Your Honor.

9          First, the argument I just heard is exactly the

10   arguments they told the Court they wouldn't make, which is

11   that CedarCrestone and TomorrowNow are noninfringing

12   alternatives and we haven't proved otherwise.

13          I'd cite the Court to docket 816, the brief by

14   Rimini at 2, where they represented to the Court they

15   wouldn't do that.

16          And the second point is it's true the jury has

17   not heard that TomorrowNow is infringing.  The jury didn't

18   learn that there's a criminal guilty plea, a criminal

19   guilty plea, for copyright infringement because they asked

20   the Court to exclude that evidence because it's prejudicial

21   to them.  And, fair enough, Your Honor, we respect the

22   Court's ruling on that.

23          But it's unfair to prevent us from introducing

24   the evidence as a fact and then claim we haven't met our

25   burden of proof on that issue.

1            The right answer is to instruct the jury

2    neutrally that you shouldn't consider TomorrowNow as an

3    alternative for causation purposes and leave it at that.

4    And we think that's entirely fair and what the law requires

5    given that we've been prevented from introducing the

6    evidence that would show they are infringing for reasons we

7    respect, Your Honor.

8            Thank you.

9            THE COURT:  All right.  I think we've covered

10   all the issues that are present before the Court, and we've

11   had argument on the ones that are considered to be the most

12   significant.

13           Let's see.  It's quarter after 11:00.  It's

14   going to take the Court some time, obviously, to get

15   through these.

16           I'm estimating that sometime between 2:00 and

17   3:00, more likely toward 3:00, we'll be able to give you

18   the proposed final set by the Court which would address

19   these remaining instructions that -- to which there has

20   been objection raised, whether it's been submitted on the

21   pleadings or whether it's been argued.

22           Whenever I do get them to you, I'll schedule a

23   hearing, probably a half hour to 45 minutes later, just for

24   a final review of what's being instructed.

25           But I would tell you that I will take your

1     arguments -- I don't want to hear new argument on

2     anything -- excuse me, I don't want to hear the same

3     arguments again on anything at all.

4             If someone sees something that's entirely new,

5     entirely unrelated to the arguments that have been raised

6     to the Court already, or if you spot a mistake, something

7     that's internally inconsistent or something that conflicts

8     with another instruction, I'll certainly hear that.  But I

9     don't want to have reargument in any way.

10             And because of the shortness of the hour, the

11    Court's obviously not in a position to give you reasoned

12    decisions for what is finally selected beyond saying that I

13    will have obviously adopted in considerable part the

14    arguments raised by whichever party is successful on the

15    final instruction.

16             And if I have also considered something else

17    that I think is significant, I will tell you, but I don't

18    think that's going to happen.

19             So I think you're on standby mode.  But I

20    won't -- I won't have anything to you until 2:00 at the

21    earliest.

22             MR. STRAND:  Your Honor, there is one

23    outstanding motion or issue regarding some documents,

24    exhibits that people tried to get in through depositions

25    last week.

1                I was asked to bring that --

2                THE COURT:  Yes, I know.  What is that, 260 or

3     DTX --

4                MR. STRAND:  Yes.

5                COURTROOM ADMINISTRATOR:  Can I go through those

6     first and then provide a list that everybody agrees on?

7                THE COURT:  Yeah.  Maybe for the benefit of our

8     records, let's --

9                COURTROOM ADMINISTRATOR:  If that's okay with

10    you.

11               THE COURT:  But you don't need to take my time

12    to do it right now.

13               MR. STRAND:  Right.

14               THE COURT:  If you can just let Dionna know

15    everything that you feel has not been ruled on.

16               I know that one is out there, and to respond to

17    that -- we're just about ready with it.

18               There will -- and I don't think it's going to

19    affect anyone's arguments.  There will be some -- I can

20    tell you already from -- I've gone through it thoroughly

21    once, and I know that there will be some significant

22    redactions.

23               MR. STRAND:  Okay.

24               THE COURT:  I can't tell you how many.  And

25    obviously there will be some that stays in.

3296

1              So we'll get those to you tonight by 5:00.

2              MR. STRAND:  That's fine, Your Honor --

3              THE COURT:  I know it's there.  I don't think it

4    would affect argument.

5              MR. STRAND:  Okay.  Thank you, Your Honor.

6              THE COURT:  And please let Dionna know on

7    anything that you think is still out there for ruling by

8    the Court on admissibility.

9              MR. RINGGENBERG:  Your Honor, at 2:00 do you

10   expect to provide a verdict form as well?

11             THE COURT:  Oh, yeah.  Yeah.  And we may -- I

12   may be able to provide you with the verdict form earlier

13   rather than later.  So you may get -- you may get that

14   earlier.

15             I'd like you to see it before we -- if it's

16   ready before we finish the rest of this.

17             All right.  Thank you.

18             COURTROOM ADMINISTRATOR:  Please rise.

19         (Recess from 11:20 a.m. until 3:49 p.m.)

20         (Outside the presence of the jury.)

21             COURTROOM ADMINISTRATOR:  Please rise.

22             THE COURT:  Have a seat, please.

23             The record will show we're in open court with

24   counsel.  The jury is not present.

25             I would guess a little over a half an hour ago

3297

```
 1    the Court had distributed the proposed final draft of jury
 2    instructions.
 3              I considered all of the arguments raised.  I
 4    think the instructions in this final package reflect my
 5    rulings based generally upon what was being argued by the
 6    party who would have been opposing or favoring as the case
 7    may be.
 8              Is there any particular question specifically to
 9    any of the instructions, or are there any errors that you
10    think need to be addressed?
11              MR. EVANSON:  We have a couple, Your Honor.
12              On the two tort claims, the --
13              THE COURT:  What pages are you on?
14              MR. EVANSON:  I'm on 79 and 82.  This is the
15    inducing breach and the intentional interference claims,
16    the elements.
17              THE COURT:  I'm on page 79.  That's return of
18    verdict.
19              I'm referring to the Court's page numbers at the
20    bottoms of the instruction package I passed out to you.
21              MR. EVANSON:  We don't have Word Perfect, so we
22    converted it to Word, and it may have changed the Word
23    numbering.
24              THE COURT:  Okay.
25              MR. EVANSON:  So it's inducing breach and
```

3298

1   intentional interference.

2           THE COURT:  All right.  Inducing breach.  Go

3   ahead.

4           MR. EVANSON:  So in both of these the Court has

5   laid out the elements of the misrepresentations claim --

6           THE COURT:  Yes.

7           MR. EVANSON:  -- which, you know, both parties

8   requested, and the one note was that there was the --

9   reliance element of that misrepresentation claim was not

10  included.  And I think both parties included reliance as an

11  element in what we proposed to the Court.

12          So I don't know if that was an oversight or not,

13  but we just wanted to raise the inclusion of -- it says

14  that Rimini Street must have intended to induce the third

15  party to rely on that statement, but we think that actual

16  reliance is also --

17          THE COURT:  Let me see if I could find it in my

18  notes.  Was this one of the A-1 through A-7 arguments?

19          MR. EVANSON:  It would have been -- I don't want

20  to guess.  I want to say it would have been A-4.

21          THE COURT:  Okay.  I've got it.

22          MR. EVANSON:  It would have been A-4.

23          THE COURT:  All right.

24          MR. EVANSON:  And I don't think -- when we

25  argued this morning, I don't think we spoke -- we discussed

1    the reliance element specifically because both parties had

2    agreed that that was one of the elements of the

3    misrepresentation claim.  That was in both of our

4    submissions from Saturday.

5                 THE COURT:  Do plaintiffs agree with that?

6                 MR. RINGGENBERG:  We do, Your Honor.  Well, we

7    don't object to the addition of a specific reliance --

8                 THE COURT:  So the specific change would be what

9    again?

10                MR. EVANSON:  So we would propose adding to the

11   end of the sentence --

12                THE COURT:  Which sentence?

13                MR. EVANSON:  The sentence that says,

14            "To satisfy this element, a misrepresentation

15   must be communicated to the customer, it must be a false

16   representation at the time it was made, it must be made

17   with knowledge or belief that it is false, and Rimini

18   Street must have intended to induce the third party to rely

19   on that statement."

20                We would add to the end of that, "and the third

21   party must have, in fact, relied on that statement."

22                THE COURT:  Well, strike the "and" after

23   "false."

24            "Rimini must have intended to induce a third

25   party to rely on that statement, and the third party must

1    have, in fact, relied on the statement."

2              MR. EVANSON:  And that would go in both the

3    inducing breach of contract and in the intentional

4    interference with prospective economic advantage.

5              THE COURT:  Give me a moment.

6              MR. EVANSON:  Okay.

7              THE COURT:  Okay.  That will be added.

8              And what's the other one and where does it go?

9              MR. EVANSON:  So that change is -- will be the

10   same in both the inducing breach and the intentional

11   interference claims.

12             Both instructions now contain that same

13   sentence, or substantially similar sentence.

14             "To satisfy this element, a misrepresentation

15   must be communicated to the customer," et cetera.

16             So add that same clause to the end of that

17   sentence in both instructions.

18             THE COURT:  Okay.  All right.

19             Anything further?

20             MR. EVANSON:  There were two other changes, Your

21   Honor, to the instructions that we didn't discuss this

22   morning at the hearing.

23             The one is on the defendants' profits.  We had

24   briefed this before, and Oracle put in its objections to

25   Your Honor's instructions that if the infringement is found

1    to be willful, then defendants' expenses are not to be

2    deducted from the revenues?

3              THE COURT:  Yes.

4              MR. EVANSON:  And we didn't file a reply brief

5    because Your Honor had instructed us not to, but we had

6    briefed that in the past, and we -- you know, we don't

7    agree that that's the correct statement of the law.

8              We didn't talk about it this morning, that's why

9    we didn't make the argument, but the statute says profits.

10   And there is some dicta in one case, the *Frank* case from

11   the Ninth Circuit, which district courts have not followed.

12             There's a published decision called *ZZ Top*.  I

13   can get you the citation if you --

14             THE COURT:  You say you briefed it before.  Can

15   you identify the document number and the pages?

16             MR. EVANSON:  Yes.  I've got that right here.

17   It's in our trial brief.  That's docket 739, at page 12.

18             THE COURT:  Just a moment.

19             MR. EVANSON:  And we briefed it in our

20   opposition to or objections to Oracle's proposed jury

21   instructions.  That's docket 766 at page 39.

22             And then it's also in our reply brief in support

23   of the jury instructions at docket 773 at page 12.

24             And it's substantially the same argument in each

25   place --

1            THE COURT:  Okay.

2            MR. EVANSON:  -- that even if the conduct is

3     willful, you don't -- the defendant still gets to deduct

4     expenses from profits in determining the infringer's

5     profits award because the statute says profits, not

6     revenues.

7            THE COURT:  Okay.  And what's the title of the

8     instruction where we put that language in?

9            MR. EVANSON:  Copyright Infringement - Damages -

10    Defendants' Profits.

11           MR. RUSK:  Page 40, Judge.

12           THE COURT:  All right.  I'll take another look

13    at it and let you know.

14           MR. EVANSON:  And then I have one more.  I'm

15    sorry to burden you.

16           THE COURT:  That's all right.

17           MR. EVANSON:  The last one is the causation

18    instruction.

19           And when we were -- Your Honor heard argument on

20    this this morning, and this was the D-20 instruction that

21    Your Honor had in the initial set that's now not in this

22    set.

23           THE COURT:  Okay.

24           MR. EVANSON:  And when we were talking this

25    morning, we were talking about that last sentence in the

1      instruction that said that causation must be proven for

2      every single client or every single customer.

3                  THE COURT:  Yes.

4                  MR. EVANSON:  We didn't talk about, you know,

5      the paragraph that came before it, which I think is an

6      absolutely correct statement of the law.  And we think that

7      that needs to be in there, even if Your Honor doesn't

8      include that last sentence which is what Oracle was

9      objecting to.

10                 Because that first paragraph put in the but-for

11     causation standard.  You know, this -- the current

12     instruction, the copyright infringement - damages causation

13     instruction, only talks about substantial factor, it

14     doesn't mention the but-for standard.

15                 And as we argued this morning, I mean, the

16     causation standard is -- it's but-for and then also a

17     causal nexus.

18                 So we think that at the very least the first

19     paragraph from D-20 that was in Your Honor's initial set of

20     instructions needs to be given even if you don't give that

21     last sentence that we were talking about this morning.

22                 MR. RINGGENBERG:  If I could just address that

23     briefly, Your Honor.

24

25

```
 1              That last sentence of the causation instruction
 2    in the Court's current draft says,
 3              "Conduct is not a substantial factor in causing
 4    harm if the same harm would have occurred without that
 5    conduct."
 6              Making clear, if -- you know, the conduct would
 7    have occurred anyway, there's no causation, no damages.
 8    And there's no reason to repeat that in an entirely
 9    separate instruction.  It's covered.
10              THE COURT:  Okay.  I'll take a look at it.
11              All right.  Anything else, Mr. Evanson?
12              MR. EVANSON:  That's all we have on the jury
13    instructions.
14              Mr. Reckers is prepared to talk about the
15    verdict form if Your Honor wants to talk about that.
16              THE COURT:  Okay.
17              MR. RECKERS:  Just real briefly, Your Honor.  On
18    the verdict form, looking over the Court's proposal, one
19    issue that we see when --
20              THE COURT:  Wait.  Just a minute.  Let me turn
21    to that.
22              Now, where are you again?
23              MR. RECKERS:  In the Court's proposed verdict
24    form.
25              THE COURT:  Yes.
```

1              MR. RECKERS:  And this is a general comment.

2              As we went through, and we see the number of

3    specific line items for -- asking for damage amounts, in

4    particular for the --

5              THE COURT:  Tell me what page you're on.

6              MR. RECKERS:  It's starting on page 4, Your

7    Honor, question 6-A, lost profits, and really continuing on

8    for the next several pages.

9              We see for -- a number of specific

10   interrogatories directed to breaking down the alleged

11   damages by product line and documentation and such for the

12   various theories.

13             And then ultimately at the end, coming to the

14   question -- skipping forward to page 18, questions 23 and

15   24, from our perspective, sort of created this -- let me

16   wait for Your Honor to get there --

17             THE COURT:  I guess we're just talking about

18   different pagination here because I don't have a page 18.

19             MR. RECKERS:  Okay.  It's questions 23 and 24.

20   The section heading is nonduplicative damages.

21             THE COURT:  Okay.  So I'm up with you now.

22             So tell me again what the point is here.

23             MR. RECKERS:  The issue is, Your Honor, that

24   we've got a number of specific questions directed to

25   essentially the same total harm, and so the jury's going to

1    be left with the position to filling in specific amounts

2    and then getting to these questions and then trying to

3    figure out what to do with all the numbers that they've

4    already put down earlier in the form.

5              And from our -- from our -- you know, our

6    position is that it's unduly complicated, and we had

7    proposed a simpler version, page 14 of Rimini's, where we'd

8    asked basically at the end for total damages.

9              And just seems like -- again, I don't mean to

10   reargue the point, Your Honor, but our proposal, I think,

11   solved some of the confusion that we think is manifest in

12   the form that's proposed currently by the Court.

13             We just ask the Court to look at page 14 of our

14   proposal, and the way that we handled the damages, and to

15   avoid a confusing situation where the jury is left to try

16   to try to decide what to do with the numbers they already

17   put down.

18             And that's really all I have on that point, Your

19   Honor.

20             THE COURT:  Okay.  All right.

21             Any input with regard to that issue on behalf of

22   plaintiffs?

23             MR. ISAACSON:  I'm not following the proposal,

24   frankly.

25             So what would you want the nonduplicative

1    damages to say?

2            MR. RECKERS:  What we proposed was basically

3    having a total for copyright damages, and then it was

4    broken down on page 14 where you have questions as to --

5    for Rimini and Ravin and grand total of damages.

6            And then obviously the computer fraud damages

7    are handled separately because those are a separate harm.

8            But the rest of the damages that the allegation

9    is essentially the same harm, same economic harm, go under

10   different theories.

11           And so that's why our proposal is that we just

12   ask for the damages essentially once, where they are

13   presented as the same economic harm.

14           MR. ISAACSON:  I'm not sure that there is a

15   substantive difference between that and what the Court is

16   proposing.

17           The Court is proposing in question number 3

18   nonduplicative damages for Oracle America and then

19   nonduplicative damages for Oracle International.  And those

20   are the two plaintiffs.

21           I guess you're saying let's break it down even

22   further to copyright and noncopyright, which seems to me

23   more complicated.  But maybe I'm missing something.

24           MR. RECKERS:  Exactly.  So if we go to 6-A, back

25   on what I have as page 4, we have a list of damages for

1    those particular -- by product line for lost profits.

2              Then 6-B is defendants' profits, again for all

3    of the product lines.

4              Then we have fair market value, again with a set

5    of 6 questions as for amount of damages.

6              Continuing to question 7, again, the same set of

7    numbers.

8              Question 8, the same set of numbers of --

9    request for damage amounts.

10             And then -- so we now have -- I don't know how

11   many that is, but that's, you know, several dozen numbers

12   that the jury has to fit in.

13             And, you know, our simple observation is that

14   when you have that number of blanks to fill in with

15   numbers, then it's going to be hard for them then to --

16   going forward, to number 23, and -- 22 and 23, and figure

17   out what they're going to do with those numbers.

18             MR. ISAACSON:  I think I understand the

19   argument.

20             But the earlier damages, as Elizabeth Dean

21   testified, do overlap, and she gave the nonduplicative

22   numbers.  And it's important, if you're going to go through

23   the other ones individually, that you reach a conclusion

24   about the nonduplicative numbers.  It's certainly helpful.

25             MR. RECKERS:  It's simply a practical

3309

1    consideration, Your Honor.  You know, I'd submit it for

2    Your Honor's consideration.

3              MR. ISAACSON:  Usually I'm a big fan of reducing

4    the verdict form, but I think in this case the practical

5    answer is you need the nonduplicative questions.

6              THE COURT:  Well, we're all a big fan of that.

7              I sent this out because I knew we needed to

8    discuss it.  So I appreciate the comments.

9              And it occurs to me -- do you need to have this

10   form finalized before closing statements?  Because we'll

11   have time tomorrow after this case is submitted.

12             But it could be that you want to work on the

13   form with your closing statements, and, if that's the case,

14   we can work it out tonight.

15             MR. ISAACSON:  Yes, Your Honor.

16             In fact, one of our reactions to this is so --

17   it's important, I think -- I know to our closing statement,

18   and I would be surprised if it isn't important to their

19   closing statement, to tell the jury how we feel the verdict

20   form should be filled out.

21             THE COURT:  Okay.

22             MR. ISAACSON:  And one reaction I had to this

23   was that there's going to be a section of closing argument

24   that's not very necessarily interesting or argumentative

25   but rather scrivener-like as we write things down for the

1    jury and give them time to write it down.

2                And so I think on that basis we would like

3    another 15 or 20 minutes for both sides for argument so

4    both sides have the ability to do that.  It's a 15- or

5    16-page -- it's a 16-page form as we printed out, and a

6    little longer in some other formats.

7                And we literally will sit there -- and you can't

8    rush through that because there's going to be some long

9    numbers --

10               THE COURT:  No, I'm sympathetic to that problem.

11               I'm willing -- if you're both requesting 15 more

12   minutes, I'll give it to you.

13               MR. ISAACSON:  Okay.  Thank you, Your Honor.

14               One other reaction we had to the verdict form

15   was on page 3, after question 6.  The way the verdict form

16   is structured, that -- is the jury makes a choice between

17   lost profits and fair market value license, and then,

18   depending on that choice, only fills out the numbers for

19   one or the other.

20               And given the parties' legal disagreements about

21   that issue, I think it would be prudent if the jury filled

22   out both regardless, so that the -- so that -- so, for

23   example, you, Your Honor, after the trial, would know where

24   the jury stood on -- you know, on the damages on those two

25   different issues.

3311

1                    THE COURT:  Okay.  I understand.

2                    MR. ISAACSON:  And then one point I would raise

3     about the instructions that we did not raise earlier, at

4     the end of the punitive damages instruction, which on our

5     printout is page 81, says,

6                    "If you decide that punitive damages should be

7     awarded against the defendant, a limited hearing will

8     follow the return of your verdict, in which the parties may

9     present relevant evidence bearing upon the amount of

10    punitive damages."

11                   And while that is certainly truthful, we do feel

12    we're entitled to punitive damages, and we don't want to

13    give the jury the sense that they can get out of here if

14    they say no.

15                   And so I think it would be prudent to leave that

16    out for now.

17                   THE COURT:  All right.  Well, I appreciate your

18    request, but I've been down that road before, and I don't

19    like to shock the jury.

20                   MR. ISAACSON:  Okay.

21                   THE COURT:  But I'll look at the language to see

22    if there's some more objective way to present it that it

23    might not tend to discourage them just due to factors of

24    time.

25                   MR. ISAACSON:  Thank you, Your Honor.

```
 1                    MR. HIXSON:  And, Your Honor, while we're on

 2      that instruction about punitive damages, the Court added a

 3      sentence about punitive damages not being available for

 4      copyright infringement?

 5                    THE COURT:  Yes.

 6                    MR. HIXSON:  But there's a typo in the sentence.

 7      It says no available rather than not available.

 8                    THE COURT:  Oh.

 9                    MR. HIXSON:  In the event, that there's

10      attention on that --

11                    THE COURT:  Good.  I'm glad you brought that to

12      my attention.

13                    What page number are we on?  Your pages are the

14      same --

15                    MR. HIXSON:  Oh, it's my page 133, but I bet

16      that has nothing to do with your page number.

17                    THE COURT:  It has nothing to do with it, you're

18      right.

19                    MR. EVANSON:  I'm on page 133.

20                    THE COURT:  Well, we know where it is.  We'll

21      find it.

22                    MR. HIXSON:  Thank you.

23                    MR. ISAACSON:  Just a -- I mean, we were able to

24      get this printed out shortly before coming over here.  We

25      cannot tell you that we have proofread this.
```

```
 1              I guess it's not going back with the jury, the
 2     instructions?  You're going to be reading it.  I don't know
 3     if -- so I don't know if typos --
 4              THE COURT:  I will send the instructions back
 5     with the jury.
 6              MR. ISAACSON:  Okay.
 7              THE COURT:  And I will actually send at least
 8     four copies back to the jury.
 9              MR. ISAACSON:  All right.  So if we --
10              THE COURT:  Possibly five.
11              MR. ISAACSON:  If we or defense see any
12     nonargumentative typos, we will, I guess, e-mail the Court
13     and let you know?
14              THE COURT:  Yes, that's good.  Because we won't
15     run those copies until we're actually into argument.
16              One thing that occurred to me, we're obviously
17     all pressed a little bit with time, but the -- I don't see
18     any instructions or verdict form questions regarding
19     statutory damages, the number of copies, the amounts to be
20     attributed to the copies based upon considerations of
21     willfulness or good faith.
22              MR. ISAACSON:  That actually reminds me.  The
23     verdict form on statutory damages says per violation, and I
24     believe it should say per infringement -- is it per
25     infringement or active infringement?
```

```
 1              MR. HIXSON:  Per work.

 2              MR. ISAACSON:  Work.  Per work.

 3              Now, that is more advantageous for the defense.

 4              A violation would be if a work was copied 10

 5    times, each one would be a violation, but per work is once.

 6              And we think that -- and I'm told quite firmly

 7    we can't ask for per violation, we can only ask for per

 8    work.  In argument, we would only ask for per work, but we

 9    might as well make the question correct.

10              THE COURT:  So the word violation should

11    be changed to --

12              MR. ISAACSON:  Question 11, instead of per

13    violation would be per work, or per each copyrighted work.

14              THE COURT:  For each work?

15              MR. ISAACSON:  Yeah.  You have per violation of

16    each copyrighted work.  It could be for each copyrighted

17    work.  And the per violation --

18              THE COURT:  Wait.  Wait a minute.  I just now

19    found where you were reading.  So give me that again.

20              MR. ISAACSON:  Question 11, which is the top of

21    my page 8, statutory damages.

22              THE COURT:  Yes.

23              MR. ISAACSON:  So the third line it says per

24    violation?

25              THE COURT:  Yes.
```

1              MR. ISAACSON:  And that would say for each

2      copyrighted work.

3              And then in line 5, it's the same thing, for

4      each copyrighted work.

5              And then in the last line, it's the same thing,

6      for each copyrighted work.

7              THE COURT:  So you would change it how?

8              MR. ISAACSON:  Instead of saying "per violation

9      of each copyrighted work," it would just say "for each

10     copyrighted work."

11             MR. EVANSON:  That is infringed?  The work that

12     is infringed?

13             MR. ISAACSON:  It already says if you found that

14     infringement as to that particular copyrighted work.

15             I'm sorry.  The amount to be awarded for each

16     violation would be -- the amount to be awarded for each

17     infringement of a copyrighted work --

18             MR. EVANSON:  Would be each copyrighted work

19     infringed.

20             MR. ISAACSON:  Oh, each copyrighted work

21     infringed, yes, that's right.

22             THE COURT:  The amount to be awarded for each --

23             MR. ISAACSON:  Copyrighted work infringed.

24             THE COURT:  So in the body of the paragraph,

25     wherever the words "per violation of each copyrighted work"

1    appears, you would replace that with "for each copyrighted

2    work"; is that correct?

3                MR. ISAACSON:  Yes.  Oh, I see.  My colleague

4    points out it should also say the total amount rather than

5    the amount.  Otherwise, someone might just write down the

6    amount that they think for each work.

7                THE COURT:  Okay.  So at the bottom of the

8    columns there, you would have a total amount?

9                MR. ISAACSON:  Yeah.  So I guess to be

10   grammatical, "The total amount to be awarded for any

11   violations of the copyrighted works infringed is as

12   follows."

13               THE COURT:  Okay.  Now, we don't have anything

14   in there about numbers.

15               MR. RECKERS:  Your Honor, we had proposed in the

16   jury instructions that we -- it's defendants' 22, that we

17   indicate that the total number of works, the maximum number

18   of works is 100, given the hundred registrations which are

19   in the jury notebook, which is the maximum.  I don't know

20   if there's any dispute on that, but --

21               MR. ISAACSON:  Well, you'll be delighted to know

22   that we think the number is 93.  There's seven JD Worlds.

23               MR. RECKERS:  Okay.  So 93, I guess, would be

24   the maximum number of --

25               MR. ISAACSON:  Right.  I will be saying that in

1    argument.

2              THE COURT:  Well, it sounds as though a

3    stipulation could be reached on the amount.

4              MR. ISAACSON:  This is in their juror notebook.

5    The list of 100 is in their jury notebook.  And so all that

6    needs to be done is for me to say 93 are in this case, and

7    7 are out, which I intend to say.

8              THE COURT:  All right.  But there still would be

9    a question --

10             MR. ISAACSON:  As to whether you multiply by 0

11   or 200 or 750 or 150,000.

12             THE COURT:  All right.

13             MR. RECKERS:  And, Your Honor, just to be clear,

14   we're not agreeing that it's 93.  I think their expert said

15   it was in the 60s.

16             But for purposes of setting an upper limit, we

17   would still propose putting in the instructions some

18   guidance on that particular point.

19             We put a hundred in our jury notebook.  We would

20   be happy to put 93 and then address those registrations.

21             What we don't want is sort of the number to be

22   untethered --

23             THE COURT:  No, I agree with that.

24             Why don't I leave it to you to submit to me a

25   proposed question that will solve this problem because it

3318

```
 1    doesn't seem to me to be complicated, and it also doesn't
 2    seem to be of significant dispute.  Will that work?
 3                MR. ISAACSON:  Yes, Your Honor.  Our number is
 4    93.
 5                THE COURT:  Okay.  Well, what I'm asking for is
 6    a proposed rewrite of the language in question 11 that will
 7    solve these problems.
 8                MR. RECKERS:  Your Honor, let me sort of suggest
 9    what -- how this now reads and why I think it's
10    problematic.
11                At this point the jury will have to take the
12    parties' arguments, look at the list of registrations,
13    discern which of those registrations apply to each of these
14    six or five product lines, and then discern for each of the
15    violations which -- a number between $750 and $150,000, and
16    then multiply those together to get each of those lines.
17                I just propose -- I suggest that it's just
18    extremely complicated to have the jury do that math and
19    divide these -- divide these up that way.
20                I suspect that we can definitely work on this
21    language.  But I just put out there, it's a fairly
22    unworkable set of questions in the first instance.
23                MR. ISAACSON:  I agree that counsel's trying to
24    improve the situation, and so -- and to accommodate his
25    suggestion, it could be the total amount to be awarded for
```

3319

1    copyright works infringed is that -- infringed, comma, not

2    to exceed 93 copyrighted works.

3              THE COURT:  Why don't I let you work on that and

4    then just let me know when you have something.

5              MR. ISAACSON:  And then we'll just have one line

6    instead of five.

7              MR. RECKERS:  We'll work on it, Your Honor.  I

8    think we'll be able to move this forward.

9              THE COURT:  Okay.  All right.  And I'll look at

10   the other question that was raised.

11             And as soon as you have that, let me know, and

12   as soon as I have the part we're doing, we'll let you know,

13   so we'll try and move it right along.

14             One other thing.  With regard to DTX 290A that

15   had all the entries that contained numerous hearsay

16   objections and concerned admissibility, and the Court

17   indicated it would have a ruling.  We've done that.

18             Madam Clerk, I'm going to give you this copy of

19   DTX 290A and ask that you provide a copy for each side, and

20   they can work on the exhibit accordingly.

21             As to the other related pieces, we just haven't

22   finished those yet.  So we'll be getting to those -- I see

23   you're wondering what I'm referring to, Mr. Isaacson.  And

24   so --

25             MR. ISAACSON:  No, no, I'm sorry.  Don't

3320

1    misinterpret my look.  It's been a long day.

2              THE COURT:  All right.  It has been.

3              But I'll get that to you as soon as we can.

4              So let's -- we have a game plan?

5              MR. RINGGENBERG:  Your Honor, we have two other

6    evidentiary issues we wanted to raise while we had you,

7    just before closing.

8              THE COURT:  Yes.

9              MR. RINGGENBERG:  I'm sorry to do it.

10             One of which is we moved -- as part of our

11   rebuttal case, we moved into evidence Plaintiffs'

12   Exhibit 609.  The only objection was the defendants'

13   continuing objection to anything referring to TomorrowNow,

14   and the Court had never ruled on whether it's admissible or

15   not.

16             THE COURT:  No, I have -- oh, go ahead.

17             MR. RINGGENBERG:  So I was going to ask for a

18   ruling so we could determine whether or not we can use it

19   in closing.

20             THE COURT:  Aren't those the ones you gave me,

21   Dionna?

22             COURTROOM ADMINISTRATOR:  Yes, Your Honor.

23             THE COURT:  I'm working on those as well.

24             MR. RINGGENBERG:  Very good.

25             And there's also an issue about a deposition

1    quote that was played during the examination of Mr. Ravin,

2    and I want to make sure that that's on the Court's radar

3    screen as well, whether you discussed it with him, whether

4    I should address it with the Court.

5              COURTROOM ADMINISTRATOR:  You should address

6    that on the record.

7              MR. RINGGENBERG:  Okay.  So the issue, Your

8    Honor, is during the examination of Mr. Ravin, we played

9    for the jury a video clip from Mr. Ravin's deposition.  And

10   because the page and line cite said out loud was off, the

11   current transcript doesn't have the portion of the

12   deposition clip that was actually played in court for the

13   jury.

14        (Discussion held off the record.)

15             MR. RINGGENBERG:  I thought it was read.  In any

16   event, the words -- I thought it was video, but it may have

17   just been read out loud, but the words don't match.  And

18   that was our error because the cite said out loud in court

19   wasn't correct.

20             So what we proposed to do is to -- the words

21   we -- we propose to try to get the transcript corrected are

22   in addition so that the words the jury heard are reflected

23   in the official transcript.

24             And for the record, the portion I'm referring to

25   is at the official transcript 823, 24 to 824, 6.

1                   And the portion of the transcript that was

2       actually read or played was from Mr. Ravin's deposition

3       347, 14, to 348, 9.

4                   I don't know the date of the deposition.  But

5       all of the Ravin transcripts are consecutive, so that's a

6       clear reference.

7                   And I don't think there's any question actually

8       as to what was said in court.  I think we agree with that

9       on either side, at least as far as I understand it.

10                  THE COURT:  So as far as the record is

11      concerned -- the most the record can do is identify the

12      mistake that was made at the time, and the record will

13      stand as it appeared at the time.

14                  MR. RINGGENBERG:  I think that's right.  We'd

15      just like to make sure that the official transcript

16      reflects the words that were read to the jury or played to

17      the jury at some point, understanding that the transcript

18      from that day can't be changed going backward.

19                  THE COURT:  I see.  And there's no dispute about

20      what was played; is that correct?

21                  MR. RINGGENBERG:  That's my understanding,

22      although -- I can show them the exact transcript.  I'm sure

23      they will recall the testimony.  Because the part that's in

24      the transcript just doesn't match what was being discussed

25      with Mr. Ravin in that part of his exam.

```
 1              And, again, I don't want to place -- I'm not
 2   trying to blame the court reporter.  There's a reason for
 3   it, which was the cite that was read was incorrect.
 4              THE COURT:  I understand.  I just want to make
 5   sure the transcript reflects what was actually presented
 6   before the jury.  And this clarification with regard to the
 7   mistake on the identification of the transcript location is
 8   explained by what you've just said.
 9              MR. RINGGENBERG:  Very good.
10              And so I will confer and show defense counsel
11   precisely the page and line we're talking about and make
12   sure we're all on the same page, and then we can submit
13   that to the Court.
14              Thank you, Your Honor.
15              THE COURT:  Okay.  Anything else?  It's a work
16   in progress.
17              MR. ISAACSON:  If your clerk waits a minute, we
18   could meet and confer right now about the question whatever
19   is 11 and give agreed language so that you don't have to
20   wait for that.
21              Because I think what we were dictating out loud
22   we'd finalize in about a minute or two.
23              THE COURT:  Run it off somewhere and give it to
24   Dionna or, if you want --
25              MR. ISAACSON:  All right.  We will do that.
```

```
 1              THE COURT:  If you'd like a court reporter to do
 2    it, she'll run it off as well.
 3              MR. ISAACSON:  Sometimes we hand edit.
 4              THE COURT:  Okay.  I think we have an
 5    understanding.
 6              COURTROOM ADMINISTRATOR:  Please rise.
 7         (Recess from 4:26 p.m. until 5:55 p.m.)
 8              (Outside the presence of the jury.)
 9              THE COURT:  All right.  Have a seat, please.
10              The record will show we're in open court.
11    Counsel are present, the jury is not.
12              You've been provided with a set of -- final set
13    of -- a proposed set of final instructions.  I'm pretty
14    sure this will be exactly what will be given.
15              But to explain pages that are different -- first
16    of all, most significantly to Defendants Rimini, you've
17    persuaded me with regard to the willfulness argument
18    insofar as it having an effect upon profits.
19              My view is that the statute defines profits.
20    It's clear on its face.  For the Court to redefine what
21    profits should be is a step that this Court is not prepared
22    to take.
23              Personally I believe that willfulness should
24    count, and that gross revenues, rather than net profits,
25    should apply where willfulness is present.  But under the
```

1    circumstances, I believe that the law does not permit that.

2         I added the reliance language in instructions

3    number 37 and 38 that was agreed upon by the parties.

4         I modified the causation language in instruction

5    number 30 pursuant to the discussion in court.

6         And in instruction number 62 on punitive

7    damages, I added a sentence that is intended to advise the

8    jury that if they feel punitive damages are warranted, that

9    the fact that an additional hearing may be necessary should

10   not bear upon their decision in any way.

11        We've also submitted a verdict form.  I have not

12   given this a final review and approval, but I believe it

13   reflects the discussions that were held in court and to

14   which there was general agreement.

15        Essentially this form has been simplified as a

16   result of the discussion in court, and I believe it

17   encapsulates what everyone was concerned about.

18        There are some remaining rulings that were

19   agreed upon by everyone, and those have been brought to

20   the -- my attention by my court clerk.

21        First of all, with regard to Exhibits PTX 609

22   and PTX 2152, I reserved ruling on those at the time.  I've

23   gone back over them, and my ruling is they are both

24   admitted.

25

1              (Plaintiffs' Exhibits 609 and 2152 received

2         into evidence.)

3              THE COURT:  With regard to the defendants'

4    exhibit -- before we took our last break I provided you a

5    copy of 290A, which has various redactions that were

6    proposed.  A number of those redactions I indicated the

7    Court ruled that they should not be included in the

8    exhibit.  I wrote the word "out" to the side of what should

9    be taken out, and I understand that counsel are resolving

10   the exhibit.

11             With regard to DTX 152, it also contained a

12   number of objectionable portions that were identified to

13   the Court.

14             I have ruled on those now, and I'm providing the

15   court clerk with a copy of DTX 152 with that part of the

16   exhibit to which there were objections raised, and I have

17   written the words "out" or "in" next to each item that the

18   Court reviewed that I felt should be excluded or should be

19   included.

20             So I'll give that to my court clerk and request

21   that she provide copies to the parties, and that will be

22   the Court's ruling with regard to that exhibit.

23             MR. HIXSON:  Your Honor, may I ask a question

24   about that?

25             THE COURT:  Yes.

3327

```
 1              MR. HIXSON:  With respect to DTX 152, 153, 154B,

 2    164A, 340 and 345, the Court does not have in front of it

 3    all of Oracle's proposed redactions because the parties met

 4    and conferred in advance of the motion and agreed that we

 5    would present exemplar proposed redactions rather than

 6    burdening the Court with all of the many that Oracle would

 7    propose.

 8              And so I just want to make sure the Court

 9    understands that those are exemplars the parties meant to

10    extrapolate from the Court's ruling.  We have not put

11    before Your Honor, because there were so many, all of the

12    proposed redactions on those exhibits.

13              THE COURT:  Okay.  I did not realize that.

14              So when do we get them?

15              MR. HIXSON:  I'm sorry.  I missed the Court's

16    question.

17              THE COURT:  When do I get all of the proposed

18    redactions?

19              MR. HIXSON:  We can provide those at any time.

20              We had understood in meeting and conferring with

21    defendants that we would be seeking the Court's guidance on

22    that.

23              It was their motion.  And the process that the

24    parties came up with were these exemplars.

25              THE COURT:  Well, my problem is I'm confusing
```

```
 1    different exhibits.  Tell me what you still will need
 2    rulings on.
 3            MR. HIXSON:  We are for -- DTX 292, 274 and 345,
 4    the Court has the complete set of --
 5            THE COURT:  292, 274, and 345?
 6            MR. HIXSON:  Yes.  Those were outside of the
 7    motion.  Sorry, 345 was in the motion and outside of it,
 8    and so the Court does have Oracle's complete proposed
 9    redactions for those.
10            But for the others, the motion as framed for
11    152, 153, and so on, it simply never asked the Court to
12    evaluate all the proposed redactions, it was just a sample
13    set.
14            THE COURT:  So what, if anything, has been done
15    with regard to 152, 153?
16            MR. HIXSON:  The parties have put before the
17    Court the sample set of proposed redactions, and I don't
18    believe anything further has been done.
19            THE COURT:  Okay.  So are the -- I guess I
20    should have it here in front of me.  We're talking about
21    152 and 153?
22            MR. HIXSON:  And 154B, 164A, and 340.
23            THE COURT:  Well, I need those.
24            Does the court clerk have those?  Is that what
25    you're telling me?
```

1           MR. HIXSON:  What I believe is what the parties

2    submitted in connection with the filing was just the

3    exemplar redactions and not the redactions to the entire

4    exhibit.

5           So that's a way of saying, no, I don't believe

6    the court clerk has the complete set of proposed

7    redactions.

8           COURTROOM ADMINISTRATOR:  I don't have anything.

9           THE COURT:  Well, I don't really even know what

10   you're talking about.  So I'm going to need those.  Whether

11   the court clerk has them or counsel has them, these are

12   proposed redactions by -- that are agreeable to both sides

13   or only by one side?

14          MR. HIXSON:  These are proposed by Oracle and

15   not agreed to by defendants.

16          And I can e-mail them to the clerk tonight with

17   the complete set of redactions.

18          COURTROOM ADMINISTRATOR:  We need hard copies to

19   go to the jury if they should get admitted.

20          MR. HIXSON:  I understand.  We're not seeking to

21   admit them, and it's not our motion to admit them, so we

22   did not go through that exercise.

23          THE COURT:  So it's defendants' motion to admit

24   them, and Oracle is objecting with regard to the redacted

25   materials?

 1              MR. HIXSON:  Yeah.  And it's defendants' motion.

 2              We have objected to their motion.  And in

 3    advance of the filing, the parties met and conferred and

 4    agreed that we would each discuss sample proposed

 5    redactions rather than all of the ones that would be at

 6    issue with those documents just given the large volume of

 7    them.

 8              THE COURT:  Well, I need the -- I need the total

 9    exhibit that shows the redactions requested by Oracle and

10    shows how the exhibit would appear without the redactions,

11    and that's what I don't have.

12              MR. HIXSON:  I am -- I can provide those to the

13    clerk in the morning in paper copy and e-mail them tonight.

14              THE COURT:  Okay.  Well, I'm prepared to rule on

15    them tomorrow, assuming that they're not going to affect

16    closing arguments.

17              MR. HIXSON:  Okay.  Thank you, Your Honor.

18              THE COURT:  Okay.

19              All right.  So that -- so that I have the

20    numbers straight it's 152, 153, 154B, 164A, and 340; is

21    that correct?

22              MR. HIXSON:  That's correct.

23              THE COURT:  Now, with regard to 345, there were

24    a number I had in the front of me, Exhibit 345, and there

25    were red tabs which indicated pages with objections?

1              MR. HIXSON:  I believe that for DTX 345, 292,

2    and 274, the Court has the complete set of proposed

3    redactions.

4              THE COURT:  Okay.  Well, with regard to 345, I

5    have ruled on that, and I've indicated if a proposed

6    redaction is to stay in, I've written the word "in."  If

7    it's to be removed, I would have written the word "out."

8              But it looks as though -- I mean, a quick

9    review, I may have ruled everything stays in.  I see an

10   "out" here.

11             So, in any event, I'll ask my court clerk to

12   provide you with copies of that on both sides, and the

13   exhibit can be prepared accordingly.  That was number 345,

14   Dionna?

15             COURTROOM ADMINISTRATOR:  Yes, Your Honor.

16             THE COURT:  Okay.  Now, I -- 292 -- I couldn't

17   place 292, candidly, when I looked at it.  Can anyone fill

18   me in on where we were on that?

19             MR. HIXSON:  This is a deposition exhibit to

20   Richard Cummins' deposition, and I have the -- I guess the

21   with and without redaction versions that we provided to the

22   Court with me if that's of assistance.

23             THE COURT:  It would be.

24             MR. HIXSON:  With redactions.  Without

25   redactions.

```
 1              THE COURT:  I'm going to have to look at that,
 2    but we will certainly advise you where we are on it by
 3    morning.
 4              Is there any critical need for it tonight?
 5              MR. HIXSON:  Not from us.
 6              MR. RECKERS:  Not from us either, Your Honor.
 7              THE COURT:  Okay.
 8              COURTROOM ADMINISTRATOR:  I did provide you with
 9    290A, correct, with the judge's comments?
10              MR. RECKERS:  Yes, ma'am.
11              THE COURT:  Okay.  Now, DTX 374.  Can someone
12    tell me what that is?
13              COURTROOM ADMINISTRATOR:  274; right?
14              THE COURT:  It's 274?
15              MR. HIXSON:  Yeah.  This is another deposition
16    exhibit to the deposition of Oracle's Rick Cummins, and,
17    again, I have the versions with and without redactions.
18              THE COURT:  Okay.  All right.  If you can
19    deliver that.  We'll do the same with that.
20              And these were associated with which deposition
21    did you say?
22              COURTROOM ADMINISTRATOR:  Cummins.
23              THE COURT:  Cummins?
24              MR. HIXSON:  Yes, with Cummins.
25              THE COURT:  Yeah, okay.  And it's indicated
```

3333

1    there.

2              I had looked at that briefly.  Okay.

3              Okay.  I'll have to rule on it.  I see now what

4    the issue is.

5              164A?

6              MR. HIXSON:  That is the similar issue with

7    respect to 152 and 153.  It's part of that motion where we

8    just give you samples.  So we'll provide the complete

9    proposed redactions to the Court.

10             THE COURT:  Okay.  So you'll provide that, and

11   that will be pending ruling from the Court; is that

12   correct?

13             MR. HIXSON:  Yes, Your Honor.

14             THE COURT:  So with regard to pending rulings, I

15   have 292, 274, and 164A; is that correct?

16             MR. HIXSON:  As well 152, 153, and 154B, because

17   those were the sample issue as well.

18             COURTROOM ADMINISTRATOR:  And 164A; correct?

19             MR. HIXSON:  Yes.

20             COURTROOM ADMINISTRATOR:  Okay.

21             MR. HIXSON:  And 340.

22             THE COURT:  All right.  Well, again, I guess I

23   have to give you rulings on those in the morning.

24             So you'll need rulings in the morning on 152,

25   153, 154B, 292, 274, 164A, and that should resolve it; is

1    that correct?

2              MR. HIXSON:  And 340.

3              THE COURT:  Oh, and 340 as well?

4              Okay.  All right.  Well, make sure I have a

5    package of all of that.  You just gave me which ones, with

6    regard to 292 and 274; is that correct?

7              MR. HIXSON:  Yes, Your Honor.

8              THE COURT:  And you're still -- and you are yet

9    to provide me with the ones for the others; is that

10   correct?

11             MR. HIXSON:  Yes.

12             THE COURT:  So the ones that you will provide

13   me -- when am I going to receive these?

14             Let's see, I have one of them now, don't I?  No,

15   the two I just mentioned, 274, and 292.  So you're going to

16   provide me with 164A --

17             MR. HIXSON:  With 152, 153, 154B, 164A, and 340.

18             THE COURT:  Okay.  All right.

19             Are there any other rulings that are out there

20   that we haven't mentioned?

21             MR. HIXSON:  I'm not aware of any.

22             THE COURT:  Think we've got it?

23             MR. RECKERS:  No, Your Honor.

24             THE COURT:  All right.

25             Okay.  I think the verdict form should be

```
1    acceptable, but if it's not, someone should let my court
2    clerk know, and we'll try to deal with that just as quickly
3    as we can.
4              MR. EVANSON:  Would you like to deal with that
5    now or in the morning, Your Honor?
6              THE COURT:  In the morning.
7              MR. EVANSON:  In the morning.
8              THE COURT:  Okay.  Because I think it's going to
9    be okay.  But if it's not, make sure we know about it and
10   we'll deal with it, we'll deal with it then.
11             MR. EVANSON:  Okay.  We have a few issues.
12   Would you like a filing or just -- we can do it orally in
13   the morning?
14             THE COURT:  It would be helpful to have a filing
15   ahead of time, but keep it brief and to the point, and
16   don't argue anything that you have argued already.
17             MR. EVANSON:  Okay.  We'll do that.
18             THE COURT:  All right.  I think we've got it.
19   I'll wish you gentlemen a pleasant evening.  At least we're
20   getting close to the end.  Thank you.
21        (The proceedings adjourned at 6:17 p.m.)
22                       *    *    *
23
24
25
```

3336

1                              -o0o-

2        I certify that the foregoing is a correct

3        transcript from the record of proceedings

4        in the above-entitled matter.

5

6        _____        10/6/15

7        Donna Davidson, RDR, CRR, CCR #318        Date
         Official Reporter

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3337

1                           I N D E X

2                        E X H I B I T S

3

   PLAINTIFF'S                                    ADMITTED
4  609 and 2152                                      3326

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25