SHOOK, HARDY & BACON LLP
B. Trent Webb, Esq. (*pro hac vice*)
Peter Strand, Esq. (*pro hac vice*)
Ryan D. Dykal, Esq. (*pro hac vice*)
2555 Grand Boulevard
Kansas City, MO 64108-2613
Telephone: (816) 474-6550
Facsimile: (816) 421-5547
bwebb@shb.com

Robert H. Reckers, Esq. (*pro hac vice*)
600 Travis Street, Suite 1600
Houston, TX 77002
Telephone: (713) 227-8008
Facsimile: (713) 227-9508
rreckers@shb.com

GIBSON, DUNN & CRUTCHER LLP
Mark A. Perry (*pro hac vice*)
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone: (202) 955-8500
mperry@gibsondunn.com

Blaine H. Evanson (*pro hac vice*)
333 South Grand Avenue
Los Angeles, CA 90071
Telephone: (213) 229-7228
bevanson@gibsondunn.com

LEWIS ROCA ROTHGERBER LLP
W. West Allen (Nevada Bar No. 5566)
3993 Howard Hughes Parkway, Suite 600
Las Vegas, NV 89169
Telephone: (702) 949-8200
wallen@lrrlaw.com

RIMINI STREET, INC.
Daniel B. Winslow (*pro hac vice*)
6601 Koll Center Parkway, Suite 300
Pleasanton, CA 94566
Telephone:  (925) 264-7736
dwinslow@riministreet.com

John P. Reilly (*pro hac vice*)
3993 Howard Hughes Parkway, Suite 500
Las Vegas, NV 89169
Telephone: (336) 908-6961
jreilly@riministreet.com

*Attorneys for Defendants Rimini Street, Inc. and Seth Ravin*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| ORACLE USA, INC., a Colorado corporation; and ORACLE INTERNATIONAL CORPORATION, a California corporation,<br><br>Plaintiffs,<br><br>v.<br><br>RIMINI STREET, INC., a Nevada corporation, and SETH RAVIN, an individual,<br><br>Defendants. | Case No. 2:10-cv-0106-LRH-PAL<br><br>**DEFENDANTS RIMINI STREET, INC.'S AND SETH RAVIN'S SUPPLEMENT TO RULE 50(a) MOTION FOR JUDGMENT AS A MATTER OF LAW**<br><br>Judge:     Hon. Larry R. Hicks |

**ARGUMENT**

Rimini filed a motion for judgment as a matter of law ("Motion") on September 28, 2015 (Dkt. 838). Oracle opposed on September 30, 2015 (Dkt. 843), and Rimini filed a reply brief on October 1, 2015 (Dkt. 855). The Court has not ruled on the Motion. On October 2, 2015, presentation of the evidence concluded and it is anticipated that the case will be submitted to the jury on Tuesday, October 5, 2015. The evidence presented in the final days of trial further demonstrates that Oracle's claims fail as a matter of law. For example:

<u>Causation</u>: Oracle cannot establish a specific, non-speculative connection between the alleged infringement, false statements, and hacking claims, on the one hand, and the harm Oracle claims to have suffered, on the other hand.

Additional evidence at trial demonstrated that customers decided not to renew their contracts with Oracle for a variety of reasons that having nothing to do with the accused conduct in this case. *See*, *e.g.*, 9/28 Tr. 2256:25-2257:9 (could not afford Oracle's fees); *id.* 2266:11-16 (customer would have dropped Oracle support regardless of whether Rimini existed); 9/29 Tr. 2404:15-2405:22; *id.* 2410:6-21 (customer transitioning to different software); *id.* 2412:2-18 (full support ending); *id.* 2412:19-2413:9 (cost savings); *id.* 2413:10-16 (looking for better service); *id.* 2506:23-2507:18 (self-supported for a year before going to Rimini); *id.* 2519:13-2520:7 ("Oracle support is extremely expensive"); *id.* 2534:1-11 ("being upset" with Oracle "is what caused us to even go look for a third-party support"); 9/30 Tr. 2734:7-14 ("dissatisfied with Oracle"); 10/2 Tr. 2270:21-22 (feeling forced to upgrade); 10/2 Tr. 3115:16-25 ("[b]udget constraints in the midst of the economic recession"); *id.* 3161:18-21 (bankruptcies); *id.* 3164:7-16 (Oracle was "nickel and diming" the customer); *id.* 3165:7-16 (customer "perceived that they were receiving awful customer service and support"). Indeed, as Richard Cummins, Oracle's Vice President of Sales Support North America, explained, there "are many reasons" that customers cancel their Oracle support. 10/2 Tr. 3117:2-12.

Oracle Senior Vice President Juan Jones stated that "the biggest reason" customers leave Oracle support is "it's software that they are just simply no longer using," the second reason is that they "moved to a -- another software competitor's software or package," and only third would "they have somehow moved to third-party support." 10/2 Tr. 3137:13-25. Mr. Jones also recognized that

other reasons included "poor service" and "no intention to upgrade." *Id.* 3138:10-21. And Jason Taylor, an Oracle Vice President, disagreed that Oracle lost customers "to low-cost competitors for service [like] Rimini Street" stating that "that is not necessarily the case." *Id.* 3162:6-17.

The evidence also demonstrates the various reasons customers joined Rimini, which also have nothing to do with the accused conduct in this case. *E.g.*, 9/28 Tr. 2106:25-2107 (geographic specific updates); *id.* 2114:3-6 (deliver updates more quickly); *id.* 2120:15-2121:11 (client-specific customized updates); *id.* 2265:15-21 (better service); *id.* 2271:19-2272:19 (Rimini support is "much superior"); 9/29 Tr. 2375:20-2376:7 (customized support); *id.* 2383:9-23 (personalized service); *id.* 2409:1-15 (ongoing support for older versions); *id.* 2505:18-2506:11 (transitioning software); *id.* 2514:17-2515:4 (not upgrading platforms further).

For example, Mr. Baggett explained that Bausch & Lomb decided to leave Oracle support for reasons having nothing to do with Rimini, including that Oracle did not "have the same … future vision for the software of PeopleSoft … so it wasn't a good strategic fit" (10/1 Tr. 2947:12-14), Bausch & Lomb "didn't believe [they] were getting the value out of the support dollars [they] were paying Oracle" (*id.* 2949:3-7), and Oracle had "a very rigid process" that resulted in "just wasting their time" without "actually moving towards a fix to the problem" (*id.* 2951:24-2952:25). Had Bausch & Lomb been "getting excellent service from Oracle," they "would have stayed with Oracle." *Id.* 2959:6-8. But, it was "far too much money for far too little benefit." *Id.* 2964:3-4. As Mr. Baggett testified: "I can't imagine a situation where at that point we would have gone back to Oracle. We tried so many times over the years … it just wasn't going to work." *Id.* 2988:25-2989:5; *see id.* 2987:23-2988:3 (noting that Bausch & Lomb would not have gone back to Oracle even if "Rimini Street was not an option for whatever reason"). And the reason Bausch & Lomb ultimately decided to contract with Rimini—after having already decided to not renew with Oracle—was because they "knew … [they] would get talented people who could fix [their] problems." *Id.* 2979:15-20.

Additional evidence at trial also further demonstrated that customers had many other support options in addition to Rimini, including self-support (9/29 Tr. 2423:23-2425:3); other consulting firms (*id.* 2425:4-2426:9); and competitor third-party support providers, such as Spinnaker, NetCustomer, Versytec, LegacyMode, and Abtech (*id.* 2426:10-2431:7).

Gibson, Dunn &
Crutcher LLP

These problems of causation are also directly relevant to Oracle's damages assumptions. Evidence was presented suggesting that Ms. Dean "didn't isolate her calculation to just the wrongful acts" but instead was "looking at Rimini Street in its entirety" (9/30 Tr. 2721:16-2722) in assessing why customers left Oracle; that Ms. Dean failed to control for the recession and financial hardship many companies were facing around 2008-2009 (*id*. 2753:6-15; *see also* 10/2 Tr. 3161:18-21 (Oracle executive Jason Taylor noting that during 2009 time frame "bankruptcies had a large impact on the cancellation rate" for Oracle support contracts)); that there was no "evidence in the record that shows that a customer left because of the infringement or the interference" across all product lines (*id*. 9/30 Tr. 2806:3-21); and that Ms. Dean's report was fatally flawed because it failed to go "customer by customer" and assess each customer's reasons for leaving (*id*. 2811:20-25).

Finally, the lack of any evidence supporting Oracle's experts' assumptions regarding whether TomorrowNow and CedarCrestone were infringing undermines Oracle's entire causation and damages model, and requires judgment for Rimini. As the Court stated on October 6, 2015, there was not sufficient evidence submitted at trial with respect to either TomorrowNow or CedarCrestone that would permit a finding that either company was infringing. Because it was Oracle's burden to establish these companies were infringing (*e.g.*, *Panduit Corp. v. Stahlin Brothers Fibre Works, Inc.*, 575 F.2d 1152, 1156 (6th Cir. 1978)), and because Oracle's entire damages model was premised on those companies being infringing,[1] the lack of evidence supporting that assumption undermines Oracle's entire model and warrants judgment.

<u>Inducing Breach of Contract</u>: Oracle's induced breach claim is now premised only on a theory that Rimini wrongfully caused Oracle customers to breach the website terms of use. Dkt. 843 at 11 ("Oracle's inducing breach of contract claim concerns Oracle's terms of use, not software licenses"). Yet *Oracle presented no evidence that a single customer breached the website terms of*

---

[1] *E.g.*, 9/24 Tr. 1689:4-13 (Yourdon) ("My general conclusion was that none of the companies … represented a viable alternative"); *id*. 1689:21-25 ("I concluded that TomorrowNow was an infringing provider …. I came to that conclusion also because I was instructed by counsel"); *id*. 1693:8-10 ("I was instructed by counsel to consider CedarCrestone to be an infringing provider and therefore not viable"); 9/25 Tr. 1911:17-21 (Dean) ("Oracle had no acceptable, noninfringing competitors").

*use*. At most, Mr. Jones testified that Oracle customers received "a customer support identifier" (or "CSI") and that "access with that CSI is … subject to terms of use on the website." 10/2 Tr. 3152:13-15, 3153:7-10. But Oracle did not present any evidence that a single customer breached the website terms of use when accessing the website with the CSI. In fact, further testimony confirmed the opposite: Oracle did not believe its customers breached their contracts. 10/2 Tr. 3136:10-14 (Jones) ("Q. To your knowledge, has Oracle ever informed any of its licensees that that licensee was -- excuse me -- breaching a license solely by getting support from Rimini Street? A. Not that I'm aware of."); *id.* 3136:21-25 ("Q. To your knowledge, has Oracle ever communicated to a licensee that it was breaching the license by going to a third-party support provider? A. Not that I'm aware of.").

<u>Computer Hacking Claims</u>:  Additional evidence demonstrated that Oracle's systems were never impaired or damaged by Rimini's use of automated downloading. 9/29 Tr. 2294:21-2295:4 (Klausner) ("average [search] response time" was "very similar or exactly the same" "for the alleged period of high Rimini activity"); *id.* 2295:20-24 ("The response time that Mr. Hicks found by looking literally at the log … was different between Rimini days and non-Rimini days by only one to two and a half seconds or so for a user"); *id.* 2296:2-11 (no server impairment); *id.* 2301:12-15 (same); *id.* 2335:17-19 (same); *id.* 2306:1-2 ("There was no damage done"). As Mr. Klausner explained: "There was no damage. I've worked in computers for a long time. I've worked on hard drive development. I've worked for companies that produce the hardware. I've computed. I've programmed for years, and I've put together computers myself, hundreds of them over the years. There's no impairment here." *Id.* 2305:6-13; *id.* 2306:14-17 (having to "reboot the system" is "different than impair," because "it comes back up and everything is okay"). And even though Oracle International Corp. asserts computer hacking claims, there is still no evidence that it even has a computer.

<u>Punitive Damages</u>:  Additional evidence demonstrated (i) that Rimini operated with a good-faith and objectively reasonable belief that its conduct was lawful, and (ii) that Rimini did *not* act with the type of despicable conduct necessary to sustain a punitive damages award. *See* 9/28 Tr. 2147:10-2148:25 (Rimini would have used alternative methods if it had known that its methods infringed Oracle's copyrights); 9/29 Tr. 2420:20-2421:3 (CedarCrestone's practices influenced

Rimini's view of the appropriateness of its processes). For example, when asked whether "Rimini's processes intentionally violated Oracle's intellectual property rights," Mr. Benge responded "No," explaining: "[T]he development team was very committed to respecting Oracle's IP rights. We were very careful to make sure that clients only received updates that they were entitled to. We were very careful to make sure that they didn't receive something -- an update from Oracle that they didn't already pay Oracle for." 9/28 Tr. 2149:1-12. When pressed on cross-examination, Mr. Benge reiterated the same point: "My thought was that we were, again, never giving a client something that they hadn't already paid Oracle for." *Id.* 2234:1-2; *see id.* 2234:3-2235:3 (same); *id.* 2235:16-24 (same).

<u>Copyright Infringement</u>: Rimini's case in chief also confirmed that liability cannot be imposed for willful copyright infringement, contributory infringement, or vicarious infringement because of a failure to prove knowledge and causation. Testimony established that Rimini serviced at least twenty percent of its customers using remote support or "client-hosted environments" (9/28 Tr. 2123:11-17), and that off-site hosting was commonplace even for customers (*id.* 2259:8-22).

In addition, Oracle's cross-examinations of Rimini's witnesses provided further corroboration of Rimini's argument that Oracle is misusing its copyrights. One witness testified that there were "two experienced, credible players in the third-party support market other than Oracle," namely "Rimini and TomorrowNow," both of whom Oracle either has, or is trying to, shut down (*id.* 2492:1-5; *see also* 10/2 Tr. 3096:3-9). Oracle executives also testified that customers had no options to reduce support fees with Oracle (10/2 Tr. 3111:19-24) and that Oracle doesn't "negotiate the price" for support (*id.* 3103:12-18; *see also* 3105:15-20). Indeed, one customer observed that maintenance fees were "higher than they've ever been." 9/29 Tr. 2492:1-3. One Oracle executive, Juan Jones, even went so far as to assert that Oracle has "the intellectual property to service" the software. *Id.* 3128:24-3129:5. Mr. Jones was also unaware of Oracle ever having granted a license to a third-party support provider. *Id.* 3135:21-25.

<u>Lost Profits and Infringer's Profits</u>: Even assuming such a showing could support Oracle's damages case under these circumstances (it cannot), Oracle failed to meet its burden of proving that no non-infringing alternatives existed during the time period at issue in this lawsuit. *IGT v. Alliance*

*Gaming Corp.*, 2008 WL 7084605, at *7-8 (D. Nev. Oct. 21, 2008). The evidence demonstrates that customers had several alternatives. 9/29 Tr. 2423:23-2425:3; *id*. 2425:4-2426:9; *id*. 2426:10-2431:7. And Oracle failed to meet its burden of proving that these alternatives were infringing. In addition, the evidence introduced during Rimini's case established that Rimini had no profits to disgorge because its expenses far exceeded its revenue. 9/30 Tr. 2639-2654; *id*. 2654 ("for the time period January of '06 through February of … 2014 …. [w]e've had a net loss of 63 million"); *id*. 2656 ("We had a 23-and-a-half-million-dollar loss for those three product lines"); *id*. at 2756-2759. Oracle's experts did not dispute or rebut this evidence.

<u>Evidentiary Rulings</u>: Several evidentiary rulings also support Rimini's alternative motion for a new trial. *See* 9/29 Tr. 2465:11-19; 9/30 Tr. 2599:18-2600:16; *id*. 2587:6-17; *id*. 2595:3-22.

## CONCLUSION

For these reasons, and the reasons previously stated in Rimini's Motion (Dkt. 838), the Court should order judgment for Rimini on all of Oracle's claims.

DATED:   October 6, 2015             GIBSON, DUNN & CRUTCHER LLP

                                     By:   *Blaine H. Evanson*
                                           Blaine H. Evanson

                                     *Attorneys for Defendants*
                                     *Rimini Street, Inc. and Seth Ravin*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 6, 2015, I caused to be electronically filed the foregoing document with the clerk of the court for the U.S. District Court, District of Nevada, using the electronic case filing system. The electronic case filing system sent a "Notice of Electronic Filing" to the attorneys of record who have consented in writing to accept this Notice as service of this document by electronic means.

By: *Blaine H. Evanson*
  Blaine H. Evanson

*Attorney for Defendants
Rimini Street, Inc. and Seth Ravin*

Gibson, Dunn & Crutcher LLP