3338

1                UNITED STATES DISTRICT COURT
                      DISTRICT OF NEVADA
2          BEFORE THE HONORABLE LARRY R. HICKS, DISTRICT JUDGE

3

4    ORACLE USA, INC., a Colorado      :
     corporation; ORACLE AMERICA,      :
5    INC., a Delaware corporation;     :
     and ORACLE INTERNATIONAL          :No. 2:10-cv-0106-LRH-PAL
6    CORPORATION, a California         :
     corporation,                      :
7                                      :
             Plaintiffs,               :
8                                      :
         vs.                           :
9                                      :
     RIMINI STREET, INC., a Nevada     :
10   corporation; and SETH RAVIN,      :
     an individual,                    :
11                                     :
             Defendants.               :
12   _____:

13

14

                  TRANSCRIPT OF JURY TRIAL - DAY 17
15                  (Pages 3338 through 3641)

16

17                      October 6, 2015

18

                      Las Vegas, Nevada
19

20

21

22

     Court Reporter:        Donna Davidson, RDR, CRR, CCR 318
23                          Certified Realtime Reporter
                            400 South Virginia Street
24                          Reno, Nevada  89501
                            (775) 329-0132
25

3339

```
 1                    A P P E A R A N C E S

 2    FOR THE PLAINTIFFS:

 3    BOIES, SCHILLER & FLEXNER LLP
      KIERAN P. RINGGENBERG
 4    1999 Harrison Street, Suite 900
      Oakland, California 94612
 5    (510) 874-1000
      Fax: (510) 874-1460
 6    kringgenberg@bsfllp.com

 7    BOIES, SCHILLER & FLEXNER LLP
      RICHARD J. POCKER
 8    300 South Fourth Street, Suite 800
      Las Vegas, Nevada 89101
 9    (702) 382-7300
      Fax: (702) 382-2755
10    rpocker@bsfllp.com

11    BOIES, SCHILLER & FLEXNER LLP
      WILLIAM A. ISAACSON
12    KAREN L. DUNN
      5301 Wisconsin Avenue, NW
13    Washington, DC  20015
      (202) 237-2727
14    Fax:  (202) 237-6131
      wisaacson@bsfllp.com
15    kdunn@bsfllp.com

16    MORGAN LEWIS & BOCKIUS LLP
      THOMAS S. HIXSON
17    NITIN JINDAL
      JOHN A. POLITO
18    One Market, Spear Street Tower
      San Francisco, California 94105
19    (415) 442-1000
      Fax:  (415) 442-1001
20    thomas.hixson@morganlewis.com
      nitin.jindal@morganlewis.com
21    john.polito@morganlewis.com

22    JAMES C. MAROULIS
      DORIAN E. DALEY
23    Oracle Corporation
      500 Oracle Parkway
24    Redwood City, California 94070
      (650) 506-4846
25    jim.maroulis@oracle.com
      dorian.daley@oracle.com
```

3340

```
 1                 A P P E A R A N C E S (Continued)

 2    FOR THE DEFENDANTS:

 3    SHOOK, HARDY & BACON LLP
      PETER E. STRAND
 4    B. TRENT WEBB
      RYAN D. DYKAL
 5    2555 Grand Boulevard
      Kansas City, Missouri 64108
 6    (816) 474-6550
      Fax: (816) 421-5547
 7    pstrand@shb.com
      bwebb@shb.com
 8    rdykal@shb.com

 9
      SHOOK, HARDY & BACON LLP
10    ROBERT H. RECKERS
      600 Travis Street, Suite 3400
11    Houston, Texas 77002
      (713) 227-8008
12    Fax: (713) 227-9508
      rreckers@shb.com
13
      SHOOK, HARDY & BACON LLP
14    ANNIE Y.S. CHUANG
      One Montgomery Tower, Suite 2700
15    San Francisco, California 94104-4505
      (415) 544-1900
16    achuang@shb.com

17
      LEWIS ROCA ROTHGERBER LLP
18    W. WEST ALLEN
      3993 Howard Hughes Parkway, Suite 600
19    Las Vegas, Nevada 89169
      (702) 949-8230
20    Fax: (702) 949-8364
      wallen@lrrlaw.com
21

22

23

24

25
```

1              LAS VEGAS, NEVADA, OCTOBER 6, 2015, 8:11 A.M.

2                             --oOo--

3                       P R O C E E D I N G S

4

5           (Outside the presence of the jury.)

6                THE COURT:  All right.  Have a seat.  Good

7      morning to everyone.

8                There are some issues that need to be addressed

9      here by the Court.

10               The record will show that we're in open court.

11     The parties and counsel are present.  The jury is not

12     present.

13               Late yesterday afternoon, actually in the

14     evening hours, the Court provided counsel with the proposed

15     instructions to be given in this case, and we also

16     discussed exhibits that were not yet fully resolved and

17     before the Court.

18               And since that time Oracle has withdrawn a

19     pursuit of its claim under the federal computer law claims,

20     I forget the exact description of the type of claims, and

21     so the verdict form required some modifications.

22               A verdict form -- I should have stated a verdict

23     form was also distributed last night.

24               And I've also received some requests for

25     modification to the verdict form in light of -- on behalf

3342

1    of Defendants Rimini which I agreed with in large part, and

2    I also saw some additional language that was needed on the

3    verdict form.

4          So we will be distributing the proposed verdict

5    form to you very shortly, but I believe that it is -- will

6    be our final verdict form for the jury.

7          Essentially the modifications to it are to

8    withdraw the federal computer claims requested by Oracle to

9    clarify some of the language about Rimini's lost profits

10   not being included in Oracle's lost profits if the jury

11   returns damages for lost profits, some language clarifying

12   the approach to the respective defendants, Rimini and

13   Ravin, and language pertaining to calculation of total

14   damages, which will be self-explanatory.

15         But I would tell you that I think I wouldn't

16   expect to see objection from either side, but certainly if

17   someone sees something that they're objecting to, please

18   bring that to the Court's attention.

19         I think we are at the point where the verdict

20   form should be acceptable, and I say that not just based on

21   the Court's ruling but on the impressions I have picked up

22   from all counsel in this case.

23         I didn't -- well, one point I wanted to address

24   was in the proposed jury instructions I did not give -- the

25   final draft of the proposed instructions did not include

3343

1    Oracle's proposed additional instruction concerning

2    TomorrowNow and CedarCrestone which essentially would have

3    resulted in the Court instructing the jury not to consider

4    TomorrowNow and CedarCrestone essentially because they

5    would have been infringing alternatives.

6             I did not give that instruction because the

7    evidence in front of the jury does not show that

8    TomorrowNow or CedarCrestone was either infringing or

9    noninfringing, but there has been testimony and evidence

10   identifying both TomorrowNow and CedarCrestone.

11            But the other side of that coin is that

12   throughout the case defendants, sensitive to TomorrowNow

13   and CedarCrestone, throughout the trial have represented

14   that essentially -- and I don't mean to oversimplify

15   here -- that they weren't going to be arguing that

16   TomorrowNow or CedarCrestone were non-infringing

17   alternatives, and essentially that's what happened as

18   evidence unfolded in front of the jury.

19            The Court has certainly been concerned over the

20   fact that TomorrowNow was prosecuted both criminally for

21   what I suspect, but don't know, were fraudulent and massive

22   copyright infringements of Oracle's product.

23            The evidence in front of the jury is that the

24   business closed down again.  I think it was -- the

25   inference is it was because it was an infringing company,

3344

```
1     and, of course, CedarCrestone ultimately resulted in

2     litigation between Oracle and CedarCrestone, which resulted

3     in a resolution of that case in favor of Oracle and

4     resulted in an affidavit of the CEO from CedarCrestone

5     confirming that their activities had been very infringing

6     regarding copyright violations.

7            But that -- all of that occurred beyond our

8     timeframe in this case, 2006 to 2011.  That evidence was

9     not admitted all the way around and partly because it was

10    being represented by defendants that they were not going to

11    be arguing that TomorrowNow or CedarCrestone were

12    noninfringing.

13           So on the basis of that history and

14    background -- and I would say that the Court still doesn't

15    have evidence in front of the Court, even considering

16    everything and without regard to what the jury has heard,

17    that the Court could make a legal conclusion that

18    TomorrowNow and CedarCrestone were infringing alternatives.

19           So given the state of the evidence in front of

20    the jury, and given that history that I've just outlined --

21    and I haven't covered every detail, we're short on time --

22    I eliminated and decided not to give the instruction

23    requested by Oracle on TomorrowNow and CedarCrestone.

24           But since there is evidence on these issues, I

25    wanted to clarify that I do not believe that either party
```

1   should be arguing in closing arguments that TomorrowNow or

2   CedarCrestone were either infringing or noninfringing.

3          There is no evidence in front of the jury to

4   show that one was infringing and one was not infringing,

5   but it certainly would be improper for defendants to be

6   arguing that TomorrowNow and CedarCrestone were,

7   quote/unquote, noninfringing alternatives in light of the

8   history that's been laid out before the Court.

9          Essentially the Court views this as a matter of

10  estoppel, judicial estoppel, for lack of a better term,

11  because the legal position taken by defendants was not to

12  pursue TomorrowNow or CedarCrestone as noninfringing

13  alternatives.

14         But, by the same token, I think in fairness it

15  would be improper for Oracle to be arguing that TomorrowNow

16  and/or CedarCrestone were, in fact, infringing alternatives

17  and should not be considered.

18         So the bottom line is I don't believe that the

19  words infringing or noninfringing should be attached to any

20  references to TomorrowNow or CedarCrestone in the course of

21  closing arguments, and the Court would be sensitive to

22  objections concerning argument that might imply one or the

23  other.  But that's not to say that counsel cannot reference

24  TomorrowNow or CedarCrestone in their closing statements.

25         Now, turning to another issue that concerns the

3346

1    Court, I -- of course, this has -- the number of exhibits

2    in this case are astounding.  And I don't need to comment

3    further.  Just a review of the pretrial order in this case

4    would show the thousands and thousands of prospective

5    exhibits that may have been considered in this case.

6            That has been winnowed down by counsel, and I

7    appreciate that.  And we've had a reduced number of them

8    presented to the jury.  But they are still massive.

9            In last night's discussion we talked about any

10   rulings that had been taken under submission by the Court,

11   and a number of exhibits were identified.

12           The Court resolved PTX 609 and 2152, and they

13   were admitted.  The Court resolved DTX 290A, and a redacted

14   format was to be admitted.

15           But as to all of the other, and certainly this

16   included DTX 152, 153, 154B, 164A, and 340 -- Madam Clerk,

17   did I have those numbers correct?

18           COURTROOM ADMINISTRATOR:  And you have two --

19           THE COURT:  I think I ruled some of those

20   admitted last night.

21           COURTROOM ADMINISTRATOR:  274 is still pending.

22           THE COURT:  274?

23           COURTROOM ADMINISTRATOR:  292, and you mentioned

24   340 already, and then 345.

25           THE COURT:  340 is not in yet.

<table>
<tr><td>1</td><td>COURTROOM ADMINISTRATOR:  Correct, and 345.</td></tr>
<tr><td>2</td><td>THE COURT:  Is -- 340 is not in?</td></tr>
<tr><td>3</td><td>COURTROOM ADMINISTRATOR:  No.</td></tr>
<tr><td>4</td><td>THE COURT:  How about 345?</td></tr>
<tr><td>5</td><td>COURTROOM ADMINISTRATOR:  No.</td></tr>
<tr><td>6</td><td>THE COURT:  153?</td></tr>
<tr><td>7</td><td>COURTROOM ADMINISTRATOR:  No.</td></tr>
<tr><td>8</td><td>THE COURT:  152?</td></tr>
</table>

1                COURTROOM ADMINISTRATOR:  Correct, and 345.

2                THE COURT:  Is -- 340 is not in?

3                COURTROOM ADMINISTRATOR:  No.

4                THE COURT:  How about 345?

5                COURTROOM ADMINISTRATOR:  No.

6                THE COURT:  153?

7                COURTROOM ADMINISTRATOR:  No.

8                THE COURT:  152?

9                COURTROOM ADMINISTRATOR:  No.  None of the

10   others are in except for we need to actually admit this

11   one -- 290A they have to give to me.  They haven't given it

12   to me.

13                THE COURT:  So anyway, what has not been

14   admitted at this point in time are Exhibits 152, 153, 154B,

15   164A, 340, 274, 292, and 345, and we have also not received

16   the one that the Court did rule on, 290A.

17                It's disturbing to me, obviously, that these

18   have not been presented to the Court for final ruling until

19   after both sides have rested and we're literally at the

20   point of closing statements, instructions, and jury

21   deliberations.

22                These exhibits are extensive, and I'm interested

23   in counsels' thoughts with regard to approaches.

24                The first thought I had was that -- let me go

25   through some history here too.

3348

1          I believe that with a large number of these

2     exhibits, the Court's understanding was that counsel would

3     attempt to work out redactions based upon a guideline

4     ruling of the Court that it recognized hearsay as to a

5     number of objections, hearsay having been argued by Oracle

6     as to client references within these documents.

7          And the Court further indicated, however, that

8     if the entries reflected present sense impressions of the

9     Oracle employees in the course of administering their

10    business records that that would be admissible.

11         I understood that counsel were going to work

12    between them to attempt to produce exhibits that would

13    reflect the Court's view.

14         We proceeded then with trial.  And everyone

15    knows how complex and how many witnesses and how many

16    counsel have been involved in this case.  As I recall,

17    these discussions went back to the early part of next week,

18    may have -- or last week, may have even gone -- arisen in

19    the week before that.

20         Although I understood counsel were going to be

21    working on this, I never was presented with anything, and,

22    of course, we were aware that the Court had reserved ruling

23    on these exhibits.

24         So when the issue arose last night about how

25    about those exhibits where the Court's reserved ruling,

1    some of them weren't even presented to the Court with

2    regard to the proposed defendants' form versus the proposed

3    plaintiffs' form, and I have just been provided with those

4    this morning.

5                Essentially what I see are the following

6    options.  And I'm interested in counsel's reaction as well.

7    First of all, I can excuse the jury, and we will wade

8    through the objections, and I'll wade through the exhibits.

9                I'm just holding up, for the benefit of counsel,

10   just one of them, DTX 274, which appears to me to be -- if

11   you include both the unredacted and the redacted formats,

12   it appears to me to be at least 70 to 100 pages of entries.

13               Looking at 274, it appears to the Court to be a

14   comparable size.

15               So this concerns me.  It obviously would take a

16   great amount of time to resolve these one by one.  I'm very

17   disappointed that counsel were not able to agree on

18   something that would be admitted, and I'm also disappointed

19   that I was informed -- not informed about the disability

20   until last night.

21               So I'm not high, I can tell you for sure, on

22   continuing and holding off this jury in hearing this case

23   until we have waded through all these exhibits.

24               One alternative I see is to admit the exhibits

25   in their redacted form.  Essentially what that does is it

3350

1    gives Oracle the benefit of all of its objections, but it

2    also would give defendants some benefit concerning

3    identification of client loss.

4           And I essentially would give that option to

5    defendants.  Because if I'm going to recognize all the

6    redactions urged by Oracle, I would want defendants to have

7    the option of whether they want to admit the exhibit or

8    not.

9           A third and possible alternative might be to

10   take some of the exhibits that are shorter in form, for

11   example, I'm looking, just as an example, at 154B, that we

12   could go through in a fairly summarized fashion and the

13   Court could rule on that in a fairly short order.

14          We could take some delay.  I wouldn't have to

15   hold the jury off as long to resolve those issues, but that

16   would not include all of the exhibits.

17          So I'm interested in counsel's thoughts

18   regarding this.  And I'll hear from you, Mr. Webb.

19          MR. WEBB:  Good morning, Your Honor.

20          First of all, I apologize.  Our wi-fi in our

21   hotel was out all night last night, so we're a little --

22   trying to catch up.

23          With the Court's permission, I would like to

24   take five minutes and confer with my team about a solution

25   that might be able to fast forward everything, if that's

1    okay.

2              THE COURT:  Okay.  And bring plaintiffs' counsel

3    into your loop.

4              MR. WEBB:  I will.

5              THE COURT:  So that we can minimize the amount

6    of time necessary.

7              MR. WEBB:  Sure.  It shouldn't take more than

8    five minutes, Your Honor.

9              THE COURT:  All right.  Court will be adjourned

10   briefly.

11             COURTROOM ADMINISTRATOR:  Please rise.

12         (Recess from 8:31 a.m. until 8:50 a.m.)

13         (Outside the presence of the jury.)

14             COURTROOM ADMINISTRATOR:  Please rise.

15             THE COURT:  Have a seat, please.

16             Before I hear from counsel on this remaining

17   issue, I have just asked my court clerk to pass out the

18   proposed verdict form.

19             I would tell you that I did not have personal

20   time to review it for final approval by the Court, but I

21   had explained to my clerk what I wanted in there, and my

22   preliminary review indicated that it was as I instructed.

23             So if anyone sees something in there that they

24   are particularly concerned about, please let me know, and

25   I'm open to addressing that before it goes in to the jury.

3352

```
 1              So that takes us to the dilemma with regard to
 2    the exhibits upon which rulings were reserved.
 3              Mr. Webb?
 4              MR. WEBB:  I believe -- we've conferred, and we
 5    think that Your Honor's suggestion is a good one.  We will
 6    accept the redactions and offer them into evidence as
 7    redacted documents.
 8              The only rub is that we have to actually do the
 9    redactions.  Our team is working on that now.  We hope to
10    have the actual documents redacted and ready to give to the
11    jury well before the jury gets the case.
12              THE COURT:  All right.  I would say that I
13    understand both sides' positions in this case, and I think
14    that there's abundant evidence to support both sides'
15    positions with regards to the exhibits that are in evidence
16    in the unredacted form that are actually in front of the
17    jury.
18              MR. WEBB:  Thank you, Your Honor.
19              THE COURT:  All right.  Thank you.
20              Mr. Isaacson?
21              MR. ISAACSON:  Yes.  Before closing statement,
22    there's two slides at issue, just to --
23              THE COURT:  All right.
24              MR. ISAACSON:  And one from each side.  So I can
25    pass those up.
```

1              The first slide, Hampton and But-For Lies.  This

2    would be the proposed slide that we would use.

3              This was unobjected-to cross-examination of

4    Mr. Hampton where I was asking him about his but-for

5    causation and avoided costs.

6              And I asked him about his theory as applied to

7    an investor who was ripped off by Bernie Madoff.  And you

8    can see the quote.

9              And he said using his theory of but-for

10   causation, there would still be a real question as to

11   whether those investors should be compensated because maybe

12   they would have found another -- another crook, another

13   Bernie Madoff, which we thought impugned his whole theory

14   of but-for causation and avoided cost that he wants to put

15   before the jury.

16             And that would be the argument that we would

17   make based on testimony that was admitted without

18   objection.

19             THE COURT:  Okay.  And what's the second one?

20             MR. ISAACSON:  The second one is a Rimini slide.

21   And you can see the title, "Contracts Clear?"

22             The jury instructions state that the contracts

23   are clear and that they are the province of the Court, and

24   it's not proper argument to argue that the contracts are

25   not clear.

1              I would further point out even on the question

2    of willfulness that the arguments as to whether the --

3              THE COURT:  Wait a minute.  Well, let me deal

4    with the first one first because I can see I'm not quite

5    tracking with what you're saying here, and maybe I should

6    hear it from defense.

7              MR. ISAACSON:  They are two separate issues.

8              THE COURT:  Yes.  Let me hear from defense with

9    regard to the Hampton and but-for lies.

10             Mr. Reckers?

11             MR. RECKERS:  Yes, Your Honor.

12             There's obviously a lot of testimony from

13   Mr. Hampton about his but-for causation theory.

14             They've chosen this particular line, I'd submit,

15   to inflame the jury.  The comparison to Bernie Madoff and

16   that, obviously, Ponzi scheme is apparent.

17             It is -- violates at least the spirit of the

18   Court's motion in limine regarding not calling Rimini

19   thieves or other pejorative terms such as that.

20             So we would submit that this is unnecessary.  It

21   provides a comparison to Bernie Madoff -- comparing Bernie

22   Madoff and Rimini Street, at least at some level, and we'd

23   submit it's unnecessary and unduly inflammatory.

24             MR. ISAACSON:  And our point is it's fair

25   because it's unobjected to, to impugn Mr. Hampton, not

```
 1   Rimini.
 2              THE COURT:  Okay.  My view is this is in
 3   evidence, that was the answer by the witness.  I think
 4   Oracle is entitled to show that to the jury, but that does
 5   not diminish in any way my earlier ruling with regard to
 6   thieves and theft and whatever the laundry list was.
 7              MR. ISAACSON:  I understand.  I tend to be going
 8   after Mr. Hampton at that point and not Rimini.
 9              THE COURT:  Okay.  And also for the record, and
10   please correct me if I'm wrong, there was no objection made
11   to this response, no request to strike the response in any
12   way.
13              MR. ISAACSON:  Right.
14              THE COURT:  That's my recollection.  Is that
15   correct?
16              MR. ISAACSON:  Correct.
17              THE COURT:  All right.  Thank you.
18              All right.  Let me hear from defense with regard
19   to the "Contracts Clear?" proposal.
20              MR. ISAACSON:  I would say one more thing about
21   the "Contracts Clear?" point --
22              THE COURT:  I'll hear from you after I hear from
23   him.
24              Mr. Reckers?
25              MR. ISAACSON:  Okay.
```

1          MR. RECKERS:  Yes, Your Honor.  Thank you.

2          The "Contracts Clear?" obviously this is

3  discussion in the cross-examination of Mr. Allison that we

4  had the end of the first week, beginning of the second

5  week.

6          One of the issues in the case, as Your Honor

7  knows, and I'm citing specifically Jury Instruction Number

8  58 --

9          THE COURT:  Let me stop you for a minute.

10         I'm trying to remember what the "Contracts

11 Clear?" reference was about.  Help me out here.

12         MR. RECKERS:  Sure.  So if you'll recall, on

13 Friday of the first week and Monday of the following week,

14 Mr. Allison, who was an Oracle executive --

15         THE COURT:  Yes, I recall Mr. Allison.

16         MR. RECKERS:  And so -- and Mr. Strand went

17 through a cross-examination and talked about some of the

18 provisions and contrasted the provisions of the contract

19 and showed, from our perspective, that they're not as clear

20 as Mr. Allison represented on direct.

21         So we have --

22         THE COURT:  You're talking about the

23 licensing --

24         MR. RECKERS:  Yes, Your Honor, the PeopleSoft,

25 JD Edwards, and Siebel licenses.

1              THE COURT:  Okay.

2              MR. RECKERS:  And where that comes in, and what

3    the argument will be in closing, is that Mr. Ravin -- when

4    we look at the question of objectively reasonable

5    conduct -- and it's Jury Instruction Number 58 looks to the

6    objectable -- the objective reasonableness of the

7    interpretation.

8              We believe that the cross-examination testimony

9    of Mr. Allison shows that there are reasonable alternative

10   interpretations of the contract, and even, in the case of

11   Mr. Ravin, subjectively reasonable interpretations, that he

12   believed for things such as facilities that informed his

13   belief, and there was a reason why punitive damages in this

14   case are not appropriate.

15             So this is the one slide that we would put in.

16   It's supported by the evidence, and it's directly relevant

17   to the reasonableness of the conduct in the context of

18   punitive damages.

19             THE COURT:  I understand what you're concerned

20   about.

21             All right.  Mr. Isaacson?

22             MR. ISAACSON:  All right.  So the Court has

23   ruled that the contracts are clear.  So the only issue is

24   whether any of this was tied to testimony of Mr. Ravin, and

25   that did not happen.

1              They didn't go back with Mr. Ravin, or any other

2      Rimini witness, and have them say, yes, I looked at site,

3      little s, capital S, territory, copies, copies, reasonable

4      number of copies.

5              This became purely a lawyer's argument about,

6      gee, we could have -- this could be considered ambiguous.

7      That was as a lawyer's argument that's been rejected by the

8      Court.

9              I would say the one exception to that would be

10     the first line, "Facilities, Not Defined."  Mr. Ravin, as I

11     do recall, said Texas was not Texas in his interpretation.

12             So if they want to make that argument, that

13     would be fine.  But there is no -- in terms of state of

14     mind, willfulness, et cetera, all the other line items on

15     here were not tied to anybody's state of mind.

16             This was purely cross-examination of Mr. Allison

17     about a contract which is purely a legal argument for the

18     Court to decide, and which the Court has decided.

19             MR. RECKERS:  Your Honor, if I may?

20             THE COURT:  You may.

21             MR. RECKERS:  Instruction 58 talks about --

22             THE COURT:  And please step to the microphone.

23             MR. RECKERS:  Yes, sir.

24             The instruction talks about objective

25     reasonableness, so obviously -- excuse me -- the objective

1   reasonableness does not turn on individual defendants'

2   state of mind.

3          THE COURT:  The Court's ruling will be that this

4   exhibit may be shown.

5          It is objective reasonableness.  By the same

6   token, there's no limit upon Oracle's right or opportunity

7   to argue that that was not Mr. Ravin's testimony, and I

8   don't -- I assume counsel would be faithful to what the

9   testimony was.

10          So the demonstrative may be used by counsel.

11   Oracle counsel is free to challenge that as they deem

12   appropriate.

13          MR. RECKERS:  And, Your Honor, could I say one

14   more thing for the record?

15          THE COURT:  Yes.

16          MR. RECKERS:  A number of their slides have

17   TomorrowNow in them, and we just want to make clear for the

18   record that we are maintaining our TomorrowNow running

19   objection as to their slides, but we don't intend to make

20   this objection further.

21          THE COURT:  Right.  That objection has been

22   viewed as a continuing objection to TomorrowNow, but

23   neither party is limited on the manner in which they can

24   refer to TomorrowNow with the exception of identifying it

25   as either infringing or noninfringing.

1             Mr. Webb?

2             MR. WEBB:  Your Honor, I'm sorry to raise

3    something else, but just out of curiosity, I was wondering

4    if, A, we could have some guidance as to the content of

5    plaintiffs' rebuttal closing.

6             And my concern is, is that there may not be

7    issues raised in their first part that I can respond to and

8    issues that are raised for the first time in rebuttal that

9    I can't respond to.  That's my first issue.

10            My second issue is I was just wanting to know

11   what the split in time is, whether it's going to be an hour

12   and a half, 30, I was wondering if I could get some

13   guidance on that.

14            MR. ISAACSON:  We're 2 hours and 15 now.

15            MR. WEBB:  That's right.

16            MR. ISAACSON:  Our goal is to reserve 15 minutes

17   for rebuttal.  That would be our goal.

18            MR. WEBB:  All right.

19            MR. ISAACSON:  And I understand rebuttal is

20   rebuttal, and I will stand up and say they said this, they

21   said that, and give a wrap-up.

22            MR. WEBB:  Do I get extra credit if I stop short

23   of two fifteen?

24            MR. ISAACSON:  I'm sure everybody will -- use of

25   your time going through the verdict form --

```
 1              MR. WEBB:  I'll try.

 2              THE COURT:  All right.  Well, counsel knows the

 3   rules with regard to arguments, and I'm not holding anyone

 4   to specific a timeframe for rebuttal argument other than

 5   the fact that it would be included within the two hours and

 6   15 minutes maximum that the Court has allocated to each

 7   side in the closing arguments.

 8              All of that stated, I think we're ready to bring

 9   in the jury, so let's do that.

10              COURTROOM ADMINISTRATOR:  Yes, Your Honor.

11         (Jurors enter courtroom at 9:03 a.m.)

12              THE COURT:  Okay.  Have a seat, please.

13              The record will show that we're in open court,

14   and the jury is all present, and counsel and the parties

15   are present.

16              Ladies and gentlemen, I'm sorry for the delay

17   this morning.  It's -- I mean, about the most I can tell

18   you is it's unavoidable.

19              As you're well aware, this case has involved

20   literally thousands of pages of exhibits, a number of

21   witnesses that I haven't even added up yet, and jury

22   instructions to you that are as long as we see in any of

23   our most complex cases.  And there are always issues which

24   arise.

25              For what it's worth, I can tell you we were here
```

1    working on those until 6:30 or 7:00 last night, and that

2    doesn't include the work that's been done since then.

3            The bottom line is that it's all for the benefit

4    of being able to finish this case and present it to you in

5    a clear and concise manner and without having to take

6    further time from you once we get started here this

7    morning.

8            So we start this morning with the reading of the

9    instructions by the Court.  This will take -- this is

10   obviously a complex case in which it is -- you're about to

11   start on the work that's before the jury in this case.

12           Other than hearing all of the evidence that's

13   been presented, some of your very most important work will

14   be now to deliberate this case and decide this case, and it

15   involves a number of issues, a number of legal issues that

16   will -- I have a total of 62 instructions on the law here.

17   It's going to take me over an hour to read them all to you.

18           You will have copies of these with you in the

19   jury room.  So don't get too concerned if you don't fully

20   understand the instruction as I'm reading it.  I think

21   you'll be able to pick up the drift, and you'll be able to

22   examine them directly in the jury room in the course of

23   your deliberations.

24           So I'll start with -- some of these repeat some

25   of what I've just said, but I'm going to read them verbatim

1    to you because that's what we do.

2              So the first instruction:

3              Members of the jury:  Now, that you've heard all

4    of the evidence and the arguments of the attorneys, it is

5    my duty to instruct you as to the law of the case.

6              Each of you will receive a copy of these

7    instructions that you may take with you to the jury room to

8    consult during your deliberations.

9              You must not infer from these instructions or

10   from anything I may say or do as indicating that I have an

11   opinion regarding the evidence or what your verdict should

12   be.

13             It is your duty to find the facts from all the

14   evidence in the case.  To those facts you will apply the

15   law as I give it to you.  You must follow the law as I give

16   it to you whether you agree with it or not.  And you must

17   not be influenced by any personal likes or dislikes,

18   opinions, prejudices, or sympathy.  That means that you

19   must decide the case solely on the evidence before you.

20   You will recall that you took an oath to do so.

21             In following my instructions, you must follow

22   all of them and not single out some and ignore others; they

23   are all important.

24             Instruction Number 2.

25             You have seen references to several "Oracle"

1    entities.  Oracle America, Inc., develops and licenses

2    certain intellectual property and software, and provides

3    software support services.  Oracle America, Inc., is the

4    successor to Oracle USA, Inc., as well as certain companies

5    that were formerly part of PeopleSoft, JD Edwards, and

6    Siebel Systems.  Oracle International Corporation is the

7    owner or exclusive licensee of the copyrights at issue in

8    this case.  In these instructions, I sometime refer to

9    these entities as "Oracle" or "plaintiff(s)."

10                However, as part of your deliberations, I inform

11   you that you must find for each plaintiff separately as to

12   those claims that a plaintiff alleges.  For example, only

13   some claims are alleged by Oracle International Corporation

14   while other claims are alleged by Oracle America, Inc.

15   When necessary in these instructions, I will refer to the

16   specific plaintiff or plaintiffs alleging a particular

17   claim.

18                Instruction Number 3.

19                Plaintiff Oracle America, Inc., plaintiff Oracle

20   International Corporation, and defendant Rimini Street are

21   corporations.  Corporations are entitled to the same fair

22   and impartial treatment that you would give to an

23   individual.  You must decide this case with the same

24   fairness that you would use if you were deciding the case

25   between individuals.

1                    Instruction Number 4.

2                    The evidence you are to consider in deciding

3     what the facts are consists of:

4                    The sworn testimony of any witness;

5                    The exhibits which are received into evidence;

6     and

7                    Any facts to which the lawyers have agreed.

8                    Counsel, are the jury books prepared for the

9     jury?

10                    COURTROOM ADMINISTRATOR:  Yes.  I have them.

11                    THE COURT:  They are?  All right.

12                    I would tell you, ladies and gentlemen, there

13    have been a number of stipulations of fact that have been

14    entered by the parties that have shortened some of the

15    processes that we would have had to go through here in the

16    trial.

17                    You'll have those what we call jury books in the

18    jury room with you, and they list facts that have been

19    stipulated to, they list different itemized listings of

20    material items that are significant in this case.

21                    They are self-explanatory to a large part, and

22    you will have those in the jury room, a copy for each one

23    of you to refer to.

24                    Instruction Number 5.

25                    In reaching your verdict, you may consider only

1    the testimony and exhibits received into evidence.  Certain

2    things are not evidence, and you may not consider them in

3    deciding what the facts are.  I will list them for you:

4              1.  Arguments and statements by lawyers are not

5    evidence.  The lawyers are not witnesses.  What they have

6    said in their opening statements, will say in their closing

7    arguments, and at other times, is intended to help you

8    interpret the evidence, but it is not evidence.  If the

9    facts as you remember them differ from the way the lawyers

10   have stated them, your memory of the facts controls.

11             2.  Questions and objections by lawyers are not

12   evidence.  Attorneys have a duty to their clients to object

13   when they believe a question is improper under the rules of

14   evidence.  But you should not be influenced by the

15   objection or by the Court's ruling on it.

16             3.  Testimony that has been excluded or

17   stricken, and that you've been instructed to disregard is

18   not evidence and must not be considered.  In addition,

19   sometimes testimony and exhibits are received only for a

20   limited purpose; when I have given a limiting instruction

21   you must follow it.

22             4.  Anything you have seen or heard when the

23   Court was not in session is not evidence.  You are to

24   decide the case solely on the evidence received at the

25   trial.

1          5.   Any notes taken by you or other jurors are

2      not evidence.

3              Instruction Number 6.

4              Evidence may be direct or circumstantial.

5      Direct evidence is direct proof of a fact, such as

6      testimony by a witness about what that witness personally

7      saw or heard or did.  Circumstantial evidence is proof of

8      one or more facts from which you could find another fact.

9      You should consider both kinds of evidence.

10             The law makes no distinction between the weight

11     to be given to either direct or circumstantial evidence.

12     It is for you to decide how much weight to give to any

13     evidence.

14             Instruction Number 7.

15             The weight of the evidence as to a fact does not

16     necessarily depend on the number of witnesses who testify.

17             During the course of trial, testimony was read

18     to you from depositions and played for you from videotapes

19     of depositions.  A deposition is the sworn testimony of a

20     witness taken before trial.  The witness is placed under

21     oath to tell the truth, and lawyers for each party may ask

22     questions.  The questions and answers are preserved in

23     writing, or in some cases on videotape.

24             You should consider deposition testimony,

25     presented to you in court either in writing or played on

3368

1    videotape, in the same way as if the witness had been

2    present to testify.

3              Instruction Number 8.

4              Some evidence may be admitted for a limited

5    purpose only.  When I instruct that an item of evidence has

6    been admitted for a limited purpose, you must consider it

7    only for that limited purpose and for no other.

8              Instruction Number 9.

9              There are rules of evidence that control what

10   can be received into evidence.  When a lawyer asks a

11   question or offers an exhibit into evidence and a lawyer on

12   the other side thinks that it's not permitted by the rules

13   of evidence, that lawyer may object.  If I overruled the

14   objection, the question may be answered or the exhibit

15   received.  If I sustained the objection, the question

16   cannot be answered, and the exhibit was not received.

17   Whenever I sustained an objection to a question, you must

18   ignore the question and must not guess what the answer

19   might have been.

20             Sometimes I ordered that evidence be stricken

21   from the record and that you disregard or ignore the

22   evidence.  That means that when you are deciding the case,

23   you must not consider the evidence that I told you to

24   disregard.

25             Instruction Number 10.

1             In deciding the facts in this case, you may have

2    to decide which testimony to believe and which testimony

3    not to believe.  You may believe everything a witness says,

4    or part of it, or none of it.  Proof of a fact does not

5    necessarily depend on the number of witnesses who testify

6    about it.  In considering the testimony of any witness, you

7    may take into account.

8             1.  The opportunity and ability of the witness

9    to see or hear or know the things testified to;

10            2.  The witness's memory;

11            3.  The witness's manner while testifying;

12            4.  The witness's interest in the outcome of the

13   case and any bias or prejudice;

14            5.  Whether other evidence contradicted the

15   witness's testimony;

16            6.  The reasonableness of the witness's

17   testimony in light of all the evidence; and

18            7.  Any other factors that bear on

19   believability.

20            The weight of the evidence as to a fact does not

21   necessarily depend on the number of witnesses who testify

22   about it.

23            Instruction Number 11.

24            Some witnesses, because of education or

25   experience, are permitted to state opinions and the reasons

1    for those opinions.

2            Opinion testimony should be judged like any

3    other testimony.  You may accept it or reject it, and give

4    it as much weight as you think it deserves, considering the

5    witness's education and experience, the reasons given for

6    the opinion, and all the other evidence in the case.

7            Instruction Number 12.

8            The parties have agreed to certain facts.  The

9    agreement is known as a stipulation.  You should treat all

10   these facts as already approved.  Your juror notebook

11   identifies these facts.

12           Instruction Number 13.

13           Certain charts, summaries, and slides not

14   received in evidence have been shown to you in order to

15   help you explain the contents of books, records, documents,

16   or other evidence in the case.  They are not themselves

17   evidence or proof of any facts.  If they do not correctly

18   reflect the facts or figures shown by evidence in the case,

19   you should disregard these charts and summaries and

20   determine the facts from the underlying evidence.

21           Instruction Number 14.

22           Certain charts and summaries have been received

23   into evidence to illustrate information brought out in the

24   trial.  Charts and summaries are only as good as the

25   underlying evidence that supports them.  You should,

3371

1    therefore, give them only such weight as you think the

2    underlying evidence deserves.

3              Instruction 15.

4              Evidence has been presented to you in the form

5    of an answer of one of the parties to a written

6    interrogatory submitted by the other side.  These answers

7    were given in writing and under oath, before the actual

8    trial, in response to a question that was submitted in

9    writing under established court procedures.  You should

10   consider the answer, insofar as possible, in the same way

11   as if it was made from the witness stand.

12             Instruction 16.

13             Certain documents received in evidence may have

14   portions blocked out or otherwise redacted.  Do not

15   speculate or consider what would have been included in the

16   document absent those redactions.  You should not consider

17   the redactions during your deliberations.

18             Instruction 17.

19             When a party has the burden of proof on any

20   claim or affirmative defense by a preponderance of the

21   evidence, it means you must be persuaded by the evidence

22   that the claim or affirmative defense is more probably true

23   than not true.

24             You should base your decision on all of the

25   evidence, regardless of which party presented it.

1              Instruction 18.

2              When a party has the burden of proving any claim

3    or defense by clear and convincing evidence, it means you

4    must be persuaded by the evidence that the claim or defense

5    is highly probable.  This is a higher standard of proof

6    than proof by a preponderance of the evidence.  You should

7    base your decision on all of the evidence, regardless of

8    which party presented it.

9              Instruction 19.

10             Rimini Street has a location on its computer

11   systems that some employees refer to as the "software

12   library."

13             The location contained a complete copy of at

14   least 31 of Oracle's registered, copyrighted works.  A list

15   of the 31 works is included in your juror notebook.  Rimini

16   breached its duty to preserve relevant evidence when it

17   deleted certain material in the software library in

18   January 2010.

19             You may, but are not required, to infer that the

20   deleted material included evidence that was favorable to

21   Oracle's claims and unfavorable to Rimini Street's defenses

22   in this case.

23             Instruction Number 20.

24             You have heard evidence and argument concerning

25   a company called TomorrowNow.

1      You may not use evidence concerning TomorrowNow

2 to infer that, because Seth Ravin was at one time

3 associated with TomorrowNow, he, Rimini Street, or any

4 individual employed by Rimini Street did, or was more

5 likely to have done, the things that Oracle contends.

6      Instruction Number 21.

7      Copyright is the exclusive right to copy.  The

8 right to copy includes the exclusive rights to:

9      1.  Authorize, or make additional copies, or

10 otherwise reproduce the copyrighted work;

11      2.  Prepare derivative works based upon the

12 copyrighted work by adapting or transforming it; and

13      3.  Distribute copies of either the copyrighted

14 work or derivative work.

15      The owner or exclusive licensee of a copyright

16 holds these exclusive rights.  "Owner" refers to the author

17 of the work, or one who has been assigned the ownership of

18 exclusive rights in the work.  In general, copyright law

19 protects against the reproduction, adaptation, or

20 distribution of the owner's copyrighted work without the

21 owner's permission.  An owner may enforce these rights to

22 exclude others in an action for copyright infringement.

23      Even though one may acquire a copy of the

24 copyrighted work, the copyright owner retains certain

25 rights and control of that copy, including uses that may

3374

1   result in additional copies or alterations of the work.

2           The term "derivative work" refers to a work

3   based on one or more preexisting works, where the

4   preexisting work is recast, transformed or adapted.

5   Accordingly, the owner of a copyrighted work is entitled to

6   exclude others from recasting, transforming or adapting the

7   copyrighted work without the owner's permission.

8           An "original work" or "original element" is one

9   that has been created independently by the author (that is,

10  the author did not copy it) using at least minimal

11  creativity.

12          Instruction Number 22.

13          In this action, Oracle International Corporation

14  contends that defendant Rimini Street is liable for direct

15  copyright infringement of Oracle International

16  Corporation's PeopleSoft, Oracle Database, JD Edwards, and

17  Siebel software and support material.  Oracle International

18  Corporation also contends that defendant Seth Ravin is

19  liable for contributory and/or vicarious copyright

20  infringement.

21          Defendant Rimini Street denies infringing

22  Oracle's copyrights and asserts an affirmative license

23  defense as to the conduct at issue, which I will explain in

24  more detail.

25          You are informed that the Court has previously

1    ruled as a matter of law that defendant Rimini Street

2    engaged in copyright infringement of Oracle International

3    Corporation's Oracle Database and PeopleSoft software

4    applications.  However, the Court has not ruled on whether

5    defendant Rimini Street engaged in copyright infringement

6    of Oracle International Corporation's JD Edwards and Siebel

7    software and related documents or Oracle International

8    Corporation's PeopleSoft documentation.  PeopleSoft

9    documentation is different from the PeopleSoft software

10   applications.  The PeopleSoft software applications are the

11   actual computer programs installed on a customer's computer

12   system.  In contrast, the PeopleSoft documentation are

13   related support materials - in the form of technical

14   manuals, installation guides, and other copied documents -

15   that help a customer utilize and install the PeopleSoft

16   software application.

17            It will be up to you, the jury, to determine

18   whether defendant Rimini Street is liable for copyright

19   infringement of Oracle International Corporation's JD

20   Edwards and Siebel software applications and related

21   documentation as well as Oracle International Corporation's

22   PeopleSoft documentation.

23            It will also be up to you to determine whether

24   defendant Seth Ravin is liable for contributory and/or

25   vicarious copyright infringement for all copyright

1    infringement engaged in by defendant Rimini Street.

2              Finally, it will be up to you to determine the

3    amount of damages to award Oracle International Corporation

4    for all copyright infringement engaged in by defendant

5    Rimini Street.  I will now instruct you on the law on these

6    issues to help you in your deliberations.

7              Instruction Number 23.

8              To prevail on its claim for direct copyright

9    infringement as to JD Edwards and Siebel software

10   applications and related documentation and PeopleSoft

11   documentation, Oracle International Corporation must prove

12   the following by a preponderance of the evidence:

13             1.  Oracle International Corporation is the

14   owner or exclusive licensee of a valid copyright in an

15   original work;

16             2.  Rimini Street copied original elements from,

17   created derivative works from, or distributed the original

18   work; and

19             3.  Rimini Street did not have permission to

20   copy the original elements of the copyrighted work.

21             The parties have agreed that Oracle

22   International Corporation owns or is the exclusive licensee

23   of certain registered copyrighted works related to the JD

24   Edwards and Siebel software applications and related

25   documentation and PeopleSoft documentation also at issue in

1    this action, which means that Oracle International

2    Corporation has proven the first element for these

3    registered works.

4           The parties have also agreed, as stated in your

5    juror notebook, that defendant Rimini Street copied the JD

6    Edwards and Siebel software applications and related

7    documentation as well as the positive documentation at

8    issue in this action.  This means that Oracle International

9    Corporation has also proven the second element for these

10   copyrighted works.

11          I inform you that Oracle International

12   Corporation's claim for direct copyright infringement

13   related to the PeopleSoft documentation is separate from,

14   and not to be confused with, the PeopleSoft copyrighted

15   software application which the Court has previously ruled

16   was infringed by Rimini Street as a matter of law.

17          It is up to you to determine whether defendant

18   Rimini Street had an express license to copy these

19   copyrighted works of JD Edwards and Siebel software

20   applications and related documentation and PeopleSoft

21   documentation.  I will explain this issue in more detail in

22   another instruction.

23          Instruction 23.

24          If you find that Rimini Street had an express

25   license to make the copies that it did of JD Edwards and

1    Siebel software applications and related documentation and

2    PeopleSoft documentation, then you must find in favor of

3    Rimini Street and against Oracle International Corporation

4    on Oracle International Corporation's claim for direct

5    copyright infringement.  If, however, you find that Rimini

6    Street did not have an express license to make the copies

7    that it did of JD Edwards and Siebel software applications

8    and related documentation and PeopleSoft documentation, you

9    must find in favor of Oracle International Corporation and

10   against Rimini Street on Oracle International Corporation's

11   claim of direct copyright infringement.

12                Instruction Number 24.

13                Defendant Rimini Street asserts an express

14   license defense to Oracle International's claim of direct

15   copyright infringement.

16                Where a defendant asserts an express license

17   defense to copyright infringement, the defendant has the

18   initial burden to identify any license provision or

19   provisions that it believes excuses the infringement.  If a

20   defendant satisfies this burden, then it becomes the

21   plaintiffs' burden to prove by a preponderance of the

22   evidence that defendants' copying or other infringement was

23   not authorized by the license provision or provisions.

24                In this action, Oracle enters into written

25   software license agreements with its customers that allow

3379

1     the customers to use Oracle International Corporation's

2     copyrighted software and have access to support materials

3     for that software.  It is undisputed that defendant Rimini

4     Street did not have its own license with Oracle relevant to

5     any of the issues that you are to decide.  Instead,

6     defendant Rimini Street asserts that its own client's

7     software license agreements with Oracle authorized any

8     copying Rimini Street engaged in as it relates to Oracle

9     International Corporation's JD Edwards and Siebel software

10    applications and related documentation and PeopleSoft

11    documentation at issue in this action.  Under the law

12    defendant Rimini Street is permitted to assert those

13    software license agreements as a defense.

14         It is up to you to determine whether defendant

15    Rimini Street's copying of Oracle International

16    Corporation's JD Edwards and Siebel software applications

17    and related documentation and PeopleSoft documentation was

18    authorized by the client's software license agreements with

19    Oracle.  To help you in your deliberations, the Court has

20    previously interpreted the relevant licenses as a matter of

21    law.

22         JD Edwards Software License Agreements.

23         As to JD Edwards software license agreements you

24    are informed that the Court has previously ruled as a

25    matter of law that the JD Edwards software license

1   agreements authorized a third party like Rimini Street -
2   who was engaged by a licensee to provide support or other
3   services - to copy the JD Edwards software application and
4   related documentation onto its computer systems to the
5   extent necessary for the customer's archival needs and to
6   support the customer's use.  An archival copy of the
7   software application and documentation is an unmodified
8   copy of the original software application and documentation
9   for use in the event that the production copy of the
10  software, the copy used on a customer's systems, is
11  corrupted or lost.  This provision does not mean that a
12  third party like Rimini Street is authorized to make copies
13  of the JD Edwards software application and documentation
14  to, among other things, access the software's source code
15  to carry out development and testing of software updates,
16  to make modifications to the software, or to use the
17  customer's software or support materials to support other
18  customers.
19          If you find that the copies of the JD Edwards
20  software application and documentation housed on Rimini
21  Street's servers were used solely for the customer's
22  archival needs and to support the customer's use, then that
23  use is authorized by the JD Edwards software license
24  agreement and you should find in favor of defendant Rimini
25  Street and against Oracle International Corporation on

3381

1    Oracle International Corporation's claim for direct

2    copyright infringement as it relates to the JD Edwards

3    copyrighted works.

4              If, on the other hand, you find that the copies

5    of the JD Edwards software application and documentation

6    housed on Rimini Street's servers were used for purposes

7    other than the customer's archival needs or to support the

8    customer's use, then that use is outside the scope of the

9    JD Edwards software license agreement and you should find

10   in favor of Oracle International Corporation and against

11   defendant Rimini Street on Oracle International

12   Corporation's claim for direct copyright infringement as it

13   relates to the JD Edwards copyrighted works.

14             Siebel Software License Agreements.

15             As to the Siebel software license agreements you

16   are informed that the Court has ruled as a matter of law

17   that the Siebel software license agreements authorized a

18   third party like Rimini Street to make a reasonable number

19   of copies of the Siebel software application and related

20   documentation into the third party's own computer systems

21   solely for the customers archive or emergency backup

22   purposes or disaster recovery and related testing.  As

23   stated previously, an archival copy of the software and

24   documentation is an unmodified copy of the original

25   software and documentation for use in the event that

3382

1    production copy of the software - the copy used on a

2    customer's system - is corrupted or lost.  This provision

3    does not mean that a third party like Rimini Street is

4    authorized to make copies of the Siebel software and

5    documentation to, among other things, access the software's

6    source code to carry out modification, development and

7    testing of the software not related to archive, emergency

8    backup, or disaster recovery purposes, or to use the

9    customer's software or support materials to support other

10   customers.

11          If you find that the copies of the Siebel

12   software application and related documentation housed on

13   Rimini Street's servers were used solely for archive or

14   emergency backup purposes or disaster recovery and related

15   testing, then that use is authorized by the Siebel software

16   license agreement and you should find in favor of defendant

17   Rimini Street and against Oracle International Corporation

18   on Oracle International Corporation's claim for direct

19   copyright infringement as it relates to the Siebel

20   copyrighted works.

21          If, on the other hand, you find that the copies

22   of the Siebel software application and related

23   documentation housed on Rimini Street's servers were used

24   for purposes other than archive or emergency backup

25   purposes or disaster recovery and related testing, then

3383

1    that use is outside the scope of the Siebel software

2    license agreement and you should find in favor of Oracle

3    International Corporation and against defendant Rimini

4    Street on Oracle International Corporation's claim for

5    direct copyright infringement as it relates to the Siebel

6    copyrighted works.

7               PeopleSoft License Agreements.

8               You have already been informed that the Court

9    has ruled as a matter of law the defendant Rimini Street

10   engaged in copyright infringement of certain of Oracle

11   International Corporation's PeopleSoft software

12   applications.  However, the Court has not ruled on the

13   issue of copyright infringement as it relates to Oracle

14   International Corporation's PeopleSoft documentation at

15   issue in this action.

16              You are informed that the Court has previously

17   ruled as a matter of law that defendant Rimini Street

18   engaged in copyright infringement of Oracle International

19   Corporation's PeopleSoft applications.

20              One little typing correction there.

21              The PeopleSoft software licenses prohibited

22   Rimini Street from copying or preparing derivative works

23   from PeopleSoft software other than to support the specific

24   licensee's own internal data processing operations on the

25   licensee's own computer systems.  Any copying or

3384

1    preparation of derivative works outside the scope of those

2    limitations was prohibited by the license agreements.  This

3    means that the licenses prohibited Rimini Street from

4    copying or preparing derivative works from PeopleSoft

5    software on Rimini Street's computer systems.  It also

6    means that the licenses prohibited Rimini Street from

7    copying or preparing derivative works from PeopleSoft

8    software in developing or testing software updates for

9    other Rimini Street customers.

10              As to the PeopleSoft software license agreements

11   you are informed that the Court rules as a matter of law

12   that the PeopleSoft software license agreements authorized

13   a third party like Rimini Street to make a reasonable

14   number of copies of the PeopleSoft documentation solely for

15   the customer's internal use and at the customer's

16   facilities.  This provision does not authorize a third

17   party like Rimini Street to copy, distribute, or use the

18   PeopleSoft documentation at its facilities or to develop or

19   test software updates for other customers.

20              If you find that copies of the PeopleSoft

21   documentation were solely at the customer's facilities and

22   were used solely for the customer's internal use, then that

23   use is authorized by the PeopleSoft software license

24   agreement and you should find in favor of defendant Rimini

25   Street and against Oracle International Corporation on

3385

1    Oracle International Corporation's claim for direct

2    copyright infringement as it relates to the PeopleSoft

3    documentation and support materials.

4         If, on the other hand, you find that the copies

5    of the PeopleSoft documentation were either at Rimini

6    Street's facilities or were used for purposes other than

7    solely for the customer's internal use then that use is

8    outside the scope of the PeopleSoft software license

9    agreements and you should find in favor of Oracle

10   International Corporation and against defendant Rimini

11   Street on Oracle International's claim for direct copyright

12   infringement as it relates to the PeopleSoft documentation

13   and support materials.

14        Instruction Number 25.

15        The license agreements between Oracle and its

16   customers are complete contracts.  The Court has explained

17   the meaning of those agreements to you.  You may not

18   consider other evidence to add or to change the meaning of

19   these agreements.

20        Instruction Number 26.

21        A defendant may be liable for copyright

22   infringement engaged in by another.  Oracle International

23   Corporation contends that Seth Ravin is liable for Rimini

24   Street's copyright infringement under the doctrine of

25   "contributory infringement."  Therefore, you must also

3386

1   consider whether Seth Ravin is liable for contributory

2   infringement.

3            To prevail on contributory infringement against

4   Seth Ravin, each of the following elements must be proved

5   by a preponderance of the evidence:

6            1.  Seth Ravin knew or had reason to know of

7   Rimini Street's infringing activity; and

8            2.  Seth Ravin intentionally induced or

9   materially contributed to that infringing activity.

10           If you find that these elements have been proved

11   by a preponderance of the evidence, you should find for

12   Oracle International Corporation and against Seth Ravin on

13   the copyright infringement claims as to contributory

14   infringement.  If, on the other hand, if either of these

15   elements have failed to have been proved, you should find

16   for Seth Ravin and against Oracle International Corporation

17   on the copyright infringement claim as to contributory

18   infringement.

19           Instruction Number 27.

20           In addition to contributory liability, a

21   defendant may also be liable for copyright infringement

22   committed by another defendant based on "vicarious

23   liability."

24           To prevail on vicarious infringement against

25   Seth Ravin, each of the following elements must be proved

1    by a preponderance of the evidence:

2              1.   Seth Ravin profited directly from Rimini

3    Street's infringing activity;

4              2.   Seth Ravin had the right and ability to

5    supervise or control Rimini Street's infringing activity;

6    and

7              3.   Seth Ravin failed to exercise that right and

8    ability.

9              If you find that each of these elements has been

10   proved by a preponderance of the evidence, you should find

11   for Oracle International Corporation and against Seth Ravin

12   on the copyright infringement claim as to vicarious

13   infringement.  On the other hand, if any of these elements

14   have not been proved, you should find for Seth Ravin and

15   against Oracle International Corporation on the copyright

16   infringement claim as to vicarious infringement.

17             Instruction Number 28.

18             You must determine Oracle International

19   Corporation's damages resulting from defendant Rimini

20   Street's copyright infringement.  Oracle International

21   Corporation is entitled to recover either the actual

22   damages suffered as a result of the infringement or

23   statutory damages established by the Copyright Act.  You

24   will be asked to determine both Oracle International

25   Corporation's actual damages as well as statutory damages

1    under the Copyright Act.  Oracle International Corporation

2    must prove damages by a preponderance of the evidence.

3         As to the measure of its actual damages, Oracle

4    International Corporation, as the plaintiff, has the right

5    to seek to recover either the fair market value of a

6    license for the rights infringed or its lost profits, not

7    both.  You must make the determination of which type of

8    damages to award to Oracle International Corporation if you

9    determine those damages are proved by a preponderance of

10   the evidence.

11        If you award Oracle International Corporation

12   actual damages based on its lost profits, then Oracle

13   International Corporation is also entitled to recover any

14   profits that defendant Rimini Street made that is

15   attributable to that infringement and that is not

16   duplicative of any lost profits that you award to Oracle

17   International Corporation.  In other words, for any

18   particular customer, Oracle may recover either its lost

19   profits or Rimini Street's infringer's profits, but not

20   both, for that customer.

21        If you award Oracle International Corporation

22   actual damages based on the fair market value of a license

23   for the rights infringed, that award takes into account

24   defendant Rimini Street's profits attributable to its

25   infringement and Oracle International Corporation is not

1    entitled to any additional award.

2                Regardless of which type of actual damages you

3    choose to award Oracle International Corporation, and even

4    if you determine that no measure of actual damages has been

5    proven, you must also make a determination of the amount of

6    statutory damages Oracle International Corporation is

7    entitled to under the Copyright Act.  When you consider

8    Oracle International Corporation's statutory damages you

9    must not consider the amount awarded as actual damages.

10   They are separate and distinct damages and do not relate to

11   each other.  All of these damages will now be explained to

12   you.

13               Instruction 29.  Copyright infringement.

14               While there is no precise formula for

15   determining actual damages, your award must be based on

16   evidence, not on speculation, guesswork, or conjecture.

17               Determining the amount of Oracle International

18   Corporation's actual damages may involve some uncertainty,

19   and Oracle is not required to establish the amount of its

20   actual damages with precision.

21               Instruction Number 30.

22               For Oracle International Corporation to recover

23   actual damages, it must prove that the infringement caused

24   damages, that is, that there is a causal relationship

25   between Oracle International Corporation's losses and

1    Rimini Street's infringement.  Infringement caused damages

2    if the infringement was a "substantial factor" in causing

3    the damages.

4            A substantial factor is a factor that a

5    reasonable person would consider to have contributed.  It

6    must be more than a remote or trivial factor.  It does not

7    have to be the only cause of harm.  Conduct is not a

8    substantial factor in causing harm if the same harm would

9    have occurred without that conduct.  This means that if a

10   client left Oracle International Corporation for reasons

11   unrelated to Rimini Street's infringement, there is no

12   causal relationship and therefore no lost profit damages as

13   to that client.

14           Instruction 31.

15           If you decide that the best measure of Oracle

16   International Corporation's actual damages is lost profits,

17   you must determine what profits Oracle International

18   Corporation proved that it would have made without the

19   infringement by Rimini Street.  Lost profits are the

20   revenue Oracle International Corporation would have made

21   without the infringement, less any additional expenses

22   Oracle International Corporation would have incurred in

23   making those profits.

24           To recover lost profits, Oracle International

25   Corporation must prove by a preponderance of the evidence

1    that:

2               1.   Rimini Street caused such damages; and

3               2.   The amount.  You may not guess the amount or

4    rely on speculative evidence to calculate lost profits.

5               Instruction Number 32 -- and I'm going to -- do

6    you have some water, Dionna?

7               Bear with me.

8               Instruction Number 32.

9               If you determine that lost profits are the best

10   measure of Oracle International Corporation's actual

11   damages, then you must also determine the amount of lost

12   profits, if any, made by the defendant Rimini Street that

13   are directly attributable to the infringement and were not

14   taken into account in computing lost profits.

15              You may make an award of defendant Rimini

16   Street's profits only if you find that Oracle International

17   Corporation showed a causal relationship between the

18   infringement and the profits generated directly or

19   indirectly from the infringement.

20              Rimini Street's profits are determined by

21   subtracting all of Rimini Street's expenses from Rimini

22   Street's gross revenue.  If Rimini Street's expenses exceed

23   its gross revenue, then there are no Rimini Street profits

24   for you to award Oracle International Corporation.

25              For purposes of determining Rimini Street's

1    profits, gross revenue is all of Rimini Street's receipts

2    from the use and sale of a product or service associated

3    with the infringement.  Oracle International Corporation

4    has the burden of proving Rimini Street's gross revenue by

5    infringement by a preponderance of the evidence.

6              Rimini Street's expenses are all operating

7    costs, overhead costs, and production costs incurred in

8    producing Rimini Street's gross revenue.  Rimini Street

9    bears the burden of proving its expenses by a preponderance

10   of the evidence.

11             Unless you find that a portion of the profit

12   from the use of copyrighted works is attributable to

13   factors other than use of the copyrights works, all of the

14   profit is to be attributed to the infringement.  Rimini

15   Street has the burden of proving the portion of the profit,

16   if any, attributable to factors other than infringing the

17   copyrighted works.

18             Instruction Number 33.

19             If you determine that the best measure of Oracle

20   International Corporation's actual damages is a fair market

21   value license, you must determine the amount of a fair

22   market value license between Oracle International

23   Corporation and Rimini Street.  The fair market value

24   license is the amount a willing buyer would have been

25   reasonably required to pay a willing seller at the time of

1    the infringement for the actual use made by Rimini Street

2    of Oracle International Corporation's copyrighted works.

3            In determining a fair market value license, you

4    must consider the entire scope of the infringement.

5    Further, you should consider all of the information known

6    to and all of the expectations of the parties on the dates

7    of the hypothetical negotiations, which are the dates on

8    which infringement began.

9            You must determine what would have been the

10   result of this negotiation in order to establish the fair

11   market value.  The fair market value is an objective

12   measure of Oracle International Corporation's damages that

13   is meant to approximate the fair market value of a license

14   for all of the copyrights Rimini Street infringed,

15   calculated at the time of the infringement, which is the

16   period from 2006 through 2011.

17           The value of a hypothetical license is not

18   necessarily the amount that Rimini Street would have agreed

19   to pay, or that Oracle International Corporation would have

20   actually agreed to accept.

21           You may consider evidence of events and facts

22   that happened after the date of the hypothetical

23   negotiation only to the extent that it proves insight into

24   the expectations of the parties at the time the

25   infringement first began, or insight into the amount a

1    willing buyer would have been reasonably required to pay a

2    willing seller at the time of the infringement.

3               Instruction Number 34.

4               Regardless of the amount of actual damages

5    awarded to Oracle International Corporation for defendant

6    Rimini Street's copyright infringement and regardless of

7    whether you chose to award Oracle International Corporation

8    lost profits or a fair market value license, you must also

9    determine the amount of statutory damages as established by

10   Congress in the Copyright Act for each work infringed.  As

11   stated previously, you must not consider the amount awarded

12   to Oracle International Corporation for actual damages in

13   determining statutory damages.

14               The purpose of statutory damages is to penalize

15   the infringer and deter future violations of copyright law.

16               The amount you may award as statutory damages is

17   not less than $750 and not more than $30,000 for each work

18   that you conclude was infringed.

19               However, if you find that the infringement was

20   innocent, you may award as little as $200 for each work

21   innocently infringed.

22               Similarly, if you find that infringement was

23   willful, you may award as much as $150,000 for each work

24   willfully infringed.

25               I will now explain to you what constitutes

3395

1     innocent infringement and what constitutes willful

2     infringement.

3                 Instruction Number 35.

4                 An infringement is considered innocent when the

5     defendant has proved both of the following elements by a

6     preponderance of the evidence:

7                 1.  The defendant was not aware that its acts

8     constituted infringement of the copyright; and

9                 2.  The defendant had no reason to believe that

10    its acts constituted an infringement of the copyright.

11                Instruction Number 36.

12                An infringement is considered willful when the

13    plaintiff has proved both of the following elements by a

14    preponderance of the evidence:

15                1.  The defendant engaged in acts that infringed

16    the copyright; and

17                2.  The defendant knew that those acts infringed

18    the copyright.

19                Instruction Number 45 -- excuse me, Instruction

20    Number 37.

21                In addition to its other claims, Oracle America

22    contends that Rimini Street and Seth Ravin induced

23    customers to breach their contracts with Oracle America.

24    Specifically, Oracle America contends that the terms of use

25    on its website are contracts with its customers.  Oracle

1   America does not claim that Rimini Street or Seth Ravin

2   caused customers to breach their software license

3   agreements with Oracle America.  Oracle America contends

4   that Rimini Street and Seth Ravin intentionally caused

5   Oracle America customers to breach such contracts with

6   Oracle America.

7           To prevail on this claim in the circumstances of

8   this case, Oracle America must prove each of the following

9   for each such contract by a preponderance of the evidence:

10          1.  A valid contract existed between Oracle

11  America and a customer;

12          2.  Rimini Street and/or Seth Ravin knew the

13  contract existed;

14          3.  Rimini Street and/or Seth Ravin intended to

15  cause Oracle America's customer to breach its contract with

16  Oracle America;

17          4.  Rimini Street and/or Seth Ravin engaged in

18  conduct that was wanton, malicious, and unjustifiable;

19          5.  Rimini Street and/or Seth Ravin's conduct

20  caused the customer to breach the contract;

21          6.  Oracle America was directly harmed; and

22          7.  Rimini Street and/or Seth Ravin's improper

23  conduct was a substantial factor in causing Oracle America

24  harm.

25          The "unjustifiable" conduct required for this

1    claim cannot include breach of contract or copyright

2    infringement.  The unjustifiable conduct that Oracle

3    America alleges is related to alleged misrepresentations

4    made by Rimini Street.  To satisfy this element, a

5    misrepresentation must be communicated to the customer, it

6    must be a false misrepresentation at the time it was made,

7    it must be made with knowledge or belief that it was false,

8    Rimini Street must have intended to induce the third party

9    to rely on that statement, and the third party must have in

10   fact relied on the statement.

11          If you find that Oracle America proved each of

12   these elements as to Rimini Street and/or Seth Ravin, you

13   should find for Oracle America and against Rimini Street

14   and/or Seth Ravin on the claim for inducing breach of

15   contract.  If, on the other hand, Oracle America has failed

16   to prove any of these elements as to Rimini Street and/or

17   Seth Ravin, you should find for Rimini Street and/or Seth

18   Ravin and against Oracle America on the claim for inducing

19   breach of contract.

20          Instruction Number 38.

21          Oracle America and Oracle International

22   Corporation seeks -- seek to recover damages based upon a

23   claim of intentional interference with prospective economic

24   advantage.

25          In order for you to find for Oracle America

3398

1    and/or Oracle International Corporation, you must find by a

2    preponderance of the evidence that:

3            1.  Oracle America and/or Oracle International

4    Corporation had an expectancy and a prospective contractual

5    relationship with the customer;

6            2.  Rimini Street and/or Seth Ravin knew of the

7    existence of the relationship;

8            3.  Rimini Street and/or Seth Ravin engaged in

9    unlawful and improper conduct;

10           4.  By engaging in this conduct, Rimini Street

11   and/or Seth Ravin intended to disrupt the relationship;

12           5.  Rimini Street and/or Seth Ravin's conduct

13   was not privileged or justified;

14           6.  The relationship was disrupted as a result

15   of such conduct;

16           7.  Oracle America and/or Oracle International

17   Corporation was harmed; and

18           8.  Rimini Street and/or Seth Ravin's unlawful

19   and improper conduct was a substantial factor in causing

20   Oracle America and/or Oracle International Corporation

21   harm.

22           "Unlawful and improper misconduct" does not

23   include breach of contract or copyright infringement.  The

24   only unlawful and improper misconduct that Oracle America

25   and Oracle International Corporation claims are related to

3399

1     alleged misrepresentations made by Rimini Street.  To

2     satisfy this element, a misrepresentation must be

3     communicated to the customer, it must be a false

4     representation at the time it was made, it must be made

5     with knowledge or belief it was false, Rimini Street must

6     have intended to induce the third party to rely on that

7     statement, and the third party must have in fact relied on

8     the statement.  You must decide whether Oracle America

9     and/or Oracle International Corporation has established any

10    actionable misrepresentations and, if so, whether it is

11    more likely than not that those misrepresentations were the

12    specific cause of harm.

13          If you find that Oracle America and/or Oracle

14    International Corporation proved each of these elements as

15    to Rimini Street and/or Seth Ravin, you should find for

16    Oracle America and/or Oracle International Corporation and

17    against Rimini Street and/or Seth Ravin on the claim for

18    intentional interference with prospective economic

19    advantage.  If, on the other hand, Oracle America and/or

20    Oracle International Corporation have failed to prove any

21    of these elements as to Rimini Street and/or Seth Ravin,

22    you should find for Rimini Street and/or Seth Ravin and

23    against Oracle America and/or Oracle International

24    Corporation on the claim for intentional interference with

25    prospective economic advantage.

1                    Instruction Number 39.

2                    For Oracle America and/or Oracle International

3    Corporation to prevail on its claim for intentional

4    interference with prospective economic advantage, you must

5    find that Oracle America and/or Oracle International

6    Corporation had expectancies in prospective contractual

7    relationships with its customers at the time of defendants'

8    conduct.

9                    And unexpected -- excuse me, an expectancy need

10   not be evidenced by a contract.  It is sufficient if you

11   find from the evidence that there were either prior

12   dealings or a prior course of conduct between Oracle

13   America and/or Oracle International Corporation and

14   purchasers of Oracle America and/or Oracle International

15   Corporation's support services and software from which

16   there would be a reasonable expectation of future economic

17   benefit.  Oracle America and/or Oracle International

18   Corporation must show this expected benefit with some

19   degree of specificity, such that it is a realistic

20   expectation, but it need not be shown with certainty

21   because prospective things in nature are necessarily

22   uncertain.  The law requires more than a mere hope or

23   optimism; what is required is a reasonable likelihood or

24   probability.

25                    Instruction Number 40.

1            For Oracle America to prevail on its claim for

2    inducing breach of contract and for Oracle America and/or

3    Oracle International Corporation to prevail on their claims

4    for intentional interference with prospective economic

5    advantage, you must also find that the defendant knew of

6    the existence of the contract or prospective relationship.

7    To have knowledge means that the defendant has information

8    concerning the contract or prospective defendant, which was

9    discovered by the defendant or was brought to defendant's

10   attention by others.

11           In this regard, knowledge may be found to exist

12   if, from the facts and circumstances of which the defendant

13   had knowledge, the defendants should have known of the

14   contract or prospective relationship.

15           Instruction Number 41.

16           For Oracle America to prevail on its claim for

17   inducing breach of contract and for Oracle America and/or

18   Oracle Corporation to prevail on their claims for

19   intentional interference with prospective economic

20   advantage, you must find intentional conduct by a

21   defendant.  For purposes of these two claims, conduct is

22   intentional if done with the desire to disrupt the contract

23   or interfere with the relationship; or if it is done with

24   the belief that disruption or interference is substantially

25   certain to result.

1          Intent ordinarily may not be proved directly,

2     because there is no way of scrutinizing the operations of

3     the human mind.  You may infer a person's intent from

4     conduct substantially certain to cause disruption or

5     interference, but you are not required to infer and should

6     consider all of the circumstances.  You may consider any

7     statements made or acts done or omitted by a party whose

8     intent is an issue, and all of the facts and circumstances

9     that indicate the party's state of mind.

10          Furthermore, in determining the intention, the

11     law assumes that every person intends the natural

12     consequences of one's knowingly done acts.  Thus, if you

13     find that the conduct of one or more of the defendants was

14     knowingly done, you may draw the inference and find, unless

15     the contrary appears from the evidence, that the defendant

16     intended all of the natural and probable consequences of

17     that conduct.

18          Instruction 42.

19          A substantial factor in causing harm is a factor

20     that a reasonable person would consider to have contributed

21     to the harm.  It must be more than a remote or trivial

22     factor.  It does not have to be the only cause of harm.

23          Conduct is not a substantial factor in causing

24     harm if the same harm would have occurred without that

25     conduct.

1          Instruction 43.

2          A party does not intentionally interfere with

3    prospective economic advantage when the party engages in

4    free competition.  In other words, a party is free to

5    divert business to itself by all fair and reasonable means

6    because it is in the interest of the public that companies

7    compete against each other.  Therefore, if you find the

8    following elements, then you must find that Rimini Street

9    and Seth Ravin did not intentionally interfere with Oracle

10   America and/or Oracle International Corporation's

11   prospective economic advantage:

12          1.  The relationship concerns a matter involved

13   in the competition between Rimini Street and/or Seth Ravin

14   and Oracle America and/or Oracle International Corporation;

15          2.  Rimini Street and/or Seth Ravin did not

16   employ wrongful means;

17          3.  Rimini Street and/or Seth Ravin's action did

18   not create or continue an unlawful restraint of trade; and

19          4.  Rimini Street and/or Seth Ravin's purpose

20   was at least in part to advance its interest in competing

21   with Oracle America and/or Oracle International

22   Corporation.

23          In other words, so long as Rimini Street and/or

24   Seth Ravin's motivation was at least partially to compete

25   with Oracle America and/or Oracle International

3404

1    Corporation, and Rimini Street and/or Seth Ravin did not

2    employ wrongful means to compete with Oracle America and/or

3    Oracle International Corporation, then you must find that

4    Rimini Street and/or Seth Ravin acted in the interests of

5    free competition and did not intentionally interfere with

6    Oracle America and/or Oracle International Corporation's

7    prospective economic advantage.

8              Instruction Number 44.

9              If you find for Oracle America on one or more of

10   these two claims (intentional interference with prospective

11   economic advantage and inducing breach of contract) and/or

12   you find for Oracle International Corporation on the

13   intentional interference with prospective economic

14   advantage claim, you must determine compensatory damages.

15   Compensatory damages consist of the amount of money that

16   will reasonably and fairly compensate Oracle America and/or

17   Oracle International Corporation for any damage due to the

18   conduct that created liability on the claim.  Oracle

19   America and Oracle International Corporation have the

20   burden to prove compensatory damages by a preponderance of

21   the evidence.

22             In determining compensatory damages on these

23   claims, you may consider whether Oracle America and/or

24   Oracle International Corporation suffered any measurable

25   loss of profits as a result of Rimini Street's and/or Seth

3405

1    Ravin's conduct.  In this case, Oracle America and Oracle

2    International Corporation contend that their business was

3    affected because of loss of profits they might have earned

4    but for Rimini Street's and/or Seth Ravin's conduct.

5           For lost profits to be recovered there must be a

6    reasonable basis for computing them.  Profits are

7    determined by deducting all expenses from gross revenue.

8    Ordinarily it is sufficient for this purpose to show actual

9    past profits and losses.  Although they cannot be taken as

10   an exact measure of future and anticipated profits, you,

11   the jury, should consider those past profits and losses

12   together with the uncertainties and contingencies by which

13   they probably would have been affected.  Losses and profits

14   that are mere guesses, speculative, remote, or uncertain

15   should not be considered.

16          Damages, if any, should be restricted to such

17   losses, if any, as proved by facts from which their

18   existence is logically and legally inferable.  The general

19   rule on the subject of damages is that all damages

20   resulting necessarily, immediately, and directly from the

21   wrong are recoverable, and not those that are contingent

22   and uncertain or mere speculation.

23          Instruction Number 44.

24          Although a qualified person may make estimates

25   concerning probable profits or losses of a going business,

1    you should, in weighing all such evidence, take into

2    consideration, among other things, the truth or falsity of

3    the basis of such estimates; the knowledge or lack of

4    knowledge of the witnesses of all of the conditions on

5    which the estimate is based; whether the facts assumed as a

6    basis for an estimate rest upon actual accounts and records

7    kept in the ordinary course of business rather than in

8    uncertain recollections; and knowledge of the witness in

9    the particular line of business about which the witness

10   testifies.  From all of the evidence in this case bearing

11   on the subject, you should determine for yourselves the

12   probability or improbability and the amount of profits

13   anticipated by Oracle America and/or Oracle International

14   Corporation.

15           The difficulty or uncertainty in ascertaining or

16   measuring the precise amount of damages does not preclude

17   recovery, and you, the jury, should use your best judgment

18   in determining the amount of such damages, if any, based

19   upon the evidence.  However, damages may not be based on

20   speculation and guesswork.

21           That Rimini Street or Seth Ravin did not

22   actually anticipate or contemplate that these losses would

23   occur is not a relevant factor for you to consider.

24           Instruction Number 45.  Oracle America and --

25   I'm just going to refer to Oracle International Corporation

1    as Oracle International.  I wish I had started that when I

2    began.

3            Oracle America and Oracle International contend

4    that Rimini Street and Seth Ravin violated two provisions

5    of the California Penal Code, section 502, known as the

6    California Computer Data Access and Fraud Act ("CDAFA").  I

7    will now instruct you on the law regarding the applicable

8    provisions of the CDAFA, and the damages you may award if

9    you find a CDAFA violation.  If you find that a defendant

10   violated at least one of the CDAFA provisions that follow,

11   you should find for Oracle America and Oracle International

12   and against that defendant on the CDAFA claim.

13           Instruction 46.

14           For the purposes of assessing Oracle America and

15   Oracle International's CDAFA claim, the following terms

16   have the following meanings:

17           1.  "Access" means to gain entry to, instruct,

18   or communicate with the logical, arithmetical, or memory

19   function resources of a computer, computer system, or

20   computer network.

21           2.  "Computer program or software" means a set

22   of instructions or statements, and related data, that when

23   executed in actual or modified form, cause a computer,

24   computer system, or computer network to perform specified

25   functions.

1              3.   "Computer network" means any system that

2      provides communications between one or more computer

3      systems and input/output devices.

4              4.   "Computer services" includes, but is not

5      limited to, computer time, data processing, or storage

6      functions, or other uses of a computer, computer system, or

7      computer network.

8              5.   "Data" means a representation of

9      information, knowledge, facts, concepts, computer software,

10     computer programs or instructions.  Data may be in any

11     form, in storage media, or as stored in the memory of the

12     computer or in transit or presented on a display device.

13             6.   "Supporting documentation" includes but is

14     not limited to all information in any form pertaining to

15     the design, construction, classification, implementation,

16     use, or modification of a computer, computer system,

17     computer network, computer program, or computer software,

18     which information is not generally available to the public

19     and is necessary for the operation of a computer, computer

20     system, computer network, computer program, or computer

21     software.

22             Instruction Number 47.

23             First, Oracle America and Oracle International

24     contend that Rimini Street and Seth Ravin violated the

25     CDAFA, section 502(c)(2).  To prevail under this provision,

3409

1    Oracle America and Oracle International must prove each of

2    the following by a preponderance of the evidence:

3              1.  A defendant knowingly accessed and without

4    permission took or made use of any data, computer, computer

5    system, or computer network, or took any supporting

6    documentation; and

7              2.  Thereby caused Oracle America and/or Oracle

8    International to suffer damage or loss.

9              If you find that Rimini Street and/or Seth Ravin

10   believed it had authorization to access Oracle America's

11   and/or Oracle International's computer, and did not exceed

12   that authorized access, then you must find that Rimini

13   Street and/or Seth Ravin did not violate the California

14   Computer Data Access and Fraud Act.

15             Instruction 48.

16             Second, Oracle America and Oracle International

17   contend that Rimini Street and Seth Ravin violated the

18   CDAFA, section 502(c)(3).  To prevail under this provision,

19   Oracle America and Oracle International must prove each of

20   the following by a preponderance of the evidence:

21             1.  A defendant knowingly accessed and without

22   permission used or caused to be used computer services; and

23             2.  Thereby caused Oracle America and/or Oracle

24   International to suffer damage or loss.

25             If you find that Rimini Street and/or Seth Ravin

3410

1    believed it had authorization to access Oracle America's

2    and/or Oracle International's computer, and did not exceed

3    that authorized access, then you must find that Rimini

4    Street and/or Seth Ravin did not violate the California

5    Computer Data Access and Fraud Act.

6              Instruction 49.

7              In addition to contending that Seth Ravin

8    personally violated the CDAFA, Oracle America and Oracle

9    International also contend that Seth Ravin assisted or

10   aided and abetted Rimini Street or its employees in

11   violating the CDAFA.  If you have not found that Seth Ravin

12   personally committed one of the CDAFA violations above,

13   then you must consider whether Seth Ravin is responsible

14   for CDAFA violations committed by Rimini Street or its

15   employees.

16             To prevail on this theory Oracle America and

17   Oracle International must prove each of the following by a

18   preponderance of the evidence:

19             1.  Seth Ravin knowingly and without permission

20   provided or assisted in providing another person a means of

21   accessing a computer, computer system, or computer network

22   in violating the CDAFA;

23             2.  Seth Ravin's conduct was of substantial

24   assistance in the other person's CDAFA violation:

25             3.  Seth Ravin knew the person intended conduct

1    that would violate the CDAFA; and

2              4.  Seth Ravin's assistance was a substantial

3    factor in causing harm to Oracle America and/or Oracle

4    International.

5              If you find that Rimini Street and/or Seth Ravin

6    believed it had authorization to access Oracle America's or

7    Oracle International's computer, and did not exceed that

8    authorized access, then you must find that Rimini Street

9    and/or Seth Ravin did not violate the California Computer

10   Data Access and Fraud Act.

11             If you find that Seth Ravin assisted or aided

12   and abetted another person's CDAFA violation, you should

13   find for Oracle America and Oracle International

14   Corporation and against Seth Ravin on the CDAFA claim.

15             Instruction Number 50.

16             If you find that a defendant violated the CDAFA,

17   you may award damages to Oracle America and/or Oracle

18   International.  These damages shall include amounts

19   sufficient to compensate Oracle America and/or Oracle

20   International for the harm it suffered as a result of any

21   violations, including any expenditure reasonably and

22   necessarily incurred to verify that their computers,

23   computer systems, computer networks, and/or data was or was

24   not altered, damaged, or deleted by the access.

25             In addition, if you find by clear and convincing

1   evidence that a defendant willfully violated the CDAFA with

2   oppression, fraud, or malice, you may additionally award

3   punitive damages for that defendant as set forth in the

4   instructions on punitive damages I will give you later.

5            You should determine actual damages separately

6   for each defendant, if any, that you find liable for

7   violating the CDAFA.

8            Instruction Number 51.  In addition to its other

9   claims, Oracle America and Oracle International contend

10   that Rimini Street and Seth Ravin violated two provisions

11   of the Nevada computer crimes law ("NCCL"), under Nevada

12   Revised Statute section 205.4765.  I will now instruct you

13   on the law regarding the applicable provisions of the NCCL

14   and the damages you may award if you find a violation of

15   the NCCL.  If you find that a defendant violated at least

16   one of the NCCL's provisions that follow, you should find

17   for Oracle America and/or Oracle International and against

18   that defendant on the NCCL claim.

19            Instruction Number 52.

20            For purposes of accessing Oracle America and

21   Oracle International's claims, the following terms have the

22   following meanings:

23            1.  "Access" means to intercept, instruct,

24   communicate with, store data in, retrieve from or otherwise

25   make use of any resources of a computer, network or data.

3413

1          2.   "Data" means a representation in any form of

2     information, knowledge, facts, concepts or instructions

3     which is being prepared or has been formally prepared and

4     is intended to be processed, is being processed or has been

5     processed in a system or network.

6          3.   "Network" means a set of related, remotely

7     connected devices and facilities, including more than one

8     system, with the capability to transmit data among any of

9     the devices and facilities.  The term includes, without

10    limitation, a local, regional or global computer network.

11         4.   "Program" means an ordered set of data

12    representing coded instructions or statements which can be

13    executed by a computer and cause the computer to perform

14    one or more tasks.

15         5.   "Response costs" means any reasonable costs

16    caused by an NCCL violation, including any reasonable cost

17    to:

18         1.   Investigate the facts surrounding the

19    violation;

20         2.   Ascertain or calculate any past or future

21    loss, injury or other damage;

22         3.   Remedy, mitigate or prevent any past or

23    future loss, injury or other damage; or

24         4.   Test, examine, restore, or verify the

25    integrity of or the normal operation or use of any Internet

3414

1    network, electronic mail address, computer system, network,

2    component, device, equipment, data, information, image,

3    program, signal, or sound.

4              6.  "System" means a set of related equipment,

5    whether or not connected, which is used with or for a

6    computer.

7              Instruction Number 53.

8              Oracle America and Oracle International contend

9    that Rimini Street and Seth Ravin violated the NCCL section

10   1.  To prevail under this provision, Oracle America and

11   Oracle International must prove each of the following by a

12   preponderance of the evidence:

13             1.  A defendant modified, damaged, disclosed,

14   used, transferred, concealed, retained possession of,

15   obtained or attempted to obtain access to, permitted access

16   to or caused to be accessed, or entered any of the

17   following:  Data, a program or any supporting documents

18   which exist inside or outside a computer, system or

19   network;

20             2.  The defendant did so knowingly, willfully,

21   and without authorization; and

22             3.  Oracle America and Oracle International was

23   the victim of the defendants' conduct.

24             If you find that Rimini Street and/or Seth Ravin

25   believed it had authorization to access Oracle America

3415

1    and/or Oracle International's computer, and did not exceed

2    that authorized access, then you must find that Rimini

3    Street and/or Seth Ravin did not violate the Nevada

4    Computer Crimes Law.

5              Instruction Number 54.

6              Oracle America and Oracle International contend

7    that Rimini Street and Seth Ravin violated the NCCL,

8    section 3.  To prevail under this provision, Oracle America

9    and Oracle International must prove each of the following

10   by a preponderance of the evidence:

11             1.  A defendant damaged, altered, transferred,

12   disclosed, concealed, used, retained possession of, or

13   obtained or attempted to obtain access to, permitted access

14   to or caused to be accessed any of the following:  A

15   computer, system or network;

16             2.  The defendant did so knowingly, willfully,

17   and without authorization; and

18             3.  Oracle America and Oracle International was

19   the victim of the defendant's conduct.

20             If you find that Rimini Street and/or Seth Ravin

21   believed it had authorization to access Oracle America

22   and/or Oracle International's computer, and did not exceed

23   that authorized access, then you must find that Rimini

24   Street and/or Seth Ravin did not violate the Nevada

25   Computer Crimes Law.

3416

1           We're getting closer, ladies and gentlemen.

2           Instruction 55.

3           If you find that a defendant violated any of the

4    above NCCL provisions, you may award compensatory damages

5    to Oracle America and or Oracle International.  These

6    damages may compensate Oracle America and/or Oracle

7    International for any response costs, loss, or injury that

8    Oracle America and/or Oracle International suffered as a

9    result of the violation.

10          In addition, if you find by clear and convincing

11   evidence that a defendant willfully violated the NCCL with

12   oppression, fraud, or malice, you may additionally award

13   punitive damages against that defendant as set forth in the

14   instructions on punitive damages I will give you later.

15          You should determine damages separately for each

16   defendant, if any, that you find liable for violating the

17   NCCL.

18          Instruction Number 56.

19          If you find that Oracle America and/or Oracle

20   International is entitled to compensatory damages for

21   actual harm or loss on any of the following claims, then

22   you may, but are not required to, award punitive damages to

23   Oracle America and/or Oracle International:

24          1.  California Computer Data Access and Fraud

25   Act (CDAFA);

3417

```
 1                    2.   The Nevada Computer Crime Law (NCCL); or
 2                    3.   Intentional interference with prospective
 3         economic advantage.
 4                    You may not award punitive damages with respect
 5         to any other claim by any of the plaintiffs.  Punitive
 6         damages are not available for copyright infringement.
 7                    If you find that Oracle America and/or Oracle
 8         International is entitled to compensatory damages for
 9         actual harm or loss caused under one or more of those
10         claims, then you may consider whether you should award
11         punitive damages against that defendant.  The question
12         whether to award punitive damages against a particular
13         defendant must be considered separately with respect to
14         each defendant.
15                    You may award punitive damages against a
16         defendant only if Oracle America and/or Oracle
17         International Corporation proves by clear and convincing
18         evidence that the wrongful conduct upon which you base your
19         finding of liability for compensatory damages was engaged
20         in with fraud, oppression or malice on the part of that
21         defendant.  You cannot punish the defendant for conduct
22         that is lawful, or which did not cause actual harm or loss
23         to Oracle.  For the purposes of your consideration of
24         punitive damages only:
25                         "Fraud" means an intentional misrepresentation,
```

3418

1    deception or concealment of a material fact known to a

2    defendant with the intent to deprive Oracle America and/or

3    Oracle International of rights or property or to otherwise

4    injure Oracle America and/or Oracle International.

5            "Oppression" means despicable conduct that

6    subjects Oracle America and/or Oracle International to

7    cruel and unjust hardship with a conscious disregard of the

8    rights of Oracle America and/or Oracle International.

9            "Malice" means conduct which is intended to

10   injure Oracle America and/or Oracle International or

11   despicable conduct which is engaged in with a conscious

12   disregard of the rights or safety of Oracle America and/or

13   Oracle International.

14           "Despicable conduct" means conduct that is so

15   vile, base or contemptible that it would be looked down

16   upon and despised by ordinary, decent people.

17           "Conscious discard" means knowledge of the

18   probable harmful consequences of a wrongful act and a

19   willful and deliberate failure to avoid those consequences.

20           The purposes of punitive damages are to punish a

21   wrongdoer that acts with fraud, oppression and/or malice in

22   harming a plaintiff and deter similar conduct in the

23   future, not to make the plaintiff whole for its injuries.

24   Consequently, a plaintiff is never entitled to punitive

25   damages as a matter of right and whether to award punitive

3419

1      damages against a defendant is entirely within your

2      discretion.

3              You are only asked to decide whether punitive

4      damages would be proper and justified in this case.  You

5      are not asked at this time to determine an amount of

6      punitive damages.  If you decide that punitive damages

7      should be awarded against a defendant, a limited hearing

8      will follow the return of your verdict in which the parties

9      may present relevant evidence bearing upon the amount of

10     punitive damages.  The prospect of taking additional jury

11     time for a limited punitive damage hearing should have no

12     bearing whatsoever upon your decision concerning whether

13     punitive damages are proper and justified in this case.

14              Instruction Number 57.

15              Because Rimini Street is a corporation, Oracle

16     America and/or Oracle International must prove at least one

17     of the following by clear and convincing evidence in order

18     for punitive damages to be available:

19              1.  That the malice, oppression, or fraud was

20     conduct of one or more officers, directors, or managing

21     agents of Rimini Street who acted on behalf of Rimini

22     Street;

23              2.  That the conduct constituting, malice

24     oppression, or defraud was authorized by one or more

25     officers, directors, or managing agents of Rimini Street;

1                    3.   That one or more officers, directors, or

2        managing agents of Rimini Street knew of the conduct

3        constituting malice, oppression, or fraud and adopted or

4        approved that conduct after it occurred.

5                    And employee is a "managing agent" if he or she

6        exercises substantial independent authority and judgment in

7        his or her corporate decision-making such that his or her

8        decisions ultimately determine corporate policy.

9                    Instruction Number 58.

10                   Even if you find that punitive damages might be

11       available, if you decided that Rimini Street and/or Seth

12       Ravin acted based on an objectively reasonable belief that

13       Rimini Street's and/or Seth Ravin's conduct was not

14       unlawful, such as at its interpretation of what the

15       licenses allowed throughout the period from 2006 through

16       2011, then you must not award any punitive damages.

17                   Instruction Number 59.   Return of verdict.

18                   A verdict form has been prepared for you.   After

19       you have reached unanimous agreement on a verdict, your

20       presiding juror will fill in the form that has been given

21       to you, sign and date it, and advise the Court that you are

22       ready to return to the courtroom.

23                   Instruction Number 60.

24                   Oracle America and Oracle International seek an

25       award of damages under multiple claims or legal theories.

1          After each claim or legal theory on your verdict

2     form, there is a space for the amount of damages, if any,

3     that you intend to award Oracle America and/or Oracle

4     International under that claim or legal theory.  The amount

5     you enter into these spaces should include all the damages

6     that you conclude Oracle America and/or Oracle

7     International may recover on that claim or legal theory,

8     regardless whether the same damages are duplicated under

9     another claim or legal theory.

10          However, Oracle America and Oracle International

11     can only recover once for each harm or item of damage.

12     Therefore, at the end of the form there are spaces for the

13     "total nonduplicative damages" against each defendant.

14          You are instructed to write the total amount of

15     damages you intend to award to Oracle America and/or Oracle

16     International for all the harm caused by all the violations

17     for you which found that defendant liable without counting

18     damages for the same harm twice as to that defendant.  When

19     determining this total amount you must exclude the amount

20     you found as statutory damages under the Copyright Act.

21          For example, if you find for Oracle America

22     and/or Oracle International on more than one claim, and

23     conclude that Oracle America and/or Oracle International

24     suffered the same harm and is entitled to the same damages

25     on more than one claim, only include those damages once in

1    the "total nonduplicative damages."  Likewise, if you

2    conclude that Oracle America and/or Oracle International

3    suffered different and distinct harm on different claims

4    resulting in different damages on those claims, you should

5    add the different damages figures resulting from those

6    claims together for the "total nonduplicative damages"

7    number.

8                    Instruction Number 61.

9                    If it becomes necessary during your

10   deliberations to communicate with me, you may send a note

11   through the marshal, signed by your presiding juror or by

12   one or more members of the jury.  No member of the jury

13   should ever attempt to communicate with me, except by a

14   signed writing.  I will communicate with any member of the

15   jury on anything concerning the case only in writing or

16   here in open court.  If you send out a question, I will

17   consult with the parties before answering it, which will

18   likely take some time.  You may continue your deliberations

19   while waiting for the answer to any question.  Remember

20   that you are not to tell anyone, including me, how the jury

21   stands, numerically or otherwise, until after you have

22   reached a unanimous verdict or have been discharged.  Do

23   not disclose any vote count in any note to the Court.

24                   Ladies and gentlemen, Instruction Number 62, I'm

25   happy to say, is the last instruction.

3423

1          When you retire, you should elect one member of

2     the jury as your foreperson.  That person will preside over

3     the deliberations and speak for you here in court.

4          You will then discuss the case with your fellow

5     jurors to reach agreement if you can do so.  Your verdict

6     must be unanimous.

7          Each of you must decide the case for yourself,

8     but you should do so only after you have considered all the

9     evidence, discussed it fully with the other jurors, and

10    listened to the views of your fellow jurors.

11         Do not be afraid to change your opinion if the

12    discussion persuades you that you should.  But do not come

13    to a decision simply because other jurors think it is

14    right.

15         It is important that you attempt to reach a

16    unanimous verdict but, of course, only if each of you can

17    do so after having made your own conscientious decision.

18    Do not change an honest belief about the weight and effect

19    of the evidence simply to reach a verdict.

20         Your verdict must be based solely on the

21    evidence and on the law as I have given it to you in these

22    instructions.  However, nothing that I have said or done is

23    intended to suggest what your verdict should be - that is

24    entirely for you to decide.

25         The arguments and statements of the attorneys

1    are not evidence.  If you remember the facts differently

2    from the way the attorneys have stated them, you should

3    base your decision on what you remember.

4           After you have reached unanimous agreement on a

5    verdict, your foreperson will complete the verdict form

6    that has been given to you, sign and date it and advise the

7    marshal outside your door that you are ready to return to

8    the courtroom.

9           Given in open court this 6th day of October,

10   2015, signed Larry R. Hicks, United States District Judge.

11          Ladies and gentlemen, as I mentioned, you will

12   have copies of all of those instructions for each one of

13   you in the jury room.

14          We will now proceed with the opening closing

15   statement of Plaintiff Oracle, and that will be followed by

16   a closing statement of Defendants Rimini.  And Oracle will

17   then have an opportunity to present a rebuttal argument to

18   the arguments of Defendants Rimini and Ravin.

19          MR. ISAACSON:  Your Honor, can we request five

20   minutes before we do that?

21          THE COURT:  Absolutely.

22          This is going to take some time, ladies and

23   gentlemen, so obviously this is an appropriate time for a

24   recess.  Relax, take a good break, and we'll reconvene and

25   proceed with the closing statements of counsel.

```
 1              And the admonition still continues.  So you're
 2     not to discuss the case yet, you're not to allow yourself
 3     to be exposed to anyone who is discussing it, and keep an
 4     open mind until you've heard all these arguments and looked
 5     at the instructions yourself.
 6              You may go ahead and step down.  Thank you.
 7              COURTROOM ADMINISTRATOR:  Please rise.
 8          (Recess from 10:43 a.m. until 11:02 a.m.)
 9          (Outside the presence of the jury.)
10              COURTROOM ADMINISTRATOR:  Please rise.
11              THE COURT:  All right.  The record will show
12     we're in open court.  The jury is not present.  And I'm
13     advised counsel were concerned about another prospective
14     demonstrative.
15              MR. ISAACSON:  Well, it's not so much the
16     demonstrative, Your Honor, but this pertains to question 6C
17     on the verdict form.
18              THE COURT:  Okay.
19              MR. ISAACSON:  We're not asking you to change
20     the verdict form.
21              THE COURT:  Go ahead, please.
22              MR. ISAACSON:  And when we get to my part of the
23     argument, I intend to be going through the verdict form and
24     indicating how plaintiffs think the jury should fill out
25     the verdict form.
```

1              6C is fair market value license.

2              THE COURT:  Yes.

3              MR. ISAACSON:  All right.  And with respect to

4     that, Elizabeth Dean testified that if she were to employ

5     that method, the value of -- or what Mr. Hampton has called

6     the value of use method, that it would be the costs of the

7     entire business and you would add in more costs, and it

8     would be higher than her damages figure.

9              And so we would intend to fill in there higher

10    than Elizabeth Dean's copyright damages figure, and

11    defendants have objected to that.

12             MR. STRAND:  Your Honor, Ms. Dean volunteered

13    that in cross-examination, and since it was

14    cross-examination, knowing the way cross-examinations of

15    experts go, it was not objected to.

16             However, it was in direct contradiction of

17    Oracle's express statement in pleadings before this Court

18    that they were withdrawing a fair market value of use

19    theory in this case.

20             So what they are now trying to do at -- later

21    than the eleventh hour, at about 4:00 this morning I saw

22    it, a copy of this new fair market value of use theory,

23    never before enunciated by Ms. Dean, expressly withdrawn by

24    Oracle in pleadings before this Court, and now in a slide

25    before the jury in closing argument, with absolutely

3427

1    nothing to support it, they want to inject it into this

2    case.

3              It's totally inappropriate, it's uncalled for,

4    and it should be excluded.  If they want to argue fair

5    market value of use, they can look at Mr. Hampton's number

6    and they can argue about that.  But I don't think this is

7    appropriate.  It's just not in the case.

8              MR. ISAACSON:  Counsel's incorrect on a couple

9    of points.  One is this was redirect of Ms. Dean, and it

10   was a question for which there was no objection.  It was

11   following up on his cross-examination.  It was a question

12   in redirect.

13             Secondly, this is not the -- we withdrew the

14   hypothetical license opinion.

15             What's happened at this trial is there's

16   something been called value of use which has been

17   incorporated into this fair market value license.  Ms. Dean

18   was asked on redirect what her opinion would be about that,

19   and she said her number would be higher.

20             Our position is, and let me be clear about this,

21   that this fair market value license position from

22   Mr. Hampton or Ms. Dean is legally deficient.  We don't

23   think this amount of money could be awarded to either party

24   or that this should be part of the case.

25             But since it is part of the case, she -- what

3428

1    Ms. Dean says in reply to a value of use theory can be

2    filled in there.

3              MR. STRAND:  Your Honor, she said it would be

4    higher than the value of use theory that Mr. Hampton opined

5    to on redirect, apparently.

6              She is now opining to $112 million as higher

7    than Mr. Hampton's number.  Higher than Mr. Hampton's

8    number is $1 more, not $103 million more with absolute

9    blindside for us this morning.

10             We never heard this number, never heard this

11   number before this morning.

12             If you want, Your Honor -- I don't have a copy

13   of it, but I could hand up the computer with a picture of

14   it.  It's a brand-new theory inflated by a factor of more

15   than 10.

16             MR. ISAACSON:  She said not higher than

17   Mr. Hampton's number, higher than her estimate of copyright

18   damages, and that's the 112.1.

19             THE COURT:  All right.

20             COURTROOM ADMINISTRATOR:  It's on the screen,

21   Your Honor.  They put it on the screen.

22             MR. ISAACSON:  The 112.1 number is her estimate

23   of copyright damages based on lost profits.  And when she

24   testified the number would be higher, she didn't say higher

25   than Hampton's number, she said higher than her lost

1    profits number.

2              MR. STRAND:  They're attempting to ascribe a

3    degree of precision here, Your Honor, that simply does not

4    exist in the record.  She said higher than.

5              They can say higher than the number that she has

6    already stated for lost profits.  Of course, there are no

7    lost profits in this case by our view, so $1 there would

8    also be higher than.  This is simply --

9              THE COURT:  I understand the argument.

10             MR. STRAND:  Okay.  Thank you.

11             THE COURT:  Where I am on it is -- it's clear

12   that there was testimony, and there's also -- it's also

13   clear that there's a dispute whether it's properly in this

14   trial.

15             But I have Rule 50 motions pending.  I

16   anticipate I'll be receiving perhaps more, and all of those

17   are under submission.

18             I will allow this issue to go to the jury.  I

19   will allow counsel to argue reasonable argument based on

20   testimony actually presented.

21             I am of the view that if there's evidence in the

22   record to support it and the evidence was presented to the

23   jury, counsel should be able to do it.

24             I appreciate defendants' argument, Mr. Strand,

25   but I -- I'd rather address this after I've had a careful

1      opportunity to review the history, review the specific

2      testimony, and determine whether it's an issue in this

3      case.

4                    MR. STRAND:  Thank you very much, Your Honor.

5                    Just fair warning to plaintiffs that if they

6      bring this up, we will view it as a waiver of any Rule 50

7      argument regarding value of use.  You may not, they will

8      not, but we will.

9                    THE COURT:  All right.

10                   MR. ISAACSON:  I will state as I just said on

11     the record, that whether money for value of use is awarded

12     to us or not awarded to us, we view it as a legally

13     deficient claim, and we are putting this -- the number in

14     just to protect our position.

15                   MR. STRAND:  And if they argue to the jury --

16                   THE COURT:  Okay.  The parties' positions are

17     preserved.

18                   I wasn't sure that I made it clear as -- with

19     regard to the exhibits that were admitted on redacted form.

20                   Dionna, did you get the numbers of those

21     exhibits?

22                   COURTROOM ADMINISTRATOR:  The ones that are

23     still pending?

24                   THE COURT:  Yes.

25                   COURTROOM ADMINISTRATOR:  Yes.

3431

1          THE COURT:  Do you have them as admitted in

2     redacted form?

3          COURTROOM ADMINISTRATOR:  Not yet because I

4     haven't received them.

5          THE COURT:  All right.  Well, when you do

6     receive them, I'll review them.  But for the benefit of the

7     record they are deemed to be admitted.

8          I'm also not sure that I said on the record, any

9     motions that are pending, with the exception of the Rule 50

10    motions that have been filed by both sides, and motions for

11    judgment based upon evidence, are taken into submission by

12    the Court.

13         All other pending motions that have not yet been

14    resolved by the Court, to the extent there are any, are

15    denied without prejudice.

16         Let's bring the jury in, please.

17         COURTROOM ADMINISTRATOR:  Yes, Your Honor.

18        (Jurors enter courtroom at 11:10 a.m.)

19         THE COURT:  All right.  Have a seat, please.

20         The record will show we are reconvened in open

21    court.  The jury is all present, and counsel and parties

22    are present.

23         It is now the time for the closing statement to

24    be made on behalf of Plaintiffs Oracle.

25         So, Ms. Dunn, you're welcome to go forward.

1              MS. DUNN:  Thank you, Your Honor.

2              And I just want to make sure that Matt is set up

3     to do the slides.

4              COURTROOM ADMINISTRATOR:  Yes.

5              MS. DUNN:  Good morning, ladies and gentlemen.

6              I thank you in advance for your time today and

7     also for your time every day that you have put in here.

8              Early in this case Seth Ravin, the defendant,

9     said it's like the sausage factory, if they want the

10    sausage, we don't necessarily talk about the factory.

11             This trial is the first time that anyone has

12    learned how the factory worked, how Rimini Street and Seth

13    Ravin actually operated, how they made thousands and

14    thousands of copies of Oracle software on their systems,

15    how they kept it on their own computer systems in violation

16    of Oracle's licenses, how they shared it among customers in

17    violation of Oracle's licenses, and how they used their

18    rampant and deliberate infringement to build a business

19    based on lies and deceit from the very beginning.

20             Ladies and gentlemen, they never wanted to talk

21    to you or anyone else about how this factory works and now

22    you know why.

23             So taking you back to opening, Bill told you

24    that we would prove copying, interference with customer

25    relationships, lies and concealment.  Over our past three

3433

1       weeks together, we have proved all of that and more.

2              So Judge Hicks has already told you that this is

3       not a criminal case.  So the burden of proof is not beyond

4       a reasonable doubt, it's preponderance of the evidence.

5       And that means that you weigh the two sides, what's more

6       likely than not.

7              And now that all the evidence is in, there can

8       be no question, Oracle has proved its case.

9              You've learned a lot about Seth Ravin, the

10      defendant.  You learned that he's CEO and founder of Rimini

11      Street and was president of a company called TomorrowNow.

12             He's Rimini's largest shareholder.  He controls

13      policy and operations.  He makes decisions about how much

14      customers are going to pay.  He personally solicits

15      references.  And he drafts those frequently asked questions

16      and controls standard messages to customers.

17             You also learned a lot about how Rimini Street

18      and Mr. Ravin operated.  And you learned that they lie

19      until they get caught.

20             You witnessed this firsthand, ladies and

21      gentlemen.  Time after time in this courtroom Seth Ravin

22      and Rimini Street have refused to tell the truth until

23      their back was up against the wall, and you saw with your

24      own eyes when confronted with documents, e-mails, and other

25      evidence, those walls came tumbling down.  And we'll talk a

3434

1    little bit about that today.

2            First, though, I want to address something that

3    Rimini's counsel started out talking about in the beginning

4    of this case.  He started out talking about customer

5    choice.  Customers have the right to choose.  Well, we

6    agree with that.

7            Safra Catz, Oracle's CEO, is here with us today.

8    And I asked Ms. Catz when she testified, I asked her what's

9    Oracle's philosophy when it comes to competition, and she

10   cited one of the all-time great movies, "Bring It On."  She

11   said, "Competition raises everyone's game, it keeps you

12   sharp."

13           So then I asked her, "Okay, well, what's the

14   difference between your competitors, like Microsoft and

15   IBM, and Rimini Street?"

16           And she said, "Well, those are honest

17   competitors.  They play by the rules."

18           She also told you why we're all here today.  She

19   told you that without copyright laws and without courts and

20   juries to enforce those laws, a lot of the technology that

21   we rely upon every day and take for granted just wouldn't

22   exist.

23           Tech companies couldn't innovate, they couldn't

24   help other companies do what they do, save lives, route

25   phone calls, fly planes, order things on the Internet,

3435

```
 1    basically anything else that businesses, hospitals,
 2    schools, and governments do.
 3              So let's talk about our claims in this case --
 4    well, let's talk first about what this case is actually
 5    about.
 6              So you know that Rimini Street does not play by
 7    the rules, and at this point you know that they break the
 8    law.
 9              So this case is now about three things.  First,
10    what did Rimini Street and Seth Ravin do?  What did Rimini
11    Street and Seth Ravin know?  And how much should Rimini
12    Street and Seth Ravin pay?
13              So I'll be talking to you about these first two
14    things, and then Bill will talk to you about the third
15    thing, which is damages, and he'll also walk you through
16    the verdict form.
17              So I'm only going to say one thing about
18    damages, ladies and gentlemen, and that's that the
19    defendants have in their mind a number that they would like
20    to pay.  And at this point, after all their lies and
21    misdirections, the one thing you can be sure about that
22    number is that it's not true.
23              All right.  So let's talk first about our
24    copyright claim.
25              All right.  So the Court has already decided
```

3436

1     several issues that you all don't need to decide.  The

2     Court has decided that Rimini Street has infringed Oracle's

3     copyrights with regard to PeopleSoft software and Oracle

4     Database.  You will be responsible for deciding

5     infringement with regard to PeopleSoft documentation,

6     Siebel, and JD Edwards.

7              So it's a copyright case.  And our first

8     witness, Dr. Davis, a professor from MIT, testified to you

9     that he counted up the copies, and he found that those

10    copies, if you laid them all out, would stretch from here

11    in Las Vegas to Rimini Street's headquarters in California.

12             No one disputes that.  Even Seth Ravin said

13    Dr. Davis's numbers look accurate to him.

14             So, Dr. Davis also told you a little bit about

15    how Rimini Street's operation worked from a technical

16    perspective, and he told you that their operation was

17    filled with Oracle's copyright software.

18             So to be totally clear, ladies and gentlemen,

19    looking at this chart, not a single thing goes to a

20    customer from Rimini Street that does not start with

21    Oracle's copyright code.  It's all in there, everywhere.

22             So let's get this issue of documentation,

23    PeopleSoft documentation, out of the way.

24             The Court has instructed you that if you find

25    the copies of PeopleSoft documentation were at Rimini

3437

```
 1    Street's facilities, or used for purposes other than solely
 2    for the customer's internal use, then that's copyright
 3    infringement.
 4              And all you need to know to find on this issue
 5    is that Dr. Davis told you that on Rimini Street's system
 6    at its facilities were almost 600,000 copies of
 7    documentation and that that included PeopleSoft
 8    documentation.
 9              So that's the finding on PeopleSoft
10    documentation; not much more to do there.
11              All right.  For JD Edwards and Siebel, I'd like
12    to show you the actual jury instructions that the Court
13    just read.
14              Now, you're going to need to decide whether
15    Siebel and JD Edwards' copyrights were infringed.  And,
16    actually, first let's go up to the three elements.
17              So, there are three elements of copyright
18    infringement:
19              One, Oracle owns or is the exclusive licensee of
20    a valid copyright in an original work;
21              Second, Rimini Street copied original elements
22    from, created derivative works from, or distributed the
23    original work;
24              And, three, Rimini did not have permission to do
25    that.
```

1          So if you go farther down, you'll find out the

2   first element and the second element have already been

3   satisfied, so that's also not what you're talking about.

4          And the judge has told you it's up to you to

5   determine whether Defendant Rimini Street has an express

6   license to copy these copyrighted works of JD Edwards and

7   Siebel software applications, related documentation.  And

8   we already did PeopleSoft documentation.

9          So that's your responsibility.

10         Let's go to the next page.

11         The Court helps you out with your

12  responsibility, ladies and gentlemen.  All those

13  instructions you were just read, those are designed to help

14  you out.

15         So if you look to the last paragraph under

16  copyright infringement, the Court tells you that it has

17  previously interpreted the relevant licenses as a matter of

18  law.  And what that means is that the Court interprets the

19  licenses, and the Court tells you what that interpretation

20  is.

21         So if anyone else is trying to tell you what

22  those licenses mean today who is not the Court, that's not

23  appropriate.  The Court is the one that tells us what the

24  licenses mean.  And, in this case, the Court has done some

25  work already.

1          So a third party, like Rimini Street, can only

2    copy software and documentation for JD Edwards to the

3    extent necessary for the customer's archival needs and to

4    support the customer's use.

5          And the Court tells you exactly what an archival

6    copy is.  It's an unmodified copy of the original software

7    application and documentation for use in the event that the

8    production copy, the copy that's being used by the client,

9    by the customer, in the event that that's corrupted or

10   lost.

11         So all we're talking about here, we're talking

12   about archive copies, is something unchanged, untouched,

13   you put on a shelf in case there's a disaster, in case

14   something is lost or corrupted.

15         Let's go to Siebel; next page.

16         So Siebel is basically the same thing.  A third

17   party can make copies -- it's the page after, page 29.

18         So a Siebel customer can make copies on -- or a

19   third party can make copies of Siebel software on their own

20   systems solely for the customer's archive or emergency

21   backup purposes or disaster recovery and related testing.

22         Again, here, this is the same things, ladies and

23   gentlemen.  An archival copy is unmodified, and it's the

24   thing that you use -- you put away -- if the copy that

25   you're using for some reason is corrupted or lost.

1            Let's go to the next slide.

2            So you already know, and Bill showed you this

3    slide in opening, it's the two rules about what Oracle's

4    license agreements prohibit.

5            One is they prohibit Rimini local environments.

6    Those are environments on Rimini's systems.  Because the

7    software is supposed to be at the customer's facility.

8            Second, they prohibit what we've talked about

9    now for several weeks, cross-use.  And that means you can

10   only use Oracle's software for that customer.  If you're

11   using it to service other customers, that's cross-use, and

12   it's not permitted.

13           So what this all boils down to, ladies and

14   gentlemen, the Siebel license and the JD Edwards license,

15   what this boils down to as the -- is that the only thing

16   that would allow Rimini to have JD Edwards and Siebel

17   software on its systems would be if they used them as an

18   emergency backup or archive, the thing that you store away

19   offsite or on a shelf, and that you only use if it's

20   lost -- or if the one you work on is lost or corrupted.

21           We never heard any witness testify about this.

22   There is no evidence in this case to support that defense,

23   and I'll talk to you more about that in a little bit.

24           But first we should talk about what Rimini

25   Street did do, and we should talk about how that evidence

1     violated those rules.

2              So in the -- as you know already, in the spring

3     of 2006, when Rimini Street was just beginning, they began

4     building a software library.

5              And so this is one of the wall of lies that came

6     tumbling down actually even before this trial exists --

7     even before this trial began.

8              So Rimini Street in 2010, and then again in

9     2011, told the Court and told Oracle a library never

10    existed at Rimini Street.

11             Well, Rimini lied about this.  As you now know

12    and the Court now knows, this was false.  The library did

13    exist.

14             And Dr. Davis explained to you what this library

15    was.  He said it's a digital library, and that's where

16    information from DVDs and websites was copied onto Rimini's

17    systems for use internally at Rimini Street.

18             We learned that the library was not for specific

19    customers.  And Dr. Davis told you that, but you also saw

20    deposition testimony from George Lester, a Rimini Street

21    employee who said that.

22             We learned that the Rimini library was critical

23    to build those local environments that Rimini Street was

24    using to service its customers.

25             And we also learned how the library came to be,

1    how it was stocked with all that Oracle copyrighted
2    software.
3              Ladies and gentlemen, this is Plaintiffs'
4    Exhibit 1, and when you go back to the jury room, this is
5    one that you might want to look at.
6              So Oracle launched a website called eDelivery.
7    And eDelivery, as you'll remember, was a big discovery for
8    the folks at Rimini Street.
9              Oracle put software up there so that people with
10   licenses, either a regular license or a trial license,
11   could download that software, and when Rimini discovered
12   this, their response was "Help yourself to the buffet."
13   That's what they thought they could do.  And that's what
14   they did do, they helped themselves to the buffet.
15             Seth Ravin saw the opportunity.  He said at the
16   time, "I don't think we could ask for a better scenario for
17   enabling us to grow our customer base."
18             He knew that this was good for business.
19             Let's go to the next slide.
20             So even Rimini Street's lawyer said to
21   Mr. Ravin, "You have to admit this looks pretty bad."
22             But Seth Ravin, when he testified, did not admit
23   that this looks pretty bad.  Instead, he said, you know, "I
24   was just wondering, does that mean everyone can help
25   themselves to it?"

1          He said this on the same day -- and if you look

2     over to the left of the screen, he said this even though

3     the same day he learned about the website, even though --

4     when he learned about -- when his people were saying "help

5     yourself to the buffet," he learned that there was a

6     license agreement, ladies and gentlemen.  Seth Ravin knew

7     that there was a license agreement that his staff person

8     here is saying, "which I haven't reviewed."

9          And he took that stand and he told you under

10    oath, these many years later, that at the time he was

11    wondering whether this was all out there just so anyone

12    could take it.  He knew that was not true.

13         So I asked Ms. Catz the same question as

14    Rimini's lawyer asked.  I asked her, "Doesn't this look

15    pretty bad?"  And she said, "Yes, it looks terrible."

16         And she explained that "This is like when you

17    walk into a department store, like Kohl's or JC Penney, or

18    you go to the grocery store, and everything's just out

19    there.  That doesn't mean you can just take it.  Everybody

20    knows that."  And that's true, everybody does know that.

21         All right.  Let's go to the next slide.

22         So also in 2006 Rimini was doing major downloads

23    from Oracle's website called Customer Connection.  And this

24    is the kind of thing that you don't say if you're innocent,

25    if you're not doing anything wrong.

3444

1            Dennis Chiu says in this instant message --

2    they're trying to get IDs so they can get into the website,

3    and they've asked some people.

4            And he says, "They would rather give me their

5    firstborn than the ID.  But Raj's connections from outside

6    of PeopleSoft seem to have less issue with things like

7    that."

8            So they're trying to find ways to get these IDs,

9    not the usual way that you would get them, by getting a

10   license, and the goal is, as you can see down there, to

11   have a complete library of content available from Customer

12   Connection.

13           So if the first lie was that there wasn't a

14   library at all, the second lie is, well, it really wasn't

15   called a library.  And let's look at Mr. Ravin's testimony

16   about that.

17           So, Bill asked him about the library.  And first

18   he says, "No, not the type of library you're talking

19   about."

20           Then he says, "No, not in the way that you're

21   talking about it."

22           And then he says, "Well, okay, it was referred

23   to as a software library."

24           And then he says, "Well, it's just complicated."

25           It's not that complicated, ladies and gentlemen.

3445

1     Library means library.  It was a library.  But, once again,

2     Mr. Ravin will only admit the truth when directly

3     confronted.

4              The next thing, the next lie in this library

5     chain is about installation media.  So while Mr. Ravin

6     really didn't want to call it a library, I think you'll all

7     recall he really did want to call it installation media.

8              But this didn't work out either because

9     eDelivery did not actually contain any installation media.

10    And you've heard that both from Oracle's technical expert

11    and from Ed Screven, who's the chief corporate architect at

12    Oracle.  And they both told you that the media is the disk,

13    and the stuff on the disk is installation software.

14             And so once you make the copy on the computer

15    and you install it, it's not installation media.

16             But even under Mr. Ravin's definition, the

17    library included far more than installation media.  It

18    included patches, updates, fixes, and documents.

19             The same thing happened with the claim that the

20    library only contained PeopleSoft software.  And we saw

21    document after document that made very clear that the

22    library contained all applications: JD Edwards, Siebel,

23    Oracle Database, and PeopleSoft software.  And Dr. Davis

24    told you that too.

25             All right.  Well, the last but maybe the best

1    library lie is "we gave you a snapshot."

2              So the Court has instructed you, ladies and

3    gentlemen, that Rimini Street breached its duty to preserve

4    evidence in this litigation when it deleted certain

5    material in the software library in January of 2010.

6              The Court also told you that you may infer that

7    the deleted material included evidence favorable to Oracle

8    and not to Rimini.

9              So obviously deleting evidence, just like the

10   buffet, you have to admit this looks pretty bad.

11             So how are they going to deal with this?  Well,

12   they say, "We gave you a snapshot of exactly what was

13   deleted."

14             Well, so on the left you can see their snapshot,

15   and on the right you see a list of files, and that's from

16   2007, three years before their snapshot, with maintenance

17   packs that Krista Williams testified were in the library.

18             They were deleted.  They were not in the

19   snapshot that Rimini claims shows exactly what was in

20   there.

21             Kind of makes you wonder what else might have

22   been in there, doesn't it?  Well, we don't know.  Because

23   the truth is that Rimini Street cannot possibly have told

24   us what was deleted because they didn't keep records about

25   what was checked in and out of the library.

1          Randy Davis said -- Dr. Davis says "There's no

2    indication that there was a way of keeping track"; and Seth

3    Ravin says, "Well, I think we had some records, but I'm

4    sure it was -- I'm not sure it was all complete."

5          Ladies and gentlemen, no audits, no records, no

6    logs, nothing electronic, nothing, just a fake snapshot and

7    a library deleted right before this case was brought.

8          All right.  So we also learned that around the

9    same time Rimini was amassing Oracle's copyrighted software

10   in their library, they also were trying to figure out how

11   to launch their Siebel business.  And as early as December

12   of 2005, Rimini was told it needed a Siebel license to get

13   software.

14          This person, Victor Shu is writing to Dennis

15   Chiu, a VP of support at Rimini Street, and he says, "I

16   would think you'd have taken out a contract with Siebel by

17   now.  I don't think you can continue operation without a

18   contract."

19          Just a few months later Rimini Street solved its

20   problem.  It paid Seth Ravin's childhood friend, Bill

21   Leake, to become a customer so they could get an ID for the

22   Siebel support website.

23          You remember Bill Leake.  He's the one that

24   right now works at Rimini Street.  Seth Ravin said he

25   couldn't remember whether he had paid Leake a million

1    dollars to become that first customer.

2              But, in any event, we did see internal e-mails

3    where Rimini Street is saying they're not a real customer.

4    And that's true, they weren't.  But they did allow Rimini

5    Street to get the Siebel extracts for many customers.

6              Christian Hicks, one of our experts, counted 18

7    customers that they were able to get because of the ID that

8    they got from their fake customer, Bill Leake.

9              All right.  So remember back there was a time we

10   didn't know what environments are?  Now we know.

11             So software in the library was used to create

12   local environments.  And this is undisputed, ladies and

13   gentlemen.  478 environments were copied by Rimini onto its

14   systems; 10 for JD Edwards, 381 for PeopleSoft, 87 for

15   Siebel, and then overlapping that number, 216 Oracle

16   Database local copies.

17             You know by now that those environments contain

18   exact copies of hundreds or thousands of Oracle's

19   copyrighted files.  That's also undisputed.

20             But Rimini Street did also lie to us about

21   whether there were general environments, those general

22   development environments that allowed Rimini Street to work

23   in them and use the work that they did in those general

24   environments from multiple customers.

25             Brian Slepko, vice-president of global

3449

1    operations, said in his deposition, when he was asked

2    whether "All the development is done for a particular

3    customer in that customer's environment using the

4    customer's files?"

5              He said "Yes."

6              "And then that work is repeated for each

7    customer for whom that work is applicable?"

8              "Yes."

9              All right.  Well, ladies and gentlemen, that's

10   obviously not true.  We saw plenty of documents in this

11   case, and this is just one of them, which showed that

12   Rimini Street had development environments and needed

13   general development environments, because to do this

14   customer by customer would have cost them too much money

15   and they wouldn't have been able to grow their business.

16             All right.  In fact, finally, when confronted

17   with these documents, Seth Ravin admitted that they did

18   have general testing and development environments at

19   Rimini.  They even had codes for them.  This d-e-v, you

20   know now, means development environment.

21             So, ladies and gentlemen, the other thing I want

22   to say is that throughout trial Rimini counsel asked Oracle

23   witnesses, "Well, don't you let customers have testing

24   environments?"

25             Don't be fooled by this, ladies and gentlemen.

3450

1      You have seen the rules.  Things can be done on the

2      customer's site that cannot be done on Rimini's site.

3              Remember, that's the first rule.  If something

4      is happening at the customer's facility, it is different

5      than if it's happening on Rimini's facility, which is

6      copyright infringement.

7              So let's talk briefly then about cross-use,

8      which is the violation of the second rule.

9              We also were told there was no cross-use.  But

10     there were so many examples, ladies and gentlemen, of the

11     cross-use we saw in this case.  The library, the misuse of

12     customer's IDs, downloading PeopleSoft before they had a

13     single PeopleSoft customer, troubleshooting in another

14     customer's environment, cloning, developing fixes and

15     updates.

16             In each of these circumstances Customer A's

17     software is being used to serve Customer B, and sometimes

18     Customer C, D, E, and F.  That's all cross-use.

19             Randy Davis told you there were 149 Rimini

20     customers who received cross-use fixes and updates.

21             And he also told you that there were 104

22     customer environments that were cloned.

23             Look at this next slide, ladies and gentlemen.

24     This is really remarkable.

25             So, in 2010, Seth Ravin, the defendant, was

1    asked,

2         "Has it ever occurred that one customer's

3    software environment has been used to develop a fix or an

4    update that was ultimately delivered to a different

5    customer?

6         "No."

7         Even at this trial,

8         "So at Rimini Street you were using environments

9    of Client A to create fixes that you then distributed to

10   Clients B and C; correct?

11        "No."

12        Finally, the next day,

13        "What about this.  Taking an update that you

14   created, your engineers created, and then using that update

15   for other clients with the same version of contract or

16   license, do you deny that you have done that?

17        "No.  We reused it all the time."

18        Finally, Seth Ravin's back is up against the

19   wall, he has no choice, and he finally admits that, yes,

20   there's been cross-use at Rimini Street.

21        So Rimini Street did all of this.  They violated

22   both rules, they kept thousands upon thousands of copies on

23   their own systems, and they used these copies to grow their

24   business and share software from customer to customer.

25        So as we talked already, there is only one

3452

1      possible defense, and that is whether the environments are

2      used as archives or backups when something is lost or

3      corrupted.

4              So we have seen no evidence of that in this

5      case, ladies and gentlemen.  Instead, the evidence we've

6      seen has been overwhelming that these copies were used for

7      purposes of working with the environments or for

8      troubleshooting problems.  And let's look at some of the

9      evidence we've seen.

10             So Randy Davis told what you a backup copy is,

11     and he told you that it's something that doesn't get

12     changed because you might need it in an emergency.

13             Seth Ravin, he says his people used all that

14     software, including Siebel and JD Edwards, in connection

15     with work for customers.

16             Next slide.

17             He says that the backups are shipped to an

18     offsite storage, but that the functioning local

19     environments on the system are separate from those backup

20     tapes.  Those are on the servers and at the data center at

21     Rimini Street, and those are the environments being used at

22     Rimini Street to support their customers.

23             Seth Ravin's own testimony gives up the

24     defendants' last possible defense.

25             Dennis Chiu said the same thing, Siebel

1    environments are used for troubleshooting.

2              And even if this was the only piece of evidence

3    in the entire case, you would know, ladies and gentlemen,

4    they have no license defense for Siebel and JD Edwards.

5    And anyone who tells you anything different, they're just

6    playing word games with you.

7              Same things with JD Edwards.  They were used for

8    diagnostics and support.

9              And we saw documents that made clear how JD

10   Edwards software was used, how these environments would be

11   used, for support, for support, for support.

12             All right.  So Bill also told you in opening

13   about a third rule that Oracle had, which was part of its

14   terms of use, and that's no automated downloading.  So in

15   addition to violating Oracle's licenses, Rimini also

16   violated its terms of use.

17             Early on in 2007, in response to TomorrowNow,

18   Oracle changed its terms of use.  And you'll see the

19   language right there on the screen.

20             It says,

21             "You may not use any software routines commonly

22   known as robots, spiders, scrapers, or any other automated

23   means, to access Customer Connection or any other Oracle

24   accounts, systems, or networks."

25             So this is actually from a Rimini Street e-mail

1    because in May of 2007, Seth Ravin and Rimini Street

2    learned that Oracle had changed its terms of use.

3              On June 20th, Seth Ravin learned from his staff

4    that the manual process wouldn't work.  It would be

5    impossible to do that.  It would take several months to

6    accomplish the same result manually.  In other words, they

7    needed automated downloads no matter what those terms of

8    use said.

9              And the next day Seth Ravin himself directed

10   that Rimini would continue massive unauthorized

11   downloading.  He said himself, "I made that decision."

12             And they didn't just download a little bit,

13   ladies and gentlemen, they downloaded a lot, more than

14   twice the Library of Congress.  That's what Christian Hicks

15   told you.

16             David Renshaw, the senior database

17   administrator, said that he had never seen anything like

18   this before, over a million entries where usually in a day

19   that are 20 or 30.

20             And you learned that Rimini's crawl on the

21   website caused deadlocks and slowed the system down.  This

22   is a chart that shows that.

23             Now, Rimini Street had an expert look at this

24   too.  But he specifically excluded the times when Rimini

25   was running its crawl; not all the times, he excluded some

1    of them.

2             But think about this.  He did a slowdown

3    analysis that excluded the times when Rimini slowed the

4    system down.  That makes no sense.

5             After this happened in November of 2008, there

6    were internal e-mails at Rimini.  "They're on to us for

7    massive downloading."  Even the customer tells them this is

8    illegal.

9             So they do change their ways for January of 2009

10   and download a little differently.  This was the e-mail

11   where you saw the e-mail address JR Corpuz at Rimini Street

12   over and over and over again, because this was the number

13   of times that Rimini Street is trying to download from the

14   Oracle system, a single user at Rimini Street responsible

15   for all the deadlocks.

16            And everyone agrees, ladies and gentlemen,

17   Oracle's server was down for four and a half hours.  Even

18   Rimini Street's expert agrees with that.  He just doesn't

19   think that that impaired the system.

20            Well, now, this is something we did

21   underestimate in opening.  So remember that Bill showed you

22   the stop watch in opening, and it went for 20 seconds and

23   he stopped talking, and that seemed like a really long

24   time?  Well, four and a half hours is a really long time.

25            Do you remember that day when Scott Hampton, the

1    Rimini damages expert, was on the stand?  He spent four and

2    a half hours refusing to answer questions.  And remember

3    how long that felt?

4          Well, now, you can imagine if you're trying to

5    run a power grid or a hospital or a phone company.  Four

6    and a half hours can be very devastating.  It could be

7    disabling.  And that's what Rimini Street did.

8          All right.  So now I'm going to talk about lies

9    and interference, which we also said we would prove, and

10   this relates to our interference claim.  Bill will walk you

11   through the actual jury instructions.

12         But the judge has already told you two things.

13   You'll need to find that Rimini Street intended to disrupt

14   Oracle's relationships with customers and that Rimini

15   Street made misrepresentations to customers.

16         So in April of 2006, Rimini Street was already

17   declaring to prospective investors that its goal was to

18   interfere with customer relationships.

19         Look at their investment proposal, ladies and

20   gentlemen.  They say it in black and white.  "Rimini Street

21   separates Oracle from its acquired licensees," those are

22   the customers, "denying Oracle recurring revenue."

23         They're even looking to capitalize on Oracle's

24   customer loss by targeting Oracle's competitors.

25         So remember when Rimini's lawyer told you none

 1    of this was intentional, it wasn't aimed at hurting anyone?

 2    Well, that is wrong, and that is not true, because it's

 3    clearly here aimed at hurting Oracle and aimed at

 4    separating Oracle from its customers.

 5             I asked the company's CFO about this, and he had

 6    to agree, this was the stated purpose from the beginning.

 7             And Seth Ravin also agreed that they were

 8    actually soliciting investors by saying that competitors of

 9    Oracle would benefit when Rimini Street caused Oracle to

10    lose customers, which is what happened in this case.

11             That was their plan from the beginning.

12             So let's talk, ladies and gentlemen, about the

13    lies and misrepresentations to customers.  This is what the

14    judge said would be talked about in the interference claim.

15             So Rimini communicated with its customers

16    through standard messaging.  And you learned where those

17    messages came from.

18             So Kevin Maddock, the head of sales at Rimini

19    Street, came to testify to you, and he told you that those

20    FAQs came from marketing.

21             And then David Rowe, head of marketing, told you

22    that those messages came from Seth Ravin and the operating

23    committee.

24             So let's look at these messages that came from

25    Seth Ravin and the operating committee.

3458

1           At this point we know that each one of them is

2     false.

3           "We never share fixes or deliverables between

4     clients."

5           "We only use your ID or password."

6           "Each client receives their own unique

7     deliverables."

8           "What we're going to deliver to you is going to

9     come from your own environment and not someone else's

10    environment."

11          We now know, ladies and gentlemen, you now know,

12    that all of these are false, and, by the way, so does Kevin

13    Maddock.  He didn't know the truth.

14          Is there anyone in this courtroom who did not

15    feel bad for Kevin Maddock when he testified?  He looked so

16    uncomfortable.  Because no one ever told him that these

17    things that he had been telling the customers for years

18    were not true.  He admitted that.

19          And a week later David Rowe testified, he took

20    the stand, and he told you the same thing.

21          Ladies and gentlemen, those messages originated

22    with the defendant, Seth Ravin.  His own witnesses told you

23    so.

24          Marketing and sales.  Those are the people that

25    talk to the customers, and those are the people who were

3459

1     not allowed to know the truth at Rimini Street.

2               So they also had standard messaging and FAQs

3     about what they called their strict procedures to protect

4     intellectual property.  And those procedures were supposed

5     to make them different from TomorrowNow.

6               Ladies and gentlemen, look at the slide.  This

7     is the sum total of the strict procedures we saw in the

8     case.  You saw nothing.  We didn't see a single shred of

9     evidence, not a single written-down policy or procedure.

10              We did see, though, that Rimini lied to specific

11    customers.  Abilene Independent School District.  "We're

12    going to build a test an development environment just for

13    Abilene Independent School District."

14              And here you see Krista Williams saying, "We're

15    going to clone Abilene's environment."

16              CKE Restaurants.  "We never share fixes or

17    deliverables between clients.  Each client receives their

18    own unique deliverables created in their own environment

19    with their source code."

20              Dr. Davis told you that "CKE received updates

21    developed or tested in environments associated with other

22    customers."

23              City of Flint.  "Test environment will be used

24    exclusively for the support of your PeopleSoft

25    application."

3460

1              Then Doug Baron said, "Here's what I had to do

2    to clone the City of Flint."

3              Next, CMS, Correctional Medical Services.  "We

4    create unique and independent environments for each client,

5    and we use their customer ID exclusively to support them."

6              Dr. Davis told you that that wasn't true also.

7              So even after this lawsuit was filed, ladies and

8    gentlemen, Kevin Maddock told you that they continued to

9    tell these customers the same standard messages, "We don't

10   share software between customers," "We don't use

11   development environments between customers," "we are not

12   violating Oracle's copyrights."

13             Not only that, the frequently asked questions

14   documents, the FAQs, became more frequent after this

15   lawsuit was filed, not less; more lies, not less, even

16   after this lawsuit was filed.

17             Rimini Street even had Brian Baggett come here

18   to testify without telling him the truth.  You remember

19   Brian Baggett?  He's the guy who used to work at Bausch &

20   Lomb but Rimini's website says he still does?

21             He told you directly if he had known that Rimini

22   Street was violating Oracle's copyrights on a massive

23   basis, he would have gotten rid of them; yet somehow he was

24   here testifying, even though this Court had already found

25   that Oracle's copyrights were violated by Rimini Street.

1       Nobody told him that, apparently, and he had no

2  idea of what's been going on at this trial.  He didn't know

3  what you knew.  He only knew what the Rimini guys told him.

4  And he said that they didn't say they actually did it.

5       So what we've learned is that lying is at the

6  center of everything that Rimini Street does.

7       In opening, I heard Rimini's lawyers say that

8  our case was built on half truths and diversions.  Well,

9  that's true.  Our case is built on Seth Ravin's half

10 truths, diversions, and sometimes out-and-out lies.

11      These folks have lied to the Court.  They've

12 lied to Oracle.  They've lied to their own customers.

13 They've lied to prospective customers.  They lied to their

14 sales department and their marketing department.  And,

15 ladies and gentlemen, as you know by now, they've lied to

16 you.

17      In fact, recently Seth Ravin made up a new lie

18 just for you.

19      Rimini's lawyer asked him how he could possibly

20 square that admission that they reused updates all the time

21 with what he had previously said.

22      And he said, "Well, that was just the base

23 software, that was vanilla code, not the individual,

24 customized components."

25      So let's focus on what they're saying here,

1    ladies and gentlemen, because I anticipate that this

2    brand-new lie is going to come up in closing.

3              For the first time ever, Seth Ravin is

4    contending that Rimini Street could legally use -- reuse

5    vanilla software but not customized software, and he's the

6    only Rimini employee ever to say that.

7              Well, this new lie will not work.  The Court has

8    already told you that having copies of a customers software

9    on Rimini's server, vanilla or customized, is copyright

10   infringement.

11             Also, you have already seen that Rimini's system

12   is filled with Oracle's code.  So for a customized

13   environment, all that means is that Rimini has changed

14   Oracle's code, not entirely, made some changes, and then

15   sent that to Rimini's own customers.  And Jim Benge, VP of

16   PeopleSoft Development, acknowledged this.

17             Randy Davis explained to you that far from being

18   particularly legal, this is what's called making a

19   derivative work.  And the judge used this term a few times.

20   You'll see it again in the jury instructions.

21             Doing this without a license, ladies and

22   gentlemen, without permission from the creator of the work,

23   in this case Oracle, is copyright infringement.

24             So what Seth Ravin is really telling you is,

25   like, if I took Harry Potter from J.K. Rowling, and I

3463

1    didn't have her permission, and I changed all the

2    characters' names in the book and then sold my version of

3    Harry Potter, somehow that would be better, that would be

4    more legal, selling my altered version of Harry Potter than

5    selling her original version without her permission.

6         Ladies and gentlemen, that is ridiculous on its

7    face, and both would be copyright infringement.

8         All right.  Well, you know -- you saw the

9    evidence, and you know that you can't believe this because

10   you saw no evidence that there's some distinction where

11   it's more legal to copy vanilla code than customized code

12   and reuse that.

13        And, actually, internal documents at Rimini

14   Street prove just the opposite.  Again here their lies are

15   defeated by the actual evidence.

16        In this e-mail Dennis Chiu says to a customer,

17   "Rimini Street is precluded from using any updates,"

18   referring to vanilla updates.

19        He says that "While Oracle can employ the method

20   of creating a single vanilla update, Rimini Street is not

21   legally able to do that."

22        That is what Seth Ravin is telling you right now

23   is okay?  And this is what they did.  They did use those

24   environments, and it was not legal.

25        So, ladies and gentlemen, don't let Seth Ravin

3464

1    and Rimini Street convince you of things that you know is

2    not true based on the evidence that you have seen with your

3    own eyes.

4            I expect that during counsel's closing, after I

5    sit down and Bill sit down, you are going to hear new

6    things you have never heard before, that there will be no

7    evidence for in this entire case.  And when you hear these

8    things, you ask yourself, have I ever heard anything like

9    this before?  Is there any evidence to back this up?  Or

10   are they just trying to put another one over on me?

11           All right.  So the last thing that I'll talk to

12   you about, ladies and gentlemen, is what Rimini and Seth

13   Ravin knew.  And this has to do with willfulness and with

14   punitive damages.

15           So here's the instruction for willfulness.  And

16   all that this means is that the defendant engaged in acts

17   that infringed the copyright and that they knew that those

18   acts engaged the copyright.

19           Punitive damages.  The judge walked you through

20   this a little bit.  And basically this means that the

21   defendant engaged with fraud, oppression, or malice.

22           Fraud includes intentional misrepresentation,

23   deception, or concealment of a material fact.

24           And also relevant to punitive damages is

25   something called conscious disregard.  That means that

```
 1   knowledge of -- if you have knowledge of a probable harmful
 2   consequence of a wrongful act but you deliberately fail to
 3   avoid the consequences.
 4            So the questions are did they know; and was it
 5   intentional?
 6            Ladies and gentlemen, of course, they did, and,
 7   of course, it was.
 8            First of all, customers warned Rimini Street
 9   that what they were doing was illegal.  Here's a list of
10   customers saying that what Rimini would do would violate
11   Oracle's copyright agreements.
12            This one person says that this is pretty much
13   boilerplate verbiage in the Oracle contract.
14            So many customers told them that what they were
15   doing was illegal.  So what did Seth Ravin say?
16            So he first said, "Well, I would interact with
17   those contracts pretty much every day."
18            But he also said, "Well, the customers signed
19   the contracts, and we didn't have access to that
20   information."
21            Then he said, "It was the customer's
22   responsibility to make sure their license wasn't violated.
23   It was the customer's liability.'
24            But then he also said, "We would influence the
25   customers.  We would give them our opinion."
```

3466

1           So based on Mr. Ravin's four separate answers to

2     essentially the same question, we can't really tell what

3     he's saying he knew.  So let's look at the evidence.

4           David Rowe told you that the truth is Rimini

5     Street could get information about those contracts when it

6     wanted to because it signed nondisclosure agreements with

7     customers.

8           So Rimini Street's excuse, and I think you'll

9     see this in their closing too, that this information was

10    all confidential as to them, that is not true, because they

11    were able to get this confidential information.

12           And we saw that Seth Ravin did give legal

13    opinions to customers about the licenses.  So you saw this

14    license a number of times.  It's a PeopleSoft license.

15           And this is an e-mail that Seth Ravin drafted to

16    be sent to a customer.  And he says, "It's our opinion,"

17    he's giving a legal opinion "that Rimini Street's services

18    do not violate the provisions of the license."

19           Mr. Ravin knew he was lying to customers about

20    what he was telling them.  He told them that that provision

21    in the license agreement only applied to systems used in

22    production, not other environments.

23           But, ladies and gentlemen, you didn't see that

24    language in any license because there isn't any; not this

25    one, not any license.

1          One thing you did see, though, was this

2    provision, where PeopleSoft can give you a license to have

3    copies solely for licensee's internal data processing

4    operations located at the sites specified in the schedules.

5          And you might remember that Rimini's lawyer made

6    a big deal that the S at the end of sites makes it plural.

7    We do agree with that.

8          So if you look, ladies and gentlemen, in this

9    agreement the site specified down here is Brazoria County,

10   Texas.

11         So when Bill asked Seth Ravin about this, he

12   said, "It means Texas, and you thought it was okay to use

13   it in California?"

14         And he said, "Yes."

15         So in the Seth Ravin dictionary, library does

16   not mean library, customer software does not mean customer

17   software, and Texas does not mean Texas.

18         Seth Ravin's legal advice was wrong, and he knew

19   that.  He knows that when he tells a customer that Texas

20   means California, that that's misleading people.

21         And defendants have tried to create a lot of

22   confusion about these licenses, but the Court has already

23   told you what this means.  It means at the customer's

24   facilities and not at Rimini Street's facilities.

25         Rimini's counsel told you in opening being wrong

1    doesn't make you a liar.  Well, being a liar, ladies and

2    gentlemen, makes you a liar.

3              And no matter what they say, they went ahead and

4    did this.

5              Brian Slepko admitted this in his deposition.

6    If a customer did not ask any questions, they just assumed,

7    they decided on their own this was legal.  And if a

8    customer did ask a question, they assured them it was legal

9    and the customer relied on that.

10             So there's other evidence obviously they knew

11   what they were doing.  Oracle puts copyright notices on

12   everything, on the websites, on the documents, on the

13   disks, even in the source code.  The source code that's

14   being manipulated by the people at Rimini Street has the

15   copyright notice in it.

16             Ladies and gentlemen, this is -- this is sort of

17   my favorite.  So there's a whole collection of documents in

18   this case where there are things you just don't say if

19   you're innocent, things you would never say if you weren't

20   doing anything wrong.

21             "They're onto us."

22             "Oracle's not checking this against the

23   licenses."

24             "I don't think this is licensed."

25             "You can download Oracle software but not to

3469

1    make money and we're making a crap load of money from their

2    free stuff."

3              And Brian Slepko, "This is something keeping me

4    up at night.  All it takes is one small misstep and they

5    would be all over us, and I can guarantee that they're

6    watching."

7              You don't say those kinds of things, ladies and

8    gentlemen, if you're not doing anything wrong.

9              And you certainly do not behave like this.  This

10   is how they got their first customer.

11             This e-mail from Thomas Shay, who is very high

12   up in the company, includes Bill Leake.  He says, "We're

13   going to say that LCGrowth is interested in getting a

14   license."

15             "I'll be on his tech staff, and you'll be the

16   one doing the implementation."

17             If you're not doing anything wrong, you don't

18   say "I'll pretend to do this and you pretend to do that."

19             Well, accidentally this e-mail got sent to

20   Oracle.  That was not a good thing.

21             And Seth Raven said "I'm not happy because these

22   kind of errors are serious stuff."

23             Well, the next one is my personal favorite of

24   things you don't say if you're innocent.

25             "Sounds quite similar to the current processes,

1    and I'm unclear as to what differentiates this approach

2    from a more 'legal' approach.  Seems like we're either

3    pregnant or we're not."

4            Well, I definitely agree with that.

5            And this person says, "flying lower under the

6    radar might be the better solution."

7            So the other thing we learned in this case is

8    that Seth Ravin was paying attention to his former company,

9    TomorrowNow.  And this is the defense timeline.  And they

10   made a very big point of telling you that Seth Ravin left

11   Rimini Street in March 2005, which they say is before

12   Oracle sued TomorrowNow.

13           Well, they have not shown you the whole story.

14   We added this line, the first red one, which shows when the

15   conduct at issue in the TomorrowNow lawsuit started, and

16   that is after Seth Ravin gets there and before he leaves.

17           The documents also show you that Seth Ravin was

18   paying attention to what was happening in his former

19   company.  So we learned that in 2007, in July, right in the

20   middle of the time period at issue in this case, SAP, the

21   parent company of TomorrowNow, admitted wrongdoing and

22   demoted the CEO.

23           TomorrowNow discontinued local environments on

24   its systems.  That's the same practice that Rimini Street

25   continued, knowing that TomorrowNow stopped it.  Rimini

1    Street, Seth Ravin, chose to continue.

2              Not only did they choose to continue, in this

3    e-mail Seth Ravin is saying that the decision to

4    discontinue local environments is a ridiculous policy.  And

5    he declared that they would be using their decision to host

6    local environments for their competitive advantage.

7              So did they know that they were doing this,

8    ladies and gentlemen?  Was it intentional?  Of course, it

9    was.

10             So Bill asked Seth Ravin, "You were never going

11   to move away from this business model, were you?"

12             And Mr. Ravin said, "Right, we did not change

13   our business model," after TomorrowNow.

14             They did, however, delete TomorrowNow from their

15   web bios and from the FAQs that they share with customers.

16             So did they know?  Was it intentional?

17             Ladies and gentlemen, you have already heard

18   that Rimini Street hid the truth from the marketing and

19   sales department.

20             David Rowe and Kevin Maddock got up here and

21   they told you "We did not know that we were sharing

22   customer software," "We did not know we were reusing fixes

23   and updates among clients all the time," "We did not know

24   we were cloning environments," "We did not know about the

25   software library," "We did not know about the general

3472

1    testing environments."

2            All things, ladies and gentlemen, that you now

3    know, and all things that the defendant, Seth Ravin, knew

4    at the time.

5            But when he was asked what he knew, Seth Ravin

6    said, again and again, "I was focused on building the

7    business."

8            There it is.  He said three times right here.

9    "I was focused on building the business."

10           "The engineers did that."

11           "I was focused on building the business."

12           But he also told you that in the early days this

13   is a business that had two or three people running the

14   show.  And given that he invented the business model, you

15   got to ask yourselves, ladies and gentlemen, how could he

16   not know?

17           And we've seen how, when Bill asked Mr. Ravin

18   questions on the stand, sometimes he just couldn't remember

19   the details.

20           But when his lawyer asked him questions, he

21   could remember all sorts of details, like about how deeply

22   he became a 24-hour customer and about what happened with

23   XO's automated downloading.

24           And we have seen by this point in this case a

25   mountain of evidence to demonstrate that Seth Ravin was

1    involved in all kinds of decisions in the details and what

2    customers were told.

3          All of this, ladies and gentlemen, makes -- make

4    no mistake, this all leads back to Seth Raven.  He was

5    focused on building a business, a business that we now know

6    never would have existed if they weren't violating Oracle's

7    copyrights.

8          So, in opening, Rimini Street and Seth Ravin's

9    lawyer said to you, "We're here to be held accountable for

10   our actions."

11         Well, then, we're all here for the same purpose.

12   We're here to hold Rimini Street accountable for what they

13   did, what they knew, and the harm they caused.

14         Seth Ravin, the CEO of Rimini Street, told you

15   that the work he did was the customer's liability, the

16   customer's legal liability.

17         Safra Catz, the CEO of Oracle, told you what it

18   really means to be a CEO, what CEO accountability really

19   means.

20         She told you it means that you're responsible.

21   It doesn't mean that you point the finger at Oracle or you

22   point the finger at your own customers.  You take

23   responsibility for what you have done, what you have

24   designed, what you have built, and what you have lied to

25   protect.

1           Ladies and gentlemen, we are so grateful for the

2    time that you have put into this case.

3           We have all worked very hard, but your job is

4    the most important job of all.

5           Hold Rimini Street and Seth Ravin accountable

6    for what they've done.  Don't let them get away with

7    breaking the law and lying to you.  That's what the law

8    requires.

9           Thank you.

10          THE COURT:  Mr. Isaacson, I'm going to interrupt

11   for a moment.  I have to correct a couple of mistakes that

12   I spotted on the instructions so that they can be run off

13   for the jurors, and we'll just take a break, no more than

14   five to ten minutes.

15          And, ladies and gentlemen, you still can't

16   discuss the case, but take advantage of the break.  We'll

17   be back within five to ten minutes, and this will not be

18   charged on anyone's time.

19          Thank you.

20          COURTROOM ADMINISTRATOR:  Please rise.

21       (Recess from 12:10 p.m. until 12:19 p.m.)

22       (Jurors enter courtroom at 12:19 p.m.)

23          THE COURT:  Have a seat, please.

24          The record will show we're reconvened after the

25   short break.  The jury is present.  Counsel and parties are

3475

1    present.

2              And, Mr. Isaacson, I see you're about to address

3    plaintiffs' damages.

4              MR. ISAACSON:   Thank you, Your Honor.   And good

5    afternoon.

6              Karen talked to you about what Rimini did and

7    what they knew.   I'm also going to talk to you about what

8    they should pay.   But I'll point out to you that so much of

9    Rimini's case, so much of Rimini's defense, is avoiding

10   those first two questions, which are involved with what

11   they should pay.

12             That started from the beginning of Rimini's

13   case.   Rimini brought to you Ms. Blackmarr, a really nice

14   person working home alone in Florida, who knew nothing

15   about this case, who knew nothing about the copying, the

16   lies, the library, the environments.   She knew she liked

17   talking to customers.

18             Rimini is not confronting what's happening here.

19   We've had to force them to tell the truth about what's

20   happening here every step of the way.

21             The verdict form which I'm going to walk through

22   with you is about what happened here.   It is about

23   copyright violations, it is about massive unauthorized

24   copyright violations, it is about lies and deception, and

25   it is about taking Oracle customers.   It's not about these

1     other things.

2             Can we show -- this was a slide that Rimini

3     showed you in opening.  This is what they said the case was

4     about, three essential truths.

5             Customers have the right to choose Rimini.  That

6     was one of the first things they've told you and they've

7     repeated throughout.  And that never had anything to do

8     with illegality.  It never denied illegality.  And it's not

9     true.

10            No one has the right to choose an illegal

11    business.  Dishonest businesses hurt honest businesses.

12    They stop honest businesses from growing and creating jobs.

13    They hurt choices that we have.

14            The real question is those last two questions

15    which are about what should Rimini and Mr. Ravin pay.

16            Karen took down the walls of lies that we've

17    been taking down throughout this trial.  The last walls are

18    coming down on damages.

19            They want you to make an award of 9.3 to

20    $14 million.  That's the last wall.

21            It's riddled with lies.  It begins with a story

22    told by Seth Ravin and ends with an expert who makes up a

23    damage theory and assumes so many things.  That's the last

24    wall that comes down.

25            Rimini's case has been about avoiding what's

1    happening here.  Rimini -- if you go to the next slide.

2              The judge has instructed you here on what

3    matters, I know that took a while, but you're going to see

4    it in the verdict form.  And what matters is the real

5    truth: copyright, lies, harms to computers, what Karen was

6    talking about, the library, the environments, the

7    downloads, the cross-use, the lies.

8              The noise is the defense, which has nothing to

9    do with what's on the verdict form.  You're not going to

10   see forced upgrades on the verdict form.  You're not going

11   to see ISO standards or reuse or vanilla or quality

12   service.  Those are all just excuses.

13             Oracle's witnesses talked about what is at issue

14   in this case, and it's an important principle to Oracle.

15   Oracle depends on innovation.  Oracle depends on research.

16   It creates jobs that way.  It grows and it makes other

17   businesses better.

18             That's why Oracle witnesses focused on

19   innovation, investment, the thousands of engineers who work

20   on what Oracle does, and then we focused on the copyright

21   violations and the lies that were attached to that.

22             The Rimini witnesses -- and you can compare the

23   Oracle witnesses to the Rimini witnesses.  You've been able

24   to see everybody; some live, some on video.

25             They told -- the Rimini witnesses told you

1    different things at different times.  Some outright lied to

2    your face, like Mr. Slepko, like Mr. Ravin.  They told you

3    things that were outright lies.

4              Mr. Leake, you saw him on video.

5              You saw one of the highest executives in this

6    company on video at the beginning of the business,

7    Mr. Chiu, and you saw him incredibly try to avoid questions

8    when you saw all the documents his name was on that

9    indicated that he knew about the copying and the

10   infringement.

11             You saw people like Mr. Grigsby, who became the

12   head of the JDE unit after he took 40,000 documents with

13   him from JD Edwards, and they showed you how he took one of

14   those documents, took JD Edwards' name off of it and put

15   Rimini's name on it, and stamped it confidential.

16             You can compare the people you saw from Rimini,

17   the support people, to people like Buffy Ransom who told

18   you about how Oracle goes about providing quality support.

19             Rimini was wrong about so many things in this

20   case.  Rimini was wrong when they talked about how support

21   is answering the phone and how quickly you answer the

22   phone.  It's not how quickly you answer the phone, and,

23   boy, Oracle answers that phone quickly, Buffy Ransom told

24   you that, but it's what happens when the phone is picked

25   up.

1          And when it's picked up at Rimini, what do they

2     have?  All that copied material, things they took from

3     websites, surrounded by the Oracle library to answer those

4     questions.

5          They were wrong about what was happening at

6     Rimini.  Rimini was short staffed.  We showed you those

7     documents.

8          We showed you how they talked about they would

9     tap dance with customers when they would ask about

10    staffing.  We saw the instant message about we need to blow

11    the whistle around here because we can't keep this hidden

12    any longer.

13         They talked about customizations.  There's

14    nothing about customizations in this verdict form.  But

15    that was exaggerated.  Because what we found out from their

16    own e-mails is they wrote internally that they lacked the

17    infrastructure in team capabilities to actually provide

18    those customizations to truly support our client's ongoing

19    customizations.

20         They couldn't do it, and so they wrote in

21    e-mails proudly, "Look how we steered the clients to

22    vanilla, not to customizations."

23         They were wrong about forced upgrades.  They

24    said it's called a forced upgrade in opening statement, and

25    the Oracle witnesses said, no, there is -- are no forced

1    upgrades, there is lifetime support.

2           Buffy Ransom explained how customers value

3    upgrades, and she talked about how often major releases

4    happen, and how it's a rare customer that skips three major

5    releases.  Why?  Because then you're playing with the Atari

6    game system when all the modern game systems are out.  You

7    don't do that.  You're playing with 1996 software in your

8    business.

9           You have a business running on 15-year-old

10   software, all of which Rimini tells its customers is a good

11   thing to do as long as you're getting 50 percent off.

12          Slide 13.

13          They told Rimini -- Rimini told its customers

14   "you don't need security."  Seth Ravin admitted it.  David

15   Rowe, the head of marketing, said "You're telling them

16   there's no risk with no security upgrades."

17          They said, "It's not a problem.  We have

18   holistic security."

19          And what does that mean?  Once again, it's the

20   customer's problem.  "You keep up your firewalls.  We don't

21   have to have security in the software."

22          And they said, "Well, that's okay, we don't

23   remember any customer complaining about it."

24          Because customers don't complain about security

25   until it's too late.  You don't complain about the security

1    in your computer until it's breached.

2              Target didn't complain about its computers

3    probably until thousands of credit card informations went

4    out to somebody.

5              This software is full of private information,

6    people's Social Security numbers and salaries, and they

7    told customers it's okay not to keep it secure.

8              Edward Screven, the head of corporate

9    architecture at Oracle, told you, "That ridiculous.  You

10   cannot possibly be claiming to provide support when you're

11   doing that."

12             And Safra Catz, the CEO, sitting here -- the

13   executive vice-president of Oracle, Dorian Daley, has been

14   sitting here throughout the trial.  We thank her for that.

15   We also thank Ms. Catz for being here because this is

16   important to Oracle.  And she told you what's happening

17   here.

18             Okay.  This isn't a discount.  This is an

19   overcharge.  They are roping customers in with things that

20   they should not be buying, and the only way they do it is

21   by copying Oracle software.

22             So I told you I would take you through the

23   verdict form.  So I'm going to do that on the screen.

24             Page 1, Matt.

25             The first question you will be asked is about

1    PeopleSoft documentation, because the Court has already

2    found liability for PeopleSoft software.

3              As Ms. Dunn explained, it really is the same

4    issue with the documentation.  We showed it was copied.  On

5    page 2, we ask you to fill that in yes.

6              And at some point, if there's any note takers,

7    there's going to be some numbers.  I'm going to ask you to

8    jot down some numbers.

9              Number 2 and number 3 are JD Edwards and Siebel

10   copyright violations, and we will ask you to answer those

11   questions yes.

12             Now, fourth, contributory infringement.

13             Now, this is where Mr. Ravin is individually

14   liable for the copyright infringement that has gone on

15   here.

16             So we look at page 33 of the instructions.  Blow

17   that up, Matt.

18             "To prevail on contributory infringement against

19   Seth Ravin, each of the following elements must be proved

20   by a preponderance of the evidence:

21             "1.  Seth Ravin knew or had reason to know of

22   Rimini Street's infringing activity."

23             Obviously he did.  That's been clear.

24             "2.  He intentionally induced or materially

25   contributed to the infringing activity."

3483

1              He caused all of it.  He gave the directions.

2              There is a similar instruction -- a similar

3     question for vicarious infringement, question 5.  There.

4     We will ask you to answer all these questions yes.

5              And now let's look at page 34, the vicarious

6     instruction, infringement instruction.  This is similar to

7     contributory infringement.

8              "To prevail on vicarious infringement against

9     Seth Ravin, each of the following elements must be proved

10    by a preponderance of the evidence:

11             "1.  Seth Ravin profited directly from Rimini

12    Street's infringing activity."

13             He told you how he is the major shareholder of

14    Rimini Street.

15             "2.  Seth Ravin had the right and ability to

16    supervise or control Rimini Street's infringing activity."

17             I'm not sure anybody else did, but he sure did.

18             "3.  Seth Ravin failed to exercise that right

19    and ability."

20             We all know that.

21             These questions, as well as other questions

22    about Seth Ravin's individual liability, are about the

23    accountability that Karen was talking about.

24             In Mr. Ravin's -- if we can look at slide 2.  In

25    Mr. Ravin's testimony, he tried to point blame at everybody

1    else because part of this trial is about him and his

2    individual liability.

3         He said it was customers who were responsible or

4    their legal departments.  He blamed Oracle.  He blamed

5    Dennis Chiu at the beginning of the company.

6         He talked about those Rimini engineers while he

7    was busy running the company.  He is a CEO who wants no

8    accountability.

9         He thought it was fine for Bill Leake to say to

10   the press "I'm going to work with Rimini for five or ten

11   years" when they weren't -- he wasn't using the Siebel

12   software at all.

13        Seth Ravin said he was a visionary, and that

14   turned out to be false.

15        He said he cared about the customers at SAP.

16   That turned out to be false.

17        He said he wanted to work with Oracle, he

18   offered to work with Siebel and Oracle.  And we learned

19   that when questions were asked of him, he refused to answer

20   those questions, and he agreed to accept a finding of

21   contempt of court rather than answer those questions.

22        All of these things have been not true and are

23   all about Mr. Ravin avoiding accountability.

24        The next slide, slide 3.

25        Mr. Ravin was caught lying so often in this

1    trial.  His own counsel asked him a loaded question.

2              "Mr. Ravin, on the stand under oath, do you

3    recall any instances where you told something to a customer

4    that wasn't truthful in your opinion?

5              "ANSWER:  No."

6              CEOs need to be accountable under the law.  It's

7    not enough to say "I do not recall having an opinion that I

8    was lying."  It's time to say "I was telling the truth."

9    And that's not what happened here.

10             If we don't hold CEOs responsible, we're not

11   going to be able to hold companies responsible.  This case

12   is not just about Rimini.

13             All right.  Let's go back to the verdict form.

14             Now, copyright infringement, actual damages,

15   question 6.  You see I've written the name Dean, or my

16   colleagues have, and Hampton.

17             Elizabeth Dean did an estimate of lost profits.

18   And we are asking you to check lost profits.

19             They would like you to check fair market value

20   license because that's what the -- what Mr. Hampton was

21   talking about.  And I'll go through that.

22             But you'll remember that was that theory that

23   Mr. Hampton has never talked about before in all of his

24   hundreds of cases, and it's another example of a made-up

25   fiction from Rimini Street.

1              Question 6A.  This is lost profits.

2              Now, you will have to look at PTX 601 -- 6010.

3       That's Elizabeth Dean's summaries of the damages.  And it's

4       back here, and I'll explain to you the total number is

5       $16.2 million.  Lower, and I'll get to that in a minute.

6              But the total number we're asking for is

7       229.7 million.

8              All right?  95.7 million, this would be the

9       answer to 6A, is due to copyright.  6A is copyright, lost

10      profits.

11             Question 6B -- oh, and let me just -- let's look

12      at the instruction on lost profits.  No, 6B.  Now we're on

13      defender's profits.

14             So the lost profits are from our lost customers.

15      For other customers we're allowed to have any profits

16      Rimini made.  And Elizabeth Dean walked that through with

17      you.  And she said here are the revenues that they made.

18      And she said it's about $32 million.

19             And then what happens then -- and let's look at

20      page 40 of the instructions.  This is infringer's profits.

21             "If you determine that lost profits are the best

22      measure of Oracle International's actual damages, then you

23      must also determine the amount of profits, if any, made by

24      Defendant Rimini Street that are directly attributable to

25      the infringement and were not taken into account in

1      computing lost profits."

2              This is what Elizabeth Dean calculated for you,

3      the additional amounts that were not taken into account.

4              And then she said here are the revenues that

5      weren't taken into account.

6              Now, Rimini Street, as you'll see down below,

7      bears the burden of proving its expenses by a preponderance

8      of the evidence.

9              So they came in and gave their expenses, all

10     right, and that was after Elizabeth Dean testified.  So

11     there needs to be a deduction for those expenses.

12             And they talked about their profit margin on

13     these products being about 50 percent.  So once you make

14     that deduction from Elizabeth Dean's numbers, based on the

15     evidence as submitted, it goes down 16.2.  And the answer

16     to 6B becomes $16.4 million.  The answer to 6B is

17     $16.4 million.

18             Now, question 6C is the Hampton question, fair

19     market value license.  That's where they'll say, I guess,

20     it's 9.3 million or 14 million or something like that.

21             But what Elizabeth Dean testified to you is, if

22     you're going to use that measure, which you should not do,

23     that they were getting it wrong, and the actual damages

24     would be higher than the total copyright damages.

25             And so the answers to questions 6, 7, and 8, are

1     all going to be the same number, $112.1 million.  So I

2     would ask you to write down 6, 7, and 8, $112.1 million

3     because that's the lost profits, the 95.7, plus the

4     infringer number put together, 16.4.  Together that adds up

5     to 112.1.

6                 And that's the contributory infringement and the

7     vicarious infringement for Mr. Ravin.

8                 So next on the verdict form is statutory

9     damages.  Statutory damages, the judge has told you, we

10    don't get on top of everything else.

11                Frankly, it's an amount of principle.  If you

12    award us the money we asked for, we don't get this money.

13    But the statute says we're entitled to ask for it and for

14    you to declare that, yes, you were correct.

15                And so, as a matter of principle, we are asking

16    you to award statutory damages.

17                Question 9 is, was the infringement innocent.

18    Answer, no.  This was not innocent infringement.

19                Question 10, on the next page, was the

20    infringement willful.  Answer, yes, because it was knowing.

21    Karen showed you those instructions on that.

22                So question 11, statutory damages -- stop there.

23                The parties have agreed there's 93 copyrighted

24    works, and you are allowed, if you make a finding of

25    willfulness, to multiply 93 by 150,000, which would be page

3489

1    7 of the instruction.

2              Move to page 7 -- next page, Matt.  There.

3              That is -- 13.95 million is the answer to

4    question 13, and that's 93 times 150,000.

5              The answer to question 12 and 13 is the same

6    number, because that's where Mr. Ravin is contributory and

7    vicariously liable.

8              Which brings us to question 14, inducing breach

9    of contract.  For that I need to look at the instruction on

10   inducing breach of contract.  Inducing means causing that.

11   That they caused a breach of contract.

12             So let's look at that instruction, page 45 of

13   the instructions.

14             To prevail on this claim, there are seven

15   things.

16             One, a valid contract between Oracle America and

17   a customer.

18             The contract that we are referring to here is

19   found in PTX 19.  It's the terms of use for the website.

20   And on page 1, section 1, of those terms of use, it says

21   you don't share your ID.

22             And who shared an ID?  Bill Leake at the

23   beginning of this company, his Siebel ID, when he got paid

24   to do that.

25             So, second, Rimini Street or Seth Ravin knew the

1    contract existed.

2              Yes, we know they knew the terms of use existed.

3              Three, Rimini Street or Seth Ravin intended to

4    cause Oracle America's customers to breach its contract.

5              Yes, they paid Bill Leake to have him give the

6    Siebel ID to Rimini Street so they could start downloading

7    from Siebel SupportWeb.

8              Four, was that justifiable.

9              Of course, not.  They're paying the man.

10   They're paying the man to hand over his ID, a fake

11   customer.

12             Five, they caused the breach of contract.

13             Yes, they caused the breach of the terms of use.

14             Six, Oracle America was directly harmed.

15             The whole Siebel business was built from the

16   beginning based on this.  Eighteen customers got the

17   extracts.

18             Rimini -- finally, the conduct was a substantial

19   factor in causing Oracle America harm.

20             That's how the business started.

21             So we ask you to answer yes to the questions on

22   question 14 for breach -- for inducing breach of contract.

23             And for the amount of damages, which is question

24   14, the amount of damages we ask you to award,

25   $21.1 million, which is Oracle America -- this is Oracle

3491

1    America, and that's Oracle America's share of the Siebel

2    business about which Elizabeth Dean testified and again is

3    in PTX 6010.

4              Now, we come to question 15.  Intentional

5    interference.  Intentional interference is the lies, lying

6    to the customers to get the business, all those FAQs, all

7    those standard messages that Karen talked about.

8              Let's look at the instruction for that.

9              Intentional interference with prospective

10   economic advantage, page 47.

11             Prospective economic advantage, that means our

12   customers.  And there's eight points here.  And while

13   that's kind of intimidating -- those are long instructions.

14   Don't worry, juries reach verdicts even after long

15   instructions.

16             There's eight points here.  Oracle America --

17   first -- and Oracle International had an expectancy in a

18   prospective contractual relationship with a customer.

19             They had contracts with customers.  That part's

20   easy.

21             Second, Rimini Street and Seth Ravin knew about

22   those relationships.

23             Yes, they knew about our customers.  They came

24   to take them.

25             Three, Rimini Street and Seth Ravin engaged in

1    unlawful or improper conduct.

2              They lied.  That's as unlawful as you get.

3              Four, by engaging in this conduct, Rimini or

4    Seth Ravin intended to disrupt the relationship.

5              Yes, they were taking the customers through the

6    lies.

7              Five, the conduct was not privileged or

8    justified.

9              Lying is never privileged or justified.

10             Six, the relationship was disrupted as a result

11   of such conduct.

12             They took the customers.

13             Seven, Oracle was harmed, we lost customers.

14             Eight, and what they did was a substantial

15   factor in causing us harm.

16             Yes, they took a lot of customers through these

17   lies, and Elizabeth Dean measured that for you.

18             So the amount of damages here are divided

19   between -- 15 and 16 are the same question, one for Oracle

20   America and one for Oracle International.  It's been

21   divided up.

22             So we ask you to answer yes for intentional

23   interference -- again, lying -- for 15 and 16.

24             Oracle America's share of that, of the total

25   number of intentional interference, is 117.6 million.

1        That's the answer to question 15, 117.6 million.

2               And the answer to question 16, which is Oracle

3        International's share, is 76.5 million.

4               Now there are the computer access claims.

5               All right.  What's going on here?  All of a

6        sudden there are pages and pages being read to you about

7        interference with computers and things on computers.  And

8        you'll have those instructions.

9               That's the automated downloading going onto our

10       system without permission.  That's what all that's about.

11              And, guess what, that's illegal under California

12       law and under Nevada law.  So we've made claims for that.

13              So let's look at -- question 17 is the

14       California computer law.  And that's -- when the judge was

15       reading those, like, I don't even know the acronyms myself,

16       CRRP or whatever, that's either the California law or the

17       Nevada law.

18              And the instruction, page 64 of the

19       instructions, is actually fairly simple when you boil it

20       down.

21              To prevail under this provision what Oracle must

22       prove is, one, a defendant knowingly accessed and without

23       permission took or made use of any data, computer, computer

24       systems or computer network or took any supporting

25       documentation.

1              We know Rimini went into our computers, our

2      servers, our websites, and took lots of data and supporting

3      documentation and other things, and they did it without

4      Oracle's permission.  They might show you we had the

5      customer's permission.  They need Oracle's permission.

6              Second, thereby causing us to suffer harm or

7      loss.

8              Christian Hicks testified about the customers

9      that were being served during that period, and you've seen

10     the evidence, how they built their Siebel business based on

11     this.  We were harmed.

12             The -- so the damages -- so question 17 and 19

13     are going to be -- the answers are going to be the same.

14     These are Oracle America questions for the computers.  17

15     is under the California statute, 19's under the Nevada

16     statute, which is very similar.

17             And the numbers there are 8.8 if it's just

18     the -- million, if it's just the Christian Hicks'

19     customers; and it's 21.1 million if it's the entire Siebel

20     customers.  That's for both Rimini Street and Seth Ravin

21     individually.

22             So the -- for Oracle International the answers

23     to questions 18 and 20 are the same, 5.6 million if you're

24     just dealing with the Christian Hicks' customers, and

25     13.8 million if you're talking about the whole Siebel

1   business.

2            Now, when we say on each of these counts these

3   numbers, that doesn't mean we get paid if these all add up.

4   Right?  This is just what we're entitled to on that

5   individual claim.

6            We only get nonduplicative damages.  And when

7   you award the same amount, which is what we're asking for,

8   for Rimini and Seth Ravin, that doesn't mean they pay

9   twice.  That means together they have to pay, but they pay

10  that same amount of money.

11           So when we ask for $229.7 million against the

12  company and Mr. Ravin, that doesn't mean the figure gets

13  doubled, that means they're both responsible for paying

14  that amount of money, that same amount of money, and that's

15  the most we would get paid.

16           All right.  So now the nonduplicative damages

17  amount.  That's question 21 and 22.  This is again divided

18  between Oracle America and Oracle International.

19           Oracle America is question 21, that's

20  117.6 million; and question 22 is 112.1 million, again, all

21  drawing from PTX 610.

22           I appreciate your patience.  It's a long verdict

23  form.  I needed to do that so you would understand what

24  we're asking for.

25           Now let me tell you some more about why that's

1    the right thing to do.

2                What should be -- what should Rimini and Ravin

3    pay, that third question.  Slide 18.

4                I showed you in opening statement, we showed it

5    to Mr. Ravin.  He knew from the very beginning of this

6    business that he -- that quality service wasn't enough, it

7    wasn't enough to pick up the phone fast, he had to have the

8    rights to use the Oracle software, and without those rights

9    everything else was noise.

10               He wrote,

11               "It wouldn't matter if we had the best JDE

12   resources in the world if we don't resolve the foundation

13   issues.  A client first and foremost must believe they have

14   the right to be with us and use their software, or the rest

15   is just noise."

16               Scott Hampton talked repeatedly about what Seth

17   Ravin says is noise.  He says, no, it's quality service.

18   Seth Ravin knew differently.

19               Next slide.

20               From the very beginning, thanks to copyright

21   violations, they had a business.

22               He wrote to someone in March of 2006, Mr. Ravin

23   did, right when the business was starting.  He said,

24               "This is the stretch where we go from a couple

25   referenceable clients to four, and then we have a business

1    core and we have a business."

2            Without copyright violations, there is no

3    business.  This business was corrupt with copying from the

4    very beginning, and it began with lies with the very first

5    customer.

6            We showed that to you with a timeline, which is

7    the next slide, that -- how Rimini grew through

8    infringement and deception.

9            The timeline again shows what happens, a company

10   built on environments full of Oracle software in violation

11   of the copyright laws, and then the library, all going on

12   while the customer base grew.

13           We showed you slides like slide 21, the first

14   Siebel customers.

15           Dr. Davis explained to you that the message is

16   Rimini Street's early growth depended in very large measure

17   on local use of customer environments and cross-uses of

18   fixes.

19           I showed Mr. Ravin these slides, and he was

20   unable to deny any of this.

21           No expert witness came up to you and said, "this

22   is wrong, they got this wrong."

23           Everything Dr. Davis told you about the very

24   beginning of this company being built on copyright

25   infringement was uncontested.

1          If -- without copyright infringement, Rimini

2    Street would not have gotten off the ground, it would not

3    have grown, it would not have had references, it would have

4    ended, and it would have taken no Oracle customers.

5          Elizabeth Dean talked about that.  Their whole

6    business model was prefaced on the alleged wrongdoing.

7    They couldn't offer a 50 percent vendor-level replacement

8    service if they hadn't done those things.

9          Rimini's pilot clients.  We went to the early

10   documents and said "who are your most important clients,"

11   and they were all riddled with copyright infringement.

12          Their top references -- now, remember,

13   PeopleSoft, about which the Court has already found

14   liability for the software, is 75 percent of the damages

15   here.

16          You don't even have to decide that liability.

17   75 percent of the damages are about something the Court has

18   already found.

19          And we know that the references that they were

20   relying on were riddled with copyright infringement.  And

21   Seth Ravin told you "without referrals we wouldn't have a

22   business."

23          This business doesn't exist without taking

24   copy -- Oracle's software.  All the customers were based on

25   wrongdoing.  Elizabeth Dean told you this.

3499

1          "My opinion is that Rimini's entire business

2    model was based on the allegations of wrongdoing from the

3    very first instance."

4          They wanted to say which customers did you talk

5    to?  So whether or not they had a direct communication with

6    one customer isn't relevant because the entire business is

7    operating in this fashion.

8          I think the entire business model being built on

9    these allegations of wrongdoing led to their success.  All

10   the customers, every last one, was part of a business that

11   was full of corrupt copying.

12          If an illegal gang sells some Starbucks on the

13   side, you don't say, well, they're doing some good.  You

14   don't say, let's say that gang has some value for whatever

15   the Starbucks that we're selling.

16          This was a corrupt business of copying and lies

17   from the beginning, and that was the business that was set

18   up.

19          They asked Elizabeth Dean about individual

20   customers, "What about Access Intelligence?"  And she told

21   you Access Intelligence and everyone else were all based on

22   this business because it was a business of wrongdoing.

23          There was never any acknowledgement from Rimini

24   to any customer that they were acting improperly.  There

25   was never a customer where they said "here's our business,

3500

1      we are going to infringe Oracle's software copyrights.  We

2      are going to violate the laws.  Come work with us."

3              They listed the companies.  These are the

4      companies that they were proud of, riddled with copyright

5      infringement.

6              And you'll remember -- I think IBM is somewhere

7      on here.  Yes, over there to the left, how they weren't

8      really working with IBM, they're just working with little

9      parts of some of these major businesses.

10             Again, it shows the business was built on

11     copyright violations.

12             Let's go to slide 30.

13             They talked about taking a billion dollars in

14     Oracle customers.  They thought they could take 5 to 10

15     percent of Oracle's customer base, and they talked about

16     bigger opportunities than $1 billion.

17             "That might have happened," said Mr. Maddock.

18             Mr. Zorn said "I have heard that."

19             They had to have the Oracle software to have a

20     billion dollar business.

21             And Safra Catz, the CEO of Oracle, said "We've

22     lost hundreds of customers."  And when you lose a

23     million-dollar customer for 10 years, that's $10 million.

24             But it's not just the money.  They broke the

25     relationship.  All right?

1              They went to the customers and said "we can

2     provide you the same service," which wasn't true, "and we

3     can do it for 50 percent off."

4              And so, guess what, some customers said, "Gee,

5     we're not as fond of Oracle anymore," right?  "We might

6     even be mad at Oracle.  Someone's offering us a better

7     price."  And, of course, that's happening because Rimini is

8     only doing that by taking Oracle software.

9              If one day you invented a great chocolate chip

10    cookie, and you started selling it on your block, and

11    everybody says "that's a great chocolate chip cookie," and

12    they just love you, and somebody copies your recipe and

13    sells the cookie for 50 percent off, the people on the

14    block are going to start thinking differently about you,

15    and that's what happened here.

16             Rimini was making lots of money.  Karen already

17    showed you, they knew that what they were doing was not

18    licensed.  They were making a crap load of money, they

19    said.

20             Next slide.

21             And they talked about their backlog.  They told

22    their investors about the backlog of orders they were

23    building up, growing from 100 million to 750 million by

24    2013.

25             Mr. Ravin tried to say that amount doesn't mean

3502

1      much -- doesn't mean much.

2              Mr. Zorn, the chief financial officer of the

3      company, said, "no, we tell that number to investors,

4      people we want to put money in our company."

5              Mr. Ravin would say whatever it took on the

6      stand to avoid what was going on here.

7              So we presented evidence of lost customers.  It

8      began with Mr. Yourdon, Mr. Yourdon, who had 25 years of

9      industry experience with enterprise software, including

10     consulting with customers who are making enterprise

11     software decisions.

12             There was no other expert of comparable

13     experience talking about what Mr. Yourdon talked about.

14             He reviewed materials, not just for 17

15     customers, for 200 customers, and he reached the conclusion

16     that most of Rimini's customers would have stayed with

17     Oracle if Rimini hadn't come along, that about 95 percent

18     of them would have stayed there.

19             Now, they show you slides and pictures about the

20     5 percent and say those people are different.

21             And Mr. Yourdon said, "No, they're not."  Okay?

22             Rimini came in and disrupted the relationship

23     with that 5 percent by promising 50 percent off and copying

24     the software.  But, otherwise, those customers would be

25     just the same as everyone else, and you would expect most

1    of them to stay with Oracle.

2              And no expert responded to Mr. Yourdon.  Nobody

3    from the industry came in here to tell you Mr. Yourdon was

4    wrong.

5              He also told you the customers would not leave

6    Oracle for illegal support which seems self-evident.  But

7    it's that same proposition.  If Rimini tells the truth,

8    they're not going to leave Oracle.  And there was no

9    response.

10             So we presented to you Elizabeth Dean who has 25

11   years experience estimating damages.  She's been in over a

12   hundred intellectual property cases and many copyright

13   cases.

14             She estimated total damages, once you make this

15   reduction that I've talked about, now we're going to put it

16   on the screen.

17             We've made the adjustment for the profits, the

18   additional profits.  And I put in red -- we put a little

19   red box that when you look at PX 2010 you have to take

20   $16.2 million off.  And that's how you get 229.7.

21             So let's compare that number to what Rimini was

22   saying internally.

23             Rimini took over $300 million in contracts from

24   Oracle.  They wrote that.  They wrote that in a document.

25   That's in 2009.  That's not even counting 2010, 2011, 2012.

3504

1              And Mr. Ravin admitted, that's right, they took

2      $300 million in business.

3              But Elizabeth Dean did not count all that

4      $300 million, and she showed you calculations.

5              I'm not going to go through the calculations.

6      But I want you to remember all those calculations she

7      showed you and ask you what did Mr. Hampton show you?  He

8      didn't walk you through any numbers like Elizabeth Dean

9      walked you through.

10             She also showed you how she wasn't counting

11     things and how she was removing customers.  She was

12     reducing the damages amount because she thought that was

13     the right thing to do, to take those things into account.

14             How she took the pieces of the pie out, how she

15     had a specific attrition rate that reduced the damage

16     amount by 25 percent.  And then she applied, on top of

17     that, the general attrition rate at Oracle.

18             Slide 44.

19             So these are these infringer profits that I told

20     you about.  So the 32.6 million is what Elizabeth Dean told

21     you about.  And we've reduced that by 16.2 million to 16.4.

22             The reason we did that is because after

23     Elizabeth Dean testified, Mr. Zorn testified about profit

24     margins, 49 percent for PeopleSoft, 50 percent for JD

25     Edwards and 70 percent for Siebel.

1                    And so we have reduced the amount of our claim

2     based on that testimony and based on the judge's

3     instruction; meaning that for PeopleSoft, where liability

4     has already been determined, the total copyright damages

5     are $71.6 million.

6                    The copyright damages, as we explained to you

7     before, go to Oracle International because 39 percent of

8     that money goes to Oracle International.  And the Court has

9     instructed you that we're correct, that Oracle

10    International Corporation is the owner or exclusive

11    licensee of the copyrights at issue.

12                   The damages for Siebel are 15.3 million, this is

13    copyright; and JD Edwards, 6 million.  And Elizabeth

14    Edwards -- Elizabeth Dean also broke down the profits by

15    customer.  This is PTX 5469.  She did it customer by

16    customer for you.

17                   So the next item of damages is Oracle Database.

18    This is another area where the Court has said that there

19    has been copyright infringement.

20                   You're not deciding whether there's copyright

21    infringement of Oracle Database, the Court has already said

22    there is.  You'll decide whether this amount should go into

23    the copyright damages.  And we have included it in our

24    total copyright damages.

25                   And the way this was done was $19.2 million.

1    Elizabeth Dean explained this to you.  This is either the

2    license value, if you pay for it, or the lost profits.

3         But she took the standard Oracle license fee,

4    she applied it to the number of actual environments used,

5    and applied that over time to get $19.2 million.

6         Mr. Hilliard, a technical expert for the

7    defense, appeared to say, well, gee, they could have put

8    this all on two computers.  That doesn't matter.  That's

9    not how Oracle prices things, and the Court has already

10   found liability.

11        The Oracle Database damages are actually kind of

12   simple.  Rimini agreed with me, Mr. Hampton agreed that

13   Rimini agrees that it would pay what Oracle actually

14   charges customers.  You only have to look at what Oracle

15   actually charges customers.

16        And Mr. Allison testified about that and said

17   Ms. Dean has it right, she's calculating how we charge

18   customers.

19        And "Could Rimini have bought one license from

20   Oracle to allow it to use Oracle Database to support

21   multiple customers?"

22        "Absolutely not."

23        And he said "Dean applied Oracle's actual

24   pricing for Oracle Database."

25        And Mr. Hampton testified that he had no

1    understanding about how Oracle does its pricing.  He became
2    irrelevant on this database question.
3              Next slide is the statutory damages.
4              I went over this on the verdict form.  93 works.
5    And these works are in tab 1A of your juror notebook.
6    There's a hundred of them, but we are only asking for 93.
7              And so 93 times $150,000 is $13.9 million
8    because you can award 150,000 if you find what happened
9    here was willful.
10             And here's the tortious interference damage, the
11   lying damages, $194.1 million, and those were on the
12   verdict form.
13             Why are we asking for this?  Because of those
14   lies.
15             The evidence is -- I showed you this in opening.
16   How many Rimini customers were told the truth?  At the end
17   of this trial you know it was zero except Mr. Leake.
18             The evidence.  Who would have gone to Rimini?
19   They would have had no credibility if they told the truth.
20             They found two customers, Bausch & Lomb and XO
21   Communications, who you've heard a lot about, but they're
22   only two customers, but even they would not say they would
23   have gone to Rimini, they just said they wouldn't have gone
24   to -- back -- they wouldn't go to Oracle -- they wouldn't
25   stay with Oracle.

1            But Elizabeth Dean explained to you she took

2    into account customers like that that were going to leave

3    anyway.  No one would have hired Rimini.

4            This was longer than the 20 seconds timers.

5            I read out loud to you, to Elizabeth Dean, 17

6    customers' testimony.  And she explained to you how this

7    related to her opinion.  Because everybody who was deposed

8    in this case, every customer agreed they would not have

9    gone to Rimini if they were illegal.

10            So -- and then here's the damages for computer

11    fraud.  The 14.4 million is just the customers during the

12    period when Mr. Hicks was analyzing his downloads, and

13    $34.9 million is the entire Siebel business, and 27,000 is

14    the cost of investigation.

15            So let's go to slide 59.

16            The only thing -- Rimini is saying that the

17    damages should be 9.4 to $14 million.  That -- they're

18    telling you that is a fair number.

19            This company broke the law, they lied, and now

20    they're telling you it's a fair number.

21            Think about it.  If this was a fair number, why

22    would they be telling you this?

23            This is the last big lie in the case.  And now

24    we know it was planted early on with Mr. Hampton in a

25    deposition by Seth Ravin.

1              This is the same company that lied to customers,

2       that lied to their sales and marketing people, that lied to

3       the Court, and now they're telling you "this is the right

4       number to award, please believe us."

5              One reason they are saying this is they say,

6       "well, gee, we had other competition."

7              Now, the evidence said that until October of

8       2008, the only competition was this TomorrowNow, which went

9       out of business and about how you've heard about.  They had

10      no credible competition.

11             In fact, their documents showed that -- even as

12      late as 2009, that they knew the customers were going to

13      stay with Oracle if they didn't come with -- to Rimini

14      Street.

15             Mr. Maddock wrote, "we have no competition."

16             The sales FAQs say, "software licensees are

17      typically evaluating between moving to Rimini or the

18      software vendor Oracle."

19             The sales and marketing witnesses, Mr. Maddock

20      and Mr. Rowe, both agreed their most frequent competitor

21      was Oracle.

22             Slide 63.

23             You heard a lot for a while about all these

24      companies, but the end of the day it boiled down to this

25      slide; self-support.

1          You heard about all the risks, about how that's

2     about driving without insurance.  Only 5 to 10 percent of

3     the time, according to Mr. Rowe, did self-support compete

4     with them directly.  In less than 5 percent of the time did

5     consulting firms compete with them directly.

6          And Elizabeth Dean told you she took that into

7     account when she used her attrition rates.

8          When we talked about the other third-party

9     providers this became comical.  NetCustomer, LegacyMode,

10    and Abtech only took two customers collectively.  These

11    companies were like unicorns that nobody ever heard of

12    before this case.

13         Versytec wasn't even selling the right product.

14    And Spinnaker only sold JD Edwards support.  And by 2009

15    Rimini was in the process of destroying Spinnaker.  They

16    were never for choice, they were about burying Spinnaker.

17         So at the end of the day it came down to

18    Mr. Hampton with a made-up damages theory, a new story to

19    tell you, something else Rimini made up called value of use

20    for avoided costs.

21         Next slide.

22         He said, "I did, as I said in my direct, develop

23    my own theory."

24         He talked about hundreds of cases, and he'd

25    never given an opinion about this before.  He came up with

1    it just for you and Rimini.

2              It had nothing to do with his professional

3    standards, it had nothing to do with accounting standards,

4    and it compared to Elizabeth Dean, who was using standard

5    methodologies.

6              This is how they tried to illustrate it for you.

7    I think it was from opening statement, maybe it was some

8    other part of the trial.  But we put Harry Potter in the

9    middle.

10             They tried to say, "well, we were only

11   infringing at the edges."

12             But the actual evidence shows they were

13   infringing through the whole thing.  They weren't taking a

14   few pages out of Harry Potter, they were taking the whole

15   book.

16             And let's talk about that avoided cost theory.

17   Here's how that theory works.

18             You have a car crash.  Someone hits you.  They

19   cause your car $4,000 worth of damages because they've got

20   detective brakes.

21             To fix those brakes, it would have only cost

22   them $200.  They could have avoided the cost by paying

23   the$200.  So rather than paying you $4,000 for the damage

24   they've done to your car, under this damage theory, they

25   pay you $200.

1          The example that I confronted him with was, I
2   asked him what about a blowout preventer in the Gulf of
3   Mexico that could be fixed for a thousand dollars, and I
4   asked -- and I asked, "should you look at what the Gulf
5   would have looked like in your but-for world?"
6          He said, "Yes, you can frame it that way."
7          But then he realized he had a problem because I
8   asked him the question, "So is it your opinion that the
9   proper measure of damages is the value of use, that is, the
10  thousand dollars to repair the blowout preventer?"
11         And he said, "The circumstances are different
12  and so there would be a different method."
13         I said, "That would be ludicrous to say that,"
14  because it is ludicrous.
15         And he says, "I don't know."
16         He had to admit that his avoided cost has
17  nothing to do with theories of lying because not lying is
18  always free.
19         It wasn't just ludicrous, it became offensive.
20         I asked him about what do you do with someone
21  who steals from investors?  How do you deal with that?  Is
22  it just the -- do they just get the value of not lying?
23         And he said, well, you have -- real question,
24  "when an investor loses their money to a crook, maybe they
25  would have found another one."

1              And then, in his world, you would actually say,

2       well, they would have thrown that money away anyhow.

3              And in another case we learned, *Ajaxo* -- I

4       painstakingly read him his deposition in that case, where

5       he took that same theory of avoided cost, and he multiplied

6       the number by six.

7              Why?  Because he was working for the plaintiff.

8       He called that a loaded question.  And it was.  But it was

9       factually true.

10             Instead of $14 million, he would have multiplied

11      it by 6, which is $64 million, which was PeopleSoft only,

12      which is higher than Elizabeth Dean's number.

13             Mr. Hampton talked repeatedly about assumptions.

14      He said, "I make assumptions constantly to calculate

15      damages, and I don't have time to go through with you all

16      these assumptions."

17             These were things he was making up.

18             Even if Mr. Hampton opened up his fairytale book

19      of avoided costs, he had no facts.  He just assumed.

20             He had -- he made only PeopleSoft assumptions.

21      And then he made up the fact that he did this 75 percent,

22      15 percent, 10 percent calculation.

23             Do you remember when I spent time on that?  I

24      spent time on that because he was making that up.  His

25      avoided costs ignored Siebel and JD Edwards.

1          But the final thing he made up was Rimini could

2     have done this remotely from India; one of the last of the

3     walls of lies to come down.

4          He assumed a brand-new business.  Rimini's

5     actual business was 80 percent Rimini environments, zero

6     percent purely remote, because they all depended on the

7     fixes and updates, and all from the US.  And now it was

8     going to go 100 percent to India, and he just assumed that

9     would work.

10         It turned out the customers don't want offshore

11    support.  We showed standard language in document after

12    document saying that.

13         It turned out -- he said, well, it would only

14    cost $19,000 to hire an engineer from India.  It turned out

15    the consultants were $75,000, which makes the cost four

16    times higher.  And if you take 9.4 times 4 and multiply it

17    by 6, instead of 57.7 million, you get $225 million.

18         In fact, he said, "Well, those are only

19    consultants."

20         Well, Rimini's documents showed in 2007 they

21    knew how much employees in India cost, $60,000.  That's

22    three times as much.  That gets you to 168 million when you

23    multiply by six.  Elizabeth Dean is much less than that.

24         He made up everything he said about India and

25    called it an assumption.

1          He didn't check the assumptions.  He assumed

2     they would have the same number of customers.  He assumed

3     it was acceptable to work from there.  He assumed customers

4     would build their own environments.

5          Great news, Customer, we've been building all

6     these things for you, now we want you to do it yourself,

7     and it's going to take weeks and months to do that.

8          He assumed you would be able to finance all

9     this, even though he didn't talk to a single lender.

10          I showed him documents where Rimini said "this

11     doesn't work"; and he said "I assumed the opposite of

12     that."

13          The ship in a bottle, in a bottle.

14          He assumed they solved that problem.  And in

15     October 2010, they still had not solved the problem.

16     Remote, whether it was from India or the United States, was

17     built into several levels of bottles.

18          He ignored the wild, wild west that the Rimini

19     engineers were talking about.  Remote access was like the

20     wild, wild west.  And here's what the -- here's what people

21     wrote about remote access.

22          "It defies our business model; it's literally

23     insane; pain; hate; ridiculous; last resort; shooting

24     ourselves in the foot if we do any of these deals."

25          And what did they tell you in this trial?

3516

1    That's just whining; his opinion; commentary; I disagree;

2    we could have do that.

3              None of that was true.

4              Mr. Hampton made up testimony at least four

5    times -- slide 90 -- slide 90 -- that was the opposite of

6    what he told you at deposition.  And I showed you those

7    tapes.

8              Slide 92.

9              He relied for his head counts on Mr. Benge, and

10   Karen talked to Mr. Benge at length about how he just made

11   up those numbers, didn't have any calculations, didn't have

12   any errors, it was just something he came up with.  That

13   didn't quite turn out to be true.

14             But what Mr. Hampton initially said was he

15   relied on Mr. Benge.  When he did that, he violated his own

16   professional standards.  And I went through these

17   professional standards.

18             It has to be testable.  And Mr. Benge said he

19   had no calculations, nothing that anyone could check.

20             Mr. Benge had to be qualified.  Mr. Benge said

21   there was no formula for this, it wasn't a scientific

22   calculation.

23             It had to be corroborated.  It was not

24   corroborated.  It was -- only came from Mr. Ravin

25   beforehand in an earlier deposition.

1             And was it just for purposes of this litigation?

2      Yes, it was.

3             More numbers were made up by Rimini accounting.

4      I showed you this document with Mr. Hampton.  This is what

5      the document that Mr. Zorn gave him.

6             And this is where they were telling him, "Here

7      is where we want you to end up."  In just five of nine

8      years -- and you remember, this is the one where it turned

9      out they did numbers for US engineers and India engineers.

10     And for the US engineers, which is the numbers they didn't

11     want to use, for five of the nine years at issue in this

12     case, the numbers were 25.3 million.

13            If you make that $40 million over nine years and

14     multiply that by six, as Mr. Hampton did in his other case,

15     just the PeopleSoft lost profits would be $240 million.

16            Elizabeth Dean was being very, very

17     conservative.

18            When Mr. Hampton was confronted with this, that

19     he was contradicting Mr. Zorn and Mr. Benge, he just threw

20     them under the bus, said the same thing about both of them,

21     they're confused, the Rimini witnesses are confused.

22            I also showed you that Rimini's accounting

23     department prepared Mr. Hampton's calculations.  You -- he

24     denied this.

25            But if you look at DTX 3018 and PTX 6008 and

3518

1    compare them, you'll find out that Mr. Hampton wasn't doing

2    his work, that these schedules were coming from the Rimini

3    accounting department.

4              At the end of the day what we learned was the

5    end of the story, this didn't come from Mr. Benge.

6              It all broke down during the examination of

7    Mr. Hampton because then what he said was, "oh, no, no, no.

8    So Mr. Benge wasn't telling me it was going to be doubled.

9    I asked him give me the head count of the people would be

10   doubling."

11             He said going into the meeting he already had

12   the assumption there would have to be twice as many people

13   in certain categories.  So he didn't get that from

14   Mr. Benge.

15             Where did he get that?  The one place it came

16   from, a 2011 deposition of Seth Ravin.

17             This man who came to you and said, "I'm an

18   expert," went to Mr. Benge having heard that Mr. Ravin said

19   the head count should be doubled, he walked into Mr. Benge,

20   according to his own testimony, said "tell me which

21   categories should be doubled."

22             Mr. Hampton's testimony was the last bit of

23   concealment in this case, and it broke down.

24             The whole analysis of Mr. Hampton started with

25   Mr. Ravin saying "we could have done this all legally and

1    properly with only twice as many people."

2              It was the buried lie of Seth Ravin that they

3    did not want you to know about because they want you to

4    award damages such as they're suggesting and not as

5    Elizabeth Dean is suggesting.

6              It's time for the truth though.  We want you to

7    fill the verdict form based on the truth.

8              The truth has come out.  The library existed.

9    The cross-use existed.  The environments existed.  They

10   were full of Oracle software.  And the proper amount of

11   damages is not something that was fed to an expert by Seth

12   Ravin.

13             Now I'm going to get a chance to talk to you one

14   more time, much more briefly.  You're now going to hear

15   from the defense.

16             We're very appreciative of your time and

17   patience, and I look forward to having a few last words

18   with you.

19             THE COURT:  Thank you, Mr. Isaacson.

20             Ladies and gentlemen, I'd rather not interrupt

21   the defense closing argument, so I'm thinking to take a

22   short break at this time for 10 to 15 minutes, and that way

23   we should be able to go straight through with the defense

24   closing, and then there would be a fairly short rebuttal on

25   behalf of plaintiff.

1          So you still can't discuss the case or allow

2     yourself to be exposed to anyone who is discussing the

3     case.  You still should be keeping an open mind, and we'll

4     step down, take a short break.

5          When you're ready to come back in, we'll get

6     started.  Thank you.

7          You may go ahead and step down.

8          (Recess from 1:20 p.m. until 1:39 p.m.)

9          (Jurors enter courtroom at 1:39 p.m.)

10          COURTROOM ADMINISTRATOR:  Court is again in

11     session.

12          THE COURT:  Have a seat, please.

13          The record will show we're in open court.  The

14     jury is all present.  The parties and counsel are present.

15          And, Mr. Webb, it's your opportunity to present

16     the defendant's closing statement at this time.

17          MR. WEBB:  Thank you, Your Honor.

18          Why?  Why is it that Oracle spent nearly two

19     weeks putting on evidence of conduct Rimini Street had

20     already admitted trying to reprove infringement that the

21     judge has already found?

22          In opening statement I told you, I told each of

23     you, that Rimini had copies of Oracle software on their

24     servers, lots of copies.

25          I told you that we'd downloaded files from the

1    Oracle website many times.  I told you we reused updates

2    for some clients and cloned environments for some clients.

3    I admitted to that.

4              In fact, despite Mr. Ravin's good faith belief,

5    I told you the Court found that Rimini Street had infringed

6    Oracle's copyrights.

7              It is Oracle's burden to prove that our

8    infringement caused them damages.

9              But what did they do?  They spent nearly two

10   weeks calling witness and witness, piling on document after

11   document, trying to prove to you something that you already

12   knew and what you knew from jury selection.  Why?

13             I have a son.  His name is Truman.

14             Back when he was in the third grade, I helped

15   coach his baseball team.  By coaching, that's sort of a

16   misnomer.  I was basically in charge of making sure the

17   kids didn't hurt themselves in the dugout.

18             You see, all the other dads, they knew something

19   about baseball.  They would help the kids with their swing

20   and their fielding technique and their throwing technique,

21   and my job was just to make sure they didn't jack around

22   too much.

23             But when a game came along, while the other dads

24   were telling their sons you got to do this, you got to do

25   this, you got to do this, I simply just had one piece of

3522

1    advice.

2              In a baseball game with little boys, it's a lot

3    of activity.  First of all, they're with their buddies,

4    and, boys, when they're with their buddies, all they want

5    to do is play, horse around, wrestle.

6              And then there's the dirt.  Nothing is more

7    fascinating to a third-grade boy than dirt.  They like to

8    play in it, they like to throw it, they like to pour things

9    into it.

10             And then, during the game, when they're trying

11   to hit the ball, you got mom in the stands carrying on a

12   full-on conversation with their son as he's trying to hit

13   the ball.

14             And while the other dads are giving him

15   technical advice about exactly how to do their baseball

16   thing, I only had one piece of advice:  Watch the ball.

17   Just keep your eye on the ball.

18             And a funny thing happened.  When they could

19   actually do that and tuned out all the distractions and

20   diversions and all the noise, if they focused on that one

21   thing, just keeping their eye on the ball, they could

22   actually hit it, they actually could get their job done.

23             That is the same advice that I have for each and

24   every one of you in this case.  Ignore the distractions,

25   ignore the diversions, and just keep your eye on the ball.

1              Ladies and gentlemen, I give to you the ball.

2      This is the most important instruction in the entire case.

3              This is the instruction about causation.  And if

4      you follow this instruction, as you're required to do,

5      Oracle's claim for $229 million in lost profits is dead.

6      And it died Thursday, September 24, at 9:51 a.m.

7              The reason Oracle spent all of this time, almost

8      two weeks of trial, telling you about all the copies and

9      downloads is because they don't want you to see the ball.

10     That's something that you did not see in two hours of

11     closing argument from Oracle's lawyers.  Why?

12             They hope that you'll be so distracted by these

13     acts of infringement, the number of copies and downloads,

14     that you'll forget that the ball even exists.

15             This is the instruction on causation, and

16     causation is a very important legal principle that it's

17     critical, absolutely essential, that you all understand.

18             Causation is that link between Oracle's proof of

19     infringement and their proof of money.  They have to link

20     together, and that link, that critical link, is called

21     causation.

22             Let me give you an example of what that is.

23     Let's say you have a car.  You get a notice from the

24     manufacturer that your alternator is defective, the

25     alternator doesn't work.

1            The next day, you're driving home from work.

2       You go to a stoplight.  There's a car stopped in front of

3       you.  You go to step on the brakes, the brakes don't work.

4       You step on them harder and harder and harder, and, boom,

5       you hit the back of the car.

6            Now, the alternator is defective.  But did it

7       cause the accident?  The defective alternator, no question

8       it's defective, and sooner or later the manufacturer will

9       have to be held accountable for the defective alternator.

10      But that's not the issue.

11           Did it cause the crash?  No, of course, not.

12      The brakes failed and they caused the crash.

13           It's not fair to hold the manufacturer of the

14      alternator responsible for something that it did not cause.

15      It's not fair and it's not the law.

16           Simply put, you haven't seen any real proof from

17      Oracle for that causation piece to tie the infringement to

18      the money.

19           What they've resorted to is rank speculation and

20      guesswork from a single paid expert witness who was on the

21      stand for about an hour in a three-week-long trial.  And

22      his job was simply to tell you what he thought our

23      customers were thinking.

24           Simply put, Oracle cannot meet its burden.  It

25      cannot meet the burden to prove causation because they

3525

1    cannot show that our infringement caused their lost
2    profits.
3              They have to prove that our infringement, the
4    things that we did the Court found to be infringing, local
5    hosting, reusing updates, using automated downloading
6    tools, that those things caused their lost profits.  The
7    evidence simply does not exist.
8              They needed to make that connection.  They
9    needed to put that link together.  They relied on
10   Mr. Yourdon to do that.  And when he left the stand at
11   9:51, Thursday, September 24, their claim for lost profits
12   died.  Their own expert broke the causal chain.
13             Now, one of the things that's in dispute in this
14   case, among many things in dispute, is where our customers
15   come from.
16             You've heard testimony in this case about how
17   Oracle loses roughly 5 percent of its customers every year.
18   That's called churn.  It's called attrition.
19             Every year 5 percent of these folks leave.  And
20   you've seen testimony, you've seen the documents, they
21   leave for a bunch of reasons, but they leave every year.
22             The big dispute is you have two world views.
23   You've got Oracle's world view which says all our customers
24   come out of this group, the 95 percent who are apparently
25   overjoyed to be Oracle customers.

3526

1          We will tell that you our customers are already

2    out the door.  They are tired of the service, they're tired

3    of being mistreated, unresponsiveness, they're just ready

4    to get out to look for something else.  And we provide them

5    a place to land.

6          So who do you believe?  Are they these folks, or

7    are they these folks?  Because this churn happens every

8    year.  And they have to go somewhere.

9          Mr. Yourdon answered that for you.  On the stand

10   on Thursday morning, September 24, he was asked this

11   question:

12          "All right.  So in the real world we know that

13   Rimini's customers are not part of the 95 percent that stay

14   with Oracle, they're part of the 5 percent that are left;

15   correct?"

16          His answer, "Yes."

17          Their own expert told you that these folks are

18   coming out of the 5 percent who leave every year.  And that

19   stands to reason.

20          For example, let's say we're syphoning customers

21   who are perfectly happy to be at Oracle.  We would take

22   those folks away from Oracle, dislodge them from Oracle.

23          You would expect that attrition to go up; right?

24   You'd expect that number to increase because we're taking

25   folks from here.

1            The attrition chart would look like this because

2    every year, as Rimini grows and starts getting more

3    customers, the pie would get bigger and bigger and bigger.

4            But what did you see in this case?  You saw

5    this.  Fewer people are leaving, not more.

6            That shows you that that Mr. Yourdon was right

7    and that we're right, that we're taking people who are

8    going to leave anyhow.

9            And our biggest product line, as you heard in

10   this case, is PeopleSoft.  That's the vast majority of

11   products that we service.

12           Look what's happened to the attrition.  On

13   PeopleSoft for Oracle, it's been cut in half.  If we were

14   truly taking folks out of here and not from here, that

15   simply would not exist.

16           Oracle knows this to be an issue.  They have to

17   know this is an issue.

18           They called Mr. Yourdon up to the stand to

19   provide that causal link, and he did not.  That's why you

20   didn't hear one word about the ball in two hours of closing

21   argument.

22           You would have expected for someone that

23   important to their case to be on the stand for hours and

24   talking to you in great detail about how causation is

25   proved.

1                    That's not what you saw.  Now you saw that when

2        it came to them proving about where all the software goes

3        at Rimini Street, detailed charts and graphs, tracking

4        software from point A to point B and cross-use and

5        downloading.

6                    I mean, that was impressive stuff.

7                    And then Ms. Dean, when talking about the money,

8        you saw charts and detailed graphs and tables, again very

9        impressive stuff.

10                    So they got this piece really down to spades,

11       and this one too.  But when it came to link them,

12       Mr. Yourdon said he would know what the customers were

13       thinking.  That's the sum total of what he said.

14                    He said that, "In my opinion, what they

15       generally would have done is renewed at the support rate

16       that they typically saw," the historical support rate.  He

17       told you what our customers were thinking.  That's the sum

18       total of his deposition.

19                    And what did he rely on?  How did he get to that

20       point?  He told you that he relied on some depositions.

21                    Now, let me set that table for you here.  At

22       that time we had about 450 customers, Rimini Street

23       customers.

24                    Oracle's lawyers picked 17 of those for

25       deposition, and they took their depositions.  Mr. Yourdon

3529

1    reviewed all 17 of those depositions.  But he admitted
2    this:
3              "QUESTION:  And you didn't select those 17
4    customers from Rimini's customer list, did you?
5              "ANSWER:  No, I did not.
6              "That's not a representative sample that you
7    chose?
8              His answer, "No."
9              "In fact, it was Oracle's attorneys that
10   selected those 17 customer deposition transcripts that you
11   reviewed, sir; isn't that correct?
12             "My understanding is that they gave me the
13   transcripts of all that they deposed, but I believe that
14   they were the ones who chose which customers they did
15   depose."
16             So Oracle's lawyers picked presumably the 17
17   best customers for their case, took their deposition, and
18   then handed them -- cherry picked them and handed them to
19   their expert so he could tell you what they're thinking.
20             "QUESTION:  And in connection with that
21   analysis, you did not conduct any mathematical or
22   statistical analysis regarding whether Rimini's clients
23   would have renewed at Oracle's historic retention rate, did
24   you?"
25             His answer is no, he did not.

```
 1                And then Ms. Dean.  Ms. Dean relied upon the

 2    causation proof that Mr. Yourdon provided to you.

 3                "QUESTION:  And you don't know what questions

 4    the customers asked Rimini, do you?

 5                "ANSWER:  I depend on Ed Yourdon, for example,

 6    his testimony was pretty clear about what customers

 7    consider.

 8                "QUESTION:  What customers consider, but he

 9    didn't have any direct evidence of what the customers asked

10    other than the 17 depositions; correct?"

11                Her answer, "I think that's correct."

12                And she goes on,

13                "And, finally, you don't know the factors that

14    those 228 customers actually concluded were deciding

15    factors in making their decision to leave Oracle and to go

16    to Rimini, correct, Ms. Dean?

17                "Yes.  If you're talking about each individual

18    customer, that evidence has not been provided in this

19    case."

20                Let's talk about the ball.  It says, "For Oracle

21    to recover damages, it must prove that the infringement

22    caused damages."

23                Then it goes on to say, "Infringement caused

24    damages if the infringement was a substantial factor in

25    causing the damages."
```

3531

1          And then we have this.  "Conduct is not a

2     substantial factor in causing harm if the same harm would

3     have occurred without that conduct."

4          If people were already leaving, that's not

5     causing lost profits.

6          This means that if a client left Oracle

7     International Corporation for reasons unrelated to Rimini

8     Street, Rimini Street's infringement, there is no causal

9     relationship and therefore no lost profits damages as to

10    that client.

11         In other words, if these folks were leaving for

12    reasons other than Rimini Street, they get no lost profits

13    for those customers.

14         Here's something interesting.  Mr. Yourdon would

15    have Bausch & Lomb in the group of customers that were

16    happy to stay at Oracle.

17         You heard Mr. Baggett testify just last week.

18    Did he sound like he was one of those customers that were

19    more than willing to stick around at Oracle?

20         What he told you was this.  He said that he had

21    decided to leave Oracle long before he ever heard of Rimini

22    Street because of poor service, unresponsive service.

23    Because of the treatment that he received at the hands of

24    Oracle, he was going to leave.  He was on his way out the

25    door.

1          He said that he was not going to go back to

2     Oracle no matter what.  But Mr. Yourdon said, no, he's one

3     of the folks who would have stayed.

4          Now, let me ask you this.  If Bausch & Lomb and

5     Brian Baggett made the cut for 17 of the best customers for

6     Oracle, can you imagine what the rest of those folks would

7     say?

8          See, Mr. Baggett represents the danger of having

9     an expert paid witness tell you what other people think.

10          He told you that Bausch & Lomb was going to

11     stay, that Rimini pulled them away from the company.  But

12     Brian Baggett told you that's not at all the case.  That's

13     the risk of relying on an expert witness in place of proof,

14     in place of real proof.

15          Now, this is another instruction.  Let me tell

16     you a little about instructions.  You're hearing that

17     thrown around a lot.  Let me try to give some color to what

18     that means.

19          In evenings when you all go home and go about

20     your day-to-day lives, you may be wondering what all these

21     lawyers do and the judge and his staff do.

22          The instructions is a big part of it.  This is a

23     very huge undertaking by everyone.  And the judge and his

24     staff work really hard to give these to you because these

25     are critically important.

1            You can think of them as the user manual for

2   being a jury.  They tell you the rules of the road, how you

3   do things, what you're supposed to look at, and what you're

4   supposed to be governed by because it's the law.

5            Here's another one of those very important

6   rules.

7            "Your award must be based on evidence, not

8   speculation, not guesswork, and not conjecture."

9            And if you follow this instruction, you also

10  have to disregard entirely Mr. Yourdon's testimony because

11  that's all it is.  And Brian Baggett proved you can't

12  believe his speculation.

13           So what did you see?

14           All right.  You may have been scratching your

15  heads a little bit when you saw us play all these customer

16  videos because in this every single one the customer's

17  asked the question, "If you knew Rimini infringed, would

18  you have gone with them?"  And every single one said "no."

19           And you're thinking why is Rimini Street playing

20  these customers when they're obviously proving Oracle's

21  case?

22           What you just saw there was called the

23  no-brainer.  It's a lawyer tool, a trick, that is meant to

24  achieve something other than what the question really asks.

25  Let me explain how that works.

3534

1          Let's say I went to dinner last night at the In

2   'n Out Burger.  And, by the way, we don't have those in

3   Kansas City.  It's like dessert, it is so good.  But let's

4   say -- oh, man, they're good.

5          Let's say you went there for dinner last night.

6   The next day -- this tool would be used like this.  Well,

7   if In 'n Out Burger was closed, would you have eaten there?

8   Well, of course not, you're not going to eat there, it's

9   closed.

10          But then the logical extension goes like this.

11   Well, obviously, then, you would not have eaten at all last

12   night.  Because it was closed, you would have stayed with

13   the status quo.

14          Now, that doesn't make sense, does it?  I mean,

15   you're hungry, you obviously went to In 'n Out Burger

16   because you're hungry.  You might go to Taco Bell or to

17   McDonald's.  You might even go back to your house and do a

18   little self-support and fix yourself a sandwich.

19          It doesn't fit.  It's meant to be one of those

20   questions that sound really logical, and you go, wow, that

21   makes perfect sense, but when you dig in, it doesn't.  And

22   it's founded upon a very weird, back-to-the-future sort of

23   hypothetical.

24          The customers were asked in 2011, if you would

25   have known in the future a decision would be made that

1    Rimini was infringing, would you then in the past have made

2    a different decision about what you would have done?

3              There are multiple time shifts going on there.

4    It does not prove what they claim it proves.

5              And here's what else we know.  We're not the

6    only ones who caught this little trick.  Rhonda Minks, you

7    may have seen her deposition video.  She's the one who was

8    tickled pink by Rimini's services.

9              She was asked the same question.

10             "And if Brazoria County knew that it was a

11   violation of PeopleSoft license and it knew that Rimini

12   Street would do that, would it have contracted with Rimini

13   Street?"

14             She's a bright one.  Here, listen to her answer.

15             "I don't know.  I don't think you want me to --

16   I mean, if you're saying, 'Hey, somebody is going to do

17   something wrong; are you still going to go with that?"  I

18   mean, the common answer would be, no, you're not going to

19   want to do something wrong."

20             She caught on to the little trick here that by

21   answering that question, it's not achieving what they

22   really think it wants to achieve.

23             And here's the poster child as to why this

24   question doesn't prove anything.  It's Brian Baggett.  He

25   was asked that question in his deposition and asked this

1    question at trial.

2              "And, Mr. Baggett, during your deposition, you

3    were asked if you would have gone to Rimini Street if you

4    thought they were infringing?"

5              His answer, "I believe I answered that, yes.

6              "And what was your answer?

7              "No."

8              He said on the stand in this courtroom right in

9    front of you, he said he would not have gone to Rimini

10   Street if he thought they were infringing.

11             But what else did he say?

12             "Back when Bausch & Lomb was considering options

13   for software support, if Rimini Street was not available as

14   an option for whatever reason, would Bausch & Lomb have

15   gone back to Oracle for support?"

16             His answer, "No."

17             Do you remember the third essential truth that I

18   talked about in opening statement?  I said in this case

19   we're going to establish these three essential truths.  The

20   third one is there's no evidence that any Rimini client

21   would have stayed and paid with Oracle.

22             Case in point, Brian Baggett.

23             And we'll get to these other depositions, as

24   well, and we'll show you with all these customers, they had

25   already made their decision to get out, and we just

1       provided a place for them to land.

2              One thing we do know for sure, no customer took

3       that stand and said, "You know what, if I would have known

4       this, I would have gone back to Oracle."

5              No customer took that stand and said, "Rimini

6       lied to me, they misled me."

7              And no customer took that stand or testified in

8       any deposition that, "Rimini didn't treat me well.  They

9       gave poor service.  They did not follow up on every promise

10      they made."

11             What did you hear from Brian Baggett?  He said,

12      "They never misrepresented anything to me.  They always

13      followed up on everything."

14             And here's something else you need to know.

15      Every video of every deposition taken by Oracle and played

16      to you in this trial, every single witness had a common

17      theme, "We love the service we get from Rimini."

18             Oracle spent two weeks pounding on issues

19      already admitted, to reprove infringement already found.

20             They spent two weeks calling my clients liars.

21      They were hiding the ball, assuming that by pounding these

22      issues, by hitting these documents and witnesses over and

23      over and over again, you would forget about the ball.

24             They called my client liars 72 times in the

25      closing argument you heard today; 72 times.  Yet they

3538

1      couldn't find it within their allotted two hours to mention

2      the ball one time.

3              They have a burden of proof here, a burden of

4      proof.  You heard about it from the judge's instructions.

5              And this is one of those other really important

6      things you have to understand, just like causation.  I will

7      now talk about the burden of proof.

8              Now, some of you may think that when you come

9      into a court and the parties are 50-50 even, and one party

10     just simply has to slightly get more than the other, game

11     over.  That's not how it works.

12             Oracle has the burden of proof to establish the

13     infringement caused their lost profits.  They come in with

14     nothing.  They have to establish a burden of proof to get

15     over 50 percent in order to meet their burden.

16             They may bring forth some evidence, some

17     documents.  But if those documents are proved to be

18     irrelevant or otherwise countered, they go back down.

19             They may show you a customer deposition, but

20     then when you realize the customer doesn't answer the

21     question, it goes back down.

22             And that process continues until their case is

23     closed.  And if they have not reached the 51 percent, they

24     simply don't get lost profits.  Oracle has not proved their

25     case.

1           You've been here.  You've seen the evidence.

2    You've seen the rule that you have to follow now.  They've

3    not proved any Rimini process caused them harm.  We'll get

4    to that in a minute.

5           They didn't prove that 228 customers would have

6    stayed and paid, and they did not prove that any lie or

7    misrepresentation was relied upon by a client and was the

8    reason that client chose to leave Oracle.  We'll talk about

9    that soon as well.

10          Now, they spent two weeks putting on their case.

11   As you saw, we put on our case in just a few days, the vast

12   majority of which was their cross-examination of our

13   witnesses.  And we tried to focus on, again, our three

14   essential  truths.

15          Just like we talked about in opening, we came

16   back to this and went back to each and every one of those,

17   and we proved to you what was going on.

18          Now, let's talk about the first one first, and

19   that is, customers have the right to choose Rimini.

20          All right.  You saw the evidence and you heard

21   the testimony in this case that Oracle didn't actually

22   write the software for PeopleSoft or Siebel or JD Edwards.

23          They bought it when they bought the companies,

24   and so to the extent that you may think that this research

25   and development was related to writing the code for these

1      products, it wasn't.

2                  Now, Oracle acquired PeopleSoft and these other

3      companies to get access to their customers, 14,000

4      customers, and more than that to get access to the golden

5      goose of maintenance profits.

6                  But they were on a buying spree, and they wanted

7      to buy these companies to get access to the customers and

8      the money.  That's exactly what they did.

9                  But because of the way they acquired PeopleSoft,

10     they could not get access to a lot of their confidential

11     documents.

12                 In a lot of transactions you have a chance to

13     look through the company's books before you buy them.  In

14     this transaction, that wasn't possible.

15                 So they spent billions of dollars to buy

16     PeopleSoft, and then, and only then, could they see these

17     confidential documents including these very important

18     contracts with customers.

19                 They didn't know that they would face

20     competition for this maintenance business.

21                 Ms. Catz was on the stand, and I asked her,

22                 "But did you not think about whether Oracle

23     would be the exclusive option for maintenance; right?"

24                 And she answered, "I -- I didn't consider

25     anybody else doing it."

3541

1          "QUESTION:  Because, in fact, you didn't -- you

2    don't remember thinking about third-party support at all

3    when you acquired PeopleSoft, true?"

4          Her answer, "That's correct."

5          Imagine the executive suite at Oracle, after you

6    buy this company for billions of dollars, and then you

7    realize that all these contracts said a third party can

8    provide the maintenance too.  They hadn't planned on that.

9    That wasn't part of the deal.  But they were stuck with it

10   at that point.

11         Now, I told you in opening that Rimini Street

12   stood in the shoes of its customers, and it could provide

13   services for those customers within the scope of their

14   agreement with Oracle.  They acted on behalf of the client,

15   and if the client's not authorized, Rimini Street is not

16   authorized.

17         I asked Ms. Catz the same question.

18         "But a third party can stand in the shoes of the

19   licensee and perform the acts the licensee is permitted to

20   perform under the contract?

21         "ANSWER:  Yes, as long as that's actually

22   permitted in the license."

23         Now, I want to address one little slight issue

24   that kind of came out during trial, but I don't think

25   anyone focused on it, and that's this concept that in order

3542

1    to provide third-party service, you've got to be licensed.

2              Now, to the extent any of you think that's the

3    case, it's not.  This testimony from Ms. Catz establishes

4    that already.

5              More than that, when asked -- Juan Jones was

6    asked in his deposition,

7              "During your time at Oracle, are you ever aware

8    of Oracle granting a license to a third party for the

9    purposes of providing support for PeopleSoft's products?"

10             His answer, "I am not."

11             Rimini Street has the right to stand in the

12   shoes of its customer.  It has the right to perform

13   third-party maintenance.  It's not whether they could do

14   it, the question is how they do it.

15             And the Court found that some of the things we

16   did were outside the scope.  But the question of whether

17   they can do it is not at issue in this case.

18             You saw this quote from Ms. Catz during the

19   other side's closing argument.

20             "Does the company have any philosophy toward

21   these competitors, towards competition?"

22             She said, "Yeah; bring it on.  The truth is

23   competition makes you better.  It keeps you sharp, very,

24   very sharp."

25             But is that what you saw when you saw the

3543

1    depositions of Oracle's witnesses and the documents?

2              This is what you saw when it comes to

3    competition and my client.  "F Seth and his Rickety Street.

4    Let's be sure we don't overreact to these gnats."

5              And he goes on, "Let's go on the offensive."

6              Now, you also heard about a SWAT team designed

7    to engage in the war against third-party providers.  Does

8    that sound like bring it on to you?

9              And here's the other question.  When we talked

10   about all these customers leaving for various reasons, you

11   heard some testimony about they either go out of business

12   or bankrupt or they usually stick around.  You heard

13   testimony to that effect, right?

14             But Oracle's own documents reveal there's a lot

15   of reasons these folks leave Oracle support.  And more than

16   that, there are a lot of these third-party providers.

17   There are a lot of these providers out there for customers

18   to choose, and they knew a lot about them.  They went

19   through an analysis about what they could provide and how

20   they could provide it.

21             But there's the problem.  If there are other

22   options in the marketplace, their lost profits case becomes

23   weaker because it goes back to this.  It goes back to this

24   causation.

25             Because if a client left for some reason

```
1    unrelated to infringement, they can't prove lost profits,
2    so they're kind of in a pickle.
3              Because on one hand these third parties are out
4    there, but, on the other hand, that kind of hurts their
5    case.  So they came up with this device.  It's called the
6    vendor-level support, vendor-quality support device.
7              Mr. Yourdon said that, well, there are really no
8    other options that can provide vendor-quality support, so
9    these other third parties, we can ignore them.  It's just
10   Rimini Street.  They are the only ones who can actually do
11   this.
12             "QUESTION:  Did you draw a general conclusion as
13   to that question?
14             "My general conclusion was that none of the
15   companies that you see on this page, taking out Rimini
16   Street, you know, for purposes of this discussion, none of
17   the others represented a viable option."
18             They constructed this false world where the
19   standard is up here and, therefore, they can readily ignore
20   every other option.
21             And during cross-examination, my partner,
22   Mr. Reckers, walked him through all the factors that all
23   these companies think about when deciding to leave,
24   everything from cost to not wanting to upgrade to being
25   unhappy with service.
```

1               And Mr. Yourdon admitted, yeah, these customers

2       think about those reasons, and they are legitimate factors.

3               But when asked this question,

4               "And to understand why a particular client made

5       a support decision, you have to look at each client

6       individually and determine how each of these factors

7       weighed against those -- that client; correct?"

8               His answer, "Only, again, within the context of

9       whether there was an alternative that was available.  With

10      no alternative, to some extent all of these factors are

11      moot."

12              So, in other words, according to Mr. Yourdon,

13      you have a right, but it's not really a right.  The fact is

14      third parties are an option, and they have a right to be in

15      this business.

16              The first essential truth is absolutely valid.

17              All right.  And one other thing.  You saw this

18      slide earlier about how it's basically self-support,

19      consulting firms or third-party providers?

20              One of the things you didn't hear a lot about

21      from Oracle was this combination, this hybrid approach.

22              Mr. Baggett, I asked him, "Hey, listen, if

23      Rimini Street wasn't an option for whatever reason, would

24      you have gone back to Oracle?"

25              He said "No."

1              I said, "Well, what would you have done?"

2              He said, "Well, we were going to self-support

3     that part of the business we could self-support and then

4     farm out the pieces we couldn't, the HR piece."

5              We heard that from several other customers that

6     you'll see their depositions here in a little bit.

7              But the fact is these are not standalone,

8     all-or-nothing options.  Clients will do what's best for

9     their company, just like Mr. Baggett did for Bausch & Lomb.

10             All right.  We told you all along that these

11    customers did not receive anything they hadn't already paid

12    for.  And that's an important concept.  I want to make sure

13    you all know this.  And forgive me if I'm repeating

14    something that you understand.

15             But Rimini Street does not sell Oracle software.

16    We don't take Oracle software and sell it to someone else.

17    We don't give software to another company unless they have

18    the rights to have it.

19             The fact is no client gets something they

20    haven't already paid Oracle for.  Oracle has been paid in

21    full for this.  They've got their money.  We're not talking

22    about selling the car, we're talking about fixing it when

23    it breaks.

24             Here's an instruction on harm.  Again,

25    "Infringement caused damages if the infringement was a

1     substantial factor in causing the damages."

2              Now, I have another question for you.  Why is it

3     that in a two-week trial Oracle never once tried to explain

4     to you exactly what Rimini Street does?

5              Not one witness or expert tried to walk you

6     through exactly what Rimini does and how they do it.  They

7     put up charts and graphs about software, but they never

8     talked about our business.  Why is that?

9              The fact is our process did not cause them any

10    harm.  And if you actually understood what is really at

11    issue here, you'd be shocked by their claim when there is

12    no actual harm.

13             Now, we did our best to try to explain that to

14    you, and we probably were a little repetitive, but it's

15    important.

16             Seth Ravin took the stand and told you what they

17    did.  Jim Benge took the stand and told you how Rimini

18    operated.  David Rowe did the same thing.

19             Again, we're trying to make sure you understand

20    this, make sure you actually have a firm grip on what we're

21    doing.  It's really important for your job in this case

22    because of this.

23             And, again, it might be repetitive, but I've got

24    two hours -- I've got to talk about something -- two hours,

25    and I'm going to talk about this.

1          Local versus remote.  You all know this by now.

2     But there are two possibilities.  If we're hosting it,

3     they'd ship a big box of DVDs, and we'd load them one at a

4     time to create an environment on our servers.

5          Or the client would host those testing and

6     development environments on their servers, and we would

7     remote in over the Internet to work on their software.  So

8     two possibilities, local or remote.

9          The fact is customers got to choose which.  This

10    isn't like we're hiding this, it's in the contract.  They

11    said we'd like local or we'd like remote.

12         Now, listen, I'm not going to tell you that our

13    engineers were delighted about remote hosting.  It was

14    harder.  It was a pain in the neck.  But they did it.

15         And you heard testimony that from day one we

16    could have done all remote.  Despite all the India stuff

17    and other stuff you've heard, the fact is technically

18    speaking it's something we could have done from day one and

19    did, in fact, do from day one.  It was the customer's

20    choice, and they decided that.

21         The other thing you need to understand is that

22    just because they are local servers, local hosted

23    environments at Rimini Street, doesn't mean we have a big

24    server in the conference room in their main building.

25         The fact is you heard from Mr. Ravin that

3549

1    Rimini's servers are not in the building, they're in North

2    Carolina or some other place.

3              It's an IP address.  And those of you who

4    understand what an IP address is will know it's how you

5    type in.  You can access any server by the IP address.

6              Now, for remote there are firewalls and security

7    that you have to get through.  The bottle, in a bottle, in

8    a bottle, in a bottle thing, let's be clear about that.

9    That was one customer.  You heard from Mr. Benge that was

10   just one customer that had a unique situation.

11             But no doubt remote was harder.  But it was

12   possible, and the clients made that decision.

13             Rich Allison took the stand and talked about the

14   contracts that Oracle had with their customers.

15             "QUESTION:  Can the third party dial in remotely

16   to the customer facility and access and use the software in

17   that way?"

18             His answer, "Yes, I believe that would fall

19   under the access and use.

20             "QUESTION:  And so can the third party go to the

21   customer's site and access and use the software there?

22             "ANSWER:  I believe so.

23             "And could the third party access the software

24   in the customer's facilities remotely?

25             "Yes, I think so."

1          Oracle admits that, yes, in fact, remote is

2    permitted.

3          Shelley Blackmarr was asked,

4          "Have you supported remote clients whose

5    software is remote on their own sites?

6          "Oh, yes.

7          "QUESTION:  Have you ever -- can you think of an

8    instance where you were unable to do your job because the

9    software was at the client site instead of Rimini?

10         "No.  Everything that you could do locally you

11   could do remote."

12         I want to take a minute and talk about

13   Ms. Blackmarr.  Our first witness that we called in our

14   case was not a powerful CEO and the head of a very large

15   company.  It was our point person, the person on the ground

16   dealing with our clients on a day-to-day basis.  Shelley

17   Blackmarr.  She's a PSE, primary support engineer.

18         Do you remember in opening statement I told you

19   about how important those folks are to our business.

20   They're the people who talk to the client.  They're the

21   people who help the client out of bad situations.

22         You heard Mr. Baggett talk about his experience

23   with a primary support engineer.  He loved them.

24         This is who our company is.  She's not super

25   powerful, maybe she's not an expert on infringement, but

1    that tells you about our company.

2              And the evidence is that we could have applied

3    this remote model on all the products that we service.

4              Now, this question about whether or not harm is

5    caused by local versus remote, I asked Ms. Catz that

6    question.  I said,

7              "Is it your view that whether the software's on

8    a local environment or remote of the clients, that actually

9    has harmed Oracle?"

10             Her answer, "Yes, it violates our contract.  It

11   violates the license."

12             I said, "No, let me be clear.  You're telling

13   this jury that the location of that software, whether it's

14   on Rimini's servers or the client's servers, has

15   financially damaged Oracle?"

16             Her answer:  "Yes, the use of it beyond the

17   license damages Oracle, that's right."

18             With respect, I don't think that really proves

19   any damages at all.  The location of this software doesn't

20   hurt Oracle at all.  There's no financial damage associated

21   with the location of that software.

22             Reuse versus rebuild.  Recall how again when

23   we're developing -- when we're installing the software, the

24   client signs an agreement with us, and we basically, for

25   local hosted environments, we would replicate and create an

3552

1    environment on our servers.  That's what we just talked

2    about for local hosting.

3              Now, if we've already got one client's software,

4    the vanilla environment, on our servers, and another client

5    signs on and they have the exact same rights, rather than

6    loading those DVDs one at time, sometimes we would clone,

7    again, if they had the exact same rights.

8              So instead of actually loading those DVDs again

9    one at a time, we take the version we already have and

10   clone it to make another version.  That's cloning.  Again,

11   you guys probably know this, and forgive me for repeating

12   it.

13             Now, the tax and regulatory update piece.  The

14   tax rate goes up, our engineers would catch that change,

15   make a change to the version that we have on our site, and

16   ship it to the clients and install it on their version

17   running on their facilities.

18             If we have multiple clients with the exact same

19   release, the same rights, we would come up with one fix and

20   then apply it to other customers that had the exact same

21   rights.  That's the cross-use, the reusing of updates that

22   you've heard about in this case.

23             Now, Ms. Blackmarr took the stand and answered

24   questions -- I'll get to her in a minute.

25             So basically we will take that update and reuse

1    it with other clients with the exact same rights.

2              Here she is.

3              "And you would test fixes in one customer's,

4    environment and then another customer would receive the

5    fix?

6              "ANSWER:  If they were a binary equal, exactly

7    the same code."

8              "And it was common at Rimini Street to test

9    client fixes at one environment and then for the fix to be

10   sent to other clients?"

11             Her answer, "If they were binary equal, that

12   means the same release, and they were exactly the same."

13             That's when this reuse and these cloning

14   instances happened.  If a client did not have the exact

15   same rights, they were not reused.  They would be

16   independently updated one at a time for customized code.

17             Now, in a confusing case, perhaps no greater

18   confusion exists around anything other than this idea of

19   sharing software.

20             You've heard from witnesses on the stand that,

21   no, we don't share software, but then you hear a witness

22   say, yeah, we share software.

23             You see in a document where they say absolutely

24   we will never share your software to anyone else, and then

25   another document saying, hey, let's share this software.

1          How does that work?  We tried to explain that,

2     some of these witnesses tried to explain that, and,

3     frankly, I'm not too sure I understood it myself.

4          But something happened to me Thursday that

5     helped me come up with maybe an example that might help you

6     all understand this.

7          Thursday, last Thursday, as I was getting ready

8     to go to trial, I pulled out my iPhone, and there is the

9     apple right there on the screen.  And it wouldn't go away.

10     I tried to reset it, restart it.  It's always there.  My

11     phone had crashed in trial.

12          I can't call anyone, I can't get texts, e-mails,

13     nothing.  A little stressful.  It's already pretty

14     stressful, but that was pretty bad.  Luckily, Erica, my

15     awesome assistant, took my phone to the Apple store to get

16     it fixed.  All right.

17          So they fixed it all right, wiped it clean.

18     Everything on my phone, gone.  And, frankly, I don't really

19     care about most of that stuff, but I had several thousand

20     pictures.  I'm still not over that one, but they had to

21     wipe it totally clean.

22          When they wiped it clean, they brought it back

23     to basically the vanilla software that every iPhone that

24     you buy off the shelf has.

25          You go to the backroom at Apple, there's

1    probably a wall of these boxes with iPhones.  At that point

2    my software was just like their software.  They could

3    interchange software, I don't care, it doesn't matter to me

4    because they're exactly the same, they're vanilla.

5              Now, in order to restore my phone back to

6    somewhat close to my settings, they then had to download

7    the apps that I had on my phone.  They would go to the

8    Apple store and download all these apps to repopulate my

9    phone with all the icons that I had.

10             At that point I still don't care because

11   everyone has access to those icons.  Those apps are not

12   mine.

13             But the next step is where I start filling in my

14   personal information, my contacts, my personal

15   photographs -- I lost my photos, not yet at least, my

16   movies, my web history, all that stuff, my texts with my

17   wife.  At this point I don't want people to know this.  I

18   don't want people to know this.  That's mine.

19             And really, as I was thinking, this really is a

20   pretty good example as to what happens with Rimini Street

21   and what happened with Mr. Baggett, if you recall.

22             Those vanilla environments that you load on the

23   software, they're all the same.  No one really cares about

24   that.  When you go to the website and put the patches and

25   fixes that are available for that code, still not that big

3556

1       of a deal.

2                   But as you heard Mr. Baggett say, once Bausch &

3       Lomb's proprietary, customized information was on that

4       software, then he considered it their software, and they

5       locked it down, and you better not share it.

6                   When you think about vanilla versus customized,

7       I hope that helps you understand exactly why that's

8       significant.

9                   And that's why when you hear we don't share

10      software, Mr. Baggett would tell you that's important

11      because if it's customized and it's yours, you better not

12      share it.  And that's what happened in this case.

13                  The evidence is that Rimini Street has not done

14      that.  To the extent they were sharing and cross-using and

15      cloning, it was on the vanilla stuff.  And I think the

16      record is pretty clear on that.

17                  Automated downloading.  I'm not going to bore

18      you with this.  Again, before the maintenance end date,

19      when we're doing the apps downloading, we download these

20      files for the client before the maintenance end date.

21                  And that process involves Rimini's basically

22      screening to make sure we get the files the client's

23      entitled to and not the ones they're not.

24                  I asked Ms. Catz,

25                  "Now, when a customer is on Oracle support,"

1    again, before the maintenance end date, "they're entitled

2    to access Oracle's website and to obtain fixes, updates,

3    and patches for their software, aren't they?

4              "ANSWER:  Yes.  That's what I shared earlier."

5              I asked, "It could be hundreds of files?

6              "It can be.

7              "It could be thousands of files?

8              "It absolutely can be."

9              The fact that we downloaded lots of files for

10   our clients is really irrelevant.  The fact is, as long as

11   they had rights to do that, we're operating within the

12   scope of their license.

13             But you heard a lot about these servers and

14   about Oracle's servers and about us automated downloading

15   and freezing them out.  I want to take a few minutes to

16   talk about that before I go on.

17             First of all, the Metalink terms of use, the

18   terms of use for this website that we access, says this,

19             "The materials may be shared with or accessed by

20   third parties who are your agents or contractors acting on

21   your behalf solely for your internal business operations

22   and you are responsible for their compliance."

23             Rimini Street was acting on behalf of its

24   clients when it accessed the files and downloaded them.

25             I'm going to refer to instructions a lot today,

3558

1    and I don't want to bore you because it's really important

2    you understand that these are the rules of the road.  You

3    have to apply these when you're making the very important

4    decisions in this case.

5              The California Computer Data Access and Fraud

6    Act, Section 2, requires that you download without

7    permission.

8              It says,

9              "If you find Rimini Street and/or Seth Ravin

10   believed it had authorization to access, and did not exceed

11   the authorized access, then you must find that they did not

12   violate this act."

13             If they had authorization and believed they had

14   authorization, they did not violate that law.

15             Here's another one.  It's basically the same

16   language in this statute as well.  If they believed they

17   had authorization, and they did not exceed their

18   authorization, you cannot find that they violated that

19   statute.

20             Here's another one, the Nevada Computer Crimes

21   Law.  These are very long instructions.  I'm trying to

22   focus you on those things that will help you make your

23   decision the best.

24             Again, without authorization.  Rimini Street was

25   authorized by its client through contracts.  Here's one

1    contract where it says,

2            "Client designates Rimini Street as an

3    authorized, designated Oracle support contact."

4            From Rimini Street's agreement with its clients,

5            "Client acknowledges that Rimini Street might

6    need to work with, configure, test, and possibly modify

7    PeopleSoft products licensed to client."

8            And "Client warrants that it has full legal

9    authority to enter into this agreement...and that no

10   third-party rights or permissions are required in order for

11   it to do so."

12           Rimini Street was authorized to make these

13   downloads both from the Metalink terms of use and its

14   contracts with its customers, and for all those state

15   causes of action that Mr. Isaacson talked to you about,

16   authorization is the key.  Authorization is what you need

17   to look for when you're making your decision.

18   Authorization is the key.

19           Part of these statutes talked        about an

20   intent to harm.  These are really statutes dealing with

21   hacking, where people get into a computer to hurt it, to

22   steal something, or to break it.  That's not at all what

23   Rimini Street does.  As a mater of fact, that's the

24   opposite of what Rimini Street does.

25           They're trying to download material.  They want

1    the servers to work.

2              And Mr. Ravin was asked,

3              "And in the event that your downloading would

4    have crashed the servers or harmed them, how could you have

5    finished your job?"

6              His answer:  "Well, we couldn't have.  There was

7    no benefit for us to crash a server we're trying to get

8    information from.  So we took as many steps as we felt we

9    could to minimize, but we still -- these customers had a

10   right to the material."

11             What did you hear -- there it is.  There's the

12   instruction on damages.  They're entitled to damages for

13   the harm they suffered as a result of the violation, for

14   the harm they suffered.

15             And what did they suffer?  Christian Hicks said

16   that the average download was increased by 2.4 seconds, and

17   that the total downtime was in excess of about 3 hours.

18   But in terms of physical harm to the servers, there was

19   none.

20             Let me be crystal clear about this.  These

21   servers were not harmed, they were rebooted, basically

22   turned off and on and they started up running again

23   perfectly.

24             Oracle wants you to believe this delay was

25   somehow a major significant harm to them.  But did you hear

3561

1     testimony from a single customer who left because they

2     couldn't get their stuff quickly?

3              Did you have any evidence from anyone to

4     indicate that there was financial harm associated with a

5     delay or these servers being down?

6              And to be clear, the entire server farm was not

7     shut down by this activity, only one server for a period of

8     a short amount of time over one night.

9              David Renshaw, another gentleman for Oracle,

10    said, "No, there was no physical damage to the servers."

11             The fact is Oracle was not hurt from the

12    automated downloading.  These servers that stopped and

13    stopped working for a period of time did not cause

14    financial harm.  So what are we actually talking about

15    here?

16             We have told you that Rimini Street could have

17    operated from day one in a remote environment.  Do you

18    remember in opening statement I drew this on the screen and

19    told you that the Court found that certain areas were

20    outside from the scope of the license, but from day one we

21    could have operated from within.

22             We still get to the same point, the same service

23    for the same price.  We just now have to use some

24    inefficient means.  All these steps were about efficiency,

25    being able to do things better, quicker, faster, with fewer

1    people.

2              The remote model means we've got to hire more

3    people.  I understand there's a dispute about how many we'd

4    have to hire.  We'll get to that in a minute.  But the end

5    result is still achievable.  And we did achieve it from day

6    one with our remote clients.

7              We just have to go over some additional hurdles.

8    We have to spend a little more time because we can no

9    longer use automated downloading tools.

10             We have to spend a little more time because we

11   no longer can local host if we have to start from the

12   beginning.  And we could no longer cross-use, so from day

13   one we have to build each and every update.

14             This is really about forcing inefficiency.  And

15   that's exactly what this is about.  There is no harm to

16   Oracle, it just makes our job more difficult.

17             We still provide the same service with the same

18   price as with the local more efficient means.

19             Now, I want to shift gears and talk about their

20   interference claim.  We've just now talked about the

21   copyright stuff, the copyright infringement claims.

22             I'm now talking about the interference claim

23   where they say that we misrepresented some facts to their

24   customers and the customers relied on our representations

25   to leave.

```
 1               Here's another instruction.  This instruction is
 2     for induced breach of contract.  This relates to the
 3     website.  This doesn't relate to customer interaction, it
 4     relates to inducing our customers to breach their terms and
 5     conditions of the website access.
 6               Oracle has to prove for each such contract that
 7     we intended to cause the customer to breach; that our
 8     conduct was wanton, malicious, and unjustifiable; that we
 9     caused the customer to breach and improper conduct was a
10     substantial factor in doing this.
11               The unjustifiable conduct at issue for this
12     claim has to be related to misrepresentations to the
13     client.
14               Now, this is important to understand.  This
15     doesn't deal with copies, this doesn't deal with sharing
16     software, this deals with communications made by Rimini
17     Street to some customers that caused them to breach their
18     agreement with Oracle.
19               And here is where it gets really important.
20     Those statements must be made, Rimini must have made those
21     statements with the knowledge that they were false.  And
22     then this.  You have to have evidence that the third
23     parties relied on that statement.
24               Ladies and gentlemen, what have you heard in
25     this case about customers relying on anything told by
```

3564

1    Rimini Street?

2              The only thing you heard was Mr. Baggett saying

3    they deliver on every promise they made.

4              This is another instance of failure of proof.  I

5    told you in opening statement this case was going to be

6    about failure of proof, and this is another instance where

7    they simply cannot make their proof.

8              And, again, this only pertains to the website.

9    This is again not talking about customers themselves, it's

10   about telling these customers something that they relied on

11   and then they breached a contract.

12             There's no proof, no proof of that, ladies and

13   gentlemen.

14             Again, the clients authorized Rimini Street to

15   do this.  They sign a contract with us and give us the

16   authority to download materials for them.

17             There's no evidence of any misrepresentation,

18   and there's no evidence of any reliance by any customer on

19   anything that we said that was wrong.

20             Okay.  So that's the inducement to infringe.

21   Again, inducement to breach the contract.

22             Now, we're shifting gears and talking about the

23   intentional interference with prospective economic

24   advantage.

25             This is the one where they say we lied to

1    customers, and they say, okay, because of that I'm going to

2    leave Oracle.

3         This is the one where we allegedly lured folks

4    from the fat part of the pie away from them, and this time

5    they're saying we did it because we lied to them.

6         Here's what the law requires.  In order to prove

7    that, they've got to say -- they've got to prove to you we

8    engaged in unlawful and improper conduct intended to

9    disrupt the relationship, the relationship was disrupted as

10   a result of that conduct, and the unlawful and improper

11   conduct was a substantial factor in causing Oracle harm.

12        And here again is the really important part of

13   that.  I'm not going to talk about all the highlighted

14   yellow stuff, I'm going to focus on the stuff that's really

15   important, and it's toward the bottom here.

16        "And the third party must have relied in fact on

17   the statement."

18        Okay.  There's no evidence that we actually told

19   customers anything knowingly false.  You had Kevin Maddock

20   on the stand saying everything I told the customers I,

21   honest to God, believed was true.  There's no evidence that

22   anyone knowingly said anything false to any customer.  It's

23   not in the record.

24        But even if you thought there was something that

25   was shady and not right about anything that we told to any

3566

1     customer, this is the nail in the coffin for this claim.

2     They have to prove that the third party relied in fact on

3     the statement.

4            I ask you, did you hear from any customer saying

5     they relied on a statement that was wrong from us?  From

6     any customer at all?

7            The answer to that is no.  Once again, a failure

8     of proof.  They cannot possibly hit their burden of proof

9     here, ladies and gentlemen, they cannot because there is no

10    evidence.

11           Did anyone actually rely on any statement that

12    you heard in this trial?  No.  It just simply isn't there.

13           Here's where Mr. Yourdon hurt them again.  Okay.

14    For this interference claim, let's keep in mind there has

15    to be an affirmative statement that we knew was false and

16    that customers relied on and, because of that, they left

17    Oracle.  Okay?

18           Mr. Yourdon totally takes the legs out from that

19    case.  Here's what Mr. Yourdon said.

20           "Now, Mr. Yourdon, in your opinion, it was

21    Rimini's promise of vendor-level support at a significantly

22    lower price than Oracle that caused customers not to renew

23    their support with Oracle; correct?"

24           His answer, "Yes, that's my opinion."

25           He didn't say, hey, listen, people were lied to

1     and they believed the lie and that's why they left.

2              He didn't say Rimini Street told these vast

3     misrepresentations to these clients and they relied on that

4     in making their decision not to renew with us.

5              That's not what he said.  He said they left for

6     vendor-level support and a lower price.  Oracle cannot

7     possibly get around that.

8              Conduct is not a substantial factor in causing

9     harm if the same harm would have occurred without the

10    conduct.

11             As I've told you, these folks were on their way

12    out of the door.

13             Now, let me stop here real quick.  We're not

14    going to contend in this trial, and I don't think we ever

15    have contended, that every Oracle customer hates them.

16    They probably have customers that are very happy.  They

17    probably have customers that feel they're getting great

18    value.

19             But, frankly, those aren't our customers.  Those

20    aren't the folks who come with us.  These are the folks who

21    come with us.  They are not happy, they're not getting

22    responsive service; and, as Brian Baggett told you, they

23    aren't getting value.

24             Once again, Mr. Yourdon says our customers are

25    coming out of this 5 percent.  That's an admission by their

1   own paid expert.

2           Here's another thing.  You heard about this from

3   the judge.  This competition angle when it comes to

4   intentional interference.

5           It says if the purpose of these communications

6   was at least in part to advance its interest in competing,

7   that's something you have to take into account.

8           First of all, we don't get there because there

9   was no affirmative misrepresentation, there's no reliance

10  on it, and there's no proof these folks weren't leaving

11  anyhow.  But that's an important part of the instruction.

12          And so long as Rimini Street and Seth Ravin's

13  motivation was at least partially to compete, that's

14  something you have to take into consideration as well.

15          And I encourage you -- I'm highlighting the

16  parts I think are most important to try to help you along

17  the path here.  But you have to read these instructions

18  unfortunately all the way through.  Each word is as

19  important as the other.  You can't ignore any part of

20  these.  You have to look at all of the instructions.

21          Mr. Maddock testified that -- that,

22          "QUESTION:  I didn't ask you about -- have you

23  ever said to customers that Rimini is abiding by or

24  following the Oracle license agreements?

25          "Yeah, I would have repeated our standard

1    messaging saying that 'we have methodologies in place to

2    ensure that you don't receive anything outside your

3    agreements.'

4              "And how many times do you think you've said

5    that to customers?

6              "Probably fewer than 10."

7              And by my math 10 is a lot fewer than 229.

8              And he goes on talking about where an opinion

9    was given, and he says, "less than 10 times."

10             And then talking about whether a customer had

11   actually questioned the legality of Rimini's business, and

12   he said for him probably fewer than five times.

13             And, finally, if they did ask a question, he

14   said, "My typical response would be that they should go

15   back to their legal team to review the contract and make

16   their own determination."

17             And, again, I told you this earlier but this

18   bears repeating.  When asked if he had ever made any -- let

19   me just ask the question.

20             "Do you believe that the statements you made to

21   clients between the time you joined the company to December

22   of 2011 were accurate when you made them?

23             "Yes, I absolutely do."

24             Brian Baggett, asked him,

25             "During the negotiations with Rimini Street, did

1    you at any time feel that Rimini Street was misleading you?

2             "No.  They were very open and forthcoming about

3    what they could do and what they couldn't.

4             "QUESTION:  Over the course of the relationship

5    between Bausch & Lomb and Rimini, did they ever fail to

6    deliver on any promise?"

7             His answer, "No, they did exactly what they said

8    they were going to do."

9             I want to talk about Mr. Baggett just real

10   quickly.  First of all, Oracle's lawyer made a point about

11   how we had not disclosed to Mr. Baggett what had gone on in

12   this trial.

13            But if you recall, when that question came up, I

14   objected, and I asked the judge to remind counsel that we

15   were under an obligation not to talk to these folks about

16   what was going on in trial.  And that's been on both sides.

17   We can't talk to these clients, these fact witnesses about

18   what's going on in this trial.

19            But I do want to talk about Mr. Baggett.  He has

20   no dog in this fight.  I mean, he does not have a stake in

21   the outcome.  He's got his own day-to-day job, 9:00-to-5:00

22   job in Rochester, New York.

23            We asked him to come and testify.  We couldn't

24   force him.  We couldn't subpoena him to testify.  We just

25   said, "It would be really helpful if you could come and

3571

1    testify in front of a jury across the country."  That's a

2    pretty big ask of anyone.

3                He no longer uses our services.  He's no longer

4    our customer.  We asked him to fly across the country to

5    take that stand and go through cross-examination to testify

6    in front of a bunch of strangers about something he was no

7    longer even involved with, and he did it.  He did it.

8                And you heard his testimony.  And it became very

9    clear from what he was saying that he genuinely believes in

10   what we do, and he appreciated the service that he got from

11   us.

12               Mr. Baggett and these customers are highly

13   important witnesses because every witness that we put up on

14   that stand, they want us to win.  Our experts, our fact

15   witnesses, they want us to win.  Every witness that Oracle

16   put on that stand desperately want them to win.

17               But these customers, Mr. Baggett, they got

18   nothing to gain.  They just want to tell you the truth

19   under oath.

20               Losses and profits that are mere guesses,

21   speculative, remote, or uncertain should not be considered.

22   And that's really important.

23               When you talk about actual harm caused to Oracle

24   from the processes used by Rimini Street, speculation isn't

25   enough.  They're has to be proof, real proof.

3572

1           Which brings us to our third essential truth.

2     There's no evidence that any Rimini client would have

3     stayed and paid.

4           And this gets back to our most important

5     instruction.  Again, looking at this instruction, this

6     means that if a client left Oracle International

7     Corporation for reasons unrelated to Rimini Street's

8     infringement, there is no causal relationship and therefore

9     no lost profits damages.

10          If these customers are leaving Oracle for

11    reasons unrelated to our infringement, there are no lost

12    profits damages.

13          Oracle has to prove that our infringement caused

14    damages.  And, again, here is that important instruction.

15    It's Instruction Number 30.  It appears on page 38 of your

16    jury instructions.

17          Mr. Yourdon says he thinks that these customers

18    were thinking that they were going to go back to Oracle if

19    Rimini Street wasn't an option.

20          He says, "In my opinion, what they generally

21    would have done is renewed their support at the same kind

22    of historical renewal levels that Oracle had already been

23    enjoying."

24          Again, you cannot base any award in this case,

25    lost profits award, based upon speculation, guesswork, or

1    conjecture.

2              And, once again, if you apply that instruction

3    to Mr. Yourdon's testimony, you cannot rely on his

4    testimony, because that's all it is.  He's telling you what

5    our customers probably thought.

6              What is the best source to figure this out?  Is

7    it an expert witness, or is it the customer?

8              Again, these customers were asked these

9    back-to-the-future type of hypothetical about what they

10   would have done if they would have known.

11             Mr. Baggett again was asked that question.  He

12   says that if Rimini Street was infringing, he would not

13   have gone with them.  But he also was emphatic, he

14   definitely would not have gone back to Oracle.

15             Mr. Baggett does not meet this definition.  But

16   he's not alone.  Again, every one of these customers were

17   asked by Oracle "If Rimini was infringing, you wouldn't

18   have gone with them, would you?"  They said "no."

19             But they didn't ask them the right question,

20   that "If Rimini Street was not an option, would you have

21   stayed with Oracle, gone back to Oracle?"  They didn't ask

22   them that one because they knew the answer.

23             Here's Clark Strong.  He was one of the first

24   depositions that we played.  He was asked by Oracle's

25   lawyer -- again, let me set the stage for you again.

3574

1          Oracle selected these 17 customers.  They took

2     this guy's deposition, and they asked him,

3          "To what extent was the lower price a factor in

4     the decision for Birdville to contract with Rimini Street

5     rather than to renew with Oracle?"

6          His answer:  "None."

7          Right there Mr. Yourdon's opinion is out the

8     window because he says price wasn't a factor at all.

9          Oracle's lawyer couldn't believe him.  He said,

10          "The price was no -- no effect whatsoever?"

11          His answer, "No."

12          Third try,

13          "So if they would have been the same price, you

14     still would have contracted with Rimini Street?"

15          His answer, "That's what I would have

16     recommended."

17          He goes on to say what -- this goes to the other

18     options that he would have considered.

19          "If Rimini Street couldn't or said it couldn't

20     provide tax and regulatory updates at the same quality as

21     Oracle, would Birdville still have contracted with Rimini

22     Street for support?

23          "I'm not sure.  I think I would have recommended

24     to my supervisor that we go forward with it.

25          "Then what would you have done with your tax and

1    regulatory updates?

2            "Would have done them ourselves like we did it

3    in the past."

4            Here's another one of those hybrid situations

5    that you didn't hear about this case.  They would have

6    self-supported what they'd done or could do and then farm

7    out to someone else to do the tax and regulatory updates.

8            "And as we sit here today, does Birdville have

9    any plans to go back to Oracle for support?

10           "I would not recommend it.

11           "Why not?

12           "Because of the support we get from Rimini

13   Street."

14           Cort Swanson, another one of these depositions

15   that you saw from customers.

16           "QUESTION:  If Rimini Street had not existed,

17   would AGCO still be on Oracle's support for JD Edwards?

18           "ANSWER:  One of the things we were also

19   considering is completely dropping Oracle for JD Edwards.

20           "And what would AGCO have done in that

21   circumstance?

22           "We would have supported the applications

23   ourselves."

24           So they were already considering leaving Oracle

25   before we even came into the picture.  And they would have

1    just self-supported if that happened.

2              Oracles's lawyer asked,

3              "When you said AGCO was considering

4    self-support, did AGCO consider the efforts required to

5    monitor new litigation?"

6              His answer, "Yes."

7              "Did AGCO have an estimate about what it would

8    cost AGCO?

9              "In North America, we looked at how we would

10   support our regulatory changes, yes."

11             And he talked about quality service, and he

12   says,

13             "We have found that the -- for the issue support

14   that we receive, Rimini Street is much superior.  We have a

15   named software engineer who contacts us within 30 minutes

16   of any problems."

17             Graham Carter, SonicWall, was asked,

18             "When SonicWall was deciding to go Rimini, had

19   SonicWall already made the decision that it was going to

20   migrate off Siebel?

21             "Absolutely, yes."

22             If you apply that instruction, ladies and

23   gentlemen, he too cannot be a lost profits customer.

24             Rhonda Minks, Brazoria County.  She's the one we

25   talked about earlier with respect to the no-brainer

3577

1   hypothetical.  They were talking about,

2           "So if Oracle cost this much, and Rimini cost

3   the exact same amount, would you have switched?"

4           Her answer was, "Back then Gene," her

5   supervisor, "was really upset because we were having to

6   repurchase a product that we already purchased.  His being

7   upset is what caused us to even go look for third-party

8   support."

9           Rimini's infringement didn't cause them to

10  leave.  Her boss being upset caused them to leave.

11          "And would Brazoria County have served as a

12  reference for Rimini Street if it wasn't getting quality

13  service?

14          "No.  We were tickled pink with our services.

15          Steve Woodward, Pitney Bowes.

16          "How important a factor was the cost?"

17          The very bottom of that.  He says, "It was

18  probably a secondary factor to the primary reason that the

19  committee was already aware of.

20          "Okay.  What was that reason?

21          "The primary reason was that we had made the

22  decision to move away from Siebel support."

23          The causal link is not here either.  They had

24  already decided to move.

25          "QUESTION:  And so you had made the decision,

1      Pitney Bowes made the decision to move away from using

2      Siebel as a product?"

3                His answer, "Correct."

4                Rimini's infringement did not cause this

5      customer to leave.

6                One year earlier, approximately, they had

7      already made the decision to move off of JD Edwards.  And

8      in the interim, he had provided self-support.

9                And then there's Mr. Baggett.  Mr. Baggett took

10     the stand and testified in this court and answered

11     questions from me and from Oracle's lawyer.  He said

12     emphatically he would not have gone back to Oracle if

13     Rimini Street was not an option.

14                He talked about how they are not getting value.

15     They paid 2.2 million a year, and they weren't getting the

16     value they needed.  They had to hire additional people

17     internally to fix problems that Oracle's folks would not

18     fix.

19                I asked him the question -- and I phrased it as

20     an important question because I wanted you all to hear

21     this.  I asked him, "If you were getting excellent service

22     from Oracle for that 2.2 million, would you have decided to

23     go off of Oracle for support?"

24                His answer, "No, we would have stayed with

25     Oracle."

3579

1          If Oracle was giving him the support that he

2     needed and wanted, they would never have left.  Once again,

3     the causal link is not there.

4          Now, I want to point out something to you about

5     Bausch & Lomb.  Bausch & Lomb was paying Oracle 2.2 million

6     every year.  When they came to us, they got the same

7     service or better service for $315,000 per year.  And

8     Mr. Baggett testified in this court that he received far

9     superior service and responsiveness and much better value.

10          "And during these negotiations did you at any

11     time feel that Rimini Street was misleading you?"

12          His answer, "No, they were very open and

13     forthcoming, and they did exactly what they said they would

14     do."

15          I mentioned this earlier, but I want you to see

16     this exactly in the transcript where Mr. Baggett said this.

17     In talking about what they would have done in the absence

18     of remote or local.

19          He said that, "We were going to support part of

20     the application ourselves, and then, for the HR piece, we

21     were either going to replace it with another piece of

22     software, or we were just going outsource it to some

23     company like ADP."

24          And then I asked him these questions again

25     regarding this important instruction about the infringement

1    causing lost profits.

2           I asked, "Mr. Baggett, if you would have known

3    that Rimini Street would have those vanilla environments on

4    their servers, would you have gone back to Oracle for

5    support?

6           "No.

7           "If you had known that Rimini Street would on

8    occasion use one of those vanilla environments and clone it

9    for another client with the same license rights, would you

10   have gone back to Oracle for support?

11          "As long as it was licensed, no, it's not an

12   issue.

13          "And the same question with updates.  If you had

14   known that, would you have gone back to Oracle?"

15          His answer, "No."

16          Now, I sat down after asking Mr. Baggett my

17   questions, and he told you a very compelling story.  He

18   went into specifics about his experience with Oracle

19   support, and, frankly, it was not a good one.

20          He talked about unresponsiveness, hostile

21   negotiations, aggressiveness.  You heard all that directly

22   from him.

23          When he left he told you that he was told that

24   he would regret that decision.  Talked about years of going

25   back and forth trying to resolve this problem, and,

1    finally, when all hope was lost, he decided to leave Oracle

2    entirely.  You heard all that.

3                Oracle's lawyer then got up and asked her

4    questions.  One of her first questions was, "Does your

5    employer know you're here?"  And he said "No."

6                And then she said this.

7                "Okay.  So I will say to you that -- so I'm a

8    representative of Oracle, and I know that Oracle takes very

9    seriously the loss of every customer, so I'm sure that they

10   were disappointed to hear about your personal experience.

11   Do you remember who your contact was at Oracle?"

12               His answer, "I don't.  We had several.

13               "Okay.  Because I'm sure they would want to

14   follow up even though it was a long time ago.  So if you

15   remember, feel free at any time to let us know."

16               I'm speechless.  I have nothing to say to that.

17               The fact is 5 percent of their customers leave

18   every year.  Every year 5 percent of their customers leave,

19   and they go someplace, and they have to establish that our

20   customers came to us because of our infringement, and they

21   suffered lost profits damages because of our infringement.

22               Again, as I told you earlier, if they were

23   right, and our customers are coming out of the fat piece of

24   the pie, their attrition numbers would increase over time.

25               What really happens is they decrease.  They

3582

1    decrease over time, especially with our very largest

2    product, PeopleSoft, has been cut in half over these --

3    over the relevant timeframe in this case.

4              And Mr. Yourdon agrees with us, that our 5

5    percent -- our customers are coming from that 5 percent in

6    the real world.

7              So why do customers come to us?  There's a

8    common thread with these customers.  They love our service,

9    and they -- and, frankly, we give them good value.  But

10   when you hear these customers, they don't talk about how

11   cheap we are, they talk about how great our service is.

12             And I told you during this trial in opening

13   statements that our secret sauce is our service.  It is at

14   the center of everything we do.

15             And you can listen to lawyers talking about lies

16   and about how our business is corrupt, or you can listen to

17   the customers who don't have a dog in this fight, and they

18   told you exactly under oath what drives them to us.

19             The fact is we are different than the vendor,

20   and we give better value to our customers, and our customer

21   satisfaction average that you all probably wanted to know

22   about earlier and it finally came out, 4.8 out of 5.

23             Causation.  This critical link between

24   infringement and lost profits simply is not in this case,

25   and Oracle has failed to meet its burden to show it.

1            Have they shown that our customers left because

2    of Rimini?  No.

3            The evidence that you've seen in this case is

4    they leave because of high cost, poor service, and forced

5    upgrades.

6            Have they shown you that these customers chose

7    Rimini because of the process we used?  No.  We chose --

8    they chose Rimini because of better service, referrals,

9    lower cost, updates, better treatment.

10            And, finally, have they shown that but for

11    Rimini these customers would have stayed and paid Oracle?

12    No, they would have self-supported, gone to another

13    third-party option, gone to a new software, or done a

14    hybrid approach, like so many of these customers said they

15    would do.

16            For all these reasons the causation chain is

17    broken.  They cannot match the infringement with the money,

18    they cannot get lost profits.

19            So when you look at their claim for damages, I

20    want you to remember the very important causation

21    instruction.  I want you to remember the failure of Oracle

22    to offer you any evidence of actual causation.

23            So what is left?  I told you in opening, you

24    heard during trial, we're not here to hide from our

25    liability.  We're not here to shirk our responsibility.

1          The Court found that we infringed, and we are

2     here to answer those claims and answer to you for that

3     infringement.

4          We are here to make things right, and we look to

5     you to tell us exactly what that looks like.  But your

6     decision has to be based on evidence, not conjecture, not

7     guesswork.  That's all we ask.

8          Value of use damages.  This is what Scott

9     Hampton talked about.  And there's been some dispute, you

10    heard already from Mr. Isaacson, he had a very long

11    discussion about his critiques of Mr. Hampton's approach.

12         Let me see if I can explain to you how this all

13    works.

14         My dad is a phenomenal negotiator.  When I was a

15    kid, he was just awesome.  Everything he went to buy, he

16    negotiated, and he could get fantastic deals, from a car to

17    something as silly as a lawnmower.

18         And in learning from him, he said, "Listen, you

19    got to always have in your hip pocket your walk-away

20    number.  You have to have in your pocket, before you even

21    start the negotiation, that once it gets to that number,

22    you're out.  There's no second guessing, there's no going

23    back and rethinking it.  It's your walk-away number."

24         Mr. Hampton offered to you what Rimini Street's

25    walk-away number would have been in this case.  The Court

1    says that the fair market value of the license is the

2    amount a willing buyer would have been reasonably required

3    to pay a willing seller at the time the infringement began

4    for the actual use made by Rimini Street.

5              So this is what's called a hypothetical

6    negotiation.  Obviously, it didn't really happen.

7              But imagine yourself, Oracle and Rimini Street

8    across the table, and they're trying to come up with a

9    number to compensate Oracle for Rimini's use of the

10   copyrighted material, the material as used by Rimini

11   Street.

12             I never talked this long in my life.

13             So, anyhow, so they're across the table doing

14   the negotiation.

15             What Mr. Hampton tried to do is figure out what

16   would Rimini Street's walk-away number be?  And so he said,

17   okay, so what would they have to do to avoid a license

18   entirely, avoid Oracle's negotiation entirely and the

19   remote model?

20             They could go to a remote model entirely and not

21   have to deal with these negotiations, they'd just do their

22   own thing.

23             But there's a cost to it.  He said there is

24   about a $9.3 million cost for them to actually go to this

25   remote model.  They knew that to go away from this license,

1    they would have to spend more money.

2              And so what he did was he came up with the

3    walk-away number for you, that number at which Rimini

4    Street said we don't need the license, we'll just go to

5    remote, it's cheaper.

6              If Oracle demanded $9.4 million, we say no

7    thanks, we'll just go remote.  If it was 9.2, it made more

8    money sense to go with Oracle.

9              So that's how this all worked.  This

10   hypothetical negotiation is this kind of hocus-pocus kind

11   of thing.  He tried to put reality, concrete numbers into

12   place, as to what exactly that would look like.  And the

13   value of use is the amount of money that they saved by

14   going through the license route.

15             Now, Mr. Hampton said, after talking to

16   Mr. Benge, he said you would get twice as many people to do

17   this, you've got to pay more people to download stuff and

18   to work a lot of these programs.

19             That could be three times, it could be something

20   else.  But Mr. Hampton tried to come up with a number that

21   best approximated what the walk-away number really would

22   be, and that's what you saw in this trial.

23             But what you also saw was this.  Oracle does not

24   have any response to a walk-away number.  No witness took

25   the stand and said actually the walk-away number would be

1    this.  It doesn't exist.

2            Randy Davis said this,

3            "And, likewise, you have not offered an opinion

4    in this case regarding the amount of money that Rimini may

5    or may not have saved through the copying at issue;

6    correct?

7            "Correct, I have not."

8            Now, you just heard from Oracle's lawyer about a

9    number from Ms. Dean that apparently is this fair market

10   value number.  You didn't hear anything about that in this

11   trial, and, frankly, neither did we.  It's some number in

12   excess of $112 million.

13           For a hypothetical negotiation to work, Rimini

14   Street would be willing to agree?  You have to answer that

15   question yourself.

16           So here's what you're left with.  Fair market

17   value.  Rimini Street said the walk-away number, the number

18   at which they would decide just to go remote is

19   $9.3 million.  And you saw no evidence from Oracle, which

20   brings us to Rimini's profits.

21           Now, you heard evidence in this case that the

22   only way Rimini Street could have charged 50 percent less

23   than Oracle is because we infringed.  But that's not

24   exactly what the evidence showed you in this trial.

25           The fact is Oracle makes a lot of money on

3588

1   maintenance.  I asked Ms. Catz,

2              "And it's true, isn't it, that the maintenance

3   revenues account for nearly half of the revenue of the

4   company?

5              "Yes.

6              "And without this money, Oracle really couldn't

7   do anything?

8              "Yeah, it's critical to us."

9              And then I read her an excerpt from an analyst's

10  report saying n-- quoting her as saying,

11             "Maintenance continues to be a 'very profitable

12  part of our business, and as the number gets bigger and

13  bigger, it's really impossible for us to actually spend our

14  way through it, and so in general that's the sort of

15  overriding thing that guides our margins.'"

16             "Ms. Catz, do you remember saying that?

17             "ANSWER:  Yes."

18             Again, to show a recovery of profits, they have

19  to establish a causal relationship again, causation again,

20  between the infringements and the profits generated by

21  Rimini Street.  That's their burden to prove that.

22             The way that Rimini Street offers its pricing

23  the way it does, is that there's so much profit already

24  built into the model, they can take half of that and still

25  have a viable business, and that's what you heard from the

3589

1    witnesses in this trial.

2                Rimini actually chose to take less profit

3    because that's still enough to run a business.

4                Despite that, Rimini Street has been running at

5    a significant loss.  Mr. Zorn took the stand and told you

6    how they've been losing money over money over money.  Now,

7    eventually, they hope to change that.  But over the course

8    of the relevant timeframe in this case, they have lost a

9    lot of money.

10               But you also heard how they've been investing

11   growth, expansion, trying to grow and expand product lines

12   into new areas.

13               And so what Mr. Hampton did is he said, okay,

14   this is what actually they experienced, this is what

15   actually Rimini experienced.

16               According to Generally Accepted Accounting

17   Principles and regular audits, they've lost a lot of money

18   over the course of time.

19               But what Mr. Hampton did is he took away the

20   growth money they spend, all the investment they're

21   spending to expand their business, and looked purely on

22   what they spend on running the business on these products.

23               Let's take away the artificial appearance that

24   we're overspending to grow.  He looked simply at what is

25   the profit for doing this business?  And he came up with

1    $14.1 million as Rimini's profits attributable to getting

2    this service for these clients on these products.

3              All the growth stuff and expansion is out of the

4    picture.  When you take that out of the picture, we show a

5    profit.

6              Now, the reality is we still lose money, but

7    we're not here to try to hide anything.  If you just look

8    at servicing these products, there is a profit.

9              Now, it was said earlier during closing that

10   we're just telling you the number that we want to pay.  I

11   can assure you we don't want to pay $14 million.  We don't.

12   That's real money.

13             What we're trying to do is give you some

14   evidence that you can use to determine what is fair

15   compensation for actually what we did.  And this is what we

16   tried to do here.

17             Database damages.  I'll go through this fairly

18   quick.  But basically Oracle has told you a pricing

19   strategy that is different than what they actually use in

20   the real word.

21             Mr. Allison was asked,

22             "Does Oracle have a standard pricing for a

23   license for Oracle Database?

24             "ANSWER:  We do.

25             "Is server information relevant to pricing for

1    database?

2           "It is.  The pricing's based on the size of the

3    server."

4           You also saw documents in connection with

5    Dr. Hilliard's testimony about how Oracle recommends

6    copying of the database for its customers and about how one

7    database can service multiple servers, and how there are

8    other databases available to Rimini Street in the

9    marketplace other than simply the Oracle Database.

10           And then you heard Mr. Allison say that he's not

11    even for sure if he would actually license Rimini even

12    under the strategy that they advanced in this case.

13           Dr. Hilliard looked at -- okay, so if you

14    actually look at how we would actually use the database,

15    what we would actually need to license to run our best, he

16    said we need probably two database licenses, and that would

17    total about $90,000.

18           But even if you expanded to all 72 clients that

19    Oracle alleges that we did, it only comes up to roughly

20    $3 million.

21           As you can see, damages in copyright cases can

22    get a little gnarly, a little hard to put your arms around,

23    and that's why Congress looked at this and offered a new

24    approach, a statutory damages approach, where you are to

25    look at certain things to come up with a number for damages

1     in lieu of your ability to come with some sort of precise

2     number from what you've heard in this case.

3               To do that -- again, the purpose of statutory

4     damages is to penalize the infringer and deter future

5     violations of copyright law.

6               The willful infringement determination that you

7     make in this case doesn't relate to copyright infringement,

8     per se, it relates to statutory damages, and that's

9     important to understand.

10              The amount that you may award in statutory

11    damages is not less than 750 and not more than $30,000 for

12    each work that you conclude was infringed.

13              Now, I'm not going to tell you what number you

14    should pick.  That's up for you to decide.  Something

15    between 750 and 30,000 is probably about right.

16              Oracle says you can go all the way to $150,000,

17    the ceiling for willful infringement, but that's your call,

18    not mine.

19              To show willful infringement, you have to show

20    that defendant knew that its acts infringed the copyright.

21    And you heard testimony in this case that Rimini Street

22    felt, it believed in good faith that what it was doing was

23    right.

24              Eventually it was determined to be wrong, but

25    that doesn't mean at the time it believed it was

1    infringing.

2            How many works do you multiply this by?  Some of

3    you may be thinking it's the number of copies involved,

4    that you've heard all this testimony about tens and

5    thousands and hundreds of thousands of copies, so you must

6    multiply those by the number.

7            That's not it.  That's not it at all.  It's the

8    number of works that you find were infringed.

9            And in this case, their own expert says, yes, I

10   determined that there were 62 different Oracle copyright

11   registrations that were on Rimini's systems, 62.

12           So you take 62 and multiply that by the number

13   that you've determined for your own self is appropriate for

14   the infringement in this case, and that's how we arrive at

15   statutory damages.

16           Now, as you see in the instructions, you have to

17   do this separate and apart from analyzing the actual

18   damages, if any, in this case.

19           So you don't add them together, but you have to

20   make this decision.  It's an important one.  We want you to

21   take your time and think about it.

22           But this is how it would look like.  If it's 750

23   times 62, it's $46,000.  If it's 30,000 times 62, it's

24   about 1.8 million.  But you all get to decide what the

25   numbers should be.

1              Ultimately when you look at this, when you

2    actually look through the damages case and actually start

3    examining how their damages case fits into the law, you see

4    that there is no lost profits damages, they cannot prove

5    causation.

6              There's no lost profit for interference because

7    they cannot prove causation.

8              They have no opinion on fair market value, no

9    proof of knowingly false statements to clients, and

10   certainly no proof of anyone relying on them, and there's

11   no proof of any harm to the servers.

12             And once you actually look at their damages

13   case, you see that it collapses on its own weight.

14             When you look at the damage case, this is what I

15   would submit to you should guide you, and this is just our

16   evidence in the case.

17             No lost profits because no causation.

18             You look at the database, it's anywhere from a

19   hundred thousand to 3 million, and then you decide with

20   respect to fair market value, the 9.3 walk-away number, or

21   the $14 million number that Mr. Hampton said was the

22   profits once you extract the growth money spent by Rimini

23   Street.

24             Before I leave, I want to talk about Mr. Ravin,

25   my client.  As you heard on the stand, this was -- this

1    company was his baby.

2           He started Rimini Street to provide a service

3    model that focused on the customer rather than the vendor.

4    He did this because he knew that there was a need in the

5    marketplace for outstanding service at a decent value.

6           And he is a personally-named defendant in this

7    case.  He's personally on the line.

8           For Oracle to prove that he is responsible, and

9    he should be hit with a number in this case, they've got to

10   show a couple things, contributory infringement and

11   vicarious liability.

12          And there are instructions in your book.  The

13   contributory infringement instruction is number 26, and I

14   will tell you that that's an important one.

15          In order to find that Mr. Ravin is personally

16   liable for this stuff, you have to show that he knew or had

17   reason to know of Rimini Street's infringing activity.

18          Mr. Ravin told you on the stand that he believed

19   that what they were doing was fine.  The fact that he is

20   wrong does not show that he is contributorily liable and

21   vicarious liability.

22          You have to show -- they have to show you and

23   you have to find that he failed to exercise his right to

24   control this company and that, as a consequence, they

25   infringed.  The evidence simply isn't there for this,

1     ladies and gentlemen.  Mr. Ravin has not been found and

2     should not be found to be personally liable.

3                Which brings me to punitive damages.  So we

4     talked now about compensatory damages.  What is the amount

5     of money proved by the evidence by real proof that supports

6     a number for you to give in this case to compensate Oracle

7     for the infringement of my client?

8                Now we're talking about something entirely

9     different.  This is called punitive damages.

10               First of all, punitive damages is not -- they're

11    not available for copyright infringement.  What that means

12    is all the evidence you heard about copying and sharing

13    software and libraries and all that stuff has nothing to do

14    with punitive damages.

15               So when you're thinking punitive damages as to

16    whether they're recoverable or not, all the stuff you heard

17    about copyright infringement is not in play, and it says so

18    right in instruction 56 from the judge.

19               In order for Oracle to prove that they are

20    entitled to punitive damages, they have to show you by

21    clear and convincing evidence that the wrongful conduct

22    upon which you base your finding was engaged in with fraud,

23    oppression, or malice on the part of my client.

24               Now, you can't really grasp the significance of

25    this until you go farther down into this instruction, and

3597

1     this is one I think you really need to look at hard.

2                First of all, clear and convincing evidence.  We

3     talked earlier about that thermometer just going to 50,

4     just over 50 to 51.  Clear and convincing evidence is

5     different.  It's higher than that.

6                You must be persuaded by the evidence that the

7     claim is highly probable.  It has to be clear and

8     convincing that punitive damages are warranted.

9                Fraud means misrepresentation, deception,

10    concealment of material fact, with an intent to deprive

11    Oracle of rights or property or otherwise injure Oracle.

12                That's what fraud means under the statute -- or

13    under the instruction.

14                Oppression.  Despicable conduct that subjects

15    Oracle to cruel and unusual hardship.  Did Rimini Street

16    engage in that kind of conduct?

17                Malice.  Intended to injure Oracle, or

18    despicable conduct which is engaged in with a conscious

19    disregard to the rights or safety of Oracle.

20                Is that the type of conduct you saw in this

21    trial?

22                Despicable conduct.  So vile, base, or

23    contemptible that it would be looked down upon and despised

24    by ordinary, decent people.

25                I will submit to you, ladies and gentlemen, my

3598

1    client's conduct falls far short of anything that would be

2    subject to punitive damages.

3              Punitive damages can only be found if you first

4    find some violation of an underlying cause of action.  And

5    what that means is you don't get to punitive damages until

6    they first prove that they win on these claims.

7              These are the only claims for which punitive

8    damages are sought, the computer fraud case in California,

9    the Nevada computer fraud statute, and intentional

10   interference.

11             Do you remember with the computer fraud it

12   requires lack of authorization.  And we've shown you that

13   there was authorization through our clients and our

14   contract with our clients.

15             So for those statutes they simply don't get to

16   punitives because they can't prove they win on the

17   underlying claim.

18             And intentional interference.  That's the one

19   where they have to show some statement was made that was

20   false, and known to be false, and someone relied on it in

21   fact.  No proof whatsoever to support that.

22             You don't get to the question of punitive damage

23   unless you first find that my client has violated one of

24   those statutes, and there is no evidence to support that.

25             And Mr. Maddock said every single one of his

3599

1    statements he believed to be true and accurate when he made

2    them.  And the number of times he actually made statements

3    about legality of their operations was fewer than 10 times.

4    And Oracle didn't prove to you any customer to whom he made

5    those statements, and no reliance by any of those

6    customers.

7          One of the things that you can look at in

8    deciding punitive damages.  Let's assume just for the sake

9    of argument that you decide that my client has, in fact,

10   violated either the California or Nevada Computer Fraud

11   Act, or you find that there was a statement that some

12   client relied on.

13          If you start actually considering whether

14   punitive damages are recoverable, and I would submit to you

15   that they are not, but if you do, one of the things that

16   you're instructed by the judge to look at is instruction

17   58.

18          It says, "Even if you find that punitive damages

19   might be available, if you decided that Rimini Street or

20   Mr. Ravin acted on an objectively reasonable belief that

21   their conduct was not unlawful, such as the interpretation

22   of the licenses allowed through the period of 2006 through

23   2011, then you must not award any punitive damages."

24          What that means is this.  If you actually get to

25   the point where you found the violations of those statutes

1     and you're questioning do we award punitive damages, one of

2     the things you can look at is did they have a good faith

3     belief, an objectively reasonable belief, that the

4     contracts allowed for them to do this.

5              Mr. Allison took the stand and told you that

6     these agreements were perfectly clear, and to him they

7     probably are.  He works with this on a daily basis, and

8     he's a very impressive man and he was a very impressive

9     witness, and I believed it when I heard it too.

10             But then I started looking at it and looking at

11    the facts surrounding it, and here's some things that I

12    want you all to think about in determining whether or not

13    Rimini Street had an objectively reasonable approach for

14    these contracts.

15             First of all, they're all confidential.

16    Mr. Ravin saw a bunch of these contracts when he was at

17    PeopleSoft, but thereafter they're confidential.

18             Facilities, not defined.

19             Site with a capital S, defined.

20             Site with a small S, not defined.

21             Territory with a capital T, defined.

22             Copies, allowed.

23             Some copies not allowed.

24             Reasonable number of copies, not defined.

25             These all relate to some of the key terms in

1    this case.  Objectively speaking, it may not be as clear as

2    Mr. Allison told you.

3              Here's what else.  You saw some of these in the

4    case.  We had customers inquiring about why don't we do

5    certain things that have been found in this case not to be

6    appropriate; for example, "Maybe I'm mistaken, however,

7    wouldn't Rimini Street create a tax update that can be

8    shared by other customers who have vanilla instances?"

9              A client is asking us "Why don't you just

10   cross-use?"

11             Another client raised concerns about our intent

12   to set up an in-house environment using their software

13   because they were unclear as to why we couldn't simply

14   develop using other environments that we had for other

15   clients.  Another one of our customers suggesting that we

16   do cross-use.

17             And, finally, a lot of sophisticated customers

18   have chosen us and requested local hosting.  And that's not

19   to say that this is right because Your Honor has found it

20   to be wrong.

21             But it just shows you that maybe it's not as

22   clear as Mr. Allison said, and maybe my clients did in fact

23   have an objectively reasonable basis to think that what

24   they're doing was okay.

25             Now, early on in our company there were

```
 1    certainly some missteps.  And if you were to ask some of
 2    our folks if they could do it over again, if they would do
 3    it a different way, I'm pretty confident you would get the
 4    answer yes.
 5              But we are where we are.  We've advanced to the
 6    point now where we are ISO certified and our processes are
 7    much more mature.  But that does not and will not and
 8    cannot take away the fact that we violated these contracts.
 9              The Court found that we exceeded the scope of
10    this license, and we are here to be held accountable for
11    it.
12              Now, to do that, I'm going to walk through for
13    you the verdict form, and this likely will be the most
14    exciting part of my presentation.  I am joking.
15              All right.  So you each get one of these.  Or I
16    think you just get one of these.  And this gives you the
17    questions you have to answer by looking at some of these
18    very important instructions, the user manual.
19              You follow the user manual back in the jury
20    room.  You talk about these instructions, you understand
21    them, and you look at the evidence and then you answer
22    this.
23              THE COURT REPORTER:  Could you please use the
24    microphone.
25              (Discussion off the record.)
```

1              MR. WEBB:  All right.  So this is what you have

2    to answer.  When you're all said and done, and you've

3    reached a verdict, you all come in here, and you hand this

4    up there, and the judge will read this for everyone to

5    hear.

6              So we really think this is important, and we

7    want you all to look at it very carefully.

8              All right.  I'm going to start with number 4,

9    and that's the contributory infringement.  That's the one

10   where Mr. Ravin will be personally liable here.

11             I would submit to you that in view of the

12   instructions and the evidence, you check no for every one

13   of those boxes, he is not personally liable.

14             Same thing for vicarious liability.  This is

15   number 5.  Check every single one of those no, he should

16   not be held personally liable.

17             Then you ask this question here, which is a

18   better measure of damages, lost profits or fair market

19   value?  Based upon the evidence that you've seen, we would

20   submit that the fair market value is a better approach in

21   this case, and that would be either the walk-away number

22   offered by Mr. Hampton, or the profit number 14.1.  And

23   that's for you all to decide.

24             There's been a total failure of proof for lost

25   profits, and that would be question number 6A.

1              Causal link.  When you guys are back there

2      debating this, and you guys are talking about all these

3      issues, I want someone to say this instruction is something

4      we need to look at because it talks about causation,

5      something you didn't hear from Oracle in the last two

6      hours.

7              All right.  So the next two numbers, this is for

8      you to decide.  This is just the evidence that we've

9      provided.  The profits will be 14.1 million, again, that's

10     the number you take away all the expenses for growth, and

11     the fair market value would be the walk-away number of

12     about $9.3 million.

13             And when it gets to contributory -- actually

14     I'll just do this, it's probably easier.  When it gets to

15     contributory and vicarious liability, I want you to put a

16     zero there on behalf of Mr. Ravin.

17             Statutory damages.  We talked about that,

18     Congress enabled you all to decide what the number should

19     be based upon your range of 750 up.  There, and only there,

20     you make a decision about innocent versus willful.

21             We would submit to you that this infringement

22     was not willful, it was innocent.  So with respect to

23     question number 9, you would check the boxes for yes, it's

24     innocent infringement, and for willful infringement you

25     would check no across the board.

1                    Statutory damages.  There are 62 works

2        registrations that are at issue, not the thousands and

3        hundreds of thousands of copies, the works.

4                    And, again, I left that blank open because

5        that's for you all to decide.  That's totally within your

6        discretion within that range.  You just do what you think

7        is right.

8                    And again, for contributory infringement and for

9        vicarious liability, zero.  And that again relates to my

10       client's personal liability.

11                   When you get to talking about inducing breach of

12       contract, interference, check no.  Because once again for

13       the interference piece, remember, they've got to show

14       affirmative misrepresentation, reliance in fact, and

15       causation.  They can't do it, ladies and gentlemen.

16                   So you put a zero in terms of the money damages

17       owed there as well.

18                   And the intentional interference, no, no, and

19       zeros.

20                   Same thing for all the computer fraud claims.

21       Again, that relates to the California statute and also the

22       Nevada statute.  You would check no, because they have not

23       met their burden of proof, and zero when it comes for

24       damages.

25                   And here's the Nevada statute for you all to

```
 1    look at there as well.
 2                And as you're going through this process, I want
 3    you to be thinking a little bit like lawyers and think
 4    about burden of proof and think about actual evidence.
 5    That will help guide you once you look at the user's manual
 6    about how to check these boxes.
 7                I'm going to talk about more of that in just a
 8    minute.
 9                So nonduplicative damages to Oracle America
10    would be zero.  They don't own the copyright in this case,
11    it's the other Oracle company, the Oracle International
12    Corporation.
13                And for them, I put down Mr. Hampton's walk-away
14    number.  But, again, that's for you to decide, what damages
15    have they actually suffered, and, more importantly, what
16    damages has Oracle actually proved and have they met their
17    burden of proof.
18                And, finally, when it comes to punitive damages
19    as we just discussed, I would submit to you that there
20    should be no punitive damages.  They have to first prove
21    their entitlement to the underlying claim, and they simply
22    can't do that, and they certainly can't prove that my
23    client acted in a manner that would warrant punitive
24    damages.
25                The fact is the three essential truths are still
```

1    intact.  The customer has the right to choose, Oracle

2    hasn't proved that they suffered any actual harm, and

3    there's no evidence that these customers would have stayed

4    and paid.

5              But what about those two weeks of trial?

6              What about all that talk of master copying and

7    downloading and libraries and silos and all these terrible

8    things?

9              I told you in opening statement that that might

10   be coming.  I drew on this board, this very board, I said,

11   listen, when you hear this evidence that's going to be

12   coming in, you could put it in one of two buckets, the real

13   proof that's going to help you make the decisions, the

14   decisions on this verdict form, and then something else

15   here, something else not intended to help give you real

16   proof to answer questions, something else.

17             I told you earlier about the no-brainer, this

18   lawyer tool that allows you to think one thing and really

19   be after something else.  That and some other things go in

20   this bucket.

21             And there's a name for this bucket.  You see

22   clever lawyers who do this for a living understand what's

23   in this bucket.

24             You see that?  You all see that?  That is a red

25   fish.  But not just any red fish.  It has a name.  It's

1    called a red herring.

2              Red herrings are designed to distract you, to

3    divert your attention, to have you thinking about something

4    else while you're not thinking about the real important

5    thing.

6              And in this case you have seen a series of red

7    herrings, and I can't help but address a few of them right

8    now.

9              First of all, number of copies.  Even in closing

10   you saw the copies going all the way from here to

11   Pleasanton, a Library of Congress full of copies.

12             But I want you to do something for me.  Look at

13   the instructions and tell me where the number of copies

14   fits in there anywhere.  It doesn't.  The number of copies

15   is meaningless to your job.  It was done for one reason,

16   and one reason only, to make you think what we did was

17   really, really bad.

18             Dr. Davis took the stand and told you about

19   hundreds of thousands of copies.  He told you for almost an

20   hour about all the copies that he found on our servers, and

21   I admitted to that the first day of this trial.

22             They wanted to make us look as though we are

23   doing something really, really bad because you won't be

24   thinking about this.

25             And about the library, and silos, and sharing

1   software.  Those things deal with matters that we admitted

2   earlier on in this case.  During opening statement I told

3   you we did these things.

4           So why is it that I had to go through the entire

5   process spending all that time telling you about it again.

6           But there's more.

7           Invalid business, also known as fruit of the

8   poisonous tree.  They want you to believe that our business

9   from the very beginning was so wrong and illegal and

10  invalid that we couldn't possibly exist.

11          Where on the jury form is that?  Where in the

12  instructions do they talk about fruit of the poisonous tree

13  or an invalid business model or a corrupt business?  It's

14  not there.  Again, it's meant to divert you from the true

15  goal in this case.

16          How about this?  Contract backlog.  Where in the

17  instructions does that fit in about these prospective

18  opportunities where our client may stay for 15 years might

19  pay us X amount of money, over a billion dollars.  That's

20  not what we've actually earned.

21          In this case you've seen that the total revenue

22  we've earned is about $100 million, not 1.6.

23          What was the business with the contract backlog

24  stuff anyhow?  Is that in the instructions, on your verdict

25  form?  No.

1                Security updates.  What in the world does

2      security updates have to do with the questions that you're

3      answering in this case?

4                Let me give you another view as a lawyer tool.

5      Some lawyers will try to cast their arguments in the terms

6      of a safety issue, security issue, because people sometimes

7      make decisions on what is best, safest and most secure, not

8      based upon the evidence but this idea that really a certain

9      way promotes security and safety.  I would submit to you

10     that's the only purpose of the security update deal.  We

11     have never contended we did this.  We have never told a

12     client we did this.  It's not an issue in this case.

13               Grigsby.  Do you remember the Grigsby video

14     where he had the presentation that he put the Rimini Street

15     stamp on it, rather than his?

16               Where is that in this case?  Where is that on

17     the instructions?  Is that on the verdict form?  Do you

18     have to answer a question about Ray Grigsby?  Why was that

19     even presented to you?

20               The no-brainer, the hypothetical question that

21     appears that it answers something important, but it really

22     doesn't answer anything.

23               Case in point, Brian Baggett.  He said "I would

24     not have gone with them if I knew they were infringing, but

25     I sure as heck wasn't going to stay with Oracle."

1              Every single question like this that was asked

2      to a customer, they answered it the only way anyone would

3      answer it.  No one would answer it, yeah, I'd love to do

4      business with an infringer.

5              And perhaps the biggest of all, TomorrowNow.

6              Can we go back to the presentation, Marie?

7              TomorrowNow.  You heard evidence in this case

8      about a company that Mr. Ravin was associated with who he

9      left and it later was sued by Oracle.

10             The Court has given you instruction.  The

11     instruction says you may not use evidence concerning

12     TomorrowNow to infer that, because Seth Ravin was at one

13     time associated with TomorrowNow, he, Rimini Street, or any

14     individual employed by Rimini Street did, or was more

15     likely to have done, the things Oracle contends.

16             This case is about Rimini Street, but Oracle

17     wants you to believe that TomorrowNow and Rimini Street all

18     together, and conclude that because SAP shut them down, and

19     because some official admitted to wrongdoing that all of a

20     sudden it's on us.

21             This case is about Rimini Street, not

22     TomorrowNow, and if you follow this instruction, you won't

23     be fooled by that trick.

24             What you find is when you actually start looking

25     at what's happened here, understanding as to what's

3612

1     happened and what you've been a witness to over the past

2     few weeks, the picture becomes remarkably clear.

3            For two weeks they talked about this.  Two weeks

4     they talked about all these things that aren't real proof,

5     that aren't in the bucket that you need to have to make

6     decisions on that very important verdict form.

7            Why did they do that?  This bucket is empty.

8     There's no proof of causation, there's no proof these

9     customers would have stayed and paid, there's no proof of

10    actual harm.

11           They filled this bucket up a lot.  You have to

12    roll up your pant legs because the fish are so deep in this

13    courtroom.

14           But the bucket, the one that actually matters,

15    is absolutely empty.  Why did they do that?  If they had a

16    strong case of causation, why did they spend all their time

17    on this stuff?

18           Ladies and gentlemen, I -- every trial I talk to

19    my wife, and I do my opening statement for her, I talk

20    about all the strategies in the case.

21           We've been married for 24 years.  I've known her

22    since I was in the first grade.  She is my staunchest

23    champion and my most severe critic.  She's not afraid to

24    tell me exactly what she thinks.  And I value her opinion

25    greatly.

1                  When I'm in trial -- I mean, we are very busy,

2       all these folks work really, really hard, but I find time

3       every night to give her a call and give her an update.  And

4       she knows what's going on, and she's very interested.  And

5       I tell her what I think.  Some days I tell her, hey, we had

6       a good day, sometimes I tell her we took a few on the chin.

7                  After day 8 I called her, and I said, you know,

8       we're getting destroyed in this thing.  All we're hearing

9       is that -- all of this stuff, and I am genuinely worried.

10                 I am worried that this is going to work, that

11      this case really about simple causation, where there's

12      linkage between infringement and money, something that

13      clear, whether the jury is actually going to be able to see

14      that, in view of all this, with some very fine lawyers.  I

15      said I'm worried.  I don't think they're going to get it.

16                 She always has the right thing to say, and she

17      said, "Don't worry, juries always get it right."

18                 I told you in opening, this is a failure of

19      proof case.  I didn't tell you that we're going to deny

20      these acts, I didn't tell you that we're going to try to

21      shirk our responsibility.

22                 I'm going to say, listen, just hold Oracle to

23      its burden.  Make them prove that they are going to get

24      this money from us, that's all.  Make it fair.  But you've

25      got to do that based upon the evidence.

3614

1          You have a job to do.  It cannot be clouded by

2     anything other than the evidence.

3          It is possible that I or my team have said

4     something in this trial that you didn't like.  It is

5     possible that you may not like my client or some of my

6     witnesses.  That's natural, that's human.  Sometimes people

7     don't like things, like people.

8          But if you follow the instructions, you can't be

9     guided by that, you can't be influenced by that.  You must

10    not be influenced by personal likes or dislikes or

11    opinions, prejudices or sympathy.  You have to make your

12    decision on evidence.  You're a jury.  You're here to do

13    that.

14         It is possible that you may get a result that

15    doesn't feel personally satisfying, may not feel

16    vindicating to you based on the evidence, but if you follow

17    the evidence, if you follow these instructions, you're

18    doing your job, and that's why you're here.

19         I don't get to talk to you again.  My say is

20    over.  Mr. Isaacson is a very capable lawyer, and I'm

21    confident he's going to get up here and say some very

22    persuasive things, and I'm done.

23         I have to let the evidence or lack of evidence

24    do my talking for me.  I have to have these instructions,

25    the user's manual back there in that jury room guide you

3615

1    and direct you to the right result because I can't say

2    anything else.

3            And even though Mr. Isaacson gets the last word,

4    you get the final word.  You are the ones who get to make a

5    choice.

6            I told you from the first day of this trial it's

7    about choice, and the choice now is yours.  Do you choose

8    to follow the instructions, to look at the real proof to

9    make your decision, or do you choose to be distracted by

10   things that don't really matter.

11           You have to make that choice based upon the

12   evidence.  You have to make that choice based upon the

13   instructions.

14           Keep your eye on the ball.  You have to keep

15   your eye on the ball.  And if you do that, and if you keep

16   your eye on the ball and make decisions based upon

17   evidence, we have absolutely no doubt that you'll make the

18   right choice in this case.

19           On behalf of my entire team, I want to thank you

20   for your time.  This has been a long and complex and

21   confusing ordeal, and we understand that, and you've been

22   very attentive, each and every one of you.

23           And again, with Mr. Isaacson, we all thank you

24   for your time.  And as I sit down I just want to say just

25   keep your eye on the ball and make the evidence match up

3616

1    with the result.

2              Thank you very much for your time.

3              THE COURT:  Thank you, Mr. Webb.  Ladies and

4    gentlemen, we'll take a break, approximately 15 minutes,

5    and return for the final argument, and this case will then

6    be submitted to you.

7              The admonitions still apply.  So you're getting

8    close to when you can discuss it, but you're not quite

9    there yet.  So go ahead and step down and we'll take a

10   short recess.

11             (Recess from 3:31 p.m. until 3:56 p.m.)

12             (Outside the presence of the jury.)

13             COURTROOM ADMINISTRATOR:  Please rise.

14             THE COURT:  Have a seat, please.

15             The record will show we're in open court without

16   the jury present, parties and counsel are present.

17             Counsel, I had during the break time distributed

18   to you a copy of the final verdict form, and I wanted to

19   explain how it differs very slightly with regard to some

20   edits before we started arguments.

21             And specifically what I did, I asked my clerk to

22   just do a very careful proofread of the entire verdict form

23   because we had gone back and forth on it in various

24   respects, and he did that, and I've reviewed what he found,

25   and we had all of those -- I say all, but it's only a few

1    edits corrected.  So I wanted to let you know what that is.

2            On this new verdict form that's been provided to

3    you, on page 6, at line 4 in the middle, he added -- jury

4    instruction entitled "copyright infringement" because

5    before the word infringement had been missed.

6            At line 15, the word -- there was an extra word

7    in there in the middle of line 15, was the word was.  That

8    was taken out.  It was mistakenly left in.

9            On line 20 at the end, again, copyright

10   infringement was added before it went on to damages and

11   willful infringement.

12           And then on page 12, on line 12, the fifth,

13   sixth, seventh word mistakenly read another on the form

14   that you had when it should have read "other."  So the a-n

15   was stricken.

16           And on the same page at line 25 in the middle of

17   the line, the same error was made.  It read "another" on

18   the last form, it should be "other," and that was

19   corrected.

20           And those are the limited changes.  I just

21   wanted you to know.

22           Because of the length of verdict form, I'm going

23   to send in verdict forms along with sets of instructions

24   for each juror.  There will be one original form, and the

25   others that are being sent to the jury will have the word

```
 1   copy marked on them, and the original will be contained in
 2   the envelope for the foreperson.
 3              So that's your heads-up.  Let's bring the jury
 4   in and go to final argument.
 5              (Jurors enter courtroom at 4:00 p.m.)
 6              THE COURT:  All right.  Have a seat, please.
 7              The record will show that we are in open court.
 8   The jury is all present, counsel and parties are present.
 9              And, Mr. Isaacson, it's now your opportunity to
10   give the final rebuttal argument on behalf of Plaintiffs
11   Oracle.
12              MR. ISAACSON:  Thank you, Your Honor.
13              There's a reason that lawyers stand when the
14   jury comes in.  It's because the lawyers on both sides of
15   this Court respect the jury system.
16              The judge told you about the importance of the
17   jury system in the Constitution.  The Constitution also
18   talks about the copyright clause, Article I, Section 8.
19   When this is all over and you're allowed to look at things,
20   you can look at the Constitution.
21              But it's not the lawyers that --
22              THE COURT REPORTER:  I'm sorry. I can't hear
23   you.
24              MR. ISAACSON:  -- jury system.  We're speaking
25   to you.  But it's our clients who come to the jury system.
```

1          Oracle has come to you asking you, for big

2    companies and small, to honor the law, to look at the

3    evidence, to look at what happened here, and to reach a

4    verdict based on the parties before you, Oracle, Rimini,

5    and Mr. Ravin.  That's who your verdict is about.

6          Now, at the outset we were told about the ball,

7    but right before that, we were -- said why did we spend two

8    weeks talking about these things, the conduct already

9    admitted?

10          Actually, all that was ever admitted at the

11   beginning of this trial was infringement of PeopleSoft

12   software.  All these other things were walls that came down

13   before trial -- during the trial.

14          All of them were lies that were told before

15   trial, during trial, and it wasn't until now, with all the

16   walls coming down that really the full truth is coming out,

17   that this was a corrupt business due to copyright

18   violations and lying from the beginning.

19          We didn't spend two weeks on these things to

20   show you some bits and pieces of copyright violations.  We

21   did this to show you what this company was about.

22          And what does that show you?  It shows you the

23   whole ball.  Causation.  What caused the customers to leave

24   Oracle, a company corrupt and full of our software.

25          Without that software, there was no business.

1    The company -- the customers don't leave except at their

2    normal rates, rates that Elizabeth Dean took into account,

3    and then some.

4         All of those two weeks were about the question

5    that was put before you by Rimini Street, what happened

6    here.  Massive copyright violations that caused customers

7    to leave; caused.

8         Now, if I was going to talk about the whole

9    ball -- and there's been a bouncing ball throughout this

10   litigation.  The whole ball has changed a lot.

11        Right now we're on the last -- we're on the last

12   gasp of Rimini Street for a defense, and that's that

13   instruction.

14        Now, if I was going to do that, if I was going

15   to show you page 37, I might show -- page 38, I might start

16   with page 37 before.

17        Copyright - actual damages.

18        "While there is no precise formula for

19   determining actual damages, your award must be based on

20   evidence, not on speculation, guesswork, or conjecture."

21        And we have never asked you for guesswork.  We

22   have put Elizabeth Dean in front of you and demonstrated

23   through a range of other evidence that I will quickly

24   resummarize for you about how this business was built on

25   copyright violations.

1              "Determining the amount of Oracle's actual

2      damages may involve some uncertainty."

3              It's okay to be somewhat uncertain.  That's the

4      instruction.  We are not required to establish the amount

5      of actual damages with precision because that wouldn't be

6      fair to us.

7              All right.  When someone does wrong to you, it's

8      their responsibility.  And sometimes it's hard to figure

9      out how much wrong they did to you exactly because you --

10     because you don't -- because of what they've done.  But

11     we've done it with enormous amounts of precision.

12             Then you get to page 38 which counsel showed

13     you.  We will blow it up here on the screen.  All right?

14             The issue is was infringement a substantial

15     factor in causing damages.  And, remember, this is just

16     copyright.  This is not interference and lying.

17             For interference and lying we talked about

18     causation because we showed that these -- without these

19     lies, none of these people would have gone to the company,

20     and the lies were all within standard messages.

21             But for copyright, a substantial factor is a

22     factor that a reasonable person would consider to have

23     contributed.  It's more than a remote or trivial factor.

24     It does not have to be the only cause of the harm.

25             It's got to be substantial, and this corrupt

1      business from the beginning was substantial.  That's what

2      we spent two weeks proving to you.

3                  Now, that does mean if a client left Oracle for

4      reasons unrelated to our infringement, there's no causal

5      relationship.  But all we have to show is that the clients

6      who left, that a substantial factor in that was this

7      business of violating our copyrights.

8                  And you can ask yourself who's going to leave

9      for Rimini Street if they don't have the Oracle software?

10     There was never any explanation of that.

11                 The next -- I would also -- let's go to page 41.

12     I'll touch on this while we're on the instructions.

13                 Fair market value license.  This was the Hampton

14     box that they want you to fill in.  And I will remind you

15     that counsel talked about a hypothetical license.

16     Mr. Hampton said, "I never did a hypothetical license, I

17     did my own thing called fair market value."

18                 You're not going to check that box because there

19     was no evidence for it.  You should check the box for lost

20     profits.

21                 Now, let's go to the verdict form.  First of

22     all, let's look at 1, 2, and 3.

23                 Counsel told you that they're accepting

24     responsibility in this situation, and he never asked you

25     how to -- never told you how Rimini says to fill out

1     questions 1, 2, and 3 for the additional copyright

2     infringement.  Rimini would not let him do that.

3              They say they are fessing up here, but they are

4     walking it back because they didn't tell you, yes, we are

5     guilty about Siebel, JDE.  They never said that.

6              Let's look at the iPhone slide.

7              They even said this, they said, look, we're

8     fessing up here, and then they show you this and say

9     everything we're doing is okay.

10              As if Apple is going to say, if you put some

11    apps on your phone, it's okay to steal our software.  And

12    that's what they were saying to you.  That's not in the

13    instructions.

14              Every time they take a step forward, they creep

15    forward to admitting something wrong, they take it back

16    because Rimini Street can't fully admit it.

17              And even when they are admitting things today,

18    when he asked you to fill out that verdict form, he asked

19    you to fill out numbers for Rimini Street and nothing for

20    Mr. Ravin.

21              Mr. Ravin has accepted no responsibility.  If

22    there's any money to be paid, he wants his company to be

23    paid, just like he never told his employees the truth about

24    what was going on, just like he built a business based

25    on -- without -- without being fair to them, he now wants

3624

1    his company to pay and not him.

2              All right.  Let's go to the damages portions of

3    the verdict.

4              I did this before, I want to do it again because

5    the numbers are hard, and this time we've got a way to do

6    it quickly for you.

7              PTX 6010 is the Dean summary.  And I want to

8    show you that every number that I've asked you for, that

9    Oracle has asked you for, is coming out -- correctly out of

10   our estimate of damages.  So 6A comes out of PTX there.

11   Those three numbers, they add up to 19.2 million -- I'm

12   sorry, add up to 95.7 million, and that's the total lost

13   profits.  That's 6A.

14             6B, the infringer profits.  Those three numbers,

15   they add up to 16.4 million, after we deducted that

16   16.2 million.  That's 6B.

17             6C, fair market value license.

18             Okay.  Elizabeth Dean testified that if you did

19   apply this avoided cost method, which makes no sense, if

20   you did, her number would be higher than her actual

21   estimate of, add it up, it would be over 112.1 million.

22             So if you actually added that, actually used

23   that number, I would say 112.1 million and add an extra

24   dollar, because that's what she said, it would be higher

25   than her damage estimate.

1          All right.  Next, contributory infringement.

2    This is where Mr. Ravin wants to be let off.  He should be

3    on the hook for the entire 112.1 million, not just his

4    company.

5          Same thing for question 8, vicarious

6    infringement, same figure.

7          Question 14, inducing breach of contract.  This

8    was the amount based -- this is the amount from Christian

9    Hicks based on Oracle America's share of the Siebel

10   business, 21.1 million.

11         Question 15, intentional interference.  This is

12   the lying count.  And did we ever hear in that whole

13   presentation any denial of all the lies?

14         The only thing that was said was Mr. Maddock

15   only talked to 10 customers, and Mr. Maddock said "I don't

16   talk to customers anymore, it's my staff, and they use the

17   standard messaging."

18         Of course, it's not Mr. Maddock talking to

19   customers, it's the sales force and the marketing force

20   which Mr. Rowe told you about, standard messaging of lies;

21   117.6 million.

22         Question 16.  This is Oracle International

23   Corporation's 39 percent share of the lie -- of the damage

24   caused by the lies; 76.5 million.  Question 16.

25         Question 17.  This is the California Computer

1        Act.  This is either the customers that were happening

2    during the automated downloading period, which would be

3    8.8 million, or their share of -- or Oracle America's share

4    of the Siebel business, 21.1 million.

5              California act again.  This is for Oracle

6    International.  This is the 39 percent share, 13.8 -- 5.6

7    or 13.8.

8              That's question 19 -- now question 19.  Now

9    we're to the Nevada statute.  These are the same numbers as

10   the California statute.  So it's 21.1 or 5.6 to 13.8.

11             And then the nonduplicative amount.  Oracle

12   America's share of the nonduplicative amounts add up to

13   117.6 million, and Oracle International's add up to

14   112.1 million.

15             So a few other points.

16             Can we look at their -- the slide on

17   infringement hypothetical.

18             All right.  This was shown to you.  And this is

19   one of those things that ignores the whole point because

20   the relevant point is sign up with Rimini.  Who would have

21   signed up with Rimini if they didn't have the copyrighted

22   Oracle software, or if they had known the truth?  Nobody

23   except William Leake.

24             Let's follow the bouncing ball because there was

25   a few other balls.  There was again a discussion of other

3627

1    third-party support, but at the end of the day, the

2    evidence showed from their own witnesses that for Siebel

3    and PeopleSoft, there were only two companies that took two

4    customers, and Elizabeth Dean took those companies into

5    account and analyzed those companies.

6              The -- Mr. Yourdon in causation.  They say our

7    causation case was based only on Mr. Yourdon, and after you

8    broke down all those walls, that could not be more false.

9              Now, Mr. Yourdon's testimony was as a 25-year

10   expert in the industry, the only one who deals with

11   customers on a regular basis, who examined not just 17

12   depositions, but records of 200 customers, and he said that

13   group of 5 percent at the end of the day would be like the

14   95 percent.

15             When they show you his testimony saying were

16   they in the 5 percent, the people who left?  Of course they

17   were.  They were the people who left.

18             But he said if they would have stayed at the

19   same rate, and he said also -- and this was not true what

20   was said to you about Mr. Yourdon, he said and testified

21   that if they had known of the illegal conduct, they would

22   not have gone to Oracle.

23             But it wasn't just Mr. Yourdon.  Elizabeth Dean

24   investigated the third-party support field, and she

25   analyzed damages customer by customer.

1          Safra Catz testified about the customers that

2     were lost from Rimini Street.

3          Elizabeth Dean said she took the missing

4     customers into account such as the Bausch & Lombs.

5          Rimini documents talked about taking

6     $300 million of Oracle business.  Other Rimini documents

7     talked about how they were taking Oracle customers.

8          Seth Ravin, on the stand, could not deny, when I

9     showed him all the clients that they were taking that had

10    copyright violations on which they built their company, he

11    could not deny all of this.

12          Dr. Davis was an essential witness on causation,

13    because he showed us that there were copyright violations

14    in all the major early customers and said this business

15    from the beginning was built on copyright infringement.

16          He says that -- and so when you pile all that

17    up, what was the evidence on the other side?

18          He says this is a case about no evidence.  What

19    was the evidence that any customer would have gone to

20    Rimini Street if they didn't have the Oracle software that

21    they improperly took in violation of the copyright laws?

22    There was no such evidence.

23          A few other points.  Counsel said that the

24    bottle, in a bottle was about one customer.  That's not

25    true.  PTX 50 and 51, that was Jeff Allen's analysis of all

1    the remote environments, and it wasn't solved in 2010.

2              Metalink, he showed you terms of use for them.

3    He didn't show you any terms of use for eDelivery or

4    Customer Connection.

5              He said -- he talked about the computer statutes

6    and he said focus on authorization.  The clients authorized

7    it.

8              I told you about that when I went through the

9    jury instructions.  It's not the clients authorizing it.

10   It's did Oracle authorize you to come on the computer.

11             Answer, no.

12             He said Rimini could have been operating remote

13   from day one.  That was Mr. Hampton, that was the lie

14   planted by Seth Ravin into Mr. Hampton and all of his

15   assumptions that followed thereafter about operating

16   remotely.

17             And that's why the TomorrowNow evidence was

18   relevant.  That's why we brought up TomorrowNow, because

19   when Seth Ravin found out that TomorrowNow had admitted

20   wrongdoing and went 100 percent remote, he said that was

21   ridiculous.  No, they couldn't do it, much less from day

22   one.

23             He says -- counsel says there's -- customers

24   relied -- there's no evidence that customers relied on

25   Rimini representations.

1              All of the evidence was that the customers

2     believed and acted in reliance on Rimini obeying the

3     copyright laws, and that the representation to the

4     contrary, that we didn't have cross-use, that we didn't

5     have the libraries, that we didn't have the general

6     environments, that all of those were false, and that's when

7     I read all 17 of those to you out loud.

8              He says Mr. Baggett -- we weren't allowed to

9     tell him what was actually going on during trial, we

10    couldn't talk to him about the testimony.

11             You could have told him before trial.  You could

12    have told him years ago exactly what was going on here.

13             Why was Mr. Grigsby brought up?  Because he

14    copied JD Edwards documents.  That's part of copyright

15    violations.

16             Binary equals.  Why don't we show that slide.

17             Shelley Blackmarr is not an expert on what

18    things are binary equals.  She says she thought they were

19    binary equals, but the rest of the company was doing it if

20    they had similar code.

21             Christian Hicks was quoted -- next, rebuttal 18.

22             The top part of this is what counsel read to

23    you,

24             "If you skip down to the next question, so when

25    you totalled the analysis provided in Exhibit 10, you found

1    the average increase was 2.4 seconds?

2              "Yes."

3              Here's what he said next.

4              "Yes.  Hang on a second.  That's this analysis

5    done by another expert, the guy who ignored Thanksgiving.

6    That doesn't make any sense."

7              That was not shown to you.

8              Rebuttal slide 20.

9              This quote from Safra Catz was shown to you.

10             "Maintenance continues to be a very profitable

11   part of our business.

12             "Yes.

13             "Do you remember saying that?"

14             What did they leave out?

15             "And do you agree with that?

16             "Yes.  Maintenance is absolutely critical to

17   improving our business and our profitability margins.  It's

18   absolutely critical, it's the only way we're able to afford

19   to invest in our product in our companies."

20             They said that Elizabeth Dean never considered

21   the cost of noninfringing.  That's not true.  She said it

22   was the cost of the whole business.

23             At the end of the day, Rimini, from the

24   beginning of this case, tried to be the masters of how to

25   get away with it.

3632

1          It started with denying that there was a

2     library, denying that there were cross-uses and fixes.

3          At the beginning of the trial they kept trying

4     to -- these things.  They talked about the things that were

5     in the library, not in the library, the installation media.

6     The walls kept coming down.

7          Then they brought Mr. Hampton in with his

8     fairytale of value of use that he had never tried in any

9     other case that was full of assumptions that didn't make

10    sense and that we ultimately found out came from a

11    discussion from Mr. Ravin.

12         What we are asking you for, it's time for truth

13    to prevail.  The walls are down.  You do have the evidence

14    in front of you, you do know the truth, it's time for

15    accountability.  It's time for accountability for CEOs.

16         When you go through the verdict form, we know

17    you'll continue to work hard.  We know you'll pay attention

18    a lot, and we thank you for that.

19         But we ask you to understand that truth and

20    accountability matter and that you reach judgment

21    accordingly.

22         I thank you for your time.

23         THE COURT:  Thank you, Mr. Isaacson.

24         Ladies and gentlemen, you'll now be -- you will

25    now turn to deliberations.

1            It's late in the day, 4:20 now.  You will

2    have -- each one of you will have a set of instructions,

3    and each one of you will also have a copy of the verdict

4    form.

5            Your first business, of course, as I indicated

6    in the instructions, will be to choose your foreperson who

7    will be your spokesperson here in court and who will

8    ultimately be responsible for signing the original verdict

9    form.

10           The original verdict form is enclosed in this

11   brown envelope.  The copies of the verdict form are with

12   it, and I will give those now to our court clerk because

13   she can give those to you along with the instructions which

14   she already has.

15           Let me talk about the admonition.  You can now

16   fully discuss this case among yourselves.  And I've watched

17   you since we started, and I'm very pleased to see that

18   you're a good group who gets along and strikes me as

19   someone who will be able to discuss this case very well.

20           You can discuss it.  You can review any exhibits

21   that you would like to see.  We're not going to send all

22   these exhibits in.  If there is a particular exhibit you

23   would like to see -- do we have them in a binder at this

24   point?

25           COURTROOM ADMINISTRATOR:  I do, I have them down

1        to what's admitted.

2                    THE COURT:  So you will have a binder in the

3        jury room.  You will not have to send out a request.

4                    There have been a number of screens put up in

5        front of you during the course of examination of witnesses.

6        Some of those were to assist the questioning and were not

7        actually in evidence.  So you do not have most of those as

8        exhibits.

9                    The exhibits were almost always identified as

10       PTX or DTX, and that is what you will actually have in the

11       jury room.

12                   The testimony, of course, you've heard from the

13       witnesses.  You've also seen the videotapes of depositions,

14       and I've instructed you regarding that.

15                   The last word I would have to say is it's so

16       critical that you not discuss this case outside the jury

17       room, that you only discuss it among yourselves.

18                   All those admonitions that I outlined to you

19       still apply as to anything outside the jury room.  So

20       discuss it freely and fully between you.

21                   I know there's a lot to cover, and I know that

22       it's an undertaking, and it's just part of this public

23       service that jury duty involves.

24                   And I'm confident that you're a strong jury who

25       will be able to satisfy that responsibility.  But under no

1     circumstances should you discuss this case in any way

2     outside the jury room.

3            Under no circumstances should you allow yourself

4     to be exposed to anyone speaking about it.

5            Under no circumstances would you ever want to

6     use anything that's not in the way of exhibits and in front

7     of all of you in the jury room, so no Googling, no Internet

8     searches, no dictionaries, nothing that's not included in

9     the evidence that you have in front of you in the jury

10    room.

11           The hours are significant to me here.  We've

12    been running on an 8:00 to 2:00 schedule on Tuesdays,

13    Wednesdays and Thursdays, but now that this case is to you,

14    it's up to you to determine which hours you would like to

15    meet.

16           I suggest a full day, obviously, but if you'd

17    like to meet at 8:00 in the morning or 9:00 in the morning,

18    either one of those times I would suggest is fine.

19           If you want to go later in the afternoon until

20    4:00 to 5:00, I would suggest to you that those times are

21    fine.

22           The only thing I would ask is that after you've

23    had a chance to discuss that among yourselves, that someone

24    give a note to Ms. Negrete as to what hours you'll be

25    deliberating, and if that changes, of course, you could

3636

1    advise us accordingly.

2              But that's significant because we have so many

3    people who are interested in following when this case is

4    finally decided and people we need to notify and they need

5    to be available.  So your hours are important to people who

6    are here in the courtroom.

7              But you're the ones who will decide those.  So

8    just let us know what will work best to you and is mutually

9    acceptable all the way around.

10             You will be provided with the same types of

11   refreshments and, I think, the better food that was finally

12   brought in, I think, starting last week.

13             And if you have any problems with what you're

14   being provided or not provided, you may send a little note

15   out and we'll see what we can do about that.

16             So I think that covers what I need to discuss

17   with you at this time.  So I think again I speak on behalf

18   of everyone in the courtroom, I thank you for your

19   attention on this case and for assuming this heavy

20   responsibility that goes with deciding this particular

21   case.

22             So at this time, I'm going to excuse you for

23   purposes of your deliberations.

24             I do need to swear in our court marshal who will

25   be outside your door.  If you have any needs or anything

1    like that, you can hand a note to him, and he'll work for

2    us.

3              (Bailiff sworn to take charge of the jury.)

4              COURTROOM ADMINISTRATOR:  Thank you.

5              THE COURT:  All right.  Thank you.  You may step

6    down.  Thank you.

7              (Jurors exit courtroom at 4:28 p.m.)

8              THE COURT:  I'm not aware of anything that the

9    Court needs to address.

10             You can have a seat.

11             Counsel, you know the importance of staying in

12   touch with the court clerk at all times.  And we'll let you

13   know what those hours are just as soon as the jury advises

14   us, and we will take it from there.

15             There will not be a shortened schedule.  If we

16   went until Friday, I would go the day, we'd work it out,

17   and if it went over until Monday, they would start in the

18   morning for the benefit of anyone's calendars.  I have no

19   idea how long the jury will take, obviously.

20             All right.  Thank you very much.

21             MR. ISAACSON:  Logistics-wise, we'll be about

22   three miles away.

23             MR. WEBB:  Regrettably, we are further than

24   that.  Our plan, Judge, is to have a partner on the team

25   here at all times for questions and things, but for the

1      verdict we might ask for a little bit of a head start so we

2      can all get back here.  I know Mr. Ravin would obviously

3      like to be here in person.

4                THE COURT:  All right.  That's what we will do.

5                One final point.  In the event I should get a

6      question from the jurors, sometimes it's a very simple

7      question, and it's much easier to resolve with everyone on

8      the phone, so make sure we know how to reach you

9      telephonically.

10               But, of course, you have the right to be here,

11     and if anyone wants to be here at the time -- I don't bring

12     the jury in if they have a question, they'd send it out in

13     a written question, but I would not respond to it without

14     having informed both sides fully of the question and taken

15     input with regard to the answer.

16               Sometimes, if it's a very simple answer, I'll

17     run the proposed answer by counsel, and if they have input

18     one way or the other, I'm certainly listening.

19               If it's a more substantive question, I certainly

20     would encourage your being here.  But once again, I'm

21     willing to work on that telephonically because it's been my

22     experience that if they send out a question, they tend to

23     wait until they get an answer, even though they're

24     encouraged to go on with other matters.  So there is some

25     issue relative to being available for substantive

3639

1    questions.

2              And, again, I follow the same practice, I would

3    review the written question with counsel, I would discuss a

4    proposed response, and no response would go to the jury

5    without having done that here in open court.

6              So that's the game plan.

7              I understand we have now received all the

8    exhibits that were not admitted because of the need for

9    redaction -- oh, and you had another point there too.

10             I'm going to review those, but I assume that

11   both sides have had an opportunity to review the exhibits

12   and their redactions and there's no objection to their

13   admission over and above what would have previously been

14   raised; is that correct?

15             MR. HIXSON:  Your Honor, Oracle has not had an

16   opportunity to review their final redactions.  We will do

17   that tonight.

18             THE COURT:  I would need to know that first

19   thing in the morning before anything would go into the

20   jury.

21             MR. HIXSON:  Thank you.

22             THE COURT:  So let's plan on meeting here a half

23   hour from when the jury tells us -- before the jury tells

24   us they're coming in tomorrow morning, and I'll cover that

25   last base with counsel.

3640

1          Let's see.  I do need a stipulation from counsel

2     to return the exhibits which have not been admitted into

3     evidence, and to return the witness binders to counsel, and

4     also a stipulation to return deposition transcripts.

5          What are you talking about there, Dionna?

6          COURTROOM ADMINISTRATOR:  All these boxes here

7     of the depositions.

8          THE COURT:  All right.  You're all more familiar

9     with that than I am.  There will be a stipulation that they

10    be returned to counsel.  I know you don't want them but you

11    get them.

12         All right.  So I think that covers what I need.

13    I'll review that evidence and I'll touch bases on that in

14    the morning.  Thank you very much.

15         COURTROOM ADMINISTRATOR:  Please rise.

16         THE COURT:  Court will be in recess.

17         (The proceedings adjourned at 4:33 p.m.)

18                    *    *    *

19

20

21

22

23

24

25

3641

1                              -o0o-

2        I certify that the foregoing is a correct

3        transcript from the record of proceedings

4        in the above-entitled matter.

5

6        _____     10/7/15

7        Donna Davidson, RDR, CRR, CCR #318      Date
         Official Reporter

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25