3648

1        UNITED STATES DISTRICT COURT
             DISTRICT OF NEVADA
2     BEFORE THE HONORABLE LARRY R. HICKS, DISTRICT JUDGE

3

4   ORACLE USA, INC., a Colorado     :
    corporation; ORACLE AMERICA,     :
5   INC., a Delaware corporation;    :
    and ORACLE INTERNATIONAL         :No. 2:10-cv-0106-LRH-PAL
6   CORPORATION, a California        :
    corporation,                     :
7                                    :
          Plaintiffs,                :
8                                    :
       vs.                           :
9                                    :
    RIMINI STREET, INC., a Nevada    :
10  corporation; and SETH RAVIN,     :
    an individual,                   :
11                                   :
          Defendants.                :
12  _____:

13

14

                TRANSCRIPT OF JURY TRIAL - DAY 20
15                  (Pages 3648 through 3906)

16

17                     October 9, 2015

18

                     Las Vegas, Nevada
19

20

21

22

    Court Reporter:        Donna Davidson, RDR, CRR, CCR 318
23                         Certified Realtime Reporter
                           400 South Virginia Street
24                         Reno, Nevada  89501
                           (775) 329-0132
25

3649

```
 1                    A P P E A R A N C E S

 2    FOR THE PLAINTIFFS:

 3    BOIES, SCHILLER & FLEXNER LLP
      KIERAN P. RINGGENBERG
 4    1999 Harrison Street, Suite 900
      Oakland, California 94612
 5    (510) 874-1000
      Fax: (510) 874-1460
 6    kringgenberg@bsfllp.com

 7    BOIES, SCHILLER & FLEXNER LLP
      RICHARD J. POCKER
 8    300 South Fourth Street, Suite 800
      Las Vegas, Nevada 89101
 9    (702) 382-7300
      Fax: (702) 382-2755
10    rpocker@bsfllp.com

11    BOIES, SCHILLER & FLEXNER LLP
      WILLIAM A. ISAACSON
12    KAREN L. DUNN
      5301 Wisconsin Avenue, NW
13    Washington, DC  20015
      (202) 237-2727
14    Fax:  (202) 237-6131
      wisaacson@bsfllp.com
15    kdunn@bsfllp.com

16    MORGAN LEWIS & BOCKIUS LLP
      THOMAS S. HIXSON
17    NITIN JINDAL
      JOHN A. POLITO
18    One Market, Spear Street Tower
      San Francisco, California 94105
19    (415) 442-1000
      Fax:  (415) 442-1001
20    thomas.hixson@morganlewis.com
      nitin.jindal@morganlewis.com
21    john.polito@morganlewis.com

22    JAMES C. MAROULIS
      DORIAN E. DALEY
23    Oracle Corporation
      500 Oracle Parkway
24    Redwood City, California 94070
      (650) 506-4846
25    jim.maroulis@oracle.com
      dorian.daley@oracle.com
```

3650

1                  A P P E A R A N C E S (Continued)

2    FOR THE DEFENDANTS:

3    SHOOK, HARDY & BACON LLP
     PETER E. STRAND
4    B. TRENT WEBB
     RYAN D. DYKAL
5    2555 Grand Boulevard
     Kansas City, Missouri 64108
6    (816) 474-6550
     Fax: (816) 421-5547
7    pstrand@shb.com
     bwebb@shb.com
8    rdykal@shb.com

9

     SHOOK, HARDY & BACON LLP
10   ROBERT H. RECKERS
     MICHAEL W. GRAY
11   600 Travis Street, Suite 3400
     Houston, Texas 77002
12   (713) 227-8008
     Fax: (713) 227-9508
13   rreckers@shb.com
     mgray@shb.com
14

15   SHOOK, HARDY & BACON LLP
     ANNIE Y.S. CHUANG
16   One Montgomery Tower, Suite 2700
     San Francisco, California 94104-4505
17   (415) 544-1900
     achuang@shb.com
18

19   LEWIS ROCA ROTHGERBER LLP
     W. WEST ALLEN
20   3993 Howard Hughes Parkway, Suite 600
     Las Vegas, Nevada 89169
21   (702) 949-8230
     Fax: (702) 949-8364
22   wallen@lrrlaw.com
      `
23

24

25

3651

1          LAS VEGAS, NEVADA, OCTOBER 9, 2015, 10:06 A.M.

2                           --oOo--

3                    P R O C E E D I N G S

4

5          (Outside the presence of the jury.)

6          THE COURT:  We are convened in court with

7     counsel outside the presence of the jury.

8          We have received the following two questions

9     from the jury:

10          May we have Ms. Dean's testimony?  May we have

11     Mr. Hampton's testimony?  Essentially asking for readbacks

12     of those two testimonies.

13          I know you want to confer about this, or I

14     suspect you do.  Maybe you don't.

15          I checked with our court reporter, Ms. Davidson,

16     and she advises that the combined testimony covers some 427

17     pages of transcript.  That tells me it would take probably

18     in the neighborhood of six to seven hours to read, which I

19     think is difficult to do.  I -- my view is I'm inclined,

20     particularly in a complicated trial such as this one that

21     covered an extended period of time, to provide readbacks.

22          And normally the readbacks that were -- are

23     requested are on substantive issues.  This is certainly a

24     substantive issue and a complicated issue as well and also

25     involves testimony that was presented to the jurors at

1     earlier times.  And so it's easy to understand why they

2     would be concerned about being refreshed with regard to

3     this testimony.

4              I also think, having sat through the testimony

5     involved, that it would be very difficult for the jury to

6     identify isolated portions or segments of testimony that

7     would be fair to both sides.

8              So my thought is -- and what I'm interested in

9     is the reaction of counsel -- first of all, is counsel's

10    own thoughts on it after you've had a chance to think about

11    this; and, secondly, of just providing the transcripts of

12    the witnesses' testimony.

13             Ms. Dean's testimony was 181 pages, and

14    Mr. Hampton's testimony is 246 pages.

15             I think in fairness to the jury that I would

16    want to run probably four copies of each witness's

17    testimony and give them those in the courtroom -- in the

18    jury room, excuse me.

19             I think that would allow them to get what they

20    need to see and to discuss, and also have the benefit of

21    the entirety of the testimony, and also not be dependent

22    upon one person in the jury room picking out a portion and

23    reading it.

24             So that's my thought on what might be practical.

25    I don't know if you have other thoughts or if you would

3653

```
 1    like a few minutes to discuss this among yourselves.  But
 2    that's what I'm thinking.
 3              MR. WEBB:  Your Honor, if that's what you think
 4    is best, then we're perfectly fine with that.
 5              THE COURT:  All right.
 6              Mr. Isaacson.
 7              MR. ISAACSON:  As much as an 8-hour readback
 8    would help pass the time, we agree with your suggestions.
 9              THE COURT:  All right.  Well, I'm pleased to
10    hear that.  There's no objection to either side, then, of
11    the proposal of printing up the transcripts and running off
12    four copies of each transcript and provide that to the
13    jury.  All right.
14              Okay.  I will prepare a response to the jury
15    that -- well, don't hold me to it verbatim.
16              As a matter of fact, I'd be more comfortable if
17    I adjourn for a moment, dictate this to my administrative
18    assistant, and then come back with the proposed response so
19    that we all know exactly what they are being told.
20              So I'll be back shortly.  Just relax.  Have a
21    seat.
22              (Recess from 10:11 a.m. until 10:24 a.m.)
23              (Outside the presence of the jury.)
24              THE COURT:  All right.  Have a seat.
25              Again, in court without jury present.  Counsel
```

1    are present.

2              On the first issue, thinking about the

3    transcripts while this response was being prepared, it will

4    be necessary to remove from the transcript the sidebar

5    conferences and objections which were sustained.  So

6    Donna's good at that.  I think that we'll be able to still

7    have the transcripts shortly.

8              So here's the response.  And I will prepare this

9    for filing in this case.  And we'll send it back to the

10   jury if there's no objection.  It's under the Court's

11   caption.

12             It says:

13             "Jury Question No. 1.

14             "Note received from jury:

15             "You have asked whether you may have

16      Ms. Dean's and Mr. Hampton's testimony.

17             "Court's response:

18             "The answer to your question is yes.  The

19      Court will provide you four copies of the

20      transcript of each of the two witnesses' testimony.

21      However, it will take at least a half an hour for

22      the copies to be prepared:

23             "Dated this 9th day of October 2015."

24             Is there any objection to that response?

25             MR. ISAACSON:  No objection.  One suggestion

1    perhaps.

2            THE COURT:  Yes.  I'm open to suggestion.

3            MR. WEBB:  Your Honor, my team has further

4    considered this question in general, and on reconsideration

5    we would object to giving the jury any transcripts and

6    advise them to rely on their recollection.

7            THE COURT:  Okay.  All right.

8            Mr. Isaacson, the position of Oracle?

9            MR. ISAACSON:  I have not been in a situation

10    before where there was an objection.  So I would actually

11    technically want to look into it before sending something

12    back that was objected to, out of prudence.  I don't

13    know -- we'd want to do some quick research.

14            THE COURT:  Okay.  Well, I respect the parties'

15    position.  I'll give you an opportunity to do that.  I'll

16    modify the note.

17            MR. ISAACSON:  We're in favor of it,

18    obviously -- or maybe not obviously.  We're in favor of it.

19    We would like to check to see if anyone has ever criticized

20    sending transcripts back to the jury over an objection.  I

21    don't know if the Court -- we won't do the research,

22    however, if the Court's inclined to not do it in light of

23    the objection.

24            THE COURT:  Well, I'm uneasy myself because

25    while I've certainly approved readbacks where a similar

1    situation has arisen where it's a sensitive issue in the

2    case and I'm of the opinion that it would benefit the jury

3    in the course of its deliberations, I have approved

4    readbacks.  And I find that's applicable here.

5            The obvious complication is that we're talking

6    about very extensive testimony that took at least three

7    days to be presented here before the jury in the course of

8    this trial.  And so we're talking about very major

9    transcripts, some 427 pages of transcript.

10           But in light of that, prudence tells me as well

11   that there's a value in doing some research to determine

12   the -- if there's a legal problem with this.  And I --

13   my -- the feelings I have expressed here are basically my

14   personal feelings based on my personal experience.

15           And I have certainly researched and considered

16   the question of readbacks before.  And I've actually

17   refused some readbacks when I felt that it was a simple

18   matter of telling the juries to rely upon their

19   recollections and return to the jury room for their

20   deliberations.

21           But this case is just too complex for the Court

22   to be of that opinion.  So let's -- rather than waste any

23   further time, I'll remind the jury that we're considering

24   their request and encourage them to continue with their

25   deliberations.

1              MR. WEBB:  Thank you, Your Honor.

2              MR. ISAACSON:  The only other thing I would add

3    is if you do go forward with it, perhaps they would like a

4    word index.

5              THE COURT:  I'm sorry?

6              MR. ISAACSON:  In the event we do provide them

7    the transcripts, my only other point would be perhaps to

8    give them the word index also.  Because if they're looking

9    for something specific, we find that handy.  The word index

10   at the back allows them to find specific things.

11             THE COURT:  Okay.

12             Donna, is there a problem with that?

13             THE COURT REPORTER:  No.

14             THE COURT:  Okay.  All right.  It's 10:30 now.

15   I'd like to -- do you have a sense, Counsel, how much time?

16             MR. WEBB:  30 minutes, Your Honor.

17             THE COURT:  All right.  We'll reconvene at

18   11:00.

19             MR. ISAACSON:  Thank you, Your Honor.

20         (Recess from 10:29 a.m. until 10:54 a.m.)

21         (Outside the presence of the jury.)

22             THE COURT:  All right.  Again, we're convened

23   without jury present in open court with counsel present.

24             I understand there's been some proposed

25   resolution of the pending issue.

1          MR. ISAACSON:  It turns out happily that there

2    is express Ninth Circuit guidance on this and an

3    instruction that would be given along with the -- providing

4    the transcript.  And I think we're in agreement that the

5    transcript could be provided along with the instruction.

6          The defense does not want the word index to go

7    back, and so we will not ask for the word index to go back.

8          THE COURT:  All right.  Okay.  I also reviewed

9    the Ninth Circuit case.  I believe -- is it Hernandez?

10         MR. ISAACSON:  There's a *US versus Montgomery*,

11   they have the exact instruction that should be given, which

12   we can hand that up.

13         THE COURT:  All right.

14         MR. STRAND:  And, Your Honor, just for the

15   record, defendants are agreeable with providing that

16   instruction.

17         While an index, I think, would be helpful, it's

18   not evidence.  We just have an objection to sending an

19   index back, as good as I'm sure that it is, to the jury

20   when it's not evidence.

21         THE COURT:  All right.

22         MR. STRAND:  But we do not object to sending the

23   transcript back.

24         THE COURT:  Okay.  And for the benefit of the

25   record, I should have also identified the history of this

1    matter.  And you can correct me if you disagree in any way.

2              But for the benefit of the record, I am aware

3    that counsel have requested a daily transcript of all

4    testimony presented during the trial, and the daily

5    transcripts have been provided.

6              And that involves final transcripts that have

7    been prepared by our court reporter that have also been

8    subject to some intense proofreading and have been prepared

9    in final form and provided to counsel.

10             So the situation we find ourselves in this trial

11   is different than in many cases where there has not been a

12   transcript prepared and counsel have not had an opportunity

13   to review what has been provided.

14             And in this case, the respective testimonies of

15   the expert witnesses, Dean and Hampton, were provided some

16   days ago and would have been provided to counsel on the

17   night or certainly by the following day of the respective

18   witness's testimony.  And I'm confident that counsel will

19   confirm that they've had an opportunity to review that

20   testimony.

21             And I'll ask you now, for the benefit of the

22   record, are there any objections to the testimony as

23   reported?

24             MR. ISAACSON:  No, Your Honor.

25             MR. STRAND:  No, Your Honor, we noted none.

1              THE COURT:  All right.  And do you confirm that

2    that has been what is occurring in this case?

3              MR. ISAACSON:  Yes, Your Honor.

4              MR. STRAND:  Yes, Your Honor.

5              THE COURT:  All right.  I will give the limiting

6    instruction as follows.  And what I'll do is incorporate it

7    into my written response to the jury relative to the copies

8    of the transcript.

9              I will prepare that and come back in and review

10   it with you because it's taking some time obviously to

11   prepare those copies.

12             MR. STRAND:  Thank you, Your Honor.

13             THE COURT:  All right.  Thank you.

14        (Recess from 10:58 a.m. until 11:19 a.m.)

15        (Outside the presence of the jury.)

16             THE COURT:  You can remain seated.  I wanted to

17   make sure there was no objection to giving this to the

18   jury.

19        (Recess from 11:20 a.m. until 11:40 a.m.)

20        (Outside the presence of the jury.)

21             THE COURT:  All right.  Have a seat, please.

22             Again, we're in open court.  Counsel are

23   present, jury is not.

24             Counsel, I had this limiting instruction

25   distributed to you, and I understand there's no objection.

1    But for the benefit of the record, I thought I would read

2    it and confirm there's no objection.

3             It provides:

4             "The Court is providing you four copies of

5        the witness testimony of Elizabeth Dean and Scott

6        Hampton.  Along with the provided transcripts, the

7        Court also provides this instruction:

8             "The testimony at trial is the evidence in

9        this case, not the transcripts that are being

10       provided to you.  The transcript is not

11       authoritative.  If you remember something different

12       from what appears in the transcripts, your

13       collective recollection is controlling.  In other

14       words, the transcripts may not serve as a

15       substitute for the collective memories of the jury

16       or take the place of the assessment of the

17       credibility of witnesses subject to the usual

18       rules.

19            "Further, as the Court has previously

20       instructed you, you must weigh all of the evidence

21       in this case and not focus on any one portion of

22       the trial.

23            Dated this 9th day of October, 2015.

24            Larry R. Hicks, District Judge."

25            Any objection to that instruction?

1           MR. STRAND:  No objection from defendants, Your

2     Honor.

3           MR. ISAACSON:  No objection, Your Honor.

4           THE COURT:  All right.  The transcripts are now

5     prepared, so I will have this instruction with a copy for

6     each juror.  And we have four sets of the copies of the

7     transcripts ready.

8           And I understand counsel have been provided with

9     copies of what's being provided.  I believe we removed all

10    of the objection material that was sustained and the

11    sidebar conferences as well.

12          MR. ISAACSON:  We've reviewed the transcripts,

13    and we're comfortable with the copies we were given, Your

14    Honor, and have no objection to those going back.

15          THE COURT:  All right.

16          Mr. Strand?

17          MR. STRAND:  As are defendants, Your Honor.  We

18    have no objection.

19          THE COURT:  All right.  Thank you.  We'll go

20    ahead and distribute the transcripts.

21          Thank you very much.  We'll stay in touch.  I

22    think you can leave for a while.

23          MR. STRAND:  Thank you, Your Honor.

24          COURTROOM ADMINISTRATOR:  Please rise.

25        (Recess from 11:42 a.m. until 12:35 p.m.)

1             (Outside the presence of the jury.)

2                 THE COURT:  Have a seat, please.

3                 The record again will show that the jury is not

4      present.  Counsel are present.  And I've distributed a copy

5      of the note with four questions to counsel previous to this

6      at the time that that came in, which escapes me at the

7      moment.  But I understand counsel have had an opportunity

8      to review the questions and have some suggestions.

9                 MR. WEBB:  Correct, Your Honor.  We agree on an

10     approach.  That is with respect to Question No. 1, we would

11     refer the jury to Instruction 28.

12                And then with respect to Question No. 2, we

13     would refer the jury to Instruction No. 60.

14                THE COURT:  60?

15                MR. ISAACSON:  6-0.

16                MR. WEBB:  I think that's right.  Bill, is that

17     correct?

18                MR. ISAACSON:  Yes.  And Question 3 we

19     understand the answer to be no, unless something's changed?

20                THE COURT:  Yeah.  I mean, if they -- here's --

21     maybe I should fast forward to 4.  And my response to 4 is,

22     "If you can reach a verdict tonight, we'll be here."  And I

23     think I spoke for everybody.

24                MR. ISAACSON:  Yes, Your Honor.

25                THE COURT:  "And if you can't reach a verdict

1     tonight, then you would reconvene on Tuesday."

2            And I would also bring them in tonight, before

3     they leave, and give them the admonition about not

4     discussing the case with anyone or resorting to any outside

5     materials, not taking any of the evidence home with them.

6            So that takes me back to 3.  And it sounds as

7     though -- if counsel felt strongly about convening them on

8     Monday, the holiday, it is possible.  I haven't gotten a --

9     I inquired with that concern over the last two days.  And

10    it is possible.  It's not guaranteed, but possible.

11           So if you felt strongly about bringing them back

12    on Monday, I -- I mean, my personal assessment is that

13    they've become conditioned to their schedule, they're

14    probably planning on their weekend, they'd like to finish

15    this case if they could; but if they were pushed to come

16    back on Monday, my -- because I think it's a federal

17    holiday, it's not a state holiday, we don't have any

18    federal employees on the jury, and I'm not -- I can't

19    recall any employers who I would think would be declaring

20    it a work holiday -- vacation day -- or, excuse me, a

21    holiday.  So I'm thinking they might conceivably be

22    available on Monday.

23           But if it's effectively only another day of

24    deliberations and there's no great urgency, I think they

25    could handle Tuesday just as well, and they could probably

1    use the break as well.

2              MR. WEBB:  We agree, Your Honor.

3              MR. ISAACSON:  Basically whatever they prefer is

4    what we would -- would be fine with us.

5              THE COURT:  All right.  That may be the way to

6    pose the question.  If they -- Monday is a federal holiday;

7    however, arrangements could be made for the jury to

8    reconvene on Monday if they would like to do so, the Court

9    will do all in its power to make that available.

10             Are you in agreement with that?

11             MR. WEBB:  Yes, Your Honor.

12             THE COURT:  Okay.  We're working out these

13   responses.  And I'll take a look at Instructions 28 and 60.

14   Before anything goes back to the jury, we'll review it

15   again.  It will take a few minutes.

16             MR. WEBB:  Thank you, Your Honor.

17          (Recess from 12:39 p.m. until 12:53 p.m.)

18          (Outside the presence of the jury.)

19             COURTROOM ADMINISTRATOR:  Please rise.

20             THE COURT:  The record will show open court, no

21   jury present, counsel present.

22             I passed out proposed responses to the last set

23   of jury questions.  I'll let you review those.  And when

24   you're finished, just let me know how that works for you.

25             MR. ISAACSON:  I think our joint request would

1   be that in response to Question 1 in the first paragraph

2   that you also refer them to Instruction No. 28.

3                 THE COURT:  Okay.  At what point?

4                 MR. ISAACSON:  Before you -- before "Concerning

5   Question 6a, 6b," et cetera.  So in the -- you have a

6   paragraph that ends with a colon.

7                 So you might say "The Court directs your

8   attention to Instruction 28 as well as the following

9   instruction," something like that.

10                THE COURT:  Okay.

11                MR. WEBB:  Just not to --

12                THE COURT:  Or we could include 28 in each one

13  of the three.  So "The Court directs your attention to Jury

14  Instruction Nos. 28 and 31, and 6b would be 28 and 32.  And

15  I don't recall if it would be included with 6c.

16                MR. ISAACSON:  It would be.  So that would be

17  fine too.  28 and 31, 28 and 32, 28 and 33.

18                MR. WEBB:  I agree, Your Honor.

19                THE COURT:  Is that agreeable?

20                MR. ISAACSON:  Yes.

21                MR. WEBB:  It is, Your Honor.

22                THE COURT:  All right.  So those will read --

23  I'm at line 5 of the second page.  "Concerning Question 6a,

24  lost profits, the Court directs your attention to Jury

25  Instructions No. 28 and No. 31."

1                    Line 7, "The Court directs your attention to

2    Jury Instructions No. 28 and 32."

3                    And line 9, "The Court directs your attention to

4    Jury Instructions No. 28 and 33."

5                    Do I have that right?

6                    MR. WEBB:  You do, Your Honor.

7                    MR. ISAACSON:  Yes, Your Honor.

8                    THE COURT:  All right.  Now, instruction --

9    Question No. 2?

10                   MR. WEBB:  We believe that's accurate, Your

11   Honor.

12                   MR. ISAACSON:  We agree, Your Honor.

13                   THE COURT:  All right.

14                   Question No. 3?

15                   MR. ISAACSON:  We're fine with that, Your Honor.

16   And if you get any response from them, we would appreciate

17   a note.

18                   THE COURT:  I would let you know.  You want the

19   language to be a little stronger?

20                   MR. ISAACSON:  No.

21                   THE COURT:  My court reporter just threatened to

22   throw her machine at me --

23                   MR. ISAACSON:  That was my wife laughing.

24                   THE COURT:  -- let the record show.

25                   All right.  We'll leave it the way it is.  I can

3668

1    just state it as we can do business on Monday.  It's not

2    clear.  We have to make arrangements for double time for a

3    whole bunch of people.  But I can do it on Monday if you

4    want to.

5              MR. WEBB:  We don't have a burning desire, Your

6    Honor.  It's up to the jury.  If they really want to --

7              THE COURT:  Okay.  We'll leave it just the way

8    it is.

9              A response to 4, self-explanatory.

10             MR. ISAACSON:  That is fine with us, Your Honor.

11             THE COURT:  Okay.

12             MR. WEBB:  Same here.

13             THE COURT:  All right.  Okay.  I'll make those

14   edits to the response to Question 1, I'll sign this, and

15   we'll deliver this to the jury.

16             MR. ISAACSON:  Thank you, Your Honor.

17             THE COURT:  Thank you.

18        (Recess from 12:58 p.m. until 4:19 p.m.)

19        (Outside the presence of the jury.)

20             THE COURT:  All right.  Let's bring the jury in,

21   please.

22        (Jurors enter courtroom at 4:20 p.m.)

23             THE COURT:  All right.  Have a seat, please.

24             The record will show that we are in open court.

25   Counsel for the parties are present on short notice, and we

3669

1       don't have everyone.  And I just wanted to call you in,

2       ladies and gentlemen.  The record will show that the jury's

3       all present.

4                    One, I appreciate the hard work that you've

5       obviously been involved in and the public service that goes

6       with serving as a juror really hits home when it finally

7       comes down to deliberating and deciding the case and moving

8       through everything that a jury must move through to reach

9       its verdict in the case.  And I speak on behalf of everyone

10      when I say we all appreciate what you're doing and the

11      obvious responsibility that you've assumed in doing it.

12                   All of that stated, as you know from the

13      response to the note I gave you earlier this afternoon, the

14      Court is going to be closed on Monday, which is Columbus

15      Day, a holiday.  I could have made arrangements to have you

16      back in if you had wanted to, but I haven't heard that you

17      did.  And I think everyone could use the three-day weekend

18      for a rest before you return to your duties here on Tuesday

19      morning.  And we'll start promptly at 8:00 on Tuesday

20      morning.

21                   But because of the gap that we will be facing

22      with the three-day adjournment, it's very important that I

23      remind you of the admonitions which still apply.  And those

24      are that it is so critically important that you not discuss

25      this case outside of the jury room with anyone.  And that

1    admonition is more critical now than ever.

2            So, please, under no circumstances should you be

3    discussing in any way this case or any evidence in this

4    case or anything about your progress in this case,

5    specifically, of course, with anyone outside the courtroom.

6    That admonition still applies.  And please do not allow

7    yourself to be exposed to anyone who may be speaking about

8    it in any way.

9            Obviously you should not read, watch, or listen

10   to any report or commentary on this case over the Internet,

11   over any kind of radio or television.  I don't think

12   there's any local news coverage on this case.  But I'm not

13   sure about it, so I just tell you that for sure.

14           It is critically important that you not do any

15   research on your own.  You have the evidence in this case.

16   It will remain in the jury room.  Your notes are in there.

17   And, of course, you have had the benefit now of discussing

18   the case and being able to form your opinions on it and

19   discuss them with your fellow jurors, and that's the way it

20   should be.  And it is so critically important that that

21   only occur in that jury room with all of you present.

22           So please keep that in mind.

23           Your notes, of course, will be secure in the

24   jury room.  Needless to say you must leave everything in

25   that jury room.  Any of the exhibits, any of the evidence

1    that you may have access to, any of your notes.  And I'm

2    sure you all appreciate now how critically important all of

3    this is because you've seen what goes in to a complex jury

4    trial, and you've seen how important it is that the jury be

5    so careful to honor all of these admonishments.

6            So with that, I will excuse you for the evening.

7    I understand you'll be coming back Tuesday morning at 8:00.

8    I'll wish you a pleasant and a restful weekend.  And I

9    think we will all appreciate having three days break before

10   we get back to the business at hand.

11           And so I'll excuse you.  I'll wish you a very

12   pleasant weekend.  And you may go ahead and step down.

13           COURTROOM ADMINISTRATOR:  Please rise.

14       (Jurors exit courtroom at 4:24 p.m.)

15           THE COURT:  All right.  I did have -- have a

16   seat, please.

17           I did want to put on the record pursuant to the

18   jury request and as we discussed on the -- in the couple of

19   breaks that occurred outside of the presence of the jury,

20   obviously, the Court provided those four copies of the

21   transcripts of the testimony of expert witnesses Dean and

22   Hampton.

23           I wanted to make sure that a copy of what we

24   provided to the jury was made a part of the record in this

25   case.

1          So, Madam Clerk, let that be reflected as an

2   order of the Court.  I realize that everyone agreed to what

3   was being provided and there were no objections, but I

4   still think that, for the benefit of the record, we should

5   have that there.

6          And I think that concludes our business.  And my

7   remarks to the jury are the same to all of the counsel.  I

8   wish you a pleasant weekend.  Get some rest.  We'll return

9   on Tuesday.

10          And next week we're going to get this case

11   finished.

12          MR. JINDAL:  Thank you, Your Honor.

13          THE COURT:  Thank you.  Have a nice weekend.

14      (Following is the portion of the transcripts

15      sent to the jury for review:)

16

17              "ELIZABETH DEAN
        called as a witness on behalf of the
        Plaintiffs, was examined and testified as follows:
18              DIRECT EXAMINATION
   BY MR. ISAACSON:
19   Q.    Good morning, Ms. Dean.  Could you introduce
   yourself to the jury.
20   A.    So my name is Elizabeth Dean, and I'm a
   vice-president at TM Financial Forensics.
21   Q.    All right.  And what do you do for a living?  You
   mentioned TM Financial Forensics.
22   A.    I'm a certified public accountant, and I do a
   specialty type of accounting, which is financial forensics.
23   Essentially we do investigations of accounting and
   financial issues.
24   Q.    And you said TM Financial Forensics.  What is that
   business?
25   A.    We're a financial and business consulting firm.  We
   have people that are MBAs, CPAs, and we're hired by clients

3673

```
 1    to review accounting documents for them or in litigations
      like this for both parties.
 2    Q.    And what's your position with TM Financial
      Forensics?
 3    A.    I'm a vice-president, and I cofounded the firm.
      Q.    What are your responsibilities as a vice-president
 4    since you founded the firm or helped found the firm?
      A.    It's a small firm.  We have about 60 employees.  So
 5    I have a lot of management responsibilities, but I spend
      most of my time doing consulting and working with clients
 6    on these kinds of engagements.
      Q.    And then the field that you work in, as I understand
 7    it, is the field of analyzing potential damages?
      A.    That's correct.
 8    Q.    How long have you been working in the field of
      analyzing damages?
 9    A.    I've worked on cases like these for about 25 years.
      Q.    And in those 25 years, have you calculated damages
10    in cases involving copyright infringement claims or
      interference claims?
11    A.    I have.
      Q.    Okay.  What other areas have you estimated damages
12    in?
      A.    Well, a large part of my work is breach of contract.
13    I also deal with a lot of interpretations of financial
      provisions and accounting codes.
14          And then I also do a lot of intellectual
      property work beyond copyrights, patents, trademarks, trade
15    secrets, those all come up in disputes quite a bit.
      Q.    All right.  How many intellectual property related
16    cases have you worked on over your career relating, again,
      to the issue of damages?
17    A.    I would estimate about a hundred.
      Q.    Okay.  Now, you said copyrights or one type of
18    intellectual property that you've dealt with?
      A.    That's right.
19    Q.    Okay.  How many intellectual property cases
      involving copyrights have you worked on, again, relating to
20    the issue of damages?
      A.    About a dozen.
21    Q.    And have you testified as an expert witness on
      damages at trials before like -- such as this?
22    A.    I have.
      Q.    About how many times?
23    A.    About half a dozen times that's actually gone all
      the way to trial.
24    Q.    All right.  Tell the jury your educational
      background.
25    A.    I have a bachelor in math and economics with a minor
      in accounting.  That's from Claremont McKenna College which
```

3674

```
 1    is in Southern California.
              And then I also attended a program on technology
 2    transfer and licensing at the University of California at
      Berkeley.
 3    Q.    All right.  Now, returning to your field of damages,
      what teaching have you done in that area?
 4    A.    Well, often accountants and attorneys want to learn
      more about this area, and they invite me to speak at
 5    seminars, conferences, law schools.
              For the last few years I've gone in and done
 6    one-day seminars at Stanford or Santa Clara Law School or
      UC Hastings.
 7            I also serve on USC's planning committee.  They
      put on a one-day conference covering all aspects of
 8    intellectual property law, including damages.
      Q.    All right.  And what professional licenses or
 9    certificates do you have?
      A.    For accounting there's a lot of choices, so I
10    actually have three right now.  I'm a certified public
      accountant.  I'm also a certified management accountant.
11    And I'm certified in financial forensics, which is the area
      most similarly aligned to what we're going to talk about
12    today.
              And then people that work with intellectual
13    property often get valuation licenses, so I also have a
      licensing professional certification.
14    Q.    All right.  And what professional standards apply in
      your field?
15    A.    Well, I consider myself an accountant, and so I
      prescribe to the rules of the American Institute of
16    Certified Public Accountants.  They promulgate a lot of
      rules with respect to professional care and due diligence,
17    and, of course, I abide by those.
              And then we also have practice aids and study
18    guides with respect to calculating damages in this type of
      case and performing an appropriate investigation.
19    Q.    And did you follow those standards in this case?
      A.    Yes, I did.
20    Q.    All right.  Now, when were you first retained by
      counsel for Oracle?
21    A.    In July of 2011.
      Q.    All right.  And with respect to your firm, TM
22    Financial Forensics, have you worked with anyone else on
      this matter at that firm?
23    A.    Yes.  Over the years there have been a number of
      different people that have been involved in this
24    engagement.
      Q.    All right.  In terms of the people who have also
25    worked on this assignment, can you describe the main people
      and their background?
```

```
 1    A.    So, two of the people that have worked most closely
      with me, another vice-president of our firm, Julie Knox,
 2    she has a masters in finance and accounting.  She also has
      a lot of accounting designations, all the same ones I have.
 3    She's also a chartered financial analyst.
                And then Karen Martinsen, she has worked out
 4    extensively with respect to all the data that we're going
      to talk about today.  We had to do quite a bit of SQL
 5    programming in order to analyze all the data.  She
      primarily took charge of that role.  And she has an MBA
 6    from Kellogg.
                MR. ISAACSON:  I tried to go the whole trial
 7    without saying SQL programming, but --
                Oh, at this point I would ask that Ms. Dean be
 8    allowed to proceed as an expert in the field of estimating
      damages.
 9                THE COURT:  She may.
      BY MR. ISAACSON:
10    Q.    All right.  Now, since July 2011, how many hours
      have you personally spent on this matter?
11    A.    I have spent hundreds of hours on this matter.
      Q.    All right.  Now, you've prepared some slides for --
12    in order to explain your work to the jury.  Let's start
      looking at those.
13              Let's look at slide one, your work steps.
                Now, before you get to your actual calculations,
14    will you explain to the jury what you did to reach your
      opinions in this case.
15    A.    Yes, I can.  This investigation on this case was
      very similar to what I do on all my cases.
16              First, I have to understand what the allegations
      are in the case.  That informs me about the kind of
17    information that I need to review.  Of course, I'm mostly
      focused on the financial information.
18              And then I perform analyses with the information
      that I've been provided, and ultimately I make a
19    determination as to whether or not there's been damages.
      Q.    Okay.  Well, let's talk about that first step, the
20    information you reviewed.  Let's go to the next slide.
                Would you explain to the jury what information
21    you reviewed in this case.
      A.    Yes.  Based on what I was informed the allegations
22    in the case were, I was available -- it was made available
      to me to look at Rimini's contracts which was very
23    important to determine the scope of the services that were
      offered, the products that were covered by their support
24    contracts.
                In corollary to that, I also received Oracle's
25    contract information, although, for the most part, I
      reviewed the data on that because it was so extensive.
```

1              Then both companies had thousands of financial
and management documents that were produced that I was able
2   to look at to get more insight into their financial
operations.
3              You have seen many of these, but there were over
a hundred depositions taken in the case, and all of those
4   were made available to me.
5              I also looked at expert reports and deposition
testimony from other experts in the case such as
Mr. Yourdon that just testified.
6              Legal filings.
7              And then at times I did independent company and
industry research.
8              And then there were Oracle personnel that I
needed to speak with to understand, for example, some of
the data that I was provided, and those were interviews
9   that I took separate from the depositions.
    Q.    All right.  So then -- once you've reviewed that
10  information, let's go to step two, analysis.
11             Would you explain to the jury what you -- how
you went about analyzing the information.
    A.    So the analysis is directly related to the
12  allegations of wrongdoing.  So first I had to really
understand what the business models were and how those were
13  impacted by the items that are claimed to be improper.
14             That really had to do with support service, so I
had to collect what everything Rimini had on their support
service offerings and which clients they had serviced.
15             I worked with Oracle's database to find out what
those customers had been getting service for on the Oracle
16  side when they had been Oracle customers to determine the
lost support revenues.
17             Then on the database -- so that was all on the
application products.  And then on the database products I
18  had to do a separate evaluation and analysis of what Oracle
had for licensing terms and policies.
19             And, finally, I looked at both companies'
financial results overall.
20  Q.    All right.  So let's -- the first item there you
said was allegations of wrongdoing.  Let's look at slide 4,
21  Summary of Alleged Misconduct.
22             What's your understanding of what Oracle's
alleging Rimini did wrong?
    A.    So what guided my work were three major areas.  The
23  first was the copyright infringement, PeopleSoft, JDE, and
Siebel software and support materials and then separately
24  the Oracle Database software.
25             Second, the claims of interference that
essentially were allegations of wrongdoing with respect to
misrepresentations to the customers, and then using

3677

1   improper means to access the support websites.
    Q.   All right.  So -- I'm sorry, go ahead.
2   A.   And last was computer fraud which had to do with
    downloading from those websites.
3   Q.   All right.  So let's be clear for the jury.  Are you
    here to give opinions about whether this wrongdoing
4   actually happened?
    A.   No.  No.
5   Q.   Okay.  What's your role in this case?
    A.   My role is to look at the financial and economic
6   implications if the Court and the jury are to decide that
    Oracle's allegations are correct.
7   Q.   So if the jury were to find these things happened,
    you're here to estimate damages?
8   A.   That's right.
    Q.   Okay.  Now you show two different companies on the
9   slide.  I see Oracle International Corporation, and I see
    Oracle America.  Why do you show those two different
10  companies on this slide?
    A.   So those two subsidiaries of Oracle Corporation
11  overall are the subsidiaries that were involved in this
    case.
12          So Oracle International Corporation owns the
    copyrights, they're the copyright holder, and Oracle
13  America provides the direct support services to the
    customers.
14  Q.   All right.  So now, once you've reviewed
    information, done analysis, gotten an understanding of the
15  allegations, let's talk about your work steps in estimating
    damages.
16          All right.  Now, would you explain in slide 5
    what are the categories of damages that we are going to
17  discuss today?
    A.   So, today we're going to discuss two.  There's
18  actual damages, those are measured as Oracle's losses, and
    there's a number of categories there.
19          And then on the other side is infringer's
    profits.  And those are the benefits that Rimini received
20  from their improper actions.
    Q.   All right.  So let's start walking through these
21  categories of documents, and we'll come back to this slide
    to remind people where we are.
22          Now, let's talk about slide 6.
            Before we go through these step by step, is this
23  a summary of your -- of the damages that you're estimating
    in this case?
24  A.   Yes.
    Q.   Would you explain this briefly, because we'll be
25  going through it in detail.
    A.   Okay.  So, overall, if you took all the claims, and

```
 1    Oracle's allegations were found to be all appropriate and
      correct, the total damages would be 245.9 million.
 2    Q.    All right.  And I see copyright infringement,
      128.3 million, interference, 194.1 million, and computer
 3    fraud, 14.4 to 34.9 million.
              Now, if we add all those up, they add up to
 4    more -- I don't have my calculator, but I can see that they
      add up to more than 245.  Why is that?
 5    A.    Well, that's calculating each of the allegations
      just with respect to them individually.  So there are lost
 6    support customers for which they're included in the
      copyright infringement and the interference, for example.
 7              So in order to avoid duplication, I can take
      those out to get to the 245.9 million.
 8    Q.    Okay.  So we'll talk later some more about how you
      remove that duplication.
 9              Slide 7.  This is the summary of the
      interference damages?
10    A.    That's right.
      Q.    All right.  And we'll go through this in detail.
11    But just explain to the jury in summary fashion what your
      conclusions are here.
12    A.    So, with respect to the interference allegations,
      they affect the PeopleSoft, JDE, and Siebel product lines
13    where my opinion is that Oracle lost customers in those
      product lines.
14              And so you can see the amounts, for example,
      PeopleSoft is 146 and a half million, by far the largest.
15    JDE is 12.7 million, and Siebel is 34.9 million.
      Q.    All right.  Let's talk about those lost support
16    customers both for copyright and -- well, and interference.
              What methodology did you use to measure Oracle's
17    lost profits from lost support customers?
      A.    I used a standard methodology for calculating lost
18    profits and infringer's profits.
      Q.    Would you explain that standard methodology.
19    A.    Well, the overview of it is to look at what actually
      happened financially, determine what would have happened,
20    and the difference is the damages on the lost profit side.
      Q.    Would you go through that one more time so that we
21    can -- so that we can understand it, the before and the
      after.
22    A.    So with respect to what actually happened, Oracle
      sells software licenses, and then they contract with
23    customers to provide support.
              What actually happened was that at some point
24    Oracle's contracts ended, and then Rimini's contracts
      started, and then from that point on Rimini takes over the
25    support revenues from those contracts.
              In my opinion, what would have happened is that
```

```
 1      the customers would have -- that some customers, at least,
        would have stayed with Oracle, and that those contracts
 2      would have continued over time, and so Oracle would have
        made more revenues and more profits.
 3      Q.    All right.  Well, let's talk about that analysis.
        Let's look at slide 8.  Would you describe what this is
 4      illustrating.
        A.    So this is illustrating generally what I was talking
 5      about.
                First, there's an upfront license fee.  That's
 6      not at issue in this case with respect to the application
        products.  What's at issue is the support revenues.
 7              The ongoing support Oracle had is demonstrated
        in the first part of the bar, then there's an interruption
 8      because of Rimini's actions, and the rest of the time
        Rimini gets that money.
 9              That's the amount of lost profits after you
        reprice it at Oracle's price and deduct costs.
10      Q.    Okay.  So we're going to be looking at that second
        part of the arrow, what happened in terms of lost profits
11      from the support end.
        A.    That's right.
12      Q.    Okay.  Let me ask you to look at slide 9 which is an
        excerpt of PTX 3 which was admitted into evidence.
13              And this is a Rimini Street investment fund --
        first round investment funding document from 2006.
14              "For investors who are direct competitors of
        Oracle, or who otherwise benefit from Oracle customer loss,
15      Rimini Street separates Oracle from its acquired licensees
        denying Oracle recurring revenue and creating new software
16      service sales opportunities in vulnerable accounts."
                How does this relate to what you were just
17      discussing?
        A.    So, it's important for me to understand how Rimini's
18      business model works, and so this informed my opinion about
        that, which is that Rimini is taking customers from Oracle.
19      That's how Rimini's business model works in terms of
        finding support customers.
20      Q.    And when it says, "Rimini Street separates Oracle
        from its acquired licensees," what did you understand that
21      to mean?
        A.    The break in the support contract.
22      Q.    All right.  And what's your understanding of the
        level of support that Rimini claims it could provide, the
23      level of support it provided to Oracle's former customers?
        A.    My understanding is that they were providing or
24      claiming to provide vendor-level replacement services.
        These customers stay on the Oracle software, they just get
25      the support from Rimini.
        Q.    All right.  Let's look at slide 10, and let's talk
```

1    about how you then did your calculation of lost profits.
     Now, we're going to do the math.  So would you explain this
2    slide, slide 10.
         A.    So this is the overall measurement.  It's fairly
3    straightforward.
               We're going to talk a lot about point A which is
4    how you determine the Oracle support revenues that it would
     have received but for the infringing acts.
5              B, you want to deduct the costs because there
     are some costs that Oracle avoided because it didn't do
6    this business, and C is the difference.
         Q.    Okay.  And the C will be the damages; is that right?
7        A.    That's right.
         Q.    All right.  So let's look at step 1.
8              The -- I'm sorry.  Let's look at slide 11.  This
     is how you went about identifying customers; right?
9        A.    That's right.
         Q.    Okay.  So let's talk about the identification of
10   customers.  Please explain slide 11.
         A.    So the purpose of slide 11 is to develop the
11   population of information that I was looking at.
               So Rimini Street provided a document that
12   indicated that they had had, over the time period that I
     analyzed, 364 customers for PeopleSoft, JD Edwards, or
13   Siebel support, and I, you know, do three steps to try to
     develop the would-have-been revenue.
14             The first is, of those 364 customers, to
     determine which ones would have stayed at Oracle.
15             Second, I price the amount they would have paid
     Oracle on an annual basis.
16             And then, third, I apply that price for a
     duration of time to represent the damages.
17       Q.    All right.  So just to go over the top part, the
     first step, there were 364 Rimini Street support customers
18   that Rimini Street provided us that were on PeopleSoft, JDE
     or Siebel; is that right?
19       A.    That's right.
         Q.    All right.  So you started from there and decided
20   how much to reduce that?
         A.    That's correct.
21       Q.    Okay.  The -- now, in step one, then, you had to
     figure out which specific Siebel, JDE, and PeopleSoft
22   products they had?
         A.    Yes.
23       Q.    Okay.  Let's look at slide 12, which is an excerpt
     of DTX 1947 which has been admitted into evidence.
24             Would you explain what this is?
         A.    So, the source that I used to determine what
25   products the customers were paying Rimini support for were
     the Rimini contracts.  So this is an example of a Rimini

1  contract that I reviewed.
    Q.    All right.  So let's -- this is an example of the
2  contract.
            Let's look at slide 13.  Is this one the same --
3  this is Exhibit A to that same contract?
    A.    That's right.  This is the School District of
4  Pittsburgh.
            MR. ISAACSON:  Matt, can you make that bigger
5  for us?  Thanks.
            There's the SQL thing again.
6  BY MR. ISAACSON:
    Q.    So go ahead and explain how this schedule -- you
7  incorporated these schedules into your analysis.
    A.    So, Exhibit A in Rimini's contracts listed the
8  covered products.
            So, if you look in the far left-hand side, you
9  can see that this was a PeopleSoft customer, and they had a
   variety of different releases and patch levels for the
10 actual products that Rimini was providing support on.  So I
   created a database of this information.
11 Q.    All right.  So you created a database from Rimini's
   actual contracts of what products they were supporting?
12 A.    That's correct.
    Q.    All right.  Let's go to another part of the City of
13 Pittsburgh contract, which would be slide 14.
            All right.  What does this show?
14 A.    The other piece of information that I needed to do
   my analysis was the dates.  Not all of these contracts
15 started at the same time, they didn't all end at the same
   time, so I had to look at every contract in order to
16 determine what period of time they were under contract with
   Rimini.
17 Q.    So we've been dealing with -- we'll talk about the
   specific time periods that you're dealing with, but we've
18 been dealing with a number of years beginning in 2006.  But
   for each customer, you were identifying the specific period
19 they were at Rimini.  Do I have that right?
    A.    That's correct.
20 Q.    And you created a database of that information?
    A.    That's correct.
21         MR. ISAACSON:  All right.  Now, slide 15.  All
   right.  This seems to be other data that you looked at.
22         Matt, maybe you can make it a little bigger.
   BY MR. ISAACSON:
23 Q.    And can you explain what this is?
    A.    So, as I mentioned before, Oracle's contracts with
24 these customers were voluminous.  They have lots of
   products.
25         So what Oracle was able to provide to me was a
   database they had already -- that they were already using,

1    the RDS database, and it has a number of columns which you
     don't even see here.  It's very wide and very long.
2              And for every customer I identified every
     product that correlated with the products that then Rimini
3    started offering service on.
               This database also told me whether the contract
4    that Oracle had was active with that customer or had been
     cancelled.
5    Q.    And so how did you use this data in your analysis?
     A.    This data was used for two primary purposes.  The
6    first was to identify the customer had been an Oracle
     customer to begin with, and, secondly, when that customer
7    left Oracle, when the customer's contract was cancelled,
     what the last annual fees were that they were paying on the
8    products that now Rimini is supporting.
     Q.    And so you started off with, I believe, 364
9    customers.  Did you look at all the Rimini contracts and
     all the Oracle data for all 364 of those customers?
10   A.    I did.
     Q.    All right.  So now let's look at slide 16.
11             Now, we're going back to -- we saw this before.
               So now you've identified Oracle's lost support
12   customers, and you've done a review of Rimini and Oracle
     contract data.  Are we now going to move to step two?
13   A.    Right.  There's -- so results of step one, then move
     to step two.
14   Q.    So let's get the results of step one straight then.
     Let's look at 17.  So this is in step one.
15             And we looked at 364 customers, and did you
     consider all of those customers -- did you use all those
16   customers in your lost profits analysis?
     A.    No, I did not.
17   Q.    Okay.  So you've excluded how many customers?
     A.    In total, 135.
18   Q.    All right.  And you included in your lost profits
     analysis how many of the 364?
19   A.    Well, 229.
     Q.    And have you knocked that down one?
20   A.    Yes, less one, so 228 now.
     Q.    Why did you go from 229 to 228?
21   A.    Because there was a customer, Leads Customers
     Growth, that met all the same criteria that qualified them
22   to be in damages.
               But then I was able to hear the testimony of
23   Mr. Ravin who described their -- that situation, and I came
     to an understanding that the amounts paid that were listed
24   in the financial statements for that customer weren't
     really for service, so I took that out.
25   Q.    Leads Customers Growth, that's Mr. Leake's company,
     the first customer of Rimini Street who we have alleged is

1    a -- through their emails is not a real customer and money
     was just going back and forth?
2    A.    Right.  It was reported in the financials that I was
     provided, that I've been reviewing for the last three or
3    four years, just like any other customer.
               And so once I understood that they -- it was
4    really -- I think he described it as a circular
     transaction, where he gave them money and they gave him
5    money, I just -- I took it out.  It's obviously not a
     customer at issue in this case.
6    Q.    Okay.  All right.  So we have this pie chart.
               Let's talk about who you excluded from the --
7    from your analysis of lost profits.
               So the red piece of pie there, no Oracle
8    cancellation.  Can you explain that?
     A.    So for 33 customers -- that's the number in the
9    bracket after each category, you can see the size of the
     pie.
10             For 33 customers there were no -- there was no
     evidence in the information that I was provided that they
11   cancelled their Oracle contract, and that could have been
     for a variety of reasons.
12             It could be that the company, or the portion of
     the company that Rimini is servicing was just an arm and
13   Oracle actually was contracting with a bigger entity.
               And so that fine level of detail just wasn't
14   provided, couldn't be tracked.  Or it could be.  There was
     certainly some circumstances where it appeared that the
15   customer was paying both Rimini and Oracle for support.
     Q.    All right.  For some of those customers, you might
16   have a very big corporation, and they would have a unit
     that dropped Oracle and went to Rimini, but because you
17   can't tell what's going on in that big corporation, you
     just excluded them from your analysis.
18   A.    That's right.  Both Oracle and Rimini may not have
     contracted at the same level.  Many of these corporations
19   have dozens of different contracts, for example.
     Q.    Right.  The green piece of pie, would you explain
20   that?
     A.    So, there were 39 customers out of the 364 that have
21   actually returned to Oracle.  They have relicensed or they
     have reinstated their old license.  So I took those out of
22   lost profits because Oracle is currently servicing those
     customers.
23   Q.    An example of that would be Yum who we've heard
     about?
24   A.    That's right.  Yum was a customer of Oracle's that
     left and went to Rimini, and then it came back to Oracle.
25   Q.    All right.  How about the purple pie slice?
     A.    That's labeled Not Oracle America.  Oracle is

3684

1    obviously a large corporation, international corporation.
             Rimini had some customers that were not in the
2    United States.
             And so for purposes of this calculation, I did
3    not include damages for lost profits for 24 of those
     because those companies have a different relationship with
4    Oracle International Corp, the copyright holder, and just
     to simplify things, I just did lost profits on companies
5    that were in the United States.
     Q.    All right.  And then the -- I guess it's a gray
6    piece of pie, JDE World, what is that?
     A.    Well, sometimes we're not as precise as we could be,
7    and there's been a lot of conversation about JDE in this
     case, and PeopleSoft too.
8            But there are a lot of different products, and
     JDE World is a certain product but it's not at issue in
9    this case, but Rimini does service it.
             So I had to take out any customer that was only
10   under a contract for JDE World, and those customers --
     they're not included in lost profits or the other bucket,
11   infringer's profits.
     Q.    Okay.  When we were talking about JDE in this case,
12   as you say, we're mainly talking about JDE Enterprise, but
     we're not talking about JDE World; is that right?
13   A.    That's right.
     Q.    Okay.  And then there's an orange piece of pie,
14   Other.  Would you explain that?
     A.    So, the intent of the pie is to tie to the 364
15   customer names.  A couple of the pumpkin pie slice, Others,
     are customers that just haven't started with Rimini.
16           Their names are on the list, but they have no
     revenues.  Most of them, I think 10 of them in the Other
17   category, are companies that showed up on Rimini's list
     that were the same company but with two different names.
18           So they're included in whichever Other category
     they actually apply in, and then I just put the second name
19   in Other just so I would add up to 364 in the pie.
     Q.    Is it your opinion with respect to those 135
20   customers that you've excluded, that there would be damages
     that Oracle suffered for some of those 135 customers, but,
21   to be conservative, you've just excluded them?
     A.    Yes, there would be lost profits for at least the
22   Not Oracle, likely to relicense, and reinstated, and
     possibly the No Oracle cancellation.
23   Q.    And that brings us to 229 -- I should say 228
     customers that you included in your lost profits analysis.
24   What time period does your damage analysis cover?
     A.    So this is a tad bit confusing.  This happens a lot
25   on cases because discovery ends at a certain time.
             These 364 customers started with Rimini in 2006

1    and were active through September 2011.
               So that's how I get my base of 364, but the
2    damage period in the case actually comes forward for just
     these customers through February of 2014.
3    Q.    All right.  So let's just say that one more time so
     we have it.
4              The 364 customers are customers of Rimini Street
     for Siebel, PeopleSoft, and JD Edwards from -- anywhere
5    from the period 2006 through September 2011; is that right?
     A.    That's right.  They could have started at any time
6    in that period.
     Q.    Right.  And for that set of customers, you have
7    calculated damages through February 2014?
     A.    That's right.
8    Q.    All right.  You haven't calculated damages for lost
     customers after September 2011?
9    A.    That's right.  Oracle, if they lost customers to
     Rimini after that point in time, that's not in this
10   analysis.
     Q.    All right.  The -- now, let's talk about what these
11   customers were -- what products these customers were using.
     Slide 18.  Can you explain this chart?
12   A.    Yes.  So oftentimes in these cases we get a lot of
     information, and especially when we have multiple products,
13   it's hard to focus on what the importance or where the big
     dollars are coming from, so this is always something that I
14   want to look at.
               So in this case, you can see the breakdown of
15   customers that were active in each of these years, and very
     quickly after 2006 you see that the PeopleSoft product is
16   the primary product the customers are licensing --
     supporting through Rimini.
17   Q.    All right.  So PeopleSoft is the blue part of the
     bar; is that right?
18   A.    That's right.
     Q.    So in 2006, Rimini Street is mainly a Siebel-based
19   business, but as it evolves, it becomes predominantly
     PeopleSoft?  Is that what we're looking at with the blue,
20   red, and green?
     A.    That's correct.
21   Q.    Okay.  And this chart stops in 2010, but your
     analysis runs through September 2011.  Did you just skip
22   the last year because it's only a part of the year?
     A.    Yes, the bar looks pretty much the same because
23   there's no -- there's not much difference.  It's not a full
     year.
24   Q.    Okay.  Let's look at it one other way.
               Slide 19.  Here's another pie chart.  Would you
25   explain the -- what we're looking at here?
     A.    So in addition to looking at it on a per-customer

```
 1    basis, I wanted to find out on a revenue basis what was
      driving the business of Rimini.
 2             And you can see I've included, just for the 364
      customers, there are PeopleSoft, JD Edwards, and Siebel
 3    revenues, and PeopleSoft is again the vast majority.
      Q.    All right.  Now, did you consider in your analysis
 4    whether Oracle customers who left Oracle and left for
      Rimini, if Rimini hadn't been around, whether they would
 5    have gone to another third-party support provider?
      A.    Yes, I did.
 6    Q.    And what did you generally conclude about that?
      A.    I generally concluded that there were very few, if
 7    any, options for customers that were seeking vendor-level
      replacement services.
 8    Q.    All right.  Let's look at a chart about that, which
      will be slide 20.
 9             All right.  There's a number of companies listed
      here.  Let's just dispense with one of them.
10             TomorrowNow was shut down in October 2008; is
      that correct?
11    A.    That's my understanding, yes.
      Q.    All right.  And is it your understanding that
12    TomorrowNow -- did you -- did you conclude that TomorrowNow
      was an infringing alternative?
13    A.    It was infringing.  I would say it's not acceptable
      because it was infringing.
14    Q.    Okay.  So now let's talk about these other
      companies.  There's a company column.  Are those the
15    third-party support -- some of the third-party support
      companies?
16    A.    Yes.  These are some of the companies that I saw in
      Rimini and Oracle's discovery with respect to customers
17    that -- I mean companies that might have claimed to offer
      third-party support.
18    Q.    All right.  What's the second column, product lines?
      A.    That again was information about what potential
19    products they were supporting.
      Q.    So, for example, Spinnaker at the bottom, I think we
20    heard testimony about this, only supported JD Edwards
      during the period we're talking about?
21    A.    That's correct.
      Q.    Okay.  Now, so you have some descriptions and
22    Rimini's statements, and then you have acceptable and
      noninfringing.  What's the fourth column?
23    A.    So the fourth column is my overall conclusion about
      whether or not Rimini's customers would have gone to these
24    other entities but for Rimini -- I mean, Oracle's customers
      would have gone to these other entities if Rimini weren't
25    available.
      Q.    And when you say no in that column, what are you
```

1    conveying?
     A.    That these were not acceptable and/or not infringing
2    alternatives.
     Q.    Okay.  Now what materials did you review in order to
3    do this analysis?
     A.    I was provided open discovery in the case, so I have
4    a tremendous amount of Oracle and Rimini documents.  That
     was the primary information that I looked at.
5              There were also analyst reports.  And at times I
     went online and looked at the companies' websites myself.
6    Q.    All right.  So let's look at NetCustomer.  Why did
     you conclude no for NetCustomer?
7    A.    This was a company that was offshore, I think we
     heard that from Mr. Yourdon this morning, which is not
8    considered to be an appropriate business model according to
     Rimini.  They classify it as dead wrong.
9              But I was also provided additional information
     that they never had more than five customers, and
10   ultimately they stopped providing any of these support
     services in October of 2010.
11   Q.    All right.  What about Conexus Partners?  Why did
     you say no about them?
12   A.    Well, they only offered JDE, and I think there was
     some debate about whether they even offer EnterpriseOne.
13   They might offer primarily World.
               But they were not offering a vendor replacement
14   service, they were consultants and affiliates that would
     work with the company but didn't take over for the vendor.
15   Q.    All right.  What about your no for LegacyMode?  This
     is another JDE only provider, I guess.
16   A.    That's right.  LegacyMode was very small, and even
     before Rimini had many JDE customers, it was already out of
17   business.  It went out of business in July of 2007.
     Q.    What about ContinuServe?
18   A.    ContinuServe was a PeopleSoft offering.  Again, it's
     not clear that at any level 3 or vendor replacement service
19   intention because Rimini evaluated their service and
     indicated that they didn't handle tax updates.
20             So with PeopleSoft product that's required.  So
     it didn't -- it didn't do vendor-level replacement service
21   and wasn't very viable.
     Q.    All right.  CedarCrestone.  Did you also consider
22   CedarCrestone to be unacceptable infringing alternative?
     A.    That's right.  Because of the infringement, it was
23   unacceptable.
     Q.    All right.  And then you also looked at some other
24   issues about CedarCrestone.  You had minor part of its
     business.
25             Would you explain what you thought of
     CedarCrestone -- what you concluded about CedarCrestone as

1    a business?
     A.    There was information available from Rimini and from
2    CedarCrestone themselves, Mr. Simmons was deposed, and they
     were very consistent in that they indicated that
3    CedarCrestone didn't market the service, they didn't
     provide it to very many people.
4              There were people they were already providing
     consultation services for, for the most part, and they
5    stopped doing it after a while.
     Q.    All right.  Let's talk about the last one then,
6    Spinnaker.  Why do you have a no for Spinnaker?
     A.    Well, again, this falls into the question of whether
7    it's unacceptable from the customer's perspective.
               And one thing we've heard a lot about in this
8    trial is how important these systems are.
               And the common indication that I saw in the
9    documents in the case is that Spinnaker just didn't have a
     track record and doesn't have an acceptable level of
10   service for making companies feel that they have the trust
     and the viability.
11             There were a lot of communications about how
     they were downsizing, and they were having trouble holding
12   management.
               There were conversations about how they mostly
13   got customers through acquisition, they weren't taking
     customers away from Oracle directly but from acquiring
14   other companies or acquiring customers when their other
     providers went out of business.
15   Q.    All right.  When you look at all these providers
     together, NetCustomer, Conexus, LegacyMode -- oh, let me
16   ask you about -- there's a couple names that came up during
     the trial, Versytec, Abtech, that didn't even make your
17   chart.  Why is that?
     A.    Well, I didn't find any evidence that Abtech
18   actually offered this type of service.
               When I did my research and when I looked at
19   information, it seemed to be only a consulting practice
     and, in fact, had more to do with -- appeared more to do
20   with hardware than necessarily with offering support.
               Versytec only supported JDE World, and they were
21   acquired by Spinnaker which, again, when we talk about the
     number of customers, sometimes it's deceptive because
22   Spinnaker's JDE practice includes that World product which
     is not at issue in this case.  It's not replacing any of
23   the support services for the customers that I analyzed.
     Q.    All right.  And so based on your analysis and
24   excluding TomorrowNow for the moment, why do you say that
     customers would have stayed with Oracle if Rimini Street
25   had not engaged in what we allege are copyright violations
     and lies to customers?

1    A.    Because when the customer is trying to make an
evaluation of who they want to have offer their support,
2    they have to go with a customer that's trusted -- I mean, a
company that's trusted because these are very important
3    systems.
            I think you've heard this a number of times, but
4    if you're running a company, and your payroll system fails,
or your inventory system fails, or your ordering system
5    fails, that's not acceptable to the business, it's not
acceptable to the company, and the company suffers, and
6    their customers aren't happy.
     Q.    All right.  Let's look at just a little bit of your
7    analysis that the documents reviewed.  Can we look at slide
21.
8            Slide 21 is an excerpt from a document where
Mr. Ravin, in May 2006, is writing an email to someone from
9    the *Wall Street Journal*.
            And he says,
10           "Although we talked extensively about the fierce
crosstown rivalry between two friends and former business
11   partners at the respective helms of Rimini Street and
SAP/TomorrowNow, and why we are -- we are the only two
12   credible, viable players in the space today."
            Why does that statement that "we are the only
13   two credible, viable players in space today" relate to your
analysis?
14   A.    That's consistent with the research I found that
these other customers that are mentioned sometimes
15   miscellaneously in various documents aren't perceived in
the market as being important companies that are taking
16   customers away from Oracle.
     Q.    All right.  If we can look at slide 22, which is
17   from the same document.  Mr. Ravin's again talking to this
person from the *Wall Street Journal*.
18           He mentions Conexus Partners, their failure to
establish a proven infrastructure, their failure to gain
19   significant traction, their management team page has been
taken down.
20           He mentions LegacyMode, how they don't list any
management team or personnel, no clients are mentioned on
21   their website, not likely a stable or significant enough
infrastructure investment for serious customers to trust.
22           And then also, "We do not consider NetCustomer
or any of the smaller companies I mentioned to be serious
23   players, won't garner any significant market share."
            How does this relate to your analysis?
24   A.    This was very consistent with the other information
that was relevant to Conexus, Legacy, and NetCustomer.  So
25   in addition to other information that I looked at, that
informed my opinion that they would not have been

1    acceptable alternatives.
     Q.    All right.  Let's look at slide 23.  This is a
2    Rimini Street Confidential Private Offering Memorandum,
     August 1st, 2007.  So it's a little later in time.
3         What's a Confidential Private Offering
     Memorandum to your understanding?
4    A.    So, Rimini Street's a private company, and in order
     to raise funds they have to go to investors, and so they
5    write these offering memorandums essentially selling stock
     in the company to raise money.
6         And during these documents they usually describe
     their business model, their competition, their potential
7    success.
     Q.    So Rimini Street tells potential investors in August
8    1st, 2002, according to industry analyst Forrester
     Research, there are only two main competitors in the
9    market, Rimini Street and TomorrowNow.
          That's the same point we were just making
10   earlier when Mr. Ravin was talking to the *Wall Street
     Journal*?
11   A.    That's right.
     Q.    And one more, slide 24.
12        Now, this document as I understand it, is
     generic -- a general set of email language that was
13   available to -- that was made available by Mr. Ravin to
     other people at Rimini Street.
14        Is that your understanding of this?
     A.    Yes.
15   Q.    And so there's a discussion of Spinnaker, and it
     says, "Well, we have the majority of" -- now, Spinnaker,
16   again, was only JDE; right?
     A.    That's right.
17   Q.    So it says, "Well," we "have the majority of TN JDE
     employees on a worldwide basis.  They have never been in
18   this business."
          They're buying people and contracts.  Their
19   management team has zero years of experience.
          They're counting on a team they brought over to
20   know what they're doing, but they don't even have a
     vice-president leader.
21        They've got "all the Indians, no chief."
          "This is a very serious risk for them because
22   they don't understand the nuances of the business."
          I think it says at the bottom,
23        "Where Spinnaker is literally a 'brand new'
     company in the market with no track record in this space."
24        Can you explain how this related to your
     analysis of Spinnaker?
25   A.    So, again, this goes to the issue of whether or not
     Spinnaker was viable in a trustworthy company that people

```
 1    would have been willing to spend money to have support
      their software when they don't appear to have a credible
 2    offering.
           Q.    All right.  So did you also give consideration to
 3    whether, if these Oracle customers left for Rimini, if
      Rimini had not done what we allege they had done, that they
 4    would have said, okay, we'll do it ourselves, we'll go on
      self-support?
 5    A.    I did consider self-support.
           Q.    And what conclusion did you reach from that?
 6    A.    I concluded from looking at the information that was
      made available to me that self-support was not a viable
 7    option for these types of programs.
           Q.    Why not?
 8    A.    Well, the landslide of information in the case has
      been that it's just too risky, that companies internally
 9    don't have the depth of IT experience to manage these
      programs and support these programs, and they don't --
10    they -- if they take that on themselves, they risk the
      possibility that those employees might leave and -- or that
11    there may be a catastrophic problem that they can't recover
      from.
12         Q.    All right.  Is slide 25 on the screen an example of
      the testimony you reviewed on this point?
13    A.    Yes.
           Q.    All right.  And how does this testimony relate to
14    your conclusions?
      A.    So, Hastings Entertainment did consider -- we talk
15    about that word consider a lot, a lot of people consider a
      rot of things.
16         Hastings Entertainment considered self-support.
      I'm sure they'd heard about it before, but with a
17    relatively quick evaluation, they realized this was just
      too risky for them.
18         Q.    All right.  So going back to we have 228 customers.
      You've talked about the alternatives.  Is it your opinion
19    that none of those 228 customers who -- would have left
      Oracle but for what Rimini did?
20    A.    No.
           Q.    Okay.  And why -- so how have -- what have you done
21    in your analysis to permit the conclusion that, yes, some
      of them still would have left?
22    A.    So while I feel like it's reasonable to conclude
      from the information that I've seen that none of these were
23    alternatives, I allowed for the possibility that some
      proportion of them would have left in the same proportion
24    historically that left Oracle.  So I applied Oracle's
      general attrition rate in all of my analyses.
25         Q.    All right.  Now, let's look at slide 26.  Now, we're
      back to our analysis.
```

3692

1    And in the blue bar we've gone from 364 to -- it
says 229, it should be 228 customers.

2    So the next step is to determine the last annual
amount paid to Oracle.  Would you explain that step?

3    A.    Well, so, step two and three we kind of threw
together.

4    Step two is, again, just pulling from the Oracle
data what these customers, the 228 customers were paying

5    Oracle the last time they renewed their support, and then
we carry that over the period of time they were serviced by

6    Rimini.

     Q.    All right.  And how did you determine the last

7    annual amount paid to Oracle?

     A.    Oracle's contract database did have, for every

8    single line item, an amount that was included in their --
as their contract pricing.  So it's Oracle's actual last

9    fees paid by that customer.

     Q.    And you're using that information -- you wanted to

10   use the actual information that the customer had been
paying Oracle, and so you went and found that information.

11   A.    That's right.  This is different from some cases.  I
don't have to estimate, I actually know what they paid

12   because they were actually Oracle customers.

     Q.    All right.  Well, let's look on -- so then how you

13   do the calculation in slide 27.  Can you explain the
calculation on this slide?

14   A.    So, remember I mentioned earlier that Oracle America
provides support.  They do so through their access to

15   Oracle International Corporation's copyrights in this case.

     So I start with Oracle America's lost support

16   revenue.  I apply the specific attrition for these
customers.  When they stopped using Rimini's support, I

17   assume they would have stopped using Oracle's support, and
then I further adjust that for the general attrition rate

18   that we've talked about.

     Q.    Okay.  So let's stop with that first box.  Oracle

19   America lost support revenue, you have an asterisk there,
and it says Less Specific Attrition.

20   Okay.  What -- would you explain that to the
jury.

21   A.    So, we know something about these customers.  When
they stopped and cancelled their Oracle support, they did

22   not stop using their product.  We know exactly how long
they used the product because they were paying Rimini to

23   support the product.  So we know that they were using it.

     But not all of these customers use the products

24   through February of 2014.  Many of them have shorter
periods of time.  They stopped using the Oracle product,

25   they stopped getting support from Rimini, and if they had
the RP needs they must have changed vendors at that point.

1      Q.    All right.  So you removed customers who
specifically changed vendors; is that right?

2      A.    Yes.  I mean, I suppose there's some bankruptcies
and other things in there, but for the most part, these

3   were circumstances where we know the customer was using the
product up until they finally stopped paying Rimini, and

4   then they are no longer using the product.

Q.    All right.  So that specific attrition, what was the

5   effect of that.  Over the damages period, how much did that
reduce Oracle's lost revenues that you had been estimating?

6      A.    So if I had taken all of these same 228 customers
and priced out their lost support revenues to Oracle for

7   the whole period until February 14th for all of them, my
number would have been 25 percent higher than it actually

8   is by stopping them when they stopped their Rimini support.

Q.    All right.  So you've reduced the revenue base by

9   about 25 percent here, and now you're going to apply a
general retention rate.

10          Is that going to further reduce the revenue that
you're estimating Oracle lost?

11     A.    That's right.

Q.    Okay.  And what's the general retention rate?

12     A.    So, we know historically, we've talked about this
number a lot, I've seen the numbers up on the screen.  It's

13   generally around 95 percent for these products.

So when customers decide to stop using the

14   product, they obviously stop their support, and that's what
that 5 percent is, the amount of time they stop using the

15   product.

Q.    All right.  That takes us to the blue box, Oracle

16   America Adjusted Lost Support Revenue.  You've reduced it
by specific attrition and by general attrition.  Explain

17   the blue box.

A.    So what's left is the amount of Oracle America

18   revenues that would have been generated through the damages
period.

19     Q.    All right.  And then I see that you moved that down
to the lower row.  Could you explain what you're doing on

20   the bottom half of this chart?

A.    So for the copyright infringement claim, I can only

21   calculate damages for the copyright holder.

So I have to look at the relationship between

22   Oracle America and Oracle International Corp who holds the
copyright, and they have a revenue sharing arrangement

23   between the two companies.

So it's 39 percent of Oracle America's revenue

24   is remitted to Oracle International Corp to pay for the
license to have the rights to offer services to its

25   customers.

Q.    All right.  So for copyright damages, you're taking

```
1     the total amount of adjusted lost revenue and only applying
      39 percent of that; is that right?
2     A.     That's right, the share that the copyright holder
      would have gotten.
3     Q.     All right.  Let's illustrate this for the jury in
      slide 28.  Would you explain this illustration?
4     A.     So the two companies that we're concerned with here
      are Oracle International, the copyright holder --
5     Q.     Say that again.  Oracle international is the --
      A.     Copyright holder, sorry.
6            And then Oracle America who actually is on the
      ground performing the service.
7            So if Oracle America has a support contract with
      the customer that's worth a million dollars, the two
8     companies share that revenue.
             Oracle America gets 61 percent -- this is the
9     way the contract is between these two companies -- and
      Oracle International Corporation gets 39 percent as a
10    payment for the copyrights.
      Q.     So if Oracle America for the support business gets a
11    million dollars, they pay 39 percent of that to Oracle
      International for the copyrights?
12    A.     That's right.  Oracle International -- that's how
      Oracle International generates revenue, and so it would
13    recognize revenue of $398,000 on that contract.
      Q.     All right.  So then let's look at how you calculated
14    the lost support revenue, slide 29.
      A.     So here's where everyone's eyes glaze over because
15    it's a bunch of math.
      Q.     Right.  There's a lot of numbers here.
16           Let's see if we can handle this.  Walk us
      through this slide.
17    A.     So this is the lost support revenue.  It spans the
      entire period.
18           There's categories down the left we can talk
      about, and then the individual columns are the individual
19    application products.
             So, for example, the lost support revenue that
20    was in the first box on the last slide for PeopleSoft is
      $169 million for these 228 customers.
21           Then, when I take out general attrition, I take
      out 5 percentish.  We'll see those exact numbers later, and
22    so I remove another $6.9 million from the lost support
      revenue, and that becomes the base of what Oracle America
23    lost in revenues.  So for PeopleSoft, again, that's 163
      million.
24    Q.     All right.  Let's just stop there.  This is just
      what Oracle America lost; right?
25    A.     At that point, yes.
      Q.     And the specific attrition is built into the first
```

1   line; correct?
    A.     That's right.  It's already 25 percent lower than it
2   would be -- I could have made this slide more complicated
    and started with the gross number.
3   Q.     All right.  And so take us from Oracle America now
    to Oracle International.
4   A.     So, now here's where we see the revenue sharing.  So
    the 163 million that Oracle America collects as revenue, it
5   remits 39 percent of that, so I multiply by 39 percent, and
    the amount Oracle International Corp gets from PeopleSoft's
6   lost support revenue in this period of time is
    63.6 million.
7          MR. ISAACSON:  All right.  I think, Your Honor,
    given this is a summary exhibit, I'm told 6002
8   is available.  I'd like to move this into evidence -- this
    slide as PTX 6002.
9          MR. STRAND:  Your Honor, I object.  It's just
    expert opinion.  It's hearsay.  It doesn't qualify as
10  admissible evidence.
           MR. ISAACSON:  Her opinion is admissible
11  evidence.  And if the slide expresses her opinion in a
    complicated way, it's admissible as her opinion.
12         THE COURT:  A summary is generally admissible
    when it serves a purpose of specifying and identifying
13  individual information, and I think that that criteria has
    been met here.  I'm going to admit the exhibit.
14         (Plaintiffs' Exhibit 6002 received into
           evidence.)
15  BY MR. ISAACSON:
    Q.     All right.  Now, let's go back to you're a, B, and
16  C, slide 30.
           So now for copyright, we finished A.  This is --
17  84.3 million was the number that we had for OIC lost
    support revenue in the previous slide; right?
18  A.     That's right.  It was the number all the way on the
    right in the total column.  So that's all three,
19  PeopleSoft, JDE, and Siebel products.
    Q.     All right.  So this is just for Oracle
20  International.  So let's go to step B.
           Now, you're going to subtract costs.  Let's look
21  at slide 31.  Explain how you went about subtracting costs,
    and I should say incremental costs?
22  A.     So, for each Oracle entity they have their own
    profit and loss statements, income statements, and so I was
23  able to get Oracle International Corporation's, and I
    looked at their cost structure, and I worked with their
24  accountant to understand what the costs were that might
    have varied.
25         I don't think that many of these costs would
    have varied, but in an abundance of caution, I used Oracle

1     International Corporation's actual cost structure and
      deducted 2 to 13 percent from the damages for potentially
2     increased costs it would have had if Oracle America had
      continued to service these same customers.
3     Q.    And once you have revenues, and you subtract costs,
      then you have lost profits; is that right?
4     A.    That's right.
      Q.    Okay.  Now, if Oracle International's incremental
5     costs are between 2 and 13 percent, does that mean its
      profit margins were between 87 and 98 percent?
6     A.    Yes, at the gross profit level, that's true,
      incremental profit level.
7     Q.    Right.  And when we say -- when we talk about
      incremental costs and incremental profits, does that mean
8     Oracle just keeps all that money and doesn't do anything
      with it?
9     A.    No.  I mean, one of the reasons why Oracle
      International is the copyright holder is because they do --
10    Oracle Corporation does research and development.
                 So Oracle International Corp shares in the cost
11    of the massive research and development that builds new
      products and that builds things like the support patches
12    too.
      Q.    When you do a lost profits analysis and you look at
13    incremental costs and incremental revenues, you don't take
      that into account; is that right?
14    A.    That's right.  Oracle Corporation has, you know,
      16,000 customers on these products.  They're going to do
15    the research and development and the support.
                 These particular 228 customers don't cost Oracle
16    additional dollars in research and development beyond what
      I've already included here if there were additional costs
17    at the support product line.
      Q.    All right.  So let's look at slide 32 and sum up
18    Oracle International Corporation's -- the calculation.
      A.    So we go back to that 84.3, that was the lost
19    revenue for Oracle International Corporation.  Their costs
      work out for this period of time to be 7.8 million so the
20    damages for Oracle International Corporation for --
      Q.    I think we have a typo here.  It should say 76.5
21    million at the bottom.  Sorry about that.
      A.    Yeah, or we could just look at the previous slide,
22    31.
      Q.    Right.  Right.
23               So the previous slide -- let's look at that, 31.
                 It's hard to go through a multiple-week trial
24    without at least $10 million typo.
                 The bottom line is 76.479 million in the lower
25    right-hand corner; right?
      A.    That's correct.

1      Q.    All right.  So what we just finished talking about
were lost profit damages for support customers for Siebel,
2      JDE, and PeopleSoft; right?
       A.    Yes.
3      Q.    Okay.  Now, we're going to talk about Oracle
Database which is also part of this case because we allege
4      infringement of that.
             Now, for Oracle Database, tell me what method
5      you used to determine Oracle's -- Oracle Database damages.
       A.    So, again, this has to do with going back to
6      understanding the allegations and understanding how those
allegations affect the business model.
7            So for the applications, Rimini was actually
selling support services.  For the database, during this
8      period of time that I studied, Oracle wasn't -- I mean, I'm
sorry, Rimini wasn't selling database support to any
9      customers.
             How they were using the copyrighted material in
10     their business model was that they couldn't actually offer
the PeopleSoft, JDE, and Siebel support without having
11     access to Oracle's database, because when they built the
local environments, they needed to replicate the whole
12     stack.  I think you guys looked at a chart earlier that
showed you that.
13           So they were using Oracle Database as a tool in
their ability to offer this separate service, but they
14     weren't charging separately for it.
       Q.    All right.  And before -- we'll move from slide 32,
15     but before we do, we'll compliment Matt Spalding for
adjusting the numbers so quickly to 76.5 million.
16     A.    Thank you.
       Q.    All right.  Let's move to slide 33 where we're
17     talking about Oracle Database.  Explain how you went about
calculating Oracle Database damages.
18     A.    So the losses to Oracle in this case are lost
licensing revenues because, as we've talked about, Oracle
19     licenses its customers to use the database.
             So first they have to understand what price
20     Oracle charges and then how they calculate that price, and
there was a wealth of information.
21           Oracle has -- I think it's called the investment
summary that tells clients how they calculate prices for
22     these products, and then they have a price list.
             So I looked at all that.  That got me down to
23     row 3 in terms of figuring out the number of customers
benefitting --
24     Q.    Okay.  Well, let's stop there and pick up the pieces
of that.
25           Slide 34, this relates to Oracle Database's
actual pricing for its licenses; is that right?

1     A.    That's right.  Oracle has a global price list for
its products, and I turned to the page that had database
2     products on it.  This is a price list from December 14th,
2007.
3             I looked at the Oracle Database products, and I
highlighted enterprise edition as that's the product that
4     was being used by Rimini.
      Q.    Okay.  Which one is the price there?
5     A.    So it's a little difficult to read, but they have
two pricing structures, an end user and a processor
6     license.
              And my understanding from looking at the
7     investment guide was that this would be a processor
license.
8             These amounts in this processor license column
are actually dollars, so the 30,000 that I have highlighted
9     is the price per processor that a customer would pay to buy
Oracle Database.
10    Q.    So that was the price list on December 14th, 2007.
Let's look at slide 35 which is dated December 18th, 2008.
11    Did the price go up?
      A.    Yes, for the duration of time that I looked at
12    Oracle's price list, this is the one time that I saw the
price change.
13    Q.    All right.  And after December 18th, 2008, and
through the time period you were estimating damages, did
14    the price increase about 47,500 after that?
      A.    No.
15    Q.    All right.  So now, you've got the price.  Let's
look at slide 36 which -- it looks very complicated.  Can
16    you explain how this fits your analysis.
      A.    So when we talk about the price, that's the price
17    per processor because Oracle's practice is to price their
product based on the computing power that's using the
18    database.  So large customers that are using a lot more
computing power pay more for their Oracle Database license.
19    Q.    All right.  And how do you figure out from this how
to -- what the right price is?
20    A.    So for Rimini's actual installations of Oracle
Database, they provided me a lot of specific information.
21    They provided me every instance that they have available
that was associated with a customer.
22            So I can actually see the customer.  If you look
at that sort of top pulled-out section on the far
23    right-hand side, you can see that this is Bausch and Lomb,
and they have four Oracle Database environments for Bausch
24    and Lomb.
              To figure out how to price it, I deal with the
25    second line, the server configuration, the processor type,
the CPUs and cores, and that software investment guide gave

3699

 1    me a formula.
              So essentially I apply that formula to this
 2    information, and it tells me how many multiples to charge
      of the 40,000 or the 47,500.
 3    Q.    All right.  So let's go back to our chart, slide 37.
      So now we've got step one, Oracle Database's license -- the
 4    actual price list, and we have the hardware configuration,
      and now we're moving to number 3, number of Rimini Street
 5    customers benefitting.
      A.    And so there were 72 customers that were in that
 6    data that was provided me.
      Q.    Now, when you say 72 customers, that's 72 different
 7    customers who were on -- who had Rimini Street environments
      running Oracle Database, and that was a stipulated number
 8    amongst the parties?
      A.    That's correct.
 9    Q.    Okay.  And did some customers -- some of those 72
      customers have more than one environment?
10    A.    Yes, like the example we saw, Bausch and Lomb had
      four.  It wasn't that unusual to have multiple
11    environments.  I think there were over 180 on the list.
      Q.    Okay.  Now, why did -- why did you use the Rimini
12    server configuration to price the license?  Why not use
      some other configuration?
13    A.    Well, what I've been trying to measure is the actual
      damage, and that's based on the actual use.
14            So Oracle's policy is to price their database
      license based on where the product is actually installed.
15    So this would be the same method that Oracle would use for
      any customer.
16    Q.    Okay.  And why is there a license fee per customer?
      Why not just one licensee fee to Rimini Street?
17    A.    Well, again, this goes to the Oracle pricing
      guidelines.
18            If Oracle were just to allow a customer to pay
      for one product, or one installation, and yet benefit
19    hundreds of other companies, then Oracle wouldn't have much
      of a business model.
20            They need to charge a license for their software
      to each customer that's going to gain a benefit from that
21    software.  So I used the 72.
      Q.    So I'd have a pretty good business if there were
22    only -- if I could just take in thousands of customers and
      just pay one license fee.
23    A.    That's right.  So this is the way in which Oracle
      sort of meters it.  They meter it based on each company
24    paying for their company's use.
      Q.    All right.  Did only 72 Rimini customers benefit
25    from Rimini's use of Oracle's database software?
      A.    No, that's not my understanding.

1    Q.    Okay.  But did you determine a price or damages -- a
price of licenses or damages for any additional customers
2    other than those 72?
     A.    No, I did not consider or try to determine a price
3    for customers that -- where environments, other customer's
environments were used for another customer's benefit.
4    Q.    All right.  So let's go to slide 38, and let's
calculate the Oracle Database damages.
5              We looked at the licenses, the 40,000 and
47,500.  Would you explain the support figure?
6    A.    Just like the applications that we talked about
before, when you have an Oracle Database license, you have
7    the ability to upgrade, to add patches, fixes, and that's
priced at 22 percent annually of the original license fee.
8    Q.    All right.  Would you explain item two, one to six
processors.
9    A.    So, again, that's based on the Rimini hardware
configuration for where these environments had actually
10   installed Oracle Database.
               I took the largest installation, which is also
11   consistent with Oracle's practices when a company has
multiple installations.
12   Q.    All right.  We talked about the 72 customers.
               So number 4, now you're subtracting, as I
13   understand it -- oh, no, I'm sorry, that's the lost
revenue, 20.2 million, and then you're going to subtract a
14   number to get to 19.2 million.  What happened there?
     A.    Well, so just to clarify, so the 20.2 million is the
15   accumulation of the license revenue and the support revenue
for the period of time that the environment -- from the
16   time the environment was built until the customer stopped
getting the application support.
17             So very possibly Rimini still has that Oracle
Database environment, but I stopped the math, and that's
18   why it's 20.2 million, or it would be much, much larger at
the time when Oracle -- I mean, Rimini stopped collecting
19   application support revenues from these customers.
               And then it drops from --
20   Q.    And just to interrupt you, you're saying you didn't
actually investigate whether Rimini still has this stuff or
21   how long they had the Oracle Database, you just stopped it
when they stopped using the related environment?
22   A.    I stopped it when they stopped receiving revenues
from customers on that application.
23   Q.    Right.
     A.    So if Bausch and Lomb had stopped in 2010, I
24   wouldn't charge a database license support fee past that
time period.
25   Q.    Okay.  And then you subtracted a number to get to
19.2 million.  What did you do there?

1     A.    So, again, we're in Oracle International
Corporation.
2           I talked to Oracle personnel.  They said that
there would not have been any incremental costs to
3     licensing Rimini for this business.
            But, again, in an abundance of caution, I put a
4     5 percent amount in.  So I took out 5 percent of the
revenues to cover any potential incremental costs.
5     Q.    All right.  Now, in your opinion, if Rimini and
Oracle had been required to negotiate the fair market value
6     of a license for Rimini's use of Oracle Database, if Rimini
had actually had to pay when Rimini first launched, what
7     amount would Rimini have paid to Oracle?
      A.    So, if this were measured as a hypothetical license
8     between the two companies when they negotiated, I believe
that they would have negotiated for this amount, the
9     19.2 million.
            And the reason that I believe that is because
10    Oracle's software investment guide and price list is there
for any customer to see and use, and this is exactly how
11    Oracle would price it.  So that's sort of Oracle's side of
the negotiation.
12          And then on the Rimini side of the negotiation,
I understand Mr. Ravin testified in his deposition that
13    if -- you know, if he's not covered by his claims in this
case or his defenses in this case, that he would pay the
14    commercial price that any customer would pay.
            MR. ISAACSON:  All right.  Your Honor, at this
15    point we're going to begin another calculation, if this
would be a good breaking point.
16          THE COURT:  Good time for a break, and I have no
problem with that.
17          Ladies and gentlemen, we'll take our second
break, 15 to 20 minutes, again, depending on when you're
18    ready.
            And same admonitions apply.
19          You may go ahead and step down.
            COURTROOM ADMINISTRATOR:  Please rise.
20        (Recess from 11:57 a.m. until 12:23 p.m.)
          (Jurors enter courtroom at 12:23 p.m.)
21          THE COURT:  Have a seat, please.
            The record will show that we're reconvened
22    following the second break and in open court.  The jury's
all present.
23          And, Mr. Isaacson, go ahead, please.
            MR. ISAACSON:  Good afternoon, Your Honor.
24    BY MR. ISAACSON:
      Q.    Good afternoon, Ms. Dean.
25          Let's explain where we were, the category of
damages.

```
 1              So we looked at this before when we talked about
    the category of damages.  Now, at this point, we've talked
 2  about lost support customers and profits for Oracle
    International and the lost database; correct?
 3  A.     That's correct.
    Q.     All right.  Let's move over to this category on the
 4  right, Infringer's Profits, Revenue on Support Services.
              What is -- and this is -- what is this last
 5  element of Oracle's copyright infringement damages that you
    have as infringer's profits based on revenues?
 6  A.     So, in a copyright infringement claim there are a
    number of different remedies available.
 7              When I measure lost profits, that's, of course,
    an available remedy.  If there are customers that Oracle
 8  didn't experience lost profits for, or that I haven't
    included in my measurement of lost profits, the law allows
 9  the recovery of infringer's profits.
    Q.     That's your understanding, in any event?
10  A.     Absolutely.  That's my understanding of why I would
    do that calculation.
11  Q.     The -- now, in terms of the infringer's profits, we
    talked about the 228 customers that you had lost profits
12  for.  Are you calculating infringer's profits for those
    customers?
13  A.     No.
    Q.     Okay.  What set of customers are you calculating
14  infringer's profits for?
    A.     So if we think back to the pie chart, there were
15  certain categories on the pie chart that would be
    appropriate for infringer's profits.
16  Q.     Okay.  All right.  Now, let's look at how you went
    about calculating the money that was earned by Rimini for
17  those other customers.
              Can we look at slide 40.  All right.  Can you
18  explain to us what we're looking at?
    A.     Yes.  Rimini made available to me during the
19  discovery of the case, I guess produced to all parties and
    then sent to me, monthly revenue recognition accounting
20  documents, and they were laid out by customer.
              So what I did was I took the customers that I
21  had included in infringer's profits, and I used this
    document to accumulate all of the revenues that Rimini has
22  recognized for them from start of their service period
    until it either ended or February of 2014.
23  Q.     All right.  So you added up the actual numbers
    earned by Rimini according to their records for that other
24  group of customers.  Is that what you did?
    A.     That's correct.
25  Q.     All right.  So let's look at slide 41.
              Here you've got the profits, revenues, customers
```

1   not -- for the customers not included in lost profits
    broken down by category.  Would you explain this.
2   A.    Yes, and just to be clear, the segments of the pie
    that weren't included in lost profits, Not Oracle America
3   Relicensed and No Oracle Cancellations are the categories
    that go into infringer's profits.
4             I don't claim infringer's profits for JDE World
    or for most of those others.  There were two small in
5   others that I kept in with the rest.  Remember, we talked
    about, it was just a naming convention so they don't go
6   into this calculation.
7             So all I've done here is I've accumulated
    Rimini's revenues for just that smaller group of customers
    by product line.
8             MR. ISAACSON:  All right.  Your Honor, this
    slide summarizes a large amount of underlying calculations.
9   I would move it in as PTX 603 as a summary of her opinion
    with respect to -- 6003 with respect to her opinion.
10            THE COURT:  Mr. Strand?
              MR. STRAND:  Same objection, Your Honor.
11            THE COURT:  All right.  The Court will make the
    same ruling.  The summary is useful for purposes of
12  summarizing some rather complicated and complex basis.  It
    is admitted.
13            (Plaintiffs' Exhibit 6003 received into
              evidence.)
14  BY MR. ISAACSON:
    Q.    All right.  Let's look at slide 42.
15            So now we're to the point where we can give your
    opinions about the copyright damages as a whole; is that
16  correct?
    A.    That's correct.
17  Q.    Okay.  Would you explain slide 42.
    A.    So on this slide and the next few slides we'll look
18  at, I've taken all the numbers that we've talked about and
    I've just put them by product each on one page.
19            So this is PeopleSoft's damages.  The top row is
    the actual damages, measured as the lost support customers,
20  $57.7 million.
              And the second row is Rimini's infringer's
21  revenues for just those customers that have PeopleSoft that
    aren't already claimed under the Oracle's lost profits.  So
22  that's 28.4 million.
              The two together would be total damages for the
23  PeopleSoft product of 86.1 million.
    Q.    Okay.  So like it says in the upper right-hand
24  corner, PeopleSoft, this is the copyright damages that you
    estimate for just the infringement of the PeopleSoft
25  copyrights.
    A.    That's right.

 1    Q.    All right.  The next slide says Oracle Database.
That's what we were looking at right before the break, the
 2   19.2 million?
      A.    That's right.
 3    Q.    That's your estimate of the license that would have
been paid.
 4    A.    Right, either measured as actual damages so a lost
license profit to Oracle International Corp, or measured in
 5   this other hypothetical negotiation, either one, would be
19.2 million.
 6    Q.    All right.  Then we -- the next slide is JD Edwards.
So this adds up to 7.1 million; is that correct?
 7    A.    That's right.  JD Edwards was a much smaller part of
their business.
 8    Q.    Okay.  And the next slide, slide 45, is Siebel, that
adds up to 15.9 million?
 9    A.    That's right.
      Q.    All right.  Then slide 46, this is your summary of
10   the copyright damages?
      A.    Right.  So here, I've taken that information and
11   just put it on one page to make it easier, you can see how
it totals.  All the amounts are broken down, and then the
12   total for all these products is 128.3 million.
            MR. ISAACSON:  All right.  I would move slide 46
13   at PTX 6004 for the previously stated grounds.
            MR. STRAND:  Same objection.
14            THE COURT:  Same ruling.  And the objection will
be viewed as continuing.
15            MR. STRAND:  Thank you, Your Honor.
            (Plaintiffs' Exhibit 6004 received into
16            evidence.)
BY MR. ISAACSON:
17    Q.    So now we've concluded the discussion of copyright
damages, so let's talk about interference damages.
18            Let's look at slide 47.  I think you've
previously said that you start with trying to understand
19   the allegations.
            Can you give us your understanding of what
20   Oracle's alleged Rimini Street did as it relates to
interference with Oracle's customer relationships?
21    A.    Yes.  Just as a general matter, it was the
misrepresentations that Rimini Street made to its
22   customers, and then its improper access to Oracle's
websites.
23    Q.    And, again, you're not here as a damages expert to
give an opinion about whether those allegations are true,
24   you're here to assist the jury in the event that they
decide those allegations are true?
25    A.    That's right.
      Q.    All right.  So this one -- let's look at your method

1    for here, and let's look at something that looks familiar,
     slide 48.
2    A.      Fortunately, we're getting to the repetitious part.
     Because the wrongdoing also affected the same support
3    contracts, I used the same method.
     Q.      All right.  Repetition is good.  That means we've
4    already done it.
     A.      Yes.
5    Q.      All right.  So for calculating interference damages,
     you're using the same method, but you're going to apply it
6    to the interference question; right?
     A.      That's right.
7    Q.      Okay.  So let's look at slide 49.  We looked at this
     before.  And explain how this relates to the interference
8    damages.
     A.      So the interference damages are going to affect both
9    Oracle International and Oracle America because Oracle
     America is a plaintiff in the claim for interference
10   damages.  They actually do the work related to the support
     contract with the customer.
11          So in the interference damages with all the same
     customers we talked about before, instead of just taking
12   the 39 percent, I get to take the whole calculation into
     account.
13   Q.      Okay.  So now we're going to look at both Oracle
     America and Oracle International's damages for the
14   interference equation, and you said for the same customers.
            For the interference estimates, did you look at
15   the same group of 228 customers reduced from 364?
     A.      I did.
16   Q.      Okay.  All right.  So let's look at slide 50.  We
     looked at this before, and it was admitted into evidence so
17   the jury would be able to see it.
            And explain now how this relates to the
18   interference damages.
     A.      So, when we do the same calculation that we talked
19   about before, the Oracle America revenues are now relevant.
            Before we just used them as a tool to get to
20   Oracle International Corp's, but now we actually use the
     Oracle America's revenues to calculate damages and the
21   Oracle International Corp's to calculate damages.
     Q.      All right.  So which line has the interference
22   damages?
     A.      So, the 216 million would be the total revenue that
23   both companies would benefit from.  They still have to
     split it out because they have different cost structures,
24   so I have to deduct their costs separately in order to get
     the real number we're looking for which is lost profits.
25   Q.      Okay.  And you have done that cost calculation and
     reduced it for the costs; correct?

1    A.    That's right.
     Q.    Okay.  So let's look at slide 51.  Is this a summary
2    of the interference damages that you have estimated?
     A.    That's right.  So when I take the 216 million, and I
3    take out the costs for each company independently, it's
     194.1 million, and you can see -- we've talked about this
4    slide before, you can see the breakdown of the three
     application products.
5              MR. ISAACSON:  All right.  I would move slide 51
     into evidence, as a summary of her opinion, as 6005 for the
6    grounds I stated before, Your Honor.
               THE COURT:  All right.  It will be admitted, and
7    the objection will be --
               COURTROOM ADMINISTRATOR:  Do you want it 4 or 5?
8              MR. ISAACSON:  Four is next?  Let's do it 6004.
          (Plaintiffs' Exhibit 6005 received into
9          evidence.)
     BY MR. ISAACSON:
10   Q.    All right.  Now, when we were talking about the
     category of damages, there's something called computer
11   fraud, and we'll talk to the jury about that in closing
     argument, but you estimated damages for that.
12             That relates to the automated downloading; is
     that correct?
13   A.    That's correct.
     Q.    Now, slide 52, would you explain what you did to
14   determine Oracle's damages related with computer fraud
     allegations, and maybe start with the simple amount, the
15   27,000.
     A.    The second line, Oracle's Investigation Costs?
16   Q.    Yes.
     A.    Okay.  Those were calculated at 27,000 because those
17   are labor costs for actual Oracle employees for short
     durations of time in November, December of 2008 and January
18   of 2009, when they were investigating why the computer
     systems were stalling or deadlocking.
19   Q.    And you actually calculated that.  How did you do
     that?
20   A.    I was provided information from Oracle as to the
     individuals who were involved in the investigation, what
21   their salaries were, and how many hours they spent working
     on the investigation.
22   Q.    People like Mr. Renshaw?
     A.    Exactly.
23   Q.    All right.  Now, let's go up to the lost support
     customers.  There's two numbers here.  What is the higher
24   number, 34.9 million?
     A.    So, these are Oracle's losses from lost support
25   customers for Siebel, and that's the total amount of lost
     profits for the Siebel customers that Rimini had under the

3707

1    assumption that the business model for Siebel was
completely developed on the back of these automated
2    downloads and the library and the mass downloading.
So if the jury were to find that that's the
3    conclusion as to what the computer fraud damages are, it
would be 34.9 million.
4    Q.    All right.  So if the evidence shows that the
automated downloading was the basis on which they built
5    their Siebel business, then your opinion would be the
$34.9 million would be appropriate?
6    A.    That's right.
Q.    Okay.  And are those the -- the Siebel customers,
7    those are the customers for Siebel that were included in
your previous calculations?
8    A.    That's right.
Q.    You used the same methods but just applied it to
9    just the Siebel?
A.    That's right.
10    Q.    Now, let me ask you about the 14.4 million, but let
me show you a piece of testimony.
11    Now, you were here when Christian Hicks
testified, I believe?
12    A.    Yes, I was.
Q.    Now, he was the one who testified about the
13    automated downloading, and he was asked which customer IDs
were ultimately used as part of this KM crawl, that was the
14    crawl that he was discussing, and he listed the IDs for
specific customers.
15    And did you go to your lost profits calculations
and add up the lost profits that you estimated for those
16    specific customers?
A.    I did.  In some cases, they're not in the lost
17    profits so I didn't add anything, but in the instance that
I was already claiming lost profits for them, they
18    accumulate to that $14.4 million.
Q.    All right.  So that's how you got 14.4 million.
19    If the jury were to conclude that the
appropriate measure of damages for the automated
20    downloading would relate to the customers whose IDs were
used, your opinion would be the damages should be
21    14.4 million for that?
A.    That's correct.
22    Q.    Okay.  So let's summarize.  Slide 54.
We looked at this before at the beginning when
23    we started.  So can you summarize, having gone through the
analysis, what we're looking at here?
24    A.    Okay.  So it's probably best to start with the
middle of the document.  So the allegations are all laid
25    out, and the total amount of damages, both actual damages
and infringer's profits, for example, for the copyright

1    infringement claim are listed here.
            So for copyright infringement the total damages
2    are 128.3 million, for interference, 194.1 million, and
     computer fraud either the 14.4 million or 34.9 million
3    depending on what your assumptions are.
            Now, we talked about -- a little bit how many of
4    these have the same lost support customers in them, so if
     you clean all of them up, if you award all of them, then
5    you only want to maximize the award at 245.9 million or
     else it would be too much money involved.
6    Q.    And explain why this duplication that you had to
     weed out?
7    A.    So as we talked about the -- we used the same
     customers for the copyright infringement, interference, and
8    for the portion of lost support in the computer fraud.
     They're just different accumulations of those customers.
9            So once I take out any overlap of the customer,
     so it only gets counted once, then it's 245.9.
10   Q.    All right.  And the computer fraud number, with the
     exception of the $27,000, the 14.4 to 34.9 million, either
11   one of those numbers would duplicate figures that are in
     the interference damages; is that right?
12   A.    That's right.  The same plaintiffs are for the
     computer fraud as the interference, so it's the same
13   calculation.
     Q.    Right.  So if the jury were to conclude we're
14   entitled to interference damages and computer fraud
     damages, we would not get both of those figures?
15   A.    That's right.
     Q.    Okay.  Now, in addition to giving --
16            MR. ISAACSON:  I would move -- this slide 54 as
     PTX 6005 for the previously stated reasons, and I imagine
17   subject to the same objection.
            MR. STRAND:  Indeed.
18            COURTROOM ADMINISTRATOR:  There seems to be some
     confusion.  So I have slide -- I apologize for this.  I
19   don't want to get too out of order.
            MR. ISAACSON:  I'm sure it's our fault.  I'm
20   sure it's our fault.
            COURTROOM ADMINISTRATOR:  Because they are not
21   marked.
            MR. ISAACSON:  Right.
22            COURTROOM ADMINISTRATOR:  I have 51 as PTX 6004.
            MR. ISAACSON:  Right.
23            COURTROOM ADMINISTRATOR:  And PTX 6003 is slide
     41.
24            MR. ISAACSON:  Yes.
            COURTROOM ADMINISTRATOR:  And 6002 is what
25   slide?
            MR. ISAACSON:  I believe it is -- I'm coming to

```
 1    it; 29.  Yes, 29.
                 COURTROOM ADMINISTRATOR:  So those are the only
 2    ones that have been admitted.
                 MR. ISAACSON:  Slide 46.  And then we should
 3    make 46 -- slide 46 is 6004.
                 COURTROOM ADMINISTRATOR:  Okay.  So 46 is PTX
 4    6004.
                 MR. ISAACSON:  Yes.
 5               COURTROOM ADMINISTRATOR:  51 is 5.  And 54
      should be 6.  Correct?
 6               MR. ISAACSON:  Right.
                 COURTROOM ADMINISTRATOR:  I'm sorry, Your Honor.
 7               THE COURT:  No problem.  I think we have it
      straightened out.
 8          (Plaintiffs' Exhibit 6006 received into
            evidence.)
 9               MR. ISAACSON:  We appreciate that.
      BY MR. ISAACSON:
10    Q.    Now, in addition to those calculations where you
      added up all those damages, you did those same calculations
11    for copyright infringement and interference customer by
      customer; isn't that right?
12    A.    That's right.
      Q.    Hopefully you have PTX 5469 in your binder.
13    A.    Yes, I do.
      Q.    All right.  Is this a schedule you prepared?
14    A.    Yes.
      Q.    All right.  Is this based -- there's a number of
15    columns here for lost -- copyright lost profits and
      interference lost profits and non-overlapping lost profits.
16    Are those all taken from schedules to your report?
      A.    Yes, they are.
17    Q.    All right.  And does this summarize a great deal of
      information that was analyzed and collected?
18    A.    Yes, it does.
      Q.    All right.  And this represents the -- your -- this
19    is the same opinion on damages that you've been giving for
      copyright and interference, but it's customer by customer
20    now; is that right?
      A.    That's correct.
21               MR. ISAACSON:  All right.  I would move into
      evidence PTX 5469.
22               MR. STRAND:  Same objection, Your Honor.
                 May I approach the bench?
23               THE COURT:  Yes.

24               THE COURT:  Ladies and gentlemen, as you've
      certainly been able to see during the course of Ms. Dean's
25    testimony, there's been several exhibits that the Court has
      admitted as summaries.
```

 1          When I admit these exhibits as summaries, they
    are not being admitted for the truth -- what we call the
 2    truth of the matter asserted.  In other words, they're
    admitted to show what her calculations are and what they're
 3    based on.
          It will ultimately be up to the jury to reach
 4    the factual determination what are the damages in this
    case, what is involved that makes up those damages, and to
 5    the extent that these charts or summaries assist you, that
    is why they are being admitted.  But they are not
 6    substantive evidence of the damage itself.
          You're hearing the witness testify because of
 7    her study and her qualification in this as you deem it --
    let me step back a point.
 8          You've heard several what we call expert
    witnesses, and Ms. Dean is certainly such a witness.
 9          You consider an expert witness's testimony under
    the same criteria as you consider any other witness's
10    testimony.  And you'll have an instruction to that effect
    at the end.
11          These exhibits are only admitted for the purpose
    of assisting you in understanding her testimony.  They are
12    not proof that this event occurred or that event occurred.
    They are only being offered as a summary to help show upon
13    which her opinion is based.
          And you will decide concerning the evidence in
14    this case and the evidence from each witness.  Those are
    functions that are exclusively reserved for the jury.
15          So I am admitting this exhibit, Plaintiffs'
    5469, because it is such a summary.  It is not being
16    admitted for the truth of the matter asserted.
          For example, if it states that X company
17    suffered X amount of damage, that's only to explain why --
    how she reached these numbers she's presented to you.
18          Whether you make such a finding, or you feel
    that those kind of numbers, or if there's liability or all
19    of the questions that are submitted to you at the end of
    the case support that or don't support that, those are the
20    decisions that are ultimately made by the jury.
          So I make these comments in the interest that it
21    helps to understand the summaries that have been admitted
    into evidence, and we have -- this is the last of the
22    summaries, well, I don't know if it's the last --
          MR. ISAACSON:  It's the second to last, Your
23    Honor.
          THE COURT:  But I can tell you that we have --
24    this will be the sixth one that is admitted, and the
    numbers from those I'm sure counsel will be referring to in
25    the course of the case and final statements, I would
    assume.

1      So with that stated, Mr. Isaacson, you may go
forward.

2      MR. ISAACSON:  All right.  And then one last
exhibit.  Well, actually, yeah, let's show the jury what

3  this looks like.
BY MR. ISAACSON:

4  Q.   Again, this is a summary of your opinions; right?
A.   That's right.

5      MR. ISAACSON:  And at the top there's a column
for copyright lost profits.  Can you make that bigger,

6  Matt?  To pick up the customer names over on the left.
There you go.

7  BY MR. ISAACSON:
Q.   All right.  So customer by customer you've indicated

8  the product line and you've -- based on your opinions and
the analysis that you've described, this is the amount of

9  copyright lost profits for each customer, the interference
lost profits for each customer, and then the nonoverlapping

10  lost profits so that you don't have that duplication.
A.   That's correct.  That's how you would read across.

11  Q.   And this is just the same methods that you've been
talking but applied customer by customer.

12  A.   That's right.  I did the analysis customer by
customer, obviously, and in the presentation we build it

13  up.
Q.   All right.  PTX 5470, which should be in your

14  binder --
A.   Yes, it is.

15  Q.   Is this a summary of your analysis of infringer
revenues which you talked about, that other group of

16  customers and the profits that Rimini earned customer by
customer?

17  A.   Yes, it is.
       MR. ISAACSON:  All right.  So I would move 5470

18  into evidence subject to the continuing objection.
       MR. STRAND:  Subject to the same objection, Your

19  Honor.
       THE COURT:  It is admitted, and my limiting

20  instruction would apply to this as well.
       (Plaintiffs' Exhibit 5470 received into

21      evidence.)
BY MR. ISAACSON:

22  Q.   All right.  And so let's -- 5470, just so we
understand what it is, this is customer by customer, and

23  you have infringer revenues.
       And let's pick up a little -- let's go down a

24  little farther so we get some of the -- there we go.
       So over on the right you've got some zeros and

25  you've got some numbers, and just explain -- remind the
jury what you said about infringer revenues.

1    A.    So, in the instance that you award lost profits,
those customers get calculated in the lost profits Other
2    schedule that we just admitted.
            In this schedule I've given you for each
3    customer their Rimini revenues, that's the infringer's
revenue column, the third column over, and then what amount
4    I included in the calculation of lost profits that I did.
            So, for example, for Access Intelligence, it's a
5    JDE product line, Rimini made $78,775 off it, but there's
nothing in the last column because Access Intelligence is
6    already accounted for as a lost support customer for
Oracle.
7            So the way that you could use the schedule is
if, for some reason, you didn't think that Access
8    Intelligence should be in lost profits, then that 78,775
slides over into that excluded customer on this infringer's
9    profits.  They work together.
            MR. ISAACSON:  Thank you.  I have no further
10    questions.
            THE COURT:  All right.
11            Cross-examination.
            MR. STRAND:  Thank you, Your Honor.  I'll get
12    organized.
            May it please the Court?
13            THE COURT:  Yes, go ahead, please, Mr. Strand.
                    CROSS-EXAMINATION
14    BY MR. STRAND:
    Q.    Good afternoon, Ms. Dean.  How are you doing?
15    A.    Good, thanks.
    Q.    It's been a while.  It's good to see you again.
16            I'd like to turn with you -- well, let's start
with this.  We talked a little bit with Mr. Isaacson about
17    the two plaintiffs in this case, Oracle America and Oracle
International Corp.  Right?
18    A.    Yes.
    Q.    And if we call them OA and OIC, will that work for
19    you?
    A.    Yes, you can call them that.  I'm probably going to
20    end up calling them the name just because that's how I've
been referring to them.
21    Q.    I learned OA.  You learned Oracle America.  We'll
sort it out.  I just don't want to confuse the jury.
22            Oracle America -- I'll try.  That company has
the actual contract with the customers in this case;
23    correct?
    A.    That's the company that's providing support
24    services.
    Q.    Right.  And they're the ones that are losing the
25    profits from the support services if that customer leaves
to go to Rimini or someplace else; correct?

1    A.    Well, not the only company that's harmed by that.
     Q.    In the first instance, they're losing the money.
2    A.    They're losing their ability to provide support
     services to that customer, but Oracle International
3    Corporation is also losing money.
     Q.    Right.  But, in the first instance, OIC, Oracle
4    International, doesn't get money either; correct?
     A.    I don't know if that's correct, but in this
5    particular calculation, that's how the math is working out.
     Q.    And Oracle America does not own the copyrights in
6    this case; correct?
     A.    They license them, that's correct.
7    Q.    From Oracle International; correct?
     A.    That's correct.  Oracle International is the
8    copyright owner.
     Q.    And to be clear, Oracle America is not making a
9    copyright infringement claim in this case; correct?
     A.    I think you may be asking me a legal question?
10   Q.    All right.  Then I'll withdraw that question.
           To be clear, you're not calculating damages for
11   copyright infringement for Oracle America in this case;
     correct?
12   A.    That's right.  They're only Oracle International
     Corporation damages.
13   Q.    And then Oracle International Corp is the company
     that actually owns the copyrights that we're here about
14   today; correct?
     A.    Yes.
15   Q.    And Oracle International Corporation does not have a
     contractual business relationship with the customers;
16   correct?
     A.    I think you might be asking me a legal question.
17   I'm not sure I know the answer to that.
     Q.    Okay.  They don't provide services to customers;
18   correct?
     A.    For these particular customers, no, they don't.
19   Q.    Right.  So they don't provide the service and the
     customer pays them direct, it comes through Oracle America;
20   correct?
     A.    That's how the money flows, yes.
21   Q.    I think that's what you described earlier; right?
     A.    That's how the money flows, yes.
22   Q.    Now, let me ask you a question.  Had Rimini Street
     not infringed, would there be any interference damages in
23   this case, Ms. Dean?
     A.    Well, I think Rimini's misrepresentations is a
24   separate claim.  So I think if Rimini could make
     misrepresentations and create a business that could have
25   convinced these customers to take support from them, then
     there likely would be a claim.

3714

1   Q.    And all the misrepresentations were about the
copyright infringement; correct?
2   A.    I don't think that's correct.
    Q.    Now, you've calculated lost profits for both Oracle
3   America and Oracle International Corp; correct?
    A.    Yes.
4   Q.    And you agree that Oracle's actual damages relating
to Oracle's copyright infringement claim may be measured as
5   lost profits or, based on the facts of this case, a more
appropriate measure of damages may be Rimini Street's value
6   of use of the copyrighted software and support materials;
correct?
7   A.    It may be.
    Q.    But you calculated damages in this case for JDE,
8   PeopleSoft, and Siebel based on lost profits and not value
of use; correct?
9   A.    That is not entirely correct.
    Q.    Well, that's what you opined to the jury; correct?
10  A.    That's right.  The presentation to the jury was
about lost profits.
11  Q.    Okay.  And that's true even though you thought that
the value of Rimini's use was a more complete remedy for
12  Oracle in this case; correct?
    A.    I believe in my report I say it may be a more
13  complete remedy.
    Q.    Now, let's look, if you would, please, at -- and I
14  don't have the number on it.  It's the but-for slide,
please.
15          You recall this in your -- I'm sorry.  Yeah,
that will be the best -- if you've got it in your notebook,
16  that's the best place to look at it or on the screen.
Either place.  Whatever you're more comfortable with.
17          This is -- and I don't have the numbers on my
slide, so if you want to take a moment to find it, that's
18  fine.
            You talked here about Oracle lost profits on
19  lost support customers, the measurement.  This is your
basic calculation; right?
20  A.    That's right.
    Q.    And I want to focus in on one phrase that you used
21  that I want to make sure I'm clear on.  But for.  You see
that?
22  A.    Yes.
    Q.    In completing your work in this case, what
23  definition of "but for" did you use, Ms. Dean?
    A.    Well, the purpose of the analysis is to determine
24  what Oracle's business would have looked like but for
Rimini's actions.  So that's what I did.
25  Q.    So how would Oracle have looked if Rimini hadn't
done what Oracle complains about in this case; correct?

```
 1    A.    That's correct.
      Q.    All right.  Thank you.
 2          Now, I want to talk for just a moment about
      automated downloads, I haven't seen you here every day.
 3    Were you here -- I think you were here during Mr. Hick's
      testimony?
 4    A.    I was.
      Q.    Okay.  Let's look just briefly at some of his
 5    testimony just so we can kind of frame -- I'm going to talk
      about automated downloads for a minute.
 6          Do you remember -- let's look at 1194, 11 to 15.
            Do you remember when Mr. Hicks was asked, "is it
 7    correct that you have no evidence that Rimini Street was
      running its knowledge base scan program other than in those
 8    three months?"
            And he answered, "I think that's right.
 9    November through end of January.  I believe that's correct,
      yes."
10          Do you recall him giving that testimony?
      A.    Yes.
11    Q.    And you recall that the years he was referring to
      were November of 2008 through January of 2009; correct?
12    A.    I believe that's correct.
      Q.    Those three months; correct?
13    A.    Yes.
      Q.    Okay.  And then you recall that it went on, at 1194,
14    16 through 23, the question was asked, "I'd like to make
      one thing clear.  You are not -- you don't have the opinion
15    that Rimini caused physical harm to Oracle's servers; is
      that right?"
16          And he said, "I don't."
            Do you recall that testimony?
17    A.    Yes.
      Q.    And then on that same day Mr. Renshaw testified.
18    Let's look at 1128, 8 to 10.  Do recall Mr. Renshaw, he had
      the lovely British accent?
19    A.    I'm not sure, I didn't see Mr. Renshaw in person.
      Q.    Oh, you missed him.  Okay.
20          Let's look at 1211, 8-10 -- do have that?
      A.    I'm sorry.  Is that an exhibit I'm supposed to be
21    looking for?
      Q.    No, she's going to get it up on the screen in just a
22    moment.  We're looking at the trial transcript.  I can do
      many things, but I can't get it in the notebook that fast.
23          And they asked Mr. Renshaw, Mr. Dykal, my
      colleague, asked Mr. Renshaw, "Got it.  And for how long
24    was the system unavailable to anybody who wanted to access
      it?"
25          Actually, I don't think it was Mr. Dykal, I
      think it was Ms. Dunn.
```

3716

```
1          But, in any event, the question was asked, "And
    for how long was the system unavailable to anybody who
2   wanted to access it?"
           And he said, "So probably about four and a half
3   hours."
           Do you recall that?
4          Well, you've not seen that testimony, but we'll
    recall it.
5          And then he went on at 1219 4-7, line 4, and
    then the question was asked, "Just to clarify, there was no
6   permanent damage done to Oracle's servers by Rimini Street;
    correct?"
7          And the answer, "There was no physical damage to
    the servers."
8          You didn't see that, but now you've seen it.
           Let me ask you a few questions.
9          In your analysis of the damages in this case,
    you did not find that any customer left Oracle and went to
10  Rimini because Oracle's computer crashed; isn't that
    correct?
11  A.    That was not an analysis I did.
    Q.    You didn't do that?  So you don't have any opinion
12  on that?
    A.    No.
13  Q.    You didn't talk to any customer that left or got
    unhappy or anything like that; correct?
14  A.    Are you talking about because of the --
    Q.    Because of the crash.  Because of the crash.
15         Excuse me.  I apologize.
           You didn't talk to any customer that left
16  because the computer crashed; correct?
    A.    That's correct.
17  Q.    All right.  Now, reflecting on the testimony you
    just gave, you said Oracle seeks $27,000 in investigation
18  costs; correct?
    A.    That's correct.
19  Q.    And Oracle seeks between 14.4 million and
    34.9 million in lost profits because the computer crashed
20  because of the downloads; correct?
           Well, let me ask you this.  Is it downloads or
21  the computer crash?
    A.    I don't think that's entirely correct.
22  Q.    All right.  Well, that's what I want to get clear.
           You said they lost between 14.4 and
23  34.9 million?
    A.    For the computer fraud claim, that's correct.
24  Q.    Okay.  What do you understand the computer fraud
    claim to be?
25  A.    My understanding is that their -- the allegation is
    that Rimini used automated tools to massively download from
```

3717

```
 1    Oracle's servers and caused harms.
           Q.    And the three months that Mr. Hicks and Mr. Renshaw
 2    testified about were November of 2008 through January of
      2009.  Correct?
 3    A.    Yes.
           Q.    Okay.  Now, if you would look for me, I don't have
 4    it for a slide, and we can switch if you want, but if you
      would look for me at the bar chart that you have in your
 5    notebook that you went through with Mr. Isaacson just a few
      moments ago, slide 18.
 6              Now, as I understand this --
               MR. STRAND:  Is there any way we can switch back
 7    to Matt so we don't leave the jury behind?
               Your Honor, if we could switch back.
 8              Could you put up the bar chart slide?
               Oh, she's going to switch.  Okay.  Thank you
 9    very much.
      BY MR. STRAND:
10    Q.    Now, you'll agree with me the red line represents
      Siebel clients; correct?
11    A.    That's correct.
           Q.    And there could have been no way that the Siebel
12    clients that Rimini obtained in 2006, 2007, and the first
      10 months of 2008, could have related in any way to the
13    massive downloads that were made in November, December, and
      January of 2008, 2009; correct?
14    A.    I'm not entirely sure that the massive downloads in
      those three months are the only basis for the computer
15    fraud claim.
           Q.    You don't know when the downloads were made, do you?
16    A.    That would be Mr. Hicks.
           Q.    Okay.  And you don't know -- there were 11 people --
17    there were 11 customer IDs on that one slide that was in
      the deck that you just referred to.  You don't know when
18    those 11 IDs were used, do you?
      A.    I don't recall when -- if Mr. Hicks testified about
19    that.
           Q.    Okay.  Now, let's talk a little bit about lost
20    profits.
               Your opinion is that customers left Oracle and
21    became Rimini's clients because of Rimini's misconduct
      alleged in this case; correct?
22    A.    That's correct.
           Q.    And you conclude that but for Rimini's conduct,
23    applying the definition you gave, those customers would not
      have left Oracle; correct?
24    A.    With the adjustments that I made for assumed
      attrition, yes.
25    Q.    Sure.  Thus, had Rimini not engaged in the
      misconduct, you believe Rimini's customers would have
```

```
 1    stayed at Oracle, continued to pay for maintenance and
      support services provided by Oracle; correct?
 2    A.    For the 228 customers less the general attrition,
      that's correct.
 3    Q.    Okay.  Now, let's look at the slide from your deck
      that talks about your work steps.  Information reviewed.
 4           MR. STRAND:  Oh, we have to switch back.  I
      promise I won't do that very often.
 5    BY MR. STRAND:
      Q.    You recall this slide; right?
 6    A.    Yes.
      Q.    All right.  Now, the -- and I won't repeat all of
 7    these.
             There's one thing I noted when I looked at this
 8    that isn't on there.  You never spoke to any former Oracle
      customer about the work you did in this case; is that
 9    correct?
      A.    That's correct.
10    Q.    You read a lot of documents; correct?
      A.    That's correct.
11    Q.    And some of those related to customers; correct?
      A.    Documents and depositions, that's correct.
12    Q.    And the 17 depositions that Mr. Yourdon talked about
      this morning?
13    A.    That's correct.
      Q.    Okay.  But you never talked to a flesh-and-blood
14    Rimini customer, any of those 364; right?
      A.    That's correct.
15    Q.    Okay.  So why don't you get in front of me -- in
      front of you your exhibit -- it's just introduced as a
16    summary Exhibit 5469.
             MR. STRAND:  I promise only one more time,
17    Dionna.
      BY MR. STRAND:
18    Q.    You remember this was just admitted into evidence?
      A.    Yes.
19    Q.    All right.  And there are 229 customers on there,
      but with the deletion that you made today, there are 228
20    that count in this case; correct?
      A.    That's already adjusted for the 228.
21    Q.    Okay.  It's already adjusted.  I'm sorry.  I stand
      corrected.  228 customers; right?
22    A.    Right.
      Q.    And you didn't talk to any of them?
23    A.    That's right.
      Q.    Okay.  So you don't know whether that customer ever
24    spoke to Rimini Street, correct, any of those 364
      customers?
25    A.    I assume they had spoken to Rimini Street.
      Q.    But you don't know as you sit here that those folks
```

3719

```
1    ever spoke to anybody at Rimini Street, do you?
          A.    I think it would be a reasonable conclusion given
2    that they were licensed customers and Rimini Street was
     supporting them.
3         Q.    You don't know whether the customer made its
     decision to leave Oracle before or after speaking to Rimini
4    Street, do you?
          A.    Well, for the 17 customers, they clearly left due to
5    Rimini Street and price.  So I don't have specific evidence
     on the other 200 and -- whatever that would be.
6         Q.    228 less 17?  I hesitate to get into a mathematical
     battle with a CPA so I'll just leave it at that.
7               The 17 that you're referring to are the folks
     that you read their depositions; right?
8         A.    That's correct.
          Q.    And it was your conclusion reading those depositions
9    they made the decision to leave Oracle after speaking to
     Rimini; is that correct?
10        A.    Well, they would need a vendor to go to, so it's my
     understanding that they made the decision to leave to go to
11   Rimini after they knew about Rimini.
          Q.    Well, let me ask you about that.  Pitney Bowes was
12   mentioned earlier this morning in Mr. Yourdon's testimony.
     Do you recall that?
13        A.    Yes.
          Q.    And as I understand it, Pitney Bowes made the
14   decision to leave to do self-support for a year before
     going to Rimini.  Do you recall that testimony?
15        A.    I do recall that.
          Q.    So it's pretty clear that probably Pitney Bowes did
16   not talk to Rimini before leaving Oracle; correct?
          A.    It is correct.
17        Q.    Okay.  And you don't know how many of the rest of
     these 228 customers likewise talked to Oracle -- excuse me,
18   talked to Rimini after deciding to leave Oracle, do you?
          A.    I don't know.  The -- in the case of Pitney Bowes,
19   the damages wouldn't start until they went to Rimini
     though.
20        Q.    You don't know what the customer said to Rimini in
     the course of any conversation that they have -- had, do
21   you?
          A.    That's right, I haven't seen any evidence about that
22   in this case.
          Q.    And you don't know what questions the customers
23   asked Rimini, do you?
          A.    I depend on Ed Yourdon, for example, his testimony
24   was pretty clear about what customers consider.
          Q.    What customers consider, but he didn't have any
25   direct evidence of what the customers asked other than the
     17 depositions; correct?
```

1     A.    I think that's correct.
      Q.    And you don't know as you sit here today what Rimini
2   Street said to the customers, do you?
      A.    I don't have specific communication, but, of course,
3   we listened to the testimony of Mr. Maddock who talked
    about what Rimini's frequently asked questions responses
4   were, for example, and I saw many documents in the case
    that had similar types of scripts like the one that was in
5   my testimony with respect to Mr. Ravin.
      Q.    But as you sit here today, you don't know what was
6   said on what day to which customer, do you?
      A.    That's correct.
7     Q.    You also don't know the factors that each of those
    228 customers considered in making their decision to leave
8   Oracle and go to Rimini, do you?
      A.    That's correct.
9     Q.    And, finally, you don't know the factors that those
    228 customers actually concluded were the deciding factors
10  in making their decision to leave Oracle and go to Rimini,
    correct, Ms. Dean?
11    A.    Yes.  If you're asking about each individual
    customer, that evidence has not been provided in this case.
12    Q.    Now, look with me at Exhibit 5466, if you would,
    please.
13              COURTROOM ADMINISTRATOR:  PTX?
              MR. STRAND:  Excuse me.  PTX.  And we need to
14  switch back.  PTX 5466.  It's the 1006 summary that was
    introduced through Mr. Allison.
15              And could you switch us?
              And as soon as I say I won't do it again, I will
16  so I'm not going to make any promises.
    BY MR. STRAND:
17    Q.    All right.  Let's look at Mr. Allison.  Time flies.
    I think it was last Monday.  Friday or Monday.  Were you
18  here for his testimony, Ms. Dean?
      A.    I believe some of it.
19    Q.    Okay.  Let's look at footnote number 1 down there at
    the bottom.  Do you remember his testimony that there were
20  12 Siebel customer licenses, and he lists the names, that
    notwithstanding a diligent search, Oracle was unable to
21  locate?
      A.    Yes.
22    Q.    Okay.  Now, it's correct, Ms. Dean, that you were --
    that in your damage calculations you have calculated
23  damages for at least 10 of those customers on this page and
    the next page of the document; correct?
24    A.    I'm not sure what you mean by this page and the next
    page of the document.
25    Q.    Okay.  I'm sorry.  Show her page 2.  Fair question.
              Second page is JD Edwards, first page is Siebel.

1    There are 12 people listed on the first page and two listed
     on the second page, and my question is this:
2             Looking at those two pages, you're still
     calculating as part of your damage base damages for about
3    10 of those customers; correct?
     A.    I don't know.
4    Q.    Okay.  You don't know.  You have no reason to
     believe you're not doing that; correct?
5    A.    Well, I could easily look.
     Q.    I know, but we won't take everybody's time to do
6    that.  We'll work that out later.
              Now, you watched customer videos, or -- did you
7    read the depositions or watch the videos or both?
     A.    I've seen some videos here in the courtroom.
8    Q.    And did you read Mr. Yourdon's report?
     A.    I did.
9    Q.    And you were here this morning for his testimony;
     right?
10   A.    Yes.
     Q.    Okay.  I want to talk a little bit about customer
11   attrition/retention, kind of two heads of the same coin.
     A.    Okay.
12   Q.    Okay.  You'll agree with me that each year Oracle
     loses some of its maintenance and support customers;
13   correct?
     A.    I'll agree with that.
14   Q.    And I believe the number 95 percent, because it's
     not absolutely precise for every product line for every
15   year, but 95 percent seems to be about the right number
     that stay, and 5 percent leave every year; correct?
16   A.    Well, I would classify it as 95 stay and 5 cancel
     their contracts.
17   Q.    Five cancel their contracts.  That's fine.
              So every year -- and you're also aware that the
18   maintenance and support agreements between Oracle and its
     customers renew each year; correct?
19   A.    In general.
     Q.    Generally speaking.  About 16,000 customers --
20   14,000 customers; correct?
     A.    About 14,000.  Well, I don't know.
21   Q.    Okay.
     A.    Different amounts at different times.
22   Q.    All right.  I've heard 14,000, I've heard 10,000 for
     PeopleSoft and JDE, but I'm trying to get -- about 5
23   percent of those cancel each year; correct?
     A.    About 5 percent of them do not support -- do not
24   renew their support, that's right.
     Q.    So every -- every year Oracle has to go out and
25   re-earn the right to continue to provide maintenance and
     support service for those customers, correct?  Because they

1    have the right to say thanks, we're done?
     A.    Well, I would imagine they're living out the whole
2    year.  It's not like they just go out the last two days and
     try to renew them.
3          But, yes, Oracle works throughout its year to
     keep customers.
4    Q.    Keep customers.  But they've got to earn those
     customers year after year after year, it's not a one-time
5    for-life kind of deal; correct?
     A.    Yeah, Oracle's customers are not locked in for
6    support.
     Q.    So there's no guarantees that those customers are
7    going to come back every year; correct?
     A.    There is no guarantee.
8    Q.    Now, you did an analysis of Oracle's customer
     retention from 2006 up to early 2014; correct?
9    A.    That's correct.
               MR. STRAND:  All right.  And that one has been
10   in evidence or in front of the jury.  So let's pull that
     one up, if we could, please, Marie.
11   BY MR. STRAND:
     Q.    This looks a lot like a demonstrative based upon
12   your analysis, correct, Ms. Dean?
     A.    It looks like it, yes.
13   Q.    Okay.  And while it says -- I thought I had your
     reference on it.  But this is the analysis that you did --
14   basically the results of the analysis that you did showing
     what percentage of customers Oracle retained year over
15   year; correct?
     A.    For support renewal, yes.
16             MR. STRAND:  Okay.  And then we could present it
     another way.  It's been done another way.  Let's look at
17   that next slide.
               Can we darken that up, or is that all we got?
18   BY MR. STRAND:
     Q.    All right.  So about 94 to 96 percent stay, and
19   about 5 to 3 percent, 6 percent, cancel their contracts
     ever year; correct?
20   A.    Is this a merge of all three products?
     Q.    It's kind of a merge of all three products so it's
21   not so busy.
     A.    Okay.
22   Q.    Does that look fair to you?
     A.    I think that sounds fair.
23   Q.    All right.  Now, looking at this Rimini Street made
     its first sale to a client in 2007; isn't that correct?
24   A.    I think -- did they have clients in 2006?  No, they
     just announced in 2006.  You're right.  They don't have a
25   client until 2007.
     Q.    Correct.

3723

1          Okay.  As far as you know -- well, were you here
for Ms. Ransom's testimony on Tuesday?
2     A.    Some of it, yes.
     Q.    All right.  Let's all get on the same page.  Let's
3   look at 1318 beginning at line 7.
          I asked her, "Looking at this JD Edwards
4   attrition, this was calculated by an expert working with
Oracle," you didn't know you had already started in the
5   case, "JD Edwards' retention rate was from 91 percent up
through 96, 95 percent.  Do you see that?"
6          She says, "Yes, 91 percent in 2006."
          Then it goes on, let's just go down to the next
7   Q and A.  Beginning at line 12.
          "Has it been your experience that somewhere
8   about 95 percent of the people are retained, 95 percent of
the customers are retained every year going all the way
9   back to the mid-1990s?"
          And her answer, "Yes, I would say so."
10          Do you see that?
     A.    Yes, I do.
11     Q.    You don't have any reason to disagree that the
historical attrition rate has been in that 95 -- excuse me,
12   historical retention rate has been about in that 95 percent
range; correct?
13     A.    That's correct, although I would say one caveat, and
that's the information I was provided was based on revenue,
14   not a customer count.
     Q.    Let's talk a little about that.  That's a good
15   point.
          You did your analysis on how many dollars were
16   up for renewal and how many dollars cancelled; correct?
     A.    That's right.  That was Oracle's methodology.
17     Q.    And that 95 percent that you come up with is the 95
percent of dollars that stayed rather than cancelled;
18   right?
     A.    When they were up for renewal, that's right.
19     Q.    Right.  So that the numbers were dollars, not
people.
20     A.    Right.
     Q.    But on average, on average you could equate the
21   retention rate in dollars to people, couldn't you, to
customers?
22     A.    Well, I think you would need to be careful that you
were -- I can understand the mathematical way that you
23   could do that, but I think you would need to be careful to
know what the average customer is for the amount that is
24   available to renew and the amount that chose to be cancel.
     Q.    But you testified in your deposition, didn't you,
25   Ms. Dean, that you could equate the retention rate in
dollars to customers?

3724

1  A.    I think you and I were discussing a hypothetical
circumstance where you told me to assume there were 10,000
2  customers, and couldn't I divide it, and I said yes.
   Q.    Okay.  I'm going to do that now.  You're ahead of
3  me.  The witness is leading counsel.
            If you have 10,000 JDE -- or, excuse me, JDE and
4  PeopleSoft customers, say just 10,000, you've heard that
number, I think it's in your report?
5  A.    No, that was the number that was disclosed in 2005
when --
6  Q.    When they were acquired.
   A.    -- Oracle bought PeopleSoft.  But I don't know how
7  relevant that number is to any other period.
   Q.    And it's probably pretty close to that in 2006,
8  wouldn't you think?
   A.    I don't know.
9  Q.    Okay.  So if we take 6 percent of 10,000, how many
customers do we end up with?
10  A.    600.
   Q.    Or 500 if we end up with 5 percent?
11  A.    Yes.
   Q.    Okay.
12  A.    I'm not sure what you meant by how much do we end up
with, but applying the percentage against the total.
13  Q.    You can agree with me that there was no year that
Rimini obtained so much as five or 600 PeopleSoft and JDE
14  customers; correct?
   A.    Not during the time period that I was analyzing,
15  that's correct.
   Q.    Now, just so we kind of set framework, again, you
16  talked about this with Mr. Isaacson, but the damages period
that you've calculated damages for begins in 2006; correct?
17  A.    For any customer that left to go to Rimini in this
2006 which we just decided didn't happen.
18  Q.    Didn't happen.
            So we've got -- but it's 2006 to 2014 is the
19  damage period for activities that occurred between 2006 and
late 2011, early -- excuse me, late 2011; correct?
20  A.    That's right.
   Q.    Okay.  Cool.
21            Now, you can't look at any information that you
have available to you from Oracle and determine how many of
22  the 6 percent of PeopleSoft customers who left Oracle in
any given year went to Rimini; correct?
23  A.    I'm not sure I'm following your question.
   Q.    Sure.  Is there any information that you have that
24  you can look at and say that of the customers that left
Oracle in a given year, how many of the 6 percent that left
25  Oracle went to Rimini?
   A.    Well, I know how many went to Rimini because I have

3725

```
 1    that from Rimini's records.  I don't know how Oracle would
      necessarily know that.
 2       Q.   Okay.  What about the rest of the 6 percent of the
      customers, 5 or 6 percent of the customers that would leave
 3    Oracle, do you have any way of knowing where they went if
      they didn't go to Rimini?
 4       A.   Yes, I do.
         Q.   Did you analyze that?
 5       A.   Well, I saw evidence in the case with respect to
      that.  The vast majority of them don't use the software.
 6    They're not going anywhere.  They're cancelling support
      because they're not using the licensed software.
 7       Q.   The one thing we know, though, is that all customers
      that left Oracle in a given year did not go to Rimini;
 8    correct?
         A.   They didn't go anywhere.  There were -- some
 9    customers went to Rimini, some customers might have gone to
      TomorrowNow or CedarCrestone that are not acceptable
10    alternatives.  But most of the customers don't go anywhere,
      they just cancel support because they're not using the
11    software.
         Q.   I don't want to parse words with you.  Not all of
12    the customers that cancel with Oracle sign a contract with
      Rimini; correct?
13       A.   I would agree with that.
         Q.   And the ones that didn't just stop using the
14    software had to do something; correct?
         A.   If there are customers that kept using the software,
15    they would have to do something.
         Q.   And the software's been described as
16    mission-critical; correct?
         A.   That's correct.
17       Q.   So a big company can't just wake up one morning and
      say "we don't want to use enterprise resource planning
18    software today so we'll just shut off the switch."  They
      can't do that; right?
19       A.   That's my understanding.
         Q.   They have to make some kind of plan.
20       A.   That's my understanding.
         Q.   And that's a fairly expensive and involved decision
21    process; correct?
         A.   Yes.
22       Q.   And these companies that tend to use the ERP
      software, many of them are very large and very
23    sophisticated; correct?
         A.   Yes.  I would assume that customers of this would be
24    primarily large, but I've seen evidence in the record that
      medium and even some small-sized companies may use it.  It
25    depends on what type of program they're using.
         Q.   Right.  And, of course, if you're a smaller company,
```

1    it's a significant expenditure just as well, maybe smaller
     dollars; right?
2    A.    As a proportion of the budget, I don't know.  I
     heard Ms. Ransom testify that the ERP software isn't a
3    substantial portion of an IT budget.
     Q.    Now, I want to talk a little bit about why do
4    customers go and where do they go.  How about that, okay?
     A.    Okay.
5    Q.    Were you here for Ms. Catz's testimony on Monday
     afternoon?
6    A.    Yes, I believe I was.
     Q.    Okay.  Let's refresh our recollection a little on
7    that, 949, beginning at line 13, please.  And we'll just go
     down to 18.
8          The question was asked of Ms. Catz -- you know
     Ms. Catz; right?
9    A.    I do.
     Q.    You met with her as a part of your interview process
10   in connection with the work you did in this case; correct?
     A.    I did.
11   Q.    Okay.  So you know she's a CEO.
     A.    I'm aware of that.
12   Q.    Okay.  So she was asked, "Based on your experience
     as CEO of Oracle, do you think that Rimini's customers
13   would have stayed with Oracle but for Rimini Street's
     conduct?"
14         Her answer, "The vast majority of our customers
     stay with us if they're using the software.  If they go
15   bankrupt, obviously, then they go away."
           Do you recall her testifying to that?
16   A.    Yes.
     Q.    Now, look with me, if you would, please, at
17   Exhibit 161, DTX 161.  This was admitted during
     Ms. Ransom's testimony.
18         Do you have that in front of you?
     A.    I do.
19   Q.    That's up on the board now in front of us.
           I believe if I -- well, in your expert report,
20   let's go back there for a moment, you were kind enough to
     provide a list of documents that you had considered in
21   connection with your work in this case; correct?
     A.    Yes, that's correct.
22   Q.    And you considered a lot of documents; right?
     A.    That's right.
23   Q.    All right.  And as I recall looking at your exhibit
     to your report, and I've got it back here if you want to
24   look at it, it's way at the back, schedule 3, you -- you
     received Exhibit DTX 161 from Oracle; correct?
25   A.    I'm not sure, but I would -- I would say yes because
     I received all the depositions, and I can see there's a

1  stamp.  This was definitely shown to a couple of deponents.
   Q.    Okay.  So you considered this then as a part of your
2  analysis of damages in this case; is that correct?
   A.    Yes.
3  Q.    And it wasn't cited in your report, you didn't feel
   it was important enough to cite in your report apparently;
4  correct?
   A.    If you're representing to me it wasn't cited in my
5  report, I can understand that, but the report is 190 pages
   long so I don't recall.
6  Q.    Okay.  Fair enough.  About 400 footnotes?
   A.    That's correct.
7  Q.    Okay.  Let's look at Defendants' Exhibit -- DTX 161,
   if we could, please.  Look with me at page 6 or slide 6 of
8  that exhibit.
           Do you recall looking at this as a part of your
9  analysis, that list of true cancellation types?
   A.    Not specifically, but this is not dissimilar to
10 other information that I looked at.
   Q.    And I'm not going to go down all these.  But this
11 gives -- based upon all the documents that you looked at in
   this case, this gives us a sense of all the various reasons
12 why Oracle customers might say they cancelled their Oracle
   maintenance and support service; correct?
13 A.    I suppose it could fall under no customer response,
   but I seem to recall a lot of documents which just say
14 "unknown" at the bottom.
   Q.    Sure.  Kind of miscellaneous.  We don't know why
15 they cancelled their service.
   A.    That's right.  These cancellations depend on
16 communications from the customers.  So they may not have
   any idea.
17 Q.    There's bankruptcy.  Why don't we highlight that.
   Right in the middle, that Ms. Catz mentioned, if they went
18 bankrupt, obviously they cancel; right?
   A.    I would assume so. I don't know.  Could be the
19 reason.
   Q.    Yeah let's look at slide 9 of that document if we
20 could, please.
           We had some conversation -- I had some
21 conversation with Ms. Ransom about this.  Were you here for
   that?
22 A.    I think so.
   Q.    And the NA column over there, three over from the
23 right, see that, that's North America, that's the one we're
   focused on; right?
24 A.    That's right.
   Q.    And the bankruptcy percentage in North America at
25 the time of this document which was in September of 2008
   was how much?

1    A.    This document shows 2.69 percent.
     Q.    Let's look at Move to Support Competitor, up there
2    second from the top.  Do you see that?
     A.    I do.
3    Q.    And what's the percentage that moved to a support
     competitor?
4    A.    This is listed at 12.38 percent.
     Q.    Right.  Let's look at DTX 164, which was also a
5    Ransom deposition exhibit and something we talked about
     with Ms. Ransom on whatever day we talked to Ms. Ransom on
6    that first page.
              Look down at the bottom.  You'll see the exhibit
7    sticker.  So you know from that that you received this
     document and you considered it as part of your analysis of
8    damages' in this case; correct?
     A.    That's correct.
9    Q.    All right.  Let's look at slide 4 of that document,
     if you would, please, ma'am.  Do you have that in front of
10   you?
     A.    I do.
11   Q.    And I apologize for the quality of the reproduction
     of it, but it's about 4 or 5 generations old.
12            You see up there there's Q2 2009 on the
     left-hand side?
13   A.    I see that.
     Q.    And looking down on the Q2 cancellation status code,
14   do you see what the percentage of bankruptcies was, people
     who said they cancelled because of bankruptcy?
15   A.    It says 1 percent.
     Q.    And looking over there at the -- or looking down at
16   the slice of pie that's at the bottom, it's very dark, can
     you see how many moved to a support competitor?
17   A.    It says 9 percent.
     Q.    Okay.  And then let's look at Q3 '09 cancellation
18   status code.  What's the percentage of bankruptcies?
     A.    It says 1 percent.
19   Q.    And what's the percentage that moved to support
     competitors?
20   A.    It says 10 percent.
     Q.    So if we look at -- let's put up the next slide.
21   This is a graphic that appeared in my colleague's opening
     statement.
22            Can you put that up?  Thanks.
              So of the customers that leave -- that cancel --
23   they're getting me squared away -- their contracts with
     Oracle, about 88 percent choose other options, and we've
24   just looked at what some of those options are, correct?
     A.    Well, I think all we've done is look at the
25   bankruptcy option.  All of these pies have a lot of other
     considerations.

3729

1    Q.    Right.  And I'm trying to get done today.  I don't
know if we're going to make it or not.

2          But we can look around those and see what the
other options were; correct?

3    A.    That's right.
     Q.    And about 12 percent, 10 or 12 percent, appear to go

4    to Rimini or someplace else for a third-party service
provider; correct?

5    A.    Well, I think that -- my review of these documents
and one reason that I don't deal with them in my analysis

6    is because those customers are primarily going to
TomorrowNow.

7    Q.    Even as late as 2009?
     A.    They close in the October of '08, but fiscal year

8    '09 starts in '08.
     Q.    So I believe that -- and the record will be clear, I

9    believe they were closed in the summer of 2008, and it's
your testimony they were continuing to go to TomorrowNow

10   after TomorrowNow was closed?
          MR. ISAACSON:  Your Honor, objection, the record

11   is actually October 2008.
          MR. STRAND:  October.  That's correct.  I was

12   going to get that slide.
BY MR. STRAND:

13   Q.    So your testimony is they continued to go to
TomorrowNow up until the last moment, October of 2008?

14   A.    Well, I know that TomorrowNow had a lot of customers
and that customers were going with them because -- I don't

15   know if I can say this or not.
     Q.    Okay.

16   A.    Probably not.
     Q.    Okay.  Now, you'll agree with me that customers

17   decided to cancel their maintenance and support agreements
with Oracle for a variety of reasons; correct?

18   A.    I would agree with that.
     Q.    Let's look at what Ms. Ransom told us on -- when she

19   testified, 1339, 19 through 21, please.
          She said, "At the end of the day, each customer

20   that leaves Oracle leaves for a different reason; correct?"
          And she said, "Yes."

21          Do you agree with that?
     A.    Well, I doubt they all leave for completely

22   independent reasons.  I mean, you can make the pie chart.
There's about six reasons.

23          But I think the accumulation of evidence that
I've seen in the case is they stop renewing support

24   primarily, and you could add up a lot of these pies for
this position, which is they are not using the software.

25          Either they never implemented it to begin with,
they've decided to transition off, they were bought by a

3730

```
 1    bigger company that uses a different software, or they were
      swept into that company's licensing, they went bankrupt.
 2          The primary reason fundamentally that people
      don't renew support with Oracle Corporation is because
 3    they're not using Oracle's software.
      Q.    All right.  So you heard Ms. Ransom testify that she
 4    joined JDE in 1993; correct?
      A.    Yes.
 5    Q.    And she went through the acquisition by PeopleSoft;
      correct?
 6    A.    That's my understanding, yes.
      Q.    And then she went through the acquisition by Oracle
 7    International Corporation; correct?
      A.    That's my understanding, correct.
 8    Q.    And she's now a senior vice-president; correct?
      A.    Yes.
 9    Q.    And she said that at the end of the day, each
      customer that leaves Oracle leaves for a different reason.
10    You don't have any reason to disagree with her about that,
      do you?
11    A.    Well, what I said I didn't think was inconsistent
      with her testimony either.
12    Q.    She just said yes, though; correct?
      A.    That's right.
13    Q.    Now, not all customers who left Oracle were fully
      satisfied with -- who cancelled their Oracle support, were
14    not satisfied with Oracle; correct?
      A.    That's a very summary statement.  I don't know if I
15    can agree or disagree with that.
      Q.    All right.  And I've learned that from talking to
16    you before, so let's look at a document so we get it
      straight.  Let's look at DTX 165 if we could, please.
17          This is a document, again, it's -- do you have
      it in front of you?  Okay.
18          This is a document that was marked and talked
      about in a deposition, it looks like Ms. Ransom's
19    deposition, and, again, based on that, you know you
      received this and considered it as a part of your analysis
20    in reaching your opinions on damages in this case; correct?
      A.    Yes.
21    Q.    Let's look at tab -- excuse me, slide 26 in that
      document if we could, please, and I won't go into this in
22    detail.
            You recall Ms.  Ransom and I discussed
23    improvement and the summary there?
            I'm sorry.  I'll let you get there.
24    A.    I generally recall you two talking about this.
      Q.    Yeah, and this was a document dated August of 2007;
25    right?
      A.    That's correct.
```

3731

1    Q.    And Oracle was talking internally about areas for
improvement; correct?
2    A.    Yeah.  I would imagine Oracle was always trying to
improve.
3    Q.    And the second bullet point says -- or the first
bullet point says, "Customers are more likely to comment
4    about the analyst than anything else."
          Do you see that?
5    A.    I see that.
     Q.    And the second bullet point says, "The analyst
6    handling and time to solution are the three main areas
customers want to see improve"; correct?
7    A.    That's what this says.
     Q.    And then let's look at DTX 160 which was admitted
8    during Ms. Ransom's testimony, defense Trial Exhibit 160,
Ms. Dean.
9          That's another one it looks like it was a
document marked as an exhibit, so you looked at that and
10   considered it as a part of your work in this case; correct?
     A.    Correct.
11   Q.    Look at slide 3 for me.
          Up there at the top it says, "JD Edwards E1
12   customers are showing consistently low levels of
satisfaction with Oracle products and services."
13        Do you see that?
     A.    I see it says that.
14   Q.    Did I read that correctly?
     A.    I see it says that.
15   Q.    Did I read it correctly?
     A.    Oh, I'm sorry.  Yes, you read it correctly.
16   Q.    Okay.  Sorry to get out of sync.
          Let's look at page -- at tab 5 of that exhibit
17   if we can, please.
          One more page, please.
18        There we have Key Target Areas to Improve there
toward the bottom.  Do you see that?
19        Ease of System Administration, Ease of Product
Installation, do you see all those?
20   A.    I do.
     Q.    And then there are lines for PeopleSoft and E1 and
21   then Siebel there.  Do you see those?
     A.    I do.
22   Q.    And the black numbers indicate above 50 percent, it
looks like, and the -- well, I'm not sure I know the
23   number -- what the black and white mean, but they've got
percentages in each one; correct?
24   A.    The squares seem to have percentages in them.
     Q.    Percentages.
25        Now, and you considered this in forming your
conclusion that but for Rimini's conduct, the Oracle

3732

1    customers would not have cancelled their contracts with
     Oracle and would have stayed with Oracle and paid for
2    Oracle maintenance and support; correct?
     A.    I think I need to hear that question back again.
3    Q.    I think I'll ask her to read it again.
           Well, would you like me to break it up?
4    A.    Sure.
     Q.    That saves you.
5          You reviewed this document and the other
     documents we're looking at; right?
6    A.    That's correct.
     Q.    As a part of reaching your conclusion that but for
7    the misconduct that Rimini allegedly engaged in in this
     case, the Oracle customers would have stayed at Oracle and
8    paid Oracle for maintenance and support; correct?
     A.    I think what you're asking is did I review it, and
9    the answer is yes.
     Q.    And it didn't -- it figured in your opinion?
10   A.    I don't know what you mean by figured in my opinion.
     Would you like to know what I think about the document?
11   Q.    Excuse me.  Go ahead.
     A.    Would you like to know what I think about this kind
12   of information?
     Q.    We'll move forward.  Your counsel will ask, I'm
13   sure, if he thinks it's important.
     A.    Okay.
14   Q.    Let's look at slide 11 in that same deck if we
     could, please, DTX 160.
15         MR. STRAND:  Did I make you go backwards?  No.
     Okay.  Slide 11.  Don't worry about it.  I'll just work it
16   with her.  Oh, you got it.
     BY MR. STRAND:
17   Q.    Let's look at -- this is called Root Cause Analysis.
     Do you see that?
18   A.    I see those words.
     Q.    Down at the bottom, let's read the bottom bullet
19   point.  It says, "Use of Oracle support system is weak and
     customer voice is typically through user groups and
20   partners."
           Do you see that?
21   A.    I do.
     Q.    Okay.  That also appeared in this document that you
22   considered; correct?
     A.    Yes, it also appears in this document.
23   Q.    All right.  Now, you talked -- we talked a little
     bit about you reviewing the depositions taken of the 17
24   customers in this case.
           Let me highlight excerpts that were shown in the
25   opening statement and either have been or will be shown, I
     believe they will be shown, coming up?

3733

1          Let's go to the next slide.
           Do you recall looking at or reading Mr. Brian
2   Baggett's deposition?
    A.    Yes.
3   Q.    And he was the IT person at Bausch and Lomb, right?
    A.    He was.
4   Q.    And they're the people that make the contact lens
    solution and stuff like that, right?
5   A.    That's my understanding.
    Q.    And he was asked, "And you -- but you ultimately
6   didn't keep support with HCM with Oracle; is that correct?"
           Now, let me pause there.  HCM, that's a
7   PeopleSoft product?
    A.    Right.  That's Human Capital Management.
8   Q.    All right.  And he says, "That's correct."
           And the question was asked, "And what led" -- I
9   think it's led, not let, but, "What led to that decision?"
           He said, "We felt Oracle was unreasonable."
10         Do you recall reading that in his deposition?
    A.    Yes.
11  Q.    And then he went on, "Unreasonable.  Can you
    describe?"
12         And his answer, "In every aspect of the
    negotiation."
13         Let's look at Mr. Baggett's, the next slide of
    his testimony.
14         Mr. Baggett was also asked that, "In terms of
    other products in the future, is Oracle considered a viable
15  support option?"
           And his answer, "My personal opinion, and
16  speaking on behalf of the recommendations that I made with
    Bausch and Lomb, they're our last choice."
17         Did I read that correctly?
    A.    You read that correctly.
18  Q.    And you considered the testimony of Mr. Baggett in
    reaching your opinions in this case; correct?
19  A.    Yes.
    Q.    Let's look at the next slide that appeared in the
20  opening statement and that the jury will be seeing the
    video here next week.
21         Mr. Clark Strong of the Birdville Independent
    School District, do you recall reading his deposition?
22  He's one of the 17, right?
    A.    Yes, he is.
23  Q.    And he was asked, "And to what extent was that lower
    price a deciding factor in the decision for Birdville to
24  contract with Rimini Street rather than renew with Oracle?"
           His answer, "None."
25         "The price was no -- no -- no effect
    whatsoever?"

3734

1           "ANSWER:  No."
            "So if it had been the same price, you still
2    would have contracted with Rimini Street?"
            "ANSWER:  That's what I would have recommended."
3           Do you recall reading that?
     A.    Yes.
4    Q.    So the price wasn't the only reason that people
     decided to cancel their contract with Oracle and contract
5    with Rimini Street; correct?
     A.    Yes.
6           And that's not my opinion.  I have the same
     opinion Mr. Yourdon does, that it was the combination of
7    the cheaper price with the guaranteed vendor-level
     replacement support.
8    Q.    All right.  And we'll talk about that in just a
     moment.
9           Let's go to the next page.
            And then he was further asked, "As we sit here
10   today, does Birdville have any plans to go back to Oracle
     support?
11          "ANSWER:  I wouldn't recommend it.
            "QUESTION:  And why not?
12          "Because of the support we get from Rimini
     Street."
13          Do you recall reading that?
     A.    Yes.
14   Q.    Now, there's a bigger binder up there, don't put it
     on the screen, there's a bigger binder up there called
15   Exhibit 154B.  Yeah, it's got a bunch -- it's got big long
     spreadsheet kind of pages.
16   A.    Okay.
     Q.    I'll represent to you, ma'am, that Exhibit 154B was
17   marked as an exhibit in Ms. Catz's deposition, so I believe
     that you -- and it's also referenced on Exhibit 3 to your
18   report, the Catz deposition and all exhibits.
            Do you recall reviewing Exhibit 154B as a part
19   of your work in this case?
     A.    I may have seen it.
20   Q.    And you received that from Oracle; correct?
     A.    If it was included in Ms. Catz's deposition.
21   Q.    And you reviewed that document as a part of your
     work in this case?
22   A.    I'm not sure necessarily that I would have reviewed
     it because it doesn't really have anything on it.
23   Q.    It doesn't have anything on it?
     A.    Well, there's no title, no indication of what it is
24   at all.
     Q.    Okay.  Take a moment and refresh your recollection
25   and look at it and so if you can recall -- well, let me ask
     you this.

 1          Did you personally review every single document
that you were given in this case, or did your two
 2   assistants that -- or the two people, MBA and -- do they
review documents as well?
 3   A.    People on my team would have reviewed documents as
well.
 4   Q.    So either you or one of the people on your team
would have reviewed this document?
 5   A.    If it was an exhibit to Ms. Catz's deposition, yes.
     Q.    And it would have been somehow factored away, high
 6   or low, in reaching your conclusion about causation in this
case; correct?
 7   A.    Well, we don't necessarily factor everything, but my
guess is just looking at it, that it probably would have
 8   been -- if it was considered, of low value --
     Q.    Low value.
 9   A.    -- since it's not clear what it is.
     Q.    Yeah, because factoring something and saying it's
10   not worth anything is still factoring it; right?
     A.    That's true.
11   Q.    All right.  Let's go to the next slide.
          Do you recall this is a slide from the deck that
12   you and Mr. Isaacson just talked through in your direct
examination?
13   A.    Yes.
     Q.    And this is a Mr. Hintz or Hintz from Hastings
14   Entertainment.  Do you recall that?
     A.    Yes.
15   Q.    And you read his deposition; correct?
     A.    Yes.
16   Q.    All right.  Look with me at the pulled-out or tabbed
portion of DTX 154B.  Do you see a reference there to --
17   A.    I'm sorry.  There are a few tabs here.  There are
two.
18   Q.    There are three tabs, one of them -- three blue
tabs.  One of them relates to Hastings.
19   A.    Is this like one document?
     Q.    Do you have that in front of you?
20   A.    Yeah, it's a little hard because the titles are on
one page --
21   Q.    Okay.
     A.    -- the information is on another.
22   Q.    And I apologize.  We were given it in native format
and I just printed it out, and that proves I'm not a
23   spreadsheet expert.

24   BY MR. STRAND:
     Q.    We were looking at 154B, that large spreadsheet
25   exhibit.  It was an exhibit -- it was an exhibit to the
Catz deposition.  So would you look with me at the back of

3736

1    the other exhibit volume I've got in front of you,
     Ms. Dean, the white one.
2    A.    Do you want me to put this away?
     Q.    No.   Leave it right there.   We're going to talk
3    about a couple other things first and then we're going to
     get back to that.
4    A.    Okay.
     Q.    Way at the back of that white volume there's
5    something that says Supplemental Schedules.   And if you
     would look with me at schedule 3 which is actually not a
6    supplemental schedule, it's a schedule to your original
     report.
7          Do you recognize schedule 3 to your original
     report, ma'am?
8    A.    This is an excerpt from it.   But, yes.
     Q.    Okay.   And there -- yeah.   It -- the first portion
9    of it are all the depositions you looked at; correct?
     A.    Right.   It appears to be.
10   Q.    And your testimony has been that you reviewed those
     depositions as a part of -- as a part of your work in this
11   case; correct?
     A.    That's correct.
12   Q.    And you reviewed all of the exhibits to those
     depositions as a part of your work in this case; correct?
13   A.    Yes, if the entry says "and exhibits."
     Q.    And I'll -- if you look there, deposition of Safra
14   Catz, taken on December 14th, 2011?
     A.    I see that.
15   Q.    And exhibits?
     A.    Yes.
16   Q.    I'll represent to you, Ms. Dean, that what we've
     marked as Defendants' Exhibits 154B was an exhibit to
17   Ms. Catz's deposition.
     A.    Okay.
18   Q.    If -- that is the case.   So either you or a member
     of your team would have reviewed Exhibit 154B; correct?
19   A.    At least in some fashion.   It might have depended on
     what the deponent said about the document.
20   Q.    Right.   And you may have concluded it was worthwhile
     or not worth much; correct?
21   A.    That's correct.
     Q.    But you considered it nonetheless; correct?
22   A.    Well, generally.   I mean, if -- there are times when
     in a deposition a witness is shown a document and doesn't
23   know anything about it, so in those cases a lot of times I
     won't look at it.
24   Q.    Is it your opinion that Hastings Entertainment, the
     slide we were just looking at, cancelled its contract with
25   Oracle due to the misconduct of Rimini?
     A.    I think they cancelled their contract to go to

1    Rimini, and the way Rimini was able to offer the service
     that they offered was as a result of the misconduct.
2              MR. STRAND:  Your Honor, I would now like to
     read that one provision.
3              MR. ISAACSON:  I don't think there's any
     foundation for the provision.
4              THE COURT:  You can ask her if she read that and
     took it into consideration.
5    BY MR. STRAND:
     Q.    Did you -- if you -- when you received that
6    document, would you or a member of your staff have read the
     entire document?
7    A.    I'm sorry.  What document are we referring to?
     Q.    Excuse me.  Defendants' Exhibit 154B.
8    A.    I don't know.  I doubt it.
     Q.    All right.  Knowing that Hastings was a customer of
9    Rimini, would that have focused your attention on that
     particular entry?
10   A.    I wasn't even aware there was an entry for Hastings.
     If you're representing there was --
11   Q.    So your testimony is you did not consider the entry
     of Hastings.
12   A.    Not that I recall.
               MR. STRAND:  Your Honor, I offer to read the
13   entry based upon the fact that she didn't read it.
               THE COURT:  I'll allow you to read the entry.
14             Ladies and gentlemen, I've reviewed it.  This
     is -- he's entitled to question if she considered this
15   entry in the course of reaching her opinions, and he may
     read it.
16   BY MR. STRAND:
     Q.    Okay.  I'd like to read the entry there in front of
17   you, Ms. Dean.
     A.    I'm sorry.  Can you just tell me where it is in this
18   big book?
     Q.    Oh, absolutely.  Yeah, I can't come up and help.
19   A.    So it was --
     Q.    To make sure we're all on the same page literally,
20   it says Hastings Entertainment, Incorporated.  Do you see
     that?
21   A.    I do.
     Q.    Okay.  And then there's a column over there in the
22   middle with comments.  Do you see that?
     A.    Let me just check and see.  It says Original Notes
23   on the front page.
     Q.    And I'm going to ask you -- I'm going to read -- I'm
24   going to ask you did you consider the following entry in
     reaching your opinions in this case.  Okay?  I'm going to
25   read the sentence that begins about seven lines down, 2-20
     colon.  Do you see that?

3738

1    A.    Yes.
     Q.    It says,
2          "2-20:   Customer advised ASN Pam Riley that they
     have already selected another support vendor."
3          And then I'm going to go down to 12-28 which
     apparently precedes that date, and it reads,
4          "Customer stated primary reason for dropping
     support as being that their software releases will no
5    longer be supported.   It appears they are on HRMS 8.3 and
     FMS 8.2.   They would not want to purchase extended support
6    even if available.   They don't intend to update in near
     future and starting to look at third-party vendors.
7    Submitted 90-day notification."
           Did I read that correctly?
8    A.    You read the information in that cell correctly.
     Q.    Did you consider that information in formulating
9    your opinions in this case?
     A.    This isn't the kind of information that I would
10   consider because I have no basis for understanding about
     what this information is.
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                        ELIZABETH DEAN
1                recalled as a witness on behalf of the
2              Plaintiffs, having been previously sworn,
                was examined and testified as follows:
3                    CROSS-EXAMINATION RESUMED
     BY MR. STRAND:
4      Q.    Good morning, Ms. Dean.
       A.    Good morning.
5      Q.    Ready to get started?
       A.    Yes.
6      Q.    I promise to wrap up.
               One moment of reset before we start the day.
7    You recall yesterday morning, or yesterday afternoon, right
     off the bat we talked about but-for causation.  Do you
8    remember that?
       A.    Yes.
9      Q.    And let's just put that up so we remember.
               But-for causation is kind of a lawyer term.
10             And as I recall what you said but-for causation
     was, was that how Oracle would have looked if Rimini hadn't
11   done what Oracle complains about in this case.  Correct?
       A.    That sounds reasonable.
12     Q.    How Oracle would have looked.
               And while we've been up and down and over and
13   around, all of our questions are basically going to answer
     that question, how Oracle would have looked if Rimini
14   hadn't engaged in the acts that Oracle complains about;
     correct?
15     A.    I'm not sure what you're referring to.  That's my
     work effort, yes.
16     Q.    That's your work effort.  Yeah, that's what we're
     talking about.  Correct?
17     A.    I assume so.
       Q.    Okay.  What I want to talk a little bit -- is about
18   acceptable noninfringing alternatives.  And to set that,
     let's get your exhibit up, Other Third-Party Entities.
19             MR. STRAND:  The chart from her slide deck.
     Okay.  Thank you.
20   BY MR. STRAND:
       Q.    You recall testifying about the -- I'm sorry.  There
21   you go.  I apologize again.  It's 20, Exhibit 20 in your
     book, and it should be in front of you now if you want it.
22     A.    My screen doesn't have anything on it.
               MR. STRAND:  Let's just go to 20.  You had it
23   up, Marie.
             (Discussion held off the record.)
24   BY MR. STRAND:
       Q.    Okay.  Well, look at Exhibit -- at slide 20 in the
25   deck that was in your notebook.  Do you recall?
       A.    Yes.

3740

1    Q.    And they'll keep working on trying to get that up.
              That's entitled Other Third-Party Entities;
2    correct?
     A.    That's correct.
3    Q.    And there were seven companies that you listed on
     that exhibit; correct?
4    A.    That's correct.
     Q.    And you talked about those companies and said that,
5    for whatever reason, none of them were available,
     acceptable, noninfringing alternatives; correct?
6    A.    These and a couple more, I think, that we talked
     about.
7    Q.    Okay.  And that if none of those were available,
     people couldn't have gone to Rimini, they would have had to
8    stick with Oracle; correct?
     A.    I believe they would have stayed at Oracle, that's
9    correct.
              MR. STRAND:  Okay.  Just can't get that up at
10   all, huh?  Okay.
              (Discussion held off the record.)
11   BY MR. STRAND:
     Q.    Okay.  This is what we were just talking about --
12   proving that lawyers who once used to be able to weave
     pictures with words now need to have pictures to support
13   their words.  But here we are.
              This is what you talked about; right?  I'd like
14   to probe in a little bit on that.
              So is it your opinion, based upon your analysis,
15   that Oracle had no acceptable, noninfringing competitors
     for maintenance and support services from 2006 to 2011;
16   correct?
     A.    Yes.
17   Q.    Okay.  So there were no other places for Oracle
     customers to go for maintenance and support services other
18   than Oracle; correct?
     A.    Well, occasionally customers went to some of these
19   companies, but as to whether or not they were providing
     vendor-level replacement services at 50 percent off as a
20   more or less corollary to what Rimini Street was offering,
     no.
21   Q.    Okay.  Let's parse that a little bit.
              Could they leave at all?  Was there no
22   alternative, or there wasn't vendor-level replacement
     services?
23   A.    I don't think that there was acceptable vendor-level
     replacement services.
24            But some customers did leave for some of these
     companies.  That doesn't mean that the companies that left
25   to go to Rimini Street would have left for these companies.
     Q.    Okay.  So that it was possible to leave, but your

3741

```
 1    testimony is it wasn't acceptable or likely; correct?
      A.    I think there's a reasonable basis to believe that
 2    those customers would have stayed with Oracle, that's
      correct.
 3    Q.    But it was possible to leave?
      A.    Yes.  Oracle does not lock their customers in.
 4    Q.    Now, I'd like to refer you to a statement that
      Ms. Catz made during her direct examination.  You recall
 5    her?
              You said you were here for her statement.  Do
 6    you recall the statement she made about competition?
      A.    I'd like to see what you're referring to.
 7            MR. STRAND:  Sure.  Can we get 918, lines 15
      through 18 up?  Well, let me read it to you so we don't
 8    take the time.
      BY MR. STRAND:
 9    Q.    There was a question asked of Ms. Catz, and she
      said -- and the question was,
10            "And does the company have any philosophy
        towards these competitors, towards competition?
11            Answer by Ms. Catz, "Yeah; bring it on.  The
        truth is competition makes you better.  It keeps
12      you very, very sharp."
              Do you recall her stating that?
13    A.    I do.
              MR. STRAND:  All right.  Let's look at the
14    competition a little bit.  If we can, bring up DTX 145.  We
      probably need to switch.  Okay.  Thank you.  You're ahead
15    of me.  That's been admitted into evidence.
              THE WITNESS:  Is that something I have in a
16    binder?
              MR. STRAND:  Yes.
17            THE WITNESS:  I'm sorry.  I didn't hear the
      number.
18            MR. STRAND:  I'm sorry, DTX 145.  It should be
      in order in the notebook.
19            THE WITNESS:  Okay.  I have it.
      BY MR. STRAND:
20    Q.    You have it there in front of you?
      A.    I do.
21    Q.    That is a document that Ms. Ransom and I talked
      about earlier this week.  It's dated October of 2007;
22    correct?  Second page?
      A.    I was going to say mine doesn't have that page.
23    Q.    Yeah, second page.
      A.    All right.  It is dated October 2007.
24    Q.    It's entitled Third Party SWAT Team - Behind Enemy
      Lines.  Do you see that?
25    A.    Yes.
      Q.    And it looks like it was marked as an exhibit during
```

3742

1   Ms. Ransom's deposition there on the third page, so that
    indicates that you received it and considered it as part of
2   your work in this case; correct?
    A.    Yes.
3   Q.    Okay.  Let's look at slide 4.  There's reference
    to -- did you get that in front of you?
4   A.    I do.
    Q.    There's reference to Versytec there.
5   A.    Yes.
    Q.    Do you see that right there in the middle?
6         That's not a company that you considered or that
    you put on your chart that we just looked at; correct?
7   A.    I did consider it.  I did actually testify about it,
    but it's not on the chart because it's JDE World only.
8   Q.    All right.  And Klee & Associates, that's another
    company that did not appear on your chart; correct?
9   A.    Also for the same reasons.  I think I did testify
    about it, and it also went out of business very early,
10  perhaps before they even offered JDE Service, so I didn't
    put it on the chart.
11  Q.    And there's various statements made about the other
    companies here.
12        But it says down at the very bottom in October
    of '07,
13        "Smaller firms seem to exist but do not really
    present any major challenges to Oracle support."
14        Do you see that?
    A.    I do.
15  Q.    Did you ask anyone at Oracle why it was they felt
    they needed to form a SWAT team for behind enemy lines in
16  October of 2007 if they felt like they had no major
    challenges for Oracle support?
17  A.    Well, I'm not sure that that classifies what -- or
    characterizes what this is saying.
18        I think Oracle did feel pressure from
    TomorrowNow, for example, exactly squarely in this time,
19  and I did have conversations with people at Oracle about
    how they addressed the service offering of TomorrowNow and
20  Rimini Street.
    Q.    Did you talk to them about the SWAT team?
21  A.    I don't know that we had a particular conversation
    just about whatever group that was, or whether there even
22  was a group, but we talked about how Oracle was trying to
    address this problem.
23  Q.    Okay.  And you heard Ms. Ransom testify that she
    attended at least one meeting of the SWAT team?
24  A.    I know she went to a meeting.  I think -- I'm not
    sure whether they officially called themselves the SWAT
25  team or not.
    Q.    All right.  So we're a little hazy on that.

1           Let's look forward to DTX 146, the next tab in
your binder.
2           Do you see that?
   A.    I do.
3           MR. STRAND:  Let's start with the first page,
Marie, if we could, please.  Page 1, the cover page.  Do
4  you have that?
BY MR. STRAND:
5  Q.    All right.  This is dated April 16th, 2009; correct?
   A.    That's correct.
6  Q.    All right.  So a couple years later, roughly,
there's an Oracle deck that says Third-Party Support
7  Providers Analysis.
           Let me try that again.  There's a document that
8  says Third-Party Support Providers Analysis.  Correct?
   A.    On the first page, that's what it says, yes.
9  Q.    And it looks like it was a deposition exhibit, so
you would have received and reviewed this document and
10  considered it as a part of your analysis in this case;
correct?
11  A.    I don't specifically recall a Taylor, but it's
possible.  We could look on my attachment 3.
12  Q.    Sure.  Let's look at page slide 6 of that document,
and this slide, in April of 2009, is characterized as
13  Competitive Landscape - Third-Party Support.
           Do you see that on this Oracle document?
14  A.    I see that.
   Q.    And let's go down that list real quick.
15           Abtech support was not listed on your chart;
correct?
16  A.    No, but I think we talked about it on direct.
   Q.    Alui was not listed on your chart; correct?
17  A.    That's correct.  It seems to service Hyperion which
is not part of this case.
18  Q.    Ciber was not listed on your report; correct?
   A.    That's correct.
19  Q.    Versytec was not listed on your report; correct?
   A.    We did just talk about that, Versytec was JDE World
20  only.
   Q.    It was not listed on your report, however, was it?
21  A.    That's right, because JDE World is not part of this
case.
22  Q.    Summit Technology was not listed on your report;
correct?
23  A.    That's correct.
   Q.    Hexaware was not listed on your report; correct?
24  A.    That's correct.
   Q.    Citagus was not listed on your report; correct?
25  A.    That's correct.
   Q.    Now, you have no opinion on whether Rimini could

1    have or did stop the activity Oracle accuses between 2006
     and 2011; correct?
2        A.    I don't have an opinion about the activity.  From a
     liability perspective, I assumed liability, that's correct.
3        Q.    You assumed that activity continued throughout the
     2006 through 2011 time period?
4        A.    I have information available and the evidence in the
     record as to different allegations.  Some of those
5    allegations, for example, like the automated tools, I
     understand there was a point when they were not using them.
6        Q.    Okay.  But you don't have a technical opinion about
     whether Rimini could stop doing something that Oracle
7    complains about; correct?
         A.    Well, I have read various pieces of information
8    about the effect on Rimini's business of doing the things
     that Oracle complains about.  So I have an understanding of
9    what the effect would be on Rimini's business of not doing
     those things.
10       Q.    Okay.  But you don't have a -- what I'm asking about
     right now -- we'll talk about the money in a second.  You
11   don't have an opinion on the technical part of whether or
     not Rimini could do or not do something; correct?
12   Technically?
         A.    I have to say that I'm not exactly sure what you're
13   asking.  If you're asking for IT or computer engineering, I
     would agree.
14       Q.    Okay.  That's all I'm -- I'm not trying to slip you
     up.
15             You're not a technical expert, you're not
     testifying about technically -- what Rimini could do
16   technically; correct?
         A.    That's correct.
17       Q.    All right.  Did you do any analysis on a financial
     perspective of what would have happened had Rimini ceased
18   doing certain of the technical things that Oracle complains
     about during the course of time between 2006 and 2011?
19       A.    I have done that analysis, that's correct.
         Q.    And that's embedded in the analysis that you talked
20   about yesterday.  Is that your testimony?
         A.    Yes.
21       Q.    Okay.  Now, your damages model is based on the
     assumption that Rimini misled all 360 customers insofar as
22   it relates to the interference claim; correct?
         A.    Well, the damage measurement is only on the 228
23   customers less deductions for attrition.
         Q.    Okay.  Do you have any opinion or assumption that
24   you made regarding the difference between the 364 customers
     and the 228 customers, whether they were misled or not?
25       A.    Well, my opinion is that Rimini's entire business
     model was based on the allegations of wrongdoing from the

```
 1   very first minute.  So all of the referrals, all of the
     references, I think, infiltrated all the customers.
 2   Q.    Do you have an opinion that -- well, you assumed in
     doing your damages model, did you not, that Rimini misled
 3   all of its customers; correct?
     A.    I'd say that my opinion is that Rimini's entire
 4   business model was based on the actions that are alleged to
     be misrepresentations and copyright infringement.
 5              So whether or not they had a direct
     communication with one customer isn't relevant because the
 6   entire business is operating in this fashion, interchanging
     and using, you know, the cross-use and the local
 7   environments.  That's all benefitting the credibility of
     the company overall.
 8              So as they get each customer, that ultimately
     leads to the success of the business.
 9   Q.    So am I correct in my understanding is that you
     don't know whether Rimini misled all 364 customers, or all
10   288 customers; correct?
     A.    I think the entire business model being built on
11   these allegations of wrongdoing led to their success.
     Q.    Okay.  Let's try to get -- 5469, this was introduced
12   yesterday during your direct examination.  Do you recall
     this?
13   A.    Yes.
                MR. STRAND:  Let's do the top little bit and the
14   column headers, if we could, please.  Can we blow that up
     even more?  Is that as good as -- there we go.
15   BY MR. STRAND:
     Q.    So the -- so I understand this, Ms. Dean, the first
16   company for which Oracle seeks damages is Access
     Intelligence LLC; correct?
17   A.    That's correct.
     Q.    All right.  Let me ask you some questions about
18   Access Intelligence.
                One, why did the customer -- I'm going to write
19   RSI since it's faster, Rimini Street, Incorporated -- over
     Oracle support.
20              So if I ask that first question of you, why did
     Access Intelligence LLC consider Rimini Street over Oracle
21   support, your answer is you don't know; correct?
     A.    I think my answer is because Rimini Street was
22   offering everyone 50 percent, or more, of a discount and
     guaranteeing that they were providing vendor-level support.
23   Q.    Do you know what the first customer considered --
     why the first customer considered RSI over Oracle support
24   of your own personal knowledge or anything you've seen in
     this case?
25   A.    Well, there wasn't discovery on every single 364
     customer, but the foundation of damages in the case is how
```

```
 1     Oracle was harmed by Rimini's actions overall, and how it
       was harmed was because Rimini offered something that was
 2     not proper.
       Q.    But you haven't seen any evidence in this case as to
 3     why Access Intelligence considered RSI over Oracle support?
             I'm limiting it just to that question.  You
 4     haven't seen any evidence as to why Access Intelligence,
       that entity, considered RSI over Oracle support, have you?
 5     A.    Access Intelligence has not provided any information
       in this litigation.
 6     Q.    Okay.  Second question.  What did Rimini say to
       Access Intelligence?
 7           Now, I understand your position, and we can
       quarrel about that, but I have a very narrow question.
 8           You haven't seen any evidence in this case about
       what did RSI say to Access Intelligence, the customer;
 9     correct?
       A.    Well, except for Rimini's overall standard
10     messaging, no.
       Q.    Third question.  What alternatives did the customer,
11     Access Intelligence, consider?
             Again, I don't want to quarrel with you, but I
12     just want to talk about Access Intelligence, number one on
       the list of 228.
13           What alternatives did the customer, Access
       Intelligence, actually consider?
14           You haven't looked at any evidence in this case
       about that, have you?
15     A.    That's right.  Access Intelligence did not get
       deposed.  You guys didn't take discovery of them.  The
16     individual customers, some of them have evidence in the
       record, but some of them don't.
17     Q.    Okay.  Did the customer -- did the customer, fourth
       question.  Did the customer know about the alleged
18     infringement?
             I have a confession to make.  There was a class
19     in college that you could learn how to write on the board,
       and I never took it.  Now I wish I would have.
20           But did the customer in this case, Access
       Intelligence, know about the alleged infringement?
21           Do you have any evidence that you've seen in
       this case that -- whether or not Access Intelligence knew
22     about the alleged infringement by Rimini?
       A.    Well, I think I know that they didn't know because I
23     think you've had Mr. Maddock and others testify that they
       never told any customers that they were reusing the
24     software amongst customers, that they were doing massive
       downloads from customer IDs they weren't entitled to.
25           I'm fairly certain, in all of the legal
       questions that were in the frequently asked questions
```

1    sheet, that there was no acknowledgement from Rimini to any
     customer that they were acting improperly.
2    Q.    Okay.  Let me ask you this.  Did Access Intelligence
     know -- well, let's ask the predicate.
3          Was Access Intelligence a remotely hosted
     customer or a locally hosted customer?  You haven't seen
4    any evidence on that, have you?
     A.    I would say that's a better question for Dr. Davis.
5    Q.    You haven't seen any question on that -- you haven't
     seen any evidence on that.  You didn't consider that in
6    your opinion?
     A.    I did consider those factors in my opinion, yes.
7    Q.    Okay.  So if you considered them in your opinion,
     help me understand.  Was Access Intelligence a locally
8    owned -- a locally owned customer -- excuse me, a locally
     hosted customer or a remotely hosted customer?
9    A.    Well, it's my understanding from Oracle's
     allegations in the case that even remotely serviced
10   customers benefited routinely from patches and fixes that
     were made in central locations and from information in the
11   central library.
           So remote versus local, that's a technical
12   question for Dr. Davis.
           But my understanding is that there was pervasive
13   use of this material.  So whether or not a customer was
     serviced remotely, they benefitted from the actions that
14   are alleged in the case.
     Q.    Okay.  I understand.  I just have a very narrow
15   question I'd like an answer to if I could, please.
           You don't know whether or not Access
16   Intelligence's test and development environments were
     locally hosted at Rimini or were remotely hosted at Access
17   Intelligence, do you?
     A.    That would be a question for Dr. Davis.
18   Q.    You don't know, do you?
     A.    That's not my scope of my work, that's right.
19   Q.    And you can't answer that yes or no.  You don't
     know, do you?
20   A.    I don't know.
     Q.    Okay.  What about cloning?
21         You don't know whether or not any environment
     for Access Intelligence was cloned out, or any environment
22   was cloned into Access Intelligence from any other Rimini
     customer, do you?
23   A.    I would say the scope, as I understand it, is
     pervasive.  But if you have specific questions about
24   specific customers, that would have been a question to ask
     Dr. Davis, who actually studied all the computer data.
25   Q.    But you don't know as you sit here today opining on
     the damages; correct?

3748

```
 1     A.    Well, because it's relevant to me that this was
       pervasive and extreme.  So for an individual customer, I
 2     did not ask Dr. Davis what he found in that respect.
       Q.    And so I'm going to ask it because I just want to
 3     make sure we're clear.
                 You don't know whether there was any cloning
 4     activity related to Access Intelligence LLC; isn't that
       correct?
 5     A.    That's correct.  I don't know.
       Q.    Cross-use.  You don't know whether or not there was
 6     any cross-use activity relating to Access Intelligence LLC,
       do you?
 7     A.    That's right, because the activities are pervasive
       and they infiltrate the whole company.  So each individual
 8     customer may or may not have evidence.
                 But Rimini Street wouldn't be a business model
 9     if they hadn't have done what they did.
                 MR. STRAND:  I move to strike the last part of
10     the answer as nonresponsive, Your Honor.
                 THE COURT:  Overruled.  And I want you to move
11     on to another subject.  What you're doing is essentially
       asking a damages expert questions about --
12                MR. STRAND:  I will move on.  I will move on.
                 THE COURT:  -- another expert's field of
13     expertise.
                 MR. STRAND:  Let me see if I've got any more on
14     this one, Your Honor.
       BY MR. STRAND:
15     Q.    Well, suffice it to say we disagree on that.
                 Let me ask you this question.  I am not going to
16     go through 228 customers.
                 If I asked the same basic questions for the
17     remaining 228 customers, Ms. Dean, which I promise I won't,
       would you and I have essentially the same colloquy?
18     A.    No.
       Q.    Why is that?
19     A.    Because I did talk to Dr. Davis, and I do understand
       what Mr. Hicks did, and there are documents in the record
20     with respect to which customers had cloning and which
       customers had cross-use.
21               So there would be specific answers to some of
       those questions, but as a general matter, I focused on the
22     economics of the business.
       Q.    Were you here during Dr. Davis's testimony?
23     A.    No, I was not.
       Q.    Okay.  And were you here during Dr. Hicks'
24     testimony?
       A.    Yes, I was for at least part of it.
25     Q.    All right.  And as the judge has encouraged me, we
       won't go into that.
```

```
 1              Let me ask about the depositions if we could.
      We talked at some length about the depositions of the
 2    customers yesterday.
      A.    Yes.
 3    Q.    Okay.  And since there were a number of them, I
      thought it might be helpful if we just quickly, quickly
 4    went through them.
              You looked at all 17 depositions and read the
 5    transcripts; right?
      A.    At one time or another, yes.
 6    Q.    Okay.  First of all, I've got in alphabetical order
      Bausch & Lomb; right?  You reviewed that?
 7    A.    I reviewed Bausch & Lomb.
      Q.    Okay.  Do you know -- you were here on Wednesday
 8    when some depositions of customers were shown to the jury.
      Do you recall that?
 9    A.    I definitely saw some of the depositions, but I
      don't recall.
10    Q.    Do you know if Bausch & Lomb was shown to the jury?
      A.    I don't recall.
11    Q.    Do you know if Bausch & Lomb -- in your report, you
      did an analysis of where customers of Rimini had gone if
12    they left Rimini; correct?
      A.    I don't know what you're referring to.
13    Q.    I believe it's Exhibit 9 where you tracked who was
      where, or Exhibit 7 where you said who has returned to
14    Oracle?
      A.    I only know in this case if a customer from Rimini
15    left and came back to Oracle.  I don't have any other
      information about them.
16    Q.    That's fine.  That's a question I want to ask.
              After the deposition, did Bausch & Lomb return
17    to Oracle?
      A.    Not to my recollection.
18    Q.    Okay.  Let's go to JB Hunt.  You read that one;
      right?
19    A.    Yes.
      Q.    Okay.  Do you know if, after the deposition, they
20    returned to Oracle?
      A.    You know, if we're going to go through 17, then I'm
21    going to look at my schedule --
      Q.    Oh, absolutely.  Absolutely.  Do you have that up
22    there?
      A.    I have it up here.
23    Q.    Okay.  So -- I'm sorry, I didn't have 17 in my book,
      but you've got it here.  That's fine.
24            Did Bausch & Lomb return to Oracle after the
      deposition?
25    A.    Does it matter if I'm looking at Schedule 9 SU and
      not 17?
```

3750

1    Q.    I apologize.  Schedule 9 SU.
     A.    No, they did not, they remained at Rimini Street.
2    Q.    Okay.  I'm going to put a little note, didn't
     return.
3          JB Hunt, did they return?
     A.    They did not return to Oracle.  Is that what you're
4    asking?
     Q.    They did not return?
5    A.    No.
     Q.    Okay.  How about Charles Karcher -- Karcher, did
6    they return after the deposition?
     A.    I think I stated on that last one that they stayed
7    with Rimini after the deposition, but I think JB Hunt went
     off Rimini in 10,000 -- 10 -- 2010.
8          So I don't know if they actually had their
     deposition when they were still at Rimini, but I'm not
9    sure.
     Q.    Okay.  2010, question mark.
10         What about Charles Karcher, did they leave
     Rimini and go back to Oracle after the deposition?
11   A.    No, they stayed at Rimini.
     Q.    What about SonicWall?  I believe we saw that
12   deposition.  Did they leave Rimini and return to Oracle
     after the deposition?
13   A.    Again, I don't know where there's -- SonicWall left
     Rimini in 2009, so I assume the deposition was taken after
14   that since the case wasn't filed until 2010.
     Q.    Okay.  What about JALPAK?  I think we saw that
15   deposition as well.  Did they leave and return to Oracle
     after the deposition?
16   A.    JALPAK is JDE World.  JALPAK is JDE World, so that
     wasn't one I followed.
17   Q.    Okay.  Hastings.  We talked a little bit about them
     yesterday.  Did they leave and return to Oracle after the
18   deposition?
     A.    It does not appear so.  They appear to still have
19   Rimini.
     Q.    What about Brazoria County, did they leave and
20   return after the deposition and go back to Oracle?
     A.    They did return to Oracle.
21   Q.    Okay.  So I'm going to put Oracle right here.  All
     right?
22         What about Koch Supply, did they leave and
     return to Oracle after the deposition?
23   A.    They never left Oracle.
     Q.    Never left Oracle.  All right.
24         What about City of Flint, did they leave and
     return to Oracle after the deposition?
25   A.    No, they did not.
     Q.    Okay.  I'm going to go to 10 on the next page.

1    A.    While you're writing, maybe I can clarify one point.
     Q.    Sure.

2    A.    When you put the zero that they don't return to
     Oracle, if they don't -- if they're not on Rimini's service

3    today, then I would assume, then, they're not actually
     using the software.

4    Q.    Well, we're under strict instructions to limit our
     focus from 2006 to 2011.

5    A.    Well -- I'm sorry.  Yes, with that constraint.
     But --

6    Q.    Your counsel can run the risk of going into that,
     I'm going to stay out of that.  I'm just going to ask my

7    narrow questions.
     A.    Right.  But the question you're asking is if they

8    returned after the deposition.  And unless you give me a
     date for the deposition, I won't know the right answer to

9    that exactly, but I will know whether or not they used the
     software.  So that makes a little bit more sense to me to

10   answer it that way.
     Q.    Most of these depositions occurred in 2011.  So

11   let's just keep that timeframe in mind, okay?
     A.    Okay.  So those that left before 2011 From Rimini

12   Street, I assume they don't use the software.
     Q.    Right.

13         Okay.  Let's look at number 10 was Kent County.
     Did Kent County leave Rimini after the deposition and

14   return to Oracle?
     A.    No, it looks like they're still a Rimini customer.

15   Q.    How about Blue Cross Blue Shield, did they leave
     Rimini after the deposition?

16   A.    No, it appears they may still be a customer.  I keep
     saying they may still be a customer because --

17   Q.    Yeah, I'm just --
     A.    -- discovery doesn't coincide with today.

18   Q.    I understand.  I appreciate your making that clear.
              What about Birdville?  Did Birdville leave

19   Rimini and return to Oracle after the deposition?
     A.    It looks like after the deposition they stopped

20   using the software.
     Q.    Okay.  Did they return to Oracle?

21   A.    No.
     Q.    Okay.  I'll just put stopped.

22            What about AGCO, A-G-C-O?  After the deposition,
     did they return to Oracle?

23   A.    No, it looks like they're still -- they may still be
     getting service from Rimini.

24   Q.    Okay.  What about Yum, after the deposition, did
     they return to Oracle?

25   A.    Yes, they did.
              And just to clarify, you wrote stop on one, but

1  many on the previous page would have had that same
   circumstance.
2  Q.    They may have stopped, but they didn't return to
   Oracle?
3  A.    They stopped using the software, that's right, so
   they would not return to Oracle for support.
4  Q.    Okay.  Fifteen, Wendy's.  After the deposition, did
   Wendy's return to Oracle?
5  A.    It looks like they stopped using the software.
   Q.    Stopped.  So they didn't return to Oracle?
6  A.    That's right.  They didn't return to Oracle because
   they stopped using the software.
7  Q.    All right.  What about Pitney Bowes, after the
   deposition, did Pitney Bowes return to Oracle?
8  A.    No, it looks like they may still be with Rimini.
   Q.    Okay.  What about Sunrise Medical, after the
9  deposition, did they return to Oracle?
   A.    They never left Oracle.
10 Q.    Never left.
              Now, in formulating your -- I'm going to shift
11 gears.  Thank you for getting through that.  And we're
   going to move on now quickly.
12            In formulating your opinion, did you calculate
   damages based upon what you perceived were Rimini's
13 misleading statements about local versus remote hosting?
   A.    I studied their whole business model so I don't have
14 a separate opinion about local versus remote hosting with
   respect to certain customers.
15 Q.    Okay.  When you were doing your analysis of damages
   in this case, did you assume that Rimini had misled its
16 customers about local versus remote hosting?
   A.    Well, I mean, I don't know that I necessarily needed
17 to assume it, I saw evidence in the case with respect to
   their misrepresentations.
18            MR. STRAND:  Let's look at Exhibit 2246, if we
   can.  Exhibit 2246.  Excuse me, DTX.
19            COURTROOM ADMINISTRATOR:  2246?
              MR. STRAND:  And we can take down the big
20 document.
              THE WITNESS:  I'm sorry.  Can you tell me that
21 number again?
              MR. STRAND:  Sure.  DTX 24 -- excuse me, DTX
22 2246.
              COURTROOM ADMINISTRATOR:  It's admitted already.
23            MR. STRAND:  Yes, it is admitted.  I'm sorry.
   BY MR. STRAND:
24 Q.    You said in your direct examination, Ms. Dean, that
   you had looked at a number of -- I think all of the Rimini
25 contracts with its customers; correct?
   A.    I did.

1    Q.    And do you recognize this as an example of one of
those contracts insofar as it relates to PeopleSoft
2    products?
     A.    Yes, this looks similar to what I would have
3    reviewed.
     Q.    And then look with me at page 4 of that exhibit,
4    specifically paragraph D.
     A.    I'm sorry, what paragraph?
5    Q.    Excuse me, paragraph capital D, begins "Copies of
Software."
6    A.    Yes.
     Q.    Let's highlight that and bring it up so we can see
7    it.
               So let's look at D.  It says,
8              "Client acknowledges that Rimini Street might
need to work with, configure, test, and possibly modify
9    certain PeopleSoft clients licensed to client in order to
render services pursuant to this agreement.  Accordingly,
10   client will either (a) provide Rimini Street copies of the
PeopleSoft products, including any required license codes,
11   required for proper operation of the products listed in
Exhibit A in a non-production development and test
12   environment, or (b) configure and prepare persistent remote
access to client's test and development database
13   environments via the Internet."
               Did I read that correctly?
14   A.    Yes.
     Q.    Was it your experience that in reviewing the Rimini
15   contracts, all of the Rimini contracts with its customers,
language like that was in every contract?
16   A.    I can't say that.  I don't know.
BY MR. STRAND:
17   Q.    In any event, we've heard testimony -- were you here
for Mr. Allison?
18   A.    I was.
BY MR. STRAND:
19   Q.    Now, in reaching your conclusion regarding causation
and damages, you relied, at least in part, on Mr. Yourdon's
20   testimony; correct?
     A.    Mr. Yourdon's testimony was consistent with what I
21   saw, that's right.
     Q.    You read his report?
22   A.    I did.
     Q.    You found it credible?
23   A.    I did.
     Q.    And you heard his testimony yesterday; correct?
24   A.    Yes.
     Q.    All right.  Did you hear Mr. Yourdon testify
25   yesterday that -- well, the question was asked,
               "In your opinion, it was Rimini's promise of

3754

1      vendor-support at a significantly lower price than
       Oracle that caused customers not to renew their
2      support with Oracle?"
               MR. ISAACSON:  Can I have a page and line?
3              MR. STRAND:  I've only got the draft, but I'm
happy to give it to you.  It's page 67, line 11 through 15.
4              MR. ISAACSON:  I don't have the --
               MR. STRAND:  It's yesterday's transcript.
5              MR. ISAACSON:  I don't have the draft.
               MR. STRAND:  Here, I'll tell you what, I'll hold
6  it with you and I'll read it, and I'll talk up.
   BY MR. STRAND:
7  Q.    Yesterday during the course of his testimony, it was
   very early, he was asked the following question:
8              "Now, Mr. Yourdon, in your opinion, it was
       Rimini's promise of vendor-level support at a
9      significantly lower price than Oracle that caused
       customers not to renew their support with Oracle;
10     correct?"
               And he said, "Yes, that's my opinion."
11             Do you recall that testimony?
   A.    Yes.
12 Q.    And you agree with that testimony; correct?
   A.    I do.
13 Q.    All right.  So is it correct, then, to characterize
   what caused customers to leave as the price for
14 vendor-level support; correct?
   A.    Well, I don't think you can isolate the price in
15 that.  It's both.  It's offering a customer exactly what
   they need from the vendor at half the price.
16 Q.    Okay.  But there was no mention in his opinion of
   any misleading statements; correct?  The word misleading
17 was not used; correct?
   A.    Well, the ability to offer that price and to offer
18 that vendor-level replacement service, I think, involved
   their whole business model which was built on the copyright
19 infringement and the misleading statements.
   Q.    From a financial perspective, you did not analyze
20 whether Rimini could provide a maintenance and support
   service at vendor level without engaging in the acts Oracle
21 complains of, did you?
   A.    I think what I stated was that their whole business
22 model was prefaced on the alleged wrongdoing.
               So I don't think they could have had the
23 business model that they had if they hadn't done those
   things.  They couldn't offer a 50 percent vendor-level
24 replacement service if they hadn't done those things.
   BY MR. STRAND:
25 Q.    Did you analyze the cost to Rimini of doing business
   without engaging in the acts that Oracle complains of in

          1     this case?
                A.    Well, the measurement that I have for that is
          2     Oracle's costs which are, I think, you know, $16 billion or
                whatever they spent to buy these companies.
          3     Q.    Did you analyze the cost to Rimini of not
                infringing?  That's my question.
          4     A.    I think they couldn't have had a business, so it
                would have cost them their entire business if they had
          5     tried to do this without the things that they did.
                Q.    So you didn't -- did you analyze and figure out how
          6     much it would cost Rimini?  You didn't do that, did you?
                A.    If it was the sacrifice of the entire business.
          7     Q.    An all-or-nothing proposition?
                A.    I think that the way that they offered service from
          8     the very beginning, to get referrals, to get credibility,
                was all based on the alleged wrongdoing.
          9     Q.    Let's move to my tab 24A, the -- all right.  You
                remember this from yesterday?
         10     A.    Yes.
                Q.    I just want to be clear on this.  You calculated
         11     Oracle's lost profits based on their lost incremental
                profit; is that correct?
         12     A.    That's the appropriate methodology, yes.
                Q.    And that's what you did?
         13     A.    Yes.
                Q.    All right.  Let's look at your tab 6.1 if I could,
         14     please, to your report.  It's both in your notebook and --
                if you're more comfortable with your report, I'm certainly
         15     happy with you looking at that.
                          And you analyzed the -- Oracle America's
         16     incremental profit margin over the time period from 2006 to
                2014; correct?
         17     A.    That's correct.  And OIC, but just on this
                schedule --
         18     Q.    Yeah, I'm looking at your schedule, 6.1 SU --  and
                I'm only talking about Oracle Americas, Inc., right now;
         19     right?
                A.    Yes.
         20     Q.    And the incremental profit for Oracle America over
                that timeframe ranged between a low of 91 percent and a
         21     high of 94 percent; correct?
                A.    Yes.
         22     Q.    And then let's look at your schedule 7 -- excuse me,
                6.4 SU, which is the Oracle International Corporation
         23     incremental profit margin.  Do you have that before you?
                A.    I do.
         24     Q.    And during the time period from 2006 to 2014, the
                incremental profit margin for Oracle International
         25     Corporation ranged from a low of 87 percent to a high of 98
                percent in a partial year; correct?

3756

1    A.    That incremental profit, yes.
     Q.    Incremental profit.
2          If we take a full year, it ranged from 87
     percent to 96 percent; correct?
3    A.    I'm not sure what you're asking if we take a full
     year.
4    Q.    Okay.  I'm sorry.  2014 was a stub; right?
           THE COURT REPORTER:  Excuse me.  A what --
5          THE WITNESS:  Yes.  For purposes of this
     analysis --
6          MR. STRAND:  Oh, I'm sorry.
     BY MR. STRAND:
7    Q.    2014 was a stub year, just a couple of months;
     right?
8    A.    For purposes of this, yes, because we were cutting
     it off in February.
9    Q.    And on a full-year basis, the incremental profit for
     Oracle International Corporation between 2006 and 2013
10   ranged from a low of 87 percent to a high of 96 percent;
     correct?
11   A.    I think that's correct.
     Q.    Okay.  If we could turn to the tab or the slide that
12   has the pie chart?
           Now, if I understand your -- it's up in front of
13   you.
           We've talked about lost profits, and I want to
14   shift a little bit to the infringer profits.  The infringer
     profits come from these slices of pie, and I'm not going to
15   iterate it all, on the left-hand side.
     A.    Not all of them, no.
16   Q.    Some of them?
     A.    Some of them.
17   Q.    Most of them?
     A.    Well, the three.  Not Oracle America, Relicensed,
18   Reinstated, and No Oracle Cancellation.
     Q.    Right around 90 customers, give or take?
19   A.    I think that's approximate.
     Q.    Okay.  So you excluded it from lost profits, but
20   Oracle's seeking Rimini's profits on those customers;
     right?
21   A.    That's right.
     Q.    And you calculated the total profits on those, and
22   you gave your opinion about that yesterday; correct?
     A.    I calculated the total revenues, yes.
23   Q.    That's the total revenues, that's top line revenues,
     gross revenues; correct?
24   A.    They might be net of something, but not net of
     costs.
25   Q.    Okay.  And if we take the costs out, it's true,
     isn't it, that Rimini shows a net operating loss during the

1   period; correct?
    A.    I don't know that that's true.
2   Q.    All right.  Well, let's look at your tab 5 to your
    report -- excuse me, schedule 5.  You generated this
3   schedule; correct?
    A.    I did.
4   Q.    And for the period from 2006 through 2011 -- well,
    let me step back a moment.  This is entitled Consolidated
5   Statements of Income Summary For Rimini Street, Inc.;
    correct?
6   A.    That's correct.
    Q.    And you prepared this; correct?
7   A.    Yes.
    Q.    And for the time period from 2006 to 2010 when you
8   calculated this, you show net income of negative
    $26,731,852; correct?
9   A.    That's correct, for the whole company.
    Q.    Now, yesterday we heard from Mr. Screven -- excuse
10  me.  Wednesday we heard from Mr. Screven regarding software
    security.  Were you here for his testimony?
11  A.    No, but I think I've read some of it.
    Q.    Okay.  You're testifying as Oracle's damages expert
12  in this case; correct?
    A.    Yes.
13  Q.    And as far as you know, you're the only Oracle
    damages expert in this case; correct?
14  A.    Well, in terms of counting the money, yes.  But
    Mr. Yourdon's opinions go to damages too.
15  Q.    Sure.  And insofar as your opinion is concerned, you
    have no opinion regarding any damages associated with
16  software security, do you?
    A.    I don't know what you're referring to.
17  Q.    Sure.  Do any of your opinions relate in any way to
    software security, the issues that Mr. Screven discussed on
18  Wednesday?
    A.    I'm not sure what you're referring to.
19  Q.    Did you break out any separate damages opinion
    relating to software security?
20  A.    You mean damages to Oracle from what allegation with
    respect to security?
21  Q.    That's what I was getting at.  I tell you what.
    Let's move on.  I want to wind this up.
22          You testified about damages arising from
    Oracle's -- from Rimini's use of Oracle's database; is that
23  correct?
    A.    Yes.
24  Q.    And I believe that was $19.2 million?
    A.    That's correct.
25  Q.    All right.  Did you -- in analyzing damages, did you
    consider alternatives to the Oracle Database that might

3758

1   have been available to Rimini?
     A.    No, it wasn't necessary to consider alternatives to
2   Oracle Database because they actually used Oracle Database.
     Q.    You are aware from Mr. Allison's testimony that
3   Microsoft SQL was an alternative, as well as IBM DB2;
     correct?
4    A.    Well, I think you're misaligning when you say
     alternatives.  I don't think that's correct.
5            But there's competitors in the marketplace that
     sell database, and that was the question that Richard
6   Allison was answering, to my understanding.
             But your questions with respect to alternatives
7   for Oracle's -- I'm sorry, for Rimini Street's use of
     Oracle Database, that's a technical question.
8            And I think many Rimini witnesses testified in
     deposition that the local environments had to be built
9   mirroring what the customer was using, and because it's the
     stack of the application on top of the database, that's why
10   they used Oracle Database in those hundred -- eighty
     instances.
11   Q.    All right.  And 72 customers?
     A.    72 unique customers.
12   Q.    Okay.  And Rimini, then, had to have been using some
     database for its other customers that it locally hosted;
13   correct?
     A.    It's my understanding that they would have mirrored
14   what the customer had.  So if the customer was running
     their production environment using a Microsoft database,
15   then the customer local environment would have been built
     to mirror that.
16   Q.    All right.  Let's go on to the chart that you had in
     your deck regarding the calculation of the Oracle Database
17   damages.
             Do you recall that?  Had 22 percent maintenance
18   fee in it?  That's what I want to focus on.
     A.    Is it important that I have it or not?
19   Q.    Well, we're going to get it here real quick.  It's
     the tab -- tab 30 in our internal tabbing.
20           Well, that's fine.
             You recall that in calculating damages for the
21   Oracle Database piece of your damages calculation, up in
     the top line you said 22 percent maintenance fee.  Do you
22   recall that?
     A.    Yes.
23   Q.    You realize that Rimini is a maintenance and service
     support company; correct?
24   A.    I understand that's what they purport to do, yes.
     Q.    And you assumed that they would pay a 22 percent
25   maintenance fee to Oracle for use of the Oracle Database;
     correct?

1              There it is.
       A.    Yes, they have to continue to mirror the client's
2    software so they have to have accessible to them the
     patches, updates, fixes, that the database -- that the
3    client has, because the clients bought a license, and they
     have to be able to mirror that on their side.
4      Q.    Now, looking at your agreement at a number of
     places, if you want to look, paragraph 56 and 57 -- but let
5    me ask you the question --
       A.    I'm sorry --
6      Q.    You're looking at your report, I'm sorry, paragraphs
     56 and 57 if you wish.
7              You understand in drafting your report that
     Rimini experienced substantial efficiencies through its
8    alleged improper use of Oracle's copyrighted software and
     support materials; correct?
9      A.    Can you just wait until I get a copy of it open.
       Q.    Sure, sure.
10     A.    Is it in the binder you gave me or --
       Q.    Your new report is in the back of the white binder.
11     A.    I think I have a copy.
       Q.    Whatever you're comfortable with, Ms. Dean.
12     A.    Okay.  I'm sorry.  You said 56, 57?
       Q.    Paragraph 56.
13     A.    Can you repeat the question?
       Q.    Sure.  And I'm going to just read it right out of
14   the report so we don't mess around.
               Final sentence of that paragraph, it says,
15             "I understand that Rimini Street experienced
     substantial efficiencies through its allegedly improper use
16   of Oracle's copyrighted software and support materials."
               Did I read that correctly?
17     A.    You read that correctly.
       Q.    You did not measure the value of the efficiencies
18   that Rimini experienced in a dollar basis, did you?
       A.    Yes, I did.  The substantial efficiencies, like we
19   talked about, was the ability to have this business.  It's
     all based on these actions.
20             This -- I understand that there's a dispute
     between us about whether you agree with that.
21             But the substantial efficiencies, it's not just
     a labor savings, there were plenty of emails in this record
22   about how remote service just wasn't feasible or how manual
     downloading wasn't feasible, and they built the business
23   off of using this.
               So that's the purpose of the substantial
24   efficiency statement in this text.
       Q.    But you didn't analyze the dollar amount related to
25   those substantial efficiencies, did you?
       A.    No.  That's incorrect.

1           MR. STRAND:  Thank you.  I have no further
questions.
2           THE COURT:  All right.
            Redirect examination?
3                 REDIRECT EXAMINATION
BY MR. ISAACSON:
4    Q.    Ms. Dean, why did you just tell counsel that he was
incorrect that you did not measure the dollar volume of
5    the -- on the inefficiency issue?
     A.    Well, because when I have to determine what Oracle's
6    harms are, if I think that Rimini could have stayed in
business and offered the same service, then I have to
7    calculate Oracle's damages differently.
            So it's my opinion that all the substantial
8    efficiencies that were gained from all of the bad behavior
that led to referrals that were, you know, misleading to
9    other companies and ultimately grew the company into the
business that it became, that that all contributed to those
10   lost customers to Oracle, and that's why I measured
Oracle's harms in the way that I did.
11   Q.    All right.  This morning you were talking about some
of the smaller companies that did not provide full
12   vendor-level support, and you said some customers left for
those smaller companies.
13          How did you account for that in your analysis?
     A.    So, I have two measures.  We talked about this on my
14   direct.
            I stopped the damages for each individual
15   customer at the time they left Rimini.  So if those
customers left Rimini and went somewhere else, didn't go
16   off software, then that would be accounted for because I
didn't include any damages for that.
17          And then, in addition, I took all the customers
that I left in, the 228, and I reduced them all by Oracle's
18   natural attrition rate.
            So just like any other customer of Oracle's,
19   there's a possibility that they wouldn't have remained on
service, and I used Oracle's actual attrition rates to
20   reduce my damages.
     Q.    You were read the following testimony from Safra
21   Catz, page 918, beginning at line 15.
            "Does the company have any philosophy
22      towards these competitors, towards competition?
            "ANSWER:  Yeah; bring it on.  The truth is
23      competition makes you better.  It keeps you very,
        very sharp."
24          Now, these competitors in the previous question
and answer, beginning at line 10 and what was not read to
25   you, the question was,
            "And you mentioned that when you're

1      negotiating, that the customers may be negotiating
       with others, your competitors.  Who are Oracle's
2      competitors?
               "ANSWER:  IBM, Microsoft, Salesforce.com.
3      We have so many competitors, I truly can't list
       them all here today."
4              How did you account for those competitors such
as SAP in your analysis?
5   A.    So those are competitors for other database
offerings, or other application offerings.
6              So what Oracle's business model is doing is it's
going to the customer, and the customer is assessing the
7   total cost of ownership for buying Oracle's ERP versus
somebody else's.
8              So when the company makes that decision -- and
they will revisit that decision over time as the company
9   changes.  As the company goes from, you know, 50 to 100 to
10,000 people, they're going to revisit whether or not they
10  have the right application software to do what they need.
               So that is, I think, what we experience when we
11  see the 95 percent retention and that 5 percent leave.
               The 5 percent that are leaving, obviously that's
12  affected a little bit by Rimini's and TomorrowNow's
actions.
13             But scoping that out for a second, let's say the
4 percent that leave for other reasons, they're leaving to
14  go to other software.
               So they're revisiting that negotiation that you
15  just described, and that Safra described in her testimony,
and they're making a different decision about what ERP
16  vendor they want to use.
               So when that happens, that's covered by my
17  general attrition.  That's a reason why I reduced my
number.
18  Q.    All right.  You were shown DTX 146 at page 6.
               You were asked about Abtech and why you didn't
19  put them in your chart.  Why didn't you put Abtech in your
chart?
20  A.    Because when we did research on it, it didn't appear
that they had provided the support services.  I think they
21  provided some IT services, so more of, like, a hardware
infrastructure thing.
22  Q.    All right.  And you said why you -- I don't even
know how to pronounce this, Alui.  But say again why you
23  didn't put them on the chart.
    A.    Because Hyperion is another product that Oracle
24  sells, but it's not a product in this case.
    Q.    Okay.  Ciber, why didn't you put them in your chart?
25  A.    So Mr. Yourdon and I had a few conversations about
several of these, and most of these companies we couldn't

1   find much information at all with respect to whether or not
    they actually provided service that was vendor replacement
2   support as opposed to consulting services.
                So my recollection is that Ciber fell into the
3   category of a company that was providing consulting
    services.
4   Q.    Is that also true for Citagus and Hexaware?
    A.    I believe it was true for Citagus.
5               These are companies that offer, for example,
    implementation or customization.
6               I think Ms. Ransom talked about how there are a
    lot of companies out there that go help customers with this
7   software because it's complicated software, but they're not
    providing updates, tax and regulatory updates and fixes.
8               Hexaware I recall being slightly different.  I
    think they were another offshore company, and they tried to
9   get something going.
                And my recollection is that they weren't of any
10  size, and then they stopped altogether, or perhaps they
    were -- I remember they were being offshore.
11              I think they might have been literally like a
    call center, and they weren't trying to replace vendor
12  support at level 3.
    Q.    Okay.  What about -- you talked about in your
13  testimony NetCustomer and Spinnaker.  So let's go to Summit
    Technology.  Why weren't they in your chart?
14  A.    So, similarly, I think they were offering -- my
    recollection is they were offering consulting services and
15  not trying to replace the vendor.
    Q.    All right.  You explained to counsel twice why
16  Versytec was not in your chart, but say it once more so we
    have it clear.
17  A.    So Versytec -- my understanding is Versytec is just
    like Alui, they're offering some service -- I don't know
18  it's support, but they're offering some service, but on a
    product not part of this case.  Versytec's only product, as
19  I understood it, was JDE World.
    Q.    All right.  The other list that you were shown was
20  DTX 145 at page 4.
                There's four companies on this list.  You just
21  talked about Versytec.  Then there's TomorrowNow and Rimini
    Street.
22              So once we take Versytec out, the competitive
    landscape, which is the title of this slide, are these
23  three companies, TomorrowNow, Klee & Associates, and Rimini
    Street.
24              And what do you have to say about Klee &
    Associates?
25  A.    So my recollection was also -- on Klee & Associates,
    that they were primarily focused on World.

```
 1              I don't know if they offered any services on
        EnterpriseOne which is the other -- which is the JDE
 2      product that we care about in this case.
                But my recollection is that they went out of
 3      business.
           Q.    All right.  Now, yesterday you were asked at the
 4      beginning of the cross-examination about a statement that
        you had made that a more appropriate measure of damages may
 5      be Rimini's value of use and how that provides -- that may
        provide a more complete remedy for Oracle in this case.
 6              Would you explain what you meant by that?
           A.    Yes.  So actual damages can be measured as lost
 7      profits or as this other framework of a hypothetical
        negotiation between the parties where they negotiate a
 8      license for the infringer's actions.
                Just to make it clear to everybody --
 9         Q.    Why would it be more complete?
           A.    Why would it be more complete?
10              So, in the hypothetical negotiations, this is a
        fictitious circumstance, not like two people negotiating
11      today where they don't know what's in the mind of the other
        side.
12              The law allows, in this fictitious negotiation,
        for both parties to know everything about what the other
13      party knows.  It's called open book or book of wisdom.
                So you can tell that in that circumstance that
14      if Oracle knew that Rimini was going to offer this service
        to every single customer at 50 percent off and use Oracle's
15      materials to do so, that Oracle would have a reaction, and
        likely a very strong reaction, to that and want to -- and
16      if they had to negotiate a contract in those circumstances,
        they would want a lot of money because they just spent
17      $16 billion to buy the companies that have this technology
        that allow them to sell these applications and sell these
18      support renewal services.
           Q.    Okay.  Let me ask you a very simple question, then,
19      about that.
                You didn't testify about a value of use measure
20      for Siebel, JDE, or PeopleSoft; correct?
           A.    No.
21         Q.    If you had used that measure, would you have stated
        that the damages were higher or lower?
22         A.    They would be much higher because they could
        incorporate things that the two companies would be thinking
23      about that lost profits can't.  Lost profits just measures
        each company that Rimini actually took.
24         Q.    Okay.  Let me ask you about something else.
                MR. ISAACSON:  Can we look at Hicks' slide 16.
25              THE WITNESS:  Do I have that?
                MR. ISAACSON:  Yes.
```

3764

1    BY MR. ISAACSON:
         Q.    Now, you were asked a series of questions about
2    three months of -- a three-month period in which there was
     automated downloading -- the KM downloading.
3              All right.  Now, Mr. Hicks testified about
     automated downloading more than the KM downloading;
4    correct?
         A.    Yes.
5        Q.    Okay.  And looking at his summary, the knowledge
     based tool at the bottom, that's the KM downloading; right?
6        A.    That's my understanding, yes.
         Q.    Right.  And when you measured -- when you estimated
7    the value of 14 lost customers, I believe it was
     $14 million.  That was related to that time -- period of
8    time?
         A.    Right.  Only related to those activities, that's
9    right.
         Q.    Right.  And what counsel did not ask you about was
10   all the other automated downloading that Mr. Hicks
     testified about that began as early as the beginning of
11   2007 and continued through the fall of 2008; correct?
         A.    That's correct.
12       Q.    And then into the beginning of 2009.  He didn't ask
     you about any of that.
13       A.    That's correct.
         Q.    All right.  And then, if the Siebel business was
14   built upon that automated downloading, that's when you get
     the higher damages number that you estimated, which I don't
15   have in front of me but was in the neighborhood of
     $40 million?
16       A.    Yeah, I think it was 34.
         Q.    34 million.  Thank you.
17             Okay.  So when counsel was asking you about the
     automated downloading that Mr. Hicks has testified about,
18   was he even coming close to asking you about all the
     automated downloading that Mr. Hicks talked about in his
19   testimony?
         A.    No.  I understood his questions to be focused just
20   on the knowledge management, November, December of 2008,
     and January of 2009.
21       Q.    All right.  Let me -- counsel yesterday showed you a
     chart about attrition rates.  Can we look at that?
22             Or cancellation rates.  But you had a long
     discussion yesterday about cancellation rates.  And, in
23   your calculations, how did you account for cancellation
     rates by Oracle customers?
24       A.    So, again, I take out everybody down to the 228.
               I take out the damages only as long as they were
25   at Rimini, and I assumed if they had been at Oracle at that
     time they would have cancelled, so that's a cancellation.

3765

1      And then on top of that, for all those same
customers.  I also take out an amount equivalent to, you
2  know, the red bar area of this chart.
    Q.    All right.  Now, he asked you -- he had you look at
3  these general cancellation rates, and then he showed you
some other cancellation rates.
4      Let's look at DTX 160, at page 3, 3 at the
bottom.
5      All right.  Do you remember looking at this with
counsel -- with defense counsel?
6  A.    Yes.
    Q.    All right.  Now, this relates to cancellation rates.
7  How did you take into account these cancellation rates in
your analysis?
8  A.    So JD Edwards was obviously one of the product lines
that I studied, and the -- I used the actual historical
9  cancellation rates that were -- that we previously talked
about to reduce my damages for the customers that I
10  calculated lost profits on.
    Q.    So you used the actual rates that are in this
11  document and the other documents that you saw to the extent
that these documents are accurate?
12  A.    Yes.  If this blends into the overall accounting,
that's what I used.
13  Q.    All right.  And it says,
          "JD Edwards customers are showing consistently
14  low levels of satisfaction with Oracle products and
services."
15      And there's been testimony about -- from
Ms. Ransom about what they means by "consistently low
16  levels," whether that's a 6 or a 5, but whatever it is, you
took it into account?
17  A.    I did.
    Q.    Okay.  Then you were also shown DTX 161 at page 7.
18  This was the JDE cancellation analysis.  This applied only
to JDE; right?
19  A.    I'm sorry.  Yes, it does.
    Q.    All right.  And then you were shown DTX 165 at page
20  28, and this is a JDE document?  If you look at --
    A.    I can't see it on this page, but I have it open in
21  front of me, and the first page says Track and Analysis E1,
which is JDE EnterpriseOne.
22  Q.    Right.  And in terms of the importance of the JDE
attrition rates or cancellation rates, can we look at the
23  JDE slide that we used during the direct testimony, the
copyright infringement damages for JD Edwards?
24  A.    Yes.
    Q.    All right.  This is fine.
25      Of the total copyright damages, JDE is
7.1 million of that; is that right?

1   A.    That's right.
    Q.    All right.  You were asked a number of questions by
2   counsel today, and you talked about how, in your opinion,
    that the business model of Rimini had been infiltrated by
3   the conduct we've alleged.
              Can I ask you to look at slide --
4             MR. ISAACSON:  Matt, let's show slide 53.  No,
    that's -- it's the first Siebel customer slide.  There we
5   go.  Fill it out.

6   BY MR. ISAACSON:
    Q.    You're familiar with the testimony of Mr. Ravin
7   where he was confronted with this evidence about what was
    happening with the first Siebel customers in their first
8   year of business?
    A.    I read that testimony.
9   Q.    And then can we look at the pilot clients' slide.
              This is where they listed their early pilot
10  clients, their most important clients.  You were familiar
    with that testimony?
11  A.    Yes, I read that as well.
    Q.    And then the public clients, the first three public
12  clients?  These were the magic three that gave them other
    references?
13  A.    I did read that as well.
    Q.    All right.  And then speaking about reference, can
14  we look at the PeopleSoft references slide, which was also
    discussed with Mr. Ravin.
15            Let's do JD Edwards first.  That's fine.
              These were the top companies giving references
16  to Rimini Street for JD Edwards.
              And then the next slide, PeopleSoft.
17            These were the top companies giving references
    to Rimini Street for PeopleSoft?
18  A.    Yes, that's my understanding.
    Q.    And then Siebel, these were their top Siebel
19  references.
              All right.  Would you explain what we were just
20  looking at here, how that relates to your analysis of how
    this business was built?
21  A.    And it's pictorial, but it's the evidence of how the
    business all built on the bad acts.
22            So you saw how many customers benefitted.  Those
    customers then gave referrals that brought new customers in
23  who also benefitted.
              So the entire foundation of the company and its
24  ability to generate revenues, its ability to take away
    Oracle's customers, is based on this foundation of exactly
25  the allegations that Oracle's put forth.
    Q.    All right.  We went through a list of 17 customers.

1    The -- I'm going to show you some of their testimony.
Counsel showed you some of their testimony.  I'm now going
2    to show you some other testimony.
           Let's start with Ms. Minks of Brazoria County.
3    This is from her deposition, page 60, line 22.

4    BY MR. ISAACSON:
     Q.    You reviewed the 17 -- you were actually shown
5    yesterday testimony from some of the 17 customers that
counsel wanted you to see.  But you read the whole
6    depositions; right?
     A.    I did.
7     Q.    All right.  Now, do you recall -- I'm going --
Ms. Minks from Brazoria County --
8           MR. ISAACSON:  Not on the screen, Matt.
    BY MR. ISAACSON:
9     Q.    Question -- this is at page 60, line 22.
           "If the use of Brazoria County's software to
10      create environments for other Rimini Street
      customers was a violation of Brazoria County's
11      PeopleSoft license, would Brazoria County have
      allowed Rimini Street to do that?
12           "No.  I mean, if it's a violation of a
      license, I don't think they would have.
13           "QUESTION:  And if Brazoria County knew that
      it was a violation of the PeopleSoft license and it
14      knew that Rimini Street would do that, would it
      have contracted with Rimini Street?
15           "ANSWER:  I don't know.  I don't think you
      want to -- I mean, if you're saying, 'Hey, somebody
16      is going to do something wrong; are you still going
      to go with that?'  I mean, the common answer would
17      be, no, you're not going to want to do something
      wrong."
18           You familiarized yourself with that testimony;
right?
19     A.    That's correct.
     Q.    And Mr. Swanson of AGCO at his deposition, page 22
20    at line 11 was asked,
           "Okay.  Is it your position -- is it AGCO's
21      position that it's okay to contract with a vendor
      that breaks the law?
22           "ANSWER:  I believe that AGCO would not
      contract with a vendor that knew was knowingly
23      breaking the law."
           You reviewed that testimony; right?
24     A.    Yes.
     Q.    Mr. Hintz of Hastings Entertainment at page 44, line
25    20, was asked,
           "If Hastings had known that Rimini Street

1         would use a copy of Hastings' PeopleSoft software
          to serve other customers and Hastings had known
2         that doing so would exceed the scope of the license
          that PeopleSoft had granted Hastings, would
3         Hastings have contracted with Rimini Street?
                  "ANSWER:  No."
4                 And while I'm bothering you with all of this,
   the jury has actually seen -- has seen some of this and
5  will see the rest of it, I believe.
                  Mr. Moore of Koch Industries, page 63, line 9.
6                 "If you knew at the time you contracted with
      Rimini that they intended to use Koch materials to
7     build environments for other Rimini customers,
      would you have agreed to sign the contract with
8     Rimini Street?
                  "I -- we -- had -- had we known that that
9     were the circumstance, no, we would not."
                  Thomas O'Brien of the City of Flint.
10                "If the City of Flint had been aware that
      Rimini's business model involved the improper use
11    of Oracle's intellectual property, would the city
      have contracted with support for Rimini?
12                "ANSWER:  If they were not in compliance
      with our licensing agreements with those companies,
13    I would say that we probably could not have.
                  "And the thing you could not have done would
14    be to contract with support with Rimini?
                  "ANSWER:  Correct."
15                Clark Strong of Birdville.  You were shown other
   testimony of his.  He was asked at page 19, line 18,
16                "If you had believed that Rimini Street was
      going to use your software to support other
17    customers, would you still have signed with Rimini
      Street?
18                "ANSWER:  I wouldn't have recommended it.
                  "QUESTION:  And if you had believed at that
19    time that Rimini Street's installing your software
      on its systems was a violation of your license
20    agreement with Oracle, would you have signed with
      Rimini Street?
21                "ANSWER:  I wouldn't have recommended it."
                  Charles Tewell of YUM Brands, at page 34, line
22 19 of his deposition.
                  "QUESTION:  So let me ask a hypothetical
23    question, then:  If you had known that Rimini
      Street was violating the law in terms of how it was
24    supporting YUM, would YUM still have been willing
      to sign with Rimini Street?
25                "ANSWER:  I'd say absolutely not.  We would
      not have -- not enter into any agreement with any

1   company that we knowingly knew was violating laws."
         James Ward, Wendy's.  This was played in court.
2         "If Wendy's believed that Rimini Street had
    a business model that involved the improper use of
3   intellectual property, would Wendy's have
    contracted with Rimini Street for support?
4         "ANSWER:  No."
         Kim Cabada of CKE Restaurants, at line 20 -- at
5   page 20, line 1.
         "So if CKE had not been reassured that
6   Rimini's services were going to comply with
    Oracle -- with CKE's licenses with Oracle, would
7   CKE have proceeded to sign a contract with Rimini
    Street?
8         "ANSWER:  No."
         You were shown testimony from Brian Baggett of
9   Bausch & Lomb.  He was asked this question and answered at
    page 69, line 19.
10         MR. STRAND:  Your Honor, if we could get a
    question mark at some point along in this?
11         MR. ISAACSON:  I've got one more -- or I've
    got --
12         MR. STRAND:  Okay.  Fair enough, Counsel.  Okay.
    Go ahead.
13         MR. ISAACSON:  I've got a couple more.  Then I'm
    going to ask her if she reviewed all these.  I'd rather not
14   do it on each one.
         MR. STRAND:  Go ahead.
15   BY MR. ISAACSON:
     Q.    Question -- this is Bausch & Lomb whose testimony
16   was shown in opening statement and to this witness.
         "And is it fair to say that Bausch & Lomb --
17   if Bausch & Lomb had knowledge at the time it
    entered into the support agreement with Rimini that
18   Rimini's business model involved improper use of
    intellectual property, that Bausch & Lomb would not
19   have contracted with Rimini?
         "ANSWER:  That's correct?"
20         Barbara Shepard of Blue Cross Blue Shield, page
    24, line 22.
21         "BlueCross BlueShield would not have gone to
    Rimini Street if it believed that Oracle's
22   allegations were true?  Is that correct?
         "ANSWER:  I don't believe -- we wouldn't
23   intentionally do business with them if we felt that
    they'd done something wrong."
24         The County of Kent, Craig Paull,
         "Is it a general practice of Kent County to
25   not contract with companies that break the law?
         "ANSWER:  Yes."

 1          Mr. Higa's testimony has been played and was
    shown in opening statement.  I won't bother you again with
 2    that.
              JB Hunt, whose name you were asked about.  Tracy
 3    Black, page 62, line 22.
              "So with the understanding that you don't
 4      know for sure one way or another, I want to ask you
        a hypothetical question -- or rather, two
 5      hypothetical questions.  First of all, would -- if
        JB Hunt knew that Rimini Street's business
 6      infringed Oracle's copyrights would JB Hunt have
        contracted with Rimini Street for support?
 7          "ANSWER:  No."
              Pitney Bowes, the deposition of Stephen
 8    Woodward, at page 31, line 16.
              "If Rimini Street hadn't been able to
 9      provide you with the reassurance" -- it wouldn't
        have been more or less -- "would that have made it
10      more or less -- more or would it have made it less
        likely for Pitney Bowes to enter into -- to enter
11      into an agreement with them?
              "ANSWER:  Again, we want to make sure that
12      they are acting with integrity.  So if we felt they
        weren't, we wouldn't have moved forward."
13          We played the testimony of Graham Carter of
    SonicWall in court, but he was asked,
14          "Is it fair to say that if SonicWall had
        knowledge at the time it entered into the support
15      agreement with Rimini, if Rimini business model
        involved improper use of intellectual property that
16      SonicWall would not have contracted with Rimini?
              "ANSWER:  Yes."
17            James Dorvee of Sunrise Medical, the final one.
    Page 45, line 13.
18            "And if you learned that using your software
        on Rimini's server was central to their business
19      model, and illegal, would you have signed the
        contract with Rimini Street?
20            "ANSWER:  I actually would not have signed
        the contract."
21            Now, that was all 17 of the customers.  And I
    apologize for reading all of those, but I thought it was
22    important.
    BY MR. ISAACSON:
23    Q.   You took that into account in your analysis?  You
    reviewed that?
24    A.   Yes.
      Q.   Okay.  And how did that relate to your analysis?
25    A.   Well, a lot of those customers were the primary
    customers that then, like City of Flint, provided a lot of

```
 1    referrals.
              So if they couldn't get those customers because
 2    their messaging had been, you know, honest, rather than
      what it was, then they couldn't have built a business
 3    because they wouldn't have had the credibility to convince
      other customers to go with them.
 4    Q.   All right.  So I want to show you PTX 2155 which --
              MR. ISAACSON:  I don't have a note as to whether
 5    this has been admitted or not.  Before you put it on the
      screen, do we know whether it's been admitted or not?
 6            COURTROOM ADMINISTRATOR:  It is admitted.
              MR. STRAND:  Do you have a copy of it, Counsel?
 7            MR. ISAACSON:  Can we get them a copy of PTX
      2155?  Let's get them 554 while we're at it.
 8            COURTROOM ADMINISTRATOR:  What was the other
      one?
 9            MR. STRAND:  You're going to start with which
      one, Counsel?
10            MR. ISAACSON:  2155 at page 4.  And this is Seth
      Ravin writing.
11            MR. STRAND:  I object, Your Honor, outside the
      scope of the cross.
12            MR. ISAACSON:  This document is talking about
      how Rimini built its business which was --
13            MR. STRAND:  I continue to object.  The document
      was not discussed or offered during the cross.  I object.
14    It's outside the scope.
              MR. ISAACSON:  He asked her the basis for her
15    opinions --
              THE COURT:  I'm going to allow the question
16    because I feel that it's within the scope of the
      cross-examination.
17    BY MR. ISAACSON:
      Q.   Okay.  Now, this is Mr. Ravin writing in March 23rd,
18    2006.  This is right when they're starting to get
      customers; right?
19    A.   Yes.
      Q.   Okay.  And he writes to someone named Alma in the
20    first -- in the second large paragraph about how you build
      this business.
21            He says,
              "We're making great strides in building the
22    business -including having our first client," who the
      jury's heard about, "to take reference calls now from other
23    prospective clients."
              'However, we are spending huge sums on
24    infrastructure and expansion, so, like every startup at
      this 'gap' between heavy spend and the growth of
25    substantial cash flows, I need to make sure our spend on
      everything is in the category of 'essential' to success."
```

1           He goes on to say, "We get to the 'nice to
have's'" -- he goes on to say, "We get to the 'nice to
2   have's' soon enough, but this is the stretch where we go
from a couple referenceable clients to four, and then we
3   have a business core and we have a business."
           Would you explain how this relates to your
4   analysis?
     A.    And so this is the kind of evidence that I looked
5   at, and this is one example.
           But there were many documents in the case that
6   went to these same points, the key to having referral
clients builds additional business and additional
7   credibility.
           The key to having the library and being able to
8   tell customers that you have all of the materials that they
would have if they were at Oracle was key to building that
9   credibility.
           And the business stemmed from those actions.
10   Q.    All right.  And then if we could look at 554.
           All right.  We've looked at this before with
11   Mr. Ravin.  This is now October 2008, a couple years later,
and he is -- and he is writing to Mr. Slepko and others.
12           At the bottom of the first -- right there.  "A
client" -- I'm sorry.
13           "It wouldn't matter if we had the best JDE
resources in the world if we don't resolve the foundation
14   issues.  A client first and foremost must believe they have
the right to be with us and use their software...or the
15   rest is just noise."
           Would you explain how that relates to the
16   opinions that you were explaining to defense counsel?
     A.    So that is the exact point about having the
17   credibility.  And the reason that the frequently asked
questions come up is that customers care about whether or
18   not they're in compliance with Oracle's license.
           And when they get -- they ask those questions
19   and they're not answered properly, then they think that
they can go to Rimini, and they continue to tell other
20   customers this is okay to do when it's not.
     Q.    All right.  Just a couple more points.
21           Now, in your pie chart you had one piece of pie
that represented customers who returned to Oracle.  I
22   believe there were 39 of those; is that right?
     A.    That's right.
23   Q.    By the way, about that returning to Oracle, you
said -- wait.  I'm sorry.  I'll start over.
24           So for those 39 customers, you calculated no
damages; correct?
25   A.    No lost profits damages, but they would be in
infringer's profits.

1    Q.    All right.  And you understand Rimini says that if
you come back to Oracle, that Oracle charges a
2    reinstatement fee and past -- along with past years of
money?
3    A.    That's a policy that Oracle has.
     Q.    Right.  And to the extent that that's been
4    implemented and any money's been received because of that,
you didn't calculate any damages for that from those 39
5    customers, you excluded that from your analysis?
     A.    Yeah, I assumed that the back support had been
6    charged.
     Q.    All right.  But you didn't add it into your damages?
7    A.    I didn't add it into my damages.  If the back
support had been charged, then Oracle would be made whole
8    on those contracts.
     Q.    And if Oracle waived it, if Oracle waived that
9    amount about which there's been testimony, you didn't
include that amount in your damages?
10   A.    That's right.  I think for the most part, the
companies that I looked at, they relicensed so that's a
11   provision that a customer takes a new -- a brand-new
license and so they basically start over with Oracle.  And
12   when they do that, they do not have to pay the back
support.
13        And so there would be a gap of losses that I did
not include in my damages model for those customers.
14   Q.    All right.  And then you talked about your specific
attrition rate.
15        And over here counsel eventually started writing
some of these things saying stopped.
16   A.    Right.
     Q.    How does your specific attrition rate take into
17   account the customers that stopped using the software?
     A.    So I only calculate damages for Oracle for the
18   period of time that customer was at Rimini.
          So I assume that if Oracle -- if a customer had
19   stayed with Oracle, it would have made the same decision it
made when it left Rimini, it obviously decided not to use
20   the software anymore.
          So I assume that that same decision would have
21   occurred at Oracle, and I have no more damages after the
customer leaves Rimini Street.
22   Q.    And we don't, in fact, know that if they had stayed
with Oracle, maybe they wouldn't have stopped.
23   A.    That's right.  I mean, we -- I think we heard Safra
testify that -- and Ms. Ransom too, that they like to work
24   with their customers.
          In fact, that's why we see all these documents
25   about testing customer satisfaction, because they want the
customers to be satisfied because customers are very, very

3774

1    important to Oracle.
             So they could have continued to work with a lot
2    of these customers and overcome some of the things like,
     for example, the misimpression that they couldn't get
3    sustaining support and that their products were going to be
     sunsetted.
4        Q.    All right.  And what was interfering with Oracle's
     abilities to be able to talk to the customers about what we
5    would call the truth?
         A.    Well, it was that they were no longer Oracle
6    customers because they had been separated from Oracle's
     day-to-day activity with them by being replaced by Rimini
7    in the report -- in the support cycle.
         Q.    All right.  And then finally, overall, I think you
8    said that during your examination that you considered your
     damages estimates to be conservative.
9            You had a long discussion with defense counsel.
     Is that still your opinion?
10       A.    Yes, absolutely.
             MR. ISAACSON:  No further questions.
11           MR. STRAND:  I just have a couple.
             THE COURT:  Recross examination.
12           MR. STRAND:  Just a couple of follow-ups, Your
     Honor.
13                   RECROSS-EXAMINATION
     BY MR. STRAND:
14       Q.    Ms. Dean, just a few moments ago you looked at the
     slides with the different clients, the referral clients,
15   the pilot clients.  Do you recall all those?
         A.    Yes.
16       Q.    All right.  Beyond those slides and what's shown on
     those slides, you didn't do any analysis of the referral
17   network for Rimini clients, did you?
         A.    Well, I definitely saw evidence in the case that may
18   have gone beyond what was listed on the slides.
         Q.    We haven't seen any of that evidence in this case,
19   have we?
         A.    Well, I assume other witnesses have sponsored that.
20       Q.    Okay.  Let me -- I'm only going to ask about three
     questions.
21           MR. STRAND:  Let's go back to 5469, page 1, and
     Access Intelligence LLC.  I guess we need to switch.
22   BY MR. STRAND:
         Q.    That very first client, remember we've talked about
23   him or them quite a bit.  Access Intelligence, do you see
     that?
24       A.    Yes.
         Q.    Do you have any knowledge about who referred -- who,
25   if anyone, referred Access Intelligence to Rimini?
         A.    I don't know who did that.

3775

1    Q.    And do you have any knowledge about who, if anyone,
Access Intelligence referred to Rimini?

2    A.    Well, personally, sitting up here, I don't.  There's
probably evidence in the case about both of those points.

3    Q.    And we could go through that whole list of 228
clients and your answer would be the same; correct?

4    A.    Right.  But there's likely a lot of evidence in the
case about that, but sitting up here right now, I can't

5    tell you.

            MR. STRAND:  Thank you very much, Ms. Dean.  I
6    have no further questions.

            THE COURT:  Any further questions, Mr. Isaacson?
7            MR. ISAACSON:  Nothing, Your Honor.

            THE COURT:  All right.  Ms. Dean, that completes
8    your testimony, and you may step down.  Thank you.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    SCOTT DEAN HAMPTON
                 called as a witness on behalf of the
2         Defendants, was examined and testified as follows:
                      DIRECT EXAMINATION
3    BY MR. STRAND:
         Q.    Good morning.  Would you please introduce yourself
4    to the jury, sir.
         A.    Yes.  As I said, my name is Scott Hampton.  I live
5    in Kaysville, Utah.
         Q.    And why are you here with us today, Mr. Hampton?
6        A.    I was engaged a few years ago, I think actually it
     was 2012, maybe '11.  I was asked to review Ms. Dean's
7    reports, or I guess it was a report at that time, and
     review her findings and report back, write a report of my
8    own as well as make calculations of my own.
         Q.    I'd like to review your educational and professional
9    background a little bit.  And why don't we bring up slide
     2.
10                 Can you tell us a little bit about your
     educational background, Mr. Hampton?
11       A.    Yes, I can.  I graduated from the University of
     Utah, David Eccles School of Business, in 1986 with a
12   bachelor's degree.
                   I then went to work for KPMG Peat Marwick, one
13   of the Big Four, it was the Big Eight at that time,
     national accounting firms.
14                 I did audit work for a couple of years.  Then I
     was invited or asked to join their consulting group, and --
15   would you like me just to go on through --
         Q.    I don't want to garner an objection.  So I'll say
16   what did you do next?
         A.    All right.  Thank you.
17                 So I did audit for a couple of years in Salt
     Lake City.  And then I was invited to join their forensic
18   or investigative accounting group, and I did that, I joined
     that group, and that was a group of 15 people.
19                 And most of the work that I did was outside of
     Salt Lake.  I spent a year in Las Vegas calculating damages
20   arising from the Michael Spinks fight that didn't occur at
     the Las Vegas Hilton, Hilton had a breach of contract
21   claim, and it was a large litigation, so I actually lived
     in Las Vegas most of one year.
22       Q.    Did you live in any other exciting places during the
     course of your professional career?
23       A.    I've enjoyed it a great deal.
                   I also worked quite extensively in Portland on
24   another large case dealing with a coal fire plant,
     electrical plant, that had a breach of contract with its
25   coal supplier.
                   So most of what I did during that period of time

1   was large litigation in the western United States.
         Q.    And then what was your next professional employment?
2    A.    In about 1989, after I married in '88, my wife
    wanted to live in Seattle, so we moved to Seattle.  And I
3   was recruited by Arthur Andersen & Company.
              This was about the time of the Exxon oil spill.
4   And so they were looking for investigative accountants, and
    so I took a position.  I changed from KPMG to Arthur
5   Andersen & Company, and actually worked on the Exxon Valdez
    oil spill the first year in Anchorage.
6             I actually lived in Anchorage and worked
    directly with the fish processors and the fishermen and the
7   tender boats, helping them to calculate the amount that
    they would have earned had they been able to fish that
8   year, and then processing payment to them for their claims.
         Q.    Now, what did you do after working for Arthur
9   Andersen & Company, sir?
         A.    After the Exxon Valdez oil spill litigation ended
10  quite abruptly, I did litigation consulting in Seattle.
    And at that time I did, again, large litigation, large
11  claims.
              I also did some consulting work with regards to
12  proficiencies and management.  So everything I did wasn't
    related exclusively to investigative accounting.  I was
13  also doing consulting work at that time.
              I did that for a few years.  And in 1994 I
14  wanted to specialize my efforts in the area of copyrights
    and patents and trademarks, and Seattle was a very good
15  place to practice in that area.
              So I couldn't do that at Arthur Andersen, they
16  already had people doing it, so I decided to leave.  And so
    in 1994 I left public accounting after eight years and
17  started my own practice.
         Q.    And what's that called?
18       A.    At that time it was Hampton Consulting.  It's now
    Hampton IP & Economic Consulting.
19            But I started on my own in Seattle.  I
    affiliated with a group from Los Angeles for a few years,
20  until about 1997.
              While I was in Seattle, I presented damage
21  calculations for law firms, I presented at the bar
    association, so I was starting to develop expertise in
22  intellectual property.
              Around 1997 my wife and I decided we wanted to
23  move back to Utah, we got little tired of the rain,
    although we liked Seattle a great deal, but I came back and
24  moved to Utah and started a practice there.
              It was quite remarkable that the connections I
25  made in Seattle allowed me to develop a national practice
    just because people move around.  So I have a national

1    practice.
                 Most of the work that I do comes off of the East
2    Coast, and so I spend part of my time in Washington, DC.  I
     have an office there as well.
3                And it's going on too long.  I don't want to
     raise an objection.
4    Q.    Let's shift gears for just a second.  Are you a CPA,
     sir?
5    A.    I am.
     Q.    And let's look at the next slide.  What is -- what
6    is a CPA?
     A.    A CPA is an accountant that's been certified and
7    licensed, licensed by the state and certified by a national
     organization as well as state societies.
8    Q.    And are there certain ethical codes or principles
     that you need to abide by?
9    A.    Well, you have to have a minimum education
     requirement, and you have to work for a CPA for a number of
10   years, and then you have a three-day exam, very rigorous
     examination you have to pass, and then you have continuing
11   education.
                 There's also the code of professional conduct
12   for certified public accountants which is an ethical code
     that ensures that accountants present financial information
13   in a credible way that's subjective and pretty much
     acknowledges the responsibility that accountants have to
14   the public to fairly present financial information.
     Q.    And in performing your services in connection with
15   this case, have you been obligated to adhere to those
     codes?
16   A.    Yes, I have.
     Q.    And have you?
17   A.    I did, yes.
     Q.    Okay.  And these codes are here on slides 3 and 4.
18   They're in the kind of tear-out sections.
     A.    Yes.  That's part of the code of professional
19   conduct that the AICPA creates.
     Q.    Have you analyzed copyright damages before today,
20   before this case, Mr. Hampton?
     A.    I have.
21               I've chaired the litigation committee for the
     state society in Utah.  I also chaired the licensing
22   executive society's chapter in Utah.
                 I've been practicing in the area of intellectual
23   property since about 1994 when I left Arthur Andersen, and
     in that time, I've done well over 180 intellectual property
24   related cases, and more than 45 of those deal with
     copyrights.
25   Q.    So based on that experience, have you -- are you
     aware of the methodologies and techniques of -- used in

```
 1    analyzing the types of damages that we have in this case?
      A.    Yes, I am.
 2    Q.    And have you applied those methodologies and relied
      on your experience in analyzing damages in this case?
 3    A.    Yes, I have.
            MR. STRAND:  Your Honor, may we proceed with
 4    Mr. Hampton's expert testimony?
            THE COURT:  You may.
 5    BY MR. STRAND:
      Q.    Now, what were you asked to do in this case,
 6    Mr. Hampton?
      A.    I was asked to review Ms. Dean's reports, as I
 7    mentioned to you, and other information in the record, and
      then write a report of my own responding to Ms. Dean's
 8    calculation, and in that report also calculate what I think
      is the amount that would compensate Oracle for the wrongful
 9    acts that have been alleged, the misconduct that is
      alleged.
10    Q.    Now, have you completed your assignment?
      A.    Yes, I have.
11    Q.    Okay.  In a nutshell -- we're going to go into this
      in detail, but, in a nutshell, can you summarize your
12    opinions for us.
      A.    Yes, I can.
13          Based on my examination of Ms. Dean's report, I
      think she's seriously overestimated -- her calculated
14    damages are too high because of some serious flaws in her
      methodology.
15          I think the database damages range in the area
      of $100,000 to 3 million.
16          I don't see that there's lost profits directly
      associated with the wrongful acts, so I don't think that
17    Oracle actually lost any clients or lost profit because of
      the infringement or from the interference.
18          I've calculated damages based on the value or
      the benefit that Rimini Street gained from its wrongful
19    acts, which is about $9.3 million.
      Q.    Now, over the next little bit we'll spend some time
20    going into those.
            Did you engage in a work plan or series of steps
21    to complete your assignment in this case to come to those
      conclusions?
22    A.    Yes, I did.
      Q.    Let's look at what the plan was.  So -- oh, here's a
23    summary.  I skipped ahead.
            So is this a summary of your conclusions in a
24    chart?
      A.    Yes, this is a schedule that more closely reflects
25    Ms. Dean's calculations and the way she presented them.
      Q.    Okay.  But that same range of 9.4 to $17 million?
```

1    A.    Correct.
     Q.    All right.  Now, let's go back to where I -- let's
2    go back to the work plan.  Did you develop a work plan?
     A.    I did.
3    Q.    Can you just give us a brief overview of the steps
     in that work plan?
4    A.    I familiarized myself with the issues, I read the
     documents, then I analyzed the claims and what I thought
5    the damages were, then I responded in a report and
     summarized my findings in that report.
6    Q.    Now, let's look at what -- what information did you
     review, Mr. Hampton?
7    A.    Well, this is a large litigation, and I've been
     involved in it since 2011 and 2012.  I think most of my
8    work was in -- started in 2012.  So it's been a few years
     ago.
9          There's been a lot of documents produced.
           I've read through the reports of Mr. Dean --
10   excuse me, Mr. Davis, as well as Ms. Dean.  I read over 50
     depositions.
11         There were thousands of pages of documents that
     have been provided by Rimini Street and Oracle in the
12   course of the litigation.  I had a chance to review those.
           The pleadings and interrogatories and different
13   back and forth from the parties during the litigation I had
     a chance to review, and I also did independent research of
14   my own.
     Q.    Okay.  So you reviewed the record in the case?
15   A.    I reviewed the record, then I did independent
     research, which was go out and look at documents that I
16   could find, as well as I had the opportunity to interview
     people at Rimini Street.
17   Q.    Now, who selected what materials you would get to
     review?
18   A.    Well, some of it just comes in the normal course,
     like the complaint and the answer and the interrogatories
19   are generated as the case progresses and the attorneys are
     exchanging information.  That comes to me.  I don't have to
20   ask for it.
           I also identify information that I want to see,
21   and I make requests.  So some of the information I looked
     at was something I actually requested.
22   Q.    And counsel provided that to you?
     A.    Yes.
23   Q.    Did you get everything you asked for?
     A.    I did.
24   Q.    And you had enough to complete your work in this
     case?
25   A.    Yes.
     Q.    Now, let's go to the next step of your analysis.  It

1    says you analyzed Oracle's alleged damages.  Can you tell
     us what you did just generally?
2    A.    Just on a high level, I familiarized myself with the
     claims that Oracle's making against Rimini Street and
3    looked at those in terms of what the appropriate remedy or
     damage amount, damage calculation would be.
4    Q.    All right.  Well, let's look first at the remedies
     for copyright infringement.
5          What did you think about when you looked at the
     remedies for copyright infringement?
6    A.    Well, first I tried to understand exactly what the
     circumstances were of the actual infringement.
7          There's really an important distinction that I
     had to make as to -- on the infringement, does this case
8    involve the actual sale of the copyrighted work, was Rimini
     Street actually palming off or copying and selling the
9    software that Oracle owns, and I found that they hadn't.
     Q.    Okay.  Go ahead.  Let's stop right there.
10         Did you find that Rimini was actually knocking
     off and selling Oracle copyrighted software?
11   A.    I did not.  They are not selling software.
     Q.    And what did you find?
12   A.    I found what Rimini sells is its services.  It has
     an assembled workforce, which is probably its largest
13   asset, it's the people who do consulting work.  That's what
     Rimini sells.  They don't sell software.
14         And the second bullet point on my slide here has
     the direct/indirect.  That's the distinction that I had to
15   make.
           Was this a direct infringement where they're
16   directly selling the software, palming it off, or is it one
     in which they're selling another product but using also the
17   copyrighted work, and that's what I found.
     Q.    And did you find this was indirect or direct
18   infringement?
     A.    I found this was indirect.
19   Q.    All right.  So what types of remedies are available
     in a situation where there's indirect infringement, based
20   upon your experience?
     A.    Thank you.
21         There are a number of different ways you can
     calculate damages for a copyright claim.  I think the most
22   appropriate to look at would be the lost profits, value of
     use, which I hope I'll have a chance to explain a little
23   more, and also lost profits would be Oracle's -- anything
     that Oracle lost.
24         The other side of that coin is how much did
     Rimini make.  So that is the infringer's profit portion of
25   that slide.  Those are the types of damages that you can
     calculate for this type of action.

1    Q.    So as you looked at all the materials in Ms. Dean's
     reports, these are the types of methodologies and practices
2    that you had in mind; is that correct?
     A.    After I had reviewed the record, looked at the
3    pleadings, and understood the case, I pursued them, yes.
     Q.    Then did you look at remedies for interference in
4    this case?
     A.    Yes.
5    Q.    And what did you find?  Let's go to the next slide
     on that.
6    A.    I reviewed the interference claims, and then I
     decided that probably the best approach would be lost
7    profits, but there would be a link between whatever's
     calculated and the actual wrongful acts.
8    Q.    Now, let's go to the next slide.
              There's been a fair amount of discussion of
9    something called but-for causation.  Can you tell us, based
     upon your experience as a damages expert, what is but-for
10   causation?
     A.    Well, it's really a legal term, but what it means in
11   a practical sense is that a damage expert needs to look at
     the evidence and draw a link or a causation link, if you
12   will, between the damage calculated and the wrongful acts.
              And so that's typically done through a but-for
13   statement.  But for this particular act, what would have
     occurred, what did occur?
14            And that way you're actually making sure that
     what you're measuring is the wrongful act and not some
15   other element of the business.
     Q.    Okay.
16   A.    That is the best I can do.
     Q.    And -- that's fine.  We'll spend a little more time
17   on that.
     A.    It's a complicated concept, but in a nutshell.
18   Q.    Whose perspective is the but-for causation question
     asked from?
19   A.    Well, to do an adequate job and do it correctly, it
     really ought to consider the alternatives of both the
20   plaintiff in this case, Oracle, as well as Rimini Street,
     the infringer.
21            So a true reconstruction of the market would
     require looking at both alternatives and everything that
22   they did and would have done.
              You really want a faithful re-creation of the
23   market, and you don't want to interject into the causation
     calculation anything that isn't true or wouldn't have
24   happened.  So you have to be faithful to the facts.
     Q.    And you've tried to do that in this case?
25   A.    Oh, yes, yeah.
     Q.    All right.  Now, with that -- against that

```
 1    background, are we prepared to actually analyze and respond
      to Ms. Dean's report?
 2    A.    Yes.
      Q.    And where did you start?  Where are we going to
 3    start that one today?
      A.    So I guess you want to move on to the database.
 4    Q.    Yes, I think so.  Are you ready?
      A.    Yes.
 5    Q.    So let's get started with that.
                  So you did an analysis of Oracle's database
 6    damages?
      A.    Yes, I did.
 7    Q.    Did you make assumptions regarding it?
      A.    I did.
 8    Q.    What was your assumption?
      A.    Well, first of all, I assumed that the wrongful
 9    acts -- and this is something that I have to do, and all
      damages experts do, is you have to assume that the
10    allegations in the complaint are true, otherwise there
      wouldn't be any damage.
11                So that's just a beginning point of any lost
      profits calculation or any kind of economic remedy is --
12    the parties are contesting a lot of different things, so as
      a damages expert, you have to assume that the plaintiff is
13    going to prevail on each point.
                  It doesn't mean okay.  They actually -- that you
14    have an opinion either way, you just make that assumption.
      So I made those assumptions.
15    Q.    And it was easy to assume here because there's been
      testimony the Court had ruled that the Oracle database
16    copyright had been infringed by Rimini; correct?
      A.    Yes.  At some point I became aware of that.
17                When I first read the complaint, I wasn't aware
      of that, but I did assume that they had actually infringed,
18    and then subsequently it was determined they had.
      Q.    And then in looking at Ms. Dean's report, what kinds
19    of damages was she talking about in her report insofar as
      they related to the Database?
20    A.    Ms. Dean did a value of use and a hypothetical
      negotiation to calculate $19.2 million of what she says
21    Rimini Street would have been willing to pay for the
      licenses that it took.
22    Q.    Did she also do a lost profits analysis and come up
      with the same number?
23    A.    They're very closely related.  So one is just about
      the same as the other in this instance.
24    Q.    Okay.  So what did you then -- after you looked at
      Ms. Dean's opinions, what were your initial conclusions or
25    initial -- did you find any errors in her report?  Let's go
      that way.
```

1       A.     Well, I was struck primarily by the fact that she
included maintenance fees in her calculations.  So -- there
2    were two other errors as well.
                But what struck me right from the beginning was
3    Ms. Dean is assuming in her calculation, or she is assuming
Oracle and Rimini Street is going to come together and
4    negotiate a price for what was taken; that Rimini Street,
who actually provides maintenance, would pay Oracle for
5    maintenance.
                MR. STRAND:  Can we -- can I switch here, or do
6    we need -- to the -- there we go.
BY MR. STRAND:
7       Q.     You recall seeing this slide from Ms. Dean's -- from
Ms. Dean's testimony, Mr. Hampton?
8       A.     I do.
        Q.     And right up here is that support maintenance that
9    she included in her -- in her report?
        A.     That's correct.
10      Q.     And that's what you've just been referring to?
        A.     That's what I was struck by when I initially read
11   through her report.  Excuse me.
                MR. STRAND:  And, Dionna, if we could switch
12   back then.
                THE WITNESS:  Because I don't think that that's
13   appropriate.  I don't think that Rimini Street would pay
for maintenance from Oracle.
14              It would be like your corner mechanic paying the
Ford dealership to work on his car, he can do it himself,
15   and Rimini Street has the capabilities to do it as well.
                So I don't think -- I think that was an error in
16   her calculation.

17   BY MS. DUNN:
        Q.     What about the second error?  Tell us about that.
18      A.     I didn't see that she gave any consideration to the
alternatives to using the Oracle database.
19              There's a Microsoft product, IBM, and others
have other types of products that work as well, and I
20   didn't see that she gave sufficient consideration to the
alternatives.
21              If Rimini Street and Oracle were sitting in a
conference room negotiating what Rimini Street should pay
22   for these licenses, I don't think she considered that at
some point, if the price was too high, that Rimini Street
23   would just say, you know what, we'll use SQL Server of
Microsoft, we just can't afford you.  And she didn't
24   consider those alternatives.
        Q.     And in thinking about that just recently, did you
25   recall Mr. Allison's testimony that there were database
products available on the market, including Microsoft SQL

1   and IBM DB2?
    A.    That's where I became aware of it, as well as in my
2   initial work.
    Q.    All right.  What was the third error?
3   A.    Well, I think we heard today that there's a
    controversy of whether it would be two licenses that would
4   be required or 72.
                This is a hypothetical negotiation, and so I
5   think if Rimini Street could operate with two, they would
    be making a persuasive argument that they didn't need 72
6   licenses.  On the other hand, they actually used 72.
                So I think it needs to be considered, and I
7   think ultimately the jury will decide which is the
    appropriate number.  So I've made my calculation to include
8   both.
    Q.    And the two licenses, is that based upon what you
9   talked to Mr. Klausner about a few years ago and then heard
    him testify about this morning?
10  A.    Did you say Mr. Hilliard?
    Q.    Excuse me.  Actually, Mr. Hilliard.  I got it wrong.
11  A.    That's okay.
                Yes, it was Mr. Hilliard that I spoke with.
12  Q.    All right.  Have you done the calculation, then,
    using what you've learned, the errors that you found, and
13  what you learned from Mr. Hilliard?
    A.    Yes, sir.
14  Q.    All right.  Let's look at the next slide.  It's got
    a lot on it.  So why don't you explain here what's going
15  on.
    A.    Sure.  It looks busy, but it's not very difficult to
16  follow.
                So the low end of the range that I calculated
17  assumes two licenses.  I assumed the same price that
    Ms. Dean included in her calculation, and that was 47,500
18  per instance.  So that -- with two licenses, that would be
    $95,000.
19              I also deducted the cost that Oracle would not
    have to pay because they actually didn't sell the software,
20  and this -- I believe, again, Ms. Dean assumed 5 percent, I
    followed her lead, so I deducted 5 percent.
21              So had the two parties come together and
    negotiated, and they decided on two instances of license, I
22  think the appropriate amount would be $90,250.
                On the other hand, at the high end of the range,
23  I did exactly the same thing except I assumed 72 separate
    licenses, and that amount came to $2,964,000.
24  Q.    So the difference is between assuming two licenses
    or 72 licenses.
25  A.    Correct.
    Q.    Okay.  Done with the Oracle Database damages in your

1  opinion?
   A.    Correct.
2  Q.    Let's move on to PeopleSoft, JD Edwards, and Siebel.
   Okay?
3  A.    All right.
              MR. STRAND:   Could we go to the next slide.
4
   BY MR. STRAND:
5  Q.    So we're all the way to that fourth button.  Let's
   go to the next slide.
6              When you looked at the PeopleSoft, JD Edwards,
   and Siebel issue, alleged damages in this case, what did
7  you first look at?
   A.    Well, again, I started with Ms. Dean's report.
8              She calculated $194 million is what she says
   Oracle lost because of Rimini Street's wrongful actions,
9  which include the infringement claims as well as the
   interference claims.
10 Q.    And those damages are in what form, sir?
   A.    Well, this is a really important point.  They're in
11 the terms of lost customers.  So Ms. Dean's analysis
   focuses almost exclusively on lost customers.
12 Q.    And the profits relating to sale that could have or
   should have been made to those customers?
13 A.    Correct.  Well, it's the maintenance fees from those
   customers.
14 Q.    Now, before you started your analysis of Ms. Dean's
   damages opinion, did you make any assumptions, sir?
15 A.    Yes, the same assumptions I made at the beginning.
   I'm assuming liability.  So I'm assuming that the
16 infringement actually occurred, I assumed that the
   interference actually occurred.
17 Q.    Now, did you start out by looking at Ms. Dean's
   opinions?
18 A.    I did, yes.
   Q.    And what did you note when you looked at Ms. Dean's
19 opinions?
   A.    Well, principally and most importantly, she's
20 decided that she would calculate damages based on lost
   customers, and I take exception to that.
21             And she assumes that 95 percent of Rimini's
   customers would have stayed with Oracle but for the
22 wrongful acts.  And I think that's an error, principally
   because she has an underlying assumption that she believes
23 that Rimini Street couldn't have existed without the
   infringement or the interference, and I don't agree there
24 as well.
              So I think the reason why her number is so large
25 is because she's assuming that Rimini's customers would be
   Oracle's customers.  But there really isn't any evidence to

```
 1    that effect.  She's just saying circumstances allow for
      that, but I don't agree at all.
 2                  So she's essentially saying that Rimini Street
      caused Oracle to lose customers.  What she really should be
 3    saying, and I prepared slides on it so we can talk about it
      later, is that she should be thinking about whether their
 4    wrongful conduct caused Rimini's customers to leave or not.
                    She didn't isolate her calculation to just the
 5    wrongful acts, she's looking at Rimini Street in its
      entirety.
 6    Q.    Now, did you prepare kind of an overview chart to
      show what you did in analyzing those lost profits?
 7    A.    I did.
      Q.    Let's see if we can jump to that.  Perfect.
 8                  So this is the overview of what we're going to
      talk about for the next little while; correct?
 9    A.    Correct.
      Q.    And why don't we not talk about what we're going to
10    talk about, let's just talk about what we're going to
      talk about, okay?
11                  Let's look at but-for causation.  You'll recall,
      just so we can reset here --
12                  MR. STRAND:  Dionna, if I could trouble you
      again --
13    BY MR. STRAND:
      Q.    You recall this is one of Ms. Dean's slides?
14    A.    Correct.
      Q.    And she talked about Oracle's support revenue it
15    would have received but for the infringement/bad acts?
      A.    Yes.
16    Q.    All right.  And you heard Ms. Dean testify -- let me
      make sure I get it right, her but-for question was,
17                  "So how would Oracle have looked" -- her answer
      is, "How would Oracle have looked if Rimini hadn't done
18    what Oracle complains about in this case?"
                    That was her but-for statement.
19    A.    Yes.  And she states something similar here, I
      believe.
20    Q.    Do you agree with that but-for statement?
      A.    I agree with the statement, and I think it's really
21    important, it's a point that the jury needs to understand.
                    I hope I can communicate it well because this is
22    what damages experts do, we calculate damages, and so to do
      that, we have to create the right but-for scenario and
23    re-create the market.
                    And so I agree that the correct measure of
24    damages would be what would Oracle look like but for Rimini
      Street's wrongful acts.
25                  And Ms. Dean talks about that, and she actually
      wrote it in her report, but her schedules and the work that
```

1    she does doesn't follow that same but-for.
              What she's following is but for Rimini, Oracle
2    would have looked like next.  So she's saying everything
     that Rimini does is accused and wrong and it caused
3    Oracle's loss.
              She should be looking at just the wrongful acts,
4    what was the impact of infringement, what was the impact of
     the interference.
5    Q.    Okay.  So it's but for Rimini, not right; but for
     Rimini's wrongful acts, right?
6    A.    That's correct.
              MR. STRAND:  Let's switch back, if we could,
7    please, Dionna.  I'm going to give you a workout, not too
     much, I hope.
8    BY MR. STRAND:
     Q.    And so in undertaking that analysis, now that we've
9    set on what but-for means, let's look at the next slide.
     A.    Sure.
10   Q.    And you first started talking about customer
     behavior; right?
11   A.    That's correct.
     Q.    Now, in analyzing customer behavior, what behavior
12   of customers -- of Oracle customers did you specifically
     consider?
13   A.    I was interested in whether Oracle lost more
     customers during the period of time that Rimini was
14   operating.
              And Oracle keeps very good records on the number
15   of its customers and the amount of revenue that it earns,
     and it tracks how many of its maintenance customers leave
16   year by year.  So that information was available, and I
     looked at it.
17   Q.    And this is the -- so can you -- this is a document
     that the jury's already seen.  It's part of the pretrial
18   stipulation.  And I believe it comes from some of Ms.
     Dean's work.
19            Can you tell us what this chart shows.
     A.    Excuse me.  Yes, I can.
20            So, this chart shows years 2006 through 2011 on
     the darkened row.  And then right below that it has three
21   rows, one for PeopleSoft, one for JD Edwards, one for
     Siebel, and then it has ratios.
22            So if you look at the 2006 column in the
     PeopleSoft row, you see 94 percent.  What that means is in
23   2006 Oracle kept 94 percent of its customers, which also
     means that it lost 6 percent.
24            And this was the first year Rimini started.
     Rimini had seven customers.
25            This -- and number of customers leaving Oracle
     would be in the hundreds, because they had thousands of

1    customers.  So they were losing hundreds of customers in
     2006 on PeopleSoft.
2    Q.    Did you create another graphic to show this in a
     graphic way?
3    A.    If we could just stay here one second longer.
     Q.    Sure.
4    A.    I'd like to move across the row on PeopleSoft.  And
     you can do the same for the other two as well.
5          If you look at how many customers they lost in
     2006, they lost 6 percent.  They kept 94, they lost 6.
6          If you look across the row and you get to 2011,
     they're actually losing fewer customers during this period
7    of time, and this is the period of time that Rimini's
     supposed to be taking customers away from them.  But in
8    reality they're holding on to more customers than they were
     before Rimini started.
9    Q.    Okay.  And did you prepare a graphic of that?
     A.    One has been prepared by the graphics people.
10   Q.    Is this basically the same data, just expressed with
     a bar chart?
11   A.    It's more visual, but it's the same information.
           It shows that the 94 percent in the gray, those
12   are the customers that stay, and then it has the customers
     that leave in the red, and you can see over time that it
13   actually improves.
           They're losing fewer customers during the time
14   that Rimini Street began operations, not more.
     Q.    And do you recall Ms. Ransom's testimony about JDE
15   that this same 95 percent or so of the customers were
     retained every year going all the way back to the mid '90s?
16   A.    And that's in support of my earlier testimony that
     Oracle has kept these records very well back in time.  So
17   you can go back and look back in time.
           And they have had approximately 5 percent loss
18   of customer year after year after year based on the
     records.
19   Q.    Now, let's look at one more graphic, one more way to
     think about this.
20         So can you explain this to us?
     A.    This is another visual.  It just makes it easier to
21   interpret-ate the ratio.
           So what we have is a hundred different customers
22   on this spread -- not spreadsheet, but on the
     demonstrative.
23         The ones in black are the ones that stay.  The
     ones in red leave.  So if you assume this is 2006, in 2006,
24   all of the black customers in black ink, they stayed, the
     ones in red ink are the ones that leave.
25         Every year they lose 6 for every hundred
     customers they have, and that happens year after year.

|   |   |
|---|---|
| 1 | It's called their churn, and they monitor it very closely. |
|   | BY MR. STRAND: |
| 2 | Q.    All right.  Let's move forward to the next slide, |
|   | 29.  Based upon your look at the attrition of the customers |
| 3 | from Oracle, were you able to draw some conclusions? |
|   | A.    I was, yes. |
| 4 | Q.    And does this help you explain that to the jury? |
|   | A.    Yes, it does. |
| 5 | Q.    And please do that. |
|   | A.    Well, it's just one more picture of the same |
| 6 | information.  It shows the 94 or 95 percent people who stay |
|   | in gray and the 5 percent each year that leave. |
| 7 |             What Ms. Dean has done in her calculation where |
|   | she's focused exclusively on customers is she's taking too |
| 8 | many of the customers out of the gray; in fact, probably |
|   | most of what she's doing is taking them from the gray. |
| 9 |             She hasn't considered that they could all come |
|   | from the red, that the people that are leaving left and |
| 10 | they're using Rimini Street, but they could have gone |
|   | anyway.  She hasn't considered that. |
| 11 | Q.    All right.  Now, let's move on to the next point of |
|   | your analysis.  Did you look at customer dissatisfaction? |
| 12 | A.    I did. |
|   | Q.    And what did you find? |
| 13 | A.    Well, I think the record is very complete that there |
|   | were many customers -- |
| 14 |             MR. ISAACSON:  Objection, Your Honor.  His |
|   | report does not say this. |
| 15 | BY MR. STRAND: |
|   | Q.    Well, let's backtrack.  Let's not talk about record |
| 16 | complete.  I'll take it in little smaller steps. |
|   | A.    Sure. |
| 17 | Q.    Why is customer dissatisfaction important to your |
|   | opinions in this case? |
| 18 | A.    Because I think it defeats Ms. Dean's causation |
|   | argument where she's saying the customer would have stayed |
| 19 | with Oracle and not stayed with Rimini. |
|   | Q.    How so? |
| 20 |             BY MR. STRAND: |
|   | Q.    As a part of your analysis, Mr. Hampton, were you |
| 21 | able to look at documents produced by Oracle in this case? |
|   | A.    Yes. |
| 22 | Q.    And do those documents relate to customer |
|   | dissatisfaction? |
| 23 | A.    Yes, they do. |
|   | Q.    Let's look at Defendants' Exhibit 278, which I |
| 24 | understand has been preadmitted. |
|   |             COURTROOM ADMINISTRATOR:  Defendants? |
| 25 |             MR. STRAND:  Yes, DTX 0278. |
|   |             COURTROOM ADMINISTRATOR:  Yes, it's preadmitted |

3791

1    by stipulation.
              BY MR. STRAND:
2     Q.    Let's look at -- let's get your report, Mr. Hampton,
     specifically paragraph 140.  That's in the notebook.
3     A.    I'm sorry.  I was waiting for it to come up on the
     screen.  I apologize.
4              COURTROOM ADMINISTRATOR:  Which one is that?
              MR. STRAND:  It's just his report.  It hasn't
5    been marked as an exhibit, but since reference was made to
     paragraph 140, I figured that would be the best place to
6    go.
              THE WITNESS:  Did you say paragraph --
7              MR. STRAND:  Paragraph 140 on page 78 of your
     report.
8              THE WITNESS:  May I take a moment to look at
     that?
9              MR. STRAND:  Sure.
              THE WITNESS:  Thank you.
10   BY MR. STRAND:
      Q.    In that portion of your report you refer to one
11   customer.  What is the name of that customer?
      A.    XO Communications.
12    Q.    And based upon your review of the record, what was
     your conclusion about whether or not XO Communication was
13   dissatisfied with Oracle?
      A.    Based on my review, I believed that they were
14   dissatisfied.
      Q.    And did you place reliance on a specific document in
15   reaching that conclusion there in footnote 301?
      A.    Yes, it's document ORCLRS0252392.
16             MR. STRAND:  Could we bring up Exhibit 268, DTX
     268, please?  Don't show it.
17             Has that one been admitted yet?
              COURTROOM ADMINISTRATOR:  It was, by
18   stipulation.
              MR. STRAND:  Okay.  So we can show that.  It has
19   been admitted?
              COURTROOM ADMINISTRATOR:  Yes.
20             MR. STRAND:  Okay.  Thank you.
     BY MR. STRAND:
21    Q.    Looking down there, about two-thirds of the way down
     the page on the right-hand side, it says Brief Background
22   at Oracle Account.
      A.    I'm unable to read the document on the screen.
23             MR. STRAND:  I know.  We're working on it.
              Down a little further, Marie.  Down a little
24   further.  Brief Background on Oracle Account.
              Can you get that whole row for us, Marie?  One
25   down.  Brief Background on Oracle Account.  Perfect.
     BY MR. STRAND:

3792

1    Q.    All right.  This is something you cited in your
report, correct, Mr. Hampton?

2    A.    Yes, it's in the footnote you asked me to read.
     Q.    Can you read that -- what Oracle says about its

3    relationship with XO?
     A.    Yes.

4          "Since the Siebel and MetaSolv acquisitions, XO
has been decreasingly satisfied with what they feel is a

5    lack of value from their maintenance dollars.  Specifically
on the Siebel side, Oracle has tried to get XO to pay for

6    ACS to analyze the XO Siebel environment, and to date XO
has rejected the idea."

7          Do you want me to continue?
     Q.    Sure.

8    A.    "As a result, when they enter an SR that Oracle
feels is related to their environment, it gets either

9    rejected as 'not a problem' or changed to an enhancement.
Eventually these issues are escalated to Rob and when he

10   gets involved, we at Oracle scramble to get someone onsite
to take a look at the issue."

11   Q.    And did you -- later in that same document there's a
strategic information section.  Let's go down a page or

12   two.  Or, excuse me, I'll get you there.
           It's a different document.  Let's just go to the

13   next page, page 293.
           It says their CIO there, right -- virtually in

14   the middle in that paragraph?
     A.    You'll have to blow it up a little bit larger.  This

15   monitor is a little fuzzy.
     Q.    That first paragraph under Briefing Questions, on

16   the right-hand side, Strategic Information.  There, I found
it.

17         Can you read the Strategic Information section
that you included in your report regarding XO.

18   A.    Yes, I would be happy to.
     Q.    Go ahead.

19   A.    "XO spends over $5.2 million annually in support.
They are the 20th largest Siebel customer in North America

20   and serve as a MetaSolv reference.  Below are specific
issues we have recently dealt with; however; the root of

21   the problem is more philosophical with regards to our
Siebel support model and approach to the strategic

22   partnership.  Their CIO, Rob Geller, feels like we are
'nickel and diming' him because every time they have an

23   urgent issue we tell them they need to pay for Expert
Services to diagnose and/or fix the problem.  It's not so

24   much the money for the ACS work that is the issue.  It's
the perception of bad customer service and support.  Rob

25   has requested a meeting with Juergen to present his views
on the situation."

```
 1              MR. STRAND:  Let's go to the next page, 94,
        dealing with XO in the same document; right?  Page 94.
 2      There we go.  But four lines up on the right-hand side,
        "The maintenance dollars."
 3              Sorry, four lines up on the right-hand column.
        It's right there.  There you go.  "The maintenance
 4      dollars."
                Can you get that one larger for us, Marie?
 5      BY MR. STRAND:
         Q.   Can you read that one for us as well out of this
 6      same document, Oracle document.
         A.   Just to make sure I'm reading the right portion --
 7       Q.   You got it.
         A.   It starts with "the maintenance dollars for Seibel"?
 8       Q.   Right.
         A.   "The maintenance dollars for Siebel are at risk as
 9      mentioned above.  Also, until the perception that XO has
        about Oracle is changed, they are unlikely to spend any
10      additional dollars with Oracle for other products and
        services."
11       Q.   Okay.  Now, did you also have occasion in your
        report to discuss another company, looking at paragraph --
12
                THE COURT:  Ladies and gentlemen, just to
13      clarify one issue here, Mr. Hampton is entitled to testify
        what he has based his opinions on.
14              And, for example, he has referred to a statement
        from a representative of XO Communications.  He's entitled
15      to testify to that concerning what his opinion is based on.
                But, by the same token, the statements from --
16      by someone from XO Communications are not as though you've
        heard the witness testify here in the courtroom.
17              This is just information Mr. Hampton has relied
        on, and that's the limited purpose for which it is
18      admitted.  So you are not to assume that this is testimony
        presented from an XO Communication witness in the courtroom
19      before you.
                Thank you.
20              MR. STRAND:  Thank you, Your Honor.
        BY MR. STRAND:
21       Q.   Moving along, Mr. Hampton, if you look with me at
        paragraph 144 of your report, you mentioned another
22      dissatisfied customer; correct?
         A.   Yes.
23       Q.   And what's the name of that company, sir?
         A.   Bausch & Lomb.
24       Q.   What do you understand Bausch & Lomb to be?
         A.   Bausch & Lomb is a lens manufacturer and optics
25      company.
         Q.   And looking at your report, 144, I'll give you a
```

```
 1    moment if you wish, why did you conclude that Bausch & Lomb
      was a dissatisfied customer?
 2       A.    Based on the record that I saw, they were unhappy
      with Oracle, and I believe -- I'll just have to look at the
 3    reference here.
                I had the opportunity to review the deposition
 4    transcript of the representative.
         Q.    And who is the representative, sir?
 5       A.    Mr. Baggett.
         Q.    What was his first name?
 6       A.    Brian.
         Q.    Okay.  So you looked at Mr. Brian Baggett's
 7    deposition in this case?
         A.    That's one of the 53 depositions I had a chance to
 8    read.
         Q.    And what did you conclude based upon your review of
 9    Mr. Baggett's deposition and other items relating to
      Bausch & Lomb?
10       A.    In his deposition he was asked, if Rimini was not a
      available support option, would Bausch & Lomb go back to
11    Oracle, and Mr. Baggett said it was unlikely.
         Q.    Now, in your report, did you also reference a market
12    survey prepared regarding Oracle?
         A.    I believe I did, yes.
13       Q.    And was that by an outfit called Piper Jaffray?
         A.    Yes, I recall it.
14             MR. STRAND:  Let's get that up in front of the
      witness, but not on the --
15             MR. ISAACSON:  Could I have a --
               MR. STRAND:  I'm trying to get it here real
16    quick.
      BY MR. STRAND:
17       Q.    All right.  What is Piper -- I'm sorry, it's 2 --
      372, DTX 372.
18             Looking at DTX -- don't put it on the screen,
      please.
19             Looking at DTX 372, can you tell us who Piper
      Jaffray is?
20       A.    Piper Jaffray is a market research company.
         Q.    And are they a source to which you commonly refer in
21    doing your work on damages cases?
         A.    They are a well-established and well-recognized
22    market research company.
         Q.    And based upon your review of the Piper Jaffray --
23    well, what was that Piper Jaffray report?
         A.    Piper Jaffray actually did a study of third-party
24    support for Oracle's maintenance.  It was the maintenance
      portion.
25             So they did a study where they went out and
      interviewed customers and asked questions about third-party
```

```
 1    support companies like Rimini Street and how the market was
      situated at that time.
 2    Q.    And what was the date of that report?
      A.    You're testing my recollection.  I don't recall.
 3    Q.    Well, and I don't mean to make this a memory test.
                In your file, in your folder up there, your
 4    book, is the Exhibit 278.  Because it has not been admitted
      as evidence, we're not showing it to the jury.
 5    A.    278?
      Q.    278.  The Piper Jaffray report.  DTX 278.  Excuse
 6    me.  I apologize.  372.
      A.    372?
 7              COURTROOM ADMINISTRATOR:  278 was preadmitted.
                MR. STRAND:  By the stipulation.
 8              COURTROOM ADMINISTRATOR:  372 is not.
                MR. STRAND:  372 is not.  Okay.  So 372 is not
 9    in.  I crossed up on my note.
                THE WITNESS:  Should I be going to a particular
10    tab?
                MR. STRAND:  Go to 372.  It's not admitted so
11    we're not going to put it on the screen.  This is the Piper
      Jaffray report.
12         (Discussion held off the record.)
                THE WITNESS:  You asked me the date?
13    BY MR. STRAND:
      Q.    Yeah, what's the date of the Piper Jaffray report?
14    A.    July 2011.
      Q.    And were there particular portions of this report
15    that you relied on in forming your conclusions that Oracle
      customers were dissatisfied?
16    A.    Yes, I reviewed this document and looked at it.
      Q.    Looking at the first bullet point, was there
17    anything in that -- on page 1 of that document, was there
      anything that struck you as indicating that Oracle
18    customers were dissatisfied?
      A.    Yes.
19    Q.    And what was that?

20    BY MR. STRAND:
      Q.    Well, now, let's skip down to Customer Options if we
21    could, please.
      A.    My monitor isn't --
22    Q.    Okay.  There we go.  Customer Options.
                Did you consider the options that Oracle
23    customers had, sir?
      A.    I did.
24    Q.    And how did you consider those?
      A.    I looked at evidence in the record and looked at
25    what a customer that was leaving -- well, we know customers
      were leaving because 5 percent left every year, so they had
```

1    to go somewhere, and they had been going somewhere for a
     long time.
2              So I reviewed the evidence, looked at the
     different reports and documents, and concluded that
3    certainly customers could self-support if they wished.
               They could -- I think there's a slide, the next
4    demonstrative.
     Q.    Let's go to the next -- what did Ms. Dean say, if
5    anything, about customer options in her report?
     A.    Sure.  Ms. Dean said that a customer may hire a
6    third-party servicer to provide consulting or support
     services to the extent permitted by the customer's license.
7              So Ms. Dean acknowledged that a customer could
     leave Oracle and use the third-party provider, consultant,
8    or a company like Rimini Street.
     Q.    And have we developed a slide showing what some of
9    the support options for customers leaving Oracle might be?
     A.    And this next slide will be what I was just saying,
10   that they could self-support if they wish.
               They could go to a consultant and use a
11   consultant to help them self-support, or they could use a
     third-party provider.
12             I don't mean these are the only options.  These
     are three options, but there were three others.
13             I guess I should wait for a question.
     Q.    I ask the questions.  You don't get the chance.
14             Now, then let's look at infringing versus
     non-infringing conduct.  What do you mean by that, sir?
15   A.    Well, I think this is a really important point is,
     when forming a damage calculation and doing the analytics
16   of what steps myself, or anyone who is calculating damages,
     would do, is to make sure that what you're measuring is
17   what you intend to measure.
               And this is where I think Ms. Dean and myself
18   part ways with regards to damages, is she's looking at the
     wrongful acts, the infringement, the interference.
19             And she's saying that's their business model,
     they couldn't exist without doing those things, but she
20   doesn't provide any evidence to that effect, she just says
     it, when, in fact, I think the business model is more about
21   the people at Rimini Street.
               Their greatest asset is their assembled workers,
22   their IT people.  People have more than 10 years of
     experience, I think.  I was in the courtroom for the
23   testimony of the --
               MR. ISAACSON:  Objection, Your Honor.
24             THE WITNESS:  -- PSEs -- I'm sorry.
               MR. ISAACSON:  He's commenting on testimony.
25             MR. STRAND:  Let's not go --
               THE WITNESS:  I'm sorry.

```
 1   BY MR. STRAND:
         Q.    Now -- and I neglected one slide.  It was out of
 2   order.
               Let's look at the responses to the first
 3   interrogatories with regard to other options that Oracle
     customers might have.
 4       A.    Sure.
         Q.    Do you recall considering Oracle's answer to one of
 5   Rimini's interrogatories or questions to Oracle in the
     litigation?
 6       A.    I do.
         Q.    And what did Oracle say there at -- beginning at
 7   line 15 in its answer to an interrogatory?
         A.    Starting with "accordingly"?
 8       Q.    Yes.
         A.    "Accordingly, based on this limited review, Oracle
 9   believes that Spinnaker's current support practices for JD
     Edwards customers are provided permissibly."
10       Q.    And I'm sorry to take that out of order, but I
     didn't want to forget about it.
11             So you've got infringing versus non-infringing
     conduct.  How did that affect Ms. Dean's valuation in your
12   opinion, sir?
         A.    Well, it's an extremely important point.  What is
13   she is valuing?  She is valuing customers.
               I think that's an inappropriate approach because
14   what she should be looking at, and what she said she was
     going to look at in her but-for statement was the wrongful
15   acts, the infringement and the interference.
               But customers don't go just for those features
16   of Rimini Street.  They're there because there are
     experienced people, PSEs and people who know those programs
17   because they're ex-PeopleSoft, Siebel, JD Edwards
     technicians.  They've got years and years of experience.
18             Ms. Dean doesn't give any credit to the good
     parts of Rimini Street.  She's focused almost entirely on
19   the bad.  Therefore her numbers are measuring the wrong
     thing.
20             She's measuring the value of Rimini Street, the
     value of Rimini Street customers, when she should be
21   focusing her analysis on what is the appropriate remedy for
     the infringement and the interference, and she should have
22   isolated her calculations to just those items.
               She shouldn't be measuring the assembled
23   workforce at Rimini Street because Rimini Street has a
     right to compete, it has a right to hire employees that
24   were past PeopleSoft or JD Edwards employees, and that's
     the business model that they employ.
25             That's why people go to Rimini Street is because
     of that experience of its assembled workers.
```

```
 1    Q.    All right.  So let's -- let's -- did you look at the
      services that Rimini Street offers?
 2    A.    I did.
      Q.    Let's go to the next slide.
 3          And is that an outline of what Rimini Street
      offers?
 4    A.    Yes, it is.
      Q.    And the concierge service, we've heard a lot about
 5    here.
      A.    We have.
 6    Q.    And does that involve something called PSEs?
      A.    Those are the primary support engineers.
 7    Q.    And we've heard testimony about that, we won't
      repeat it, but that's what we've got depicted on the next
 8    page?
      A.    Correct.
 9    Q.    And have we met any primary support engineers during
      the last couple weeks?
10    A.    I was in the courtroom for the testimony of Shelley
      Black --
11          MR. ISAACSON:  Objection, Your Honor.
            THE WITNESS:  Black -- I don't remember her
12    name.  She was from Florida.  I remember she was from
      Florida.  And she testified --
13          MR. ISAACSON:  Objection, Your Honor.
            THE WITNESS:  I'm sorry.  I can't do that.
14          MR. STRAND:  Just the name.
            THE WITNESS:  I'm sorry.
15    BY MR. STRAND:
      Q.    All right.  Moving on.
16          Now, you said also you considered relevant
      economic factors including price and demand.  Can you tell
17    us about what you considered in reaching your conclusions
      about economic factors and its effect on Ms. Dean's lost
18    profit analysis?
      A.    Yes.  I think we all recall that in 2008 and '9
19    there was a large recession, probably the largest since
      World War II.  Those were difficult times.
20          Many of Oracle's customers, as everyone else,
      was suffering during 2008 and 2009, and were struggling to
21    stay profitable because the economy took a severe dip.
            I didn't see that Ms. Dean really gave a lot of
22    consideration in her analysis to the fact that some
      companies were financially strapped and having a hard time
23    making ends meet.
      Q.    And did you -- strike that.
24          When you did your report, were you under -- what
      was your impression regarding whether or not Oracle
25    discounted maintenance and support services?
      A.    I recall reading the deposition transcripts, and I
```

1    gained the understanding that Oracle doesn't give any
     discounts, they don't change the fees.
2             So if a program costs a million dollars, then
     the maintenance fees would be 22 percent of that, over
3    $200,000 a year for maintenance, and so that's a large
     expenditure for a company, and that could be a small one.
4             So --
     Q.    Now, were you able to conclude also where the Rimini
5    50 percent discount came from --
     A.    Sure.
6    Q.    -- as a part of this economics?
     A.    Yes.  I read Ms. Dean's report.  She claims that the
7    only way that Rimini Street could provide its price at 50
     percent of the Oracle price was through the wrongful acts,
8    but she didn't provide any support for that.  It's just a
     statement she claimed, but she didn't have any support or
9    backing for that.
              I looked at what the amount of profit was
10   available to Rimini Street and whether or not they could
     have been profitable in a non-accused way.
11            And what I found was -- the real important point
     is that Oracle's charging profits of 95 percent, their
12   profit margin is 95 percent.  There's a lot of money in
     their price.
13            And so Rimini Street can set its price at half
     of Oracle's, and there's still a lot of profit, and they --
14   and that's why they're in the market.
              And that's why the ex-employees are working for
15   Rimini Street is because they can provide the service, and
     because Oracle's price is so high that they can discount
16   their price to 50 percent and still make a healthy profit.
     Q.    Now, based upon the analysis that we've talked about
17   for the last several minutes, Mr. Hampton, were you able to
     form a conclusion regarding Oracle's lost profits damages?
18   A.    Yes.  I don't think that Oracle actually has lost
     customers or profit.
19            I think Rimini Street has benefitted through its
     use, but as far as Ms. Dean's calculation of damage, I
20   think that she's measuring the wrong thing.
              She's measuring customers.  But those customers
21   wouldn't have gone back to Oracle, they would have stayed
     at Rimini Street, and so that's a fundamental error in her
22   calculation.
              She starts in the wrong direction.  She's
23   beginning her calculation looking strictly at customers,
     and because she does that, she's picking up value for
24   Rimini Street's assembled workers, for the PSEs and all the
     good that Rimini does, as well as bad, she's got in her
25   calculation.  That's why her calculation's wrong.
     Q.    Okay.  And your conclusion is no lost profit

1    damages?
     A.    I don't believe that Oracle lost profits because of
2    the infringement or the interference, and that's what I
     focused on, is what I think we should focus on.
3    Q.    Other than lost profits, you mentioned early on
     possible value-of-use damages or damages based on Rimini's
4    profits.  Can we turn to Rimini's profits now for a few
     minutes?
5    A.    Sure.
     Q.    Can you explain the concept from the damages from
6    Rimini's perspective of the infringer's profits or Rimini's
     profits based on your experience --
7               THE COURT REPORTER:  Excuse me --
                MR. STRAND:  I'm sorry, I'll slow down.  I was
8    doing pretty well.  I'll try again.
     BY MR. STRAND:
9    Q.    Based on your experience, Mr. Hampton, can you
     explain what the concept of infringer's profits is as a
10   remedy in a copyright case?
     A.    Yes.  It goes back to the copyright statute, which
11   is really the beginning point of calculating damages, like
     it is with the Patent Act, if you're calculating patent
12   damages, start with the Patent Act.
                The Copyright Act says that the copyright owner,
13   if there's actually infringement, is entitled to its own
     lost profits.
14              We've identified that Oracle hasn't lost any
     profits, they actually kept more employees -- or customers
15   during the infringement period than they were before.  So
     there's no basis for a lost profits calculation.
16              So the Copyright Act, from the perspective of a
     damages expert and most of the people that do what I do,
17   have a different remedy as well.
                There's -- the statute allows for a look at the
18   infringer.  So if you don't have lost profits for the
     owner, then maybe you look at, well, how did the infringer
19   benefit, and that can be a remedy as well.
                In this case, I think it's more appropriate than
20   lost profits because we can't establish that Oracle
     actually lost any customers.
21              So it's the infringer -- an accounting of the
     infringer's profit is what we're going to go over next.
22   Q.    All right.  So let's look at -- well, let's start
     out with the slide we saw this morning from Mr. Zorn.  We
23   won't go through this.
                MR. STRAND:  42.  There we go.
24   BY MR. STRAND:
     Q.    We went through this with Mr. Zorn.  You were in the
25   courtroom.  Is this the way you get from gross revenue,
     though, to net profits?

1  A.    Yes, sir, it is.
   Q.    Okay.  And that's what you used in your analysis in
2  this case?
   A.    I did an accounting.  I looked at the financial
3  records for Rimini Street --
   Q.    And did you look at --
4  A.    -- and what their benefit was.
   Q.    Did you look at the financial accounting for the
5  whole company first?
   A.    I did.
6  Q.    And let's look at the DTX 3019 which was admitted
   this morning.  Can you explain -- this is the income
7  street -- Inc. -- income statement summary for January
   through -- of 2006, through February 12, '14?
8  A.    Correct.
   Q.    And based on that income statement, what was the
9  total profit or loss for Rimini for all product lines for
   that time period?
10 A.    Over that time period, the company lost $63,159,855.
   Q.    Did you also have occasion to look at Rimini's
11 profits or losses on just the three product lines at issue
   in this case?
12 A.    Yes, sir, I did.
   Q.    Let's look at DTX 3018, final column there.  This is
13 the income statement for those three profit lines -- three
   product lines; correct?
14 A.    That's correct.
   Q.    And what was your finding when you looked at that?
15 What was Rimini's profit or loss from the three product
   lines at issue in this case during the relevant time
16 period?
   A.    $23,529,448.
17 Q.    Loss or profit?
   A.    That's a loss.
18 Q.    Did you do another calculation after looking at
   these numbers, sir?
19 A.    Yes, I did.
   Q.    And why did you do that?
20 A.    Well, going back to the patent statute and the
   different remedies, we can look at Oracle's lost profits,
21 which there were none, and then we can look at the
   infringer's profit.
22         Well, if the infringer doesn't make a profit,
   bottom line, that can be overcome by just not deducting all
23 the costs.  All the costs don't have to be deducted in
   order to calculate a remedy.
24         So I looked at the financial statements, and I
   selected to not deduct the least direct cost, the overhead
25 costs, the IT costs, but I did deduct the direct labor, the
   cost of providing the service, from their financial.

1        So, instead of a $23 million loss, if I don't
deduct some of their costs, I arrive at a profit, a gain.

2    Q.    So what is your opinion, sir, regarding whether or
not Rimini had a profit from the infringement in this case?

3    A.    Well, they didn't have any profit.  They were
negative on net profit, so they weren't profitable.

4    Q.    Okay.  Now, you concluded Oracle didn't have lost
profits and that Rimini made no profits.  Is there any

5    other alternative remedy available to Oracle for Rimini's
infringement?

6    A.    Yes, there is.

     Q.    And what's that called?

7    A.    That would be a value-of-use calculation.

     Q.    And what do you mean when you say value of use, sir?

8    A.    This is another approach to calculating damages.
It's the third approach we discussed.

9        You can look at Oracle's lost profits.  They
weren't there.  You can then look at the infringing profits

10   which we've just done.

         The next available approach would be the most

11   efficient to get to what exactly was the value of the
wrongful acts.

12       You can look specifically at what was the value
of the infringement and what was the value of the

13   interference and make a calculation.

     Q.    And have you done that in this case?

14   A.    Yes, I have.

     Q.    And let's -- tell us what this first slide is that

15   we've got in front of us.

     A.    This is a step-by-step overview of the procedures

16   that I went through in order to use the value-of-use
approach in this particular case.

17   Q.    So, first, did you isolate the accused infringing
acts?

18   A.    Yes, I did.

     Q.    Let's look at the next slide.  And is this the

19   misconduct in this case that you identified, sir?

     A.    It's also the wrongful acts from the beginning I

20   assume are true and -- are true and enforceable, I guess,
is the word I'm struggling to find.

21       So I assumed all of these actually occurred,
this underlying assumption, the blue misconduct column.

22   Q.    Now, did you also then look at whether there were
efficiencies from practicing those -- from engaging in the

23   misconduct?

     A.    Yes.

24   Q.    And were you able to find anything in Ms. Dean's
report that talked about efficiencies?

25   A.    In multiple places in Ms. Dean's report she talked
about the efficiencies gained from the misconduct, and she

1    cited Dr. Davis.

         Dr. Davis is the technical expert who testified
2    on behalf of Oracle, and he spoke also -- and I had a
chance to read this report.

3         In his report, he said that what was gained
through the infringement, that Rimini was more efficient.

4         MR. STRAND:  Now, let's look at a couple of
those slides, if we could, Marie.

5         Let's go to the next slide.  We've already
looked at that one.  Let's go to 47.

6    BY MR. STRAND:

    Q.   Is this an excerpt from Ms. Dean's report?
7    A.   Yes, it is.

    Q.   And what does it say there?
8    A.   Would you like me to read the whole thing, or just
the underlined portion?

9    Q.   Whatever you think is relevant, sir.

    A.   Well, just for the context.  It says,
10         "If the third-party provider wants to provide
support for a customer who no longer has access to Oracle's
11    updated support services and materials at a level
'comparable' or 'superior' to support provided by Oracle at
12    50 percent of Oracle's prices" -- and this is Ms. Dean in
her report saying, "-- it would require" that "the
13    third-party support provider to either have a license to
Oracle's intellectual property or," and this is the most
14    important part, "invest a significant amount of money" --
excuse me, "a significant" amount of -- "amounts of time
15    and resources."

         Sorry I didn't read that more faithfully, but
16    you can get the gist of it, I hope.

    Q.   Did you also find -- you also mentioned a portion of
17    Ms. Dean's report dealing with efficiencies.

         Let's look at the next slide.
18         Is that the portion of the report that you were
referencing, sir?

19    A.   Yes.  May I read it?

    Q.   Sure.
20    A.   She says,

         "I understand that Rimini Street experienced
21    substantial efficiencies through its alleged improper use
of Oracle's copyrighted software and support materials."
22         And then she footnotes back to Oracle's
technical expert, Dr. Davis, and he pretty much said the
23    same thing, that what was gained from the infringement were
efficiencies, it was less expensive to operate that way.
24    Q.   And, Mr. Hampton, did you undertake to value those
efficiencies?
25    A.   When I read --- I'm sorry.  When I read Dr. Davis'
report and I read Ms. Dean's report, it became clear to me

1  that the most appropriate way to measure just the wrongful
   acts, just the interference, and just the infringement,
2  wasn't to value the customer, because then I would be
   picking up all of the stuff that Oracle does that isn't
3  accused.
            So I decided here's the right approach.  Let's
4  look at what those efficiencies would be, calculate the
   additional labor that Dr. Davis talks about, Ms. Dean spoke
5  of, and that is a closer representation of the true benefit
   that was gained through the infringement rather than a
6  customer.
   Q.    And is your -- a high-level overview of your work
7  set forth on slide 49 here in front of us?
   A.    Correct.
8  Q.    Let's walk through that.  What did you do to
   calculate the efficiencies in this case, Mr. Hampton?
9  A.    Well, I started with Dr. Davis' report and
   Ms. Dean's report where they talked about labor
10 efficiencies.
            So the next thing I did was I also -- I had the
11 chance to read deposition transcripts, and there was also
   references to labor efficiencies there.
12          Seth Ravin had been asked about efficiencies,
   and he said, well, if we were to do it in a non-accused way
13 that didn't infringe or interfere, it would take twice as
   much labor.
14          I also had the opportunity to talk directly with
   Mr. Zorn, who you heard from just before me.  He's their
15 chief financial officer.
            So I spoke with Mr. Zorn, and I proposed, well,
16 this is the right way to do this, let's calculate exactly
   what the benefit was with the efficiencies from the
17 wrongful acts, and we'll have the best calculation
   available.
18          And I asked him if there was information
   available that would allow us to do that.
19          Mr. Zorn suggested, because he's the financial
   person and not the production -- he's not the IT person,
20 that we should ask Mr. Benge to assist us in finding out
   which people within Rimini Street would have to have
21 additional labor to perform their tasks in a non-accused
   fashion.
22          So I spoke with Mr. Zorn, and then he and I both
   spoke with Mr. Benge, and Mr. Benge said that he would go
23 back and talk with his production people within the company
   and come up with an estimate of which employees would have
24 to be doubled, because Seth Ravin testified that it would
   take twice as much, there was talk of efficiencies.
25          I thought doubling was a lot more than a
   substantial efficiency, and so I decided that would be my

1    approach.

Q.    Now, is the number of employees, then, reflective of
2    your addition of employees to accommodate -- to accommodate
the not doing the wrongful acts here in your summary that
3    we've got in front of us?

A.    What I calculate is the amount of money that Rimini
4    Street would have to spend in order to operate legitimately
without any of the misconduct.

5    Q.    Okay.  And is that what's reflected on the exhibit
before us?

6    A.    It is, yes.

Q.    All right.  And what was the total amount that you
7    concluded Rimini would have to spend to not engage in the
misconduct?

8    A.    Well, my analysis started in 2006 and went through
February of 2014.

9           Because the financial records were not complete
in 2006 and 2007, I relied on the 2008 year.  That was the
10   year that Mr. Zorn went to the company and started really
putting their house in order with regards to their
11   financial records.

           So I used the 2008 to make estimates about the
12   real beginning.  2006, there was only a handful of
customers, only a handful of employees.

13          And over this course of time, I have additional
employees, as you can see on this schedule just above the
14   dollar amounts, so I calculated it.

           Over this period of time, Rimini Street would
15   have had to hire about 47 additional people in order to
operate in the non-accused fashion.

16          So if they weren't going to infringe and they
weren't going to interfere, then they would have had to
17   hire 47 more people, which, for some of these years, would
be like a 30 percent increase in their payroll overall, not
18   just for the production, it's really more doubling the
production.

19          I also, through the conversations I had with
management at Rimini Street, identified that it didn't make
20   a lot of sense to double the PSEs because you have a PSE
for each customer, and the customers is the same number of
21   customers.

           So just as an efficiency, I increased the PSE by
22   a quarter.  So I assumed it would take -- out of every four
PSEs, they would hire one more.

23          What I came to, after I calculated where they'd
be -- also there's some underlying assumptions that where
24   these people would actually be would be in India because
it's less expensive to operate there, and they can speak
25   English, and they have the skill set, and other companies
do as well.

```
 1              So assuming these new employees, at least the
     production people, would be located in India, the PSEs, the
 2   additional primary service engineers, I assumed would be in
     the United States.
 3              So I added an amount for overhead for this time
     period of what it would cost to operate in India, which is
 4   the 99,000.
                I don't know if the jury can see the final
 5   number because it's cut off on my screen.  If it could just
     be shifted to the left a little bit, it would help.
 6              So --
                MR. STRAND:  Let's do this.  Your Honor --
 7   BY MR. STRAND:
     Q.    Is this a summary of your work?
 8   A.    Yes, it is.
     Q.    And it's -- all the work that you've just talked
 9   about went into this summary; correct?
     A.    This is the summary.  It's quite complex, but this
10   is the summary.
                MR. STRAND:  Your Honor, I move the admission of
11   Defendants' Exhibit 3022 as a summary of Mr. Hampton's
     work, what we've just been looking at on the screen.
12              THE COURT:  Any objection?
                MR. ISAACSON:  No objection.
13              THE COURT:  It is admitted.
                (Defendants' Exhibit 3022 received into
14              evidence.)
     BY MR. STRAND:
15   Q.    All right.  So the total number you came up with
     is --
16              THE COURT:  Let's establish a number for that.
                MR. STRAND:  Excuse me.  It's DTX 3022.  I went
17   out of order.  But I'm going to work back to 3011, I
     promise.
18              COURTROOM ADMINISTRATOR:  Do we have copies?
                MR. STRAND:  We will have copies almost
19   instantly.  But you will have a copy right now.  And I'll
     get the electronic tab fixed on that.
20   BY MR. STRAND:
     Q.    Now, based upon that $3 million number -- excuse me,
21   $9.3 million number, Mr. Hampton, then do you have a final
     opinion about the appropriate amount of damages in this
22   case?
     A.    I do.  What this schedule shows is that -- could we
23   go back --
     Q.    Sure.  Sure.  We can go back.
24   A.    So over the period under review, which goes through
     February of 2014, I've calculated if Rimini Street had not
25   infringed and didn't interfere, they would have to employ
     approximately 47 more people.
```

```
 1            And I calculated the wages for those people,
      with their overhead of space and phones and computers, and
 2    I arrived at a number of $9,281,000.
                 For that period of time, they would have to
 3    spend almost $10 million in additional labor to work in a
      non-accused fashion.
 4    Q.    Now, and then have you -- going to the next slide,
      where I got ahead of you, have you calculated total damages
 5    in this case based upon everything we talked about today?
      A.    Yes.
 6    Q.    And what is that calculation, sir?
      A.    This is summarized in the same fashion that Ms. Dean
 7    had presented her damages.
                 So with regard to the lost profits for OIC, I
 8    don't think there were any.  I don't think Oracle lost any
      additional customers because of the infringement and
 9    interference.
      Q.    Okay.
10    A.    Also with Oracle America, I don't think Oracle
      America has lost a customer due to the interference or the
11    infringement, and we shouldn't look at anything other than
      that.
12               We don't want to measure the wrong thing.  We're
      trying to measure just the impact of the wrongful acts.
13    Lost profits is an incorrect measure and arrives at a
      windfall for Oracle.
14               With regards to the database --
      Q.    Yes, sir.
15    A.    Thank you.
                 With regards to the database, if it's two
16    instances, if they would have negotiated for two licenses,
      it would have been about $100,000.  If they would have
17    licensed 72 copies, about 3 million.
                 So the best metric of the damages is what it
18    actually benefitted Rimini Street, and we just went through
      that, it was $9.3 million.
19               That's the value -- that's the cost savings that
      Dr. Dean talked about, those are the efficiencies,
20    9.3 million.  That has a direct link to the wrongful acts.
      That's the appropriate remedy because it links directly to
21    wrongful acts.
                 The problem with Ms. Dean's calculation is it
22    doesn't have a direct link.  She has to make all sorts of
      assumptions about Rimini couldn't exist, and it's too
23    speculative.
      Q.    So -- go ahead.
24    A.    I'm sorry.
      Q.    No, go ahead.
25    A.    With the 100,000 and 3 million on the database
      license, adding that to the value of use, the range of
```

 1   damages that I think is the appropriate amount that
     compensates for this infringement and interference is
 2   9.4 million to $17 million.
         Q.   Now, have you summarized that all in the slide
 3   that's before us?
         A.   I didn't hear you.  I'm sorry.
 4       Q.   Have you summarized all of that that's in the slide
     before us?
 5       A.   Yes.
                 MR. STRAND:  I move the admission of DTX 3021,
 6   Your Honor.
                 MR. ISAACSON:  No objection.
 7               THE COURT:  All right.  It is admitted as a
     summary.
 8           (Defendants' Exhibit 3021 received into
             evidence.)
 9               MR. STRAND:  Mr. Hampton, thank you.  I have no
     further questions.
10               THE COURT:  All right.
                           CROSS-EXAMINATION
11   BY MR. ISAACSON:
         Q.   Mr. Hampton, we haven't met.  Good afternoon.  Bill
12   Isaacson.
         A.   Hello.
13       Q.   Let's talk about the last subject you were talking
     about, value of use, which you measure at $9.4 million.
14               Now, that -- that is one measure of plaintiffs'
     copyright damages; right?
15               That's your opinion?
         A.   I think that it also could be an appropriate remedy
16   for the interference claims as well.
                 MR. ISAACSON:  Your Honor, I move to strike as
17   nonresponsive and outside of his report.
                 THE COURT:  The motion will be granted.  The
18   nonresponsive portion is stricken.
                 THE WITNESS:  I apologize.
19   BY MR. ISAACSON:
         Q.   My question is, that's one measure of plaintiffs'
20   copyright damage; correct?
         A.   Yes, sir.
21       Q.   Okay.  And let's understand what value of use is
     because that kind of went by a little quickly.
22               Basically what you're saying is, and tell me if
     I have this right, is that if Rimini had operated legally,
23   if it hadn't engaged in all these copyright violations, if
     it had gone about it the right way, it could have run its
24   business, but the business would have been more expensive,
     and that extra expense would have been about $9.4 million.
25   Do I have that right?
         A.   Yes.

1    Q.    So what we're going to pretend for purposes of this
damage -- this damage model, is that Rimini is acting

2    legally, and you've estimated that behaving legally costs
$9.4 million; correct?

3    A.    I'm looking at a but-for scenario of with and
without the accused actions and how much more profit Rimini

4    Street would have had.
            Because if you avoid a cost, it falls to the

5    bottom line as additional profit.
      Q.    All right.  And what you're principally looking at

6    is labor costs, that Rimini, in your opinion, was avoiding
labor costs by engaging in the infringement we have

7    alleged, otherwise they would have had to hire more people?
      A.    Most of Rimini Street's costs are labor related.

8    Q.    All right.  Now, how many cases -- intellectual
property cases did you say you've testified in?  It was a

9    lot.
      A.    I've been engaged in over 180 over the course of the

10   years since 1994 through today.
      Q.    And there was a lot of those that were copyright

11   cases; right?
      A.    Yes, there were.

12   Q.    All right.  And you don't remember a single one of
those cases in which you have measured or given opinion

13   that copyright infringement damages should be set at the
amount of the defendants' avoided costs; isn't that

14   correct?
      A.    I think that's right.  I think this is the first

15   time that it's been -- the metric was avoided cost for the
value-of-use calculation.

16   Q.    A hundred and eighty cases, and this is the first
time you've come up with it?

17   A.    Each case is unique, and so the application is --
the method is value of use.  Each case is unique as far as

18   fact pattern.
      Q.    Are your methods unique in every case?

19   A.    The approach is not unique.
      Q.    Right.

20   A.    The methods, I think they are unique.  I think each
case, you have to look at the facts for each particular

21   case, and they're going to differ.
      Q.    Your approach in this case is unique, at least for

22   your career.  You've never done this method before in a
copyright case; correct?

23   A.    I don't recall ever using a value-of-use approach
using avoided cost, but I've certainly used the

24   value-of-use approach before.
      Q.    But never in a copyright case?

25   A.    I'm not sure of your question.  Are you talking
about applying value of use --

1    Q.    Yes.
     A.    -- or are you talking about avoided labor?
2    Q.    Value of use -- well, avoided labor.
     A.    Sure, I think that's true.
3          This is an interesting case because --
     Q.    Sir --
4    A.    Oh, I'm sorry.
     Q.    My question is what you've done in the past.
5    A.    I apologize.
     Q.    I'm glad you think it's an interesting case.  So do
6    we.
     A.    Could I ask -- am I too loud in this microphone?  Am
7    I hurting everybody's ears?  Okay.  I wanted to be sure.
     Thank you.
8    Q.    I think you're okay.
     A.    Thank you.
9    Q.    Now, in terms of these avoided labor costs, what you
     assumed, if Rimini had not engaged in copyright violations,
10   if they hadn't done all this copying, you assumed that they
     would have to double the amount of their developers and
11   their quality assurance engineers; isn't that right?  Do I
     have that right?
12   A.    Well, what I asked Mr. Benge to do was go back and
     talk with --
13   Q.    Sir --
     A.    I was trying to answer.  I'm sorry.
14   Q.    We'll get to Mr. Benge.
           My question is your assumption.  Did you assume
15   for purposes of your estimate of avoided labor costs that
     you would have to have double the amount of PeopleSoft
16   developers and quality assurance engineers?
     A.    Among others, yes.
17   Q.    Okay.  And you assumed 25 percent more primary
     support engineers?  Is that right?
18   A.    That's correct.
     Q.    Okay.  And in terms of that remote -- and let's be
19   clear.  You also assumed that the business would be
     entirely using remote environments; correct?
20   A.    You want a yes or no, or can I explain?
     Q.    I would like a yes or a no.
21   A.    Yes.
     Q.    Now -- and just to go back over that, I think we've
22   learned this at this point, but you're talking about --
     when we talk about remote environments, you're talking
23   about environments on the client's system and not on the
     Rimini system?
24   A.    Yes.
     Q.    And in terms of your assumptions, you assumed that
25   all of the engineers servicing those remote environments
     would be hired in India?

1    A.    Except for the PSEs, they would be hired in the
United States.  The primary contact, the primary support
2    engineer would be in the United States.
     Q.    But those aren't the remote engineers.  The remote
3    engineers are the ones who work with the environments, and
they would be entirely based in India; correct?
4    A.    I don't fully understand your question.
     Q.    All right.  Do you know the --
5    A.    Technical area of --
     Q.    You don't know what a remote engineer does versus
6    what a PSE does?
     A.    I think I do.  It's not my area of expertise.  I
7    have a layperson's understanding.
     Q.    All right.  You also assumed that they would have to
8    hire -- they would have to double their amount of
onboarding employees; right?
9    A.    Yes.
     Q.    And those would come from India?
10   A.    Yes, they would.
     Q.    You mentioned Mr. Benge.  So now let's talk about
11   that.
             For your assumptions about the increased
12   employment that would be required, you didn't do any
analysis of your own, as you've said, you don't really have
13   that technical background, you relied on Mr. Benge;
correct?
14   A.    I think my testimony was I relied on Dr. Davis and
Ms. Dean's reports primarily.  That's where I understood
15   that there were efficiencies and labor savings, from them.
And then --
16   Q.    In terms of quantifying --
     A.    -- I went to Mr. Benge for the metric or the
17   measure.
     Q.    I'm asking you about your assumptions about the
18   doubling -- that it would be sufficient to double the
amount -- I'm asking you about your assumptions that all
19   that would be required to double the amount of
remote engineers, quality assurance engineers, 25 percent
20   more PSEs, those all came from Mr. Benge; right?
     A.    Not entirely.
21   Q.    Okay.  You did talk to Mr. Zorn, but all that
Mr. Zorn gave you was some payroll information as to what
22   it would cost -- what it would take to hire those people;
correct?
23   A.    I don't know if it was limited to the way you say
it.  I got financial information from Mr. Zorn.
24   Q.    Is it correct that based on the assessment made by
Jim Benge and Doug Zorn, you understood that doubling the
25   amount of PeopleSoft developers and PeopleSoft quality
assurance engineers would be sufficient to perform their

```
 1    duties in a remote-only manner?
      A.    It wasn't limited to Mr. Benge and Mr. Zorn.
 2    Q.    Can we look -- would you look at paragraph 169 of
      your report.
 3            I would ask permission to show this paragraph on
      the screen to assist the jury.
 4    A.    I think I went to the wrong page.
      Q.    Paragraph 169, page 90.
 5    A.    Thank you.
              MR. ISAACSON:  Any objection?
 6            MR. STRAND:  No.
              MR. ISAACSON:  Would you show paragraph 169.
 7    BY MR. ISAACSON:
      Q.    You wrote in your report,
 8            "First, based on an assessment made by Jim Benge
      and Doug Zorn, I understand that doubling the number of
 9    PeopleSoft developers and PeopleSoft quality assurance
      engineers would be sufficient to perform their duties in a
10    remote-only manner of operation for Rimini's current
      PeopleSoft client base."
11            That is what you said in your report; right?
      A.    That's correct.
12    Q.    Do you stand by it?
      A.    Yes, I do.  I also had other sources, but I did
13    mention those two.
      Q.    Well, you didn't mention the other sources when you
14    wrote that part of your report, did you?
      A.    I didn't mean it to be exclusive.  I was just saying
15    that I did use those sources.
      Q.    Let me ask you about Mr. Zorn.
16            Then what Mr. Zorn did was limit it to
      information regarding Rimini's actual staffing and salary
17    information for certain positions identified by Mr. Benge.
      I have that correct, don't I?
18    A.    I think you read that correctly.
      Q.    Okay.  Now, and that makes sense.  Mr. Zorn's in
19    finance, he's not going to give you a technical opinion
      about how many engineers you need; is that fair?
20    A.    Yes.
      Q.    Now, Mr. Benge told you that -- well, Mr. Benge gave
21    you this information, it was in a verbal conversation;
      correct?
22    A.    He may have.  I also got it electronically as well.
      Q.    All right.  But when he first -- well, when you say
23    you got it electronically, did you get electronic
      calculations from Mr. Benge?
24    A.    No, they came through Mr. Zorn.
      Q.    All right.  So Mr. Zorn gave you a calculation that
25    plugged in numbers that Mr. Benge gave him.
      A.    I don't know that I can -- I don't know what you
```

3813

1    mean by plugged in.
         Q.    Well, I mean the number of employees.
2    A.    Could you restate your question?
         Q.    Sure.  I think we're in agreement that you -- that
3    Mr. Benge gave you an estimate of how many additional
     engineers were needed, that that number of engineers did
4    not come from Mr. Zorn.
               So when you received a spreadsheet or other
5    document with calculations from Mr. Zorn, were the numbers
     of employees derived from what Mr. Benge said?
6    A.    Oh, absolutely, yes, that was the intent.
         Q.    And you understood with respect to the intent that
7    Mr. Benge had prepared his estimate for purposes of this
     litigation?
8    A.    Based on my request.
         Q.    And you knew that Mr. Benge understood that the
9    purpose of his conversation with you was so that Rimini
     could escape liability in this case?
10   A.    I didn't have that understanding.
         Q.    All right.  Did Mr. Benge -- you knew that Mr. Benge
11   knew that the company's goal was to minimize their damages
     in this case; correct?
12   A.    I'm not sure as a production person he was actually
     thinking along those lines.  I'm not sure that he actually
13   understood my calculation or what I was doing.
               I didn't tell him how I was going to calculate
14   damages.  I asked him to give me an estimate of how many of
     the production people would have to be increased in order
15   to operate in a noninfringing, non-accused fashion.
         Q.    Were you here in court when Mr. Benge said that he
16   knew that the company's goal was to minimize damages when
     he spoke to you?
17   A.    I wasn't present.
         Q.    Now, Mr. Benge himself did not give you any
18   calculations that you could check; right?
         A.    I understood that the numbers of the employees that
19   would need to be added came from Mr. Benge.

20

21

22

23

24

25

3814

```
 1                        SCOTT DEAN HAMPTON
                    recalled as a witness on behalf of the
 2              Defendants, having been previously sworn,
                    was examined and testified as follows:
 3                      CROSS-EXAMINATION RESUMED
       BY MR. ISAACSON:
 4       Q.    Mr. Hampton, I want to ask you about some of your
       calculations that are found in exhibits to your report.
 5              You've got your report up there with you with
       the exhibits?
 6       A.    Yes, I do.
         Q.    And you have the -- your second report, the
 7     supplemental report where you updated some of your
       calculations?
 8              All right.  And you've got a tab E --
         A.    I'm sorry, I can't hear you.
 9       Q.    You've got a tab E or Exhibit E?
         A.    Yes.
10       Q.    All right.  And there's an Exhibit E1.SU.  SU means
       it's your supplement?
11       A.    Correct.
         Q.    All right.  I want to ask you about some of the
12     numbers on this.
                MR. ISAACSON:  I think it will assist the jury
13     if we put this on the screen, if there's no objection.
                MR. STRAND:  No objection.
14     BY MR. ISAACSON:
         Q.    All right.  Now, this is one of several pages in E1.
15     You can see the E1 up in the upper right.
                In E2, you have calculated Rimini Street's
16     estimated revenues and profits for its PeopleSoft, Siebel,
       and JD Edwards support services; is that correct?
17       A.    Yes, I think that's correct.
         Q.    All right.  And in -- and then what you've done in
18     your supplemental report -- you did it in your opening
       report, and then you extended your calculation to some
19     additional years; correct?
         A.    Yes, that's right.
20       Q.    All right.  And E1.SU is a chart you calculated?  Is
       that right?
21       A.    Yes, sir.
         Q.    Okay.  Is that -- when we say "you," is that you or
22     your staff?
         A.    Under my direction my staff created this schedule.
23       Q.    All right.  Now, can we look at -- can we look at
       DTX 3019.
24              All right.  Now, were you here yesterday for --
       when Mr. Zorn was testifying?
25       A.    I was.
         Q.    All right.  And we can make this bigger.
```

1          Mr. Zorn testified that this document was
prepared by the accounting group for Rimini Street.  And if
2    you look at it, it's identical to your schedule E1.SU;
right?
3    A.    I believe it is, yes.
     Q.    In fact, your schedule E1 was not prepared by you or
4    your staff, it was prepared by the accounting group at
Rimini; right?
5    A.    This particular spreadsheet that we're looking at --
     Q.    Sir, would you answer the question.
6          Was your E1.SU in fact not prepared by your
staff or you, was it prepared by the accounting group at
7    Rimini?
     A.    It was prepared by me.
8    Q.    It was prepared by you?
     A.    The exhibit in my report at E1.SU was prepared by me
9    and my staff or my staff under my direction.
     Q.    And what that means is that you took the identical
10   document, the identical fonts, the identical format, and
you put into it your exhibit; right?
11   A.    No, these fonts and formats are mine.
           The document that Mr. Ravin is talking about --
12   not Ravin, but Zorn, was the spreadsheet he created.
           So my staff was taking the financial information
13   that was provided by Mr. Zorn and put it in this format.
He looked at it and saw the same close -- something so
14   close to the same format, and it's an Excel spreadsheet.
           But -- so we're talking numbers from Rimini
15   Street's financial information that was in an Excel
spreadsheet that was given to us, and we put it into our
16   format for our report.
           So the formatting is mine.  The numbers are
17   coming from Rimini Street.
     Q.    The numbers in the document prepared by the Rimini
18   accounting staff -- let's look at DTX 3019.  All right.
And then let's look at your exhibit.
19         Every last one was identified; right?
     A.    Because they're the same document.
20   Q.    All right.  And let's go to the bottom of 3019,
little asterisks, "may not foot due to rounding"; right?
21   A.    Correct.
     Q.    Let's go to your exhibit.  Same footnote; correct?
22   A.    Because they're both my documents.
     Q.    All right.  Let's look at footnote 1 of your
23   document, as you say.
           "For 2008 I have adjusted the amounts" -- "I
24   have adjusted the amounts of general and administrative
other income and taxes to reconcile with Rimini Street's
25   2008 audited financial statements."
           Let's go up to the line for general and

1    administrative.  Highlight that line.
              Let's look at DTX 3019 which is prepared by
2    Rimini's accounting department.
              Those are identical numbers, aren't they, sir,
3    in the general and administrative line?
     A.    They are.
4    Q.    All right.  When you said in your footnote that you
     had made those adjustments, you had, in fact, made no
5    adjustments.  Those were adjustments made by the Rimini
     accounting department; correct?
6    A.    No.
     Q.    Okay.  When you said, "I have made adjustments,"
7    what you did was you took -- your staff took -- took the
     exact same numbers as the Rimini accounting department and
8    made no changes, no adjustments to them; correct?
     A.    No, you're wrong.
9    Q.    All right.  The -- let's look at Exhibit 2.SU.
              I gather you say this was your work as well.
10             Oh, by the way, one change you are making in
     these, let's go to the bottom, is you're putting the
11   Hampton logo on these; right?
     A.    No, I created the whole document.  My staff created
12   this in Excel.  Both documents were created by my staff.
     Q.    All right.
13   A.    I think Mr. -- may I continue?  Or would you like me
     to stop?
14   Q.    I just asked you --
     A.    I can wait --
15   Q.    I just asked if you put the Hampton logo on it.
     A.    I don't want to go too far so I'll just wait.
16   Q.    The E2.SU.  Okay.  Let's look at DTX 3018.
              DTX 3018 Mr. Zorn said was prepared by the
17   Rimini accounting department.
              Let's look at your exhibit.  Other than the
18   Hampton logo, it's identical; right?
     A.    Because my staff created both documents.
19   Q.    The first document Mr. Zorn testified was created by
     the Rimini accounting department.
20   A.    I think what he was saying was that the numbers were
     generated by his accounting department.
21   Q.    No, that's not what he said, sir.
     A.    Well, then, he misunderstood, and he thought they
22   had created this, but they didn't.  My staff created both
     documents.
23   Q.    All right.  So what's going on here, sir?
              Okay.  Rimini got on the stand yesterday and
24   talked about their financials that are produced in the
     ordinary course of business by their accounting department,
25   and you're saying, no, they were using material prepared by
     your staff?  Is that what you're saying happened?

3817

1    A.    No, what I'm saying, they gave us the information in
     the Excel spreadsheet in columns and rows, and then my
2    staff took that and input it into an Excel spreadsheet and
     formatted it in this way.
3            Now, they look fairly similar so I think
     Mr. Zorn was just confused and thought his staff had
4    created it.
             But, in reality, both of these documents were
5    created by my staff under my direction, but --
     Q.    Because they're --
6    A.    -- coming from the source documents, you can make a
     mistake.
7    Q.    Now, your Exhibits F, G, H, all have that similar
     foot format, and all have the asterisks saying "may not
8    foot due to rounding"; correct?
     A.    That is my format for the way I generate a report,
9    and I put the "will not foot due to rounding" on every
     schedule I create.
10           MR. ISAACSON:  Now, Your Honor, so that the jury
     may compare DTX 3018 and 3019 in format, footnotes, and
11   numbers, I would move to admit, not for the truth, but for
     that purpose so the jury can compare, Exhibit E1.SU to his
12   report as 6007, PTX 6007, and Exhibit E2.SU as PTX 6008.
             MR. STRAND:  No objection.
13           THE COURT:  All right.  They will be admitted.
             And, ladies and gentlemen, I would instruct you
14   that they're being admitted for purposes of comparison
     only.
15           You still would consider the evidence based upon
     what the qualified witnesses have actually testified.
16        (Plaintiffs' Exhibits 6007 and 6008 received
          into evidence.)
17           MR. ISAACSON:  All right.  I gave you the other
     side of this demonstrative.  Did you have any objection to
18   this?
             MR. STRAND:  No, we didn't.  I'm sorry.
19   BY MR. ISAACSON:
     Q.    We prepared a little summary to see if we can
20   describe where we're at in this case.
             The -- you recognize, until you get to the last
21   column, this was your chart from yesterday summarizing your
     opinion of Oracle's -- of what you considered to be the
22   damages in this case.
     A.    I'm not sure I understand what you just said.
23   Q.    So the first two columns are a chart that you had
     prepared yesterday.  See?
24   A.    Yes, I understand that.  Thank you.
     Q.    Okay.  And we've added a third column so that
25   everybody can see what you say versus what Ms. Dean says.
     All right?

 1          And so your opinion, if I understand it, tell me
    if I'm right, is if there is a determination of copyright
 2    infringement by this -- for PeopleSoft, Siebel, and JD
    Edwards, your opinion of the damages that should be awarded
 3    is 9.3 million to 14 million; is that correct?
         A.    That's correct.
 4         Q.    Okay.  And the reason you say 9.3 to 14 million is
    that's your value measure, the avoided labor costs?
 5         A.    Well, some of that is the database portion.
              I calculated the database based on two licenses
 6    or the full 72 licenses, and the range is 100,000, if it
    were two licenses --
 7         Q.    Right, I'm sorry.
         A.    -- and three million if it were the full 72
 8    licenses.
         Q.    That's absolutely right.
 9              So up above you can see for database, 100,000 to
    3 million, so that gets folded into the 9.3 to 14 million,
10    and the remainder is the avoided labor costs?
         A.    Yes.
11         Q.    And the -- and what you're saying here, if I
    understand it, is if Rimini Street had operated with a new
12    business model that had not infringed on Oracle's software,
    it would have incurred an additional amount of labor costs
13    of about 9.3 million; correct?
         A.    No.
14         Q.    Okay.  The -- well, the avoided labor costs are
    9.3 million; right?
15         A.    Yes, but it's not based on a different business
    model, it's based on the same business model of the -- of
16    Rimini Street's assembled workers.
         Q.    Well, wait, wait, wait, wait.
17         A.    So that's what we're dealing with.  The business
    model --
18         Q.    You're talking about 100 percent remote business
    model; correct?
19         A.    I'm talking about an assembled workforce of what the
    business model is.  You want to say --
20         Q.    Would you --
         A.    -- the business model is infringing.  I think that's
21    why your number is so large.
         Q.    Try and answer the question, sir.
22         A.    I'm sorry.
         Q.    You're talking about a 100 percent remote business
23    model; right?
         A.    Yes.  It would be --
24         Q.    Okay.
         A.    -- 100 percent remote.  So there wouldn't be any
25    hosting at Rimini Street.
         Q.    Exactly.  And that was not true -- that was not

3819

1    Rimini's business model in 2006, was it?
     A.    It was a different procedure.  I'm not sure you
2    could say it's a business model, but it would be a
     different procedure.
3    Q.    It was -- Rimini was not 100 percent remote in 2006,
     in fact, it only had a fraction of its business that was
4    remote; correct?
     A.    That fraction I believe would be about one in five.
5    Q.    Okay.  Same thing in 2007?
     A.    As far as I know, the remote portion was about 20
6    percent, or one in the five customers was dealt with in a
     remote manner.
7    Q.    Same thing in 2008?
     A.    As far as I know.  I'm sure it changed over time,
8    but the best I understand, it would be about one in five.
     Q.    So 2006 to 2011, one in five.
9    A.    It might be somewhat different, but that's the best
     ratio that I understand sitting here today.
10   Q.    And for your damages estimate, you're saying Rimini
     would have had five out of five, all remote?
11   A.    That's correct.
     Q.    Okay.  And, now, what is your opinion -- if there's
12   a finding of liability for only infringement of PeopleSoft
     copyrights, what's the amount of damages?
13   A.    That would be about 75 percent of the total that
     I've calculated.
14   Q.    Okay.  So when you calculated the avoided labor
     costs of 9.3 million, did you calculate the avoided labor
15   costs for PeopleSoft, JDE, and Siebel separately?
     A.    No.  I put them together in one spreadsheet to make
16   it more streamline, but I have separate calculations and I
     can provide it if asked.
17   Q.    How much of the avoided labor costs in the
     9.3 million was attributable to PeopleSoft?
18   A.    I believe it was 75 to 77 percent.
     Q.    Okay.  How much was due to Siebel?
19   A.    I believe it was around 10 percent.
     Q.    And how much to JDE?  That would leave the 15
20   percent?
     A.    Yes, the remaining.
21   Q.    All right.  And, now, you also talked in your direct
     about causation.
22          And so you have these zeros up above, and that's
     because it's your opinion that the infringement here did
23   not cause Oracle to lose a single dollar or even a single
     customer; right?
24   A.    I don't think that the infringement and interference
     caused Oracle to lose a customer.  I don't think that's a
25   proper measure.  I think it's so global that it picks up
     all of the good and the bad --

```
 1    Q.    Sir.  It was a simple question, okay?
      A.    I'm sorry.
 2    Q.    Okay.  Did you, in fact, reach the opinion that
      Oracle did not lose a single customer or a single dollar
 3    due to copyright infringement?
      A.    I don't think that there's evidence in the record
 4    that shows that a customer left because of the infringement
      or the interference.
 5    Q.    And that's true of PeopleSoft; correct?
      A.    True.
 6    Q.    That's correct -- that's your opinion for JD
      Edwards; correct?
 7    A.    Correct.
      Q.    And that's your opinion for Siebel; correct?
 8    A.    That's my opinion.
            I don't believe that there's evidence that shows
 9    that customers left because of the infringement or the
      interference.  I think they left for other reasons.
10    Q.    Right.  And I think you've said it twice and you've
      said it in direct, but let's be clear about this.
11          The reason you're reaching this opinion about
      zero is because you find there is no evidence; correct?
12    A.    Well, I think I -- in my direct said that it was the
      wrong approach or --
13    Q.    You just told me --
      A.    -- method to calculating damages.
14    Q.    You just told me twice it was because there was --
      we're talking about causation now.
15    A.    And causation leads to method, and because there's
      no evidence --
16    Q.    Right.
      A.    -- of them leaving because of the -- just the
17    interference and the copyright infringement, that using a
      calculation based solely on customer is the inappropriate
18    approach.
            There's -- a better approach would be directly
19    what's the impact of those causation items.
      Q.    But what you're saying is there's no evidence, and
20    that's your opinion after you review all the work that
      Ms. Dean says, is you summarized that as that's not
21    evidence of any lost customers or any lost dollars;
      correct?
22    A.    Well, I don't work in absolutes.  There may be
      anecdotal evidence, but -- the preponderance -- but there's
23    not enough evidence to show that the lost profits approach
      would be the appropriate way to calculate damages because
24    it includes all of Rimini Street, all of their efforts,
      their assembled workers.
25    Q.    Right?
      A.    And so that's why I say it's the inappropriate
```

```
 1   approach.  I'm not saying there's no evidence, I'm saying
     there isn't sufficient evidence.
 2   Q.    Okay.  So now it's insufficient evidence.
           So after reviewing Ms. Dean's report, it's not
 3   that there's no evidence, it's insufficient evidence.  Is
     that your view?
 4   A.    Sure.  That's my view.  I think the right approach
     would be the value of use for the reasons I stated.
 5   Q.    I didn't ask you for the right approach.
     A.    I apologize.
 6   Q.    Okay.
     A.    Sorry.
 7   Q.    Now, let's see if we can break things down and
     explain where we're at, okay, which is what I'm trying to
 8   do now.  I'm just trying to define where we agree and where
     we disagree.
 9         So there's a couple steps we're going through in
     this case.  One is liability.  And you're a damages expert,
10   you don't have any opinions on liability; correct?
     A.    I have no opinions, but I make assumptions and I've
11   assumed those liability issues.
     Q.    That's fair.  You assume that there is liability;
12   right?
     A.    I make that assumption right at the beginning, yes.
13   Q.    Right.  Now, in order for damages to be awarded, the
     next step is whether -- if the liability -- if there was
14   wrongful conduct, did that cause any damages, and that's
     what you -- that's this term causation; right?
15   A.    That's not just if, but what is the best approach
     for capturing it.
16   Q.    Right.  But when we're talking about -- we're
     talking about causation, and you -- so you're saying there
17   is no causation here and so there's no lost profits and no
     lost customers; correct?
18   A.    I'm saying that the right approach, it would be the
     value of use because the evidence doesn't support the lost
19   profits because there's not enough evidence showing why the
     customer decided to leave Oracle and go to Rimini Street.
20         And there's other reasons why they might do it.
     They might do it because they have a relationship with
21   someone at Rimini Street, they've worked with them for
     years and they want to work with them again.
22   Q.    Sir, I don't know why I'm asking yes or no questions
     and getting speeches.
23         All right.  You --
     A.    I apologize, you're right.  I'll try to limit my
24   answer and wait for my chance to talk later.  I'm sorry.
     Q.    The -- you're -- so, step one, liability, no
25   opinion, assumptions; step two, causation, your opinion,
     insufficient evidence of causation.  Correct?
```

1    A.    And it would be the wrong approach.
      Q.    And the wrong approach.
2          Okay.  Step 3 is, if there is liability, and if
  there is, contrary to your opinions, causation, then you
3  quantify the damages, you do the calculation; right?
          That would be the next step.
4    A.    Yes.
      Q.    All right.  And if the jury finds causation, your
5  report did not include any opinions about Ms. Dean's
  quantification of lost profits.  You didn't go into that
6  third step; correct?
      A.    I thought I did.  I'm not quite -- maybe we're
7  misspeaking, but I critiqued Ms. Dean's report in my report
  and went step by step why I thought that she was wrong --
8    Q.    Well, let me --
      A.    -- and she was measuring the wrong thing.
9    Q.    Let me go over that for you.  Okay.
          If you assume, and I know you disagree with this
10  assumption, but if you assume that the wrongful conduct
  here caused lost profits and -- I mean, caused lost
11  customers to Oracle, right -- you did not review Ms. Dean's
  methods for calculating lost profits from lost customers.
12  You didn't go there; right?
      A.    I thought I had.  I would have to go back and look
13  at my report, but I certainly thought I had.
      Q.    All right.  Now, if this jury were to find that the
14  company behind me, Rimini Street, beginning in 2006,
  engaged in massive copying of Oracle's software in
15  violation of -- in violation of copyright laws, and that
  remote environments were not feasible in 2006, that it
16  couldn't be done, you have not addressed that last issue of
  quantification of damages; right?  You have not looked at
17  that question?
      A.    I thought I had.
18          I think my report critiqued her calculation of
  lost profits and why I thought that it was inappropriate
19  and wrong and that there wasn't sufficient evidence
  customer by customer.
20          She groups all the customers together and uses
  just one number.  She's not going back through and taking
21  customer by customer and saying here's the evidence that
  shows that they were impacted by the infringement and they
22  went to Rimini Street solely because of the infringement or
  the interference.  It's just not there.
23    Q.    Okay.  So your last critique, the critique you would
  have of the quantification of damages, is whether Ms. Dean
24  calculated damages customer by customer; correct?
      A.    I think if you were to take an approach of saying
25  customers, you would still be wrong, and I spoke to that in
  my report as well.

1    Q.    Wait, wait, wait.
     A.    But you have to follow the steps --
2    Q.    Did you just say --
     A.    -- that Mr. Isaacson's just discussed.
3    Q.    Did you just say that if you take the approach --
that the problem with Ms. Dean's approach was that she
4    didn't go customer by customer, but if she did go customer
by customer, you would still disagree with her?
5    A.    Right.  Because if you take one customer at a time,
there still needs to be an apportionment between all the
6    good that Rimini Street does and the harmful acts, the
wrongful acts.
7              You can't -- you can't create damages for
copyright on noncopyrighted revenue of -- if Rimini Street
8    acts in a -- in a way in which they're providing a service,
some of the -- and I've assumed liability, some of the
9    revenue might be associated with the wrongful act, but it's
only a small portion.
10             They're providing the service, they're not
selling the copyrighted work.
11             Thank you for allowing me to talk.  I appreciate
it.
12   Q.    It seems inevitable at this point.
     A.    I have a hard time stopping.  I'll do my best,
13   though, thank you.
     Q.    I wish you would, sir.
14             The -- but if this jury were to conclude that
this business could not have gotten any customers beginning
15   in 2006 without copyright infringement, that they couldn't
have done it with remote environments, and that all of the
16   customers were due to copyright infringement, is it your
conclusion that no damages should be awarded?
17   A.    Not for copyright or interference.
               If Rimini Street is out of business, they're out
18   of business, but I don't think that is the reality of it.
               I think that the infringement and the
19   interference was only a portion of their business, it
wasn't the business.  They're not selling the copyrighted
20   work, they're selling services.
     Q.    Sir, sir, if they're out of business, there is no
21   other portion of their business, is it -- is there?
     A.    It's a hypothetical that doesn't make a lot of
22   sense, I agree.
     Q.    Okay.  So -- you know, I'm going to go forward with
23   this just in the case it's a hypothetical that's based on
all the evidence that's been presented to this jury.
24             All right.  If Rimini would not have been able
to build this business, if it would not have been able to
25   have any customers without copyright infringement, if it
wouldn't have existed, your opinion is that no damages

1    should be awarded because the other portion of their
     business that was providing services in a now nonexistent
2    company would -- means that no damages should be awarded.
     That's your opinion?
3    A.    Absolutely true, and for a variety of reasons.
     Q.    I appreciate the "absolutely true."
4          Now, this term but-for causation, let's see if
     we can help people out.
5          Now, but-for causation is a terrible phrase used
     by mainly lawyers and experts, and what that means is but
6    for Rimini's wrongful conduct; right?
     A.    I think I explained that.  The but-for causation
7    concept is --
     Q.    Do you agree --
8    A.    -- to link damages --
     Q.    Do you --
9    A.    -- to the numbers you create.
     Q.    Do you agree with me --
10   A.    I'm sorry.
     Q.    Do you agree with me that it would -- that but-for
11   causation here, put simply, means but for Rimini's wrongful
     conduct?
12   A.    Well, in this instance, you could use it that way.
     Q.    Thank you.
13   A.    You could create different but-for scenarios or
     but-for statements with the purpose of connecting whatever
14   damage you calculate back to just the wrongful acts.
     Q.    All right.  And so what we're talking about is what
15   if Rimini hadn't done anything wrong; correct?
     A.    Yes.
16   Q.    Okay.
     A.    The customers still would have left Oracle even if
17   Rimini Street hadn't existed.  That's the problem with your
     hypothetical.
18   Q.    I'm not asking you any hypotheticals at this point.
     A.    Oh, I'm sorry.
19   Q.    I'm just asking you about what your terms mean.
           Now, so -- then we're saying the second part is,
20   so if Rimini had not done these wrongful things, what would
     Oracle look like.  That's the second part of it.  Right?
21   A.    It could be, yes.
     Q.    Okay.  And so putting it just simply, we're talking
22   about, if Rimini hadn't done all these things wrong, what
     would Oracle look like, would they have more customers, or
23   would they have the same amount of customers; right?
     A.    Could you ask that -- did you say what would Rimini
24   look like or would Oracle look like?
     Q.    I'll say it again in case I said Rimini.
25   A.    Did you --
     Q.    I don't know.

1    A.    Maybe I misheard you.
     Q.    It doesn't matter.  Right.
2          What we're talking about here is if Rimini
     hadn't done all these wrongful things, what would Oracle
3    look like, would they have more customers, or would they
     have the same amount of customers.  That's what we're
4    arguing about; right?
     A.    You can, yes.
5    Q.    Okay.  Now, just to explain this but-for causation
     concept, if you put this into another context, talk about
6    the oil spill in the gulf with BP, the way you would phrase
     that is, suppose we're saying that was BP's fault, an oil
7    company's fault.
           But for BP doing something wrong, say a
8    defective piece of equipment, a blowout preventer, what
     would the gulf look like?  Would there have been an oil
9    spill?  That's how we -- that's how you look at the but-for
     causation question; right?
10   A.    Yes, you can frame it that way, yes.
     Q.    Right.  You know, in another terrible event, if --
11   but for Bernie Madoff taking all that money from his
     investors, what would the investors look like; would they
12   have their money back?
     A.    Right.  And there would be a real question whether
13   they would have put their money -- if they hadn't given it
     to Bernie, maybe they would have found another Bernie, I
14   don't know.
     Q.    Right.  And so going over this, your value of use
15   opinion, right, the BP example, if -- suppose that blowout
     preventer -- that there was a defective blowout preventer
16   in the Gulf that would have cost BP a thousand dollars to
     fix it, that if they had acted legally, that it would have
17   cost a thousand dollars to fix that blowout preventer,
     right, and that defective blowout preventer caused massive
18   damage in the Gulf.
           Is it your opinion that the proper measure of
19   damages is the value of use, that is, the thousand dollars
     to repair the blowout preventer?
20   A.    The circumstances are different and so there would
     be a different method, and so I don't think there's a
21   direct parallel between an oil spill and copyright
     infringement.
22   Q.    Right.  That would be ludicrous --
     A.    It's very different --
23   Q.    That would be ludicrous --
     A.    -- types of things.
24   Q.    That would be ludicrous to say, that; right?
     A.    I don't know.
25   Q.    To say that the cost of repairing a blowout
     preventer should measure the damages when that defective

3826

1    blowout preventer caused so much harm, that would be
     ludicrous; right?
2    A.    I don't -- I haven't given it a great deal of
     thought.  It doesn't make a lot of sense to me because
3    there's a great deal of difference between negligence of
     drilling an oil -- drilling to an oil well and copyright
4    infringement and interference.
              I think you're drawing a false analogy.  I don't
5    follow it.  I don't agree with it.
     Q.    Well, let me try a different analogy.
6              What if the oil company had deliberately
     violated the laws and knowingly installed a defective
7    blowout preventer.  You would not say that the measure of
     damages should be what if the company had been able to
8    operate with a working blowout preventer.  You wouldn't say
     that, would you?
9    A.    No, because it's not a copyright case.  I mean,
     they're apples and oranges.
10   Q.    All right.  The -- this value of use measure, that's
     not -- you mentioned the AICPA standards that guide you;
11   right?
     A.    I have, yes.
12   Q.    All right.  That value of use standard is not found
     in -- you didn't cite any AIPCA standard in your report
13   regarding value of use; right?
     A.    No, it's not covered by the AICPA.
14   Q.    All right.  You did not cite any accounting standard
     relating to value of use; right?
15   A.    I have not.
     Q.    All right.  You did not cite anywhere any standard
16   from any organization saying that value of use is a proper
     way of looking at damage; correct?
17   A.    In my testimony?
     Q.    In your report.
18   A.    I may have cited the *Timex* case.
     Q.    Okay.  A legal case.
19   A.    It's a legal case, it's a legal precedent that used
     the value of use approach.
20   Q.    Okay.  So you looked at one legal case?
     A.    No, I didn't look at one legal case.
21   Q.    For your report.
     A.    You asked me what I cited.
22   Q.    Okay.  That's fair.
              You cited one legal case to say value --
23   A.    I may have cited others, I can't recall.
     Q.    All right.  And just to complete the picture, so we
24   make sure we understand what's happening here, you are
     saying that but for Rimini's wrongful conduct, that you are
25   going to assume that they would have had different
     environments, they would have been 100 percent remote;

1    right?
      A.    I assumed that they would change their procedures so
2    they avoid the infringement and the interference.  So both
     of them.
3     Q.    And in four out of five cases they would have had
     brand-new environments that didn't exist; right?
4     A.    I don't know that that would be the case.
               I think some of the clients hosted environments
5    themselves.  So if a client already had an environment
     created, then it wouldn't have to be recreated.
6     Q.    I said four out of five.
      A.    I'm talking about the four, not the fifth.
7               I'm talking about Rimini Street may have hosted
     environment for, say, Bausch & Lomb, but Bausch & Lomb may
8    have already had the environment created because they
     wanted to do it.
9     Q.    But you don't know that, do you?
      A.    No, I don't know that.  But I have to assume that
10   some of them may have actually had their own --
      Q.    Why do you have to assume anything you don't know?
11    A.    I make assumptions constantly to calculate damages.
      Q.    I gather.  But you don't actually have a single fact
12   about a single client who was in that group of four, the
     four out of the five, that had their own environments;
13   correct?
      A.    I'd have to go back and look at the record.  There's
14   probably records indicating just that, but I don't know
     sitting here today.
15    Q.    And what you are doing is asking a purely
     hypothetical question.  You are saying, what if Rimini had,
16   in 4 out of 5 cases, gone remote -- gone remote instead of
     having those environments on their own system; correct?
17    A.    My calculation includes that.  It's more
     comprehensive.
18              I'm assuming that Rimini Street would have
     remained in the market, and they would have changed their
19   procedures so they could remain in the market in a
     noninfringing way and a noninterference manner.
20    Q.    All right.  Sir, let's try and answer the question.
      A.    I think I just did answer your question as far as I
21   know.  I was --
               (Simultaneous indecipherable conversation.)
22              THE COURT REPORTER:  You need to speak one at a
     time.
23   BY MR. ISAACSON:
      Q.    My question was --
24    A.    We're talking over each other, and I apologize.
     I'll try to keep it to yes or no.
25    Q.    My question is, you're saying what if Rimini, in 4
     out of 5 cases, had gone remote, gone remote instead of

3828

```
 1    having those environments on their own system; correct?
              That's your hypothetical.
 2    A.    I'm not sure.  You're reading from my testimony?
      Q.    No, I'm reading the question you didn't answer.
 3    A.    Could you read it again.  I'm sorry.
      Q.    All right.  Your hypothetical is that what if
 4    Rimini, in 4 out of 5 cases, had gone remote, gone remote
      instead of having those environments on their own system;
 5    correct?
      A.    That is what I asked.
 6    Q.    All right.  And in terms of assumptions, you've
      mentioned assumptions a lot, you are assuming that Rimini,
 7    beginning in 2006, could have won its first customers, its
      first references, and built a business from 2006 to 2012 of
 8    the same size using remote environments from the beginning;
      correct?
 9    A.    Yes.
              My -- my understanding and my assumption
10    is without -- but for the infringement and the
      interference, that Rimini Street wouldn't have just stopped
11    operations and walked away, they would persist and keep
      trying to compete.
12    Q.    Now, talking about 2006 and 2007.  Mr. Benge did not
      discuss or provide you any information for 2006 and 2007;
13    correct?
      A.    That's right.
14    Q.    And Mr. Benge, in providing his estimate about what
      would be required to go all remote, and saying he thought
15    it would be feasible, he was looking only at the year 2012;
      correct?
16    A.    You may be right, yes.
              I think he was extrapolating, but I think he was
17    using some experience from that time period.
      Q.    And based on what Mr. Benge told you in 2006, 2007,
18    2008, 2009, 2010, 2011, you don't know yourself if a remote
      model would have worked?
19    A.    That's an underlying assumption that they would not
      leave the market, they would persist and try to keep going
20    and compete.
      Q.    But you don't know technically whether it would have
21    worked?
      A.    I know that 20 percent or one in five of their
22    customers they were operating remotely.
      Q.    But you don't --
23    A.    So that's not an assumption, that's a fact, and I'm
      assuming they could do it with all five.
24    Q.    But you don't have the technical ability or
      background, and you have no information from Mr. Benge as
25    to whether they could have actually done that from 2006 to
      2011; correct?
```

3829

1    A.    I don't have the information because it is a
hypothetical, it is -- but for the wrongful acts, what
2    would Rimini Street have done.
              So I mentioned in my direct you have to
3    reconstruct the market from both perspectives.  You're
looking at more Oracle's perspective.  From Rimini Street's
4    perspective --
     Q.    Sir --
5    A.    I'm sorry.
     Q.    I don't -- I've interrupted you more than I've
6    perhaps interrupted any other person, but --
     A.    I'm terribly sorry.
7    Q.    -- I'm going to ask you to answer the questions.
     A.    I am attempting to answer your question.  Thank you.
8    Q.    Now, when you made the assumption for 2012 that a
100 percent remote business would work, was technically
9    feasible, you were relying on Mr. Benge, or anyone else
from Rimini, that told you that; correct?
10   A.    No.   That's not correct.
     Q.    All right.  The -- let me ask you to look in your
11   binder at PTX 11.
     A.    Which binder?  I have two up here.
12   Q.    There's a binder with PTX in it.  So it would be
that.
13            MR. STRAND:  PTX what number, Counsel?
              THE WITNESS:  Did you say P or T?
14            MR. ISAACSON:  P; that means plaintiff.
              MR. STRAND:  Is this admitted?
15            MR. ISAACSON:  Yes.
              This has been admitted, so please put this on
16   the screen.
              THE WITNESS:  And which number was it, sir?
17            MR. ISAACSON:  Eleven.
              THE WITNESS:  It's the first -- second one.
18   BY MR. ISAACSON:
     Q.    All right.  This is December 2006.  You know that
19   Mr. Chiu is a vice-president of Rimini Street; correct?
     A.    Yes.
20   Q.    Was he still working at Rimini Street when you began
your work?
21   A.    I'm not sure.
     Q.    He -- Mr. Lester, he's another senior person at
22   Rimini Street, you know that; correct?
     A.    I had the opportunity to read his deposition.
23   Q.    All right.  And Mr. Lester says to Mr. Chiu,
              "We can't deliver regulatory updates without a
24   support environment to create the update.  We can't create
a fix master support environment without the patches.  For
25   payroll support, this would be a showstopper."
              Now, this is something that you assumed in 2006

```
 1   was not true; correct?
              You assumed that they could deliver regulatory
 2   updates without a support environment; correct?
     A.    I assumed that they would create the patches and
 3   updates remotely on the client's environment.
     Q.    Right.  You assumed that the opposite of what was
 4   being written here was true; correct?
     A.    Yes, I have.
 5   Q.    Okay.
     A.    Well, I don't know.  I haven't read the whole
 6   document.  I would have to review it, but I do see the
     attention that you're drawing with that document.
 7   Q.    Now, this was -- there were only Siebel clients at
     this point.  You know that; right?
 8   A.    You're in 2006.
     Q.    Yes.
 9   A.    There may have been one PeopleSoft --
     Q.    I'm sorry.  This is December.  It's mostly Siebel
10   clients; correct?
     A.    I think that's right.
11   Q.    Okay.  And you never talked to Mr. Benge about the
     feasibility of supporting the Siebel clients without the
12   environments on the Rimini system; correct?  You only
     talked to him about PeopleSoft?
13   A.    Yeah, I didn't speak to him because I was talking to
     the technical experts, which was Mr. Hilliard, and then I
14   had the opportunity to read the other technical expert,
     Mr. Davis', report.
15   Q.    All right.  Well, let's go over that.  Let me see if
     I can find that.  Well, I'll get that at the break.
16            Now, you don't know what Rimini -- what Rimini
     was actually saying or doing, or what their views were in
17   this 2006, about whether they could -- whether they could
     operate their businesses without the environments that were
18   on the Rimini system; right?
     A.    May I hear the question again?
19   Q.    Sure.
     A.    I don't really understand what you're asking.
20   Q.    You don't know what Rimini was actually saying or
     doing or what their views were in 2006 on the issue of
21   whether they could operate their business without having
     environments on the Rimini system; correct?
22   A.    Well, most of the work I did was in 2012.  I read 53
     depositions.
23            And I did, as I said in my direct, develop my
     own theory that the appropriate approach was looking at the
24   efficiencies because Dr. Dean said what was happening was
     the copyright infringement and the interference allowed
25   them to be more efficient.
              He didn't say allowed them to operate, he said
```

3831

1   more efficient.  And you're asking me to remember 53
    depositions that I read three years ago.  So I don't think
2   I could say yes to your query on that one.
        Q.    All right.
3       A.    Or no.  I can't recall which way you were taking
    that.
4       Q.    And when, as you say, you developed your own theory,
    all right, you didn't ask Mr. Benge whether this was doable
5   in 2006; correct?
        A.    I don't think Mr. Benge was with Rimini Street in
6   2006.  I think he started in 2008.
                And I may have asked him, but it's just -- the
7   distance in time is so long, it's been a couple of years,
    three years, so --
8       Q.    You didn't ask Mr. Hilliard whether it was doable in
    2006, did you?
9       A.    I think I did.  I was certainly interested in the
    2006 because that's the beginning of my damage period.
10  So --
        Q.    You didn't put anything about that in your report;
11  correct?
        A.    I have a full section in my report saying that I
12  believe that -- based on the evidence, that Rimini Street
    could have operated --
13      Q.    But you didn't --
        A.    -- without the infringement or the interference.
14  And I went --
        Q.    But you made --
15      A.    -- point by point.
        Q.    -- those statements without talking about any
16  specific years; correct?
        A.    I already defined my period of review as 2006.  At
17  that time I think it went through 2012.  So I explicitly
    said that those were the years I was looking at.
18      Q.    All right.  Now, let me ask you again about, as you
    called it, my own theory.
19              Now, we've been talking about copyright
    infringement.  Now, one of the other claims in this as
20  case, as you know, is interference with customer
    regulations.  You know that; right?  We've called that the
21  interference claim.
        A.    I'm aware of it, yes.
22      Q.    Now, avoided costs is not a proper measure of
    damages if the damages are caused by lies.  Isn't that
23  correct?
        A.    I don't know that that's correct.  I think that that
24  goes to the jury and what the jury decides.  So --
        Q.    I'm not talking to the jury right now, I'm talking
25  to you.
        A.    -- I'm talking about -- I've calculated what I think

1    the benefit is of the wrongful acts which includes
interference.

2            So if the jury decides that there has been
interference, I think that the $9.3 million certainly could

3    be the right remedy.
Q.    But you wouldn't say, sir, would you, that if Rimini

4    hadn't lied to all those customers, if they had told the
truth, and that telling the truth wasn't going to cost them

5    any more money, or it was going to cost them a hundred
dollars to tell the truth, you wouldn't say avoided costs

6    are a proper measure of damages for interference.
            You wouldn't say that, would you?

7    A.    I would say that it would be -- as I said in my
deposition two years ago, that I think it would be a call

8    for the jury.
Q.    And so you're not reaching an opinion on that;

9    right?
A.    I did, and I told you that when I gave my

10   deposition.
Q.    You just said it was for the jury.  I'm trying to

11   find out what you're saying, okay?
            Would you say to this jury today that if all

12   this lying to customers caused lost customers, that the
proper measure of damages is to -- is to ask the

13   hypothetical, how much would it have cost Rimini to tell
the truth, that maybe -- and if that cost only a hundred

14   dollars, the proper measure of damages would be a hundred
dollars, would you say that to this jury?

15   A.    No, I don't think I would say a hundred dollars.  I
think you have to look at the totality of the case.

16            And, as I said in my deposition, if the jury
finds on the interference, then I think the $9.3 million is

17   a much better estimate for Rimini than 250 million.
Q.    Okay.  Let's talk about that.

18   A.    All right.  I'm sorry, I spoke the wrong number.
Q.    Your 9.3 million -- because that's not making sense

19   to me, sir.
            Your $9.3 million is your estimate of avoided

20   labor costs if Rimini did not violate the copyrights.  It's
not your measure of avoided costs if Rimini wasn't lying to

21   the customers; correct?
A.    Well, I think they have been very closely linked.

22   Q.    I'm trying to -- it's a simple question.
A.    Sure.

23   Q.    It's your measure of what Rimini -- of a world where
Rimini doesn't engage in copyright infringement, it's not

24   your mixture of the cost of where Rimini does not engage in
lying; correct?

25   A.    That was a long question.  I think there was two of
them in there too.

1    Q.    Let me put it simply.  You didn't do a calculation
of avoided labor costs where you -- of -- where Rimini
2    doesn't lie?
     A.    I did an analysis, and I didn't reach --
3    Q.    Did you hear --
     A.    -- the same number as Ms. Dean because I felt she
4    hasn't gone client by client and established that they
heard the lie and that they left Oracle because of the lie.
5    So --
     Q.    All right.  I'm going to ask you again, sir.
6          You didn't do a calculation of avoided labor
costs in a hypothetical where Rimini did not lie.  You
7    didn't do that, did you?
     A.    Those were the causes of action that were listed in
8    the complaint, and I grouped those in my analysis.
     Q.    Right.  But let's -- we'll get to that.  But let's
9    answer the question.  I'm going to try it a third time.
     A.    Okay.
10   Q.    You didn't do a calculation of avoided labor costs
in a situation where Rimini wasn't lying; correct?
11   A.    Not specifically.  I would -- just to end the
colloquy, yes, I would agree, yes.
12   Q.    Right.
     A.    But --
13   Q.    What you --
     A.    -- I did do a calculation.
14   Q.    What you just said was true before that, you lumped
them together, you just treated copyright infringement the
15   same as interference, and you actually said that in your
report, didn't you?
16         You said that -- that you estimated damages for
copyright infringement, and within copyright infringement
17   you include all of Oracle's causes of action.
     A.    You can read it to me.  I don't recall.  But I'm
18   sure it's there if you say it is.
     Q.    Well, look at paragraph 10 of your report.  This is
19   the opening report.
     A.    So this is the introduction to my report?
20   Q.    It's paragraph 10, yes.
     A.    Right.  This is a statement of opinions in my
21   report.
     Q.    Right?
22   A.    Which there's multiple bullets.  Is there one you
want me to read from?
23   Q.    And what you say at the very top is that you have
estimated damages for copyright infringement, and within
24   copyright infringement you include all of Oracle's causes
of action --
25   A.    I can't see where you're reading.
     Q.    -- unless you state otherwise.

```
 1       A.    Are you reading verbatim?  I didn't see that.
         Q.    The words "include all of Oracle's causes of
 2    action," yes.  Look at your paragraph 10.
         A.    Yes, I think I see what you're saying.
 3             So I say,
               "Because Oracle is claiming such a large number
 4    of cases of action in this litigation, for purposes of
      brevity, my use of the term copyright infringement should
 5    be understood to include all causes of action."
               You're right, yes.
 6       Q.    That's the lumping together.  You just threw
      copyright infringement and all the causes of action
 7    together and called them copyright infringement.
               And when you calculated avoided labor costs, you
 8    didn't do that for interference, you didn't do that for
      damages to computers, you just did it for copyright
 9    infringement; right?
         A.    Well, primarily, but -- you're right.
10       Q.    I'll take --
         A.    Yeah.
11       Q.    Now, let's go back to this PeopleSoft question.
               When you talked about avoided costs for
12    PeopleSoft environments, and you've -- you were talking
      primarily about PeopleSoft -- additional PeopleSoft
13    employees and engineers; right?
         A.    I believe so.
14       Q.    Okay.
         A.    I'm not quite sure what you're asking.
15       Q.    In fact, you did not make any determination about
      whether additional employees would be required to support
16    JDE or Siebel?
         A.    Most of my analysis was directed to PeopleSoft.
17             But when I asked for the additional employees,
      when I asked Mr. Benge and Mr. Zorn to go back through the
18    production and calculate and understand how many additional
      employees, it was for all three.
19       Q.    Okay.  That's false, sir, isn't it?
               You've never even looked at the issue of how
20    many additional employees would be required for Siebel and
      JDE; correct?
21       A.    No, I don't agree with you.
               Because when I asked Mr. Zorn, I was including
22    all three, but most of the added employees were needed for
      the PeopleSoft program.
23       Q.    All right.  And when you talked to Mr. Benge, he did
      not put -- are you telling me that when you talked to
24    Mr. Benge that you discussed with him how many additional
      employees would be required to support JDE or Siebel?
25       A.    My recollection is that we were talking about all
      three.
```

```
 1    Q.    All right.
      A.    I was.
 2    Q.    All right.  Mr. Benge, at his deposition, page 81,
      line 20 through 25, was asked the question,
 3              "Did you make any determination about
         whether additional employees would be required to
 4       support JDE or Siebel?
                "ANSWER:  No.
 5              "QUESTION:  Is that an issue you looked at?
                "ANSWER:  Not at all."
 6              Okay.  When you were talking to Mr. Benge, he
      had not done any consideration of how many additional
 7    employees were necessary for JDE or Siebel.  Did you know
      that?
 8    A.    My understanding, when I asked him to identify the
      additional employees, was for all three, and that's what I
 9    thought he did.
      Q.    All right.  I'm going to move to admit that excerpt
10    from the Benge deposition as PTX 6008.
                MR. WEBB:  Objection, Your Honor.
11              MR. ISAACSON:  Or 6009?
                COURTROOM ADMINISTRATOR:  I was going to say,
12    you just said 6008.  What is that?
                MR. ISAACSON:  6009.  Benge deposition, 81,
13    lines 20 through 25, as a party admission.
                MR. STRAND:  I object, Your Honor.  I don't know
14    that he was designated as a 30(b)(6) deposition.
                He was already here live to testify.  Counsel
15    could have asked him the question then.  Designating it as
      an exhibit at this point is inappropriate.  He's read it
16    into the record.  That's more than enough.
                THE COURT:  I'll reserve ruling on it.  I need
17    to review the actual portion myself.
      BY MR. ISAACSON:
18    Q.    Now, when you did your value of use, and you were
      trying to make assumptions about whether -- what would be
19    done in order for Rimini to behave legally with respect to
      copyright infringement, we've covered that you assumed that
20    they would have 100 percent remote environments.
                You also assumed they would not use crawlers to
21    download Oracle files; correct?
      A.    I did.
22    Q.    All right.  And you also assumed they would not
      share fixes, patches, and updates amongst customers;
23    correct?
      A.    That's right.
24    Q.    You did not make any assumptions about whether they
      would maintain a library of Oracle software; right?
25    A.    I thought I had.
                My understanding was I wanted to be
```

1    comprehensive, and so when I discussed how much more it
     would cost to work in a noninfringing, noninterfering way,
2    I was trying to be expansive and capture all of the
     wrongful acts that I was assuming occurred.
3              MR. ISAACSON:  All right.  Let's look at
     paragraph 73 of your report.
4              I think it would help the jury if we put
     paragraph 73 on the screen because there's a long sentence.
5              MR. STRAND:  No objection.
     BY MR. ISAACSON:
6    Q.    I'm going to look at the second sentence there, "it
     is my understanding."  Do you see that sentence, sir?
7    A.    I can see that, yes.
     Q.    Okay.  What you wrote in your report is,
8              "It's my understanding that Rimini Street can
     avoid liability by not hosting accused computer
9    environments on its own computers, by not using crawlers to
     download Oracle files, and by not sharing fixes, patches,
10   and taxes and regulatory updates among its customers."
               In your report, you did not make any assumptions
11   as to whether or not Rimini Street maintained -- continued
     to maintain a library; correct?
12   A.    It says that in the report, but my calculation, when
     I asked for the additional labor, was how much it would --
13   how much more labor to avoid the causes of action and to
     work in a noninfringing, noninterfering way.
14             So the report -- I'm trying to explain what I
     did.  I was not being comprehensive when I wrote the
15   sentence, but I don't think the sentence meant that I was
     excluding the other issues, it's just I'm summarizing and
16   I'm not listing to all of them in that instance.
               But at the beginning of my report I do list each
17   of them, and I'm saying that I'm assuming each of them are
     right, or that they're true allegations.
18   Q.    All right.  In fact, at the time of your report, you
     didn't know one way or the other whether you were assuming
19   a library of PeopleSoft, JDE, and Siebel software continued
     to -- would have existed on the Rimini system; correct?
20   You didn't know one way or the other?
     A.    That's -- I'm not quite sure that's true.
21             What I was assuming, that there had been
     copying, and so my understanding -- and I have to go back
22   and look at the list because the list is so long.
               So if I try to tell you everything that I was
23   working on right at this time, I would have a difficult
     time listing them all.
24             My understanding is they used automated
     crawlers, they created environments --
25   Q.    I'm talking about the library --
     A.    -- they copied --

1    Q.    I'm talking not about the crawlers, I'm talking
about the library.  Okay?

2    A.    Okay.

    Q.    In the remote-only model, you did not know in your
3  hypothetical whether Rimini would continue to have archives
of software updates and support materials on Rimini's

4  computer systems; correct?

    A.    When I discussed the approach of using the value of
5  use with Mr. Hilliard and Mr. Zorn and Mr. Benge, I was
more comprehensive.

6            I was saying I need to know the amount of labor
that would allow them to work in a nonaccused,

7  noninfringing manner.  Those were my exact words.

            I didn't go through and list every one of these
8  because I'm talking to the technical people.

            And so from an accounting perspective, I said
9  how much more would it cost to operate without infringing
or interfering with Oracle.

10   Q.    I'd like to get a yes -- I'd like to get an answer
to this question.

11   A.    I'm trying my best, I'm sorry.

    Q.    In the remote-only model, you didn't know whether
12  Rimini would continue to have customer archives of software
updates and support materials on Rimini's computer systems;

13  correct?

    A.    My assumption was that they would work in a
14  nonaccused manner.

    Q.    Is that yes or no?

15   A.    That's a no -- or a yes.  I did assume those things,
all of it.

16            I was -- my underlying assumption is whatever
they're doing that is wrong, let's stop, and how much more

17  would it cost.

    Q.    Your answer to that question is yes.

18            I would like to show you your deposition, line
63 -- I mean, page 63, lines 1 through 9 where the same

19  question was asked.

    A.    Okay.  Is it in the book?

20   Q.    You're about to see it on your screen.

    A.    Okay.

21       (Videotape deposition of Scott Hampton played
         as follows:)

22          "Q.    In the remote-only model, do you know
         if Rimini will continue to have customer

23       archives of software updates and support
         materials on Rimini's computer systems?

24          "A.    No, I don't know.  It's my
         understanding is  they would operate in a

25       non-infringing manner, so I'm relying on others
         to understand the technical aspects of -- of the

3838

1          case. I'm not opining on it myself."
    BY MR. ISAACSON:
2      Q.    I want to ask you about an exhibit in your book.
       A.    I couldn't hear you, I'm sorry.
3      Q.    I want to ask you about an exhibit in the book, PTX
    5529.
4              MR. ISAACSON:  Don't show this on the screen
    because it's not admitted.
5              MR. STRAND:  5529?
               MR. ISAACSON:  Yes.
6              THE COURT:  For the benefit of the record,
    Mr. Isaacson, I think you need to ask him whether that was
7    his testimony in that deposition.
    BY MR. ISAACSON:
8      Q.    That was your testimony in that deposition; correct?
    That video I just showed you?
9      A.    You're asking me was it consistent with what I just
    told you --
10     Q.    No, I'm asking you was that -- I'll let the jury
    decide whether it's consistent.
11     A.    Sure.
       Q.    I'm asking you was that your testimony at your
12    deposition?
       A.    Yes, it was.
13     Q.    So PTX 5529.
       A.    PTX 5529.
14     Q.    So it's going to be towards the back.  It's a bigger
    number.
15             Now, yesterday you told me that you had received
    an electronic report from Mr. Zorn with a calculation of
16    labor costs.  Do you remember that?
       A.    Yes.
17     Q.    Okay.  And it was a large electronic file; correct?
       A.    Which file are you talking about?
18     Q.    What Mr. Zorn gave you.
       A.    I received thousands of files.  Well, not files,
19    thousands of pages, probably hundreds of files.
       Q.    But do you remember being given -- I'm talking about
20    that electronic file he gave you.  I was asking you what
    you received from Mr. Benge and Mr. Zorn, and you said
21    yesterday you got an electronic file.
               And I think it was shown to you at your
22    deposition because it's so large, and I believe what you
    said was that you reviewed those calculations but you
23    didn't use them.
               Does any of that ring a bell?
24     A.    Not entirely, no.  And I received so many files that
    I'm not sure which one you're talking about.
25     Q.    All right.  Well, just to -- okay.  Let me come back
    to that.  I'll get you the deposition pages, and I'll

```
 1    remind you of that after the next break.
      A.   Okay, great.
 2    Q.   Now, going back to what Mr. -- going back to your
      value of use.
 3          Now, another phrase, I'm afraid, that's been
      used during this trial is a hypothetical license measure of
 4    damages, and both you and Ms. Dean have used that for
      Oracle's database, although you have very different results
 5    from that analysis; correct?
      A.   Yes.
 6    Q.   And you're familiar with hypothetical negotiations
      being a potential measure of damages in an intellectual
 7    property case; right?
      A.   I am.
 8    Q.   Okay.  And you used that measure of damages before;
      correct?
 9    A.   Yes, probably more than 80 times on different cases.
      Q.   And the -- in the hypothetical negotiation, you're
10    assuming there's a willing buyer and a willing seller;
      right?
11    A.   Yes.
      Q.   And here Rimini would be the willing buyer and
12    Oracle would be the willing seller; correct?
      A.   You're talking about the database; right?
13    Q.   Yes.
      A.   Yes.  Okay.
14    Q.   And if you apply -- now, you didn't do -- your value
      of use measure of damages is not a hypothetical license
15    assessment for PeopleSoft, Siebel, or JD Edwards; correct?
      A.   No, it is a -- the benefit derived or the profit
16    that Rimini gained through it's wrongful actions.
      Q.   So -- and I may have done a double negative here,
17    but I think we're in agreement, so I'll say it one more
      time.
18          You're not giving a hypothetical license opinion
      for PeopleSoft, JD Edwards, or Siebel; correct?
19    A.   Well, it's been a few years since I wrote that
      report.  I'd probably have to go back and look.
20          I -- you could touch on it in --
      Q.   During your testimony you didn't; correct?
21    A.   I didn't mention it that I recall.
      Q.   All right.  You have not in court given a
22    hypothetical license opinion about PeopleSoft, JD Edwards,
      and Siebel; correct?
23    A.   I'm sorry, I don't understand your question, because
      those aren't products that were actually sold by Rimini
24    Street.  So I'm confused by --
      Q.   I'm just trying to define what you have and haven't
25    done.
      A.   Fair.  And I just want to make sure I answer --
```

1    Q.    In your testimony in court, you did a hypothetical
license measurement for Oracle database.  You did not do
2    one for PeopleSoft, JD Edwards, and Siebel; correct?
     A.    In my testimony I think that's right.  In my report,
3    I'd have to go back and --
     Q.    I'm just asking you about your testimony.
4    A.    Sure.
     Q.    And for PeopleSoft, JD Edwards, and Siebel, in your
5    testimony, you didn't look at -- you didn't look at any
comparable licenses that might have influenced your
6    opinion; correct?
     A.    I'm not sure of the question.
7             So you're asking for the copyright infringement
claims other than the database, whether I looked at
8    comparable licenses.
     Q.    Right.  Because you weren't doing a hypothetical
9    license, you didn't need to look at comparable licenses;
right?
10   A.    Boy, it is a big report.  So that's hard to say.
     Q.    In your testimony --
11   A.    There were a lot of licenses so you're asking about
comparable licenses.  I don't have an opinion without going
12   back and looking.
     Q.    Okay.  I'm talking about your testimony in court,
13   not your report.
     A.    I'm sorry.
14   Q.    In your testimony in court, you weren't relying on
any comparable licenses to support an opinion; correct?
15   Excluding Oracle Database.
     A.    That's a very good question.  I have to think about
16   it for a minute.
              Certainly I was aware of the contracts, the
17   underlying contracts.
     Q.    I'm talking about --
18   A.    You're asking just about what I said in my
deposition or in my trial testimony?
19   Q.    Right.
     A.    I don't remember mentioning it.
20   Q.    Okay.  And there's -- I'm not even going to explain
this to the jury, sorry, but there's something in a
21   hypothetical license format called the *Georgia-Pacific*
factors.  You did not apply *Georgia-Pacific* here; correct?
22   A.    Well, that's a very difficult question to answer.
     Q.    In your trial testimony?
23   A.    Also difficult to answer.
              The 13 *Georgia-Pacific* factors that he's
24   referencing are very comprehensive.  They're the things you
would look at if you were calculating damages in a patent
25   case.
              So there's -- almost everything's involved in

3841

1     the *Georgia-Pacific* factors so it would be hard to answer
    that with --

2     Q.    But you weren't going through the *Georgia-Pacific*
    factors in your trial testimony; correct?

3     A.    I didn't walk through the factors, no.
    Q.    Okay.  Now, you have been an expert in copyright

4     cases, you've said before.  One of them was called *Ajaxo*
    *versus Bank of America Technology and Operations.*  Do you

5     remember that?
    A.    That was, what, eight years ago, ten years ago?

6     It's been a long time.  I don't remember -- I remember the
    case but not the specifics of it.

7     Q.    All right.  It's actually -- let's see.  How long
    ago was that?  2008.

8           And you've listed it in your report in this case
    as one of the copyright cases that you've done before.  Do

9     you remember that?
    A.    Yes.

10     Q.    All right.  And that -- to explain that, one of the
    things you do in your report is you attach, you know,

11     recent cases -- cases within relatively recent years that
    you've worked on, and we list them so that we know what the

12     cases are.  And one of them was the *Ajaxo* case; right?
    A.    Yes.

13     Q.    Now, *Ajaxo* was a copyright case; right?
    A.    To the best of my recollection.  That, and may have

14     had other causes of action, just like this case has
    multiple --

15     Q.    Well, you can look at your opinion or your report,
    5510.  That's in the binder.  And if you look at paragraph

16     9, you'll see,
          "I was asked to provide an opinion on damages

17     related to Bank of America's alleged copyright
    infringement."

18     A.    Yes.
    Q.    All right.  So in that case, you were in a slightly

19     different position, you were working with the plaintiff who
    was seeking instead of the defendant who was opposing

20     damages; right?
    A.    You know, I don't even remember it's been so many

21     years ago.
    Q.    Look at paragraph 1 of the report.

22     A.    Yes.  And I have to look at who the plaintiff was,
    yes.  Ajaxo was the plaintiff.  Okay.

23     Q.    So, in that case, you're working for the plaintiff
    who is seeking damages and not the defendant who is

24     opposing damages; correct?
    A.    I believe you're right, yes.

25     Q.    Right.  And the defendant's expert, you remember,
    was a Mr. Cox?

3842

1   A.    I don't remember.
    Q.    All right.  Well, let's look at PTX 5509.
2         Now, this is an excerpt that was available in
    Westlaw of a portion of your deposition in that case.  And
3   do you see on page 6 of 10 the discussion where you're
    being asked questions about what Dr. Cox did?
4   A.    Did you say page 6?
    Q.    Yeah, page 6 of 10, at the bottom.
5   A.    Okay.
    Q.    All right.  And so take a look at that.  Refresh
6   your memory.
          Remember that you were giving opinions that were
7   disagreeing with Mr. Cox in that case.
    A.    So it's talking about statutory damages at the
8   beginning.  That's the correct page, 6 of 10, right?
    Q.    At the bottom.
9   A.    I'm sorry.
    Q.    Is it your understanding that Dr. Cox -- so the
10  expert on the other side was Dr. Cox?
    A.    Can I take a minute to absorb what is being said and
11  what the context is?
          I'm not recalling the details of the case, I'm
12  sorry.
    Q.    You can see that there was a Dr. Cox whose opinion
13  you were disagreeing with; correct?
    A.    I do see that, yes.
14  Q.    And you were asked,
          "Is it your understanding that Dr. Cox came up
15  with that number," referring to a damages number, "at least
    in part based on his opinion that the bank would not have
16  paid more for royalty than it would have cost the bank to
    create the applications itself?"
17        You answered, "Yes."
          And what's happening there is that the expert,
18  who you were disagreeing with, estimated damages based on
    what it would have cost the bank to create the application
19  that it had used in -- to create the application itself,
    one that it had taken from someone else in violation of
20  copyrights.
          That's what's happening there; right?
21  A.    I don't recall.
          So Dr. Cox would have been the defense expert.
22  Q.    Right.
    A.    I really don't recall all my specifics, so --
23  Q.    That case involved the accusation that the Bank of
    America had taken the software application in violation of
24  Ajaxo's copyrights.
    A.    I think you're right.  That does refresh my memory a
25  little bit.  I think it was a bank merger, and they were
    combining the two banks, if I recall.

1    Q.    And the other side's expert said the proper measure
of damages is how much would it have cost the bank to build
2    that software itself rather than taking it; correct?
     A.    Yeah.   You're testing my memory, but --
3    Q.    That's what --
     A.    I mean, we can read this, but I don't know if I can
4    read in as much as -- I mean, it doesn't say that here.   I
mean, obviously, you've researched this more than I have.
5    Q.    But what it says is that Dr. Cox based his opinion
in part on whether the bank -- based on whether it would
6    cost -- how much it would have cost the bank to create the
application itself.
7    A.    Right.   And this could be in the context of a
hypothetical.   I'd have to read --
8    Q.    I believe it is in the context of a hypothetical
negotiation.
9    A.    You do?
     Q.    Yes.
10   A.    Okay.
     Q.    And you were asked do you agree with that, and you
11   answered "No."  Do you see that?
     A.    It says,
12           "Okay.   Is it your understanding that Dr. Cox
came up with that number at least in part based on his
13   opinion that the bank would not have paid more for a
royalty than it would have cost the bank to create the
14   application itself."
     Q.    Right.
15   A.    I said, "Yes."
     Q.    Right.   And then you were asked whether you agreed
16   with Dr. Cox, and you said, "No."  Do you see that?
     A.    Yeah.   I was wondering why I said yes and then no,
17   because this is the progression of the answers --
     Q.    Because --
18   A.    He's asking if I read it correctly or something.
     Q.    The first question is was it your understanding that
19   Dr. Cox said something.   You said "Yes."  And then you were
asked did you agree with Dr. Cox, and you said "No."
20   A.    Okay.
     Q.    Okay?   So let's look at the next page in the middle.
21           Now, do you see the question,
             "But you still think the bank would pay some
22   extraordinary amount?"
             In the middle of the page?
23   A.    Yes.
     Q.    Why don't you read those next couple of questions
24   and answers.
     A.    "But you still think that the bank" --
25   Q.    No.   I'm sorry.   You don't -- you can read it to
yourself.   I'll ask you some questions.

3844

1    A.    I wouldn't mind reading it out loud.
           Okay.
2    Q.    Okay.  Now, the debate that's going on there between
     you and Dr. Cox is Dr. Cox is saying that the proper
3    measure of damages is what would it have cost the bank to
     create that software it took itself, if it just developed
4    the software itself, what would that have cost.
           And you're saying, no, they should pay more than
5    that; correct?
     A.    I think this is in the context of a hypothetical.
6    Q.    In the context of a hypothetical negotiation,
     Dr. Cox is saying that the -- that the bank should not have
7    to pay any more than what it would have cost to be
     noninfringing to develop the software itself; correct?
8    A.    I don't remember all the circumstances, but this
     part of the deposition, yes, I agree with you.
9    Q.    And in that part of the deposition, you're saying I
     disagree with Dr. Cox, they should -- the bank should have
10   to pay more than what it would have cost to be
     noninfringing, correct, in the context of a hypothetical
11   negotiation?
     A.    Yes.  And I think the context was is that this
12   software was a very short bit of code that Mr. Ajaxo
     created that allowed the bank to make its two databases for
13   the merger appear as just one.
           So the interface -- when the user logged into
14   the bank's website, even though the banks had two separate
     databases, two separate systems, they would only see one,
15   and it would make it transparent.
     Q.    And for the reasons you're saying that, in that
16   case, as the plaintiff expert, you said the proper measure
     of damages was not what it would have cost to be
17   noninfringing for purposes of a hypothetical negotiation,
     the proper number was six times that cost; right?
18   A.    I don't remember any of the numbers or any of the
     amounts.
19   Q.    Well, do you see that's what you said in answer to
     the questions in front of you?  Right where you were
20   reading.
           You were asked,
21         "QUESTION:  Why do you think the bank would
         pay six times more according to your
22       calculations to license software that it could
         just create itself?"
23   A.    I'm seeing "extraordinary amount," so did you move?
           I'm seeing what you say, but -- too bad it's not
24   a numbered page.
           I see, "But you still think the bank would pay
25   some extraordinary amount."
     Q.    Right.  Keep reading.

1    A.    And the next one is "extraordinary."
           Oh, I see.  Down the page further.
2    Q.    Right.  You were giving the opinion that it should
be six times the cost of noninfringement for purposes of a
3    hypothetical negotiation; right?
     A.    And you're testing my recollection going back that
4    far.  It was a hypothetical license negotiation.
     Q.    Right.
5    A.    And I think -- well, my testimony is what it is, but
I don't remember all the context of it.
6    Q.    But your testimony that you're looking at said you
were multiplying the costs by six; correct?
7    A.    It doesn't say cost, it says six times.  I'm not
sure what they're multiplying, or I was at that point in
8    time.
     Q.    Well, it was six times what Dr. Cox had estimated;
9    right?
     A.    That might be true, and I don't remember what his
10   basis was.
     Q.    Well, you can read his basis, didn't you?  That
11   Dr. Cox was basing his estimates on what it would cost to
create the software in a noninfringing manner; correct?
12   A.    I don't know that.  I would have to go back and
look.
13         You say that.  Maybe you've researched it.  I
could agree with you, but I don't know that.  I mean, I
14   could agree that you probably know it.
     Q.    Well, you understand -- so the question -- you were
15   asked the question,
           "You still think the bank would pay some
16   extraordinary amount of money to license software that it
could just recreate even according to your calculations for
17   significantly less?"
           And you answered, "I think you mischaracterized
18   my testimony."
           The question was, "How so?
19         "Well, I'm not saying they would pay an
extraordinary amount, I'm saying they would pay the value
20   of the copyrighted works.
           "QUESTION:  Why do you think the bank would pay
21   six times more, according to your calculations, to license
software that it could just create itself?"
22         You were measuring damages based on six times
what it would cost the bank to create the software itself
23   in a noninfringing manner; correct?
     A.    I don't have that recollection.  I mean, we've read
24   a small excerpt.
           I think, if I recall, this wasn't a hypothetical
25   license negotiation, and I don't recall whether it was a
value of use, but it may be the value of use, what's the

```
 1    value to the bank type of calculation, not what's it cost
      to create the software.
 2                That might have been where we were differing at
      this point in the deposition.  I don't really recall,
 3    though.
           Q.   But the -- as you read that deposition testimony,
 4    I've got it correct, don't I, that there you were
      multiplying the cost by six, whether it was for
 5    hypothetical negotiation or not.
           A.   I'm not sure it was the cost, because it doesn't say
 6    the cost.
           Q.   You multiplied --
 7         A.   I didn't remember it did.
           Q.   Six times more.
 8         A.   Yes.  And it doesn't say what the more is, and I
      don't remember at this point.
 9         Q.   But it does say what it's more.  More -- six times
      more to license the software than it could just create
10    itself.
           A.   Okay.  So it's probably a value of use in a
11    hypothetical setting, cost X to write the software, just
      write the code, but what is the value of use.
12         Q.   Right.  So for your value of use calculation in that
      case, you were multiplying the cost of being noninfringing
13    by six, and, in this case, you're just taking the actual
      cost of being noninfringing.  That's what's happening here;
14    right?
           A.   No.
15         Q.   Okay.  Here in this case, your estimate of damages
      is based on the actual cost of noninfringement; correct?
16    That would be the avoided labor costs?
           A.   But there's no parallel to it because I'm basing my
17    calculation --
           Q.   I didn't ask you about the parallel, okay?
18                I think you actually would agree with me that I
      have this right, that, in this case, you are basing your
19    estimate of damages on the actual avoided labor costs,
      you're not multiplying them by 2, 3, 4, 5, or 6; correct?
20         A.   That's correct.  I'm calculating the benefit based
      on Dr. Davis.
21         Q.   And in the Ajaxo case, okay, you took the cost that
      would -- of what it would take for the bank to create the
22    noninfringing software itself, and you multiplied that by
      six; correct?
23         A.   I don't recall.  Today I don't remember the
      circumstances of that case, and I don't remember the
24    portion of this deposition.  So I just can't answer that.
           Q.   I think you agree with me, and you did agree with
25    me, that that's what the deposition in front of you says;
      correct?
```

1       A.    It appears to from that portion, but I -- I don't
have a recollection.  I would like to read the whole
2    deposition.
        Q.    All right.  And it's pretty simple math; right?
3    Isn't it?  If you multiply 9.3 or 9.4 by 6, now the damage
calculation is $56 million; correct?
4       A.    I wouldn't suggest that we do that unless we know
more about what the other case was about and what the
5    circumstances were.
        Q.    Okay.  And the --
6       A.    I would agree with you that this case is about the
efficiencies as Dr. Davis defined them.
7       Q.    And the other differences between the two cases is
that in *Ajaxo* you were testifying for the plaintiff and
8    seeking damages, and here you're testifying for the
defendant who doesn't want to pay much damages; correct?
9       A.    Well, that's a very loaded question.
        Q.    It is --
10      A.    But I agree that --
        Q.    It is factually correct what I just said; right?
11      A.    I calculated the efficiencies in this case.
        Q.    Was it --
12      A.    I didn't have a preconceived notion to come up with
the damage number.  I followed the evidence as best I
13   could.
        Q.    All right.  Did I have it factually correct that in
14   *Ajaxo* you were testifying for a plaintiff seeking damages,
and in this case you're testifying for a defendant who
15   doesn't want to pay much damages?
                Do I have that right?
16      A.    Yes, you have the sides of the case right, yes.
                MR. ISAACSON:  Okay.  Can we -- I want to move
17   to a new topic here, Your Honor.  I don't know when you
want -- or if you tell me when you want me to --
18              THE COURT:  I would normally take our break in
about 10 minutes.
19              MR. ISAACSON:  Okay.  Can we look at Hampton
demo 3 and 4.  This is from their presentation.
20   BY MR. ISAACSON:
        Q.    All right.  These were slides that you went over in
21   your direct.  Do you recognize these?
        A.    Yes, I do.
22      Q.    So over there it says AICPA.  That's the American
Institute of CPAs, and they have rules of conduct, and
23   we've shown them to the jury.
                And it says that you should exercise sensitive,
24   professional, and moral judgments in all their activities.
                And then on the next page there's an integrity
25   principle,
                "To maintain and broaden public confidence.

3848

```
 1    Members should perform all professional responsibilities
      with the highest sentence of integrity."
 2              Then there's an objectivity and independence
      principle.
 3              "A member should maintain objectivity and be
      free of conflicts of interest in discharging professional
 4    responsibilities."
                Those are all from the AICPA code or rules of
 5    professional conduct; right?
      A.    Correct.
 6    Q.    All right.  And there's also an AICPA code of
      professional conduct rule that says that,
 7              "Members, in performing professional services,
      shall not subordinate his or her judgment to others."
 8              You're familiar with that?
      A.    I'm not sure what you're reading from, what
 9    document.
      Q.    All right.  So let's look at -- I don't know if we
10    have -- do we have those rules --
                (Discussion held off the record.)
11              MR. ISAACSON:  Do you mind if I show a rule of
      professional conduct on the screen?
12              MR. STRAND:  That's fine.
                MR. ISAACSON:  Matt, maybe you can show Rule
13    100.001.  And there's an objectivity rule.
      BY MR. ISAACSON:
14    Q.    Do you recognize this as one of the other AICPA
      rules?
15    A.    Yes.  Now I understand where you're reading from.
      Q.    Right.
16              "In the performance of any professional service,
      a member shall maintain objectivity and integrity, shall be
17    free of conflicts of interest, and shall not knowingly
      misrepresent facts or subordinate his or her judgment to
18    others."
                You're familiar with that; right?
19    A.    I am.
      Q.    And the AICPA also has guidelines and practice aids
20    that talk about how you handle client-supplied information.
      You're familiar with those?
21    A.    There are quite a number of practice aids.  I've
      actually been involved in writing some of them but years
22    ago.
      Q.    I was asking you about ones that specifically deal
23    with client-supplied information.
      A.    You would have to identify the practice aid.
24    There's so many of them.
      Q.    All right.  Would you agree with me that,
25              "While a damages expert may rely on a client's
      representations and information as part of the normal
```

3849

1    delivery of professional services, it should not be done
     without appropriate consideration"?
2    A.    I would agree with that completely.
     Q.    And that goes back to that principle about
3    subordinating your judgment to others.
               If a client gives you -- I think we're okay --
4    if a client gives you information, you don't simply accept
     it or subordinate your judgment to them, you give your own
5    consideration to those materials; is that fair?
     A.    That's absolutely correct.
6    Q.    Okay.  And the -- and, in fact, when you use
     management-supplied information or projections that rest on
7    assumptions that are tested, you should -- would you agree
     with me that you should use information that's testable?
8    Meaning you can corroborate it or test it?
     A.    Yes, I would agree with you.
9    Q.    Okay.  Would you agree with me that when you get
     information from management of a company -- of your client,
10   that it should come from qualified people at the company?
     A.    Yes, I think the source of information is important.
11   Q.    Okay.  Would you agree with me that the information
     should be corroborated?
12   A.    It would depend on the circumstances, but I think
     that's a good rule of thumb, yeah.  That's a good
13   procedure.
     Q.    And should you also take into account whether the
14   information was provided for a litigation purpose as
     opposed to something that was done in the regular course of
15   business?
     A.    Yes.
16   Q.    Okay.  Now, let's go back to Mr. Benge and Mr. Zorn.
               The -- your head count estimates, meaning your
17   personnel -- how many extra people would have to be hired,
     we talked about the doubled employees, the doubled remote
18   engineers, 25 percent more PSEs, those head count numbers
     came from Mr. Zorn and Mr. Benge; correct?
19   A.    And I understand that Mr. Benge, when I spoke with
     him, that he was going to go back and talk with his
20   production people and come up with the estimate of how many
     hours -- or, excuse me, how many people it would take for
21   Rimini Street to operate in a nonaccused fashion.
     Q.    Okay.  I'm going to come back and get an answer to
22   my question, but let me ask you about that.
     A.    Okay.  I thought I did.
23   Q.    You understood that when Mr. Benge gave you head
     count numbers, that he went and talked to other people in
24   order to corroborate and confirm that the numbers he was
     going to give you were accurate?
25   A.    That's my understanding, yes.
     Q.    Okay.  And were you here when Mr. Benge testified in

1   court?
    A.    No, I was not present.
2   Q.    Have you reviewed his testimony?
    A.    I have, yes.
3   Q.    Okay.  And were you aware that he said that he did
    not discuss his estimate with engineers in onboarding?
4   A.    Yeah, I saw that.
    Q.    Were you aware that he said that he didn't provide
5   you a scientific calculation, there was nothing written
    down, there was no formula, and there was no study of the
6   hours?
    A.    Well, I think that -- I read that transcript.
7         He said that he spoke with people, and then I
    think Ms. Dunn characterized it differently and he agreed.
8         But I would say that he did do a study, he
    just --
9   Q.    Whoa, whoa, whoa, whoa, whoa.
    A.    -- doesn't see it as the same kind of study.
10        He went back and spoke with his production
    people.  To me, that's an investigation.
11        If you want to call it a study, if you don't
    want to, you don't have to, but that's what I asked him to
12  do.
    Q.    Did you just say that Ms. Dunn characterized it
13  differently, Mr. Benge agreed under oath, but you would not
    accept Mr. Benge's testimony under oath?
14        That's what you just told us; right?
    A.    I did not tell you that.
15  Q.    Okay.  Do you accept the truth of what Mr. Benge
    said under oath?
16  A.    I heard what -- I read what he said, but I didn't
    think that -- I think he was a little confused.  I think he
17  could have just as easily said that he went back and talked
    with people, he could have characterized that as a study,
18  but he didn't.
    Q.    Is the answer to my question no, that you don't
19  accept what he said under oath because you thought he was
    confused?
20  A.    No, I accept what he said under oath, but it wasn't
    in conflict with what I understood that he did.
21  Q.    Now, is it your testimony that you talked about --
    that you got the head count estimates from anyone other
22  than Mr. Zorn and Mr. Benge?
    A.    My understanding is, is that he went back and spoke
23  with his production people.
    Q.    I'm talking about who you got -- we're done with the
24  production people.  Mr. Benge said what he said.
          What I'm asking you now is who you got the
25  information from.
    A.    Oh, I'm sorry.

```
 1      Q.    The -- did you have other sources for your
        assessment -- we talked yesterday, I showed you language
 2      from your report about how your estimate was based on an
        assessment by Mr. Benge and Douglas Zorn, and you told me
 3      you had other sources.  Do you remember that?
        A.    I don't remember the context.  Was it --
 4      Q.    I showed you a part of your report that said based
        on an assessment by Jim Benge and Douglas Zorn, and you
 5      said I know --
        A.    I do recall that.  I was thinking of Dr. Davis.  I
 6      was thinking of Ms. Dean and Mr. Ravin, I think, when I
        answered that question.
 7      Q.    We're talking about head counts for a 100 percent
        remote environment model.  Mr. Davis didn't do an estimate
 8      of the head count for that; right?
        A.    Well, we may have been talking past each other.  I
 9      may have misunderstood.  I thought -- and we can look at
        the transcript and --
10      Q.    Well, let's --
        A.    -- I could have been confused.
11             But I got the head count from Mr. Benge and
        Mr. Zorn.  I got the theory of -- this is the right
12      approach from Dr. Davis who said the infringement and the
        interference allowed them to work more efficiently.
13      Q.    All right.  Let's look at the paragraph again,
        paragraph 169 of your report.
14             MR. ISAACSON:  And I'd like to put that on the
        screen.
15             MR. STRAND:  No objection.
               THE COURT:  You may do so.
16      BY MR. ISAACSON:
        Q.    I think we looked at it on the screen yesterday.
17      The second sentence.
               "First, based on an assessment made by Jim Benge
18      and Doug Zorn, I understand that doubling" -- and you go on
        to talk about how that would be sufficient to perform
19      duties in a remote-only manner.
               Remember, we looked at this yesterday?
20      A.    I do.
        Q.    Okay.  And I asked you wasn't this information --
21      wasn't your assumption based on assessment by Jim Benge and
        Doug Zorn, and I thought you told me it was based -- you
22      had other sources.
        A.    Yes, and I recall now.
23      Q.    Okay.  And your other -- now, Dr. Davis did not
        estimate -- our expert did not estimate how many PeopleSoft
24      developers and engineers would be necessary in a
        remote-only manner; right?
25      A.    I think that's right.  He --
        Q.    And Elizabeth Dean did not do an estimate that it
```

1   would require doubling the amount of developers in a
    remote-only environment; correct?
2   A.    No, I don't think she did.
    Q.    Okay.  Now, do you have other sources other than the
3   assessment made by Jim Benge and Doug Zorn that -- on which
    you base your assumption of the appropriate number of
4   developers and engineers for a remote-only operation?
    A.    No, it was Dr. -- or, excuse me, Mr. Benge and
5   Mr. Zorn was the source of the information for the head
    count.
6   Q.    All right.  It was only the management of Rimini
    that you relied on for the assessment that twice -- that
7   all that would be required would be doubling the number of
    PeopleSoft developers; correct?
8   A.    That's true.
    Q.    Okay.
9   A.    Yes.
    Q.    And you had no way to corroborate that; correct?
10  A.    I looked at it for reasonableness.
              So when I got the numbers, I looked at how many
11  employees are we adding relative to the size of the
    company, and it was, I thought, substantial, to --
12  Q.    You --
    A.    -- to the production of people was about a third,
13  and I thought that was a major increase.
    Q.    You looked at it for reasonableness, but you have no
14  technical ability to know how many engineers would be
    required to operate in a remote-only environment; correct?
15  A.    No, I was relying on Mr. Benge and Mr. Zorn and the
    deposition testimony, I think, of Mr. Ravin as well.
16  Q.    All right.  Now, you don't mention Mr. Ravin's
    deposition testimony, but -- all right.  We'll add him in.
17            So you're relying on -- and I think you
    testified yesterday, Mr. Zorn does finance, he's not
18  technical.
              He can tell you the salaries of the developers,
19  but he can't estimate how many developers would be needed
    in these environments; correct?
20  A.    I think Mr. Zorn has a pretty good understanding of
    the company, but he wanted to consult and talk with
21  Mr. Benge as well.
    Q.    Okay.  So Mr. Benge and Mr. Ravin were the people
22  who told you, and who you believe had the technical ability
    to tell you, how many PeopleSoft developers would be needed
23  such as the doubling?
    A.    Mr. Ravin wasn't involved.  I had read his
24  deposition that he had given, I think, in 2011, and so I
    didn't consult with him.
25            I was working just with Mr. Zorn, the
    financial -- the chief financial officer, and then to get

1    the production side, we spoke with Mr. Benge, and then I
     understand Mr. Benge went to the people within the
2    production department and made the estimate.
          Q.    I was hoping to get an answer to the question before
3    the break.
                 For your estimate that doubling the amount of
4    engineers would be required, you relied on Mr. Benge in
     terms of whether -- the technical truth of that, whether
5    that was -- whether -- as a matter of looking at the
     technology, how many extra developers would be required,
6    you relied on Mr. Benge and the deposition of Mr. Ravin;
     correct?
7         A.    Well, for the numbers, it would just be the
     testimony or the -- I relied on Mr. Benge, Mr. Zorn.
8         Q.    But Mr. Zorn, I think you -- and you told me
     yesterday you agreed, did not have the technical ability to
9    say we'd need twice as much engineers in order to be remote
     only.
10        A.    I think -- I think he has a lot of knowledge, but he
     relied on Mr. Benge as well.
11        Q.    All right.  So I don't know why this is so hard.
                 In order to make the technical assessment of how
12   many additional engineers would be required, you relied on
     Mr. Benge, and you also looked at the deposition testimony
13   of Mr. Ravin.  I have that right; correct?
          A.    Yes.
14        Q.    Okay.  And that number was created for litigation;
     correct?
15        A.    That number was created within the context of the
     litigation.  It wasn't contemporaneous before the accused
16   acts, that's right.
          Q.    And you saw Mr. Benge testify that that number was
17   created for litigation; correct?
          A.    I didn't see it.  I read his trial transcript, and I
18   saw that he said -- and what he was saying was it was
     created after the litigation was filed.
19        Q.    Right.  Well, he said it was for purposes of the
     litigation.  You read that, didn't you?
20        A.    I think he might have characterized it that way,
     yes.
21        Q.    Yeah.  You couldn't test that number because you
     don't have the technical background to test whether twice
22   as many engineers would be all that would be required to
     operate a 100 percent remote business; correct?
23        A.    No, I'm relying on Dr. Davis, Dr. Hilliard, and my
     reasonableness test, that this would be about a 30 percent
24   increase for the company overall.
          Q.    Okay.  Now, you're throwing out more names.
25               We agreed that Dr. Davis, who is our expert,
     didn't estimate how many engineers would be required to

3854

```
 1    operate in a 100 percent remote environment; correct?
      A.    No, but I was struck by the fact that he said the
 2    infringement created efficiencies.  So I --
      Q.    Efficiencies.  That doesn't tell you a number, that
 3    doesn't tell you whether it's 2, 3, 4, 5, or 6 times as
      many engineers --
 4    A.    It gives me a magnitude, though.
      Q.    Just the word efficiency gives you a magnitude?
 5    A.    Well, if somebody -- if something is more efficient,
      then I think that that is not doubling, even, I think that
 6    was conservative, because.
      Q.    Do you --
 7    A.    -- efficiency to me is -- says -- if he would have
      said they made a great deal of money, that would be
 8    different.  But he couldn't go there.
                  And he also didn't say they couldn't have worked
 9    without these things.  He characterized it as an
      efficiency.  That's the beginning of my analysis.
10    Q.    So the beginning of your analysis is you take the
      word efficient and says, well, that couldn't be more than
11    double.
      A.    I think doubling was sufficient based on my read of
12    Ms. Dean's characterizations of it in her report and
      Dr. Davis, that the wrongful acts, the infringement and
13    tortious interference allowed them to work more
      efficiently.
14    Q.    All right.  And you --
      A.    That's the way he characterized it, and that did
15    influence me.
      Q.    And now you mentioned Mr. Hilliard.  He did not give
16    you any information about head counts for a remote-only
      model; correct?
17    A.    No.  I relied on him as to the fact that it could be
      done.
18    Q.    But he didn't tell you anything about how many
      people it would take to get it done; correct?
19    A.    I went back and spoke with him, after I got the
      numbers from Mr. Benge, and said, "Does this look
20    reasonable?"  He thought it did.
      Q.    All right.  I would like to show you --
21                THE COURT:  Well, let's take our break.
                  MR. ISAACSON:  Could I -- it's on this exact
22    point, and then I'm done.
                  THE COURT:  All right.
23                MR. ISAACSON:  It's four lines.  Page 73 of your
      deposition, lines 12 through 16.
24                THE WITNESS:  Are you going to put that on the
      screen or is that in the binder?
25                MR. ISAACSON:  It's going to play right for you.
                  THE WITNESS:  Okay.
```

3855

1          (Videotape deposition of Scott Hampton played
           as follows:)
2              "Q.   Was Mr. Hilliard one of the people
           that provided you a head count estimate for
3          the remote-only model?
               "A. No, I got that information from Doug
4          Zorn and Jim Benge."
   BY MR. ISAACSON:
5    Q.    That was your testimony at your deposition, wasn't
   it, sir?
6    A.    Yes.  I got the actual numbers from Mr. Zorn and
   Mr. Benge, and that's what I just told you a few minutes
7    ago.
               MR. ISAACSON:  All right.
8          Thank you, Your Honor.
               THE COURT:  Thank you.
9              Ladies and gentlemen, we'll take our first break
   of the day, and I remind you not to converse among
10   yourselves or with anyone else on any subject connected
   with the trial, or allow yourselves to be confronted by
11   anyone who may be speaking about the case.
               Keep an open mind.
12             And we'll take a break for approximately 15
   minutes and reconvene at that time.  Let us know when
13   you're ready.  You may step down.
               COURTROOM ADMINISTRATOR:  Please rise.
14         (Recess from 10:49 a.m. until 11:11 a.m.)
           (In the presence of the jury.)
15             COURTROOM ADMINISTRATOR:  Court is again in
   session.
16             THE COURT:  Have a seat, please.
               The record will show the jury is present,
17   parties and counsel are present.  We're in open court.
               Mr. Isaacson, you may pick up with your
18   cross-examination, please.
               MR. ISAACSON:  Thank you, Your Honor.
19   BY MR. ISAACSON:
     Q.    Before the break -- and I think you said, and I
20   think it's in your report, that the -- Mr. Benge's numbers
   about head counts, the doubling of engineers, was
21   consistent with Seth Ravin's deposition testimony.
     A.    Yes.
22   Q.    All right.  And it's your understanding that
   Mr. Benge's estimate was discussed with Mr. Ravin; correct?
23   A.    No.
     Q.    Now, you met Mr. Benge two weeks before your report
24   was due; correct?
     A.    My recollection is I spoke with him prior to that.
25             I was in Salt Lake City, they were in
   San Francisco, so I was on the phone, and then I did have a

1    meeting in San Francisco two weeks before the report was
     written or issued.  It had been in the process of being
2    written for quite a while.
         Q.    And it was at that meeting that Mr. Benge gave you
3    the head count numbers, including the doubling figures?
         A.    I don't recall it that way.
4        Q.    Okay.  That's what Mr. Benge testified to.  You read
     that; right?
5        A.    I don't -- I did read his transcript.  I guess I
     just wasn't focusing on that issue.
6              As I said, my best recollection is I got the
     head count through Mr. Zorn.
7              So we may have discussed where we were going,
     how things were going when I met with him, but I don't --
8    Mr. Benge never handed me a piece of paper with the head
     count, or at least I have no recollection of that.
9        Q.    But he told you at the meeting twice as many
     environment engineers, 25 percent more PSEs, and the
10   other -- the other relevant figures for head counts in your
     report; correct?
11       A.    I think we discussed it.  I don't recall specific
     conversations this many years past.
12       Q.    Well, we'll rely on what Mr. Benge said.
               Now, at that point, when you talked to
13   Mr. Benge, you knew that Seth Ravin had already testified
     that remote development would require twice as much labor
14   to operate; correct?
         A.    I believe that deposition was given in 2011, so I
15   was aware of it, and that factored into my conclusion that
     the best approach would be -- based on Dr. Davis and
16   Ms. Dean's report of there being efficiencies, well, how do
     we capture that.
17       Q.    So when you walked into the meeting with Mr. Benge,
     you already had in your head from Mr. Ravin it would take
18   twice as many people, and then Mr. Benge said to you it
     will take twice as many people.  That's what happened;
19   right?
         A.    I think you've got it a little bit wrong.  What
20   happened was I read Dr. Davis' report about efficiencies
     and Ms. Dean's --
21       Q.    Dr. Davis didn't mention doubling; right?
         A.    I'd be happy to answer your question if you allow me
22   to tell you.
         Q.    I'm asking you about doubling, so I would like you
23   to answer my question.
         A.    I'll be happy to do it if you would let me speak.
24       Q.    When you walked into the meeting with Mr. Benge, you
     already had in your head from Mr. Ravin's deposition that
25   this all-remote business would take twice as many people,
     and then Mr. Benge said to you it will take twice as many

1   people.
                 That's what happened; right?
2      A.    No.
       Q.    Okay.
3      A.    What happened is I told Mr. Benge -- or I asked
    Mr. Benge, I said, "This is what I want to do, I want to
4   find out who needs to be replicated, who needs to be
    doubled.  Find me the positions that we're going to
5   double."
                 Based on me telling him this is my approach,
6   we're talking about efficiencies, we've got additional
    employees, let's see who would have to be replicated in
7   order to work in a nonaccused fashion.
       Q.    And he told you that he -- you would need to double
8   the amount of employees, and you said, well, probably not
    the PSEs; right?  And then you had a discussion about PSEs?
9      A.    I had asked him to give me the list of people that
    would be replicated or the people that would be doubled.
10                So my instructions to him was my theory is is
    there would have to be more people, and so -- and I assumed
11  that there would have to be twice as many people in certain
    categories of production of the people doing the work.
12                Tell me who those people would be, and then I'm
    going to look at what they were actually paid, and I'm
13  going to calculate how much more it would cost based on
    real people.
14                So I was asking him which people would have to
    be doubled in a sense.  So he wasn't telling me it was
15  going to be doubled.  I asked him, give me the head count
    of the people we would be doubling.
16                So that's how it worked out.
       Q.    Okay.  So before that meeting, you read Mr. Ravin
17  say that in order to do a remote-only business, it would
    take twice as many people.
18                So you went into the meeting, and you said to
    Mr. Benge, "Which categories of people are we talking
19  about, which ones do you need twice as many?"
                 Is that what happened?
20     A.    No.  It was because I had spoken to him over the
    phone, and I had already explained my approach and how I
21  wanted to capture the efficiencies.
                 And so he wasn't telling me let's double, and I
22  wasn't telling him let's double, the point was, who do we
    need to replicate, or what positions would be doubled in
23  order to work in a nonaccused fashion?
       Q.    But going into that meeting, you would have already
24  assumed there would have to be twice as many people in
    certain categories; correct?
25     A.    Yes, that was the underlying assumption.
       Q.    Right.  That was your underlying assumption.

```
 1            And you had already read that Mr. Ravin had said
    it would take twice as many people; correct?
 2    A.    Well, that was absolutely correct.
              And then I spoke with Dr. Hilliard and asked
 3    does this seem like a reasonable approach.
      Q.    Sir, we just played you your deposition where you
 4    said you never talked to Dr. Hilliard about head counts.
      A.    I didn't say I didn't talk with Dr. Hilliard.  He
 5    didn't come up in that conversation.  I was asking where I
    got the head count, not the idea to do it.
 6    Q.    The head count --
      A.    So that's the difference.
 7    Q.    Okay.  So you're saying -- when we're talking about
    doubling, we're talking about doubling the head counts;
 8  right?
      A.    Absolutely.
 9    Q.    Right.  And you were asked, "Did you talk to
    Dr. Hilliard about head counts?"  And you said, "No";
10  right?
      A.    I spoke with him about doubling, not who would be
11    replicated.  So I spoke with him about is it reasonable to
    take this approach.
12              And we didn't talk about who would we -- be
    doubled.  So --
13              MR. ISAACSON:  Your Honor, I would ask this
    answer --
14              THE WITNESS:  -- we're talking past each other.
              MR. ISAACSON:  I ask this answer be struck and
15    he be instructed to answer the question.
              THE COURT:  I'd rather just move on,
16  Mr. Isaacson.
    BY MR. ISAACSON:
17    Q.    Okay.  You said under oath in your deposition, you
    were asked, "Did you talk about head counts with
18  Dr. Hilliard?"  And you said under oath "No"; correct?
      A.    It wasn't about head counts, it was about the theory
19  of doubling, but we weren't talking about how many.  So
    head count is how many.
20    Q.    Right.  So doubling --
      A.    -- the theory of how to do it.
21    Q.    Let me get this straight.
              Doubling is not the same as head counts, but
22    when we're talking about doubling, we're talking about
    doubling the head counts.  Do I have that right?
23    A.    You're trying to confuse it quite well.
              And what the point was how many people do we
24  head count --
              THE COURT:  Mr. Hampton --
25              THE WITNESS:  I'm sorry.
              THE COURT:  -- you need to listen to the
```

1  question, answer the question, and wait for the next
   question.
2            THE WITNESS:  Yes, sir.
   BY MR. ISAACSON:
3  Q.    Do I understand your testimony correctly doubling is
   not the same as head counts, but when we're talking about
4  doubling, we're talking about doubling the head counts; is
   that right?
5  A.    We're talking about the approach.
   Q.    Am I right?  Am I right that your testimony is that
6  doubling is not the same as head counts, but when you're
   talking about doubling, you're talking about doubling the
7  head counts?
   A.    I'm talking about the approach versus the actual
8  number of people.
   Q.    Why won't you answer --
9  A.    I'm trying to answer your question.
   Q.    Can you give me a yes or no?
10 A.    It isn't a yes or no question that I can quite
   understand it that way.
11 Q.    Okay.
   A.    I'm sorry.  I would if I could.
12 Q.    All right.  I'll let the jury evaluate that.  I'll
   move on.
13            Now, in terms of going back to talking to --
   talking to Mr. Ravin, separate from reading his deposition,
14 you also had conversations with Mr. Ravin; right?
   A.    Yes, I did.
15 Q.    Okay.  And did you talk to him about the doubling
   issue or the head count issue?
16 A.    I don't recall discussing that issue with him.  I
   was talking to him about another issue.
17 Q.    All right.  You knew that -- it was your
   understanding that Mr. Ravin was -- that Mr. Ravin knew
18 that you were talking to Mr. Benge about the doubling
   issue; correct?
19 A.    No, I'm not sure that he was aware that I was
   talking -- he may have been, but I wouldn't know if he had.
20 Q.    Right.  And you talked with Mr. Benge, didn't you,
   about doubling being a concept talked about in Mr. Ravin's
21 deposition; correct?
   A.    Probably not.
22            I didn't tell him what I was doing.  I just
   asked for --
23 Q.    All right.
   A.    -- how many people would we have to duplicate, which
24 people -- in fact, I was asking which people would we have
   to duplicate to work in a noninfringed manner.
25            I didn't tell him about what I was going to use
   it for.  I didn't tell Mr. Zorn what I was going to use it

1   for.
    Q.   So -- but when you go into this meeting, and you say
2   "I want to talk about doubling, which categories of
    employees to double," and Mr. Benge tells you which
3   categories of employees to double, you never mentioned, you
    know, funny coincidence here, this doubling we're talking
4   about, that's exactly what Mr. Ravin said was necessary in
    his deposition.
5            Never talked about that with Mr. Benge?
    A.   Well I don't think the conversation went that way.
6            I don't think it makes a difference.  But in
    that -- you keep characterizing this discussion that we had
7   differently than how it went.
             I had asked Mr. Zorn for how many employees we'd
8   have to duplicate and -- not how many, but specifically
    which employees would be duplicated, and then he went to
9   Mr. Zorn and asked that.
             When I met with Mr. Zorn and Mr. Benge in
10  San Francisco, he didn't give me the head count at that
    time.  I got it through an electronic file, as I said, from
11  the beginning.  So I got it through Mr. Zorn.
    Q.   Well, let's talk about that electronic file.  We
12  were talking about this PTX 5529.  And do we have that
    deposition --
13           COURTROOM ADMINISTRATOR:  5529 is not admitted.
             MR. ISAACSON:  You're going to have to give him
14  the transcripts so -- to refresh his recollection.  I know
    it's not in.
15           COURTROOM ADMINISTRATOR:  Okay.
             MR. ISAACSON:  So I'll come back to that.
16  BY MR. ISAACSON:
    Q.   Now, in terms of setting up this remote-only
17  business in India, your assumption was that there would not
    have to be much effort or planning in order to do that;
18  right?
    A.   I think, if I recall, that they were already working
19  with consultants in India, and that would be -- that make
    it easier to set up an Indian office and hire people.
20  Q.   Right.  You assumed it would be easy to set up
    because they were already working with consultants in
21  India.
             Was Rimini working with any consultants in India
22  in 2006?
    A.   I don't know exactly that timeframe.  I would have
23  to look.
    Q.   Okay.  They weren't, were they?  They weren't
24  working with them in 2006 or 2007 or even 2008?
    A.   I don't know.  That's very possible that they
25  weren't.
    Q.   You never investigated -- when you said I assumed

```
 1   that not much planning would be necessary because they were
     already working with consultants in India, you didn't go
 2   back and look as to whether that was going to be true from
     the start of the company; correct?
 3   A.    No, not specifically to that answer.
     Q.    Okay.  Now, if you can look at 5529, and then I'm
 4   going to have you look at your deposition just to see if I
     can help your memory out here.
 5   A.    5529?
     Q.    Yes.
 6   A.    Okay.  Thank you.
     Q.    And then we're going to look at page 92 of your
 7   deposition.
     A.    Is that in one of these binders?
 8         COURTROOM ADMINISTRATOR:  It's the one I just
     gave you.
 9         THE WITNESS:  I've got it.  I see it.  Thank
     you.
10         Could you give me the page number again?
           MR. ISAACSON:  92.
11   BY MR. ISAACSON:
     Q.    And you can see there that you were discussing
12   calculations that were given to you by Mr. Zorn.
           And if you remember, my colleague, Mr. Hixson,
13   because these are so voluminous, he showed them to you
     electronically so you could look at them on the screen.
14         Okay?  And then at lines 12 through 17, you said
     you remembered reviewing them but you didn't use them in
15   your report.  Right?
           Is this coming back to you, that -- this large
16   amount of information you got from Mr. Zorn that you looked
     at but didn't use?
17   A.    This is the electronic file where I said that he
     gave me the people that we would replicate.
18         That's what I was waiting for.  We had been
     waiting a number of weeks for it, and then about two weeks
19   before the report was issued, I finally got what I had been
     asking for.
20         And it came through this electronic file, and
     what I was looking for was which people in the organization
21   would have to be replicated or doubled in order to work in
     a noninfringing manner.
22   Q.    Right.  And he gave you a lot more than you asked
     for.  It was this really large file?
23   A.    Yeah.  I was surprised, he gave me an Excel
     spreadsheet that had 20 tabs and was full of financial
24   results of Rimini Street over eight years or so.
     Q.    Right.  Okay.  We're talking --
25   A.    It may not have been quite eight years --
     Q.    We're talking about --
```

```
 1      A.      -- but a number of years.
        Q.      We're talking about the same thing.
 2              All right.  So that's the electronic file I'm
        talking about, and somewhere in that electronic file there
 3      were head count numbers that you used.
        A.      There were.  There were actually just not the head
 4      count, but the actual employee that they were assuming
        would have to be doubled.
 5      Q.      Right.  And other than the head count numbers, you
        didn't use what Mr. Zorn gave you?
 6      A.      I didn't look elsewhere in the spreadsheet.
                So I was -- I already had my own model created,
 7      and I needed to know which people were going to be doubled,
        and that's what I was looking for, and that's what I took
 8      out of it.
        Q.      And your understanding of what Mr. Zorn gave you was
 9      a model where the additional employees would be hired in
        the United States and not India?
10      A.      I'm sorry, could you ask that question again?
        Q.      Sure.  So you're assuming a 100 percent remote
11      business where all the engineers providing environmental
        support are in India; right?
12      A.      I think we're agreeing, yes.
                The production people, as I think I
13      characterized them, would be in India, yes, except for the
        PSEs.
14      Q.      And the people in India in your -- when you do your
        calculations, have lower salaries than if you hire people
15      in the United States to do the same work; correct?
        A.      Yes.
16      Q.      Okay.  And what Mr. Zorn gave you in that file was
        here's what it will cost if we hire all these people in the
17      United States; right?
        A.      No.  At the time I got the spreadsheet, I didn't
18      even look, and I wasn't aware of the fact that he had given
        me more until my deposition.
19      Q.      All right.
        A.      I just looked at the head count and the position.
20              I was unaware that there was another tab in that
        file where Mr. Zorn had gone further than what I asked him
21      to do.
        Q.      All right.
22      A.      So he calculated what it cost to work in India.
                MR. ISAACSON:  Matt, can you play lines 12
23      through 21, page 92.  Do you have it cut that way?
                (Videotape deposition of Scott Hampton played
24              as follows.)
                "Q.     And what, if anything, did you do with
25              the projections for the cost of the remote-only
                model that Mr. Zorn had included in that
```

1    planning document?
          "A.   I remember reviewing them, but I didn't
2    use them in my report that I recall."
          MR. ISAACSON:  Okay.  And keep going down to
3    line 6 on the next page.
          (Videotape deposition of Scott Hampton played
4     as follows:)
          "Q.   Why is that?
5          "A.   Because I was trying to identify the
      cost in India of using additional employees,
6      rather than in the United States.
          "Q.   Sure.  You understand that Mr.
7      Zorn's planning document also made an attempt at
      estimating cost in India?
8          "A.  No, I'm not familiar with that.  I
      think his estimate would be in the United
9      States."
BY MR. ISAACSON:
10   Q.   All right.  So what Mr. Zorn gave you, and you've
     remembered at the time of your deposition, was that he gave
11   you an estimate for what it would cost to do this model in
     the United States, and you discarded that in favor of doing
12   it with engineers from India.
          That's what happened; right?
13   A.    No.
     Q.    It is the case that the report he gave you used
14   additional employees in the United States and not India;
     correct?
15   A.    At the time I was testifying, I got his spreadsheet
     and I looked at the portion of those that had the employees, and
16   that was in the United States.
          What I wasn't aware of was in another tab
17   elsewhere in the spreadsheet, he'd calculated what it would
     cost in India.
18          I didn't know that at the time I was testifying
     here but subsequently became aware of it during the
19   deposition.
     Q.    All right.  So we'll go over that.
20          So at the time -- at the time period when you
     received the report from Mr. Zorn, you understood it was an
21   estimate only of what it would cost if you did this in the
     United States.  You didn't know it said anything about
22   India; correct?
     A.    I didn't know the spreadsheet had anything about
23   India, and what it had was head count for the United
     States.
24   Q.    Right.  And so you discarded it thinking,
     incorrectly, that it was only about the United States, and
25   did your own estimate of what it would cost to do this in
     India; correct?

1    A.    Almost.  I didn't discard anything.
          I just took the people that had said -- that
2  Mr. Benge had said needed to be doubled, and then I took
   those people and put them into my model, and I didn't use
3  any of the rest of his spreadsheet.
     Q.    Right.  So --
4    A.    Because that wasn't what I --
     Q.    I guess you don't like the word discard, but you
5  decided not to use it because it was United States only;
   right?
6    A.    Not at all.  I used -- his summary -- actually, what
   he did was he took his --
7    Q.    Sir --
     A.    -- the reason the document was so big is because it
8  was everything that Rimini had ever done over -- since its
   existence.
9    Q.    Right.  But you decided not to use his estimates and
   not rely on them because you thought, incorrectly, that
10 they were relying on US employees; correct?
     A.    No, you've got it wrong still.
11          What he was talking about, and what I'm talking
   about in my deposition, was the US portion of what actually
12 occurred, and it was identifying the people that we were
   going to replicate, and I just took the people out of the
13 spreadsheet.
          I didn't need the US portion, and I was unaware
14 that he'd even calculated anything for India.
          So all I was asking for was who are the people
15 that we need to replicate, and then I took those and put
   them into my model.
16          I didn't need to discard anything because all I
   had asked for was give me the people that would have to be
17 replicated.
     Q.    All right.  When you received Mr. Zorn's document,
18 you thought his estimate was only for the United States;
   correct?
19   A.    Well, his --
     Q.    Yes or no, sir.
20   A.    What he had was he had the actual results in the
   United States, and then he had highlighted the people that
21 needed to be replicated.
     Q.    Sir.
22   A.    Yes.
     Q.    Yes or no.  You thought his estimate when you
23 received it was only for the United States?
     A.    There wasn't an estimate.  It was the actual results
24 and then just a highlight of the people that needed to be
   replicated.
25   Q.    Sir, I just played you your deposition testimony.
   It's right in front of you.  Where you said I think his

```
 1   estimate would be in the United States.
                 It's right in front of you, page 92.
 2    A.    Of the head count, of the people.
      Q.    Right.  That's what we're talking about?
 3    A.    Because they did operate in the United States.
      Q.    You thought --
 4    A.    I asked him which people would have to be
     duplicated, and that's what he gave me.
 5    Q.    You thought -- you thought his estimate of head
     counts was only for the United States; correct?
 6    A.    It was only for the United States because we were
     duplicating actual people who worked in the United States.
 7    Q.    And then you didn't use that part of his report
     because you were trying to identify the cost in India of
 8   using additional employees rather than in the United
     States; correct?
 9    A.    Right.  These weren't estimates, this was the actual
     employment wages for these people.
10              So that's what -- we're looking at a payroll
     tab, and this was the list of employees and what they
11   actually made in the United States.
      Q.    Let's --
12    A.    That's what we're dealing with.
                 And I just took those and took the people, and
13   then I assumed they actually worked in India, so I had to
     calculate a wage in India.
14    Q.    All right.  Let's look at 5529.  This is the summary
     tab from that document.  Do you recognize this?
15    A.    You're going to have to give me a moment.  5529?
      Q.    Yes.
16    A.    Okay.
                 MR. ISAACSON:  All right.  5529 has been
17   produced by the other side as the document that we've been
     discussing.
18              All right.  I would move 5529 -- sorry, as one
     tab of the document because the document is quite
19   voluminous.
                 MR. STRAND:  On the understanding it's one tab
20   of a voluminous document, Your Honor, we have no objection.
                 THE COURT:  All right.  It's admitted as to the
21   one tab.
           (Plaintiffs' Exhibit 5529 received into
22         evidence.)
                 MR. ISAACSON:  All right.  There's a number of
23   trees now grateful for not putting in the other tabs.
     BY MR. ISAACSON:
24    Q.    This is the summary of what Mr. Zorn did, not what
     you did, and if you look at page 2 up at the top, do you
25   see additional costs?  And there's total additional costs?
      A.    Yes, I see that.
```

1    Q.    All right.  Now, this is Mr. Zorn estimating total
additional costs of being remote only if you use US-based
2    engineers.  You understand that; right?
     A.    No, you're wrong.  This is India.
3    Q.    Well, no, let's --
     A.    At least if it's the right tab -- you haven't said
4    what tab this is.
     Q.    I believe it's tab A, the summary.
5          I'll help you out here.  Look down below.  You
see Total Cost Reductions Offshoring with much lower
6    numbers?
     A.    Okay.  So I was unaware that he had the US in this
7    tab.  Okay.
     Q.    Okay.  So the total additional costs that's at the
8    top, that's assuming US engineers, and down below we'll get
to what it would cost if you did it in India.  Do you
9    recognize that?
     A.    I don't.  I'm not sure that's what it is.
10   Q.    All right.  The total additional -- I think if you
review the document, you will understand that that's what
11   it is.
           But the total additional cost in the United
12   States is only for four years, 2008 through 2012.  Do you
see that?
13   A.    If that's what it is.  I mean, you represent it to
be that.  It's a column of numbers, but --
14   Q.    I have it right that those numbers apply only to
2008 to 2012?
15   A.    That's what it appears to do, yes.
     Q.    Right.  And I'm going to ask you to trust me on
16   this that those -- I'm sorry, that's five years, that those
five years add up to about 25.3 million.
17         You're more than good enough with numbers to see
that I'm probably about right.
18   A.    You may be correct, yeah.
     Q.    Right.  So we're missing 2006, 2007, as well as 2013
19   and 2014, which are part of your analysis.
           If you used US-based engineers, would you agree
20   with me that, based on what Mr. Zorn was telling you, that
the remote-only model would cost about -- would cost in
21   excess of $40 million?
     A.    I don't know.  I'd have to review.  It's a huge
22   spreadsheet with numbers coming in from many different
tabs.
23         So I'm not sure you're correct.  I would have to
look.
24   Q.    Does it seem reasonable to you that when five of the
nine years are 25.3, that if you did all nine years, that
25   the number would be $40 million or greater?
     A.    I don't know.  I haven't actually looked to see what

3867

1    the cost would be in the United States.  I assume the
     employees would be in India.

2       Q.    All right.  And then let's go down to -- and so what
     happened here was that for just four, five years, Mr. Zorn

3    gave you an estimate of what it would take to run this
     business in the United States.

4            For those five years it added up to $25 million,
     and you said, okay, but we're not doing it that way, so I'm

5    not going to use that, we're going to go to India only, and
     then you did your own estimates of that?

6       A.    I was unaware that I even received this, because I
     was looking at the payroll tab, and this was a separate tab

7    with 20 tabs across the bottom of the page.

8            So, as I testified in my deposition, I didn't
     know that he'd actually made a calculation.  I just asked
     him for the people to be replicated.

9            I was unaware that he'd actually gone forward
     and made a calculation of his own.

10      Q.    You knew he had done an estimate was what you said
     in your deposition?

11      A.    I was unaware of this tab when I gave my deposition.

        Q.    All right.  Then the -- if you go down to the

12   off-shoring, remind me, is this a 90 percent reduction?
             What Mr. Zorn did was take the above numbers for

13   the United States and reduce them by -- I can't remember if
     it's by 80 percent or 90 percent.  Maybe you can tell me.

14   But he just took a percentage reduction to estimate India.

        A.    He took 90 percent.  I spoke with him about this

15   after the fact.

        Q.    Thank you for reminding me.

16           So he took the US numbers and reduced them by 90
     percent, and that's not the method you used, but that's the

17   method he was using; right?

        A.    He took that approach and came up with a number of

18   about 6.5 million if I read his schedule properly.

        Q.    Right.  I counted it 6.4.  Now, that was for five of

19   the nine years.

        A.    And I was unaware that he had actually assumed that

20   the top portion was the US because I think that 90 percent
     number comes from the payroll tab.

21           So I didn't know he characterized that as the
     US.

22      Q.    So, right.  So the -- that's what he's reducing by
     90 percent, he's reducing the US salaries by 90 percent.

23      A.    He is doing that.  That's my understanding.  Yes.

        Q.    And for India, for five of the nine years we're

24   talking about, as you said, he estimated 6.5, and for all
     nine years you've estimated 9.4; right?

25      A.    Approximately, yes.

        Q.    So what's happening here is that Rimini gave you a

1    model which you say you didn't use --
     A.    I wasn't even aware that it existed at the time.
2    Q.    That you say you didn't know existed and -- by the
     way, was this given to your staff?
3    A.    We had been using this document for weeks.  He added
     the tab.  We didn't look at it again that comprehensively,
4    so --
     Q.    But your staff had the electronic document; correct?
5    A.    Sure, yeah.
     Q.    Okay.  And what happened was, was Rimini gave you an
6    electronic document with an estimate that said for five of
     the nine years, it would be 6.4 million, and that, in this
7    litigation, you've come up with a very similar number;
     right?
8    A.    My number's higher.
     Q.    Higher for nine years, about the same if --
9    A.    Well, if you consider 6.4 similar to this 8.6, then,
     yeah.  There's quite a difference.
10   Q.    You both came up with the number -- you both came up
     with a number under 10 million.  That's fair isn't it?
11   A.    I calculated the amount that it would have cost
     Rimini Street to operate in a nonaccused fashion from 2006
12   through 2014, at least February of 2014.
     Q.    Right.  Rimini gave you very clear information that
13   they wanted this damage number under $10 million; right?
     A.    That's not true.
14   Q.    Okay.  The -- now, when you said -- assumed that
     Rimini could hire double the amount of its employees, you
15   were talking about people with 10 years of experience in
     the relevant software, PeopleSoft, Siebel, JDE; right?
16   A.    Could I hear the question again, please?
     Q.    Sure.  When you assumed doubling the head counts of
17   certain categories, such as the people providing support
     for the environments, you assumed that those people would
18   have at least 10 years of experience in the relevant
     software, whether it's PeopleSoft or Siebel, et cetera?
19   A.    My best recollection is I just asked who would have
     to be replicated in order to work in a nonaccused fashion,
20   and so I was assuming the people would have enough
     experience to be able to do whatever task they were asked
21   to do.
     Q.    All right.  But in reading the transcripts, you've
22   seen Rimini Street saying, you know, we hire people who
     have at least 10 years of experience.
23             Is that an assumption that you made in this
     performing your calculations?
24   A.    I disagree with your statement.  They hire some
     people with 10 years appearance, but that doesn't mean all
25   people have 10 years experience.
     Q.    Now, you've read Rimini suffered from shortages of

1    personnel in 2009, they were having difficulties hiring
     enough people in 2009.
2              What makes you think they could -- when they
     were unable to overcome that shortage of people, that they
3    would be able to actually double their employees in that
     year?
4      A.    You're making the assumption because they don't have
     employees on staff that they -- and I think it was
5    difficult to get really experienced people.
               Not minimizing that, but for a small startup, I
6    think there's always going to be labor shortages where you
     are working on a short staff because you -- every dollar is
7    essentially borrowed, so you're going to be extremely
     frugal.
8              So you're saying because they had people who
     were complaining about not having enough people, that there
9    were not enough people available.
               I don't know that's the case.  I think it may be
10   they're trying to keep the staff very thin to keep the
     costs down.
11     Q.    Now, but you assumed that they would be able to hire
     the number of qualified people they needed; right?
12     A.    That is an assumption that I make is that the people
     could be found.
13     Q.    All right.  And you know that had -- and you were
     relying on Mr. Benge for that; right?
14     A.    Not entirely, no.
       Q.    Okay.  Now, you reviewed Mr. Benge's testimony, you
15   know that he has testified that in saying that you would be
     able to hire those number of people, that he didn't account
16   for the competitive market for engineers.
               You read that; right?
17     A.    I read his deposition -- or his trial transcript and
     saw that, yes.
18     Q.    You read that he testified that he did not account
     for any difficulties in finding qualified candidates.  You
19   read that; right?
20     A.    I remember something to that effect, yes.  I'm not
     sure you characterized it exactly as it's said, but, yeah,
     I think he said that.
21     Q.    Well, it's for those who want to know, it's
     transcript 2198, lines 14 through 21.
22             You assumed that when Rimini went 100 percent
     remote from India that it was going to keep all but a few
23   of its customers; right?
       A.    I assumed that they might lose some and they may
24   gain some, but they would have approximately the same.
       Q.    Approximately the same.
25             And they would have a net loss of, at most, a
     few customers?

1    A.    I'm not sure they would lose any customers at all in total.  They may lose a few, but they may gain a few.

2         My underlying assumption is that the number of customers would remain the same even though there may be

3    some that wouldn't have come on as a customer, and then others may have because they're now working in a nonaccused

4    fashion.

     Q.    And you did not do any survey of customers to

5    determine their willingness to work with a company that was operating 100 percent remote from India; right?

6    A.    I did not perform a survey.

     Q.    And you thought that that would be acceptable to

7    customers based on the information you received from Mr. Benge; right?

8    A.    Not solely.

     Q.    Who else?

9    A.    In fact, I'm not sure that I discussed that issue with Mr. Benge at all.  I was talking about head count with

10   Mr. Benge and who would have to be replicated.

     Q.    All right.  You didn't discuss with anyone whether

11   Rimini's customer base would find it acceptable to be -- for Rimini to be operating 100 percent remotely from India;

12   correct?

     A.    The only other person I can think of that I may have

13   had a conversation with would be the technical expert, Mr. Hilliard.

14   Q.    You say you may have had that conversation.  You don't know that you had that conversation; right?

15   A.    If I had that conversation, it was three years ago.

     Q.    You don't remember any --

16   A.    I don't recall.  I don't recall sitting here today, it's true.

17   Q.    All right.  It's a fact, sir, that you have assumed that -- that customers would find it acceptable to work

18   with Rimini from India 100 percent remotely, and did you not -- you don't recall talking to anybody about that

19   assumption?

     A.    That wasn't my testimony.

20   Q.    I asked you if that's true.

     A.    Oh.

21   Q.    It's true, sir --

     A.    I don't recall sitting here today -- I did an

22   investigation of what it would take to work in India.  So I did go online, I looked at who operated in India as far as

23   companies that were already there, I looked at the wages that --

24   Q.    Sir, listen to my question.

     A.    Sorry.

25   Q.    You have assumed that customers would -- customers would find it acceptable to work with Rimini from India 100

1    percent remotely, and you don't recall talking to anybody
     about that assumption; correct?

2    A.   No, I don't.

     Q.   Okay.

3    A.   Not sitting here today.

     Q.   Now, you knew that some customers of Rimini viewed

4    the fact that Rimini had local environments on the Rimini
     system as a key selling point of Rimini's services;

5    correct?

     A.   I think there may be documents to that effect, yes.

6    Q.   In fact, you are aware that some of Rimini's
     customers regard it as a key selling point of Rimini's

7    services that Rimini would have a local environment on its
     system for that customer.  You are aware of that; right?

8    A.   As I said, I believe I did see documents to that
     effect, yes.

9    Q.   Okay.  And -- now, you understand that in order to
     have a remote environment, that the clients have to build

10   those remote environments, that they have to use their own
     IT resources and they have to administer that environment?

11   A.   Yes.  We spoke of that earlier today.

     Q.   Right.  So when the environment is on the Rimini

12   system, Rimini builds it.  They use their IT people, they
     use their resources, and they administer the environment.

13           And when it's on the customer system, the
     customer has to build it, use their own IT resources, and

14   administer the environment.  You understand that; right?

     A.   I understand that's possible, and probably the

15   majority, in most cases that's true, yes.

     Q.   And you made the assumption that customers would be

16   willing to do that?

     A.   I made the assumption that they wouldn't lose any

17   customers in total.  I assumed that there would be some who
     would be unhappy with that situation.

18           But I also assumed that if other companies
     aren't using Rimini Street because they think that -- they

19   don't like what they were doing, and if they stopped the
     bad acts, that there would be additional customers.

20           So rather than go either way, I just kept it
     static, the same number of customers.

21   Q.   You assumed that enough customers would be willing
     to do that so that Rimini would, on a net basis, be able to

22   maintain their customer base; correct?

     A.   I did.

23   Q.   Okay.  And so can we look at PTX 30.  That's in your
     binder.

24   A.   I'm sorry.

     Q.   It's also going to go on your screen?

25   A.   Did you say D or T?

     Q.   P, plaintiff.  We only have Ps and Ds so far, no Ts.

3872

```
 1    A.     What was the number again?
      Q.     30, 3-0.
 2           Now, this is an email from Mr. Ravin in 2007
      discussing how TomorrowNow is going to a business with 100
 3    percent remote environments.
             And so in the middle it says,
 4           "So, TN has sent notice to every client telling
      them that TN will no long host copies of the client's test
 5    environments used by TomorrowNow to diagnose issues and
      build tax updates."
 6           You understand that Mr. Ravin is discussing the
      business model that you're talking about, 100 percent
 7    remote, although not from India?
      A.     Did he say business model?  Could you show me that?
 8    Q.     Sure.  Do you see that TN has sent notice, and you
      can read the previous paragraph that says the same thing,
 9    and the testimony has been that what I'm telling you is
      correct, that,
10           "TomorrowNow has sent notice to every client
      telling them that TomorrowNow will no longer host copies of
11    the client's test environments used by TomorrowNow to
      diagnose issues and build tax updates."
12           They were getting rid of the local environments
      in TomorrowNow and going remote only.  Were you aware of
13    that?
      A.     Yes, I was aware of that.  I wasn't aware of the
14    business model part that you mentioned.  I don't see it
      here.
15    Q.     All right.  The -- and he says,
             "Instead, every client will now be responsible
16    for setting up their own environments for use by
      TomorrowNow, and have to procure all hardware and software
17    at their own expense.  These clients never agreed to such
      costs as part of their contracts, and why they are very
18    upset over the attempt by TomorrowNow to force this" --
             He says, "Rimini Street has no such conflicts
19    and no such ridiculous policies."
             Okay?
20           What you're saying in your damages world is that
      Rimini would go to what Mr. Ravin characterized as
21    "ridiculous policies" and they'd be from India.
      A.     Yes, that was the understanding that I had.
22    Q.     And did you see Krista Williams' deposition
      testimony, which was part of the record in this trial, that
23    says it takes two to six weeks to build an environment
      depending on complexity?
24    A.     I do think I've seen that document, yes.
      Q.     And that's something you assumed the customers were
25    willing to do?
      A.     I assumed that they would lose some customers that
```

```
 1    would be unwilling, but I also assumed that there were
      customers, potential customers, that were worried about the
 2    wrongful acts and didn't come onboard.
                  And so I'm just assuming that as many had a
 3    problem with going to the remote environment would leave,
      that there would be equal number that would come onboard
 4    because all of the wrongful acts are now taken care of.
      There's no litigation.
 5                And, so, yeah, I'm making that assumption that
      it's zero.
 6    Q.    You're making that assumption, and you don't recall
      discussing that assumption with anybody; correct?
 7    A.    I don't recall a conversation sitting here today.
                  But I didn't do this in a day or even a week.
 8    It took months to do the calculation.
      Q.    All right.  Let me ask you about your 2006 and 2007
 9    head counts.  Let's look at Exhibit D1.SU, which I think we
      looked at before.  That's the one we started off the day
10    with.
      A.    Let's see.  So could you give me the reference
11    again?
      Q.    Your Exhibit D to your supplemental report, and
12    actually we looked at number 2 and number 3.  We're going
      to look at number 1, and this will be --
13    A.    Maybe I'm mishearing you.  You're saying D?
      Q.    Yes, Exhibit D to your supplement report.
14    A.    So it would be D1.SU?
      Q.    Yes.
15    A.    Okay.
                  MR. ISAACSON:  Any objection to putting this on
16    the screen?
                  MR. STRAND:  No, go ahead.
17    BY MR. ISAACSON:
      Q.    All right.  Now, you see the numbers across the
18    page.  These are your estimates of salaries and related
      costs if you hire all these -- for your remote-only model;
19    right?
      A.    Yes.
20    Q.    Okay.  And you'll see that you've got numbers at the
      top for 2008 through 2013, but you have no numbers -- 2006
21    and 2007 are blank until you get down to the totals.
      A.    That's correct.
22    Q.    All right.  And the reason for that is, is you
      didn't discuss with Rimini whether -- what number of
23    additional employees they would need in 2006 and 2007 to
      avoid infringement; correct?
24    A.    No.
      Q.    And Mr. Benge -- Mr. Benge did not tell you that
25    Rimini would need to add employees in 2006 and 2007;
      correct?
```

```
 1    A.    I think you've got it a little bit wrong.
      Q.    Well, he didn't discuss 2006 and 2007 head counts
 2  with you, did he?
      A.    Mr. Benge and Mr. Zorn weren't at Rimini Street, and
 3  principally Mr. Zorn wasn't there, so the accounting
    records were real spotty in those two years.
 4          Mr. Zorn came onboard in the 2008.  So we're
    getting good information in 2008.
 5          So for 2006 and 2007, I used 2008 to estimate
    those two years.
 6    Q.    I'm going to get to that.
            But I'm just trying to simply say, Mr. Benge
 7  didn't give you any numbers for 2006 and 2007 because he
    wasn't there and they had spotty records?
 8    A.    That's right.  He wasn't there.
      Q.    All right.  So you did your own calculation because
 9  you have totals at the bottom, and you did that based on a
    ratio from 2008 back to 2007 and 2006; is that fair?
10    A.    That's true.
      Q.    And you did not corroborate that method or that
11  ratio with anyone; correct?
      A.    I worked it out with my staff.  We decided what are
12  we going to do, the accounting information is spotty, you
    know, they started in 2006.
13          And so we discussed it and decided that we could
    look at 2008 and use a proportion of their costs going back
14  to '6 and '7, and that would be the best available
    information to make the estimate.
15    Q.    All right.  So the only people you talked to about
    using that ratio to plug in numbers for the totals for 2006
16  and 2007 were your staff; correct?
      A.    I believe you're right.
17    Q.    Okay.  Now -- we're done with that exhibit.
            All right.  Now, your damage estimate was 9.4 to
18  14 point million dollars based on value of use, and that
    would require Rimini to have 9.4 to $14 million in order to
19  fund that; correct?
      A.    Or be able to get it.
20    Q.    Right.  And the -- and they would need that money
    beginning in 2006; correct?
21    A.    Well, they wouldn't need very much because they only
    had, I think, just a handful of employees and just a
22  handful of people.
            So they would need the amount of money that I
23  have.  You've taken it down and I could look at it.
            They would have had -- would have needed in 2006
24  an additional $116,000.
      Q.    All right.  And that's based on those ratios that
25  you plugged in?
      A.    That's based on 2008 looking backwards based on the
```

1   growth of the company.
    Q.    All right.  And so were you assuming -- now, you
2   assumed that they would be able to get enough financing;
    correct?
3   A.    I spoke with Mr. Ravin and Mr. Zorn and asked about
    where --
4   Q.    I just want to --
    A.    -- this money would come from.
5   Q.    I just want to know if you assumed they would be
    able to get enough financing.  I'll get to who you talked
6   to in a minute.
    A.    Well, I just didn't do what you're suggesting, that
7   I just assumed.  I went and spoke with the financial people
    at Rimini Street and asked where it would come from.
8   Q.    You assumed that they would be able to raise 9.4 to
    $14 million, but you had a basis for that assumption.  Do
9   you agree with that?
    A.    That's correct.  I had a basis for it.
10  Q.    All right.  And when you made that assumption, did
    you assume that they would be going out for financing in
11  every year, or how was it going to work?
    A.    My underlying assumption is they would get the money
12  as needed, or they could get it in a lump sum.  It would
    depend.
13          I just asked was there additional financing
    available in 2006 through 2012 at that point, could you
14  have gotten the money either through borrowing it or
    through equity.
15  Q.    All right.  And as you said, you had a basis for
    that assumption.
16          You got -- your basis for that assumption, that
    they would be able to raise 9.4 to $14 million over that
17  period of time, was conversations with Doug Zorn and Seth
    Ravin; right?
18  A.    True.
    Q.    And when you talked to them, they were not specific
19  about what sources would be -- would lend them that money;
    correct?
20  A.    No, not specific to what source, just that it -- the
    money could have been gathered and found.  They could have
21  borrowed it or they would find additional investors.
    Q.    They just said they had sources of funding, but they
22  didn't tell you what those sources of funding were?
    A.    Not entirely.  My recollection of the conversation I
23  had with Mr. Ravin is he discussed their financing and what
    parties the money could come from.
24          But I didn't ask him to pin it down to a
    particular party because I thought what good would it do.
25          I mean, we're talking hypothetical whether the
    money was available, and I didn't feel the need to go any

1    further with it.
               I was satisfied that rather than go out of
2    business or for them to stop, they would be able to find
     the money.
3    Q.    They did not identify to you any potential lenders;
     right?
4    A.    No, we discussed the lenders and the people that
     were investing.  I discussed those sources with Mr. Ravin.
5    Q.    Did they identify for you any potential lenders for
     that additional money?
6    A.    I think we spoke of the different lenders.  Well, I
     could actually remember more the different investors.  We
7    spoke of them, but I didn't -- I didn't list them in the
     report.
8    Q.    I understand that.  But did they identify for you
     any potential lenders?
9    A.    Oh, I see.
               I think I was already aware of their line of
10   credit, and I think they did have a line.  They may not
     have in the beginning of 2006, though, so --
11   Q.    The line of credit was not for $14 million; right?
     A.    No, but they don't have to get all 14 at that point,
12   sir.
     Q.    So let's get an answer to the question.  Did they
13   identify for you any potential lenders?
     A.    I guess they did, because I had the financial
14   statements and it listed the lenders.
     Q.    All right.  Can we show him his deposition, page 77,
15   lines 3 through 5.
               (Videotape deposition of Scott Hampton played
16             as follows:)
                  "Q.  Did they identify for you any potential
17            lenders?
                  "A.  No, no one specific."
18   BY MR. ISAACSON:
     Q.    That was your testimony under oath at the
19   deposition, wasn't it, sir?
     A.    Yes.
20   Q.    Now, in saying that you made an assumption they
     could raise the money, you're not offering an opinion that
21   they would have been able to raise the money; correct?
     A.    No, I didn't go back and make an analysis of -- and
22   talk to the lenders or talk to the investors.  I assumed
     that they would be able to raise that amount of money to
23   operate the business.
     Q.    Exactly.  You assumed it, but you haven't given an
24   opinion, you haven't done any analysis, and you haven't
     spoken with any investors; correct?
25   A.    That's absolutely correct, yes.
     Q.    Okay.  And, in fact, you were relying upon Mr. Ravin

```
 1   and Mr. Zorn to substantiate at this trial that funding was
     available; correct?
 2     A.    I wasn't thinking about the trial at that time, I
     was doing a damage calculation, and I was trying to satisfy
 3   myself as to whether I believed that Rimini Street could
     have gotten the money to operate in a noninfringing manner
 4   and nonaccused manner.
       Q.    Right.  But you were expecting Mr. Ravin and
 5   Mr. Zorn to be the ones to substantiate that assumption;
     correct?
 6     A.    I really didn't have any other sources that I could
     identify.
 7     Q.    All right.
       A.    What would have happened in 2006 if they would have
 8   needed an additional $116,000, I assume they could have
     gotten it at that point.
 9     Q.    All right.  Now, in arriving at your opinions about
     Rimini's support of PeopleSoft customers, that Rimini would
10   be able to do this remotely from India, you -- there's been
     a lot of documents produced in this case, maybe over a
11   million, don't tell me, the -- other than deposition
     exhibits, for your first report you only relied on six
12   documents that Rimini produced; correct?
       A.    Doesn't sound right to me, because I reviewed 53
13   depositions and thousands of pages.
       Q.    All right.
14     A.    I guess it depends on your definition of rely.
       Q.    Okay.  Let's look at your report, Exhibit C.  I'd
15   like to show page 1 and 2 on the screen.
                 MR. STRAND:  Of Exhibit C?
16               MR. ISAACSON:  Yes.
                 MR. STRAND:  Fine.  I have no objection.
17   BY MR. ISAACSON:
       Q.    All right.  Now, this is something you attached to
18   your report called Documents Relied on.
       A.    Yes, that's true.
19     Q.    Okay.  And on the first page you talk about core
     pleadings in the case, other expert reports, and then
20   deposition transcripts.
                 Can we get that on the screen?
21               All right.  Down below deposition -- so
     Documents Relied on at the top, and then deposition
22   transcripts, and these deposition transcripts often or even
     usually have documents attached to them.
23     A.    Yes.
       Q.    That were discussed in the deposition.  And you
24   would have reviewed those documents.
       A.    I reviewed probably thousands of pages of documents
25   associated with the depositions as exhibits to the
     depositions.
```

```
 1    Q.    And other than the deposition exhibits -- let's look
      at the next page.  In terms of documents provided by
 2    Rimini, Bates stamped documents -- all right, now, the
      Rimini documents are the RSI documents; right?
 3    A.    Yes.
      Q.    Okay.  So there were, at the time of your report,
 4    other than the deposition exhibits, five Rimini documents
      that you relied on.  Right?
 5    A.    But when it says relied on, it's cited in the
      report.  So these are documents that were cited as
 6    footnotes in the report.
      Q.    Okay.  The -- now, let's look at PTX 2152.  That's
 7    in the PTX binder you have.
      A.    I'm sorry.  I was waiting for it to come up on the
 8    screen.
      Q.    You can wait for it to come up on the screen.  That
 9    works too.  I just don't want to --
                MR. ISAACSON:  PTX 2152 is not admitted.  Any
10    objection?
                MR. STRAND:  Counsel, I don't have a copy of it.
11              MR. ISAACSON:  It should be in the witness
      binder.
12              MR. STRAND:  That's what I'm looking for; 02 --
                MR. ISAACSON:  2152.
13              MR. STRAND:  Yes, I object, Your Honor.
                It's hearsay to this witness and lacks
14    foundation.  Unless he can lay a foundation with this
      witness, we object.
15              MR. ISAACSON:  It's a Rimini Street document
      produced in discovery so it's self-authenticating, Your
16    Honor.
                MR. STRAND:  There's no foundation.
17              THE COURT:  You certainly may ask him about it
      at this point in time.  I'll reserve ruling on the
18    admission.
                MR. ISAACSON:  All right.
19    BY MR. ISAACSON:
      Q.    You see at the bottom of page 1 --
20    A.    I'm still looking for the document.
                MR. ISAACSON:  2152.
21              THE WITNESS:  I'm not hearing you; 152?
                MR. ISAACSON:  2152.
22              COURTROOM ADMINISTRATOR:  2152.
      BY MR. ISAACSON:
23    Q.    All right.  And then if you look at page 2, you see
      Dennis Chiu is talking, in April 2007, about Moraine Park
24    Technical --
                MR. STRAND:  Your Honor, excuse me, I object,
25    unless we lay a foundation before we start describing the
      document and talking about what's in it.
```

1       That's my objection, there's no foundation that
this witness has ever seen this document.

2              MR. ISAACSON:  Well, that's relevant as to
whether -- to an expert opinion that if he testifies he

3   hasn't seen it, that's important information.
               THE COURT:  Bring the loop together for me, if

4   you would, Mr. Isaacson.
BY MR. ISAACSON:

5   Q.    Have you seen the statement there that,
               "Seth," referring to Mr. Ravin, "and Rich are

6   well aware that developing tax and regs remotely on their
system isn't viable"?

7              THE COURT:  I'll allow the question.
               THE WITNESS:  Yes.  I can read that.

8   BY MR. ISAACSON:
Q.    Did you see that as part of your preparation of your

9   reports in this litigation?
A.    I'm not sure.  I saw so many documents, that I'm

10  unsure three years ago -- I think I've either seen this or
heard reference to it.

11  Q.    You've seen documents from 2006 and 2007 that says
doing remote environments is not -- was not viable;

12  correct?
A.    I'm not quite sure what they're talking about.  It

13  says remote is not viable, but that's not my understanding.
So I don't know if there's more to it than what we have

14  here on the page.
Q.    What about PTX 60, which we'll put on the screen

15  because that's been admitted into evidence.
               You've seen this before in this trial?

16  A.    This is PTX 2160?
Q.    No, six zero.

17  A.    Oh, clear back in the front?  Okay.
Q.    This is going to go up on the screen for you.

18             This is where Mr. Freeman says to Mr. Benge,
"It's insane and defies our business model to offer to

19  support remote environments."
               This is in 2009.

20             Did Mr. Benge ever tell you that in 2009 they
thought it was insane to support remote environments?

21  A.    I didn't have that conversation with Mr. Benge.  I
was asking him who could be replicated in order to work in

22  a noninfringing manner.  I don't have a recollection of
that conversation.

23  Q.    Well, when you or your staff saw this document, did
you go back and say to Mr. Benge why are you telling us

24  that you could have done this business all remotely in 2009
when we're reading that that would be insane?

25  A.    No, I didn't.  In fact, I -- I don't remember seeing
this document in that context, because my understanding was

1    they were actually working in a remote manner.
                So this doesn't -- if this is specific to just
2    working remotely, I think there's an added element to it.
         Q.    Okay.  And you have resisted the term business model
3    to referring to remote environments versus local
     environments, but you understand that Rimini referred to
4    this as a business model, a business model where they
     did -- where they wanted to use remote environments only as
5    a last resort.  You knew that; right?
         A.    Well, I have the document.  I would still resist
6    characterizing Rimini Street's business model as infringing
     or the wrongful acts defined in it.
7        Q.    Well, I would also characterize Rimini's business
     model as infringing and having wrongful acts, but --
8        A.    We differ on that point.
         Q.    Let's look at PTX 50, which has been admitted.
9                And maybe you've seen discussion of this.
                This is Jeff Allen, a senior PeopleSoft
10   developer at Rimini Street who at the bottom talks about
     the ship in a bottle, in a bottle problem.
11               And then goes on to the next page that says,
                "The time required by staff to complete a task
12   on a remote environment is generally three times that
     required for one in-house."
13               Now, you were assuming doubling of certain
     categories.  You never assumed tripling any of the
14   categories; correct?
         A.    I didn't assume three times.  I assumed doubling.
15       Q.    All right.  And you and your staff, when you saw
     Mr. Allen say this, didn't go back to Mr. Benge and -- or
16   Mr. Ravin and say, "Why are you saying doubling?  Your
     senior PeopleSoft developer in 2009 is saying it would
17   require three times as much"?
                You didn't have that conversation, did you?
18       A.    No, as I mentioned, Mr. Hilliard was the source for
     the technical issues with regards to the case.
19       Q.    All right.  And you never said to Mr. Hilliard,
     "What are you talking about, sir?  Internally they're
20   saying three times"?
         A.    Right.  But I don't know who this person was, and I
21   don't know what was happening in the context.
                If they had a difficult client, and maybe they
22   were having issues with the client that were more difficult
     than what the general difficulty would be.
23       Q.    Well --
         A.    So I am assuming a doubling, and that that level of
24   effort would allow them to work in a noninfringing manner.
         Q.    Exactly.  You don't know who this individual is.
25               Let's go back to Exhibit C of your report, the
     deposition transcripts?

1          Now, Mr. Allen was deposed in this case.  He's
not one of the deposition -- he's not one of the
2    depositions that you relied on; right?
     A.    This isn't a complete list because I think there was
3    a supplemental report, and I think there was another
schedule C, and, if I remember right, it's been a couple
4    years, a revision --
     Q.    Sir -- go ahead.
5    A.    I think when I counted up, there was more than 50
depositions that we received.
6    Q.    Well, let's look at the supplemental list because
you only added three depositions there.
7    A.    And do you happen to recollect that there was a
revision to C?
8    Q.    The revision is in the first report, you can see at
the top, it says Amended Exhibit C.
9    A.    Mine doesn't say that, so I'm not looking at the
right document.  Mine just says Exhibit C.  So I must not
10   be at the same place you are.  I'm sorry.
     Q.    What we're showing you on the screen, shown at the
11   top is Amended Exhibit C.
          No, we're showing Exhibit C.  I'm looking at
12   Amended Exhibit C, and I can tell you Jeff Allen's not on
it.
13   A.    Okay.
     Q.    All right?  The supplement added three depositions.
14   A.    Okay.
     Q.    Okay?
15   A.    I think the revision may have more, but I remember
50 plus depositions, and they're not listed here, so we
16   must have something going on.
          MR. ISAACSON:  May I hand him the amended
17   Exhibit C?
          THE COURT:  Give it to my court clerk.
18        MR. ISAACSON:  I just want to reassure you,
sir --
19        THE WITNESS:  Okay.  Thank you.
          MR. ISAACSON:  -- that you're looking at the
20   right document.
          THE WITNESS:  All right.  Thank you.  Thank you.
21   The amended doesn't list them either.
BY MR. ISAACSON:
22   Q.    All right.  And it doesn't list Mr. Allen; right?
     A.    Correct.  Well, I guess I should look at it.
23        Allen.  Yeah, you're correct.  It doesn't have
Mr. Allen.
24   Q.    Now, in terms of hiring these engineers from India,
you did not assume they would have any specific numbers of
25   years of experience; correct?
     A.    No, I assumed only that they would have enough

```
 1    background to be able to do the work.
           Q.    All right.
 2         A.    I would assume for some tasks, like downloading from
      the Internet, that you wouldn't need a lot of experience to
 3    do that.  Someone with just a few years could probably
      handle it.
 4         Q.    All right.  Now, let's look at DTX 3004.
                  COURTROOM ADMINISTRATOR:  I don't believe that's
 5    in evidence.
                  MR. STRAND:  3004?
 6                MR. ISAACSON:  Yes.
                  MR. STRAND:  DTX?
 7                MR. ISAACSON:  Yes.  And I want the 2013 tab and
      the 2014 tab, Matt.
 8                THE WITNESS:  3004?
                  MR. ISAACSON:  Yeah.  It's probably going to be
 9    easier if I put it on the screen for you.
                  THE WITNESS:  Because I'm not seeing it in the
10    binder.
                  COURTROOM ADMINISTRATOR:  It's in the binder.
11                MR. STRAND:  Is it admitted?
                  COURTROOM ADMINISTRATOR:  It's in this binder.
12           (Discussion held off the record.)

13    BY MR. ISAACSON:
           Q.    Would you look at DTX 3004, sir.  Would you look at
14    it in your binder.
           A.    Yes.
15         Q.    All right.  Do you recognize this as a schedule of
      salaries, bonuses, total compensation, and overhead costs
16    that you looked at in preparing your supplemental report
      for 2013?
17         A.    No, I don't recognize this document.
           Q.    Did you look at actual salary information that
18    Rimini Street provided for India -- for engineers in India
      for 2013 and 2014?
19         A.    2013 and '14?
           Q.    Yes.  Because, remember, in your supplemental
20    report, you expanded the years that you were covering from
      2012 to 2013 to 2014?  Do you remember that?
21         A.    I do recall that, yes.
           Q.    Okay.  And in looking at that work, did you look at
22    any actual salaries of Indian employees of Rimini?
                          *    *    *
23                     SCOTT DEAN HAMPTON
                 recalled as a witness on behalf of the
24            Defendants, having been previously sworn,
                 was examined and testified as follows:
25                  CROSS-EXAMINATION RESUMED
      BY MR. ISAACSON:
```

1    Q.    Good afternoon, Mr. Hampton.
          Now, with respect to the costs that you were
2    estimating for Rimini operating 100 percent remote, your
     understanding was that the increased labor needs relating
3    to Siebel would be minor in a remote-only model; right?
     A.    Yes.
4    Q.    Okay.  And can we look at -- and that -- and the
     reason that was your understanding was because you thought
5    Siebel in-house environments were used in only a small
     percentage of support cases; correct?
6    A.    I think that and other reasons, yes.
     Q.    And also you thought they were of limited value;
7    correct?
     A.    I don't recall saying that they were limited value.
8    Q.    Well, look at your report at paragraph 171.
     A.    Which report, the first one or second one?
9    Q.    Yeah, 171, that means it's your first report.
     A.    Page?
10   Q.    It just has a paragraph number, 171.
     A.    Okay.
11   Q.    All right.  Those are your exact words, that Siebel
     in-house environments are of limited value; correct?
12   A.    So I'm a little confused as to whether I'm
     addressing the Siebel or the environment.
13   Q.    Well, you can see the first paragraph, the first
     sentence refers to -- talking about Siebel.
14   A.    It's definitely Siebel.  I agree with you.
     Q.    All right.  And you said that -- and when you said
15   that the Siebel environments were of limited value and were
     used in only a small percentage of support cases, you were
16   talking about 2012, weren't you?
     A.    I don't remember having a specific timeframe in
17   mind.
     Q.    Okay.  What you just said -- what you said in your
18   report about them being of limited value and not -- and
     being used in a small percentage of support cases, that was
19   not true at the beginning of the company in 2006, was it?
     A.    I don't know why it would change.  So I would have
20   to give it some thought.  I'm sorry.
     Q.    All right.  I'll ask you to look at PTX 1461.
21   A.    I found a 61.
     Q.    1461.
22   A.    Okay.
     Q.    This has been admitted in evidence.  We're going to
23   put it on the screen for you, if that's of any help.
     A.    Good.  Thank you.
24   Q.    This is back in September of 2006.  This is
     Mr. Chiu.
25        Mr. Chiu is writing to Mr. Davichick, Mr. Ravin,
     his cofounder, Mr. Shay, talking about Siebel environments.

```
 1    Do you see that?
      A.    Yes.
 2    Q.    Okay.  And in the middle of the first paragraph they
      talk about a conference call they had in September of 2006
 3    with the team from Accenture.  That's the consulting group;
      right?
 4    A.    I'm aware of them, yes.
      Q.    And they said,
 5              "We reclarified how our support model," "our
      support model is based on building up an in-house lab
 6    environment with a vanilla fix master and a customized
      replica of their dev/test environment which would enable us
 7    to maximize our responsiveness to them."
                In 2006, this company's support model was built
 8    on using in-house environments, lab environments, at Rimini
      to support Siebel customers.
 9    A.    Is there a question?
      Q.    You knew that, didn't you?
10    A.    I guess I did, I mean, if the document was in the
      file.
11    Q.    Right.  But in your report you just said that the
      Siebel environments were of limited value because you were
12    talking about in later years; isn't that right?
      A.    No, that's not my recollection.
13              My recollection is they didn't have the source
      code for Siebel, so that's why I thought that it was used
14    less --
      Q.    And --
15    A.    -- was the basis for it.
      Q.    And you didn't talk --
16    A.    I don't remember having a timeframe in mind.
      Q.    Exactly.  You did not have a timeframe in mind, and
17    you didn't talk to anybody that you recall at Rimini about
      how the business was actually being run in 2006 with Siebel
18    environments; right?
      A.    Other than the deposition transcripts that I was --
19    had available.
      Q.    Okay.  Now, you also said in that same paragraph of
20    your report that the JDE support -- that Rimini Street
      would not require any significant additional labor relating
21    to its JD Edwards practice in a remote-only model.
      A.    I see that, yes.  I did.
22    Q.    And, in fact, when you estimated the additional
      labor costs for the remote -- all-remote model, you only
23    looked at PeopleSoft engineers.
      A.    I didn't direct my inquiry to just PeopleSoft, I
24    spoke with Mr. Zorn and Mr. Benge.
                I explained that I wanted to calculate the
25    amount of labor it would require to -- for Rimini Street to
      have operated in a noninfringing manner.
```

1              So I didn't intentionally limit it to
PeopleSoft, but I understand that the majority of the
2    costs, 75 to 77 percent, was in the PeopleSoft area.
     Q.    Okay.  Let's go over that.
3              Now, did you discuss what additional costs for
JDE or Siebel would be required with Mr. Hilliard?
4    A.    I just spoke with Mr. Hilliard on a more of a
reasonable check and just kind of walking through what I
5    was doing and asked him --
     Q.    I've got a more specific question.  Okay?
6              My question was, did you discuss what additional
costs were required for JDE or Siebel with Mr. Hilliard?
7    A.    I don't remember specific references to those two.
     Q.    Right.
8    A.    I think I was more general.
     Q.    And you understand that Mr. Benge has testified that
9    he did not make any determinations as to how many
additional employees would be required to support JDE or
10   Siebel.  You know that; right?
     A.    For the first two years, 2006, 2007?
11   Q.    No, for any years.
     A.    I didn't -- if he said it in his direct -- or his
12   trial testimony, I read the testimony.  I was probably just
not thinking in the same course that you are.
13   Q.    Yeah.
     A.    So if he said that, then he did.
14   Q.    All right.  Then Exhibit D2.6 -- D2.2, so of your
original report.
15             MR. ISAACSON:  Oh, do you have any objection to
me showing --
16             MR. STRAND:  No objection.
               THE COURT:  All right.
17   BY MR. ISAACSON:
     Q.    All right.  Now, this is a schedule, and it says
18   2008, says Rimini Street's Avoided Labor Costs, you or your
staff prepared one of these schedules for every year;
19   right?
               I'm sorry.  I have to wait for you to get to
20   that page.  It's on the screen too.
     A.    Thank you.  Okay.  Sorry it took me so long.
21   Q.    No, it takes a while to get to those pages.
               So this is a schedule you or your staff
22   prepared, this says 2008, because you prepared one for
every year, and where you were explaining your backup for
23   how you were estimating avoided labor costs?
     A.    Yes.
24   Q.    And if we can make it a little bigger, there's lists
of actual names; right?  And those were the names that
25   Mr. Benge gave you.
     A.    Actually, I received them from Mr. Zorn in that

3886

          spreadsheet that we've discussed.
 1        Q.    Right.  And you were aware that every one -- so the
     first two people, Corpuz and Pamalee are onboarding
 2   engineers, and that every one of those engineers that's
     listed here is a PeopleSoft engineer, or a tax and
 3   regulations engineer?
 4        A.    Yes.
          Q.    Okay.  And then when you add them all up on the next
 5   page, page 2 of 2, you're doing total PSE PeopleSoft
     employees?
 6        A.    Yes.
          Q.    All right.  You didn't add up any employees for
 7   Siebel or JD Edwards?
          A.    No.
 8        Q.    Okay.  Let me -- I'm not sure if we did a double
     negative.  Did you add up any employees for JDE or Siebel?
 9        A.    I just took the employees from Mr. Zorn's
     spreadsheet because I had asked which employees need to be
10   duplicated, and these are the ones they gave me.
                And I was aware that they were PeopleSoft, so I
11   assumed that to work in the JD Edwards there would be no
     additional staff.
12        Q.    All right.  You assumed no additional staff and
     no -- for Siebel or -- for JD Edwards or Siebel.
13        A.    I understood there was a difference between the
     programs, between PeopleSoft and JD Edwards and Siebel
14   having to do with the availability of source code.
          Q.    Right.  But no one told you, you don't recall anyone
15   telling you that "if we had to operate remotely for JDE or
     Siebel, that we wouldn't require any more employees?"  No
16   one told you that?
          A.    No, I don't recall that, that anyone did.
17        Q.    All right.  And now I think you said that you -- you
     did an allocation of 75 percent of the labor cost to
18   PeopleSoft.  Do you remember that?
          A.    Well, I wasn't doing -- I guess, in effect, I was
19   doing PeopleSoft.  I was doing the total that you've
     identified.  They are PeopleSoft, right.
20        Q.    Right.  So when we were talking earlier today you
     told me, when I asked you these questions about whether you
21   had taken into account Siebel and JDE, you said "Yes."
                You said, "I did 75 percent PeopleSoft."  You
22   said, "I did 15 percent JDE, and I did 10 percent Siebel."
     And that was just plain wrong; right?
23        A.    No.  You'll see that we already discussed in 2006
     we've got, was it 116,000 in additional labor.  And 2007
24   has 297.  I believe in 2006 that was almost all Siebel.
          Q.    Right.  But in 2007 -- I'm sorry, 2008, 2009, 2010,
25   and forward, it's all PeopleSoft; right?
          A.    True, yes.

3887

1    Q.    Right.  And when you did 2006 and 2007, you did an
extrapolation from all PeopleSoft; correct?

2    A.    Right.

     Q.    And you never did what you said -- what you said
3    today, that -- an allocation of 75 percent, 15 percent, and
10 percent, that never happened; right?

4    A.    I made that allocation.  I know the ratios.  I'm
trying to think what document I was using to do that.

5    Q.    You didn't have one.  You didn't do it, did you?

     A.    Well, I had the ratios.  So I did look at the
6    proportion of the business between the three.

            But I will agree with you that the calculation's
7    based on PeopleSoft.  But when I made the extrapolation
back to 2006 and 2007, that would have picked up some

8    Siebel for those first two years.

     Q.    But when you estimated the additional labor costs,
9    you didn't do an -- it was 100 percent PeopleSoft, you
didn't do that 75-15-10 thing you talked about; right?

10   A.    The ratios are based on the number of customers and
the type of customers that Rimini Street had each year.

11   Q.    Yes.  But that -- we're not talking about the number
of customers, we're talking about the added labor costs.

12          And so I will ask you again, that when you
estimated additional labor costs, it was 100 PeopleSoft,

13   and what you told me earlier today about allocating 75
percent, 15 percent, and 10 percent, was just plain wrong?

14   A.    If you don't like the calculation, I guess that's
right.  That's based on the number of customers for each

15   type.

     Q.    I'm not talking about liking the calculation.  I'm
16   talking about you said -- you said you did a calculation,
and you didn't.

17          When you did the additional labor cost, you did
not do a calculation of 75 percent PeopleSoft, 15 percent

18   JD Edwards, 10 percent Siebel, you did 100 percent
PeopleSoft; correct?

19   A.    I think we've already identified that I have
$116,000 in 2006 as additional labor, and there were, if

20   anything, maybe one PeopleSoft, and it was all Siebel, so,
no, you're not absolutely correct.

21   Q.    All right.  You didn't do an allocation of labor
cost of 75 percent PeopleSoft, 15 percent JD Edwards, 10

22   percent Siebel, did you?

     A.    That would be based on the number of customers.

23   Q.    You didn't do it, did you?

     A.    I have done it.  I can tell you the ratios.  It's
24   based on the number of customers.

     Q.    Right.  But we -- you testified -- you're changing
25   the language to customers, and we are talking about
additional labor costs.  You know that?

```
1    A.    Yes.
     Q.    Okay.  And when you talked this morning, you -- we
2    were talking about additional labor costs, and you told me
     you did an allocation of additional labor costs on that
3    basis, 75 percent, 10 percent, 15 percent.
              Now you want to talk about customers.  But that
4    allocation of additional labor cost you did not do;
     correct?
5    A.    I think I see the confusion is you asked me how --
     if I --
6             MR. ISAACSON:  I'd like the witness to be
     directed to answer the question.
7             THE COURT:  Madam Reporter, would you read the
     question again.  And, Mr. Hampton, please answer the
8    question.
              THE WITNESS:  Sure.
9         (The question was read by the court
          reporter.)
10            THE WITNESS:  I don't know how to answer your
     question yes or no.
11            MR. ISAACSON:  All right.  I'll move on.
     BY MR. ISAACSON:
12   Q.    Now, you talked -- we talked earlier about whether
     customers would have accepted third-party -- third-party
13   support from India.
              Now, in -- we talked about how you didn't do any
14   customer surveys.  You also did not review any Rimini
     marketing materials about whether that would be acceptable
15   to customers; right?
     A.    I didn't catch the thread of your long question.  Do
16   you think you could just shorten it just a little bit so I
     can understand?
17   Q.    Sure.  Now, I'm changing topics.  Okay?  And now
     we're going to talk about the acceptability to Rimini
18   customers of providing support from India, okay?
     A.    Right.
19   Q.    Okay.  Did you review any Rimini marketing materials
     that discussed that subject?
20   A.    I looked at the marketing materials.  I don't recall
     seeing that subject.
21   Q.    Were you unaware of -- you were -- let me start
     over.
22            From 2006 to 2011 -- and let me stop there and
     say I'm going to be talking to you about 2006 to 2011.
23   I'll try to say that each time, but if I don't, I'm still
     talking about 2006 to 2011.  Okay?
24   A.    Fine.
     Q.    Okay.  Now, from 2006 to 2011, you were unaware of
25   any customers who would have opposed receiving offshore
     support for their -- from India.
```

3889

1      A.   I don't know that I was unaware of it.   I assumed
that there would be -- I didn't expect this to be easy.   I
2   thought that it would be hard because it was a major change
in their policy.   So I didn't make assumptions that
3   everybody was going to be happy about it, no.
       Q.   Your understanding was that customers had not
4   expressed any views about offshore support; correct?
       A.   I'm not sure I had that understanding at that time.
5           MR. ISAACSON:   Okay.   Well, can we show him his
deposition page 140, beginning at line 25, through 141,
6   line 10.
       A.   Are you going to put it on the screen, because --
7   Yes.
       Q.
8           (Videotape deposition of Scott Hampton played
            as follows:)
9              "Q.   Are you aware that any of Rimini's
            customers expressed that view?
10             "A.   That they didn't want to have support
            offshore?
11             "Q.   Correct.
               "THE WITNESS:   No, that runs contrary to my
12          understanding.   My understanding is that Oracle
            was moving to that type of a operation.   They
13          were employing more engineers in India, so, no,
            I am not familiar with that."
14  BY MR. ISAACSON:
       Q.   So at the time of your deposition, you were unaware,
15  and it was contrary to your understanding, that any Rimini
customers had expressed the view that they didn't want to
16  have support offshore; correct?
       A.   You're taking me back three or four years, and I've
17  heard the testimony --
       Q.   Isn't that what you just --
18     A.   I would agree with you, yes.   I think.   I mean, I
think it's more complicated than that, but to move things
19  along, let's go with it.
       Q.   All right.   During the -- have you -- I can't
20  remember, did you review Mr. Rowe's testimony?
       A.   No, I don't think I have.   I may have because there
21  was some testimony that I looked at that I'm not recalling
all the names.   So I did read the trial transcripts for
22  certain days.   So -- I may have forgotten his name.
       Q.   I'll try not to go through these documents again.
23  They've been admitted into evidence.
            But I showed Mr. Rowe responses to requests for
24  proposal from Rimini Street to various clients of Rimini in
which the standard language was used and repeated, "any
25  deliverable scoped, developed, tested, or supported by
offshore (outside North America) resources.   If so, please
describe details."

1           And Rimini would say, "No.  All deliverable
scoped, developed, tested, and supported by North American
2    based resources."
           That was in PTX 2140, PTX 2142, and PTX 2158.
3           And Mr. Rowe said it was part of Rimini's
standard messaging -- again, 2006 to 2011, that all of your
4    deliverables are developed, tested or supported in North
America.  Are you aware of that?
5    A.    I think so.  It was my understanding that that was
their approach that -- I think they had some consultants in
6    India, but everything else, I think, was done in the United
States.
7    Q.    I'm not talking about just what they were doing, I'm
talking about what they were telling customers and what
8    customers were expecting.
    A.    I was aware of it, yes.
9    Q.    And Mr. Rowe said that standard message was
important to clients.  Did you know that?
10    A.    I don't recall it, but I would not doubt it.
    Q.    All right.  And were you aware of requests for
11    proposals from customers that said "we won't work with
anybody who's using offshore resources for support"?
12    A.    I may have been because I did form an opinion that I
thought some people would fall off, but other people would
13    like the new procedures; so I assumed you would lose some,
gain some.
14    Q.    Right.  And that was an assumption.  You didn't
quantify it, you didn't say how many would go down, how
15    many would go up, it was just an assumption?
    A.    True, yes.
16    Q.    And in your model you assumed that Rimini would pay
a total of about 16,720 for each additional employee based
17    in India.  We were just looking at that in D2.2.  Does that
ring a bell?
18    A.    Yes.
    Q.    And then for each subsequent year you assumed an
19    increase in salary each year until it went up to around a
little over 19,000.  Does that ring a bell?
20    A.    Yes, it does.
    Q.    Okay.  And you've got that salary information from
21    India from a website called payscale.com.
    A.    That's right.
22    Q.    And the -- now, when you talked to Mr. Zorn, you
talked to him about the consultants in India that they used
23    in 2007 and 2009; right?
    A.    I believe I did.  It's been a few years ago, but I
24    think I did.
    Q.    Okay.  And do you remember reviewing documents
25    indicating that in 2007 Rimini Street was paying $26 an
hour for a PeopleSoft engineer in India?

1     A.    A PeopleSoft consultant, I believe.  I don't think
it was -- this person wasn't an employee of Rimini Street.

2     Q.    A consultant, but an engineer.

      A.    An engineer, yes.

3     Q.    Let's look at 2146.

            COURTROOM ADMINISTRATOR:   PTX?

4           MR. ISAACSON:   PTX, which has not been admitted.
I would move to admit.

5           MR. STRAND:   Is this on his documents-relied-on
list?

6           MR. ISAACSON:   I know he's been deposed about
it.  This is the Indian consultant issue.

7           MR. STRAND:   I'll object to it unless there's a
foundation laid.

8           MR. ISAACSON:   All right.
BY MR. ISAACSON:

9     Q.    In the meantime, I'll ask you to look at page 9.

      A.    I went to PTX 2146.

10    Q.    So 2146.  Yes, and look at page 9 of 10 at the
bottom.

11          All right.  And you see Dennis Chiu is writing
to Seth Ravin?

12    A.    I'll take your word for it.  It says, "Hi, Seth."  I
don't see.

13    Q.    Look on the next page.

      A.    Yes.

14    Q.    Okay.  And do you see in the first sentence they're
talking about viable offshore resources to help with the

15    PeopleSoft lab environments?

      A.    Are you in the first paragraph?

16    Q.    Yes.  Do you see that?

      A.    I'm reading it.

17          I see it, yes.

      Q.    Okay.  And you see, just for purpose of context,

18    they're talking about a technical person who might be
available who has background with PeopleSoft?  That's in

19    the second paragraph.

      A.    Yes.  I do see it, yes.

20    Q.    All right.  And do you see then there's two numbered
items, and the second is competitive rate, and the

21    competitive rate which is described as very cost effective
was for a consultant name Krishna, his rate is $26 per

22    hour?

      A.    Right.  I see that.

23    Q.    And you were familiar with Rimini paying that amount
to consultants in India to support PeopleSoft Lab

24    environments in 2007; correct?

      A.    As a consulting fee they paid, yes.

25    Q.    And that amount, $26 an hour -- and then later on --
by 2009, that same person was getting $36 an hour; right?

1    A.    That's a consulting fee, not a wage.
    Q.    And $36 an hour, that's about -- if you -- that's
2  74,880 per year, right?  75,000?
    A.    What rate did you say?  I'm sorry.
3    Q.    $36 an hour, at 40 hours a week, 52 weeks a year,
  you get a little under $75,000?
4    A.    Yes.
    Q.    And you're assuming salaries in 2009 of about
5  19,000; right?
    A.    For an employee and not necessarily the same number
6  of years of experience.
    Q.    Well, are you assuming that -- you say not the same
7  levels of experience.  Are you assuming in your model that
  you're hiring people who have just a few years experience?
8    A.    No.  I remember -- I think you asked, or Mr. Hixson
  asked in the deposition, I assumed, I think -- best
9  recollection, I would assume that you would need somebody
  with about five years of experience.
10    Q.    Okay.  And we were talking about one consultant.
  From your review of the record, you saw other consultants
11  in 2009 who were being paid about the same rate as a
  consultant as Krishna.
12    A.    In this document you just --
    Q.    That and other documents you reviewed.  You're aware
13  of that; right?
    A.    I read the Second Foundation documents.  It might be
14  what you're talking about.
    Q.    Right.  And so the point being Krishna was not the
15  only consultant getting $36 an hour.  There were others in
  that neighborhood.
16    A.    I would have to go back and look.  I don't recall.
    Q.    All right.  Well, take a look at -- just refresh
17  your memory here, 2153.
                COURTROOM ADMINISTRATOR:  PTX; right?
18                MR. ISAACSON:  PTX 2153.
  BY MR. ISAACSON:
19    Q.    And just look at the first page.
    A.    Yes, these are consulting rates.
20    Q.    Right.
    A.    $36 -- excuse me --
21    Q.    Right.  You see Krishna --
    A.    -- $31 an hour.
22    Q.    You see Krishna is at $36 an hour, Guna is at $31 an
  hour, and Venkata is at $36 an hour; right?
23    A.    Yes.
    Q.    And on the top of the next page, that's described as
24  the market rate for comparable skills in both the domestic
  and international market.
25    A.    Right.  But these aren't wages.  These are
  consulting fees for a company that's hired --

3893

1    Q.    And you didn't --
     A.    -- the employee, then using them as consultants.
2    Q.    Right.  Well, the consultant will have some overhead
built in; correct?
3    A.    Yes, that's true.
     Q.    About 20 percent?
4    A.    No.
     Q.    Is it 80 percent overhead?
5    A.    When I started in public accounting --
     Q.    Is it 80 overhead, sir?
6    A.    80 percent overhead would not be unusual, yes.
     Q.    Okay.  80 percent overhead is normal?
7    A.    Right.
     Q.    Is it your view that regardless of the size of the
8    company purchasing the service, consulting would always be
cheaper than support?
9    A.    Consulting would always be cheaper than support?  I
don't understand --
10   Q.    I'm sorry.  Cheaper -- in other words, employees
providing support?
11   A.    I'm sorry.  You're going to have to slow down and
bring me along a little bit.
12   Q.    Sure.  Is it your view that regardless of the size
of the company, purchasing the service through consulting
13   would always be cheaper than direct employment?
     A.    No, it doesn't sound right to me.  You're saying
14   that consultants are cheaper than wages?
     Q.    All right.  Or would they be always -- have you done
15   any study as to whether hiring an employee, which comes
with overhead in your company, is always as -- cheaper or
16   more expensive than hiring a consultant?
     A.    Well, I am a consultant.  I've been a consultant a
17   long time.  And I will tell you that it's more expensive to
hire a consultant than an employee.
18

19

20

21

22

23

24

25

3894

SCOTT DEAN HAMPTON
recalled as a witness on behalf of the
Defendants, having been previously sworn,
was examined and testified as follows:
CROSS-EXAMINATION RESUMED
BY MR. ISAACSON:

1    Q.    Good morning.

            Mr. Hampton, we spent a little bit of time

2    yesterday talking about four out of five of -- the
     environments at Rimini, 2006 to 2011, we talked about how

3    four out of five were on the Rimini system and one out of
     five were remote.

            So just coming back to that, I want to talk to
     you about the one out of five.

            Now, the Rimini environments that -- the
     so-called remote environments, during the time -- not the
     hypothetical environments, but the actual Rimini remote
     environments, those were not purely remote environments,
     were they?

            They were receiving fixes and updates from
     general -- from general environments on the Rimini system.

     A.    That's my understanding, yes.

     Q.    All right.  Right.  And you've seen the testimony
     about that from the Rimini witnesses?

     A.    Yes.

     Q.    All right.  So when we're talking about going 100
     percent remote from India, and comparing that to what
     Rimini was doing before, it's the case that what Rimini was
     actually doing was never one out of five, one out of six,
     it was never anything where it was 100 percent remote?

     A.    That's correct.

     Q.    Now, I want to ask you about automated downloading.

            Now, you've assumed, for purposes of your
     hypothetical world where Rimini goes to a 100 percent
     remote model, that they're also not doing any automated
     downloading using crawlers; right?

     A.    I assumed that it would be manual.

     Q.    That would be manual.  Thank you.

            And you assumed it would be feasible in 2006 and
     2007 for Rimini to operate its business using manual
     downloading?

     A.    Yes.  And then I assumed that they would operate in
     a nonaccused fashion.

     Q.    All right.  And if we could look at PTX 27, which
     should still be in those binders you have.

            All right.  This has been admitted into
     evidence.  This is an e-mail exchange between Mr. Chiu and
     Mr. Ravin.

            At the bottom of page 1, Mr. Ravin writes to
     Mr. Chiu ending with,

1             "Please use our automation tools to complete the
downloads as it is not feasible to complete the entire
2     downloads without such tools or processes."
             Did you assume that Rimini was not going to be
3     able to complete the entire downloads that it was doing in
2006 and 2007 manually?
4     A.    That's correct.
      Q.    Okay.  So you -- the business that you're describing
5     would not be able to download -- to do as much downloading
as what Rimini was actually doing; is that correct?
6     A.    I assumed that they would have to do it manually,
and I added additional labor.
7             Are you talking specifically the 2006, 2007?
      Q.    Yes.
8     A.    So I think it was 100,000 to 4- or $500,000 for that
time period.
9     Q.    Right.  Mr. Ravin isn't saying we can get this done
for an extra hundred thousand dollars, he's saying we can't
10    get it done; right?
      A.    I believe he is, yes.
11    Q.    Okay.  The -- can you look at Exhibit 454, which has
been admitted into evidence.
12            And this is a report to Mr. Ravin with a table.
This is again in 2007, and George Lester is writing to
13    Mr. Ravin,
             "Seth, this table helps identify how long it
14    would take to manually download all updates and fixes a
client is licensed for."
15            And then you can see in the right-hand column
workdays to complete download manually.
16    A.    Yes.
      Q.    And this is for one, two, three, four, five, six,
17    seven, eight, nine clients.
             And are you saying that if you take all of those
18    workdays that are required for manual downloading and
expand them over the entire client base of Rimini during
19    this period, that that would cost Rimini an extra 100,000
to $500,000?
20    A.    That's implicit in the calculation, yes.
      Q.    Okay.  And if you look at PTX 21, which has also
21    been admitted into evidence, the second page, on the second
page --
22    A.    Did you say PTX 21?
      Q.    21, 2-1, 3 times 7.
23            All right.  This is an e-mail to Mr. Ravin,
again from Mr. Lester, and he says in the middle paragraph
24    that begins, "You are correct."
             "It would be impossible for one person to
25    download all the individual fixes manually in less than a
month.  My initial estimates indicate it would take several

3896

```
 1    months to accomplish this task manually."
              Is that something that you took into account
 2    when you made your assumptions about this costing only
      additional 100,000 to $500,000 to do the manual updates
 3    during the period we're discussing?
         A.    It's been a few years, but I think I had this
 4    document.
         Q.    Okay.  Now, you -- it's your understanding that
 5    Oracle Database was necessary to support the Rimini
      customers and that Rimini has admitted that; correct?
 6       A.    I have a different understanding.
         Q.    All right.  Is it your understanding that in order
 7    to support the Rimini's customers it's necessary to have an
      installed instance of the Oracle Database that you can
 8    re-create their environment for, for purposes of generating
      code that you send them?
 9       A.    It's my understanding that there were alternatives,
      Microsoft and IBM and other databases, that would also
10    work.
              MR. ISAACSON:  All right.  Can we play
11    Mr. Ravin's deposition, November 18th, 2011, page 448,
      lines 17 through 24.
12            THE COURT:  Go ahead.
              (Videotape deposition of Seth Ravin played as
13            follows:)
              "Q.   And so in order to support those
14            customers, it's necessary to have an installed
              instance of the Oracle database that you can
15            recreate their environment for purposes of
              generating code deliverables that you send
16            them?
              "A.   Yes, and we get that either from
17            the customer under their license, or we get --
              use a developer license, it seems."
18    BY MR. ISAACSON:
         Q.    All right.  Your understanding is different from
19    Mr. Ravin's; is that correct?
         A.    It would appear so, yes.
20       Q.    All right.  Now, if Rimini Street were, in fact, not
      using Oracle Database properly, if they were violating
21    Oracle's copyrights, is it your understanding that Rimini
      Street would be willing to pay whatever the commercial
22    amount would normally be for that license just like any
      other customer?
23       A.    Yes, that's what I included in my calculation is the
      price that they charged.
24       Q.    All right.  So let's -- just to make -- I'm going
      to -- this is slightly repetitive, but to be clear, your
25    understanding is that if Rimini was violating the Oracle
      Database copyrights, they would be willing to pay the same
```

3897

 1   rate for a license for that as any other customer of
     Oracle?
 2   A.     You're talking from Rimini Street's perspective?
     Q.     Yes.
 3   A.     Yes.  Yes, sir.
     Q.     Okay.  Now, in this case, you based your estimate of
 4   how much Rimini would pay for a license based on -- well,
     it would -- two servers; is that right?
 5   A.     I had a range.  I have two at the minimum and 72 at
     the maximum.
 6   Q.     Right.  Okay.  Let's talk about the minimum one now.
               So two licenses for two servers; right?
 7   A.     Yes, sir.
     Q.     Okay.  Now, remember in -- you have in other
 8   copyright cases measured the price for copyrighted work
     based on the number of servers, right, that were actually
 9   used?
     A.     You're talking about the *Ajaxo* case?
10   Q.     That would be one, yes.
     A.     I don't have a direct recollection.  This is 2008.
11   But I assume that you're right.
     Q.     Okay.  Let's go over this just for clarity purposes.
12             When you say two servers, that's not the number
     of servers that Oracle Database was actually on at -- at
13   Rimini; correct?
     A.     You're right.
14   Q.     Right.  And there were, in fact, a hundred and --
     216 environments on its servers that contained installed
15   copies of Oracle Database; correct?
     A.     I believe you're right, yes.
16   Q.     And that was used to serve 72 customers; correct?
     A.     Yes.
17   Q.     Okay.  And what you're saying is -- and this goes
     back to when Mr. Hilliard was here -- people may not be
18   sure why he was here -- Mr. Hilliard said that, as a matter
     of technology, you could have put all -- you could have put
19   those copies of Oracle Database on the two servers, and if
     you -- that that was technically possible.
20             And you're saying since that's technically
     possible, then you would only have to have a license for
21   two servers.  That's what's going on here; right?
     A.     That low end of my range would be if the jury
22   decides that two licenses are appropriate, then the damage
     number was 90,000, and then I also calculated for all 72
23   customers as well.
     Q.     Right.  And so -- and so the decision point is
24   between how many servers that Rimini actually had Oracle
     Database on and what they technically could have done;
25   right?
     A.     How many they would have purchased, correct.

1   Q.    And when you talk about the two, putting it on two
servers, we're saying that a company like Rimini could have
2   put Oracle Database on two servers and then served at least
72 customers, and then they would only have had to pay for
3   two licenses; right?
    A.    That's the low end of the range I calculated, yes.
4   Q.    Right.  And the two licenses then would cost only
$95,000?
5   A.    I believe that's the price that Oracle charged.
    Q.    Right.  And now, do you -- is it your -- is it your
6   opinion that Oracle actually permits a company to put
Oracle Database on one server and then use that for as many
7   customers as that company wants?
    A.    That would be a technical question that I don't have
8   an opinion on.
    Q.    No, I'm not asking you a technical question.  So let
9   me get this straight.
    A.    I'm sorry.
10  Q.    I'm asking you about Oracle's pricing policies.  All
right?
11          I mean, if a company could put Oracle Database
on one server and then service a thousand customers, that
12  was technically possible, right, would Oracle's pricing
policy permit that, or would Oracle say you've got a
13  thousand customers, we charge for each customer?
            MR. STRAND:  Objection, foundation, speculation.
14          THE COURT:  Overruled.
            THE WITNESS:  I'm sorry.  I didn't hear the
15  question.
BY MR. ISAACSON:
16  Q.    I'm asking you about your understanding of how
Oracle prices, okay?
17  A.    It's my understanding, based on Mr. Hilliard, that
the pricing was consistent with Ms. Dean's prices that she
18  had.
            As far as their policy of allowing the customer
19  to use it for multiple customers, I don't know.
    Q.    Mr. Hilliard is a technology expert.  He didn't
20  testify to this jury about Oracle's pricing policies.
Okay?  He just said how much stuff you can put on a
21  computer.  Okay?
            I'm asking you about Oracle's actual pricing
22  policies.  Okay?
            Does Oracle actually permit someone to say look
23  how much -- I can put this all on one computer and then I
can take a thousand of your customers?
24          Or does Oracle say, no, that's a thousand
customers, we're going to charge you per customer?
25  A.    And is there a question?
    Q.    Yes.  Which is -- what is your understanding --

1    A.    I don't have an understanding of Oracle's policy
with regards to whether they would allow two licenses to
2    service 72 customers.
     Q.    Okay.  Thanks.
3          So when you're -- so when you're talking about
your low end, the two -- the two -- just the two licenses,
4    you're just -- you're offering that to the jury as an
option, but you don't know what Oracle's pricing policy is?
5    A.    No, I would have to go investigate because I
haven't.  I just assumed that they would.
6    Q.    Okay.  And when you estimated what it would cost for
72 licenses for 72 customers, you also, again, didn't
7    investigate what Oracle's pricing policy is?
     A.    I took the 72 -- I got the number from Ms. Dean's
8    report, and I applied the price.  And you're right, I
didn't investigate the pricing policy.
9    Q.    Okay.  And it's your understanding that Rimini would
have been willing to pay a license for Oracle Database
10   based on standard Oracle pricing policies, the same prices
as paid by other customers?
11   A.    Yes.
           MR. ISAACSON:  Okay.  Can we look at -- it was
12   slide 34 from his presentation.
BY MR. ISAACSON:
13   Q.    Now, this was not a slide that you prepared, was it,
that we saw this first with Mr. Rowe?
14   A.    I believe the demonstrative company created it.
     Q.    Okay.
15   A.    The consultants.
     Q.    All right.  Now, we saw this with Mr. Rowe.
16         And in terms of self-support, you would rely on
the testimony of Rimini witnesses as to when and how often
17   that was an available option; is that correct?
     A.    I -- it's been three years ago, but when I made the
18   calculation, I thought I made it based on the deposition
testimony that I read and the record.
19   Q.    That would have been the deposition testimony of the
Rimini witnesses?
20   A.    No, it would have been deposition testimony of
Oracle witnesses and Rimini witnesses.
21   Q.    Okay.  That's fair.
           The -- and have you -- in reviewing any of the
22   testimony of the Rimini witnesses at trial about
self-support, have you reviewed any testimony you disagree
23   with?
     A.    I'm not sure I understand your question.
24   Q.    You mentioned that you've been reviewing the trial
transcript, I guess, as it's been going along?
25   A.    Not all of it.
     Q.    But some of it?

1    A.    I had the opportunity to read Ms. Dean's transcript
and Mr. Ravin's, but not all of it.  I haven't read every
2    day.
     Q.    You've been reading her work product.
3    A.    I have.
     Q.    And you've been doing that back in your office, and
4    you've been reading some of it.
            And so my question is, have you read any of the
5    testimony of the Rimini witnesses about self-support that
you've disagreed with?
6    A.    I can't think of any, no.
     Q.    Consulting firms.  Now, it's your understanding that
7    they were in direct competition with Rimini with respect to
support less than 5 percent of the time; correct?
8    A.    I'm not sure of the question.  You're asking about
consultants?
9    Q.    Well, it says the title of the support -- the title
of the slide is Support Options For Customers Leaving
10   Oracle Support.  There's one, self-support, two, consulting
firms.
11   A.    Yes.
     Q.    So is it your understanding that those consulting
12   firms that were in the slide that you were -- that we're
showing the jury, that they were in direct competition with
13   Rimini for Oracle support less than 5 percent of the time?
     A.    No, I can't recall forming that opinion.
14   Q.    Okay.  Did you have -- do you have any understanding
as to what percent of the time consulting firms were in
15   direct competition with Rimini for providing Oracle
support?
16   A.    I suspect it would depend on which program,
PeopleSoft, Siebel, JD Edwards.
17          It's my understanding that these consultants are
ex-employees of those three companies, and that there
18   are -- my understanding was that there were hundreds of
them, and that they do consulting on a small basis as sole
19   proprietorships.  They're individuals in many instances.
     Q.    Right.  I asked you what percent of the time.  I
20   didn't hear a percentage in your answer.
     A.    I'm sorry.  Then I'll try to be brief.
21          I would think they're in competition all the
time because they're available.
22   Q.    Okay.  And in terms of being in direct competition
with Rimini for third-party support, your position would
23   be, or opinion would be, that those consulting firms are in
competition with Rimini 100 percent of the time, direct
24   competition?
     A.    I believe that they are direct competitors by
25   platform.  They may not support all three programs, but if
you have a Siebel program, and you're an ex-Oracle

 1   customer, then they're available to consult on Siebel, and
     they would be available at any time.
 2   Q.    Now, Mr. Rowe, you understand, is the head of
     marketing at Rimini and has been for some time?
 3   A.    Yes.
     Q.    You understand that he's knowledgeable about the
 4   competition that Rimini faces?
     A.    I would think he would be, yes.
 5   Q.    Right.  Much more knowledgeable than you are; right?
     A.    Yes.
 6   Q.    Okay.  And he has testified in this court that they
     were in direct competition with these consultants less than
 7   5 percent of the time.  That's directly contrary to your
     assumptions; right?
 8   A.    I'm not sure that's directly contrary.  I'm not
     quite sure what it means to be in competition only 5
 9   percent of the time.
     Q.    Okay.  Third-party providers.  Now, with -- let me
10   ask you some things about the third-party providers.
               Now, at the time that Rimini got its first
11   customers in 2006, there were no alternative third-party
     support providers; correct?
12   A.    In 2006.
     Q.    Yes.
13   A.    It's my understanding that there were third-party
     providers in that year.  That was my understanding.
14   Q.    Okay.  The -- oh, I'm -- but in 2006, the first
     customers were all Siebel; right?
15   A.    There may have been one PeopleSoft, but you're
     right, the majority were Siebel.
16   Q.    They had no competition for Siebel support, correct,
     other than Oracle?
17   A.    I would think that they would be competing with the
     self-support and the consulting firms as well as third
18   party providers that support.
     Q.    All right.  Can we play Mr. Ravin's deposition
19   November 17th, 2011, line -- page 94, lines 4 through 13.
               THE COURT:  You may.
20          (Videotape deposition of Seth Ravin played as
             follows:)
21          "Q. And as of the time Rimini Street launched
             its first support offering, TomorrowNow is its
22           only credible competitor in the third-party
             support space?
23          "A. Well, again, we were the only Siebel
             provider initially.
24          "Q. So there was -- at that point, there was
             no credible alternative competitor to Rimini
25           Street at the time that it launched Siebel?
             "A. That's correct."

BY MR. ISAACSON:
Q.      That, what Mr. Ravin said, was contrary to what you assumed; correct?
A.      It does, yes.
Q.      And then once you're going into PeopleSoft at the beginning of the business, Rimini Street's only credible competitor for third-party support was that company called TomorrowNow; correct?
A.      You have to -- I mean, it's qualified as credible.
Q.      Yes.
A.      And so you have to define credible, but I would agree, yes.
Q.      Okay.  And as of February 2007, early 2007, TomorrowNow was the only credible support competitor to Rimini; right?
A.      Yes.
Q.      Other companies had tried to enter the market but had failed; correct?
A.      I believe he's talking about companies that are similar to Rimini Street.
Q.      Right.  And they failed?
A.      Yes.
Q.      And throughout the period 2006, 2011, it's correct that the most frequent competition for Rimini for Oracle support was Oracle?
A.      I didn't quite hear the first part of your question.  Could you ask again?  I'm sorry.
Q.      For 2006 to 2011, the most frequent competition Rimini faced for Oracle support was from Oracle?
A.      Most frequent, yes.
Q.      Now, after TomorrowNow shut down, now we're toward -- now we're to October, November, 2008, Rimini had only much smaller competitors; correct?
A.      Correct.
Q.      And going down the list that we see here, we see Spinnaker.  Now, Spinnaker, by 2009, was not growing, it had flattened out in terms of the number of customers it was acquiring; correct?
A.      I think that's correct, yes.
Q.      Okay.  And Spinnaker only provided support --
A.      Excuse me.
Q.      Are you okay?
A.      I apologize.
Q.      Don't apologize for coughing.
        Spinnaker only provided support for JDE; right?
A.      I believe you're right, yes.
Q.      So Spinnaker is not a competitor for Siebel or PeopleSoft?
A.      Correct, it's a different program or --
Q.      So once TomorrowNow goes out of business, the only

1     potential competitors for the other -- for PeopleSoft and
      Siebel are the other four companies that you listed there;
2     right?
         A.    Those -- there may be some smaller ones, but these
3     were the larger ones.  So, yes, you're right.
         Q.    Okay.  So what did you -- what did you assume about
4     the ability of these four companies to compete for Siebel
      and PeopleSoft products and JDE products that are at issue
5     in this case?
         A.    I was aware of the fact that they were struggling,
6     and so I considered them, but I had that in mind.
         Q.    Okay.  When you say you considered them, that's
7     fine, but I want to know what you assumed about their
      ability to compete for Siebel, PeopleSoft, and JDE after
8     TomorrowNow shuts down?
         A.    I understand they had limited customers, so they
9     would have been competition but not at the same level as
      Rimini Street.
10       Q.    Okay.  What was your assumption about the number of
      customers they had?
11       A.    They were not anywhere near the number that Rimini
      Street had.
12       Q.    Okay.  Can you tell me what that means?  What's your
      estimate of the number of customers they had?
13       A.    Oh, it's been a couple years.  I would have to go
      back and look.  I really don't recall.  But it would be
14    under a hundred, would be my best guess sitting here today.
         Q.    And collectively how many customers did these four
15    companies win in competition versus Rimini?
         A.    I don't know.  They're in the market, they're
16    providing services, they didn't have a lot of customers, so
      it would be commensurate with the environment.
17       Q.    Well, what would be your estimate of -- taking all
      four of them together, of the number of customers they took
18    from Rimini for the products at issue in this case,
      PeopleSoft, the JDE product at issue in this case, and
19    Siebel?
         A.    I don't have a number in my head.  I don't have an
20    opinion.
         Q.    Do you know Mr. Rowe said the number was two?
21       A.    No, I wasn't aware of that.
         Q.    Versytec, what product do they make?
22       A.    Which product do they support?
         Q.    Yes.
23       A.    I don't recall.
         Q.    Okay.  Do they -- why do you have them on this
24    chart?
         A.    I didn't put them on the chart.  This chart was
25    prepared by the demonstrative company.
                   If they're in my report, then they're in the

 1    report.  I generated the report, not the exhibit.
      Q.    This is slide 34 from the presentation during your
 2    direct.
      A.    Yes, it is.
 3    Q.    Right.  You testified about this slide.  Why did you
      testify about a slide with Versytec on it?
 4    A.    Because I understand that Versytec was a competitor.
      Q.    A competitor for what?
 5    A.    Three years after the fact, I just don't recall.
      Q.    Okay.  You know, it's been -- are you aware that the
 6    Rimini witnesses have said that Versytec supported JDE
      World, which is not a product in this case?
 7    A.    I wasn't aware of that.
      Q.    They're completely -- Versytec's completely
 8    irrelevant to this case, and you didn't know that?
      A.    I would have to go back and look at my report.  I
 9    wrote the report three years ago.  So, I'm sorry, I don't
      know sitting here today.
10              MR. ISAACSON:  All right.  I don't have any
      further questions.
11              THE COURT:  Redirect examination?
                MR. STRAND:  Thank you, Your Honor.
12              THE COURT:  Mr. Strand.
                        REDIRECT EXAMINATION
13    BY MR. STRAND:
      Q.    Good morning, Mr. Hampton.  I just have a couple or
14    three questions.
                Yesterday you and Mr. Isaacson talked at some
15    length about your calculation as to the value of Rimini's
      use of Oracle's copyrighted material.  Do you recall that
16    series of questions?
      A.    Yes.
17    Q.    And you also testified at some length regarding
      Rimini's profits from that infringing use.  Do you recall
18    that series of questions?
      A.    Yes, I do.
19    Q.    Would you look with me, please, at your supplemental
      report.  It's in the back of your white notebook there.  Do
20    you have that in front of you?
      A.    Yes, I do.
21    Q.    The September of 2015 report?
      A.    I have the report.
22    Q.    Okay.  Would you look with me, please, sir, at
      paragraph 6 of that report here on page 2, carryover on top
23    of page 6 -- 7.
      A.    Paragraph 6?
24    Q.    Yes.
      A.    May I take just a moment to look at it?
25    Q.    Sure.  Please do.
      A.    Okay.  Thank you.

1    Q.    You've read that paragraph?
     A.    I have.
2    Q.    Okay.  Tell me, following up on your conversations
     with Mr. Isaacson yesterday, is there a relationship
3    between Rimini's value of use of Oracle's copyrighted
     materials and Rimini's profits from the use of those
4    copyrighted materials?
     A.    Yes, there are.
5    Q.    What is that relationship?
     A.    Well, the calculation's based on avoided cost.  So
6    if you avoid a cost, you gain more profit.
             So it's really -- another way to look at it
7    would be the additional profit which Rimini made due to the
     efficiencies that they gained from their wrongful acts.
8    Q.    And so the avoided costs that you testified to was
     what amount?
9    A.    $9.3 million.
     Q.    And the additional profits that Rimini would have
10   obtained based upon those avoided costs would be in what
     amount?
11   A.    $9.3 million.
             MR. STRAND:  Thank you.  I have no further
12   questions."

13           (End of transcripts sent to jury for review.)

             (The proceedings adjourned at 4:26 p.m.)

                       *   *   *

3906

-o0o-

I certify that the foregoing is a correct

transcript from the record of proceedings

in the above-entitled matter.


<u>                                        </u>     <u>10/9/15</u>

Donna Davidson, RDR, CRR, CCR #318     Date
Official Reporter