SHOOK, HARDY & BACON LLP
B. Trent Webb (*pro hac vice*)
Peter Strand (*pro hac vice*)
Ryan D. Dykal (*pro hac vice*)
2555 Grand Boulevard
Kansas City, MO 64108-2613
Telephone: (816) 474-6550
Facsimile: (816) 421-5547
bwebb@shb.com

Robert H. Reckers (*pro hac vice*)
600 Travis Street, Suite 1600
Houston, TX 77002
Telephone: (713) 227-8008
Facsimile: (713) 227-9508
rreckers@shb.com

GIBSON, DUNN & CRUTCHER LLP
Mark A. Perry (*pro hac vice*)
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone: (202) 955-8500
mperry@gibsondunn.com

Blaine H. Evanson (*pro hac vice*)
Joseph A. Gorman (*pro hac vice*)
333 South Grand Avenue
Los Angeles, CA 90071
Telephone: (213) 229-7228
bevanson@gibsondunn.com

LEWIS ROCA ROTHGERBER LLP
W. West Allen (Nevada Bar No. 5566)
3993 Howard Hughes Parkway, Suite 600
Las Vegas, NV 89169
Telephone: (702) 949-8200
wallen@lrrlaw.com

RIMINI STREET, INC.
Daniel B. Winslow (*pro hac vice*)
6601 Koll Center Parkway, Suite 300
Pleasanton, CA 94566
Telephone:  (925) 264-7736
dwinslow@riministreet.com

John P. Reilly (*pro hac vice*)
3993 Howard Hughes Parkway, Suite 500
Las Vegas, NV 89169
Telephone: (336) 908-6961
jreilly@riministreet.com

*Attorneys for Defendants Rimini Street, Inc. and Seth Ravin*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| ORACLE USA, INC., a Colorado corporation; ORACLE AMERICA, INC., a Delaware corporation; and ORACLE INTERNATIONAL CORPORATION, a California corporation, | **HEARING REQUESTED** |
| Plaintiffs, | Case No. 2:10-cv-0106-LRH-PAL |
| v. | **DEFENDANTS RIMINI STREET, INC.'S AND SETH RAVIN'S OPPOSITION TO ORACLE'S MOTION FOR A PERMANENT INJUNCTION** |
| RIMINI STREET, INC., a Nevada corporation; and SETH RAVIN, an individual, | |
| Defendants. | |

# TABLE OF CONTENTS

Page

INTRODUCTION ...................................................................................................................1

BACKGROUND ...................................................................................................................3

I.   Oracle Sues and Seeks Summary Judgment..............................................................3

II.  Rimini Stops All Processes Adjudicated as Infringing or Improper .........................4

III. Oracle Opposes Rimini's Requests to Litigate Its Current Processes in *Rimini I*......................................................................................................................5

IV.  The Jury Finds Rimini Liable Only for Innocent Infringement and for Unauthorized Access to Oracle's Computers.............................................................6

V.   Oracle's Proposed Injunction ...................................................................................7

LEGAL STANDARD .............................................................................................................7

ARGUMENT ........................................................................................................................8

I.   Oracle Is Not Entitled to Any Injunction .................................................................8

    A.   Oracle Has Not Established Any Irreparable Harm Caused by Rimini's Innocent Acts of Infringement ................................................8

    B.   Oracle Has an Adequate Remedy at Law.................................................14

    C.   The Balance of Hardships Favors Rimini ................................................16

    D.   An Injunction Would Be Contrary to the Public Interest .........................17

II.  Oracle's Proposed Injunction Is Impermissibly Vague and Overbroad........................18

III. Oracle Is Not Entitled to an Order Impounding Rimini's Computers and Media..........................................................................................................................25

IV.  Oracle's Motion for Judgment on Its UCL Claim Is Entirely Improper ...................27

V.   Oracle Is Not Entitled to an Injunction Under the State Anti-Hacking Statutes .....................................................................................................................27

    A.   The Nevada Anti-Hacking Statute Does Not Authorize Oracle's Injunction ................................................................................................28

    B.   No Injunction Is Warranted Under the California Anti-Hacking Statute ......................................................................................................28

CONCLUSION....................................................................................................................30

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Active Sports Lifestyle USA LLC v. Old Navy, LLC*,
  2014 WL 1246497 (C.D. Cal. Mar. 21, 2014)................................................................10

*ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*,
  694 F.3d 1312 (Fed. Cir. 2012)...................................................................................18

*Alcatel USA, Inc. v. DGI Techs., Inc.*,
  166 F.3d 772 (5th Cir. 1999) ................................................................................16, 18

*Apple Inc. v. Psystar Corp.*,
  673 F. Supp. 2d 943 (N.D. Cal. 2009) ........................................................................19

*Apple, Inc. v. Samsung Elecs. Co.*,
  678 F.3d 1314 (Fed. Cir. 2012).............................................................................10, 12

*Apple Inc. v. Samsung Elecs. Co.*,
  695 F.3d 1370 (Fed. Cir. 2012)......................................................................................9

*Apple Inc. v. Samsung Elecs. Co.*,
  735 F.3d 1352 (Fed. Cir. 2013)................................................................7, 12, 13, 16

*Bartee v. Michelin N. Am., Inc.*,
  374 F.3d 906 (10th Cir. 2004) .....................................................................................10

*Barton v. U.S. Dep't of Agric.*,
  523 F. Supp. 1019 (S.D. Ill. 1981)...............................................................................15

*Brighton Collectibles, Inc. v. Pedre Watch Co., Inc.*,
  2013 WL 5719071 (S.D. Cal. Oct. 21, 2013)..........................................11, 14, 16, 18

*Chamberlain Grp., Inc. v. Skylink Tech., Inc.*,
  381 F.3d 1178 (Fed. Cir. 2004)....................................................................................16

*Chicago Bd. of Educ. v. Substance, Inc.*,
  354 F.3d 624 (7th Cir. 2003) .......................................................................................20

*City of Carlsbad v. Shah*,
  850 F. Supp. 2d 1087 (S.D. Cal. 2012)........................................................................26

*Columbia Pictures Indus., Inc. v. Fung*,
  710 F.3d 1020 (9th Cir. 2013) ...............................................................................19, 30

*Contessa Food Prods., Inc. v. Lockpur Fish Processing Co.*,
  2003 WL 25778704 (C.D. Cal. Jan. 29, 2003) ............................................................17

*Craigslist Inc. v. Naturemarket, Inc.*,
  694 F. Supp. 2d 1039 (N.D. Cal. 2010).................................................................20, 30

*Curtis v. Illumination Arts, Inc.*,
  33 F. Supp. 3d 1200 (W.D. Wash. 2014)................................................................26, 27

*Dolori Fabrics, Inc. v. Limited, Inc.*,
  662 F. Supp. 1347 (S.D.N.Y. 1987).............................................................................17

## TABLE OF AUTHORITIES *(continued)*

Page(s)

*Douglas Dynamics, LLC v. Buyers Prods. Co.*,
  717 F.3d 1336 (Fed. Cir. 2013)..................................................................11

*eBay, Inc v. MercExchange, L.L.C.*,
  547 U.S. 388 (2006).................................................................1, 7, 8, 14, 17

*Evony, LLC v. Holland*,
  2011 WL 1230405 (W.D. Pa. Mar. 31, 2011) ...........................................25

*Flexible Lifeline Sys., Inc. v. Precision Lift, Inc.*,
  654 F.3d 989 (9th Cir. 2011) .....................................................................11

*Fox Broadcasting Co. v. Dish Network L.L.C.*,
  747 F.3d 1060 (9th Cir. 2013) .............................................................12, 15

*Getty Images (U.S.), Inc. v. Virtual Clinics*,
  2014 WL 1116775 (W.D. Wash. Mar. 20, 2014) ......................................26

*Goldie's Bookstore, Inc. v. Superior Court of State of Cal.*,
  739 F.2d 466 (9th Cir. 1984) .....................................................................10

*Gowan Co., LLC v. Aceto Agr. Chemicals*,
  2009 WL 2028387 (D. Ariz. Jul. 10, 2009) ................................................9

*GTE Sylvania Inc. v. Cont'l T.V., Inc.*,
  537 F.2d 980 (9th Cir. 1976) .....................................................................10

*Hamilton v. State Farm Fire & Cas. Co.*,
  270 F.3d 778 (9th Cir. 2001) .....................................................................14

*i4i Ltd. P'ship v. Microsoft Corp.*,
  598 F.3d 831 (Fed. Cir. 2010).....................................................................16

*Iconix, Inc. v. Tokuda*,
  457 F. Supp. 2d 969 (N.D. Cal. 2006) .......................................................20

*Jacobsen v. Katzer*,
  609 F. Supp. 2d 925 (N.D. Cal. 2009) .........................................................9

*Los Angeles Police Protective League v. Gates*,
  995 F.2d 1469 (9th Cir. 1993) ..............................................................10, 17

*Melendres v. Arpaio*,
  695 F.3d 990 (9th Cir. 2012) .....................................................................29

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*,
  518 F. Supp. 2d 1197 (C.D. Cal. 2007) .................................................14, 20

*Microsoft Corp. v. Motorola, Inc.*,
  2012 WL 5993202 (W.D. Wash. Nov. 30, 2012) ......................................15

*Minco, Inc. v. Combustion Eng'g, Inc.*,
  95 F.3d 1109 (Fed. Cir. 1996).....................................................................15

*Monsanto Co. v. Geertson Seed Farms*,
  561 U.S. 139 (2010).....................................................................................9

*Nat'l Labor Relations Bd. v. Express Publ'g Co.*,
  312 U.S. 426 (1941).....................................................................................22

## TABLE OF AUTHORITIES *(continued)*

Page(s)

*New Hampshire v. Maine,*
532 U.S. 742 (2001)...........................................................................14

*Opperman v. Path, Inc.,*
87 F. Supp. 3d 1018, 1056 (N.D. Cal. 2014) ...............................29

*Oracle America, Inc. v. Google Inc.,*
798 F. Supp. 2d 1111 (N.D. Cal. 2011) .......................................15

*Paramount Pictures Corp. v. Doe,*
821 F. Supp. 82 (E.D.N.Y. 1993) .................................................25

*Perfect 10, Inc. v. Google, Inc.,*
653 F.3d 976 (9th Cir. 2011) ..........................................................9

*Polygram Intern. Pub, Inc. v. Nevada/TIG, Inc.,*
855 F. Supp. 1314 (D. Mass 1994) ...............................................17

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.,*
2015 WL 604582 (N.D. Cal. Feb. 12, 2015) ................................11

*Precision Instrument Mfg. Co. v. Automotive Maintenance Mach. Co.,*
324 U.S. 806 (1945)........................................................................18

*Price v. City of Stockton,*
390 F.3d 1105 (9th Cir. 2004) .......................................................20

*Reno Air Racing Ass'n, Inc. v. McCord,*
452 F.3d 1126 (9th Cir. 2006) ...............................................19, 21

*Rogers v. Koons,*
960 F.2d 301 (2d Cir. 1992)...........................................................26

*Societe Civile Succession Richard Guino v. Int'l Found. for Anticancer Drug
Discovery,*
460 F. Supp. 2d 1105 (D. Ariz. 2006) ..........................................26

*Software Freedom Conservancy, Inc. v. Best Buy Co., Inc.,*
2010 WL 2985320 (S.D.N.Y. Jul. 27, 2010) ...............................25

*Software Freedom Conservancy, Inc. v. Westinghouse Digital Elecs., LLC,*
812 F. Supp. 2d 483 (S.D.N.Y. 2011)...........................................26

*Ted Arnold Ltd. v. Silvercraft Co.,*
259 F. Supp. 733 (S.D.N.Y. 1966).................................................25

*TMX Funding, Inc. v. Impero Tech., Inc.,*
2010 WL 2745484 (N.D. Cal. July 9, 2010)................................28

*United States v. Nosal,*
676 F.3d 854 (9th Cir. 2012) (en banc) ........................................28

*Weinberger v. Romero-Barcelo,*
456 U.S. 305 (1982)..........................................................................7

*Westinghouse Elec. Corp. v. Gen. Circuit Breaker & Elec. Supply Inc.,*
106 F.3d 894 (9th Cir. 1997) ...................................................11, 17

## TABLE OF AUTHORITIES *(continued)*

Page(s)

*WPOW, Inc. v. MRLJ Enters.*,
   584 F. Supp. 132 (D.D.C. Mar. 15, 1984) ..................................................................25

*XpertUniverse, Inc. v. Cisco Sys., Inc.*,
   2013 WL 6118447 (D. Del. Nov. 20, 2013) ...............................................................15

### Statutes

17 U.S.C. § 102...............................................................................................................24

17 U.S.C. § 106...............................................................................................................21

17 U.S.C. § 502.................................................................................................................7

Nev. Rev. Stat. § 205.511...............................................................................................28

Nev. Rev. Stat. § 205.513...............................................................................................28

### Other Authorities

11A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2955
   (3d ed.) .........................................................................................................................18

5-14 Nimmer on Copyright § 14.06...............................................................11, 20, 24

### Rules

Federal Rule of Civil Procedure 65 ...........................................................................18, 21

OPPOSITION TO MOTION FOR A PERMANENT INJUNCTION

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### INTRODUCTION

Oracle's motion is premised on the same over-reaching claims and arguments that Oracle pressed for more than three weeks at trial, but which the jury definitively rejected in its verdict. Having failed to achieve its anti-competitive aims through a massive damages award, Oracle now attempts a blatant end-run around the jury's verdict.  The Court should deny Oracle's motion.

The findings by the jury preclude the imposition of ***any*** injunction on this record, and as a result, Oracle largely ignores them. Nowhere in its motion does Oracle acknowledge the jury's finding that Rimini's infringing acts were *innocent*.  Oracle does not even *mention* the $35.6 million fair market value license award, let alone try to square its demands for additional equitable relief with that award.  Oracle also fails to acknowledge that the jury found that Oracle lost *zero* profits and Rimini earned *zero* profits as a result of the infringement.  The jury also found that Rimini did not disrupt *a single* customer relationship, rejected every one of Oracle's tortious business interference claims, and rejected any punitive damages liability.

These findings by the jury preclude Oracle from meeting its burden for proving the lawful and appropriate basis for a permanent injunction under the seminal case, *eBay, Inc v. MercExchange, L.L.C.*, 547 U.S. 388, 398-93 (2006), which requires proving:  (1) imminent, irreparable injury with a causal nexus to Rimini's infringement; (2) that the fair market value license the jury awarded is inadequate to compensate for any injury; (3) that the balance of hardships favors Oracle; or (4) that the public would not be disserved by a permanent injunction.  The Court's and jury's findings of infringement do not alone warrant an injunction because, as the Supreme Court explained in *eBay*, the "Court has consistently rejected invitations to replace traditional equitable considerations with a rule that an injunction automatically follows a determination that a copyright has been infringed." *Id*. at 392-93.  That is doubly true where the infringement was *innocent*.

Moreover, Oracle cannot show that it faces *imminent* harm or the risk of *irreparable* injury because in more than five years of litigation (including a year and a half since the Court found Rimini infringing) it has never moved for injunctive relief, and Rimini long ago halted the processes the jury found infringing or otherwise unlawful.  The trial in this case involved a discrete set of processes that Rimini engaged in during the specified time period (2006-2011) and an automatic

1   downloading tool that Rimini stopped using *nearly seven years ago*. But Rimini has made clear, and

2   as the declarations filed with this opposition demonstrate, Rimini *no longer engages in the conduct*

3   the Court and jury found infringing or in violation of the anti-hacking statutes. Rimini even filed a

4   lawsuit in this Court to obtain a declaration that its current, revised processes are lawful. Oracle

5   cannot show that the processes Rimini abandoned long ago—the only conduct adjudicated at trial—

6   are causing Oracle any imminent and irreparable harm. Rimini invested substantial resources in its

7   revised processes specifically so that it would not infringe Oracle's copyrights, and there is no

8   evidence or any reason to believe that Rimini (an innocent infringer) would revert to its prior

9   processes.

10       Oracle acknowledges multiple times in its motion that any injunction must be limited only to

11   conduct adjudicated to be unlawful, but the injunction Oracle proposes includes vague and sweeping

12   language that is not limited to the conduct found to be infringing or to violate the anti-hacking

13   statutes, and which could be read to encompass Rimini's revised processes that Oracle expressly and

14   vigorously fought to exclude from this case. If the Court enters the proposed injunction, Rimini

15   could suffer significant harm to its lawful business and to its ability to litigate contested conduct in

16   the second action still pending in this Court. That Oracle's proposed injunction is so vague and

17   overbroad is yet another basis for rejecting it.

18       In short, having failed in its bid to hobble Rimini—Oracle's leading competitor in

19   aftermarket software support for Oracle products—with a massive damages award, Oracle now asks

20   this Court to disregard the jury verdict and achieve Oracle's anti-competitive goal through a vague

21   and overbroad injunction. The Court should reject Oracle's inequitable efforts and deny Oracle's

22   motion for a permanent injunction and an unprecedented order impounding Rimini's computers.

23       Rimini also respectfully requests that the Court schedule a hearing on Oracle's motion, given

24   the importance of these issues. And if the Court concludes that an injunction is warranted (it should

25   not), then, given the vagueness of Oracle's proposed injunction and the risk of jeopardizing Rimini's

26   existing business practices, Rimini respectfully requests that the Court submit its draft injunction to

27   the parties and invite the parties' comments and objections, consistent with the procedure the Court

28   followed during trial in connection with the jury instructions and verdict form.

# BACKGROUND

## I.     Oracle Sues and Seeks Summary Judgment

Rimini offers third-party support for a variety of software programs, including Oracle programs such as PeopleSoft, J.D. Edwards ("JDE"), Siebel, and Oracle Database, as well as software licensed by Oracle's software rival, SAP.  There is no dispute that the software licenses at issue explicitly *allow* third-party support and that Oracle has *no exclusive rights* to provide aftermarket support services for its licensed software products.  *See* 9/18 Tr. 839, 846; 9/21 Tr. 961, 1061.  In addition, several witnesses testified at trial that Rimini provides valuable market competition in servicing enterprise software, offering a different mix of services than offered by Oracle in its standard support program, and better service than Oracle at significant cost savings. *E.g.*, 10/1 Tr. 2984-2986 ("the responsiveness and speed was exceptional").

Oracle sued Rimini in January 2010, alleging, among other things, that Rimini had infringed Oracle's copyrights while engaging in software support; that Rimini had intentionally interfered with Oracle's current and prospective client relationships; and that Rimini had violated certain laws prohibiting computer hacking.  *Oracle USA, Inc. v. Rimini Street, Inc.*, 2:10-cv-00106 (D. Nev.) ("*Rimini I*").  Oracle abandoned several other claims against Rimini during trial, before the case was submitted to the jury.  *See* Dkt. 752 at 66-87; 10/6 Tr. 3341:18-19; Dkt. 767 at 84; Dkt. 852 at 2.

Oracle's copyright infringement claims in *Rimini I* were based on (i) local hosting of Oracle enterprise application and database software on Rimini's own servers, (ii) using automated means to download from Oracle's websites, (iii) "cloning" development environments from one client to another, and (iv) literal reproduction of Oracle code from one client to another.  In particular, Oracle argued that Rimini infringed by creating "local environments" of Oracle's PeopleSoft, JDE, Siebel, and Oracle Database software and documentation on Rimini's servers, sometimes by "cloning" software environments from another client.  Oracle also argued that, to create updates for its clients, Rimini "'start[ed] up' the environments present on its computer systems" (Dkt. 253 at 11), edited the Oracle code in "one or two environments" (*id*. at 12), and "copied the resulting project(s) or data change(s) for delivery" to "every customer receiving the update" (*id*.).  Oracle argued that this literal reproduction of Oracle code from one Rimini client to another constituted infringement.

At summary judgment, Oracle explained to the Court that its "motion, which addresses copies made by Rimini, concerns **only** the *reproduction right*."  Dkt. 284 at 9-10 (emphases added). As to PeopleSoft and Oracle Database, the Court agreed, holding that Rimini's own computer network did not constitute the "facilities" of its clients and, therefore, Rimini's reproductions on Rimini's systems fell outside the scope of the Oracle licenses.  *See, e.g.*, *Rimini I*, 6 F. Supp. 3d at 1098 (Rimini "not authorized" to copy software "on its own systems"), 1101 (Rimini's copying "on its own systems" outside scope of licenses); Dkt. 474 at 9 (license did not authorize Rimini to make copies "on its own systems" and commercially exploit them).  The Court also held that the copying of Oracle software to multiple Rimini clients was infringing because the literal reproduction of Oracle intellectual property from one client to another was not, as the licenses required, solely for the internal data processing operations of the first client.  *See Rimini I*, 6 F. Supp. 3d at 1097.  The Court denied Oracle's summary judgment motion as to JDE and Siebel, holding there were disputed issues of material fact as to whether Rimini had maintained those copies solely for archival purposes. *Id.* at 1104.

Oracle did not seek a preliminary injunction when it filed this action in 2010, nor did it make any claim of imminent harm or seek to enjoin Rimini following the Court's summary judgment orders in February and August 2014.  And when Rimini attempted to include its revised processes in the trial of this case, Oracle vigorously resisted any such effort.

## II.   Rimini Stops All Processes Adjudicated as Infringing or Improper

Although Oracle did not request an injunction, with the benefit of the Court's guidance in the summary judgment rulings, and at a cost of millions of dollars, Rimini began a transition to non-infringing alternative processes.  By no later than July 2014, Rimini had completed the transition and stopped using local copies of Oracle-authored software to service clients, instead remotely accessing software environments that are unique to each of its customers, none of which are stored on Rimini's computer systems.   Declaration of Jim Benge ("Benge Decl.") ¶¶ 3-10; Declaration of Ron Teegarden ("Teegarden Decl.") ¶¶ 3-6; Declaration of Kien Phung ("Phung Decl.") ¶¶ 3-10; Declaration of Craig Mackereth ("Mackereth Decl.") ¶¶ 4-11; Declaration of David Miller ("Miller Decl.") ¶¶ 4-6.  Rimini also developed a revised software development process and a new set of

proprietary software development tools that eliminated the copying of Oracle intellectual property from one client to another. *Id.*; Benge Decl. ¶ 10 ("Rimini's current process does not reproduce PeopleSoft software or documentation licensed to one client from that client to any other client"). In addition, much earlier, by at least early 2009, Rimini had stopped using automated tools to download software from Oracle servers. 9/17 Tr. 583-84; *see also* Benge Decl. ¶¶ 7-8; Teegarden Decl. ¶ 4; Phung Decl. ¶ 7; Mackereth Decl. ¶¶ 8-9; Miller Decl. ¶¶ 3-4.

On October 15, 2014, Rimini filed a lawsuit against Oracle seeking a declaration that its revised development processes and new proprietary tools, in use since at least July 31, 2014, do not infringe Oracle's PeopleSoft copyrights. *Rimini Street Inc. v. Oracle Int'l Corp.*, 2:14-cv-01699 (D. Nev. May 21, 2015) ("*Rimini II*"). That action is pending before this Court, and discovery is currently scheduled to run through at least December 5, 2016. *Rimini II* Dkt. 110.

## III. Oracle Opposes Rimini's Requests to Litigate Its Current Processes in *Rimini I*

Oracle opposed every effort by Rimini to litigate, or even refer to, its revised support processes in *Rimini I*, and therefore the trial was strictly limited to a discrete set of practices processes and conduct (described above) over a specified time period (2006 to 2011). For example, Rimini requested supplemental discovery on September 17, 2014, and sought to introduce evidence of its revised processes at trial. Dkt. 488 at 12-20. Oracle argued in opposition that the "extensive discovery" needed to "test Rimini's claim of a non-infringing business model" would unnecessarily delay trial. *Id.* at 5-7. The Court agreed, limiting trial to the support processes "Rimini used up to February 13, 2014" and excluding evidence at trial that Rimini had ceased using the processes at issue in *Rimini I* or any evidence of Rimini's "new support process." Dkt. 515 at 2-3.

Rimini moved to consolidate *Rimini I* and *Rimini II* in May 2015. Dkt. 554. Oracle again argued in opposition that the Court had "established a clear dividing line between the two cases: the close of discovery in *Rimini I*," and that litigating the legality of the revised processes would "require extensive additional discovery." Dkt. 593 at 11, 13. The Court denied Rimini's motion because the additional discovery would "lead to an unreasonable delay of trial." Dkt. 669 at 5.

In July 2015, Oracle moved *in limine* to preclude from trial any evidence, argument, or even *reference* to Rimini's revised processes, contending that the "legality of the [new support] model"

1   had yet to be determined.  Dkt. 646 at 5.  Oracle argued that "[i]ssues relating to Rimini's 2014 (and

2   later) conduct will get a full hearing in [*Rimini II*]."  *Id.* at 3.  The Court granted Oracle's *in limine*

3   motion, holding that all "claims, issues, and evidence related to the new support model are being

4   addressed solely in [*Rimini II*]."  Dkt. 723 at 3.  Rimini's two motions for reconsideration of this

5   decision were denied (Dkts. 793, 845), and Rimini was precluded at trial even from eliciting

6   testimony that it had halted local hosting of Oracle software on its own servers and was using a

7   revised development process that did not copy any Oracle code between clients, given that its doing

8   so occurred after the December 2011 cut-off (*see* 9/17 Tr. 580-583; Dkts. 845, 857, 860).

9   **IV.    The Jury Finds Rimini Liable Only for Innocent Infringement and for Unauthorized**

10  **Access to Oracle's Computers**

11          Oracle argued in closing that Rimini's business was built on a "Wall of Lies," calling Rimini

12  and Mr. Ravin liars dozens of times, and asserting that Rimini and Mr. Ravin "disrupted" or "took"

13  Oracle's customer relationships.  Oracle asked the jury to award Oracle nearly $250 million, plus

14  punitive damages, against Rimini and Seth Ravin for willful copyright infringement, intentional

15  interference with current and prospective customer relationships, and violations of two state-law

16  computer hacking statutes.  Oracle argued that this amount included $95.7 million in lost profits

17  (10/6 Tr. 3486) and $16.4 million in infringer's profits (*id.* at 3487) attributable to Rimini's specific

18  acts of willful copyright infringement.  Oracle argued that Mr. Ravin should be held liable for willful

19  vicarious and contributory infringement (*id.* at 3488), and Oracle also sought $117.6 million in

20  damages for intentional interference with current and prospective customer relationships (*id.* at

21  3492-93), which it characterized as "the lies" that Rimini used "to get the business" and to "disrupt

22  the relationship[s]" Oracle had with customers (*id.* at 3491-92).  Oracle also sought $34.9 million in

23  damages for violation of two state-law anti-hacking statutes.  *Id.* at 3493-95.

24          The jury rejected nearly all of Oracle's contentions, concluding that Rimini's infringement

25  was "innocent," that the best measure of damages for the innocent infringement was a fair market

26  value license of $35.6 million (based on the cost to Rimini of adopting a non-infringing alternative),

27  that Rimini's infringement caused Oracle to lose *zero* dollars in profit, and that the infringement

28  earned *zero* dollars in profit for Rimini.  Dkt. 896 at 4-6.  The jury also rejected Oracle's claim that

1   Mr. Ravin was vicariously or contributorily liable for Rimini's innocent copyright infringement.  *Id.*

2   at 2-3.  The jury awarded $14.4 (rather than $34.9) million for the anti-hacking statute violations.

3   The jury rejected outright Oracle's request for punitive damages (*id.* at 13-14), and—particularly

4   notable for this motion—all claims that Rimini intentionally interfered with Oracle's current or

5   prospective customers (*id.* at 10-12).

6   **V.    Oracle's Proposed Injunction**

7          After more than five years of litigating this case, Oracle for the first time sought injunctive

8   relief, arguing that it would be irreparably harmed by Rimini's unlawful conduct.  Oracle's proposed

9   injunction is hopelessly vague and overbroad, and could prohibit conduct that has not been

10  adjudicated by the Court or the jury, including:

11  • the preparation of derivative works "from" or "with" Oracle software (II (3)-(9), (11)-(13), (16)-

12     (17));

13  • certain "use" of Oracle software "to support" licensees (II (4)-(6), (9), (11)-(12), (15)-(16));

14  • the reproduction of Oracle software that occurs anywhere other than "a specific licensee's own

15     computer systems" (II (5), (9), (11), (15));

16  • "use" of Oracle software in a manner that "benefits" more than one customer (II (6), (12), (16));

17  • any copying or access to JDE and Siebel software source code (II (10), (14));

18  • any reproduction of Oracle Database software (II (17)); and

19  • accessing any Oracle website using any entity's credentials for the benefit of any entity other

20     than the entity to which the credentials were issued (IV (4)).

21                                  **LEGAL STANDARD**

22         The Copyright Act provides that a court "may … grant … injunctions on such terms as it

23  may deem reasonable to prevent or restrain infringement of a copyright."   17 U.S.C. § 502(a).

24  However, the Supreme Court "has consistently rejected … a rule that an injunction automatically

25  follows a determination that a copyright has been infringed."  *eBay*, 547 U.S. at 392-93; *see also*

26  *Apple Inc. v. Samsung Elecs. Co.*, 735 F.3d 1352, 1359 (Fed. Cir. 2013) ("An injunction is a drastic

27  and extraordinary remedy, which should not be granted as a matter of course"); *Weinberger v.*

28  *Romero-Barcelo*, 456 U.S. 305, 312 (1982) ("An injunction should issue *only* where the intervention

of a court of equity is essential in order effectually to protect property rights against injuries otherwise irremediable") (internal quotation omitted).

Under *eBay*, Oracle "must satisfy a four-factor test before [the] court may grant [injunctive] relief." 547 U.S. at 391. Oracle must prove, with specific, non-speculative evidence: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public would not be disserved by a permanent injunction." *Id.*

## ARGUMENT

The jury found that the acts of infringement in this case were innocent, rejected Oracle's lost profits theory, and awarded a fair market value license as damages to fully compensate Oracle for those infringing acts. In addition, the processes and conduct that Oracle challenged at trial have ceased, and Rimini's new processes do not include the conduct that has been found to infringe. Oracle's request for an overreaching and vague injunction and impoundment order is irreconcilable with the jury's verdict and is entirely unsupported by the record. Oracle's motion should be denied in its entirety.

## I.      Oracle Is Not Entitled to Any Injunction

Oracle has not satisfied the four-factor test for obtaining injunctive relief. The jury's verdict and Rimini's abandonment of its prior processes preclude an injunction on this record. Oracle has been fully compensated for Rimini's past infringing conduct by the fair market value license damages the jury awarded. And an injunction would be decidedly against the public interest in robust and lawful competition, as an injunction could prevent Rimini, Oracle's leading competitor in the aftermarket support services and an innocent infringer, from being able to lawfully and fairly compete in the marketplace. Rimini respectfully submits that it would be error to enter *any* injunction given Oracle's failure to satisfy the four-factor test, and in the teeth of the jury verdict.

### A.      Oracle Has Not Established Any Irreparable Harm Caused by Rimini's Innocent Acts of Infringement

To establish the irreparable harm factor, Oracle "must establish **both** … (1) that absent an

injunction, it will suffer irreparable harm, and (2) that a sufficiently strong causal nexus relates the alleged harm to the alleged infringement." *Apple Inc. v. Samsung Elecs. Co.*, 695 F.3d 1370, 1374 (Fed. Cir. 2012) (emphasis added); *see also Perfect 10, Inc. v. Google, Inc.*, 653 F.3d 976, 981-82 (9th Cir. 2011) (no injunction for copyright infringement where plaintiff failed to demonstrate "sufficient causal connection" between irreparable harm and infringement).   Oracle's motion presents the same misguided theory that the jury rejected, with the added allegation (devoid of any evidence) that Rimini's innocent acts of infringement caused harm to Oracle's goodwill and reputation.   Oracle has not established any irreparable harm, much less harm with a "sufficiently strong causal nexus" to Rimini's infringement of the copyrighted works.

**1. No irreparable harm**.   To prove irreparable harm, Oracle must establish "a real or immediate threat of imminent harm in the future." *Jacobsen v. Katzer*, 609 F. Supp. 2d 925, 937 n.3, 938 (N.D. Cal. 2009) (denying injunction where plaintiff "failed to demonstrate that there is any *continuing or ongoing conduct* that indicates future harm is imminent") (emphasis added); *Gowan Co., LLC v. Aceto Agr. Chemicals*, 2009 WL 2028387, at *4 (D. Ariz. Jul. 10, 2009) (same); *see also Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 162-63 (2010) (permanent injunction improper when it does not "guard against any present or imminent risk of likely irreparable harm").

The *only* purported harm Oracle identifies as supporting an injunction is "injury to business reputation and to goodwill" because Rimini's infringing acts allegedly "disrupted" Oracle's customer relationships, "undermined trust in Oracle and Oracle's offerings," and "enable[d] Rimini to offer maintenance services at half-off of Oracle's price" to gain customers.   Dkt. 900 at 15-16. But Oracle adduces no new evidence in support of its assertions of harm.   Instead, these are the same accusations—lost profits, interference with business relationships, and infringer's profits—that Oracle forcefully asserted at trial.   *See* 10/6 Tr. 3492 ("Rimini or Seth Ravin intended to disrupt the relationship"); *id.* ("they were taking the customers through the lies") *id.* at 3501 (customers "not as fond of Oracle anymore" and "might even be mad at Oracle" because Rimini was "offering us a better price"); *id.* at 3502 ("Rimini came in and disrupted the relationship with that 5 percent by promising 50 percent off and copying the software").   Oracle even equates lost profits with lost goodwill in its brief.   *See* Dkt. 900 at 16:11-25.

9

But the jury completely rejected these arguments.  The jury unanimously concluded that Oracle suffered **zero** lost profits as a result of the infringement.  Oracle ignores the jury's verdict in arguing that "Courts find irreparable harm even where lost profits … **may be difficult** to prove." Dkt. 900 at 17.  Here, there is no ambiguity about what Oracle "may" prove.  The jury rejected Oracle's arguments in refusing to award any lost profits, finding that none of Rimini's profits were attributable to the infringement, and concluding that Rimini **did not** interfere with Oracle's existing or prospective business relationships.  Dkt. 896 at 4, 8-9.

Those factual findings "bind this Court in its consideration of equitable remedies." *Active Sports Lifestyle USA LLC v. Old Navy, LLC*, 2014 WL 1246497, at *1 (C.D. Cal. Mar. 21, 2014); *GTE Sylvania Inc. v. Cont'l T.V., Inc.*, 537 F.2d 980, 986 n.7 (9th Cir. 1976), *aff'd*, 433 U.S. 36 ("When issues common to both legal and equitable claims are to be tried together . . . the findings of the jury are binding on the trier of the equitable claims").  Indeed, "the Seventh Amendment requires the trial judge to follow the jury's implicit or explicit factual determinations." *Los Angeles Police Protective League v. Gates*, 995 F.2d 1469, 1473 (9th Cir. 1993) (internal quotation omitted); *Bartee v. Michelin N. Am., Inc.*, 374 F.3d 906, 912-13 (10th Cir. 2004) ("in fashioning equitable relief, a district court is bound by both a jury's explicit findings of fact and those findings that are necessarily implicit in the jury's verdict").  The jury's rejection of Oracle's theory—that Rimini's infringement caused Oracle to lose profits and customers and interfered with customer relationships causing a loss of goodwill—dooms Oracle's instant argument that, absent an injunction, it will lose sales, customers, and goodwill due to Rimini's (speculative) future conduct.  *See, e.g.*, *Apple, Inc. v. Samsung Elecs. Co.*, 678 F.3d 1314, 1324 (Fed. Cir. 2012) (no irreparable harm "if sales would be lost regardless of the infringing conduct").

Oracle's cited "evidence" also is insufficient as a matter of law to establish harm to goodwill and amounts to little more than an argument that copyright infringement always causes irreparable harm.  *See, e.g.*, Dkt. 900 ¶¶ 85-89.  The conclusory assertion based on hearsay by Oracle CEO Safra Catz that Rimini's lower prices will cause customers to wonder "whether [Oracle is] overcharging them" (*id.* at 17), is rank speculation that is entirely unrelated to the types of harms redressable under copyright law.  *Goldie's Bookstore, Inc. v. Superior Court of State of Cal.*, 739 F.2d 466, 471-72

(9th Cir. 1984) (vacating injunction where hypothetical loss of goodwill and customers was "speculative" because "[s]peculative injury does not constitute irreparable injury"); *Brighton Collectibles, Inc. v. Pedre Watch Co., Inc.*, 2013 WL 5719071, at *4 (S.D. Cal. Oct. 21, 2013) ("conclusory assertion that [plaintiff's] reputation and goodwill has been and will be harmed" without "specific facts or evidence" insufficient to establish irreparable harm for purposes of permanent injunction).

Oracle's request for an injunction based entirely on the finding of *past* infringement is precisely what the Supreme Court rejected in *eBay*. *See Flexible Lifeline Sys., Inc. v. Precision Lift, Inc.*, 654 F.3d 989, 998 (9th Cir. 2011) ("presuming irreparable harm in a copyright infringement case is inconsistent with, and disapproved by, the Supreme Court's opinions in *eBay* and *Winter*"). This is particularly true since the jury found the infringement to have been "innocent." *Westinghouse Elec. Corp. v. Gen. Circuit Breaker & Elec. Supply Inc.*, 106 F.3d 894, 903 (9th Cir. 1997) (affirming denial of injunction where "defendants were innocent infringers"). And Oracle's argument that Rimini's success is due to infringement amounts to a "fruit of the infringing tree" theory, which courts routinely reject. *See* 5-14 Nimmer on Copyright § 14.06[C][1][a] (collecting cases rejecting the theory because "such a broad injunction would alter copyright into an engine of suppression").

Oracle's only cited case for this proposition, *Douglas Dynamics, LLC v. Buyers Prods. Co.*, 717 F.3d 1336 (Fed. Cir. 2013), is entirely inapposite. There, the court concluded that the infringer's inclusion of a patented feature in products considered "less prestigious and innovative" than plaintiff's would irreparably harm plaintiff's reputation. *Id.* at 1344-1345; *see Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 2015 WL 604582, at *5 (N.D. Cal. Feb. 12, 2015) (denying permanent injunction and distinguishing *Douglas Dynamics* because plaintiff "submitted no evidence" that infringement "diminished" plaintiff's "reputation"). By contrast, there is no evidence of harm to Oracle's reputation here; rather, several witnesses testified that Oracle's *own* conduct and poor service led them to terminate their contracts. *See* 10/1 Tr. 2962.

Oracle also fails to explain why, more than five years after this case began in January 2010, *after* two summary judgment orders in February and August 2014, and only *after* a trial and verdict

that has largely rejected Oracle's claims, Oracle now asserts *irreparable* harm—particularly given that, as noted above, Rimini had already *ceased* the adjudicated processes no later than July 2014.

Oracle's years of delay in moving for injunctive relief is further proof of the absence of any immediacy justifying injunctive relief. After all these years, Oracle has failed to offer any evidence—beyond the speculation of its CEO—of any actual harm to its reputation or goodwill, or any causal link to the adjudicated and now ceased processes of Rimini. *Apple*, 678 F.3d at 1325-26 ("delay in bringing an infringement action and seeking a preliminary injunction are factors that could suggest that the patentee is not irreparably harmed by the infringement"). Oracle announced its "need" for immediate injunctive relief only *after* the jury rejected most of Oracle's case.

The real reason Oracle never previously sought an injunction is likely because, as the jury concluded, the acts of infringement could have been avoided with a non-infringing alternative and did not cause Oracle to lose any profits, did not cause Rimini to gain any profits, and did not interfere with or disrupt any of Oracle's current or prospective client relationships. The price of Rimini's infringement was a fair market value license award, and the parties should now proceed to compete lawfully in the marketplace.

**2. No causal nexus**. Oracle has not presented evidence of a causal nexus. The Court and jury found only that (i) Rimini infringed Oracle's copyrights, and (ii) Rimini competes with Oracle in the aftermarket software servicing industry. There is no causal nexus between the two, and thus there can be no injunction. *Apple*, 735 F.3d at 1363 ("Without a showing of causal nexus, there is no relevant irreparable harm"); *see also Fox Broadcasting Co. v. Dish Network L.L.C.*, 747 F.3d 1060, 1072-73 (9th Cir. 2013) (no injunction where harms did not "flow from" infringing copies).

The overwhelming evidence at trial demonstrated that customers left Oracle, and joined Rimini, for reasons having nothing to do with infringement, and the jury agreed. 9/23 Tr. 1518 (Oracle customers leave for "a variety of reasons," including not "lik[ing] the way that they've been treated [at Oracle]"); 9/24 Tr. 1715 (Pitney Bowes left Oracle before considering Rimini); 9/28 Tr. 2265 (customer experienced better service with Rimini); *id.* 2271-72: (Rimini support is "much superior"); *id.* at 2383 (personalized service); 10/1 Tr. 2987-88 (Bausch & Lomb would not have gone back to Oracle even if "Rimini Street was not an option for whatever reason"); Dkts. 838, 876

(collecting citations).  In fact, during the relevant time period, Oracle's attrition rate has *improved*. 9/22 Tr. 1318; 9/24 Tr. 1866-68; DTX 160, 164.  And Oracle's own expert (Mr. Yourdon) testified that Rimini's customers were part of the 5% of Oracle's clients that left Oracle each year even before Rimini entered the market.  9/24 Tr. 1722.

Any harm to Oracle's reputation and goodwill with its clients was caused by Oracle's own poor customer service and mistreatment of its clients—which Oracle's own clients described as "aggressive and, at points, hostile."  10/1 Tr. 2962-63; *see also* 9/29 Tr. 2534 ("being upset" with Oracle "is what caused us to even go look for a third-party support"); 10/1 Tr. 2955-56, 2959 (stating he "would have stayed with Oracle" if he had been "getting excellent service from Oracle" but "we were talking to people who had very little experience with the software" and were "not well trained"); 10/2 Tr. 3165 (customer "perceived that they were receiving awful customer service and support").  Indeed, not a single Oracle licensee testified that Rimini (let alone Rimini's *infringement*) caused that licensee to view Oracle in a negative light.  Oracle has thousands of clients, and not one of them testified on Oracle's behalf at trial or in support of Oracle's motion.

Moreover, the alleged "harm" to goodwill and reputation that Oracle identifies is not cognizable under the Copyright Act because it has nothing to do with Oracle's ability to license its enterprise software.  Oracle's alleged harm is only in its ability to compete in the aftermarket software support market, where Oracle has no right to exclude Rimini or any other competitor.  For example, Oracle claims that its "harms will only be amplified by continued or future infringement" (Dkt. 900 at 16), but Oracle has *offered no explanation* for how Rimini's acts of innocent infringement (e.g., local hosting vs. remote hosting), which *not a single customer* relied upon in making the decision to join Rimini or to leave Oracle, have caused it any harm or could in the future. Oracle has essentially ignored the causal nexus requirement, and the jury's verdict, and its motion fails on that basis alone.  *Apple*, 735 F.3d at 1363.

***3. No risk of future harm***.  Oracle cannot demonstrate a threat of future harm, let alone "imminent or irreparable" harm, because Rimini no longer engages in the infringing or improper conduct.  *See* Benge Decl. ¶¶ 3-10; Teegarden Decl. ¶¶ 3-6; Phung Decl. ¶¶ 3-10; Mackereth Decl. ¶¶ 4-11; Miller Decl. ¶¶ 3-6.  There is therefore no continuing infringement or improper conduct to

enjoin.  *See Brighton Collectibles*, 2013 WL 5719071, at *5 (permanent injunction denied where "future threat of infringement is questionable"); *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 518 F. Supp. 2d 1197, 1214-15 (C.D. Cal. 2007) ("Irreparable harm cannot be established solely on the fact of past infringement").

Moreover, having invested substantial time, labor, and financial resources in developing and implementing revised processes to comply with this Court's rulings, there is no practical risk that Rimini would resume its infringing conduct now that it has the guidance of the Court's summary judgment order and the jury's verdict.  Rimini revised its processes specifically so that it would not infringe Oracle's copyrights, and it would defy common sense that Rimini, an innocent infringer, would revert to processes determined to be infringing.

Oracle may not rely on Rimini's revised, *current* processes as a basis for asserting harm, because Oracle has repeatedly argued that the legality of those revised processes should be litigated only in *Rimini II*.  As noted above, Oracle successfully resisted Rimini's repeated requests to consolidate the two lawsuits (*Rimini I* and *Rimini II*).  Having taken that position, Oracle cannot now assert that any proposed injunction ought to reach Rimini's revised, current processes.  *See New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (where a party successfully argues one position, "he may not thereafter . . . assume a contrary position" especially if that change would be prejudicial).  Enjoining Rimini's revised processes, when Oracle itself successfully prevented Rimini from litigating their lawfulness in *Rimini I*, would be fundamentally unfair and inconsistent with basic principles of equity.  *See Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 782 (9th Cir. 2001) (judicial estoppel invoked "not only to prevent a party from gaining an advantage by taking inconsistent positions, but also because of general consideration[s] of the orderly administration of justice and regard for the dignity of judicial proceedings, and to protect against a litigant playing fast and loose with the courts") (internal quotations omitted).

**B.    Oracle Has an Adequate Remedy at Law**

Oracle has not demonstrated that "remedies available at law, such as monetary damages, are inadequate to compensate" Oracle.  *eBay*, 547 U.S. at 391.  In fact, the jury's award of a fair market value license for Rimini's innocent acts of infringement not only fully compensates Oracle for the

1  acts of infringement proved at trial but also aptly demonstrates that monetary damages are available
2  to fully compensate Oracle for any potential future harm.  *See Fox Broadcasting Co.*, 747 F.3d at
3  1073 (denial of injunction affirmed where licensing agreements could "constitute a starting point or
4  an aid in calculating damages").

5       A fair market value license award compensates the copyright holder "for the actual
6  infringement that took place—no more and no less."  *Oracle America, Inc. v. Google Inc.*, 798 F.
7  Supp. 2d 1111, 1117 (N.D. Cal. 2011).  Here, the jury concluded as a matter of fact that the value of
8  the license was $35.6 million. (Dkt. 896 at 4), which took into account "the entire scope of the
9  infringement" (Dkt. 880 at 41), and all of Oracle's supposed harm.  *See Minco, Inc. v. Combustion
10 Eng'g, Inc.*, 95 F.3d 1109, 1121 (Fed. Cir. 1996) ("goodwill acquired by infringement" was "already
11 acknowledged" in "hypothetical license"); *cf. also XpertUniverse, Inc. v. Cisco Sys., Inc.*, 2013 WL
12 6118447, at *13 (D. Del. Nov. 20, 2013) ("money damages are rarely inadequate for a patentholder
13 that is willing to forego its exclusive right for some manner of compensation"); *Microsoft Corp. v.
14 Motorola, Inc.*, 2012 WL 5993202, at *6 (W.D. Wash. Nov. 30, 2012) (denying injunction because
15 license constituted adequate remedy at law in patent case); *Barton v. U.S. Dep't of Agric.*, 523 F.
16 Supp. 1019, 1022 (S.D. Ill. 1981) (denying injunction where "fair market value" is an "adequate
17 remedy at law").

18      By adopting the fair market value measure for Oracle's actual damages, and rejecting the lost
19 profits and infringer's profits measure, the jury decided that, in the context of *Rimini I*, there was an
20 alternative process that did not infringe, and therefore that it is possible for Rimini to operate in a
21 non-infringing manner.  Rimini's revised, *current* processes (*see* Benge Decl. ¶¶ 3-10; Teegarden
22 Decl. ¶¶ 3-6; Phung Decl. ¶¶ 3-10; Mackereth Decl. ¶¶ 4-11; Miller Decl. ¶¶ 3-6) are at issue in
23 *Rimini II*.  The fair market value license compensates Oracle for *past* acts of infringement, and
24 Oracle does not argue otherwise.

25
26
27
28

OPPOSITION TO MOTION FOR A PERMANENT INJUNCTION

1

**C.      The Balance of Hardships Favors Rimini**

2

The balance of hardships factor "'assesses the relative effect of granting or denying an

3

injunction on the parties.'"  *Apple*, 735 F.3d at 1731 (quoting *i4i Ltd. P'ship v. Microsoft Corp.*, 598

4

F.3d 831, 862 (Fed. Cir. 2010)).  Oracle argues that it has an interest in protecting "its copyrighted

5

works" (Dkt. 900 at 18), but there is no allegation (let alone evidence) in this case that Oracle was

6

ever unable to license its copyrights as a result of Rimini's infringement, or that it would be unable

7

to do so without a permanent injunction.  Oracle's failure to produce any such evidence is

8

particularly noteworthy given that Rimini and Oracle have coexisted in the marketplace for over ten

9

years.

10

Rather, through its proposed injunction, Oracle is improperly seeking to leverage its software

11

copyrights into a secondary market (support services) over which it currently enjoys a near-

12

monopoly even though it has no legally enforceable right to exclusivity.  For example, Oracle's

13

proposed injunction would bar Rimini from "accessing" JDE software source code (Dkt. 900-1 at

14

14), but Oracle witnesses testified at trial that it would be *impossible* for any third party to service its

15

customers without accessing source code.  9/22 Tr. 1307-08 ("There's no way for [a third party] to

16

deliver a critical fix on a solution that doesn't have source code").  Oracle's request for injunctive

17

relief is an example of Oracle's copyright misuse, and the motion should be rejected on that ground

18

as well.  *See Chamberlain Grp., Inc. v. Skylink Tech., Inc.*, 381 F.3d 1178, 1201 (Fed. Cir. 2004);

19

*Alcatel USA, Inc. v. DGI Techs., Inc.*, 166 F.3d 772, 793 (5th Cir. 1999) (reversing order granting

20

permanent injunction because plaintiff used "copyrights to indirectly gain commercial control over

21

products [it] does not have copyrighted").

22

In stark contrast, Rimini could suffer significant harm to its *current* business activities if

23

Oracle's proposed injunction is issued, because the injunction's vague, overly broad, and expansive

24

scope threatens to bar Rimini's current conduct, the legality of which Oracle itself demanded be

25

excluded from adjudication in *Rimini I.  Cf. Brighton Collectibles*, 2013 WL 5719071, at *5

26

(declining to grant permanent injunction where a "broad" "over-encompassing" injunction would

27

amount to "an unnecessary restraint of trade on Defendant"); *see* Section II *infra*.

28

1

### D.      An Injunction Would Be Contrary to the Public Interest

2        Oracle cannot demonstrate that "the public interest would not be disserved by a permanent

3   injunction" (*eBay*, 547 U.S. at 391), because every customer that testified at trial lauded Rimini's

4   services and stressed the importance of having competitive vendor and service choices for the after-

5   market service of Oracle products.  *See*, *e.g.*, Dkt. 838, 876.  Indeed, the injunction Oracle seeks

6   would be decidedly *against* the public interest, as Oracle is pursuing injunctive relief against the

7   interests of the market and consumers, and its vague and overbroad language would reach conduct

8   not adjudicated in *Rimini I* and that could interfere with Rimini—Oracle's leading competitor in the

9   aftermarket for support services for Oracle products—competing lawfully and fairly in the

10  marketplace.

11       Oracle argues that the public interest at issue here is to "discourage infringers who free ride

12  on the works of others."  Dkt. 900 at 19.  But the jury rejected this argument in finding that none of

13  Rimini's profits were attributable to infringement.  To the contrary, witnesses credited Rimini's

14  success to superior customer service and value.  10/1 Tr. 2985 ("I was very pleased with the service,

15  and they delivered everything they said they were going to, plus they delivered … value beyond

16  that").

17       Moreover, the jury's finding of innocent infringement was a determination that, as the jury

18  instructions explained, Rimini "was not aware that its acts constituted infringement" ***and*** that it had

19  "no reason to believe that its acts constituted an infringement."  Dkt. 880 at 43.  Because Rimini

20  "has infringed innocently" and substantially revised its processes, "the public needs no protection.

21  In these circumstances, courts usually deny requests for permanent injunctions."  *Contessa Food*

22  *Prods., Inc. v. Lockpur Fish Processing Co.*, 2003 WL 25778704, at *7 (C.D. Cal. Jan. 29, 2003).

23  The jury's finding of innocent infringement is binding.  *See Los Angeles Police Protective League v.*

24  *Gates*, 995 F.2d 1469, 1473 (9th Cir. 1993).  Accordingly, no injunction is warranted here.  *See*

25  *Westinghouse Elec. Corp.*, 106 F.3d at 903 (affirming denial of injunction where "defendants were

26  innocent infringers"); *Dolori Fabrics, Inc. v. Limited, Inc.*, 662 F. Supp. 1347, 1350 (S.D.N.Y. 1987)

27  (declining to issue injunction against "innocent infringer" who has "ceased its infringement");

28  *Polygram Intern. Pub, Inc. v. Nevada/TIG, Inc.*, 855 F. Supp. 1314, 1334-35 (D. Mass 1994) (no

1  injunction warranted in copyright infringement action where defendant had "good faith basis for

2  believing that, under existing law" it was not infringing).

3  　　　Similarly, Oracle argues that an injunction "that vindicates copyright rights" is necessarily in

4  the public interest.  Dkt. 900 at 19.  "But the Supreme Court rejected the idea that there is a general

5  rule that courts should issue permanent injunctions against patent infringement" in *eBay*.

6  *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1341 (Fed. Cir. 2012).

7  　　　Oracle's proposed injunction is decidedly *against* the public interest, as it would stifle

8  important, lawful competition.  *See Brighton Collectibles*, 2013 WL 5719071, at *6 (injunction

9  denied where it "would not encourage innovation" and would instead "stifle fair competition" and

10  "impair the public interest").  Indeed, the testimony presented at trial demonstrated that customers

11  greatly benefit from the increased competition resulting from Rimini's presence in the market.  9/23

12  Tr. 1518; 9/24 Tr. 1715; 9/28 Tr. 2265; *id.* 2271-2272; *id.* at 2383; 10/1 Tr. 2987-2988.   Yet,

13  Oracle's proposed injunction, due to its vagueness and overbreadth, would interfere with Rimini's

14  ability to conduct business.   An injunction is an equitable remedy, and Oracle's request for an

15  injunction to inhibit Rimini's fair competition in the market is decidedly inequitable and should be

16  rejected for this reason as well.  *See Alcatel USA*, 166 F.3d at 793-95 (abuse of discretion to award

17  injunctive relief where the jury found that the plaintiff had "used its copyrights to indirectly gain

18  commercial control over products [it] does not have copyrighted"); *id.* ("by misusing its software

19  copyright, DSC sullied its hands, barring itself from obtaining the equitable award of injunction on

20  grounds of copyright infringement"); *see also Precision Instrument Mfg. Co. v. Automotive*

21  *Maintenance Mach. Co.*, 324 U.S. 806, 814 (1945) ("one tainted with inequitableness or bad faith

22  relative to the matter in which he seeks relief" is barred from a court of equity, "however improper

23  may have been the behavior of the defendant").

24  **II.    Oracle's Proposed Injunction Is Impermissibly Vague and Overbroad**

25  　　　Oracle's proposed injunction is so vague that it fails to meet the drafting standard established

26  by Federal Rule of Civil Procedure 65: that an ordinary person reading the court's order can

27  ascertain from the document itself "exactly what conduct is prescribed."  11A Charles Alan Wright

28  & Arthur R. Miller, Federal Practice and Procedure § 2955 (3d ed.).  Rule 65 is meant to "prevent

uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague to be understood." *Columbia Pictures Indus., Inc. v. Fung*, 710 F.3d 1020, 1047 (9th Cir. 2013) (citation omitted); *see also Reno Air Racing Ass'n, Inc. v. McCord*, 452 F.3d 1126, 1134 (9th Cir. 2006) ("The benchmark for clarity and fair notice is not lawyers and judges, who are schooled in the nuances of [the] law," but instead the "lay person, who is the target of the injunction").

Oracle's injunction is also overbroad. Oracle proceeded to trial on the theory that Rimini violated Oracle's reproduction rights by copying Oracle software and documentation onto its computers, and reproducing that material from one client to others. But Oracle has submitted a 17-paragraph injunction that deals almost exclusively with acts and rights *other* than—and *beyond*—conduct determined to be infringing and for which damages were awarded at trial. In so doing, Oracle attempts to leverage its narrow verdict with respect to Rimini processes that violated Oracle's reproduction right into a sweeping prohibition against conduct never adjudicated by the Court or the jury. That includes conduct that the Court, at Oracle's urging, confined to *Rimini II*.[1]

Moreover, Oracle itself asserts that it "seeks only to enjoin acts that have already been determined to be unlawful." *See* Dkt. 900 at 18; *id.* at 15 ("only to enjoin illegal actions or copying that this Court has found to be outside the scope of any license"); *id*. at 20 n.1 (injunction "restraining Rimini from continuing to commit the infringement that this Court and the jury have already determined to constitute copyright infringement"). Oracle is, of course, correct that the injunction cannot extend beyond the processes that have been found to infringe, but as discussed below, Oracle's proposed injunction language fails to comply with this legal requirement.

Oracle's attempt to enjoin activities other than those that were adjudicated as infringing is

---

[1] Oracle's repeated insistence that Rimini's new processes not be adjudicated in *Rimini I* makes *Apple Inc. v. Psystar Corp.*, 673 F. Supp. 2d 943 (N.D. Cal. 2009) totally inapposite here. In *Psystar*, the court found that Psystar had strategically avoided providing *any* information or evidence to the court about the practices that were the subject of a separate litigation. *Id.* at 952 (noting that "details on exactly what [Psystar's software] does . . . are not forthcoming in Psystar's opposition brief"). The *Psystar* court made clear that its ruling was without prejudice to an application by Psystar to modify the injunction in the event Psystar was willing to "open[] itself up to formal discovery." *Id.* at 955.

OPPOSITION TO MOTION FOR A PERMANENT INJUNCTION

improper: an "injunction must be narrowly tailored … to remedy only the specific harms shown by the plaintiffs, rather than 'to enjoin all possible breaches of the law.'" *Iconix, Inc. v. Tokuda*, 457 F. Supp. 2d 969, 998 (N.D. Cal. 2006) (quoting *Price v. City of Stockton*, 390 F.3d 1105, 1117 (9th Cir. 2004)); Nimmer on Copyright § 14.06[C] ("the scope of the injunction should be coterminous with the infringement"); *see also*, *e.g.*, *Chicago Bd. of Educ. v. Substance, Inc.*, 354 F.3d 624, 632 (7th Cir. 2003) (*sua sponte* reversal of injunction where it prohibited forms of copyright infringement beyond what was resolved in the litigation); *Grokster*, 518 F. Supp. 2d at 1226-28 (injunction rejected as overbroad where it was based on unresolved theory of liability).

That Oracle's overreach is legally impermissible is clear from both *Grokster* and *Substance*. In *Grokster*, the defendants were found liable on a theory of inducing infringement, but the plaintiffs sought an injunction based on other theories of liability that went "far beyond the bounds of th[e] lawsuit" before the court. 518 F. Supp. 2d at 1226. The court rejected that proposal, holding that the injunction "should not include acts (or descriptive words)" that went beyond the infringement theory. *Id*. at 1228. Similarly, in *Substance*, the Court of Appeals rejected as "appallingly bad" an injunction that prohibited infringement of the plaintiff's display and performance rights, when only the reproduction and distribution rights were litigated. 354 F.3d at 632.

As demonstrated below, Oracle's proposed injunction is vague and overbroad, and it should therefore be rejected. Moreover, if any injunction were issued, language very different from that proposed by Oracle would need to be crafted.

***1. Derivative Works***. Injunctions that simply prohibit all possible breaches of the law are not sufficiently precise and tailored. *See Craigslist Inc. v. Naturemarket, Inc.*, 694 F. Supp. 2d 1039, 1062 (N.D. Cal. 2010) ("Generally, an injunction must be narrowly tailored to remedy only the specific harms shown by a plaintiff, rather than to enjoin all possible breaches of the law"). Here, the proposed injunction merely parrots the statutory text, barring creation and distribution of "derivative works" without giving any notice as to the specific prohibited acts. *See* Dkt. 900-1 at II (3)-(9), (11)-(13), (16)-(17). Oracle compounds this mistake with text that is, at best, difficult to parse. For example, paragraph 5 states: "Rimini shall not reproduce, prepare derivative works from, or use PeopleSoft software or documentation on, with, or to any computer systems other than a

specific licensee's own computer systems."  Unpacking that language, it reads, "Rimini shall not ... prepare derivative works from … with, or, to any computer systems other than a specific licensee's own computer systems."  But the scope of what is covered by the prohibition of behavior "on, with, or to" certain computer systems is opaque.  That text is far from the "fair and precisely drawn notice" required by Rule 65, and would be difficult for a "lay person" who is not "schooled in the nuances of [the] law" to understand.  *Reno*, 452 F.3d at 1134.

Oracle's proposed injunction also reaches issues that have not been litigated.  Indeed, Oracle specifically disclaimed any reliance on the derivative works right, noting that the "derivative work right is legally distinct from the reproduction right, distribution right, and other rights granted under the Copyright Act.  *See* 17 U.S.C. § 106.  **Oracle's motion**, which addresses copies made by Rimini, **concerns only the reproduction right**."  Dkt. 284 at 9 (emphases added).  Because Oracle expressly represented to the Court that its motion concerned "only the reproduction right," any injunction based on the adjudicated conduct could not address derivative works.

Oracle's stark departure from its prior position is yet another attempt to resolve a live issue in *Rimini II*:  whether Rimini's creation and distribution of custom code and documentation violates Oracle's intellectual property rights.  Oracle's injunction seeks to prohibit Rimini from distributing any "derivative works" that are "created from **or with**" Oracle's software or documentation.  *See* Dkt. 900-1 at II (3) (emphasis added).  Because Oracle successfully sought to exclude this issue from *Rimini I*, it should be decided only with the benefit of a complete record in *Rimini II*.

**2. Cloud Service Providers.**  Oracle's proposed injunction would restrict Rimini's activities to a "specific licensee's own computer systems," but Oracle fails to define what that phrase encompasses and, in particular, whether it includes cloud-based computing.  Certain of Oracle's software licenses limit copying to a client's "facilities."  *See* Dkt. 900 ¶ 32.  This Court held in *Rimini I* that Rimini's own computer network did not constitute the "facilities" of its clients and, therefore, that Rimini was "not authorized to have a copy of the licensed software on its own systems."  *Rimini*, 6 F. Supp. 3d at 1098.  But the Court did not hold that Rimini could perform its

activities only on a "specific licensee's own computer systems."[2]   It was not asked to address whether cloud service providers controlled by the customer constitute the customer's facilities.  And Oracle's vague language does not provide notice of what conduct is prohibited.

Oracle's use of the phrase "specific licensee's *own* computer systems" could also prejudice issues in dispute in *Rimini II*, and which this Court ruled should be excluded from *Rimini I*.  Rimini has contended in *Rimini II* that Oracle licensees are permitted to contract with cloud providers to host Oracle software because such services qualify as "facilities" of those licensees.   Oracle disagrees.  *See* Dkt. 488 at 5 ("The only apparent difference between the 'new' and the 'old' does not appear to be a change in the development process, but that Rimini's conduct takes place in the cloud.").  The Court should addresses this question in *Rimini II* based on a sufficient record, and not through an overbroad injunction.

***3. Overbroad and Undefined Contractual Language.***   The proposed injunction's restriction of use to "internal data processing operations" relies on a contractual term, the full scope of which is at issue in *Rimini II*.  *See* Dkt. 900-1, II (4).  This is precisely the type of vague language that courts routinely reject in crafting injunctive relief.  *Nat'l Labor Relations Bd. v. Express Publ'g Co.*, 312 U.S. 426, 435 (1941) ("the mere fact that a court has found that a defendant has committed an act in violation of a statute does not justify an injunction broadly to obey the statute and thus subject the defendant to contempt proceedings if he shall at any time in the future commit some new violation unlike and unrelated to that with which he was originally charged").  Oracle seeks, in essence, an injunction that commands Rimini to "obey the [contract]," rather than identifying specific prohibited acts.  This Court should decline to impose "restraints upon the commission of unlawful acts" that are so "dissociated from those which [Rimini] has committed."  *Id.*

---

[2]   Nothing in the Court's opinion addresses—much less resolves—whether remote access by Rimini, or cloud-based storage by Rimini's clients, would be prohibited by the "facilities" restriction in Oracle's licenses.  Oracle itself has recognized the distinction between local copying and remote access.  *See* Dkt. 253 at 5 ("The unlicensed copies maintained on Rimini's computer systems (rather than on customers' systems) make it faster for Rimini to provide customer support than if Rimini employees had to log in remotely to a software environment at the customer's site, because the software that Rimini needs is at its disposal immediately"); 9/18 Tr. 839 (stating that remote access to Oracle's software would "fall under access and use").

OPPOSITION TO MOTION FOR A PERMANENT INJUNCTION

This provision is also overbroad.  This Court held that Rimini's copying and distribution of one client's Oracle software to another was not solely for the "internal data processing operations" of the first client.  *Rimini I*, 6 F. Supp. 3d at 1097.  It did not pass on Rimini's support process writ large; rather, at Oracle's urging the Court declined to consider whether Rimini's revised processes comply with the licenses.  Dkt. 723 at 3 (new support model "being addressed solely in [*Rimini II*]").

**4. "Benefit" Reaches Revised Processes.**  Perhaps the most striking examples of Oracle's overreach are the proposed injunction's prohibitions on Rimini's use of Oracle software licensed to one customer in a manner that would "benefit any other licensee."  Dkt. 900-1, II (6), (12), (16).  Nowhere in the Court's opinion or the jury instructions does the word "benefit" appear, and that concept is absent from the licenses that were at issue in this case.  Nor did the Court rule that Rimini was prohibited from using Oracle software to support or "benefit" multiple clients.[3]  Instead, the Court ruled that Rimini could not reproduce Oracle's intellectual property on its own systems, and could not reproduce that material from one licensee to another.

Oracle's overbroad language appears, once again, to reflect an effort to restrict the very processes that Oracle successfully urged the Court not to consider in this proceeding, despite Oracle's concessions that the injunction should address only those practices that have been found to be infringing.  *See* Dkt. 900 at 18 ("Oracle seeks only to enjoin acts that have already been determined to be unlawful").  When Oracle moved for summary judgment in 2012, Rimini maintained Oracle's software on its own computer systems, and copied Oracle code from one client from that client to another client.  *See*, *e.g.*, Proposed Findings of Fact (Dkt. 900), ¶ 23 ("Rimini created and used full working copies of the PeopleSoft, JD Edwards, and Siebel software as 'environments' **on Rimini's servers**"), ¶ 56 ("Rimini 'reused [] all the time' by taking an update or fix that Rimini created for one customer and using it for and distributing it to another customer, **including using Oracle's copyrighted code**, changing it and distributing it to multiple Rimini customers.") (emphases added).  Those are facts upon which Oracle grounded its complaint and

---

[3] Such a limitation would be improper under copyright law because it would prohibit Rimini engineers from relying on their own knowledge and experience gained from servicing clients.

1    summary judgment motion, and upon which the Court and jury found infringement.

2         But Rimini's revised processes rely on remote access instead of local copies of Oracle's

3    intellectual property on Rimini's computers and no longer involve copying any Oracle code from

4    one client to another.  *See* Benge Decl. ¶¶ 3-10; Teegarden Decl. ¶¶ 3-6; Phung Decl. ¶¶ 3-10;

5    Mackereth Decl. ¶¶ 4-11; Miller Decl. ¶¶ 3-6.  And as Oracle conceded at trial, remote access to its

6    software by a third-party provider is permissible under the licenses.  *See* 9/18 Tr. 839:13-19 (stating

7    that remote access to Oracle's software would "fall under access and use").

8         Moreover, these provisions seek relief that the Copyright Act does not afford under any

9    circumstance.  The Copyright Act does not grant any person a monopoly in ideas or knowledge, only

10   their expression as fixed in a tangible medium.  *See* 17 U.S.C. § 102(b) ("In no case does copyright

11   protection for an original work of authorship extend to any idea, procedure, process, system, method

12   of operation, concept, principle, or discovery, regardless of the form in which it is described,

13   explained, illustrated, or embodied in such work"); Nimmer on Copyright § 14.06[C] ("Because

14   facts, ideas, methods and certain other matter are never copyrightable, no injunction should extend to

15   forbid reproduction of those facts, ideas, methods ... regardless of the expression in which they are

16   clothed").   Yet, prohibiting Rimini from making any use of Oracle's software to support,

17   troubleshoot, or perform development or testing for the "benefit" of more than one licensee is so

18   broad as to prevent a Rimini engineer from relying on her earlier work for one client to provide

19   services to another client.  The restriction would, in essence, prevent Rimini employees from using

20   knowledge that they obtain in the course of providing services for one client to assist any other

21   client.  This is a plainly an impermissible use of copyright law.

22        *5. Absolute Prohibition on Copying JDE, Siebel, and Oracle Database.*   The proposed

23   injunction also overreaches by flatly barring Rimini from copying or accessing JDE or Siebel source

24   code or Oracle Database software even if those materials are not located on Rimini's computers.  *See*

25   Dkt. 900-1, II (10), (14).  This case, however, did not address whether Rimini was prohibited from

26   remotely accessing and reproducing its clients' JDE, Siebel, or Oracle Database software.  Instead,

27   the Court held that Rimini was not authorized to keep copies of Oracle software "housed on its

28   servers."  *See* Dkt. 880 at 28, 29.  If any injunction issues at all, it should be narrowly tailored to

1   reproductions on Rimini's own computers because that was the issue adjudicated, and even Oracle

2   conceded that remote access to Oracle's software would "fall under" the permissible "access and

3   use" of the software.  *See* 9/18 Tr. 839.

4          In short, Oracle's proposed injunction is impermissibly vague and overbroad.  Its purpose

5   appears to be preemption of the very issues that Oracle demanded be tried in a separate action.  To

6   the extent the Court issues any injunction at all (and it should not), Oracle's proposal could not be

7   entered.  Rimini respectfully requests that, consistent with the Court's procedure for developing the

8   jury instructions and verdict form in this case, the parties be provided an opportunity to comment on

9   any proposed language from the Court.

10   **III.    Oracle Is Not Entitled to an Order Impounding Rimini's Computers and Media**

11          Impoundment and destruction are rare and extraordinary remedies that are not warranted

12   here.  *See Ted Arnold Ltd. v. Silvercraft Co.*, 259 F. Supp. 733, 736 (S.D.N.Y. 1966) (denying

13   request for impound "there being no extraordinary circumstances to require it"); Register's Rep.

14   on the Gen. Revisions of the U.S. Copyright Law 67 (1961) ("Impounding and destruction are

15   extraordinary remedies").  Contrary to Oracle's suggestion, impoundment is not mandatory, and

16   courts have not granted such orders lightly.  *WPOW, Inc. v. MRLJ Enters.*, 584 F. Supp. 132, 134

17   (D.D.C. Mar. 15, 1984) ("The Copyright Act makes impoundment discretionary with the Court

18   rather than mandatory, as plaintiff's argument would imply"); *Evony, LLC v. Holland*, 2011 WL

19   1230405, at *7 (W.D. Pa. Mar. 31, 2011) (noting that impoundment is not "a mandatory form of

20   relief," but ordering it because defendant "willfully infringed the copyrighted material"); *Paramount

21   Pictures Corp. v. Doe*, 821 F. Supp. 82, 85-6 (E.D.N.Y. 1993) (impoundment is not "a mandatory

22   form of relief").

23          Rather, such orders should be granted "only where legal remedies or statutory damages do

24   not provide adequate relief."  *Software Freedom Conservancy, Inc. v. Best Buy Co., Inc.*, 2010 WL

25   2985320, at *4 (S.D.N.Y. Jul. 27, 2010).  Oracle's overly broad impoundment proposal—which

26   demands that Rimini turn over "all computers and storage media" containing any "complete or

27   partial copies" of Oracle's software—should be denied.  Rather than propose an order that would

28   require, for example, images of Rimini's relevant files on certain identified servers, Oracle requests

1  that Rimini hand over the physical servers in their entirety, even though those same servers are

2  necessary for Rimini to perform the day-to-day functions of its business.  In fact, the text of Oracle's

3  order is so broad that, on its face, it does not even require the copies on a Rimini server to be

4  infringing.[4]

5          Although Oracle styles its request as one for "disposition," Oracle disclaims any request to

6  take "direct possession" of the infringing copies or to have them destroyed.  Dkt. 900 at 25.  Instead,

7  Oracle seeks an order that Rimini turn over actual computers and storage media to "a neutral third

8  party of Oracle's choice," purportedly so that both Oracle and Rimini will "have appropriate access

9  to the materials during litigation" (Oracle does not specify *Rimini I* or *II*) while ensuring that no

10  "data or metadata will be altered or destroyed."  *Id.*  Disposition orders, however, are not discovery

11  devices, and Oracle cites no authority for using them as such.

12          The cases Oracle relies on involve *willful* infringers, or infringers held in *contempt* for failing

13  to abide by a previous court order, and do not endorse using disposition as a discovery device to

14  preserve the availability of materials for litigation.  *Getty Images (U.S.), Inc. v. Virtual Clinics*, 2014

15  WL 1116775, at *5 (W.D. Wash. Mar. 20, 2014) (ordering *willful infringer*, who had defaulted on

16  the judgment, to destroy copies of copyrighted photographs); *Curtis v. Illumination Arts, Inc.*, 33 F.

17  Supp. 3d 1200, 1214 (W.D. Wash. 2014) (ordering *willful infringer* who did not oppose injunction

18  motion to return copies of three books, and to destroy the electronic means of reproducing those

19  books); *Rogers v. Koons*, 960 F.2d 301, 313 (2d Cir. 1992) (ordering *willful infringer* to turn over a

20  sculpture that was based on a copyrighted photograph); *City of Carlsbad v. Shah*, 850 F. Supp. 2d

21  1087, 1090 (S.D. Cal. 2012) (primarily a trademark case in which the court ordered a *willful*

22  *infringer* to return business cards containing copyrighted logo of municipal golf course); *Software*

23  *Freedom Conservancy, Inc. v. Westinghouse Digital Elecs., LLC*, 812 F. Supp. 2d 483, 486

24  (S.D.N.Y. 2011) (issuing *contempt order* requiring defendant who had defaulted on the judgment to

25

---

26  [4] Oracle's proposed order also improperly requires Rimini's "subsidiaries, affiliates, employees,
directors, officers, principals, and agents" to turn over materials, even though there was no finding
of infringement against these parties.  *Societe Civile Succession Richard Guino v. Int'l Found. for*

27  *Anticancer Drug Discovery*, 460 F. Supp. 2d 1105, 1110 (D. Ariz. 2006) (collecting authority

28  "support[ing] restriction of § 503(a) impoundment to infringers").

1   turn over infringing articles *because* of "continuing infringement").

2   Oracle's proposed form of relief would significantly disrupt Rimini's business operations by

3   commanding that it turn over—to a third party and for an unlimited period of time—physical

4   computer equipment and storage media that Rimini uses to conduct its day-to-day business servicing

5   clients.  Oracle has failed to articulate any need for such a disruptive order, and this Court should

6   deny Oracle's request.[5]

7   ## IV.   Oracle's Motion for Judgment on Its UCL Claim Is Entirely Improper

8   Oracle's injunction motion includes a request for "judgment" on its claim under the

9   California unfair competition law ("UCL"), which was not submitted to the jury.  The Court set

10  separate deadlines for injunctive relief and all other post-trial motions (Dkts. 893, 899, 903), and a

11  request for judgment under the UCL is not injunctive relief.  When Oracle included the request for

12  judgment on the UCL claim in the pending motion, the Court Clerk entered an order stating that

13  Oracle's motions "should have been filed as separate entries," and advised Oracle to re-file an

14  "additional request for Judgment."  Dkt. 902.  Oracle has not re-filed that request or otherwise

15  acknowledged the Clerk's order.  Rimini will move under Rule 50(b) for judgment on Oracle's UCL

16  claim—because, for example, the UCL claim is preempted, Oracle has failed to demonstrate that it

17  suffered a cognizable injury under the UCL, and the failure of the predicate computer hacking claims

18  is fatal to the UCL claim (*see* Dkt. 838 at 18)—pursuant to the briefing schedule ordered by the

19  Court.  *See* Dkts. 893, 899, 903.

20  ## V.   Oracle Is Not Entitled to an Injunction Under the State Anti-Hacking Statutes

21  In addition to its arguments under the Copyright Act, Oracle also seeks an injunction

22  pursuant to the California and Nevada anti-hacking statutes.  This request is premature because

23  Rimini will demonstrate in its forthcoming Rule 50(b) motion that it is entitled to judgment as a

24  

---

25  [5] If Rimini were ordered to impound or destroy any materials (which would be entirely inappropriate
    here), it would be entitled to deduct from the amount of damages awarded by the jury ($35.6
26  million) the cost of those materials (*see Curtis*, 33 F. Supp. 3d at 1214-15 (offsetting damages
    award after issuing impoundment order against *willful* infringer who did not oppose the injunction
27  motion)), and Rimini therefore requests the opportunity to brief the amount of those costs with
    supporting evidence in the event that such an order is issued.  Oracle's proposed impoundment
28  order is so vague (*see* Section III *supra*) that Rimini cannot estimate such costs at this stage.

matter of law on all computer hacking claims.  Among other things, the relevant statutory provisions are unconstitutional both facially and as applied and, as a matter of law, do not prohibit the conduct in which Rimini engaged.  *Cf. United States v. Nosal*, 676 F.3d 854 (9th Cir. 2012) (en banc).  Accordingly, the Court should defer ruling on Oracle's injunction request until after it has resolved Rimini's Rule 50(b) motion.  In any event, Oracle's half-hearted request for an injunction under the state anti-hacking laws is meritless.

### A.     The Nevada Anti-Hacking Statute Does Not Authorize Oracle's Injunction

The Nevada anti-hacking statute does not permit private parties to seek injunctive relief.  The statute states that an individual "may bring a civil action to recover: (a) Damages … (b) Punitive damages; and (c) Costs and reasonable attorneys' fees."  Nev. Rev. Stat. § 205.511.  In comparison, only "the Attorney General or the appropriate district attorney" may "file an action in any court of competent jurisdiction to prevent the occurrence or continuance of that act or practice."  Nev. Rev. Stat. § 205.513.  The plain language of the statute does not authorize Oracle, which is neither "the Attorney General" nor "the appropriate district attorney," to seek an injunction.

Oracle also incorrectly states that "[a]n injunction may issue under the NCCL without proof of irreparable harm."  Dkt. 900 at 14.  The statute provides that the Attorney General or district attorney may obtain an injunction "without proof of *actual damage* sustained by any person."  Nev. Rev. Stat. § 205.513(2) (emphasis added).  The statute expressly limits injunctions only "to prevent the occurrence or continuance" of an unlawful act or practice that has occurred "or is about" to occur.  *Id.* § 205.513(2).  Thus, even if a private party were authorized to seek an injunction, the Nevada statute clearly would require that party to make a showing of imminent and irreparable harm.

### B.     No Injunction Is Warranted Under the California Anti-Hacking Statute

In its discussion of irreparable harm and adequacy of legal remedies (Dkt. 900 at 15-17), Oracle *does not even mention* the computer hacking claims, let alone identify any irreparable or imminent harm that would result absent an injunction or attempt to explain why legal remedies would not fully compensate Oracle.  This alone is reason to deny Oracle's request for an injunction.  *See TMX Funding, Inc. v. Impero Tech., Inc.*, 2010 WL 2745484, at *8 (N.D. Cal. July 9, 2010)

1    (denying injunction under Section 502(e) because the plaintiff failed to show that the defendant

2    "poses any present or future threat to its interest" and "[u]nder *Winter*, a party seeking [an]

3    injunction *must* show that it is likely to suffer irreparable harm absent the entry of" the injunction).

4         Nor could Oracle make such a showing.  The conduct at issue took place during three months

5    from November 2008 to January 2009 when Rimini used automated tools to download support

6    materials, in purported violation of Oracle's website terms of use.  9/22 Tr. 1194.  It was undisputed

7    that Rimini voluntarily ceased that conduct in January 2009—a year before this lawsuit was filed

8    and nearly *seven years* before Oracle sought this injunction.  *Id.*; *see* Benge Decl. ¶¶ 7-8; Teegarden

9    Decl. ¶ 4; Phung Decl. ¶ 7; Mackereth Decl. ¶¶ 8-9; Miller Decl. ¶¶ 3-4.  There is no risk of

10   imminent irreparable harm when the only isolated unlawful acts occurred over a three-month time

11   period nearly seven years ago and ceased voluntarily.  *See Opperman v. Path, Inc.*, 87 F. Supp. 3d

12   1018, 1056 (N.D. Cal. 2014) (dismissing claim for CDAFA injunction because plaintiff was not

13   "realistically threatened by a repetition of the violation" when defendants had ceased the practice).

14        In any event, the only harm Oracle's expert identified during that three-month time period

15   were "database deadlocks" and a "slow-down effect" (9/22 Tr. 1172), and one instance where the

16   database crashed, which Oracle resolved by simply "rebooting the servers" (*id.* at 1195).  The

17   downloading did not cause any physical harm or damage to Oracle's computers or servers, let alone

18   irreparable harm.  *Id.* at 1194; *id.* at 1219; 9/29 Tr. 2306.  In fact, Rimini was indisputably

19   attempting *not* to burden Oracle's servers.  9/18 Tr. 770-71; PTX 42 at 3.

20        Oracle's only argument in support of the proposed anti-hacking injunction is that "Oracle's

21   burden in continuing to block Rimini's IP addresses and send cease-and-desist communications

22   outweighs any burden Rimini would face in ceasing its unlawful downloading."  Dkt. 900 at 18.  But

23   Oracle submits *no evidence* that Oracle is "continuing to block Rimini's IP addresses," let alone

24   evidence that this causes Oracle any ongoing hardship.

25        Oracle's proposed injunction would also prohibit indisputably lawful, pro-competitive

26   activity not adjudicated in this lawsuit.  For example, the injunction would prohibit Rimini from

27   "accessing" "any Oracle website in any manner that could" "overburden" that website.  Dkt. 900-1

28   at 16.  With respect to access, however, Oracle witnesses agreed, consistent with the website terms

of use, that customers were allowed to "have consultants access the [Oracle] website on their behalf."  9/18 Tr. 866; 9/22 Tr. 1107, 1201; PTX 1569 (MetaLink Terms of Use) ("the Materials may be shared with or accessed by third parties who are your agents or contractors acting on your behalf").  The term "overburden," moreover, is fatally vague.

Oracle similarly proposes to enjoin Rimini from accessing Oracle's website in "any manner" that benefits any party other than the client to which the credentials were issued.  *See* Dkt. 900-1, IV (4).  This prohibition is exactly the kind of vague language that courts routinely reject for failing to provide "fair and precisely drawn notice" to enjoined parties.  *Columbia Pictures Indus.*, 710 F.3d at 1047.  It is strikingly similar to the language rejected in *Craigslist*, where the plaintiff sought to enjoin the defendant from "engaging in any activity that disrupts, diminishes the quality of, interferes with the performance of or impairs the function of" the plaintiff's website.  *See* 4:08-cv-05065-PJH (Dkt. 23).  The court declined to adopt that broad language because it was "not directed specifically at the Defendants' infringing conduct, but rather, a general proscription against Defendants engaging in any conduct that negatively affects Plaintiff's business or services."  *Craigslist*, 694 F. Supp. 2d at 1062.  Oracle's requested injunction similarly fails.

## CONCLUSION

Oracle's motion for a permanent injunction should be denied.  No injunction (or impoundment) is warranted under either the Copyright Act or the anti-hacking statutes, and Oracle's request for judgment under the UCL is premature.  Even if the Court were to conclude (as it should not) that some injunction is warranted, Oracle's proposed injunction could not be entered because it is impermissibly vague and overbroad, inequitably anti-competitive, and unlawfully directed to processes and activities that Oracle insisted be tried in a separate action.  If the Court concludes that an injunction is warranted, Rimini respectfully requests that the Court issue a draft injunction and invite the parties' comments and objections.

DATED:        November 2, 2015

GIBSON, DUNN & CRUTCHER LLP

By:   */s/ Blaine H. Evanson*
Blaine H. Evanson
*Attorneys for Defendants*
*Rimini Street, Inc. and Seth Ravin*

**APPENDIX**

**RIMINI'S RESPONSE TO ORACLE'S PROPOSED FINDINGS OF FACT**

| # | Oracle's Proposed Finding of Fact | Rimini Street's Response | Evidentiary Objections |
|---|---|---|---|
| 21. | Rimini copied "massive amounts" of Oracle software and support materials, without ever obtaining any license from Oracle. Tr. 165:12-16 (Davis); 302:3-4 (Ravin). | **Disputed in part.**<br><br>Rimini operated under the licenses of its clients, which the Court found it could assert as a defense in this action. Dkt. 474 at 8-10. Rimini downloaded only what its clients were entitled to under their licenses. Tr. 567:22-568:8, 728:12-22 (Ravin); Tr. 975:11-25 (Catz) ("Q. It could be thousands of files? A. It absolutely can be. Q. And the customer would be totally within its rights to download those materials; correct? A. Yes, as long as they're licensed for them, they may download them during their support contract."). Further, Mr. Ravin did not testify to the quantity of Oracle software and support material copied by Rimini. Tr. 302:3-4 (Ravin). | |
| 28. | All of the copies of and derivative works prepared from Oracle software and support materials that Rimini created and distributed to provide support were infringing. PTX 1458 (Dkt. 401), 5328 (Dkt. 5328) (stipulations); Jury Instruction 24, Dkt. 880 (final jury instructions); Dkt. 896 (verdict). | **Disputed in part.**<br><br>Undisputed that the copies and derivative works addressed at trial or on summary judgment were found to infringe. Disputed to the extent this finding implies that any other copies or derivative works were found to be infringing. Also disputed to the extent the cited documents do not support the alleged fact. | |
| 36. | This Court already found that the JD Edwards license for Giant Cement (PTX 704) and the Siebel license for Novell (PTX 705) permit copies for "archival" and "backup" purposes only. Dkt. 474 at 22, 24. | **Disputed in part,** as incomplete.<br><br>The JD Edwards license for Giant Cement (PTX 704) and the Siebel license for Novell (PTX 705) permit copies for "archival | **Fed. R. Evid. 106** |

| # | Oracle's Proposed Finding of Fact | Rimini Street's Response | Evidentiary Objections |
|---|---|---|---|
| | | *needs and to support Users*," and "***archive or emergency*** backup ***purposes or disaster recovery and related testing …***" purposes only.  Dkt. 474 at 21, 23. | |
| 37. | Mr. Allison's testimony established that those licenses were representative of the JD Edwards and Siebel licenses generally, as both companies "used form license agreements." Tr. 1117:25-1118:5, 1118:15-19 (Allison). | **Disputed in part.**  Undisputed that this was Mr. Allison's testimony.  Disputed to the extent it is Mr. Allison's opinion and does not establish that these licenses were "representative." | **Fed. R. Evid. 702** (Improper expert opinion) |
| 39. | That provision can only be satisfied if Rimini's copies for "us[e] exclusively for archival and back-up purposes, and related testing, as directly contemplated by Section 2.1(iv)." Dkt. 474 at 24 n.20. | **Disputed,** on the same grounds as 36. | |
| 41. | Rimini "used all of the software," including all its "Siebel software" and "JDE software" in its "work for customers." Tr. 303:1-5 (Ravin); Tr. 364:3-8 (Ravin) (all environments on Rimini's systems were "used in order to support customers" and for "troubleshooting"). | **Disputed in part**.  Mr. Ravin's cited testimony was specific to Siebel environments, not *all* environments. Tr. 364:3-8 (Ravin).  Further, Mr. Ravin testified he did not know how the Siebel environments were used. Tr. 364:10-13 (Ravin). | |
| 42. | Rimini's Siebel environments were "designed" at the outset for, among other uses, "testing and development." Tr. 318:19-22 (Ravin); Tr. 1146:5-25 (Chiu) (Siebel copies "used to provide support"); Tr. 758:23-759:4 (Ravin) (same); Tr. 1754:8-15 (Whittenbarger) (Siebel copies used for training); PTX 1461 (Chiu discussing customer Caterpillar (Siebel) "[w]e reclarified how our support model is based on building up an in- | **Disputed in part.**  Mr. Ravin testified he did not know how the Siebel environments were used.  Tr. 321:3-6 (Ravin). | |

| # | Oracle's Proposed Finding of Fact | Rimini Street's Response | Evidentiary Objections |
|---|---|---|---|
| | house lab environment with a vanilla [not customized] fix-master [environment to test fixes and patches] and a customized replica of their dev/test environment would enable us to maximize our responsiveness to them"). Tr. 3034:3-7 (Chiu). | | |
| 43. | Ravin likewise confirmed that JD Edwards environments were for "testing and development" and for "diagnostics and support." Tr. 321:1-6, 760:8-15 (Ravin). | **Disputed in part**. Mr. Ravin testified he did not know how the JD Edwards environments were used. Tr. 321:1-6 (Ravin). | |
| 45. | Rimini's copies of Oracle software were "general development test environments" or "generic environment[s]" otherwise used for testing, development, support, and troubleshooting. Tr. 320:8-18, Tr. 367:2-8 (Ravin); Tr. 367:18-23 (Ravin) (Rimini would use Customer A's software to troubleshoot for Customer B); Tr. 1146:5-25 (Chiu) (explaining that Rimini's internal Siebel environments were "used to provide support for those clients that provided us their software"); Tr. 3186:13-3187:4 (Slepko) (Siebel local environments were used to assist clients with their problems); Tr. 1754:8-15 (Whittenbarger) (Siebel environment used for internal training); Tr. 1757:14-1758:5 (Whittenbarger) (Rimini "set up environments to troubleshoot issues"); Tr. 2043:22-2044:21 (Blackmarr) (use of Customer A's software to support Customer B); PTX 181 at 2 (June 2009 installation of JD Edwards was "to be used for any configuration, testing and development required"); PTX 186 at 2 (Chiu explaining "I am planning a JDE install for Medtronic's Support system"); PTX 190 (JD Edwards environments associated with | **Disputed,** as overbroad and incomplete. Rimini creates unique and independent environments for each client that has customized code. Tr. 597:2-11 (Ravin). | **Fed. R. Evid. 106** |

| # | Oracle's Proposed Finding of Fact | Rimini Street's Response | Evidentiary Objections |
|---|---|---|---|
| | specific customers continued to be created through February 2010); PTX 33 ("Rimini would build out a[] [JD Edwards] environment to support the[] [customer]"); PTX 310 (Siebel environments used for troubleshooting); PTX 744 (same). | | |
| 46. | An environment used for testing, development, or troubleshooting is not a backup because you "don't touch" a backup. Tr. 180:9-22, 182:16-183:4 (Davis). | **Disputed in part.**<br><br>Undisputed that this is the cited testimony.  Disputed to the extent this "fact" is a legal conclusion, and cites only to the testimony of Oracle expert Dr. Davis. | **Fed. R. Evid. 702** (Improper expert opinion) |
| 47. | An "archive" or "backup": a "copy . . . put on a physically different place," on a "separate disk" or otherwise "put aside." Tr. 180:5-181:17, 182:16-24 (Davis); see also Tr. 362:21-363:23 (Ravin) (discussing archives shipped to customers on DVDs or USB drives and backups on tape drives). | **Disputed in part.**<br><br>Undisputed that this is the cited testimony.  Disputed to the extent this "fact" is a legal conclusion, and cites only to the testimony of Oracle expert Dr. Davis and testimony from Mr. Ravin that does not support the ultimate conclusion. | **Fed. R. Evid. 702** (Improper expert opinion) |
| 48. | Backups are stored on tapes or other storage, unmodified. Tr. 730:4-11 (Ravin); Tr. 180:5-181:17, 182:16-24 (Davis). | **Disputed in part.**<br><br>Disputed to the extent this "fact" is a legal conclusion, and cites only to the testimony of Oracle expert Dr. Davis and testimony from Mr. Ravin that does not support the ultimate conclusion.  Further disputed to the extent Mr. Ravin did not testify the backups were stored unmodified.  Tr. 730:4-11 (Ravin). | **Fed. R. Evid. 702** (Improper expert opinion) |
| 49. | Copies used for troubleshooting, support, testing, or development are not backups. Tr. 180:5-181:17, 182:16-24 (Davis). | **Disputed in part.**<br><br>Undisputed that this is the cited testimony.  Disputed to the extent this "fact" is a legal conclusion, and cites only to the testimony of Oracle expert Dr. Davis. | **Fed. R. Evid. 702** (Improper expert opinion) |
| 51. | Rimini's unlicensed copying | **Disputed in part, as** | |

34

| # | Oracle's Proposed Finding of Fact | Rimini Street's Response | Evidentiary Objections |
|---|---|---|---|
| | included widespread cross-use of Oracle software. Tr. 799:6-16 (Ravin). | overbroad.<br><br>Mr. Ravin did not testify to the quantity of "cross-use." Tr. 799:6-16 (Ravin). | |
| 52. | After previously denying cross-use, Ravin admitted at trial cross-use occurred "all the time." Tr. 552:1-13 (Ravin). | **Disputed.**<br>Oracle cites to no support for "previously denying cross-use," and has not shown or explained what "cross-use" means. | **Vague and ambiguous.** |
| 53. | Rimini's cross-use included unlicensed "cloning" of Oracle software (copying an environment created ostensibly for one customer for another customer). Tr. 371:5-9, 374:12-15, 777:22-24 (Ravin); 1365:23-1366:14, 1381:1-8 (Williams); 192:22-193:7, 196:25-197:25, 198:24-199:11 (Davis); PTX 439; PTX 1491A; PTX 3507 at 31. | **Disputed in part.**<br>Undisputed that Rimini cloned certain Oracle software on its systems. Disputed to the extent Oracle has not shown or explained what "cross-use" means. | **Vague and ambiguous.** |
| 54. | On many occasions, Rimini used one customer's environment to support other customers. Tr. 2232:2-2233:23 (Benge). | **Disputed in part.**<br>Mr. Benge did not testify to the frequency that Rimini used one customer's environment to support other customers. Tr. 2232:2-2233:23 (Benge). | |
| 56. | Rimini "reused [] all the time" by taking an update or fix that Rimini created for one customer and using it for and distributing it to another customer, including using Oracle's copyrighted code, changing it and distributing it to multiple Rimini customers. Tr. 552:1-552:5, 809:19-810:13 (Ravin); 2232:2-2233:23 (Benge). | **Disputed.**<br>Mr. Benge did not testify to the frequency that Rimini used one customer's environment to support other customers. Tr. 2232:2-2233:23 (Benge). | |
| 57. | On many occasions, Rimini used one customer's software to troubleshoot issues other customers were having. Tr. 367:18-23 (Ravin); 2043:22-2044:21 (Blackmarr). | **Disputed in part,** as overbroad.<br><br>In the cited testimony, Ms. Blackmarr was discussing "testing," not troubleshooting. Further, Ms. Blackmarr testified that Rimini would cross-use for testing purposes if the customers were "binary | |

35

OPPOSITION TO MOTION FOR A PERMANENT INJUNCTION

| # | Oracle's Proposed Finding of Fact | Rimini Street's Response | Evidentiary Objections |
|---|---|---|---|
| | | equal, exactly the same code." Tr. 2044:8. | |
| 58. | Rimini used the code in one customer environment to write a detailed design document to be used with other clients. Tr. 1656:20-1661:4 (Grigsby). | **Disputed in part**, as overbroad.<br><br>Mr. Grigsby was testifying only with respect to J.D. Edwards. | |
| 59. | Rimini also used Oracle copyrighted support material as part of a sales presentation to customers. Tr. 1662:16-1668:7 (Grigsby). | **Disputed in part.**<br><br>Mr. Grigsby used Oracle support material to prepare a J.D. Edwards presentation to give to Rimini's sales team. The cited testimony does not establish that this presentation was presented to customers. Tr. 1662:16-1668:7 (Grigsby). | |
| 60. | Rimini stored Oracle support materials in non-client-specific folders. Tr. 1155:18-21 (Hicks). | **Disputed in part.**<br><br>Undisputed that this occurred. Disputed to the extent the finding implies this was a common practice or was performed for the entire period-at-issue. | |
| 61. | Rimini used support documentation downloaded on behalf of one customer to rephrase the information and distribute it to other Rimini clients whose Oracle support was expired. PTX 236; Tr. 188:8-189:15 (Davis). Rimini created "extracts" that Rimini gave its customers so that unlicensed copies that were shared amongst customers. Rimini told customers that it was creating separate extracts for each customer, but Rimini was using one customer's log-in, starting with a faux customer, Leads Customers Growth, to copy all materials from Oracle's websites and then copying disks that Rimini distributed to multiple customers. Tr. 333:9-334:3, 335:12-16 (Ravin); 1160:15-1161:10 | **Disputed in part.**<br><br>Leads Customer Growth was a Siebel licensee with an active support agreement during the relevant timeframe.  Tr. 335:8-11 (Ravin).<br><br>Rimini worked as a consultant to Leads Customer Growth's overall implementation plan. Tr. 342:18-23.<br><br>Also disputed to the extent that all of the customers receiving such materials were entitled to them under their agreements with Oracle. | |

OPPOSITION TO MOTION FOR A PERMANENT INJUNCTION

| # | Oracle's Proposed Finding of Fact | Rimini Street's Response | Evidentiary Objections |
|---|---|---|---|
| | (Hicks); PTX 7. | | |
| 62. | Rimini's "software library" was massive. PTX 10; Tr. 166:9-20 (Davis); 242:1-3, 242:14-20 (Ravin). | **Disputed in part.** Mr. Ravin did not testify to the quantity of Oracle software and support material copied by Rimini.  Tr. 302:3-4 (Ravin).  Further disputed to the extent the citations do not support the alleged fact. | |
| 66. | Rimini also used customer log-ins to download massive amounts of materials, for multiple clients, including materials customers were not authorized to download. Tr. 1751:4-16 (Whittenbarger); PTX 7. | **Disputed.** Cited testimony does not support alleged fact. | |
| 70. | Rimini used "automated" downloading tools that Ravin and Rimini knew were not authorized. Tr. 479:3-15, 769:9-10, 769:22-25 (Ravin); 1140:17-20 (Chiu). | **Disputed in part.** Undisputed that Mr. Ravin authorized the use of automated tools.  Disputed to the extent the "fact" is a legal conclusion. | |
| 77. | Oracle blocked Rimini IP addresses in response to Rimini's downloading, and Rimini "obtained some additional fixed IP addresses" to circumvent Oracle's IP blocks and continue downloading. Tr. 771:19-772:7 (Ravin); Tr. 1175:17-1176:3 (Hicks); Tr. 1232:8-20 (Baron). | **Disputed in part.** Disputed to the extent this "fact" mischaracterizes Rimini's actions.  Mr. Baron testified that they obtained additional IP addresses "So that we could continue the extract that we were attempting to get for XO Communications, an extract they were entitled to get."  Tr. 1232:17-20 (Baron). | |
| 78. | Rimini employees also used their home, residential IP addresses to attempt to evade Oracle's detection and avoid Oracle's IP blocking. PTX 46 at 4 ("Started downloading the attachments. . . . (from my house and not using the download VMs) but got blocked after about 2,000 attachments"); Tr. 1232:21-1233:14 (Baron). | **Disputed in part.** Undisputed that a Rimini employee used his residential internet connection to access Oracle's website.  Disputed to the extent the cited testimony does not support that he did so to "evade Oracle's detection" or "avoid Oracle's IP blocking." | |
| 79. | Rimini used the IDs for multiple customers to "crawl" Oracle's | **Disputed in part.** Undisputed that Rimini | **Fed. R. Evid. 702** (Improper expert |

OPPOSITION TO MOTION FOR A PERMANENT INJUNCTION

| # | Oracle's Proposed Finding of Fact | Rimini Street's Response | Evidentiary Objections |
|---|---|---|---|
| | website, causing more than 184,000 deadlocks. Tr. 1180:19-1181:4 (Hicks). | performed downloads for multiple customers.  Disputed to the extent that the "fact" is a legal conclusion supported only by the testimony of Mr. Hicks.  Further disputed to the extent that Rimini caused these deadlocks; in fact, Oracle admitted that many deadlocks were not caused by Rimini.  Tr. 1218:22-1219:3 (Renshaw) ("Q. Now, is it true that you had seen deadlocks that were not caused by Rimini Street? A. Yes."). | opinion) |
| 80. | Rimini's unauthorized access using automated tools from November 2008 through January 2009 harmed Oracle's systems, causing slowdowns, errors, and deadlocks, and crashed Oracle's server. Tr. 1172:9-15, 1174:5-1175:1, 1179:9-23 (Hicks); 1201:14-1202:11; 1210:5-1211:10 (Renshaw); PTX 665; PTX 669. | **Disputed in part.**  Undisputed that Rimini used automated tools in November 2008 to January 2009, and that this is the testimony of Oracle's expert.  Disputed to the extent the "fact" contains legal conclusions. | **Fed. R. Evid. 702** (Improper expert opinion) |
| 81. | Rimini's unauthorized access using automated tools rendered Oracle's Knowledge Management system completely unavailable for four and a half hours in January 2009. Tr. 1211:8-10 (Renshaw); PTX 669. | **Disputed in part.**  Undisputed that Rimini used automated tools in November 2008 to January 2009, and Oracle's Knowledge Management system experienced downtime in January 2009 for four and a half hours.  Disputed to the extent the "fact" contains legal conclusions. | **Fed. R. Evid. 702** (Improper expert opinion) |
| 82. | Rimini's use of automated tools to access Oracle's systems "harmed Oracle significantly." Tr. 1168:23-1169:2 (Hicks). | **Disputed.**  There was no server impairment as a result of Rimini's use of automated tools.  Tr. 2296:2-7 (Klausner). | |
| 83. | Oracle's Terms of Use forbid using any entity's credentials for the benefit of any entity other than the entity to which the credentials were issued. PTX 19. | **Disputed in part.**  Undisputed that Oracle's Terms of Use address user credentials.  Disputed to the extent this "fact" is a legal conclusion. | |

| # | Oracle's Proposed Finding of Fact | Rimini Street's Response | Evidentiary Objections |
|---|---|---|---|
| 84. | Rimini did not abide by this restriction on the use of credentials. PTX 8; Tr. 289:22-291:19, 333:9-334:3, 335:12-16 (Ravin); Tr. 1601:10-1602:24 (Leake); Tr. 1738:2-18 (Holmes); Tr. 2011:15-2013:5 (Blackmarr); 1160:15-1161:10 (Hicks); PTX 7; PTX 236; Tr. 188:8-189:15 (Davis). | **Disputed in part**, on the same grounds as 83. | |
| 85. | Rimini's copyright infringement and computer access violations allowed it to charge substantially less than Oracle charged for support: often 50% or less of what Oracle charged. Tr. 207:10-16 (Davis); Tr. 1940:6-1942:6, 1950:16-1951:12 (Dean). | **Disputed.** Rimini's ability to offer support services for 50% less than Oracle was not a result of any copyright infringement and computer access violations.  Tr. 2663:11-2664:16 (Zorn). | |
| 86. | Rimini's copyright infringement and computer access violations allowed it to gain scale quickly, with minimal effort and investment. Tr. 443:4-445:6 (Ravin); Tr. 1702:18-1703:22 (Yourdon); Tr. 1453:22-1476:6 (Maddock). | **Disputed.** Mr. Ravin and Mr. Maddock did not testify that Rimini's copyright infringement and computer access violations allowed it to gain scale quickly, with minimal effort and investment. | |
| 87. | By purporting to offer vendor-level support at half the price or less of Oracle support and creating the impression that Oracle was overcharging for support, Rimini eroded "the bonds and the trust that [Oracle] ha[d] with [its] customers." "For the customers [Oracle] lost, it totally broke the relationship." By breaking these relationships, customers were also less likely to purchase other Oracle products. Tr. 948:17-949:8, 934:14-936:11 (Catz); DTX 146. | **Disputed.** Cited testimony is only opinion of Oracle employee Ms. Catz. | **Fed. R. Evid. 701** (Improper opinion testimony)**, 702** (Improper expert opinion) |
| 88. | A customer who moves to Rimini for support may later find that its systems are out of date. Tr. 935:18-936:3 (Catz); Tr. 1571:11-1573:6 (Screven). | **Disputed.** Cited testimony is the opinion of Oracle employees Ms. Catz and Mr. Screven. | **Fed. R. Evid. 701** (Improper opinion testimony)**, 702** (Improper expert opinion) |

OPPOSITION TO MOTION FOR A PERMANENT INJUNCTION

| # | Oracle's Proposed Finding of Fact | Rimini Street's Response | Evidentiary Objections |
|---|---|---|---|
| 89. | By creating uncertainty and distrust in the marketplace, Rimini's copyright infringement and computer access violations caused Oracle to "hav[e] to work extra hard to keep the customers [Oracle] ha[d]" due to the injury to Oracle's goodwill and reputation. Tr. 948:17-949:12 (Catz). As well, customers who left Oracle support for Rimini support were less likely to license additional software of any type from Oracle. *Id.* | **Disputed.** Cited testimony is the opinion of Oracle employee Ms. Catz. | **Fed. R. Evid. 701** (Improper opinion testimony)**, 702** (Improper expert opinion) |
| 91. | Rimini created local environments and prepared and distributed derivative works from those environments for years after SAP and TomorrowNow conceded liability for copyright infringement and after TomorrowNow pled guilty to criminal copyright infringement. See Dkt. 823-6 (civil stipulation discussing local environments on TomorrowNow's computer systems); Dkt. 823-5 (guilty plea discussing local environments on TomorrowNow's computer systems). | **Disputed in part.** Disputed to the extent this implies that Rimini had knowledge of these facts, which Oracle has not established. | **Fed. R. Evid. 403** (Unduly prejudicial and irrelevant; implies a contradiction with jury's finding of innocent infringement) |
| 92. | Before trial, Rimini claimed that a software library never existed at Rimini Street. PTX 5332 (March 29, 2010 Answer) at ¶ 34 (denying existence of software library); PTX 1482 (June 16, 2011 Answer) at ¶ 34 (same). | **Disputed in part.** In its *Rimini I* Complaint, Oracle stated that "This case is about the massive theft of Oracle's software," and alleged that Rimini would download "entire families of software (e.g., PeopleSoft, JDE, or Siebel that the customers does not license and for which it has no use." Dkt. 1 at 3:6-9. Oracle further alleged that "the scope of the downloaded Software and Support Materials – across multiple libraries in multiple lines of business – for customers that had no license to take, or need for, those products, suggests that Rimini Street took the Software and | |

| # | Oracle's Proposed Finding of Fact | Rimini Street's Response | Evidentiary Objections |
|---|---|---|---|
| | | Support Materials to stockpile a library to support its present and prospective customers." Dkt. 1 ¶ 50, Dkt. 36 ¶ 59, and Dkt. 146 ¶ 60.<br><br>In its Answer, Rimini admitted to having Oracle materials on its servers, explaining that, "as a matter of process and procedure, Rimini Street's clients are only delivered the Oracle Software and Support Materials to which they are legally entitled." Dkt. 30 at 9:11-13. Rimini's Answer then referred back to Oracle's language describing the alleged 'library" of illegally stockpiled materials and stated that **"[s]uch a 'library'** has never existed at Rimini Street ..." Dkt. 30 at 9:24-27 (emphasis added).<br><br>At trial, Mr. Ravin testified that he believed these statements to be true, explaining that the denial of having "such a 'library'" at Rimini Street in the Answer referred back to how Oracle was using this term in its Complaint. *See, e.g.*, Tr. 245:18-19. | |
| 93. | At trial, Ravin claimed that Rimini's software library was not really a library, Tr. 247:7-12, that it was only "installation media," Tr. 255:6-9, 565:9-11, and that it was only PeopleSoft, Tr. 247:14-20. | **Disputed in part**, on the same grounds as **92.** | |
| 94. | Before trial, Rimini's 30(b)(6) designee, Senior Vice President Brian Slepko, and Ravin each flatly denied in depositions ever using one customer's environment to develop or test updates for other customers. Tr. 804:25-805:5 | **Disputed in part.**<br><br>Disputed to the extent this "fact" conflates testimony regarding Rimini's processes for "vanilla" environments with processes used for "custom" environments. *See, e.g.*, Tr. | |

41

| # | Oracle's Proposed Finding of Fact | Rimini Street's Response | Evidentiary Objections |
|---|---|---|---|
| | (Ravin); 3173:1-3174:3 (Slepko). | 1675:5-11 (Beth Lester); Tr. 2043-2045 (Blackmarr); Tr. 2980-2983 (Baggett). | |
| 95. | At trial, Ravin admitted that Rimini used one customer environment to develop or test updates for other customers "all the time." Tr. 552:1-5 (Ravin). | **Disputed in part**, on the same grounds as 94. | |
| 97. | To date, Rimini has failed to produce a complete list of its customers, a complete list of environments that it has created or used, a complete list of the fixes and updates that it has distributed, and a complete list of its downloads, despite Oracle's discovery requests. Polito Decl. ¶¶ 5-8 & Ex. C. | **Disputed in part.** Rimini has produced or agreed to produce to Oracle, *in Rimini I*, supplemental discovery that includes a complete list of its customers, a complete list of environments that it has created or used at the time of disclosure. Rimini and Oracle have further agreed upon a schedule for the production of the referenced items. | |
| 98. | To date, Rimini has declined to provide any information regarding its "migration" from its infringing business model to its allegedly new business model. Polito Decl. ¶ 5-6, 8 & Ex. C. | **Disputed.** Rimini has produced extensive documentation describing its revised processes.  Further, Rimini's discovery responses in *Rimini II* include descriptions of its revised processes, its migration to those processes, as well as an agreement to produce documents from which the answer(s) to Oracle's "migration" interrogatory can be ascertained. | |

42

1

## CERTIFICATE OF SERVICE

2    I hereby certify that on November 2, 2015, I electronically filed the foregoing document with

3 the clerk of the court for the U.S. District Court, District of Nevada, using the electronic case filing

4 system. The electronic case filing system sent a "Notice of Electronic Filing" to the attorneys of

5 record who have consented in writing to accept this Notice as service of this document by electronic

6 means.

7                                              By: */s/ Blaine H. Evanson*
                                                   Blaine H. Evanson
8

9                                              *Attorney for Defendants*
10                                             *Rimini Street, Inc. and Seth Ravin*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28