# EXHIBIT 28

1  BINGHAM McCUTCHEN LLP
   DONN P. PICKETT (SBN 72257)
2  GEOFFREY M. HOWARD (SBN 157468)
   HOLLY A. HOUSE (SBN 136045)
3  ZACHARY J. ALINDER (SBN 209009)
   BREE HANN (SBN 215695)
4  Three Embarcadero Center
   San Francisco, CA  94111-4067
5  Telephone: (415) 393-2000
   Facsimile:  (415) 393-2286
6  donn.pickett@bingham.com
   geoff.howard@bingham.com
7  holly.house@bingham.com
   zachary.alinder@bingham.com
8  bree.hann@bingham.com

9  BOIES, SCHILLER & FLEXNER LLP
   DAVID BOIES (Admitted *Pro Hac Vice*)
10 333 Main Street
   Armonk, NY 10504
11 Telephone: (914) 749-8200
   dboies@bsfllp.com
12 STEVEN C. HOLTZMAN (SBN 144177)
   1999 Harrison St., Suite 900
13 Oakland, CA 94612
   Telephone: (510) 874-1000
14 sholtzman@bsfllp.com

15 DORIAN DALEY (SBN 129049)
   JENNIFER GLOSS (SBN 154227)
16 500 Oracle Parkway, M/S 5op7
   Redwood City, CA  94070
17 Telephone: 650.506.4846
   Facsimile: 650.506.7114
18 dorian.daley@oracle.com
   jennifer.gloss@oracle.com
19

20 Attorneys for Plaintiffs
   Oracle USA, Inc., *et al.*

   JONES DAY
   ROBERT A. MITTELSTAEDT (SBN 060359)
   JASON McDONELL (SBN 115084)
   ELAINE WALLACE (SBN 197882)
   555 California Street, 26th Floor
   San Francisco, CA  94104
   Telephone:    (415) 626-3939
   Facsimile:    (415) 875-5700
   ramittelstaedt@jonesday.com
   jmcdonell@jonesday.com
   ewallace@jonesday.com

   JONES DAY
   THARAN GREGORY LANIER (SBN 138784)
   JANE L. FROYD (SBN 220776)
   1755 Embarcadero Road
   Palo Alto, CA  94303
   Telephone:    (650) 739-3939
   Facsimile:    (650) 739-3900
   tglanier@jonesday.com
   jfroyd@jonesday.com

   JONES DAY
   SCOTT W. COWAN (Admitted *Pro Hac Vice*)
   JOSHUA L. FUCHS (Admitted *Pro Hac Vice*)
   717 Texas, Suite 3300
   Houston, TX  77002
   Telephone:    (832) 239-3939
   Facsimile:    (832) 239-3600
   swcowan@jonesday.com
   jlfuchs@jonesday.com

   Attorneys for Defendants
   SAP AG, SAP America, Inc., and
   TomorrowNow, Inc.

21 |  |  |
---|---|---

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| ORACLE USA, INC., *et al.*,<br><br>   Plaintiffs,<br><br>  v.<br><br>SAP AG, *et al.*,<br><br>   Defendants. | Case No. 07-CV-01658 PJH (EDL)<br><br>**JOINT PRETRIAL STATEMENT**<br><br>Date:   September 30, 2010<br>Time:   9:00 am<br>Place:   3rd Floor, Courtroom 3<br>Judge:  Hon. Phyllis J. Hamilton |

Line numbers: 22, 23, 24, 25, 26, 27, 28

1      Pursuant to the Court's standard Pretrial Instructions, stipulated Revised Case

2 Management and Pretrial Order of June 11, 2009 (D.I. 325) and Order of July 21, 2010 (D.I.

3 726), plaintiffs Oracle USA, Inc. ("Oracle USA"), Oracle International Corporation ("OIC"),

4 Oracle EMEA Limited ("OEMEA") and Siebel Systems, Inc. ("SSI") (collectively "Oracle" or

5 "Plaintiffs") and defendants SAP AG, SAP America (together "SAP") and TomorrowNow, Inc.

6 ("TomorrowNow" or "TN") (collectively "Defendants") submit this Joint Pretrial Statement.

7 **I.**     **BRIEF DESCRIPTION OF THE SUBSTANCE OF THE CLAIMS AND**
        **DEFENSES**

8

9     **A.**     **Oracle's Brief Summary of Its Claims**

10      This case concerns TomorrowNow's extensive and unlawful downloading, copying, and

11 use of Oracle's copyrighted software and related support materials, and the efforts by SAP AG

12 and SAP America to leverage TomorrowNow's unlawful conduct to harm Oracle and benefit

13 SAP.  As explained in more detail below, Plaintiffs will prove that Defendants made a library of

14 *thousands* of copies of Oracle's copyrighted software and *millions* of copies of Oracle's

15 downloadable software support materials in violation of U.S. copyright law, U.S. computer fraud

16 law and the applicable licensing and Terms of Use.  Oracle will also prove that Defendants then

17 used this library of Oracle intellectual property to – as a member of SAP AG's Executive Board

18 put it soon after SAP acquired TomorrowNow – "inflict pain" on Oracle by enabling Defendants

19 to enter into "extraordinary deals" with support customers and eventually migrate them to SAP

20 enterprise software.  Oracle will prove that SAP AG and SAP America knew of, enabled, and

21 benefited from that extensive infringement.  In the words of SAP AG's then CEO, SAP

22 "knowingly undertook" the risk involved in acquiring this unlawful enterprise, and then

23 expanded that enterprise, continuing to operate it for years after the acquisition.

24      Plaintiffs have ten claims, all of which are asserted against all three defendants:

25 (1) copyright infringement; (2) violations of the Federal Computer Fraud and Abuse Act

26 ("CFAA"); (3) violations of the California Computer Data Access and Fraud Act ("CDAFA");

27 (4) breach of contract; (5) intentional interference with prospective economic advantage; (6)

28 negligent interference with prospective economic advantage; (7) violations of California

1  Business & Professions Code § 17200; (8) trespass to chattels; (9) unjust enrichment; and, (10)

2  an accounting.  As explained below, Oracle will ask the jury to award in excess of $2 billion in

3  damages against Defendants, and punitive damages, and Oracle will seek equitable relief in the

4  form of restitution and an injunction against further misconduct.

5        At summary judgment, Defendants conceded both direct and vicarious liability on

6  significant portions of Oracle's copyright and computer fraud claims.  Of the four Oracle

7  software brands at issue in the case – PeopleSoft, J.D. Edwards, Siebel and Oracle Database,

8  Defendants have conceded they made 295 illegal copies of PeopleSoft software (covering three

9  copyright registrations) and have conceded essentially all of Oracle's Database software

10 copyright claim.[1]  The PeopleSoft family of software was the primary focus of SAP and its

11 internal and public statements of the expected benefits for its TomorrowNow acquisition.  The

12 same or similar evidence that led Defendants to concede the 295 PeopleSoft copies in the

13 summary judgment motion should lead to additional concessions regarding thousands of

14 additional copies, and many additional copyrights.  The concession concerning Oracle Database

15 Software programs is also significant because TomorrowNow supported at least 40% – and

16 likely almost all – of its customer base on illegal copies of Oracle's Database software.

17       Oracle will prove that TomorrowNow directly, and SAP indirectly, infringed additional

18 copyrighted works for PeopleSoft and Oracle Database software beyond those for which SAP

19 conceded liability on Summary Judgment (as well as copyrighted works in the other product

20 families at issue, J.D. Edwards and Siebel).  Defendants elected not to pursue a license defense to

21 these copies on summary judgment.  This election signals the lack of any license defense at all.

22 Defendants made and have the copies.  And no license protects them, individually or as a whole.

23       In addition, SAP conceded a portion of Oracle's CFAA and CDAFA claims related to

24 SAP's unauthorized downloading from Oracle's customer support websites.[2]  Other variations of

25

26 [1]    See SAP's Opposition to Oracle's Motion for Summary Judgment, Dkt. No. 670 at 4:28-
   5:5.
27 [2]    See SAP's Opposition to Oracle's Motion for Summary Judgment, Dkt. No. 670 at 14
   n.5.

28

1    these claims remain, but the concessions on summary judgment should apply with equal force to

2    those.

3         At the May 5, 2010 summary judgment hearing, the Court encouraged the parties to

4    spend significant time meeting and conferring in an effort to streamline the case for trial.  This

5    concern was well-founded.  In its current form, given the extent of Defendants' wrongdoing and

6    the voluminous evidence necessary to prove it without stipulations of fact as well as Defendants'

7    late production of massive new evidence and their persistent refusal to streamline liability,

8    Oracle anticipates that trial will require approximately 12 weeks (rather than the 6 weeks

9    currently scheduled).

10        Taking the Court's guidance seriously, on May 14, Oracle initiated the pre-trial meet and

11   confer process in an effort to streamline the case and arrive at a realistic estimate for length of

12   trial.  Despite having just admitted in summary judgment to 295 unauthorized application copies

13   and more than 1,000,000 unauthorized downloads, Defendants refused to discuss specifics until

14   Oracle made a written proposal.  They promised to promptly respond to a written proposal if

15   Oracle made one.  During approximately the same period, beginning on March 15, 2010 and

16   continuing through June 30, 2010, Defendants produced over 500,000 files previously withheld

17   from production.  These files included copies of Oracle's software and support materials

18   downloaded by Defendants, and over 26,000 instant message chats from key TomorrowNow

19   witnesses.[3]  This late production was in violation of multiple provisions of the pretrial order in

20   this case, and the new materials bear directly on the core liability issues in the case.  For

21   example, some are flat admissions of copyright infringement previously denied under oath.

22   After an initial review of these new materials, on July 2, 2010, Oracle submitted two extensive

23   proposals to Defendants for streamlining trial of the copyright claims.  The stipulations reflect

24   _____

25   [3] Defendants contend that they told Oracle all along they would withhold these files.  That is
     incorrect.  They represented on multiple occasions, including to the Court, that they were
26   producing all responsive documents for all produced custodians, including documents responsive
     to the parties' agreed search terms (which these are).  Defendants never said they would withhold
27   entire categories of files, particularly ones that include some of the most responsive,
     incriminating documents in the case.

28

1  Oracle's view of the most basic, indisputable liability facts and legal issues related to Oracle's

2  copyright claims. Oracle designed the stipulations to reduce the length and complexity of trial,

3  focusing on the most important copyright registrations, the admitted copies of Oracle's software

4  on Defendants' systems and other basic elements of proof. The stipulations also involved

5  substantial compromise by Oracle on its core copyright claims. Thus, contrary to Defendants'

6  suggestion (below) that the approach proposed by Oracle would "never really focus the trial,"

7  Oracle's careful, detailed proposals would do precisely that, by eliminating the need for

8  redundant, time-consuming proof of myriad facts relevant to Oracle's copyright claims that

9  should not be contested. For the Court's reference, these stipulations are attached to this

10  statement as Exhibits A and B. A month after Oracle provided the proposed stipulations,

11  Defendants rejected them in their entirety without explaining if there were any specific aspects -

12  in the nearly 50 pages of proposals - to which Defendants would stipulate.

13  The parties continue to negotiate over proposals to streamline the trial. Oracle's latest

14  proposal, based on mutual concessions regarding both the claims at issue and the required proof,

15  would result in a trial of 5 weeks. Absent a successful conclusion to those discussions, as noted

16  above, the parties will need approximately 12 weeks to try the complex, multiple issues raised in

17  this action. The parties anticipate over 100 witnesses and have marked thousands of exhibits.

18  Defendants' conduct transpired for a period of over three years and involved one of the most

19  intrusive and voluminous copyright infringements ever. Their conduct violated numerous state

20  and federal laws and makes Defendants liable for at least ten claims. The Court's admonition

21  that the parties work to simplify the issues and shorten the trial was certainly proper, but it takes

22  both sides to make that happen. In Oracle's view, Defendants have, so for, fallen woefully short,

23  insisting at every turn that they intend to put Oracle to its full burden of proof – all despite the

24  obvious existence of many facts and elements of the claims that could and should readily be

25  stipulated. Defendants' proposed verdict form alone would run, when populated as contemplated

26  by Defendants, 171 pages.

27  Until two days ago, Defendants had made just two proposals related to possibly

28  streamlining the case. The first is to bifurcate (actually quadricate) the trial into four pieces.

Case No. 07-CV-01658 PJH (EDL)

JOINT PRETRIAL STATEMENT

1    That proposal would result in an even longer trial.  The usual advantage of bifurcation is that the

2    result of the first proceeding may eliminate any need for the second.  Here, given the summary

3    judgment concessions, the first three of the separate proceedings -- all but the punitive damages -

4    - would be required in any event.  Defendants' second "streamlining" idea is for Oracle

5    unilaterally to drop certain claims.  Defendants must recognize there is a quid pro quo for

6    dropping claims.  Oracle's proposed attached stipulations, which Defendants rejected out of hand

7    after a month, as well as other proposals Oracle has made more recently, involve mutual

8    concessions.

9         In addition to these proposals, Defendants also made a proposal two days ago to shorten

10   the trial in a variety of ways.  Although that proposal would unacceptably shift all blame to TN

11   and fundamentally change the substance of the trial, it contains elements that could form the

12   basis of a joint effort to streamline the case.  Oracle has provided a counterproposal to SAP's

13   new proposal that would accept many features of SAP's proposal, while retaining the ability for

14   the parties to contest the critical issue of SAP's contributory infringement at trial.  Oracle's

15   proposal, which involves mutual concessions, would substantially reduce liability issues and

16   shorten the trial to 5 weeks.

17        Against this backdrop, Oracle expects trial to focus on the following issues:

18        **Copyright:**  Oracle will prove that Defendants infringed Oracle's copyrights by illegally

19   copying, distributing and modifying Oracle's software and related support materials in violation

20   of the Copyright Act, 17 U.S.C. § 101, *et seq.*[4]  Defendants used these copies to convince

21   Oracle's current, former and prospective customers to purchase support for existing Oracle

22   products from SAP and then used support relationships with Oracle customers to convert them to

23   SAP software altogether.  Oracle will prove that TomorrowNow made copies of entire software

---

24   [4]      As Oracle explained to the Court in its motion to amend its Third Amended Complaint to
25   add additional copyright registrations (which the Court granted), Oracle has pled some
     registrations defensively due to discovery positions SAP has taken.  These defensively-pled
26   registrations do not affect the amount of Oracle's damages and, subject to SAP's agreement that
     the remaining copyrights cover the relevant software and support materials, Oracle does not
27   intend to pursue those registrations at trial.  Oracle has also offered to dismiss other registrations
     in an effort to streamline the trial and awaits SAP's response to that proposal.

28

1 programs and related support materials owned and registered by Oracle, and its predecessors-in-

2 interest PeopleSoft, J.D. Edwards and Siebel Systems, and that TomorrowNow is therefore liable

3 for copyright infringement.  *See, e.g.*, *Triad Sys. Corp. v. Southeastern Ex. Co.*, 64 F.3d 1330,

4 1335 (9th. Cir. 1995), *cert. denied,* 516 U.S. 1145 (1996) (protectable expression plainly copied

5 where accused infringer's "service activities involved copying entire programs"); *Stenograph*

6 *L.L.C. v. Bossard Assocs., Inc.*, 144 F.3d 96, 100, 102 (D.C. Cir. 1998) (in case of "wholesale

7 copying" of source code, plaintiff need not show which software elements were protectable).

8        Further, Oracle will prove that SAP AG and SAP America are vicariously and

9 contributorily liable for copyright infringement of all the copyrighted works at issues in the case.

10 *See, e.g., Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1170-74 (9th Cir. 2007)*; Ellison*

11 *v. Robertson*, 357 F.3d 1072, 1076 (9th Cir. 2004); *Gershwin Publ'g Corp. v. Columbia Artists*

12 *Mgmt., Inc*., 443 F.2d 1159, 1162 (2d Cir. 1971).  SAP AG and SAP America bought

13 TomorrowNow based on the SAP AG Executive Board's and key employees' full knowledge

14 that TomorrowNow's operating procedures created a "serious liability" that would "likely" result

15 in legal action by Oracle.  Both the Board and key employees knew about the specific infringing

16 activities and permitted them to continue for over three years when, by their own admission, they

17 could easily have ended the infringement on day one.  In fact, SAP has conceded that it had

18 control over TomorrowNow, and that it received direct financial benefit from TomorrowNow's

19 operations.  Thus, the focus at trial will be on the Board's knowing undertaking of, and its

20 conscious and willing acceptance of the risk of being found liable for, a plan to harm Oracle

21 through TomorrowNow's infringing business model, which SAP allowed to continue even long

22 after the litigation began.

23        **Computer Fraud and Trespass Claims:**  Oracle will prove that TomorrowNow

24 illegally accessed and downloaded millions of electronic support materials, including terabytes

25 of data, from Oracle's customer support websites in violation of the federal Computer Fraud and

26 Abuse Act ("CFAA") and California's Computer Data Access and Fraud Act ("CDAFA").  *See*

27 18 U.S.C. § 1030 (CFAA); Cal. Penal Code § 502 (CDAFA).  These illegal downloads also

28 constitute common law trespass to chattels.  *See, e.g., eBay, Inc. v. Bidder's Edge, Inc.*, 100 F.

1    Supp. 2d 1058, 1069-70 (N.D. Cal. 2000). Oracle will show that these violations were knowing

2    and intentional. They caused damage to Oracle, including through harm to Oracle's computer

3    systems and its data. TomorrowNow employees questioned the legality of this mass

4    downloading. They compared the effect to a denial of service attack on Oracle. TomorrowNow

5    management instructed them to continue or lose their jobs. Similar to the copyright claims,

6    Oracle will show that SAP AG and SAP America are liable for the computer fraud violations

7    based on their complete control of TomorrowNow, knowledge of the unlawful conduct, and the

8    benefits that they received as a result of that conduct.

9        **Interference:** Oracle will prove that SAP intentionally interfered with Oracle's

10   prospective economic advantage in connection with the specific TomorrowNow customers who

11   would not otherwise have left Oracle for SAP. *See, e.g.*, *Korea Supply Co. v. Lockheed Martin*

12   *Corp.*, 29 Cal. 4th 1134, 1164-66 (2003) (standard for intentional interference).[5] It was this set

13   of customers that the SAP Board targeted in its deliberate effort to harm Oracle by funding a

14   known illegal enterprise in TomorrowNow and expanding it globally. TomorrowNow supported

15   the vast majority of its customers by using information obtained by accessing Oracle's customer

16   support websites. This information included downloads illegally taken from Oracle's website in

17   violation of the computer fraud and trespass laws. This downloading was considered, and

18   advertised by TomorrowNow to its customers, as an "urgent step" in establishing the foundation

19   for future support of each customer. SAP AG and SAP America then used TomorrowNow to

20   convince customers to switch to SAP enterprise software.

21       **Other claims:** Oracle will also prove that Defendants breached Terms of Use on

22   Oracle's customer support websites to effectuate their plan of taking Oracle's customers, that

23   Defendants' conduct constituted unfair competition under California Business and Professions

24   Code § 17200, that Defendants were unjustly enriched by their illegal conduct at the expense of

25   Oracle, and that Defendants should be held to account for the money they received at Oracle's

26   _____

[5]       This interference will also be shown to have been negligent. *See, e.g. Avago*

27   *Technologies U.S., Inc. v. Venture Corp. Ltd.*, 2008 WL 5383367, *7-8 (N.D. Cal. 2008)
     (standard for negligent interference).

28

JOINT PRETRIAL STATEMENT

1   expense as a result of their illegal conduct. Oracle expects that certain of these claims and

2   requests for relief may be decided by the Court, although the Court may wish to obtain an

3   advisory verdict from the jury as to those claims and requests for relief.

4       **B.      Oracle's Statement of Relief Sought**

5           As compensation for the harm that SAP's copyright violations caused, Oracle seeks

6   actual damages in the amount of $2.15 billion as the fair market value of the licenses for the

7   infringed PeopleSoft, J.D. Edwards, Siebel and Oracle Database software and related support

8   materials. Oracle's expert witnesses, including its damages expert, Paul Meyer, have estimated

9   that the fair market value of licenses for the infringed software and related support materials,

10  negotiated at the time of the infringement, would have been approximately $2 billion for

11  PeopleSoft/J.D. Edwards, $100 million for Siebel and $56 million for Oracle Database. Oracle

12  anticipates that SAP will ask the Court or jury to award lost profits in lieu of Oracle's fair market

13  value licenses. Such an award alone would not provide adequate compensation for the

14  infringement and theft of Oracle's property and would reward SAP's calculated decision in 2005

15  to take the business risk of being found liable for infringement. In that instance, Oracle will also

16  seek SAP's infringers' profits, which Oracle's damages expert has estimated as being up to $288

17  million.

18          As compensation for the harm caused by SAP's computer fraud, Oracle will seek the

19  damages to its systems and in responding to the violations, as well as the lost business from the

20  computer fraud. Oracle's damages expert has estimated these damages as being up to $277.4

21  million.

22          As compensation for the harm caused by SAP's interference, Oracle will seek the lost

23  profits associated with the lost business relationships that SAP disrupted through its illegal

24  conduct. Oracle's damages expert estimated that Oracle's lost profits from these disrupted

25  relationships were up to $318.1 million.

26          As compensation for SAP's breach of contract, Oracle will seek the lost profits that

27  Oracle USA suffered from the customers it lost due to SAP's illegal conduct. Oracle's damages

28  expert has estimated that Oracle USA lost profits due to SAP's contractual breaches up to $156.4

1   million.

2       As compensation for SAP's unjust enrichment at the expense of Oracle, Oracle will seek

3   restitution from SAP in the amount of the development costs that SAP avoided and saved

4   through its illegal business model, rather than competing fairly. Oracle's damages expert has

5   estimated that the avoided costs SAP saved and that Oracle expended are up to $3.5 billion.[6]

6       In addition, Oracle seeks an award of attorneys' fees and costs and an injunction

7   permanently enjoining Defendants from continuing or resuming the unlawful conduct at issue in

8   the case. Oracle also intends to seek an award of punitive damages. Finally, Oracle will seek

9   appropriate pre-judgment interest on any damages awards as allowed by law.

10      **C.      Defendants' Brief Summary of Their Defenses**

11      Four Plaintiffs assert ten legal and equitable claims against three Defendants.[7] Plaintiffs'

12  ten claims resolve into three basic allegations: (1) TomorrowNow improperly copied Plaintiffs'

13  (or their predecessors') software; (2) TomorrowNow improperly accessed and downloaded from

14  Plaintiff's computers; and (3) SAP AG and SAP America are responsible for TomorrowNow's

15  alleged misconduct. Defendants have substantial defenses to all of these claims, briefly

16  described here.

17      The most important "defense" is that ***Plaintiffs Cannot Meet Their Burden Of Proof***.

18  This case has lasted years and has cost the parties tens of millions of dollars, or more, in great

19  part because Plaintiffs have insisted on pursuing infringement claims for 120 copyright

20  registrations (now 111 registrations, and the number yet may change). Yet, when Plaintiffs' lead

21  technical expert presented his report and was deposed, he was unable to establish that there had

22  been copying, much less more than *de minimis* copying, of software purportedly covered by

23

---

24  [6]     Oracle does not seek duplicative damages, but Oracle's damages for certain claims
        present overlapping amounts of harm, lost profits and/or restitutionary amounts. These amounts
25  are easily separable by Plaintiff and claim, as clarified by Oracle's damages expert, Dr. Paul
        Meyer, in Ex. 2017 to his deposition.
26  [7]     What follows is necessarily a brief summary of Defendants' defenses, supplemented by
        Defendants' Trial Brief filed concurrently, and is subject to the parties' ongoing meet and confer
27  and the Court's rulings to come on the pending motions for summary judgment, motions in
        limine filed concurrently, Daubert motions to be filed, and other pretrial issues.

28

1  dozens of the asserted registrations.  There cannot be a copyright infringement case without

2  proof of impermissible copying.

3       Similarly, Plaintiffs brought their pending motion for summary judgment as a so-called

4  "template" for how Plaintiffs would try this case.  That "template" relied on several registrations

5  for which no Plaintiff had the right to sue and focused on conduct that happened mostly before

6  SAP America bought TomorrowNow or at the margins of TomorrowNow's service.  If that is

7  Plaintiffs' template for trial, they will not prevail.

8       It is also notable that much of ***TomorrowNow's Conduct Was Proper Under Customer***

9  ***Licenses***.  Plaintiffs have publicly conceded that third party support can be conducted consistent

10  with the relevant customer licenses.  As explained in Defendants' opposition to Plaintiffs'

11  pending motion for summary judgment, many provisions in those customer licenses permit

12  specific conduct about which Plaintiffs complain.

13       Additionally, most of ***Plaintiffs' State Law Claims Are Preempted By The Copyright***

14  ***Act***.  While the Court denied that part of Defendants' Rule 12(b)(6) motion to dismiss raising

15  this issue, in so doing the Court specifically stated that the motion was denied except to the

16  extent that Plaintiffs' claims were preempted.  That extent is vast, as most of Plaintiffs' claims

17  focus on alleged misconduct exclusively covered by the Copyright Act.  In fact, Plaintiffs'

18  damages expert was unable to distinguish most of the state law damage claims and underlying

19  conduct from the alleged copyright damages.  And, if they are not preempted, Plaintiffs' claims

20  for unfair competition and intentional and negligent interference (as to Oracle EMEA) are barred

21  for lack of standing, and plaintiffs' claim for an "accounting" is moot in view of extensive

22  damages discovery and the fact that TomorrowNow's operations ceased long ago.  This is

23  primarily a copyright case, and it should be resolved under the Copyright Act.

24       Beyond preemption, many of ***Plaintiffs' Claims Are Barred By The Statutes Of***

25  ***Limitations, Laches or Waiver***.  Plaintiffs and their predecessors knew of TomorrowNow's

26  support activities for many years.  Plaintiffs' predecessors first sent letters to TomorrowNow

27  about its third party support in 2002, almost five years before this case was filed.  Plaintiffs

28  assisted TomorrowNow in some of the very downloading activities and "local environments"

11

Case No. 07-CV-01658 PJH (EDL)

JOINT PRETRIAL STATEMENT

1    about which they now complain.  Plaintiffs even provided additional advice and updates to

2    TomorrowNow after this case was filed.  Plaintiffs knew too much, for too long, for their claims

3    to entirely survive the various statutes of limitations and defenses of laches and waiver.

4         To the extent any claims survive past these hurdles, ***SAP AG And SAP America Are Not***

5    ***Secondarily Liable For TomorrowNow's Alleged Misconduct***.  The pending motion for

6    summary judgment illustrates the point well.  Plaintiffs could not prove that SAP AG or SAP

7    America knew anything about TomorrowNow's alleged misconduct, much less induced or

8    encouraged TomorrowNow to commit acts of copyright infringement or the other alleged torts.

9    To the contrary, as to the one alleged copyright infringement about which SAP AG and SAP

10   America did know in part (that TomorrowNow had some customer software on its computers to

11   expedite customer service), SAP specifically directed the conduct to stop.  Plaintiffs cannot

12   properly hold SAP AG and SAP America secondarily liable for conduct of which they were

13   unaware or they ordered be stopped.

14        Finally, ***There Is No Basis To Lengthen The Trial.***  Plaintiffs contend that the trial

15   should be lengthened to 12 weeks because of the complexity of the issues and complaints about

16   pretrial meet and confer and untimely production of a small volume of documents.  None of

17   these points have merit or justify such an extreme burden on the Court and the jury.

18        To start with, when this trial was scheduled for six weeks, there were at least as many

19   facts in dispute, more copyright registrations at issue and, depending on summary judgment,

20   more parties, claims and damages theories in play.  Nothing has changed since then that would

21   justify increasing the length of trial.  In fact, and as explained in Defendants' Trial Brief, trial can

22   and should be shortened.

23        And, Plaintiffs' complaints notwithstanding, the parties have actually worked hard to

24   focus this case for trial.  The problem is that the parties have taken radically different approaches

25   to that challenging problem.  Plaintiffs have proposed that Defendants agree to hundreds of

26   alleged facts (on which Plaintiffs also insist they have the right to put in evidence at trial even if

27   the facts are stipulated).  Many of those facts were stipulated through the meet and confer

28   process (leaving aside those that were simply argumentative assertions from Plaintiffs' trial

1    brief), but given the mass of information at issue in this case, that approach would never really

2    focus the trial.  By contrast, Defendants have made proposals that would logically organize the

3    trial (bifurcation) or eliminate issues that need not be tried (dropping claims seeking duplicative

4    damages).  These approaches, and others discussed in Defendants' Trial Brief, will lead to a trial

5    that is shorter, more efficient, and more likely to lead to a fair and timely resolution of this case.[8]

6         Finally, Plaintiffs' claim that discovery issues should lead to a lengthened (or delayed)

7    trial should be rejected outright.  Over three and one half years Defendants have produced

8    staggering volumes of information (over 10 million numbered pages of documents and multiple

9    terabytes of data).  Several months ago Defendants produced some additional materials,

10   including files containing "IMs" (instant messages), representing a tiny fraction of the overall

11   production in this case.  These files were preserved but not previously produced because they

12   were included in "file types" that Defendants had made clear for years they were not searching.

13   Compared to the volumes of data Defendants have already produced, this marginal, albeit later,

14   production, made months ago, is cumulative of previous productions and has no impact on the

15   length of trial.  The additional production proves mostly that there comes a point when turning

16   over more stones only reveals more of the same.  (Plaintiffs excitement over these "IMs" also

17   begs an important question – where are Oracle's IMs?  None were produced.)

18        **D.    Defendants' Response to Oracle's Statement of Relief Sought.**

19        SAP purchased TomorrowNow for $10 million.  It never made a profit.  Before filing

20   suit, Plaintiffs publicly dismissed TomorrowNow's impact on their business, and never disclosed

21   any material impairment or loss attributable to TomorrowNow.  Now, Plaintiffs seek billions.

22        For the reasons set forth in Defendants' pending motion for summary judgment, Plaintiffs

23   multi-billion dollar claim for "saved acquisition costs" is legally impermissible and should be

24   _____

25   [8]     Plaintiffs propose above that trial be shortened by one week, to five weeks.  They would
     accomplish this by essentially by eliminating all defenses to liability.  Reading Plaintiffs' own
26   description of how they would prove their claims, or recalling the complexity of their effort to
     obtain summary judgment on only 6 of 120 registrations, demonstrates that Plaintiffs' proposal is
27   not intended as a compromise.  No one could credibly contend that eliminating most or all
     liability issues from this case would shorten its length by only 1/6.

28

1    struck from the case.  Plaintiffs' other multi-billion dollar damage claim, for a so-called "fair

2    market value license," survived summary judgment on a threshold issue (whether proof of

3    causation was required), but was not "rubber-stamped" by the Court, which expressly cautioned

4    that any such damages would have to be reasonable and not speculative.  There is, of course, no

5    precedent for the license Plaintiffs seek here.  For many reasons, it is both unreasonable and

6    wildly speculative to assert that any "willing buyer" would have agreed to pay billions to run

7    TomorrowNow.  Plaintiffs' license claim should not survive.

8           What is left is Plaintiffs' claim for alleged lost maintenance profits and disgorgement of

9    SAP's alleged license sales profits to which TomorrowNow supposedly contributed.  These

10   claims are also grossly exaggerated.  Plaintiffs seek hundreds of millions of dollars for lost

11   profits, but Plaintiffs cannot prove the required causation of damages, that but for

12   TomorrowNow's conduct these profits would not have been lost.  This is because Plaintiffs' own

13   extensive internal records, and customer testimony, confirm that because of Plaintiffs' poor and

14   expensive maintenance service, most customers that came to TomorrowNow were going to leave

15   Plaintiffs' maintenance service anyway, if not for TomorrowNow then for someone else or for

16   "self support" (no vendor-provided maintenance service at all).  Similarly, the evidence is

17   abundant that no SAP customers chose SAP software because of TomorrowNow support; the

18   important decision to pick a business software platform was never driven by the chance of saving

19   a few dollars on interim maintenance and support.

20          Plaintiffs' claim for punitive damages should not get substantial attention.  As Oracle's

21   own Mr. Ellison confirmed at his deposition, competition for customers is "the American Way."

22   This case is a business dispute about the proper boundaries of third party support, against the

23   backdrop of licenses that permit much of TomorrowNow's conduct and Plaintiffs' own statement

24   that third party support can be legal.  This is not a case where punitive damages are appropriate.

25   **II.     STATEMENT OF ALL RELEVANT UNDISPUTED FACTS**

26          The following facts are undisputed, and the Parties will stipulate to them for

27   incorporation into the trial record without the necessity of support testimony or exhibits, subject

28   to the Court's ruling on pending motions for summary judgment, motions in limine, anticipated

14

*Daubert* motions and other pretrial issues:

      1.      OIC is a California corporation duly authorized to do business in the State of California, with its principal place of business in Redwood City, California.

      2.      OIC owns and licenses certain Oracle intellectual property including copyrighted enterprise application and Database software programs.

      3.      OIC is the owner or exclusive licensee of certain copyrights in suit, except for carve-outs in the EMEA (Europe, the Middle East and Africa) region.

      4.      As part of Oracle's acquisition of PeopleSoft, Inc., ownership of certain PeopleSoft and J.D. Edwards copyrights and other intellectual property (with carve-outs related to J.D. Edwards) was transferred to OIC on March 1, 2005.

      5.      OIC is the owner of certain PeopleSoft and J.D. Edwards intellectual property developed after March 1, 2005.

      6.      Siebel Systems, Inc. provided OIC with an exclusive license to its copyrights and other intellectual property, including rights to enforce intellectual property rights, effective March 1, 2006.

      7.      OIC is also the owner of all Siebel intellectual property developed after March 1, 2006.

      8.      OIC's claims include copyright infringement, violations of the Computer Fraud and Abuse Act, violations of the Computer Data Access and Fraud Act, intentional and negligent interference with prospective economic advantage, unfair competition, unjust enrichment, and an accounting.

      9.      Oracle USA is a Colorado corporation duly authorized to do business in the State of California, with its principal place of business in Redwood City, California.

      10.      Oracle USA develops and licenses certain intellectual property, including the copyrighted enterprise software programs owned and licensed by OIC, and provides related services.

1      11.     Oracle USA is the successor in interest to certain PeopleSoft, J.D. Edwards, and

2  Siebel entities.[9]

3      12.     Oracle USA's claims include violations of the Computer Fraud and Abuse Act,

4  violations of the Computer Data Access and Fraud Act, breach of contract, intentional and

5  negligent interference with prospective economic advantage, unfair competition, trespass to

6  chattels, unjust enrichment, and an accounting.

7      13.     OEMEA is an Irish private limited company with its principal place of business in

8  Dublin, Ireland.

9      14.     Directly and through its subsidiaries, OEMEA licenses certain intellectual

10  property, including the copyrighted enterprise applications software programs used around the

11  world and owned and licensed by OIC.

12      15.     OEMEA is a successor in interest to certain PeopleSoft and J.D. Edwards entities.

13      16.     OEMEA's claims include intentional and negligent interference with prospective

14  economic advantage, unfair competition, unjust enrichment, and an accounting.

15      17.     SSI is a Delaware corporation duly authorized to do business in the State of

16  California, with its principal place of business in Redwood City, California.

17      18.     SSI developed, owned, and licensed certain intellectual property, including

18  copyrighted enterprise software programs.

19      19.     SSI is the owner of Siebel intellectual property developed prior to March 1, 2006.

20      20.     SSI's claims include unfair competition, unjust enrichment, and an accounting.

21      21.     The software products at issue here are from the PeopleSoft, J.D. Edwards, Siebel

22  and Oracle Database software product families.

23      22.     As is typical in the enterprise software industry, Oracle does not sell ownership

24  rights to this software or the related support products Oracle provides to its paying customers.

25      23.     Instead, Oracle's customers purchase licenses that grant them limited rights to use

26

27  [9]     On February 15, 2010, Oracle USA, Inc. merged into Sun Microsystems, Inc., which was concurrently renamed Oracle America, Inc.

28

1    specific Oracle software programs.

2        24.    Separate from the license to the underlying software, Oracle also charges an

3    annual maintenance fee that entitles customers to receive support for the software, including

4    fixes, patches and updates typically made available for download from Oracle's password-

5    protected websites.

6        25.    Oracle offers licensed customers with active support contracts the option to access

7    and download updates and support materials from Oracle's customer support websites.

8        26.    The primary customer support websites accessed by TN were named Customer

9    Connection (including through the Change Assistant tool) and SupportWeb (together the "Oracle

10   Websites").

11       27.    The computer systems associated with the operation of the Oracle Websites

12   generally resided in California, Colorado and Utah and were used in interstate commerce and

13   communication.

14       28.    Customers across the United States and around the world regularly accessed and

15   downloaded licensed materials from Oracle's Websites.

16       29.    Oracle's computer systems accessed by SAP TN to download to its own

17   computers were protected computers within the meaning of 18 U.S.C. § 1030(e)(2).

18       30.    To access certain portions of the Oracle Websites, Oracle provides a unique

19   username and password ("login credentials") to licensed customers with active support contracts.

20       31.    SAP AG is a German corporation with its principal place of business in Walldorf,

21   Germany.

22       32.    SAP AG sells enterprise software applications programs that compete with

23   Oracle's programs.

24       33.    SAP America, Inc. is a Delaware corporation with its principal place of business

25   in Newtown Square, Pennsylvania.

26       34.    SAP America is a wholly-owned subsidiary of SAP AG.

27       35.    TN is a Texas corporation with its principal place of business in Bryan, Texas.

28       36.    TN became a wholly-owned subsidiary of SAP America and an indirect wholly-

1   owned subsidiary of SAP AG on January 19, 2005.

2       37.     As of January 19, 2005, SAP AG and SAP America (together "SAP") became the

3   parent companies of TN.

4       38.     TN supported PeopleSoft and J.D. Edwards products when acquired by SAP.

5       39.     TN expanded its service offerings to the Siebel line of products.

6       40.     As the parent corporation, SAP had ultimate control over TN.

7       41.     Two months after acquiring TN, SAP AG Board member Leo Apotheker told

8   SAP America president Bill McDermott to "inflict some pain on oracle" by "clos[ing] a few TN

9   deals at extraordinary conditions."

10      42.     The following is a list of Oracle copyright registrations issued by the Copyright

11  Office, including the Title of the Work, the Date that the Registration issued, and the Copyright

12  Registration Number (the "Registered Works"):

| Row | Title of Work | Date of Registration | Registration Number |
|---|---|---|---|
| 1 | Oracle Relational Database Management System (RDBMS): Release 8.0.4 | November 21, 2001 | TX 5-392-842 |
| 2 | Oracle Relational Database Management System (RDBMS), Release 8.0.5 | November 21, 2001 | TX 5-392-861 |
| 3 | Oracle 8i Enterprise Edition, release 2 (8.1.6) | February 2, 2001 | TX 5-222-106 |
| 4 | Oracle9i Database Enterprise : Edition Release 1 | June 13, 2003 | TX 5-673-281 |
| 5 | Oracle9i Database Enterprise : Edition Release 2 | June 13, 2003 | TX 5-673-282 |
| 6 | Oracle Database 10g: Release 1 | January 16, 2009 | TX 6-938-648 |
| 7 | Oracle Database 10g: Release 2 | June 29, 2009 | TX 6-942-003 |
| 8 | PeopleTools 7.5 | November 20, 1998 | TX 4-792-578 |
| 9 | PeopleSoft 7.0 financials, distribution & manufacturing 7.0 | December 15, 1998 | TX 4-792-576 |
| 10 | PeopleSoft HRMS 7.0 | December 15, 1998 | TX 4-792-577 |
| 11 | PeopleSoft HRMS 7.5 | December 15, 1998 | TX 4-792-575 |
| 12 | PeopleSoft Financials, Distribution & Manufacturing 7.5 | December 15, 1998 | TX 4-792-574 |
| 13 | PeopleTools 8.0 | September 5, 2000 | TX 5-266-222 |
| 14 | PeopleSoft Financials and Supply Chain Management (FIN/SCM) 8.0 | November 20, 2000 | TX 5-291-439 |
| 15 | PeopleSoft HRMS 8.0 | November 20, 2000 | TX 5-291-440 |

Case No. 07-CV-01658 PJH (EDL)

JOINT PRETRIAL STATEMENT

| Row | Title of Work | Date of Registration | Registration Number |
|---|---|---|---|
| 16 | PeopleTools 8.10 | September 5, 2000 | TX 5-266-221 |
| 17 | PeopleSoft 8 HRMS SP1 | March 26, 2001 | TX 5-501-312 |
| 18 | PeopleSoft 8 FIN/SCM SP1 | March 26, 2001 | TX 5-501-313 |
| 19 | PeopleSoft 8 EPM SP3 | March 30, 2001 | TX 5-345-698 |
| 20 | PeopleSoft 8 Customer Relationship Management | September 27, 2001 | TX 5-456-777 |
| 21 | PeopleSoft 8 Financials and Supply Chain Management: Service Pack 2 | September 27, 2001 | TX 5-456-780 |
| 22 | PeopleSoft 8 Student Administration Solutions | November 30, 2001 | TX 5-431-289 |
| 23 | PeopleSoft 8.3 HRMS | February 1, 2002 | TX 5-469-032 |
| 24 | PeopleSoft 8.3 Enterprise Performance Management | March 11, 2002 | TX 5-485-839 |
| 25 | PeopleSoft 8.1 Customer Relationship Management | March 20, 2002 | TX 5-493-450 |
| 26 | PeopleTools 8.4 | August 5, 2002 | TX 5-586-248 |
| 27 | PeopleSoft 8.4 Financials and Supply Chain Management | August 5, 2002 | TX 5-586-247 |
| 28 | PeopleSoft 8.8 Enterprise Performance Management | June 11, 2004 | TX 5-993-616 |
| 29 | PeopleSoft 8.8 HRMS | June 11, 2004 | TX 6-093-947 |
| 30 | PeopleSoft 8.8 Customer Relationship Management | June 11, 2004 | TX 6-015-317 |
| 31 | PeopleSoft Payroll 7 | June 22, 1999 | TX 4-501-140 |
| 32 | PeopleSoft Payroll Interface 7 | June 22, 1999 | TX 4-501-138 |
| 33 | PeopleSoft Pension Administration 7 | June 21, 1999 | TX 3-772-290 |
| 34 | PeopleSoft Time and Labor 7.0 | June 28, 1999 | TX 4-994-866 |
| 35 | PeopleSoft Benefits Administration 7.0 | June 15, 1999 | TX 4-258-824 |
| 36 | PeopleSoft Human Resources 7 | June 28, 1999 | TX 4-994-865 |
| 37 | PeopleSoft Payroll Interface 7 Higher Education | June 28, 1999 | TX 5-013-124 |
| 38 | PeopleSoft Time and Labor 7 | June 28, 1999 | TX 5-013-128 |
| 39 | PeopleSoft Benefits Administration 7.50 | June 14, 1999 | TX 5-072-090 |
| 40 | PeopleSoft Human Resources 7.50 | June 28, 1999 | TX 5-013-123 |
| 41 | PeopleSoft Payroll 7.50 | June 28, 1999 | TX 5-013-125 |
| 42 | PeopleSoft Payroll Interface 7.50 | June 21, 1999 | TX 3-772-292 |
| 43 | PeopleSoft Pension Administration 7.50 | June 21, 1999 | TX 3-772-291 |
| 44 | PeopleSoft Time and Labor 7.50 | June 28, 1999 | TX 4-994-867 |
| 45 | PeopleSoft Application Update Installation Instructions (UPD595817) | May 2, 2008 | TX 6-838-544 |
| 46 | PeopleSoft Payroll 1200457000 - User Documentation | May 2, 2008 | TX 6-838-537 |
| 47 | PeopleSoft 8.01 & 8.31 Payroll Tax Update 05-F Year-End Processing: Canada | May 2, 2008 | TX 6-838-549 |
| 48 | EAP WTHD06:  1099 IRS changes for the year 2006 | April 26, 2007 | TX 6-541-023 |

Case No. 07-CV-01658 PJH (EDL)

JOINT PRETRIAL STATEMENT

| Row | Title of Work | Date of Registration | Registration Number |
|---|---|---|---|
| 49 | ECRM89:  Common Errors on Mobile Sales | April 26, 2007 | TX 6-541-020 |
| 50 | GM--Grants issues resolved by FMS ESA 8.9 Bundle #10-653723 (Oct 06) | April 26, 2007 | TX 6-541-021 |
| 51 | PeopleTools Third Party Daylight Saving Time Required Modifications | April 26, 2007 | TX 6-541-019 |
| 52 | PeopleTools Third Party Daylight Saving Time Required Modifications (Revised) | April 26, 2007 | TX 6-541-018 |
| 53 | Database of Documentary Customer Support Materials for PeopleSoft Software | July 1, 2009 | TXu1-607-454 |
| 54 | Initial release of JD Edwards World A7.3 | April 26, 2007 | TX 6-541-029 |
| 55 | Initial release of JD Edwards World A8.1 | April 26, 2007 | TX 6-541-047 |
| 56 | Initial release of JD Edwards World A9.1 | April 26, 2007 | TX 6-541-030 |
| 57 | Accounts Payable program | March 7, 1995 | TXu 619-320 |
| 58 | Accounts Receivable program | March 7, 1995 | TXu 619-312 |
| 59 | Capacity Requirements Planning program | March 7, 1995 | TXu 619-307 |
| 60 | Configuration Management program | March 7, 1995 | TXu 619-305 |
| 61 | EDI Interface (6) program | March 7, 1995 | TXu 619-304 |
| 62 | Enterprise Facility Planning program | March 7, 1995 | TXu 619-311 |
| 63 | Equipment Management (5) program | March 7, 1995 | TXu 619-309 |
| 64 | Financial Modeling, Budgeting & Allocations program | March 7, 1995 | TXu 619-321 |
| 65 | Financial Reporting (FASTR) program | March 7, 1995 | TXu 619-318 |
| 66 | General Ledger & Basic Financial program | March 7, 1995 | TXu 619-310 |
| 67 | Inventory Management program | March 7, 1995 | TXu 619-314 |
| 68 | Master Production Scheduling program | March 7, 1995 | TXu 619-306 |
| 69 | Product Data Management program | March 7, 1995 | TXu 619-317 |
| 70 | Purchase Order Processing program | March 7, 1995 | TXu 619-316 |
| 71 | Sales Order Processing/Sales Analysis program | March 7, 1995 | TXu 619-315 |
| 72 | Shop Floor Control program | March 7, 1995 | TXu 619-303 |
| 73 | Warehouse Management program | March 7, 1995 | TXu 619-313 |
| 74 | WorldCASE Development Environment program | March 7, 1995 | TXu 619-308 |
| 75 | WorldCASE Foundation Environment (3) program | March 7, 1995 | TXu 619-319 |
| 76 | Cumulative Update 6 for JD Edwards World A8.1 | May 1, 2007 | TX 6-545-421 |
| 77 | Cumulative Update 16 for JD Edwards World A7.3 | April 26, 2007 | TX 6-541-031 |
| 78 | Code Change for JD Edwards World A7.3 | April 26, 2007 | TX 6-541-043 |

Case No. 07-CV-01658 PJH (EDL)

JOINT PRETRIAL STATEMENT

| Row | Title of Work | Date of Registration | Registration Number |
|-----|---------------|----------------------|---------------------|
| 79 | Code Change for JD Edwards World A8.1 | April 26, 2007 | TX 6-541-044 |
| 80 | JD Edwards World -- 1099 Changes for Tax Year 2006 | April 26, 2007 | TX 6-541-026 |
| 81 | Changes to Daylight Savings Time for 2007 (DST) | April 26, 2007 | TX 6-541-025 |
| 82 | Initial release of JD Edwards EnterpriseOne XE | April 26, 2007 | TX 6-541-033 |
| 83 | Initial release of JD Edwards EnterpriseOne 8.0 | April 26, 2007 | TX 6-541-050 |
| 84 | Initial release of JD Edwards EnterpriseOne 8.9 | April 26, 2007 | TX 6-541-049 |
| 85 | Initial release of JD Edwards EnterpriseOne 8.10 | April 26, 2007 | TX 6-541-038 |
| 86 | Initial release of JD Edwards EnterpriseOne 8.11 | April 26, 2007 | TX 6-541-028 |
| 87 | Initial release of JD Edwards EnterpriseOne 8.11 SP1 | April 26, 2007 | TX 6-541-040 |
| 88 | Initial release of JD Edwards EnterpriseOne 8.12 | April 26, 2007 | TX 6-541-041 |
| 89 | Cumulative Update 8 for JD Edwards EnterpriseOne Xe | April 26, 2007 | TX 6-541-048 |
| 90 | Cumulative Update 1 for JD Edwards EnterpriseOne 8.0 | April 26, 2007 | TX 6-541-034 |
| 91 | Cumulative Update 2 for JD Edwards EnterpriseOne 8.10 | April 26, 2007 | TX 6-541-032 |
| 92 | Cumulative Update 1 for JD Edwards EnterpriseOne 8.11 SP1 | April 26, 2007 | TX 6-541-039 |
| 93 | Cumulative Update 1 for JD Edwards EnterpriseOne 8.12 | April 26, 2007 | TX 6-541-042 |
| 94 | ESU for JD Edwards EnterpriseOne Xe | May 3, 2007 | TX 6-541-051 |
| 95 | ESU for JD Edwards EnterpriseOne 8.0 | April 26, 2007 | TX 6-541-046 |
| 96 | ESU for JD Edwards EnterpriseOne 8.9 | April 26, 2007 | TX 6-541-036 |
| 97 | ESU for JD Edwards EnterpriseOne 8.10 | April 26, 2007 | TX 6-541-037 |
| 98 | ESU for JD Edwards EnterpriseOne 8.11 | April 26, 2007 | TX 6-541-035 |
| 99 | ESU for JD Edwards EnterpriseOne 8.11 SP1 | April 26, 2007 | TX 6-541-027 |
| 100 | ESU for JD Edwards EnterpriseOne 8.12 | April 26, 2007 | TX 6-541-045 |
| 101 | E1:  1099:  Year 2006 1099 ESUs | April 26, 2007 | TX 6-541-024 |
| 102 | E1:  07/77:  Quantum for Payroll Tax v.280 | April 26, 2007 | TX 6-541-022 |
| 103 | Database of Documentary Customer Support Materials for J.D. Edwards Software | July 1, 2009 | TXu1-607-455 |
| 104 | Siebel 6.3 Initial Release and Documentation | June 29, 2009 | TX 6-941-989 |

Case No. 07-CV-01658 PJH (EDL)

JOINT PRETRIAL STATEMENT

| Row | Title of Work | Date of Registration | Registration Number |
|-----|---------------|----------------------|---------------------|
| 105 | Siebel 7.0.5 Initial Release and Documentation | June 29, 2009 | TX 6-941-988 |
| 106 | Siebel 7.5.2 Initial Release and Documentation | June 29, 2009 | TX 6-941-990 |
| 107 | Siebel 7.7.1 Initial Release and Documentation | June 29, 2009 | TX 6-941-993 |
| 108 | Siebel 7.8 Initial Release and Documentation | June 29, 2009 | TX 6-941-995 |
| 109 | Siebel 8.0 Initial Release and Documentation | June 29, 2009 | TX 6-942-000 |
| 110 | Siebel 8.1.1 Initial Release and Documentation | June 29, 2009 | TX 6-942-001 |
| 111 | Database of Documentary Customer Support Materials for Siebel Software | July 1, 2009 | TXu1-607-453 |

**Table 1: Registered Works in Suit**

43.     For the registrations described in rows 1-53, 56-81, 83-103, and 107-111 of Table 1, the effective date of the registration is before or within five years after first publication of the Registered Work.

44.     For the registrations described in rows 1-5, 8-44, and 57-75 of Table 1, the effective date of the registration predates the first alleged infringement of those registrations by any Defendant.

45.     For the registrations described in rows 14-16, 20-22, 24-25, 52, 56 and 91 of Table 1, the work is registered as published and the effective date of the registration was within three months of first publication of the work.

46.     Since March 1, 2002, OIC has held all exclusive rights under the Copyright Act for each registration described in rows 1-4 of Table 1.

47.     Since March 1, 2006, OIC has held all exclusive rights under the Copyright Act for each registration described in rows 104-108 of Table 1, save for the rights to reproduce, create derivative works, and distribute the registered software in Europe, the Middle East and Africa.

48.     TN copied J.D. Edwards World version A7.3 by installing the software onto TN's systems in Bryan, Texas.

JOINT PRETRIAL STATEMENT

1  49.  TN copied J.D. Edwards EnterpriseOne version XE by installing the software

2  onto TN's systems in Bryan, Texas.

3  50.  TN installed J.D. Edwards World version A7.3 and J.D. Edwards EnterpriseOne

4  version XE local environments using software obtained from TN's first two J.D. Edwards

5  customers.

6  51.  TN copied portions of PeopleSoft Customer Relationship Management (CRM)

7  8.0-8.9, Enterprise Performance Management (EPM) 8.8 SP1-8.9, Financials and Supply-Chain

8  Management (FSCM; also Financials, Distribution and Manufacturing (FDM)) 7.5-8.9,

9  PeopleSoft Human Resources Management Software (HRMS) 7.0-8.9, and Student

10  Administration (SA, also Campus Solutions and HRMS for Higher Education) 7.0-8.0 SP1 by

11  installing the software onto TN's systems in Bryan, Texas.

12  52.  TN copied the PS_HOME component, database component, or both components

13  of PeopleSoft CRM, EPM, FSCM, HRMS, SA and PeopleTools software thousands of times by

14  backing up, "cloning" and restoring components of existing environments.

15  53.  TN copied some portions of PeopleSoft CRM, EPM, FSCM, HRMS, SA and

16  PeopleTools software by placing electronic copies of some of the installation software into "CD

17  Client Jukebox" folders on TN's servers.

18  54.  TN copied some portions of Siebel software by placing electronic copies of some

19  of the installation software into "CD Client Jukebox" folders on TN's servers.

20  55.  TN copied some components of some versions of PeopleSoft CRM, EPM, FSCM,

21  HRMS, SA, and PeopleTools software by burning them onto CDs.

22  56.  TN retained many of these CDs in CD binders.

23  57.  TN directed that some of its customers apply modifications distributed by TN to

24  the environments located on the customers' servers.  TN applied to local environments on TN's

25  servers copies of the same modification to which it directed its customers.

26  58.  TN distributed copies of some of the PeopleSoft local environments and

27  environment backups that are or were located on TN's systems to TN's customers.

28  59.  TN created local environments using Oracle installation software received from or

23

Case No. 07-CV-01658 PJH (EDL)

1   through Oracle's customers.

2   60.   In some instances, TN used local environments to support multiple customers.

3   61.   TN used some local environments to develop and test fixes it sent to multiple

4   customers in some instances.

5   62.   Defendants cannot identify the customer whose software was used to create at

6   least 95 different local environments.

7   63.   TN copied the Oracle Database software program versions 8.1.6, 9.2 and 10.2 by

8   downloading the installation software for Oracle Database 8.1.7, 9.2 and 10.2 onto TN's systems

9   in Bryan, Texas.

10   64.   TN copied the Oracle Database software program versions 8.1.6, 9.2 and 10.2 by

11   installing the software for Oracle Database 8.1.7, 9.2 and 10.2 onto TN's systems in Bryan,

12   Texas.

13   65.   TN made further copies of certain of the Oracle Database software programs by

14   copying both the installation software and the installations of the Oracle Database software from

15   one TN system to another TN system.

16   66.   TN did not install or run Oracle Database software on any single processor

17   servers.

18   67.   TN copied PeopleSoft and Siebel database components by backing up the

19   contents of database instances containing PeopleSoft or Siebel database components and

20   restoring the contents of those instances.

21   68.   TN copied millions of updates and support materials for J.D. Edwards World, J.D.

22   Edwards EnterpriseOne, PeopleSoft and Siebel by downloading them from the Oracle Websites

23   onto TN's computers.  It then further copied certain portions of those materials between TN's

24   servers.

25   69.   Over the course of its use, Titan incremented through the URL addresses for

26   millions of support materials available on the Oracle Websites and copied all requested items to

27   TN's computer systems.

28   70.   TN counted approximately 5 million Oracle support files on its systems in 2008.

Case No. 07-CV-01658 PJH (EDL)

71.     At least hundreds of thousands of these files contain portions of Oracle's updates and support materials.

72.     TN made additional copies of downloaded updates and support materials for PeopleSoft software when TN applied the updates and support materials to PeopleSoft environments on TN's servers.

73.     TN made additional copies of certain updates and support materials for J.D. Edwards World, J.D Edwards EnterpriseOne, and PeopleSoft by burning them onto CDs.

74.     Some of these CDs were retained by TN in CD binders; others were distributed to some of TN's current and former customers.

75.     Certain updates and support materials for J.D. Edwards World and J.D. Edwards EnterpriseOne were stored in a generic master folder until 2006, when they were copied into customer-labeled folders.

76.     Some updates and support materials for PeopleSoft were stored in a generic master folder.

77.     Some updates and support materials were stored in folders labeled with the names of prospects who never became TN customers, or with the names of entities that were no longer TN customers.

78.     In 2006, the J.D. Edwards World and J.D. Edwards EnterpriseOne updates and support materials kept in a prospect's folder were copied into several other customer-labeled folders.

79.     TN modified some of the downloaded Oracle fixes and updates to be applied to J.D. Edwards World, J.D. Edwards EnterpriseOne and PeopleSoft enterprise software, made subsequent copies of the modified Oracle fixes and updates, and distributed the modified Oracle fixes and updates to some of TN's customers.

80.     TN used information downloaded from the Oracle Websites to help support customers in competition with Oracle.

81.     TN considered downloading updates and support materials from Oracle's websites an "urgent step" in the initial process for bringing on a customer for TN support, called

1    "on-boarding."

2    82.    TN developed software tools to automate the downloading of Oracle updates and

3    support materials from the Oracle Websites.

4    83.    These software tools, including Titan, would automatically transmit requests from

5    TN's computer systems.

6    84.    Titan would increment through the URL addresses for thousands of support

7    materials available on the Oracle Websites and copy requested items to TN's computer systems.

8    85.    TN also performed some downloading using customer login credentials to

9    complete on-boarding for particular customers that no longer had a valid support contract with

10   Oracle.

11   86.    TN also tested Titan using login credentials from a customer that no longer had a

12   valid support contract with Oracle.

13   87.    One TN employee informed management that he had legal concerns regarding

14   TN's downloading activity.

15   88.    He had concerns about whether the downloading activity could violate Oracle's

16   Terms of Use.

17   89.    This former TN employee says he was instructed to continue.

18   90.    The former TN employee also says he was instructed not to put any concerns that

19   he had about downloading into writing.

20   91.    In their Answer, Defendants first admitted that some of their downloads were

21   "inappropriate."

22   92.    Oracle sells software licenses and support contracts for PeopleSoft, J.D. Edwards

23   World, J.D. Edwards EnterpriseOne, Oracle Database and Siebel enterprise software.

24   93.    TN contracted with a total of 358 customers to provide support for PeopleSoft,

25   J.D. Edwards World, J.D. Edwards EnterpriseOne and/or Siebel enterprise software between

26   2002 and 2008.

27   94.    Each of TN's customers licensed PeopleSoft, J.D. Edwards World, J.D. Edwards

28   EnterpriseOne and/or Siebel enterprise software from Oracle or from Oracle's predecessors.

95.     Defendants were aware that each of TN's customers was a current or former customer of Oracle and/or its predecessors.

96.     TN competed for support contracts for PeopleSoft, J.D. Edwards World, J.D. Edwards EnterpriseOne and/or Siebel enterprise software directly with Oracle.

97.     Starting prior to July 2003 and continuing thereafter, TN downloaded, installed, copied and accessed versions of Oracle's Database software to provide TN maintenance services through the wind-down of TN's business in October 2008.

98.     TN installed and ran Oracle Database software on certain servers with multiple processors.

99.     Plaintiffs and Defendants SAP America and SAP AG are competitors in the market for development and sale of Enterprise Resource Planning ("ERP") software and related services and support.

100.     In June 2003, Plaintiffs initiated an unsolicited tender offer for PeopleSoft.

101.     The acquisition of PeopleSoft by Oracle caused fear, uncertainty and doubt ("FUD") among some PeopleSoft and JDE customers over the future of PeopleSoft and JDE products and support.

102.     Plaintiffs acquired PeopleSoft on January 7, 2005.

103.     During Oracle's approximately 18 month attempt to acquire PeopleSoft, SAP saw a competitive opportunity to win PeopleSoft and JDE customers.  SAP initiated a marketing program called Safe Harbor intended to take advantage of that competitive opportunity.

104.     On January 19, 2005, SAP America acquired TN for approximately $10 million.

105.     TN had been in the business of providing third party support services for PeopleSoft products since early 2002, and JDE products since early January 2005.

106.     TN had approximately 50 customers at the time of the acquisition.

107.     Also on January 19, 2005, SAP announced Safe Passage, a successor marketing program to Safe Harbor.

108.     SAP's Safe Passage campaign had several components.  These included a license credit of up to 75% on a customer's previous license, to be applied against the price of a new

JOINT PRETRIAL STATEMENT

1    SAP license.

2         109.    One component of SAP's Safe Passage program was the offer of support for

3    PeopleSoft and JDE products at approximately 50% of the fee previously paid to Oracle or

4    PeopleSoft for support, with the support services to be provided by TN.

5         110.    The TN support offering was an optional part of the Safe Passage program;

6    customers could purchase SAP products without purchasing support from TN, purchase TN

7    support without purchasing products from SAP, or continue to purchase products from SAP or

8    support from TN without participating in the Safe Passage program at all.

9         111.    In January 2006, Oracle acquired Siebel Systems, Inc. ("Siebel").

10        112.    TN began providing support to Siebel customers in September 2006.

11        113.    Beginning in approximately 2004, PeopleSoft, Inc. began tracking customers it

12   considered to be at risk of cancelling PeopleSoft support services.

13        114.    TN wound down its business operations on October 31, 2008.

14        115.    Between January 2002 and October 31, 2008, TN had a total of 358 customers, of

15   which 16 were Siebel customers.  TN signed its first Siebel customer in September 2006.

16        116.    Before March 1, 2005, certain PeopleSoft and JDE entities owned the PeopleSoft

17   and JDE registrations asserted in the Fourth Amended Complaint.

18        117.    On March 1, 2005, these PeopleSoft and JDE entities transferred ownership of

19   their copyrights to OIC, after which they merged with and into OSC (then known as Oracle

20   Corporation).

21        118.    For the registrations described in rows 6-7, 45-56, and 76-111 of Table 1, the

22   effective date of the registration post-dates the first alleged infringement of those registrations by

23   any defendant.

24        119.    For the registrations described in rows 1-13, 17-19, 23, 26-51, 54-55, 76-90, 92-

25   102, and 104-110 of Table 1, the effective date of the registration is not within three months of

26   first publication of the work covered by the registration.

27        120.    The registrations described in rows 53, 57-75, 103 and 111 of Table 1 were

28   registered as unpublished works.

Case No. 07-CV-01658 PJH (EDL)

JOINT PRETRIAL STATEMENT

121.   The registrations identified in rows 54-55, 82, and 104-106 of Table 1 were not registered within five years of first publication.

122.   In an eWeek article entitled "Oracle Warns SAP to Step Lightly," dated January 26, 2005, Oracle CEO Larry Ellison was quoted as saying in response to SAP's acquisition of TN, "That's our intellectual property, and they should be cautious."

123.   PeopleSoft tracked the customers and revenues lost to TomorrowNow.

124.   On January 11, 2005, Richard Blotner, Vice President, North America Operations at Oracle, stated in an e-mail: "what i'm really concerned with is this . . . . . . . . is tomorrow now taking advantage of the situation by getting updates from their most recent new customers, and applying them to their older ones?  i have no evidence and no one has said this, but i have a suspicious little mind.  worst case, it might be worth sending them a legal letter, ensuring they know that they cannot do something like this."

125.   PeopleSoft retained Crimson Consulting Group in October 2004 to research third party support providers, one of which was TomorrowNow.

126.   OEMEA is not registered to do business in California.

127.   Oracle's acquisition of PeopleSoft significantly increased Oracle's share of the enterprise application software market.

128.   SAP believed that the acquired PeopleSoft customer base was vulnerable to defection from Oracle because of the Fear, Uncertainty and Doubt ("FUD") associated with Oracle's effort to acquire PeopleSoft.

129.   SAP decided to acquire TN to coincide with the closing of Oracle's acquisition of PeopleSoft.

130.   Prior to Plaintiffs filing this lawsuit Plaintiffs did not contact any Defendant to discuss the allegations.

131.   TN continues to exist as a Texas corporation.

## III.   STATEMENT OF ALL RELEVANT DISPUTED FACTS WHICH REMAIN TO BE DECIDED

The following facts are disputed and will be subject to proof at trial, subject to the

1  Court's rulings on pending motions for summary judgment, motions-in-limine, anticipated

2  *Daubert* motions and other pretrial issues.  The parties have provided basic header information

3  for various categories of facts for the convenience of the Court.  However these headers are not

4  intended to limit the applicability of those facts only to the subject matter of the header.

5  <u>**DIRECT LIABILITY - COPYRIGHT**</u>

6      1.    OIC is the owner or exclusive licensee of all copyrights in suit.

7      2.    OIC is owner of all PeopleSoft and J.D. Edwards intellectual property developed

8  after March 1, 2005.

9      3.    As part of Oracle's acquisition of PeopleSoft, Inc., ownership of all PeopleSoft

10  and J.D. Edwards copyrights and other intellectual property was transferred to OIC on March 1,

11  2005.

12      4.    PeopleSoft's and J.D. Edwards' rights to sue for pre-transfer infringement were

13  transferred to OIC on March 1, 2005.  As of March 1, 2005, OIC held the right to sue for pre-

14  March 1, 2005 infringement of PeopleSoft and J.D. Edwards intellectual property.

15      5.    After merging with and into OSC, the PeopleSoft and JDE entities ceased to exist.

16      6.    Each row in Table 1 above lists a valid and enforceable copyright in software or

17  updates and support materials that has been registered with the United States Copyright Office.

18      7.    Since March 1, 2005, OIC has held all exclusive rights under the Copyright Act

19  for each registration described in rows 8-46, 54-55 and 57-76 of Table 1.

20      8.    Since March 1, 2005, OIC has held all exclusive rights under the Copyright Act

21  for each registration described in rows 82-86, 89-90, and 94-95 of Table 1, save for the right to

22  distribute the registered software in Europe, the Middle East and Africa.

23      9.    OIC has held all exclusive rights under the Copyright Act for each registration

24  described in rows 5-7, 47-53, 56, 77-81, 87-88, 91-93, 96-103, and 109-111 of Table 1 ever since

25  the registered software was first created.

26      10.    Since March 1, 2002, OIC has held the right to sue for any infringement of each

27  registration described in rows 1-4 of Table 1, regardless of when or where the infringement

28  occurred.

11.     Since March 1, 2005, OIC has held the right to sue for any infringement of each registration described in rows 8-46, 54-55 and 57-76 of Table 1, regardless of when or where the infringement occurred.

12.     Since March 1, 2005, OIC has held the right to sue for any infringement of each registration described in rows 82-86, 89-90, and 94-95 of Table 1, regardless of when or where the infringement occurred, save for the right to sue for unauthorized distribution of the registered software in Europe, the Middle East and Africa.

13.     Since March 1, 2006, OIC has held the right to sue for any infringement of each registration described in rows 104-108 of Table 1, regardless of when or where the infringement occurred, with respect to infringement that occurred on or after March 1, 2006, save for the right to sue for unauthorized reproduction, creation of derivative works, or distribution of the registered software in Europe, the Middle East and Africa.

14.     OIC has held the right to sue for any infringement of each registration described in rows 5-7, 47-53, 56, 77-81, 87-88, 91-93, 96-103, and 109-111 of Table 1 ever since the registered software was first created.

15.     OIC has rights to enforce Oracle's PeopleSoft, J.D. Edwards and Siebel copyrights to protect Oracle from alleged infringers such as Defendants.

16.     Prior to their merger with and into OSC, the PeopleSoft and JDE entities did not expressly transfer the right to sue for pre-March 1, 2005 infringement to OIC.

17.     Prior to their merger with and into OSC, the PeopleSoft and JDE entities did not expressly transfer the right to sue for pre-March 1, 2005 infringement to OSC.

18.     OIC holds the right to sue for infringement of PeopleSoft and J.D. Edwards intellectual property that post-dates the transfer of PeopleSoft's and J.D. Edwards' copyrights to OIC (with carve-outs related to J.D. Edwards).

19.     Neither SAP nor TN were licensed or otherwise authorized by Oracle to reproduce, modify or distribute any version of J.D. Edwards World, J.D. Edwards EnterpriseOne, PeopleSoft or Siebel enterprise software.

20.     Neither SAP nor TN were licensed or otherwise authorized by Oracle to

1  reproduce, modify, distribute or publicly display any version of J.D. Edwards World, J.D.

2  Edwards EnterpriseOne, PeopleSoft, or Siebel updates and support materials.

3      21.    No relevant customer's license allowed SAP or TN to reproduce, modify or

4  distribute the enterprise software copies described herein.

5      22.    The limited use rights in the Oracle licenses did not allow Defendants to maintain

6  their own copies of the software and did not allow software to be cross-used or copied between

7  customers.

8      23.    TN was not licensed or otherwise authorized by Oracle to reproduce or distribute

9  Oracle Database software for use in commercial and production environments.  Neither SAP's

10  Oracle Database reseller agreement nor any relevant customer's license allowed TN to reproduce

11  or distribute the Oracle Database software copies described above.

12      24.    No relevant customer's license allowed SAP or TN to reproduce, modify,

13  distribute or publicly display the copies of updates and support materials described above.

14      25.    Each TN installation of J.D. Edwards World software supported multiple J.D.

15  Edwards World environments.

16      26.    A fully-functional PeopleSoft environment requires both a PS_HOME component

17  and a PeopleSoft database component, run in conjunction with an installation of PeopleTools.

18      27.    TN could perform substantial testing and development with use of only a

19  PS_HOME component or a PeopleTools database component, with or without PeopleTools.

20      28.    TN copied J.D. Edwards World versions A7.2 and A8.1 by installing the software

21  onto TN's systems in Bryan, Texas.

22      29.    Each TN installation of J.D. Edwards EnterpriseOne software supported multiple

23  J.D. Edwards EnterpriseOne environments.

24      30.    TN copied J.D. Edwards EnterpriseOne versions XE, 8.0, 8.10, 8.11 and 8.12 by

25  installing the software on the computers controlled by TN in the custody of TN employee Ashis

26  Ghosh.

27      31.    Each installation supported multiple J.D. Edwards EnterpriseOne environments.

28      32.    TN copied PeopleSoft Customer Relationship Management (CRM) 8.0-8.9,

JOINT PRETRIAL STATEMENT

1   Enterprise Performance Management (EPM) 8.8 SP1-8.9, Financials and Supply-Chain

2   Management (FSCM; also Financials, Distribution and Manufacturing (FDM)) 7.5-8.9, Human

3   Resources Management Software (HRMS) 7.0-8.9, Student Administration (SA, also Campus

4   Solutions and HRMS for Higher Education) 7.0-8.0 SP1, and PeopleTools 7.06-8.48 by

5   installing the software onto TN's systems in Bryan, Texas.  Each of the hundreds of installations

6   created an environment.

7        33.    TN copied PeopleSoft CRM, EPM, FSCM, HRMS, SA and PeopleTools

8   thousands of times by backing up, "cloning" and restoring existing environments.

9        34.    Each PeopleSoft local environment created by TN contained all or almost all

10  modules of that product in one or more languages.

11       35.    A PeopleSoft local environment comprises one or more of the following:  a

12  PS_HOME component and a PeopleSoft database component.

13       36.    The true number and nature of the environment backups cannot be known,

14  because TN deleted many of the backups from TN's servers; at least some of these copies were

15  not backed up prior to deletion.

16       37.    The true number, nature and extent of the installation software copied into "CD

17  Client Jukebox" folders on TN's servers cannot be known, because TN's regular practice was to

18  delete the copies of installation software from TN's servers after using the installation software

19  to create local environments.

20       38.    The modifications to Oracle's code that TN applied to its local environments

21  included fixes and updates created by Oracle.

22       39.    TN used most local environments for a variety of purposes not permitted by any

23  license, such as training and research.  This allowed TN to better support its customers.

24       40.    Each instance of Oracle Database contained a copy of a PeopleSoft or Siebel

25  database component.

26       41.    The true number and nature of copies of the updates and support materials cannot

27  be known because TN downloaded and then deleted millions of files containing updates and

28  support materials as part of its testing and development of automated downloading tools.

JOINT PRETRIAL STATEMENT

42.     The true number of such updates and support materials cannot be known because TN later deleted the generic master library.

43.     The true number and nature of the updates and support materials copied into multiple other customer folders cannot be known, because TN later deleted the prospects' and former customers' folders.

44.     Some of the downloaded and subsequently copied updates and support materials were fixes and updates created by Oracle to be applied to J.D. Edwards World, J.D. Edwards EnterpriseOne and PeopleSoft enterprise software.

45.     Starting prior to July 2003 and continuing thereafter, TN downloaded, installed, copied, accessed and otherwise used versions of Oracle's Database software to provide TN maintenance services through the wind-down of TN's business in October 2008.

46.     TN copied Siebel versions 5 through 7.8 by installing the software onto TN's systems in Bryan, Texas.  Each installation created a Siebel environment.

47.     TN copied Siebel multiple times by backing up existing environments.

48.     TN modified J.D. Edwards World, J.D. Edwards EnterpriseOne, and PeopleSoft local environments by modifying Oracle's code (including source code and application database schemas and contents) to change the features and functionality of Oracle's software, by copying portions of one TN customer's code into a second TN customer's code, and by combining code from multiple TN customers into one environment.

49.     TN publicly displayed updates and support materials covered by one or more of Oracle's copyright registrations described in 51-52 of Table 1 by making the updates and support materials freely available on TN's website.

50.     Each installation, backup, restore, electronic copy and creation of a CD containing PeopleSoft, J.D. Edwards World, J.D. Edwards EnterpriseOne and Siebel installation software resulted in one or more reproductions of all or virtually all of the PeopleSoft, J.D. Edwards World, J.D. Edwards EnterpriseOne and Siebel enterprise software covered by one or more of Oracle's copyright registrations described in rows 8-44, 54-77, 82-93 and 104-110 of Table 1.

51.     TN's modifications of J.D. Edwards World, J.D. Edwards EnterpriseOne, and

1  PeopleSoft local environments constituted the creation of derivative works based on all or

2  virtually all of the PeopleSoft, J.D. Edwards World and J.D. Edwards EnterpriseOne enterprise

3  software covered by one or more of Oracle's copyright registrations described in rows 8-44, 54-

4  77 and 82-93 of Table 1.

5       52.    The distribution of modifications to PeopleSoft, J.D. Edwards World and J.D.

6  Edwards EnterpriseOne enterprise software, by TN, to its customers constituted contributory

7  infringement and inducement of infringement of one or more of Oracle's copyright registrations

8  described in rows 8-44, 54-77 and 82-93 of Table 1.

9       53.    TN's distribution of PeopleSoft environments, environment backups and

10  modifications constituted the distribution of all or virtually all of the PeopleSoft enterprise

11  software covered by one or more of Oracle's copyright registrations described in rows 8-44 of

12  Table 1.

13       54.    All or substantially all fixes to which customers were directed by TN were

14  actually distributed to customers.

15       55.    In May 2009 Defendants contended that it would be "impossible" to provide "a

16  detailed description of the support provided with each local environment."  In October 2009,

17  Defendants contended that it required over 500 hours of attorney time to describe in narrative

18  form the local environments used for just 10 master fixes delivered by TN.  Defendants further

19  contended the narratives resulting from that 500 hours of work did not imply "that the activities

20  associated with any other master fix record were the same or even similar to the activities

21  described" for the 10 master fixes.

22       56.    TN used local environments to develop and test fixes it sent to multiple

23  customers.

24       57.    According to Oracle's expert, Kevin Mandia, TN provided over 890 fixes to TN's

25  customers.

26       58.    Each of the fixes that TN provided to TN's customers contained more than a de

27  minimis amount of protected expression from the PeopleSoft, J.D. Edwards World and J.D.

28  Edwards EnterpriseOne enterprise software covered by the registrations described in 8-44, 54-77

1   and 82-93 of Table 1.

2      59.      Each installation, copy, backup and restore of Oracle Database software resulted

3   in one or more reproductions of all or virtually all of the Oracle Database software covered by

4   one or more of Oracle's copyright registrations described in rows 1-7 of Table 1.

5      60.      Each installation supported multiple instances of the Oracle Database software.

6      61.      TN made further copies of the Oracle Database software programs by copying

7   both the installation software and the installations of the Oracle Database software from one TN

8   system to another TN system.

9      62.      TN copied the Oracle Database software programs by creating instances of Oracle

10  Database software programs, by backing up the contents of the instances of the Oracle Database

11  software programs and by restoring the contents of those instances.

12     63.      The distribution of certain PeopleSoft environments and environment backups

13  from TN's servers to TN's customers resulted in one or more reproductions or distributions of

14  more than a de minimus amount of protected expression from the Oracle Database software

15  covered by the registrations described in rows 1-7 of Table 1.

16     64.      Each installation of J.D. Edwards World software onto TN's systems created at

17  least one local environment.  Each environment constitutes a copy of the software.

18     65.      Each installation of J.D. Edwards EnterpriseOne software onto TN's systems

19  created at least one local environment.  Each environment constitutes a copy of the software.

20     66.      Each installation of PeopleSoft CRM, EPM, FSCM, HRMS or SA software onto

21  TN's systems created a local environment.  Each environment constitutes a copy of the software.

22     67.      TN copied PeopleTools 7.06-8.48 by installing the software onto TN's systems in

23  Bryan, Texas.  Each installation of PeopleTools constitutes a copy of the software.

24     68.      TN copied some versions of PeopleSoft CRM, EPM, FSCM, HRMS, SA and

25  PeopleTools installation software by burning them onto CDs.

26     69.      TN copied some versions of PeopleSoft CRM, EPM, FSCM, HRMS, SA and

27  PeopleTools software by placing electronic copies of the installation software into "CD Client

28  Jukebox" folders on TN's servers.

JOINT PRETRIAL STATEMENT

70. TN copied some versions of Siebel software by placing electronic copies of the installation software into "CD Client Jukebox" folders on TN's servers.

71. TN sometimes downloaded for some prospective customers before they had signed any contract and without their permission.

72. TN, with the prospective customer's permission, downloaded for some prospective customers before they had signed any contract.

73. In 2006, the J.D. Edwards World and J.D. Edwards EnterpriseOne updates and support materials kept in a prospect's folder to support other customers were copied into several other customer-labeled folders.

74. In analyzing the computer systems produced by TN, Oracle's expert Kevin Mandia determined that approximately 9 million Oracle support files remained on TN's systems.

75. All files, including updates and support materials, on TN's server DCITBU01 were copied there from other TN computers.

76. TN's downloading and subsequent copying of Oracle's updates and support materials for PeopleSoft, J.D. Edwards World, J.D. Edwards EnterpriseOne and Siebel resulted in one or more reproductions of updates and support materials covered by one or more of Oracle's copyright registrations described in rows 45-53, 78-81, 94-103 and 111 of Table 1.

77. TN's downloading and subsequent copying of Oracle's updates and support materials for J.D. Edwards World and J.D. Edwards EnterpriseOne resulted in one or more reproductions of all or virtually all of the J.D. Edwards World and J.D. Edwards EnterpriseOne software covered by one or more of Oracle's copyright registrations described in rows 54-77 and 82-93 of Table 1.

78. TN's downloading and subsequent copying of Oracle's updates and support materials for PeopleSoft, J.D. Edwards World and J.D. Edwards EnterpriseOne contained more than a de minimis amount of protected expression covered by the registrations described in 8-44, 54-77 and 82-93 of Table 1.

79. The Oracle Websites are maintained on protected computer systems owned by Oracle.

Case No. 07-CV-01658 PJH (EDL)

JOINT PRETRIAL STATEMENT

1    80.    The Terms of Use on Oracle's Websites describe how the data, including the

2    updates and support materials on them, may be accessed and downloaded.

3    81.    The Terms of Use and license agreements varied slightly over time.  In all

4    instances they prohibited Defendants from using the Oracle Websites and the data, including the

5    updates and support materials on them, for Defendants' own commercial purposes.

6    82.    Oracle's updates and support materials are copyrighted materials.

7    83.    Each of Oracle's updates and support materials contained with Oracle's

8    automated database registrations are covered by that registration.

9    84.    Every JD Edwards Code Change and ESU is covered by one or more copyright

10   registrations described in rows 54-79 and 82-100 of Table 1.

11   85.    The true number and nature of the updates and support materials TN downloaded

12   cannot be known, including because TN deleted millions of them without keeping backups.

13   86.    For each customer or potential customer, TN generally attempted to download all

14   customer support materials available on the Oracle Websites in that customer's product family.

15   87.    TN also accessed and downloaded updates and support materials from Oracle

16   related to Oracle's Database software.

17   88.    TN's downloaded PeopleSoft updates and support materials were stored in a

18   generic master library (folder) from at least 2002-2007.

19   89.    TN employees informed management that that they believed that TN's access and

20   downloading were illegal.

21   90.    These TN employees believed that the downloading violated copyright laws,

22   Oracle's license agreements and Terms of Use.

23   91.    These TN employees were instructed to continue.

24   92.    TN employees were also instructed not to put any concerns that they had about

25   downloading into writing.

26   93.    TN knew that the login credentials it used to test Titan were no longer valid, even

27   for the customer who originally provided the credential.

28   94.    In developing later versions of Titan, TN downloaded approximately a million

JOINT PRETRIAL STATEMENT

1  files from the Oracle Websites using the login credential supplied by a TN employee who had it

2  from a prior employer.

3      95.    Of the approximately 5 million Oracle support files that TN counted on its

4  systems in 2008, at least hundreds of thousands of these files contain Oracle's updates and

5  support materials.

6      96.    After downloading millions of updates and support materials for J.D. Edwards

7  World, J.D. Edwards EnterpriseOne, PeopleSoft and Siebel, TN copied all or almost all of the

8  updates and support materials between TN's servers.

9      97.    TN's business model required it to access and download from the Oracle

10  Websites.

11      98.    TN shared downloads among customers to provide support.

12      99.    All Titan testing downloads were later deleted.

13      100.    Defendants represented to Oracle that they would no longer download from

14  Oracle's websites to TN systems after August 23, 2007 at the latest.

15  **INDIRECT LIABILITY - COPYRIGHT**

16      101.    SAP AG acquired TN through SAP America.

17      102.    SAP AG and SAP America had the right and ability to supervise, control, and

18  stop TN from copying Oracle's software, updates and support materials without a license.

19      103.    SAP also could stop TN from accessing and downloading from Oracle Websites

20  without authorization.

21      104.    SAP provided TN with the site and facilities for TN's business operations, and

22  expanded TN across the globe.

23      105.    SAP AG and SAP America anticipated direct financial gains to ultimately result

24  from TN's business model through cooperative marketing and sales programs, like SAP's Safe

25  Passage program.

26      106.    As parent corporations of TN, SAP AG and SAP America received a direct

27  financial benefit from the business activities

28      107.    SAP subsequently attempted to "ring-fence" the intellectual property issues with

1   TN as a separate company as a "liability shield."

2       108.    After it acquired TN, SAP knew or should have known, through regular

3   communications between SAP AG, SAP America and key TN personnel, of TN's ongoing

4   copying of Oracle software and further access to and downloading from Oracle Websites.

5       109.    SAP directed TN to expand its service offerings to the Siebel line of products.

6       110.    In expanding TN to the Siebel product line, SAP knew that TN required

7   additional unlicensed copies of Oracle software and additional unauthorized access to and

8   downloading from Oracle Websites.

9       111.    SAP did not prevent TN from engaging in these activities.  Instead, it encouraged

10  TN to rapidly grow its Siebel support services business.

11      112.    TN informed SAP of the headcount increases and other resources that TN would

12  need to stop its infringing activities.

13      113.    SAP refused to provide these resources, ensuring that TN would continue to

14  infringe Oracle's copyrights.

15      114.    SAP gave substantial assistance and encouragement to TN.  As examples:

16      a)  SAP chose not to evaluate TN's performance based on any Key Performance

17          Indicator ("KPI") related to stopping the software copying and downloading that

18          SAP knew was occurring.

19      b)  SAP created "Rules of Engagement" that approved TN's unlicensed software

20          copying and unauthorized downloading.

21      c)  SAP supported and financed TN's geographic and product expansion.

22      d)  SAP repeatedly failed to address TN's requests for Oracle Database software

23          licenses, despite its knowledge that TN was improperly using the Oracle Database

24          Software.

25      e)  SAP engaged with TN's salespeople and TN's customers as part of the Safe

26          Passage marketing program to convince customers that TN's business model was

27          operating legally and that they should leave Oracle. This assistance and

28          encouragement were substantial factors in sustaining and increasing the harm that

40                                                      Case No. 07-CV-01658 PJH (EDL)

1          TN caused to Oracle

2      f)  Though it had the right and ability to do so, SAP failed to take steps sufficient to

3          prevent or correct the unlicensed copying and unauthorized downloading until

4          TN's wind-down on October 31, 2008.

5      115.   SAP knew that unlicensed Oracle software copies and unauthorized updates and

6  support materials were on TN's systems.

7      116.   SAP knew when it bought TN that TN required both to support the customers that

8  they took from Oracle.

9      117.   The SAP AG executive board of directors approved the purchase of TN with

10  knowledge that TN's operations created a "serious liability" that would "likely" result in legal

11  action.

12      118.   Throughout SAP and TN's corporate relationship, SAP intended that TN act on

13  SAP's behalf, TN accepted that undertaking, and SAP knew of TN's acceptance.

14      119.   SAP management knew of and approved TN's reproduction, modification,

15  distribution and use of local environments to support multiple customers.

16      120.   SAP management knew of and approved TN's distribution of fixes to TN's

17  customers.

18      121.   SAP management knew of and approved TN's reproduction and distribution of

19  Oracle Database software.

20      122.   SAP management knew of and approved TN's reproduction, modification,

21  distribution, public display and use of Oracle's updates and support materials.

22      123.   As examples of SAP's ultimate control over TN: SAP changed TN's management

23  and board and controlled TN's headcount and purchasing decisions, including for computer

24  hardware and software.

25      124.   SAP acquired TN to "inflict pain" on Oracle.

26      125.   It intended to use TN to harm Oracle's share price.

27      126.   SAP used TN's illegal business as a "strategic weapon" to take customers and

28  market share from Oracle, all to SAP's benefit.

1    127.    SAP knew that TN would illegally download from Oracle Websites and illegally

2    copy and use Oracle's software in pursuit of this goal.

3    128.    SAP made it TN's highest priority to quickly expand these illegal activities

4    around the world.

5                    **COMPUTER FRAUD CLAIMS**

6    129.    When logging into Oracle's computer systems with valid login credentials, a user

7    is confronted with Terms of Use, which the user must accept by clicking before proceeding.

8    130.    These Terms of Use govern the use of the Oracle Websites.

9    131.    These Terms of Use describe how the data, including the updates and support

10    materials on them, may be used.

11    132.    Through these Terms of Use, TN contracted with one or more Plaintiffs when

12    entering Oracle Websites.

13    133.    The PeopleSoft Customer Connection Terms of Use in effect before September

14    20, 2005 constituted an agreement offered by PeopleSoft, Inc. to customers with a valid license

15    agreement with PeopleSoft.

16    134.    The PeopleSoft Customer Connection Terms of Use in effect between September

17    20, 2005 and February 19, 2007 constituted an agreement offered by Oracle Corporation to

18    customers with a valid license agreement with Oracle.

19    135.    The PeopleSoft Customer Connection Terms of Use in effect between February

20    19, 2007 and March 1, 2008 constituted an agreement offered by Oracle Corporation to

21    customers with a valid license agreement with Oracle.

22    136.    The PeopleSoft Customer Connection Terms of Use in effect starting March 1,

23    2008 constituted an agreement offered by Oracle Corporation to customers with a valid license

24    agreement with Oracle.

25    137.    The PeopleSoft Special Terms of Use in effect before January 19, 2005

26    constituted an agreement offered by PeopleSoft, Inc. to customers with a valid license agreement

27    with PeopleSoft.

28

JOINT PRETRIAL STATEMENT

138.    The SAR Legal Restrictions constituted an agreement offered by Oracle Corporation to customers with a valid license agreement with Oracle.

139.    The Oracle Legal Download Agreement constituted an agreement offered by Oracle Corporation to customers with a valid license agreement with Oracle.

140.    The SupportWeb Terms of Use in effect between February 20, 2006 and February 19, 2007 constituted an agreement offered by Siebel Systems, Inc. to customers with a valid license agreement with Siebel.

141.    The SupportWeb Terms of Use in effect between February 19, 2007 and January 2008 constituted an agreement offered by Oracle Corporation to customers with a valid license agreement with Oracle.

142.    Oracle owned all of the computer hardware associated with the operation of the Oracle Websites and the data and documents, including the updates and support materials, that resided on those computer

143.    Defendants have conceded that Oracle's computer systems constitute protected computers within the meaning of 18 U.S.C. § 1030(e)(2).

144.    TN knew about Oracle's Terms of Use and customer license restrictions, but TN downloaded from the Oracle Websites without regard for these rules or restrictions.

145.    TN's access to and downloading from Oracle's websites was unauthorized and unlicensed.

146.    SAP knew or should have known of TN's downloading and Oracle's downloading restrictions by virtue of the due diligence performed prior to SAP's acquisition of TN in January 2005, and the pervasive and continuing control SAP exercised over TN.

147.    In their Opposition to Oracle's summary judgment motion, Defendants further admitted that over a million of these downloads constituted computer fraud under the CFAA and CDAFA.

148.    TN gained access to Oracle's customer support website using a login credential from a former Oracle employee working at TN.

149.    TN management and corporate officers instructed its employees to develop, test

43

1   and use automated downloading software tools regardless of the impact to Oracle, the Oracle

2   Websites, and authorized Oracle customers.

3       150.    These TN employees were instructed to continue by management or lose their

4   jobs.

5       151.    In early 2007, SAP IP attorneys examined TN's downloading practices.

6       152.    TN management attempted to keep their downloading hidden from Oracle.  For

7   example:

8           a)  TN requested that customers provide login credentials that hid TN's identity from

9               Oracle.

10          b)  TN instructed customers to request that Oracle send software to TN using the

11              pretense that TN's office location was a new customer office location.

12          c)  TN used fake and misleading contact information in performing downloads from

13              Oracle.

14          d)  TN modulated its volume of downloading in an attempt to avoid detection by

15              Oracle.

16      153.    TN continued its automated downloading until at least two weeks after Oracle

17  filed its Complaint, and continued some form of unauthorized downloading into 2008, over a

18  year after Oracle filed its Complaint.

19      154.    TN's downloading caused damage and harm to Oracle.

20      155.    Through its automated downloading, TN constructed its own library of Oracle

21  support materials to support its customers.

22      156.    Oracle discovered TN's unauthorized downloading in late 2006 when it noticed

23  suspicious download requests coming from TN's IP address in Bryan, Texas.

24      157.    Oracle began a related investigation beginning in January 2007, after an Oracle

25  employee noticed unusual items related to TN downloading in a report created to summarize

26  customer feedback.

27      158.    Using Titan, TN crashed portions of the Oracle Websites and impaired the ability

28  of customers to access the Oracle Websites.  TN's employees informed TN management and

Case No. 07-CV-01658 PJH (EDL)

JOINT PRETRIAL STATEMENT

1  corporate officers of the crashes on the Oracle Websites.

2      159.    In addition to crashes, system impairments and damaged data, the large amount of

3  downloads imposed a bandwidth drain and used Oracle computing resources.

4      160.    These impacts decreased the ability of Oracle and its authorized customers to

5  access and download from the Oracle Websites.

6      161.    The false and misleading data entered by TN also became co-mingled with

7  legitimate customer data, altering the data set as a whole and rendering much of that customer

8  data useless for its intended purposes.

9      162.    TN also compromised the integrity of Oracle's confidential, internal and private

10  data through its use of automated downloading tools.

11      163.    Oracle spent over $300,000 in preliminary investigation costs during the first year

12  to assess the damage to the systems and related issues.

13      164.    The parties dispute whether TN caused any slowdowns, disruptions in service,

14  crashes, or other impairment to the availability or accessibility of the systems or data on

15  Plaintiffs' customer support websites alleged to have been improperly accessed by TN.

16      165.    The parties dispute whether TN's access or downloading activities ever changed,

17  altered, deleted, or destroyed any data, programs, systems, or other information on Plaintiffs'

18  customer support websites, or resulted in any other type of damage to the computer systems or

19  data contained thereon.

20      166.    The parties dispute whether TN intended to damage Plaintiffs' computer systems.

21      167.    The parties dispute whether Oracle USA, Inc. is a party to all of the Terms of Use

22  agreements TN is alleged to have breached.

23      168.    The parties dispute whether TN is a party to any of the Terms of Use agreements

24  TN is alleged to have breached.

25                              **OTHER LIABILITY FACTS**

26      169.    Oracle's  past  and  existing  relationships  with  customers  often  yield  future

27  economic benefit through ongoing sales of both software licenses and support contracts.

28      170.    Oracle's customers rarely cancel their software support contracts with Oracle.

1    171.    Those few customers that do typically choose to return to Oracle support at a later

2    time.

3    172.    SAP AG, SAP America and TN conspired to interfere with Oracle's ongoing and

4    prospective relationships with Oracle's customers.

5    173.    SAP AG, through its subsidiary SAP America, bought TN to take away Oracle's

6    support contract revenue stream, lower Oracle's share price, get a "public relations win" and

7    disrupt Oracle's business operations.

8    174.    TN ceased operation on October 31, 2008, but continues to exist as a Texas

9    corporation.

10    175.    The support for PeopleSoft, J.D. Edwards World, J.D. Edwards EnterpriseOne

11    and Siebel that TN offered to its customers was predicated on wrongful activity, including but

12    not limited to, CFAA and CDAFA violations, violations of California Business & Professions

13    Code § 17200, trespass to chattels, breach of contract and inducement of breach of contract.

14    176.    For PeopleSoft, J.D. Edwards World, J.D. Edwards EnterpriseOne and Siebel, TN

15    regularly accessed the Oracle Websites in unauthorized ways, as described above.  As examples:

16    a)    TN regularly used a customer's login credentials after that customer's support

17    contract had expired, in violation of the Terms of Use.

18    b)    TN regularly used a customer's login credentials to access software and support

19    materials on the Oracle Websites that were not licensed to the customer whose

20    login credentials were used, in violation of the Terms of Use.

21    c)    TN regularly accessed the Oracle Websites using a customer's login credentials for

22    purposes other than supporting the authorized use of that customer's licensed

23    enterprise software, in violation of the customer license agreements and the Terms

24    of Use.

25    177.    For PeopleSoft, J.D. Edwards World, J.D. Edwards EnterpriseOne and Siebel, TN

26    regularly breached, or induced customers to breach, the Oracle Websites' Terms of Use, the

27    customers' contract terms and customers' support renewal agreements.  As examples:

28    a)    TN used software and support materials downloaded with one customer's

46

Case No. 07-CV-01658 PJH (EDL)

1    credential as a reference in supporting other customers' enterprise software, in

2    violation of the Oracle Websites' Terms of Use.

3    b)   TN used software and support materials downloaded with one customer's

4    credential to train TN employees in the use and support of PeopleSoft, J.D.

5    Edwards World, J.D. Edwards EnterpriseOne and Siebel enterprise software, in

6    violation of the Oracle Websites' Terms of Use.

7    c)   TN reviewed software and support materials downloaded with one customer's

8    credential to support other customers, in violation of the Oracle Websites' Terms

9    of Use.

10   d)   TN used local environments created from one customer's licensed enterprise

11   software as a reference in supporting other customers, in violation of the

12   customer's license agreements.

13   e)   TN used local environments created from one customer's licensed enterprise

14   software to train TN employees on that software, in violation of the customer's

15   license agreements.

16   f)   TN reviewed local environments created from one customer's licensed enterprise

17   software to support other customers, in violation of the customer's license

18   agreements.

19   g)   TN misrepresented to Oracle's current and former customers the manner in which

20   customers' login credentials for the Oracle Website and customers' enterprise

21   software would be used by TN.

22   h)   To the extent that some or all DAT files, project files or any other object files

23   relating to Oracle's PeopleSoft enterprise software are determined to be

24   uncopyrightable subject matter, TN downloaded, copied, generated, modified and

25   distributed such files in violation of applicable customer license agreements and

26   the Terms of Use.

27   178.    TN relied upon the improper activity described above, as well as upon copyright

28   infringement, to provide support for any and all PeopleSoft, J.D. Edwards World, J.D. Edwards

1    EnterpriseOne and Siebel products.

2          179.    Defendants' marketing of TN's support offering included the marketing of illegal

3    activity – such as half price service and the use of customers as references who were being

4    supported illegally – as a way to take new customers from Oracle.

5          180.    Through its wrongful conduct, including Defendants' advertising or marketing,

6    Defendants actually interfered with or disrupted Oracle's existing or prospective economic

7    relationships with Oracle's customers for each of the 297 customers who entered into support

8    contracts with TN instead of with Oracle or its predecessors because TN's support was

9    predicated on wrongful activity.

10         181.    Without the ability to market and sell its services that were based on illegal access

11   to and use of Oracle's materials, TN could not have taken customers away from Oracle.

12         182.    TN's use of its customers' login credentials for Oracle's support website and

13   customers' enterprise software caused customers to breach their license agreements with Oracle.

14         183.    By so doing, TN gained unauthorized access to Oracle's updates and support

15   materials, including Oracle's enterprise software.

16         184.    Oracle lost revenue for each customer that entered into a support contract with TN

17   in lieu of a support contract with Oracle.

18         185.    Oracle and TN entered into contracts regarding the Terms of Use of the Oracle

19   Websites.

20         186.    As described in more detail above, Defendants reviewed and agreed to the terms

21   and conditions in the Terms of Use on the Oracle Websites.

22         187.    Defendants accepted these Terms of Use when they accessed and downloaded

23   updates and support materials from Oracle Websites.

24         188.    Oracle performed all conditions, covenants and promises required on its part to be

25   performed, in accordance with the terms and conditions of the Terms of Use on the Oracle

26   Websites.

27         189.    By way of example, and as described in more detail above, in violation of the

28   Terms of Use on the Oracle Websites:

a) TN regularly cross-used and shared Oracle support materials that it had downloaded on behalf of one customer between and among multiple customers.

b) TN used its access to data and files received from the Oracle Websites for purposes other than in support of the customer on whose behalf TN ostensibly took the data and files.

c) TN secured access to the data and files on the Oracle Websites using fraudulent means and in violation of the Terms of Use, such as by improper use of customer login credentials and use of expired login credentials.

d) TN entered false, fake and misleading data into the Oracle Websites to expand access to the Oracle Websites.

e) Defendants' breaches of contract were a substantial factor in TN's ability to provide its support services to customers.

190. Oracle lost revenue for each customer that entered into a support contract with Defendants in lieu of a support contract with Oracle as a result.

191. Defendants have engaged in unlawful, fraudulent and unfair business practices by committing the acts described in detail above.

192. These acts include computer fraud, trespass to chattels, breach of contract and interference with business relationships.

193. Defendants committed these acts to gain an unfair competitive advantage in the form of, for example, better publicity, better revenue stream, disruption of Oracle's ability to compete, harm to Oracle's share price and devaluation of Oracle's recently acquired software brands.

194. Defendants recruited Oracle customers and acquired support fees from those customers based on their unlawful, unfair and/or fraudulent business practices.

195. As a result of the conduct described above, Defendants unjustly received benefits at the expense of Oracle through Defendants' wrongful conduct.

196. As described further above, that wrongful conduct included Defendants' breach of the agreements governing access to and use of the Oracle Websites, interference with Oracle's

1   business relationships and other unfair business practices.

2       197.    It also included Defendants' trespass on, and computer fraud concerning, the

3   Oracle Websites, including the access and further use of Oracle data, updates and support

4   materials, which took substantial time and money for Oracle to develop.

5       198.    As a result of the conduct described further above, Defendants have received

6   money properly due and owing to Oracle, and Defendants misappropriated Oracle's property and

7   used that property to create a financial benefit in which Oracle is entitled to share.

8       199.    The amount of money due from Defendants to Oracle is unknown to Oracle and

9   cannot be ascertained without an accounting of the income and gross profits Defendants have

10   obtained through their wrongful and unlawful conduct.

11       200.    Oracle is entitled, therefore, to a full accounting.

12       201.    Defendants' illegal conduct discussed above caused harm to Oracle for which it

13   seeks compensation in the form of the value of the use of Oracle's intellectual property by

14   Defendants.

15                  **<u>DAMAGES</u>**

16       202.    The date of the hypothetical negotiation to arrive at the fair market value of use

17   license for PeopleSoft and J.D. Edwards software is the day SAP acquired TN, January 19, 2005.

18       203.    With regard to the hypothetical license, the parties dispute whether Plaintiffs and

19   SAP would ever have agreed to a license and whether that matters.  Defendants contend the

20   parties would not have agreed to a license.

21       204.    The parties dispute the form a hypothetical license would have taken.  Plaintiffs

22   contend that the license would have been a fully paid-up, lump sum license.  Defendants contend

23   that the license would have taken the form of a running royalty.

24       205.    Defendants' damages expert and Plaintiffs agree that the 2005 hypothetical

25   negotiation would have been between OIC and SAP.  Specifically, Defendants' damages expert

26   stated that "SAP would have been negotiating to acquire the License . . . ."

27       206.    The parties dispute how the hypothetical license would have been calculated.

28       207.    For example, as one input in their valuation, Plaintiffs make various adjustments

1  to the price Plaintiffs paid to acquire PeopleSoft and Siebel.  Defendants contend that the price to

2  acquire these companies is not an appropriate reference in measuring the value of use.

3       208.    Plaintiffs contend that the fair market value of the infringed copyrights is not

4  determined with a focus on the actual number of customers obtained by TN, but instead should

5  focus on SAP's and Oracle's expectations and projections at the time the parties would have

6  negotiated the license (January 2005).  Defendants contend that the actual number of customers

7  and their associated TN revenue should be the only relevant metric on which the hypothetical

8  license must be measured, and that Oracle and SAP expectations, and the projections SAP had in

9  hand and had created as of the negotiation date are not relevant.

10       209.    Defendants contend that since Plaintiffs have alleged that infringement

11  commenced in 2002, there would have been two hypothetical negotiations – one in 2002

12  between PeopleSoft and TN, and one in 2005 between OIC and TN – and thus two hypothetical

13  licenses.  Plaintiffs concede that there would have been two hypothetical negotiations, did not

14  quantify the 2002 license, and contend the second one would have been between OIC and SAP,

15  not OIC and TN.

16       210.    Plaintiffs contend that saved acquisition costs are an appropriate measure of fair

17  market value and/or a factor to consider in determining the fair market value for Plaintiffs'

18  copyright claim and of their unjust enrichment damages.  Defendants contend that saved

19  acquisition costs is not an appropriate measure of damages for any of Plaintiffs' claims.

20       211.    As of January 19, 2005, Oracle and SAP were direct competitors in the market for

21  development and sale of enterprise application software and related services and support, with

22  SAP the historically dominant seller.

23       212.    SAP wanted to stop Oracle's traction and decrease Oracle's market share.

24       213.    SAP knew it needed an immediate and uniquely attractive alternative to staying

25  with Oracle to take advantage of that vulnerability.

26       214.    In order to take advantage of the perceived vulnerability, SAP searched for

27  existing alternatives and identified TN.

28       215.    TN was the only viable and immediately available company providing

1    comparable alternative support on PeopleSoft products.

2            216.    It did so to take maximum advantage of its perceived opportunity to decrease

3    Oracle's market share.

4            217.    Acquiring TN on January 19, 2005 and immediately offering TN's support to the

5    vulnerable PeopleSoft customer base was highly desirable to SAP.

6            218.    For example, in SAP's January 19, 2005 announcement to analysts regarding the

7    TN acquisition, SAP also announced TN's role in the simultaneously created SAP "Safe

8    Passage" program.

9            219.    Plaintiffs have marketing programs designed to win SAP customers, including a

10   program called OFF-SAP that was introduced in approximately June 2005.

11           220.    By acquiring TN and continuing its support delivery model, SAP avoided

12   spending billions of dollars to independently develop products similar to the Oracle-owned

13   materials TN infringed as part of attracting and supporting customers.

14           221.    SAP also avoided the significant delays and inevitable missteps associated with

15   such a development effort.

16           222.    In assessing whether to acquire TN and how to best use TN, SAP understood that

17   the majority of PeopleSoft customers were users of PeopleSoft's HRMS and Financial product

18   suites.

19           223.    These PeopleSoft HRMS and Financial product suites customers were the most

20   attractive customers to SAP.

21           224.    In addition, as described above, SAP sought to expand TN's practice of offering

22   software support service for all PeopleSoft and J.D. Edwards products.

23           225.    In late December 2004, while SAP was negotiating to acquire TN, SAP forecasted

24   and expected $897 million in financial benefits in the years 2005-2007 from owning TN.

25           226.    These included forecasted support revenues and forecast up-sales and cross-sales

26   to TN customers.

27           227.    The forecast acknowledged SAP's initial goal of targeting joint SAP and

28   PeopleSoft HRMS customers and joint J.D. Edwards and SAP customers.

228.     The creator of the forecast, SAP Vice President of Service Solution Management - Global Services and Support, Thomas Ziemen, attempted to be reasonable in his estimation.

229.     He sent the forecast to several SAP Executive Board members, none of whom thought it unreasonable.

230.     SAP set a goal to convert at least 50% of PeopleSoft and J.D. Edwards customers to SAP.

231.     SAP Executive Board member and Chief of SAP's Products and Technology Group, Shai Agassi, thought SAP could have done even better.

232.     In addition, in a January 19, 2005 analyst call, SAP spoke of its plans to initially target the estimated 4,000 joint SAP and PeopleSoft/J.D. Edwards customers, of its anticipated expansion of its TN service offering globally, of its expectation that its Safe Passage offerings would significantly accelerate the migration to SAP by lowering the PeopleSoft customer's total cost of ownership, and of its pledge to scale TN's offering by providing additional resources to meet expected significant demand.

233.     Also in the January 19, 2005 analyst call, SAP explained that from a financial perspective, "the rationale is more around the value . . . that these customers represent as a potential future set of customers for SAP applications.  And it's -- the value was estimated by Oracle . . . as $10 billion."

234.     SAP contemporaneously forecasted other benefits from being able to offer TN's claimed comparable or better than Oracle support at half price or less on January 19, 2005. These benefits included:

  a)  adversely impacting Oracle's share price,

  b)  adversely impacting Oracle's expected return on investment for its PeopleSoft acquisition,

  c)  adversely impacting Oracle's ability to pay for the PeopleSoft acquisition out of cash flow,

  d)  diminishing Oracle's ability to deliver as promised on the PeopleSoft acquisition,

  e)  taking support revenue away from Oracle and thus siphoning off Oracle's ongoing

1         product development research and development ("R&D") funding, discrediting

2         Oracle's efforts to create a next-generation applications platform,

3      f) and distracting Oracle from its core business by forcing Oracle to protect its

4         maintenance stream rather than sell software, all of which would potentially

5         impact Oracle's pricing and market position.

6      235.    Defendants intended and marketed that TN could provide support for all current

7  and retired PeopleSoft Enterprise releases, as well for all versions and products of J.D. Edwards

8  World and Enterprise One, and that it could do so globally.

9      236.    As of January 19, 2005, Oracle had just paid an up-front lump-sum amount of

10  $11.1 billion to acquire PeopleSoft.

11      237.    Further, "Oracle had just fought for almost two years for the right to purchase

12  [PeopleSoft which] was critical to Oracle's expansion in the applications business dominated by

13  SAP."

14      238.    Oracle acquired PeopleSoft in order to gain PeopleSoft's customer base.

15      239.    It expected to continue getting lucrative support revenue from that base, which

16  was essential to funding Oracle's ongoing R&D.

17      240.    The R&D would fund PeopleSoft-related support and products.

18      241.    Oracle also expected other important benefits from the PeopleSoft customer base.

19      242.    Oracle expected to up-sell and cross-sell additional products.

20      243.    Oracle expected to benefit from PeopleSoft's existing and in process application

21  software technology and intellectual property.

22      244.    Oracle expected through these benefits and others to become more competitive

23  against SAP.

24      245.    Oracle alone had the rights to leverage the PeopleSoft and J.D. Edwards

25  copyrighted materials it acquired to support the PeopleSoft customer base.

26      246.    Based on Oracle's contemporaneous pre-acquisition model for PeopleSoft, Oracle

27  expected an annual PeopleSoft support customer attrition rate of 3.5%, average annual support

28  fees of $125,000 to $130,000, an incremental license purchase rate of 14% of the support

JOINT PRETRIAL STATEMENT

1    customer base, average selling price of an incremental license of $130,000, average selling price

2    of a new license of $300,000, and annual support fees at a rate of 22% of license revenue.

3        247.    At the time of the PeopleSoft acquisition, Oracle recognized intangible assets

4    acquired of $6.5 billion in goodwill, and $3.4 billion in other intangible assets, which included a

5    value of $2.1 billion for existing maintenance agreements and customer relationships, and $250

6    million for new customer relationships acquired.

7        248.    A license to SAP for TN's use of Oracle's just-acquired PeopleSoft software and

8    support materials, would have endangered Oracle's achievements of all of its PeopleSoft

9    acquisition goals.

10        249.    "Oracle ha[d] never given any entity a license to 'copy Oracle's application

11    software and support materials in order to create their own fixes, patches or updates for

12    customers.'"

13        250.    The hypothetical license has "nothing in common with any agreement Oracle has

14    with any business Partner," and "the parties have no history of negotiating similar licenses for

15    the use of comparable enterprise software applications."

16        251.    Oracle would have understood and expected the license would "cover any

17    'attempt [by Defendants] to convert the customer to a competing software platform and . . . daily

18    wholesale copying and cross-use of Oracle's application software and support materials.'"

19        252.    Oracle would have understood and expected that the "license would have given

20    Defendants free rein 'to use Oracle applications and service support intellectual property to

21    aggressively compete against Oracle for applications customers and market share.'"

22        253.    Oracle would have expected that the hypothetically negotiated license would

23    undermine one of the purposes of its PeopleSoft acquisition, which was to expand its application

24    business such that it could equal or surpass SAP.

25        254.    Oracle would have viewed the license as creating a "zero-sum" situation: any

26    customer lost by Oracle would be a customer gained by SAP.

27        255.    With a license to its arch rival and powerful competitor SAP at this critical time,

28    Oracle would have expected the potential loss of thousands of PeopleSoft customers and not to

1  have enjoyed most of the above-described benefits Oracle anticipated from the PeopleSoft

2  acquisition.

3      256.    Oracle also would have expected to have to spend significant sums and time in

4  efforts to prevent its PeopleSoft customers from leaving to TN and/or SAP.

5      257.    If 30% of the approximately 10,000 acquired PeopleSoft support customers would

6  be lost to SAP, Oracle executives would consider the fair market value of that loss to be

7  approximately $3.33 billion, or 30% of PeopleSoft's acquisition price.

8      258.    The fair market value to Oracle and SAP of TN's use of Oracle's PeopleSoft and

9  J.D. Edwards copyrighted software and support materials is $2 billion.

10      259.    The date of the hypothetical negotiation to arrive at the license for the fair market

11  value of use of Siebel IP is the day TN first supported a Siebel customer, September 29, 2006.

12      260.    Through its acquisition of Siebel, Oracle had become the leader in Customer

13  Relationship Management ("CRM") software applications and also SAP's undisputed main

14  enterprise application software competitor.

15      261.    SAP estimated that SAP's "competitive edge diminished by 40% post SEBL

16  acquisition."

17      262.    SAP wanted to stop Oracle's ever-increasing competitive traction from its

18  enterprise application software acquisitions.

19      263.    Oracle's pending acquisition of Siebel prompted SAP's Executive Board to

20  expand its Safe Passage program to include offerings for Siebel customers.

21      264.    SAP believed that the acquired Siebel customer base was vulnerable to defection

22  from Oracle.

23      265.    By including Siebel in its Safe Passage program, SAP was able to quickly offer

24  them a uniquely attractive alternative to staying with Oracle to take advantage of that perceived

25  vulnerability.

26      266.    SAP believed that being able to offer Oracle's just acquired Siebel customers the

27  claimed comparable or better support at half price or less through TN would provide SAP many

28  benefits.

    Case No. 07-CV-01658 PJH (EDL)

JOINT PRETRIAL STATEMENT

1   267.   These benefits included the ability to grow maintenance revenue for TN, to create

2   future SAP license revenue, to take away lucrative and needed maintenance revenue from Oracle

3   and to otherwise distract Oracle.

4   268.   A contemporaneous SAP Business Case for providing TN support for Oracle-

5   acquired Siebel customers asserted that the Siebel customer base consisted of 4,000 customers,

6   including a large number of joint SAP/Siebel customers, and presented a "huge market

7   opportunity" for SAP.

8   269.   SAP forecasted and expected to win 40, 100 and 200 customers of TN for Siebel

9   support between 2006 and 2008 and projected TN revenues would grow from €1.5 million in

10  2006 to €5.8 million in 2007 to €11.9 million in 2008 on which TN would earn a 32% margin.

11  270.   In another contemporaneous SAP forecast (dated October 2005) titled "Siebel

12  Safe Passage Program Playbook," SAP stated it believed it had the opportunity to migrate at least

13  300 Siebel customers to mySAP CRM.

14  271.   By expanding TN's support delivery method to Siebel, SAP could avoid spending

15  billions of dollars to independently develop products similar to the Siebel-owned materials that

16  TN infringed as part of attracting and supporting customers.  SAP could also avoid the

17  significant delays and inevitable missteps associated with such a development effort.

18  272.   Oracle had just paid an up-front lump sum of $6.1 billion to acquire Siebel.

19  Among the key assets acquired was Siebel's lucrative support revenue.

20  273.   This revenue was essential to funding Oracle's ongoing R&D, including for

21  Siebel-related product and support development.

22  274.   At the time of the Siebel acquisition, Oracle recognized intangible assets acquired

23  of $2.5 billion in goodwill, and $1.6 billion in other intangible assets.

24  275.   These assets included a value of $808 million for existing maintenance

25  agreements and customer relationships.

26  276.   The Siebel products Oracle acquired were considered "best in breed" in the

27  industry.

28  277.   Siebel had spent at least hundreds of millions of dollars developing them.

1    278.    Oracle alone had the rights to leverage the Siebel copyrighted materials it

2    acquired to support the Siebel customer base.

3    279.    Oracle's goals for the Siebel acquisition included obtaining Siebel's customer

4    base, being able to sell that base other Oracle products, using the valuable maintenance support

5    stream to fund future R&D, gaining additional traction against SAP and establishing a leadership

6    position in the CRM market.

7    280.    SAP's backing of TN's support for Siebel applications, combined with TN's 50%

8    off or more Oracle support pricing, made TN a uniquely attractive third party alternative support

9    provider to Oracle's just-acquired Siebel customers.

10    281.    That the hypothetically negotiated license would allow TN to leverage Oracle's

11    proprietary Siebel software and support materials would make that offering all the more

12    attractive.

13    282.    Oracle was aware of Siebel's level of source code protection and of SAP's and

14    TN's inability to convert as many acquired PeopleSoft customers as expected by SAP, Oracle

15    and the analysts in 2005.

16    283.    A license to SAP for TN's use of Oracle's just-acquired Siebel software and

17    support materials would endanger Oracle's achievement of its acquisition goals for Siebel.

18    284.    With a license to its arch rival and powerful competitor SAP, Oracle would have

19    expected to lose many Siebel customers and not to have enjoyed many of the above-described

20    anticipated benefits of the Siebel acquisition.

21    285.    Oracle also would have expected to have to spend significant efforts and costs to

22    prevent its acquired Siebel customers from leaving to TN and/or SAP.

23    286.    The fair market value to Oracle and SAP of TN's use of Oracle's Siebel

24    copyrighted software and support materials is at least $100 million.

25    287.    Oracle's Database software was "critical" to TN's provision of maintenance

26    services.

27    288.    SAP and TN knew they did not have, and needed, a license from Oracle in order

28    for TN to access, copy and/or use Oracle's Database software and related materials in the manner

1    it did.

2        289.    TN could not have offered the advertised "comparable" or "superior" support it

3    did, at the price it did, in the manner it did, and in the time period it did, to Oracle's PeopleSoft,

4    J.D Edwards, and Siebel applications customers without the copies of the Oracle Database

5    programs it used.

6        290.    In addition to the 71 unique customers related to TN local environments running

7    Oracle Database software, at least 43 additional PeopleSoft customers received fixes that were

8    developed and/or tested on an Oracle Database software instance associated with a different

9    customer's local environment on TN's servers.

10       291.    It is more likely than not that every one of TN's 172 PeopleSoft HRMS customers

11   received support delivered, at least in part, through TN's use of Oracle Database software for

12   which TN had no commercial license.

13       292.    TN repeatedly asked SAP for help regarding obtaining such a license for Oracle

14   Database Software.

15       293.    SAP never did secure an appropriate Database software license from Oracle.

16       294.    No standard Database software license Oracle has ever issued would permit a

17   licensee to use – or to have its third party support vendor use – Oracle's Database software in the

18   manner in which TN did.

19       295.    SAP and Oracle have an agreement that allows SAP to develop SAP database

20   applications and resell Oracle's Database software to SAP customers.

21       296.    That contract does not permit TN's use of Oracle's Database software.

22       297.    TN used Oracle Database software for at least 130 local environments accessed

23   on TN's internal systems.

24       298.    Some customers had more than one environment associated with them.

25       299.    Based on the servers used by TN, Oracle would price a license for TN at six

26   processors.

27       300.    The fair market value to Oracle and SAP of TN's use of Oracle's Database

28   software is $55.6 million.

1   301.   The sale of any Oracle Database software licenses to TN would have little, if any,

2   impact on Oracle's costs.

3   302.   TN's use of Oracle Database software was not consistent with the rights granted

4   under a standard database license.

5   303.   However, as a benchmark for pricing a hypothetical license to TN for its use,

6   Oracle's list price per processor per customer for the basic Enterprise Edition license and support

7   between 2004 and 2008 was $40,000/processor for the license and $8,800/processor per year for

8   support.

9   304.   Between 2002 and October 31, 2008, TN had over 358 PeopleSoft, J.D. Edwards

10   and/or Siebel support customers, approximately 300 of which it acquired after SAP acquired TN.

11   305.   From 2005 (when SAP acquired TN) through 2008, SAP received $899.6 million

12   in revenue from sales of SAP software licenses, support, training and other services to the 86

13   SAP customers after the customer started receiving support services from TN.

14   306.   The parties dispute the extent to which the alleged actions caused Plaintiffs to lose

15   support revenue.  Plaintiffs contend that, but for TN, most or all of the customers at issue would

16   have renewed their support services agreements with Plaintiffs consistent with Plaintiffs' average

17   renewal rate for its entire customer base.  Defendants contend that customers cancelled the

18   agreements for reasons unrelated to TN and would have done so even absent TN.

19   307.   The parties dispute the extent to which alternatives to TN existed to customers

20   who wished to cancel their support agreements with Plaintiffs.

21   308.   For a support option other than TN to be a viable alternative to PeopleSoft or

22   Oracle support, the option had to be known to the customer, available on their application(s) in

23   their geography, and not unacceptably risky by virtue of size, reputation, insufficient operating

24   history or lack of financial stability or adequate backing.

25   309.   Self support was rarely an option considered or used by customers leaving Oracle

26   support.

27   310.   The parties dispute the extent to which the alleged actions caused the 86

28   customers to purchase products or services from SAP.  Defendants contend that most or all of the

60

1  purchases were made for reasons unrelated to TN and/or the alleged actions, and would have

2  been made even in the absence of TN and/or the alleged actions.

3      311.    The parties dispute the extent to which the alleged actions were reasonably related

4  to the 86 customers who purchased products or services from SAP while they were with TN.

5  Defendants contend that most or all of the purchases were made for reasons unrelated to TN

6  and/or the alleged actions, and would have been made even in the absence of TN and/or the

7  alleged actions.

8      312.    Defendants' recruitment of customers away from Oracle caused Oracle to lose

9  support revenue for those customers.

10     313.    Customers switch from either Oracle or SAP for various reasons.  Some reasons

11  include the total cost of ownership, reputation, because of a merger or acquisition, or the desire

12  to standardize on one ERP vendor's software.

13     314.    Customers rarely cancel their support services with either Oracle or SAP.

14  Reasons for cancellation include cost or a lack of perceived value from the service.

15     315.    Once a customer was dislodged from PeopleSoft or Oracle by TN, it usually

16  resulted in a permanent or long term support revenue loss to Oracle because of financial and

17  political obstacles for that customer to return to Oracle for support.

18     316.    Any TN customer who also transitioned to SAP applications was even harder for

19  Oracle to get back because of costs and time expended on the product switch.

20     317.    If TN did not exist (or if TN were not providing illegal support), those customers

21  lost to TN more likely than not would have stayed with PeopleSoft and/or Oracle.

22     318.    One or more of the following facts support this conclusion:

23         a)  Absent its misuse of Oracle's software and support materials, TN would not have

24             been able to market the ability to provide comparable or better service at a

25             significantly lower price than first PeopleSoft and then Oracle.

26         b)  Former TN customers have confirmed that TN customers would not have left

27             PeopleSoft or Oracle support if TN did not offer support comparable to or better

28             than the vendor.

Case No. 07-CV-01658 PJH (EDL)

c) Most TN customers would not have gone to TN if TN did not offer 50% or more off vendor support.

d) Former TN customers have confirmed that no TN customers would have chosen TN if that customer had known that TN provided support through misuse of PeopleSoft and/or Oracle software and support materials.

e) The acquisition of TN by SAP made TN a more legitimate, more financially viable, and less risky option for customers.

f) Throughout the entire time period that TN provided third party vendor support for PeopleSoft, J.D. Edwards and Siebel products, the market for support of these products was primarily a two supplier market consisting of TN and Oracle.

g) Most of the other third party service providers for the relevant products who operated at any time TN did are no longer in business or only offer consulting services that differ from the level of support that Oracle or TN provided.

h) Rimini Street, a third party support vendor for the applications at issue beginning in 2006, was founded by the former President of TN.  It was described as having the exact same business model as TN.

i) While TN was in business, Oracle, TN and SAP all viewed TN as Oracle's only significant competition for support on PeopleSoft, J.D. Edwards and Siebel applications.

j) TN customers did not know of and/or did not seriously consider leaving PeopleSoft or Oracle support for any other third party support provider other than TN when they left for TN.

k) The acquired PeopleSoft customers who stayed with Oracle, post-acquisition, reported increased satisfaction with the support services provided.

319.    For PeopleSoft and Oracle, prior to 2007 or 2008, the only third party vendor whom Oracle's applications customers considered a comparable support provider was TN. Subsequently, Rimini Street, whose founder came from TN, has received some interest, as it appears to employ an approach that is similar to TN's model, and acquired a large number of TN

Case No. 07-CV-01658 PJH (EDL)

1    customers when TN was shut down.

2          320.    Defendants' illegal acts, except where otherwise excluded based on evidence

3    Oracle's damages expert will explain at trial, caused Oracle to lose the customers who went to

4    TN.  Otherwise, Oracle would have retained them at its annual retention rates

5          321.    Oracle has suffered lost support profits damages beginning on the date that each

6    TN customer cancelled its contract, or contracts, with Oracle and switched that support to TN.

7          322.    Those damages include standard annual contractual increases or inflationary

8    increases.

9          323.    The damages are subject to adjustments for historic incremental profit margins

10   and certain Oracle inter-company payments.

11         324.    Except in certain customer-specific circumstances, a customer's damages end 10

12   years after Oracle's acquisition of PeopleSoft, based on Oracle and SAP evidence on the

13   expected life of a support customer.

14         325.    Oracle's lost support profits are $156.4 million for Plaintiff Oracle USA, $120.7

15   million for Plaintiff OIC and $41.0 million for Plaintiff OEMEA.

16         326.    Because SAP operated TN as a loss leader, and because of costs associated with

17   this lawsuit and its closure by SAP, TN had minimal revenue and no profits.

18         327.    TN's "comparable" or "better" support at low, or often no, cost to these eventual

19   SAP applications customers, was a factor in their decisions to purchase SAP products and

20   services.

21         328.    SAP, the largest and most experienced enterprise application software vendor,

22   premised its use of TN as the "cornerstone" of its Safe Passage marketing program based on its

23   expectation that TN would drive just such SAP cross-sales and up-sales.

24         329.    After appropriate adjustments based on, *e.g.*, evidence that TN was not a factor in

25   a customer's SAP purchasing decision, and after deducting SAP's costs and applying a 50%

26   profit margin, the infringers' profits damages from SAP are $288.6 million.

27         330.    Defendants avoided significant research and development costs, as well as risks

28   and delays  associated  with  creating  the  PeopleSoft,  J.D.  Edwards,  and  Siebel  software

1   applications and support materials used by TN.

2     331. Conservatively, Defendants avoided billions of dollars in development costs and

3   avoided years of delays to market.

4     332. Defendants also avoided incurring the licensing costs and support fees to use

5   Oracle's Database software as TN did in the servicing of its customers.

6     333. Conservatively, those avoided database licensing and support costs are $55.6

7   million.

8     334. In conducting both investigations related to TN's downloading, in the first year

9   after discovery, Oracle incurred costs of approximately $306,000 related to personnel time and

10   labor, hardware and software, travel and telecommunications.

11     335. Oracle has incurred significant ongoing legal expenses related to this matter

12   including attorney's fees, costs and other recoverable legal expenses.

13     336. These fees and costs are not yet quantified because they continue to mount.

14     337. Oracle is entitled to, as yet to be quantified, pre-judgment interest on any damages

15   awarded.

16     338. As a result of Defendants' illegal conduct, Oracle has also suffered irreparable

17   injury and, unless Defendants are enjoined, will continue to suffer irreparable injury, whereby

18   Oracle has no adequate remedy at law.

19     339. Defendants' conduct, described above, was malicious, oppressive or in reckless

20   disregard of Oracle's rights.  For example:

21      a) TN created a sophisticated software automation program, called Titan, that

22       intentionally downloaded approximately a million files using the login credential

23       of a former Oracle employee and TN continued to test and use the Titan program

24       even after it learned it crashed Oracle's systems.

25      b) Defendants continued to provide support services to customers and grow TN's

26       support business, even encouraging customers to serve as references for one

27       another, with knowledge that TN's support model relied on violation of those

28       customers' license agreements with Oracle.

c)  Defendants continued to make and use illegal copies of Oracle software even after the start of this litigation.

d)  Defendants knowingly destroyed or altered evidence important to Oracle's proof of Defendants' illegal conduct.

340.  Defendants' conduct, described above, was accompanied by ill will, or spite, or undertaken for the purpose of injuring Oracle.

341.  For example, TN served as a "strategic weapon" against Oracle, designed to "hurt Oracle" and fuel SAP's "Oracle disruption campaign."

342.   As another example, SAP boasted they left a "ticking time bomb" for Oracle through SAP's acquisition of TN.

343.  Defendants acted in the face of known risks that their actions would violate Oracle's rights under federal law.

344.  For example, SAG AG approved the acquisition of TN despite its knowledge that TN was servicing its customers with intellectual property that resided on TN's own computers and that TN's operating issues presented the risk of "serious liability."

345.   As another example, TN downloaded software and support material from Oracle's websites without regard for rules and restrictions – even after TN employees informed management that they believed that their access and downloading were illegal.

346.  If and when the Court determines punitive damages are appropriate given the facts and findings at trial, Oracle shall present appropriate punitive damages calculations and demands.

## **DEFENSES**

347.  The parties dispute whether, and to what extent, each of Plaintiffs' relevant agreements with TN's customers permit the complained-of activities.

348.  The parties dispute whether, when, and to what extent, Plaintiffs knew or should have known about the complained-of activities prior to filing this lawsuit.

349.  The parties dispute whether, and to what extent, Plaintiffs expressly or impliedly consented to the complained-of activities.

1    350.    The parties dispute whether TN, or any Defendant, is a party to any agreement

2    relating to access or use of any of Plaintiffs' website at issue in the litigation.

3    351.    A letter dated July 10, 2002, from David Chavez, Assistant General Counsel of

4    PeopleSoft, Inc. to Seth Ravin, then Co-President of TomorrowNow, Inc. ("TN") stated that

5    TN's activities "violate PeopleSoft's rights," including through "access to confidential

6    PeopleSoft information in your possession" and "misleading" representations regarding its

7    ability to offer support services to PeopleSoft customers.

8    352.    James Spencer, general counsel for TN, sent a response letter on behalf of TN

9    dated July 27, 2002.  In that response to the 2002 letter from PeopleSoft, TN denied any

10   violation of PeopleSoft's rights.

11   353.    PeopleSoft did not respond to Mr. Spencer's letter.

12   354.    On April 21, 2004, Terry Wagner, Manager Subcontracts at Lockheed Martin, e-

13   mailed Gregory Stevenson at PeopleSoft, stating, "In order for Lockheed Martin to engage

14   TomorrowNow for continued support of V7.5 tax updates we need to have PeopleSoft's

15   authorization to provide the CD's that they are requesting."  The same day, Stevenson forwarded

16   Wagner's e-mail to Seth Ravin, then Co-President of TN, asking "Why would we need to

17   provide authorization?"  The April 21, 2004 e-mail received by Mr. Stevenson includes an e-mail

18   from Shelley Nelson of TN stating that "TomorrowNow's standard procedure is to get a demo

19   copy of your PeopleSoft Demo software CD's in order to install a 'demo support environment' at

20   TomorrowNow on your behalf.'"   The April 21, 2004 email also indicates that Mr. Stevenson

21   "recommended" TN to Lockheed Martin for "continued tax update support of version 7.5."

22   355.    In or around December, 2004, PeopleSoft suggested that customer UBS look at

23   third party support providers for maintenance of its PeopleSoft products.

24   356.    Seth Ravin testified that, in late 2002, Andy Allbritten of PeopleSoft proposed

25   that "TomorrowNow focus on smaller customers and that PeopleSoft would take the large

26   customers."

27   357.    On August 2, 2004, Sharon Piper, then an employee of TN, e-mailed PeopleSoft

28   employee Surasi Pavani, stating: "I compared the SQR you had attached in your e-mail to ours

1    and it is identical. I am not seeing the paygroup or account code in the header. Could you send

2    me a copy of how the output looks from your system? I am attaching a copy of how it looks

3    when I run it in our demo database."

4         358.    On September 1, 2004, Kevin Maddock, Vice-President of Support Service Sales,

5    stated that PeopleSoft should begin tracking information "about all customers who state that a

6    3rd Party is offering to sell them support."

7         359.    An email dated October 13, 2004 from a PeopleSoft customer to Andy Allbritten,

8    the Managing Director and Group Vice President PeopleSoft Support Services, Worldwide Sales

9    & Operations, stated that "TomorrowNow encourages customers, while they are under existing

10   PSoft support to grab the latest release, prior to PSoft maintenance expiring."

11        360.    The customer's October 13, 2004 email to PeopleSoft's Andy Allbritten did not

12   inform him that TN, rather than the customer, was downloading materials from PeopleSoft or

13   that TN was taking more support materials for applications that the customer was not licensed

14   for.

15        361.    On October 14, 2004, after PeopleSoft became aware that TomorrowNow

16   encouraged PeopleSoft customers to "grab" the latest version of their software before they

17   cancelled PeopleSoft support, a PeopleSoft employee informed PeopleSoft's Managing Director

18   and Group Vice President PeopleSoft Support Services, Worldwide Sales & Operations that

19   "some safeguards are needed (per our discussion this am…) to protect our Update/Fix IP."

20        362.    This follow on email on October 14, 2004 about the information provided to Mr.

21   Allbritten from the customer about TN conveyed no knowledge by PeopleSoft of any

22   improprieties by TN. Rather, PeopleSoft thought TN was using a loophole from PeopleSoft's

23   "product drop support process technical gaps."

24        363.    On October 27, 2004, the head of PeopleSoft's competitive intelligence for

25   support services instructed a colleague to review TomorrowNow's website on a weekly basis

26   after Andy Allbritten stated that TomorrowNow had "updated their website and how (sic) state

27   they will also be offering support for the E1 and World product lines."

28

1    364.    In November 2004, the TomorrowNow website indicated that TomorrowNow was

2    providing software support services for PeopleSoft software, including fixes and updates.

3    365.    In November 2004, PeopleSoft circulated internally a document titled "Third

4    Party Support Vendor Questions" that purported to be a series of "questions customers should

5    ask potential third-party support vendors prior to dropping enterprise software support" and

6    included the following questions under the section titled "Intellectual Property and

7    Confidentiality Issues":

8        a.  "Have you taken and used software updates downloaded from an enterprise

9            software vendor by a customer and applied them to other customers?  Have you
        applied updates to those that are no longer receiving support from the creating

10           vendor?"

    b.  "Have you taken and used software upgrade scripts downloaded from an

11           enterprise software vendor by a customer and applied them to multiple
        customers?"

12       c.  "Have you used an end customer ID to access an enterprise software vendor's
        website to download software?"

13       d.  "Are you offering me indemnification that the fixes you provide do not infringe

14           upon the intellectual capital of the vendor?"
    e.  "What mechanisms do you have in place to ensure that intellectual capital abuses

15           don't take place?"

16   366.    The November 2004 PeopleSoft document titled "Third Party Support Vendor

17   Questions" was marked confidential and for internal use, was never provided to any customers,

18   and no feedback was ever received or collected related to any of the listed questions.  After the

19   acquisition of PeopleSoft, Oracle never used the document.

20   367.    On December 7, 2004, Nancy Lyskawa indicated that "My team is actually

21   leading the competitive/marketing strategy on the emerging third party support providers.

22   [Redacted sentence] We are very aware of TomorrowNow and have quite a bit of information on

23   them."

24   368.    In the fall of 2004, when PeopleSoft first began tracking TN, the only information

25   PeopleSoft employee, Ms. Lyskawa, and her small team of PeopleSoft support marketers had on

26   TN was what they learned from TN's website, which provided no indication that TN was

27   supporting customers in a manner that violated PeopleSoft's intellectual property or contract

28   rights.

Case No. 07-CV-01658 PJH (EDL)

JOINT PRETRIAL STATEMENT

369. Prior to acquiring PeopleSoft, Oracle asked PeopleSoft to provide them with the number of customers lost to the third party emerging market, including the names of the third party competitors and lost revenue dollars.

370. A document created on January 19, 2005 by Julie O'Shea, a Senior Product Manager at Oracle, states: "Worried at first about companies like TomorrowNow infiltrating the Update Center."

371. An Oracle document created in 2005, entitled "Oracle Support Exclusive Advantages Versus Third Party Vendor Support" states, "While Oracle recognizes that vendors can legitimately offer competitive support services for PeopleSoft products; we are concerned about the potential violation of our intellectual property rights and the terms of our contracts. We are investigating this matter vigorously and will pursue any and all means at our disposal to protect the company's assets."

372. Plaintiffs' privilege logs in this case demonstrate that they anticipated litigation against TN at least as early as September 2004.

373. On January 12, 2005, in response to Richard Blotner's January 11, 2005 email referencing TN, Oracle's Michael Lochead stated in an email: "As far as I know, there are no obvious 'violations' at this point, but I believe we want to reinforce the fact that they cannot be using any orcl/psft intellectual property for the services they provide."

374. Oracle employee Buffy Ransom discovered Defendants' illegal downloading in November 2006. Oracle learned of Defendants' other infringing activities after filing this lawsuit.

375. Prior to Ms. Ransom's discovery of TN's downloading activity, Oracle had no knowledge that TN was illegally downloading or otherwise infringing Oracle's copyrights.

376. Prior to Ms. Ransom's discovery of TN's downloading activity, the only information first PeopleSoft and then Oracle had on TN came from TN's website and from what limited hearsay information customers would relate. TN's website provided no indication that TN was providing support illegally; to the contrary TN and SAP repeatedly conveyed publically and to customers that TN's support model was legitimate.

377.    Prior to Ms. Ransom's discovery of TN's downloading activity, Oracle had no knowledge or information about how TN provided its support.

378.    Prior to Ms. Ransom's discovery of TN's downloading activity, Oracle's executives never believed that a company of SAP's stature would condone TN's now admitted violations of Oracle's intellectual property or contractual rights.

379.    Prior to Oracle filing this lawsuit, neither TN or SAP ever told Oracle that SAP or TN had directly or indirectly infringed Oracle's copyrights, or otherwise violated Oracle's intellectual property or contractual rights.

## ADDITIONAL FACTS

380.    In June 2003, Plaintiffs initiated a hostile acquisition of for PeopleSoft.

381.    Plaintiffs' attempt to acquire PeopleSoft caused PeopleSoft to initiate a lawsuit against Plaintiffs.  It was also the subject of an anti-trust action by the Department of Justice.

382.    The acquisition attempt also caused concern among PeopleSoft and JDE customers over the future of PeopleSoft and JDE products and support, and whether customers may be forced to migrate to a new product line called Fusion that Plaintiffs were developing.

383.    The customer fear, uncertainty and doubt over Oracle's acquisition of PeopleSoft was created by many sources, including Oracle's arch rival, SAP and other Oracle competitors, each of which hoped to benefit from PeopleSoft customers' concerns.  To address PeopleSoft customer fear, uncertainty and doubt, Oracle announced that it would "continue to develop and improve PeopleSoft's products for at least the next ten years -- even longer, if customers require further support."

384.    Oracle also made a "public commitment to PeopleSoft customers" that they would "not be forced to convert to Oracle" products, and that Oracle would "increase the value of [their] PeopleSoft investments through ongoing enhancements and maintenance delivered by one of the largest software development organizations in the world."

385.    During Oracle approximately 18 month attempt to acquire PeopleSoft, SAP and other ERP vendors saw a competitive opportunity to win PeopleSoft and JDE customers who were concerned that Oracle may succeed in acquiring PeopleSoft.  SAP initiated a marketing

JOINT PRETRIAL STATEMENT

1    program called Safe Harbor intended to take advantage of that competitive opportunity.

2        386.    Oracle finalized its acquisition of PeopleSoft on January 7, 2005 and had a much-

3    publicized public unveiling by its highest executives of its going-forward plans for PeopleSoft on

4    January 18, 2005.

5        387.    The timing of SAP's acquisition of TN and announcement of Safe Passage was

6    designed by SAP to undermine Oracle's prior day's presentation on its going-forward plans for

7    PeopleSoft.

8        388.    Throughout SAP TN's operating years, SAP advertised, and touted internally and

9    externally, that TN was the "cornerstone" of the Safe Passage program.

10       389.    Customers switch ERP vendors for a variety of reasons, including a desire to

11   standardize on one ERP vendor's software or to obtain specific functionality that is only

12   available from another vendor.

13       390.    Customers also cancel an ERP vendor's support services for a variety of reasons,

14   including cost, dislike of the vendor's support service, or a lack of perceived value from the

15   service.

16       391.    Customers who cancel an ERP vendor's support service may obtain support

17   services from another provider, some combination of other providers, or may go without support

18   from an outside party (i.e. self-support).

19       392.    Plaintiffs identified several characteristics of "at risk" customers.  These include

20   customers on old and/or stable releases of products, customers who do not intend to upgrade to a

21   new release of a product, and customers who require little or no support.

22       393.    Plaintiffs identified the characteristics of "at risk" customers after SAP and TN

23   began offering their services.  The most prevalent "at risk" factor was cost of support, and the

24   greatest risk to Oracle was that these customers would leave for SAP TN.  This risk is why

25   Oracle began tracking such customers.

26       394.    Over the relevant time period, on average, Oracle applications customers using

27   alternative support options account for less than 3% of all Oracle applications customers.

28

395.     PeopleSoft also competed in certain aspects of the ERP software and support business, offering its own products and those of J.D. Edwards, Inc. ("JDE"), which PeopleSoft had acquired shortly before Plaintiffs' hostile acquisition.

396.     Like Safe Harbor, SAP's Safe Passage program was intended to win PeopleSoft and JDE customers.

397.     Of the 358 TN customers, at least 86 were customers that purchased TN support services and SAP products or services simultaneously, or that were existing TN customers at the time that they purchased new SAP software.

398.     There may also have been an untold amount of additional customers who purchased TN support services and migrated to SAP via their parent companies' SAP volume contracts.

399.     SAP products and services sold to these customers included both the sale of SAP software to replace the customers' PeopleSoft, J.D. Edwards or Siebel applications, as well as sales of other non-replacement SAP products and services.

400.     After merging with and into OSC, the PeopleSoft and JDE entities ceased to exist as independent entities.

401.     OEMEA is a part of and acts for the benefit of Oracle's consolidated corporate operations, the headquarters of which are located in California.

402.     OEMEA's sales territory is Europe, the Middle East, and Africa.

403.     OEMEA's sales territory includes various countries in Europe, the Middle East, and Africa.

404.     OEMEA's customers contract with Oracle distributors, Oracle commissionaires and undisclosed agents acting on OEMEA's behalf pursuant to various agreements.  The commissionaires', undisclosed agents' and distributors' territories are in Europe, the Middle East, and Africa.

405.     OEMEA's customers contract with directly with OEMEA, through Oracle distributors, or through Oracle commissionaires and undisclosed agents acting on OEMEA's behalf pursuant to various agreements. The commissionaires', undisclosed agents' and

1  distributors' territories include one or more countries in Europe, the Middle East, and Africa.

2       406.   OEMEA's customers are located outside the U.S.

3       407.   Many of OEMEA's global customers have locations in California.

4       408.   TN is a Texas corporation with its principal place of business in Bryan, Texas.

5       409.   TN's support of customers, both domestic and abroad, occurred in Texas.

6       410.   TN's support of customers, both domestic and abroad, occurred from its offices in

7  Texas and around the world, including the United Kingdom, Singapore, Australia and other

8  European locations.

9       411.   TN's marketing to European customers occurred in Europe.

10       412.   TN's marketing to European customers originated in California and Texas, in

11  collaboration with SAP employees in California. Germany and elsewhere, and occurred in

12  Europe, among other places.

13       413.   Even though they are direct competitors, Oracle and SAP have a reseller

14  agreement for SAP to sell Oracle's database software, which has resulted in billions of dollars in

15  sales.

16       414.   TN ceased actively supporting customers on October 31, 2008, and as to date has

17  not resumed those support activities.

18

19

20

21

22

23

24

25

26

27

28

# IV. STIPULATIONS

## A. Existing Stipulations

The Parties have agreed to the following stipulations:

    1.    Discovery responses served by the Parties are deemed verified by the responding party or Parties pursuant to the Federal Rules of Civil Procedure.

    2.    All documents and data produced by the Parties during the course of the litigation are authentic and genuine pursuant to the Federal Rules of Evidence.

    3.    The individual testimony of John Baugh and William Thomas on December 3 and 4, 2010, respectively, may be considered as corporate Rule 30(b)(6) testimony with respect to Defendants copying and use of Oracle's Database products.  The individual testimony of Michael Garafola on September 17, 2009, may be considered as corporate Rule 30(b)(6) testimony on the same topics.  The Oracle Database software to which Mr. Garafola referred to during his deposition originated from the same Oracle Database software downloads testified to by Mr. Baugh.

    4.    The Parties agree that deposition designations for the July depositions of Scott Trainor and Seth Ravin shall be due two weeks after the final transcript is received by the Parties and that any counter-designations shall be due three weeks after the final transcript is received.  To that end, the Parties have agreed to share costs to expedite these transcripts.

    5.    The Parties have agreed that certain native productions of databases used by Defendants shall be admissible pursuant to the Federal Rules of Evidence for certain purposes, as agreed by email on November 3, 2009 and as described in the Stipulation re Admissibility of TN Databases.

    6.    The Parties agree that for readability and ease of use of trial exhibits, they will cooperate in substituting native documents with appropriate markings for any previously marked non-native version of trial exhibits.

    7.    The Parties have agreed to the availability for trial of certain media stored at TN, including the collection of media known as the "CD Binders", and the admissibility of a neutral-party index of information recorded on the labels of certain of that media, all as reflected in the CD Storage and Access Agreement of October 23, 2009.  The Parties have also stipulated to the admissibility of the final version of the related Merrill Corporation Coding Manual of October 27, 2009.

1        **B.      Oracle's Proposed Stipulations**

2        Oracle has submitted two extensive stipulations to Defendants in an effort to streamline

3    the liability case, attached as Exhibits A and B.

4        **C.      Defendants' Proposed Stipulations**

5        Defendants have proposed that Plaintiffs dismiss those claims for which Plaintiffs have

6    pursued entirely duplicative damages/monetary relief.  Defendants have also proposed that the

7    parties stipulate to bifurcation of the trial as described in Section VII(B).  Defendants have also

8    proposed that the parties agree to narrow liability issues and focus this case on damages, as more

9    fully described in their Trial Brief.

10   **V.    DISPUTED POINTS OF LAW**

11       The Parties agree that there will be a number of discrete points of law in dispute at or

12   before trial, including legal disputes as to the admissibility of evidence, some of which are

13   addressed in the Parties' separately filed motions in limine and will be addressed in *Daubert*

14   motions to come.  Similarly, issues pending on summary judgment are not all addressed below.

15   The Parties have endeavored to identify below the key disputed points of law that this Court will

16   have to decide at or before trial.  The issues in ¶¶ 2-4 and 6 were previously presented in

17   Oracle's Motion for Partial Summary Judgment, Dkt. No. 649.  This is not intended to be an

18   exhaustive list of all disputed points of law that may arise at or before trial.

19       1.      The evidentiary weight to be given to six certificates of copyright registrations

20   (and the factual statements in those registrations), which must be determined by the court under

21   17 U.S.C. § 410(c) because the copyrights were not registered within five years of first

22   publication.  This evidentiary determination in ¶ 1 "shall be within the discretion of the court.".

23   17 U.S.C. § 410(c).

24

25

| Registration Number | Registration Date | Title of the work. | Date of Publication |
|---|---|---|---|
| TX 6-541-029 | 4/26/2007 | Initial release of JD Edwards World A7.3 | 6/3/1996 |
| TX 6-541-047 | 4/26/2007 | Initial release of JD Edwards World A8.1 | 10/1/1997 |

26

27

28

| Registration Number | Registration Date | Title of the work. | Date of Publication |
|---|---|---|---|
| TX 6-541-033 | 4/26/2007 | Initial release of JD Edwards EnterpriseOne XE | 9/18/2000 |
| TX 6-941-989 | 6/29/2009 | Siebel 6.3 Initial Release and Documentation | 12/15/2000 |
| TX 6-941-988 | 6/29/2009 | Siebel 7.0.5 Initial Release and Documentation | 11/15/2001 |
| TX 6-941-990 | 6/29/2009 | Siebel 7.5.2 Initial Release and Documentation | 9/4/2002 |

2.      Whether, for each asserted copyright registration that is a derivative work, OIC must plead and prove infringement of prior registered versions of the same work in addition to proving infringement of the asserted, registered derivative work, where all or almost all of the code contained in prior registered works is also contained in the asserted, registered derivative work.

3.      Whether, for literal copying of unregistered derivative works, OIC may use a prior registered work to prove infringement of the later, unregistered derivative versions of the same work where all or almost all of the code contained in the asserted, prior registered work is also contained in the unregistered derivative works.

4.      Whether, for literal copying of unregistered works, OIC may use a later, registered derivative work to prove infringement of the prior, unregistered versions of the same work where all or almost all of the code contained in asserted, prior registered works is also contained in the unregistered derivative work.

5.      Whether, for certain asserted copyright registrations that are derivative works, OIC may prove infringement of each derivative work by proving infringement of the unregistered, incremental changes between the earlier version and the derivative version.

6.      Whether (and under what circumstances) Plaintiffs or Defendants bear the burden of proof on any asserted license defense.

7.      The extent to which Plaintiffs' state law claims are preempted by the Copyright Act.

8.      Whether Plaintiffs must present and prove their various claims on behalf of the

1    specifically named Plaintiffs for each claim.

2        9.      Whether each Plaintiff pursuing a particular claim must prove its individual

3    damages and standing.

4        10.     Whether Plaintiffs must prove their claims specifically and individually against

5    each named Defendant.

6        11.     Whether awareness of a general pattern of ongoing infringement meets the

7    knowledge element of contributory infringement.

8        12.     Whether the contributory infringement standard is met by showing a parent

9    corporation knew about the infringement, could have stopped it, but did not.

10       13.     Whether Plaintiffs must prove that Defendants owed them a special duty of care

11   to prevail on their claim for negligent interference.

12       14.     Whether Plaintiffs' claim for unfair competition is barred for lack of standing.

13       15.     Whether Plaintiffs must prove some loss or transfer of property to recover for

14   unjust enrichment/restitution.

15       16.     The causation standards Oracle must satisfy for any lost profits or infringer's

16   profits claims it pursues.

17       17.     Whether Plaintiffs are precluded from pursuing an alleged fair market value

18   license when there is proof of lost profits.

19       18.     Whether (and if so to what extent) it is permissible to look forward to actual

20   results when calculating value at the time of a hypothetical negotiation to establish the fair

21   market value of infringed intellectual property.

22       19.     Whether Defendants can restrict "actual use" to only the Oracle software and

23   support materials identified in Defendants' support contracts with their customers, rather than the

24   full list of Oracle software and support materials that Defendants actually copied, used in

25   conducting and promoting their business, and stored on their computers, computer systems and

26   computer network.

27       20.     Whether Plaintiffs' claim for an accounting is moot in view of discovery in this

28   case.

JOINT PRETRIAL STATEMENT

1    21.    Whether Plaintiffs are entitled to any relief for unjust enrichment.

2    22.    Whether Plaintiffs are entitled to seek injunctive relief and/or restitution under

3  the UCL.

4    23.    Whether Plaintiffs are entitled to an accounting.

5  **VI.    STATEMENT REGARDING BIFURCATION OR SEPARATE TRIAL**

6    **A.    Plaintiffs' Statement**

7    Bifurcation under Federal Rule of Civil Procedure 42(b) is inappropriate in light of the

8  breadth of overlapping evidence between direct liability, indirect liability and damages in this

9  case.  Bifurcation would confuse the jury and extend the length of trial.  This matter does involve

10  numerous issues arising out of Defendants' illegal activities.  However, the evidence of direct

11  liability, indirect liability, actual damages and punitive damages is inextricably tied together.

12  Bifurcating in the way Defendants suggest would confuse the jury and prolong the trial because

13  the same evidence would be presented two, three or even four times.  For example, SAP TN

14  continued to infringe Oracle's copyrights after its acquisition by SAP pursuant to SAP policies

15  that merely restricted that infringement to segregated SAP TN facilities.  The infringement, and

16  the contribution to it, overlap almost exactly.  Similarly, SAP's expectations for SAP TN and the

17  scope of SAP TN's infringing business model both relate directly to damages.

18    The same witnesses and documents would be offered for direct liability, SAP's

19  knowledge and contribution to those infringing acts, and the value of the intellectual property

20  that SAP and SAP TN knowingly infringed.  Some of the same evidence of indirect liability

21  showing SAP's knowledge of TN's illegal business model at the time of the acquisition also goes

22  directly to punitive damages because it shows both knowledge of the illegal business model and

23  a malicious intent to harm Oracle (*e.g.* SAP AG Executive Board member Shai Agassi boasted

24  that SAP's acquisition of TN left a "ticking time bomb" for Oracle).

25    The quickest, most efficient way to decide this case is for the parties to present the

26  evidence once and only once.  Each side will present its case and the jury will deliberate on all

27  issues at one time.  Further, Defendants have already admitted liability at summary judgment on

28  a portion of direct liability and a portion of indirect liability.  Thus even if the jury found TN *not*

1    liable for other infringement presented at trial, the case would still proceed to the damages phase.

2            Defendants also argue that bifurcation is appropriate in light of the nine claims

3    Oracle has against Defendants.  That argument fails because those claims are all based on related

4    facts and issues -- SAP TN's infringing business model and SAP's knowing purchase and

5    continued facilitation of it.

6        In addition, Defendants' bifurcation proposal does not address any supposed

7    complication regarding those claims at all.  Bifurcating direct and indirect liability and actual and

8    punitive damages would not impact Oracle's nine direct liability claims at all.  There is no

9    efficiency gained by separating these issues.

10           In sum, the volume of overlapping evidence between direct liability, indirect

11    liability, actual damages and punitive damages strongly favors trying and resolving this matter in

12    one, non-bifurcated, trial.  The party requesting bifurcation has the burden to prove that

13    bifurcation is warranted "[f]or convenience to avoid prejudice, or to expedite and economize in

14    that particular case."  *See* FRCP 42(b); *Spectra-Physics Lasers, Inc. v. Uniphase Corp.*, 144

15    F.R.D. 99, 102 (N.D. Cal. 1992).  <u>Defendants have not met that burden</u>.  *See, e.g., Intersong-*

16    *USA, Inc. v. CBS, Inc*., No. 84 Civ. 998 (JFK), 1985 U.S. Dist. LEXIS 21588, at *3-4 (S.D.N.Y.

17    Mar. 20, 1985) (Denying motion to bifurcate liability and damages in a copyright case and

18    noting that a single trial "tends to lessen the delay, expense and inconvenience to all concerned,

19    and the courts have emphasized that separate trials should not be ordered unless such a

20    disposition is clearly necessary.") (internal citations omitted); *GEM Acquisitionco, LLC v.*

21    *Sorenson Group Holdings LLC*,  No. C 09-01484 (SI), 2010 U.S. Dist. LEXIS 50622 (N.D. Cal.

22    Apr. 27, 2010) (in the Ninth Circuit, "Bifurcation . . . is the exception rather than the rule of

23    normal trial procedure.") (internal citations omitted).

24        **B.    Defendants' Statement**

25        Defendants have proposed that the jury trial of this case be bifurcated (on the current

26    schedule and within the current time limits) into four stages:  (1) direct liability of

27    TomorrowNow; (2) secondary liability of SAP AG or SAP America on claims as to which there

28    is a finding of direct liability of TomorrowNow; (3) actual damages; and (4) punitive damages.

1       Under Rule 42(b), the Court has the discretion to order separate trials of any number of

2   claims or issues "[f]or convenience to avoid prejudice, or to expedite and economize."  Dividing

3   a trial into phases is particularly useful where "litigation of the first issue might eliminate the

4   need to litigate the second issue."  *Amato v. City of Saratoga Springs, N.Y.*, 170 F.3d 311, 316

5   (2d Cir. 1999) (affirming bifurcation of trial on police officer's individual liability from trial

6   against City and Police Department) (citations omitted).  It is also appropriate where "each

7   liability phase depends on a distinct theory of liability."  *Jackson v. County of Los Angeles*, 29

8   Fed. Appx. 430, 435-36 (9th Cir. 2001).  These factors support bifurcation as proposed by

9   Defendants, as briefly summarized here.

10       The most important reason to bifurcate or phase the trial, however structured, is the sheer

11   number of issues that will be presented to the jury and the Court.  Four different plaintiffs assert

12   a total of ten claims against three defendants on various theories of direct and indirect liability.

13   Each claim is subject to a different statute of limitations.  Each claim has a different standard for

14   indirect liability.  Each state law claim is  subject to preemption under the Copyright Act.  Some

15   of plaintiffs' claims will be presented to the jury, and the Court may or may not want the

16   assistance of the jury in resolving Plaintiffs' claims in equity.  It is hard to imagine that a jury

17   would be better off deciding all these issues at once, as opposed to in a logical, structured order.

18       That logical, structured order is presented by the very nature of this case.  As the parties'

19   briefing on the pending motions for summary judgment makes clear, this case is focused on the

20   conduct of TomorrowNow.  SAP AG and SAP America are liable, if at all, only if

21   TomorrowNow is liable.  It would be a waste of the jury's and Court's time to deal with damages

22   and other issues on any claims that cannot get over the threshold of TomorrowNow's liability

23   (including issues of standing, statutes of limitation, other time- or conduct-based defenses, and

24   preemption).  That issue should be resolved first, and then the jury can properly focus on SAP

25   AG's and SAP America's alleged indirect liability, under different standards for different claims,

26   then damages on any claims that survive.

27       Additionally, Plaintiffs seek punitive damages on two of their nine claims asserted in the

28   Fourth Amended Complaint (Plaintiffs apparently contend that they are entitled to seek punitive

1   damages on three claims, but did not pray for that relief in the Fourth Amended Complaint, the

2   fifth complaint they filed in this case).  Courts frequently try the amount of punitive damages in a

3   separate phase at the end of trial.  *See, e.g.*, *Estate of Gonzales v. Hickman*, 2007 WL 3237635,

4   at *10 (C.D. Cal. June 28, 2007); *U.S.E.E.O.C. v. The Copley Press, Inc.*, 2006 WL 5201348, at

5   *3 (S.D. Cal. Oct. 12, 2006); *Robinson v. Crown Equip. Corp.*, 2007 WL 2819661, at *2 (E.D.

6   Ark. Sept. 26, 2007).  Doing so in this case will promote efficiency because the liability phase

7   may dispense with the need to reach the issue of punitive damages, if neither of the underlying

8   claims (under the CDAFA and for intentional interference with contract) survive the liability

9   phase, time-based defenses or preemption (much less the pending motion for summary

10  judgment), or if no damages are awarded on those claims.

11       Rule 42 and the law of this Circuit certainly permit bifurcation of this case into its four

12  key phases, and the many and complicated issues in this case strongly support doing so.  Beyond

13  making it clear that Plaintiffs see the upcoming trial primarily as a publicity forum for Oracle to

14  take shots at its competitor, Plaintiffs' response to Defendants' proposal is to point out the

15  obvious, that many facts may relate to more than one issue.  This is the situation most every time

16  bifurcation is at issue.  What matters is whether bifurcation would help the Court manage this

17  case and assist the jury in timely reaching a fair verdict on issues that actually require decision.

18  It would.

19  **VII.   STATUS OF SETTLEMENT NEGOTIATIONS**

20       The Parties first engaged in mediation before Richard Abramson on May 29, 2008

21  without resolution.  Since then, the Parties have appeared for settlement conferences before

22  Magistrate Judge Joseph C. Spero, but have not been able to reach a settlement.  The first

23  settlement conference before Magistrate Judge Spero occurred on October 6, 2008, followed by a

24  second settlement conference before Magistrate Judge Spero on February 23, 2009.   The Court

25  has set a further settlement conference date before Magistrate Judge Spero on September 7,

26  2010.

27  **VIII.  CONFIDENTIAL MATERIAL**

28       Pursuant to the Court's July 21, 2010 Order, the parties will file any requests for

1  confidential treatment of information at trial by August 26, 2010.  The Parties will discuss the

2  possibility of redacting confidential material from certain documents to avoid the need to request

3  sealing of those documents pursuant to Civil L.R. 79-5(d).

4  DATED:  August 5, 2010                    Bingham McCutchen LLP

5
                                        By:_____/s/ Geoffrey M. Howard_____
6                                                    Geoffrey M. Howard
                                                     Attorneys for Plaintiffs
7                                         Oracle USA, Inc., Oracle International
                                          Corporation, Oracle EMEA Limited, and Siebel
8                                                     Systems, Inc.

9

10        In accordance with General Order No. 45, Rule X, the above signatory attests that

11  concurrence in the filing of this document has been obtained from the signatory below.

12

13  DATED:  August 5, 2010                    JONES DAY

14
                                        By:_____/s/ Tharan Gregory Lanier_____
15                                                   Tharan Gregory Lanier
                                                     Attorneys for Defendants
16                                         SAP AG, SAP America, Inc.,
                                           and TomorrowNow, Inc.

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

| 1 | BOIES, SCHILLER & FLEXNER LLP | Robert A. Mittelstaedt (SBN 060359) |
| | DAVID BOIES (*pro hac vice application* | Jason McDonell (SBN 115084) |
| 2 | *pending*) | Elaine Wallace (SBN 197882) |
| | 333 Main Street | JONES DAY |
| 3 | Armonk, NY 10504 | 555 California Street, 26th Floor |
| | Telephone: (914) 749-8200 | San Francisco, CA 94104 |
| 4 | Facsimile: (914) 749-8300 | Telephone: (415) 626–3939 |
| | dboies@bsfllp.com | Facsimile: (415) 875–5700 |
| 5 | STEVEN C. HOLTZMAN (SBN 144177) | ramittelstaedt@jonesday.com |
| | 1999 Harrison St., Suite 900 | jmcdonell@jonesday.com |
| 6 | Oakland, CA 94612 | ewallace@jonesday.com |
| | Telephone: (510) 874-1000 | |
| 7 | Facsimile: (510) 874-1460 | Tharan Gregory Lanier (SBN 138784) |
| | sholtzman@bsfllp.com | Jane L. Froyd (SBN 220776) |
| 8 | | JONES DAY |
| | BINGHAM McCUTCHEN LLP | 1755 Embarcadero Road |
| 9 | DONN P. PICKETT (SBN 72257) | Palo Alto, CA 94303 |
| | GEOFFREY M. HOWARD (SBN 157468) | Telephone: (650) 739–3939 |
| 10 | HOLLY A. HOUSE (SBN 136045) | Facsimile: (650) 739–3900 |
| | Three Embarcadero Center | tglanier@jonesday.com |
| 11 | San Francisco, CA 94111-4067 | jfroyd@jonesday.com |
| | Telephone: (415) 393-2000 | |
| 12 | Facsimile: (415) 393-2286 | Scott W. Cowan (Admitted *Pro Hac Vice*) |
| | donn.pickett@bingham.com | Joshua L. Fuchs (Admitted *Pro Hac Vice*) |
| 13 | geoff.howard@bingham.com | JONES DAY |
| | holly.house@bingham.com | 717 Texas, Suite 3300 |
| 14 | | Houston, TX 77002 |
| | DORIAN DALEY (SBN 129049) | Telephone: (832) 239–3939 |
| 15 | JENNIFER GLOSS (SBN 154227) | Facsimile: (832) 239–3600 |
| | 500 Oracle Parkway, M/S 5op7 | swcowan@jonesday.com |
| 16 | Redwood City, CA 94070 | jlfuchs@jonesday.com |
| | Telephone: (650) 506-4846 | |
| 17 | Facsimile: (650) 506-7114 | Attorneys for Defendants |
| | dorian.daley@oracle.com | SAP AG, SAP AMERICA, INC., and |
| 18 | jennifer.gloss@oracle.com | TOMORROWNOW, INC. |
| 19 | Attorneys for Plaintiffs Oracle USA, Inc., | |
| | Oracle International Corporation, Oracle | |
| 20 | EMEA Limited, and Siebel Systems, Inc. | |

|  |  |
|---|---|
| 21 | UNITED STATES DISTRICT COURT |
| 22 | NORTHERN DISTRICT OF CALIFORNIA |
| | OAKLAND DIVISION |
| 23 | |

| 24 | **ORACLE USA, INC.,** *et al.*, | **No. 07-CV-01658 PJH (EDL)** |
| 25 | **Plaintiffs,** | PRE-TRIAL STIPULATION AND |
| | v. | [PROPOSED] ORDER NO. 1 REGARDING |
| 26 | | CERTAIN FACTS, AUTHENTICATION |
| | **SAP AG,** *et al.*, | OF DOCUMENTS, AND FEDERAL RULE |
| 27 | | OF EVIDENCE 1006 SUMMARIES |
| | **Defendants.** | |
| 28 | | |

07-CV-01658 PJH (EDL)

1        Plaintiffs Oracle USA, Inc. ("Oracle USA"), Oracle International Corporation

2  ("OIC"), Oracle EMEA Limited, and Siebel Systems, Inc. ("SSI"; and, together with Oracle

3  USA, OIC and Oracle EMEA Ltd., "Oracle") and Defendants SAP AG, SAP America, Inc., and

4  TomorrowNow, Inc ("SAP TN"; and, together with SAP AG and SAP America, Inc.,

5  "Defendants"; and, all together with Oracle, the "Parties"), jointly enter this Stipulation and

6  Order (the "Stipulation").

7        WHEREAS, the Parties have spent three years conducting voluminous discovery,

8  producing more than 10 TB of data and taking nearly 1,000 record hours of deposition thus far;

9        WHEREAS, on May 5, 2010, the Court instructed the Parties to meet and confer

10  so as to streamline this matter for trial;

11        **NOW, THEREFORE, THE PARTIES HEREBY STIPULATE**, through their

12  respective counsel of record, as follows:

13  **I.**     **DEFINITIONS**

14      1.   "Copy," used as a noun, means a reproduction of, a derivative work of, or a public

15  display of any Oracle Enterprise Software, Oracle Database Software, Oracle Install Software or

16  Oracle Updates and Support Materials that embody a substantial portion of one or more

17  Stipulated Registered Works.  "Copy," used as a verb, means to reproduce, to create a derivative

18  work from, or to publicly display any Oracle Enterprise Software, Oracle Database Software,

19  Oracle Install Software or Oracle Updates and Support Materials that embody a substantial

20  portion of one or more Stipulated Registered Works.

21      2.   "Oracle Database Software" means Oracle's Relational Database Management

22  System software.

23      3.   "Oracle Enterprise Software" means Oracle's J.D. Edwards Software, Oracle's

24  PeopleSoft Software, and Oracle's Siebel Software.

25      4.   "Oracle Install Software" means install media in the form of a CD or DVD, an

26  electronic image of a CD or DVD, a binary executable, or a compressed file that, when run or

27  executed, creates one or more instances of Oracle Enterprise Software or Oracle Database

28  Software.

1        5.    "Oracle's J.D. Edwards Software" means Oracle's J.D. Edwards-branded enterprise

2  application software.

3        6.    "Oracle's PeopleSoft Software" means Oracle's PeopleSoft-branded enterprise

4  application software.

5        7.    "Oracle's Siebel Software" means Oracle's Siebel-branded enterprise application

6  software.

7        8.    "Oracle Updates and Support Materials" means without limitation all program

8  updates, software updates, bug fixes, patches, custom solutions, and instructional materials

9  created or owned by Oracle, or derived from, copied from, or based on any such materials,

10  including by SAP AG, SAP America or SAP TN, across the entire family of PeopleSoft-branded,

11  J.D. Edwards-branded, and Siebel-branded products.

12        9.    "Stipulated Registered Works" means Oracle's copyright registrations for Oracle

13  Software, Oracle Database and Oracle Updates and Support Materials as listed in Attachment A.

14  **II.**      **FACTS**

15        **A.**      **Interpretation under the Case Management and Pretrial Order**

16        10.    Sections I and II.B-II.C of this Stipulation shall be considered "relevant and

17  undisputed facts to which the parties will stipulate for incorporation into the trial record without

18  the necessity of supporting testimony or exhibits."  *See* Case Management and Pretrial Order,

19  Dkt. 84, at 3(a)(iii).

20        11.    The Parties agree that Oracle is not prohibited from entering evidence at trial

21  relating to any stipulated facts set forth below.

22        12.    The Parties agree that Oracle is permitted to characterize any stipulated facts that

23  refer or relate to Copying as concessions or admissions.

24        **B.**      **Oracle's Copyright Registrations**

25        13.    Oracle USA, together with predecessors-in-interest, or SSI authored each of the

26  Stipulated Registered Works.

27        14.    OIC or SSI owns all of the Stipulated Registered Works.

28        15.    OIC holds exclusive copyright rights in all of the Stipulated Registered Works,

### C.    Copyrightable Subject Matter

16.    Each Stipulated Registered Work includes one or more computer programs or other literary works that are original works of authorship fixed in a tangible medium of expression under the meaning of the copyright law, and is protected under United States copyright law.

17.    Software companies typically create many new versions of their software, and voluminous updates to it that they separately create.  It is impractical and unnecessary to register all of them with the Copyright Office because each later software versions typically contains virtually all of the code contained in earlier versions.  The versions Copied by SAP TN of Oracle Enterprise Software and Oracle Database Software may not match exactly the versions of the Oracle Enterprise Software and Oracle Database Software in the Stipulated Registered Works.  Nonetheless, the existence of those Copies on SAP TN computers is sufficient to prove Plaintiffs' copyright infringement claims in order to prove infringement.

18.    All Stipulated Registered Works that are derivative works incorporate all or almost all protected expression contained within the preceding versions of the same work.  A reproduction or public display of a preceding version, or a derivative work based on the preceding version, is also a reproduction or public display of or a derivative work that contains a substantial amount of the protected expression found within the derivative version.  Therefore, a reproduction of the preceding version, a public display of the preceding version, or a derivative work based on the preceding version is a Copy that infringes the copyright registration for the derivative work.

19.    For example, a reproduction that SAP TN made of the Oracle Software named PeopleSoft HRMS 7.02 contains a substantial portion of the code, schema and other protected expression found in the Stipulated Registered Work named PeopleSoft HRMS 7.5.  The reproduction of PeopleSoft HRMS 7.02 is thus a Copy of PeopleSoft HRMS 7.5, and is covered by the copyright registration that Plaintiffs have asserted for PeopleSoft HRMS 7.5.

20.    All derivative works for which the preceding works are Stipulated Registered Works incorporate all or almost all protected expression contained within the preceding versions of the same work.  A reproduction or public display of a derivative version, or a derivative work

1    based on the derivative version,  is also a reproduction or public display of or a derivative work

2    that contains all or almost all of the protected expression found within the preceding version.

3    Therefore, a reproduction of the derivative version, a public display of the derivative version, or ,

4    or a derivative work based on the derivative version is a Copy that infringes the copyright

5    registration for the preceding work.

6         21.    For example, a reproduction that SAP TN made of the Oracle Software named

7    PeopleSoft HRMS 7.02, contains a substantial portion of the code, schema and other protected

8    expression found in the Stipulated Registered Work named PeopleSoft HRMS 7.0.  The

9    reproduction of PeopleSoft HRMS 7.02 is thus a Copy of PeopleSoft HRMS 7.0, and is covered

10   by the copyright registration that Plaintiffs have asserted for PeopleSoft HRMS 7.0.

11        22.    As illustrated in the examples above, for the majority of versions of Oracle

12   Software and Oracle Database copied by SAP TN, a reproduction of, public display of, or or a

13   derivative work that embodies any given version of Oracle Software or Oracle Database is both a

14   Copy of a preceding Stipulated Registered Work and a Copy of a derivative Stipulated

15   Registered Work.

16        23.    All Copies made by SAP TN embody particular expressions, protected by the

17   copyright law, that are expressions of ideas found in one or more of the Stipulated Registered

18   Works.  Certain of the Stipulated Registered Works contain objects and schema.

19        24.    An "object" is an individual computer program that is a building block of the large,

20   enterprise software products at issue in this case.  Objects are often described by referencing the

21   programming language used to create them, or by file extension appended to the name of the file.

22   Objects include COBOL files, SQR files, SQC files, PeopleCode objects, fields, records, pages,

23   menus, components, messages, panels, stored statements, panel groups, rule packages, DAT

24   files, DMS files, project files, batch files, configuration files, .c and .h files.  Some files contain

25   collections of objects or portions of them, such as Electronic Software Updates (known as

26   "ESUs"), code changes and paper fixes.  These objects are protected by United States copyright

27   law.  A Copy of any of them constitutes, reproduction, distribution, public display or creation of

28   a derivative work that embodies a substantial amount of protected expression contained within

07-CV-01658 PJH (EDL)

1   one or more of the Stipulated Registered Works.

2        25.   A "schema" is a set of database structures such as tables and fields, together with

3   the relationships between those database structures.  Schema are contained within Oracle

4   Software, such as for Oracle's PeopleSoft-branded software, and in Oracle Database.  These

5   schema are protected by United States copyright law.  A Copy of any of them constitutes a

6   reproduction, distribution, public display or creation of a derivative work that embodies a

7   substantial amount of protected expression contained within one or more of the Stipulated

8   Registered Works

9        26.   SAP TN reproduced, publicly displayed, distributed and modified many of the

10  objects and schema included in Oracle Enterprise Software and Oracle Database Software as part

11  of providing service to its customers.  That Copying constituted infringement of the Stipulated

12  Registered Works.

13  **III.   CONSENT TO CONFORM TO PROOF AT TRIAL**

14       27.   Oracle may conform the list of copyright registrations in suit to proof at trial.

15  **IV.   ADMISSIBILITY OF EVIDENCE**

16       28.   The Parties agree that Attachment A shall be admitted into evidence at trial.

17  **V.   AUTHENTICATION**

18       29.   All documents produced by the parties in discovery in the above-named action are

19  deemed authenticated for purposes of this litigation only pursuant to Federal Rule of Evidence

20  901.

21  **VI.   FEDERAL RULE OF EVIDENCE 1006 SUMMARIES**

22       30.   In light of the volume of evidence at issue in this litigation, neither party will object

23  to a chart or summary of voluminous evidence introduced pursuant to Federal Rule of Evidence

24  1006 ("FRE 1006 Summary") on the grounds that an attorney prepared the FRE 1006 Summary.

25       31.   The Parties also agree that a sponsoring witness will be identified for each FRE

26  1006 Summary by the Party seeking to introduce that summary.  The sponsoring witness will be

27  made available for questioning at trial regarding the contents of the FRE 1006 Summary, the

28  process for generation of the FRE 1006 Summary, and the underlying evidence.

1

2

3   DATED:  July [    ], 2010                    BINGHAM McCUTCHEN LLP

4                                                By:_____

5                                                          Geoff Howard
                                                      Attorneys for Plaintiffs
6                                                Oracle USA, Inc., Oracle International
                                                 Corporation, Oracle EMEA Limited, and
7                                                       Siebel Systems, Inc.

8            In accordance with General Order No. 45, Rule X, the above signatory attests that

9    concurrence in the filing of this document has been obtained from the signatory below.

10   DATED:  July  [    ], 2010                   JONES DAY

11

12                                               By:_____

13                                                          Scott Cowan
                                                     Attorneys for Defendants
14                                               SAP AG, SAP America, Inc., and
                                                       TomorrowNow, Inc.

15

16

17           **IT IS SO ORDERED**.

18

19   Dated:  July ___, 2010

20                                               _____

21                                                        Phyllis J. Hamilton
                                                      United States District Judge
22

23

24

25

26

27

28

PRE-TRIAL STIPULATION AND ORDER NO. 1 REGARDING CERTAIN FACTS, AUTHENTICATION OF
DOCUMENTS, AND FRE 1006 SUMMARIES

## ATTACHMENT A

| Title of Work | Date of Registration | Registration Number |
|---|---|---|
| PeopleSoft 8 Customer Relationship Management | September 27, 2001 | TX-5-456-777 |
| PeopleSoft 8.8 Customer Relationship Management | June 11, 2004 | TX 6-015-317 |
| PeopleSoft 8.8 Enterprise Performance Management | June 11, 2004 | TX-5-993-616 |
| PeopleSoft Financials, Distribution & Manufacturing 7.5 | December 15, 1998 | TX 4-792-574 |
| PeopleSoft 8 Financials and Supply Chain Management: Service Pack 2 | September 27, 2001 | TX-5-456-780 |
| PeopleSoft 8.4 Financials and Supply Chain Management | August 5, 2002 | TX-5-586-247 |
| PeopleSoft HRMS 7.0 | December 15 1998 | TX 4-792-577 |
| PeopleSoft HRMS 7.5 | December 15, 1998 | TX 4-792-575 |
| PeopleSoft 8 HRMS SP1 | March 26, 2001 | TX 5-501-312 |
| PeopleSoft 8.3 HRMS | February 1, 2002 | TX 5-469-032 |
| PeopleSoft 8.8 HRMS | June 11, 2004 | TX 6-093-947 |
| PeopleSoft 8 Student Administration Solutions | November 30, 2001 | TX 5-431-289 |
| PeopleTools 7.5 | November 20, 1998 | TX 4-792-578 |
| PeopleTools 8.10 | September 5, 2000 | TX 5-266-221 |
| PeopleTools 8.4 | August 5, 2002 | TX 5-586-248 |

**Table A-1: Infringed PeopleSoft Application Registrations**

| Title of Work | Date of Registration | Registration Number |
|---|---|---|
| Database of Documentary Customer Support Materials for PeopleSoft Software | July 1, 2009 | TXu1-607-454 |
| PeopleTools Third Party Daylight Saving Time Required Modifications | April 26, 2007 | TX 6-541-019 |
| PeopleTools Third Party Daylight Saving Time Required Modifications (Revised) | April 26, 2007 | TX 6-541-018 |
| PeopleSoft 8.01 & 8.31 Payroll Tax Update 05-F Year-End Processing: Canada | May 2, 2008 | TX 6-838-549 |
| PeopleSoft Payroll 1200457000 - User Documentation | May 2, 2008 | TX 6-838-537 |
| PeopleSoft Application Update Installation Instructions (UPD595817) | May 2, 2008 | TX 6-838-544 |

**Table A-2: Infringed Oracle Updates and Support Materials Registrations for Oracle's PeopleSoft-branded Products**

| Title of Work | Date of Registration | Registration Number |
|---|---|---|
| Initial release of JD Edwards EnterpriseOne Xe | April 26, 2007 | TX 6-541-033 |
| Initial release of JD Edwards EnterpriseOne 8.0 | April 26, 2007 | TX 6-541-050 |
| Initial release of JD Edwards EnterpriseOne 8.10 | April 26, 2007 | TX 6-541-038 |
| Initial release of JD Edwards EnterpriseOne 8.11 | April 26, 2007 | TX 6-541-028 |
| Initial release of JD Edwards EnterpriseOne 8.12 | April 26, 2007 | TX 6-541-041 |

07-CV-01658 PJH (EDL)

| Title of Work | Date of Registration | Registration Number |
|---|---|---|
| Initial release of JD Edwards World A7.3 | April 26, 2007 | TX 6-541-029 |
| Initial release of JD Edwards World A8.1 | April 26, 2007 | TX 6-541-047 |

**Table A-3: Infringed J.D. Edwards Application Registrations**

| Title of Work | Date of Registration | Registration Number |
|---|---|---|
| Cumulative Update 8 for JD Edwards EnterpriseOne Xe | April 26, 2007 | TX 6-541-048 |
| Cumulative Update 1 for JD Edwards EnterpriseOne 8.0 | April 26, 2007 | TX 6-541-034 |
| Cumulative Update 2 for JD Edwards EnterpriseOne 8.10 | April 26, 2007 | TX 6-541-032 |
| Cumulative Update 1 for JD Edwards EnterpriseOne 8.12 | April 26, 2007 | TX 6-541-042 |
| Cumulative Update 16 for JD Edwards World A7.3 | April 26, 2007 | TX 6-541-031 |
| Cumulative Update 6 for JD Edwards World A8.1 | May 1, 2007 | TX 6-545-421 |

**Table A-4: Infringed J.D. Edwards Cumulative Update Registrations**

| Title of Work | Date of Registration | Registration Number |
|---|---|---|
| Database of Documentary Customer Support Materials for J.D. Edwards Software | July 1, 2009 | TXu1-607-455 |
| Changes to Daylight Savings Time for 2007 (DST) | April 26, 2007 | TX 6-541-025 |
| ESU for JD Edwards EnterpriseOne Xe | May 3, 2007 | TX 6-541-051 |
| ESU for JD Edwards EnterpriseOne 8.0 | April 26, 2007 | TX 6-541-046 |
| ESU for JD Edwards EnterpriseOne 8.9 | April 26, 2007 | TX 6-541-036 |
| ESU for JD Edwards EnterpriseOne 8.10 | April 26, 2007 | TX 6-541-037 |
| ESU for JD Edwards EnterpriseOne 8.11 | April 26, 2007 | TX 6-541-035 |
| ESU for JD Edwards EnterpriseOne 8.11 SP1 | April 26, 2007 | TX 6-541-027 |
| ESU for JD Edwards EnterpriseOne 8.12 | April 26, 2007 | TX 6-541-045 |
| Code Change for JD Edwards World A7.3 | April 26, 2007 | TX 6-541-043 |
| Code Change for JD Edwards World A8.1 | April 26, 2007 | TX 6-541-044 |
| E1: 07/77: Quantum for Payroll Tax v.280 | April 26, 2007 | TX 6-541-022 |
| E1: 1099: Year 2006 1099 ESUs | April 26, 2007 | TX 6-541-024 |
| EAP WTHD06: 1099 IRS changes for the year 2006 | April 26, 2007 | TX 6-541-023 |
| JD Edwards World -- 1099 Changes for Tax Year 2006 | April 26, 2007 | TX 6-541-026 |
| ECRM89: Common Errors on Mobile Sales | April 26, 2007 | TX 6-541-020 |
| GM--Grants issues resolved by FMS ESA 8.9 Bundle #10-653723 (Oct 06) | April 26, 2007 | TX 6-541-021 |

**Table A-5: Infringed Oracle Updates and Support Materials Registrations for Oracle's J.D. Edwards-branded Products[1]**

---

[1] The Cumulative Updates, separately listed in Table A-3, are also Oracle Update and Support Materials for Oracle's J.D. Edwards-branded products.

07-CV-01658 PJH (EDL)

PRE-TRIAL STIPULATION AND ORDER NO. 1 REGARDING CERTAIN FACTS, AUTHENTICATION OF DOCUMENTS, AND FRE 1006 SUMMARIES

| Title of Work | Date of Registration | Registration Number |
|---|---|---|
| Siebel 6.3 Initial Release and Documentation | June 29, 2009 | TX 6-941-989 |
| Siebel 7.0.5 Initial Release and Documentation | June 29, 2009 | TX 6-941-988 |
| Siebel 7.5.2 Initial Release and Documentation | June 29, 2009 | TX 6-941-990 |
| Siebel 7.7.1 Initial Release and Documentation | June 29, 2009 | TX 6-941-993 |
| Siebel 7.8 Initial Release and Documentation | June 29, 2009 | TX 6-941-995 |

**Table A-6: Infringed Siebel Application Registrations**

| Title of Work | Date of Registration | Registration Number |
|---|---|---|
| Database of Documentary Customer Support Materials for Siebel Software | July 1, 2009 | TXu1-607-453 |

**Table A-7: Infringed Oracle Updates and Support Materials Registrations for Oracle's Siebel-branded Products**

| Title of Work | Date of Registration | Registration Number |
|---|---|---|
| Oracle 8i Enterprise Edition, release 2 (8.1.6) | February 2, 2001 | TX 5-222-106 |
| Oracle9i Database Enterprise : Edition Release 2 | June 13, 2003 | TX 5-673-282 |
| Oracle Database 10g: Release 2 | June 29, 2009 | TX 6-942-003 |

**Table A-8: Infringed Oracle Database Registrations**

# EXHIBIT B

1   BOIES, SCHILLER & FLEXNER LLP
    DAVID BOIES (pro hac vice application
2   pending)
    333 Main Street
3   Armonk, NY 10504
    Telephone: (914) 749-8200
4   Facsimile: (914) 749-8300
    dboies@bsfllp.com
5   STEVEN C. HOLTZMAN (SBN 144177)
    1999 Harrison St., Suite 900
6   Oakland, CA 94612
    Telephone: (510) 874-1000
7   Facsimile: (510) 874-1460
    sholtzman@bsfllp.com
8
    BINGHAM McCUTCHEN LLP
9   DONN P. PICKETT (SBN 72257)
    GEOFFREY M. HOWARD (SBN 157468)
10  HOLLY A. HOUSE (SBN 136045)
    Three Embarcadero Center
11  San Francisco, CA  94111-4067
    Telephone:  (415) 393-2000
12  Facsimile:  (415) 393-2286
    donn.pickett@bingham.com
13  geoff.howard@bingham.com
    holly.house@bingham.com
14
    DORIAN DALEY (SBN 129049)
15  JENNIFER GLOSS (SBN 154227)
    500 Oracle Parkway, M/S 5op7
16  Redwood City, CA  94070
    Telephone:  (650) 506-4846
17  Facsimile:  (650) 506-7114
    dorian.daley@oracle.com
18  jennifer.gloss@oracle.com

19  Attorneys for Plaintiffs Oracle USA, Inc.,
    Oracle International Corporation, Oracle
20  EMEA Limited, and Siebel Systems, Inc.

Robert A. Mittelstaedt (SBN 060359)
Jason McDonell (SBN 115084)
Elaine Wallace (SBN 197882)
JONES DAY
555 California Street, 26th Floor
San Francisco, CA  94104
Telephone:    (415) 626–3939
Facsimile:    (415) 875–5700
ramittelstaedt@jonesday.com
jmcdonell@jonesday.com
ewallace@jonesday.com

Tharan Gregory Lanier (SBN 138784)
Jane L. Froyd (SBN 220776)
JONES DAY
1755 Embarcadero Road
Palo Alto, CA  94303
Telephone:    (650) 739–3939
Facsimile:    (650) 739–3900
tglanier@jonesday.com
jfroyd@jonesday.com

Scott W. Cowan (Admitted Pro Hac Vice)
Joshua L. Fuchs (Admitted Pro Hac Vice)
JONES DAY
717 Texas, Suite 3300
Houston, TX  77002
Telephone:    (832) 239–3939
Facsimile:    (832) 239–3600
swcowan@jonesday.com
jlfuchs@jonesday.com

Attorneys for Defendants
SAP AG, SAP AMERICA, INC., and
TOMORROWNOW, INC.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

|  |  |
|---|---|
| **ORACLE USA, INC.,** *et al.*, <br><br>   **Plaintiffs,**<br>  v.<br><br>**SAP AG,** *et al.*,<br><br>   **Defendants.** | **No. 07-CV-01658 PJH (EDL)**<br><br>PRE-TRIAL STIPULATION AND [PROPOSED] ORDER NO. 2 REGARDING CERTAIN FACTS, REGISTRATIONS AND DEFENSES |

1      Plaintiffs Oracle USA, Inc. ("Oracle USA"), Oracle International Corporation

2  ("OIC"), Oracle EMEA Limited, and Siebel Systems, Inc. ("SSI"; and, together with Oracle

3  USA, OIC and Oracle EMEA Ltd., "Oracle") and Defendants SAP AG, SAP America, Inc., and

4  TomorrowNow, Inc ("SAP TN"; and, together with SAP AG and SAP America, Inc.,

5  "Defendants"; and, all together with Oracle, the "Parties"), jointly enter this Stipulation and

6  Order (the "Stipulation").

7      WHEREAS, the Parties have spent three years conducting voluminous discovery,

8  producing more than 10 TB of data and taking nearly 1,000 record hours of deposition thus far;

9      WHEREAS, on May 5, 2010, the Court instructed the Parties to meet and confer

10  so as to streamline this matter for trial;

11      **NOW, THEREFORE, THE PARTIES HEREBY STIPULATE**, through their

12  respective counsel of record, as follows:

13  **I.      DEFINITIONS**

14      1.      "Copy," used as a noun, means a reproduction of, a derivative work of, or a public

15  display of any Oracle Enterprise Software, Oracle Database Software, Oracle Install Software or

16  Oracle Updates and Support Materials that embody a substantial portion of one or more

17  Stipulated Registered Works.  "Copy," used as a verb, means to reproduce, to create a derivative

18  work from, or to publicly display any Oracle Enterprise Software, Oracle Database Software,

19  Oracle Install Software or Oracle Updates and Support Materials that embody a substantial

20  portion of one or more Stipulated Registered Works.

21      2.       "Oracle Database Software" means Oracle's Relational Database Management

22  System software.

23      3.      "Oracle Enterprise Software" means Oracle's J.D. Edwards Software, Oracle's

24  PeopleSoft Software, and Oracle's Siebel Software.

25      4.      "Oracle Install Software" means install media in the form of a CD or DVD, an

26  electronic image of a CD or DVD, a binary executable, or a compressed file that, when run or

27  executed, creates one or more instances of Oracle Enterprise Software or Oracle Database

28  Software.

5.      "Oracle's J.D. Edwards Software" means Oracle's J.D. Edwards-branded enterprise application software.

6.      "Oracle's PeopleSoft Software" means Oracle's PeopleSoft-branded enterprise application software.

7.      "Oracle's Siebel Software" means Oracle's Siebel-branded enterprise application software.

8.      "Oracle Updates and Support Materials" means without limitation all program updates, software updates, bug fixes, patches, custom solutions, and instructional materials created or owned by Oracle, or derived from, copied from, or based on any such materials, including by SAP AG, SAP America or SAP TN, across the entire family of PeopleSoft-branded, J.D. Edwards-branded, and Siebel-branded products.

9.      "Stipulated Registered Works" means Oracle's copyright registrations for Oracle Software, Oracle Database and Oracle Updates and Support Materials as listed in Attachment A.

## II.     FACTS

### A.     Interpretation under the Case Management and Pretrial Order

10.     Sections I and II.B-II.G of this Stipulation shall be considered "relevant and undisputed facts to which the parties will stipulate for incorporation into the trial record without the necessity of supporting testimony or exhibits."  *See* Case Management and Pretrial Order, Dkt. 84, at 3(a)(iii).  Footnotes are intended as references to evidence for the Parties and the Court, and shall not be read to the jury.

11.     The Parties agree that Oracle is not prohibited from entering evidence at trial relating to any stipulated facts set forth below.

12.     The Parties agree that Oracle is permitted to characterize any stipulated facts that refer or relate to Copying as concessions or admissions.

### B.     Separate Copies

13.     Each reference to a Copy in this Stipulation refers to a separate Copy of Oracle Enterprise Software, Oracle Database Software, Oracle Install Software, or Oracle Updates and Support Materials.  For the vast majority of Copies, there is no double-counting.

## C.    SAP TN's Computers and Network

14.    SAP TN owned dozens of computers, including servers, desktop computers and laptop computers, on which it stored Oracle Enterprise Software, Oracle Updates and Support Materials and Oracle Database Software.

15.    After March 1, 2005, a significant amount of Oracle Enterprise Software, Oracle Updates and Support Materials and Oracle Database Software were copied onto or installed onto computers owned by SAP TN.

16.    SAP TN's AS/400 was not brought into service by SAP TN until after March 1, 2005.[1]

17.    SAP TN stored at least 214,807 files (over 695 GB in size)[2] and 602 libraries[3] containing Oracle Updates and Support Materials on SAP TN's IBM AS/400 computer.

18.    All copies of Oracle Enterprise Software ever present on SAP TN's AS/400 were copied onto or installed on SAP TN's AS/400 after March 1, 2005.

19.    All copies of Oracle Updates and Support Materials ever present on SAP TN's AS/400 were copied onto SAP TN's AS/400 after March 1, 2005.

20.    SAP TN's computer known as TN-FS01 was not brought into service by SAP TN until after March 1, 2005.[4]

21.    SAP TN stored at least 273,663 files (over 154 GB in size)[5] containing Oracle Updates and Support Materials on TN-FS01.

---

[1] *See* TN-OR02150053 (stating that "the handover of the AS[/]400 to TomorrowNow" is occurring on March 17-18, 2005).

[2] *See* TN-OR01006965 ("jd-wsvr01 . . . is the xSeries server on the iSeries machine."); Table 17 of Appendix D to the Supplemental Expert Report of Kevin Mandia.

[3] Defendants'' Third Amended Response to Request No. 11 of Plaintiffs'' Amended Fifth Set of Requests for Admission; *id.*, Exhibit B.

[4] *See* TN-OR09449935 (stating that "the COMPLETE file transfer . . .  to the new TN-FS01" was completed on November 11, 2006).  Prior to this date, a different server had been referred to as TN-FS01. *See id.*

[5] Table 17 of Appendix D to the Supplemental Expert Report of Kevin Mandia.

1    22.   All copies of Oracle Enterprise Software and Oracle Database Software on TN-

2    FS01 were copied onto or installed on TN-FS01 after March 1, 2005.

3    23.   All copies of Oracle Updates and Support Materials ever present on TN-FS01 were

4    copied onto TN-FS01 after March 1, 2005.

5    **D.    Infringing Copies of Oracle Enterprise Software**

6    24.   SAP TN Copied Oracle's Enterprise Software when it installed Oracle's

7    Enterprise Software onto SAP TN's computer systems.  SAP TN called these software Copies

8    "environments."  Some environments were live environments, available for immediate use by

9    SAP TN employees.

10   25.   SAP TN Copied Oracle's Enterprise Software when it created backups of the

11   environments installed on SAP TN's computer systems.  Backup environments were zipped or

12   compressed Copies that would need to be restored before they were available for use by SAP TN

13   employees.

14   26.   SAP TN Copied Oracle's Enterprise Software when it restored backups of the

15   environments onto SAP TN's computer systems.

16   27.   SAP TN made at least 6,189 Copies of Oracle's PeopleSoft Software.  Each such

17   Copy constituted an infringement of one or more of the particular Stipulated Registered Works

18   listed in Table A-1, below.  These 6,189 Copies include at least 566 live environment Copies,[6]

19   3,141 backup Copies,[7] and 2,482 restore Copies[8]:

20   _____

21   [6] These Copies consist of actual environments found on SAP TN's computer systems, as listed
     on the "Actual_Live" tab of ORCLX-MAN-000382.  Each actual environment Copy is a Copy

22   of both a version of a PeopleSoft base application, such as PeopleSoft 8 Customer Relationship
     Management, and a version of PeopleTools, such as PeopleTools 8.1.

23   [7] These Copies consist of 2,669 backup Copies recorded in BakTrak, as listed in ORCLX-MAN-
     000133, and 472 additional backup Copies, listed on ORCLX-MAN-000129, that were present

24   on SAP TN's computer systems but not recorded in BakTrak.  Each backup Copy is a Copy of
     both a version of a PeopleSoft base application, such as PeopleSoft 8 Customer Relationship

25   Management, and a version of PeopleTools, such as PeopleTools 8.1.

26   [8] These Copies consist of 2,482 restore Copies recorded in BakTrak, as listed in ORCLX-MAN-
     000132.  Each restore Copy is a Copy of both a version of a PeopleSoft base application, such as

27   PeopleSoft 8 Customer Relationship Management, and a version of PeopleTools, such as

28

(Footnote Continued on Next Page.)

PRE-TRIAL STIPULATION AND ORDER NO. 2 REGARDING CERTAIN FACTS, REGISTRATIONS AND
DEFENSES

| Title of Work | Date of Registration | Registration Number |
|---|---|---|
| PeopleSoft 8 Customer Relationship Management | September 27, 2001 | TX-5-456-777 |
| PeopleSoft 8.8 Customer Relationship Management | June 11, 2004 | TX 6-015-317 |
| PeopleSoft 8.8 Enterprise Performance Management | June 11, 2004 | TX-5-993-616 |
| PeopleSoft Financials, Distribution & Manufacturing 7.5 | December 15, 1998 | TX 4-792-574 |
| PeopleSoft 8 Financials and Supply Chain Management: Service Pack 2 | September 27, 2001 | TX-5-456-780 |
| PeopleSoft 8.4 Financials and Supply Chain Management | August 5, 2002 | TX-5-586-247 |
| PeopleSoft HRMS 7.0 | December 15 1998 | TX 4-792-577 |
| PeopleSoft HRMS 7.5 | December 15, 1998 | TX 4-792-575 |
| PeopleSoft 8 HRMS SP1 | March 26, 2001 | TX 5-501-312 |
| PeopleSoft 8.3 HRMS | February 1, 2002 | TX 5-469-032 |
| PeopleSoft 8.8 HRMS | June 11, 2004 | TX 6-093-947 |
| PeopleSoft 8 Student Administration Solutions | November 30, 2001 | TX 5-431-289 |
| PeopleTools 7.5 | November 20, 1998 | TX 4-792-578 |
| PeopleTools 8.10 | September 5, 2000 | TX 5-266-221 |
| PeopleTools 8.4 | August 5, 2002 | TX 5-586-248 |

**Table A-1: Infringed PeopleSoft Application Registrations**

28.    SAP TN made at least 29 Copies of Oracle's J.D. Edwards Software.[9]  Each such Copy constituted an infringement of one or more of the particular Stipulated Registered Works[10] listed in Tables A-3 and A-4, below:

| Title of Work | Date of Registration | Registration Number |
|---|---|---|
| Initial release of JD Edwards EnterpriseOne Xe | April 26, 2007 | TX 6-541-033 |
| Initial release of JD Edwards EnterpriseOne 8.0 | April 26, 2007 | TX 6-541-050 |
| Initial release of JD Edwards EnterpriseOne 8.10 | April 26, 2007 | TX 6-541-038 |
| Initial release of JD Edwards EnterpriseOne 8.11 | April 26, 2007 | TX 6-541-028 |

(Footnote Continued from Previous Page.)

PeopleTools 8.1.

[9] These Copies consist of at least at least nine J.D. Edwards World A7.3 environments listed on Exhibit 45, at least 12 J.D. Edwards EnterpriseOne Xe environments listed on Exhibit 52, at least three J.D. Edwards World A8.1 environments listed on Exhibit 55, and at least one installation of J.D. Edwards EnterpriseOne Xe, J.D. Edwards EnterpriseOne 8.0, J.D. Edwards EnterpriseOne 8.10, J.D. Edwards EnterpriseOne 8.11, and J.D. Edwards EnterpriseOne 8.12, as discussed in instant messaging between Ashis Ghosh and Pete Surette .

[10] See Attachment A, Tables A-3 and A-4.

| | Title of Work | Date of Registration | Registration Number |
|---|---|---|---|
| 1 | Initial release of JD Edwards EnterpriseOne 8.12 | April 26, 2007 | TX 6-541-041 |
| 2 | Initial release of JD Edwards World A7.3 | April 26, 2007 | TX 6-541-029 |
| | Initial release of JD Edwards World A8.1 | April 26, 2007 | TX 6-541-047 |

**Table A-3: Infringed J.D. Edwards Application Registrations**

| Title of Work | Date of Registration | Registration Number |
|---|---|---|
| Cumulative Update 8 for JD Edwards EnterpriseOne Xe | April 26, 2007 | TX 6-541-048 |
| Cumulative Update 1 for JD Edwards EnterpriseOne 8.0 | April 26, 2007 | TX 6-541-034 |
| Cumulative Update 2 for JD Edwards EnterpriseOne 8.10 | April 26, 2007 | TX 6-541-032 |
| Cumulative Update 1 for JD Edwards EnterpriseOne 8.12 | April 26, 2007 | TX 6-541-042 |
| Cumulative Update 16 for JD Edwards World A7.3 | April 26, 2007 | TX 6-541-031 |
| Cumulative Update 6 for JD Edwards World A8.1 | May 1, 2007 | TX 6-545-421 |

**Table A-4: Infringed J.D. Edwards Cumulative Update Registrations**

29.     SAP TN made at least 31 Copies of Oracle's Siebel Software.[11]  Each such Copy constituted an infringement of one or more of the particular Stipulated Registered Works[12] listed in Table A-6, below:

| Title of Work | Date of Registration | Registration Number |
|---|---|---|
| Siebel 6.3 Initial Release and Documentation | June 29, 2009 | TX 6-941-989 |
| Siebel 7.0.5 Initial Release and Documentation | June 29, 2009 | TX 6-941-988 |
| Siebel 7.5.2 Initial Release and Documentation | June 29, 2009 | TX 6-941-990 |
| Siebel 7.7.1 Initial Release and Documentation | June 29, 2009 | TX 6-941-993 |
| Siebel 7.8 Initial Release and Documentation | June 29, 2009 | TX 6-941-995 |

**Table A-6: Infringed Siebel Application Registrations**

**E.     Infringing Copies of Oracle Enterprise Software and Oracle Database Software from Oracle Install Software**

30.     SAP TN obtained Oracle Install Software through its customers. SAP TN made Copies of Oracle Enterprise Software and Oracle Database Software by Copying the Oracle Install Software that SAP TN obtained.

31.     SAP TN stored some electronic Copies of Oracle Install Software on its computer

---

[11] These Copies consist of at least six Siebel environments as listed on Exhibit 1623 and at least 25 copies and backup copies, as listed in ORCLX-MAN-000147.

[12] See Attachment A, Table A-5.

07-CV-01658 PJH (EDL)

1    systems in an area it referred to as the "CD Client Jukebox" (the "SAP TN CD Client Jukebox").

2    32.    SAP TN Copied CDs of Oracle Enterprise Software and Oracle Database

3    software, placed its own labels on the Copies, and stored them in a set of binders (the "SAP TN

4    CD Binders").

5    33.    Attachment B is a photograph that fairly and accurately represents the SAP TN

6    CD Binders as they were kept by SAP TN.

7    34.    SAP TN made, from Oracle Install Software, at least 127 Copies of Oracle

8    Enterprise Software that it stored in the SAP TN CD Client Jukebox,[13] and at least 727 Copies of

9    Oracle Enterprise Software or Oracle Database Software that it stored in the SAP TN CD

10    Binders.[14]

11    35.    The Copies of Oracle Enterprise Software and Oracle Database Software stored in

12    the SAP TN CD Client Jukebox and the SAP TN CD Binders infringed one or more of the

13    particular Stipulated Registered Works listed in Attachment A, Tables A-1, A-3, A-6 and A-8.

14    **F.    Infringing Copies of Oracle Updates and Support Materials and of
        Component Files**

15

16    36.    SAP TN downloaded approximately 9 million Oracle Updates and Support

17    Materials from Oracle's websites.

18    37.    Of the Oracle Updates and Support Materials that SAP TN downloaded from

19    Oracle's websites, at least 826,905[15] were Copies that infringed one or more of the Stipulated

20    Registered Works listed in Attachment A, Tables A-1, A-2, A-5 and A-7.

21    38.    The following 39,349 Copies made by SAP TN of Oracle Updates and Support

22    _____

23    [13] Table 9 of the Appendices to the Supplemental Expert Report of Kevin Mandia.

24    [14] ¶ 233 of the Supplemental Expert Report of Kevin Mandia

25    [15] Consisting of 114 Copies of Software and Support Materials found on the Data Warehouse, as
     described in Table 53 of the Appendices to the Supplemental Expert Report of Kevin Mandia; at
     least 225,843 Copies of Software and Support Materials found on the Data Warehouse and on
26    DCITBU01, as described in Table 20 and ¶ 222 of the Supplemental Expert Report of Kevin
     Mandia; and, at least 600,948 Copies of Oracle Software, as described in Table 20 of Appendix
27    E to the Supplemental Expert Report of Kevin Mandia.

28

1 Materials, taken together, infringed one or more of the Stipulated Registered Works listed in

2 Attachment A, Tables A-3 and A-4:

3          a.    SAP TN made at least 31,334 Copies of Oracle Updates and Support

4               Materials by downloading those Copies in excess of the license rights for

5               customers Merck, Oce Technologies, SPX Cooling, SPX Flow, SPX Weil-

6               McLain, Yazaki North America and Metro Machine;[16]

7          b.    SAP TN made at least 5,442 Copies of Oracle Updates and Support

8               Materials by downloading those Copies from Oracle's website into a

9               generic download library—not a customer-specific library—at SAP TN,

10              and then further Copying them into a customer-labeled folder for customer

11              Praxair;[17] and

12          c.    SAP TN made at least 2,573 Copies of Oracle Updates and Support

13              Materials by downloading those Copies from Oracle's website and Copying

14              them into a folder for TBC Corp., which was never an SAP TN customer.[18]

15    **G.**    **SAP TN's Business**

16    39.    SAP TN had access to Oracle Software, Oracle Database and Updates and

17 Support Materials, and Install Software embodying each of the Stipulated Registered Works.

18    40.    SAP TN infringed each of the Stipulated Registered Works.

19    41.    SAP TN's support for the majority of its customers was based on SAP TN's use

20 of other customers' software.

21    42.    SAP TN continued to infringe some or all of the Stipulated Registered Works

22 after Oracle filed this lawsuit on March 22, 2007.

23    43.    Defendants had no authority or license to create all Copies described in Section II,

24

25   [16] Table 15 of the Supplemental Expert Report of Kevin Mandia; ORCLX-MAN-000116.

26   [17] ORCLX-MAN-000389.

27   [18] ORCLX-MAN-000389.

28

1  above.

2  **III.    VOLUNTARY DISMISSALS OF CERTAIN REGISTRATIONS AND DEFENSES**

3        44.      Oracle shall voluntarily dismiss its claims for copyright infringement as to the

4  registrations listed in Attachment C, conditioned upon the execution of this stipulation by all

5  Parties and upon entry of the Court's order regarding this stipulation.  Defendants shall consent

6  to dismissal with prejudice and shall waive costs and any claim for attorneys' fees associated

7  with these registrations.

8        45.      Defendants shall voluntarily dismiss their first, fifteenth and sixteenth affirmative

9  defenses of copyright invalidity, statute of limitations and failure to mitigate, conditioned upon

10  the execution of this stipulation by all Parties and upon entry of the Court's order regarding this

11  stipulation.  Plaintiffs shall consent to dismissal with prejudice and shall waive costs and any

12  claim for attorneys' fees associated with these defenses.

13        46.      All Parties shall be precluded from referring, directly or indirectly, at trial to

14  dismissal of these registrations and defenses.

15  **IV.    ADMISSIBILITY OF EVIDENCE**

16        47.      The Parties agree that Attachment A, Attachment B and the documents and

17  Exhibits referenced in Section II shall be admitted into evidence at trial.

18

19

20  DATED:  July [   ], 2010          BINGHAM McCUTCHEN LLP

21                                  By:_____

22                                     Geoff Howard

23                                 Attorneys for Plaintiffs
                        Oracle USA, Inc., Oracle International

24                     Corporation, Oracle EMEA Limited, and
                            Siebel Systems, Inc.

25       In accordance with General Order No. 45, Rule X, the above signatory attests that

26  concurrence in the filing of this document has been obtained from the signatory below.

27

28

PRE-TRIAL STIPULATION AND ORDER NO. 2 REGARDING CERTAIN FACTS, REGISTRATIONS AND
DEFENSES

1    DATED:  July  [ __ ], 2010                    JONES DAY

2                                                                 By:_____

3

4                                                                          Scott Cowan
                                                                      Attorneys for Defendants
5                                                                 SAP AG, SAP America, Inc., and
                                                                           TomorrowNow, Inc.
6

7

8            **IT IS SO ORDERED**.

9

10   Dated:  July ___, 2010

11                                                                 _____

12                                                                          Phyllis J. Hamilton
                                                                      United States District Judge
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PRE-TRIAL STIPULATION AND ORDER NO. 2 REGARDING CERTAIN FACTS, REGISTRATIONS AND
DEFENSES

# ATTACHMENT A

| Title of Work | Date of Registration | Registration Number |
|---|---|---|
| PeopleSoft 8 Customer Relationship Management | September 27, 2001 | TX-5-456-777 |
| PeopleSoft 8.8 Customer Relationship Management | June 11, 2004 | TX 6-015-317 |
| PeopleSoft 8.8 Enterprise Performance Management | June 11, 2004 | TX-5-993-616 |
| PeopleSoft Financials, Distribution & Manufacturing 7.5 | December 15, 1998 | TX 4-792-574 |
| PeopleSoft 8 Financials and Supply Chain Management: Service Pack 2 | September 27, 2001 | TX-5-456-780 |
| PeopleSoft 8.4 Financials and Supply Chain Management | August 5, 2002 | TX-5-586-247 |
| PeopleSoft HRMS 7.0 | December 15 1998 | TX 4-792-577 |
| PeopleSoft HRMS 7.5 | December 15, 1998 | TX 4-792-575 |
| PeopleSoft 8 HRMS SP1 | March 26, 2001 | TX 5-501-312 |
| PeopleSoft 8.3 HRMS | February 1, 2002 | TX 5-469-032 |
| PeopleSoft 8.8 HRMS | June 11, 2004 | TX 6-093-947 |
| PeopleSoft 8 Student Administration Solutions | November 30, 2001 | TX 5-431-289 |
| PeopleTools 7.5 | November 20, 1998 | TX 4-792-578 |
| PeopleTools 8.10 | September 5, 2000 | TX 5-266-221 |
| PeopleTools 8.4 | August 5, 2002 | TX 5-586-248 |

**Table A-1: Infringed PeopleSoft Application Registrations**

| Title of Work | Date of Registration | Registration Number |
|---|---|---|
| Database of Documentary Customer Support Materials for PeopleSoft Software | July 1, 2009 | TXu1-607-454 |
| PeopleTools Third Party Daylight Saving Time Required Modifications | April 26, 2007 | TX 6-541-019 |
| PeopleTools Third Party Daylight Saving Time Required Modifications (Revised) | April 26, 2007 | TX 6-541-018 |
| PeopleSoft 8.01 & 8.31 Payroll Tax Update 05-F Year-End Processing: Canada | May 2, 2008 | TX 6-838-549 |
| PeopleSoft Payroll 1200457000 - User Documentation | May 2, 2008 | TX 6-838-537 |
| PeopleSoft Application Update Installation Instructions (UPD595817) | May 2, 2008 | TX 6-838-544 |

**Table A-2: Infringed Oracle Updates and Support Materials Registrations for Oracle's PeopleSoft-branded Products**

| Title of Work | Date of Registration | Registration Number |
|---|---|---|
| Initial release of JD Edwards EnterpriseOne Xe | April 26, 2007 | TX 6-541-033 |
| Initial release of JD Edwards EnterpriseOne 8.0 | April 26, 2007 | TX 6-541-050 |
| Initial release of JD Edwards EnterpriseOne 8.10 | April 26, 2007 | TX 6-541-038 |
| Initial release of JD Edwards EnterpriseOne 8.11 | April 26, 2007 | TX 6-541-028 |
| Initial release of JD Edwards EnterpriseOne 8.12 | April 26, 2007 | TX 6-541-041 |

07-CV-01658 PJH (EDL)

PRE-TRIAL STIPULATION AND ORDER NO. 2 REGARDING CERTAIN FACTS, REGISTRATIONS AND DEFENSES

| Title of Work | Date of Registration | Registration Number |
|---|---|---|
| Initial release of JD Edwards World A7.3 | April 26, 2007 | TX 6-541-029 |
| Initial release of JD Edwards World A8.1 | April 26, 2007 | TX 6-541-047 |

**Table A-3: Infringed J.D. Edwards Application Registrations**

| Title of Work | Date of Registration | Registration Number |
|---|---|---|
| Cumulative Update 8 for JD Edwards EnterpriseOne Xe | April 26, 2007 | TX 6-541-048 |
| Cumulative Update 1 for JD Edwards EnterpriseOne 8.0 | April 26, 2007 | TX 6-541-034 |
| Cumulative Update 2 for JD Edwards EnterpriseOne 8.10 | April 26, 2007 | TX 6-541-032 |
| Cumulative Update 1 for JD Edwards EnterpriseOne 8.12 | April 26, 2007 | TX 6-541-042 |
| Cumulative Update 16 for JD Edwards World A7.3 | April 26, 2007 | TX 6-541-031 |
| Cumulative Update 6 for JD Edwards World A8.1 | May 1, 2007 | TX 6-545-421 |

**Table A-4: Infringed J.D. Edwards Cumulative Update Registrations**

| Title of Work | Date of Registration | Registration Number |
|---|---|---|
| Database of Documentary Customer Support Materials for J.D. Edwards Software | July 1, 2009 | TXu1-607-455 |
| Changes to Daylight Savings Time for 2007 (DST) | April 26, 2007 | TX 6-541-025 |
| ESU for JD Edwards EnterpriseOne Xe | May 3, 2007 | TX 6-541-051 |
| ESU for JD Edwards EnterpriseOne 8.0 | April 26, 2007 | TX 6-541-046 |
| ESU for JD Edwards EnterpriseOne 8.9 | April 26, 2007 | TX 6-541-036 |
| ESU for JD Edwards EnterpriseOne 8.10 | April 26, 2007 | TX 6-541-037 |
| ESU for JD Edwards EnterpriseOne 8.11 | April 26, 2007 | TX 6-541-035 |
| ESU for JD Edwards EnterpriseOne 8.11 SP1 | April 26, 2007 | TX 6-541-027 |
| ESU for JD Edwards EnterpriseOne 8.12 | April 26, 2007 | TX 6-541-045 |
| Code Change for JD Edwards World A7.3 | April 26, 2007 | TX 6-541-043 |
| Code Change for JD Edwards World A8.1 | April 26, 2007 | TX 6-541-044 |
| E1: 07/77: Quantum for Payroll Tax v.280 | April 26, 2007 | TX 6-541-022 |
| E1: 1099: Year 2006 1099 ESUs | April 26, 2007 | TX 6-541-024 |
| EAP WTHD06: 1099 IRS changes for the year 2006 | April 26, 2007 | TX 6-541-023 |
| JD Edwards World -- 1099 Changes for Tax Year 2006 | April 26, 2007 | TX 6-541-026 |
| ECRM89: Common Errors on Mobile Sales | April 26, 2007 | TX 6-541-020 |
| GM--Grants issues resolved by FMS ESA 8.9 Bundle #10-653723 (Oct 06) | April 26, 2007 | TX 6-541-021 |

**Table A-5: Infringed Oracle Updates and Support Materials Registrations for Oracle's J.D. Edwards-branded Products[19]**

---

[19] The Cumulative Updates, separately listed in Table A-3, are also Oracle Update and Support Materials for Oracle's J.D. Edwards-branded products.

07-CV-01658 PJH (EDL)

| Title of Work | Date of Registration | Registration Number |
|---|---|---|
| Siebel 6.3 Initial Release and Documentation | June 29, 2009 | TX 6-941-989 |
| Siebel 7.0.5 Initial Release and Documentation | June 29, 2009 | TX 6-941-988 |
| Siebel 7.5.2 Initial Release and Documentation | June 29, 2009 | TX 6-941-990 |
| Siebel 7.7.1 Initial Release and Documentation | June 29, 2009 | TX 6-941-993 |
| Siebel 7.8 Initial Release and Documentation | June 29, 2009 | TX 6-941-995 |

**Table A-6: Infringed Siebel Application Registrations**

| Title of Work | Date of Registration | Registration Number |
|---|---|---|
| Database of Documentary Customer Support Materials for Siebel Software | July 1, 2009 | TXu1-607-453 |

**Table A-7: Infringed Oracle Updates and Support Materials Registrations for Oracle's Siebel-branded Products**

| Title of Work | Date of Registration | Registration Number |
|---|---|---|
| Oracle 8i Enterprise Edition, release 2 (8.1.6) | February 2, 2001 | TX 5-222-106 |
| Oracle9i Database Enterprise : Edition Release 2 | June 13, 2003 | TX 5-673-282 |
| Oracle Database 10g: Release 2 | June 29, 2009 | TX 6-942-003 |

**Table A-8: Infringed Oracle Database Registrations**

PRE-TRIAL STIPULATION AND ORDER NO. 2 REGARDING CERTAIN FACTS, REGISTRATIONS AND DEFENSES

1

2 **ATTACHMENT B**

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

07-CV-01658 PJH (EDL)

PRE-TRIAL STIPULATION AND ORDER NO. 2 REGARDING CERTAIN FACTS, REGISTRATIONS AND DEFENSES

## ATTACHMENT C

| Title of Work | Date of Registration | Registration Number |
|---|---|---|
| PeopleSoft 8.1 Customer Relationship Management | March 20, 2002 | TX 5-493-450 |
| PeopleSoft 8 EPM SP3 | March 30, 2001 | TX 5-345-698 |
| PeopleSoft 8.3 Enterprise Performance Management | March 11, 2002 | TX 5-485-839 |
| PeopleSoft 7.0 financials, distribution & manufacturing 7.0 | December 15, 1998 | TX 4-792-576 |
| PeopleSoft Financials and Supply Chain Management (FIN/SCM) 8.0 | November 20, 2000 | TX 5-291-439 |
| PeopleSoft 8 FIN/SCM SP1 | March 26, 2001 | TX 5-501-313 |
| PeopleSoft HRMS 8.0 | November 20, 2000 | TX 5-291-440 |
| PeopleTools 8.0 | September 5, 2000 | TX 5-266-222 |
| PeopleSoft Pension Administration 7 | June 21, 1999 | TX 3-772-290 |
| PeopleSoft Payroll 7 | June 22, 1999 | TX 4-501-140 |
| PeopleSoft Payroll Interface 7 | June 22, 1999 | TX 4-501-138 |
| PeopleSoft Time and Labor 7.0 | June 28, 1999 | TX 4-994-866 |
| PeopleSoft Benefits Administration 7.0 | June 15, 1999 | TX 4-258-824 |
| PeopleSoft Human Resources 7 | June 28, 1999 | TX 4-994-865 |
| PeopleSoft Payroll Interface 7 Higher Education | June 28, 1999 | TX 5-013-124 |
| PeopleSoft Time and Labor 7 | June 28, 1999 | TX 5-013-128 |
| PeopleSoft Benefits Administration 7.50 | June 14, 1999 | TX 5-072-090 |
| PeopleSoft Payroll Interface 7.50 | June 21, 1999 | TX 3-772-292 |
| PeopleSoft Pension Administration 7.50 | June 21, 1999 | TX 3-772-291 |
| PeopleSoft Human Resources 7.50 | June 28, 1999 | TX 5-013-123 |
| PeopleSoft Payroll 7.50 | June 28, 1999 | TX 5-013-125 |
| PeopleSoft Time and Labor 7.50 | June 28, 1999 | TX 4-994-867 |
| Current development environment for JD Edwards EnterpriseOne Xe | April 26, 2007 | TXu1-345-109 |
| Current development environment for JD Edwards EnterpriseOne 8.0 | April 26, 2007 | TXu1-345-111 |
| Current development environment for JD Edwards EnterpriseOne 8.9 | April 26, 2007 | TXu1-345-112 |
| Current development environment for JD Edwards EnterpriseOne 8.10 | April 26, 2007 | TXu1-345-113 |
| Current development environment for JD Edwards EnterpriseOne 8.11 | April 26, 2007 | TXu1-345-114 |
| Current development environment for JD Edwards EnterpriseOne 8.11 SP1 | April 26, 2007 | TXu1-345-115 |
| Current development environment for JD Edwards EnterpriseOne 8.12 | April 26, 2007 | TXu1-346-350 |
| Current development environment for JD Edwards World A7.3 | April 26, 2007 | TXu1-345-110 |
| Current development environment for JD Edwards World A8.1 | May 1, 2007 | TX 6-545-422 |
| Initial release of JD Edwards EnterpriseOne 8.9 | April 26, 2007 | TX 6-541-049 |
| Initial release of JD Edwards EnterpriseOne 8.11 SP1 | April 26, 2007 | TX 6-541-040 |
| Initial release of JD Edwards World A9.1 | April 26, 2007 | TX 6-541-030 |
| Cumulative Update 1 for JD Edwards | April 26, 2007 | TX 6-541-039 |

15

| | | |
|---|---|---|
| EnterpriseOne 8.11 SP1 | | |
| Accounts Payable program | March 7, 1995 | TXu 619-320 |
| Accounts Receivable program | March 7, 1995 | TXu 619-312 |
| Capacity Requirements Planning program | March 7, 1995 | TXu 619-307 |
| Configuration Management program | March 7, 1995 | TXu 619-305 |
| EDI Interface (6) program | March 7, 1995 | TXu 619-304 |
| Enterprise Facility Planning program | March 7, 1995 | TXu 619-311 |
| Equipment Management (5) program | March 7, 1995 | TXu 619-309 |
| Financial Modeling, Budgeting & Allocations program | March 7, 1995 | TXu 619-321 |
| Financial Reporting (FASTR) program | March 7, 1995 | TXu 619-318 |
| General Ledger & Basic Financial program | March 7, 1995 | TXu 619-310 |
| Inventory Management program | March 7, 1995 | TXu 619-314 |
| Master Production Scheduling program | March 7, 1995 | TXu 619-306 |
| Product Data Management program | March 7, 1995 | TXu 619-317 |
| Purchase Order Processing program | March 7, 1995 | TXu 619-316 |
| Sales Order Processing/Sales Analysis program | March 7, 1995 | TXu 619-315 |
| Shop Floor Control program | March 7, 1995 | TXu 619-303 |
| Warehouse Management program | March 7, 1995 | TXu 619-313 |
| WorldCASE Development Environment program | March 7, 1995 | TXu 619-308 |
| WorldCASE Foundation Environment (3) program | March 7, 1995 | TXu 619-319 |
| Siebel 8.0 Initial Release and Documentation | June 29, 2009 | TX 6-942-000 |
| Siebel 8.1.1 Initial Release and Documentation | June 29, 2009 | TX 6-942-001 |
| Oracle Relational Database Management System (RDBMS): Release 8.0.4 | November 21, 2001 | TX 5-392-842 |
| Oracle Relational Database Management System (RDBMS), Release 8.0.5 | November 21, 2001 | TX 5-392-861 |
| Oracle9i Database Enterprise : Edition Release 1 | June 13, 2003 | TX 5-673-281 |
| Oracle Database 10g: Release 1 | January 16, 2009 | TX 6-938-648 |

07-CV-01658 PJH (EDL)

PRE-TRIAL STIPULATION AND ORDER NO. 2 REGARDING CERTAIN FACTS, REGISTRATIONS AND DEFENSES