BOIES, SCHILLER & FLEXNER LLP
RICHARD J. POCKER (NV Bar No. 3568)
300 South Fourth Street, Suite 800
Las Vegas, NV 89101
Telephone: (702) 382-7300
Facsimile: (702) 382-2755
rpocker@bsfllp.com

BOIES, SCHILLER & FLEXNER LLP
WILLIAM ISAACSON (*pro hac vice*)
KAREN DUNN (*pro hac vice*)
5301 Wisconsin Ave, NW
Washington, DC 20015
Telephone: (202) 237-2727
Facsimile: (202) 237-6131
wisaacson@bsfllp.com
kdunn@bsfllp.com

BOIES, SCHILLER & FLEXNER LLP
STEVEN C. HOLTZMAN (*pro hac vice*)
KIERAN P. RINGGENBERG (*pro hac vice*)
1999 Harrison Street, Suite 900
Oakland, CA 94612
Telephone: (510) 874-1000
Facsimile: (510) 874-1460
sholtzman@bsfllp.com
kringgenberg@bsfllp.com

MORGAN, LEWIS & BOCKIUS, LLP
THOMAS S. HIXSON (*pro hac vice*)
KRISTEN A. PALUMBO (*pro hac vice*)
One Market Street
Spear Street Tower
San Francisco, CA 94105
Telephone: (415) 442-1000
Facsimile: (415) 442-1001
thomas.hixson@morganlewis.com
kristen.palumbo@morganlewis.com

DORIAN DALEY (*pro hac vice*)
DEBORAH K. MILLER (*pro hac vice*)
JAMES C. MAROULIS (*pro hac vice*)
ORACLE CORPORATION
500 Oracle Parkway, M/S 5op7
Redwood City, CA 94070
Telephone: (650) 506-4846
Facsimile: (650) 506-7114
dorian.daley@oracle.com
deborah.miller@oracle.com
jim.maroulis@oracle.com

*Attorneys for Plaintiffs*
Oracle USA, Inc., Oracle America, Inc., and
Oracle International Corp.

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

ORACLE USA, INC., a Colorado corporation; ORACLE AMERICA, INC., a Delaware corporation; and ORACLE INTERNATIONAL CORPORATION, a California corporation,

Plaintiffs,

v.

RIMINI STREET, INC., a Nevada corporation; SETH RAVIN, an individual,

Defendants.

CASE NO. 2:10-cv-0106-LRH-PAL

**PLAINTIFFS ORACLE USA, INC., ORACLE AMERICA, INC., AND ORACLE INTERNATIONAL CORPORATION'S OPPOSITION TO DEFENDANTS' RULE 50(b) RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW**

Judge: Hon. Larry R. Hicks

**TABLE OF CONTENTS**

STATEMENT OF FACTS AND PROCEDURAL BACKGROUND ..... 1

I. THE PARTIES ..... 1

II. RIMINI'S NEED FOR MATERIALS ON ORACLE'S SUPPORT WEBSITES ..... 2

III. DEFENDANTS KNEW THEIR ACTIVITIES WERE PROHIBITED ..... 3

IV. MASS DOWNLOADING AND IP BLOCK EVASION ..... 4

V. HARM TO ORACLE'S SYSTEMS ..... 6

VI. ORACLE'S LOST PROFITS AND COST OF INVESTIGATION ..... 7

VII. JURY INSTRUCTIONS AND VERDICT FORM ..... 8

ARGUMENT ..... 8

I. DEFENDANTS' CONFLICT-OF-LAW, EXTRATERRITORIALITY, AND COMMERCE CLAUSE ARGUMENTS FAIL. ..... 9

A. CONFLICT OF LAW ANALYSIS IS UNNECESSARY BUT WOULD SHOW CALIFORNIA OR NEVADA TO APPLY. ..... 10

B. APPLICATION OF CALIFORNIA OR NEVADA LAW IS NOT UNCONSTITUTIONALLY EXTRATERRITORIAL OR CONTRARY TO THE COMMERCE CLAUSE. ..... 13

II. RIMINI AND RAVIN ARE LIABLE UNDER THE CDAFA OR, IN THE ALTERNATIVE, THE NCCL. ..... 15

A. DEFENDANTS' STANDING ARGUMENT FAILS. ..... 15

B. THE TRIAL RECORD SHOWS RIMINI AND RAVIN VIOLATED THE CDAFA AND NCCL. ..... 18

C. THE CDAFA AND NCCL ARE CONSTITUTIONAL ON THEIR FACE AND AS APPLIED. ..... 23

III. THE JURY'S AWARD OF DAMAGES IS AMPLY SUPPORTED. ..... 26

A. THE STATUTES AUTHORIZE RECOVERY OF LOST PROFITS. ..... 26

B. AMPLE EVIDENCE SUPPORTS THE JURY'S DAMAGES AWARD. ..... 27

IV. RIMINI'S MOTION AS TO COPYRIGHT IS MERITLESS. ..... 29

CONCLUSION ..... 30

# TABLE OF AUTHORITIES

Cases

*Allstate Ins. Co. v. Hague*,
449 U.S. 302 (1981) ........ 13

*Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*,
869 P.2d 454 (1994) ........ 21, 22

*Arntz Contracting Co. v. St. Paul Fire & Marine Ins. Co.*,
47 Cal. App. 4th 464 (1996) ........ 22

*AT&T Mobility LLC v. AU Optronics Corp.*,
707 F.3d 1106 (9th Cir. 2013) ........ 13, 14

*BMW of North North America v. Gore*,
517 U.S. 559 (1996) ........ 14

*Burgess v. United States*,
553 U.S. 124 (2008) ........ 26

*Capitol Audio Access v. Umemoto*,
980 F. Supp. 2d 1154 (E.D. Cal. 2010) ........ 26

*Chance v. E.I. du Pont De Nemours & Co., Inc.*,
57 F.R.D. 165 (E.D.N.Y. 1972) ........ 10

*Chinatown Neighborhood Ass'n v. Harris*,
794 F.3d 1136 (9th Cir. 2015) ........ 15

*City of Chicago v. Morales*,
527 U.S. 41 (1999) ........ 24

*Colautti v. Franklin*,
439 U.S. 379 (1979) ........ 24

*Comm. for Idaho's High Desert, Inc. v. Yost*,
92 F.3d 814 (9th Cir. 1996) ........ 25

*Cone v. W. Virginia Pulp & Paper Co.*,
330 U.S. 212 (1947) ........ 9

*Craigslist Inc. v. 3Taps Inc.*,
964 F. Supp. 2d 1178 (N.D. Cal. 2013) ........ 23

*Craigslist, Inc. v. Autoposterpro, Inc.*,
No. CV 08 05069 SBA, 2009 WL 890896 (N.D. Cal. Mar. 31, 2009) ........ 28

*Creative Computing v. Getloaded.com LLC*,
386 F.3d 930 (9th Cir. 2004) ........ 27

*DP Aviation v. Smiths Indus. Aerospace & Defense Sys. Ltd.*,
268 F.3d 829 (9th Cir.2001) ........ 11

*E.E.O.C. v. Go Daddy Software, Inc.*,
581 F.3d 951 (9th Cir. 2009) ........ 9, 10

*Elect. Funds Sols. v. Murphy*,
134 Cal. App. 4th 1161 (4th Dist. 2005) ........ 26

*Experience Hendrix L.L.C. v. Hendrixlicensing.com Ltd.*, 762 F.3d 829 (9th Cir. 2014)....................13

*Flextronics Int'l, Ltd. v. Parametric Tech. Corp.*, No. 5:13-CV-00034-PSG, 2014 WL 2213910 (N.D. Cal. May 28, 2014)....................18

*Freund v. Nycomed Amersham*, 347 F.3d 752 (9th Cir. 2003)....................9

*Gen. Motors Corp. v. Eighth Judicial Dist. Ct.*, 122 Nev. 466 (2006)....................12

*Gen. Signal Corp. v. MCI Telecommunications Corp.*, 66 F.3d 1500 (9th Cir. 1995)....................10

*Gonzales v. Carhart*, 550 U.S. 124 (2007)....................24

*Grosso v. Miramax Film Corp.*, 383 F.3d 965 (9th Cir. 2004)....................28

*Groupion, LLC v. Groupon, Inc.*, No. C 11-00870 JSW, 2012 WL 2054993 (N.D. Cal. June 5, 2012)....................14

*Healy v. Beer Institute*, 491 U.S. 324 (1989)....................15

*Hoffman v. L & M Arts*, No. 3:10-CV-0953-D, 2015 WL 1000838 (N.D. Tex. Mar. 6, 2015)....................10

*Hunt v. Superior* Court, 21 Cal. 4th 984 (1999)....................23, 26, 27

*In re Google Android Consumer Privacy Litig.*, No. 11-MD-02264 JSW, 2013 WL 1283236 (N.D. Cal. Mar. 26, 2013)....................17

*In re iPhone Application Litig.*, No. 11-MD-02250-LHK, 2011 WL 4403963 (N.D. Cal. Sept. 20, 2011)....................18

*In re Yagman*, 796 F.2d 1165 (9th Cir. 1986)....................10

*Instructional Sys., Inc. v. Computer Curriculum Corp.*, 35 F.3d 813 (3d Cir. 1994)....................14

*Janes v. Wal–Mart Stores, Inc.*, 279 F.3d 883 (9th Cir. 2002)....................9

*Jasty v. Wright Med. Tech., Inc.*, 528 F.3d 28 (1st Cir. 2008)....................11

*Johnson v. Paradise Valley Unified Sch. Dist.*, 251 F.3d 1222 (9th Cir. 2001)....................8

*Joseph Oat Holdings, Inc. v. RCM Digesters, Inc.*, 409 F. App'x 498 (3d Cir. 2010)....................22

*Josephs v. Pac. Bell*, 443 F.3d 1050 (9th Cir. 2006)....................8, 9

*JRS Products, Inc. v. Matsushita Elec. Corp. of Am.*,
115 Cal. App. 4th 168 (Cal. Ct. App. 2004) .......... 22

*LVRC Holdings LLC v. Brekka*,
581 F.3d 1127 (9th Cir. 2009) .......... 8, 19, 20

*Mintz v. Mark Bartelstein & Associates Inc.*,
906 F. Supp. 2d 1017 (C.D. Cal. 2012) .......... 16, 17

*Murphy v. City of Long Beach*,
914 F.2d 183 (9th Cir. 1990) .......... 9

*Name Intellingence, Inc. v. McKinnon*,
No. 2:10-cv-1202-RCJ-GWF, 2013 WL 1793953 (D. Nev. Apr. 26, 2013) .......... 11

*NovelPoster v. Javitch Canfield Grp.*,
No. 13-CV-05186-WHO, 2014 WL 5594969 (N.D. Cal. Nov. 3, 2014) .......... 16

*O'Connor v. Uber Techs., Inc.*,
No. C-13-3826 EMC, 2013 WL 6354534 (N.D. Cal. Dec. 5, 2013) .......... 15

*Patton v. Sherwood*,
152 Cal. App. 4th 339 (2d Dist. 2007) .......... 26

*Pavao v. Pagay*,
307 F.3d 915 (9th Cir. 2002) .......... 8

*People v. Hawkins*,
98 Cal. App. 4th 1428 (6th Dist. 2002) .......... 23

*People v. Wesson*,
138 Cal. App. 4th 959 (6th Dist. 2006) .......... 27

*People v. Yuksel*,
207 Cal. App. 4th 850 (2d Dist. 2012) .......... 27

*Pharm. Res. & Mfrs. of Am. v. Walsh*,
538 U.S. 644 (2003) .......... 15

*Pike v. Bruce Church, Inc.*,
397 U.S. 137 (1970) .......... 15

*Progressive Gulf Ins. Co. v. Faehnrich*,
327 P.3d 1061 (Nev. 2014) .......... 13

*Reeves v. Sanderson Plumbing Products, Inc.*,
530 U.S. 133 (2000) .......... 9

*Rio Properties, Inc. v. Stewart Annoyances, Ltd.*,
420 F. Supp. 2d 1127 (D. Nev. 2006) .......... 10

*Sanchez-Corea v. Bank of America*,
38 Cal. 3d 892 (1985) .......... 26

*Shannon-Vail Five Inc. v. Bunch*,
270 F.3d 1207 (9th Cir. 2001) .......... 10

*Smyers v. Workers' Comp. Appeals Bd.*,
157 Cal. App. 3d 36 (1st Dist. 1984) .......... 26

*Sw. Airlines Co. v. Farechase, Inc.*,
318 F. Supp. 2d 435 (N.D. Tex. 2004)....................21

*Transgo, Inc. v. Ajac Transmission Parts Corp.*,
768 F.2d 1001 (9th Cir. 1985)....................25

*Tri-County Equipment & Leasing v. Klinke*,
286 P.3d 593 (Nev. 2012)....................11

*United States v. Christensen*,
801 F.3d 970 (9th Cir. 2015)....................18, 19, 21, 24

*United States v. Drew*,
259 F.R.D. 449 (C.D. Cal. 2009)....................25

*United States v. Nosal*,
676 F.3d 854 (9th Cir. 2012)....................passim

*Valentine v. NebuAd*,
804 F. Supp. 2d 1022 (N.D. Cal. 2011)....................14

*Villar v. Crowley Mar. Corp.*,
782 F.2d 1478 (9th Cir. 1986)....................10

*Yee v. Lin*, No.
No. C 12-02474 WHA, 2012 WL 4343778 (N.D. Cal. Sept. 20, 2012)....................16

*Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*,
259 F.3d 1101 (9th Cir. 2001)....................10

*Zinser v. Accufix Research Institute, Inc.*,
253 F.3d 1180....................11

Statutes and Rules

Cal. Penal Code § 502....................16

Cal. Penal Code § 502(a)....................14

Cal. Penal Code § 502(c)....................16, 20, 21, 24

Cal. Penal Code § 502(e)....................16, 17, 26, 27

Cal. Penal Code § 502(h)....................24

Fed. R. Civ. P. 50(b)....................1, 9

Nev. Rev. Stat. § 205.509....................25

Nev. Rev. Stat. § 205.511(1)....................17, 27

Nev. Rev. Stat. § 205.471(3)(c)....................17

Nev. Rev. Stat. § 205.4605(4)....................17

Nev. Rev. Stat. § 205.4765(1)....................19, 21

Nev. Rev. Stat. § 205.4765(3)....................21

Other Authorities

2011 Nev. Stat. 1862....................23

2015 Cal. Legis. Serv. Ch. 614 (A.B. 32) (West) .......... 23

2A Sutherland on Statutes and Statutory Construction § 47:7 (7th ed. 2007) .......... 26

9 C. Wright & A. Miller, Federal Practice and Procedure § 2335 (3d ed.) .......... 28

9A C. Wright & A. Miller, Federal Practice and Procedure § 2529 (2d ed. 1995) .......... 9

Restatement (Second) of Conflict of Laws § 6 (1971) .......... 12

vi

ORACLE'S OPPOSITION TO DEFENDANTS' RULE 50(b) RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

Defendants' Rule 50(b) Renewed Motion ("Mot.") (filed as Dkt. Nos. 913 & 915) provides no basis to set aside the jury verdict.

Defendants failed to raise their choice-of-law and related Constitutional arguments before the verdict, rendering them improper now; they are also meritless. The same is true of almost all of Defendants' copyright arguments as well as the argument that one of the Oracle[1] plaintiffs lacks statutory standing under California's Computer Data Access and Fraud Act ("CDAFA") and Nevada's Computer Crimes Law ("NCCL").

Defendants' principal remaining attacks on the verdict characterize the CDAFA and NCCL claims as raising broad constitutional concerns about using anti-hacking laws to enforce contractual terms of use agreements. Their efforts suffer from many flaws, but most obviously, at Defendants' request, the jury was instructed that it could only find liability under the CDAFA and NCCL if Defendants believed that their conduct was unauthorized. And the evidence supporting the jury's verdict goes far beyond Defendants' specific knowledge and understanding of the terms of the user agreement, including express notices, letters, and IP blocking. Defendants then continued despite knowledge that their conduct was prohibited. The evidence showed that Defendants even took measures to conceal and evade Oracle's efforts to block their activities. In any event, such statutes have been repeatedly upheld against similar attacks.

The jury also heard ample evidence that Defendants' taking of material from Oracle's websites was a critical component of Rimini's pitch to convince those customers to leave Oracle support for Rimini, causing Oracle's lost profits. Finally, Defendants' copyright arguments cannot overcome the Court's correct, prior rulings construing Oracle's licenses.

## STATEMENT OF FACTS AND PROCEDURAL BACKGROUND

### I. THE PARTIES

Oracle International is a California corporation with its principal place of business in Redwood City, California, and it owns or is the exclusive licensee of the copyrights at issue in

[1] Plaintiffs Oracle USA, Inc., Oracle America, Inc. ("Oracle America"), and Oracle International Corp. ("Oracle International") are collectively referenced as "Oracle."

this action. Joint Pretrial Order, Stipulated Facts ("Stip. Facts") ¶¶ 5, 40.

Oracle America is the Oracle operating entity for the United States. Tr. 1023:2-11 (Allison). It has its principal place of business in Redwood City, California and is the successor to Oracle USA, Inc. as well as several PeopleSoft, J.D. Edwards, and Siebel entities that Oracle acquired. Stip. Facts ¶¶ 2, 4. In the relevant period, Oracle America received the revenue customers paid for support and provided 39% percent of that revenue, as a sublicense fee, to Oracle International pursuant to inter-company agreements. Stip. Facts ¶¶ 30-32.

Rimini has claimed that its headquarters are both in Las Vegas and California. PTX39 at 5 ("Rimini Street is headquartered in Pleasanton, CA and has 48 employees."), 18 ("Rimini Street's main office is located in Pleasanton, California."); Tr. 2442:25-2443:7 (Rowe). Many of Rimini's senior executives live and work in California, and during the relevant period it had its largest operational center in California. Tr. 574:7-16, 691:17-22, 813:14-22 (Ravin); Tr. 1391:11-17 (Maddock); 2361:11-15 (Rowe); 2093:12-17 (Benge).

Rimini does not offer software licenses, but competes with Oracle to provide maintenance for customers who use Oracle's PeopleSoft, J.D. Edwards, and Siebel software. Stip. Facts ¶¶ 11-12. Oracle is Rimini's most frequent competitor. Tr. 1475:19-1476:1 (Maddock). From the outset, Rimini described itself as taking maintenance customers at Oracle's expense: "Rimini separates Oracle from its acquired licensees denying recurring revenue." PTX3 at 1; Tr. 545:17-546:13 (Ravin). Edward Yourdon, with decades of industry experience, testified that during the relevant time period, no competitor to Rimini (other than Oracle) was a viable alternative for Oracle support. Tr. 1689:4-13 (Yourdon). Ravin admitted, and internal Rimini documents showed, that "Rimini Street had taken over $300 million in contracts from Oracle." Tr. 548:6-25 (Ravin); PTX5352 at 14.

## II. RIMINI'S NEED FOR MATERIALS ON ORACLE'S SUPPORT WEBSITES

As part of its maintenance offering, Oracle offered customers access to websites containing valuable support information, including documentation, patches, and security updates. Tr. 1277:20-1282:7 (Ransom). Licensees often prefer to obtain information in this way. Tr. 1298:5-1299:3 (Ransom). Rimini's actual and prospective customers were "trained Siebel IT

professionals who demand a self-service mechanism," including access to the materials on Oracle's support websites, because they "rely on accessible information to resolve as many issues independently as they would by engaging technical support." PTX206; Tr. 326:1-327:22 (Ravin). Rimini's customers "need to be able to access" those materials. Tr. 327:10-22 (Ravin).

Rimini attempted to download these materials for clients before their maintenance contracts with Oracle expired "[b]ecause once a customer passes the maintenance end date, they're no longer under contract with Oracle support and therefore no longer entitled to access their websites or get delivery of any materials." Tr. 567:4-9 (Ravin).

Rimini often used automated downloading programs to obtain copies of those materials for clients. "[T]hese are extremely large systems and require huge amounts of downloads . . . . So the volumes alone is why these tools were used." Tr. 726:1-6 (Ravin); *see also* Tr. 478:23-479:11, 724:4-16 (Ravin). "Otherwise, it would take a decade." Tr. 1587:6-1587:16 (G. Lester). Ravin approved the use of these tools. Tr. 479:12-19 (Ravin), 1588:16-1598:6 (G. Lester).

## III. DEFENDANTS KNEW THEIR ACTIVITIES WERE PROHIBITED.

During the relevant time period, access to Oracle's support websites required a login and password obtained with a valid support agreement, and access also required agreement to the Terms of Use governing the sites. Tr. 861:7-16, 863:10-864:8 (Allison); PTX19. Those Terms of Use incorporate by reference the Oracle.com Terms of Use, which contain a California choice of law provision. PTX19 at 1 (incorporating by reference Allison Decl. Exs. A, B (ORCLRS0044624, at -626-27 (2006 rev.); ORCLRS0045696, at -704 (2009 rev.))).

On February 19, 2007, Oracle changed its Terms of Use on its support websites for PeopleSoft, J.D. Edwards, and Siebel to specifically state, "you may not use any software routines commonly known as robots, spiders, scrapers, or any other automated means, to access [the site], or any other Oracle accounts, systems or networks." PTX19 at 1; Tr. 867:5-869:15 (Allison). By May 31, 2007, Ravin and others at Rimini knew of the change and considered the implications for Rimini's business. Tr. 480:10-14 (Ravin); PTX20. Ravin knew that Rimini's use of automated tools violated the Terms of Use, but he decided that Rimini should continue using automated tools despite the change. Tr. 481:24-483:5 (Ravin). Ravin admitted at trial

that, when he read the Terms of Use, he understood they prohibited Rimini's automated tools. *Id.*, Tr. 823:2-825:16 (Ravin). He also admitted that he testified falsely at his deposition when stating that he did not understand the Terms of Use to prohibit Rimini's automated tools. *Id.*

Defendants continued despite knowing the Terms of Use prohibited their conduct because they believed that "using a manual process, there's just no way to get everything. It's far too time consuming and costly." Tr. 484:6-485:22 (Ravin); PTX454; *see also* Tr. 727:8-16 ("We didn't have at that time the manpower, we didn't have the resources to get all materials in a manual way") (Ravin); PTX27 at 1 ("Please use our automation tools to complete the downloads as it is not feasible to complete the entire downloads without such tools and processes").

**IV. MASS DOWNLOADING AND IP BLOCK EVASION**

In 2008, Oracle transitioned certain support materials to a system called My Oracle Support and announced the older systems would be shut down in October 2008. PTX37. After discussions with Ravin, Doug Baron of Rimini created programs to scrape and download material from the new system. PTX37. Oracle assigned a unique number to each its Knowledge Base documents, and one of Baron's programs downloaded those documents indiscriminately, in order by document number, in rapid succession. PTX38 at 3. Baron's tool was called "Knowledge Base Scan." Tr. 1166:12-25 (Hicks); *see also* PTX45; PTX46. Rimini used Baron's program to conduct "mass downloads" from Oracle's new system. Tr. 1243:4-1243:20 (Corpuz), 1230:1-1231:13 (Baron). Using Baron's tools, Rimini accessed and downloaded materials on Oracle's websites plainly not within the scope of the pertinent customer's license. Tr. 1230:23-1234:17 (Baron) ("all of the content for PeopleSoft and JD Edwards and people were all mixed together on the website . . . we downloaded by doc ID range and then deleted any content that was inappropriate for that particular client"); PTX46 at 5 (admitting that of downloaded attachments for XO, a Siebel licensee, "most were PeopleSoft related and not Siebel related"); *see also* Stip. Facts ¶ 18 (XO was Siebel customer only).

Oracle detected more than a million attempts to download by a single user and concluded it was "some sort of automated crawl." PTX667. By November 20, 2008, due to the program's effects on Oracle's systems, Oracle blocked an IP address used by Rimini. Rimini's John

Whittenbarger of Rimini then wrote: "It seems they're onto us for massive download volumes." PTX42. "Q. And you were inferring that they blocked -- that Oracle blocked that IP address in response to the massive download volumes? A. Probably, yes." Tr. 1759:5-9 (Whittenbarger).

Oracle wrote an email to Rimini's customer, XO Communications, stating that "Oracle has detected improper activity" and that "this activity is affecting the Oracle websites and must be addressed." PTX43. On November 25, 2008, XO forwarded that email to Whittenbarger, writing, "Is that you downloading from Metalink? Apparently this is illegal." PTX43.

Ravin learned of these communications and was involved in discussions about how to respond. Tr. 511:4-513:8 (Ravin). On November 25, 2008, Dennis Chiu of Rimini wrote to Oracle: "I understand our current methodology creates issues with CPU utilization on Oracle's servers, and as such, you've had to block any access from our IP addresses, which prevents us from fulfilling our obligation to XO Communications." PTX482. Ravin received that email the same day. PTX482; *see also* PTX230. Oracle's counsel wrote to XO, explained that Rimini's downloading behavior violated the Terms of Use, and that Oracle was blocking Rimini's IP addresses to protect its systems. PTX230; Tr. 1140:3-1141:8 (Chiu) (referring to PTX230 as Deposition Exhibit 232). Despite warnings that its activities were not permitted and harming Oracle's systems, Rimini continued to use its Knowledge Base Scan program. Tr. 1139:7-1141:8 (Chiu); Tr. 770:17-22 (Ravin); PTX45; PTX46.

Rimini also took steps to circumvent Oracle's blocking of Rimini's IP addresses used to access Oracle's systems, including by obtaining additional IP addresses. Tr. 1232:1-1233:1 (Baron); Tr. 1590:3-1592:2 (G. Lester); PTX456; PTX457; PTX5376. Baron carefully examined how Oracle detected Rimini's activities to avoid future detection. PTX611. Rimini also downloaded using Baron's residential internet connection with a different IP address, evading detection for a time. Tr. 1233:3-1233:14 (Baron); PTX46 ("downloading . . . (from my house and not using the download VMs) but got blocked after about 2,000 attachments").

Rimini undertook similar conduct for XO and other customers. Tr. 770:17-22 (Ravin); Tr. 1140:3-1141:8 (Chiu); *see also* PTX45. Rimini continued because it had promised its customers a set of material from Oracle's support website to convince the customers to leave

Oracle support and join Rimini. As Chiu wrote, as a "current Oracle (Siebel) customer, they require a complete library," and "[w]hile Oracle clients can access all of the content under their current maintenance agreement, aside from manually downloading every distinct knowledge item, or patch, there isn't a simplified method to obtain all their entitled content. As part of the services that XO Communications has contracted with Rimini Street, we are helping them obtain all of their content." PTX482; Tr. 1139:20-1140:1 ("we were continuing to try to complete this obligation that we had") (Chiu). Rimini also admitted that the downloading of this specific material was critical to signing and keeping its customers. As Rimini's Brian Slepko wrote, "we do know that they [XO] will be very 'uncomfortable' should we not get this done[.]" PTX482. Ravin similarly admitted: "[W]e had a window. We had to get it done before their maintenance end date. . . . [T]his was the only way Oracle was giving us as a method to download all these files, and so we had to do that." Tr. 771:19-772:7 (Ravin).

Rimini used its California data center as part of its "massive" access and downloading. Christian Hicks traced a Rimini IP address, 71.5.6.20, to Rimini's California data center. Tr. 1165:8-1166:11 (Hicks). Rimini used that IP address to download as part of its most egregious conduct. PTX482 (admitting that Rimini's conduct from 71.5.6.20 "creates issues with CPU utilization on Oracle's servers"); PTX43 (Oracle's notice to XO that 71.5.6.20 was blocked due to improper accesses); Tr. 1589:7-1592:16 (G. Lester).

## V. HARM TO ORACLE'S SYSTEMS

Christian Hicks analyzed Rimini's use of its Knowledge Base Scan program and explained that, in the key time period, Rimini generated more accesses to Oracle's Knowledge Management system than all of Oracle's customers worldwide, combined. Tr. 1167:8-1168:2 (Hicks). No expert responded to Hicks' testimony. Rimini's own technical expert, David Klausner, largely ignored Hicks' testimony, but admitted that Rimini was accessing Oracle's system as many as 18,000 times per hour. Tr. 2301:16-2302:6 (Klausner).

Hicks explained that Rimini's accesses "harmed Oracle significantly" by causing database deadlocks and significant slowdowns of Oracle's system. Tr. 1168:23-1169:2, 1172:9-1174:4 (Hicks). Klausner admitted that Rimini "was certainly a factor" in creating the

deadlocks, and that "Rimini was responsible to some extent." Tr. 2302:24-2304:10 (Klausner). The deadlocks caused, among other problems, customers to receive error messages when trying to obtain support information from Oracle's website. Tr. 1174:5-1175:11 (Hicks). David Renshaw, a database administrator responsible for one of Oracle's systems Rimini targeted, explained that Rimini "made a system unavailable to customers and analysts internally" so that "they were unable to access the knowledge management tab, . . . were getting strange Java errors when they were trying to use the system." Tr. 1202:2-13 (Renshaw); *see also* PTX665; PTX667.

Rimini ultimately crashed Oracle's server, making it inaccessible to customers and resulting in several hours of downtime. Tr. 1178:8-1179:23 (Hicks); Tr. 1209:2-1211:10 (Renshaw) (system was "unavailable" for "four and a half hours"); PTX669 ("KM Core crashed and Systems was unable to restart"). The crash occurred because the same logins – namely "jcorpuz@riministreet.com" and "jrcorpuz@riministreet.com," PTX5372; PTX662; Tr. 1211:19-1213:12 (Renshaw) – were used on multiple computers concurrently, each rapidly downloading large volumes of information. PTX5376 ("this could only be done by many multiple searches on many machines under the same user id . . . They knew we were monitoring for high numbers of transactions by IP address. This circumvents that detection."); Tr. 1179:16-23 (Hicks) ("Oracle system was crashed by 10 virtual machines hitting the system as fast as they could using the same user ID"). Rimini's expert agreed and only said Oracle's system should have withstood it. Tr. 2304:3-2304:16 (Klausner).

In addition to those effects, other users faced substantial delays in obtaining materials from Oracle's servers because of Rimini's activities. Tr. 1182:21-1186:22 (Hicks).

## VI. ORACLE'S LOST PROFITS AND COST OF INVESTIGATION

Oracle's damages expert, Elizabeth Dean, calculated Oracle's cost of investigating and responding to Rimini's activity at $27,000. Tr. 1831:3-21 (Dean). She also calculated Oracle America's and Oracle International's lost profits from the loss of the customers whose logins were used with the Knowledge Base Scan program during the November 2008 to January 2009 time period, which amounted to a total of $14.4 million. Tr. 1833:1-19 (Dean). Hicks identified those customers by analyzing technical materials such as log files, Tr. 1180:5-1181:1 (Hicks),

and the customer list is confirmed by contemporaneous Rimini documents. PTX45 ("Please find the list that breaks down the method used for the archives for the most recent clients since XO."; identifying customers and uses of the Knowledge Base Scan program). The fact that Rimini contracted with those customers, and the dates service began, are stipulated. Stip. Facts ¶ 18.

## VII. JURY INSTRUCTIONS AND VERDICT FORM

Defendants proposed adding the following requirement to the CDAFA and NCCL jury instructions: "If you find that Rimini Street and/or Seth Ravin believed it had authorization to access Oracle America and/or Oracle International Corporation's computer, then you must find that Rimini Street and/or Seth Ravin did not violate the [statute]." Dkt. 869 at 98, 100, 108, 110. Defendants provided a single argument in support of the modification: "constitutional concerns underlying the Ninth Circuit's opinions in *Nosal* and *LVRC* apply to the [CDAFA and NCCL]." *Id*. Defendants argued that their proposed modifications were necessary to "explain[] the scope of the statute to the jury and prevent[] it from applying this vague and overbroad statute in a constitutionally impermissible way." *Id.* They argued the language would provide the jury "legitimate guidance regarding the proper scope of this statute [and] Rimini's available good-faith belief affirmative defense" sufficient to ensure the jury applied "a specific intent *mens rea* requirement." Dkt. 869 at 91, 109. The Court adopted Defendants' proposed language. Jury Instruction Nos. 47-49, 53-54, Dkt. 880.

The jury returned findings of liability on both CDAFA and NCCL against both Rimini and Ravin, and damages of $14.427 million between Oracle America and Oracle International.

## ARGUMENT

"A jury's verdict must be upheld if it is supported by substantial evidence, which is evidence adequate to support the jury's conclusion, even if it is also possible to draw a contrary conclusion." *Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir. 2002). The Court "must disregard evidence favorable to the moving party that the jury is not required to believe," "must view the evidence in the light most favorable to the nonmoving party," and must "draw all reasonable inferences in that party's favor." *Id.* (quoting *Johnson v. Paradise Valley Unified Sch. Dist.*, 251 F.3d 1222, 1227 (9th Cir. 2001)); *Josephs v. Pac. Bell*, 443 F.3d 1050, 1062 (9th Cir. 2006).

Defendants' motion must be denied unless "the evidence permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict." *E.E.O.C. v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir. 2009) (quoting *Josephs*, 443 F.3d at 1062).[2] Even if Defendants were to show some defect in the proof, the Court has discretion to order a new trial rather than grant judgment as a matter of law. Fed. R. Civ. P. 50(b)(2); *Cone v. W. Virginia Pulp & Paper Co.*, 330 U.S. 212, 215 (1947).

## I. DEFENDANTS' CONFLICT-OF-LAW, EXTRATERRITORIALITY, AND COMMERCE CLAUSE ARGUMENTS FAIL.

Defendants raise a variety of conflict-of-law, extraterritoriality, and Commerce Clause arguments, none of which was in their Rule 50(a) motion. Defs.' Rule 50(a) Mot., Dkt. 838 at 8-12 (raising seven other arguments to the computer abuse claims). This is fatal.[3]

[2] Defendants pay lip service to these requirements but ask the Court to rely impermissibly upon impeached testimony from their own witnesses. *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 151 (2000) (the Court "must disregard all evidence favorable to the moving party that the jury is not required to believe" and should consequently only "give credence" to "'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses'") (quoting 9A C. Wright & A. Miller, Federal Practice and Procedure § 2529 (2d ed. 1995)). Defendants ask the Court to impermissibly believe that: "Rimini downloaded only the specific materials that each client was entitled to download," *compare* Mot. at 3 (citing Ravin's testimony), *with* Tr. 1230:23-1234:17 (Baron) ("we downloaded by doc ID range and then deleted any content that was inappropriate for that particular client"); Rimini "made all sorts of arrangements to minimize the impact on Oracle servers" including "working on nights and weekends," *compare* Mot. at 3 (citing Ravin's testimony), *with* Tr. 1182:1-20 (Hicks) ("after November 25th, in both categories, day versus night, weekday versus weekend, you simply had an increase in both sets of activities"); Rimini's use of automated tools was limited to a "three-month period, from November 2008 to January 2009," *compare* Mot. at 3, *with* Tr. 1164:15-1166:11 (Hicks) ("in June and July of 2007 the user seth+ravin downloaded more than 11,000 copies of PeopleSoft files to a Rimini Street IP address"); and that Oracle introduced no evidence regarding "where Rimini's conduct occurred," *compare* Mot. at 9-10 (citing testimony from Ravin and Maddock), *with* Tr. 1165:24-1166:11 (Hicks) ("we tracked this IP address, 71.5.6.20, and it's a Rimini Street IP address for their data center in northern California").

[3] "A Rule 50(b) motion for judgment as a matter of law is not a freestanding motion. Rather, it is a renewed Rule 50(a) motion." *E.E.O.C.*, 581 F.3d at 961. It is limited to the grounds asserted in the pre-deliberation Rule 50(a) motion, and a party cannot "raise arguments in its post-trial motion for judgment as a matter of law under Rule 50(b) that it did not raise in its preverdict Rule 50(a) motion." *Freund v. Nycomed Amersham*, 347 F.3d 752, 761 (9th Cir. 2003); *Murphy v. City of Long Beach*, 914 F.2d 183, 186 (9th Cir. 1990) (judgment notwithstanding the verdict is "improper if based upon grounds not alleged in a directed verdict" motion). In ruling on a Rule 50(b) motion based on grounds not previously asserted in a Rule 50(a) motion, the Court is "limited to reviewing the jury's verdict for plain error, and should reverse only if such plain error would result in a manifest miscarriage of justice." *E.E.O.C.*, 581 F.3d at 961 (quoting *Janes v. Wal–Mart Stores, Inc.*, 279 F.3d 883, 888 (9th Cir. 2002)). "This exception . . . permits only

(Footnote Continued on Next Page.)

Those arguments also fail on their merits. There is no actual conflict between the two states' computer abuse statutes in this case. If a choice were needed, California would be correct and either state's statute may constitutionally apply.

### A. CONFLICT OF LAW ANALYSIS IS UNNECESSARY BUT WOULD SHOW CALIFORNIA OR NEVADA TO APPLY.

As to Defendants' conflict-of-law argument – that "there is no basis in the record upon which the Court can determine whether California's or Nevada's computer crime law can be applied" (Mot. at 9) – the motion proceeds from the false premise that Oracle was required to prove to the jury facts necessary to resolve a potential conflict-of-law issue. Mot. at 10 ("there must be facts in the record establishing that one or the other state's law *actually* applies"). That is wrong for three reasons.

Determining the law to apply is a question for the court—not the jury. *In re Yagman*, 796 F.2d 1165, 1171 n.2 (9th Cir. 1986) (applying California approach); *Chance v. E.I. du Pont De Nemours & Co., Inc.*, 57 F.R.D. 165, 169-71 (E.D.N.Y. 1972) (same under Restatement (Second) of Conflict of Laws approach); *see also Shannon-Vail Five Inc. v. Bunch*, 270 F.3d 1207, 1210 (9th Cir. 2001). Some factual determinations may be made by the Court to resolve it. *Villar v. Crowley Mar. Corp.*, 782 F.2d 1478, 1479 (9th Cir. 1986); *Chance*, 57 F.R.D. at 169-71. The Court may resolve the conflict-of-law issue at any time, even after trial. *Rio Properties, Inc. v. Stewart Annoyances, Ltd.*, 420 F. Supp. 2d 1127, 1130 (D. Nev. 2006) (Hicks, J.) (resolving choice-of-law dispute and construing choice-of-law provision in parties' contract during post-trial briefing on prejudgment interest).[4] Thus, in no event would Defendants

---

(Footnote Continued from Previous Page.)

extraordinarily deferential review that is limited to whether there was *any* evidence to support the jury's verdict." *Id.* at 961-2 (quoting *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1109 (9th Cir. 2001)).

[4] *Hoffman v. L & M Arts*, No. 3:10-CV-0953-D, 2015 WL 1000838, at *3 (N.D. Tex. Mar. 6, 2015) ("Although it is often helpful to resolve such issues pretrial, absent a court-ordered deadline, a party can wait until trial to raise a choice of law issue, such as during a Rule 50(a) motion for judgment as a matter of law or when addressing the jury charge.") (citation omitted); *see also Gen. Signal Corp. v. MCI Telecomm. Corp.*, 66 F.3d 1500, 1505 (9th Cir. 1995) (parties do not waive choice-of-law arguments when the issue has not been previously resolved and there

(Footnote Continued on Next Page.)

conflicts-of-law argument justify discarding the jury verdict.

Second, the computer abuse claims are statutory, not common law, and therefore the "most significant relationship" test is inapplicable. *Name Intelligence, Inc. v. McKinnon*, No. 2:10-cv-1202-RCJ-GWF, 2013 WL 1793953, at *4 (D. Nev. Apr. 26, 2013). Under the Full Faith and Credit Clause, a state statute should be applied unless it is in "conflict with the public policy" of the forum state. *Id.* (citation omitted). Defendants cite no case applying the most significant relationship test to a statutory claim. Nor do they show any conflict between the CDAFA and Nevada public policy. Plainly, no conflict exists between the Nevada statute and its own public policy.

Third, even if conflict of laws were to be considered, Defendants bear the burden to show an actual conflict. "When the laws of more than one state potentially apply, before undertaking a conflict-of-law analysis, a court should determine whether a conflict of law actually exists." *Tri-Cnty. Equip. & Leasing v. Klinke*, 286 P.3d 593, 595 (Nev. 2012). "A conflict of law exists when two or more states have legitimate interests in a particular set of facts in litigation, and the laws of those states differ or would produce different results in the case." *Id.* (citation omitted). Defendants have not and cannot identify an actual conflict between the laws of California and Nevada that would "produce different results" in this case. The jury returned the same verdict on both California and Nevada claims, including the same damages, and thus there is no conflict. [5] This entirely disposes of Defendants' argument. *See id.*; *see also Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1187 (9th Cir. 2001) ("the foreign law proponent must identify the applicable rule of law in each potentially concerned state and must show it materially differs"

(Footnote Continued from Previous Page.)

is no unfair surprise to the other side); *Jasty v. Wright Med. Tech., Inc.*, 528 F.3d 28, 39 n.15 (1st Cir. 2008) (same); *DP Aviation v. Smiths Indus. Aerospace & Defense Sys. Ltd.*, 268 F.3d 829, 848 (9th Cir. 2001) (noting first consideration of foreign law may be appropriate after trial or even on appeal).

[5] "If there is no conflict, no further analysis is necessary, and the law of the forum state usually applies." *Tri-Cnty. Equip.*, 286 P.3d at 595 (citation omitted). While Oracle is entitled to more prejudgment interest under Nevada law, Oracle consents to the lower California interest of $1,568,000 to Oracle International and $2,471,560 to Oracle America. *See* Dkt. 910 at 2 & n.4.

from forum law) (citation omitted).[6]

If the Court were to undertake a common-law style conflict-of-laws analysis, it would lead to the application of California law. The forum state applies the Restatement's "most significant relationship" test, which considers seven factors. *Gen. Motors Corp. v. Eighth Judicial Dist. Ct. of State of Nev. ex rel. Cty. of Clark*, 134 P.3d 111, 116 (Nev. 2006); Mot. at 10. All seven[7] favor California law or are neutral on the facts of this case. The victims, Oracle America and Oracle International, have their principal places of business in California, and Oracle International is also a California corporation. Stip. Facts ¶¶ 2, 5. Rimini used computers in northern California, where it maintained servers, to conduct downloading on which liability was premised. Tr. 1165:24-1166:11 (Hicks); Tr. 574:7-25 (Ravin); *see also* PTX43, PTX482. Further, many of Rimini's most senior executives have lived and worked in California since Rimini's founding, and Rimini has held itself out as based in California. PTX39 at 5, 18; Tr. 691:17-22 (Ravin); Tr. 1391:10-1392:8 (Maddock); Tr. 2093:17 (Benge); Tr. 2361:8-2362:9, 2442:25-2443:7 (Rowe). Rimini identifies no other jurisdiction with a "more significant relationship," and that disposes of the issue. The only other plausible candidate is Nevada, where Rimini is headquartered and Ravin resides. Tr. 2442:25-2443:7 (Rowe); Tr. 239:7-13, 684:3-4 (Ravin).

If still more were required, a California choice-of-law agreement controls. The agreement was confirmed every time Defendants accessed Oracle's support websites, as access to Oracle's systems required agreeing to their Terms of Use, Tr. 861:7-16, 863:10-864:8 (Allison), which incorporated by reference the Oracle.com Terms of Use. PTX19. The

---

[6] For the same reason, Defendants' suggestion that some other unspecified law might apply, Mot. at 9 ("Oracle Failed to Prove Which (If Any) State Law Applies"), also fails. This argument also was not made in Defendants' Rule 50(a) motion.

[7] The factors are "(a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of the law to be applied." *Gen. Motors*, 134 P.3d at 116-17 (citing Restatement (Second) of Conflict of Laws § 6 (1971)).

Oracle.com Terms at all times contained the following provision:

> All matters relating to your access to, and use of, the Site [and Content provided on or through or uploaded to the Site] shall be governed by U.S. federal law or the laws of the State of California.

Allison Decl. Exs. A, B (ORCLRS0044624, at -626-27 (2006 rev.); ORCLRS0045696, at -704 (2009 rev.)). Defendants reviewed, understood, and clicked to assent to the Terms of Use in consideration for access to Oracle's sites. Tr. 480:10-14, 481:24-483:5, 823:2-825:16 (Ravin); Tr. 861:7-16, 863:10-864:8 (Allison); PTX20.

Nevada respects choice-of-law agreements "within broad limits" so long as the agreement was in good faith, the chosen law has a "substantial relation" with the agreement, and it does not offend a "fundamental Nevada policy." *Progressive Gulf Ins. Co. v. Faehnrich*, 327 P.3d 1061, 1064 (Nev. 2014). Here, the substantial connection to California, where Oracle was headquartered, is obvious, and Defendants identify no contrary Nevada public policy.

### B. APPLICATION OF CALIFORNIA OR NEVADA LAW IS NOT UNCONSTITUTIONALLY EXTRATERRITORIAL OR CONTRARY TO THE COMMERCE CLAUSE.

Defendants claim application of the statutes is unconstitutional, citing cases applying the Due Process and Commerce Clauses. Neither supports Defendants' argument.

A state statute may apply, consistent with Due Process, to conduct involving other states so long the state has "significant contact or significant aggregation of contacts, creating state interests, such that choice of its law is neither arbitrary nor fundamentally unfair." *Allstate Ins. Co. v. Hague*, 449 U.S. 302, 312-13 (1981); *accord AT&T Mobility LLC v. AU Optronics Corp.*, 707 F.3d 1106 (9th Cir. 2013) (quoting *Allstate* and affirming application of California statute to nationwide overcharges caused by global price-fixing conspiracy); *see also Experience Hendrix L.L.C. v. Hendrixlicensing.com Ltd.*, 762 F.3d 829, 836 (9th Cir. 2014) (applying *Allstate* and *AT&T Mobility* in affirming application of Washington statute to sales around United States). "[M]ost commentators have viewed *Allstate* as setting a highly permissive standard." *AT&T Mobility*, 707 F.3d at 1111; *Experience Hendrix*, 762 F.3d at 836.

The CDAFA is based on California's indisputable interest in the "protection of the integrity of all types and forms of lawfully created computers, computer systems, and computer

data is vital to the protection of the privacy of individuals as well as to the well-being of financial institutions, business concerns, governmental agencies, and others within this state that lawfully utilize those computers, computer systems, and data." Cal. Penal Code § 502(a). That interest is more than sufficient to show that the application of the statute in this case, to protect Oracle America and Oracle International, is "neither arbitrary nor fundamentally unfair." *See also, e.g.*, *Groupion, LLC v. Groupon, Inc.*, No. C 11-00870 JSW, 2012 WL 2054993, *7 (N.D. Cal. June 5, 2012) ("California has an interest in protecting companies which conduct business there"). Defendants prove the point by relying on *BMW of North North America v. Gore*, 517 U.S. 559, 573 (1996), which merely holds a state cannot punish or deter "conduct that was lawful where it occurred and that had no impact on [that state] or its residents." The contractual choice-of-law provision, Allison Decl. Exs. A, B, is itself also patently sufficient.

In any event, far more than a de minimis amount of the relevant conduct occurred in California, as Rimini downloaded to its California data center. Tr. 1165:8-1166:11 (Hicks); PTX43; PTX482. That alone would make application of California law constitutional, even if Oracle were located elsewhere. *AT&T Mobility*, 707 F.3d at 1113 ("we hold in this case that the [California statute] can be lawfully applied without violating a defendant's due process rights when more than a de minimis amount of that defendant's alleged conspiratorial activity leading to the sale of price-fixed goods to plaintiffs took place in California"). Likewise, because Rimini is a Nevada corporation headquartered in Las Vegas, where Ravin works and resides, Tr. 239:9-13; 683:25-684:4 (Ravin); DTX 375, application of Nevada law is also permissible as a matter of Due Process. *See Valentine v. NebuAd, Inc.*, 804 F. Supp. 2d 1022, 1027-28 (N.D. Cal. 2011) (defendant cannot avoid its own state's computer crime statute simply because it harmed out of state residents; to do otherwise would allow violations "with impunity with respect to out-of-state individuals and entities").[8]

[8] Defendants also invent an "apportionment" requirement whereby damages must be apportioned among the states where its agents initiated the downloading. Rimini cites no case for this proposed rule. It is not the law. *Cf. Instructional Sys., Inc. v. Computer Curriculum Corp.*, 35 F.3d 813, 825 (3d Cir. 1994) ("The Supreme Court has never suggested that the dormant Commerce Clause requires Balkanization, with each state's law stopping at the border. . . .

(Footnote Continued on Next Page.)

Defendants' Commerce Clause argument also misses the mark. Non-discriminatory laws must be upheld under the Commerce Clause unless they place a burden on interstate commerce that is "clearly excessive in relation" its legitimate local benefits. *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970). Rimini relies on *Healy v. Beer Institute, Inc.*, 491 U.S. 324 (1989), but its holding applies only when a state attempts to reach "wholly" out of state commerce by regulating the price of out of state transactions. *Id.* at 336-37; *Pharm. Res. & Mfrs. of Am. v. Walsh*, 538 U.S. 644, 669 (2003). As the Ninth Circuit recently explained, in *Healy* and its progeny, "the Supreme Court struck down price-control or price-affirmation statutes that had the effect of preventing producers from pricing products independently in neighboring states. We have recognized the sui generis effect on interstate commerce of such price-control regimes and the correspondingly limited scope of these cases." *Chinatown Neighborhood Ass'n v. Harris*, 794 F.3d 1136, 1146 (9th Cir. 2015) (citations omitted). This case involves nothing similar.[9]

## II. RIMINI AND RAVIN ARE LIABLE UNDER THE CDAFA OR, IN THE ALTERNATIVE, THE NCCL.

Defendants' scattershot arguments that the evidence does not support a verdict on the CDAFA and NCCL claims lack merit.[10]

### A. DEFENDANTS' STANDING ARGUMENT FAILS.

Defendants argue that Oracle International lacks standing to assert its CDAFA and NCCL claims.[11] Mot. at 9. Defendants failed to raise this purely statutory argument in their Rule 50(a)

---

(Footnote Continued from Previous Page.)

While a contract which covers multiple states may raise a difficult choice-of-law question, once that question is resolved there is nothing untoward about applying one state's law to the entire contract, even if it requires applying that state's law to activities outside the state.") (citations omitted).

[9] Moreover, the contractual California choice-of-law provision also bars the Commerce Clause argument. *O'Connor v. Uber Techs., Inc.*, No. C-13-3826 EMC, 2013 WL 6354534, at *2-4 (N.D. Cal. Dec. 5, 2013) (agreement to apply California law on matters "in connection" with an agreement eliminates any Commerce Clause issue for statutory claims related to the agreement).

[10] Defendants' arguments against UCL liability presume that Rimini succeeds in eliminating Oracle's computer abuse claims, Mot. at 28, so they fail together. As to restitution, Oracle seeks only a UCL judgment of liability and injunctive relief. Dkt. 900 at 25.

[11] Defendants concede Oracle America has standing to pursue its CDAFA and NCCL claims. Mot. at 9 ("the trial evidence established that the Oracle support website that was the subject of the anti-hacking claims belonged to Oracle America").

motion,[12] requiring denial as there is no manifest miscarriage of justice here. *See supra* at n.3.

Regardless, Defendants misconstrue the statutory requirements for standing under each computer abuse statute, and substantial evidence at trial supported Oracle International's standing and injury. Defendants argue that only "the 'owner or lessee' of computers accessed by Rimini" have standing to bring a CDAFA claim. Mot. at 9. However, § 502(e)(1) provides that "the owner or lessee of the computer, computer system, computer network, computer program, <u>or data</u> who suffers damage or loss by reason of a violation of any of the provisions of subdivision (c) may bring a civil action against the violator[.]" Cal. Penal Code § 502(e)(1) (emphasis added). Courts routinely find that injured plaintiffs whose data were obtained from another's computer systems in violation of § 502(c) have standing pursuant to § 502(e) when presented with analogous facts. *E.g.*, *Yee v. Lin*, No. C 12-02474 WHA, 2012 WL 4343778, at *3 (N.D. Cal. Sept. 20, 2012) (standing under § 502(e) because plaintiff "owns the data contained in his email accounts" stored on another's computers that were accessed without authorization); *NovelPoster v. Javitch Canfield Grp.*, No. 13-CV-05186-WHO, 2014 WL 5594969, at *1, *9 (N.D. Cal. Nov. 3, 2014) (standing under § 502(e) where defendants accessed plaintiff's data stored on third party computers like "Google and Google Adwords, Goodsie, Etsy, Storenvy, Facebook and Facebook Ads, Twitter, MailChimp, Stripe, and PayPal"); *Mintz v. Mark Bartelstein & Assocs. Inc.*, 906 F. Supp. 2d 1017, 1031-32 (C.D. Cal. 2012) (standing under § 502(e) when defendant accessed plaintiff's information stored on Google computer systems through www.gmail.com).[13] Evidence sufficiently showed Oracle International's

---

[12] Recognizing their error in failing to raise the issue, Defendants point to a one-sentence footnote in their Rule 50(a) Motion attached to an argument that Rimini did not breach a contract with Oracle International by accessing its computers in violation of Oracle's Terms of Use because "Oracle International Corporation failed to prove it even had computer systems." Rule 50(a) Mot. at 13 n.3. Defendants now claim the footnote constituted an argument that Oracle International lacks standing for its California and Nevada computer abuse claims under each statute's distinct language, incredibly contending that "Oracle failed to respond [to its footnote], and thus has conceded this point." Mot. at 9. The footnote did not refer to "standing" and *only* concerned Oracle's breach of contract claim, which Oracle dropped, because unlike the breach of contract claim, Oracle International's computer abuse claims don't require that it "even had computer systems."

[13] The single case Defendants cite on this point dismissed plaintiffs' CDAFA claim because plaintiffs did not "allege that they suffered loss or damage because of actions taken by

(Footnote Continued on Next Page.)

interest in the data that was subject to Rimini's and Ravin's computer abuse violations to support the jury's findings of injury and damages from Defendants' CDAFA violations. *E.g.*, Tr. 1772:18-1773:3, 1833:1-19 (Dean).

Oracle International likewise has standing to bring an NCCL claim under Nev. Rev. Stat. ("NRS") § 205.511(1) which provides: "Any victim of a crime described in NRS 205.473 to 205.513, inclusive, may bring a civil action[.]" Defendants' motion implies that Oracle International is not a victim "because Rimini never accessed a computer or website owned by Oracle International Corporation." Mot. at 7. Evidence showed that Rimini's and Ravin's NCCL violations caused Oracle International millions of dollars in lost profits. Tr. 1833:1-19 (Dean). Rimini cites no authority that such injury is not sufficient. The statute does not define "victim," and the jury found that Oracle International was a victim of Rimini's and Ravin's offenses after being instructed using the plain language of the statute. Jury Instruction Nos. 53 & 54.[14] Defendants offered no objection or alternative instruction on the "victim" requirement. Defs.' (Corrected) Resp. to Ct.'s Proposed Jury Instructions, Dkt. 869 at 108.

---

(Footnote Continued from Previous Page.)

[defendants]." *In re Google Android Consumer Privacy Litig.*, No. 11-MD-02264 JSW, 2013 WL 1283236, at *11 (N.D. Cal. Mar. 26, 2013) . The decision addressed only allegations of loss; it did not address standing under § 502(e) or the NCCL. That court noted "the CDAFA does not include a monetary threshold for damages, and some courts have concluded that 'any amount of loss or damage may be sufficient,' to establish statutory standing." *Id.* at *11 (quoting *Mintz*, 906 F. Supp. 2d at 1032). Unlike plaintiffs in *In re Google*, Oracle presented the jury with an adequate basis to determine that Rimini's and Ravin's actions caused Oracle International's loss and damage in the form of lost licensing revenue from the support services Oracle America would have otherwise provided the customers Rimini gained from its computer abuse statute violations. *E.g.*, Stip. Facts ¶¶ 30-32.

[14] Moreover, other provisions in the Nevada Revised Statutes addressing Crimes Against Property define "victim" broadly to include "(1) A person, including a governmental entity, against whom a crime has been committed; (2) A person who has been injured or killed as a direct result of the commission of a crime; and (3) A relative of a person described in subparagraph (1) or (2)." NRS § 205.471(3)(c) (entitled "Collection of fee from offender; amount and disposition of fee"). The Nevada legislature has elected to allow civil recovery to narrower classes for other violations, and it could have done so with the NCCL if it intended to limit civil enforcement. *Cf.* NRS § 205.4605(4) (creating a civil cause of action for a category narrower than "victim": "A person whose social security number has been willfully and intentionally posted or displayed in violation of this section may bring a civil cause of action against the person who commits such a violation.").

### B. THE TRIAL RECORD SHOWS RIMINI AND RAVIN VIOLATED THE CDAFA AND NCCL.

Despite the extensive evidence of their misconduct at trial, Defendants offer four meritless arguments they did not violate the statute as a matter of law.

**First**, Defendants claim the "*only* basis for liability is if an individual has no right to access the website or the information at all." Mot. at 14. That is dead wrong. The Ninth Circuit recently affirmed RICO and identity theft criminal convictions based on defendants' intent to violate the CDAFA, holding that the statute bars "logging into a database with a valid password and subsequently taking, copying, or using the information in the database improperly." *United States v. Christensen*, 801 F.3d 970, 994 (9th Cir. 2015). In *Christensen*, a police officer and a telephone company employee used databases they had authorization to access as part of their jobs in an improper manner (by looking for and obtaining information for others in exchange for money). *Id.* at 982, 988-89, 991. Here, similarly, even if Defendants had a "valid password" from a client, Defendants knew they were not permitted to use their automated programs to access and take from Oracle's systems, and they took technical measures to evade Oracle's detection and circumvent Oracle's efforts to stop them. *E.g.*, Tr. 823:2-825:16 (Ravin knew his conduct was prohibited); PTX482 at 3 (Chiu admitted Rimini's "methodology" of automated downloading "creates issues with CPU utilization" and that Oracle in response "had to block and access from our [Rimini's] IP addresses"); PTX5376 at 1 (Rimini "circumvents that detection").

To suggest a contrary rule, Defendants rely on two district court cases preceding *Christensen*, both of which – by Defendants' own admission – rely on an interpretation of the CDAFA that *Christensen* rejects. Mot. at 14-15 n.5.[15] It is no wonder that Defendants'

[15] *Compare Flextronics Int'l, Ltd. v. Parametric Tech. Corp.*, No. 5:13-CV-00034-PSG, 2014 WL 2213910, at *4 (N.D. Cal. May 28, 2014) ("to take an action 'without permission' under the CDAFA, a defendant must overcome some technical or code barrier to do so"), *and In re iPhone Application Litig.*, No. 11-MD-02250-LHK, 2011 WL 4403963, at *12 (N.D. Cal. Sept. 20, 2011) (same), *with* Mot. at 14 n.3 ("that line of analysis precedes and is inconsistent with" *Christensen*). Both decisions also involve a plaintiff who voluntarily installed the offending software: "when software containing 'surreptitious code' is installed voluntarily by a plaintiff, a defendant has not accessed the plaintiff's computer 'without permission'" under the CDAFA. *Flextronics*, 2014 WL 2213910 at *4. Here, by contrast, Oracle told Defendants to cease their conduct and did its best to prevent their conduct from continuing, which is the opposite of

(Footnote Continued on Next Page.)

application of the CDAFA directly contradicts *Christensen*. *Compare* Mot. at 14 ("there is no liability because the defendant had some permission to access the plaintiff's computer when the plaintiff installed the file, and the additional unauthorized activity did not establish access without permission"), *with Christensen*, 801 F.3d at 994 (CDAFA bars "logging into a database with a valid password and subsequently taking, copying, or using the information in the database improperly."). And while the case law on the NCCL is limited, the statute by its terms covers the same conduct for the same reasons as the CDAFA, as explained in *Christensen*. NRS 205.4765(1), ("knowingly, willfully and without authorization . . . Uses . . . Takes . . . [or] Obtains . . . data"); *id.* (3) ("knowingly, willfully and without authorization . . . Takes . . . Uses . . . or Obtains . . . access to . . . a computer, system").[16]

**Second**, Defendants argue they "had permission and authorization to access the website from the clients, which precludes liability under either [state] statute as a matter of law." Mot. at 15. The claim boils down to the nonsense assertion that Rimini's clients granted Defendants the right to do something the clients themselves did not have the right to do, namely, log on and take material from Oracle's systems with prohibited automated tools and evade efforts to block them.

The only authority cited by Defendants offers them no support. Both cases involved the federal CFAA, not the state statutes at issue here. In *LVRC Holdings LLC v. Brekka*, 581 F.3d 1127 (9th Cir. 2009), the computer at issue was LVRC's, which had allowed its employee, Brekka, to use it. The Ninth Circuit was clear that *LVRC*'s authorization, not a third party's, was

---

(Footnote Continued from Previous Page.)

voluntarily installing code. *E.g.*, PTX230 (cease and desist letter); PTX482 (IP blocking).

[16] Even the *Nosal* court considering the CFAA's "exceeds authorized access" language suggested that parties could authorize certain methods of access and ban others. "[L]et's say an employee is given full access to the information, provided he logs in with his username and password. In an effort to cover his tracks, he uses another employee's login to copy information from the database. Once again, this would be an employee who is authorized to access the information but *does so in a manner he was not authorized* 'so to obtain.'" *United States v. Nosal*, 676 F.3d 854, 858 (9th Cir. 2012) (en banc) (emphasis added); *see also Craigslist Inc. v. 3Taps Inc.*, 942 F. Supp. 2d 962, 969 (N.D. Cal. 2013) (reading *Nosal* to recognize restrictions on methods of access under the CFAA: "*who* may access information, *what* information may be accessed, or the *methods* by which information may be accessed, all of which the Ninth Circuit [in *Nosal*] suggested were more properly considered 'access' restrictions under the CFAA").

determinative: "Because LVRC permitted Brekka to use the company computer . . . Brekka did not act 'without authorization.'" *Id.* at 1133. And similarly, in *United States v. Nosal*, 676 F.3d 854 (9th Cir. 2014) (en banc), the defendant's accomplices' employer had authorized their access to databases of confidential material and they used that material for an improper purpose. *Id.* at 856. Again, it was the employer's databases, and its permission was determinative. *Id.* at 857.

In the same way, in this case, Oracle's systems are at issue, and Oracle's authorization is determinative. The evidence shows that Defendants *knew* that Oracle did not authorize their conduct. *See* above at 3 to 6. Ravin admitted it (and that his contrary deposition testimony was false). Tr. 823:2-825:16 (Ravin). Oracle wrote and specifically demanded they stop, repeatedly, and took active measures to block Defendants' access, which Defendants acknowledged. *E.g.*, PTX43; PTX230; PTX482. Defendants continued nonetheless and took active measures to avoid detection and blocking. *E.g.*, PTX611 (careful review of what lead to blocking to avoid detection); PTX46; Tr. 1233:3-1233:14 (Baron) (use of residential internet access to avoid detection); PTX5376 (Rimini "circumvents that detection").

The jury heard this evidence and concluded that Defendants were not authorized, and that Defendants did not *believe* they were authorized. The jury instructions required that finding in order to return a verdict. Jury Instruction Nos. 47, 48, 53, 54. Ravin's admitted perjury on this point, Tr. 823:2-825:16 (Ravin), is alone enough to support that finding.

Moreover, the evidence also showed – contrary to Defendants' blithe assertion that "Rimini maintained its policy of downloading only materials to which specific clients were entitled" (Mot. at 3) – that Defendants conduct involved massive downloading of content for which its clients were not authorized at all. Tr. 1230:23-1234:17 (Baron) ("all of the content for PeopleSoft and JD Edwards . . . were all mixed together on the website"); PTX46 at 5 (admitting that of downloaded attachments for XO, a Siebel licensee, "most were PeopleSoft related and not Siebel related"). Defendants have no argument whatsoever that this was authorized.

**Third**, Defendants argue that the CFADA and NCCL only cover "using data or computers" and not merely "accessing," which, Defendants say, is all they did. Mot. at 17. Most fundamentally, Section 502(c)(2) is not limited to "using" but specifically also covers

knowing, unauthorized "taking" and "copying" of data. § 502(c)(2). *Christensen* says expressly that "logging into a database with a valid password and subsequently **taking, copying, or using** the information in the database improperly" is a violation. *Christensen*, 801 F.3d at 994 (emphasis added). NRS 205.4765(1) contains a parallel prohibition. Defendants do not dispute that they took a great deal of data. In addition, NRS 205.4765(3) expressly covers "access."

Defendants also do not seriously dispute that they "used computer services" as covered by Section 502(c)(3). Defendants' unauthorized activity on Oracle's Knowledge Management system exceeded all of Oracle's customers combined, and that Oracle's customers suffered from Rimini's intensive use of Oracle's computer resources. Tr. 1167:8-1168:2, 1185:2-24 (Hicks). If this does not satisfy the term "used computer services," it is hard to imagine what would.

**Fourth**, Defendants also argue that "Oracle is trying to transform a breach-of-contract claim" into liability under the state statutes. Mot. at 17. The fact that Oracle established access restrictions in a binding contract that Defendants breached does not excuse Defendants from statutory liability for precisely the sort of conduct these statutes were meant to prevent: using harmful computer programs to barrage a company's critical customer-facing computer systems with full knowledge that the programs are not permitted, knowingly causing the computer systems' performance to suffer, ignoring further notices that the tools are harmful and banned, and ultimately intensifying their use and crashing computer resources—all while subjectively believing the activities causing the harm were not permitted. *E.g., Sw. Airlines Co. v. Farechase, Inc.*, 318 F. Supp. 2d 435, 439-40 (N.D. Tex. 2004) ("Regardless of whether the Use Agreement creates an enforceable contract . . . Outtask knew that Southwest prohibited the use of 'any deep-link, page-scrape, robot, spider or other automatic device, program, algorithm or methodology which does the same things.' Even if Outtask did not read the Use Agreement . . . Southwest alleges that it directly informed Outtask that their access was unauthorized.") (citations omitted).

Defendants cite no relevant authority. Instead, they cite three California cases addressing common law interference torts. *Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal. 4th 503, 514 (1994) ("tort cause of action for interference with contract does not lie against a party to the contract"); *JRS Products, Inc. v. Matsushita Elec. Corp. of Am.*, 115 Cal. App. 4th 168, 181

(2004) (applying *Applied Equip.* to interference with prospective economic advantage because it "involved an interference with contract, a sibling" tort); *Arntz Contracting Co. v. St. Paul Fire & Marine Ins. Co.*, 47 Cal. App. 4th 464, 478-80 (1996) (terminating a contract without good cause is not sufficient to meet the "wrongful conduct" element of intentional interference with prospective economic relations).[17] Defendants reach to expand the holding of *JRS Products* beyond recognition. The trial in *JRS Products* concerned only tortious interference and held only that the defendant's breach of a contract alone cannot fulfill the "wrongful act" requirement of a common law tortious interference claim. The *JRS Products* court did not question that violations of statutes were *themselves* enforceable.

Before arguing that Oracle's contractual Terms of Use cannot determine whether Rimini was authorized to access and use Oracle's systems under the CDAFA and NCCL as a matter of law, Mot. at 17-18, Defendants argue that Oracle's Terms of Use *in fact authorized* Defendants to access Oracle's systems under the CDAFA and NCCL, Mot. at 8, 15. Defendants argue that "the testimony and documents established that Rimini was authorized to access the website" and support that statement with citations to testimony concerning authorization as defined by Oracle's Terms of Use and to the text of Oracle's Terms of Use itself. *See* Mot. at 15 (citing Tr. 866:9-12 (Allison) (regarding Customer Connection Terms of Use); Tr. 1107:15-19 (Allison) (regarding Metalink Terms of Use); PTX 1569 (Metalink Terms of Use (2008 rev.))). Defendants similarly argue that their contracts with clients conferred authorization on Rimini and "precludes liability under either anti-hacking statute as a matter of law." Mot. at 15. Defendants' arguments fail, but they rely themselves on the proposition that authorization under the CDAFA and NCCL can be defined by contract.

Moreover, Oracle made Defendants aware that their activities were impermissible in a

---

[17] Defendants also open their brief quoting *Joseph Oat Holdings, Inc. v. RCM Digesters, Inc.*, 409 F. App'x 498, 506 & n.12 (3d Cir. 2010). That opinion, after describing a case where a party "was both sanctioned and found liable under anti-hacking laws" for issuing an "overbroad subpoena" to collect emails from an internet service provider during discovery, wrote: "*Some commentators have noted that* suits under anti-hacking laws have gone beyond the intended scope of such laws and are increasingly being used as a tactical tool to gain business or litigation advantages." *Id.* (emphasis added to portion Rimini omitted).

number of ways: through the Terms of Use that they understood and assented to, but also by sending letters, blocking Rimini's IP addresses, and issuing notices. Defendants knew that their activities were without permission or authorization even absent its understanding of its contractual breach. *See* above at 3 to 6.

### C. THE CDAFA AND NCCL ARE CONSTITUTIONAL ON THEIR FACE AND AS APPLIED.

Having never moved to dismiss or obtain summary judgment on any computer abuse claims, Defendants now ask this Court to be the first to hold these statutes entirely unconstitutional on their faces, Mot. at 21, despite decades of prosecution and litigation under them.[18] Defendants also make as-applied arguments. California and Ninth Circuit courts have addressed these questions recently with respect to both federal and state computer abuse statutes. A California Court of Appeal has squarely rejected the argument that the CDAFA is unconstitutionally vague after comprehensively examining the statute, although Defendants do not address or even cite the decision. *People v. Hawkins*, 98 Cal. App. 4th 1428, 1439-43 (2002), *as modified on denial of reh'g* (July 2, 2002), *rev. denied* (2002), *cert. denied*, 537 U.S. 1189 (2003). The Northern District of California, considering both the CFAA and the CDAFA, held that there are "no serious constitutional doubts" about computer abuse statutes when applied to facts such as this case. *Craigslist Inc. v. 3Taps Inc.*, 964 F. Supp. 2d 1178, 1184 (N.D. Cal. 2013). The "average person" will not unwittingly violate the law because he does not innocently "bypass an IP block set up to enforce a banning communicated via personally-addressed cease-and-desist letter." *Id.*; *see also Nosal*, 676 F.3d at 862 (interpreting and applying an ambiguous term in the CFAA; quoting precedent, "We would not uphold an unconstitutional statute merely

---

[18] Defendants make much of the statutes' longevity. Mot. at 19. The CDAFA and NCCL have each been amended numerous times – most recently in 2015 and 2011, respectively – indicating legislative attention and continued relevance. 2015 Cal. Legis. Serv. Ch. 614 (A.B. 32) (West) (newly specifying that one of the provisions Rimini violated carries felony liability); 2011 Nev. Stat. 1862. Defendants seek judicial notice of legislative history about these terms. California law does not "permit [courts] to examine extrinsic" sources such as legislative history unless the statute's text is ambiguous. *Hunt v. Superior Ct.*, 21 Cal. 4th 984, 1000 & 1005 (1999). There is no ambiguity, so the legislative history is irrelevant, and Oracle therefore objects.

because the Government promised to use it responsibly."). In August of this year the Ninth Circuit applied the CDAFA in a criminal case without constitutional hesitation. *Christensen*, 801 F.3d at 994. In so doing, the Circuit noted that the CDAFA's "plain language" poses even fewer liability hurdles than the CFAA. *Id.*

In arguing that the statutes are vague, Defendants ignore that the jury was required to find, and did find, that the Defendants did not believe their conduct was authorized. The Supreme Court "has made clear that scienter requirements alleviate vagueness concerns." *Gonzales v. Carhart*, 550 U.S. 124, 149 (2007); *see also Colautti v. Franklin*, 439 U.S. 379, 395 (1979) ("This Court has long recognized that the constitutionality of a vague statutory standard is closely related to whether that standard incorporates a requirement of *mens rea*"). This Court instructed the jury: "If you find that Rimini Street and/or Seth Ravin believed it had authorization to access Oracle America's and/or Oracle International Corporation's computer, and did not exceed that authorized access, then you must find that Rimini Street and/or Seth Ravin did not violate the [CDAFA/NCCL]." Jury Instruction Nos. 47, 48, 53, 54.

The instructions would have permitted even unreasonable beliefs to defeat liability, which ensured the jury found defendants acted with sufficient *mens rea*. Defendants argued that the *mens rea* instruction it proposed and the Court adopted was necessary precisely for this reason: "The CFAA contains a specific intent *mens rea* requirement. . . . And a good-faith mistake as to the requirements of the law is a complete defense. . . . That belief need not be objectively reasonable, just sincerely held." Dkt. 869 at 91. "[T]he purpose of the fair notice requirement is to enable the ordinary citizen to conform his or her conduct to the law." *City of Chicago v. Morales*, 527 U.S. 41, 58 (1999). Given the *mens rea* requirements on which the jury was instructed, there can be no serious doubt that purpose is satisfied.[19]

---

[19] Each statute likewise has additional features governing its enforcement that prevent arbitrariness. Enforcement of §502(c)(3) violations is limited to acts that both cause "an injury" and use computer services worth over $250. Cal. Penal Code § 502(h)(2). All of § 502(c) does not apply to "acts which are committed by a person within the scope of his or her lawful employment." Cal. Penal Code § 502(h)(1). The NCCL similarly presumes that employees "have the authority to access and use" employer resources "unless the presumption is overcome

(Footnote Continued on Next Page.)

Defendants' as-applied challenge also fails. Courts have paid heed to the opinion in *Nosal* and have focused on sufficiency of notice.[20] Defendants have no basis to suggest they lacked notice their access and downloading were unauthorized and without permission or that the prohibitions were vague or ambiguous. Ravin admitted he and others actually knew about the Terms of Use, read them, understood them—*and made a calculated decision to violate them anyway*. Tr. 481:24-483:15; 824:25-825:16 (Ravin); PTX20-23. Ravin understood they prohibited Rimini's automated tools, and he also admitted that, when he testified at his deposition that he did not understand the terms of use to prohibit Rimini's automated tools, he was testifying falsely. Tr. 823:2-825:16 (Ravin). Oracle caught Defendants, blocked their IP addresses, and sent notices about the illegal downloading. Defendants persisted—intentionally evading Oracle's IP blocking and engaging multiple virtual machines. *E.g.*, Tr. 769:4-770:9 (Ravin); 1171:7-1172:8, 1175:23-1176:3 (Hicks); Tr. 1232:8-1233:14 (Baron). Defendants knew that their activities on Oracle's computers lacked permission and authorization. Defendants' as-applied challenge laments vague terms of use that some might not read or understand, terms that may change day-by-day, and confusion about the permissibility of using automated tools. Of course, none of those concerns apply to Defendants.

(Footnote Continued from Previous Page.)

by clear and convincing evidence to the contrary." NRS § 205.509; *cf. Nosal* (concerning employee use of employer computers).

§ 502(h)(1) does not excuse Ravin of personal liability because "a corporate officer or director is, in general, personally liable for all torts which he authorizes or directs or in which he participates, notwithstanding that he acted as an agent of the corporation and not on his own behalf." *Comm. for Idaho's High Desert, Inc. v. Yost*, 92 F.3d 814, 823 (9th Cir. 1996) (quoting *Transgo, Inc. v. Ajac Transmission Parts Corp.*, 768 F.2d 1001, 1021 (9th Cir. 1985)).

[20] Defendants' reliance on *United States v. Drew*, 259 F.R.D. 449 (C.D. Cal. 2009) is also misplaced. *Drew* concerned a conviction under the federal CFAA for *creation* of a user profile on a social media website in a manner contrary to the terms of use, and held in that context it was "unclear" whether such conduct was "equivalent to an intent to access the site without authorization or in excess of authorization." *Id.* at 467. The "only basis" for finding Drew's access without authorization was her violation of the terms of use. *Id.* at 461. Here, by contrast, Defendants had notice their access was unauthorized from additional sources to the terms of use, and the jury was required to find that Rimini and Ravin *did not believe* their access was authorized. Jury Instruction Nos. 47-48, 53-54.

## III. THE JURY'S AWARD OF DAMAGES IS AMPLY SUPPORTED.

### A. THE STATUTES AUTHORIZE RECOVERY OF LOST PROFITS.

Defendants wrongly argue that neither the CDAFA nor NCCL permits lost profits.

#### 1. The CDAFA permits lost profits.

The CDAFA provides civil plaintiffs a full range of traditional remedies: "compensatory damages and injunctive relief or other equitable relief." Cal. Penal Code § 502(e)(1). A separate sentence declares "Compensatory damages shall include any expenditure reasonably and necessarily incurred by the owner or lessee to verify" system integrity after a violation. *Id.* Defendants want to limit "compensatory damages" to the verification damages, so they misconstrue "shall include" as a limitation. Mot. at 23-24. Defendants would have the Court re-write the statute to read: "compensatory damages shall *be limited to*" verification expenses. That is contrary to its plain meaning and to the CDAFA's manifest allowance of a range of remedies.

Statutory terms presumptively receive their plain meaning. *Hunt v. Superior Ct.*, 21 Cal. 4th 984, 1000 (1999). Under California law, "compensatory damages" include "lost profits." *Sanchez-Corea v. Bank of America*, 38 Cal. 3d 892, 906-07 (1985); *Elect. Funds Solutions v. Murphy*, 134 Cal. App. 4th 1161, 1179-80 (2005). The "word 'includes' is ordinarily a word of enlargement, not limitation." *Patton v. Sherwood*, 152 Cal. App. 4th 339, 346 (2007); *Burgess v. United States*, 553 U.S. 124, 131 n.3 (2008) ("'includes' is usually a term of enlargement, and not of limitation") (quoting 2A Sutherland on Statutes and Statutory Construction § 47:7 (7th ed. 2007)). It "conveys the conclusion that there are other items includable, though not specifically enumerated." *Smyers v. Workers' Comp. Appeals Bd.*, 157 Cal. App. 3d 36, 41 (1984) (quoting Sutherland). Thus, damages for lost support engagements are a form of compensatory damages under the CDAFA. *See Capitol Audio Access, Inc. v. Umemoto*, 980 F. Supp. 2d 1154, 1157-60 (E.D. Cal. 2013) (CDAFA damages claim stated where harm allege was loss of license agreements "valued at more than $5,000 per year," though did not provide CFAA standing).

To argue otherwise, Defendants cite legislative history about *different* terms—"injury" and "expenditures." Mot. at 24-25. But courts construing California law "must interpret different words in a statute to mean different things" absent "absurd results." *People v. Yuksel*,

207 Cal. App. 4th 850, 854 (2012). On the other hand, Defendants point to provisions that say "including, but not limited to" as a basis to infer that "shall include" drastically limits the plain meaning of "compensatory damages." Mot. at 24. Defendants argue there is sufficient "ambiguity" to apply the rule of lenity, Mot. at 24, but § 502(e)(1) is expressly limited to private civil actions so the rule of lenity is irrelevant. And there is no ambiguity. *Cf. People v. Wesson*, 138 Cal. App. 4th 959, 968 (2006) (expressing no hesitation about interpreting "including" as a term of enlargement in a criminal provision to the defendant's detriment).[21]

### 2. The NCCL permits lost profits.

The NCCL also permits lost profit damages. A civil plaintiff has a private right of action to recover "Damages for any response costs, loss or injury suffered as a result of the crime[.]" NRS § 205.511(1). Damages for "loss" or "injury" plainly include lost profits, at least. Defendants instead argue about "response costs." Mot. at 25.

Defendants conclude by analogizing these statutes to the CFAA—a different statute with different words. The analogy is misplaced. Defendants primarily cite cases about the CFAA's "loss" provision, but "loss" is a defined term in the CFAA that relates to standing; it does not control CFAA damages. *See Creative Computing v. Getloaded.com LLC*, 386 F.3d 930, 934 (9th Cir. 2004). At any rate, the CFAA permits "economic damages," which the Ninth Circuit has explained includes "damages for loss of business." *Id.* at 935.

## B. AMPLE EVIDENCE SUPPORTS THE JURY'S DAMAGES AWARD.

Defendants imagine that nothing in the record supports the jury's lost profits award. Mot. at 26-27. The jury had extensive evidence from which to infer that automated downloading caused Oracle's lost profits from these clients. Rimini's clients "need" a library of support materials for reference. Tr. 327:10-22 (Ravin); PTX206 (Rimini's customers "demand a self-service mechanism" and "rely on accessible information"). It was critical for Rimini to offer its

---

[21] Defendants seek judicial notice of legislative history about these terms. California law does not "permit [courts] to examine extrinsic" sources such as legislative history unless the statute's text is ambiguous. *Hunt*, 21 Cal. 4th 984 at 1000 & 1005. There is no ambiguity, so the legislative history is irrelevant, and Oracle therefore objects.

new customers Oracle's library of support materials, particularly in the 2008-09 period when Rimini was still trying to establish itself as a serious third-party support competitor. PTX482 ("we do know that they will be very 'uncomfortable' should we not get this done"); Tr. 725:19-726:6 (Ravin). Rimini was under intense time pressure to complete the download before its new customers' Oracle maintenance end dates. Tr. 567:4-9 (Ravin); Tr. 1587:6-1589:5 (G. Lester). For example, it was so critical to Rimini's taking XO Communications – alone responsible for more than $8 million of the lost profits (PTX5469) – from Oracle that Rimini knowingly evaded Oracle's attempts to block its IPs because of Rimini's misconduct using XO's credentials. Tr. 1139:20-1140:1 (Chiu); PTX482; Tr. 769:4-770:9 (Ravin); 1171:7-1172:8, 1175:17-1176:3 (Hicks). The downloading was so important that Defendants calculated the risk of liability was worth proceeding. Tr. 481:24-483:15; 824:25-825:16 (Ravin); PTX20-23.

Defendants also assert that the copyright hypothetical license damages and jury's advisory response of $0 in copyright lost profits somehow undermines the downloading award. Mot. at 26-27. As an initial matter, the advisory answer cannot undermine the binding verdict. *See* 9 C. Wright & A. Miller, Federal Practice and Procedure § 2335 (3d ed.) (advisory findings "of no binding legal significance"). Regardless, there is no inconsistency: The jury was entitled to infer that computer abuse caused these losses, even if the evidence did not support a quantification of copyright lost profits.

Defendants conclude by arguing that the computer statute damages duplicate the copyright damages or are preempted. Mot. at 27 & n.10. Copyright infringement is not the same as intruding into computer systems and networks. The computer statutes are not preempted because they contain extra elements (e.g., intentional computer misconduct) and protect qualitatively different rights (e.g., the right to be free from unauthorized computer intrusions). *Grosso v. Miramax Film Corp.*, 383 F.3d 965, 968 (9th Cir. 2004); *Craigslist, Inc. v. Autoposterpro, Inc.*, No. CV 08 05069 SBA, 2009 WL 890896, at *2-3 (N.D. Cal. Mar. 31, 2009) (analyzing and rejecting copyright preemption over the CDAFA). As for the supposedly duplicative damages, the hypothetical license only compensates Oracle International for the infringement, and compensates Oracle America for nothing. *See* Jury Instruction No. 33. The

jury concluded that the downloading caused lost profits not compensated by the hypothetical license by determining the total non-duplicative damages. *Id.* No. 60.

## IV. RIMINI'S MOTION AS TO COPYRIGHT IS MERITLESS.

The jury properly found that Rimini infringed all of the copyrights-in-suit by creating derivative works based upon Oracle's software and support materials; by reproducing installation media, installed software, documentation, patches, and related derivative works; and by distributing Oracle's software and support materials and related derivative works. Dkt. 896. Rimini does not dispute that Oracle presented sufficient evidence of prima facie infringement of the reproduction, derivative work, and distribution rights as to each registration.

Instead, Rimini limits its Motion to its express license defense, claiming that evidence in its favor would be undisputed if the Court were to reverse its prior constructions of the relevant licenses. But the Court's prior constructions are correct, Rimini has waived its right to challenge its liability for copying PeopleSoft software, and there is sufficient evidence to find Rimini liable even under its preferred contract interpretation. Oracle incorporates by reference argument and evidence submitted on summary judgment and relevant jury instructions. Dkt. 246-47, 284-85, 417-18, 454-55, 575, 671, 752, 768, 771, 852, 867; Tr. 3230:4-3231:19, 3234:4-3235:13, 3236:21-3237:12, 3240:13-3243:24, 3246:12-3247:20 (counsel for Oracle).

The Court has correctly determined that Oracle's licenses limit third-party copying and use of each customer's licensed Oracle software and support materials. Dkt. 474 (construing PeopleSoft, J.D. Edwards, and Siebel licenses); Dkt. 476 (construing Oracle Database licenses), Jury Instruction No. 24 (construing all relevant licenses). The plain language of representative PeopleSoft licenses (PTX698, 699) either do not allow third parties to make copies or allow third-party copies of software and documentation only for a licensee's internal data processing operations at its facilities. Dkt. 474 at 11-20; Dkt. 599 ¶ 1 (licenses are representative). The plain language of representative JD Edwards (PTX704) and Siebel (PTX705) licenses permit third-party copies for "archival," "backup," and (for Siebel) "emergency back-up" purposes only. Dkt. 474 at 22, 24; Tr. 1117:25-1118:5, 1118:15-19 (Allison) (licenses are representative); PTX5466 (license summary). And the only license that Rimini can assert as to Oracle Database

does not permit Rimini to make multiple copies or to create updates and software fixes for other software applications using Oracle Database. Dkt. 476 at 8-15. Rimini's arguments that its customers' non-exclusive licenses insulate it from liability are nonsense, given the express and implied limitations on third-party rights in the operative licenses. The evidence at trial showed that Rimini violated each of these license restrictions on a massive scale. PTX1-2, 5, 7, 9-11, 14, 40, 65, 150, 159, 181, 190, 194-96, 199, 203, 239, 310, 348-49, 591, 641, 1491A, 2159, 3507, 3510-12, 5429, 6000; Tr. 174:3-24, 177:10-179:1, 182:16-24, 185:5-186:11 (Davis); Tr. 320:8-321:6, 362:21-363:23, 366:9-369:6, 758:22-759:4,760:8-15 (Ravin).

Second, Defendants have unreservedly "stipulated to liability as to the PeopleSoft software," extinguishing their license defense as to that product line. Dkt. 766 at 19. While a prior stipulation waiving their express license defense expressly reserved the right to "challenge or appeal the Court's prior decisions," their unqualified stipulation to liability did not. *Compare id.* (no reservation), *with* Dkt. 599 ¶¶ 3-4 (reservation). In the same pleading that stipulated to liability, Defendants persuaded the Court to instruct the jury on copyright liability including lack of "permission" as an element. Dkt. 766 at 22; *see also* Jury Instruction No. 23 (adopting proposal). Having conceded liability, Rimini cannot now walk back a portion of that concession.

Third, even under Rimini's proposed (and incorrect) construction, Rimini made an objectively unreasonable number of copies, such that the jury's verdict would still stand. PTX3507, 3510-12; Tr. 174:3-24, 177:10-179:1, 185:5-186:11 (Davis).[22]

## CONCLUSION

Oracle respectfully requests that the Court deny Defendants' motion.

[22] Rimini also introduces brand-new arguments that it did not infringe because its clients had non-exclusive licenses, its bad acts constituted at most breach of contract, and parol evidence should be considered. Dkt. 915 at 2. It also newly introduces, and injects characterizations of, evidence about RAM copies and the facilities license restriction. *Id.* at 1. Rimini's failure to raise these arguments in its Rule 50(a) Motion dooms them. *See supra* at n.3.

DATED: December 14, 2015

BOIES SCHILLER & FLEXNER LLP

By: /s/ *Kieran P. Ringgenberg*
Kieran P. Ringgenberg
Attorneys for Plaintiffs
Oracle USA, Inc., Oracle America, Inc., and
Oracle International Corp.

31

ORACLE'S OPPOSITION TO DEFENDANTS' RULE 50(b) RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW