**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| ORACLE USA, INC., a Colorado corporation; ORACLE AMERICA, INC., a Delaware corporation; and ORACLE INTERNATIONAL CORPORATION, a California corporation,<br><br>Plaintiffs,<br><br>v.<br><br>RIMINI STREET, INC., a Nevada corporation; SETH RAVIN, an individual,<br><br>Defendants. | Case No. 2:10-cv-0106-LRH-PAL<br><br>**AFFIDAVIT OF**<br>**JOHN L. TRUNKO** |

<u>**AFFIDAVIT OF JOHN L. TRUNKO**</u>

STATE OF MISSOURI     )
                      ) SS.
CITY OF ST. LOUIS     )

JOHN L. TRUNKO, being first duly sworn, deposes and says:

1.   I am an attorney and a Director of Legal Audit with the legal fee auditing firm of Stuart, Maue, Mitchell & James, Ltd. ("Stuart Maue"), in St. Louis, Missouri, and I have been employed by the firm since 1996.

2.   Defendants Rimini Street, Inc. and Seth Ravin ("Rimini") have retained Stuart Maue to review and analyze Oracle's invoices in connection with Oracle, USA, Inc.'s and Oracle International Corporation's (collectively, "Oracle") motion for attorneys' fees in the *Oracle USA, Inc. v. Rimini Street, Inc*. lawsuit. Stuart Maue is being compensated for our work in this matter, which is ongoing. I have not testified at trial or deposition in the last four years.

1

## PROFESSIONAL BACKGROUND AND QUALIFICATIONS

3. I am an attorney and a Director of Legal Audit with Stuart Maue, a firm specializing in legal fee auditing, in St. Louis, Missouri. I have been employed by Stuart Maue since 1996, engaged full time in the review and analysis of legal fees. Prior to my employment at Stuart Maue, I practiced law for 12 years in St. Louis, Missouri, and Orange County, California, and have had extensive experience, including trial experience and complex case involvement, in a wide variety of civil litigation, including business and commercial litigation, product liability litigation, and toxic tort litigation. I am a graduate of Georgetown University Law Center in Washington, D.C., where I received my Juris Doctor degree in 1983. I am admitted to practice law in the states of Missouri and California and before the United States District Courts for the Central and Southern Districts of California. I am a member in good standing of the California and Missouri bars. Attached as Exhibit A is a copy of my resume.

4. Stuart Maue was founded in 1985, and has been recognized by *The Wall Street Journal* as the nation's oldest legal fee auditing firm. Stuart Maue has also been recognized in numerous other publications, including the *New York Law Journal*, *Corporate Legal Times*, *The ABA Journal*, *Investor's Business Daily*, *St. Louis Business Journal*, and *St. Louis Post-Dispatch*, among others. Over the past 30 years Stuart Maue has performed reviews and audits of attorneys' fees and costs in some of the largest fee cases in the country, including: Celebrex litigation, Oxycontin litigation, Caterpillar Asbestos litigation, Lockheed Skunkworks litigation, El Paso Pipeline Explosion litigation, Anaconda Copper arbitration, *Pizza Hut v. Papa John's* advertising litigation, Sears, Roebuck and Co. litigation, Exxon Valdez litigation, Goodyear Asbestos litigation, Dow Corning Breast Implant litigation, and 3M Breast Implant litigation. Stuart Maue has been appointed as Fee Examiner by courts and as such has reviewed attorneys' fee applications in many large Chapter 11 bankruptcies, including: Tribune Companies, Delta Petroleum, Kmart Corporation, Motors Liquidation Company (General Motors Corporation), Phar-Mor, Montgomery Ward, and Winn-Dixie Stores. Stuart Maue has assisted numerous clients who retain outside counsel to create and implement legal fee billing guidelines and review

legal fees for compliance with these guidelines. Stuart Maue is regularly retained by sophisticated consumers of legal services, such as insurance companies, large corporations, and bankruptcy courts, to identify questionable billing practices and analyze information concerning fees and the allocation of time that is used, for example, to evaluate reasonableness or make payment decisions. Stuart Maue is regularly retained by law firms to consult and self-monitor the firm's own billing practices.

5.  As a Director of Legal Audit at Stuart Maue, my primary responsibility is to lead teams of attorneys, accountants, and computer personnel in the review and analysis of legal billings for professional fees and expenses. Since 1996, I have reviewed in excess of $1 billion in legal fees and expenses for various clients throughout the United States and Europe, including Fortune 500 corporations, major insurance carriers, a professional sports franchise, a major retailer, governmental agencies, the courts, and many others. In this capacity I have reviewed and analyzed legal fees and costs in a wide variety of matters and numerous complex cases, including class actions, complex commercial litigation, major bankruptcies, toxic tort litigation, employment litigation, intellectual property and patent litigation, construction defect litigation, and shareholder and securities litigation, among others. I have also assisted clients in the development and implementation of litigation management guidelines for outside counsel, litigation and case budgets, and legal cost management review programs. I have served as an expert and consultant on legal fee billing and as expert consultant on attorneys' fees in many of these cases, including litigated fee disputes and fee award cases involving complex litigation, class actions, and major insurance coverage litigation. Examples of some of the significant attorneys' fee reviews I have performed in the last 19 years are listed on the attached resume.

\*   \*   \*

## OVERVIEW OF ANALYSIS

6.  I have been asked to provide an independent evaluation and analysis of the fees and costs claimed by Oracle's counsel for legal services rendered in connection with the matter of *Oracle Corp. v. Rimini Street, Inc., et al.*, Case No. 2:10-cv-0106, U.S. District Court for the

District of Nevada ("the litigation") in the amount of $58,215,124.37. In performing my review and analysis, I have reviewed Oracle's motion for award of attorneys' fees and expenses, and the declarations, exhibits, and other materials submitted by Oracle's counsel in support thereof, including the billing records submitted by Oracle's counsel. I have also reviewed copies of various pleadings and documents from the litigation, including Rimini's Trial Brief and the Master Docket Sheet for the litigation, among other documents.

7. Oracle has submitted fees from three different law firms in connection with their motion. Combined, Oracle has submitted a total of over ▮▮▮▮ hours and ▮▮▮▮▮▮▮ in fees billed by at least ▮ different timekeepers.

      a. Morgan, Lewis and Bockius ("Morgan Lewis") and Bingham McCutchen LLP ("Bingham"). The fees submitted for Bingham's work on the case began in ▮▮▮▮▮▮▮. In ▮▮▮, the Bingham attorneys working on the litigation joined the Morgan Lewis firm and continued to work on and bill fees to the litigation. For purposes of my review and this report, the combined fees of the Bingham and Morgan Lewis firms are treated together, and the firms are referred to herein simply as "Morgan Lewis." Morgan Lewis's representation of Oracle during the litigation was on an hourly basis. ▮▮▮▮ different timekeepers from the firm billed a total of ▮▮▮▮ hours and ▮▮▮▮▮▮ in fees to the litigation.

      b. Boies, Schiller & Flexner LLP ("Boies") began work on the litigation in ▮▮▮▮▮▮. Boies's representation of Oracle during the litigation was on an hourly basis. ▮▮▮ different timekeepers from the firm billed a total of ▮▮▮▮ hours and ▮▮▮▮▮▮ in fees to the litigation.

      c. Attached as an exhibit for each firm is an invoice schedule detailing the fees and costs charged by each firm on an invoice-by-invoice basis (Exhibits B-1 and C-1); summaries of the total hours and fees billed by each timekeeper detailing the hours, fees, billing rates, and position of each timekeeper, with hour and fee totals for each firm (Exhibits B-2 and C-2); schedules of the hourly billing rates billed by each timekeeper

4

during the litigation (Exhibits B-3 and C-3); and calendars graphically displaying the hours recorded by each timekeeper each day, with monthly timekeeper and firm totals (Exhibits B-4 and C-4).

8. The invoices submitted for the two firms contain no less than ▮ separate fee and expense entries, including ▮ for Morgan Lewis and ▮ for Boies. To facilitate review of the billing entries submitted by Oracle's counsel, a computer database was created by inputting all of Oracle's counsels' itemized fee and expense entries from the hard copy billing statements into Stuart Maue's computer system. The database was then reconciled with the amounts claimed by Oracle to insure accuracy. The exhibits to this declaration displaying fee and expense entries were generated from the database created by Stuart Maue from the billing records produced by Oracle's counsel.

9. In reviewing and classifying the categories of fees and costs set forth herein, I employed the standard legal fee auditing methodology used by Stuart Maue in auditing billings for legal fees and costs, which is based on generally accepted principles regarding reasonable attorneys' fee billing as reflected in case authorities, ethical rules and opinions, scholarly articles, and client billing guidelines (*see*, *e.g.*, *Hensley v. Eckerhart*, 461 U.S. 424, 103 S. Ct. 1933 (1983); American Bar Association Standing Committee on Ethics and Professional Responsibility Formal Opinion 93 379 (1993); The Honest Hour, The Ethics of Time Based Billing by Attorneys, William G. Ross, Carolina Academic Press (1996)). These generally accepted principles have been applied by many courts when awarding attorneys' fees, and the categories of fees identified herein are consistent with these standards.

\* \* \*

**OBSTACLES TO RECONCILING DATA WITH ORACLE'S REQUEST**

10. Because of the way in which Oracle presented the evidence in support of its request for fees and costs, we faced several obstacles in reviewing and calculating the fees and costs, including missing pages, apparent mathematical errors, and other discrepancies. The way

in which we addressed these obstacles, which include the following, among others, is set forth further below:

11. **No Adjustment for Redactions.** The fee and expense entries on the invoices for several firms/vendors were heavily redacted; however, the totals appearing on the invoices for fees and expenses were not adjusted by Oracle to reflect the redactions. The redactions obliterated entire entry rows on the invoices, including the entry date, timekeeper identifier, hours, fees, and task descriptions. Therefore, reconciliation was not a matter of using invoice totals and subtracting redacted entries, but rather, consolidating the remaining unredacted entries for fees and expenses and trying to determine the amount billed for each invoice to reconcile to the amount claimed by Oracle in total for each firm/vendor. Oracle did not provide a summary by invoice to explain the calculation by invoice of the amounts claimed for each firm/vendor. Summaries of the amounts claimed by timekeeper were provided for Boies and Morgan Lewis; however these were difficult to use and substantiate for the reasons described below.

12. **Morgan Lewis Rates.** For Bingham and Morgan Lewis, the exhibit of hours and fees by timekeeper provided as "Amended Exhibit 2" to the Supplemental Declaration of Thomas S. Hixson in Support of Oracle's Motion for Costs and Attorneys' Fees adjusted each timekeeper's fees by a ▊% discount for most of the invoices. For the ▊ invoices, however, the discount was subtracted from the bottom of the schedule in whole and was not broken down by timekeeper. This made a comparison between the total hours and fees for each timekeeper as computed from the line item billing entries on the invoices and the totals provided on the summary attached to the Supplemental Declaration difficult and time consuming. We were able to determine, from a review of the summary by timekeeper, that sometimes a different rate was used on the summary from the rate that was used on the actual invoice. We used the rate from the invoices since the summary does not list billing rates, but merely listed total hours and total fees for the entire time period. In many cases, timekeeper rates increased multiple times during the time period.

13.     **Boies Rates.**  For Boies, we were able to perform a comparison between the exhibit of hours and fees by timekeeper provided as "Corrected Exhibit 2" to Supplemental Declaration of Kieran P. Ringgenberg in Support of Oracle's Motion for Costs and Attorneys' Fees to a summary of hours and fees as computed from the line item billing entries on the invoices.  This comparison revealed that, possibly, for some timekeepers, a different rate was used on the summary from the rate that was used on the actual invoice.  We used the rate from the invoices since the summary does not list billing rates.  ████████████████████ ████████████████████████████████████████████████  For several timekeepers, we could not identify the reason for the difference.  In addition, there were entries with embedded time amounts in the description where the sum of the embedded time did not equal the entry hours displayed on the invoice.

\*     \*     \*

## HOURLY BILLING RATES

14.     The law firms billed at hourly rates of up to ██████ per hour for partners, up to ██████ per hour for associates, and up to ██████ per hour for paralegals and other personnel.

15.     I have reviewed the affidavit of Dennis L. Kennedy, a Las Vegas attorney who practices law in the State of Nevada and is familiar with the prevailing market rates for attorneys in the District of Nevada.  Based on Mr. Kennedy's affidavit, it is my opinion that the rates billed by the majority of the law firm timekeepers for the litigation are higher than the typical prevailing market rates for similar legal work in the District of Nevada and the Southern Nevada area.  In order to adjust for the differences in market rates, I have recalculated the law firms' fees using the maximum rates set forth in Mr. Kennedy's report.  Exhibits E-1 and E-2 are summaries of the total hours and fees for the litigation for all law firm timekeepers recalculated using the maximum billing rates provided by Mr. Kennedy.  Without further deducting any additional hours and fees from Oracle's lodestar for the other reasons stated below, this recalculation results in a reduction of ██████████ (██%), from the total ██████████ in fees billed by the law firms for the litigation.  It is my opinion, based upon the above, that this reflects a reasonable

7

adjustment to compensate for higher than market rates billed by most law firm timekeepers in this case.

16. All exhibits, categories, and discussion in this report are calculated at these adjusted rates to avoid any duplication in any reduction of fees.

* * *

### ANALYSIS OF LODESTAR HOURS AND FEES

17. **Blocked Billing Entries.** Block billing is the practice of billing more than one task with a single time amount. Block billing occurs where, for instance, an attorney spends many hours on a single day working on various tasks and, instead of entering time separately for each task, he or she records a single entry for the day that does not specify how much time was devoted to each task. The result is that multiple activities are "blocked" or "lumped" together so that the amount of time actually spent on each task cannot be determined from the billing entry. The practice of block billing has been widely criticized and commonly prohibited by billing guidelines. Block billing renders billing descriptions inherently less accurate, hiding the amount of time charged for any given task and thus making the determination of the reasonableness of the time spent for a task impossible, or at best very difficult and uncertain. The use of block billing also tends to artificially inflate fees; by lumping together all tasks performed in a single day on a particular matter, a timekeeper will tend to charge clients for time spent on everyday events that are not otherwise billable, such as internal office matters or personal needs. By contrast, itemized billing allows a fee-paying party or a court the opportunity to evaluate the reasonableness of time entries on a task-by-task basis. Block billing is so problematic that courts have found it appropriate to significantly reduce the amount of fees sought based on the use of block billing. Due to the uncertainty block billing creates when attempting to evaluate the reasonableness of fees, its use has been widely criticized, and has often been found to warrant a percentage reduction in the fees sought.

18. The time records produced by Oracle's counsel contain numerous "blocked" task descriptions in which a timekeeper has combined two or more discrete activities for a particular

unit of time without identifying the time spent on each activity.  Of the over ▮▮▮▮ total hours claimed for the two law firms for the litigation, no less than ▮▮▮▮ hours, or ▮▮% of the total hours billed, are described in blocked billing entries.  Some examples of blocked billing entries from the invoices submitted by Oracle are displayed on Exhibit F.

19.     **Vague Billing Entries.**  An attorney's time entries should be recorded contemporaneously in sufficient detail so that the work performed or the task accomplished is clearly described or precisely communicated in a meaningful way.  Attorneys, by virtue of their education and training, should be capable of precise articulation.  Billing guidelines promulgated by sophisticated consumers of legal services require such detail, and courts evaluating the reasonableness of fees require such precision in evaluating the reasonableness of fees billed by counsel.  Sufficiently detailed time entries give the fee-paying party an opportunity to identify the specific task that has been performed and to determine from each entry the nature and scope of the activity, the benefit of the activity to the litigation, whether that time entry is appropriately billed to that file, and the reasonableness of the time spent by the timekeeper in performing that activity.  Courts often question entire entries that include vague tasks that make it impossible to determine whether reimbursable work has been performed.

20.     In order to segregate fees billed for nonreimbursable activities, detail is required in the billing description.  In reviewing the billing entries in identifying vague entries, we applied the following standards and guidelines.  Billing entries should be sufficiently detailed to allow the court or other reviewer of the fees to determine the nature of the service performed, its relationship and utility to the litigation, and the reasonableness of the time billed for the activity.  For example, entries for conferences, telephone calls, emails, and correspondence should identify the participants and the subject matter of the communication; entries for legal research should include a description of the issue(s) researched and the purpose of the research; and entries for drafting or reviewing documents should identify the documents involved with reasonable specificity.  A number of the billing entries consist of nondescriptive task descriptions such as "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" or "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮."  Such descriptions make it

impossible to determine what task was actually performed. Many of the entries for conferences fail to identify the subject matter of the conference. As such, the relationship and/or the utility of the conference to the litigation, whether the conference relates to a compensable or noncompensable claim or activity, whether the conference was duplicative of another, or whether multiple timekeepers unreasonably billed for the conference, is often unclear. The party seeking a fee award must provide adequate descriptions of services and expenses to allow the court to make a finding of reasonableness. Time entries that are too vague or insufficient to allow for a fair evaluation of the time expended and the nature and need for the service are generally considered not compensable. The time entries here contained a substantial amount of vague time entries, examples of which are displayed on Exhibit G.

21. **Non-prevailing Claims and Allocation of Fees.** Our review of the fee entries revealed billing for activities associated with claims upon which it is my understanding that Oracle did not prevail. For example, "█████████████████████████," "█████████████████████████," and "█████████████████████████" are clearly time entries relating to the interference with prospective economic advantage and inducing breach of contract claims on which Oracle did not prevail. Some examples of entries that reflect work related to non-prevailing claims are displayed on Exhibit H. The majority of the fees described on the invoices could not be clearly allocated to prevailing or non-prevailing claims either because they were not specific and reflected general work, or because they were vaguely described in such a way as to make it unclear which claim or claims they related to. The allocation of fees was made more difficult by blocked billing, and the voluminous number of entries combined with the vague nature of many of the task descriptions.

22. **Long Billing Days.** While undoubtedly attorneys and paralegals often work long hours, a law firm should bill only the actual productive time spent on a client's case. Attorneys should make every effort to remove from charges to a client time that is unproductive, unnecessary, duplicative, or excessive. Every event in a lawyer's day is not a billable event.

Attorneys eat lunch, take restroom breaks, call family members, and occasionally chat with their co-workers. Attorneys must dedicate time to continuing legal education, training subordinates, and the constant demands of business development. Since attorneys charge clients at high hourly rates, care should be taken to bill clients only for actual time spent performing tasks for those clients. Rarely can lawyers charge all of their time spent in a day to their clients. For perspective, a lawyer who bills fourteen hours in one day suggests that she began working on the matter at 8:00 a.m. and worked on it until 10:00 p.m. without taking a break of any kind whatsoever. Such billing appears to approach the limits of ineffective representation, let alone credibility. More than even a single long billing day, a series of consecutive long days with little time for sleep, commute, or personal life, suggests inflated time. The billing statements of Oracle's counsel contain numerous instances of timekeepers billing days in excess of ▮▮▮▮ and in at least one case even ▮▮ hours. For example, on ▮▮▮▮, Boies timekeeper J. Holdip billed ▮▮ hours for providing courthouse trial support (see Exhibit J). This was after consecutive days on which he billed ▮▮▮▮▮▮▮▮ hours, respectively. Additionally, although paragraph 12 of the Hixson declaration states that "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮," we found no evidence in the invoices that the fees charged to Oracle were limited or reduced to a maximum of ▮ hours per day, let alone any way to identify which days were reduced for which timekeepers. Exhibit I-1 contains a summary of all entries for days where a single law firm timekeeper billed in excess of ▮ hours. Exhibit I-2 contains examples of billing for such days.

23. **Excessive Conferencing Between Attorneys.** The billing statements of Oracle's counsel contain numerous entries reflecting conferences between two or more attorneys of one or both firms. Of the ▮▮▮▮▮▮ in fees sought by Oracle's counsel, over ▮▮▮▮▮▮ (or over ▮▮%) was billed for conferences between personnel of one or both firms (both totals are calculated using the adjusted rates). In my experience, this is a significant amount of billing for internal conferencing between attorneys. The amount of such conferencing was no doubt increased as a result of the parallel involvement of two firms in the case. On many occasions,

11

multiple attorneys and other personnel from the two law firms participated in the same conference. The bills contain numerous and frequent descriptions of "▮▮▮▮▮▮," often attended by ▮▮▮▮▮ billers. Examples of "▮▮▮▮▮▮" are displayed on Exhibit K. Frequent conferencing among attorneys has often been criticized by the courts as indicating excessive staffing and has been used as a basis for reducing fees.

24. **Administrative and Clerical Activities.** Administrative and clerical activities are considered to be part of a law firm's overhead and, as such, included within the law firm's hourly rates for professional services. They are generally not properly chargeable to a client or compensable in litigation. Clerical activities include tasks that do not require legal acumen and that can be effectively performed by secretaries, file clerks, messengers, librarians, and other nonprofessional staff. Examples of activities considered to be clerical include: typing or data entry, making photocopies, checking court dockets or court dates, mailing or delivering documents, obtaining court reporters, scheduling depositions, making travel arrangements, organizing or updating files, filing or retrieving documents from files, moving boxes, and numbering or labeling documents. Time spent on administrative activities that constitute part of the day-to-day operation of a law firm is also considered to be overhead and as such reflected in the hourly rate charged by the law firm for professional services. Examples of administrative activities include tasks associated with law firm management such as arranging staffing, assigning work, and activities associated with billing for services rendered by the law firm, which are usually considered law firm business, not legal services. Oracle's counsels' billing records contain numerous billing entries for administrative activities that promote the business of the law firm rather than the provision of legal services, such as creating and updating case files, hiring and attending to administrative issues regarding temporary personnel, training, and preparing copies of documents for shipment. Examples of billing entries describing administrative and clerical activities are displayed on Exhibit L. Based on my review, fees billed by the two law firms for administrative and clerical activities total over ▮▮▮▮▮▮.

*   *   *

25.     **Post Offer of Judgment Fees.**  We were also asked to identify fees and costs incurred after the July 27, 2015 and August 24, 2015 Offers of Judgment.

a.      **July 27, 2015.**  We understand that Rimini made Oracle an Offer of Judgment on July 27, 2015, which Oracle rejected the next day.  We calculated all fees and costs incurred by Oracle after the date of the offer, as displayed on Exhibit M.  In instances where Oracle's invoices are not clear as to what day in a month time was incurred, we began calculating fees and costs on August 1, 2015.  To ensure that there was no duplication in reductions when calculating this figure, attorneys' fees for Morgan Lewis and Boies were first calculated at the adjusted billing rates, and then reduced by ▮%.  For Stroz, Oracle redacted some entries, but did not adjust the totals on the invoice for those entries.   When calculating the ▮▮▮▮ in post-offer fees and expenses for Stroz, we were required to manually calculate the entries as a result of Oracle's practice of redacting some entries but not adjusting the totals.

b.      **August 24, 2015.**  We understand that Rimini also made Oracle an Offer of Judgment on August 24, 2015, which Oracle rejected the next day.  We calculated all fees and costs incurred by Oracle after the date of the offer, as displayed on Exhibit M.  In instances where Oracle's invoices are not clear as to what day in a month time was incurred, we began calculating fees and costs on September 1, 2015.  Again, attorneys' fees for Morgan Lewis and Boies were calculated at the adjusted billing rates and then reduced by ▮% to ensure that there was no duplication in reductions.  When calculating the ▮▮▮▮ in post-offer fees and expenses for Stroz, we were required to manually calculate the entries as a result of Oracle's practice of redacting some entries but not adjusting the totals.

*     *     *

26.     **Law Firm Expenses.**  Summaries by category of the expense charges billed on the law firm invoices are attached as Exhibits N-1 and N-2.

a. **Morgan Lewis Expenses.**

(i) *Duplicative Expense Charges*: The Morgan Lewis invoices appear to contain duplicative expense charges totaling ▮▮▮▮▮▮ (or more) relating to the expert vendor TM Financial. Oracle requests in its fee application ▮▮▮▮▮▮ in expenses incurred by TM Financial. And Oracle submitted invoices from TM Financial to Oracle to substantiate this number. However, adding up the charges in all TM Financial invoices, we calculated only ▮▮▮▮▮▮. Thus, Oracle is requesting ▮▮▮▮▮▮ *more* than is supported by the actual invoices. We examined the invoices to determine the cause of this discrepancy. Here is what we found: It appears that for the month of ▮▮▮▮▮▮, TM Financial billed Morgan Lewis, rather than Oracle, ▮▮▮▮▮▮ for its monthly invoice. This was unusual because typically TM Financial billed Oracle directly. But on this particular month, Morgan Lewis paid TM Financial and *then* billed Oracle separately for reimbursement. Thus, there are *two* documents reflecting the ▮▮▮▮▮▮ charge (*see* Exhibit N-3), but Oracle only paid it *once*. Yet, Oracle is asking *Rimini* to pay the ▮▮▮▮▮▮ charge twice, i.e., double-counting. This discovery also caused us to look if there are other instances where TM Financial billed Morgan Lewis rather than Oracle. We located three additional instances: ▮▮▮▮▮▮ (▮▮▮▮▮▮), ▮▮▮▮▮▮ (▮▮▮▮▮▮), and ▮▮▮▮▮▮ (▮▮▮▮▮▮). For these three months, it appears that TM Financial billed Morgan Lewis, Morgan Lewis paid TM Financial, and then Oracle reimbursed Morgan Lewis. Yet, again, these three figures were necessary to come up with the ▮▮▮▮▮▮ in TM Financial expenses. In other

words, the ▮▮▮▮ includes *both* the double counted ▮▮▮▮ *as well as* the total invoices for ▮▮▮▮. Because these expenses also occur on Morgan Lewis invoices, under the methodology that Oracle applied as I understand it, they would also then be included in the "▮▮▮▮" category, although this is impossible to know because Oracle did not provide an itemized list of "▮▮▮▮." Thus, it appears that not only was the ▮▮▮▮ double-counted, but it appears possible that the ▮▮▮▮ were also double-counted, as well as the ▮▮▮▮ being triple-counted.

(ii)   *Overhead Expenses*: Exhibit N-4 lists expenses that Oracle has categorized as "▮▮▮▮," yet it appears to be seeking from Rimini. Specifically, these expenses appear to relate to the entity called Black Letter Discovery, which billed Oracle directly for hourly temporary contract attorney charges at ▮ per hour totaling ▮▮▮▮. It appears that these contract attorneys conducted their work at the Morgan Lewis offices, and that Morgan Lewis in turn billed Oracle ▮▮▮▮ per hour in "▮▮▮▮" for hosting these contract attorneys. This conclusion is further supported by the fact that the Morgan Lewis invoices specifically identify the invoice numbers that correlate with the invoice numbers on the seven Black Letter Discovery invoices that were billed separately to Oracle. In other words, each time Black Letter Discovery billed Oracle, Morgan Lewis *also* billed Oracle for overhead costs associated with hosting these attorneys at the Morgan Lewis offices. ▮▮▮▮ overhead costs are not generally

15

charged to a client. Reckers Decl. Ex. 2 at para. 5 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮"), para. 7 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" and listing certain overhead expenses).

\*   \*   \*

## THIRD-PARTY VENDOR EXPENSES

27.     Oracle has claimed a total of ▮▮▮▮▮▮▮▮ in other costs and expenses, including database and document services, experts, consultants, and court reporter services. Such charges were generally not included on the law firm invoices as reimbursable expense charges but rather appear to have been billed directly to Oracle for payment (although there are exceptions, such as those discussed in para. 26(a)(i)).

28.     **Stroz Friedberg, LLC.**  Oracle is requesting a total of ▮▮▮▮▮▮▮▮ in fees and costs incurred by data vendor Stroz Friedberg, LLC ("Stroz"). Oracle allocates this as ▮▮▮▮▮▮▮▮ in taxable costs, and ▮▮▮▮▮▮▮▮ in non-taxable costs. To differentiate between taxable and non-taxable costs, Oracle highlighted the taxable costs in blue on the invoices. It is impossible to validate these numbers based on the evidence provided by Oracle.

29.     We reviewed ▮ monthly invoices from Stroz in an attempt to validate these numbers. The monthly invoices typically include both a summary page and pages containing detailed entries. However, the summary pages were largely useless in attempting to validate these numbers because (i) Oracle redacted various detailed entries and is not seeking reimbursement for those entries, but those entries would be reflected in the amount on the summary page; and (ii) Oracle highlighted taxable costs in blue on the detailed entries, not the summary pages.

30.     The invoices are missing numerous pages. For example, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ are missing pages. Some of the monthly invoices are missing *all* of the detailed entry pages for that invoice, and include *only* a summary page, making it so that there is no meaningful way to evaluate that

month's invoice. For example, █████████████████████████████████████ are missing all detail.

31. We created a database of all detailed entries appearing in Oracle's filing. We did not include redacted entries in this database because, of course, we cannot see those entries and because the declaration of James C. Maroulis states that Oracle is not seeking recovery of the redacted entries. Adding up all of the detailed entries amounted to only ████████ which is ████████ less than Oracle is requesting. Thus, Oracle is seeking fees that we were unable to substantiate. This discrepancy is presumably due to the missing pages, but there is no way to know if there were redactions on those pages.

32. We also added together the totals from all of the summary pages (████████), and that number was also inconsistent with the amount Oracle is requesting. The cause of this discrepancy may be due to redactions on the missing detailed entry pages, but there is no way to know because we do not have all of the invoices, and because Oracle redacted many entries but did not adjust the summary pages for those redactions.

33. The missing pages also make it impossible to categorize the expenses to determine if they are reasonable, as Mr. Timothy Opsitnick has attempted to do. For example, six invoices that are missing pages include on the summary page a line item for "████████ ████████████████" and/or "████████." It is unclear what these items are meant to describe. On other invoices where the detailed entries were provided, these categories were further broken down into other categories, but again, because of the missing pages, that was not done here. The line item description of ████████████████████████ " and/or "████████," on its own without the supporting detail totaled ████████.

34. **Stroz – Taxable v. Nontaxable Costs.** Oracle highlighted in blue what it considered "████████" on the PDFs of the Stroz invoices.

35. Attached as Exhibit D is a list of all entries in the Stroz invoices. Where an entry was highlighted in blue by Oracle, it is also marked in blue on the Exhibit. Oracle frequently

highlighted some descriptions in blue, but would not later highlight that exact same description. Oracle provided no explanation for the inconsistency.

36. We totaled the taxable costs (entries highlighted in blue by Oracle) for a total of ▇▇▇▇▇▇▇. Yet Oracle asserts that the number of taxable costs from the Stroz invoices is ▇▇▇▇▇▇▇. Therefore, there is a discrepancy of $1,467,564.65 between the Oracle's request and the invoices. Although the cause of the discrepancy is unknown, it may be due to missing pages that Oracle did not file and/or pages on which Oracle did not highlight an entry in blue but nonetheless counted that entry.

37. For some entries, it is difficult to tell whether the item is supposed to be a taxable cost or a non-taxable cost. For example, on page 3 of invoice 65039, an expense in the amount of ▇▇▇▇ is highlighted in blue. However, the description of that expense ("▇▇▇▇▇▇▇▇▇▇▇▇") is not highlighted. Thus, it is unclear whether Oracle intended to include this expense as a taxable or non-taxable cost. Because Oracle did not generally highlight this category as taxable on other invoices, we considered this partial highlighting a clerical error and did not include it in our computation of "▇▇▇▇▇▇." We made this assumption notwithstanding Oracle's other inconsistent highlighting of taxable and non-taxable for the same or similar categories without explanation.

38. The following exhibits relating to the Stroz invoices are attached: Expense Entries By Category (O-1); Hours and Fees by Timekeeper (O-2); and the Summary of Expenses (O-3).

39. **Elysium.** For Elysium, Oracle redacted the fees and expenses but did not adjust the invoice totals to reflect the redactions. The unredacted fee and expense entries displayed on the invoices total ▇▇▇▇ less than the amount claimed by Oracle. The cause of the discrepancy is unclear, and it may indicate a missing invoice or mathematical error. The following exhibits relating to the Elysium invoices are attached: Invoice Schedule (P-1); and the Hours and Fees by Timekeeper (P-2).

40. **Advanced Analytical Consulting Group (AACG).** The Invoice Schedule for AACG is attached as Exhibit Q-1.

41. **Barg Coffin.** The Invoice Schedule for Barg Coffin is attached as Exhibit Q-2.

42. **Black Letter.** The Invoice Schedule for Black Letter is attached as Exhibit Q-3.

43. **H5.** The Invoice Schedule for H5 is attached hereto as Exhibit Q-4.

44. **Huron.** The Invoice Schedule for Huron is attached hereto as Exhibit Q-5.

45. **Jury Research Institute (JRI).** The Invoice Schedule for JRI is attached hereto as Exhibit Q-6.

46. **Legal Media.** The Invoice Schedule for Legal Media is attached hereto as Exhibit Q-7.

47. **NODRUOY, Inc.** The Invoice Schedule for NODRUOY, Inc. is attached hereto as Exhibit Q-8.

48. **Randall Davis.** The Invoice Schedule for Randall Davis is attached hereto as Exhibit Q-9.

49. **TM Financial Forensics (TMF).** The Invoice Schedule for TMF is attached hereto as Exhibit Q-10. There is a discrepancy with the amount claimed by Oracle as discussed in para. 26(a)(i).

\*   \*   \*

I declare under penalty of perjury that the foregoing is true and correct.

Executed at St. Louis, Missouri on ___March 7___, 2016.

By: _____
John L. Trunko