## DECLARATION OF WILLIAM G. ROSS

STATE OF ALABAMA    )
                         ) SS.
COUNTY OF JEFFERSON  )

     WILLIAM G. ROSS, being first duly sworn, deposes and says:

     1.     My name is William G. Ross.  I am the Lucille Stewart Beeson Professor of Law at the Cumberland School of Law at Samford University in Birmingham, Alabama.  I have been retained by Rimini Street, Inc. and Seth Ravin to provide an independent opinion regarding Rimini's opposition to Oracle's petition for attorneys' fees and costs in this action.  I am being compensated for my work in this matter, which is ongoing.

     2.     As explained more fully below, it is my opinion that the Court should deny in its entirety Oracle's request for fees and costs, but that if the Court awards Oracle any fees or costs, that such fees and costs (i) should be adjusted for reductions in the hourly rates of Oracle's outside counsel; and (ii) should be cut by at least an additional thirty percent because of significant deficiencies in the legal bills submitted to Oracle by the law firms of Bingham McCutcheon LLP ("Bingham"), Boies, Schiller & Flexner, LLP ("Boies Schiller"), and Morgan Lewis & Bockius LLP ("Morgan Lewis").  In my opinion, those bills are rife with entries that do not conform to the standards recommended by various commenters, including myself, and required by various courts, including the United States Court of Appeals for the Ninth Circuit and the United States District Court for the District of Nevada.  In particular, it is my opinion that a very large proportion of the billing entries contain deficiencies that would impede or preclude the Court's evaluation of whether the work performed by Oracle's attorneys and paraprofessionals was reasonably necessary or whether a reasonable amount of time was

expended on reasonably necessary work.   Further, it is my opinion that any fees and costs awarded should be reduced to reflect the fact that Oracle did not prevail on a substantial portion of its claims against Rimini and Ravin.   Nothing in this declaration should be interpreted as impugning the integrity or competence of any attorney or other timekeeper.

## I.  ABBREVIATED CURRICULUM VITAE

3.      As is outlined more fully on the resume that is attached hereto as an exhibit to this Affidavit, my qualifications to render my expert opinion are based upon my experiences as a practicing attorney, law teacher, legal scholar, and consultant on billing issues.   After graduating from Stanford in 1976 and the Harvard Law School in 1979, I spent nine years as a litigator in law firms in New York City.   In 1988, I became a member of the faculty at Cumberland, where I have been a full and tenured professor since 1993 and have held the Beeson chair since 2012.   I regularly teach legal ethics at Cumberland, and I also have taught this subject as a visiting professor at the law schools of Notre Dame and Florida State.

4.      I am the author of numerous publications regarding legal ethics, including the ethics of legal fees.   My book about billing ethics, *The Honest Hour: The Ethics of Time-Based Billing by Attorneys*, was published by Carolina Academic Press in 1996.   I am also the co-author of a treatise about legal fees, *Legal Fees: Law and Practice* (with John W. Toothman, Carolina Academic Press, 2003).   My articles about billing ethics include "The Ethics of Hourly Billing by Attorneys," 44 *Rutgers Law Review* 1-100 (1991); "Formulating Standards for Ethical Billing," 35 *Law Office Economics and Management* 301-07 (1994); "Kicking the Unethical Billing Habit," 50 *Rutgers Law Review* 2199-2210 (1998); "An Ironic and Unnecessary Controversy: Ethical Restrictions on Billing Guidelines and Submission of Insurance Defense Bills to Outside Auditors," 14 *Notre Dame Journal of Law, Ethics, and Public Policy* 527-588

(2000); "The Ethics of Billing by the Hour for Re-Cycled Work," *Accounting and Financial Planning for Lawyers,* Aug. 2003, at 1; and "The Ethics of Double Billing," *Accounting and Financial Planning for Lawyers*, Aug. 2004, at 1.

5.      In addition to writing on this subject, I have lectured on billing ethics at various meetings and seminars in Alabama, Arizona, California, Florida, Great Britain, Mississippi, New Jersey, Quebec, and Texas.  I have served as a consultant and expert witness in various fee disputes.

6.      The United States Supreme Court cited my *Honest Hour* book in *Gisbrecht v. Barnhart*, 535 U.S. 789, 800-01 (2002).  Seven *Wall Street Journal* articles and two *New York Times* articles (most recently on Mar. 26, 2013) have quoted me as an authority on legal billing, as have articles in *The Washington Post*, *The National Law Journal*, *the ABA Journal*, *The Chicago Tribune* (most recently on Apr. 6, 2015), and *The American Lawyer* (most recently on Nov. 12, 2015).

## II.  DOCUMENTS REVIEWED

7.      In preparation for drafting this Affidavit, I have reviewed, line by line, all of the unredacted legal bills submitted by the defendants in support of their motion, particularly the bills presented to the defendants by the law firms of Bingham, Boies Schiller, and Morgan Lewis for the periods from approximately December 2008 through November 2015.  I have also reviewed the following documents:  the "Verdict" of the jury, dated Oct. 13, 2015; "Oracle's Motion For Costs And Attorneys' Fees" as well as supplements and corrections to this document; "Declaration Of Kieran P. Ringgenberg In Support of Oracle's Motion For Costs and Attorneys' Fees" as well as supplements and corrections to this declaration; "Declaration of Thomas S. Hixson In Support Of Oracle's Motion For Costs And Attorneys' Fees" as well as

supplements and corrections to this declaration; Affidavit of John L. Trunko; Affidavit of Dennis L. Kennedy; and "Defendant Rimini Street, Inc.'s and Seth Ravin's Opposition to Oracle's Motion for Attorneys' Fees and Costs," among other documents.

### III.  REDUCTION OF FEE REQUEST

8.     It is my opinion that the Court should deny the fee award in its entirety.  If the Court were to award any fees or costs at all, the award should be significantly lower than the $58.2 million that Oracle is seeking.

**A.     Reduction for Deficiencies in Billing Records and Billing Practices**

9.     It is my opinion that the Court, if it awards any fees, should reduce any fee award by at least 30 percent to account for the multitude of billing deficiencies, including block billing, vague and redundant entries, questionable conferences, administrative and clerical activities, and excessively long billing days, among other deficiencies.

**1.     <u>Vagueness</u>**

10.     It is my opinion that the vagueness of Oracle's billing entries compels a substantial reduction in the fee request.  The bills of all three firms are replete with vague entries that fail to provide sufficient information about the activities of timekeepers that would enable the Court to make an informed decision about whether such time was actually and reasonably expended.

11.     Hundreds of entries for written correspondence (emails and letters), telephone calls, and conferences fail to specify the subject matter of the communication and/or the person or persons with whom the timekeeper communicated.  For example, William Norton's bills for ██████ contain  approximately  ████ entries  for  "█████████████████ ██████████" and ██ entries for "██████████████████████" in blocked entries for a total

4

of ▮▮ hours at ▮▮ per hour.  Other typical examples that fail to discuss the subject matter or purpose of the conference are Gregory Dubinsky's entries for "▮▮▮▮▮▮▮▮▮▮▮▮" (▮▮ hours on ▮▮) and "▮▮▮▮▮▮▮▮▮" (▮▮ hours on ▮▮), at ▮▮ per hour.

12.      Some entries for document review fail to specify the subject matter of the documents that the timekeeper reviewed or the purpose of the review.  Examples include B. Hann's entries for "▮▮▮▮▮▮▮▮▮▮▮" (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮) in blocked entries ranging from ▮▮ hours to ▮▮ hours at ▮▮ per hour; M. Gentry's entry for "▮▮▮▮▮▮▮▮" for ▮▮ hours on ▮▮; and G. Howard's entries for "▮▮▮▮▮▮▮▮▮" (▮▮ hours on ▮▮ and ▮▮ hours on ▮▮), and in blocked entries for ▮▮ hours on ▮▮ (▮▮ hours on ▮▮ and ▮▮ hours ▮▮).  Such vagueness also is found among the entries of non-attorneys.  Examples include K. Tsai's entries for "▮▮▮▮▮▮▮▮" (▮▮ hours on both ▮▮ and ▮▮); N. Song's entries for "▮▮▮▮▮▮▮" (▮▮ hours on both ▮▮ and ▮▮, and ▮▮ hours on ▮▮); and C. Langenbeck's entries for "▮▮▮▮▮▮▮" hours on ▮▮ and ▮▮ hours on ▮▮).  Other entries refer only to review of documents produced by Rimini, which seems unduly vague insofar as Rimini presumably produced such enormous quantities of documents that this slight addition of detail means almost nothing.  Nasrina Bargzie, for example, had ▮▮ entries in ▮▮▮▮▮▮ for review of documents produced by Rimini.  Her time for this work, at ▮▮ per hour, totaled ▮▮ hours in unblocked entries, and she recorded other time for this work in blocked entries totaling ▮▮ hours.

13.      Other entries make vague references to discovery, which could refer to almost anything in a case that involved such massive discovery during such a long period of time.  Examples include G. Howard's entry for "▮▮▮▮▮▮▮▮▮" on ▮▮ and William

Norton's entries for " █████████████████████████ " ( ████████

████████████████ ), and " ████████████ " ( █████████████

██████████████████████████████████████████████

████████████████████ ).

     14.    Similarly, G. Howard's notation for " ██████████████ " ( ███████ on

██████ ) seems meaningless in a case in which there were so many issues of law.  Likewise,

K. Papay's entry for " ██████████████████ " ( ███ hour on ██████ ); G. Howard's

entry for " ████████████████ " ( ███ of an hour on ██████ , ███ hour on ██████ , ███ hour on

██████ , ███ hour on ██████ and ██████ , and ███ hour on ██████ ); and K. McCornock's entry

for ████████████████ " ( ███ hours on ██████ ) are remarkably cryptic since they appear

to describe any kind of work performed by any timekeeper in connection with this litigation.

     15.    Another noteworthy example of vagueness appears in Karen Dunn's bills for

████████████ , at ██████ per hour, which include approximately ██████ entries containing

nothing except the cryptic notation " ████████████ ."  On ███ of those days, she billed more

than ██████ hours per day.

     16.    In addition, entries recorded by attorneys and paralegals for both firms *during* the

trial are particularly profuse in their vagueness.  Although legal bills may arguably require less

explanation during trial than at other times because what attorneys do during trial may be more

evident, a substantial number of billing entries are prodigally vague even by the most generous

standards.  For example, Mr. Ringgenberg cryptically recorded ██████ hours for " ██████

██████████ " among the ██████ hours he billed at a rate of ██████ per hour during ████████████ .

Similarly vague entries by paralegals include the nearly identical entries of Christina Seki for

██████████ consecutive days (for a total of ██████ hours) at the rate of ██████ per hour during

████████████. ████████ of these entries record: "████████████████████████████████████████████████████████████," and ████ others are the same except that they omit: "████████." It appears that the entry was copied and pasted day after day.

17.     The problem of vagueness in these bills is particularly significant because there appears to be a marked correlation between vague entries and the seniority of the timekeeper. Vague entries appear more common among attorneys than among paraprofessionals, and appear more common among partners than associates.   Vague entries, therefore, generate a disproportionately large share of the amount of fees that Oracle is seeking in this action.   For example:

a.     The entries of Thomas S. Hixson, Ms. Hann, and Ms. Dunn contain a high proportion of vague entries, and many of Mr. Howard's entries also were vague.  For example, Mr. Hixson included at least seven vague notations in his blocked entry for ████ hours at ████ per hour on ████ insofar as he referred to five emails without specifying whether he drafted them or provided the name of the person to whom they were sent; he referred to correspondence without identifying the intended recipient; and he recorded a conference without including the name of any participant.  Similarly, T. Hixson's blocked entry for ████ hours on ████ referred to five emails, three conferences, and one item of correspondence without identifying the names of the parties with whom he communicated.  Likewise, T. Hixson's entry for ████ hours on ████ listed two conference calls, two conferences, one piece of correspondence, an "████████" and three instances of multiple emails, all without identifying the person or persons with whom he communicated.

b.       Likewise, G. Howard, in his blocked entry for ▌▌ hours at ▌▌ per hour on ▌▌1, recorded one email without identifying the author or recipient and another email without recording the subject; a conference without naming any participant; and a telephone call without identifying the subject of the call.   The final notation in G. Howard's entry is "▌▌▌▌▌," which fails to identify the expert, or the subject of the "▌▌."

c.       Examples of vague entries by another partner, Richard Pocker, include approximately ▌▌ entries in ▌▌▌▌, at ▌▌ per hour, for telephone conferences and voice mails without any identification of the subject matter of those communications.

18.    Time records need to provide information that is sufficiently detailed to enable a client, a party opposing a fee petition, or a judge in a fee petition hearing to identify the task performed by a timekeeper in order to permit an informed determination about whether the work performed and the time expended was sufficiently reasonable that it should be compensable.  *See* John W. Toothman and William G. Ross, *Legal Fees: Law and Practice* (Carolina Academic Press. 2003), 50.   As I have explained, "[a]t a minimum, clients should demand the type of records required by courts in fee applications, which the Sixth Circuit has described as documentation 'of sufficient detail and probative value to enable the court to determine with a high degree of certainty that such hours were actually and reasonably expended.'"   William G. Ross, *The Honest Hour: The Ethics of Time-Based Billing by Attorneys* (Carolina Academic Press, 1996), at 63-64, *citing United Slate, Tile & Composition v. G & M Roofing*, 732 F.2d 495, 502 n.2 (6th Cir. 1984).

19.    Ambiguous or vague detail is a common basis for reduction of a fee request.  *See United States v. $167,070.00 in United States Currency*, No. 3:13-CV-00324-LRH-VPC, 2015 WL 5057028, at *5 (D. Nev. Aug. 25, 2015) (reducing fee in civil forfeiture case because of vague entries that recorded "meeting with client" or "conference with client" without additional information).   Such fee reductions are consistent with the standards of detail that I have advocated in my books about legal fees.   William G. Ross, *The Honest Hour: The Ethics of Time-Based Billing by Attorneys* (Carolina Academic Press, 1996), at 63-64; John W. Toothman and William G. Ross, *Legal Fees: Law and Practice* (Carolina Academic Press, 2003), at 49-51. Such detail is even more important when fees are shifted pursuant to statute because an opposing party and court are likely to have far less information or knowledge than the client about how the attorneys and paraprofessionals spent their time insofar as they have not assigned or monitored the work.   An opposing party and a judge in a fee petition likewise will have less of a basis for discerning the reasonableness of the work and the time expended because, as in the present case, much of the work may have been performed many years before adjudication of the fee petition.

20.    It is my opinion that a substantial proportion of the bills in this case are significantly deficient in the kind of detail that clients, much less courts in fee petition hearings, should demand.  It is my understanding that the legal auditing firm of Stuart, Maue, Mitchell & James, Ltd. ("Stuart Maue") has concluded that billing entries representing a substantial number of fees are unduly vague.  In reaching this conclusion, Stuart Maue has used a methodology for defining vague descriptions that I regard as soundly based upon judicial decisions, ethical rules and opinions, client billing guidelines, and scholarly authorities, including my *Honest Hour* book.  It is therefore my opinion that vague entries alone justify a substantial portion of the thirty percent reduction for unreasonable billing practices that Rimini is seeking.

21.     It is also my opinion that Oracle should receive no compensation for the $4,389,838.32 in fees that it is seeking for the services it claims to have been performed by contract attorneys at H5 and Huron Consulting Group because the invoices for those timekeepers are largely devoid of any description of their activities.  Without a more complete description to account for the expenditure of more than four million dollars in fees, those bills provide an inadequate predicate for the Court to assess whether any services performed by such attorneys justify the transfer of fees from Oracle to Rimini.

**2.     Block Billing**

22.     It is also my opinion that a high incidence of "blocked" bills presented by Oracle in support of its fee petition also compels a substantial reduction of the fee request.  A blocked bill is one in which individual billing entries aggregate multiple activities without specifying how much time was spent on individual activities.  According to analysis performed by Stuart Maue, blocked bills account for a total of approximately ███ hours, which is approximately █% percent of the fees that Oracle is seeking to shift to Rimini.  The blocking in the present case is particularly significant because a substantial proportion of the bills contain an especially large proportion of entries for discrete activities.  For example, Mr. Hixson's entry for ██ hours at ██ per hour on █████ contains notations for ███ discrete activities, Mr. Ringgenberg's entry for ██ hours on █████ contains notations for ███ discrete activities, and Ms. Duong's entry for ██ hours on █████ lists ██ separate activities.  The blocking in the bills for which Oracle seeks compensation from Rimini also is a significant problem because many of the heavily blocked entries record substantial amounts of time by timekeepers whose billing rates were high.  The aforesaid entries of Mr. Hixson and Mr. Ringgenberg are examples of this.

10

23.     As I explained in *The Honest Hour*, a "bill should always specify exactly how much time was spent by each attorney on each day on each specific task." *The Honest Hour*, at 65.  Like vague entries, blocked entries impede the Court's ability to determine whether the time spent on specific activities was reasonable so as to justify the shifting of fees.  When separate tasks are lumped together in blocked entries, a court cannot evaluate how much time was spent on any particular task and therefore cannot evaluate the reasonableness of the time spent on any task unless a court concludes that a particular task was worth the total time recorded in the entry.  Blocking also permits the recovery of fees for activities that were so insubstantial that they would not be compensable if they were individually reported.  *The Honest Hour*, *id.*  Such recovery may involve large sums of money when, as in the present case, large numbers of entries are blocked.  Moreover, blocking exacerbates the problem of vagueness because it impedes or precludes the ability of a court or a client to determine the dollar value of vague entries when such entries are mixed with those that do not suffer from vagueness.  Like vagueness, blocking may provide the predicate for significant fee reductions.  *See Home Gambling Network, Inc. v. Piche*, No. 2:05-CV-610-DAE, 2015 WL 1734928, at *7-8 (D. Nev. Apr. 16, 2015) (reducing fee request in patent case by 50 percent of the block-billed hours); *see also Welch v. Metropolitan Life Ins. Co.*, 480 F.3d 942, 947 (9th Cir. 2007) (expressing approval of a report by the California State Bar's Committee on Mandatory Fee Arbitration concluding that block billing may increase time by ten to thirty percent).  Such fee reductions are consistent with the standards I have advocated in my books about legal fees.  *The Honest Hour, supra,* at 63-67; *Legal Fees: Law and Practice*, *supra*, at 55-57.

### 3.     <u>Redactions</u>

24.     It is my opinion that another basis for reduction in any award is that a significant proportion of the entries are redacted.  I have examined many legal bills as a consultant and expert witness during nearly twenty years and I have rarely, if ever, seen any redaction of bills, even those submitted in support of fee shifting motions, much less the significant redactions that appear on Oracle's bills.  Although it is my understanding that Oracle does not seek to shift fees for redacted entries, the redaction of entries may hinder the ability of the Court and of Rimini and its attorneys and expert witnesses to evaluate the extent to which unredacted entries are deficient.  In particular, the redactions may interfere with efforts to place unredacted billing entries in their proper context.  For example, redacted entries might have helped to clarify some of the vague entries, particularly those involving correspondence and conferences.  The redacted entries, if disclosed to Rimini and the Court, also might have provided a better basis for determining the reasonableness of some of the work for which Oracle is seeking to shift fees, particularly with regard to staffing decisions.  For example, the need for T. Hixson to have billed ██ hours on ██████ and ██ hours on ██████ for "██████████████████████" would be clearer if three entries preceding these entries on the same page had not been redacted since those entries might have disclosed if other timekeepers also had worked on the drafting of the motion.

### 4.     <u>Dubiously Long Days</u>

25.     It is also my opinion that the large number of entries for long work days justifies a reduction in fees.  Stuart Maue's analysis has disclosed that entries for more than ████ hours in a day account for ████████ of Boies Schiller's billings, and ██████████ of the bills from Morgan Lewis.  Its analysis also reveals that days in excess of ██████ hours account for ████████

of the Boies Schiller's bills and ███ of the bills from Morgan Lewis.  For the Morgan

Lewis firm, I have identified ███ entries for more than ███ hours:  Z.S. Hill recorded ███

hours on ███ and ███ hours on ████, and N. Jindal listed ██ on ████.  ████

entries for the Boies firm from ██████ record at least ████ hours in a single day

(███ for Gregory Dubinsky; ██ for Alexander Konik; ██ for Sean Rodriquez; ██ for

Kristina Seki; and ███ for Jerren Holdip).  One entry records █ hours for one day of work

(Jerren Holdip on ████).  Such an entry calls into question the accuracy of all entries.  *See The*

*Honest Hour*, *supra*, at 25-27.  As a judge stated in one case, a "day with 10 billable hours, while

extraordinary, will occasionally occur.  But 17 days where billable hours equaled or exceeded 12

hours is not justifiable."  *Chrapliwy v. Uniroyal, Inc.,* 583 F. Supp. 40, 50 (N.D. Ind. 1983).

Questioning the accuracy of an entry for 18.9 hours in a single day, another federal judge

observed that the attorney "would have had to have been in his office from 5:06 in the morning

until midnight, without taking any time for meals, to relieve himself or to do anything else."

*Metro Data Syst., Inc. v. Durango Syst., Inc.*, 597 F. Supp. 244, 246 (D. Ariz. 1984).  Although

some of the most egregious entries for long days occurred during trial, many of those entries are

remarkably long even by the standards of the hours that attorneys need to work during trial.

### 5.    Clerical Work

26.    It is also my opinion that an additional reduction is warranted by the many entries

in which timekeepers performed clerical tasks that may have been more economically performed

by clerical staff whose time was not recorded and was part of the law firm's unbilled overhead.

Such tasks include data entry; logistical arrangements for meetings and hotel accommodations;

and photocopying, circulation, packing, moving, shredding, obtaining, locating, printing,

forwarding, storing, delivery, and shipping of documents.    Examples of entries for logistical

arrangements include Christina Seki's entries for "███████████████████

████████████████" on █████, █████, █████, █████, █████, █████, █████, and

█████ at █████ per hour; L. Lee's entry for "███████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████" on █████; L. Lee's four-hour entry for "██████████████

██████████████" on █████; K.A. McCornock's entry for "█████████████████████" in

a blocked entry for █████ hours on █████; T. Hilton's █████ hour entries for "██████████████

██████" (█████ hours on █████ and █████ hour on █████; L. Lee's entry for "█████████████████" in

a blocked entry for █████ hours on █████;   L. Lee's entries for "████████████████████

██████████████████████" and "█████████████████████████████████████████████

██████" which are parts of a blocked entry with █████ discrete entries for █████ hours on █████;

and Ms. Duong's notations for "█████████████████," which are part of an entry for █████ hours on

█████, her notations for "████████████████," which are part of entries for █████ hours on █████,

and █████ hours on █████, and her notations for "█████████████," which are part of entries for

█████ hours on █████ and █████ hours on █████.   Examples of clerical activities involving

documents include L. Lee's entries on █████ for "███████████████████████████████

██████████████████████████" and "█████████████████████████████████████████

██████████████████"; L. Lee's entry for "█████████████████████████████████████████"

in a blocked entry for █████ hours on █████;   K. Papay's entries for "████████████████████

██████████████████████" in a blocked entries for █████ hours on █████ and █████ hours on

█████; B. Quinn's entry for "██████████████████████" in a blocked entry for █████ hours on

█████; L. Lee's entry for "███████████████████████████████████" in a blocked entry for

█████ hours on █████; L. Lee's "████████████████████████████████████████████████



” for ▮▮ hours on ▮▮; L. Lee's entry for “▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮” in a blocked entry for ▮▮ hours on ▮▮; and L. Lee's entry

for “▮▮▮▮▮▮▮▮▮” in a blocked entry for ▮ hours on ▮▮

27.   The billing records also are rife with notations for data entry and other computer

work.  Examples include L. Lee's entry for “▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮”

in a blocked entry for ▮▮ hours on ▮▮▮; L. Lee's entry for ▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮” on ▮▮; B. Quinn's entry for “▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮” in a

blocked entry for ▮▮ hours on ▮▮; B. Quinn's entry for “▮▮▮▮▮▮▮▮▮▮▮▮” in a

blocked entry for ▮▮ hours on ▮▮; and B. Quinn's entry for “▮▮▮▮▮▮▮▮▮▮

▮▮” on ▮▮.  One paraprofessional, S. MacNeill, billed for data work.  On ▮▮, for

example, this timekeeper billed ▮▮ hours for “▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮”

28.   Finally, L. Lee's entry for “▮▮▮▮▮” on ▮▮▮ may be the only notation for

coordination of food delivery, but it is emblematic of the manner in which timekeepers may have

billed Oracle for activities that one might expect to have been performed by secretarial staff

whose time was a part of overhead.

29.   As I have explained in my books, such clerical work should warrant reductions

in awardable time, and has provided the basis for such reductions in various cases.  *The Honest

Hour*, *supra*, at 138; *Legal Fees: Law and Practice*, *supra*, at 45-46.  Although there are

instances in which timekeepers may need to perform clerical work, the duty to perform services

for clients in a cost-efficient manner generally requires attorneys to delegate tasks to clerical

staff, whose compensation is part of the law firm's overhead, whenever clerical workers are

capable of performing such work. ████████████████████████████
████████████████████████████ Oracle Billing Guidelines, para. 7.

**6.** <u>**Training**</u>

30.    There are also entries in which timekeepers appear to have billed for attendance at technology training sessions that presumably ought to have been counted as part of overhead. Examples include "███████████████████████████████" in a blocked entry by John Neukorn for ███ hours on █████, "███████████████████████████" in a blocked entry by Sean Rodriquez for ███ hours on █████; "████████████████████████████████████" in a blocked entry for ███ hours at ████ per hour by Kieran P. Ringgenberg on █████; "█████████████████████████████" in a blocked entry for ███ hours by Alexis Loeb on █████; "███████████████████████████████████████" in an entry for ███ hours by Christina Seki on ██████; and "████████████████████████████" in an entry for ███ hours by Catherine Duong on ██████. It is generally not appropriate for timekeepers to bill clients for education and training, and it is even more inappropriate for a party to whom a fee is shifted to have to pay for such overhead expenses. ███████████████████████ ████████████████████████████ Oracle Billing Guidelines, para. 7.

31.    It is also my opinion that additional reductions are required because Oracle's attorneys appear to have spent an excessive amount of time in intra-office conferences involving multiple timekeepers. The time entries are replete with references to "███████████" and other conferences between and among attorneys. Stuart Maue has found that Oracle's attorneys billed approximately ███████████ at the adjusted rates (or more than ███%) for such conferences. Although I have explained in my *Honest Hour* book that conferences can be useful by providing coordination of activities that prevent duplication of effort, there are obvious limits to such

utility.  Because multiple timekeepers attend conferences, such meetings present a particularly perilous opportunity for undue inflation of bills. If not all participants benefit from a conference or benefit only marginally, the presence of such redundant timekeepers wastes a client's money and imposes unfair costs upon a party onto whom fees are shifted. ████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

Deborah K. Miller to Steven Holtzman, Jan. 25, 2010, p. 2, section 3.   It is, therefore, particularly important for conference entries to provide at least some detail about the subjects discussed in order for a client or a court to assess the need for the presence of the participant. Entries for intra-office conference time in Oracle's bills, however, typically fail to identify the subject matter of the discussion.  The enormous amounts of time and money disclosed by Stuart Maue's analysis suggests that conference time may have exceeded the point of marginal utility, particularly because so many of the entries for conference time, particularly those for "████

██████" fail to disclose the subject matters discussed or the names of the participants. Such vagueness also prevents the Court from determining whether such conferences were duplicative.

### 7.   Repetitive Entries

32.     Some timekeepers have recorded identical entries for many days that call into question whether they actually expended time on those tasks on those days.  For example, Catherine   Duong   had   approximately   ████████   entries   for   "█████████████████

████████████████████████████████████████" between ████ and ██████████

████, and approximately ██████████ more during those months that were the same except that they added "█████████████." Similarly, she had approximately ████ entries for "█████████



" from ███████ through ███████████ and approximately ███████ entries for "███████████████████████████████" from ███████ through ███████████. During ███████████, she had notations for "███████████████████████████████████████████████" in ███████████ blocked entries totaling ███████ hours. Likewise, Ms. Duong had approximately ███████ entries for "███████████████████████████████████████████████" in ███████████ and ███ entries for "███████████████████████████" in ███████████.

33.    Other examples of repetitive entries were recorded by J. Kurka, who had ███████ entries for "███████████████████████████████████████████" or slight variations on this wording during ███████████, and Z. Hill, who had ███████ entries totaling ███████ hours at ███ per hour for "███████████████████████████████████████████ ███████████████████."

## 8.    Expenses

34.    It is also my opinion that a reduction of Oracle's expenses is justified because many of the expenses appear on their face to be excessive. For example, an entry by the Boies firm for ███████ appears to record ███████ in meals for nine persons at the upscale restaurant "███." Airfares that seem high include flights that cost ███████ (███████) and ███████ (███████), among others. Although there may be acceptable reasons for such expenditures, Oracle should not expect the Court to shift such expenses onto Rimini without additional documentation or explanation.

## B.    Across-the-Board Reductions for Limited Success

35.    It is my opinion that the Court should reduce the final fee award to account for Oracle's limited success. *See Mahach-Watkins v. Depee*, 593 F.3d 1054, 1063 (9th Cir. 2010)

(affirming 80 percent reduction because of plaintiff's "limited success" on one federal claim and lack of any success on state law claims).

36.     I have reviewed the four methodologies proposed by Rimini, and they appear to be reasonable methodologies that the Court could use to perform this calculation.

Signed this __5ᵗʰ__ day of March 2016.


_William G. Ross_
WILLIAM G. ROSS

Exhibit A

### WILLIAM G. ROSS

**PUBLICATIONS (During the Past Ten Years):**

**Books:**

*Constitutional Law in Context* (textbook with Michael Kent Curtis, J. Wilson Parker, Davison M. Douglas, and Paul Finkelman) (Carolina Academic Press, 3rd ed., 2011);

*The Chief Justiceship of Charles Evans Hughes, 1930-1941* (University of South Carolina Press, 2007) (recipient of Lightfoot, Franklin & White Award for Faculty Scholarship, 2008);

**Book Chapters:**

"German-Americans*"* in Charles Riggs, ed., *Immigrant Challenges, Immigrant Gifts* 15- 35 (George Mason University Press, 2012);

"Meyer v. Nebraska," in Alan Gless, ed., *A Legal History of Nebraska*, pp. 271-88 (Ohio State University Press, 2008);

**Selected Articles:**

"The Controversy over U.S. Membership in the League of Nations, 1918-1920," 53 *American Journal of Legal History* 1-88 (2013);

"The Supreme Court as an Issue in Presidential Campaigns," 37 *Journal of Supreme Court History* 322-34 (2012);

"The Presidential Aspirations of U.S. Supreme Court Justices: A History and an Ethical Warning," *Northern Kentucky Law Review* 115-72 (2011);

"Abuse of Hourly Billing: Results of a Recent Survey," *Accounting and Financial Planning Law Firms* (October 2007);

"The Role of Religion in the 1937 Court Packing Controversy," 23 *Journal of Law and Religion* 629-72 (2007-08);

"When Did the 'Switch in Time' Actually Occur?: Re-Discovering the Supreme Court's 'Forgotten' Decisions of 1936-37," 37 *Arizona State Law Journal* 1153-1220 (2006);

**Book Reviews:**

Anne Emanuel, "Elbert Parr Tuttle: Chief Jurist of the Civil Rights Movement," in *Judicature* 237-39 (March/April, 2012);

Paula Abrams, "Cross-Purposes: <u>Pierce v. Society of Sisters</u> and the Struggle over Compulsory Public Education," 28 *Law and History Review* 1076-78 (2010);

D. Don Welch, "The Vanderbilt Law School: Aspirations and Realities," in 27 *Law and History Review* 480-82 (2009);

**Encyclopedia Articles:**

– contributor to *The Oxford Encyclopedia of American Business, Labor, and Economic History* (forthcoming): "Godcharles v. Wigeman; United States v. E.C. Knight."

– contributor to The Oxford International Encyclopedia of Legal History (Oxford University Press, 2009): "United States Law – Equity."

– contributor to *Encyclopedia of American Civil Liberties* (Routledge Reference, 2006): "Sandra Day O'Connor."

– contributor to The American Midwest: An Interpretative Encyclopedia (Indiana University Press, 2006): "Chief Justice Melville W. Fuller."

**Other Publications:**

*JURIST* columns (online):

– "Why Obama Should Want to Make a Recess Appointment to the Supreme Court," February 17, 2016
– "Obama's Comments and Challenges to Judicial Review," April 12, 2012;
– "Popular Vote Compact: Fraught with Constitutional Peril," February 28, 2012;
– "Arizona's Immigration Law: Constitutional, but...," May 3, 2010;
– "Roberts's Response: Not Out of Line (Either)," March 16, 2010;
– "Constructive Criticism: Presidential Opposition to Supreme Court Rulings," February 2, 2010;
– *"*Should Obama Nominate a Justice without Judicial Experience?," May 15, 2009;
– "Advice and Consent': How the Senate Should Vet Obama Cabinet Picks," February 9, 2009;
– "Why the Supreme Court Matters in the Presidential Election," October 20, 2008;
– "Mukasey Nomination Requires Robust Scrutiny on Senate Floor," November 6, 2007;

**Testimony (Past 4 Years)**

*Twin Peaks Coal Company, Inc. and RGG Land & Minerals, Ltd., LP v. Colonial Pipeline Company,* Case No. 2:09-cv-1403-SLB (N.D. Ala. Feb. 12, 2013).