SHOOK, HARDY & BACON LLP
B. Trent Webb, Esq. (*pro hac vice*)
Peter Strand, Esq. (*pro hac vice*)
Ryan D. Dykal, Esq. (*pro hac vice*)
2555 Grand Boulevard
Kansas City, MO 64108-2613
Telephone: (816) 474-6550
Facsimile: (816) 421-5547
bwebb@shb.com

Robert H. Reckers, Esq. (*pro hac vice*)
600 Travis Street, Suite 1600
Houston, TX 77002
Telephone: (713) 227-8008
Facsimile: (713) 227-9508
rreckers@shb.com

GIBSON, DUNN & CRUTCHER LLP
Mark A. Perry (*pro hac vice*)
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone: (202) 955-8500
mperry@gibsondunn.com

Blaine H. Evanson (*pro hac vice*)
Joseph A. Gorman (*pro hac vice*)
333 South Grand Avenue
Los Angeles, CA 90071
Telephone: (213) 229-7228
bevanson@gibsondunn.com

HOWARD & HOWARD PLLC
W. West Allen (Nevada Bar. No. 5566)
3800 Howard Hughes Parkway, Suite 1000
Las Vegas, Nevada 89169
Telephone: (702) 667-4843
Facsimile: (702) 567-1568
wwa@h2law.com

LEWIS ROCA ROTHGERBER CHRISTIE LLP
Daniel Polsenberg (Nevada Bar. No. 2376)
Joel Henriod (Nevada Bar. No. 8492)
3993 Howard Hughes Parkway, Suite 600
Las Vegas, NV 89169
Telephone: (702) 949-8200
dpolsenberg@lrrc.com

RIMINI STREET, INC.
Daniel B. Winslow (*pro hac vice*)
6601 Koll Center Parkway, Suite 300
Pleasanton, CA 94566
Telephone: (925) 264-7736
dwinslow@riministreet.com

John P. Reilly (*pro hac vice*)
3993 Howard Hughes Parkway, Suite 500
Las Vegas, NV 89169
Telephone: (336) 908-6961
jreilly@riministreet.com

*Attorneys for Defendants Rimini Street, Inc. and Seth Ravin*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| ORACLE USA, INC., a Colorado corporation; ORACLE AMERICA, INC., a Delaware corporation; and ORACLE INTERNATIONAL CORPORATION, a California corporation,<br><br>　　　　　　　Plaintiffs,<br><br>　　v.<br><br>RIMINI STREET, INC., a Nevada corporation, and SETH RAVIN, an individual,<br><br>　　　　　　　Defendants. | Case No. 2:10-cv-0106-LRH-PAL<br><br>**AFFIDAVIT OF TIMOTHY M. OPSITNICK**<br><br>Judge:　　Hon. Larry R. Hicks |

Declaration of Timothy M. Opsitnick

I, Timothy M. Opsitnick, declare as follows:

1. I have been retained on behalf of Rimini Street, Inc. to provide my expert opinions regarding the reasonableness or necessity of legal fees and expenses for the preservation, processing, review, and production of electronically stored information ("ESI" or "eDiscovery") sought by Oracle in its Motion for Costs and Attorneys' Fees in *Oracle USA, Inc., et al. v. Rimini Street, Inc., et al.* (Case No. 2:10-cv-0106-LRH-PAL) in the United States District Court for the District of Nevada. I am being compensated for my work in this matter, which is ongoing.

## I.   Background

2. I am an attorney licensed in the State of Ohio and the Senior Partner, General Counsel, and Founder of JURINNOV Ltd., a leading electronic discovery, computer forensics, and consulting provider for large international law firms and Fortune 500 companies. I have extensive experience in the electronic discovery industry and legal practice, including evaluating acceptable and reasonable fees and costs charged for those services. My experience in the electronic discovery industry and legal practice includes my contributions to: (i) the Sedona Conference (founding participant in The Sedona Conference's Working Group Series on Best Practices for Electronic Document Retention and Production); (ii) the American Bar Association (contributor to the Working Group on Information Security Guidelines for Lawyers of the Information Security Committee of the Section of Science and Technology Law); (iii) Georgetown University Law Center (member of Continuing Legal Education Advisory Board where I assist in the development of programs for the EDiscovery Institute); and (iv) the Cleveland Bar Association's (Chair of the E-Publication/Technology Committee), among many other organizations and publications. I have also served as a Special Master and court-appointed technical expert/neutral, including in litigation relating to the World Trade Center. I have served as an expert witness in matters involving the preservation and discovery of ESI. I previously worked as a litigation attorney at Jones Day for approximately 14 years, where I focused on the management of complex, multi-district litigation, which included the identification, preservation, collection, review, copying, and production of large volumes of documents and information, including ESI. A complete copy of my Curriculum Vitae, including court appointments,

testifying expert appearances, publications, and selected continuing legal education seminars, is available at Exhibit A.

3. I am therefore familiar with the standards accepted by legal practitioners and electronic discovery professionals concerning electronic discovery ("industry standards").

4. In the course of conducting my analysis, I have reviewed numerous documents. Exhibit B contains a complete list of the documents I relied upon in forming my opinion.

## II. Obstacles in Rendering Opinion

5. Due to the way in which Oracle presented its evidentiary support, I encountered several obstacles in preparing this Opinion. For example, the total amount of eDiscovery fees and costs found in the invoices differs from the amount found in Thomas S. Hixon's Supplemental Declaration in Support of Oracle's Motion for Costs and Attorneys' Fees. The review of Stroz Friedberg's expenses by Stuart Maue revealed several computational differences between detail fee and expense entries and those claimed by Stroz Friedberg.

6. Yet another obstacle in rendering this Opinion were the vague, ambiguous, unclear, or missing explanations for certain fees and expenses incurred by Stroz Friedberg. For example, the repeated use of terms such as "Standard Processing," "Electronic Discovery & Other Fees," "Discovery," and "Professional Services" do not allow a determination of whether the fees were reasonably incurred. Nevertheless, in forming this Opinion, I have assumed industry standard definitions.

7. Yet another obstacle in rendering this Opinion was Stroz Friedberg's inconsistent labeling of costs. Oracle inconsistently highlighted certain costs in blue to indicate that they were taxable costs, but did not highlight other costs in blue to indicate that they were non-taxable costs, even though the exact same description was used for those costs. For example, Oracle sometimes categorized "Bates Stamping" as taxable, and sometimes it did not. Oracle also sometimes categorized "CD(S)," "ESI – Stroz Extract," "Load File Delivery," "Native File Delivery," and "Text Endorsement" as taxable, and sometimes it did not. Oracle provided no explanation for this inconsistency. I have reviewed the spreadsheet prepared by Stuart Maue and attached to the

declaration of John Trunko as Exhibit D showing the costs that Oracle categorized as taxable vs. non-taxable.

8. In addition to the aforementioned inconsistencies, for many of these categories, there is no way to determine whether the entry is taxable or non-taxable under 28 U.S.C. § 1920 because of the vague description. However, based on the descriptions provided, I disagree with the categorization for many of the expenses. For example, I would not include standard processing of ESI as a taxable cost because, based on the description provided, it does not appear that the task was "essential to the making of copies necessary to the case."[1] Indeed, even Oracle only labeled this cost as taxable for certain entries, but not others.

### III.   Summary of Opinion

9. It is my opinion that the following fees and costs requested by Oracle are unreasonable and disproportionate:

- **Hosting costs** are excessive by approximately ▓▓▓▓ to ▓▓▓▓.
- **Data processing costs** are excessive by approximately ▓▓▓▓ to ▓▓▓▓.
- **Other expenses** (such as Forensic Computer Time, OCR/Auto Indexing, User Licenses, TIFF Generation, Forensic Hard Drives and Expenses Missing Detail) are excessive by approximately ▓▓▓▓ to ▓▓▓▓.

10. Based on these adjustments, Oracle's request for fees and costs incurred by Stroz Friedberg should be reduced by no less than $3,769,202.84.

11. In addition, it is my opinion that Oracle has improperly categorized certain costs as taxable costs (as well as inconsistently categorizing those costs as taxable v. non-taxable as described in para. 7).

### IV.   Analysis

12. The following chart reflects services for which Stroz Friedberg charged Oracle in this matter. This chart does not include hours billed by individual employees at Stroz Friedberg.[2]

---

[1] *See In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 914, 931-32 (2015).
[2] Declaration of John Trunko Ex. O-3 at 1-2.

| Item # | Category | Amount $ | % of Total |
|---|---|---|---|
| SF-1 | Hosting on Stroz Review | | |
| SF-2 | Standard Processing | | |
| SF-3 | Electronic Discovery & Other Fees [Missing Detail] | | |
| SF-4 | Paper Processing | | |
| SF-5 | Stroz Review User License(s) | | |
| SF-6 | Forensic Computer Machine Time | | |
| SF-7 | TIFF Generation | | |
| SF-8 | OCR/Auto Indexing | | |
| SF-9 | Forensic Hard Drives | | |
| SF-10 | Load File Delivery | | |
| SF-11 | Bates Stamping | | |
| SF-12 | Text Endorsement | | |
| SF-13 | Stroz Extract | | |
| SF-14 | Overnight Delivery/Courier | | |
| SF-15 | Discovery | | |
| SF-16 | CDs/DVDs | | |
| SF-17 | Native File Delivery | | |
| SF-18 | Professional Services | | |
| SF-19 | TIFF Import | | |
| SF-20 | Car Service | | |
| SF-21 | Expenses [Missing Detail] | | |
| SF-22 | PDF Generation | | |
| SF-23 | Ingestion of Pre-Processed Data | | |
| SF-24 | Travel | | |
| SF-25 | Mileage | | |
| SF-26 | Archive Data Tool | | |
| SF-27 | Telephone | | |
| SF-28 | Grid Wall Bins | | |
| SF-29 | Meal for Office | | |

| Item # | Category | Amount $ | % of Total |
|---|---|---|---|
| SF-30 | Automated Privilege Filter | ███ | ███ |
| SF-30 | Discount | ███ | ███ |
| | **Totals** | ███ | ███ |

13. The following analysis primarily considers the top 13 categories (SF-1 to SF-13 below) of expenses charged by Stroz Friedberg for its services.

14. The analysis below excludes ███ in fees and expenses that Stroz Friedberg incurred after July 27, 2015, because I understand that Rimini contends those fees and expenses are not recoverable as a matter of law.

15. **Data Hosting Expenses** (SF-1, ███): As previously stated, Oracle did not provide a description for what services Stroz Friedberg provided when it charged Oracle for "Data Hosting Services." Nevertheless, typically data hosting expenses include those expenses incurred by a vendor that hosts a litigation support software application and ESI on their own network or in the cloud, and delivers it to customers typically via the Internet. Customers, like Oracle, then use the application for various ESI tasks, such as analysis, review, and production.

16. Stroz Friedberg's reports indicate a total of ███5 for data hosting expenses between April 30, 2010, to July 31, 2015.[3] The amount of data hosted by Stroz Friedberg during this time period ranged from ███ Gigabytes (April 30, 2010, monthly billing) to ███ Gigabytes (July 31, 2015, monthly billing).

17. An analysis of Stroz Friedberg expenses during this period revealed the following:

   a. <u>Inconsistency in charges</u>: From April 30, 2010 to September 30, 2010, Stroz Friedberg charge ███ per Gigabyte. From October 31, 2010 to May 31, 2014, Stroz Friedberg capped its charges at ███ per month. In April 30, 2012, Stroz Friedberg applied a "███" of ███. In June 30, 2014, Stroz Friedberg reduced the charges to ███ per month even though the data hosted increased. From July 31, 2014 to May 31, 2015, Stroz Friedberg did not charge Oracle, even though data hosted remained at ███

---

[3] Declaration of John Trunko Ex. O-1 at 9-13.

1   Gigabytes.  From July 31, 2015 to September 30, 2015, Stroz Friedberg charged Oracle
2   ▇▇▇ per month, even though the data hosted remained at ▇▇▇ Gigabytes.
3           b.      <u>Inadequate explanations of charges</u>:  Based on a review of the documents
4   provided by Oracle, I was unable to determine a precise basis for either capping the expenses
5   at ▇▇▇ per month, for the provision of the discount, reducing the cap to ▇▇▇ per
6   month, for further reducing the monthly cap to ▇▇▇, or for the months for which there were
7   no charges.  There is also an inadequate explanation of why the reduced prices were not
8   charged earlier, or why the earlier, higher rates are reasonable as compared to the later, lower
9   rates.
10          c.      <u>Excessive rates</u>: Even the lowest price charged by Stroz Friedberg (▇ per
11  Gigabyte), between April 2010 and September 2010, greatly exceeds the reasonable rate
12  charged in the industry.  Between April 2010 and September 2010, Stroz Friedberg charged
13  ▇ per Gigabyte per month for hosting a cumulative of ▇▇▇ Gigabytes for a cumulative
14  charge of ▇▇▇.  Particularly for a client with a large project (like Oracle here), I
15  would have expected to see rates at half, or less than half, of what Stroz charged.  Specifically,
16  I would have expected to see industry-hosting rates at approximately ▇ per Gigabyte when
17  the data hosted is in excess of one Terabyte.  For example, during the same time period,
18  JURINNOV charged approximately ▇ to ▇ per Gigabyte.  JURINNOV's retail rates would
19  have been substantially discounted for such a high volume as ▇▇▇ Gigabytes.  By way of
20  further example, Autonomy, Inc. (Rimini's eDiscovery service provider) charged ▇ per
21  Gigabyte of data hosted although the data volumes were considerably smaller or approximately
22  ▇ Gigabytes during this period.  An application of industry rates around ▇ to ▇ would
23  have resulted in data hosting expenses ranging between ▇▇▇ (▇▇▇ Gigabytes at
24  ▇ per Gigabyte) and ▇▇▇ (▇▇▇ Gigabytes at ▇ per Gigabyte).  Accordingly,
25  in my opinion, data-hosting expenses, applied at 2010-2011 reasonable industry rates, would
26  result in a reduction of approximately ▇▇▇ to ▇▇▇ (compared to
27  ▇▇▇, i.e., ▇▇▇ Gigabytes at ▇ per Gigabyte).
28

6
Declaration of Timothy M. Opsitnick

1         d.      The last data processing charge was as of June 30, 2012.  After this date, there was a cumulative of ▮▮▮▮▮ for data-hosting expenses between July 31, 2012 and July 31, 2015.  To that end, it was unnecessary for Stroz to keep the entire corpus of the data hosted during this period of time, and there were industry-accepted methods for reducing the hosted data and expense.

       e.      For example, the vendor could have rendered the database inactive or dormant to facilitate fewer expenses if, and when, the case allowed, such as when a dispositive motion is pending and little or no discovery is taking place.  Further, a tiered pricing approach based on case activity and data size could have resulted in significant savings in this case.  And, once the document review was completed, only the documents that were produced would need to be kept active and the remainder archived, at a substantially lesser charge, if they ever needed to be reviewed again.  Relatedly, another strategy to reduce hosting costs is "nearlining," which "enables reviewers to set aside unnecessary data for potential use at a later time.  As a review progresses and reviewers deem certain documents or categories of documents non-responsive, those non-responsive documents may be nearlined, which reduces a client's data footprint without deleting portions of the collection.  This allows reviewers to easily access and focus on the most relevant content, but also lowers costs for clients by reducing their footprint on vendor servers, thus reducing hosting costs."[4]  Nearlining is not only important for saving hosting costs, but also in improving data access performance because "review databases are often cluttered with non-critical data, resulting in sluggish searches and larger-than-necessary database volumes.  Using nearline storage in a review tool for unessential data, databases remain nimble and inexpensive — nearline storage is at least 50% less expensive than active storage."[5]  Nearlining practices have been utilized in the legal industry for a decade or more.  Based on the failure to use cost reduction strategies like archiving or nearlining, it is my

---

[4] *See* Kyle Evans Gay, *Controlling Data Storage Costs with Nearlining*, MORRIS JAMES LLP (Jan. 26, 2015) http://www.morrisjames.com/blogs-Delaware-eDiscovery-Report,archives-2015-1 (discusses methods for reducing hosting charges).
[5] *See* Kroll Ontrack, *Nearline is Necessary: Save on Data Hosting Costs by Reducing Data Sets by 85%*, EDISCOVERY.COM (2015) https://www.ediscovery.com/cms/pdf/CST_NearLine_krollontrack2015.pdf.

7
Declaration of Timothy M. Opsitnick

1  opinion that at least 25%-75% of the ▮▮▮▮ data hosting costs incurred between July 31,
2  2012 and July 31, 2015 were unnecessary, unreasonable, and excessive, particularly where
3  such a relatively small amount of the data was actually produced.  In my opinion, such
4  practices would have resulted in a reduction of approximately ▮▮▮ to ▮▮▮ in
5  hosting costs based on the overbreadth of the collection and the small production.

6  18.  **Standard Processing** (SF-2, ▮▮▮▮): As stated above, Oracle provided no
7  explanation for what activities Stroz Friedberg conducted when it billed Oracle for "▮▮▮
8  ▮▮▮" and there is thus no way to determine whether the fees charged are reasonable.
9  Nevertheless, giving Oracle the benefit of the doubt, I have analyzed this as a data processing charge,
10  which is generally defined as "the automated ingestion of Electronically Stored Information into a
11  program for the purpose of extracting metadata and text; and in some cases, the creation of a static
12  image of the source Electronically Stored Information files according to a predetermined set of
13  specifications, in anticipation of loading to a database.  Specifications can include the de-duplication
14  of ESI, or filtering based on metadata contents such as date or email domain and specific metadata
15  fields to be included in the final product."  In other words, I am assuming that standard processing
16  here (although there is no description provided) is conversion of electronic data into a form that is
17  amenable for review.[6]

18  19.  From April 30, 2010 to June 30, 2012, Stroz Friedberg generally charged Oracle
19  ▮▮▮ per Gigabyte of data processed, for a total of ▮▮▮▮ for these "Standard Processing"
20  expenses.[7]  Between April 30, 2010 and June 30, 2012, Stroz Friedberg charged for processing a net
21  of ▮▮▮ Gigabytes.

22  20.  A charge of ▮▮▮ per Gigabyte is double—even triple at this amount of data—the
23  accepted industry rate, even applying 2010-2011 industry rates.  As an industry comparison from the
24  same time period, JURINNOV's retail charges ranged around ▮▮▮▮ per Gigabyte of data
25  processed.  However, given the large volumes involved in this case, JURINNOV would have offered

---

[6] The Sedona Conference, The Sedona Conference Glossary, EDiscovery and Digital Information Management (Fourth Edition 2014), at 39.
[7] Declaration of John Trunko Ex. O-1 at 34-37.

8
Declaration of Timothy M. Opsitnick

discounts to lower the price to ▮ per Gigabyte or less.  As a further example, Autonomy charged ▮ per Gigabyte of data for Rimini even though data volume processed was much smaller.

21.   Based on industry rates, especially for the large volume involved in this litigation, data processing rates should have been approximately ▮ per Gigabyte.  Thus, the total amount charged for ▮ Gigabytes during this time period (April 30, 2012 to June 30, 2012) should be in the range of ▮ (at ▮ per Gigabyte) to ▮ (at ▮ per Gigabyte). Accordingly, in my opinion, data processing expenses, applied at industry rates, should have resulted in savings of around ▮ to ▮ from the actual charge of ▮.

22.   **Redundant or Unnecessary Expenses** (Forensic Computer Time, item SF-6 above, ▮):  As stated, Oracle has provided no explanation for what the tasks on Stroz Friedberg's invoices include.  Nevertheless, it appears that several tasks are duplicative of other tasks.  Giving Oracle the benefit of the doubt, Forensic Computer Machine Time (SF-6 above, ▮) is likely an expense charged for computers indexing raw data to enable data filtering to sort or search the data in order to identify potentially relevant documents.[8]

23.   JURINNOV does not charge extra for Forensic Computer Machine Time, and it is my opinion that industry practice is to not charge for such time.

24.   Accordingly, based on general industry practices, it is my opinion that expenses for "Forensic Computer Time," totaling ▮, are unreasonable and inappropriate.

25.   **OCR/Auto Indexing** (SF-8 above, ▮): As stated, Oracle has provided no explanation for what the tasks on Stroz Friedberg's invoices include, including OCR/Auto Indexing. Giving Oracle the benefit of the doubt, OCR or auto indexing is typically defined as the ability to provide full text searching by indexing fixed image format documents, tiff or .pdf files.  Paper files that have been scanned and imaged, or ESI that has no text files, are typically indexed to allow searching.

---

[8] *Id.* at 7-9.

1   26.     Between July 31, 2010 and May 31, 2012, Stroz Friedberg generally charged ███
2   per page for ███ pages of OCR/Auto Indexing. For certain billings in March 31, 2011, April
3   30, 2011, and May 31, 2011, Stroz Friedberg charged at ███ per page.[9]

4   27.     Based on industry practices, including JURINNOV's, especially given the large
5   number of licenses used in this litigation, it is my opinion that it would have been reasonable for
6   Oracle to negotiate a competitive rate of around ███ or ███ per page of OCR/Auto Indexing.  For
7   example, Autonomy charged Rimini ███ per page of OCR/Auto Indexing.

8   28.     Accordingly, it is my opinion that OCR/Auto Indexing expenses were unreasonable
9   and disproportionate by around ███, and should be reduced to approximately ███ at
10  ███ per page.

11  29.     **Stroz User Licenses** (SF-5 above, ███): "User License" expenses are
12  typically incurred for user access fees or licenses. These include account logins and credentials for
13  authorized reviewers (users) to access, generally over the internet or via some other network, the
14  eDiscovery Application Service Provider's eDiscovery application for reviewing processed data.

15  30.     Between May 31, 2010 and July 31, 2015 (approximately 57 monthly billings), Stroz
16  Friedberg charged Oracle for ███ licenses at ███ per user license per month, for a total of ███
17  total expenses for user licenses.[10]

18  31.     In a litigation of this scale and magnitude, adequate planning should have been
19  performed to minimize costs, including user access licenses. Such planning would have resulted in
20  variations in the numbers of licenses utilized during ups and downs in litigation activity. That did not
21  occur.

22  32.     Based on industry practices, including JURINNOV's, especially given the large
23  number of licenses used in this litigation, it is my opinion that it would have been possible to
24  negotiate a competitive rate of around ███ per user license.[11]  As a further example, Autonomy
25  charged Rimini ███ per user license.

---

[9] *Id.* at 15-16.
[10] *Id.* at 36-40.
[11] Kristopher Wasserman, *How Much is this Going to Cost?*, LINKEDIN (Dec. 15, 2014) https://www.linkedin.com/pulse/how-much-going-cost-kristopher-wasserman.

33. It is my opinion that the user license expenses should have been around ▮ at ▮ per user license. Accordingly, it is my opinion that the user license expenses were unreasonable and disproportionate by approximately ▮.

34. **TIFF Generation** (SF-7 above, ▮): TIFF is generally defined as "Tagged Image File Format: A widely used and supported graphic file format for storing bit-mapped images, with many different compression formats and resolutions."[12] ESI is often converted to TIFF format for review and production.

35. Stroz Friedberg charged ▮ for each of the ▮ TIFF pages, for a total of ▮.[13]

36. Industry rates during 2010-2011, particularly for bulk quantities, were around ▮ per TIFF page.[14] During the same time period, JURINNOV would have discounted retail prices even from ▮ to ▮ per TIFF page, especially for such large volumes as in this case. In addition, Autonomy charged Rimini a rate of ▮ per TIFF page during this time period.

37. It is my opinion that the TIFF-generation expenses should have been around ▮ at the ▮ per TIFF page rate. Accordingly, it is my opinion that TIFF generation expenses were unreasonable and disproportionate by approximately ▮.

38. **Forensic Hard Drives** (SF-9, ▮): A hard drive is a storage device consisting of one or more magnetic media platters on which digital data can be written and erased.[15] It appears Stroz Friedberg charged Oracle ▮ for ▮ hard drives in this case between April 30, 2010, and August 31, 2015. Generally, a forensic hard drive is wiped and later used to store ESI as part of the preservation and collection process.

39. Stroz Friedberg charged Oracle for ▮ forensic hard drives between April 30, 2010, and July 31, 2015, at an average of ▮ per drive. The breakup of the hard drives is as follows: less

---

[12] The Sedona Conference, The Sedona Conference Glossary, EDiscovery and Digital Information Management (Fourth Edition 2014), at 49.
[13] Declaration of John Trunko Ex. O-1 at 40-41.
[14] *See* Seth Eichenholtz, *Pricing Processing in E-Discovery: Keep the Invoice from Being a Surprise*, AM. BAR ASS'N, (Winter/Spring 2011) www.americanbar.org/content/dam/aba/uncategorized/litigation-pretrial-winterspring11-pricing-processing.authcheckdam.pdf.
[15] The Sedona Conference, The Sedona Conference Glossary, EDiscovery and Digital Information Management (Fourth Edition 2014), at 24.

than 400 Gigabytes (▮), more than 400 Gigabytes (▮), 1 Terabyte (▮), 2 Terabytes (▮) and 4 Terabytes (▮).[16]

40. Industry rates, including JURINNOV's, especially for large volumes such as this case, ranged around ▮ per each 1 Terabyte forensic hard drive. This range converts to ▮ (at ▮ per drive, for ▮ drives) and ▮ (at ▮ per drive for ▮ drives).

41. It is my opinion that Forensic hard drive expenses were not reasonable or proportionate by approximately ▮ to ▮.

42. **Expenses Missing Detail**: Stuart Maue identified ▮ (which is a total of item SF-3 above (▮) and SF-21 above (▮)) as "missing detail." These included items with ambiguous or incomplete descriptions, such as "Electronic Discovery & Other Fees" or "Expenses." There is insufficient detail in these line items for me to conclude whether the expenses are reasonable and appropriate. Thus, it is my opinion that a total of ▮ should be deducted as inappropriate.

43. **Timekeeper Fees**: Stuart Maue identified that Stroz Friedberg timekeeper hourly rates were between ▮ and ▮ per hour with the vast majority of charges billed at the ▮ to ▮ hourly rates.[17] Based on industry practices, including JURINNOV's, especially given the large number of hours billed in this litigation, it is my opinion that it would have been reasonable for Oracle to negotiate more competitive hourly timekeeper rates.

V. **Summary of Unreasonable ESI Expenses**

44. It is my opinion that the fees and expenses sought by Stroz Friedberg are unreasonable, unnecessary, and inappropriate by an amount of approximately $3,769,202.84 to $5,830,354.18, as follows:

| Category | Amount Requested ($) | Excess Charges (Low End) ($) | Excess Charges (High End) ($) |
|---|---|---|---|
| Data Hosting Expenses (April 30, 2010 to September 30, 2010) See ¶ 17(c). | ▮ | ▮ | ▮ |

---

[16] Declaration of John Trunko Ex. O-1 at 7-9.
[17] *Id.* Ex. O-2 at 1-3.

| Category | Amount Requested ($) | Excess Charges (Low End) ($) | Excess Charges (High End) ($) |
|---|---|---|---|
| Data Hosting (July 31, 2012 to July 31, 2015) *See* ¶ 17(e). | | ▇ | ▇ |
| Standard Processing *See* ¶ 21. | ▇ | ▇ | ▇ |
| Forensic Computer Time *See* ¶ 24. | ▇ | ▇ | ▇ |
| OCR/Auto Indexing *See* ¶ 28. | ▇ | ▇ | ▇ |
| Stroz User Licenses *See* ¶ 33. | ▇ | ▇ | ▇ |
| TIFF Generation *See* ¶ 37. | ▇ | ▇ | ▇ |
| Forensic Hard Drives *See* ¶ 41. | ▇ | ▇ | ▇ |
| Expenses Missing Detail *See* ¶ 42. | ▇ | ▇ | ▇ |
| Other expenses | ▇ | | |
| **Total Requested** | ▇ | | |
| **Total Excess** | | 3,769,202.84 | 5,830,354.18 |

I declare under penalty of perjury that the foregoing is true and correct. Executed at Cleveland, Ohio on March __7__, 2016.

Timothy M. Opsitnick

# Exhibit A



# Timothy M. Opsitnick

**Founder and General Counsel**
**JURINNOV LTD.**
**The Idea Center; Suite 400**
**1375 Euclid Avenue**
**Cleveland, Ohio 44115**
**Phone: 216.664.1100**
**Facsimile: 216.664.0800**
www.jurinnov.com
tim.opsitnick@jurinnov.com

## OVERVIEW

Timothy M. Opsitnick is the Founder and General Counsel of JurInnov Ltd. ("JurInnov"). Mr. Opsitnick founded JurInnov in 2000.  Mr. Opsitnick is at the forefront of practitioners addressing issues involved in the security and discovery of electronically stored information. His consulting practice focuses on electronic discovery, information governance, cybersecurity, computer forensics, and cloud-based document management systems.  His clients include United States and international law firms and companies.  He has also conducted numerous continuing legal education seminars regarding electronic discovery, cybersecurity, and other technology issues.  In addition, he has served as a court-appointed Special Master and as an expert witness.

Mr. Opsitnick was with the law firm of Jones Day from 1986 until 2000, where he was a member of the Litigation and Product Liability sections.  His practice concentrated in the management of complex, multi-district litigation.

## EDUCATION

Ohio Wesleyan University, Delaware, Ohio – 1978-82
    Bachelor of Arts, Political Science and Psychology
    Phi Beta Kappa

Case Western Reserve University, School of Law, Cleveland, Ohio – 1982-85
    Juris Doctor

## LICENSES

Licensed Attorney, State of Ohio

Licensed Private Investigator, State of Ohio

Licensed Private Investigator, State of Michigan


## PROFESSIONAL ASSOCIATIONS

Cleveland Metropolitan Bar Association – Litigation Section

Ohio Bar Association – Litigation Section

American Bar Association – Section of Science and Technology Law (Information Security Committee, Privacy and Computer Law Committee), Law Practice Management Section, Section of Intellectual Property Law, Section of Litigation (Pretrial Practice and Discovery Committee, Technology for the Litigator Committee)

Association of Records Managers and Administrators International (ARMA)

InfraGard

International Association of Privacy Professionals (IAPP)

The Lawyers Guild of the Catholic Diocese of Cleveland


## BOARDS

Westlake/Bay Village Rotary (2005-2009), past President (2007-2008)

Red Tail Master Home Owners Association (2003-2008, 2015 to present), past President (2003-2007)

Red Tail Master Home Owners Association, Architectural Review Board (2003 to present)

Entrepreneurs' Organization (2008-2009), Cleveland Chapter, Membership Chairman

Cleveland Association of Phi Beta Kappa (2011 to present)

Council Of Smaller Enterprises (COSE), Advocacy Committee (2014 to present)

# Exhibit B

# **Matters Reviewed**

- Oracle's Motion for Costs and Attorneys' Fees, filed November 13, 2015;

- Declaration of Thomas S. Hixson in Support of Oracle's Motion for Costs and Attorneys' Fees, filed November 13, 2015;

- Declaration of Kieran P. Ringgenberg in Support of Oracle's Motion for Costs and Attorneys' Fees, filed November 13, 2015;

- Declaration of James C. Maroulis in Support of Oracle's Motion for Attorneys' Fees and Expenses, filed November 13, 2015, and exhibits attached thereto;

- Notice of Errata re Motion for Costs and Attorneys' Fees, filed November 30, 2015;

- Supplemental Declaration of Thomas S. Hixson in Support of Oracle's Motion for Costs and Attorneys' Fees, filed November 30, 2015, and exhibits attached thereto;

- Supplemental Declaration of Kieran P. Ringgenberg in Support of Oracle's Motion for Costs and Attorneys' Fees, filed November 30, 2015, and exhibits attached thereto;

- Affidavit of John L. Trunko and exhibits attached thereto submitted in support of the Rimini Defendants' Response to the Oracle Parties' Motion for Costs and Attorneys' Fees, including, but not limited to:
    - Exhibit D – Stroz Taxable and Non-taxable Costs;
    - Exhibit O-1 – Expense Entries by Category;
    - Exhibit O-2 – Hours and Fees by Timekeeper;
    - Exhibit O-3 – Summary of Expenses by Category;

- Invoices/documents reflecting rates charged to Rimini Street, Inc. by Autonomy, Inc.

- Seth Eichenholtz, *Pricing Processing in E-Discovery: Keep the Invoice from Being a Surprise*, Am. Bar Ass'n, (Winter/Spring 2011) www.americanbar.org/content/dam/aba/uncategorized/litigation-pretrial-winterspring11-pricing-processing.authcheckdam.pdf;

- Kyle Evans Gay, *Controlling Data Storage Costs with Nearlining*, Morris James LLP (Jan. 26, 2015) http://www.morrisjames.com/blogs-Delaware-eDiscovery-Report,archives-2015-1;

- Kroll Ontrack, *Nearline is Necessary: Save on Data Hosting Costs by Reducing Data Sets by 85%*, Ediscovery.com (2015) https://www.ediscovery.com/cms/pdf/CST_NearLine_krollontrack2015.pdf;

- The Sedona Conference, The Sedona Conference Glossary, EDiscovery and Digital Information Management (Fourth Edition 2014);

- Kristopher Wasserman, *How Much is this Going to Cost?*, LinkedIn (Dec. 15, 2014) https://www.linkedin.com/pulse/how-much-going-cost-kristopher-wasserman.