# Exhibit H


# Snell & Wilmer
### L.L.P.
### LAW OFFICES

One Arizona Center
Phoenix, AZ 85004-2202
602.382.6000
602.382.6070 (Fax)
www.swlaw.com

DENVER
LAS VEGAS
ORANGE COUNTY
PHOENIX
SALT LAKE CITY
TUCSON

Dan W. Goldfine
602.382.6282
dgoldfine@swlaw.com

December 3, 2008

**VIA EMAIL**

Jeffrey S. Ross
Legal Department
Oracle USA, Inc.
10 Van de Graaf Drive
Burlington, MA 01803

Re: **Continued Business Interference and Anti-Competitive Practices**

Dear Mr. Ross:

As you will recall, Snell & Wilmer L.L.P. represents Rimini Street, Inc. ("Rimini") as lead counsel for matters involving Oracle Corporation and its acquired entities.

In our June 28, 2007 letter, Rimini brought to Oracle's attention, amongst other issues, serious customer access and downloading impediments relating to Oracle's web portals required for use by Oracle's annual maintenance-paying PeopleSoft, JD Edwards, and Siebel licensees.

It does not appear that Oracle has taken any corrective actions to resolve the issues. In fact, Oracle has expanded the issues with its recent introduction of Oracle's new web portal http://www.metalink3.oracle.com ("MetaLink3/MyOracle Support") which denies Oracle's annual maintenance-paying clients the ability to reasonably identify, catalog, and take delivery of all available program updates, software updates, bug fixes, patches, custom solutions, and instructional documents ("Support Materials") for covered products.

Even accepting that Oracle may have an interest in protecting its intellectual property, the antitrust laws only permit a company to impose the least restrictive means to protect that property. The new MetaLink3/MyOracle Support web portal far exceeds the least restrictive means to achieving that interest. Even if the web portal was the least restrictive means, the antitrust laws would still bar Oracle's new web portal because Oracle's imposition of it after its customers and their agents have billions of dollars of sunk costs, if not more, into having access to the Support Materials.

Snell & Wilmer is a member of LEX MUNDI, The Leading Association of Independent Law Firms.

Confidential Information

RSI03206203



Oracle USA, Inc. v. Rimini Street, Inc.
10cv106-LRH-PAL
**DTX 0398**

# Snell & Wilmer
L.L.P.

Jeffrey S. Ross
December 3, 2008
Page 2

      The antitrust laws further prohibit a company's pretextual use of intellectual property protection to bar competition. Accepting for argument sake that Oracle can otherwise engage in exclusionary conduct to protect legitimate intellectual property rights, the new web portal is facially and massively overbroad. In this light, Oracle's object of protecting intellectual property rights is not genuine and obviously pretextual. Moreover, as explained below, this object can be more simply *and more effectively* achieved without having the effect of excluding Oracle's customers from engaging in "self-support" and "self-performance" with respect to minor and major upgrades to other currently available software releases. Further, this change – after Oracle's customers have expended substantial sunk costs – is evidence of exclusionary effect and Oracle's anticompetitive intent. This evidence strongly supports antitrust claims based on either a tying or monopolization of an after-market theory.

      Oracle maintenance-paying customers have collectively paid Oracle billions of dollars in annual support fees to obtain and be able to use all available "Support Materials," and Oracle has recently taken additional actions to make it potentially impossible for customers to ever obtain or be able to obtain by reasonable means all the Support Materials they have already paid for. Such actions might entitle customers to potentially substantial refunds, damages, and settlements for fraud, false and misleading advertising, or breach of contract claims. Further, Oracle may also be liable to thousands of PeopleSoft licensees for substantial claims related to the PeopleSoft Customer Assurance Program that are triggered by material reductions in support services.

      We can only surmise that Oracle preventing annual maintenance-paying customers from being able to reasonably identify, catalog, and take delivery of all available Support Materials for which a customer has already paid substantial sums of money would, from Oracle's position, have a potentially negative impact on its total annual maintenance renewal rates, maintenance revenues, and consulting revenues. Oracle may view a customer's possession of all Support Materials as making it easier for customers to "self-support" their licenses and "self-perform" minor and major upgrades to other currently available software releases.

      In addition to the foreclosure effect described above, Oracle's actions appear intended to intimidate Oracle customers from terminating Oracle annual maintenance services that are contractually optional and not required to be purchased by Oracle licensees as a condition of their software license; self-supporting licensed Oracle products; or pursuing the purchase of maintenance services from Rimini Street and/or other third party consultants. Thus, in addition to the antitrust claim arising from the foreclosure effect in the tied maintenance services market as well as a monopolization claim, Rimini Street and/or other third party consultants may have a common law tortious interference with contract and/or business expectancy claim.

      Once again, and because of the overwhelming breadth and exclusionary effect of the new web portal, we are bringing this matter to your attention to afford Oracle another opportunity to promptly investigate and resolve the legal issues presented, mitigate potential accrued liabilities,

Confidential Information

RSI03206204

Snell & Wilmer
L.L.P.

Jeffrey S. Ross
December 3, 2008
Page 3

and avoid future potential liabilities. Oracle has both the technological means and resources to assure annual maintenance-paying Oracle licensees can fully exploit their contractual rights while ensuring reasonable, adequate protection of Oracle's intellectual property.

**Impediments to Oracle Annual Support Customers Seeking to Obtain From Oracle Materials for which They Paid**

In consideration of Oracle Annual Support fees paid for listed licensed products, licensees have been and remain entitled to access to and rights to download and use all Support Materials for such licensed products from the start through the end of a pre-paid "Support Period." Oracle terms usually require pre-payment of annual support fees at time of annual contract renewal.

*Issue #1: Annual Support Paying Clients Cannot Properly Identify Each and Every One of the Support Materials They Are Entitled to Obtain and Use*

Although Oracle has full knowledge of the actual licensed products for each licensee and each annual maintenance renewal clearly indicates what licensed products are covered by the support fees, Oracle continues to choose not to utilize this information to help licensees identify all the Support Materials the maintenance-paying licensee is entitled to obtain and use under their Oracle licenses and the annual maintenance agreement.

Instead, Oracle continues to leave its entire intellectual property set available to each and every maintenance-paying licensee with a login and password, regardless of what Support Materials the maintenance-paying licensee is actually entitled to obtain and use. Oracle then claims that full license and intellectual property compliance is solely the responsibility of the maintenance-paying licensee. This is not reasonable or workable since (a) there have been many product name changes and recombination of features and products over the years that make it nearly impossible for a reasonable customer to be 100 percent sure of license compliance and match up to their license agreements; and (b) users of Oracle Support Services are the users of the software products and rarely have access to or have ever seen the legal license agreement which is usually filed away in the customer's legal department and therefore are not 100 percent sure of license compliance with their original license agreement.

Oracle has the technological means to resolve this license ambiguity issue to the benefit of all parties. As an example of one possible solution, Oracle can (a) tag each item on its web portal with metadata that clearly indicates what licensed product or product line is associated with each item, and (b) only display for viewing, selection, and download to the licensee and its representatives those Support Materials where the metadata tag matches the maintenance-paying client's licensed product list and where support fees have been paid for such licensed product.

Confidential Information                                                                                                                    RSI03206205

# Snell & Wilmer
L.L.P.

Jeffrey S. Ross
December 3, 2008
Page 4

As Oracle is the world leader in manufacturing the very software products needed to implement this solution, taking steps (a) and (b) above would be reasonable steps by Oracle that would assure that its intellectual property is being protected by making sure that Oracle intellectual property is only being obtained by those maintenance-paying customers with a right to obtain particular and specific intellectual property that is licensed to them. Clients would immediately benefit by being able to search on Support Materials where the metadata indicates a link to a particular and specific licensed product where maintenance-fees have been paid.

### *Issue #2: Annual Support Paying Clients Cannot Obtain a Catalog of All Support Materials They Are Entitled to Obtain and Use*

It remains impossible for a maintenance-paying client to self-identify and produce a full and complete catalog of the Support Materials a maintenance-paying licensee is entitled to obtain and use following payment of support fees, the sufficiency of which is agreed upon with Oracle's acceptance of fees. Oracle claims that it does not have the current technical capability of identifying and producing such a catalog based on each customer's own list of licensed products that are covered under a support agreement. Oracle also claims provision of the catalog is not a service they provide maintenance-paying customers on demand or at any time during their paid Support Period. Therefore, due solely as a result of intentional acts and decisions by Oracle, at this time, neither Oracle nor a maintenance-paying customer have (and never have had) the ability to determine with 100 percent accuracy the catalog of Support Materials that a maintenance-paying customer is entitled to obtain and use of a particular date and time.

Oracle's decision not to provide this catalog of Support Materials impacts (in a negative manner) the framework on which the above-mentioned legal claims are evaluated. Clearly, if Oracle elects to implement a metadata solution on all Support Material items, it could easily develop a search capability that could provide Oracle and licensees a 100 percent accurate catalog of the Support Materials a particular maintenance-paying customer is entitled to obtain and use. That is telling about the pretext that Oracle is undertaking here.

### *Issue #3: Annual Support Paying Clients Cannot Reasonably Obtain All Support Materials They Are Entitled to Obtain and Use*

With Issues #1 and #2 above we have established that, due solely to Oracle's intentional acts and decisions, it is impossible today (and previously) for an Oracle maintenance-paying customer to determine with 100 percent certainty all Support Materials it is entitled to obtain and use from Oracle and for which they paid. Without the ability to determine 100 percent what Support Materials a maintenance-paying client is entitled to obtain and use and no active guidance from Oracle, Oracle leaves its maintenance-paying customers on their own to use their best reasonable efforts to identify and catalog the Support Materials each customer believes they may be entitled to obtain and use.

Confidential Information

RSI03206206

Snell & Wilmer
L.L.P.

Jeffrey S. Ross
December 3, 2008
Page 5

A maintenance-paying customer with several products may be entitled to obtain and use tens of thousands or more Support Material items available on Oracle's web portal. Manually identifying which tens of thousands of items in a total of web portal pool of potentially millions of items would require professional labor time of potentially hundreds and thousands of hours. Such labor expenditures and timelines are so extensive and unreasonably burdensome as to assure any reasonable person would conclude that Oracle has, solely through its own intentional acts and decisions, made it virtually impossible to complete such a task manually.

Therefore, if a maintenance-paying customer wishes to attempt to use best efforts to identify, catalog, and obtain all Support Materials they are entitled to obtain and use, the only potential solutions are:

1. Develop and use automated tools to search the Oracle web portal and make educated, reasonable guesses as to which Support Materials most likely match with the Oracle maintenance-paying customer's licensed product set and then automatically download such items.

2. Oracle staff can search the Oracle web portal and make educated, reasonable guesses as to which Support Materials most likely match with the Oracle maintenance-paying customer's licensed product set and then deliver the entire set of Support Material electronically or on media.

However, not only does Oracle refuse or otherwise fail to deliver, upon request, all Support Materials for which its Oracle Support Services customers have contracted and paid to access, possess, and use within their license rights, but Oracle has recently attempted to ban the use of any automation tools to assist with the massive, burdensome projects. While Oracle has publicly cited "performance concerns" for their web portal as a result of the use of such tools as the reason for banning their usage, Oracle's letter of October 11, 2007 to Rimini Street clearly stated a different, more troubling explanation for the new policy that indicated the change was anticompetitive behavior.

Historically, maintenance-paying licensees and their contracted agents have had no choice but to resort to automation tools as the only feasible way to try and identify, catalog, and download such a large volume of Support Materials. Maintenance-paying clients who did not invest significant sums of money and technical time to develop such automation tools more than likely are entitled to obtain and use an incalculable number of Support Materials they paid for but have been unable to reasonably identify, obtain, and enjoy the benefits of their purchase.

Beginning in late November 2008, with the move of PeopleSoft, JD Edwards, and Siebel support to the MetaLink3/MyOracle Support web portal, Oracle has escalated its anticompetitive

Confidential Information

RSI03206207

# Snell & Wilmer
L.L.P.

Jeffrey S. Ross
December 3, 2008
Page 6

activities and has made it impossible for Oracle maintenance-paying customers to download any substantial amount of items from its new MetaLink3/MyOracle Support web site in a single login session. According to our experience and subsequently confirmed and documented by Oracle personnel, any attempt to access and download a substantial amount of Support Material items, without any regard to the verification of any actual rights of the customer to the Support Materials, will cause Oracle's network to immediately shutdown the valid login session and automatically block the initiator's valid IP address so that no additional or subsequent login requests are accepted from such IP address.

With Oracle's recent implementation of the ban on the use of automation tools designed to help with the massive, unreasonably costly, and time consuming project of identifying, cataloging, and downloading authorized Support Materials or even allowing long, manual sessions of downloading Support Materials, Oracle no longer provides any reasonable mechanism by which a licensee paying support fees to Oracle can physically obtain what it reasonably believes are all the Support Materials they have paid for and are entitled to obtain, possess, and use.

If Oracle implements and utilizes its own software products, it would be capable of matching the metadata of authorized Support Material items to the maintenance-paying customer's licensed product and supported product lists – assuring control and protection of its intellectual property.

If Oracle has chosen to use data volume measures and session timers to allegedly protect intellectual property, this is invalid. Such measures are completely useless in determining the extent of the intellectual property rights of the downloading party.

If Oracle has chosen to use data volume measures and session timers to allegedly protect its web user population from significant performance degradation, this is invalid. Oracle sells billions of dollars a year in annual maintenance with a ninety percent gross profit margin and claims to manufacture the heaviest-duty database products in the world capable of record performance under heavy loads. If Oracle's web portal performance is unreasonably slow under the heavy load of its customers trying to obtain all of their rightful Support Materials, then Oracle has the capabilities, resources and obligation to increase performance to levels that are acceptable and reasonable under all loads and user conditions.

Unfortunately, based on the information available and Oracle's past comments, it appears that Oracle is simply using such measures to effectively block maintenance-paying customers from identifying, cataloging, and obtaining all the Support Materials they have paid for and are entitled to use under their Oracle agreements.

Confidential Information                                                                                                                                    RSI03206208

Snell & Wilmer
L.L.P.

Jeffrey S. Ross
December 3, 2008
Page 7

Until and unless Oracle agrees to indentify, catalog, and package-up on demand of the customer all Support Materials that it reasonably believes a maintenance-paying customer is entitled to obtain and use, Oracle should immediately (a) suspend its "no automation tools" rules, (b) remove session timeout and data volume cutoff thresholds, and (c) provide reasonable extended access for maintenance-paying customers to get all the Support Materials they should have been able to identify, catalog, and obtain while their Oracle maintenance contract was valid and in force.

*Issue #4: "Only in Furtherance..." Website Use Term Designed as a Competitive Barrier*

The revised Terms of Use on Oracle's website state that a licensee's "username and password are confidential information and may only be distributed to persons within [licensee's] organization who have a legitimate business purpose for accessing the materials contained on this server in furtherance of [licensee's] relationship with Oracle/PeopleSoft/JDEdwards." To the extent Oracle interprets this language and seeks to enforce this provision in a way that prevents Oracle licensees from enabling their third party agents to access Support Materials on the Oracle customer support websites—on the licensees' behalf and for the purpose of obtaining authorized content—such enforcement activities are clearly anticompetitive and tortious interference with contractual relationships as well as a myriad of claims belonging to the licensee. Moreover, any attempt by Oracle to redefine the terms and scope of a licensee's access to and downloads of authorized Support Materials after that licensee's decision to terminate Oracle Support Services, but during the valid, paid Support Period, would be nothing more than a scheme to deprive the licensee of the Support Materials for which it invested significant resources (to Oracle's benefit).

*Issue #5: Annual Support Paying Clients May Be Intimidated Away From Obtaining All Support Materials They Are Entitled to Obtain and Use Because of Support Portal Design and Oracle's Attempt to Make License Compliance 100% Client Responsibility*

Oracle's company-wide policy of attempting to make license and intellectual property compliance 100 percent the sole responsibility of its licensees and customers is not reasonable and creates ambiguity with respect to license rights.

Because Oracle maintenance-paying clients must make educated, reasonable guesses about what Support Materials might be appropriately licensed to them without 100 percent certainty, many clients may be intimidated from trying to identify, catalog, and obtain the Support Materials they have paid for and are legally entitled to use to their benefit.

Confidential Information                                                              RSI03206209

# Snell & Wilmer
L.L.P.

Jeffrey S. Ross
December 3, 2008
Page 8

      It is anticompetitive to intimidate Oracle customers from terminating Oracle annual maintenance services, self-supporting licensed Oracle products, or pursuing the purchase of maintenance services from Rimini Street and/or other third party consultants.

      Oracle's failure to take timely corrective action to resolve the above issues could lead to a further response from Rimini Street, government entities with jurisdiction, and/or Oracle's customers.

                              Sincerely,

                              SNELL & WILMER L.L.P.

                              Dan W. Goldfine

cc:    Daniel Wall, Latham & Watkins (*via e-mail and facsimile*)
        Board of Directors, Rimini Street, Inc. (*via e-mail*)

9321342

Confidential Information        RSI03206210