BOIES, SCHILLER & FLEXNER LLP
RICHARD J. POCKER (NV Bar No. 3568)
300 South Fourth Street, Suite 800
Las Vegas, NV 89101
Telephone: (702) 382-7300
Facsimile: (702) 382-2755
rpocker@bsfllp.com

BOIES, SCHILLER & FLEXNER LLP
WILLIAM ISAACSON (*pro hac vice*)
KAREN DUNN (*pro hac vice*)
5301 Wisconsin Ave, NW
Washington, DC 20015
Telephone: (202) 237-2727
Facsimile: (202) 237-6131
wisaacson@bsfllp.com
kdunn@bsfllp.com

BOIES, SCHILLER & FLEXNER LLP
STEVEN C. HOLTZMAN (*pro hac vice*)
1999 Harrison Street, Suite 900
Oakland, CA 94612
Telephone: (510) 874-1000
Facsimile: (510) 874-1460
sholtzman@bsfllp.com

MORGAN, LEWIS & BOCKIUS LLP
THOMAS S. HIXSON (*pro hac vice*)
KRISTEN A. PALUMBO (*pro hac vice*)
One Market, Spear Street Tower
San Francisco, CA  94105
Telephone:  415.442.1000
Facsimile:  415.442.1001
thomas.hixson@morganlewis.com
kristen.palumbo@morganlewis.com

DORIAN DALEY (*pro hac vice*)
DEBORAH K. MILLER (*pro hac vice*)
JAMES C. MAROULIS (*pro hac vice*)
ORACLE CORPORATION
500 Oracle Parkway, M/S 5op7
Redwood City, CA 94070
Telephone:  650.506.4846
Facsimile:  650.506.7114
dorian.daley@oracle.com
deborah.miller@oracle.com
jim.maroulis@oracle.com

Attorneys for Plaintiffs
Oracle USA, Inc., Oracle America, Inc., and
Oracle International Corp.

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| ORACLE USA, INC., a Colorado corporation; ORACLE AMERICA, INC., a Delaware corporation; and ORACLE INTERNATIONAL CORPORATION, a California corporation,<br><br>Plaintiffs,<br><br>v.<br><br>RIMINI STREET, INC., a Nevada corporation; AND SETH RAVIN, an individual,<br><br>Defendants. | Case No. 2:10-cv-0106-LRH-PAL<br><br>**DECLARATION OF THOMAS S. HIXSON IN SUPPORT OF ORACLE'S REPLY IN SUPPORT OF ITS MOTION FOR COSTS AND ATTORNEYS' FEES**<br><br>PUBLIC VERSION |

I, Thomas S. Hixson, declare as follows:

1.  I am an attorney admitted to practice *pro hac vice* before this Court in the above captioned matter, and a partner with Morgan, Lewis & Bockius LLP (and was previously a partner with Bingham McCutchen LLP), counsel of record for Plaintiffs Oracle USA, Inc.; Oracle America, Inc.; and Oracle International Corporation (collectively "Oracle") in this action. I have personal knowledge of the facts stated below and could and would testify to them if called upon to do so.

2.  I make this declaration in support of Oracle's Reply in Support of Its Motion for Costs and Attorneys' Fees.

I.   **FEES AND COSTS SOUGHT BY ORACLE**

3.  In response to assertions raised by Rimini in its Opposition to Oracle's Motion for Costs and Attorneys' Fees, my team and I re-reviewed our prior calculations of Oracle's attorneys' fees, costs, and our allocations of Oracle's non-taxable and taxable costs. Attached as **Exhibit A** is the revised schedule showing a summary and breakdown of the total amount of fees and costs sought by Oracle. This revised schedule replaces Oracle's prior schedule of fees and costs (Dkt. 972, Ex. 1). I supervised the calculation of the totals included in **Exhibit A** and its predecessors. Those totals were created under my supervision by totaling the unredacted individual fee and cost entries in the invoices for which Oracle seeks recovery and totaling them according to the categories described in **Exhibit A**. I supervised the assessment of which fees and expenses fit in each category in **Exhibit A**.

4.  **Exhibit A** makes the following corrections:
    a.  One $7,931.24 invoice from TM Financial Forensics was inadvertently included twice in the calculation of non-taxable expert costs. I have deducted this amount from Oracle's non-taxable costs in **Exhibit A**. I further investigated Rimini's claim that additional TM Financial Forensics invoices may have been double-counted or triple-counted and determined none were. This correction is described in greater detail in paragraph 29, below.

1
DECLARATION OF THOMAS S. HIXSON IN SUPPORT OF ORACLE'S REPLY IN SUPPORT OF ITS MOTION FOR COSTS AND ATTORNEYS' FEES

      b. $1,467,564.65 in electronic discovery costs was inadvertently allocated to Oracle's taxable cost calculation, rather than to its non-taxable costs, including an entry for $120,000 that was inadvertently highlighted in the invoice as a taxable cost. This entry has been highlighted in green in **Exhibit F**. Also, upon reviewing our allocations, I determined that "Load File Delivery" entries totaling $53,550 are more appropriately categorized as non-taxable electronic discovery costs, not taxable electronic discovery costs. These entries have been highlighted in green in **Exhibit F**. Finally, certain taxable costs totaling $5,835.20 were inadvertently not highlighted and not included in the taxable costs category. These costs have been highlighted in yellow in **Exhibit F**. These allocation mistakes, resulting in a net reduction of $1,515,279.45 in taxable costs and net increase of $1,515,279.45 in non-taxable costs, have been corrected in **Exhibit A**.

      c. Oracle's claim for Elysium expenses was reduced by $815 based on further review of Elysium Digital's invoices. Declaration of Beko Richardson ¶ 23. I have deducted this amount from Oracle's non-taxable costs in **Exhibit A**.

      d. Based on Mr. Richardson's review of the Boies Schiller invoices, it was determined that Oracle would reduce its fees claim by $6,480 and its non-taxable expenses by $1,409. Declaration of Beko Richardson ¶¶ 19, 21. I have adjusted **Exhibit A** accordingly.

5. Together, these corrections reduce Oracle's attorneys' fees claim by $6,480 and its costs claim by $10,155.45.

6. Of the attorneys' fees and costs that Oracle seeks to recover in its motion, Oracle incurred $49.5 million prior to Rimini's July 27, 2015 Rule 68 offer and $ 51.3 million prior to its October 15 Rule 68 offer.

## II.   REMAINING EXHIBITS

7. Attached as **Exhibit B** is a true and correct copy of a printout of a February 27, 2015 article from the website of The Register, available at

http://www.theregister.co.uk/2015/02/27/to_beat_oracle_in_court_or_commerce_start_outside_california/.

8. Attached as **Exhibit C** is a true and correct copy of the relevant excerpts of the civil docket for case #: 2:10-cv-00106-LRH-PAL, showing the law firms representing Defendants Seth Ravin and Rimini Street.

9. Attached as **Exhibit D** is a true and correct copy of the relevant excerpts of Rimini's Form S-1, filed with the Securities and Exchange Commission on May 13, 2014, marked as PTX 3212.

10. Attached as **Exhibit E** is a true and correct copy of the relevant excerpts of Rimini's 2012-2014 consolidated financial statements, marked as DTX 3023.

11. Attached as **Exhibit F** is a true and correct copy of Stroz Friedberg invoices previously authenticated in the Declaration of James C. Maroulis, Dkt. 925.  This exhibit corrects the highlighting to indicate taxable and non-taxable costs, as described above in paragraph 4(b).

12. Attached as **Exhibit G** is a true and correct copy of the expert report of Daniel S. Levy, Ph.D. in this matter, dated January 17, 2012.

13. Attached as **Exhibit H** is a true and correct copy of Rimini's August 24, 2015 Offer of Judgment Pursuant to Fed. R. Civ. P. 68.

14. Attached as **Exhibit I** is a true and correct copy of Rimini's July 27, 2015 Offer of Judgment Pursuant to Fed. R. Civ. P. 68.

## III.  RIMINI'S LITIGATION EXPENSES

15. Attached as **Exhibit J** is a chart comparing Rimini's 2011-2014 litigation expenses, by year, to 2011-2014 Oracle's total litigation expenses, by year.

16. This chart of Oracle's yearly litigation expenses is based on the fees and costs aggregated in **Exhibit A**.  The chart of Rimini's litigation expenses for 2011-2014 is based on the amounts provided by Rimini in its SEC filing and its consolidated financial statements (**Exhibits D & E**).

17. ██████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████

## IV. ORACLE/ATTORNEY RELATIONSHIP

18. Bingham McCutchen's relationship with Oracle extended at least back to the litigation surrounding Oracle's 2003 tender offer to acquire PeopleSoft, Inc. Bingham McCutchen also represented Oracle in its lawsuit against SAP and TomorrowNow from 2007 to 2014. In that litigation, Seth Ravin was deposed twice as one of the designers of TomorrowNow's business model and the former President of TomorrowNow.

19. Many of the Bingham McCutchen lawyers that had worked on the SAP TomorrowNow litigation also worked on the Rimini Street litigation, including myself, Geoffrey Howard, Frank Hinman, Zachary Alinder, Bree Hann, Joy Sherrod, Chad Russell, John Polito, Kyle Zipes, Nitin Jindal, Martha Jeong.

20. Because TomorrowNow and Rimini both supported the same Oracle products (PeopleSoft, J.D. Edwards, Siebel), used Oracle Database, provided service to many of the same customers, and shared many support practices in common, the two cases share many of the same factual and legal issues. Indeed, in both litigations, Oracle alleged the violation of many of the same copyright registrations and alleged not only copyright infringement, but violation of computer access statutes. Moreover, many of the same Oracle witnesses who had relevant knowledge in the TomorrowNow case also had relevant knowledge in the Rimini case.

21. Because of our familiarity and experience with the legal and factual issues in the SAP TomorrowNow litigation, this group of lawyers was significantly more efficient and effective in our work on the Rimini litigation than we would have been without that familiarity and experience. This included our familiarity with: relevant Oracle documents and evidence to be produced, relevant Oracle witnesses, relevant legal theories and claims, Seth Ravin, support practices Mr. Ravin designed, the software products at issue, and the relevant industry.

## V. ENTRIES RELATED TO OTHER MATTERS

22. When putting together Oracle's motion for costs and attorneys' fees, I personally oversaw the review of each Bingham McCutchen, Morgan Lewis, TM Financial Forensics, Advanced Analytical Consulting Group, Stroz Friedberg, Elysium Digital, H5, and Huron Consulting invoice. The lawyers reviewing those invoices were instructed to redact every time or expense entry, including block-billed time entries, that included any time or expense incurred that may have related to matters other than *Rimini I*, including *Rimini II* and the SAP TomorrowNow litigation. Based on my review of the redactions, I believe no entry relating to a different case remained.

23. Bingham McCutchen and Morgan Lewis use separate billing numbers for different matters. Separate billing numbers were established for the SAP TomorrowNow litigation, the *Rimini I* litigation, and the *Rimini II* litigation to ensure that work done on one case would not be included on an invoice for another case. While there was a time when some work related to *Rimini II* was taking place before we had set up a separate billing number, we reviewed the firms' invoices to make sure that any such time entries were removed from Oracle's fee request in this case.

24. Because Rimini requested information and documents related to the SAP TomorrowNow litigation, Oracle attorneys spent some time on tasks related to the collection and production of documents from the SAP TomorrowNow litigation. There are some unredacted entries in the invoices that reference SAP TomorrowNow for this reason.

25. Because of the similarity of the legal and factual issues in this litigation and the SAP TomorrowNow litigation, Oracle attorneys occasionally reviewed emails, pleadings, and memoranda from the SAP TomorrowNow litigation for reference, in order to avoid duplicating legal research or fact investigations. There are some unredacted entries in the invoices that reference SAP TomorrowNow for this reason.

26. Because facts related to SAP TomorrowNow were relevant to this case, there may be time entries that reference SAP TomorrowNow in relation to certain legal or factual investigations in the case.

27. Oracle filed its second amended complaint on June 1, 2011. Dkt. 146. The second amended complaint includes copyright registrations not included in its first amended complaint. *Compare* Dkt. 36 at 20-23 *with* Dkt. 146 at 21-24. Oracle attorneys worked on those copyright registrations before the second amended complaint was filed for the purpose of including those registrations in the second amended complaint, and therefore time entries that include work on those copyright registrations represent expenses incurred by Oracle as part of this litigation.

28. For example, on March 16, 2011, Manu Pradhan billed 3.9 hours to this matter, including: "analyze deposits for Rimini-only copyright registrations and emails to Mr. Polito re same; phone conference with Ms. Palumbo re Database registrations in draft amended complaint." This work was related to copyright registrations that were ultimately added to the second-amended complaint.

## VI. TM FINANCIAL FORENSICS INVOICES

29. Beginning in 2015, Morgan Lewis began including bills for TM Financial on its invoices rather than having them bill Oracle directly. Because of this, Morgan Lewis invoices for January through April of 2015 include amounts for TMF in the costs section. For the fees motion, however, those amounts were removed from Morgan Lewis' costs and grouped with the rest of the TM Financial invoices in order to ensure a proper categorization of costs. We failed to remove one invoice in the amount of $7,931.25, and thus inadvertently double-counted that amount in Oracle's total fees request. The total for expert costs in **Exhibit A** has been adjusted downward accordingly.

30. Other than the $7,931.25 amount, I am aware of no other double-counting of TM Financial Forensics fees, and I am not aware of any triple-counting of TM Financial Forensics fees.

## VII. ORACLE STAFFING AND BILLING PRACTICES

31. Due to the volume of documents produced in this case, Oracle hired contract attorneys and contract attorney firms Black Letter Discovery, H5 and Huron Consulting Group to

review documents in order to complete review projects in a timely manner and avoid incurring excess legal fees.

32. Oracle selected the contract attorneys and firms primarily based on their cost and general document review experience. While each attorney needed to have a law degree so they could review documents for attorney-client privilege and relevance based on the legal issues in the case, each individual attorney's individual credentials were not relevant. Rather, the firm's experience and overall proposal drove the hiring decision.

33. The contract attorneys were not allowed to work for more than eight hours a day while they were working on document review projects because we did not want to incur any overtime expenses. Thus, it was often the case that the contract attorneys worked until the daily maximum they were allowed to work for that day.

34. The contract attorneys reviewed documents at an hourly rate that was significantly lower than the rate charged by the Morgan Lewis, Bingham McCutchen, or Boies Schiller lawyers.

35. Mr. Trunko complains that Oracle was billed for "overhead" for Black Letter Discovery contract attorneys, and he argues that this is not a recoverable expense. Trunko Decl. ¶ 26(a)(ii). In fact, the "overhead" charges at issue here were fees for costs that are normally recovered by billable rates, such as insurance. These contract attorneys did not work for other Bingham McCutchen clients during the time of this engagement. These expenses were approved by Oracle and paid accordingly.

36. During the course of this case, the paralegals staffed on the case have become familiar with the case file, the case calendar, the various vendors, and the parties' and the Court's operating procedures. Due to the complexity of this case, the paralegals' work is part of the core work on the case, and Oracle has approved and paid for the paralegals' work on the logistical and administrative aspects of the case. It would have been inefficient for the numerous attorneys in this case to use only their assistants or other secretarial support to conduct these tasks.

37. Throughout this litigation, I have observed that Rimini's paralegal, Jeffrey Glidewell, regularly performs what Mr. Kennedy refers to as "secretarial" work, such as serving documents on Oracle's counsel.

38. I have been a partner managing aspects of this litigation from its inception to the present. Throughout its history, this matter has been very complex, requiring a large team of lawyers and support staff to handle the wide variety of tasks on this case, including document production, document review, third-party discovery, taking and defending depositions (including preparation), legal research and brief writing, meeting and conferring, oral argument, expert discovery (technical and damages), and preparing for and conducting a five-week trial. Due to the wide variety of legal and factual issues, Oracle's successful prosecution of this case required that certain individuals and teams specialize in certain subject matters. And, because no aspect of the case is completely isolated, it often occurs that an issue from one individual's or team's area of specialization will affect an issue from another individual's or team's area of specialization. Therefore, communication between individuals and teams was a constant requirement. For some issues, only smaller teams or a few individuals needed to be aware of developments. Other issues were of such importance that it was necessary for the entire team to be aware of any developments related to that issue. Similarly, some projects required input from multiple teams or individuals given their different areas of expertise in relation to the case.

39. Meetings – sometimes "all hands" meetings – were necessary to successfully coordinate case projects and the flow of knowledge across specialized teams and individuals.

40. Mr. Kennedy complains that "Bingham and Morgan Lewis frequently had up to 7 attorneys and non-attorneys attend joint strategy meetings or participate in conference calls with up to 9 attorneys and non-attorneys from Boies Schiller." Kennedy Decl. ¶ 29.3.4.3. Such meetings did happen on this large and complex case, were necessary for proper case management, and resulted in efficiencies.

41. Similarly, certain projects and tasks for the case often required input from multiple individuals or teams with specialized knowledge. One senior attorney would often take

the lead managing a team to draft a brief, and once a draft was ready, other experienced lawyers with specific factual or legal expertise regarding different areas on the case would review the draft and make edits.  This practice was essential in making sure that the legal work on this case was at the highest level our team could produce.

42.   Mr. Kennedy cites the fact that "12 attorneys at Bingham (4 partners and 8 associates) and 7 attorneys at Boies Schiller (4 partners and 3 associates) worked on case management statements" as support for his argument that "attorneys and non-attorneys in each firm worked on all aspects of the Case, which led to duplication of effort."  Kennedy Decl. ¶¶ 29.2.5, 29.2.5.6.  These numbers are appropriate for the size and complexity of this case.  During discovery in this case, Judge Leen held regular case management conferences.  Before each conference, the parties filed a statement of the status of discovery, including motions to compel.  The issues covered in this statement spanned the entire case.  There were many discovery disputes in this case, and drafting summaries of the issues and legal research required input from many different individuals and teams on the case.

43.   During trial, different members of the team were working on different trial preparation tasks, from drafting and meeting and conferring over jury instructions to witness preparation to working on the closing statement.  These different tasks required different level of knowledge of the ongoing trial testimony and oral argument.  Attorneys on the team attended trial as necessary to aid in their trial preparation tasks.  For example, since the ideas and themes introduced in the parties' opening statements influence nearly every aspect of the trial going forward, almost every trial team member attended trial on the day of the opening statements.

44.   I observed at trial that Rimini's attorneys divided up trial responsibilities and numerous attorneys from Rimini's multiple law firms attended each day even if they had no specific trial role that day.

45.   Partners are usually the most experienced and knowledgeable members of both the overall team and the more specialized teams.  Therefore, partners' involvement in work on

all aspects of the case was essential, and, because of their greater experience, sometimes more efficient than the same work by more junior lawyers.

46. Mr. Kennedy complains that I "conducted legal research on the Oracle Parties' claims and motions for summary judgment." Kennedy Decl., ¶ 29.4.4.1. I have worked on this case from the original complaint until the present, and during that time I have worked on all aspects of the case, from submitting discovery responses to arguing before this Court. In order to ensure that the arguments submitted to this Court are the best and most accurate that Oracle can make, it is often necessary for me to read cases and perform some of my own legal research. I can and do assign most legal research tasks to more junior attorneys, but it would not be beneficial for the client for me not to read cases or never to confirm Oracle's position on a close question of law with my own research.

47. A large number of "non-legal" logistical and administrative tasks are necessarily involved in a case of this size and complexity. Oracle's attorneys made every effort to delegate these tasks to non-billing administrative staff wherever possible. However, there were certain tasks for which it was necessary to involve an attorney, and sometimes it was most effective to involve a senior attorney.

48. For example, Mr. Kennedy complains that "[a]ttorneys at each firm regularly billed for preparing task lists and other documents outlining work to be done in the Case." Kennedy Decl. ¶ 29.7.1. During the active phases of the case, there were often dozens of outstanding tasks that the team had to manage, with varying deadlines and team members responsible for reach task. In my experience as a litigator, maintaining a task list is an effective away to manage a case of this size and complexity. Monitoring the progress and status of each task on a regular basis requires knowledge of the various teams and their ongoing work, and it requires an understanding of the outstanding legal and factual issues in the case. This is not an "administrative task" that could be handled successfully without involvement by lawyers who are familiar with the details of the case.

49. Mr. Kennedy and Mr. Trunko complain about "training sessions for discovery purposes" as one of the "administrative activities that promote the business of the law firm rather than the provision of legal services." Kennedy Decl. ¶ 29.8.4; Trunko Decl. ¶ 24. In fact, the training in question was training in the use of the document review system in this case, Stroz Review, including the case-specific details of how the documents were structured and how the review tool was set up. This training was necessary for the attorneys and staff to be able to review and retrieve documents for this case. The training was not a general training that would be applicable to other firm clients.

50. Throughout the life of this case, several attorneys at Bingham McCutchen and Morgan Lewis have pursued other career opportunities. We had to replace those attorneys with new attorneys that lacked the background and context for the case. These "new" attorneys added to the case team had to familiarize themselves with the facts of the case. Oracle approved each new attorney that was added to the case team and also either approved the time it took the new attorney to "ramp up" on the case, or did not so approve and the time was written off and is not reflected in our invoices or Oracle's fee request.

51. [redacted]

52. The chart attached as **Exhibit K** is derived from the information contained in the invoices in Exhibits 3-9 to the Hixson Declaration (Dkt. 923) and Exhibits 3-8 to the Ringgenberg Declaration (Dkt. 924). It describes the hours Oracle's attorneys worked each month of the litigation.

53. As can be seen, Oracle's attorneys worked more when case events required a greater effort on their part. For example, near the close of fact and expert discovery, many attorneys on the team worked long hours to meet the Court's deadlines. Similarly, immediately

11
DECLARATION OF THOMAS S. HIXSON IN SUPPORT OF ORACLE'S REPLY IN
SUPPORT OF ITS MOTION FOR COSTS AND ATTORNEYS' FEES

1  before and during trial, at least some portion of the team was working around the clock nearly
2  every day.
3       54.    ██████████████████████████████████████████████████████████
4  ██████████████████████████████████████████████████████████████████████
5  ██████████████████████████████████████████████████████████████████████
6  ██████████████████████████████████████
7       55.    ██████████████████████████████████████████████████████████
8       56.    During active periods of the case, in order to stay abreast of all the outstanding
9  tasks and deadlines and manage the case, the attorneys have held weekly team meetings during
10 which they update the status of outstanding tasks and discuss case strategy.  Near important case
11 deadlines during which attorneys were very busy on multiple tasks, the team would hold these
12 meetings more frequently.  During trial, team meetings were held nearly every day.  Oracle
13 approved and paid for these meetings.
14      57.    Oracle was aware that experienced attorneys would often review the work of
15 other experienced attorneys in order to provide comments and improve the work product.  Oracle
16 approved charges that reflect this practice.
17      58.    Oracle's headquarters are in Redwood City, California, and most of the key
18 Oracle witnesses and subject matter experts involved in this case are located in Redwood City.
19 Many of Rimini's employees are also located in the Bay Area.  Therefore, many of the
20 depositions and document inspections that Oracle took and defended were in San Francisco.  The
21 lawyers at the Bingham McCutchen and Morgan Lewis firms were and are located in San
22 Francisco.  Their proximity to the Oracle and Rimini witnesses created substantial cost savings
23 for Oracle in this litigation.
24      59.    Based on a review of the deposition transcripts in this matter, I have concluded
25 that Jim Maroulis, Oracle's in-house attorney managing this litigation, attended 14 days of
26 depositions (eight Oracle witnesses and five Rimini [one for two days]), during which he
27 contributed to the efforts of Oracle's outside lawyers.
28

60. The attorneys on this case have consistently held weekly conferences with Mr. Maroulis during the active periods of this case.

61. Mr. Maroulis has reviewed and provided comments on or edits to every one of Oracle's substantive court filings, discovery requests and responses, and meet and confer correspondence.

62. Mr. Maroulis attended every day of the trial in this matter.

63. Oracle's General Counsel, Dorian Daley, and/or Oracle's Associate General Counsel, Deborah Miller, have reviewed and provided edits or commented on important case materials in this litigation. They also participated in meetings to determine case strategy and attended most days of the trial.

Dated: April 4, 2016

                                                     /s/ Thomas S. Hixson
                                                        Thomas S. Hixson

# CERTIFICATE OF SERVICE

I certify that on April 4, 2016, I electronically transmitted the foregoing **DECLARATION OF THOMAS S. HIXSON IN SUPPORT OF ORACLE'S REPLY IN SUPPORT OF ITS MOTION FOR COSTS AND ATTORNEYS' FEES** to the Clerk's Office using the Electronic Filing System pursuant to Special Order No. 109.

Dated: April 4, 2016

Morgan, Lewis & Bockius LLP

By:     /s/ *Thomas Hixson*
        Thomas Hixson

Attorneys for Plaintiffs
Oracle USA, Inc.,
Oracle America, Inc. and
Oracle International Corporation