# EXHIBIT E

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
:
ANNE POPE, et al.,                                               :
:
               Plaintiffs,                             :
:
  -against-                                                     :   No. 11-cv-0736 (LEK) (CFH)
:
COUNTY OF ALBANY, et al.,                                        :
:
               Defendants.                             :
:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

### DECLARATION OF MITCHELL A. KARLAN IN SUPPORT OF PLAINTIFFS' APPLICATION FOR ATTORNEYS' FEES AND COSTS

**Mitchell A. Karlan**, an attorney admitted to practice before this Court, declares under penalty of perjury, pursuant to 28 U.S.C. § 1746, as follows:

1. I am a partner in the law firm of Gibson, Dunn & Crutcher, LLP ("Gibson Dunn"), counsel to Plaintiffs. I make this declaration in support of Plaintiffs' Application for Attorneys' Fees and Costs.

2. Gibson Dunn, as Plaintiffs' counsel, seeks $6,295,935.00 in attorneys' fees, $58,334.29 in costs and disbursements, and $56,726.45 in expert fees and costs, for a total of $6,410,995.74. As described below, Gibson Dunn has voluntarily eliminated numerous time entries and reduced its standard hourly rates by 20%. Further, we intend to donate $50,000 of our fee award to the local Albany chapter of the NAACP and $50,000 to Centro Civico of Amsterdam.

3. Taking on this voting rights case involved a financial risk for Gibson Dunn. If Plaintiffs lost the case, Gibson Dunn would recover nothing for its time and expenses incurred in

litigating this matter. The expenses in this matter have been significant, including out of pocket costs for filing fees, travel, experts, and transcripts.

4. Representing Plaintiffs in this action also posed a financial burden on Gibson Dunn. This burden is due to the fact that, even where Plaintiffs in such an action succeed, there is always a significant delay in payment of fees and costs. Gibson Dunn has been working for years in this litigation and has not received any payment for this work. Most small to mid-sized firms cannot front the significant litigation expenses that Gibson Dunn assumed when taking on this matter.

5. Seeking to defray certain upfront costs, I contacted the NAACP, the NAACP Legal Defense Fund, the New York Civil Liberties Union, and the Lawyers' Committee for Civil Rights at various points during this litigation. None of these major civil rights organizations had the capacity to invest money or attorney time to our cause.

6. The County of Albany's annual budget is approximately $597 million. Trial Tr. 1259:14–16 (testimony of Daniel McCoy).

## Legal Services Provided

7. In May 2011, Paul DerOhannesian, of the Albany law firm DerOhannesian & DerOhannesian, and Aaron Mair contacted Gibson Dunn regarding a potential lawsuit in connection with the soon-to-be enacted redistricting plan for Albany County ("Local Law C"). Between this date and filing of the complaint, attorneys at both Gibson Dunn and DerOhannesian & DerOhannesian devoted a significant amount of time to investigating potential plaintiffs' claims, retaining experts, and drafting the complaint.

8. On June 29, 2011, Plaintiffs filed their complaint, which alleged that Local Law C violated Section 2 of the Voting Rights Act of 1965.

2

9. On July 15, 2011, Plaintiffs moved by an order to show cause for a preliminary injunction enjoining Albany County from conducting any election-related activities under Local Law C.

10. On August 3 and 4, 2011, this Court conducted a hearing on Plaintiffs' motion for a preliminary injunction, which this Court denied on August 18, 2011.

11. Plaintiffs promptly appealed this decision to the Second Circuit. On August 22, 2011, Plaintiffs filed a Notice of Appeal. After an expedited briefing schedule, oral arguments were held on December 16, 2011. On May 29, 2012, the Second Circuit issued its opinion, which, although it technically affirmed this Court's decision, clarified several significant questions of law before this Court.

12. Simultaneous to this interlocutory appeal, the parties engaged in extensive discovery regarding the process resulting in Local Law C, the political cohesion of the County's Black and Hispanic communities, and the existence of the totality of the circumstances necessary for Plaintiffs' claims. In addition to exchanging initial disclosures, Plaintiffs served two requests for admissions and one set of interrogatories, and Defendants served one set of interrogatories. In response to Plaintiffs' requests for the production of documents, Defendants made 17 separate document productions between July 2011 and November 2014. In response to Defendants' requests for the production of documents, Plaintiffs made 13 separate document productions between October 2011 and November 2014, as well as several Rule 26 and expert disclosures. In addition, between January 2012 and November 2014, the parties deposed 23 fact witnesses.

13. Plaintiffs also retained three experts, who together submitted ten expert reports. Defendants also retained two experts, who together submitted four expert reports. Two of Plaintiffs' experts, Dr. Baodong Liu and Mr. Aaron Mair, as well as Defendants' experts, Mr.

3

Ronald Keith Gaddie and Mr. John Merrill, were deposed in April 2012.  In light of certain issues with respect to Dr. Liu's data and Mr. Gaddie's definition of the word "minority," each expert sat for a limited continuation of his deposition in February and March 2013, respectively.

14. Significant motion practice also accompanied this litigation, including, *inter alia*, various discovery disputes; Plaintiffs' motion for discovery sanctions (filed May 29, 2012); Plaintiffs' motion to compel the deposition of opposing counsel (filed May 29, 2012); Plaintiffs' appeal of Judge Homer's denial of their request for discovery sanctions (filed August 14, 2012); Plaintiffs' motion for leave to conduct additional depositions (filed February 19, 2013); Plaintiffs' motion for partial summary judgment (filed March 26, 2013); Defendants' motion for summary judgment (filed March 26, 2013); Plaintiffs' motion for leave to file a second amended complaint (filed April 29, 2013); Defendants' motion to substitute their expert (filed July 2, 2014); and Defendants' motion quash the trial subpoena (filed Nov. 10, 2014).

15. Subsequent to the summary judgment opinion, the parties began to prepare for trial.  Plaintiffs prepared extensive pre-trial briefing and submissions, and prepared dozens of witnesses for potential testimony at trial.  *See* Dkts. 321, 322, 322-1, 323, 324, 334-1, 341.  In addition, Plaintiffs spent many hours addressing Defendants' repeated attempts to substitute their expert.  *See, e.g.*, Dkts. 267, 272, 286, 297, 325.

16. And finally, this litigation culminated in an eleven day bench trial, which took place between November 6, 2014 and January 13, 2015, and substantial post-trial briefs were submitted thereafter.  Pursuant to this Court's order dated March 24, 2015, Plaintiffs were the prevailing parties in this case, and as such, were awarded attorneys' fees and costs.  *See* Dkt. 427.

**Failed Settlement Attempts Leading Up to Trial**

17. At the suggestion of this Court, settlement negotiations were re-kindled in this litigation beginning in March 2014, and continued until June 2014. While these efforts were underway, this Court held trial in abeyance. Plaintiffs earnestly tried to settle this matter through a series of extensive mediation sessions with Magistrate Judge Hummel, and such efforts consumed a significant amount of attorneys' time, including preparing written mediation submissions, creating proposed settlement maps in consultation with Plaintiffs and their expert, and attending multiple mediation conferences. These settlement efforts failed as a result of Defendants' reversals regarding the necessary terms of any settlement.

18. As trial approached, settlement discussions began again. In December 2014, Defendants made a multitude of statements, both publicly and in settlement stipulations, expressing their agreement with Plaintiffs that a fifth majority-minority district was necessary and feasible. These statements included the following:

- On December 3, 2014, McCoy's counsel was quoted as saying that McCoy had "fought to uphold . . . the rights of minorities to have redistricting in 2015." McCoy later stated that any charter amendment should not come "at the expense of the minority community in Albany County."

- On December 2, 2014, Legislator Chris Higgins posted on Twitter that "[e]veryone wants to see a 5th MMD created." Further, Legislator Higgins posted on Twitter that "many support a 5th MMD."

- On December 2, 2014, Legislator Charles Dawson was quoted as saying "[t]here wasn't anybody who didn't want a fifth district."

- On December 2, 2014, Legislator Noelle Kinsch was quoted as saying she "support[s] an additional majority-minority district."

- On December 2, 2014, Legislator Doug Bullock was quoted as saying the County was "going to lose" if trial continued.

- On December 5, 2014, Legislator and Chair of the County Republican Party Christine Benedict was quoted as saying that the "Republican Party supports the creation of minority districts."

19. In spite of these statements evidencing Defendants' agreement with Plaintiffs that five MMDs were warranted, Defendants and their counsel, Mr. Marcelle, refused to settle the instant lawsuit and continued to litigate the case to final judgment.

20. After trial commenced, Defendants stipulated to a settlement agreement, which required the Albany County Legislature to vote to adopt the terms of the agreement by December 2, 2014. Dkt. 360. On December 2, 2014, Daniel McCoy's outside counsel at Boies, Schiller & Flexner LLP moved to vacate the settlement agreement. Dkt. 363. Both the settlement agreement and the motion to vacate were rendered moot, however, when the Albany County Legislature declined to vote on the agreement by December 2, 2014. *See* Dkt. 368.

21. The parties' settlement efforts were thwarted again when the Legislature overwhelmingly voted against adopting the December 23, 2014 settlement agreement, which the parties had negotiated with County Executive McCoy. *See* Dkt. 374. It appeared at the time that the vote was largely the result of political infighting between the Legislature and the County Executive.

### Fees for Legal Services from June 6, 2011 Through March 31, 2015[1]

22. Attached as Exhibit 1 is a true and correct copy of the billing records for the legal services rendered and related costs incurred on behalf of Plaintiffs throughout the course of Gibson Dunn's representation of Plaintiffs in this matter (the "Gibson Dunn Billing Records").

---

[1] Plaintiffs do not seek fees for Gibson Dunn's preparation of this application for fees.

6

The Gibson Dunn Billing Records were compiled from contemporaneously created time records created by Plaintiffs' counsel during the period from June 6, 2011 to March 31, 2015.

23. Gibson Dunn has included in this bill the time of the principal Gibson Dunn attorneys who worked on this case: Mitchell Karlan, Aric Wu, Anne Champion, Molly Claflin, Lindsey Schmidt, Brendon Fleming, Jonathan Fortney, Teresa Kung, Chris Muller, Sapna Desai Pandya, Jeana Bisnar Maute, Kristin Carlson, Kyle Kolb, Brittany Garmyn, Gabriel Gillett, Amy Mayer, Rena Kates Stern, Peter Wade, Masha Bresner, Alyssa Kuhn, and Chelsea Kelly (the "Gibson Dunn Billing Attorneys"). Attached as Exhibit 2 are true and correct copies of biographies of the Gibson Dunn Billing Attorneys.

24. I have devoted a substantial portion of my 36 year legal career to prosecuting civil claims for plaintiffs whose constitutional or civil rights have been abridged. I have had considerable success in these matters and have developed meaningful expertise. This Court is of course already familiar with my role in the successful prosecution of the Voting Rights Act claims against the County based on the last census and redistricting in the *Arbor Hill* litigation. Thereafter I also was lead counsel on the Voting Rights Act and constitutional claims against the County based on the County's illegal practices and procedures surrounding absentee ballots, in the *Willingham, et al. v. County of Albany, et al.*, No. 04 Civ. 04-369 (N.D.N.Y.), litigation.

25. Outside the area of voting rights, I have successfully tried or settled numerous cases involving cruel and unusual punishment, denial of free speech rights, abridgement of the right to free exercise of religion, and denials of due process in connection with imposition of the death penalty. In addition to representing individual victims themselves, I have also represented organizations such as the ACLU, the NAACP, and the Anti-Defamation League. The recent events in Baltimore, Maryland, are echoes of the class action I successfully settled against

7

Baltimore arising out of its use of mass arrests that never resulted in any criminal charges against the arrestees. *See Md. State Conference of NAACP Branches et al. v. Baltimore City Police Dep't et al.*, No. 06-cv-01863 (D. Md. 2010).

26. My average billing rate during the period in which this action was pending was $1,174.00.

27. Aric Wu's average billing rate for this time period was $888.00.

28. Anne Champion's average billing rate for this time period was $804.00.

29. Molly Claflin's average billing rate for this time period was $561.00.

30. Lindsey Schmidt's average billing rate for this time period was $560.00.

31. Brendon Fleming's average billing rate for this time period was $545.00.

32. Jon D. Fortney's average billing rate for this time period was $772.00.

33. Teresa Kung's average billing rate for this time period was $535.00.

34. Christopher Muller's average billing rate for this time period was $609.00.

35. Sapna Desai Pandya's average billing rate for this time period was $614.00.

36. Jeana Bisnar Maute's average billing rate for this time period was $450.00.

37. Kristin Carlson's average billing rate for this time period was $623.00.

38. Kyle Kolb's average billing rate for this time period was $601.00.

39. Brittany Garmyn's average billing rate for this time period was $571.00.

40. Gabriel Gillett's average billing rate for this time period was $695.00.

41. Amy Mayer's average billing rate for this time period was $629.00.

42. Rena Kates Stern's average billing rate for this time period was $416.00.

43. Peter Wade's average billing rate for this time period was $530.00.

44. Masha Bresner's average billing rate for this time period was $563.00.

8

45. Alyssa Kuhn's average billing rate for this time period was $561.00.

46. Chelsea Kelly's average billing rate for this time period was $502.00.

47. Each of those billing rates listed above is similar to those prevailing in the Southern District of New York for similar services by lawyers of comparable skill, experience, and reputation.[2] My firm's rates have been approved and ordered paid by the Bankruptcy Court for the Southern District of New York in connection with our representation of chapter 11 debtors. *See, e.g.*, *In re Arcapita Banks B.S.C.(c)*, Case No. 12-11076 (Bankr. S.D.N.Y. 2013); *In re FLAG Telecom Holdings Ltd.*, Case Nos. 02-11732 through 02-11736 and 0211975 through 02-11979 (Bankr. S.D.N.Y. 2002); *see also In re The Standard Register Company*, Case No. 15-10541 (Bankr. D. Del. 2015).

48. These rates are regularly charged to and paid by the firm's clients.

49. The National Law Journal's 2014 Billing Survey shows that these rates are consistent with the rates of comparable New York City law firms. Attached as Exhibit 3 is a true and correct copy of the 2014 *National Law Journal* Billing Survey for firms in New York City. Indeed, our rates are consistent with the billing rates in recent bankruptcy filings by major New York law firms. Attached as Exhibit 4 are true and correct copies of the relevant pages of of the New York Regional Report in Westlaw CourtExpress, Legal Billing Report, dated May 2013.

50. The reasonableness of the amount of time spent on this case is evidence by other Voting Rights Act litigations. Attached as Exhibit 5 is a true and correct copy of the Plaintiffs'

---

[2] At various points since this litigation began Gibson Dunn associates from the Washington D.C. office (Brendon Fleming, Molly Claflin, Brittany Garmyn, and Rena Kates Stern) have charged rates commensurate with the Washington D.C. market.

9

Motion for Attorneys' Fees and Costs filed in *Montes, et al. v. City of Yakima, et al.*, No. 12-cv-3108, Dkt. 147 (E.D. Wa. Mar. 3, 2015).

51. My practice is nationwide, and I have a single rate that I charge my clients regardless of where the matter is located. In the past 36 years, I have appeared in courts in Louisiana, Texas, Florida, Minnesota, Nevada, Massachusetts, Pennsylvania, New Jersey, Ohio, Rhode Island, Delaware, California, Arizona, Connecticut, Wisconsin, North Carolina, Missouri, Kentucky, Kansas, Puerto Rico, and Washington, D.C. I have also practiced in a variety of smaller New York locales, including Long Island, Albany, Buffalo, and Poughkeepsie. No matter the location, my clients are expected to pay—and do pay—one rate for my services. These clients pay the undiscounted rate for the full amount of Gibson Dunn's services.

52. I supervised the work of all lawyers on this matter, and I believe that the work performed was necessary and reasonable and was completed efficiently.

53. In fact, much of the work that Gibson Dunn and DerOhannesian & DerOhannesian performed on this matter was necessitated by Defendants' actions. For example, Defendants' purported efforts to settle this matter, which were highly publicized by various members of the legislature (*see, e.g.*, *supra* ¶ 18), failed numerous times due to internal political fracturing. In addition, Defendants repeatedly rebuffed Plaintiffs' requests for clarity with respect to whether Dr. Gaddie would attend trial, only to file a motion to substitute him during the eleventh hour.

54. As this Court is keenly aware, this litigation has dragged on for several years. Throughout, the case was staffed to provide the most efficient legal services and to minimize unnecessary cost. Where necessary, new lawyers were substituted for those who left the firm or the New York office. Therefore, while the total number of associates who billed to this matter

10

since June 2011 may seem high, most associates cycled into and out of the litigation at various times during the past four years. As set forth in the chart in paragraph 58 below, many associates were involved in this matter for only a fraction of the entire litigation.

55. The actual fees for services rendered by Gibson Dunn are more than those reflected in the Gibson Dunn Billing Records and more than those requested in the instant fee application.

56. After reviewing the entirety of the billing records in this matter, I have voluntarily eliminated time entries for over 48 timekeepers, including attorneys and staff who contributed substantive and administrative support for this matter. Such exclusions include time entered by (1) all attorneys whose aggregate hours were less than 100; (2) all summer associates; and (3) all paralegals, project assistants, and support staff. After exercising billing judgment and eliminating these timekeepers' entries, I reduced Plaintiffs' fee request by $860,339.40.

57. Taking into account these voluntary time exclusions and fee reductions, the Gibson Dunn Billing Records total 12,648.73 hours, or $7,869,918.75 in fees. In light of the magnitude of the fees in this matter, I will also voluntarily reduce Gibson Dunn's fees by 20%, which reduces Plaintiffs' request for Gibson Dunn's attorneys' fees to $6,295,935.00.

58. The following table summarizes all of the services rendered by Gibson Dunn from June 6, 2011 to March 31, 2015, for which the recovery of fees is sought. For each timekeeper, I have stated their average hourly rate during the time billed to this case, the number of hours worked, the total amount of fee, and the time period during which the timekeeper billed to this matter:

11

| Time Keeper | Average Hourly Rate During Time Period Billed | Total Number of Hours Billed | Total Fees | Time Period |
|---|---|---|---|---|
| Mitchell A. Karlan | $1,174.00 | 742 | $872,136.25 | 06/2011 – 03/2015 |
| Aric H. Wu | $888.00 | 502.25 | $438,112.75 | 07/2011 – 03/2015 |
| Anne M. Champion | $804.00 | 378.93 | $307,765.35 | 04/2012 – 02/2015 |
| Molly M. Claflin | $561.00 | 1,695.55 | $924,744.00 | 06/2011 – 03/2015 |
| Lindsey D. Schmidt | $560.00 | 148.7 | $83,272.00 | 04/2012 – 08/2012 |
| Brendon S. Fleming | $545.00 | 1,652.2 | $855,182.00 | 06/2011 – 07/2014 |
| Jon D. Fortney | $772.00 | 303.8 | $235,407.00 | 04/2014 – 03/2015 |
| Teresa M. Kung | $535.00 | 369.29 | $197,570.15 | 06/2011 – 12/2011 |
| Christopher A. Muller | $609.00 | 182.7 | $109,875.25 | 10/2011 – 07/2013 |
| Sapna Desai Pandya | $614.00 | 209.3 | $129,192.25 | 12/2011 – 07/2012 |
| Jeana Bisnar Maute | $450.00 | 799.6 | $359,820.00 | 06/2011 – 12/2011 |
| Kristin N. Carlson | $623.00 | 266.75 | $164,246.25 | 10/2012 – 01/2015 |
| Kyle J. Kolb | $601.00 | 1,809.15 | $1,110,700.00 | 12/2011 – 03/2015 |
| Brittany L. Garmyn | $571.00 | 1,755.25 | $979,562.50 | 10/2011 – 03/2015 |
| Gabriel K. Gillett | $695.00 | 478.4 | $332,805.00 | 06/2014 – 03/2015 |
| Amy R. Mayer | $629.00 | 193.6 | $121,655.00 | 02/2014 – 02/2015 |
| Rena Kates Stern | $416.00 | 134.57 | $56,184.85 | 10/2012 – 05/2013 |
| Peter M. Wade | $530.00 | 120.94 | $64,958.40 | 10/2012 – 08/2014 |
| Masha L. Bresner | $563.00 | 383.8 | $219,251.00 | 03/2014 – 03/2015 |
| Alyssa B. Kuhn | $561.00 | 179.6 | $102,901.00 | 02/2014 – 02/2015 |
| Chelsea T. Kelly | $502.00 | 342.35 | $174,567.75 | 09/2014 – 03/2015 |
| **Total** | | **12,648.73** | **$7,869,918.75** | |

59. Should this Court decline to award Gibson Dunn its standard rates, and instead award the standard rates currently charged by DerOhannesian & DerOhannesian, Plaintiffs' local counsel, the total fees for Gibson Dunn is $2,918,556.95 ($375 per hour for partners; $215 per hour for associates). *See* Declaration of Paul DerOhannesian II, dated May 5, 2015 (the "DerOhannesian Declaration").

**Costs and Disbursements from June 6, 2011 through March 31, 2015**

60. I have voluntarily excluded certain costs from this fee application, including (1) all electronic legal research databases (e.g., Lexis and Westlaw); (2) all other research databases and document retrieval services (e.g., Bloomberg); (3) in house duplication; and (4) PACER

12

access. Although Gibson Dunn clients ordinarily pay these costs, I exercised billing judgment to remove these costs, totaling $354,785.36, from the fee application.

61. Taking into account these voluntary cost exclusions, the Gibson Dunn Billing Records total $58,334.29 in costs. The following table identifies Gibson Dunn's costs incurred by category:

| Category | Amount |
|---|---|
| Admission Fees | $400.00 |
| Certified Copies | $10.00 |
| Computer Supplies | $143.44 |
| Filling Fees | $1,181.00 |
| Lodging | $13,022.31 |
| Meals | $4,568.71 |
| Messenger and Courier Expense | $2,815.98 |
| Expert Fees | $11,000.00 |
| Postage | $14.05 |
| Reference Materials | $32.00 |
| Telephone Charges | $5,044.93 |
| Transcripts/Digesting | $3,370.45 |
| Travel - Air & Rail | $10,148.10 |
| Travel - Parking | $11.00 |
| Travel - Taxi & Other Modes | $6,572.32 |
| **Total** | **$58,334.29** |

62. In addition to the costs set forth above, Plaintiffs retained two testifying expert witnesses to assist Plaintiffs in meeting their burden of establishing the Gingles factors and Senate factors: Dr. Baodong Liu, a political science professor at Utah State University, who provided expert opinions regarding the existence of racial polarization in the County's elections, and William Cooper, with decades of experience as a redistricting and mapping expert, who provided expert opinions regarding the ability to create additional MMDs in the County and demographics analysis of the results of the American Community Survey.

13

63. Defendants submitted multiple expert reports from two experts: Dr. Ronald Keith Gaddie and Mr. John Merrill.

64. Dr. Liu and Mr. Cooper provided initial expert reports in connection with Plaintiffs' motion for a preliminary injunction (Dkts. 24, 25), and seven further expert reports throughout the course of this litigation, including in order to rebut the conclusions of Defendants' expert Dr. Ronald Keith Gaddie.

65. Plaintiffs' expert Dr. Baodong Liu billed $49,950.00 (499.50 hours at a rate of $100 per hour) in fees during the pendency of this litigation. Plaintiffs have already reimbursed Dr. Liu for $14,000 for his work in connection with this matter, and this amount is included in Plaintiffs' costs as detailed above and in the DerOhannesian Declaration. *See supra* ¶ 8; DerOhannesian Declaration ¶¶ 64–67. As such, Plaintiffs request a total of $35,950.00 for the remainder of Dr. Liu's fees. Attached as Exhibit 6 is a true and correct copy of Dr. Liu's billing records in this matter.

66. Plaintiffs' expert William Cooper billed $19,635.00 (196.35 hours at a rate of $100 per hour) in fees during the pendency of this litigation. Mr. Cooper also incurred $1,141.45 in costs for travel related to the preliminary injunction hearing and the trial. Plaintiffs have not yet reimbursed Mr. Cooper for any of his work, nor any of his travel costs incurred in connection with this matter. Plaintiffs request a total of $20,776.45 for Mr. Cooper's fees and costs. Attached as Exhibit 7 is a true and correct copy of Mr. Cooper's billing records in this matter.

67. The total amount of Gibson Dunn's costs and disbursements, together with the experts' fees and costs, is $115,060.74. Should this Court award's to Gibson Dunn cover its costs by exceeding $115,060.74, Gibson Dunn intends to donate up to $50,000 to the local

14

Albany chapter of the NAACP and up to $50,000 to Centro Civico of Amsterdam, and collect the remainder of this Court's award as reimbursement for attorney's fees.

68. Attached as Exhibit 8 is a true and correct excerpt of the transcript of trial testimony in this proceeding, dated January 6, 2015.

I declare, under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct.


Dated:    New York, New York
           May 5, 2015


                                          /s/ Mitchell A. Karlan
                                          Mitchell A. Karlan