BOIES, SCHILLER & FLEXNER LLP
RICHARD J. POCKER (NV Bar No. 3568)
300 South Fourth Street, Suite 800
Las Vegas, NV 89101
Telephone: (702) 382-7300
Facsimile: (702) 382-2755
rpocker@bsfllp.com

BOIES, SCHILLER & FLEXNER LLP
WILLIAM ISAACSON (pro hac vice)
KAREN DUNN (pro hac vice)
5301 Wisconsin Ave, NW
Washington, DC 20015
Telephone: (202) 237-2727
Facsimile: (202) 237-6131
wisaacson@bsfllp.com
kdunn@bsfllp.com

BOIES, SCHILLER & FLEXNER LLP
STEVEN C. HOLTZMAN (pro hac vice)
1999 Harrison Street, Suite 900
Oakland, CA 94612
Telephone: (510) 874-1000
Facsimile: (510) 874-1460
sholtzman@bsfllp.com

MORGAN, LEWIS & BOCKIUS LLP
THOMAS S. HIXSON (pro hac vice)
KRISTEN A. PALUMBO (pro hac vice)
One Market, Spear Street Tower
San Francisco, CA 94105
Telephone: 415.442.1000
Facsimile: 415.442.1001
thomas.hixson@morganlewis.com
kristen.palumbo@morganlewis.com

DORIAN DALEY (pro hac vice)
DEBORAH K. MILLER (pro hac vice)
JAMES C. MAROULIS (pro hac vice)
ORACLE CORPORATION
500 Oracle Parkway, M/S 5op7
Redwood City, CA 94070
Telephone: 650.506.4846
Facsimile: 650.506.7114
dorian.daley@oracle.com
deborah.miller@oracle.com
jim.maroulis@oracle.com

Attorneys for Plaintiffs
Oracle USA, Inc., Oracle America, Inc., and
Oracle International Corp.

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| ORACLE USA, INC., a Colorado corporation; ORACLE AMERICA, INC., a Delaware corporation; and ORACLE INTERNATIONAL CORPORATION, a California corporation,<br><br>Plaintiffs,<br><br>v.<br><br>RIMINI STREET, INC., a Nevada corporation; AND SETH RAVIN, an individual,<br><br>Defendants. | Case No. 2:10-cv-0106-LRH-PAL<br><br>**DECLARATION OF RONALD ESSIG IN SUPPORT OF ORACLE'S REPLY IN SUPPORT OF ITS MOTION FOR COSTS AND ATTORNEYS' FEES**<br><br>PUBLIC VERSION |

## I. BACKGROUND

1. I am a Vice President in the Electronic Discovery & Disclosure (EDD) practice and have been employed with Stroz Friedberg since March 2008, joining through its acquisition of Docuity, Inc., where I worked since August 2006. I am responsible for managing the Technology Solutions Engineering (TSE) team, which provides day-to-day technical expertise and solutions to clients and Stroz Friedberg's EDD practice team. I am also responsible for the TSE team development of customized client solutions and software enhancements. Prior to my current role, I was a Director in Stroz Friedberg's EDD practice, where I was responsible for managing day-to-day EDD operations, including the planning and execution of data processing deliverables and quality control. I was also responsible for managing the conversion of data and creation of load files for exports and productions for ingestion into other software packages as and when requested by our clients.

2. I have been involved since the opening of the Oracle-Rimini engagement in April 2010 and assisted with project setup, designing custom workflows to handle the complex datasets (including importing data from another litigation support provider), and resource assignments for the project. I have over 20 years of experience in litigation technology support and data management services. Prior to joining Stroz Friedberg/Docuity, I worked three years at Planet Data Solutions as Director of Electronic Technologies, and helped lead the growth of the company's eDiscovery services. Prior to Planet Data Solutions, I was employed for 13 years at Merrill Corporation as a Director of Support Services, where I led a large team of technical professionals in complex data management projects. I have a B.S. Degree in Computer Science from Manhattan College, in New York.

3. Stroz Friedberg is a trusted, industry-leading technical service and consulting firm specializing in complex eDiscovery, computer forensics, data breach response, online fraud analysis, and private investigations. The firm has approximately 500 employees across ten offices in the U.S., as well as London, Zurich, Dubai, and Hong Kong. The EDD practice has operational centers in New York, NY; Purchase, NY; San Francisco, London, and Zurich.

DECLARATION OF RONALD ESSIG IN SUPPORT OF ORACLE'S REPLY IN SUPPORT OF ITS MOTION FOR COSTS AND ATTORNEYS' FEES

4.      Stroz Friedberg's management is comprised of former Assistant U.S. Attorneys, former Federal Trade Commission counsel, FBI Supervisory Special Agents and other former federal law enforcement officers, former civil litigators (including AmLaw 100 equity partners), and technology and litigation experts from the private sector, all of whom have deep experience identifying, preserving, harvesting, processing, and analyzing data. Complementing its knowledge of the law, Stroz Friedberg applies both cutting-edge technological tools and traditional investigative techniques to solve client problems, identify issues, and scientifically preserve and analyze data. Stroz Friedberg offers nationally recognized leaders in digital technology to lead its engagements and to provide unmatched analysis and advice that can be relied upon by all parties -- executive management, in-house and litigation counsel, opposing parties, regulators, and the courts. Stroz Friedberg has provided testimony or advice in many high-profile cases, including testifying at the Martha Stewart and Enron trials, advising State Attorneys General in the massive TJX and Heartland data breach investigations, and serving as eDiscovery consultant to the court in the Intel v. AMD antitrust litigation.

5.      ███████████████████████ Stroz Review is built on top of a highly-scalable Oracle database, which allows for the processing and hosting of multiple terabytes of data without any loss of performance or stability. Stroz Review also offered Oracle comprehensive, easy-to-use search capabilities and several advanced features to accelerate document processing and analysis, reduce attorney review time, and thereby generate significant cost savings. In addition, Stroz Friedberg also levered its forensic expertise and experience to narrow the body of relevant data before the data was even loaded and processed in Stroz Review. Finally, as referenced above, Stroz Friedberg has experienced professional staff with the knowledge, resources, and internal controls to handle large and complex matters.

DECLARATION OF RONALD ESSIG IN SUPPORT OF ORACLE'S REPLY IN SUPPORT OF ITS MOTION FOR COSTS AND ATTORNEYS' FEES

1   6.   I have reviewed Oracle's Motion for Costs and Attorneys' Fees and the
supporting declaration of James C. Maroulis and exhibits. I have also reviewed Defendants
Rimini Street, Inc.'s and Seth Ravin's Opposition to Oracle's Motion for Attorneys' Fees and
Costs, as well as the supporting Affidavit of Timothy M. Opsitnick.

## II.   FEES INVOICED TO ORACLE

### A.   Hosting

1.   Mr. Opsitnick claims that the fees Stroz Friedberg charged Oracle for hosting services exceeded the reasonable rate charged in the industry at the time. Opsitnick Decl., ¶¶ 15-17. He claims that a more reasonable rate would have been $▮/gigabyte/month for a project of this size, even though Rimini's own provider, Autonomy, Inc., charged $▮/gigabyte/month. *Id.* ¶ 17(c). Mr. Opsitnick also claims that Stroz Friedberg should have taken certain cost-reducing measures (such as taking all or portions of the document review database offline during inactive periods of the case). *Id.*, ¶ 17(d)-(e). ▮▮▮ *Id.*, ¶ 44.

2.   Mr. Opsitnick's statements are inaccurate and misleading because he considers only the first six months of Stroz Friedberg's invoices in 2010, during which our firm charged $▮/gigabyte/month for hosting, ▮▮▮ What Mr. Opsitnick does not mention, however, is that over the next five years of the project and as Oracle's data volumes grew, ▮▮▮. Exhibit A to this declaration lists the quantity of data hosted, the hosting fee per gigabyte, and the hosting fee/gigabyte/month for each month of the project, derived from Exhibit C to the supporting Declaration of James C. Maroulis, Dkt. 925.

3.   ▮▮▮ Mr. Opsitnick's "reasonable rate charged

1 | in the industry," and approximately ▮▮▮ than the rate he says Rimini paid to its own
2 | provider.
3 | 4. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
10 | 5. I understand that this case was relatively inactive, from a discovery perspective,
11 | for much of 2012 and 2015. During this quieter period, Stroz Friedberg charged an average of
12 | ▮▮▮ /gigabyte/month for "active" hosting, which is approximately ▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Opsitnick Decl., ¶ 17(e). ▮▮▮ d
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ al
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

19 | 6. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ See Exhibit A. ▮▮▮

24 | **B. Standard Processing**
25 | 7. Mr. Opsitnick claims that Stroz Friedberg's rates for Standard Processing exceed
26 | the "accepted industry rate." Opsitnick Decl., ¶ 20. "Standard Processing" on Stroz Friedberg's
27 | invoices refers to the kinds of processes that eDiscovery providers use to help reduce the volume
28 |

1  of Electronically Stored Information (ESI) and convert it, if necessary, to forms more suitable for
2  review and analysis. As a practical matter, this typically includes copying data off a hard drive
3  or container files, unpacking and uploading the data to a discovery technology platform and
4  converting it to a readable form for attorney review in an online computer workspace
5  environment.

6        8.     "Stroz Extract," as shown on Stroz Friedberg's invoices, is a proprietary
7  technology that automatically extracts dates, addresses, organizations, person names and
8  applicable document types based upon the text of documents, e-mails, e-mail attachments,
9  scanned collections of paper converted to electronic format, and production image sets received
10 from the other parties. Stroz Extract is, ostensibly, a more efficient form of what is customarily
11 referred to as "human coding," a process in which a lawyer or practice support professional
12 compares text content to a list of pre-determined codes, e.g., names, dates, and relevant terms or
13 phrases and then records the appropriate codes in an online database. Coding may be structured
14 (e.g., as a "Yes/No" option or consist of a drop down menu of several potential coding choices),
15 or unstructured (e.g., a narrative comment about a document). Coding may be objective (e.g.,
16 limited to the name of the sender or the date of a document), or subjective, (e.g., require the
17 evaluation of the meaning of a document). When Stroz Friedberg bills for Standard Processing, it
18 typically includes its special "Stroz Extract" services along with its optical character recognition
19 ("OCR") application of scanned paper images without text and metadata (referred to as "Stroz
20 Extract – OCR & Auto Indexing – TDE") if those services are used. Stroz Friedberg typically
21 separately bills on a $/GB basis (i.e., outside of its Standard Processing fee) for data that it
22 migrates from another technology review platform, along with text and metadata, and refers to
23 those services as "Ingestion of Pre-Processed Data (per GB)."

24       9.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Opsitnick Decl., ¶ 19. He claims that the industry rate for data processing
27
28

5
DECLARATION OF RONALD ESSIG IN SUPPORT OF ORACLE'S REPLY IN SUPPORT
OF ITS MOTION FOR COSTS AND ATTORNEYS' FEES

1  during that time period was $█████/gigabyte, and he calculates that, at those rates, █████

██████████████████████████████████████████████████████████

3       10.   Mr. Opsitnick's calculations are incorrect. Based on the information from the

4  invoices included in Exhibit C to the supporting Declaration of James C. Maroulis, Dkt. 925,

5  ██████████████████████████████████████████████████████████. Exhibit

6  B to this declaration lists the quantity of gigabytes that Stroz Friedberg processed, the processing

7  costs, and the processing cost/gigabyte for each month, based on the information from such

8  invoices included in Exhibit C. ████████████████████████████

█  ██████████████████████████████████. *See* Exhibit B. Mr.

10 Opsitnick appears to have failed to account for ██████████████████████

█  ██████████, as shown on the invoices. *See, e.g.*, Maroulis Decl., Ex. C (June 30, 2010

12 invoice: "████████████████████████████████████████

█  ████████████████████████).

14     11.   Therefore, even if Stroz Friedberg charged for processing at Mr. Opsitnick's

15 purported then "accepted industry rate" of $█████, the total cost to process the amount of data

16 actually listed in the invoices included in Exhibit C to the Maroulis Declaration (██████

█  █████) at those supposed industry rates would be ████████████████, █████

█  ████████████████████████████████████████████████████

█  █████ *See* Opsitnick Decl., ¶ 21.

20     12.   Moreover, as discussed in ¶ 8 above, Stroz Friedberg's Standard Processing

21 includes substantially more than Mr. Opsitnick assumes in his declaration, and considerably

22 more than the standard processing employed by most vendors. ████████████████

█  ████████████████████████████████████████████████████

█  ████████████████████████████████████████████████████

█  █████████████████████████████

26

27

28

DECLARATION OF RONALD ESSIG IN SUPPORT OF ORACLE'S REPLY IN SUPPORT
OF ITS MOTION FOR COSTS AND ATTORNEYS' FEES

### C. Forensic Computer Machine Time

13. Mr. Opsitnick assumes that the description on Stroz Friedberg's invoices for "Forensic Computer Machine Time" refers to "computers indexing raw data to enable data filtering to sort or search the data in order to identify potentially relevant documents." Opsitnick Decl., ¶ 22. Based on that description, Mr. Opsitnick claims that the total amount that Oracle paid for Forensic Computer Machine Time, ▮▮▮▮▮, is unreasonable because JURINNOV does not charge extra for that service.

14. Stroz Friedberg's regular practice in the provisioning of digital forensic services is to charge computer forensic machine time when a machine is running and devoted to a forensic process. This fee is consistent with a practice the firm has maintained and regularly applied for over 10 years and has been paid by numerous clients. Stroz Friedberg charges Forensic Computer Machine time whenever proprietary tools, specialized forensics hardware, or specialized digital forensics applications are used to support client casework. Examples of software that can incur forensic machine time include, but are not limited to: ▮▮▮▮▮ ▮▮▮▮▮. Hardware devices that incur forensic machine time include, but are not limited to: ▮▮▮▮▮ for data preservation; forensic workstations; and consultant laptops when used to perform forensic preservations or analyses. ▮▮▮▮▮ ▮▮▮▮▮ For this reason, computer forensic machine time can include "computers indexing," as Mr. Opsitnick states, but it also includes much more, including forensic imaging and analysis.

### D. OCR/Auto Indexing

15. Mr. Opsitnick claims that "it would have been reasonable for Oracle to negotiate a competitive rate of around ▮▮▮▮▮ per page of OCR/Auto Indexing," ▮▮▮▮▮ ▮▮▮▮▮ Opsitnick Decl., ¶¶ 26-27.

16. Despite Mr. Opsitnick's claims about "industry practices," Stroz Friedberg is a leader in this industry, and regularly negotiated – and still negotiates -- a rate of ▮▮▮ per page for OCR/Auto Indexing with its customers.

7

DECLARATION OF RONALD ESSIG IN SUPPORT OF ORACLE'S REPLY IN SUPPORT OF ITS MOTION FOR COSTS AND ATTORNEYS' FEES

17.    Further, unlike other providers, Stroz Friedberg bundles Stroz Extract along with the OCR for the price of OCR. So, for scanned documents, as described in ¶ 8 above, it provides both OCR and intelligent auto-coding for documents that typically have no metadata for about the same rate other providers charged for mere OCR. Therefore, customers paying $▮ per page for Stroz Friedberg's OCR/Auto Indexing service with Stroz Extract included obtain significantly more overall value than customers paying ▮ per page for other vendors' OCR service.

### E.  Stroz User Licenses

18.    Mr. Opsitnick claims that user licenses should have been negotiated at ▮ per user license, for a total of $▮ and a ▮▮▮▮▮ Opsitnick Decl., ¶¶ 29-33.

19.    Despite Mr. Opsitnick's claims about a proper negotiation, Stroz Friedberg regularly negotiates user license fees for projects like this one, and it regularly bills at a rate of ▮, ▮▮▮▮▮.

20.    Further, the Stroz Review user license fees provide users "thin client access" to the hosting platform via Citrix and includes the native applications (such as Microsoft Office, Lotus Notes, etc.) necessary to view native files within the platform - thus negating the need for users to pay additional license fees to have these applications available locally in their environment. The ▮ license fee included Stroz Friedberg third party licensing costs for this offering. Therefore, customers paying the user license fee for a Stroz Review user license obtain significantly greater value than customers paying a user license fee to a vendor that does not provide a license for the necessary native applications.

### F.  TIFF Generation

21.    Mr. Opsitnick claims that TIFF Generation services should have been negotiated at ▮ per TIFF page, for a total of ▮ and ▮▮▮▮ Stroz Friedberg's TIFF Generation fees. Opsitnick Decl., ¶¶ 34-37.

1  22. Despite Mr. Opsitnick's claims about a proper negotiation, Stroz Friedberg regularly negotiates TIFF Generation fees for projects like this one, and charges a rate of $████ to other clients, as well as Oracle.

23. Moreover, ████████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████ Thus, in addition to benefiting from accurate and efficient TIFF generation services by Stroz Friedberg's expert staff, ████████ ████████████████.

### G. Forensic Hard Drives

24. Mr. Opsitnick claims that the industry rate for the 423 hard drives used in document production in this case ranged around ████ 1 TB drive, which is ████ ████████ charged by Stroz Friedberg from April 30, 2010 through July 31, 2015 (covering various sized drives), ████████████████████. Opsitnick Decl., ¶¶ 38-41.

25. The rate that Stroz Friedberg charges for hard drives includes not only the standalone cost of goods, but also the labor costs associated with Stroz Friedberg's work to prepare the hard drives for use in digital forensic matters. Before a hard drive is put into use on a case it is inventoried, labeled, forensically wiped, verified, entered into an evidence tracking database, and (often) shipped from our headquarters to one of our geographically distributed forensic labs. ████████████████████████████████ ████████████████████████ This standard practice applies to other clients as well as Oracle.

26. Further, Mr. Opsitnick conveniently includes a long time span when looking at other companies' rates for this particular comparison, though most hard drive charges naturally were incurred during the early stages of the engagement in 2010-2011, when document productions were most active. ████████████████████ ████████████████████████████████████████ ████████████

28

9

## III.  TAXABLE COSTS

27.  Mr. Opsitnick claims that certain categories of work descriptions on the Stroz invoices are vague or incorrectly categorized as taxable costs because they are not "essential to the making of copies necessary to the case." Opsitnick Decl., ¶¶ 7-8. Mr. Opsitnick does not provide any further explanation aside from identifying "Standard Processing" as an example. *Id.*

28.  I understand that Oracle was required to produce ESI to Rimini in this litigation. As Oracle's ESI discovery provider in this case, Stroz Friedberg completed numerous steps in order to convert ESI into the proper production formats.

29.  After collecting the ESI from Oracle's data sources, Stroz Friedberg first had to extract the metadata and text from those sources. The work description "Standard Processing" on Stroz Friedberg's invoices refers to this extraction process and varies on invoices depending on whether Stroz Extract was included or added as a separate line item, as discussed in ¶ 8 above.[1]

30.  Stroz Friedberg next had to convert many of the native files into TIFF images. The work description "TIFF Generation" on Stroz Friedberg's invoices refers to this process.

31.  Stroz Friedberg next had to affix a Bates number and a confidentiality designation to the TIFF images. The work descriptions "Bates stamping" and "Text Endorsement" on Stroz Friedberg's invoices refer to these processes.

32.  Stroz Friedberg next had to load the native files and TIFF images in a production format for delivery to Rimini. The work descriptions "Load File Delivery" (the generation of document level (e.g. DAT) and page level (e.g. OPT) cross-reference files associated with production exports of images, text, and native files) and "Native File Delivery" (the export of documents where image-based renderings were not generated, such as Excel documents) on Stroz Friedberg's invoices refer to these processes.

---

[1] This description was only used for the processing of Oracle ESI. When Stroz processed ESI or documents produced by Rimini or third parties, it billed for such services under the billing category "Paper Processing."

33. Stroz Friedberg next had to load the production files onto media that Oracle could send to Rimini. The work description "CD(s)" on Stroz Friedberg's invoices refers to this process and includes disc label generation.

34. All of the entries on the Stroz Friedberg invoices attached to the Maroulis declaration for "Bates stamping," "CD(s)," "ESI – Stroz Extract," "Native File Delivery," "Text Endorsement," and "Standard Processing" describe work performed by Stroz Friedberg that was essential to making copies necessary to the case.

35. Mr. Opsitnick refers to inconsistent highlighting of the above work descriptions as taxable costs in the invoices included in Exhibit C to the Maroulis Declaration. Opsitnick Decl., ¶ 7. Regardless of any highlighting errors by the attorneys putting together the documentation for the attorneys' fees and costs request, all entries for the categories listed in the above paragraph describe work performed by Stroz Friedberg that was essential to the making of copies necessary to the case.

IV. "EXPENSES MISSING DETAIL"

36. Mr. Opsitnick states that ███████ of expenses from Stroz Friedberg invoices do not include sufficient descriptions to assess them. Opsitnick Decl., ¶ 42. However, the references to "Electronic Discovery & Other Fees" and "Expenses" are not to actual individual charges but appear to be the result of missing sections or pages from copies of Stroz Friedberg invoices. It should be apparent to anyone who has reviewed some of the dozens of complete invoices that "Electronic Discovery & Other Fees Summary" is the heading which appears above the detailed line items for processes such as Bates Stamping, Standard Processing, and the like. "Expenses" is the heading which appears above detailed miscellaneous charges such as postage and delivery. Hourly timekeeper fees appear under a separate heading. Given the context of the other complete invoices that were provided, these headings provide sufficient information about the categories of fees included in the invoice.

37. Where there are pages missing from the copies of Stroz Friedberg invoices in Exhibit C to the Maroulis Decl., Dkt. 925, I have confirmed by reviewing Stroz Friedberg's

DECLARATION OF RONALD ESSIG IN SUPPORT OF ORACLE'S REPLY IN SUPPORT OF ITS MOTION FOR COSTS AND ATTORNEYS' FEES

1  historical records that the totals in the "Electronic Discovery & Other Fees Summary" and
2  "Expenses" headings on each affected invoice correctly reflect the actual total of individual
3  category charges under the respective heading from the missing pages.

4  V.  **PROJECT CHALLENGES**

5  38.  This engagement was a technologically complex and challenging matter. The
6  total volume of these collections resulted in over 43 million documents processed or ingested,
7  over 18 million documents and 29 million images made accessible to reviewers, and a huge
8  volume of production documents and images stored in a repository that exceeded 19 terabytes
9  (or over 19,000 gigabytes). To put that volume into perspective, one gigabyte of common mixed
10 file types (e.g., email, Word documents, text files, Excel sheets) can generate 100,000 (or more)
11 printed pages. 100,000 printed pages would fill 40 standard 10" x 12" x 15" bankers boxes used
12 routinely in litigation, which if stacked on top of each other would stand 33 feet tall. Thus, if
13 printed out, the ▓▓▓ GB of data that Stroz Friedberg processed in this matter would fill
14 773,040 bankers' boxes and would rise 122 miles into the air, and deep into the earth's
15 Thermosphere.

17 If called as a witness, I could and would competently testify from my personal
18 knowledge to the facts stated herein. I declare under penalty of perjury under the laws of the
19 United States that the foregoing is true and correct. Executed this 4th day of April 2016, in
20 *Purchase, New York*.

22 Dated: April 4, 2016

_____
Ronald Essig

DECLARATION OF RONALD ESSIG IN SUPPORT OF ORACLE'S REPLY IN SUPPORT
OF ITS MOTION FOR COSTS AND ATTORNEYS' FEES

## CERTIFICATE OF SERVICE

I certify that on April 4, 2016, I electronically transmitted the foregoing **DECLARATION OF RONALD ESSIG IN SUPPORT OF ORACLE'S REPLY IN SUPPORT OF ITS MOTION FOR COSTS AND ATTORNEYS' FEES** to the Clerk's Office using the Electronic Filing System pursuant to Special Order No. 109.

Dated: April 4, 2016

Morgan, Lewis & Bockius LLP

By: /s/ Thomas Hixson
Thomas Hixson

Attorneys for Plaintiffs
Oracle USA, Inc.,
Oracle America, Inc. and
Oracle International Corporation