1

1          UNITED STATES DISTRICT COURT
                  DISTRICT OF NEVADA
2        BEFORE THE HONORABLE LARRY R. HICKS, DISTRICT JUDGE


3


4   ORACLE USA, INC., a Colorado      :
    corporation; ORACLE AMERICA,      :
5   INC., a Delaware corporation;     :
    and ORACLE INTERNATIONAL          :No. 2:10-cv-0106-LRH-VCF
6   CORPORATION, a California         :
    corporation,                      :
7                                     :
            Plaintiffs,               :
8                                     :
        vs.                           :
9                                     :
    RIMINI STREET, INC., a Nevada     :
10  corporation; and SETH RAVIN,      :
    an individual,                    :
11                                    :
            Defendants.               :
12  _____  :

13

14

                   TRANSCRIPT OF MOTION HEARING
15

16

                        May 25, 2016
17

18                      Reno, Nevada

19

20

21

22  Court Reporter:         Donna Davidson, RDR, CRR, CCR 318
                            Certified Realtime Reporter
23                          400 South Virginia Street
                            Reno, Nevada  89501
24                          (775) 329-0132

25

2

```
 1                    A P P E A R A N C E S

 2    FOR THE PLAINTIFFS:

 3    BOIES, SCHILLER & FLEXNER LLP
      RICHARD J. POCKER
 4    300 South Fourth Street, Suite 800
      Las Vegas, Nevada 89101
 5    (702) 382-7300
      Fax: (702) 382-2755
 6    rpocker@bsfllp.com

 7    MORGAN LEWIS & BOCKIUS LLP
      THOMAS S. HIXSON
 8    NITIN JINDAL
      JOHN A. POLITO
 9    One Market, Spear Street Tower
      San Francisco, California 94105
10    (415) 442-1000
      Fax:  (415) 442-1001
11    thomas.hixson@morganlewis.com
      nitin.jindal@morganlewis.com
12    john.polito@morganlewis.com

13    JAMES C. MAROULIS
      Oracle Corporation
14    500 Oracle Parkway
      Redwood City, California 94070
15    (650) 506-4846
      jim.maroulis@oracle.com

16

17    FOR THE DEFENDANTS:

18    GIBSON, DUNN & CRUTCHER LLP
      MARK A. PERRY
19    1050 Connecticut Avenue N.W.
      Washington, DC 20036-5306
20    (202) 955-8500
      mperry@gibsondunn.com
21
      GIBSON, DUNN & CRUTCHER LLP
22    JOSEPH A. GORMAN
      555 Mission Street
23    San Francisco, California 94105
      (415) 393-8296
24    jgorman@gibsondunn.com

25
```

3

```
 1              A P P E A R A N C E S  (Continued)

 2    FOR THE DEFENDANTS:

 3    GIBSON DUNN & CRUTCHER LLP
      BLAINE H. EVANSON
 4    333 South Grand Avenue
      47th Floor
 5    Los Angeles, California 90071
      (213) 229-7000
 6    bevanson@gibsondunn.com

 7    SHOOK, HARDY & BACON LLP
      PETER E. STRAND
 8    2555 Grand Boulevard
      Kansas City, Missouri 64108
 9    (816) 474-6550
      Fax: (816) 421-5547
10    pstrand@shb.com

11    LEWIS ROCA ROTHGERBER CHRISTIE LLP
      W. WEST ALLEN
12    DANIEL F. POLSENBERG
      3993 Howard Hughes Parkway, Suite 600
13    Las Vegas, Nevada 89169
      (702) 949-8230
14    Fax: (702) 949-8364
      wallen@lrrlaw.com
15    dpolsenberg@lrrc.com

16    DANIEL B. WINSLOW
      RIMINI STREET, INC.
17    6601 Koll Center Parkway
      Suite 300
18    Pleasanton, California 94566
      (925) 264-7736
19    DWinslow@riministreet.com

20    JOHN P. REILLY
      RIMINI STREET, INC.
21    3993 Howard Hughes Parkway
      Suite 500
22    Las Vegas, Nevada 89169
      (336) 908-6961
23    JReilly@riministreet.com

24

25
```

4

```
 1                RENO, NEVADA, MAY 25, 2016, 10:02 A.M.

 2                            --oOo--

 3              P R O C E E D I N G S

 4

 5           THE COURT:  Good morning.  Have a seat, please.

 6           I haven't seen this many suits in the courtroom

 7    since last October.

 8           COURTROOM ADMINISTRATOR:  Today is the date and

 9    time for hearing regarding plaintiffs' motion for

10    attorneys' fees, number 917, and motion for preliminary

11    injunction, number 900, in civil case 2:10-cv-106-LRH-VCF,

12    Oracle USA, Inc., and others, versus Rimini Street, Inc.,

13    and others.

14           Counsel, if you could please state your

15    appearances for the record.

16           MR. HIXSON:  Good morning, Your Honor.  Tom

17    Hixson, John Polito, and Nitin Jindal, with Morgan Lewis,

18    for Oracle.

19           THE COURT:  Thank you.

20           MR. MAROULIS:  Good morning, Your Honor --

21           MR. POLSENBERG:  Good morning, Your Honor, Dan

22    Polsenberg for defendants.  And if I may, I'd like to

23    introduce --

24           THE COURT:  Just a second, Mr. Polsenberg.

25           MR. POLSENBERG:  I'm sorry.  I thought Tom
```

1    covered everybody.

2              MR. MAROULIS:  Good morning, Your Honor.  James

3    Maroulis for plaintiffs.

4              THE COURT:  Thank you.

5              MR. MAROULIS:  From Oracle.

6              MR. POCKER:  Your Honor, Richard Pocker, Boies,

7    Schiller and Flexner, also on behalf of plaintiffs.

8              THE COURT:  All right.

9              See, Mr. Polsenberg, you have to get used to

10   this crowd.

11             MR. POLSENBERG:  Really.  More than at a state

12   bar meeting.  And most of them pro hoc.

13             Dan Polsenberg, Your Honor.  And if I could

14   introduce three Gibson, Dunn and Crutcher lawyers.  I have

15   Mark Perry, from Washington, DC, who will be arguing the

16   injunction motion; Blane Evanson, from California, who will

17   be arguing the attorneys' fees motion; and assisting them

18   is Joe Gorman, also from California.

19             THE COURT:  All right.  Thank you.

20             MR. POLSENBERG:  Thank you.

21             THE COURT:  Welcome to all of you in the

22   courtroom.  I do appreciate having you here.  I appreciate

23   the obvious interest on both sides.

24             And I'll tell you up front, I appreciate the

25   quality of the briefing in this matter and compliment you

6

1    on it.  I consider it professional and well done.  And it's

2    a pleasure to have you back in the courtroom.

3              We had earlier entered a minute order indicating

4    that argument for both sides should not exceed 45 minutes

5    on the respective motions.  That's not to say they

6    necessarily should go 45 minutes, but I certainly would

7    allow you that amount of time and for Plaintiff Oracle to

8    divide it between opening and reply argument as necessary.

9              So all of that stated, Mr. Hixson, are you

10   carrying the laboring oar here?

11             MR. HIXSON:  I'll be arguing the permanent

12   injunction motion, and Mr. Pocker will be arguing the

13   attorneys' fees motion.

14             If Your Honor has a preference, we will argue

15   them in the order the Court prefers, otherwise we --

16             THE COURT:  We have been treating them with A,

17   for attorneys' fees, first.  So let's go with that.

18             Mr. Pocker?

19             MR. POCKER:  Good morning, Your Honor.

20             As the Court has noted, this case has been --

21   this issue, rather, the attorneys' fees issue, has been

22   extensively briefed.  I think there's 700 to 1,100 pages of

23   declarations and documentation regarding our request and in

24   response.

25             As a consequence I'm not going to be belaboring

1    a lot of the evidence that's been submitted.  We seek a

2    substantial number or amount of attorneys' fees in this

3    case but one which, when the Court analyzes the law and the

4    facts of this matter and the way this litigation has

5    unfolded, you'll determine that we're entitled to every

6    dollar we've asked.

7              We have noted throughout our pleadings that this

8    isn't the total amount that we would have been justified in

9    asking for under the law and the facts and the

10   circumstances of this case either.

11             The defendants primarily oppose our request for

12   attorneys' fees on four grounds.  They first cite Section

13   505 indicating that it is a discretionary statutory

14   provision regarding an award of costs and fees in a

15   copyright case and opine that because there was a finding

16   by the jury that there was not willful infringement by

17   Rimini or Mr. Ravin, that for some reason that would make

18   an award of attorneys' fees in this case an abuse of

19   direction on your part.

20             Second, they even quarrel with who won this case

21   and who the prevailing party is, despite the overwhelming

22   evidence that Oracle is in fact the winner of the

23   underlying litigation.

24             Third, they take issue with broad categories of

25   costs that we have asked to be reimbursed and certain

1    categories of attorney work that we've claimed attorneys'

2    fees for, citing a number of their experts who opine on

3    whether or not these practices are not only compensable but

4    permissible, duplicative.  There's a raft of objections

5    that are made in that context.

6             And they also quarrel with whether or not the

7    lodestar that Oracle has proposed based upon the reasonable

8    rate times the amount of hours actually expended at that

9    rate is in fact permissible given the legal market in Las

10   Vegas.

11            The Court has heard our arguments -- or has read

12   our arguments.  I'd like to address some of what the

13   opponents have said with respect to the prevailing party

14   issue.

15            The prevailing party issue is important not just

16   for the 505 analysis but also with respect to the arguments

17   that Rimini has made that there should be massive

18   percentage discounts of whatever amounts the Court might be

19   tempted to award in this case based on what they have

20   described as the limited success achieved by Oracle in this

21   litigation.

22            Sometimes I feel from reading the pleadings in

23   this case that I attended a completely separate trial from

24   the one that the Rimini lawyers attended.

25            There's no question in this case that a $50

1     million copyright infringement and a computer access abuse

2     verdict is a substantial win for Oracle, regardless of how

3     much those damages could have been had certain arguments

4     been adopted by the jury.

5              Just the other day across my desk came a

6     publication about the top 100 verdicts of 2015.  This case

7     was number 35, and it had a synopsis in there of all the

8     arguments and all the claims and the results on those, and

9     there was input from attorneys for both sides.

10             This case wouldn't be number 35 in a journal of

11    top 25, top 100 2015 verdicts if Rimini Street was the

12    prevailing party.

13             So it's almost ludicrous for them to advance

14    that argument.  It's done, of course, because they believe

15    that by demonstrating by any of three metrics they've

16    proposed, such as how many claims were pled versus how many

17    claims Oracle prevailed on, or their second measure, how

18    much money was asked, how much money was awarded by the

19    jury, or their third one had to do with another percentage

20    of success percentage, their argument is that somehow

21    that's how this Court should approach this when

22    determining the ultimate amount of attorneys' fees, that

23    somehow it matters whether or not Oracle wins on every

24    single claim.

25             But it's just wrong to count up the claims and

1          say just because we got rid of the accounting claim, just

2          because we did not proceed with the contract claim that

3          somehow Oracle did not succeed in this litigation.

4                    Everybody knows, everybody in this room -- maybe

5          not Mr. Polsenberg, but everybody in this room was at that

6          trial and saw what this case was about.  It was a copyright

7          infringement case and a computer abuse case, and Oracle

8          prevailed on both of those claims with damages that

9          totalled over $50 million.

10                   On the infringement claim alone Oracle received

11         an award from that jury that was three and a half times

12         what Rimini's expert claimed the damages were.

13                   And on the computer claim, they received -- we

14         received $14 million, which coincidentally happens to be

15         the same amount that was posed by our expert, Ms. Dean,

16         with respect to the damages in this case.

17                   Every piece of evidence that was presented at

18         that trial came in to demonstrate Rimini Street's

19         infringement or the abuse of Oracle's computer system.  The

20         fact that other claims were pled really isn't the

21         appropriate measure of whether or not what was presented at

22         trial actually needed to be presented at trial and whether

23         or not our arguments were accepted.

24                   For Rimini Street to argue that the jury by and

25         large accepted their arguments and thus they prevailed on

1    more issues than did Oracle is ludicrous on its face.  And

2    I do not believe for a minute that they wouldn't gladly

3    switch places with us in the results ultimately that are

4    rendered in this judgment.

5            The other thing to keep in mind is that much of

6    this case ended even before the jury was seated.  We had

7    two hard-fought summary judgment motions with respect to

8    two of the software license -- or copyrights that have been

9    infringed.  And on both of those, Oracle won without

10   calling a single witness at trial.

11           This measures into the ultimate success as well

12   because after those motion for summary judgment rulings

13   there was less to try and less to present to the Court.

14           Rimini didn't win on the raw numbers of damages

15   either.  $50 million is huge for any federal jury.  And as

16   the Court has noted during the trial, in a case like this,

17   they don't come around Nevada very often, and an award

18   this -- of this level of damages is unusual.

19           There's no way that this is not a significant

20   victory for Oracle.  We have Rimini's expert, Mr. Hampton,

21   argued for $10 million in copyright damages, and that was

22   based on his theory of how -- with a few more -- hiring a

23   few more people and maybe expanding their work facilities

24   Rimini would have been able to operate the same -- in a

25   noninfringing manner.

1          Well, the jury rejected that flat out of hand,

2     and, instead, they awarded $35 million.

3          The computer access statutes.  Rimini dismissed

4     those completely and said no damages are entitled there.

5     The jury came back with 14 million.  And let's talk about

6     what claims were actually at issue at trial and what their

7     ultimate disposition was.

8          There were three claims on which Oracle

9     prevailed:  Direct copyright infringement against Rimini

10    Street for $35 million and the Nevada and California

11    computer statutes for $14.4 million.  Now, arguably, those

12    two are based on the same conduct, and the California and

13    Nevada claims, the damages will be for one of those claims

14    and not the other.

15          There was one active claim that was not

16    presented to the jury.  The California Unfair Competition

17    allegation, which is under Section 17200.  That is part of

18    what the Court will be hearing later today, part of the

19    injunction proceedings.

20          And that's because that's not a jury claim.  It

21    is an equitable claim.  It's to be decided by this Court.

22          Two -- only two claims were presented to the

23    jury upon which Oracle did not prevail.  And both were

24    varieties of tortious interference claims.  One was

25    interference with perspective economic advantage under

1    Nevada law and one was tortious interference with contract.

2              It is true that on both of those cases -- both

3    of those claims, the jury ruled against Oracle and did not

4    award damages.

5              But what was the underlying conduct that was at

6    issue on all of those claims that went before the jury?  It

7    was Rimini Street's downloading of Oracle's material

8    violating the computer access statutes, using that to build

9    a business on the cheap, competing with Oracle in the

10   marketplace by infringing their copyrights and violating

11   the licenses -- or the -- without a license and violating

12   the licenses of their customers.

13             It was all part and parcel of one course of

14   conduct.  And as a result, the fact that the jury found

15   them responsible under one theory, copyright infringement,

16   is more than enough to demonstrate that in this particular

17   case Rimini's arguments did not prevail, Oracle's did, and

18   Oracle was the winner.

19             Much is made of five claims that were originally

20   pled that did not reach the jury.  Let's talk about those.

21   The federal Computer Fraud and Abuse Act claim.  Oracle did

22   in fact decide not to proceed with that after the settling

23   of the jury instructions, not wanting to confuse the jury.

24             We had California and Nevada statutes that

25   covered similar, if not identical, conduct.  That was more

1    than sufficient for us to set Rimini's conduct in front of

2    that jury and get the kind of verdict and damages we

3    needed.

4              Breach of contract.  Same thing.  It had to do

5    with the breach of the terms of use of Oracle's website.

6    Under the circumstances it wasn't necessary to proceed to

7    proceed to -- to pursue the same damages.

8              Trespass to chattels.  That was abandoned.  But

9    that's, again, premised upon trespassing on the computer

10   systems which were more than adequately addressed by the

11   other claims.

12             Unjust enrichment.  Of course, it would be --

13   never go to the jury because it's reserved as an equitable

14   remedy and the situation in which a jury may find against

15   Oracle that Oracle would be entitled to pursue an unjust

16   enrichment equitable claim.  So of course that was

17   abandoned.  It wasn't necessary, given the fact that Oracle

18   won substantial damages.

19             And, lastly, the accounting claim, which is pled

20   in almost every case of this magnitude as an additional

21   equitable remedy, which might come in handy if there did

22   become a question during the proof as to what the scope of

23   the damages or economic underpinnings of those damages

24   were.

25             As Magistrate Judge Cooke opined in one of the

1    many cases cited by the defendants in this particular case,

2    the plaintiff is the captain of its complaint.

3              And in this particular case Oracle was free to

4    clean it up a little bit before it went to the jury.  That

5    doesn't mean that any of these five claims were for some

6    reason definitively decided against them.  And in that

7    context the fact that they did not proceed to the jury

8    means nothing at all.

9              Also with respect to this issue of who really

10   won this case, let's talk about Rimini's counterclaims.

11   Early on in this case they had a counterclaim for

12   defamation.  They were offended that Oracle had made

13   statements to the effect that Rimini had engaged in massive

14   downloading of its software and accusing it -- it's -- the

15   Rimini Street claim said, of criminal conduct.  They lost

16   that.  They lost that on summary judgment.

17             The declaration of copyright misuse was pled as

18   a defense in this case.  They lost that on a motion to

19   dismiss.  Yet they continue to try to argue it in the

20   context of this case, despite the fact that it really

21   hasn't been a part of this case since many, many months

22   before trial began.  And they also had a California Unfair

23   Competition claim of their own under 17200.  That was

24   defeated on a motion to dismiss.

25             They also abandoned or lost 11 affirmative

1    defenses.  And those affirmative defenses were rejected by

2    the jury.

3            Those included such things as consent, implied

4    license, actual license, the doctrine of merger, fair use,

5    statutes of limitations.  All of these were advanced by

6    Rimini Street, allegedly in good faith, none of which

7    succeeded at trial.

8            So if we're going to get into this balancing of

9    the claims and who won what, all of that needs to be taken

10   into consideration as well.

11           Rimini has made much of this notion of what they

12   continually call innocent infringement.  And I think in our

13   reply we pointed out how many times the word innocent keeps

14   popping up in their papers on this issue.

15           But we need to keep in mind exactly what this

16   whole concept is about.  First of all, Section 505 does not

17   condition an award of fees on a showing of a willful

18   infringement by a defendant.  And that's the *Casella versus*

19   *Morris* case.  We've cited it.  There's been no change to

20   that.

21           We don't have to show willful infringement to be

22   entitled under Section 505 to an award of attorneys' fees

23   and costs.  The whole notion of innocent versus willful

24   infringement only comes into play with statutory damages in

25   the copyright framework.  And that is they were asked --

1    the jury was asked, for an advisory ruling on whether -- or

2    advisory opinion as to whether or not they thought the

3    infringement was willful or innocent.

4            It comes into play only with respect to what --

5    a situation in which Oracle would choose its statutory

6    damages as its award over its actual damages and that the

7    finding of willful would have allowed those statutory

8    penalties to increase.

9            In this particular case it never really even

10   came into play.  Because the jury returned a calculation of

11   $2.79 million in statutory damages.  With a willfulness

12   enhancement, it would have only gone up to 2.9.  But in

13   reality the actual damages, the award by the jury which

14   Oracle is accepting, is $35 million.  So it never had any

15   play in this case whatsoever.

16           What Rimini Street wants to do with it is say

17   you can infer from this finding on this advisory issue that

18   somehow the jury concluded that Rimini Street was basically

19   a technical violator here, that they were innocent of any

20   wrongful intent or anything of that sort, whereas the very

21   findings of that jury show they did not conclude anything

22   of the sort.

23           If you look at the other claims that they found

24   for Oracle, found in favor of Oracle, the computer claims

25   under California and Nevada law, both of them required that

1     they be convinced by a preponderance of the evidence that

2     there was knowing and willful misconduct and that Rimini

3     Street did not believe their conduct was permissible at the

4     time.

5               So by finding for Oracle on those two claims,

6     this whole notion of innocence and just a technical mistake

7     on the part of Rimini Street was clearly not accepted by

8     the jury.

9               Now, why is any of this important?  Well, it's

10    important to knock down those arguments that somehow

11    there's a proportional or a percentage discount that

12    they're entitled to because Oracle somehow failed to have

13    more than limited success on these claims.  But it also

14    brings us, with respect to the attorneys' fees award under

15    Section 505, to this notion of why should this Court

16    exercise its discretion in favor of Oracle on this case?

17              And in our opening motion we set forth the

18    numerous ways and extensive amount of litigation

19    misconduct, there's really no other word for it, and foot

20    dragging that Rimini engaged in this case, which resulted

21    in the fact that this case dragged on for five years, at

22    great expense to everybody, and really there was a trial

23    which in many respects never really had to be had.

24              Why is this important?  Well, under this

25    circumstances -- under these circumstances and what we've

1    set forth in our motion and in our reply, what is revealed

2    is a pattern on the part of Rimini Street, a pattern of

3    behavior during the litigation -- which, by the way, an

4    advisory ruling on whether or not the actual infringement

5    was willful or innocent has no bearing.

6              Let's look at how Rimini Street litigated this

7    case.  We pointed out that on a number of instances their

8    responses were just plain inaccurate, to be charitable, or

9    false, with respect to discovery requested in this case.

10   Most notably the entire series of events which resulted

11   ultimately in a spoliation motion by Oracle and a

12   spoliation ruling by Magistrate Judge Leen, combined with

13   the foot dragging that occurred in this case, the examples

14   of Rimini Street deliberately, because there would be no

15   other way that this could have happened, prevaricating

16   about whether or not cross-use -- one of the most important

17   issues in this case, cross-use of the copyrighted material

18   by Rimini Street, whether or not that occurred, these

19   elongated the discovery process, complicated the efforts

20   that Oracle was required to make in order to discover the

21   information necessary to prove it, and basically turned out

22   to be an utter sham on the part of Rimini Street.

23             The Court will recall that Seth Ravin -- it took

24   him until his testimony at trial to admit and acknowledge

25   that cross-use happened, quote, all the time.

1           Going into that, and we've set forth in our

2      motion the evidence that backs this up, they denied, Rimini

3      Street denied that such a cross-use was occurring.  And it

4      took three and a half years of motions practice and

5      discovery for Oracle to build the case which Rimini Street

6      could easily have acknowledged early on in this case.

7           They did the same thing with the second summary

8      judgment motion, keeping alive the issue of whether or not

9      there was liability with respect to a couple of the

10     software copyrights by arguing that they only used them for

11     archival purposes when ultimately, as the evidence showed

12     at trial, that was not true.

13          Under the circumstances what this Court is

14     allowed to take into consideration with respect to deciding

15     whether an award of copyright -- or attorneys' fees is

16     appropriate under Section 505 is Rimini Street's litigation

17     conduct and whether or not that increased the burden on

18     Oracle with respect to the efforts it needed to make by its

19     attorneys in order to prove its case.

20          And we've demonstrated that in our opening

21     motion.  Rimini Street's response in opposition was

22     certainly not effective to negate any of that.  And we've

23     demonstrated that in our reply.

24          That forms a basis for this Court to conclude

25     that Oracle should not be left to its own devices to pay

1    for activity and lawyer's activities and discovery

2    activities that it would never have had to engage in were

3    it not for Rimini Street's obstructive behavior in this

4    case.

5            The argument made by Rimini Street that some of

6    the attorneys' fees are not reimbursable because they dealt

7    with issues that ultimately either Rimini Street prevailed

8    upon or were not necessary to the proof of what Oracle

9    prevailed upon is, of course, completely ridiculous, given

10   the fact that this case was a seamless web of factual

11   allegations and a situation where we had to prove all of

12   these different elements.

13           There's been no effort by Rimini Street to turn

14   around and try to parcel out any efforts made during the

15   discovery proceedings or at trial even in the proof that

16   Oracle engaged in which weren't necessary and thus should

17   not be the subject of compensable attorneys' fees.

18           I think a very important factor that comes into

19   this case that Rimini Street has injected is this notion

20   that somehow Oracle's attorneys' fees' requests are

21   burdensome and basically outrageous and in excess of what

22   is appropriate.

23           But it completely ignores the fact of the

24   conservatism that Oracle has exercised and the demands that

25   it's made.  And this is a classic example of the old

1     admonition, no good deed goes unpunished.

2              Almost $6 million in recoverable fees, over 14

3     percent of Oracle's total fees, was never claimed in this

4     case, largely because some of the entries that embraced

5     that time were block-billed with entries that we redacted.

6              So Oracle legal, in an abundance of caution,

7     didn't even place those into our request for attorneys'

8     fees in this particular case.  That amounts to 14 percent

9     of Oracle's total fees in this particular case.

10             But out of an abundance of caution and an

11    interest to be fair and conservative, Oracle didn't even

12    include those in its request.

13             Moreover, no attorneys' fees are claimed for any

14    activity after November 2015.  That, despite the fact that

15    Rimini Street continues to overlitigate, obstruct, and drag

16    this proceeding out.

17             In this particular case, it's a request for

18    attorneys' fees, and yet Rimini Street has submitted expert

19    declarations from five different experts to which, of

20    course, in order to fully address the issues and knock down

21    the erroneous conclusions and arguments made by Rimini

22    Street, Oracle has had to engage its own experts in order

23    to counter that.

24             It just hasn't stopped.  And it never will, Your

25    Honor, until there is deterrence to Rimini Street so

1   that -- when they can pay a price so that this will not

2   continue to happen.  And by that continuing to happen, I'm

3   talking about two things.

4            One is defending the case on borderline bad

5   faith with respect to how they've conducted the defense,

6   but second of all this serial notion that they continue to

7   engage in borderline-at-best, infringing-at-worst business

8   activities throughout the course of litigating it at the

9   same time.

10            They didn't change their business model until

11  this Court found them to be liable by summary judgment, and

12  then they professed, oh, we went and we changed to a

13  process 2.0 and now everything is fine.

14            And yet there's another lawsuit pending now.

15  And Rimini Street has characterized it as *Rimini II*, a

16  declaratory judgment action on their part to get a

17  declaratory judgment that what they're doing is okay and

18  doesn't infringe.  But coupled with that are numerous

19  counterclaims by Oracle about this new process and how it

20  infringes.

21            And the Court is well aware that, through the

22  motion for an injunction in this proceeding, that part of

23  Rimini Street's defense is, no, you can't enter this

24  injunction because it will interfere with the way we're

25  operating now.

1                    Well, if that's the case, then they must still

2          be infringing now, in light of the fact that the injunction

3          we've proposed addresses the infringing conduct as found by

4          this Court and the jury.

5                    So what does that tell us?  That tells us that

6          Rimini Street in this particular case is content to

7          continue to take their chances, roll their dice, go to

8          court.  Yeah, they have to pay attorneys' fees, yeah, they

9          can tie everything up for years and years; but in the

10         meantime let's just switch things a little different, let's

11         try a different way of operating our business.

12                   If you go through this whole series from

13         Mr. Ravin's involvement at TomorrowNow, which didn't come

14         before the jury in any great detail but the Court's aware

15         of it and it was briefed and discussed quite extensively in

16         the pretrial proceedings, I think what we can glean from

17         that is that Mr. Ravin's always pushing the envelope,

18         always close to the line, we would submit always over the

19         line, and there's only one thing that's going to make this

20         conduct stop, and that is the deterrent effect of not only

21         having to pay the damages which are rightfully assessed

22         against him, but also to pay for the long, drawn-out battle

23         Oracle has had to engage in simply to protect its

24         intellectual property rights.

25                   And we had motions in limine about this notion,

1     a long time ago, of Rimini Street wanting to refer to

2     Oracle with certain characterizations and negative terms.

3     And they're back at it again here today with characterizing

4     Oracle as a behemoth, quoting a US Supreme Court case that

5     used the term in connection with another company, and

6     arguing that somehow, because Oracle is successful and big,

7     it's not entitled to its attorneys' fees because it's not

8     hard for Oracle to go out and foot a $50 million bill;

9     whereas it might be for some poor starving artist, the

10    implication being that somehow Rimini Street is the

11    starving artist in all of this.

12            But as a consequence, that's not justice.  And

13    as a consequence, Rimini Street can continue to play these

14    games, try to see how close they can get to infringing

15    without maybe getting a court to declare it an infringer at

16    great expense to Oracle.

17            And this is not some random commercial case

18    where the parties pay their money, come in, and, you know,

19    they take their chances and take their own attorneys' fees

20    home.  This is a situation in which the very need to go

21    that far and to have that many depositions and that many

22    experts and that much discovery is all the consequence of

23    how Rimini Street defended this case.

24            That's why it's rich when Rimini Street talks

25    about the experts and says, well, you know, that's way too

1    much to pay for this expert, you know, that's an outrageous

2    amount.  They didn't need to do all that.

3            And yet in reality what did we find; that

4    because Rimini Street spoliated evidence, destroyed the

5    software library, Oracle, in order to prove its case, had

6    to go out and basically prove another way, through

7    extensive expert analysis, electronic discovery, through

8    testimony, through depositions, to reconstruct what Rimini

9    had really been up to.

10           And they say, well, yeah, we got rid of the

11   software library.  We were bad.  We offered somebody to

12   testify about it.  Yeah, okay, you got a spoliation

13   instruction.  All is well.

14           But that is just emblematic of what's wrong with

15   Rimini Street's approach to this case and why it has been

16   ridiculously expensive in this case.

17           And if ever there was a situation in which the

18   documented behavior -- and part of it occurred during trial

19   in this Court's presence when Rimini Street finally came

20   clean on a lot of issues, that if they had given that

21   testimony two, three years ago, there may never have even

22   been a trial in this case.

23           All this evidence, all this conduct is relevant

24   to this issue of whether this Court should issue its -- or

25   exercise its discretion to award fees at all in this

```
1     particular case.

2              With respect to the -- and they are just so many

3     in number.  The various objections that have been put

4     forward by Rimini Street as to what's wrong with the

5     individual billing statements, what's wrong with the rates

6     that were charged, I just have a few summary remarks about

7     those.

8              Again, with respect to the conservativism,

9     Oracle had a billing policy which Mr. Kennedy and several

10    of these experts addressed about limiting participation of

11    the lawyers to 10 billable hours per day.  Well, there are

12    a number of instances in this, and it's highlighted in the

13    declarations of my co-counsel, where time was in fact

14    worked beyond 10 hours but it was capped at 10 hours with

15    respect to what was sought in our attorneys' fees request.

16             We also deliberately did not seek attorneys'

17    fees for the activities of in-house counsel, despite the

18    fact that they are very involved in this case.

19    Mr. Maroulis especially.  And as a result that was

20    reimbursable attorneys' fees which could have been claimed

21    but in this particular case were not.

22             And, more pertinently, both the Morgan Lewis

23    attorneys in their current incarnation, and as Bingham

24    lawyers before, and Boies, Schiller & Flexner offered

25    discounted rates.  These are not even their standard rates
```

1    with respect to what was charged to Oracle in this

2    particular case.

3              Now, as to the rates -- and we have a big long

4    declaration from Dennis Kennedy about all his experience

5    and how he knows what the market in Las Vegas is, et

6    cetera, et cetera.  That's been posited by Rimini Street.

7    And we've had them cherry pick a number of district court

8    opinions where courts come down to billable ranges that

9    they find acceptable, which are considerably below what was

10   billed in this case, and they say this proves that these

11   rates are unreasonable and thus when multiplied by the

12   hours worked, it produces an unreasonable lodestar.

13             Well, much like antitrust cases and a lot of

14   other context, defining the market is important.  I think

15   the first thing to remember about this case is it was

16   essentially an all-star game.  The Court even commented

17   during trial that the caliber of lawyering in this case, on

18   both sides, was much beyond what you would get in a typical

19   piece of litigation here or anywhere else.

20             Now, the argument can be, well, that's the

21   choice of the parties.  If they want to hire extremely

22   expensive, extremely capable lawyers, they just have to pay

23   for them.  But that's the context in which we're operating

24   here.  And it moves both ways.

25             And this was a point that we made in our

1    opposition is that -- or in our reply.  Curiously missing

2    from their opposition is the fact that they had six

3    different law firms, five of which -- actually all six of

4    which, I think, are basically regional or national law

5    firms, including Gibson, Dunn and Crutcher, one of the most

6    expensive law firms in this country.  And yet they have the

7    temerity to say that it's a problem that Oracle, in this

8    particular case, in order to go up against a team like

9    that, had high-priced lawyers from Morgan Lewis and Boies,

10   Schiller and Flexner.

11           The market in which this particular case, even

12   though it occurred here in Nevada, needs to be evaluated is

13   in the market for top-tier trial and copyright talent.

14           And that's not a ridiculous situation at all.

15   As a couple of the cases cited by Rimini Street and one

16   cited by us show, that -- in cases right here in this

17   district, on occasion the courts have said, you know what,

18   in this case it was reasonable for you to go with your

19   tried-and-true attorneys who you're comfortable with, top

20   caliber people from other markets.  And those rates have

21   been approved and been part of the calculation.

22           The other thing that I -- and these motions

23   always put us in difficult positions because, as the

24   attorneys participating in the case, we have to critique

25   our relative worth or discuss comparisons between different

1    law firms and different people in our profession.  It's

2    always uncomfortable.  But I think something to keep in

3    mind here is this isn't a battle necessarily about

4    out-of-state rates.  I've lived in Las Vegas for 32 years.

5    I am not an out-of-state lawyer who came in here pro hoc

6    and charged some ridiculously, in their view, high billing

7    rate.

8           My billing rate is my billing rate, and it's

9    part of Nevada, and it's not -- it's part of the Nevada

10   market, and it is not in any regard an outlier.  And I say

11   this -- there are -- and I'm sure Mr. Kennedy would agree

12   with this, there are divorce lawyers in Las Vegas who bill

13   at a higher rate than the lawyers in this case have.

14          And speaking of Mr. Kennedy, he can be a

15   benchmark.  He opines that the talent on this side of the

16   room here should not have been billed any higher than $475

17   an hour for partners and 200 something for associates.  Yet

18   what did he charge Rimini Street for his report?  He

19   charged them $800 an hour.

20          Now, that isn't even for legal work.  That's for

21   basically Monday morning quarterbacking and editing our

22   bills and basically a trip down memory lane about how he

23   thinks various rates comport with the market at various

24   times.

25          So if you just use Dennis Kennedy as a

1   benchmark, go to his résumé and stack it up against the

2   biographies of anybody on this side, and you'll see that at

3   the least the rates -- if he's market rate in Las Vegas, at

4   the very least we're all market rate in Las Vegas, given

5   the relative talents, accomplishments, and credentials.

6           And it's sad when you have to make that

7   argument, but he injected himself into this.  If he can

8   charge $800 for this kind of a report, I assume he probably

9   charges more for his legal services.  And you can compare

10  his credentials with the credentials of everyone else here.

11          So this whole rate of market rate -- and I agree

12  there are cases out there where a judge for a particular

13  case will say, well, it shouldn't be any more than this or

14  any less than that.  Also something to keep in mind is what

15  kind of cases are they.

16          And several of them cited by Rimini Street, a

17  couple of them were debt collection actions, one was a RCRA

18  case.  You know, there are cases where one might look at it

19  and say, you know, almost any Nevada lawyer could have

20  handled this case.  We think the market right about now is

21  at this rate; so that's what we should cap our fees at.

22          This was not the kind of case that any lawyer

23  off the street could litigate.  And you can tell just by

24  looking at the amount of time put into analyzing the

25  evidence in this case, the issues in this case, that this

1    is a one-off situation.  I've characterized it as an

2    all-star game.  It had to be an all-star game because of

3    its complexity.  And that requires a little different

4    analysis here and one which takes into account the relative

5    values and the relative expenditures on both sides.

6            In our reply we had submitted evidence regarding

7    what Rimini Street claims to its -- through its financials

8    and its disclosures to the public that it spent on

9    litigating this particular case.  And you'll see it's in

10   the millions.  And it's -- yes, is it a fraction of

11   Oracle's?  Yes.  But not a very small fraction either.

12           And would Oracle be expected to spend more money

13   than Rimini Street?  Yes, it would.  We have the burden of

14   proof.  We're up against all the obstruction and the delay

15   that was caused by the activity we've set out in our

16   motion.  And quite frankly we won.

17           And the case law, and it's cited in the

18   pleadings, indicates that sometimes one side will spend

19   more money than the other side.  And if they win, the

20   presumption can often be, or the inference can be, because

21   they worked harder, they worked more.  And in a situation

22   like this, it's the results that matter.

23           Throughout the case law there's reference to

24   excellent results.  And there is no other way to

25   characterize what happened at this trial than excellent

1       results were obtained.  If Rimini Street wants to be in the

2       fantasy land that it could have been worse, yeah, great,

3       yeah, maybe it could.  But they did not win this case.

4              And those issues dovetail together.  Not only

5       are we the prevailing party, but the amount of investment

6       and attorney time, effort, and quite frankly success was

7       worth every penny of that.

8              And if we are -- much has been made of this

9       notion that, well, attorneys' fees awards should advance

10      the interest of the copyright statute.  And Rimini Street

11      turns this completely on its head and says, well, if you

12      give attorneys' fees to Oracle, you're discouraging

13      defendants from making arguments in defense in these

14      complicated copyright issues and contentious legal issues

15      piggybacking off of case law in which awards were made in

16      favor of the defendants because they turned out to win the

17      case.

18             Rimini Street did not win.  There is no public

19      interest in saying don't award attorneys' fees, it might

20      discourage defendants from fighting tooth and nail,

21      dragging their feet, abusing the discovery process,

22      spoliating evidence, all in the course of trying to defend

23      themselves.  So it's completely backward there.

24             Now, it was actually said best in one of the

25      district court opinions which is cited by Rimini Street.

1    It was the *Liberty Media Holdings* case at page 3.  Judge

2    Navarro stated that not only does an award of attorneys'

3    fees deter any copyright infringement -- she didn't say any

4    willful copyright infringement -- it also deters the

5    needless extension of litigation regarding claims of

6    copyright infringement, thus making it more financially

7    feasible for copyright holders to protect their

8    intellectual property.

9              And that, in a nutshell, is the justification

10   for fees in this particular case.  That's exactly the

11   situation we have here.  Had nothing to do with whether or

12   not the infringement was willful or not.

13             Copyright infringement -- and it is a done deal.

14   They infringed.  However they want to sweeten it up is

15   fine.  But they are infringers.  And there was needless

16   extension of the litigation regarding these issues.

17             And the only way it makes any sense

18   businesswise, innovationwise for Oracle is that Oracle be

19   compensated for this added extra effort that was necessary

20   based on Rimini Street's conduct and that Rimini Street

21   receive a deterrent that this doesn't happen again.

22             They wrap themselves in the Seventh Amendment at

23   one point and say, well, we have the right to defend

24   ourselves and pursue our claims, you know, to the utmost of

25   our due process rights.

1          It's like, yeah, you do.  But when they don't

2    work and when your defenses lose and when in the end you're

3    on the other side of that extreme success in the

4    litigation, you may have to pay.  Your rights come with a

5    price.

6          And in this particular case nobody said they

7    shouldn't have put forth every colorable argument they had.

8    But if they're going to do what they did in this particular

9    case, or if the arguments they make don't prevail, that's

10   an entirely different situation.

11         Briefly on the offers of judgment.  Rimini

12   Street's argument on the offer of judgment appears to be

13   that -- well, the logical extension of their arguments is

14   if they had made an offer of judgment two years before

15   trial that they would offer to have judgment entered

16   against them for a payment of $20 billion 10 years from

17   now, that somehow that offer of judgment should be valued

18   at its face value for purposes of analyzing the attorneys'

19   fees request.  And that's just preposterous.  But that's

20   the logical extension of what they're going.

21         Because what they're saying is that the Rule 68

22   offers of judgement they made, which were entirely

23   contingent, basically resulted in deferred payment over a

24   four-to-five-year period, have been characterized by us

25   accurately in our pleadings as a very low interest

1   financing of Rimini Street's business, those aren't offers

2   of judgment.  They are not capable of being analyzed as if

3   Rimini Street had come in and said here's $60 million in

4   July, here's $100 million in August, and you can have

5   judgment for this tomorrow.

6            Oracle, if it had accepted those two offers of

7   judgment, would not be better off than what it received in

8   this trial.  They would instead have these risky loan

9   situations with Rimini Street where a company that's

10   plagued by this litigation and allegations of infringement

11   that told us at trial that hasn't turned a profit in years,

12   that barely has -- as you've seen from Elizabeth Dean's

13   report, barely has enough working capital and cash flow to

14   service itself, let alone to pay off Oracle over a 5-year

15   period.

16            The mere notion that somehow making those an

17   offer to settle this case that way in the form of an offer

18   of judgment has any impact upon the justice of attorneys'

19   fees here is ridiculous.

20            I think with respect to many of the other claims

21   that have been made by Rimini Street about the

22   reasonableness of the eDiscovery charges and travel

23   expenses and that type of thing, we'll leave it to the

24   Court to see the competing reports and declarations

25   regarding that.

1              But the bottom line on this case is there's a

2    very strong public interest behind awarding attorneys' fees

3    in this particular case.  Oracle has demonstrated that we

4    have a statutory basis with respect to the computer fraud

5    claims, which isn't even addressed by Rimini Street, that

6    would justify the award of fees that would qualify under

7    Section 505 for the Court to exercise its discretion in

8    favor of awarding fees, and we've shown you to the tune of

9    800 pages of backup for all the fees incurred in this case,

10   which represent a reduced amount from what was actually

11   incurred.

12             We've met our burden.  The nitpicking and the

13   criticism that we've received as to individual items or

14   whatever, it's been addressed in Mr. Pearl's report and in

15   the other submissions to the Court that I'm not going to

16   get into that kind of detail.

17             But under the circumstances is the number large?

18   Yes, it is.  But is the value of what was received in this

19   case large?  Yes, it is.  And this case isn't even over

20   yet.

21             On that last point, the offer of judgment notion

22   and the success -- relative success of Oracle in this case,

23   half of this case is really about the injunction.  It's

24   about getting Rimini to finally stop what it's been doing

25   for years.

1              And the Court will hear that in a little bit.

2      But before any definitive judgment is made that somehow

3      what Oracle won isn't enough and isn't successful enough,

4      it's not done yet.  And when the injunction is resolved, if

5      Oracle succeeds in getting the injunction it needs to stop

6      that behavior, there will be no question who the prevailing

7      party is in this case and the justification for attorneys'

8      fees.

9              Because if the resistance that Rimini has placed

10     to the entry of the injunction is rejected, we'll see the

11     same old pattern, which is let's keep operating in business

12     until somebody tells me we can't and let's drag this out as

13     long as we can.  And that's why we need an injunction.  And

14     that's why we also need, and it's perfectly permissible,

15     the deterrent effect of an attorneys' fees award in this

16     case.  Thank you.

17              THE COURT:  Thank you, Mr. Pocker.

18              I note that Mr. Pocker's argument did consume

19     the full 45 minutes.  And I anticipate that the Rimini

20     argument will certainly go in the neighborhood of that

21     amount of time.

22              So in light of that we'll take a short break at

23     this time and reconvene in approximately 10 to 15 minutes,

24     depending on when everyone is lined up and ready to go.

25     Thank you.

```
 1                COURTROOM ADMINISTRATOR:  Please rise.

 2            (Recess from 10:52 a.m. until 11:08 a.m.)

 3                THE COURT:  Have a seat, please.

 4            All right.  Rimini argument, please.

 5                MR. EVANSON:  Good morning, Your Honor.  Blane

 6     Evanson on behalf of the defendants.

 7                I've prepared some slides to help guide my

 8     presentation today.  I have a few copies for the Court and

 9     for Oracle.  If you'll -- may I approach and deliver those?

10                THE COURT:  Yes, please do.

11                MR. EVANSON:  Your Honor, there are two separate

12     questions that the Court must answer in deciding Oracle's

13     motion.  The first is whether fees should be awarded at

14     all, even though Oracle is a prevailing party as to one of

15     the two defendants.

16                And I want to make that point clear because it

17     was said over and over again in Mr. Pocker's presentation

18     that we're disputing that Oracle is a prevailing party, and

19     that's not our argument at all.  But even for prevailing

20     parties, there's a standard that Oracle must meet in order

21     to obtain any fees at all.

22                The second question is if the Court is to award

23     fees what is the reasonable attorneys' fees available under

24     Section 505 of the Copyright Act?  And if the Court -- and

25     on that point -- I guess on the first point there are
```

1    factors that the Court uses to guide itself.  Those are the

2    *Fogerty* factors, which I will discuss, and which Mr. Pocker

3    did not mention.

4            And on the second question we submit that

5    Oracle's unprecedented fee request in a case where it

6    prevailed on 25 percent of its claims and obtains less than

7    15 percent of the damages it sought is really unprecedented

8    and sort of on its face unreasonable.

9            Oracle is seeking $58 million.  Mr. Pocker

10   didn't mention that number.  But $58 million is an enormous

11   amount of money.  And we submit that is not anywhere near

12   reasonable, that is -- and we will talk about why, is the

13   methodology that 25 percent success on the claims that

14   Oracle brought brings the number down to about $9 million,

15   and we submit that is the outermost cap of what is

16   reasonable attorneys' fees and that the actual reasonable

17   amount again, if the Court is to award any fees, would be

18   around $5 million.

19           Three points I want to cover, Your Honor, on

20   this first question of whether any fees should be awarded.

21           No fees should be awarded because Rimini Street

22   was adjudicated an innocent infringer.

23           Second, that Oracle's success in the case, even

24   though it was a prevailing party against one of the two

25   defendants, was limited.

1               And then finally I'll touch on the rest of the

2      *Fogerty* factors that guide this Court's decision on whether

3      to award any fees.

4               Our position, Your Honor, is that the finding by

5      the jury that Rimini Street's infringement, in its

6      exoneration of Mr. Ravin for any copyright liability, is

7      alone sufficient to award denial of attorneys' fees.

8               The jury found that Rimini Street did not know

9      and had no reason to know that it was infringing Oracle's

10     copyrights.

11              And Mr. Pocker talked about inferences that can

12     be drawn from the jury's finding of innocent infringement.

13     But there's no inference necessary.  This was a finding

14     that Rimini Street did not know and had no reason to know

15     that its conduct was infringing.

16              And we submit, Your Honor, that no purpose of

17     the Copyright Act would be served by awarding fees in

18     this -- against innocent infringer as we discuss in our

19     brief.  It's therefore not surprising that no court

20     anywhere has ever awarded attorneys' fees against an

21     innocent infringer.

22              And we've cited cases affirmatively disapproving

23     of awarding fees against innocent infringer.  In fact, even

24     Oracle's featured case, *McCulloch versus Albert Price,*

25     which was disapproved by the Supreme Court for being too

```
 1    plaintiff friendly, even in this case the Ninth Circuit
 2    said the defendant's status as an innocent infringer
 3    justifies the denial of fees.
 4            Oracle cites no authority in response, not one
 5    case or even a commentator suggesting that attorneys' fees
 6    were appropriate or appropriately awarded against an
 7    innocent infringer.  Oracle's asking the Court to be the
 8    first in history to cross that bridge.
 9            Oracle also has no answer for its statements in
10    its trial brief that it was seeking to prove willful
11    infringement at trial specifically in order to obtain
12    attorneys' fees.
13            Innocence is the converse of willfulness, and
14    since willfulness favors fees, as Oracle's told the Court,
15    innocence cuts the other way.
16            You also heard Mr. Pocker talk about -- you
17    know, rail on Mr. Ravin and talk about how, you know, from
18    TomorrowNow to this case to Rimini II how he's escaping
19    infringement.
20            The jury found Mr. Ravin did not infringe.
21    Oracle's not even a prevailing party against Mr. Ravin.
22    There's no possible way that an attorneys' fees award under
23    the Copyright Act can be imposed to deter Mr. Ravin from
24    infringing copyrights when the jury exonerated him of any
25    copyright liability.
```

1              The second point, Your Honor, is Oracle's

2    limited degree of success.  And, again, I just want to make

3    absolutely clear this is not a prevailing party argument.

4    Oracle did establish copyright infringement, innocent

5    copyright infringement against Rimini Street.

6              But there is still one of the *Fogerty* factors,

7    as the Ninth Circuit said in the *Ets-Hokin* case, one of the

8    factors is the degree of success, even if you're a

9    prevailing party.

10             And Oracle's limited success at trial warrants a

11   denial of fees here.  Oracle tried three principal buckets

12   of cases -- buckets of claims in this case.  It sought to

13   prove copyright infringement, it sought to prove various

14   intentional torts, and it sought to prove hacking of

15   Oracle's computers.

16             Oracle lost, abandoned, or withdrew 9 out of the

17   12 causes of action it pursued.  And that 25 percent is

18   generous because, as Mr. Pocker acknowledged, the two

19   hacking claims were duplicative.

20             In addition, as I mentioned, Oracle established

21   only innocent copyright infringement against only one of

22   the two defendants, and its request for punitive damages

23   was rejected.  Oracle lost completely on all the claims and

24   theories having to do with Rimini's intentional conduct,

25   the willful infringement, the intentional torts, the

1    punitive damages, every single claim and finding.

2                Now, Mr. Pocker mentioned that it's common to

3    drop claims before trial.  But these claims were not

4    dropped years ago, they were not dropped even before trial

5    for the most part, they were dropped after trial, after the

6    parties had litigated this issues -- these issues, and in

7    many cases the Court's rulings precluded them.

8                For example, the federal hacking claim Oracle

9    dropped after trial when the Court rejected the -- in the

10   jury instructions, the lost profits damages theory as

11   available remedy for federal computer hacking.

12               So these are not, you know, superfluous issues

13   that were hardly featured in the case.  These were

14   litigated all the way through trial.

15               What this means is that Oracle is again a

16   technically prevailing party, but barely.  Oracle prevailed

17   against only Rimini Street, not Mr. Ravin.  It prevailed on

18   infringement, but only innocent infringement.  And then it

19   lost the majority of its remaining claims.

20               We are not aware of another copyright case in

21   which a plaintiff was prevailing by such a slim margin.

22   Oracle certainly has not cited a case.  And being a

23   prevailing party does not entitle one to fees.  Rather the

24   copyright gives the Court discretion to award fees.  And as

25   we learned from the solicitor general in the *Kirtsaeng* case

1      that is pending before the Supreme Court this term to be

2      decided next month, attorneys' fees were awarded in only

3      about 50 percent of copyright cases.  And that is all

4      copyright cases.  That includes cases involving willful

5      infringement, in cases where the plaintiff prevailed on

6      every single claim, ran the tables.  Given that Oracle is

7      barely a prevailing party in this case, this is not one of

8      the 50 percent of copyright cases where fees should be

9      awarded.

10              Now, Oracle largely ignores the innocent

11     infringement finding and it ignores the intentional torts,

12     this whole aspect of the case that it lost, and it doesn't

13     dispute that there's no precedent, no cases suggesting that

14     attorneys' fees can be awarded against an innocent

15     infringer.  Instead Oracle's focus in its brief and a good

16     portion of its presentation today is what Oracle calls

17     Rimini's unreasonable litigation positions during

18     discovery.

19              First, this is not a motion for discovery

20     sanctions.  It is a motion under Section 505 of the

21     Copyright Act for fee shifting to a prevailing party.  And

22     the question whether a prevailing party is entitled to its

23     attorneys' fees depends not on the discovery record but on

24     the outcome in the case.

25              Every complex case involves discovery disputes.

```
 1   And here they were relatively mild.  Oracle points to 9 out

 2   of 250 requests for admission and 3 out of 40

 3   interrogatories.  That is not litigation misconduct by any

 4   definition of that term.

 5           And finally, Your Honor, even if -- even if this

 6   were a discovery motion, even if Oracle were trying to

 7   obtain its fees spent in litigation in these discovery

 8   disputes, Oracle does not apportion its fees.  It does not

 9   tell the Court what portion of the fees incurred were in

10   responding -- or were meeting and conferring about those

11   RFAs or those interrogatories.

12           And as the Ninth Circuit held in the *Toth versus*

13   *Trans World* case, it is an abuse of discretion to award

14   fees as discovery sanctions without that apportionment.

15           I mentioned the *Fogerty* factors.  And here they

16   are.  And I just want to stress, Your Honor, that this is

17   the standard for determining whether fees should be

18   awarded.  It's black and white case law.

19           The Supreme Court's decision in *Fogerty* and the

20   Ninth Circuit's decisions in cases like *Ets-Hokin*, they lay

21   out these factors that the Court considers when determining

22   whether any fees should be available at all.

23           And we submit that every one of them favors

24   denial of fees.  And that is likely why Mr. Pocker did not

25   mention them.
```

1              Innocent infringement justifies denial of fees

2      as the Ninth Circuit held in *McCulloch*.

3              A low degree of success.  Here at best 25

4      percent warrants a denial of fees.  The Ninth Circuit held

5      that in *Ets-Hokin*.

6              Rimini's arguments and defenses were by

7      definition objectively reasonable, since the jury accepted

8      many of them, if not most of them, and even the

9      infringement finding against one of the two defendants was

10     found to be innocent.

11             Fourth, deterrence.  There is no reason to deter

12     innocent infringers.  The commerce department said that

13     expressly in a recent major report on the Copyright Act

14     that we cite in our brief.

15             Fifth, Oracle has been fully compensated with a

16     paid-up license, and it is a huge corporation with no need

17     for additional incentive to file lawsuits protecting its

18     intellectual property.

19             Now, Mr. Pocker talked about this language from

20     *Fogerty* about a corporate behemoth and starving artists.

21     He was critical of that metaphor, but that is the legal

22     standard.  That's what the Supreme Court said in *Fogerty*.

23     There is no reason to award fees to a corporate behemoth,

24     and there is reason to award fees to starving artists so

25     that these claims can be litigated.

1              Sixth, the purposes of the Copyright Act are to

2     encourage meritorious defenses and to promote competition,

3     not to saddle innocent infringers with crushing fee awards.

4              And then the remaining factors Oracle does not

5     address even in their briefing.

6              Now, everything I've said to this point warrants

7     outright denial of fees.  That is the first question I

8     mentioned at the beginning.

9              The second question is if the Court is going to

10    award any fees, what is the reasonable attorneys' fees.

11    And we submit, Your Honor, that it is facially unreasonable

12    to request 100 percent of a party's attorneys' fees, $58

13    million, where that party prevailed in at most 25 percent

14    of the case.

15             A whole string of cases from the Supreme Court

16    and the Ninth Circuit, *Hensley*, *Farrar*, *Schwarz*, *Welch*,

17    they all hold that where a party does not outright win a

18    case fees must be apportioned to account for the portion of

19    the case in which the prevailing party did not succeed.

20    The Supreme Court's decision in *Hensley* calls this the most

21    critical aspect of the Court's reasonable attorneys' fees

22    analysis.

23             The second point I'll discuss, Your Honor, is

24    Oracle's utter failure on its burden to show what the

25    reasonable attorneys' fees here is, that Oracle has asked

1       for basically $58 million or zero.

2                   And then, third, I'll walk the Court through

3       Rimini's proposed methodology for arriving at a reasonable

4       attorneys' fee.

5                   Oracle claims and Mr. Pocker argued today that

6       this was really a copyright case and that it obtained a

7       complete victory because everything else the parties

8       disputed was sort of a side show and that infringement was

9       the main event.

10                  Your Honor, that is simply not true.  This is a

11      slide that Oracle used in its closing arguments to the jury

12      to summarize its theories of the case.  Oracle sought to

13      prove not only unauthorized copying, copyright

14      infringement, but also intentional interference, lies and

15      concealment, and computer hacking.

16                  I'm sure the Court recalls -- it's been a while,

17      but I'm sure the Court recalls Oracle's closing statement.

18      For two and a half hours the theme was wall of lies.

19      Oracle devoted the vast majority, 142 slides, in its

20      closing to the theme that the trial finally uncovered the

21      lies that Mr. Ravin had been telling.

22                  And Mr. Isaacson called -- or Oracle's counsel

23      referred to Rimini Street and Mr. Ravin as liars over 75

24      times in that closing.

25                  But Oracle lost on all the claims premised on

1    this theme that Rimini Street lied and interfered with

2    customer relationships, every single claim.

3              Oracle talked -- or Mr. Pocker talked about the

4    evidence related to the marketplace and how that was a

5    feature of the trial.  That's absolutely true.  We had all

6    these customers' depositions.  There was a whole host of

7    marketplace evidence.  That was all intentional

8    interference evidence, and the jury rejected Oracle's

9    intentional interference claim.

10             And Oracle did not tell the jury that its

11   infringement case was the main event and the complex issue

12   the Court was to -- or the jury was to decide.  Instead

13   Oracle told the jury that finding infringement was

14   straightforward.

15             Here's what Oracle said at closing:  "All you

16   need to know to find infringement is that Dr. Davis told

17   you that on Rimini Street's system at its facilities were

18   almost 600,000 copies of PeopleSoft documentation.  So

19   that's the finding on PeopleSoft documentation; not much

20   more to do there."

21             The primary focus of trial was Oracle's attempt

22   to amplify the infringement, to amplify the unauthorized

23   copying and prove that it was knowing and willful and that

24   Mr. Ravin and Rimini Street lured Oracle's customers away

25   by lying to them.  Again, this consumed 142 slides of the

1    two-and-a-half-hour closing.  And the jury rejected all the

2    claims premised on that theory.

3             Oracle also tries to mush all the claims

4    together, to say that these were all basically part and

5    parcel of the same claim.  Again, that is not true.

6             Oracle told the Court the opposite in its Rule

7    50 oppositions.  There, in arguing against preemption of

8    its tort claims, Oracle argued that copyright infringement

9    is not the same as the tort claims because the tort claims

10   contained extra elements and protect qualitatively

11   different rights.  They told the Court this with respect to

12   all of the noncopyright claims.

13            Your Honor, Oracle spent a lot of time and money

14   trying to prove all those extra elements above and beyond

15   copyright infringement.  But they've completely failed.

16   They are not entitled to fees for that extra part of the

17   case.

18            And we've laid out here in this chart how

19   fundamentally different the three buckets of claims are.

20   Each set relied on different evidence, it sought different

21   relief, and alleged different harm.  Again, copyright

22   infringement is technical acts of copying for which the

23   jury awarded a fair market value license.

24            The tort claims, the intentional conduct,

25   related to Mr. Ravin's and Rimini Street's interference

1    with Oracle's customer relationships and is unrelated to

2    whether the copying constituted infringement.  And it

3    sought different damage, lost profits and punitive damages,

4    which again the jury rejected.

5           Computer hacking is a completely separate set of

6    conduct.  It has nothing to do with whether the copies that

7    were downloaded infringed.

8           So the question is how do we determine what is

9    the reasonable fee in this case?  And Oracle offered the

10   Court no means of apportioning its bills to account for its

11   limited success or to account for any of the other issues

12   that we've laid out in our brief and in the expert reports.

13          Mr. Pocker criticized Rimini for its five expert

14   reports it put in support of its opposition.  But that was

15   required because Oracle offered nothing, no methodology, no

16   analysis, no apportionment.

17          Oracle essentially dumped a huge set of invoices

18   on the Court's desk and said, "Figure it out."  We submit,

19   Your Honor, that Oracle has asked the Court to award either

20   $58,000 or zero, and the answer should be zero.  But we --

21   and we know that it can't be $58 million because Oracle's

22   fee request contains a whole host of problems, all of which

23   require reductions.  And I'm going to go through these

24   four.

25          The first is that Oracle was required under the

1     legal standard to submit evidence that its rates were

2     reasonable for the Nevada market, and it failed to do so.

3               And Mr. Pocker talked about, you know, a few

4     cases that had required community local market rates.  And

5     this is not a few cases, this is binding Ninth Circuit case

6     law.  The *Welch* case, the *Jordan* case, those cases require

7     that the reasonable attorneys' fee under the Copyright Act

8     is Nevada market rates.

9               Second, Oracle's bills are overwhelmingly

10    block-billed and plagued with a whole host of improper

11    billing practices.

12              Third, Oracle seeks millions of dollars in costs

13    and expenses that are improper or excessive.

14              And then, fourth, the lack of apportionment.

15              Now, I want to make one thing clear because

16    Mr. Pocker was talking about, you know, whether they're

17    worth this, whether -- you know, that somehow the Court has

18    to determine the worth of the attorneys, whether they're

19    worth this billing rate.

20              Oracle is a large, successful, and

21    well-capitalized corporation, and it hired an army of

22    lawyers -- able lawyers in this case, to pursue every

23    avenue of relief.  They ran up huge legal bills.  And

24    Oracle says that it paid them.  All of that is Oracle's

25    right.

1              What is not Oracle's right is to say at the end

2       of the process that the Court should impose on Rimini

3       Street the entire cost for Oracle's decision to litigate

4       that way.

5              The American rule is that each party pays its

6       own fees.  And even where exceptions apply and some fees

7       are shifted, the prevailing party is entitled to recover

8       only reasonable attorneys' fees, only reasonable expenses.

9              And the appellate courts have explained that

10      that means local market rates and reductions for things

11      like block-billing.  It limits the costs and expenses that

12      be recovered, and it requires apportionment to limit the

13      fees to the claims that were won.

14             Our experts put in an enormous amount of work to

15      go through Oracle's fee request in detail and come up with

16      a methodology that the Court could use to analyze the

17      rates, the billing practices, the costs and the

18      apportionment.  And this is laid out in our brief.  But I'd

19      like to just walk the Court through it briefly so that it's

20      clear.

21             The first step in adjusting the rates is

22      adjusting the rates downward to approximate the market

23      rates in Nevada.

24             Your Honor, again, the law is clear on this

25      point.  The *Welch* case and the *Jordan* case in particular.

1    The rates that are recoverable through the lodestar are the

2    rates in the venue where the case is tried, here the

3    southern district -- or here southern Nevada.

4             And the evidence in the record on the Nevada

5    market rate is undisputed.  Mr. Kennedy analyzed the Nevada

6    market rate based on his over 40 years of experience and

7    what courts in this district have awarded in past cases.

8             His analysis is thorough and complete.  And

9    Mr. Kennedy is probably the best person in the world to

10   opine on Nevada market rates.

11            In addition to his experience and his work on

12   this case, he has served on essentially every state bar in

13   Nevada Supreme Court committee dealing with ethics and

14   rates and responsibility.

15            Mr. Kennedy's declaration walks through the fee

16   request in detail and in a very methodical and meticulous

17   way shows that the rates Oracle seeks to recover and the

18   billing practices that Oracle's counsel engaged in were

19   unreasonable for the Nevada legal market.  Oracle's reply

20   brief does not mention Mr. Kennedy once.

21            Oracle offered the testimony from Richard Pearl

22   who is a California attorneys' fees expert.  He has never

23   testified in a case in Nevada.  His declaration cites no

24   relevant Nevada experience.  He does not purport to have

25   surveyed Nevada attorneys' fees, and he does not opine on

1     the rates in Nevada.  Instead his testimony repeatedly

2     compares the rates in this case to those charged by

3     attorneys in the San Francisco Bay area.

4             This case is not in the Northern District of

5     California, and therefore Mr. Pearl's testimony is simply

6     not relevant.

7             Mr. Kennedy's opinion on the reduction of hourly

8     rates is generous.  He provides for one lawyer of each firm

9     billing well above the market rate, $800 an hour, which is,

10    you know, the rate that Mr. Pocker was referencing.

11            Mr. Kennedy allows for Mr. Isaacson and

12    Mr. Howard to bill at that rate.  He also allows for a

13    second lawyer at each firm, Ms. Dunn and Mr. Hixson, to

14    bill at a rate at the top of the legal market as well.  The

15    remaining partners, associates, and staff he discounts to

16    the Nevada market rate.

17            And these rates that Mr. Kennedy -- that

18    Mr. Kennedy includes in his analysis are higher than what

19    any court has awarded in any previous case in this district

20    for prevailing parties.  They are more than reasonable.

21    And Oracle has no relevant evidence in response.

22            So just this reduction -- just applying the

23    community Nevada market rates requires a reduction of about

24    $9 million.

25            Step 2 in Rimini's proposed methodology is

1    reductions to account for Oracle's improper billing

2    practices.

3                And the first point we've made, Your Honor, and

4    what's laid out in the declarations, is that Oracle's

5    lawyers billed essentially all -- or block-billed

6    essentially all their time.

7                You can see from a few examples on this slide --

8    I'm sorry that the text isn't very legible.  But you'll see

9    that in these bills there are up to 10 different entries,

10   10 different tasks on a given day that span different

11   claims in the case, and there is no way of separating the

12   time entries that went to a certain claim or another claim,

13   there's no way of determining whether a task -- the time

14   spent on a task was reasonable.  There's no way to analyze

15   these bills -- or it exceedingly complicates our ability to

16   analyze these bills.

17               And block-billing is not prohibited.  It's not

18   unethical.  Some clients permit it and some don't.

19               But the key point and the reason why the courts

20   and appellate courts have disapproved the block-billing is

21   that it prevents the Court from being able to analyze the

22   reasonableness of the fees and to tell which -- and to

23   apportion the fees before the claims that were won and the

24   claims that were lost.

25               The second improper billing practice is attorney

1    conferences.  These were meetings lasting up to four hours

2    and involving up to 16 attorneys.  Over 10 percent of the

3    fee request is for these conferences.  Mr. Kennedy

4    testified that this is an unreasonable amount of attorneys'

5    fees and that this warrants a reduction.

6             Third is the redundant work.  Oracle hired two

7    law firms to try this case.  Both firms worked on the same

8    motions, participated in the same meetings, and attended

9    the same depositions of hearings.  Depositions and hearing.

10   Oracle essentially did everything twice.

11            And that was Oracle's choice.  It was perfectly

12   within its right to do so.  But because hiring two firms

13   resulted in redundant work, Oracle cannot shift all those

14   fees to Rimini Street.

15            Fourth is the vague entries.  Many of the

16   entries -- and these are laid out in Mr. Kennedy's and

17   Professor Ross's declarations.  Many of these entries were

18   simply too vague for our experts to review for

19   reasonableness.

20            And the long days.  There are many dubiously

21   long days in Oracle's bills.  The most egregious example we

22   list here on the slide was a 24-hour workday, which means

23   that this person did not go to the bathroom, did not eat,

24   did not shower, or do anything nonbillable that day.  And

25   this was a -- this particular day was a Friday during trial

1    where, you know, there was obviously no court on Saturday

2    and Sunday.

3              It's very hard to believe that this individual

4    and lots of the 20-plus hour days that are discussed in the

5    declaration are accurate or reasonable.

6              Finally, there are about a half million dollars

7    in fees billed for clerical tasks at hundreds of dollars an

8    hour.  These charges are not reasonable.

9              So Mr. Kennedy and Professor Ross's testimony is

10   that all of these improper billing practices warrant a

11   reduction of -- a combined reduction of 30 percent.  And

12   this reduction is conservative and absolutely supported by

13   the case law, Your Honor.

14             Numerous courts, and we cite these decisions in

15   our briefs, have imposed a 10 to 30 percent reduction for

16   each of these practices.  And a 30 percent reduction for

17   all of them combined is fully supported by the evidence and

18   warrants a $6.6 million reduction.

19             Step 3 is the unreasonable and unwarranted

20   costs.  Oracle claims in its brief that it is presumptively

21   entitled to costs.  But that is not the standard of the

22   Copyright Act.  Whether Oracle obtains its costs is, as

23   with its fees, governed by the *Fogerty* standard.  That's

24   footnote 11 of the Supreme Court's decision in *Fogerty* and

25   several courts have held that.

1               And so our position is that costs should be

2       rejected, just like fees, outright for all the reasons I

3       mentioned at the outset.

4               Oracle's request for costs is also completely

5       unprecedented for a copyright case and, we submit,

6       excessive.

7               First is the Rule 68 offers.  And Mr. Pocker

8       mentioned these.  Your Honor, Rimini Street wanted to

9       resolve this case without a trial.  Mr. Pocker said that,

10      you know, this case didn't need to go to trial.  And that

11      was absolutely our position too.

12              And we made three offers of judgment to Oracle,

13      two of which exceeded the verdict.  And this is also a

14      complete answer to Oracle's argument that Rimini Street

15      somehow litigated this case improperly or overly

16      aggressively.  And because the second and third offers

17      exceed the jury verdict, the fees and costs that Oracle

18      incurred after those offers must be deducted from the

19      amount that Oracle receives.

20              I only just mention Mr. Pocker talked about the

21      discount rate and the time value of money.  But as we point

22      out in our brief and -- that is -- that is not the law.

23      The Supreme Court in the *Marek* case did not discount the

24      offer.  And in the *Rolland* case we cite in our brief, the

25      court expressly rejected this argument.

1            And Oracle does not cite a case for the

2     proposition that you discount a Rule 68 offer to account

3     for the time value of money.

4            Second is contract attorneys.  Mr. Kennedy's

5     opinion is that two of the contract attorney firms that

6     Oracle hired should not -- fees should not shift because

7     time entries are vague or in some cases totally

8     nonexistent.

9            Some of these contract attorneys were billing at

10    rates commensurate with senior associates and even junior

11    partners in the Nevada market.

12            Oracle's eDiscovery costs are frankly

13    unbelievable.  Our expert Mr. Opsitnick, who has decades of

14    experience in this industry, was flabbergasted by the

15    amount they paid.  The rates they paid were well above

16    market, and Oracle inexplicably did not receive any volume

17    discount.

18            So Mr. Opsitnick's opinion is that these costs

19    should be reduced by 3.7 to $5.8 million, and for our

20    analysis we adopted the lower number, the 3.7 million.

21            Expert fees, Your Honor.  Again, Oracle's

22    request here is unprecedented.  Only two cases in the Ninth

23    Circuit have awarded expert fees under the Copyright Act.

24    Those courts awarded $31,000 and $50,000.  Oracle's

25    requesting almost 8 million, including for experts who did

1    not testify at trial and whose testimony the jury, in whole

2    or in part, rejected.

3            The Court will remember, just one example,

4    Ms. Dean's primary damages model before trial was a

5    hypothetical license.  That was the main thrust of her

6    report.  But we challenged that model in a Daubert motion.

7    And in response Oracle withdrew it.  But Oracle is

8    including in its fees all the costs, all the fees

9    associated with coming up with that damages model that it

10   jettisoned before trial.

11           And finally, Your Honor, other costs.  We don't

12   really know what these are.  These are not itemized or

13   explained anywhere by Oracle.  They say that they're buried

14   somewhere in the invoices.  And Oracle acknowledges that

15   some of these costs are overhead, which are not

16   recoverable.

17           The testimony from Mr. Kennedy, Professor Ross,

18   Mr. Trunko, and Mr. Opsitnick is that the improper and

19   unreasonably excessive costs that Oracle seeks requires a

20   reduction of about $21 million.

21           Finally, Your Honor, step 4, to come back to the

22   point that Oracle did not win on all its claims; in fact,

23   it lost most of them.  And as I mentioned, the most

24   generous view of the outcome of the case, we submit, is

25   that Oracle prevailed on 25 percent of its claims and

1    obtained 15 percent of its damages; yet it inexplicably

2    seeks 100 percent of its fees.

3            The case law from the Supreme Court and the

4    Ninth Circuit requires that the amount of any cost in

5    attorneys' fees must be apportioned to account for the

6    plaintiffs' limited success.  The Supreme Court in *Hensley*

7    held this is the most critical aspect, again, of

8    determining the reasonableness of a fee award.

9            Oracle did not give the Court any means of

10   apportioning its bills.  They did not attempt to tell the

11   Court which fees, which portion of the fees were spent on

12   which claims or which portion of the fees and costs were

13   attributed to the claims that it won.

14            In fact, Oracle's counsel's billing practices,

15   the block-billing, makes it impossible to do this.  So

16   Rimini's experts could not even go through Oracle's bills

17   and carve out the time spent on the claims that they

18   prevailed on and the time spent on the claims that they

19   lost.

20            So our brief and the expert reports lay out four

21   reasonable ways of apportioning Oracle's fee request

22   according to Oracle's degree of success.  And I've put the

23   two simplest methods on the slide.  And we submit that

24   either would be a permissible way for the Court to

25   apportion fees.

1          First, again, the 25 percent degree of success

2     would require a $15.5 million reduction.  And, again, this

3     is a conservative degree of success because it assumes

4     Oracle won on three claims, even though two of those claims

5     were duplicative, and the copyright claim was successful

6     against only one defendant, and the defendant it was

7     successful against was found to be an innocent infringer.

8     So a 25 percent degree of success really is the outermost

9     cap.

10          And the second method is based on damages.

11     Oracle sought $341 million but obtained only $50 million.

12     And that would require a $17.7 million reduction.

13          Now Oracle, in its briefs -- and I didn't hear

14     it today, but in its briefs, in its reply brief takes, you

15     know, shots at these analyses and at the idea of reducing a

16     fee award based on a mathematical calculation based on a

17     portion or percentage.

18          The Ninth Circuit has absolutely upheld that.

19     In the *Schwarz* case the Ninth Circuit said expressly that

20     where the Court is left to its own devices, which it

21     absolutely is here, mathematical approach is consistent

22     with *Hensley* and authorized.  And that's also in the *Ryan*

23     case at 786 F.3d 754.  It's a case from last year.

24          We have assumed the most conservative, again,

25     apportionment number for this analysis, the 15.5 million.

1    And we've assumed for purposes of this analysis that the

2    jury's verdict on the hacking claims stand.  And I know the

3    Court did not ask for argument on this.  I just want to

4    make our position clear that those claims should be thrown

5    out entirely.  But this analysis assumes that they remain

6    in the case.

7              And if the Court were to throw out those claims,

8    further reductions would be required because that would be

9    even a lower degree of success in the case.

10             So to sum things up, this is how we and our

11   experts arrive at the $5.2 million figure which we think is

12   the reasonable fees; again, if the Court is to award any of

13   them.

14             First, you reduce the hourly rates to

15   approximate Nevada market rates.

16             Second, you reduce for the unreasonable billing

17   practices.

18             Third, the unreasonable and unwarranted

19   categories of fees and costs are removed.

20             And, fourth, you account for Oracle's limited

21   degree of success.

22             These are all widely accepted reductions

23   supported and, in some cases, compelled by the governing

24   case law cited in our brief and in Mr. Kennedy's

25   declaration.  And we submit this methodology, Your Honor,

1     is very well supported.  It's based on meticulous analysis

2     of multiple experts and the judgment of Dennis Kennedy, who

3     has decades of experience dealing with these very issues in

4     the southern Nevada legal market.

5               $5.2 million is a reasonable number, which the

6     Court can also confirm with a, you know, back-of-the-

7     envelope reality check.  Remember that Oracle prevailed on

8     only 25 percent of its claims.  Cutting the $58,000 request

9     by 75 percent results in a $9 million cap.  And then a 40

10    percent reduction for the billing practices and unwarranted

11    costs takes off another 40 percent, which gives you about

12    $5 million.

13              Rimini Street's position remains that there

14    should be no fees awarded in this case.  Any fee award here

15    would be completely unprecedented because no court has

16    awarded fees against an innocent infringer, particularly

17    where the plaintiff prevailed against only one of two

18    defendants on only a fraction of its claims.  But if some

19    fees are awarded, the proper amount is $5 million.

20              I'm happy to answer any questions the Court has.

21              THE COURT:  No, I don't have any.  And I thank

22    you, Mr. Evanson.

23              MR. EVANSON:  Thank you.

24              THE COURT:  All right.  That will conclude

25    argument on the attorneys' fees portion.  And we're 15

67

1    minutes before the lunch hour.

2              Why don't we plan on reconvening at 1:15, and

3    we'll start directly into the argument concerning

4    preliminary injunction.

5              All right.  Thank you.

6              COURTROOM ADMINISTRATOR:  Please rise.

7         (The noon recess was taken at 11:43 a.m.)

8                        *    *    *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    RENO, NEVADA, MAY 25, 2016, 1:18 p.m.

 2                              --oOo--

 3

 4              THE COURT:  Good afternoon.  Have a seat,

 5     please.

 6              All right.  The record will show that we are

 7     reconvened for the hearing of motions today.  We've

 8     completed the arguments pertaining to the attorney's fees

 9     motion and now turn to the motion by Oracle for permanent

10     injunction.

11              You're welcome to go forward, Mr. Hixson.

12              MR. HIXSON:  Good afternoon, Your Honor.  I'll

13     plan to talk for 30 minutes and then reserve my remaining

14     15 for reply.

15              THE COURT:  All right.  Thank you.

16              MR. HIXSON:  So this is our motion for a

17     permanent injunction, for disposition of infringing copies,

18     and for judgment on Oracle's unfair competition claim.

19              I'm going to begin with the permanent

20     injunction, focusing first on the irreparable injury and

21     the inadequacy of the remedies at law.

22              THE COURT:  All right.

23              MR. HIXSON:  The parties have focused their

24     briefing on the *eBay* standard that established the

25     four-factor test for the issuance of an injunction.  I'd
```

1    like to speak for a moment about Chief Justice Roberts'

2    concurrence in that case.  He joined the unanimous opinion

3    for the Court, and then they also wrote separately.

4         And the chief justice noted that since at least

5    the early 19th century courts have granted injunctive

6    relief after finding infringement in the vast majority of

7    patent cases.  And the chief justice sought to explain why

8    when you have a discretionary four-factor test, in the vast

9    majority of cases courts were enforcing patent rights in

10   addition by an injunction.  And the explanation he provided

11   is that a patent is a right to exclude, to stop somebody

12   else from using your invention.

13        But monetary remedies allow the infringer to use

14   the invention against the patentee and simply charge a

15   price for that.  They don't stop the infringement or

16   protect the exclusion right.  And this was the explanation

17   that the chief justice gave for why this four-factor test

18   inevitably in patent cases seems to lead to enforcement of

19   the right to exclude through an injunction.

20        The reason I draw your attention to the

21   concurrence is because a copyright is also a right to

22   exclude.  Title 17, Section 106 of the Copyright Act gives

23   Oracle the exclusive rights to copy, to distribute, to

24   reproduce, and to prepare derivative works of its software.

25        However, Rimini Street has been exercising those

1    rights that belong to Oracle for years and continues to do

2    so.

3            The fair market value damages award allowed --

4    allows for that use by Rimini and charges a price to

5    Rimini.  But like monetary remedies in a patent case, that

6    damages award doesn't vindicate Oracle's statutory right to

7    exclude.

8            Oracle wants to stop Rimini from using its

9    software.  That is its right under Section 106.  And that

10   is the right that is irreparably harmed and that is not

11   vindicated through a fair market value damages award.

12           We cited for the Court in our briefing the

13   Federal Circuit's decision in *Douglas Dynamics*, which

14   focuses on the exclusivity of rights under -- again under

15   patent law.

16           The Court recognized that the patent is this

17   right to exclude and that often exclusivity is the primary

18   value of it.  And the Court explained that when two

19   companies are in competition with one another, the patentee

20   suffers the irreparable harm of having to effectively

21   compete against itself, against its own products being used

22   against it.

23           Oracle suffers from that kind of irreparable

24   harm here as well.  Because every time it goes against

25   Rimini head-to-head trying to retain a customer that may

1     want to go to Rimini, Oracle was having to compete against

2     it's own copyrighted software used unfairly by Rimini to

3     draw their customer away.

4            This right to exclude is something that can only

5     be vindicated by an injunction from this Court telling

6     Rimini to stop exercising Oracle's exclusive right under

7     Section 106.  Only a permanent injunction by this Court can

8     remedy this irreparable harm that Oracle has suffered.

9            There's also another type of irreparable harm

10    that is not adequately remedied by the damages award, and

11    that is Rimini's continued infringement and certainly the

12    threat of additional infringement.

13           As the Court knows, there is a second case

14    between the parties.  Rimini says that following the

15    Court's summary judgment orders in 2014 they cleaned up

16    their act.  We say they didn't.  And that's in dispute in

17    the second case.

18           And I realize that case is not before you today.

19    But -- so you're not in a position to make factual findings

20    about Rimini's 2.0 process as they call it.

21           But what is before you today is our request for

22    a permanent injunction.  And we put forward specific

23    language for the Court to consider taken from the summary

24    judgment orders, taken from the jury instructions, and the

25    finding of liability from the jury across the board in our

1    copyright registrations.

2            And something remarkable happened in Rimini's

3    opposition.  They said that if you were to enforce those

4    terms from the jury instructions and the Court's orders and

5    grant that injunction, Rimini Street represented to the

6    Court that that injunction would impact their current,

7    their ongoing processes that they continue to use today.

8    This is an admission by Rimini that they continue to engage

9    in the same actions that this Court and the jury determined

10   to be copyright infringement.

11           To give an example, we asked for an injunction

12   against the preparation and distribution of derivative

13   works based on Oracle's software.  Certainly the derivative

14   works issue was litigated at trial.

15           The first witness, Dr. Randall Davis, gave

16   extensive expert testimony about Rimini's creation and

17   distribution of patches and updates.

18           Rimini's own president, Mr. Ravin, admitted that

19   Rimini distributed these all the time.

20           Rimini's witness Mr. Benge confirmed that this

21   was true as well.

22           The jury was presented with extensive

23   documentary evidence showing how these patches and other

24   derivative works were created and the hundreds of customers

25   to whom they were distributed.

1            This Court instructed the jury on derivative

2    works in Jury Instructions No. 21 and 24 concerning

3    copyright liability and the license defense.  And the jury

4    found liability on every one of these copyright

5    registrations.

6            So the legality of derivative works was

7    adjudicated in the first case.  It was adjudicated in the

8    trial last fall.  And the evidence was clear.  And we are

9    asking for an injunction to enforce that adjudicated

10   determination.

11           But Rimini comes back now and says that they're

12   still doing it, that they're still doing it today, and that

13   this proposed injunction would impact their current terms.

14   This means the conduct is ongoing.  The infringement is not

15   a thing of the past; it's continuing.

16           In similar vein we proposed an injunction that

17   restricted the software to the licensee's own computer

18   systems.  That prohibited the cross-use between customers

19   of software, that restricted the use to the customers'

20   internal data processing operations.

21           These issues too were all decided by the Court

22   on summary judgment and by the jury following the Court's

23   jury instructions.  The language about the licensees' own

24   computer systems comes from the Court's summary judgment

25   order in February 2014 and from the jury instructions

1          concerning the PeopleSoft documentation, the Siebel and the

2     JD Edwards software as well.

3               Likewise, the cross-use and the internal data

4     processing operations came from the Court's summary

5     judgment orders and the jury instructions.

6               In fact, internal data processing operations is

7     an exact quote from the PeopleSoft licenses that Rimini

8     stipulated apply uniformly to its PeopleSoft customers.

9               And Oracle's witness Richard Allison gave

10    extensive testimony about the meaning of that term just as

11    Dr. Davis gave testimony about what is cross-use, namely

12    the cloning of environments from one customer to another,

13    the development of patches or fixes; in other words,

14    derivative works with one customer's software that's then

15    supplied for the benefit of another customer.

16              And the jury followed the Court's instructions,

17    which were in turn adapted from the summary judgment

18    rulings, and again ruled in Oracle's favor across the

19    board.

20              But when we came to the Court with a proposed

21    injunction that would enjoin those adjudicated practices,

22    again Rimini says that that would affect their current

23    processes.

24              So before you is in effect a representation by

25    Rimini that the infringement hasn't stopped, it is

1    continuing, it's ongoing.  This is irreparable harm.  We

2    have no adequate remedy at law for this.  We need an

3    injunction.

4              Perhaps the most astonishing admission by Rimini

5    was in response to our request for a disposition under

6    17 U.S.C. 503(b).  Rimini claimed previously to the Court

7    that they adopt an all-remote model, that the software that

8    was infringing is no longer on their systems.

9              And so we asked for a disposition of the

10   computers and storage media that contained the infringing

11   software.  And here Rimini threw up its arms in a panic and

12   said that this would heavily impact their current ongoing

13   business of supporting customers.

14             This means that their computers must be a wash

15   in Oracle's software, in copies that the jury found were

16   all infringing.

17             And so what we have here is an admission by

18   Rimini that this conduct is ongoing, and the only way to

19   stop ongoing conduct is for the Court to issue an

20   injunction.

21             But I do want to also address the hypothetical.

22   What if Rimini had actually stopped infringing in 2014?

23   Because they say this, they claim that after the Court

24   issued its order in February 2014, Rimini says it stopped

25   its infringing ways.

1            We now know that that's not really true.  But we

2    should talk about the hypothetical.  What if it were true

3    that after years of litigation, after years of hard-fought

4    discovery disputes, after heavily litigated summary

5    judgment motion where the Court found they were infringing,

6    what if it were true that they stopped then?

7            The case law is clear that you should still

8    issue an injunction.  Because under the Voluntary Cessation

9    Doctrine, that doesn't count as a voluntary cessation, and

10   the threat of resuming the infringing activity is

11   substantial and warrants an injunction.

12            We've cited a number of cases to that effect.

13   Probably the most on point is *MGM v. Grokster*, another

14   copyright case in an eerily parallel factual situation.

15   There the defendant lost on infringement on summary

16   judgment, and thereafter it claimed it would stop

17   infringing and there was no need for an injunction.

18            And the Court rejected that and issued a

19   permanent injunction explaining an injunction remains

20   appropriate to ensure that the misconduct does not recur as

21   soon as the case ends, quoting a similar case from the

22   Seventh Circuit.

23            To the same effect is the DC Circuit's decision

24   in *Disney v. Powell*.  There, after years of hard-fought

25   litigation, the defendant admitted at trial that having

1    engaged in copyright infringement, much as Mr. Ravin after

2    years of denial admitted the cross-use occurred at Rimini

3    Street all the time, and in *Disney v. Powell*, the defendant

4    said it acted in good faith, it would change its infringing

5    ways and stop, much as the story that Rimini is spinning

6    here.

7           And the DC Circuit agreed that wasn't enough.

8    It wasn't a voluntary cessation, it happened as a result of

9    litigation in the face of undisputed evidence of liability.

10          And so this is the line the courts draw, that

11   when there's an order, a finding of infringement, when

12   there's an admission at trial in the face of evidence of

13   infringement, that at that point if the defendant stops, at

14   that point if they say they won't continue to infringe,

15   that's not good enough anymore.  It wasn't a voluntary

16   cessation, it was beaten out of the defendant.

17          And the Ninth Circuit case law in the *SEC v.*

18   *Koracorp* and the Supreme Court decision in *US v. Parke,*

19   *Davis* that are routinely cited by courts on these points

20   support that.

21          So even if we adopted Rimini's -- even if the

22   Court were to believe Rimini's hypothetical that they

23   stopped in 2014, that wouldn't be good enough because they

24   did it only after you ruled that they were infringing.

25          And we should recognize the reality that the

1    courts recognize that Rimini has every financial incentive

2    to continue and certainly to resume infringing if no

3    injunction is entered against it.

4            Mr. Ravin testified how Rimini, by not

5    developing its own software and by cross-using between

6    customers, was able to very efficiently build scale in his

7    business and acquire many more customers.  That would be

8    true tomorrow just as it would be true years ago if there's

9    no injunction in place.  Rimini has shown that its promises

10    can't be trusted.

11            At the beginning of this case Rimini denied it

12    had a software library.  But the truth is it had one, and

13    when it knew that litigation was coming it destroyed it and

14    then lied about that, for which there were ultimately

15    spoliation sanctions.

16            When Mr. Ravin saw his former company

17    TomorrowNow stop having local copies of software on its

18    servers -- you saw that, the jury saw it in PTX 30 -- he

19    viewed that not as a warning to him that he should stop his

20    infringing ways but as a business opportunity for Rimini to

21    press forward, confirming that Rimini sees this financial

22    incentive to continue infringing.

23            And so that's why cessation in the teeth of a

24    summary judgment order, even if that were what happened,

25    wouldn't be sufficient to deter a permanent injunction.

1          Rimini also argues that it shouldn't be enjoined

2    because it's an innocent infringer.  That's wrong for two

3    basic reasons.

4          First, an injunction is prospective.  A

5    permanent injunction wouldn't address what happened last --

6    yesterday or last year or five years ago.  A permanent

7    injunction addresses what will happen in the future.  And

8    any future infringement by Rimini wouldn't be innocent at

9    this point.  At this point they know -- from the Court's

10   summary judgment orders, from the jury verdict, they know

11   that what they did was infringement.  And so an injunction

12   directed to the future is not aimed at an innocent

13   infringement -- infringer.

14         And, second, the cases that Rimini cites about

15   innocent infringement are really just cases that involve

16   the voluntary cessation doctrine, such as the *Dolori*

17   *Fabrics* case that Rimini cites.

18         There have been cases where as soon as an

19   infringer is put on notice that it was infringing, it

20   immediately stopped before litigation was filed, before

21   court orders were entered against it, before spoliation

22   sanctions were entered against it.  And that's what Rimini

23   cites, those cases in which there was true voluntary

24   cessation.

25         And we acknowledge that those cases are out

1    there in the courts where people who have, as soon as they

2    were put on notice they were infringing, stopped and they

3    didn't need a court to order them to do something.  That's

4    clearly not the situation we have here.  And Rimini's

5    reliance on those cases is misguided.

6           First of all, there's been no stop at all to

7    Rimini's infringement.  Their opposition brief makes clear

8    that their infringing continues today.

9           But, second of all, even if they had in this

10   hypothetical world stopped in 2014, that wasn't voluntary.

11   It didn't -- they didn't stop as soon as they were on

12   notice.  They -- that would have been four and a half years

13   after Oracle filed the lawsuit, after years of discovery

14   aimed at prying the truth out of them after a hard-fought

15   summary judgment.

16           This case is much more like *MGM v. Grokster,*

17   *Disney v. Powell,* and the others we've cited where there's

18   continued infringement and any change in their support

19   processes was done essentially against their will as a

20   result of the Court's summary judgment order.

21           There's a third type of irreparable harm that

22   we've suffered here in adequate remedy at law, and that's

23   injury to business reputation and goodwill.  And we've

24   cited to the Court a number of decisions, including the

25   Ninth Circuit's decision in *Apple v. Psystar,* where injury

```
 1    to business reputation and goodwill were the sole
 2    irreparable harm that sustained that injunction.  And
 3    courts have repeatedly issued injunctions to protect that
 4    type of interest.
 5           Here the evidence at trial established that
 6    there was injury to reputation and goodwill from Rimini's
 7    infringement.  As I've said, Mr. Ravin proudly testified
 8    that Rimini made a business decision not to develop its own
 9    competing software.  So it didn't incur any of those
10    development costs.  And it could go out and offer 50
11    percent off because it was using Oracle's software.
12           And we presented to you the testimony of
13    Oracle's CEO Safra Catz, who testified about the harm to
14    the business relationships that Oracle has suffered as a
15    result of this, that when Rimini comes in and says, "We can
16    give you similar support, we can give you vendor level
17    support and you don't have to pay Oracle's prices," that
18    customers now see less value in the support from Oracle;
19    understandably, if they think they can get the support
20    cheaper down the street.
21           And she talked about the injury to Oracle's
22    customer relationships and the harm in how customers
23    perceive Oracle.
24           And she and Edward Screven testified about the
25    harm to Oracle from Rimini telling customers that they
```

1    don't need to upgrade because they can use Rimini's

2    infringing support instead.

3            And Mr. Screven testified about the need for

4    updates for security purposes so that customers can keep

5    their software secure and how if customers don't update

6    they can become frozen over time and ultimately blame

7    Oracle if their software doesn't work as it should because

8    they've gone with Rimini and not updated their software.

9            We also had expert testimony from Edward Yourdon

10   and Elizabeth Dean talking about how the promise of vendor

11   level support at 50 percent off, which Rimini can do only

12   because of infringement, hurts the bonds between Oracle and

13   its customers.

14           All of this evidence shows the injury to

15   goodwill and reputation.

16           And we cited to the Court cases that have held

17   this type of evidence more than sufficient to sustain an

18   injunction.  The *Teller v. Dogge* decision from the District

19   of Nevada issued a permanent injunction on summary judgment

20   based on the declaration by the plaintiff.

21           There's the *Harolds Stores* case out of the Tenth

22   Circuit where the Court held that a corporate officer

23   familiar with company history, the financial statements,

24   and customer relationships may offer testimony on harm to

25   goodwill.

1            That's what we did here, with Oracle's CEO

2     providing exactly that type of testimony, all of which was

3     admitted without any objection at the time by Rimini

4     Street.

5            What's also interesting is that there's no

6     contrary testimony.  There's no testimony that Rimini's

7     conduct somehow failed to harm Oracle's reputation and

8     goodwill.  Rimini points to testimony by customers at

9     trial, customer depositions that said they were unhappy

10    with the relationship with Oracle.

11           The Court may recall the live testimony of Brian

12    Baggett, who testified that Bausch and Lomb was satisfied

13    with the quality of Oracle support, but they didn't see the

14    value in it because they thought it was too expensive.

15    Rimini points to this and claims that testimony supports

16    them.  But it doesn't because it confirms the injury to

17    reputation and goodwill.  It confirms the very harm that

18    Oracle's CEO testified about.

19           The fair market value damages award does not

20    compensate Oracle for this injury to reputation and

21    goodwill.  And you can recall this from the testimony of

22    both sides' experts about how they calculated damages.

23           Mr. Hampton put in a fair market value number

24    that was aimed at Rimini Street's avoided costs, and at

25    cross-examination some of his cost estimates were revealed

1   to be too low.  Mr. Hampton didn't put in anything based on

2   injury to Oracle's reputation or goodwill that didn't

3   factor into his analysis.

4           And when Ms. Dean calculated the fair market

5   value of a database license, she focused on the number of

6   users and the number of licenses that would be needed, but

7   no part of her opinion either intended to calculate harm to

8   reputation or goodwill.

9           So this is a type of injury to Oracle that has

10  not been compensated for and does not have an adequate

11  remedy at law.

12          Now, Rimini argues that the jury's failure to

13  award lost profits for copyright infringement means the

14  jury found no causation.  They say that Rimini must have

15  thought -- or that the jury must have thought that Rimini's

16  conduct didn't harm Oracle.

17          But that's not true.  Because the Court's

18  instructions to the jury require the jury to find injury to

19  Oracle on all of the claims on which Oracle prevailed.

20  And I'm referring specifically to Instruction No. 28 on

21  copyright infringement, explaining the damages had to prove

22  causation and injury to Oracle.

23          And, of course, Instructions 50 and 55 on the

24  California and Nevada computer access claims required proof

25  of injury and harm to Oracle.

1          And so the jury's awards in favor of Oracle on

2     all of those claims means that they did find injury and

3     harm.

4          Now, they did not quantify a lost profits

5     number.  They don't explain their reason.  They didn't give

6     one.

7          But courts have looked at that and said that

8     irreparable harm can be present even where lost profits are

9     difficult or impossible to improve.

10          We cited the Federal Circuit's decision in

11     *Mytee Products v. Harris*.

12          And in fact a lot of courts have gone further,

13     and the lost profits are often a very difficult type of

14     damages to prove and the difficulty of proving it is an

15     additional reason why the injury to harm, the injury to

16     reputation and goodwill is precisely considered an

17     irreparable harm of the type that justifies an injunction.

18          And in fact Rimini Street in its closing to the

19     jury remarked on this.  They argued that it was very

20     difficult to quantify Oracle's lost profits, further

21     bolstering the view that while the jury did find causation,

22     they weren't able to put a number on lost profits, which

23     courts agree is a reason why these types of injury are

24     irreparable, that they're difficult to remedy at law, and

25     further supporting our request for an injunction.

1              So that's irreparable harm and remedies at law.

2              The balance of hardships and public policy are

3     relatively straightforward.  We're simply asking for an

4     injunction against conduct that has already been

5     adjudicated to be illegal.  There is no public policy in

6     allowing conduct like that to continue at all.  The balance

7     of hardships tips entirely in Oracle's favor on this.

8              Rimini does try in their opposition brief to

9     resuscitate their copyright misuse defense that the Court

10    struck years ago.  However, we're not asking for an

11    injunction to shut down the lawful business practices or to

12    stop any form of support, we're simply asking the Court to

13    enforce Oracle's copyrights and to enjoin Rimini Street

14    from further infringement.  There's no conceivable way why

15    public policy would want to deny Oracle that type of

16    remedy.

17             Let me turn next to the tailoring of the

18    injunction.  What we did in drafting this proposed order is

19    we looked at the Court's jury instructions, in particular

20    Instruction Number 24, which instructed the jury about the

21    various different product lines, and we looked at the

22    Court's summary judgment orders, and then we took some of

23    the testimony from trial, and that's how we came up with

24    them.

25             So all of the categories, all of the prohibited

1    conduct lines up exactly with the Court's summary judgment

2    orders and with the instructions the Court gave to the

3    jury.

4         Let me address briefly some of the categories

5    that Rimini complains about.  They complain about the

6    derivative works language.  But we've cited the *Craigslist*

7    case and the *Apple v. Psystar* cases in which the courts in

8    the Ninth Circuit upheld an injunction that used the term

9    derivative works.

10        And Dr. Davis at trial also explained what a

11   derivative work is.  And this Court's instructions to the

12   jury also used the term derivative work.

13        So an injunction against the preparation and

14   distribution of derivative works tracks this language in

15   the Court's orders and in the jury instructions that they

16   followed to find infringement against every copyright

17   registration at issue.

18        Likewise, licensees on computer systems was a

19   term from the Court's summary judgment order.  It was a

20   term from the jury instructions.  And same with internal

21   data processing operations.

22        Benefit was a term that Dr. Davis explained on

23   the stand.  And the various restrictions involving JD

24   Edwards' and Siebel's source code, those came from Jury

25   Instruction No. 24.

1              And the prohibitions on copying and distribution

2       of Oracle database, again those came from the Court's

3       second summary judgment order in August of 2014, where we

4       just lifted language out of that order and put it into the

5       proposed injunction.

6              So we -- we have done our work to put together

7       language that tracks the Court's orders.  And I think in

8       both our moving and reply papers we've addressed the

9       specific complaints Rimini has.

10             They did say in their opposition that they want

11      a second bite of the Apple.  They said that if Your Honor

12      is considering issuing a permanent injunction that you

13      submit a draft for the parties to comment on.

14             We urge the Court not to do this.  We did go

15      through the effort of meticulously crafting a proposed

16      order.  They have had every opportunity to comment on that

17      and us to respond.  And so we think that you can go ahead

18      and enter the order.

19             It has been quite some time since briefing

20      concluded on the permanent injunction motion.  That was

21      last November, I believe.  And we need that to be finalized

22      for there to be a judgment in this case.  And we submit

23      that it's time for that, six and a half years after we

24      filed, that we should get the injunction to which we're

25      entitled.

1          Let me turn then to the second of the three

2     things we request in the motion, and that's the disposition

3     order under 17 U.S.C. 503(b).

4          Here Rimini has confused two different copyright

5     remedies, a disposition under 503(b) with an impoundment

6     under 503(a).  And all of Rimini's authorities are off

7     point and don't apply because they all talk about

8     impoundments.

9          An impoundment under 503(a) is analogous to an

10    injunction.  Under the plain language of the statute a

11    Court can issue an impoundment at any time in the

12    proceeding.  It can do it at a TRO, at a preliminary

13    injunction or a permanent injunction.  And it's

14    discretionary in that way.

15         Courts have looked at that, the fact that an

16    impoundment can be issued at a time in the proceeding and

17    have analogized that to an injunction and have applied the

18    *eBay* factors to 503(a), irreparable injury and so on.

19         And Rule 50 -- or Rule 65, Federal Rule of Civil

20    Procedure 65, that governs the issuance injunctions,

21    explicitly applies in subsection F to 503(a).  So those

22    standards, the *eBay* standards for an injunction, apply to

23    an impoundment.

24         But 503(b) is different, and Federal Rule of

25    Civil Procedure 65 does not apply to 503(b).  And there's a

1    big reason for that.  A 503(b) disposition can only happen

2    after the finding of infringement.  It can't be

3    preliminary.  It can't be the TRO.  It has to be after

4    there has already been a final adjudication of

5    infringement.

6              And so you don't have to worry about things like

7    likelihood of success because the plaintiff would already

8    have succeeded.  There is no case law holding that a

9    disposition order under 503(b) needs to meet the standards

10   for an injunction or needs to meet the *eBay* standards.

11             Now, we submit we have made such a showing and

12   that the -- if such standards were applicable, a

13   disposition order should still issue.  But there isn't any

14   authority that we need to satisfy those standards.

15             Instead, the disposition order is governed under

16   the permissive standards explained by the Second Circuit in

17   *Rogers v. Koons,* which described it as an equitable remedy

18   issued under the broad powers vested in a trial of judge

19   under 17 U.S.C. 503(b).

20             The form of the disposition that we've asked for

21   was to put the computers and storage media that had the

22   infringing software into an escrow, a neutral third party,

23   rather than turning it over to Oracle.  We think this would

24   be fair because it would allow both sides to have access to

25   it, as appropriate, for discovery purposes in the second

1    case.

2         Rimini has objected to this escrow provision.

3    They say it's unwarranted to turn it over to a third party.

4    We were trying to be nice.  We were trying to oppose a

5    disposition order that wouldn't unduly interfere with the

6    second case.

7         But if Rimini doesn't want an escrow with a

8    neutral third party, then this Court can do what is

9    typically done in a 503(b) disposition and order the

10   materials turned over to Oracle for it to have because they

11   contain the infringing software on it.

12        We would be fine with either remedy under

13   503(b).  The reason we proposed the escrow is because we

14   thought it was less prejudicial to Rimini if the Court were

15   to enter that type of order.

16        Finally, last but not least, is our request for

17   a judgment on our unfair competition law claim.  This is

18   the California state law claim under Business and

19   Professions Code 17200.  That statute makes it unlawful to

20   commit any unlawful, unfair, or fraudulent business

21   practice.

22        Under the Supreme Court -- California Supreme

23   Court's decision in *Cel-Tech*, the UCL borrows violations of

24   other laws and makes them violations of the UCL.

25        Here the jury has found liability under the

1    California computer access statute, and so the UCL borrows

2    that violation.

3            There's no right to a jury trial under 17200.

4    The case law is well established on that.  We've cited that

5    in our papers.  I don't think Rimini disputes that, that

6    this is a claim to be tried to the judge.

7            Here we are, Your Honor, trying the claim to the

8    judge.  And so we would ask for a judgment to be entered in

9    Oracle's favor because having prevailed on the California

10   computer access claim action, we necessarily prevail on the

11   UCL claim.

12           And so with that, unless Your Honor has any

13   questions, I'll save my remaining time for reply.

14           THE COURT:  All right.  Thank you, Mr. Hixson.

15           All right.  Rimini response.  Mr. Rand?

16           MR. PERRY:  It's Mark Perry, Your Honor, for the

17   plaintiffs.

18           THE COURT:  I'm sorry.  I apologize.  I haven't

19   had you here before.

20           MR. PERRY:  I'll take those in reverse order as

21   Mr. Hixson presented them, if I may.

22           The UCL claim is entirely derivative of the

23   hacking claims on which we heard nothing else from

24   Mr. Hixson today so I assume we won't in rebuttal.  We'd

25   move for judgment on the hacking claims, and we would

1    submit on the papers on the hacking claims, and the UCL

2    claim falls with the hacking claims.

3              I do have, Your Honor, a short slide deck as

4    well.  If I may approach?

5              THE COURT:  Yes.

6              MR. PERRY:  Thank you, Your Honor.

7              The second of the three points that Mr. Hixson

8    raised was the disposition order.  And I agree there's

9    confusion here.

10             Your Honor, disposition does not mean put in

11   escrow.  Disposition means dispose of.  503(b) authorizes

12   the Court to order the destruction or reasonable

13   disposition of the copies, as opposed to 503(a), which is

14   the impoundment provision, which is -- can be done with an

15   escrow.

16             Your Honor, if the defendant has a hundred

17   unauthorized copies of The Catcher in the Rye, 503(a) lets

18   the Court impound them during the trial, put them in the

19   court registry so they don't enter the stream of commerce,

20   and 503(b) lets the court destroy them after the trial or

21   give them to the public library system so that they don't

22   get sold by the defendant.

23             That's what that provision is for.  It has

24   nothing to do with seizing all the computers and servers

25   run by a computer software services corporation, which is

1     what Oracle is seeking here.

2              Your Honor, they're seeking not just the copies,

3     in other words, but every computer and storage media on

4     which they are stored.  No case that they cite and no case

5     ever decided under 503 has ever authorized that.  In fact,

6     every case cited by Oracle has involved willful

7     infringement.  And I'm going to talk more about the

8     importance of that point in connection with the injunction.

9              This Court would have to make a finding that

10    destruction of the computers is authorized.  They haven't

11    even tried to make that showing.

12             Now, Mr. Hixson said today that our opposition

13    to the seizure and destruction of our computers must mean

14    that we have copies still on them.  They know that.  We

15    have copies still on them because we're required to retain

16    them for document preservation because there's ongoing

17    litigation, Your Honor.  If we destroyed those copies, they

18    would bring another spoliation claim.  It's no surprise

19    those copies are there, that they're not being used.

20    That's the *Rimini II* case as to what that's all about.  But

21    this suggestion that we've admitted liability is both not

22    supported by evidence and just not true.

23             Your Honor, a destruction order, a disposition

24    order also is not a discovery device.  They can't get --

25    you know, Oracle wants the computers apparently so they can

1    poke around in them.  They have discovery in the second

2    case.  They can use it for that.

3         Now, more importantly, though, you heard

4    Mr. Hixson say at the end of his presentation a 503 order

5    is an equitable remedy, as such it must comply with Rule

6    65, that's what 65(f) says, it says impoundment.  But it

7    clearly applies to the whole provision.  Their order

8    obviously doesn't comply with Rule 65.  And it must comply

9    with all the *eBay* factors.

10        The Court in *eBay* and in many other cases, such

11   as *Winter,* has said that any exercise of the traditional

12   equitable powers by this Court sitting as an equity court

13   must comply with the traditional standards of equity

14   including the four *eBay* factors.

15        Oracle hasn't tried to make out the four *eBay*

16   factors as to the disposition order.  It can't or it

17   collapses into their argument on the injunction, in which

18   case the Court should decide them together.

19        So I would like to address them together because

20   I think it's the same considerations that apply, although

21   when you're talking about seizure and destruction of

22   computers in spades.

23        So on to the main event, if you will.  The

24   Copyright Act injunction, the permanent injunction

25   requested by Oracle.

1          To set the stage, the jury exonerated Mr. Ravin

2     of all claims under the Copyright Act and found that Rimini

3     Street's challenged acts while infringing were innocent.

4          The jury's verdict of a $35.6 million fair

5     market value license fully compensates Oracle for any harm

6     that is suffered.  On this record, Your Honor, we submit

7     that no permanent injunction can or should issue under the

8     Copyright Act.

9          The statute, of course, provides that the Court

10    may enter a permanent injunction.  It is entirely

11    discretionary with the Court.  And Oracle bears the burden

12    of proving its entitlement to an injunction.

13          The Supreme Court expressly warned in the *eBay*

14    case that automatic issuance of copyright injunctions even

15    after a finding of liability has been established.

16          My colleague cited you to Chief Justice Roberts'

17    concurrence, in which he observed that historically the

18    majority of patent cases have resulted in injunctions.

19    That is true.

20          Mr. Hixson drew from that, quote, that it's

21    inevitable, end quote, that a finding of liability should

22    lead to an injunction.  That was his word, inevitable.

23          Your Honor, inevitable means automatic.  It is

24    not inevitable.  The holding of *eBay* is that injunctions

25    are not inevitable, they're not automatic, and even if they

1     apply in the majority of patent cases, they don't actually

2     get issued in the majority of copyright cases, and they

3     certainly shouldn't be issued -- an injunction certainly

4     shouldn't be issued in this copyright case for a number of

5     reasons.

6                    Your Honor, we'd like to make three sets of key

7     points regarding the injunction.

8                    First is the importance of the jury's finding

9     that Rimini Street's infringement was innocent.  We

10    respectfully submit, Your Honor, that this finding, in the

11    unique circumstances of this case, precludes the imposition

12    of an injunction.  It would be an abuse of discretion, in

13    other words, to do what Oracle is asking the Court to do.

14                   Second, Your Honor, I'd like to discuss each of

15    the four traditional factors from *eBay*.  And I'll explain

16    why none of them supports Oracle's request for an

17    injunction.

18                   And the third category, which is what Mr. Hixson

19    spent most of his time on, is the scope of the injunction.

20    Mr. Hixson's argument proceeded from the assumption that an

21    injunction was issued and we were here to debate the scope

22    of it.  I suggest, Your Honor, that gets it backwards.  I

23    think we should discuss first whether an injunction can and

24    should issue at all.  And we say no.

25                   And act of copyright infringement is like a

1    trespass except the property's intangible.  And an

2    injunction is an order prohibiting further trespasses on

3    that property.  That's injunctions 101.

4           And just like a landowner can sometimes get a

5    court order prohibiting a person from walking across his

6    yard, sometimes a copyright owner can get an injunction

7    prohibiting additional copies.  But also like that

8    landowner, there are some things that will stand in the way

9    of a copyright owner getting an injunction.

10          One of those barriers to injunctive relief, Your

11   Honor, is the premise that innocent conduct can't be

12   enjoined.  If the trespasser in our example reasonably

13   believed that he had a right to be on the property, he

14   thought it was his own yard or a public park or whatever,

15   then the courts are not going to issue an injunction

16   against him.  They're just not.  The courts will rightly

17   assume that clarification of the boundary of the property

18   will be sufficient to deter future violations of the

19   property right.  The Supreme Court has said that in many

20   cases, Your Honor.

21          Now, in this case, as the Court will undoubtedly

22   recall, Oracle took the position that Rimini Street was, in

23   our example, a deliberate and intentional trespasser.

24   Their theory was that Rimini Street willfully infringed the

25   copyrights.

1          Rimini Street's position was quite different, of

2     course.  And you heard more about that this morning, by the

3     way, from Mr. Pocker and Mr. Hixson.

4          Rimini Street at trial took the position that it

5     was an innocent infringement, that it was trying to comply

6     with the law, and the licenses and the software support

7     that it was providing was permitted under those licenses

8     and that any violations were inadvertent, it was an

9     innocent trespasser.

10          The parties presented these competing narratives

11     at the trial, the Court will recall well.

12          And the jury decided that Rimini Street was

13     right on this point.  And on this point, Your Honor, there

14     is no ambiguity.  We put that up on the slide.

15          The Court gave jury Instruction No. 35:  An

16     infringement is considered innocent when the defendant has

17     proved by a preponderance of the evidence that it was not

18     aware and had no reason to believe that its acts

19     constituted an infringement of the copyright.

20          And then the jury in question 9 was asked:  Do

21     you find that the Defendant Rimini Street has proven by a

22     preponderance of the evidence that its infringement, if

23     any, was innocent as explained in that instruction?

24          And the jury answered "yes" with respect to each

25     and every software product at issue.

1           Mr. Pocker mentioned an inference from the

2    verdict.  There's no inference at issue here, Your Honor.

3    This is an express factual finding by the jury of citizens

4    who heard this case that Rimini Street did not know and had

5    no reason to know that its acts were infringing.

6           Oracle's motion for a permanent injunction never

7    mentions the innocent infringement finding.  It's not in

8    there.  We pointed this out in our opposition.  And we

9    argued that the jury's innocent infringement finding should

10   not only weigh heavily in the *eBay* factors but actually

11   preclude an injunction altogether under the unique

12   circumstances of this case.

13          Oracle addressed the jury's innocence finding

14   for the first time in its reply brief at page 12 where it

15   made three arguments, which I've summarized on slide 6.

16          This morning and this afternoon my colleagues at

17   the other table have made four additional arguments, and

18   I'm happy to address those as well.

19          Let me talk about their new arguments first,

20   which don't appear in their briefs.

21          First -- in their injunction briefs.  Mr. Pocker

22   said that this is an advisory verdict.  That's not true,

23   Your Honor.  Innocence and willfulness was submitted to the

24   jury by the Court at Oracle's request as essential

25   predicates to the statutory damages request which they are

1    entitled to elect any time before final judgment.  There is

2    nothing advisory about this verdict.  And it was put in --

3    the jury was asked this question at Oracle's request.

4            Second, Mr. Pocker said the hacking claims show

5    that the jury found intentional conduct.  We can talk about

6    those later, if you'd like, but certainly for the copyright

7    claims that's not true.  And the injunction we're talking

8    about here would have to be justified under the Copyright

9    Act, where the only finding of infringement was innocent.

10           Mr. Hixson then said two additional arguments

11   that aren't in the injunction papers.  First, he said we're

12   talking here about prospective infringement and any future

13   infringement will be intentional.  And I will talk about

14   that in the context of the *Rimini II* case.  There's no

15   evidence of that, and it's wrong for a variety of reasons.

16           And then, fourth, he mentioned the voluntary

17   cessation cases which I'll also address.

18           As to the arguments they actually do make in

19   their papers, they make three arguments, Your Honor.

20           First, that Rimini Street's past infringement

21   was not innocent at all.

22           Second, that their current -- that our current

23   infringement is willful.  That's the argument that

24   Mr. Hixson expanded on.

25           And, third, they say courts, quote, can and do

1    enjoin innocent infringers.

2              They're quite wrong.

3              Now, Mr. Pocker this morning accused Rimini

4    Street of, quote, wrapping ourselves in the Seventh

5    Amendment.  I plead guilty.  It's true.  We embraced the

6    Constitution of the United States, Your Honor.  And we

7    submit that it precludes Oracle's arguments that are

8    contrary to the jury's verdict.

9              This Court is precluded from reexamining the

10   facts found by the jury.  One of those facts is that Rimini

11   Street did not know or have reason to know that the acts

12   were infringing.  All of these arguments about lies and

13   this and that, they're just rearguing.  You heard that all

14   in the closing argument, and the jury didn't buy it; in

15   fact, the jury rejected it.  And they can't come here on an

16   injunction motion and ask this Court to do what the jury

17   didn't do.  The Seventh Amendment says exactly that.

18             Your Honor, we all know what Oracle's litigating

19   position was.  It was no surprise.  We heard the trial.

20   But they lost that point.  Their continued disagreement

21   with that verdict, Your Honor, we submit demonstrates a

22   profound disturbing lack of respect for the jury system.

23             A panel of 10 citizens sat in the box in Las

24   Vegas, heard these arguments, heard the evidence, and

25   decided that Oracle was wrong and Rimini Street was right.

1    That finding was not advisory.  It binds the Court for

2    purposes of this equitable proceeding.  Oracle's motion is

3    simply at war with the verdict.

4          For the purposes of this motion, the jury's

5    verdict conclusively establishes that Rimini Street's acts

6    were innocent; that is, that Rimini Street did not know and

7    did not have reason to know that those acts were unlawful.

8    And the Seventh Amendment precludes the Court from

9    reconsidering that point.

10          Now, faced perhaps with that fact, Oracle spent

11   much time talking about the current processes and accusing

12   us of willful infringement today.

13          Your Honor, some background is helpful to

14   understand this argument.

15          First, there's no secret about what happened.

16   Rimini Street believed in good faith that its past

17   practices were consistent with the licenses and the law.

18   This lawsuit ensued and the Court issued a summary judgment

19   ruling construing those licenses, disagreeing with Rimini

20   Street's position.

21          We respect that opinion, Your Honor.  After that

22   opinion came out, Rimini Street embarked on an extensive

23   exercise, spent millions of dollars to reconfigure its

24   processes, to comply with the licenses as construed by this

25   Court and the Copyright Act as being litigated in this

1    case.

2              Rimini Street then so sure, or at least to

3    cert- -- to ascertain clarity, filed the second lawsuit,

4    brought a declaratory judgment action asking this Court to

5    make a determination whether those second set of processes

6    complied, as Rimini Street has always tried to comply with

7    the licenses and the law.

8              It was Oracle, Your Honor, that strenuously and

9    successfully kept all evidence and even mention of the

10   current practices out of this lawsuit, the lawsuit in which

11   this injunction is being sought.

12             Oracle opposed discovery into the current

13   practices.  Oracle opposed consolidation of the two

14   actions.  Oracle moved in limine to preclude any mention of

15   the current practices at trial, and this Court granted that

16   action.  And Oracle opposed Rimini Street's motion for

17   reconsideration of that.

18             So the trial of this case, the record of this

19   case contains no evidence of the current practices because

20   Oracle insisted that they be kept out.  Oracle convinced

21   this Court, in other words -- and this is a direct quote

22   from one of its papers filed in this court, and we put the

23   citations on slide 8 -- to limit *Rimini I* to Rimini

24   Street's past practices, while issues related to Rimini's

25   2014 and later conduct will get a full hearing in

1    *Rimini II.*

2              That was Oracle's choice.  This Court accepted

3    it.  We respect it.  But it means there's two cases, Your

4    Honor.

5              And it also means that Oracle's motion, its

6    motion for a permanent injunction in case *I* cites not one

7    shred of evidence regarding the current processes.  Not one

8    declaration, not one deposition, not one document, not one

9    email, nothing.

10             I submit, Your Honor, this Court has rarely seen

11   a motion for permanent injunction that's not supported by

12   evidence on something that a party has the burden of proof

13   on.  And certainly as to current practices, Oracle has

14   none.

15             And meanwhile Rimini Street, of course, has no

16   burden of proof.  We are the responding party in this

17   motion.  But we came forward with evidence.  We put in five

18   declarations, five sworn declarations from the employees in

19   charge of servicing the various product lines which attest

20   that the current practices do not include the acts that

21   were accused and adjudicated in the first case.

22             What does Oracle have to say about that

23   evidence, Your Honor?  What did Mr. Hixson say today?

24   Nothing.  He didn't mention it.  He doesn't dispute it.  In

25   their reply brief they don't mention it.  They don't

1    dispute it.  They just pretend that it doesn't exist.

2              But when the party of the burden of proof has no

3    evidence and the responding party puts in uncontradicted

4    evidence that the current practices don't infringe, the

5    only thing this Court can conclude, we submit, is that the

6    moving party has not carried its burden.

7              To be clear, Judge Hicks, we are not asking the

8    Court to rule in this motion on the lawfulness of the

9    current practices.  That is *Rimini II* under the orders this

10   Court has already entered.

11             But to be clear, as well, this Court could not

12   rule for Oracle on this point because it has no evidence

13   and because the only evidence in the record is the

14   contrary.

15             All of it, in other words, should be deferred to

16   the second case.

17             Your Honor, Oracle's third and final response to

18   the innocent infringement finding is a generic assertion

19   that courts, quote, can and do enjoin innocent infringers.

20   Can and do.

21             For the proposition that courts can enjoin

22   innocent infringers, Oracle cites a provision of the

23   Copyright Act, Section 405(b), which sets forth a special

24   rule regarding notices and applies only to, quote, copies

25   publicly distributed by authority of the copyright owner

1      before the effective date of the Berne Convention

2      Implementation Act of 1988, end quote.

3              Suffice it to say, Your Honor, that none of the

4      works at issue in this case are subject to that provision,

5      and Oracle doesn't dispute that.

6              And, more importantly, the fact that Congress in

7      this one, you know, oddball unique provision of the

8      Copyright Act expressly authorized an injunction against

9      those innocent infringers involving notices just reenforces

10     the background rule that injunctions are not available in

11     the ordinary case in this case against innocent infringers.

12     In other words, Congress had to codify an exception.  So

13     Oracle's own authority actually proves our point.

14             Second, Your Honor, for the proposition that

15     courts do enjoin innocent infringers, Oracle cites a single

16     district court case, the *Jackson* case from the Northern

17     District of Illinois in 1988.

18             That case involved a preliminary injunction, not

19     a permanent injunction.  There had been no trial and no

20     adjudication of innocence.  So that case is not authority

21     at all.

22             The reality, Judge Hicks, is that no court has

23     ever entered a permanent injunction under the Copyright Act

24     against a person adjudicated to have been an innocent

25     infringer.

1          You heard this morning about the $58 million in

2     attorney's fees that Oracle has racked up.  I think the

3     Court can rest assured that the army of lawyers employed by

4     Oracle looked long and hard for a case enjoining an

5     innocent infringer.  They didn't find any.  We didn't

6     either, Your Honor.  There are no such cases.

7          In other words, Oracle is asking this Court to

8     become the first in the history of the republic, the first

9     since the first copyright statute was enacted by the first

10    Congress in 1790, to enjoin an innocent infringer.

11         Now, Mr. Hixson referred to the chief justice's

12    concurrence in *eBay*.  And I think it's an excellent place

13    for the Court to look, both that concurrence and the

14    majority, and, for that matter, Justice Kennedy's

15    concurrence.  Because all of them stress the importance of

16    historical practice in applying permanent injunctions in

17    intellectual property cases.

18         And what the Supreme Court said in so many words

19    in the majority opinion, which, of course, is binding on

20    this Court, that equity practice generally, in the issuance

21    of permanent injunctions in particular, is not a good place

22    for judicial innovation.  The whole point of adhering to

23    historical practice is not to break new ground.

24         Your Honor, in fact, the *eBay* case -- it's

25    interesting that Mr. Hixson brought it up.  I went back and

1    looked at the briefs in *eBay*, and Oracle joined a brief in

2    that case, a very interesting brief, which argued that

3    injunctions should not issue against, quote, inadvertent

4    infringers because, as this brief explained, quote, the

5    intent of a wrongdoer has always been relevant to

6    determining a just and equitable remedy, end quote.  And we

7    pause there.

8            Of course that makes sense.  A willful infringer

9    more likely to need an injunction, innocent, not likely or

10   maybe no injunction at all.  And that has to be the rule.

11           This brief, Your Honor, went on to say, I'm

12   quoting again, injunctions against innocent infringers

13   frequently impose burdens on inadvertent infringers far out

14   of proportion to the harm done to the rights holder, end

15   quote.

16           And those are all from the brief for the

17   American Innovators Alliance, a group Oracle was a member,

18   at pages 21 and 22, Your Honor.  Oracle was right, we

19   submit, a decade ago when it said that to the Supreme

20   Court, and it's wrong today when it's representing the

21   opposite to you.

22           The truth, Judge Hicks, is that the equitable

23   power of injunction has always been used to deter, not to

24   punish.  The Supreme Court said that in the *Hecht Co.* and

25   many others.

1          And the deterrence of the remedial rationale of

2     an injunction does not apply to an innocent infringer who

3     does not know or have reason to know that what it was doing

4     was unlawful.

5          As I said before, judicial clarification of the

6     property rights for such a person is alone sufficient to

7     ensure future compliance.  Certainly an innocent infringer

8     doesn't need to be deterred when it changed its practices

9     following that judicial clarification to respect those

10    boundaries as determined by the Court, which is what Rimini

11    Street did here.

12         In the unique circumstances of this case, in

13    short, we submit that the finding of an innocent

14    infringement by the jury, the fact that Rimini Street did

15    not know or have reason to know that its infringing acts

16    were unlawful, precludes injunctive relief.  It's a silver

17    bullet, we submit.

18         Now, if that's not the case, if that doesn't end

19    it, at the very least the innocence finding and the unique

20    factors that I described and the absence of any precedent

21    in this context must surely weigh heavily in the equitable

22    balance under *eBay* as we explained in our opposition brief.

23    And I'll try to explain that as well.

24         Of course, Your Honor, *eBay* adopts the four-

25    factor test.  Oracle bears the burden of proof.  And we

1    submit they haven't carried it.  Irreparable injury,

2    adequacy of damages, balance of hardships, and the public

3    interest.

4          Your Honor, the first *eBay* factor, and I think

5    in this case one of the two most important, on that I do

6    agree with Mr. Hixson, is irreparable injury.

7          Now, it's worth pausing here to consider that

8    the trial involved acts of infringement that occurred years

9    ago, as Mr. Hixson said at the end of his argument, six and

10   a half years or something.  It's rather odd for Oracle to

11   be asserting today that it's suffering an irreparable

12   injury that requires a prospective injunction, since it

13   never moved for a TRO or a preliminary injunction or any

14   other equitable relief until after it learned that it

15   hadn't persuaded the jury on its -- most of its theories.

16   This injunction action, in other words, is an afterthought,

17   not the main event.

18          But in any event, Oracle asserts in its motion

19   that harm to business reputation and goodwill can be

20   irreparable.  In fact, that's the only harm it asserts in

21   its motion.

22          Today Mr. Hixson said two additional harms are

23   being suffered.  One is the right to exclude.  He said that

24   three times in his oral presentation.  They say that no

25   times in their briefs.  It sort of doesn't matter.  All

1    rights holders have the right to exclude.  If that's an

2    irreparable injury, then you would be in the automatic

3    injunction world that *eBay* rejected.  So that's just

4    another way that they're disagreeing with the Supreme

5    Court.

6            His second argument today was a continued

7    infringement theory, that they're being irreparably injured

8    by continued infringement.  But as I just explained, they

9    have absolutely no proof of continued infringement and so

10   that goes by the by.

11           So back to what they do argue in their papers:

12   Reputation and goodwill.

13           Now, it is absolutely true that at some level of

14   generality harm to reputation and goodwill can be an

15   irreparable injury.  And cases like *Douglas Dynamics* say

16   that.  Of course cases like *Douglas Dynamics* involve cases

17   to general reputation in the marketplace and corporate

18   goodwill, which is not what Oracle is arguing here.

19   They're arguing a much more limited sort, a much more

20   specific kind of harm that pertains only to their goodwill

21   among support customers.

22           That's not me saying that, that's them saying

23   that.  In their motion at page 16, they say that in so many

24   words.  Quote, Rimini undermines Oracle's customer

25   relationships and harms Oracle's goodwill with its

1    customers.

2          And they repeat that in its reply brief on page

3    7:  Rimini's infringement damaged the bonds between Oracle

4    and its customers.

5          Okay.  That's the only harm that Oracle claimed

6    in its briefs to be irreparable.  Oracle failed to prove

7    that harm.  You know, this is an absolutely essential

8    point, Your Honor.  It's the lynchpin of their motion for a

9    permanent injunction.  But they don't have legally

10   sufficient evidence to support it.

11         On slide 16 we have identified every page and

12   line in which Oracle has cited evidence in support of its

13   irreparable injury argument.  We put that there for the

14   Court because we urge the Court, and we know it will,

15   review it carefully.  We're not afraid of it.  Because when

16   the Court reviews it, you will find some very interesting

17   things.

18         First, Oracle cites no testimony from actual

19   customers.  Remember their theory of harm is that Rimini

20   Street has damaged the goodwill among customers.  But they

21   cite no customer evidence.

22         This is very unlike, then, the *Apple versus*

23   *Psystar* case that Mr. Hixson mentioned and which Oracle

24   places principal reliance.  In that case the rights holder

25   had come forward with actual customer testimony of

1    confusion, disparagement, and dismay.

2            There was no such evidence in this case.  In

3    fact, not a single customer came to Las Vegas and testified

4    for Oracle.  That says a lot right there about this theory

5    of irreparable harm.

6            Second, aside from no customer evidence, Oracle

7    cites no survey or other expert evidence that would

8    indirectly examine customer reactions.  Usually in a case

9    like this, where the rights holder is complaining of a

10   damaged reputation or goodwill, a survey expert will go out

11   and canvass the customers to determine their attitudes

12   towards the infringer and the rights holder and so forth.

13           Oracle doesn't have any of that evidence in

14   here.  In other words, it has no direct evidence and no

15   indirect evidence of how customers respond.  And that is

16   absolutely fatal to its claim of loss of customer goodwill,

17   which is the only irreparable injury it asserts here.

18           Now, Oracle made all our lives somewhat easier

19   in the reply brief at page 7 when it makes the point that

20   compelling proof, compelling proof, it says, of the

21   irreparable harm is afforded by Ms. Catz, Mr. Yourdon, and

22   Ms. Dean.  Great.  We can focus on that.

23           In the next two slides, Your Honor, we've put

24   all of that testimony that Oracle puts, you know, basically

25   all its stock in.  And here it is.  What did Ms. Catz have

1    to say?  She was the CEO as the Court knows.  And because

2    Rimini Street offers support services half off, it really

3    breaks the bonds and trust that we have with our customers.

4                You heard Mr. Hixson repeat that today.  This is

5    the key evidence they rely on in support of its irreparable

6    injury theory.  But it doesn't establish irreparable harm,

7    Your Honor.

8                Oracle admitted at trial Rimini Street is

9    allowed to provide third-party support.  And customers,

10   software customers, are allowed to contract with

11   third-party support providers.

12                Competition, in other words, the availability of

13   a lower priced alternative, cannot be the irreparable harm

14   of which Oracle complains because that is not unlawful.

15   The only thing that was adjudged at trial was not

16   competition were Rimini Street's existence in the

17   marketplace, but rather the technical acts of copying in

18   the past practices about which Oracle complained.

19                Oracle doesn't have any evidence that those

20   technical acts of copying caused any lack of customer

21   goodwill.  There is no such evidence in the record.

22                The other two snippets -- and, by the way, out

23   of a 4,000-page trial transcript, Oracle came up with three

24   pages to present on irreparable harm -- are from the expert

25   witnesses Yourdon and Dean.

1           Oracle says they corroborate Ms. Catz'

2      testimony.  Your Honor, an expert witness cannot

3      corroborate the facts, okay?  Either the facts exist or

4      they don't.  And these experts did not offer any expert

5      opinions on customer goodwill or reputation, the subject of

6      irreparable harm.  So they're absolutely irrelevant to this

7      portion of this legal proceeding.

8           And more importantly, perhaps, than all of that

9      is that all of this evidence, Ms. Catz' testimony,

10     Mr. Yourdon's testimony Ms. Dean's testimony, and, for that

11     matter, all of the other evidence cited in Oracle's papers

12     was presented to the jury at trial.  And it was all

13     presented in connection with the theory that Rimini Street

14     had built a business based on infringement and was using it

15     to steal customers away from Oracle.

16          You heard Mr. Hixson just quote almost verbatim

17     from Mr. Isaacson's closing argument on that earlier today.

18     The jury heard all of that too, all the argument and all

19     the evidence.  And the jury rejected each and every one of

20     those claims, Your Honor.  The jury rejected the lost

21     profits theory.  It said that Oracle sustained no lost

22     profits with respect to this copyright infringement.

23          What does Oracle say about that?  In the reply

24     brief at page 8, footnote 4, they say, well, that was just

25     an advisory verdict.  Okay.  It was.  We'll give them that

1    one.  Unlike the innocence verdict.

2         But Oracle doesn't explain why the Court

3    shouldn't follow the jury's advice.  I mean, the whole

4    point of an advisory verdict is to give guidance to the

5    Court in the equitable proceeding.  And here we are in the

6    equitable proceeding, the jury found no lost profits.  The

7    Court should be guided by that jury -- that verdict.

8         Oracle failed to persuade the jury on this

9    point.  It now has to persuade the Court.  But it doesn't

10   have any additional evidence.  Once again, its arguments in

11   this proceeding are at war with the jury verdict.

12        And more importantly, I think, Your Honor, even

13   setting aside lost profits, because we agree that was an

14   advisory verdict, Oracle also accused Rimini Street of

15   inducing customers to breach their contracts with Oracle

16   and of intentionally interfering with Oracle's customer

17   relationships.  These were the tort causes of action that

18   went directly at customer goodwill and reputation, the

19   irreparable harm now being claimed.  And the jury found for

20   Rimini Street on those claims.

21        Those findings, Your Honor, are not advisory.

22   Those findings are binding on this Court for this equitable

23   proceeding.

24        What does Oracle have to say about those?  Well,

25   it doesn't say anything in its motion, it doesn't say

1    anything in the reply brief, and it didn't say anything

2    earlier today.  So I guess we'll learn from Mr. Hixson for

3    the first time in rebuttal what -- Oracle's position on

4    that.

5              Our position is clear.  Here is yet another

6    example of Oracle asking this Court to ignore the jury

7    verdict and do something that the jury declined to do.

8              In other words, Your Honor, we submit that the

9    Court could not accept Oracle's theory of irreparable harm

10   without reexamining the jury's verdict and violating the

11   Seventh Amendment to the United States Constitution.  Even

12   if it could, Oracle has offered zero evidence that the jury

13   didn't already consider and reject in connection with very

14   similar claims of harm.

15             And even if this Court could start on a blank

16   slate, we submit that the miniscule amounts of evidence,

17   essentially one sentence from Safra Catz, does not

18   constitute legally sufficient evidence to support a finding

19   of irreparable injury.

20             For those three reasons Oracle's motion for

21   permanent injunction doesn't even get past the starting

22   gate.

23             Oracle's irreparable harm fails for a second and

24   independent reason, which is the causal nexus requirement,

25   something Mr. Hixson didn't talk about earlier.

1           The Federal Circuit, in an important series of

2    cases, has clarified that part of the irreparable harm

3    requirement is the showing by the rights holder of a causal

4    nexus between the actual acts of infringement and the

5    irreparable harm claimed at the injunction stage.  Those

6    were all cases involving *Apple versus Samsung*.  It was a

7    series of three cases that build among one another.  We

8    cited them all in our briefs.

9           And just for the Court's convenience, I put some

10   key quotes and citations on page 20.

11          Oracle doesn't dispute that this requirement

12   applies to injunctions under the Copyright Act.  Its only

13   argument, and Mr. Hixson did hint at this, is that the

14   jury's damages award indicates that Rimini Street caused

15   harm to Oracle.

16          That's not enough, however, to satisfy the

17   causal nexus requirement, Your Honor.  In every permanent

18   injunction case that is after a liability verdict, you have

19   to make an additional showing -- it's not just the

20   causation of liability, otherwise you would be in the world

21   of the automatic injunction that *eBay* rejected.

22          In fact, the last *Apple versus Samsung* case, the

23   2013 decision, involved a liability determination of

24   infringement where the exact same argument that Oracle is

25   now making was made by the rights holder and the Federal

1   Circuit said, no, the causation at the liability stage is

2   different than at the permanent injunction stage and the

3   rights holder has the additional burden of showing that the

4   specific infringing acts directly caused the irreparable

5   harm being complained of.

6          That's a burden that Oracle doesn't dispute that

7   it has and that it indisputably has not discharged.  That

8   reason alone is sufficient.

9          And if we go back to the trial evidence, which

10  is all that we have at this motion, Your Honor, the trial

11  record actually establishes the absence of a causal nexus.

12         As the Court may recall, about 5 percent of

13  Oracle's support customers leave each year.  The Court

14  heard testimony regarding a couple of them, Pitney Bowes

15  and Bausch and Lomb, which left Oracle for reasons having

16  with nothing to do with Rimini Street.

17         Oracle's own expert witness, Mr. Yourdon, agreed

18  that Rimini Street's customers come from this 5 percent.

19  And that alone, that evidence, Your Honor, is sufficient to

20  break the causal chain between the technical acts of

21  copying from the innocent infringement verdict and the harm

22  now identified by Oracle as irreparable.  For that reason

23  too no irreparable injury can be shown.

24         Now, Judge Hicks, the second *eBay* factor is the

25  adequacy of legal relief, of damages.  Here it's Oracle's

1    burden to show that damages not only would not but could

2    not provide full recompense for the injuries it complains

3    of.

4            The jury, of course, found as a factual matter

5    $35.6 million in damages, a fair market value license, was

6    sufficient to cover, quote, the entire scope of the

7    infringement.  That's what this Court charged the jury in

8    Instruction No. 33.  The entire scope of the infringement

9    is covered by $35.6 million in damages.

10           That award fully compensates Oracle for past

11   infringement, and, as I've already discussed, there's no

12   evidence in this record of future infringement.  $35.6

13   million it is.

14           And how did we get there, Your Honor?  In

15   question 6, the jury determined that the fair market value

16   license rather than lost profits was the best measure of

17   Oracle's damages.  It was given an either/or choice.

18           And then in question 7 it identified the amount

19   of that license, 35.6 million.

20           And the associated Jury Instruction No. 33 made

21   clear that this was an objective measure of damages that,

22   quote, is meant to approximate the fair market value of the

23   license for all of the copyrights Rimini Street infringed.

24           Why is that important, Your Honor?  Oracle

25   admits in its motion at page 20, footnote 1, that its

1    requested injunction is limited to acts that have already

2    been determined to infringe.

3              I'm going to return to the importance of this

4    footnote 1.  But for now let's just look at that quote.

5              "Oracle asks the Court for a permanent

6         injunction restraining Rimini from continuing to

7         commit the infringement that this Court and the

8         jury have already determined to be copyright

9         infringement."

10             Those same acts are the subject of the license

11   awarded by the jury.  The license is coterminous,

12   coextensive.  It maps exactly to the requested injunction.

13             Your Honor, Oracle can't double dip.  It can't

14   get a license payment and an injunction for the same

15   conduct.  It's yet another way of saying that the legal

16   remedy afforded to Oracle under the Copyright Act is

17   adequate recompense for any harm suffered.

18             What does Oracle have to say in response to

19   this?  In its papers it mentions the license award only

20   once, once again in its reply brief, so this is our first

21   time to respond to their arguments.  Its objection is that,

22   quote, Rimini fails even to articulate how the jury's award

23   quantifies or compensates for the harm to Oracle's goodwill

24   and reputation.

25             Now, first if the Court agrees that there's no

1    evidence to harm and goodwill and reputation, this is a

2    moot point.  So there's that logical difficulty with their

3    argument.

4            Second, it's important to note what Oracle

5    doesn't say.  Oracle doesn't dispute that a lost profits

6    award would have provided full compensation.  In fact

7    that's what it sought.  Its primary request for relief was

8    lost profits.  And if the jury had awarded lost profits, it

9    would have been made whole.

10           That point, Your Honor, kills their adequacy of

11   damages argument.  Because the question is not whether the

12   legal relief awarded is adequate but whether the legal

13   relief available is adequate.  In other words, Oracle's

14   inability and failure to prove lost profits doesn't remove

15   the point that the lost profits award would have been

16   sufficient had they had enough evidence of it, had it

17   actually happened.

18           You know, otherwise anybody that can't muster up

19   enough evidence to secure lost profits comes back for a

20   second bite at the apple at the injunction stage.  The law

21   is contrary.  In fact, once again, Oracle's request is

22   simply another request for this Court to reconsider the

23   jury's verdict.

24           And even setting aside the failure to prove lost

25   profits, Oracle ignores the nature of the fair market value

1      license award that the jury did award.

2              The only proof of harm to Oracle's customer

3      relationships at trial that matters that Oracle relies on

4      now is Ms. Catz' testimony.  But the jury heard that

5      testimony, and they were fully capable of factoring it into

6      the hypothetical license negotiation.

7              A rights holder after all, Your Honor, concerned

8      that its competitor will use the license works to compete,

9      will factor that point into its royalty demand for those

10     works.

11             In other words, in the hypothetical negotiation

12     Oracle would have taken into account any impact to customer

13     relationships.  And the jury instruction specifically told

14     the jury, quote, you should consider all of the information

15     known to and all of the expectations of the parties.

16     Certainly Ms. Catz' view was among those things.

17             Today Mr. Hixson argued for the first time that

18     this point didn't appear in Oracle's expert reports.  So

19     what?  It was Oracle's burden of proof.  What it chose to

20     put in its expert reports or not doesn't matter.  The point

21     is the jury heard this testimony and was able to evaluate

22     the license and determine whether -- what the value of it

23     was and so forth.

24             If Oracle is right, by the way, the jury's

25     damages award provides the requisite causal nexus between

1    infringement and goodwill, then it can't deny that the same

2    award fully compensates Oracle for that harm.

3              In other words, if they're going to rely on the

4    jury verdict to establish causation, then they've just shot

5    themselves in the foot on the second *eBay* factor.

6              The third *eBay* factor is the balance of

7    hardships.  It requires the Court to weigh the competing

8    interest of the parties, whether Oracle would suffer harm

9    in the absence of an injunction and whether Rimini Street

10   would be harmed by the issuance of an injunction.

11             Oracle, we submit, would not suffer any harm if

12   the Court were to deny the injunction motion.  These two

13   companies have now competed for 10 years.  They're parties

14   to two lawsuits related to that competition.  The legal

15   system can resolve this dispute through damages without the

16   distorting effects of an injunction.

17             Rimini Street in contrast could suffer

18   significant harm to its current business practices if the

19   proposed injunction were entered.  It's a small company

20   with fewer resources than Oracle, and then vague and

21   overbroad injunction proposed by Oracle appears designed to

22   prevent current processes, even though Oracle fought to

23   keep those processes out of this litigation and they are

24   actively being litigated in *Rimini II*.

25             Now, Oracle's principal response to this, Your

1    Honor, and you heard it today from both Mr. Pocker and

2    Mr. Hixson, is that if the current processes don't infringe

3    then Rimini Street won't be harmed by an injunction and

4    Rimini Street's very resistance to an injunction, the fact

5    that I'm standing at this podium today, must mean -- it

6    must be an admission that we continue to infringe.

7    Mr. Hixson used the word admission five times in his

8    argument.

9            It's not an admission, Your Honor.  In fact,

10   what it is is one of the classical logical fallacies.

11   Formally it's known as the either/or fallacy or the fallacy

12   of the excluded middle.  The structure of this fallacious

13   reasoning is that it assumes a binary outcome, an either/or

14   outcome, when in fact there is at least a third option.  A

15   third option is present here, and it's one that Oracle

16   simply refuses to acknowledge.

17           The third option, Your Honor, is that the

18   proposed injunction is not limited to past practices

19   adjudicated in *Rimini I* but in fact would improperly extend

20   beyond the verdict in this case to reach noninfringing

21   current conduct.

22           Rimini Street is resisting the injunction not

23   because it continues to engage in the practices adjudicated

24   in *Rimini I* but because Oracle is trying to prevent it from

25   engaging in noninfringing conduct, the very conduct that is

1    issue in *Rimini II*.

2            The Supreme Court spoke to this very problem in

3    the *NLRB* case that we cited in our opposition on page 22.

4    And this is a quote that bears keeping in mind.

5            "The mere fact that a court has found that a

6        defendant has committed an act in violation of a

7        statute does not justify an injunction broadly

8        to obey the statute and thus subject the

9        defendant to contempt proceedings if he shall at

10       any time in the future commit some new violation

11       unlike and unrelated to that with which he was

12       originally charged."

13           But that's exactly the game that Oracle is

14   trying to play here.  Mr. Pocker said so in so many words

15   this morning, Your Honor.  He said that Oracle wants to

16   come in and hold Rimini Street in contempt for what he

17   called borderline infringement.  Borderline infringement.

18   I don't even know what borderline infringement is.

19           But if this Court were to enter that injunction,

20   it doesn't stop there.  Oracle's going to come in here with

21   contempt motion after contempt motion because they're going

22   to use every weapon in the litigation arsenal.  Not because

23   Rimini Street will be violating the injunction but because

24   they are using the litigation process as a tool to exert

25   pressure on a competitor.

1            Your Honor, this is an important point because

2      the scope of the injunction.  And I'd like to address that

3      a little bit more in a minute.

4            The final *eBay* factor is the public interest.

5      No injunction should issue if it would have adverse effects

6      on persons not represented in this courtroom today.

7            On the public at large, Your Honor, is the

8      public better off with one provider of support services for

9      enterprise software or two?

10           The question answers itself.  The interest of

11     competition and consumer choice are -- clearly favor

12     multiple participants in the marketplace.  This Court

13     should take that into account in declining Oracle's request

14     for equitable relief.

15           Rimini Street's customers should be considered

16     as well.  Hundreds of corporations, schools, hospitals, and

17     governments have contracted with Rimini Street to provide

18     enterprise software support.  And the Court heard at trial

19     that these customers are pleased with Rimini Street's

20     services.  This Court should not enter an injunction that

21     might disrupt their business operations.

22           Now, our position is that no injunction

23     whatsoever should be entered on this record for all the

24     reasons I've just explained.  But if the Court were to

25     enter an injunction, it should not simply adopt Oracle's

1    proposed order.  It fails to comply with Rule 65 in a

2    number of important respects.

3            At the outset the facts recited in that order

4    are incomplete and erroneous.  We've put forth specific

5    objections in the appendix to our brief, and the Court

6    would have to resolve those disputes.

7            On the merits Oracle's proposed injunction

8    contains a number of provisions that go far beyond the

9    conduct actually adjudicated in *Rimini I*, and that can only

10   be explained as an effort on Oracle's part to prejudge the

11   issues in *Rimini II*, the very issues that Oracle insisted

12   be kept out of this litigation.

13           We've listed the five most problematic, Your

14   Honor, on slide 34, and they're explained in detail in our

15   opposition brief at pages 20 to 25.  I'm not going to go

16   through them one by one because Oracle has the same answer

17   to all of them.

18           Oracle says they all -- at least that these

19   blanket prohibitions all involve terms that were defined by

20   the Court or used in the litigation.  And that's true.

21   Oracle's problem or what Oracle doesn't acknowledge is that

22   Oracle's proposed injunction makes no effort to limit those

23   terms to the context in which they are used.  And the Court

24   is well aware from many context that terms have meaning

25   only in context.

1           Oracle seeks a blanket prohibition that's

2    designed to capture and prevent and prohibit and subject to

3    contempt proceedings Rimini Street's current processes

4    without waiting for the second lawsuit.  Let me just give

5    you one example, Your Honor.

6           Oracle's proposed injunction would appear to

7    prohibit Rimini Street from using cloud-based servers to

8    provide support services to its customers, even though

9    there is absolutely no doubt that cloud computing played no

10   role whatsoever in *Rimini I*.

11          We pointed this out in our opposition.  We said

12   that's an example of where the injunction is just too broad

13   and goes beyond adjudicated conduct.

14          Oracle's only response, only response, Your

15   Honor, is at page 4 of its reply brief, which is, "The

16   pendency of *Rimini II* is not a get-out-of-jail-free card."

17   "The pendency of *Rimini II* is not a get-out-of-jail-free

18   card."

19          In other words, Oracle doesn't dispute our

20   showing that the proposed injunction would reach cloud

21   computing, that cloud computing was not at issue in *Rimini*

22   *I*, that cloud computing is at issue in *Rimini II*, and that

23   therefore -- and then our point was, therefore, the

24   injunction clearly can't reach it.  And Oracle's answer is,

25   "The pendency of *Rimini II* is not a get-out-of-jail-free

1   card."

2            That's not responsive, Your Honor.  Oracle's

3   trying to get a leg up in *Rimini II*, and this Court should

4   not assist in that exercise.

5            Another example Mr. Hixson brought up today --

6            THE COURT:  Mr. Perry, I want to caution you,

7   you've hit your 45 minutes.  So please wind it down.

8            MR. PERRY:  And, Your Honor, I will wind it

9   down.

10           The simplest answer, Your Honor, is the most

11  equitable.  Oracle's motion for a permanent injunction

12  should simply be denied.  It should be denied because the

13  motion -- the finding of innocent infringement precludes an

14  injunction in the circumstance of this case.  It should be

15  denied because Oracle hasn't proven the *eBay* factors.  It

16  should be denied because the proposed injunction doesn't

17  comply with Rule 65.

18           Oracle had a full and fair opportunity to

19  challenge Rimini Street's past practices at trial.  The

20  jury concluded that the infringement was innocent and that

21  the $35.6 million fair market value award was sufficient.

22           Oracle's request for a permanent injunction is

23  inconsistent with that verdict, unsupported by the facts,

24  and contrary to principles of equity.  The motion should be

25  denied.

1                    THE COURT:  All right.

2                    MR. PERRY:  Thank you.

3                    THE COURT:  Thank you.

4                    Let's see.  We probably should take a short

5      break before we turn to Oracle's reply argument.  Let's

6      take approximately 10 minutes and reconvene at that time.

7                    Madam Clerk, let me know when everyone's ready

8      to go.

9                    COURTROOM ADMINISTRATOR:  Yes, Your Honor.

10                   Please rise.

11              (Recess from 2:38 p.m. until 2:51 p.m.)

12                   THE COURT:  Have a seat, please.

13                   The record will show that we're reconvened after

14     an afternoon break.

15                   And, Mr. Hixson, it's your opportunity to

16     present Oracle's reply argument.

17                   MR. HIXSON:  Thank you, Your Honor.

18                   I began this afternoon by talking about the

19     right to exclude and Oracle's exclusive rights under

20     Section 106 of the Copyright Act.  And so I'll begin reply

21     arguments on there as well.

22                   And I thought that opposing counsel offered a

23     useful analogy when he talked about a landowner, physical

24     land, as opposed to an intangible property right, like a

25     copyright, and he talked about a trespasser who comes on to

1       the land and may have to pay damages for a trespass.

2              This illustrates why an injunction is necessary

3       to protect Oracle's right to exclude.  If somebody

4       trespasses and trespasses again and they just have to pay

5       dollar amounts to measure those past trespasses, that

6       doesn't protect your right, as the landowner, to say, "Get

7       off my land."

8              That's the order we are seeking here, that they

9       have trespassed again and again against Oracle's

10      copyrights.  And what we want is an order from this Court

11      to say, "Get out of our property."  This is ours.  It's not

12      Rimini's.  And I think the analogy to the land illustrates

13      why injunctive relief is so important in protecting the

14      right to exclude.

15             Now, opposing counsel did accuse us of raising a

16      new argument today.  But he's saying that the right to

17      exclude wasn't in our papers.

18             But it was.  It was on page 17 of our motion

19      where we talked about the right to exclude.  And I quoted

20      in the paper the exact same quotation we had today from the

21      *Douglas Dynamics* case in the Federal Circuit saying where

22      two companies are in competition against one another, the

23      patentee suffers the harm, often irreparable, of being

24      forced to compete against products that incorporate and

25      infringe its own patented invention.

1          And that's what I began with today about

2     Oracle's own -- forcing to be with its own software.  And

3     the only way that can be remedied is by an order from this

4     Court enforcing Oracle's right to exclude.

5          This also explains why no matter how opposing

6     counsel phrases it a damages award and an injunction are

7     not double dipping.  Because your instructions to the jury

8     that they consider all infringements meant all

9     infringements that had happened.

10          But an injunction, if the Court issues one, is

11     for future conduct.  It reaches forward to future

12     infringements that hadn't occurred as of the time of the

13     trial.  Damages are necessarily backwards looking, so an

14     injunction isn't double dipping, and it necessarily can't

15     be compensated for any kind of damages award.

16          Second, I'd like to turn to the other type of

17     irreparable harm, which is that the continued infringement

18     and the threat of continued infringement.

19          I don't know why Rimini finds it so interesting

20     that we objected and kept out of trial their new 2.0

21     processes.  Of course we did.  We hadn't had any discovery

22     about that, and that was just an attempt to sandbag us in

23     front of the jury.

24          But that doesn't mean that you can't read

25     Rimini's opposition brief, which is all that we're asking

1     you to do.  We're not asking you to make factual findings

2     in case number *II* about what did or did not happen.  We're

3     asking you to read the brief that Rimini Street filed and

4     to look at that and to see if you can -- are confident that

5     there's no more infringement going on by Rimini.

6                    And Rimini says on page 2 of their opposition,

7     "If the Court enters the proposed injunction, Rimini could

8     suffer significant harm to its lawful business and to its

9     ability to litigate contested conduct in the second action

10    still pending in this Court."

11                   They are saying that the injunction we put

12    forward would impact their current processes.  If you agree

13    with Oracle that our proposed form of injunction enjoins

14    practices that have already been adjudicated to be

15    unlawful, then that is an admission by Rimini that they are

16    continuing with those practices; they are ongoing.

17                   And Rimini says this multiple times in their

18    opposition brief again and again on pages 20 through 24,

19    specifically on, for example, page 21, where they say our

20    request for an injunction against the distribution of

21    derivative works is yet another attempt to resolve a live

22    issue in *Rimini II*, whether Rimini's creation and

23    distribution of custom code and documentation violates

24    Oracle's intellectual property rights.

25                   Your Honor, this was the trial we had last fall,

1     where Dr. Davis was on the witness stand and explained

2     about the creation and distribution of the derivative

3     works, the patches and fixes that Rimini was providing.

4              And again on page 23, where Rimini says,

5     "Perhaps the most striking examples of Oracle's overreach

6     are the proposed injunction's prohibitions on Rimini's use

7     of Oracle's software licensed to one customer in a manner

8     that would benefit any other licensee," this was your first

9     MSJ ruling, where you ruled that Rimini Street couldn't do

10    that with respect to PeopleSoft and then JD Edwards and

11    Siebel.

12             This was all covered in the jury instructions.

13    This is what Dr. Davis testified to, what Mr. Ravin

14    admitted to on the witness stand.  This was the conduct

15    that was adjudicated in the first case and that we're

16    entitled to have an injunction restraining them from

17    committing.  And this is what they're saying that

18    injunction would impede their current processes.

19             So all we're saying is you can read the

20    opposition brief and it should indicate to you, as it

21    indicated to us, that they are continuing to infringe.

22             And contrary to opposing counsel's statement,

23    this is not a new argument that I'm making here today.  It

24    was all over our reply brief.  We've said this many times.

25    For example, on page 1 of our reply, we said, "Worse,

1    Rimini's opposition is strong evidence that Rimini

2    continues to infringe Oracle's copyrights."

3              So this is not a new argument -- oral argument

4    today, this is something that we laid out in detail in our

5    reply brief.

6              And so we have both the need to protect Oracle's

7    right to exclude, and we have the ongoing infringement.

8              But it's also interesting what Rimini Street

9    didn't respond to in their oral argument today.  Because I

10   talked about the hypothetical.

11             What if it were really true that they had

12   stopped infringing in 2014 after your summary judgment

13   order?  And I went on in some detail about this, talking

14   about the *MGM v. Grokster* case, the *Disney v. Powell* case,

15   about how when an infringement comes to a halt only after a

16   judicial finding of liability and that doesn't count as

17   voluntary cessation, the courts still see the risk of

18   resuming the infringement the day the lawsuit ends and

19   courts still issue permanent injunctions in those

20   situations.

21             And we've cited the cases in our papers, and I

22   discussed that earlier today.  There was no response from

23   Rimini Street.  There was simply nothing about that,

24   nothing addressing the voluntary cessation case law.

25             And I explained also, and we explained this in

1       our papers, how courts apply this voluntary cessation case

2       law when defendants claim to be innocent.  And I explained

3       how when there's an innocent infringer that immediately

4       stops infringing upon notice that it was doing so, that in

5       that situation courts don't issue permanent injunctions.

6              And then I explained how this was different, how

7       despite Rimini's claim that they were an innocent

8       infringer, they did not stop when Oracle brought this

9       lawsuit or when Oracle notified them of its claims.  They

10      fought for years in discovery and litigation, they fought

11      over summary judgment, and they had an order entered

12      against them, and that that's the kind of situation where

13      courts have repeatedly held that a permanent injunction is

14      necessary.

15             As to the jury's finding that Rimini's

16      infringement was innocent, that simply has no bearing under

17      *eBay*.  It's not one of the *eBay* factors that's discussed.

18      It's largely not discussed in the case law.

19             It's untrue that it would be somehow

20      unprecedented for the Court to enter an injunction against

21      an innocent infringer.  In most cases that's -- the issue

22      of innocent infringement is irrelevant and it doesn't come

23      up.  Instead what courts look at is if the defendant

24      stopped was it voluntary cessation or was it after a court

25      found them liable?  That's the key factor that courts

1    distinguish about and show why a permanent injunction is so

2    appropriate here.

3         The next thing they do is they talk about harm

4    to goodwill, and they talk about evidence that Oracle did

5    not present in this case, that we did not present a

6    customer survey.

7         We don't need to have a customer survey.  Courts

8    don't require that type of evidence in order for a court to

9    make a finding of injury to reputation and goodwill.  We

10   addressed this point in our briefs, and I did earlier

11   today, that their -- the *Teller v. Dogge* case in this

12   district found that a declaration could be sufficient to

13   support an injury to goodwill or reputation, and the Tenth

14   Circuit's decision in *Harolds Stores* that the testimony of

15   the plaintiff's executive could be sufficient.  And we

16   offered that kind of evidence here.

17        Opposing counsel put on the screen a couple of

18   slides in which he highlighted a few sentences from Safra

19   Catz's testimony, and then he told the Court that's all the

20   evidence there was in the record about injury to goodwill

21   or reputation.

22        That's not true, and I would invite the Court to

23   take a look at our proposed facts 87, 88, and 89, where we

24   more comprehensively address the evidence in the record

25   that shows the injury to reputation and goodwill.

1          It's also not true that the fair market value

2    damage award somehow took account of injury to reputation

3    or goodwill.

4          Mr. Hampton's analysis said nothing at all and

5    made no attempt to quantify that analysis.  He only looked

6    at avoided costs on the Rimini's side, and Ms. Dean's

7    opinion with respect to database again only dealt with

8    license.

9          So there was no attempt by either side to

10   quantify injury to reputation or goodwill; so there's no

11   basis to think that it was part of the fair market value

12   damages award.

13         Rimini also argues today that the jury's finding

14   against lost profits implies that the jury found no

15   causation or implies that there was no causal nexus, that

16   supposedly the jury didn't see that Rimini's copyright

17   infringement caused injury or damage to Oracle.  That's

18   what they would like you to draw from the verdict on lost

19   profits.

20         But that's incorrect because of the way the

21   Court instructed the jury on damages.

22         Your Instruction No. 28 to the jury on copyright

23   damages told them:  You must determine Oracle International

24   Corporation's damages resulting from Defendant Rimini

25   Street's copyright infringement.  Oracle International

1    Corporation is entitled to recover either the actual

2    damages suffered as a result of the infringement or

3    statutory damages.

4            You then explained that, as a measure of actual

5    damages, there are two choices: a fair market value for the

6    license rights or lost profits.  But those were both

7    measures of actual damages, and you instructed the jury

8    that they had to find that those damages resulted from

9    infringement, that they found the copyright infringement

10   caused those damages.

11           And you repeated that in Instruction No. 30,

12   where you said that for Oracle International Corporation to

13   recover actual damages it must prove that the infringement

14   caused damages; that is, that there is a causal

15   relationship between Oracle International Corporation's

16   losses and Rimini Street's infringement.

17           And the jury took those instructions and they

18   went back in the jury room, and they come up with a

19   $35.6 million actual damages award.  That represents a

20   finding that Rimini Street's infringement caused that

21   injury to Oracle.  They found the causal nexus.  They found

22   the link between the infringement and the harm to Oracle.

23           Now, it is true that they rejected our lost

24   profits measure of damages, and they didn't explain why.

25   But as we've cited many cases holding, the lost profits are

1    often very difficult to quantify, and that difficulty in

2    quantification of the lost profits is one reason why this

3    injury to lost profits, to goodwill, to reputation is often

4    deemed an irreparable harm.

5            But Rimini Street is absolutely wrong in saying

6    that the jury rejected causation or that the jury didn't

7    think the infringement harmed Oracle.  The jury did

8    quantify and find causation and harm to Oracle based on

9    Jury Instructions No. 28 and 30.  So there was that

10   causation here.

11           Next Rimini Street quibbles with some of the

12   terms in the proposed injunction that we have, and they

13   identify one dealing with cloud computing.  I'm not going

14   to address all the points that they raised in their papers

15   because I addressed some of them earlier today.

16           But this goes to where we're asking for an

17   injunction that is fully in line with what was litigated.

18   We want an injunction saying that they can only use the

19   software on the customer's own facilities and that for JDE

20   and Siebel it could be at a third party if it's for a

21   backup or archive purposes.

22           That comes right from this Court's summary

23   judgment orders, docket 474, your February 2014 summary

24   judgment order.  You held that, quote, Section 1.1 of the

25   license grants the City of Flint a license to use the

1    licensed software, solely for the customer's internal data

2    processing operations at its facilities.

3            You then went on to say that Section 1.2(b)(i)

4    expressly limits copying the licensed software only to the

5    City of Flint's facilities.

6            And likewise on page 21, you addressed JD

7    Edwards, and on page 24 you addressed Siebel, both saying

8    that the use was restricted to the customers' facilities

9    except for third-party archive and backup copies.

10           We are asking you for an injunction entering

11   that order, what you already ruled two years ago on summary

12   judgment, consistent with the jury instruction as -- again

13   as well.

14           I acknowledge that cloud computing is at issue

15   in *Rimini II* and it wasn't at issue in *Rimini I*.  But we're

16   entitled to an injunction that codifies what you already

17   ruled.  And then in *Rimini II* we can fight with each other

18   whether cloud constitutes the customers' facilities.  We

19   don't believe it does.  But that's the fight we can have in

20   *Rimini II*.

21           But the fact that cloud computing might be in

22   *Rimini II* doesn't mean that you should stop and not enter

23   an injunction based on decisions you've already made,

24   conduct that was already adjudicated in *Rimini I*.  That's

25   what we're asking you to do, and our proposed injunction

1    tracks that.

2              Next Rimini says that there shouldn't be a

3    permanent injunction because we never moved for a

4    preliminary injunction.  But that request doesn't make any

5    sense.

6              Courts have held that whether or not a party

7    seeks a preliminary injunction has nothing to do with a

8    permanent injunction.  We've cited the Second Circuit's

9    decision in *Louis Vuitton*, and we cited the *Capitol Records*

10   case in our papers as well.

11             We moved for a permanent injunction as soon as

12   we were entitled to ask for one, which was after we had

13   prevailed on the merits on a jury trial.  We moved as fast

14   as we could.  We asked for expedited briefing.  We made

15   every effort to seek this permanent injunction.

16             Undoubtedly if we had moved for a preliminary

17   injunction, Rimini would have opposed on the grounds that

18   there were too many contested facts and we can't do that

19   before the trial.  We asked for the relief that we're

20   seeking at the earliest possible opportunity.

21             And, lastly, I do want to address the

22   disposition question that counsel raised at the start of

23   his remarks.

24             Section 503(b) does not require only the

25   destruction of infringing materials.  It says it can

1    require the destruction or other reasonable disposition of

2    the infringing materials.  One of those dispositions can be

3    turning it over to Oracle, another can being escrowing

4    third party.

5         But it's not true that 503(b) is a light switch

6    where you have to just simply destroy everything or not do

7    anything at all.  It gives the Court discretion in addition

8    to destruction to effectuate another reasonable

9    disposition.  And that's what we're asking for.

10        And as to the suggestion that Rule 65 or the

11   standards governing an injunction somehow reach out and

12   apply to disposition under 503(b), the advisory committee's

13   notes to Rule 65 expressly note that Rule 65(f) only

14   applies to impoundment proceedings under Rule 503(a).

15   There's no authority saying that they apply to Rule 503(b).

16        And so accordingly, because of these irreparable

17   harms that Oracle faces that its right to exclude not being

18   enforced, because of the ongoing infringement as indicated

19   by Rimini's opposition papers, and hypothetically, even if

20   Rimini had ceased infringing in 2014, the case law saying

21   that when they do that in the face of a finding of

22   liability, that doesn't count, it doesn't stop the

23   irreparable harm, that justifies issuing the injunction in

24   Oracle's favor.

25        And we have very carefully gone through the

1    Court's orders and jury instructions to craft a proposed

2    injunction that embodies the terms that the Court has

3    already ruled on and that it is focussed specifically on

4    the conduct that was adjudicated at the trial last fall and

5    that would restrain and enjoin Rimini from repeating that

6    unlawful infringing activity.  And so we'd ask that the

7    Court grant that motion.

8                 THE COURT:  All right.  Thank you, Mr. Hixson.

9                 All right.  Thank you, Counsel, very much for

10   your arguments on this.  I appreciate them.

11                I want to compliment counsel on both sides.

12   They've done an excellent job.  But I also have to say I

13   appreciate finally hearing from a Nevada lawyer in this

14   case.  Mr. Pocker, you did a fine job on behalf of Oracle.

15   And that's not to suggest that anyone didn't do a fine job

16   in this case.  I think everyone did.

17                I will hope to get a decision to you as soon as

18   I can.  In the for-what-it's-worth department, I've just

19   had a flood of trials and judicial hearings which have

20   been -- have followed fairly complex evidence and require

21   decisions from the Court which are time-consuming.

22                And so I have no doubt whatever I issue here is

23   going to be backed up, in part at least, by what I have to

24   do in other cases.

25                But all of that stated, I certainly recognize

1    the importance of being able to give you a decision on

2    these matters as soon as reasonably possible.  And that's

3    what I will do.

4              I wish I could give you a timetable, but I

5    really can't, given the complexities that I just mentioned.

6              So all of that stated, I want to thank you all

7    for being here.  I appreciate the obvious interest on both

8    sides.  I'm well aware of it, obviously, after five weeks

9    in trial and, what is it now, six years of litigation.

10             But I will hope to get back to you as soon as I

11   can.  Thank you very much.

12             Court will be in recess.

13             COURTROOM ADMINISTRATOR:  Please rise.

14        (The proceedings concluded at 3:10 p.m.)

15                         *    *    *

16

17

18

19

20

21

22

23

24

25

148

1                              -o0o-

2        I certify that the foregoing is a correct

3        transcript from the record of proceedings

4        in the above-entitled matter.

5

6        _____        5/31/16

7        Donna Davidson, RDR, CRR, CCR #318        Date
         Official Reporter

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25