```
 1                    UNITED STATES DISTRICT COURT
                           DISTRICT OF NEVADA
 2           BEFORE THE HONORABLE PEGGY A. LEEN, MAGISTRATE JUDGE

 3

 4    ORACLE USA, INC., a Colorado       :
      corporation; ORACLE AMERICA,       :
 5    INC., a Delaware corporation;      :
      and ORACLE INTERNATIONAL           :No. 2:10-cv-0106-LRH-PAL
 6    CORPORATION, a California          :
      corporation,                       :
 7                                       :
              Plaintiffs,                :
 8                                       :
          vs.                            :
 9                                       :
      RIMINI STREET, INC., a Nevada      :
10    corporation; and SETH RAVIN, an    :
      individual,                        :
11                                       :
              Defendants.                :
12    _____:

13

14                      TRANSCRIPT OF MOTION HEARING

15

16

                           September 10, 2010
17

18                         Las Vegas, Nevada

19

20
      FTR No. 3B/20100910 @ 9:09 a.m.
21

22
      Transcribed by:        Donna Davidson, CCR, RDR, CRR
23                           (775) 329-0132
                             dodavidson@att.net
24

25    (Proceedings recorded by electronic sound recording,
      transcript produced by mechanical stenography and computer.)
```

TRANSCRIBED FROM DIGITAL RECORDING

2

1                      A P P E A R A N C E S

2    FOR THE PLAINTIFFS:

3    BOIES, SCHILLER & FLEXNER LLP
     KIERAN P. RINGGENBERG
4    1999 Harrison Street, Suite 900
     Oakland, California 94612
5    (510) 874-1000
     Fax: (510) 874-1460
6    kringgenberg@bsfllp.com

7    BOIES, SCHILLER & FLEXNER LLP
     RICHARD J. POCKER
8    300 South Fourth Street, Suite 800
     Las Vegas, Nevada 89101
9    (702) 382-7300
     Fax: (702) 382-2755
10   rpocker@bsfllp.com

11   MORGAN LEWIS & BOCKIUS LLP
     THOMAS S. HIXSON (By telephone)
12   One Market, Spear Street Tower
     San Francisco, California 94105
13   (415) 442-1000
     Fax:  (415) 442-1001
14   thomas.hixson@morganlewis.com

15   JAMES C. MAROULIS (By telephone)
     Oracle Corporation
16   500 Oracle Parkway
     Redwood City, California 94070
17   (650) 506-4846
     jim.maroulis@oracle.com
18
     BOIES, SCHILLER & FLEXNER, LLP
19   FRED NORTON
     1999 Harrison Street
20   Oakland, California 94612
     (510) 974-1000
21   Fax:  (510) 874-1460
     fnorton@bsfllp.com
22

23

24

25

TRANSCRIBED FROM DIGITAL RECORDING

3

1               A P P E A R A N C E S (Continued)

2    FOR THE DEFENDANTS:

3    SHOOK, HARDY & BACON LLP
     B. TRENT WEBB
4    2555 Grand Boulevard
     Kansas City, Missouri 64108
5    (816) 474-6550
     Fax: (816) 421-5547
6    bwebb@shb.com

7

     SHOOK, HARDY & BACON LLP
8    ROBERT H. RECKERS
     600 Travis Street, Suite 3400
9    Houston, Texas 77002
     (713) 227-8008
10   Fax: (713) 227-9508
     rreckers@shb.com

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

TRANSCRIBED FROM DIGITAL RECORDING

4

1             LAS VEGAS, NEVADA, SEPTEMBER 10, 2010, 9:09 A.M.

2                              --oOo--

3                   P R O C E E D I N G S

4

5             COURTROOM ADMINISTRATOR:  We are back on record.

6             We are now calling the hearing in the matter of

7    Oracle, USA., Inc., et al., versus Rimini Street, Inc., et

8    al.  The case number is 2:10-cv-0106-LRH-PAL.

9             Beginning with plaintiffs' counsel, counsel,

10   let's go ahead and start with our telephonic appearance.

11   Please state your names for the recorded record.

12             MR. MAROULIS:  Good morning, Your Honor.  James

13   Maroulis of Oracle for plaintiffs.

14             And thank you for permitting me to appear

15   telephonically.

16             MR. HIXSON:  Good morning, Your Honor.  Tom

17   Hixson with Bingham, also for plaintiffs.

18             And, likewise, thank you for allowing me to

19   appear telephonically.

20             MR. RINGGENBERG:  Kiernan Ringgenberg for the

21   plaintiffs.

22             MR. NORTON:  Fred Norton for the plaintiffs.

23             MR. POCKER:  Your Honor, Richard Pocker, also

24   for the plaintiffs.

25             MR. WEBB:  Trent Webb, Shook, Hardy & Bacon, for

TRANSCRIBED FROM DIGITAL RECORDING

5

1     the defendants.

2              MR. RECKERS:  Robert Reckers, the same.

3              THE COURT:  Counsel, I have reviewed, although

4     candidly not studied, given the volume of materials that

5     have been submitted since our last status conference, your

6     new motions that pertain to the preservation order and your

7     updated status report in this case.

8              Let me hear from first counsel for plaintiffs

9     concerning any immediate issues that need to be addressed,

10    other than I need to give you a discovery plan and

11    scheduling order.

12             I've read your competing proposals, and I'm

13    familiar with what you are each asking for.  But let me

14    hear from the plaintiff concerning whether -- what your

15    immediate needs are from the Court, in addition to

16    resolving the issue concerning the preservation order.

17             MR. RINGGENBERG:  Your Honor, in addition to the

18    preservation order and the discovery plan, the only issue

19    before the Court for today, I believe, is the stipulation

20    between the parties, stipulation and order concerning

21    communications with former employees of Oracle who are now

22    employed by Rimini Street.  And that would be the only

23    other issue.

24             I'm prepared to address that right now, or we

25    can defer that for later in the hearing.

TRANSCRIBED FROM DIGITAL RECORDING

6

1          THE COURT:  Please.  I'd like to hear from that

2     right now.  Because I will tell you candidly I'm behind.

3          MR. RINGGENBERG:  I understand.

4          THE COURT:  I have a settlement conference

5     beginning at 9:30 this morning, and it's been a very hectic

6     week.  So I'd like to spend more time reading your papers

7     with more particularity, but I candidly haven't been able

8     to do it with the level I have comfort and understanding

9     what your issues are.

10          MR. RINGGENBERG:  I'll cut to the chase.

11          THE COURT:  But why don't you talk to me about

12     that.

13          MR. RINGGENBERG:  A large number of my client's

14     former employees work for the defendants.  A number of

15     those employees have privileged, proprietary, or otherwise

16     confidential information.

17          The defendants agree that the employees have

18     such information, that defendants should not have access to

19     such information, as a corporate entity, and they agree

20     they should take steps to make sure that there's no

21     disclosure of that information.

22          Our dispute is if notwithstanding our efforts to

23     permit disclosure of Oracle's confidential and privileged

24     information to the defendants, if it happens anyway, what

25     obligations do they have to tell us?

TRANSCRIBED FROM DIGITAL RECORDING

7

1              They say they don't have any.  They appear to

2      concede in their papers that if there is a disclosure by a

3      former employee of privileged information, that counsel has

4      an obligation to tell us.  I don't think anybody could

5      dispute that.

6              The case law is clear, their obligation goes

7      beyond that.  If they come into possession, whether it's

8      deliberate or inadvertent, of unprivileged information,

9      they have to tell us so we can do something about it.

10              The defendants can't be expected to appreciate

11      the significance once they've -- even assuming they

12      appreciate that it is privileged information or it's

13      confidential information, they can't be expected to

14      understand its significance or what's necessary to protect

15      Oracle's rights once that happens.

16              Their sole issue of dispute is once they learn

17      that one of their employees has, in fact, disclosed to

18      other defendant employees or agents Oracle's privileged

19      information, Oracle's proprietary information, they have to

20      tell us and tell us in enough detail that we can then say,

21      okay, here's what we need to do to remedy that situation,

22      whatever remedy may be appropriate.

23              But we need to be in a position where we can

24      assess the harm to Oracle and then we can work with counsel

25      to find out what happens next.

TRANSCRIBED FROM DIGITAL RECORDING

8

1          Their position is they will take care of it.

2    And a situation in which defense counsel and defendants are

3    exclusively charged with protecting Oracle's privilege is

4    simply not tolerable.

5          THE COURT:  Well, give me concretely what it is

6    that you propose.

7          First of all, they have to recognize that

8    they've received privileged information.  And there may be

9    an issue with respect to whether or not they even

10   appreciate that.

11         So how do you propose to define the issue?

12         MR. RINGGENBERG:  That's fair.  And so the way

13   that we've drafted the stipulation, which is attached to

14   Exhibit B to the CMC statement, is if they become aware if

15   there has been a disclosure.  So they have to know.

16         And we're not suggesting they have strict

17   liability obligation.  But if they know that this has

18   happened, then they have an obligation to tell us what was

19   disclosed, who disclosed it, the time of the disclosure,

20   and other pertinent details, to the extent that they know

21   them.

22         Now, it is certainly conceivable that there will

23   be such a disclosure and they won't know.  But we're not

24   asking for anything there.  All we're asking is to the

25   extent that they know that there has been a breach and to

TRANSCRIBED FROM DIGITAL RECORDING

1    the extent that they know who breached, what was breached,

2    and the other pertinent details, they tell us, they tell us

3    in a reasonable amount of time, and then we can take steps

4    with that information.

5         We're not asking them to do anything other than

6    that.  They agree that to the extent that they know that

7    there are such breaches that they -- and they've agreed in

8    the stipulation, they will take steps to remedy the breach.

9         They're willing to assume that much of a burden.

10   The burden they won't take on is to tell us.  And they

11   don't offer any justification for that refusal except they

12   don't think they have to.  They don't think they have to

13   tell them.

14        But they understand they have an obligation to

15   stop the breach and to do something to remedy it.  They

16   just don't want us involved.  And we need to be involved.

17        THE COURT:  Who will be addressing the

18   defendants' position?

19        MR. RECKERS:  I will, your Honor.

20        THE COURT:  Mr. Reckers.

21        MR. RECKERS:  Yes, Your Honor.  I think the

22   issue is very straightforward.

23        What we've proposed and what we've and -- our

24   consistent position has been that we will follow any of the

25   ethical guidelines as propounded in professional code of

DONNA DAVIDSON    (775) 329-0132

TRANSCRIBED FROM DIGITAL RECORDING

1    responsibility and also the legal authority.  We'll follow

2    all of the law.  Luckily, this is a hypothetical, because

3    we're not aware of any such breaches.

4            But what Oracle has proposed as a reporting

5    mechanism, where we give a whole set of information that's

6    not required by the Rules of Professional Conduct --

7            THE COURT:  Well, let me stop you there.  And

8    let me see if I understand your position.

9            If you had a document production and one side

10   received the attorney-client privilege materials, for

11   example, or clearly confidential proprietary materials and

12   so forth, you would have a legal obligation under the rules

13   to determine whether or not those documents had been

14   inadvertently or accidentally produced; correct?

15           MR. RECKERS:  Absolutely.

16           THE COURT:  Why don't you have a similar idea to

17   inquire or to report, in the case of former employees who

18   are now your employees, to the other side?  Why isn't it

19   akin to an inadvertent production of privileged materials?

20           MR. RECKERS:  For privilege it likely is.  And

21   our starting point is the rules.  The rules are obviously

22   written in a deliberate fashion.  And they are written such

23   that the attorney-client privilege on our side is also

24   protected.  It's very likely that we will learn about -- if

25   we were -- if such a disclosure were to happen and we were

TRANSCRIBED FROM DIGITAL RECORDING

11

1    to learn about it, it would come to us through an attorney-

2    client communication.

3           So while we certainly have the obligation to --

4    to --

5           THE COURT:  But you don't get to keep

6    attorney-client privilege information through the

7    attorney-client privilege.

8           MR. RECKERS:  And that's exactly what the rule

9    says.  The rule says you have to give it back.

10           But what the rule doesn't go on to say is that

11    you have to say the time, place, date, you know, the

12    very --

13           THE COURT:  Could you live with that order if it

14    was not limited to attorney -- if it did not require a

15    disclosure of the attorneys ascertaining, even if -- the

16    information?

17           In other words, if the information has been

18    disclosed to co- -- what they're worried about is who knows

19    their privileged material.

20           MR. RECKERS:  Right.  So we're happy to make the

21    disclosure that's required by the professional rules.

22    We're happy to let them know that we have the information

23    if it's tangible, that we can return it, we'll return it.

24    I think that's clearly dicta -- that's not the dispute.

25    The dispute is the other reporting obligations, where it

TRANSCRIBED FROM DIGITAL RECORDING

1    came from.

2            And where this comes up probably -- you know, we

3    only know of one individual who has privileged information.

4    There may be others, but we know of one.  She's very aware

5    of her obligation not to disclose that privileged

6    information to us.

7            Counsel -- we're aware.  I mean, everyone is

8    very aware.

9            So I think it's not very likely that she's going

10   to come into one of our offices or tell us something.

11           I think the real risk is if one of former Oracle

12   employees were to disclose arguably proprietary information

13   that they had from their other company and that that came

14   to us, that's a different -- that's a different legal

15   analysis, what we have to do in that case.

16           We agree that we can't use the information.  We

17   also agree that if we have a document that we shouldn't

18   have, we have to give it back.

19           But the other information to the time, place,

20   date, person, we don't see any authority that we would have

21   to -- that we would have to provide the information that's

22   requested.

23           And, in particular, we also have the obligation,

24   the competing obligation under the rules of professional

25   responsibility, to maintain the confidence of an

1    attorney-client privilege.

2              So that's the disconnect.  It's not really that

3    we don't want to.  There are competing rules and principles

4    that are in play here.  And that's why the rule of

5    disclosure, I would suggest, is so narrowly tailored to --

6    simply to return the information and not the broader

7    reporting that Oracle is --

8              THE COURT:  Right.  And let me test then --

9    first of all, have you attached your former proposed

10   stipulation as well?

11             MR. RECKERS:  Yes, Your Honor.  And what we've

12   done is we have one -- we have one draft.  And there's only

13   one sentence.  And it's submitted with the joint statement.

14   And it's in bold so either you --

15             THE COURT:  Okay.  That's.

16             MR. RECKERS:  -- accept ours --

17             THE COURT:  -- what I thought is that you were

18   in agreement with everything except this one issue, and

19   you've identified what language you can live with and what

20   language you can't.

21             MR. RECKERS:  And that's right.  And we've

22   agreed to, you know, the interview process where we've

23   allowed Oracle's attorneys to sit in on our conversations

24   that might touch on confidential or arguably privileged

25   information.

TRANSCRIBED FROM DIGITAL RECORDING

14

1            We've agreed to send a notice to our employees

2     addressing these issues.

3            We've agreed, of course, that we can't use the

4     information if we were to --

5            THE COURT:  All right.  Let me then just test

6     because their concern is disclosing, knowing whether or not

7     their information has been disclosed.

8            Employee A comes to you, and your discussions

9     with employee A are covered by the attorney-client

10    privilege because you're trying to learn about your

11    client's position in connection with this litigation.

12            However, during the course of that

13    communication, employee A says, I told employees B, C, and

14    E information that's privileged to the other side in this

15    case.

16            What, if any, disclosure obligations do you

17    claim you have?

18            MR. RECKERS:  Other than look at -- we cite the

19    rules, and they cite the rules, as well, and it appears

20    that verbal communication like that the rules are silent as

21    to what needs to be disclosed to the other side.

22            THE COURT:  And that's where your dispute is,

23    isn't it?  I mean --

24            MR. RECKERS:  Well --

25            THE COURT:  Counsel --

TRANSCRIBED FROM DIGITAL RECORDING

1              MR. RECKERS:  It -- that --

2              THE COURT:  -- do you really -- you're not

3    claiming that they have to disclose to you the content of

4    the communication with an employee of their client who is

5    communicating with them in an attorney-client privilege

6    situation, do you?

7              MR. RINGGENBERG:  We would not pretend that they

8    have to disclose the communication.  The privilege does not

9    protect facts.

10             So in the Court's hypothetical, I told employees

11   B, C, and E, that's not privileged.  The communication with

12   the attorney is privileged.  The facts are not.  So what

13   they told the lawyer, we have some concern about that.

14             But I don't know how we can deal with the

15   privilege problem in a stipulation.

16             THE COURT:  Right.

17             MR. RINGGENBERG:  So if the employees come --

18             THE COURT:  And that's why I'm trying to find

19   out the outer markers of your respective positions because

20   I think I appreciate now -- Mr. Reckers, I absolutely

21   appreciate the observation that attorney-client

22   communications are protected from disclosures.  Facts that

23   you learn from an employee are not protected from

24   disclosure.

25             And if you learn in an attorney-client protected

TRANSCRIBED FROM DIGITAL RECORDING

1    conversation that an employee has disclosed privileged

2    information from the other side, your position is you're

3    not required to disclose that to the other side?

4              MR. RECKERS:  That's a privilege.  For privilege

5    I think there is a more -- that the law refunds a broader

6    obligation.  So if we have privileged information, I think

7    we would report the privileged information that we had.

8    The fact that it -- whatever that would be, again, I think

9    it's --

10             THE COURT:  But who is "we," for purposes of

11   your answer?

12             MR. RECKERS:  Counsel for Rimini.

13             THE COURT:  But the issue is whether or not the

14   employee has disclosed to others, other than counsel.

15             You know your ethical obligations, and you know

16   the repercussions of violating those ethical obligations.

17   However, the essence of the communication and who else has

18   received privileged information is something that your

19   adversary -- or you would want to know, for example, if it

20   was occurring --

21             MR. RECKERS:  I -- I --

22             THE COURT:  -- to you as well.

23             MR. RECKERS:  And so let me sort of broaden my

24   statement since I was suggesting perhaps a different

25   hypothetical.

TRANSCRIBED FROM DIGITAL RECORDING

17

1           Certainly if we learn that there's any

2    disclosure of privileged information, I think it is

3    reflected in the rules, that's really not part of the

4    dispute here, that there would be a disclosure to the other

5    side of -- disclosure to the other side of the improper

6    disclosure of the -- their attorney-client --

7           THE COURT:  And the scope of that improper

8    disclosure?

9           MR. RECKERS:  I would think so.  I would think

10   so.

11          Again, our position is that we're going to

12   follow -- when this hypothetical overcomes the past, we'll

13   follow our ethical obligations.  I think there are special

14   rules, as Your Honor suggests, there are special rules to

15   protect privileged communications.

16          But the proposed stipulation goes beyond that to

17   protect their contractual obligations for proprietary

18   information that they have with their former employees.  We

19   can -- we have not seen anything in the case law or the

20   code of professional responsibility that would require us

21   to report those types of disclosures, we can't use it,

22   we -- if it's a document we have to give it back.

23          But still it's not our process -- it's not the

24   process of the federal rules to have us report on misdeeds

25   of our employees; in fact, we have a formal process where

TRANSCRIBED FROM DIGITAL RECORDING

1    they can learn from their discovery, if it's otherwise

2    relevant, to the -- for the proprietary information.  It's

3    two different --

4              THE COURT:  Right.  I think I have a handle on

5    your respective positions.  I'll take a look at the -- and

6    read over the stipulation in detail and enter an order

7    resolving the dispute one way or the other.  Okay?

8              MR. RINGGENBERG:  I'm sorry, Your Honor.  If I

9    could just make one observation --

10             THE COURT:  Yes, sir.

11             MR. RINGGENBERG:  -- in response to the last

12   question.

13             While Mr. Reckers' communications with his

14   clients are privileged, the information that one would

15   normally put on a privilege log, that is I spoke to my

16   client, general -- very general description of the subject

17   matter and the time and date as the information is

18   routinely disclosed, and if so, if there is that much

19   information, at the very least we would still be within the

20   ambit of what we would want to know and what we would be

21   entitled to.

22             THE COURT:  All right.  Let's move on to the

23   issue concerning the request for a preservation order and

24   forensic copy.

25             And if I understand correctly, what you're

TRANSCRIBED FROM DIGITAL RECORDING

19

1  asking for, forensic copy and a mirror image would be

2  synonymous terms, Mr. --

3      MR. RINGGENBERG:  Yes, Your Honor.  That's

4  correct.

5      THE COURT:  All right.  And, Mr. Ringgenberg, if

6  you will address your client's position with respect to

7  this.

8      I've read the moving and responsive papers, the

9  dueling going back and forth.  You tell me, and your expert

10  tells me, it takes a couple hundred dollars, several

11  hundred dollars and two hours per computer, and you're

12  asking for 30 records custodians.

13      The other side says we have potentially 200

14  computers that are issued, it would be extremely disruptive

15  and will cost $200,000 and you can have it but you have to

16  pay for it.

17      MR. RINGGENBERG:  That's a precise description

18  of the bid and ask, Your Honor.

19      Let me make four brief points.  I know Your

20  Honor is pressed for time.

21      The first is that this information is crucial.

22  The information on Rimini --

23      THE COURT:  And yet you didn't ask for it until

24  two days before the motion was filed.  You sent a

25  13-page -- or a 13-page category request for preservation

TRANSCRIBED FROM DIGITAL RECORDING

1    after the lawsuit was filed, but it didn't include IMs, and

2    it didn't include the server logs that you are now asking

3    for.

4             MR. RINGGENBERG:  The -- Your Honor, there's at

5    least three times when we've explained to Rimini their need

6    to preserve relevant information, including --

7             THE COURT:  That --

8             MR. RINGGENBERG:  -- information subject --

9             THE COURT:  That --

10            MR. RINGGENBERG:  -- to this motion.

11            THE COURT:  Okay.

12            MR. RINGGENBERG:  And if I could please --

13            THE COURT:  Sure.

14            MR. RINGGENBERG:  -- explain?

15            THE COURT:  I'm sorry.

16            MR. RINGGENBERG:  The most specific, three days

17   after this case was filed, we sent a letter broadly

18   describing issues and suggested the parties meet and confer

19   about exactly what they should do.

20            Our goal was to reach a stipulation so that

21   Oracle can precisely describe its own preservation duties

22   and everyone can come to agreement, and we can do the same

23   for Rimini Street's.

24            Rimini Street did not care to engage with us on

25   that.  And as a result what happened is we didn't know what

TRANSCRIBED FROM DIGITAL RECORDING

1    they were doing until they sat for a 30(b)(6) deposition.

2              But within a month or six weeks of this

3    litigation being filed, Your Honor, we sent them the list

4    of items that described with particularity what we thought

5    they had to preserve.  And one was all communications among

6    Rimini Street employees regarding copying and downloading

7    of Oracle software.

8              And we believe that clearly encompasses the

9    instant messages that are the subject of our motion.

10             THE COURT:  It didn't say instant messages, but

11   it means the same thing?

12             MR. RINGGENBERG:  Well, it is a communication.

13   And our view, Your Honor, is that Rimini Street knows how

14   its employees communicate.  Its own documents demonstrate

15   that this is an important tool that they use for their

16   business.

17             And obviously if the lawyers are speaking with

18   the employees, they're going to ask them what they used to

19   communicate, and they're going to find out.

20             And on the basis of all that information, they

21   should have known the instant messages, as well as all

22   their communications, had relevant information and should

23   have been preserved.

24             If the test were that we had to identify,

25   without knowing the details of their systems, every type --

TRANSCRIBED FROM DIGITAL RECORDING

1    every scrap of paper and every type of document they had to

2    preserve, you know, that's not a workable standard

3    because --

4              THE COURT:  Understandable.  But, on the other

5    hand, the -- the cases and the authors that address the

6    electronic discovery issues do say that fragmented

7    information and transitory information, or ephemeral

8    information, is treated differently than documentation or

9    electronic data that is stored in the ordinary course of

10   business.

11             MR. RINGGENBERG:  That is correct.

12             THE COURT:  And they've countered saying we have

13   all of these -- you know, to assure you that they're not

14   deleting things, they don't have a document destruction

15   policy, they don't have a policy in which mailboxes are

16   limited to certain amount of data and it automatically gets

17   dumped out and so forth.

18             So what they're suggesting is the cost of what

19   you are requesting outweighs its likely benefit, given

20   their preservation policies.

21             MR. RINGGENBERG:  Correct.  And let me explain

22   why -- why that's not the case, Your Honor, is the evidence

23   that's subject to this motion is evidence that lives on

24   individual employee's hard drives.

25             None of the preservation measures that are in

TRANSCRIBED FROM DIGITAL RECORDING

1    any way automatic -- the only preservation measures they've

2    even suggested that apply to that particular data depend

3    entirely on the discretion of the individual employees.

4           That is to say, individual employees decide,

5    without any guidance, whether documents in the ordinary

6    course are kept or destroyed.  Rimini Street says they

7    don't have a document destruction policy.  Fair enough.

8    They also don't have a document retention policy; meaning

9    every employee, setting aside the litigation hold, decides

10   what to keep and what to throw away.

11          And in that situation, Your Honor --

12          THE COURT:  With guidance from the lawyers that

13   say this is what you're obligated to keep.

14          MR. RINGGENBERG:  Well, after the litigation has

15   begun, such direction was provided.  But for the year and a

16   half, when Rimini Street was on notice that this litigation

17   was coming, when they were telling the United States

18   District Court for the District of Nevada that Oracle was

19   planning litigation against them, during that time period

20   no such direction was provided.

21          As a result, employees in that time period were

22   not told that they were required to keep the information.

23   I will say there is -- in the fall of '09, they received a

24   third-party subpoena, and we learned in their opposition

25   that they issued some kind of notice in connection with

1    that.  Fair enough.  But it's very circumscribed in scope

2    because the subpoena's very circumscribed in scope.

3              We've attached it.  The information it requests

4    Rimini Street is documents sufficient to show three

5    specific things.

6              And so certainly with regard to -- other than

7    that very narrow litigation hold notice, they've conceded

8    that as to information on employee hard drives there is

9    nothing that they did until this litigation was filed,

10   despite being on notice of it for at least 18 months in

11   advance.

12             THE COURT:  All right.  Have you identified the

13   key custodians?  Because they tell me that from the start

14   they have been amenable to some limited forensic freezing

15   or mirror imaging.

16             MR. RINGGENBERG:  Well --

17             THE COURT:  But you didn't respond to that.

18             MR. RINGGENBERG:  Well, Your Honor, what they've

19   said is, "We won't do it unless we pay."

20             And Oracle does not -- we believe it's not

21   appropriate that Oracle should have to pay for Rimini

22   Street's preservation efforts.

23             Oracle has invested a great deal of time and

24   resources in preserving its own data, preparing 200 -- at

25   least approximately 200 forensic images of its own

1      employees' hard drives at significant expense and trouble.

2      And we believed if Rimini Street had taken appropriate

3      preservation measures, when they were on notice of this

4      litigation and after the litigation was filed, forensic

5      images may not have been necessary.

6              But because they delayed, despite being on

7      notice of the litigation, and because they have failed to

8      take anything beyond relying on employees' discretion as to

9      the great deal of employees, that's what gives the --

10             THE COURT:  And yet --

11             MR. RINGGENBERG:  -- need --

12             THE COURT:  -- you acknowledge that the issue

13     right now is freezing what they have because once you find

14     out, if I order the mirror images, the content of that,

15     then you may not want to look at it all.

16             MR. RINGGENBERG:  It's correct.  And let me be

17     very clear about this, Your Honor.  And let me use instant

18     message --

19             THE COURT:  Because that's the biggest -- the

20     cost is not in freezing it as much as it is in reviewing it

21     and producing it or developing a protocol for determining

22     what within the mirror images should be produced.

23             MR. RINGGENBERG:  That's correct.  And let me

24     use instant messages as a very concrete example of what our

25     concern is and how we think this ought to work.

TRANSCRIBED FROM DIGITAL RECORDING

1        It's conceded that Rimini Street did not direct

2   its employees to archive instant messages until August of

3   2010.

4        We know the instant messages in this case on the

5   tool that they use are not ephemeral.  The -- Mr. Mattal's

6   declaration explains that he reviewed their specific tool

7   that they use, which is publicly available, in its -- in

8   its default setting it saves a file on each computer's hard

9   drive preserving instant messages that that employee makes.

10       It's just that they're deleted automatically

11  whenever that user logs out.  So they exist, and then

12  they're gone.  If they'd just taken the time to check a box

13  that said archive these, they're not deleted at the end --

14  end of the logoff session, they're preserved.

15       THE COURT:  And that was the issue in which your

16  30(b)(6) -- the 30(b)(6) deponent was mistaken during his

17  deposition?

18       MR. RINGGENBERG:  No.  He testified accurately

19  on this.

20       THE COURT:  Okay.

21       MR. RINGGENBERG:  He said employees have not

22  been instructed to archive them.

23       And I said, "Well, what about your computer?  Do

24  you use IM?"

25       He said, "Every day."

1          And I says, "Is archive enabled in your

2    computer?"

3          And he said, "Absolutely not."

4          And that's when we discovered.  And the next day

5    we said, "Look, guys, this is a big problem.  We need to

6    preserve this."

7          And that specifically -- of course, they'd been

8    encompassed in our general notices.

9          So as a result, those files existed and were

10   deleted in the ordinary course every day -- or at least

11   whenever the employee logged off, up until August 2010.

12         Those files still remain on those employees'

13   hard drives.  Now, you can't see them ordinarily, but a

14   skilled technician can pull them off.  At least in most

15   instances.

16         But over time, as the hard drive is used, it

17   becomes more and more difficult to obtain them because

18   additional information  --

19         THE COURT:  I understand.  Because they get

20   overwritten.

21         MR. RINGGENBERG:  That's right.  And all we're

22   asking on this motion is to preserve the -- for the

23   custodians that both parties agree should be subject to

24   producing --

25         THE COURT:  And have you --

1              MR. RINGGENBERG:  -- documents in this case --

2              THE COURT:  -- reached that agreement now?

3              MR. RINGGENBERG:  They proposes 30, we proposed

4    60, and we're negotiating.  But that's the bid and ask.

5    And I suspect that we'll come to closure on that in the

6    near future.

7              But 60 would be the cap of what we're asking,

8    which substantially drops the cost, obviously.

9              And so if we freeze those images, then later on,

10   if we discover that they contain crucial information that's

11   not otherwise available, then we can go and do the

12   analysis necessary to get them.

13             THE COURT:  And how do you propose to discover

14   whether they contain crucial information that's not

15   otherwise available without looking at it?

16             MR. RINGGENBERG:  Well, because we'll note --

17   well, we won't know what's in those files.  But what we

18   will note is what else we get from Rimini Street in

19   discovery.

20             And so if there are holes or if we discover

21   leaks or if we discover suspicious activity or if we

22   discover just there's entire time periods where information

23   is missing, then we have a very good reason to simply come

24   in and ask for -- that their forensic analysis be prepared

25   on some portion of the information.

TRANSCRIBED FROM DIGITAL RECORDING

1        But, Your Honor, if this information is not

2    preserved now and in short order, that won't be possible

3    later.

4        Now, of course, we could file --

5        THE COURT:  So you're doing this as -- basically

6    as a double check.  Because if you get the discovery from

7    the other side in this case and you don't have concerns

8    about the completion -- the completeness of the data, then

9    you may never ask for the forensic review or re-creation of

10   the data that's captured?

11       MR. RINGGENBERG:  Exactly.  And that's exactly,

12   Your Honor, why Oracle created forensic images of 200 of

13   its own computers is so that --

14       THE COURT:  Because you don't intend to do that

15   yourself either?

16       MR. RINGGENBERG:  I'm sorry?

17       THE COURT:  You don't intend to do that either

18   for purposes of discovery?

19       MR. RINGGENBERG:  Correct.  But if we discover a

20   mistake, if something -- if something has gone missing,

21   then that's there as a backup, and so that will -- it is

22   true that we could just wait until the end of the case and

23   file a sanctions motion, Your Honor.

24       But we believe it's our duty to bring this to

25   the Court's attention so that judicial process is more

TRANSCRIBED FROM DIGITAL RECORDING

1    likely to be accurate.

2            And let me make one other point, Your Honor.  We

3    have a specific cause to be concerned that employees in

4    this case will conceal illicit activity because we have

5    evidence that they've done it before.

6            THE COURT:  I have read your papers.  I know

7    that you're concerned about the instant messaging and so

8    forth.

9            MR. RINGGENBERG:  And that's just one example.

10   That's what -- the proof we have.  Of course it'd go

11   broader than that.  And so that's why we think it's

12   important.

13           One more point about the cost, Your Honor, is if

14   the Court were to determine cost shifting is appropriate in

15   some measure, one concern we have is if Oracle's footing

16   the bill but has no control over the process, then the

17   incentives for keeping costs down and not in place.  So

18   if -- if the Court --

19           THE COURT:  Yeah, it depends on who you really

20   trust.  Does your expert -- can you get it done a lot

21   cheaper than they can?

22           MR. RINGGENBERG:  Our expert identified a means

23   by which this can be done much more efficiently than the

24   bids that they obtained.  And I'll tell you exactly how.

25           Rimini Street's employees are located all over

1    the country.  They mostly work remotely.  Their bids

2    require the technician to fly to -- you know, from hither

3    and yon to prepare forensic images.

4            Our expert explained that especially for

5    individuals who are technically savvy, which, of course,

6    Rimini Street's employees, are software developers and

7    technical support folks, you can send them a hard drive in

8    the mail, attach it to the computer.  The technician can

9    connect over the Internet, prepare the process overnight so

10   it doesn't interfere with the person's working hours.  And

11   then all of that can be done without the expense of a plane

12   ticket or hotel room.

13           Half of their expense in their bids is dedicated

14   to plane tickets, hotel rooms, and rental cars --

15           THE COURT:  And --

16           MR. RINGGENBERG:  That can be avoided.

17           THE COURT:  And if those costs were avoided,

18   you're not going to complain that the employees may have

19   improperly copied the data?  Because that's what the

20   counter --

21           MR. RINGGENBERG:  We would not say that it's

22   improper to do it remotely, of course, Your Honor.  I don't

23   know what they're going to do, so I can't swear that their

24   process is going to be correct.

25           But certainly as to that, we would not say it's

TRANSCRIBED FROM DIGITAL RECORDING

1      improper to do it remotely.  Because we suggested it, Your

2      Honor.  Absolutely.

3                THE COURT:  All right.  Let me hear the opposing

4      view.

5                MR. WEBB:  I'll be very brief, Your Honor.  I

6      know you're late already.

7                If this case becomes war of attrition we will

8      lose.  There is zero doubt about it.  This issue goes not

9      only to the schedule and managing this case closely so it

10     doesn't happen, but this is a concrete example.

11               If they want this stuff, just pay for it.  You

12     can have it.  And we've said that repeatedly.  This isn't

13     an issue about them preserving, it's an issue about us

14     having to pay for it.

15               Now, listen, we want to get to the merits on

16     this case.  They've said some stuff about our client and

17     about Mr. Ravin.  We just want to clear the air and have

18     this case decided on its merits.  And all we want is a

19     process and a schedule that allows us to stay a viable

20     company to get to that point so we can fight on the merits.

21               And so this is a concrete example.  And

22     listen -- Judge, I can't predict the future, but I will

23     predict there will be a discovery motion filed by these

24     guys, one or more, I just don't know what (indiscernible),

25     because that is going to be a litigation within a

TRANSCRIBED FROM DIGITAL RECORDING

33

1  litigation, just as the process that's already before you

2  is illustrating this is going to become a problem.

3  　　　　　　And this is why we just ask the Court to tightly

4  control this.  Give parties -- give everybody strict rules

5  and make us follow them.  Don't let this become the

6  litigation within the litigation.  Because, once again,

7  we've already suffered because of this lawsuit and the

8  marked communications going on about this lawsuit.

9  　　　　　　If we now have to deal with paying $200,000 to

10  give them something that we don't think they need -- and

11  where does it end?  And we have depositions.  And we saw

12  what happened in the *SAP* case with two multi-billion dollar

13  companies with unlimited resources battling each other.  We

14  don't have that here.

15  　　　　　　We're a small company with finite resources.

16  And they're being stretched already, starving.

17  　　　　　　So all I ask is that for this issue and the

18  schedule the Court look at this very closely and say we're

19  going to do what is necessary.  These guys have already

20  kicked the tires on this TomorrowNow stuff.  They're going

21  to trial in November.  They know exactly what to look for.

22  I would hope they don't have to reinvent the wheel all over

23  again in this case.  Tell us what they want; we'll give

24  it.

25  　　　　　　We've got (indiscernible) that were around at

1    least as early as May of 2009.  Listen, we knew this was

2    going to be an issue.  We knew this was going to be

3    something they teed up.  We've done everything we can.  We

4    shouldn't have to pay for their -- for something they don't

5    need.  Thank you.

6            THE COURT:  The motion is granted to the extent

7    that the plaintiffs may designate the custodian for whom

8    they request mirror images of computers and have mirror

9    images prepared at plaintiffs' cost.  Okay.

10           And so I'll direct the parties to meet and

11   confer to identify those custodians.  You're apart between

12   30 and 60.  Identify those.  You really need them, you pay

13   for them.

14           You don't need them and you think they've

15   destroyed something, that's another issue for another day;

16   if you just determine their documents are incomplete, then

17   what consequences should flow from that.

18           MR. WEBB:  Thank you, Your Honor.

19           THE COURT:  All right.  With respect to the

20   schedule, I'm going to enter a discovery plan and

21   scheduling order.  I'm going to limit depositions to 20

22   depositions of seven hours duration unless for good cause

23   shown.  Discovery is inadequate in order for you to

24   complete this case.

25           I'm going to limit interrogatories in number to

TRANSCRIBED FROM DIGITAL RECORDING

1    40.   You haven't requested a limitation on request for

2    production.   None will be imposed.

3              I'm going to impose a 12-month fact discovery

4    cutoff and a four-month expert discovery cutoff.   And I'll

5    enter a written order that establishes those precise

6    deadlines.

7              So we'll go from there.   And then I will enter

8    an order resolving your stipulation concerning the employee

9    contact issue as soon as I've been able to go back and read

10   in more detail your respective positions.

11             So at this point do either side believe that

12   further status conferences are required?   Or do you want to

13   rely upon the ordinary method of resolving disputes, as if

14   they exist, you file a motion, response, brief, et cetera?

15             Counsel for plaintiffs?

16             MR. RINGGENBERG:   I would suggest that we --

17   although we do not need a status conference in 30 days,

18   that we be back no later than 75 days from now, not

19   thinking about where that date falls, so we can inform the

20   Court about how much progress we're making with the

21   discovery we have.

22             I understand the Court's order.   I note that the

23   Court has ordered less discovery than even plaintiffs --

24   I'm sorry, than even defendants propose.   And so I

25   suspect --

TRANSCRIBED FROM DIGITAL RECORDING

1           THE COURT:  I understand.  So it requires you to

2   both be as efficient as possible and doesn't foreclose the

3   possibility that I'll give you more.  But you're going to

4   have to -- the party requesting more than that is going to

5   have to show good cause for it.

6           MR. RINGGENBERG:  And understanding that, I

7   suggest that we set a time now because I do anticipate that

8   we will have to come back and discuss with the Court again

9   what further we need.

10          THE COURT:  That's fine.

11          Mr. Webb?

12          MR. WEBB:  I tend to think we can get along a

13   little better than that.  But we're fine with that, Your

14   Honor.

15          THE COURT:  All right.  I'll set a status

16   conference in 75 days on your progress in meeting discovery

17   plan and scheduling order deadlines.

18          And let me tell you, counsel, I'll consider

19   individual tweaks or adjustments.  You attempt to schedule

20   a witness you can't get it done for reasons that one or

21   both sides are unavailable, the witness is unavailable,

22   that's one thing.  But wholesale extensions of the

23   discovery plan and scheduling order, I'm not inclined to

24   allow you.

25          So do the absolute best you can to start talking

TRANSCRIBED FROM DIGITAL RECORDING

37

1 to one other.  Litigation does not have to be crushing to

2 both sides.  It can be.  So there are a lot of reasons why

3 you should try to cooperate on things that are mutually

4 advantageous.  But if you can't, that's what I get paid the

5 big bucks to decide.

6     Mr. Miller, would you give me a 75-day status

7 conference, please.

8     COURTROOM ADMINISTRATOR:  Yes, Your Honor.  As

9 75 days actually falls right on the Thanksgiving holiday,

10 we'll go ahead and set this matter for Tuesday, November

11 the 30th, 2010, at 9:00 a.m., in this courtroom.

12     THE COURT:  All right.

13     And then if you will, please, give me a joint

14 status report the Friday before, which tells me where you

15 are, whether there are any impediments, and whether either

16 side is requesting any adjustments to the discovery plan

17 and scheduling order deadlines.

18     Thank you, folks.  Good day.

19     MR. WEBB:  Thank you, Your Honor.

20     MR. RINGGENBERG:  Thank you, Your Honor.

21    (The proceedings concluded at 9:44 a.m.)

22      *  *  *

23

24

25

38

1                              -o0o-

2          I certify that the foregoing is a correct

3       transcript from the electronic sound recording

4       of the proceedings in the above-entitled matter.

5

6       _____        11/22/16

7          Donna Davidson                       Date

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25