1

1    UNITED STATES DISTRICT COURT
            DISTRICT OF NEVADA
2    BEFORE THE HONORABLE PEGGY A. LEEN, MAGISTRATE JUDGE

3

4    ORACLE USA, INC., a Colorado      :
     corporation; ORACLE AMERICA,      :
5    INC., a Delaware corporation;     :
     and ORACLE INTERNATIONAL          :No. 2:10-cv-0106-LRH-PAL
6    CORPORATION, a California         :
     corporation,                      :
7                                      :
            Plaintiffs,                :
8                                      :
        vs.                            :
9                                      :
     RIMINI STREET, INC., a Nevada     :
10   corporation; and SETH RAVIN, an   :
     individual,                       :
11                                     :
            Defendants.                :
12   _____  :

13

14                TRANSCRIPT OF STATUS CONFERENCE

15

16

                        March 29, 2011
17

18                     Las Vegas, Nevada

19

20
     FTR No. 3B/20110329 @ 10:00 a.m.
21

22
     Transcribed by:        Donna Davidson, CCR, RDR, CRR
23                          (775) 329-0132
                            dodavidson@att.net
24

25   (Proceedings recorded by electronic sound recording,
     transcript produced by mechanical stenography and computer.)

TRANSCRIBED FROM DIGITAL RECORDING

2

1                    A P P E A R A N C E S

2    FOR THE PLAINTIFFS:

3    BOIES, SCHILLER & FLEXNER LLP
     KIERAN P. RINGGENBERG
4    1999 Harrison Street, Suite 900
     Oakland, California 94612
5    (510) 874-1000
     Fax: (510) 874-1460
6    kringgenberg@bsfllp.com

7    BOIES, SCHILLER & FLEXNER LLP
     RICHARD J. POCKER
8    300 South Fourth Street, Suite 800
     Las Vegas, Nevada 89101
9    (702) 382-7300
     Fax: (702) 382-2755
10   rpocker@bsfllp.com

11   MORGAN LEWIS & BOCKIUS LLP
     GEOFFREY M. HOWARD
12   One Market, Spear Street Tower
     San Francisco, California 94105
13   (415) 442-1000
     Fax:  (415) 442-1001
14   geoff.howard@morganlewis.com

15   JAMES C. MAROULIS
     Oracle Corporation
16   500 Oracle Parkway
     Redwood City, California 94070
17   (650) 506-4846
     jim.maroulis@oracle.com

18


19
     FOR THE DEFENDANTS:
20
     SHOOK, HARDY & BACON LLP
21   ROBERT H. RECKERS
     600 Travis Street, Suite 3400
22   Houston, Texas 77002
     (713) 227-8008
23   Fax: (713) 227-9508
     rreckers@shb.com

24


25

TRANSCRIBED FROM DIGITAL RECORDING

3

1          A P P E A R A N C E S (Continued)

2    FOR THE DEFENDANTS:

3    LEWIS ROCA ROTHGERBER LLP
     W. WEST ALLEN
4    3993 Howard Hughes Parkway, Suite 600
     Las Vegas, Nevada 89169
5    (702) 949-8230
     Fax: (702) 949-8364
6    wallen@lrrlaw.com

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

TRANSCRIBED FROM DIGITAL RECORDING

**4**

1          LAS VEGAS, NEVADA, MARCH 29, 2011, 10:00 A.M.

2                        --oOo--

3               P R O C E E D I N G S

4

5          THE COURT:  Good morning.  Please be seated.

6          COURTROOM ADMINISTRATOR:  Your Honor, we are now

7     calling the status conference in the matter of Oracle, USA,

8     Inc., et al, versus Rimini Street, Inc., et al.  The case

9     number is 2:10-cv-0106-LRH-PAL.

10          Beginning with plaintiff's counsel, counsel,

11     please state your names for the recorded record.

12          MR. HOWARD:  Good morning, Your Honor.  Jeff

13     Howard representing Plaintiff Oracle.

14          With me Kiernan Ringgenberg, Jim Maroulis, and

15     Rick Pocker.

16          MR. ALLEN:  Good morning, Your Honor.  West

17     Allen, from Lewis & Roca, appearing for the first time to

18     make an appearance on behalf of defendants, Rimini Street,

19     Inc., and Seth Ravin.

20          And also with me is counsel Rob Recker from

21     Shook, Hardy.

22          THE COURT:  This is the time set for a status

23     conference in this matter.  I have reviewed your joint case

24     management report in this matter.

25          And let me hear first from the plaintiffs

1    concerning the status of the supplemental document

2    production that you've been expecting from Rimini in this

3    matter and where you are in that process.

4              MR. HOWARD:  Thank you, Your Honor.  As

5    reflected in that statement, the parties, I think it's fair

6    to say, have been working hard with the volume that they

7    have to deal with and the technical material.

8              We have received about 1.5 million documents

9    from -- pages from the plaintiffs so far.  What we're

10   waiting for is a list of things.  Some of them are

11   custodial documents.  There's only been one custodian that

12   has been fully produced on their side, two more which are

13   almost complete.

14             And so we are expecting, just judging from the

15   volume that has been produced for the one and the partial

16   production so far -- and counsel can correct me if my math

17   is wrong, but our estimation is they'll be somewhere in the

18   order of 20 or 30 million documents produced once the

19   custodial productions are complete.

20             I don't know when those will be complete.  But

21   both parties are producing additional custodians over the

22   course of the next couple of weeks and month and then

23   continuing thereafter.  I can, if the Court is interested,

24   tell you where we are in that process as well.

25             That's the custodial documents.  In some ways

TRANSCRIBED FROM DIGITAL RECORDING

6

1     the more challenging part is the noncustodial documents.

2     Those -- that's the actual copies of the software, copies

3     of the downloads, copies of the installed environments that

4     the defendants maintain on their systems.

5              With respect to those, the environments, we've

6     received just about 10 -- less than 10 percent of those

7     environments.

8              With respect to the records that reflect how the

9     defendants go about generating their fixes that they

10    deliver to customers, which is in some ways the most

11    critical part of the evidentiary record, we haven't had any

12    production of those.  We've had access to that system

13    through a VPN protocol, but we haven't had any actual

14    production yet.  And we will need it in order to prepare

15    our evidence and for our experts to do their analysis.

16              With respect to the archives, the archives are

17    the downloaded materials that the defendants have gone into

18    Oracle's websites and downloaded.  There's about 22

19    terabytes worth of that material.  It's a -- an almost

20    mind-numbing amount of material.  And by comparison we've

21    said to the Court, 10 terabytes is the amount of materials

22    in the Library of Congress.

23              That also has been done on an access basis

24    through the VPN protocol.  There hasn't been any of it

25    actually produced yet.  And let me pause and say that we're

TRANSCRIBED FROM DIGITAL RECORDING

7

1    not casting aspersions, and I hope it's clear.  There were,

2    I think, very good reasons why the parties agreed and why

3    these issues have not been presented to Your Honor.

4           When dealing with this kind of material, it

5    didn't seem reasonable for us to just say give us 22

6    terabytes worth of material.  They proposed a process, and

7    we agreed to it, whereby we went in, we inspected it

8    through a remote procedure so that we could be more

9    surgical in the actual productions that we would do.

10   That's taken some time.

11          I think in the end it will be more efficient.

12   It would result in less material being produced.  But this

13   is where we are; for example, the archives not yet actually

14   produced.

15          THE COURT:  All right.  And I want to stop you

16   there.

17          MR. HOWARD:  Yes.

18          THE COURT:  Because it's obvious that you have a

19   massive amount of material.

20          If you uncover every rock, if you look under

21   everything, if you analyze everything, if you have experts

22   pore over it, what you are describing is not doable within

23   the time that the federal court's going to allow you to

24   keep this case active before it's tried and resolved.

25          MR. HOWARD:  And I hope it was clear, and we

TRANSCRIBED FROM DIGITAL RECORDING

8

1    tried to say in our statement, we're not going to attempt

2    and we're not asking the Court to allow us to go in and

3    uncover every rock.

4           Really what we're doing, and I hope it's

5    reflected in our proposed additional depositions and in the

6    way that we're going to go about the analysis, is we're

7    looking for a fraction in each of these discrete categories

8    of conduct.  We have to multiply everything we do by four

9    product lines because they did -- they had PeopleSoft, they

10   had JDE, they had Siebel, they have the database.

11          So we're not asking to depose all of those

12   people.  We're not going to ask for all 22 terabytes

13   ultimately to be produced.  Or if we do, are able to work

14   out a protocol, we're not going to be able to analyze that.

15   Nobody could.  It's humanly impossible to do.  And you

16   wouldn't let us anyway.

17          So our approach so far is that we need to have

18   enough that we can reasonably analyze, and then what we

19   expect we'll be doing is employing statistical analysis so

20   that we can --

21          THE COURT:  And have the parties discussed

22   whether you can agree upon a protocol for a representative

23   statistical analysis of the evidence on both sides so that

24   you both have a common approach to presenting this to a

25   jury, if it goes there, or closing discovery and having a

TRANSCRIBED FROM DIGITAL RECORDING

9

1    factual basis for presenting your dispositive motions on

2    the key elements of your claims and defenses?

3            MR. HOWARD:  We haven't discussed it in detail,

4    Your Honor.  They've seen what we've said and -- in the

5    meet-and-confer that's led up to the filing of this

6    conference.  So they know that that's the approach we're

7    thinking about.

8            It is -- just to give an example -- but I think

9    it's -- let me just say, I think it's a good suggestion.

10   It's one that the parties ought to sit down and explore.

11   It may or may not shorten the time because there's an

12   almost endless number of rabbit holes that you could go

13   down in looking at what it is that I would evaluate.

14           THE COURT:  All right.  And Rule 26 tells me

15   that I'm supposed to impose a proportionality review, what

16   you can do, and what I should allow you to do.

17           And so I sincerely appreciate the spirit of

18   cooperation and the collegiality that both sides have

19   expressed in tackling what is admittedly a massive project

20   here.  But there has to be a reasonable way to get a handle

21   on this.

22           And what is -- if you hit the litigation home

23   run, what do you expect to recover in this case, based on

24   now you've been at this since March of last year?

25           MR. HOWARD:  Well, that's a very good question,

TRANSCRIBED FROM DIGITAL RECORDING

1    Your Honor.  There are a couple of holes.

2             Damages are obviously something that we think

3    that we would be entitled to.  But probably as important,

4    or more important than that, we want to stop having our

5    intellectual property infringed.  And it gets right to the

6    question of whether you -- how you approach the analysis.

7             Because, for example, if there's a thousand

8    fixes that they have sent out just for PeopleSoft and each

9    of those fixes has up to 30 objects, that's the level of

10   analysis that you approach.

11            If you, for example, were to say, well, let's do

12   10 percent of the fixes and you weren't going to try to

13   extrapolate that, then we might be able to prove, and I

14   think we clearly would be able to prove, infringement for

15   10 fixes.

16            But it would allow them to say, well, there's no

17   proof as to the remainder, there's no proof as to what

18   we've done with the remainder, and then we'd be in a very

19   tough discussion about what the scope of the injunction

20   would be.

21            And so it's very important to us to at least

22   have an ability to extrapolate from a fraction of the

23   evidence to put on proof, trial proof --

24            THE COURT:  I understand that.  And that's why

25   I'm asking you if you've talked to the other side.  Because

TRANSCRIBED FROM DIGITAL RECORDING

1    I hear from the other side all the time, you're one -- when

2    you tell me that in your portion of the report, you're one

3    of the biggest companies in the world.  You want to do an

4    amount of discovery and run this case -- run them into the

5    ground in the process.

6              So it would seem to me that the defendants have

7    every incentive to agree with you on a protocol that gives

8    you sufficient representative sample in order to -- for you

9    both to get and adjudication on the merits.

10             MR. HOWARD:  And I think that that's -- and

11   hopefully we can agree on that.

12             Even if we can't, the way -- and I will, if I

13   may, Your Honor, draw on the experience that we've just had

14   in a very, very similar case, the *Oracle/SAP* case, where it

15   was the same software, it was the same -- very similar

16   business processes that were being applied to the software

17   because the defendant, Mr. Ravin, architected that same

18   model there, that was two and a half years of fact

19   discovery agreed by the parties and agreed by the Court,

20   and we ended up adopting a statistical model there.

21             But in order to do that, we had to have -- the

22   experts had to have -- the forensic experts and the

23   statistical experts, had to have a population to sample

24   from.

25             And so, for example, if you take the

TRANSCRIBED FROM DIGITAL RECORDING

1    environments and you're going to run an analysis to compare

2    the files in the environments against the files in Oracle's

3    registered works, or you're going to take the fixes that

4    are delivered and compare the objects in those, which there

5    may be 20 or 30,000 of them, and compare that against the

6    files in Oracle's registered works, that is just a

7    time-consuming process.  There's no number of bodies you

8    can throw at that.  There's no amount of money you can

9    throw at that.  That's assembling your team.  And we have a

10   very large, very expensive legal team and expert team that

11   are working hard at this.

12            But, you know, as evidenced by the example that

13   it took four weeks just to run an index of one of these

14   data stores just to do that baseline analysis for the

15   population and then draw out your sample, your population

16   sample to do that extrapolation, it just is a month-long

17   process after you have the evidence.  Even if it's agreed.

18            THE COURT:  I started -- the question that

19   started this back and forth here was how much is in dispute

20   in terms of damages?  And you didn't answer that question.

21   You said what you're really looking for, if I heard you

22   correctly, is injunctive relief that stops the infringing

23   practices that you believe the defendants are engaged in.

24            MR. HOWARD:  I'm sorry, Your Honor.  I -- what I

25   was trying to say is I thought I heard the Court say what

DONNA DAVIDSON      (775) 329-0132

TRANSCRIBED FROM DIGITAL RECORDING

1    are you looking for?  And what I was trying to say is that

2    injunctive relief is just as important as damages.  How

3    much is the damages number?  Our damages experts haven't

4    been through that analysis yet to say that.

5            The damages number that was offered at trial in

6    the trial last fall was $1.6 billion for a similar -- a

7    similar set -- a similar number of registered works,

8    similar software, similar activities in scope that had been

9    applied to that.  The jury's verdict was 1.3 billion.

10           There are factors that are the same and there

11   are factors that are different.  So I can't say to the

12   Court that it will be that number.  But --

13           THE COURT:  The reason I ask you is because some

14   of your status report is directed towards -- you're talking

15   about the fairness of being able to do an accurate damages

16   calculation here.

17           And so the question I have for you, does it make

18   sense to bifurcate liability and damages to save the time

19   that it would take to do the damages analysis and focus and

20   get you ready for the summary judgment and trial stage on

21   the liability aspect of the case?

22           Because that seems to me that what you're

23   telling me is the most expensive portion of the discovery

24   that you need to do.  But perhaps not.

25           MR. HOWARD:  Well, I think -- it's an

TRANSCRIBED FROM DIGITAL RECORDING

14

1    interesting idea, Your Honor.  And I think it's one that we

2    would certainly entertain.

3             The damages -- I think what we were just --

4    we've just been discussing in terms of the statistical

5    analysis is likely necessary for the underlying liability

6    in looking at the list of registered works.

7             And so it probably does make sense to have the

8    ability to focus on that, for the parties to focus on that

9    in staging the damages until after that's done.  I think,

10   you know, that that is a good suggestion.

11            The part that in particular we were focusing on

12   with respect to damages in the statement itself also had to

13   do with causation and with respect to the customers.  And

14   that was really reflected in the idea to have this bucket

15   of hours that you would be able to choose some -- again, a

16   small fraction of the customers that were out there because

17   there are different damages models.

18            One of them is a lost profits model.  The

19   customers that they have recruited are going to be directly

20   implicated in a lost profits analysis.  We're going to say

21   that we would have had that licensing maintenance revenue

22   had they not gone to the defendants.

23            Defendants are going to say they would have

24   gone -- left you anyway.  And so being able to explore

25   those issues --

TRANSCRIBED FROM DIGITAL RECORDING

15

1          THE COURT:  Because they needed to fix your

2   product, yeah.

3          MR. HOWARD:  That's right.  That's exactly

4   right, Your Honor.  And so -- and there's no way -- there's

5   no better way to do that than to ask the customers.  But

6   you can't -- you know, agree that nobody wants to go fly

7   out and talk to 200 customers either.  And so, again, we're

8   looking at a fraction of those.

9          So that's -- it was really those causation

10  issues with respect to lost profits that was driving that

11  part of the proposal to expand the hours.

12         THE COURT:  All right.  And I've interrupted you

13  several times.  So if there's something that you wanted to

14  add.

15         I'm trying to figure out if there is a way that

16  we can divide this case into more manageable chunks to

17  determine, through the dispositive motion practice, such

18  things as, for example, the argument that the defendants

19  have that they have license agreements, that what they are

20  doing is covered by the licensing agreements with the

21  customers.

22         Is that something that could be litigated and

23  carve out a huge part of the case one way or the other?

24         MR. HOWARD:  Maybe.  It may be.  There -- and

25  it's something that we actually considered, Your Honor, as

DONNA DAVIDSON    (775) 329-0132

TRANSCRIBED FROM DIGITAL RECORDING

16

1    whether it would be efficient and whether it would make

2    sense to bring to the Court a limited motion that would

3    address the licensing defense.

4            There are some hurdles to that.  And it may be

5    that the parties should be discussing whether we can

6    overcome those hurdles because, you know, we were imagining

7    things that they might say, such as there's variation in

8    the license agreements and so -- whereas we can't expect

9    the Court to review 200 license agreements, if we were able

10   to present five or six that we thought were representative

11   and focus on the key terms for a resolution of that, I

12   think that would be efficient.

13           If the response is you can't do that, they're

14   not representative, and so what you've decided as --

15           THE COURT:  Well, that's why I started off by

16   asking you folks if you've talked to one another.  Because

17   again obviously you want broad-reaching relief.  However,

18   they want to be able to exist after this litigation is over

19   and not have spent every dime on litigating.

20           And so it seems that you both have a

21   self-interest in mind in trying to get a judicial

22   determination with a reasonable amount of discovery instead

23   of the, as you call it, inconceivable almost amount of

24   discovery that you could do if you had all the time in the

25   world and no -- and no time or monetary limitations.

TRANSCRIBED FROM DIGITAL RECORDING

17

1           MR. HOWARD:  And I -- and so we have tried to

2    construct a proposal that acknowledges the reality that we

3    can't do everything, that we can only do a fraction.

4           I think the idea of building -- of having the

5    parties discuss and build in a possible targeted set of

6    motion issues is a good one.  The idea of --

7           THE COURT:  For example, is there any chance

8    that you might have a stipulated set of facts with respect

9    to certain things?  Can you stipulate that this is what

10   they're doing, this is what the customers are receiving,

11   this is what our software is, we think it's unlawful, they

12   think it's authorized by the license agreement?

13           MR. HOWARD:  I think my guess is --

14           THE COURT:  Obviously I'm simplifying, but --

15           MR. HOWARD:  Yeah, no, I think that's -- my

16   guess is the answer's yes.  I'm sure the parties can

17   stipulate to facts.

18           However, the licensing defense is, you know, a

19   big defense, and it would apply to, in particular, the

20   existence of the environments, the many, many copies of the

21   software that are on the systems, perhaps to the existence

22   of the downloads on the systems.

23           What it doesn't as well address or what it's

24   harder to resolve through a motion on it is the issue of

25   cross-use.  And it's really the issue of cross-use that we

1    think is the key issue in the case.  Because we don't think

2    there's any argument under any license agreement that

3    they're allowed to take one customer's software and use it

4    to develop fixes for another customer.  And unfortunate --

5            THE COURT:  You're saying what the problem is is

6    exponential every time -- they're passing along by using

7    iterations of the -- what they did the time before, which

8    increases exponentially the number of potential

9    infringements you have to look at.

10           MR. HOWARD:  Well, that is true.  But even if it

11   wasn't true, they're nevertheless for each object, you

12   know, these tens of thousands of objects that comprise

13   these thousands of just PeopleSoft fixes that they've sent

14   out, every time they create an object, our belief is, and

15   so far it appears to be true, that they are taking that

16   object from one customer's installed -- software that

17   they've installed on their systems, and they're copying it

18   and they're modifying it and sending that exact same file

19   out to dozens and dozens of other customers.

20           And so that's what becomes exponential and

21   difficult -- that's what requires -- as much as anything,

22   requires a time --

23           THE COURT:  I understand that.  I understand

24   it's a huge project.  It's hard for extraordinary lawyers

25   like yourselves to get around it.

1          But at the end of the day you're going to be

2     asking the judge what's that order going to say?  What's

3     that judgment going to say that gives you the relief you

4     think you're entitled to?  Or the defendants have the same

5     issue.

6          You are going to have to get a handle on it in a

7     way that is presentable and that you get relief that means

8     something.

9          MR. HOWARD:  Yes.  And that's -- and that's why

10    I think that the statistical analysis, being able to

11    address that fixed population -- and it's -- unfortunately,

12    it's a human process.  There isn't -- you have to talk to

13    the people who are doing it to understand the data.

14         So we're going to -- it's a fraction of the

15    people.  It's a fraction of the fixes.  That, I think, is,

16    as much as anything, what drives the time.  And to be able

17    to say that it wasn't just March of 2009 with fix 11, but

18    it was essentially all fixes over time, and you can't do it

19    anymore.

20         THE COURT:  Okay.  And who will be addressing

21    the defendants' position with -- obviously plaintiff had to

22    go first, so I peppered them with some questions and

23    suggestions about how to try to get a handle on this.

24         MR. ALLEN:  I'll start, Your Honor.

25         THE COURT:  Mr. Allen.

TRANSCRIBED FROM DIGITAL RECORDING

20

1          MR. ALLEN:  Sometimes fresh eyes on a big

2     problem can be helpful.  I hope I might have some

3     insightful things to say.

4          We're here on the fifth -- appears to be the

5     fifth discovery hearing.  And I wanted to address the Court

6     because, as the Court's noted in articles, the pretrial

7     tail is now about to wag the trial dog.

8          And I say that in sincerity because this

9     Court's -- obviously this Court's obligation is to make

10    sure, especially in patent cases, that very large

11    corporations don't multiply unnecessarily proceedings in a

12    way that unfairly harms a smaller, in particular very small

13    defendant.

14          THE COURT:  Sure.  But they have to protect

15    their intellectual property.

16          MR. ALLEN:  They absolutely do.  And that's why

17    for this case there's no secret, everybody knows really

18    what the case is about.  It's not like the *SAP* case, from

19    what I can tell so far.

20          This case is about a very successful large,

21    multibillion dollar corporation that drafts very helpful

22    software for the world.  And they want to couple that with

23    a very lucrative service industry that basically says,

24    "Once you've bought our product, now you got to pay a lot

25    of money to help us keep it updated and serviced," which is

TRANSCRIBED FROM DIGITAL RECORDING

1    entirely fine.

2            That creates a very large market for consumers

3    that don't want to pay the expensive prices of the company

4    that made the software, and within the scope of their

5    proper license, they want to do what they're allowed to do

6    within the scope of that proper license, to ask somebody

7    else to come and help them, what they would basically do

8    themselves if they could, but they can't, don't have time,

9    don't know how to do it, so they ask a third party to come

10   in and do basically what they would like to do.

11           THE COURT:  Hence, the argument that what your

12   client is doing is perfectly lawful.

13           MR. ALLEN:  That's true.  But that goes right to

14   the issue of how you grapple all of discovery that

15   plaintiff would like to do.  The plaintiff --

16           THE COURT:  And that's why I'm asking them, is

17   some bifurcation -- does some bifurcation make sense?  Can

18   you limit -- can you agree upon a statement of facts?  They

19   want to know the universe of what it is you're doing before

20   they bite into --

21           MR. ALLEN:  Well, I think Your Honor made an

22   excellent starting suggestion, which is let's look at this

23   issue of licensing.  Because the way I viewed it when I

24   started looking at this case, just less than a day or two

25   ago, is that the first question everyone ought to ask is,

TRANSCRIBED FROM DIGITAL RECORDING

22

1    are these consumers allowed to do within the scope of their

2    license what they're asking Rimini to do?

3             And I just heard the issue of cross-using

4    software that things are not supposed to do.  From what

5    I've seen Rimini, all they ever do, is exactly what the

6    consumer could do.

7             And to the extent that Oracle's worried about

8    cross-using of licenses, they are meticulous -- and this is

9    why it's not like the *SAP* case, they are meticulous at

10   making sure --

11            THE COURT:  They think your client has erased

12   data that makes it difficult to trace exactly what you've

13   done, that you deleted data.

14            MR. ALLEN:  From what I've seen so far, this

15   client is very meticulous about making sure that they do

16   exactly what that consumer has a license to do.

17            And to the extent they might create economies of

18   scale by taking what consumer A can do and it's exactly

19   what consumer B can do, they may create economies of scale

20   of doing the exact same thing for consumer B within the

21   parameters of the scope of the license that consumer B is

22   allowed to do, which matches what consumer A did.

23            THE COURT:  And what is --

24            MR. ALLEN:  They may want to call that

25   cross-using software improperly, but really it's not.  It's

DONNA DAVIDSON    (775) 329-0132

TRANSCRIBED FROM DIGITAL RECORDING

1    within the parameters of a license doing what that consumer

2    is entitled to do.

3            And maybe the way for this case to get resolved

4    is to just define -- Oracle could define and we could all

5    agree what is appropriate.

6            I think the concern in this case is that

7    Oracle's reporting to its shareholders, they want to do

8    what they did with SAP, which is eliminate that whole side

9    industry and keep that for themselves.  Of course, they

10   would want to do that.  All of us would if that's what we

11   could do.

12           But the real issue is what is proper --

13           THE COURT:  If it belongs to them, they can; and

14   if it doesn't, they can't.

15           MR. ALLEN:  That's right.

16           THE COURT:  I mean --

17           MR. ALLEN:  And consumers, we believe, have a

18   right to have a third party come in and, within the proper

19   scope of their license, fix and make updates --

20           THE COURT:  Right, so is --

21           MR. ALLEN:  -- and do repairs and do those

22   things.

23           THE COURT:  -- the issue resolvable, as a matter

24   of law, in a reasonable amount of discovery, Mr. Allen?

25   That's what I asked the plaintiff, I hope in plain English.

1          Without going through the massive project that

2     this is, will you agree -- can you agree with the

3     plaintiffs on what a representative sample of the discovery

4     is to present the issue to a judge to get a decision as a

5     matter of law and whether -- what it is that you are doing?

6          First, can you agree on what you're doing; and,

7     two, can you agree on whether there's a small enough

8     universe of licenses that are involved; and, three, can you

9     frame the issue for dispositive motion practice?

10         MR. ALLEN:  I would say on behalf of the Rimini,

11    yes.  In fact, that's one of the reasons we were here

12    today, to make sure that that's what happens as opposed to

13    what I perceive has happened is Oracle thought this might

14    just be SAP case 2.  They came in and realized that it was

15    not.  Because this company is very meticulous in making

16    sure that they do only what that licensee can do.

17         And so what has happened, in my view so far, is

18    that Oracle now realizes:  We don't have the massive what

19    they would deem as fraud or improper conduct; what we might

20    have, if we can get enough samples, is individual episodes

21    of maybe a little error here, a little error there, and we

22    can couple those all together and be able to show this

23    horrible story.

24         But what the truth is is that we're here because

25    we want to do what Your Honor just said, have a

TRANSCRIBED FROM DIGITAL RECORDING

1    representative sample to show that this defendant is very

2    good at making sure that they only do what the consumers

3    are allowed to do themselves and that they don't do --

4              THE COURT:  And how do you --

5              MR. ALLEN:  -- what Oracle wants to show.

6              THE COURT:  -- propose to get to the point --

7              MR. ALLEN:  Well --

8              THE COURT:  -- in which you give the plaintiff a

9    comfort level that they have a genuine representative

10   sample as opposed to the tip of the iceberg that they're

11   not comfortable relying upon?

12             MR. ALLEN:  I went through for the first time

13   and went through the discovery that's been made so far.

14   And I have to say, as Your Honor's noted, these parties are

15   very professional, and they've done an exceedingly good job

16   to accomplish and tackle a very large problem.

17             But as I put together the scope of the discovery

18   that's been done already, it is a staggering number.  They

19   have and will have almost 2 million pages of actual Bates

20   labelled documents.  They have 1.5 million as of today,

21   they'll have 2 million within the next few weeks.

22   They've --

23             THE COURT:  And you've only done one complete

24   custodian's production?

25             MR. ALLEN:  Is that correct?

TRANSCRIBED FROM DIGITAL RECORDING

1          MR. RECKERS:  Your Honor, let me address that

2     real quickly.

3          THE COURT:  Yes, sir.

4          MR. RECKERS:  We did not proceed on a

5     custodian-by-custodian basis.  We estimate that we can

6     finish the majority of our productions by the -- or at

7     least for any priority custodians, by the end of --

8          THE COURT:  But there are only five priority

9     custodians?

10         MR. RECKERS:  Right.  So by the end of April

11    we'll finish those --

12         THE COURT:  Right.  How many total custodians

13    were you asked for?

14         MR. RECKERS:  54.  And we'll finish those, we

15    believe, almost everything by June with some -- perhaps

16    some exception files into July, with the goal of the August

17    1st discovery cutoff.

18         THE COURT:  So you propose to give them the

19    materials that they've asked for by the -- before they can

20    use them?

21         MR. RECKERS:  Well, I think what we're aiming

22    for, the goal is to have all the custodians basically

23    complete --

24         THE COURT:  I understand.  But you're opposing

25    any -- any adjustments to the discovery plan, but you're

DONNA DAVIDSON     (775) 329-0132

TRANSCRIBED FROM DIGITAL RECORDING

1    acknowledging that you can't produce anything in time for

2    them to use it until the discovery cutoff.

3              So, you know, that impresses me as not a fair

4    position.

5              MR. RECKERS:  I think -- and when it asked for a

6    priority custodian, a custodian to be finished, we've been

7    able to do so in two weeks.  And we think we're able to do

8    that.  So two weeks before whatever date they've noticed

9    for their deposition.  And that's proven to be true for the

10   first four or five depositions that have been noticed.

11             We think we can continue that pace.  We think we

12   can finish all of the 54 custodians substantially by a

13   month before discovery ends, giving us another month window

14   for any files that, for whatever reason, didn't process

15   correctly, whatever needs special handling, then, of

16   course, you know, other things that come up in the course

17   of depositions as identified as production items to -- then

18   we'll have that month window to finalize the production at

19   the end.

20             And maybe it is the case that there will be

21   things produced in that last month --

22             THE COURT:  Because everybody's nightmare is to

23   take a bunch of depositions and then have a subsequent

24   document production and find out there's some game changer

25   that needs to be reexamined with everything you've done

TRANSCRIBED FROM DIGITAL RECORDING

28

1    before.  And that's not efficient, and that is what

2    especially the defense side in your position usually tries

3    to avoid.

4              MR. RECKERS:  And, believe me, we are trying to

5    avoid that.  And I think that, you know, if it is the case

6    that there is a late production, we're happy to work with

7    plaintiff's counsel in remedying the issue.

8              And even if we stick to the schedule that we

9    have, we are able to produce in that timeframe, it's

10   possible, though, there could be depositions after the

11   cutoff, a slight, you know, one- to two-month amount of

12   wiggle --

13             THE COURT:  You just don't want an open-ended

14   procedure here?

15             MR. RECKERS:  We just -- we want a targeted end

16   date so this doesn't just go on and on.  So it --

17             THE COURT:  Right.  But they're entitled to a

18   fair amount of discovery to identify the problem and the

19   merits of their claims.

20             And that's what I'm grappling with here, to

21   accomplish your objective, which is not to run your company

22   into the ground with so much discovery that it's cost

23   prohibited but, on the other hand, giving the plaintiff a

24   fair opportunity, in their due process rights, to explore

25   their claims.

1           MR. ALLEN:  Completely agree.  And I know the

2    defendants have no intention of hiding back anything that

3    would preclude the plaintiffs from showing their case.

4           I simply note that in addition to the 2 million

5    pages of documents, they have now 72 complete environments,

6    which is a substantial, substantial number.  In fact,

7    that's over 3.8 terabytes of data which, in my mind, and

8    maybe we're incorrect, and we could get corrected, but --

9           THE COURT:  Of a thousand --

10           MR. ALLEN:  -- that seems to be a --

11           THE COURT:  Of a thousand --

12           MR. ALLEN:  -- by far large enough sample to

13    understand the scope of what they belive the problem is.

14    Because with those environments or those silos, they can

15    basically see exactly what Rimini did for those clients.

16    And they can see --

17           THE COURT:  As long as you don't take a position

18    that those aren't truly representative of the environments

19    as a whole.  And that's what their -- you know, that's what

20    their problem is, that's fine if I limit discovery.  And

21    you say but it's so limited it doesn't mean anything.

22           And that's why I'm kind of urging you folks to

23    talk about your respective self-interests in limiting the

24    discovery, giving them what they need in order to get full

25    and effective relief if they win, and stopping the bleeding

TRANSCRIBED FROM DIGITAL RECORDING

30

1    if you do.

2              MR. ALLEN:  I know the Court's noted, because

3    it's in the documents, the size of the discovery that's

4    been done to date.  And I guess one of the issues that I

5    would suggest to the Court and to all the parties is that

6    with those kinds of -- as other counsel said, the

7    conceivable discovery that we've already produced, yes, you

8    could have their 11 experts go through and endlessly look

9    through that.

10             It seems appropriate that with the type of

11   discovery that's been done to date there's more than enough

12   there to have those 11 experts go through that within the

13   discovery plan that's been set forth by the Court to do

14   it --

15             THE COURT:  The question is will you agree to be

16   bound by a finite sample?  Will you agree to a common set

17   of facts that makes the finite sample meaningful for an

18   ultimate resolution of the case?

19             MR. ALLEN:  Well, I certainly can confer with

20   the client.  But I presume they definitely would agree to a

21   certain set of facts.  They would say:  This is what we do,

22   and this is what we have done.

23             THE COURT:  And giving them an opportunity to --

24             MR. ALLEN:  Where the disputes will be, you

25   know, was there a day that for one extra day the consumer

TRANSCRIBED FROM DIGITAL RECORDING

1    used his -- through our -- through Rimini, used his

2    password to access the database of Oracle?  Could that have

3    happened?  I don't know.  It could have.  Will Oracle jump

4    all over that and line that up and say:  Look at all these

5    instances of abusing our website?  I'm sure that's what

6    they'll have to do.

7             But the truth is if you stack up all the

8    evidence that we have, and been produced, you get a picture

9    that's quite different than the *SAP* case.  You get a

10   picture of a company that's legitimately doing the things

11   that they're allowed to do under the scope of the license

12   agreement and, in good faith, I believe, trying to do that

13   without getting the ire of Oracle.

14            And if there's a way that the parties can sit

15   down and do what Your Honor suggests, which is to say

16   here's a representative sample, here's exactly what we do,

17   let's have the dispute over whether or not we can do that,

18   let's have -- and I think it's a great idea to have

19   dispositive motions maybe on the issue of the scope of the

20   license.  Can we do this or can't we?  We say that we can.

21   We say consumers have a right to have this; and Oracle says

22   no.

23            And that's a legitimate dispute for the parties

24   to have before you start going into, you know, these

25   unseemly numbers of 20 terabytes of data and where the

TRANSCRIBED FROM DIGITAL RECORDING

1    damage is.

2          The truth is this case is somewhat simple

3    really.  Can consumers allow a third party to come in and

4    help them with their Oracle software?  And what can be done

5    to get that done?  And what can you access?

6          Rimini's position is you can access everything

7    that you're allowed to access under the scope of your

8    license agreement.  When your license agreement ends and

9    your service agreement ends, that's it.  You can't go past

10   that --

11         THE COURT:  Can you identify the universe of

12   your license agreements that you are operating under that

13   leads you to take that position?

14         MR. ALLEN:  I presume there would be license

15   agreement for every client, which I would think for --

16         THE COURT:  Are they --

17         MR. RECKERS:  It's Oracle's license agreement.

18   So it would be the standard Oracle license agreement.

19   Unless -- they may have different agreements for every

20   customer.  Maybe they do.

21         But that's the premise of what Rimini does, is

22   look and understand the scope of the license agreement.

23   That licensee has a right to make a copy, has a right to

24   tinker and fix its software to the extent it can, I

25   suppose.

TRANSCRIBED FROM DIGITAL RECORDING

1           And Rimini's niche, which is a very niche and

2   demand, apparently, is to not have consumers have to be

3   handcuffed to the company that made the software and to

4   allow third parties to come in.

5           A typical example is, I learned today, the

6   Detroit Public School System.  They save a tenth of their

7   budget because they can have third-party people come in and

8   help tweak their HR system without having to pay an extreme

9   high price of Oracle to do it.

10          And that's just an example of why I think the

11  law will support this premise that licensees can do this as

12  long as it's within the proper scope of the license.  And

13  that's really what this patent suit's going to be about.

14          So to answer Your Honor's question how do we

15  grapple with this large discovery issue, I think the --

16          THE COURT:  Well, I'm trying to explore whether

17  the defendants are willing to -- you want a limitation on

18  discovery, but with the limitation on discovery comes the

19  fairness consideration for the plaintiff -- for both sides.

20          But if you can reach an accomodation and

21  agreement on stipulated facts and stipulated terms of

22  agreements upon which you base your respective positions to

23  get it to a summary judgment motion, that can only be

24  effective if your side of the table is willing to be bound

25  by, systemwide, the result of that effort; in other words,

TRANSCRIBED FROM DIGITAL RECORDING

1    and not take the position that the representative sample

2    that we agreed upon is not adequately represented or a

3    resolution of this fraction doesn't resolve the whole of

4    what it is that we are doing.

5              MR. ALLEN:  Well, I think our client can agree

6    in premise to that sample, although our client also wants

7    to preserve and has the right to show that that is accurate

8    and to show the types of --

9              THE COURT:  I got that.

10             MR. ALLEN:  -- things that show their defense.

11             THE COURT:  But -- that's what I'm saying.

12   That's why you -- you can't have it both ways.

13             You can't tell them to limit discovery to a

14   small fraction of what it is that they have good cause to

15   believe you're doing and then say that their discovery on

16   that fraction that you convince the Court to limit you to

17   isn't representative of what you're doing as a whole.

18             MR. ALLEN:  I agree.  And I would add to that, I

19   don't believe -- because the scope is so significant, I

20   think there's enough out there that the parties have plenty

21   to show their case, both on the plaintiffs and perhaps on

22   the defendants.

23             I think the issue for today is that we have a

24   scheduling order in place, there really isn't, in fact, a

25   motion in front of the Court to change the scheduling order

TRANSCRIBED FROM DIGITAL RECORDING

1    yet --

2              THE COURT:  That's because I've allowed the

3    parties to present motions through this mechanism instead

4    of filing a formal motion.

5              MR. ALLEN:  Yeah.  And I think that's helpful.

6    And I would suggest, respectfully, that we have these dates

7    in place, let's work with the dates we have to get

8    everything done and then to talk, as Your Honor suggested,

9    to get it to.

10             I think it's literally the plaintiff's

11   responsibility to do the discovery it needs to do for its

12   case within the times the rules allow.  And, sure, every

13   plaintiff, especially every big one, would love to have

14   that go on indefinitely because it's the purpose of a

15   patent case sometimes to really put pressure on a smaller

16   company.

17             And the Court's obligation obviously is to

18   balance that, to make sure it's fair and appropriate.  I

19   think that the time that the Court's given, which is now

20   that they filed over a year ago, there's a lot out there.

21   And there's a lot --

22             THE COURT:  No, except you haven't been able to

23   produce on your end.

24             MR. ALLEN:  Pardon me?

25             THE COURT:  Except until very recently you

TRANSCRIBED FROM DIGITAL RECORDING

1    haven't been able to produce on your end.

2            MR. ALLEN:  Well, I note that what's produced

3    today is -- and within the next few weeks, will be 2

4    million pages of documents and these environments and all

5    the terabytes of the information that was used from the

6    Oracle website.

7            THE COURT:  I understand.  But we started off

8    with a plan that didn't contemplate that it would take you

9    up to this point to get where you are here today.

10           So I believe in deadlines and I believe in

11   schedules, and I push people to adhere to those.  But I

12   also believe to be as fair as possible to both sides and,

13   within the limitations of my intellect, I try to do that.

14           MR. ALLEN:  Well, as long as we are fairly

15   keeping a watch on how much discovery is being demanded,

16   and today it seems to me it's been fair, it's been

17   remarkably overwhelming in its -- in the amount.  The

18   amount of data obviously we have already out there that has

19   been produced is more than people can perhaps get their

20   hands around.

21           But given that large amount that's out there, I

22   am confident that both sides should be in the range where

23   they can tell their story.  I think defendants, of course,

24   want to say let's not get out of hand, you have the picture

25   of what's happened.  In my view and the defendant's view,

TRANSCRIBED FROM DIGITAL RECORDING

37

1    the plaintiffs want to say, well, no, let's find

2    everything.  Because this isn't how the *SAP* case--

3                THE COURT:  No, counsel for plaintiff just --

4    that's the first place where I started with him.  And he

5    assured me that that is not the intention, that they want

6    to understand the universe before they narrow it to get the

7    issue towards resolution.

8                MR. ALLEN:  Well, just to line these things up,

9    I think, respectfully, they do really, truly have maybe

10   that universe.

11               They've got 70 some of the environments,

12   which -- which is a significant --

13               THE COURT:  But they deposed a --

14               MR. ALLEN:  -- number of all the environments.

15               THE COURT:  -- a 30(b)(6) witness who said:  I'm

16   only familiar with a fraction of this, and you have to look

17   at all the pieces together.

18               MR. ALLEN:  Well, the environments in and of

19   themselves reveal and tell a story.  That's what their

20   computer scientists and his 11 full-time helpers are doing.

21   They're going through forensically and deciding here's what

22   was downloaded, here's what was used when.

23               And I presume they intend to show here's why

24   it's beyond the scope of what should have been allowed and

25   what Rimini shouldn't have been able to do.

TRANSCRIBED FROM DIGITAL RECORDING

1    And it would be wonderful for them if they could

2    take out of 20-some terabytes of data, you know, 300

3    episodes of going two days beyond the password lockout

4    date, or using something a little bit beyond what you

5    should have.

6    And that's basically what this case, I assume,

7    will come down to now.  Because you don't have what the *SAP*

8    case was, which was someone kind of grabbing lots of stuff

9    and perhaps using it in a way that was beyond the scope of

10   those licensees.

11   Now you have a situation that you have a whole

12   new model that is trying to do, within the rules, exactly

13   what's allowed; and so Oracle now has to show all the many

14   episodes of copying something where you technically should

15   not have, or used a password when you really should not

16   have.

17   And that's kind of what seems to be the reason

18   we have so much more discovery needed now, in addition to

19   what's been provided, because they want to be able to find

20   all those episodes, line them up, and tell their story with

21   that.  And that's kind of where we are, from what I could

22   see.

23   So, yes, our client is willing to produce

24   everything to make sure the plaintiff can tell their story,

25   but it's not willing to have discovery go on indefinitely.

39

1    And so far that doesn't seem to be a real demand or need to

2    go even beyond the time we have set in the scheduling

3    order.  We still have the whole summer left.

4              And I know that plaintiffs probably want to do a

5    lot more depositions than they ever said they needed to do

6    early on, or maybe it's just a handful or more, but it's

7    definitely -- it looks to me that we're about to have that

8    situation where pretrial discovery is about to consume and

9    overwhelm anything that could be had and hoped for at

10   trial.

11             And I just make sure the Court's mindful of that

12   calculation by large plaintiffs in patent cases to do that

13   precise thing.  And it seems like we're getting really

14   close to that happening.

15             THE COURT:  All right, Mr. Allen.

16             And I'll give counsel the last word to respond

17   here because I think you've both got an inkling of how I'm

18   pushing you to organize this.

19             MR. HOWARD:  Well, I think it's helpful, Your

20   Honor.  Very briefly.

21             I understand that my colleague may be newer to

22   the case, and so there's a couple of factual clarifications

23   I want to make.

24             And I want to be very clear.  We do not, as I

25   stand here, have the tools, or even close to it, to do the

TRANSCRIBED FROM DIGITAL RECORDING

40

1    analysis that we need to do, even for a sample.

2              We need to have the population, we need to have

3    the things that the 30(b)(6) witness identified, we need to

4    have the custodian documents, we need to depose some number

5    of the developers.

6              We gave Your Honor an Exhibit B, which was a

7    document that I used -- I deposed the 30(b)(6) witness a

8    couple of weeks ago, when she told me that you need to go

9    work out all these other things.

10             And if you look through it, in her testimony, is

11   not what counsel just said.  It's not meticulous.  It's not

12   by customer.  It's not according to the license.

13             But in order to figure that out -- and if I

14   could just for one second use Exhibit B as the example, in

15   a note on page 2 of Exhibit B, it says:  Birdville ISD

16   confirmed they do not need this update.

17             Well, you have to go to three other documents

18   and go through the notes to understand that Birdville

19   software was the software that was used to create the

20   update.  If that note wasn't in Exhibit B, you wouldn't

21   know on the face of it that one customer's software has

22   been used to create a fix to send to another customer.

23             So that was an example.  But that's the work

24   that you have to do with enough developers, with enough

25   fixes in order to do an extrapolation with documents we

DONNA DAVIDSON    (775) 329-0132

1    don't have, data we don't have, environments we don't have,

2    just to run them through.

3              And the declaration we provided to the Court,

4    Mr. Hicks' declaration, is unrebutted.  And we asked him:

5    How long will it take you, once you get this stuff, to do

6    the statistical analysis?

7              And his answer was eight months for that.

8              The licenses are not the same.  They're legacy

9    companies; PeopleSoft, J.D. Edwards, Siebel.  So they vary.

10   But the one thing they are consistent about is you cannot

11   use the software to support another customer.

12             So whatever other arguments there may be about

13   everything else, I think that fix analysis, which

14   unfortunately is the most time-consuming, is where we're

15   going to be focusing.

16             THE COURT:  All right.  Counsel, I'm going to

17   set this matter for a status check after April 29th, which

18   is the deadline that the defendants have committed to

19   make -- to produce a significant amount of additional

20   discovery.

21             I'm going to give the plaintiff some adjustment

22   to the discovery plan and scheduling order deadlines in the

23   matter.  And I'm going to require the parties to meet and

24   confer to determine whether you can come to an agreement of

25   some type of reasonable bifurcation that will limit the

TRANSCRIBED FROM DIGITAL RECORDING

42

1    scope of discovery to get to a resolution on a stipulated

2    set of facts or elsewhere on portions of the case to make

3    it more manageable and time and cost efficient for both

4    sides.

5           And there are a lot of arrows in my quiver, but

6    this case is not going to take two and a half years to

7    finish for discovery.  And what your expert might want to

8    do is the ideal case and what your expert is going to be

9    stuck with is another thing.

10          And the defense, again I've tried to be as

11   explicit as I can, if you want a limitation, you're going

12   to live with that limitation.  It's going to have a binding

13   effect on you.  And so it would seem to me that you have

14   mutual interests in seeing if you can agree on common

15   protocols to get the case to resolution with a reasonable

16   amount of discovery and analysis on a stipulated set of

17   facts or a representative sample of data and accounts that

18   you're concerned about.

19          Perhaps you can and perhaps you cannot.  But I'm

20   not going to give open-ended discovery.  The plaintiff has

21   made a convincing case that more is needed.  But I'm also

22   not going to allow you to do an infinite amount of analysis

23   and calculation on terabytes of documents for an

24   undefinable period of time.

25          So I hope that gives you some guidance.  I am

TRANSCRIBED FROM DIGITAL RECORDING

1    going to give them some adjustments.  And that's, in large

2    part, because you're producing on a rolling basis and have

3    not been able to keep up the schedule on your end.

4           And so I am not going to unreasonably compress

5    the time the plaintiff has to review and analyze data

6    because of your client's inability to produce more faster.

7           Because I could say -- if they already had the

8    universe, I could say throw as many people as you need to

9    throw at it, to do it.  It's been done to me when I was on

10   your side of the table.

11          So been there and done that, folks.

12          Let me give you a date in approximately mid-May

13   and see where we are, see if you have a proposal for

14   managing this case in chunks that make it less expensive

15   for everybody and more likely to get you, if not full

16   relief, at least perhaps incremental relief.

17          Mr. Miller, do we have a date for a status

18   check?

19          COURTROOM ADMINISTRATOR:  Yes, Your Honor.  This

20   matter will be set for status check on Tuesday, May 17th,

21   2011, at 9:00 a.m.

22          THE COURT:  Okay.  And I strongly urge you to

23   confer in person.  I know e-mail is *de rigueur*, but it's

24   really difficult to come to a meeting of the minds and

25   communicate on concepts of any depth.  At least it is for

TRANSCRIBED FROM DIGITAL RECORDING

44

1    me.

2            So we'll see you back, see if we have some

3    substantial progress and if we have a proposal for trimming

4    this down into more manageable parts.

5            And if not, that's what I get paid the big bucks

6    to decide.

7            All right.  Thank you for appearing here,

8    counsel.  Good day.

9            COURTROOM ADMINISTRATOR:  All rise.

10        (The proceedings concluded at 10:49 a.m.)

11                    *    *    *

12

13

14

15

16

17

18

19

20

21

22

23

24

25

45

1                              -o0o-

2         I certify that the foregoing is a correct

3     transcript from the electronic sound recording

4     of the proceedings in the above-entitled matter.

5

6     _____       __11/22/16__

7         Donna Davidson                          Date

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DONNA DAVIDSON    (775) 329-0132