1

1              UNITED STATES DISTRICT COURT
                    DISTRICT OF NEVADA
2        BEFORE THE HONORABLE PEGGY A. LEEN, MAGISTRATE JUDGE

3

4    ORACLE USA, INC., a Colorado       :
     corporation; ORACLE AMERICA,       :
5    INC., a Delaware corporation;      :
     and ORACLE INTERNATIONAL           :No. 2:10-cv-0106-LRH-PAL
6    CORPORATION, a California          :
     corporation,                       :
7                                       :
           Plaintiffs,                  :
8                                       :
         vs.                            :
9                                       :
     RIMINI STREET, INC., a Nevada      :
10   corporation; and SETH RAVIN, an    :
     individual,                        :
11                                      :
           Defendants.                  :
12   _____    :

13

14                 TRANSCRIPT OF STATUS CONFERENCE

15

16                        May 17, 2011

17

18                      Las Vegas, Nevada

19

20
     FTR No. 3B/20110517 @ 8:58 a.m.
21

22
     Transcribed by:        Donna Davidson, CCR, RDR, CRR
23                          (775) 329-0132
                            dodavidson@att.net
24

25   (Proceedings recorded by electronic sound recording,
     transcript produced by mechanical stenography and computer.)

TRANSCRIBED FROM DIGITAL RECORDING

2

1                    A P P E A R A N C E S

2    FOR THE PLAINTIFFS:

3    BOIES, SCHILLER & FLEXNER LLP
     KIERAN P. RINGGENBERG
4    1999 Harrison Street, Suite 900
     Oakland, California 94612
5    (510) 874-1000
     Fax: (510) 874-1460
6    kringgenberg@bsfllp.com

7    BOIES, SCHILLER & FLEXNER LLP
     RICHARD J. POCKER
8    300 South Fourth Street, Suite 800
     Las Vegas, Nevada 89101
9    (702) 382-7300
     Fax: (702) 382-2755
10   rpocker@bsfllp.com

11   MORGAN LEWIS & BOCKIUS LLP
     GEOFFREY M. HOWARD
12   One Market, Spear Street Tower
     San Francisco, California 94105
13   (415) 442-1000
     Fax:  (415) 442-1001
14   geoff.howard@morganlewis.com

15   JAMES C. MAROULIS (By telephone)
     Oracle Corporation
16   500 Oracle Parkway
     Redwood City, California 94070
17   (650) 506-4846
     jim.maroulis@oracle.com

18

19
     FOR THE DEFENDANTS:
20
     SHOOK, HARDY & BACON LLP
21   B. TRENT WEBB
     2555 Grand Boulevard
22   Kansas City, Missouri 64108
     (816) 474-6550
23   Fax: (816) 421-5547
     bwebb@shb.com

24

25

TRANSCRIBED FROM DIGITAL RECORDING

3

1                    A P P E A R A N C E S (Continued)

2

       SHOOK, HARDY & BACON LLP
3      ROBERT H. RECKERS
       600 Travis Street, Suite 3400
4      Houston, Texas 77002
       (713) 227-8008
5      Fax: (713) 227-9508
       rreckers@shb.com

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

TRANSCRIBED FROM DIGITAL RECORDING

**4**

1          LAS VEGAS, NEVADA, MAY 17, 2011, 8:58 A.M.

2                          --oOo--

3                    P R O C E E D I N G S

4

5          THE COURT:  Good morning.  Please be seated.

6          COURTROOM ADMINISTRATOR:  Your Honor, we are now

7   calling the status conference in the matter of Oracle,

8   USA., Inc., versus Rimini Street, Inc.  The case number is

9   2:10-cv-0106-LRH-PAL.

10          Beginning with plaintiff's counsel, counsel,

11   please state your names for the record.

12          MR. HOWARD:  Good morning, Your Honor.  Jeff

13   Howard, from Bingham McCutchen, for plaintiff.

14          MR. RINGGENBERG:  Good morning, Your Honor.

15   Kiernan Ringgenberg, from Boies, Schiller & Flexner, for

16   the plaintiffs.

17          MR. POCKER:  And, Your Honor, Richard Pocker,

18   also from Boies, Schiller & Flexner, for plaintiffs.

19          MR. RECKERS:  Good morning, Your Honor.  Rob

20   Reckers for the defendant, Shook, Hardy & Bacon.

21          MR. WEBB:  Good morning.  Trent Webb, Shook,

22   Hardy & Bacon, for the defendant.

23          COURTROOM ADMINISTRATOR:  And, Your Honor,

24   Mr. James Maroulis appears telephonically for the

25   plaintiffs.

TRANSCRIBED FROM DIGITAL RECORDING

5

1              MR. MAROULIS:  Good morning, Your Honor.

2              THE COURT:  Good morning, counsel.

3              All right.  We're on calendar on the status

4     conference.  And we've made some substantial progress, but

5     we still have some discovery impasses.

6              So I have read your status report.  I think I

7     have a handle on what your disputes are.

8              But let me hear first from plaintiff.  Who will

9     be addressing Oracle's position?

10             MR. HOWARD:  Your Honor, Jeff Howard.

11             We have divided up the issues.  And so depending

12    on how Your Honor would like to proceed, I'll be handling

13    the response to the defendants' issues.

14             Mr. Ringgenberg will handle our issues.

15             And we thought it might make sense to spend a

16    couple of minutes talking with Your Honor about where we

17    are in the meet-and-confer process.  So in whatever order

18    is your preference.

19             THE COURT:  Certainly.

20             MR. HOWARD:  Okay.

21             THE COURT:  Go ahead.

22             MR. HOWARD:  With respect to the meet-and-confer

23    then, the parties have made a lot of progress and have been

24    working hard, as I hope is evident from the statement and

25    the correspondence that we attached.

1          From our perspective, there are really two

2   separate but overlapping issues that we're working on.  One

3   is how can we narrow, going back to our discussion at the

4   last -- the case management conference, and how can we do

5   that in a way that reduces the need for the discovery in

6   the time that we were asking the Court for at the last

7   statement.

8          Separate but related from that is the issue of

9   even if we are able to reach some agreement, what will be

10  necessary in order to assess the subset of materials and

11  put on the -- call it the trial balloon or the sample proof

12  that we'll need.  And I think that's an issue that the

13  parties are still also actively discussing.

14          And so if we come back -- if the Court agrees

15  with the parties that another status conference is

16  appropriate in about 45 days, and if we come back, our hope

17  then is that we will have resolved, for good or bad, the

18  current impasses and the meet and confer -- and I won't

19  call them impasses, they're not really, we're just -- we

20  just haven't gotten all the way through it.

21          And that we'll also be able to say, and our hope

22  is that we will have reached agreement and then will then

23  be able to say that that impacts and reduces the need for

24  further time, then whether we feel there would be a need

25  for additional time beyond what we're asking the Court for

TRANSCRIBED FROM DIGITAL RECORDING

7

1    on a stipulated basis today, we don't know.  And we're

2    certainly going to try to have that be -- not be the case.

3            But I just wanted the Court to be clear it's not

4    necessarily the case from our perspective that reaching

5    agreement on the -- in the meet-and-confer process would

6    obviate the need for additional time or some additional

7    discovery.

8            And it may depend on what the contours of the

9    meet-and-confer agreement are.

10            With respect to the issues themselves, and I

11    think there are really two of them that we're focused on

12    now -- and for the Court to know, and I think the Court --

13    the parties agree on this, we've had these letters, we've

14    had these in-person and telephonic meet-and-confers.  We're

15    now at the point where we will draft a stipulation so that

16    we're going to reduce the discussions that we've had and

17    start working on the details of the language.  Because

18    without that, it's hard to refine things down to their --

19    the precision that's needed to know if we have agreement or

20    not.

21            Two issues I think that are going to be

22    particularly challenging for the parties to get through.

23    The first is how to reduce the set of licenses and test

24    those license terms, test the defendants' license defense

25    in defense to the alleged infringement.

1           And I think there maybe the parties are just

2    coming at it from opposite directions.

3           From Oracle's perspective, we think that a set

4    of infringement or a set of conduct has to be selected and

5    then the licenses that relate specifically to that conduct

6    can be tested.  And in that way you get an entire universe

7    of conduct, alleged conduct, and defense.

8           The way we understand the defendants' proposal

9    so far, they would like to select a set of license terms

10   that are representative and apply that to whatever conduct

11   is selected.  And we think that that disconnect isn't going

12   to work.

13          We're still working on that.  But the good news

14   is we've narrowed down the issues.  We think we have a

15   general agreement on the concept of how we're going to go

16   about it.  And I'm hopeful that we'll be able to work

17   through these obstacles.

18          THE COURT:  My impression when I was reading

19   your discussion in the joint status report is that each

20   side is vying to require the other side to show first.

21          MR. HOWARD:  Well, that may be -- that may be a

22   fair way of looking at it.

23          And I think the question really from our

24   perspective is do you get to associate a license with

25   conduct that doesn't necessarily relate to that license?

TRANSCRIBED FROM DIGITAL RECORDING

9

1          And, you know, there may be some other creative

2     things we can do to get through that.  The other -- the

3     other issue --

4          THE COURT:  Are there a variety of different

5     kinds of licenses, or is the license -- is there a license

6     or a specimen license?

7          MR. HOWARD:  I think that's the question.  Or do

8     you manufacture a specimen license?

9          In other words, do you try and generate a

10    license that in its aggregate doesn't exist but is

11    nevertheless in its terms representative of the incidence

12    of those terms in the overall population?

13         THE COURT:  Kind of a claim construction for

14    license agreement?

15         MR. HOWARD:  Yeah.

16         THE COURT:  Okay.

17         MR. HOWARD:  That's a fair way of looking at it.

18    So there's more work to do there.

19         The other issue that I think has been

20    challenging the parties is how to select and then

21    extrapolate the conduct that is going to be tested through

22    this process.

23         And there, part of it is a logistical issue and

24    a statistical issue that we just need to get down to the

25    nitty-gritty of.

TRANSCRIBED FROM DIGITAL RECORDING

10

1          Part of it, though, is understanding what that

2    conduct is that's going to be tested.

3          And from our perspective, we've had a couple of

4    depositions now that have been important depositions that

5    have been postponed because of late and large document

6    productions shortly in advance of the original scheduled

7    date, a lot of documents that have been produced as the

8    defendants are trying to meet their deadlines.

9          And so we're hard at work going through there to

10   make sure that we understand what set of conduct we would

11   include in these issues that would be subset issues to

12   test.

13         Right now we are not confident that we

14   understand all of them.  And things tend to change, as

15   things do, as you go through discovery.  And so that is

16   just going to take a little time to work through.

17         I don't think it should hold up the drafting of

18   the stipulation.  But it is going to be down to the wire, I

19   think, at least to get through them -- that material, get

20   through some -- the next two or three depositions so that

21   we can be comfortable that we've got the right set of

22   conduct that would be -- even though it's a subset, that

23   would then be tested and extrapolated out to the business

24   activity as a whole at Rimini Street.

25         I think that's my summary of where we are.  We

TRANSCRIBED FROM DIGITAL RECORDING

1    think that drafting the stipulation, working hard, coming

2    back in 45 days we should know where we have agreement and

3    where we don't and what that means for what we may think we

4    need to do for the rest of the case.

5              THE COURT:  Thank you.

6              Does defense counsel wish to respond to that

7    summary?

8              MR. RECKERS:  I'll just say that Mr. Howard's

9    summary is a fair one, that the parties have been working

10   together very hard.  We're down to really the issues of

11   extrapolation and how that relates to licenses and where

12   it -- getting to the point where we can start putting the

13   details on paper and seeing really where we are.  How do we

14   extrapolate, then also consider the full scope of the

15   various, in very different licenses, provisions that are

16   out there.

17             It's -- it took a long time to get to this

18   point.  We're there.  And I think, you know, we're going to

19   continue to work to iron that additional detail out.

20             THE COURT:  All right.  Thank you.

21             Why don't we take the discovery disputes kind of

22   in the order in which they're in -- represented in the

23   joint status report.

24             MR. HOWARD:  If I may, Your Honor --

25             THE COURT:  Sure.

TRANSCRIBED FROM DIGITAL RECORDING

1        MR. HOWARD:  -- before we get to that, just --

2   the point that I --

3        THE COURT:  This is Mr. Howard for the record.

4        MR. HOWARD:  -- probably is clear is that the --

5   the parties are jointly requesting a two-month extension of

6   the case schedule.

7        And there's only one aspect of that that isn't

8   agreed.  And that is the last day to amend the pleadings.

9   And so we can take that up now or at the end, however Your

10  Honor prefers.

11       THE COURT:  That's fine.  I'm going to grant you

12  the request for your adjustment.

13       So let me hear the remaining dispute on the

14  motion to amend the pleadings.

15       MR. HOWARD:  The remaining dispute is that the

16  one date to amend the pleadings, there are a couple of

17  reasons why we think that date should move along with the

18  rest of the schedule.

19       The first is we're still working through a lot

20  of discovery that has just recently been produced.  And we

21  don't know yet whether that discovery would lead to

22  additional parties or claims.

23       The parties that it could lead to are additional

24  plaintiff entities, affiliated Oracle plaintiff entities

25  that would be the proper plaintiffs for a claim relating to

TRANSCRIBED FROM DIGITAL RECORDING

1    international infringement.

2              At the time that the complaint was filed, the

3    defendants' operations were essentially domestic, and in

4    the interim time they've expanded globally, and we're

5    actively assessing whether there would be a claim similar

6    to what we have already filed but simply extend beyond US

7    borders that would require a different plaintiff.

8              In addition they have said that they would begin

9    service on a different Oracle product line, the E-Business

10   Suite, which is not currently part of the case, and that

11   they would supplement their discovery responses.

12             The letters from last fall from September

13   indicated that they would be doing that in April.  Not the

14   amendment but they would begin the service on the product

15   line in April.

16             And so we'd like to get their supplemental

17   discovery responses so that we can evaluate whether that

18   product line should be part of the case or not.

19             And so for those reasons, and the ones that we

20   gave in the CMC, we think it would just be appropriate to

21   move that date along with the others.

22             THE COURT:  Yes, sir?

23             MR. RECKERS:  Rimini's -- from Rimini's

24   perspective, the reason they agreed to this extension in

25   the first place was so we could work on limiting the issues

TRANSCRIBED FROM DIGITAL RECORDING

1    in dispute, narrowing the case down to something that could

2    be tried, so by extending the opportunity to add parties

3    for -- in the case of adding the additional product line

4    that only expands the case.  And so it was, you know,

5    obviously an objective beyond the purpose of our

6    agreement, and that's why Rimini hadn't agreed to that

7    particular -- or didn't join that particular request for an

8    extension.

9            As to the other product line, the new product

10   line, I understand that they haven't begun offering that

11   product yet.  It's perhaps a little delayed than they

12   first, you know, put out in the press release.

13           So I don't know exactly when they plan to

14   release it.  Still, even if they release it towards the end

15   of discovery here, that would, again, extend the

16   litigation, which is not Rimini's objective.  And we're

17   hoping that we could get discovery in the case to continue

18   to proceed and not to be expanded.

19           THE COURT:  On this one, I side with counsel for

20   defendants on this.

21           The objective of the Court is to get a

22   manageable case to trial in a manageable period of time.

23           And no doubt the parties may have future

24   disputes, but there's got to be some time in which the

25   pleadings in this case close so that this case can be

TRANSCRIBED FROM DIGITAL RECORDING

1    presented to the trier of fact and a reasonable resolution

2    reached.

3              So I'm going to grant your request for an

4    extension of time with the exception of the deadline to

5    extend the time for amending the pleadings or adding

6    parties.

7              Okay.  And next in order?  Mr. Kiernan --

8              MR. RINGGENBERG:  Kiernan Ringgenberg, Your

9    Honor, for the plaintiffs.

10             I would like to address Oracle's two requests

11   for -- relating to discovery.

12             We agreed in the fall that each party would

13   produce documents from 54 custodians, so e-mails, instant

14   messages, files from an individual computer, 54 people.  We

15   agreed if material new information came to light, that

16   number could be revisited.

17             The state of the record when that agreement was

18   made was the foundational discovery we took at the

19   beginning, a couple depositions, a limited set of

20   documents.

21             The testimony, as it stood at that time, was

22   that Rimini Street's practice was never to cross-use

23   customer software in the process of developing updates.  So

24   if they were developing a software update for the City of

25   Flint, Michigan, they would use only the City of Flint,

TRANSCRIBED FROM DIGITAL RECORDING

16

1    Michigan's software and no other customer's.

2              That's what Mr. Slepko's deposition testimony

3    had stated, rather unequivocally; and if they needed to

4    provide that same update to a different customer, they

5    would repeat the process using that customer's software.

6              What the evidence shows that we've uncovered

7    since then is that's not really accurate and that many

8    instances, if not most, Rimini Street uses software from

9    one customer to develop and distribute updates to other

10   customers.

11             So using the City of Flint, Michigan's software,

12   develop and distribute software upgrades to as many as

13   dozens or hundreds of other customers.

14             And in Oracle's view, this is unlicensed

15   conduct, copyright infringement, plain and simple.

16             The -- in order to discover the extent of this,

17   we require the files of the people who actually do the

18   work.

19             When we agreed to 54 custodians, we had a very

20   small sample of the actual developers, a handful in the

21   custodian set.  We've since come to learn that that sample

22   is not sufficient of the group of 25 or so individuals who

23   have this job at Rimini Street in order for us to

24   understand what they do, even on a sampling basis.

25             So our request is for nine additional

TRANSCRIBED FROM DIGITAL RECORDING

1    custodians, who we have identified by name, for Rimini

2    Street.  We asked for 10.  We reached an agreement as to --

3    or we agreed to exclude one based on information Rimini

4    provided.  So we have a request for nine more people, which

5    is frankly not an onerous burden to produce e-mails and

6    documents from nine additional people.

7              Rimini Street's arguments are this is cumulative

8    because we have documents from other individuals who have

9    the same job.

10             But Rimini Street has produced hundreds of

11   software updates.  And each of the developers works on

12   different ones.  And so the question we have to answer is

13   what is the -- what is the extent of the disputed practice?

14   How often do they do it?  And we can't answer that by

15   looking at the files of only a handful of people.

16             We're not asking for them all, by any stretch,

17   but we need a reasonable subset in order to test the issue.

18             If I could, Your Honor, the second issue we have

19   is the number of depositions.  And it's closely related.

20   So if it's okay, I would address that as well.

21             THE COURT:  Please.  And if you'll just address

22   everything that you're requesting, and then I'll let the

23   defendants respond, and we'll do the flip --

24             MR. RINGGENBERG:  Sure.  Oh, you would like --

25   Okay.

TRANSCRIBED FROM DIGITAL RECORDING

18

1          THE COURT:  -- of that.  That's fine.

2          MR. RINGGENBERG:  Very good.

3          THE COURT:  Sure.

4          MR. RINGGENBERG:  The number of depositions

5   is -- the Court ordered 20 depositions per side.  Rimini

6   Street has offered to provide six additional customer

7   depositions.

8          Oracle's request is for six additional party

9   depositions and to allow the customer depositions to

10  proceed by an hour limit rather than by a number.  And let

11  me explain why.

12         As with regard to the six additional party

13  depositions, the core reason is the same I just gave, which

14  is Rimini Street has 25 developers, approximately, and we

15  need to take depositions of a significant subset of them to

16  understand their process.  We can't do that with the 20

17  depositions currently scheduled.

18         I should add that of the two that have been

19  counted to date, they were the original foundational

20  depositions we did really without any documents.  The total

21  time for those two foundational depositions was less than

22  five hours.

23         So in our view, it's really a request for only

24  four real merits depositions.  And we don't want to fight

25  about how they're counted.  But that's really what the

1    substance of it is.

2            And the reasoning is the same, which is there

3    are hundreds of fixes.  And even to address a subset of

4    them in the negotiated resolution of the process that

5    Mr. Howard discussed, we need to have enough confidence at

6    least as to a subset of the universe as we understand how

7    it works and what they did.

8            And that's really not possible with the 20

9    depositions we have because we need to cover, among other

10   things, a couple third parties, some finance people, some

11   salespeople, people related to the other product lines.

12   And if you add all that up, there's just not enough left

13   over to do this fairly detailed PeopleSoft development

14   issue that otherwise go undone.

15           With respect to customers, Rimini Street has or

16   has had more than 300 customers.  Rimini Street's defense

17   hinges on an argument in certain respects that the

18   customers would have left Oracle and would never have come

19   back to Oracle regardless of their infringement.  Discovery

20   from the customers obviously is centrally relevant to that

21   issue.

22           I think Rimini Street doesn't dispute that, they

23   just -- the question is how many is an appropriate number

24   to take?  How many depositions of customers is an

25   appropriate number?

1       We would say they have three different product

2  lines, three entirely different products.  So if we only

3  had six depositions, that's only two per product line,

4  which isn't -- it's hard to say is representative in any

5  sense.

6       We're not going to take every customer's

7  deposition.  It wouldn't be possible.  But we need to take

8  a sufficient number so we understand the inputs and what

9  matters.

10      And so in our view, if we -- Rimini Street is on

11  board with 42 hours for six depositions, and if we had 42

12  hours, then we could divvy up into depositions that lasted

13  one or two hours apiece, that would give us a reasonable

14  number so that we could have a sample across their

15  different product lines and across the different criteria

16  that the customers used.

17      Let me give you a couple other examples.  The

18  PeopleSoft product, which is the majority of the customers,

19  some people use it for finance issues, some people use it

20  for human resources.  They're really different products.

21      So if we only have two depositions for

22  PeopleSoft, really that be would be one per product.  Many

23  of their customers came from TomorrowNow, which was

24  Mr. Ravin's previous business, which had a similar business

25  model.

TRANSCRIBED FROM DIGITAL RECORDING

1          For those customers the causation issues are

2   different than customers that left directly from Oracle.

3          So for us to get a smattering of all those

4   different categories, six really doesn't do it.  We think

5   42 is a reasonable number.  And if -- or 42 hours is a

6   reasonable number of hours, divided up probably among one

7   or two hours apiece, which is what our experience in the

8   *SAP* shows -- *SAP* case shows you can't do in a reasonable

9   and efficient manner.

10          THE COURT:  Thank you.

11          MR. RINGGENBERG:  Thank you.

12          THE COURT:  Let me hear the defendants'

13   response.

14          And then I'll turn the page and let you tell me

15   what you're asking for.

16          MR. RECKERS:  Start with the --

17          THE COURT:  Mr. --

18          MR. RECKERS:  Excuse me?

19          THE COURT:  And your name for the record?

20   You're Mr. Webb?

21          MR. RECKERS:  Pardon?

22          THE COURT:  Your name for the record, since the

23   record --

24          MR. RECKERS:  Okay.  My name is Rob Reckers.

25          THE COURT:  Mr. Reckers.

1            MR. RECKERS:  Starting with the additional

2     custodians that they've requested.  And the issue here

3     remains the reasonable discovery limits.

4            We negotiated 54 custodians.  By the way, that's

5     almost one-third of Rimini's total employee head count.

6     They've got about 170 employees.  So it's a substantial

7     percentage of the -- of my client's employees have already

8     been -- had their documents collected and in the process of

9     being produced.

10            As you may have noticed, we are closing in on

11     over three and a half million pages of produced documents.

12     And that's in addition to numerous noncustodial sources,

13     large other data stores that we've produced in various

14     forms.

15            So that includes, on the custodian side, a large

16     number of -- a fairly decent number of people in this

17     development organization that Mr. Ringgenberg was

18     discussing; and on the noncustodial side many, many sources

19     that will show how the -- how the updates and fixes are

20     created more than sufficient for them to test the alleged

21     cross-use that Mr. Ringgenberg discussed.

22            And so we come to the parties' original

23     agreement, the idea of the safeguard that new custodians

24     would only be added if there was material new information.

25            And we don't have that here.  We don't have

1    specific pieces of information, unique pieces of

2    information that a custodian has that was unanticipated

3    when we made the deal originally.

4            There's no specific person to -- you know,

5    Mr. So and So worked on this project and he may have

6    documents as to that particular update, which is -- which

7    is of particular interest to us, and it's not contemplated

8    by the rest of the set.

9            But there's details that they've asked for these

10   developers over a numbers year period, over 300 search

11   terms against their various data sources, and what it does

12   is it multiples discovery.  It makes it so nine additional

13   custodians take additional time to collect, to produce, the

14   expense, the burden, and there's going to be more

15   depositions.  There's only been six depositions taken so

16   far.

17           Every deposition will tend to be additional

18   information that -- and they see that some other person

19   might have some information, that person might not be on

20   the custodian list.

21           So for just the certainty and maintaining the

22   reasonable limits that we originally agreed to, Rimini

23   would request that that be original of 54 could be

24   maintained, absent some very specific, unique piece of

25   information that some non -- nonidentified custodian may

1    have.

2            Moving on to the depositions, the issue that's

3    most troubling to Rimini that -- more problematic to Rimini

4    is the customer deposition.  So I'll start with that one.

5            You know, from our perspective, this is no

6    different than any other typical IP case where the IP owner

7    intends to argue that the sales, the defendants' sales, are

8    driven by the acts of infringement.  That happens to almost

9    every patent case.

10           Just as patent cases don't typically include

11   some substantial set of customer discovery, there's no need

12   for that type of additional huge bucket of discovery in

13   this case.

14           As is typically the case, third parties can be

15   brought in a reasonable manner.  Here we suggested six

16   customer depositions.

17           THE COURT:  Out of 300 that you have?

18           MR. RECKERS:  Out of 300.  They've already all

19   been subpoenaed.  Almost all of them.  They're in the

20   process of subpoenaing the customers.

21           The testimony, I think, will generally be the

22   same.  The demand for the product can be shown in different

23   ways, you know, with the exemplary testimony and also

24   through the documents, through marketing experts, or

25   whatever kind of experts may be produced to show what the

25

1    demand for my client's product is and, you know, whether or

2    not it is, in fact, a sub -- driven by the alleged act of

3    infringement.

4            And six depositions is over half of what a

5    typical case would be.

6            And probably more fundamentally, the hours-based

7    approach that Oracle suggests, 42 hours of 20 to 40

8    depositions, is just -- would be extremely burdensome, both

9    to the parties and also to the nonparties.  The expense of

10   going all over the country taking these, what are sure to

11   be, short depositions, the cost and the burden of that are

12   not proportional to the benefits.  So Rimini would request

13   that a reasonable limit be set as opposed to an hours-based

14   approach.  And we would suggest that number should be about

15   six.

16           Turning to the additional custodian depositions,

17   it is related to the request for more custodians in that,

18   again, it's the issue of reasonable limits.  Oracle's taken

19   six depositions.  Now they want six more on an interim

20   basis.

21           They argue that there's inconsistencies in the

22   testimony; that there were -- that the 30(b)(6) witness

23   defer to other people with other personal knowledge.

24           That's always going to be the case.  We're

25   always going to be -- it's always going to be different

TRANSCRIBED FROM DIGITAL RECORDING

1    people who know different things.

2              But the Court's limit of 20 depositions

3    appropriately required the parties to tailor and focus

4    their requests, and so Rimini would suggest that that limit

5    be held in place.

6              THE COURT:  And let me turn now to what Rimini

7    is asking for in terms of your discovery impasses.

8              MR. RECKERS:  Sure.

9              So Rimini has propounded a couple of written

10   discovery requests seeking protective measures -- details

11   on protective measures in Oracle's website meant to protect

12   against the types of damaging traffic that Rimini has

13   alleged to have initiated.

14             And just by way of background, Oracle's claim is

15   that Rimini flooded their website in a way that calls some

16   of the intermediate servers, nine servers in particular, to

17   experience periods of temporary impairment.

18             So it's not a case where the machines were

19   trashed, where they had to be replaced, or had to bring in

20   a repairman.  We have a period of alleged temporary

21   repairman.  And so that will, of course, be a subject of

22   expert discovery.

23             Now, what Rimini -- Rimini has asked for, for

24   those nine servers, what measures were in place to prevent

25   excessive traffic from hitting them.  Now, in typical web

TRANSCRIBED FROM DIGITAL RECORDING

1      scenario, especially one for a website as large as

2      Oracle's, there are governing mechanisms in the network to

3      prevent this very damage.

4              Oracle explains in their brief that they have

5      such traffic governor's in their website, and their website

6      is designed for tens of thousands of users.

7              Obviously if tens of thousands of users are all

8      using the website, there needs to be some mechanisms in

9      place to regulate and control the traffic.  So Rimini has

10     tailored its request to focus just on the nine machines

11     that were allegedly impaired and to also -- we've asked for

12     the types of security measures that would be typically used

13     to govern the traffic going to the machine.

14              And why that's relevant is if, in fact, those

15     machines are working, and if they are, in fact, controlling

16     the rate of the test -- of the traffic, I think it would

17     tend to show that the machines were not damaged, that

18     Rimini's traffic was slowed to a place where -- within

19     tolerances, of what would be expected to handle the

20     machine.

21              I'll give you an example.  The -- one of the --

22     one of the elements of many of the CFAA claims is the

23     intent to damage.

24              Well, if Rimini's traffic is within -- if the

25     rate of it is within the tolerances that the governors have

TRANSCRIBED FROM DIGITAL RECORDING

1    set, it would be hard to show that we actually intended to

2    break the machine with the type of traffic that we

3    propounded.

4            Oracle's position is that the request is, at

5    best, overly broad.  And they point to, you know, the size

6    of their network.  They have a large computer network.  And

7    that's true.  But that can't be a basis for withholding all

8    discovery on the types of protective measures that would

9    slow down the traffic.

10           We haven't listed every single protective

11   measure.  No demand.  An easier -- an easy example is

12   anti-virus.  We didn't list anti-virus.  We listed things

13   like rate controllers and bandwidth limiters and router

14   configurations.  A router is a device that actually manages

15   the flow of the traffic.

16           So if we could figure out how they were

17   controlling the traffic, we'll able to see whether or not

18   it was within sort of the norms or the parameters that the

19   network set up.

20           What Oracle's produced, the transaction logs.

21   They've produced records indicating what actually made it

22   to the server.

23           That doesn't identify any of the protective

24   measure.  That doesn't tell us how that traffic got to the

25   machine when it did.  What we need is the next -- the

TRANSCRIBED FROM DIGITAL RECORDING

1    intermediate step, the device that would have basically

2    pushed it to the machine before it got there and the

3    machine -- the device that would have been designed to

4    control how fast they've gotten to that machine.

5              So from our perspective, the request is as

6    tailored as we can possibly make it with the information we

7    had.  We are not asking for a -- as they suggest, a roadmap

8    for hackers to break into the security system.  We just are

9    looking for identification of these mechanisms so that we

10   can keep -- take further discovery and more tailored

11   discovery as to how those mechanisms control the rate --

12   controlled the rate of the Rimini traffic to be something

13   that our expert can consider when he answers the question

14   of whether or not this traffic could have caused the

15   alleged damage.

16             THE COURT:  Thank you.

17             And the opposing view, Mr. Howard?

18             MR. HOWARD:  Thank you, Your Honor.  Let me

19   start with the statement at page 16 of the CMC statement by

20   the defendants.

21             Contrary to what to Mr. Reckers just said, we

22   didn't withhold all responsive material, and we didn't

23   refuse to produce.  We did produce, in their words, a,

24   quote, subset of responsive material.  That's from them.

25             Now, we don't think that there's anything more

TRANSCRIBED FROM DIGITAL RECORDING

1    that is required because, number one, it isn't relevant;

2    number two, the request is overbroad and burdensome; and,

3    number three, for the confidentiality concerns we've

4    addressed in the statement.  And let me touch on each of

5    those briefly.

6             We're focusing on the distinction, which we

7    think is the right distinction, between the impact to the

8    databases that hold this material that they downloaded and

9    the protective measures which are employed in the web

10   system through which somebody goes to get to the server

11   that houses the database that, in turn, houses the

12   materials that they downloaded.

13            The claim of impairment, the claim of impact

14   relates to the database on the server that holds the

15   material, database lockups at that database level.

16            It doesn't relate to the web system, the portal,

17   the way you go through from the outside to get to that

18   server and that database.

19            That system is a systemwide measure.  It -- you

20   know, everybody, every company has routers.  Every company

21   has all kinds of things that govern their Internet traffic.

22   But that's not our claim.  That's not what we're talking

23   about.

24            So the reason we think it's not relevant is that

25   it doesn't matter what protective measures were installed

TRANSCRIBED FROM DIGITAL RECORDING

31

1    at that outer layer of the web portal to take traffic in

2    and direct it to the server that has the database that has

3    the materials.

4            It doesn't matter whether there was something

5    there or there was nothing there.  Because under the CFAA

6    and the analogous state law claims, if they were not

7    authorized, and if they went in and they caused damage or

8    impairment to the data or to the computer, then they're

9    liable.

10            And that would be true whether we had the

11   world's greatest system and it was the National Security

12   Agency or if there was nothing there.

13            And so they ask in their statement -- again, I'm

14   referring now to page 16 of their statement, they ask:  How

15   plausible is it -- or maybe this is page -- yeah, page 16:

16   How plausible is it that Rimini's activities damaged

17   Oracle's servers in the manner claimed if Oracle has those

18   measures in place?

19            Well, the answer is that the measures are not

20   what determines that question.  What determines that

21   question is looking at the amount of traffic hitting the

22   database and the impact on the database.

23            And we have produced all of the logs that we

24   have for the six months prior, the period during, and the

25   six months after.  And what they show is, if you look at

1    the logs, and if you track them into a chart, they show in

2    comparison virtually no activity coming into those

3    databases, an almost imperceptible amount of activity.

4              And then they show 1.3 million or 1.5 million

5    hits into that server at that time from the defendants' IP

6    address and then drops back down, and that period of that

7    intense activity is what forms the basis of the claim.

8              And that's what we think is the relevant

9    material and what they concede is at least a subset of the

10   responsive material.

11             So, again, to the bank analogy, if the bank's

12   security system goes down and they break in and they take

13   the money, they still broke in and take the -- took the

14   money.  Whether the security system's working or not has

15   nothing to do with that activity.  And we think that is

16   exactly the right analogy here.  So that's the relevance

17   point.

18             As to the overbreadth, and I've touched on it,

19   they say that they're focused on just the nine servers that

20   we've identified.  But it isn't really possible, so far as

21   we know right now, to isolate the measures that they're

22   talking about from the broader global system of Internet

23   traffic regulation and security to those nine servers.

24             They're behind the Internet portal, just like

25   all other databases are that house these kinds of materials

TRANSCRIBED FROM DIGITAL RECORDING

1    that they don't, so far as we know right now, have their

2    own independent, discrete, protective measures of the type

3    they're describing.

4            So really what we're talking about, and the

5    reason we think it's overbroad and burdensome, and

6    certainly not something you could do in an interrogatory

7    response, is we're talking about a global network of

8    hundreds of machines and dozens of applications that are

9    involved in this outer layer of Internet security.

10           Finally, the confidentiality reason that we've

11   expressed.  We think that even if the Court were to agree

12   with the defendants that there was some limited relevance

13   to this material, it is the case that there's a balance

14   that has to be made, and even when there's a protective

15   order in place what they're asking us to disclose is

16   exactly our security systems for our entire outer network

17   security, and we think that that would be, if in the wrong

18   hands, inadvertent as it may be, would create terrible

19   problems and competitive harm for Oracle.  And given what

20   we think is no relevance but, at best, limited relevance,

21   the Court should weigh that in the balance and deny the

22   request.

23           THE COURT:  Thank you.

24           Well, counsel, I sincerely appreciate, first of

25   all, your efforts to meet and confer and the civility with

TRANSCRIBED FROM DIGITAL RECORDING

34

1    which you continue to present your respective disputes.

2    And I appreciate that these are significant issues on both

3    sides.

4              With respect to Oracle's request for nine

5    additional custodian documents, that request is denied.

6              With respect to Oracle's request for 42 hours of

7    Rimini customer deposition, that request is granted.

8              Rimini's request to limit the number of

9    depositions to six customers, however, is denied;

10             And the plaintiff may take up to 20 customer

11   depositions, limited to two hours in duration.

12             The request for additional custodian depositions

13   is denied at this time.  The defendants are correct that

14   you've only taken a limited number of depositions in this

15   case.  You still have a long way to go.

16             And on this record I'm not going to give you any

17   more depositions.  I'll leave the door open a crack, in the

18   event you do persuade me that there's new material

19   information that's not duplicative of the discovery you've

20   been allowed.  But at this point you're not going to be

21   allowed that additional number of depositions of the

22   opposing counsel.  Especially I'm persuaded because of the

23   number of custodians that have already been allowed in this

24   case and the relative sizes of Rimini's workforce in this

25   matter.

1            And with respect to Rimini's request for the

2   additional discovery concerning Oracle's protective

3   measures, I find that that, the likely benefit of that

4   discovery is outweighed by its burden.  It is broad.

5            Rimini has requested and received information

6   that was responsive to its requests.  And especially given

7   the extremely sensitive nature of what you're requesting

8   measured against the value of what it's likely to show and

9   your ability to obtain information about the damages from

10  other sources, I concur with Oracle that no further

11  discovery with respect to that should be permitted.  So

12  your request to compel that further discovery is denied.

13  Okay?

14            I will give you the follow-up status conference

15  that you've requested on June 28th.

16            Mr. Miller, could you check what the schedule

17  is, and give them a time.

18            COURTROOM ADMINISTRATOR:  Your Honor, we can

19  schedule this matter for Tuesday, June the 28th, 2011, at

20  9:30 a.m., in this courtroom.

21            THE COURT:  Anything further, counsel for

22  plaintiffs?

23            MR. RINGGENBERG:  No, thank you, Your Honor.

24            THE COURT:  Counsel for defendants?

25            MR. RECKERS:  Nothing for us.

TRANSCRIBED FROM DIGITAL RECORDING

36

1          THE COURT:  All right.  Thank you for appearing

2     here today.

3               Good day now.

4               COURTROOM ADMINISTRATOR:  All rise.

5          (The proceedings concluded at 9:37 a.m.)

6                         *   *   *

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

37

-o0o-

    I certify that the foregoing is a correct

transcript from the electronic sound recording

of the proceedings in the above-entitled matter.


_____     _____
    Donna Davidson                              11/22/16

    Donna Davidson                              Date