1

1           UNITED STATES DISTRICT COURT
                 DISTRICT OF NEVADA
2       BEFORE THE HONORABLE PEGGY A. LEEN, MAGISTRATE JUDGE

3

4   ORACLE USA, INC., a Colorado      :
    corporation; ORACLE AMERICA,      :
5   INC., a Delaware corporation;     :
    and ORACLE INTERNATIONAL          :No. 2:10-cv-0106-LRH-PAL
6   CORPORATION, a California         :
    corporation,                      :
7                                     :
          Plaintiffs,                 :
8                                     :
        vs.                           :
9                                     :
    RIMINI STREET, INC., a Nevada     :
10  corporation; and SETH RAVIN, an   :
    individual,                       :
11                                    :
          Defendants.                 :
12  _____  :

13

14

                    TRANSCRIPT OF STATUS CONFERENCE
15

16

                        November 8, 2011
17

18                      Las Vegas, Nevada

19

20
    FTR No. 3B/20111108 @ 9:00 a.m.
21

22
    Transcribed by:        Donna Davidson, CCR, RDR, CRR
23                         (775) 329-0132
                           dodavidson@att.net
24

25  (Proceedings recorded by electronic sound recording,
    transcript produced by mechanical stenography and computer.)

TRANSCRIBED FROM DIGITAL RECORDING

2

1                    A P P E A R A N C E S

2    FOR THE PLAINTIFFS:

3    BOIES, SCHILLER & FLEXNER LLP
     KIERAN P. RINGGENBERG
4    1999 Harrison Street, Suite 900
     Oakland, California 94612
5    (510) 874-1000
     Fax: (510) 874-1460
6    kringgenberg@bsfllp.com

7    BOIES, SCHILLER & FLEXNER LLP
     RICHARD J. POCKER
8    300 South Fourth Street, Suite 800
     Las Vegas, Nevada 89101
9    (702) 382-7300
     Fax: (702) 382-2755
10   rpocker@bsfllp.com

11   MORGAN LEWIS & BOCKIUS LLP
     GEOFFREY M. HOWARD
12   One Market, Spear Street Tower
     San Francisco, California 94105
13   (415) 442-1000
     Fax:  (415) 442-1001
14   geoff.howard@morganlewis.com

15   JAMES C. MAROULIS (By telephone)
     Oracle Corporation
16   500 Oracle Parkway
     Redwood City, California 94070
17   (650) 506-4846
     jim.maroulis@oracle.com

18

19
     FOR THE DEFENDANTS:
20
     SHOOK, HARDY & BACON LLP
21   ROBERT H. RECKERS
     600 Travis Street, Suite 3400
22   Houston, Texas 77002
     (713) 227-8008
23   Fax: (713) 227-9508
     rreckers@shb.com

24

25

TRANSCRIBED FROM DIGITAL RECORDING

3

1              A P P E A R A N C E S (Continued)

2    FOR THE DEFENDANTS:

3    LEWIS ROCA ROTHGERBER LLP
     W. WEST ALLEN
4    3993 Howard Hughes Parkway, Suite 600
     Las Vegas, Nevada 89169
5    (702) 949-8230
     Fax: (702) 949-8364
6    wallen@lrrlaw.com

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

TRANSCRIBED FROM DIGITAL RECORDING

4

1          LAS VEGAS, NEVADA, NOVEMBER 8, 2011, 9:00 A.M.

2                              --oOo--

3                      P R O C E E D I N G S

4

5               COURTROOM ADMINISTRATOR:  All rise.

6               THE COURT:  Good morning.  Please be seated.

7               COURTROOM ADMINISTRATOR:  Your Honor, we are now

8    calling the status conference in the matter of Oracle, USA,

9    Inc., versus Rimini Street, Inc.  The case number is

10   2:10-cv-0106-LRH-PAL.

11              Beginning with plaintiff's counsel, counsel,

12   please state your names for the record.

13              MR. RINGGENBERG:  Kiernan Ringgenberg, Boies,

14   Schiller & Flexner, for the plaintiffs.

15              MR. HOWARD:  Jeff Howard, from Bingham,

16   McCutchen, for the plaintiffs.

17              MR. POCKER:  Richard Pocker, Boies, Schiller &

18   Flexner, for the plaintiff.

19              MR. RECKERS:  Rob Reckers, Shook, Hardy & Bacon,

20   for the defendants.

21              MR. ALLEN:  And West Allen, from Lewis & Roca,

22   for the defendants.

23              THE COURT:  This is the time set for the status

24   hearing.  I have read all of your voluminous material

25   supporting your joint case management report in this

TRANSCRIBED FROM DIGITAL RECORDING

5

1     matter.

2          As a housekeeping matter, two things.  Counsel,

3     I remind you, please, if you're going to file something

4     that's over 50 pages, provide a courtesy copy to chambers

5     so that I can have a prayer of reading everything before

6     the hearing in the matter.  My eyes are too old frankly to

7     read that many pages online.  And I have access to it and

8     so forth, but if you will please do that.  And that saves

9     my staff from being tied up making copies for me.

10         Second, if you will consult our newly amended

11    local rules on filing matters under seal, there is a

12    specific provision -- rather than giving me courtesy copies

13    with omitting the sealed documents or not filing the sealed

14    documents, the local rule permits you to file documents

15    under seal contemporaneously with a motion requesting that

16    the matter be kept under seal.

17         So unless you have the most extraordinary

18    document that you have a fear will be exposed if I don't

19    grant your motion, in which case don't rely on it, just go

20    ahead and file them contemporaneously with the motion to

21    seal so that it doesn't require duplicate filings and so

22    forth.

23         All right.  With that, by way of minor

24    housekeeping issue aside, let me take up the four discovery

25    disputes that are listed.

TRANSCRIBED FROM DIGITAL RECORDING

6

1          And I did see that an emergency motion for

2     protective order was filed, which I'm not going to address

3     today, but I'll talk to you about a briefing schedule and

4     how much of an expedited basis a decision is needed.

5          So let me hear first from Oracle concerning its

6     request to compel an amended response to Interrogatories

7     No. 20 and 25.

8          MR. RINGGENBERG:  Thank you, Your Honor.  The

9     relevance of the material requested by Interrogatories 24

10    and 25 is not disputed.  It goes straight to one of

11    Rimini's central defenses.

12         The problem with the response is this.  There's

13    a very short substance free narrative response, has a list

14    of folders with very generic and unspecific descriptions

15    about what was done with them.  Let me just read you an

16    example.

17         One folder, quote, has materials relating to

18    PeopleSoft software that may have been used in building

19    environments for a particular client.

20         That is the substance.  That is not an answer to

21    the interrogatory.  Certainly it's not a nonevasive

22    complete answer, which is what the rules require.

23         The substance of Rimini's response is contained

24    in a list of 1,200 documents, most of which are e-mails and

25    electronic -- instant messages, which are, in many cases,

TRANSCRIBED FROM DIGITAL RECORDING

7

1    entirely irrelevant.  I don't know how the list was

2    compiled, but, you know, we've attached some examples of

3    ones that really have nothing to do with the question.

4              There are some on the list that are clear

5    enough.  There are some that are ambiguous.  But even the

6    ones that are clear enough, Rimini Street's witnesses have

7    disputed exactly what the e-mails say and mean.

8              So there's an example.  Attached as Exhibit I to

9    Mr. Howard's declaration is an e-mail in which Rimini

10   employees asked, "Please copy the following Oracle CDs to

11   this specific location."

12             He replies, "I have done what you asked.  I have

13   copied it to the specified location."

14             But when confronted in his deposition, he

15   refused to admit that that's what he did.  And he said,

16   "Well, for all I know, I could have had a separate

17   conversation, maybe my e-mail's referring to a different

18   copy or a different location" --

19             THE COURT:  "I don't remember."  I know what the

20   e-mail says.

21             MR. RINGGENBERG:  Right.  And I want to

22   distinguish between him saying "I don't remember that

23   situation so I can't tell you anything," that might be a

24   fair enough answer, but he did more than that.  He

25   attempted to undermine the point that the e-mail actually

TRANSCRIBED FROM DIGITAL RECORDING

8

1    did say by disputing, well, saying, "Look, for all I know,

2    there were other conversations that show that this e-mail

3    doesn't really mean what it seems to mean."

4            And if witnesses are going to do that, then it

5    entirely undermines the point of referring to documents in

6    this way.  If you had --

7            THE COURT:  You want --

8            MR. RINGGENBERG:  -- (inaudible) to business

9    records --

10           THE COURT:  -- an interrogatory response that

11   binds the defendant to what their position is on this

12   issue?

13           MR. RINGGENBERG:  That's exactly right, Your

14   Honor.  We're entitled to know what the facts are, or at

15   least what they say the facts are -- and if -- we probably

16   will disagree with what they say, but at least we know what

17   their position is and we can dispute it at trial -- as

18   opposed to affording them the flexibility to stand up at

19   trial and say, "Well, yes, that's what the document is, but

20   that's not really what it means, our interrogatory answer

21   really meant something different."  And that's the kind of

22   dispute we're trying to avoid.

23           And I will say, the vast majority of e-mails are

24   either irrelevant or, frankly, difficult to discern.  And

25   that's another reason why the answer can't be provided.

TRANSCRIBED FROM DIGITAL RECORDING

9

1        I want to make one other point, which is there's

2   a bit of a side show in the papers about the deletion of

3   these materials that -- they were -- there's no dispute

4   that they were deleted shortly before this lawsuit was

5   filed.  We do believe that that was a violation of their

6   duty to preserve evidence.  But that's not the issue we're

7   presenting.

8        What we want now is an answer to the

9   interrogatory.  We do intend to file, at an appropriate

10   time, request for relief for what we regard as spoliation;

11   and our understanding is the right procedure is to follow

12   that with the district court at the in fact discovery

13   absent further direction from the Court.

14        So I don't want to get sidetracked with that

15   issue now, although Rimini has addressed it in the papers.

16        THE COURT:  Thank you.

17        Let me hear the opposing view.  Mr. Reckers.

18        MR. RECKERS:  Yes.  Your Honor, from Rimini's

19   perspective, we've given them everything we have to these

20   particular questions.

21        We've interviewed the witnesses.  We have

22   compiled the brief narrative to provide a high-level

23   summary in a folder-by-folder basis.  We've also identified

24   the specific and regularly kept business records of those

25   requests.  We've listed them separately in our response.

TRANSCRIBED FROM DIGITAL RECORDING

1           But we also went and we searched a larger

2    database of responsive information for these e-mail --

3    primarily e-mails, this list of 1,200 -- 1,200 documents.

4    And it was compiled through targeted searches to yield the

5    relevant results.

6           Let me tell you why we had to go through

7    e-mails.  What they've asked for is every instance -- every

8    type of software that is in these folders -- Oracle

9    software in these folders over a long period of time and

10    how they were used, specific uses of that content over

11    time.

12           It's not something that individuals are actually

13    going to remember.  I'll show you some examples in the

14    documents that Oracle puts forward in their declaration.

15    But this is the only source of the information.  It's not

16    that the witnesses are going to be able to tell us, oh,

17    yeah, in 2009, I copied this folder to this location or

18    this particular client.

19           So we did the targeted searches.  They've asked

20    for a lot of information, and we have a lot of documents.

21    It's the same database that we produced 6 million pages

22    from, for example.  So it's a huge database.

23           We culled it down as narrowly as we could to

24    provide them all the responsive information that we have.

25           Mr. Ringgenberg says that the vast majority of

1    them are irrelevant and don't actually answer the question.

2    I'll dispute that.  Each of these documents --

3              THE COURT:  Well, that's the rut.  If both sides

4    are reviewing the same materials in good faith, they have a

5    point that you are in superior position to understand your

6    own documents.  Not you personally, obviously, but you and

7    your client are in a superior position to understand what

8    your documents say and what they mean.

9              MR. RECKERS:  Absolutely, Your Honor.  And if I

10   would point the Court's attention to Exhibit 9 to

11   Mr. Howard's declaration, which is the first -- which is

12   the first e-mail they cite as one of the list of irrelevant

13   documents, on the very first page of that thread -- again,

14   this is the example that Oracle gives, is there's a -- it

15   says, and this is the first substantive line in the -- it's

16   the second to last page of the exhibit.  It's designated

17   with Bates number RSI04223171.

18             It says:  I have to install Oracle 10G -- sorry.

19   I have to install Oracle 10G for Experian VM, and I

20   understand that it's located at a particular file location.

21             Oracle 10G is database software that's at issue

22   in this case.  Experian is a Rimini client.  It references

23   the software for it.

24             This is Oracle's first example.  It says Oracle

25   10G software; it identifies the client, Experian; it

1    identifies the location.  There's nothing ambiguous about

2    what's in this particular e-mail.

3           The other e-mails they cite in the list -- in

4    their -- the following exhibits, E, F, and G, are all

5    talking about the same file storage, and their beef with

6    those e-mails is that they talk about nonOracle software.

7    They are not.

8           Some of our responses talked about other

9    software, nonOracle branded software.  But I don't think

10   that comprises the whole set.  We made a good faith basis

11   to identify what software was in those files.  Yes, some of

12   it might be for other software vendors.  But what we

13   attempted to do through our targeted searches, to find

14   clear examples of what happened.

15          Another example, the one we just talked about on

16   Exhibit I with the -- the Corpuz e-mail that was discussed

17   at his deposition.  He said he didn't know.

18          And they asked him, they said, "Well, can you

19   give any other explanation as to, you know, what you could

20   have meant when you said they loaded to the specific

21   location?"

22          And he did.  He tried to provide some other

23   examples.  But only when prompted.

24          THE COURT:  And you understand opposing

25   counsel's issue here?  They want to make sure that your

TRANSCRIBED FROM DIGITAL RECORDING

13

1   interrogatory answer represents the knowledge of the

2   corporation, that you're bound by it, and that you're not

3   providing an answer and then having your people back off of

4   that, when they are testifying at deposition.  And you read

5   the Corpuz deposition differently than your opposing

6   counsel.

7           MR. RECKERS:  Yes.

8           THE COURT:  You read it as saying, "I don't

9   know"; and then he was asked to say, "Well, give me

10  possible other explanations for how this could have

11  happened?"

12          MR. RECKERS:  Yes.  And, again, I think he was

13  trying to answer that question honestly.  But the gist is

14  that he doesn't know -- and that's why we have

15  interrogatories, so we, as the counsel, can pull it out,

16  look at it, and say we are not going to dispute the

17  contents here.  Mr. Corpuz didn't deny that he did this.

18  He was asked for other explanations when he said, "I don't

19  know."

20          He doesn't know.  And that's the fact of the

21  matter.  And, of course, this is a particular event that

22  happened in early 2009.  How is he going to remember it?

23  How is he going to know?  How would he say anything other

24  than "I don't know"?  Or --

25          THE COURT:  It depends on how significant of an

TRANSCRIBED FROM DIGITAL RECORDING

14

1    issue it is.

2              MR. RECKERS:  And that's certainly true.  But

3    this is -- this is something where the record is clear this

4    is what happened.  And we're not going to dispute it.  And

5    that's why we put it on our list, interrogatory response.

6              And they're -- and, you know, that's how, you

7    know, this type of discovery vehicle works.  They're free

8    to rely on it, that this is what happened.  This represents

9    a use of this software in a way that's reflected by the

10   document that we've listed.

11             THE COURT:  Was Ms. Williams deposed in her

12   individual capacity or as the corporation's Rule 30(b)(6)

13   designee?

14             MR. RECKERS:  In her individual capacity.

15             THE COURT:  And do you intend -- your response

16   to their request for an order compelling them an answer

17   says you intend to supplement the interrogatory responses

18   with her testimony.

19             MR. RECKERS:  Yes.

20             THE COURT:  And you say you intend to be bound

21   by what she has testified about.

22             MR. RECKERS:  Yes.

23             THE COURT:  Is there anyone in the corporation

24   who has superior knowledge to Ms. Williams about this

25   issue?

TRANSCRIBED FROM DIGITAL RECORDING

15

1          MR. RECKERS:  No.  And so that's -- and that's

2     one of the reasons we put it in our briefing, and the

3     deposition's transcript just went final.

4          So I think that with her testimony -- she was

5     deposed obviously on this important issue at some length --

6          THE COURT:  Are you telling me that this is the

7     best answer that your corporation can provide because she

8     is the most knowledgeable person and she has what level of

9     detail the corporation has?

10          MR. RECKERS:  Absolutely.  Yes.

11          THE COURT:  And you're bound by that?

12          MR. RECKERS:  Yes, Your Honor.

13          THE COURT:  And you're not going to claim that

14     she's incorrect?

15          MR. RECKERS:  If we put -- we're going to have

16     to put the citations down and we're going to review the

17     citations and put the ones down that the corporation will

18     be bound by.

19          And as I stand here today, my general

20     understanding is that she's correct and that is the

21     corporation's answers to these questions.

22          THE COURT:  And how soon are you going to be in

23     a position to supplement your response with her testimony

24     that's now the corporation's answer?

25          MR. RECKERS:  We can do some (indiscernible).

DONNA DAVIDSON     (775) 329-0132

1          THE COURT:  Okay.  Thank you.

2          Oracle's motion to compel amended responses to

3  Interrogatories No. 24 and 25 is granted to the extent that

4  Rimini shall supplement Answer to Interrogatory No. 24 and

5  25 with the information provided with Ms. Williams,

6  clarifying that it is the corporation's response, and

7  within 14 days of today's date, and denied in all other

8  respects.

9          I'll hear from you on your motion to compel read

10  only access to Rimini's SharePoint Internet.

11          MR. HOWARD:  Thank you, Your Honor.  Jeff

12  Howard.

13          With respect to the SharePoint materials, I

14  don't think there's any dispute that they are relevant.

15  They were not disclosed as a source of information.  We

16  found them by asking questions in deposition and then by

17  finding a remnant of a file in a personal virtual machine

18  from one of our witnesses that was the menu for the

19  SharePoint system.

20          And it was revelatory because what it shows is

21  links between the different materials that are on there

22  that are the specific materials that are central to the

23  case, the software copies that they have, the way that they

24  label those, the way that they bring them up.

25          Exhibit R to my -- to the Howard declaration is

TRANSCRIBED FROM DIGITAL RECORDING

1    that -- one of the exhibits that we used in that

2    deposition, it was Mr. Conley's deposition.

3         So there is an important category of information

4    that you can only have, and our experts can only have, by

5    seeing the interrelationship that is revealed through the

6    dynamic system that is SharePoint, how it's used, how

7    they're brought up, how they're labeled, what they mean.

8    That's how they use the software.

9         What we do have as a result violates Rule 34,

10   both because it doesn't reveal those characteristics of the

11   data as they exist in the ordinary --

12        THE COURT:  You reached an agreement at the

13   beginning of this case about what you were going to do and

14   if what you got in response to electronic request for data

15   was inadequate.  And you have a procedure in place, and

16   you've been operating under that procedure in place, to

17   request native information through files in which you

18   agreed the TIFF version of it is inadequate for purposes.

19        So how are they violating any rule when you

20   reached an agreement about "we're going to do it this way

21   at first, and then if you need something else, let us know,

22   and we'll -- we'll talk about it and provide it if we think

23   that's reasonable"?

24        MR. HOWARD:  Yeah.  And I think -- I think that

25   is all right and true as far as it goes.  And it applies,

1    and the parties have been operating under that quite well

2    with respect to individual documents, say that -- a

3    PowerPoint or an Excel file which is produced.

4              It's produced in a TIFF, you can't, you know,

5    see the dynamic character of it; you ask for it in native,

6    the parties change those in native.

7              THE COURT:  But most of the time you don't need

8    it --

9              MR. HOWARD:  We don't --

10             THE COURT:  -- but sometimes you do.

11             MR. HOWARD:  Exactly.  And when we do, we ask

12   for it, and they give it to us.

13             The difference here is that this is more in the

14   nature of a database.  And so it isn't possible to simply

15   produce the native, you know, in quotes.  That -- that --

16             THE COURT:  They represent to you that they have

17   gone through this database and searched it for responsive

18   documents and produced all documents that they believe are

19   responsive to your discovery requests.  And in every

20   discovery case you have to rely on -- I mean, you signed

21   these discovery responses under penalty of Rule 26(g), and

22   you have to rely on people doing what they said they did.

23             You have a reason to believe that they have not

24   adequately searched the SharePoint database to produce

25   responsive documents.

1           MR. HOWARD:  Yes, Your Honor.  And maybe it's me

2    misunderstanding what they're saying.  But we have not

3    heard them say, and I don't see in their papers that they

4    say, that they have comprehensively searched SharePoint for

5    all relevant and responsive materials as a source of

6    information which should have been disclosed.

7           I asked Mr. Conley at his deposition, "How do I

8    find the information behind this link?  Is there" -- and he

9    said, "The only way to do that is to go into SharePoint."

10          And I can tell you that for categories of those

11   links, either we don't have them, which in some cases is

12   true, that we do not have them, or we can't tell how what

13   we have relates to the groupings that are in SharePoint.

14          Let me give you one example of that from

15   Mr. Grigsby's deposition.

16          I asked him, "Where are the documents that are

17   in the JDE library?"

18          There's a library that he testified about, that

19   was the JDE library.

20          He said, "Well, they're in SharePoint."

21          I said, "Well, what are they?  Can you identify

22   them?"

23          "No, I'd have to look in SharePoint."

24          We asked, technically, opposing counsel --

25          THE COURT:  Can you remember the content of your

1    own office files and your own office directory?

2             MR. HOWARD:  Well, no.  It was a perfectly

3    appropriate answer.  But that -- but that's -- but consider

4    that foundational testimony.

5             So we then said, "Well, we'd like to have, you

6    know, that information."

7             And they said, "Well, we've provided it."

8             But you can't -- when you look at what has been

9    provided in the TIFF form out of SharePoint, you can't

10   associate -- this is the groupings issue, you can't

11   associate which of those documents belong in the JDE

12   library.  That is actually important to know what documents

13   he was referring to as a category, even if he couldn't

14   remember the individual ones, which ones were kept

15   generically, without a specific customer reference, in the

16   JDE software library.

17            And that's the information -- so that -- that's

18   an example where the information we would say has been

19   produced in a form, in a fashion.  But we can't match it up

20   with the witness' testimony, and we can't make a case or

21   put our evidence together as to which of those documents

22   have been kept in this library that the witness had

23   testified about and which even he said he would have to go

24   into SharePoint to identify.

25            So there's two categories.  One is the

TRANSCRIBED FROM DIGITAL RECORDING

1    information that reveals the groupings and the linkings.

2    The other is information that we don't think has been

3    produced at all and they haven't said they have gone

4    through comprehensively and searched for all of that

5    responsive and relevant information.

6              THE COURT:  All right.  Thank you, Mr. Howard.

7              Mr. Reckers, let's go to counsel's point.  Have

8    you comprehensively searched the SharePoint database for

9    all relevant and responsive documents?

10             MR. RECKERS:  Yes, Your Honor.  We believe we

11   have.

12             THE COURT:  All right.  And so now talk about

13   the -- they have a whole mass of information here.

14             MR. RECKERS:  Yes.

15             THE COURT:  You've given them a huge amount of

16   material.  They can't link -- they can't tell what Mr. So

17   and So is talking about without having access to this data

18   that -- you know, you open the file and then you can see

19   what's in the JDE library.

20             MR. RECKERS:  Absolutely.  And this is the exact

21   type of discussions that come up in every case, what was he

22   talking about in his deposition?  Can you confirm what you

23   produced and where it is?

24             And we'd be happy to, when there are issues like

25   that, to tell them.  What we've gotten is requests for

TRANSCRIBED FROM DIGITAL RECORDING

1    direct access, no list of deposition --

2              THE COURT:  That's what I understood your

3    position is, if you have a specific issue like this, where

4    is the -- what was the content of the JDE --

5              MR. RECKERS:  Yes.

6              THE COURT:  -- library that Mr. So and So

7    testified about at his deposition, you're willing to

8    provide that information.  What you don't want them doing,

9    tip-toeing through your entire internal Internet --

10             MR. RECKERS:  Yes.

11             THE COURT:  -- program?

12             MR. RECKERS:  Yes, Your Honor.  I would contend

13   that this is no different than any other dispute.  We -- or

14   any other discovery, course of discovery, where there's

15   documents that are referenced, there's a large set of

16   produced documents, produced in a way that - in this case

17   TIFF images, that are a bit different than how they're

18   actually accessed on the computer.  We have to work

19   together.  But it's not a typical case where direct access

20   to the whole database.

21             What we've done is we have searched -- we --

22   even initially, when we did our collections went through

23   SharePoint and identified the relevant groups, the groups

24   that work for Oracle products, including the JDE group, and

25   pulled down the documents that were stored on SharePoint by

1    those groups.

2              THE COURT:  And refresh my recollection.  Didn't

3    we, at the very beginning of the case management in the

4    case, talk about identifying up to 60 custodians who would

5    have relevant and discoverable information in this matter?

6              MR. RECKERS:  Yes, Your Honor.

7              THE COURT:  And you searched for those

8    custodians as well as by subject matter?

9              MR. RECKERS:  Yes.  The custodian -- so there's

10   two types of collection.  There's the custodial

11   collections, which were typically e-mails, but also things

12   from their local hard drives --

13             THE COURT:  But you -- your collection of --

14   under both methods included the SharePoint?

15             MR. RECKERS:  Well, the SharePoint's

16   noncustodial.  So it was collected from, but as a

17   noncustodial source.  It is shared by -- so the JDE group,

18   for example, has their own page on SharePoint, and there

19   are documents that the SharePoint group can share -- or

20   that the JDE group can share -- a SharePoint, by the way --

21   and you mentioned -- saw this in the papers is just a --

22             THE COURT:  You're linked to Microsoft, yes.

23             MR. RECKERS:  It's a Microsoft product.  So it's

24   not something that's unique or that Rimini has some special

25   version of.  It's just a way for employees to post

TRANSCRIBED FROM DIGITAL RECORDING

24

1    documents that other people they work with might have

2    interest in.  We've pulled the documents off the site,

3    because, as counsel says, they are -- there's no dispute.

4    These are relevant documents that are used in the course of

5    Rimini performing services at issue here.

6              THE COURT:  All right.

7              Mr. Howard, that falls in the

8    nice-try-but-no-cigar.  I'm going to deny that request for

9    essentially all rights to look at their database and

10   require you, on an individual basis, to request the type of

11   information and the level of detail that you have requested

12   to fill in the gaps rather than have complete access to the

13   database.

14             On Oracle's motion to compel two-day deposition

15   of Mr. Ravin.  Mr. Howard, I'll hear from you on that one.

16             MR. HOWARD:  Thank you, Your Honor.  We have not

17   asked for this relief for any other witness in this case.

18   We're only asking for it because of Mr. Ravin's central

19   importance.  I know Your Honor has read the papers.  I

20   think we've laid out the reasons there.

21             There's an enormous number of documents.  He's

22   been involved in the daily operations of the company from

23   the day he conceived it, right up to the current day.

24             He's a prolific e-mail writer.  There's an

25   enormous amount of material to cover and -- essentially

TRANSCRIBED FROM DIGITAL RECORDING

1  touching on every issue in the case, ours and theirs, on

2  the defenses and on his status as a personal defendant.

3          I don't want to spend more than one day with

4  him, but it's just required by the law and the material and

5  the centrality of him as a witness in the case.

6          THE COURT:  And Mr. Allen?

7          MR. ALLEN:  Good morning, Your Honor.

8          Mr. Reckers asked me to help with this one

9  issue.  It's simply rather straightforward.  Federal Rule

10 of Civil Procedure 30(d) is pretty clear, you get seven

11 hours; one day.

12          And that's particularly important for matters of

13 corporate officers.  And this is a case, as Your Honor is

14 well aware, extraordinarily large plaintiff against a very

15 small defendant.  It's 170-some employees.

16          These officers, and particularly the CEO, are

17 very critical to the operations day-to-day.  And the idea

18 of trying to distract that CEO for two days, when the rule

19 is pretty clear, give us your fair -- you have a chance for

20 a fair examination, give us your details and show good

21 cause why you need more.

22          And so far we just don't have that.  We have --

23 what we do know is that this CEO has been deposed twice

24 already by this plaintiff, that they know the background

25 information of this --

TRANSCRIBED FROM DIGITAL RECORDING

26

1          THE COURT:  And once --

2          MR. ALLEN:  -- CEO --

3          THE COURT:  -- contempt because he refused to

4    answer questions and had to go to court and get an order

5    compelling him to do that.

6          MR. ALLEN:  So he's well aware of how to get to

7    the point.

8          And the point really for this deposition is that

9    the defendants will be completely reasonable.  We think you

10   can do it in one day.  We think you should do it in one

11   day.  And if you legitimately can do it in one day and we

12   can be shown good cause of what couldn't get asked because

13   we truly were so busy with all these other things that had

14   to be asked, we'll certainly defer and talk about that if

15   it's necessary.

16         But the idea of coming in and just saying give

17   me two days because I want to talk about whatever I want to

18   talk about, it's just not appropriate for a CEO of a

19   corporation, and it's not contemplated by the rules, there

20   isn't good cause that's been shown other than we have a lot

21   to talk about.

22         Well, show us an outline.  Show us what you're

23   not going to get to, and we'll figure out a way.  And

24   that's all we've --

25         THE COURT:  I'd love to --

TRANSCRIBED FROM DIGITAL RECORDING

1          MR. ALLEN:  -- we've said.

2          THE COURT:  -- have my adversary's outline of

3     the proposed deposition --

4          MR. ALLEN:  Right.  Well, not necessarily an

5     outline, but at least the things -- the topics and why

6     specifically you don't think you can fit it in two days.

7               And, of course, if they can't fit it in two

8     days, at the end of the day we'll know they did in good

9     faith, they asked their questions, they got as fast as they

10    could, and they need some more time, we're going to be

11    amenable to doing that for some limited amount of time and

12    once they tell us what else didn't get asked.

13              But to just say I need two days because I really

14    want to talk to this guy and keep him out of this company

15    for two days, that's just not proper.

16         THE COURT:  All right.  The rules were enacted

17    and limitations imposed to try to cut some of the enormous

18    cost of discovery.  And I would agree with you, Mr. Allen,

19    if this was a rear-end automobile case or a run-of-the-mill

20    limited scope witness that the limitation of Rule 30 should

21    apply.

22              But with respect to this gentleman, who is a

23    pivotal person, both with percipient knowledge and

24    knowledge binding the corporation, I'm going to allow them

25    to -- and grant their request for up to two days, subject,

TRANSCRIBED FROM DIGITAL RECORDING

1       of course, if you believe that the examination is being

2       conducted in a manner that unreasonably annoys, harasses,

3       et cetera, or is duplicative and so forth, you have your

4       remedies under Rule 30(d) as well.

5                    But those should be exercised carefully because

6       the losing party will pay a price on a motion to terminate

7       or limit a deposition.

8                    So I understand, Mr. Allen, that your executive

9       doesn't want to be subjected up to two days.  But if

10      they're really just pronging things and asking questions

11      over and over again, you have remedies under the rule.  But

12      he's significant enough that two days is not unreasonable

13      for this case.

14                   MR. ALLEN:  Okay.  Thank you, Your Honor.

15                   THE COURT:  Okay.  And we have the request for

16      clarification concerning pretrial depositions.

17                   Mr. Reckers.

18                   MR. RECKERS:  Thank you, Your Honor.  The issue

19      here really is one of unfair surprise.  Oracle's a huge

20      corporation.  They have --

21                   THE COURT:  Sure.  And they listed about a

22      hundred people in their initial disclosures.  And so you

23      both came to me, and from day one you have been arguing

24      passionately on behalf of your client, don't let them do

25      all the discovery they want to do because it will bury my

TRANSCRIBED FROM DIGITAL RECORDING

1    client and will destroy us, just by being sued.

2              And so I listened very carefully to you, and I

3    resolved the disputes between both sides about how many

4    depositions would be allowed unless, for good cause shown,

5    more were needed.

6              And now you've taken eight depositions.  You've

7    noticed two more, or suggested two more.  And I'll give you

8    the clarification you're looking for.  But it's probably

9    not the answer you want; and that is I side with Oracle on

10   this one, that the -- that provision in my September 21st,

11   2010, order was intended to tell you if there is genuinely

12   a surprise that someone has sandbagged you and you see a

13   new name on -- in the pretrial order that you couldn't

14   reasonably anticipate having conducted thorough discovery

15   in your case within the parameters the Court allowed,

16   you're going to have an opportunity to take that.

17             But you're not going to have an opportunity to

18   take depositions in the case at -- you conclude discovery,

19   you get rulings on dispositive motions, you file a joint

20   pretrial order, and now you really take depositions in the

21   case.

22             That's not going to happen.  You're going to be

23   required to show good cause that you could not have

24   anticipated that this was a trial witness or that -- and

25   that was the whole reason.  I gave you 20 limitation that

TRANSCRIBED FROM DIGITAL RECORDING

1    both sides were jockeying about how many depositions could

2    be taken in this case.

3              I gave you the limitations, not all that you

4    wanted, but I limited the discovery they could do, buying

5    your argument they shouldn't be able to bury your client.

6    But that doesn't relieve you of the obligation to do the

7    discovery during the original discovery cutoff.

8              And then if you convince me that there is a

9    surprise and you couldn't have known that this was a

10   witness, or you didn't reasonably think this was a witness,

11   or somebody dies and somebody is substituted, or somebody

12   becomes ill and somebody is substituted, those are the kind

13   of things that what I intended and envisioned in the

14   September 21st order about the -- if you need a pretrial

15   deposition you're going to get one.  But not -- not the way

16   you're interpreting it.

17             So I hope I have given you sufficient

18   clarification of what I intended and what I am likely to

19   allow.

20             MR. RECKERS:  Thank you, Your Honor.

21             THE COURT:  Okay.  I know you don't like that

22   answer, but I'll try to be as clear as I can about what I

23   meant.

24             So we have now an emergency motion for

25   protective order.  How much of an emergency is this really?

TRANSCRIBED FROM DIGITAL RECORDING

1   This issue came up on an October 20th deposition.  Is it

2   imminently going to rear its head in upcoming imminent

3   discovery?

4           MR. RECKERS:  Yeah, we believe it will.  And I

5   think the issue came into clarity of deposition transcript

6   on the 3rd, just last Thursday.

7           And there's another deposition this coming

8   Thursday, in two days, that we don't know whether or not

9   Oracle's going to try to get in the same amount of

10  questioning.  But by that time, by next Thursday, we think

11  at least there's a potential for it.

12          And then going forward over the next three or

13  four weeks, I believe there's a total of another 10 to 12

14  depositions that are scheduled -- at least by the end of

15  the month I believe there's another 10 depositions

16  scheduled that could -- appears to be implicated by this

17  particular issue, this particular line of questions that we

18  find highly objectionable.

19          THE COURT:  All right.  So opposing counsel, how

20  long do you need to respond to the brief?  And is there

21  perhaps a way to deal with the upcoming deposition on

22  Thursday?  Is that an issue that you intend to pursue with

23  the witness to be deposed on Thursday?

24          MR. HOWARD:  I -- the answer is I don't know,

25  Your Honor.  I'm not handling that deposition.

There were a -- dozens of clients who received a communication which -- from Rimini Street, which is highly confidential. So I'm not going to disclose the content of it. But the line of questioning is directly responsive to that communication that they received from Rimini Street. That's only one basis on which we'll oppose the motion.

I'd like to get this resolved quickly. I think it's in everybody's interest. I think responding by tomorrow is a tall order. And having Your Honor rule before the deposition, which is on the East Coast on Thursday, is an even taller order.

THE COURT: I can't -- I can't do it anyway, so what's a reasonable briefing --

MR. HOWARD: But we could respond by Thursday.

THE COURT: All right. I'll have -- then give you until Thursday to respond.

Mr. Reckers, do you want a reply brief, or do you just want to orally argue it?

MR. RECKERS: I think there's no need for a reply brief.

THE COURT: All right. So, Mr. Miller, do we have some time next Tuesday?

And then if the issue comes up during the deposition, obviously you try to work it out, if you can. You're welcome to try to get me in a dispute resolution

1    conference.  But I can't promise that I'm going to be

2    available.

3           So -- but if you need an immediate resolution

4    on -- of an issue during a deposition, try to contact

5    chambers.  And if I'm available, I'll try to give you a

6    dispute resolution conference.

7           Or if you want to make sure that you have a more

8    comprehensive ruling that's not so much on the fly, I

9    suspect you can reach an accomodation about how to get as

10   much progress as you can on that witness testimony without

11   this issue, and, depending on the outcome of my ruling,

12   reserve your right to either ask questions or not.

13           MR. HOWARD:  It's a customer.  So I think we'd

14   both prefer not to inconvenience the customer for a second

15   day of deposition.  But we'll see if we can work out some

16   accomodation in the meantime.

17           THE COURT:  Okay.  All right.  So I'll do the

18   best I can.  But I can't give you a time on Thursday

19   anyway.

20           And so, Mr. Miller, do we have some time next

21   Tuesday?

22           COURTROOM ADMINISTRATOR:  Your Honor, the

23   Court's schedule in the morning of Tuesday, the 15th, at

24   this time is scheduled all the way through to 11:30.

25           But we do have the 1:30 p.m. slot available on

TRANSCRIBED FROM DIGITAL RECORDING

1    Tuesday, the 15th, if that's convenient for all parties.

2              THE COURT:  Counsel?

3              MR. HOWARD:  That's fine with us, Your Honor.

4              THE COURT:  Mr. Reckers?

5              MR. RECKERS:  Yes.

6              MR. HOWARD:  I think we would likely appear

7    telephonically, if that's okay with your Honor.

8              THE COURT:  That's fine.  Either side could

9    appear telephonically, or both sides can appear

10   telephonically, if that's more convenient for you.

11             All right.  Mr. Miller, why don't we give them

12   the 1:30 slot.  And I'll read your papers and be prepared

13   to give you a ruling from the bench.

14             MR. HOWARD:  Thank you, Your Honor.

15             COURTROOM ADMINISTRATOR:  Yes, Your Honor.  And

16   that is Tuesday, the 15th, and 1:30 p.m.  And I'll include

17   that in the minute order, to get everybody connected

18   telephonically.

19             MR. HOWARD:  Thank you.

20             We did have the issue, Your Honor, I don't know

21   if you intended to take it up, as to when the next CMC

22   would occur and whether there would be one or two between

23   now and the end of the discovery period and the time for

24   filing motions.

25             THE COURT:  Why don't we take that up on next

TRANSCRIBED FROM DIGITAL RECORDING

1    Tuesday, and I can give you some more time then.  I'm

2    holding some other people up who are waiting to be heard.

3              MR. HOWARD:  Very well, Your Honor.

4              THE COURT:  So both sides remind me, in case I

5    forget and -- about your respective proposals, and we'll

6    give you some dates.

7              Okay.  If I recall correctly, we have an April

8    of next year discovery cutoff?

9              MR. HOWARD:  No.  It's December 5th of this

10   year.

11             THE COURT:  Didn't -- wasn't -- weren't the

12   dates suggested after the district judge gave an extension

13   of the discovery plan and scheduling order deadlines?  I

14   thought there was an order that was entered -- maybe I --

15             MR. HOWARD:  There is expert discovery that --

16             MR. RECKERS:  Yeah, maybe expert discovery.

17             MR. HOWARD:  Yeah, percipient discovery is -- I

18   think the parties are in agreement, would end December 5th.

19   Expert discovery, I think, may be the date you've recited.

20             THE COURT:  Okay.  Maybe that's what I'm looking

21   at then.  Because I saw -- you requested an adjustment of

22   the deadlines back in August --

23             MR. HOWARD:  Yes.

24             THE COURT:  -- and I did adjust the deadlines.

25   But it's only for experts; correct?

TRANSCRIBED FROM DIGITAL RECORDING

36

1          Okay.  All right.  Now we're on the same page.

2          MR. HOWARD:  I think the December 5th deadline

3   was part of that package.  But it's a fact discovery

4   cutoff.  And then we'll go into April on the expert.

5          THE COURT:  All right.  We'll hear back from you

6   on Tuesday at 1:30 and go from there.

7          MR. HOWARD:  Thank you, Your Honor.

8          THE COURT:  Thank you, counsel.

9        (The proceedings concluded at 9:36 a.m.)

10                    *    *    *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

37

-o0o-

I certify that the foregoing is a correct
transcript from the electronic sound recording
of the proceedings in the above-entitled matter.

_____          11/22/16
                                         _____

Donna Davidson                              Date