BOIES, SCHILLER & FLEXNER LLP
RICHARD J. POCKER (NV Bar No. 3568)
300 South Fourth Street, Suite 800
Las Vegas, NV 89101
Telephone: (702) 382-7300
Facsimile: (702) 382-2755
rpocker@bsfllp.com

BOIES SCHILLER FLEXNER LLP
WILLIAM ISAACSON (*pro hac vice*)
KAREN DUNN (*pro hac vice*)
1401 New York Avenue, NW, 11th Floor
Washington, DC 20015
Telephone: (202) 237-2727
Facsimile: (202) 237-6131
wisaacson@bsfllp.com
kdunn@bsfllp.com

BOIES SCHILLER & FLEXNER LLP
STEVEN C. HOLTZMAN (*pro hac vice*)
BEKO O. REBLITZ-RICHARDSON (*pro hac
vice*)
1999 Harrison Street, Suite 900
Oakland, CA 94612
Telephone: (510) 874-1000
Facsimile: (510) 874-1460
sholtzman@bsfllp.com
brichardson@bsfllp.com

Attorneys for Plaintiffs
Oracle USA, Inc., Oracle America, Inc., and
Oracle International Corp.

MORGAN, LEWIS & BOCKIUS LLP
THOMAS S. HIXSON (*pro hac vice*)
JOHN A. POLITO (*pro hac vice*)
One Market, Spear Street Tower
San Francisco, CA  94105
Telephone:  415.442.1000
Facsimile:  415.442.1001
thomas.hixson@morganlewis.com
john.polito@morganlewis.com

DORIAN DALEY (*pro hac vice*)
DEBORAH K. MILLER (*pro hac vice*)
JAMES C. MAROULIS (*pro hac vice*)
ORACLE CORPORATION
500 Oracle Parkway, M/S 5op7
Redwood City, CA 94070
Telephone:  650.506.4846
Facsimile:  650.506.7114
dorian.daley@oracle.com
deborah.miller@oracle.com
jim.maroulis@oracle.com

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| ORACLE USA, INC., a Colorado corporation; ORACLE AMERICA, INC., a Delaware corporation; and ORACLE INTERNATIONAL CORPORATION, a California corporation,<br><br>Plaintiffs,<br><br>v.<br><br>RIMINI STREET, INC., a Nevada corporation; and SETH RAVIN, an individual,<br><br>Defendants. | Case No. 2:10-cv-0106-LRH-VCF<br><br>**ORACLE'S RENEWED MOTION FOR PERMANENT INJUNCTION AGAINST DEFENDANT RIMINI STREET, INC.** |

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ........................................................................... 1

II.  PROPOSED FINDINGS OF FACT ............................................... 2

    A.  Plaintiffs Oracle USA, Inc., Oracle America, Inc. And Oracle International Corporation ........................................................................ 3

    B.  Defendants Rimini Street And Seth Ravin .................................... 4

    C.  Copies Of Oracle Software And Support Materials On Rimini's Servers ............ 5

    D.  Rimini's Copying Of PeopleSoft Software And Support Materials ..................... 5

    E.  Rimini's Copying Of Oracle Database ..................................... 6

    F.  Copying of Siebel And JD Edwards Software And Support Materials ................. 6

    G.  RAM Copies ......................................................................... 8

    H.  Cross-use And Distribution Of Oracle Software And Support Material .............. 8

    I.  Software Library ............................................................... 10

    J.  Rimini's Illegal Actions Have Harmed Oracle's Reputation And Goodwill ....... 10

    K.  Rimini Has Been Evasive And Dishonest Throughout This Litigation .............. 11

    L.  Oracle Alleges Continued Infringement In *Rimini II* ........................... 12

III.  LEGAL STANDARDS ................................................................ 12

IV.  ARGUMENT ............................................................................. 12

    A.  The Court Should Enter A Permanent Injunction ............................... 12

        1.  Rimini's Infringement Has Caused And Will Cause Irreparable Injury To Oracle's Goodwill And Reputation ........................... 14

        2.  Remedies Available At Law Are Inadequate To Compensate For Oracle's Irreparable Injury ....................................... 16

i

1

**TABLE OF CONTENTS**
(continued)

2                                                                                              **Page**

3

4            3.      The Balance Of Hardships Tips Strongly In Favor Of Oracle
                     Because Rimini's Acts Have No Legitimate Business Purpose ............. 17
5

6            4.      Public Policy Favors Entry Of An Injunction Against Copyright
                     Infringers Such As Rimini ...................................................................... 18
7

             5.      Rimini's Arguments That It Has Ceased Its Improper Behavior
8                    Should Not Be Credited And Do Not Bar Injunctive Relief................... 19

9       B.      Oracle's Proposed Injunctive Relief Is Appropriately Tailored .......................... 22

10
     V.     CONCLUSION ............................................................................................................ 24
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MOTION FOR PERMANENT INJUNCTION

# TABLE OF AUTHORITIES

Page(s)

CASES

*Am. Broadcasting Cos., Inc. v. Aereo, Inc.*,
  874 F. Supp. 2d 373 (S.D.N.Y. 2012) ................................................................... 14

*Apple Computer v. Franklin Computer Corp.*,
  714 F.2d 1240 (3d Cir. 1983) ............................................................................... 18

*Apple Inc. v. Psystar Corp.*,
  658 F.3d 1150 (9th Cir. 2011) ........................................................................ 12, 14

*Apple Inc. v. Psystar Corp.*,
  673 F. Supp. 2d 943 (N.D. Cal. 2009) ........................................................... 17, 18

*BMG Music v. Gonzalez*,
  430 F.3d 888 (7th Cir. 2005) ............................................................................... 19

*Broad. Music, Inc. v. McDade & Sons, Inc.*,
  928 F. Supp. 2d 1120 (D. Ariz. 2013) ................................................................. 19

*Douglas Dynamics, LLC v. Buyers Prods. Co.*,
  717 F.3d 1336 (Fed. Cir. 2013) ........................................................................... 15

*eBay, Inc. v. Bidder's Edge, Inc.*,
  100 F. Supp. 2d 1058 (N.D. Cal. 2000) ............................................................... 17

*eBay Inc. v. MercExchange, L.L.C.*,
  547 U.S. 388 (2006) ....................................................................... 12, 13, 17, 19

*Eldred v. Ashcroft*,
  537 U.S. 186 (2003) .............................................................................................. 19

*Flexible Lifeline Sys., Inc. v. Precision Lift, Inc.*,
  654 F.3d 989 (9th Cir. 2011) ............................................................................... 12

*Golden State Bottling Co., v. N.L.R.B.*,
  414 U.S. 168 (1973) .............................................................................................. 24

*Inst. of Cetacean Res. v. Sea Shepherd Conservation Soc'y*,
  774 F.3d 935 (9th Cir. 2014) ............................................................................... 24

*Irwin v. Mascott*,
  370 F.3d 924 (9th Cir. 2004) ............................................................................... 24

*Metro-Goldwyn-Mayer Studios v. Grokster, Ltd.*,
  518 F. Supp. 2d 1197 (C.D. Cal 2007). ..................................................... 18, 19, 20

iii

Case No. 2:10-cv-0106-LRH-VCF

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

CASES

*MySpace, Inc. v. Wallace*,
498 F. Supp. 2d 1293 (C.D. Cal. 2007) .................................................... 14

*Mytee Products, Inc. v. Harris Research, Inc.*,
439 F. App'x 882 (Fed. Cir. 2011) ......................................................... 17

*Oracle USA, Inc. v. Rimini Street, Inc.*,
879 F.3d 948 (9th Cir. 2018).......................................................... 1, 15

*Presidio Components, Inc. v. Am. Technical Ceramics Corp.*,
702 F.3d 1351 (Fed. Cir. 2012)......................................................... 14

*Rent-A-Center, Inc. v. Canyon Television & Appliance Rental, Inc.*,
944 F.2d 597 (9th Cir. 1991)........................................................... 14

*SEC v. Koracorp Indus., Inc.*,
575 F.2d 692 (9th Cir. 1978)........................................................... 20

*Teller v. Dogge*,
No. 2:12-CV-591, 2014 WL 4929413 (D. Nev. Sept. 30, 2014).................. 14, 18

*United States v. Parke, Davis & Co.*,
362 U.S. 29 (1960)..................................................................... 21

*Walt Disney Co. v. Powell*,
897 F.2d 565 (D.C. Cir. 1990) ......................................................... 21

STATUTES

17 U.S.C.
§ 502 ................................................................................... 23
§ 502(a) ........................................................................... 1, 12, 22

RULES

Fed. R. Civ. P.
65(d)(2)(B)-(C) ........................................................................ 24

MOTION FOR PERMANENT INJUNCTION

1    **NOTICE OF MOTION AND MOTION**

2        Plaintiffs Oracle USA, Inc., Oracle America, Inc. and Oracle International Corporation

3    renew their motion for a permanent injunction against Defendant Rimini Street, Inc. ("Rimini").

4    I.   **INTRODUCTION**

5        In 2016, after Oracle prevailed at trial, after full briefing, and after oral argument, the

6    Court entered a permanent injunction with two separate sections.  Section I, entitled "Injunction

7    Pursuant to 17 U.S.C. § 502(a)," barred Rimini from specific conduct infringing Oracle's

8    copyrights.  Section II, entitled "Injunction Pursuant to CDAFA," barred Rimini from certain

9    downloading activities.  ECF No. 1065.  On appeal, the Ninth Circuit affirmed the Court's

10   copyright rulings, reversed the computer fraud verdict relating to downloading, and vacated the

11   injunction, so that this Court could determine whether Rimini's adjudicated infringement of 93

12   Oracle copyrights warrants re-issuing the injunction.  *Oracle USA, Inc. v. Rimini Street, Inc.*, 879

13   F.3d 948, 954–60, 962, 964 (9th Cir. 2018).  The copyright injunction should be re-issued for all

14   the reasons the Court issued Section I of the earlier injunction.  The Court's prior rulings, and the

15   prior injunction itself, make clear that the copyright portion of the injunction was entirely

16   separate from the injunction's computer fraud provisions.  Because the Ninth Circuit has upheld

17   all of this Court's and the jury's decisions concerning Oracle's copyright claims, the Court

18   should re-issue the injunction.

19       In this action, Oracle proved that Rimini built its business through pervasive, undisputed,

20   and unauthorized copying of Oracle's software and support materials.  The jury found, this Court

21   previously held—and now the Ninth Circuit has affirmed—that Rimini provided support by

22   making hundreds of unlicensed copies of Oracle's software in the form of local software

23   "environments" on Rimini's systems and by engaging in "cross-use," *i.e.*, the copying and use of

24   one customer's licensed software and derivative works to support other customers in violation of

25   the customer's license.  *Oracle*, 879 F.3d at 955–60.  The Ninth Circuit affirmed this Court's

26   finding that for each Oracle product at issue, Rimini's support processes, including its local

27   hosting and cross-use of Oracle software environments and other files, infringed Oracle's

28   copyrights.  *Id*.

1    Allowing Rimini to compete unfairly against Oracle by continuing any acts of

2    adjudicated copyright infringement harms the relationships and trust that Oracle has built for

3    decades with its customers.  Such broad market impacts are exactly the type of harm for which

4    injunctive relief is warranted.  Furthermore, Rimini's long history of infringement, along with its

5    destruction of evidence, shifting explanations of its business practices, and outright lies in *Rimini*

6    *I* warrant a permanent injunction to ensure that such infringing activity has truly stopped. Those

7    harms, articulated previously in Oracle's Motion for a Permanent Injunction (ECF No. 900) and

8    in this Court's Order granting Oracle's Motion (ECF No. 1049), remain more than sufficient to

9    warrant injunctive relief in light of the Ninth Circuit's affirmance.

10    This Court previously rejected Rimini's argument that no injunction should issue because

11    Rimini claims it has voluntarily ceased its improper actions, and if Rimini raises that argument in

12    opposition, the Court should reject it again.  Under well-established case law, Rimini's history of

13    infringement, its obstreperous conduct and falsehoods over five years of litigation in *Rimini I*, its

14    business imperatives, the harm caused by its infringement to Oracle's goodwill, and the fact that

15    the Ninth Circuit has affirmed judgment for Oracle on each of its copyright claims (covering 93

16    copyrights) all support Oracle's request for injunctive relief.  If Rimini is, once again, lying

17    about its business practices, an injunction is essential to ensure that Rimini ceases its infringing

18    conduct.  By contrast, if Rimini's claims about its purported "new process" turn out to be true—

19    and they are not—then the injunction would impose no burden on Rimini, and would benefit

20    Oracle by preventing Rimini from reverting to its old infringing ways.

21    **II.    PROPOSED FINDINGS OF FACT**

22    The below proposed facts were all proved at trial, and in most cases were undisputed.

23    These proposed findings of fact were previously submitted to the Court in connection with

24    Oracle's first motion for a permanent injunction and for the convenience of the Court are set

25    forth again here.[1]

26

---

27    [1] Oracle has removed proposed findings of fact that related to the state-law computer access claims, as well as two proposed findings concerning the status of the *Rimini II* lawsuit that are

28    now outdated.

**A.**   **Plaintiffs Oracle USA, Inc., Oracle America, Inc. And Oracle International Corporation**

1.   On February 15, 2010, Plaintiff Oracle USA, Inc., a Colorado corporation, merged with and into Sun Microsystems, Inc. Sun Microsystems, Inc., the surviving corporation, was then renamed "Oracle America, Inc." ("Oracle America").  ECF No. 528, Undisputed Fact ("UF") 1.

2.   Plaintiff Oracle America is a Delaware corporation, with its principal place of business in Redwood City, California.  ECF No. 528, UF 2.

3.   Oracle America develops and licenses certain intellectual property, including copyrighted enterprise software programs, and provides related services.  ECF No. 528, UF 3.

4.   Oracle America is the successor in interest to Oracle USA, and through Oracle USA is the successor to PeopleSoft USA, Inc. and a successor in interest to certain PeopleSoft, JD Edwards, and Siebel entities.  Hereinafter, Oracle USA, Inc. and Oracle America, Inc. are referred to collectively as "Oracle America."  ECF No. 528, UF 4.

5.   Plaintiff Oracle International Company ("OIC," and together with Oracle America, "Oracle") is a California corporation, with its principal place of business in Redwood City, California.  OIC owns and licenses certain intellectual property, including copyrighted enterprise software programs used around the world.  ECF No. 528, UF 5.

6.   In December 2004, Oracle acquired PeopleSoft, including the PeopleSoft copyrighted materials in suit related to PeopleSoft Enterprise, JD Edwards Enterprise One and JD Edwards World, for $11.1 billion.  Trial Transcript ("Tr.")  957:15-22 (Catz).

7.   In January 2006, Oracle acquired Siebel, including the Siebel copyrighted materials in suit, for $6.1 billion.  ECF No. 528, UF 39.

8.   OIC is the owner or exclusive licensee for each of the copyright registrations-in-suit at issue in this case, and each of those registrations is valid.  ECF No. 528, UF 40-41.

9.   Intellectual property rights formerly held by certain PeopleSoft, JD Edwards, and Siebel entities were transferred to OIC as part of the acquisitions of PeopleSoft and Siebel by

1    Oracle.  ECF No. 528, UF 6.

2          10.    As is typical in the enterprise software industry, Oracle does not sell ownership

3    rights to this software or the related support products Oracle provides to its paying customers.

4    ECF No. 528, UF 7.

5          11.    Instead, Oracle's customers purchase licenses that grant them limited rights to use

6    specific Oracle software programs.  ECF No. 528, UF 8.

7          12.    Separate from the license to the underlying software, Oracle also enters into

8    support contracts with its customers, which entitled them to receive, for an annual maintenance

9    fee, software upgrades and software support, including certain fixes, patches and updates.  ECF

10    No. 528, UF 9.

11          13.    Oracle's predecessors also sold both software licenses and support contracts for

12    PeopleSoft, JD Edwards, and Siebel enterprise software.  ECF No. 528, UF 10.

13        **B.**    **Defendants Rimini Street And Seth Ravin**

14          14.    Defendant Rimini Street, Inc. is a company that provides similar software support

15    services to licensees of Oracle's PeopleSoft, JD Edwards and/or Siebel software.  ECF No. 528,

16    UF 11.

17          15.    Rimini competes directly with Oracle to provide these services.  ECF No. 528, UF

18    12.

19          16.    Defendant Seth Ravin is the founder, president and CEO of Rimini, as well as the

20    former President of TomorrowNow, Inc., a subsidiary of SAP AG ("TomorrowNow").  Tr.

21    240:9:15, 351:2-7 (Ravin).

22          17.    Rimini launched its operations in September 2005, offering support services for

23    Oracle's Siebel software.  Rimini conducted a pilot launch of its Siebel support in January 2006

24    and acquired its first Siebel customer in February 2006.  ECF No. 528, UF 13.

25          18.    Rimini expanded its support offering to Oracle's PeopleSoft products in April

26    2006 and to Oracle's JD Edwards products in September 2006.  ECF No. 528, UF 14.

27          19.    Rimini contracted with 364 customers to provide support for PeopleSoft, JD

28    Edwards, and/or Siebel enterprise software between 2006 and November 2011.  ECF No. 528,

UF 15.

20.     Each of Rimini's PeopleSoft, JD Edwards, and/or Siebel customers licensed PeopleSoft, JD Edwards and/or Siebel enterprise software from Oracle.  ECF No. 528, UF 16.

**C.     Copies Of Oracle Software And Support Materials On Rimini's Servers**

21.     Rimini copied "massive amounts" of Oracle software and support materials, without ever obtaining any license from Oracle.  Tr. 165:12-16 (Davis); 302:3-4 (Ravin).

22.     Rimini had "thousands and thousands" of copies of Oracle software on Rimini servers.  Tr. 551:10-18 (Ravin).

23.     Rimini created and used full working copies of the PeopleSoft, JD Edwards, and Siebel software as "environments" on Rimini's servers.  Tr. 303:1-5, 320:13-321:2, 758:23-759:4, 760:8-15 (Ravin); 1146:5-17 (Chiu); 1757:14-1758:11 (Whittenbarger).

24.     Rimini had at least 478 PeopleSoft, JD Edwards, and Siebel environments on its own computer systems.  ECF No. 528, 19, 24, Exs. B & F (undisputed); Tr. 174:8-20 (Davis).

25.     Rimini has at least 216 environments on its servers that contain installed copies of Oracle Database.  ECF No. 528, UF 25.

26.     Each environment on Rimini's local systems constitutes a reproduction of one or more of the copyright registrations-in-suit.  ECF No. 528, UF 24.

27.     Many of Rimini's fixes for PeopleSoft software involved files that contained modified versions of Oracle's source code.  ECF No. 528, UF 42.

28.     All of the copies of and derivative works prepared from Oracle software and support materials that Rimini created and distributed to provide support were infringing.  PTX 1458 (ECF No. 401), 5328 (ECF No. 5328) (stipulations); Jury Instruction 24, ECF No. 880 (final jury instructions); ECF No. 896 (verdict).

**D.     Rimini's Copying Of PeopleSoft Software And Support Materials**

29.     Rimini's PeopleSoft copies were unauthorized.  ECF No. 474 (Order re Oracle's First Mot. for Part. Summ. J.) at 27-28; ECF No. 896 (verdict).

30.     The City of Flint and Pittsburgh Public Schools licenses are representative of "the PeopleSoft license agreements for all of Rimini's PeopleSoft customers."  ECF No. 599 at 1.

31.     The PeopleSoft license expressly limits "copying the licensed software to only the [customer's] facilities" and "solely" for the customer's "internal data processing."  ECF No. 474 at 11-13; 17-18.

32.     Both licenses forbid Rimini to have PeopleSoft software or documentation on its systems.  PTX 698 at 5, § 16 (defined term "Software" includes documentation); *id.* at 1 § 1.1 ("Software" must be at customer's facilities); PTX 699 at 6 § 15 (defined term "Licensed Rights" includes both software and documentation); *id.* at 1 § 2.1(d) (customer may not "[d]istribute . . . to any third party any portion of the Licenses Rights").

**E.      Rimini's Copying Of Oracle Database**

33.     The Court granted summary judgment to Oracle on its copyright infringement claim as to Oracle Database.  ECF No. 476 at 15-16.

**F.      Copying of Siebel And JD Edwards Software And Support Materials**

34.     Rimini's Siebel and JD Edwards copies were unauthorized.  ECF No. 896 (verdict).

35.     This Court already found that the JD Edwards license for Giant Cement (PTX 704) and the Siebel license for Novell (PTX 705) permit copies for "archival" and "backup" purposes only.  ECF No. 474 at 22, 24.

36.     Mr. Allison's testimony established that those licenses were representative of the JD Edwards and Siebel licenses generally, as both companies "used form license agreements." Tr. 1117:25-1118:5, 1118:15-19 (Allison).

37.     Licenses gave the customer the right "[t]o reproduce, exactly as provided by [Oracle], a reasonable number of copies of the [software] solely for archive or emergency back-up purposes or disaster recovery and related testing."  ECF No. 474 at 23 (quoting PTX 705, § 2.1(iv)).

38.     That provision can only be satisfied if Rimini's copies for "us[e] exclusively for archival and back-up purposes, and related testing, as directly contemplated by Section 2.1(iv)." ECF No. 474 at 24 n.20.

39.     Copies only fit that definition when they are created as "inherently an unmodified

1  copy of the software for use in the event that the production copy of the software (the copy used

2  on a customer's systems) is corrupted or lost."  ECF No. 474 at 11 (emphasis supplied).  In

3  "complete contrast" to that permitted backup copy, a software copy that is "modifiable (or

4  already modified)" is outside the scope of the license.  *Id.*

5      40.    Rimini "used all of the software," including all its "Siebel software" and "JDE

6  software" in its "work for customers."  Tr.  303:1-5 (Ravin); Tr. 364:3-8 (Ravin) (all

7  environments on Rimini's systems were "used in order to support customers" and for

8  "troubleshooting").

9      41.    Rimini's Siebel environments were "designed" at the outset for, among other

10  uses, "testing and development."  Tr. 318:19-22 (Ravin); Tr. 1146:5-25 (Chiu) (Siebel copies

11  "used to provide support"); Tr. 758:23-759:4 (Ravin) (same); Tr. 1754:8-15 (Whittenbarger)

12  (Siebel copies used for training); PTX 1461 (Chiu discussing customer Caterpillar (Siebel) "we

13  reclarified how our support model is based on building up an in-house lab environment with a

14  vanilla [not customized] fix-master [environment to test fixes and patches] and a customized

15  replica of their dev/test environment would enable us to maximize our responsiveness to them").

16      42.    Ravin likewise confirmed that JD Edwards environments were for "testing and

17  development" and for "diagnostics and support."  Tr. 321:1-6, 760:8-15 (Ravin).

18      43.    Ravin explained Rimini's troubleshooting process:  "you're taking the software,

19  you're playing with it to see if you can figure out what's going wrong, what the customer had

20  called in and reported."  Tr. 364:24-365:1 (Ravin).

21      44.    Rimini's copies of Oracle software were "general development test

22  environments" or "generic environment[s]" otherwise used for testing, development, support,

23  and troubleshooting.  Tr. 320:8-18, Tr. 367:2-8 (Ravin); Tr. 367:18-23 (Ravin) (Rimini would

24  use Customer A's software to troubleshoot for Customer B); Tr. 1146:5-25 (Chiu) ("explaining

25  that Rimini's internal Siebel environments were "used to provide support for those clients that

26  provided us their software"); Tr. 3186:13-3187:4 (Slepko) (Siebel local environments were used

27  to assist clients with their problems); Tr. 1754:8-15 (Whittenbarger) (Siebel environment used

28  for internal training); Tr. 1757:14-1758:5 (Whittenbarger) (Rimini "set up environments to

1  troubleshoot issues"); Tr. 2043:22-2044:21 (Blackmarr) (use of Customer A's software to

2  support Customer B); PTX 181 at 2 (June 2009 installation of JD Edwards was "to be used for

3  any configuration, testing and development required");  PTX 186 at 2 (Chiu explaining "I am

4  planning a JDE install for Medtronic's Support system"); PTX 190 (JD Edwards environments

5  associated with specific customers continued to be created through February 2010); PTX 33

6  ("Rimini would build out a[] [JD Edwards] environment to support them [customer]"); PTX 310

7  (Siebel environments used for troubleshooting); PTX 744 (same).

8       45.     An environment used for testing, development, or troubleshooting is not a backup

9  because you "don't touch" a backup.  Tr. 180:9-22, 182:16-183:4 (Davis).

10      46.     An "archive" or "backup":  a "copy . . . put on a physically different place," on a

11  "separate disk" or otherwise "put aside."  Tr. 180:5-181:17, 182:16-24 (Davis); *see also* Tr.

12  362:21-363:23 (Ravin) (discussing archives shipped to customers on DVDs or USB drives and

13  backups on tape drives).

14      47.     Backups are stored on tapes or other storage, unmodified.  Tr. 730:4-11 (Ravin);

15  Tr. 180:5-181:17, 182:16-24 (Davis).

16      48.     Copies used for troubleshooting, support, testing, or development are not backups.

17  Tr. 180:5-181:17, 182:16-24 (Davis).

18      **G.     RAM Copies**

19      49.     Rimini created additional in-memory copies, called RAM copies, every time it

20  started up or ran Oracle software.  Tr. 184:3-185:4 (Davis).

21      **H.     Cross-use And Distribution Of Oracle Software And Support Material**

22      50.     Rimini's unlicensed copying included widespread cross-use of Oracle

23  software.  Tr. 799:6-16 (Ravin).

24      51.     After previously denying cross-use, Ravin admitted at trial cross-use occurred "all

25  the time."  Tr. 552:1-13 (Ravin).

26      **Cross-use to Create Environments: Cloning**

27      52.     Rimini's cross-use included unlicensed "cloning" of Oracle software (copying an

28  environment created ostensibly for one customer for another customer).  Tr. 371:5-9, 374:12-15,

1   777:22-24 (Ravin); 1365:23-1366:14, 1381:188 (Williams); 192:22-193:7, 196:25-197:24,

2   198:25-199:11 (Davis); PTX 439; PTX 1491A; PTX 3507 at 31.

3          **Cross-use of Environments:  Developing Fixes and Updates**

4          53.     On many occasions, Rimini used one customer's environment to support other

5   customers.  Tr. 2232:2-2233:23 (Benge).

6          54.     Rimini used unlicensed "development" environments to create updates and fixes

7   for multiple customers.  Tr. 320:2-7 (Ravin); 202:18-203:3, 204:2-205:10 (Davis); PTX 5429.

8          55.     Rimini "reused [] all the time" by taking an update or fix that Rimini created for

9   one customer and using it for and distributing it to another customer, including using Oracle's

10  copyrighted code, changing it and distributing it to multiple Rimini customers.  Tr. 552:1-552:5,

11  809:19-810:13 (Ravin); 2232:2-2233:23 (Benge).

12         **Cross-use of Environments: Troubleshooting**

13         56.     On many occasions, Rimini used one customer's software to troubleshoot issues

14  other customers were having.  Tr. 367:18-23 (Ravin); 2043:22-2044:21 (Blackmarr).

15         **Cross-use of Support Material**

16         57.     Rimini used the code in one customer environment to write a detailed design

17  document to be used with other clients.  Tr. 1656:20-1661:4 (Grigsby).

18         58.     Rimini also used Oracle copyrighted support material as part of a sales

19  presentation to customers.  Tr. 1662:16-1668:7 (Grigsby).

20         59.     Rimini stored Oracle support materials in non-client-specific folders.  Tr.

21  1155:18-21 (Hicks).

22         60.     Rimini used support documentation downloaded on behalf of one customer to

23  rephrase the information and distribute it to other Rimini clients whose Oracle support was

24  expired.  PTX 236; Tr. 188:8-189:15 (Davis).  Rimini created "extracts" that Rimini gave its

25  customers so that unlicensed copies were shared amongst customers.  Rimini told customers that

26  it was creating separate extracts for each customer, but Rimini was using one customer's log-in,

27  starting with a faux customer, Leads Customers Growth, to copy all materials from Oracle's

28  websites and then copying disks that Rimini distributed to multiple customers.  Tr. 333:9-334:3,

335:12-16 (Ravin); 1160:15-1161:10 (Hicks); PTX 7.

**I.      Software Library**

61.      Rimini's "software library" was massive.  PTX 10; Tr. 166:9-20 (Davis); 242:1-3, 242:14-20 (Ravin).

62.      Ravin approved copying to that library (PTX 4 at 3-4; PTX 5), which included software and documentation for all of the products at issue:  PeopleSoft, JD Edwards, Siebel, and Database.  Tr. 167:5-10 (Davis); Tr. 1756:6-1757:8 (Whittenbarger); PTX 8; PTX 9; PTX 10; PTX 223.

63.      Rimini downloaded PeopleSoft and JD Edwards materials into the library before Rimini even had any clients licensed for those products.  Tr. 289:5-10 (Ravin); PTX 4; PTX 5; PTX 6.

64.      Rimini did not keep track of how that library was used or audit the library, and Rimini deleted that library shortly before Oracle filed this lawsuit.  Tr. 170:24-171:10 (Davis); Tr. 421:18-20, 422:21-423:4 (Ravin).

**J.      Rimini's Illegal Actions Have Harmed Oracle's Reputation And Goodwill**

65.      Rimini's copyright infringement allowed it to charge substantially less than Oracle charged for support: often 50% or less of what Oracle charged.  Tr. 207:10-16 (Davis); Tr. 1940:6-1942:6, 1950:16-1951:12 (Dean).

66.      Rimini's copyright infringement allowed it to gain scale quickly, with minimal effort and investment.  Tr. 443:4-445:6 (Ravin); Tr. 1702:18-1703:22 (Yourdon); Tr. 1453:22-1476:6 (Maddock).

67.      By purporting to offer vendor-level support at half the price or less of Oracle support and creating the impression that Oracle was overcharging for support, Rimini eroded "the bonds and the trust that [Oracle] ha[d] with [its] customers."  "For the customers [Oracle] lost, it totally broke the relationship."  By breaking these relationships, customers were also less likely to purchase other Oracle products.  Tr. 948:17-949:8, 934:14-936:11 (Catz); DTX 146.

68.      A customer who moves to Rimini for support may later find that its systems are out of date.  Tr. 935:18-936:3 (Catz); Tr. 1571:11-1573:6 (Screven).

69.     By creating uncertainty and distrust in the marketplace, Rimini's copyright infringement caused Oracle to "hav[e] to work extra hard to keep the customers [Oracle] ha[d]" due to the injury to Oracle's goodwill and reputation.  Tr. 948:17-949:12 (Catz).  As well, customers who left Oracle support for Rimini support were less likely to license additional software of any type from Oracle.  *Id.*

**K.     Rimini Has Been Evasive And Dishonest Throughout This Litigation**

70.     Rimini continued its infringing activities through at least February 2014.  Tr. 751:7-15 (admission by counsel for Rimini).  Rimini claims to have changed certain of its infringing behaviors after the Court granted partial summary judgment to Oracle on its copyright claims.  Tr. 754:9-13 (colloquy with the Court).

71.     Rimini created local environments and prepared and distributed derivative works from those environments for years after SAP and TomorrowNow conceded liability for copyright infringement and after TomorrowNow pled guilty to criminal copyright infringement.  *See* ECF No. 823-6 (civil stipulation discussing local environments on TomorrowNow's computer systems); ECF No. 823-5 (guilty plea discussing local environments on TomorrowNow's computer systems).

72.     Before trial, Rimini claimed that a software library never existed at Rimini Street.  PTX 5332 (March 29, 2010 Answer) at ¶ 34 (denying existence of software library);  PTX 1482 (June 16, 2011 Answer) at ¶ 34 (same).

73.     At trial, Ravin claimed that Rimini's software library was not really a library, Tr. 247:7-12, that it was only "installation media," Tr. 255:6-9, 565:9-11, and that it was only PeopleSoft, Tr. 247:14-20.

74.     Before trial, Rimini's 30(b)(6) designee, Senior Vice President Brian Slepko, and Ravin each flatly denied in depositions ever using one customer's environment to develop or test updates for other customers.  Tr. 804:25-805:5 (Ravin); 3173:1-3174:3 (Slepko).

75.     At trial, Ravin admitted that Rimini used one customer environment to develop or test updates for other customers "all the time."  Tr. 552:1-5 (Ravin).

1        **L.**      **Oracle Alleges Continued Infringement In _Rimini II_**

2        76.      Rimini filed its declaratory action regarding its allegedly new business model on

3 October 15, 2014.  ECF No. 901, Decl. of John A. Polito in Supp. of Mot. ("Polito Decl.") ¶ 3 &

4 Ex. A.  Oracle filed its Counterclaims on February 17, 2015, alleging copyright infringement and

5 additional claims.  _Id._ ¶ 4 & Ex. B.

6 **III.**     **LEGAL STANDARDS**

7        The Copyright Act authorizes this Court to enter a permanent injunction "on such terms

8 as it may deem reasonable to prevent or restrain infringement of a copyright." 17 U.S.C.

9 § 502(a).  The Ninth Circuit applies the traditional, four-factor test set forth in _eBay Inc. v._

10 _MercExchange, L.L.C._, 547 U.S. 388 (2006), to a request for an injunction in a copyright case.

11 _Flexible Lifeline Sys., Inc. v. Precision Lift, Inc._, 654 F.3d 989, 999 (9th Cir. 2011).

12 **IV.**     **ARGUMENT**

13        Oracle renews its request for a permanent injunction barring further copyright

14 infringement by Rimini.  The trial record and other evidence before the Court evidences Oracle's

15 entitlement to this remedy.  Oracle advances the same arguments previously submitted with its

16 motion for a permanent injunction (ECF No. 900), which have been updated in light of this

17 Court's prior Order granting Oracle injunctive relief (ECF No. 1049), as well as the Ninth

18 Circuit's opinion affirming Rimini's copyright infringement.

19        Since this Court entered the permanent injunction, the factual record has not changed, the

20 law concerning issuing permanent injunctions in copyright cases has not changed, and

21 accordingly, the merits of this motion have not changed.

22        **A.**      **The Court Should Enter A Permanent Injunction**

23        To obtain an injunction on its copyright claims, Oracle must show that "1) [it] suffered an

24 irreparable injury; 2) remedies available at law are inadequate to compensate for that injury;

25 3) considering the balance of hardships between [Oracle] and [Rimini], a remedy in equity is

26 warranted; and 4) the public interest would not be disserved by a permanent injunction." _Apple_

27 _Inc. v. Psystar Corp._, 658 F.3d 1150, 1152–53 (9th Cir. 2011) ("_Apple II_").

28

1    The record in this case shows why harm from continued or future infringement will be

2    irreparable.  The Ninth Circuit affirmed this Court's judgment that Rimini unlawfully infringed

3    Oracle's 93 copyrights at issue.  Rimini's unlawful actions irreparably injured Oracle's business

4    reputation and harmed its goodwill.  Rimini's infringing and illegal short-cuts enabled it to

5    rapidly gain scale and offer cut-rate support for Oracle software.  Through that misconduct,

6    Rimini gained an improper advantage that, to this day, it uses to harm Oracle's goodwill by

7    telling customers that Oracle's services are overpriced and could be provided at Rimini's rates.

8    Because Oracle seeks only to enjoin illegal actions or copying that this Court has found to be

9    outside the scope of any license, and because Rimini claims that it no longer infringes, the

10   balance of hardships tips entirely in favor of Oracle.  Finally, public policy favors entry of

11   injunctions against unlawful behavior.

12   The Ninth Circuit's reversal on the state statutory claims in no way undercuts the basis or

13   need for a permanent injunction to restrain Rimini's copyright infringement.  The prior

14   Injunction, itself, is divided into two separate parts, citing different statutes (one federal

15   copyright, and the other state law computer fraud), and enjoining different Rimini conduct.

16   There never was, and there is not now, any linkage between the two parts of the injunction.

17   Oracle never argued that the CDAFA or the NCCL[2] supported the issuance of a copyright

18   injunction, and Rimini never argued that these statutes militated against issuing a copyright

19   injunction.  Rather, the parties vigorously litigated whether the activity found to be copyright

20   infringement warranted the issuance of a copyright injunction, and the Court correctly

21   determined that an injunction was appropriate under *the Copyright Act*.  Just as this Court

22   previously held, all four *eBay* factors continue to support issuing a permanent injunction as to

23   Rimini's adjudged—and now affirmed—infringement of Oracle's copyrights.

24

25

26

27

28   [2] This Court previously ruled that Oracle could not seek a permanent injunction under the NCCL.
ECF No. 1049 at 4:7–15.

1    **1.    Rimini's Infringement Has Caused And Will Cause Irreparable**
2         **Injury To Oracle's Goodwill And Reputation**

3    This Court previously found that Rimini's infringement of Oracle's copyrights

4    "irreparably injured Oracle's business reputation and goodwill."  ECF No. 1049 at 5:17–19.

5    Nothing in the Ninth Circuit's opinion alters that conclusion.  Courts routinely find that injury to

6    business reputation and to goodwill is irreparable harm.  *See Apple II*, 658 F.3d at 1154

7    (irreparable harm shown where infringement was "causing Apple a loss of business reputation"

8    and "'goodwill'") (internal citation omitted); *see also Rent-A-Center, Inc. v. Canyon Television*

9    *& Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991) ("[I]ntangible injuries, such as

10   damage to ongoing recruitment efforts and goodwill, qualify as irreparable harm."); *MySpace,*

11   *Inc. v. Wallace*, 498 F. Supp. 2d 1293, 1305 (C.D. Cal. 2007) ("Harm to business goodwill and

12   reputation is unquantifiable and considered irreparable."); *Am. Broadcasting Cos., Inc. v. Aereo,*

13   *Inc.*, 874 F. Supp. 2d 373, 399 (S.D.N.Y. 2012) (finding likelihood of irreparable harm where

14   alternative content-delivery company was expanding rapidly and the company's CEO had

15   testified that "part of the idea . . . was to allow consumers to bypass" traditional content-delivery

16   channels), *aff'd sub nom. WNET v. Aereo, Inc.*, 712 F.3d 676, 696 (2d. Cir. 2013), *rev'd on diff.*

17   *grounds sub nom. Am. Broadcasting Cos., Inc. v. Aereo, Inc.*, 134 S. Ct. 2498 (2014); *Teller v.*

18   *Dogge*, No. 2:12-CV-591, 2014 WL 4929413, at *5 (D. Nev. Sept. 30, 2014) (entering

19   permanent injunction because copyright infringement "likely to have a negative effect on

20   plaintiff's reputation and goodwill").

21   "[I]t is undisputed that Oracle and Rimini directly compete with each other to provide

22   software support services and that Rimini infringed Oracle's copyrighted works."  ECF No. 1049

23   at 5:19–20.  "Direct competition in the same market is certainly one factor suggesting strongly

24   the potential for irreparable harm without enforcement of the right to exclude."  *Presidio*

25   *Components, Inc. v. Am. Technical Ceramics Corp.*, 702 F.3d 1351, 1363 (Fed. Cir. 2012).

26   In addition to this direct competition, Rimini's business model causes irreparable injury

27   to Oracle's business reputation and goodwill.  That business model, as this Court previously

28   found, "was built entirely on its infringement of Oracle's copyrighted software."  ECF No. 1049

1    at 6:3–4.  Rimini's "continued infringement," this Court found, "enabled it to rapidly build its

2    business and gain market share against Oracle in the software support service market by offering

3    cut-rate prices on its support services for Oracle software, generally at a discount of 50% of

4    Oracle's prices for similar service contracts." *Id.* at 5:24–6:3.  Without this massive

5    infringement, "Rimini would not have achieved its current market share and business growth

6    . . . ." *Id.* at 6:5–6.  This robbed Oracle of the "head start" it was entitled to as the copyright

7    holder.  *See Oracle*, 879 F.3d at 958 ("Giving a head start to Oracle in creating development

8    environments is entirely consistent with the Supreme Court's teaching[s]").  Put differently,

9    through its infringement of Oracle's copyrights, "Rimini gained an improper advantage that it

10   used to harm Oracle's business reputation and goodwill in the software service industry."  ECF

11   No. 1049 at 6:9–11; *cf. Douglas Dynamics, LLC v. Buyers Prods. Co.*, 717 F.3d 1336, 1345

12   (Fed. Cir. 2013) ("Where two companies are in competition against one another, the patentee

13   suffers the harm—often irreparable—of being forced to compete against products that

14   incorporate and infringe its own patented inventions.").

15          The evidence at trial amply supports the Court's findings of irreparable injury.

16   Testimony from Rimini top executives established that Rimini's copyright infringement enabled

17   Rimini to gain scale quickly with minimal effort, and this infringement is the reason why Rimini

18   can offer its cut-rate support today.  Tr. 443:4-445:6 (Ravin) (Rimini's plan was to avoid writing

19   its own software, thereby enabling it to get high valuation multiples without significant

20   investment); *see also* Tr. 1702:18-1703:22 (Yourdon); Tr. 1453:22-1476:6 (Maddock) (non-

21   infringing alternatives lack scale).  Rimini copied Oracle software, built a business (PTX 2155 at

22   4), and did so that, in Rimini's words, Rimini Street would "separate Oracle from its acquired

23   licensees -- denying Oracle recurring revenue."   PTX 3.  Rimini copied Oracle software,

24   targeted Oracle customers and disrupted the goodwill in those relationships, as well as the

25   opportunity to repair any damaged relationships.  Ravin acknowledged terminating Oracle's

26   relationships with $300 million of Oracle contracting customers.  Tr. 548:11-19, 549:6-11

27   (Ravin).  Rimini even talked about Oracle customers as a billion-dollar opportunity.  Tr.

28   1441:25-1442:5 (Maddock); Tr. 2691:21-24 (Zorn).

1    Rimini's infringing business model further undermines trust in Oracle, Oracle's business

2    offerings and customer relationships, and additionally harms Oracle's goodwill with its

3    customers.  As this Court previously found, "Rimini landed clients for its services by telling

4    customers that Oracle's services were overpriced and could be provided at the same rate Rimini

5    was offering while still providing Oracle significant profits, thereby harming Oracle's business

6    reputation."  ECF 1049 at 6:6–9.  The evidence also supports this finding—namely, testimony

7    from Oracle's CEO, Ms. Safra Catz:

8        Q. And what does a promise like this mean for Oracle?

9        A. Well, when they come to our customers, our customers wonder

10       all of a sudden whether we are overcharging them. It really breaks

11       the bonds and the trust that we have with our customers. We've

12       negotiated a price with them. All of a sudden, they're wondering

13       whether we've treated them fairly.

14   Tr. 935:11-17.  The evidence similarly showed that a customer who believes Rimini's promises

15   may later find its systems out of date and "fr[ozen] in time," then incorrectly blame Oracle for a

16   bad experience.  Tr. 935:18-936:3 (Catz); *see also* Tr. 1571:11-1573:6 (Screven).  As such,

17   Rimini's unlawful infringement continues to damage Oracle's reputation among its customers

18   and continues to harm Oracle's goodwill.  These harms will only be amplified by continued or

19   future infringement.

20       **2.      Remedies Available At Law Are Inadequate To Compensate For**
                    **Oracle's Irreparable Injury**
21

22       This Court also recognized that the nature of the irreparable harm suffered by Oracle

23   supports a finding that no adequate remedy at law exists to compensate Oracle.  ECF No. 1049 at

24   6:24–25 ("Oracle has established that monetary damages alone are inadequate to compensate it

25   for the losses suffered because of defendants.").

26       First, the harms to Oracle's goodwill and market reputation are unquantifiable, and thus

27   cannot be compensated solely by remedies at law.  ECF No. 1049 at 6:25–7:1 ("[C]ertain harm

28   suffered by Oracle like lost market share and company goodwill are intangible injuries difficult

1 | to quantify and compensate.").  "Harm resulting from lost profits and lost customer goodwill is
2 | irreparable *because* it is neither easily calculable, nor easily compensable and is therefore an
3 | appropriate basis for injunctive relief."  *eBay, Inc. v. Bidder's Edge, Inc.*, 100 F. Supp. 2d 1058,
4 | 1066 (N.D. Cal. 2000) (emphasis supplied); *accord Apple Inc. v. Psystar Corp.*, 673 F. Supp. 2d
5 | 943, 949–50 (N.D. Cal. 2009) ("*Apple I*") ("the same evidence and rationale put forth by Apple
6 | to show irreparable harm support the conclusion that an award of damages would be inadequate,
7 | simply because the harm caused to Apple's reputation, goodwill, and brand is difficult, if not
8 | impossible, to quantify."), *aff'd*, *Apple II*, 658 F.3d at 1162.

9 |      Second, courts find irreparable harm even where lost profits or lost future sales may be
10 | difficult to prove.  *See Mytee Products, Inc. v. Harris Research, Inc.*, 439 F. App'x 882, 887
11 | (Fed. Cir. 2011) ("We have never held, however, that in order to establish irreparable harm a
12 | patentee must demonstrate that it is entitled to lost profits . . . .").  Any finding by the jury that
13 | the amount of Oracle's lost profits had not been adequately proven is therefore no bar to entry of
14 | Oracle's requested injunction.  Indeed, it is fully consistent with the need for injunctive relief.
15 | That is particularly the case here, because as this Court previously found, "[t]he difficulty for the
16 | jury in determining damages in this action supports Oracle's claim that monetary damages alone
17 | are insufficient to fairly and fully compensate it for defendants' conduct."  ECF No. 1049 at
18 | 7:13–15.  And consideration must also be given to the copyright holder's right to exclude, which
19 | "has routinely been held difficult to compensate solely through monetary compensation."  *Id.* at
20 | 7:16–17 (citing *eBay*, 547 U.S. at 395 (Roberts, C.J. concurring)).  In sum, the harms Rimini has
21 | caused to Oracle's goodwill and market reputation are not adequately compensated by money
22 | damages.

23 |     **3.**      **The Balance Of Hardships Tips Strongly In Favor Of Oracle Because**
24 |                   **Rimini's Acts Have No Legitimate Business Purpose**

25 |      Because Oracle seeks only to enjoin acts that have already been determined to be
26 | unlawful, the balance of hardships tips in Oracle's favor.  This Court agreed and previously
27 | found this *eBay* factor also weighed in Oracle's favor.  ECF No. 1049 at 8:2–8.  Nothing has
28 | changed that warrants a different conclusion now.

1    With respect to copyright infringement, the balance of hardships tips undisputedly in

2    favor of a rights holder seeking to protect its copyrighted works where the party to be enjoined

3    does not have a "separate legitimate business purpose" for continuation of the infringing acts.

4    *Metro-Goldwyn-Mayer Studios v. Grokster, Ltd.,* 518 F. Supp. 2d 1197, 1220 (C.D. Cal 2007);

5    *Teller,* 2014 WL 4929413 at *5 ("Any harm to defendant in forcing him to comply with the

6    requirements of the law is outweighed by plaintiff's efforts to protect his copyrighted

7    performances . . . from consumer confusion."); *cf. Rimini II*, Order re Mot. to Strike, Dkt. 90 at 6,

8    2015 WL 4139051, *3 (D. Nev. July 9, 2015) (declining to give weight to "[t]he fact that there

9    may not be any manner by which a competing company like Rimini can engage in its services

10   without engaging in copyright infringement").  Here, the Court held that "Rimini does not have a

11   separate legitimate business purpose for continuation of the infringing acts."  ECF No. 1049 at

12   8:2–3.  Not once has Rimini argued to the contrary.

13   If, as Rimini claims, it has ceased all infringing conduct, then an injunction would create

14   no burden whatsoever on Rimini, as Rimini only would be barred from doing things that it

15   purportedly is no longer doing.  *See id.* at 8:3–7 ("[N]o evidence [shows that] Rimini would be

16   harmed by an injunction … because Rimini has already represented to the court that it has

17   changed its business model and support services away from the infringing model in response to

18   the court's orders on summary judgment.").  However, if, as Oracle believes, Rimini's

19   misconduct is continuing, then the balance of hardship tips decisively in Oracle's favor as Rimini

20   is a recidivist, with no legitimate business purpose for its actions, that can only be stopped

21   through an appropriate injunction.

22        **4.    Public Policy Favors Entry Of An Injunction Against Copyright
              Infringers Such As Rimini**

23

24   This Court also previously found that an injunction against future copyright infringement

25   is in the public interest.  ECF No. 1049 at 8:13–15.  A "reasonably tailored" injunction that

26   vindicates copyright rights "would not harm the interests of the public; rather, [it would be]

27   consistent with the policies underlying copyright protection . . . ."  *Apple I*, 673 F. Supp. 2d at

28   950; *see also Apple Computer v. Franklin Computer Corp.*, 714 F.2d 1240, 1255 (3d Cir. 1983)

1  ("[I]t is virtually axiomatic that the public interest can only be served by upholding copyright

2  protections and, correspondingly, preventing the misappropriation of the skills, creative energies,

3  and resources which are invested in the protected work."). Those policies are to encourage

4  creating new, original works and discourage infringers who free ride on the works of others.

5  *Compare Eldred v. Ashcroft*, 537 U.S. 186, 225–26 (2003), *with* Tr. 443:4-445:6 (Ravin)

6  (Rimini's plan was to get the high-multiples valuation of a software company while avoiding the

7  investment required to write original software).

8       Nor would an injunction impair the public's interest in enterprise software support

9  services. That is "because Rimini has repeatedly represented to the court that its current business

10  model is not based on its prior infringing conduct. Taking defendants' statements as true, then

11  Rimini's ability to compete against Oracle in the software support service market would not be

12  lost with an injunction, and thus, the public would still have access to competition in that

13  market." ECF No. 1049 at 8:20–23.

14      Because each of the *eBay* factors again favors issuance of a permanent injunction, this

15  Court should re-enter those portions of its previous injunction that enjoin Rimini's infringement

16  of Oracle's copyrights.

17         **5.    Rimini's Arguments That It Has Ceased Its Improper Behavior
              Should Not Be Credited And Do Not Bar Injunctive Relief**
18

19      Rimini's previous arguments that it no longer performs the actions adjudged to infringe

20  are no basis to oppose entry of an injunction. "A private party's discontinuation of unlawful

21  conduct does not make the dispute moot, however. An injunction remains appropriate to ensure

22  that the misconduct does not recur as soon as the case ends." *Grokster*, 518 F. Supp. 2d at 1222

23  (quoting *BMG Music v. Gonzalez*, 430 F.3d 888, 893 (7th Cir. 2005)); *see also Broad. Music,*

24  *Inc. v. McDade & Sons, Inc.*, 928 F. Supp. 2d 1120, 1136 (D. Ariz. 2013) ("Because Defendants

25  received numerous calls, letters, and cease and desist notices from BMI but did not cease

26  infringement, a permanent injunction is warranted to prevent future copyright violations.").

27      In particular, discovery in the *Rimini II* litigation has enabled Oracle to refute Rimini's

28  self-serving claim that its behavior has changed such that it no longer infringes Oracle's

1    copyrights.  Oracle has adduced evidence of Rimini impermissibly copying Oracle software,

2    cross-using customers' environments in violation of their license agreements with Oracle, and

3    creating and distributing unlicensed derivative works of Oracle's software.  It suffices to show

4    now that Rimini's protests of changed behavior are entitled to little weight, particularly given its

5    misconduct both pre- and post-injunction in the *Rimini I* case.[3]

6        ***Rimini's Pre-Injunction Misconduct*.**  Rimini has told this Court that its purported

7    changes to its practices largely occurred only after the Court ruled against it on summary

8    judgment.  Tr. 751:10-15 (assertion by Rimini counsel); ECF No. 901-1, ¶ 8.  Rimini continued

9    creating and using local environments on its computer systems for years after the lawsuit was

10   filed, after SAP conceded civil liability, and after TomorrowNow pleaded guilty to criminal

11   charges for having local environments of Oracle software on its computer systems.  ECF No.

12   823-6 (civil stipulation); ECF No. 823-5 (guilty plea); *see also* ECF No. 823 at 5-6 (detailing

13   how guilty plea to criminal copyright infringement and civil stipulation detailed local

14   environments on TomorrowNow's systems).  And, as was admitted at trial, Rimini still created,

15   copied, and relied upon local environments until at least February 2014.  Tr. 751:7-15 (admission

16   by counsel).  Rimini claimed it stopped these practices in light of the Court's summary judgment

17   order, but as the Court commented at trial, "frankly, I'm unimpressed that he changes his

18   business practice after the Court has ruled that he's committed copyright infringement in various

19   ways, that he's following the order of the Court, essentially, at the time he does that."  Tr. 754:9-

20   13.

21        Rimini's supposed change in practice only after a finding of infringement supports the

22   inference that Rimini will continue to infringe in the absence of a permanent injunction.

23   *Grokster*, 518 F. Supp. 2d at 1221 ("such an inference is warranted based upon various

24   undisputed facts, including . . . [cessation] admittedly did not commence until after this Court's

25   September 27, 2006 Order granting Plaintiffs' motion for summary judgment."); *accord SEC v.*

26   _____

27   [3] To be clear, Oracle is not asking now for a ruling on the merits of the issues in dispute in
     *Rimini II*.  Instead, Oracle asks the Court for a permanent injunction restraining Rimini from
     continuing to commit the infringement that this Court and the jury have already determined to

28   constitute copyright infringement.

1    *Koracorp Indus., Inc.*, 575 F.2d 692, 698 (9th Cir. 1978) ("[t]he fact that illegal conduct has

2    ceased does not foreclose injunctive relief … especially if no evidence of remorse surfaces until

3    the violator is caught"); *Walt Disney Co. v. Powell*, 897 F.2d 565, 568 (D.C. Cir. 1990)

4    (upholding trial court's permanent injunction where the defendant "simply took the action that

5    best suited him at the time [by voluntarily ceasing infringement]; he was caught red-handed . . .

6    [and defendant] suddenly reformed"); *see also United States v. Parke, Davis & Co.*, 362 U.S. 29,

7    48 (1960) (observing that voluntary cessation of activities prompted by a government

8    investigation and subsequent suit is not reason "to deny relief altogether by lightly inferring an

9    abandonment of the unlawful activities from a cessation which seems timed to anticipate suit").

10        Rimini's protestations of reform should not be accepted especially given its history of

11    lying to the Court.  Rimini falsely claimed that a software library never existed at Rimini Street.

12    PTX 5332 (March 29, 2010 Answer) at ¶ 34 (denying existence of software library);  PTX 1482

13    (June 16, 2011 Answer) ¶ 34 (same).  Rimini (through Ravin) denied at trial the full truth about

14    the software library, falsely claiming it was not really a library, Tr. 247:7-12, that it was only

15    "installation media," Tr. 255:6-9, 565:9-11, and that it was only PeopleSoft.  Tr. 247:14-16.  In

16    fact, Rimini's employees called the library a library, and the library contained copies of software

17    and documentation for all the products at issue in the case.  PTX 6 (3 terabytes of Siebel part of

18    "full local library"); PTX 8 ("major download from Cust Conn [PeopleSoft documentation] . . .

19    all of this in house and at our disposal"); PTX 9 ("20 GB of content . . . so far" for "PSFT

20    Customer Connection Extract"); PTX 10 ("complete library of all the content that is available

21    from Customer Connection . . . proactively download all the available content"); PTX 223 ("now

22    setup to download contents of the Oracle eDelivery website on a weekly basis" including Siebel,

23    PeopleSoft, and J.D. Edwards; "Thanks for adding this to the library"), Tr.  1756:6-1757:8

24    (Whittenbarger) (confirming PeopleSoft, Oracle Database, Siebel, and J.D. Edwards were all

25    present and "used in connection with [Rimini's] work for customers"); 167:5-10 (Davis) (library

26    had all products).

27        Similarly, Rimini continued to deny cross-use all the way until trial.  Rimini's 30(b)(6)

28    designee, Senior Vice President Brian Slepko, and Ravin each flatly denied in depositions ever

1    using one customer's environment to develop or test updates for other customers.  Tr. 804:25-

2    805:5 (Ravin); 3173:1-3174:3 (Slepko).  Then at trial, Ravin said Rimini did it "all the time."

3    Tr. 552:1-5 (Ravin).  Rimini's demonstrated refusal to take responsibility for its infringing

4    conduct and its repeated self-serving and false denials of such conduct—before and even through

5    trial—confirm the necessity of an injunction to prevent continued infringement.

6        ***Rimini's Post-Injunction Misconduct***.  The day after the Court entered its permanent

7    injunction (ECF No. 1065), Rimini filed an emergency motion to stay the injunction, suggesting

8    that it "might cause 'untold, irreversible consequences.'"  ECF No. 1069 at 7:13.  Yet that very

9    same day, Rimini issued a press release assuring the public that "[t]he injunction does not

10   prohibit Rimini Street's ongoing or future provision of support for [Oracle's PeopleSoft, JD

11   Edwards, Seibel, and Database] product lines" but merely "constrains" how Rimini provides that

12   support.  ECF No. 1073-3.  The Court found this double-speak to be "disingenuous" (ECF No.

13   1094 at 4:6) and should do so again in granting Oracle's renewed request for injunctive relief.

14       Rimini also submitted a new declaration as part of its reply in support of its emergency

15   stay motion, alleging for the first time that the "October 11, 2016 [injunction] would require

16   Rimini to further modify its support processes for Oracle products."  ECF No. 1079-1 at ¶ 4.  Not

17   only were these new allegations "not the kind of irreparable harm that warrants a stay" (ECF No.

18   1094 at 4:7–8), but they constituted an admission that Rimini's then-current processes violated

19   the terms of the injunction.

20       These facts confirm that Rimini's claims about how it provides support to Oracle's

21   licensees simply cannot be trusted.  Only the entry of another permanent injunction—containing

22   the same ban on copyright infringement from the Court's October 11, 2016 injunction—will

23   ensure that Rimini does not return to its old, infringing ways.

24       **B.    Oracle's Proposed Injunctive Relief Is Appropriately Tailored**

25       After thorough briefing and oral argument regarding the proper scope of a copyright

26   injunction, the Court issued the October 11, 2016, injunction that included Section I ("Injunction

27   Pursuant to 17 U.S.C. § 502(a)").  Although Rimini challenged the scope of this injunction on

28   appeal, the Ninth Circuit made no finding that the injunction was in any way overbroad.

1    Accordingly, if the injunction is re-issued, as Oracle submits it should be, there is no reason to

2    modify its prior scope.

3        As before, Oracle's requested relief is appropriately tailored to prevent future occurrences

4    of the conduct adjudged to constitute copyright infringement in this case.  As to Oracle's

5    copyright claims, this Court has determined as a matter of law that:

6        • PeopleSoft licenses "prohibit[] Rimini Street from copying or preparing

7          derivative works . . . other than to support the specific licensee's own internal data

8          processing operations on the licensee's own computer systems" (Jury Instruction

9          24, ECF No. 880);

10        • JD Edwards licenses prohibit Rimini Street from "mak[ing] copies . . . [to] access

11          the software's source code to carry out development and testing of software

12          updates, to make modifications to the software, or to use the customer's software

13          or support materials to support other customers" (Jury Instruction 24, ECF No.

14          880);

15        • Siebel licenses prohibit Rimini Street from "mak[ing] copies . . . [to] access the

16          software's source code to carry out modification, development and testing of the

17          software not related to archive, emergency back-up, or disaster recovery purposes,

18          or to use the customer's software or support materials to support other customers"

19          (Jury Instruction 24, ECF No. 880); and,

20        • clients' licenses to Oracle Database do not permit Rimini to make any copies, and

21          do not permit Rimini Street to use any client copies of Oracle Database to

22          "develop and test updates for its clients" or to "support multiple customers" (ECF

23          No. 476 at 14-15).

24    Oracle's proposed injunction pursuant to 17 U.S.C. § 502 seeks (as before) to enforce precisely

25    these license restrictions.

26        Oracle's injunction appropriately reaches not only Rimini, but also its subsidiaries,

27    affiliates, employees, directors, officers, principals, and agents involved in the relevant behavior.

28    The Court has the power "to enforce orders against 'a person who is not a party . . . as if a

1   party.'" *Irwin v. Mascott*, 370 F.3d 924, 931–32 (9th Cir. 2004) (citing Fed. R. Civ. P. 71

2   (2004)).  Any injunction entered by the Court will bind not only Rimini, but also its "officers,

3   agents, servants, employees, and attorneys" and "other persons who are in active concert or

4   participation with" them.  Fed. R. Civ. P. 65(d)(2)(B)-(C).  The phrase "active concert or

5   participation" includes both aiders and abettors of, and privies of, an enjoined party.  *See Golden*

6   *State Bottling Co., v. N.L.R.B.*, 414 U.S. 168, 179–80 (1973).  Oracle's proposed injunction is

7   fully consistent with the scope of this Court's equitable power.  *See Inst. of Cetacean Res. v. Sea*

8   *Shepherd Conservation Soc'y*, 774 F.3d 935, 949–50 (9th Cir. 2014) (discussing parties' and

9   non-parties' duties and obligations under an injunction).

10   **V.**     **<u>CONCLUSION</u>**

11        For the foregoing reasons, the Court should grant this motion and issue Oracle's proposed

12   permanent injunction, containing the same copyright-related restrictions that the Court

13   previously entered after extensive briefing and oral argument.

14

15   Dated:  March 21, 2018           Respectfully submitted,

16                            Morgan, Lewis & Bockius LLP

17

18                            By:          /s/ *Thomas Hixson*
                                              Thomas Hixson

19                            Attorneys for Plaintiffs
                            Oracle USA, Inc.,

20                            Oracle America, Inc. and
                            Oracle International Corporation

21

22

23

24

25

26

27

28

MOTION FOR PERMANENT INJUNCTION

1

**<u>CERTIFICATE OF SERVICE</u>**

2    I hereby certify that on the 21st day of March, 2018, I electronically transmitted the

3    foregoing ORACLE'S RENEWED MOTION FOR PERMANENT INJUNCTION AGAINST

4    DEFENDANT RIMINI STREET, INC. to the Clerk's Office using the CM/ECF System for

5    filing and transmittal of a Notice of Electronic Filing to all counsel in this matter; all counsel

6    being registered to receive Electronic Filing.

7    Dated:  March 21, 2018                Respectfully submitted,

8                                          Morgan, Lewis & Bockius LLP

9

10                                         By:  _____ /s/ *Thomas Hixson*_____
                                                          Thomas Hixson
11
                                           Attorneys for Plaintiffs
12                                         Oracle USA, Inc.,
                                           Oracle America, Inc. and
13                                         Oracle International Corporation

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28