# EXHIBIT A
# March 15, 2018 Rimini Street, Inc. 10-K SEC Filing

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**FORM 10-K**

(Mark One)

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(D) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the Fiscal Year Ended December 31, 2017**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(D) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the Transition Period from to**

Commission File Number 001-37397

# Rimini Street, Inc.

(Exact Name of Company as Specified in its Charter)

| Delaware | 36-4880301 |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| **3993 Howard Hughes Parkway, Suite 500, Las Vegas, NV** | **80401** |
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code: **(702) 839-9671**

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class: | Name of each exchange on which registered: |
|---|---|
| **Common Stock, par value $0.0001 per share** | **The Nasdaq Global Market** |
| **Public Units, each consisting of one share of Common Stock, $0.0001 par value, and one-half of one Warrant** | **OTC Pink Current Information Marketplace** |
| **Warrants, exercisable for one share of Common Stock, $0.0001 par value** | **OTC Pink Current Information Marketplace** |

Securities registered pursuant to Section 12(g) of the Act: **None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.    YES ☐ NO ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.    YES ☐ NO ☒

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Company was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.    YES ☒ NO ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).    YES ☒ NO ☐

Indicate by check mark if disclosure of delinquent filers, pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of the Registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K ☒

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, and an emerging growth company. See the definitions of "large accelerated filer", "accelerated filer", "smaller reporting company", and "emerging growth company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☐        Accelerated filer ☒        Non-accelerated filer ☐

Smaller reporting company ☐        Emerging growth company ☒

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act.    ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).    YES ☐ NO ☒

As of June 30, 2017, the last business day of the second fiscal quarter, the aggregate market value of the Registrant's voting stock held by non-affiliates, was approximately $157,130,000, based on the last reported sales price of $10.01 as quoted on the Nasdaq Capital Market on such date.

The registrant had 59,410,816 shares of its $0.0001 par value common stock outstanding as of March 12, 2018.

**DOCUMENTS INCORPORATED BY REFERENCE**

The Registrant's definitive Proxy Statement for the Annual Meeting of Stockholders (the "2018 Proxy Statement") is incorporated by reference in Part III of this Form 10-K to the extent stated herein. The 2018 Proxy Statement, or an amendment to this Form 10-K, will be filed with the SEC within 120 days after December 31, 2017. Except with respect to information specifically incorporated by reference in this Form 10-K, the Proxy Statement is not deemed to be filed as a part hereof.

**Item 1A - Risk Factors**

*Our business, financial condition, results of operations and cash flows are subject to a number of risk factors, both those that are known to us elsewhere, and may adversely affect our business, financial condition, results of operations or cash flows. If any significant adverse developments resulting from these risk factors should occur, the trading price of our securities could decline, and moreover, investors in our securities could lose all or part of their investment in our securities.*

*You should refer to the explanation of the qualifications and limitations on forward-looking statements under "Special Note Regarding Forward-Looking Statements." All forward-looking statements made by us are qualified by the risk factors described below.*

**Risks Related to Our Business, Operations and Industry**

<u>Risks Related to Litigation</u>

***We and our Chief Executive Officer are involved in litigation with Oracle. An adverse outcome in the ongoing litigation could result in the payment of substantial damages and/or an injunction against certain of our business practices, either of which could have a material adverse effect on our business and financial results.***

      In January 2010, certain subsidiaries of Oracle Corporation (together with its subsidiaries individually and collectively, "Oracle") filed a lawsuit, Oracle USA, Inc. et al v. Rimini Street, Inc. et al (United States District Court for the District of Nevada) ("District Court"), against us and our Chief Executive Officer, Seth Ravin, alleging that certain of our processes violated Oracle's license agreements with its customers and that we committed acts of copyright infringement and violated other federal and state laws ("Rimini I"). The litigation involved our business processes and the manner in which we provided our services to our clients. To provide software support and maintenance services, we request access to a separate environment for developing and testing the updates to the software programs. Prior to July 2014, PeopleSoft, J.D. Edwards and Siebel clients switching from Oracle to our enterprise software support systems were given a choice of two models for hosting the development and testing environment for their software: the environment could be hosted on the client's servers or on our servers. In addition to other allegations, Oracle challenged the Rimini Street-hosted model for certain Oracle license agreements with its customers that contained use and site-based restrictions. Oracle alleged that its license agreements with these customers restrict licensees' rights to provide third parties, such as Rimini Street, with copies of Oracle software who then use those companies to serve other customers, and restrict where a licensee physically may install the software. Oracle alleged that, in the course of providing services, we violated such license agreements and illegally downloaded software and support materials without authorization. Oracle further alleged that we impaired its computer systems in the course of downloading materials for our clients. In April 2010 Oracle filed its first amended complaint, and in June 2011 Oracle filed its second amended complaint. Specifically, Oracle's second amended complaint asserted the following causes of action: copyright infringement; violations of the Federal Computer Fraud and Abuse Act; violations of the Computer Data Access and Fraud Act; violations of Nevada Revised Statute 205.4765; breach of contract; inducing breach of contract; intentional interference with prospective economic advantage; unfair competition; trespass to chattels; unjust enrichment/restitution; unfair practices; and a demand for an accounting. Oracle's second amended complaint sought the entry of a preliminary and permanent injunction prohibiting us from copying, distributing, using, or creating derivative works based on Oracle Software and Support Materials except as allowed by express license from Oracle; from using any software tool to access Oracle Software and Support Materials; and from engaging in other actions alleged to infringe Oracle's copyrights or were related to its other causes of action. The parties conducted extensive fact and expert discovery from 2010 through mid-2012.

      In March and September 2012, Oracle filed two motions seeking partial summary judgment as to, among other things, its claim of infringement of certain copyrighted works owned by Oracle. In February 2014, the District Court issued a ruling on Oracle's March 2012 motion for partial summary judgment (i) granting summary judgment on Oracle's claim of copyright infringement as it related to two of our PeopleSoft clients and (ii) denying summary judgment on Oracle's claim with respect to one of our J.D. Edwards clients and one of our Siebel clients. The parties stipulated that the licenses among clients were substantially similar. In August 2014, the District Court issued a ruling on Oracle's September 2012 motion for partial summary judgment (i) granting summary judgment on Oracle's claim of copyright infringement as it relates to Oracle Database and (ii) dismissing our first counterclaim for defamation, business disparagement and trade libel and our third counterclaim for unfair competition. In response to the February 2014 ruling, we revised our business practices to eliminate the processes determined to be infringing, which was completed no later than July 2014.

     A jury trial in Rimini I commenced in September 2015. On October 13, 2015, the jury returned a verdict against us finding that (i) we were liable for innocent copyright infringement, (ii) we and Mr. Ravin were each liable for violating certain state computer access statutes, (iii) Mr. Ravin was not liable for copyright infringement, and (iv) neither we nor Mr. Ravin were liable for inducing breach of contract or intentional interference with prospective economic advantage. The jury determined that the copyright infringement did not cause Oracle to suffer lost profits, that the copyright infringement was not willful, and did not award punitive damages. Following post-trial motions, Oracle was awarded a final judgment of approximately $124.4 million, consisting of copyright infringement damages based on the fair market value license damages theory, damages for violation of certain state computer access statutes, prejudgment interest and attorneys' fees and costs. In addition, the District Court entered a permanent injunction prohibiting us from using certain processes – including processes adjudicated as infringing at trial – that we ceased using no later than July 2014. We paid the full judgment amount of approximately $124.4 million to Oracle on October 31, 2016 and appealed the case to the United States Court of Appeals for the Ninth Circuit ("Court of Appeals") to appeal items (i) and (ii) above, as well as the injunction. With regard to the injunction entered by the District Court, we argued on appeal that the injunction is vague and contains overly broad language that could be read to cover some of our current business practices that were not adjudicated to be infringing at trial and should not have been issued under applicable law. On December 6, 2016, the Court of Appeals granted our emergency motion for a stay of the permanent injunction pending resolution of the underlying appeal and agreed to consider the appeal on an expedited basis. The Court of Appeals heard argument on July 13, 2017.

     On January 8, 2018, the Court of Appeals reversed certain awards made in Oracle's favor during and after our 2015 jury trial in Rimini I and vacated and remanded others, including the injunction that had previously been stayed by the appellate court in December 2016, all awards and judgments against Mr. Ravin, and approximately $50.3 million of the judgment previously paid by Rimini Street consisting of Oracle's legal fees of $28.5 million, an award under state computer access statutes and related taxable costs and interest totaling $21.3 million, and post-judgment interest of $0.5 million. In its opinion, the Court of Appeals, while affirming the finding of infringement against us (which the jury had found to be "innocent" infringement) for the processes that we ceased using no later than July 2014, also stated that we "provided third-party support for Oracle's enterprise software, in lawful competition with Oracle's direct maintenance services". We currently believe that Oracle may refund approximately $21.3 million in the second quarter of 2018, with the remaining amount to be resolved in 2018, but we can make no assurances as to the ultimate amount of the refunds or the timing of receipt by us.

     On January 22, 2018, we filed a petition for rehearing en banc with the Court of Appeals regarding two other components of the final judgment awarded to Oracle. First, we asked the Court of Appeals to rehear the calculation of prejudgment interest, arguing that the trial court set the interest rate using a date that precedes the filing of the litigation, which resulted in an additional approximate amount of $20.2 million cost paid by us. Second, we asked the Court of Appeals to rehear the award of non-taxable costs, arguing that this decision is in direct conflict with decisions in other federal circuit courts and decisions of the United States Supreme Court and resulted in us paying approximately $12.8 million that we would not have had to pay in other court jurisdictions. The Court of Appeals denied the petition for rehearing en banc on March 2, 2018, and the mandate was issued on March 13, 2018. We have up to 90 days within which to file a request for certiorari in the United States Supreme Court. We may or may not choose to pursue further appeal and we cannot predict whether any such appeal would be successful.

     The attorney's fee award and injunction that were vacated by the Court of Appeals were remanded to the District Court for further consideration. The injunction originally ordered by the District Court, which was vacated and remanded by the Court of Appeals, would have required that we incur additional expense in the range of 1% to 2% of net revenue for additional labor costs to provide support for our clients as contracted. Any injunction that might be ordered in the future may or may not have a similar, lesser or greater impact on our costs of support for our clients or other business impacts. The ultimate refund amount owed to us by Oracle would be subject to the District Court judge's review of attorney's fees that were remanded. Any decision by the District Court judge on matters remanded for further consideration will be subject to further appeal to the Court of Appeals. We may or may not seek such further appeal. We cannot predict whether any further appeal would be successful.

     All amounts refunded to the Company as a result of the appeal are required to be utilized to pay down our Credit Facility (including make-whole applicable premium if received prior to June 24, 2019) as discussed in Note 5 in our 2017 consolidated financial statements included in Item 8 of this Report. In addition, once all remands are completed and all appeals have been exhausted, a portion of the ultimate Oracle attorney's fees refunded to us, net of all costs associated with the remand and appeal, are required to be reimbursed to the insurance company that previously provided payments.

In October 2014, we filed a separate lawsuit, Rimini Street Inc. v. Oracle Int'l Corp. (United States District Court for the District of Nevada) ("Rimini II"), against Oracle seeking a declaratory judgment that our revised development processes, in use since at least July 2014, do not infringe certain Oracle copyrights. In February 2015, Oracle filed a counterclaim alleging copyright infringement, which included (i) substantially the same allegations asserted in Rimini I but limited to new or existing clients for whom we provided support from the conclusion of Rimini I discovery in December 2011 until the revised support processes were fully implemented by July 2014, and (ii) new allegations that our revised support processes also infringe Oracle copyrights. Oracle's counterclaim also included allegations of violation of the Lanham Act. It also sought an accounting. On February 28, 2016, Oracle filed amended counterclaims adding allegations of violation of the Digital Millennium Copyright Act. On December 19, 2016, we filed an amended complaint against Oracle asking for a declaratory judgment of non-infringement of copyright and alleging intentional interference with contract, intentional interference with prospective economic advantage, violation of the Nevada Deceptive Trade Practices Act, violation of the Lanham Act, and violation of California Business & Professions Code § 17200 et seq. On January 17, 2017, Oracle filed a motion to dismiss our amended claims and filed its third amended counterclaims, adding three new claims for a declaratory judgment of no intentional interference with contractual relations, no intentional interference with prospective economic advantage, and no violation of California Business & Professions Code § 17200 et seq. On February 14, 2017, we filed our answer and motion to dismiss Oracle's third amended counterclaims. On March 7, 2017, Oracle filed a motion to strike our copyright misuse affirmative defense. By stipulation of the parties, the District Court granted our motion to file our third amended complaint to add claims arising from Oracle's purported revocation of our access to its support websites on behalf of our clients, which was filed and served on May 2, 2017. By agreement of the parties, Oracle filed its motion to dismiss our third amended complaint on May 30, 2017, and our opposition was filed on June 27, 2017, and Oracle's reply was filed on July 11, 2017. On September 22, 2017 the Court issued an order granting in part and denying in part our motion to dismiss Oracle's third amended counterclaims. The Court granted our motion to dismiss as to count five, intentional interference with prospective economic advantage, and count eight unjust enrichment. On October 5, 2017, Oracle filed a motion for reconsideration of the Court's September 22, 2017 Order. We filed our opposition to Oracle's motion for reconsideration on October 19, 2017. Oracle filed its reply to its motion for reconsideration on October 26, 2017. On November 7, 2017, the Court issued an order granting in part and denying in part Oracle's motion to dismiss our third amended complaint. The Court granted Oracle's motion to dismiss as to our third cause of action for a declaratory judgment that Oracle has engaged in copyright misuse, fifth cause of action for intentional interference with prospective economic advantage; sixth cause of action for a violation of Nevada's Deceptive Trade Practices Act under the "bait and switch" provision of NRS § 598.0917; and seventh cause of action for violation of the Lanham Act. The Court denied Oracle's motion as to our causes of action for intentional interference with contractual relations, violation of Nevada Deceptive Trade Practices Act, under the "false and misleading" provision of NRS § 598.0915(8) and unfair competition. On November 17, 2017, the Court denied Oracle's motion for reconsideration of the Court's September 22, 2017 Order. On November 22, 2017, we filed a motion for reconsideration of the Court's November 7, 2017 Order. Oracle filed its opposition to our motion for reconsideration on December 6, 2017, to which we filed our reply on December 13, 2017. That motion is still pending the Court's decision.

Fact discovery with respect to the above action substantially ended in February 2018, with some depositions rescheduled to March 2018 to accommodate witness or counsel availability, and expert discovery is currently expected to end in July 2018. There is currently no trial date scheduled, and we do not expect a trial to occur in this matter earlier than 2020, but the trial could occur earlier or later than that. Given that discovery is ongoing, we do not have sufficient information regarding possible damages exposure for the counterclaims asserted by Oracle or possible recovery by us in connection with our claims against Oracle. Both parties are seeking injunctive relief in addition to monetary damages in this matter.

For counterclaims in Rimini II on which Oracle may prevail, we could be required to pay substantial damages for our current or past business activities, be enjoined from certain business practices and/or be in breach of various covenants in our Financing Agreement with certain lenders listed therein, Cortland Capital Market Services as administrative agent and collateral agent, and CB Agent Services LLC as origination agent for the lenders, and the other parties named therein, dated as of June 24, 2016, as amended from time to time (the "Credit Facility"), which itself could result in an event of default, in which case the lenders could demand accelerated repayment of principal, accrued and default interest, and other fees and expenses. Any of these outcomes could result in a material adverse effect on our business and the pendency of the litigation alone could dissuade clients from purchasing or continuing to purchase our services. Our business has been and may continue to be materially harmed by this litigation and Oracle's conduct. During the course of these cases, we anticipate there will be rulings by the District Court in Rimini II and the Court of Appeals in Rimini I in connection with hearings, motions, decisions and other matters, as well as other interim developments related to the litigations. If securities analysts or investors regard these rulings as negative, the market price of our common stock may decline. If current or prospective clients regard these rulings as negative, it could negatively impact our new client sales or renewal sales.

While we plan to continue vigorously litigate the appeal in Rimini I and litigate the claims and counterclaims in Rimini II, we are unable to predict the timing or outcome of these lawsuits. No assurance is or can be given that we will prevail on any appeal, claim or counterclaim.

See Item 3, *Legal Proceedings* and Notes 10 and 15 of the 2017 consolidated financial statements included in Item 8 of this Report for more information related to this litigation.

**The Oracle software products that are part of our ongoing litigation with Oracle represent a significant portion of our current revenue.**

Subject to the final outcome of the appeal, during 2016 we paid the Rimini I final judgment of $124.4 million in full, and recovery of any part of the judgment will depend on the outcome of the appeal. If the permanent injunction is reinstated and upheld on further appeal in Rimini I, we estimate it will cost us between 1% and 2% of net revenue to further modify our support processes to comply with the terms of the injunction as ordered by the District Court. In Rimini II, Oracle has filed counterclaims relating to our support services for Oracle's PeopleSoft, J.D. Edwards, Siebel, E-Business Suite and Database software products. For the year ended December 31, 2017, approximately 72% of our total revenue was derived from the support services that we provide for our clients using Oracle's PeopleSoft, J.D. Edwards, Siebel, E-Business Suite and Database software products. The percentage of revenue derived from services we provide for just PeopleSoft software was approximately 19% of our total revenue during this same period. Although we provide support services for additional Oracle product lines that are not subject to litigation and support services for software products provided by companies other than Oracle, our current revenue depends significantly on the product lines that are the subject of the Rimini II litigation and Rimini I appeal. Should Oracle prevail on its claims in Rimini II or should an injunction be entered in the future in either litigation, we could be required to change the way we provide support services to some of our clients, which could result in the loss of clients and revenue, and may also give rise to claims for compensation from our clients, any of which could have a material adverse effect on our business, financial condition and results of operations.

*Our ongoing litigation with Oracle presents challenges for growing our business.*

We have experienced challenges growing our business as a result of our ongoing litigation with Oracle. Many of our existing and prospective clients have expressed concerns regarding our ongoing litigation and, in some cases, have been subjected to subpoenas, depositions and various negative communications by Oracle in connection with the litigation. We have experienced in the past, and may continue to experience in the future, volatility and slowness in acquiring new clients, as well as clients not renewing their agreements with us, due to these challenges relating to our ongoing litigation with Oracle. Further, certain of our prospective and existing clients may be subject to additional subpoenas, depositions and negative communications from software vendors. We have taken steps to minimize disruptions to our existing and prospective clients regarding the litigation, but we continue to face challenges growing our business while the litigation remains ongoing. In certain cases, we have agreed to reimburse our clients for their reasonable legal fees incurred in connection with any litigation-related subpoenas and depositions or to provide indemnification or termination rights if any outcome of litigation results in our inability to continue providing any of the paid-for services. In addition, we believe the length of our sales cycle is longer than it otherwise would be due to prospective client diligence on possible effects of the Oracle litigation on our business. We cannot assure you that we will continue to overcome the challenges we face as a result of the litigation and continue to renew existing clients or secure new clients.

*Oracle has a history of litigation against companies offering alternative support programs for Oracle products, and Oracle could pursue additional litigation with us.*

Oracle has been active in litigating against companies that have offered competing maintenance and support services for their products. For example, in March 2007, Oracle filed a lawsuit against SAP and its wholly-owned subsidiary, TomorrowNow, Inc., a company our Chief Executive Officer, Seth Ravin, joined in 2002, and which was acquired by SAP in 2005. After a jury verdict awarding Oracle $1.3 billion, the parties stipulated to a final judgment of $306 million subject to appeal. After the appeal, the parties settled the case in November 2014 for $356.7 million. In February 2012, Oracle filed suit against Service Key, Inc. and settled the case in October 2013. Oracle also filed suit against CedarCrestone Corporation in September 2012 and settled the case in July 2013. TomorrowNow and CedarCrestone offered maintenance and support for Oracle software products, and Service Key offered maintenance and support for Oracle technology products. Given Oracle's history of litigation against companies offering alternative support programs for Oracle products, we can provide no assurance, regardless of the outcome of our current litigations with Oracle, that Oracle will not pursue additional litigation against us. Such additional litigation could be costly, distract our management team from running our business and reduce client interest and our sales revenue.

*We have received a federal grand jury inquiry directing delivery of certain documents relating to the Company's operations. If such inquiry leads to legal proceedings against the Company, the Company would incur legal costs and may potentially suffer an adverse outcome negatively affecting our business and financial results.*

On March 2, 2018, we received a subpoena directing us to produce to a federal grand jury certain communications and documents relating to the Company's support for certain software systems and certain related operational practices. We intend to cooperate with this governmental inquiry but cannot predict its ultimate resolution. A governmental inquiry, and any legal proceedings instituted involving us, if any, from such inquiry, would require us to incur legal costs, and if adversely determined, may ultimately result in the imposition of fines or other penalties. The mere fact of a grand jury inquiry regardless of merit or outcome could have a negative impact on our future net revenue and our prospects to obtain new or alternative financing. Any such material costs and expenses or other penalties could have a material adverse effect on our financial condition and results of operations.

<u>Risks Related to Indebtedness</u>

*We have substantial indebtedness, and the fact that a significant portion of our cash flow is used to make debt service payments could adversely affect our ability to raise additional capital to fund our operations, limit our ability to react to changes in the economy or our industry and prevent us from making debt service payments.*

We have substantial indebtedness. As of December 31, 2017, our indebtedness included principal obligations of $125.9 million, mandatory exit fees of $9.6 million, and mandatory consulting fees of $4.0 million that result in total contractual liabilities under the Credit Facility of $139.5 million as of December 31, 2017. Additionally, we were obligated under the Credit Facility to make future payments for an amendment fee of $1.25 million and an equity raise delay fee of $1.25 million to the lenders pursuant to the fifth amendment to the Credit Facility (the "Fifth Amendment"), and an amendment fee of $3.75 million pursuant to the sixth amendment to the Credit Facility (the "Sixth Amendment"). Further, the Credit Facility has a make-whole applicable premium provision that expires in June 2019. As a result, a significant portion of our liquidity needs are for servicing debt, including significant interest payments and significant monthly amortization. See Note 5 to our consolidated financial statements for the year ended December 31, 2017 included in Item 8 of this Report for details of our outstanding indebtedness under the Credit Facility, including the related restrictive covenants. In addition, upon consummation of the business combination, an outstanding loan payable incurred by GPIA that is payable to GPIC, Ltd. ("GPIC") for approximately $3.0 million was not repaid and will remain as our continuing obligation. This loan is non-interest bearing and will become due and payable when the outstanding principal balance under the Credit Facility is less than $95.0 million.

**Exhibit 23.1**

**Consent of Independent Registered Public Accounting Firm**

The Board of Directors
Rimini Street, Inc.:

We consent to the incorporation by reference in the registration statements on Form S-8 (No. 333-222104), Form S-1 (No. 333-221709) and Form S-8/S-3 (No. 333-223471) of Rimini Street, Inc. of our report dated March 15, 2018, with respect to the consolidated balance sheets of Rimini Street, Inc. as of December 31, 2017 and 2016, and the related consolidated statements of operations and comprehensive loss, stockholders' deficit, and cash flows for each of the years in the three-year period ended December 31, 2017, and the related notes (collectively, the "consolidated financial statements"), which report appears in the December 31, 2017 annual report on Form 10-K of Rimini Street, Inc..

/s/ KPMG LLP

San Francisco, California
March 15, 2018

**EXHIBIT 31.1**

**CERTIFICATION**

I, Seth A. Ravin, certify that:

1. I have reviewed this Annual Report on Form 10-K of Rimini Street, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and have:

    (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (c) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

    (a) All significant deficiencies and material weaknesses in the design or operation of internal controls over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls over financial reporting.

Date: March 15, 2018

/s/ Seth A. Ravin
Seth A. Ravin
Title: Chief Executive Officer
(Principal Executive Officer)

**EXHIBIT 31.2**

**CERTIFICATION**

I, Thomas B. Sabol, certify that:

1   I have reviewed this Annual Report on Form 10-K of Rimini Street, Inc.;

2.   Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.   The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and have:

   (a)   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   (b)   Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   (c)   Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.   The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

   (a)   All significant deficiencies and material weaknesses in the design or operation of internal controls over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   (b)   Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls over financial reporting.

Date: March 15, 2018

/s/ Thomas B. Sabol
Thomas B. Sabol
Title: Chief Financial Officer
(Principal Financial and Accounting Officer)

**EXHIBIT 32.1**

**CERTIFICATION PURSUANT TO**
**18 U.S.C. 1350**
**(SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002)**

Pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, I, Seth A. Ravin, Chief Executive Officer of Rimini Street, Inc. (the "Company"), certify, that, to the best of my knowledge:

1. The Annual Report on Form 10-K of the Company for the year ended December 31, 2017 (the "Report") fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and

2. The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Dated: March 15, 2018                                   By: /s/ Seth A. Ravin
                                                            Seth A. Ravin
                                                            Title: Chief Executive Officer
                                                            (Principal Executive Officer)

A signed original of this written statement required by Section 906 of the Sarbanes-Oxley Act of 2002 has been provided to the Company and will be retained by the Company and furnished to the Securities and Exchange Commission or its staff upon request.

EXHIBIT 32.2

CERTIFICATION PURSUANT TO
18 U.S.C. 1350
(SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002)

Pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, I, Thomas B. Sabol, Chief Financial Officer of Rimini Street, Inc. (the "Company"), certify, that, to the best of my knowledge:

1. The Annual Report on Form 10-K of the Company for the year ended December 31, 2017 (the "Report") fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and

2. The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Dated: March 15, 2018

By: /s/ Thomas B. Sabol
Thomas B. Sabol
Title: Chief Financial Officer
(Principal Financial and Accounting Officer)

A signed original of this written statement required by Section 906 of the Sarbanes-Oxley Act of 2002 has been provided to the Company and will be retained by the Company and furnished to the Securities and Exchange Commission or its staff upon request.