# Exhibit A:

*Oracle USA, Inc. v. Rimini St., Inc.*,
879 F.3d 948 (9th Cir. 2018)

Case 2:10-cv-00106-LRH-VCF Document 1134-1 Filed 04/04/18 Page 2 of 17

Oracle USA, Inc. v. Rimini Street, Inc., 879 F.3d 948 (2018)
2018 Copr.L.Dec. P 31,207, 125 U.S.P.Q.2d 1380, 18 Cal. Daily Op. Serv. 230...

879 F.3d 948
United States Court of Appeals, Ninth Circuit.

ORACLE USA, INC., a Colorado corporation;
Oracle America, Inc., a Delaware corporation;
Oracle International Corporation, a
California corporation, Plaintiffs-Appellees,
v.
RIMINI STREET, INC., a Nevada corporation;
Seth Ravin, an individual, Defendants-Appellants.

Nos. 16-16832
|
16-16905
|
Argued and Submitted July 13,
2017 San Francisco, California
|
Filed January 8, 2018

**Synopsis**
**Background:** Software developer that held copyright in computer programs filed suit against provider of software support services, and its chief executive officer (CEO), alleging, among other things, copyright infringement and violations of Computer Fraud and Abuse Act (CFAA), California Computer Data Access and Fraud Act (CDAFA), and Nevada Computer Crimes Law (NCCL). Following partial summary judgment and jury verdict in favor of developer, the United States District Court for the District of Nevada, No. 2:10-cv-00106-LRH-VCF, Larry R. Hicks, J., 209 F.Supp.3d 1200, granted developer's motion for permanent injunction, prejudgment interest, and attorney fees. Provider appealed.

**Holdings:** The Court of Appeals, Jeremy D. Fogel, District Judge, sitting by designation, held that:

[1] provider infringed developer's copyright by copying its programs to create development environments for future customers under color of licenses of its existing customers;

[2] copyright misuse doctrine did not bar developer from granting licenses that limited provider to copying its programs only to support use of programs by its existing customers that held license;

[3] provider infringed developer's copyright by maintaining copies of developer's program on its own computers, as opposed to licensees' computers;

[4] copyright misuse doctrine did not bar developer from granting licenses that restricted provider to maintaining copies of its programs on its own computers;

[5] provider did not violate CDAFA and NCCL by taking developer's data by method prohibited by applicable terms of use;

[6] District Court was within its discretion in calculating award of prejudgment interest; but

[7] remand was required for District Court to apply four-factor test for granting permanent injunctions.

Affirmed in part, reversed in part, and vacated and remanded in part.

West Headnotes (26)

[1] **Federal Courts**
  Taking case or question from jury;
judgment as a matter of law

  The Court of Appeals reviews de novo the district court's denial of a motion for judgment as a matter of law.

  Cases that cite this headnote

[2] **Federal Civil Procedure**
  Evidence
  **Federal Civil Procedure**
  Construction of evidence

  A renewed motion for judgment as a matter of law is properly granted only if the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict.

  1 Cases that cite this headnote

Case 2:10-cv-00106-LRH-VCF   Document 1134-1   Filed 04/04/18   Page 3 of 17

Oracle USA, Inc. v. Rimini Street, Inc., 879 F.3d 948 (2018)
2018 Copr.L.Dec. P 31,207, 125 U.S.P.Q.2d 1380, 18 Cal. Daily Op. Serv. 230...

[3] **Federal Courts**
  Verdict

A jury's verdict must be upheld if it is supported by substantial evidence, which is evidence adequate to support the jury's conclusion, even if it is also possible to draw a contrary conclusion.

Cases that cite this headnote

[4] **Copyrights and Intellectual Property**
  Defenses

The existence of a license creates an affirmative defense to a claim of copyright infringement. 17 U.S.C.A. § 501(a).

Cases that cite this headnote

[5] **Copyrights and Intellectual Property**
  Acts Constituting Infringement

When a licensee exceeds the scope of the license granted by the copyright holder, the licensee is liable for infringement. 17 U.S.C.A. § 501(a).

Cases that cite this headnote

[6] **Copyrights and Intellectual Property**
  Trial

Jury instruction that it was permissible for provider of software support services to make copies of software developer's copyrighted computer programs, as third-party to its customers' licenses, did not construe permissible direct use out of licenses, where instruction specifically told jury that provider could hold copies of developer's programs solely for its customers' archive or emergency back-up purposes or disaster recovery and related testing.

Cases that cite this headnote

[7] **Federal Courts**
  Failure to mention or inadequacy of treatment of error in appellate briefs

On appeal, arguments not raised by a party in its opening brief are deemed waived.

Cases that cite this headnote

[8] **Copyrights and Intellectual Property**
  Licenses in general

Licenses permitting licensees to copy software developer's copyrighted computer programs for archival and support purposes, and to outsource archival and support work to third parties, did not authorize provider of software support services to copy developer's program to create development environments for future customers using licenses of its existing customers, where each license limited copying and use to supporting particular licensee, and any work that provider performed under color of license held by its existing customer for other customers was not work in support of that particular licensee.

Cases that cite this headnote

[9] **Copyrights and Intellectual Property**
  Defenses

The copyright misuse doctrine prevents holders of copyrights from leveraging their limited monopoly to allow them control of areas outside the monopoly.

Cases that cite this headnote

[10] **Copyrights and Intellectual Property**
  Defenses

While it does prevent copyright holders from using the conditions to stifle competition, the copyright misuse doctrine does not prohibit using conditions to control use of copyrighted material.

Cases that cite this headnote

[11] **Copyrights and Intellectual Property**
  Defenses

The copyright misuse doctrine is to be applied sparingly; specifically, it operates when copyright holders attempt to impose license

Case 2:10-cv-00106-LRH-VCF   Document 1134-1   Filed 04/04/18   Page 4 of 17

**Oracle USA, Inc. v. Rimini Street, Inc., 879 F.3d 948 (2018)**
2018 Copr.L.Dec. P 31,207, 125 U.S.P.Q.2d 1380, 18 Cal. Daily Op. Serv. 230...

agreements that would prevent licensees from using any other competing product.

Cases that cite this headnote

[12]  **Copyrights and Intellectual Property**
      Defenses

Copyright misuse doctrine did not bar software developer from granting licenses that limited third-party provider of software support services to copying its copyrighted computer programs only to support use of programs by its existing customers that held license; licenses did not preclude third parties from developing competing software or providing competing support services.

Cases that cite this headnote

[13]  **Federal Courts**
      Summary judgment
      **Federal Courts**
      Summary judgment

The Court of Appeals reviews a district court's grant of summary judgment de novo, and, in doing so, the Court must determine whether, viewing the evidence in the light most favorable to the nonmoving party, there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law.

1 Cases that cite this headnote

[14]  **Copyrights and Intellectual Property**
      Other works

Licenses expressly limiting copying software developer's copyrighted computer programs to only licensee's facilities did not authorize provider of software support services to create development environments on its own computers, as opposed to licensees' computers, where provider's servers where copying took place were outside control of its licensed customers.

Cases that cite this headnote

[15]  **Copyrights and Intellectual Property**
      Defenses

Copyright misuse doctrine did not bar software developer from granting licenses that restricted third-party provider of software support services to maintaining copies of its copyrighted computer programs on its own computers, as opposed to its licensed customers' computers; restriction on location of copies did not stifle competition.

Cases that cite this headnote

[16]  **Telecommunications**
      Fraud;unauthorized access or transmission

Provider of software support services did not violate the California Computer Data Access and Fraud Act (CDAFA) or Nevada Computer Crimes Law (NCCL) by taking and using software developer's data, even though provider used automated tools to take data in direct contravention of developer's terms of use, where provider was authorized in the first instance to take and use information that it downloaded. Cal. Penal Code § 502(c); Nev. Rev. Stat. § 205.4765 (1), (3).

1 Cases that cite this headnote

[17]  **Telecommunications**
      Fraud;unauthorized access or transmission

Taking data using a method prohibited by the applicable terms of use, when the taking itself generally is permitted, does not violate the California Computer Data Access and Fraud Act (CDAFA) or the Nevada Computer Crimes Law (NCCL). Cal. Penal Code § 502(c); Nev. Rev. Stat. § 205.4765(1), (3).

1 Cases that cite this headnote

[18]  **Federal Courts**
      Interest

Case 2:10-cv-00106-LRH-VCF   Document 1134-1   Filed 04/04/18   Page 5 of 17

**Oracle USA, Inc. v. Rimini Street, Inc., 879 F.3d 948 (2018)**
2018 Copr.L.Dec. P 31,207, 125 U.S.P.Q.2d 1380, 18 Cal. Daily Op. Serv. 230...

The Court of Appeals reviews a district court's decision to award prejudgment interest for abuse of discretion.

[Cases that cite this headnote]

[19]  **Federal Courts**
      Interest

The Court of Appeals reviews the rate used by the district court to calculate prejudgment interest for abuse of discretion.

[Cases that cite this headnote]

[20]  **Interest**
      Computation of rate in general

District Court was within its discretion in calculating award of prejudgment interest based upon Treasury rate on date copyright infringement began, rather than on date of judgment in favor of software developer, where the Court did not use higher rate in effect on date of infringement based solely on litigation conduct on part of provider of software support services, but, rather, it used higher rate based primarily on jury's award of copyright damages based on hypothetical license, making it appropriate to approximate licensing fees that developer lost out on and would have received, absent infringement. 28 U.S.C.A. § 1961.

[Cases that cite this headnote]

[21]  **Interest**
      Prejudgment Interest in General

Prejudgment interest is an element of compensation, not a penalty. 28 U.S.C.A. § 1961.

[Cases that cite this headnote]

[22]  **Federal Courts**
      Injunction

As to a permanent injunction, the Court of Appeals reviews the district court's legal conclusions de novo, its factual findings for clear error, and its decision to grant a permanent injunction, as well as its scope, for an abuse of discretion.

[Cases that cite this headnote]

[23]  **Federal Courts**
      Injunction

To review a grant of permanent injunction for abuse of discretion, the Court of Appeals first looks to whether the trial court identified and applied the correct legal rule, then to whether the trial court's resolution of the motion resulted from a factual finding that was illogical, implausible, or without support in inferences that may be drawn from the facts in the record.

[Cases that cite this headnote]

[24]  **Federal Courts**
      Issues or questions not passed on below

Remand was required for District Court to apply four-factor test for granting permanent injunction, in software developer's action against provider of software support services, alleging copyright infringement and violations of state computer laws, where District Court had assessed factors by reference to both copyright infringement and state computer law claims, without considering separately propriety of issuing injunction as to copyright claims alone, and Court of Appeals reversed judgment as to state computer law claims.

[Cases that cite this headnote]

[25]  **Federal Courts**
      Costs and attorney fees

The Court of Appeals reviews the award of fees and costs for abuse of discretion, but will overturn it if it is based on an erroneous determination of law.

[Cases that cite this headnote]

[26]  **Courts**
      Decisions of Same Court or Co-ordinate Court

Case 2:10-cv-00106-LRH-VCF   Document 1134-1   Filed 04/04/18   Page 6 of 17

Oracle USA, Inc. v. Rimini Street, Inc., 879 F.3d 948 (2018)
2018 Copr.L.Dec. P 31,207, 125 U.S.P.Q.2d 1380, 18 Cal. Daily Op. Serv. 230...

The Court of Appeals is bound by its precedent unless the theory or reasoning of the decision is clearly irreconcilable with a higher intervening authority, such as a decision by the Supreme Court.

[Cases that cite this headnote](#)

Appeals from the United States District Court for the District of Nevada, [Larry R. Hicks](#), District Judge, Presiding, D.C. No. 2:10-cv-00106-LRH-VCF

**Attorneys and Law Firms**

[Mark A. Perry](#) (argued) and [Jeremy M. Christiansen](#), Gibson Dunn & Crutcher LLP, Washington, D.C.; [Blaine H. Evanson](#), [Joseph A. Gorman](#), and [Joseph C. Hansen](#), Gibson Dunn & Crutcher LLP, Los Angeles, California; for Defendants-Appellants.

[Paul D. Clement](#) (argued), [Erin E. Murphy](#), and [Matthew D. Rowen](#), Kirkland & Ellis LLP, Washington, D.C.; [William A. Isaacson](#) and [Karen L. Dunn](#), Boies Schiller & Flexner LLP, Washington, D.C.; [Thomas S. Hixson](#) and [John A. Polito](#), Morgan Lewis & Bockius LLP, San Francisco, California; [David B. Salmons](#), Morgan Lewis & Bockius LLP, Washington, D.C.; for Plaintiffs-Appellees.

[Jamie Williams](#) and Aileen Nguyen, San Francisco, California, as and for Amicus Curiae Electronic Frontier Foundation.

Before: [Susan P. Graber](#) and [Michelle T. Friedland](#), Circuit Judges, and Jeremy D. Fogel,[*] District Judge.

**Opinion**

## OPINION

FOGEL, District Judge:

 **\*952** Oracle USA, Inc. and related entities (collectively, "Oracle") licenses its proprietary enterprise software for a substantial one-time payment. Oracle also sells its licensees maintenance contracts for the software that are renewed on an annual basis. The maintenance work includes software updates, which Oracle makes available to purchasers of the contracts through its support website.

At all relevant times, Rimini Street, Inc. ("Rimini") provided third-party support for Oracle's enterprise software, in lawful competition with Oracle's direct maintenance services. But in order to compete effectively, Rimini also needed to provide software updates to its customers.[1] Creating these software updates inherently required copying Oracle's copyrighted software, which, unless allowed by license, would be copyright infringement. With Oracle's knowledge, Rimini in fact did copy the software to provide the updates. At least from late 2006 to early 2007, Rimini obtained software from Oracle's website with automated downloading tools in direct contravention of the terms of use of the website.

Oracle filed suit against Rimini and Rimini's CEO, Seth Ravin ("Ravin"), in the District of Nevada in 2010. After lengthy and sometimes contentious discovery and motion practice, the district court granted partial summary judgment to Oracle on certain aspects of Oracle's copyright infringement claim, and a jury found in favor of Oracle on others after trial. The jury also found against both Rimini and Ravin with respect to Oracle's claims under the California Comprehensive Data Access and Fraud Act ("CDAFA") and the Nevada Computer Crimes Law ("NCCL") (collectively, the "state computer laws"). Based on the jury's determination with respect to the CDAFA claim, the district court entered judgment against Rimini and Ravin under California's Unfair Competition Law ("UCL"). The jury awarded damages in the sum of $50,027,000 which, when prejudgment interest, attorneys' fees and costs were added, resulted in a total monetary judgment of $124,291,396.82. The district court also issued an extensive permanent **\*953** injunction. Rimini subsequently filed this timely appeal. The Electronic Frontier Foundation ("EFF") has filed an amicus brief with respect to the state computer law claims.

The first principal dispute in this case is whether Rimini copied Oracle's software in a manner that infringed Oracle's copyright. It is undisputed that Rimini used Oracle's software to develop and test updates for its customers and that the software licenses, with certain restrictions, permitted Oracle's licensees to hire Rimini to perform such work for them. There are numerous subtleties involved but, at the highest level of generality, Rimini's alleged copyright infringement included copying under the license of one customer for work for other

Case 2:10-cv-00106-LRH-VCF Document 1134-1 Filed 04/04/18 Page 7 of 17

Oracle USA, Inc. v. Rimini Street, Inc., 879 F.3d 948 (2018)
2018 Copr.L.Dec. P 31,207, 125 U.S.P.Q.2d 1380, 18 Cal. Daily Op. Serv. 230...

existing customers or for unknown or future customers, rather than restricting such copying to work for that particular customer. The second principal dispute is whether Rimini and Ravin violated applicable state laws intended to prevent computer-based fraud by flouting Oracle's restrictions against the use of automated tools to download software from its website. We also consider the appropriateness of the remedies awarded by the district court.

As explained below, we affirm the judgment with respect to the copyright infringement claims. We also affirm the remedies with respect to those claims, except that we vacate the injunction and the award of attorneys' fees and remand for reconsideration in light of this opinion. We modify the district court's award of taxable costs as the parties have agreed. We reverse the judgment with respect to Oracle's claims under the state computer laws and the UCL.

I. Copyright Infringement Claims

A. The Software in Suit [2]

Four software products are at issue: J.D. Edwards, Siebel, PeopleSoft, and Database. The products are related, but they do not perform identical functions. As the district court explained:

> Oracle's Enterprise Software platforms have both an installed database component and an installed application component. The database component provides a foundation for the application software which then uses, stores, and retrieves data in the database for use across an entire organization. Oracle's Enterprise Software application programs— including its PeopleSoft, J.D. Edwards, and Siebel-branded products—are run on Oracle's Relational Database Management Software ("Oracle Database") as the database component for the programs.

*Oracle USA, Inc. v. Rimini St., Inc.*, 6 F.Supp.3d 1108, 1113 (D. Nev. 2014) ("*Oracle II*"). J.D. Edwards, Siebel, and PeopleSoft were acquired by Oracle from other companies, while Oracle developed Database internally.

Because of this history and because of the technical differences among them, the licensing terms of the four products are not identical. We first address J.D. Edwards and Siebel. We next turn to PeopleSoft and, finally, to Database.

B. J.D. Edwards and Siebel

[1] [2] [3] Oracle's claims as to the J.D. Edwards and Siebel software were submitted to the jury. Rimini appeals the district court's denial of its motion for judgment as a matter of law following the jury's verdict. ***954** "We review de novo the district court's denial of a motion for judgment as a matter of law. A renewed motion for judgment as a matter of law is properly granted only 'if the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict.' " *Castro v. Cty. of Los Angeles*, 833 F.3d 1060, 1066 (9th Cir. 2016) (en banc) (citations omitted) (quoting *Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir. 2002)) (internal quotation mark omitted), *cert. denied*, ––– U.S. ––––, 137 S.Ct. 831, 197 L.Ed.2d 69 (2017). "A jury's verdict must be upheld if it is supported by substantial evidence, which is evidence adequate to support the jury's conclusion, even if it is also possible to draw a contrary conclusion." *Id.* (quoting *Pavao*, 307 F.3d at 918) (internal quotation marks omitted).

Rimini challenges the jury's finding of copyright infringement with respect to these products on two grounds. First, it argues that its activities were permissible under the terms of the licenses Oracle granted to its customers. Second, it contends that holding it accountable for its alleged conduct would condone copyright misuse. Neither of these arguments is persuasive.

1. Express License Defense

As will be explained in further detail, there is no dispute that, absent an applicable license, Rimini's accused acts violated the exclusive right Oracle enjoys as owner of the software copyright to copy or to modify the software. Rimini asserts as an affirmative defense that its accused acts were expressly licensed.

Case 2:10-cv-00106-LRH-VCF   Document 1134-1   Filed 04/04/18   Page 8 of 17

**Oracle USA, Inc. v. Rimini Street, Inc., 879 F.3d 948 (2018)**
2018 Copr.L.Dec. P 31,207, 125 U.S.P.Q.2d 1380, 18 Cal. Daily Op. Serv. 230...

**[4]** **[5]** The Supreme Court has explained the express license defense as follows:

> "Anyone who violates any of the exclusive rights of the copyright owner," that is, anyone who trespasses into his exclusive domain by using or authorizing the use of the copyrighted work in one of the five ways set forth in the statute, "is an infringer of the copyright." Conversely, anyone who is authorized by the copyright owner to use the copyrighted work in a way specified in the statute ... is not an infringer of the copyright with respect to such use."

*Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 433, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984) (quoting 17 U.S.C. § 501(a)). Thus, "[t]he existence of a license creates an affirmative defense to a claim of copyright infringement." *Worldwide Church of God v. Phila. Church of God, Inc.*, 227 F.3d 1110, 1114 (9th Cir. 2000). However, "[w]hen a licensee exceeds the scope of the license granted by the copyright holder, the licensee is liable for infringement." *LGS Architects, Inc. v. Concordia Homes of Nev.*, 434 F.3d 1150, 1156 (9th Cir. 2006).

As Rimini itself did not have a license to copy or to modify from Oracle, the success of Rimini's affirmative defense turns on whether Rimini's accused acts came within the scope of licenses held by its customers.

a) Software Licenses

The pertinent provisions of the J.D. Edwards and Siebel licenses are excerpted below:

**\*955**

| Software | License Language |
|---|---|
| J.D. Edwards | "Customer shall not, or cause anyone else to ... (iii) copy the Documentation or Software except to the extent necessary for Customer's archival needs and to support the Users." |
| Siebel | "Customer" may "reproduce, exactly as provided by [Oracle], a reasonable number of copies of the Programs and the Ancillary Programs solely for archive or emergency back-up purposes or disaster recovery and related testing." |

Like the language of the licenses themselves, the district court's constructions of the two licenses when instructing the jury were similar.

The district court told the jury that it was permissible for Rimini, as a third-party, to make copies of the Oracle software to support its customers by archiving, backup, and related testing. At the same time, the district court instructed that the licenses "do[ ] not mean that a third party like Rimini Street is authorized to make copies of the ... software application ... to use the customer's software ... to support other customers."

b) Accused Acts

(1) Background

Work produced by humans is rarely if ever perfect, and computer software is no exception. Even casual users of computers are familiar with regular software patches and updates intended to correct glitches and to modify software in light of changing circumstances.

However, unlike the off-the-shelf consumer software used by individuals in everyday life, enterprise software employed by large organizations is customized around the organizations' specific needs. While producers of consumer software generally design updates around standard use cases and make them available for end users to download and install directly, updates to enterprise software must be tested and modified to fit with bespoke customizations before being put to actual use.

This testing process requires the creation of "development environments." A "development environment," sometimes called a "sandbox," is distinct from a "production environment," which is the "live" version of the software that members of the enterprise ultimately deploy. As the district court explained:

> In order to develop and test software updates for Enterprise Software, support service providers ... create development environments of the software. A development environment is a software environment that contains a copy of the software program which is

Case 2:10-cv-00106-LRH-VCF   Document 1134-1   Filed 04/04/18   Page 9 of 17

Oracle USA, Inc. v. Rimini Street, Inc., 879 F.3d 948 (2018)
2018 Copr.L.Dec. P 31,207, 125 U.S.P.Q.2d 1380, 18 Cal. Daily Op. Serv. 230...

then modified to develop and test software updates. Given the critical nature of Enterprise Software programs, updates to the software must be fully tested and verified in a development environment before they are provided to a customer.

Oracle USA, Inc. v. Rimini St., Inc., 6 F.Supp.3d 1086, 1092 n.4 (D. Nev. 2014) ("*Oracle I*").

**\*956** In other words, the very work of maintaining customized software requires copying the software, which without a license to do so is a violation of the exclusive right of the copyright owner. Here, it is undisputed that the licenses generally permit Oracle's licensees to maintain the software and make development environments for themselves. However, some licensees of the software, lacking either the capability or the interest, opt to outsource the work of maintenance to others, such as Rimini or even Oracle itself.

### (2) "Direct Use" and "Cross Use"

Oracle alleges that Rimini engaged in two distinct types of copyright infringement with respect to J.D. Edwards and Siebel. The first has to do with the way it created development environments, under color of a license held by these particular, identifiable customers of Rimini, for that specific customer. We refer to this as "direct use."

The second is "cross use."[3] "Cross use," generally speaking, is the creation of development environments, under color of a license of one customer, to support *other* customers. There are numerous forms of "cross use." In its narrowest form, "cross use" is the making of development environments, under color of a license held by one identifiable customer of Rimini, for another identifiable customer of Rimini that also holds a license. It also may include the creation of development environments under a given license for other customers of Rimini that may themselves hold licenses or even for licensees who have yet to become customers of Rimini. Rimini claims that "cross use" is not infringement, arguing that it may create environments without restriction because any organization that might hire Rimini to service its software would itself have a license to create development environments. Rimini's counsel explained at oral argument that "cross use" enabled it to reduce expense by reusing work it had done for one customer in providing service to others.

### c) Analysis

Rimini argues on appeal that the jury instructions were erroneous because they suggested that certain direct uses and cross uses were prohibited while Rimini believes they were permitted.

[6] With respect to "direct use," we may dispose quickly of Rimini's claim that the district court construed "direct use" out of the licenses. Rimini successfully persuaded the district court to include the language, "to support the customer's use," in its jury instruction about the J.D. Edwards license. The instruction concerning Siebel told the jury specifically that Rimini could hold copies of the Siebel software application "solely for customer's archive or emergency back-up purposes or disaster recovery and related testing." Rimini did not object to that instruction at trial, and, contrary to Rimini's arguments on appeal, those instructions treated these forms of direct use as permitted.

Rimini also argues, however, that the instructions should have approved expressly of other forms of direct use. The district court had no reason or need to instruct the jury that the licenses permitted other types of direct use, because, as the district court's order shows, Rimini had represented that the only forms of direct use it engaged in were those allowed by the instruction:

> **\*957** Rimini has proffered evidence that the development environments associated with [specific Siebel licensee] are used exclusively for archival and back-up purposes, and related testing, as directly contemplated by [the license].

*Oracle I*, 6 F.Supp.3d at 1105 n.20; *see also id.* at 1103 (similar findings concerning J.D. Edwards). Had Rimini wanted a broader construction, Rimini should have said so in district court. Having failed to do that, Rimini cannot complain that the jury found that Rimini's direct use with respect to J.D. Edwards and Siebel exceeded the scope of the licenses.

Case 2:10-cv-00106-LRH-VCF   Document 1134-1   Filed 04/04/18   Page 10 of 17

Oracle USA, Inc. v. Rimini Street, Inc., 879 F.3d 948 (2018)
2018 Copr.L.Dec. P 31,207, 125 U.S.P.Q.2d 1380, 18 Cal. Daily Op. Serv. 230...

[7] With respect to "cross use," Rimini's assertion—made for the first time in its reply brief to us—that "cross use" is a contractual rather than a copyright issue is not properly before us. The principal case on which Rimini relies, *MDY Industries, LLC v. Blizzard Entertainment, Inc.*, 629 F.3d 928 (9th Cir. 2011), was not cited in Rimini's opening brief, and "on appeal, arguments not raised by a party in its opening brief are deemed waived," *Smith v. Marsh*, 194 F.3d 1045, 1052 (9th Cir. 1999).[4]

[8] As to the substance of its position, Rimini argues that, contrary to the jury instructions, the licenses in fact permit "cross use." It observes that: 1) each of Rimini's customers had its own license; 2) each license permits copies to be made for archival and support purposes; 3) the licenses authorize the customers to outsource the archival and support work to third parties; and 4) such archival and support work includes the creation of development environments. Rimini dismisses evidence showing that it created development environments for future customers using the license of an existing customer on the basis that future customers presumably would have licenses that would permit them to hire Rimini to create development environments.

Oracle properly responds that each of the licenses at issue here "pointedly limits copying and use to supporting the '*Licensee*.'" The licenses do not authorize Rimini to "develop products *Rimini* could sell for *Rimini's* financial gain." Any work that Rimini performs under color of a license held by a customer for other existing customers cannot be considered work in support of that particular customer. The same logic applies to work Rimini performs for unknown, future customers. The licensees may hire a third party such as Rimini to maintain their software for them, but nothing in the licenses permits them to grant a non-party to the license a general right to copy proprietary software.

### 2. Copyright Misuse

[9] [10] [11] We turn next to the question of copyright misuse, which Rimini asserts as a defense. The copyright misuse doctrine prevents holders of copyrights "from leveraging their limited monopoly to allow them control of areas outside the monopoly." *Apple Inc. v. Psystar Corp.*, 658 F.3d 1150, 1157 (9th Cir. 2011). (quoting *A&M Records v. Napster, Inc.*, 239 F.3d 1004, 1026 (9th Cir. 2001)) (internal quotation marks omitted). To that end, while it "does prevent copyright holders from using the conditions to stifle competition," "[t]he copyright misuse doctrine does not prohibit using conditions to control use of copyrighted material." *Id.* at 1159. Accordingly, **\*958** the doctrine is to be "applied ... sparingly"; specifically, it operates when copyright holders attempt to impose license agreements that would "prevent[ ] ... licensee[s] from using *any other competing product*." *Id.* at 1157 (emphasis added).

[12] Rimini claims that holding it liable for copyright infringement would condone misuse of Oracle's copyright. In Rimini's view, the district court's pretrial construction of the licensing terms, as embodied in the jury instructions, "would foreclose competition in the aftermarket for third-party maintenance" because it would limit copies made by third parties to those made only for archival and emergency backup purposes and because the software could not be serviced simply by making exact copies. Oracle counters that the licenses "plainly do not preclude third parties from developing competing software or providing competing support services," but instead "require third parties to do so in ways that do not disregard Oracle's exclusive rights under copyright law."

We agree with Oracle. The district court did not construe the licenses to permit only archival and emergency backup purposes. For example, the jury instructions as to J.D. Edwards stated specifically:

> If you find that the copies of the J.D. Edwards software application ... housed on Rimini Street's servers were used solely for the customer's archival needs and *to support the customer's use*, then that use is authorized by the J.D. Edwards software license agreement....

The district court gave similar instructions as to Siebel. ("[Y]ou are informed that the court has ruled as a matter of law that the Siebel software license agreements authorized ... Rimini Street to make a reasonable number of copies ... solely for the customer's archive or emergency back-up purposes or disaster recovery *and related testing*." (emphasis added)). These constructions would not preclude Rimini from creating development environments for a licensee for various purposes *after* that licensee has become a customer of Rimini.

Case 2:10-cv-00106-LRH-VCF   Document 1134-1   Filed 04/04/18   Page 11 of 17

Oracle USA, Inc. v. Rimini Street, Inc., 879 F.3d 948 (2018)
2018 Copr.L.Dec. P 31,207, 125 U.S.P.Q.2d 1380, 18 Cal. Daily Op. Serv. 230...

The only remaining question is whether it would be copyright misuse to forbid Rimini from creating development environments for licensees *before* they have become customers or, in other words, whether it would contravene the policy of the Copyright Act to allow Oracle, as a copyright holder, to have a head start in making copies. The Supreme Court has held that "the right of first publication" is "an important marketable subsidiary right." *Harper & Row, Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 549, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985). Just as a copyright holder has the "right of first publication," it also must enjoy the right of "first copy." Giving a head start to Oracle in creating development environments is entirely consistent with the Supreme Court's teaching in *Harper*.

### C. PeopleSoft

[13] The district court granted summary judgment on Oracle's copyright claim with respect to PeopleSoft. "This Court reviews a district court's grant of summary judgment de novo. The Court must 'determine whether, viewing the evidence in the light most favorable to the nonmoving party, there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law.' " *Mitchell v. Washington*, 818 F.3d 436, 441–42 (9th Cir. 2016) (quoting *Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir. 2000) (en banc)).

Rimini again asserts an express license defense and contends that it would be **\*959** copyright misuse to hold it liable for infringement. Again, its arguments are without merit.

### 1. Express License Defense

The PeopleSoft license is similar to its J.D. Edwards and Siebel counterparts, but it contains an additional limitation about "[the licensee's] facilities":

| Software | License Language |
|---|---|
| PeopleSoft[5] | "Licensee may ... make a reasonable number of copies of the Software, solely for: (i) use in accordance with the terms set forth herein ... ; (ii) archive or emergency back-up purposes; and/or (iii) disaster recovery testing purposes[.]" "PeopleSoft grants Licensee a ... license to use the licensed Software, solely for Licensee's internal data processing operations at its facilities[.]" |

[**Editor's Note**: The preceding image contains the reference for footnote [5] ].

[14] Based on this limitation, the district court construed the PeopleSoft license more restrictively than the J.D. Edwards and Siebel licenses. Specifically, it stated that "[the PeopleSoft license] expressly limits copying the licensed software to only the [licensee's] facilities." *Oracle I*, 6 F.Supp.3d at 1097 (emphasis omitted).

Because of the difference in the construction of the pertinent licenses, the nature of Oracle's claim concerning PeopleSoft is somewhat different in character from those concerning J.D. Edwards and Siebel. Specifically, the accused act concerning PeopleSoft is the creation of development environments, whether for "direct use" or "cross use," on Rimini's own computers, as opposed to the licensees' computers. Rimini describes this practice as "local hosting," a term that we adopt in this opinion. Rimini asserts that it does this to avoid transmission delays.

In the words of the district court, "it is undisputed that Rimini made copies of the licensed software at its own facilities and *outside the control* of the [customers]." *Id. at 1101* (emphasis added). The district court concluded that the PeopleSoft licenses of Rimini's customers "do[ ] not authorize Rimini's off-site copies of the licensed software," and therefore granted summary judgment to Oracle on the copyright infringement claims as to PeopleSoft. *Id.* at 1097.

On appeal, Rimini contends that "[a licensee's] facilities" can span Rimini's own servers. In its words:

> Sophisticated companies like Oracle's customers (and Rimini's clients) do not keep all their servers on the actual premises of their principal place of business **\*960**

Case 2:10-cv-00106-LRH-VCF Document 1134-1 Filed 04/04/18 Page 12 of 17

**Oracle USA, Inc. v. Rimini Street, Inc., 879 F.3d 948 (2018)**
2018 Copr.L.Dec. P 31,207, 125 U.S.P.Q.2d 1380, 18 Cal. Daily Op. Serv. 230...

> .... They may own some, lease others, and contract with third parties for still more capacity. All are encompassed within the plain meaning of "facilities."

We agree with Oracle that "facilities under the control of a third party" could not qualify as "the *licensee*'s facilities." It was not only sensible but also necessary for the district court to read a requirement of "control" into the definition of "[a licensee's] facilities." The record supports the district court's conclusion that the Rimini servers where the copying took place were "outside the control of the [customers]." *Id.* at 1101. Indeed, Rimini made no showing that its customers had even constructive control of the servers.[6]

### 2. Copyright Misuse

 **[15]** As just explained, the district court concluded that Rimini infringed the PeopleSoft copyright by "local hosting," that is, by maintaining copies of PeopleSoft on its own computers as opposed to its customers' computers. *Oracle I*, 6 F.Supp.3d at 1097. Rimini offers no argument as to why a restriction on the location of copies would stifle competition and run afoul of the copyright misuse doctrine. *Id.* Rimini's inability to "local host" may result in inconvenience and expense on its part, but that restriction on its conduct does not amount to copyright misuse. Indeed, at oral argument, Rimini admitted that the restriction against "local hosting" was one it could overcome.

### D. Database

The district court also granted summary judgment for Oracle on the Database copyright infringement claim. It was undisputed that Rimini copied Oracle's copyright protected software when it built development, or non-production, environments for a number of Rimini customers using Oracle Database.

Rimini's arguments on appeal with respect to Database are the same as those with respect to the other software at issue, except that here Rimini contends that its acts in fact were authorized by the Oracle License and Service Agreements ("OLSAs"). Oracle properly points out that Rimini has waived this point because it has failed to challenge the district court's legal conclusion that Rimini was not entitled to assert the OLSAs as a defense. Accordingly, we affirm the district court's determination of copyright infringement as to Database.

## II. State Computer Law Claims

### A. The CDAFA and the NCCL

The CDAFA is California's computer abuse law. It states, in relevant part, that:

> any person who commits any of the following acts is guilty of a public offense:
>
> ....
>
> (2) Knowingly accesses and without permission takes, copies, or makes use of any data from a computer, computer system, or computer network, or takes or copies any supporting documentation, whether existing or residing internal or external to a computer, computer system, or computer network.
>
> (3) Knowingly and without permission uses or causes to be used computer services.

CAL. PENAL CODE § 502(c). It provides a cause of action to "the owner or lessee of the computer, computer system, computer network, computer program, or data who **\*961** suffers damage or loss by reason of a violation." *Id.* § 502(e)(1).

The NCCL is Nevada's counterpart to the CDAFA. In relevant part, it provides that "a person who knowingly, willfully and without authorization: (a) Modifies; (b) Damages; (c) Destroys; (d) Discloses; (e) Uses; (f) Transfers; (g) Conceals; (h) Takes; (i) Retains possession of; (j) Copies; (k) Obtains or attempts to obtain access to, permits access to or causes to be accessed; or (l) Enters data, a program or any supporting documents which exist inside or outside a computer, system or network" or "who knowingly, willfully and without authorization: (a) Destroys; (b) Damages; (c) Takes; (d) Alters; (e) Transfers; (f) Discloses; (g) Conceals; (h) Copies; (i) Uses; (j) Retains possession of; or (k) Obtains or attempts to obtain access to, permits access to or causes to be accessed, a computer, system or network" is guilty of a misdemeanor. NEV. REV. STAT. § 205.4765(1), (3). The NCCL also provides a civil cause of action to "[a]ny victim of [such a misdemeanor]." *Id.* § 205.511(1).

Case 2:10-cv-00106-LRH-VCF   Document 1134-1   Filed 04/04/18   Page 13 of 17

**Oracle USA, Inc. v. Rimini Street, Inc., 879 F.3d 948 (2018)**
2018 Copr.L.Dec. P 31,207, 125 U.S.P.Q.2d 1380, 18 Cal. Daily Op. Serv. 230...

### B. Accused Acts

The ultimate question as to whether Rimini and Ravin (referred to collectively in this section as "Rimini") violated the state computer laws by downloading content from Oracle's website was submitted to the jury, which found in favor of Oracle. In denying Rimini's renewed motion for judgment as a matter of law, the district court observed that Oracle had for some time "encouraged its customers to use automated downloading tools as a means to obtain" large numbers of customer support files in a timely manner. *Oracle USA, Inc. v. Rimini St., Inc.*, 191 F.Supp.3d 1134, 1139 (D. Nev. 2016) ("*Oracle III*"). Rimini had been doing just that when, "in response to an increased volume of mass downloads through the use of automated tools, and other server and database pressures, Oracle America changed its website's Terms of Use to specifically prohibit the use of 'any software routines commonly known as robots, spiders, scrapers, or any other automated means to access [the site] or any other Oracle accounts, systems or networks,' " a change which "prohibited the use of previously allowed automated downloading tools." *Id.* at 1139–40 (alteration in original). The evidence showed that, in response, Rimini stopped using automatic downloading tools for about a year but then "began reusing automated tools on the website in violation of the Terms of Use (terms which it had to specifically agree to when logging on to the website) in order to download full libraries of support documents and files for entire software products lines—each involving hundreds of thousands of different files." *Id.* at 1140.

### C. Positions of the Parties

Rimini and EFF contend that the statutory language "without permission" should not be read in a way that criminalizes violation of a website's terms of use. As EFF puts it, "[n]either statute ... applies to bare violations of a website's terms of use—such as when a computer user has permission *and* authorization to access *and* use the computer or data at issue, but simply accesses or uses the information in a manner the website owner does not like."

Oracle, on the other hand, urges us to read the state statutes as not requiring unauthorized access for a violation, which appears to be how the district court construed them. See *id.* at 1143–44 (holding that Rimini's "claim that they had permission from their clients to access Oracle['s] ... website is irrelevant" under the state statutes).

### D. Analysis

We review the denial of Rimini's motion for judgment as a matter of law de novo. ***962** *Castro v. Cty. of Los Angeles*, 833 F.3d 1060, 1066 (9th Cir. 2016) (en banc).

The district court treated the two statutes as essentially identical, and for purposes of this appeal, we will take the CDAFA as representative. As the district court observed, "[w]hile the case law on the NCCL is limited, the statute covers the same conduct as the CDAFA and the same legal reasoning should apply." *Oracle III*, 191 F.Supp.3d at 1144. The parties appear to agree with this approach; indeed, their arguments about liability do not differentiate between the two statutory schemes.

**[16]** Here, there is no question that Rimini "t[ook]" and "m[ade] use of" "data." See *Oracle III*, 191 F.Supp.3d at 1143 ("Nor do defendants contest that they took and subsequently used data from the website...."). Nor is there any dispute that Oracle permitted some degree of access and taking from its website. *Id.* at 1139–40. ("[Oracle America] owns and operates a website that ... contains millions of technical support files.... [T]his online database was accessible through a website that required both the customer's unique [login] and acceptance of the website's specific Terms of Use." (footnote omitted)). The central issue here is whether, by using automated tools to take data in direct contravention of Oracle's terms of use, Rimini violated the statutes.

**[17]** We hold that taking data using a *method* prohibited by the applicable terms of use, when the taking itself generally is permitted, does not violate the CDAFA. Because the same reasoning applies to the NCCL claim, we reverse the judgment as to both claims.

Oracle obviously disapproved of the method—automated downloading—by which Rimini took Oracle's proprietary information. But the key to the state statutes is whether Rimini was authorized in the first instance to take and use the information that it downloaded. See *United States v. Christensen*, 828 F.3d 763, 789 (9th Cir. 2015) (emphasis added) ("A plain reading of the [CDAFA] demonstrates that *its focus is on unauthorized taking or use of information.*").

Case 2:10-cv-00106-LRH-VCF   Document 1134-1   Filed 04/04/18   Page 14 of 17

Oracle USA, Inc. v. Rimini Street, Inc., 879 F.3d 948 (2018)
2018 Copr.L.Dec. P 31,207, 125 U.S.P.Q.2d 1380, 18 Cal. Daily Op. Serv. 230...

Because it indisputably had such authorization, at least at the time it took the data in the first instance, Rimini did not violate the state statutes. This result is consistent with our decision in *Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058, 1069 (9th Cir. 2016), *cert. denied*, ––– U.S. ––––, 138 S.Ct. 313, 199 L.Ed.2d 206 (2017) (affirming the district court's holding that the defendant violated the CDAFA on the ground that the defendant "*without permission* took, copied, and made use of [the downloaded] data" (emphasis added)).

III. Violation of California's Unfair Competition Law

A violation of California's UCL occurs where there is a predicate offense, one of which is a violation of the CDAFA. CAL. BUS. & PROF. CODE § 17200. The district court granted judgment in favor of Oracle on its UCL claim based on its finding that Rimini and Ravin had violated the CDAFA. Because we reverse as to the CDAFA claim, we also reverse the district court's determination that Rimini and Ravin violated the UCL.

IV. Damages[7]

The jury awarded a total of $14,427,000 to two Oracle subsidiaries based on Rimini's **\*963** alleged violation of the CDAFA and NCCL. Because we have concluded that Rimini did not violate those laws, we reduce damages by this amount.

V. Prejudgment Interest

[18] [19] We review a district court's decision to award prejudgment interest for abuse of discretion. *Barnard v. Theobald*, 721 F.3d 1069, 1075 (9th Cir. 2013). We also review the rate used by the district court to calculate the prejudgment interest for abuse of discretion. *Blankenship v. Liberty Life Assurance Co. of Bos.*, 486 F.3d 620, 628 (9th Cir. 2007).

The district court awarded $22,491,636.16 in prejudgment interest on the copyright claims and $5,279,060.12 in prejudgment interest on the NCCL claims. Because we have concluded that Rimini did not violate the NCCL, we reverse as to the latter amount. For the reasons discussed below, we affirm as to the former.

We have held that "[g]enerally, 'the interest rate prescribed for post-judgment interest under 28 U.S.C. § 1961 is appropriate for fixing the rate of pre-judgment interest unless the trial judge finds, on substantial evidence, that the equities of that particular case require a different rate.' " *Blankenship*, 486 F.3d at 628 (quoting *Grosz-Salomon v. Paul Revere Life Ins. Co.*, 237 F.3d 1154, 1164 (9th Cir. 2001)).

[20] The district court calculated its award of $22,491,636.16 based upon the Treasury rate on the date infringement began, that is, 5.07% in October 2006, rather than on the "starting point" set forth in 28 U.S.C. § 1961, that is, 0.61% in October 2016. The district court explained its deviation from the normal rate, which resulted in a difference of approximately $20,000,000, as follows:

> [T]he court finds that there is good cause to set the prejudgment interest rate at the Treasury rate on the date infringement began, rather than at the time of judgment. The court makes this finding because of the nature of the jury's award of hypothetical license damages. As the jury awarded damages to Oracle in an amount it would have received from Rimini for licensing Oracle's software at the time it began infringing Oracle's copyrights in late 2006, the court finds that this is the relevant time period for prejudgment interest. After this date, when Rimini began infringing Oracle's copyrights, Oracle lost out on the licensing fees it would have received, absent infringement. It is not equitable in the court's view to allow defendants to reap a windfall by the lower interest rates that are now available simply because they engaged in discovery delays and other litigation tactics (addressed more thoroughly in Oracle's motion for attorneys' fees) that kept this action in litigation for several years. Therefore, the court shall ... set the appropriate rate for prejudgment interest under the Copyright Act as the weekly average one-year constant maturity Treasury yield at the start of the infringement.

Case 2:10-cv-00106-LRH-VCF   Document 1134-1   Filed 04/04/18   Page 15 of 17

**Oracle USA, Inc. v. Rimini Street, Inc., 879 F.3d 948 (2018)**
2018 Copr.L.Dec. P 31,207, 125 U.S.P.Q.2d 1380, 18 Cal. Daily Op. Serv. 230...

Despite these specific findings, Rimini asserts that the district court failed to make the "exceptional case" determination that would permit it to depart from the presumptive rate set forth in 28 U.S.C. § 1961. It contends that the district court may not set the interest rate based on a defendant's bad behavior, citing our holding in *Dishman v. UNUM Life Insurance Co. of America* for the proposition that, "[a]lthough a defendant's bad faith conduct may influence whether a court awards prejudgment interest, it should not influence the rate of the interest." 269 F.3d 974, 988 (9th Cir. 2001). Rimini also asserts that the **\*964** 0.61% adequately represents market rates and fully compensates Oracle's loss.

 **[21]** It is true that "prejudgment interest is an element of compensation, not a penalty." *Barnard*, 721 F.3d at 1078. Rimini is correct that it would have been improper for the district court to set a higher rate based on Rimini's litigation conduct alone. But considering the district court's analysis in its totality, it is apparent that the rate was based primarily on the jury's award of copyright damages based on a hypothetical license, making it appropriate to approximate the licensing fees that Oracle "lost out on" and "would have received, absent infringement" by using the Treasury rate on the date of infringement.

The district court made an extensive and detailed record throughout many years of complex and contentious litigation. Its understandable frustration with Rimini's litigation conduct is apparent in some of the orders now before us. However, there is ample evidence in the record to support the court's award of prejudgment interest at the Treasury rate on the date infringement began. We find no abuse of discretion.

VI. Injunctive Relief

 **[22]**  **[23]** As to [a] permanent injunction, we review the legal conclusions de novo, the factual findings for clear error, and the decision to grant a permanent injunction, as well as its scope, for an abuse of discretion. To review for abuse of discretion, "we first look to whether the trial court identified and applied the correct legal rule ... [then] to whether the trial court's resolution of the motion resulted from a factual finding that was illogical, implausible, or without support in inferences that may be drawn from the facts in the record."

*Columbia Pictures Indus., Inc. v. Fung*, 710 F.3d 1020, 1030 (9th Cir. 2013) (quoting *United States v. Hinkson*, 585 F.3d 1247, 1263 (9th Cir. 2009) (en banc)).

The district court entered permanent injunctions against Rimini based on copyright infringement and against Rimini and Ravin based on alleged violations of the CDAFA.[8] We stayed both injunctions pending resolution of this appeal.

In view of our conclusion that there was no violation of the state computer laws, we reverse as to the CDAFA injunction. As explained below, we vacate the copyright injunction and remand for reconsideration in light of our opinion.

 **[24]** The Supreme Court established a four-factor test that must be applied before a district court may grant a permanent injunction. *eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391, 126 S.Ct. 1837, 164 L.Ed.2d 641 (2006). Here, the district court assessed the four factors by reference to *both* the copyright and the CDAFA claims, without considering separately the propriety of issuing an injunction as to the copyright claims alone. For example, the court concluded that Rimini's "violations of state computer access statutes" contributed to an "irreparable injury" to Oracle's business reputation and goodwill.

Based on the record before us, we do not know how the district court would weigh the *eBay* factors with respect to the copyright claims alone. We express no view on the propriety or scope of any injunctive relief, which are matters committed to the district court's discretion in the first instance.

**\*965** VII. Fees

 **[25]** "We review the award of fees and costs for abuse of discretion, but will overturn it if it is based on an erroneous determination of law." *Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1250 (9th Cir. 2006).

The district court awarded $28,502,246.40 in attorneys' fees to Oracle. It concluded that this award was appropriate under the fee-shifting provisions of the Copyright Act and the state computer laws. Although Ravin was not found liable for copyright infringement, the district court decided that Ravin was, along with Rimini, "severally and equally" liable for the award because he had violated the state computer statutes.

Case 2:10-cv-00106-LRH-VCF Document 1134-1 Filed 04/04/18 Page 16 of 17

**Oracle USA, Inc. v. Rimini Street, Inc., 879 F.3d 948 (2018)**
2018 Copr.L.Dec. P 31,207, 125 U.S.P.Q.2d 1380, 18 Cal. Daily Op. Serv. 230...

In view of our conclusion that there was no violation of the state computer laws, we reverse the judgment with respect to Ravin's liability for fees. As to Rimini, we vacate the fee award and remand for reconsideration in light of Oracle's more limited success at litigation.

VIII. Costs

A. Taxable Costs

The district court awarded Oracle $4,950,566.70 in taxable costs. Rimini originally asked us to reduce this award by approximately $1,700,000, contending that Oracle only requested roughly $3,200,000 in taxable costs in the district court. Oracle conceded that approximately $1,500,000 in non-taxable costs improperly was counted as taxable. About $200,000 remains in dispute.

The district court's cost award apparently was based on the following chart it received from Oracle:

| Attorneys' Fees | Dkt. 996, Ex. 1 | Adjustments | Final |
|---|---|---|---|
| Bingham and Morgan Lewis | $18,695,129.67[1] | | $18,695,129.67 |
| Boies Schiller | $12,542,840.00[2] | -$6,480.00[3] | $12,536,360.00 |
| H5 & Huron | $4,360,943.20[4] | | $4,360,943.20 |
| Other (Black Letter, Barg Coffin) | $28,895.12[5] | | $28,895.12 |
| **TOTAL ATTORNEYS' FEES** | $35,627,807.99 | | $35,621,327.99 |
| **Taxable Costs** | | | |
| Deposition Costs | $192,999.70[6] | | $192,999.70 |
| Stroz Fees for Oracle Productions | $4,757,561.00[7] | -$1,515,279.45[8] | $3,242,281.55 |
| **TOTAL TAXABLE COSTS** | $4,950,560.70 | | $3,435,281.25 |

The district court evidently read the wrong column when it awarded $4,950,566.70 in taxable costs. Given the parties' agreement that Oracle is entitled to about $3,200,000 in taxable costs, the remaining dispute involves $192,999.70 in deposition costs. Because Rimini's briefs articulate no basis for our doing so, we do not disturb the district court's inclusion of these expenses in the taxable cost award. We thus reduce the award to $3,435,281.25.

B. Non-taxable Costs

Title 17 U.S.C. § 505 provides:

> In any civil action under [the Copyright Act], the court in its discretion may allow the recovery of full costs by or against any party other than the United States or an officer thereof. Except as otherwise provided by this title, the court may also award a reasonable attorney's fee to the prevailing party as part of the costs.

By contrast, 28 U.S.C. § 1920 identifies only six categories of costs that are taxable against the losing party.

In *Twentieth Century Fox v. Entertainment Distributing*, we held that, because 17 U.S.C. § 505 permits the award of *full* costs, the award of costs under § 505 is not limited to the categories of costs described **\*966** in 28 U.S.C. § 1920. 429 F.3d 869, 885 (9th Cir. 2005). Here, relying expressly on *Twentieth Century Fox*, the district court awarded Oracle $12,774,550.26 in non-taxable costs.

Rimini contends that *Twentieth Century Fox* has been abrogated by *Marx v. General Revenue Corp.*, 568 U.S. 371, 133 S.Ct. 1166, 185 L.Ed.2d 242 (2013), and that, accordingly, the district court erred. We disagree.

[26] We are bound by our precedent unless the theory or reasoning of the decision is "clearly irreconcilable" with a higher intervening authority, such as a decision by the Supreme Court. *Miller v. Gammie*, 335 F.3d 889, 899–900 (9th Cir. 2003) (en banc). Our decision in *Twentieth Century Fox* concerned the relationship between 17 U.S.C. § 505 and 28 U.S.C. § 1920. The Supreme Court's decision in *Marx* concerned neither statute. Instead, the Court held that 15 U.S.C. § 1692k(a)(3) is not contrary to the costs provision in Federal Rule of Civil Procedure 54(d)(1). Nothing in *Marx* is clearly irreconcilable with *Twentieth Century Fox*.

The parties shall bear their own costs on appeal.

**AFFIRMED in Part, REVERSED in Part, VACATED and REMANDED in Part.**

**All Citations**

879 F.3d 948, 2018 Copr.L.Dec. P 31,207, 125 U.S.P.Q.2d 1380, 18 Cal. Daily Op. Serv. 230, 2018 Daily Journal D.A.R. 235

Footnotes

\*     The Honorable Jeremy D. Fogel, United States District Judge for the Northern District of California, sitting by designation.

Case 2:10-cv-00106-LRH-VCF   Document 1134-1   Filed 04/04/18   Page 17 of 17

Oracle USA, Inc. v. Rimini Street, Inc., 879 F.3d 948 (2018)
2018 Copr.L.Dec. P 31,207, 125 U.S.P.Q.2d 1380, 18 Cal. Daily Op. Serv. 230...

1     All of Rimini's customers pertinent to this dispute were licensees of Oracle's software, but not all licensees of Oracle's software are Rimini's customers. To avoid confusion, we will use the word "customers" to refer to the subset of Oracle's licensees who did contract or might contract with Rimini for the maintenance of Oracle's software.

2     The district court specifically distinguished between Oracle's copyright in software and Oracle's copyright in the software documentation. Rimini does not appeal the jury's determination that Rimini infringed the documentation copyright.

3     Rimini offered this description of its "cross use" in its closing statement to the jury: "If we have multiple clients with the exact same release, the same rights, we would come up with one fix and then apply it to other customers that had the exact same rights. That's the cross-use, the reusing of updates that you've heard about in this case."

4     Even if we were to consider the applicability of *MDY Industries*, that case teaches specifically the distinction between "conditions," "the breach of which constitute copyright infringement," and "covenants," "the breach of which is actionable only under contract law." 629 F.3d at 939. Rimini has offered no analysis as to which terms of the licenses at issue are "conditions" and which are "covenants."

5     Two different PeopleSoft licenses are at issue here, one belonging to the City of Flint and the other to the Pittsburgh Public Schools. The district court concluded that the two licenses have "similar" language. *Oracle I*, 6 F.Supp.3d at 1100. On appeal, the parties make no distinction between the two licenses; the language discussed here is drawn from the license held by the City of Flint.

6     Because we address the question of infringement as to PeopleSoft on the narrow ground of "local hosting," we do not decide whether "direct use" or "cross use" was permitted by the PeopleSoft license.

7     Rimini does not challenge the amount of the jury's award of $35,600,000 in damages for copyright infringement.

8     The injunction entered by the district court is clearly divided into separate portions. We therefore treat the injunction as if there were two separate injunctions.

---

**End of Document**        © 2018 Thomson Reuters. No claim to original U.S. Government Works.