# Exhibit I:

Cited Testimony of
Safra Catz

1    popped up at that point.

2    Q.    So we're -- it seems like there's a lot of stuff on

3    this screen.

4              So I want to ask you whether -- when a customer

5    logs in to My Oracle Support whether they're restricted to

6    seeing only what they're licensed for or whether they can

7    see other things too?

8    A.    No, they can see absolutely everything because when

9    they're logging on, we don't want to put up in any walls

10   between them and getting what -- the fix they need, if --

11   because we don't want to have an administrative error on

12   our part, slow them down.

13             Some of these systems are running ultra critical

14   things, and we don't want to slow them down one second,

15   frankly, so we put it all out there.  But they don't take

16   it unless they're licensed for it.

17   Q.    So we just talked about My Oracle Support.  Let's

18   talk also about Oracle's eDelivery website which the jury

19   has already heard a little bit about.

20             First of all, what's the difference between My

21   Oracle Support and eDelivery?

22   A.    eDelivery allows you to take down whole products.

23             So if you're just getting started, you may go to

24   eDelivery for an easy download of the entire product.  You

25   would need a license, or you would be working under a trial

1     license, but it's available.

2     Q.    Okay.  So I may be getting this wrong, but so

3     eDelivery is that software, and My Oracle Support is

4     support, or is there a cross-pollination?

5     A.    No.  So eDelivery has full products, full downloads.

6     My Oracle Support also has full products, full downloads

7     and all sorts of additional things.

8             So you can actually get a full download of a

9     product on either, but on My Oracle Support, you can also

10    get little pieces and patches and things like that.

11    Q.    Okay.  So for both those things you need a license?

12    A.    Yes, you need a license.

13    Q.    Okay.  So I'd like to put up on the screen

14    Plaintiff's Exhibit 1 which has already been admitted, and

15    we talked about this a little bit the other day during the

16    my cocounsel's examination of Mr. Ravin.

17            So if you look at the top, you can see that this

18    e-mail refers to eDelivery, the website that we just

19    discussed.

20            And a little lower down -- this is an internal

21    Rimini Street e-mail.  A little lower down it says,

22    "Basically it's an open door to their software."

23            On Thursday, Mr. Ravin, the defendant, was asked

24    about the last quote that you see here which says,

25            "Sounds to me like they just said, 'Help

1    yourself to the buffet.'"

2           And Mr. Ravin's lawyer asked him, you have to

3    admit this looks pretty bad.  Ms. Catz, do you agree that

4    this looks pretty bad?

5    A.    Yes, it looks terrible.

6    Q.    Why?

7    A.    Because you actually have to have a license to take

8    these down.  It's like going to the supermarket or to

9    Kohl's or JC Penney's, the stuff is all out there, but

10   you're not supposed to just take it without paying for it.

11   Everyone knows that.

12   Q.    In response his lawyer's question how can it not be

13   wrong, Mr. Ravin said,

14           "The context that I'm seeing this in was simply

15   saying if they're going to put all of this stuff in public,

16   does that mean that everyone can help themselves to it."

17   A.    No, of course, not.  You have to have a license.

18   Just like when you go to a store, you have to actually pay

19   for what you take.

20   Q.    All right.  Let's move on to Defendants' Exhibit 146

21   which has been preadmitted, and it should be in your

22   binder?

23   A.    I have it.

24   Q.    Great.  I just need to get there.

25           So what is this, if you recognize it?

1    A.    It's an analysis of third-party support providers

2    done by the support organization.

3    Q.    And this is a multipage presentation from

4    April 2009.  I'm not going to ask you to walk through the

5    whole thing, I just want to look at one page.

6              COURTROOM ADMINISTRATOR:  Ms. Dunn, I'm sorry.

7    I don't see that admitted.  146?

8              MR. WEBB:  No objection, Your Honor.

9              MS. DUNN:  Thank you.  No, that's okay.

10             THE COURT:  All right.  No objection to

11   admission or no objection to referring to it on the chart?

12             MR. WEBB:  No objection to the -- well, either.

13             THE COURT:  All right.  It's admitted.

14             MS. DUNN:   We move to admit.

15         (Defendants' Exhibit 146 received into

16         evidence.)

17             MS. DUNN:  Thank you.

18   BY MS. DUNN:

19   Q.    If we can just look at page 3.  This is part of this

20   presentation from April  of 2009, and the heading on this

21   page says "The Myth of Third-Party Support."

22             And then it says,

23             "Third-party support claims to provide up to 50

24   percent cheaper than Oracle Support, but, in reality, you

25   only get a small fraction of the value."

1                    What does this mean?

2     A.    Well, they are offering at a 50 percent price of

3     ours, so in our example this would be $500,000, and they're

4     saying that they do more than what we do, that they're

5     better than what we do at Oracle for half the price.

6                    But, in fact, they can't possibly do what we do,

7     they don't have access to the source code, they simply

8     couldn't really help in a true emergency.  They couldn't

9     really do it.  So, really, 50 percent is an overcharge,

10    it's not a bargain.

11    Q.    And what does a promise like this mean for Oracle?

12    A.    Well, when they come to our customers, our customers

13    wonder all of a sudden whether we are overcharging them.

14                   It really breaks the bonds and the trust that we

15    have with our customers.  We've negotiated a price with

16    them.  All of a sudden, they're wondering whether we've

17    treated them fairly.

18    Q.    What does it mean for the customer then?

19    A.    Well, for a customer I could see how it's tempting

20    to pay half price, but it gives them a false sense of

21    security.

22                   Maybe they don't want to upgrade today.  Let's

23    say they just upgraded, they don't have any upgrade plans

24    tomorrow or even next year, but another year from now they

25    won't be able to.

1             They don't have the new software that they may

2    need for security issues.  It just gives them a complete

3    false sense of security, freezes them in time.

4    Q.    And speaking of security, what, then, is the

5    problem?  What do you mean a false sense of security?

6    A.    Well, I don't think these customers realize the

7    danger they were putting themselves in, because there are

8    constantly evolving threats, and they won't -- they can't

9    possibly handle them.  They don't have the source code.

10            And, in addition, to the extent that they do

11   ever want to upgrade, now they can't.

12   Q.    Ms. Catz, are you the person who made the final

13   decision to file this lawsuit?

14   A.    Yes, I am.

15   Q.    I'd like to show you what's been marked as

16   Plaintiffs' Exhibit 5465, and that should be in your

17   binder.

18   A.    I don't think so.

19            Oh, I'm sorry.  I apologize.  It's here.

20   Q.    Do you recognize what that is?

21   A.    Yes.

22   Q.    Okay.  What is it?

23   A.    This is an e-mail I got from Rich Allison about

24   Rimini Street support.

25   Q.    What's the date on the e-mail?

1    A.    It's September 2006.

2                MS. DUNN:  Your Honor, Oracle moves to admit PTX

3    5465 and show it to the jury.

4                MR. WEBB:  Objection; hearsay, Your Honor.

5                THE COURT:  Sustained.  Also, there's an

6    insufficient foundation.

7                MS. DUNN:  Okay.

8    BY MS. DUNN:

9    Q.    Okay.  Ms. Catz, is this an e-mail that you

10   received?

11   A.    Yes, this is an e-mail I received telling me

12   about --

13   Q.    Before you get to the content of it, is this an

14   e-mail that you received?

15   A.    Yes, it's an e-mail I received from Rich Allison.

16   Q.    Okay.  And Rich Allison works with you?

17   A.    Rich Allison reports directly to me.

18   Q.    Do you keep e-mails in the ordinary course of your

19   work?  Does Oracle maintain its e-mails?

20   A.    Yes.

21                MS. DUNN:  Your Honor, we move 5465 as a

22   business record.

23                MR. WEBB:  Objection; hearsay, Your Honor.

24                THE COURT:  Well, once again, I need further

25   foundation on it in light of the objection.

1      MS. DUNN:  Your Honor, we're also happy to admit

2  this not for the truth of the matter asserted if that

3  would --

4      THE COURT:  Well, that may be, but I -- the fact

5  is the exhibit needs to be identified and explained before

6  it's going to be admissible.

7      MS. DUNN:  Okay.

8  BY MS. DUNN:

9  Q.   Ms. Catz, can you explain what this e-mail is and

10  the context in which you received it?

11  A.   Yes.  Rimini Street made an announcement of their

12  existence, and this was talking to me about the fact that

13  the person that started Rimini Street had founded

14  TomorrowNow, and he was the one that had sold it to SAP.

15      MS. DUNN:  Your Honor --

16      THE COURT:  All right.  The Court will admit the

17  exhibit at this time.

18      Ladies and gentlemen, when a foundation needs to

19  be shown for an exhibit, it needs to be shown that it's

20  relevant and competent to the case.

21      The attorneys have been able to agree on many of

22  the exhibits in this case, and we've moved along well.  But

23  on occasion there'll be an exhibit, I'm sure, where they

24  are not in complete agreement.

25      This exhibit is being admitted not for the truth

1    of what it says but for the witness to explain how and why

2    she acted at a particular point of time.  That's evident to

3    me from having looked at it, and with the foundation that's

4    now been given, I will admit it.

5            (Defendants' Exhibit 5465 received into

6            evidence.)

7            MS. DUNN:  Thanks, Matt.  If we can blow up and

8    actually look -- see the whole thing, if we could, the top

9    also, that would be great.

10   BY MS. DUNN:

11   Q.    So, Ms. Catz, this is the e-mail from Rich Allison

12   to you in September of 2006?

13   A.    Yes.  It's from Rich telling me -- just pointing out

14   that the person who founded TomorrowNow had now just

15   founded another company.

16   Q.    And was that your impression of what this meant when

17   it says, "Son of TomorrowNow"?

18   A.    Yes, of course, it's the follow-on to TomorrowNow.

19   Q.    And when it says in the e-mail, "The guy who runs

20   this started TomorrowNow," who did you understand that to

21   refer to?

22   A.    The defendant.

23   Q.    What was TomorrowNow?

24   A.    TomorrowNow was a company that also offered

25   third-party support, but in their case also, they

1    downloaded our software, they made software libraries, and

2    they made many --

3              MR. WEBB:  Objection, Your Honor.  May we

4    approach?

5              THE COURT:  You may approach.

6         (Sidebar conference held as follows:)

7              MR. WEBB:  That testimony has stepped way over

8    the line of what Your Honor said is permissible.

9              There was a discussion that was TomorrowNow, and

10   the fact that TomorrowNow existed and Mr. Ravin was

11   associated with it.

12             Now, this witness is going through all the

13   things, all the acts that are not into evidence about

14   TomorrowNow trying to connect the two, one to the other.

15             This is far beyond the scope of what was

16   permitted earlier by Your Honor's rulings, and this is

17   extremely prejudicial because what they're trying to do now

18   through this witness with that knowledge, going through

19   trying to link up everything that happened at TomorrowNow

20   with what is alleged in this case.

21             That's been their plan all along, and now that

22   just happened.

23             MS. DUNN:  To be entirely clear, this respects

24   the line that you specifically drew which is you identified

25   your line as misstatement of facts, no criminal plea and no

1     result of the litigation.

2               This witness has been specifically instructed

3     not to cross over the line.

4               In addition, we looked back at Mr. Ravin's

5     testimony, and he discussed the model of TomorrowNow, the

6     fact that he founded TomorrowNow, and also already in

7     evidence is the fact that SAP shut down the processes at

8     TomorrowNow.  We will not go beyond that with this witness.

9               Your Honor, if that issue comes up, it will be

10    adjudicated by Your Honor when it does come up.

11              But we have done everything to specifically

12    request -- respect the line that Mr. Webb himself outlined,

13    and this witness has not gone beyond that.

14              In addition, she is the person who made the

15    decision to sue TomorrowNow and made the decision to sue

16    Rimini Street.

17              So it is impossible for her to discuss her

18    recollections of that time without discussing TomorrowNow

19    and her impression of what was going on at the time.

20              THE COURT:  I've heard enough.

21              It's obviously a sensitive subject matter, and

22    it also has some bearing and relevancy to this case.

23              I will allow her to testify that she was very

24    concerned about TomorrowNow, that it had become a problem.

25              I'm not going to allow her to go through the

```
 1    specific problems with TomorrowNow or the outcome of what

 2    became of litigation or challenges to TomorrowNow or even

 3    her decision to bring the suit against TomorrowNow.

 4              But I will allow her to place this lawsuit in

 5    some context of being partially a result of her concern

 6    over what had happened in connection with TomorrowNow.

 7    That's relevant.

 8              MS. DUNN:  Two questions, Your Honor.  One is,

 9    I'd like to ask her why she authorized the suit of

10    TomorrowNow.

11              But the second thing, everyone knows already

12    that Oracle sued TomorrowNow, and defense counsel has made

13    a big deal of saying that defendant left TomorrowNow before

14    that lawsuit happened, but the conduct at issue in the

15    lawsuit well predates Mr. Ravin's departure from

16    TomorrowNow.  So it is --

17              MR. WEBB:  Sooner or later I get a chance --

18              MS. DUNN:  What?

19              MR. WEBB:  Sooner or later I get a chance to

20    respond.

21              First of all, the only thing the jury knows is

22    TomorrowNow was sued --

23          (Simultaneous indecipherable conversation.)

24              MS. DUNN:  -- that's okay.

25              MR. WEBB:  -- and they changed no longer local
```

1    hosting.  That's what they know.

2              The witness just went down a litany of

3    downloading and all that stuff which I'm going to move to

4    strike.

5              The other thing is, Your Honor, I mean, you've

6    said this, she can talk about this, she was concerned about

7    TomorrowNow, that's why she authorized the lawsuit.  She

8    also authorized this lawsuit.

9              The jury has no idea -- and Mr. Ravin testified

10   he didn't know the technical processes used by TomorrowNow.

11   That's not in the case.  His testimony was he did not know

12   the process that was used.

13             THE COURT:  Now, wait a minute.  I've heard

14   enough argument.  I've made my ruling.

15             I'll allow her to testify that she was concerned

16   about TomorrowNow, that she authorized the suit against

17   TomorrowNow, and now she was concerned about this one for

18   many of the same reasons, and I don't want to go into

19   TomorrowNow beyond that.

20             MS. DUNN:  Your Honor, if you'll permit me, we

21   do want to establish the date of conduct in response to the

22   fact that they have made the point over and over by this

23   point that Mr. Ravin left --

24             THE COURT:  Well, the dates, the dates are

25   relevant for context, and I'll allow that.

1          MR. WEBB:  I would move to strike her last few

2     sentences because they go into details beyond the Court's

3     guidance.

4          THE COURT:  All right.

5          MS. DUNN:  I'm not sure about that.  I think we

6     need to look at the realtime, because based on what Your

7     Honor just said, I actually think her answer was within the

8     bounds.

9          Not only that, the fact that TomorrowNow was

10    doing automated downloading and that that's why Oracle

11    changed its process is already in evidence.

12         So in part, Your Honor just said that she can

13    testify to the fact that she was concerned, brought suit

14    for similar reasons.  That's why we're happy to stay with

15    that and establish the date.

16         That is all I will elicit with this witness, and

17    I want to assure Your Honor she has been preinstructed not

18    to cross the line that Mr. Webb articulated.

19         THE COURT:  All right.  I will allow that and

20    build a cautionary instruction, if you would like it, with

21    regard to her previous answer with regard to TomorrowNow.

22         MR. WEBB:  I would, thank you.  Your Honor.

23         MS. DUNN:  Thank you.

24         THE COURT:  All right.

25         (Sidebar conference concluded.)

 1              THE COURT:  And, ladies and gentlemen, the

 2    discussion with counsel concerned a reference in the

 3    testimony by Ms. Catz concerning the other company that's

 4    been referred to on occasion throughout this case,

 5    TomorrowNow.

 6              I would caution you as jurors that Ms. Catz'

 7    explanations as to why she authorized litigation in this

 8    matter are relevant to this case, but they are only offered

 9    to show why she acted as she did, not for the truth of the

10    matter asserted as to the conduct by another company or the

11    conduct by a defendant in this case.

12              I realize this is a little bit confusing.  I

13    just want you to understand that the witness can only

14    testify as to her personal reasons for bringing this

15    particular -- authorizing this particular lawsuit, and I

16    would caution you to consider her testimony only in that

17    respect.

18              Ms. Dunn, you may go ahead, please.

19              MS. DUNN:  Thank you, your Honor.

20    BY MS. DUNN:

21    Q.    So to reorient everybody, Ms. Catz, you testified

22    that you participated in making the final decision in

23    bringing this lawsuit against Rimini Street; is that right?

24    A.    Yes.

25    Q.    Okay.  And the jury has already heard that Oracle

1    previously sued a company called TomorrowNow.  Do you

2    understand that?

3    A.    Yes.

4    Q.    And as you've testified, that that was -- that "Son

5    of TomorrowNow" in this e-mail referred to Mr. Ravin, the

6    defendant?

7    A.    Yes.

8    Q.    And that he was also the founder of TomorrowNow.

9    You understand that?

10   A.    Yes.

11   Q.    Okay.  When we took a break, you were explaining

12   what TomorrowNow was.

13           When you brought suit against TomorrowNow, when

14   Oracle brought suit, was it concerned about TomorrowNow's

15   conduct for similar reasons to the reasons in this case?

16   A.    Yes.

17   Q.    Okay.  When did you bring suit against TomorrowNow?

18   A.    2007.

19   Q.    And if you remember, what was the time period at

20   issue in that lawsuit?

21   A.    From the end of 2002 until then.

22   Q.    The jury has also already heard in this case that

23   SAP, who had acquired TomorrowNow, had admitted to some

24   wrongdoing in 2007.  Is that something that you remember?

25   A.    Yes.

1    Q.    The jury has also heard that SAP decided to shut

2    down the relevant programs at TomorrowNow.  Is that

3    something that you know about?

4    A.    Yes, they shut down TomorrowNow.

5              MR. WEBB:  Your Honor, may we approach?

6              THE COURT:  No, not at this time.

7              If you have an objection to a specific question

8    beyond this one, I'll entertain it, and perhaps we'll have

9    a sidebar.  I'll deny your objection as it applies to this

10   question.

11   BY MS. DUNN:

12   Q.    If you know, what happened to TomorrowNow's

13   customers?

14   A.    Some came to Oracle and some went on to Rimini

15   Street.

16   Q.    Okay.  Returning now to this lawsuit, when was this

17   lawsuit filed?

18   A.    2010.

19   Q.    And if you remember, what specifically triggered the

20   filing of this lawsuit in 2010?

21   A.    Well, we saw massive unauthorized downloading, and

22   we learned some other things related to that.

23   Q.    Did Rimini ever pay Oracle for any license for

24   PeopleSoft software?

25   A.    No.

1   Q.    Did Rimini ever pay Oracle for any license for JD

2   Edwards software?

3   A.    No.

4   Q.    Did Rimini ever pay Oracle for any license for

5   Siebel software?

6   A.    No.

7   Q.    Did Rimini ever pay Oracle for any license for

8   database software?

9   A.    No.

10   Q.    Did Rimini ever pay Oracle for a license permitting

11   Rimini to have copies of Oracle software on its computers?

12   A.    No.

13   Q.    And did Rimini ever pay Oracle for a license

14   permitting Rimini to use Oracle software to support

15   multiple customers?

16   A.    No.

17   Q.    What impact, if any, has Rimini Street's conduct had

18   on Oracle?

19   A.    Well, first of all, we've lost hundreds of

20   customers, and we've lost the revenue associated with their

21   support.

22          Like I mentioned, a $1 million contract, 10

23   years of that, minimal, which is what we generally use when

24   we're making projections just to be conservative, so that

25   would be $10 million for that $1 million customer example I

1    gave.

2           So we lost 300 customers plus.  We lost an

3    opportunity to get their support revenues.  But we also

4    ended up having to work extra hard to keep the customers we

5    have.

6           But for the customers we lost, it totally broke

7    the relationship, and they would be much less likely to buy

8    additional software modules from us.

9    Q.    So someone might say to you, okay, you know, what's

10   one customer or 300 something customers.

11   A.    Every customer matters to us.  Every single one of

12   them.  We want to keep all of them.

13   Q.    Based on your experience as CEO of Oracle, do you

14   think that Rimini's customers would have stayed with Oracle

15   but for Rimini Street's conduct?

16   A.    The vast majority of our customers stay with us if

17   they're using the software.  If they go bankrupt,

18   obviously, then, they go away.

19          But for Rimini, since Rimini Street, all those

20   customers are still using our software, I believe that we

21   would have been able to have them all stay with us but for

22   Rimini's behavior.

23   Q.    Thank you, Ms. Catz.  I just have one last question

24   for you.  How do you feel to be in litigation over these

25   issues?

1    A.    I wish I wasn't here.  I wish -- I bet all of us

2    wish we weren't here, but this is just too important to let

3    go by.

4              This is an absolute critical foundation of the

5    software industry, investing, then licensing and protecting

6    copyrights.

7              If we don't protect our rights, we don't have

8    any rights.  If we don't protect our rights, the whole

9    software industry doesn't exist and innovation we take for

10   granted wouldn't even exist.

11             MS. DUNN:  Thank you, Ms. Catz.

12             Your Honor, I have no further questions at this

13   time.

14             THE COURT:  All right.

15             Cross-examination?

16             MR. WEBB:  Just a few minutes, your Honor.

17             May it please the Court.

18             THE COURT:  Oh, yes, go ahead, please.

19                       CROSS-EXAMINATION

20   BY MR. WEBB:

21   Q.    Good afternoon, Ms. Catz.  We have not met before.

22   My name is Trent Webb.  I have a few questions for you this

23   afternoon.

24             Have you ever testified before in trial like

25   this?

1    A.    Yes.

2    Q.    How many total times have you testified in front of

3    a jury?

4    A.    I think four times?  This is my fourth time, I

5    think.

6    Q.    You are the CEO of Oracle?

7    A.    I am.

8    Q.    And your company has annual revenues of about 38

9    billion?

10   A.    Yes.

11   Q.    And over 130,000 employees worldwide?

12   A.    Yes.

13   Q.    And about 110 billion in assets?

14   A.    In total assets?  Yes.

15   Q.    And it is a publicly traded company; correct?

16   A.    Yes.

17   Q.    And as CEO, your public statements are very

18   important?

19   A.    Yes, they are.

20   Q.    It's essential that you're truthful when you make

21   statements about the company?

22   A.    Very much so.

23   Q.    Now, your compensation is tied to the performance of

24   the company; correct?

25   A.    Yes, it is.

1    Q.    And according to your public filings, every year

2    since 2010 you've made at least $36 million in

3    compensation, is that accurate?

4    A.    I have --

5              MS. DUNN:  Objection, Your Honor.

6              THE COURT:  Pardon?

7              MS. DUNN:  Objection, Your Honor, foundation.

8              THE COURT:  There is some ambiguity in the

9    question.  I'll allow you to rephrase the question,

10   Mr. Webb, and I'm sure the witness is competent to testify.

11             MS. DUNN:  Your Honor, may we approach?

12             THE COURT:  Yes.

13         (Sidebar conference held as follows:)

14             THE COURT:  All right.  Your objection?

15             MS. DUNN:  My objection is on foundation basis

16   which is I presume that you're headed towards a bias line

17   of questioning, and there's been no foundation laid for

18   that at all.

19             MR. WEBB:  Your Honor, we addressed this in the

20   motion in limine that you denied.

21             You said,

22             "The Court has reviewed this motion on the issue

23   and finds that Oracle's overall company wealth and

24   financial issues are relevant as Oracle has put its wealth

25   and financial condition at issue in this case."

1    correct?

2    A.    It's the customer's responsibility regarding their

3    actions.

4    Q.    And that's not unreasonable to require a customer

5    with that contract to make some decisions for itself, is

6    it?

7    A.    I'm not exactly sure what you're asking me.  Could

8    you ask me again?

9    Q.    Sure.  It's not unreasonable to have a client make

10   sure that what it's doing under its contract is okay?

11   A.    An Oracle client.

12   Q.    An Oracle client?

13   A.    There's a couple negatives in there, but we expect

14   our customers to follow the rules and do the right thing.

15   I hope that answers that.

16   Q.    That does.

17   A.    Okay.

18   Q.    And, generally speaking, you believe Oracle

19   customers act within the scope of their licenses?

20   A.    Yes, they do.  We trust our customers.

21   Q.    They do what they are lawfully entitled to do in

22   your opinion?

23   A.    I believe they want to do what they've licensed.

24   Q.    And you believe that your customers know their own

25   contracts very well?

1   A.    They negotiated them, and, so, yes, I expect them to

2   know them.

3   Q.    And you think it would be presumptuous of you to try

4   to remind them of what their contracts mean, true?

5   A.    No, I mean, I may remind them if I think there might

6   be an issue.

7   Q.    So, obviously, if these customers decide to let a

8   third party provide support for their software, you would

9   expect them to carefully consider whether that's going to

10  be permissible, true?

11  A.    Yes.

12  Q.    Because, again, they know their own contracts;

13  right?

14  A.    Yes.  But I don't know that they'd know what the

15  third party is doing.

16  Q.    And some of those companies have signed on with

17  Rimini Street; correct?

18  A.    Some customers, I think I've heard, I was allowed to

19  hear that 300 plus customers have signed up with Rimini

20  Street.

21  Q.    And you were here for my opening statement, weren't

22  you?

23  A.    Yes.

24  Q.    Sitting right over there?

25  A.    Yes.

1    Q.    And you heard me say that Rimini Street gives to its

2    customers the option of whether they have their software on

3    their servers or Rimini Street's servers.  You heard that?

4    A.    I don't remember you saying that, but I believe you.

5    Q.    Would it surprise you to know that the vast majority

6    of Rimini Street's clients ask Rimini Street to host their

7    software on Rimini's servers?

8              MS. DUNN:  Objection.

9              THE COURT:  Sustained.

10   BY MR. WEBB:

11   Q.    Ms. Catz, is it your position that when one of your

12   customers, clients, signs on with Rimini Street and has

13   them host the software on Rimini's servers, has that client

14   violated its agreement with Oracle?

15   A.    Well, I know that Rimini doesn't have a license to

16   do that.  That I know for sure.

17   Q.    You also agreed, though, earlier that the third

18   party could stand in the shoes of its customer and provide

19   services for the maintenance and support of software, true?

20   A.    I think that's what you said.

21   Q.    And you agreed with me, did you not?

22   A.    It depends on the contract.

23   Q.    But a third party can stand in the shoes of the

24   licensee and perform the acts the licensee is permitted to

25   perform under that contract?

1    A.    Yes, as long as that's actually permitted in the

2    license.

3    Q.    But with respect to those companies that have gone

4    to Rimini Street and asked Rimini Street to host their

5    software on Rimini's own servers, you have not gone to them

6    and said, "That's a problem, you're breaching your

7    contract," have you?

8              MS. DUNN:  Objection, Your Honor.

9              THE COURT:  Sustained.

10   BY MR. WEBB:

11   Q.    Now, when a customer is on Oracle support, they're

12   entitled to access Oracle's website and to obtain fixes,

13   updates, and patches for their software, aren't they?

14   A.    Yes, that's what I shared earlier.

15   Q.    And that could be a substantial amount of material,

16   true?

17   A.    Yes, it is a substantial amount.

18   Q.    It could be hundreds of files?

19   A.    It can be.

20   Q.    It could be thousands of files?

21   A.    It absolutely can be.

22   Q.    And the customer would be totally within its rights

23   to download those materials; correct?

24   A.    Yes, as long as they're licensed for them, they may

25   download them during their support contract.

1    Q.    And customers may also have the right to customize
2    their software; isn't that true?
3    A.    It would depend.  As long as what their
4    customization, you know, was not a derivative work, it
5    would still belong actually to Oracle.
6    Q.    And if a customer who has customized their code goes
7    to Oracle to have that code serviced, Oracle can refuse to
8    do that, true?
9    A.    It would really depend on the situation.  As I
10   mentioned in the previous questions, customized code, we
11   may very well figure out how to help them anyway.
12   Q.    But if Oracle decides not to provide support on that
13   customized code, you would expect that customer to hire a
14   third party to do it, correct?
15   A.    Yes.  And if it's custom programming, a third party
16   did it to begin with, they would probably hire whoever did
17   it to change it.
18   Q.    And that would be perfectly within their rights,
19   true?
20   A.    That would be, sure.
21   Q.    All right.  You were here in the courtroom during my
22   opening statement, and I talked about Oracle's process not
23   actually financially harming Oracle.
24         Let me rephrase that.  I talked about how
25   Rimini's process did not actually financially harm Oracle.

1    Do you remember that?

2    A.    Yes.

3    Q.    Is it your view that whether the software's on a

4    local environment or remote of the clients, that actually

5    has harmed Oracle?

6    A.    Yes, it violates our contract.  It violates the

7    license.

8    Q.    No, I understand that.  I'm asking financial harm.

9    How is the location of that software financially harming

10   Oracle?

11   A.    Well, you see, when that original license was

12   negotiated, all those kinds of terms actually have

13   financial implications.

14         If you want to have additional rights and even

15   additional sites and things like that, depending on the

16   contract, we charge you a higher price for that.

17         So if you're doing it outside your license

18   agreement, you're actually not -- you are not paying us for

19   what you -- what you are actually doing.

20   Q.    So is it your testimony to this jury that the

21   location of that software financially damaged Oracle?

22   A.    Yes, it does.  It's part of the original license.

23   It's part of the original negotiation, and had they wanted

24   different rights, they would have cost more.

25         All the restrictions implicate financial

```
 1    results.  Expanding beyond those restrictions usually

 2    involves paying for those rights like other customers do.

 3    Q.    To be clear, you're telling the jury that the

 4    location of that software, whether it's on Rimini's servers

 5    or the client's servers, financially damaged Oracle?

 6    A.    Yes, the use of it beyond the license damages

 7    Oracle, that's right.

 8    Q.    And is it your view that whether Rimini Street

 9    reused tax and regulatory updates versus rebuilt them one

10    at a time, that created financial damage to Oracle?

11            MS. DUNN:  Objection, Your Honor.

12            THE COURT:  Sustained.

13    BY MR. WEBB:

14    Q.    Now, we saw a graph earlier about the attrition rate

15    of customers from Oracle.  Do you remember that?

16    A.    Yes.

17    Q.    It's in your binder.  Do you remember that graph?

18    A.    I do.  Do you want to tell me which number it is?

19    Q.    It was the chart used with your lawyer showing the

20    attrition rate on the chart.

21    A.    Yes.

22    Q.    Do you have that?  Would you pull it out?

23    A.    I have it in the binder that she gave me.  Is that

24    what you want?

25    Q.    Yes?
```