# Exhibit J:

Cited Testimony of
Seth Ravin

```
 1              You do solemnly swear that the testimony you
 2    shall give in the cause now before the Court shall be the
 3    truth, the whole truth, and nothing but the truth, so help
 4    you God?
 5              THE WITNESS:  I do.
 6              COURTROOM ADMINISTRATOR:  Please be seated.
 7              Can you please state your name and spell your
 8    last name for the record.
 9              THE WITNESS:  Certainly.  My name is Seth Ravin;
10    R-a-v-i-n.
11              COURTROOM ADMINISTRATOR:  Please tell us your
12    city and state of residence.
13              THE WITNESS:  Las Vegas, Nevada.
14              And please pardon my cold I picked up yesterday.
15              COURTROOM ADMINISTRATOR:  Thank you.
16              THE COURT:  Mr. Isaacson, go ahead, please.
17              MR. ISAACSON:  I don't want the jury to sit
18    through another twenty or forty seconds of me sitting --
19    standing silently, so I'm going to ask one of our lawyers,
20    Meryl Governski, to make some notes on the white board for
21    me.
22              THE COURT:  All right.
23              MR. ISAACSON:  So she'll be doing that while we
24    talk.
25              THE COURT:  All right.
```

240

1          MR. ISAACSON:  We have a couple binders that

2     we'll periodically be talking about with Mr. Ravin.

3          THE COURT:  All right.  Thank you.

4                          SETH RAVIN

5               called as a witness on behalf of the

6          Plaintiffs, was examined and testified as follows:

7                      DIRECT EXAMINATION

8     BY MR. ISAACSON:

9     Q.    Mr. Ravin, we've only got a little bit of time

10    today.  Let's see if we can do a few introductory things.

11              You are the founder and CEO of Rimini Street?

12    A.    Yes, I am.

13    Q.    And you're currently the CEO and chairman of Rimini

14    Street?

15    A.    CEO and chairman, yes.

16    Q.    You started Rimini Street in the fall of 2005?

17    A.    September 2005.

18    Q.    And you got your first customer at the beginning of

19    2006?

20    A.    That sounds about right.

21    Q.    And you have policy and operational control over

22    Rimini Street; is that fair?

23    A.    As it would go along with a CEO and chairman, yes.

24    Q.    And you are the largest single shareholder for

25    Rimini Street, and that's been true since the inception of

1    the company; correct?

2    A.    Yes, I do hold the largest single amount of shares

3    for the company, yes.

4    Q.    And I think your counsel said in opening you

5    formerly worked at PeopleSoft.  Was that from 1996 to 2000?

6    A.    Actually, I think we went to 2001.

7    Q.    2001.  Okay.  Thank you.

8              Now, in the opening statement you saw us show

9    the jury a part of the answer that was filed in this case,

10   and then that was shown to Professor Davis.

11             MR. ISAACSON:  That was Exhibit PTX 5332 which

12   has been shown before, so if we can put that on the screen,

13   and if we can go to paragraph 34.  Make that bigger, Matt.

14             THE WITNESS:  Thank you.  Now I can see it.

15   BY MR. ISAACSON:

16   Q.    Now, you've seen this before.  We've shown it a

17   couple times while you've been in court.

18             It talked about how we accused Rimini Street,

19   Oracle did, of stockpiling a library of Oracle's

20   intellectual property to support its present and

21   prospective customers.

22             And the answer said such a library has never

23   existed at Rimini Street, and Oracle's aware of that fact

24   and could easily have confirmed it if it worked with Rimini

25   Street.

1                My question, sir, is this answer was a formal

2       document filed with the Court that you approved; correct?

3       A.    That's correct.  I did approve it, did read it.

4       Q.    Now, that was -- this was filed in March 2010.

5                MR. ISAACSON:  If we can -- is 1482D in his

6       binder?

7                May I approach the witness, Your Honor?

8                THE COURT:  Actually, give that to my court

9       clerk and have her do that, Mr. Isaacson.

10      BY MR. ISAACSON:

11      Q.    I've handed you PTX 1482D.  This is basically the

12      same document.  You amended your answer, the court's filing

13      in this case, a year later, June 2011, and you said the

14      same thing about the library.  You denied the library

15      existed.

16      A.    Yes, that's correct.

17      Q.    And, again, having -- between -- again, after

18      March 2010 and June 2011 in its filing to the court you

19      approved this statement the library didn't exist; correct?

20      A.    Yes, because it didn't exist, that's correct.

21      Q.    Now, you also told customers that the library didn't

22      exist; correct?

23      A.    I imagine so, yes.

24      Q.    Okay.  Well, I don't want you just to imagine

25      things.  Let me show you an example.  PTX 1475.  That

1       should be in the second binder in front of you.

2                   And so we have number --

3       A.    Which PTX was that again?

4       Q.    1475.  And I appreciate it's not always easy to find

5       the tabs.  If you ever have any difficulty, we've got

6       people who can help you.

7       A.    I think I've got it.

8       Q.    And if we could turn --

9                   MR. ISAACSON:  Oh, don't run the screen yet I

10      don't think.

11                  Is this -- this is preadmitted.  So I'd like to

12      put it on the screen, Your Honor.

13                  (Plaintiffs' Exhibit 1475 received into

14                  evidence.)

15                  THE COURT:  All right.  Ladies and gentlemen,

16      one of the rules which we follow is that we don't publish

17      anything to you on the video screen that's not in evidence

18      or supported by something directly in evidence.

19                  So in this case, the pause was because counsel

20      wasn't certain whether this exhibit had been preadmitted.

21      It turns out that it has been, and so it may properly be

22      displayed in front of you.

23                  And yet I still will approve or disapprove the

24      publications because sometimes we need to move the case

25      along, and that becomes repetitive or doesn't serve a

1    purpose.

2           But the requests here have been acceptable to

3    the Court, and they may be published.

4           MR. ISAACSON:  All right.  Thank you, Your

5    Honor.

6           So if we can look at the second page, Matt.

7    BY MR. ISAACSON:

8    Q.   Now, here, this is an e-mail at Rimini Street, and

9    you were talking about what to say to the city manager for

10   Eugene, a city in Oregon.  Do you see that?

11   A.   Yes, I do.

12   Q.   And Sharon is talking to Peter about what it -- how

13   to respond to the city of Oregon, and you can see on page 1

14   that these answers are being forwarded to you; correct?

15   A.   Yes, they were forwarded to me.

16   Q.   All right.  Now, returning to page 2 in the middle,

17   where it says --

18           MR. ISAACSON:  Matt, if you could pick up right

19   in the middle where it says "Rimini Street does not host."

20           "Rimini Street does not host or maintain a

21   software library on behalf of the client.  If one client

22   had a file or update that another client did not obtain

23   prior to the end of their Oracle maintenance, Rimini Street

24   will not provide such update to another client.  That is

25   why it's important that Rimini Street have enough time to

1    perform the requested archiving process."

2    BY MR. ISAACSON:

3       Q.    You told this customer that Rimini Street does not

4    host or maintain a software library on behalf of the

5    client; right?

6       A.    That's correct.

7       Q.    Okay.  And, in fact, up above you also said, "If a

8    Rimini Street" -- a couple lines above.

9             "ANSWER:  If a Rimini Street client would like

10   Rimini Street to download a library of documents they are

11   entitled to, we will do so at their request and/or their

12   behalf."

13            And then you go down, "The files are then

14   compiled into a Customer Connection archive DVD and

15   delivered directly to the client."

16            All right.  So there were libraries that you

17   sent to the client; correct?

18      A.    Yes, but this is a different library than Oracle had

19   accused us of in the complaint.

20      Q.    All right.  I just want to talk about your

21   procedures for libraries, sir.

22      A.    Sure.

23      Q.    And actually I'll ask you about that.

24            You did have libraries that you sent directly to

25   clients; correct?

1    A.    We sent them archives of updates they were entitled

2    to from the Oracle website.

3    Q.    When you say archives, you also called those

4    libraries; right?

5    A.    Sometimes we would interchange that wording, yes.

6    Q.    All right.  Then, is it your statement that you did

7    not maintain such libraries of your own at Rimini Street?

8    A.    Well, we had -- in the Siebel days we actually had a

9    different archive process in the early years that we

10   changed.  So there was that process.

11            In terms of for every client, every client,

12   again, only got the files that they were entitled to.

13   Q.    Okay.  Let's be clear, sir.  When you say you had

14   something in the earlier days for Siebel, did you have a

15   library of Siebel software and documents at Rimini Street?

16   A.    We actually had an archive that used -- because of

17   the way that the Siebel web product worked, and the way

18   that the system worked, we had to do a -- what we called an

19   incremental archive, and so the process was different than

20   it was for PeopleSoft or even J.D. Edwards.

21            And so during the early years before Siebel

22   systems were assimilated into Oracle's, there was a

23   different process.

24            But, again, the most important part is no

25   customer ever got a file that they weren't entitled to.

1          MR. ISAACSON:  All right.  And I'll ask that the

2     last part of the answer be stricken as not responsive, your

3     Honor.

4          THE COURT:  That will be granted.  The jury

5     should disregard the nonresponsive portion of the answer.

6     BY MR. ISAACSON:

7     Q.    Sir, did you have a Siebel library?

8     A.    Not of the type that you're talking about in the

9     complaint.

10    Q.    Did you have a library of Siebel software and

11    documentation at Rimini Street?

12    A.    Not for use in the way that you're talking about.

13    Q.    I didn't ask about use, sir.

14          Did you have a library of Siebel software and

15    documentation at Rimini Street?

16    A.    No.

17    Q.    Did you have a library at any point of PeopleSoft

18    software and documentation at Rimini Street?

19    A.    We had installation media which was referred to as

20    the software library.

21    Q.    All right.  So you had a PeopleSoft library, and it

22    consisted solely of installation media; is that correct?

23    A.    Yes, it was the installation media which is separate

24    from what is downloaded from the website for updates and

25    fixes.  That's the core CDs.

1   Q.    And when customers asked you if you had a library at

2   Rimini Street of Siebel software or PeopleSoft software,

3   you said no; is that right?

4   A.    That's correct.  We said no because it didn't exist.

5           MR. ISAACSON:  Okay.  Let me take a minute on

6   another subject because I want to get through this part.

7   This won't have to do with the library.

8           Matt, can you put up their opening slide?

9   BY MR. ISAACSON:

10  Q.    All right.  My colleague has graciously written down

11  the names from the opening slide.  So maybe you recognize

12  these names.  These are clients that you were proud enough

13  of to put them into your lawyer's opening statement.

14          And you heard Professor Davis talk about

15  environments, cross-use of fixes, and you're aware that

16  your company has agreed, stipulated that a number of your

17  customers had environments on the Rimini system; correct?

18  A.    Yes.

19  Q.    Okay.  And so I'm now running down what has been --

20  what I have from the stipulation.  AT&T, do you sometimes

21  called them JJill?

22  A.    AT&T as a hosting provider of PeopleSoft products

23  worked with us.  There were several customers we shared

24  including JJill, yes.

25  Q.    Because of JJill I'm going to give that a check.

1           Oh, no, I'm sorry.

2           Any reason to disagree that all these companies

3    that I checked here had Rimini environments at Rimini with

4    copies of Oracle software?

5    A.    Actually, I wouldn't know without seeing the

6    documents or evidence to that effect.

7    Q.    Now, did -- you're aware of the stipulation as to

8    the environments with copies of Oracle software; right?

9    A.    I know we have some stipulations, but I'm not sure

10   exactly what all of them are on the legal front.

11   Q.    All right.  Did you check on the accuracy of that?

12   Did you look into what you had been doing?

13   A.    I'm sorry, I don't understand your question.

14   Q.    Well, we have a stipulation in this case that there

15   are hundreds of environments at Rimini, including many of

16   the customers you shared with us in opening statement, that

17   have environments at Rimini or have had them, with copies

18   of Oracle software.  Did you look into that issue yourself?

19   A.    Oh, I know for a fact we had hundreds of copies of

20   Oracle software per our customers contracts, yes.

21   Q.    And that includes -- you wouldn't argue with me if I

22   said almost all of your major customers have them.

23   A.    Well, again, I don't know specifically whether IBM

24   or AT&T had environments on our system.  I'm not that close

25   to it.

1    Q.   All right.  Did you ever look into it?  Once you

2    realized you had these environments that had copies of

3    Oracle software and that this was going to be an issue in

4    the case, did you, yourself, look into this?

5    A.   Well, again, my belief was that we had every right

6    to have the software on our system, so I wouldn't have --

7    of course, I knew we had environments.  There was, from my

8    position, no problem with that.

9    Q.   Well, but you haven't gone back to check what was

10   going on with these environments; is that right?

11   A.   Well, I know how we used the environments to provide

12   support and to build tax, legal, and regulatory updates.

13   So I didn't have any need to go back and do a personal

14   line-by-line investigation for it.

15   Q.   All right.  Dr. Davis also talked about cross-use of

16   fixes.

17        All right.  You saw Dr. Davis testify about

18   these.  Have you looked into the accuracy of what he said,

19   that all of these clients, these customers who were talked

20   about in your opening statement, received cross-uses of

21   fixes -- received cross-use fixes?

22   A.   Well, again, I didn't do any line-by-line analysis.

23   In fact, I'm not even sure I saw his report.  It may have

24   been attorney's fees only.

25        So I do know, of course, we were providing fixes

1    and updates to hundreds of clients, yes.

2    Q.    Doesn't surprise you to see this, that you had

3    all -- once you look at your major customers that were

4    shown to the jury in opening statement, that they had these

5    local environments with the Oracle copies and that they

6    were receiving these cross-use of fixes?

7    A.    No.  I certainly know we have hundreds of clients,

8    and we provide updates and fixes and support for hundreds

9    of clients.

10            So, no, I'm not surprised we had lots of

11   environments and lots of copies of Oracle product.

12   Q.    Thank you.

13            All right.  So let's go back to talking about

14   the library.

15            MR. ISAACSON:  The -- can we look at -- this has

16   been preadmitted.  So, Your Honor, it's been preadmitted,

17   it's okay if I just directly put it on the screen?

18            THE COURT:  Yes, I'll allow you to do that at

19   this time.

20        (Plaintiffs' Exhibit 4 received into

21        evidence.)

22            COURTROOM ADMINISTRATOR:  What number is it?

23            MR. ISAACSON:  PTX 4.

24            COURTROOM ADMINISTRATOR:  Thank you.

25

1    BY MR. ISAACSON:

2    Q.    And you can -- whatever is more comfortable for you,

3    sir.  You've got a binder, and it's also going to be shown

4    on your screen.

5    A.    Thank you.  You said PTX 4.

6    Q.    Let's look at the last page because sometimes you

7    have to read e-mails backwards to get the chronology of

8    what's going on.

9              All right.  This is an e-mail to you from Dennis

10   Chiu.  It's addressed to you.  "Hi, Seth."

11             Now, this is in 2006, June 2006.  Your company's

12   young.  He's one of your handful of vice-presidents at this

13   time; right?

14   A.    Yes.  I'm sorry.  I'm just trying to find --

15   Q.    PTX 4.

16   A.    Yes.  Okay.  It's the first page.  Yes.

17   Q.    All right.  Dennis Chiu, in June 2006, was one of

18   your handful of vice-presidents at the time.

19   A.    I think he may have been the only vice-president at

20   the time.

21   Q.    Okay.  There was you, another founder, Mr. Shay, and

22   then your vice-president, Mr. Chiu.  That's basically the

23   management structure at that time; is that right?

24   A.    I think that was pretty much the whole company other

25   than Susan Tahtaras referred to here.

1    Q.    Okay.  And, indeed, he's talking about "I had" -- at

2    the top of the page, "I had a couple things in mind for

3    Susan in terms of her getting ramped up."

4         So she's just coming to the company; right?

5    A.    Yes.

6    Q.    All right.  And down below it says, "I also wanted

7    to begin" -- "I also wanted to begin having her download

8    all the PeopleSoft application software that is currently

9    available on the Oracle website which would help with the

10   software library we want to set up, and once we have all

11   the software, have her begin installing some vanilla

12   environments.  The intent is to familiarize her with our

13   lab process and infrastructure as well as having

14   environments on hand when we confirm a PeopleSoft client."

15        So in June 2006, you were setting up a library

16   with PeopleSoft application software; correct?

17   A.    Well, come back to what I said earlier.  This is the

18   installation media which we're talking about downloading

19   here, which is common across all of the PeopleSoft

20   products.

21   Q.    All right.  You're saying it's common to have

22   installation media.

23        And so the application software refers to

24   installation media.  We agree with that.  You were setting

25   up a software library of that; correct?

254

1    A.    Well, again, it's different.  If you go back to what

2    you alleged in the complaint, you talked about us doing

3    something different.

4    Q.    You called it a software library; right?

5    A.    Yes -- I'm sorry, I didn't mean to talk over you.

6          We've talked about it, and you've seen in

7    several documents and even in more, you'll find people use

8    library in different ways.

9    Q.    Maybe you didn't hear my question.  My question was,

10   in your company, did you call it a software library?

11   A.    Yes, it was referred to as a software library.

12   Q.    And the people at your company when they wrote about

13   it called it a software library; right?

14   A.    Different people did, yes.

15   Q.    All right.  And they called it a software library

16   when they wrote to you; right?

17   A.    Sometimes, depending on the installation media, yes.

18   Q.    And you never wrote back and said it's not a

19   library?

20   A.    No, I didn't always correct them every time because

21   people used library in different ways.

22   Q.    All right.  And at this point you're setting up the

23   PeopleSoft library with installation media, at least the

24   installation media, so that you can do -- you can install

25   some environments when you don't even have a PeopleSoft

1    client yet; correct?

2    A.    Yes, that's what it says.

3    Q.    Okay.  And then on page 3 at the top you respond in

4    the middle, "Dennis, sounds like a solid plan that should

5    keep her very busy in the next week."

6              All right.  You approved the setting up of this

7    PeopleSoft library as recommended to you by Mr. Chiu;

8    right?

9    A.    Yes, for the installation media.

10   Q.    Right.

11             All right.  So now can we look at Exhibit 5,

12   which is easy for you, because that's the next tab in your

13   binder.  It has been preadmitted, so let's put it on the

14   screen.

15             (Plaintiffs' Exhibit 5 received into

16        evidence.)

17             THE WITNESS:  By the way, is my screen blurry or

18   is it just my eyes?  I can't really read it unless it blows

19   up.

20             THE COURTROOM ADMINISTRATOR:  It's blurry.

21             THE WITNESS:  That's -- it is blurry, right?

22             MR. ISAACSON:  All right.  We will do our best

23   to keep that in mind.

24             THE WITNESS:  Really, I can't even read it.

25   Unless you blow it up real big, I can't even read it.

 1             MR. ISAACSON:   Yeah, actually it's a little
 2   blurry here too, so, yes.
 3   BY MR. ISAACSON:
 4   Q.    So now, on PTX 5 at page 2, Mr. Chiu is writing to
 5   you again, again in June 2006, and you see the part where
 6   it says, "I do have Susan gathering information regarding
 7   the PeopleSoft software"?
 8   A.    Yes, I see it.
 9   Q.    He says, "The software packages are pretty large
10   because it bundles the applications."  That's installation
11   media; right?
12   A.    Yes.
13   Q.    PeopleTools, that's installation media; correct?
14   A.    Yes.
15   Q.    Kits.  That's not installation media, is it?  That's
16   used for training.
17   A.    I'm not sure exactly what he's referring to, but I
18   think that must be the training kits.
19   Q.    Right.  So now the library's going to include the
20   installation -- it's not -- it's going to include more than
21   the installation media, it's going to include the kits;
22   right?
23   A.    No, that's part of the installation media.
24   Q.    It's your testimony that the kits refers to
25   installation media; is that right?

1    A.    Yes.

2    Q.    Okay.  This is written to you, and you approve this

3    continued action; right?

4    A.    Yes.  I don't remember whether it was done or not,

5    but this is certainly from me.

6    Q.    All right.  Let's look at 167, which is preadmitted,

7    it's in the same binder.

8          (Plaintiffs' Exhibit 167 received into

9          evidence.)

10              THE WITNESS:  Okay.  Found it.

11   BY MR. ISAACSON:

12   Q.    All right.  And this is again -- this is some people

13   in your company, this is -- now we've moved to March 2007.

14   On page 2 of the document, Doug Baron, he's one of your

15   executives -- one of your engineers; correct?

16   A.    He's an engineer, right.

17   Q.    And he's writing to you and Mr. Chiu as well as

18   Mr. Lester, another executive; right?

19   A.    Yes.

20   Q.    And he's talking about loading things into the

21   library that we've been discussing for PeopleSoft; right?

22   A.    Yes, we're talking about the installation media,

23   yes.

24   Q.    All right.  And he says, "George already grabbed all

25   the PeopleTools updates for all releases a while back."

1           Updates are not installation media, are they?

2      A.    Well, no, this is a -- PeopleSoft updates are

3      actually PeopleTools are part of installation media.

4      Q.    I understand PeopleTools are, but once we get to

5      updates, once we get to patches and updates, we're no

6      longer talking about installation media, are we, sir?

7      A.    No.   When you actually refer to PeopleTools, they

8      can come as an 8.1, 8.2.   They actually come with

9      installation media.

10     Q.    I understand that, sir.   PeopleTools come with

11     installation media.

12           But when you have an update for PeopleTools,

13     okay, or when you have a patch for some other PeopleSoft

14     software, you're not talking about installation media, are

15     you?

16     A.    That's not true.

17     Q.    Okay.   So is it your testimony that when you say

18     installation media, you're including patches as well as

19     updates?

20     A.    I didn't say patches, I said updates.   That's what

21     they're actually called, PeopleTools updates, but they're

22     part of installation media.

23     Q.    Let me ask you about patches.   Are patches

24     installation media?

25     A.    Actually, not the individual patches I wouldn't

```
 1    directories that you disclosed in discovery of what your

 2    libraries -- of the address listings for your archive --

 3    for your library; right?

 4    A.    Yes, I remember that from the presentation.

 5    Q.    Okay.  And it's a fact, in that item number 1,

 6    client-software/PeopleSoft, you don't know what patches

 7    were in there, what updates were in there, what fixes were

 8    in there.  You don't know what downloading went into that;

 9    correct?

10    A.    No, that's correct, yes.

11    Q.    All right.  447, this is now June 2009?

12    A.    I'm sorry.  Which document are we looking at?

13    Q.    PTX 447.  We move forward from 2006 and 2007 to

14    2009?

15    A.    Okay.

16    Q.    And on page 1 at the bottom, Krista Williams is

17    talking.  She's your senior PeopleSoft manager; correct?

18    A.    Environments manager, yes.

19    Q.    Right.  She's in charge of the PeopleSoft

20    environments that we've been talking about in this case?

21    A.    Yes.

22    Q.    And she says the software is now in, she identifies

23    the drive.  "Under there is PeopleSoft with all of the

24    install media for PeopleSoft," and, "There is another

25    directory for development use which holds the Oracle,
```

1    Microsoft, and IBM software which we need.  Is that what

2    you need in one of those locations?"

3             That Oracle software for development use, that's

4    referring to Oracle Database software; right?

5    A.    I think that's accurate.

6    Q.    All right.  So for general development purposes, you

7    were putting Oracle Database software in the library;

8    correct?

9    A.    It looked like there was a directory of Oracle

10   Database software.

11   Q.    Okay.  Let's back -- let's turn one tab to 448.

12   We're going back in time to January 2008?

13   A.    Okay, I'm there.

14   Q.    At the bottom Mr. Baron and Mr. Slarve are talking

15   by email on January 28, 2008.

16             He says, "Guys, we're running real low on space

17   on rsi-data datastore drive.  This is where we keep the

18   PeopleSoft software library."  Right?

19   A.    Yes, I see it.

20   Q.    This library, in 2008, was continuing to grow, and

21   you were running out of space?

22   A.    Yes, apparently so.

23   Q.    All right.  But you were not aware of that; is that

24   your testimony?

25   A.    I don't recollect whether I was aware or not.  I was

1    involved in, obviously, certain things, but I don't

2    remember this one particularly.

3    Q.    All right.  And then let's talk about that eDelivery

4    website.  We'll go back to that.  That license you never

5    looked at.

6            Could you look at -- don't put on the screen --

7    PTX 649.

8            Sir, this is a --

9    A.    Wait a second.  I'm still trying to find it here.

10   Q.    If you want to look at them together --

11   A.    I've got it here.

12   Q.    -- 649 is a page where you enter the Oracle

13   eDelivery website, and 650, which is the next tab over, is

14   the electronic delivery trial license agreement.

15           All right?  Do you see that?

16   A.    Yes.

17   Q.    All right.  Now, it -- the -- when you enter the

18   Oracle eDelivery website, it said, "By accessing the

19   software on this website, you agree that (1) you have

20   already obtained a license from Oracle, or an Oracle

21   partner, for your use of the software," and it goes on to

22   talk about that license.

23           "Or (2) if you have not already obtained a

24   license from Oracle or an Oracle partner for your use of

25   the software, the Oracle Electronic Delivery Trial License

1    Agreement on this website governs your use of the

2    software."

3            You did not have a license with Oracle; correct?

4    A.    That's correct.

5    Q.    Okay.  And you see that there was a trial license,

6    that's at 650, that says this gives you a temporary right

7    to use the programs for evaluation purposes on a single

8    computer designated by you, and it tells you the term of

9    the license is 30 days.  All right?

10           Have you ever reviewed this license before?

11   A.    This particular one, I don't remember, no.

12   Q.    And it's fair to say that all of that software that

13   you've downloaded from eDelivery you kept for more than 30

14   days and you didn't just look at it on a single computer?

15   A.    Again, I don't know how it was used, and I don't

16   know if it was kept longer than we had actual customers who

17   had the same licenses.

18   Q.    That wasn't my question, sir.  You kept it a lot

19   longer than 30 days; right?

20   A.    Again, I don't know what was downloaded under it,

21   but my assumption would be you're probably correct, right.

22   Q.    And I would be correct to say your people weren't

23   looking at it on just one, stand-alone computer; correct?

24   A.    Well, my guess is it was probably on one server

25   based on what I saw.

1    Q.    Now, you used -- your people used all of the

2    software, PeopleSoft software, Oracle Database software,

3    Siebel software, JDE software, you used that in connection

4    with your work for customers; correct?

5    A.    Yes.

6    Q.    And the library, in addition to PeopleSoft and

7    Siebel, also included JDE install media; correct?

8    A.    I'm sorry.  Can you say that again?

9    Q.    Sure.  We talked about the library having Siebel and

10   PeopleSoft.  It also included JD Edwards installation

11   media; correct?

12   A.    That's my understanding, yes.

13            MR. ISAACSON:  All right.  And let's go back

14   to -- oh, let's look at 35 -- PTX 3511 at 4.  This is a

15   response to an interrogatory, interrogatory number 25.  Do

16   you have any objection to me showing it on the screen?

17            COURTROOM ADMINISTRATOR:  It's not admitted.

18            MR. ISAACSON:  It's not admitted.

19            COURTROOM ADMINISTRATOR:  No.

20            MR. ISAACSON:  Correct, it's not admitted.  I'm

21   asking if he has -- if I have his permission.

22            THE COURT:  Oh.

23            MR. ISAACSON:  Oh, please take -- I'm sorry, I

24   didn't see it was on the screen yet.

25            THE WITNESS:  I'm sorry.  Which number is that?

```
 1              MR. ISAACSON:  3511.

 2              I'm sorry.  We made it a separate handout.  If I

 3    could approach, Your Honor?

 4              THE COURT:  Just give it to my court clerk,

 5    Mr. Isaacson.

 6              MR. WEBB:  Your Honor, before we do that, can we

 7    approach on this?

 8              THE COURT:  Yes.

 9          (Sidebar conference held as follows:)

10              MR. ISAACSON:  That would be the end of

11    interrogatory 24.

12              MR. WEBB:  So this is a partial.

13              MR. ISAACSON:  All of interrogatory 25 and the

14    answer to interrogatory 25.

15              MR. WEBB:  No objection.  Sorry.

16              THE COURT:  All right.

17          (Sidebar conference concluded.)

18    BY MR. ISAACSON:

19     Q.   I'd like you to look at page 4 of this.

20              MR. ISAACSON:  Do you have any objection to

21    showing page 4 on the screen?

22              MR. WEBB:  No.

23              MR. ISAACSON:  I'd like to move to admit it.

24              THE COURT:  It's admitted.

25
```

1              (Plaintiffs' Exhibit 3511 received into

2         evidence.)

3    BY MR. ISAACSON:

4    Q.    Could we look at page 4?

5    A.    Sorry.  I don't seem to have page 4 in the handout.

6              Sorry.  Okay.

7    Q.    All right.  You'll see on page 4 there's that same

8    listing of library directories we looked at before that was

9    part of 3510, and so --

10   A.    Yes.

11   Q.    So what happened here was you -- you and your

12   company answered in the interrogatory a question we asked

13   in the discovery, you gave us this information, it was

14   later put into a stipulation, and about that first

15   direct -- about that first library -- and this is a library

16   that no longer exists; right?

17   A.    But my understanding is these are part of the

18   documents that were deleted prior to the litigation.

19   Q.    Right.  In January of 2010, right, that first

20   directory?

21   A.    That's my understanding.

22   Q.    And the -- you say about that directory, that first

23   directory, that it included materials relating to

24   PeopleSoft software, and you say about the second one that

25   it included materials related to PeopleSoft software and

1    Oracle Database software; correct?

2    A.    I see that in the document, yes.

3    Q.    All right.  You never disclosed that these libraries

4    also had material for JD Edwards and Siebel; correct?

5    A.    I don't see it listed in these particular name

6    directories.

7    Q.    In fact, you said under oath yesterday that the

8    library did not include Siebel software; right?

9    A.    I don't remember saying that.

10   Q.    Well, "Did you have a library of Siebel software and

11   documentation at Rimini Street?

12              "No."

13              Do you remember saying that yesterday?

14   A.    Again, you're talking about -- you were asking me

15   about what the allegation was versus what I said the

16   installation media --

17   Q.    I just read you the complete question.  "Did you

18   have a library of Siebel software and documentation at

19   Rimini Street?

20              "ANSWER:  No."

21              Do you remember giving that testimony?

22   A.    No, I don't remember it in that context, no.

23   Q.    Okay.  You did have a library of Siebel software and

24   documentation; correct?

25   A.    Based on the documents we reviewed and

1    318.

2    A.    Yes, I'm there.

3    Q.    All right.  This has been --

4         MR. WEBB:  Objection, Your Honor.  Could we

5    approach?

6         THE COURT:  318 is not in evidence at this

7    point?

8         MR. ISAACSON:  It's not admitted at this point.

9         THE COURT:  All right.  You may approach.

10        (Sidebar conference held as follows:)

11        THE COURT:  All right.  Go ahead.

12        MR. WEBB:  I thought we had an understanding

13   we're not going to get into the TomorrowNow issues until

14   the break.  But this is relating to the lawsuit with

15   TomorrowNow, something we need to address after --

16        MR. ISAACSON:  I'll deal with it without putting

17   it on the screen.  I wasn't actually coming to that part of

18   it right now, so I'll just read him parts of it and deal

19   with the TomorrowNow stuff later.  I will not move to admit

20   it, but I'll move to admit it later.

21        THE COURT:  All right.  So you're referring to

22   what part?

23        MR. ISAACSON:  So in the last page, beginning

24   with "when we set up our internal VM environment."

25        THE COURT:  I'm not seeing that.

1          MR. ISAACSON:  So below page 3.

2          MR. WEBB:  There it is.

3          MR. ISAACSON:  318.  Yes.  So page 3 of 3.  So

4   this, that paragraph, and then I'm going to go to the first

5   page.

6          So there's just one reference to Oracle lawsuit,

7   and I'm not going to mention that, and I'll move to admit

8   this and the judge can rule on it later.

9          THE COURT:  Do you have an objection to that?

10         MR. WEBB:  You're going to read the paragraph

11  right after the --

12         MR. ISAACSON:  Uh-huh, uh-huh.

13         MR. WEBB:  I don't see how you can do that

14  without having the contextual issue right in the middle of

15  that.

16         MR. ISAACSON:  This is a clearly relevant

17  document, and you're making a fine argument for admitting

18  the TomorrowNow evidence, but I'm trying to make it easier

19  for you now.

20         MR. WEBB:  I appreciate that, Bill.  But I

21  thought TomorrowNow was something we did address.

22         MR. ISAACSON:  I wasn't going to -- I didn't

23  know that was there because I wasn't going to talk about

24  it.

25         MR. WEBB:  All right.  Fine.

```
1            THE COURT:  All right.

2         (Sidebar conference concluded.)

3            THE COURT:  Go ahead, please, Mr. Isaacson.

4   BY MR. ISAACSON:

5    Q.   Do you have Exhibit 318 in the front of you?

6            THE COURT:  Pardon?

7            MR. ISAACSON:  I was asking the witness.

8   BY MR. ISAACSON:

9    Q.   Do you have 318 in front of you?

10   A.   Yes, I do.

11   Q.   All right.  Let's look at page 3 but not on the

12   screen.

13         I just want to get some context here.  "When we

14   set up" -- you're talking about a question.

15   Mr. Whittenbarger is talking about a question.

16         "When we set up our internal VM environment for

17   a customer," which is virtual machine, "are we assuming

18   they are giving us one or more of their Siebel licenses to

19   set this up at our site?"

20         And then let's go to -- I wanted you to have

21   that for context.  Let's look at page 1.

22   A.   Yes, I see it.

23            MR. ISAACSON:  All right.  Now, counsel has

24   given me permission to put the first page of this document

25   on the screen, Your Honor.  So if we can put the first page
```

1     of 318 on the screen, and this --

2             THE COURT:  The first page of 318 is admitted.

3             (Plaintiffs' Exhibit 318, page 1 received

4             into evidence.)

5     BY MR. ISAACSON:

6     Q.    Mr. Chiu, again that vice-president in your company,

7     this is March 2007, is responding to Mr. Whittenbarger.

8             He says, "Great question and I'm glad you asked.

9             "Our clients can extend their software licenses

10    to us for testing and development purposes, much like they

11    would extend them to a consultant they hire to perform

12    development or testing -- exactly what our virtual

13    environments are for and exactly what we do."

14            So at this point, Mr. Chiu was saying internally

15    in the company that the Siebel licenses could be extended

16    for testing and development purposes, and he was saying

17    that to your environmental engineers; correct?

18    A.    Yes, that's accurate.

19    Q.    And he was saying that that's exactly what your

20    Siebel environments were doing, testing and development;

21    right?

22    A.    That's what they were designed for, yes.

23    Q.    And what we've been saying about separate silos and

24    your golden rule about keeping things separately, you told

25    that to customers also; right?

1    A.    Yes, we told them that we indeed made sure that,

2    again, overall, customers didn't get anything that they

3    didn't pay for through silos, yes.

4    Q.    All right.  And that was standard messaging for your

5    sales force; correct?

6    A.    Yes.  I believe that they took that and used that in

7    the sales process to -- again, the whole idea was to make

8    sure customers knew they wouldn't get something that wasn't

9    theirs.

10   Q.    And you had standard messaging tools for your sales

11   force, such as responses to frequently asked questions,

12   that had those messages so your sales force would spread

13   that to your customers and potential customers; correct?

14   A.    Yes.

15   Q.    And you had, as you grew, a growing sales force;

16   correct?

17   A.    Yes.

18   Q.    You spent a lot of money over the years on sales and

19   marketing?

20   A.    Yes.

21   Q.    You spent -- between 2006 and 2010, you probably

22   spent close to $20 million on sales and marketing; is that

23   right?

24   A.    I'm sorry.  I don't know the number offhand.

25   Q.    Are you comfortable saying it was over $10 million?

1    A.    I'd actually have to look at the numbers.

2    Q.    Okay.  In actuality, though, at Rimini you were

3    using copies of customers' licensed Oracle software to

4    serve multiple clients; right?

5    A.    We were using the generic version of a release to

6    serve as multiple clients that had the same, yes, the

7    reuse.

8    Q.    Okay.  Let's talk about that, using the generic

9    version of a release.

10           Now, a generic version of a release, you mean by

11   Oracle software that requires a license; right?

12   A.    Yes.

13   Q.    Okay.  And you would get that release from a

14   customer and put it into a general testing and development

15   environment; correct?

16   A.    Yes.  It was a general development test environment

17   that originally sourced from some particular customer's

18   media, yes.

19   Q.    And you did that for PeopleSoft; correct?

20   A.    Yes.

21   Q.    You did that for Siebel; correct?

22   A.    For a few environments.  I think it was eight to

23   ten, something like that, early years.

24   Q.    And in the early years you also did that for JD

25   Edwards; correct?

1    A.    I think we did a few environments in the early years

2    for JDE, yes.

3    Q.    Specifically for these testing and development

4    purposes; correct?

5    A.    Yes, they were for testing and development, but I

6    don't know how the Siebel or JD Edwards were actually used.

7    Q.    All right.  The -- and so with respect to these

8    general environments, you were taking customer software,

9    putting it into a general environment, and then using it

10   for multiple customers; right?

11   A.    These were all clients who had licensed the same

12   product from Oracle, yes.

13   Q.    Well, that -- I'm not sure what you're saying yes

14   to, sir, because you didn't start off by answering my

15   question.

16        You were taking customer specific software, I

17   guess from one of those silos, and putting it into a

18   general environment, and using that for multiple customers;

19   right?

20   A.    No, this is back to the -- I'm sorry.  If I can

21   explain.

22        It's the installation media we would use to

23   build an environment that a customer would have provided

24   the original source.  But, again, this is a single version

25   of the software that would then be used for reuse with

1    customers that had the same exact licenses.

2    Q.    You were taking it out of the silo and using it for

3    general customer purposes; right?

4    A.    No.

5    Q.    Well, let's go over that one more time then.  Maybe

6    you and I have a different idea about what a silo is.

7          But you were taking software out of a silo and

8    putting it in a general environment; right?

9    A.    No, this is the installation media that's used to

10   build environments.  So the installation media we've

11   already said was not part of these individual silos because

12   it was common media across multiple clients.

13   Q.    You took -- so the installation media, which

14   would -- by installation media, you're including everything

15   you took off -- you took from downloads from websites;

16   right?

17   A.    We took from -- no.  A lot of it was loaded up by

18   DVDs again provided from the clients for particular

19   licenses.

20   Q.    Some of it was DVDs, some of it was downloads from

21   the Oracle websites; right?

22   A.    That, I don't remember the exact source of each

23   environment, but it's possible it came from one or the

24   other.  I think we saw it in the slide yesterday from your

25   expert, yes.

1    Q.    And we looked at all that library -- I thought I was

2    finished with the library, but we looked at all the library

3    and saw all of that installation media in there as well as

4    the patches, et cetera; right?  All of that was being used

5    to set up general environments; right?

6    A.    I would say yes.

7              Again, as your expert showed, some of it

8    probably came from -- it looked like he had done the

9    research on that, and it looked like it either came from

10   Oracle's website or customers.

11             But, again, we used the customers' media to

12   build these environments.

13   Q.    All right.  And you never told your customers that,

14   "By the way, we told you they're separate silos, but what

15   we're really doing is taking installation media and using

16   it for general purposes for whatever -- for multiple

17   customers"?  You never told them that; right?

18   A.    Well, again, you're talking -- you're talking about

19   the fact that we did talk to customers and told them we do

20   not give them software that's not their licensed rights,

21   yes.

22   Q.    I'm talking about the silos, sir.  We'll get back to

23   how you told customers that they were within their licensed

24   rights.  I'll talk about that later.

25             With respect to these silos, you never told the

324

```
 1    customers that you were actually taking installation media
 2    out of the silos and using it for general development
 3    purposes?
 4    A.    We didn't take them out of the silos.
 5    Q.    Okay.  The -- so let's look at Plaintiffs'
 6    Exhibit 219.
 7    A.    Okay.  I'm there.
 8          MR. ISAACSON:  Hopefully this is pretty easy.
 9    This is very early history, September 2006.  It's
10    preadmitted, so you can put this on the screen.
11          And blow up the top of it.
12    BY MR. ISAACSON:
13    Q.    And this is a list, as of September 2006, of your
14    first customers, with the exception of Leads Customers
15    Growth; correct?
16    A.    Looks fairly accurate, yes.
17    Q.    Okay.  It has start dates, and these are all Siebel
18    customers with the exception of FileNet and City of Flint,
19    and City of Flint has a start date of September 13, 2006.
20    That's your first PeopleSoft customer; right?
21    A.    Yes, it sounds right.
22          MR. ISAACSON:  Now, can we -- Matt, can we put
23    up Ravin Exhibit 1, the slide?
24    BY MR. ISAACSON:
25    Q.    You were here when I showed the jury this in opening
```

1    Q.    Well, I'm talking about downloading from Siebel

2    SupportWeb?

3    A.    Right.  But I think you're confusing that between

4    downloading and what the second -- you just asked me about

5    whether we were rewriting documents, and that's something

6    that -- this one is about downloading.

7              Yes, of course, we built a tool to download from

8    Siebel SupportWeb.

9    Q.    Okay.  Thank you for clarifying that.

10             So let's just get this straight as to what you

11   agree to and what you don't agree to.

12             You agree that there was downloading on an

13   automated basis from Siebel SupportWeb of the Oracle

14   documentation.  You disagree that you then went about

15   rewriting or editing those documents for your customers?

16   A.    That's correct.

17             MR. ISAACSON:  Okay.  And the -- can we look at

18   210.  This has been preadmitted.

19   BY MR. ISAACSON:

20   Q.    So we can look at page 1, and let's look at the

21   bottom of that.

22             This is Mr. Chiu writing to Mr. Whittenbarger

23   and Ms. Bola, and it says at the bottom, "Dan has created a

24   methodology" -- and this is in June 2006 now?

25   A.    Yes.

331

1      Q.    "Dan has created the methodology and framework for

2  the SupportWeb extract process, including the process to

3  capture daily incrementals from SupportWeb which will then

4  be integrated into the extract database."

5            At this point you're doing daily downloads from

6  the Siebel SupportWeb and putting it into your database;

7  right?

8      A.    That's correct.  And goes back to what we talked

9  about as Siebel having a very unique structure in the way

10 that its systems worked, and we went from weekly downloads

11 to daily downloads, yes.

12     Q.    Right.  And he then says, "In parallel, he's

13 prototyping the design documentation."

14            That's the Oracle design documentation; right?

15     A.    I'm sorry, where is --

16     Q.    "In parallel, he's prototyping the design

17 documentation."

18            That's the Oracle design documentation; correct?

19     A.    I think that's relating to something else.  I don't

20 think that's Oracle.

21     Q.    He says, "The design documentation will then be

22 passed to John."  Is that Mr. Whittenbarger?

23     A.    This looks more like this relates to customizations

24 that we do for Siebel.

25     Q.    My question is really easy.

1              Is John Mr. Whittenbarger?

2    A.    John is Mr. Whittenbarger, yes.

3    Q.    And so this design documentation was going to be

4    passed to Mr. Whittenbarger "for reviews, updates and

5    edits," so it could be made into a user guide document;

6    right?

7    A.    Yes.

8    Q.    Okay.

9    A.    That's what it says.

10   Q.    All right.  And so let's look at Plaintiffs'

11   Exhibit 5 which has been preadmitted.

12   A.    Yes, I'm there.

13   Q.    Now, this is now again in June 2006, this same

14   period of time, this is June 28th, and -- all right.  And

15   we might even have looked at this yesterday, but I want to

16   look at another part of it, page 4.  Okay?

17   A.    Yes, I'm there.

18   Q.    The "sounds good paragraph" at the top.

19              Okay.  This is Mr. Chiu writing to you.

20              "Sounds good.  We're getting the wheels rolling

21   on some of the tasks for them already."

22              And he talks about, of course, the creation and

23   delivering of the SupportWeb extract DVD?

24   A.    Yes.

25   Q.    Now, that DVD refers you're downloading from Siebel

333

1    SupportWeb, and you're putting it on to DVDs; right?

2    A.    Yes.  For the customers we would put the files

3    they're entitled to onto a DVD and then ship it to the

4    customer.

5    Q.    So in this case, you're creating one DVD, and as he

6    says in the next paragraph, "Once packaged, we use that

7    extract as the basis of the DVD for Albridge, Brandes,

8    Caterpillar and now FileNet."

9              Right?  So you're doing an extract, you're

10   creating one DVD, and you're giving copies of the same

11   things to multiple customers; correct?

12   A.    Yes, all of them were entitled to the same files.

13   Q.    All right.  And that's because -- and you say that,

14   these are all Siebel licensees, and you're saying that they

15   were entitled to this under the Siebel license.  Is that

16   your testimony?

17   A.    Yes, because they were all on support and ended

18   support around the same time.  So all the files that were

19   available up to that time were then put on that DVD and

20   shared with all --

21   Q.    Right.  But you would use one customer log-in to the

22   Siebel SupportWeb, download, and then give it to multiple

23   customers; right?

24   A.    Yes, in this particular design early on in the

25   company, that's why I mentioned this was different than as

1    it evolved over time, because we did use one company's

2    log-in -- all of them had log-ins, but it used one to do

3    this extract for all of them, yes.

4    Q.    All right.  In fact, let's look at Exhibit 7.

5    A.    Uh-huh.

6    Q.    Which has been preadmitted, so we can look at this

7    on the screen.

8          Let's start at the back of this email, page 2.

9    It takes a little bit of work, but be patient with me.

10         This is Mr. Whittenbarger with Mr. Chiu and

11   Mr. Slarve.  Do you see that?

12   A.    Yes.

13   Q.    It says July 10, 2006, a little bit after late June.

14         And he's saying -- he's talking about the

15   SupportWeb extract and how it's scheduled and running each

16   day.  Do you see that?

17   A.    Yes.

18   Q.    And you're using the Brandes user name and password;

19   right?

20   A.    That's what it says.

21   Q.    Okay.  And he says, "Just curious what our policy is

22   for using user name/password of client whose support has

23   expired.  Should I leave it running under their username

24   for now?"

25         So the Brandes password had expired; correct?

1      A.     That's what it says, yes.

2      Q.     So what Mr. -- I believe it's Mr. Whittenbarger, and

3   Mr. Slarve responds, he gives the Leads Customer Growth

4   password; right?

5      A.     Yes, that's what it says, that they -- apparently

6   they decided not to use the Brandes and switched to another

7   password for a customer who has live support.

8      Q.     And Leads Customer Growth at this point wasn't even

9   operating the Siebel software, were they?

10     A.     No, but they were a licensee, and they did have

11  support they had paid for.

12     Q.     All right.  So you are using the Leads Customer

13  Growth password to access the Siebel support website and

14  download all of those support materials so that you could

15  hand them to multiple customers.  That's correct, isn't it?

16     A.     Yes.

17     Q.     All right.  And it's your understanding that if a

18  customer's log-in credential is used to download materials

19  that that customer was not licensed to, that would be

20  improper; right?

21     A.     Yes.  But, again, coming back to -- specifically to

22  the way the Siebel website worked in those early years, we

23  had only one methodology to get that information.

24     Q.     All right.  And, for example, if we can look at 214.

25              COURTROOM ADMINISTRATOR:  It's not admitted.

1          MR. ISAACSON:  Not admitted.

2          Do we have an objection?

3          MR. WEBB:  No objection, Your Honor.

4          THE COURT:  It is admitted.

5      (Plaintiffs' Exhibit 214 received into

6      evidence.)

7          MR. ISAACSON:  So please put this on the screen.

8  BY MR. ISAACSON:

9  Q.    Now, I'm going to go to page 5 of 6.  And just

10 looking at this, this -- what you're discussing here is

11 just basically what the package is going to look like when

12 you give the customers the Siebel SupportWeb DVD; right?

13 A.    Yes, apparently.

14 Q.    And on page 5 --

15         MR. ISAACSON:  You can blow up that part in the

16 middle.

17 BY MR. ISAACSON:

18 Q.    This is what you're going to tell -- this is

19 actually what you're going to give the customer.  It's

20 going to be on top of the DVD or attached to the DVD

21 somehow, or CD.

22         "This CD gains an archive of data available to

23 Oracle/Siebel Support Services customers for their use and

24 download on Oracle's Siebel SupportWeb website as of" -- a

25 certain date.  "The data has been extracted and placed on

1    the media by Rimini Street, Inc., at the request of Siebel

2    licensee and Rimini Street client FileNet corporation."

3              This is specifically for FileNet, but you would

4    give this same -- for Albridge, you would say at the

5    request of Albridge; right?

6    A.    Yes.  FileNet's IBM.  Yes.

7    Q.    But you weren't actually -- when you -- when you

8    went and got the DVD information, you weren't actually

9    using FileNet's user name or passwords; right?  You were

10   using, like, Leads Customer Growth?

11   A.    Apparently so, yes.

12   Q.    And you told customers, because you agreed, that the

13   entire contents of this media are the intellectual and

14   copyrighted property of Oracle Corporation?

15   A.    Yes, I believe there's several discussions around

16   the fact that we wanted to make sure that Oracle's

17   intellectual property copyright was carried.

18              MR. ISAACSON:  All right.  Can we go back to

19   Ravin 1 in that slide.  And put the environments in there,

20   Matt.

21              We've also listed who got these DVDs from your

22   first customers.  Would you put those in there.

23         (Off the record.)

24              THE COURT REPORTER:  Your Honor, could we have a

25   short break?

```
 1                 THE COURT:  Well, I'm sure there's others who
 2     having a similar thought.
 3                 We'll take a short break, ladies and gentlemen,
 4     approximately -- 10 to 20 minutes, depending on when you
 5     are ready.
 6                 The usual admonition not to discuss the case, or
 7     allow it to be discussed in your presence applies, and keep
 8     an open mind as we go through the testimony and evidence.
 9                 We'll take our recess.  Please let my court
10     clerk Dionna know when you're ready to return, and that's
11     what we'll do.  You may step down.  Thank you.
12                 COURTROOM ADMINISTRATOR:  Please rise.
13           (Jurors exit courtroom at 9:44 a.m.)
14           (Recess from 9:44 a.m. until 9:59 a.m.)
15           (Jurors enter courtroom at 9:59 a.m.)
16                 COURTROOM ADMINISTRATOR:  Court is again in
17     session.
18                 THE COURT:  All right.  Have a seat, please.
19                 The record will show we concluded the first
20     morning break.  The jury's all present.  Counsel and
21     parties are present.  We're in open court.
22                 And, Mr. Isaacson, you may continue with your
23     cross-examination of Mr. Ravin.
24                 MR. ISAACSON:  Thank you, Your Honor.
25                 Can we get Ravin Exhibit 1 up there again?  We
```

```
 1              MR. ISAACSON:  Page 419.

 2              COURTROOM ADMINISTRATOR:  Thank you.

 3              THE COURT:  You may do so.

 4    BY MR. ISAACSON:

 5    Q.    All right.  Do you have page 419 in front of you,

 6    sir?

 7    A.    Yes, I do.

 8    Q.    You were asked the question,

 9              "How much has Rimini Street paid Mr. Leake and

10    his company from the inception of the relationship?

11              "ANSWER:  I wouldn't know.

12              "QUESTION:  Approximately?

13              "ANSWER:  I wouldn't know.

14              "QUESTION:  Is it more than $100,000?

15              "ANSWER:  I wouldn't know.

16              "QUESTION:  Is it more than a million dollars?

17              "ANSWER:  I wouldn't know."

18              You said under oath that you didn't even know

19    whether you paid him more than a million dollars; right?

20    A.    No.  I don't know.

21    Q.    And those customers like Albridge who got references

22    from LCG Growth, you never told them that you were paying

23    this customer to be your first customer.  You never told

24    them that, did you?

25    A.    That's your characterization, not mine.
```

1    Q.    I'm asking you what you told your customers, the

2    customers who got references from LCGrowth.  You never told

3    them that you were paying LCGrowth, did you?

4    A.    We didn't pay LCG Growth.  We worked out an

5    arrangement, and they went ahead and gave us the reference

6    that they felt comfortable giving.

7    Q.    I understand they felt comfortable giving it, but

8    you are putting money in their -- you just said we weren't

9    paying them.  You put money in their pocket, sir, didn't

10   you?

11   A.    We were a customer of LCG for many, many years, yes.

12   Q.    And you didn't tell the customers who were getting

13   references that they -- that you were paying LCG Growth

14   money.  You didn't tell them that, did you?

15   A.    As far as the fact that they were a vendor of ours

16   as well?  No, I'm not sure whether I did or didn't tell

17   them that.

18   Q.    All right.  And you actually had Mr. Leake speak to

19   the press for you, didn't you?

20   A.    Again, I don't recollect, but it wouldn't surprise

21   me.

22   Q.    Do you recall that in August 2006 that he said in an

23   article -- this is months after he's not implementing the

24   Siebel system, that he retained Rimini Street for

25   maintenance believing his support will help him stretch the

1     life of the application for five to ten years.

2              Do you remember him making statements like that?

3     A.    Don't remember it specifically.

4              MR. ISAACSON:  All right.  Let's look -- is 1431

5     in the binder?  I think that's separate, right.

6     BY MR. ISAACSON:

7     Q.    By the way, while we're getting that, Mr. Leake is

8     now a vice-president at Rimini Street; right?

9     A.    Actually, I don't know his current title.  He is --

10    I think he's reduced to a part-time basis at this point.

11    Q.    He has been a vice-president at Rimini Street;

12    right?

13    A.    Yes.  He joined us a couple years ago, yes.

14    Q.    And he's still working on a part-time basis for you?

15    A.    I believe that's his status, yes.

16    Q.    All right.  And after -- and after he -- the

17    decision was made in May 2006 that LCG Growth was not

18    implementing the Siebel software, you kept Siebel -- you

19    kept LCG Growth on your customer list that you shared with

20    other customers?

21    A.    Sure.  It was a signed contract.

22    Q.    All right.  So after May 2006, they don't have

23    Siebel software, you're not providing them any services,

24    and you have a customer list that you're sharing with other

25    customers, and they're on it?

1    A.    Yes.

2    Q.    And you also kept them on your website.  You had a

3    website that would -- you sort of scroll through customers,

4    and LCG Growth was one of them?

5    A.    Yes.

6              MR. ISAACSON:  Okay.  Do we have --

7              COURTROOM ADMINISTRATOR:  It's been withdrawn on

8    the list.

9              MR. ISAACSON:  I'm not seeing to admit it, I'm

10   going to show it to -- well, I'll come back to that.

11   BY MR. ISAACSON:

12   Q.    Let me do the -- let's talk about those local

13   environments on the Rimini system some more.

14              Now, I think we've agreed that you had those

15   environments for your first customers, and they had Oracle

16   software, copies of Oracle software on them; right?

17   A.    We agreed on that for JD Edwards and Siebel, we had

18   for the early customers.  But PeopleSoft we kept all the

19   way until we stopped using environments locally on our

20   systems in July of '14.

21   Q.    Now, during this time in your early years, and

22   actually 2006 through 2011, when you had customers, you

23   would give them backups of their software; right?

24   A.    I'm sorry.  Can you explain what you mean by that?

25   Q.    So you would give them backup copies of their

1    software so they could have a safe backup so they could

2    store that in a safe place; right?

3    A.    No, we did not provide backups to the customers.

4    Q.    All right.  Did you provide any kind of archives to

5    the customers?

6    A.    Yes, we gave them copies of their download archives

7    which we packaged up and delivered to them, yes.

8    Q.    And you would ship those on USB drives?

9    A.    I think they were DVDs in the early days and

10   probably switched to USB as technology changed, yes.

11   Q.    All right.  And you would then keep your own backups

12   with an offsite storage company; right?

13   A.    I don't think those went to an offsite storage.

14         Are you talking about the physical software that

15   Oracle shipped us?

16   Q.    No, I'm talking about you maintained backups of your

17   local environments in a tape format; right?

18   A.    Oh, yes, our own backups of our systems, yes.  They

19   were stored onsite, and then, because there's so many of

20   them, they would be shipped to an offsite storage, a

21   special protection unit, yes.

22   Q.    In a tape format?

23   A.    I believe they were tape format.

24   Q.    And then you would keep the functioning local

25   environments on your system separate from those tapes that

1    you sent other places?

2    A.    Yes, on our own servers and our data center, yes.

3    Q.    All right.  And those -- the environments that you

4    were using at Rimini were used in order to support

5    customers; right?

6    A.    That was their full design and purpose, yes.

7    Q.    All right.  And that included troubleshooting for

8    customers?

9    A.    Yes.

10   Q.    Okay.  And specifically for Siebel customers, you

11   used Siebel environments for troubleshooting; correct?

12   A.    That was their design, but I don't know actually how

13   they were used day to day, yes.

14   Q.    All right.  Well, let's talk about the design first,

15   and then we'll talk about the day to day.

16            Now, by, troubleshooting in layman's terms, that

17   means that you have an environment that's separate from the

18   operating system and so you can look at it and say why is

19   the operating system having troubles, I'll look at this

20   other copy of it and work with it and see if I can figure

21   out what the trouble is over there.

22            Is that a fair summary?

23   A.    Well, a little bit different.

24            Essentially, yes, you're taking the software,

25   you're playing with it to see if you can figure out what's

1   going wrong, what the customer had called in and reported,

2   yes.

3   Q.   Right.  Exactly.  You're playing with it.

4        And once you play with that software, that's not

5   software that you would use for a backup purpose in case

6   there's a hurricane or a disaster.

7        You need a pure backup, and once you've played

8   with that software, that's not good for that backup

9   purpose; right?

10  A.   No, I wouldn't agree with that.

11  Q.   And once you've played with it, you've altered it,

12  and it's no longer pristine; right?

13  A.   No.  You don't necessarily make any changes to the

14  software in order to do a diagnostic with it.  You could

15  literally just be looking at it, operating it.  It doesn't

16  necessarily change any of the data.

17  Q.   It doesn't necessarily.  Sometimes it does; right?

18  A.   It could, depending on what process you run or what

19  you're looking at, yes.

20  Q.   And once you've played with it, you don't always

21  know whether you have changed it, so you don't use that

22  type of software as a backup in case of emergencies; right?

23  A.   Well, again, you have to look at the different types

24  of software.  Siebel, very different than a PeopleSoft than

25  a JD Edward.  They're very different products and

1    technologies here.

2    Q.    Right.  I'm talking about -- I'm probably talking

3    about any type of software.

4              But in terms of these types of software for your

5    emergency backup when you need a pristine copy that you

6    know has not been altered, you don't use software that

7    someone's been playing with; right?

8    A.    No, I don't necessarily agree with that.

9    Q.    All right.  So let's look at Exhibit 310.

10   A.    Yes, I'm there.

11   Q.    Okay.  All right.  And this is talking about your

12   customer --

13             MR. ISAACSON:   This is preadmitted, yes.

14   BY MR. ISAACSON:

15   Q.    So this is your customer, XO Communications; right?

16   A.    Yes.

17   Q.    And Mr. Whittenbarger, on the first page, is talking

18   about,

19             "One of the initial tasks we perform with new

20   clients is setting up an environment dedicated to that

21   client prior to any issues being reported, so that we are

22   already prepared once a client calls on us to troubleshoot

23   a problem."

24             That's your plan for the Siebel environments;

25   right?

1    A.    Yes, for this client, yes.

2    Q.    Okay.  And then -- so -- and what you were doing

3    here with these troubleshooting environments is you were

4    using one customer's environment to research or

5    troubleshoot problems for different customers; right?

6    A.    Well, as I said before, we would use a generic

7    environment for a particular release of the product that

8    other multiple customers would have the same license, yes.

9    Q.    All right.  And just to be clear, you would use the

10   Siebel environment, if there's trouble, someone would play

11   with it, maybe altering the system, maybe not, trying to

12   figure out what the trouble is, and you would use that

13   environment to check out troubles for a customer that had

14   software of one customer, and you would be doing that for a

15   customer -- for a different customer.

16          I'm not sure that came out good?

17   A.    Say that again, please.

18   Q.    Sure.  You had an environment for troubleshooting

19   that had a customer's software on it, call it Customer A,

20   and that would be used for troubleshooting, played around

21   with, to see what troubles Customer B was having; right?

22   A.    If they were on the same release and the same

23   license, yes.

24   Q.    Okay.  And you also installed copies of the Siebel

25   environment to learn about it, to evaluate it, to see how

1    it worked, not just for clients; right?

2    A.    Well, Dennis Chiu was head of all support for

3    Siebel, so we didn't need to learn about Siebel.  We knew

4    Siebel.  Yes.

5    Q.    All right.  You had engineers who used those

6    environments to evaluate the latest versions of Siebel

7    software, didn't you?

8    A.    Well, again, as customers would come on, they would

9    learn the software, yes.  Standard.

10   Q.    All right.  And -- but they were using it to learn

11   about the new software to help them with other customers,

12   weren't they?

13   A.    Sure.  They would use the environments that

14   customers, again, that were licensed for.  But, yeah, they

15   learned about the software.

16   Q.    And when you installed Siebel software environments

17   for those early customers such as Albridge and Brandes, you

18   told them in their contracts that they were going to have

19   development and test environments, didn't you?

20   A.    I think it was a standard part of our agreements

21   from the first contracts we ever wrote, yes.

22   Q.    Exactly.  So a standard provision of the Siebel

23   contracts, your contracts with your customers, said that

24   you would be setting up general testing and development

25   environments to support them?

```
 1    A.    We said that we would be setting up environments,
 2    yes, to support their software, yes.
 3    Q.    And you specifically told them you would be using it
 4    for development and testing; right?
 5    A.    Yes.  That is the way it's written into the
 6    contract, yes.
 7    Q.    All right.
 8    A.    Development, testing, and troubleshooting -- I'm
 9    sorry, if it's okay for me to explain.
10    Q.    Actually, I'm going -- it's a good point, but let me
11    ask the questions.
12              We talked about troubleshooting.  Now, we're
13    talking about development and testing.
14              Testing is where you actually test and update
15    for a fix before putting it onto the actual client's
16    system; right?
17    A.    In general, yes.
18    Q.    And when you test it on one environment, you
19    potentially alter that environment, it no longer becomes a
20    pristine copy; correct?
21    A.    This is why it's unfortunately a little more
22    complicated, because Siebel -- we never delivered any code
23    updates because it's a different kind of product.  So I
24    just want to make sure we're clear.
25    Q.    But I think we agree on testing.
```

1           And you would test, in Siebel environments,

2      using software of customer A, whether it would work for

3      customer B who was running the same software; right?

4      A.    If you are referring to PeopleSoft, yes.  Siebel,

5      no.

6      Q.    The development is when you actually developed

7      upgrades in the environment; right?

8      A.    Well, a development environment is used actually

9      where you make changes to the code.  And, again, Siebel, we

10     didn't actually create any code, it was a different kind of

11     product.

12     Q.    So -- and -- so you develop -- I think I said

13     upgrades, I probably should have said updates.  You develop

14     updates in that environment using code?

15     A.    Yeah, or a fix if the customer -- but, again,

16     Siebel, different product.

17     Q.    All right.  So we've got troubleshooting, we've got

18     testing, and then we've got development.

19           And you told the Siebel customers in their

20     contracts, in the standard form, you were going to be doing

21     all of those in the Siebel environments; right?

22     A.    Yes, I believe so.

23     Q.    All right.  Now, you heard Professor Davis talking

24     about how Rimini would clone one customer's environment to

25     another; right?

1    A.    We would actually use a base copy of a license for

2    one customer to create environments or that generic

3    development environment for customers who had the same

4    similar license, yes.

5    Q.    Right.  You would copy the environment for customer

6    A and re-create it for customer B?

7    A.    Yes.

8    Q.    And that's cloning?

9    A.    That's cloning, yes.

10    Q.    So I won't spend much time on cloning, but let's

11    look at 58.

12              MR. ISAACSON:  All right.  I want to -- this has

13    been preadmitted.

14    BY MR. ISAACSON:

15    Q.    So this is Mr. Slepko and Mr. Chiu in 2009 talking

16    about environmental builds, and down below they're talking

17    about some specific builds, and specifically here it talks

18    about how you -- that one of your clients in Oklahoma was a

19    clone of Abilene School District?

20    A.    Yes, just as your expert testified to the way that

21    worked.

22    Q.    Right.  And that's actually on page 2.

23              And the reason we're bringing that up is

24    because -- and you saw me show a document in opening where

25    you told the Abilene School District that they were only --

1    you were only going to use their environment for them.  Do

2    you remember seeing that?

3    A.    Yes, I see that.

4    Q.    Okay.  So what happened was you told Abilene School

5    District you were only going to use their environment for

6    them, and you cloned their environment for another

7    customer; right?

8    A.    Again, these are same licensed software.

9          You're talking about the way that the software

10   is licensed versus what you're calling customer software.

11   We don't agree with that.

12   Q.    Sir, my question was, you told Abilene School

13   District that you were only going to use their software for

14   them, and then you cloned their software for another

15   client.  That's what happened; right?

16   A.    No.

17   Q.    The -- can we look at the pilot -- Ravin 2.  It's

18   going to be on the screen.  I'm sorry, it's not a PTX.

19   A.    Okay.

20   Q.    It's a slide.  Sorry.

21         All right.  I want to look -- the exhibit you

22   can look at is PTX 4896.

23         COURTROOM ADMINISTRATOR:  It's not admitted.

24         MR. ISAACSON:  Because it's large -- I'm going

25   to hand it up.  It was kind of large so we didn't want to

1    put it into the binder.

2              COURTROOM ADMINISTRATOR:  But it's on the

3    screen.  It's not admitted.

4              MR. ISAACSON:  This is a demonstrative that's

5    not been objected to.  This is not the actual exhibit.

6              THE WITNESS:  I'm on 4896.

7    BY MR. ISAACSON:

8    Q.    Okay.  Now, you would advertise and market to

9    clients who your major first clients were; right?

10   A.    Sure, as much as possible.

11   Q.    You would use the term pilot clients.  Do you

12   recognize that term?

13   A.    Yes.

14   Q.    Okay.  And this is -- this is a group of pilot

15   clients that you promoted in -- to other clients; right?

16   A.    They all look familiar, yes.

17   Q.    Okay.  The -- they had local environments, didn't

18   they, with copies of Oracle software?

19   A.    I'm not sure which ones had environments or didn't.

20   Q.    Well, we tracked it from what's been stipulated to,

21   all right?  A lot of your pilot clients had those local

22   environments with copied Oracle software, didn't they?

23   A.    Yes.  It looks like not all of them on here.

24   Q.    All right.  And then there was the Oracle library.

25   You had the Oracle library operating during this time,

1   other than when you had Beekley and Caterpillar and

2   Brandes; right?

3    A.   Yes, installation media, yes.

4    Q.   Okay.  And you had the DV -- some of these customers

5   got those DVDs from Oracle SupportWeb; right?

6    A.   That looks right, if that's what you guys found.

7    Q.   Okay.  And you heard Professor Davis talk about

8   cross-uses of fixes.  These clients were getting those

9   cross-use fixes, right, several of them?

10   A.   If they were on the same release and entitled to

11  them, yes.

12   Q.   Okay.  And you were cloning for these clients,

13  right, for several of them?

14   A.   Again, cloning was a part of our methodology,

15  certainly.

16   Q.   Okay.  What about your public clients?  Let's look

17  at Ravin 3.

18        These were your first three public clients;

19  right?  And by public I mean in the government sector.

20   A.   I thought we had one in Washington that was our

21  first -- or in the first, but if you say these are, I'll go

22  with that.

23   Q.   You called them the magical 3; right?

24   A.   Yes.  In the public sector, a lot of RFPs require

25  you have three references in order to go forward to

1    hopefully win a bid.

2    Q.    So what that means -- an RFP is a request for

3    proposal; right?

4    A.    Right.

5    Q.    So a public sector client, they need to get multiple

6    bids or offers, so they put out a request for proposal, and

7    they typically require three references?

8    A.    Yes, they look for three people who can say that the

9    service or the people or the partners are good, yes.

10   Q.    And these first three references are very important

11   because then they give you the opportunity to bid.  You

12   don't have the opportunity to go after these clients, at

13   least most of them, until you have those three references?

14   A.    Yes, but they have to be good references.

15   Q.    Okay.  And just to go over with these three, your

16   magic 3, let's look at the local environments.

17          All right.  All three had local environments

18   with copied Oracle software; right?

19   A.    Again, I don't know for a fact, but if you say so.

20   Q.    Okay.  The -- they were all -- your library with

21   people -- with Oracle software was in existence when you

22   were getting these clients; right?

23   A.    Again, I'll go with your -- if you say that's in the

24   stipulation.

25   Q.    Right.  And you actually told the City of Flint that

376

1    you were only going to use their Oracle software for them;

2    right?

3    A.    Well, again, only use the software that they were

4    licensed for for them, yes.

5    Q.    In fact, that was a standard message to clients;

6    correct?

7    A.    Yes.

8    Q.    And cross-uses of fixes, Professor Davis, all three

9    of them got that; right?

10   A.    If that's what it says, yes.

11   Q.    And then cloning.

12         Okay.  All three had cloning, but all three were

13   told we're only going to use your software for you?

14   A.    Yes.  The software that they're licensed for, that's

15   correct.

16   Q.    And then you cloned it for someone else?

17   A.    Well, again, this -- we may be going through

18   semantics here, but from our perspective, it was Oracle

19   licensed software that they all had the same license to,

20   yes.

21   Q.    So from your perspective, it was okay to clone even

22   when you were telling these clients across the board we're

23   only going to use your software for yourself, that it was

24   okay to use it for someone else?

25   A.    There's no inconsistency there.  They had the same

377

1    license.  So we did not use anything particular to that

2    client for another client that wasn't licensed for the same

3    software.

4    Q.    You didn't use it, you actually took the City of

5    Flint's software, copied it and cloned it for someone else;

6    right?

7    A.    That's not the City of Flint's software, it's

8    Oracle's software.

9    Q.    Okay.  You took the City of Flint's licensed

10   software that you got from the City of Flint and cloned it

11   for someone else; right?

12   A.    We cloned it.  But, again, this was the same license

13   that every other client with the same license had.

14   Q.    All right.  Let me make sure we've nailed down this

15   point.  You would tell this customer -- so City of Flint

16   would get its software from Oracle, either directly or

17   through you; right?

18   A.    They would take delivery of it through a DVD,

19   download, et cetera, yes.

20   Q.    And then you said we're only going to use this for

21   you; right?

22   A.    We said that we're only going to use the software

23   you're licensed for for you.  We will not give you license

24   to things that you are not entitled to.

25   Q.    And then you took their software, and you put it in

1    Q.   And he says,

2              "I'd like to gather everyone's" -- in the second

3    paragraph, "I'd like to gather everyone's input regarding

4    the topic of selling/supporting our message."

5              All right.  And he goes on to say,

6              "While we've always 'sold' the benefit of having

7    a copy of the client's production database for our tax

8    development work, it's also been positioned as a benefit to

9    the client to better support their customizations."

10             What he's saying there is one of your sales

11   messages is "we want these general testing and development

12   environments so that we can offer you customization of your

13   environments and not just plain vanilla environments."

14             Is that right?

15   A.   I'd say it differently.  Could I explain?

16   Q.   I'm sure you would say a lot of things differently,

17   but I would like a yes or no answer?

18   A.   That's not an accurate description.

19   Q.   Okay.  The -- he is talking about that, as part of

20   your general sales pitch, that you say to the clients "we

21   will support customization."

22   A.   That's not what he's referring to.

23   Q.   Okay.  That is part of your sales pitch, isn't it?

24   A.   Yes, we support all customizations that a client

25   makes to their environment.

1    Q.    And you use the -- your testing and development

2    environments to support those customizations, isn't that

3    right?

4    A.    Depends on the customization, yes.

5    Q.    So you use the testing developments to support

6    customizations though you also use other things; is that

7    fair?

8    A.    That would be fair, yes.

9    Q.    And Mr. Chiu says,

10            "The underlying truth is we aren't truly

11   leveraging their environments in such a fashion.  It's

12   primarily purpose is that of a working, up-to-date

13   environment that's required for development of tax updates,

14   particularly in the absence of a viable, fix-master demo."

15            You're not actually using environments in that

16   fashion.

17            And then,

18            "To truly support our clients' ongoing

19   customization means regular synchronization of the clients

20   code changes, and possibly database refreshes over time,

21   resulting in significant overhead downstream challenges of

22   reconciling environmental discrepancies beyond our

23   infrastructure and team capabilities."

24            He is saying there that you are telling the

25   clients that you can support customizations with these

```
 1    environments when that's not true; correct?
 2    A.     No, you're completely wrong in the way that you
 3    understand this document.
 4    Q.     All right.  He is saying that to truly support our
 5    clients' ongoing customization means regular
 6    synchronization, database refreshing over time, significant
 7    overhead and downstream challenges, and that's beyond our
 8    infrastructure and team capabilities; correct?
 9    A.     That's what he's saying, but your interpretation is
10    completely wrong.
11    Q.     The --
12    A.     I'm happy to explain to the jury if you want me to.
13    Q.     No, I'll let your counsel -- I think it says what it
14    says.
15           And one topic I didn't cover with you.  We've
16    talked about how you are the CEO of Rimini Street.  You
17    also own roughly 70 percent of the company, right, of the
18    active shares?
19    A.     Probably somewhere around that, yes.
20    Q.     Okay.  And back in November 2011 you put a value on
21    your stock holdings in Rimini Street of between 30 and 40
22    million; is that right?
23    A.     Yes.
24    Q.     Okay.  And that's most of your net worth?
25    A.     That's correct.
```

1    Q.    And you also have family members who are invested in

2    the company; right?

3    A.    Yes.

4    Q.    Okay.  And, now, one of your goals for the company

5    in making it valuable is something you call scalability;

6    right?

7    A.    Yes, which means to be able to serve more and more

8    customers more efficiently over time.

9    Q.    All right.  To have -- to have fewer people or the

10   same amount of people serve more customers?

11   A.    Yes, essentially that would be -- that would be a

12   correct way to look at it, although you're adding people

13   all the time, yes.

14   Q.    And you have actually said to people about the value

15   of your company that it should be given a valuation that's

16   similar to a software company because of that scalability;

17   right?

18   A.    Yes.  A software company gets highly valued because

19   of the concept of building one piece of software and being

20   able to sell it multiple times, yes, at low cost.

21          MR. ISAACSON:  All right.  Let's look at PTX 12

22   which has been preadmitted.

23          THE WITNESS:  Give me a second.  I'm drowning in

24   binders.

25          Okay.  I'm at PTX 12.

1    BY MR. ISAACSON:

2    Q.    And you're talking to someone in this email named

3    Scott.  Is he -- from El Dorado.  Is he a potential

4    investor?  Who is he?

5    A.    Yeah, that's El Dorado Capital.  They're a Silicon

6    Valley investor that puts money in technology companies.

7    Q.    All right.  And what you argue to him on the first

8    page in point one is you're talking about the valuation for

9    your revenue.

10   A.    Yes.

11   Q.    And you expect a 3 to 4X with the same type of

12   business, because he had been saying I think it should only

13   be 1 to 2X.

14           And you see scalability closer to a software

15   company than a consulting company.  You wanted to get the

16   same type of valuation as a company that makes software

17   without producing any software?

18   A.    Well, I think as we said closer to.  You can't get a

19   software valuation being a services company.

20   Q.    All right.  You want to get something closer to a

21   software company without actually having to make the

22   software.

23   A.    Right.

24   Q.    And to do that, you built a business -- you had your

25   business model, and you saw me show this in opening

445

1   statement, said that your business focuses on the most

2   profitable component of software business, annual

3   maintenance fees, without any of the capital investment

4   required to develop software.  That is accurate, was it?

5   That's your goal?

6   A.    Yes.

7   Q.    Okay.  And at this point, as I understand it,

8   there's also a concept in your business of a backlog of

9   bookings?

10  A.    Yes, this is like aircraft orders that the customer

11  can cancel, they're not really committed, but they give you

12  an idea of the future, yes.

13  Q.    Right.  And by the -- so by the end of 2011, 2012,

14  do you remember what your backlog of bookings were?

15  A.    Sorry, not offhand.

16  Q.    Okay.  Today can you measure them?

17  A.    Today I know what they are, yes.

18  Q.    What are they?

19  A.    About one point -- I think they're 1.6 billion.

20  Q.    The -- your -- your -- your counsel talked about the

21  term forced upgrades in opening statement, and that's

22  referring to new upgrades to new versions of the software;

23  right?

24  A.    Yes, that a vendor requires that a customer install

25  in order to be eligible to continue support.

446

1   Q.   All right.  And Rimini Street, at least until -- at

2   least through 2011, as I understand it, did not provide any

3   security updates to its clients; right?

4   A.   That's correct.

5   Q.   And, in fact, you actually told customers that they

6   weren't necessary, and they -- you told them they weren't

7   necessary; right?

8   A.   Yes, because it's an outdated model relative to what

9   we call holistic security today.

10  Q.   Yeah.  All right.  Holistic security means don't put

11  security in the software, just put it in the firewall at

12  your place of business; right?

13  A.   It's actually the most innovative version available

14  today for security people, yes.

15  Q.   All right.  But it involves not putting any security

16  updates in the software to deal with hackers; right?

17  A.   Right.  It's called virtual patching and firewall

18  systems, yes.

19  Q.   Right.  And the firewall systems are systems that

20  are maintained by the client, the customer, not by Rimini

21  Street for the customer; right?

22  A.   That's correct.  They're responsible for their own

23  firewalls and their own security protections.

24  Q.   You tell them, "gee, the way it should work is you

25  should upgrade your firewalls, you should protect yourself,

```
 1    and we don't need to put any security in our -- security

 2    updates in the software."

 3              Right?

 4    A.    Yes, that's the -- if you go out and look at the

 5    white papers, that's security patching and holistic

 6    security, yes.

 7    Q.    All right.  That was part of your sales

 8    presentations, wasn't it?

 9    A.    I'm sure it was because, again, we can't provide

10    security patches because we don't have those parts of

11    source code for Oracle products.

12    Q.    Let's look at example 5433 -- I'm sorry, 5455.

13    A.    Okay.  I'm on 5455.

14    Q.    All right.  And the -- this is an email from Krista

15    Williams talking about how to talk to customers.  Do you

16    see that?

17    A.    Yes.

18    Q.    All right.  And it says -- this is July 2009 --

19              MR. ISAACSON:  Do I need to move to admit this?

20    Yeah, I move to admit 5455, your Honor.

21              MR. WEBB:  No objection, Your Honor.

22              THE COURT:  It's admitted.

23         (Plaintiffs' Exhibit 5455 received into

24         evidence.)

25
```

1    BY MR. ISAACSON:

2    Q.    All right.  In the middle, the question is asked,

3          "Are security patches part of the maintenance

4    agreement similar to tax and regulatory updates?"

5          "Answer, the biggest security threat is

6    unauthorized access to a client's network."

7          And it concludes a little farther down, "The

8    strategy that we recommend" --

9          MR. ISAACSON:  Right above the paragraph --

10   right above that, Matt.  There we go.

11   BY MR. ISAACSON:

12   Q.    "The strategy that we recommend to our clients is to

13   shore up all other aspects of security such as user

14   accounts, network access, firewall rules and system

15   architecture."

16         You recommend that they handle the security and

17   that you not worry about security upgrades for the

18   software; right?

19   A.    That's absolutely correct.  That's the holistic

20   security model, yes.

21   Q.    All right.  And when -- another term, you said --

22   well, we're talking about upgrades, we're talking about new

23   versions of the software; right?

24   A.    Yes.  Again, there's always semantics, but

25   essentially it means a big version, a next big release that

1    A.    It appears to be, yes.

2    Q.    All right.  Let's look at page 11.  And it's fair to

3    say at page 11 you're complaining about the fact that

4    Oracle sued you in this lawsuit?

5    A.    I'm sorry.  Which line and which section again?

6    Q.    Page -- the section -- the section that begins at

7    the bottom of the page 10 and continues at the top of page

8    11.  You're talking about the fact that Oracle sued you in

9    this case that we're in court about today.

10   A.    I'm sorry.  I need to see the date of this document.

11   Q.    You'll see at the bottom of page 10 it refers to

12   this lawsuit, okay, and one of the points you're telling

13   your salespeople --

14   A.    Yes.

15   Q.    -- is that Rimini Street had taken over -- this is

16   the top of page 11, that Rimini Street had taken over

17   $300 million in contracts from Oracle?

18   A.    Yes, that's what it says with our growth of 270

19   percent, yes.

20   Q.    All right.  That was something your salespeople were

21   telling customers; correct?

22   A.    Well, it sounds like that was a calculation, yes.

23   Q.    All right?

24   A.    In terms of the amount that -- all the contracts,

25   yes.

1    Q.    All right.  And that was a correct calculation,

2    wasn't it?

3    A.    Again, I don't know where the number was calculated

4    from, but I would assume they'd done some work to calculate

5    it.

6    Q.    Okay.  And it was something you were telling your

7    customers -- it was something your salespeople were told to

8    tell your customers, that you had taken $300 million of

9    contracts from Oracle?

10   A.    These would have been the customers that moved to

11   Rimini Street, yes.

12             MR. ISAACSON:  All right.  I have no further

13   questions.

14             THE COURT:  All right.

15             Cross-examination?

16                     CROSS-EXAMINATION

17   BY MR. WEBB:

18   Q.    Mr. Ravin, good morning?

19   A.    Good morning.

20   Q.    We have not spoken for a few days.

21             Just to clear a few things up before we begin,

22   have you ever testified in front of a jury before?

23   A.    Just once before.

24   Q.    It's fair to say that you're not in your comfort

25   zone?

1    A.    No, I'm -- no.

2    Q.    And you just experienced somewhat of an unusual

3    situation because, even though you're my client,

4    Mr. Isaacson got to ask you questions first.  He gets to

5    try to prove his case before we get to talk.  So let me see

6    if I can clear the underbrush to begin with.

7               During Mr. Isaacson's cross-examination which

8    began on Tuesday and completed just now, did he ask you one

9    time about the contractual right for Rimini Street to be in

10   business?

11   A.    Not that I recollect.

12   Q.    It's fair to say that's fairly important to your

13   company?

14   A.    Yes.

15   Q.    And you were sitting right here during opening

16   statements.  Do you remember that?

17   A.    Yes.

18   Q.    First thing I wrote up on the board was what?

19   A.    The different choices that a customer has after the

20   first year of maintenance is included with the contract.

21   Q.    And how many times did Mr. Isaacson talk about that

22   over the last three days?

23   A.    None that I could recollect.

24   Q.    Let's start by trying to clear some things up,

25   because the last few days it appeared that you all were

1    talking past each other.

2              Let me first talk about this.  You don't deny,

3    do you, that Rimini Street has copies of Oracle's software

4    on their servers?

5    A.    No.  A lot of it, yes.

6    Q.    A lot of copies?

7    A.    Yes.

8    Q.    And you don't deny that?

9    A.    No.

10   Q.    And you were sitting here beside me when Professor

11   Davis testified, and he said you had thousands and

12   thousands of copies?

13   A.    That's correct.

14   Q.    And to this jury, you're not denying that, are you?

15   A.    No.  It looked pretty accurate to me.

16   Q.    So that's clear.  You admit that you have Oracle

17   software on your servers?

18   A.    Yes.

19   Q.    All right.  This idea of taking a vanilla version

20   and using it for other clients with the same version, they

21   call that cloning?  Do you remember that?

22   A.    Yes.

23   Q.    Do you deny that Rimini Street has cloned Oracle

24   software?

25   A.    No.

552

1    Q.    What about this.  Taking an update that you created,

2    your engineers created, and then using that update for

3    other clients with the same version of contract or license,

4    do you deny that you all have done that?

5    A.    No.  We reused it all the time.  Yes.

6    Q.    So you admit all that stuff?

7    A.    Yes.

8    Q.    Now, let's talk about a library.  A library would be

9    Oracle software?

10   A.    Yes, the installation media, yes.

11   Q.    And you've already admitted that you had Oracle

12   software on your servers?

13   A.    Yes.

14   Q.    To be honest, the jury may conclude that you're

15   splitting hairs when you're talking about a library.  Do

16   you understand that?

17   A.    Well, it's complicated because everyone's using a

18   different definition.  Yes.

19   Q.    Okay.  Let's take a few minutes to see if we can

20   sort it out.

21         You mentioned something about installation

22   media.  What is that?

23   A.    Well, that's the base software.  I guess the best

24   way to put it is, if you were buying Microsoft Office, and

25   you get a box of DVDs, it would be the DVDs you get from

1     the store that you load, the generic, the base.

2     Q.    Sort of like these?

3     A.    Yes.

4     Q.    So when a client signs up for PeopleSoft or Oracle

5     software, they're sent a bunch of these?

6     A.    They used to.

7     Q.    This is back in the day when you were doing this,

8     you got DVDs?

9     A.    Yes.

10    Q.    And then what would you do with the DVDs?

11          Well, let's take a step back.  Why do you need

12    these?

13    A.    Well, that's the actual base of the program.  So if

14    you were going to install it, just like you would Microsoft

15    Office, you need to install the base software.

16    Q.    So that would be the first step, to install?

17    A.    Yes.

18    Q.    So take these DVDs -- and let's give an order of

19    magnitude to the jury.  About how many DVDs would typically

20    be associated with an install for an Oracle client?

21    A.    Well, unlike Microsoft Office, which might be three

22    or four, you're talking about a few hundred DVDs.

23    Q.    And where would they go?

24    A.    They get loaded onto a server, onto a computer, and

25    put into a file directory, yes.

1    Q.    Okay.  That's my depiction of a couple of servers.

2    So these would be loaded onto the servers?

3    A.    Correct.

4    Q.    And after they're loaded, what do you call what you

5    have there?

6    A.    That's basically the installation media.

7    Q.    Installation media?

8    A.    Yes.

9    Q.    Now, is it possible that you would have two clients

10   that would send you the exact same DVDs for the exact same

11   version?

12   A.    Yes.

13   Q.    What would you call those DVDs, if they have two

14   with the exact same version?  Do they have the same license

15   rights?

16   A.    Well, they're actually -- I guess the term would be

17   that they are nonexclusive license.

18   Q.    Okay.  What would be the next step after you've

19   loaded all the DVDs onto your servers, the installation

20   media onto your servers?

21   A.    Well, then you would actually take the -- and,

22   again, it depends on the product for between Siebel,

23   PeopleSoft, JD Edwards, but essentially you would run the

24   installation program to make the software configured to

25   actually be used.

1    Q.    At this time have you done anything with the Oracle

2    website?

3    A.    No.

4    Q.    All right.  When does that come into play?

5    A.    Well, after you -- after you load up the software,

6    very much like a Microsoft Office, you may remember that it

7    automatically connects to Microsoft's site and brings down

8    all these new files and updates that have been done since

9    the base media came out, right?

10         Same process for the big software except it

11   doesn't automatically come down, you have to go get it, and

12   it could be tens of thousands of files.

13   Q.    Now, is this the download stuff that we've been

14   talking about?

15   A.    Yes, this is the downloads and the archives.

16   Q.    And that's basically where you get it on the Oracle

17   website on the Internet, and then you download files onto

18   your servers that already have the installation media on

19   them?

20   A.    Yes.  But it's only really after the installation

21   media's set up for each configuration, yes.

22   Q.    So you install it and set it up.  That's one

23   process?

24   A.    Yes.

25   Q.    Then you go to the website and download all the

1           "Rimini Street accessed and downloaded the

2     software and support materials when it either had no

3     legitimate basis to access Oracle's restricted website, or

4     in a way that grossly violated the limited access rights it

5     did have."

6           It goes on.  "Further, the scope of the

7     downloaded software and support materials across multiple

8     libraries and multiple lines of business for customers that

9     had no license to take or need those products suggest that

10    Rimini Street took the software support materials to

11    stockpile a library to support its present and prospective

12    customers."

13          Is that true, Mr. Ravin?

14    A.    This is what it says, but it's not true.  We did not

15    do that.

16    Q.    And when they're talking about downloading materials

17    to create a stockpile or a library, which part of this

18    process are they referring to?

19    A.    The second part, the downloads.

20    Q.    The second part right here.

21          And when you download those materials, did you

22    ever use those materials for anyone other than the client

23    that you were downloading them for?

24    A.    No, customers only had access to and use of the

25    software that they were entitled to.

563

1      Q.    But Mr. Isaacson didn't show you this paragraph when

2  he cross-examined you, did he?

3      A.    No.

4      Q.    All right.  So in this installation media piece,

5  just walk again for the jury exactly step by step, how

6  would you even get those DVDs?

7      A.    Well, the DVDs, when a customer signed the contract,

8  they had to do one of two things, give us access remotely

9  to an environment, to the test and development

10  environments, or they had to give us the software so that

11  we could build it locally in our environment, right, on our

12  systems.  So it was either local or remote.

13            And if the customer was having us build this on

14  our systems, they had to get us the software.  So the

15  customer either had to ship us the software, or they

16  ordered it from Oracle and had Oracle ship us the software

17  directly.

18      Q.    Okay.  So you've got one client's DVDs, a whole

19  bunch of them, and you upload them onto your servers until

20  you've completed the process?

21      A.    Right.

22      Q.    Let's say the next day another customer sends you

23  another box of DVDs just like these and ask you also to

24  install those as well.

25            What if you've already got the exact version the

564

1     client sent you, what would you do?

2     A.    Well, what we did was that's where we created the

3     installation media, which is we left it on the computer

4     because we get the same DVDs again and again from the

5     customers.

6              So it can take a week to load 200 plus DVDs.

7     It's not a short process.  So, you know, for efficiency, we

8     just would say we already have these 200 DVDs loaded, let's

9     just use the ones already on the computer and skip the load

10    step.

11    Q.    But you still required the client to ship you the

12    DVDs?

13    A.    Yes, we still required it, because the customer

14    signed in their contract what products they were licensed

15    for from Oracle, and then they had to make the software

16    available to us in order for us to be able to build the

17    environment, yes.

18    Q.    So you made sure you had the DVDs before you cloned

19    an environment to replicate that?

20    A.    That was our process, yes.

21    Q.    And then what would you do with the DVDs that they

22    sent you?

23    A.    Then they would be packaged up, inventoried, and

24    those DVDs would be shipped to a storage area where we had

25    hundreds of boxes of Oracle software, yes.

1    Q.    Okay.  So now you've said that you've already put

2    the DVDs on your server, and you've already got a version

3    of that on your server.  So when another one comes in with

4    the same DVDs, sometimes would you make a clone of that?

5    A.    That's correct.

6    Q.    All right.  Now, over time you had multiple versions

7    of software that you had loaded onto your servers?

8    A.    That's correct.

9    Q.    Okay.  Now, isn't that a library?

10   A.    No.  Again, we had lots of installation media from a

11   lot of different products and releases.

12   Q.    Could someone come into the directory of these

13   versions and take software whenever it wanted?

14   A.    No, customers had no access, and our people were not

15   allowed to move software that customers were not entitled

16   to into any other directory and make it available to a

17   customer.

18   Q.    Let's say I'm a Rimini Street engineer, and I'm

19   working on a project, and I'm working on a project, and I

20   go, "wow, it would be nice to have that version I know is

21   over here on this directory, why don't I just go over and

22   just get some of that."  Is that possible?

23   A.    Well, we kept -- we kept close tabs on access to

24   those directories and eventually even put in security

25   mechanisms requiring that access be granted, yes.

566

1    Q.    All right.  Now, let's talk a little more about the

2    download piece.

3              What do we see on the screen here, Mr. Ravin?

4    A.    This appears to be a graphic relating to what

5    happens after the first year of maintenance when that

6    customer has a choice and selects Rimini Street.

7    Q.    Okay.  Let's go back to that.  Talk about that

8    one-year period of time --

9    A.    Sorry.

10   Q.    -- during which the customer has Oracle support?

11   A.    Yes.

12   Q.    What is -- what's that based on?

13   A.    When a customer signs a new license agreement,

14   generally it requires that they pay for at least the first

15   year, and then they get the option of choosing what to do

16   after that first year.

17   Q.    Does Rimini enter an agreement with the client

18   before or after that one-year term expires?

19   A.    Well, we actually -- if the customer's made the

20   decision to move to Rimini Street, whether it's the first

21   year or whether they've been with Oracle for five years,

22   ten years, it doesn't matter.

23             But after that period of time, if they're going

24   to move to Rimini Street, they sign with us before the

25   Oracle maintenance is over so that we have a window of time

1    to gather all the information that they're entitled to and

2    deliver it to the customer before their maintenance end

3    date.

4    Q.    All right.  And why is that important to get that

5    done before the maintenance end date?

6    A.    Because once a customer passes the maintenance end

7    date, they're no longer under contract with Oracle support

8    and therefore no longer entitled to access their websites

9    or get delivery of any materials.

10   Q.    So all of these steps happen before the maintenance

11   end date?

12   A.    Yes, at least the making sure the software is

13   ordered and delivered and making sure that the archives,

14   the downloads, are done from the website, yes.

15   Q.    Okay.  So after the maintenance end date, do Rimini

16   Street engineers ever access the Oracle website again for

17   that customer?

18   A.    No, for that customer, they should be done, and, in

19   fact, later procedures included even disabling those

20   log-ins so that nobody could even accidentally go into the

21   Oracle website for a customer.

22   Q.    Okay.  You said earlier that when you're downloading

23   materials on behalf of a client, there's like a check box

24   sequence to determine what you're downloading for them.

25   A.    Yes.  It's a really quite complicated process for

1    any customer, and we actually are pretty good at it.

2              But think the fact you're dealing with

3    potentially thousands of files, and you've got to figure

4    out which ones go with the product.  So it's a big,

5    complicated process.

6              And you create a -- you generally create a pick

7    list, again, just like a warehouse, an inventory, and then

8    you go and you download that inventory.

9              MR. WEBB:  My clicker is not working.  Could we

10   get that next screen?

11   BY MR. WEBB:

12   Q.    And after the maintenance end date, Mr. Ravin, when

13   you're creating updates for your clients, where is that

14   work coming from?  Who generates that work?

15   A.    The updates?  The updates are generated by our team.

16   After the end of Oracle's maintenance, we take over all

17   work.

18   Q.    And so when you generate an update for a client, or

19   a fix, it's Rimini's engineers' work?

20   A.    Yes.

21   Q.    All right.  Let's talk more about environments, and

22   Mr. Isaacson asked you a few questions about environments

23   and about remote hosting.  Do you remember that?

24   A.    Yes.

25   Q.    Let's start off with local hosting.  What is shown

1    on this screen?

2    A.    This appears to show what -- a test and development

3    environment on Rimini Street, a local environment.

4    Q.    Okay.  So when you're talking about those testing

5    and development environments, you're talking about what is

6    produced from this process on servers?

7    A.    That's correct.  That creates the test environment,

8    development environment, yes.

9    Q.    What are those used for?

10   A.    Test and development environments are primarily used

11   to develop tax, legal and regulatory updates like a payroll

12   update that has to be built and then tested and then

13   packaged and shipped over to a customer.

14   Q.    Why is that important?

15   A.    Why is it important to --

16   Q.    Why is it important to test it before you send it to

17   a client?

18   A.    Well, this is mission critical software.  If we make

19   a mistake, that means payroll is wrong or taxes are filed

20   wrong, it's obviously a very serious situation.  So you

21   have to test it, yes.

22   Q.    So in one of these environments, you develop the

23   update or the fix, and then you take whatever you developed

24   and you test it in another environment which is an exact

25   replica of what's running at the client's facilities?

570

1    A.    Often close, but you can never fully replicate an

2    environment because of all the parameters, but it's a close

3    replica.

4    Q.    And then if everything works out, you then apply it

5    to the client's actual version running in their facilities?

6    A.    We ship it to the client.  The client does one last

7    test in their own test and development environments

8    because, again, this is very important that nothing happen

9    and that it really work in their particulars, and then they

10   will apply it into their production environment and it

11   becomes a live change.

12              MR. WEBB:  Okay.  Let's go back one slide,

13   Marie, please.

14   BY MR. WEBB:

15   Q.    All right.  Now, when it's local, when these

16   environments are local environments, where do they reside?

17   A.    When they're local, they reside on Rimini Street's

18   servers in our data center.

19   Q.    So when we say local, they are local to Rimini

20   Street?

21   A.    Yes.

22   Q.    They're on Rimini Street's servers?

23   A.    Yes.

24              MR. WEBB:  All right.  Then let's go to the next

25   slide, Marie.

1    BY MR. WEBB:

2      Q.    What are remote servers, remote environments, then,

3    Mr. Ravin?

4      A.    Well, the only difference, and not to get too

5    technical, you guys probably have heard of IP addresses, I

6    know at least a few of you know what that means, but

7    essentially that's an address, it's a computer address.  If

8    you type in that number, it connects you to a computer

9    anywhere.

10              And the difference between our local environment

11   and a customer's environment literally is a different IP

12   address.  It's on their servers instead of our servers.

13     Q.    Okay.  And then how would you actually access the

14   testing and development environments if they're on the

15   client's servers?

16     A.    We type in a different IP address than we would use

17   if it was on our servers.

18              And we have to go through the customer's

19   security and firewalls and things like that to protect

20   their systems generally.

21     Q.    We just saw some documents, some Rimini documents,

22   where your engineers were complaining quite a bit about

23   having to do remote hosting.

24     A.    Oh, yes.  There was definitely some good whining

25   that was going on about the extra work of connecting

1    Texas, yes.

2    Q.    Okay.  Let's go down to the next paragraph.

3          It says, "Likewise, section 14.2 merely seeks to

4    assure that the licensed software is protected by assuring

5    that it is not provided to parties without proper

6    authorization and the same level of guaranteed

7    confidentiality to protect the" access.

8          All right.  I'm sorry, "asset."

9          Is that relating to the confidentiality

10   provision that we just discussed, Mr. Ravin?

11   A.    Yeah, this is just saying that we're looking to make

12   sure in the rights of the third party to do work on behalf

13   of the customer that they're not taking the software and

14   giving it away to other people who could then get it

15   without actually paying Oracle for a license.

16   Q.    And did you ever provide software -- has Rimini

17   Street ever provided software to someone who had not

18   already paid Oracle for the license?

19   A.    No.

20   Q.    And let's take a step back here.  We're using the

21   word "always" and "never" a lot.  Is Rimini Street perfect?

22   A.    No.  Clearly, we've made mistakes as we've already

23   seen here in the Court.

24   Q.    Can you rule out the possibility that sometime

25   someone received a file they weren't legally entitled to?

1    A.    Well, it's possible in some of the downloads that --

2    because, again, you're talking about tens of thousands of

3    files, that there could be disagreement or maybe there were

4    a file downloaded that wasn't exact or right for a

5    particular product.

6              But it's like getting car parts for a car that

7    you don't own.  They don't provide any value.  It's not

8    software you can use or turn on.  They're just parts.

9    Q.    Now, Mr. Isaacson showed you a number of client

10   e-mails raising questions about the scope of the license

11   and whether you could do your job.  I'd like to talk about

12   just a few more.

13             MR. WEBB:  At this time I'd like to introduce

14   PTX 0446.

15             COURTROOM ADMINISTRATOR:  It's not admitted yet.

16             MR. ISAACSON:  No objection, Your Honor.

17             THE COURT:  It's admitted.

18        (Plaintiffs' Exhibit 446 received into

19        evidence.)

20             MR. WEBB:  Okay, Marie, can you pull that up.

21             Let's go down to the -- I guess the third to the

22   last paragraph, please, Marie, the one that begins "the

23   client raised a few concerns."  Yeah, perfect.

24   BY MR. WEBB:

25   Q.    First of all, Mr. Ravin, before we get to that, can

1    we go to the top and identify who this is from.

2              All right.  So, Mr. Ravin, tell the jury who

3    this e-mail is from and to?

4    A.    It seems to be an e-mail from Dennis Chiu to George

5    Lester and copied to Beth Lester.

6    Q.    And what is this e-mail pertaining to?

7    A.    The subject says it's notes regarding the kickoff

8    meeting, which would be our first, again, kickoff with this

9    new client, Correctional Medical Services.

10   Q.    All right.  Let's go down to the paragraph we were

11   at second ago.

12             It says, "The client raised a few concerns about

13   our intent to set up an in-house environment using their

14   software because they were unclear as to why we couldn't

15   simply develop using other environments we had for other

16   clients."

17             Do you see that, Mr. Ravin?

18   A.    Yes.

19   Q.    Can you explain to the jury what is meant by that?

20   A.    Well, the -- this, again, just from what it says, it

21   looks like the client wanted us to use something for

22   another client specifically for their environments.

23   Q.    So they wanted you to cross-use?

24   A.    Well, I think, again, they wanted us to use

25   something that we weren't entitled to use for that

1    customer.

2    Q.    Okay.  So let's look at the next sentence.  It says,

3    "It was reiterated to them that we create unique and

4    independent environments for each client and in accordance

5    with the terms of the software license agreement."

6              Do you see that?

7    A.    Yes.

8    Q.    Is that a true statement, Mr. Ravin?

9    A.    Yes.  I mean, this -- this relates to the custom

10   environments that we had for people with customized code,

11   yes.

12   Q.    Well, we've heard a lot in your cross about sharing

13   software and documents saying that clearly Rimini Street's

14   sharing software.  How can you reconcile that with

15   statements like this?

16   A.    Well, again, you have your base software

17   environments which were the -- we call them for reuse,

18   which were the individual releases that everyone had.

19             And then we had customized environments that

20   were used for things that were particular to a customer

21   that were unique to them.

22   Q.    So is it your testimony that you can both share

23   software and not share software in your business?

24   A.    Yes.  I know it's complicated because there's

25   different pieces, but, yes, that's correct.

598

```
 1    Q.    And so when this client was told, reiterated that
 2    "Rimini Street creates unique and independent environments
 3    for each client in accordance with their license
 4    agreement," it's your testimony that's actually accurate?
 5    A.    Yes, because we would never give customers a piece
 6    of software that they're not entitled to, yes.
 7              MR. WEBB:  Thank you.
 8              Let's pull up PTX -- actually, don't pull it up
 9    yet, Marie.
10              I'd like to introduce, Your Honor, PTX 59.  I
11    don't believe it's objected to, it's a plaintiffs' --
12              COURTROOM ADMINISTRATOR:  That one was
13    previously admitted.
14              MR. WEBB:  Okay, thank you.
15              COURTROOM ADMINISTRATOR:  In the stipulation.
16              MR. WEBB:  Thank you.
17              THE COURT:  It's admitted.  Go ahead.
18         (Plaintiffs' Exhibit 59 received into
19         evidence.)
20              MR. WEBB:  Can you pull that up, Marie.
21    BY MR. WEBB:
22    Q.    Again, let's do this again with this e-mail.  Tell
23    the jury who this is from and to whom and what date?
24    A.    It's from Dennis Chiu to some representative of -- I
25    think CKR is probably CKE, Carl Karcher Enterprises,
```

1    Carl's, Jr.

2            MR. WEBB:  Let's go to the second page, Marie,

3    the very top.

4    BY MR. WEBB:

5    Q.    This is Kim Cabada with Carl Karcher, or CKE, to

6    Dennis Chiu.  Again, who is Dennis Chiu?

7    A.    At that time Dennis Chiu was the head of support for

8    Rimini Street.

9    Q.    Okay.  She says, "Dennis, we have always utilized

10   the vanilla tax updates from PeopleSoft."

11           Let me stop there.

12           Mr. Ravin, do you know if PeopleSoft also had

13   vanilla updates?

14   A.    Yes, they were provided -- the way customers would

15   receive it from the software vendor is they would get the

16   same deliverable, everybody would get the same and then

17   have to customize it to their customized environment.

18   Q.    Okay.  She goes on,

19           "One would think the in order for you to catch

20   up to the release we are on, you could apply ones you

21   already have."

22           Do you see that?

23   A.    Yes.

24   Q.    She goes on.  "I am hard-pressed to understand the

25   fact that you wouldn't have them."

1           Stop there.

2           Do you have an understanding as to what is being

3    said there?

4    A.    Yes.

5    Q.    And what is it?

6    A.    The customer's simply saying -- again, that there

7    are parts in order to build environments that you have to

8    add in all these other updates, and she's saying, "well, if

9    you clearly already have copies of these updates for other

10   customers, why don't you just put them in our environment

11   and be done with it," and we're saying, "no, that's not the

12   case."

13   Q.    Let's go on to the next sentence.  Ms. Cabada goes

14   on to say,

15           "Maybe I am mistaken, however wouldn't Rimini

16   Street create a tax update that can be shared by other

17   customers who have vanilla instances."

18           Do you see that?

19   A.    Yes.

20   Q.    Now, we already talked about Rimini's process of

21   taking an update and using it for other clients?

22   A.    Yes.

23   Q.    Do you understand that she is asking if, in fact,

24   you can do that?

25   A.    Well, I think what she's asking for is, in order to

601

1    have those types of updates, you have to be entitled to it.

2    If an Oracle customer wasn't entitled to that, even though

3    another Oracle customer of ours was, they would not get

4    access to that update.

5    Q.    Mr. Ravin, are you familiar that some of these

6    agreements require that the software be used only at the

7    customer's facilities?

8    A.    The language is in the agreement, but that's not our

9    interpretation of --

10    Q.    I want to talk about your state of mind.

11          When you started this business and had local

12    environments, what made you think that you could actually

13    have software on Rimini servers when the agreement said

14    that the software had to be on the facilities of the

15    client?

16    A.    Well, I've been using, writing, interpreting,

17    executing contracts for PeopleSoft for the five, six years

18    I was there and reading them for many years after.

19          The interpretation of facility, my state of

20    mind, and based on all my years of experience was we always

21    extended facilities to include beyond the customer's

22    physical facilities to anyone who was doing service for

23    them like a service bureau, an outsourcer.  We never

24    contested that under my watch.

25    Q.    All right.  So, again, remind the jury where

725

1    A.    Well, we had to make two decisions.  One, we had to

2    go to manual, which meant literally click, click, click,

3    click.  We had to hire a lot of people to do that work.

4              And, because it's so much material, we had to

5    make a decision with the customers to narrow the scope.

6              So customers, although they're entitled to

7    potentially tens of thousands of files, there are thousands

8    of files, I think, on average, that we leave behind for

9    clients that we just don't have enough time and manpower to

10   get for them, and that's just an agreement we reach with

11   the clients.

12   Q.    So you stopped sometime in 2009 -- early 2009.  Did

13   there come a time before then that Oracle said you can't

14   use automated tools?

15   A.    Yes, I believe there was a time, yes.

16   Q.    Okay.  So we'll talk about that in a minute.  But

17   before that time, were automated tools permitted?

18   A.    To our knowledge, there was no prohibition to it.

19   Q.    Certainly at one point Oracle said no more automated

20   tools?

21   A.    Yes, they changed their terms of use for the

22   website.

23   Q.    How did you -- how did you react to that?

24   A.    I was pretty surprised at the change for a number of

25   reasons.

1     Q.     Explain to the jury a few of those reasons.

2     A.     Well, first, again, these are extremely large

3   systems and require huge amounts of downloads for fixes and

4   updates if a client wants to take delivery of the items

5   that they're owed.  So the volumes alone is why these tools

6   were used.

7           Two, Oracle had recommended to use these tools.

8   They actually put in their support guides that if you're

9   downloading a lot of material, be sure to use a download

10  tool to help you deal with the volume.  So they recommended

11  themselves as a best practice to use download tools.

12          Three, the fact is that when customers sign

13  license agreements and they get the idea of what their

14  service is going to look like going forward, a lot of them

15  have provisions that say that the vendor can change the

16  terms of service, but whatever those changes are not

17  allowed to reduce the rights under the agreement, and I

18  felt that the change of terms violated that license part of

19  the agreement.

20    Q.     But you knew they had changed the rules?

21    A.     Yes.

22    Q.     But you didn't stop using automated tools?

23    A.     No, because I felt it was a violation of the license

24  agreements with the customers and therefore invalid.

25    Q.     But you eventually did stop using them?

1    A.    Yes, eventually.

2    Q.    Now, we saw some documents in this case about how

3    people thought it would be not feasible to do what you do

4    without automated tools.  Do you remember seeing those?

5    A.    Yes.

6    Q.    But in 2009, you stopped using automated tools?

7    A.    Yes.

8    Q.    Were you still able to provide the service to your

9    clients?

10   A.    Yes.  Well, I think that the comments you saw

11   related to the fact that we -- in order to get everything,

12   and it said all materials, it would be really very costly.

13          We didn't have at that time the manpower, we

14   didn't have the resources to get all materials in a manual

15   way, but we did figure out how to do a subset of that and

16   to do it manually.

17          MR. WEBB:  Your Honor, I'm about ready to shift

18   gears.  I can go another five minutes if you'd like.

19          THE COURT:  Well, we're going -- as agreed, we

20   would finish today by 2:00.

21          MR. WEBB:  Okay.

22          THE COURT:  If you can finish by 2:00, that's

23   acceptable.

24          MR. WEBB:  Certainly.

25

1    BY MR. WEBB:

2    Q.    You've seen Dr. Davis testify in this case; right?

3    A.    Yes.

4    Q.    And you saw his charts with the -- with lots of

5    copies and files illustrated on the charts?

6    A.    Yes.

7    Q.    Let's talk about -- just getting some orders of

8    magnitude, when you are -- okay.  So you've gone through

9    the process of installing the installation media on the

10   servers, now you're moving to the second step of

11   downloading.

12           When your folks are downloading for -- again,

13   before the maintenance end date, when they're downloading

14   those files for that client, how many files will they

15   download for just one client on average?

16   A.    In the thousands.

17   Q.    So just for one client you may have thousands of

18   files for that one client?

19   A.    Yes.

20   Q.    And it's your belief that the client is entitled to

21   have those files?

22   A.    Yes.

23   Q.    And if you are hosting this client locally on Rimini

24   Street's servers, those files would go down to Rimini's

25   computers?

729

1    A.    Originally, yes.

2    Q.    If you're doing it for the client, it would go to

3    their computers?

4    A.    Yes.  It depends.  Sometimes it would be to Rimini

5    and then moved over to that client's computers, yes.

6    Q.    But in any event we're talking about a whole lot of

7    files for even one client?

8    A.    Yes.

9    Q.    Now, there are 300 some clients at issue in this

10   case.  If we -- if you downloaded 10,000, 20,000 files for

11   each of those clients, it would get up to a large number?

12   A.    Yes.

13   Q.    I want to talk briefly about backup.  Tell the jury

14   what the backup tapes are?

15   A.    Pretty much like it says, that once a -- when you

16   have data and material on your computer, just like your

17   home computer, you never want to risk having your hard

18   drives freezes up or losing the data so you make backups.

19   Q.    And how often does Rimini Street make backups for

20   its clients?

21   A.    Well, given the importance of the data on our

22   systems, we were daily.

23   Q.    Daily backups.  And help the jury understand that --

24   what's involved in making a backup tape?

25   A.    Well, we have these giant tape units with these high

730

1    density tapes look like old VCR tapes in many ways, and

2    these tapes would be put into the machine, many of them,

3    and the systems would run.

4            I mean, these were big, specialized backup

5    systems because we have so much data, and they would run

6    automated every day.

7            And then the tapes are taken out.  The tapes are

8    rotated through -- again, part of these quality processes,

9    the tapes are taken out, placed offsite to another location

10   in case there's a fire or any problem at the computer

11   center, And they're rotated.

12           There's a whole process for rotating through

13   them as Oracle's witness talked about.

14   Q.    Now, in your belief, is the act of making backup

15   tapes within the scope of rights that the client has with

16   Oracle?

17   A.    Yes, of course.  I mean, customers have to make

18   backups of their systems.  These are complex

19   mission-critical systems.

20   Q.    In the industry, software industry, is it common to

21   make backup tapes?

22   A.    Yes.

23   Q.    And in your business with just the 364, 46 clients,

24   whatever the case may be, if we look just at the number of

25   copies of software on the backup tapes, what would we be

1    looking at?

2    A.    I would imagine thousands have copies based on

3    daily, weekly, monthly, annual.  We have a whole scheme of

4    backup tapes.

5    Q.    Now, those backup tapes, are they shared between

6    clients?

7    A.    Oh, no, they're just done for Rimini Street's

8    emergency backup systems.

9    Q.    And does Rimini Street charge extra for providing

10   backup tapes to its clients?

11   A.    No, it's an expected part of running -- if you have

12   computers, they expect them to be backed up, certainly.

13   Q.    In terms of the services that are provided by Rimini

14   Street and the services covered within the pricing, we've

15   already talked a little bit about service on customized

16   code that vendors typically do not cover.

17          Can you think of any other services offered by

18   Rimini Street under its one price that typically customers

19   have to pay extra for with other vendors?

20   A.    The interoperability support, for example, is

21   certainly one that we provide which would be considered

22   additional consulting under other support agreements.

23   Q.    And you mentioned earlier something about the

24   complexity of the interoperability support piece?

25   A.    Right.  Well, that's what I was talking about, our

1    team, our technology services organization.

2    Q.    And can you think of anything else that would be

3    outside the scope of typical vendor contracts?

4    A.    Well, as we talked about earlier, the support for

5    customized code is huge, yes.

6    Q.    Before we leave that topic, the installation

7    support -- I'm sorry, the upgrade support, I thought you

8    testified earlier that Rimini Street doesn't do upgrades.

9    A.    No, we don't do the physical labor for an upgrade

10   which I talked about could take a large company several

11   years.

12          We literally just provide support to the team of

13   people that they hire or their own staff who are going to

14   do the upgrade themselves.

15          THE COURT:  All right.  Mr. Webb, I think we're

16   going to have to close it down.  If you have one or two

17   more questions, I'll allow you to do that.

18          MR. WEBB:  All right.  I think I can't get into

19   a new area for just a couple of -- I'm afraid I'm probably

20   not wasting the time on that one.

21          THE COURT:  All right.

22          Ladies and gentlemen, what that means is we've

23   completed today's session.

24          A little bit of a word.  Remember we change our

25   schedule on Fridays and Mondays.  So tomorrow we'll start

733

1    promptly at 8:00 in the morning, and we had planned to go

2    through until noon, but I'm going to shorten that to 11:30.

3    That's because my entire team has to catch flights at

4    McCarran, and McCarran this week issued a notice that

5    because of increased security that earlier arrival will be

6    necessary for flights.

7              So tomorrow we'll finish by 11:30, and then on

8    Monday we will not be starting until 1:00.  That time is a

9    firm time, so for the benefit of making your own plans,

10   that's where we are.

11             And then on Monday we will go through until five

12   o'clock.

13             And, let's see.  Do we have the snack tray

14   coming in tomorrow, Dionna, do you know?  Donuts tomorrow.

15   You'll also have the same type of refreshments on Monday

16   before you get here, and whatever you've saved in the

17   refrigerator.

18             So, ladies and gentlemen, I remind you of the

19   admonishment not to converse among yourself or anyone else

20   on any subject connected with the trial.

21             I haven't mentioned before because I had not

22   seen any indication that anything pertaining to this trial

23   is being covered in any newspapers or television, radio,

24   that type of thing.  But, as you can imagine, the

25   admonition certainly applies to that.

1      Your Honor.

2              I believe you said that he could say "I relied

3      on the advice of my lawyers," which would be an

4      advice-of-counsel defense, even if he doesn't get into the

5      details of what that advice is.

6              And we were denied -- because they've maintained

7      the privilege, we don't -- and we don't have the documents

8      to be able to show that that's false, that the advice was

9      different or he dictated the letters or anything like that.

10             So, with respect, I don't think, in the -- when

11     there is no advice-of-counsel defense, I don't think he can

12     say "I relied on advice of counsel."

13             THE COURT:  I will allow him to go that far, not

14     beyond that.

15             It's for that same reason -- well, essentially

16     we're dealing with state-of-mind relevancy here.  That's

17     relevant to his state of mind.

18             I'm not going to go into it, though.  And I

19     would instruct the jury that they could not -- well, I

20     don't want to get in -- go down that road, frankly.  I

21     would expect that you not go any further.

22             MR. WEBB:  Understood.  To be perfectly clear, I

23     can say -- I'll ask him "To what extent did the letter sent

24     to Oracle inform your belief as to whether you could go

25     forward" --

1          THE COURT:  No, no.  I just said we're not going

2     into the letters.

3          MR. WEBB:  Okay.  I'm sorry.  I'm sorry.  Okay.

4     I misunderstood.  I'm glad I asked.

5          I just want to be clear that he can -- actually,

6     can you just rephrase, Your Honor?  I want to make sure

7     I'm --

8          THE COURT:  He can testify that he was

9     represented by counsel, he consulted with his counsel, he

10    felt that -- as a result of that consultation, he felt that

11    what he was doing was acceptable.

12         MR. WEBB:  All right.  That's as far as I'll go.

13    Consulted with lawyers at the time, and did you rely on

14    that -- I just -- I want to be very clear here, Judge.  I

15    just don't want to -- I don't want to cross any lines.

16         THE COURT:  All right.  He can testify that --

17    well, it's a slippery slope.  I'm uneasy about it.

18         Mr. Isaacson, I'll hear from you briefly.

19         MR. ISAACSON:  I just think once he says advice

20    of counsel, it's advice of counsel.  So once you go beyond

21    that he had lawyers and spoke to lawyers, that you're in to

22    advice-of-counsel defense.

23         THE COURT:  I will allow him to testify -- that

24    he can -- he relied in part upon advice of counsel, and

25    that's as far as it goes.

1           MR. ISAACSON:  We do think this is a serious

2    legal issue, Your Honor.  Because as soon as -- whether

3    it's in part or in whole -- that he says he relied on

4    counsel, it's a new defense for which we've been denied

5    discovery.

6           THE COURT:  Well, it is.  That's why I'm

7    uncomfortable about it because there's been no briefing of

8    this, and you're seeking an order from the Court as I sit

9    here without having fleshed this out myself.

10          Under those circumstances, what I'm going to do

11   is -- you will not be able to ask him that question.

12          You can re-call him if the Court -- I want some

13   points and authorities on this.  You have some weekend time

14   to do it.  And so I would expect to have points and

15   authorities on Monday.  That will give us an opportunity to

16   flesh it out ourselves.  And I'll give you a ruling, but

17   stay away from it today.

18          MR. WEBB:  Won't touch it, Judge.

19          THE COURT:  All right.  I think we've covered

20   everything I need to cover.  Let's bring in the jury.

21          (Jurors enter courtroom at 8:29 a.m.)

22          THE COURT:  Good morning.  Have a seat, please.

23          Ladies and gentlemen, again, my apologies for

24   the late start.

25          We attempt to avoid these in every way that we

```
 1    can.  We spend time after you leave in the afternoon and

 2    time in the morning before you're supposed to start, and

 3    yet we still -- particularly in the early stages of a

 4    complex trial such as this one, things can take a little

 5    longer than anticipated.

 6              But I can assure you that everyone's working

 7    while you're waiting, and we're working as fast as we can

 8    so that you're not delayed.

 9              All of that stated, we're ready to go.

10              The record will show the jury is present.

11    Counsel and parties are present.

12              And, Mr. Webb, you may go forward, please.

13              MR. WEBB:  Thank you, your Honor.

14                        SETH RAVIN

15              recalled as a witness on behalf of the

16              Plaintiffs, having been previously sworn,

17              was examined and testified as follows:

18                   CROSS EXAMINATION RESUMED

19    BY MR. WEBB:

20    Q.   Good morning, Mr. Ravin.

21    A.   Good morning.

22    Q.   Welcome back.

23              Prior to 2012, did Rimini Street have copies of

24    Siebel software on its servers?

25    A.   Yes.
```

1    Q.    And what were those copies used for?

2    A.    Well, they're designed to -- according to the

3    contracts, to, again, help us provide support to Siebel

4    customers.

5    Q.    Were they used for tax and regulatory updates?

6    A.    No.

7    Q.    So those Siebel copies that you had were not used

8    for that part of the business where you see a change in the

9    law and you modify the code?

10   A.    No, because it's CRM software, so it's not a tax and

11   regulatory product.

12   Q.    Okay.  So, again, what does CRM mean?

13   A.    Client relationship management or customer

14   relationship management.

15   Q.    So remind the jury again why you wouldn't need tax

16   and regulatory updates for that type of a product?

17   A.    Well, that's primarily storing data about customers

18   and prospects, so it doesn't -- there's nothing you're

19   calculating.  It's not like a paycheck.

20   Q.    So when you're talking about the paycheck piece, the

21   HR, we're talking about what product?

22   A.    That would be payroll; payroll product.

23   Q.    And would that be a PeopleSoft product?

24   A.    Yes.  Of these product lines, it would be

25   PeopleSoft, yes.

1    Q.    Okay.  Now, I want to turn the page and talk about

2    JDE, JD Edwards.  Again, remind the jury what that software

3    product does.

4    A.    Well, JD Edwards software was another brand of --

5    and they had payroll and human resources, just like the

6    PeopleSoft side, and financials, manufacturing, all those

7    same types of products.

8    Q.    So prior to 2012, did Rimini Street have copies of

9    JD Edwards software on its servers?

10   A.    Yes.

11   Q.    You're not denying that.

12   A.    No.

13   Q.    And what were those copies used for?

14   A.    Those copies were, again, used for diagnostics and

15   support.

16   Q.    Were they used for archiving?

17   A.    Were they used for --

18   Q.    Archiving?

19   A.    You mean in terms of creating archives?  Yes, they

20   would have been.

21   Q.    Were they -- were they -- in terms of the copies of

22   JD Edwards, were they on your servers or were they on the

23   client servers?

24   A.    Well, I -- we had some copies on our system.

25   Q.    Now, when you're actually using the JD Edwards

1    software, is that a local or remote operation?

2    A.    I'm sorry, can you rephrase that?

3    Q.    When you were performing services on JD Edwards

4    software, were you accessing the software locally or

5    remotely?

6    A.    My understanding is that we were accessing it

7    remotely.

8    Q.    So, okay, I'm a little confused.

9         So you're using a remote process with the

10   software on the client servers?

11   A.    Yes.  I mean, we had some software locally as well

12   in the early years, yes.

13   Q.    In the early years?

14   A.    Yes.

15   Q.    Okay.  Now, but later you didn't have copies of JD

16   Edwards or your software.

17        MR. ISAACSON:  Your Honor, objection, leading.

18   There's been a lot of that, but I think we've got to let

19   the witness testify.

20        THE COURT:  Rephrase the question, please.

21   BY MR. WEBB:

22   Q.    If you have a remote operation, why would you have

23   software on your servers?

24   A.    Well, in the early years we were setting up

25   environments like we did for the PeopleSoft product, but

```
 1    found that it was actually not very worthwhile to have the

 2    local environment, so we just started doing all remote.

 3    Q.    Does Rimini use the JD Edwards software for tax and

 4    regulatory development?

 5    A.    There -- there was some tax and regulatory

 6    development in the financials area where 1099s were done.

 7    But that was done remotely for customers.

 8    Q.    Was there cross-use using JD Edwards software?

 9    A.    In terms of JD Edwards software?  No.

10    Q.    So the concept of cloning environments did not

11    happen with JD Edwards?

12    A.    Not that I'm aware of, no.

13    Q.    And the taking one update and reusing it for others?

14    A.    Not that I'm aware of, no.

15    Q.    Again, we talked about this yesterday at the close

16    of your testimony, and, again, Mr. Ravin, just real

17    briefly, tell the jury what we're looking at.

18    A.    This was laying out Oracle's three programs of

19    premier, extended, sustained, of what happens to a release

20    over its lifecycle, how it ages and what kind of support is

21    generally available, and as I noted yesterday, Oracle has

22    exceptions to those policies as well.

23    Q.    And we talked about sustaining classification?

24    A.    Yes.

25    Q.    And remind the jury, again, what type of customers
```

1    fall within that classification?

2    A.    Well, again, these are older releases that, once a

3    customer reaches a certain age of the release, they have to

4    upgrade to a new version, or they wind up with a support

5    level of sustaining which means they don't get any new

6    fixes, they don't get any new updates, they only get what's

7    available already for a fee.

8    Q.    I believe you testified yesterday that there were

9    some customers, some clients, who came to you not directly

10   from Oracle.

11   A.    That's correct.

12   Q.    Explain to the jury if you would download anything

13   for those customers.

14   A.    No.  I mean, if a customer comes to us from another

15   support provider or they were doing service themselves, and

16   then they decided, you know, they didn't want to or they

17   decided to give it to Rimini Street, those customers --

18   there would be no archiving done because they weren't

19   coming from Oracle.

20            So they had already -- they were already off of

21   Oracle maintenance, and so there would be no archive done

22   for them.

23   Q.    If they were off Oracle maintenance, would they be

24   still paying Oracle?

25   A.    No.

774

1    software, change configurations, do whatever they want to

2    the software with the source code, with the understanding

3    no matter how you change it, it still belongs to PeopleSoft

4    or now Oracle.

5    Q.    When this software is shipped to the client, is it

6    capable of being modified?

7    A.    Yes.  There are parts that come with source code,

8    which is the code that you can make changes to.

9              And there are parts that come with areas that

10   can't be changed, like we talked about some of the security

11   areas where there's no ability for us to make a change

12   because only Oracle can.

13   Q.    When this software shipped, does Oracle provide any

14   tools the client can use to make changes to the software?

15   A.    Yes.  The products -- and, again, different -- by

16   different products.  But, for example, PeopleSoft comes

17   with an entire toolkit designed to help people make changes

18   to the software, yes.

19   Q.    In your experience in this industry, can you make

20   changes or modifications to software when it's running, as

21   a production company?

22   A.    Well, you can, but you'd never want to do that.

23   Q.    Why?

24   A.    Well, because, again, it's like servicing a car

25   while it's running at 60 miles an hour.  You wouldn't do

1    that because you have to be very, very careful.

2              The production system is what's actually

3    running, and in these large corporations they could be

4    doing thousands of transactions a hour.

5              So if you mess something up, you could have a

6    real problem.  You could idle, you know, thousands of

7    workers around the world who can't do their job when the

8    computer goes down.

9              So everything has to be done in test systems,

10   development systems, and rigorous -- most companies have

11   very, very rigorous schedules for how production changes

12   are made.  They're actually scheduled because it's a very

13   big deal to change a production system.

14             MR. WEBB:  Now, let's go to -- towards the end

15   of the document.  Marie, it's paragraph 16 under the

16   heading Definition in the second column for "Software."

17             On the right-hand side there.  We just need the

18   first half, Marie.  That's fine.

19   BY MR. WEBB:

20   Q.   All right.  It says here, again in the definitions,

21   when this agreement talks about software, it defines it as,

22             "'Software' means all or any portion of the then

23   commercially available global version," apostrophe S close

24   parentheses -- I'm sorry, parentheses close parentheses --

25   "of the binary computer software programs and enhancements

776

1     thereto."

2              Do you see that?

3     A.    Yes.

4     Q.    To what extent did that provision, if at all, inform

5     your belief that what you were doing was proper as it

6     pertains to the word "version"?

7     A.    Well, this, again -- I mean, no matter -- no matter

8     what product the customer is licensed for, then they get

9     license to particular versions.

10             And, again, when we talk about making sure a

11    customer doesn't get access to something that they're not

12    entitled to, this is going to be important because, if a

13    customer, for example, was still on maintenance when an 8.1

14    was available but not 8.2, they don't get 8.2.

15             Even if another customer joins us a year later

16    and has 8.2, the old customer that left earlier doesn't get

17    that.

18    Q.    Okay.  We're going to go to a new topic, Mr. Ravin,

19    the deletion of the software library.

20             Do you remember talking about that with

21    Mr. Isaacson?

22    A.    Yes.

23    Q.    All right.  You don't dispute that you had -- that

24    Rimini Street had Oracle software on their servers.

25    A.    No, not at all.

1  Q.   So I'd like to add some clarity to the dust-up you

2  had with Mr. Isaacson on this.

3            In your mind, when they accused you of

4  stockpiling software to create the library, what did you

5  think the library meant?

6  A.   You mean from their allegations?

7  Q.   Yes?

8  A.   I think their allegation was that we were

9  downloading all sorts of software in order to be able to

10  hand it out to customers who weren't entitled to it.

11  Q.   So when you think of the word library in that

12  context, what comes to your mind?

13  A.   I'm sorry.  Can you rephrase it?

14  Q.   When you think of the word library in that context,

15  what comes to your mind?

16  A.   Well, I think that's -- in my mind, the way that

17  they were saying it, it was sort of like we were creating a

18  free-for-all that, handing out of the back of a trunk,

19  anyone who wanted Oracle software didn't pay for it.

20  Q.   And is that in truth what happens at Rimini Street?

21  A.   Not at all.

22  Q.   But there was a directory that had software that was

23  used to clone environments?

24  A.   Yes, there was, indeed.

25  Q.   Describe the process someone had to go through to

778

1    actually get access to that software in that directory.

2    A.    Well, they had to be at Rimini Street, they had to

3    be key engineers.

4            They had to make sure that a customer was

5    licensed for certain products that we build into those

6    environments.

7            These were all -- and, again, over time we

8    created even more security mechanisms in terms of those

9    items, and then eventually, of course, stopped using it

10   altogether in terms of any of those directories.

11           MR. WEBB:  I'm going to show on the screen,

12   Mr. Ravin, PTX 63, which I believe is preadmitted.

13           COURTROOM ADMINISTRATOR:  Yes.

14           MR. WEBB:  Marie, could you pull up PTX 63.

15           Okay.  Let's go on the back of that page, page

16   2.

17   BY MR. WEBB:

18   Q.    All right.  So this is an e-mail to Dennis Chiu from

19   Krista Williams.  Again, remind the jury who Dennis Chiu

20   is.

21   A.    Dennis Chiu was a vice-president running support.

22   Q.    And who is Krista Williams?

23   A.    She was in charge of the environments, client

24   environments.

25   Q.    And this is dated January 12, 2010.  Had the lawsuit

1   been filed, this lawsuit, by January 12, 2010?

2   A.    Yes, a couple years already.

3   Q.    No, no.  Had this lawsuit been filed January 12,

4   2010?

5   A.    This lawsuit was filed January 2010, yes.

6   Q.    Was this e-mail before or after the filing of the

7   lawsuit, Mr. Ravin?

8   A.    I'm sorry, I can't see the date.

9   Q.    It's on the other page, January 12, 2010.

10  A.    I'm sorry, I can't read it.  I'm sorry, I don't know

11  the exact date that the litigation was filed.

12  Q.    We can bring that to you later, but let's go ahead

13  and talk about this document?

14  A.    Yes.

15  Q.    She says,

16        "Dennis, as I was looking for the Liz Claiborne

17  updates, I found this repository of software.  Back when we

18  were cloning environments, this served as a sort of

19  software media library."

20        Do you see that?

21  A.    Yes.

22  Q.    Then she goes on,

23        "So long as the customer was licensed, it was

24  okay to use this media from here without necessarily

25  copying the customer media around the network for the

1    build."

2    A.    Yes.

3    Q.    So at that time, in January of 2010, Rimini Street

4    was no longer cloning.

5    A.    That's correct.  We had stopped that a while back

6    and were using and reinstalling all those DVDs each

7    separate time.

8    Q.    And she says back when that was happening, "this

9    served as a sort of software media library."

10            Do you see that?

11   A.    Yes.

12   Q.    So clearly at least some people called this

13   directory a library?

14   A.    Yes.

15   Q.    But not the library in your terms of how you think

16   of a library.

17   A.    Correct, not the way it was alleged in Oracle's

18   complaint.

19   Q.    She goes on,

20            "So long as the customer was licensed, it was

21   okay to use this media here without necessarily copying the

22   customer media."

23   A.    Yes, that's what cloning was all about.

24   Q.    So it's consistent with your understanding of the

25   practice that used to be done at Rimini Street called

```
 1    find that, Matt?  23 -- 23:44 time signature.  There we go.
 2    BY MR. ISAACSON:
 3    Q.    "The cases just keep on coming." "Not sure what to
 4    do."
 5              Mr. Conley says, "Tell you" -- "Tell you manager
 6    that the feel the caseload is too great for one person.
 7    Tell her you don't think that one person can adequately
 8    represent RSI to JBH."
 9              It goes on, Tim Conley,
10              "You need to make it formal."
11              "It needs to move up the chain.  Someone higher
12    up needs to know about this."
13              And Unknown responds, "It just feels like I'm in
14    had a no win situation."
15              Conley says, "Blow the whistle.  They can't keep
16    this hidden any longer. "
17              Are you aware of the issue that was being raised
18    by Mr. Conley with this unknown individual?
19    A.    I don't know who unknown is, so, number one, I can't
20    answer that.
21              But, two, we had constraints --
22    Q.    That's not my question, sir.
23              THE COURT:  Mr. Ravin, you need to listen to the
24    question and just answer the question.  You seem to be
25    giving explanations that go well beyond the answer called
```

1    for, and I'm going to limit you to responding to the

2    question.

3              THE WITNESS:  Yes, sir.

4    BY MR. ISAACSON:

5    Q.    My question was, are you aware of the issues in this

6    instant message, and specifically Mr. Conley talking to

7    someone about blowing the whistle about the case loads

8    being too great?

9    A.    No.

10   Q.    Okay.  Now, you talked about you produced documents

11   in discovery to Oracle.  Now, that's -- in this lawsuit.

12   Now, that's because Oracle gave you written discovery

13   requests, and if you didn't comply with them, you would be

14   potentially ordered by the Court to produce them; correct?

15   A.    Yes.

16   Q.    This is one of those documents; correct?

17   A.    My understanding is this was produced, yes.

18   Q.    All right.  And this document talks -- you've got an

19   engineer, who we believe to be a team head, but you just

20   believe to be an engineer, who is talking about telling

21   someone to blow the whistle, they can't keep this hidden

22   any longer, he's talking about this to someone unknown.

23             Have you or anyone looked into who this unknown

24   person was or followed up on this issue?

25   A.    I have not.

1    Q.    Let's look a little later.  That's actually that

2    same month in 2009, Plaintiffs' Exhibit 605.

3              COURTROOM ADMINISTRATOR:  Preadmitted?

4              MR. ISAACSON:  Yes.  This has been admitted.

5    I'm sorry for not saying that.

6    BY MR. ISAACSON:

7    Q.    This is the same month as that instant message.

8              Now, we have Mr. Benge and Mr. Slepko, who are

9    two senior executives with your company; correct?

10   A.    Yes.

11   Q.    All right.  And Mr. Benge is writing to Mr. Slepko

12   on November 18th, 2009, at the top.

13             "As a confidential side note, when I pinged Ed

14   Freeman about this issue earlier today" -- he is one of

15   your engineers, correct, Mr. Freeman?

16   A.    Yes.

17   Q.    "He said he was working a couple other cases and

18   doing two builds.  Quote:  'We need more staff'" quote,

19   "and," quote, "'seeing that we've got a security team the

20   same size as the PeopleSoft's environmental team made me

21   laugh/cry.'"

22             All right.  Your lack of resources to support

23   these customers continued into late 2009; right?

24   A.    Yes.

25   Q.    The remote environments, you talked about the remote

1    environments which are the customer and the local

2    environments which are at Rimini.

3              Now, from 2006 to 2011, I believe it's your

4    testimony that you had remote environments; correct?

5    A.    Yes.

6    Q.    You had general testing and development environments

7    at Rimini?

8    A.    Yes.

9    Q.    And you created updates for one client and gave it

10   to other clients you believed had the same license, and you

11   did that from environments at Rimini?

12   A.    Yes.

13   Q.    And, specifically, one customer software environment

14   at Rimini was used to development a fix or update that was

15   ultimately delivered to a different customer; correct?

16   A.    Yes.

17   Q.    Now, in fact, when you had remote environments and

18   environments at Rimini providing updates, your remote

19   clients are not supported in a completely remote manner.

20   You create updates centrally at Rimini, and then you

21   deliver them to the remote environments; correct?

22   A.    Yes.

23   Q.    Now, about these remote environments.  Would you

24   look at PTX 495.

25              PTX 495 is dated April 11th, 2007.  It's between

1    Ms. Lester and Mr. Davichick.  So this is one of your

2    executives talking to your head of sales; right?

3    A.    Yes, that's true.

4    Q.    All right.  And if we go to page 2 -- all right.

5    Well, let's actually start at page 3 so we understand the

6    full context.

7              Beth Lester writes at the top,

8              "While it's still unclear to me where Moraine

9    got the idea that remote development is one of our service

10   options, I understand the need to make this work and am

11   committed to guiding the team through successful deliveries

12   in this manner."

13             Then on the next page you reply to Beth Lester;

14   right?

15   A.    I'm sorry.  Can you highlight the area?

16   Q.    On page 2, you reply to Beth Lester?

17   A.    Yes.

18   Q.    Okay.  And now, at this point, I think it was your

19   testimony to your counsel that this -- whether you were

20   going to go remote or on the Rimini environment, that was a

21   client option, and you might urge them a little bit, but it

22   was ultimately a client option.

23             Is that a summary of your testimony?

24   A.    Yes.

25   Q.    Okay.  Now, what you wrote here to Beth Lester is

1    that -- at the top,

2              "The remote dev/test system option is neither

3    ideal, pushed as preference, or to be promoted as a

4    'whatever you want to do' option to clients."

5              Okay?

6              You are instructing Beth Lester, and then your

7    head of sales, that you are not to promote remote

8    environments as a "whatever you want to do" option to

9    clients; correct?

10    A.    That's what it says, yes.

11    Q.    Okay.  And moving down to where it says, "This

12    remote deal is NOT," in all capital letters?

13              Now, this is talking about this customer,

14    Moraine, who is indicating an interest in remote, you say,

15              "This remote deal is NOT," all capital letters,

16    "intended to be any kind of strategic change of model, but

17    is a one-off project that we will try to minimize as a last

18    resort for other client opportunities."

19              That was your business model, remote

20    environments were a last resort, and that was the

21    instruction to the sales team, correct?

22    A.    Yes, that's what I wrote.

23    Q.    Okay.  And in terms of how you were going to go

24    about doing this, let's move down to the next paragraph.

25    In the middle, "Rich, Mike, and I."

```
 1              So Mike is Mike Davichick.  Who is Rich?  Who is
 2    Rich in this --
 3    A.    Oh, I'm sorry.
 4    Q.    "Rich, Mike and I."  So that's Mike Davichick, you
 5    and --
 6    A.    Rich Hughes, which was a sales rep.
 7    Q.    So the three of you,
 8              "Will look to convince them," Moraine, "that
 9    their license does not have these location restrictions and
10    ultimately (hopefully) prevail on them for a change to our
11    preferred model."
12              So you were telling customers, in order to
13    convince them to bring their -- to bring the Oracle
14    software onto the Rimini system, that there was no location
15    restriction in the license; correct?
16    A.    Related to Moraine Park, yes.
17    Q.    Okay.  The -- well, let's talk about that.
18              Well, actually, one thing before we do that.
19              Now, you have said -- you said yesterday, and
20    you just said to me now, that you have -- that you take
21    updates that you -- that you create at Rimini, and then you
22    use those updates for other clients.
23              And that's what you said yesterday, is we reused
24    those fixes and updates all the time.  That was your
25    testimony yesterday; right?
```

1    2010.

2              Thursday, yesterday, in response to questions

3    from your client, is the first time that you have disclosed

4    and admitted that you were using fixes and updates and

5    creating them at Rimini and using them for other clients;

6    right?

7    A.    No.  Again, if I'm permitted to answer in a wider

8    way?

9    Q.    I'll let your counsel do that with you.

10             Now, your counsel showed you a number of awards

11   that your company has won and used that in opening

12   statement, I believe.

13             Do you remember seeing that?

14   A.    Actually, I don't remember the slide.

15   Q.    The -- then let me move on to the license agreement.

16   3726.  I spent some time on this with your counsel.

17             You and your counsel talked about this as the

18   Brazoria license; right?

19   A.    Yes, this looks to be -- yes, it looks to be.

20   Q.    Right.  It's the exact document that your counsel --

21   that you were testifying about with your counsel.  You said

22   this is the Brazoria agreement?

23   A.    Yes.

24   Q.    All right.  So page 3, 14.2, I just want to point

25   you to some language here.  This has been shown in opening

1    and shown multiple times to you.

2            "Licensee may provide access to and use of the

3    software."

4            Now, it's the Court's responsibility to instruct

5    on the law and the license agreement and what that means.

6    So I'm not going to talk about that.

7            But you have said what you think these things

8    mean.  So I'm just going to talk to you about what you

9    thought these things meant back then.

10           And you said -- there's the term there "access

11   to and use of."  But that provision doesn't mention

12   copying, does it?

13   A.    Does not explicitly say the word copy.

14   Q.    And when you say it does not explicitly say it, that

15   means it doesn't say it?

16   A.    Yes.

17   Q.    All right.  Let's go to page --

18   A.    Yes, I'm sorry.

19   Q.    Let's go to page 1, section 2, License Exclusions.

20           "Except as expressly authorized herein,

21   licensee" -- now, that would be Brazoria.  Licensee is

22   Brazoria; right?

23   A.    Yes.

24   Q.    That's the one you say you stand in the shoes of?

25   A.    Yes.

1    Q.    Okay.  "Licensee shall not, A, copy the software."

2    Right?  So unless you've got express permission to copy the

3    software, you can't copy the software.

4    A.    That's what the wording says.

5    Q.    All right.  And then it says in C, "distribute," and

6    then a number of other things, but let's just focus on

7    distribute, "the software or the documentation."

8          So the licensee, Brazoria, can't distribute the

9    software or the documentation as -- except as expressly

10   authorized; correct?

11   A.    That's what the wording says, yes.

12   Q.    And you understood that at the time?

13   A.    Yes, I had an understanding.

14   Q.    Okay.  And your counsel looked at the definition of

15   software on page 4 -- have you look at that.  And just to

16   be clear, software, the definition, includes documentation;

17   correct?

18   A.    Yes.

19   Q.    You knew that at that time.

20   A.    That software includes documentation, yes.  I can

21   read it.

22   Q.    All right.  Let's go back to page 1, paragraph 1.1.

23          This is the first paragraph of the agreement.

24   "PeopleSoft grants licensee," that's Brazoria; right?

25   A.    Yes.

1    Q.    That perpetual, nonexclusive, nontransferable

2    license that's been discussed, to use the licensed number

3    of copies of software.

4          All right.  Then there's a phrase, "solely for

5    licensee's," that's Brazoria's, "internal data processing

6    operations."

7          MR. ISAACSON:  I'd like to write that down.

8    Actually, it would be great if you wrote it down, Zach,

9    because your handwriting is going to be better than mine.

10          Would you write down "solely for licensee's

11   internal data processing operations."

12          All right.  Thanks a lot, Zach.

13   BY MR. ISAACSON:

14   Q.    So the licensee is Brazoria; right?

15   A.    Yes.

16   Q.    And internal data processing, this is a PeopleSoft

17   contract; right?

18   A.    Yes.

19   Q.    So internal data processing operations refer to the

20   operations using the PeopleSoft software, is that fair?

21   A.    That's correct.

22   Q.    The -- when you distributed fixes made for one

23   client to another client, you used copies of PeopleSoft

24   software for the internal data operations of customers that

25   were not Brazoria County; correct?

1    A.    That's correct.

2    Q.    So -- and you knew that from the very beginning.

3          You knew that you were using copies of

4  PeopleSoft software for internal data processing operations

5  for customers other than the licensee, other than Brazoria?

6    A.    Yes.

7    Q.    The -- now, and you're also aware that Professor

8  Davis has said that the cloning that took place, that

9  Brazoria County's environments, was cloned from Dave and

10  Buster's, and then was taken and cloned from Abilene,

11  Knoxville, and I'm going to mispronounce this, Yavapai

12  college, you know that that cloning was going on; right?

13    A.    Yes, we were definitely cloning.

14    Q.    All right.  Let's go back to 3726, and let's pick up

15  the next -- we've looked solely for licensee's internal

16  data operations.  All right?

17          Okay.  It next says,

18          "On the corresponding number of servers located

19  at the sites specified in the schedules."

20          Now, that's what you refer to as the site

21  restriction; correct?

22    A.    Yes, that would be site and server restrictions.

23    Q.    Okay.  Now, when you look -- the sites that you're

24  allowed to are specified in schedules of the contract;

25  right?

1    A.    Yes, often.

2    Q.    Okay.  And if you look at 3726 in your book, it

3    doesn't have the schedules, does it?

4    A.    Not that I see in this document.

5    Q.    Okay.  This is -- 3726 is not a complete and correct

6    copy of the contract, is it?

7    A.    Yes.  I don't know whether there's amendments,

8    schedules, et cetera.

9    Q.    Well, let's -- let's go find that schedule at

10   Plaintiffs' Exhibit 23 which is in your book.  We looked at

11   this together before.

12            Plaintiffs' Exhibit 23 is where Brazoria County

13   sent you their contract; correct?

14   A.    Yes, appears to be.

15   Q.    All right.  And if we go to page 8 of 15, just at

16   the top, you'll see here's the schedule.  Right?  Do you

17   see that?

18            And then if we go to page schedule -- there's a

19   couple pages, then we go to page 10 of 15, there's item 4,

20   Designated Initial Software Support Sites.

21            That is -- when it says in the contract at the

22   site in schedule 1, this is the site; right?

23   A.    Yes, it appears to be.

24   Q.    And the site is -- it says the Support Site,

25   Associated Countries/Regions, Brazoria County, Texas;

1    correct?

2    A.    Yes, that's what it says.

3    Q.    Now, your testimony yesterday was that the

4    interpretation of facility, the interpretation of this site

5    restriction, based on your state of mind, based on your

6    years of experience, that you always extended facilities to

7    include beyond the customer's physical facilities to anyone

8    who was doing service, and that you never contested that

9    under your watch.

10           That was your testimony; right?

11   A.    That's correct.

12   Q.    So when the contract said -- let's go back to

13   paragraph 1 of the --

14           MR. ISAACSON:  And you can pick that up in this

15   agreement, Matt, at page 4 of 15, section 1.1.

16   BY MR. ISAACSON:

17   Q.    When it says, "On the servers located at the sites

18   specified in the schedules," your state of mind in 2007,

19   2006, 2005, that that meant you could use the software

20   outside of Texas, outside of Brazoria County, you could use

21   it anywhere; right?

22   A.    For our test and development systems, yes.

23   Q.    All right.  It says that the site is Brazoria

24   County, Texas.

25           I mean, how hard is this?  You're telling the

813

```
 1    jury that you had a good faith belief standing in the shoes
 2    of the licensee that you were complying with the license
 3    agreement, and it said use this only in Brazoria County,
 4    Texas, and based on your years of experience and your state
 5    of mind, you said I can go anywhere with this?
 6    A.    Yes.
 7    Q.    And it didn't matter what the site restriction said,
 8    it didn't matter what state, what county, you would use it
 9    anywhere.
10          So if it said Georgia, you would use it in
11    California.  If it had said Texas, would you use it in
12    California.  It didn't matter, did it?
13    A.    Actually, the answer is no.
14    Q.    Okay.  Well, in this case.  With this Brazoria
15    County contract that we're talking about, it said Texas,
16    and you thought it was okay to use it in California;
17    correct?
18    A.    Yes.
19    Q.    Okay.  Because that's where -- that's where you were
20    remotely hosting this software -- not -- locally hosting
21    this software?
22    A.    Yes.
23    Q.    Now, yesterday we looked -- not yesterday, but
24    previously I had looked at PTX 30 with you, which is again
25    in your binder, and we talked about this before.  I'm just
```