# Exhibit K:

Cited Testimony of
Kevin Maddock

1    made prior to joining of Rimini Street.

2              So that's just an issue I wanted to bring to the

3    judge because of the impression that's being left.

4              THE COURT:  All right.

5              Mr. Isaacson?

6              MR. ISAACSON:  The actual 30(b)(6) topic that

7    we're discussing is Rimini's communications with customers

8    and prospective customers regarding:

9              A, the legality of Rimini's business practices;

10             B, Rimini's policies regarding Oracle's

11   intellectual property;

12             C, compliance of Rimini Street's business

13   practices with the terms of license agreements with Oracle;

14             Also, the Oracle versus SAP lawsuit in this

15   litigation which I did not address with him.

16             He testified that he recalled those were the

17   topics he was addressing.

18             Counsel seems to be making the unusual argument

19   that his only job at this deposition was to explain what

20   the company was saying and he had no responsibility for

21   understanding whether those statements were true or not in

22   a case about misrepresentations.

23             Now, I'm happy to address with the witness if he

24   thought that that was his province, that his only job was

25   to say what they say and not find out before the deposition

1    whether they were true or not.

2           I believe that that's in effect what he has

3    said.  But there's absolutely nothing improper about this

4    line of testimony --

5           THE COURT:  I've heard enough.  I'll stand by my

6    ruling on this matter.  He was designated as a 30(b)(6)

7    witness.

8           It appears as though the subject matters which

9    were just identified certainly would fall within the scope

10   of the examination, both at the time of deposition and at

11   the time of this testimony, and I will allow reasonable

12   cross-examination into that.

13          So let's bring in the jury, please.

14          COURTROOM ADMINISTRATOR:  Yes, Your Honor.

15      (Jurors enter courtroom at 10:24 a.m.)

16          THE COURT:  All right.  Have a seat, please.

17          The record will show that we are in open court,

18   the jury is all present, Counsel and the parties are

19   present.

20          Ladies and gentlemen, I apologize for the

21   extension of the break, and all I can do is reaffirm to you

22   that I absolutely attempt to make those as minimal as

23   possible.

24          But inevitably, in every lengthier trial, there

25   are some issues that arise that need to be addressed by the

1    Court, and I do everything that I can to move that along

2    quickly and also to do it before and after you're here, but

3    still, there are occasions where I need to address

4    something.

5            And you should draw no inference from that

6    whatsoever, one way or the other, it's just the way we have

7    to do our trials.

8            So at this time, we're in the course of the

9    cross-examination of Mr. Maddock, and you may go forward,

10   Mr. Isaacson.

11           MR. ISAACSON:  Thank you, Your Honor.

12   BY MR. ISAACSON:

13   Q.    Mr. Maddock, we were talking about when you joined

14   the company, December of 2008, and how as part of your job

15   you paid attention to what the competition was doing.

16           When you were going through the interview

17   process, did you talk to Mr. Ravin about who the

18   competition was?

19   A.    I don't remember that, no.

20   Q.    And -- but as soon as you joined the company, one of

21   your focuses was to learn about your competition so that

22   you could deal with it from the perspective of the head of

23   sales?

24   A.    That would have been something that I would have

25   looked at, yes.

1    Q.    Okay.  And one of the things that at some point you

2    must have quickly learned was that one of your competitors,

3    TomorrowNow, had closed in October 2008, a month or so

4    before you joined the company?

5    A.    Yes, I was aware of TomorrowNow.

6    Q.    Okay.  And so at the point when you joined the

7    company, and through -- through 2009, your view was for

8    third-party support, you didn't have any competition from

9    any other third-party support providers.  Your only

10    competition for Oracle support was Oracle?

11    A.    Through -- the date again on that?

12    Q.    From the time you joined the company through the end

13    of 2009?

14    A.    I don't recall.  I believe there were a couple other

15    small competitors.

16           MR. ISAACSON:  All right.  Well, let's look at

17    PTX 5350.  I'm not sure if that's been --

18           COURTROOM ADMINISTRATOR:  5350?

19           MR. ISAACSON:  Which I would move to admit.

20           MS. CHUANG:  No objection, Your Honor.

21           THE COURT:  It's admitted.

22        (Plaintiffs' Exhibit 5350 received into

23        evidence.)

24    BY MR. ISAACSON:

25    Q.    It has very small print, so Matt's going to help us

1    out here.

2            Now, on the last page, the third page, Tim

3    Piechowski is writing to you.  Is he one of your

4    salespeople?

5    A.    He was, yes.

6    Q.    Okay.  And what he's talking about is what pricing

7    to offer a customer and whether you should go below your 50

8    percent model; correct?

9    A.    That's correct.

10            MR. ISAACSON:  Okay.  So let's go up to the

11    first page.  And make it bigger at the top, Matt.  Do

12    the -- yeah.

13    BY MR. ISAACSON:

14    Q.    Okay.  So this is you writing in December 2009;

15    correct?

16    A.    Correct.

17    Q.    It's right before the holidays, and you've been on

18    the job for about a year.  I've got that right?

19    A.    That's correct, yes.

20    Q.    Okay.  So given -- you write, "Given our 50 percent

21    off model" -- that's referring to 50 percent off of Oracle

22    support; right?

23    A.    Correct.

24    Q.    "I REALLY," all capital letters "hate discounting,"

25    and that's referring to discounting off of 50 percent off;

1455

1    correct?

2    A.    Yes.

3    Q.    And the reason you really hate discounting, you're

4    telling Mr. Piechowski, you hate discounting anything,

5    particularly when you have no competition.

6              And when you say "discounting anything," you

7    mean any amount below 50 percent; right?

8    A.    That would be correct, yes.

9    Q.    And what you're telling Mr. Piechowski is, at end of

10   2009, your view was you had no competition, and by that you

11   would have been referring to other third-party support?

12   A.    Yeah.  I mean, this email may have been referring to

13   competition on a particular deal, not just no competition

14   period.

15   Q.    Right.  But you weren't talking about competition --

16   you didn't make reference to no competition on a particular

17   deal, did you?  You said, "I hate discounting, particularly

18   when we have no competition."

19   A.    There's no reference in this email referencing other

20   competition on this deal, correct.

21   Q.    When you mentioned the possibility of minor

22   competitors, you had no major competitors in 2009; correct?

23   A.    No, not correct.

24   Q.    I'm sorry?

25   A.    I said not correct.  I don't agree with that.

1   Q.   Who would you consider a major competitor in 2009

2   other than Oracle?

3   A.   There was a company named Spinnaker in 2009 that we

4   competed with.

5   Q.   Spinnaker was only JD Edwards; right?

6   A.   From what I remember at that time, yes.

7   Q.   And Spinnaker was JD Edwards only -- JD Edwards only

8   through 2009, 2010, 2011, 2012; correct?

9   A.   I don't remember the exact date that they started

10  bringing on other products, but certainly in 2009 they

11  would have been -- only have been JD Edwards.

12  Q.   Okay.  We'll go back over that a little bit later.

13           But so in 2009, you -- your view was you had no

14  competition with respect to support of PeopleSoft, correct,

15  other than Oracle?

16  A.   There was a company named CedarCrestone that I

17  believe was in the market in 2009.

18  Q.   All right.  Anybody else?

19  A.   There was a company named NetCustomer that I believe

20  said that they offered PeopleSoft.

21  Q.   Did they?

22  A.   We didn't see them in a lot of deals, so I don't

23  know.

24  Q.   So you didn't even know if NetCustomer was a

25  competitor in 2009; is that right?

1   A.    They were listed on our -- from what I recall, they

2   were listed on our FAQs as a competitor.

3   Q.    All right.  That wasn't my question.

4         In 2009, you didn't even actually know whether

5   they had any PeopleSoft customers or were actually

6   competing; correct?

7   A.    I don't remember if they had customers or not.

8   Q.    Okay.  And CedarCrestone, is it your memory that

9   they were a competitor in 2009?

10  A.    2009 -- certainly my early days at Rimini Street.

11  Q.    But you don't know whether in 2009?

12  A.    I seem to remember them being a competitor in 2009,

13  yes.

14  Q.    And you didn't consider them to be a major

15  competitor, did you?

16  A.    I wouldn't say a big competitor.  They showed up in

17  deals, some deals.

18  Q.    All right.  They were not a big competitor, they

19  were just a competitor that showed up in some deals.  Is

20  that an occasional deal?

21  A.    Yeah, I would say they showed up maybe 10 percent,

22  so not the majority.

23  Q.    So 90 percent of the time they were not showing up.

24        All right.  So let's talk about Spinnaker.  Now,

25  Spinnaker -- JDE was the only product line where -- at

1    least as of 2011, 2012, JD Edwards was the only product

2    line where Spinnaker offered Rimini any real competition;

3    correct?

4    A.    In 2011 and 2012 you said?

5    Q.    Through 2011 and 2012.

6    A.    That's my memory, yes.

7    Q.    Okay.  And so just to be clear, that meant they

8    offered third-party support for JD Edwards, but Spinnaker

9    did not offer third-party support for PeopleSoft or Siebel

10   through those years?

11   A.    That's correct.

12   Q.    So for customers leaving -- actually, let me -- and

13   at least as of 2009, Spinnaker itself was, in your view, a

14   weak competitor; correct?

15   A.    I don't know if I would agree they were a weak

16   competitor.  They showed up in many of our JD Edwards

17   deals, and they beat us on many.

18   Q.    Well, they were a very recent -- in the beginning of

19   2009, they were a new entrant or very recent entrant to

20   third-party support; correct?

21   A.    That's what I call it, yes.

22   Q.    And third-party support was not their main business.

23   Their main business was supply chain and system consulting?

24   A.    That was my understanding at the time, yes.

25   Q.    Okay.  And they had a -- they had an unproven track

1  record of support for this mission-critical software;

2  correct?

3  A.    In early 2009, I would agree with that.

4  Q.    Right.  And, in fact, you were aware of reports that

5  they were having a hiring freeze in 2009?

6  A.    I do remember reports to that effect, yes.

7  Q.    All right.  And it was your view in 2009 that this

8  was possibly a company that wasn't going to make it, they

9  weren't viable in the future?

10  A.    We did hear some reports to that extent.

11  Q.    Okay.  And those were reports that you repeated to

12  customers?

13  A.    That's correct.

14  Q.    Okay.  And that you told your salespeople to report

15  to customers.

16  A.    Yes.

17  Q.    And Spinnaker for the JD Edwards support charged a

18  premium, an amount above the 50 percent, for

19  customizations, interoperability and configuration;

20  correct?

21  A.    That's what I remember, yes.

22  Q.    All right.  So they were charging more than Rimini

23  Street; correct?

24  A.    For like-to-like services, yes.

25  Q.    All right.  And they would have escalation clauses

1    in their contract -- in their multiple year contract so

2    that they could increase those prices, which is something

3    Rimini wasn't doing; correct?

4    A.    It's correct that Rimini was not doing that.  I

5    don't remember if JD -- or if Spinnaker was doing that at

6    that time.

7    Q.    And they had no track record of actually being able

8    to provide support for tax and regulatory updates; correct?

9    A.    Certainly on a global basis, I remember that being

10   the case.  In North America, I think they did provide tax

11   and regulatory updates.

12   Q.    Well, let me ask you -- all right.

13          The -- 5352, which has been admitted.  Could you

14   put this on the screen.

15          This is dated at the top April 14th, 2011, and

16   here do you see that there's a distribution going on of the

17   most recent FAQs?

18   A.    It looks that way, yes.

19   Q.    Okay.  And if we can go to page 5 of 20.  You see

20   sales FAQs.

21          All right.  So these are your FAQs as of the

22   time?

23   A.    They look that way, yes.

24   Q.    All right.  So now we're in 2011, not 2009.  And if

25   we go to page 12 of 20.  All right?  There's Spinnaker at

1   the bottom, JD Edwards.

2           All right.  And it says the core business is

3   systems hosting and supply chain consulting.  That's what

4   we talked about before.  Support was not their core

5   business; correct?

6   A.    Yes.

7   Q.    Okay.  And the second bullet is about how they were

8   charging more than you do for the same services; right?

9   A.    Yes, that's correct.

10  Q.    And the third bullet is about how they were

11  increasing those prices over time?

12  A.    Yes.

13  Q.    All right.  And then the sixth bullet, the last one,

14  is flat or negative growth in JDE clients in the last year.

15  So the business between -- at least from 2010 into 2011

16  stopped growing; right?

17  A.    Based on what this says here, yes.

18  Q.    All right.  And that -- as far as you knew, those

19  were true statements; correct?

20  A.    Yeah, I would have believed them to be true.

21  Q.    Now, this is -- we talked before about things you

22  believed to be true versus what you knew to be true.

23          With respect to statements about your

24  competition, those are statements that you could

25  actually -- when you made these statements, these were

1    based on your own investigation, or your sales department

2    or sales and marketing department's investigation?

3    A.    Yes, marketing department's investigation.

4    Q.    You actually had a firmer grasp about whether these

5    statements are true than the ones we were talking about

6    earlier today; correct?

7    A.    I would agree with that, yes.

8    Q.    All right.  The -- and by 2000 and -- so that's

9    Spinnaker.  And they were your only competitor at the

10   beginning of 2000 -- only major competitor at the beginning

11   of 2009.  That's correct; right?

12   A.    It depends how you define major.  They were

13   certainly the strongest competitor.

14   Q.    The -- now, you also would tell customers that

15   compared to Spinnaker, Rimini had a stronger management

16   team; correct?

17   A.    That's correct.

18   Q.    You supported more customers; correct?

19   A.    Correct.

20   Q.    And that you supported customizations and

21   interoperability at no additional cost; correct?

22   A.    Yes, that's correct.

23   Q.    All right.  And you also -- it was the case that

24   Rimini, as Rimini has told the jury, had a third-party -- a

25   group within the company devoted to tax, legal, and

1463

```
 1    regulatory research of its own, Spinnaker did not have
 2    that?
 3    A.    Are you looking at --
 4    Q.    No, I'm not looking at that document.
 5    A.    Okay.  Yeah, I remember that being part of our
 6    messaging, yes.
 7    Q.    Okay.  And you understood that to be true?
 8    A.    I did.
 9    Q.    Okay.  And tax and regulatory updates were important
10    to customers; right?
11    A.    Yes.
12    Q.    The -- and so just to make that clear, if you're not
13    providing tax and regulatory updates, you have the software
14    that's doing payroll and withholding, and it's not keeping
15    up with the current laws, so you could actually be getting
16    all of that wrong.
17    A.    That's what tax and regulatory updates do, yes.
18    Q.    Right.  And you also had the understanding and told
19    customers that Rimini was rated as a strong company by
20    major analysts, but Spinnaker had very little coverage by
21    any analysts?
22    A.    Yes, that was part of our message.
23    Q.    So in terms of analysts who were following the
24    industry, Rimini was a major company, and Spinnaker did not
25    have a following?
```

1    A.    You're asking if I agree with that statement?

2    Q.    Yes?

3    A.    They had much less of a following than we did.

4    Q.    All right.  And Spinnaker at some point then started

5    losing key staff; correct?

6    A.    I remember that, yes.

7    Q.    Okay.  And then you would go out -- you and your

8    sales force would go out in the marketplace and tell

9    customers that Spinnaker was losing key staff?

10    A.    That did occur, yes.

11    Q.    So in terms of this 2009 to 2011 period, you know,

12    when a customer was choosing Rimini Street, it really

13    didn't have a choice of going to Spinnaker, did it, even

14    for JD Edwards?

15    A.    I don't agree with that, no.

16    Q.    Okay.  If it went to JD Edwards, it wasn't going to

17    have reliable tax and regulatory updates, it wasn't going

18    to have effective management, it was going to be joining a

19    company that was stagnant and who was laying off employees.

20    All of that is true; right?

21    A.    I agree with all -- I'm still not clear on the tax

22    and regulatory updates.  My understanding was that they did

23    have tax and regulatory updates, not as much of a dedicated

24    team that we had that you just brought up.

25    Q.    All right.  You believed and told customers that

1465

```
 1   there was a risk that they had inaccurate tax and
 2   regulatory updates; correct?
 3   A.    I don't remember saying the terms inaccurate.  We
 4   may very well have said ours was superior, or --
 5   Q.    Well, when you talk about superior, I mean, tax and
 6   regulatory, you either get it right or you get it wrong,
 7   right?
 8          I mean, you have to get the correct tax number
 9   in -- tax number or tax rule in there or else you've got
10   wrong information, right?
11   A.    Yeah, if the information is not correct, it would be
12   wrong, yes, I agree with that.
13   Q.    Right.  So when you're saying specifically about tax
14   and regulatory updates, and when you're saying you've got
15   superior service, that might be a qualitative thing.
16          But when you're talking about tax and regulatory
17   updates, you're actually talking about this other company
18   getting it wrong; correct?
19   A.    I don't recall us talking about getting it wrong.
20   What I recall about us saying was that we had a more robust
21   group.
22   Q.    Would you -- would you say -- it is -- it is fair to
23   say that you were saying correctly and giving the
24   impression correctly that if you were working with an
25   inferior provider of tax and regulatory updates, that they
```

1   could get it wrong?

2   A.    I would say that would be a way it could be

3   interpreted, yes.

4   Q.    Now, by early 2009, you and Mr. Ravin were also

5   talking about your opportunities to actually bury Spinnaker

6   and put them out of business?

7   A.    Yeah, I saw that email in my depositions, yes.

8   Q.    All right.  Well, let's look at 5432 which I would

9   move to admit.

10              MS. CHUANG:  No objection.

11              THE COURT:  It's admitted.

12         (Plaintiffs' Exhibit 5432 received into

13         evidence.)

14  BY MR. ISAACSON:

15  Q.    All right.  Let's look at the second page of the

16  email.

17              Now, eventually you are -- you're actually

18  copied on this email at the top, but this is Mr. Rowe from

19  the marketing department writing on the second page;

20  correct?

21  A.    Yes.

22  Q.    All right.  You can see Mr. Rowe, and then how

23  you're copied on that, and this is March 2009.  So you've

24  been on the job for three months or so?

25  A.    Approximately, yes.

1    Q.    All right.  And you're looking for the -- he's

2    looking for the Spinnaker link.  He says,

3            "It's still hard to find, had to search on

4    Spinnaker JDE support to get them to pop up, and then it's

5    called www.spinnakermanagement.com."

6            So he's saying it's not even easy to find them

7    on the -- through an Internet search?

8    A.    That's what it appears, yes.

9    Q.    All right.  Obviously still a consulting firm.

10   That's what we were talking about before, support is not

11   their principal business?

12   A.    That's what it refers to.

13   Q.    "Looks like support comes third to consulting and

14   execution.  They also don't have someone in exec staff that

15   runs the support business."

16            They don't even have an executive that runs the

17   support business.  That's what that's saying; right?

18   A.    That's what Dave's reporting there -- is that Dave

19   or Brian reporting that?

20   Q.    This is -- I believe it's Dave.

21            "Benson is listed as leading the support LOB on

22   an interim basis."

23            So the person leading the support is there only

24   on an interim basis, correct?

25   A.    I mean, I don't know who that individual is, but

1468

1    that's what this is stating, yes.

2    Q.    And what he's reporting is that, based on the

3    website, seems like this is a sidelight business for them

4    still."

5    A.    Yes.

6    Q.    All right.  Now, on the next page at the bottom,

7    Mr. Slepko is writing to Mr. Ravin and copying you.  This

8    is again March 20th.

9          And he's reporting that based on his analysis,

10   that Spinnaker's most likely losing money right now; right?

11   I'm sorry, this is Mr. Ravin writing?

12   A.    Yes, this is Seth writing.

13   Q.    This is Mr. Ravin writing to you and Mr. Slepko, as

14   well as his cofounder Mr. Shay, along with Mr. Rowe in

15   marketing, and he's saying Spinnaker's most likely losing

16   money right now; right?

17   A.    Yes.

18   Q.    Okay.  And he says -- his conclusion is,

19         "We need to bury them by taking away their

20   renewal business in the back half of 2009, pushing them

21   further into loss territory and maybe destroy them."

22         What's the renewal business?

23   A.    The renewal business would be the second year that

24   the clients come back on to buy another year of support.

25   Q.    All right.  So he is saying that what you need to do

1   is to take away those renewals in the second year and

2   destroy them; right?

3   A.    Yes.

4   Q.    Okay.  And then you respond about his analysis of

5   whether they're making money.  You say,

6            "I would say breaking even is absolute best

7   case."

8   A.    That's correct.

9   Q.    And he then says,

10           "Absolutely.  If we take away a chunk of the

11  renewals and keep them from getting much new business, we

12  really put them in a world of hurt."

13           And that was the business plan right then for

14  Spinnaker; right?

15  A.    Well, that was what this email communication was.  I

16  don't recall if we actually put a full plan into place for

17  it.

18  Q.    Well, you agreed with Mr. Ravin that there was a

19  possibility that you could destroy Spinnaker at that point?

20  A.    I did.

21  Q.    In fact, you thought you could take the renewal

22  business away from them and just take the oxygen out of the

23  air and destroy them?

24  A.    I did, yes.

25  Q.    And that was your major competitor in 2009?

1    A.    Yes.

2    Q.    And then later in 2009 -- let's look at PTX 5471.

3          This is now an actual email from you in the

4    middle of 2009 following a -- so now you're on the job

5    about nine months; right?

6    A.    Yes.

7    Q.    Okay.  And you're talking about Spinnaker.

8          MR. ISAACSON:  And I need to move to admit.

9          MS. CHUANG:  No objection.

10          THE COURT:  It's admitted.

11          (Plaintiffs' Exhibit 5471 received into

12          evidence.)

13          MR. ISAACSON:  Let's put 5471 on the screen.

14    BY MR. ISAACSON:

15    Q.    All right.  Now, you're talking to -- I've

16    mispronounced this gentleman's name before, Walter

17    Hakenewert?

18    A.    Hakenewert, yes.

19    Q.    I'm getting better at that.

20          Is he in sales?

21    A.    He is, yes.

22    Q.    He reports to you?

23    A.    At this point in time he did, yes.

24    Q.    And he's saying,

25          "We absolutely need to beat Spinnaker on these

1    deals," referring to some JD Edwards' deals; right?

2    A.    Yes.

3    Q.    "Below are some points to use as a discussion about

4    FUD."

5              FUD is fear, uncertainty, and doubt; correct?

6    A.    That's correct.

7    Q.    And so what you're talking about here is how to

8    communicate to the customers that they should have fear,

9    uncertainty, and doubt about Spinnaker; correct?

10   A.    Correct.

11   Q.    All right.  And so what you say there are -- you

12   say,

13             "There are rumors surfacing that Spinnaker is

14   experiencing serious financial difficulties and had to make

15   cuts to employee compensation.  Many employees believe

16   Spinnaker will not be viable in the future.  Rimini Street

17   has received inquiries from Spinnaker employees seeking

18   alternative employment."

19             All right.  Those were -- that was information

20   that you then began to communicate to customers; correct?

21   A.    That's correct.

22   Q.    All right.  You say,

23             "It is our estimates that they are losing money

24   and did the salary cut as opposed to layoffs because

25   layoffs would have sent too negative a message to

1472

1    marketplace."

2              You also began to tell customers that as well;

3    right?

4    A.    We likely did, yes.

5    Q.    You say in the last paragraph,

6              "Additionally Rimini Street will shortly

7    announce the most extensive support and tax and reg support

8    available for JDE's products, and such global offering will

9    significantly eclipse Spinnaker's team and offerings to JDE

10   clients.  This expanded offering and service team will

11   remove any remaining services that Spinnaker offers today

12   that Rimini Street has not offered in the past and then

13   goes beyond Spinnaker's offering in every service feature."

14             That's how you described Spinnaker to your

15   customers; correct?

16   A.    As of August of 2009, yes.

17   Q.    Right.  And you thought -- you thought this was

18   correct and knew it to be correct?

19   A.    Yes.

20   Q.    All right.  And basically at this point Spinnaker's

21   cutting salaries, it's declining, and you're surprised

22   they're even still in business?

23   A.    We heard they were cutting salaries, I agree with

24   that.  We had heard that their sales may have been

25   declining.  I don't know if I can say I was surprised that

1  they were still in business.

2  Q.    Well, you thought that -- you were hearing comments

3  from people saying that people were surprised they were

4  still in business?

5  A.    Or that they were worried that they may not be in

6  business in the future.  I don't know if I specifically

7  remember the comment "surprised they're still in business."

8  Q.    "We thought they were a sinking ship," and people

9  were telling you that they were surprised Spinnaker was

10 still in business?

11 A.    That may have been.  I don't know if it was those

12 exact words.

13                MR. ISAACSON:  All right.  Well, let me see if I

14 can remind you.  This would be January 5th, 2012,

15 deposition, the individual deposition, at page 138, line

16 15, and I would propose to play 138, line 15, through 1396,

17 6.

18                COURTROOM ADMINISTRATOR:  Whose deposition is

19 this?

20                MR. ISAACSON:  This is Mr. Maddock's deposition,

21 his January 5th, 2012 deposition.

22                And we have extra transcripts.  If I may

23 approach and give one to the --

24                COURTROOM ADMINISTRATOR:  January 5th you said?

25                MR. ISAACSON:  Do you want me to give one to the

1474

1    witness?

2              THE COURT:  Just give it to Dionna.

3              MS. CHUANG:  Your Honor, I'm unclear.  Is he

4    just refreshing recollection?

5              MR. ISAACSON:  Yes.

6              So, Your Honor, page 138, beginning at line 15,

7    through 139 at line 7 -- line 6, I'm sorry.

8              THE COURT:  All right.  You may do so.

9              MR. ISAACSON:  Matt, would you play that for the

10   witness.

11          (Videotape deposition of Kevin Maddock played

12            as follows:)

13        "Q.   And what did Mr. Slepko report?

14        "A.   Would you like me to read it?

15        "Q.   Sure.

16        "A.   "Sorry, Seth, I couldn't resist letting the

17        team know.  Just got off the phone with a guy that

18        is close to 5XTN folks that went over to

19        Spinnaker, and he shared some very interesting

20        intel.  Spinnaker just cut salaries by 10 percent

21        across the board.  Comments he is hearing from the

22        folks there.  Surprised Spinnaker is still in

23        business.  Believe they will go under.  Worried.

24        Just hanging on."

25        All in quotes.

1       "Q.   And what was your reaction to this

2       email?

3       "A.   I wrote, "Yup, this is the time the

4       investors would love to get out, if the ship is

5       sinking?"

6   BY MR. ISAACSON:

7     Q.   Does that help you remember that you were receiving

8   reports where people were saying that they were surprised

9   that Spinnaker was still in business, and you were

10  describing Spinnaker as a sinking ship?

11    A.   Yes, it does.

12    Q.   And the investors that would love to get out, were

13  those investors in Spinnaker?

14    A.   That's what I believe I was referring to, yes.

15    Q.   Now, it is the case, isn't it, that when an Oracle

16  customer chooses not to go to Rimini Street, in most cases

17  they stay with Oracle?

18    A.   That's correct, yes.

19    Q.   Okay.  In fact, your most frequent competitor in

20  support for Oracle software is Oracle?

21    A.   That's correct.

22    Q.   And since TomorrowNow closed and you joined Rimini

23  Street, your most frequent competitor is not Spinnaker,

24  it's not any other company, for Oracle support, it's

25  Oracle?

1    A.    That's correct.

2    Q.    Now, it's your understanding, based on your

3    discussions with customers and your salespeople with

4    customers, that Oracle rarely charges reinstatement fees;

5    isn't that correct?

6    A.    That's what I understand, correct.

7    Q.    Let's go over what reinstatement fees are.

8          If a customer leaves Oracle -- the jury has

9    heard discussion in this case, you don't know this?

10   A.    Okay.

11   Q.    The jury's heard that if they want to come back to

12   Oracle, there could be a reinstatement fee, that you would

13   have to pay those past years that you were gone.

14         So if someone went to Rimini Street and then

15   decided, no, I don't like it there, I'm going back to

16   Oracle, they would be charged a reinstatement fee, and it's

17   your understanding that Oracle normally waived that fee and

18   rarely charged it, correct?

19   A.    That is my understanding, yes.

20   Q.    And you would actually tell customers that so that

21   they would have comfort that they could go back to Oracle?

22   A.    That's correct.

23   Q.    Now, you mentioned some other third-party support

24   companies.  Taking them all together, and during this

25   period 2009 through 2012, okay, Rimini Street was the only

1    third-party support company that supported more than one --

2    that supported more than one product line; is that

3    correct?

4              Oh, I'm sorry.  I misstated that.  Let me start

5    over.

6              It generally was the case that the other

7    third-party support companies would only support one

8    product line, that is, only JDE, only Siebel, only

9    PeopleSoft?

10   A.    I believe that's accurate, yes.

11   Q.    And Rimini has many more -- during that period had

12   many more customers for third-party support than any other

13   third-party support company you might happen to name;

14   right?

15   A.    I agree with that, yes.

16   Q.    All right.  And unlike those other third-party

17   support companies, you were the only one who was actually

18   dedicated to third-party support, the others all had other

19   businesses as well?

20   A.    Yes, that's correct.

21   Q.    For example, some of them were consulting -- offered

22   consulting services, and Rimini Street generally didn't do

23   that?

24   A.    Correct.

25   Q.    Okay.  You mentioned a company called NetCustomer.

                                                                    1478

1               Now, in general, Rimini Street believed that

2    NetCustomer's business model was dead wrong and would fail;

3    is that fair?

4    A.     I think that's fair.

5    Q.     Okay.  Would you describe why?

6    A.     I believe because -- this goes back many years, but

7    I believe it was because they were an offshore model, and I

8    just don't remember us having a lot of understanding of

9    their model and seeing them in a lot of deals.

10   Q.     Now --

11   A.     I think they may -- I think they may have done

12   something where they reported to work with PeopleSoft

13   customers.  I don't recall the specifics.

14              But what I recollect about NetCustomer was that

15   they were an offshore model and didn't seem to have a lot

16   of customers.

17   Q.     Did you say didn't see a lot of customers?

18   A.     Didn't seem -- we didn't hear that they had a lot of

19   customers.

20   Q.     Okay.  So they didn't have a lot of customers as far

21   as you know; is that correct?

22   A.     That's correct, yes.

23   Q.     And by an offshore model, you mean they were -- 100

24   percent of their support people were located outside the

25   United States and were trying to support inside the United

1479

1     States?

2     A.     That's what an offshore model would be, yes.

3     Q.     And, in this case, you understood them to be fairly

4     far offshore, they were in India?

5     A.     That's what I remember, yes.

6     Q.     And your understanding and belief was they were not

7     succeeding with that model, trying to support US customers

8     100 percent from India?

9     A.     That's what I remember, yes.

10    Q.     All right.  They also -- in addition, NetCustomer

11    did not, as you understood it, have any extensive

12    experience with clients?

13    A.     Meaning that they didn't have a lot of clients?

14    Yes.

15    Q.     Right.  Or past experience with -- the people

16    working there didn't have any prior experience with

17    clients?

18    A.     I don't remember that specifically, but if I were to

19    look at the FAQs, my guess is that that would be there.

20    Q.     I don't want you guessing.  5352, which has been

21    admitted.  We looked at this before.  Let's go to page 12.

22           We looked at -- we looked at Spinnaker support

23    on here.  Let's look at NetCustomer.

24    A.     Okay.

25    Q.     All right.  Here are the points: