# Exhibit M:

Cited Testimony of
Former Oracle Customers

1   Can you explain to the jury what that entailed?

2   A.   Yeah.  I mean, it could be a variety of things, but

3   always it was a legal person on the customer side going

4   through our contract to determine that they agreed with the

5   terms in the contract and it was sufficient for them.

6   Also, as part of the legal review, they very

7   often were going through their own contracts to ensure that

8   their contracts entitled and enabled them to become a

9   customer of ours.

10   Q.   On average, how long does the process that you've

11   described to us take from the initial call with a client

12   until that client signs up with Rimini Street?

13   A.   It's somewhat product dependent, but I would say on

14   average three to six months.

15   Q.   And why does it take so long?

16   A.   Well, typically customers do a lot of due diligence,

17   and it's a long cycle.  They don't just sign a contract.  I

18   wish they did, but they don't.

19   And they ask a lot of questions and perform a

20   lot of due diligence.  And then the legal negotiations

21   often take multiple weeks as well.

22   Q.   You were asked by Oracle's counsel about your

23   understanding based on discussions with customers and your

24   salespeople that when customers don't choose Rimini, they

25   usually choose Oracle.  Do you recall that line of

1516

1    testimony?

2    A.    I do, yes.

3    Q.    Do you also have an understanding based on your

4    discussions with your customers and your salespeople why

5    people are choosing to leave Oracle?

6    A.    Sure.

7    Q.    And what is that understanding?

8              MR. ISAACSON:  Objection, Your Honor.

9              THE COURT:  Sustained.

10   BY MS. CHUANG:

11   Q.    During the sales process or the sales cycle we've

12   been talking about, if a customer asks whether a certain

13   practice is permissible under their license agreement with

14   Oracle, what would be your typical response?

15   A.    My typical response would be that they would have to

16   go back to their legal team to review their contract and

17   make that determination.

18   Q.    And have there been instances, after you were hired

19   until December of 2011, where you've seen that a client

20   asks for Rimini's opinion and Rimini has responded?

21   A.    I have seen that, yes.

22   Q.    Can you give the jury an estimate of how many times

23   that you've personally observed that happening from the

24   time you came onboard to the end of 2011?

25   A.    Where an opinion was given?

1    Q.    Right.

2    A.    Less than 10.

3    Q.    Less than 10?

4    A.    Yes.

5    Q.    Have you ever personally advised a potential client

6    about any provision in their underlying contract with

7    Oracle?

8    A.    No, I have not.

9    Q.    As part of your duties as senior vice-president of

10   sales, would it be part of your responsibility to

11   understand why customers choose to come to Rimini?

12   A.    Sure.  I think that -- sure, yes.

13   Q.    And I think you testified that you need to

14   understand the competition; right?

15   A.    Yes.

16   Q.    Are you personally aware of any instances where a

17   customer has chose Rimini's services because Rimini hosted

18   that client's software on its servers?

19   A.    Can you repeat that again, please?

20   Q.    Sure.  Are you personally aware of any instances

21   where a customer signed on with Rimini, chose Rimini Street

22   because Rimini Street hosted that client's software on its

23   servers?

24            MR. ISAACSON:  Objection, Your Honor.

25            THE COURT:  Sustained.

1    BY MS. CHUANG:

2    Q.   Based on your experience, Mr. Maddock, what are some

3    of the reasons that clients choose Rimini Street?

4              MR. ISAACSON:  Objection, Your Honor.

5              THE COURT:  Overruled.

6              THE WITNESS:  There's a variety of reasons.  I

7    mean, the cost savings is certainly one of them, also

8    dissatisfaction with the support levels that they're

9    receiving at Oracle, and, in many cases, we hear that they

10   don't like doing business with Oracle.  They don't like the

11   way that they've been treated.

12             MS. CHUANG:  No further questions.

13             THE COURT:  Redirect examination?

14                       REDIRECT EXAMINATION

15   BY MR. ISAACSON:

16   Q.   A couple minor points, Mr. Maddock.

17             I think you referred to an average

18   three-and-a-half-minute response time to phone calls for

19   service; is that right?

20   A.   That's what our delivery team was averaging,

21   certainly in the earlier years, from what I remember, yes.

22   Q.   All right.  And the vast majority of inquiries,

23   however, that you get for support are not through phone

24   calls, those would be -- those would come through email or

25   web requests; right?

1519

1    A.    I actually don't know that for sure, no.

2    Q.    You don't know one way or the other how -- whether

3    customers are principally dealing with you for support

4    through the phone or through the web?

5    A.    No, I don't.

6    Q.    Okay.  Now, you've talked with your counsel and you

7    talked with me about when technical questions would come

8    up, you would refer the customer to someone more technical.

9    Do you remember that generally?

10   A.    Yes.

11   Q.    Okay.  Now, for Siebel during this 2008 through 2011

12   period, that would principally have been Mr. Chiu?

13   A.    That's correct, yes.

14   Q.    Dennis Chiu?

15   A.    Dennis Chiu, yes.

16   Q.    And for JD Edwards, that would be Mr. Grigsby?

17   A.    That's correct, or some -- or someone in his

18   organization.

19   Q.    All right.  And just in terms of your background, as

20   I understand it you actually managed software

21   implementation.  How many years did you do that?

22   A.    I was at Anderson for four or five years.  Five

23   years.

24   Q.    Did you manage software implementation in any other

25   part of your career?

1     A.     No, I did not.

2     Q.     And after managing software implementation for four

3     or five years, I guess by 1998 you were talking to

4     PeopleSoft customers about support; is that right?

5     A.     I mean, that's what I did when I got to PeopleSoft.

6     That's where I learned the support business, yes.

7     Q.     Right.  And it is true that in terms -- during the

8     period you've been with the company, most inquiries from

9     customers go to your sales staff and not to you directly;

10    correct?

11    A.     Most inquiries during the sales process?

12    Q.     Yes, from customers?

13    A.     That's correct, yes.

14    Q.     Okay.  And when you write FAQs, those are for

15    frequently asked questions, not for infrequently asked

16    questions; correct?

17    A.     They are for questions that I would say come up in

18    10 percent of the conversations or more.

19    Q.     The actual title is Frequently Asked Questions;

20    right?

21    A.     That's correct.

22    Q.     And you're not aware of any document in this case

23    that says that the questions we are talking about says

24    these are infrequently asked?

25    A.     No, I'm not.

1521

1    Q.    Okay.  Your counsel asked you about how your sales

2    went up after Oracle filed this lawsuit in January of 2010.

3    Do you remember that?

4    A.    I remember -- yeah, I remember her asking what

5    happened to the numbers, yes.

6    Q.    Okay.  After Oracle filed this lawsuit, Rimini

7    continued to have as its standard messaging to clients that

8    Rimini did not share software between customers.  Isn't

9    that correct?

10   A.    Yes, it is.

11   Q.    Okay.  And after Oracle filed this lawsuit out there

12   in the marketplace, Rimini's standard messages continued to

13   be that they were obeying the customer's license agreement,

14   that they were abiding by it?

15   A.    Yes.

16   Q.    Okay.  And after Oracle filed this lawsuit, it

17   was -- Rimini's standard messaging continued to be that

18   they didn't use one customer's development environment for

19   another; correct?

20   A.    Yes.

21   Q.    Okay.  Sir -- and after this lawsuit was filed,

22   generally you kept saying that your business was legal and

23   you had not violated Oracle's copyrights; correct?

24   A.    That's correct.

25   Q.    And those frequently asked questions about your

1712

1   below the historical rate; correct?

2   A.   That's correct.

3   Q.   Okay.  And so it would be fair to say, can we talk

4   about the historical rate as being about 95 percent?

5   A.   And that was the -- that's how I intended to convey

6   that, yes.

7   Q.   Yes, sir.

8            And so, just so we have a clear record, in your

9   opinion, about 95 percent of Rimini's customers would have

10  stayed with Oracle but for the promise of vendor-level

11  support at a significant discount by Rimini; correct?

12  A.   Well, again, precisely what I was saying was that I

13  felt that they would renew it at the historic renewal rates

14  which I tried to summarize or characterize succinctly as

15  approximately 95 percent.

16  Q.   Yes, sir.

17           In connection with that analysis, you did not

18  conduct any mathematical or statistical analysis regarding

19  whether Rimini's clients would have renewed at Oracle's

20  historical retention rate, did you?

21  A.   No, I did not.

22  Q.   Okay.  You will agree with me, sir, if the

23  historical retention rate is about 95 percent, that means

24  that 5 percent of the customers leave Oracle every year;

25  correct?

1    A.    Yes, from arithmetic, yes, I would agree with that.

2    Q.    All right.  So in the real world we know that

3    Rimini's customers are not part of the 95 percent that

4    stayed with Oracle, they're part of the 5 percent that

5    left; correct?

6    A.    Yes.

7    Q.    Okay.  So let's talk about that 5 percent that left,

8    or that historically leaves.

9          Would you agree with me, sir, that historically

10   customers with certain characteristics are more likely to

11   leave vendor support?

12   A.    No, I don't agree with that.

13   Q.    Well, let's talk about what you said in your report.

14         Your report lists factors that customers weigh

15   when considering to renew their maintenance agreements; is

16   that correct?

17   A.    Yes, it is.

18   Q.    And I'm referring specifically, sir, to page 31 of

19   your report, paragraph 59.

20   A.    Yes, I see that.

21   Q.    So you list about eight factors that customers

22   consider when making support decisions?

23   A.    Yes, that they consider or that they weigh.  That's

24   the word that I chose.  But, yes.

25   Q.    Okay.  We'll use your word, they weigh these factors

1714

1     when they're making their support decisions; correct?

2     A.    Yes.

3     Q.    All right.  Mr. Yourdon, we've got a slide, and

4     we're going to go through your different -- your factors

5     from your report.

6             The first factor which I think you talked about

7     on direct was price.  So you agree with me, sir, that price

8     is a factor weighed when licensees consider whether to

9     renew their support decisions?

10    A.    Yes, I do.

11    Q.    Okay.  And, in fact, in your report you list several

12    Rimini customers that, from your review of the evidence,

13    weigh price; is that fair?

14    A.    Yes, that's fair.

15    Q.    Okay.  Now, the price isn't the only factor that you

16    wrote -- that you reflect in your report, is it, sir?

17    A.    No, it's not.

18    Q.    Okay.  So the next factor is the reliability -- or

19    the availability of reliable alternatives; is that right,

20    sir?

21    A.    Yes.

22    Q.    Okay.  And, again, this is a factor that is weighed

23    by licensees when considering whether to renew maintenance

24    agreements with their vendor; correct?

25    A.    That's correct.

1715

1    Q.    And one of the alternatives that at least some of

2    Rimini's customers considered was self-support; correct?

3    A.    Yes.

4    Q.    And we talked about self-support a little bit during

5    your direct; correct?

6    A.    That's correct.

7    Q.    And self-support, just to remind the jury, is when

8    the licensee does not have a vendor, they support it

9    themselves with their own personnel; correct?

10   A.    Basically that's correct, yes.

11   Q.    And so, for example, referring to your case study

12   clients, Pitney Bowes is one of the clients that did not

13   renew it's Oracle support contract and elected to proceed

14   with self-support before going to Rimini Street; is that

15   correct?

16         I'll give you the page if you like.

17   A.    Yes, please, if you could.

18   Q.    Yes.  It's page 70, it's paragraph 132.

19   A.    Yes, I see that.

20   Q.    So you agree with me that Pitney Bowes elected

21   self-support before going to Rimini Street?

22   A.    Well, certainly I see that they elected to proceed

23   with self-support.  I'm looking for the -- well, yes, in

24   the following paragraph, Pitney was unwilling to continue

25   running the risks associated with self-support and then

1716

1    moved to Rimini.

2    Q.    Exactly.  They considered themselves lucky to be

3    able to have self-supported their product.  Is that what

4    you said in your report?

5    A.    They considered themselves lucky to have avoided the

6    consequences of the risks that they were experiencing with

7    self-support.

8    Q.    All right.  Nevertheless they self-supported

9    themselves in this case for about a year; is that right?

10   A.    Yes, that appears to be the case.

11   Q.    Okay.  So let's move on to your third bullet point,

12   sir, which is stability or stagnation of the existing ERP

13   system; is that right?

14   A.    Yes.  So we're back to the list in paragraph 59?

15   Q.    Yes.

16   A.    Yes.

17   Q.    And so the stability, stagnation of existing ERP

18   system is another factor that's weighed by licensees in

19   considering whether to renew maintenance agreements;

20   correct?

21   A.    Yes.

22   Q.    And there's evidence in this case that at least some

23   of the Rimini customers considered the stability or

24   stagnation of their existing system in making the decision

25   to leave Oracle support; correct?

1    A.    Yes, they considered it.

2    Q.    Okay.  And the next factor, sir, is likelihood of

3    upgrading.  So, sir, you list likelihood of upgrading to a

4    newer version as a factor that customers weigh in

5    considering whether to renew maintenance agreements with

6    ERP vendors; is that correct?

7    A.    Yes, that's correct.

8    Q.    And, again, there's evidence in this case that at

9    least some of the Rimini customers considered this factor

10   when -- the likelihood of upgrading to a newer version in

11   making their support decisions; correct?

12   A.    Yes.

13   Q.    Again, referring you, sir, to footnote 42 on page

14   32, you cite -- I'm sorry, I'll let you get there.  Are you

15   there?

16   A.    Oh, yes, I'm on page 32, but I thought you were

17   going to cite a footnote.

18   Q.    It's footnote 42 on page 32.

19   A.    Oh, got it, yes.

20   Q.    Okay.  So in this case you cite Hastings

21   Entertainment, J-Pac Travel, JB Hunt, Koch Business

22   Solutions, Sunrise Medical, and YUM Brands as Rimini

23   clients that considered the likelihood of upgrading to a

24   newer version in connection with their support decisions;

25   correct?

1    A.    Yes, that's correct.

2          Although ultimately all customers, all

3    companies, in my experience, upgrade.  It's simply a

4    question of whether it's this year or next year, you know,

5    or a couple years further down the road.

6    Q.    Right.  In this case, these customers left Oracle

7    support with consideration to their upgrade plans; correct?

8    A.    Let's see.  We'll need to look at the footnotes to

9    see whether that --

10   Q.    Footnote 42, sir?

11   A.    Yeah, footnote 42 says that they considered this

12   factor.  I didn't see the closing of the loop, so to speak,

13   indicating that those companies had, in fact, gone to

14   Rimini because that -- that term had to be a determinative

15   factor.  I certainly agree that it was a factor that they

16   weighed.

17   Q.    Yes, sir.  And that was my question.

18         And so moving on to the next factor that you

19   list of the likelihood of moving to a different vendor.

20   Again, this is back on page 32, sir.

21   A.    Yes.

22   Q.    You list likelihood of moving to a different vendor

23   as a factor weighed in considering whether to renew

24   maintenance agreements with vendors; correct?

25   A.    Yes.

1      AGCO's JDE software?

2      A. The contractor with Rimini Street in

3      December of 2010.

4       PAGE 15:18 TO 16:01 (RUNNING 00:00:21.940)

5      Q. And before December 2010, who was

6      supporting it?  Was another company

7      supporting JDE's software?

8      A. Oracle was supporting our JD Edwards

9      software.

10     Q. And before Oracle supported AGCO's JD

11     Edwards software, was another company

12     supporting AGCO's JD Edwards software?

13     A. No.

14      PAGE 18:20 TO 18:22 (RUNNING 00:00:02.178)

15       (The Reporter marked the document

16        referred to as Deposition

17       Exhibit 1182 for identification.)

18      PAGE 19:03 TO 19:08 (RUNNING 00:00:15.941)

19     Q. What is this document?

20     A. This is an executive summary that was

21     prepared, I believe by Larry Maya,

22     accompanying the contracts for Rimini Street.

23     Q. Do you believe that because you've seen

24     this document before?

25      PAGE 19:09 TO 19:20 (RUNNING 00:00:39.518)

1      A. I do not recall seeing this document, but

2      this is the format of the executive summary.

3      Q. Does that mean that AGCO regularly

4      prepares executive summary agreements?

5      A. Yes.

6      Q. And what is the purpose of an executive

7      summary?

8      A. The executive summary document often will

9      accompany the contract information so that an

10     executive can quickly read and pertain what

11     this agreement is without having to read

12     through the entire resulting documents.

13       PAGE 20:04 TO 20:13 (RUNNING 00:00:38.675)

14     Q. Why does AGCO prepare executive summaries?

15     A. I believe to give someone an initial

16     understanding of what the documents are that

17     accompany this are about.  I don't think that

18     the intent is that they just read the

19     executive summary.  I think the intent is to

20     give them an overview before they read the

21     entire document.

22     Q. Are the points raised in the executive

23     summary the points that are most important in

24     the agreement that accompanies the summary?

25       PAGE 20:14 TO 20:22 (RUNNING 00:00:28.905)

1          A. Generally, yes.

2          Q. I'd like you to read the last bullet under

3          "Business Driver/Need"?

4          A. "These agreements will continue to provide

5          software support for JD Edwards and

6          PeopleSoft applications on a global basis at

7          a 50% cost reduction."

8          Q. Was that the most important reason for the

9          attached agreement?

10          PAGE 20:25 TO 21:11 (RUNNING 00:00:37.917)

11          THE WITNESS:  I would say yes, it probably

12          was the most important reason.  It was not

13          the only reason, but it was the most

14          important.

15          BY MR. RODRIGUEZ:

16          Q. Okay.  Are any other reasons provided in

17          the executive summary?

18          A. No.

19          Q. So an executive who picked up the

20          executive summary in the contract would see

21          the price as the most important agreement --

22          as the most important reason?

23          A. I think that's correct.

24          PAGE 27:22 TO 27:25 (RUNNING 00:00:15.828)

25          Q. If I could prove to you and to the Court

1          that Rimini Street had engaged in large scale

2          and systematic illegal downloading of Oracle

3          materials, would AGCO have contracted with

4          Rimini Street?

5           PAGE 28:04 TO 28:06 (RUNNING 00:00:13.274)

6          THE WITNESS:  If Rimini Street was convicted

7          of illegal activity, I do not think AGCO --

8          AGCO would not do business with them.

9           PAGE 28:08 TO 28:11 (RUNNING 00:00:17.641)

10         Q. When you say, "convicted," do you mean if

11         it had been proven in a court of law that

12         Rimini Street engaged in illegal activities?

13         A. Yes.

14          PAGE 32:04 TO 32:05 (RUNNING 00:00:06.542)

15         Q. Is it important to you that Rimini Street

16         be able to at least match Oracle's support

17         level?

18          PAGE 32:06 TO 32:08 (RUNNING 00:00:07.312)

19         A. Our understanding and experience has been

20         that Rimini Street has surpassed Oracle's

21         support level.

22          PAGE 32:25 TO 33:06 (RUNNING 00:00:28.318)

23         Q. Okay.  Were there any other companies

24         besides Rimini Street and Oracle that AGCO

25         considered contracting with for JD Edwards

2266

1      support?

2      A. Not that I'm aware of.

3      Q. Are you aware of any companies besides

4      Rimini Street and Oracle that would be

5      capable of satisfying AGCO's need for JD

6      Edwards support?

7       PAGE 33:07 TO 33:08 (RUNNING 00:00:08.999)

8      A. I am not aware of any other companies that

9      provide that type of support for JD Edwards.

10     PAGE 33:09 TO 33:21 (RUNNING 00:01:02.471)

11     Q. If Rimini Street had not existed, would

12     AGCO still be on Oracle's support for JD

13     Edwards?

14     A. One of the things we were also considering

15     is completely dropping Oracle support for JD

16     Edwards.

17     Q. And what would AGCO have done in that

18     circumstance?

19     A. Supported the applications ourself.

20     Q. Okay.  Do you have a sense as to the

21     manpower that would be required for that?

22     A. We get very little support from Oracle

23     over the last several years.  We are not

24     upgrading our product that we had from them,

25     and we have had very few calls to their

1          support line that I'm aware of.
2           PAGE 37:11 TO 37:14 (RUNNING 00:00:19.878)
3          Q. When you said AGCO was considering self
4          support, did AGCO consider the efforts
5          required to monitor new legislation?
6          A. Yes.
7           PAGE 37:15 TO 38:02 (RUNNING 00:00:47.997)
8          Q. Did AGCO have an estimate of what that
9          would cost AGCO?
10         A. In North America, we looked at how we
11         would support our regulatory changes, yes.
12         Q. And did looking at how AGCO would support
13         regulatory changes involve estimating the
14         cost to AGCO of supporting those regulatory
15         changes?
16         A. Yes.
17         Q. What was that cost?
18         A. For North America, the cost would be
19         acquiring a third-party product to produce
20         1099 documents, which is relatively
21         inexpensive as compared to the amount we were
22         being charged by Oracle.
23          PAGE 38:03 TO 38:12 (RUNNING 00:00:41.640)
24         Q. And what about South America?
25         A. I have no knowledge of what their cost

1       estimates were.

2       Q. Does AGCO have JD Edwards installations in

3       Europe?

4       A. AGCO does have an older JD Edwards

5       implementation in Europe.

6       Q. Did AGCO consider the efforts involved in

7       monitoring European legislation?

8       A. I have no knowledge of the European

9       efforts.

10       PAGE 46:01 TO 46:02 (RUNNING 00:00:06.156)

11       Q. As of 2007, was it AGCO's position that it

12       wanted to be on SAP by 2010?

13       PAGE 46:03 TO 46:07 (RUNNING 00:00:25.922)

14       A. My memory is that we had firm plans for

15       initial implementations.  After the initial

16       implementations, the plans were less

17       concrete.  But, yes, there was a desire to

18       move toward -- to SAP from the top of the

19       corporation.

20       PAGE 46:08 TO 46:17 (RUNNING 00:00:47.871)

21       Q. "From the top of the corporation."  Does

22       that mean that the plans are not coming from

23       technology people?

24       A. These can be business plans.  These were

25       largely driven by business plans that are

1          seeking to have a unified software

2          architecture.

3          Q. Have those plans run into difficulties?

4          A. Implementations are always difficult, so

5          there have been difficulties.  Or they have

6          been amended over time.

7           PAGE 57:04 TO 57:10 (RUNNING 00:00:42.651)

8          Q. In AGCO's experience, does Oracle

9          negotiate on price?

10          A. Yes, except for maintenance.

11          Q. What do you mean, "except for

12          maintenance"?

13          A. We have tried in the past to reduce our

14          maintenance for our JD Edwards applications,

15          and I don't think we've had very good success

16          in that.

17           PAGE 59:19 TO 59:24 (RUNNING 00:00:23.081)

18          Q. Does AGCO today see a long-term future

19          with Oracle, with respect to any software,

20          not just JD Edwards?

21          A. With respect to any software?

22          Q. Any Oracle software.

23          A. I would say yes.

24           PAGE 63:13 TO 64:08 (RUNNING 00:01:16.013)

25          Q. All right.  Earlier opposing counsel asked

2270

1          some questions about considerations that AGCO

2          made in determining to move from Oracle

3          support to Rimini Street support, one of

4          which was cost; is that correct?

5          A. Correct.

6          Q. What other considerations did AGCO weigh

7          when making a decision to switch to Rimini

8          Street?

9          A. One of the other big considerations is --

10         for us was cost avoidance of having to

11         upgrade our JD Edwards environments to still

12         maintain support from an outside party.

13         Q. And why -- if AGCO had stayed with Oracle,

14         why would AGCO have been forced to switch to

15         a newer software platform?

16         A. Oracle only provides support for -- it is

17         my understanding that Oracle only provides

18         support for older releases of software for a

19         certain period of time, and in order to still

20         be in a position to get support on those

21         applications, we feel forced to upgrade to

22         the next release.

23          PAGE 65:07 TO 65:19 (RUNNING 00:00:54.704)

24         Q. Sure.  Sure.  We were discussing cost and

25         quality of service and fit for situation as

1        reasons why AGCO chose Rimini Street.

2        A. Okay.  The fit for the situation was --

3        really describes the fact that we are at the

4        end of our -- the perceived end of our life

5        of these JD Edwards applications and really

6        are trying to extend that life while we are

7        rolling out the new SAP solution.  We would

8        ideally not like to go through the time and

9        effort to implement a new release to be able

10       to extend the life of our existing release of

11       the software, continuing to provide the same

12       functions that they are delivering in our

13       business.

14        PAGE 65:20 TO 66:22 (RUNNING 00:01:49.151)

15       Q. And has the Rimini Street support allowed

16       AGCO to extend the life of its JD Edwards

17       software?

18       A. Yes.

19       Q. And one of the other considerations you

20       mentioned was quality of service.  When you

21       compare the quality of support service

22       received from Oracle versus that of Rimini

23       Street, which is superior?

24       A. We have found that the -- for the issue

25       support that we receive, Rimini Street is

```
 1          much superior.  We have a named software
 2          engineer who contacts us within 30 minutes of
 3          any problems.  We are able to self select the
 4          seriousness of the issue, and if we have a
 5          very high priority one, we can designate it
 6          high priority.  And just three weeks ago we
 7          had a situation where we had that issue, and
 8          we had a Rimini Street person on the phone
 9          with us at 9:00 o'clock at night within 30
10          minutes of calling the issue in, and he
11          stayed on the phone with us through almost
12          1:00 o'clock in the morning.  So that was
13          pretty good support.  Excellent support.
14          Q. And did you have a similar experience with
15          Oracle support?
16          A. Oracle support is -- was not nearly as
17          customer focused.  Oracle support only
18          supports their application, and if the
19          application is modified, they do not support
20          it.  So Rimini Street is willing to work with
21          us kind of where we are in the situation
22          22 that we're in."
23              (End of Deposition.)
24              THE COURT:  All right.  It's 5:00, ladies and
25      gentlemen.  I'm sure you're ready to go home.  We are all
```

2273

1   are.

2           I will give you the cautionary instruction just

3   because it's been a while.

4           I remind you not to converse about the case with

5   anyone, or allow anyone to discuss it in your presence.

6           I remind you not to read, watch, or listen to

7   any report or commentary relative to this case in any way

8   in any medium, and that would include the Internet,

9   newspaper, radio, television, et cetera.

10          I caution you not to do any independent research

11  on your own of any kind with the interest that this jury

12  decide this case based on having heard all the same

13  evidence.

14          Please keep an open mind until all the witnesses

15  and evidence has been presented and you've heard the

16  Court's instructions on the law, you've heard the

17  attorneys' closing arguments, and the jury is finally able

18  to deliberate this case.

19          And if you've taken your notes, please leave

20  them in the jury room.

21          We'll start promptly in the morning at 8:00 a.m.

22          And I would tell you, I think we continue to be

23  moving along fairly well.  So I wish you a pleasant

24  evening.  Thank you very much, and you may step down.

25          COURTROOM ADMINISTRATOR:  Please rise.

1          (Jurors exit courtroom at 5:06 p.m.)

2               MR. ISAACSON:  Your Honor, nothing major.

3               During the last few minutes we've gotten a Rule

4     50 brief that's about 42 pages so then rather than tomorrow

5     night, we'd like until 8:00 a.m. the following day.

6               THE COURT:  Not a problem.

7               But that brings to mind another thought that I

8     had earlier today.  I anticipate that the briefing on the

9     Rule 50 is extensive, as you've just indicated, and I

10    haven't seen -- I haven't seen what has been filed on

11    behalf of defendants.

12              But it's entirely possible -- usually I -- if

13    the question is complex, if I feel that I need to review

14    evidence and -- it's just not a straightforward question, I

15    will frequently take those motions under consideration and

16    reserve ruling on them, and we'll go ahead and instruct and

17    go to the jury on the issues.

18              That brings to mind that I haven't received any

19    proposed verdict forms, and I'm sure that's not a pleasant

20    subject for anyone to deal with in a case like this, but it

21    needs to be dealt with.

22              So I'd like to have some proposed verdict forms.

23    I'm not really giving you a time limit on this, but it's in

24    our interest to get that underway.

25              MR. ISAACSON:  The parties have exchanged

1    proposed verdict forms.  I think we're only 999 pages apart

2    in length, but I think we're both in a position to submit

3    competing verdict forms.

4                THE COURT:  If you are, I would encourage you to

5    do that; the earlier the better.

6                MR. WEBB:  One more thing, Judge, and I haven't

7    had a chance to talk to Bill about this, but the way the

8    schedule has sort of fallen out, it looks like we may be

9    sort of done with the presentation of evidence Thursday, if

10   not Wednesday.

11               Rather than bringing the Court back on Friday,

12   one possibility would be for us to come up to Reno so your

13   staff doesn't have to come back down here after your

14   meeting on Thursday.

15               We're just trying to do the charge conference up

16   there in your court.  I just put that as a possibility.

17   I'm sure that Oracle wouldn't object, but it may save you

18   another trip back and forth.

19               THE COURT:  Say again.

20               MR. WEBB:  If we're doing the charge conference,

21   and you expect that it might be the better part of a full

22   day, if we wrap up early enough, it may prevent you all

23   from coming back down here because to finish up the rest of

24   the week because I know Your Honor has to go up to Reno --

25               THE COURT:  Well, that's unique to me, not to

1          MS. CHUANG:  The hearsay exception is to test

2     whether this material is suspect or -- it's not here.  This

3     is information that is used to run Rimini Street

4     businesses.

5          It's recorded, it's routinely recorded per

6     Rimini protocols, and they were made at the time of the

7     events, and they were made with personal knowledge.  And so

8     it's to --

9          THE COURT:  All right.  Here's the --

10          (Simultaneous indecipherable conversation.)

11          THE COURT REPORTER:  I didn't hear what he just

12     said.

13          THE COURT:  That's all right, Donna.

14          I'm going to sustain the objection because I

15     feel that it -- that you are going into a subject matter

16     that's outside of this witness's certainly realm and

17     position and role with the company.

18          I'm not -- he can testify to surveys, but I have

19     a problem with him going through specific surveys and what

20     they are and what they show because once you do that,

21     you're offering him as a witness in support of inadmissible

22     evidence which would be in the form of survey results one

23     way or the other.

24          He can testify to what they did as a result of

25     surveys.

1                MR. ISAACSON:  Right.  Then that's what's

2    happened before is Mr. Maddock testified they did surveys

3    and testified about how they used them.

4                Ms. Ransom testified about Oracle surveys and

5    how they used them.

6                No one testified about the result of surveys.

7                THE COURT:  And that's my view.

8                MS. CHUANG:  Thank you, Your Honor.

9                THE COURT:  Thank you.

10          (Sidebar conference concluded.)

11                THE COURT:  All right.  Go ahead, please,

12    Ms. Chuang.  The objection is sustained.

13    BY MS. CHUANG:

14    Q.    Okay.  Mr. Rowe, going back to the Service

15    Dissatisfaction, was this an issue that Rimini Street felt

16    was something you needed to address within the marketplace?

17    A.    Yes, definitely.

18    Q.    And when you talked to customers or marketed

19    Rimini's services, what did you tell customers specifically

20    about Oracle's support and the state of the enterprise

21    software of Oracle?

22    A.    Well, I think, as a large ERP provider, Oracle fits

23    into the same framework.  Their software works really well,

24    it's really mature, it's really stable.

25                My understanding from my experience is that the

2382

1  incremental releases does not add as much value as they

2  used to.

3          They do have the similar support window that

4  other software vendors do, and eventually you end up

5  without getting new updates for fixes and tax and

6  regulatory updates, you have an upgrade decision, and they

7  spend roughly about six cents of every dollar of support on

8  support.

9          MS. CHUANG:  Can we turn to slide 2, Marie?

10  BY MS. CHUANG:

11  Q.    Mr. Rowe, has the marketing department also

12  developed a standard message that helps educate Rimini

13  Street's support model?

14  A.    Yes.

15  Q.    And is this support model something that was

16  developed in response to what we just saw, the unmet needs

17  within the industry?

18  A.    Yes, it was.

19  Q.    And before we talk about this slide, would this also

20  be an example of a presentation that Rimini Street

21  salespeople or marketing would use?

22  A.    Yes, it is.

23  Q.    And let's see if we can break this down for the

24  jury, if we could.

25          First of all, tell us what this slide describes.

1    A.    So, what this slide is, is based on that state of

2    the enterprise software market that we just looked at, this

3    is our view on the fact that the industry needs a new

4    model, something that's more focused on the services that

5    companies need, and is a better value so that they can save

6    money and spend it on more innovation that they need for

7    their business.  That's why we created this new model.

8    Q.    Okay.  So let's look at this new model.

9          Under Focus you have traditional is

10   vendor-centric, and then Rimini Street is client-centric.

11   What do you mean by that?

12   A.    What I mean by that is that, you know, we believe a

13   customer should receive personalized service.  When they

14   have an issue, they receive the fix for that issue.

15         And, in many cases, at enterprise software

16   companies, it's a one-to-many relationship where it's

17   generic fixes for all customers, not personalized.

18         Or the fix, if it's provided, might be in a

19   bundle of a hundred other fixes, and you have to apply them

20   all to get the one you want, and sometimes that's more

21   work, more effort, and breaks other things.

22         And we believe it should be one-to-one in terms

23   of the relationship, much more personalized.

24   Q.    Okay.  Cost Model.  We've already talked about the

25   90 percent plus margins.  What's Rimini Street's support

2384

1    model?

2    A.    Rimini Street's simple in terms of our pricing.

3    It's 50 percent of what the customer pays the software

4    vendor today.

5    Q.    And then Support Coverage, Vanilla Software Only,

6    and under Rimini Street support you have custom and

7    vanilla.  Can you tell us about that?

8    A.    Sure, yes.

9          I mean, we just talked about the custom

10   software, and that's where many or most, in our experience,

11   of the issues are in enterprise software.

12         We believe that the new model should support

13   both, custom -- issues in custom code and in vanilla code

14   that comes right from the software vendor.

15   Q.    Delivery Model.  Here, the traditional model,

16   book-trained help desk.  What is Rimini Street's support

17   model?

18   A.    Rimini Street's model is putting the expert on the

19   frontline working directly with the customer, rather than

20   having a help desk of generic folks that may not have the

21   same expertise and you have to go through escalations to

22   ever talk to an engineer.

23         MS. CHUANG:  Okay.  Can you flip to the next

24   slide, please, Marie?

25

1    BY MS. CHUANG:

2    Q.    Okay.  And is this the model that Rimini Street

3    employs?

4    A.    It is, yes.

5    Q.    Okay.  So let's look at this.  Primary support

6    engineer, can you explain to us kind of the first two

7    columns, if you could.

8    A.    Yes.  So this slide represents really the core, the

9    essence of the Rimini Street model.  I mean, this is it.

10            It's about having a primary support engineer, we

11   call it the PSE, working directly with the client.  It's

12   the expert taking the phone call.

13            In fact, many of our customers have the mobile

14   phone of their expert engineer.  It's that sort of

15   relationship; right?

16            And it's more expensive because that's a very

17   expensive resource, but it's much more cost effective.  For

18   us, it's much more efficient because they're just better at

19   fixing issues.  You call the person, and they know it much

20   more quickly.

21            And because the expert's on the frontline,

22   that's how we can support customizations.  They get to know

23   the client's environment, and this is really the core of

24   our entire support model.

25   Q.    So, what's that -- you have a line also with a box.

2386

1    Explain that to the jury.

2    A.    Yes.  And this is also very, very important in our

3    support model.

4            The PSE is on the frontlines, the expert, but

5    these software systems are vast, both functionally in terms

6    of modules, as well as technically, lots of technologies

7    and things.

8            One person could not know everything.  So you

9    have an expert on the front, but you've got to have this

10   team behind you supporting you as a PSE across all the

11   technologies, across all the world, in fact, the

12   geographies we support.

13           And that's what this team do -- does across the

14   functionality, the business, the QA, everything; all right?

15   Very, very important in our model.

16   Q.    Mr. Rowe, the jury has heard from Shelley Blackmarr,

17   who is a Rimini Street primary support engineer, or PSE.

18           Based on your experience and observations, how

19   important is a PSE when you sell Rimini's services?

20   A.    In my opinion, this is the most important thing

21   about our software support model.  You know, the PSEs, like

22   Ms. Blackmarr that you just mentioned, get to know their

23   environments, fix the issues that customers have.

24           And it's interesting what happens.  In our

25   experience, when customers come onboard, their case volume

2531

```
 1    are from 2011.  This video is about five minutes long, and
 2    there are no exhibits.
 3              THE COURT:  All right.  Thank you.
 4         (Videotape deposition of Rhonda Minks
 5         played.)
 6              PAGE 7:13 TO 7:16 (RUNNING 00:00:09.859)
 7         "Q. Ms. Minks, we met just before this
 8         deposition started; but could you state and
 9         spell your name for the record?
10         A. Rhonda Minks, R-H-O-N-D-A M-I-N-K-S.
11          PAGE 11:18 TO 11:24 (RUNNING 00:00:17.918)
12         Ms. Minks, what's your current job title at
13         Brazoria County?
14         A. I am in the information systems
15         department, and I'm a programmer analyst.
16         Q. And is that the same job title as you had
17         in 2007?
18         A. Yes.  It is.
19          PAGE 12:09 TO 12:18 (RUNNING 00:00:29.723)
20         Q. So what were your job responsibilities in
21         2007?
22         A. Back then, when we had PeopleSoft support,
23         it was more of a perpetual upgrading mode and
24         software support.
25         Q. Okay.  So Brazoria County uses PeopleSoft
```

2532

1          software.  Is that right?

2          A. We do.

3          Q. And you use Financials and HCM?

4          A. We do.

5           PAGE 13:23 TO 14:10 (RUNNING 00:00:45.409)

6          Q. Ms. Minks, at some point Brazoria County

7          decided to consider third-party support for

8          PeopleSoft.  Is that right?

9          A. Yes, it is.

10          Q. Did Brazoria County ever consider

11          self-supporting?

12          A. Yes.

13          Q. And why did it decide not to use

14          self-supporting?

15          A. Gene was our main programmer, Gene

16          Wittneben, and he never -- I couldn't say why

17          he decided, but he just took it into

18          consideration when he made his decision and,

19          I guess, won out with a third party.

20           PAGE 14:11 TO 14:21 (RUNNING 00:00:42.767)

21          Q. Does Brazoria County require tax and

22          regulatory updates?

23          A. We do, in both HR and Financials.

24          Q. Does Brazoria County have the expertise

25          and the resources to develop and research tax

2533

1        and regulatory updates?

2        A. We have not done that in the past, our

3        present staff.  Are we capable of it?  It

4        seems like it would be all-consuming, and

5        there is more to our job than that one thing;

6        so I feel that's why we went out to get

7        someone else to do it.

8         PAGE 14:22 TO 15:07 (RUNNING 00:00:30.663)

9        Q. And Brazoria County has never developed

10       its own tax and regulatory updates.  Is that

11       right?

12       A. I cannot swear to that because, prior to

13       my time, Gene was the main programmer and he

14       did a lot of the payroll stuff; so I wouldn't

15       put it past him back there.

16       But to answer yes or no, I don't know; and

17       he's not here to ask.

18       Q. And would that have been before Brazoria

19       County used PeopleSoft?

20       A. Yes, it would be.

21        PAGE 36:02 TO 36:14 (RUNNING 00:00:46.004)

22       Q. (By Mr. Hill) But it's not likely?

23       A. So you're saying if Oracle cost this much

24       and Rimini cost the exact same amount, would

25       we have switched?

2534

1        Q. That's right.

2        A. Back then, Gene was really upset because

3        we were having to repurchase a product that

4        we already purchased.  His being upset is

5        what caused us to even go look for a

6        third-party support; so in my opinion, we may

7        have switched, because it would have allowed

8        us not to have to do perpetual updates and

9        just to stay with what we had and let them do

10       our tax updates and we could continue with

11       the customizing product.

12        PAGE 60:22 TO 61:01 (RUNNING 00:00:17.849)

13       If the use of Brazoria County's software to

14       create environments for other Rimini Street

15       customers was a violation of Brazoria

16       County's PeopleSoft license, would Brazoria

17       County have allowed Rimini Street to do that?

18        PAGE 61:03 TO 61:08 (RUNNING 00:00:21.893)

19       A. No. I mean, if it's a violation of a

20       license, I don't think they would have.

21       Q. (By Mr. Hill) And if Brazoria County knew

22       that it was a violation of the PeopleSoft

23       license and it knew that Rimini Street would

24       do that, would it have contracted with Rimini

25       Street?

```
 1              PAGE 61:10 TO 61:14 (RUNNING 00:00:18.741)
 2         A. I don't know.  I don't think you want to
 3         -- I mean, if you're saying, "Hey, somebody
 4         is going to do something wrong; are you still
 5         going to go with that?"
 6         I mean, the common answer would be, no,
 7         you're not going to want to do something
 8         wrong.
 9              PAGE 65:18 TO 65:21 (RUNNING 00:00:10.740)
10         Q. Would Brazoria County have served as a
11         reference for Rimini Street if it wasn't
12         getting quality service?
13         A. No. We were tickled pink with our
14         services.
15              PAGE 67:15 TO 67:17 (RUNNING 00:00:11.312)
16         Q. Would you have recommended Rimini Street
17         if you knew that Rimini Street was infringing
18         Oracle's PeopleSoft copyrights?
19              PAGE 67:20 TO 67:21 (RUNNING 00:00:09.135)
20         A. If somebody was breaking the law, I would
21         not recommend them; but we didn't know that."
22         (End of videotape deposition.)
23              MR. RECKERS:  Your Honor, that would be all that
24    we have for today.
25              THE COURT:  All right.  And it's shortly before
```

2536

```
 1    2:00, and I appreciate that we've been able to fill the
 2    afternoon.
 3              Ladies and gentlemen, I'm going to excuse you
 4    for your evening recess.
 5              I remind you of all of the admonitions, and I'm
 6    not going to go through them again, you've heard them
 7    enough, for now.
 8              But please remember how important those are.
 9    You've seen what goes into a trial like this and how much
10    is involved and everyone's time and how important it is.
11    So I ask you to please keep those admonitions in mind at
12    all times.
13              A couple of words for you.  We'll start tomorrow
14    morning at 8:00 as usual, but we will be finishing a little
15    bit early.  I anticipate closing down by 12:30 tomorrow.
16    It will be right around that time.
17              And on the following morning, on Thursday
18    morning, we will probably not start until 9:00 a.m.  But I
19    can confirm that again with you when I excuse you tomorrow.
20    So if that affects your personal schedules at all, that's
21    why I like to let you know.
22              So please remember the admonitions.
23              You may go ahead and step down for the evening,
24    and I'll wish you a pleasant evening.
25              COURTROOM ADMINISTRATOR:  Please rise.
```

```
1              (Jurors exit courtroom at 2:01 p.m.)

2              THE COURT:  Have a seat.

3              I'm actually going to take a brief recess, but

4    before we take the time to go through the video deposition

5    of Mr. Simmons -- isn't it -- I wanted to confirm that, in

6    fact, it's the intention of defendants to offer the

7    deposition -- the video deposition into evidence.  Is that

8    correct?

9              MR. RECKERS:  Yes, Your Honor.

10             And just to be clear, the version that you're

11   reviewing has both Rimini's designations and Oracle's

12   designations and basically everyone's counters and all.

13             There is a -- further means of explanation,

14   there are some sections of that that have additional

15   objections beyond the overall relevance objection that I

16   think is a threshold issue for the clip that plaintiffs are

17   offering, and that if Your Honor overrules the relevancy

18   objection there are some, it's a small number, of

19   additional objections for really small passages.

20             I think that's where we are.

21             THE COURT:  Ms. Dunn, is there anything you

22   would like to offer too?

23             MS. DUNN:  Yes.  We'd like to respond to the

24   foundation question based on Mr. Rowe's testimony.

25             THE COURT:  I recognize that.
```

1    and we'd get a call back from someone at Oracle and Oracle

2    support.

3              But what we found was over time the calls that

4    we were getting back were not from people who understood

5    the software or understood the different aspects or

6    components of what could be broken.

7              So basically people would call us back, but it

8    was just like -- it was just more of a courtesy callback

9    just to say, yeah, we know you -- and we just want to let

10   you know we know that you've logged a problem, and we'll

11   have our engineers look at it.

12             Okay.  And then we'd go through a process of

13   they'd say, hey, can you please upload the log files where

14   there's an error.  Sure.  So, you know, we'd send them some

15   information, and we'd wait.

16             And then we'd ping them and say, you know, have

17   you guys made any progress, and then they would come back

18   with more questions.  Well, can you send us information on

19   this or on this other piece.  And a lot of times the

20   information they were asking for wasn't relevant at all to

21   what was broken.

22             So I was finding that my guys were spending a

23   lot of time -- what I would describe as just wasting their

24   time, and it wasn't -- and it was time that was not

25   actually moving towards a fix to the problem.

1          And what everybody needs to understand is while

2     it's broken, that's causing -- that's something that Bausch

3     & Lomb can't do.

4          So whether it's something on the financial side,

5     or whether it's taking orders, that whole time that the

6     product isn't functioning, Bausch & Lomb is losing money.

7     So time's important.

8          And we found that there was a lot of back and

9     forth, and, in the end, in many cases, we wound up just

10    fixing it ourselves.

11         So, I had development staff there, and we

12    couldn't let it be broken any more, so, you know, I'd get

13    my guys together and say you've got to figure it out,

14    you've got to fix it.

15         So they would dig into the code, and they would

16    see what was broken, and then they would come back and say,

17    hey, we could do this or that to fix it, and, great, they'd

18    fix it.

19         And then we would actually provide that fix back

20    to Oracle, and say, hey, you know, that case we have

21    opened, here's our fix, here's what we did.

22         We would send it back to them with the hope that

23    they would include it in future releases so that when --

24    it's a circle, so when it comes back to us in a patch, it

25    doesn't re-break what was already broken the first time.

1    So that was fairly consistent.

2    Q.    Did you ever have an occasion to call the Oracle

3    help desk?

4    A.    Well, we did it via phone, or sometimes it was

5    through their portal where you would actually log a ticket.

6    Q.    Understood.  And in either respect, did you find

7    that Oracle's responsiveness was at a high level?

8    A.    So the responsiveness -- and this is a tricky thing.

9    You could argue that in one aspect they were responsive.

10   So when we log a ticket, they would call you back, but the

11   call-back wasn't a fix, it was just a -- they would call

12   back to acknowledge that we have your ticket and we'll work

13   on it.

14          So, in that sense, did they call back?  Yes, but

15   they weren't responsive in fixing problems.  So the

16   problems would just linger.

17   Q.    How did this impact your team and the resources at

18   your disposal?

19   A.    So it was problematic for my team.

20          I had about 40 people working on my team.  We

21   had only slated 20 of them to help support PeopleSoft.  The

22   other 20 were supposed to be off doing other projects.

23          But because we weren't getting the support we

24   needed from Oracle, we had to pull a lot of those back in

25   to support the platform.

1    And basically what we wound up doing for the

2    other projects was going out to a vendor and paying a

3    consultant to come in and do that work instead of having my

4    guys do the work because my guys were busy back supporting

5    the PeopleSoft environment which was never the plan.

6    Q.   So you would log a problem with Oracle, and they

7    would not fix it in a timely fashion, so your folks would

8    have to do the fixing for you?

9    A.   Yes.

10   Q.   When you contacted Oracle with a problem, describe

11   for the jury the level of experience of the person who

12   answered the phone.

13   A.   Yeah.  The level of experience deteriorated over

14   time.

15        So at the point of acquisition where PeopleSoft

16   was doing the support, in the beginning, it was the same

17   people we were talking to, and they were fairly

18   knowledgeable.

19        What we found over time was we were being -- we

20   were talking to people who had very little experience with

21   the software.

22        And to give you an example, we'd have a problem

23   in our accounts payable software, and -- which sits in the

24   financial suite.  So we'd call and say, hey, here's the

25   problem, it's in accounts payable.

1           And then we would get questions back like, okay,

2    well, which vertical is that, is that in HR?  No, it's not

3    in HR, it's your product, and you should know that, it's in

4    the financial suite.

5           So it was clear from the questions we were

6    getting back that the people we were talking to didn't have

7    a lot of experience.  They were, I would argue, not well

8    trained.

9    Q.    What would you have to do to actually get and reach

10   someone that you felt was sufficiently experienced to help?

11   A.    We escalated.  So we had an account manager that we

12   would call, especially when the problem was really causing

13   us an issue.

14          We just -- we'd log the ticket, and this became

15   routine.  And we would call up the account manager, and

16   we'd say, hey, you got to help us here, you got to reach

17   back into Oracle.  We're dealing with the first level of

18   support, but can you reach out and get somebody deeper in

19   second or third level of support, someone who has the kind

20   of experience that can fix this for us.

21   Q.    Now, the jury has heard from Oracle executives that

22   Oracle provides excellent service.  Is that consistent with

23   your experience?

24   A.    No, it was certainly not consistent with mine.

25   Q.    Okay.  Now, you mentioned earlier that the reason

1    you decided to move off of Oracle was that you were not

2    getting good value for $2.2 million you were paying Oracle?

3    A.    Yeah.  So, there's two pieces to that support

4    payment that we make, and one piece certainly is the

5    support that we're talking about.  When something breaks,

6    we need it fixed.

7              But the other piece is that 2.2 million gave us

8    rights to all the future software that we were licensed for

9    that Oracle was developing.

10             So it's kind of like a new release of Windows,

11   you know, when you're going from 7 to 8 to 9 to 10,

12   whatever, you have rights to that because you cut them a

13   check every year.

14             So that was a big piece of the value that we

15   were interested in was the new features and functions that

16   were going to come as part of the PeopleSoft software.

17             So over time, you know, as Bausch & Lomb grew,

18   we would have an ERP that would have more functionality and

19   more capabilities.

20             And we found that when Oracle acquired

21   PeopleSoft, that that wasn't happening anymore.  It seemed

22   like their strategy was moving in a different direction.

23   They talked about a product called Fusion.

24             They couldn't describe it, they didn't know

25   exactly what it was going to look like, but they just

2958

1   painted this picture that was very different from the one

2   that we had -- that we knew when we had purchased the

3   software from PeopleSoft.

4           So it was clear to our executives at Bausch &

5   Lomb that the strategy that Oracle was taking and where

6   they were moving their product was not at all in alignment

7   with what PeopleSoft was going to do and where we were

8   trying to be.

9           So, you know, we knew that that didn't have

10  value to us.  Maybe it had value to other customers, but it

11  didn't have value to us, and it wasn't going to help Bausch

12  & Lomb.  So that's what I mean by no value or limited

13  value.

14  Q.    You mentioned price.  Was price the reason that

15  Bausch & Lomb decided to move away from Oracle support?

16  A.     Again, price but in the context of value.

17          We would have happily continued to pay the

18  2.2 million if the value was there.

19          On the flip side, we would have -- for less

20  service, if the agreement was going to change and say, hey,

21  instead of the service you were getting before, now you're

22  going to get less service, and we're going to charge you

23  less, and the price was less, you know, that would have

24  been okay too.

25          But there needs to be a match between the

2959

1    service that you're getting and the money that you're

2    paying.  You can't pay this much and only get this much

3    service back.

4    Q.    Mr. Baggett, I'm going to ask you an important

5    question.

6              If you were getting excellent service from

7    Oracle, would you have decided to go off Oracle support?

8    A.    No, no, we would have stayed with Oracle.

9    Q.    Mr. Baggett, what's a request for quote?

10   A.    When you decide that you're going to do something

11   new, you're either going to purchase a new software package

12   or you're going to get a new service, it's important to

13   help the -- companies that you're going to buy that service

14   from, it's important to help them understand what it is

15   you're asking for.

16             So a request for quote is exactly that, where

17   you outline to potential bidders or vendors, hey, here's

18   what we need, you know, we need tires, we need a car seat,

19   we need steering wheels, and it needs to be leather and it

20   needs to be blue.

21             So you outline what you need, and you put that

22   in a document that's called a request for quote, or an RFQ,

23   and you send it out, and basically you're saying just give

24   me a price.  So here's what I need, and tell me what it's

25   going to cost or what you would charge me if we went with

2960

1    you.

2    Q.    Mr. Baggett, did there come a time when Bausch &

3    Lomb sent out a request for quote for its support services?

4    A.    We did.  It was in early 2009.

5    Q.    Mr. Baggett, in front of you is a notebook of

6    potential exhibits that we might talk about today, and

7    maybe opposing counsel might talk about as well.

8          So I'd like you first to open that up and turn

9    to tab 435.

10   A.    I'm sorry, 435?

11   Q.    435.

12   A.    435.  Okay.

13         MR. WEBB:  At this time I would offer into

14   evidence PTX 435.

15         MS. DUNN:  No objection.

16         THE COURT:  It is admitted.

17         (Plaintiffs' Exhibit 435 received into

18         evidence.)

19   BY MR. WEBB:

20   Q.    All right.  And Mr. Baggett I'm just going to have a

21   few questions about this.

22         What is this exhibit that we're looking at?

23   A.    It looks like an email chain that contains the

24   request for quote.

25   Q.    All right.  Now, let's flip back a few pages to page

1    6.

2    A.    Okay.

3    Q.    Do you see that?

4    A.    I do.

5    Q.    And what do we see here?

6    A.    Well, this is -- this is the request for quote that

7    I described.

8    Q.    All right.  So this is the document that you sent

9    out to companies asking for them to bid on your support

10   work.

11   A.    Yes.

12   Q.    Mr. Baggett, who did you send this to?

13   A.    We sent it to three companies.  We sent it to

14   Oracle, we sent it to Rimini, and, I apologize, I don't

15   recall the name of the third company.  I think it was

16   either Systems Efficiency or Transchannel, but it was

17   another support firm.

18   Q.    So another third-party support company?

19   A.    Yes.

20   Q.    In 2009?

21   A.    Yes.

22   Q.    Mr. Baggett, you sent this to Oracle?

23   A.    We did.

24   Q.    I thought you just told the jury that you didn't

25   have a stellar experience with them.

1      A.     We didn't.

2             And -- so one of the things that Bausch & Lomb

3      valued was partnerships.  We didn't feel we did business

4      with vendors, we felt -- we always tried to do business

5      with partners.

6             And so we -- whenever things weren't going well,

7      we always tried to reconcile a relationship as best we

8      could because it's always -- in the long run, if you can

9      get it to work, it's always less expensive to get it to

10     work with what you have than try to go out and do new

11     things.

12            So although we had made a number of calls into

13     Oracle, and we had complained numerous times, we didn't

14     feel we were getting any response.

15            So our hope was -- this was kind of last-ditch

16     effort that if we included Oracle in a request for quote,

17     first, they would understand that we were at a point where

18     this is serious, we were looking to dissolve the

19     relationship.

20            And it was our hope -- we knew it was a long

21     shot, but it was our hope that they would come back and

22     work with us in a way that would be agreeable or at least

23     better.

24     Q.    And is that how they reacted?

25     A.    No.  They were very -- they were very -- I don't

1    know what the word -- unhappy with the request for quote.

2    I think they realized at that time that we had made

3    decisions and that we were ready to move on.

4              They were aggressive and, at points, hostile in

5    the conversations back or as we tried to take the

6    discussion forward.

7    Q.    Okay.  So just to lay the land, you were personally

8    involved in these negotiations with Oracle?

9    A.    Oh, I was.

10   Q.    And how frequently did you interact with them in

11   this process?

12   A.    It varied.  When we first sent the RFQ there were a

13   number of phone calls that went back and forth, and

14   certainly I wasn't alone in it.  There was a person in

15   purchasing named Brian Schankat.

16             So we were on a number of calls with Oracle

17   early on when they got the request for quote because,

18   again, at first I think they were a little confused as

19   to -- they said, "Hey, we already have a contract, you

20   can't ask us to quote it out again.  So you have a

21   contract, just pay your maintenance, and we don't

22   understand this."

23             And we went through and we explained that -- you

24   know, we -- we resaid -- we repeated everything we had said

25   and all the complaints we had made, "we're not getting good

```
 1    service, we're not happy with where the software is going

 2    from a strategy standpoint, it's not helping us, the

 3    arrangement isn't working.  So it's far too much money for

 4    far too little benefit to Bausch & Lomb and we need to do

 5    something different."

 6              And it was at that point that -- with some

 7    silence back, I think there was a week or two where we

 8    didn't hear anything back, and then there was some

 9    engagement, and then there were a number of calls again,

10    and then -- you know, so it was on and off.

11    Q.    You mentioned that you had a hope that when they

12    realized that the relationship was nearing an end, they

13    would become flexible on pricing.

14    A.    Yes.

15    Q.    Did you actually see any flexibility in pricing?

16    A.    No, there was no flexibility offered.

17    Q.    In your 20 years in the software business, have you

18    been involved in negotiations like this before?

19    A.    Many.

20    Q.    In terms of -- how would you characterize this

21    experience with Oracle relative to the other negotiations

22    that you'd been involved in?

23    A.    Yeah.  So it's been my experience in working with

24    other companies that, you know, it's business, and

25    everybody understands sometimes companies just have
```

1    different agendas or strategies or what they're trying to

2    do.  So, you know, relationships come and go, and that's

3    okay.

4          So in most of my dealings, what I've found is

5    companies are okay with that.  We sit down, we have a

6    pretty good conversation on the phone, or we meet in

7    person, and we talk about what we need and what they need,

8    and where the two don't meet, you just go, well, that's

9    okay, and you shake hands and you walk away.

10          And you try to keep -- you always try to keep a

11   good relationship up because you never know when maybe

12   things will change and you'll be back doing business with

13   them again.

14          So that's the normal, and that's the

15   expectation, especially with the bigger players because

16   they work in so many different spaces.

17          So that certainly was our expectation going into

18   this was, you know, even if Oracle wouldn't work with us on

19   price or flexibility, or -- that it would be okay, you

20   know, we would shake hands, we'd walk away, and at some

21   point in the future, you know, maybe we'd be back with them

22   again.

23          That wasn't at all how it played out.  Again, I

24   don't know how to describe the discussions other than

25   just -- just hostile.

1              And, you know, Oracle made it very clear that

2    should we continue to pursue this path of walking away from

3    them, I believe the word one of the reps used was regret,

4    that we would -- it was a stupid decision, we would regret

5    the decision.

6              And that's just not -- not common in business

7    dealings like that.  So it was an exception, and it stood

8    out.

9              MS. DUNN:  Objection, Your Honor.  A portion of

10   the last answer was hearsay.  Move to strike that portion.

11             MR. WEBB:  Present sense impression, Your Honor.

12             THE COURT:  The objection is overruled.  I think

13   the answer is --

14   BY MR. WEBB:

15   Q.    Let's shift away from that piece of the experience,

16   Mr. Baggett.

17             But before we leave, did Oracle ever tell you at

18   that time that Rimini was doing something wrong?

19   A.    No.

20   Q.    Did they ever tell you at that time don't go to

21   Rimini because they're infringing our copyright?

22   A.    No.  Again, at that time it had very little to do

23   with Rimini, and the conversations with Oracle were more

24   about the fact that we were leaving Oracle.

25   Q.    All right.  So did you ultimately make a decision

1    issue for us.

2            So we had a lot of favorable experiences with

3    them where not only would they fix things, but oftentimes

4    they would call me back and say, hey, listen, I can fix

5    this one of three ways.  If I fix it this way, here are the

6    pros and cons, if I fix it -- you know, option B, here are

7    the pros and cons.  What works best for Bausch & Lomb.

8            And we would talk about it, and they would apply

9    the fix that suited us.  So, you know, that was a new

10   experience.  That was something I didn't even get out of my

11   own people.  Typically, when they looked at something, they

12   just went here's a way to fix it, and they fixed it.

13           So it was a very positive experience.  I was

14   very pleased with the service, and they delivered

15   everything they said they were going to, plus they

16   delivered even -- even value beyond that.

17   Q.   I want to talk about the speed of responsiveness for

18   both contact and repair.  Describe for the jury your

19   experience in those regards with Rimini.

20   A.   Again, very positive.

21           So when either myself or one of my developers,

22   somebody on my team would call, they were actually calling

23   that -- the person who was going to fix it directly.

24           So there was nobody in the middle, there was no

25   logging a ticket.  There was no -- they just picked up the

2986

```
1     phone and they would talk to the particular person who
2     worked in that space at Rimini.
3              They would have a quick conversation.  That
4     person would log in.  And for minor issues, we typically
5     had it fixed in a couple of hours.
6              For issues that were more complicated, they
7     would come back, and they would just tell us, they'd say,
8     okay, we know what it is, we know it's broken, but it's
9     going to take us a day to fix this.
10             And then, you know, they would go and they would
11    work on it, and they were very good at whatever they
12    estimated, they delivered that.
13             There were some rare cases where they called
14    back and said, hey, this is really, really, really
15    complicated, we're going to need time.
16             I think there were even one or two cases where
17    they reached out to somebody else in their own company for
18    additional expertise in different areas to come back.
19             But it was -- the responsiveness and speed was
20    exceptional.  It was basically like I had walked down the
21    hall and talked to one of my own guys and said, hey, this
22    is important, I need it fixed, and they dropped everything
23    else they were doing and they just worked on it until they
24    fixed it.
25    Q.   All right, Mr. Baggett, did you have occasion to
```

1    provide any references to other companies for Rimini?

2    A.    Sure, I provided a number of references.

3    Q.    And when you provide a reference, do you only tell

4    companies positive things?

5    A.    No.

6          So a reference is a courtesy to the other

7    company that's considering a purchase.  And I'm often in

8    that spot, as well, where I'm actually asking for a

9    reference from another director of IT in another shop.

10         So there's -- you know, the ethical component

11   that I'm having a conversation with somebody else, one of

12   my counterparts at another company, I tell them the good,

13   the bad, the ugly, here's what works, here's what doesn't

14   work, and here's what's going to get you into trouble.

15         And it's not fluff.  It's -- it's important that

16   I do that for other people because I need to do that -- I

17   need them to pay that back to me when I call them and ask

18   them, hey, you're running this software over here, how does

19   it work for you guys.

20         And then we talk about the particular situation

21   that the company's in and try to figure out if that would

22   work for them.

23   Q.    All right.  Mr. Baggett, we're on the homestretch.

24         Back when Bausch & Lomb was considering options

25   for software support, if Rimini Street was not available as

1    an option for whatever reason, would Bausch & Lomb have

2    gone back to Oracle for support?

3    A.    No.

4    Q.    What would you have done?

5    A.    We had already kicked around a number of other

6    options.

7              Although we knew we couldn't support the

8    application itself in its entirety, again, in areas like

9    the payroll fixes, my guys just weren't experts in that,

10   and so at no point did we ever think we were going to do it

11   all ourselves.

12             But outside of HR, we knew we could support the

13   rest of it pretty well, so our plan B or C or D was, if

14   none of these alternatives panned out with Rimini or with

15   the other third party, we were going to support part of the

16   application ourselves, and then, for the HR piece, we were

17   either going to replace it with another piece of software,

18   or we were just going to outsource it to a company like ADP

19   where, you know, they just do the payroll for you.

20             So that was what we had thought through.

21   Q.    Now, in assessing the various options that you had

22   considered at the time, where would Oracle rank on the list

23   of options for continuing support?

24   A.    Yeah, I -- certainly -- certainly last.

25             And I say that -- I can't imagine a situation

```
 1    where at that point we would have gone back to Oracle.
 2              We tried so many times over the years, and we
 3    just couldn't reach an agreement with Oracle, which is
 4    fine, that's fine.  It just -- it just wasn't going to
 5    work.
 6              So for us, we had a number of other options.
 7    Every option would have failed, and I don't see that as a
 8    reality.
 9              MR. WEBB:  All right.  Thank you very much,
10    Mr. Baggett.
11              Those are all the questions I have, Your Honor.
12              THE COURT:  Thank you.
13              Cross-examination?
14                        CROSS-EXAMINATION
15    BY MS. DUNN:
16    Q.    Hi, Mr. Baggett.  Good afternoon.
17    A.    Hi.
18    Q.    My name is Karen Dunn, and I'm a lawyer for Oracle,
19    and I'm just going to ask you some questions today.
20    A.    Sure.
21    Q.    So just to clarify, you're testifying about your
22    experience at Bausch & Lomb?
23    A.    That's correct.
24    Q.    You're not currently employed there; right?
25    A.    I'm not.
```

2990

1    Q.    Okay.  You work at a company called Carestream?

2    A.    I do.

3    Q.    Do I have that right?

4          And Carestream does health imaging and IT,

5    things like that?

6    A.    Yeah, we do, x-ray machines, that kind of thing.

7    Q.    Okay.  And you know that Carestream is an Oracle

8    customer?

9    A.    Sure.

10   Q.    And I think Carestream is even partnered with

11   Oracle.  Are you aware of that?

12   A.    I'm not, but I'd believe it.

13   Q.    Yeah.

14         Okay.  So let's go back to your history.  You

15   left Bausch & Lomb in 2013?

16   A.    Yes.

17   Q.    Did you leave on your own accord?

18   A.    No.  Bausch & Lomb was purchased by Valiant, it was

19   acquired by another company.  There was already a director

20   of IT there, and they don't need two of us.

21   Q.    And when was the last time you spoke to the folks at

22   Bausch & Lomb?

23   A.    It varies.  I stay in touch with some of the folks.

24   They're not all still at Bausch & Lomb.  Many of us left

25   and went different places; so, occasionally.

1    Q.    When was the last, do you remember?

2    A.    Sure.  I had lunch with one of the developers last

3    week.

4    Q.    Okay.  And does Bausch & Lomb management know that

5    you're here to testify today?

6    A.    I -- I'm -- so I don't know.  I don't know that

7    Bausch & Lomb -- it's Valiant now, so it's a different

8    company.  I don't know what they know.

9    Q.    Did you tell the company that you were going to

10   testify today?

11   A.    No.

12   Q.    Okay.  So when I heard you were coming, I did look

13   you up on Rimini Street's website, and they have a

14   testimonial up there from you, and it identifies you as

15   Bausch & Lomb Director of Business Technologies.

16             It doesn't say former.  So it suggests that you

17   still work there.  Did you know about that?

18   A.    I gave the testimonial, yes.  I wasn't aware that

19   it's currently up there.

20   Q.    Okay.  Do you know whether it's been up there since

21   you left the company in 2013?  Do you have any idea?

22   A.    I don't know.

23   Q.    That's up to the folks at Rimini Street?

24   A.    Yes.

25   Q.    So the website quotes you as saying -- and I think

1    A. For my space in the top accounts, it's no

2    longer a large concern or a bigger issue.

3    PAGE 99:09 TO 99:21 (RUNNING 00:00:29.620)

4    Q. Okay.  And I believe on the third bullet

5    point you state that:

6    "Given the current economic environment we

7    wanted to see if we were losing customers to

8    low-cost competitors for service, Rimini

9    Street, for example, or to other software

10   companies in replacing Oracle/SAP/IBM."  And

11   you state:

12   "We are finding that is not necessarily the

13   case."

14   Do you see that?

15   A. Yes.

16   Q. Do you think that was accurate?

17   A. Yes.

18   PAGE 99:22 TO 99:23 (RUNNING 00:00:03.535)

19   Q. Do you think that statement would be

20   accurate, as you sit here today?

21   PAGE 99:25 TO 100:14 (RUNNING 00:00:24.575)

22   THE WITNESS:  I would assume that that's the

23   case without direct knowledge.

24   Q. BY MS. REDMOND:  Okay.  How would you get

25   direct knowledge?

```
 1          A. I would have to do this analysis all over
 2          again for the entire contract base for this
 3          last fiscal year.
 4          Q. Okay.  And have you done this analysis for
 5          the last fiscal contract year yet?
 6          A. No.
 7          Q. Do you intend to?
 8          A. No.
 9          Q. Why is that?
10          A. That's the operations group's
11          responsibility.
12           PAGE 129:03 TO 131:25 (RUNNING 00:03:35.465)
13          Q. BY MS. REDMOND:  The court reporter has
14          handed you what has been marked as Deposition
15          Exhibit 18.
16          Have you seen Deposition Exhibit 18 before?
17          A. Yes.
18          Q. And what is Deposition Exhibit 18?
19          A. It is an e-mail thread describing some of
20          the problems that XO was running into related
21          to the software and their concerns.
22          Q. Okay.  And on the second page of
23          Deposition Exhibit 18 which, for the record,
24          is 152546, I believe it is an e-mail from you
25          to your boss?
```

3164

1      A. Yes.

2      Q. In part.

3      And I see Alison Taylor copied on this.

4      Was she a manager?

5      A. Yes, she was the manager who worked for

6      me.

7      Q. And then the second paragraph from the

8      bottom, you say, the third sentence in:

9      "It seemed crazy that we don't provide

10      customer support to XO over something like

11      this.  Rob feels like we are nickel and

12      diming him and I don't disagree."

13      Do you see that?

14      A. Yes.

15      Q. Do you agree with that statement?

16      A. Yes.

17      Q. And what were you referring to there?

18      A. I was referring to a situation they were

19      having where they were running into a problem

20      that they weren't sure was an Oracle-related

21      problem or a problem with how they set up the

22      software.

23      The solution was we could send a service

24      person out for a cost of somewhere around

25      $2,000 a day.  And Rob's position was it

3165

```
 1          seems kind of crazy that we spend two and a
 2          half million dollars and you are going to
 3          send someone out here for $2,000 a day to
 4          potentially find a problem that is wrong with
 5          your software.  And I didn't disagree with
 6          him.
 7     Q. You go on to say:
 8          "It's the perception of awful customer
 9          service and support."
10     Do you see that?
11     A. Yes.
12     Q. Do you agree with that sentiment?
13     A. Well, this was Rob's perspective.  Rob in
14          XO perceived that they were receiving awful
15          customer service and support.  That wasn't
16          necessarily my opinion.
17          Like I said, I thought that he had a point
18          regarding the $2,000 a day for service, but
19          in terms of the support and service he was
20          getting, I actually think we went above and
21          beyond in his situation.  So I certainly
22          didn't think he was getting bad customer
23          service and support.
24     Q. Have you ever had an instance in your
25          experience where you have believed a customer
```

3166

1      has had bad support and service from Oracle?

2      A. Yes.

3      Q. And what customer was that for?

4      A. Off the top of my head, Siemens comes to

5      mind.  There were a few instances where

6      customers received poor support from Oracle.

7      It happens.

8      Q. What happened in the Siemens situation?

9      A. In that situation specifically the

10      customer was logging service requests that

11      were at severity 1 levels and it was taking

12      Oracle an inexcusable amount of time to get

13      back to them and help resolve their issues.

14      It required escalation on our part to get

15      them the service that they needed.

16      Q. Okay.  Any other examples that come to

17      mind?

18      A. Not specific ones, no."

19      (End of videotape deposition.)

20          MR. WEBB:  Good morning, Your Honor.

21          THE COURT:  Mr. Webb?

22          MR. WEBB:  At this time defendants rest.  Thank

23  you.

24          THE COURT:  Thank you.

25          Do the Plaintiffs Oracle have any rebuttal

1    evidence or intend to offer any rebuttal evidence?

2              MR. ISAACSON:  We'll be filing our Rule 50

3    motion to you directly, Your Honor, as to certain issues

4    that we think should be foreclosed at this point.

5              But we have a short video we'd like to play in

6    rebuttal.  There's some disputes about that.  Perhaps this

7    would be a good time to have a break and we can resolve

8    that and then show a very short video.

9              THE COURT:  All right.

10             Ladies and gentlemen, what that all means is

11   that Plaintiffs Oracle presented all of their evidence in

12   support of their case.  Now defendants have presented all

13   their evidence in support of their defense in their case.

14             And now Plaintiffs Oracle have a final and last

15   opportunity to offer what sounds to be a fairly short

16   video.  And upon conclusion of that, you're going to have

17   all the evidence in the case.

18             But to give you a little bit of a heads-up, what

19   that means is that we're going to finish with the evidence

20   today, but they're still are major issues that the Court

21   has to deal with because I, of course, will be giving you

22   instructions on the law before you go in and decide this

23   case.

24             And after I've given you those instructions on

25   the law, you'll hear the closing statements of the -- each

1    side, and at that time you'll be able to go in and decide

2    and discuss the case for the first time and reach your

3    verdict.

4           But what that also means is that we're still

5    quite a ways away from when you're going to have those

6    instructions on the law and be able to deliberate and hear

7    the arguments of counsel.

8           By the time we do the instructions on the law

9    and the arguments of counsel, that's going to consume most

10   of the day.

11          And what needs to be done between now and then

12   will be for the Court to finalize all of the instructions

13   on the law which will be given to you.

14          Those aren't just automatic because I need to

15   hear from both sides regarding those instructions on the

16   law.  We need to make sure that everyone understands what

17   the instructions are that I'm giving and that I've

18   considered the input of both parties.

19          So what it means is I will be returning here on

20   Monday to have that session with the counsel and the

21   attorneys.  I don't know how long it will take, but I will

22   not bring you in on Monday just because I don't want you

23   sitting out before we're ready to go and then have you

24   going in for deliberations on a very major, complex case

25   with a limited amount of time.