# Rimini Street's Opposition To Oracle's Renewed Motion For A Permanent Injunction

*Oracle USA, Inc. v. Rimini Street*, No. 2:10-cv-0106-LRH-VCF
United States District Court for the District of Nevada
Hearing on Remand from the Ninth Circuit
July 23, 2018



1

**Rimini Street**

# Disputed Effect of the CA9 Decision

## Oracle

- "[N]othing in the [Ninth Circuit's] decision forecloses" or "narrows this Court's rulings or the jury's verdict on copyright infringement." Reply (Dkt. 1139) at 2.

- "Not one single aspect of Rimini's copyright liability was reversed by the Ninth Circuit on *appeal—including this Court's PeopleSoft cross-use adjudication*." Reply (Dkt. 1139) at 2 (emphasis added).

## Rimini

- "The only acts that have already been determined to be unlawful are those identified in the Ninth Circuit's opinion." Opposition (Dkt. 1130) at 15.

- "As to PeopleSoft, the court did *not affirm 'cross-use' as a viable theory of infringement* ...." Opposition (Dkt. 1130) at 5 (emphasis added).

**Rimini Street**

# Ninth Circuit Holding (PeopleSoft)

- **Local Hosting:** "[T]he Rimini servers where the copying took place were outside the [actual or constructive] **control** of" Rimini's customers.
  *Oracle*, 879 F.3d at 960 (emphasis added).

- **Cross Use:** "Because we address the question of infringement as to PeopleSoft on the ***narrow ground*** of 'local hosting,' *we do not decide whether* 'direct use' or *'cross use' was permitted by the PeopleSoft license*."
  *Id.* at 960 n.6 (emphases added).

**Rimini Street**

# Only Grounds Expressly Affirmed Are Binding

- "If the judgment of the court of first instance was based on a determination of two issues, either of which standing independently would be sufficient to support the result, and the appellate court upholds **both** of these determinations as sufficient, and accordingly affirms the judgment, the judgment is conclusive as to **both** determinations."

- **"If the appellate court upholds one of these determinations as sufficient and refuses to consider whether or not the other is sufficient and accordingly affirms the judgment, *the judgment is conclusive as to the first determination*."**

Restatement (Second) of Judgments § 27 cmt. o (emphases added).

**Rimini Street**

# Federal Courts Follow the Restatement Approach

"**It is a well-established principle of federal law that if an appellate court considers only one of a lower court's alternative bases for its holding, affirming the judgment without reaching the alternative bases, *only the basis that is actually considered can have any preclusive effect in subsequent litigation*.**"

*City of Colton v. Am. Promotional Events, Inc.-West*, 614 F.3d 998, 1004 n.4 (9th Cir. 2010) (emphasis added) (quoting *Niagara Mohawk Power Corp. v. Tonawanda Band of Seneca Indians*, 94 F.3d 747, 754 (2d Cir. 1996)) (citing Restatement (Second) of Judgments § 27 cmt. o).

(Additional authorities collected in hearing booklet.)

**Rimini Street**

# Ninth Circuit Holding (JDE and Siebel)

- **Local Hosting**:  "[T]he district court construed the PeopleSoft license more restrictively than the JD Edwards and Siebel licenses," which do not "contain[] an additional limitation about the licensee's facilities[.]" *Oracle*, 879 F.3d at 959 (quotations omitted).

- **Cross-Use**:
  - Rimini "created development environments for *future customers* using the license of an existing customer on the basis that *future customers* presumably would have licenses that would permit them to hire Rimini to create development environments."
    *Id.* at 957 (emphases added).
  - "[I]t would [not] be copyright misuse to forbid Rimini from creating development environments for licensees *before* **they have become customers**."
    *Id.* at 958 (emphasis added).

*Oracle v. Rimini Street – July 23, 2018*

**Rimini Street**

# Skepticism Regarding Cross-Use

"[I]f they had the right to make ten copies for each of ten clients, one for each, and they, in fact, made ten, but they did it in one – in one place and spread it out over the ten, why – *why does that make any difference in the real world?* … [I]f all ten people have paid for one copy, if all paid, and they all have a license, and instead of making ten copies that are put into the correct slots, they make ten copies in Slot Number 3, and then give them to the same ten people, *I don't understand why that makes any difference*."



Ninth Circuit Judge Graber, *Oral Argument Before the Ninth Circuit*, Opposition, Ex. B (Dkt. 1134-2) at 30:10–31:4 (emphases added).

**Rimini Street**

# Ninth Circuit Holding (Database)

Rimini **waived** its reliance on the Oracle License and Service Agreements ("OLSAs") because it did not "challenge the district court's legal conclusion that Rimini was not entitled to assert the OLSAs as a defense."

*Oracle*, 879 F.3d at 960.

**Rimini Street**

# Oracle Concedes that Rimini Can Provide Support

"[W]hether [Rimini] can go in and assist a licensed user in creating a testing environment on that licensed user's server and use it to make a fix, *I think they can probably do that*, with the caveat that it might depend on the specific terms of the specific license."

"And to the extent there are disputes about that, I mean [Gibson Dunn is] involved in Rimini 2 at a stage that they weren't involved in Rimini 1, and *those issues can be resolved [in Rimini 2]*."

*Counsel for Oracle Before the Ninth Circuit,*
Opposition, Ex. B (Dkt. 1134-2) at 25:8–20 (emphases added).

**Rimini Street**

# Ninth Circuit Infringement Holdings

| PeopleSoft | JD Edwards | Siebel | Database |
|---|---|---|---|
| Local Hosting | Future-Customer Cross-Use | Future-Customer Cross-Use | Waiver |



**Rimini Street**

# This Court Relied on Infringement <u>and</u> Hacking

"Rimini's business model was built entirely on its infringement of Oracle's copyrighted software ***and its improper access and downloading of data from Oracle's website and computer systems***, and Rimini would not have achieved its current market share and business growth without these infringing ***and illegal actions***…. Through ***this misconduct***, Rimini gained an improper advantage that it used to harm Oracle's business reputation and goodwill…."

Order Granting Permanent Injunction (Dkt. 1049) at 6 (emphases added).

**Rimini Street**

# Ninth Circuit Holding (Injunction)

- "Here, the district court **assessed the four factors by reference to *both* the copyright and the [hacking] claims**, without considering separately the propriety of issuing an injunction as to the copyright claims alone."
  *Oracle*, 879 F.3d at 964 (emphasis added).

- "For example, the court concluded that Rimini's **'violations of state computer access statutes' contributed to an 'irreparable injury'** to Oracle's business reputation and goodwill."
  *Id.* (emphasis added).

**Rimini Street**

# Oracle's Revisionist History

## Oracle Now

"Oracle ***never argued*** that the CDAFA or the NCCL supported the issuance of a copyright injunction."

Motion (Dkt. 1117) at 13 (emphasis added).

## Oracle Then

The district court "considered the copyright and state-law violations *together ... **And rightly so, as much of [Rimini's] business, and the harms [Rimini] caused Oracle, depended on the unauthorized downloading that formed the basis of the computer abuse verdicts**.*"

Oracle's Answer Brief (Ninth Cir. Dkt. 50) at 44 (emphases added).

**Rimini Street**

# Innocent Infringement

Rimini "proved ... by a preponderance of the evidence" that it "*was not aware that its acts constituted infringement*" and that it "*had no reason to believe that its acts constituted ... infringement*."

Opposition, Ex. E (Dkt. 1134-5) at 43 (jury instructions) (emphases added), Ex. D (Dkt. 1134-4) at 6 (jury verdict finding Rimini had proven innocent infringement on all product lines).

# Safra Catz's Testimony— Oracle's Marquee Evidence

**Rimini Street**



Safra Catz
CEO
Oracle

```
12    A.    Well, when they come to our customers, our customers
13    wonder all of a sudden whether we are overcharging them.
14            It really breaks the bonds and the trust that we
15    have with our customers.  We've negotiated a price with
16    them.  All of a sudden, they're wondering whether we've
17    treated them fairly.
```

Cited Testimony of Safra Catz, Opposition, Ex. I (Dkt. 1134-9) at 935–36.

**Rimini Street**

# Rimini Changed Its Processes Years Ago

- Benge Declaration (PeopleSoft)
- Mackereth Declaration (Oracle Database)
- Miller Declaration (JD Edwards)
- Phung Declaration (Siebel)
- Teegarden Declaration (JD Edwards)

Opposition, Ex. C (Dkt. 1134-3).







# Causal Nexus Requirement



**Rimini Street**

- "Without a showing of causal nexus, there is **_no relevant irreparable harm_**." *Apple Inc. v. Samsung Elecs. Co.*, 735 F.3d 1352, 1363 (Fed. Cir. 2013) (*Apple III*) (emphasis added).

- "[A] likelihood of **_irreparable harm cannot be shown_** if sales would be lost regardless of the infringing conduct." *Apple Inc. v. Samsung Elecs. Co.*, 678 F.3d 1314, 1324 (Fed. Cir. 2012) (*Apple I*) (emphasis added).

- "[T]he causal nexus inquiry is indeed **_part of the irreparable harm calculus_**: it informs whether the patentee's allegations of irreparable harm are pertinent to the injunctive relief analysis, or whether the patentee seeks to leverage its patent for competitive gain ...." *Apple Inc. v. Samsung Elecs. Co.*, 695 F.3d 1370, 1375 (Fed. Cir. 2012) (*Apple II*) (emphasis added).

**Rimini Street**

# Oracle's Causal Nexus Argument

"Rimini also argues 'Ms. Catz did *not* testify that Oracle's purported loss in goodwill was 'directly' tied to *specific infringing features* of Rimini's practices…. But the word 'directly' appears nowhere in *Perfect 10*. Rather, the Ninth Circuit applied a standard of 'sufficient causal connection[.]'"

Reply (Dkt. 1139) at 4–5 (emphasis added).

# The Causal Nexus Standard

**Rimini Street**

- Oracle must "present[] ... evidence that ***directly ties consumer demand for [Rimini's support services] to [Rimini's] allegedly infringing feature***," *i.e.*, local-hosting for PeopleSoft and future-client cross-use for JD Edwards and Siebel. *Apple II*, 695 F.3d at 1375 (emphasis added).

- It "is not enough" for Oracle to assert "some insubstantial connection between the alleged harm and the infringement" to "check the causal nexus requirement off the list." *Id.* at 1375

- A party must show "a ***sufficient causal connection*** between irreparable harm to [its] business and [the particular infringing conduct]." *Perfect 10, Inc. v. Google, Inc.*, 653 F.3d 976, 981 (9th Cir. 2011) (emphasis added).

**Rimini Street**

# Oracle's Logical Fallacy

"If … [Rimini] has ceased all infringing conduct, then **an injunction would create no burden whatsoever on Rimini**, as Rimini only would be barred from doing things that it purportedly is no longer doing…."



Motion (Dkt. 1117) at 18 (emphasis added).

Rimini Street

# Oracle's Proposed Injunction Goes Way Too Far

- Affirm in Writing Requirement
- Distribution and Derivative Works
- Prohibition on "Use," "Support," and "Benefit"
- Prohibition on "Accessing" Source Code
- Site Restrictions

BOIES, SCHILLER & FLEXNER LLP
RICHARD J. POCKER (NV Bar No. 3568)
300 South Fourth Street, Suite 800
Las Vegas, NV 89101
Telephone: (702) 382-7300
Facsimile: (702) 382-2755

BOIES, SCHILLER & FLEXNER LLP
WILLIAM ISAACSON (pro hac vice)
KAREN DUNN (pro hac vice)
5301 Wisconsin Ave, NW
Washington, DC 20015
Telephone: (202) 237-2727
Facsimile: (202) 237-6131

BOIES, SCHILLER & FLEXNER LLP
STEVEN C. HOLTZMAN (pro hac vice)
KIERAN P. RINGGENBERG (pro hac vice)
1999 Harrison Street, Suite 900
Oakland, CA 94612
Telephone: (510) 874-1000
Facsimile: (510) 874-1460

Attorneys for Plaintiffs
Oracle USA, Inc., Oracle America, Inc., and
Oracle International Corp.

MORGAN, LEWIS & BOCKIUS LLP
THOMAS S. HIXSON (pro hac vice)
KRISTEN A. PALUMBO (pro hac vice)
One Market, Spear Street Tower
San Francisco, CA 94105
Telephone: 415.442.1000
Facsimile: 415.442.1001

DORIAN DALEY (pro hac vice)
DEBORAH K. MILLER (pro hac vice)
JAMES C. MAROULIS (pro hac vice)
ORACLE CORPORATION
500 Oracle Parkway, M/S 5op7
Redwood City, CA 94070
Telephone: 650.506.4846
Facsimile: 650.506.7114

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

ORACLE USA, INC., a Colorado corporation; ORACLE AMERICA, INC., a Delaware corporation; and ORACLE INTERNATIONAL CORPORATION, a California corporation,

Plaintiffs,

v.

RIMINI STREET, INC., a Nevada corporation; and SETH RAVIN, an individual,

Defendants.

Case No. 2:10-cv-0106-LRH-PAL

**[PROPOSED] ORDER GRANTING ORACLE'S MOTION FOR PERMANENT INJUNCTION AGAINST DEFENDANTS RIMINI STREET, INC. AND SETH RAVIN, FOR DISPOSITION OF INFRINGING COPIES, AND FOR JUDGMENT ON ORACLE'S UNFAIR COMPETITION CLAIM**

Case No. 2:10-cv-0106-LRH-PAL

[PROPOSED] ORDER GRANTING MOT. FOR INJUNCTION, DISPOSITION, AND JUDGMENT

**Rimini Street**

# No Injunction is Necessary

"I don't really understand why there also needs to be an injunction, when it seems like [Rimini is] trying to comply," and where there is "a whole lawsuit [*i.e., Rimini II*] to figure out if they're complying with the liability determinations."



Ninth Circuit Judge Friedland, *Oral Argument Before the Ninth Circuit*, Opposition, Ex. B (Dkt. 1134-2) at 41:18–22.

**Rimini Street**

**Appendix A**



*ORACLE USA, INC. v. RIMINI STREET, INC.*
USDC FOR THE DISTRICT OF NEVADA
CASE NO. 2:10-cv-00106-LRH-VCF

## INDEX

| TAB | DOCUMENT |
|-----|----------|
| 1 | Ninth Circuit Oral Argument Transcript |
| 2 | Ninth Circuit Opinion |
| 3 | Restatement (Second) of Judgments and Case Summaries |
| 4 | Appendix III in Support of Rimini's Opposition to Oracle's Renewed Motion for a Permanent Injunction |
| 5 | Appendix A in Support of Rimini's Opposition to Oracle's Renewed Motion for Attorneys' Fees |

1

**Atkinson-Baker Court Reporters**
www.depo.com

1          IN THE UNITED STATES COURT OF APPEALS

2                FOR THE NINTH CIRCUIT

3

4

5   ORACLE USA INC., a Colorado          )
    corporation; ORACLE AMERICA,         )
6   INC., a Delaware corporation;        )
    ORACLE INTERNATIONAL                 ) Nos. 16-16832
7   CORPORATION, a California            )      16-16905
    corporation,                         )
8                                        )
         Plaintiffs-Appellees,           )
9                                        )
         vs.                             )
10                                       )
    RIMINI STREET, INC., a               )
11  Nevada corporation; SETH             )
    RAVIN, an individual,                )
12                                       )
         Defendants-Appellants.         )
13  _____)

14

15

16           TRANSCRIPTION OF ORAL ARGUMENT

17                 JULY 13, 2017

18

19

20

21  ATKINSON-BAKER, INC.
    COURT REPORTERS
22  (800) 288-3376
    www.depo.com

23

24  REPORTED BY:  RENAE E. LOPEZ, CSR NO. 12142

25  FILE NO.:  AB07AA8

**Atkinson-Baker Court Reporters**
www.depo.com

```
1                    A P P E A R A N C E S

2          BEFORE:

3          MICHELLE FRIEDLAND,
           JUDGE ON THE NINTH CIRCUIT
4
           SUSAN P. GRABER,
5          JUDGE ON THE NINTH CIRCUIT

6          JEREMY D. FOGEL,
           JUDGE ON THE NORTHERN DISTRICT
    OF CALIFORNIA
7
8          FOR PLAINTIFFS-APPELLEES:
           KIRKLAND AND ELLIS, LLP
9          BY:  PAUL D. CLEMENT, ESQ.
           655 Fifteenth Street NW
10         Washington, DC  20005
           (202) 879-5000
11

12
           FOR DEFENDANTS-APPELLANTS:
13         GIBSON, DUNN & CRUTCHER, LLP
           BY:  MARK A. PERRY, ESQ.
14         555 Mission Street
           Suite 3000
15         San Francisco, California  94105
           (415) 393-8200
16

17

18

19

20

21

22

23

24

25
```

2

**Oral Argument**
**July 13, 2017**

**Atkinson-Baker Court Reporters**
www.depo.com

1                    I N D E X

2                                        PAGE

3  Mr. Perry                            4, 44

4  Mr. Clement                            20

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Oral Argument**
**July 13, 2017**

Atkinson-Baker Court Reporters
www.depo.com

```
 1              TRANSCRIPTION OF ORAL ARGUMENT

 2        IN THE UNITED STATES COURT OF APPEALS

 3                FOR THE NINTH CIRCUIT

 4                   JULY 13, 2017

 5                      -  -  -

 6

 7      MR. PERRY:  Thank you, Your Honor, and may it

 8  please the Court, Mark Perry for Rimini Street and

 9  Mr. Ravin.  I'll try to save two minutes for rebuttal.

10            From the constructions through the

11  instructions to the injunction, a single fundamental

12  error infected and pervaded the entire copyright case.

13  The district court ruled that third party maintenance

14  and support, and specifically the making of a testing

15  and development environment for updates and fixes, is

16  not within the licenses.

17            That one ruling made at summary judgment led

18  to summary judgment of infringement as to the

19  PeopleSoft and Database products, to directed verdicts

20  as to the Siebel and J.D. Edwards products, and to an

21  injunction that today prohibits Rimini Street from

22  conducting the conduct that is expressly authorized by

23  the licenses.

24            The court made this error at Page 100 to 102

25  first in the summary judgment record.  That's where the
```

4

1 train jumped the tracks, Your Honors.  The court ruled

2 that development and testing is not within the

3 licenses, even though it was undisputed then and

4 Oracle's witnesses admitted at trial that this complex

5 enterprise software requires updates, requires fixes,

6 and that a separate testing and development environment

7 is necessary to make those updates and fixes.

8         It may be important to understand why, Your

9 Honors.  This is mission critical software.  This is

10 running the payroll, the taxes, the supplier contracts,

11 and so forth for these enterprises, these companies.

12 If they need to make an update or a fix, they can't do

13 it on the application program.  They have to have a

14 separate copy to run the update, to run the fix, to

15 test it out, to make sure it works, and then you apply

16 that to the application program.

17         The single fundamental error that

18 Judge Hicks made was in not recognizing that that

19 separate testing and development environment is a

20 licensed use, is a necessary use within the contract,

21 and that prohibiting that use, as the injunction does,

22 is not authorized by the Copyright Act.  It has nothing

23 to do with the Copyright Act.  It has -- is not

24 authorized by the licenses, and if upheld by this court

25 would constitute copyright misuse, as the Nimmer

1   treatise makes clear, in so many words.

2        JUDGE FRIEDLAND:  Say we agree with you on that

3   point.  Don't you also need to win on the using that

4   environment to help another client point?  I mean, it

5   seems like the court was resting on both points.

6        MR. PERRY:  Your Honor, in the jury instructions,

7   the court rested on "or."  It was either you can -- may

8   find liability if it was used -- not used only for

9   archival support, or was used for a third party

10  customer.  So the jury -- the jury verdict would have

11  to be vacated even if that is.  But our bigger

12  submission, Your Honor, is that the Copyright Act --

13  this is a copyright case.  The Copyright Act goes to

14  the copying, and the copying here was authorized, the

15  making of a separate environment.  How that environment

16  was used, or as Oracle's secondary argument, where that

17  environment was housed, on which server it lived, those

18  are license disputes.  Those are questions about the

19  application of a contract that ought to be under the

20  copyright laws, and this court's decision in MDY versus

21  Blizzard resolved as a matter contract law.

22           That's just a plain old commercial

23  dispute about the use of data, because once Oracle, as

24  they clearly have, has surrendered the exclusive right

25  to copy, all the remaining restrictions are not

6

1  copyright problems.  They are contract problems.  And
2  Oracle, in this case, brought contract claims.  They
3  lost them or they withdrew them, but they had them, and
4  they could bring them in the future, but -- but this is
5  not a copyright dispute.
6        And -- and part of the -- the confusion, we
7  believe, starting in the summary judgment orders is in
8  the so-called cross-use and local hosting issues being
9  real issues.  And, look, our company as it reflected in
10 the record, we have -- we have corrected those problems
11 now that Oracle has informed us that they are problems
12 from Oracle's perspective.  We have taken steps to
13 redress them, and the second case, which is pending,
14 deals with whether those are acceptable under the
15 license, but they are not prohibited by the Copyright
16 Act.
17       Nothing in the Copyright Act has anything to
18 say about maintenance, other than to authorize it in
19 Section 117, about where -- which server data resides
20 on, about which customers use it for.  And analogies to
21 the physical world are imperfect, Judge Friedland, but
22 imagine if I have ten clients, and I have ten copies of
23 an identical support manual from Oracle.  This
24 cross-use argument is if I pull down one support
25 manual, and I don't look at which client it is, even

7

1   though they're all identical, I have to -- I have to

2   instead look at the spine and pull down the support

3   manual that's labeled Client Number 2.  I have to look

4   at Support Manual Number 2.  That's all that's going on

5   here.

6           That may well be a license restriction, just

7   like the Federal Circuit said in the Storage Tech case,

8   you know, if I license you a book, and I say you can

9   read this book, but not the last ten pages, if you read

10  the last ten pages, you may have violated the license,

11  but you have not violated the Copyright Act.

12          Cross-use is a contract problem.  Local

13  hosting is a contract problem.  They are not copyright

14  problems.  The only copyright issue in this case, we

15  submit, is the making of a development and testing

16  environment.  We submit that the court got that plainly

17  wrong and it did it four times.

18          JUDGE FRIEDLAND:  Isn't there the possibility,

19  though, that the -- the sharing with another can be the

20  problem even if you've made a copy?  So you can copy

21  the music for your own sake, but when you start playing

22  it for a lot of other people, it starts to be a

23  problem.  Maybe that -- that's, in theory, a kind of

24  copyright issue, isn't it?

25          MR. PERRY:  Well, in your example, Your Honor,

1  that's the public performance right, which is a

2  separate right under 106.  In -- in this case, every

3  Rimini Street client has a license.  No unlicensed

4  software was ever given to any customer or client

5  without a license.  The only question was whether, as

6  -- as Mr. Ravin put it at trial, operational silos, that

7  is keeping everybody within the Data -- the PeopleSoft

8  tower, or the Database tower, or physical silos, that

9  is Client 1 versus Client 2 versus Client 3 was

10  required.  That was a contract dispute we have had that

11  we believe has now been resolved.  We'll see -- again,

12  that's the second case, but that is not a Copyright Act

13  problem.

14          The -- the -- and -- and even if -- by the

15  way, let's spot Oracle this one, that would be a new

16  trial.  We -- a new trial would still be required.  It

17  wouldn't -- that wouldn't be a judgment.  That would

18  just be a new trial, because all of the liability

19  determinations, both at summary judgment and in the

20  verdict, rest not only on the so-called cross-use, but

21  also on the prohibition that Judge Hicks found on

22  creating development and testing environments.

23          And this development and testing

24  environments is the most critical piece in the case.

25  It is something we have raised over and over again.  We

9

1    put it front and center in our brief, and Oracle -- it

2    doesn't appear in Oracle's brief.  All that Oracle says

3    in their brief in this court is well, these licenses

4    only are -- authorize archival copies, and that's just

5    not true.  The licenses do authorize archival copies,

6    as they have to, by the way, the -- the Copyright

7    Statute 35, USD Section 117 actually makes clear that

8    archival copies aren't even an act of infringement, so

9    that -- you know, that part of the license is not

10   necessary.

11           Then they also authorize each and every one

12   of the four licenses at issue, also authorized third

13   party support providers to assist the customer in their

14   use of the software.  What Judge Hicks said is that use

15   is, quote, related to internal business operations or

16   internal data processing operations, and that that

17   doesn't include copying for testing and updates.

18           Your Honor, that's just not the case.  The

19   trial record, Oracle's own witnesses, Page 924, Page

20   1046 and 1047, Page 1064 to 65 of the Excerpts of

21   Record all admitted that that kind of copying, that

22   kind of testing and development is permitted under

23   these licenses, and that makes sense if you look at the

24   licenses themselves.  Just give you one example from

25   the Siebel license, Page ER1163.

Atkinson-Baker Court Reporters
www.depo.com

```
 1        JUDGE GRABER:  Just a second.  Thank you.  Okay.
 2   I'm with you.
 3        MR. PERRY:  Section 2.3 of the Siebel license,
 4   "The customer should have the right to make suggestions
 5   regarding new features, functionality or performance
 6   and to create its own implementations of such
 7   suggestions or to have them created for the customer."
 8   In other words, the customer can hire a third party to
 9   develop new features, functionality, or performance.
10        JUDGE GRABER:  Where do you see third party in
11   that, though?
12        MR. PERRY:  Your Honor, it's at the very last
13   sentence, "to have them created for the customer."  And
14   the third parties are more specifically referred to in
15   2.1 Romanette VIII, "to have third parties, such as
16   system integrators install, integrate, and otherwise
17   implement the software."
18             So the third parties are expressly
19   authorized under this contract, as under all others,
20   and not just for archival purposes, as -- as Oracle
21   would have it, and as Judge Hicks agreed, but for
22   implementation, integration, installation, new
23   features, new functionality, and new performance.
24   That's what Rimini Street's business is.  This -- these
25   provisions describe my client and expressly authorize
```

11

1    the activities that it undertakes.

2              And what Judge Hicks did at summary

3    judgment, and then again in the jury verdict is said --

4    for the Siebel contract in the jury verdict, at Page

5    548 of the Excerpts of Record, he said these provisions

6    authorize only archival copies and do not authorize the

7    making of development and testing copies.  That is just

8    plain legal error.  He misread the contract, and -- and

9    correcting that error requires, we submit, a judgment for

10   Rimini, and Oracle hasn't disputed this.

11             Oracle has never disputed either at the Rule

12   50 stage or in this court, that if you reverse that

13   license construction, it's not just a new trial, it's a

14   judgment issue, because all the other issues in the

15   case, Judge -- Judge Friedland, this goes to your

16   question, are about contract application and licensing,

17   which ought to be resolved.  There is a second case

18   pending, as the court is aware, involving the current

19   processes.  That can all get sorted out on commercial

20   terms.

21             This whole thing -- by the way, this is a

22   commercial dispute.  Oracle doesn't want competition in

23   this space.  That is no secret.  It has sued every

24   third party service provider we believe ever to have

25   entered the market.  It usually has been successful,

12

1  and it has usually driven them out of the market.

2  That's its prerogative, so long as it stays within the

3  law, but these licenses were not written by Oracle.

4  These licenses were written by companies that Oracle

5  acquired.  These licenses authorized third party

6  support.

7           My client is doing its best to comply with

8  these licenses and offer a service to customers as an

9  alternative for competition.

10      JUDGE FRIEDLAND:  So I think your -- your client

11  is still doing okay at this point, but -- so I'm

12  wondering how that affects your copyright misuse

13  argument.  So you say you're complying with this order,

14  but if this order is right, it's copyright misuse to

15  interpret it this way, but it seems like you are

16  surviving as a business.

17      MR. PERRY:  There's two answers to that.  First,

18  we -- we have changed the processes to address the

19  cross-use and local hosting aspects, which we agree are

20  contractual issues.  We think the court got those wrong

21  too, for reasons I'm happy to explain, but it is, you

22  know, more -- it makes it more expensive for my client,

23  to no benefit to Rimini Street.  To go back to my

24  example, if I have ten identical support manuals, to

25  make me look at Number 2 to support Client Number 2,

1   instead of just pick one of the ten identical manuals,

2   I can do that.  It adds a step to the process, and

3   every step is an expense, and it's no difference from

4   Oracle's perspective, because I still have ten

5   identical support manuals, but -- but we can do that,

6   and same with the local hosting.  There are some

7   transmission delays and so forth, but whether the

8   material is stored on Rimini's servers, or on the

9   client's servers, or on other servers -- by the way,

10  cloud servers, the client has control over, we submit

11  are within the client's -- that those are within the

12  site restrictions.

13       JUDGE GRABER:  Which -- which portion of the

14  instructions specifically are you contending is -- are

15  infected by this issue?

16       MR. PERRY:  Your Honor, it's on ER547 and ER548.

17  It's instruction -- it is the instruction entitled

18  "Copyright Infringement Express License," which is

19  Instruction Number 24.

20       JUDGE GRABER:  Right, I'm there.

21       MR. PERRY:  On 547 is the J.D. Edwards

22  instruction.  It's Lines 6 through 10, "This

23  provision," that is, the license provision, "does not

24  mean that a third party, like Rimini Street, is

25  authorized to make copies of the J.D. Edwards software

14

```
 1   application and documentation to, among other things,"
 2   dot, dot, dot, "carry out development and testing of
 3   software updates."  That is the eh--a and on 548, the
 4   same sentence exists for Siebel, and just to close the
 5   loop on it, the summary judgment stage is at Page 102
 6   for PeopleSoft and Page 71 for Database under the
 7   customer license, exact same sentence, exact same
 8   error.  And, Judge Friedland, to answer your question,
 9   that's the part that creates the business problem, and
10   that would be copyright misuse.  If that construction
11   is sustained, that is, that -- if a third party cannot
12   create development and testing environments, then
13   Oracle has effectively precluded third party
14   maintenance and support.
15        JUDGE FOGEL:  Well, I'm sorry, if I might
16   interrupt.  There's more to the instruction than that.
17   I mean, it says you can't create those environments for
18   certain purposes.  You -- you can do it for archival
19   purposes, and you can do it to support the customers
20   that -- that your client supported, but it says you
21   can't do it to use the -- to make modifications of the
22   software, use the customer's software or support
23   materials to support other customers.  So it's -- it's
24   using the software for purposes outside the scope of
25   the -- the business that your client was engaged in
```

15

1   with the identified licensees.  I think that's the

2   total import of the instruction, isn't it?

3       MR. PERRY:  Well, there are -- the cross-use

4   aspect is in there.  It is in there, Judge Fogel, as an

5   "or" on Line 9 on Page 547.  It's either you make a

6   development and testing copy, or you use it to support

7   somebody else.  The jury can find liability on both.

8   We submit that the first is a clear error of copyright

9   law, and the second is a license dispute that ought to

10  be resolved, as such, and, by the way, is not without

11  the license is simply because the licence is --

12      JUDGE FOGEL:  Does it -- does it say you can't

13  make any development and testing copies at all?  I

14  thought it said you -- you can't make any copies for

15  these prohibited purposes.

16      MR. PERRY:  Your Honor, it says the provision

17  does not mean that Rimini Street is authorized to make,

18  to carry out development and testing of software

19  updates.  I mean, that's the plain language of the

20  instruction.  Same thing in the summary judgment.

21      JUDGE GRABER:  Well, inter -- it's unfortunately

22  not very precise grammatically.  I just --

23      MR. PERRY:  Your --

24      JUDGE GRABER:  -- say that it's possible to read

25  the "supporting other customers" as modifying

1  everything that comes before in the sentence, and it's

2  possible to read it the way you do.

3      MR. PERRY:  Yes, Your Honor, I -- I agree with

4  you --

5      JUDGE GRABER:  But you --

6      MR. PERRY:  -- because --

7      JUDGE GRABER:  But it is possible to read it the

8  way Judge Fogel was just suggesting, that all of this

9  can't be done to help someone else.

10      MR. PERRY:  Well, that is because Oracle insisted

11  on making this case about cross-use, and kept trying to

12  elide this point about the development and testing

13  environments.  So let me -- let me make a very simple

14  way to under -- to think about this, that I -- simple

15  for me, anyway.  If the customer makes a development

16  and testing environment, is the customer within the

17  license?  We submit absolutely yes.  The customer,

18  however, would fit within the jury instruction, the

19  injunction, which I haven't touched on yet, but the

20  injunction which prohibits, by the way -- I mean, if

21  you look at the injunction as --

22      JUDGE GRABER:  Well, this -- this -- this

23  instruction is purely about third party use.  It's not

24  about the customer.

25      MR. PERRY:  But our --

```
 1        JUDGE GRABER:  It doesn't say that.
 2        MR. PERRY:  But -- but third parties have the
 3   same rights as the customers.
 4        JUDGE GRABER:  Well, that's a separate question,
 5   but -- but it --
 6        MR. PERRY:  Well, no, it's not a separate
 7   question.
 8        JUDGE GRABER:  Well, it is, because you said the
 9   jury instruction would apply to the customer, but
10   it's -- it starts by saying this doesn't mean what a
11   third party can do, so it's all about third parties.
12        MR. PERRY:  Fair enough, Your Honor.  Our
13   submission is that there are no special restrictions on
14   third parties.  Oracle has tried to find some in its
15   brief here.  They are evanescent.  They are
16   nonexistent, because each of the licenses -- I'll just
17   point this out, PeopleSoft, Section 14.2, at Page
18   ER1180, "The licensee may provide access to and use of
19   the software to third parties that provide services."
20   J.D. Edwards, ER1172, Article II, Section 7, "Customer
21   may cause anyone to copy the software, to the extent
22   necessary to support the users."  Siebel, ER1163,
23   Section 2.1, Romanette VIII, "To have third parties
24   install, integrate, and implement the software."
25   Database customer arrangement, ER1183.  "You may" --
```

1  the rights granted, "You may allow your agents and
2  contractors to use the programs for this purpose," and
3  the purpose is for business operation.
4        Each of these contains an express
5  authorization for third parties to help the customer
6  use the software, and the undisputed evidence at trial,
7  the evidence from Oracle's witnesses was to -- using
8  the software requires updates, fixes, maintenance, and
9  support, and the only way to provide update, fixes,
10  maintenance, and support is to create a development and
11  testing environment so that this whole thing comes
12  together.
13        And as to the injunction, briefly, you know,
14  it carries through these same license constructions
15  that were in the summary judgment order and in the
16  instructions, and prohibits, for example, J.D. Edwards
17  and Siebel, third parties shall not use the software
18  for any purpose other than archiving.  That's not what
19  the licenses say.  The injunction goes so far beyond
20  the license.  They say, for JDE and Siebel, that the
21  Rimini Street cannot access the source code.
22        Your Honor, access is not a right under
23  Section 106.  106 applies to reproduction,
24  distribution, and derivative works, as relevant here.
25  Access -- you can't prohibit somebody from reading a

**Atkinson-Baker Court Reporters**
www.depo.com

1   copyrighted book or from watching a copyrighted movie.

2   The courts don't have that power, Your Honor, but

3   Judge Hicks has ordered us not to access Oracle's

4   source code.  That's a First Amendment violation, in

5   addition to a Copyright Act violation.

6           And then the injunction also says that

7   Rimini Street can't use anyone's software for the

8   benefit of another, so to take my manual example, if I

9   take down the manual, and I learn for Client A, and I'm

10  using Client A's manual, that to update the tax

11  software, I have to set the switch to three this year,

12  and then I go to Client B, apparently, I can't just go

13  in and set the switch to B, because I'm using something

14  that I learned from that manual for the benefit of

15  another client.  So it's -- it's -- it's prohibiting

16  the mental processes of engineers and -- and -- and

17  innovators.

18      JUDGE GRABER:  Did you wish to save some rebuttal

19  time?

20      MR. PERRY:  I would.  Thank you very much, Your

21  Honor.

22      JUDGE GRABER:  Thank you.

23      MR. CLEMENT:  Good morning, Your Honors, and may

24  it please the court, Paul Clement for Oracle.

25          Rimini engaged in massive unauthorized

1   copying of Oracle's copyrighted works.  That copying

2   was not limited to application programs, but extended

3   to copyrighted materials made exclusively available to

4   customers who paid Oracle extra to support and update

5   Oracle's software in their application programs.  The

6   copying was conceded, as was distribution, to a degree,

7   was conceded, as was, belatedly, the unauthorized

8   cross-use by Rimini of copyrighted works downloaded for

9   one client and then copied and used to service a

10  different client.

11          Now, Mr. Perry makes some very interesting

12  arguments today, but they were not the arguments that

13  were contemporaneously made in the district court.  He

14  suggests that the root error here was that -- the

15  judge's summary judgment ruling.  Now, he talks about,

16  in the context of the Siebel case, some provisions of

17  the Siebel license that aren't even discussed in that

18  summary judgment order.

19          If you look at the Excerpts of Records, Page

20  112 and 113, you'll see the entirety of the discussion

21  of the Siebel license in the context of the license

22  that Siebel had with Novell.  Now, you won't see the

23  kind of provisions that he's talking about, and there's

24  a reason for that.

25          I mean, you know, litigation, especially a

1   litigation where one party to the litigation makes

2   repeated misrepresentations to the court, it has an

3   evolution of its own, and you can't just go into the

4   appellate court and sort of get a complete do-over.

5   Now, at the point the summary judgment order is being

6   litigated, and I think this is important to recognize,

7   Rimini Street is denying cross-use.  They're saying

8   they don't do it, they never do it.  That's their

9   position at that time.

10          By the time you get to trial, they're saying

11   cross-use happens all the time.  So at this point, the

12   only reason -- and you'll see this if you read these

13   two pages -- the only reason that they avoid summary

14   judgment, based on the aspects of the license that they

15   actually bring to the judge's attention

16   contemporaneously is because they actually say that

17   they can show that the only copies on their system were

18   there for archival and back-up purposes.

19          Now, that turns out to be another lie, and

20   by the time trial happens, they can't even sustain that

21   that's what they're going to do with the trial.

22   JUDGE GRABER:  Well, do -- I'm a little unclear

23   on what it is you're trying to tell us.  Are you

24   telling us that the issue that has been argued here was

25   waived, or are you telling us that it's wrong?  Because

22

1   those are two quite very different things, and -- and
2   Opposing Counsel has pointed to text in the licensing
3   agreements that, in his view, suggests that third
4   parties do have a right, beyond archiving, to -- to
5   make use of -- of these materials, and so I'm trying to
6   pinpoint which thing you're saying.
7   　　　MR. CLEMENT:  I'm ultimately saying both, Your
8   Honor.  I guess what I'm saying, though, is principally
9   on appeal, I think we have to litigate this on the
10  basis of the case that was actually litigated before
11  the judge, and if Mr. Perry wants to come up here and
12  say that the root cause of all the problems in this
13  case are the summary judgment order, he can't make
14  arguments based on little romanettes and licenses that
15  weren't part of the summary judgment argument.
16  　　　JUDGE GRABER:  Why is he wrong if we look at the
17  licensing agreements?
18  　　　MR. CLEMENT:  He's wrong if you look at the
19  licensing agreements -- if I can just back up one step.
20  The way that this case was litigated, and the way I
21  think it's properly litigated in this court is the
22  first question is did Rimini Street engage in copying
23  and distribution, and of course they did, and that's
24  conceded.  So then the burden shifts to them to provide
25  an affirmative defense, and they had a couple, but the

```
 1   principal affirmative defense was express license.

 2       JUDGE GRABER:  Right.

 3       MR. CLEMENT:  It was expressly licensed.  The

 4   burden's on them to point to provisions in the -- in

 5   the licenses that authorize their conduct.

 6       JUDGE GRABER:  Okay.  He's done that today.

 7       MR. CLEMENT:  Well, if -- if I can say, first, he

 8   has to do that at the right time in the litigation.

 9       JUDGE GRABER:  I understand.

10       MR. CLEMENT:  And he hasn't done that.  Secondly,

11   even the provisions that he points to today do not

12   remotely map onto the copying and distribution that

13   they conceded below.  And so I'm happy to talk about

14   specific romanettes if we'd like, but nothing in any of

15   these licenses remotely authorized them to have

16   thousands and thousands of copies on their own servers

17   and to engage in copying and distribution for the

18   copyrighted work of one client and use it on another

19   client.

20           And these are not just contract disputes.  I

21   mean, again, that's another argument that they didn't

22   properly preserve.

23       JUDGE FRIEDLAND:  Though your opposing counsel

24   argued, though, that the -- that the injunction and --

25   and the copyright ruling prohibits them from using
```

1   the -- from making -- even -- even the licensee from

2   making a copy for a testing environment.  Do you -- and

3   then by proxy, their client from helping the -- the

4   licensee from doing that.  Do you dispute that it

5   prevents them from doing that?

6       MR. CLEMENT:  I -- I certainly would say that

7   they can't make a testing environment on their own

8   servers.  Now, you know, whether -- whether they can go

9   in, consistent with the terms of the lease, and not

10  engaging in any cross-use, and not doing it on their

11  own servers, whether they can go in and -- and assist a

12  licensed user in creating a testing environment on that

13  licensed user's servers and use it to make a fix, I

14  think that they probably can do that, with the caveat

15  that it might depend on the specific terms of the

16  specific license.

17          And to the extent there are disputes about

18  that, I mean, Mr. Perry and his law firm are involved

19  in Rimini 2 at a stage that they weren't involved in

20  Rimini 1, and those issues can be resolved.  And to the

21  extent that they say that there's something very

22  specific that they can't do under the license, that

23  they say they need to do in order to provide this

24  service, I suppose we could then have a copyright

25  misuse affirmative defense that was focused on that

1  delta --

2       JUDGE GRABER:  Could I --

3       MR. CLEMENT:  -- but --

4       JUDGE GRABER:  Could I ask you about that, then?

5  So, for example, I'm looking at ER1163, which was the

6  page we were going over, which is the Siebel license

7  where it says that they have the right to have third

8  parties, EG, system integrators, install, integrate and

9  otherwise implement the programs and ancillary

10 programs, and have suggested fixes created.  You're

11 saying that can happen only on the servers of Siebel,

12 and not on the servers of the third party?  Is that

13 your argument as to what that means?

14      MR. CLEMENT:  That is the gist of it, Your Honor.

15      JUDGE GRABER:  Okay.

16      MR. CLEMENT:  I think what we would say is that

17 all of these provisions in the license, you know, that

18 provision can't be read in isolation.  It has to be

19 read in conjunction with the other license terms, and

20 the other license terms make clear two things; one,

21 that it takes -- it should take place on the licensee's

22 servers, on their -- on their facilities, and secondly,

23 that it really needs to be done in the way that at the

24 time of the litigation that the summary judgment went

25 down, they were saying that they were doing it, which

1  is they said at that time, we don't engage in -- in

2  cross-use.  We have a siloed approach to every one of

3  our users, and we never engage in this -- this kind of

4  cross-use.

5         That cross-use is important, in terms of the

6  conditions in the license.  It's not just a contract

7  dispute.  You know, there's a difference in this

8  court's cases between a condition and covenant, and it

9  is just not the law that if my client wants to license

10 somebody to engage in copying and distribution, to a

11 very limited extent, that once we do that, somebody

12 else, even a third party to it, can come in, engage in

13 massive copying and distribution and Katy, bar the

14 door, all we have is a contract claim.  That is not the

15 law, and he only refers to half of the illustration in

16 the Court's case.

17        Sure, if I tell somebody here's a copy of

18 Shakespeare or copyrighted work -- I guess it should be

19 something more contemporaneous.

20    JUDGE GRABER:  I would think so.

21    MR. CLEMENT:  Yeah, so -- so -- so a Garshin

22 novel or whatever, if I say here it is, it's yours, you

23 can -- you know, you can even make a copy, but, by the

24 way, don't read the last ten pages, that is just a

25 covenant that's contractually enforced.  But if I say,

**Atkinson-Baker Court Reporters**
www.depo.com

1   oh, well, we're going to engage in -- I'm going to give
2   you this software, but I'm really worried, because it's
3   software, and my whole business is licensing, so I'm
4   really worried that this is going to get out, and all
5   of a sudden, a hundred users are going to use this
6   instead of just one, so I am going to significantly
7   limit and put a condition on the copying and
8   distribution you can do of this.  If the user then goes
9   and engages in massive copying, that is not just a
10  contract dispute, that is a clear violation of the
11  copyright laws, and it is something where their only
12  defense can be express license, and they have to point
13  to the specific provisions of the license that
14  authorized their conduct.

15          And this is, I think, important is that it's
16  not just enough for them to now talk about, look, we
17  have a little dispute about the licenses, about whether
18  it would authorize the way we now want to provide
19  service, or the way we hypothetically might have
20  provided service.  Their burden is to show that they
21  had an express license to engage in the conduct they
22  actually engaged in, and that issue --

23      JUDGE FRIEDLAND:  Is it your position that they
24  ever used one client's software to help another client,
25  who didn't have their own license?

28

1    MR. CLEMENT:  Well, it is our position that they

2  routinely used one client's copyrighted software to

3  provide service to another and engage in copying and

4  distribution that is not authorized by either license.

5    JUDGE GRABER:  That doesn't answer the question

6  that was asked.

7    JUDGE FRIEDLAND:  If both --

8    JUDGE GRABER:  Would you --

9    JUDGE FRIEDLAND:  -- people -- did both parties

10  in the -- in that exchange of both clients have

11  licenses with Oracle?

12    MR. CLEMENT:  In -- in many of the cases, yes.

13  Not exclusively.  I mean, there are arguments before

14  the jury, and I'm not sure, because of the way the case

15  was litigated, anything particularly turned on this,

16  but there were arguments that they were providing

17  service for PeopleSoft holders before they had a single

18  client.

19    The issue, with respect to Database, is

20  actually separate, and there, they just flatly violated

21  the terms of their own developer license, and there's

22  no third party.  So when you look at the case, and you

23  look at the 93 counts of copyright infringement where

24  the jury found copyright infringement for 93 works, you

25  break it down.  It is simply not the case as to -- that

29

1   to all 93 of those, everybody was covered by some

2   license.

3        JUDGE GRABER:  Would that matter?

4        MR. CLEMENT:  No, as -- as my, perhaps not

5   entirely responsive answer to the first question

6   indicates, our position is it doesn't matter at all,

7   maybe because you simply -- they engaged in massive

8   copying --

9        JUDGE GRABER:  Why wouldn't it matter?  Because

10  if they had the right to make ten copies for each of

11  ten clients, one for each, and they, in fact, made ten,

12  but they did it in one -- in one place and spread it

13  out over the ten, why -- why does that make any

14  difference in the real world?  Why do any damages flow

15  from that?

16       MR. CLEMENT:  It makes a difference in the real

17  world, I think, if you understand the licensing model

18  for software, because when you're licensing the use of

19  software, and you're not selling them the software,

20  you're licensing it, it is critical that your licensor

21  only uses it on their servers and their systems.

22       JUDGE GRABER:  I don't understand why.  I

23  understand -- you -- you keep saying that, but if --

24  but to use my hypothetical, if all ten people have paid

25  for one copy, if all paid, and they all have a license,

1  and instead of making ten copies that are put into the

2  correct slots, they make ten copies in Slot Number 3,

3  and then give them to the same ten people, I don't

4  understand why that makes any difference.

5      MR. CLEMENT:  It makes a difference, Your Honor,

6  because if you don't honor the terms of the license,

7  and you don't keep essentially the license, and you

8  just mix them all together, what you end up is not with

9  ten copies on one person where it's consistent with a

10  licensing term.  You end up with exactly what you had

11  in this case, which is the software library that they

12  destroyed that had thousands and thousands of Oracle's

13  copyrighted works on it, and in a way that wasn't even

14  sorted from one client to another.  So they couldn't

15  even tell you that they -- even thought they were

16  contemporaneously claiming that we do this client by

17  client --

18      JUDGE FRIEDLAND:  But if they had downloaded a

19  whole bunch of things and put them on a server and

20  never touched them, your -- never used them to help any

21  client, never did anything with them, would -- it's

22  your position that would be a big problem?

23      MR. CLEMENT:  It would --

24      JUDGE FRIEDLAND:  Not sure what damages would

25  flow from that.  You wouldn't have lost any customer

31

1   service business or anything.

2       MR. CLEMENT:  It -- if that had happened -- I

3   mean, it's an interesting question whether we would

4   have brought a copyright action under those

5   circumstances, but we would have one.

6       JUDGE FRIEDLAND:  I --

7       MR. CLEMENT:  I mean, look, if I just try to be

8   responsive to that, I mean, if we have a license, and

9   it licenses somebody to make just one copy for archival

10  and back-up purposes, and they make a thousand, that's

11  a copyright violation.  Now, if they keep the thousand,

12  and they never do anything --

13      JUDGE GRABER:  There are no damages.

14      MR. CLEMENT:  There's no damages.  What's that?

15      JUDGE GRABER:  Then there'd be no damages.  It's

16  just --

17      MR. CLEMENT:  Well, there'd be statutory damages.

18      JUDGE GRABER:  Right.

19      MR. CLEMENT:  I mean --

20      JUDGE GRABER:  Yeah.

21      MR. CLEMENT:  -- there might not be loss of

22  profit damages --

23      JUDGE GRABER:  Right.

24      MR. CLEMENT:  -- but there would be statutory

25  damages, and if they did it a way that was

1  disrespectful for the copyrights and the like, you

2  might, in that case -- I mean, you know, maybe in that

3  case, you get statutory damages of 200.

4       JUDGE GRABER:  Before you run --

5       MR. CLEMENT:  In this case --

6       JUDGE GRABER:  Before you run out of time,

7  though, I -- I want to shift the focus, if I may, with

8  my colleagues' permission, to the statutory claims.

9       JUDGE FOGEL:  May I?

10      JUDGE GRABER:  Yes.

11      JUDGE FOGEL:  Before you do that, can I just ask

12 one question?

13      JUDGE GRABER:  Please.

14      JUDGE FOGEL:  Counsel made a point about the --

15 the jury instructions, and some potential ambiguity in

16 the jury instructions.  Can you -- can you address

17 that?

18      MR. CLEMENT:  Sure.  Well, first of all is -- you

19 know, I think it would be helpful to ask him on

20 rebuttal exactly where they preserved their objection

21 and exactly what their objection was contemporaneously,

22 because I -- the way this case is litigated, I hadn't

23 thought that they were objecting to that jury

24 instruction in that way.

25           I -- my contemporaneous understanding is

**Atkinson-Baker Court Reporters**
www.depo.com

1  they didn't even object to it in these terms.  My

2  answer to it would be, though, if you actually look

3  at -- I think this is Excerpts of Record, Page 547.

4      JUDGE FOGEL:  Right.

5      MR. CLEMENT:  If you look at this, all of this,

6  as I read it, is something about -- you know, this is

7  not something that says, broadly speaking, you can

8  never have a development testing environment, because

9  that's not really the way the case was being litigated,

10  and the specific prohibition, as I see it, is whether

11  you can access the software source code to carry out

12  development, testing of software updates.  Now, the

13  licenses are very clear that you can't access the --

14  the source code, and that's not uncommon, and I don't

15  think it's a First Amendment problem, and certainly no

16  First Amendment issue was adjudicated contemporaneously

17  or until about 20 minutes ago, but the licenses do not

18  allow access to source code.  As I say, that's a common

19  provision in licenses --

20      JUDGE FOGEL:  So --

21      MR. CLEMENT:  -- because --

22      JUDGE FOGEL:  So the syntax is not perfect, but

23  if you look at it in context, it's -- and particularly

24  if there's no objection, you don't see it as being an

25  issue?

34

1    MR. CLEMENT:  I don't see it being an issue at
2  all.  And, again, I think what -- what they need is a
3  contemporaneously raised objection that also maps onto
4  the conduct they actually engaged in, and gives them a
5  colorable argument that the conduct they actually
6  engaged in was expressly licensed by these licenses.
7    JUDGE GRABER:  Okay.
8    MR. CLEMENT:  And if you think about it that way,
9  it's really not a particularly close question because
10  of what they did.
11    JUDGE GRABER:  Question about the statutory
12  claims.  I wanted to get your position on this, because
13  it appeared to me that the defendants had permission to
14  obtain the data, but what they did wrong was to use
15  things that I don't even understand, bots and scrapers.
16  Is that a correct understanding of what happened, that
17  if -- if an individual had laboriously downloaded each
18  thing one time, it had been downloaded, that would have
19  been okay, but using the bots and scrapers caused a lot
20  of problems, and that was not okay?  Is that -- is that
21  a correct understanding of what that claim is really
22  about?
23    MR. CLEMENT:  I think that is a correct
24  understanding of what the claim is about.
25    JUDGE GRABER:  Okay.  So if that's true, why is

1   that a statutory violation at all, because it -- the

2   example I used in my own head was I say to you, you are

3   welcome to download this information, but please don't

4   do it on the weekends, 'cause I don't want to have to

5   have employees at my end on the weekends, and you do it

6   on Saturday afternoon.  I -- I'm not accessing the

7   information without permission.  I'm accessing it in a

8   manner that is contractually disallowed, and so I don't

9   understand why that isn't merely a contractual

10  violation and not a violation of the statute.

11       MR. CLEMENT:  I think it's a violation, Your

12  Honor, because what the statutes require, and this is

13  from this court's Christensen decision, is you have to

14  knowingly access without permission.  Now, they did not

15  have access, they did not have permission to access,

16  using the scrapers that they used in the manner that

17  they used them.

18       JUDGE GRABER:  But that's the -- the -- that's --

19  you're getting into my exact problem, which is the

20  manner, because Christensen -- in Christensen, they had

21  no permission to have the data, period, so they,

22  without permission, took, copied, and made use of the

23  data.  And here, there was permission to take the data,

24  make use of the data, but what they did wrong was how

25  they did it, and so I guess I just have difficulty

1   seeing how that fits with the text of the statute with

2   Christensen and with our Nosal and Facebook cases that,

3   on the federal side, distinguish between violations of

4   terms of use and -- and wrongful acquisition of

5   information.

6       MR. CLEMENT:  Your Honor, I think it fits

7   comfortably within the terms of the statutes.  I'm

8   not -- for one thing, again, I'm not sure that the

9   exact argument you're making right now was

10  contemporaneously preserved, but -- and so that's one

11  answer, but the other answer is I do think it fits

12  within both the statute and within the terms of what

13  this court said in Christensen, and I think it's

14  important to recognize that one of the things that's

15  different about the statutes here, and one of the

16  things that I think makes them completely satisfied is

17  what really is a sine qua non of the violation is the

18  taking or use without permission, and --

19      JUDGE GRABER:  But they had permission to take

20  it.

21      MR. CLEMENT:  Not in this manner, Your Honor.

22      JUDGE GRABER:  But that's --

23      MR. CLEMENT:  Not --

24      JUDGE GRABER:  That's the --

25      MR. CLEMENT:  -- in this manner.

1    JUDGE GRABER:  But --

2    MR. CLEMENT:  And --

3    JUDGE GRABER:  Christensen is about taking

4  something you have no right to take at all.  That --

5  those were the facts, and that was the decision, and

6  that's what the text of the statute seems to say,

7  because what you're saying is, in my example, if I say

8  you are absolutely welcome to have this information,

9  please don't do it on Saturday.  You do it on Saturday,

10  you've committed a crime in -- in California.  That --

11  I don't think that's what the legislature had in mind,

12  I guess --

13    MR. CLEMENT:  Well, I --

14    JUDGE GRABER:  -- and I have difficulty with

15  saying that the manner equates to a statutory

16  violation.

17    MR. CLEMENT:  Well, Your Honor, with respect, I'm

18  not sure why there's anything in the word without

19  permission that forecloses somebody from providing a

20  permission that has essentially a manner restriction on

21  it, and I think when you think about -- whatever might

22  be true of some other hypotheticals -- I mean, when you

23  think about here where the manner restriction is

24  critical to protecting the integrity of the computer

25  systems --

38

1    JUDGE GRABER:  Well, that's --

2    MR. CLEMENT:  -- it gets to the heart.

3    JUDGE GRABER:  Except that the -- that there

4  are -- there are ways to get to that, which would be,

5  you know, contractual, or contracts, or torts, or

6  whatever, but remember, this is basically a criminal

7  statute that carries with it civil liabilities,

8  so how --

9    MR. CLEMENT:  Sure, and with respect, that's why

10  the jury was instructed in this particular case.

11  Essentially, they -- they were told to find -- not find

12  liability unless they found subjective understanding

13  that what Rimini Street was doing was forbidden by the

14  terms of use.

15    And so the jury -- and this is one way in

16  which this is, I think, critically different from the

17  issue with respect to the copyright, because I find,

18  given all the conduct in this case, the most puzzling

19  aspect of this case is the innocent infringement

20  finding.  But I think it makes a little more sense when

21  you understand, and you can look at their closing

22  arguments and see this, their principle argument below

23  for why the infringement was innocent is because they

24  didn't have contemporaneous access to the license

25  terms, because the license terms were confidential.

```
 1          And so the argument that they made, which I
 2   think the jury accepted, was, look, we couldn't have
 3   knowingly violated the terms of the licenses, because
 4   we didn't have contemporaneous access to them.  It's a
 5   completely different situation when it comes to the
 6   terms of use.  There, they have -- there's all sorts of
 7   contemporaneous evidence, and a cease and desist letter
 8   to boot, that shows that they knew that they couldn't
 9   take them essentially wholesale and -- because if you
10   take it wholesale, I mean, obviously two things are
11   going on.
12          The reason they're doing this is because
13   they have some customer who's moving from Oracle to
14   Rimini, and as a practical matter, they have like
15   six -- six days left on their contract that gives them
16   access to this site, and they don't have enough time to
17   load them down one by one, so they just rip everything
18   off the site, with the prospect of our -- my client's
19   servers essentially getting shut down.  That's why it's
20   in there in the terms of use, and I don't see
21   anything --
22          JUDGE GRABER:  Well, that's particularly --
23          MR. CLEMENT:  To answer your question, I don't
24   see anything in -- without permission that says --
25          JUDGE GRABER:  Well, without permission what?
```

**Oral Argument**
**July 13, 2017**

1   Without permission takes information, and that's not

2   what happened here.  They had permission to take the

3   information, but only in a certain way.

4       MR. CLEMENT:  They did not have the -- they did

5   not have permission to take data in the way that they

6   took data.

7       JUDGE GRABER:  I understand your argument, and

8   you've exceeded your time.

9       JUDGE FRIEDLAND:  Can I ask one more question?

10      JUDGE GRABER:  Yes.

11      JUDGE FOGEL:  And I have one question too as

12  well.

13      JUDGE FRIEDLAND:  Yeah.

14      JUDGE FOGEL:  But please go ahead.

15      JUDGE FRIEDLAND:  So if we were to agree with you

16  on the liability determinations of the damages, can you

17  speak to why the injunction is necessary?  It seems

18  like they've brought a whole lawsuit to try to figure

19  out if they're complying with the liability

20  determinations, so I don't really understand why there

21  also needs to be an injunction, when it seems like

22  they're trying to comply.

23      MR. CLEMENT:  Well, I think there needs to be an

24  injunction principally because of the history of this

25  lawsuit and the history of Oracle's ability to rely on

41

**Oral Argument
July 13, 2017**

1   representation that Rimini Street makes to Oracle or to

2   courts.   I mean, if you understand that this is a

3   company that said that they had no software library,

4   they didn't have one at all, then when it came out that

5   they had one, and they said, well, you know, okay, it

6   was there, but, you know, they denied that they

7   destroyed it.   They destroyed it.

8        JUDGE FRIEDLAND:  So say --

9        MR. CLEMENT:   Then you get to the --

10       JUDGE FRIEDLAND:  So say they violate again in

11  your view, they -- they do something that you think is

12  another copyright violation.   Is there a practical

13  difference at that point between going to the court and

14  saying, look, we have this judgment that said they

15  can't do this, and now they're doing it again, versus

16  we have this injunction that also says they can't do

17  it, and now they're doing it again?

18       MR. CLEMENT:   Sure, and I mean one practical

19  difference is the ability to hold them in contempt, and

20  the ability to hold somebody who is repeatedly engaged

21  in contumacious conduct in contempt, I think, is no

22  small thing, and I think ultimately, the question is is

23  it an abuse of discretion?  And I think Judge Hicks was

24  very well positioned to understand that this was no

25  ordinary infringer, and this is somebody who I would

1  say, in my humble opinion, richly deserves to be

2  subject to an ongoing injunction enforced by the

3  contempt power of a court.

4      JUDGE FOGEL:  Just a related question.  The

5  statutory injunction -- two injunctions.  So the

6  statutory injunction is the only way you get Mr. Ravin

7  personally, but -- but under the copyright injunction,

8  he's bound by -- by the terms of the injunction.  Given

9  the innocent infringement finding -- I think you may

10  have addressed this question in part already, but given

11  the innocent infringement finding, did -- did

12  Judge Hicks apply the proper equities in issuing the

13  statutory injunction?

14      MR. CLEMENT:  In -- yes, but I think with respect

15  to the statutory injunction, it's -- and I think I did

16  sort of get to this, as to the -- as to the state law

17  claims, there's a finding of willful misconduct.

18      JUDGE FOGEL:  On the terms of use?

19      MR. CLEMENT:  Yes.

20      JUDGE FOGEL:  Yeah, not -- not copyright, but

21  terms of use.

22      MR. CLEMENT:  Right, and I thought that's what

23  you were asking me.

24      JUDGE FOGEL:  Yeah.

25      MR. CLEMENT:  And so the statutory claims, I

43

1  mean, you know, again, I think there, the issue's

2  pretty straightforward, because you have a willful

3  finding, and I think the statutory injunction, which is

4  the only injunction that's directed to him personally,

5  is amply justified, especially because he was also

6  find -- found personally liable.

7      JUDGE FOGEL:  In terms of protection that your

8  client gets, does the statutory injunction add anything

9  other than naming Mr. Ravin personally?

10     MR. CLEMENT:  It -- it does, because I think

11 the -- the conduct that is enjoined by the statutory

12 injunction is different from the conduct that's

13 enjoined by the copyright injunction, and it's

14 oversimplifying matters, but it roughly corresponds to

15 sort of the access to the website issues, which are

16 principally covered by the statutory injunction, and

17 the sort of avoiding unauthorized copying, which is

18 principally covered by the copyright issue.

19     JUDGE FOGEL:  Thank you.

20     JUDGE GRABER:  Thank you, Counsel.  We'll hear

21 from Mr. Perry.

22     MR. PERRY:  Four quick points, if I may.  On the

23 injunction, what Oracle really likes -- and they say

24 lots of nasty things about my clients, by the way.  The

25 jury rejected all of that, all the tort claims, all the

44

1  punitive damages, all the willfulness.  They found us

2  innocent, and they found us innocent because our

3  reading of the license was reasonable and correct.  But

4  in the injunction, what Oracle really likes is

5  Paragraph 2-A, which says that every one of our

6  customers has to affirm in writing that Rimini's

7  specific conduct is authorized by the licenses.

8          So they want to hold the sort of contempt

9  over their own customers and our customers, and they

10  want to drive them back from Rimini into the Oracle

11  fold, by requiring them to affirm, in writing, what

12  these contracts mean, which we're here in the Ninth

13  Circuit arguing what they mean, and that is not

14  something for the customers.  And that's not in the

15  Copyright Act, that's not in the licenses.  This is

16  just in terrorem, and this injunction is totally

17  unnecessary.

18          Judge Friedland, in answer to your question,

19  Mr. Clement said, in so many words, although it took a

20  long sentence, that developing and testing environments

21  may be authorized.  May be authorized.  We'll take

22  that.  That means a new trial, at minimum, and we think

23  it means judgment, but it means a new trial, because

24  again, at ER102, ER71, ER547, and ER548, Judge Hicks

25  ruled that testing and development --

1       JUDGE GRABER:  What is your response to his

2   argument that at the time of summary judgment and at

3   the time of the crafting of the jury instructions, this

4   was not the specific argument that was made?

5       MR. PERRY:  Your Honor, it was -- it was exactly

6   the argument made for PeopleSoft and Database, and

7   that's specifically addressed at Page 102 and 71.  At

8   summary judgement --

9       JUDGE FRIEDLAND:  Sorry, could you say the page

10  again?

11      MR. PERRY:  I'm sorry, ER100 to 102 for the

12  PeopleSoft argument, Page ER71 for the Database

13  customer license.  For the Siebel and J.D. Edwards

14  arguments, Mr. Clement is correct, in the sense that

15  the summary judgment argument turned on the factual

16  record as to archival use; however the later -- the

17  other provisions that I've talked about were very much

18  injected later in the case.

19          I'll point the court, among other places, to

20  ER142 to 162, which is our detailed objection of the

21  injunctions, which pulled together in one place all of

22  the license constructions.  The injunction, of course,

23  carries through the license constructions from summary

24  judgement to the instructions to judgement.

25          As to the jury instructions themselves,

1   Judge Graber, we objected, and Docket Number 620 is our

2   redacted version of our objection to application of the

3   summary judgment standards.  In the jury instructions,

4   we had also moved, of course, Rule 50(a), on the ground

5   that the --

6       JUDGE GRABER:  Specifically, did you -- did you

7   quarrel with the inclusion of the material about making

8   the --

9       MR. PERRY:  We -- we objected to the --

10      JUDGE GRABER:  -- extra copy for --

11      MR. PERRY:  We objected to the application of the

12  summary judgment standards in total, which is the same

13  as our Rule 50(a) motion, which is --

14      JUDGE GRABER:  That's not my question.  I'm not

15  being clear.  Your objection earlier, when you were

16  talking about the jury instructions, had to do with the

17  part that said the provision does not mean that a third

18  party, just paraphrasing here, has the authorization to

19  access the source code to carry out development and

20  testing.

21      MR. PERRY:  Yes.

22      JUDGE GRABER:  Did you object to that specific

23  sentence in the jury instructions?

24      MR. PERRY:  Not in so many words, Your Honor.

25      JUDGE GRABER:  Okay.

47

1    MR. PERRY:  We objected to the application of the

2  summary judgment constructions in the -- to instructing

3  the jury on the summary judgment constructions, because

4  we maintained our -- our ongoing objection.

5    JUDGE FOGEL:  But -- but following up, the -- you

6  pointed out the potential -- and I'm sorry I keep

7  saying this, the syntactical problem in the way they

8  leads -- the language and some of the instructions

9  track.  Was there ever any objection to that?  Was the

10  trial court ever given an opportunity to address that?

11    MR. PERRY:  Yes, yes, Your Honor.  That -- there

12  is a -- thank you.  There is a separate document, which

13  is -- if my old eyes can read this thing, which they

14  probably can't.  My colleague will tell me the

15  citation.  We -- Rimini Street submitted an alternative

16  set of instructions that rewrote that one included to

17  have a different grammatical structure.  It still

18  incorporated the summary judgment language, because we

19  had lost the objection at Rule 52, carrying forward

20  summary judgment language, but the syntactical, I

21  believe, was corrected there.  In general, the court

22  adopted Oracle's instructions, Docket Number 869, Your

23  Honor, at 32 to 36, I'm told.

24        The last thing I'd like to offer, and

25  I'll -- and I'll sit down, is no client ever got any

48

1  software for which it wasn't licensed.  We had a whole

2  trial.  Oracle could have showed that.  Mr. Clement

3  didn't give you any evidence.  They have theories, but

4  they have no evidence.

5          Every single one of Rimini's clients is an

6  Oracle customer that has paid millions and millions of

7  dollars for this software.  The only dispute here is

8  whether they need to be physically siloed and on which

9  server they reside.  If you've got an authorized copy

10 of a book, it's like saying you have to read it in your

11 library and not in your den, or you have to read it in

12 your house, but not at your office, or you have to look

13 at it in this order and not in that order.  Again,

14 those are restrictions.

15     JUDGE GRABER:  Well, why isn't it -- why isn't it

16 more like saying, you know, you have -- you have the

17 authority to have the book, but I'm withholding

18 authority for you to have the movie?  Why isn't it more

19 like that?

20     MR. PERRY:  Well, that specific point, Your

21 Honor, they have authorized the creation of modified

22 works in each of these agreements, so -- so they've

23 already granted that right, but the -- the use -- the

24 location restrictions are not something the Copyright

25 Act is concerned with, how -- where a work is stored,

1  because the -- the fixation of the work is not

2  protected.  It is the work itself; okay?

3       The code is the code.  Wherever it resides,

4  that's what the copyright is in, and as long as the

5  code that the user has a license to the code, then

6  which copy it is -- and, by the way, Judge Hicks

7  actually understood this point and got it in rejecting

8  Oracle's argument regarding the installation media,

9  which is earlier in the first summary judgment order

10  when -- when Oracle said you had to use the specific

11  physical disc to feed them in the computer, and he said

12  no.  Judge Hicks said no, the code is the code, and the

13  copyright resides in the code.

14       And so the important thing for our purposes

15  is every single service, every single practice, every

16  update, fix, modification was provided for a customer

17  with a license.  There is no unlicensed --

18       JUDGE FRIEDLAND:  But he's saying that there was

19  this huge downloading of an entire library.  Are you

20  saying every bit of that library was used for someone,

21  or was there this extra file storage in case you needed

22  it?

23       MR. PERRY:  There may well have been extras, Your

24  Honor, because these are gigantic programs.  And if I

25  can just give you an example, you know, the PeopleSoft

 1   tax program is going to have all 50 states.  If I've
 2   got a customer, who is a deli in California, they may
 3   only need the California tax regime, but if they get
 4   the whole PeopleSoft package, it's going to have
 5   thousands and thousands of files, as Mr. Clement says,
 6   and it's going to include Michigan, and Wisconsin, and
 7   California, and New York, and Illinois, and they might
 8   not need these other 49 states, but next year, when
 9   they expand into Nevada, or the year after that, when
10   they expand into Arizona, they will need those.  And
11   they paid for those, and they're entitled to those, and
12   then they can use those, or if they have an employee
13   that moves out of state, and under ERISA or something,
14   they have an obligation to keep up the tax reporting,
15   so there -- yes, there may be unused data --
16       JUDGE FRIEDLAND:  But had Rimini downloaded all
17   these things, like in anticipation for hoping to some
18   day get a client in Michigan?
19       MR. PERRY:  No, Your Honor, I -- and, again, it's
20   another mischaracterization.  Here's a simple way to
21   understand it:  The deli in California, its -- its --
22   its annual contract with Oracle is going to expire on
23   December 31st.  That client's entitled to a whole bunch
24   of things, for example, the Michigan tax data that it
25   hasn't yet downloaded, because it's only in California,

**Atkinson-Baker Court Reporters**
www.depo.com

1  but it looks forward and says we may be going to

2  Michigan.  So it goes to Rimini Street and says

3  download that for me and hold if for me so that if I go

4  to Michigan, I can have it.  That's what is -- is

5  happening here, and that's what the clients are

6  entitled to.  That's what they paid for.

7         Every bit of data was bought and paid for.

8  Every bit, byte was bought and paid for.  It was taken

9  down.  It was held by Rimini Street for use by Oracle's

10  customers.  Remember, our clients are Oracle's

11  customers, and every bit of use here was authorized by

12  these licenses.  This whole case needs to be resolved

13  in that manner.

14     JUDGE GRABER:  Thank you, Counsel.  The case just

15  argued is submitted, and we appreciate very much the

16  stimulating and interesting arguments from both

17  counsel.

18                 (End of recording.)

19

20

21

22

23

24

25

52

**Oral Argument**
**July 13, 2017**

**Atkinson-Baker Court Reporters**
**www.depo.com**

```
1                    TRANSCRIBER'S CERTIFICATE

2

3        I, RENAE E. LOPEZ, attest that the foregoing

4   proceedings provided to me via audio were transcribed

5   by me to the best of my ability.

6        I further attest that I am not a relative or

7   employee to any attorney or party, nor financially

8   interested in this action.

9        I declare under penalty of perjury under the laws

10  of the State of California that the foregoing is true

11  and correct.

12       Dated this _____ day of _____, 2017.

13

14

15       _____

16                  Renae E. Lopez

17

18

19

20

21

22

23

24

25
```

**Oral Argument**
**July 13, 2017**

2

Nevada statute lists multiple means of violation, *i.e.*, possessing, procuring, or manufacturing, because the jurors need not agree on the means of violation, the statute "must still be regarded as indivisible," and our inquiry is again at an end. *Id.*; *see also Lopez–Valencia*, 798 F.3d at 868. Because N.R.S. § 454.351 is overbroad and indivisible, it cannot be used as a predicate offense to support removal. *See Alvarado*, 759 F.3d at 1126.

## IV.  CONCLUSION

Villavicencio was not removable under 8 USC § 1227(a)(2)(B)(i). N.R.S. §§ 199.480 and 454.351 are both overbroad. N.R.S. § 199.480 criminalizes a broader range of conduct than is described in the generic definition of conspiracy, and N.R.S. § 454.351 encompasses a wider range of substances than those set forth in the federal Controlled Substances Act. Because neither statute is divisible, the modified categorical approach was unavailable to determine if Villavicencio was convicted of a removable offense. As a result, Villavicencio is entitled to his requested relief reversing the determination of removability.[5]

**PETITION GRANTED.**



5.  Our reversal of the removability determination terminates the removal proceedings. We

---

**ORACLE USA, INC., a Colorado corporation; Oracle America, Inc., a Delaware corporation; Oracle International Corporation, a California corporation, Plaintiffs-Appellees,**

v.

**RIMINI STREET, INC., a Nevada corporation; Seth Ravin, an individual, Defendants-Appellants.**

Nos. 16-16832
16-16905

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted July 13, 2017
San Francisco, California

Filed January 8, 2018

**Background:** Software developer that held copyright in computer programs filed suit against provider of software support services, and its chief executive officer (CEO), alleging, among other things, copyright infringement and violations of Computer Fraud and Abuse Act (CFAA), California Computer Data Access and Fraud Act (CDAFA), and Nevada Computer Crimes Law (NCCL). Following partial summary judgment and jury verdict in favor of developer, the United States District Court for the District of Nevada, No. 2:10-cv-00106-LRH-VCF, Larry R. Hicks, J., 209 F.Supp.3d 1200, granted developer's motion for permanent injunction, prejudgment interest, and attorney fees. Provider appealed.

**Holdings:** The Court of Appeals, Jeremy D. Fogel, District Judge, sitting by designation, held that:

(1) provider infringed developer's copyright by copying its programs to create development environments for future

need not and do not address cancellation of removal.

customers under color of licenses of its existing customers;

(2) copyright misuse doctrine did not bar developer from granting licenses that limited provider to copying its programs only to support use of programs by its existing customers that held license;

(3) provider infringed developer's copyright by maintaining copies of developer's program on its own computers, as opposed to licensees' computers;

(4) copyright misuse doctrine did not bar developer from granting licenses that restricted provider to maintaining copies of its programs on its own computers;

(5) provider did not violate CDAFA and NCCL by taking developer's data by method prohibited by applicable terms of use;

(6) District Court was within its discretion in calculating award of prejudgment interest; but

(7) remand was required for District Court to apply four-factor test for granting permanent injunctions.

Affirmed in part, reversed in part, and vacated and remanded in part.

## 1. Federal Courts ⬄3605

The Court of Appeals reviews de novo the district court's denial of a motion for judgment as a matter of law.

## 2. Federal Civil Procedure ⬄2608.1, 2609

A renewed motion for judgment as a matter of law is properly granted only if the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict.

## 3. Federal Courts ⬄3602

A jury's verdict must be upheld if it is supported by substantial evidence, which is evidence adequate to support the jury's conclusion, even if it is also possible to draw a contrary conclusion.

## 4. Copyrights and Intellectual Property ⬄75

The existence of a license creates an affirmative defense to a claim of copyright infringement. 17 U.S.C.A. § 501(a).

## 5. Copyrights and Intellectual Property ⬄53(1)

When a licensee exceeds the scope of the license granted by the copyright holder, the licensee is liable for infringement. 17 U.S.C.A. § 501(a).

## 6. Copyrights and Intellectual Property ⬄88

Jury instruction that it was permissible for provider of software support services to make copies of software developer's copyrighted computer programs, as third-party to its customers' licenses, did not construe permissible direct use out of licenses, where instruction specifically told jury that provider could hold copies of developer's programs solely for its customers' archive or emergency back-up purposes or disaster recovery and related testing.

## 7. Federal Courts ⬄3733

On appeal, arguments not raised by a party in its opening brief are deemed waived.

## 8. Copyrights and Intellectual Property ⬄48

Licenses permitting licensees to copy software developer's copyrighted computer programs for archival and support purposes, and to outsource archival and support work to third parties, did not authorize provider of software support services to

copy developer's program to create development environments for future customers using licenses of its existing customers, where each license limited copying and use to supporting particular licensee, and any work that provider performed under color of license held by its existing customer for other customers was not work in support of that particular licensee.

### 9. Copyrights and Intellectual Property ⟨⟩75

The copyright misuse doctrine prevents holders of copyrights from leveraging their limited monopoly to allow them control of areas outside the monopoly.

### 10. Copyrights and Intellectual Property ⟨⟩75

While it does prevent copyright holders from using the conditions to stifle competition, the copyright misuse doctrine does not prohibit using conditions to control use of copyrighted material.

### 11. Copyrights and Intellectual Property ⟨⟩75

The copyright misuse doctrine is to be applied sparingly; specifically, it operates when copyright holders attempt to impose license agreements that would prevent licensees from using any other competing product.

### 12. Copyrights and Intellectual Property ⟨⟩75

Copyright misuse doctrine did not bar software developer from granting licenses that limited third-party provider of software support services to copying its copyrighted computer programs only to support use of programs by its existing customers that held license; licenses did not preclude third parties from developing competing software or providing competing support services.

### 13. Federal Courts ⟨⟩3604(4), 3675

The Court of Appeals reviews a district court's grant of summary judgment de novo, and, in doing so, the Court must determine whether, viewing the evidence in the light most favorable to the nonmoving party, there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law.

### 14. Copyrights and Intellectual Property ⟨⟩67.3

Licenses expressly limiting copying software developer's copyrighted computer programs to only licensee's facilities did not authorize provider of software support services to create development environments on its own computers, as opposed to licensees' computers, where provider's servers where copying took place were outside control of its licensed customers.

### 15. Copyrights and Intellectual Property ⟨⟩75

Copyright misuse doctrine did not bar software developer from granting licenses that restricted third-party provider of software support services to maintaining copies of its copyrighted computer programs on its own computers, as opposed to its licensed customers' computers; restriction on location of copies did not stifle competition.

### 16. Telecommunications ⟨⟩1342

Provider of software support services did not violate the California Computer Data Access and Fraud Act (CDAFA) or Nevada Computer Crimes Law (NCCL) by taking and using software developer's data, even though provider used automated tools to take data in direct contravention of developer's terms of use, where provider was authorized in the first instance to take and use information that it downloaded.   Cal. Penal Code § 502(c); Nev. Rev. Stat. § 205.4765 (1), (3).

**17. Telecommunications ⇐1342**

Taking data using a method prohibited by the applicable terms of use, when the taking itself generally is permitted, does not violate the California Computer Data Access and Fraud Act (CDAFA) or the Nevada Computer Crimes Law (NCCL). Cal. Penal Code § 502(c); Nev. Rev. Stat. § 205.4765(1), (3).

**18. Federal Courts ⇐3618**

The Court of Appeals reviews a district court's decision to award prejudgment interest for abuse of discretion.

**19. Federal Courts ⇐3618**

The Court of Appeals reviews the rate used by the district court to calculate prejudgment interest for abuse of discretion.

**20. Interest ⇐31**

District Court was within its discretion in calculating award of prejudgment interest based upon Treasury rate on date copyright infringement began, rather than on date of judgment in favor of software developer, where the Court did not use higher rate in effect on date of infringement based solely on litigation conduct on part of provider of software support services, but, rather, it used higher rate based primarily on jury's award of copyright damages based on hypothetical license, making it appropriate to approximate licensing fees that developer lost out on and would have received, absent infringement. 28 U.S.C.A. § 1961.

**21. Interest ⇐39(2.6)**

Prejudgment interest is an element of compensation, not a penalty. 28 U.S.C.A. § 1961.

**22. Federal Courts ⇐3616(1)**

As to a permanent injunction, the Court of Appeals reviews the district court's legal conclusions de novo, its factual findings for clear error, and its decision to grant a permanent injunction, as well as its scope, for an abuse of discretion.

**23. Federal Courts ⇐3616(1)**

To review a grant of permanent injunction for abuse of discretion, the Court of Appeals first looks to whether the trial court identified and applied the correct legal rule, then to whether the trial court's resolution of the motion resulted from a factual finding that was illogical, implausible, or without support in inferences that may be drawn from the facts in the record.

**24. Federal Courts ⇐3783**

Remand was required for District Court to apply four-factor test for granting permanent injunction, in software developer's action against provider of software support services, alleging copyright infringement and violations of state computer laws, where District Court had assessed factors by reference to both copyright infringement and state computer law claims, without considering separately propriety of issuing injunction as to copyright claims alone, and Court of Appeals reversed judgment as to state computer law claims.

**25. Federal Courts ⇐3617**

The Court of Appeals reviews the award of fees and costs for abuse of discretion, but will overturn it if it is based on an erroneous determination of law.

**26. Courts ⇐90(1)**

The Court of Appeals is bound by its precedent unless the theory or reasoning of the decision is clearly irreconcilable with a higher intervening authority, such as a decision by the Supreme Court.

———

Appeals from the United States District Court for the District of Nevada, Larry R. Hicks, District Judge, Presiding, D.C. No. 2:10-cv-00106-LRH-VCF

Mark A. Perry (argued) and Jeremy M. Christiansen, Gibson Dunn & Crutcher LLP, Washington, D.C.; Blaine H. Evanson, Joseph A. Gorman, and Joseph C. Hansen, Gibson Dunn & Crutcher LLP, Los Angeles, California; for Defendants-Appellants.

Paul D. Clement (argued), Erin E. Murphy, and Matthew D. Rowen, Kirkland & Ellis LLP, Washington, D.C.; William A. Isaacson and Karen L. Dunn, Boies Schiller & Flexner LLP, Washington, D.C.; Thomas S. Hixson and John A. Polito, Morgan Lewis & Bockius LLP, San Francisco, California; David B. Salmons, Morgan Lewis & Bockius LLP, Washington, D.C.; for Plaintiffs-Appellees.

Jamie Williams and Aileen Nguyen, San Francisco, California, as and for Amicus Curiae Electronic Frontier Foundation.

Before: Susan P. Graber and Michelle T. Friedland, Circuit Judges, and Jeremy D. Fogel,* District Judge.

## OPINION

FOGEL, District Judge:

Oracle USA, Inc. and related entities (collectively, "Oracle") licenses its proprietary enterprise software for a substantial one-time payment. Oracle also sells its licensees maintenance contracts for the software that are renewed on an annual basis. The maintenance work includes software updates, which Oracle makes available to purchasers of the contracts through its support website.

At all relevant times, Rimini Street, Inc. ("Rimini") provided third-party support for Oracle's enterprise software, in lawful competition with Oracle's direct maintenance services. But in order to compete effectively, Rimini also needed to provide software updates to its customers.[1] Creating these software updates inherently required copying Oracle's copyrighted software, which, unless allowed by license, would be copyright infringement. With Oracle's knowledge, Rimini in fact did copy the software to provide the updates. At least from late 2006 to early 2007, Rimini obtained software from Oracle's website with automated downloading tools in direct contravention of the terms of use of the website.

Oracle filed suit against Rimini and Rimini's CEO, Seth Ravin ("Ravin"), in the District of Nevada in 2010. After lengthy and sometimes contentious discovery and motion practice, the district court granted partial summary judgment to Oracle on certain aspects of Oracle's copyright infringement claim, and a jury found in favor of Oracle on others after trial. The jury also found against both Rimini and Ravin with respect to Oracle's claims under the California Comprehensive Data Access and Fraud Act ("CDAFA") and the Nevada Computer Crimes Law ("NCCL") (collectively, the "state computer laws"). Based on the jury's determination with respect to the CDAFA claim, the district court entered judgment against Rimini and Ravin under California's Unfair Competition Law ("UCL"). The jury awarded damages in the sum of $50,027,000 which, when prejudgment interest, attorneys' fees and costs were added, resulted in a total monetary judgment of $124,291,396.82. The district court also issued an extensive perma-

---

* The Honorable Jeremy D. Fogel, United States District Judge for the Northern District of California, sitting by designation.

1.  All of Rimini's customers pertinent to this dispute were licensees of Oracle's software, but not all licensees of Oracle's software are

Rimini's customers. To avoid confusion, we will use the word "customers" to refer to the subset of Oracle's licensees who did contract or might contract with Rimini for the maintenance of Oracle's software.

nent injunction. Rimini subsequently filed this timely appeal. The Electronic Frontier Foundation ("EFF") has filed an amicus brief with respect to the state computer law claims.

The first principal dispute in this case is whether Rimini copied Oracle's software in a manner that infringed Oracle's copyright. It is undisputed that Rimini used Oracle's software to develop and test updates for its customers and that the software licenses, with certain restrictions, permitted Oracle's licensees to hire Rimini to perform such work for them. There are numerous subtleties involved but, at the highest level of generality, Rimini's alleged copyright infringement included copying under the license of one customer for work for other existing customers or for unknown or future customers, rather than restricting such copying to work for that particular customer. The second principal dispute is whether Rimini and Ravin violated applicable state laws intended to prevent computer-based fraud by flouting Oracle's restrictions against the use of automated tools to download software from its website. We also consider the appropriateness of the remedies awarded by the district court.

As explained below, we affirm the judgment with respect to the copyright infringement claims. We also affirm the remedies with respect to those claims, except that we vacate the injunction and the award of attorneys' fees and remand for reconsideration in light of this opinion. We modify the district court's award of taxable costs as the parties have agreed. We reverse the judgment with respect to Oracle's claims under the state computer laws and the UCL.

I.   Copyright Infringement Claims

A.   The Software in Suit [2]

Four software products are at issue: J.D. Edwards, Siebel, PeopleSoft, and Database. The products are related, but they do not perform identical functions. As the district court explained:

> Oracle's Enterprise Software platforms have both an installed database component and an installed application component. The database component provides a foundation for the application software which then uses, stores, and retrieves data in the database for use across an entire organization. Oracle's Enterprise Software application programs—including its PeopleSoft, J.D. Edwards, and Siebel-branded products—are run on Oracle's Relational Database Management Software ("Oracle Database") as the database component for the programs.

*Oracle USA, Inc. v. Rimini St., Inc.*, 6 F.Supp.3d 1108, 1113 (D. Nev. 2014) ("*Oracle II*"). J.D. Edwards, Siebel, and PeopleSoft were acquired by Oracle from other companies, while Oracle developed Database internally.

Because of this history and because of the technical differences among them, the licensing terms of the four products are not identical. We first address J.D. Edwards and Siebel. We next turn to PeopleSoft and, finally, to Database.

B.   J.D. Edwards and Siebel

[1–3] Oracle's claims as to the J.D. Edwards and Siebel software were submitted to the jury. Rimini appeals the district court's denial of its motion for judgment as a matter of law following the jury's verdict.

---

2. The district court specifically distinguished between Oracle's copyright in software and Oracle's copyright in the software documenta-

tion. Rimini does not appeal the jury's determination that Rimini infringed the documentation copyright.

"We review de novo the district court's denial of a motion for judgment as a matter of law. A renewed motion for judgment as a matter of law is properly granted only 'if the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict.'" *Castro v. Cty. of Los Angeles*, 833 F.3d 1060, 1066 (9th Cir. 2016) (en banc) (citations omitted) (quoting *Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir. 2002)) (internal quotation mark omitted), *cert. denied*, — U.S. —, 137 S.Ct. 831, 197 L.Ed.2d 69 (2017). "A jury's verdict must be upheld if it is supported by substantial evidence, which is evidence adequate to support the jury's conclusion, even if it is also possible to draw a contrary conclusion." *Id.* (quoting *Pavao*, 307 F.3d at 918) (internal quotation marks omitted).

Rimini challenges the jury's finding of copyright infringement with respect to these products on two grounds. First, it argues that its activities were permissible under the terms of the licenses Oracle granted to its customers. Second, it contends that holding it accountable for its alleged conduct would condone copyright misuse. Neither of these arguments is persuasive.

### 1. Express License Defense

As will be explained in further detail, there is no dispute that, absent an applicable license, Rimini's accused acts violated the exclusive right Oracle enjoys as owner of the software copyright to copy or to modify the software. Rimini asserts as an affirmative defense that its accused acts were expressly licensed.

**[4, 5]** The Supreme Court has explained the express license defense as follows:

"Anyone who violates any of the exclusive rights of the copyright owner," that is, anyone who trespasses into his exclusive domain by using or authorizing the use of the copyrighted work in one of the five ways set forth in the statute, "is an infringer of the copyright." Conversely, anyone who is authorized by the copyright owner to use the copyrighted work in a way specified in the statute … is not an infringer of the copyright with respect to such use."

*Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 433, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984) (quoting 17 U.S.C. § 501(a)). Thus, "[t]he existence of a license creates an affirmative defense to a claim of copyright infringement." *Worldwide Church of God v. Phila. Church of God, Inc.*, 227 F.3d 1110, 1114 (9th Cir. 2000). However, "[w]hen a licensee exceeds the scope of the license granted by the copyright holder, the licensee is liable for infringement." *LGS Architects, Inc. v. Concordia Homes of Nev.*, 434 F.3d 1150, 1156 (9th Cir. 2006).

As Rimini itself did not have a license to copy or to modify from Oracle, the success of Rimini's affirmative defense turns on whether Rimini's accused acts came within the scope of licenses held by its customers.

### a) Software Licenses

The pertinent provisions of the J.D. Edwards and Siebel licenses are excerpted below:

| Software | License Language |
|---|---|
| J.D. Edwards | "Customer shall not, or cause anyone else to ... (iii) copy the Documentation or Software except to the extent necessary for Customer's archival needs and to support the Users." |
| Siebel | "Customer" may "reproduce, exactly as provided by [Oracle], a reasonable number of copies of the Programs and the Ancillary Programs solely for archive or emergency back-up purposes or disaster recovery and related testing." |

Like the language of the licenses themselves, the district court's constructions of the two licenses when instructing the jury were similar.

The district court told the jury that it was permissible for Rimini, as a third-party, to make copies of the Oracle software to support its customers by archiving, backup, and related testing. At the same time, the district court instructed that the licenses "do[ ] not mean that a third party like Rimini Street is authorized to make copies of the ... software application ... to use the customer's software ... to support other customers."

#### b) Accused Acts

##### (1) Background

Work produced by humans is rarely if ever perfect, and computer software is no exception. Even casual users of computers are familiar with regular software patches and updates intended to correct glitches and to modify software in light of changing circumstances.

However, unlike the off-the-shelf consumer software used by individuals in everyday life, enterprise software employed by large organizations is customized around the organizations' specific needs. While producers of consumer software generally design updates around standard use cases and make them available for end users to download and install directly, updates to enterprise software must be tested and modified to fit with bespoke customizations before being put to actual use.

This testing process requires the creation of "development environments." A "development environment," sometimes called a "sandbox," is distinct from a "production environment," which is the "live" version of the software that members of the enterprise ultimately deploy. As the district court explained:

In order to develop and test software updates for Enterprise Software, support service providers ... create development environments of the software. A development environment is a software environment that contains a copy of the software program which is then modified to develop and test software updates. Given the critical nature of Enterprise Software programs, updates to the software must be fully tested and verified in a development environment before they are provided to a customer.

*Oracle USA, Inc. v. Rimini St., Inc.,* 6 F.Supp.3d 1086, 1092 n.4 (D. Nev. 2014) ("*Oracle I*").

In other words, the very work of maintaining customized software requires copying the software, which without a license to do so is a violation of the exclusive right of the copyright owner. Here, it is undisputed that the licenses generally permit Oracle's licensees to maintain the software and make development environments for themselves. However, some licensees of the software, lacking either the capability or the interest, opt to outsource the work of maintenance to others, such as Rimini or even Oracle itself.

### (2) "Direct Use" and "Cross Use"

Oracle alleges that Rimini engaged in two distinct types of copyright infringement with respect to J.D. Edwards and Siebel. The first has to do with the way it created development environments, under color of a license held by these particular, identifiable customers of Rimini, for that specific customer. We refer to this as "direct use."

The second is "cross use." [3] "Cross use," generally speaking, is the creation of development environments, under color of a license of one customer, to support *other* customers. There are numerous forms of "cross use." In its narrowest form, "cross use" is the making of development environments, under color of a license held by one identifiable customer of Rimini, for another identifiable customer of Rimini that also holds a license. It also may include the creation of development environments under a given license for other customers of Rimini that may themselves hold licenses or even for licensees who have yet to become customers of Rimini. Rimini claims that "cross use" is not infringement, arguing that it may create environments

without restriction because any organization that might hire Rimini to service its software would itself have a license to create development environments. Rimini's counsel explained at oral argument that "cross use" enabled it to reduce expense by reusing work it had done for one customer in providing service to others.

### c) Analysis

Rimini argues on appeal that the jury instructions were erroneous because they suggested that certain direct uses and cross uses were prohibited while Rimini believes they were permitted.

[6] With respect to "direct use," we may dispose quickly of Rimini's claim that the district court construed "direct use" out of the licenses. Rimini successfully persuaded the district court to include the language, "to support the customer's use," in its jury instruction about the J.D. Edwards license. The instruction concerning Siebel told the jury specifically that Rimini could hold copies of the Siebel software application "solely for customer's archive or emergency back-up purposes or disaster recovery and related testing." Rimini did not object to that instruction at trial, and, contrary to Rimini's arguments on appeal, those instructions treated these forms of direct use as permitted.

Rimini also argues, however, that the instructions should have approved expressly of other forms of direct use. The district court had no reason or need to instruct the jury that the licenses permitted other types of direct use, because, as the district court's order shows, Rimini had represented that the only forms of direct use it engaged in were those allowed by the instruction:

> with one fix and then apply it to other customers that had the exact same rights. That's the cross-use, the reusing of updates that you've heard about in this case."

---

3. Rimini offered this description of its "cross use" in its closing statement to the jury: "If we have multiple clients with the exact same release, the same rights, we would come up

Rimini has proffered evidence that the development environments associated with [specific Siebel licensee] are used exclusively for archival and back-up purposes, and related testing, as directly contemplated by [the license].

*Oracle I*, 6 F.Supp.3d at 1105 n.20; *see also id.* at 1103 (similar findings concerning J.D. Edwards). Had Rimini wanted a broader construction, Rimini should have said so in district court. Having failed to do that, Rimini cannot complain that the jury found that Rimini's direct use with respect to J.D. Edwards and Siebel exceeded the scope of the licenses.

[7]  With respect to "cross use," Rimini's assertion—made for the first time in its reply brief to us—that "cross use" is a contractual rather than a copyright issue is not properly before us. The principal case on which Rimini relies, *MDY Industries, LLC v. Blizzard Entertainment, Inc.*, 629 F.3d 928 (9th Cir. 2011), was not cited in Rimini's opening brief, and "on appeal, arguments not raised by a party in its opening brief are deemed waived," *Smith v. Marsh*, 194 F.3d 1045, 1052 (9th Cir. 1999).[4]

[8]  As to the substance of its position, Rimini argues that, contrary to the jury instructions, the licenses in fact permit "cross use." It observes that: 1) each of Rimini's customers had its own license; 2) each license permits copies to be made for archival and support purposes; 3) the licenses authorize the customers to outsource the archival and support work to third parties; and 4) such archival and support work includes the creation of development environments. Rimini dismisses evidence showing that it created develop-

ment environments for future customers using the license of an existing customer on the basis that future customers presumably would have licenses that would permit them to hire Rimini to create development environments.

Oracle properly responds that each of the licenses at issue here "pointedly limits copying and use to supporting the '*Licensee*.'" The licenses do not authorize Rimini to "develop products *Rimini* could sell for *Rimini's* financial gain." Any work that Rimini performs under color of a license held by a customer for other existing customers cannot be considered work in support of that particular customer. The same logic applies to work Rimini performs for unknown, future customers. The licensees may hire a third party such as Rimini to maintain their software for them, but nothing in the licenses permits them to grant a non-party to the license a general right to copy proprietary software.

2.  Copyright Misuse

[9–11]  We turn next to the question of copyright misuse, which Rimini asserts as a defense. The copyright misuse doctrine prevents holders of copyrights "from leveraging their limited monopoly to allow them control of areas outside the monopoly." *Apple Inc. v. Psystar Corp.*, 658 F.3d 1150, 1157 (9th Cir. 2011). (quoting *A&M Records v. Napster, Inc.*, 239 F.3d 1004, 1026 (9th Cir. 2001)) (internal quotation marks omitted). To that end, while it "does prevent copyright holders from using the conditions to stifle competition," "[t]he copyright misuse doctrine does not prohibit using conditions to control use of copyrighted material." *Id.* at 1159. Accordingly,

---

4.  Even if we were to consider the applicability of *MDY Industries*, that case teaches specifically the distinction between "conditions," "the breach of which constitute copyright infringement," and "covenants," "the breach of

which is actionable only under contract law." 629 F.3d at 939. Rimini has offered no analysis as to which terms of the licenses at issue are "conditions" and which are "covenants."

the doctrine is to be "applied ... sparingly"; specifically, it operates when copyright holders attempt to impose license agreements that would "prevent[ ] ... licensee[s] from using *any other competing product.*" *Id.* at 1157 (emphasis added).

[12]   Rimini claims that holding it liable for copyright infringement would condone misuse of Oracle's copyright. In Rimini's view, the district court's pretrial construction of the licensing terms, as embodied in the jury instructions, "would foreclose competition in the aftermarket for third-party maintenance" because it would limit copies made by third parties to those made only for archival and emergency backup purposes and because the software could not be serviced simply by making exact copies. Oracle counters that the licenses "plainly do not preclude third parties from developing competing software or providing competing support services," but instead "require third parties to do so in ways that do not disregard Oracle's exclusive rights under copyright law."

We agree with Oracle. The district court did not construe the licenses to permit only archival and emergency backup purposes. For example, the jury instructions as to J.D. Edwards stated specifically:

> If you find that the copies of the J.D. Edwards software application ... housed on Rimini Street's servers were used solely for the customer's archival needs and *to support the customer's use,* then that use is authorized by the J.D. Edwards software license agreement....

The district court gave similar instructions as to Siebel. ("[Y]ou are informed that the court has ruled as a matter of law that the Siebel software license agreements authorized ... Rimini Street to make a reasonable number of copies ... solely for the customer's archive or emergency back-up

purposes or disaster recovery *and related testing.*" (emphasis added)). These constructions would not preclude Rimini from creating development environments for a licensee for various purposes *after* that licensee has become a customer of Rimini.

The only remaining question is whether it would be copyright misuse to forbid Rimini from creating development environments for licensees *before* they have become customers or, in other words, whether it would contravene the policy of the Copyright Act to allow Oracle, as a copyright holder, to have a head start in making copies. The Supreme Court has held that "the right of first publication" is "an important marketable subsidiary right." *Harper & Row, Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 549, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985). Just as a copyright holder has the "right of first publication," it also must enjoy the right of "first copy." Giving a head start to Oracle in creating development environments is entirely consistent with the Supreme Court's teaching in *Harper.*

## C.   PeopleSoft

[13]   The district court granted summary judgment on Oracle's copyright claim with respect to PeopleSoft. "This Court reviews a district court's grant of summary judgment de novo. The Court must 'determine whether, viewing the evidence in the light most favorable to the nonmoving party, there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law.'" *Mitchell v. Washington,* 818 F.3d 436, 441–42 (9th Cir. 2016) (quoting *Lopez v. Smith,* 203 F.3d 1122, 1131 (9th Cir. 2000) (en banc)).

Rimini again asserts an express license defense and contends that it would be

copyright misuse to hold it liable for infringement. Again, its arguments are without merit.

1. Express License Defense

The PeopleSoft license is similar to its J.D. Edwards and Siebel counterparts, but it contains an additional limitation about "[the licensee's] facilities":

| Software | License Language |
|---|---|
| PeopleSoft[5] | "Licensee may … make a reasonable number of copies of the Software, solely for: (i) use in accordance with the terms set forth herein …; (ii) archive or emergency back-up purposes; and/or (iii) disaster recovery testing purposes[.]" "PeopleSoft grants Licensee a … license to use the licensed Software, solely for Licensee's internal data processing operations at its facilities[.]" |

[**Editor's Note**: The preceding image contains the reference for footnote [5]].

[14]  Based on this limitation, the district court construed the PeopleSoft license more restrictively than the J.D. Edwards and Siebel licenses. Specifically, it stated that "[the PeopleSoft license] expressly limits copying the licensed software to only the [licensee's] facilities." *Oracle I*, 6 F.Supp.3d at 1097 (emphasis omitted).

Because of the difference in the construction of the pertinent licenses, the nature of Oracle's claim concerning PeopleSoft is somewhat different in character from those concerning J.D. Edwards and Siebel. Specifically, the accused act concerning PeopleSoft is the creation of development environments, whether for "direct use" or "cross use," on Rimini's own computers, as opposed to the licensees' computers. Rimini describes this practice as

"local hosting," a term that we adopt in this opinion. Rimini asserts that it does this to avoid transmission delays.

In the words of the district court, "it is undisputed that Rimini made copies of the licensed software at its own facilities and *outside the control* of the [customers]." *Id.* at 1101 (emphasis added). The district court concluded that the PeopleSoft licenses of Rimini's customers "do[ ] not authorize Rimini's off-site copies of the licensed software," and therefore granted summary judgment to Oracle on the copyright infringement claims as to PeopleSoft. *Id.* at 1097.

On appeal, Rimini contends that "[a licensee's] facilities" can span Rimini's own servers. In its words:

Sophisticated companies like Oracle's customers (and Rimini's clients) do not keep all their servers on the actual premises of their principal place of busi-

---

5.  Two different PeopleSoft licenses are at issue here, one belonging to the City of Flint and the other to the Pittsburgh Public Schools. The district court concluded that the two licenses have "similar" language. *Oracle*

*I*, 6 F.Supp.3d at 1100. On appeal, the parties make no distinction between the two licenses; the language discussed here is drawn from the license held by the City of Flint.

ness.... They may own some, lease others, and contract with third parties for still more capacity. All are encompassed within the plain meaning of "facilities."

We agree with Oracle that "facilities under the control of a third party" could not qualify as "the *licensee*'s facilities." It was not only sensible but also necessary for the district court to read a requirement of "control" into the definition of "[a licensee's] facilities." The record supports the district court's conclusion that the Rimini servers where the copying took place were "outside the control of the [customers]." *Id.* at 1101. Indeed, Rimini made no showing that its customers had even constructive control of the servers.[6]

### 2. Copyright Misuse

[15] As just explained, the district court concluded that Rimini infringed the PeopleSoft copyright by "local hosting," that is, by maintaining copies of People-Soft on its own computers as opposed to its customers' computers. *Oracle I*, 6 F.Supp.3d at 1097. Rimini offers no argument as to why a restriction on the location of copies would stifle competition and run afoul of the copyright misuse doctrine. *Id.* Rimini's inability to "local host" may result in inconvenience and expense on its part, but that restriction on its conduct does not amount to copyright misuse. Indeed, at oral argument, Rimini admitted that the restriction against "local hosting" was one it could overcome.

### D. Database

The district court also granted summary judgment for Oracle on the Database copyright infringement claim. It was undisputed that Rimini copied Oracle's copyright protected software when it built develop-

ment, or non-production, environments for a number of Rimini customers using Oracle Database.

Rimini's arguments on appeal with respect to Database are the same as those with respect to the other software at issue, except that here Rimini contends that its acts in fact were authorized by the Oracle License and Service Agreements ("OL-SAs"). Oracle properly points out that Rimini has waived this point because it has failed to challenge the district court's legal conclusion that Rimini was not entitled to assert the OLSAs as a defense. Accordingly, we affirm the district court's determination of copyright infringement as to Database.

## II.   State Computer Law Claims

### A.   The CDAFA and the NCCL

The CDAFA is California's computer abuse law. It states, in relevant part, that:

> any person who commits any of the following acts is guilty of a public offense:
>
> . . .
>
> (2) Knowingly accesses and without permission takes, copies, or makes use of any data from a computer, computer system, or computer network, or takes or copies any supporting documentation, whether existing or residing internal or external to a computer, computer system, or computer network.
>
> (3) Knowingly and without permission uses or causes to be used computer services.

CAL. PENAL CODE § 502(c). It provides a cause of action to "the owner or lessee of the computer, computer system, computer network, computer program, or data who

---

**6.** Because we address the question of infringement as to PeopleSoft on the narrow ground of "local hosting," we do not decide

whether "direct use" or "cross use" was permitted by the PeopleSoft license.

suffers damage or loss by reason of a violation." *Id.* § 502(e)(1).

The NCCL is Nevada's counterpart to the CDAFA. In relevant part, it provides that "a person who knowingly, willfully and without authorization: (a) Modifies; (b) Damages; (c) Destroys; (d) Discloses; (e) Uses; (f) Transfers; (g) Conceals; (h) Takes; (i) Retains possession of; (j) Copies; (k) Obtains or attempts to obtain access to, permits access to or causes to be accessed; or (*l*) Enters data, a program or any supporting documents which exist inside or outside a computer, system or network" or "who knowingly, willfully and without authorization: (a) Destroys; (b) Damages; (c) Takes; (d) Alters; (e) Transfers; (f) Discloses; (g) Conceals; (h) Copies; (i) Uses; (j) Retains possession of; or (k) Obtains or attempts to obtain access to, permits access to or causes to be accessed, a computer, system or network" is guilty of a misdemeanor. NEV. REV. STAT. § 205.4765(1), (3). The NCCL also provides a civil cause of action to "[a]ny victim of [such a misdemeanor]." *Id.* § 205.511(1).

### B. Accused Acts

The ultimate question as to whether Rimini and Ravin (referred to collectively in this section as "Rimini") violated the state computer laws by downloading content from Oracle's website was submitted to the jury, which found in favor of Oracle. In denying Rimini's renewed motion for judgment as a matter of law, the district court observed that Oracle had for some time "encouraged its customers to use automated downloading tools as a means to obtain" large numbers of customer support files in a timely manner. *Oracle USA, Inc. v. Rimini St., Inc.,* 191 F.Supp.3d 1134, 1139 (D. Nev. 2016) ("*Oracle III*"). Rimini had been doing just that when, "in response to an increased volume of mass downloads through the use of automated tools, and other server and database pres-

sures, Oracle America changed its website's Terms of Use to specifically prohibit the use of 'any software routines commonly known as robots, spiders, scrapers, or any other automated means to access [the site] or any other Oracle accounts, systems or networks,'" a change which "prohibited the use of previously allowed automated downloading tools." *Id.* at 1139–40 (alteration in original). The evidence showed that, in response, Rimini stopped using automatic downloading tools for about a year but then "began reusing automated tools on the website in violation of the Terms of Use (terms which it had to specifically agree to when logging on to the website) in order to download full libraries of support documents and files for entire software products lines—each involving hundreds of thousands of different files." *Id.* at 1140.

### C. Positions of the Parties

Rimini and EFF contend that the statutory language "without permission" should not be read in a way that criminalizes violation of a website's terms of use. As EFF puts it, "[n]either statute . . . applies to bare violations of a website's terms of use—such as when a computer user has permission *and* authorization to access *and* use the computer or data at issue, but simply accesses or uses the information in a manner the website owner does not like."

Oracle, on the other hand, urges us to read the state statutes as not requiring unauthorized access for a violation, which appears to be how the district court construed them. *See id.* at 1143–44 (holding that Rimini's "claim that they had permission from their clients to access Oracle['s] . . . website is irrelevant" under the state statutes).

### D. Analysis

We review the denial of Rimini's motion for judgment as a matter of law de novo.

*Castro v. Cty. of Los Angeles*, 833 F.3d 1060, 1066 (9th Cir. 2016) (en banc).

The district court treated the two statutes as essentially identical, and for purposes of this appeal, we will take the CDAFA as representative. As the district court observed, "[w]hile the case law on the NCCL is limited, the statute covers the same conduct as the CDAFA and the same legal reasoning should apply." *Oracle III*, 191 F.Supp.3d at 1144. The parties appear to agree with this approach; indeed, their arguments about liability do not differentiate between the two statutory schemes.

[16] Here, there is no question that Rimini "t[ook]" and "m[ade] use of" "data." *See Oracle III*, 191 F.Supp.3d at 1143 ("Nor do defendants contest that they took and subsequently used data from the website. . . ."). Nor is there any dispute that Oracle permitted some degree of access and taking from its website. *Id.* at 1139–40. ("[Oracle America] owns and operates a website that . . . contains millions of technical support files. . . . [T]his online database was accessible through a website that required both the customer's unique [log-in] and acceptance of the website's specific Terms of Use." (footnote omitted)). The central issue here is whether, by using automated tools to take data in direct contravention of Oracle's terms of use, Rimini violated the statutes.

[17] We hold that taking data using a *method* prohibited by the applicable terms of use, when the taking itself generally is permitted, does not violate the CDAFA. Because the same reasoning applies to the NCCL claim, we reverse the judgment as to both claims.

Oracle obviously disapproved of the method—automated downloading—by which Rimini took Oracle's proprietary information. But the key to the state statutes is whether Rimini was authorized in the first instance to take and use the information that it downloaded. *See United States v. Christensen*, 828 F.3d 763, 789 (9th Cir. 2015) (emphasis added) ("A plain reading of the [CDAFA] demonstrates that *its focus is on unauthorized taking or use of information*.").

Because it indisputably had such authorization, at least at the time it took the data in the first instance, Rimini did not violate the state statutes. This result is consistent with our decision in *Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058, 1069 (9th Cir. 2016), *cert. denied*, — U.S. —, 138 S.Ct. 313, 199 L.Ed.2d 206 (2017) (affirming the district court's holding that the defendant violated the CDAFA on the ground that the defendant "*without permission* took, copied, and made use of [the downloaded] data" (emphasis added)).

III. Violation of California's Unfair Competition Law

A violation of California's UCL occurs where there is a predicate offense, one of which is a violation of the CDAFA. Cal. Bus. & Prof. Code § 17200. The district court granted judgment in favor of Oracle on its UCL claim based on its finding that Rimini and Ravin had violated the CDAFA. Because we reverse as to the CDAFA claim, we also reverse the district court's determination that Rimini and Ravin violated the UCL.

IV. Damages [7]

The jury awarded a total of $14,427,000 to two Oracle subsidiaries based on Rimi-

---

7. Rimini does not challenge the amount of the jury's award of $35,600,000 in damages for

copyright infringement.

ni's alleged violation of the CDAFA and NCCL. Because we have concluded that Rimini did not violate those laws, we reduce damages by this amount.

## V. Prejudgment Interest

[18, 19] We review a district court's decision to award prejudgment interest for abuse of discretion. *Barnard v. Theobald*, 721 F.3d 1069, 1075 (9th Cir. 2013). We also review the rate used by the district court to calculate the prejudgment interest for abuse of discretion. *Blankenship v. Liberty Life Assurance Co. of Bos.*, 486 F.3d 620, 628 (9th Cir. 2007).

The district court awarded $22,491,636.16 in prejudgment interest on the copyright claims and $5,279,060.12 in prejudgment interest on the NCCL claims. Because we have concluded that Rimini did not violate the NCCL, we reverse as to the latter amount. For the reasons discussed below, we affirm as to the former.

We have held that "[g]enerally, 'the interest rate prescribed for post-judgment interest under 28 U.S.C. § 1961 is appropriate for fixing the rate of pre-judgment interest unless the trial judge finds, on substantial evidence, that the equities of that particular case require a different rate.'" *Blankenship*, 486 F.3d at 628 (quoting *Grosz-Salomon v. Paul Revere Life Ins. Co.*, 237 F.3d 1154, 1164 (9th Cir. 2001)).

[20] The district court calculated its award of $22,491,636.16 based upon the Treasury rate on the date infringement began, that is, 5.07% in October 2006, rather than on the "starting point" set forth in 28 U.S.C. § 1961, that is, 0.61% in October 2016. The district court explained its deviation from the normal rate, which resulted in a difference of approximately $20,000,000, as follows:

[T]he court finds that there is good cause to set the prejudgment interest rate at the Treasury rate on the date infringement began, rather than at the time of judgment. The court makes this finding because of the nature of the jury's award of hypothetical license damages. As the jury awarded damages to Oracle in an amount it would have received from Rimini for licensing Oracle's software at the time it began infringing Oracle's copyrights in late 2006, the court finds that this is the relevant time period for prejudgment interest. After this date, when Rimini began infringing Oracle's copyrights, Oracle lost out on the licensing fees it would have received, absent infringement. It is not equitable in the court's view to allow defendants to reap a windfall by the lower interest rates that are now available simply because they engaged in discovery delays and other litigation tactics (addressed more thoroughly in Oracle's motion for attorneys' fees) that kept this action in litigation for several years. Therefore, the court shall ... set the appropriate rate for prejudgment interest under the Copyright Act as the weekly average one-year constant maturity Treasury yield at the start of the infringement.

Despite these specific findings, Rimini asserts that the district court failed to make the "exceptional case" determination that would permit it to depart from the presumptive rate set forth in 28 U.S.C. § 1961. It contends that the district court may not set the interest rate based on a defendant's bad behavior, citing our holding in *Dishman v. UNUM Life Insurance Co. of America* for the proposition that, "[a]lthough a defendant's bad faith conduct may influence whether a court awards prejudgment interest, it should not influence the rate of the interest." 269 F.3d 974, 988 (9th Cir. 2001). Rimini also asserts that the

0.61% adequately represents market rates and fully compensates Oracle's loss.

**[21]**  It is true that "prejudgment interest is an element of compensation, not a penalty." *Barnard*, 721 F.3d at 1078. Rimini is correct that it would have been improper for the district court to set a higher rate based on Rimini's litigation conduct alone. But considering the district court's analysis in its totality, it is apparent that the rate was based primarily on the jury's award of copyright damages based on a hypothetical license, making it appropriate to approximate the licensing fees that Oracle "lost out on" and "would have received, absent infringement" by using the Treasury rate on the date of infringement.

The district court made an extensive and detailed record throughout many years of complex and contentious litigation. Its understandable frustration with Rimini's litigation conduct is apparent in some of the orders now before us. However, there is ample evidence in the record to support the court's award of prejudgment interest at the Treasury rate on the date infringement began. We find no abuse of discretion.

## VI.  Injunctive Relief

**[22, 23]**  As to [a] permanent injunction, we review the legal conclusions de novo, the factual findings for clear error, and the decision to grant a permanent injunction, as well as its scope, for an abuse of discretion. To review for abuse of discretion, "we first look to whether the trial court identified and applied the correct legal rule … [then] to whether the trial court's resolution of the motion resulted from a factual finding that was illogical, implausible, or without support

in inferences that may be drawn from the facts in the record."

*Columbia Pictures Indus., Inc. v. Fung*, 710 F.3d 1020, 1030 (9th Cir. 2013) (quoting *United States v. Hinkson*, 585 F.3d 1247, 1263 (9th Cir. 2009) (en banc)).

The district court entered permanent injunctions against Rimini based on copyright infringement and against Rimini and Ravin based on alleged violations of the CDAFA.[8] We stayed both injunctions pending resolution of this appeal.

In view of our conclusion that there was no violation of the state computer laws, we reverse as to the CDAFA injunction. As explained below, we vacate the copyright injunction and remand for reconsideration in light of our opinion.

**[24]**  The Supreme Court established a four-factor test that must be applied before a district court may grant a permanent injunction. *eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391, 126 S.Ct. 1837, 164 L.Ed.2d 641 (2006). Here, the district court assessed the four factors by reference to *both* the copyright and the CDAFA claims, without considering separately the propriety of issuing an injunction as to the copyright claims alone. For example, the court concluded that Rimini's "violations of state computer access statutes" contributed to an "irreparable injury" to Oracle's business reputation and goodwill.

Based on the record before us, we do not know how the district court would weigh the *eBay* factors with respect to the copyright claims alone. We express no view on the propriety or scope of any injunctive relief, which are matters committed to the district court's discretion in the first instance.

---

8.  The injunction entered by the district court is clearly divided into separate portions. We

therefore treat the injunction as if there were two separate injunctions.

## VII. Fees

[25] "We review the award of fees and costs for abuse of discretion, but will overturn it if it is based on an erroneous determination of law." *Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1250 (9th Cir. 2006).

The district court awarded $28,502,246.40 in attorneys' fees to Oracle. It concluded that this award was appropriate under the fee-shifting provisions of the Copyright Act and the state computer laws. Although Ravin was not found liable for copyright infringement, the district court decided that Ravin was, along with Rimini, "severally and equally" liable for the award because he had violated the state computer statutes.

In view of our conclusion that there was no violation of the state computer laws, we reverse the judgment with respect to Ra-

vin's liability for fees. As to Rimini, we vacate the fee award and remand for reconsideration in light of Oracle's more limited success at litigation.

## VIII. Costs

### A. Taxable Costs

The district court awarded Oracle $4,950,566.70 in taxable costs. Rimini originally asked us to reduce this award by approximately $1,700,000, contending that Oracle only requested roughly $3,200,000 in taxable costs in the district court. Oracle conceded that approximately $1,500,000 in non-taxable costs improperly was counted as taxable. About $200,000 remains in dispute.

The district court's cost award apparently was based on the following chart it received from Oracle:

| Attorneys' Fees | Dkt. 996, Ex. 1 | Adjustments | Final |
|---|---|---|---|
| Bingham and Morgan Lewis | $18,095,129.67 | | $18,095,129.67 |
| Boies Schiller | $12,542,840.00 | -$6,480.00 | $12,536,360.00 |
| H5 & Huron | $4,360,943.20 | | $4,360,943.20 |
| Other (Black Letter, Barg Coffin) | $28,895.12 | | $28,895.12 |
| **TOTAL ATTORNEYS' FEES** | $35,627,807.99 | | $35,621,327.99 |
| **Taxable Costs** | | | |
| Deposition Costs | $192,999.70 | | $192,999.70 |
| Suroz Fees for Oracle Productions | $4,757,561.00 | -$1,515,279.45 | $3,242,281.55 |
| **TOTAL TAXABLE COSTS** | $4,950,560.70 | | $3,435,281.25 |

The district court evidently read the wrong column when it awarded $4,950,566.70 in taxable costs. Given the parties' agreement that Oracle is entitled to about $3,200,000 in taxable costs, the remaining dispute involves $192,999.70 in deposition costs. Because Rimini's briefs articulate no basis for our doing so, we do not disturb the district court's inclusion of these expenses in the taxable cost award. We thus reduce the award to $3,435,281.25.

### B. Non-taxable Costs

Title 17 U.S.C. § 505 provides:

In any civil action under [the Copyright Act], the court in its discretion may

allow the recovery of full costs by or against any party other than the United States or an officer thereof. Except as otherwise provided by this title, the court may also award a reasonable attorney's fee to the prevailing party as part of the costs.

By contrast, 28 U.S.C. § 1920 identifies only six categories of costs that are taxable against the losing party.

In *Twentieth Century Fox v. Entertainment Distributing*, we held that, because 17 U.S.C. § 505 permits the award of *full* costs, the award of costs under § 505 is not limited to the categories of costs de-

879 FEDERAL REPORTER, 3d SERIES

scribed in 28 U.S.C. § 1920. 429 F.3d 869, 885 (9th Cir. 2005). Here, relying expressly on *Twentieth Century Fox*, the district court awarded Oracle $12,774,550.26 in non-taxable costs.

Rimini contends that *Twentieth Century Fox* has been abrogated by *Marx v. General Revenue Corp.*, 568 U.S. 371, 133 S.Ct. 1166, 185 L.Ed.2d 242 (2013), and that, accordingly, the district court erred. We disagree.

[26] We are bound by our precedent unless the theory or reasoning of the decision is "clearly irreconcilable" with a higher intervening authority, such as a decision by the Supreme Court. *Miller v. Gammie*, 335 F.3d 889, 899–900 (9th Cir. 2003) (en banc). Our decision in *Twentieth Century Fox* concerned the relationship between 17 U.S.C. § 505 and 28 U.S.C. § 1920. The Supreme Court's decision in *Marx* concerned neither statute. Instead, the Court held that 15 U.S.C. § 1692k(a)(3) is not contrary to the costs provision in Federal Rule of Civil Procedure 54(d)(1). Nothing in *Marx* is clearly irreconcilable with *Twentieth Century Fox*.

The parties shall bear their own costs on appeal.

**AFFIRMED in Part, REVERSED in Part, VACATED and REMANDED in Part.**



**CALIFORNIA PUBLIC UTILITIES COMMISSION, Petitioner,**

**California Department of Water Resources State Water Project; Sacramento Municipal Utility District; Transmission Agency of Northern California, Petitioners-Intervenors,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent,**

**Pacific Gas & Electric Company, Respondent-Intervenor.**

No. 16-70481

United States Court of Appeals, Ninth Circuit.

Argued and Submitted October 13, 2017, San Francisco, California

Filed January 8, 2018

**Background:** California Public Utilities Commission (CPUC) petitioned for review of Federal Energy Regulatory Commission's (FERC) determination that utility whose participation in regional transmission organization was involuntary and mandated by state law was eligible for an upward adjustment, or "incentive adder," to the rate of return on equity of utilities that participated in transmission organizations.

**Holdings:** The Court of Appeals, Thomas, Chief Circuit Judge, held that:

(1) FERC's determination that its order authorized FERC to grant upward adjustment to utility whose participation in transmission organization was involuntary and was mandated by state law was plainly erroneous;

(2) FERC's interpretation of order as authorizing it to grant upward adjustment to utility whose participation in transmission organization was involuntary and was mandated by state law constituted post hoc rationalization of the order on review;

3

*Oracle USA, Inc. v. Rimini Street, Inc.*, No. 2:10-cv-00106-LRH-VCF

Hearing on Renewed Post-Trial Motions

## PRECLUSION: RESTATEMENT (SECOND) OF JUDGMENTS AND RELEVANT CASE SUMMARIES

### Restatement (Second) of Judgements § 27

**When an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim.**

*Exceptions to this general rule are stated in § 28.*

**Comment:**

*a. Subsequent action between the same parties.* The rule of issue preclusion is operative where the second action is between the same persons who were parties to the prior action, and who were adversaries (see § 38) with respect to the particular issue, whether the second action is brought by the plaintiff or by the defendant in the original action. It is operative whether the judgment in the first action is in favor of the plaintiff or of the defendant. The effect of a judgment for the defendant in the first action may be to require a judgment for the defendant in the second action. See Illustration 1. A judgment for the plaintiff in the first action may have the effect of enabling him to recover in the second action without proving his claim, provided that the controlling issues were litigated and determined in the prior action, but the defendant is not precluded from defending the second action on the basis of an issue not litigated and determined in the first action. See Illustration 2.

**Illustrations:**
1. A brings an action against B to recover interest due on a promissory note which A alleges was executed by B and was payable to A. B denies that he executed the note. After a trial on this issue there is a verdict and judgment for B. Thereafter A sues B for a second installment of interest. The determination that B did not execute the note is conclusive in the second action.

2. A brings an action against B for failure to deliver goods on January 1, 1972, in accordance with the terms of an installment contract. B defends on the basis that the contract should be rescinded because of A's fraud in obtaining it. After a trial on this issue, there is a verdict and judgment for A.

Thereafter, A sues B for failure to deliver goods on June 1, 1972, in accordance with the same contract. B is precluded by the prior judgment from seeking rescission on the basis of fraud. B is not precluded, however, from setting up other defenses, for example, that he was discharged of the duty to deliver on June 1 because of occurrences beyond his control.

*b. Direct and collateral estoppel.* In some cases, a judgment does not preclude relitigation of all or part of the claim on which the action is brought. See §§ 20, 26. In such cases, the rule of this Section precludes relitigation of issues actually litigated and determined in the first action when a second action is brought on the same claim. See Illustration 3. Issue preclusion in a second action on the same claim is sometimes designated as direct estoppel. If, as more frequently happens, the second action is brought on a different claim, the rule of this Section also applies; in such cases, preclusion is sometimes designated as collateral estoppel.

**Illustration:**
3. A brings an action against B for personal injuries arising out of an automobile accident. Jurisdiction is asserted over B, a nonresident, on the basis that the automobile involved in the accident was being operated in the state by or on his behalf. After trial of this issue, the action is dismissed for lack of jurisdiction. In a subsequent action by A against B for the same injuries, brought in the state of B's residence, the prior determination that the automobile was not being operated by or on behalf of B is conclusive.

*c. Dimensions of an issue.* One of the most difficult problems in the application of the rule of this Section is to delineate the issue on which litigation is, or is not, foreclosed by the prior judgment. The problem involves a balancing of important interests: on the one hand, a desire not to deprive a litigant of an adequate day in court; on the other hand, a desire to prevent repetitious litigation of what is essentially the same dispute. When there is a lack of total identity between the particular matter presented in the second action and that presented in the first, there are several factors that should be considered in deciding whether for purposes of the rule of this Section the "issue" in the two proceedings is the same, for example: Is there a substantial overlap between the evidence or argument to be advanced in the second proceeding and that advanced in the first? Does the new evidence or argument involve application of the same rule of law as that involved in the prior proceeding? Could pretrial preparation and discovery relating to the matter presented in the first action reasonably be expected to have embraced the matter sought to be presented in the second? How closely related are the claims involved in the two proceedings? For

2

examples of cases in which such factors are relevant, see Illustrations 4, 5, and 6.

Sometimes, there is a lack of total identity between the matters involved in the two proceedings because the events in suit took place at different times. In some such instances, the overlap is so substantial that preclusion is plainly appropriate. See Illustration 8. Preclusion ordinarily is proper if the question is one of the legal effect of a document identical in all relevant respects to another document whose effect was adjudicated in a prior action. And, in the absence of a showing of changed circumstances, a determination that, for example, a person was disabled, or a nonresident of the state, in one year will be conclusive with respect to the next as well. In other instances the burden of showing changed or different circumstances should be placed on the party against whom the prior judgment is asserted. See Illustration 7. In still other instances, the bearing of the first determination is so marginal because of the separation in time and other factors negating any similarity that the first judgment may properly be given no effect. See Illustration 9.

An issue on which relitigation is foreclosed may be one of evidentiary fact, of "ultimate fact" (i.e., the application of law to fact), or of law. See also Comment *j* below. Thus, for example, if the party against whom preclusion is sought did in fact litigate an issue of ultimate fact and suffered an adverse determination, new evidentiary facts may not be brought forward to obtain a different determination of that ultimate fact. See Illustration 4. And similarly if the issue was one of law, new arguments may not be presented to obtain a different determination of that issue. See Illustration 6.

**Illustrations:**

4. A brings an action against B to recover for personal injuries in an automobile accident. A seeks to establish that B was negligent in driving at an excessive rate of speed. After trial, verdict and judgment are given for B. In a subsequent action by B against A for injuries in the same accident, A is precluded from setting up B's negligence as a defense, whether or not the alleged negligence is based on an assertion of excessive speed. It is reasonable to require A to bring forward all evidence in support of the alleged negligence in the initial proceeding. (It is assumed in this Illustration that the forum has no applicable compulsory counterclaim rule. See § 22.)

5. A brings an action against B to recover royalties due under an oil lease for oil produced from certain wells. After trial, judgment is given for A, the

court finding that all the wells in question are covered by the lease. In a second action by A against B for later royalties under the lease with respect to the same wells, B seeks to assert for the first time that one of the wells was not covered by the lease because it was diagonally drilled into state-owned underwater land adjacent to the leased land. Whether B is precluded with respect to this assertion under the rule of this Section should turn on application of the factors described in this Comment, particularly the relation between the evidentiary presentation, the applicable rule of law, and the claim involved in each of the two proceedings.

6. A brings an action against B to recover an installment payment due under a contract. B's sole defense is that the contract is unenforceable under the statute of frauds. After trial, judgment is given for A, the court ruling that an oral contract of the kind sued upon is enforceable. In a subsequent action by A against B to recover a second installment falling due after the first action was brought, B is precluded from raising the statute of frauds as a defense, whether or not on the basis of arguments made in the prior action, but is not precluded from asserting as a defense that the installment is not owing as a matter of law on any other ground.

7. A brings an action against B to set aside a conveyance of Blackacre by C to B on the ground that at the time of the conveyance C was mentally incompetent. After trial, verdict and judgment are given for A. A second action is brought by A against B to set aside a conveyance of Whiteacre by C to B which took place one week after the conveyance of Blackacre. Unless B can establish changed circumstances occurring in the time between the two conveyances, the prior judgment is conclusive that C was incompetent when Whiteacre was conveyed. (The result would be the same if the Whiteacre conveyance had occurred one week before the Blackacre conveyance.)

8. The facts are as stated in Illustration 7, except that the Whiteacre conveyance occurred immediately after the Blackacre conveyance. If the two actions are held to involve different claims, the prior judgment is conclusive that B was incompetent when Whiteacre was conveyed.

9. In an action brought by the A corporation against the taxing authorities with respect to taxes for the year 1940, judgment is based on a determination that A should have been taxed as a nonresident corporation because it had no office or place of business in the state. A similar action is brought by A with respect to taxes for the year 1970. If it is concluded that the separation in time between the two proceedings is so great that the first

4

determination has little if any bearing on the question whether A had an office or place of business in the state in 1970, then the first judgment should be given no effect on that question and A should have the same burden of proof as that imposed on any other taxpayer.

*d. When an issue is actually litigated.* When an issue is properly raised, by the pleadings or otherwise, and is submitted for determination, and is determined, the issue is actually litigated within the meaning of this Section. An issue may be submitted and determined on a motion to dismiss for failure to state a claim, a motion for judgment on the pleadings, a motion for summary judgment (see Illustration 10), a motion for directed verdict, or their equivalents, as well as on a judgment entered on a verdict. A determination may be based on a failure of pleading or of proof as well as on the sustaining of the burden of proof.

The determination of an issue by a judge in a proceeding conducted without a jury is conclusive in a subsequent action whether or not there would have been a right to a jury in that subsequent action if collateral estoppel did not apply. See Illustrations 10 and 11.

**Illustrations:**
10. In January, B agrees to buy a horse from A, and in February B agrees to buy Blackacre from A. A brings a suit for specific performance of the February agreement; B alleges with supporting proof that he was an infant when the agreement was made, and the court enters summary judgment for B on that ground. Thereafter A brings an action against B for damages for breach of the January agreement and demands a jury. The judgment in the prior suit is conclusive that B was an infant when the contract was made.

11. The facts are as stated in Illustration 10, except that in the first proceeding the issue of infancy is decided for B after trial without a jury on the basis of conflicting evidence of B's age. The judgment in the prior suit is conclusive that B was an infant when the contract was made.

*e. Issues not actually litigated.* A judgment is not conclusive in a subsequent action as to issues which might have been but were not litigated and determined in the prior action. There are many reasons why a party may choose not to raise an issue, or to contest an assertion, in a particular action. The action may involve so small an amount that litigation of the issue may cost more than the value of the lawsuit. Or the forum may be an inconvenient one in which to produce the necessary evidence or in which to litigate at all. The interests of conserving judicial resources, of maintaining

consistency, and of avoiding oppression or harassment of the adverse party are less compelling when the issue on which preclusion is sought has not actually been litigated before. And if preclusive effect were given to issues not litigated, the result might serve to discourage compromise, to decrease the likelihood that the issues in an action would be narrowed by stipulation, and thus to intensify litigation.

It is true that it is sometimes difficult to determine whether an issue was actually litigated; even if it was not litigated, the party's reasons for not litigating in the prior action may be such that preclusion would be appropriate. But the policy considerations outlined above weigh strongly in favor of nonpreclusion, and it is in the interest of predictability and simplicity for such a result to obtain uniformly.

Sometimes the party against whom preclusion is asserted is covered by an insurance policy and represented by insurance company counsel in the prior action but not in the subsequent action. In such instances, preclusion with respect to unlitigated issues seems particularly unfair.

An issue is not actually litigated if the defendant might have interposed it as an affirmative defense but failed to do so; nor is it actually litigated if it is raised by a material allegation of a party's pleading but is admitted (explicitly or by virtue of a failure to deny) in a responsive pleading; nor is it actually litigated if it is raised in an allegation by one party and is admitted by the other before evidence on the issue is adduced at trial; nor is it actually litigated if it is the subject of a stipulation between the parties. A stipulation may, however, be binding in a subsequent action between the parties if the parties have manifested an intention to that effect. Furthermore under the rules of evidence applicable in the jurisdiction, an admission by a party may be treated as conclusive or be admissible in evidence against that party in a subsequent action.

In the case of a judgment entered by confession, consent, or default, none of the issues is actually litigated. Therefore, the rule of this Section does not apply with respect to any issue in a subsequent action. The judgment may be conclusive, however, with respect to one or more issues, if the parties have entered an agreement manifesting such an intention.

It should be noted that, although issue preclusion does not apply to issues not actually litigated, there is a concept of estoppel in pais, not dealt with in this Restatement, which may be applicable in appropriate cases. Under this concept, a person who makes a representation may be estopped to deny its

truth if the person to whom it was made has changed his position in reliance.

*f. Extrinsic evidence to determine what issues were litigated.* If it cannot be determined from the pleadings and other materials of record in the prior action what issues, if any, were litigated and determined by the verdict and judgment, extrinsic evidence is admissible to aid in such a determination. Extrinsic evidence may also be admitted to show that the record in the prior action does not accurately indicate what issues, if any, were litigated and determined.

The party contending that an issue has been conclusively litigated and determined in a prior action has the burden of proving that contention.

*g. If several issues litigated.* If several issues are litigated in an action, and in a subsequent action between the parties, one of the parties relies on the judgment as conclusive of one of the issues, that party must show that the issue was determined by the judgment in the prior action.

If several issues are litigated in an action, and a judgment cannot properly be rendered in favor of one party unless all of the issues are decided in his favor, and judgment is given for him, the judgment is conclusive with respect to all the issues.

**Illustration:**
12. A brings an action against B to recover interest on a promissory note payable to A, the principal not yet being due. B alleges that he was induced by the fraud of A to execute the note, and further alleges that A gave him a release under seal of the obligation to pay interest. After a trial of these issues, verdict and judgment are given for A. After the note matures, A brings an action against B for the principal. The judgment in the prior suit is conclusive that B was not induced by the fraud of A to execute the note.

*h. Determinations not essential to the judgment.* If issues are determined but the judgment is not dependent upon the determinations, relitigation of those issues in a subsequent action between the parties is not precluded. Such determinations have the characteristics of dicta, and may not ordinarily be the subject of an appeal by the party against whom they were made. In these circumstances, the interest in providing an opportunity for a considered determination, which if adverse may be the subject of an appeal, outweighs the interest in avoiding the burden of relitigation.

*Oracle USA, Inc. v. Rimini Street, Inc.*, No. 2:10-cv-00106-LRH-VCF

Hearing on Renewed Post-Trial Motions

**Illustrations:**

13. A brings an action against B to recover interest on a promissory note payable to A, the principal not yet being due. B alleges that he was induced by the fraud of A to execute the note, and further alleges that A gave him a release under seal of the obligation to pay interest. The court, sitting without a jury, finds that A had given such a release but that B was not induced by A's fraud to execute the note, and gives verdict for B on which judgment is entered. After the note matures A brings an action against B for the principal of the note. B is not precluded from defending this action on the ground that B was induced by A's fraud to execute the note.

14. A, as owner of a trademark, brings an action against B for infringement. B denies the validity of the trademark and denies infringement. The court finds that the trademark is valid, but that B had not infringed it, and gives judgment for B. Thereafter A brings an action against B alleging that since the rendition of the judgment B infringed the trademark. B is not precluded from defending this action on the ground that the trademark is invalid.

*i. Alternative determinations by court of first instance.* If a judgment of a court of first instance is based on determinations of two issues, either of which standing independently would be sufficient to support the result, the judgment is not conclusive with respect to either issue standing alone. See Illustration 14. Cf. § 20, Comment *e*.

It might be argued that the judgment should be conclusive with respect to both issues. The matter has presumably been fully litigated and fairly decided; the determination does support, and is in itself sufficient to support, the judgment for the prevailing party; and the losing party is in a position to seek reversal of the determination from an appellate court. Moreover, a party who would otherwise urge several matters in support of a particular result may be deterred from doing so if a judgment resting on alternative determinations does not effectively preclude relitigation of particular issues.

There are, however, persuasive reasons for analogizing the case to that of the nonessential determination discussed in Comment *h*. First, a determination in the alternative may not have been as carefully or rigorously considered as it would have if it had been necessary to the result, and in that sense it has some of the characteristics of dicta. Second, and of critical importance, the losing party, although entitled to appeal from both determinations, might be dissuaded from doing so because of the likelihood that at least one of them would be upheld and the other not even reached. If

8

he were to appeal solely for the purpose of avoiding the application of the rule of issue preclusion, then the rule might be responsible for increasing the burdens of litigation on the parties and the courts rather than lightening those burdens. Compare Comment *o*, dealing with the effect of an appellate decision based on alternative determinations.

There may be causes where, despite these considerations, the balance tips in favor of preclusion because of the fullness with which the issue was litigated and decided in the first action. But since the question of preclusion will almost always be a close one if each case is to rest on its own particular facts, it is in the interest of predictability and simplicity for the result of nonpreclusion to be uniform.

The case discussed, and exemplified by Illustration 15, is to be distinguished from a case in which there are alternative bases for a determination that is essential to the judgment. In such a case, failure to appeal from that determination cannot be attributed to the losing party's anticipation that the judgment will be affirmed on other grounds. Thus relitigation of the issue so determined is properly precluded under the rule of this Section. See Illustration 16.

**Illustrations:**

15. A brings an action against B to recover interest on a promissory note payable to A, the principal not yet being due. B alleges that he was induced by the fraud of A to execute the note, and further alleges that A gave him a binding release of the obligation to pay interest. The court, sitting without a jury, finds that B was induced by A's fraud to execute the note and also finds that A had given him a binding release of the obligation to pay interest. Judgment for B is not appealed. After the note matures, A brings an action against B for the principal of the note. The prior judgment is not a defense to the action, and the issue of fraud must be relitigated if B chooses to raise it.

16. The facts of the first action are as stated in Illustration 15, but in the second action A sues for another installment of interest before the principal becomes due. The determination that B is not liable for interest on the note is conclusive, even though there were alternative bases for that determination.

The distinction between Illustrations 15 and 16 is that the first action, even though decided on alternative grounds, necessarily adjudicated the issue as to liability for interest, but did not necessarily adjudicate the issue—

fraud—relevant to recovery of the principal.

*j. Determinations essential to the judgment.* It is sometimes stated that even when a determination is a necessary step in the formulation of a decision and judgment, the determination will not be conclusive between the parties if it relates only to a "mediate datum" or "evidentiary fact" rather than to an "ultimate fact" or issue of law. It has also been stated than even a determination of "ultimate fact" will not be conclusive in a later action if it constitutes only an "evidentiary fact" or "mediate datum" in that action. Such a formulation is occasionally used to support a refusal to apply the rule of issue preclusion when the refusal could more appropriately be based on the lack of similarity between the issues in the two proceedings. If applied more broadly, the formulation causes great difficulty, and is at odds with the rationale on which the rule of issue preclusion is based. The line between ultimate and evidentiary facts is often impossible to draw. Moreover, even if a fact is categorized as evidentiary, great effort may have been expended by both parties in seeking to persuade the adjudicator of its existence or nonexistence and it may well have been regarded as the key issue in the dispute. In these circumstances the determination of the issue should be conclusive whether or not other links in the chain had to be forged before the question of liability could be determined in the first or second action.

The appropriate question, then, is whether the issue was actually recognized by the parties as important and by the trier as necessary to the first judgment. If so, the determination is conclusive between the parties in a subsequent action, unless there is a basis for an exception under § 28—for example, that the significance of the issue for purposes of the subsequent action was not sufficiently foreseeable at the time of the first action.

**Illustrations:**

17. A brings an action against C to recover for personal injuries caused in an automobile accident involving a car driven by B and owned by C. A alleges that C is liable for B's negligence because B was driving with C's express or implied permission within the meaning of applicable state law making an owner liable in such circumstances. The action is defended by C's insurer; at the trial, the evidence is in conflict as to whether B was employed by C at the time of the accident and whether he was driving the car on C's business or on a frolic of his own. After trial, verdict and judgment are given for A, with explicit findings that B was C's employee and was driving the car within the scope of his employment at the time of the accident. When C fails to satisfy the judgment, A brings an action

against C's insurer to collect the proceeds of the policy. C's insurer is precluded from defending on the basis of a clause in the policy limiting coverage to accidents caused by the owner or by persons acting within the scope of their employment by the owner. Although the "ultimate" question in the first action was one of express or implied permission to use the car, the finding as to scope of employment precludes relitigation of that issue in the second action. (Note: C's insurer, having defended the first action, is bound to the same extent as C. See § 57.)

18. A, an attorney, brings an action against B, an attorney, for a declaratory judgment as to the rights and interests of the parties in certain attorneys' fees collected by B. At trial, there is a conflict in the evidence with respect to the terms of an oral agreement between A and B, and in particular with respect to the date after which all fees received would be shared. After trial, judgment is given for B on the basis that A had no right or interest in the fees in question. There is an explicit finding that the fee-sharing agreement between A and B did not apply to sums collected before January 1971, and that the fees in question were collected before that date. In a subsequent action by A against B for a share of fees collected by B after the first action was instituted but before January 1971, A is precluded from showing that his agreement with B extended to these fees.

*k. Requirement of a valid, final judgment.* The requisites of a valid judgment are set forth in § 1, and the definition of a final judgment may be found in § 13. Particular reference is made to the distinction in § 13 between finality for purposes of merger and bar and finality for purposes of issue preclusion. Pursuant to this distinction, a litigation may have reached a stage at which issue preclusion is appropriate even though claim preclusion—application of the rules of merger and bar—is not.

*l. Effect on pending action.* If two actions which involve the same issue are pending between the same parties, it is the first final judgment rendered in one of the actions which becomes conclusive in the other action, regardless of which action was brought first. See § 14.

*m. Inconsistent judgments.* If in two successive actions between the same parties the same issue is actually litigated and determined, and that issue arises in a third action between the parties, the rules for determining which judgment is conclusive with respect to that issue are those set forth in § 15.

*n. Judgment not precluding another action on the same claim.* A judgment that does not preclude another action on the same claim—one that is not a

bar—may have collateral as well as direct estoppel effects. See § 20, Comment *b*. If, however, a judgment of dismissal is wholly without prejudice, then it has no conclusive effect between the parties in a subsequent action on the same or a different claim.

**o. Effect of an appeal. If a judgment rendered by a court of first instance is reversed by the appellate court and a final judgment is entered by the appellate court (or by the court of first instance in pursuance of the mandate of the appellate court), this latter judgment is conclusive between the parties.**

**If the judgment of the court of first instance was based on a determination of two issues, either of which standing independently would be sufficient to support the result, and the appellate court upholds both of these determinations as sufficient, and accordingly affirms the judgment, the judgment is conclusive as to both determinations. In contrast to the case discussed in Comment i, the losing party has here obtained an appellate decision on the issue, and thus the balance weighs in favor of preclusion.**

**If the appellate court upholds one of these determinations as sufficient but not the other, and accordingly affirms the judgment, the judgment is conclusive as to the first determination.**

**If the appellate court upholds one of these determinations as sufficient and refuses to consider whether or not the other is sufficient and accordingly affirms the judgment, the judgment is conclusive as to the first determination.**

### Restatement (Second) of Judgements § 28

Although an issue is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, relitigation of the issue in a subsequent action between the parties is not precluded in the following circumstances:

(1) The party against whom preclusion is sought could not, as a matter of law, have obtained review of the judgment in the initial action; or

(2) The issue is one of law and (a) the two actions involve claims that are substantially unrelated, or (b) a new determination is warranted in order to take account of an intervening change in the applicable legal context or otherwise to avoid inequitable administration of the laws; or

(3) A new determination of the issue is warranted by differences in the quality or extensiveness of the procedures followed in the two courts or by factors relating to the allocation of jurisdiction between them; or

(4) The party against whom preclusion is sought had a significantly heavier burden of persuasion with respect to the issue in the initial action than in the subsequent action; the burden has shifted to his adversary; or the adversary has a significantly heavier burden than he had in the first action; or

(5) There is a clear and convincing need for a new determination of the issue (a) because of the potential adverse impact of the determination on the public interest or the interests of persons not themselves parties in the initial action, (b) because it was not sufficiently foreseeable at the time of the initial action that the issue would arise in the context of a subsequent action, or (c) because the party sought to be precluded, as a result of the conduct of his adversary or other special circumstances, did not have an adequate opportunity or incentive to obtain a full and fair adjudication in the initial action.

Comment:

*a. Inability to obtain review (Subsection (1)).* As noted in § 27, Comments *h* and *i,* the availability of review for the correction of errors has become critical to the application of preclusion doctrine. If review is unavailable because the party who lost on the issue obtained a judgment in his favor, the general rule of § 27 is inapplicable by its own terms. Similarly, if there was an alternative determination adequate to support the judgment, the rule

of § 27 does not apply.

There is a need for an analogous exception to the rule of preclusion when the determination of an issue is plainly essential to the judgment but the party who lost on that issue is, for some other reason, disabled as a matter of law from obtaining review by appeal or, where appeal does not lie, by injunction, extraordinary writ, or statutory review procedure. Such cases can arise, for example, because the controversy has become moot, or because the law does not allow review of the particular category of judgments.

The exception in Subsection (1) applies only when review is precluded as a matter of law. It does not apply in cases where review is available but is not sought. Nor does it apply when there is discretion in the reviewing court to grant or deny review and review is denied; such denials by a first tier appellate court are generally tantamount to a conclusion that the questions raised are without merit.

Note: With respect to controversies that have become moot, it is a procedural requirement in some jurisdictions, in order to avoid the impact of issue preclusion, that the appellate court reverse or vacate the judgment below and remand with directions to dismiss.

Cross-reference. An acquittal in a criminal case in certain limited contexts can have preclusive effect in a subsequent civil proceeding, even though the prosecution is unable to obtain review. See § 85. One reason why such effect is generally not accorded is the difference in the burden of proof in the two proceedings. Cf. Comment *f*, below.

*b. Issues of law (Subsection (2)).* The distinction between issues of fact and issues of law is often an elusive one. In an action tried to a jury, a party may be entitled to a directed verdict "as a matter of law," or a question like that of the meaning of a written contract may be a question of "law" in the sense that it is decided by the judge rather than the jury. In addition, courts and commentators frequently refer to "mixed question of fact and law," suggesting that the journey from a pure question of fact to a pure question of law is one of subtle gradations rather than one marked by a rigid divide. Thus the question whether A negligently caused injury to B, for example, may involve the application of a recognized legal standard to a set of undisputed historical facts, may involve a dispute over the allocation and extent of the burden of persuasion, or over the legal standard of due care, or may involve a dispute over what actually happened.

14

When the claims in two separate actions between the same parties are the same or are closely related—for example, when they involve asserted obligations arising out of the same subject matter—it is not ordinarily necessary to characterize an issue as one of fact or of law for purposes of issue preclusion. If the issue has been actually litigated and determined and the determination was essential to the judgment, preclusion will apply. See § 27, and Comment *c* and Illustration 6 thereto. See also Illustration 1, below. In such a case, it is unfair to the winning party and an unnecessary burden on the courts to allow repeated litigation of the same issue in what is essentially the same controversy, even if the issue is regarded as one of "law." Thus if a corporation issues a series of notes for the repayment of a loan, and the holder of the notes brings an action on one of them, and the corporation's defense that issuance of the notes was ultra vires is rejected by the court, the judgment is conclusive on that issue in a subsequent action on another of the notes.

On the other hand, if the issue is one of the formulation or scope of the applicable legal rule, and if the claims in the two actions are substantially unrelated, the more flexible principle of stare decisis is sufficient to protect the parties and the court from unnecessary burdens. A rule of law declared in an action between two parties should not be binding on them for all time, especially as to claims arising after the first proceeding has been concluded, when other litigants are free to urge that the rule should be rejected. Such preclusion might unduly delay needed changes in the law and might deprive a litigant of a right that the court was prepared to recognize for other litigants in the same position. See Illustration 2.

**Illustrations:**
1. A brings an action against B to recover for infringement of the trademark "Florasynth" by use of the trade name "Flora Essential Oils." The court grants judgment for B on B's motion to dismiss for failure to state a claim, holding that the name "Flora" is a descriptive word of extensive and common use and is not subject to appropriation as a trademark. In a second action by A against B for infringement of the same trademark, in which the allegations of the complaint are the same except that the asserted infringement is limited to the period after the first judgment, the judgment in the first action is conclusive on the issue whether the name "Flora" is subject to appropriation as a trademark.

2. A brings an action against the municipality of B for tortious injury. The court sustains B's defense of sovereign immunity and dismisses the action.

Several years later A brings a second action against B for an unrelated tortious injury occurring after the dismissal. The judgment in the first action is not conclusive on the question whether the defense of sovereign immunity is available to B. Note: The doctrine of stare decisis may lead the court to refuse to reconsider the question of sovereign immunity. See § 29, Comment *i*.

*c. Change in applicable legal context; avoidance of inequitable administration of the laws.* Even when claims in two actions are closely related, an intervening change in the relevant legal climate may warrant reexamination of the rule of law applicable as between the parties. Such reexamination is particularly appropriate when the application of the rule of issue preclusion would impose on one of the parties a significant disadvantage, or confer on him a significant benefit, with respect to his competitors. See Illustration 3. But even when such competition is lacking, reexamination is appropriate if the change in the law, or other circumstances, are such that preclusion would result in a manifestly inequitable administration of the laws. See Illustration 4.

In determining whether the applicable legal context has changed, or that applying preclusion would result in inequitable administration of the law, it is important to recognize that two concepts of equality are in competition with each other. One is the concept that the outcomes of similar legal disputes between the same parties at different points in time should not be disparate. The other is that the outcomes of similar legal disputes being contemporaneously determined between different parties should be resolved according to the same legal standards. Applying issue preclusion invokes the first of these concepts, treating temporally separated controversies the same way at the expense of applying different legal standards to persons similarly situated at the time of the second litigation. The problem is illustrated by the situation where a taxpayer's liability for tax in a certain transaction in one tax year is determined according to a particular interpretation of the tax law, and that interpretation is thereafter abandoned in favor of another interpretation. If issue preclusion is applied in a subsequent tax year, the taxpayer will receive treatment different from that accorded to other taxpayers similarly situated at that time. On the other hand, refusing to apply issue preclusion invokes the second concept of equality. Thus, in the situation posed, if the taxpayer's liability in subsequent years is determined according to the new interpretation of the law, the taxpayer will be treated in those years in the same way as other taxpayers but in a way inconsistent with the determination previously made with respect to him. Comparable problems can arise in other types of

transactions in which the same fact pattern presents itself in adjudications occurring over the course of time.

In deciding whether to apply issue preclusion, or instead to apply a subsequent emerging legal standard, the choice is between two forms of disparity in resolution of legal controversy. In making the choice, the courts sometime pose the question as whether the "rights" involved in the two successive actions are the same. This only poses the problem in different terminology. The same is true of attempting a distinction between an issue of "mixed law and fact" and an issue of the "governing legal rule" because the essential problem is that there has been change in the law but not the facts. Rather, the choice must be made in terms of the importance of stability in the legal relationships between the immediate parties, the actual likelihood that there are similarly situated persons who are subject to application of the rule in question, and the consequences to the latter if they are subject to different legal treatment. In this connection it can be particularly significant that one of the parties is a government agency responsible for continuing administration of a body of law that affects members of the public generally, as in the case of tax law. Refusal of preclusion is ordinarily justified if the effect of applying preclusion is to give one person a favored position in current administration of a law.

**Illustrations:**
3. A, a state agency, brings an action against B to revoke B's wholesale liquor license on the ground that B has violated the law governing the license by selling only to himself as a retailer. The court grants B's motion to dismiss for failure to state a claim, holding that the conduct charged does not violate the law. In a subsequent action by A against C, a higher court holds that identical conduct by C is ground for the revocation of C's wholesale liquor license. In a second action against B for revocation of B's license, A is not precluded from asserting that since the first dismissal, B has continued, as before, to sell only to himself as a retailer.

4. A, a non-profit organization, brings an action against B, the tax commissioner, for a refund of property taxes on the ground that it is exempt as a charity. The court gives judgment for B, adopting a narrow definition of the charitable exemption. Shortly after, a higher court of the same jurisdiction grants a property tax refund to C, an organization quite similar to A, and in doing so formulates a much broader definition of the exemption. In a subsequent action by A against B for a refund of property taxes paid for the following year, A is not precluded from asserting that it is entitled to the charitable exemption. It does not matter that the nature of A's

activities has not changed since the first action.

5. A, an employer, brings an action against B, a labor union, to enjoin a strike in breach of a collective bargaining agreement. The action is dismissed on the ground that a statute deprives the court of jurisdiction to issue such injunctions. In a subsequent case involving two different parties, the decision in A v. B is overruled and jurisdiction to enjoin such a strike is sustained. A is not precluded from asserting jurisdiction in an action to enjoin B from continuing the same strike, from engaging in another strike in breach of the same contract, or from engaging in a strike in breach of a subsequent contract.

*d. Courts of the same state (Subsection (3)).* Not infrequently, issue preclusion will be asserted in an action over which the court rendering the prior judgment would not have had subject matter jurisdiction. In many such cases, there is no reason why preclusion should not apply; the procedures followed in the two courts are comparable in quality and extensiveness, and the first court was fully competent to render a determination of the issue on which preclusion is sought. In other cases, however, there may be compelling reasons why preclusion should not apply. For example, the procedures available in the first court may have been tailored to the prompt, inexpensive determination of small claims and thus may be wholly inappropriate to the determination of the same issues when presented in the context of a much larger claim. The scope of review in the first action may have been very narrow. Or the legislative allocation of jurisdiction among the courts of the state may have been designed to insure that when an action is brought to determine a particular issue directly, it may only be maintained in a court having special competence to deal with it. In such instances, after a court has incidently determined an issue that it lacks jurisdiction to determine directly, the determination should not be binding when a second action is brought in a court having such jurisdiction. The question in each case should be resolved in the light of the nature of litigation in the courts involved and the legislative purposes in allocating jurisdiction among the courts of the state.

**Illustrations:**

6. A brings an action against B to recover for property damage in a court whose jurisdiction is limited to claims not exceeding $2,000. The rules governing the conduct of litigation applicable in the court are substantially the same as those in courts of general jurisdiction. After trial, verdict and judgment are rendered for A on the basis of a finding of B's negligence. In a subsequent action by B against A for $10,000 for personal injuries arising

out of the same occurrence, the finding of B's negligence in the first action is conclusive.

7. The facts are the same as in Illustration 6, except that the first action is brought in a small claims court which has a jurisdictional ceiling of $500, and which operates informally without pleadings, counsel, or rules of evidence. The finding of B's negligence is not conclusive in the second action.

8. In a probate court proceeding involving the estate of A, in which B and C are active and adverse participants, it is determined that C is A's legitimate son. A subsequent action by B against C is brought in a court of general jurisdiction for a declaratory judgment that C is not entitled to share in the proceeds of a certain inter vivos trust because he is not A's legitimate son. The procedures followed in the probate court are of comparable quality to those in the court of general jurisdiction. The determination of legitimacy in the prior action is conclusive.

9. H brings an action for forcible entry and detainer against W before a justice of the peace. W defends on the ground that the parties are legally married and that under the law of the State such an action cannot be maintained between spouses. The justice of the peace rejects the defense, ruling that the parties are not legally married. A subsequent action for divorce is brought between W and H in the domestic relations court, which has exclusive jurisdiction over divorce actions. The determination in the prior action that the parties are not legally married is not conclusive.

*e. Courts of different states; state and federal courts.* This Restatement deals primarily with the effect of a judgment in the courts of the state in which it was rendered. The problem covered in Subsection (3), however, frequently arises when the second action is brought in the courts of another state, or in the federal courts. The problem also arises when the first action brought in a federal court and the second action in a state court. In many such cases, the Full Faith and Credit Clause or the Supremacy Clause of the United States Constitution, or federal statutes or rules of decision, may require that preclusive effect be given to the first judgment. For example, in a state court action on a patent license agreement, a determination may be made that the agreement terminated on a particular date; such a determination would be conclusive in a subsequent federal court action between the same parties for patent infringement. See 28 U.S.C. § 1738. And in a federal court action for patent infringement, a determination that the patent is invalid would be conclusive on that issue in a subsequent state

court action on a license agreement. See Article VI, Clause 2, of the U.S. Constitution (the Supremacy Clause). On the other hand, a determination in a state court action on a patent license agreement upholding the defense that the patent was invalid for want of invention would not be held binding in a subsequent federal court action for patent infringement if the Congressional grant of exclusive jurisdiction in patent infringement cases to the federal district courts is construed to require otherwise. The question in each such case would be resolved in the light of the legislative purpose in vesting exclusive jurisdiction in a particular court. See § 86. See also the related discussion in Comment *d* to this Section.

As a further example, a court in State A may determine an issue involving title to land in State B, even though the A court would not have had jurisdiction over the land itself. In such a case, the determination is conclusive as between the parties to the proceeding in State A and should be given preclusive effect in State B and other states. See Restatement, Second, Conflict of Laws § 95. The different question of the extraterritorial effect of a decree ordering the conveyance of land in another state, or of other equity decrees, is dealt with in Restatement, Second, Conflict of Laws § 102, and discussed in § 18, Comment *d*.

*f. Differences in the burden of persuasion (Subsection (4)).* To apply issue preclusion in the cases described in Subsection (4) would be to hold, in effect, that the losing party in the first action would also have lost had a significantly different burden being imposed. While there may be many occasions when such a holding would be correct, there are many others in which the allocation and weight of the burden of persuasion (or burden of proof, as it is called in many jurisdictions) are critical in determining who should prevail. Since the process by which the issue was adjudicated cannot be reconstructed on the basis of a new and different burden, preclusive effect is properly denied. This is a major reason for the general rule that, even when the parties are the same, an acquittal in a criminal proceeding is not conclusive in a subsequent civil action arising out of the same event. See § 85.

**Illustrations:**

10. A brings an action against B for injuries incurred in an automobile accident involving cars driven by A and B. Under the governing law, A has the burden of proving his freedom from contributory negligence. Verdict and judgment are given for B on the basis that A has not sustained that burden. In a subsequent action by B against A for injuries incurred in the same accident, the issue of A's negligence (on which B now has the burden

of persuasion) is not concluded by the first judgment.

11. A brings an action against B to recover on a promissory note. B defends on the ground that he was induced by A's fraud to give this and other notes in the series, but fails to establish fraud by clear and convincing evidence as required by law. After judgment for A, the law is changed to provide that in such cases fraud need be proved only by a preponderance of the evidence. In an action by A on another note in the series, B is not precluded from asserting the defense of fraud.

*g. Rationale for Subsection (5).* As stated in the introduction to Title E, the policy supporting issue preclusion is not so unyielding that it must invariably be applied, even in the face of strong competing considerations. There are instances in which the interests supporting a new determination of an issue already determined outweigh the resulting burden on the other party and on the courts. But such instances must be the rare exception, and litigation to establish an exception in a particular case should not be encouraged. Thus it is important to admit an exception only when the need for a redetermination of the issue is a compelling one.

*h. Potential adverse impact on persons not parties.* There are many instances in which the nature of an action is such that the judgment will have a direct impact on those who are not themselves parties. For example, an agency of government may bring an action for the protection or relief of particular persons or of a broad segment of the public, or an individual may sue as representative of a class. In such cases, when a second action is brought, due consideration of the interests of persons not themselves before the court in the prior action may justify relitigation of an issue actually litigated and determined in that action. For example, in a class action, see § 41, members of the class may be content to have a particular person represent them in connection with one claim, not knowing or having reason to know that an issue may be litigated in the action that is crucial to the determination of another, unrelated claim in which they have an interest.

*i. Unforeseeability that issue would arise in the context of the second action.* As noted in § 27, Comment *j*, it is not necessary to the application of the rule of preclusion that the issue be one of "ultimate fact" in either the first or the second action. But at the same time, preclusion should not operate to foreclose redetermination of an issue if it was unforeseeable when the first action was litigated that the issue would arise in the context of the second action, and if that lack of foreseeability may have contributed to the losing party's failure to litigate the issue fully. Such instances are

21

rare, but they may arise, for example, between institutional litigants as a result of a change in the governing law. Thus, a determination in an action between the taxing authorities and a corporate taxpayer that a transfer of property has not occurred may become relevant to a wholly different question of tax liability under an amendment to the tax law passed after the initial judgment was rendered. Another example of a case in which a determination may have unforeseeable consequences is one in which that determination is relevant to a claim involving property acquired after the first judgment has become final.

*j. Lack of fair opportunity to litigate in the initial action.* In an action in which an issue is litigated and determined, one party may conceal from the other information that would materially affect the outcome of the case. Such concealment may be of particular concern if there is a fiduciary relationship between the parties. Or one of the parties may have been laboring under a mental or physical disability that impeded effective litigation and that has since been removed. Or it may be evident from the jury's verdict that the verdict was the result of compromise. Or the amount in controversy in the first action may have been so small in relation to the amount in controversy in the second that preclusion would be plainly unfair.

In some of these instances, relief from the first judgment may be available, at least within specified time limits, see §§ 70- 73; in others such relief is unavailable. But whether or not relief from the first judgment may be obtained, the court in the second proceeding may conclude that issue preclusion should not apply because the party sought to be bound did not have an adequate opportunity or incentive to obtain a full and fair adjudication in the first proceeding. Such a refusal to give the first judgment preclusive effect should not occur without a compelling showing of unfairness, nor should it be based simply on a conclusion that the first determination was patently erroneous. But confined within proper limits, discretion to deny preclusive effect to a determination under the circumstances stated is central to the fair administration of preclusion doctrine.

## Case Summaries

### *City of Colton v. Am. Promotional Events, Inc.-West*, 614 F.3d 998 (9th Cir. 2010):

The City of Colton ("Colton") sued numerous entities engaged in industrial activities in the Rialto-Colton groundwater basin, from which Colton draws its water supply. *Id.* at 1003. Colton alleged that the entities' activities resulted in a high concentration of a contaminant—perchlorate—in the water basin. *Id.* Colton sought recovery of $4 million it spent to investigate the contamination and implement a wellhead treatment program under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), and sought declaratory relief as to future costs under the Declaratory Judgment Act. *Id.* The district court granted summary judgment for the defendants, holding that Colton failed to show that recovery costs were necessary and consistent with the national contingency plan ("NCP"). *Id.* at 1004. Colton conceded that it failed to comply with the NCP, which the Ninth Circuit found was a sufficient ground upon which to affirm the grant of summary judgment. *Id.* In declining to review the merits of the district court's conclusion that the costs were unnecessary, the court of appeals explained that "in a future action, Colton could argue that our reliance on the NCP compliance holding alone vitiates any preclusive effect of the district court's necessity holding." *Id.* at 1004 n.4 (citing Restatement (Second) of Judgments § 27 cmt. o (1982)); *see also id.* ("It is a well-established principle of federal law that if an appellate court considers only one of a lower court's alternative bases for its holding, affirming the judgment without reaching the alternative bases, only the basis that is actually considered can have any preclusive effect in subsequent litigation.") (quoting *Niagara Mohawk Power Corp. v. Tonawanda Band of Seneca Indians*, 94 F.3d 747, 754 (2d Cir. 1996)).

### *Liberty Mutual Ins. Co. v. EEOC*, 691 F.2d 438 (9th Cir. 1982):

The district court denied defendant's motion to amend an injunction and motion for costs. *Id.* at 440. The Ninth Circuit reversed the district court's ruling on the motion to amend, granted defendant's motion for costs on appeal, but was silent on the district court's denial of costs. *Id.* On remand, the district court concluded that the Ninth Circuit affirmed its prior denial of costs. *Id.* The Ninth Circuit disagreed, holding that its judgment was conclusive only as to the motion to amend and not as to the motion for costs, which was "open for consideration by the district court on remand." *Id.* at 441–42.

### *In re Peters*, 642 F.3d 381 (2d Cir. 2011):

An attorney was sanctioned by the district court (acting for the Committee on Grievances) and was suspended from practicing before that court for seven years. *Id.* at 383. The court of appeals had previously affirmed the underlying sanctions to the extent the district court had reprimanded the attorney. *Id.* at 384. But the Second Circuit had

not addressed the two charges upon which the Grievance Committee's suspension was based. *Id.* at 385, 386. The Second Circuit disagreed that the Grievance Committee could rely on preclusion doctrines in finding that it did not need to hold a hearing as to the two issues the Second Circuit had expressly declined to reach in its prior opinion. *Id.* at 386 ("[T]he Court nonetheless made clear that appellate review had been limited to the sampling of conduct explicitly discussed in the opinion…. Thus, the Committee was incorrect to rely on such preclusion doctrines as collateral estoppel and res judicata in finding that it need not hold its own hearing."); *see also id.* ("If an appeal is taken and the appellate court affirms on one ground and disregards the other, there is no collateral estoppel as to the unreviewed ground.") (quoting *Gelb v. Royal Globe Ins. Co.*, 798 F.2d 38, 45 (2d Cir. 1986)).

### *In re Baylis*, 217 F.3d 66 (1st Cir. 2000):

The First Circuit reversed the district court's determination that an earlier, separate probate court proceeding had preclusive effect in the current bankruptcy proceeding with respect to bad faith. *Id.* at 72. The result of the probate court proceeding (regarding the proceeds of a trust) had been appealed to the Supreme Judicial Court of Massachusetts, which "expressly refused to reach the issue of bad faith, stating that a finding of negligent breach of fiduciary duty would suffice to affirm the judgment." *Id.* at 70. This finding was raised in the bankruptcy proceedings because the plaintiffs opposed the discharge of judgment debt to them under the Bankruptcy Code, which prohibits the discharge of debt arising from "defalcation while acting in a fiduciary capacity" or from "willful and malicious injury." *Id.* at 70. Because the court of first instance declined to decide the issue, preclusion did not apply. *Id.* at 72 ("In other words, the alternative determination cannot have preclusive effect until the appellate court analyzes it and decides that the court of first instance correctly resolved it."); *see also id.* at 71 ("If a judgment of a court of first instance is based on determinations of two issues, either of which standing independently would be sufficient to support the result," and "the appellate court affirms on one ground and passes on the other, [then] the judgment is conclusive only as to the first determination.") (quotations omitted).

### *Aviall, Inc. v. Ryder Sys., Inc.*, 110 F.3d 892 (2d Cir. 1997):

Aviall sought to disqualify KPMG as arbitrator in a dispute between the parties. *Id.* at 893. The district court granted summary judgment to Ryder finding that the Federal Arbitration Act ("FAA") does not provide for pre-award removal of an arbitrator *Id.* at 895. Aviall appealed, arguing that Ryder could use the judgment to preclude Aviall from bringing a post-award challenge. *Id.* at 897. The Second Circuit found this concern "unfounded," holding that the district court only determined that it had no power under the FAA to remove KPMG for its conduct. *Id.* Thus, the court of appeals explained, the district court's additional ruling that Aviall had not shown evident partiality on KPMG's

part "was in no way essential to his decision." *Id.* Further, because the court of appeals "ha[d] no occasion to review [the district court's] findings, they cannot have any preclusive effect in any subsequent action"—"when there has been no review even though an appeal has been taken [on an issue], it is equivalent to the party not having had an opportunity to appeal [the issue], and prevents the challenged decision from becoming the law of the case." *Id.* at 897–98.

### *Dow Chem. v. EPA*, 832 F.2d 319 (5th Cir. 1987):

In an earlier ruling, the district court ruled that it lacked subject matter jurisdiction over a dispute between Dow and the EPA on the meaning of a regulation governing industrial discharges of vinyl chloride. *Id.* at 322. The district court's ruling rested on two grounds: lack of federal question jurisdiction and lack of final agency action. *Id.* The Fifth Circuit affirmed on other grounds. *Id.* The parties eventually settled most of the case, except on the issue of "final agency action." *Id.* The Fifth Circuit determined that because it "affirmed on one ground and passed over another, preclusion does not attach to the ground omitted from its [prior] decision." *Id.* at 323. Thus, the Fifth Circuit was free to hold that the EPA had not engaged in final agency action, and to dismiss Dow's petition for lack of subject matter jurisdiction. *Id.* at 325–26.

4

1   GIBSON, DUNN & CRUTCHER LLP          RIMINI STREET, INC.
    Mark A. Perry (*pro hac vice*)              Daniel B. Winslow (*pro hac vice*)
2   1050 Connecticut Avenue, N.W.          6601 Koll Center Parkway, Suite 300
    Washington, DC 20036-5306              Pleasanton, CA 94566
3   Telephone: (202) 955-8500             Telephone: (925) 264-7736
    mperry@gibsondunn.com                  dwinslow@riministreet.com
4
    Blaine H. Evanson (*pro hac vice*)          John P. Reilly (*pro hac vice*)
5   Joseph A. Gorman (*pro hac vice*)          3993 Howard Hughes Parkway, Suite 500
    333 South Grand Avenue                 Las Vegas, NV 89169
6   Los Angeles, CA 90071                  Telephone: (336) 908-6961
7   Telephone: (213) 229-7228             jreilly@riministreet.com
    bevanson@gibsondunn.com
8
    HOWARD & HOWARD PLLC
9   W. West Allen (Nevada Bar No. 5566)
10  3800 Howard Hughes Parkway, Suite 1000
    Las Vegas, NV 89169
11  Telephone: (702) 667-4843
    wallen@howardandhoward.com
12
13                    *Attorneys for Defendants Rimini Street, Inc. and Seth Ravin*

14                    **UNITED STATES DISTRICT COURT**
                               **DISTRICT OF NEVADA**
15

| | |
|---|---|
| 16  ORACLE USA, INC., a Colorado corporation; ORACLE AMERICA, INC., a Delaware corporation; and ORACLE INTERNATIONAL CORPORATION, a California corporation, | |
| 18  Plaintiffs, | Case No. 2:10-cv-0106-LRH-PAL |
| 19  v. | **APPENDIX III IN SUPPORT OF DEFENDANTS' OPPOSITION TO ORACLE'S RENEWED MOTION FOR A PERMANENT INJUNCTION** |
| 20  RIMINI STREET, INC., a Nevada corporation; and SETH RAVIN, an individual, | |
| 22  Defendants. | **RIMINI'S SPECIFIC OBJECTIONS TO ORACLE'S PROPOSED INJUNCTION** |

**TABLE OF APPENDICES AND EXHIBITS**

**Appendix I**: Rimini's Objections to Oracle's Proposed Findings of Fact

**Appendix II**: Rimini's Proposed Order Denying Oracle's Renewed Motion

**Appendix III**: Rimini's Specific Objections to Oracle's Proposed Injunction

**Appendix IV**: Exhibits

Volume I

Exhibit A: *Oracle USA, Inc. v. Rimini St., Inc.*, 879 F.3d 948 (9th Cir. 2018).

Exhibit B: Excerpts of Oral Argument Transcript from Ninth Circuit

Exhibit C: Rimini Declarations Regarding Changed Processes

Exhibit D: Jury Verdict

Exhibit E: Jury Instructions

Exhibit F: Permanent Injunction

Exhibit G: Ninth Circuit Order Staying Permanent Injunction Pending Appeal

Exhibit H: Slide 34 from Rimini's Permanent Injunction Argument

Exhibit I: Cited Testimony of Safra Catz

Volume II

Exhibit J: Cited Testimony of Seth Ravin

Exhibit K: Cited Testimony of Kevin Maddock

Volume III

Exhibit L: Cited Testimony of Edward Yourdon

Exhibit M: Cited Testimony of Former Oracle Customers

Exhibit N: Cited Testimony Regarding Oracle Improved Attrition

Exhibit O: Oracle's Internal Reports Regarding Customer Satisfaction

Exhibit P: Cited Testimony of Elizabeth Dean Regarding Damages

Exhibit Q: Declaration of Brian J. Slepko Regarding Costs of Overbroad Injunction

Exhibit R: Oracle's Trial Exhibit 3

Exhibit S: Oracle's Trial Exhibit 2155

Gibson, Dunn &
Crutcher LLP

# **Appendix III**:
## Rimini's Specific Objections to Oracle's Proposed Injunction

## APPENDIX III

## RIMINI'S SPECIFIC OBJECTIONS TO ORACLE'S PROPOSED INJUNCTION

Rimini hereby submits the following objections to Oracle's proposed injunction. Oracle's proposed injunction is fatally flawed for numerous reasons, most critically that it (i) prohibits conduct far beyond the scope of the Ninth Circuit's narrow rulings on infringement, and (ii) fails to provide Rimini with adequate notice of what conduct is enjoined because it is unduly vague and overbroad. *See Columbia Pictures Indus., Inc. v. Fung*, 710 F.3d 1020, 1047 (9th Cir. 2013) (Rule 65(d) is intended "to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague to be understood"); *Price v. City of Stockton*, 390 F.3d 1105, 1117 (9th Cir. 2004) (injunction "must be narrowly tailored … to remedy only the specific harms shown by plaintiffs, rather than to enjoin all possible breaches of the law"). Rimini respectfully requests that the Court reject Oracle's proposed injunction.

For the Court's convenience, Rimini's specific objections are listed below and interlineated in Oracle's proposed injunction. To the extent they are not included herein, these objections are in addition to those made in Rimini's brief in opposition to Oracle's renewed motion for a permanent injunction.

1. Objection 1: This language is vague and overbroad, fails to provide adequate notice of what conduct is enjoined, and would create uncertainty and confusion.

2. Objection 2: This language is vague and overbroad in that it requires notice to persons based on the prohibited acts. It also requires notice to persons, such as Rimini's "affiliates" and "subsidiaries," that are not covered by Federal Rule of Civil Procedure 65(d) or otherwise defined in Oracle's proposed injunction. The provision should require notice only to persons directly involved in support for the specific products.

3. Objection 3: This language prohibits more conduct than the Ninth Circuit adjudicated infringing. *See Oracle USA, Inc. v. Rimini St., Inc.*, 879 F.3d 948 (9th Cir. 2018).

4. Objection 4: This language seeks to rewrite and expand the restrictions in the licenses,

which do not refer to specific conduct that is permitted.

5. <u>Objection 5</u>: This language is an impermissible obstacle to competition. If conduct is licensed, then there is no requirement to affirm it in writing. Moreover, as the Ninth Circuit acknowledged, "[*a*]*ll* of Rimini's customers pertinent to this dispute were licensees of Oracle's software." 879 F.3d at 952 n.1 (emphasis added). Rimini was never held liable for providing Oracle's copyrighted materials to any customer without a valid license, and therefore there is no basis for requiring that licensees affirm in writing that they are licensees.

6. <u>Objection 6</u>: The Ninth Circuit upheld liability based on the reproduction right (*see* 17 U.S.C. § 106(1))—not on the distribution or derivative works rights (*see id.* § 106(2)–(3)). *See* 879 F.3d at 952–53, 956–57, 959–60.

7. <u>Objection 7</u>: The term "specific licensee's own computer systems" is vague, undefined, and overbroad in view of the Ninth Circuit's holding that only the PeopleSoft licenses—and not the licenses for the other produce lines—contained a so called "facilities" limitation limiting copying to servers over which the licensee retains actual or constructive control. *See* 879 F.3d at 958–60.

8. <u>Objection 8</u>: The term "internal data processing operations" is overbroad and vague, and has never been defined by this Court. The full scope of this contractual phrase is at issue in *Rimini II*.

9. <u>Objection 9</u>: The term "benefit" is vague and undefined.

10. <u>Objection 10</u>: This provision seeks to prohibit "copy[ing]" and "access[ing]" "source code," even though no license—let alone every one of the various licenses—contains these overbroad, vague, and undefined terms and restrictions. *See, e.g.*, Oracle's Trial Exhibit 705 (Siebel license not restricting access to source code). Further, "access" goes beyond the exclusive rights of the Copyright Act.

11. <u>Objection 11</u>: This provision seeks to make Rimini's ability to service one product line contingent on its adherence to the injunction's terms concerning a different

product line, even though the Ninth Circuit recognized that the licenses at issue have meaningful differences in their terms. *See* 879 F.3d at 953. There is no basis in the licenses or the law to tie product lines together, such that failure to comply with the injunction as to one product line precludes lawful activity on a different product line.

12. Objection 12: This provision seeks to prohibit forms of cross use not reached by the Ninth Circuit's decision. The Ninth Circuit upheld infringement liability for JD Edwards and Siebel only on the grounds that Rimini performed services under color of a license for an existing customer for future or unknown clients. *See* 879 F.3d at 953, 957. The injunction cannot prohibit more than that.

13. Objection 13: This provision seeks to prohibit Rimini from copying Oracle Database software using valid Oracle License and Service Agreements, even though the Ninth Circuit only upheld liability on the ground that developer licenses do not permit such copying. *See* 879 F.3d at 960. The injunction cannot reach lawful reproduction of Oracle Database, but may only prevent what has actually been adjudicated unlawful.

14. Objection 14: Distribution to a specific licensee of materials that Rimini downloads for that licensee is permitted. *See* 879 F.3d at 962. The Ninth Circuit did not uphold liability based on violations of the distribution right.

15. Objection 15: Oracle purports to limit copying of JD Edwards and Siebel only to unmodified, back-up copies; but the Ninth Circuit expressly held that Rimini may "creat[e] development environments for a licensee for various purposes after that licensee [of JD Edwards and/or Siebel] has become a customer of Rimini." 879 F.3d at 958

APPENDIX III: RIMINI'S SPECIFIC OBJECTIONS TO ORACLE'S PROPOSED INJUNCTION

## INJUNCTION PURSUANT TO 17 U.S.C. § 502(a)

Good cause being shown, the Court permanently enjoins and restrains Defendant Rimini
<sup>Obj. 1, 2, 3</sup>
Street, Inc. and its subsidiaries, affiliates, employees, directors, officers, principals, and agents

(collectively, "Rimini") as follows:  Obj. 1, 2, 3

1.      Rimini Street, Inc. shall provide notice of this Section 502 Order to all subsidiaries,
Obj. 1
affiliates, employees, directors, officers, principals, and agents that may have any
Obj. 1, 3, 6, 14
involvement whatsoever in reproducing, preparing derivative works from, or

distributing PeopleSoft, JD Edwards, Siebel, or Oracle Database software or

documentation.  Obj. 1, 3, 6, 14

2.      Rimini shall not reproduce, prepare derivative works from, or distribute PeopleSoft,

JD Edwards, or Siebel software or documentation in any way unless both of the
Obj. 1, 3, 5
following conditions are met:
Obj. 1, 3, 6, 14

(a)      Rimini shall not reproduce, prepare derivative works from, or

distribute PeopleSoft, JD Edwards, or Siebel software or documentation unless solely
Obj. 1, 3, 4, 5
in connection with work for a specific customer that has affirmed in writing that the

customer holds a valid, written license agreement for the particular PeopleSoft, JD
Obj. 1, 3, 4, 5
Edwards, or Siebel software and documentation authorizing Rimini's specific

conduct; and  Obj. 1, 3, 6, 14

(b)      Rimini shall not reproduce, prepare derivative works from, or  Obj. 1, 3, 11

distribute PeopleSoft, JD Edwards, or Siebel software or documentation unless such

conduct is consistent with the remaining terms of this Order.

A.      PeopleSoft
Obj. 1, 3, 6, 14                                        Obj. 1, 3, 6

3.      Rimini shall not distribute PeopleSoft software or documentation or any derivative

works created from or with PeopleSoft software or documentation;
Obj. 1, 3, 6                                        Obj. 1

4.      Rimini shall not reproduce, prepare derivative works from, or use a specific  Obj. 1, 3, 7

licensee's PeopleSoft software or documentation other than to support the specific
Obj. 1, 3, 8
licensee's own internal data processing operations;

1

APPENDIX III: RIMINI'S SPECIFIC OBJECTIONS TO ORACLE'S PROPOSED INJUNCTION

Obj. 1, 3, 6                                    Obj. 1

5.   Rimini shall not reproduce, **prepare derivative works from,** or **use** PeopleSoft    Obj. 1, 3, 7

software or documentation on, with, or to any computer systems other than a **specific**

**licensee's own computer systems;**
          Obj. 1, 3, 6                    Obj. 1

6.   Rimini shall not reproduce, **prepare derivative works from,** or **use** PeopleSoft

software or documentation on one licensee's computer systems to support,

troubleshoot, or perform development or testing for any other licensee, including,
          Obj. 1, 3, 9

specifically, that **Rimini shall not use a specific licensee's PeopleSoft environment to**

**develop or test software updates or modifications for the benefit of any other**

**licensee:**

        **B.   JD Edwards**
          Obj. 1, 3, 6, 14                                    Obj, 1, 3, 6

7.   Rimini shall not **distribute** JD Edwards software or documentation or any **derivative**

**works** created from or with JD Edwards software or documentation;
          Obj. 1, 3, 6

8.   Rimini shall not reproduce, **prepare derivative works from,** or **use** a specific
                  Obj. 1, 3, 7

licensee's JD Edwards software or documentation other than on a **specific licensee's**

**own computer systems;**
          Obj. 1, 3, 10

9.   **Rimini shall not copy or access JD Edwards software source code:**
          Obj.1, 3, 6                    Obj. 1

10.  Rimini shall not reproduce, **prepare derivative works from,** or **use** JD Edwards    Obj. 1, 3, 7
          Obj. 1, 3

software or documentation **on, with, or to** any computer systems other than a **specific**
          Obj. 1, 3, 12, 15

**licensee's own computer systems, except to create an unmodified copy of a specific**

**licensee's software application and documentation for use by that specific licensee in**

**the event that the production copy of the licensee's software is corrupted or lost;**
          Obj. 1, 3, 6                    Obj. 1

11.  Rimini shall not reproduce, **prepare derivative works from,** or **use** JD Edwards

software or documentation on one licensee's computer systems to support,
          Obj. 1, 3, 9, 12

troubleshoot, or perform development or testing for any other licensee, **including,**

**specifically, that Rimini shall not use a specific licensee's JD Edwards environment**

**to develop or test software updates or modifications for the benefit of any other**

**licensee:**

2

### C.  Siebel  Obj. 1, 3, 6

12.  Rimini shall not distribute or prepare derivative works from Siebel software or documentation;  Obj. 1, 3, 10

13.  Rimini shall not copy or access Siebel software source code;  Obj. 1, 3

14.  Rimini shall not reproduce or use Siebel software or documentation on, with, or to  Obj. 1, 3, 7  any computer systems other than a specific licensee's own computer systems, except solely to:  Obj. 1, 3, 12, 15

   a.  create un unmodified copy of a specific licensee's software application and documentation for the use of that specific licensee in the event that the production copy of the licensee's software is corrupted or lost;

   b.  create an unmodified copy of a specific licensee's software application and documentation for emergency back-up purposes; or,

   c.  create an unmodified copy of a specific licensee's software application and documentation for disaster recovery purposes and related testing;  Obj. 1, 3, 6       Obj. 1

15.  Rimini shall not reproduce, prepare derivative works from, or use Siebel software or documentation on one licensee's computer systems to support, troubleshoot, or perform development or testing for any other licensee, including, specifically, that  Obj. 1, 3, 9, 12  Rimini shall not use a specific licensee's Siebel environment to develop or test software updates or modifications for the benefit of any other licensee;

### D.  Oracle Database  Obj. 1, 3, 13       Obj. 1, 3, 6

16.  Rimini shall not reproduce, prepare derivate works from, or distribute Oracle Database software.

**IT IS SO ORDERED.**

DATED:

APPENDIX III: RIMINI'S SPECIFIC OBJECTIONS TO ORACLE'S PROPOSED INJUNCTION

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

By:_____

Hon. Larry R. Hicks

United States District Judge

4

APPENDIX III – RIMINI'S SPECIFIC OBJECTIONS TO ORACLE'S PROPOSED INJUNCTION

**CERTIFICATE OF SERVICE**

I hereby certify that on April 4, 2018, I electronically filed the foregoing document with the clerk of the court for the U.S. District Court, District of Nevada, using the electronic case filing system. The electronic case filing system sent a "Notice of Electronic Filing" to the attorneys of record who have consented in writing to accept this Notice as service of this document by electronic means.

GIBSON, DUNN & CRUTCHER LLP

By:*s/ Mark A. Perry*
Mark A. Perry
*Attorneys for Defendants*
*Rimini Street, Inc. and Seth Ravin*

5

# Appendix A

$28,502,246.40
Oracle's Requested Amount
$X Offset for
Mr. Ravin's Fees
No Offset
50% Reduction Because
Mr. Ravin is a Prevailing
Party
$ 23,817,700.11
$ 14,251,123.20
Reduction for
8.3% degree
of success
Reduction for
14.5% degree
of success
Reduction for
27.7% degree
of success
$ 1,984,808.34
$ 3,448,190.82
$ 6,608,808.45
$ 2,375,187.20
$ 4,126,392.73
$ 7,908,651.38
$ 1,187,593.60
$ 2,063,196.36
$ 3,954,325.69
Rule 68
Reduction
$ 1,660,796.36
$ 2,885,287.53
$ 5,529,947.02
$ 1,987,447.43
$ 3,452,775.70
$ 6,617,595.82
$ 993,723.72
$ 1,726,387.85
$ 3,308,797.91
Unreasonable
Rates Reduction
$ 1,398,210.94
$ 2,429,100.10
$ 4,655,617.41
$ 1,789,166.28
$ 3,108,303.51
$ 5,957,379.84
$ 894,583.14
$ 1,554,151.76
$ 2,978,689.92

