BOIES SCHILLER FLEXNER LLP
RICHARD J. POCKER (NV Bar No. 3568)
300 South Fourth Street, Suite 800
Las Vegas, NV 89101
Telephone:     702.382.7300
Facsimile:     702.382.2755
rpocker@bsfllp.com

BOIES SCHILLER FLEXNER LLP
WILLIAM ISAACSON (*pro hac vice*)
KAREN DUNN (*pro hac vice*)
1401 New York Avenue, NW, 11th Floor
Washington, DC 20005
Telephone:     (202) 237-2727
Facsimile:     (202) 237-6131
wisaacson@bsfllp.com
kdunn@bsfllp.com

BOIES SCHILLER FLEXNER LLP
STEVEN C. HOLTZMAN (*pro hac vice*)
BEKO O. REBLITZ-RICHARDSON
   (*pro hac vice*)
1999 Harrison Street, Suite 900
Oakland, CA 94612
Telephone:     510.874.1000
Facsimile:     510.874.1460
sholtzman@bsfllp.com
brichardson@bsfllp.com

MORGAN, LEWIS & BOCKIUS LLP
BENJAMIN P. SMITH (*pro hac vice*)
JOHN A. POLITO (*pro hac vice*)
SHARON R. SMITH (*pro hac vice*)
One Market, Spear Street Tower
San Francisco, CA  94105
Telephone:     415.442.1000
Facsimile:     415.442.1001
benjamin.smith@morganlewis.com
john.polito@morganlewis.com
sharon.smith@morganlewis.com

DORIAN DALEY (*pro hac vice*)
DEBORAH K. MILLER (*pro hac vice*)
JAMES C. MAROULIS (*pro hac vice*)
ORACLE CORPORATION
500 Oracle Parkway, M/S 5op7
Redwood City, CA 94070
Telephone:     650.506.4846
Facsimile:     650.506.7114
dorian.daley@oracle.com
deborah.miller@oracle.com
jim.maroulis@oracle.com

*Attorneys for Plaintiffs Oracle USA, Inc.,*
*Oracle America, Inc., and Oracle*
*International Corp.*

GIBSON, DUNN & CRUTCHER LLP
MARK A. PERRY (*pro hac vice*)
1050 Connecticut Avenue, N.W.
Washington, DC 11101
Telephone: 202.955.8500
mperry@gibsondunn.com

GIBSON, DUNN & CRUTCHER LLP
JEFFREY T. THOMAS (*pro hac vice*)
BLAINE H. EVANSON (*pro hac vice*)
JOSEPH A. GORMAN (*pro hac vice*)
CASEY J. MCCRACKEN (*pro hac vice*)
3161 Michelson Drive
Irvine, CA 92612-4412
Telephone: 949.451.3800
bevanson@gibsondunn.com
jgorman@gibsondunn.com
cmccracken@gibsondunn.com

GIBSON, DUNN & CRUTCHER LLP
SAMUEL G. LIVERSIDGE (*pro hac vice*)
ERIC D. VANDEVELDE (*pro hac vice*)
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: (213) 229-7000
sliversidge@gibsondunn.com
evandevelde@gibsondunn.com

RIMINI STREET, INC.
DANIEL B. WINSLOW (*pro hac vice*)
6601 Koll Center Parkway, Suite 300
Pleasanton, CA 94566
Telephone: (925) 264-7736
dwinslow@riministreet.com

RIMINI STREET, INC.
JOHN P. REILLY (*pro hac vice*)
3993 Howard Hughes Parkway, Suite 500
Las Vegas, NV 89169
Telephone: (336) 908-6961
jreilly@riministreet.com

HOWARD & HOWARD ATTORNEYS
PLLC
W. WEST ALLEN (Nevada Bar No. 5566)
3800 Howard Hughes Parkway, Suite 1000
Las Vegas, NV 89169
Telephone: (702) 667-4843
wwa@h2law.com

*Attorneys for Defendants Rimini Street, Inc.*
* and Seth Ravin.*

---

JOINT SUBMISSION RE: DISCOVERY PLAN

UNITED STATE DISTRICT COURT
DISTRICT OF NEVADA

| | |
|---|---|
| ORACLE USA, INC.; a Colorado corporation; ORACLE AMERICA, INC.; a Delaware corporation; and ORACLE INTERNATIONAL CORPORATION, a California corporation,<br><br>　　　　　Plaintiffs,<br><br>　　v.<br><br>RIMINI STREET, INC., a Nevada corporation; and SETH RAVIN, an individual,<br><br>　　　　　Defendants. | CASE NO. 2:10-CV-0106-LRH-VCF<br><br>**JOINT STATUS REPORT AND SUBMISSION RE: DISCOVERY PLAN**<br><br>**HEARING REQUESTED** |

Pursuant to the Court's Order (ECF No. 1228), Plaintiffs Oracle America, Inc. and Oracle International Corp. (collectively, "Oracle") and Defendants Rimini Street, Inc. and Seth Ravin (collectively, "Rimini"; all parties collectively, "Parties," any party, "Party") submit this Joint Status Report.  The Parties each submit their own Proposed Scheduling Order.  Rimini requests that the Court set a hearing at its convenience to resolve the Parties' competing proposals.

**ORACLE'S PROPOSED DISCOVERY PLAN AND STATUS UPDATE**

**Oracle's Status Update**

Magistrate Judge Hoffman's recent order permits Oracle to use *Rimini II* discovery in this action to prove Rimini's violation of the Injunction.  That is a helpful development because *Rimini II* discovery (which had a fact cutoff of February 28, 2018) shows Rimini conduct (including cross-use and cloud hosting) that would clearly violate the Injunction if such conduct continued after the Injunction became effective on November 5, 2018.  Ex. 1 (Oracle letter describing in detail how *Rimini II* evidence shows conduct that would violate specific terms of the Injunction, which are based on rulings from *Rimini I*).

Seeking to streamline any additional discovery, Oracle has repeatedly asked Rimini for information regarding any changes it made in response to the Injunction.  If Rimini stipulates that it continued to engage in the same conduct after November 5, 2018, that could both focus and reduce the amount of additional discovery Oracle needs for any contempt proceeding.  Rimini, however, has so far refused to provide the requested information regarding any changes and refused to stipulate to the continuation of conduct shown by the *Rimini II* discovery.

Rimini's responses to the discovery Oracle served on May 1 (Exs. 2 & 3) consisted entirely of objections, and Rimini has been unwilling to respond substantively to Oracle's proposed factual stipulations.  Rimini's separate statement below now indicates that it will (eventually) respond in part to some of Oracle's discovery served May 1, 2019, as its "Phase 1" proposals track Oracle's Requests for Production Nos. 1, 2 and 5, and Oracle's Interrogatory Nos. 4 and 5, as reflected by this chart:

| Oracle's May 1 Discovery Request | Proposal in Rimini's Separate Statement |
|---|---|
| **REQUEST FOR PRODUCTION NO. 1**:<br>All Documents concerning any changes Rimini made in response to the Injunction. | A request for production of non-privileged documents sufficient to show the changes to Rimini's support processes made in response to the injunction |

| Oracle's May 1 Discovery Request | Proposal in Rimini's Separate Statement |
|---|---|
| **REQUEST FOR PRODUCTION NO. 2**:<br>A copy of Rimini's AFW database containing records from November 5, 2018 to the present. | A request for production of AFW records stored in the AFW database that reflect what "has changed after the date of the injunction" |
| **REQUEST FOR PRODUCTION NO. 5**:<br>All policies or memoranda Rimini wrote or developed in response to the Injunction regarding Rimini's support processes, including but not limited to notices to all subsidiaries, affiliates, employees, directors, officers, principals, and agents pursuant to paragraph 1 of the Injunction. | A request for production of non-privileged policies or memoranda that Rimini created and promulgated in response to the injunction regarding Rimini's support practices<br><br>A request for production of documents sufficient to show Rimini's compliance with Paragraph 1 of the injunction, requiring Rimini to give "notice" of the injunction to certain of its employees and other agents |
| **INTERROGATORY NO. 4**:<br>For the Oracle product lines identified in the Injunction, provide a list identifying by customer each Oracle Software Environment Rimini has accessed since November 5, 2018, the dates of such access, and whether the Oracle Software Environment is located on Rimini's systems, in a third-party cloud (such as Windstream / Tierpoint, Amazon Web Services, or Azure), on a customer's own computer systems, or elsewhere. | An interrogatory seeking a list of Rimini's clients that, for the period after November 5, 2018, have chosen to host their Oracle software in the cloud, to the extent Rimini is able to obtain this information from Remote Access Documents or Statements of Work for its clients |
| **INTERROGATORY NO. 5**:<br>For the Oracle product lines identified in the Injunction, provide a list identifying all of the tax and regulatory updates, break fixes, new or revised functionality, and documentation that Rimini has provided to its customers since November 5, 2018, including the names of the files, the customers to whom they were provided, the Persons who were involved in developing or testing them, the associated Oracle product line, product, and version, and the dates they were provided to each customer. | An interrogatory seeking a list of tax, legal, and regulatory updates to the relevant software that Rimini developed after November 5, 2018, identifying the updates, the related product lines, and the clients to which Rimini distributed the updates |

As discussed below, Oracle asks the Court to order Rimini to respond to all of Oracle's May 1 discovery by date certain, so that Oracle may promptly prepare additional written discovery (and may promptly move to compel further responses as needed).

Rimini has also so far refused to state whether it continues to engage in twenty specific practices that Oracle identified more than five months ago in its January 2, 2019 letter.  Ex. 4. Despite the representations of Rimini's counsel at the April 4, 2019 hearing that Rimini would work cooperatively with Oracle to resolve any discovery disputes without judicial intervention, Rimini has not produced a single document and has not provided any other relevant information that Oracle has requested.

2

JOINT STATUS REPORT AND SUBMISSION RE: DISCOVERY PLAN

As detailed in Oracle's recent letter (Ex. 1), Rimini's obstruction of Injunction-related discovery is based on meritless contentions regarding the scope and basis for the Injunction. Although Rimini continues to feign ignorance about what the Injunction covers and how the injunction is grounded in *Rimini I* rulings, those topics were fully litigated before Judge Hicks prior to his issuance of the Injunction. The Injunction's terms are clear and derive directly from *Rimini I* rulings about the meaning of Oracle licenses.

With no discovery regarding Rimini's practices since November 5, 2018, Oracle cannot possibly know every way in which Rimini has violated the Injunction. Oracle's targeted discovery seeks to confirm such violations. Based on the discovery uncovered in *Rimini II*, Oracle seeks discovery sufficient to assess the extent to which Rimini has violated the Injunction since November 5, 2018. Specifically, Oracle seeks information similar to that produced in *Rimini II* that would update that discovery to determine the extent to which Rimini has violated the Injunction.

Nonetheless, to take Rimini's frivolous protestations off the table, Oracle detailed for Rimini specific conduct that would constitute contempt if it continued since November 5, 2018, reiterated to Rimini how this conduct is squarely covered by specific paragraphs in the Injunction, explained how those provisions are based on issues fully litigated and decided in *Rimini I*, and identified *Rimini II* evidence demonstrating Rimini's continuation of that conduct. The Court should not allow Rimini's feigned confusion to continue to block discovery into its conduct since November 5, 2018.

**<u>Oracle's Proposed Discovery Plan</u>**

Oracle proposes that the Court order Rimini to provide substantive responses to the discovery requests Oracle's served May 1 by June 24, and proposes to otherwise extend the discovery schedule that Oracle previously proposed by two weeks, as follows:

JOINT STATUS REPORT AND SUBMISSION RE: DISCOVERY PLAN

| Deadlines | Oracle Proposal |
|---|---|
| Deadline to complete production of documents in response to May 1 document requests | July 8, 2019 |
| Deadline to serve final written discovery | July 22, 2019 |
| Close of fact discovery | September 10, 2019 |
| Expert disclosures | September 18, 2019 |
| Expert rebuttal disclosures | September 25, 2019 |
| Close of expert discovery | October 2, 2019 |
| Deadline to file motion for order to show cause/contempt motion | October 14, 2019 |

Oracle's proposal regarding discovery limits remains unchanged:

| Type of Discovery | Oracle Proposal | Served to Date[1] |
|---|---|---|
| Requests for production | 20 | 5 |
| Requests for inspection | 5 | 0 |
| Interrogatories | 12 | 5 |
| Depositions (fact witnesses) | 5 | 0 |
| Depositions (non-party) | 5 | 0 |
| Requests for admission[2] | 35 | 0 |
| Third-party subpoenas | 10 | 0 |

**Oracle's Statement Re Rimini's Status Update**

Nothing in Rimini's lengthy response below provides a basis to delay, narrow, or otherwise prevent the targeted Injunction-focused discovery proposed by Oracle.  Sections I-III of Rimini's submission also constitute an improper motion for reconsideration of the Court's Order granting Oracle's motion for post-injunction discovery.  To limit the burden on the Court, Oracle

---

[1] Oracle's discovery served to date was previously submitted to the Court with ECF No. 1223-5.

[2] Oracle proposes that this limit not apply to RFAs used to authenticate documents, which should instead be unlimited.

responds only briefly to Rimini's arguments, but also stands ready to provide any additional information that would be useful to the Court.

*First*, Rimini's claim that "Oracle's proposal ignores the Court's guidance" regarding discovery is baseless. Oracle's proposed discovery plan is based on and consistent with the Court's guidance. After the April 4, 2019 hearing, Oracle revised its initial discovery in light of the Court's guidance, and Oracle then served that discovery as a first "stage" to obtain foundational information regarding Rimini's processes since the Injunction became effective on November 5, 2018. That initial information will inform potential factual stipulations and the scope of any additional discovery. Although access to the *Rimini II* information will help streamline this additional discovery, it cannot substitute for the foundational information Oracle seeks about post-November 5, 2018 practices, as the *Rimini II* discovery cutoff was in February 2018. Rimini's refusal to provide the requested foundational information absent further Court order is preventing the efficient resolution of these proceedings.

*Second*, Rimini's claim that Oracle improperly seeks discovery beyond the scope of practices prohibited by the *Rimini I* rulings is meritless. Oracle has identified specific Rimini practices that would constitute contempt if they continued post-Injunction and that are fully within the scope of the *Rimini I* Injunction and rulings. *See* Ex. 1 & 4. Rimini seeks to ignore the clear terms of the Injunction, which it believes are overbroad, including by citation to related disputes in *Rimini II*. Rimini may not disregard the Injunction because of a belief that it is overbroad or that it also pertains to practices at issue in *Rimini II*—as the Court already has made clear. Apr. 4, 2019 Hearing Tr. at 40:10-12 ("if those new practices actually violate the terms of the injunction, it's not a defense to say these are new practices").

Rimini's contention that Oracle seeks to go beyond *Rimini I* is also belied by the discovery from *Rimini II*, which shows that Rimini's top executives understood that continued cross-use and cloud hosting were impermissible after Judge Hicks' February 13, 2014 summary judgment ruling in *Rimini I*. For cross-use, one Rimini executive wrote in connection with draft messaging points regarding the February 2014 ruling: "What about the cross-use items???"

1  RSI2_015147884.  Rimini CEO Seth Ravin nonetheless sent an email to all employees on

2  February 15, 2014, stating that Rimini's employees should continue to provide support and

3  development "EXACTLY as we do today …."  RSI2_018128771.  For cloud hosting, on

4  February 15, 2014, Mr. Ravin specifically referenced "cloud data centers" and wrote:  "The judge

5  agreed with Oracle's argument that the contracts are not open to interpretation – must be

6  interpreted literally when they say 'software can only reside on customer's premises.'"

7  RSI2_018547737; *see also* RSI2_015147884 ("the judge ruled that the licensed software must be

8  run on licensee facilities").  Given this evidence, there is no basis for Rimini to now argue that

9  these practices were outside the scope of *Rimini I* rulings.

10     ***Third***, Rimini's claim that Oracle has taken inconsistent positions regarding the scope of

11  the Injunction is not only incorrect, but it presumes that Judge Hicks is incapable of interpreting

12  the very injunction he entered in an effort to stop Rimini's infringing conduct.  Judge Hicks

13  entered the injunction; he knows what its terms mean; and he knows what positions the parties

14  took previously.  The issue in the instant matter only concerns *the scope of discovery that Oracle*

15  *will receive*.  Rimini's argument that "Oracle's about-face on the scope of the *Rimini I* injunction

16  is inequitable . . . and legally erroneous" should be made (if at all) to Judge Hicks in a contempt

17  proceeding.  Rimini cannot evade discovery into whether its current practices violate a valid,

18  unstayed permanent injunction by raising arguments about the merits of its injunction

19  compliance.  Rimini is obliged to comply with the injunction "until it is modified or reversed,

20  even if they have proper grounds to object to the order."  *GTE Sylvania, Inc. v. Consumers Union*

21  *of U.S., Inc.*, 445 U.S. 375, 386 (1980).[3]  Right now, only Rimini knows what its purported "new"

22  practices are, and both Oracle and the Court need information regarding what Rimini (at

23  adjudicated copyright infringer) is up to.

24     Further, Rimini has previously raised these arguments in its efforts to oppose and stay the

25  _____

26  [3] None of Rimini's citations suggest otherwise.  *Price v. City of Stockton*, 390 F.3d 1105 (9th Cir. 2004), *Mulcahy v.
Cheetah Learning LLC*, 386 F.3d 849 (8th Cir. 2004), and 4 *Nimmer on Copyright*, § 14.06[C][1][a] concern the

27  standards for issuing and appealing injunctions, not enforcing them.  *TiVo Inc. v. EchoStar Corp.*, 646 F.3d 869 (Fed.
Cir. 2011), is a patent case, and its "colorable differences" standard has been rejected in the copyright context.
*Disney Enters., Inc. v. VidAngel Inc.*, 2017 WL 6820015, at *3 (C.D. Cal. Sept. 13, 2017).

28

injunction (ECF No. 1130 at 18-23; *Oracle USA, Inc., v. Rimini Street, Inc.*, No. 18-16554, ECF No. 4-1 (9th Cir. Sep. 14, 2018) at 12-14), and these arguments were rejected by Judge Hicks and the Ninth Circuit (ECF No. 1164; *Oracle USA, Inc. v. Rimini Street, Inc.*, No. 18-16554, ECF No. 11 (9th Cir. Nov. 5, 2018)).

Rimini's repeated claim that the Injunction cannot extend to specific examples of conduct not directly litigated in *Rimini I*—despite that the controlling license interpretations *were* litigated in *Rimini I*—is without merit.  Allowing Rimini to evade contempt penalties for violating the Injunction merely because its "violation occurs in conjunction with a technology that is 'more than colorably different' from its initial technology" would "defeat the purpose of the injunction by giving [Rimini] the virtually unfettered ability to make use of [Oracle's] copyrighted works without penalty for every 'more than colorably different' version of the service they can create." *Disney Enters., Inc. v. VidAngel Inc.*, 2017 WL 6820015, at *3 (C.D. Cal. Sept. 13, 2017).  But again, that argument should be raised, if at all, to Judge Hicks when on a fully developed factual record, which is why Oracle needs discovery.

*Fourth*, Oracle has serious concerns regarding Rimini's attempt to narrow the scope of document discovery and instead focus on 30(b)(6) deposition testimony.[4]  As noted by Judge Hicks in his post-trial rulings, Rimini's employees have a history of lying under oath, including during 30(b)(6) depositions.  *Rimini I*, ECF No. 1164 at 14 (finding by Judge Hicks that Ravin's admission at trial that Rimini "did in fact engage in cross-use" was a "direct and major alteration" when compared to Rimini's "assertions through various affidavits and deposition testimony submitted at summary judgment").  Oracle is willing to proceed with a 30(b)(6) deposition, but documents are necessary both to prepare for that deposition and to assess the veracity of any testimony.

---

[4] Rimini's argument that the Seventh Amendment should limit the scope of Oracle's discovery requests is unsupported by case law, and is yet another premature (and incorrect) collateral attack on the scope of the injunction.

1    **RIMINI'S PROPOSED DISCOVERY PLAN AND STATUS UPDATE**

2    **I.    EXECUTIVE SUMMARY**

3            This Court's direction to the parties was to move forward with "limited discovery" in

4    "stages"—to "do some scouting."  Apr. 4, 2019 Hrg. Tr. at 39:12–14 ("THE COURT: … I think

5    what I would like to do is try and do this at least in some stages."), 56:9–15 ("I think you should

6    try to structure [the discovery] in a way that, you know, you get the lay of the land without trying

7    to get all the discovery you would possibly need in order to have a contempt hearing, just you

8    know, do some scouting.").  And Judge Hoffman's recent ruling allowing Oracle to use *Rimini II*

9    discovery in *Rimini I* reinforces the appropriateness of that phased discovery approach regarding

10   injunction compliance.  Rimini thus proposes, in accordance with this Court's observations at the

11   April 4, 2019 hearing, moving forward with "limited discovery" in "stages," focusing on changes

12   since the injunction went into effect on November 5, 2018.  Of course, this approach requires

13   Oracle to identify what conduct evidenced by the *Rimini II* discovery, if continued today, it

14   believes would violate the injunction.  Yet Oracle, despite having received its requested relief of

15   being able to use *Rimini II* discovery in *Rimini I*, proposes virtually the same omnibus discovery

16   plan it did previously, without any effort to tailor its requests to either this Court's directives or

17   Judge Hoffman's order.  That approach ignores this Court's guidance, treats this dispute as if the

18   Parties were in the midst of full-blown, limitless fact discovery, and would impose enormous

19   discovery burdens on Rimini—in a case that is *closed*.  Oracle's plan also confirms that it intends

20   to take discovery regarding issues never adjudicated in *Rimini I*, which cannot legally be the

21   subject of a contempt proceeding.

22           Consistent with this Court's direction for there to be "stage[d]" discovery, Rimini

23   proposes a reasonable discovery plan that, once approved by the Court, would proceed in two

24   phases.  *See* Apr. 4, 2019 Hrg. Tr. at 39:12–14 ("THE COURT: … I think what I would like to do

25   is try and do this at least in some stages.").  In the first phase, Oracle could conduct "limited

26   discovery" regarding the changes Rimini made to its software support processes after the

27   injunction went into effect on November 5, 2018.  *See id.* at 56:9–15.  In Phase 1, Rimini would

28

8

1    respond to targeted discovery requests (described below) regarding the changes it made to its

2    processes in response to the injunction, including a Rule 30(b)(6) deposition.  After the

3    conclusion of this initial "scouting" discovery, if Oracle believes that any of Rimini's post-

4    injunction conduct is potentially actionable as contempt, Oracle should explain which of Rimini's

5    post-injunction support processes, if any, are contumacious, with specific evidence and

6    allegations regarding the alleged violations and where the processes were adjudicated in *Rimini I*,

7    and thus subject to the injunction.  If Oracle can make that showing, discovery would proceed to

8    Phase 2, in which the Parties could take further targeted discovery based on the specific post-

9    injunction conduct that Oracle claims is contumacious.  This would have the beneficial effect of

10   focusing the Parties' efforts (and the Court's resources) on the specific processes (if any) at issue,

11   rather than reopening discovery generally.

12         Judge Hoffman's recent ruling allowed Oracle to use *Rimini II* discovery in *Rimini I*, thus

13   permitting Oracle to use the evidence discovered in *Rimini II* to identify purported violations of

14   the *Rimini I* injunction (if such conduct were continuing today).  In a letter dated June 4, 2019,

15   Oracle claims to have done so, but Oracle's letter makes clear that the conduct about which it

16   now complains was *never* adjudicated as unlawful in *Rimini I*, and, indeed, is directly at issue in

17   fully briefed summary judgment motions currently pending before Judge Hicks in *Rimini II*.

18   Oracle previously argued that there was a "clear division between *Rimini I* and *Rimini II*" (ECF

19   No. 646 at 4–6), that "Rimini's liability related to its 2014 support model [*i.e.*, Process 2.0] is not

20   at issue in [*Rimini I*]" (*id.* at 5), that Process 2.0 is "irrelevant to any liability issue at trial" in

21   *Rimini I* (*id.*), and that the *Rimini I* injunction it proposed and the Court adopted was limited to

22   "the infringement that this Court and the jury have already determined to constitute copyright

23   infringement" and was not an attempt to pre-judge "a ruling on the merits of the issues in dispute

24   in *Rimini II*."  ECF No. 1117 at 20 n.3.  In a 180-degree turn, Oracle now contends that practices

25   that were never litigated or adjudicated as infringing have nevertheless been enjoined—such as

26   Rimini clients' use of "the cloud," which Oracle's lawyers have acknowledged "wasn't at issue in

27   *Rimini I*" (ECF No. 1209-5, May 25, 2016 Hrg. Tr. at 143:14–20).  *See* Ex. 1.  Indeed, Oracle

28

admits in this Joint Statement that Rimini's new processes are "more than colorably" different from the old processes adjudicated in *Rimini I* (*supra* at 7), yet Oracle still seeks discovery on those new processes because it contends that the *Rimini I* injunction can cover them.  In other words, Oracle seeks to deny Rimini its Seventh Amendment right to a jury trial on the permissibility of Rimini's new, *indisputably* different processes and skip straight to holding Rimini in contempt for engaging in them.

Oracle's about-face on the scope of the *Rimini I* injunction is inequitable (given that Oracle secured the injunction by promising Judge Hicks that it would be limited to conduct adjudicated in *Rimini I*) and legally erroneous.  An injunction can enjoin only conduct that has been adjudicated as infringing.  *See Price v. City of Stockton*, 390 F.3d 1105, 1117 (9th Cir. 2004) (an injunction must be "narrowly tailored … to remedy *only the specific harms shown by the plaintiffs*") (emphasis added); *Mulcahy v. Cheetah Learning LLC*, 386 F.3d 849, 852 & n.1 (8th Cir. 2004) (vacating provision of injunction covering "course materials that were not before the court"); *see also TiVo Inc. v. EchoStar Corp.*, 646 F.3d 869, 890 (Fed. Cir. 2011) (finding that an injunction cannot be enforced when the new conduct is "more than colorably different" from the adjudicated process).[5]  Discovery into matters not adjudicated in *Rimini I* can have no possible relevance to a contempt proceeding in that case, and the significant discovery burdens Oracle seeks to impose on Rimini are therefore unjustified.  Oracle is seeking to use the contempt process to pre-judge issues that are squarely at issue in *Rimini II*, and thus deprive Rimini of its Seventh Amendment right to a trial by jury, among other violations of law.

These serious problems with Oracle's proposal for contempt discovery provide further support for the phased approach that Rimini proposes (and that the Court expressly requested): allowing initial discovery into any changes Rimini made to its support processes as a result of the *Rimini I* injunction, holding a status hearing, and, if necessary, allowing more in-depth, targeted discovery on specific ongoing conduct already adjudicated in *Rimini I*.  This would provide Oracle the discovery it needs to attempt to make its contempt case, minimize the burden on

---

[5]   Indeed, the Ninth Circuit will hear argument on the scope of the injunction on July 12.

JOINT STATUS REPORT AND SUBMISSION RE: DISCOVERY PLAN

Rimini to provide discovery regarding conduct that cannot possibly be the basis for contempt, and allow any further proceedings to proceed in an orderly and efficient fashion.  It also would maintain the distinction between *Rimini I* and *Rimini II* that Oracle previously insisted on, and Judge Hicks adopted.

Oracle's proposed discovery schedule, on the other hand, is unworkable for at least the following reasons:

- Oracle's plan fails to follow the Court's direction that discovery proceed in "stages";

- Oracle's plan fails to follow the Court's direction that discovery initially be "limited" (Oracle's requests, including 20 RFPs and 12 unbounded interrogatories, are anything but limited);

- Under Oracle's proposal, Oracle would conduct onerous, wide-ranging discovery regarding *all* of Rimini's support processes (whether adjudicated in *Rimini I* or not) before specifically identifying the post-injunction conduct it is actually accusing as allegedly contumacious (the reverse of a logical procedure), precluding Rimini's ability to serve defensive discovery;

- Oracle's schedule does not allow sufficient time for Rimini to identify and produce responsive materials, let alone mount a defense;

- Oracle's schedule provides Rimini only one week to serve an expert rebuttal report after receiving Oracle's expert report (whereas expert discovery in *Rimini II* took more than six months, with 10 weeks for rebuttal reports); and

- Oracle seeks 12 interrogatories, with no stated limits on burden or subject matter, despite the Court's ruling that the Parties should refrain from serving interrogatories at this time.

Oracle claims that its break-neck schedule and deviation from normal procedures is justified by "irreparable harm," but Judge Hicks *already ruled* that Oracle did not suffer any harm as a result of the absence of an injunction since 2016.  ECF No. 1177 at 4:25–27 ("Oracle has not established that it suffered any harm after the Ninth Circuit granted a stay of the previous injunction back in 2016.").  That has not changed, and Oracle provides this Court with *no evidence* of any harm from a more measured approach to discovery as Rimini proposes.

Much of Oracle's section of this Joint Submission is devoted to accusing Rimini of refusing to provide discovery.  That is baseless; Rimini has not refused to provide discovery.  Rimini has committed to providing substantial discovery, but in stages and in a targeted fashion, after the entry of a discovery plan and schedule.  *See* Apr. 4, 2019 Hrg. Tr. at 61:4–6 ("Get that

11

[joint plan and scheduling order] in … *then* you can do some discovery.") (emphasis added). Rimini is acting consistent with the Court's direction, and Oracle's contrary suggestion ignores the current procedural status.

Oracle also wrongly criticizes Rimini for objecting to its premature discovery requests, which were served before any discovery plan was entered and, in many cases, directly contravened this Court's orders at the April 4, 2019 hearing.  As Rimini told Oracle, Rimini has been diligently collecting documents relevant to Phase 1 discovery, and will produce such documents in accordance with its obligations under the discovery plan adopted by this Court. Similarly, Oracle's accusation that Rimini has "refused to provide even … basic information" regarding the changes it made in response to the injunction (Ex. 1 at 1) is false—Rimini's discovery plan proposes to provide exactly that information.  And Oracle's characterization of Rimini's unwillingness to stipulate to Oracle's one-sided and misleading "facts" as "obstructionist" is unfounded—Rimini proposed stipulated facts to Oracle, which Oracle rejected. *See* ECF No. 1225 at 11–12.  The reality is that in this contentious and protracted litigation, the Parties agree on very little.  Nevertheless, Rimini remains ready to continue discussing potential stipulated facts with Oracle.

Rimini's plan does not, as Oracle suggests, "attempt to narrow the scope of document discovery and instead focus on 30(b)(6) testimony."  *Supra* at 7.  Instead, in Phase 1, Rimini has agreed to provide Oracle with multiple categories of documents related to Rimini's support process changes in response to the injunction, *as well as* a 30(b)(6) deposition on changes to the PeopleSoft processes.

Rimini proposes that the Court implement a reasonable, phased discovery approach as set forth in more detail below.  Rimini further respectfully requests that the Court hold a hearing at its convenience to resolve Rimini's and Oracle's competing discovery plans.

## II.   STATUS UPDATE

On May 1, 2019, before any discovery plan had been entered and before the Parties had submitted any joint discovery plan, and despite the fact that the Court had already ordered that

1    "[w]e'll hold off on the interrogatories" (Apr. 4, 2019 Hrg. Tr. at 53:7–11), Oracle served Rimini

2    with five interrogatories and five requests for production.

3        On May 6, the Parties submitted a Joint Discovery Plan Re: Injunction.  ECF No. 1225.

4    Oracle proposed a plan by which the Parties would engage in immediate, full-blown discovery,

5    without taking discovery in phases, and complete discovery by September 30, 2019.  Rimini

6    proposed a plan in which discovery would proceed in two phases: (1) a first phase in which

7    narrowly-tailored scouting discovery regarding Rimini's post-injunction process changes would

8    take place, and (2) (if necessary) a second phase involving targeted discovery of specific post-

9    injunction conduct identified by Oracle as contumacious.  ECF No. 1225 at 16–21.

10       On May 14, Judge Hoffman issued an order authorizing *Rimini II* discovery to be used in

11   *Rimini I* (with relevance and admissibility to be decided later).  *Rimini II*, ECF No. 1237.

12       On May 17, this Court, recognizing "the significant change in circumstance regarding

13   discovery in this case as a result of Judge Hoffman's May 14, 2019 Order in *Rimini II*," ordered

14   the Parties to file a status report and/or new plan.  ECF 1228 at 2.

15       On May 31, Rimini served formal responses and objections to the written discovery

16   requests Oracle served on May 1, objecting on numerous grounds, including that this Court had

17   not yet entered a discovery plan and scheduling order, and that Oracle's requests ignored the

18   Court's clear guidance at the April 4, 2019 hearing (*e.g.*, Oracle propounding interrogatories

19   when Court told it not to).  *See* Apr. 4, 2019 Hrg. Tr. at 61:4–6 ("Get that [joint plan and

20   scheduling order] in … **then** you can do some discovery.") (emphasis added).  Nevertheless, in

21   meet and confer correspondence, Rimini explained to Oracle that it was already diligently

22   collecting documents regarding changes Rimini made to its support processes as a result of the

23   injunction (*i.e.*, the materials Rimini agreed to provide under Phase 1 of Rimini's proposed plan).

24       Rimini also sent a letter to Oracle asking, as it has for several months, that Oracle identify

25   the specific evidence from *Rimini II* that Oracle contends shows Rimini is engaging in conduct

26   that Oracle believes would violate the terms of the injunction if that conduct occurred after the

27   injunction became effective, and to identify where in the *Rimini I* record that conduct was

28

1  supposedly adjudicated.  On June 4, Oracle responded to Rimini's letter.  In its response, Oracle

2  confirmed that it intends to take discovery into issues that were never adjudicated in *Rimini I*

3  (which are being litigated in *Rimini II*), and that cannot lawfully be subject to the *Rimini I*

4  injunction.

**III.    ORACLE'S JUNE 4, 2019 LETTER CONFIRMS THAT ORACLE INTENDS TO
          TAKE DISCOVERY REGARDING CONDUCT NOT ADJUDICATED IN
          *RIMINI I***

7          Since January 2019, when Oracle first raised the specter of initiating contempt

8  proceedings, Rimini has repeatedly asked Oracle to provide two key pieces of information that

9  would help to streamline any contempt discovery: (1) what conduct it believes Rimini is engaged

10  in that constitutes a violation of the injunction (including evidence regarding the same), and

11  (2) ***where in the Rimini I record*** that conduct was adjudicated as unlawful.  Rimini asked Oracle

12  to provide citations to the *Rimini I* record because it is black-letter law that an injunction must be

13  "narrowly tailored … to remedy *only the specific harms shown by the plaintiffs*." *Price v. City of*

14  *Stockton*, 390 F.3d 1105, 1117 (9th Cir. 2004) (emphasis added); *see also* 4 *Nimmer on*

15  *Copyright*, § 14.06[C][1][a] ("[T]he scope of the injunction should be coterminous with the

16  infringement.").  Thus, discovery into matters ***not adjudicated*** in *Rimini I* is irrelevant, unduly

17  burdensome, and a waste of the Parties' time and the Court's resources.

18          After refusing for nearly six months to provide this information, Oracle sent Rimini a

19  letter on June 4 alleging that four categories of conduct *at issue in **Rimini II**—*which are fully

20  briefed in summary judgment motions pending before Judge Hicks—violate the *Rimini I*

21  injunction.  *See* Ex. 1.  Oracle contends that these four categories of conduct were "fully litigated

22  and decided in *Rimini I*."  *Supra* at 3.  But in reality, the letter only proves what Rimini has

23  voiced concern about all along—that Oracle is attempting to stretch the *Rimini I* injunction to

24  cover conduct that was never litigated in *Rimini I*, thus depriving Rimini of its right to a trial by

25  jury.  Oracle's theory of copyright infringement in *Rimini I* concerned two processes that were in

26  use by Rimini at the time, but were discontinued in 2014: (1) local hosting and (2) what was

27  referred to in *Rimini I* as "cross-use."  "Local hosting" referred to Rimini storing and developing

28

updates and modifications to its clients' licensed Oracle software locally on Rimini's computer systems. *Oracle USA, Inc. v. Rimini Street, Inc. (Rimini I)*, 879 F.3d 948, 960 (9th Cir. 2018). The term "cross-use" in *Rimini I* referred to "the making of development environments, under color of a license held by one identifiable customer of Rimini, for another identifiable customer of Rimini that also holds a license" or "for licensees who have yet to become customers of Rimini." *Id.* at 956. Oracle's letter does not identify any alleged instance in which Rimini locally hosted any Oracle software environment since 2014 (let alone after November 5, 2018), and does not identify any instance in which Rimini made a development environment for one licensee under color of a different licensee's license. Oracle thus implicitly concedes that the massive discovery effort undertaken in *Rimini II* did not turn up any evidence that Rimini is engaged in the processes that were *adjudicated* as infringing in *Rimini I*. That should end the inquiry.

In contrast, the conduct alleged in Oracle's letter was never adjudicated in *Rimini I*. Oracle effectively concedes that Rimini's Process 2.0 is "more than colorably different" than the processes adjudicated in *Rimini I* (indeed, they are substantially different). *Supra* at 7. Rimini is thus entitled under the Seventh Amendment to a jury trial on those different processes.

**Clients' Use of the Cloud.** Oracle's letter accuses "Cloud Hosting," *i.e.*, the practice of some Oracle licensees (that are Rimini clients) hosting their software in "the cloud" rather than their physical premises. But the cloud was not litigated, let alone adjudicated, in *Rimini I*, as Oracle itself has admitted. *See* ECF No. 1209-5, May 25, 2016 Hrg. Tr. at 143:14–20 (Oracle's counsel acknowledging that "cloud computing is at issue in *Rimini II* and it ***wasn't*** at issue in *Rimini I*" (emphasis added)). Indeed, Oracle's letter—which purportedly explains where use of the cloud was litigated in *Rimini I*—fails to point to a single *Rimini I* citation in support of that claim.

Oracle tries to sidestep this issue by arguing that the "facilities restriction" in certain Oracle licenses was litigated in *Rimini I*. Ex. 1 at 5. But the issue in *Rimini I* was whether *Rimini's* hosting of clients' Oracle software on *Rimini's computer systems* violated the "facilities" restriction in certain legacy PeopleSoft agreements (*Rimini I*, 879 F.3d 948 at 960); the issue of

1  whether "facilities" included cloud computing systems (which the clients pay for and control) was

2  never litigated.  In essence, Oracle is claiming that because the facilities restriction was at issue in

3  *Rimini I*, any conduct that Oracle now accuses (for the first time) of violating the facilities

4  restriction, was also adjudicated in *Rimini I*.  That is incorrect and illogical.

5        The Ninth Circuit held that the question of whether a computer system is the client's

6  "facilities" is a question of "control," and that *Rimini's* systems were "outside the control of the

7  [customers]."  *Rimini I*, 879 F.3d at 960.  The Ninth Circuit said nothing about the cloud, and the

8  issue of whether software hosted in a cloud account—which the client controls and has the ability

9  to delete or terminate access to at any time—is the client's "facilities" was never litigated or

10  adjudicated in *Rimini I*.  Moreover, in *Rimini II*, Judge Hoffman ruled that Rimini does ***not***

11  control its clients' computer systems, including its clients' cloud systems, *Rimini II*, ECF No.

12  606, and the issue of whether a client's cloud computing resources are part of that client's

13  "facilities" is the subject of multiple summary judgment motions currently pending before Judge

14  Hicks in *Rimini II*.

15        Oracle also seeks to confuse the issue by arguing that excerpts from a handful of *Rimini II*

16  documents—in which non-legal Rimini personnel discuss the potential impact of Judge Hicks's

17  summary judgment ruling—somehow support the notion that use of the cloud (and any conduct

18  within Oracle's now radically expanded view of "cross-use") is subject to the *Rimini I* injunction.

19  *Supra* at 5–6.  Oracle's mischaracterizations aside, such discussions have *no impact* on whether

20  conduct like use of the cloud was actually litigated in *Rimini I*.  Indeed, by Oracle's own

21  admission, *it was not.*

22       ***Automated Framework ("AFW").***  Oracle also claims that Rimini engages in "replicating

23  … update[s] via AFW."  Ex. 4 at 2.  AFW is a set of automated tools used to facilitate updates to

24  remote environments; it was created as part of Process 2.0 when Rimini stopped locally hosting

25  its clients' environments.  AFW ***did not even exist*** as part of Rimini's Process 1.0, which was

26  litigated in *Rimini I*.  It was not, and could not have been, adjudicated in *Rimini I*.

27       ***"Cross-Use."***  Oracle claims that Rimini continues to engage in "cross-use," but the

28

conduct Oracle refers to as supposed "cross-use" in its June 4 letter is fundamentally different from the conduct referred to as "cross-use" in *Rimini I*.  "Cross-use" is not a term in any Oracle license, nor is it a term of art in copyright law; it is a term that Oracle made up for this litigation that Oracle uses to refer to conduct that it believes violates a certain provision of its licenses.  But if one practice was determined to be "cross-use" in *Rimini I*, a different practice cannot be enjoined, and Oracle cannot get around that problem by labeling the new practice "cross-use."  The question is what *conduct* was adjudicated (and enjoined), not what labels Oracle's lawyers choose to attach to that conduct.

In *Rimini I*, the parties litigated Rimini's legacy practice of cloning one licensee's Oracle software environment to create an environment for a different client with an identical license.  *See Rimini I*, 879 F.3d at 960 ("cross-use" is "the making of development environments, under color of a license held by one identifiable customer of Rimini, for another identifiable customer of Rimini that also holds a license" or "for licensees who have yet to become customers of Rimini").  The Ninth Circuit did not affirm "cross-use" as an infringement theory for PeopleSoft, instead affirming a much narrower theory of "cross-use" for J.D. Edwards and Siebel:  that Rimini "created development environments for ***future*** customers using the license of an existing customer on the basis that ***future*** customers presumably would have licenses that would permit them to hire Rimini to create development environments." *Id.* at 957 (emphases added).

Oracle's letter characterizes conduct as "cross-use" that is completely different from the "cross-use" litigated in *Rimini I*.  For example, its main allegation is that Rimini's "prototype" process for PeopleSoft violates the injunction (*see* Ex. 1 at 4).  In that process, Rimini remotely accesses a first client's development environment, develops an update for that first client on that first client's development environment, and then, after perfecting that update, remotely accesses a second client's development environment, and uses its knowledge and experience from having performed the update for the first client (*i.e.*, the "prototype") to develop the update on the second client's environment more quickly.  But no aspect of that prototype process was litigated in *Rimini I*; indeed, the word "prototype" does not even appear in the 4,000-page *Rimini I* trial

transcript.[6]

Moreover, the expansive (and novel) theory underlying Oracle's accusation of the prototyping process is that engineers infringe Oracle's copyrights anytime they gain and reuse knowledge and experience in the course of providing support to multiple clients. *Rimini II*, ECF No. 927 at 14–24. According to Oracle's new theory, engineers are prohibited from remembering and using the results of any testing, remembering how to fix a problem for one client and applying that same knowledge to fix the same problem for another client, and talking to other engineers about how to fix a bug for one client, if those engineers are supporting different clients. None of these issues were litigated in *Rimini I*, where "cross-use" meant copying an entire environment or update (including Oracle code) from one licensed client's environment and providing it to another client with the same license. Moreover, Oracle's novel theories are squarely at issue and the subject of summary judgment motions in *Rimini II*. *See, e.g.*, *Rimini II*, ECF No. 927 at 15. That Oracle is reusing the same word "cross-use" to refer to these completely new issues does not mean that they were adjudicated in *Rimini I*.[7]

***Distribution and Derivative Works.*** Oracle's letter also claims that "Acts of Distribution Were Litigated in *Rimini I*." Ex. 1 at 8. Oracle carefully worded that statement for a reason— whether acts of distribution were "litigated" is debatable, but distribution was certainly never ***adjudicated***. That is because the jury was never asked to, and did not, render any verdict based on "distribution" or "derivative works;" the verdict solely concerns reproduction. ECF No. 896 at 1–2. Hence, Oracle's letter misleadingly cites a jury instruction stating that Oracle, as the

---

[6] Perplexingly, Oracle's June 4, 2019 letter also cites Rimini's "migration" of its clients' software environments off of Rimini's systems and back to the clients, in order to comply with the Court's order that Rimini's systems were not the clients' "facilities," as a purported injunction violation. Ex. 1 at 9. While Rimini disagrees that complying with a Court order can be infringement, it is beyond reasonable dispute that the "migration" that was completed in 2014 cannot possibly have violated an injunction that went into force in November 2018.

[7] The other example of supposed "cross-use" Oracle cites in its letter is testimony from Rimini developer Jim Benge that work is performed "update by individual update" rather than "all of the work in a bundle all at once for [one] client." Ex. 1 at 4. In other words, if Rimini has 50 clients that need the same 10 updates in a bundle, Rimini may implement the first update for each of the 50 clients (separately in each client's own environment), then the second, and so on, rather than performing all 10 for the first client, all ten for the second client, and so on. That is not problematic, nor does it have anything to do with "cross-use."

copyright holder, "has the exclusive right to distribute Oracle's copyrighted works, including derivative works" (Ex. 1 at 8).  But the jury was never asked to determine whether Rimini's conduct actually impinged on Oracle's distribution or derivative works rights, as opposed to its reproduction right.

      ***Source Code Access for J.D. Edwards.***  Oracle's letter also claims that whether Rimini is permitted to "access J.D. Edwards source code" was adjudicated in *Rimini I*, but that is not true. The jury was never instructed that "accessing" source code could give rise to infringement liability; indeed, "access" is not an exclusive right under the Copyright Act.  *See* 17 U.S.C. § 106. The jury instruction Oracle misleadingly cites in its letter states that the licenses permit third parties, like Rimini, to "copy the J.D. Edwards software … ***onto its computer systems***" to "the extent necessary for the customer's archival needs and to support the customer's use," and then states that this "archival" use provision does not allow such ***copying*** to, "among other things, access the software's source code to carry out development and testing"—activities that the Court had ruled were not "archival."  ECF No. 880 at 28 (emphasis added).  The issue that was litigated was whether the locally hosted client development environments were used for archival purposes and whether Rimini "created development environments for future customers using the license of an existing customer on the basis that future customers presumably would have licenses that would permit them to hire Rimini to create development environments."  *Rimini I*, 879 F.3d at 957.  "Access" to "source code"—a term never even defined for the jury—was never at issue.

      Oracle argues (*supra* at 6) that the issue of whether Oracle is seeking to hold Rimini in contempt for conduct not adjudicated in *Rimini I* should be deferred until "a contempt proceeding" after conducting full-blown discovery.  That is illogical.  This is an issue bearing precisely on the scope of discovery: discovery into conduct not adjudicated in *Rimini I* cannot be relevant to a contempt proceeding as a matter of law.

## IV.   RIMINI'S PROPOSED DISCOVERY PLAN

      At the April 4, 2019 hearing, the Court ruled that the Parties should develop a Joint Discovery Plan that takes discovery in phases.  In the first phase, the Court directed that Oracle

1   could take some "limited discovery" to "get the lay of the land without trying to get all the

2   discovery [Oracle] would possibly need in order to have a contempt hearing, just, you know, ***do***

3   ***some scouting***."  Apr. 4, 2019 Hrg. Tr. at 56:9–15 (emphasis added); *see also id.* at 39:12–14

4   ("THE COURT: … I think what I would like to do is try and do this at least in some stages.").

5   After the first phase is complete, Oracle may file a motion requesting leave to proceed with

6   specific additional discovery.  *Id.* at 61:4–6 ("THE COURT: … you can do some discovery, and

7   if you need something else, just file a motion."); *id.* at 39:15–17 ("THE COURT: … If actually

8   you do this first discovery and you find something that you think deserves to go deeper, then we

9   can talk about it.").

10          Following this guidance, Rimini respectfully submits that rather than entering an order

11  that permits Oracle to serve a specific number of discovery requests, without specifying what

12  information those requests will seek, the Court should set a schedule that takes into account

13  Oracle's claim to need some "narrowly tailored," "target[ed]" discovery into Rimini's processes

14  after November 5, 2018 (*id.* at 21:6–11), to test Rimini's compliance with the injunction, while

15  reserving more burdensome discovery until Oracle can make a showing that additional discovery

16  is warranted.  The Court's recent Order in *Rimini II*, allowing *Rimini II* discovery to be used in

17  *Rimini I*, only increases the need for a phased approach—discovery should initially focus on the

18  processes Rimini changed as a result of the injunction.  That discovery, combined with any

19  relevant discovery from *Rimini II*, will assist the Court in determining whether further discovery

20  is warranted, and, if so, will allow the Parties to be more targeted and efficient in subsequent

21  discovery requests (including discovery by Rimini once Oracle identifies the conduct it alleges is

22  contumacious).  Phasing will also allow the Court to address the serious issue of whether

23  unadjudicated conduct can be the subject of contempt discovery, depending on what conduct

24  Oracle ultimately identifies.

25          Rimini thus proposes that the Parties pursue the following phased discovery approach.

26  ***Phase 1***:  **Limited "Scouting" Discovery Regarding Rimini's Post-Injunction**
    **Changes to Processes**

27

28  In the first phase, Rimini would respond to the following preliminary discovery regarding

                                            20

post-injunction conduct:

- A request for production of non-privileged documents sufficient to show the changes to Rimini's support processes made in response to the injunction;

- A request for production of non-privileged policies or memoranda that Rimini created and promulgated in response to the injunction regarding Rimini's support practices;

- A request for production of AFW records stored in the AFW database that reflect what "has changed after the date of the injunction" (*id.* at 42:18–19);[8]

- A request for production of documents sufficient to show Rimini's compliance with Paragraph 1 of the injunction, requiring Rimini to give "notice" of the injunction to certain of its employees and other agents;[9]

- An interrogatory seeking a list of tax, legal, and regulatory updates to the relevant software that Rimini developed after November 5, 2018, identifying the updates, the related product lines, and the clients to which Rimini distributed the updates; and

- An interrogatory seeking a list of Rimini's clients that, for the period after November 5, 2018, have chosen to host their Oracle software in the cloud, to the extent Rimini is able to obtain this information from Remote Access Documents or Statements of Work for its clients.

In Phase 1, after production of documents and information responsive to the above requests, Rimini would make a deponent available for a half-day (3.5 hour) Rule 30(b)(6) deposition concerning any changes Rimini made to its PeopleSoft support processes in response to the injunction.

Consistent with the Court's ruling at the April 4, 2019 hearing, Rimini does not believe that any additional interrogatories are warranted at this time. *See id.* 53:7–11 ("THE COURT: … We'll hold off on the interrogatories.").  Likewise, consistent with the Court's guidance, Rimini believes that permitting Oracle access to Rimini's online resources, such as DevTrack, is premature, and should be addressed during a later phase of discovery, if necessary. *See id.* at 44:3–4 (the Court, referring to Rimini's online resources: "We can do that during the second

---

[8]  As noted *supra*, AFW was not part of Rimini's Process 1.0 and thus was not adjudicated in *Rimini I*. Nevertheless, Rimini will comply with this Court's guidance at the April 4 hearing.  Apr. 4, 2019 Hrg. Tr. at 42:18–23 ("To the extent the AFW database has changed after the date of the injunction … those need to be produced").

[9]  Oracle complains in its June 4, 2019 letter that Rimini has not provided copies of the notices.  Rimini complied with provision 1 of the injunction, Oracle has **zero** evidence to the contrary, and Rimini does not object to producing the notice letters in Phase 1.

JOINT STATUS REPORT AND SUBMISSION RE: DISCOVERY PLAN

part.").

At the conclusion of Phase 1, if Oracle believes that it can make a showing that further discovery is necessary into specific, post-injunction conduct that it believes is contumacious, Oracle should identify the conduct and where it was adjudicated in *Rimini I*, and file a motion for further discovery.  *See id.* at 61:4–6 ("THE COURT: … you can do some discovery, and if you need something else, just file a motion."); *id.* at 39:15–17 ("THE COURT: … If actually you do this first discovery and you find something that you think deserves to go deeper, then we can talk about it.").  Rimini proposes that after completion of briefing on any such motion, the Court hold a hearing to determine whether there is good cause for more extensive discovery targeted to Oracle's specific accusations, and, if so, to set a schedule for this discovery and any necessary motion practice.

### *Phase 2*:  Further Targeted Discovery (Good Cause Showing)

Following Phase 1, Oracle should identify the specific, post-injunction conduct it alleges is contumacious (if any), and the Court should hold a hearing on Oracle's motion for further discovery to decide whether additional discovery is warranted and, if so, to determine an appropriate schedule.  If the Court determines that Oracle has shown good cause to conduct further discovery, the Parties will proceed to Phase 2 and engage in more extensive discovery (including discovery propounded by Rimini) targeted to Oracle's specific allegations.

### Rimini's Proposed Discovery Schedule

| Discovery Event | Date |
| --- | --- |
| Phase 1 Discovery begins | Upon Court's adoption of a discovery plan and issuance of a scheduling order |
| Deadline for Oracle to serve three document requests and two interrogatories (described *supra*) | 30 days after Court's adoption of a discovery plan and issuance of a scheduling order |
| Deadline to complete production of documents in response to first round of document requests | 60 days after service of written discovery |
| Close of Phase 1 Discovery | 45 days after production of documents and responses to interrogatories |

| Discovery Event | Date |
|---|---|
| Deadline for Oracle to file Motion for Further Discovery, specifically identifying the acts it accuses of being contumacious, if any | 15 days after close of Phase 1 Discovery |
| Hearing on Oracle's Motion for Further Discovery (if Motion granted, schedule and scope provided for Phase 2 Discovery) | A date acceptable to the Court in approximately December 2019 |
| Close of Phase 2 Discovery | To be set at Hearing on Oracle's Motion for Further Discovery (if Motion granted) |
| Motion for Order to Show Cause / Contempt Motion (if any) | To be set after close of Phase 2 Discovery |

### A.     Rimini's Plan Is Workable, Efficient, and Faithful to the Court's Order.

*First,* the phased discovery approach the Court ordered at the April 4, 2019 hearing (Tr. at 39:12–17, 56:9–15, 61:4–6) is the most efficient way for the Parties to proceed.  It orients discovery around potentially dispositive issues and avoids the unnecessary (and disproportionate) expenditure of resources in the event Oracle either is unable to proffer a showing of contumacious conduct or does not need additional discovery to test Rimini's compliance with the injunction. Fed. R. Civ. P. 26(f) advisory committee's note ("[I]t is desirable that the parties' proposals regarding discovery … discuss how discovery can be conducted most efficiently and economically.").

*Second,* phasing is appropriate because, as Oracle concedes, the discovery the Parties will need to take in a second phase depends on the results of initial discovery into Rimini's post-injunction changes.  As Oracle stated in its June 4, 2019 letter, "[t]he extent to which Oracle will need discovery beyond the scope of [its] initial requests and in particular the scope of any third-party discovery ***will depend in part on Rimini's responses*** and [any stipulated facts]."  Ex. 1 at 5 (emphasis added).  Further, Rimini made changes to its processes after the injunction, and thus it is not clear what, if anything, Oracle intends to accuse.

*Third,* Rimini's phased approach is also more equitable than the plan proposed by Oracle. Typically, contempt discovery does not begin until a complaining party sets forth its allegations regarding the allegedly contumacious conduct, which define the scope of discovery and any

subsequent contempt hearing.  *See Rutherford v. Baca*, 2009 WL 10653011, at *3 (C.D. Cal. Aug. 4, 2009) (limiting new discovery "to the issues identified in Plaintiffs' motion"); *nCube Corp. v. Seachange Int'l Inc.*, 2010 WL 2266335, at *3 (D. Del. June 4, 2010) (granting "discovery on the contentions alleged in the Contempt Motion").  Without knowing what ***specific*** conduct Oracle contends is contumacious, Rimini cannot pursue its own discovery to rebut those claims, including preparing expert witnesses.  In this phased approach, Rimini's own discovery (if necessary) would come in Phase 2, after Oracle has specifically articulated the allegedly contumacious conduct it is accusing and where that conduct was adjudicated in *Rimini I*.  Oracle admits that it does not presently have evidence of any post-injunction practices that it believes are contumacious because it has not had discovery into Rimini's post-injunction processes (*supra* at 3).  The reasonable solution is to permit Oracle to conduct "scouting" discovery into those processes, have Oracle come forward with its allegations, and then allow both Parties to conduct additional, targeted discovery, if necessary.

*Fourth,* a phased approach in which Oracle is required to identify the post-injunction conduct it is accusing will allow the Court to evaluate whether that conduct was litigated and adjudicated in *Rimini I* and thus, whether it can properly be the subject of contempt discovery.

**B.      Oracle's Plan Is Unworkable.**

Oracle's proposed discovery plan is contrary to the Court's statements during the April 4, 2019 hearing, seeks extremely broad, unfettered discovery, and seeks to complete that discovery—including expert discovery—in just a few months.  That schedule is extremely burdensome, unnecessary, and unworkable.

*First,* Oracle's proposed plan is at odds with the Court's statements during the April 4, 2019 hearing.  Oracle's proposal ignores the Court's guidance that the parties start with less burdensome "scouting" discovery, Apr. 4, 2019 Hrg. Tr. at 56:9–15, and instead proposes that all discovery be done at once on a significantly accelerated schedule.  Further, while the Court stated that interrogatories (with the exception of one) were not warranted at this stage, *id.* at 53:7–11, Oracle propounded 5 interrogatories on Rimini and proposes 7 more, for a total of 12

interrogatories in a 3-month period—one third as many as the Parties answered in 3 years of discovery in *Rimini II*.  Oracle also propounded 5 document requests, including requests that the Court specifically rejected, and its proposal demands that Rimini produce documents in response to those burdensome requests by July 8, 2019.  *Id.* at 44:5–20.  While Rimini has been working to collect documents regarding changes it made in response to the injunction (consistent with its phased approach), it should not be required to undertake the burdensome task of responding to Oracle's already-rejected document requests prior to the adoption of a discovery plan, and a July 8 deadline is unreasonable.  Still further, Oracle's proposed plan provides for 20 RFPs and puts no limit on the nature or scope of those RFPs—contravening the Court's instructions that many of Oracle's previously-proposed RFPs were overbroad and that the parties should start with "scouting" discovery.

> **Second,** Oracle's proposal contemplates immediate, broad discovery and is contrary to the Court's direction that the parties start with reasonable requests and sampling, where possible. The discovery Oracle proposes herein is not "limited" or "narrowly tailored" in any meaningful way; Oracle's June 4, 2019 letter confirms that it seeks full-blown discovery on par with the discovery in *Rimini II* (which took 3 years).  Oracle states that it seeks information "similar to that produced in *Rimini II*: documents (including AFW records, DevTrack records, and emails), interrogatory responses, responses to requests for admission, deposition testimony, and third-party discovery."  Ex. 1 at 5, 8.  It also states that it will seek "Rimini internal communications, including emails and chat records."  *Id.*  Essentially, it seeks all of Rimini's internal documents regarding all of its Oracle-related business; similar discovery in *Rimini II*, consisted of approximately 9 million documents (40 million pages).  That type of plenary discovery from November 5, 2018 to the present will be substantial, to say the least, and would involve significant costs.

> **Third,** the timeline for Oracle's discovery proposal is completely unreasonable given its breadth.  It took 3 years to conduct similar discovery in *Rimini II*.  Oracle's suggestion that fact discovery can be completed by September 10, 2019 is not feasible.  It is impossible to know,

1  before Oracle makes any specific accusations regarding Rimini's post-injunction conduct,

2  precisely how long fact discovery will take, but it is likely to require a minimum of 6 to 8 months.

3    *Fourth,* Oracle's proposal for expert discovery—just one week for rebuttal expert reports

4  and one week for depositions—borders on ludicrous.  Expert discovery in *Rimini II* took over 6

5  months to complete and involved the analysis of more than 8 terabytes of data.  It cannot possibly

6  be completed in one week.  Indeed, in *Rimini II*, it took several weeks for Rimini's experts to *load*

7  the unprecedented volume of data produced by just one of Oracle's (seven) experts before

8  analysis of that data could even begin.  Rimini cannot submit expert reports in a week,

9  particularly because under Oracle's proposed schedule, Rimini would not know what issues to

10 address, or even what expert(s) to retain, until it received Oracle's report(s).

11   Rimini thus respectfully requests that the Court enter an order adopting Rimini's phased

12 discovery plan.

13

14 Dated: June 17, 2019

15

16

| BOIES SCHILLER FLEXNER LLP | GIBSON, DUNN & CRUTCHER LLP |
|---|---|
| By:  */s/ John A. Polito*<br>   John A. Polito<br>*Attorneys for Plaintiffs Oracle USA, Inc.,*<br>*Oracle America, Inc. and Oracle*<br>*International Corporation* | By:  */s/ Mark A. Perry*<br>   Mark A. Perry<br>*Attorneys for Attorneys for Defendants Rimini*<br>*Street, Inc. and Seth Ravin.* |

JOINT STATUS REPORT AND SUBMISSION RE: DISCOVERY PLAN

1

2

**<u>ATTESTATION OF FILER</u>**

3

   The signatories to this document are Mark Perry and me, and I have obtained Mr. Perry's

4

concurrence to file this document on his behalf.

5

Dated:  June 17, 2019

6

                              MORGAN, LEWIS & BOCKIUS LLP

7

8

                              By:_____*/s/ John A. Polito*_____
                                            John A. Polito

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

JOINT STATUS REPORT AND SUBMISSION RE: DISCOVERY PLAN

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**<u>CERTIFICATE OF SERVICE</u>**

I certify that on June 17, 2019, I electronically transmitted the foregoing **JOINT**

**SUBMISSION RE: DISCOVERY PLAN** to the Clerk's Office using the Electronic Filing

System pursuant to Local Rules Section 1C.

Dated:  June 17, 2019                                   MORGAN, LEWIS & BOCKIUS LLP


By:   /s/ *John A. Polito*
                      John A. Polito

1
CERTIFICATE OF SERVICE