# EXHIBIT 1
# Oracle letter to Rimini dated June 4, 2019



June 4, 2019

<u>VIA EMAIL</u>

Eric D. Vandevelde, Esq.
Gibson, Dunn & Crutcher LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
evandevelde@gibsondunn.com

   Re: *Oracle USA, Inc. et al. v. Rimini Street, Inc. & Seth Ravin*
      Case No. 2:10-cv-0106-LRH-VCF (D. Nev.)

Dear Mr. Vandevelde:

  I write in connection with the filing due on June 17.

  Since January (by letter dated January 2, 2019), Oracle has been seeking information from Rimini concerning its compliance with the Injunction that became effective on November 5, 2018. Among other things, Oracle's January letter asked Rimini to confirm whether it continued 20 specific practices post-Injunction. Oracle also has asked for basic information about Rimini's practices since November 5, 2018, including by serving foundational discovery requests on May 1, 2019. Yet, Rimini has to date provided Oracle with **no** documents or information regarding its compliance, despite the Court's order on April 5, 2019 that Injunction-related discovery should proceed.

  Seeking to streamline discovery, Oracle has repeatedly requested information regarding any changes Rimini made in response to the Injunction. Providing that information could substantially reduce Oracle's need for additional discovery. For example, if Rimini stipulates that it continued to engage in the same conduct, with no changes in response to the Injunction, then the parties could agree to use the *Rimini II* discovery record to seek a determination regarding whether Rimini's post-Injunction conduct violates the Injunction. If Rimini made changes in response to the Injunction, then the parties can at least stipulate that Rimini otherwise continued to engage in the same conduct, and Oracle can focus its discovery on those changes. If Rimini has not made changes in response to the Injunction, then Oracle can focus its discovery on the violations of the Injunction that have taken place since the Injunction became effective based on Rimini's existing policies and practices. Rimini has refused to provide even this basic information, complicating Oracle's efforts to address these Injunction compliance issues in a timely and efficient manner.



Rimini has continued to insist, most recently in its May 16, 21, and 29 letters, that it cannot and will not respond to Oracle's requests for information because it allegedly does not know (1) what practices violate the Injunction, (2) how those practices are covered by *Rimini I* rulings, or (3) how *Rimini II* discovery evidence relates to these proceedings.  These arguments are frivolous and do nothing but obstruct and delay any determination regarding Rimini's compliance with the Injunction.

The parties heavily litigated the basis and scope of the Injunction before Judge Hicks prior to his entry of the Injunction, including the issues of what conduct is prohibited and how *Rimini I* rulings support the Injunction.  Judge Hicks then entered the Injunction, which clearly prohibits certain practices that the parties have long litigated and well understand.  Rimini also made and lost arguments about the Injunction's basis and scope in unsuccessfully seeking to stay that Injunction and, most recently, opposing Oracle's motion to seek Injunction-compliance-related discovery.

Oracle has no obligation at this point to provide more information to justify the discovery it seeks, which focuses on Rimini practices prohibited by the Injunction during the period since November 5, 2018.  Yet, because Rimini continues to mount these repetitive arguments as a barrier to any discovery, and to take Rimini's frivolous arguments off the table, Oracle provides the information below—already known to both parties.  Oracle provides this information without prejudice to its ability to seek discovery and contempt regarding other conduct.

**Cross-Use**

The Injunction prohibits cross-use:  all Rimini reproduction and preparation of derivative works from Oracle's PeopleSoft, JD Edwards, and Siebel software and documentation that is not "*solely* in connection with work for a specific customer …." Paragraph 2(a) (emphasis added); *see also* Paragraph 4 (for PeopleSoft software and documentation, reproduction, preparation of derivative works, and use may not be "other than to support the *specific* licensee's own internal data processing operations"); Paragraphs 6, 10, 14 (for PeopleSoft, JD Edwards, and Siebel software and documentation, reproduction, preparation of derivative works, and use may not be "to support, troubleshoot, or perform development or testing for any other licensee" or "to develop or test software updates or modifications for the benefit of any other licensee").

Oracle may seek contempt on the basis that Rimini has continued to engage in cross-use in violation of Paragraphs 2, 4, and 6 in connection with Oracle's PeopleSoft software and documentation and also in violation of Paragraphs 2, 10, and 14 in connection with Oracle's JD Edwards and Siebel software and documentation.  Accordingly, Oracle seeks discovery that will show Rimini's acts of cross-use since November 5, 2018.



<u>Cross-Use Was Litigated in *Rimini I*</u>

The cross-use prohibitions in Paragraphs 2, 4, 6, 10, and 14 of the Injunction are all based on issues litigated and decided in *Rimini I*, as reflected in multiple rulings by Judge Hicks and the Ninth Circuit's ruling affirming in full the copyright infringement judgment. We understand that Rimini refuses to accept these *Rimini I* rulings, but they are in force and support the Injunction.

In February 2014, after extensive fact discovery and full briefing by the parties, Judge Hicks granted in part Oracle's first summary judgment motion. ECF No. 474. In that ruling, Judge Hicks construed unambiguous license terms for certain PeopleSoft, JD Edwards, and Siebel licenses. *Id.* at 6-24. Judge Hicks ruled that Rimini infringed Oracle's copyrights and had no license defense for PeopleSoft software environments "used to develop and test software updates for the City of Flint *and other Rimini customers*." *Id.* at 13 (emphasis added). This was based on the license term requiring that any use of the software be "solely for [the City of Flint's] *internal data processing operations* …." *Id.* at 12 (brackets and emphasis in original). The terms of the Injunction directly flow from that order and other *Rimini I* rulings. *See also* ECF No. 476 at 14 (ruling on second summary judgment motion, considering "internal business operations" clause in Oracle Database license and finding Rimini's conduct unlawful where "Rimini used Oracle Database to create updates for all clients using a particular version of a copyrighted software program. Rimini's use of Oracle Database to support multiple customers is also outside the scope of this license provision.").

In October 2015, Judge Hicks further explained the relevant license provisions in the *Rimini I* jury instructions. Judge Hicks stated the "PeopleSoft software licenses prohibited Rimini Street from copying or preparing derivative works from PeopleSoft software *other than to support the specific licensee's own internal data processing*" and that "prohibited Rimini Street from copying or preparing derivative works from PeopleSoft software in developing or testing software updates *for other Rimini Street customers*." ECF No. 880 at 30 (emphasis added). Judge Hicks likewise instructed the jury that Rimini cross-use was impermissible in connection with Oracle's licensed JD Edwards and Siebel software and documentation. *Id.* at 28 (for JD Edwards, no permission "to use the customer's software or support materials to support other customers") and 29 (same for Siebel).

The Ninth Circuit confirmed that cross-use constitutes copyright infringement, ruling: "Any work that Rimini performs under color of a license held by a customer for other existing customers cannot be considered work in support of that particular customer." *Oracle USA, Inc. v. Rimini Street, Inc.*, 879 F.3d 948, 957 (9th Cir. 2018).



These *Rimini I* rulings—which made clear that Rimini's cross-use is copyright infringement— are the basis for Paragraphs 2, 4, 6, 10, and 14 of the Injunction. Rimini understands these rulings perfectly well:  for example, Rimini's counsel admitted to the Ninth Circuit that Judge Hicks' February 2014 ruling held that "using one client's software environment to develop and test updates for other clients with identical licenses (which Oracle calls 'cross-use')" was "outside the scope of the licenses and constituted copyright infringement."  Case No. 18-16554 (9th Cir.), ECF No. 4-1 at 2.

*Rimini II* Discovery Demonstrates Continuing Cross-Use

The *Rimini II* discovery demonstrates Rimini's cross-use that would violate Paragraphs 2, 4, 6, 10, and 14 of the Injunction, absent confirmation that Rimini has ceased all implicated practices after November 5, 2018.  That *Rimini II* discovery is cited extensively in Oracle's expert reports and court filings in *Rimini II*, including the expert reports of Barbara Frederiksen-Cross and Christian Hicks.  Those reports contain specific sections focused on cross-use for the different Oracle product lines, citing relevant evidence. *E.g.*, 6/13/2018 Suppl. Expert Report of Barbara Frederiksen-Cross at 23-94, 113-41.

For example, internal Rimini emails describe how Rimini development during the *Rimini II* discovery period was "not done by client" and was instead done "across the full client base" with changes for "all clients."  RSI2_013178095.  Rimini executive Jim Benge further explained:  "It's not like we sit down once with a client and do all of the work in a bundle at once for that client.  We're doing it individual update by individual update."  2/23/2018 Benge Dep. Tr. at 247:21-24.  Rimini even developed updates in Oracle software environments associated with customer that were "not actually receiving the update."  RSI2_013037053.

Emails obtained through discovery in *Rimini II* also demonstrate that Rimini continued to engage in acts of cross-use during the period when the prior injunction was in effect in 2016.  For example, Rimini-produced emails from the *Rimini II* discovery period show that, during the time the prior injunction was in effect in 2016, Rimini employees continued to use "prototype clients" to develop Oracle software updates for multiple customers and to "cross check" updates across customers.  RSI2_019973238. During development, Rimini employees also were noting "discrepancies" across customers and conducting "testing" for only a subset of customers before "deploying to all clients."  RSI2_023318303, RSI2_022046455; *see also* RSI2_022045605 (noting "prototype completed in CMC, need retrofit to all US clients); RSI2_020022971 (noting Rimini's use of one client's Oracle software environment for "prototype" and testing).

In sum, throughout the *Rimini I* and *Rimini II* discovery periods and including during the period when the prior injunction was effective in 2016, Rimini routinely and

4



repeatedly reproduced and prepared derivative works from Oracle software and documentation in ways that would violate Paragraphs 2, 4, 6, 10, and 14 of the Injunction if such practices continued on or after November 5, 2018.  Oracle is entitled to discovery regarding the extent to which Rimini has continued to engage in such practices since November 5, 2018.

Discovery Oracle Seeks To Determine Injunction Compliance

Oracle sent Rimini a letter on January 2, 2019 seeking information regarding Rimini's processes after November 5, 2018, and identifying specific practices that constitute cross-use in violation of the Injunction.  Rimini has since refused to provide the requested information and refused to agree to the stipulated facts proposed by Oracle.

Oracle seeks discovery sufficient to assess the extent to which Rimini has violated Paragraphs 2, 4, 6, 10, and 14 of the Injunction since November 5, 2018.  Specifically, Oracle seeks information regarding cross-use similar to that produced in *Rimini II*: documents (including AFW records, DevTrack records, and emails), interrogatory responses, responses to requests for admission, deposition testimony, and third-party discovery.  On May 1, Oracle served discovery on Rimini seeking foundational information regarding Rimini's processes since November 5, 2018.  The extent to which Oracle will need discovery beyond the scope of those initial requests and in particular the scope of any third-party discovery will depend in part on Rimini's responses and Rimini's willingness to stipulate to certain facts.

Discovery concerning Rimini's compliance with these paragraphs of the Injunction should include Rimini internal communications, including emails and chat records.  As noted above, emails produced by Rimini for the period in 2016 when the prior injunction was in effect demonstrates Rimini's continuing cross-use, in violation of the prior injunction.

**Facilities Restrictions/Cloud Hosting**

The Injunction prohibits all Rimini reproduction, preparation of derivative works from, and use of Oracle's PeopleSoft software and documentation "on, with, or to any computer systems other than *a specific licensee's own computer systems*."  Paragraph 5.

Oracle may seek contempt on the basis that Rimini has continued to "reproduce, prepare derivative works from, or use PeopleSoft, software or documentation on, with, or to any computer systems other than a specific licensee's own computer systems" in violation of Paragraph 5.  Accordingly, Oracle seeks discovery focused on Rimini's practices with respect to the facilities restriction (including cloud hosting) since November 5, 2018.



### Facilities Restrictions Were Litigated in *Rimini I*

The requirements of Paragraph 5 of the Injunction are based on issues litigated and decided in *Rimini I*, as reflected in multiple rulings by Judge Hicks and by the Ninth Circuit's affirmance in full of the copyright infringement judgment against Rimini.

In February 2014, after extensive fact discovery and full briefing by the parties, Judge Hicks granted in part Oracle's first summary judgment motion. ECF No. 474. In that ruling, Judge Hicks concluded in relevant part that Rimini's infringement of Oracle's copyrighted PeopleSoft software was not excused by any license because the Oracle license "expressly limits copying the licensed software to *only* the [customer's] facilities." *Id.* at 12 (emphasis in original).

In October 2015, Judge Hicks confirmed this ruling in the *Rimini I* jury instructions. Judge Hicks stated the "PeopleSoft software licenses prohibited Rimini Street from copying or preparing derivative works from PeopleSoft software other than to support the specific licensee's own internal data processing *on the licensee's own computer systems*." ECF No. 880 at 30 (emphasis added).

The Ninth Circuit affirmed the jury verdict, ruling: "We agree with Oracle that 'facilities under the control of a third party' could not qualify as 'the *licensee*'s facilities." *Oracle USA*, 879 F.3d at 960 (emphasis in original); *see also id.* at 959 (quoting and affirming district court ruling that licenses to Rimini customers "do not authorize Rimini's off-site copies of the licensed software").

### *Rimini II* Discovery Demonstrates Continuing Violations

The *Rimini II* discovery demonstrates Rimini's violation of Paragraph 5 of the Injunction unless such conduct was ceased. That *Rimini II* discovery is cited extensively in Oracle's expert reports and court filings in *Rimini II*, including the expert reports of Barbara Frederiksen-Cross and Christian Hicks.

The *Rimini II* discovery demonstrates that Rimini's top executives knew that Judge Hicks' February 2014 ruling did not permit copying of Oracle software and documentation to third-party cloud locations, but Rimini continued to do so anyway. On February 15, 2014, the day after Judge Hicks' summary judgment ruling, Rimini CEO Seth Ravin wrote: "The judge agreed with Oracle's argument that the *contracts are not open to interpretation – must be interpreted literally when they say 'software can only reside on customer's premises*.'" RSI2_018547737 (emphasis added). Rimini also had talking points stating "the judge ruled that the licensed software must be run on licensee facilities, and not at Rimini Street (and therefore *not at a hosting provider or other facility either*)." RSI2_015147884 (emphasis added). Combined with evidence showing

6



continued copying of Oracle software and documentation to cloud-servers with Windstream and Amazon Web Services, the *Rimini II* discovery shows Rimini's willful disregard of the Court's clear rulings.

In addition, Rimini emails demonstrate that Rimini's support of cloud-hosted PeopleSoft software continued unabated during the period that the prior injunction was in effect in 2016.  For example, one internal Rimini email dated October 13, 2016 notes that Windstream clients contractually agreed that Rimini would manage the Oracle software environments on Windstream, and that the "VMs for these clients are attached to our domain, and *clients have no way of logging on to them*."  RSI2_022771599.  Rimini also continued to regularly push out updates for Oracle software from Windstream-hosted development environments to multiple other customers during this time period.  *E.g.*, RSI2_019908444, RSI2_019952144, RSI2_019952066, RSI2_020023700, RSI2_020023020.  Rimini actively "used" at least one Windstream environment during the 2016 injunction period.  RSI2_020340898.

The *Rimini II* discovery also evidences massive Rimini copying of Oracle software and support materials to servers not located on customers' premises.  Rimini created at least 139 archives on AWS.  6/13/2018 Suppl. Expert Report of Barbara Frederiksen-Cross ¶ 531 & Ex. LLLLL.  These archives include a significant number of copies of Oracle's software and support materials.  *Id.* ¶¶ 533-40.S4 & accompanying exhibits.

Rimini also continued during that 2016 period to copy Oracle software and documentation to AWS.  Rimini continued to use AWS to host archives of Oracle software and documentation during Rimini's onboarding process, and Rimini executive David Miller wrote that "All clients have to use AWS for archive execution in every region."  RSI2_019771235; RSI2_025221775.  And an email template for clients, also drafted by Mr. Miller, indicated that AWS hosting was critical to Rimini's ability to archive: "We have executed on premise archives in the past but our experience of well over 800 archives projects is that there was not enough time for clients to align the resources required, meet our connectivity requirements or provide the bandwidth necessary to complete the archive in time."  RSI2_025232592.

<u>Discovery Oracle Seeks To Determine Injunction Compliance</u>

Oracle sent Rimini a letter on January 2, 2019 seeking information regarding any changes to its processes after November 5, 2018, and identifying specific conduct that would violate Paragraphs 5, 9, and 13 of the Injunction.  Rimini has since refused to provide the requested information or to agree to the stipulated facts proposed by Oracle, despite the fact that Rimini's counsel admitted during the April hearing that Rimini



continues to access and use Oracle software copied to cloud servers.  Apr. 4, 2019 Hearing Tr. at 19:22-20:1.

Oracle seeks discovery sufficient to assess the extent to which Rimini has violated Paragraphs 5, 9, and 13 of the Injunction since November 5, 2018.  Specifically, Oracle seeks information similar to that produced in *Rimini II* showing the locations of the software Rimini supports:  documents (including AFW records, DevTrack records, and emails), interrogatory responses, responses to requests for admission, deposition testimony, and third-party discovery.  On May 1, Oracle served discovery on Rimini seeking foundational information regarding Rimini's processes since November 5, 2018.  The extent to which Oracle will need discovery beyond the scope of those initial requests and in particular the scope of any third-party discovery will depend in part on Rimini's responses and Rimini's willingness to stipulate to certain facts.

Discovery concerning Rimini's compliance with these paragraphs of the Injunction should include Rimini internal communications, including emails and chat records.  As noted above, emails produced by Rimini for the period in 2016 when the prior injunction was in effect demonstrates Rimini's continuing access to and use of Oracle software and documentation on cloud servers, in violation of the prior injunction.

**Distribution of Oracle Software and Derivative Works**

Pursuant to Paragraphs 3, 7, and 11 of the Injunction, Rimini is not permitted to distribute PeopleSoft, JD Edwards, and Siebel software and documentation or derivative works based upon PeopleSoft, JD Edwards, and Siebel software and documentation.  Oracle may seek contempt on the basis that Rimini has continued to distribute Oracle software and documentation and derivative works created therefrom in violation of Paragraphs 3, 7, and 11.  Accordingly, Oracle seeks discovery that will show Rimini's acts of distribution since November 5, 2018.

Rimini's Infringing Acts of Distribution Were Litigated in *Rimini I*

The requirements of Paragraphs 3, 7, and 11 of the Injunction are based on issues litigated and decided in *Rimini I*.  Oracle conducted significant discovery directed at identifying Rimini's distribution of software, software updates, and documentation to Rimini's customers.  Oracle's expert witness, Dr. Randy Davis, discussed Rimini's acts of distribution in his expert report, and testified about them at trial.  *See, e.g.*, *Rimini I*, Trial Tr. 186:12-189:15 (discussing Rimini's distribution of documentation); *id.* at 213:3-23 (discussing Rimini's distribution of derivative works based upon Oracle software).  The Court instructed the jury that Oracle had the exclusive right to distribute Oracle's copyrighted works, including derivative works.  *Rimini I*, ECF No. 880 at 22.



### *Rimini II* Discovery Demonstrates Continuing Violations

As established during discovery in *Rimini II*, Rimini infringed Oracle's exclusive rights to distribute Oracle software and documentation (including distribution of derivative works) throughout the *Rimini II* time period.  *See, e.g.*, Rimini's Seventh Suppl. Resp. to Oracle's Interrog. No. 6, Feb. 8, 2018 (describing Rimini's acts of distribution—including distribution of environments, software archives, and software updates—and referring to several hundred documents pursuant to Fed. R. Civ. P. 33(d)).  Rimini also "migrated" hundreds of environments containing installed copies of Oracle software and hundreds of software archives during the *Rimini II* time period.  *See, e.g.*, Rimini's Fourth Suppl. Resp. to Oracle's Interrog. No. 4, Feb. 8, 2018 (describing steps in the migration, referring to over one hundred documents pursuant to Fed. R. Civ. P. 33(d), and incorporating Rimini's responses to Oracle's Interrog. No. 6); May 17, 2016 Deposition of Rimini Street, Inc. (S. Salaets) Pursuant to Fed. R. Civ. P. 30(b)(6) at 153:18-295:11, 305:11-354:25, 364:12-368:7 (discussing Rimini's migration, related business records, and related custodial e-mails).

### Discovery Oracle Seeks To Determine Injunction Compliance

Oracle sent Rimini a letter on January 2, 2019 seeking information regarding any changes to its processes after November 5, 2018, and identifying specific conduct that would violate Paragraphs 3, 7, and 11 of the Injunction.  Rimini has since refused to provide the requested information or to agree to the stipulated facts proposed by Oracle.

Oracle seeks discovery sufficient to assess the extent to which Rimini has violated Paragraphs 3, 7, and 11 of the Injunction since November 5, 2018.  Specifically, Oracle seeks information similar to that produced in *Rimini II* that identifies Rimini's distribution of software environments, archives, and software updates:  documents (including AFW records, DevTrack records, and emails), interrogatory responses, responses to requests for admission, deposition testimony, and third-party discovery.  On May 1, Oracle served discovery on Rimini seeking foundational information regarding Rimini's processes since November 5, 2018.  The extent to which Oracle will need discovery beyond the scope of those initial requests and in particular the scope of any third-party discovery will depend in part on Rimini's responses and Rimini's willingness to stipulate to certain facts.

**Source Code Access**

Pursuant to Paragraph 8 of the Injunction, Rimini is not permitted to copy or access JD Edwards source code.  Oracle may seek contempt on the basis that Rimini has continued to copy and access JD Edwards source code in violation of Paragraph 8.



Accordingly, Oracle seeks discovery that will show Rimini's copying of and access to JD Edwards source code since November 5, 2018.

### Rimini's Unlicensed Acts Were Litigated in *Rimini I*

The requirements of Paragraph 8 of the Injunction are based on issues litigated and decided in *Rimini I*. Oracle conducted significant discovery directed at understanding Rimini's conduct in the course of providing support for JD Edwards to Rimini's customers. The Court instructed the jury that, pursuant to customers' JD Edwards license agreements, Rimini was not "authorized to make copies of the J.D. Edwards software application and documentation to, among other things, access the software's source code to carry out development and testing of software updates [or] to make modifications to the software." *Rimini I*, ECF No. 880 at 28.

### *Rimini II* Discovery Demonstrates Continuing Violations

As established during discovery in *Rimini II*, Rimini unlawfully made copies of JD Edwards software and documentation, including accessing JD Edwards source code to carry out development and testing of software updates and modifications, throughout the *Rimini II* time period. *E.g.*, RSI2_022303620 (refraining from copying and accessing JD Edwards source code would be a "MAJOR change to [Rimini's] process"); RSI2_022261811 (describing Rimini's regular access to JD Edwards environments from "RSI VMs" and stating that without "developer workstation" access Rimini "CANNOT SUPPORT [customers] AT ALL"). Emails obtained through discovery in *Rimini II* also demonstrate that Rimini continued to engage in improper copying of and access to JD Edwards source code during the period when the prior injunction was in effect in 2016. *E.g.*, RSI2_022303620 ("This is Rimini accessing the source code by looking over a [Rimini customer] Silgan person's shoulder. Not sure if we think that is ethical (or legal).").

### Discovery Oracle Seeks To Determine Injunction Compliance

Oracle sent Rimini a letter on January 2, 2019 seeking information regarding any changes to its processes after November 5, 2018, and identifying specific conduct that would violate Paragraph 8 of the Injunction. Rimini has since refused to provide the requested information or to agree to the stipulated facts proposed by Oracle.

Oracle seeks discovery sufficient to assess the extent to which Rimini has violated Paragraph 8 of the Injunction since November 5, 2018. Specifically, Oracle seeks information similar to that produced in *Rimini II* that identifies Rimini's copying of and access to JD Edwards software and documentation, including JD Edwards source code: documents (including AFW records, DevTrack records, and emails), interrogatory



responses, responses to requests for admission, deposition testimony, and third-party discovery. On May 1, Oracle served discovery on Rimini seeking foundational information regarding Rimini's processes since November 5, 2018. The extent to which Oracle will need discovery beyond the scope of those initial requests and in particular the scope of any third-party discovery will depend in part on Rimini's responses and Rimini's willingness to stipulate to certain facts.

**Rimini's Compliance With Paragraph 1 Notice Requirement**

On January 2, 2019, to assess Rimini's compliance with Paragraph 1 of the Injunction, Oracle asked Rimini to provide a copy of the required notice along with a list of all recipients with the date that each recipient received the notice. Oracle made that request in light of Rimini's long history of disregarding its legal obligations, including with the proven infringement and spoliation, and Rimini's extensive use of contractors and other agents in connection with the Oracle software products at issue. On January 23, 2019, Rimini responded to Oracle's letter without addressing that request regarding Paragraph 1. Rimini still has not provided any documents demonstrating compliance with Paragraph 1. Oracle seeks documents sufficient to assess Rimini's compliance with Paragraph 1. This should not be burdensome to Rimini.

Sincerely,

*Kathleen R. Hartnett*
Kathleen R. Hartnett

cc: *Rimini I* Distribution List