```
 1                   UNITED STATES DISTRICT COURT
                          DISTRICT OF NEVADA
 2          BEFORE THE HONORABLE CAM FERENBACH, MAGISTRATE JUDGE
                              ---o0o---
 3

 4   ORACLE USA, INC., a            :
     Colorado corporation; et       :
 5   al.,                           :
                                    : No. 2:10-cv-106-LRH-VCF
 6              Plaintiffs,         :
                                    : September 3, 2019
 7         -vs-                     :
                                    : Las Vegas, Nevada
 8   RIMINI STREET, INC., a         :
     Nevada corporation; et al.,    :
 9                                  :
                Defendants.         :
10   _____:

11

12                  TRANSCRIPT OF MOTION HEARING

13

14   APPEARANCES:

15   FOR THE PLAINTIFFS:  RICHARD J. POCKER, JAMES C. MARGOULIS,
                          KATHLEEN HARTNETT AND JOHN A. POLITO
16                        Attorneys at Law

17

18   FOR THE DEFENDANTS:  ERIC VANDEVELDE, CASEY J. McCRACKEN,
                          W. WEST ALLEN
19                        Attorneys at Law

20

21

22   Transcribed by:      Margaret E. Griener, CCR #3, FCRR
                          Official Reporter
23                        400 South Virginia Street
                          Reno, Nevada 89501
24

25
```

1          LAS VEGAS, NEVADA, TUESDAY, SEPTEMBER 3, 2019, 9:59 A.M.

2                              ---o0o---

3

4                    THE CLERK:  Oracle USA, Inc., et al., versus

5     Rimini Street, Inc., et al., 2:10-civil-106-LRH-VCF.

6                    This is before the Court on a motion, dockets

7     1237 and 1238.

8                    Counsel, your appearance, please.

9                    MR. VANDEVELDE:  Good morning, your Honor.  Eric

10    Vandevelde for Rimini Street.

11                   THE COURT:  Mr. Vandevelde.

12                   MR. McCRACKEN:  Good morning, your Honor.  Casey

13    McCracken for Rimini Street.

14                   THE COURT:  Mr. McCracken.

15                   MR. ALLEN:  Good morning, your Honor.  West

16    Allen on behalf of Rimini Street with my colleagues.  Thank

17    you.

18                   THE COURT:  Thank you, Mr. Allen.

19                   MR. POCKER:  Your Honor, Richard Pocker, Boise,

20    Schiller & Flexner on behalf of the plaintiff Oracle entities.

21                   MR. MARGOULIS:  Good morning, your Honor.  James

22    Margoulis from Oracle for Oracle.

23                   THE COURT:  Mr. Margoulis.

24                   MS. HARTNETT:  Good morning.  Kathleen Hartnett

25    from Boise Schiller Flexner for the Oracle entities.

```
 1                    THE COURT:  Hartnett.

 2                    MS. HARTNETT:  Yes.

 3                    MR. POLITO:  Good morning.  John Polito from

 4   Morgan, Lewis & Bockius for the Oracle plaintiffs.

 5                    THE COURT:  Thank you, Mr. Polito.

 6                    All right.  Before I -- I've read through

 7   everything, I really appreciate that I got courtesy copies of

 8   all the exhibits, it certainly helps.

 9                    And I just want to make sure first, because

10   we're talking about custodians and search terms, are we

11   talking primarily about e-mails here, or are we talking

12   exclusively about e-mails here, just to be sure.  Could

13   somebody clarify that?

14                    MR. POCKER:  Your Honor, I don't know that it

15   would be exclusively e-mail.

16                    THE COURT:  Right.

17                    MR. POCKER:  But I think the distinction is the

18   noncustodial stuff is what's also referenced in a number of

19   places in the pleadings as technical information.

20                    THE COURT:  Right.

21                    MR. POCKER:  Those are reports and items that

22   come from Rimini's operating systems.

23                    THE COURT:  Right.

24                    MR. POCKER:  But then we have also sought

25   through a series of discovery requests custodial productions
```

1    from individuals.

2                    THE COURT:  And those are the e-mails.  There

3    might be things attached to the e-mails, but --

4                    MR. POCKER:  Right, or they could be memoranda,

5    they could be memos to file, drafts, inner-office

6    communications other than e-mail, but that's what we're

7    talking about, custodial documents in the old sense before

8    everything was subsumed by electronic communication.

9                    THE COURT:  Right.  Okay.  I think that helps.

10                   And this, I hope, is the only remaining dispute

11   having to do with postinjunction production of documents?  Is

12   that fair?

13                   MR. VANDEVELDE:  I think it is from our

14   perspective, your Honor.

15                   MR. POCKER:  Well, I mean, there's a lot of

16   parts to that, your Honor.

17                   THE COURT:  Right.

18                   MR. POCKER:  But at this point in time, yes,

19   we're not getting any custodial production --

20                   THE COURT:  Right, right.

21                   MR. POCKER:  -- and we need to get that.

22                   THE COURT:  So if I can solve the custodial

23   problem, that should be the last brick in the wall, so to

24   speak.

25                   MR. VANDEVELDE:  Well, just to correct

1  Mr. Pocker, we are -- we are reviewing a reasonable set of

2  custodial documents, actually a very substantial set of

3  custodial documents, so the notion that we are not providing

4  custodial documents is not accurate.

5              THE COURT:  No, no, I understand.  I read all

6  that.  It's okay, you don't have to protect that stuff.

7              MR. POCKER:  And, your Honor, given your last

8  statement about whether this is the capstone on the whole

9  process --

10             THE COURT:  Right.

11             MR. POCKER:  -- there is another issue we're

12  investigating.  It's really not going to be resolved obviously

13  in this context.

14             THE COURT:  It hasn't been briefed or anything,

15  right?

16             MR. POCKER:  There is perhaps spoliation claims

17  that we might make as well.

18             THE COURT:  That would be -- that would be

19  independent.  Okay.  Okay, then.

20             All right.  So I had one other question, then

21  I'll just hear argument.  And I have an idea, of course, what

22  I want to do, but there's a lot going on here, I want to be

23  sure.

24             But so Rimini -- am I pronouncing that right,

25  Rimini?  Is that right?

```
 1                    MR. VANDEVELDE:  Rimini, your Honor.

 2                    THE COURT:  Rimini --oh, okay.  You know --

 3                    MR. VANDEVELDE:  It's actually a street here in

 4    Las Vegas.

 5                    THE COURT:  Wow.  No, kidding.  Rimini.  I

 6    didn't know that, and I've been here a long time.

 7                    Yeah, I have a problem, a lot of our -- not to

 8    cast any similarity, but a lot of my criminal defendants that

 9    I have here, I'm also getting the accent wrong on the --

10    Rimini.  Got it.  Rimini.  Okay.

11                    So Rimini predicts that 19 custodians with 246

12    search terms will produce 780,000 documents.  So I wonder,

13    maybe you can explain to me what process you came -- what you

14    did, what research you did to come up with that number, how

15    you can know that number.

16                    MR. VANDEVELDE:  Sure, your Honor.  I'll go to

17    the lectern.

18                    Well, each custodian that they've proposed, that

19    takes a quantum of work, approximately eight to ten hours just

20    to --

21                    THE COURT:  I saw the time here --

22                    MR. VANDEVELDE:  No --

23                    THE COURT:  Number of documents, that's all I

24    want to know.  We'll talk about time later.  But I just want

25    to know how do you know 780,000.  And you're talking about
```

1    documents, those could be multipage documents.

2                    MR. VANDEVELDE:  Oh, yes, your Honor.

3                    THE COURT:  Okay.  So how do you get that

4    number, 780,000?

5                    MR. VANDEVELDE:  That is taking the data from

6    those custodians and running their 240 something search terms

7    across those to see what hits, that results in almost 800,000.

8                    THE COURT:  Okay.  So it's kind of like you

9    actually ran the -- I guess the term -- I don't want to misuse

10   it, but you ran the algorithm of the search or whatever, and

11   without actually pulling up the documents and looking at them,

12   you were able to get a count on how many documents that would

13   reveal.

14                   MR. VANDEVELDE:  Correct.

15                   THE COURT:  Okay.  Great.  That's exactly what I

16   wanted to know.

17                   MR. VANDEVELDE:  Okay.

18                   THE COURT:  Thank you.

19                   Well, now, let's see.  I guess this is Oracle's

20   motion, right, so I'll hear from Mr. Pocker first.

21                   MR. POCKER:  Thank you, your Honor.

22                   This motion highlights a very strange conflict

23   and disconnect in this particular case.

24                   On the one hand we have the context, which is

25   the enforcement of an already-adjudicated, entered,

1    upheld-on-appeal-by-the-Ninth-Circuit permanent injunction

2    issued by Judge Hicks in this case, a very weighty and

3    important matter, the enforcement of not only the Court's

4    order, but the public interest given the fact that this

5    injunction would not issue were it not in the public interest,

6    a very serious case, serious allegations with serious

7    consequences for Rimini Street, and yet, in conflict with that

8    is the Rimini Street proposal for discovery in this case which

9    can be described as nothing better than discovery-lite, which,

10   if you really boil it down to what they have proposed doing,

11   not what they're complaining about, how many e-mails they have

12   to look at, how many people they have to ask about the

13   custodial stuff, but what they're proposing as an acceptable

14   solution here, it is reverse engineering a process that will

15   result in them only having to look at 30,000 documents and

16   only having to commit a certain number of hours all for their

17   own convenience.

18             That disconnect is huge and improper here, and

19   it's what's really created a logjam of what otherwise should

20   have been a fairly orderly process.

21             As the Court knows, last January we made some

22   inquiry after the injunction went into effect in the late

23   autumn of 2018, saying, "What are you all doing?  Are you

24   doing these processes?  Are you engaged in this?"  We got the

25   veritable stonewall.

1          We then filed a motion seeking discovery with

2   respect to their current practices which they now have

3   acknowledged have changed since the entry of the injunction,

4   and we ultimately received that after a hearing in front of

5   the Court here in April.

6          You issued an order in June, that is, June 21st,

7   setting out what the Court's anticipated discovery schedule

8   would be pursuant to the --

9          THE COURT:  And that was -- I think I had asked

10   you -- I kind of ruled and asked you to get together and give

11   me an order, and then you wouldn't give me an order so I just

12   had to make one up.

13          MR. POCKER:  No, that's -- that's a fair

14   assessment, your Honor.

15          THE COURT:  All right.  Okay.  Good.  I just

16   wanted to make sure -- there was a long delay there from April

17   to June, and I --

18          MR. POCKER:  Yeah, no, no, no.

19          THE COURT:  I don't usually take that long so --

20          MR. POCKER:  And, in fact, the parties started

21   to engage in the discovery process before that, at least our

22   side of it.

23          On May 1st we issued some of the discovery

24   requests that not only request their technical information but

25   custodial documents.

```
 1                    THE COURT:  Right.

 2                    MR. POCKER:  And, finally, at the beginning of

 3   July, Rimini Street agreed that they would produce custodial

 4   documents, but they have yet to do so.

 5                    And we are now two months down the road.

 6   Instead of getting to work and looking for custodial documents

 7   as requested by us or the custodians requested by us, they

 8   instead want to limit this entire process to this truncated

 9   little offer on their part that, "Well, you know, we'll give

10   you four custodians, it can't be any more than 30,000

11   documents produced, and, you know, we're only going to do this

12   limited amount of search terms, we'll decide the search terms,

13   and that's all you're going to get."

14                    And the Court -- I won't belabor all the back

15   and forth with the meet and confer --

16                    THE COURT:  Right.

17                    MR. POCKER:  -- but we're not getting there, and

18   nothing Rimini Street proposes even resembles the type of

19   discovery process that ought to be in place here to decide

20   these weighty issues.

21                    We directed in our pleadings, and I won't

22   belabor the point too much here, but we followed the Court's

23   admonition to identify five respects in which we believed that

24   Rimini Street was violating Judge Hicks' injunction.

25                    THE COURT:  They say you really just paraphrased
```

1    your -- you know, your claims, you really didn't focus it

2    down, right?

3                    MR. POCKER:  Well, but we did, your Honor.

4                    The biggest problem here is that the Ninth

5    Circuit has addressed all of Rimini Street's arguments that,

6    oh, that was Rimini I, that's yesterday, we changed it, what

7    we do in Rimini II is totally different, you know, it

8    shouldn't be at issue in this injunction, it couldn't be at

9    issue in this injunction.  The Ninth Circuit has kind of shot

10   that down.

11                   Every vagueness, every overbreadth, every

12   argument with the exception of two -- two small changes and

13   tweaks -- and I know the Court has seen the Ninth Circuit's

14   order, otherwise what Judge Hicks put in that injunction

15   stands.

16                   And, as this Court observed in April, aptly,

17   just because it's an issue in Rimini II doesn't mean it also

18   doesn't violate the injunction in Rimini I.

19                   And I think what happens here is, if I can use

20   an analogy, they say, "Well, Rimini I was us infringing in red

21   shoes, and in Rimini II we were really doing kind of the same

22   thing, but we're wearing yellow shoes, so this has to be

23   adjudicated all over again."  No.

24                   And the Ninth Circuit recognized it, and the

25   injunction embraces it, and our description of what they're

1    doing is as precise as it can be in the sense that we believe

2    they are still cross-using.  Whether they're doing it with

3    their new tools, their old tools, or some other manner that we

4    have yet been given the option of discovering is irrelevant,

5    it's still the infringing conduct.

6            And that's why, if you look at this, we believe

7    the cross-use is still in effect for both Peoplesoft and JD

8    Edwards.  There's still copying of JD Edwards source code.

9    And there's distribution, which is a major part of the

10   violations that were all adjudicated in Rimini I with respect

11   to Peoplesoft and JD Edwards.

12           The cloud hosting, I know Mr. Vandevelde wasn't

13   the attorney at that time, but Mr. Perry tried to make some

14   huge distinction about how that couldn't possibly be under the

15   injunction in Rimini I because, after all, that was only about

16   the fact that it was on Rimini's system.

17           No.  Rimini I adjudicated that unless it's on

18   the customer's system, it's an infringing violation.  So cloud

19   hosting and putting it places other than on the system of the

20   customer is indeed something that was embraced by the Rimini I

21   injunction and is still a potential violation if it's still

22   going on now.

23           So that's -- I mean, you think about the five --

24           THE COURT:  So the five are cross-use with

25   Peoplesoft, cross-use JDE, distribution Peoplesoft,

1    distribution JDE, and then cloud hosting.

2                    MR. POCKER:  Copying JD Edwards source code.

3                    THE COURT:  Copying the source code, all right.

4                    MR. POCKER:  Yes, JD Edwards source code, yeah.

5                    THE COURT:  All right.

6                    MR. POCKER:  Now, there was -- we had to correct

7    our -- well, we actually just kind of tailored it down.  After

8    the injunction came out, we had said access and copy source

9    code, but access source code is one of the two minor ways in

10   which the Ninth Circuit said the injunction is not accurate or

11   not viable.

12                    But what remains is their copying of JD Edwards

13   source code, and then, of course, the cloud hosting of the

14   Peoplesoft software because that's the software that the

15   licenses have the facilities restriction.

16                    THE COURT:  Facilities restriction.

17                    MR. POCKER:  That was the other minor change

18   that the Ninth Circuit had, is that with respect to a couple

19   of the other software families, there were no facilities

20   restrictions in the license and so they took that out of the

21   injunction.

22                    THE COURT:  All right.  Got it.

23                    MR. POCKER:  But, yeah, so that's what's at

24   issue here, your Honor.  It's not -- it shows the magnitude of

25   what's going on here because, really, what we're dealing with

1    is an as yet un-totally defined Rimini 3.0.

2                    You've heard that they had a system Rimini 1.0

3    which was the subject of Rimini I and then all these changes,

4    and now they have a new system 2.0 that they want the Court to

5    give them a blessing with a declaratory relief action,

6    although it's curious that they have acknowledged that they've

7    made changes in light of the injunction, so what are we doing

8    in Rimini II if it's not even their system any more?

9                    There's no indication that they're going to

10   dismiss their declaratory relief action or amend or anything

11   else.  So that's kind of interesting.  They're acknowledging

12   that they no longer use that system, so the idea that all this

13   will all be sorted out in Rimini II, well, you know, it won't

14   actually.

15                    And as the Court in our discovery hearing, I

16   know that you pushed us as to -- you know, what time frame and

17   what are you really looking at here, and at that point in time

18   Judge Hoffman had not yet amended -- or entered his order

19   allowing us to use the Rimini II information in this case.

20   Well, that gives us information through February 2018.

21                    THE COURT:  Right.

22                    MR. POCKER:  Because that's when discovery

23   closed in Rimini II.  Then our injunction was initially

24   entered in August of 2018 but then stayed -- well, or delayed

25   so that Rimini could seek the stay.  They didn't get a stay,

```
 1   so it went into effect in November of 2018.

 2                   And as we discussed last time, the Court said,

 3   well, that's the -- one of the central focus time periods is

 4   November until now, and we have no custodial documents from

 5   that time period as to how this implementation occurred, the

 6   communications that these folks may have had with the

 7   customers about the changes.  All we have is them saying, "Oh,

 8   you can just kind of look at certain aspects of our system and

 9   you should be able to figure it out from there."

10                   THE COURT:  So have the parties agreed on the --

11   if custodial productions are ordered, the time period we're

12   talking about here, or is there a dispute on that?

13                   MR. POCKER:  Well, we have the custodial

14   production from Rimini II.

15                   THE COURT:  So that's through February.

16                   MR. POCKER:  Through February.  So they should

17   be giving us --

18                   THE COURT:  So your position would be from

19   February '18 all the way to the present.

20                   MR. POCKER:  At the very least from the --

21   the -- November.

22                   THE COURT:  The injunction, because it seems to

23   the extent --

24                   MR. POCKER:  And I guess it I just --

25                   THE COURT:  -- reduce the load in November kind
```

1    of makes sense.

2                   MR. POCKER:  Well, again, they don't really even

3    address that.

4                   I think what's frustrating about the Rimini

5    Street argument back and forth in our meet and confer and even

6    in this motion briefing is you just don't ever get custodial

7    evidence, it's not relevant, it's not pertinent, it's not

8    proportional to the issues.

9                   Well, we've just outlined the issues.  The

10   issues are darned important, and they're even at a context now

11   where if we can't do full discovery regarding these

12   violations, and if Judge Hicks can't have a complete record in

13   front him when we file our contempt motion, how do you ever

14   enforce an injunction.

15                  And they've latched onto a couple of phrases

16   that the Court used in our last hearing about, "Well, let's

17   take a peek here, let's limit our discovery," that kind of

18   thing, to make it look as if all we're really entitled to is a

19   quick peek behind the curtain, like kind of a preview or a

20   trailer for what they're doing now, and that should be enough,

21   whereas this is where this disconnect comes in.  We're talking

22   serious business here.

23                  We litigated -- this Court took public resources

24   and litigated their conduct in Rimini I for eight years

25   between filing and entry of that injunction, and it's not

1    important enough to see that they're violating that?  That we

2    don't get anything more than a peek behind the curtain?  Or we

3    have to take their word for it?

4              And this whole issue of what are we going to get

5    from custodial discovery is one of the things -- I'm sure it

6    comes out even in the pleadings that have come since you've

7    joined the case is they're a very hands-on company over there.

8    Seth Ravin, his right-hand people, Nancy Rizkallah and

9    Mr. Grady, these are deeply involved people in the day-to-day

10   process of that company.  Those folks don't do anything unless

11   they've run it by Seth and Sebastian.

12             This is not the typical -- it's not like we're

13   running e-mail searches on the chairman of General Motors

14   over, you know, a product defect case somewhere.  They are

15   deeply involved in this whole process.

16             And we are entitled, and certainly -- I mean, if

17   you want to take a weight on the line, Judge Hicks needs to

18   know whether or not -- you know, what were the reasons that

19   this injunction was violated.  Was it a one-off set of rogue

20   programmers who said, "We'll just" -- or employees, "We'll

21   just take the easy way out here, we'll do that even though we

22   know it's against the injunction"?  Or did it come about

23   because of the way the policy was disseminated to them, "Well,

24   you can do this but you can't do that"?

25             The matter is important in the sense that do you

1    have a willful violation of that injunction?  Do you even have

2    a violation of the injunction, or is it just an isolated act?

3               This type of evidence, which is easy to get,

4    they did it in Rimini I, they did it in Rimini II, even the

5    Ninth Circuit acknowledges that e-mail were one of the

6    major -- the internal e-mail from Rimini Street were one of

7    the major components of demonstrating that the injunction was

8    valid and worthwhile.

9               So we're not talking about irrelevant stuff

10   here.  And then I guess it begs the question, if it's so

11   irrelevant, if they have to go through all this stuff, and it

12   has nothing to do with whether they're violating the

13   injunction, then go ahead, give it to us, it's only going to

14   show that you're in compliance, and you're thinking -- if they

15   were thinking strategically, it would be, you know, we're

16   fully in compliance now, let's get this fight over with, and

17   it's going to be a long time before Oracle is going to be able

18   to come back with any credibility and say things have changed,

19   we want another bite at this apple.

20               So I find the whole irrelevance argument beside

21   the point.  So it really comes down to this notion of, "Oh, we

22   have to do too much work" --

23               THE COURT:  It's proportionality.

24               MR. POCKER:  And, you know what, in many

25   respects this kind of -- 30,000 documents, that's less than

1    some of these poor third-party subpoena recipients produced in

2    their case; not just reviewed, produced.

3                    So, you know, if they can -- if the public

4    school system in Kansas can be required to look through 80,000

5    documents in Rimini II and produce 40,000, whatever they did,

6    the least they can do as the potential offenders of the

7    injunction is do a little legwork.

8                    The idea that -- it's also -- we know they can

9    do it.  They've done it in Rimini I, they've done it in Rimini

10   II, and moreover we have a situation where -- and I know you

11   didn't want Mr. Vandevelde to get into how many hours it would

12   take and all that kind of stuff, but --

13                   THE COURT:  Well, we can get into it now, I just

14   wanted an answer to my question is all.

15                   MR. POCKER:  Okay.  No, I -- I don't see where

16   there's this huge burden, and it's certainly so insignificant

17   compared to what's at stake here.

18                   THE COURT:  All right.

19                   MR. POCKER:  And that's -- we're frustrated in

20   that regard, your Honor, because, quite frankly, this is a

21   form of discovery that they're proposing that no one has ever

22   authorized.  Even in the simplest breach of contract case you

23   get to look for people's e-mail and then internal documents

24   regarding these things.

25                   I don't know if the Court has questions about

1    the search --

2                    THE COURT:  Not right now.  You'll get another

3    chance after I hear from Mr. Vandevelde.

4                    MR. POCKER:  All right.  Thank you.

5                    THE COURT:  Mr. Vandevelde.

6                    MR. VANDEVELDE:  All right.  Good morning, your

7    Honor.

8                    And just to clarify, that roughly 800,000

9    documents number, that is documents after November 2018.

10                   THE COURT:  Okay.  During that period.  Okay.

11   That's good.  Thank you for clarifying that.

12                   MR. VANDEVELDE:  All right.  Your Honor, a few

13   months ago Oracle asked your Honor for permission to take,

14   quote, limited discovery, and your Honor granted at the

15   April 4th hearing, quote, limited discovery, but that is not

16   what's happening here.

17                   There's three points I want to raise if you'll

18   indulge me.  The first, I want to provide some background how

19   we got here, what we've been producing, and why Oracle has or

20   will soon receive everything it could possibly need for this

21   compliance proceeding.

22                   Second, I want to discuss why the custodial

23   documents that Oracle is demanding are irrelevant in light of

24   the technical information we are providing and the access to

25   Rimini databases that we are providing.

1                And, third, I want to discuss how we have

2    tried -- I'll get into this in some detail, how we have tried

3    to work with Oracle on the issue of custodial documents.

4                So, first, some background on how we got here.

5                Earlier this year Oracle, without citing any

6    specific evidence whatsoever, accused Rimini of violating the

7    injunction.

8                Among other things, as Mr. Pocker noted, Oracle

9    says that Oracle licensees who use the cloud, unless it's

10   Oracle's cloud, are in violation of that license or are

11   infringing, and that Rimini, if we help clients who use a

12   non-Oracle cloud, that we are somehow infringing and in

13   violation of the injunction.

14               They also say that our tool, the automated

15   framework tool, AFW, which hadn't even been invented during

16   the Rimini I discovery period and thus was never litigated,

17   also violates the injunction.

18               And, third, they say that Rimini still engages

19   in cross-use in violation of the injunction even though Oracle

20   has radically expanded what cross-use means.

21               Their definition now is that if Rimini solves a

22   problem for client A, and then solves that same problem for

23   client B in the same way, then Rimini is violating the

24   injunction.

25               And let me make that more concrete.  Oracle's

1    theory is literally that if a Rimini engineer from the product

2    of their own ingenuity writes ten lines of code to solve

3    client A's problem, if client B has that same problem, Rimini

4    cannot use those ten lines of code to help client B.  That is

5    their radically expanded definition of cross-use.

6              So Oracle acknowledges that all of these issues,

7    every one that I just mentioned, they are fully briefed, they

8    are sitting on Judge Hicks' desk.  Briefing was completed

9    almost a year ago.  Cloud hosting is teed up, AFW is teed up,

10   so-called cross-use is teed up.  They have been pending

11   resolution for roughly 9, 10 months.

12             THE COURT:  So -- and this is in the form of a

13   contempt motion?

14             MR. VANDEVELDE:  No, summary judgment.

15             THE COURT:  Oh, you're talking about in --

16             MR. VANDEVELDE:  Yeah.

17             THE COURT:  -- Rimini II.

18             MR. VANDEVELDE:  Yeah, Rimini II.

19             THE COURT:  Okay.

20             MR. VANDEVELDE:  There are seven summary

21   judgment motions that address all the issues that we're

22   talking about.

23             THE COURT:  Oh, for this same time period?

24             MR. VANDEVELDE:  For the same -- well, the

25   ruling on those will affect what is contempt or what is not

1    contempt of this injunction.

2                    THE COURT:  Okay.  I understand.

3                    MR. VANDEVELDE:  So those summary judgment

4    motions represent the culmination of a staggering amount of

5    discovery.  Over ten million documents were produced by Rimini

6    in Rimini II, over nine terabytes of technical data, there

7    were over a hundred depositions.

8                    Oracle subpoenaed over 700 of Rimini's clients.

9    They issued over 700 third-party subpoenas.  Mr. Pocker will

10   refer to them as poor third-party subpoena recipients.  700 of

11   them were subpoenaed.

12                   Every single issue, again, is teed up on those

13   summary judgment motions in front of Judge Hicks.

14                   So -- but last spring, we've moved forward,

15   Oracle raises the specter of contempt, asked your Honor to

16   reopen discovery.  They asked for limited discovery.  They

17   wanted to know what changes we have made postinjunction.  We

18   have told Oracle what changes we have made, we have produced

19   nearly a hundred thousand documents of technical information

20   that show what we do on a daily basis.

21                   We have also given Oracle remote access --

22   Oracle is a competitor of ours, and they are accessing

23   remotely our key development database that shows, that

24   reflects what our engineers do on a daily basis.

25                   Simultaneously Oracle went to Judge Hoffman and

1    said it needed to use Rimini II discovery, that ten million

2    pages, a hundred -- all that stuff because, in their view,

3    they said, quote, they would be able to, quote, assess

4    Rimini's compliance with the Rimini injunction based on the

5    relevant discovery in Rimini II.

6              They have now flip-flopped from that position,

7    they say it's not relevant.  But based on Oracle's

8    representations to your Honor and Oracle's representations to

9    Judge Hoffman, your Honor authorized limited discovery.  We've

10   moved past that, we've accepted that fact.

11             But what has transpired since then is anything

12   but limited.  On June 21st, your Honor authorized discovery,

13   and Rimini immediately went to work collecting or reviewing

14   and producing information.

15             Since that date we have timely responded to

16   every single discovery request often well in advance of the

17   time authorized under the rules.

18             We have made seven productions.  That's roughly

19   one a week, almost a hundred thousand documents, and let me

20   tell you what those are.  Those are technical files, logs,

21   database data, source code, updates, documentation, other data

22   showing Rimini's technical processes.

23             These documents show what Rimini engineers

24   actually do, and we're in the process of providing SharePoint

25   data which will be tens, if not hundreds of thousands of

1    documents more.

2              We have also provided Oracle with the AFW

3    database.  That tool I referenced earlier, we have provided

4    them the AFW database, the source code for every version of

5    the AFW tool, the logs related to that tool.

6              In addition to what we've produced, we've

7    also -- as I said before, we've given them access to what --

8    the two development databases, DevTrack and Jura.  Those are

9    the databases that reflect what our engineers are actually

10   doing.

11             So Oracle has, or will soon, have everything

12   they could possibly need to prove injunction compliance.  Why?

13   Because these materials again show what we do, and they're the

14   only evidence necessary to show whether we're in compliance

15   with the injunction.

16             That brings me to my second point which is about

17   the relevance of custodial documents, things like e-mails,

18   instant messages, chat sessions.

19             Those are essentially irrelevant to injunction

20   compliance.  Communications about conduct do not prove the

21   conduct.  It's like the old adage actions speak louder than

22   words.

23             THE COURT:  All right.  But, I mean, Mr. Pocker

24   makes the point that if people in control, you know, it could

25   be at issue what was their intent when they did these things

1    and whatnot, wouldn't that be revealed in the communication?

2                    MR. VANDEVELDE:  But the injunction is about

3    technical processes.

4                    THE COURT:  But does it matter whether the

5    violation of the technical process was inadvertent or it was

6    done on purpose?

7                    MR. VANDEVELDE:  I agree that that later on will

8    be a component, and if they bring a motion for contempt, yes,

9    willfulness --

10                    THE COURT:  That's what we're doing in

11   discovery --

12                    MR. VANDEVELDE:  That will be an issue for sure,

13   and that's why we have consented to some custodial documents.

14                    THE COURT:  Okay.

15                    MR. VANDEVELDE:  But the injunction is again

16   about technical processes, it's how we provide support, it's

17   about what files are at issue, what code are we actually

18   updating, where is that code, where are the copies made.

19                    I mean, I was thinking about an analogy that

20   might be appropriate.  It's like if an auto mechanic was

21   enjoined from using non-OEM parts, and your Honor took your

22   car in, I mean, you don't care what the mechanic is telling

23   you, you don't care what the chitchat between him and his

24   assistant, you don't care what, you know, he says to you as

25   you pick up your car and drive off the lot.

1            What you care about is whether he used non-OEM

2    parts, and what would show that, right?  It's the technical

3    information.  It's the inventory logs of the mechanic showing

4    what went into your car.  It's the labels on the parts

5    themselves.  It's the diagnostics from the car reflecting what

6    parts were inserted.  It's the videotape of the mechanic shop

7    showing what the mechanic actually did to your car, it is not

8    the communications.

9            THE COURT:  But suppose that all that direct

10    evidence showed that somewhere along the line non-OEM parts

11    were used, you know, maybe it happened, life's not perfect.

12    All right.

13            So now the mechanic's company is going to say,

14    "Oh, that was inadvertent, it was a mislabeled part," or

15    whatever, and they're going to say, "Well, we've got an e-mail

16    here that says let's slide in as many OEM parts as we can when

17    nobody is looking.'"

18            MR. VANDEVELDE:  I --

19            THE COURT:  I'm not saying it's there, but --

20            MR. VANDEVELDE:  Yeah.

21            THE COURT:  -- theoretically, I'm doing

22    discovery, that's something relevant to a claim or defense.

23            MR. VANDEVELDE:  Well, one, we should do that in

24    stages, and, two --

25            THE COURT:  Oh, well, stages --

1            MR. VANDEVELDE:  -- we have agreed, we have

2    agreed to some custodial discovery.  We have agreed to the

3    maximum we can do under your Honor's schedule.

4            THE COURT:  All right.  Okay.  I gotcha.

5            MR. VANDEVELDE:  Which I'll get to in a second.

6            But, again, we have provided the type of

7    technical information that allows Oracle to do what it

8    purports to want to do which is to see whether we are in

9    technical compliance with the injunction.  So that's the

10   database logs, the transaction logs, technical specifications,

11   debt instructions.

12           THE COURT:  I think I understand that.

13           MR. VANDEVELDE:  Yeah.

14           THE COURT:  And you said something about -- hang

15   on a moment here.  You said everything they could possibly

16   need is coming soon, right?

17           MR. VANDEVELDE:  No, I said we have produced a

18   hundred thousand technical documents, there's more coming on

19   the way.  We have until October 8th to finish production.

20           THE COURT:  Well, I misunderstood you, because I

21   thought you said -- you were telling me about various things,

22   you were telling me about the background, that everything they

23   could possibly need is coming soon, the custodial is

24   irrelevant, and then you tried --

25           MR. VANDEVELDE:  Maybe I misspoke, your Honor, I

1    said they either have or will have soon.

2                  THE COURT:  Oh, okay.

3                  MR. VANDEVELDE:  There's certainly processes

4    still in place.  We are reviewing -- I'll get to this in a

5    moment.  We are collecting reviewing and producing material as

6    we speak.

7                  THE COURT:  I'd like to hear about that.  It --

8                  MR. VANDEVELDE:  Yeah, okay.  So let me move to

9    that.

10                 So as you've seen in the papers, there's been a

11   lot of back and forth about custodians and search terms and

12   the breadth of the search terms and the overbreadth of the

13   RFPs which we have timely objected to.

14                 But at the end of the day Oracle refused to

15   narrow its custodians, its search terms, and we have literally

16   said, okay, we have this much time, we'll have -- that took

17   this much time, these discussions, we have this much time

18   left, how much can we reasonably do, what is proportional,

19   what is the cost, and we came up with a number of roughly 20

20   to 30,000 documents, and we're actually on pace to get close

21   to 40,000 documents.

22                 THE COURT:  That would be by October 8th?

23                 MR. VANDEVELDE:  By October 8th.

24                 THE COURT:  All right.

25                 MR. VANDEVELDE:  But we essentially adopted the

1   approach, your Honor, of here's a bucket, fill it with

2   whatever custodial documents you want, right, and we'll review

3   to the maximum of our ability.

4           So we tried over and over again to get Oracle to

5   prioritize its custodians, to prioritize the search terms.

6           They wanted search term hits in statistics.  We

7   gave that to them.

8           They asked for our opinion on who the most

9   relevant custodians would be, we told them, they ignored it.

10           They want executives.  Fine, we told them, look,

11   executives are not doing the engineering work, they're not

12   that relevant, and, two, they're the most likely to be

13   privileged, but if you want them, fine, we consented and let

14   them choose executives if they wanted.

15           We literally gave them a bucket and said, "What

16   do you want to put in this bucket?  This is the maximum we can

17   do in the time remaining."  And they refused.

18           And then ultimately we said, "Look, if you're

19   not going to narrow, we'll just take your search terms, we'll

20   choose the ones that cover the gamut what we're looking for,

21   and we need to start reviewing.  We can't just let this

22   process drag out until you tell us, you know, what you want."

23           And so we said, "Look, we're going to review

24   these custodians with these search terms.  We're going to work

25   as fast as we can.  Let us know if you object," and the next

1    thing we know, they want to file this motion.

2                    So we have 12 attorneys that have been reviewing

3    documents nonstop all day every day for the last few weeks.

4    They're reviewing right now as we speak at enormous cost to

5    Rimini, enormous cost to Rimini, and that wasn't good enough

6    for Oracle.  They want 800,000 an order of magnitude greater.

7    It is literally impossible, unless your Honor is willing to

8    order us to hire a hundred lawyers, and still that would take

9    two months.  It would cost millions and millions of dollars.

10                   And so we think the motion should be denied.

11   They are getting the most relevant information, the technical

12   information that shows whether we're in compliance.

13                   We are exerting ourself to the maximum we

14   possibly can in the time remaining in this schedule, and so

15   it's almost like, "What juice is there left to squeeze,

16   Oracle?  You've squeezed every ounce of juice out of us."

17                   So the motion should be denied.  We are going to

18   continue apace reviewing as many custodial documents as we

19   possibly can.  Our cue for those 12 reviewers that are

20   literally in a room reviewing document after document all day

21   every day, it's not a glamorous job --

22                   THE COURT:  Sounds pretty grim.

23                   MR. VANDEVELDE:  -- they're going to be

24   reviewing documents until the very bitter end of this.

25                   So there's no more bandwidth for them to read

1    documents, because after these custodial set that we're trying

2    to get through, there's also SharePoint and other information

3    that they need to review as well.

4              So we think their motion should be denied.

5              THE COURT:  Okay, I understand.

6              MR. VANDEVELDE:  Thanks.

7              THE COURT:  Thank you very much.

8              Okay.  Mr. Pocker, briefly, you've got some

9    points.  Actually, I had a question, too.

10             So it is true that you guys have remote access?

11   You can go in there and see what they're doing, is that true?

12             MR. POCKER:  Well, not to everything.  There's a

13   couple of their systems that we do, but, I mean, that raises a

14   point that -- I mean, there's a number of things he said that

15   I think we need to clear up for the record here.

16             First of all, this reliability of all the

17   technical information they're giving us has been called into

18   question recently because they've got one tool, it's transfer

19   files that is used to transfer updates and work to the

20   customer but then it immediately deletes the -- for lack of a

21   better term -- evidence of what was transferred on their

22   systems so that what we are getting, and this is -- and we may

23   get into it deeper if we don't resolve it with them in another

24   way, but this was this spoliation issue that I referenced

25   before.

1            This technical information that he says should

2    answer all our questions sometimes only creates more

3    questions.

4            And it's not a minor thing.  The transfer files

5    mechanism could be, we believe it is, the method for cross-use

6    and distribution of copyrighted material in violation of that

7    injunction, and yet it's set up to delete all that information

8    about what it is that was sent to the customers.

9            THE COURT:  You mentioned cross-use, and I

10   understand your thing on transfer file there.

11           Now, Mr. Vandevelde said that you've expanded

12   cross-use to such an extent that if one of their, you know,

13   programmers creates their own line of something to solve for

14   customer A and then they do the same work for customer B,

15   that's cross-use?

16           MR. POCKER:  No.  I mean, that's -- that's the

17   same oversimplified accusation we've had from the beginning.

18           THE COURT:  Okay.  Well, straighten me out on

19   it.

20           MR. POCKER:  And actually there's 800 pages of

21   expert reports back and forth about what is or isn't

22   cross-use, and I think the salient feature here in this

23   context for what we're looking at is the cross-use notion is

24   really -- we're talking about it's this ongoing massive

25   electronic distribution of our copyrighted material.

1            It's not -- it's taking the work from one

2    client, done for one client, and then using it for other

3    clients.  It's how it's done.

4            It's kind of this whole issue with the AFW and

5    the transfer file mechanisms.  All they've really done is

6    figured out a different way to do what the Court said you

7    can't do the first time.  This notion that we're talking about

8    it's just know-how, it's that we want to stop this engineer

9    from using what he learned, that's not what it is.

10           THE COURT:  Okay.  But you're saying they're

11   doing indirectly what they're prohibited from doing directly

12   it sounds like.

13           MR. POCKER:  I'm sure they do indirectly.

14           THE COURT:  Indirectly what the injunction

15   prohibits them from doing directly, is that kind of what

16   you're saying?

17           MR. POCKER:  It's the same thing, it's like the

18   same wine in a new bottles.  It's indirectly or directly, I

19   don't know if there's a precise delineation, but --

20           THE COURT:  I understand.

21           MR. POCKER:  -- it's a different way.

22           THE COURT:  A different way.

23           MR. POCKER:  And it's kind of like it's to say

24   you can't copy or you can't make derivative works.

25           THE COURT:  Okay.

1              MR. POCKER:  That's the injunction, and then,

2    "Well, but we did it wearing yellow shoes instead of red

3    shoes," as my analogy before.

4              So I mean, it's -- they always try to sidetrack

5    this with, "Oh, my God, you're just trying to punish our

6    know-how."  That's going to be an issue in the substance of

7    the injunction proceedings or in Rimini II, wherever it

8    happens to come up, and you'll have a whole lot better record

9    in order to resolve that.

10              It really doesn't matter --

11              THE COURT:  So your point is, though, if we're

12    arguing about this, it's certainly relevant so it should be

13    discoverable.

14              MR. POCKER:  Sure, sure.  And it's not a -- I

15    mean, that's -- it's just mystifying that custodial e-mail

16    could not be relevant in light of the concessions that have

17    already been made about the intent and why they do this, and

18    the policy of the company are certainly relevant especially if

19    they're going to come in, and you know they will.

20              If we come up with an example, oh, look, they

21    did it here, oh, that rogue employee, he shouldn't have done

22    that, our policy was this, well, we'd like to discover your

23    policy.  We'd like to be able to know exactly what we're

24    doing, and it was uncontroversial in the first two cases, and

25    now all of a sudden it's a problem because it's an injunction

1    proceeding, and that's where the disconnect is, and they just

2    can't justify why it should be treated any differently.

3              I mean, all this stuff about the burden, too, we

4    made an offer somewhere in the back and forth on meet and

5    confer that, "You know, what, just run the search terms, give

6    us the stuff, we won't complain that it's a document dump, let

7    our lawyers sort it out" --

8              THE COURT:  Yeah, but they're worried about

9    their privilege.

10             MR. POCKER:  -- "we'll have a clawback

11   provision, you can come and get all of it back, we'll send it

12   back.  We'll take the burden of the work that needs to be done

13   in a short time."

14             And I guess that's a threshold issue here, too,

15   is instead of trying to pretend like none of this is relevant

16   or that, you know, your poor associates are going to be dying

17   at eleven o'clock on Saturday night doing this, why don't you

18   just say, "I can't do it, give us 30 more days."

19             Because if that were the Court's compromise and

20   said, okay, fine, if they have to do it, they have to do it,

21   they get another month to do it, we're fine with that.

22             THE COURT:  All right.

23             MR. POCKER:  We want to do it right.  We want to

24   get this adjudicated, but we also want to make sure that it's

25   done right.

1          So that's a red herring right there, and it's a

2     simple solution to all of this "we're having to do too much."

3          I just --

4          THE COURT:  Hold on.  I want to hear from

5     Mr. Vandevelde.

6          MR. POCKER:  Just so the record is clear, some

7     of the other things that were said, Rimini Street stated to us

8     that they would not give us executive e-mail which is why

9     we're here.  The motion for --

10          THE COURT:  Yeah, I don't like to look backwards

11     in these things, I'm just trying to find a solution here,

12     okay?

13          MR. POCKER:  Okay.  Well, then -- but the idea

14     that somehow this was, you know, all our fault, we filed a

15     motion for no reason --

16          THE COURT:  No --

17          MR. POCKER:  The other thing, it's important to

18     note that the injunction was in effect, it's never been

19     stayed.  It's now been held on the Ninth Circuit, and yet they

20     keep trying to get a stay by alluding to these summary

21     judgment motions in Rimini II.  It's nothing more than trying

22     to postpone --

23          THE COURT:  I guess you would say they're

24     seeking a stay of discovery, they're not seeking a stay of the

25     injunction, right?  The injunction is the injunction.

1          MR. POCKER:  Well, it's -- the practical effect

2    is the same.

3          THE COURT:  If you can't do your discovery, then

4    the injunction --

5          MR. POCKER:  If we don't do the discovery to

6    develop a comprehensive motion with respect to this

7    injunction, the injunction is meaningless as long as they can

8    violate it.

9          THE COURT:  All right.

10          MR. POCKER:  So it is, it really is just back to

11    the same old issue again, and it just comes down to -- this is

12    not that unusual conceptually of a case.

13          We have asked for reasonable things given the

14    issues, given the complexity of the businesses involved here,

15    and we have gotten as a counterproposal, a truncated

16    discovery-lite version of what they're willing to do for us.

17          THE COURT:  All right.

18          MR. POCKER:  And we needed the Court's

19    intervention on that.

20          THE COURT:  All right.  Thank you very much.

21          Mr. Vandevelde, you had a couple of --

22          MR. VANDEVELDE:  I'll keep it brief --

23          THE COURT:  -- very briefly on whatever it was

24    he raised that you felt was new.

25          MR. VANDEVELDE:  Yeah, I'll keep it very brief.

```
 1                    I just -- I want to emphasize the noncustodial

 2    sources.  We have produced a vast amount of noncustodial

 3    sources.  Oracle's lawyers or whoever they're using, experts,

 4    are literally inside our systems looking at those development

 5    databases.  So this is -- custodial sources are less relevant

 6    and the tail of the dog here.

 7                    Again, our approach is we have a bucket, this is

 8    the maximum amount we can do.

 9                    THE COURT:  I understand.

10                    MR. VANDEVELDE:  Fill it with what you want, and

11    we will work as hard as we possibly can to get as much as we

12    can done by October 8th.

13                    He suggested 30 more days.  If your Honor saw in

14    our briefs, it's actually 9 months to 18 months --

15                    THE COURT:  I saw that.

16                    MR. VANDEVELDE:  -- at the current pace.

17                    This delete transfer files, they can bring a

18    motion.  That's fine, it's a sideshow, it's not relevant.

19                    THE COURT:  The spoliation issue.  That's not

20    before me.

21                    MR. VANDEVELDE:  It's not relevant to this.

22                    And I'll just put a plug in for the cross-use

23    issue because I think it's important to understand it

24    literally is their theory that if Rimini writes a line of code

25    to solve client A's problem, they can never use that line of
```

1    code again for Client B.

2              I took the deposition of their expert in Rimini

3    II.  That is what -- she would not disavow that theory.  That

4    is what their theory is.  If we touch any Oracle code,

5    everything becomes a derivative work, and we can never use it

6    again.  That is their theory.

7              THE COURT:  All right.  Okay.

8              MR. VANDEVELDE:  Thank you.

9              THE COURT:  All right.  Thanks a lot.

10             Well, you know, I've, of course, thought a lot

11   about this, and I had a plan, and I think your arguments made

12   me more convinced that I think this plan will work, I hope.

13             You know, really, it's a proportionality issue

14   here.  You know, a lot of talking about irrelevance, but -- it

15   may be marginal relevance compared to the cost, but it's

16   really a proportionality issue.

17             And so I am -- I feel a little bit like Charley

18   Brown and the football, but I am going to order the parties to

19   get together and come up with an order by September 5th for me

20   to review.

21             Now, I think I'm going to give all the specifics

22   so there shouldn't be much of a dispute about what the order

23   says, but I find when I do these kinds of orders, if I write

24   them myself, then I always get a motion for clarification.

25             So I'd like you guys to get together, and so the

1    two of you agreeing what it means, and then send it to me, and

2    if it has these provisions in it, I'll sign it.

3                   Okay.  So here's what -- the way we're going to

4    do it.  You'll get this order to me by September 5th, and you

5    can start working already because by September 6th Oracle will

6    give Rimini a list of ten custodians and 120 search terms.

7                   Oracle has complete control of those ten

8    custodian names and 120 search terms.  Rimini has no input

9    into that.

10                  Okay.  Then by September 16th, which I believe

11   is a Monday, yeah, Rimini will make the first rolling weekly

12   production of nonprivileged documents identified using those

13   custodians and those search terms.

14                  And I believe -- now, I'm only suggesting this.

15   If you don't want this, I don't care, but I think it would be

16   helpful if the productions were grouped by custodian, so, in

17   other words, you have to go through the pipelines so you're

18   going to get all of custodian A's stuff and then all of

19   custodian B's, and, I don't know, you might want to agree in

20   what order, or, if you can't, I guess I'm going to say Oracle

21   can set the order if they want to.  If you don't want to do

22   that, I don't care.  It might be helpful as you'll see in a

23   minute.

24                  Okay.  So each production you must disclose the

25   number of documents reviewed to create the rolling production,

1  the number of attorney hours devoted to this weekly

2  production, including privilege review, the actual fees to be

3  paid by the client for the attorney time quantified.

4  Now, I know, I expect, there's all kinds of

5  ways -- my intent here is that I want to get, you know, what

6  it's really costing the client, not, you know, how it's being

7  billed and it's going to be written off later and stuff like

8  that. I don't know if you can do that or not, but that's what

9  I'd like to see.

10  All right. So the actual fees to be paid by the

11  client for the attorney time quantified, and, of course, a

12  privilege log memorializing any documents withheld.

13  Now, this disclosure must be signed by at least

14  one attorney of record in the attorney's own name -- that

15  language comes right of Rule 26(g)(1)(A), one attorney of

16  record in the attorney's own name certifying pursuant to Rule

17  26(g)(1)(A) that this disclosure is complete and correct.

18  All right. Then Rimini will pay the attorney's

19  fees for the first hundred thousand documents produced. For

20  the next 200,000, the cost will be shared 50-50, and if you go

21  up over -- that would be the 300,000 documents, then Oracle is

22  going to pay for everything over 300,000.

23  All right. So that's what I'd like the order to

24  say.

25  And, finally, we'll set a status hearing for

1    30 days from today to see how the production is going and to

2    consider whether we need to change the discovery cutoff dates

3    which right now the discovery cutoff date is still

4    October 8th, and October 20th is the deadline for filing the

5    motion for order to show cause.

6                    All right.  So that's what I want to see in the

7    order.

8                    Now, here's my thinking.  You know, a lot of

9    predicting about what's this going to cost, how much time is

10   this going to take, we'll have, you know, two or three weeks,

11   we'll see what's happening here, and then, you know, the

12   attorneys can decide whether it makes sense.

13                    You know, I've solved this proportionality

14   problem this way before by allocating costs between parties.

15   You know, the numbers I fixed were kind of necessarily

16   arbitrary, but my thinking was, we're talking about 800,000,

17   I've cut it by about half, so I went down to 400,000, and I

18   put it in the gradual -- you know, cost shifting from one

19   party to the other.

20                    All right.  So does anybody want to have any

21   questions, I guess?

22                    MR. VANDEVELDE:  I have some questions, your

23   Honor.

24                    THE COURT:  Okay.

25                    MR. VANDEVELDE:  This is just about other

1    aspects of your Honor's schedule that was set.  I believe

2    Oracle's affirmative expert reports are due in two days.

3               THE COURT:  Ah, I forget about that.

4               MR. VANDEVELDE:  And the rebuttal reports are

5    due only a week later.  So, you know, I see two issues.

6               THE COURT:  Okay.  I forgot about the experts.

7               MR. VANDEVELDE:  I see two issues with the

8    current schedule.  One is that the discovery cutoff, whether

9    it's October 8th or some other date in the future if Oracle

10   gets additional documents, that is after expert disclosure.

11              THE COURT:  Right.

12              MR. VANDEVELDE:  So what that is inviting a

13   serial --

14              THE COURT:  No, you're right, you're right.  I

15   forgot about the experts.

16             So, okay, I'm going to vacate the October 8th

17   and the experts until we have our status hearing.

18              MR. VANDEVELDE:  Perfect.

19              THE COURT:  I'm sorry, I forgot about the

20   experts.  Yeah, let's just do that.  So those deadlines are

21   gone.  Focus your efforts, you know, on getting through these

22   documents.

23             You know, I'm sure you sincerely predict, you

24   know, what the burden is going to be, see how you're doing, I

25   mean, you know how it's going to be allocated.  If they want

1    to hire up more attorneys so they can get 500,000 documents, I

2    mean, you guys can figure out how you're going to do that.

3                    But, you know, I think that's a fair way to do

4    it.  The -- the custodian discovery, they have to have some

5    shot at custodian discovery.  After they see the first ones

6    they've picked, if it's not going anywhere, then maybe they'll

7    decide, you know, this is, in fact, not worth it.

8                    But -- you see what I'm saying?

9                    MR. VANDEVELDE:  You know, I totally agree, your

10   Honor.

11                   The other thing I wanted to raise is privilege

12   log.  So throughout -- I wasn't involved in Rimini I, but I've

13   been involved for many years now with Rimini II.

14                   The parties' practice has been to send privilege

15   logs at some point after, and that works well with the way the

16   vendor works and the attorney-client --

17                   THE COURT:  You need more time for the privilege

18   log?

19                   MR. VANDEVELDE:  So the privilege log, there

20   needs to be some delta.  It's just unfeasible for us to do --

21                   THE COURT:  Okay.  I get it, I get it.

22                   MR. VANDEVELDE:  Yeah.

23                   THE COURT:  That's been the practice.  You agree

24   with that, Mr. Pocker, some delay on the privilege log?

25                   MR. POCKER:  I'll have to defer to my colleague

```
 1   as to --
 2                   THE COURT:  Okay.  Whoever knows over there.
 3                   MR. POLITO:  That's right, your Honor.  We
 4   previously have stipulated delay on the privilege log.
 5                   THE COURT:  So what usually is the --
 6                   MR. POLITO:  The stipulation is (inaudible).
 7                   MR. VANDEVELDE:  I was going to say I think
 8   that's something we can work out.
 9                   THE COURT:  Put it in the order.  Yeah, okay.
10   Put it in the order.  That's great.
11                   MR. VANDEVELDE:  Okay.
12                   THE COURT:  So delay, that's fine.
13                   Okay.  Anything from Mr. Pocker?
14                   MR. POCKER:  Well, your Honor, just one point of
15   clarification.  A number of the observations you made count
16   off the number of documents that are produced --
17                   THE COURT:  Right.
18                   MR. POCKER:  -- and all that.  I take it we're
19   talking about nonidentical documents there?
20                   THE COURT:  Well, I mean, okay.  I see what
21   you're saying.
22                   MR. POCKER:  If we get 50,000 copies of the same
23   document --
24                   MR. VANDEVELDE:  Well, your Honor, the 800,000,
25   that is unique documents.
```

1           THE COURT:  Those were unique documents.

2           MR. VANDEVELDE:  We're working on a unique

3    document universe.  I don't think --

4           THE COURT:  Okay.  That sounds like that's

5    agreeable to both sides.  So, yeah, just make it unique

6    documents.

7           I mean, I don't know what's a unique document.

8    Of course, when I did this it was not near as sophisticated as

9    it is now, but, you know, you can have the same document and

10   somebody scribbled some notes on one document, it's not on

11   another, you know, that can be pretty important what note was

12   scribbled on the document.

13          MR. POCKER:  Well, but that -- I think we would

14   probably say the one with Seth Ravin's handwritten notes is a

15   unique document.

16          THE COURT:  Okay.

17          MR. VANDEVELDE:  It's all software.  Software

18   will determine what's unique and not.  If there's a

19   handwritten document, it's not going to be to have the same

20   hash value, it will not be considered unique -- it will be

21   considered unique if there's a difference.

22          THE COURT:  Right.  And also there's these

23   things where you -- you know, you can put little comments

24   electronically on the documents and stuff, but that's all

25   identifiable in the search, I'm sure, so each one would be

1    unique if they had unique --

2              MR. POCKER:  Well, we just didn't want to be

3    paying for 5,000 copies of the same thing.

4              THE COURT:  Well, right, and I -- you know,

5    that's not going to happen.  I think -- I mean, I got to tell

6    you, you know, as everyone realizes, an intense case, people

7    working hard, it's very important.

8              But even though you had to file this motion, I

9    don't think it was fault on any side.  You know, it's a tough

10   issues to work through.  I thought you did a good job.  Thank

11   you.

12             THE CLERK:  Do you want to set the status check

13   date, your Honor?

14             THE COURT:  Oh, yeah.  What's that date, Jerry?

15             THE CLERK:  October 7th, 2019, 1:00 p.m., and

16   that will be here in courtroom 3-D.

17             THE COURT:  Okay.  Thank you.

18                            -o0o-

19

20        I certify that the foregoing is a correct
          transcript from the record of proceedings
21        in the above-entitled matter.

22        /s/Margaret E. Griener          9/8/2019
           Margaret E. Griener, CCR #3, FCRR
23         Official Reporter

24

25