**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**
**BEFORE THE HONORABLE CAM FERENBACH, MAGISTRATE JUDGE**
**---o0o---**

| | |
|---|---|
| **ORACLE USA, INC., a Colorado corporation; ORACLE AMERICA, INC., a Delaware corporation; and ORACLE INTERNATIONAL CORPORATION, a California corporation,** | |
| **Plaintiffs,** | **No. 2:10-cv-106-LRH-VCF** |
| **-vs-** | **October 7, 2019** |
| **RIMINI STREET, INC., a Nevada corporation; and SETH RAVIN, an individual,** | **Las Vegas, Nevada** |
| **Defendants.** | |

**TRANSCRIPT OF STATUS CONFERENCE**

**APPEARANCES:**

**FOR THE PLAINTIFFS:**

**RICHARD J. POCKER**
**Attorney at Law**
**Las Vegas, Nevada**

**JAMES C. MAROULIS**
**Attorney at Law**
**Redwood City, California**

**JOHN A. POLITO and**
**LINDSEY McGRATH SHINN**
**Attorney at Law**
**San Francisco, California**

**(Appearances continued on Page 2.)**

**APPEARANCES (Continued):**

**FOR PLAINTIFFS:** **KATHLEEN HARTNETT**
**Attorney at Law**
**San Francisco, California**

**FOR THE DEFENDANTS:** **ERIC VANDEVELDE**
**Attorney at Law**
**Los Angeles, California**

**STEVEN C. WHITTAKER**
**Attorney at Law**
**Irvine, California**

**W. WEST ALLEN**
**Attorney at Law**
**Las Vegas, Nevada**

**Transcribed by:** **Margaret E. Griener, CCR #3, FCRR**
**Official Reporter**
**400 South Virginia Street**
**Reno, Nevada 89501**

LAS VEGAS, NEVADA, MONDAY, OCTOBER 7, 2019, 12:56 P.M.

---o0o---

THE CLERK: This is the time set for a status conference in case 2:10-CV-106-LRH-VCF, Oracle USA versus Rimini Street, Inc.

Counsel, please enter your appearances for the record.

MR. POCKER: Your Honor, Richard Pocker, Boies Schiller Flexner, on behalf of the Oracle parties.

THE COURT: Thank you, Mr. Pocker.

MR. MAROULIS: Good afternoon, your Honor. James Maroulis from Oracle for the Oracle parties.

THE COURT: Mr. Maroulis, thank you.

MS. HARTNETT: Kathleen Hartnett from Boies Schiller Flexner also for Oracle.

THE COURT: Thank you, Ms. Hartnett.

MR. POLITO: John Polito from Morgan, Lewis & Bockius for Oracle.

THE COURT: Mr. Polito.

MS. SHINN: Lindsey Shinn from Morgan Lewis for Oracle.

THE COURT: Thank you, Ms. Shinn.

MR. VANDEVELDE: Good afternoon, your Honor. Eric Vandevelde from Gibson Dunn on behalf of Rimini Street.

THE COURT: Mr. Vandevelde.

MR. WHITTAKER: Stephen Whittaker on behalf of Rimini Street from Gibson Dunn.

THE COURT: Mr. Whittaker.

MR. ALLEN: And West Allen from Howard & Howard on behalf of Rimini Street.

THE COURT: Mr. Allen.

Okay. So I've got my paperwork out here, and I saw the notice submission of certificates was filed. I read through it. It looked kind of like what I had contemplated in the order, and I haven't received any filings by anybody saying there's a problem, but I'm glad you all came in.

Is there anything I need to address here today or -- no? Seeing nothing -- I guess, do I need to set another status conference, or do you think it's going to move along --

MR. POCKER: From Oracle's perspective, I agree that things have worked relatively smoothly thanks to the structure and protocol you set up in here.

If we have any concern, and it's a major one given the fact that we're trying to enforce a very important injunction in this case, it's the timeliness, and you've seen the submissions that -- they made productions on September 16th, the 23rd, the 27th, and we anticipate another one today.

THE COURT: Right.

MR. POCKER: The total number -- and this is where we have our concern about whether this can be done promptly and needs to be a little guidance from the Court to move that along, you recall in the previous hearing when we were proposing 19 custodians, I think, or 20, and there was discussion with the Court about what do we think the document universe is going to look like, Rimini represented something like, I think, on the order of 750,000 documents, somewhere along there.

Subsequently my colleagues have had meet and confer meetings with them and progress discussions, and during one call they indicated with the new list of custodians that it's closer to maybe half a million, 500,000, maybe upward of that slightly, because there's other devices they may need to search beyond what they've already got.

THE COURT: Okay.

MR. POCKER: To date, according to the reports, it looks like they've gone through a 120,000 documents.

THE COURT: That's what it looked like to me roughly, yeah. Well, not gone through, actually produced, right?

MR. POCKER: Produced, yeah, but --

THE COURT: There's another production coming.

MR. POCKER: And that's where we're looking at that, your Honor. Also --

MR. VANDEVELDE: Gone through, produced about 50.

MR. POCKER: They've produced 50? Yeah, 59,000 is what they've produced.

THE COURT: Fifty-nine boxes?

MR. POCKER: 59,000. They've gone through 120,000. 120,000 reflects what they've reviewed out of the 500,000.

THE COURT: Okay. Yeah, I guess we need to be precise there so --

MR. VANDEVELDE: I can give you statistics.

THE COURT: Perfect. That's okay, let's get this so we're all talking about the same thing.

MR. VANDEVELDE: As of what we expect to be by the end of today, the universe is roughly 572,000 documents. We will have reviewed by today roughly 144,000 documents. We will have produced roughly 90,000 documents.

THE COURT: So let me just say, there's another, like, 31 coming today, do you think, or do you agree with their 59 number for the earlier part?

MR. VANDEVELDE: I believe, yes, that would be right. I'm not sure about the 59,000, but at the end of today it should be roughly 90,000.

THE COURT: Okay, okay.

MR. VANDEVELDE: And the total cost to date is

over a quarter million dollars.

THE COURT: Right. Okay. All right. So -- oh, go ahead.

MR. VANDEVELDE: If I could just say --

THE COURT: Sure.

MR. VANDEVELDE: So if you do the math, we are about exactly a quarter of the way through the document review universe, that is devoting a ton of resources both in terms of contract review, reviewing nonstop all day every day, as well as second overview, privilege log review from attorneys both at Gibson and in-house.

So we're about a quarter of the way through. So if you extrapolate out, and you take into account the time necessary for privilege logging, which we expect to be in the several thousands of documents in the privilege log, we're looking at roughly four more months.

THE COURT: You're looking at 1.25 million probably, roughly.

MR. VANDEVELDE: At least. There are some factors that may adjust the amount of work required, for example, just so your Honor knows, towards the end of the queue of custodians, there are some higher level executives that are more involved with legal counsel.

There's going to be more attention to privilege review and more documents that will have to be logged which

may make it more laborious.

THE COURT: Sure.

MR. VANDEVELDE: But if you just extrapolate out, yes, roughly 1.25 million and roughly four more months.

THE COURT: Okay. Thank you. All right.

MR. POCKER: So our concern, your Honor, is more with the pace of what's going on, and if you just extrapolate out at this pace, maybe he's correct that it does require another four months from Rimini's view, but we think they can do better, and there's a metric in what they've reported that's illustrative of that fact.

When you look at the -- well, obviously, they're using document reviewers, Mr. Vandevelde has said that. It comes out to like $126 an hour, the cost so far, with respect to the effort made to generate this one quarter basically of -- or one fifth of the available documentation.

Simply by getting more document reviewers, I think they can pick up the pace over there. It's not as if -- and it's pretty obvious that it's not a lot Gibson Dunn attorney time in this because they charge a whole lot more than $126 an hour, and the Court is familiar with that from other case as well.

So, in this instance, if it's a matter of getting enough bodies -- and both sides have done this, by the way. We've had instances on our side of the aisle where we've had

to hire additional document reviewers for concentrated periods of time in order to make certain deadlines with respect to disclosure in both the first Rimini case and the second Rimini case.

And our concern here is that because time is of the essence, it's their continuing violations, if all that's necessary is throwing a few more bodies into this, it's not going to increase the cost, if I understand what Mr. Vandevelde has said, it's just going to concentrate this into a workable time frame.

The -- as it was before September 5th, the Court had the discovery deadline is October 8th, which would have been tomorrow --

THE COURT: Right.

MR. POCKER: -- and then a date of October 21st by which we had to file our motion for contempt.

THE COURT: Contempt, yeah.

MR. POCKER: As it is, what we're proposing, because we think it's imminently doable --

THE COURT: Right.

MR. POCKER: -- in the framework that you've set up --

THE COURT: Okay.

MR. POCKER: -- is for them to do all their custodial and noncustodial production by Thanksgiving, and

then expert disclosures we'd propose mid December, and that would set up a time frame where the motion for contempt could be filed by the end of January 2020. That will give everybody time to digest the expert analysis as well.

Another thing that we're --

THE COURT: Hold on before you go to another thing because -- if you don't mind --

MR. POCKER: Sure.

THE COURT: -- unless it's something that's really pertinent to this part, what you were going to say, here's what I wanted -- I just had a question. You're already into the 50-50 split range, right?

MR. VANDEVELDE: Not quite, your Honor.

MR. POCKER: We're close, your Honor.

THE COURT: Well, a hundred thousand documents -- oh, produced. Is it a hundred thousand produced or a hundred thousand reviewed?

MR. VANDEVELDE: Your Honor, we believe it's produced at the last hearing. There was --

THE COURT: I see.

MR. VANDEVELDE: -- some debate about what your Honor had intended. That's what we're going with, it's produced or logged in a privilege log.

THE COURT: Okay. Okay. Oh, produced or logged.

MR. VANDEVELDE: Yes.

THE COURT: Okay. So when's your first log coming in?

MR. VANDEVELDE: Today.

THE COURT: Okay. So you should -- was the 90 you gave me both produced and logged, or just produced?

MR. VANDEVELDE: There's actually very few logged documents, but we expect that to increase so roughly 90,000 --

THE COURT: So next week you're going to break the hundred thousand barrier, right? So then you'll be 50-50, and then, if you speed up the process, pretty soon they're going to be paying a hundred percent, right?

MR. VANDEVELDE: Yeah. I know Mr. Pocker hasn't been involved in the day-to-day meet and confers and discovery.

There's substantial difficulty, you can't just ramp up from -- I think we have 12-ish reviewers to -- this would be a four fold increase to 50 -- 48 reviewers. That is just not feasible to get them trained up and start on the issues they need to be to review this document set.

It is not feasible to accelerate by a factor of four the document review process with contract reviewers. I will -- go ahead.

THE COURT: I was going to say, well, what do

you think might -- is it possible to speed up some from your point of view?

MR. VANDEVELDE: We can track with the third-party vendor who coordinates with the contract reviewers and see if we can add additional bodies, but it is not feasible to do it by a factor of four, let alone a factor of two.

THE COURT: All right. Okay.

MR. VANDEVELDE: I will also just say just harkening back to our prior hearing, this is the least relevant information.

Recall that the information that will or will not show whether Oracle's allegations about whether we violated the injunction, that is the technical data that they are collecting. We've produced source code, we've produced logs, we've produced databases. The custodial information cannot show whether or not we have violated the injunctions.

THE COURT: Well, okay. You had another point to raise. I cut you off so if you want --

MR. POCKER: And, actually, it dovetails really with what this last observation is.

THE COURT: Okay.

MR. POCKER: But in the context of our discussions with the Rimini Street lawyers about the production, they have said as much in e-mail that the

custodial production is going to impact their ability to continue the noncustodial production, the very things that Mr. Vandevelde says hold the key to the case in his opinion. There's been a slowdown with respect to that, and that does also concern us as far as getting this all done in a reasonable time to make use of it. So --

THE COURT: Okay. That was the other point I was going to make.

MR. POCKER: So we --

MR. VANDEVELDE: Your Honor, I just have to correct the record. We offered Oracle the choice, what would you like us to prioritize, and they chose to prioritize the custodial documents. That was entirely Oracle's choice to have us focus on that, and we had told them and they acknowledged that there would be an impact on other sources.

THE COURT: So let me -- so using the same reviewers for the technical documents that you're using for the custodial production?

MR. VANDEVELDE: In some instances, yes.

THE COURT: But in others, no?

MR. VANDEVELDE: Yes. The Salesforce is a database that Oracle has sought access to. We have decided -- the parties have agreed to do a giga export of it. It requires manual review, and those are being manually reviewed.

THE COURT: And that would be by a different

type of reviewer.

MR. VANDEVELDE: The same reviewers, and we're talking about many tens of -- I don't know the exact number, but I believe it's in the hundreds of thousands of documents as well.

THE COURT: Well, I mean, I know -- of course, I don't have a lot of firsthand experience at this level, but I know very early in my career we had the MGM fire litigation, and we hired people to go and look through stuff, and they did.

It's hard to hire people. And you want it to do with a certain degree reliability, you know, and it's a tough way to go here. I don't know how I can figure it out, to tell you the truth.

MR. VANDEVELDE: Well, my proposal would be, I think, consistent with your Honor's, which is let's get through another month, the parties can meet and confer, see where we are in mid or early to mid November, and then come up -- hopefully the parties can -- we have not had a chance to discuss what a reasonable schedule looks like.

By then we'll have another -- we should be close to halfway through, and we can project out what a -- the remainder of discovery looks like, fact discovery, what expert phase looks like, and what a reasonable briefing schedule looks like.

**THE COURT: I don't know --**

**MR. POCKER: Just so the record is clear, too, your Honor, Rimini's representation that they needed to prioritize custodial over noncustodial, we certainly heard them, we acknowledge that that's their position, but we haven't accepted that position.**

**THE COURT: Well, which would you like them to prioritize?**

**MR. POCKER: Well, I don't think we have to prioritize either one. We move on two tracks all the time in this case, and discovery is discovery.**

**And, in fact, this one is a little simpler in the sense that we've got this universe of roughly 500 to 600,000 documents and an understanding of how many contract reviewers and resources it takes.**

**The cost aspect, the Court pointed out at some point it's going to be shared between us, and at some point maybe all Oracle depending on how much is there.**

**So a lot of the usual things you don't know going into open-ended discovery which might lead someone to think, gee, we can't really decide when this is going to be over, they don't exist here, and it just requires a little more commitment and organization on the other side, and we can get this done on the timetable that we've proposed.**

**The noncustodial production, I think last time there**

were a few small discovery issues that we alerted the Court, but nothing has percolated to the point of being an issue that you need to decide or we need to brief. But there's no reason they can't do both things at the same time.

Certainly in the underlying litigation and in the Rimini 2 case, custodians were producing, depositions were going on, documents were coming noncustodial, that's the ordinary situation, and there's nothing less important about these proceedings than about the discovery in those other trials.

I think there's a tendency for my adversaries to see this as -- as they characterized during the earlier hearings, oh, this is just limited discovery, a peek behind the curtain. No, no, no. This is discovery for whether or not a federally-issued injunction is being complied with or not.

The issues are just as big as in the other two underlying litigations, and, as a result, I think we're justified in expecting that they'll give it the same kind of full-throated attention and commitment that they would in that other discovery context.

THE COURT: All right, Mr. Pocker.

MR. POCKER: I'm not asking for it tomorrow --

THE COURT: I understand.

MR. POCKER: Thank you.

MR. VANDEVELDE: A couple of lines.

Mr. Pocker is right in some respects, and those issues are the exact issues that are fully briefed in summary judgment in Rimini 2 which is where these issues should be resolved, not in this proceeding.

About Rimini 2 and discovery processes, in that situation, and it is not applicable here, the parties agree there was technology-assisted review that made this type of laborious custodial document review process easier to get through large volumes. In that case I think many millions of documents were produced.

I think in Oracle in -- back in, I think, late spring, early summer, suggested TAR, technology-assisted review, might be workable here. They've since acknowledged that it's just not. This requires a manual process.

Rimini has already spent over a quarter million dollars in the last month employing numerous contractors. We are open to trying to add a few contractors, but to your Honor's point, accuracy and reliability, there's a ramp-up speed and educational component to this that makes them more efficient.

And so we are happy to try, but it is not feasible to operate on the time frames that Oracle is talking about.

THE COURT: All right. I understand your position.

Last word here, Mr. Pocker.

MR. POCKER: You know, maybe if we were able to confer with their review vendor with respect to some of these details and time frames and whatever, that might lead to us having some sort of a better understanding of what's reasonable in this case or not. That would certainly help us with respect to evaluating their representations.

I also would note Mr. Vandevelde talked about these technical documents. Does Rimini have a projected production date for sales ports in SharePoint?

Because we haven't heard that yet. It would be nice, rather than we proposing a schedule and then saying it's complicated, that we get some sort of an insight there.

THE COURT: Okay. So then you would want -- you would have sort of an idea of where the custodial type production is going if we stay at this pace, you would like to have information on when the other production looks like it's going to be finished.

MR. POCKER: Yes.

THE COURT: Okay. I think the way to do this has to be -- you're off to a good start. I'll go with what Rimini thinks.

We'll set another hearing in four weeks. I'll order you to ramp up to the extent you can to feel safe that you've got good quality, you know, and then work with Mr. Pocker to -- and his side to provide them what insight -- I mean, I

can understand why you might object to them going in and visiting with your reviewers, but, you know, there might be some way to have some communication on that point to reassure him.

You know, I mean, to me, you're just looking -- it looks like everybody is operating in good faith here. You would like them to go faster, they're saying we're going as fast as we can. I don't know --

MR. POCKER: The mechanism you set up, your Honor, was fabulous, we just --

THE COURT: Could have been a little more clear on produced or review I see now, but it's hard to know when you're making these things up so -- but I think we're in a good place, it's just the timing is the issue.

Okay. So what's a good date, Tawni, about four weeks? Can you look on my calendar, please?

THE CLERK: Tuesday, November 5th, at ten o'clock.

THE COURT: How does that work?

Take a look at your calendars. If that's going to cause a big problem, we can find another date.

MR. VANDEVELDE: That works for Rimini, your Honor.

THE COURT: Okay, great.

MR. POCKER: Works for our side as well, your

**Honor.**

**THE COURT: Okay. What time was that, ten o'clock?**

**THE CLERK: That was Tuesday, November 5th, at ten o'clock in courtroom 3D here.**

**THE COURT: Okay, fine. In the meantime, sort of continue on, try to ramp up if you can, communicate a little better, and a deadline -- projection for the other noncustodial --**

**MR. VANDEVELDE: Yeah, I think we're very close on the Salesforce side so I don't think that will be an issue.**

**THE COURT: All right. They'll get that to you then.**

**All right. Thank you for coming in.**

**-o0o-**

**I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.**

**/s/Margaret E. Griener 10/25/2019**
**Margaret E. Griener, CCR #3, FCRR**
**Official Reporter**