1          UNITED STATES DISTRICT COURT
                DISTRICT OF NEVADA
2      BEFORE THE HONORABLE CAM FERENBACH, MAGISTRATE JUDGE
                    ---o0o---
3

4    ORACLE USA, INC., a Colorado      :
     corporation; ORACLE AMERICA,      :
5    INC., a Delaware corporation;     :
     and ORACLE INTERNATIONAL          :
6    CORPORATION, a California         :
     corporation,                      :
7                                      :
                  Plaintiffs,          : No. 2:10-cv-106-LRH-VCF
8                                      :
            -vs-                       : January 22, 2020
9                                      :
     RIMINI STREET, INC., a Nevada     : Las Vegas, Nevada
10   corporation; and SETH RAVIN,      :
     an individual,                    :
11                                     :
                  Defendants.          :
12                                     :
     _____   :
13

14

15              TRANSCRIPT OF STATUS CONFERENCE

16

17   APPEARANCES:

18   FOR THE PLAINTIFFS:       RICHARD J. POCKER
                               Attorney at Law
19                             Las Vegas, Nevada

20                             JAMES C. MAROULIS (Telephonic)
                               Attorney at Law
21                             Redwood City, California

22                             JOHN A. POLITO, SHARON R. SMITH and
                               LINDSEY McGRATH SHINN
23                             Attorneys at Law
                               San Francisco, California

24

25   (Appearances continued on Page 2.)

1    APPEARANCES (Continued):

2

3    FOR THE DEFENDANTS:        ERIC VANDEVELDE
                                Attorney at Law
4                               Los Angeles, California

5                               CASEY J. McCRACKEN
                                Attorney at Law
6                               Irvine, California

7                               W. WEST ALLEN
                                Attorney at Law
8                               Las Vegas, Nevada

9

10

11

12   Transcribed by:           Margaret E. Griener, CCR #3, FCRR
                                Official Reporter
13                              400 South Virginia Street
                                Reno, Nevada 89501
14

15

16

17

18

19

20

21

22

23

24

25

1      LAS VEGAS, NEVADA, WEDNESDAY, JANUARY 22, 2020, 1:00 P.M.

2                          ---o0o---

3              THE CLERK:  Oracle USA, Inc., et al., versus

4      Rimini Street, et al., 2:10-civil-106-LRH-VCF.

5              This is before the Court on motions in dockets

6      1290, 1291, 1292, 1296 and 1301.  Counsel make your

7      appearance, please.

8              MR. POCKER:  Your Honor, Richard Pocker, Boies,

9      Schiller & Flexner, on behalf of the Oracle parties.

10             THE COURT:  Mr. Pocker.

11             MS. SHINN:  Lindsey Shinn from Morgan, Lewis &

12     Bockius on behalf of Oracle USA, Inc., Oracle America, Inc.,

13     and Oracle International Corporation.

14             THE COURT:  Thank you, Ms. Shinn.

15             MS. SMITH:  Good afternoon, your Honor.  Sharon

16     Smith on behalf of the Oracle entities.

17             THE COURT:  Ms. Smith.

18             MR. POLITO:  Your Honor, John Polito on behalf

19     of plaintiffs Oracle.

20             THE COURT:  All right, Mr. Polito.  Okay.

21             MR. VANDEVELDE:  Good afternoon, your Honor.

22     Eric Vandevelde on behalf of Rimini Street.

23             THE COURT:  Mr. Vandevelde.

24             MR. McCRACKEN:  Good afternoon, your Honor,

25     Casey McCracken, from Gibson, Dunn & Crutcher on behalf of

1   Rimini Street.

2              THE COURT:  Mr. McCracken.

3              MR. ALLEN:  And Mr. West Allen on behalf of the

4   Rimini parties, your Honor.

5              THE COURT:  All right.  Thank you, Mr. Allen.

6              Did we have anybody on the phone for this one?

7   I guess not.

8              MR. MAROULIS:  Yes, your Honor.  This is James

9   Maroulis from Oracle for the Oracle entities.

10             THE COURT:  Okay.  Let's see.  I'm sorry, could

11  you say your name again, sir?

12             MR. MAROULIS:  I'm sorry, your Honor.  It's

13  James Maroulis from Oracle for the Oracle entities.

14             THE COURT:  James Maroulis.  Okay.  Great.

15  Thank you very much.

16             So the motions 1291, 96 and 1301 are the motions

17  to seal.  I've looked at those, that I find there's good

18  cause.  This is not a dispositive matter so I'm going to order

19  those all be granted, the documents will be sealed.

20             And then, actually, 1292 is the sealed version

21  of 1290 which is redacted.  So I'm just going to -- I

22  guess I'm just going to argue 1292, which is the unredacted

23  version, and I'll grant that one, and just take the gavel off

24  1290.  And I'll rule -- let me say I'll rule on it, and we'll

25  take the gavel off the other one after I rule.

1                     All right.  Now, fact discovery closed on the

2     17th, so I had a question just first, if I can hear from both

3     sides, other than the items that we're going to argue today,

4     is everything else that, you know, is contemplated?

5                     I went back and looked at the various orders I

6     entered over the last few -- I guess there was the -- I think

7     the operative ones were 1232 was the post objection discovery

8     scheduling order, and then that was in June.

9                     And then in September, after we had a hearing,

10    the parties got together and wrote up the more detailed order

11    that had to do with allocating the costs and all that, and

12    then -- and then I entered minute orders on the 20th setting

13    some dates, and one of those dates is the one I just

14    referenced.

15                    So is everything done under those orders, you

16    know, as they evolved except for what we're going to talk

17    about that's spelled out in this motion today?

18                    MR. VANDEVELDE:  I believe so, your Honor.

19                    THE COURT:  Oh, good.

20                    MR. VANDEVELDE:  Expert discovery begins in a

21    couple of weeks, on the 31st.

22                    THE COURT:  Right.  We've got a cutoff for that,

23    yeah.

24                    MR. POCKER:  And, your Honor, nothing is

25    pending, obviously.  Since discovery just closed on

1    January 17th, it's foreseeable that if we're reviewing

2    discovery, if some issue comes up, we would seek leave from

3    you to either entertain that motion or not.

4              And you've heard us reference in sketchy detail

5    at the time, because it's still under analysis, but there may

6    be a possible request for spoliation sanctions as well in

7    connection with this.

8              THE COURT:  Yeah, that would be down the road.

9              I'm not trying to, you know, cut you off.

10   Just -- it sounds to me -- of course, you can't predict the

11   future how I'm going to rule on this motion, and as things get

12   produced, something might happen.

13             But as things stand now and what's known,

14   setting aside this possible spoliation which you reserve that,

15   everything else seems to be completed?

16             MR. POCKER:  The Rule 30(b)(6) deposition has

17   been completed.

18             THE COURT:  Yeah, that and -- okay.  Great.

19   Well, that's helpful.

20             All right.  So as I understand it, the motion to

21   compel addressed three requests for production, 9, 11, and 14,

22   and interrogatory number 5.

23             And I think the things that are sought to be

24   produced is -- let's see, a complete list of updates and other

25   materials actually delivered to customers, then whitepapers,

```
 1    webinars and other things, and manuals available on Rimini's

 2    website, and then documents relating to the Oracle software

 3    and support materials used to create those first two things,

 4    and then the draft Dev Instructions.

 5                   So is that pretty much the universe of what

 6    we're going to talk about?

 7                   MR. VANDEVELDE:  Yes, your Honor.  It may make

 8    sense to kind of address those three issues separately.

 9                   THE COURT:  Right.  Okay.  Well, I'm fine.  I

10    just wanted to make sure I kind of had a point context.

11                   So, okay.  So we're ready to go.  It's Oracle's

12    motion so who is going to argue?

13                   MR. POCKER:  Your Honor, Ms. Shinn and Ms. Smith

14    will be arguing different parts.  Mr. Vandevelde has indicated

15    it's really --

16                   THE COURT:  Okay.  Well, have you guys discussed

17    which ones you want to talk about first, or do you have an

18    idea which one you want to talk about first?

19                   MR. VANDEVELDE:  I'm happy to start wherever,

20    your Honor.

21                   THE COURT:  Okay.  Wherever?  Okay.

22                   MS. SHINN:  We're happy to go in order, your

23    Honor.

24                   THE COURT:  Okay, so, Ms. Shinn.  You're up.

25    Thank you.
```

1            MS. SHINN:  Good afternoon, your Honor.

2            I'll be primarily addressing interrogatories --

3    interrogatory number 5 and RFP number 11, and my cocounsel,

4    Sharon Smith, will be primarily addressing the draft up

5    instructions under RFPs 9 and 14.

6            THE COURT:  Okay.  So the draft Dev are under 9

7    and 14, the RFP, and then interrogatory 5 and 11 has to do

8    with what you're doing.  Okay.  Good.

9            MS. SHINN:  Yes, and one other point of

10   clarification, you mentioned that the documents that we're

11   seeking that were used in creation of other materials is

12   limited to RFP 11 and our Rog 5, which I'll speak about in

13   more detail shortly, we're seeking a list of the materials

14   that were delivered to customers.

15           THE COURT:  List of materials, right.  But

16   that's under the interrogatory or the request?

17           MS. SHINN:  Yes, that's under interrogatory

18   number 5.

19           THE COURT:  Okay.

20           MS. SHINN:  But just to start off and kind of

21   give you a bigger picture overview, the injunction places

22   restrictions on Rimini's support processes for developing and

23   testing software updates and for the creation of documents and

24   support materials, (unintelligible) goal that was entitled to

25   discovery to test whether Rimini's processes are in compliance

1    with the injunction.

2              Now, Rimini admits that the injunction restricts

3    the manner in which that -- in which it provides the support,

4    and that means that Oracle is entitled to discovery, not just

5    regarding the final deliverables that Rimini delivers to

6    customers, but discovery into the processes and the manner in

7    which they create those final deliverables before they're

8    actually delivered to customers.

9              And as I mentioned, I'll be addressing

10   interrogatory number 5 which is information about the updates

11   and fixes and deliverables that Rimini in fact gave to

12   customers.

13             And RFP 11 seeks information about documents, as

14   you mentioned, made available on Rimini's website and the

15   documents that were used -- the Oracle documents that were

16   used to create those updates.

17             For both of these, Rimini has superior access

18   to, and knowledge of, the records that contain this

19   information, superior to Oracle, that is, and that's why we

20   believe that they should produce these documents.

21             As to Rog 5, Rimini is under injunction that

22   covers what it sends to customers, and so Rog 5 seeks a list

23   of what Rimini sent to its customers so that Oracle can assess

24   whether or not they're in compliance.

25             Rimini knows what it sends to customers, that's

1     its business.  It provides support to customers in the guise

2     of tax and regulatory updates, break fixes, new functionality,

3     the kinds of items referenced in the full scope of

4     interrogatory number 5.

5                  But that's their business.  They have to be able

6     to tell what they've sent to their customers, and all we're

7     asking them to do is that they tell us.

8                  In the ordinary case, Rimini would keep copies

9     of the files that it sends to customers, and we asked them in

10    2019 to do that as part of this postinjunction discovery, but

11    they refused.  So now we're just seeking the list of what they

12    provided.

13                 The list as it stands now is deficient in two

14    ways as you would have seen in our briefing.  The first is

15    that they provided information on the updates they've provided

16    to customers, but those updates, as they're referenced, are

17    Rimini-created ID numbers and don't contain the names of the

18    actual files that they send to customers, and that's the

19    information that we're looking for there.

20                 They also don't contain the version information.

21                 THE COURT:  Well, I'll ask you -- when you say

22    they're Rimini-created ID numbers, are those created as part

23    of discovery or in the ordinary course?

24                 MS. SHINN:  In the ordinary course of business

25    they create -- you know, they have numbers that refer to the

1     fixes that they're implementing or sort of higher level

2     release bundle numbers that will then bundle a few of those

3     release update numbers, and then the files that they're

4     actually sending to customers fall under those organizational

5     numbers beneath them.

6                     THE COURT:  Okay.

7                     MS. SHINN:  And, as I mentioned at the outset,

8     the parties don't have equal access to the tools and

9     information that contains this information.

10                    Rimini's declarant mentions that there are a

11    number of disparate systems and applications that have this

12    information.  We don't have access to those.

13                    We do have access to -- online access only to

14    JIRA, Rimini's development processing, development processing

15    tracking software, sorry, called JIRA, but our access to that

16    system is limited, and we can't do the same queries on the

17    back-end databases that track the underlying information.

18                    Rimini's declarant also doesn't state

19    specifically that they don't track file names and version

20    information, and, in fact, we know that they do because the

21    client delivery documents that Rimini says that we should use

22    contains that information.  But the client delivery documents

23    that contain that information aren't generated manually by

24    Rimini, they're generated with an automated process.

25                    Rimini has tools that can parse the data in

1   their various databases to create those client delivery

2   documents, and all we're asking is that they use those same

3   tools and databases at their disposal to provide us the list

4   of the files under each of those updates without resulting --

5   resorting to the client delivery documents.

6           And the problem with the client delivery

7   documents is that they are large .pdf files.  They are OCRed

8   so we don't have the benefit of native text to search those

9   documents.  They are often dozens of pages long.  Many of

10  those pages contain texts that aren't pertinent to

11  interrogatory number 5.

12          THE COURT:  Well, but hold on.  They're OCRed,

13  that means they're searchable, right?

14          MS. SHINN:  OCR can -- OCR can introduce errors

15  into the documents, and especially in a highly technical

16  document, you know, certain searches may not come through

17  if --

18          THE COURT:  I guess it shows my computer

19  naivete, because I always thought if you wanted to search

20  something, you wanted to have it in .pdf.  But you're saying

21  it's better to have something when it's not in .pdf.  How are

22  you going to search it?

23          MS. SHINN:  Well, we would prefer to have Rimini

24  provide the update information, the file names in the format

25  that they've been providing the other portions of the update

1    but with a column with the file name included.

2                    THE COURT:  Oh, okay.

3                    MS. SHINN:  And the other problem with the

4    client delivery documents is that Rimini won't even represent

5    that they're the official record of what files were sent to

6    customers.  Their interrogatory response just says that those

7    client delivery documents are perhaps the best source of

8    information for what has been delivered to customers.

9                    And their invitation for us to go back and

10   cross-check the JIRA documentation and others, when, for

11   example, we have this limited access, is a much larger burden

12   on Oracle than it is for Rimini to simply, you know, search

13   over their databases of information that they have.

14                   And they can clearly export this kind of

15   information because the export does go into the client

16   delivery documents eventually but mixed in with all that other

17   material.

18                   THE COURT:  Okay.

19                   MS. SHINN:  If you don't have questions about

20   Rog 5, I can turn to RFP 11.

21                   THE COURT:  You know what, let's do Rog 5 first

22   because I've got to tell you, it's hard -- that's the --

23                   MS. SHINN:  Sure.

24                   THE COURT:  Let's let Mr. Vandevelde come back

25   to Rog 5, and then you can come back on RFP 11.

−14−

1              MS. SHINN:  Okay.  Sounds good.  Thank you.

2              THE COURT:  Mr. Vandevelde, I assume it's you?

3              MR. VANDEVELDE:  Yeah, I think that makes sense,

4    your Honor.

5              Let me start by just providing a little bit of

6    background so I think we're on the same page of what's

7    actually happening.

8              The rog, Rog 5, what it's asking for is a

9    summary chart, you can imagine a spreadsheet with certain

10   columns, and they want for each update -- which is somewhat of

11   an ambiguous term -- each update, the, quote, names of files

12   provided to each customer along with product line, product,

13   version information, et cetera.

14             The context I want to provide, though, is that

15   Rimini doesn't provide updates as if they're some fixed set of

16   files for every customer.

17             We're essentially consultants, right?  We

18   actually go into each client's environment, first we go into

19   client A, we implement it, go into client B and implement and

20   update, go into client C.  We're essentially consultants.

21   Sometimes it's to fix bugs, sometimes it's to make a

22   configuration change, sometimes it's to develop and implement

23   new code, it can be all sorts of things.

24             And it --

25             THE COURT:  So let me ask this.  So sometimes

1    it's something you initiate and sometimes it's something a

2    customer requests?

3                    MR. VANDEVELDE:  Yeah, it could be some

4    customer, a client could call Rimini and say, "We're having an

5    issue, can you come look at it."

6                    THE COURT:  Right.

7                    MR. VANDEVELDE:  Sometimes we know, for example,

8    a state tax change has happened, and it's going to affect a

9    certain set of customers, and so we proactively will implement

10   that functionality for each of the customers A, B, C, D, and

11   et cetera that are within that set that need --

12                   THE COURT:  That are using this particular

13   product.

14                   MR. VANDEVELDE:  Exactly.

15                   So if you view us as a consultant, there are --

16   it's actually -- the reason I want to raise this is it makes

17   sense why we don't have some master tracking sheet that

18   documents everything we do with every company, every action we

19   take, every update we provide, every update we implement.  It

20   just doesn't work that way.

21                   And we spoke to Ms. Sheryl Arnold, she is the

22   senior manager of the Global Service Delivery Group, and she

23   has submitted a sworn declaration.  We do not have the

24   information in the form that Rimini wants, and there is no way

25   to automatically generate it.  That's just a fact.

1            We have asked the person most knowledgeable

2    about how these systems work, and there is no way for us to

3    generate this master chart that Rimini -- I'm sorry, that

4    Oracle wants.

5            So let me tell you what we have done.  We have

6    answered --

7            THE COURT:  So you're saying there's no way to

8    generate it by sending instructions to a --

9            MR. VANDEVELDE:  Database.

10           THE COURT:  -- a database.

11           MR. VANDEVELDE:  Yes.

12           THE COURT:  So you have to find some other way

13   to do it if you were going to do it.

14           MR. VANDEVELDE:  It would be manual.

15           THE COURT:  Manual.  All right.

16           MR. VANDEVELDE:  It would be manual.

17           And so what we've done is we've answered the Rog

18   5 by providing all of the underlying raw information, and then

19   we have told Oracle how to compile the information, and that's

20   a proper invocation of Rule 33(d).

21           And I'll tell you, what the key data set

22   here is, and opposing counsel referred to it, is a set of

23   documents called the client delivery documentation.

24           So when we provide and implement an update for a

25   client, at some point we are going to send that client a set

1      of files that we call the client delivery documentation, and

2      it says what the new functionality is, what the objects

3      affected are.  It's technical jargon for the types of changes

4      and where they will be found in the client's system, and

5      those -- that set of client documentations which are .pdfs

6      which are OCR-able -- I know that's not a word -- but they can

7      be --

8                      THE COURT:  Searchable, yes.

9                      MR. VANDEVELDE:  -- OCRed, and they can be

10     searchable.

11                     THE COURT:  You know, just -- as long as we've

12     got these lawyers here, you know, you're supposed to file

13     documents with the court that's OCRed, and a lot of people

14     don't, and then I have to -- somebody has to do something, so

15     I just mention that.

16                     Okay.  Go ahead.

17                     MR. VANDEVELDE:  So we provide for each

18     implementation of an update for each client a set of client

19     delivery documentation files that details the changes, the

20     objects affected and other information about that update, and

21     that can be compiled, yes, manually into the chart that Oracle

22     wants.

23                     Oracle has all the client delivery

24     documentation, they have all those .pdfs, they are searchable,

25     and they are just as capable as us of going through those

1  materials and compiling the chart that they want.  We do not

2  have an automated way to generate the type of information in

3  the format that Oracle wants.

4              Now, I will say that during the deposition last

5  week one of the topics was about Rimini's systems, and the

6  question was posed to the witness what is the best way to find

7  out what work Rimini has done for a particular client, and the

8  client pointed Oracle's counsel to the client delivery

9  documentation.  That is the best source of truth, so to speak,

10  for figuring out what Rimini did for each particular client

11  for each particular update.

12              Now, the ultimate source of truth obviously is

13  in each client's environment.  That's where the vast majority

14  of work happens so the --

15              THE COURT:  But that would involve third-party

16  discovery.

17              MR. VANDEVELDE:  That would involve third-party

18  discovery which, as you may recall, and Rimini, too, that I

19  think there was 700 plus subpoenas sent to our clients in this

20  proceeding.

21              I don't know how many were in the trial phase,

22  but in the posttrial and contempt proceeding phase, they got a

23  certain limited number that your Honor authorized.

24              THE COURT:  I remember I allowed --

25              MR. VANDEVELDE:  But that is the ultimate truth.

1    From our records the best source of truth is the client

2    delivery documentation.

3              Now, in addition to that set of data, there's a

4    couple other tools that your Honor has probably seen in the

5    papers, one is called JIRA.

6              THE COURT:  Right.

7              MR. VANDEVELDE:  One is called DevTrack, one is

8    Salesforce.  Those are not as reliable as a source of truth

9    because they're not designed to be a logging or a tracking

10   mechanism for the work we do in each client's environment.

11             Salesforce documents are kind of Rimini client

12   interactions.  So, for example, by consulting Salesforce in

13   conjunction with the client delivery documentation, Oracle can

14   find out when we sent that documentation to each client.

15             JIRA is a development tool.  Our developers use

16   it to plan out how they're going to do the work for the

17   clients that need the work to be done.

18             But it is not -- it is good as a snapshot in

19   time, but it's constantly evolving and changing because it's

20   being used by developers.  It is not designed to be, and

21   cannot in most instances be, relied upon as a source of truth

22   for the information they want.

23             So, again, they can look at the client delivery

24   documentation.  They have that.  They can look at JIRA.  They

25   have 24/7 access to that.  They can look at DevTrack.  They

1    have 24/7 access to it.  They can look at Salesforce.  We've

2    produced Salesforce.  They have all the building blocks to

3    create this table, and there's no automated way for us to do

4    it.

5                    And the reference to exportability and JIRA and

6    why can't -- it's not designed for that tool.  It would not

7    generate a reliable chart.

8                    And so we have provided everything, told them

9    how to do it, and they are equally capable of doing it

10   themselves.

11                   THE COURT:  Okay.  I understand your position on

12   interrogatory 5.

13                   Ms. Shinn, you get the last word on that one.

14                   MS. SHINN:  Thank you, your Honor.

15                   As opposing counsel said, you know, they do work

16   for customers, and they provide them the files where they do

17   that work, and they -- what Oracle wants to know is what work

18   are they doing, what files are they providing to customers, or

19   what files they are modifying for customers.

20                   All of that is relevant to the injunction

21   because that governs the manner in which Rimini can provide --

22                   THE COURT:  I don't think they're disputing

23   relevance.

24                   MS. SHINN:  I'll move on then to the next point

25   which is that, you know, opposing counsel says there's no way

1    to generate this information, but they do generate this

2    information.  They have all of their databases, and they

3    generate the client delivery documents with the information

4    they have in their databases.

5                    THE COURT:  Well, they generate the delivery

6    documents, but they're saying to provide the kind of chart

7    that you want -- and they have an affidavit, you know, saying

8    that -- that it would have to be done manually, and --

9                    MS. SHINN:  Your Honor, there's no evidence in

10   the record as to where the file names or where the version

11   information is stored in those databases, and their declarant

12   doesn't say that those fields themselves are not exportable.

13                   So it's not clear from the record -- the

14   original interrogatory also asks for information about which

15   developer worked on each of those.  That's not addressed in

16   our briefing, and maybe that's further information, but that's

17   not information we're seeking today.

18                   And so this more narrow set of information is

19   certainly information that we think -- because they're able to

20   automatically put it into the client delivery documents,

21   there's no reason they can't automatically put it into this

22   chart as well.

23                   THE COURT:  Okay.

24                   MS. SHINN:  And then, as far as, you know, what

25   source is the best source of truth for what was provided to

1    customers in this case, it would be helpful if Rimini then

2    would admit that the client delivery documents are the best

3    source of truth as far as what information it's delivered to

4    customers, and that might be one way forward if it is indeed

5    the fact that they simply can't provide this information any

6    other way.

7                    THE COURT:  Okay.  Thank you.

8                    MS. SHINN:  Thank you.

9                    THE COURT:  You know, I mean, Rule 33(d) does

10   say,

11              "If the answer to an interrogatory may be

12         determined by examining, auditing," compelling --

13         "compiling, abstracting or summarizing the party's

14         business records...and if the burden of deriving or

15         ascertaining the answer will be substantially the

16         same for either party, the responding party may..."

17         specify "the records that must be reviewed, in

18         sufficient detail to enable the" interrogatory

19         party -- interrog -- "interrogating party to locate

20         and identify them as readily as the responding party

21         could; and giving the" interrog -- "interrogating

22         party a reasonable opportunity to examine and

23         audit....."

24              Well, these records have been given -- I'm

25   sorry, I'm ruling now so I'm not asking you a question so --

1               MS. SHINN:  Can I make one more point, then,

2     your Honor?

3               THE COURT:  Okay.

4               MS. SHINN:  Just on that point, you know, it's

5     Oracle's position that the burden is more difficult for Oracle

6     because it would have to sift through these voluminous

7     documents that aren't in a helpful format, whereas Rimini can,

8     in fact, generate this information with the databases and

9     tools that it has at its disposal.

10              THE COURT:  Well, that's what you claim, but,

11    you know, I don't -- it seems at a minimum it's disputed, and

12    you have the burden of convincing me.

13              So, anyway, based on all that, I'm going to

14    find -- and also I guess I'm telegraphing a little bit here.

15              You know, this has been going on a long time.  I

16    put a lot of pressure on Rimini to do things, and both counsel

17    have worked together, and that's great, I really appreciate

18    that, and a ton of discovery has been given.

19              So I really think I have to be thinking about

20    sort of general proportionality here, too, as well as this

21    burden of balancing in 33(d).

22              So I'm going to deny the motion to compel with

23    regard to interrogatory number 5.

24              Okay.  Do you want to go on with number 11,

25    or --

1            MS. SHINN:  Sure.

2            THE COURT:  -- the request to produce number 11?

3            MS. SHINN:  Okay.  So the language of the

4    injunction says that Rimini can't create documents using

5    Oracle copyrighted materials, and RFP 11 attempts to get to

6    that.  It seeks information about the documentation and other

7    online materials that Rimini has made available on its website

8    and any underlying Oracle materials that he has used to create

9    those materials.

10            THE COURT:  All right.

11            MS. SHINN:  Their interpretation is overly

12   narrow of our RFP because that RFP has included the phrase

13   Oracle's software and support materials, and on its face that

14   term is defined to include instructional -- I'm sorry, let me

15   make sure I get the language right here -- instructional

16   documents so meaning documentation.

17            In Rimini's opposition it admits that it uses

18   publicly-available Oracle materials.  The Reneke declaration

19   refers to an Oracle tool.  And I'm sure I'm not pronouncing

20   the last name correctly, the Beichler declaration refers to

21   using other public sources of information.

22            THE COURT:  Let me ask you this.  So if they use

23   publicly-available Oracle information, is that a violation of

24   the injunction?

25            MS. SHINN:  It is, your Honor.  There is no

1    exception in the injunction for using publicly-available,

2    copyrighted Oracle information, and so to the extent that they

3    are doing that, which is what the RFP seeks to discover, that

4    would be forbidden under the injunction.

5                    THE COURT:  Okay.

6                    MS. SHINN:  As to the burden and

7    proportionality, the documents that are available on the

8    website should be easily retrievable by Rimini.  Documents are

9    made available on websites or, you know, typically kept in a

10   file system somewhere, and it should be no trouble finding the

11   copy and producing those documents to us.

12                   As to the sources of Oracle materials that

13   they're using to create those documents, Rimini's declarant

14   suggests that they didn't keep diligent records of what

15   materials they were using, but that shouldn't penalize Oracle.

16                   Rimini is under an injunction not to use

17   Oracle's copyrighted materials, and it's their responsibility

18   to make sure they don't violate it.

19                   We think that they need to perform a good faith

20   investigation into whether these sources are available.  They

21   do have declarations from two individuals, but there is no

22   evidence they've conducted an investigation into whether other

23   members of the team that creates documents that are available

24   on their website do have that information.

25                   THE COURT:  Okay.  Thank you.

1            MS. SHINN:  Thank you.

2            THE COURT:  Mr. Vandevelde.

3            MR. VANDEVELDE:  Your Honor, this one is frankly

4    baffling to me.

5            The entire *Rimini I* case is about support

6    processes.  In fact, Ms. Shinn, I think her first few

7    sentences today said the injunction is about support

8    processes.

9            THE COURT:  Yes.

10           MR. VANDEVELDE:  So why are we talking about

11   online marketing materials?  It just doesn't make sense.

12           The *Rimini I* trial was about support processes.

13   The summary judgment rulings in *Rimini I* were about support

14   processes.  The injunction is about support processes.  That's

15   what Ms. Shinn said at the very outset of today's hearing.

16   The Ninth Circuit's opinion is about support processes.

17           Marketing materials have nothing to do with how

18   Rimini developers and engineers carry out their job to provide

19   support; nothing.  This information is irrelevant.

20           And, in fact, when Oracle -- I think it was in

21   April or May last year -- came to your Honor and sought to

22   reopen discovery, there was no mention of marketing materials.

23           When your Honor asked them to identify the 5

24   things that they think Rimini is doing that violate the

25   injunction, they didn't mention marketing materials.

1              Marketing materials has nothing to do with our

2    support processes.  What we put out on the Web as an

3    advertisement, or a client's success story where it's a client

4    testimonial, or a white paper, or a data sheet, these are all

5    types of marketing materials.  Those have nothing to do with

6    how our engineers carry out their job to provide support.

7              I think what's telling is just a few days ago,

8    on Friday, we had our 30(b)(6) deposition.  The topics were

9    quite broad.  They covered virtually everything about our

10   company and its support processes.  You want to know the one

11   that I think that was not in the topics?

12              THE COURT:  I can guess.

13              MR. VANDEVELDE:  Yes.  Online marketing

14   materials.  That was not a topic.  If they think it's

15   relevant, they sure would have put it in their topics for

16   their one 30(b)(6) deposition.

17              On this basis alone this aspect of the motion

18   should be denied.  If your Honor is -- you know, if they

19   really want the online marketing materials, those are publicly

20   available, they're downloadable.

21              They said there was a hiccup, and they had some

22   trepidation about trying to pull down a whitepaper because

23   they thought that it might be some communication to counsel,

24   and ethic rules bar -- sorry, communication to a party, a

25   represented party, and they thought they weren't allowed to

1    fill out some form that could be construed as contacting a

2    party, so we provided that one, right?

3                    If they identify ones that they see that they

4    have some trepidation about ethical obligations to not contact

5    represented parties, we can provide those.  But the vast

6    majority of them they can just go on our website and download

7    them if that's what they're concerned about.

8                    THE COURT:  Well, I guess they want the backup

9    information.

10                   MR. VANDEVELDE:  Well, yeah.  I mean, let me go

11   there.

12                   So they've taken a step further.  Not only do

13   they want the irrelevant set of marketing materials which have

14   nothing, again nothing, to do with our support processes, they

15   want to know what materials, if any, anyone in the marketing

16   department who create these materials might have referenced

17   or -- I think Ms. Shinn just used the word used.  I don't know

18   what that means.

19                   But that undertaking is simply not possible.  We

20   don't keep records of everything people read or see or hear

21   about.

22                   I mean, imagine if your Honor was asked a

23   question what have you ever used when you issued this opinion.

24   Yes, there are some citations in an order, but that doesn't

25   capture everything you might have read, right?  All the

1    discussions you might have had, some things you might have

2    seen.

3                    And so we don't keep track.  We don't have

4    cameras over our marketing personnel that track everything

5    they might have ever seen or received or heard about.

6                    So we just don't have those records.  So what it

7    would entail would be interviewing everyone who has ever had a

8    role in creating online marketing materials, which, again, are

9    irrelevant to support processes, and asking them what they

10   remember.

11                   It's a futile, pointless exercise.  That is what

12   the sworn declarations of now Ms. Beichler and Mr. Reneke say,

13   and so, on that basis, this should be denied as irrelevant and

14   pointless and unduly burdensome and not proportional.

15                   THE COURT:  All right.  I understand your

16   position.

17                   Ms. Shinn.

18                   So I guess the first question is, I mean, you

19   can download the stuff that's on the website, right?

20                   MS. SHINN:  Yes, your Honor.

21                   THE COURT:  Marketing materials that are on the

22   website you can --

23                   MS. SHINN:  Yes, for a number of the

24   documents -- at least some of the documents on the website,

25   including the whitepaper that opposing counsel referred to,

1    the website requires you to enter some information --

2                    THE COURT:  Right.

3                    MS. SHINN:  -- before you can download the

4    material, and that -- you know, entering that information,

5    performing that interaction was something that caused concern

6    for us.

7                    THE COURT:  No, I understand that, but it's true

8    that when you raised that, they said, okay, well, that makes

9    sense, so we'll get it for you.  So they gave you that, I

10   assume; is that right?

11                   MS. SHINN:  They have not actually said that --

12                   THE COURT:  Or they agreed --

13                   MS. SHINN:  -- would be perfectly acceptable for

14   us to do that.  They have not said that.

15                   THE COURT:  So it's not acceptable?

16                   MS. SHINN:  They have not -- they have not said

17   that -- they have said that we have not provided authority for

18   our position --

19                   THE COURT:  Okay.  So they're still taking the

20   position that it's irrelevant.

21                   MS. SHINN:  Yes.

22                   THE COURT:  Okay.  Well, Mr. Vandevelde, I

23   thought you said something different.

24                   MR. VANDEVELDE:  No, we have -- they asked us

25   for that whitepaper, we gave it to them.  I don't think we've

```
 1    taken a position -- frankly, I'd have to consult with the

 2    client.  I don't think we have a problem with them downloading

 3    and filling out some form.  I would not consider that --

 4                    THE COURT:  Okay.

 5                    MR. VANDEVELDE:  -- contact with a represented

 6    party.  I can confirm that after this hearing, I mean, we'll

 7    take that position.

 8                    But to the extent they want -- if they tell us

 9    something that they have a fear about submitting that form,

10    we're happy to give it to them.  We've already done so.

11                    THE COURT:  Okay.  Well, maybe -- he says he's

12    done so.  You disagree?

13                    MS. SHINN:  That's new information to us, your

14    Honor.  So --

15                    THE COURT:  It's a big case.

16                    MS. SHINN:  Certainly.

17                    But, really, I think the main point here is

18    that -- whether the documents are Rimini marketing material or

19    something else, that's really irrelevant.  The question is

20    whether they're using Oracle software and support materials to

21    create that information.

22                    And there are two paragraphs in the injunction

23    that would cover that.  Paragraph 3, I'll just refer to

24    quickly says that,

25                    "Rimini Street shall not distribute
```

1        PeopleSoft software or documentation or any

2        derivative works created from or with PeopleSoft

3        software or documentation."

4              And paragraph 5 similarly says --

5              THE COURT:  Okay.  Stop right there.

6              MS. SHINN:  All right.

7              THE COURT:  So you're construing derivative

8   works as including marketing material?

9              MS. SHINN:  If Rimini -- if Rimini is using

10  PeopleSoft documentation in the creation of derivative works

11  or -- in the next paragraph it refers to reproducing

12  PeopleSoft documentation, those would be violations of the

13  injunction.

14              THE COURT:  Right, but the argument the defense

15  is making is that marketing materials are not, you know,

16  prohibited, are not relevant.

17              MS. SHINN:  It's not the marketing materials

18  itself, it's the Oracle software and support materials that

19  they're either reproducing or preparing derivative works from

20  in the creation of those marketing materials.

21              So to the extent that they've used or copied

22  from or derived information from that PeopleSoft documentation

23  to put into those materials, that's where the violation would

24  lie.

25              THE COURT:  Okay.  All right, anything else?

1          MS. SHINN:  I would just mention that I did

2   mention the creation of documentation and support materials in

3   my opening earlier, and we do believe that this conduct does

4   fall within the ambit of the June 28th letter, and in the

5   deposition that just took place on Friday, I'll note that, we

6   did discuss PeopleSoft documentation in that deposition.

7          THE COURT:  Okay.  But that's not marketing

8   materials, is it?

9          MS. SHINN:  Rimini's use and possession and

10  reproduction of PeopleSoft documentation.

11         THE COURT:  To create marketing materials?

12         MS. SHINN:  It was not specific -- without

13  having the transcript in front of me, it was -- pertained to

14  Rimini employees e-mailing each other (inaudible).

15         THE COURT:  Note coming up there.  If you're

16  having trouble reading it and you want to go back and talk to

17  him, that's okay.

18         MS. SHINN:  If that would be --

19         THE COURT:  No, I've been there.  I've been

20  there.

21              (Discussion held off the record.)

22         MS. SHINN:  Thank you, your Honor.

23         The final point I'll make is that in the Supreme

24  Court case of *Stewart versus Abend*, derivative works don't

25  have a subject matter limitation.  The fact that these

1    marketing materials may be different from the PeopleSoft

2    documentation that may have been used to create them is of no

3    matter, that that's kind of a classic derivative work that

4    they've been turned into something else.

5                    THE COURT:  It would be derivative work.  So --

6    all right.

7                    Okay.  I'm going to grant the motion to compel

8    in part only to the extent that, you know, you can download

9    from the website any marketing materials you want, you can

10   already do that, but if you have a problem downloading them

11   because of the concerns raised here or really anything else,

12   as long as -- I'm talking about only the marketing materials,

13   not all the backup stuff but the marketing materials, the

14   defendant needs to take reasonable steps to cooperate so you

15   can get the marketing materials off the website, so granted to

16   that extent.

17                    Okay.  So now it's time for Ms. Smith.

18                    MS. SMITH:  Thank you, your Honor.

19                    Rimini objects to producing the draft Dev

20   Instructions first based on relevance and, second, based on an

21   assertion of the attorney-client privilege.

22                    So what are Dev Instructions?  The parties do

23   agree that Dev Instructions are a technical documentation, and

24   the Rimini engineers create those in order to allow other

25   developers to create the same fixes and updates for other

1    customers.

2                    THE COURT:  Are other developers within the

3    company, within Rimini?

4                    MS. SMITH:  Yes, yes.

5                    THE COURT:  Okay.

6                    MS. SMITH:  And Rimini admitted in its

7    opposition that it does view the Oracle code in the process of

8    creating these Dev Instructions, and that's important because

9    the injunction prohibits Rimini from using Oracle code for the

10   benefit of servicing multiple customers, and the Ninth Circuit

11   referred to that as cross-use, and I'm sure you're familiar

12   with that term.

13                   And the injunction also prohibits Rimini from

14   hosting Oracle code on its systems, and in an example that we

15   put into evidence in this motion, it's clear that at least in

16   that one example Rimini is including copies of Oracle code in

17   this Dev Instruction draft document, and it's instructing its

18   engineers to delete that Oracle code and replace it with a

19   Rimini code.

20                   And these are facts that are put in through the

21   declaration of Barbara Frederiksen-Cross that were undisputed,

22   and then in the final version of this Dev review document the

23   Oracle code is removed and there's some editorial changes made

24   to the technical documentation.

25                   And so the injunction does govern Rimini's

1    development processes, not just the final documentation that's

2    used or sent to clients.

3              So Rimini's position that these draft Dev

4    Instructions are irrelevant really -- it ignores the terms of

5    the injunction that say that Rimini can't use Oracle's code or

6    use Oracle's code retained on its server for any purpose

7    including in developing these instructions.

8              THE COURT:  Okay.  So then you want all of the

9    drafts of the Dev --

10             MS. SMITH:  Yes, your Honor, because essentially

11   it's a -- it's a -- it's evidence of how they developed the

12   instruction, yes.

13             THE COURT:  Okay.  All right.

14             MS. SMITH:  And their second argument in

15   objecting to the production is attorney-client privilege.

16             THE COURT:  Right.

17             MS. SMITH:  Now, Rimini asserts a blanket

18   privilege objection.  There's no privilege log, they didn't

19   redact these documents and log them.  Their position is that

20   all of these drafts are put, since around June of 2019, into a

21   folder labeled For Legal Review, but all of those drafts are

22   privileged, and they support that by just the fact that

23   they're in this folder as well as an attorney declaration that

24   says that the in-house attorneys may review and may provide --

25   I'm sorry strike that.

1           The attorney declaration says that the in-house

2  attorneys may provide comments and may ask questions about the

3  draft Dev Instructions.

4           THE COURT:  Okay.

5           MS. SMITH:  There's no specific showing by the

6  lawyer that each and every document that they're withholding

7  does contain attorney-client communications.

8           They don't make a showing at all that the

9  primary or predominant purpose for creating the document was

10  for legal advice.  In fact, the evidence that we put in

11  through our expert, Barbara Frederiksen-Cross, indicates that

12  previously they put these same draft Dev Instructions in a

13  folder titled Individual Updates.

14           So on or about June of '19, they stopped calling

15  that folder that housed the drafts as Individual Updates and

16  they changed it to For Legal Review.

17           So part of their position is that by virtue of

18  putting them in there, they've become privileged because the

19  lawyers look at them, but that ignores the standard here which

20  they haven't even attempted to show.

21           They do admit that these drafts are used by the

22  engineers, they have a business purpose, and they think that

23  that's really undisputed in the record.

24           I think, your Honor, just based on the fact that

25  there's been no individual showing, no privilege log as each

1    of the documents could order that they be produced, but I

2    think also, if you look at the documents, and we have examples

3    in Exhibits 1 and 2, and Exhibit 3 to Barbara

4    Frederickson-Cross's declaration is a comparison of Exhibits 1

5    and 2, and those are the drafts and finals of these Dev

6    Instructions.

7                THE COURT:  Hold on a minute.  This would be --

8    is this in your motion?

9                MS. SMITH:  In the motion.

10                THE COURT:  Okay.  So it would be 1290, and then

11    which -- 1290 dash what?  I hope you have the document number.

12                MS. SMITH:  Let's see if I have.  I hope it's

13    the first one, the Frederiksen --

14                THE COURT:  Declaration of Barbara Ann

15    Frederiksen-Cross, that's dash one, right, 6-page declaration?

16                MS. SMITH:  Yes, that is it.

17                THE COURT:  And then there are exhibits attached

18    to it.

19                MS. SMITH:  Yes.  Exhibit 1 --

20                THE COURT:  Exhibit 1.  Okay.  Exhibit 1 would

21    be attachment 2 on the docket, and I'm looking at it now.  It

22    says Rimini documents Bates number RSI-1 -- RSI006953654, is

23    that the one we're talking about?

24                MS. SMITH:  Yes.

25                THE COURT:  Both filed under seal.  I thought I

1    was looking at the sealed.  Hold on.  I was looking at the

2    wrong one.

3              Okay.  Hold on a second.  All right.  Oh, my

4    gosh.  So this says create updates folder has been run for HCM

5    20075, is that the one you're talking about?

6              MS. SMITH:  Yes, and that is the final version

7    of this Dev Instruction.

8              THE COURT:  All right.

9              MS. SMITH:  Exhibit 2 --

10             THE COURT:  Okay.  Hang on.

11             MS. SMITH:  -- to her declaration is the draft

12   version, and Exhibit 3 is a comparison between the two so you

13   can see what changes were made.

14             THE COURT:  Okay.  So let me -- I'll pull up

15   Exhibit 3.

16             Okay.  This is -- just for the record is -- it's

17   document number 1294-4, I believe.  Hold on.  It covers up the

18   page.  Actually, 1294-4, yeah, so it starts out with Araxis

19   Merge File Comparison Report.

20             MS. SMITH:  Yes, and under Comparison Detail,

21   your Honor, I think is where you can see a side-by-side of

22   the --

23             THE COURT:  Comparative detail, number 5, okay.

24             MS. SMITH:  Yes, of the draft and the final.

25             I mean, the first thing to note is just the

1    highly technical nature of this document.  This is not the

2    type of document that a lawyer is really going to be able to

3    provide any legal advice regarding.

4              And all the cases cited by Rimini are really

5    inapposite because they're things like draft press releases or

6    draft 10-Ks that lawyers can provide comments and make

7    substantive edits about.

8              And I think there's no authority that this type

9    of technical specification for a softwear engineer, that the

10   changes made in the comparison are legal advice, and I think

11   they make zero showing that they are.

12             THE COURT:  Well, let me ask you this.  The

13   comparison detail doesn't label which one is the draft and

14   which one is the final.

15             MS. SMITH:  So I believe the declaration

16   includes that detail, and that the comparison on the left --

17             THE COURT:  Yeah.

18             MS. SMITH:  -- is the draft, and the comparison

19   on the right is the final that Rimini appears to argue has

20   been edited by its in-house counsel.

21             THE COURT:  Well, at least reviewed, right?  Are

22   they saying that these are actual edits by lawyers on here?

23             MS. SMITH:  It's unclear.  They argue in their

24   opposition that the edits that were made certainly are --

25   could be legal advice so it's a little bit unclear, and they

1    don't make a specific representation about this particular

2    document.

3              THE COURT:   Okay.   I'm going to leave this one

4    up.   Maybe I can talk about it with Mr. Vandevelde so we've --

5    is that it on the Dev Instructions?

6              MS. SMITH:   I have a couple of more points to

7    make your Honor, if that's okay.

8              THE COURT:   Sure.

9              MS. SMITH:   Okay.   One of the important points

10   in the Barbara Frederiksen-Cross report that is undisputed is

11   that she identifies in the draft that there is Oracle code in

12   the draft, and in the final that that's removed, and that was

13   undisputed.

14             So the larger context of this privilege argument

15   is that Rimini has developed a system to place these drafts in

16   a legal folder in a way that really attempts to hide what's

17   already been a violation of the injunction because they're not

18   allowed to use Oracle code in developing a Dev Instruction or

19   in their development process, and that just can't be.   You

20   can't use the attorney-client privilege to shield discovery

21   from a violation of the injunction.

22             And this is just the one example that we have

23   because it was produced to us, and we believe that, you know,

24   if allowed discovery, you know, the chances of there being

25   more, there's a high likelihood of that.

1            THE COURT:  How many Dev Instructions have been

2    produced?

3            MS. SMITH:  So they produced the drafts that

4    ended up, for some reason, going to clients, and I don't have

5    an exact number.  I think it's around a hundred.

6            So for those they produced drafts and finals,

7    and we can't always match those up, they haven't represented

8    how many they're withholding.  There's no privilege log --

9            THE COURT:  Okay.  Well, how many in the final

10   version that went to clients have you gotten roughly?

11           MS. SMITH:  I don't know, but I think a lot.

12           THE COURT:  Ten thousand?  No, I'm kidding.

13   Okay.

14           MS. SHINN:  No, your Honor.  We have received

15   approximately 500 copies of Dev Instructions.

16           THE COURT:  Five hundred.

17           MS. SHINN:  Although some of those are

18   duplicates it appears.

19           THE COURT:  And that also includes some of the

20   drafts that got sent to clients by mistake.

21           MS. SHINN:  Yes.

22           THE COURT:  Maybe by mistake, or got sent to

23   clients.  Okay.  I got that.

24           MS. SMITH:  Two more points, your Honor.

25           THE COURT:  All right.

1                    MS. SMITH:   The last one is that if you look at

2      the edits that were made to the final in the comparison,

3      they're not legal advice.

4                    THE COURT:   Okay.

5                    MS. SMITH:   They're not substantive edits we

6      would submit.

7                    And the final point I'll make is that virtually

8      all of Rimini's development processes with respect to Oracle

9      products implicate the injunction.

10                    And so if you -- if Oracle wins -- excuse me, if

11     Rimini wins in this argument that because they placed these

12     drafts if a review folder, even though they have this ongoing

13     business purpose, they'll be able to shield their entire

14     development process from discovery for compliance with the

15     injunction, and that is wholly inconsistent with all the case

16     law that requires an individualized showing with respect to

17     each communication that meets the elements that its primary

18     purpose is for legal advice that they're maintained

19     confidential, and it just hasn't been done here.

20                    THE COURT:   Got it.

21                    MS. SMITH:   Thank you, your Honor.

22                    THE COURT:   Thank you, Ms. Smith.

23                    Mr. Vandevelde.

24                    MR. VANDEVELDE:   So, I want to be crystal clear

25     on what we've produced just so that there's no confusion.

-44-

1          We have produced and we are not claiming

2   privilege over, nor are we claiming they're irrelevant, any

3   Dev Instruction that was approved by Rimini legal that came

4   out of this process.

5          THE COURT:  Okay.

6          MR. VANDEVELDE:  So, as Ms. Shinn said,

7   something around 500.  Maybe there's some duplicates though.

8          We are also not claiming privilege over any Dev

9   Instruction that was used with a client.  So this Dev

10  Instruction that your Honor was looking at that Ms. Smith was

11  referring to, it may be labeled draft, but we produced it

12  because it was sent to a client.

13         THE COURT:  Okay.

14         MR. VANDEVELDE:  The narrower situation that

15  we're dealing with in this motion are draft Dev Instructions

16  that have never come out of the legal process and have never

17  been sent to or used with a client.

18         THE COURT:  So even though -- so you're saying

19  these are -- in the process of apparently, you know, the

20  instruction gets drafted, it gets sent to this legal review

21  file, and if it came out of legal review --

22         MR. VANDEVELDE:  Oracle has it.

23         THE COURT:  -- Oracle has it.

24         MR. VANDEVELDE:  Yep.

25         THE COURT:  And they have -- they have the

45

1    drafts, too.

2                    MR. VANDEVELDE:  No, those are privileged.

3                    THE COURT:  Okay.

4                    MR. VANDEVELDE:  They have the final.  But if a

5    draft was sent, even if it didn't come out of final, if it was

6    sent to a client or used with a client, then we produced it.

7                    THE COURT:  Okay.

8                    MR. VANDEVELDE:  And that's why we have this

9    example that your Honor was looking at.

10                    This was one where we determined that even

11   though it was still labeled draft, it was sent to a client --

12                    THE COURT:  Right.

13                    MR. VANDEVELDE:  -- and so we produced it.

14                    THE COURT:  Right.

15                    MR. VANDEVELDE:  The only thing we're talking

16   about here is a set of draft instructions that have never come

17   out of the legal review process and have never been used or

18   transferred to a client.

19                    THE COURT:  Right, but there may be an

20   instruction that was derivative from that draft instruction?

21   That's what I'm trying to understand.  The term draft

22   instruction is kind of confusing me.

23                    So let's just suppose, you know, you have

24   customer A and you have customer B, and so two draft

25   instructions go into legal, one for A and one for B, both --

1    one of them goes through all the way through the process and

2    gets sent to customer A, but B, for some reason, it never

3    comes out.

4                All right.  So for A, have you produced

5    everything in the A stream?  Is that what you're telling me?

6                MR. VANDEVELDE:  Yeah, and I'm glad you asked

7    that question because it actually works a little bit

8    differently, right?

9                So imagine we have clients A, B and C.

10               THE COURT:  Right.

11               MR. VANDEVELDE:  And Rimini has determined that

12   there's a -- not a problem, but some issue that needs -- that

13   requires an update to be implemented in all three

14   environments, client A, client B, client C.

15               Now, those environments could be different, they

16   could have different versions of the softwear, they could have

17   different customizations.

18               THE COURT:  Okay.

19               MR. VANDEVELDE:  But when a Rimini developer

20   remotely connects to client A, and basically figures out how

21   to solve the problem for client A, a Dev Instruction, which is

22   kind of like guidance of how to solve that problem, can be

23   created.

24               Now, there's a -- Rimini has a policy and a

25   rule, don't include Oracle code in these draft Dev

1    Instructions, but certainly Rimini is allowed to learn, right?

2    Allowed to solve problems and remember how it solves the

3    problems.  So a Dev Instruction is essentially a

4    memorialization of how Rimini engineers solved the problem for

5    client A.

6                    THE COURT:  Okay.

7                    MR. VANDEVELDE:  Now, that Dev Instruction can

8    then be used -- it's Rimini's knowledge, it's their know-how,

9    it's their experience.  It can be used to solve the similar

10   problem for client B, maybe in a different way, but it is

11   guidance, right?

12                   THE COURT:  Right.

13                   MR. VANDEVELDE:  So in your example, there's not

14   a Dev Instruction for client A and then a Dev -- you know, a

15   separate one for client B.  There is a Dev Instruction that is

16   a memorialization of Rimini's know-how that is then used to

17   solve the same issue for multiple clients.

18                   THE COURT:  Okay.

19                   MR. VANDEVELDE:  And it does not contain Oracle

20   IP, that's the policy.  So --

21                   THE COURT:  Now, is the purpose of the attorney

22   check to make sure that the policy is being followed?  Is

23   that --

24                   MR. VANDEVELDE:  Yeah, that's part of the -- I

25   mean, look, Rimini has been (inaudible) with Oracle for ten

1    years.

2                    THE COURT:  Right.

3                    MR. VANDEVELDE:  There is -- almost ten years.

4    There is an injunction.  The legal review process was created

5    before discovery reopened in this case, if I have my timing

6    right.  The lawyer who reviews it is a senior counsel at

7    Rimini, she reads code, she has a technical background.

8                    THE COURT:  Right.

9                    MR. VANDEVELDE:  And she applies her technical

10   background plus her legal skills to analyze whether any of the

11   draft Dev Instructions placed in the For Legal Review folder

12   may implicate injunction issues.

13                    THE COURT:  Right.

14                    MR. VANDEVELDE:  This is the paradigmatic

15   example of someone, an engineer in this case, communicating

16   something to a counsel, Ms. Mendillo in this case, or any

17   other IP counsel at Rimini, who then provides legal advice

18   about whether it implicates any legal issues with respect to

19   the injunction or any other compliance issue.

20                    THE COURT:  Right.

21                    MR. VANDEVELDE:  I don't see this -- I mean,

22   just as a hypothetical, I mean, if I'm an executive at a

23   company, and some event has happened, and I e-mail my GC at

24   eleven o'clock at night and say, "We need to put out a

25   statement.  Here's a draft statement."  And it's about the

1    facts of that event and the company's take on that event, that

2    communication to the GC is privileged, I mean, there's no

3    dispute about that.

4            When a developer creates a draft Dev

5    Instruction, that is the communication.  It doesn't matter

6    that it's code, the communication is the provision of it to

7    counsel.  It's the reason why I'm going to counsel.

8            I'm going to counsel.  I'm going to Ms. Mendillo

9    or other counsel at Rimini and saying, "Please look at this

10   code and tell me your legal opinion about whether or not this

11   implicates injunction issues or other compliance issues."

12           This is the archetypical example of a client, in

13   this case a developer, seeking legal advice from counsel.

14           And this is not a situation -- I'm sure your

15   Honor is very aware of situations where sometimes there's a

16   gray area, is the counsel -- in-house counsel wearing a

17   business hat or their legal hat.  This is not that situation.

18   They're wearing their pure legal hat evaluating the draft Dev

19   Instruction for injunction compliance issues.

20           And I'll just finish by saying imagine if

21   developers could not consult with counsel about these issues,

22   I mean, think of the chilling effect.  I mean, they would kind

23   of operate in the dark.

24           We want to foster, and Rimini has a culture of

25   compliance and encourages its employees to ask questions of

         1    legal if there are any gray areas or questions they have.

         2                    This is the developers doing what they should be

         3    doing, what the policy behind the attorney-client privilege

         4    contemplates, right?  It's what it's designed for, that is the

         5    very purpose of the attorney-client privilege.

         6                    And, again, Oracle has all final Dev

         7    Instructions, and any Dev Instruction, even if labeled draft

         8    that was sent to a client, the only ones at issue are the ones

         9    that have gone into that process and have never come out.

        10                    THE COURT:  Never come out in that form.  They

        11    might have come out in a revised form --

        12                    MR. VANDEVELDE:  Exactly.

        13                    THE COURT:  -- where the lawyer might have said,

        14    "Wait, you're getting too close to the injunction here," or

        15    something, in theory.

        16                    MR. VANDEVELDE:  Exactly, exactly.  And that

        17    advice, whether provided in the context of the document or

        18    external conversations over the telephone or in person, that

        19    is legal advice.

        20                    And you want developers to be able to go to

        21    their lawyer and say, "Do you see any issues with this?  I

        22    know we're under an injunction, I'm not a lawyer, I don't

        23    understand the injunction as well as you do, please identify

        24    any legal issues you see."  That is what is happening here.

        25                    THE COURT:  So, really, that is your position,

1    you shouldn't have to produce them because it's privileged.

2                    MR. VANDEVELDE:  Yes.

3                    THE COURT:  That's the position.  I got it.  I

4    understand your position.

5                    MR. VANDEVELDE:  I'll just say, too, they're

6    also not relevant because they've never been sent or used with

7    a client, right, so they don't reflect what's

8    actually happened.

9                    THE COURT:  Okay.  So you view that relevance,

10   too, but it sounds like privilege is the main --

11                   MR. VANDEVELDE:  Yeah.

12                   THE COURT:  Okay.  Got it.

13                   MR. VANDEVELDE:  Thanks, your Honor.

14                   THE COURT:  Thank you.

15                   MS. SMITH:  The first thing I'd say, your Honor,

16   is that the injunction is not limited to development by

17   Rimini -- only development that was sent to clients.

18                   THE COURT:  Right.  But how does this work from

19   a practical point of view?  I mean, you know, this is an

20   organization, they send out all kinds of instructions, don't

21   look at code, don't do this, don't do that, you know, it's --

22   you know, but they want to set up a procedure to make sure at

23   the end of the day that they're not violating the injunction.

24                   They've got a lawyer whose job it is -- who

25   apparently is some kind of computer person who understands

1    code and is going to look through there and make sure that the

2    client -- that the defendant, your client, is not violating

3    the injunction.  Why isn't that attorney-client privilege?

4                    MS. SMITH:  Because at the point at which

5    they've showed the lawyer the draft Dev Instruction, the deed

6    has already been done.  They've already violated the

7    injunction because they admit, your Honor, that they're

8    looking at Oracle code.  They're viewing it to create the Dev

9    Instruction for the sole purpose of using it with other

10   customers, and that's cross-use.

11                   So what Mr. Vandevelde described as a

12   memorialization of the update with third parties, that's

13   cross-use.  That's prohibited.

14                   So putting the lawyer in the middle after the

15   junction has already been violated does not create a privilege

16   over those documents as to how they developed it, and I'll

17   tell you why, because in the original draft Dev Instruction,

18   if they put Oracle code in there, or they've used Oracle code

19   in there, and then in the final version they can still

20   maintain those instructions that use the Oracle code but they

21   sanitize it by hiding the evidence that they actually copied

22   Oracle code to do that.  And you can't use the privilege to

23   hide conduct that violates the injunction by putting the

24   lawyer in the middle.

25                   So the way to avoid this, if they got attorney

1    advice before they start drafting the Dev Instruction, can we

2    look at Oracle code while we're creating this instruction to

3    cross use it?  The advice must be no.

4              But that's not what we're talking about here.

5    We're talking about a business document that's always existed

6    that they've now just put in this middle folder, and they want

7    to claim privilege over it.

8              THE COURT:  So apparently you already have that

9    they're using Oracle code so what's the point?

10             MS. SMITH:  In one example, because we don't

11   have all of them.

12             THE COURT:  All right.

13             MS. SMITH:  So it's evidence that they're using

14   this legal process to hide violations of the injunction.

15             THE COURT:  Anything else?

16             MS. SMITH:  One more point, your Honor.

17             Mr. Vandevelde stated that the input by the

18   lawyers were pure legal advice.  We have no evidence of that.

19   The lawyer declaration doesn't say that.  There's no privilege

20   log.  There's no redactions.  We have no way to test that.

21   There's no evidence in the record of that.

22             So I would just submit that they failed to meet

23   their burden as the party asserting the privilege as to

24   particularized privilege as to each of the documents.

25             How many there are, we don't know, but they

1    haven't met their burden.

2                    THE COURT:  All right.  Okay.  Well, I don't

3    know, this is a little bit harder one.

4                    But it seems like to me, you know, assuming

5    everything really from your point of view, from Oracle's point

6    of view, that what Rimini is doing is taking steps to comply

7    with the injunction, and they're using lawyers to do that, and

8    it seems that if I were to order they've got to produce all

9    that now, that that's -- I don't know, it just doesn't seem

10   right to me.

11                   You can make a record if you want in a minute.

12   Let me finish ruling, okay?

13                   So I find that the claim of attorney-client

14   privilege in this set circumstance where there's a draft of a

15   Dev Instruction to deal with a situation, and that they have

16   taken an extra step to make sure they're not violating the

17   injunction when they go ahead and send it off to the

18   customers, that that's an appropriate attorney-client

19   interaction.

20                   It is a communication to an attorney for advice.

21   And so those draft Dev Instructions, as long as they weren't

22   sent out to anybody beyond the copy, will not be produced.

23                   Now -- or what was I going to say?  You know, if

24   it -- you've got the one example, you know, you can argue from

25   that, but I just don't think it's appropriate -- you know, I

1    think it is appropriate to protect the attorney-client

2    privilege in this situation.  So the motion to compel the

3    draft Dev Instructions is denied.

4                    Okay.  Go ahead and make your record.

5                    MS. SMITH:  Your Honor, I just wanted to inquire

6    whether the Court would consider ordering Rimini to produce a

7    privilege log or redaction of the alleged privilege

8    communications so we can assess claim because right now it's

9    just --

10                   THE COURT:  No, I understand.

11                   MS. SMITH:  -- a blanket objection.

12                   THE COURT:  I'm glad you asked me that because

13   that's where I was going to go.

14                   No, because I think the point here is that when

15   the engineers send the draft to the lawyer, that whole thing

16   is -- that's the communication from the client to the attorney

17   to get legal advice.  So to me the whole draft is a privileged

18   communication, and, you know, it's part of the process so a

19   redaction doesn't make any sense.  I think that's what the

20   record establishes.

21                   Okay.  What have we got left here?

22                   MR. VANDEVELDE:  That's it from our perspective,

23   your Honor.

24                   THE COURT:  Was that it?  All righty.

25                   Okay, good.  So the next thing, I guess, is the

1    expert discovery.  Do we need to set -- the spoliation,

2    Mr. Pocker, you're saying there may be a spoliation motion

3    brought?  Shall we talk about the timing of that so we don't

4    hold things up or whatever?

5                   MR. POCKER:  I think it's premature to discuss

6    specific timing because, as the Court knows, it could come up

7    at the tail-end of the discovery period, or it could be

8    something that impacts the actual trial.

9                   THE COURT:  Right, and maybe that's something I

10   can just say, it might help to make things more efficient.

11                  You know, I get the spoliation motions, and, you

12   know, they're difficult for a magistrate judge because I'm not

13   going to be holding the hearing or the trial or whatever, and

14   it's really up to the presiding officer at the trial to decide

15   as the evidence comes in what's the appropriate, you know,

16   remedy, especially under these electronic -- you know, when

17   they revised the rule on that and they set up, you know, kind

18   of higher standards and then sort of a sliding scale of

19   remedies, very difficult, you know, in advance of the actual

20   hearing or trial for a magistrate judge to say what's

21   appropriate.

22                  And so you might want to just consider maybe --

23   I don't know if you're going to have any kind of conference

24   with Judge Hicks about, you know, witnesses and documents and

25   exhibits and whatnot.  You might just see if he would be

1    willing to take that spoliation motion.  If not, I will, of

2    course -- if you coerce me to do it, I'll do it, but I just

3    think it's a probably more efficient way to handle something

4    like that.

5            MR. POCKER:  Well, your Honor, the spoliation

6    issue earlier in this case --

7            THE COURT:  Right.

8            MR. POCKER:  -- was before Magistrate Judge

9    Leen, but, again, that was in the context of a jury trial so

10    the remedy is different.

11            THE COURT:  Maybe so, but, you know, and that

12    was probably well before the changes to the rule, too.

13            MR. POCKER:  Well, this case has been here a

14    long time.

15            THE COURT:  Yeah.  Because, you know, that's

16    very tempting when you get into it.

17            I had one where I -- actually, it was a jury

18    trial in front of me so it made it easier, and, you know,

19    there was a dispute about -- you know, because the phone

20    disappeared and the messages were on different AVI, and this

21    and that, and all these codes, and at the end the day it just

22    seemed better -- I said, you know what, we'll let the jury

23    decide if somebody monkeyed with the voice recording or not,

24    and, guess what, the voice recordings didn't come into

25    evidence so -- you know, that's kind of -- I think a pretty

1   smart thing that the rules people did to try and, you know,

2   not foreclose the actual trier of fact from getting into those

3   issues if it makes sense.  Sometimes it does.

4                    Anyway.  Okay.  Thank you very much.

5                    MR. POCKER:  Thank you, your Honor.

6                    MS. SHINN:  Thank you, your Honor.

7                              -o0o-

8

9            I certify that the foregoing is a correct
             transcript from the record of proceedings
10           in the above-entitled matter.

11           /s/Margaret E. Griener          2/10/2020
              Margaret E. Griener, CCR #3, FCRR
12            Official Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25