# EXHIBIT B

Excerpts from
Rebuttal Expert Report of
Professor Owen Astrachan,
served March 13, 2020

**PUBLIC REDACTED VERSION**

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

ORACLE USA, INC., et al.,

                Plaintiffs,

     v.

RIMINI STREET, INC., et al.,

                Defendants.

Case No. 2:10-cv-00106-LRH-VCF

# REBUTTAL EXPERT REPORT
# OF PROFESSOR OWEN ASTRACHAN

## March 13, 2020

Professor Owen Astrachan
Dated: March 13, 2020

# TABLE OF CONTENTS

Page

I. INTRODUCTION ............................................................................................ 1

II. EXPERT QUALIFICATIONS ........................................................................ 2

III. EXECUTIVE SUMMARY ............................................................................ 4

1. RIMINI'S PROCESS 2.0 IS FUNDAMENTALLY DIFFERENT FROM THE PROCESSES ADJUDICATED IN *RIMINI I* ............................................................................ 4

2. RIMINI'S PROCESSES DO NOT VIOLATE THE INJUNCTION ............................... 6

3. MS. FREDERIKSEN-CROSS'S OPINIONS ARE BASED ON A SERIES OF FUNDAMENTAL ERRORS ............................................................................................................ 9

IV. ASSUMPTIONS AND DEFINITIONS ....................................................... 14

1. "CROSS-USE" .......................................................................................... 14

    1.1 Examples of Conduct Ms. Frederiksen-Cross Considers "Cross-Use" .......... 17

    1.2 Ms. Frederiksen-Cross's "Cross-Use" Assumptions Are Inconsistent with Oracle's Positions Regarding That Term at Trial in *Rimini I* ....................... 21

    1.3 Ms. Frederiksen-Cross's Definition of "Cross-Use" Is Inconsistent with Other Evidence ............................................................................................ 23

    1.4 Ms. Frederiksen-Cross's Assumed Definition of "Cross-Use" Leads to Illogical Results ................................................................................. 24

    1.5 The Ninth Circuit's Discussion of "Cross-Use" ......................................... 26

    1.6 Reproducing, Distributing, or Creating Derivative Works of One Client's Software to Support That Client ....................................................... 28

2. DERIVATIVE WORKS .............................................................................. 28

3. COLOCATION SERVERS AND THE CLOUD ................................................ 30

4. LEGAL STANDARDS RELATING TO CIVIL CONTEMPT ............................. 31

V. OVERVIEW OF SOFTWARE SUPPORT AND RIMINI'S POST-INJUNCTION PROCESSES ..................................................................................................... 31

1. BACKGROUND REGARDING ERP SOFTWARE ......................................... 32

2. ENVIRONMENTS AND SOFTWARE SUPPORT ........................................... 34

3. RIMINI'S GENERAL SUPPORT PRACTICES AND SERVICES ..................... 36

    3.1 Remote Hosting and Access ..................................................................... 36

    3.2 Types of Rimini Support Services ............................................................ 37

        3.2.1 Break/Fix Support ....................................................................... 37

        3.2.2 TLR Updates ................................................................................ 38

4. RIMINI'S POST-INJUNCTION PEOPLESOFT SUPPORT PRACTICES ............. 38

    4.1 Overview of Process 2.0 PeopleSoft Processes ......................................... 39

    4.2 Process Changes Since *Rimini II* Close of Fact Discovery ....................... 42

5. RIMINI'S POST-INJUNCTION JD EDWARDS SUPPORT PRACTICES ............. 43

**TABLE OF CONTENTS**
(continued)

Page

VI. RIMINI'S PROCESS 2.0 IS FUNDAMENTALLY DIFFERENT FROM THE PROCESSES ADJUDICATED IN THIS CASE .................................................................................. 43

1. RIMINI'S PROCESS 1.0 .............................................................................. 43
2. RIMINI'S PROCESS 2.0 .............................................................................. 47
3. ORACLE'S CRITICISMS OF PROCESS 2.0 ARE ENTIRELY DIFFERENT FROM THE ISSUES LITIGATED ON SUMMARY JUDGMENT AND AT TRIAL IN *RIMINI I* ................................. 49

VII. THE CLIENTS' "OWN COMPUTER SYSTEMS" PROVISION ............................... 50

1. CLIENTS' CLOUD-HOSTED ENVIRONMENTS, INCLUDING WINDSTREAM, ARE THE CLIENTS' "OWN COMPUTER SYSTEMS" ...................................................... 50
2. ALLEGED ORACLE CODE OR DOCUMENTS ON RIMINI'S SYSTEMS ................ 58
   2.1 Dev Instructions .............................................................................. 58
   2.2 ███████████ .............................................................................. 63
   2.3 ███████████ .............................................................................. 66
   2.4 ███████████ .............................................................................. 67
   2.5 Supposed "Other" Examples of Oracle Intellectual Property on Rimini's Systems ............................................................................... 68
   2.6 Alleged PeopleSoft Documentation on Rimini's Systems ............... 71
   2.7 Alleged Copying of Updates Across Multiple Clients ..................... 71

VIII. ALLEGED PEOPLESOFT "CROSS-USE" ..................................................... 74

1. USE OF CODEANALYZER DOES NOT VIOLATE THE INJUNCTION ................... 74
   1.1 The Discontinuation of CodeAnalyzer Post-Injunction ................... 77
   1.2 Four Uses of the ███████████ Utility from November 5 to 9, 2018, Are Not "Cross-Use" ...................................................... 78
   1.3 Eight Uses of the Diff Process Between November 5 and 8, 2018, Are Not "Cross-Use" ............................................................ 79
   1.4 Rimini's Responses to Requests for Admission Are Correct ........... 80
2. USE OF THE AFW TRANSFERFILES TOOL IS NOT "CROSS-USE" ................... 81
3. USE OF RIMINI'S CREATEUPDATE TOOL IS NOT "CROSS-USE" ................... 82
4. RIMINI'S DEVELOPMENT MODEL, ███████ ██ ██████ DOES NOT VIOLATE THE INJUNCTION ............................................................... 84
5. RIMINI'S TEST PLANS AND TESTING OF CLIENT SOFTWARE ON CLIENT ENVIRONMENTS DO NOT VIOLATE THE INJUNCTION ...................................................... 88
6. ███████ .............................................................................................. 92
7. RIMINI'S USE OF CLIENT ENVIRONMENTS IS NOT "CROSS-USE" ................. 93
8. USE OF DEV INSTRUCTIONS IS NOT "CROSS-USE" ................................... 95
9. ALLEGED TRANSFER OF FILES THROUGH MEANS OTHER THAN TRANSFERFILES ....... 96

IX. ALLEGED JD EDWARDS "CROSS-USE" ...................................................... 96

**TABLE OF CONTENTS**
(continued)

Page

X. JD EDWARDS SOFTWARE SOURCE CODE ....................................................... 104

XI. ALLEGED "DISTRIBUTION" OF SOFTWARE............................................................ 106

    1.    ALLEGED ACTS OF DISTRIBUTION ............................................. 106

    2.    MS. FREDERIKSEN-CROSS'S OPINION THAT "UPDATES REMAIN AVAILABLE TO MULTIPLE RIMINI CUSTOMERS AFTER THEIR INITIAL DEVELOPMENT"..................... 108

XII. ALLEGED "OTHER" VIOLATIONS ................................................................. 109

    1.    ORACLE DATABASE ................................................................. 109

    2.    ALLEGED USE AND COPYING OF JD EDWARDS DOCUMENTATION ON RIMINI'S COMPUTERS ............................................................................ 109

XIII. MS. FREDERIKSEN-CROSS'S "CASE STUDIES" ....................................... 110

XIV. MS. FREDERIKSEN-CROSS'S OPINIONS REGARDING ALLEGEDLY DESTROYED RECORDS ARE MISLEADING AND WRONG .............................................. 114

    1.    MS. FREDERIKSEN-CROSS'S ASSERTIONS REGARDING ALLEGED "SYSTEMIC DELETION OF FILES" ARE MISLEADING ............................................. 114

    2.    RIMINI'S RECORD-KEEPING PRACTICES ................................. 118

### III.  EXECUTIVE SUMMARY

16.     I disagree with Ms. Frederiksen-Cross's opinions, which I believe are based on unfounded assumptions, fundamental errors, and misconstructions of the evidence, and are thus fundamentally unreliable.

**1.     RIMINI'S PROCESS 2.0 IS FUNDAMENTALLY DIFFERENT FROM THE PROCESSES ADJUDICATED IN *RIMINI I***

17.     By the end of July 2014, Rimini completed its transition to Process 2.0, which I analyzed extensively in my *Rimini II* reports.

18.     It is my opinion that Rimini's Process 2.0, which includes processes for PeopleSoft and JD Edwards, is fundamentally different from the processes that were litigated and adjudicated in this matter (*i.e.*, "Process 1.0").

19.     The following table identifies these fundamental differences:

| Process 1.0 (pre-July 2014) | Process 2.0 (post-July 2014 to present) |
| --- | --- |
| • Clients' Oracle software development environments were located on Rimini's systems (*i.e.*, they were "locally hosted" by Rimini); <br><br> • Clients' Oracle software could be intermixed rather than kept separate for each client; <br><br> • Rimini cloned Oracle software environments of Client A to give to Client B (where Client B also had a license for such software); <br><br> • Rimini created and used generic Oracle development environments, not tied to any particular client, to develop updates (often in the form of Oracle modified files and therefore containing Oracle code) that Rimini would then send to multiple clients—conduct which Oracle called "cross-use." | • Every client has its own separate licensed Oracle software environments; <br><br> • Each client's environments are located on that client's computer systems, which that client controls; <br><br> • There are no Oracle software environments on Rimini's systems; <br><br> • Oracle software is not permitted on Rimini's systems; <br><br> • To provide support for a particular client, Rimini remotely accesses each client's separate software environments and implements updates and other fixes using that client's Oracle software to support that particular client; <br><br> • Files containing Oracle code are not transferred from one client to another, or from clients to Rimini. |

20.     These fundamental differences are depicted in the graphic below:





21.     Although Rimini has made certain other changes to its processes following the Injunction, which are described further below, the Process 2.0 model remains unchanged.

- Rimini cannot reproduce, prepare derivative works from, or distribute PeopleSoft, JD Edwards, or Siebel software or documentation "unless solely in connection with work for a specific customer" that holds a valid license from Oracle;[6]

- Rimini cannot reproduce, prepare derivative works from, or use a specific PeopleSoft licensee's software "other than to support the specific licensee's own internal data processing operations";[7] and

- Rimini cannot "reproduce, prepare derivative works from, or use a specific licensee's PeopleSoft or JD Edwards software "to support, troubleshoot, or perform development or testing for any other licensee, including, specifically, that Rimini Street shall not use a specific licensee's [PeopleSoft or JD Edwards] environment to develop or test software updates or modifications for the benefit of any other licensee."[8]

26. These Injunction prohibitions address the conduct at issue in the trial phase of *Rimini I*, in which Rimini (1) cloned environments from Client A to give to Client B, thus using Client A's software not for Client A's own data processing operations, but for the benefit of Client B, and (2) used generic environments, not segregated by client, to create files containing Oracle software that would be sent to multiple clients, thus reproducing and preparing derivative works from Oracle software not "solely in connection with work for a specific customer" and for the benefit of many clients, not the client whose Oracle software was being used.

27. In my opinion, Process 2.0 complies with these prohibitions. Under Process 2.0, Rimini remotely connects to each client's separate software environment on the client's own computer systems and implements the client's update in that particular client's environment for the benefit of that client. Oracle software is not transferred from one client to another, nor from a client to Rimini's systems. When Rimini remotely connects to Client A's environment to work

6 Injunction ¶ 2a.

7 *Id.* ¶ 4.

8 *Id.* ¶¶ 6, 10.

with Client A's software, Rimini uses Client A's software to create software updates or fixes, in Client A's environment "solely in connection with work for" Client A, to support Client A's "own internal data processing operations" for the benefit of Client A.[9]  Unlike Process 1.0, Rimini no longer has generic environments that are used to create update files containing Oracle software to send to multiple clients—instead, each Client has a separate environment and that client's Oracle software does not leave that environment.

28.     Ms. Frederiksen-Cross's opinions regarding so-called "cross-use" are not based on how that term was used in the trial phase of *Rimini I*.  Instead, she has adopted a new definition of that term, as she did in *Rimini II*.  Her opinions in this post-trial *Rimini I* proceeding are premised on an assumed definition of "cross-use" that would preclude engineers from using their own experience and know-how in performing their work.  For example, in *Rimini II*, Ms. Frederiksen-Cross testified that based on the definition of the term "cross-use" she was told to assume, if an Information Technology employee worked at Company A in PeopleSoft support and learned how to fix a particular bug, and then later that employee switched jobs to Company B and encountered the same bug, it would be "cross-use" for the employee to use her prior knowledge to fix the bug for her new employer.[10]  This is so because, Ms. Frederiksen-Cross contends, the employee's previous use of Company A's software now "benefits" Company B.  Specifically in her Post-Injunction Report, Ms. Frederiksen-Cross applies this new definition of "cross-use" (the same one she was given in *Rimini II*) to opine that if Rimini implements an update for Client A in Client A's environment using Client A's software and then separately implements an update for Client B in Client B's environment using Client B's software, but performs Client B's update more quickly because Rimini has already solved the problem once, this is supposedly using Client A's environment "for the benefit of" multiple clients.[11]  Similarly, applying this expanded definition of "cross-use," Ms. Frederiksen-Cross opines that if Rimini tests an update for Client A in Client A's environment and then performs a shorter test of Client B's update for Client B in Client B's environment—because Rimini knows from

---

[9]  *Id.* ¶ 4.

[10]  Deposition of Barbara Frederiksen-Cross, Sept. 19, 2018, pp. 233–34.

[11]  *See*, for example, Frederiksen-Cross Post-Injunction Rpt., ¶¶ 232, 240, 300.

Client A's test that the update is likely to work—this is "cross-use" because Rimini was able to "leverage" its knowledge from Client A in testing for Client B.[12]

29.     This new and different definition of "cross-use" is directly at odds with the testimony of Oracle's own expert witness in *Rimini I*, , industry practice, and common sense.  I also find no support for this expanded definition in the Injunction itself.  Because, under Rimini's Process 2.0 (and thus post-Injunction) processes, all development and testing of any specific client's updates occurs within that specific client's software environment on that specific client's own computer systems, to support that specific client, it is my opinion that those processes do not constitute so-called "cross-use."

### 3.   MS. FREDERIKSEN-CROSS'S OPINIONS ARE BASED ON A SERIES OF FUNDAMENTAL ERRORS

30.     Ms. Frederiksen-Cross's opinions are based on a series of fundamental errors that are repeated throughout her report.  I summarize and categorize them below:

31.     ***Fundamental Error #1:  Accusing Copying of Files with No Oracle IP.***  Ms. Frederiksen-Cross repeatedly describes alleged "copying" that does not involve any Oracle copyrighted software or documentation.  For example, she accuses copying of files containing exclusively Rimini-written code,[13] Rimini-created documents that do not contain any code,[14] ████████████████████████████████████████████.[15]  The Injunction applies to certain *Oracle* software.  As I understand it, copying of files that do not contain Oracle intellectual property does not violate the Injunction.[16]

---

[12]   *See*, for example, *id.* ¶¶ 272, 277.

[13]   *See*, for example, *id.* ¶¶ 132, 150, 155, 157–60, 218, 227, 274, 280, 282, 302, 304, 338.

[14]   *See*, for example, *id.* ¶¶ 326, 329.

[15]   *See*, for example, *id.*  ¶ 274.

[16]   *See*, for example, Injunction ¶¶ 2 (applying to reproducing, preparing derivative works from, or distributing certain <u>Oracle</u> software or documentation),  6–10 (certain prohibitions on copying, distribution and use of <u>PeopleSoft</u> software), 7–10 (certain prohibitions on copying, distribution and use of <u>JD Edwards</u> software).

32.     For example, Ms. Frederiksen-Cross contends that Rimini ████████ ████████████████████████████████████████████████ ████████████████████████.[17]



33.     Rimini's ████████████████████████████ is not copying of Oracle "software or documentation" and is not implicated by the Injunction.

34.     As another example, Ms. Frederiksen-Cross opines that "substantial amounts of source code has been copied into [Rimini documents]…" without pointing out the critical fact that the code she is referring to is *Rimini* code, not Oracle code.[18]  Ms. Frederiksen-Cross's repeated discussion of supposedly "copied" code, without pointing out that it is not Oracle code and not covered by the Injunction, is highly misleading.

35.     ***Fundamental Error #2: Accusing Copying Within a Single Client.***  Ms. Frederiksen-Cross repeatedly accuses so-called "copying" or transferring of Oracle files within a single client's environment or between environments owned by the *same* client.  Reproductions of a client's software files that stay within the same client's systems are not so-called "cross-use."  There is nothing improper about such use of a client's licensed files.  As I understand it, the Injunction prohibits using one client's software or documentation other than to support that specific client, but there is no prohibition against reproduction of the client's software to support that specific client.[19]

36.     For example, Ms. Frederiksen-Cross opines that Rimini delivered updates to its client ██████████ by ████████████████████████████████████████████

---

[17]   Frederiksen-Cross Post-Injunction Rpt., ¶ 204.

[18]   *Id.* ¶ 304.

[19]   *See,* for example, Injunction ¶¶ 4, 6.

████████████████████████████████.[20]  She contends this violates the Injunction, but what she neglects to state is that Rimini simply ████████████████████████████████████████████████████.  Nothing in the Injunction prohibits Rimini from providing its client with the client's own files, all within that client's systems.

37.     In a separate example, Ms. Frederiksen-Cross opines that files were "subsequently downloaded by third parties," when in fact the conduct she describes was simply a client accessing its own systems ████████████████████████████████████.[21]  Her analysis is thus highly misleading.

38.     ***Fundamental Error #3:  Referring to "Copying" When Two Files Are Modified Separately.***  Ms. Frederiksen-Cross repeatedly states that two files are "copied" when in fact they are not.  Clients with the same software, such as PeopleSoft or JD Edwards, often have files that are the same because those files come standard with such software.  If Rimini makes a change to Client A's file in Client A's environment and then separately makes the same change to Client B's file in Client B's environment, Rimini has *not* copied Client A's file to Client B.  Yet Ms. Frederiksen-Cross opines that in such a situation, she "would still reach the conclusion that such files were copied" from either Client A to Client B or vice versa.[22]  That is wrong.

39.     As another example, Ms. Frederiksen-Cross assumes that if two clients have similar files, "Rimini must have copied this derivative work PeopleSoft file on its own system, between its own system and a third party system, or between third party systems."[23]  That does not follow.  Many of Rimini's clients' files start out similar (*e.g.*, because they license the same version of PeopleSoft or JD Edwards).  If they are modified in similar ways, they would remain similar.  That does not imply copying of the entire file from one client to another.  Code and solutions may, understandably, be the same for more than one client.

---

[20]   Frederiksen-Cross Post-Injunction Rpt. ¶¶ 332–33.

[21]   *Id.* ¶ 183.

[22]   *Id.* ¶ 206.

[23]   *Id.* ¶ 205.

40.     ***Fundamental Error #4:  Referring to "Sending," "Providing," or
"Distributing" When Nothing is Transferred.***  Ms. Frederiksen-Cross repeatedly states that files
were "sent," "provided," or "distributed" to clients when in fact she is referring to Rimini
remotely connecting to a client's environment and modifying files in that environment.  For
example, she opines that a specific file on a client's system was "distributed" by Rimini,[24] thus
implying that Rimini had the file on its systems and sent it out to the client, when in fact there is
no evidence that anything of the sort occurred.  Rimini's process for modifying Oracle files is to
log in remotely to a client's software environment and modify the file within that environment.
Ms. Frederiksen-Cross does not refer to any evidence that this standard process was not followed
here—instead, she appears to be intentionally (and misleadingly) referring to Rimini's standard
process as a "distribution."  Similarly, she opines that ███████████████████████████

███████████████████████████████████████████████████████████

████████.[25]  But, again, Rimini's process is to independently modify each client's files in each
client's own separate environment, and she does not suggest that this process was not followed.
The use of "sent" or "distributed" to describe these situations, when nothing is sent or
distributed, is misleading.

41.     ***Fundamental Error #5:  Accusing the Use of Knowledge and Know-How.***
Under her expanded definition of "cross-use" that she was asked to assume, Ms. Frederiksen-
Cross opines that anyone who gains knowledge when working for Client A using Client A's
software cannot use that knowledge when working for Client B using Client B's software—even
if each client's software is kept separate and no Oracle files or documentation are copied
between clients.  For example, she testified in *Rimini II* that under her assumed definition of
"cross-use," it is "cross-use" if a developer uses "the specific *knowledge* of what needs to be
updated, how it needs to be updated, how it needs to be tested" that the developer learned from
working on Client A's software when working for a subsequent client.[26]  This understanding of
Ms. Frederiksen-Cross's is not based on anything in the Injunction, and is inconsistent with the
testimony of Oracle's own expert witness in *Rimini I*, Oracle's approval of other third-party

---

[24]   *Id.* ¶ 181.

[25]   *Id.* ¶ 40.

[26]   Deposition of Barbara Frederiksen-Cross, Sept. 19, 2018, pp. 143–44 (emphasis added).

support processes, the testimony of Oracle's head of licensing, and industry practice, as explained below.  Under Ms. Frederiksen-Cross's definition of "cross-use" that she was told to assume, it is impossible for a developer to ever fix the same problem for two clients.  Indeed, she was asked at her deposition in *Rimini II* how it would be possible to provide support to two clients, and she was unable to provide an answer.[27]

42.     ***Fundamental Error #6:  Misrepresentation of Derivative Works.***  Another pervasive error Ms. Frederiksen-Cross makes is misapplying the definition of "derivative works."  As I understand it, to be a derivative work, a work must substantially incorporate protected material from a preexisting work.  Ms. Frederiksen-Cross deviates from that definition and opines that any Rimini-written work that "extends existing Oracle software"[28] or that is designed to "interoperate with Oracle's software"[29] is a derivative work.  This leads her to the erroneous conclusion that software written by Rimini, which contains no Oracle code or intellectual property and therefore does not "substantially incorporate" any Oracle work, is nevertheless proscribed by the Injunction.

43.     In addition, she misapplies the definition of "derivative works" by conflating the difference between a Rimini-created modification standing alone (not a derivative work) with an Oracle environment that has had Rimini's modification applied to it (a derivative work).  Rimini-created code, or a Rimini-created program, *before it is combined with Oracle software*, is *not* a derivative work of Oracle software because it does not substantially incorporate any *Oracle* software.  When the Rimini-created code is applied to a client's Oracle software environment on the client's computer systems, that entire modified environment (containing Oracle code and, now, Rimini code) *is* a derivative work because it substantially incorporates Oracle software (*i.e.*, the software originally on the environment).  However, those modified environments—the derivative works—exist only on the client's computer systems for use with that client, and therefore do not violate any Injunction provision or Oracle license agreement.  At times, Ms. Frederiksen-Cross refers to a Rimini "update," or a Rimini "modification," as a "derivative

---

[27]   *Id.* at pp. 213, 216.  Ms. Frederiksen-Cross suggested that such an engineer should "go and confer with counsel and find out what the legal answer is."

[28]   Frederiksen-Cross Post-Injunction Rpt., ¶ 102.

[29]   *Id.* ¶ 333.

work," but that language is imprecise and incorrect because the update/modification standing alone is not a derivative work.

44.     ***Fundamental Error #7:  Misrepresenting Injunction Prohibitions.***  The Injunction contains a restriction on the location of PeopleSoft software and documentation; such software must be used only on the "client's own computer systems."[30]  There is no such restriction for JD Edwards software.  Yet Ms. Frederiksen-Cross alleges that Rimini had a small number of JD Edwards files on its systems, as though this alleged fact (if true) would have any significance.  For example, she alleges that Rimini had an "Oracle file[]" on its system, implying that this is a violation of the Injunction, but she fails to mention that the file is a JD Edwards file.[31]  In another example, she opines that screenshots of public JD Edwards documents saved to one Rimini employee's electronic notes constitute "another violation of the injunction."[32]

## IV.  ASSUMPTIONS AND DEFINITIONS

45.     In addition to the fundamental errors discussed above, Ms. Frederiksen-Cross's opinions are also a result of numerous unfounded assumptions.  I do not agree with several of these assumptions and find them to be unsupported, illogical, and inconsistent with other facts of the case.  Below I discuss the problems with Ms. Frederiksen-Cross's assumptions, as well as the assumptions and understandings I use for my analysis.

## 1.     "CROSS-USE"

46.     Ms. Frederiksen-Cross's opinions regarding Rimini's technical processes are based on her assumed understanding of the term "cross-use."  ███████████████████ ███████████████████████████████████████████████████████████.[33]  I understand that the term "cross-use" was specifically created by Oracle for use in litigation. Oracle uses the term to refer to conduct that Oracle believes violates restrictions in its license agreements requiring licensees to use the licensed software for their internal business purposes.

---

30   Injunction ¶ 5.

31   Frederiksen-Cross Post-Injunction Rpt., ¶ 192.

32   *Id.* ¶ 363.

33   Deposition of Richard Allison, Mar. 28, 2018, pp. 86–87.

47. As she did in *Rimini II*, and unlike the type of "cross-use" Oracle described during the trial phase of *Rimini I* (*i.e.*, copying environments of one client to give to another, or using "generic" environments to develop Oracle derivative works that were sent to multiple clients), Ms. Frederiksen-Cross adopts a new and expansive view of "cross-use" that profoundly affects virtually every aspect of her opinions. She states that she uses the term "cross-use" to refer to the "reproduction, distribution, the creation of derivative works, or any other form of use of the licensed software or support materials for multiple customers."[34] She further states:

> I understand that any development or testing of an update to Oracle software with one customer's licensed Oracle software constitutes cross-use if the update is provided to another customer, and that such cross-use violates all relevant Oracle licenses.[35]

She also states:

> I understand that any reproduction of, distribution of, or creation of derivative works with one customer's licensed Oracle software constitutes cross-use if that reproduction, distribution, or creation of derivative works benefits another customer.[36]

48. It is important to understand the astonishing breadth of conduct that falls under this view of "cross-use," as Ms. Frederiksen-Cross is now defining and applying it. She first states that "cross-use" occurs where there is "any development or testing of an update to Oracle software" and "the update is provided to another customer."[37] To understand just how wide-ranging this is, I explain how Ms. Frederiksen-Cross is using the terms "update" and "provided."

49. The term "update" can have two meanings, one broad and one narrow. Used broadly, the term "update" describes a generic modification that addresses a particular tax, legal, or regulatory ("TLR") change. Under this broad definition, if 10 companies are affected by a change to a regulation and all require changes to their software to address that regulation change, one would say that all 10 clients received the same "update," even if the specific coding changes needed to address the TLR change are different for each client.

---

[34] Frederiksen-Cross Post-Injunction Rpt., ¶ 15.

[35] *Id.* ¶ 16.

[36] *Id.* ¶ 17.

[37] *Id.* ¶ 16.

50.     Used more narrowly, the term "update" refers to a *specific* implementation, *i.e.*, the particular coding change that a client receives to address a TLR change.  That is, if two clients are each affected by a TLR change, and each receives different coding, data, or configuration changes to address that TLR change, a person using the broad definition of "update" would say they received the same update; a person using the narrow definition would say they received two different updates to address the same issue.  In her assumed definition of "cross-use," Ms. Frederiksen-Cross is using "update" in the broader sense.

51.     Ms. Frederiksen-Cross also uses the term "provided" in her definition of "cross-use" to broadly include the separate implementation of updates to separate client environments, even where the implementation is not the same.  Normally one thinks of "provided" as meaning that the same file is *sent* to multiple clients, but Ms. Frederiksen-Cross uses the word much more broadly to include remotely connecting to an environment and making changes in that environment, when nothing is *sent* at all.  If one implementation of an update (in the broad sense) is coded for one client, and a different implementation of the update is coded separately for a different client, Ms. Frederiksen-Cross says that the update has been "provided" to both.  Ms. Frederiksen-Cross would say that two clients have been "provided" an update even where no file is given to both clients, and no file is moved or shared between clients.[38]  Indeed, she admitted at her deposition in *Rimini II* that her use of "providing" an update encompasses separately typing code into two different clients' environments.[39]

52.     When one combines the way in which Ms. Frederiksen-Cross uses the word "update" and the word "provide" in her assumed definition of "cross-use," her definition means that she assumes that "cross-use" occurs any time Rimini implements any solution to the same tax, regulatory, or other necessary change for more than one client.

53.     Ms. Frederiksen-Cross also states that she understands that "any reproduction of, distribution of, or creation of derivative works with one customer's licensed Oracle software constitutes cross-use if that reproduction, distribution, or creation of derivative works benefits

---

[38]  *See*, for example, *id.* ¶ 380; R2 Frederiksen-Cross Supp. Rpt., ¶¶ 382, 390–95, 722.

[39]  Deposition of Barbara Frederiksen-Cross, Sept. 19, 2018, p. 146; *see id.* at p. 165.

another customer."[40]  As applied by Ms. Frederiksen-Cross, this is a material deviation from the wording of the Court's Injunction, which states that "Rimini Street shall not use a specific licensee's PeopleSoft environment to develop or test software updates or modifications for the benefit of any other licensee."[41]  Among other things, the "for the benefit" language of the Injunction indicates a primary purpose of benefiting other licensees, whereas Ms. Frederiksen-Cross's reframed definition would find a violation whenever Client A's Oracle software is used to develop an update or modification for the benefit of Client A, but that development provides some ancillary benefit to Client B, including (according to Ms. Frederiksen-Cross) by Rimini simply gaining knowledge and experience from its earlier work.

### 1.1     Examples of Conduct Ms. Frederiksen-Cross Considers "Cross-Use"

54.     Under Ms. Frederiksen-Cross's assumed definition of "cross-use," it is largely irrelevant whether any Oracle code is shared or copied between clients.  She opines that "cross-use" occurs whenever a developer *gains knowledge* by solving a problem and implementing an update in Client A's environment if the developer uses that knowledge when he separately implements a similar update for Client B.  At her deposition in *Rimini II*, Ms. Frederiksen-Cross explained that her broad view of "cross-use" encompassed Rimini's use of its own know-how.

55.     Specifically, she opined that it is "cross-use" if a developer uses "the specific *knowledge* of what needs to be updated, how it needs to be updated, how it needs to be tested" that was learned from working on Client A's software when working for a subsequent client.[42]

56.     She opined that, under her understanding of "cross-use," if a developer works in Client A's environment and develops his own solution for an update and "determine[s] what the change needed to be and generally where it needed to be" and then "appl[ies] that *knowledge* in the second environment, then I would say yes, you're cross using that *knowledge* and the update itself."[43]

---

40   *Id.* ¶ 17 (emphasis added).

41   Injunction ¶ 6.

42   Deposition of Barbara Frederiksen-Cross, Sept. 19, 2018, pp. 143–44.

43   *Id.* at p. 151.

57.     Ms. Frederiksen-Cross was also asked about the following situation during her deposition in *Rimini II*.  Rimini creates an update for Client A that requires 10 lines of new Rimini-written code implemented on Client A's environment.  Six months later, Client B becomes a client, and Rimini, knowing how it previously solved the problem, implements the same 10 lines of code for Client B.  Ms. Frederiksen-Cross opined that this is "cross-use" under the definition of "cross-use" she was told to assume.[44]

58.     Her testimony regarding this situation also indicated that the definition of "cross-use" she was asked to assume means that whether any given reproduction of Oracle software is "cross-use" can change over time.  Assume that Rimini only has one client (Client A) that requires an update, and Rimini remotely connects to Client A's environment, figures out the update, and implements it for Client A.  That is not "cross-use" at that point, even under Ms. Frederiksen-Cross's assumed definition because the use of Client A's software is solely for the benefit of Client A.  Now assume that 6 months later, Rimini is hired by Client B.  Client B faces the same problem as Client A and requires the same update that Rimini implemented for Client A.  Ms. Frederiksen-Cross opined that if Rimini implements the update for Client B, using its prior knowledge of how to solve the problem, then that is "cross-use."[45]  Notably, the implementation of the update for Client B causes the use of Client A's environment *from six months earlier* to suddenly become "cross-use" because supposedly that use of Client A's environment was now supposedly "for the benefit of" both Client A and Client B.

59.     Ms. Frederiksen-Cross also assumes that testing an update on one client's environment is "cross-use" if Rimini uses its knowledge of whether the update passed or failed the test in one client's environment when working with a second client.  As Ms. Frederiksen-Cross testified: If Rimini "[r]uns a test in customer A's environment and uses the knowledge gained from that test to avoid having to retest in customer B's [environment, that] is cross-use of that first customer's environment.  They are using the *knowledge* resulting from that test to the benefit of customer B…"[46]  Her testimony was consistent with her Report in *Rimini II*, in which

---

[44]  *Id.* at p. 163.

[45]  *Id.* at pp. 163–64.

[46]  *Id.* at p. 186 (emphasis added).

she opined that "using the knowledge [Rimini] gains from conducting a longer test in an environment associated with one customer to reduce or completely eliminate testing efforts for other customers" is "cross-use," notwithstanding that no specific files are copied between or sent to multiple clients.[47]

60.     Ms. Frederiksen-Cross testified that if a developer "learned on customer A's environment what program needed to be changed and where the change needed to go in the program and what specifically he needed to change," making the same change for a second client is "cross-use" under her definition.[48]  Similarly, in response to a different question, she testified:

> So now I go to customer B, and they're having the same problem [that Rimini solved for customer A].  And I want to help them out.  And I go, "Oh, I know exactly what I did for customer A.  I remember, you know, I did all that testing to make sure my fix was going to fix everything and wasn't going to break anything after I applied it."  So, you know, maybe I spent two entire weeks on customer A just making sure this is the right fix.  Now I go to customer B, and I just go, "Oh, I know what that was.  I remember exactly.  I remember the exact line.  I remember the exact place in the code it needs to go.  I remember the exact way I need to insert it.  And I don't even need to test it because … 'this is the same thing.'"  Then you're benefitting from that.  You're benefitting from the work done on customer A's license over those few weeks when you make that change to customer B.[49]

61.     Ms. Frederiksen-Cross also provided testimony indicating that under her assumed definition of "cross-use," engineers could not share information with each other.  She was asked about the following situation:

> Let's say an engineer at Rimini working for client A figures out that a particular table, let's call it ["]state tax table["], needs to be changed in some way.  A different engineer implementing the same fix, the same update for Client B emails the first engineer and says, "Hey, do you know what table will need to be changed to implement this fix?"  And the engineer replies, "The state tax table."  Is that cross-use because the name of the table was referenced?

---

[47]   R2 Frederiksen-Cross Supp. Rpt., ¶ 217.

[48]   Deposition of Barbara Frederiksen-Cross, Sept. 19, 2018, p. 175.

[49]   *Id.* at p. 194.

She testified that it was "cross-use" because under her "understanding of – of what's prohibited in cross-use because the first customer's environment was used to create that knowledge, then the reuse of that creation in a second customer's environment, even for a comparatively simple fix, would be – constitute a form of cross-use."[50]

62.    Ms. Frederiksen-Cross also explained how her assumed definition of "cross-use" would apply outside the third-party support market, to IT professionals working at companies. She testified that if an IT professional working at Company A "gained knowledge of a specific solution strategy" or "a specific code problem" and "how that particular problem could be fixed or remedied," it would be "cross-use" if that employee later changed jobs to Company B, encountered the same problem, and attempted to fix it using the knowledge he learned while working at Company A.[51]

63.    Ms. Frederiksen-Cross opined that even if an update consists of changing one line of code, if Rimini changes that line of code for more than one client, that is "cross-use" under her definition.[52]  Specifically, she opined that, "if the development of that one line of [Rimini-developed] code relied on the use of customer A's environment to identify where the code should be – or identify what the line of code should be, identify where the line of code should be [in]serted or deleted, identify how to test the code, actually test the one line to make sure it was the right line to do in the right place and insert it in the right way.  You know, if any of that activity on behalf of customer A is then conveyed via the provision of that line of code, whether it's the line of code itself or a reduced testing time or – or any other benefit that … customer B is now getting that benefit without having its own license been used to achieve that benefit.  That's where the cross-use occurs."[53]

64.    In explaining this, she conceded: "*I can't think of an example as I sit here that would not be cross-use.*"[54]

---

[50]   Deposition of Barbara Frederiksen-Cross, Sept. 19, 2018, pp. 248–50.

[51]   *Id.* at pp. 233–34; *see also id.* pp. 223–30.

[52]   *Id.* at p. 171.

[53]   *Id.*

[54]   *Id.*

65.     On that point, she was asked a series of questions enquiring:  if reusing knowledge is prohibited, how can a developer who solved a problem for Client A ever solve the same problem when encountered with Client B or C?  She was not able to provide a way in which the developer could perform a subsequent update without violating the definition of "cross-use" she was told to assume.  She stated that "my solution would be to go and confer with counsel and find out what the legal answer is."[55]

66.     She applied the same assumed definition of "cross-use" in her Post-Injunction Report as she did in her prior *Rimini II* reports and deposition.  As a result, Ms. Frederiksen-Cross again opines that any time Rimini gains experience and know-how developing or testing an update for one client, any re-use of that know-how is "cross-use."[56]  This "cross-use" assumption drives the majority of her opinions.

### 1.2   Ms. Frederiksen-Cross's "Cross-Use" Assumptions Are Inconsistent with Oracle's Positions Regarding That Term at Trial in *Rimini I*

67.     I reviewed trial testimony from *Rimini I* to determine how Oracle interpreted the term "cross-use" at that time.  Oracle's technical expert at trial was Professor Randall Davis.  He testified regarding alleged "cross-use."  Ms. Frederiksen-Cross's assumed definition of the term "cross-use" in her Post-Injunction report is inconsistent with Professor Davis's testimony at trial.

68.     Professor Davis used the following illustration to describe what Oracle accused as "cross-use" in *Rimini I*:

> Imagine this software support person is using software that was created for Customer A, but he's using it to support Customer B because Customer B is on the phone.  That's what we mean by cross-use, using software created for one customer for another customer's benefit.[57]

---

[55]   Deposition of Barbara Frederiksen-Cross, Sept. 19, 2018, p. 213; *see id.* at p. 216 (similar).

[56]   For example, Frederiksen-Cross Post-Injunction Rpt., ¶¶ 204 (Rimini re-typing its own header information the same way across clients is supposed "cross-use"); 240 (one set of developers using Rimini knowledge gained by other developers during their work is alleged "cross-use"); 277 (attempts to "seek to reduce the testing [Rimini testers] have to perform" are "cross-use"); 294, 297 (alleging that when Rimini developer Michael Jacob implements an update for a second client faster than the first client, this is "cross-use").

[57]   Trial Tr., p. 192.

69.     In other words, Oracle accused as "cross-use" conduct that made use of Oracle software for Client A to provide support for Client B, not Client A—*e.g.*, where Rimini is "on the phone" solving a problem for Client B but using Client A's software to do so.  Ms. Frederiksen-Cross's definition of "cross-use" is now much broader, and includes any use of Client A's software that may provide any ancillary benefit to some other client, at any time.  For example, if a Rimini engineer was "on the phone" with Client A (not Client B) debugging an issue for Client A using Client A's software, Ms. Frederiksen-Cross would still call that "cross-use" if Client B someday received a similar fix or otherwise "benefit[ted]" from the knowledge Rimini gained in supporting Client A's software.

70.     Professor Davis also explained that he understood that copying, or "cloning," one client's environment to create a new environment for a different client (who is also licensed to the software) would constitute "cross-use":

> [S]ee how an environment for one customer was cloned to create an environment for another customer.  That's what we mean by cross-use.[58]

71.     Cloning Client A's environment to give the copy to Client B does not support Client A (the client whose software is being copied).  Professor Davis's example and related definition are thus much narrower than Ms. Frederiksen-Cross's assumptions regarding Oracle's term "cross-use"—under Ms. Frederiksen-Cross's assumption, even the use of Client A's software to support Client A could still be "cross-use" if it has some benefit to Client B.

72.     Professor Davis also stated at trial that, in his opinion, it would constitute "cross-use" to use a "single dev environment" created "for a particular client" to develop updates containing Oracle software that are then copied and sent to multiple clients.[59]  He explicitly distinguished this conduct (which he accused as "cross-use") from having a separate development environment for each client.

> Q.  And is [having a single development environment per PeopleSoft release] different than envisioning a dev environment for each custom client?

---

[58]  *Id.* at p. 195.

[59]  *Id.* at p. 204.

Case 2:10-cv-00106-LRH-VCF   Document 1324-2   Filed 04/02/20   Page 24 of 51
A.  Well, if you talk about an environment for each client, then you need one, to put it in slightly different terms, for every different customer and every different customer's environment, as opposed to one per version of the software.

So if one version of the software is used by 10 clients, and you only have one dev environment for the version of the software as opposed to one dev environment for every client who is using the software, you've saved yourself a lot of time, money, and effort.[60]

73.    Ms. Frederiksen-Cross, on the other hand, uses her expanded definition of Oracle's term "cross-use" to characterize the exact situation Professor Davis explicitly characterized as <u>not</u> involving impermissible "cross-use"—having "one dev environment for every client who is using the software."[61]

### 1.3    <u>Ms. Frederiksen-Cross's Definition of "Cross-Use" Is Inconsistent with Other Evidence</u>

74.    As I explained in my Rebuttal Expert Report in *Rimini II*, Ms. Frederiksen-Cross's assumed definition of "cross-use" is directly inconsistent with:

- [REDACTED]

- [REDACTED]

- [REDACTED]

---

[60]  *Id.* at pp. 204–05.

[61]  *Id.*

23

- Industry practice.

75.     My opinions in this regard are explained in detail in my Rebuttal Expert Report in *Rimini II*, and I incorporate those by reference.[62]

### 1.4     Ms. Frederiksen-Cross's Assumed Definition of "Cross-Use" Leads to Illogical Results

76.     Ms. Frederiksen-Cross's assumptions regarding "cross-use" lead to illogical results.  In addition, third-party support would be practically impossible, which is inconsistent with what I understand is Oracle's public position that third-party support is permitted.[63]  It is also inconsistent with the Ninth Circuit's statements that Rimini "provided third-party support for Oracle's enterprise software, in lawful competition with Oracle's direct maintenance services,"[64] and that "[i]t is undisputed that Rimini used Oracle's software to develop and test updates for its customers and that the software licenses, with certain restrictions, permitted Oracle's licensees to hire Rimini to perform such work for them."[65]

77.     Ms. Frederiksen-Cross's stated assumption that "any development or testing of an update to Oracle software with one customer's licensed Oracle software constitutes cross-use if the update is provided to another customer"[66] would preclude providing support to more than one company that encounters the same change to tax law and requires the same generic update.  For example, if two companies have employees in California, and California makes a change to its minimum wage, both companies are going to need an update to address that change.  But once the update is "develop[ed] or test[ed]" for the first client, under Ms. Frederiksen-Cross's opinion, it could not be "provided" to a second client.  Ms. Frederiksen-Cross's assumption would prohibit the same third-party support company from supporting both clients.

---

[62]   R2 Astrachan Rebuttal Rpt., ¶¶ 36–54.

[63]   Trial Tr., p. 961 (testimony of Oracle's CEO, Safra Catz).

[64]   *Rimini I*, 879 F.3d at 952.

[65]   *Id.* at 953.

[66]   Frederiksen-Cross Post-Injunction Rpt., ¶ 16.

78.     Ms. Frederiksen-Cross's assumption that any use of one client's licensed Oracle software constitutes "cross-use" if that use also later "benefits" another client, leads to a host of illogical and unreasonable results.

79.     First, it would effectively preclude Rimini from using its own knowledge and experience.  Under Ms. Frederiksen-Cross's assumption, as applied by her, a developer could never use any knowledge gained from working in one client's environment when later working in a different client's environment.  To avoid "benefitting" other clients, developers in Ms. Frederiksen-Cross's world would either have to only work for one client, or forget everything they learned from developing for one client before they develop for the second client.

80.     Second, it would require unnecessary and perhaps wasteful and pointless testing.  If a developer tests an update for one client and learns whether it works, Ms. Frederiksen-Cross opines that such testing "benefits" a second client that needs a similar update in the future, because the second client will require shorter testing given the knowledge gained from the first test.[67]  To avoid conferring a "benefit," under Ms. Frederiksen-Cross's assumption, the developer would either have to forget what she learned from testing, or waste client resources by re-testing despite already knowing the outcome.  Ms. Frederiksen-Cross admitted at her deposition in *Rimini II* that her assumed definition of "cross-use" would require retesting even if Rimini already knows the answer:  "I'm not sure there is a way you can do it without doing the full testing that would be acceptable under the license terms."[68]  She also stated that "you know, under – under my understanding of that, I would say that this may not be about common sense."[69]

---

[67]   Frederiksen-Cross Post-Injunction Rpt., ¶¶ 272, 277, 342–43; R2 Frederiksen-Cross Supp. Rpt., ¶ 217 (accusing as "cross-use," "using the knowledge [Rimini] gains from conducting a longer test in an environment associated with one customer" to reduce testing for other clients.).

[68]   Deposition of Barbara Frederiksen-Cross, Sept. 19, 2018, p. 204.

[69]   *Id.* at p. 200.

81.    Third, a developer could not communicate to other developers any know-how gained from work performed for one client because doing so would "benefit" other clients in that those other developers would become more proficient in their work.[70]

82.    Fourth, an IT professional that supported PeopleSoft software at one company could never change jobs to support PeopleSoft software at a different company; otherwise the second company would "benefit" from her use of PeopleSoft software at the first company.[71]

83.    Indeed, the only way to comply with Ms. Frederiksen-Cross's definition of "cross-use" that she was asked to assume would be to completely silo engineers such that they could never work for more than one client or communicate with any developer who performs work for a different client.[72]  Such a result would be illogical and at odds with standard software practices.  As discussed in my Rebuttal Report in *Rimini II*, it would also be inconsistent with industry practice, ███████████████████████████████████████████████████ ██████████ and its positions at trial.[73]

### 1.5    The Ninth Circuit's Discussion of "Cross-Use"

84.    Ms. Frederiksen-Cross opines that what she refers to as "cross-use" is "consistent with . . . the discussion in the Ninth Circuit briefing and decision."[74]  I am not a lawyer, but I read the Ninth Circuit's decision to see if it supported Ms. Frederiksen-Cross's assumption of "cross-use" (when she made this assumption the first time, in *Rimini II*).  I do not find any support for Ms. Frederiksen-Cross's assumptions regarding the term "cross-use" in the opinion issued by the United States Court of Appeals for the Ninth Circuit in *Rimini I*.

85.    The Court wrote:

---

[70]  *See*, for example, *id.* at pp. 248–50.

[71]  *Id.* at pp. 232–34.

[72]  At her deposition, Ms. Frederiksen-Cross was unable to identify any way that a single developer could provide an update to two clients without "cross-using."  *See id.* at p. 213; *see also* Section IV.1.1, above.

[73]  R2 Astrachan Rebuttal Rpt., ¶¶ 29–54.

[74]  Frederiksen-Cross Post-Injunction Rpt., ¶ 15.

> "Cross-use," generally speaking, is the creation of development environments, under color of a license of one customer, to support other customers. . . .  In its narrowest form, "cross-use" is the making of development environments, under color of a license held by one identifiable customer of Rimini, for another identifiable customer of Rimini that also holds a license.[75]

86.    Ms. Frederiksen-Cross does not mention this aspect of the Ninth Circuit's opinion.  It has no applicability because Ms. Frederiksen-Cross does not allege, either in her Post-Injunction Report in this matter or in her numerous reports in *Rimini II*, that Rimini created development environments under one client's license to be used for a different client, since moving to Process 2.0.

87.    The Court also wrote that "at the highest level of generality, Rimini's alleged copyright infringement included copying under the license of one customer for work for other existing customers or for unknown or future customers, rather than restricting such copying to work for that particular customer."[76]  It further stated that:

> [a]ny work that Rimini performs under color of a license held by a customer for other existing customers cannot be considered work in support of that particular customer.  The same logic applies to work Rimini performs for unknown, future customers.  The licensees may hire a third party such as Rimini to maintain their software, but nothing in the licenses permits them to grant a non-party to the license a general right to copy proprietary software.[77]

88.    I also understand that the Court did not address "cross-use" in the context of PeopleSoft.[78]

89.    The Court never stated that "cross-use" occurs when there is "any development or testing of an update to Oracle software" occurs and "the update is provided to another customer," as Ms. Frederiksen-Cross contends.  It also never stated that any copying, distribution, or use of one client's Oracle software is "cross-use" if it "benefits" another client at some point, as Ms. Frederiksen-Cross contends.  In fact, the word "benefit" does not appear in the Ninth Circuit's opinion.  Thus, in reviewing the Ninth Circuit's decision, in light of my knowledge of the facts

---

[75]  *Oracle USA, Inc. v. Rimini St., Inc.*, 879 F.3d 948, 956 (9th Cir. 2018) (emphasis omitted).

[76]  *Id.* at 953.

[77]  *Id.* at 957.

[78]  *Id.* at 960 n.6.

of Process 1.0, I disagree that it provides any support for Ms. Frederiksen-Cross's assumptions regarding "cross-use."

### 1.6 Reproducing, Distributing, or Creating Derivative Works of One Client's Software to Support That Client

90.     For all of the above reasons, I find Ms. Frederiksen-Cross's assumed definition of "cross-use" to be unsupported.

91.     Instead, for purposes of my analysis, I have followed the language of the Court's Injunction:

> 4.  Rimini Street shall not reproduce, prepare derivative works from, or use a specific licensee's PeopleSoft software or documentation other than to support the specific licensee's own internal data processing operations;[79]
>
> 6.  Rimini Street shall not reproduce, prepare derivative works from, or use PeopleSoft software or documentation on one licensee's computer systems to support, troubleshoot, or perform development or testing for any other licensee, including, specifically, that Rimini Street shall not use a specific licensee's PeopleSoft environment to develop or test software updates or modifications for the benefit of any other licensee;[80]

92.     In essence, I analyze whether the reproduction, distribution, or creation of derivative works of one client's protectable Oracle software, under color of that client's license, is for the purpose of supporting that particular client, or if it is for the purpose of supporting a different client.

## 2.   DERIVATIVE WORKS

93.     Ms. Frederiksen-Cross states that she understands that "Section 101 of the Copyright Act defines a 'derivative work' in relevant part as 'a work based upon one or more preexisting works, such as a translation . . . or any other form in which a work may be recast, transformed, or adapted.'"[81]  I also understand that is what Section 101 says.  I further understand

---

[79]   Injunction ¶ 4.

[80]   *Id.* ¶ 6.  The Injunction contains a similar paragraph relating to JD Edwards software.

[81]   Frederiksen-Cross Post-Injunction Rpt., ¶ 13.

that courts have stated that, "[t]he statutory language is hopelessly overbroad," and that courts have provided more specific guidance for what constitutes a derivative work in the software context.[82]

94.     I have been asked to assume that, in the software context, to be a "derivative work," a work must (1) "substantially incorporate protected material from the preexisting work," and (2) "exist in a concrete or permanent form."[83]

95.     At various places in her Post-Injunction Report, as well as in her *Rimini II* reports, Ms. Frederiksen-Cross opines that ███████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████. At her

deposition in *Rimini II*, she ███████████████████████████████

████████████████████████████████████████████████████

█████████████████████████"[86] I do not share Ms. Frederiksen-Cross's assumption

and apparent legal conclusion tha██████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

96.     It is important to understand the implications of the definition of "derivative work" in the context of a Rimini update to an Oracle software environment.  As explained throughout this report, Rimini may, in some cases, create its own code to fix a problem with Oracle software.  In general, Rimini-created code, or a Rimini-created program, *before it is*

---

[82] *Micro Star v. Formgen Inc.*, 154 F.3d 1107, 1110 (9th Cir. 1998).

[83] *Id.*; *Lewis Galoob Toys, Inc. v. Nintendo of Am., Inc.*, 964 F.2d 965, 969 (9th Cir. 1992) ("A derivative work must incorporate a protected work in some concrete or permanent form.").

[84] *See*, for example, R2 Frederiksen-Cross Supp. Rpt., ¶¶ 180, 695.

[85] *See*, for example, Frederiksen-Cross Post-Injunction Rpt., ¶ 210; R2 Frederiksen-Cross Supp. Rpt. ¶¶ 180, 382.

[86] Deposition of Barbara Frederiksen-Cross, Sept. 19, 2018, p. 101; *see id.* at pp. 104–05.

*combined with Oracle software*, is *not* a derivative work of Oracle software because it does not substantially incorporate any *Oracle* software.  When the Rimini-created code is applied to a client's Oracle software environment on the client's computer systems, that entire modified environment (containing Oracle code and, now, some Rimini code) *is* a derivative work because it substantially incorporates Oracle software (*i.e.*, the software originally on the environment).  However, that modified environment—the derivative work—exists only on the client's computer systems for use with that particular client, and therefore does not violate any Injunction provision or Oracle license agreements.  At times Ms. Frederiksen-Cross refers to a Rimini "update," or a Rimini "modification," as a "derivative work," and that language is incorrect because the update/modification, standing alone and not applied to an Oracle software environment is not a derivative work.[87]

### 3.     COLOCATION SERVERS AND THE CLOUD

97.     Ms. Frederiksen-Cross understands that "



"[88]

98.     Ms. Frederiksen-Cross focuses on the term "facilities"; I note that the Injunction does not contain the term "facilities."  Rather, the Injunction states that "Rimini Street shall not reproduce, prepare derivative works from, or use PeopleSoft software or documentation on, with, or to any computer systems other than a specific licensee's own computer systems."[89]  The key language is "computer systems," not "facilities."  It appears that Ms. Frederiksen-Cross's discussion of "facilities" is a holdover from her reports in *Rimini II*.

---

[87]   In some cases, Ms. Frederiksen-Cross states it correctly.  For example, in Paragraph 292 of her Post-Injunction Report, she states that "when Rimini applies an update to an Oracle software environment, the resulting modified copy of the Oracle application software is a derivative work."  That is correct and consistent with what I just explained—once Rimini's update/modification is applied to the client's Oracle software environment, the entire modified environment is a derivative work.

[88]   Frederiksen-Cross Post-Injunction Rpt., ¶ 14.

[89]   Injunction ¶ 5.

99.     Based on her testimony in *Rimini II*, it appears that ██████████████ ███████████████████████████████████████████████[90]  I understand that this is a disputed legal issue in *Rimini II*, and I discussed at length and provided opinions relevant to that issue in my reports in *Rimini II*.  Further, I understand that ███ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████.

## 4.     LEGAL STANDARDS RELATING TO CIVIL CONTEMPT

100.    I have been informed that for civil contempt of an injunction, a party must (1) violate a clear and definite court order, (2) the violation must be significant enough that it cannot be said that the defendant "substantially complied" with the order, and (3) the violation must not be based on a good faith and reasonable interpretation of the order.  With regard to the second element, "substantial compliance," I understand that perfect compliance is not required, and that minor noncompliance or technical noncompliance does not constitute a violation of an injunction necessary for civil contempt.

## V.  OVERVIEW OF SOFTWARE SUPPORT AND RIMINI'S POST-INJUNCTION PROCESSES

101.    Below I provide background regarding Enterprise Resource Planning ("ERP") software, the support of that software, and Rimini's support processes for supporting PeopleSoft and JD Edwards software.  I discussed Rimini's support processes extensively in my Opening and Rebuttal reports in *Rimini II*, and incorporate that discussion by reference.  As described below, Rimini's Process 2.0 (and thus post-Injunction) support processes for JD Edwards are substantially the same as the processes analyzed in my *Rimini II* reports, and Rimini's PeopleSoft support processes for PeopleSoft are mostly the same, with some minor differences (mostly the discontinuation of certain tools) discussed below.

102.    At a high level, Rimini's current processes for both PeopleSoft and JD Edwards software involve the following procedures.  All clients have their own software environments located on the clients' own computer systems, which could be in their physical buildings, at an

---

[90]  Deposition of Barbara Frederiksen-Cross, Sept. 19, 2018, pp. 253–54.

off-site location such as a data center, or in the clients' cloud accounts.  The clients' Oracle software is housed on the clients' environments.  Rimini supports each client's software by remotely connecting to the client's environment, located on the clients' own computer systems.  Rimini then performs modifications to the clients' software, tests that software, and does other work in the clients' systems to fix bugs or provide updates.  When multiple clients require an update to fix the same problem (*e.g.*, a tax change in North Carolina requires an update to be made for all clients doing business in North Carolina), Rimini implements the update for Client A in Client A's environment using Client A's software through a remote connection.  Rimini then implements the update for Client B in Client B's environment using Client B's software through a remote connection.  And so on.  Pursuant to Rimini's processes, files containing Oracle software are not copied or otherwise shared between clients.  There are no Oracle software environments on Rimini's systems; they are located on the clients' systems.  Pursuant to Rimini's policies, Rimini is prohibited from having any Oracle intellectual property on its own systems, and from sending any Oracle files or code to clients.  It does, in some circumstances, send code or files written by Rimini (*i.e.*, not containing any Oracle protectable expression) to its clients.

1. **BACKGROUND REGARDING ERP SOFTWARE**

103.    ERP software is enormously complex.  It typically requires a team of information technology ("IT") personnel within a company to maintain it, customize it to that company's specific needs, and fix problems as they arise.[91]  Most companies also retain support, either from the software vendor or a third party, to perform maintenance, fixes, and other tasks that IT staff cannot or do not have time to perform.  Fully integrating and implementing ERP software is an arduous process carried out over many years and can cost millions of dollars.[92]  Once ERP software is installed and configured, larger entities often hire IT staff whose entire job is to oversee development and maintenance of the software.[93]

---

[91]   https://searcherp.techtarget.com/feature/Know-your-ERP-requirements-before-buying; https://www.computerweekly.com/opinion/How-to-achieve-ERP-success-part-3-support-and-development.

[92]   https://www.computerworld.com/article/2508381/enterprise-applications/oracle-sued-by-university-for-alleged-erp-failure.html.

[93]   *See*, for example, https://www.indeed.com/q-Peoplesoft-Developer-jobs html.

104.     For most businesses, ERP software does not suit the business's needs (or function properly at all) when installed "out of the box" like typical software programs.[94]  Most businesses require, and some ERP software programs themselves require, the software to first be configured before it will work properly.  This requires the assistance of technical experts familiar with the various native tools housed within the software.  Those experts set up, among other things, the language, currency, time zone preferences, default email clients, data fields, security parameters, page layouts, and standard options, and otherwise map the software so that it can be fully integrated into an existing system environment.[95]

105.     In addition to complex configurations, a majority of businesses using ERP software further customize their software by writing custom code to increase the software's functionality and better integrate it into the business.[96]  This allows more tailoring than can be done with the software's native tools.[97]  Customizations to ERP software consist of additions or changes to the software code that allow the user to modify, enhance, or add features not included in the base software.[98]

106.     Recognizing that "out-of-the-box" ERP software typically does not meet specific business requirements, vendors anticipate that most users will further configure and customize the software, and those vendors provide specific tools and guidance on how to track, implement, or retrofit software customizations to the standard-issue software.[99]  Because Oracle recognizes

---

[94]  http://blog.lnsresearch.com/blog/bid/204226/Understanding-Out-of-the-Box-vs-Configured-vs-Customized-Software.

[95]  https://www.encorebusiness.com/blog/erp-customization-vs-configuration/; http://blog.lnsresearch.com/blog/bid/204226/Understanding-Out-of-the-Box-vs-Configured-vs-Customized-Software; https://www.clarity-ventures.com/articles/erp-configuration-vs-customization.

[96]  https://it.toolbox.com/blogs/erpdesk/configuration-vs-customization-in-erp-072913; https://www.panorama-consulting.com/takeaways-from-panoramas-2015-manufacturing-erp-report.

[97]  https://docs.oracle.com/cd/E52319_01/infoportal/configuration html; https://www.encorebusiness.com/blog/erp-customization-vs-configuration/.

[98]  https://www.clarity-ventures.com/articles/erp-configuration-vs-customization; https://docs.oracle.com/cd/E24705_01/doc.91/e56635/undrstnd_jdemobile_dev htm#EOTMD112; http://www.oracle.com/webfolder/technetwork/tutorials/jdedwards/OBE/ToolsandTech/CustomizationWorkbench/customization_workbench.html.

[99]  https://docs.oracle.com/cd/E17984_01/doc.898/e14719/custmods_packs.htm; https://docs.oracle.com/cd/E91187_01/pt855pbr2/eng/pt/tswu/task_UsingCustomizationRepository.html?pli=ul_d181e160_tswu;

the need to be able to update and customize its ERP software, its software includes specific applications and utilities for that purpose.  It also includes tools that enable users to develop and test certain configurations and customizations before implementing them into the live system.[100]

107.    Additionally, because the software is designed to be updated and customized, some Oracle ERP software (*e.g.*, PeopleSoft and JD Edwards) contains certain code files that are "open" and can be modified by the licensee or others acting on the licensee's behalf.  In other words, the software comes with fully editable code that licensees (or their support providers) are encouraged to edit to both keep the software up to date and to customize it to a business's needs.

## 2.    ENVIRONMENTS AND SOFTWARE SUPPORT

108.    Support for these ERP systems involves maintaining and updating this complex software and fixing any problems that arise.  For example, a customer may encounter problems with its software (stemming from anything from user error, to bugs in the software, to problems with customizations or configurations, to corrupt data, or a host of other things) that need troubleshooting and resolution.  This is referred to as "break/fix" support.  A "fix," in software parlance, is a technical solution to a problem, which could take the form of educating the user on proper operation of the software, changing configurations, modifying software code, or a variety of other things.  The software also may need "updates" to account for changes in laws or regulations that affect the software's calculations (*e.g.*, changes in tax rates).

109.    ERP Software licensees typically have multiple copies of the software—called "environments"—that serve different purposes.  Examples of different environments are

---

https://docs.oracle.com/cd/E24705_01/doc.91/e56635/undrstnd_jdemobile_dev htm#EOTMD112; http://education.oracle.com/pls/web_prod-plq-dad/ou_product_category.getFamilyPage?p_family_id=24; http://education.oracle.com/pls/web_prod-plq-dad/ou_product_category.getPage?p_cat_id=128; https://docs.oracle.com/cd/E91187_01/pt855pbr2/eng/pt/tgst/concept_PeopleToolsOverview.html?pli=ul_d25e2 3_tgst.

[100]  https://dsisys.com/peoplesoft-support/peopletools/; https://docs.oracle.com/cd/E91187_01/pt855pbr2/eng/pt/tsvt/task_SettingUpthePeopleToolsDevelopmentEnvir onment-07108d.html; https://blogs.oracle.com/peopletools/automated-configuration-management-in-peoplesoft; https://docs.oracle.com/cd/E87544_01/pt856pbr1/eng/pt/tsvt/task_StartingPeopleSoftConfigurationManager-071054.html; https://docs.oracle.com/cd/E41633_01/pt853pbh1/eng/pt/tgst/task_PeopleSoftConfiguration Manager-0767fe html; https://docs.oracle.com/cd/E24902_01/doc.91/e24417/config_jde_e1.htm#EOITT00004; https://docs.oracle.com/cd/E16582_01/doc.91/e15086/intro_to_e1_cfg.htm#EOABC00313.

production environments, development environments, and quality assurance or testing environments.

110.    The "live" version of the software that a business's users (*e.g.*, human resources department, general employees) use to perform day-to-day functions is known as the "production environment."  Because ERP software performs critical tasks across multiple locations, systems, and divisions of a business, it is important that all updates, configurations, customizations, and other changes to the system are tested and vetted *prior to* implementation into the production environment.  Otherwise, errors or bugs created during modification of the software could have severe consequences for the business, such as rendering the software unusable or causing the business to issue reports that are erroneous.[101]  Thus, most configurations, customizations, and updates are (and should be) developed within a separate environment, called a "development environment," often located on virtual machines, that contain copies of the software.[102]  For various reasons, a licensee may have more than one development environment.

111.    In a development environment, changes, fixes, and updates can be created and subsequently tested before being implemented into the production software environment.  Software engineers utilize development environments to make any desired or necessary changes to the software, to avoid any failures or disruptions that would otherwise occur while making these complex changes in a production environment.

112.    Licensees may also maintain a separate environment called a "quality assurance" ("QA") environment in which to test customizations, fixes, or other changes made to the software, again to avoid negatively affecting the production environment.  Thus, for example, fixes and updates may be developed in a development environment, transferred to a QA environment where they are tested, and then moved to the production environment to be rolled out into the live version of the software.

---

[101]   http://freebalance.com/public-financial-management/anatomy-of-an-erp-payroll-failure/.

[102]   https://docs.oracle.com/cd/E80738_01/pt854pbh2/eng/pt/tptf/concept_UnderstandingthePTFDevelopment Environment-427e2b html#topofpage; https://docs.oracle.com/cd/E91187_01/pt855pbr2/eng/pt/tsvt/task_ SettingUpthePeopleToolsDevelopmentEnvironment-07108d.html.

113.   The process of providing support inherently requires copying of software.  For example, copying occurs when the environments are created, when work is performed in the environment, and when files are modified as part of updates or fixes.  The Ninth Circuit recognized on appeal in *Rimini I* that "the very work of maintaining customized software requires copying the software."[103]  I understand that most copying is permitted by licenses, and that the Injunction sets forth the circumstances when copying is not permitted.

## 3.   RIMINI'S GENERAL SUPPORT PRACTICES AND SERVICES

### 3.1   Remote Hosting and Access

114.   Rimini's clients maintain development (and often QA) environments for their Oracle software in which modifications and updates to the software can be made without impacting production environments.  Under Process 2.0, all of Rimini's clients' Oracle software environments are located on the clients' computer systems, not on Rimini's computer systems.

115.   Rimini accesses these environments remotely



116.   Remotely accessing software environments, including Oracle software environments, is a common business practice for many enterprises.  I understand that Oracle does not contend that remotely accessing client environments to provide support violates its

---

[103]   *Rimini I*, 879 F.3d at 956.

[104]   R2 Astrachan Opening Rpt., ¶ 48.

[105]   *Id.*

license agreements.  I am aware that Richard Allison, Oracle's Senior Vice President of Global Practices and Risk Management, testified at trial in *Rimini I* that it is permissible for "a third party to dial in remotely to the customer's facility and access and use the software that way."[106]

117.    Rimini has a policy, in place since at least the transition to Process 2.0 in July 2014, that there can be no Oracle software, code, or other intellectual property on its systems.

### 3.2    **Types of Rimini Support Services**

118.    For purposes of this report, Rimini's support processes under Process 2.0 for clients using the relevant Oracle software products can generally be broken down into two categories: (1) break/fix support; and (2) tax, legal, and regulatory ("TLR") updates.  Below, I provide a general description of each.

#### 3.2.1    **Break/Fix Support**

119.    Break/fix support simply means that the client perceives that something with its software is broken and needs to be fixed—it is akin, in a general sense (though vastly more sophisticated), to the technical support, sometimes called "IT helpdesk support," generally available within any large organization.  Clients that have encountered problems using their software request support directly from their assigned Rimini engineers, through a hotline, or through a computer system in which they can submit a support request "ticket."  Rimini engineers triage these requests and work with clients to troubleshoot and resolve issues.[107]

120.    The root causes of these issues vary widely, ranging from situations in which the client is using the software incorrectly and needs to be educated, to simple data-entry errors, to bugs in code, to interoperability issues with Oracle code, client customized code, and/or other third-party vendor code.  The work Rimini may need to do to resolve a problem can also vary widely.  In most instances, a Rimini engineer can troubleshoot the problem by observing a client replicate the problem via a shared screen, and offering advice.  In some instances, after identifying the problem, Rimini may have to take further action, such as writing a custom script or making modifications to the client's software environment.  A script is a set of instructions

---

[106]   Trial Tr., pp. 839, 846.

[107]   *See* R2 Astrachan Opening Rpt., ¶¶ 53–55.

that can be read by a computer to perform the instructions. Scripts can be written in a simple text editor such as Notepad. Break/fix support is provided on an ad-hoc, as-needed basis when the client encounters a problem.

121.    The allegations made by Oracle's experts, both in *Rimini II* and in this post-trial proceeding, have not focused on break/fix support and barely discuss it. The focus is on Rimini's TLR support.

### 3.2.2    TLR Updates

122.    PeopleSoft and JD Edwards contain applications that relate to human resources, payroll, or financial software for managing an enterprise. These applications make various calculations that depend on current laws or regulations. For example, payroll software that calculates employee withholdings will need to take into account federal, state, and local tax laws as well as minimum wage laws, social security, and many other laws and regulations. As these laws change, the software needs to be updated to adapt.

123.    TLR updates ensure that the software is updated to account for the latest changes in tax laws or other regulations in the various states or countries in which a client does business.[108] TLR updates are provided to clients periodically as tax, legal, or regulatory changes are made. TLR updates are provided for both PeopleSoft and JD Edwards clients.

124.    It is common that multiple clients will be affected by the same tax, legal, or regulatory change, and thus multiple clients will require an update to address that change.

## 4.    RIMINI'S POST-INJUNCTION PEOPLESOFT SUPPORT PRACTICES

125.    I analyzed Rimini's Process 2.0 PeopleSoft support processes at length in my *Rimini II* reports.[109] I do not repeat that analysis here, but focus only on the concepts that are relevant to my analysis of Ms. Frederiksen-Cross's opinions. I also identify certain changes to Rimini's processes that have occurred between my last report and this report.

---

[108]   https://www.riministreet.com/Documents/Collateral/Rimini-Street-Brochure-Global-Tax-and-Regs.pdf, p. 2.

[109]   For example, R2 Astrachan Opening Rpt., ¶¶ 74–117; R2 Astrachan Rebuttal Rpt., ¶¶ 89–106, 132–150, 154–156, 166–177.

**4.1**     <u>**Overview of Process 2.0 PeopleSoft Processes**</u>

126.     Clients' PeopleSoft development environments are located on the clients' own computer systems, not Rimini's.  Rimini thus accesses them remotely.  In general, to implement updates for any particular client, Rimini accesses that client's development environment remotely and then performs the necessary work in that client's environment.  In this process, the client's software is being used, on the client's own computer systems, to support the client by implementing the update for the client.  The work may involve deleting, modifying, or adding code to the software, or creating scripts to modify the client's database.  Oracle code is not copied from one client to another or to Rimini's systems.

127.



128.     It is relatively common that a tax, legal, or regulatory change affects more than one Rimini client.  For example, a change to North Carolina withholding requirements would affect all clients who do business in North Carolina.  In those situations, Rimini will need to implement an update to address that change for every client that is affected.



129.



---

[110]   R2 Astrachan Rebuttal Rpt. ¶ 110.



130.

131.

132.

---

111 *See* R2 Astrachan Opening Rpt., ¶¶ 56–59, 110 for a general description of the roles of business analysts and QA personnel.

112 Deposition of Craig Mackereth, Jan. 17, 2020, pp. 213–15, 218.

113 *Id.*



133.

134.

Once Rimini learns how to solve the problem, solving it again a second, third, and fourth time, would be expected to be faster.

135.

136.    These are the general processes.  Each update is different and could vary in certain respects, but the above is intended to give a general overview.  I address Ms. Frederiksen-

---

[114] ECF No. 1297 (Opp. to Mtn. to Compel), pp. 14–15.

[115]

Cross's specific opinions regarding these processes in the sections below, beginning in Section VII.

### 4.2   Process Changes Since *Rimini II* Close of Fact Discovery

137.   I understand that Rimini made some changes to its support practices between the close of fact discovery in *Rimini II* in March 2018 and the Injunction.[116]  Those changes include:



[116]   RSI007954666 (; RSI006850037 (); Rimini's Corrected First Supplemental Response to Oracle Supplemental Interrogatory No. 1, July 18, 2019, pp. 6–8.

[117]   As explained in my *Rimini II* Rebuttal Report, I understand that R2 Astrachan Rebuttal Rpt., ¶ 594.

## 5.    RIMINI'S POST-INJUNCTION JD EDWARDS SUPPORT PRACTICES

138.    I described JD Edwards support practices in my prior reports.[118]  I am not aware of any material changes to J.D. Edwards support between the J.D. Edwards processes addressed in my prior report and those in place after the Injunction issued.[119]  As relevant here, at a high level, JD Edwards support is similar to PeopleSoft support, except in the following respects.



## VI.  RIMINI'S PROCESS 2.0 IS FUNDAMENTALLY DIFFERENT FROM THE PROCESSES ADJUDICATED IN THIS CASE

143.    Rimini's Process 2.0 (and thus post-Injunction) processes are fundamentally different than the processes that were adjudicated in this case at summary judgment in 2014, and at trial in 2015 (practices dating back to 2011 and prior), *i.e.*, Rimini's Process 1.0.

## 1.    RIMINI'S PROCESS 1.0

144.    Under Process 1.0, Rimini maintained large amounts of Oracle software and documentation on its servers and did not segregate or "silo" that software by client.  I understand that Rimini believed this was permissible because all of its clients held a license to the Oracle

---

[118]  R2 Astrachan Opening Rpt., ¶¶ 129–37; R2 Astrachan Rebuttal Rpt., ¶¶ 534–56.

[119]  RSI006850025, Deposition of Craig Mackereth, Jan. 17, 2020, Ex. 1833 (email from Ray Grigsby regarding "███████████████████"); Rimini's Corrected First Supplemental Response to Oracle Supplemental Interrogatory No. 1, July 18, 2019, pp. 6–8.

[120]  Deposition of Craig Mackereth, Jan. 17, 2020, pp. 243–44.

software.  Rimini thus did not segregate any particular client's software from the (same) software of other clients.  Oracle contended that Rimini's practice of maintaining copies of its clients' software on its own systems—called "local hosting"—violated its license agreements.[121]  Oracle also argued that even if two clients are licensed to the same software, use of Client A's software to support Client B, violated the licenses, an argument it dubbed "cross-use."[122]

145.    As alleged by Oracle at trial, Rimini "cloned" entire client software environments. That is, if Client B needed to have a development environment containing its Oracle software set up, Rimini might simply copy Client A's development environment for use with Client B (under the theory that the two clients had the same license and were entitled to the same software). Oracle's expert at trial, Professor Randall Davis, testified that Rimini cloned 478 software environments in this manner, not counting instances of Oracle Database.[123]  This was alleged to be "cross-use" because Rimini copied one client's software to create an environment for a different client, and constituted local hosting because all of these environments were maintained on Rimini's systems.  As testified to by Professor Davis, Rimini also made 13,500 backup copies of these environments.[124]

146.    Professor Davis also testified that Rimini maintained nearly 600,000 copies of Oracle documentation on its systems and used this as a "library" to provide support to clients.[125]

147.    Professor Davis also testified about "cross-use."  He showed the following graphic to describe "cross-use" and testified as follows:[126]

---

[121]  *Rimini I*, 879 F.3d at 959.

[122]  *Id.* at 956 (stating that "'cross-use,' generally speaking, is the creation of development environments, under color of a license of one customer, to support other customers.").

[123]  Trial Tr., p. 174.

[124]  *Id.* at p. 184.

[125]  *Id.* at p. 186.

[126]  *Id.* at p. 192.



Imagine this software support person is using software that was created for Customer A, but he's using it to support Customer B because Customer B is on the phone. That's what we mean by cross-use, using software created for one customer for another customer's benefit.

148. He was then asked whether that behavior is "consistent with the idea of keeping something in a silo?" to which he answered, "No, it is not."[127] He testified that there were "two broad categories" of "cross-use": "cloning" and "updates."[128] Cloning refers to the cloning of entire development environments to provide support to a different client, as discussed above.[129]

149. With respect to updates, Professor Davis testified that Rimini maintained generic environments associated with a particular software version, which it would use to develop fixes and updates to Oracle software files, to be sent out to *all* clients with that version. He testified that:

> So they had an idea of an environment, let's say for the PeopleSoft 881, and they'd have an environment which had originally been built for this particular customer to use as 881, but they would then use that routinely as a place in which they could test and develop fixes to that version of the software.[130]

---

[127] *Id.*

[128] *Id.*

[129] *Id.* at p. 195.

[130] *Id.* at pp. 202–03.

150.    Professor Davis noted in his expert report that Rimini's process was ████████

██████████████████████████████████████████████████████████████

███████████████████████████████████████████[131]  He also

stated in his report that █████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████.[132]

151.    Professor Davis then █████████████████████████████████████████

████████████████████████████████████████  ████████████████████████████████

████████████████████████████:

152.    In response to the question "is [having a single development environment per PeopleSoft release] different than envisioning a dev environment for each custom client?," he responded:

> Well, if you talk about an environment for each client, then you need one, to put it in slightly different terms, for every different customer and every different customer's environment, as opposed to one per version of the software.
>
> So if one version of the software is used by 10 clients, and you only have one dev environment for the version of the software as opposed to one dev environment for every client who is using the software, you've saved yourself a lot of time, money, and effort.[134]

153.    Thus, the key features of Process 1.0 included the following elements:

a.   Clients' Oracle software development environments were located on Rimini's systems (*i.e.*, they were locally hosted by Rimini);

b.   Clients' Oracle software could be intermixed rather than kept separate for each client;

---

[131]   R1 Expert Report of Randall Davis, May 2012, p. 40.

[132]   *Id.* at p. 49.

[133]   Trial Tr. p. 204.

[134]   *Id.* at pp. 204–05.

   c.   Rimini cloned Oracle software environments of Client A to give to Client B (where Client B also had a license for such software);

   d.   Rimini created and used generic Oracle development environments, not tied to any particular client, to develop updates (in the form of Oracle modified files and therefore containing Oracle code) that Rimini would then send to multiple clients—conduct which Oracle called "cross-use."

## 2.    RIMINI'S PROCESS 2.0

154.   Rimini's Process 2.0, described earlier, is fundamentally different from Process 1.0.  The fundamental differences include:

   a.   Every client has its own licensed Oracle software environments;

   b.   Each client's environments are located on that client's computer systems, which that client controls;

   c.   There are no Oracle software environments on Rimini's systems;

   d.   Oracle software is not permitted on Rimini's systems;

   e.   To provide support for a particular client, Rimini remotely accesses each client's separate software environment and implements updates and other fixes using that client's Oracle software to support that particular client;

   f.   Files containing Oracle code are not transferred from one client to another, or from clients to Rimini.





3.    **ORACLE'S CRITICISMS OF PROCESS 2.0 ARE ENTIRELY DIFFERENT FROM THE ISSUES LITIGATED ON SUMMARY JUDGMENT AND AT TRIAL IN *RIMINI I***

155.    As I understand it, the Injunction addresses and prohibits these Process 1.0 processes.  For example, Rimini's process of locally hosting PeopleSoft environments was enjoined by Paragraph 5 of the Injunction, which prohibits Rimini's use of PeopleSoft software other than on "a specific licensee's own computer systems."  As another example, the Injunction prohibits the Process 1.0 process of using a "generic" environment not associated with any specific client to create updates and then sending those updates to one or more different clients.

156.    The conduct Ms. Frederiksen-Cross opines is "cross-use" in this proceeding is substantially different than the conduct at issue at trial in this matter.  I have discussed above Ms. Frederiksen-Cross's expanded view of "cross-use."  I find it significant that while Ms. Frederiksen-Cross uses the same term "cross-use," the accused conduct does not resemble the Process 1.0 "cross-use" conduct litigated on summary judgment and at trial in *Rimini I.*

157.    The issues in dispute are different.  For example, one of the issues in dispute in this post-trial proceeding is whether Rimini's clients' cloud software accounts, which they pay for and control but Rimini accesses with permission pursuant to contract, constitute the clients' "own computer systems" or whether they constitute someone else's computer systems.  Based on my review of the trial transcript and court orders, the issue of cloud account ownership was not litigated in *Rimini I.*  In fact, I understand that Oracle's counsel stated that clients' use of cloud accounts was not at issue in *Rimini I.*[135]

158.    Further, in this proceeding, as in *Rimini II*, it is undisputed that Rimini does not have any Oracle software environments on its systems.  Rimini also does not develop modified Oracle files in generic environments to then copy and distribute to clients, and for the most part, this is undisputed.

159.    Instead, the focus of Ms. Frederiksen-Cross's opinions, as in *Rimini II*, is on Rimini's re-use of knowledge and experience gained when implementing an update for a specific

---

[135]  Tr. of May 25, 2016 Hearing, p. 143 (Oracle's counsel acknowledging that "cloud computing is at issue in *Rimini II* and it wasn't at issue in *Rimini I.*").

client using that client's specific software.  When Rimini implements an update for Client A using Client A's software, in Client A's environment, it learns how to solve the problem and may document its experience and knowledge.  It can then implement the update for Client B, using Client B's software, in Client B's environment faster than it performed the update for Client A because it has already solved the problem once.  Ms. Frederiksen-Cross has been asked to assume a definition of "cross-use" that encompasses this re-use of know-how, and that forms the crux of her opinions.

160.    Based on my review of the record, Rimini's use of its own knowledge and experience was not litigated in *Rimini I*.  *Rimini I* involved the explicit copying of one client's Oracle software and providing that software to a different client, which is not at issue here.

## VII.  THE CLIENTS' "OWN COMPUTER SYSTEMS" PROVISION

### 1.    CLIENTS' CLOUD-HOSTED ENVIRONMENTS, INCLUDING WINDSTREAM, ARE THE CLIENTS' "OWN COMPUTER SYSTEMS"



161.    Ms. Frederiksen-Cross states that it is her ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████"[137]  Based on her testimony in *Rimini II*, I understand this statement to mean that ██████████████████████████████████████████████████████████████████████████████.[138]

162.    The Injunction states that "Rimini shall not reproduce, prepare derivative works from, or use PeopleSoft software or documentation on, with, or to any computer systems other than a specific licensee's own computer systems."[139]

---

[136]  I understand that Windstream now operates as TierPoint.  For consistency, I refer to the company as Windstream.

[137]  Frederiksen-Cross Post-Injunction Rpt., ¶ 14.

[138]  Deposition of Barbara Frederiksen-Cross, Sept. 19, 2018, pp. 253–54.

[139]  Injunction ¶ 5.