# Exhibit 7
## Rimini Street's 28(j) Notice of Authorities, filed in *Oracle USA, Inc. v. Rimini Street, Inc.*, Case No. 18-16554, (ECF Nos. 53-1 and 53-2)

# GIBSON DUNN

Gibson, Dunn & Crutcher LLP

1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Tel 202.955.8500
www.gibsondunn.com

Mark A. Perry
Direct: +1 202.887.3667
Fax: +1 202.530.9696
MPerry@gibsondunn.com

Client: 79957-00008

August 13, 2019

VIA ECF FILING

Molly Dwyer
Clerk of the Court
U.S. Court of Appeals for the Ninth Circuit
P.O. Box 193939
San Francisco, CA  94119-3939

Re:     Oracle USA, Inc. v. Rimini Street, Inc., No. 18-16554

Dear Ms. Dwyer:

Oral argument in this appeal was heard on July 12, 2019, in Portland, Oregon, before Judges Tashima, Graber, and Owens.

Pursuant to Rule 28(j), Rimini Street, Inc. previously submitted Oracle's June 28, 2019 statement to the district court identifying five practices that Oracle alleges contravene the injunction the Court is considering in this appeal.  *See* Dkt. 46-3.  To complete the record, Rimini hereby submits its August 5, 2019 response to Oracle's statement regarding these five practices.  *See* Exhibit A.

The Court's forthcoming decision in this appeal could moot or materially affect the course of all contempt-related proceedings in the district court.  Accordingly, Rimini respectfully submits that the parties and the district court would greatly benefit from the issuance of the Court's decision, at least as to the validity and scope of the permanent injunction, by October 20, 2019—the deadline for Oracle to file any application in the district court regarding Rimini's compliance with the extant injunction (which has not been stayed pending appeal).  *See* Dkt. 46-2.

Respectfully submitted,

*/s/ Mark A. Perry*

Mark A. Perry

Beijing • Brussels • Century City • Dallas • Denver • Dubai • Frankfurt • Hong Kong • Houston • London • Los Angeles • Munich
New York • Orange County • Palo Alto • Paris • San Francisco • São Paulo • Singapore • Washington, D.C.

# EXHIBIT A

# GIBSON DUNN

Gibson, Dunn & Crutcher LLP

1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Tel 202.955.8500
www.gibsondunn.com

Mark A. Perry
Direct: +1 202.887.3667
Fax: +1 202.530.9696
MPerry@gibsondunn.com

Client: 79957-00020

August 5, 2019

VIA ELECTRONIC MAIL

John A. Polito
Morgan Lewis & Bockius LLP
One Market, Spear Street Tower
San Francisco, CA 94105-1596

Re:  *Oracle USA, Inc. v. Rimini Street, Inc.*, Case No. 2:10-cv-0106-LRH-VCF (D. Nev.)

Dear Mr. Polito:

Pursuant to the Court's June 21, 2019 Order (ECF No. 1232), Rimini responds to each of the five items in Oracle's June 28, 2019 letter describing "conduct disclosed in *Rimini II* (including cross-use and cloud hosting) which Oracle contends would violate Judge Hicks' injunction if it continued after the injunction was effective."

Before providing an item-by-item response, we emphasize four global deficiencies in Oracle's June 28 letter.

*First,* Oracle's letter does not assert that Rimini has engaged in either of the practices actually adjudicated in *Rimini I*—local hosting (*i.e.*, Rimini physically locating its clients' licensed Oracle software environments locally on Rimini's own computer systems) or "cross-use" (*i.e.*, "the making of development environments, under color of a license held by one identifiable customer of Rimini, for another identifiable customer of Rimini that also holds a license" or "for licensees who have yet to become customers of Rimini")—after the entry of the Injunction. *Oracle USA, Inc. v. Rimini Street, Inc.*, 879 F.3d 948, 956, 959–60 (9th Cir. 2018). That omission is telling, as Oracle has had full discovery in *Rimini II* (and, now, contempt-related discovery in *Rimini I*) to ascertain whether the adjudicated practices have continued. The only conclusion to be drawn from Oracle's silence on this point is that those practices have ceased—which is not surprising, as Rimini long ago put into the *Rimini I* record detailed evidence establishing the fact that Rimini ceased both of these practices, at considerable expense, no later than July 2014. *See* ECF No. 1134-3.[1] Oracle has never disputed or even responded to that evidence. Instead, Oracle has taken the untenable position

---

[1] Notably, this evidence of Rimini's transition to Process 2.0 was withheld from the *Rimini I* jury at Oracle's insistence. *See* ECF No. 646 at 1–7 (Oracle Motion *in Limine* No. 1 to "Exclude Evidence and Argument Relating to Rimini's 2014 Support Model"); *see also* ECF No. 723 at 3 (Order granting Oracle's Motion).

Beijing • Brussels • Century City • Dallas • Denver • Dubai • Frankfurt • Hong Kong • Houston • London • Los Angeles • Munich
New York • Orange County • Palo Alto • Paris • San Francisco • São Paulo • Singapore • Washington, D.C.

**GIBSON DUNN**

John A. Polito
August 5, 2019
Page 2

that an injunction can go beyond the acts adjudicated as unlawful. Oracle's principal authority for that proposition is *U.S. v. Gypsum Co.*, 340 U.S. 76 (1950), but that case actually demonstrates the error in Oracle's approach. The Supreme Court explained: "Acts in disregard of law call for repression by sterner measures than where the steps could reasonably have been thought permissible." *Id.* at 89–90. Here, Rimini was adjudged an innocent infringer by the jury, thus establishing that its conduct was reasonable at the time it was undertaken. Accordingly, there is no basis in law, equity, or reason to enjoin it from anything besides the conduct actually adjudicated in *Rimini I* (if indeed there needs to be any injunction at all).

**Second,** as discussed in detail below, Oracle's letter describes conduct that is part of Rimini's revised support processes ("Process 2.0"), which were not adjudicated in *Rimini I* and therefore cannot support a contempt finding. *See Price v. City of Stockton*, 390 F.3d 1105, 1117 (9th Cir. 2004) (An injunction must be "narrowly tailored … to remedy only the specific harms shown by the plaintiffs[.]"); 4 Nimmer on Copyright, § 14.06[C][1][a] ("[T]he scope of the injunction should be coterminous with the infringement."). Oracle's contention that Rimini's Process 2.0 (or any of the constituent practices of its current support services) violates the *Rimini I* Injunction is particularly prejudicial to Rimini in light of Oracle's previous insistence that these processes *not* be litigated in *Rimini I*. Indeed, Oracle previously objected to Rimini's attempt to consolidate *Rimini I* and *II*, arguing that evidence related to Process 2.0 was "irrelevant to any liability issue at trial" in *Rimini I*. ECF No. 646 at 5; *see also* ECF No. 490 at 12–20 (Oracle arguing that "the Court should limit the trial [in *Rimini I*] to Rimini's old support model"). The Court agreed with Oracle, and, as a result, issues related to Rimini's Process 2.0 (such as Oracle's radically expanded view of so-called "cross-use") are currently being litigated in *Rimini II*. In fact, there are multiple summary judgment motions currently pending before Judge Hicks in *Rimini II* that cover the precise issues Oracle raised in its June 28 letter. Oracle's attempt to prejudge these unadjudicated issues in post-trial *Rimini I* proceedings (without a jury) is improper, unlawful, and unconstitutional.

**Third,** as discussed in further detail in this letter, Oracle's attempt to enforce the Injunction against conduct never adjudicated as infringing in *Rimini I* constitutes copyright misuse, as it would impermissibly eliminate competition in the aftermarket for third-party maintenance of Oracle software. *See Omega S.A. v. Costco Wholesale Corp.*, 776 F.3d 692, 698–700 (9th Cir. 2015) (Wardlaw, J., concurring) ("[U]se of the copyright to secure an exclusive right or limited monopoly not granted by the Copyright [Act]" is copyright misuse. (citation omitted)). Indeed, the acts that Oracle now labels as contumacious are not proscribed by the Copyright Act or any applicable license agreement. Oracle is attempting to use the Injunction to rewrite the terms of the licenses. The conduct described in Oracle's June 28 letter does not constitute copyright infringement and therefore it cannot even be enjoined, much less held to constitute contempt, under the Copyright Act. *See* 17 U.S.C. 502(a) (authorizing courts

**GIBSON DUNN**

John A. Polito
August 5, 2019
Page 3

to grant injunctions only to "prevent or restrain *infringement of a copyright*") (emphasis added). Oracle's submission of the proposed Injunction—which went far beyond the judgment and the Copyright Act—was itself an act of copyright misuse, and any attempt by Oracle to enforce that Injunction through contempt proceedings would also be actionable as copyright misuse.

***Fourth,*** Oracle's June 28 letter fails to follow the letter and spirit of Judge Ferenbach's Order. The Court's June 21, 2019 Order required Oracle to disclose "a list describing conduct disclosed in *Rimini II* … which Oracle contends would violate Judge Hicks' injunction if it continued after the injunction was effective," and required that each described item "must state ***precisely and unambiguously each separate process, practice or other conduct***" Oracle is accusing. ECF No. 1232 at 2 (emphasis added). Oracle does not "precisely" or "unambiguously" accuse any specific conduct. Instead, Oracle's letter merely repeats the language of the Injunction and makes vague, high-level allegations that do not identify any particular "process, practice or other conduct." This problem is compounded by Oracle's similarly vague, high-level descriptions of the supposed types of evidence Oracle believes exemplify contumacious conduct, and by Oracle's failure to cite specific documents or testimony from *Rimini II* in support of its allegations. These failures reflect the vagueness with which the Injunction is drafted, and confirm that any attempt to enforce it would violate Rimini's due process rights as well as other laws, equitable principles, and constitutional provisions.

Oracle's deficient submission significantly constrains Rimini's ability to respond. Judge Ferenbach's June 21, 2019 Order requires Rimini to "describe with reasonable particularity" "all documents in its possession, custody or control" that support any assertion by Rimini that it does not engage in the practices accused by Oracle. ECF No. 1232 at 2. But because Oracle has not, for example, identified specific conduct that it believes constitutes so-called "cross-use" (an undefined term not used in the Copyright Act, the Injunction, or in any license agreement) together with the specific documents and testimony that Oracle claims support its position, Rimini is essentially asked to prove the negative—that Rimini does not engage in whatever undefined conduct Oracle chooses to label for purposes of litigation as "cross-use," including conduct never adjudicated in *Rimini I*. This would require describing nearly every document and all data related to Rimini's PeopleSoft and JD Edwards support processes. Notwithstanding the deficiencies of Oracle's letter, Rimini has made its best efforts to identify information that supports its positions.

Rimini further responds to Oracle's five allegations as follows:

**GIBSON DUNN**

John A. Polito
August 5, 2019
Page 4

1. <u>**Cloud-Hosting of PeopleSoft Software and Support Materials**</u>

Oracle's Allegation:

*Oracle contends that Rimini "reproduce[s], prepare[s] derivative works from, or use[s] PeopleSoft software or documentation on, with, or to . . . computer systems other than a specific licensee's own computer systems[.]" Injunction ¶ 5. Rimini regularly reproduces, prepares derivative works from, and uses PeopleSoft software and documentation on computer systems other than a specific licensee's own computer systems, including environments, virtual machines, and cloud storage hosted by Tierpoint (formerly known as Windstream) and Amazon Web Services. Evidence that Rimini hosts PeopleSoft software and support materials on computer systems other than a specific licensee's own computer systems in violation of the Injunction includes documents, deposition testimony, discovery responses, and Rimini's own in-court statements concerning cloud-hosting of Oracle software and support materials.*

Rimini's Response:

Rimini denies that it has reproduced, prepared derivative works from, or used PeopleSoft environments stored at locations that are not a client's facilities (or a client's "own computer systems"), either before February 28, 2018, or after November 5, 2018. Rimini further denies that "Rimini hosts[2] PeopleSoft software and support materials on computer systems other than a specific licensee's own computer systems."

As an initial matter, the *Rimini I* Injunction cannot prohibit Oracle licensees from hosting their PeopleSoft software environments on cloud systems—nor Rimini from accessing such clients' systems to provide support—because that issue, which is squarely at issue in *Rimini II*, was never adjudicated in *Rimini I*. In *Rimini I*, Judge Hicks held that a subset of PeopleSoft licenses required that PeopleSoft software be stored at a client's "facilities." Judge Hicks determined, and the Ninth Circuit agreed, that *Rimini's* computer systems were not a *client's* "facilities" because there was no evidence that clients exercised control over those computer systems. *See* 879 F.3d at 959–60. As Oracle knows from extensive *Rimini II* discovery and does not dispute, Rimini has not hosted a client environment on Rimini's systems since at least July 2014. In *Rimini I*, neither the district court nor the Ninth Circuit considered—much less ruled on—whether a client's cloud system constitutes a client's facilities, ███████████████████████████████████████████████████████

---

[2] Rimini does not "host" its clients' Oracle software environments on cloud computer systems, or anywhere for that matter. Clients themselves host their own Oracle software environments, which Rimini engineers may remotely access to provide support.

**GIBSON DUNN**

John A. Polito
August 5, 2019
Page 5

Thus, Oracle's contention that Rimini violates the Injunction when Rimini remotely accesses its clients' cloud systems for purposes of providing support is an impermissible attempt by Oracle to expand the scope of the Injunction beyond conduct litigated in *Rimini I*.[3] Indeed, there are multiple, fully briefed summary judgment motions in *Rimini II* on this exact issue pending before Judge Hicks. *See Rimini II*, ECF No. 927 (Motion for Partial Summary Judgment as to Certain Undisputed Processes); ECF No. 941 (Motion for Partial Summary Judgment Regarding Migration and Windstream Hosting).

Moreover, Oracle is incorrect that a client's cloud systems do not constitute a client's "facilities" or the client's "own computer systems." Some Rimini clients choose to host their PeopleSoft software environments and support materials on cloud computing resources (*i.e.*, virtual machines), and Rimini may access those environments and support materials—at the clients' direction—in the course of providing support. Clients control their cloud systems just as they would a physical server: clients pay for (and can decommission) their cloud systems, clients can grant and revoke access to those systems, clients control who can access the software and data on such systems, and clients can move or delete the software at any time. *See also Rimini II*, ECF No. 606 at 1–2 (The Court: "Rimini does not have control over (nor possession or custody of) its clients' software environments and archives located on its clients' computer systems"). Accordingly, clients' cloud systems used to host PeopleSoft software are the clients' "facilities."[4]

---

[3] [redacted]

[4] This position is consistent with the industry understanding that clients' cloud systems constitute clients' "facilities." *See, e.g., Rimini II*, ECF No. 990-12 (Lanchak Reb. Rpt.) at 5–6 ("Given the multitude of hosting options available today, as well as the ubiquity of the cloud in general, customers have not generally interpreted a 'facilities restriction' to prohibit cloud-hosting."). Indeed, Oracle has never argued that the "facilities restriction" in its licenses is violated in the common scenario where one of its licensees chooses to store its Oracle software environments on servers in a building that the licensee rents or leases; it thus cannot be the case that this contract provision is violated merely because a client may rent *virtual* (as opposed to physical) space for this same purpose.

**GIBSON DUNN**

John A. Polito
August 5, 2019
Page 6

Documents that support Rimini's position include the documents produced and testimony provided in *Rimini II*, and the documents that have been or will be produced and testimony that will be provided in this post-trial proceeding, related to Rimini's support for PeopleSoft clients who choose to host their software in the cloud, including, but not limited to:

- The contracts between Rimini's clients and Tierpoint (formerly known as Windstream), Amazon Web Services, and any other cloud services provider, and all documents and communications related thereto, as well as documents and data evidencing the means and methods by which clients obtain, access, use, and control their cloud computing resources;

- The *Rimini II* depositions of David Miller, Susan Tahtaras, Manjula Hosalli, Owen Astrachan, Tierpoint, Toll Brothers, Easter Seals, UNICOM, and Guest Services, Inc., including all relevant exhibits to those depositions; and

- The expert reports of Owen Astrachan and Stephen Lanchak in *Rimini II* and all documents and materials cited therein related to cloud hosting.

**2.     Cross-Use of PeopleSoft Software and Support Materials**

Oracle's Allegation:

*Oracle contends that Rimini "reproduce[s], prepare[s] derivative works from, or use[s] a specific licensee's PeopleSoft software or documentation on one licensee's computer systems to support, troubleshoot, or perform development or testing for . . . other licensee[s], including, specifically, that Rimini Street . . . use[s] a specific licensee's PeopleSoft environment to develop or test software updates or modifications for the benefit of . . . other licensee[s] and that Rimini's reproduction, creation of derivative works, and use is not solely "to support the specific licensee's own internal data processing operations [.]" Injunction ¶¶ 4, 6. Rimini regularly develops and tests software updates (including both code and documentation) for PeopleSoft software using one or more environments associated with a small number of customers, and then provides those updates to and for the benefit of multiple customers, including customers whose associated environments were not used for development or testing. Evidence that Rimini cross-uses PeopleSoft software and support materials in violation of the Injunction includes documents, deposition testimony, and discovery responses that show Rimini's manual cutting and pasting and sending via email and file transfer of PeopleSoft code and documentation, Rimini's use of internal tools such as AFW and Dev Review and of Oracle tools such as PeopleTools, and Rimini's creation of what it calls a*

**GIBSON DUNN**

John A. Polito
August 5, 2019
Page 7

*"prototype" and then copying and use of that prototype (or detailed documentation derived from the prototype) to "retrofit" updates for other customers.*

Rimini's Response:

Rimini denies that it engaged in the above-described conduct (1) from at least July 2014 through February 28, 2018, and (2) after November 5, 2018.

*Oracle's Allegations Concern Conduct Not at Issue in Rimini I.* As an initial matter, the conduct newly described by Oracle as "cross-use" was not adjudicated in *Rimini I*, and therefore, is not properly the subject of the *Rimini I* Injunction. In *Rimini I*, Oracle used the term "cross-use" to refer to "the making of development environments, under color of a license held by one identifiable customer of Rimini, for another identifiable customer of Rimini that also holds a license" or "for licensees who have yet to become customers of Rimini." *Rimini I*, 879 F.3d at 956. Rimini does not currently engage in that conduct, and has not done so since the end of July 2014. Under Rimini's Process 2.0, every client has its own development environment located on the client's own systems, and Rimini eliminated reliance on generic environments. Therefore, by Oracle's own definition of "cross-use" in *Rimini I*, Rimini has not engaged in "cross-use" since at least July 2014.

In *Rimini II*, Oracle radically expanded its definition of "cross-use" to include conduct that was never adjudicated in *Rimini I*. Whereas *Rimini I* dealt with Rimini's creation of development environments for one licensed client by copying an environment from another client with the same license, and Rimini's hosting of generic development environments, Oracle now contends that if a Rimini engineer creates a software update for Client A in Client A's environment using solely Client A's licensed software, and then reuses *knowledge gained* in creating Client A's update to later create a similar or identical update for Client B in Client B's environment using solely Client B's licensed software, then that engineer has used Client A's environment to "benefit" Client B and has thus engaged in "cross-use." This version of "cross-use" was not litigated in *Rimini I*, has no foundation in copyright law, and is the subject of multiple summary judgment motions in *Rimini II*. See *Rimini II*, ECF Nos. 927, 1084. And yet, Oracle is now proposing to take this new, expanded definition of "cross-use" from *Rimini II* and apply it to contempt proceedings in *Rimini I*. That is improper and cannot be the basis for contempt.

In addition, while Oracle identifies the preparation of derivative works as conduct that would violate the injunction if continued after the injunction was effective, the derivative right

# GIBSON DUNN

John A. Polito
August 5, 2019
Page 8

was not adjudicated in *Rimini I*. Oracle admitted at summary judgment that its claims in *Rimini I* "concern[ed] only the reproduction right." ECF No. 284 at 9. And the jury was not asked to determine whether Rimini created derivative works.

*Rimini Does Not Engage in So-Called "Cross-Use."* Oracle is incorrect that Rimini reproduces, prepares derivative works from, or uses one licensee's PeopleSoft software or documentation to support other licensees. Ever since Rimini completed the transition to Process 2.0 in July 2014, every Rimini client has had its own, dedicated development environment. Pursuant to Process 2.0, updates are developed in each client's environment to support that particular client, and Oracle code is not copied from one client's environment to a different client's environment.

Rimini supports over 100 PeopleSoft clients, all of which have paid Oracle for a license to PeopleSoft software that allows them to update, modify, and create derivative works from the software—and to hire a third-party support provider like Rimini to do so for them. In some instances, multiple Rimini clients may need the same update (for example, an update that implements a change in how the federal tax rate is calculated in PeopleSoft's payroll module). In such cases, a Rimini developer may begin by accessing Client A's environment to develop and test the update for Client A (sometimes referred to as the "prototype" client). After that work is done, the developer may access Client B's environment to make the same tax rate change. Because the developer has gained on-the-job knowledge by creating the update for Client A, the developer may be able to implement the change for Client B more quickly. But in this process, Rimini is using Client A's environment to develop and test updates for Client A, and is using Client B's environment to develop and test updates for Client B. Rimini is not, as Oracle suggests, using Client A's environment to support Client B.

At times between July 2014 and November 5, 2018, Rimini used certain proprietary software tools to assist with the PeopleSoft update process, including the CodeAnalyzer tool and the Dev Review tool that are referenced in Oracle's allegations. These tools, and their functionality, did not even exist during the *Rimini I* timeframe and cannot be subject to the Injunction. Indeed, these tools are—like Oracle's newly expanded definition of "cross-use"—squarely at issue in *Rimini II* and the subject of multiple, pending summary judgment motions. *See Rimini II*, ECF Nos. 927, 1084. These tools also do not reproduce, create derivative works from, or distribute Oracle copyrighted software of one licensee to support a different licensee, and thus they are lawful in all respects. Nevertheless, in light of the vagueness and ambiguity of the Injunction's terms (an issue the Ninth Circuit is currently considering), and to avoid a costly and protracted compliance proceeding over them, Rimini stopped using the CodeAnalyzer and Dev Review tools on or very shortly after November 5, 2018.

(11 of 18)

Case 2:10-cv-00106-LRH-VCF Document 1348-3 Filed 05/12/20 Page 12 of 19
Case: 18-00106, 08/13/2019, ID: 11395494, DktEntry: 20, Page 11 of 17

**GIBSON DUNN**

John A. Polito
August 5, 2019
Page 9

Documents that support Rimini's position include all documents produced and testimony provided in *Rimini II*, and all documents that have been or will be produced, and testimony that will be provided in this matter related to Rimini's support of PeopleSoft clients, including, but not limited to:

- The PeopleSoft license agreements between Oracle and its customers;

- Documents concerning Oracle's treatment of other third-party support providers for Oracle software, including all communications and deposition testimony related thereto;

- The *Rimini II* depositions of Seth Ravin, Susan Tahtaras, Jim Benge, Timothy Conley, Rick Frank, Owen Astrachan, Stephen Lanchak, and Richard Allison, including all relevant exhibits to those depositions;

- The *Rimini II* depositions of Rimini's clients, including, but not limited to, Snelling Holdings, LLC; Guest Services, Inc.; Brandeis University; Lifeway Christian Resources; Shawnee Mission School District; and PNMR; including all relevant exhibits to those depositions;

- The expert reports of Owen Astrachan and Stephen Lanchak in *Rimini II* and all documents and materials cited therein related to Rimini's support processes for PeopleSoft;

- All documents and testimony cited in Rimini's Motion for Partial Summary Judgment as to Certain Undisputed Processes, *Rimini II*, ECF No. 927, and Rimini's Opposition to Oracle's Motion for Partial Summary Judgment Regarding "Cross-Use" and Derivative Works, *Rimini II*, ECF No. 1084;

- The AFW databases produced in *Rimini II* and this post-trial proceeding;

- The documents produced in response to Request for Production No. 4 in this post-trial proceeding; and

- Rimini's Supplemental Response to Interrogatory No. 1 in this post-trial proceeding.

(12 of 18)
Case 2:10-cv-00106-LRH-VCF Document 1348-3 Filed 05/12/20 Page 13 of 19
Case 2:10-cv-00106-LRH-VCF Document 1305-1 *SEALED* Filed 05/12/20 Page 13 of 19

**GIBSON DUNN**

John A. Polito
August 5, 2019
Page 10

### 3. Cross-Use of JD Edwards Software and Support Materials

Oracle's Allegation:

*Oracle contends that Rimini "reproduce[s], prepare[s] derivative works from, or use[s] J.D. Edwards software or documentation on one licensee's computer systems to support, troubleshoot, or perform development or testing for . . . other licensee[s], including, specifically, that Rimini Street . . . use[s] a specific licensee's J.D. Edwards environment to develop or test software updates or modifications for the benefit of other licensee[s][.]" Injunction ¶ 10. Rimini regularly develops and tests software updates (including both code and documentation) for JD Edwards software using one or more environments associated with a small number of customers, and then provides those updates to and for the benefit of multiple customers. Evidence that Rimini cross-uses JD Edwards software and support materials in violation of the Injunction includes documents, deposition testimony, and discovery responses that show Rimini's manual cutting and pasting and sending via email and file transfer of JD Edwards code and documentation, Rimini's use of Oracle tools such as Object Management Workbench, and Rimini's creation of what it calls a "prototype" and then copying and use of that prototype (or detailed documentation derived from the prototype) to "retrofit" updates for other customers.*

Rimini's Response:

Rimini denies that it engaged in the above-described conduct (1) from at least July 2014 through February 28, 2018, and (2) after November 5, 2018.

Oracle's contention with respect to supposed "cross-use" in Rimini's JD Edwards support processes is identical to Oracle's PeopleSoft theory—Oracle attempts to expand the definition of "cross-use" to cover any Rimini reliance on and reuse of its own know-how to provide updates for multiple clients. Again, that version of "cross-use" was not litigated in *Rimini I*, during which Oracle used the term "cross-use" in a more narrow sense to refer to the use of locally hosted, generic environments to create updates that were then copied to multiple clients. Thus, this new, unadjudicated and novel definition of "cross-use" is not within the ambit of the Injunction.

Moreover, as with PeopleSoft, Oracle's allegations that Rimini reproduces or prepares derivative works using one licensee's JD Edwards software to support a different licensee are false. By July 2014, Rimini had transitioned to Process 2.0 in which every Rimini client has its own, dedicated development environment. Pursuant to Process 2.0, updates are developed in each client's environment to support that particular client, and Oracle code is not copied from one client's environment to a different client's environment. When providing updates to

**GIBSON DUNN**

John A. Polito
August 5, 2019
Page 11

multiple JD Edwards clients that need the same or similar updates, Rimini performs development and testing work for Client A in Client A's environment. While a Rimini developer may learn from that work and implement a similar update more efficiently for Client B as a result, the work for Client B is performed in Client B's environment and for Client B's benefit.

Documents that support Rimini's position include all documents produced and testimony provided in *Rimini II*, and all documents that have been or will be produced and testimony that will be provided in this matter, related to Rimini's support of JD Edwards clients, including, but not limited to:

- The JD Edwards license agreements between Oracle and its customers, and all documents and communications related thereto;

- Documents concerning Oracle's treatment of other third-party support providers for Oracle software, including all communications and deposition testimony related thereto;

- The *Rimini II* depositions of Seth Ravin, Michael Jacob, Owen Astrachan, Stephen Lanchak, and Richard Allison, including all relevant exhibits to those depositions;

- The *Rimini II* depositions of Rimini's clients, including, but not limited to, Berry Global, Inc., including all relevant exhibits to those depositions;

- The expert reports of Owen Astrachan and Stephen Lanchak in *Rimini II* and all documents and materials cited therein related to support processes for JD Edwards; and

- All documents and testimony cited in Rimini's Motion for Partial Summary Judgment as to Certain Undisputed Processes (*Rimini II*, ECF No. 927), and Rimini's Opposition to Oracle's Motion for Partial Summary Judgment Regarding "Cross-Use" and Derivative Works (*id.*, ECF No. 1084).

**4.     Access to JD Edwards Source Code**

Oracle's Allegation:

Oracle contends that Rimini "cop[ies] or access[es] J.D. Edwards software source code to carry out development and testing of software updates[.]" Injunction ¶ 8. Rimini regularly copies and accesses JD Edwards source code in the course of developing and testing software updates and in the course of installing, configuring, and administering JD Edwards

**GIBSON DUNN**

John A. Polito
August 5, 2019
Page 12

*environments. Evidence that Rimini copies and accesses JD Edwards source code in violation of the Injunction includes documents, deposition testimony, and discovery responses that show Rimini's access to and copying of source code, both directly and by causing a third party to display the source code to Rimini.*

Rimini's Response:

Rimini denies that it has "copie[d] or accesse[d] [JD] Edwards source code in the course of developing and testing software updates and in the course of installing, configuring, and administering JD Edwards environments," either before February 28, 2018, or after November 5, 2018.

JD Edwards software has numerous components. When companies license JD Edwards software, many of the core components are provided as "closed" code, meaning that they are not intended to be modified or accessed in a human readable form. Other components are provided in "open" code that is human readable and explicitly intended to be modified, for example, to account for tax and regulatory changes.

Oracle wrongly interprets the Injunction's prohibition against accessing "source code" to prohibit copying or accessing open code that licensees are intended and encouraged to modify. Oracle's interpretation is at odds with the Ninth Circuit's holdings in this case, would effectively preclude support of JD Edwards software and eliminate competition, and would constitute copyright misuse. As the Ninth Circuit held in this case, "[Oracle's] licenses generally permit Oracle's licensees to maintain the [JD Edwards] software and make development environments for themselves," *Rimini I*, 879 F.3d at 956, and these licensees can "hire Rimini to perform such work for them," *id.* at 953; *see also id.* at 958 (the Ninth Circuit holding that JD Edwards licenses do "not preclude Rimini from creating development environments for a licensee for various purposes"). The Ninth Circuit further held that Rimini provides third-party support for Oracle's JD Edwards software in "*lawful competition*" with Oracle's own support services. *Id.* at 952 (emphasis added). And, the Court continued, this support necessarily requires "copying." *Id.* at 956 ("[T]he very work of maintaining customized software requires copying."). Thus, Oracle's claim that the Injunction prohibits Rimini's access to *all* JD Edwards code—including the "open code" Oracle provides its licensees and that Oracle intends its licensees to modify—runs counter to the Ninth Circuit's rulings and would impermissibly eliminate competition in the support services industry for JD Edwards software. *Omega S.A. v. Costco Wholesale Corp.*, 776 F.3d 692, 699–700 (9th Cir. 2015) (Wardlaw, J., concurring) ("[U]se of the copyright to secure an exclusive right or limited monopoly not granted by the Copyright [Act]" is copyright misuse) (citation omitted).

**GIBSON DUNN**

John A. Polito
August 5, 2019
Page 13

Documents that support Rimini's position include all documents produced and testimony provided in *Rimini II*, and all documents that have been or will be produced and testimony that will be provided in this matter, related to Rimini's support of JD Edwards software, including, but not limited to:

- The JD Edwards license agreements between Oracle and its customers, and all documents and communications related thereto;

- Documents concerning Oracle's treatment of other third-party support providers for Oracle software, including all communications and deposition testimony related thereto;

- The *Rimini II* depositions of Michael Jacob, Stephen Lanchak, and Owen Astrachan, including all relevant exhibits to those depositions; and

- The expert reports of Stephen Lanchak and Owen Astrachan in *Rimini II* and all documents and materials cited therein related to JD Edwards source code.

**5.**     **Distribution of PeopleSoft and JD Edwards Software and Support Materials**

Oracle's Allegation:

*Oracle contends that Rimini "distribute[s] PeopleSoft software or documentation or any derivative works created from or with PeopleSoft software or documentation" and "distribute[s] J.D. Edwards software or documentation or any derivative works created from or within J.D. Edwards software or documentation[.]" Injunction ¶¶ 3, 7. Rimini regularly develops software updates (including both code and documentation) for PeopleSoft and JD Edwards software and other derivative works based upon PeopleSoft and JD Edwards software and distributes them to or otherwise makes them available to customers. Evidence that Rimini distributes PeopleSoft and JD Edwards software and support materials in violation of the Injunction includes documents, deposition testimony, and discovery responses that show Rimini's acts of distribution, including via e-mail, FTP, and operation of software tools.*

Rimini's Response:

Rimini denies that it has distributed PeopleSoft software or documentation or any derivative works created from or with PeopleSoft software or documentation, either before February 28, 2018, or after November 5, 2018. Rimini further denies that it has distributed JD Edwards software or documentation or any "derivative works" created from or withJD Edwards software or documentation, either before February 28, 2018, or after November 5, 2018.

# GIBSON DUNN

John A. Polito
August 5, 2019
Page 14

As an initial matter, neither the distribution nor derivative works rights were adjudicated in *Rimini I*. Oracle admitted at summary judgment that its claims in *Rimini I* "concern[ed] only the reproduction right." ECF No. 284 at 9. And the jury was not asked to determine whether Rimini created derivative works or distributed Oracle copyrighted material; instead, the jury's only job was to determine whether Rimini had an express license to copy Oracle software. ECF No. 896 at 1–2. Thus, the distribution and derivative works rights were not adjudicated in *Rimini I*.

Moreover, Rimini has not violated either right. To violate a copyright owner's exclusive distribution right, a party must issue copies of the copyrighted work (1) "to the public"; (2) "by sale or other transfer of ownership, or by rental, lease, or lending." 17 U.S.C. § 106(3). Neither element is satisfied by any of Rimini's processes. Every client Rimini supports has a license that allows the client to copy and use Oracle's software, and Oracle has never contended that any client received software it is not licensed to possess. Rimini provided clients—not the public—with software. And Rimini did not sell or otherwise transfer ownership in that software, as the clients were already licensed. Providing licensed clients their licensed software, and support necessary to use that software, is simply not a distribution under the Copyright Act.

In addition, even if sending updates or documentation containing Oracle copyrighted software to a licensed client could be considered a "distribution," under Process 2.0, Rimini does not engage in such conduct. Under Process 2.0, updates or files containing Oracle copyrighted expression are not copied from one client's environment to a different client's environment, nor from Rimini to a client's environment. Rather, updates containing Oracle copyrighted expression are developed and implemented in each licensed client's individual environment (and such development is licensed). Therefore, Rimini rejects the contention that Rimini's former or current support processes "distribute" PeopleSoft or JD Edwards software.

Further, Oracle's contention that Rimini distributes, or otherwise provides, derivative works to multiple clients is incorrect. In the Ninth Circuit, to constitute a "derivative work" of copyrighted material in the software context, a work must "substantially incorporate protected material from the preexisting work." *Micro Star v. Formgen Inc.*, 154 F.3d 1107, 1110–11 (9th Cir. 1998); *Lewis Galoob Toys, Inc. v. Nintendo of Am., Inc.*, 964 F.2d 965, 969 (9th Cir. 1992); *see also Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1161 (9th Cir. 2007); *Litchfield v. Spielberg*, 736 F.2d 1352, 1357 (9th Cir. 1984) (to be a derivative work, "the infringing work must incorporate in some form a portion of the copyrighted work"). Under this controlling precedent, Rimini's work product that does not contain Oracle code or other Oracle expression is not a derivative work as a matter of law.

(17 of 18)

Case: 2:10-cv-00106-LRH-VCF Document 1348-3 Filed: 05/12/20 Page 17 of 19
Case 18-00156, 03/13/2019, Document 54948, Entry: 05/12/20, Page 16 of 187

**GIBSON DUNN**

John A. Polito
August 5, 2019
Page 15

      Documents that support Rimini's position include all documents produced and testimony provided in *Rimini II*, and all documents that have been or will be produced and testimony that will be provided in this matter, related to Rimini's support for PeopleSoft and JD Edwards clients, including, but not limited to:

- The PeopleSoft and JD Edwards software licenses between Oracle and its customers, and all documents and communications related thereto;

- Documents concerning Oracle's treatment of other third-party support providers for Oracle software, including all communications and deposition testimony related thereto;

- The *Rimini II* depositions of Owen Astrachan, John Cauthen, and Richard Allison, including all relevant exhibits to those depositions; and

- The expert reports of Owen Astrachan and John Cauthen in *Rimini II* and all documents and materials cited therein related to the distribution right and derivative works.

Very truly yours,

*/s/ Mark A. Perry*

Mark A. Perry

MAP/dl

**GIBSON DUNN**

John A. Polito
August 5, 2019
Page 16

cc: Karen L. Dunn
Kathleen R. Hartnett
William Isaacson
Ashleigh Jensen
Tran Le
Richard J. Pocker
Beko Reblitz-Richardson
Sean Rodriguez
Gabriel Schlabach
Samuel Ungar
Zachary S. Hill
David Kocan
Lisa S. Lee
Jacob J.O. Minne
John A. Polito
Lindsey M. Shinn
Benjamin P. Smith
Sharon R. Smith