BOIES SCHILLER FLEXNER LLP
RICHARD J. POCKER (NV Bar No. 3568)
300 South Fourth Street, Suite 800
Las Vegas, NV 89101
Telephone:    702.382.7300
Facsimile:    702.382.2755
rpocker@bsfllp.com

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
WILLIAM A. ISAACSON (*pro hac vice*)
KAREN DUNN (*pro hac vice*)
2001 K Street, NW
Washington, DC 20006
Telephone:    202.223.7300
Facsimile:    202.223.7420
wisaacson@paulweiss.com
kdunn@paulweiss.com

BOIES SCHILLER FLEXNER LLP
SEAN P. RODRIGUEZ (*pro hac vice*)
44 Montgomery Street, 41st Floor
San Francisco, CA 94104
Telephone:    415.293.6800
Facsimile:    415.293.6899
srodriguez@bsfllp.com

MORGAN, LEWIS & BOCKIUS LLP
BENJAMIN P. SMITH (*pro hac vice*)
JOHN A. POLITO (*pro hac vice*)
SHARON R. SMITH (*pro hac vice*)
One Market, Spear Street Tower
San Francisco, CA  94105
Telephone:    415.442.1000
Facsimile:    415.442.1001
benjamin.smith@morganlewis.com
john.polito@morganlewis.com
sharon.smith@morganlewis.com

DORIAN DALEY (*pro hac vice*)
DEBORAH K. MILLER (*pro hac vice*)
JAMES C. MAROULIS (*pro hac vice*)
ORACLE CORPORATION
500 Oracle Parkway, M/S 5op7
Redwood City, CA 94070
Telephone:    650.506.4846
Facsimile:    650.506.7114
dorian.daley@oracle.com
deborah.miller@oracle.com
jim.maroulis@oracle.com

*Attorneys for Plaintiffs Oracle USA, Inc.,*
*Oracle America, Inc., and Oracle*
*International Corp.*

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| ORACLE USA, INC.; a Colorado corporation; ORACLE AMERICA, INC.; a Delaware corporation; and ORACLE INTERNATIONAL CORPORATION, a California corporation,<br><br>          Plaintiffs,<br><br>     v.<br><br>RIMINI STREET, INC., a Nevada corporation; and SETH RAVIN, an individual,<br><br>          Defendants. | Case No. 2:10-cv-0106-LRH-VCF<br><br>**ORACLE'S MOTION FOR ORDER TO SHOW CAUSE WHY RIMINI STREET, INC. SHOULD NOT BE HELD IN CONTEMPT** |

**TABLE OF CONTENTS**

Page

I.     INTRODUCTION ............................................................................................... 1

II.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY ......................... 3

    A.    The Rimini I MPSJs and Trial Proved Rimini Infringed Oracle's
        Copyrights. .......................................................................................... 3

    B.    The Court Entered the Injunctions to Prevent Cross-Use and the Copying
        of PeopleSoft Software Outside Customers' Computer Systems. ........... 5

    C.    Rimini Knows It Is in Contempt and Resists Post-Injunction Discovery.............. 6

    D.    Rimini's Business Model Has Not Changed........................................... 7

        1.    Rimini's PeopleSoft Support Processes ..................................... 7

        2.    Rimini's JD Edwards Support Processes .................................. 10

        3.    Rimini's Oracle Database Support Processes ........................... 10

        4.    Rimini's Purported Record Keeping ........................................ 11

III.   LEGAL STANDARDS..................................................................................... 11

IV.    RIMINI'S PEOPLESOFT SUPPORT PROCESSES VIOLATE THE
    INJUNCTION. ................................................................................................ 12

    A.    Rimini Is Violating Paragraphs 4 and 6 of the Injunction. .................. 12

        1.    Rimini's prototype/retrofit development model is cross-use. ................... 13

        2.    Rimini's creation and use of "Dev Instructions" is cross-use.................. 15

        3.    Rimini's tools automate its systematic cross-use..................................... 16

        4.    Rimini cross-uses PeopleSoft when testing its updates. ........................... 17

    B.    Rimini Continues to Violate Paragraph 5 of the Injunction by Copying and
        Using PeopleSoft Outside of its Customers' Own Computer Systems. .............. 18

        1.    Windstream-hosted PeopleSoft environments are not a specific
            licensee's own computer systems. ........................................... 18

        2.    Rimini creates copies of PeopleSoft software and documentation,
            storing them on its networks and computer systems............................... 21

    C.    Rimini's Updates and Modifications to PeopleSoft Software are Derivative
        Works in Violation of Paragraphs 4, 5, and 6 of the Injunction. .......................... 21

i

**TABLE OF CONTENTS**
(continued)

Page

V.      RIMINI'S JD EDWARDS SUPPORT PROCESSES VIOLATE THE
        INJUNCTION. .......................................................................................... 23

        A.      Rimini Copies JD Edwards Source Code When Developing and Testing
                Updates, Violating Paragraph 8 of the Injunction. .................................. 23

                1.      Rimini copies JD Edwards source code into computer memory,
                        electronic documents, and various JD Edwards environments. ............... 24

                2.      Rimini waived its meritless "open code"/"closed code" distinction. ........ 25

        B.      Rimini's JD Edwards Development and Testing Processes Violate
                Paragraph 10 of the Injunction Through Cross-Use and Creation of
                Derivative Works. ................................................................................. 26

VI.     RIMINI DISTRIBUTES PEOPLESOFT AND JD EDWARDS SOFTWARE
        AND SUPPORT MATERIALS IN VIOLATION OF THE INJUNCTION. ................... 27

VII.    RIMINI'S PEOPLESOFT AND JD EDWARDS SUPPORT PROCESSES ALSO
        VIOLATE THE INJUNCTION AS TO ORACLE DATABASE. ................................ 28

VIII.   A BAR ORDER, IMPOUNDMENT, AND DAMAGES ARE JUST
        SANCTIONS. ......................................................................................... 28

ii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A&M Records, Inc. v. Napster, Inc.*,
284 F.3d 1091 (9th Cir. 2002)................................................................................29

*ABS Enter., Inc. v. CBS Corp.*,
908 F.3d 405 (9th Cir. 2018)..................................................................................21

*Adobe Sys. Inc. v. Software Tech*,
No. 5:14-CV-02140-RMW, 2015 WL 6951875 (N.D. Cal. Nov. 10, 2015)...........30

*Apple, Inc. v. Psystar Corp.*,
673 F. Supp. 2d 931 (N.D. Cal. 2009), *aff'd* 658 F.3d 1150 (9th Cir. 2011)...........22

*AT&T Intellectual Prop. II, L.P. v. Toll Free Yellow Pages Corp.*,
No. CV 09-5707, 2009 WL 10675732 (C.D. Cal. Dec. 14, 2009) ...........................11

*BMG Music v. Perez*,
952 F.2d 318 (9th Cir. 1991)..................................................................................30

*Broadcom Corp. v. Qualcomm Inc.*,
No. SACV-05-467-JVS-RNBx, 2008 WL 11336330 (C.D. Cal. Nov. 17, 2008)..............29, 30

*ClearOne Commc'ns, Inc. v. Chiang*,
670 F. Supp. 2d 1248 (D. Utah 2009) ....................................................................30

*Cooke v. United States*,
267 U.S. 517 (1925)................................................................................................28

*Dun & Bradstreet Software Servs., Inc. v. Grace Consulting, Inc.*,
307 F.3d 197 (3d Cir. 2002)....................................................................................22

*Elohim EPF USA, Inc. v. Total Music Connection, Inc.*,
No. CV 14-02496-BRO (EX), 2015 WL 12655556 (C.D. Cal. Oct. 1, 2015)...........27

*Flexible Lifeline Sys., Inc. Precision Lift, Inc.*,
CV 10-44-H-DWM, 2011 WL 13133925 (D. Mont. Sept. 13, 2011) ......................27

*Ford Motor Co. v. Summit Motor Prods., Inc.*,
930 F.2d 277 (3d Cir. 1991)....................................................................................27

*Inst. of Cetacean Research v. Sea Shepherd Conservation Soc'y*,
774 F.3d 935 (9th Cir. 2014)...................................................................................11

*Mercury Serv., Inc. v. Allied Bank of Tex.*,
117 F.R.D. 147 (C.D. Cal. 1987) ............................................................................12

iii

# TABLE OF AUTHORITIES
(continued)

Page

*Micro Star v. Formgen Inc.*,
    154 F.3d 1107 (9th Cir. 1998)........................................................................21, 22, 23, 27

*Omni Outdoor Advertising, Inc. v. Columbia Outdoor Advertising, Inc.*,
    974 F.2d 502 (4th Cir. 1992)........................................................................26

*Oracle USA, Inc. v. Rimini St., Inc.*,
    783 F.App'x 707 (9th Cir. 2019), *cert. denied*, 140 S. Ct. 850 (2020)....................................6

*Oracle USA, Inc. v. Rimini Street, Inc.*,
    879 F.3d 948 (9th Cir. 2018)........................................................................5

*Peterson v. Highland Music, Inc.*,
    140 F.3d 1313 (9th Cir. 1998)........................................................................11

*Rebis v. Universal CAD Consultants, Inc.*,
    No. C-96-4201 SC, 1998 WL 470475 (N.D. Cal. Aug. 11, 1998), *aff'd*, 189
    F.3d 474 (9th Cir. 1999)........................................................................29

*Triad Sys. Corp. v. Se. Express Co.*,
    64 F.3d 1330 (9th Cir. 1995)........................................................................29

*United States v. Bright*,
    596 F.3d 683 (9th Cir. 2010)........................................................................11

*United States v. Patterson*,
    878 F.3d 215 (6th Cir. 2017)........................................................................26

*Wolfard Glassblowing Co. v. Vanbragt*,
    118 F.3d 1320 (9th Cir. 1997)........................................................................26

**Statutes**

17 U.S.C.
    § 106(3)........................................................................27
    § 117(c)........................................................................29
    § 503(b)........................................................................3, 29
    § 504(b)........................................................................30
    § 505........................................................................30

**NOTICE OF MOTION AND MOTION**

Plaintiffs Oracle USA, Inc., Oracle America, Inc., and Oracle International Corp. ("Oracle") move the Court to issue an order to show cause ("OSC") as to why Defendant Rimini Street, Inc. ("Rimini") should not be held in contempt for violating the Court's August 15, 2018 injunction.  ECF No. 1166 ("Injunction").  This motion is based on the matters and argument contained herein, the supporting Declarations of Barbara Frederiksen-Cross ("BFC Decl.") and John A. Polito ("Polito Decl."), Appendix of Exhibits, the entire record in this action, and such other matters as may be presented to the Court.

**I.   INTRODUCTION**

Rimini has violated and is violating multiple provisions of this Court's Injunction and has done so thousands of times since the Injunction went into effect.

Rimini is violating Paragraph 4 of the Injunction, which dictates that Rimini "shall not reproduce, prepare derivative works from, or use a specific licensee's PeopleSoft software or documentation other than to support the specific licensee's own internal data processing operations."  Rimini has never stopped its practice of using one customer's PeopleSoft environment to develop and test fixes and updates that Rimini distributes to other Rimini customers.  Defying the Injunction, the jury's verdict, and this Court's February 2014 summary judgment Order, Rimini deployed its cross-use development model for at least ██ updates since the Injunction went into effect.  Rimini has gone further, creating an automated tool called "Automated Framework" (AFW) to distribute these updates to its customers.  Rimini has executed its AFW tools over ████ times during the post-Injunction period, which is profligate cross-use—not independent development.  As Rimini's expert witness recently admitted at deposition, no customer would hire Rimini if Rimini could not "re-use" the patches and updates that it developed for other customers.  Polito Decl. ¶ 36, Ex. 39 (Lanchak Depo.) at 107:9–111:4.  This Court found that Rimini's business model was "built entirely on its infringement of Oracle's copyrighted software."  ECF No. 1164 at 6.  It still is.

This same Rimini conduct also violates Paragraph 6 of the Injunction, which commands Rimini not to "reproduce, prepare derivative works from, or use PeopleSoft software or

1  documentation on one licensee's computer systems to support, troubleshoot, or perform

2  development or testing for any other licensee, including, specifically, that Rimini Street shall not

3  use a specific licensee's PeopleSoft environment to develop or test software updates or

4  modifications for the benefit of any other licensee."  Rimini cross-uses PeopleSoft software when

5  testing its updates by copying PeopleSoft software to develop test cases and then reusing the test

6  cases (on the order of ████████ in many instances) to benefit multiple other customers

7  receiving the same update.

8         Rimini is violating Paragraph 5 of the Injunction, which prohibits Rimini from

9  "reproduc[ing], prepar[ing] derivative works from, or us[ing] PeopleSoft software or

10  documentation on, with, or to any computer systems other than a specific licensee's own

11  computer systems."  In the Post-Injunction period, at least █ customer-associated PeopleSoft

12  environments are hosted on computer systems at facilities owned and operated by a third party

13  named Windstream.  These environments are not "a specific licensee's **own** computer systems"

14  because Windstream owns the servers and other equipment for cloud-hosting these environments.

15  Rimini's use of these environments as its own private sandbox—to ███████████

16  ████—is yet another violation of the Injunction.

17         Rimini is also violating Paragraph 8 of the Injunction, which prohibits copying "J.D.

18  Edwards software source code to carry out development and testing of software updates."  Rimini

19  routinely copies JD Edwards source code into computer memory, electronic documents, and

20  various JD Edwards environments when preparing updates for its customers.  Rimini also violates

21  the cross-use prohibitions in Paragraph 10 of the Injunction (which mirror those set forth above in

22  Paragraph 6) by adopting substantially the same cross-use development processes that it uses for

23  PeopleSoft.

24         Rimini also violates Paragraphs 3 and 7 of the Injunction, which prohibit Rimini from

25  distributing PeopleSoft and JD Edwards software and derivative works.  This again is Rimini's

26  core business model: turn-the-crank delivery of cookie-cutter PeopleSoft and JD Edwards updates

27  so that Rimini customers can keep pace with tax, regulatory, and other legal changes.  Rimini also

28  violates the Injunction's requirement that Rimini "shall not reproduce, prepare derivative works

2

1  from, or distribute Oracle Database software" as set forth in Paragraph 15.  Rimini unlawfully

2  reproduced Oracle Database every time that it used one of the more than ███ customer-associated

3  environments containing Oracle Database to develop, test, or install its updates.

4    Knowing that it faces contempt for its flagrant disregard of the Injunction, Rimini

5  attempted to hide its violations.  Shortly after the Injunction went into effect, Rimini refused to

6  provide any information regarding what steps, if any, it was taking to comply.  Rimini refused to

7  place its files in escrow so that its compliance with the Injunction could be assessed.  Rimini

8  repeatedly resisted compliance discovery, and lost multiple motions.  Rimini maintained the

9  worst documentation and record-keeping that Oracle's expert has seen in her over 40 years of

10  software development and related consulting.  Rimini wrote a program to delete over ███ files

11  that it distributed to customers, and failed to suspend this deletion program as the law requires.

12    Rimini's wanton disregard of the Injunction warrants a finding that Rimini is in contempt.

13  This Court should amend the Injunction to bar Rimini from providing support for any Oracle

14  PeopleSoft or JD Edwards product.  The Court should also order impoundment of Rimini's

15  computer systems under 17 U.S.C. § 503(b) or alternatively require that they be placed into the

16  escrow service of Oracle's choice so that Oracle can continue to monitor compliance with this

17  Court's Injunction.  Oracle further requests an award of attorneys' fees expended in enforcing the

18  Injunction as well as compensatory damages and limited damages-related discovery.

19  **II.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

20    **A.    The *Rimini I* MPSJs and Trial Proved Rimini Infringed Oracle's Copyrights.**

21    Rimini is the second incarnation of a business model that its CEO, Seth Ravin, originally

22  started with a company called TomorrowNow.  TomorrowNow pled guilty to criminal copyright

23  infringement and paid hundreds of millions of dollars to Oracle in an earlier civil case.  ECF No.

24  1120, Oracle's Renewed Mot. for Attorneys' Fees at 8–9.  Mr. Ravin conceded the core services

25  of the Rimini and TomorrowNow support models are the same.  ECF No. 790 (Tr. at 410:10–21).

26    After Oracle brought suit in January 2010, Rimini and Mr. Ravin maintained throughout

27  pretrial proceedings that Rimini's core support processes did not involve cross-use, only to admit

28  at trial that cross-use occurred "all the time."  ECF No. 1120 at 3–6.  This is only one entry in the

3

catalog of "unreasonable litigation tactics," "significant litigation misconduct," and spoliation that Rimini adopted throughout the litigation, all of which are well documented.  *Id.*; ECF No. 1164, Order at 14–15 (Rimini's belated cross-use admission was "effectively a sea change[] in Rimini Street's copyright defense throughout the litigation to that time and needlessly caused extensive investigation, discovery and expense to Oracle").  Rimini also deleted a software library of Oracle materials two months before it alleged in its counterclaim that this software library "never existed."  ECF No. 466 at 17.  The Court imposed spoliation sanctions, including an adverse jury instruction.  *Id.* at 18; ECF No. 880, Jury Instructions at 20; ECF No. 1164, Order at 14.

Despite the challenges posed by Rimini's litigation misconduct, Oracle prevailed on partial summary judgment and at trial, establishing that Rimini infringed all 93 of Oracle's copyrights-in-suit on two primary grounds: cross-use and violation of the facilities restriction.

*Cross-use:*  In February 2014, the Court ruled that Rimini's copying and use of Oracle's PeopleSoft software was unlicensed because "the development environments associated with the City of Flint were not used solely for the City of Flint's internal data processing operations. Instead, the development environments were used to develop and test software updates for the City of Flint and other Rimini customers …."  ECF No. 474 at 13.  The Court also held that the licenses did not permit Rimini to reproduce or create derivative works from PeopleSoft software. *Id.* at 12-14; *see also* ECF No. 880, Jury Instruction at 30 (similar derivative work jury instruction).[1]  The Court further ruled that "the right to modify the software is granted solely to the [licensee], and not to any third-party."  ECF No. 474 at 13.

*Facilities restriction:*  In that same February 2014 Order, the Court rejected Rimini's express license defense to copyright infringement and held that the PeopleSoft licenses at issue prohibit copying the software to *any* offsite location.  ECF No. 474 at 12 (noting the licenses at

---

[1] A few months later in *Rimini II*, this Court acknowledged the possibility that "there may not be any manner by which a competing company like Rimini can engage in its services without engaging in copyright infringement," ruling that such a situation "does not constitute copyright misuse."  *Rimini II*, ECF No. 90, July 9, 2015 Order Granting Mot. to Strike at 6.  Rimini's preference to pursue a given business model does not give it license to violate copyright law (or the Court's Injunction).

ORACLE'S MOTION FOR ORDER TO SHOW CAUSE

1    issue authorize use of the software "solely for [the customer's] internal data processing operations

2    at its facilities…") (emphasis omitted).  With respect to customer City of Flint, MI, the Court held

3    that "[t]his license provision expressly limits *use* of the software [] to the City of Flint's

4    facilities…." and that "Section 1.2(b)(i) expressly limits *copying* the licensed software to *only* the

5    City of Flint's facilities."[2]  ECF No. 474 at 12 (emphasis added); *id.* at 13 (excepting certain

6    back-up copies); *see also* ECF No. 880, Jury Instruction at 30 ("The PeopleSoft software licenses

7    prohibited Rimini Street from copying or preparing derivative works from PeopleSoft software

8    other than to support the specific licensee's own internal data processing operations on the

9    licensee's own computer systems").

10         **B.    The Court Entered the Injunctions to Prevent Cross-Use and the Copying of**
           **PeopleSoft Software Outside Customers' Computer Systems.**
11

12         After the jury verdict, an initial appeal, and a limited remand, this Court entered the

13   Injunction over Rimini's objection that the Injunction enjoined "cross-use" too broadly.  ECF No.

14   1164, Order; ECF No. 1166, Injunction; ECF No. 1130, April 4, 2018 Opp. to Oracle's Renewed

15   Mot. for a Perm. Inj. at 5, 16.  This Court appropriately recognized that the Ninth Circuit defined

16   cross-use broadly: "*[a]ny work* that Rimini performs under color of a license held by a customer

17   for other existing customers cannot be considered work in support of that particular customer."

18   *Oracle USA, Inc. v. Rimini Street, Inc.*, 879 F.3d 948, 957 (9th Cir. 2018) (emphasis added).  This

19   Court then denied Rimini's request to stay the Injunction because Rimini raised "the same

20   argument and issues it has raised throughout this action which the court has repeatedly denied as

21   without merit," and its request was "premised on an unsupported and extremely narrow reading of

22   the [first] Ninth Circuit opinion…."  ECF No. 1177 at 3.

23         Despite this clear guidance, Rimini continued to represent it did not know what the

24   Injunction meant and that the Injunction was unlawful.  ECF No. 1339-3, Feb. 7, 2019 letter from

25   E. Vandevelde to Z. Hill at 1 (Rimini "█████████████████████████████████

26   _____

27   [2] Rimini stipulated "[f]or purposes of this action" that "all of Rimini's PeopleSoft customers have
     identical or similar language" in their licenses agreements such that "the PeopleSoft license
28   agreements for all of Rimini's PeopleSoft customers shall be governed by the license construction
     provided by the Court" in its summary judgment order.  ECF No. 599 at ¶¶ 1-2.

5

ORACLE'S MOTION FOR ORDER TO SHOW CAUSE

1   ████████████████████████████" and that "█████████████████████████████████

2   ███████████████████████████████████████████████████████████"); ECF No. 1168,

3   Rimini's Emergency Mot. for Stay at 7, 8, 17, 23–24 ("every aspect of the injunction" is

4   "erroneous"); ECF No. 1333-5, 2018 Appeal ECF No. 4-1, Mot. for Stay at 1 ("The injunction

5   entered below … is unprecedented, inequitable, unlawful, and unconstitutional.").

6        On appeal, Rimini argued to the Ninth Circuit that the "injunction as entered is unlawfully

7   overbroad and vague," on the ground, *inter alia*, that the Injunction enjoins cross-use.  ECF No.

8   1209-3, 2018 Appeal ECF No. 12, Opening Brief at 11; *see also id.* at 41–48, 50–54.  But the

9   Ninth Circuit rejected nearly all of Rimini's arguments, vacating only two paragraphs and four

10  words of the Injunction (none of which are relevant to this motion), holding that "[i]n all other

11  respects, the injunction is not overbroad" and "not impermissibly vague."  *Oracle USA, Inc. v.*

12  *Rimini St., Inc.*, 783 F.App'x 707, 710–12 (9th Cir. 2019), *cert. denied*, 140 S. Ct. 850 (2020).

13       **C.    Rimini Knows It Is in Contempt and Resists Post-Injunction Discovery.**

14       Typically, a publicly traded corporation that is subject to a permanent injunction will

15  transparently demonstrate that it is complying, but Rimini is no typical corporation.  Rimini

16  refused to provide *any* information voluntarily about what steps, if any, it was taking to comply.

17  Rimini resisted Oracle's request for post-Injunction discovery, rejected a stipulation to permit the

18  use of *Rimini II* material in *Rimini I*, and refused to discuss saving relevant support materials in

19  escrow, at Oracle's expense.  Oracle successfully moved to reopen discovery in *Rimini I* and to

20  modify the Protective Order in *Rimini II*.  ECF No. 1201; *Rimini II,* ECF No. 1226 (Motions);

21  ECF No. 1215, April 4, 2019 Order; *Rimini II*, ECF No. 1237, May 14, 2019 Order at 3.

22       Even after losing nearly everything in its second merits appeal, Rimini continued resisting

23  discovery.  Rimini sought to impose absurd and arbitrary limits on Injunction-compliance

24  discovery, proposing that Rimini produce vastly fewer documents than some *third parties* had

25  produced in this matter.  ECF No. 1239, Mot. at 15–16.  Oracle was forced to file another motion

26  to compel, which the Court granted in part.  ECF No. 1239, Mot.; ECF No. 1244, Opp.; ECF No.

27  1248, Reply; ECF No. 1255, Order.  Rimini recently threw a Hail Mary: a filing styled "Motion

28  to Enforce the Court's Orders," rehashing—for a seventh time—the same, unavailing arguments

1   it has always made against the Court's Injunction.  ECF No. 1323.

2          Then, in a last-ditch effort to ward off contempt, Rimini simply stalled.  Rimini opposed

3   the current schedule for this motion, insisting that expert discovery must be completed and then

4   arguing that expert discovery should be postponed until after the Coronavirus pandemic subsided

5   because expert depositions had to be conducted in person.  ECF No. 1351 at 4–5.  After the Court

6   rejected this position, the parties proceeded with video depositions.  Rimini attorneys, who argued

7   that depositions could not be safely conducted in person under current conditions, flew across the

8   country and defended them in person.  Polito Decl. Ex. 39 (Lanchak Depo) at 10:10–16.

9          In fighting against the Injunction, Rimini conceded to this Court, the Ninth Circuit, and

10   the public that the Injunction as written and subsequently affirmed covers Rimini's more recent

11   conduct and would require further changes to its support processes.  ECF No. 1333-5, 2018

12   Appeal, Dkt. 4-1 at 12 (district court's "conclusion—that Rimini can be enjoined from (and

13   potentially held in contempt for) conduct in *Rimini I* that is actively being litigated in *Rimini II*—

14   is illogical and erroneous"); ECF No. 1130 at 5, 16; ECF No. 1168, Rimini's Emergency Mot. for

15   Stay at 2, 10, 16, 21; ECF No. 1168-4, Slepko Decl. ISO Mot. for Stay; ECF No. 1118-2, Hill

16   Decl., Ex. A, Mar. 15, 2018 Rimini 10-K SEC Filing.  Rimini's counsel also represented that

17   Rimini had made such changes, including that when "updates for one client finished, the engineer

18   then turns to the second client and goes back to the white paper and – you know, the whiteboard

19   and starts over from scratch."  ECF No. 1218, Apr. 4, 2019 Hearing Tr. at 6:20–24; *id.* at 11:21–

20   24.  But Rimini's processes do not "start over from scratch"; they instead rely on cross-use.

21          **D.     Rimini's Business Model Has Not Changed.**

22          In pre-trial proceedings, Rimini maintained one defense for the entirety of discovery, and

23   abruptly changed course at trial.  ECF No. 1120 at 3–6; ECF No. 1164, Order at 14 (discussing

24   Rimini's cross-use contradictions).  The same has happened post-trial: Rimini has spent the last

25   two years claiming that it does not know what the Injunction means and that it is too broad, but

26   now claims that Rimini somehow complies.  Discovery shows this is not true.

27          **1.     Rimini's PeopleSoft Support Processes**

28          After the temporary stay on the Court's Injunction expired on November 5, 2018,

Rimini's PeopleSoft support processes have violated the Injunction in several respects.

*First*, Rimini's development model is effectively the same as the one discussed in this Court's 2014 summary judgment order.  ECF No. 474 at 13; BFC Decl. ¶¶ 13–14.  Rimini copies PeopleSoft updates developed in environments associated with a small number of customers (what Rimini refers to as "prototype" environments) into additional environments associated with many other customers (what Rimini refers to as "retrofit" environments).[3]  BFC Decl. ¶¶ 13–15. Records produced by Rimini show that it has used its prototype/retrofit model for over █ ██████████████████████████████████████████████████ in the post-Injunction period. BFC Decl. ¶¶ 16–18.

*Second*, after the Injunction went into effect, Rimini started generating a detailed set of instructions called "Dev Instructions" to allow developers to ████████████████████████ █████████████████████████████.  BFC Decl. ¶¶ 28–29.  A "Dev Instruction" documents the code changes and other modifications to Oracle software by which Rimini developed an update for a prototype client (*e.g.*, Client A).  *See* ECF No. 1310, Jan. 22, 2020 Hearing Tr. at 47:1–5.  Rimini's Dev Instructions contain detailed steps for ██████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████.  BFC Decl. ¶¶ 30–33; Polito Decl. ¶¶ 15–16, Ex. 18 (RSI006913538), Ex. 19 (RSI006952588); ECF No. 1292-13 (RSI006954036); ECF No. 1292-1 to -5 (Frederiksen-Cross Decl.) ¶¶ 7–15, Exs. 1–4; BFC Decl. ¶ 87, Ex. 3.  Rimini developers ███████████████ ████████████████████████████████████████████████  ECF No. 1292-10 (Rimini's First Supp. Resp. to Rog. 1) at 7.

*Third*, Rimini continued to use its own set of AFW software tools ████████████████

---

[3] In the post-Injunction period, Rimini has adopted the terms "Scrum" and "Kanban" as replacements for "prototype" and "retrofit," respectively.  Because "Scrum" and "Kanban" are sometimes used with formalized software development methods, Rimini's adoption of them now appears to be an attempt to add legitimacy to its processes.  But as shown below, though Rimini's names keep changing, its underlying cross-use of Oracle software does not.

ORACLE'S MOTION FOR ORDER TO SHOW CAUSE

1   ███ of Oracle's PeopleSoft software.  BFC Decl. ¶¶ 37–39, 43.  Before the Injunction went into

2   effect, Rimini primarily used AFW's ████████████████ to ██████████████████

3   ████████████████████████████████████████████████████████████████████

4   ████████████████████████████████████████████████████████ .

5   BFC Decl. ¶ 38.  After November 5, 2018, Rimini began using the AFW TransferFiles program

6   as one of the primary means of distributing update files to customers.  BFC Decl. ¶ 42.

7   TransferFiles allows Rimini to distribute identical copies of update files that are developed using

8   one Oracle software environment to multiple other Oracle software environments.  BFC Decl.

9   ¶ 39.  TransferFiles accomplishes this by copying and distributing files from a ██████████

10  ████ to customer-associated environments.  *Id.*  In the TransferFiles "█████████" mode of

11  distribution, a Rimini developer ████████████████████████████████████████

12  ████████████████████████████ .  BFC Decl. ¶ 40.  AFW then ████████████

13  ████████████████████████████████████████████████████████████████

14  ████████████████████████████████████████████████████ .  BFC

15  Decl. ¶ 41.  Rimini has successfully completed at least ████ file transfer cycles during the post-

16  Injunction period, using AFW to distribute files having ████████████████████████

17  ███████████ .  BFC Decl. ¶ 44.

18       *Fourth*, to test its PeopleSoft updates, Rimini ████████████████████████████

19  ████████████████████████████████████████████████████████

20  ████████████████████████████████████████████████████████

21  ████████████████████████████████████████ .  BFC Decl. ¶¶ 49, 52.  Rimini then

22  reuses these ██████████████████████████████████ for other Rimini customers

23  receiving the same update.  BFC Decl. ¶¶ 53–68.

24       *Fifth*, Rimini continues to reproduce and use PeopleSoft software on environments that

25  are cloud-hosted by Windstream.[4]  In fact, for ████ of its post-Injunction updates, Rimini used at

26  least one Windstream environment for ████████████████████ .  BFC Decl. ¶ 73.  In the post-

27  _____

28  [4] Windstream is now known as TierPoint, but documents produced in discovery continue to refer to it as "Windstream" and so will Oracle in its OSC Motion.

1    Injunction period, there are at least ▬ such Windstream environments associated with ▬ Rimini

2    customers.  Polito Decl. ¶¶ 24, 26, Ex. 27 (Rimini Supp. Resp. to Oracle's Supp. Interrog. No. 4)

3    at 9:23–26, Ex. 29 ("WSM" environments); BFC Decl. ¶ 72.  These Rimini customers entered

4    into ▬▬▬▬ with Windstream to ▬▬▬▬

5    ▬▬▬▬▬▬▬▬▬▬

6    ▬▬.  Polito Decl. ¶¶ 19, 22, Ex. 22 (Heaberlin Depo.) at 15:9–23, 17:1–10, 56:10–

7    20, Ex. 25 (Depo. Ex. 2231).  Windstream—not the Rimini customers—▬▬▬.  Polito

8    Decl. ¶ 23, Ex. 26 (RSI2_022009236).  Rimini also continues to reproduce PeopleSoft software

9    and documentation on its own systems.  BFC Decl. ¶¶ 77–82, Ex. 1, Ex. 2; Polito Decl. ¶¶ 3, 8,

10   Ex. 6 (Mackereth Rule 30(b)(6) Depo.) at 281:11–282:5, Ex. 11 (Depo Ex. 1852).

11         *Sixth*, Rimini continues to modify and extend the features of PeopleSoft software.  BFC

12   Decl. ¶ 83.  Oracle's and Rimini's experts agree that Rimini creates derivative works when it

13   applies its PeopleSoft updates to existing environments.  BFC Decl. ¶ 84; Polito Decl. ¶ 37, Ex.

14   40 (Astrachan Rpt.) at n.87.  Rimini's individual updates likewise qualify as derivative works

15   because they extend and expand Oracle's copyrighted PeopleSoft software, rely for their

16   operation on the underlying PeopleSoft architectural framework, and do not operate

17   independently from the PeopleSoft components.  BFC Decl. ¶¶ 84–85.

18              **2.       Rimini's JD Edwards Support Processes**

19         Rimini ▬▬▬▬▬▬▬▬▬▬▬

20   ▬▬▬▬▬▬▬▬ Polito Decl. ¶¶ 3–4, Ex. 6 (Mackereth

21   Rule 30(b)(6) Depo.) at 132:8–134:21, Ex. 7 (Depo. Ex. 1833).  As a result, Rimini continues to

22   copy JDE source code by modifying JDE source code files (BFC Decl. ¶¶ 90–93) and by copying

23   JDE source code ▬▬▬▬ (BFC Decl. ¶¶ 97–101, Ex. 5) and ▬▬▬

24   ▬ (BFC Decl. ¶ 94, Ex. 4).  Rimini also uses effectively the same prototype/retrofit

25   development model that it does for PeopleSoft.  BFC Decl. ¶¶ 102–04.

26              **3.       Rimini's Oracle Database Support Processes**

27         There are at least ▬ environments associated with Rimini customers that use Oracle

28   database as the database component.  BFC Decl. ¶ 121.  Any fixes or updates that Rimini

1  developed, tested, or installed on these environments resulted in the unlawful reproduction of

2  Oracle Database in violation of the Injunction.  BFC Decl. ¶ 120; Injunction ¶ 15.

3  **4.      Rimini's Purported Record Keeping**

4  Rimini has made various claims regarding how it purportedly keeps its business records,

5  and assuming Rimini is not misrepresenting its business practices, then it appears that Rimini has

6  organized its business to ensure that it has very little insight into what materials Rimini provides

7  to its own customers.  BFC Decl. ¶¶ 122–24.  Oracle's technical software expert, with over forty-

8  five years of experience as a software developer and consultant, has "not seen a poorer example

9  of recordkeeping for complex software development than that presented by Rimini." *Id.*  Further,

10  Rimini wrote a computer program to *delete* copies of the files it sent to its customers that would

11  show what was sent.  Rimini did not suspend this deletion when the Injunction-compliance

12  proceedings began, and Oracle intends to seek sanctions for spoliation (again).

13  **III.    LEGAL STANDARDS**

14  Contempt proceedings "ensure that the court's vindication of litigants' rights is not merely

15  symbolic." *Inst. of Cetacean Research v. Sea Shepherd Conservation Soc'y*, 774 F.3d 935, 952

16  (9th Cir. 2014).  To hold Rimini in contempt, Oracle must show (1) Rimini violated the Court's

17  Injunction, (2) beyond substantial compliance, (3) that Rimini's violations were not based on a

18  good faith and reasonable interpretation of the Injunction, and (4) by clear and convincing

19  evidence. *United States v. Bright*, 596 F.3d 683, 694 (9th Cir. 2010).  In seeking an Order to

20  Show Cause, Oracle must cite the injunction provisions at issue and show why Rimini has not

21  complied. *AT&T Intellectual Prop. II, L.P. v. Toll Free Yellow Pages Corp.*, No. CV 09-5707,

22  2009 WL 10675732, at *2 (C.D. Cal. Dec. 14, 2009).  Upon satisfaction that the "motion states a

23  case of non-compliance, the court orders the [enjoined party] to show cause why he should not be

24  held in contempt and schedules a hearing for that purpose." *Id.* (alterations in original).[5]

25  ────────────────

26  [5] Oracle notes the Court may impose contempt sanctions "solely on the basis of affidavits" when "the affidavits offered in support of a finding of contempt are uncontroverted." *Peterson v.*

27  *Highland Music, Inc.*, 140 F.3d 1313, 1324 (9th Cir. 1998).  Rimini's expected submission of competing declarations does not prevent this Court from issuing an OSC or from otherwise

28  proceeding to a contempt hearing.  That is particularly so when Rimini has made repeated

**IV.     RIMINI'S PEOPLESOFT SUPPORT PROCESSES VIOLATE THE
       INJUNCTION.**

**A.     Rimini Is Violating Paragraphs 4 and 6 of the Injunction.**

Rimini's PeopleSoft support processes continue to constitute cross-use, just as they always have.  Under Paragraph 4, Rimini "shall not reproduce, prepare derivative works from, or use a specific licensee's PeopleSoft software or documentation other than to support the specific licensee's own internal data processing operations."  Injunction ¶ 4.  Under Paragraph 6, Rimini "shall not reproduce, prepare derivative works from, or use PeopleSoft software or documentation on one licensee's computer systems to support, troubleshoot, or perform development or testing for any other licensee, including, specifically, that Rimini Street shall not use a specific licensee's PeopleSoft environment to develop or test software updates or modifications for the benefit of any other licensee."[6]  Injunction ¶ 6.

Rimini's PeopleSoft support processes rely on numerous forms of cross-use that violate these prohibitions.  *First*, Rimini continues to copy updates developed ███████████████ ████████████████████████████████████, with or without modification. *Second*, Rimini creates what it euphemistically says are "Dev Instructions" to memorialize "how Rimini engineers solve[] [a] problem for client A" (ECF No. 1310 at 47:1–5), so that its developers can apply that "know-how" to propagate updates for clients B, C, and D.  But in practice, Rimini's Dev Instructions are cross-use and "know-how" means creating code that constitutes derivative works of Oracle's copyrighted software.  *Third*, Rimini's automated framework (AFW) tools are designed to ████████████████████████. *Fourth*, Rimini uses a PeopleSoft environment associated with one of its customers to ███████████

---

inconsistent statements about its cross-use of Oracle software, deletion of its software library, and its general support practices as outlined above.  *Mercury Serv., Inc. v. Allied Bank of Tex.*, 117 F.R.D. 147, 158 (C.D. Cal. 1987) ("Sanctioning a party or its counsel for the filing of false or seriously misleading affidavits is appropriate under these inherent powers, whether the Court makes a specific contempt finding or not, to maintain the authority and dignity of the Court.").  A full hearing is thus required should Rimini contest the evidentiary showing Oracle makes herein.

[6] Paragraph 2 of the Injunction likewise requires that Rimini's reproduction, distribution, and preparation of derivative works from Oracle software be "solely in connection with work for a specific customer" with a valid license agreement authorizing Rimini's conduct.  Injunction ¶ 2.

12

1 ████████████████████████████████████████ receiving the same update.

2   The evidence clearly and convincingly shows that cross-use remains the centerpiece of

3 Rimini's PeopleSoft support processes.  In fact, Rimini's own expert testified that no customer

4 would hire Rimini if it did not "re-use" materials it developed for other customers.  Polito Decl.

5 Ex. 39 (Lanchak Depo.) at 107:9–111:4.  Rimini's professed reforms are window dressing on the

6 same unlawful core practices.  This is the antithesis of substantial compliance with the Injunction.

7   **1.    Rimini's prototype/retrofit development model is cross-use.**

8   Rimini's prototype/retrofit development model relies on the unlawful cross-use of Oracle

9 software.  BFC Decl. ¶¶ 13–14, 23.  A "prototype," by definition, is a "first, typical or

10 preliminary model, especially a machine, from which other forms are *developed or copied*."[7]  In

11 fact, this development model harkens back to the same "creation and use of generic development

12 environments" that Rimini adamantly claims to have stopped after this Court's February 2014

13 summary judgment order.  ECF No. 1323 at 1 (Rimini detailing same).  But whatever the label,

14 Rimini continues to do exactly what this Court held it could not (back in 2014): use a PeopleSoft

15 environment "to develop and test software updates for [the associated customer] and other Rimini

16 customers with similar software licenses."  ECF No. 474 at 11.  Thus, while the names keep

17 changing ("generic" is apparently out; "Scrum" and "Kanban" are now in), the underlying cross-

18 use remains the same.  Rimini copies PeopleSoft software in the prototype environments when

19 developing and testing an update, and Rimini's copying and use is for the benefit of the retrofit

20 customers.  BFC Decl. ¶ 14.

21   Rimini uses a relatively small number of prototype (*i.e.*, "Scrum") clients to perform the

22 time-consuming work of development, memorializes much of that development work in Dev

23 Instructions and ███████████████████, and then rapidly copies that work to many more

24 retrofit (*i.e.*, "Kanban") clients.  BFC Decl. ¶ 15.  Rimini even created a ████████████████

25 for its retrofit team, which shows that Rimini workers need only ████████████████████

26 ████████████████████████████████████████████████████

27

28 [7] Oxford University Press, available at: https://www.lexico.com/en/definition/prototype (last accessed July 10, 2020) (emphasis added).

██████████████████████████████████████████████████████████████████

██████████.  BFC Decl. ¶ 17; ECF No. 1292-6 (excerpts of PUSP-15223).

One example is Rimini's HCM200443 update from early 2019, shortly after the Injunction went into effect.  Rimini's development records[8] show development for ████████████████ ███████████████████████████████████████████████ BFC Rpt. ¶¶ 19–21; Polito Decl. ¶ 9, Ex. 12 (ORCLRSJIRA00000376 (PUSP-14966)). Development involved several tasks: ███████████████████████████████████████████████████ ████████████████.  *Id.*  By contrast, the retrofit team ███████████████████████ ██████████████████████████████████████████████████████████████████ BFC Decl. ¶¶ 21–22; Polito Decl. ¶ 10, Ex. 13 (ORCLRSJIRA00000400 (PUSP-15200)). Rimini's retrofitting of the updates to the retrofit clients was ████████████████████ ███████████ BFC Decl. ¶ 21.  In short, Rimini cross-used at least ██████████████ ███████████ selected for this update as a platform for development so that Rimini could rapidly build and distribute the update for the remaining ██ retrofit customers.  BFC Decl. ¶ 23.

The same cross-use is evident in Rimini's PeopleSoft update HCM200440.  Prototype development for this update began on ██████████████████████████████████████████ ████████████████████████ BFC Decl. ¶ 24; Polito Decl. ¶¶ 13, 11, Ex. 16 (RSI007899901); Ex. 14 (ORCLRSJIRA00000121 (PUSP-16095)).  But the retrofit work was ████████████████ ██████████████████████████████████████████████████████████████ ██████ BFC Decl. ¶ 25; Polito Decl. ¶ 12, Ex. 15 (ORCLRSJIRA00000460 (PUSP-16643)); Ex. 16.  Internal emails show ████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████ ██████████████████████████████████.  ECF No. 1292-15 (RSI007041886); BFC Decl. ¶ 26.  Rimini also referred to the Dev Instructions for this update █████████████████ underscoring that the retrofit team traffics in cross-use instead of actual development work. Polito Decl. ¶ 14, Ex. 17 (RSI007042001); BFC Decl. ¶ 27.

─────────────────

[8] Rimini uses the Jira online platform to track development and distribution of updates.  BFC Decl. ¶ 16; Polito Decl. Ex. 6 (Mackereth Rule 30(b)(6) Depo.) at 222:15-21.

14

Rimini has cloned its ███████████████████, indicating that Rimini used its cross-use model on at least as many occasions to develop PeopleSoft updates.  BFC Decl. ¶¶ 17–18.  The ███████████████ that Rimini produced from the post-Injunction period corroborate this staggering cross-use because ██████████████████████ ████████████████████████████████████████████  These ████████████████ "Scrum" designations and more than ████████ as many for "Kanban" (████), proving that Rimini's business model continues to be built on the unlawful cross-use of Oracle's software.  BFC Decl. ¶ 18.

### 2.    Rimini's creation and use of "Dev Instructions" is cross-use.

Cross-use is the entire purpose of Rimini's new reliance on so-called "Dev Instructions."  ECF No. 1292-10 (Rimini's First Supp. Resp. to Rog. 1) at 7; BFC Decl. ¶¶ 28–29.  A "Dev Instruction" memorializes the code changes and other modifications to Oracle software by which Rimini developed an update for a prototype client (*e.g.*, client A).  *See* ECF No. 1310 at 47:1–5.  Rimini developers ████████████████████████████ ████████████████████████████ ECF No. 1292-10 at 7.   The bottom line is simple: customer A does not need the Dev Instruction because its update has already been completed.  Dev Instructions exist only for Rimini to deliver to customers B, C, and D the same update that Rimini created using the environment associated with customer A.

Rimini's Dev Instructions contain code changes and highly detailed steps for replicating the same updates previously developed in a prototype environment.  BFC Decl. ¶ 30.  At least ███ of Rimini's Dev Instructions contain Oracle source code, which in itself, is a violation of the Injunction.  Injunction ¶ 5; Note 12, *infra*.  Other Dev Instructions ████████████ ████████████████████████████████████████████ ████████████████████████████████████ ████ BFC Decl. ¶ 33; ECF No. 1292-13 (RSI006954036).  Another Dev Instruction ████████ ████████████████████████████████████████████ ████ BFC Decl. ¶ 31–32; Polito Decl. Ex. 18 (RSI006913538) (████████████████ in Oracle source code file ████████████).  Yet another Dev Instruction does not

15

1   even require development in the target environment, instead ██████████████████

2   ██████████████████████████████████████████████████████████████████████

3   BFC Decl. ¶ 30; Polito Decl. Ex. 19 (RSI006952588) (██████████████████████

4   ████████████████).  Dev Instructions are cookie-cutter cross-use in violation of Paragraphs 4

5   and 6 of the Injunction.

6           As to Paragraph 4, when Rimini views PeopleSoft software on an environment associated

7   with customer A to create a Dev Instruction, a copy of PeopleSoft is necessarily reproduced into

8   computer memory.  BFC Decl. ¶ 34.  Rimini agrees that ████████████████████████

9   ██████████████████████████████████████████████████████████████

10  ████████████████████████████████████████   ECF No. 1297 (Opp. to Oracle's Mot.

11  to Compel) at 22:17–20.  But Rimini's use and reproduction of PeopleSoft software to create this

12  Dev Instruction does not support Customer A's "internal data processing operations," as

13  Paragraph 4 of the Injunction requires, because Rimini uses the Dev Instruction to implement the

14  update for multiple other customers and relies on the Dev Instruction to do so.  Injunction ¶ 4.

15  Rimini violates Paragraph 6 of the Injunction because it creates Dev Instructions "for the benefit"

16  of multiple other licensees receiving the same update (Customers B, C, and D).  Injunction ¶ 6.  If

17  Rimini created each update independently for individual customers, there would be no need for

18  technical documentation like Dev Instructions to allow a Rimini engineer to replicate an update

19  with another customer.  BFC Decl. ¶ 35.

20          Rimini has wrongly argued that its use of Dev Instructions is permissible because

21  copyright law permits the re-use of "know how."  Neither copyright law nor the Injunction

22  recognizes an exception for "know how," and Rimini has no legal authority to support this

23  position.  *See Rimini II*, ECF No. 1085 (Oracle's Opp. to Rimini's Mot. for Part. Summ. J.) at 16–

24  18.  Further, Dev Instructions are not "know how," as an engineer who knows how to develop a

25  fix or update would not require step-by-step instructions.

26                  **3.      Rimini's tools automate its systematic cross-use.**

27          Rimini's continued use of and reliance on its AFW tools (and TransferFiles in particular)

28  violates the Injunction's cross-use prohibitions.  TransferFiles is designed to maximize cross-use

16



1  because it allows Rimini █████████████████████████████████████████████

2  ████████████████████████████████████████████████████████████████████.

3  BFC Decl. ¶ 43.  Rimini has successfully completed at least ██████ file transfer cycles during the

4  post-Injunction period, with AFW distributing files having ████████████████████████

5  █████████.  BFC Decl. ¶ 44.

6       These metrics show that Rimini frequently uses TransferFiles as part of its cross-use

7  development process to █████████████████████████████████.  BFC Decl. ¶¶ 45–

8  46.  For one exemplary update (HCM200640), a Rimini developer sent a file named ██████████

9  to the PeopleSoft environment associated with one customer (████████) ██ times between July 23

10  and July 26, 2019 as part of prototype development; █████████████ was then distributed to ██ other

11  Rimini customers between July 27 and August 2, 2019.  This pattern of activity shows that

12  Rimini used the environment associated with ████████ to support development for ████ other

13  customers.  BFC Decl. ¶¶ 47–48.  Rimini also regularly sent identical copies of Dev Instruction

14  files to ██████ of customers at the same time, and, on at least ██████ separate occasions, sent the

15  same Dev Instruction file to █████████████ customers at the same time.  BFC Decl. ¶ 47.

16  **4.  Rimini cross-uses PeopleSoft when testing its updates.**

17       Rimini also is violating the Injunction's cross-use prohibitions that extend to "test[ing]

18  software updates or modifications."  Injunction ¶ 6.  As Rimini does not have a license to Oracle

19  software, Rimini can only test PeopleSoft updates in a customer's environment.  Rimini *could*

20  fully test each update a customer receives in that customer's environment, but that would be too

21  time-consuming and expensive for Rimini, thus preventing Rimini from undercutting Oracle's

22  prices.  So, once again, Rimini resorts to cross-use for testing.

23       Rimini first tests an update in a PeopleSoft environment associated with one customer—

24  thus copying PeopleSoft software into system memory—then ██████████████████████

25  ████████████████████████████████████████████████████.  BFC

26  Decl. ¶¶ 49–52.  Rimini then reuses these █████████████████████████████████

27  ████████████████████████████████  BFC Decl. ¶¶ 52–68.  To ██████████████

28  ████████████████████████, Rimini frequently █████████████████████████████████

1 ██████████████████████████████████████████████████████

2 ████████████████████████████████████. BFC Decl. ¶¶ 49, 52–68.

3 Rimini developers then ████████████████████████████████████

4 █████████████████████████████ BFC Decl. ¶¶ 49, 52–68.

5     Rimini also cross-used the ███████ environment associated with the City of Eugene

6 (COE or COEX) for ██████████████████████████. BFC Decl.

7 ¶¶ 69–71; Polito Decl. ¶¶ 17–18, Ex. 20 (RSI007421994), Ex. 21 (RSI007330441).

**B.    Rimini Continues to Violate Paragraph 5 of the Injunction by Copying and Using PeopleSoft Outside of its Customers' Own Computer Systems.**

Since this Court issued its February 2014 summary judgment Order, Rimini has known that PeopleSoft software must reside at the "licensee's facilities."  ECF No. 474 at 12–13, 17–19. Likewise, the Injunction commands Rimini to "not reproduce, prepare derivative works from, or use PeopleSoft software or documentation on, with, or to any computer systems ***other than a specific licensee's own computer systems***."  Injunction ¶ 5 (emphasis added).

Rimini is violating Paragraph 5 of the Injunction in two ways.  *First*, Rimini continues to use, reproduce, and prepare derivative works from the PeopleSoft environments hosted by Windstream.  Windstream environments are not "a specific licensee's *own* computer systems." To the contrary, licensees contract with Windstream for cloud services and do not own or possess any of the equipment through which Windstream provides its cloud services.  *Second*, Rimini continues to create copies of PeopleSoft software and documentation and stores those copies on its local network and computer systems.[9]

**1.    Windstream-hosted PeopleSoft environments are not a specific licensee's own computer systems.**

Before this Court's February 2014 summary judgment ruling, Rimini began "migrating" the infringing PeopleSoft environments that it hosted on its computer systems to other locations,

---

[9] Windstream- and Rimini-hosted copies of PeopleSoft software and support materials also violate the facilities restriction and thus Paragraph 2 of the Injunction, which requires that Rimini's copying of PeopleSoft software be authorized by a "valid, written license agreement."

18

1  including Windstream. *See Rimini II*, ECF No. 941 at 3–19 (Oracle's Mot. For Part. Summ. J.).

2  Windstream is a separate, standalone company that Rimini customers contract with for cloud

3  services.  Polito Decl. Ex. 22 (Heaberlin Depo.) at 60:17–25.  Rimini customers enter into

4  ██████████████ with Windstream, in which the customers receive ██████████████

5  ████████████████████████████████████████████████████████████████████

6  ████████████.  Polito Decl. Ex. 22 (Heaberlin Depo.) at 15:9–23, 17:1–10.  Windstream—

7  not the Rimini customers—████████████.[10]  Polito Decl. Ex. 26 (RSI2_022009236).

8        Since entry of the Injunction, Windstream has continued to provide ███████████

9  ████ Rimini customers, maintaining at least ████ PeopleSoft environments associated with these

10  customers.[11]  Polito Decl. Ex. 27 (Rimini Supp. Resp. to Oracle's Supp. Interrog. No. 4) at 9:23–

11  26, Ex. 29; BFC Decl. ¶ 72.  These Rimini customers entered into ████████████████ with

12  Windstream.  Polito Decl. ¶ 20, Ex. 23 (Waide Depo.) at 10:15–23, 11:19–12:4, 12:24–13:13,

13  12:6–22, 26:23–27:10; Ex. 22 (Heaberlin Depo.) at 56:10–20; Ex. 25 (Depo. Ex. 2231) (███

14  ████████████████████████) at Section 1.b.  Rimini used a Windstream environment for

15  prototype development of at least ████ of its post-Injunction PeopleSoft updates.  BFC Decl. ¶ 73.

16        Under these ██████████ relationships, Windstream ████████████████████

17  ████████████████████████████████  Polito Decl. Ex. 26 (RSI2_022009236).  Windstream

18  testified that it "procure[s] the [hardware] asset and then deliver[s] it back as a service" to the

19  customer, and that when the customer stops contracting for cloud services, Windstream would

20  "deprovision the environment."  Polito Decl. Ex. 22 (Heaberlin Depo.) at 36:5–38:2.  Rimini

21  customer Easter Seals confirmed that it did not purchase any physical hardware from

22  Windstream—only what it referred to as a "[s]ervice."  Polito Decl. ¶ 28, Ex. 31 (Hoyt Depo.) at

---

[10] These ████████████████████████ Windstream's co-location arrangement, in which
the customer owns the computer systems, but uses Windstream's facilities for space, power, and
network connectivity.  Polito Decl. Ex. 22 (Heaberlin Depo.) at 61:1-11, 14:7-22, 31:5-18.

[11] Mindful of the Court's guidance to submit exhibits that will "help the [C]ourt make its ruling
on the merits" (ECF No. 1349), Oracle marshals evidence of Windstream's relationship with
Rimini customer ████████████████ as an exemplary proffer of Windstream's
relationship with all of Rimini's post-Injunction customers.  Oracle adduced similar evidence
regarding this customer in its *Rimini II* Motion for Partial Summary Judgment Regarding
Rimini's Migration and Windstream Hosting.  *Rimini II*, ECF No. 941.

19

20:12–16.  There is no evidence that any other Rimini customer purchased computer systems from Windstream or provided them to the cloud hosting company.

The agreements governing these relationships eliminate any doubt.  They explain that ███████████████████████████████████████████████████████████████████ ████████████████████████████████████████████ Polito Decl. Ex. 25 (Depo. Ex. 2231) at Section 3.g.  Customers are also responsible for ████████████████████ ███████████████████████████████████████████████████████████████████ ████████████.  *Id.* at Sections 3.i, 2.d, and 9.  Some Windstream agreements add that the Rimini customer ██████████████████████████████████████████████████████ ███████████████████████████████████ in Windstream's data center.  Polito Decl. ¶ 21, Ex. 24 (Depo. Ex. 2213) at TIERPOINT2-SUB00000153, Section 3.

Rimini migrated PeopleSoft environments to Windstream so that Rimini could maintain the same control over them as when they were installed on Rimini's computer systems.  Rimini ████████████████████████████████████ the Windstream environments through Rimini's ████ ████ BFC Decl. ¶ 74.  Furthermore, once an environment was migrated to Windstream, the customer associated with that environment generally had very little to do with its configuration and maintenance.  Easter Seals testified to this ████████████ during *Rimini II* discovery, stating that it ████████████████████████████████████████████████████ ostensibly associated with it.  BFC Decl. ¶ 75; Polito Decl. ¶¶ 27, 29, Ex. 30 (Bonfanti Depo.) at 52:12–15, 53:14–23; Ex. 32 (Depo. Ex. 1809).  This state of affairs continues post-Injunction, with Easter Seals testifying almost five years later that ████████████████████████████████ ███████████████████████████████ and that Easter Seals did not have credentials to access those environments.  BFC Decl. ¶ 76; Polito Decl. Ex. 31 (Hoyt Depo.) at 47:8–48:6; 49:11–50:11; Ex. 32 (Depo. Ex. 1809).  Another Rimini customer (████████████████████) similarly explained: ██████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████ Polito Decl. ¶ 30, Ex. 33.

The evidence clearly establishes that Rimini's customers have no possessory interest in

20

the computer systems through which Windstream provides its cloud-hosting services.  These

Windstream-hosted PeopleSoft environments are not "a specific licensee's *own* computer

systems."  Injunction ¶ 5.  Rimini's continued use, reproduction of, and preparation of derivative

works from the PeopleSoft software on these environments violates Paragraph 5 of the Injunction.

> **2.    Rimini creates copies of PeopleSoft software and documentation,
> storing them on its networks and computer systems.**

Rimini maintains several items of Oracle software and support materials on its systems in

violation of the Injunction.  Individual Rimini update files on Rimini's own systems contain

Oracle code.  Approximately one third of the lines of code in Rimini's ███████████ file

were copied from Oracle's PeopleSoft ███████████ source code file.  BFC Decl. ¶¶ 77–78,

Ex. 1.  Rimini saved the ███████████ file to its systems and distributed it ███████████

customers.  BFC Decl. ¶ 77.  Oracle's ███████ source code file is also on Rimini's systems

(including the Oracle copyright notice), modified only with a ███████████████████████

███. BFC Decl. ¶ 79, Ex. 2.  Rimini internally emailed multiple pieces of PeopleSoft

copyrighted documentation that Rimini's corporate witness ████████████████████████

Polito Decl. Ex. 6 (Mackereth Rule 30(b)(6) Depo.) at 281:11–282:5, Ex. 11 (Depo Ex. 1852).

Still more PeopleSoft documentation is on Rimini's systems, including two ████████████████

██████████████████████████████.  BFC Decl. ¶¶ 80–82.

> **C.    Rimini's Updates and Modifications to PeopleSoft Software are Derivative
> Works in Violation of Paragraphs 4, 5, and 6 of the Injunction.**

Paragraphs 4, 5, and 6 of the Injunction also bar Rimini from preparing derivative works

from Oracle's PeopleSoft software and documentation.  Injunction ¶¶ 4–6.  A derivative work is

"'based upon one or more preexisting works' that 'recast[s], transform[s], or adapt[s]' a

preexisting work and 'consist[s] of editorial revisions, annotations, elaborations, or other

modifications which, as a whole, represent an original work of authorship.'"  *ABS Enter., Inc. v.

CBS Corp.*, 908 F.3d 405, 414 (9th Cir. 2018) (quotations and alterations in original).

Derivative works must exist in a permanent form and "substantially incorporate protected

material from the preexisting work."  *Micro Star v. Formgen Inc.*, 154 F.3d 1107, 1110 (9th Cir.

1998).  Such incorporation may take the form of verbatim copying of a portion of the underlying work, or it may take the form of a modification and extension of the underlying work.  The Ninth Circuit affirmed the second approach in *Micro Star*, directing entry of a copyright injunction that stopped an infringer (Micro Star) from selling new levels to a copyrighted videogame ("Duke Nukem 3D") because those additional levels constituted derivative works.  The new video game levels (called MAP files) "contain[ed] a series of instructions that tell the game engine (and, through it, the computer) what [artwork] to put where" but did not contain any of the copyrighted artwork itself.  *Id.*  The Ninth Circuit rejected the defendant's arguments that its standalone MAP files are not derivative works because they do not incorporate any protected expression, holding instead that a "copyright owner holds the right to create sequels, and the stories told in [Micro Star's] MAP files are surely sequels, telling new (though somewhat repetitive) tales of [the protagonist's] fabulous adventures."  *Id.* at 1112 (citations omitted); *Rimini II*, ECF No. 904 at 22–23; ECF No. 1143 at 13–15 (Oracle analyzing *Micro Star*).

Applying these standards to Rimini's PeopleSoft support processes reveals both categories of derivative works.  Rimini's creation of these derivative works through cross-use and violation of the Injunction's computer systems restriction is further grounds for contempt.

***1. Derivative Work Modifications***.  Rimini routinely creates derivative works when it modifies and extends the features of PeopleSoft environments.  BFC Decl. ¶ 83.  Modification of copyrighted software infringes the derivative work right.  *See Apple, Inc. v. Psystar Corp.*, 673 F. Supp. 2d 931, 938 (N.D. Cal. 2009), *aff'd* 658 F.3d 1150 (9th Cir. 2011) (summary judgment that defendant's modification of "Mac OS X to run on a non-Apple computer" was an infringing derivative work); *Dun & Bradstreet Software Servs., Inc. v. Grace Consulting, Inc.*, 307 F.3d 197, 207–08 (3d Cir. 2002) (consulting company created an infringing derivative work by copying and modifying a copy of the plaintiff's tax program without a license granting the right to do so).

***2. Derivative Work Environments***.  Rimini also creates derivative works when it applies its PeopleSoft updates to existing environments.  BFC Decl. ¶ 84.  Rimini's expert ███████ ████████████████████████████████████████████████████████████████████ ███████████████████████████████████  Polito Decl. Ex. 40 (Astrachan Rpt.) at n.87.

22

***3. Derivative Work Individual Updates***.  Rimini's PeopleSoft updates are themselves derivative works because they extend and expand Oracle's copyrighted PeopleSoft software, rely for their operation on the underlying PeopleSoft architectural framework, and do not operate independently from PeopleSoft components.  BFC Decl. ¶ 84.  One example is a ████████ ██████████████████████████████████████.  BFC Decl. ¶ 85; Polito Decl. ¶ 31, Ex. 34.  Rimini's ████████ modified existing PeopleSoft environments by replacing the PeopleSoft functionality for creating ██████████████████████████████.  BFC Decl. ¶ 85.  This Rimini update is not stand-alone software—it is specifically tailored only to work with Oracle's PeopleSoft software, creating a "new version" of PeopleSoft that remains substantially similar to the preexisting version of Oracle's PeopleSoft software.  *Id.*  Just as the MAP files were infringing derivative sequels to the game at issue in *Micro Star*, so too are Rimini's PeopleSoft updates derivative extensions of PeopleSoft.  *Micro Star*, 154 F.3d at 1112 & n.5.  Rimini's Dev Instructions also constitute derivative works in their own right when such documents incorporate Oracle software, as illustrated by examples in the below footnote.[12]  BFC Decl. ¶ 86.

## V.  RIMINI'S JD EDWARDS SUPPORT PROCESSES VIOLATE THE INJUNCTION.

The Injunction prevents Rimini from (1) copying J.D. Edwards source code in developing and testing software updates, (2) using a licensee's J.D. Edwards environment for the benefit of another licensee, and (3) preparing derivative works based on J.D. Edwards software.  Injunction ¶¶ 7, 8, 10.  But Rimini does ██████████████████████████████████████████ ████████████████████████ Polito Decl. Ex. 6 (Mackereth Rule 30(b)(6) Depo.) at 132:8–134:21, Ex. 7 (Depo. Ex. 1833).  This is the exact opposite of substantial compliance.

### A.  Rimini Copies JD Edwards Source Code When Developing and Testing Updates, Violating Paragraph 8 of the Injunction.

Under the Injunction, Rimini cannot "copy J.D. Edwards software source code to carry

---

[12] A draft Dev Instruction for one Rimini PeopleSoft update (HCM200075) copied lines of code from the Oracle source code file ████████.  ECF No. 1292-1 to -5 (Frederiksen-Cross Decl.) ¶¶ 7–15, Exs. 1–4.  A Dev Instruction for another Rimini PeopleSoft update (HCM200929) ████████████████████ from the Oracle source code file ████████.  BFC Decl. ¶ 87, Ex. 3.

23

out development and testing of software updates." Injunction ¶ 8. Rimini copies JD Edwards

source code into computer memory, electronic documents, and various JD Edwards environments

when preparing updates for its customers, violating the Injunction on its face.

### 1.     Rimini copies JD Edwards source code into computer memory, electronic documents, and various JD Edwards environments.

"Source code" is "code in a human-readable format." BFC Decl. ¶ 88. This is in contrast

to "object code," which is code that has been compiled for machine execution. *Id.* Dictionaries

and the U.S. Copyright Office maintain this distinction between "source code" and "object code,"

as does Rimini's own expert, Professor Astrachan.[13]

Oracle's JD Edwards software platform has a variety of source code files. They include

".h" and ".c" files (written in the C programming language), Business Functions, Interactive

Applications, Batch Applications, and Event Rules code. BFC Decl. ¶ 89. Each of these file

types is a human-readable version of a program that must be compiled into object code or

otherwise interpreted before execution. *Id.* These files types are therefore "J.D. Edwards

software source code" under the Injunction. BFC Decl. ¶ 88.

Rimini copies this source code when it develops and tests updates for the JD Edwards

software at issue in this case (JD Edwards EnterpriseOne and JD Edwards World). BFC Decl.

¶ 90. With JD EnterpriseOne, Rimini copies source code whenever it uses Oracle's Object

Management Workbench (OMW), the primary tool for creating and modifying source code files.

BFC Decl. ¶ 92. When Rimini uses OMW, a copy of a source code file is created each time the

file is opened (*i.e.*, "checked out") or closed (*i.e.*, "checked in") or its contents are displayed.

BFC Decl. ¶¶ 92–93. Rimini also copies JD Edwards source code when it promotes (*i.e.*, copies)

source code files between environments (such as from a development environment to a test

environment). BFC Decl. ¶ 93. Rimini also copied JD Edwards source code onto its own

---

[13] Polito Decl. ¶ 32, Ex. 35 (ORCLRS1360223) (defining "source code" as "a computer program in its original programming language (such as FORTRAN or C) before translation into object code usually by a compiler"); Ex. 40 (Astrachan Rpt.) at ¶ 309 ███████████████████ ████████████████████████████████████████████████████████████████ .

ORACLE'S MOTION FOR ORDER TO SHOW CAUSE

1    systems, as evidenced by Rimini copying the JD Edwards source code file ███████ onto its

2    own systems and then making modifications.  BFC Rpt. ¶ 94, Ex. 4.

3          Rimini's development process for JD Edwards World also involves copying source code

4    in violation of the Injunction.  Rimini developers display the contents of JD Edwards source code

5    members[14] in source editors, which results in copies of the code being created in system memory.

6    BFC Decl. ¶ 95.  Additionally, as with EnterpriseOne, Rimini developers generate copies of

7    source code in JD Edwards World each time they promote source code from one environment to

8    another.  *Id.*  The update documentation that Rimini sends to clients further confirms that Rimini

9    developed its updates by retrieving and copying JD Edwards source code.  BFC Decl. ¶ 96; Polito

10   Decl. ¶¶ 6–7, Ex. 9 (Depo. Ex. 1840), Ex. 10 (Depo. Ex. 1841); Ex. 6 (Mackereth Rule 30(b)(6)

11   Depo.) at 199:17–203:4, 203:9–19, 204:18–206:9.

12         Rimini also copies JD Edwards source code into technical specification documents that it

13   uses for developing and testing updates.  In the technical specification for its JDE105328 update,

14   Rimini repeatedly copied and pasted source code blocks from the JD Edwards source code file

15   ███████ and included ████████████ (boxed and marked with the notation "ADD") for

16   its employees to implement without engaging in actual development work.  BFC Decl. ¶¶ 97–

17   100, Ex. 5.  Into that same technical specification, Rimini also copied source code excerpts from

18   JD Edwards World A9.3 source code file ████.  BFC Decl. ¶ 101.

19                    **2.      Rimini waived its meritless "open code"/"closed code" distinction.**

20         Rimini attempts to avoid contempt by inventing a new distinction between what it calls JD

21   Edwards "open code" (apparently meaning all source code written by Oracle and made available

22   to Oracle's JD Edwards licensees) and JD Edwards "closed code" (apparently meaning all source

23   code written by Oracle not made available to Oracle's JD Edwards licensees).  Polito Decl. Ex. 7

24   (Depo. Ex. 1833).  According to Rimini, Paragraph 8 of the Injunction only prohibits copying of

25   the latter.  But procedurally and substantively, this new gloss on the Injunction fails.

26         *First*, Rimini never presented this argument during the prior two rounds of injunction

27   briefing or its appeal to the Ninth Circuit.  If there was any ambiguity about the meaning of "J.D.

28   ────────────────
     [14] JD Edwards World source code is stored in source code "member" files.  BFC Decl. ¶ 91.

1   Edwards software source code," then Rimini should have included its "open code" / "closed

2   code" arguments among the host of overbreadth and vagueness challenges that it twice presented

3   to this Court and the Ninth Circuit.  Rimini waived this challenge to the Injunction.  *United States*

4   *v. Patterson*, 878 F.3d 215, 218 (6th Cir. 2017); *Omni Outdoor Advertising, Inc. v. Columbia*

5   *Outdoor Advertising, Inc.*, 974 F.2d 502, 505 (4th Cir. 1992).

6         *Second*, Rimini's argument conflicts with the plain language of Paragraph 8 of the

7   Injunction, which prohibits copying of "J.D. Edwards *software source code*."  (emphasis added).

8   The Injunction prohibits copying of software source code, regardless of whether Rimini describes

9   it as "open" or "closed." ███████████████████████████████████████████

10  ████████████        Polito Decl. Ex. 6 (Mackereth Rule 30(b)(6) Depo.) at 135:5–20.

11        *Third*, Rimini's new "open code" / "closed code" distinction, if accepted, would restrict

12  Rimini from copying only what Rimini designates as JD Edwards "closed code."  That is

13  nonsensical because Rimini defines "closed code" as the source code that Oracle does not make

14  available to licensees (or Rimini).  Under Rimini's latest attempt to re-write the Injunction, it

15  would only be barred from copying code *it cannot copy*, and it would be free to copy any code

16  *that it can copy*.  Rimini's new argument also disregards the full language of Paragraph 8:

17  "Rimini Street shall not copy J.D. Edwards software source code to carry out *development and*

18  *testing of software updates*."  Injunction ¶ 8 (emphasis added).  Referring to "source code" in the

19  context of "development and testing of software updates" can only be understood to prohibit

20  Rimini from copying the very JD Edwards software source code that Rimini indisputably copies

21  when developing and testing updates. *Wolfard Glassblowing Co. v. Vanbragt*, 118 F.3d 1320,

22  1323–24 (9th Cir. 1997) (rejecting interpretation of a trademark injunction that would render its

23  "prohibition of 'colorable imitations' [to] be of no effect").

24        **B.    Rimini's JD Edwards Development and Testing Processes Violate Paragraph**
           **10 of the Injunction Through Cross-Use and Creation of Derivative Works.**

25

26        Rimini's development practices for JD Edwards continue to rely on its unlawful cross-use

27  of Oracle software, violating Paragraph 10 of the Injunction.  Injunction ¶ 10.  The whole point of

28  Rimini's copying JD Edwards source code into technical specifications and creating other highly

1    detailed documents is to reuse the work performed using the environment associated with one

2    customer for the benefit of other customers.  BFC Decl. ¶ 105.  Rimini uses substantially the

3    same prototype/retrofit development model for JD Edwards that it does for PeopleSoft.  *Id.*

4    ¶¶ 102–04.  Rimini also reuses and copies JD Edwards testing procedures that it designs using

5    software environments associated with one customer for the benefit of other customers.  *Id.* ¶ 107.

6           Rimini also develops derivative works based on JD Edwards software, further violating

7    Paragraph 10 of the Injunction.  Rimini continues to develop updates that extend the functionality

8    of JD Edwards software through the addition of new features, forms, and user interfaces.  BFC

9    Decl. ¶ 106.  These updates are extensions that rely upon JD Edwards software, and therefore

10   constitute derivative works per the Ninth Circuit's analysis in *Micro Star*.  154 F.3d at 1112.

11   **VI.    RIMINI DISTRIBUTES PEOPLESOFT AND JD EDWARDS SOFTWARE AND
             SUPPORT MATERIALS IN VIOLATION OF THE INJUNCTION.**
12

13          The Injunction also commands Rimini to "not distribute PeopleSoft software or

14   documentation or any derivative works created from or with PeopleSoft software or

15   documentation."  Injunction ¶ 3.  Identical prohibitions exist for J.D. Edwards software.  *Id.* ¶ 7.

16   Rimini violated both provisions many times through several different acts of distribution.[15]

17          Rimini's use of TransferFiles alone yielded ███ distributions of files that were copied

18   from Rimini's computer systems to customer-associated environments.  BFC Decl. ¶ 108.  Rimini

19   also emailed its derivative work updates to customers, as evidenced by the ████

20   discussed above.  BFC Decl. ¶ 109.  Rimini also used ███████████████ to

21   distribute derivative work updates.  BFC Decl. ¶ 110; Polito Decl. Ex. 31 (Hoyt Depo.) at 64:16–

22   19 (agreeing that "the purpose of the FTP site — is to have someplace where you can go and

23   download the files"); Ex. 33 (similar explanation).[16]  Rimini used ██████ to transfer files

24

---

25   [15] Under 17 U.S.C. § 106(3), "even one person can be the public."  *Ford Motor Co. v. Summit
     Motor Prods., Inc.*, 930 F.2d 277, 300 (3d Cir. 1991); *Flexible Lifeline Sys., Inc. Precision Lift,
26   Inc.*, CV 10-44-H-DWM, 2011 WL 13133925, at *4 (D. Mont. Sept. 13, 2011) (same).

27   [16] Rimini's making update-related files available via ███ is sufficient evidence of distribution.
     *Elohim EPF USA, Inc. v. Total Music Connection, Inc.*, No. CV 14-02496-BRO (EX), 2015 WL
28   12655556, at *13 (C.D. Cal. Oct. 1, 2015).

to customers, and copy-paste functionality to transfer material from Rimini's systems to a client's environment.  BFC Decl. ¶¶ 111–12.  Rimini also made ███████████████ of updates to customers, doing so by cross-using development and testing in the environment associated with one customer to provide ███████████ of the update to another customer.  BFC Decl. ¶¶ 113–15; Polito Decl. ¶¶ 33–34; Ex. 36 (RSI007038524), Ex. 37 (RSI007142189).

Rimini's updates also ████████████████████████████████████.  BFC Decl. ¶¶ 116–17.  Using one update as an example (HCM200105), Rimini's related documentation confirms that Rimini cross-used this update for at least customers █████████ ████████████████████████████████████████████████████████████, so that instead of having to support each customer individually, Rimini's customer would instead be on the same code base.[17]  Polito Decl. ¶ 35, Ex. 38 (RSI007899877); BFC Decl. ¶¶ 118–19.

## VII.   RIMINI'S PEOPLESOFT AND JD EDWARDS SUPPORT PROCESSES ALSO VIOLATE THE INJUNCTION AS TO ORACLE DATABASE.

Rimini's PeopleSoft and J.D. Edwards support processes also violate the Injunction's prohibition that Rimini "shall not reproduce, prepare derivative works from, or distribute Oracle Database software."  Injunction ¶ 15.  Any fixes or updates that Rimini developed, tested, or installed on any of the ███ customer-associated environments containing Oracle Database resulted in the reproduction of Oracle Database because carrying out these actions necessarily copied Oracle Database software into memory.  BFC Decl. ¶¶ 120–21.  Even Rimini's expert concedes that ████████████████████████████████████████████████████ ████████████  Polito Decl. Ex. 40 (Astrachan Rpt.) at ¶ 322.

## VIII.   A BAR ORDER, IMPOUNDMENT, AND DAMAGES ARE JUST SANCTIONS.

This Court should levy Oracle's requested contempt sanctions pursuant to its inherent powers.  *Cooke v. United States*, 267 U.S. 517, 539 (1925).

***Bar Rimini from Supporting Oracle Software***.  The Injunction should be amended to bar Rimini from providing support for Oracle's PeopleSoft and JD Edwards product lines.  Oracle

---

[17] ████████████████████████ became a Rimini customer on █████████████.  Polito Decl. ¶ 25, Ex. 28 (Rimini's Suppl. Ex. A-1 to Supp. Resp. to Oracle's Supp. Interrog. No. 3) at 4.

1   welcomes lawful competition from third parties.  However, Rimini has shown that it will not

2   compete lawfully.  Rimini has infringed Oracle's copyrights during its entire existence (almost

3   fifteen years).  Rimini is a company whose leader, Seth Ravin (co-founder of TomorrowNow) has

4   been infringing Oracle copyrights for almost twenty years.  Rimini persisted in its infringement

5   after TomorrowNow pled guilty to twelve felonies and was subject to civil judgment for over

6   $350 million, after Rimini paid Oracle almost $100 million in this matter, and after the Injunction

7   issued.  Rimini views damages, injunctions, and sanctions as a cost of doing business, and the

8   only way to stop the recidivism is a bar order, putting an end to a business that was "built entirely

9   on its infringement of Oracle's copyrighted software."  ECF No. 1164 at 6; *A&M Records, Inc. v.*

10  *Napster, Inc.*, 284 F.3d 1091, 1097–99 (9th Cir. 2002) (affirming "zero tolerance" preliminary

11  injunction); *Triad Sys. Corp. v. Se. Express Co.*, 64 F.3d 1330, 1337–38 (9th Cir. 1995)

12  (affirming preliminary injunction that forbade all servicing of computers containing licensed

13  copies of rightsholder's software), *superseded by statute on other grounds*, 17 U.S.C. § 117(c).

14      ***Impoundment and Attorneys' Fees***.  In addition to a bar order, this Court should order

15  impoundment of Rimini's infringing copies and computer systems under 17 U.S.C. § 503(b) so

16  that Oracle can ascertain the full extent of Rimini's improper conduct.[18]  The Court declined to

17  order impoundment when it issued its first copyright injunction on the grounds that "Oracle's

18  disposition remedy - preclusion of Rimini from using the infringing works - is achieved the same

19  with a permanent injunction as it would be with a disposition order."  ECF No. 1049 at 10:1–3.

20  But Rimini's willingness to flout the Injunction demonstrates that the Injunction is not a sufficient

21  remedy.  Impoundment should therefore be ordered.  *Rebis v. Universal CAD Consultants, Inc.*,

22  No. C-96-4201 SC, 1998 WL 470475, at *5 (N.D. Cal. Aug. 11, 1998), *aff'd*, 189 F.3d 474 (9th

23  Cir. 1999) (contempt and order of impoundment or destruction of software that violated an

24  injunction); *Broadcom Corp. v. Qualcomm Inc.*, No. SACV-05-467-JVS-RNBx, 2008 WL

25  11336330, at *6 (C.D. Cal. Nov. 17, 2008) (contempt and order requiring defendant to procure

26  return of chips violating injunction and destroy them).  As an alternative to impoundment, Oracle

27  requests that Rimini's computer systems be placed into an escrow service of Oracle's choice so

28  
---

[18] Impoundment would let Rimini support customers by using the customers' own computers.

29

that Oracle can continue to monitor compliance with the Court's Injunction until Rimini

demonstrates to this Court's satisfaction that it fully complies with the Injunction's requirements.

*ClearOne Commc'ns, Inc. v. Chiang*, 670 F. Supp. 2d 1248, 1283–84 (D. Utah 2009) (ordering

contemnors to deliver to plaintiff "all code and other design materials and intellectual property

covered by the Permanent Injunction" as a contempt sanction).  Oracle should also be awarded

attorneys' fees for its injunction enforcement efforts against Rimini, both under 17 U.S.C. § 505

and as "a customary remedy in favor of a party who has successfully mounted a contempt

proceeding." *Broadcom*, 2008 WL 11336330, at *6 (citations omitted).  Oracle requests 30 days

from the date of the order on this motion to present its application for fees and costs.

   ***Compensatory Damages***.  The Court may award compensatory damages as a sanction for

contempt.  *See BMG Music v. Perez*, 952 F.2d 318, 320 (9th Cir. 1991); *Adobe Sys. Inc. v.*

*Software Tech*, No. 5:14-CV-02140-RMW, 2015 WL 6951875, at *6 (N.D. Cal. Nov. 10, 2015)

(granting $1.9 million in damages under 17 U.S.C. § 504 as contempt sanctions for software

copyright infringement in violation of injunction); 17 U.S.C. § 504(b).  The scope of discovery so

far allowed in the Injunction enforcement phase was limited to determining whether or not Rimini

has violated the terms of the Injunction.  *See* ECF No. 1232 at 1:22–24.  Therefore, Oracle has

not yet had the opportunity to obtain discovery into the profits Rimini gained or Oracle lost

because of Rimini's violations.  In the 2015 trial, the jury found that Rimini had infringed

Oracle's copyrights and awarded Oracle $35.6 million in actual damages.  ECF No. 896 (jury

verdict). Oracle expects that discovery into (1) Rimini's support revenue and profits during the

Injunction period and (2) the connection between Rimini's support practices and its support

revenues and Oracle's customer losses would support a damages award of at least the same order

of magnitude.  Rimini reported $17.5 million in net income (profits) for fiscal year 2019 and $2.5

million in the first quarter of 2020.[19]  Oracle requests a limited reopening of discovery to

determine the amount of compensatory damages that should be awarded to Oracle.

---

[19]  *See* https://www.riministreet.com/press-releases/03122020 (2019 Q4 and annual financial results); https://www.riministreet.com/press-releases/05072020 (Q1 2020 financial results).

1

2     DATED: July 10, 2020                    MORGAN, LEWIS & BOCKIUS LLP

3
                                              By: _____/s/ John A. Polito_____
4                                                        John A. Polito

5                                             Attorneys for Plaintiffs Oracle USA, Inc., Oracle
                                              America, Inc. and Oracle International Corporation
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

31

1

## **CERTIFICATE OF SERVICE**

2          I hereby certify that on the 10th day of July, 2020, I electronically transmitted the

3    foregoing ORACLE'S MOTION FOR ORDER TO SHOW CAUSE WHY RIMINI STREET,

4    INC. SHOULD NOT BE HELD IN CONTEMPT to the Clerk's Office using the CM/ECF

5    System for filing and transmittal of a Notice of Electronic Filing to all counsel in this matter; all

6    counsel being registered to receive Electronic Filing.

7                                      MORGAN, LEWIS & BOCKIUS LLP

8    DATED: July 10, 2020

9                                      By:  _____ */s/ John A. Polito*_____
                                                John A. Polito
10

11                                     Attorneys for Plaintiffs Oracle USA, Inc., Oracle
                                       America, Inc. and Oracle International
12                                     Corporation

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CERTIFICATE OF SERVICE