# Exhibit 22

**Excerpts from the Feb. 28, 2018 Rule 30(b)(6) Deposition of TierPoint (Denny Heaberlin)**

**REDACTED**

Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

RIMINI STREET, INC., a        :
Nevada corporation,           :
                              :
     Plaintiff,               :
                              :   CASE NO.
     vs.                      :   2:14-cv-01699-LRH-CWH
                              :
ORACLE AMERICA, INC., a       :
Delaware corporation; and     :
ORACLE INTERNATIONAL          :
CORPORATION, a California     :
corporation,                  :
                              :
     Defendants.              :
_____
(Caption continued on Page 2)

_____


VIDEOTAPED 30(b)(6) DEPOSITION OF TIERPOINT, LLC,
     through its designated representative,
              DENNY HEABERLIN

          DATE TAKEN: February 28, 2018
             TIME BEGAN: 11:00 a.m.
             TIME ENDED: 1:02 p.m.

          LOCATION: Regus - Charleston

                    4000 South Faber Place Drive
                    Suite 300
                    North Charleston, SC


REPORTED BY:

Marie H. Bruegger, RPR, CRR

Job No. 2833086


Pages 1 - 79

Page 14

7  Q   What is colocation?
8  A   Colocation is where you take space,
9  power, and network connectivity within one of our
10 data centers or a service provider's data centers.
11 Q   Is the space that the customer takes in
12 the data center dedicated to the single customer?
13 A   In what capacity, in colocation?
14 Q   Yes.
15 A   In colocation, you essentially either buy
16 a physical 42U cabinet, multiple physical 42U
17 cabinets, or you buy an amount of square footage
18 that's enclosed in a cage.
19 Q   Whether a cabinet or a cage, is it the
20 case that the physical space is dedicated to the
21 colocation customer?
22 A   Yes.
23 Q   Do you have an understanding whether that
24 is in the nature of a lease?
25 A   I'm sorry?

Page 15

1  Q   Do you have an understanding as to
2  whether the customer leases the physical space in a
3  colocation agreement?
4  A   I don't.
5      MR. REILLY:  I'm going to object to that,
6  object to form.
7      THE WITNESS:  I don't.
8  BY MR. RODRIGUEZ:

Page 16

2      (Exhibit 2202, Master Services
3      Agreement [TIERPOINT2-SUB 5-10], was
4      marked for identification.)
5  BY MR. RODRIGUEZ:
6  Q   The court reporter has placed before you
7  Exhibit 2202.  Mr. Heaberlin, please take a moment
8  to review Exhibit 2202, and let me know if you have
9  an understanding of what this document is.
10 A   I do.
11 Q   What is it?
12 A   It's the MSA for Windstream Hosted
13 Solutions within a given period of time.
14 Q   Looking at the bottom left of the first
15 page, it says review -- I'm sorry, it says, "Rev
16 7-10."  Do you have an understanding of what 7-10
17 means?
18 A   I don't.  I mean, they made changes
19 periodically, and I'm not as familiar with the ins
20 and outs of the document to be able to understand
21 what the differences are.
22 Q   I'd like you to turn to the second page.
23 It ends in TIERPOINT2-SUB, a lot of zeroes, and
24 then six.
25 A   Yes, sir.

Page 17

1  Q   Paragraph (g), it's titled Equipment.
2  Would you please read into the record the second
3  sentence?
4  A   "For cloud services, customer's servers
5  will be virtual servers that run on physical
6  servers which may host virtual servers for other
7  company customers."
8  Q   Does that describe a multitenant
9  relationship?
10 A   Yes.
11     (Exhibit 2203, Addendum to Master
12     Services Agreement [TIERPOINT2-SUB
13     11-12], was marked for identification.)
14 BY MR. RODRIGUEZ:
15 Q   The court reporter has marked
16 Exhibit 2203.  It's a document titled Addendum to
17 Windstream Master Services Agreement.
18 Mr. Heaberlin, do you recognize Exhibit 2203?
19 A   I do not directly recognize it.
20 Addendums could be different for different
21 agreements, and so I'm not sure exactly which one
22 this is.



Page 34

1 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
2 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
3 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
4     Q   A few lines above Installation POC,
5 there's a line that says, "Location."  It says,
6 "Charlotte 1, NC."  What is Charlotte 1, NC?
7     A   Charlotte 1 is the name designation for
8 one of the data centers in Charlotte, North
9 Carolina.
10     Q   Charlotte 1 is a physical location in
11 North Carolina?
12     A   Yes, sir.
13     Q   Where is it located?
14     A   It's located on Rose Lake Drive in
15 Charlotte.
16     Q   How long has Charlotte 1 been located at
17 Rose Lake Drive?
18     A   To the best of my ability, I would say
19 2014.
20     Q   Does Charlotte 1 --
21     A   I'm sorry.  Wait.  2011.  I'm sorry.
22     Q   Does Charlotte 1 continue to operate
23 today as a TierPoint facility?
24     A   Yes, sir.
25     Q   Does Exhibit 2011 refer to a multitenant

Page 35

1 or a colocation service?
2     A   Multitenant.
3     Q   I see under the first item, it says,
4 "Custom dedicated HP hardware, HPDL 160 server."
5 Did I get that right?
6     A   That's correct.
7     Q   What does that mean?
8     A   It's a specific configuration of a
9 Hewlett-Packard in-rack server.
10     Q   Does that mean that the services provided
11 under this sales order are provided on a particular
12 computer?
13     A   So there's multiple delivery models for
14 the services in this sales order.  One model is the
15 multitenant cloud, one model is a server that has
16 some kind of specific need to be broken out as a
17 physical server outside of the multitenant
18 environment.
19     Q   Let's start with that physical server
20 that's broken out of the multitenant environment.
21 Which line item is that?
22     A   The first line item on the sales order,
23 the one that states, "HP Hardware - Custom."
24     Q   Would that piece of HP hardware be a
25 particular machine that's identifiable?

Page 36

1     A   Yes.
2     Q   Is that particular machine specific to
3 the customer identified in the sales order?
4     A   Yes.
5     Q   Who owns that machine?
6     A   So I'm not -- I'm not sure exact -- I
7 don't recall exactly who owns this one.  I would
8 say that TierPoint, one of their business models is
9 to deliver infrastructure as a service back on a
10 monthly recurring model, so that basically means
11 that TierPoint would procure the asset and then
12 deliver it back as a service.
13     Q   Do you have an understanding as to
14 whether TierPoint retains ownership of that
15 hardware?
16     A   I don't know.
17     Q   What happens if a customer stops paying
18 the monthly service fee for that piece of hardware?
19     A   Then they would be notified.  Again, I'm
20 thinking back when I was in sales.  They would be
21 notified by our financial team, "Hey, you need to
22 square up on this."  If not, we would deprovision
23 the environment.
24     Q   What happens when an environment is
25 deprovisioned in this custom dedicated hardware

Page 37

1 scenario?
2     A   They physically unplug it and pull the
3 chassis out of the cabinet.  Essentially, the
4 architecture no longer exists for that client.
5     Q   What happens to that chassis once it's
6 pulled out of the cabinet?
7     A   I have no idea.
8     Q   Do you know if it's sent back to the
9 customer?
10     A   I have no idea.
11     Q   Can you tell if this sales order is an
12 initial sales order for the client?
13     A   I would say that it appears to be that
14 way because there's no negative line items removing
15 some level of services and then replacing them with
16 this one.
17     Q   I also see a Note column, and at least
18 all the entries on the first page say, "New
19 Service," correct?
20     A   Yes.
21     Q   Do you have an understanding of
22 approximately how much an HPDL 169 (sic) server
23 costs if you were to purchase it?
24     A   Three grand.
25     Q   Does the sales order look like it

Page 38

1  involves the sale of an HP 169 server?
2     A   No.
3         (Exhibit 2212, 9/16/13 Sales Order
4         [TIERPOINT2-SUB129-132], was marked for
5         identification.)
6  BY MR. RODRIGUEZ:



Page 39

Page 40

17         MR. RODRIGUEZ:  Let's go ahead and mark
18     the next exhibit.

Page 41

Page 54

Page 55

Page 56

Page 57

```
 6      Q   I'm going to return to Exhibit 2227.
 7   Exhibit 2227 was produced at Bates
 8   TIERPOINT2-SUB109.
 9          Mr. Heaberlin, do you have an
10   understanding of what Exhibit 2227 is?
11          You know what, strike that.  I already
12   marked that exhibit with a different number on it.
13   We'll just strike 2227.
14          Mr. Heaberlin, thanks very much for your
15   time.  I have no further questions pending
16   questioning from Mr. Reilly.
17      A   Thank you.
18              EXAMINATION
19   BY MR. REILLY:
20      Q   Mr. Heaberlin, I introduced myself before
21   the deposition.  My name is John Reilly, and I
22   represent Rimini Street.  Just a few follow-up
23   questions, sir.
24      A   Sure.
25      Q   In preparing for today's deposition, did
```

Page 58

1  you have any contact with any representative,
2  including any lawyer, for Oracle?
3      A   No.

Page 59

Page 60

15      MR. RODRIGUEZ:  Same objections.
16  BY MR. REILLY:
17      Q   Does Rimini Street own TierPoint or have
18  any ownership interest in the company, to your
19  knowledge?
20      A   Not that I'm aware of.
21      Q   Did it have any ownership interest in
22  Windstream?
23      A   Not that I'm aware of.
24      Q   How about Hosted Solutions?
25      A   Not that I'm aware of.

Page 61

1      Q   You were asked a series of questions
2  about colocation services.  Can you just describe
3  what those are again?
4      A   Sure.  Colocation is when a service
5  provider builds a data center or multiple data
6  centers, and their end clients come in, and instead
7  of building their own facilities and staffing to
8  manage those facilities, they simply take a certain
9  amount of space, power, and network bandwidth and
10  then house their own IT infrastructure within that
11  given space.

```
 1              CERTIFICATE OF REPORTER
 2
 3         I, Marie H. Bruegger, Registered
 4  Professional Reporter, Certified Realtime Reporter,
 5  and Notary Public for the State of South Carolina
 6  at Large, do hereby certify that the foregoing
 7  transcript is a true, accurate, and complete
 8  record.
 9         I further certify that I am neither
10  related to nor counsel for any party to the cause
11  pending or interested in the events thereof.
12         Witness my hand, I have hereunto affixed
13  my official seal this 6th day of March, 2018, at
14  Charleston, Charleston County, South Carolina.
15
16
17
18
19
20
21
22  _____
23              Marie H. Bruegger
24     Registered Professional Reporter, CCR
25     My commission expires: April 18, 2021
```

Page 75