# Exhibit 23

# Excerpts from the Oct. 17, 2019 Rule 30(b)(6) Deposition of TierPoint (Jeff Russell Waide)

```
 1              UNITED STATES DISTRICT COURT
 2                   DISTRICT OF NEVADA
 3             Case No. 2:10-cv-0106-LRH-VCF
 4
 5   ORACLE USA, INC, a Colorado  )
 6   corporation; ORACLE AMERICA, )
 7   INC., a Delaware corporation )
 8   and ORACLE INTERNATIONAL     )
 9   CORPORATION, a California    )
10   corporation,                 )
11        Plaintiffs,             )
              vs.                 )
12   RIMINI STREET, INC., a Nevada)
13   corporation; and SETH RAVIN, )
14   an individual,               )
15        Defendants.             )
     _____)
16
17        VIDEOTAPED DEPOSITION OF JEFF RUSSELL WAIDE,
18        taken at 600 Fairview Road, Suite 1273,
19        Charlotte, North Carolina, commencing at
20        10:03 a.m., Thursday, October 17, 2019,
21        before Sandra Berkeland, Notary Public
22        in and for the State of North Carolina.
23
24   JOB No. 3569687
25   PAGES 1 - 42
```

Page 1

1 have knowledge that he was involved in this case.
2    Q. Did you see his deposition transcript?
3    A. No.
4    Q. How long have you been at TierPoint?
5    A. I joined April 1, 2017. Two and a half
6 years roughly.
7    Q. What's your current position?
8    A. I'm the RVP of sales for the Carolinas.
9    Q. Has that been your position since you joined
10 TierPoint?
11   A. It has. It's changed a little bit. I used
12 to work outside of the Carolinas in Tennessee, so
13 Tennessee and surrounding states out there. Same
14 title.
15   Q. Do you have an understanding as to whether
16 Rimini Street is a TierPoint customer today?
17   A. I believe they are not. They were formerly
18 a customer and we had a situation where there was
19 kind of a parent/child relationship with contracts,
20 so I believe some of the children still exist but
21 I -- I believe that Rimini Street is no longer a
22 TierPoint customer as of the middle of 2018, I
23 believe.
24   Q. In front of you is a document the court
25 reporter has marked as Exhibit 1817. Please take a
Page 10

1    THE WITNESS: My understanding is that some
2 of the, what is referred to here as child accounts,
3 still exist. I don't have an answer as to how many
4 that would be.
5 BY MR. RODRIGUEZ:
6    Q. Next sentence, "We had tried an exercise to
7 break these out, but I don't believe it was ever
8 fully completed."
9    What does it mean to break out a child
10 account?
11   MR. WHITTAKER: Objection. Lacks foundation.
12 Calls for speculation.
13   THE WITNESS: To break these out would be,
14 you know, the way that our contracts would work, we
15 have, as I explained earlier, a parent account and
16 several children underneath that could have, you
17 know -- could be making use of the same master
18 agreement, so terms and conditions, et cetera.
19   What it means to break these out would be the
20 parents may no longer want to have a contract with
21 TierPoint, and we would -- we would separate out the
22 children accounts to deal directly with us.
23 BY MR. RODRIGUEZ:
24   Q. So what happens -- could you explain to me
25 how the terms are allocated between a parent, a
Page 12

1 moment to familiarize yourself with it and let me
2 know when you're comfortable.
3    A. Yeah. I browsed this document prior to
4 today as well.
5    Q. What is it?
6    A. It's a string of emails from within our
7 company. One of the reps inside of here used to
8 report to me, Brad Dillard. So some correspondence
9 in here from -- emails from folks at our company.
10   Q. You said Brent Dillard (sic). I see a Brad
11 Dillard.
12   A. Sorry. I meant Brad. Sorry about that.
13   Q. That's okay. Now on page two there is an
14 email from Bradley Dillard. It says, Sent
15 Wednesday, June 13, 2018, 11:06 a.m.
16   A. Uh-huh.
17   Q. Do you see where I am?
18   A. Yes.
19   Q. The first sentence says, "Careful with this
20 one. We still have about ten child Rimini Street
21 accounts and I believe all assets are tied to the
22 main Rimini Street account."
23      Is it true today that TierPoint still has
24 about 10 child Rimini Street accounts?
25   MR. WHITTAKER: Objection. Lacks foundation.
Page 11

1 master account, and a child account agreement?
2    MR. WHITTAKER: Objection. Vague.
3    THE WITNESS: So, a parent we would see, you
4 know, we would see a parent account in -- I'll give
5 you an example like a government such account where
6 the government may have shared services or they
7 create an account with us, negotiate the master
8 agreement, the terms and conditions that would be in
9 place for that account. And if they had state
10 agencies, they could also use or utilize the master
11 agreement, but they -- they're separate operating
12 entities, if you will, so we tend to use it in that
13 sense.
14 BY MR. RODRIGUEZ:
15   Q. And was the Rimini Street customer parent/
16 child relationship the same as what you just
17 described?
18   A. When I arrived at TierPoint, I believe that
19 to be the case, yes.
20   Q. When a child account is broken out, what
21 happens to the master services agreement that was
22 previously associated with that child account?
23   A. Typically, that child agreement or child
24 customer would assume the master agreement that was
25 in place. There could be negotiations that happen.
Page 13

4 (Pages 10 - 13)

```
 1  referring to a master agreement?
 2  BY MR. RODRIGUEZ:
 3     Q.  What makes up an agreement between TierPoint
 4  and a customer?
 5         MR. WHITTAKER:  Same objection.
 6         THE WITNESS:  I mean, it would be a master
 7  agreement and sales order.  It also, you know, prior
 8  to generating these documents, we would go through a
 9  lengthy proposal period and we'd have a schematic or
10  a drawing of what the services would be, and at that
11  time it's obviously laid out between us and the
12  customer, whether it's a private or public or
13  multi-tenant cloud type of arrangement.
14         But again, our engineer -- our engineer
15  could probably look at this, because they're the
16  ones who create this, and again, because I'm not
17  familiar with this particular customer, I don't --
18  I don't have a view into if this is dedicated or
19  not.  It looks to me like it's dedicated, but I
20  would -- I would want to review it with an engineer
21  who created this.
22         MR. RODRIGUEZ:  Let's mark the next exhibit.
23         THE WITNESS:  I'll also say again in looking
24  at the pricing for this, I would assume it's a
25  multi-tenant agreement.  The monthly fee is a
                                                  Page 26
```

```
 1  thousand dollars and a typical private cloud
 2  infrastructure would be much more than that.
 3  BY MR. RODRIGUEZ:
 4     Q.  Can you give me a range, generally?
 5     A.  I mean, I would say anything over the kind
 6  of ten to 15,000 a month would be a general comment
 7  of a private infrastructure that we would set up.
 8  Anything under that in the, you know, hundreds to
 9  thousands would typically be a multi-tenant
10  arrangement.
11         (Court Reporter marks 8/21/19 Email Chain
12  Exhibit 1819.)
13         MR. RODRIGUEZ:  The court reporter has marked
14  as Exhibit 1819 a document ending in with Bates No.
15  TIERPOINT3-SUB-00000059.
16  BY MR. RODRIGUEZ:
17     Q.  Mr. Waide, have you seen Exhibit 1819 before
18  this morning?
19     A.  I don't have the exhibit in front of me.
20     Q.  I'm sorry.  I got ahead of the court
21  reporter.
22     A.  No problem.
23     Q.  Mr. Waide, have you seen Exhibit 1819 prior
24  to this morning?
25     A.  I think this is probably included in a
                                                  Page 27
```

```
 1  larger document.  There was a bunch of email
 2  exchanges.  Again, probably quickly scanned through
 3  it but not intimately familiar with this.
 4     Q.  Do you have an understanding as to who
 5  MOSAIC is?
 6     A.  I do not.
 7     Q.  I'd like to focus on the first email on the
 8  first page from Shelly Leyden.  Wednesday,
 9  August 21st, 2019, 10:31 AM.  Did I get that right?
10     A.  Yes.
11     Q.  What does the table in this email depict?
12         MR. WHITTAKER:  Objection.  Calls for
13  speculation.
14         THE WITNESS:  To me, this table would depict
15  the administrative rights in our portal system for
16  those who would have access to certain things.
17  BY MR. RODRIGUEZ:
18     Q.  And the second paragraph, last sentence,
19  the, quote, A in the below list represents who has
20  admin rights.  What are admin rights?
21     A.  Again, this is -- an engineer would be much
22  more familiar.  To me, administrative rights in the
23  system would be a person who works for a customer of
24  ours who would have rights to change or make
25  modifications to certain rights that their employees
                                                  Page 28
```

```
 1  would have in our system.
 2         So, for example, if somebody wants to enter
 3  our data center, they have to be assigned that right
 4  in our portal before we would let them enter or come
 5  into our data center.
 6         Somebody with administrative rights would be
 7  able to set up those people who are able to do that.
 8  So usually I'll call it the quarterback of the
 9  TierPoint account on the customer side, if you will.
10     Q.  Is the table on the first page of 1819, the
11  sort of table that is available in what you just
12  described as the portal?
13         MR. WHITTAKER:  Objection.  Lacks foundation.
14         THE WITNESS:  Yeah.  I'm not -- again, I
15  manage a sales team.  I don't get too involved with
16  the portal.  To me, this looks like something that
17  has come out of our portal but I can't say a hundred
18  percent.
19  BY MR. RODRIGUEZ:
20     Q.  The far right column of the table has a
21  series of letters.  Are you familiar with the
22  letters and the format of them?
23     A.  I am not.
24     Q.  Are you familiar with the administrative
25  rights that are assigned to Rimini customer
                                                  Page 29
```

8 (Pages 26 - 29)

```
1   STATE OF NORTH CAROLINA
    COUNTY OF MECKLENBURG
2

3            REPORTER'S CERTIFICATE
4        I, Sandra Berkeland, Shorthand Reporter and
5   Notary Public in and for the State of North
6   Carolina, do hereby certify that there came before
7   me on Thursday, the 17th day of October, 2019, the
8   person hereinbefore named, who was by me duly sworn
9   to testify to the truth and nothing but the truth of
10  his knowledge concerning the matters in controversy
11  in this cause; that the witness was thereupon
12  examined under oath, the examination reduced to
13  typewriting under my direction, and the deposition
14  is a true record of the testimony given by the
15  witness.
16       I further certify that I am neither attorney
17  or counsel for, nor related to or employed by, any
18  attorney or counsel employed by the parties hereto
19  or financially interested in the action.
20       IN WITNESS WHEREOF, I have hereto set my hand,
21  this the 31st day of October, 2019.
22
23       [signature: Sandra Berkeland]

24       Sandra Berkeland, Notary Public
25       Notary Number: #201323800050
```

Page 42