GIBSON, DUNN & CRUTCHER LLP
MARK A. PERRY (*pro hac vice*)
1050 Connecticut Avenue, N.W.
Washington, DC 20036
Telephone: 202.955.8500
mperry@gibsondunn.com

GIBSON, DUNN & CRUTCHER LLP
JEFFREY T. THOMAS (*pro hac vice*)
BLAINE H. EVANSON (*pro hac vice*)
JOSEPH A. GORMAN (*pro hac vice*)
CASEY J. MCCRACKEN (*pro hac vice*)
3161 Michelson Drive
Irvine, CA 92612-4412
Telephone: 949.451.3800
jtthomas@gibsondunn.com
bevanson@gibsondunn.com
jgorman@gibsondunn.com
cmccracken@gibsondunn.com

GIBSON, DUNN & CRUTCHER LLP
SAMUEL LIVERSIDGE (*pro hac vice*)
ERIC D. VANDEVELDE (*pro hac vice*)
333 South Grand Avenue
Los Angeles, CA  90071-3197
Telephone: 213.229.7000
sliversidge@gibsondunn.com
evandevelde@gibsondunn.com

RIMINI STREET, INC.
DANIEL B. WINSLOW (*pro hac vice*)
6601 Koll Center Parkway, Suite 300
Pleasanton, CA 94566
Telephone: 925.264.7736
dwinslow@riministreet.com

RIMINI STREET, INC.
JOHN P. REILLY (*pro hac vice*)
3993 Howard Hughes Parkway, Suite 500
Las Vegas, NV 89169
Telephone: 336.908.6961
jreilly@riministreet.com

HOWARD & HOWARD ATTORNEYS PLLC
W. WEST ALLEN (Nevada Bar No. 5566)
3800 Howard Hughes Parkway, Suite 1000
Las Vegas, NV 89169
Telephone: 702.667.4843
wwa@h2law.com

*Attorneys for Defendant*
*Rimini Street, Inc.*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| ORACLE USA, INC., et al.,<br><br>                    Plaintiffs,<br><br>          v.<br><br>RIMINI STREET, INC., et al.,<br><br>                    Defendants. | CASE NO. 2:10-CV-00106-LRH-VCF<br><br>**RIMINI STREET, INC.'S OPPOSITION TO ORACLE'S MOTION FOR SANCTIONS PURSUANT TO RULE 37**<br><br>**ORAL ARGUMENT REQUESTED**<br><br>**PUBLIC REDACTED VERSION** |

# TABLE OF CONTENTS

<u>Page</u>

I. INTRODUCTION ...................................................................................................1

II. FACTUAL AND PROCEDURAL BACKGROUND ............................................3

    A.      Procedural History ........................................................................................3

           1.      *Rimini I (Process 1.0) And Rimini II (Process 2.0)* ......................3

           2.      *Rimini I Proceedings—Through Final Judgment* ..................................4

           3.      *Rimini II Proceedings—Pending Summary Judgment* ..........................5

           4.      *Oracle Initiates Wide-Ranging Injunction Compliance Discovery* ..........................................................................................6

    B.      Rimini's TransferFiles Tool Creates *Additional* Copies Of Transferred Files ...............................................................................................................7

           1.      *How TransferFiles Works* ...................................................................7

           2.      *Oracle Has Known How TransferFiles Operates Since At Least 2015* ...............................................................................................10

III. LEGAL STANDARD ..........................................................................................11

IV. ARGUMENT ........................................................................................................12

    A.      Oracle's Motion Should Be Denied Outright Because It Is Untimely .............13

    B.      Oracle's Motion Must Be Denied Because There Was No Spoliation ............14

           1.      *There Was No Spoliation Because No ESI Was "Lost"* ......................15

           2.      *Rimini Had No Duty To Preserve Temporary, Transitory Files Used To Create Additional Duplicate Copies* ......................................16

    C.      Oracle Was Not Prejudiced By Rimini's Creation Of *Additional* Copies Of Transferred Files .......................................................................................19

    D.      Oracle's Accusation That Rimini Intended To Deprive Oracle Of Information Is Patently False ........................................................................21

V. CONCLUSION .....................................................................................................24

RIMINI STREET, INC.'S OPPOSITION TO ORACLE'S MOTION FOR RULE 37 SANCTIONS
CASE NO. 2:10-CV-00106-LRH-VCF

Gibson, Dunn & Crutcher LLP

1

# TABLE OF AUTHORITIES

2
Page(s)

3
**Cases**

4
*Adams AV Select Invs., LLC v. Klein*,
   2020 WL 2425715 (D. Del. May 12, 2020)...............................................................15, 16

5

6
*Alexce v. Shinseki*,
   447 F. App'x 175 (Fed. Cir. 2011) ..................................................................................17

7
*Apple Inc. v. Samsung Elecs. Co.*,
   881 F. Supp. 2d 1132 (N.D. Cal. 2012) ..........................................................................17

8

9
*Arista Recs. LLC v. Usenet.com, Inc.*,
   608 F. Supp. 2d 409 (S.D.N.Y. 2009) ............................................................................17

10
*Brown v. Albertsons, LLC*,
   2017 WL 1957571 (D. Nev. May 11, 2017).....................................................................17

11

12
*CAT3, LLC v. Black Lineage, Inc.*,
   164 F. Supp. 3d 488 (S.D.N.Y. 2016) ............................................................................22

13
*Colonies Partners, L.P. v. Cnty. of San Bernardino*,
   2020 WL 1496444 (C.D. Cal. Feb. 27, 2020) ................................................................22

14

15
*Convolve, Inc. v. Compaq Comput. Corp.*,
   223 F.R.D. 162 (S.D.N.Y. 2004) ....................................................................................17

16
*CrossFit, Inc. v. Nat'l Strength & Conditioning Ass'n*,
   2019 WL 6527951 (S.D. Cal. Dec. 4, 2019)...................................................................23

17

18
*Express Restoration Corp. v. ServiceMaster Glob. Holdings*,
   2020 WL 2084669 (C.D. Cal. Jan. 24, 2020) ................................................................22

19
*Goodman v. Praxair Servs., Inc.*,
   632 F. Supp. 2d 494 (D. Md. 2009) ...............................................................................13

20

21
*Healthcare Advocs., Inc. v. Harding, Earley, Follmer & Frailey*,
   497 F. Supp. 2d 627 (E.D. Pa. 2007) ........................................................................17, 18

22
*Holguin v. AT&T Corp.*,
   2018 WL 6843711 (W.D. Tex. Nov. 8, 2018) ................................................................20

23

24
*HP Tuners, LLC v. Sykes-Bonnett*,
   2019 WL 5069088 (W.D. Wash. Sept. 16, 2019)...........................................................23

25
*Jenkins v. Woody*,
   2017 WL 362475 (E.D. Va. Jan. 21, 2017) ...................................................................22

26

27
*Larios v. Lunardi*,
   --- F. Supp. 3d ---, 2020 WL 1062049 (E.D. Cal. Mar. 5, 2020)..............................13, 14

28
*Living Color Enters., Inc. v. New Era Aquaculture, Ltd.*,
   2016 WL 1105297 (S.D. Fla. Mar. 22, 2016) ................................................................15

# TABLE OF AUTHORITIES

Page(s)

*MB Realty Grp., Inc. v. Gaston Cnty. Bd. of Educ.*,
  2019 WL 2273732 (W.D.N.C. May 28, 2019) ...............................................................20

*In re Napster, Inc. Copyright Litig.*,
  462 F. Supp. 2d 1060 (N.D. Cal. 2006) ........................................................................17

*Newberry v. Cnty. of San Bernardino*,
  750 F. App'x 534 (9th Cir. 2018) .............................................................................12, 21

*OmniGen Res. v. Yongqiang Wang*,
  321 F.R.D. 367 (D. Or. 2017) .......................................................................................23

*Oracle Am., Inc. v. Hewlett Packard Enter. Co.*,
  328 F.R.D. 543 (N.D. Cal. 2018) ..................................................................................15

*Oracle USA, Inc. v. Rimini Street, Inc.*,
  783 F. App'x 707 (9th Cir. 2019) ....................................................................................5

*Oracle USA, Inc. v. Rimini Street, Inc.*,
  879 F.3d 948 (9th Cir. 2018) ...........................................................................................4

*Rhabarian v. Cawley*,
  2014 WL 546015 (E.D. Cal. Feb. 11, 2014) .................................................................14

*Sherwin-Williams Co. v. JB Collision Servs., Inc.*,
  2015 WL 4077732 (S.D. Cal. July 6, 2015) .................................................................13

*Small v. Univ. Med. Ctr.*,
  2018 WL 3795238 (D. Nev. Aug. 9, 2018) .............................................................12, 19

*Steves & Sons, Inc. v. JELD-WEN, Inc.*,
  327 F.R.D. 96 (E.D. Va. 2018) .................................................................................15, 20

*Wai Feng Trading Co. v. Quick Fitting, Inc.*,
  2019 WL 118412 (D.R.I. Jan. 7, 2019) .........................................................................19

*Wakefield v. ViSalus, Inc.*,
  2019 WL 1411127 (D. Or. Mar. 27, 2019) ..............................................................13, 14

*Wal-Mart Stores, Inc. v. Cuker Interactive, LLC*,
  2017 WL 239341 (W.D. Ark. Jan. 19, 2017) ................................................................19

**Rules**

Fed. R. Civ. P. 37(e) ..............................................................................................12, 15, 16

Fed. R. Civ. P. 37(e)(1) ...............................................................................................12, 21

Fed. R. Civ. P. 37(e)(2) ...............................................................................................12, 22

Gibson, Dunn &
Crutcher LLP

1

## TABLE OF AUTHORITIES

2

<u>Page(s)</u>

3

**Other Authorities**

4

Fed. R. Civ. P. 37 advisory committee's note to 2015 amendment ................................. *passim*

5

*The Sedona Principles, Third Edition: Best Practices, Recommendations &*
  *Principles for Addressing Electronic Document Production,*

6

  19 Sedona Conf. J. 1 (2018) ................................................................................................16

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

RIMINI STREET, INC.'S OPPOSITION TO ORACLE'S MOTION FOR RULE 37 SANCTIONS
CASE NO. 2:10-CV-00106-LRH-VCF

After years of discovery turned up *no evidence* that Rimini is violating the injunction, Oracle manufactured a phony discovery violation so it can attempt to impugn Rimini's integrity while arguing that the *absence* of evidence somehow shows that Rimini is in contempt of the injunction. Oracle's Motion for Rule 37 Sanctions is baseless. No information has been destroyed, lost, or spoliated. Rimini has scrupulously complied with this Court's orders and judgment, including the injunction, as well as with its discovery obligations. Oracle's present Motion thus serves to confirm that its entire contempt theory is bereft of legal and evidentiary support.

## I. INTRODUCTION

Contrary to the premise of Oracle's Motion, there is no "Deletion Program" that Rimini created or used to destroy evidence. The program at issue, called "TransferFiles," actually *creates copies* of ███████████████████████, and similar files that do not contain Oracle intellectual property. When a Rimini engineer uses TransferFiles to transmit such a file to a client, it creates a *new copy* on the client's system while *retaining* Rimini's original file. To do this, ████████████████████████████████████████████
████████████████████████████████████████████████
███████████████████████████████████ :

████████████████████████████████████

Oracle objects *only* to Rimini's alleged failure to preserve the transitory ████████ copy (which typically exists for a matter of seconds)—even though the result of the TransferFiles process is (at least) *two* identical copies of a file where only one previously existed. No information has been lost.

The copy/paste functionality in a word-processing program is analogous. When a user copies text from one document to another, the text is first copied to an intermediate "clipboard" in the computer's memory, from which it can then be pasted to its destination. The original

1   copy remains, in addition to the newly created duplicate; but the transitory copy on the clipboard
2   is not retained in the ordinary course.  Just as the absence of clipboard copies would not
3   constitute "spoliation," Rimini's TransferFiles program is not objectionable, let alone
4   sanctionable.

5          Oracle's Motion should be denied for four reasons.

6          **First**, Oracle's Motion is untimely.  Oracle has known about the TransferFiles program
7   *for years*, and Rimini has been completely transparent regarding its use.  As early as *2015*,
8   Rimini produced the source code underlying TransferFiles to Oracle, whose experts reviewed
9   and analyzed the code.  Rimini further explained the transfer process (including the handling
10  of the temporary, intermediate copies) to Oracle in a December 2018 letter, and Oracle raised
11  no issue.  Litigants are required to bring claims of spoliation as soon as reasonably possible
12  after uncovering the facts supporting such a claim.  But Oracle chose to stay silent and raise
13  this supposed "spoliation" concern to the Court seven months *after* the close of discovery (on
14  the same day as its contempt motion).  By doing so, Oracle sacrificed the ability for the Court
15  to address any alleged spoliation through corrective action during the discovery period.  Rimini
16  cannot be sanctioned when Oracle's delay is the reason other options are unavailable.

17         **Second**, there was no spoliation at all.  Rule 37, as amended in 2015, is clear that
18  multiple duplicative copies of electronically stored information need not be retained or
19  produced.  No information has been "lost" as a result of TransferFiles, a *copying* program that
20  *creates* additional copies of Rimini-created or other non-Oracle files on client environments.
21  Rimini manually located 99% of the files Oracle identified as having been transferred and
22  produced them to Oracle, and Oracle makes no complaint about the other 1% (six files total),
23  which include clearly irrelevant files such as "sample.txt" and a public state tax form.

24         **Third**, Oracle has not even attempted to explain how it could be prejudiced by failing
25  to receive duplicate copies of files that it does not even reference in its contempt motion.  In
26  particular, Oracle does not anywhere in its Motion tie the temporary, intermediate files to its
27  contempt theories.  Nor could it.  Oracle's Motion is based on copies of files that Oracle already
28  has, and its contempt motion—filed the same day as this Motion—does not even mention the

1    archival copies of these files that Rimini produced to Oracle.

2        **Fourth**, there is no evidence whatsoever that Rimini "intentionally" destroyed evidence,

3    which is what Oracle must prove for the sanctions it requests under Rule 37.   Oracle's

4    accusations that a file *copying* tool that ███████████████ was somehow deliberately

5    designed to destroy evidence of Rimini violating a 2018 injunction are baseless.   Rimini

6    disclosed and explained TransferFiles in detail throughout the discovery process, including the

7    fact that it creates logs of all its actions.   There is no evidence that Rimini intentionally

8    destroyed evidence—much less the clear and convincing evidence that Oracle must prove.

9        Oracle's Motion is a dramatic overreach and a clear indication of the weakness of its

10   contempt case.   The Motion should be denied.

## II.  FACTUAL AND PROCEDURAL BACKGROUND

11

12   **A.    Procedural History**

13       Oracle's baseless accusations of discovery misconduct must be appreciated within the

14   context of the decade of litigation in which Oracle has received more discovery than probably

15   any litigant in the history of civil litigation in this District—indeed, having virtually lived *inside*

16   Rimini's computer systems through years of live, real-time access.

17       **1.    *Rimini I (Process 1.0) And Rimini II (Process 2.0)***

18       Oracle filed this lawsuit 10 years ago, alleging that the *manner* in which Rimini was

19   providing third-party support to its clients at that time ("Process 1.0") exceeded the scope of

20   the clients' Oracle licenses.   In February 2014, this Court held on summary judgment that

21   certain legacy PeopleSoft licenses prohibited Rimini from locally hosting its clients' licensed

22   environments on its own systems, and that Rimini exceeded the scope of the license agreements

23   by using at least one generic environment—*i.e.*, an environment not dedicated to any particular

24   licensed client—to create software updates containing Oracle code, which it distributed to other

25   clients who also held licenses.   ECF No. 474 at 13.

26       Rimini invested millions of dollars to revise its processes to conform to this Court's

27   summary judgment rulings, completing the transition to Process 2.0 by the end of July 2014.

28   ECF No. 905 at 4–5; ECF No. 1130 at 3–4.   Process 2.0 eliminated the acts of "local hosting"

and "cross-use" that were at issue in *Rimini I*.  *See* ECF No. 1134-3.  Unlike Process 1.0, which was the subject of this litigation, under Process 2.0, each client (not Rimini) hosts its own, separate, licensed Oracle software environment on the client's own systems, and Rimini remotely accesses those clients' environments (on the clients' systems) to provide support.  ECF No. 1134-3 (Benge Decl.) ¶¶ 3, 5; *see generally* ECF No. 1323 at 4–6.

Process 2.0 was never litigated in *Rimini I*.  *See* ECF No. 1323 at 3, 8–12.  After Rimini transitioned to Process 2.0, Rimini filed a separate lawsuit against Oracle in October 2014 (*Rimini II*) to seek a declaration that Process 2.0 was legal.  Rimini sought to consolidate *Rimini I* and *Rimini II*, but Oracle opposed those efforts, claiming that the two cases must be kept separate because they involve different processes and conduct.  *See id.* at 7–8.  This Court agreed with Oracle and excluded all evidence of Process 2.0 from *Rimini I*, ruling that "Rimini's new service support model is not relevant to any claim or issue in [*Rimini I*]" and that all "claims, issues, and evidence related to the new support model [*i.e.*, Process 2.0] are being addressed *solely* in [*Rimini II*]."  ECF No. 723 at 3 (emphasis added).

### 2.     *Rimini I Proceedings—Through Final Judgment*

*Rimini I* proceeded to trial in September 2015.  The jury found that Rimini's copyright infringement was "innocent," meaning that it "was not aware" and "had no reason to believe that its acts constituted" infringement.  *See* ECF No. 896.  After trial, Oracle moved for injunctive relief for the first time.  ECF No. 900.  Rimini opposed, arguing that Oracle was submitting an intentionally overbroad and vague injunction to try to prejudge issues being litigated in *Rimini II*.  ECF No. 906 at 5, 16–19; ECF No. 1069 at 7–8.  In response, Oracle stated it was seeking only "an injunction that codifies" the bases of liability in *Rimini I*.  ECF No. 1040 at 143:15–17.  This Court entered Oracle's proposed injunction.  ECF No. 1065.

The Ninth Circuit affirmed the finding of innocent infringement on narrow grounds, but vacated the injunction.  *Oracle USA, Inc. v. Rimini Street, Inc.*, 879 F.3d 948, 953–64 (9th Cir. 2018).  On remand, Oracle asked this Court to reenter essentially the same injunction.  ECF No. 1117.  Rimini again argued that Oracle was seeking to prejudge *Rimini II*; Oracle again assured this Court that it was "not asking now for a ruling on the merits of the issues in dispute in

1    *Rimini II*" but rather asking "for a permanent injunction restraining Rimini from continuing to

2    commit the infringement that this Court and the jury *have already determined to constitute*

3    *copyright infringement*" in *Rimini I*.  *Id.* at 20 n.3 (emphasis added).  Oracle further represented

4    to this Court that the injunction was permissible because it "just track[s] the scope of the

5    infringing conduct" adjudicated in *Rimini I*.  ECF No. 1158 at 30–44.

6    This Court granted Oracle's motion and entered the injunction (ECF No. 1166),

7    specifically ruling that it enjoins "only acts that have already been determined to be unlawful,

8    and which have been affirmed on appeal."  ECF No. 1164 at 9.

9    On appeal, the Ninth Circuit narrowed the injunction and otherwise affirmed.  *See*

10   *Oracle USA, Inc. v. Rimini Street, Inc.*, 783 F. App'x 707, 710–11 (9th Cir. 2019).  Rimini has

11   paid the entire judgment (totaling some $90 million), and *Rimini I* is concluded, with the

12   exception of the newly filed "contempt" proceedings.  *See* Declaration of Thomas D. Vander

13   Veen ¶ 3.

14   **3.    *Rimini II Proceedings—Pending Summary Judgment***

15   Meanwhile, *Rimini II* progressed through fact and expert discovery concerning

16   Process 2.0.  The discovery in *Rimini II* spanned more than three years.  Rimini produced nearly

17   10 million documents (*40 million pages*) and 4.2 *terabytes* of data from 50 custodians, ranging

18   from its CEO and upper management to developers.  Declaration of Jennafer M. Tryck ("Tryck

19   Decl.") ¶¶ 2–3.  Rimini produced all source code for its proprietary Automation Framework

20   ("AFW") software tools, including the source code for the TransferFiles program.  *Id.* ¶ 9.  It

21   produced its ███████████████████████████████████████████████████████████████

22   ██████████████████████████████████████.  *Id.* ¶ 10.  Rimini also

23   produced large swaths of its internal networked drives with directory listings so Oracle could

24   cross-check Rimini's production.  *Id.* ¶¶ 6–7.  Rimini also produced massive data exports from

25   its ████████████████████████████████████████████████████████████████████████

26   ██████████████████████████████.  *Id.* ¶ 11.  Furthermore, Rimini gave Oracle

27   unprecedented *live access* to its software development management platforms—which Rimini

28   uses to track fixes and updates for its clients—which allowed Oracle's lawyers and experts to

monitor Rimini's development in real time.  *Id.* ¶ 12.  Rimini also answered 25 interrogatories and 200 requests for admission, and sat for 25 depositions.  *Id.* ¶¶ 13, 15, 16.

In addition to discovery from Rimini, *Oracle issued more than 700 subpoenas* to Rimini's clients, seeking not only their documents, but also their software environments into which Rimini remotely accesses to provide support.  *Id.* ¶ 17.  Oracle also deposed more than 30 of Rimini's clients and other third parties. *Id.* ¶ 22.  The Court held that all of the discovery from *Rimini II* could be used in this proceeding.  *Rimini II*, ECF No. 1243.

Following years of intense discovery, there are seven summary judgment motions pending in *Rimini II*, fully briefed as of December 2018, which collectively address the aspects of Process 2.0 that Oracle asserts (and Rimini disputes) constitute copyright infringement.  *See Rimini II*, No. 14-1699, ECF Nos. 881–1079, 1124–206, 1208, 1210–22.

### 4.    *Oracle Initiates Wide-Ranging Injunction Compliance Discovery*

Oracle waited until discovery closed in *Rimini II* and then did exactly what Rimini had long predicted to this Court (and Oracle had just as long denied) that Oracle would do: accuse Rimini of violating the *Rimini I* injunction by engaging in Process 2.0—conduct that was never litigated in *Rimini I* and was kept from the jury at Oracle's insistence and over Rimini's objection.  *See generally* ECF No. 1199; *see also* ECF No. 1323 at 12–13.  Magistrate Judge Ferenbach permitted Oracle to take discovery to "verify what it needs to verify," but made clear that he was only supervising Oracle's access to information—and not deciding the merits of Oracle's accusations about Rimini's injunction compliance.  ECF No. 1218 at 20:20–21.

Oracle then took far-reaching discovery into Rimini's post-injunction conduct, all of which Rimini complied with.  Not only did Oracle have access in these proceedings to all the discovery in *Rimini II*, but in a matter of roughly seven months, Rimini produced to Oracle nearly one million additional documents, updated source code to Rimini's proprietary software tools, and massive data exports from its AFW database, its ███████ platform, and its internal network drives and file sharing systems, including its intranet.  Tryck Decl. ¶¶ 35–38.  Rimini also responded to 10 additional interrogatories and proffered a corporate witness to testify on *more than 30* topics.  *Id.* ¶¶ 39–40.

Gibson, Dunn &
Crutcher LLP

In addition, Rimini again gave Oracle 24/7 direct access to its internal software development tracking systems, including ███████████████, so that, again, Oracle's lawyers and experts had real-time access to the very software platforms that Rimini developers were using to plan and track their work. *Id.* ¶ 41. If an Oracle lawyer or expert wanted to see what Rimini's developers were working on (and how), they could log in with their own credentials and do so. *Id.*

It is in this context of virtually unlimited discovery into every aspect of Rimini's business over the last six years that Oracle brings the present Motion, claiming "spoliation" over a tool that *creates* copies of files—files that Oracle already has in its possession.

**B.     Rimini's TransferFiles Tool Creates *Additional* Copies Of Transferred Files**

Oracle's Motion is based on Rimini's use of TransferFiles, a tool within Rimini's AFW program, Rimini's patented suite of software tools that Rimini uses to remotely support certain clients.   Declaration of Professor Owen Astrachan, Ex. A ("Astrachan Rpt.") ¶ 222. TransferFiles is a software process that Rimini uses to transfer a copy of a file from Rimini's system to a client's environment. *Id.* ¶ 333. Rimini uses this tool to transfer files that do not contain any Oracle intellectual property, such as ██████████████████████████ ████████████████████████████████████████████████████████████. Declaration of Richard Frank ("Frank Decl.") ¶¶ 4, 6. ████████████████████████ ███████████████████████████████████████████████████. *Id.* ¶¶ 4, 12.[1]

**1.     *How TransferFiles Works***

TransferFiles works as follows: █████████████████████████ █████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████ █████████████████████████████████████████████████. Frank Decl. ¶ 8;

---

[1]   Oracle claims that shortly after the injunction took effect, ████████████████ ████████████████████████████████████████████████████. Mot. at 5. This is simply false. *See* Frank Decl. ¶¶ 15–18.

Astrachan Rpt. ¶¶ 334–35. ███████████████████████████████

███████████████████████████████████████████████████ :

████████████████████████████

Frank Decl. ¶¶ 4; Astrachan Rpt. ¶ 333.  At the end of the process, the original copy of the file on Rimini's system is retained and there is an additional, duplicate copy of the file on the client's system.  Frank Decl. ¶ 10; Astrachan Rpt. ¶ 334.

To accomplish this file transfer, ██████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████ .  Frank Decl. ¶ 8; Astrachan Rpt. ¶ 335.  ████████████████

████████████████████████████████████████████████████████████████

████ :

████████████████████████████

Astrachan Rpt. ¶ 335.  ████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████ :

████████████████████████████

*Id.* ¶ 337.   Contrary to Oracle's assertion that there is "no legitimate operational reason to remove files from its FTP server" (Mot. at 15), ████████████████████████████████

Gibson, Dunn &
Crutcher LLP

1  ███████████████████████████████████████████████████████████████

2  ██████████████████████████████████████████████   Frank Decl. ¶ 11. █████████████

3  ███████████████████████████████████████████████████████

TransferFiles does not modify or remove the original copy of the file on Rimini's system.  The net result is to *create* an additional copy on the client's system (while retaining the one on Rimini's system), as even Oracle's own expert admits.  *See* ECF No. 1363-2 ¶ 385 (Oracle's Expert: "[A]fter a successful … transfer, ***two copies of the original file exist***, the original file itself and the new copy on the destination system.") (emphasis added).

Contrary to Oracle's assertions, there is no "data-deletion program" that ████████████ ████████████████████████████████  Mot. at 6 (citing ECF No. 1363-2 ¶¶ 387–88). ██████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ Astrachan Rpt. ¶ 338; Frank Decl. ¶¶ 8, 12.  As explained above, ███████████████ ███████████████████████████████████████████████████████████████ ██████████████████████████.  Frank Decl. ¶ 12.  Oracle's suggestion that there exists a separate "Deletion Program" that Rimini implemented to avoid its discovery obligations in this injunction-compliance proceeding is patently false.

█████████████████████████████████████████████████  *Id.* Astrachan Rpt. ¶ 347; *see also* ECF No. 1363-2 ¶ 134. ████████████████████████████████████ ███████████████████████████████████████████████████████████████ █████████████████████████  ECF No. 1360-1 ¶¶ 131–32; *see also* Astrachan Rpt. ¶ 347. These records were produced to Oracle both in *Rimini II* and in this proceeding.  Tryck Decl. ¶¶ 10, 37; Declaration of Eric D. Vandevelde ("Vandevelde Decl."), Ex. F.

According these records, Rimini sent ████ unique files (based on filenames) to clients using TransferFiles during the post-injunction discovery period.  *See* Vandevelde Decl., Ex. C. Although Oracle's Motion claims that "more than ████ files" have been transferred using TransferFiles (*see*, *e.g.*, Mot. at 1, 6), Oracle's statistic is wildly exaggerated because ████████

1  ███████████████████████████████████████████████████████

2  ███████████████████████████████████████████. Vandevelde Decl., Ex. H at 8; Frank Decl.

3  ¶¶ 9–10; *see also infra*, note 2.

4      **2.    *Oracle Has Known How TransferFiles Operates Since At Least 2015***

5      Rimini has been transparent with Oracle from the beginning about how TransferFiles

6  works, and Oracle has known how it works for well over four years.  In late 2015, Rimini

7  produced the TransferFiles source code to Oracle in the *Rimini II* litigation, and it has continued

8  to produce every new version of the source code in this proceeding.  *See* Vandevelde Decl.,

9  Ex. A; Tryck Decl. ¶ 9.  Oracle's own expert in *Rimini II* confirmed *in June 2017* that he had

10  reviewed this underlying source code and understood how it worked.  *Rimini II*, ECF No. 515

11  ¶ 5.  Indeed, that expert submitted an 83-page report in May 2018 directed specifically to his

12  review of the source code and operation of AFW tools, including TransferFiles specifically.

13  Vandevelde Decl. ¶ 11.

14      In December 2018, in response to inquiries from Oracle, Rimini also explained in a

15  plain and straightforward manner how TransferFiles works:

16
17  ████████████████████████████████████████████████████████
18  █████████████████████████████████████████

19  ECF No. 1363-19 (2018.12.10 Vandevelde Letter).  Rimini offered to "discuss further" if

20  Oracle had any concerns or questions, but Oracle did not engage with Rimini.  *Id.*

21      It was not until nearly 10 months later, on August 21, 2019, that Oracle suddenly

22  asserted for the first time that it believed that the temporary, intermediate files that it had known

23  about for four years needed to be preserved, and that Rimini was allegedly "spoliating"

24  evidence.  ECF No. 1363-23 at 1.

25      Rimini promptly explained to Oracle why its concerns were unfounded, and met and

26  conferred with Oracle.  *See*, *e.g.*, ECF No. 1363-27 at 1.  Nevertheless, to resolve the issue,

27  Rimini undertook a time-consuming manual process to search for and produce a copy of each

28  of the ███ unique files that Oracle identified as having been copied through TransferFiles.  *See*

ECF No. 1363-24 at 1.  Rimini was able to locate **99%** (*i.e.*, ████) of these files, which it produced to Oracle.[2]  Vandevelde Decl., Ex. H at 8; *id.*, Ex. G.  Of the six files that Rimini could not locate on its systems—which include clearly irrelevant files like "sample.txt" and a publicly available Georgia tax form—Rimini explained to Oracle that they were not necessarily deleted, and instead ████████████████████████ Vandevelde Decl., Ex. H at 8.

In addition, in September 2019, shortly after Oracle raised this alleged "spoliation" issue, Rimini voluntarily made custom code revisions to the TransferFiles process ████████ ████████████████████████████████████████████████████.  *See* ECF No. 1363-24 at 1; Frank Decl. ¶ 14; Vandevelde Decl., Ex. D.  Rimini had no obligation to modify TransferFiles—and indeed, there is no business purpose to saving a *third* duplicative copy of transferred files.  *See* Frank Decl. ¶ 11.  Rimini did so only at Oracle's request, as first articulated in late August 2019.  *See* ECF No. 1363-23 (2019.08.21 Kocan Letter).

Rimini produced to Oracle these extra, newly created archival copies ████████████ ████ through the document discovery cutoff in November 2019, even though they were duplicative.  Tryck Decl. ¶ 10; Vandevelde Decl., Exs. E, G.  *Neither Oracle nor its expert has cited or relied upon any of these archived files* in connection with its contempt motion.

If Oracle still had an issue after all these efforts by Rimini, Oracle had every opportunity to take it up with Magistrate Judge Ferenbach, who, if he agreed with Oracle, could have ordered any appropriate relief, including allowing Oracle to subpoena additional copies of the same files from Rimini's clients (given that the TransferFiles program creates a copy on the client's machine).  Oracle *never* raised the issue with the Court before the fact discovery cutoff in January 2020, choosing instead to file this Motion six months after the close of discovery.

## III.  LEGAL STANDARD

Since 2015, Rule 37(e) has provided the sole basis for sanctions involving electronically

---

[2]  Oracle's Motion falsely claims that Rimini did not produce "actual copies of ████ of the ████████████" from ████████████████.  *See* Mot. at 16; ECF No. 1363-11 ¶ 15.  As Rimini has explained to Oracle multiple times, ████████████████████████████████████ ████████████████████████████████████████████████.  Even so, Rimini undertook significant efforts to locate those files on its systems and produced a copy of 99% of the transferred files ██████████████████████████.

Gibson, Dunn &
Crutcher LLP

stored information ("ESI").  *Newberry v. Cnty. of San Bernardino*, 750 F. App'x 534, 537 (9th Cir. 2018).  A court may impose sanctions *only if* the moving party carries its burden of proving that (1) the ESI "should have been preserved in anticipation or conduct of litigation," (2) the party "failed to take reasonable steps to preserve it," and (3) the ESI is "lost" and "cannot be restored or replaced."  Fed. R. Civ. P. 37(e).  There can be no spoliation where the data still exists.  Moreover, the 2015 amendments recognize that "[d]ue to the ever-increasing volume of electronically stored information … , perfection in preserving all relevant electronically stored information is often impossible."  Fed. R. Civ. P. advisory committee's note to 2015 amendment.  The rule therefore does not require a party to preserve "information that is marginally relevant or duplicative"—"'reasonable steps' to preserve suffice; it does not call for perfection."  *Id.*  And "[b]ecause electronically stored information often exists in multiple locations, loss from one source may often be harmless when substitute information can be found elsewhere."  *Id.*

Even where the requisite elements are met, the remedies available to the movant depend on whether it can establish specific intent.  As this Court has stated, "[t]he days of imposing severe, punitive sanctions for loss of ESI that can be restored or replaced by other discovery, especially ESI that is marginally relevant or duplicative of information from other sources should be over."  *Small v. Univ. Med. Ctr.*, 2018 WL 3795238, at *69 (D. Nev. Aug. 9, 2018).  The harshest sanctions, such as the adverse inference Oracle requests here, are available "only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation."  Fed. R. Civ. P. 37(e)(2).  Even lesser sanctions may only be imposed "upon finding prejudice to another party from loss of the information" and are limited to "measures no greater than necessary to cure the prejudice."  Fed. R. Civ. P. 37(e)(1).[3]

## IV.  ARGUMENT

Oracle complains that Rimini's systems did not retain transitory duplicates of files already produced to Oracle and that are merely artifacts of a technical process that Oracle has

---

[3]  Oracle is not entitled to the fees or costs it requests (Mot. at 24) because Rule 37(e) does not permit any award of fees or costs.  *See Newberry*, 750 F. App'x at 537; Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment.

Gibson, Dunn &
Crutcher LLP

1   known about for years.  The Motion should be denied for four independent reasons.  ***First***, the

2   Motion is untimely because it alleges spoliation based on facts that Oracle has long known but

3   chose to do nothing about during the discovery period.  ***Second***, there has been no spoliation at

4   all:  Rimini's TransferFiles process did not "delete" any data—to the contrary, it *created more*

5   *copies* of the files that Oracle alleges were "destroyed" (which Rimini had no obligation to

6   retain).  ***Third***, Oracle was not prejudiced by the creation of *more copies*, and Oracle has copies

7   of the underlying files.  ***Fourth***, Rimini did not "intentionally" destroy any ESI; Rimini has

8   transparently, and in good faith, fully disclosed to Oracle how TransferFiles worked all along.

9   **A.      Oracle's Motion Should Be Denied Outright Because It Is Untimely**

10  A litigant must bring a claim of spoliation "as soon as reasonably possible after

11  discovery of the facts that underlie the motion."  *Sherwin-Williams Co. v. JB Collision Servs.,*

12  *Inc.*, 2015 WL 4077732, at *2 (S.D. Cal. July 6, 2015); *see also Goodman v. Praxair Servs.,*

13  *Inc.*, 632 F. Supp. 2d 494, 508 (D. Md. 2009) ("[T]here is a particular need for [spoliation]

14  motions to be filed as soon as reasonably possible after discovery of the facts that underlie the

15  motion.").  This is to ensure there is an adequate opportunity for courts to engage in fact-finding

16  and fashion an appropriate remedy, if necessary, to resolve such discovery disputes.  *Wakefield*

17  *v. ViSalus, Inc.*, 2019 WL 1411127, at *4 (D. Or. Mar. 27, 2019).  Courts are especially "wary

18  of any spoliation motion made on the eve of trial," *id.* at *3, and "are justifiably unsympathetic

19  to litigants who" delay out of "neglect or … to achiev[e] an unwarranted tactical advantage,"

20  *Goodman*, 632 F. Supp. 2d at 508.  Thus, "it is well-established that unreasonable delay can

21  render a spoliation motion untimely."  *Larios v. Lunardi*, --- F. Supp. 3d ---, 2020 WL 1062049,

22  at *4 (E.D. Cal. Mar. 5, 2020) (internal quotation marks and citation omitted).  To determine if

23  a motion is untimely, the Court should consider "how long after the close of discovery the

24  spoliation motion is made," "when the movant learned of the discovery violation," and "how

25  long [the movant] waited before bringing it to the court's attention."  *Wakefield*, 2019 WL

26  1411127, at *3 (internal quotation marks and citation omitted).

27  In particular, it is inappropriate to bring a spoliation motion long after the close of

28  discovery because by then it is too late for the Court to rule on the issue and order any corrective

action during the discovery period, when any prejudice can be cured.  *See*, *e.g.*, *Larios*, 2020 WL 1062049, at *4 (denying spoliation motion where movant "waited over nine months to raise a claim of spoliation—after discovery closed"); *Wakefield*, 2019 WL 1411127, at *4 (denying spoliation motion where movant filed motion "more than a year after the close of discovery, more than two years after she first learned of the alleged destruction of call records, and less than two months before trial"); *Rhabarian v. Cawley*, 2014 WL 546015, at *3 (E.D. Cal. Feb. 11, 2014) (denying spoliation motion raised after the close of discovery).

Oracle's Motion comes far too late.  Oracle has known all the material facts about TransferFiles for years and could have brought this Motion long before now.  It could have brought the Motion as early as December 2015, when it reviewed the TransferFiles source code that contained this functionality (Tryck Decl. ¶ 9; *Rimini II*, ECF No. 515 ¶ 5), or in December 2018, when Rimini explained in a letter exactly how TransferFiles works, including with respect to intermediate files (ECF No. 1363-19 (2018.12.10 Vandevelde Letter); *see also* Mot. at 7), or in August 2019, when Oracle suddenly announced that the process it knew about for four years was somehow problematic (ECF No. 1363-23 (2019.08.21 Kocan Letter)).

Oracle's failure to bring its Motion during the contempt discovery period (which closed in January 2020), or even shortly thereafter, warrants outright denial.  If Oracle had brought its Motion at that time, Magistrate Judge Ferenbach could have taken steps to address any legitimate concerns during the discovery period, assuming he agreed with Oracle.  For example, he could have allowed Oracle to serve (additional) limited subpoenas to Rimini's clients to obtain the additional copies of the transferred files from the client's systems (██████ ██████████████████████████████████████████████████).  Instead, Oracle waited *another* seven months to spring this supposed "spoliation" issue upon the Court—long after discovery closed and the same day it filed its contempt motion.  Oracle's actions show that it has no interest in evidence preservation; instead, it seeks only to malign Rimini, which has fully complied with its discovery obligations—including with respect to TransferFiles.

## B.    Oracle's Motion Must Be Denied Because There Was No Spoliation

On the merits, the Motion must be denied because (1) no ESI was "lost," and (2) Rimini

had no duty to preserve temporary, intermediate, duplicate files.

### 1. *There Was No Spoliation Because No ESI Was "Lost"*

Rule 37(e) requires Oracle to establish that ESI was actually "lost." Fed. R. Civ. P. 37(e). ESI is not "lost," however, if it is available from another source or if it "exists in multiple locations." Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment. Thus, where the allegedly missing information has been provided through some other means, it is "not truly 'lost.'" *See Living Color Enters., Inc. v. New Era Aquaculture, Ltd.*, 2016 WL 1105297, at *6 (S.D. Fla. Mar. 22, 2016) (no loss of text messages where they could be produced from other source); *Steves & Sons, Inc. v. JELD-WEN, Inc.*, 327 F.R.D. 96, 107 (E.D. Va. 2018) (ESI "not 'lost' in any sense of the word" when it is "still attainable … [from another] copy"); *Oracle Am., Inc. v. Hewlett Packard Enter. Co.*, 328 F.R.D. 543, 553 (N.D. Cal. 2018) (no information was "lost" where "responding party … provide[d] duplicates" from other sources "to replace the information"); *Adams AV Select Invs., LLC v. Klein*, 2020 WL 2425715, at *5 (D. Del. May 12, 2020) (no sanctions warranted where emails were "forwarded to [different] account or sent to other parties").

Oracle's Motion fails because it cannot show that the TransferFiles program caused any ESI to be "lost." As explained above, TransferFiles is a *copying* program that creates additional copies of Rimini-created or other non-Oracle files on client environments. No information is "lost" as a result of TransferFiles: once the program has been executed, the result is that there exist *two* (or more) copies of a file where only *one* originally existed. Frank Decl. ¶ 8; Astrachan Rpt. ¶ 335. Nor does TransferFiles cause any deletion or alteration of the original file on Rimini's system. *See id.*

Thus, Oracle's assertion that Rimini supposedly "deleted more than ▮▮▮▮ files" (Mot. at 1) through TransferFiles is completely (and inexcusably) false. In reality, Oracle already has the files that it claims were "deleted" from the AFW FTP server. As explained above, Rimini located and produced to Oracle ▮▮▮ of the ▮▮▮ files (*i.e.*, **99%**) that Oracle identified as having been copied and sent to clients through TransferFiles. Vandevelde Decl., Exs. C, H. The remaining six files (1%) that could not be located after a reasonable search were likely ▮▮▮▮

1   ███████ (*id.*, Ex. H); they may have been produced as part of the nearly one million

2   documents Rimini produced in this proceeding.  If those six files were somehow important,

3   Oracle could have brought this Motion to Judge Ferenbach during the discovery period and

4   sought to obtain those remaining six files from the clients' systems through subpoenas, but it

5   chose not to do so.  (Moreover, Oracle's Motion is *not* based on those six files.)

6       At most, Oracle's complaint is that Rimini did not preserve copies of the transferred

7   files in *a specific folder* (*i.e.*, ████████████), or that ████████████████

8   ████████████████.  But a party has no obligation to maintain a copy of a file in a

9   specific location when that information is already maintained elsewhere, and renaming or

10  reorganizing files does not constitute spoliation.  *See Adams AV Select Invs.*, 2020 WL 2425715

11  at *5.  In short, Oracle has nothing to complain about; TransferFiles did not cause any

12  information to become "lost," and Oracle has in fact already obtained all but six of the copies

13  of the transferred files from other sources and locations.

### 2.   *Rimini Had No Duty To Preserve Temporary, Transitory Files Used To Create Additional Duplicate Copies*

15      Rule 37(e) also requires Oracle to establish that the temporary, duplicative files "should

16  have been preserved in anticipation or conduct of litigation."  For good reasons, parties are not

17  required to "preserve each instance of relevant electronically stored information":

> ESI is maintained in a wide variety of formats, locations, and structures.  **Many copies of the same ESI may exist in active storage, backup, or archives.** Computer systems manage data dynamically, meaning that the **ESI is constantly being cached, rewritten, moved, and copied.**  For example, a word processing program usually will save a backup copy of an open document into a temporary file every few minutes, overwriting the previous backup copy.  In this context, imposing an absolute requirement to preserve all ESI would require shutting down computer systems and making copies of data on each fixed disk drive, as well as other media that normally are used by the system.

*The Sedona Principles, Third Edition: Best Practices, Recommendations & Principles for Addressing Electronic Document Production*, 19 Sedona Conf. J. 1, 112 (2018) (emphases added).  Consistent with these principles, courts are clear that absent a specific request for temporary electronic data, a party does not have any duty to preserve temporary, intermediate electronic data—especially where the information in the temporary files exists elsewhere and

1   where there is no legitimate business purpose for the preservation of the temporary copy.  *See*,

2   *e.g.*, *Alexce v. Shinseki*, 447 F. App'x 175, 178 (Fed. Cir. 2011) ("reject[ing] [plaintiff's] theory

3   of spoliation" for "destruction of the duplicate records … already found in the file").

4          Oracle's own cited case—*Healthcare Advocates, Inc. v. Harding, Earley, Follmer &*

5   *Frailey*, 497 F. Supp. 2d 627 (E.D. Pa. 2007) (cited at Mot. at 14)—illustrates this rule.  A

6   defendant deleted temporary screenshot cache files from its computer that it had printed to hard

7   copy.  *Id.* at 639–40.  Although plaintiff alleged that defendant "clearly knew that the cache

8   files were relevant," the court observed that it "has not seen any evidence showing that the

9   [defendant] knew or should have known … that temporary cache files would be sought";

10  moreover, the temporary screenshots were deleted automatically, there was no evidence that

11  defendant "affirmatively destroy[ed] the evidence," and defendant retained printed copies of

12  the screenshots.  *Id.* at 640–41.  Accordingly, even though it was not "a perfect evidentiary

13  situation," the court declined to impose sanctions against defendant "for not preserving

14  temporary files that were not requested."  *Id.* at 641–42; *see also Arista Recs. LLC v.*

15  *Usenet.com, Inc.*, 608 F. Supp. 2d 409, 431 (S.D.N.Y. 2009).[4]

16         Similarly, in *Convolve, Inc. v. Compaq Computer Corp.*, the court held that there was

17  no duty to preserve "intermediate" wave form data that existed on a measurement device.  223

18  F.R.D. at 177.  Even though it was theoretically possible to preserve the data by "printing the

19  screen" or "saving the data to a disk," the court held that "absent [a] violation of a preservation

20  order," a defendant could not be sanctioned for not going beyond its "regular course of

21  business" to implement additional measures to preserve "ephemeral" data, which by their nature

22  "exist only until … the next adjustment" and the retention of which serves "[n]o business

23  purpose."  *Id.*  Oracle's position to the contrary would have world-changing ramifications for

---

[4]  Oracle's other cases are inapposite because they address deletion of e-mails, which "normally
have some semi-permanent existence" and therefore are materially different from the transitory,
intermediate AFW FTP files at issue in this Motion.  *Convolve, Inc. v. Compaq Comput. Corp.*,
223 F.R.D. 162, 177 (S.D.N.Y. 2004); *see also, e.g.*, *In re Napster, Inc. Copyright Litig.*, 462
F. Supp. 2d 1060, 1070 (N.D. Cal. 2006) (sanctioning defendant for deleting e-mails); *Apple
Inc. v. Samsung Elecs. Co.*, 881 F. Supp. 2d 1132, 1150 (N.D. Cal. 2012) (same); *Brown v.
Albertsons, LLC*, 2017 WL 1957571, at *1 (D. Nev. May 11, 2017) (sanctioning defendant for
destroying "virtually all evidence" relating to its investigation of a slip and fall, including video,
photographs, and an incident report).

litigation: Litigants would have to preserve every intermediate and transitory copy, even where (as here) duplicate files reside elsewhere in the system.

Here, Rimini had no duty to preserve the transitory, intermediate files. The files were entirely duplicative of the files that *already* existed on Rimini's (and also the client's) systems. Moreover, ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ████████████████████████████████████████████. Frank Decl. ¶ 11. Indeed, ██████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ██████████████████████████████. *Id.* ¶¶ 7–8.

Finally, Rimini did not know—and had no reason to know—that the "temporary [AFW FTP] files would be sought" by Oracle. *Healthcare Advocs.*, 497 F. Supp. 2d at 640. Indeed, it had reason to think the *opposite*. Even after Rimini produced the TransferFiles source code to Oracle, told Oracle how it worked, and invited Oracle to discuss if it had any concerns, Oracle ignored Rimini's invitation and remained silent—the most reasonable inference being that Oracle would affirmatively *not* be requesting those temporary files (because they are duplicative). *See supra*, pp. 10–11. Oracle *knew* that Rimini was not producing the transitory, intermediate copies, and why. If Oracle had actually wanted them, it should have asked Rimini (and, if necessary, the Court) to preserve them.

Had Oracle properly advised Rimini earlier that it believed the TransferFiles process was problematic, and that the duplicate files were somehow necessary, the issue could have been resolved years ago. When, in August 2019, Oracle finally did put Rimini on notice that it believed the temporary, duplicative files were important and asked that they be preserved and produced, Rimini promptly (1) manually searched for and produced the files that had been transferred in the past, locating 99% of them; (2) ████████████████████████████████ ██████████████████████████████████████████████████████; and (3) produced those intermediate, duplicate copies to Oracle for the remainder of the discovery

period.  *See supra*, p. 11.

**C.**   **Oracle Was Not Prejudiced By Rimini's Creation Of *Additional* Copies Of Transferred Files**

Oracle incorrectly argues that this Court may presume prejudice and that it is Rimini's burden to prove the absence of prejudice.  *See* Mot. at 21.  That is not the law.  As this Court has explained, Rule 37(e) "does not place the burden of proving or disproving prejudice on one party or the other."  *Small*, 2018 WL 3795238, at *69 (quoting Fed. R. Civ. P. 37(e)(1) advisory committee's note to 2015 amendment).  Rather, it may be reasonable to "[r]equir[e] the party seeking curative measures to prove prejudice," such as when "the content of the lost information may be fairly evident, the information may appear to be unimportant, or the abundance of preserved information may appear to be sufficient to meet the needs of all parties."  *Id.*; *see also Wai Feng Trading Co. v. Quick Fitting, Inc.*, 2019 WL 118412, at *6 (D.R.I. Jan. 7, 2019) ("proof that the lost ESI is important or material to a significant issue should fall on the movant").  Courts are "unwilling to base a finding of prejudice … on speculation about the content of material that is not in the record."  *Wal-Mart Stores, Inc. v. Cuker Interactive, LLC*, 2017 WL 239341, at *2 (W.D. Ark. Jan. 19, 2017).  Given that Oracle has copies of the files at issue, in addition to the mountain of other discovery produced in this case (including the AFW FTP duplicates after September 2019), it is incumbent on Oracle to show prejudice from the absence of additional duplicate copies of those same files before that date.  Oracle has not even attempted to articulate how it has been prejudiced by Rimini's use of TransferFiles, and the Court should reject its claim of prejudice for four reasons.

***First***, Oracle has no basis to complain of prejudice because Rimini has located all but six (*i.e.*, 99%) of the transferred files Oracle requested and produced them to Oracle from their underlying locations on Rimini's systems.  *See* Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment ("loss from one source may often be harmless when substitute information can be found elsewhere").  Oracle does not even contend that the six files that were not located are material.  Because Oracle has received *virtually all* of the transferred files, Oracle cannot show that the failure to preserve duplicate copies had any "impact on [Oracle's] presentation of

Gibson, Dunn &
Crutcher LLP

proof." *Steves & Sons*, 327 F.R.D. at 110.  Indeed, Oracle previously acknowledged that Rimini's production of a *single copy* of each transferred file, along with a list of the clients that received each file, would be a "fair and proportional way for Rimini to satisfy its discovery obligations."  Vandevelde Decl., Ex. B at 6.  That obligation has been amply satisfied.

**Second**, Oracle has made no showing that the duplicate files at issue would have materially improved its contempt case.  *See Holguin v. AT&T Corp.*, 2018 WL 6843711, at *7 (W.D. Tex. Nov. 8, 2018) (no prejudice where movant "has articulated what he believes the lost ESI will prove or disprove," but "has not articulated *how* the lost ESI affects his presentation of proof"); *see also MB Realty Grp., Inc. v. Gaston Cnty. Bd. of Educ.*, 2019 WL 2273732, at *5 (W.D.N.C. May 28, 2019) (no prejudice where plaintiff failed to show "how the deletion of [ESI] … would be important to proving their case … *per se*").  Oracle claims it has been prejudiced because it wonders whether the documents Rimini produced from its systems may not be identical to the files as they existed at the time of transfer.  Mot. at 16.  In other words, if a file was transferred in January 2020 and produced in September 2020, Oracle hypothesizes that the file may have changed in the interim, such that the January 2020 copy somehow may be materially different from the file as produced.  But that is pure speculation, both as to whether the files changed at all, and whether any changes matter.  Oracle claims in conclusory fashion that the duplicate, intermediate files would have contained "information about Rimini's development process" and would otherwise have "show[n] the extent to which Rimini engaged in cross-use in violation of the Injunction" (Mot. at 22), but Oracle does nothing to prove that assertion.  It has not shown that the duplicate, intermediate copies contain information different from the copies Oracle already received in discovery and how that supposedly prejudiced its case—particularly in light of the nearly one million documents Oracle already received and its 24/7 *live access* to Rimini's software systems.

Oracle also claims that some "logs show that many of the files actually sent to customers originated in one directory, but the purported copies that Rimini produced came from another directory."  *Id.* at 17 n.6.  But *where* a file may be stored has nothing to do with the *contents* of the file, and Oracle provides no reason why files Rimini located and produced would be

Gibson, Dunn &
Crutcher LLP

different from the duplicate transferred copies.

*Third*, contrary to Oracle's speculation, the actual evidence establishes that even had the intermediate, duplicate files been produced in this proceeding, their production would have no impact on Oracle's case.  In September 2019, less than a month after Oracle claimed the TransferFiles process constituted "spoliation," Rimini revised the TransferFiles process to create an additional, redundant archive of the intermediate files, and Rimini produced those archived files through the end of the document discovery cutoff.  Rimini produced thousands of files this way.  Tryck Decl. ¶ 38.  But *neither Oracle nor its expert has cited a single one of those intermediate files* in support of its contempt motion.  The clear conclusion is that these files are immaterial, particularly in view of the mountain of discovery Oracle obtained, including its 24/7 access into Rimini's development systems.  Nor did Oracle consider these files important enough to its case to bring the issue to the Court's attention earlier, when the Magistrate Judge (if he agreed with Oracle) could have fashioned a remedy.  Oracle's complaints about the intermediate files ring hollow.

*Finally*, to the extent Oracle has suffered any prejudice (it has not), it is of its own making.  Oracle had every opportunity to make its "spoliation" case to Judge Ferenbach during the discovery period when, if he agreed with Oracle, he could have ordered a remedy.  *See* Fed. R. Civ. P. 37(e)(1) (authorizing court to "order measures *no greater than necessary to cure the prejudice*") (emphasis added).  Oracle chose not to.

In sum, there is no merit to Oracle's claim that it has been prejudiced by Rimini's use of TransferFiles.  Accordingly, Rule 37 does not entitle Oracle to *any* sanction remedy, and its request must be denied.  *See Newberry*, 750 F. App'x at 537; Fed. R. Civ. P. 37(e) advisory committee's notes to 2015 amendment (Rule 37 provides *sole* authority for sanctions regarding alleged spoliation of ESI).

## D.  Oracle's Accusation That Rimini Intended To Deprive Oracle Of Information Is Patently False

Oracle asks this Court to presume that the supposed "lost" information was favorable to Oracle and unfavorable to Rimini and to "consider" that in ruling on Oracle's contempt motion.

Gibson, Dunn & Crutcher LLP

Mot. at 20–23.  That remedy requires Oracle to prove, with *clear and convincing evidence*, that Rimini developed and used TransferFiles for the "intent [of] depriv[ing] [Oracle] of the information's use in the litigation."  Fed. R. Civ. P. 37(e)(2).  Nothing in the record supports Oracle's baseless accusation.  To the contrary, the record clearly shows that Rimini acted transparently and in good faith at all times.

A finding of an intent to deprive is "a stringent … requirement that does not parallel other discovery standards."  *Jenkins v. Woody*, 2017 WL 362475, at *17 (E.D. Va. Jan. 21, 2017).  In particular, it requires *clear and convincing evidence* that a party "purposefully destroyed evidence to avoid its litigation obligations."  *Colonies Partners, L.P. v. Cnty. of San Bernardino*, 2020 WL 1496444, at *9 (C.D. Cal. Feb. 27, 2020); *CAT3, LLC v. Black Lineage, Inc.*, 164 F. Supp. 3d 488, 499 (S.D.N.Y. 2016).  Courts must "exercise caution" in "making findings about a party's intent," and "[n]egligent or even grossly negligent behavior does not logically support a finding of deliberate, intentional misconduct … under Rule 37(e)(2)."  *Express Restoration Corp. v. ServiceMaster Glob. Holdings*, 2020 WL 2084669, at *3 (C.D. Cal. Jan. 24, 2020) (citing Fed. R. Civ. P. 37(e)(2) advisory committee's note to 2015 amendment) (internal quotation marks omitted).

Oracle does not come close to proving that Rimini acted with an intent to deprive Oracle of information.  TransferFiles is not designed to hide anything.  To the contrary, it *creates* copies of files, and ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  Frank Decl. ¶ 13.  A company trying to hide or destroy data does not affirmatively create logs of all its actions.  In addition, there is a clear technical reason why the TransferFiles tool works the way it does: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  That has nothing to do with trying to conceal information in discovery— the files still exist in at least two other places.

Additionally, from the outset, Rimini has been completely transparent with Oracle about the TransferFiles process.  As explained above, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

1 ██, and Oracle and its experts have had access to the AFW source code—including regarding

2 TransferFiles—since at least 2015.  *See* Tryck Decl. ¶ 9.  When Oracle inquired about the ██

3 ██ in November 2018, Rimini promptly responded with a plain, straightforward

4 explanation of how the AFW FTP process works: that "████████████████████████

5 ████████████████████████████████████," and that

6 "██████████████████████████."  ECF No.

7 1363-19 (2018.12.10 Vandevelde Letter).  Moreover, while Oracle argues the Court can infer

8 intent because the letter shows Rimini was "on clear notice … that it needed to preserve the

9 files at issue" (Mot. at 19), Oracle's failure to respond to it demonstrates the exact opposite.

10 Oracle's arguments about intentionality are further disproved by the fact that when

11 Oracle claimed, in August 2019, that the intermediate FTP files were somehow necessary,

12 Rimini engaged with Oracle in good faith, provided Oracle with extensive information

13 regarding TransferFiles, and went above and beyond to locate and produce the transferred files.

14 Rimini also revised the TransferFiles source code to maintain a *third* duplicate copy going

15 forward, which serves no purpose other than to appease Oracle.

16 Rimini's transparency about TransferFiles also shows why Oracle's authorities

17 regarding Rule 37(e)(2) intentionality are inapplicable.  All of Oracle's cited cases involve the

18 willful and covert destruction of evidence after a party has already been put on clear notice of

19 a request for the destroyed evidence.  *See* Mot. at 18–20; *see, e.g.*, *HP Tuners, LLC v. Sykes-*

20 *Bonnett*, 2019 WL 5069088, at *4 (W.D. Wash. Sept. 16, 2019) (sanctioning defendant for

21 destroying flash drive with hammer after plaintiff had served defendant with RFPs requesting

22 information from the flash drive); *CrossFit, Inc. v. Nat'l Strength & Conditioning Ass'n*, 2019

23 WL 6527951, at *10 (S.D. Cal. Dec. 4, 2019) (sanctioning defendant for "continuously deleting

24 emails" even after judge ordered defendant to certify that it had produced all responsive

25 documents, and which deletions plaintiff only "discovered" later); *OmniGen Res. v. Yongqiang*

26 *Wang*, 321 F.R.D. 367, 372 (D. Or. 2017) (sanctioning defendant for deleting emails one week

27 after being served with discovery request and deleting again after second order of production).

28 Oracle's argument that Rimini purposefully destroyed files with the intent of depriving Oracle

of their contents by telling Oracle exactly what it was doing (while Oracle meanwhile sat on its hands for years) is as unsupported as it is unprecedented.

Oracle argues that the alleged spoliation was intentional because "Rimini's creation and implementation" of TransferFiles "was a relevant and intentional act." Mot. at 20. However, this argument ignores the fact that TransferFiles ████████████████████████████████████. Frank Decl. ¶ 12. There is no separate "Deletion Program" designed and implemented to withhold information from the litigation; this is purely an Oracle-created fiction.

Finally, the Court should disregard Oracle's resort to alleging "Rimini's history of spoliation as evidence of its bad faith." Mot. at 20. Oracle seizes upon one event from over 10 years ago from an early stage in the company's history. It paid the price for that 10-year-old mistake twice over—once through an adverse inference instruction at trial and again when the Court awarded Oracle over $28 million in attorney fees.

One decade-old event is not a "history" of anything. Since then, Rimini retained new counsel and has an exemplary record in discovery, having fully cooperated through *years* of no-stone-unturned discovery in both *Rimini II* and the post-judgment phase of *Rimini I*. *See generally* Tryck Decl. ¶¶ 2–46. Two magistrate judges have commended Rimini for its cooperation and good faith. *See* ECF No. 1280 at 19:6; *Rimini II*, ECF No. 1119-2 at 102:8–18. During discovery in this post-injunction proceeding, Oracle moved to compel on only four issues, which were *all* denied in full or in substantial part, and Oracle was ordered to pay a portion of Rimini's costs to partially offset the burden. Tryck Decl. ¶¶ 45; ECF Nos. 1252, 1307. Throughout that discovery period, Oracle had full knowledge of the TransferFiles program—yet chose not to bring any issue to the Court's attention until now.

This Motion should be seen for what it is. Oracle has no evidence of contumacious conduct and has sought to manufacture a belated and demonstrably false discovery dispute in a last-ditch effort to distract from its failure of proof.

## V.  CONCLUSION

For the foregoing reasons, the Court should deny Oracle's Motion for Sanctions.

Gibson, Dunn &
Crutcher LLP

Dated:  July 24, 2020

GIBSON, DUNN & CRUTCHER LLP


By:   /s/ *Eric D. Vandevelde*
                    Eric D. Vandevelde

*Attorneys for Defendant*
*Rimini Street, Inc.*

RIMINI STREET, INC.'S OPPOSITION TO ORACLE'S MOTION FOR RULE 37 SANCTIONS
CASE NO. 2:10-CV-00106-LRH-VCF