1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

GIBSON, DUNN & CRUTCHER LLP
MARK A. PERRY (*pro hac vice*)
1050 Connecticut Avenue, N.W.
Washington, DC  11101
Telephone: 202.955.8500
mperry@gibsondunn.com

GIBSON, DUNN & CRUTCHER LLP
JEFFREY T. THOMAS (*pro hac vice*)
BLAINE H. EVANSON (*pro hac vice*)
JOSEPH A. GORMAN (*pro hac vice*)
CASEY J. MCCRACKEN (*pro hac vice*)
3161 Michelson Drive
Irvine, CA  92612-4412
Telephone: 949.451.3800
jtthomas@gibsondunn.com
bevanson@gibsondunn.com
jgorman@gibsondunn.com
cmccracken@gibsondunn.com

GIBSON, DUNN & CRUTCHER LLP
SAMUEL LIVERSIDGE (*pro hac vice*)
ERIC D. VANDEVELDE (*pro hac vice*)
333 South Grand Avenue
Los Angeles, CA  90071-3197
Telephone: 213.229.7000
sliversidge@gibsondunn.com
evandevelde@gibsondunn.com

*Attorneys for Defendant*
*Rimini Street, Inc.*

RIMINI STREET, INC.
DANIEL B. WINSLOW (*pro hac vice*)
6601 Koll Center Parkway, Suite 300
Pleasanton, CA 94566
Telephone: (925) 264-7736
dwinslow@riministreet.com

RIMINI STREET, INC.
JOHN P. REILLY (*pro hac vice*)
3993 Howard Hughes Parkway, Suite 500
Las Vegas, NV 89169
Telephone: (336) 908-6961
jreilly@riministreet.com

HOWARD & HOWARD ATTORNEYS PLLC
W. WEST ALLEN (Nevada Bar No. 5566)
3800 Howard Hughes Parkway, Suite 1000
Las Vegas, NV 89169
Telephone: (702) 667-4843
wwa@h2law.com

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| ORACLE USA, INC., et al., | Case No. 2:10-cv-00106-LRH-VCF |
| Plaintiffs, | **RIMINI'S OPPOSITION TO ORACLE'S MOTION FOR ORDER TO SHOW CAUSE** |
| v. | |
| RIMINI STREET, INC., et al., | **ORAL ARGUMENT REQUESTED** |
| Defendants. | **_PUBLIC REDACTED VERSION_** |

1

**TABLE OF CONTENTS**

2

Page

3

I. INTRODUCTION ..................................................................................................1

4

II. FACTUAL AND PROCEDURAL BACKGROUND ........................................3

5

A.   *Rimini I* (Process 1.0) and *Rimini II* (Process 2.0).............................3

6

B.   *Rimini I* Injunction Compliance ..........................................................7

7

III. LEGAL STANDARD ........................................................................................11

8

IV. ARGUMENT ......................................................................................................11

9

A.   Rimini Has Not Engaged In Any Practice Adjudicated As Infringing ............11

10

1.   Rimini Discontinued The Infringing Aspects Of Process 1.0...............11

11

2.   Process 2.0 Is More Than Colorably Different From Process 1.0 ........14

12

B.   Rimini's Current Support Model Does Not Violate The Injunction.................17

13

14

1.   Rimini Has Not Violated Paragraphs 2–7 or 10 (Derivative
Works)........................................................................................17

15

2.   Rimini Has Not Violated Paragraphs 4, 6, or 10 (Knowledge
"Cross-Use") .............................................................................18

16

17

3.   Rimini Has Not Violated Paragraph 5 ("Own Computer
Systems")...................................................................................22

18

4.   Rimini Has Not Violated Paragraph 8 (JDE Source Code) .................26

19

5.   Rimini Has Not Violated Paragraphs 3 or 7 (Distribution) .................29

20

6.   Rimini Has Not Violated Paragraph 15 (Oracle Database) .................29

21

V. CONCLUSION ...................................................................................................30

22

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

1

# TABLE OF AUTHORITIES

2

Page(s)

3

**Cases**

4

5

*Antonick v. Elec. Arts, Inc.*,
   841 F.3d 1062 (9th Cir. 2016)............................................................................17, 18

6

*Apple Comput., Inc. v. Microsoft Corp.*,
   35 F.3d 1435 (9th Cir. 1994)...................................................................................25

7

8

*Bishop Paiute Tribe v. Inyo Cty.*,
   863 F.3d 1144 (9th Cir. 2017)..................................................................................29

9

*DropzoneMS, LLC v. Cockayne*,
   2019 WL 7630788 (D. Or. Sept. 12, 2019)..............................................................25

10

11

*EarthCam, Inc. v. OxBlue Corp.*,
   49 F. Supp. 3d 1210 (N.D. Ga. 2014) .....................................................................22

12

*McCullough Tool Co. v. Well Surveys, Inc.*,
   395 F.2d 230 (10th Cir. 1968)..................................................................................14

13

14

*Micro Star v. Formgen Inc.*,
   154 F.3d 1107 (9th Cir. 1998)..................................................................................17

15

*nCube Corp. v. SeaChange Int'l, Inc.*,
   732 F.3d 1346 (Fed. Cir. 2013)................................................................................15

16

17

*Oracle USA, Inc. v. Rimini Street, Inc.*,
   783 F. App'x 707 (9th Cir. 2019) ..............................................................................8

18

*Oracle USA, Inc. v. Rimini Street, Inc.*,
   879 F.3d 948 (9th Cir. 2018)...........................................1, 3, 4, 5, 23, 28, 30

19

20

*Price v. City of Stockton*,
   390 F.3d 1105 (9th Cir. 2004)..................................................................................12

21

22

*Rentmeester v. Nike, Inc.*,
   883 F.3d 1111 (9th Cir. 2018)..................................................................................25

23

24

*Skydive Ariz., Inc. v. Quattrocchi*,
   673 F.3d 1105 (9th Cir. 2012)..................................................................................12

25

*Sony Comput. Entm't Am., Inc. v. Bleem, LLC*,
   214 F.3d 1022 (9th Cir. 2000)..................................................................................22

26

27

*TiVo Inc. v. EchoStar Corp.*,
   646 F.3d 869 (Fed. Cir. 2011)........................................................2, 14, 15

28

Gibson, Dunn &
Crutcher LLP

ii

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*United States v. U.S. Gypsum Co.*,
    340 U.S. 76 (1950) ............................................................................................12

*W. Knight Foster P'ship v. Saratoga Data Sys., Inc.*,
    2018 WL 1000373 (N.D. Cal. Feb. 21, 2018) ..................................................28

*Wolfard Glassblowing Co. v. Vanbragt*,
    118 F.3d 1320 (9th Cir. 1997) ..........................................................................28

**Treatises**

11A Charles A. Wright et al., Fed. Prac. & Proc. Civ. § 2960 (3d ed. 2013) ...........................11

Rutter Group, Prac. Guide: Fed. Civ. Proc. Before Trial (2020) ¶ 13:246 ..............................11

Gibson, Dunn &
Crutcher LLP

RIMINI'S OPPOSITION TO ORACLE'S MOTION FOR ORDER TO SHOW CAUSE
CASE NO. 2:10-CV-00106-LRH-VCF

**TABLE OF EXHIBITS AND ABBREVIATIONS**

| Exhibits | |
|---|---|
| **Ex. A** | Rebuttal Expert Report of Professor Owen Astrachan, dated March 13, 2020.  Other portions of this report have been previously submitted as **ECF Nos. 1327** and **1374-1** |
| **Ex. B** | Supplemental Report of Professor Owen Astrachan, dated June 26, 2020 |
| **Ex. C** | Expert Rebuttal Report of Stephen Lanchak, dated March 13, 2020 |
| **Ex. D** | Excerpts from Rimini's Acceptable Use Policy |
| **Ex. E** | Email from Rimini's General Counsel re: Injunction Notice |
| **Ex. F** | Email from Rimini's CEO re: Injunction |
| **Ex. G** | Email from Rimini's VP of Global Product Development for PeopleSoft to PeopleSoft team re: injunction |
| **Ex. H** | Email from Rimini VP of Global JDE Service Delivery to JDE team regarding injunction |
| **Ex. I** | Email from client, R.R. Donnelley & Sons |
| **Ex. J** | Excerpts from deposition of Easter Seals in *Rimini II*, dated December 1, 2016 |
| **Ex. K** | Excerpts from deposition of Barbara Frederiksen-Cross in *Rimini II*, dated September 19, 2018 |
| **Ex. L** | Excerpts from deposition of Easter Seals in this proceeding, dated September 20, 2019 |
| **Ex. M** | Excerpts from deposition of TierPoint (formerly Windstream), dated October 17, 2019 |
| **Ex. N** | Excerpts from deposition of Rimini Group VP for Global Support, Craig Mackereth, dated January 17, 2020 |
| **Ex. O** | Excerpts from deposition of Barbara Frederiksen-Cross in this proceeding, dated June 19, 2020 |
| **Abbreviations** | |
| **Mot. for Jury Trial** | Rimini's Motion for a Jury Trial (filed concurrently), dated July 31, 2020 |
| **Mot. to Exclude** | Rimini's Motion to Exclude Declaration and Opinions of Oracle's Expert, Barbara Frederiksen-Cross (filed concurrently), dated July 31, 2020 |

1

# I.      INTRODUCTION

Rimini has fully complied with the injunction.  The acts accused by Oracle *cannot* and *do not* violate the injunction.  The Motion for an Order to Show Cause (OSC) should be denied.

Rimini supports Oracle enterprise software in "lawful competition" with Oracle's own support services. *Oracle USA, Inc. v. Rimini Street, Inc.*, 879 F.3d 948, 952 (9th Cir. 2018) ("*Rimini I*").  The manner in which Rimini provides such support is the subject of two entirely separate lawsuits in this Court.  *See* ECF No. 1323 at 3–12; ECF No. 1347 at 1–6.

*Rimini I* concerned Rimini's legacy support model (Process 1.0), in which Rimini *locally hosted* its clients' software environments on its own systems and used *generic development environments* to create updates.  All of Rimini's clients held licenses from Oracle authorizing third-party support, and Rimini reasonably believed that these practices were within the scope of those licenses.  After this Court interpreted the licenses differently, Rimini spent millions of dollars to change its support model.  By the time a jury found Rimini liable for *innocent* infringement in 2015, the practices at issue in *Rimini I* had already stopped.

*Rimini II* was filed by Rimini and concerns Rimini's current support model (Process 2.0), which is fundamentally different from Process 1.0.  In Process 2.0, Rimini has no environments on its systems; it *remotely connects* to each client's *siloed*, *client-hosted*, *client-specific* environments to support that particular client.  Rimini has submitted detailed evidence, including a video tutorial, explaining how Process 2.0 works and how it differs from Process 1.0—facts Oracle studiously avoids in its Motion.  ██████████████████████

██████████████████████████████████  Benge Decl. ¶ 3.  In *Rimini II*, multiple fully briefed motions for summary judgment address whether Process 2.0 is consistent with the Copyright Act and Oracle's license agreements.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████  Contrary to the premises of Oracle's Motion, however, Oracle's massive (and expensive) discovery operation, with which Rimini fully complied, turned up *no evidence* of any violation of the injunction.

Gibson, Dunn &
Crutcher LLP

The accused acts cannot violate the injunction because this Court has already ruled that the *Rimini I* injunction enjoins "*only acts that have already been determined to be unlawful, and which have been affirmed on appeal*." ECF No. 1164 at 9 (emphasis added). Rimini has not engaged in any such acts since the injunction was entered, and the OSC Motion *does not accuse any such acts*. Rather, the acts accused by Oracle are all aspects of Process 2.0 that were excluded from *Rimini I*, but are squarely presented in *Rimini II*. Where, as here, infringing processes have been redesigned, and the revised processes are "more than colorably different" from those that were previously adjudicated, contempt is unavailable. *TiVo Inc. v. EchoStar Corp.*, 646 F.3d 869, 882 (Fed. Cir. 2011). It is undisputed that Process 2.0 is fundamentally different from Process 1.0, and accordingly the acts recited in Oracle's OSC Motion cannot be adjudicated in a contempt proceeding. They can and should be resolved in *Rimini II*.

Moreover, the accused acts do not violate the injunction because Process 2.0 is fully compliant with the injunction. In its overreaching attempt to capture never-before-adjudicated conduct, Oracle advances legally untenable positions including a new, radically different "cross-use" theory that would preclude Rimini engineers from reusing their own know-how and Rimini-created work product; the idea that clients' cloud servers are somehow not those clients' "computer systems"; and a definition of "source code" that would prevent third-party support providers from even looking at, let alone modifying, files that licensees must necessarily update to keep their software current. Oracle also takes liberty with the facts. For example, Oracle accuses Rimini of "22,591 distributions of files," but *does not contend that the files contain Oracle expression*; of "copying" when no Oracle software was reproduced; and of creating "derivative works" when Rimini's updates do not contain and are not substantially similar to *any* Oracle software. And to distract from its failure of proof, Oracle falsely accuses Rimini of "resisting" discovery when Rimini fully complied with Oracle's extensive requests, claims Rimini "lost" motions to compel that it in fact won, and filed a frivolous "spoliation" motion over a technical process it has known about for years and that *duplicates* (not deletes) data.

In myriad ways, Oracle misrepresents Rimini's processes, misconstrues the injunction, and misapplies or ignores applicable law. Its OSC Motion should be denied.

## II.   FACTUAL AND PROCEDURAL BACKGROUND

Rimini provides third-party support for enterprise software, including several of Oracle's software products.  Since it was founded in Las Vegas in 2005, Rimini has grown dramatically, and it became a publicly traded company in 2017.  Today, Rimini has 1,300 employees operating in Las Vegas and nearly 20 countries, with annual revenues of $281 million.  Vandevelde Decl. ISO Mot. for Jury Trial ¶¶ 4–5.  Rimini has hundreds of clients, including Fortune 500 companies, hospitals, schools, municipalities, and government agencies—all of which rely on Rimini to support their mission-critical software.  *Id.* ¶¶ 4, 6. Rimini has won numerous awards for the quality of its service.  *Id.* ¶¶ 7, 9.

Oracle has over a 95% market share and earns a 94% profit margin on its support services, even though its customers routinely complain about the poor quality of those services. *Rimini II*, 14-01699, ECF No. 927 at 5.  While admitting (as it must) that third-party support is lawful and permitted by the license agreements, Oracle has used aggressive litigation tactics to drive most of its competitors out of the support market.  Today, Rimini is Oracle's largest global competitor for providing aftermarket support for Oracle software.  Oracle's apparent goal in more than a decade of litigation with Rimini is the elimination of competition.

### A.   *Rimini I* (Process 1.0) and *Rimini II* (Process 2.0)

This Court is presiding over two separate lawsuits between Oracle and Rimini:  *Rimini I*, which concerned the support model Rimini used before July 2014 (Process 1.0), and *Rimini II*, which concerns Rimini's current support model (Process 2.0).  *Rimini I* resulted in a final judgment that has been affirmed on appeal; *Rimini II*, in contrast, is pending before the Court on the parties' multiple cross-motions for summary judgment.

**1.**  Oracle filed the *Rimini I* lawsuit a decade ago, alleging 24 claims, 23 of which Rimini won or Oracle abandoned.  The sole claim on which Oracle prevailed was a jury verdict of *innocent* copyright infringement involving two specific aspects of the *manner* in which Rimini previously provided third-party support to its clients at that time (Process 1.0), which Oracle called "local hosting" and "cross-use."  *Rimini I*, 879 F.3d at 956–60.

***Local Hosting.***  Rimini initially stored copies of its clients' development environments,

1    and developed updates for and modifications to the clients' Oracle software, *locally* on Rimini's

2    own servers.  *Id.* at 960.  This Court held on summary judgment that such "local hosting" was

3    impermissible under a provision in some PeopleSoft license agreements requiring that the

4    software be used only at the *clients'* "facilities."  *Rimini I*, ECF No. 474 at 11–15.

5         ***Cross-Use.***  Oracle invented the term "cross-use" for purposes of the *Rimini I* lawsuit—

6    it is not a software industry term, is not found in the Copyright Act or any of the licenses, and

7    did not exist in any case law prior to *Rimini I*.  As the Ninth Circuit explained, "cross-use" in

8    the trial phase of *Rimini I* referred to "the creation of development environments, under color

9    of a license of one customer, to support other customers," and thus the *intermingling of Oracle*

10   *code between clients*.  *Rimini I*, 879 F.3d at 956.  Rimini used "generic" environments—not

11   associated with any particular client—to create updated Oracle files (containing Oracle code)

12   that were then sent to multiple clients with licenses to the same version of the software.  ECF

13   No. 785 (Trial Tr.) at 202:19–203:3, 204:10–205:10.  Thus, the accused *Rimini I* "cross-use"

14   involved the copying of Client A's Oracle copyrighted software and sending it to Client B,

15   rather than keeping clients' software separate.

16        On summary judgment, construing an exemplary license for one client, this Court held

17   that "the development environments associated with the City of Flint were not used solely for

18   the City of Flint's internal data processing operations.  Instead, the development environments

19   were used to develop and test software updates for the City of Flint and other Rimini customers

20   with similar software licenses."  ECF No. 474 at 13.  The conduct the Court adjudicated was

21   the copying of Oracle files and modified Oracle files in the City of Flint's environment (*i.e.*,

22   *City of Flint's* copies of Oracle software) and sending of those files—containing Oracle code—

23   to other clients, thus using City of Flint's software as a "generic" environment to create files

24   for other clients with the same version.  *Id.*  This was not authorized by the licenses, the Court

25   ruled, because support copies had to be used solely for a particular client's own operations.  *Id.*

26        At trial in 2015, the jury found that Rimini's infringement was "innocent," meaning that

27   Rimini "was not aware" and "had no reason to believe that its acts constituted" infringement.

28   *See* ECF No. 896 at 6; ECF No. 880 at 43.  The Ninth Circuit affirmed on narrow grounds.  As

to **"local hosting,"** the Ninth Circuit upheld liability for PeopleSoft because the Rimini "servers where the copying took place were 'outside the control of the [customers].'" *Rimini I*, 879 F.3d at 959–60 & n.6.  As to **"cross-use,"** the Court defined the term as "the creation of development environments, under color of a license of one customer, to support *other* customers," and held that work Rimini performed using one licensee's software for other licensees was not authorized by the licenses.  *Id.* at 956–57 (emphasis in original).

**2.**  More than a year before the *Rimini I* trial, Rimini invested millions of dollars to revise its processes to conform to this Court's summary judgment rulings construing the license terms, completing the transition to Process 2.0 by the end of July 2014.  *See* ECF No. 1130 at 3–4; ECF Nos. 905-1–905-5.  Under Process 2.0, every Rimini client **has its own development environment** located **on the client's own systems**, not Rimini's.  Benge Decl. ¶ 7; Mackereth Decl. ¶ 7 (explaining that JDE support under Process 2.0 is conceptually similar to PeopleSoft); ECF No. 1327 (Owen Astrachan ("OA") Rpt.) ¶¶ 19–20.  Process 2.0 thus eliminated the legacy practice of "local hosting."  Benge Decl. ¶ 7.  It also eliminated the conduct characterized by Oracle as "cross-use" in *Rimini I* by using a separate environment for each client rather than generic environments.  Benge Decl. ¶¶ 8, 17; ECF No. 1327 ¶¶ 125–36, 154.  In October 2014, shortly after summary judgment and prior to trial, Rimini filed *Rimini II* seeking a declaration that Process 2.0 is lawful.

The declaration of Jim Benge, VP of Global Product Development for PeopleSoft, including the video tutorial he helped prepare ███████ describes Process 2.0 in detail.  ████████ Benge Decl. ¶¶ 7, 17.

████████ Benge Decl. ¶¶ 26, 29. ████████

████████ Benge Decl. ¶ 32. ████████

1   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  Benge Decl. ¶ 26; *see also* ECF No. 1327 (OA Rpt.)

2   ¶¶ 131–35.

3         Process 2.0 thus *eliminated* the acts of "local hosting" and "cross-use" adjudicated on

4   summary judgment and at trial in *Rimini I*, and affirmed on appeal. ▮▮▮▮▮▮▮▮▮▮▮▮

5   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

6   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

7   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

8   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  ECF No. 1327 ¶¶ 27, 154.

9   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

10  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  Benge Decl. ¶ 30. ▮▮▮▮▮▮▮▮

11  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

12  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  *Id.* ¶¶ 30–31. ▮▮▮▮▮▮▮▮▮▮

13  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  *Id.* ¶ 27. ▮▮▮▮▮▮▮▮

14  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

15  ▮▮▮▮▮▮▮▮▮▮▮▮  *Id.* ¶ 31; Mackereth Decl. ¶ 9. ▮▮▮▮▮▮▮▮

16  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

17  ▮▮▮▮▮  Benge Decl. ¶ 31. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

18  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  *Id.* ¶¶ 18,

19  31; *see also* ECF No. 1327 ¶¶ 126–36 (describing Process 2.0).

20  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

21  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  Benge Decl. ¶¶ 32–34. ▮▮▮▮▮▮▮▮

22  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

23  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

24  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  *Id.*

25  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

26  ▮▮▮▮▮▮▮▮▮▮▮  *See* ECF No. 1327 ¶¶ 126–36; Ex. A ¶¶ 248–60.

27  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

28  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  Davenport Decl. ¶ 3. ▮▮▮▮

1

2

3                         *Id.* ¶ 4.

4         *Id.*

5

6                         *Id.*

7                               *Id.*

8

9                                        *See* Ex. A ¶¶ 261–65 (describing testing

10   procedures).

11

12                        Benge Decl. ¶ 35.

13

14

15         *Id.* ¶¶ 40–42.

16

17

18

19                                   *Id.* ¶ 40.

20   **B.    *Rimini I* Injunction Compliance**

21         After filing *Rimini II* to secure a declaration that Process 2.0 is lawful, Rimini sought to

22   consolidate *Rimini I* and *Rimini II*, but Oracle objected.  *See* ECF No. 1323 at 7–8.  The Court

23   excluded Process 2.0 from *Rimini I* and held that all "claims, issues, and evidence related to

24   [Process 2.0] are being addressed *solely* in [*Rimini II*]."  ECF No. 723 at 3 (emphasis added).

25   *Rimini I* thus proceeded to final judgment based solely on Process 1.0.

26         **1.**  When Oracle moved for injunctive relief in *Rimini I*—both initially and on remand—

27   Rimini opposed, arguing that Oracle was attempting to prejudge the Process 2.0 issues being

28   litigated in *Rimini II*.  ECF No. 906 at 5, 16–19; ECF No. 1069 at 7–8.  Both times, Oracle

RIMINI'S OPPOSITION TO ORACLE'S MOTION FOR ORDER TO SHOW CAUSE
CASE NO. 2:10-CV-00106-LRH-VCF

repeatedly represented that the injunction was limited to conduct already adjudicated (*i.e.*, Process 1.0).  ECF No. 1040 at 143:15–17; ECF No. 1117 at 20 n.3; ECF No. 1158 at 30:16–17 (representing that the injunction "just track[s] the scope of the infringing conduct" adjudicated in *Rimini I*).  This Court granted Oracle's motion and entered the injunction (ECF No. 1166), specifically ruling that it enjoins "*only acts that have already been determined to be unlawful, and which have been affirmed on appeal.*"  ECF No. 1164 at 9 (emphasis added).  On a second appeal, the Ninth Circuit narrowed the injunction and otherwise affirmed.  *See Rimini I*, 783 F. App'x 707, 710–11 (9th Cir. 2019).  The Court of Appeals did not hold that the injunction could reach unadjudicated conduct; on the contrary, at oral argument, Judge Graber indicated that this issue was "not in front of us."  Oral Argument at 2:10–2:25, *Rimini I*, No. 18-16554 (9th Cir. July 12, 2019), https://tinyurl.com/sbyw42x.

The *Rimini I* injunction is directed to the acts adjudicated at summary judgment and trial, and affirmed on appeal, all of which Rimini stopped long ago.  It prohibits the adjudicated **"local hosting"** by prohibiting use of PeopleSoft software "on, with, or to any computer systems other than a specific licensee's own computer systems."  ECF No. 1166 ("Inj.") ¶ 5.  It also prohibits *Rimini I*-type **"cross-use"** by prohibiting Rimini from using "a specific licensee's PeopleSoft [or JDE] software or documentation other than to support the specific licensee's own internal data processing operations," or similarly, using one licensee's software to "develop or test software updates or modifications for the benefit of any other licensee," *id.* ¶¶ 4, 6, 10, thus prohibiting the Process 1.0 practice of using **generic environments** to create software that was then shared with multiple clients.

The injunction went into effect on November 5, 2018.  Years earlier, Rimini had overhauled its processes and implemented Process 2.0, which eliminated the acts found to be infringing (and addressed by the injunction) by ensuring that every client maintained its own environments on its own computer systems, and that Rimini would log in to each client's specific environment separately to perform updates for that client. ███████████████████ ████████████████████████████████████████████████ *See* Benge Decl. ¶ 43 n.2.

**2.** ███████████████████████████████████████████████

Gibson, Dunn &
Crutcher LLP

1  ██████████████████████████████████████. Mackereth Decl. ¶ 10. ███████

2  ████████████████████████████████████████████████████████████████████

3  ███████████████████████████████████████████████ Ex. D §§ 10.6,

4  10.7. █████████████████████████████████████████. *Id.*

5  § 10.1.2. ██████████████████████████████████████ *Id.*

6  ████████████████████████████████████████████████████

7  ████████████████████████████████████████████████████████████████████

8  ████████████████████████████████████████████████████████████████████

9  ████████████████. Ex. D at -5498. ████████████████████████

10  █████████████████████████████████████████ *E.g.*, Ex. E.

11  █████████████████████████████████████████████ *Id.*

12  ████████████████████████████████████████████████████████████████████

13  ███████████ Ex. G; Ex. H. ████████████████████████████████

14  ███████████████ Ex. N at 62:20–63:16; 68:25–69:13; 178:13–179:5.

15  In addition, Rimini instructs its clients *not* to send any Oracle or other third-party

16  intellectual property to Rimini.  Mackereth Decl. ¶ 13.  Despite these instructions, clients do

17  occasionally send such material to Rimini. ████████████████████████████

18  ████████████████████████████████████████████████████████████████████

19  ████████████████. Ex. D § 10.1.2.1. █████████████████

20  ████████████████████████████████████████. Ex. N at 76:14–

21  78:7. █████████████████████████████████████████████████

22  ████████████████████████████████████████████████████████████████████

23  ██████████████. *See* ECF Nos. 1297-3 and 1297-4.  Magistrate Judge Ferenbach reviewed

24  this process and said Rimini was taking "an extra step to make sure they're not violating the

25  injunction."  ECF No. 1310 at 54:13–19.

26  **3.** Rimini has been in compliance with the injunction since it was entered.

27  Nevertheless, in February 2019, without providing any specifics, Oracle accused Rimini of

28  violating the injunction and sought discovery into Rimini's compliance.  ECF No. 1199.

Gibson, Dunn &
Crutcher LLP

The magistrate judge allowed Oracle extensive discovery without making any rulings on the substance of the contempt theories. ECF No. 1374 at 6–7. Between *Rimini II* and the post-injunction proceeding, Rimini has produced a literal mountain of information. ECF No. 1374-3 (detailing discovery provided). Oracle's suggestion that Rimini "resisted" discovery is false: Rimini more than satisfied its obligations. In addition to exhaustive discovery (over *40 million pages* of documents, among other things) regarding Process 2.0 from *Rimini II*, Rimini produced nearly a million additional documents, gigabytes of additional technical data, code to all of its proprietary tools, and exports from its databases and customer relationship platform, among other things. *See id.* Rimini also continued to grant Oracle 24/7 direct access to its internal software development tracking systems ███████████████ so that Oracle's lawyers and experts had real-time access to the very systems Rimini developers use to plan and track their work. *Id.* ¶ 41. Oracle's claim that Rimini "lost multiple motions" to compel is also false. In reality, Oracle moved to compel on four issues, lost three of them outright, and "won" the other only in part and only after being ordered to pay a portion of Rimini's costs. *Id.* ¶ 45. At the end of the fact discovery period, Magistrate Judge Ferenbach recognized Rimini's cooperation and noted that "*a ton of discovery has been given.*" *Id.* ¶ 46. After receiving all this discovery, Oracle now claims that Rimini's recordkeeping is "poor" (Mot. at 11) but those claims are false. Ex. A ¶¶ 342–51.[1]

As Rimini predicted (and Oracle long denied), Oracle's contempt theories all seek to prejudge the merits of *Rimini II*. None of the Process 1.0 conduct at issue in *Rimini I* is at issue in Oracle's OSC Motion. Oracle concedes that Rimini does not have any Oracle software environments on its systems. Ex. O at 27:13–15. It does not argue that Rimini continues to use "generic" environments, and therefore concedes the "cross-use" adjudicated in *Rimini I* has

---

[1] In addition to falsely claiming that Rimini "resisted" discovery, Oracle claims that Rimini's CEO, Seth Ravin, was a "co-founder" of a company called TomorrowNow, which pleaded guilty to criminal copyright infringement. Mot. at 3. What Oracle fails to mention is that Mr. Ravin had left TomorrowNow long before it engaged in the acts that led to its guilty plea, and he was not a defendant or a party to any TomorrowNow litigation or plea. Indeed, this Court ruled *five years ago* that evidence of TomorrowNow "is not relevant to this case." ECF No. 880 at 21. And Oracle's claim against Mr. Ravin was tried to the *Rimini I* jury, which exonerated him of copyright infringement. Oracle's false narrative thus disregards— and disrespects—both the jury's verdict and this Court's orders.

Gibson, Dunn &
Crutcher LLP

ceased.  Instead, it argues a host of Process 2.0 issues never litigated in *Rimini I*, including the propriety of clients' cloud environments, the meaning of "J.D. Edwards software source code," and a new theory of "cross-use" of Rimini's own know-how.  *All* of the arguments made in Oracle's OSC Motion are also presented in the *Rimini II* summary judgment briefing, while *none* was advanced or decided in *Rimini I*.

### III.    LEGAL STANDARD

At the OSC stage, Oracle has the burden of establishing that Rimini has engaged in specific acts that, if proven, would violate particular terms of the injunction.  *See* 11A Charles A. Wright et al., Fed. Prac. & Proc. Civ. § 2960 (3d ed. 2013); Rutter Group, Prac. Guide: Fed. Civ. Proc. Before Trial (2020) ¶ 13:246.  Under this Court's prior ruling, such acts must have been determined to be unlawful in *Rimini I*, and affirmed on appeal.  ECF No. 1164 at 9.

### IV.    ARGUMENT

Oracle's OSC Motion should be denied for two reasons.  *First*, the accused acts *cannot* violate the injunction because Rimini has not engaged in any acts within the scope of the injunction as previously defined by this Court, including any revised processes that are not more than colorably different from acts previously adjudicated.  *Second*, while Rimini maintains that Process 2.0 must be addressed in *Rimini II* rather than through a contempt proceeding, the accused aspects of Rimini's current support model *do not* violate the injunction.[2]

### A.    Rimini Has Not Engaged In Any Practice Adjudicated As Infringing

Oracle's OSC Motion fails as a matter of law because it is undisputed that Rimini discontinued the acts found to infringe in *Rimini I*, and which were enjoined.  And Process 2.0 is fundamentally different from Process 1.0, requiring Rimini's current support processes to be adjudicated in a plenary action (*Rimini II*), not in contempt proceedings.

### 1.    Rimini Discontinued The Infringing Aspects Of Process 1.0

The injunction was entered to enforce the *Rimini I* verdict, which found that particular

---

[2] Because Oracle has not established that Rimini violated any aspect of the injunction, no sanctions are warranted.  Oracle's reference to possible sanctions (Mot. at 28) is premature, although it does confirm that a jury trial is required.  *See* Mot. for Jury Trial at 9–13.  If and when Oracle makes a formal request for sanctions, or as otherwise requested by the Court, Rimini will address the issue and reserves all of its rights until then.

Gibson, Dunn &
Crutcher LLP

aspects of Process 1.0, adjudicated at trial, constituted innocent infringement. Oracle does not contend that Rimini has engaged in either of the acts—"local hosting" and the type of "cross-use" involving the intermingling of clients' Oracle software, *i.e.*, generic environments—tried to the jury and affirmed on appeal. The OSC Motion should be denied for this reason alone.

The Court has already ruled that the injunction prohibits "only acts that have already been determined to be unlawful, and which have been affirmed on appeal." ECF No. 1164 at 9. The Court issued that order in response to Rimini's repeated concerns that Oracle would attempt to use the injunction to prejudge *Rimini II*, to which Oracle repeatedly responded that it was asking "for a permanent injunction restraining Rimini from continuing to *commit the infringement that this Court and the jury have already determined to constitute copyright infringement.*" ECF No. 1117 at 20 n.3 (emphasis added); *see also* ECF No. 1323 at 14.

The Court's ruling was consistent with settled law that an injunction must be "narrowly tailored to the scope of the issues tried in the case," and no further. *Skydive Ariz., Inc. v. Quattrocchi*, 673 F.3d 1105, 1116 (9th Cir. 2012); *Price v. City of Stockton*, 390 F.3d 1105, 1117 (9th Cir. 2004). Where, as here, the acts on which liability is premised "could reasonably have been thought permissible," an injunction may not reach unadjudicated conduct. *United States v. U.S. Gypsum Co.*, 340 U.S. 76, 89–90 (1950). Given that the jury found Rimini liable only for "innocent" infringement, the injunction does not extend past the conduct adjudicated in *Rimini I*.

As explained above, *Rimini I* resolved Oracle's allegations that Rimini had exceeded the scope of the licenses by (1) ***locally hosting*** client environments on Rimini's computer systems; and (2) using ***generic environments***, not associated with any particular licensee, to develop updates containing Oracle code to send to multiple licensees (which Oracle called "cross-use"). Rimini has not engaged in either practice since July 2014, when the transition to Process 2.0 was completed. Since then, there have been *no* Oracle environments on Rimini's systems, and Rimini has not intermingled any client environments in developing updates. Oracle has confirmed this fact through extensive discovery. Tellingly, its OSC Motion says *nothing* about the conduct adjudicated in *Rimini I*.

*None* of the conduct Oracle accuses in its Motion was adjudicated in *Rimini I*. For example, Oracle contends that Rimini transgresses Oracle's licenses by supporting clients who have chosen to host their environments in the cloud. Mot. at 18–21. But Oracle has admitted that "cloud computing is at issue in *Rimini II* and it wasn't at issue in *Rimini I*." ECF No. 1040 at 143:14–15. Oracle also contends Rimini violates the injunction by allegedly copying "JDE Software source code," but that issue (and the meaning of that term) was never litigated in *Rimini I*. Oracle's sole infringement witness, Professor Davis, did not discuss it in his testimony (ECF No. 785 at 148–237), and the issue was not mentioned in opening statements (*id.* at 55–97), or closing arguments. ECF No. 881 at 3431–3519.

Oracle's principal argument is that Rimini continues to engage in "cross-use"—but Oracle's theory of what constitutes "cross-use" has completely changed since the *Rimini I* trial, and the conduct it calls "cross-use" today is fundamentally different than what the jury considered. Oracle does not contend that Rimini continues to have "generic" environments, or copies Oracle software of one client to give to others. That is the only kind of "cross-use" at issue in *Rimini I*, *see* 879 F.3d at 956–57, and Oracle accuses nothing like that in its Motion.

Rather, Oracle is now using the same word of its own invention—"cross-use"—to describe *entirely different conduct*. Oracle's new theory of "cross-use" has nothing to do with copying Client A's Oracle files (or environments) and sending them to Client B, or the intermingling of client software. Instead, Oracle's new theory is that Rimini "cross-uses" by ***reusing its own knowledge and work product***. Oracle contends that Rimini "cross-uses" Oracle software whenever Rimini gains knowledge or creates work product (even if 100% Rimini-written) while supporting Client A and uses that knowledge or work product to develop a similar update for Client B. ECF No. 1327 (OA Rpt.) ¶¶ 28, 53–73; Ex. B (OA Supp. Rpt.) ¶¶ 41–43; *see* Mot. to Exclude at 22–24. ████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████ ECF No. 1369-37 at 107:9–110:13. Yet Oracle's expert, Ms. Frederiksen-Cross,

repeatedly opined that, based on the "cross-use" definition Oracle told her to assume, if a Rimini developer ever solves a problem for Client A using Client A's software in Client A's own environment, he cannot use that knowledge to solve the same problem for Client B in Client B's environment.  Ex. K at 151:5–24 (if a developer "determine[s] what the change needed to be and generally where it needed to be" and then "appl[ies] that knowledge in the second environment, then I would say yes, you're cross using that knowledge and the update itself"); *see* Ex. B ¶¶ 41–42.

This Court already ruled that the injunction enjoins "only acts that have already been determined to be unlawful, and which have been affirmed on appeal."  ECF No. 1164 at 9. Oracle does not acknowledge that ruling or attempt to explain how its Motion can be squared with it.  Because Rimini indisputably does not engage in the enjoined Process 1.0 conduct that was adjudicated in *Rimini I*, Oracle's Motion should be denied.  The Process 2.0 acts that Oracle does accuse can be litigated in *Rimini II* (and, indeed, they are all subjects of pending summary judgment motions), but they cannot be the subject of this contempt proceeding.

### 2. Process 2.0 Is More Than Colorably Different From Process 1.0

Oracle may object that the injunction should not be limited to *precisely* those acts adjudicated at trial, and affirmed on appeal, because an adjudged infringer should not be permitted to make an insignificant change to its practices and thereby avoid an injunction.  At the same time, the public policies behind intellectual property (and antitrust) law favor legitimate redesigns to avoid infringement, and counsel against taking a broad interpretation of what acts have been adjudicated.  *See*, *e.g.*, *McCullough Tool Co. v. Well Surveys, Inc.*, 395 F.2d 230, 233 (10th Cir. 1968).  Equity courts balance these interests by asking whether the redesigned process is "not more than colorably different" than the process previously adjudicated.  *TiVo*, 646 F.3d at 882; ECF No. 1323 at 19–22; Mot. for Jury Trial at 15–17. Where a redesigned process is more than colorably different from that previously adjudicated, adjudication of that new process in a summary contempt proceeding is not appropriate or constitutional.  *TiVo*, 646 F.3d at 882.  Rather, the new issues raised by different processes need to be decided by a jury in a separate infringement suit.  In contrast, if (and only if) the redesigned

1    process is not more than colorably different, then it may be resolved in a contempt proceeding.

2         Accordingly, Oracle had the burden to prove *at the outset* that Process 2.0 is not more

3    than colorably different from Process 1.0.  *TiVo*, 646 F.3d at 883.  Although Rimini has

4    previously made precisely this point (ECF No. 1323 at 19–22), Oracle ignores this threshold

5    requirement in its Motion, presumably because the evidence is overwhelming (and entirely

6    unrebutted) that Process 2.0 is fundamentally different from Process 1.0.

7         The colorable differences inquiry focuses on the differences between "those aspects of

8    the accused product [or process] that were previously alleged to be, and were a basis for, the

9    prior finding of infringement, and the modified features of the newly accused product [or

10   process]."  *TiVo*, 646 F.3d at 882.  The Court should focus on those elements the plaintiff

11   "previously contended, and proved" infringed.  *Id*.  "Where one or more of those elements

12   previously found to infringe has been modified, or removed" the court must analyze whether

13   that modification is "significant," and if it is, "[c]ontempt is then inappropriate."  *Id.*

14        Here, the changes to Process 2.0 were "more than colorable."  Indeed, they were

15   fundamental—the processes of local hosting and generic environments were removed entirely.

16   *See nCube Corp. v. SeaChange Int'l, Inc.*, 732 F.3d 1346, 1350 (Fed. Cir. 2013) (holding that

17   removing the infringing element is a significant change).  Oracle has no contrary evidence.

18   Rimini's expert, Duke Computer Science Professor Owen Astrachan, analyzed Process 1.0—

19   as characterized by Oracle at trial—██████████████████████████████████

20   ████████████████████████████████████████████████████████████

21   ████████████████████████████████████████████████████████████

22   ████████████████████████████████████████████████████████████

23   ████████████████████████████████████████████████████████████

24   ████████████████████████████████████████████████████████████

25   ECF No. 1327 (OA Rpt.) ¶ 154; *see id.* ¶¶ 143–60.  Ms. Frederiksen-Cross reviewed Professor

26   Astrachan's analysis and served a surrebuttal report responding to portions of it, but ***did not***

27   ***respond*** to Professor Astrachan's analysis of the fundamental differences between Process 1.0

28   and 2.0.  Her declaration provides no analysis either.  *See* ECF No. 1368-1 ("BFC Decl.").

Indeed, Oracle's own *Rimini I* evidence demonstrates that Rimini's changes were "more than colorable." At trial, on direct examination, Oracle's expert witness, Professor Davis, drew an explicit distinction between Rimini's Process 1.0 practice of having a "single dev environment per release" (*i.e.*, a generic environment), which he contended was infringing, versus having "an environment for each client," which he implied would not be infringing. ECF No. 785 (Trial Tr.) at 204:15–205:5; ECF No. 1327 (OA Rpt.) ¶¶ 149–53; *see id.* ¶¶ 67–73.

Oracle argues that "Rimini's development model is effectively the same as the one discussed in this Court's 2014 summary judgment order" (Mot. at 8:2–3), seizing on the Court's statement, and divorcing it from any context, that City of Flint's "development environments were used to develop and test software updates for the City of Flint and other Rimini customers." Mot. at 4 (quoting ECF No. 474 at 13). Oracle argues that, by developing updates for Client A in Client A's environment, documenting its know-how, and then using that know-how to develop the update for Client B in Client B's environment, Rimini is still using Client A's development environment to develop updates *for* Client B (and not just Client A). Mot. at 15–16. The underlying conduct, however, is fundamentally different. When the Court wrote that sentence, it was referring to the *copying of Oracle code* from City of Flint's environment to other clients—the environment nominally referred to as City of Flint was a generic environment to create and distribute files *containing Oracle code* for other clients. ECF 474 at 12–13. The conduct now accused by Oracle is the re-use of Rimini know-how, including Rimini work product *not containing any Oracle code*, gained by performing work for Client A to perform similar work for Client B. ECF No. 1327 (OA Rpt.) ¶¶ 154–60. Unlike the City of Flint example, Client A's and B's environments remain siloed, Rimini works separately on each, and no Oracle code is intermingled between them. *Id.* ¶ 154.

To be sure, Oracle maintains that Rimini's *new* processes still are not within the licenses. But that is a *Rimini II* issue, quite literally: Oracle filed two summary judgment motions, and Rimini filed one, devoted to this argument. While this and other issues will have to be resolved on a full record in *Rimini II*, they cannot be decided in this contempt proceeding. To conclude otherwise would violate the Due Process Clause and the Seventh Amendment.

**B.    Rimini's Current Support Model Does Not Violate The Injunction**

Oracle's accusations that certain aspects of Process 2.0 violate the injunction are meritless.  Rimini has scrupulously abided by the Court's orders in *Rimini I*, including the injunction.  Although Process 2.0 should be adjudicated only in *Rimini II*, Rimini demonstrates below that the accused acts are consistent with each part of the injunction raised by Oracle in its OSC Motion.  Accordingly, the Motion should be denied.

**1.    Rimini Has Not Violated Paragraphs 2–7 or 10 (Derivative Works)**

Paragraphs 2–7 and 10 of the injunction contain prohibitions on Rimini's creation of derivative works under certain conditions (*e.g.*, creating derivative works using one client's software "for the benefit of" another client).  "Derivative work" is a term of art in the Copyright Act, and the injunction's use of this term of art is informed by a substantial body of case law.  To constitute a "derivative work" of copyrighted material in the software context, a work must "substantially incorporate protected material from the preexisting work."  *Micro Star v. Formgen Inc.*, 154 F.3d 1107, 1110 (9th Cir. 1998).  That requires that the work be "substantially similar" to the protected work, requiring a substantial similarity analysis, including analytic dissection.  *Antonick v. Elec. Arts, Inc.*, 841 F.3d 1062, 1065–66 (9th Cir. 2016); *see* Mot. to Exclude at 12–15; *Rimini II*, ECF No. 1164 at 3–4.

Oracle makes two fundamental errors with regard to derivative works.

*First*, Oracle correctly notes that when Rimini modifies an Oracle file in a client's environment, both the modified environment *as a whole* and any *modified files* are derivative works because the modified works contain substantial Oracle protected material (*i.e.*, all the preexisting Oracle material that was not modified).  Mot. at 22.  But that is *irrelevant*.  ECF No. 1327 (OA Rpt.) ¶¶ 42–43, 96.  The creation of derivative works in the client's environment to support the client does not violate the injunction.  *Id.* ¶¶ 35–37; Inj. ¶¶ 4, 6, 10.[3]

*Second*, Oracle claims that Rimini's "Individual Updates," standing alone, "are themselves derivative works."  Mot. at 23.  That is wrong.  Rimini's updates do not contain, and are not substantially similar to, any Oracle protected material.  Indeed, the sole update

---

[3]    Professor Astrachan identified seven fundamental errors that pervaded Ms. Frederiksen-Cross's analysis.  ECF No. 1327 ¶¶ 30–44.  This is Fundamental Error #2.

RIMINI'S OPPOSITION TO ORACLE'S MOTION FOR ORDER TO SHOW CAUSE
CASE NO. 2:10-CV-00106-LRH-VCF

Gibson, Dunn &
Crutcher LLP

Oracle discusses in its Motion is *not alleged to contain any Oracle protected material whatsoever. Id.* (citing BFC Decl. ¶¶ 84–85); ECF No. 1327 ¶¶ 42–43 (Fundamental Error #6); Ex. A ¶ 318 n.313; Mot. to Exclude at 13.  Thus, it is not a derivative work as a matter of law. Oracle contends that the update is a derivative work because it is "specifically tailored only to work with Oracle's PeopleSoft software" and, when applied to Oracle software in a client's environment, will create a derivative work in the client's environment.  Mot. at 23.  But that is the wrong legal test.  It is irrelevant that the Rimini file, when later sent to and incorporated into a client's PeopleSoft environment, causes that modified environment *as a whole* to become a derivative work (which is licensed and compliant with the injunction) because that does not make the stand-alone file (*i.e.*, something 100% Rimini-created) a derivative work.

Oracle also claims that two Dev Instructions (out of hundreds) allegedly contain Oracle code and thus constitute derivative works that Rimini purportedly "used" to support multiple customers.  *Id.*  But again, that is false.  To be a derivative work, the work must be "substantially similar" to Oracle's copyrighted expression.  *Antonick*, 841 F.3d at 1065–66.  Oracle's expert did not even opine that the Dev Instructions are substantially similar to any Oracle files, let alone conduct the required analysis to reach a conclusion on that point.  Mot. to Exclude at 5–8, 14.  Rimini's expert, on the other hand, performed the analysis and concluded they are not substantially similar.  Ex. A (OA Rpt.) ¶¶ 182–94; Ex. B (OA Supp. Rpt.) ¶¶ 16–17.

## 2. Rimini Has Not Violated Paragraphs 4, 6, or 10 (Knowledge "Cross-Use")

Paragraphs 4, 6, and 10 of the injunction prohibit Rimini from using Client A's software environment "other than to support [Client A's] own internal data processing operations."  This is not an exclusive right secured by the Copyright Act.  Rather, it is based on certain Oracle licenses, which permit licensees to use the software for their own "internal data processing operations."  This language is the basis for Oracle's ever-expanding view of "cross-use."

Rimini does not violate these provisions because Rimini uses each client's software only to support that client's operations.  Unlike Process 1.0, under Process 2.0 all of Rimini's clients have their own, separate software environments, Rimini logs into each of those environments separately to perform work for the benefit of the client who owns it, and Rimini does not use

generic environments or intermingle clients' Oracle software. When Rimini logs into Client A's environment to perform an update for Client A, that work is *for* Client A. The same is true of Client B, C, D, etc. Benge Decl. ¶¶ 29–34; Mackereth Decl. ¶ 9; ECF No. 1327 ¶ 27; Ex. A ¶ 256. And Oracle's expert conceded that Rimini never used Client A's environment to create an update that was not *for* Client A (*i.e.*, an update only intended for Client B). Ex. O at 162:9–13. In light of those undisputed and dispositive facts, Oracle's Motion fails.

To avoid that result, Oracle redefined its own malleable term "cross-use" to preclude use of Rimini's own knowledge. Under Oracle's absurd interpretation, a Rimini developer can never solve a problem for two different clients because the second client "benefits" from the knowledge gained when working for the first. *See supra* pp. 13–14; ECF No. 1327 ¶¶ 28, 54–66, 76–79. Ms. Frederiksen-Cross could not answer—at either of her depositions—how a Rimini developer who solved a problem for Client A could ever solve the same problem for Client B, C, or D without committing "cross-use" under Oracle's theory. Ex. K at 171:22–24 ("*I can't think of an example as I sit here that would not be cross-use.*") (emphasis added); 211:2–213:15, 216:4–217:1, Ex. O at 147:24–148:17. That is enough to doom Oracle's new theory, but there are many other problems with it too.

*First*, Oracle's Motion claims at times that Rimini "copied" updates developed in one client's environment to other clients' environments. *See, e.g.*, Mot. at 8:3, 12:14. That is false. Even Oracle's own expert and its own "evidence" do not show any copying. Instead, Oracle is referring to Rimini *separately implementing* the same or similar Rimini changes to separate client environments. *See* BFC Decl. ¶¶ 14–15 (calling this "retrofitting"). While that may result in two clients ending up with the same update, it is wrong to say that Rimini "copied" anything. ECF No. 1327 (OA Rpt.) ¶¶ 38–39 (Fundamental Error #3).

*Second*, ████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████ Oracle's Motion pretends this process is somehow nefarious, but in reality "Scrum" and "Kanban" are standard industry terms in software development. Ex. A (OA Rpt.) ¶¶ 249–51. Oracle's "evidence" that this process

leads to "cross-use" is limited to two supposed examples from Ms. Frederiksen-Cross.  Mot. at 13–14.  Ms. Frederiksen-Cross does *not* claim that any Oracle code was copied between clients or that the Dev Instructions for the updates contained Oracle code.  BFC Decl. ¶¶ 19–27.  Each update was independently implemented in each client's environment.  She also concedes that every client who received the update needed it (Ex. O at 162:9–13), and thus each client's update was "for the benefit of" that client.  The only thing Ms. Frederiksen-Cross's examples attempt to demonstrate is the unremarkable fact that Rimini got faster as it performed these updates over time *because Rimini relied on its know-how and work product*.  This does not violate the injunction or the Copyright Act (which protects Oracle's *expression*, not Rimini's *ideas*).  Ex. A ¶¶ 248–60, 325–26; Ex. C ¶¶ 20–22, 53–66.



RIMINI'S OPPOSITION TO ORACLE'S MOTION FOR ORDER TO SHOW CAUSE
CASE NO. 2:10-CV-00106-LRH-VCF

Gibson, Dunn &
Crutcher LLP

1

2

3

4

5

6  Oracle also claims that Rimini Dev Instructions constitute "cross-use" because allegedly

7  a temporary copy of Oracle software is made in Random Access Memory (RAM) while Rimini

8  is performing the update for Client A.  But that is not a violation.  The RAM copies are created

9  in Client A's environment to support Client A because Client A needs the update.  ECF No.

10  1327 ¶ 102; Ex. A ¶¶ 245–46, 256.

11  *Fourth*, Oracle contends that Rimini's TransferFiles tool is designed to "maximize

12  cross-use" because ███████████████████  Mot. at 16–17.  This is

13  fundamentally misleading because Oracle *does not claim* that *any* of the transferred files are

14  Oracle files.  *Id.*; Ex. A ¶¶ 238–43; Ex. B ¶ 15.  The injunction prohibits reproduction of certain

15  *Oracle* software; Rimini is free to copy and send its *own* documents to clients as it pleases.

16  *Fifth*, Oracle contends that Rimini "cross-uses" Oracle software ████████

17

18

19  Mot. at 17–18.

20

21  ████  This argument fails for the same reasons as Oracle's arguments on Dev Instructions and

22  Technical Specifications.  ██████████████████

23

24

25  ████—reuse of that knowledge is not a violation of the injunction, even if Rimini gets faster

26  at testing as a result of that knowledge.  *Id.* ¶¶ 264–66.  Oracle does not contend that any Oracle

27  code is copied between Rimini clients during testing, or that Rimini tested an update in Client

28  A's environment that was not actually for Client A.  Mot. at 17–18.  ████████

Rimini includes "screenshots of PeopleSoft software running" in some test cases, *id.* at 17, Oracle does not argue that such screenshots are protectable, and they are not. *See EarthCam, Inc. v. OxBlue Corp.*, 49 F. Supp. 3d 1210, 1233 (N.D. Ga. 2014) (citing *Sony Comput. Entm't Am., Inc. v. Bleem, LLC*, 214 F.3d 1022, 1028 (9th Cir. 2000)); Ex. A ¶¶ 266–67.  Ms. Frederiksen-Cross did not perform analytic dissection or opine that the screenshots are similar to any protectible Oracle expression, and thus there is no basis to conclude that they violate the injunction.  Ex. A ¶¶ 268–71; Mot. to Exclude at 10–11.

### 3. Rimini Has Not Violated Paragraph 5 ("Own Computer Systems")

Paragraph 5 of the injunction prohibits Rimini from reproducing, creating derivative works of, or using PeopleSoft software or documentation on, to, or from "any computer systems other than a specific licensee's own computer systems."  This is a requirement of only certain PeopleSoft license agreements, and is not one of the exclusive rights under the Copyright Act. Oracle contends that Rimini violates this prohibition by (1) supporting clients who choose to store their PeopleSoft software environments in the cloud and (2) purportedly copying PeopleSoft materials on Rimini's own servers.  Both arguments fail.

### a. Clients' Cloud-Based Servers Are Their "Own Computer Systems"

Rimini has not violated paragraph 5 by supporting clients who chose to host their PeopleSoft environments in the cloud, and specifically, with Windstream.  ████████████ ████████████████████████████████████.  Ex. L at 26:18–22, 57:14–58:5; *Rimini II*, ECF No. 992-1 at 64:4–65:9, 68:20–69:15.  ██████████████████████ █████████████████████████████████████████████████████████████████ ███████.  Ex. L at 53:14–25; 54:6–15; *Rimini II*, ECF No. 992-21 at 154:11–155:16; *Rimini II*, ECF No. 992-2 at 110:23–111:14, 112:7–16.

Clients who use Windstream's cloud services store their PeopleSoft software within virtual machines ("VMs") that run on underlying physical hardware.  While multiple VMs may exist on the same hardware (referred to as a "multitenant" model), each VM functions as a *separate*, *independent* physical server that is only accessible to the client that owns it.  Ex. A ¶ 166; Ex. B ¶ 59; Ex. O at 213:23–214:7; Ex. M at 35:7–36:21.  As Windstream's 30(b)(6)

representative testified, these VMs are purchased and controlled *by the client* and are for the client's "exclusive use" (Ex. M at 36:18–21); the client controls who can access the environments and other data stored within the VM (*id.* at 36:18–37:10); and Windstream has no access to, and "no control whatsoever," over such environments and other data (*id.* at 31:20–35:6). Both Windstream and the client agree that client's VMs *are part of the <u>client's</u> computer systems*. *Id.* at 37:12–20 ("Q: So would you consider [a client's] cloud account part of the client's computing resources? A: Yes."); Ex. L (Easter Seals Dep.) at 20:5–21 ("Q: . . . do you consider [Easter Seals' Windstream cloud account] to be your system? A: Yes."); *see also* Ex. A ¶¶ 163–68; Ex. C ¶¶ 47–52.

Oracle argues that a client's environments stored within the client's VM at Windstream is not on that client's "computer systems" because, while the client owns its cloud account and the software stored therein, the client does not "own" the *physical hardware* on which the VM runs and their software is stored; in Oracle's view, owning the VM server is not enough. Oracle's focus on the physical hardware is wrong.

*First,* by its plain meaning, a client's "own computer systems" includes VMs that belong to that client. Oracle's own technical expert, agreeing with Rimini's technical expert, concedes that a VM is software that "can provide services comparable . . . or perhaps even almost identical *to those provided by a particular computer system*." Ex. O at 213:23–214:7 (emphasis added); Ex. B ¶ 59; Ex. A ¶ 168 ("[A] company's cloud account is the company's own computer systems."). Similarly, Rimini's ERP industry expert opined that "the industry understands that, in every meaningful sense, a licensee's cloud computing resources (*i.e.*, its virtual servers) are its own systems." Ex. C ¶ 47.

*Second*, the Ninth Circuit's interpretation of the "facilities" restriction—the genesis of the "own computer systems" language in the injunction—underscores that a client's virtual servers are its own computer systems. Recognizing that it was "necessary" to "read a requirement of control" into the facilities restriction, the court of appeals held that because there was no evidence that clients had actual or constructive control over "the Rimini servers where the copying took place," those computer systems were not the clients' "facilities." *Rimini I,*

879 F.3d at 960.  Here, the server (*i.e.*, computer system) where the copying takes place is the client's VM, and the client controls that environment, the software on it, and the access to it. Ex. A ¶¶ 163–68; Ex. B ¶¶ 56–57.  Having *physical* possession of the hardware does not confer ownership or control of a software environment, just like having physical possession of someone else's cell phone, without the password, does not confer control over the contents of that phone—what matters are the right and ability to control the software and access to it.  Ex. A ¶ 174; Ex. B ¶ 57.[5]  Ignoring these realities, Oracle has taken shifting and inconsistent positions about what a client must control, ████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ██████████████████████████.  *Rimini II*, ECF No. 993-1 at 59.  All of these positions—including Oracle's latest argument that clients must own the physical hardware— ignore the key issue: who can set/change/revoke access credentials to, and who has the *rights to*, and can determine the *existence* of, the software environment.  Ex. A ¶ 174; Ex. B ¶¶ 56– 57.  Those rights and controls all belong to Rimini's *clients*.

        *Third*, implicitly acknowledging that control is what matters, Oracle argues that *Rimini*, rather than its clients, control its clients' Windstream cloud accounts.  Mot. at 20.  That argument directly contradicts Magistrate Judge Hoffman's ruling that "Rimini does not have control over (nor possession or custody of) its clients' software environments and archives." *Rimini II*, ECF No. 606 at 1.  Moreover, Oracle's expert did not perform any technical analysis of Rimini's clients' ability to control their Windstream environments (including their ability to grant or revoke access to those environments).  Ex. O at 254:25–257:24; Ex. B ¶ 61.  Instead, Oracle notes that one client—Easter Seals—testified that it did not have "'information on how to access'" its Windstream environment.  Mot. at 20.  But this does not indicate that Easter Seals—let alone all Rimini clients that use Windstream—lack control over their environments.

---

[5]  Oracle notes that "Windstream retains the right to terminate services in the event of certain billing disputes or default."  Mot. at 20.  Terminating services does not, of course, give Windstream any control over the software itself; at most, Windstream has the ability to turn the power switch on and off.  The same would obviously be true of any vendor providing services (cloud or otherwise) related to computing—if a client fails to pay its electric bill, the power company can turn off power to a server in the client's own basement, or if a client fails to pay the lease on its datacenter building, a lessor could lock the client out.

RIMINI'S OPPOSITION TO ORACLE'S MOTION FOR ORDER TO SHOW CAUSE
CASE NO. 2:10-CV-00106-LRH-VCF

1   To the contrary, Easter Seals testified that even though it did not access the environment itself

2   (that is what Rimini was hired to do), the Windstream environment was "for" Easter Seals, that

3   Rimini only accessed it to provide services *to* Easter Seals for Easter Seals' benefit, that Easter

4   Seals could revoke Rimini's access to it, and that Easter Seals could obtain access if it wanted,

5   because it was Easter Seals' (not Rimini's) relationship with Windstream.  *See* Ex. J at 121:21–

6   123:21, 125:5–17; Ex. A ¶¶ 171–73.

7   ### b.   Rimini Does Not Reproduce, Prepare Derivative Works From, or Use Oracle PeopleSoft Materials on Its Own Computer Systems

8   Nor has Rimini violated paragraph 5, by reproducing, preparing derivative works from,

9   or using PeopleSoft materials on Rimini's computer systems.  Rimini's longstanding policies

10  prohibit that, and indeed, out of nearly one million documents produced in this proceeding,

11  Oracle alleges only four isolated instances where purported Oracle intellectual property was

12  found on Rimini's computer systems.  Mot. at 21.  Oracle's analysis of the relevant files is

13  erroneous, and its descriptions of them misleading, but even if Oracle were correct, this

14  exceedingly small number of files only demonstrates the efficacy of Rimini's policies and

15  compliance processes.  None of the four allegations shows any injunction violation.

16  *First*, Oracle contends that ███████████████████████████████████████████

17  ███████████ "were copied" from an Oracle file.

18  *Id.*  But Oracle fails to conduct analytic dissection, as is required by the Ninth Circuit.

19  *Rentmeester v. Nike, Inc.*, 883 F.3d 1111, 1118 (9th Cir. 2018); *Apple Comput., Inc. v. Microsoft

20  Corp.*, 35 F.3d 1435, 1443 (9th Cir. 1994); Mot. to Exclude at 5–15.  Without that analysis, Ms.

21  Frederiksen-Cross has no basis to conclude—and this Court cannot conclude—that the Rimini

22  file is an unlawful reproduction and hence an injunction violation.  Indeed, Ms. Frederiksen-

23  Cross made the very same error in another recent case, and her opinions were excluded and

24  found insufficient to establish infringement as a matter of law.  *See DropzoneMS, LLC v.

25  Cockayne*, 2019 WL 7630788, at *14 (D. Or. Sept. 12, 2019).  By contrast, Rimini's technical

26  expert performed analytic dissection and concluded that, after filtering out unprotectible

27  elements, the Rimini file was not substantially similar to the Oracle file.  Ex. A ¶¶ 195–202.

28

1    That expert opinion is unrebutted.

2         *Second*, Oracle contends that ██████████████████████████

3    ████████████████  Mot. at 21.  ████████████████████████████████

4    ████████████████████████  Mackereth Decl. ¶ 14; Ex. I; Ex. A ¶ 205.  Oracle

5    cites no evidence that any Rimini employee asked the client to send the file (indeed, that would

6    be a violation of Rimini's AUP policy), nor that Rimini ever used the file.  Rimini cannot be

7    held in contempt because an external party sent it a prohibited file that was never used.

8         *Third*, Oracle contends that a single email produced by Rimini (out of more than

9    600,000) has a handful of purported PeopleSoft documents (text documents, not code) attached

10   to it.  Mot. at 21; ECF No. 1369-11.  As in the previous instance, that email was initially sent

11   by a *Rimini client* (in violation of Rimini's policies and clear instructions to clients) and there

12   is no evidence that Rimini ever used the attached files.  ECF No. 1369-11 at -0433; Ex. A ¶ 212.

13        *Fourth*, Oracle contends that "still more" PeopleSoft documentation is supposedly on

14   Rimini's system, but refers to only two additional documents.  Mot. at 21.  Once again, Oracle

15   cites to no evidence that Rimini—as opposed to a client—caused those two documents to be

16   copied on its systems, or that anyone at Rimini used these documents for any purpose.

17        **4.      Rimini Has Not Violated Paragraph 8 (JDE Source Code)**

18        Paragraph 8 of the injunction prohibits Rimini from copying "J.D. Edwards software

19   source code to carry out development and testing of software updates."  Rimini does not copy

20   "J.D. Edwards software source code" when developing or testing J.D. Edwards updates.

21   Oracle's arguments are premised on an incorrect interpretation of that term, which was never

22   at issue, let alone adjudicated, prior to judgment.

23        It is undisputed that when Oracle licenses JDE, the licensee receives both "open code"

24   and "closed code" portions of the software.  ████████████████████████████████

25   ████████████████████████████████████████████████████████████

26   ██████████████  Ex. C ¶¶ 69, 75; Ex. A ¶ 107.  ████████████████████

27   ████████████████████████████████████████████████████████████

28   ████████████████████████████  Ex. C ¶¶ 69–83; Mackereth Decl. ¶ 5; Mot. at

24.  It is also undisputed that modifying (or even looking at) open code causes the code file to be temporarily copied into RAM. Ex. O at 263:7–264:23.  Closed code, in contrast, is delivered in an obfuscated form and cannot be viewed without taking steps to reverse engineer or "decompile" it. Ex. C ¶ 72.

Oracle contends that paragraph 8 prohibits Rimini from copying "open code," and all of Oracle's contempt allegations under that paragraph relate solely to Rimini's alleged copying of (including by merely *looking at*) JDE open code, *i.e.*, the code Oracle intends for its licensees to modify to keep their software up to date.  Oracle's arguments fail for multiple reasons.

*First*, instead of confronting the Court's actual words in the injunction—"*J.D. Edwards software* source code" (emphasis added)—Oracle discusses the phrase "source code" in isolation and its generic, academic sense.   Rimini's ERP industry expert, unrebutted by any evidence (for Oracle has no industry expert), has explained that— ████████████ ██████████████████████████████████████████████████████████ ███████████ . Ex. C ¶¶ 24, 72, 83. ████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████ . *Id.* ¶ 83.  This is consistent with Oracle's JDE licenses, which prevent a licensee or any other party from seeking to decompile or otherwise reverse engineer the closed code to access (and thereby copy) the JDE software "source code."  *Rimini II*, ECF No. 925-14 (Giant Cement License) § 7(i); Ex. C ¶ 70.

*Second*, interpreting paragraph 8 to prohibit copying of (and thus even *looking at*) JDE open code is inconsistent with paragraph 10.  Paragraph 10 allows Rimini Street to "reproduce, prepare derivative works from, or use" a licensee's "J.D. Edwards software" to "develop or test software updates or modifications," so long as the update or modification is not "for the benefit of any other licensee."  But Rimini *must* copy open code to make such updates. Ex. O at 263:7– 264:23; Ex. C ¶¶ 83–84.   Thus, if paragraph 8 prevents Rimini from copying open code, paragraph 10 would be superfluous—Rimini would not be permitted to create software updates for Client A at all under paragraph 8, even if they were not "for the benefit of any other licensee" under paragraph 10. *Id.* ¶ 85; Ex. A ¶¶ 311–12.  Oracle admits the injunction cannot be read in

a manner that gives other prohibitions "no effect."  Mot. at 26 (citing *Wolfard Glassblowing Co. v. Vanbragt*, 118 F.3d 1320, 1324 (9th Cir. 1997)); *see also W. Knight Foster P'ship v. Saratoga Data Sys., Inc.*, 2018 WL 1000373, at *3 (N.D. Cal. Feb. 21, 2018) (declining to read injunction provision in a manner that would render words superfluous).  Rimini's reading gives effect to both paragraphs: under paragraph 8, Rimini would be prohibited from copying the source code underlying the "J.D. Edwards software" itself (*i.e.*, the closed code); under paragraph 10, Rimini would be prohibited from copying one licensee's JDE open code "for the benefit of any other licensee."

███████████████████████████████████████████████████

████████████████████████████     ████████████████████

██████████████████████████████, (Ex. C ¶¶ 69, 84; Mackereth Decl. ¶ 5), and that JDE could not run properly without these updates.  Ex. O at 262:18–263:5.  ████

███████████████████████████████████████████████. *See* Ex. C ¶ 83; Mackereth Decl. ¶ 5.  Such a result would directly contradict the Ninth Circuit's holding that third-party support for Oracle software is "lawful," and that licensees "may hire a third party such as Rimini to maintain their software for them."  *Rimini I*, 879 F.3d at 952, 957.

   *Finally*, a ███████████████████████████████ to provide support would constitute blatant copyright misuse.  The Ninth Circuit held that this Court's license constructions did not lead to copyright misuse *because* they "would not preclude Rimini from creating development environments for a licensee for various purposes."  *Id.* at 958.  ██

███████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████████  The Ninth Circuit's opinion forbids such a result.  *Id.* at 957 (copyright misuse doctrine prevents copyright holders from leveraging "limited monopoly" to "control areas outside the monopoly" and "stifle competition").[6]

---

[6]  Oracle's waiver argument is meritless.  Mot. at 25–26.  As Oracle admits, the previous litigation over the injunction concerned whether it was overbroad and vague, and thus invalid on its face.  *Id.* at 26.  No court has been asked, until Oracle's OSC Motion, to apply specific terms in the injunction to specific Rimini processes; thus, until now, arguments

*(Cont'd on next page)*

Gibson, Dunn &
Crutcher LLP

### 5.    Rimini Has Not Violated Paragraphs 3 or 7 (Distribution)

Rimini has not violated paragraphs 3 and 7 regarding the alleged "distribution" of Oracle software and derivative works.  First, for every single file that Oracle alleges Rimini "distributed," Oracle does not even contend, let alone prove, that the file contains Oracle code or is substantially similar to an Oracle copyrighted work. Mot. at 27–28; Ex. A ¶ 318; ECF No. 1327 ¶¶ 31–34 (Fundamental Error #1).  Second, a "distribution" under the Copyright Act requires proof of several elements, including that the work "changed hands" and that it was disseminated "to the public," *see* Mot. to Exclude at 15–16, which Oracle does not even mention, let alone prove.  When Rimini makes available Client A's updated software file on Client A's systems, for Client A to pick up and transfer to its "live" system, that is not a "distribution" under the Copyright Act even if it did contain Oracle code, which none of the alleged distributions do.  Ex. A ¶¶ 316–18.

### 6.    Rimini Has Not Violated Paragraph 15 (Oracle Database)

Rimini has not violated paragraph 15, which states that "Rimini shall not reproduce, prepare derivative works from, or distribute Oracle Database software."  This paragraph stems from the Court's August 2014 summary judgment order, which held that because Rimini downloaded to its own systems certain full copies of Oracle Database environments from Oracle's website (rather than obtaining them from clients), and because such downloads were subject to Oracle's limited "developer license," Rimini had to rely on that *developer license* for its express license defense; it could not assert its clients' standard Oracle Database licenses, even though all clients have them.  ECF No. 476 at 9–12.

*First*, Oracle ignores the above history.  Oracle's Motion does not identify any downloading of Oracle Database (in reliance on the developer or any other license), or the creation of any copies of full Oracle Database environments, by Rimini.  Indeed, Oracle points to no evidence that Rimini has engaged in that conduct since the injunction became effective,

---

about how specific terms should be understood and applied were not ripe.  *See Bishop Paiute Tribe v. Inyo Cty.*, 863 F.3d 1144, 1153 (9th Cir. 2017) ("[T]o be ripe, … issues [must be] 'definite and concrete, not hypothetical or abstract.'").  The cases cited in Oracle's OSC Motion (Mot. at 27)—which merely apply the rule that *ripe* issues not raised are waived—are inapposite.  Moreover, if Oracle were correct, *Oracle's* interpretive arguments regarding the injunction (which Oracle has never raised until now) would also be waived.

and there is none.  Kumar Decl. ¶¶ 7–8; Ex. O at 25:10–22; Ex. C ¶ 89.  Instead, Oracle accuses Rimini of violating paragraph 15 merely by fixing bugs and other problems with *other applications* that may rely on Oracle Database.  Mot. at 28.  Specifically, Oracle contends that paragraph 15 prohibits Rimini from creating even RAM copies of Oracle Database—on the client's system and for the clients benefit—even though such copies are fully *authorized by the client's license*. *Id.*; Ex. C ¶¶ 86.

     *Second*, and relatedly, ████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████.  Ex. A ¶¶ 321–22; Ex. C ¶¶ 88, 91–92; Ex. O at 270:3–274:13.  Such a result would directly contradict the Ninth Circuit's holding that third-party support for Oracle software is lawful.  *Rimini I*, 879 F.3d at 952.  It would also constitute copyright misuse, as explained above.

     *Third*, while Oracle *generally* claims that Rimini creates copies of Oracle Database in the RAM of its clients' computer systems when it fixes bugs and other problems with such software, it has not identified any specific client, copy, file, date, or instance of such of copying. *See* BFC Decl. ¶¶ 120–21.  As such, Oracle has not offered any evidence that any particular RAM copy of a portion of Oracle Database purportedly made by Rimini qualifies as a "reproduction" under the Copyright Act and injunction.  Oracle has failed to meet its evidentiary burden, and its arguments regarding violation of paragraph 15 must be rejected.

## V.    CONCLUSION

     Oracle's Motion for an Order to Show Cause should be denied because Process 2.0 *cannot* and *does not* violate the *Rimini I* injunction.  Whether or not any aspect of Process 2.0 is otherwise actionable must be resolved in *Rimini II*.

Dated: July 31, 2020

GIBSON, DUNN & CRUTCHER LLP

By: _/s/ Eric D. Vandevelde_
Eric D. Vandevelde

*Attorneys for Defendant*
*Rimini Street, Inc.*

Gibson, Dunn &
Crutcher LLP