# EXHIBIT A

# Excerpts from Rebuttal Expert Report of Owen Astrachan, dated March 13, 2020

# PUBLIC REDACTED VERSION

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| ORACLE USA, INC., et al.,<br>Plaintiffs,<br>v.<br>RIMINI STREET, INC., et al.,<br>Defendants. | Case No. 2:10-cv-00106-LRH-VCF |

# REBUTTAL EXPERT REPORT OF PROFESSOR OWEN ASTRACHAN

**March 13, 2020**

**HIGHLY CONFIDENTIAL—ATTORNEYS' EYES ONLY**

Professor Owen Astrachan
Dated: March 13, 2020

# TABLE OF CONTENTS

Page

I. INTRODUCTION ..... 1

II. EXPERT QUALIFICATIONS ..... 2

III. EXECUTIVE SUMMARY ..... 4

1. RIMINI'S PROCESS 2.0 IS FUNDAMENTALLY DIFFERENT FROM THE PROCESSES ADJUDICATED IN *RIMINI I* ..... 4
2. RIMINI'S PROCESSES DO NOT VIOLATE THE INJUNCTION ..... 6
3. MS. FREDERIKSEN-CROSS'S OPINIONS ARE BASED ON A SERIES OF FUNDAMENTAL ERRORS ..... 9

IV. ASSUMPTIONS AND DEFINITIONS ..... 14

1. "CROSS-USE" ..... 14
   - 1.1 Examples of Conduct Ms. Frederiksen-Cross Considers "Cross-Use" ..... 17
   - 1.2 Ms. Frederiksen-Cross's "Cross-Use" Assumptions Are Inconsistent with Oracle's Positions Regarding That Term at Trial in *Rimini I* ..... 21
   - 1.3 Ms. Frederiksen-Cross's Definition of "Cross-Use" Is Inconsistent with Other Evidence ..... 23
   - 1.4 Ms. Frederiksen-Cross's Assumed Definition of "Cross-Use" Leads to Illogical Results ..... 24
   - 1.5 The Ninth Circuit's Discussion of "Cross-Use" ..... 26
   - 1.6 Reproducing, Distributing, or Creating Derivative Works of One Client's Software to Support That Client ..... 28
2. DERIVATIVE WORKS ..... 28
3. COLOCATION SERVERS AND THE CLOUD ..... 30
4. LEGAL STANDARDS RELATING TO CIVIL CONTEMPT ..... 31

V. OVERVIEW OF SOFTWARE SUPPORT AND RIMINI'S POST-INJUNCTION PROCESSES ..... 31

1. BACKGROUND REGARDING ERP SOFTWARE ..... 32
2. ENVIRONMENTS AND SOFTWARE SUPPORT ..... 34
3. RIMINI'S GENERAL SUPPORT PRACTICES AND SERVICES ..... 36
   - 3.1 Remote Hosting and Access ..... 36
   - 3.2 Types of Rimini Support Services ..... 37
     - 3.2.1 Break/Fix Support ..... 37
     - 3.2.2 TLR Updates ..... 38
4. RIMINI'S POST-INJUNCTION PEOPLESOFT SUPPORT PRACTICES ..... 38
   - 4.1 Overview of Process 2.0 PeopleSoft Processes ..... 39
   - 4.2 Process Changes Since *Rimini II* Close of Fact Discovery ..... 42
5. RIMINI'S POST-INJUNCTION JD EDWARDS SUPPORT PRACTICES ..... 43

**TABLE OF CONTENTS**
(continued)

Page

VI. RIMINI'S PROCESS 2.0 IS FUNDAMENTALLY DIFFERENT FROM THE PROCESSES ADJUDICATED IN THIS CASE ..... 43

1. RIMINI'S PROCESS 1.0 ..... 43
2. RIMINI'S PROCESS 2.0 ..... 47
3. ORACLE'S CRITICISMS OF PROCESS 2.0 ARE ENTIRELY DIFFERENT FROM THE ISSUES LITIGATED ON SUMMARY JUDGMENT AND AT TRIAL IN *RIMINI I* ..... 49

VII. THE CLIENTS' "OWN COMPUTER SYSTEMS" PROVISION ..... 50

1. CLIENTS' CLOUD-HOSTED ENVIRONMENTS, INCLUDING WINDSTREAM, ARE THE CLIENTS' "OWN COMPUTER SYSTEMS" ..... 50
2. ALLEGED ORACLE CODE OR DOCUMENTS ON RIMINI'S SYSTEMS ..... 58
   - 2.1 [REDACTED] ..... 58
   - 2.2 [REDACTED] ..... 63
   - 2.3 [REDACTED] ..... 66
   - 2.4 [REDACTED]s ..... 67
   - 2.5 Supposed "Other" Examples of Oracle Intellectual Property on Rimini's Systems ..... 68
   - 2.6 Alleged PeopleSoft Documentation on Rimini's Systems ..... 71
   - 2.7 Alleged Copying of Updates Across Multiple Clients ..... 71

VIII. ALLEGED PEOPLESOFT "CROSS-USE" ..... 74

1. USE OF CODEANALYZER DOES NOT VIOLATE THE INJUNCTION ..... 74
   - 1.1 The Discontinuation of [REDACTED] Post-Injunction ..... 77
   - 1.2 Four Uses of the [REDACTED]t Utility from November 5 to 9, 2018, Are Not "Cross-Use" ..... 78
   - 1.3 Eight Uses of the Diff Process Between November 5 and 8, 2018, Are Not "Cross-Use" ..... 79
   - 1.4 Rimini's Responses to Requests for Admission Are Correct ..... 80
2. USE OF THE AFW[REDACTED]s TOOL IS NOT "CROSS-USE" ..... 81
3. USE OF RIMINI'S [REDACTED] TOOL IS NOT "CROSS-USE" ..... 82
4. RIMINI'S DEVELOPMENT MODEL, INCLUDING [REDACTED] [REDACTED] [REDACTED] DOES NOT VIOLATE THE INJUNCTION ..... 84
5. RIMINI'S TEST PLANS AND TESTING OF CLIENT SOFTWARE ON CLIENT ENVIRONMENTS DO NOT VIOLATE THE INJUNCTION ..... 88
6. RS-PREFIXED FILES ..... 92
7. RIMINI'S USE OF CLIENT ENVIRONMENTS IS NOT "CROSS-USE" ..... 93
8. USE OF DEV INSTRUCTIONS IS NOT "CROSS-USE" ..... 95
9. ALLEGED TRANSFER OF FILES THROUGH MEANS OTHER THAN T[REDACTED] ..... 96

IX. ALLEGED JD EDWARDS "CROSS-USE" ..... 96

**TABLE OF CONTENTS**
(continued)

Page

X. JD EDWARDS SOFTWARE SOURCE CODE ..... 104

XI. ALLEGED "DISTRIBUTION" OF SOFTWARE ..... 106

1. ALLEGED ACTS OF DISTRIBUTION ..... 106
2. MS. FREDERIKSEN-CROSS'S OPINION THAT "UPDATES REMAIN AVAILABLE TO MULTIPLE RIMINI CUSTOMERS AFTER THEIR INITIAL DEVELOPMENT" ..... 108

XII. ALLEGED "OTHER" VIOLATIONS ..... 109

1. ORACLE DATABASE ..... 109
2. ALLEGED USE AND COPYING OF JD EDWARDS DOCUMENTATION ON RIMINI'S COMPUTERS ..... 109

XIII. MS. FREDERIKSEN-CROSS'S "CASE STUDIES" ..... 110

XIV. MS. FREDERIKSEN-CROSS'S OPINIONS REGARDING ALLEGEDLY DESTROYED RECORDS ARE MISLEADING AND WRONG ..... 114

1. MS. FREDERIKSEN-CROSS'S ASSERTIONS REGARDING ALLEGED "SYSTEMIC DELETION OF FILES" ARE MISLEADING ..... 114
2. RIMINI'S RECORD-KEEPING PRACTICES ..... 118

[redacted] When Rimini implements an update for Client A using Client A's software, in Client A's environment, it learns how to solve the problem and may document its experience and knowledge. It can then implement the update for Client B, using Client B's software, in Client B's environment faster than it performed the update for Client A because it has already solved the problem once. [redacted]

160. Based on my review of the record, Rimini's use of its own knowledge and experience was not litigated in *Rimini I*. *Rimini I* involved the explicit copying of one client's Oracle software and providing that software to a different client, which is not at issue here.

## VII. THE CLIENTS' "OWN COMPUTER SYSTEMS" PROVISION

### 1. CLIENTS' CLOUD-HOSTED ENVIRONMENTS, INCLUDING WINDSTREAM, ARE THE CLIENTS' "OWN COMPUTER SYSTEMS"

[redacted]

162. The Injunction states that "Rimini shall not reproduce, prepare derivative works from, or use PeopleSoft software or documentation on, with, or to any computer systems other than a specific licensee's own computer systems."[139]

[136] I understand that Windstream now operates as TierPoint. For consistency, I refer to the company as Windstream.

[137] Frederiksen-Cross Post-Injunction Rpt., ¶ 14.

[138] Deposition of Barbara Frederiksen-Cross, Sept. 19, 2018, pp. 253–54.

[139] Injunction ¶ 5.

163. I understand that whether cloud services leased by a Rimini client are that client's "own computer systems" within the meaning of the Injunction is a disputed legal issue, and that the issue of whether a cloud account constitutes a client's "own computer systems" was not resolved in *Rimini I*.[140] I am not a lawyer, and I express no opinion as to the legal interpretation or meaning of the Injunction's terms. However, from a technical perspective, when a company uses a cloud account, it is my opinion that the cloud account is part of that company's "computer systems." I provide technical background and other support for my opinion below.

164. Some users of complex software commonly choose to store or locate their software at remote locations or in the cloud. Two common remote hosting arrangements are colocation and cloud hosting. The "cloud" refers to computing resources available for lease over the Internet. Cloud computing resources operate like traditional on-premises computing resources, but can be cheaper, more efficient, more secure, and provide better scalability. "Colocation" is the practice of locating a client's equipment (whether owned or leased) in a third-party datacenter.[141] The colocation provider provides the client with network connectivity, electrical power, and space for placement of computer servers.[142]

165. The location of software, whether physically at a client's place of business, on a colocation server, or in the cloud, has almost no practical effect on the use of the software. In fact, a typical user of remotely hosted PeopleSoft software may not even know where that software is hosted. Whether a company uses computing resources physically located in its own building or off-premises is largely irrelevant from a functionality perspective. In both cases, they are the company's computing resources, and thus the company's "computer systems" as I understand that term from a technical perspective. For purposes of computing, a business's "computer systems" can be in any location in the world where a business has chosen to locate its computing resources.

---

140 Tr. of May 25, 2016 Hearing, p. 143 (Oracle's counsel acknowledging that "cloud computing is at issue in *Rimini II* and it wasn't at issue in *Rimini I*.").

141 Encyclopedia – Definition of colocation, https://www.pcmag.com/encyclopedia/term/39977/colocation.

142 Deposition of Denny Heaberlin (Windstream/TierPoint), Feb. 28, 2018, p. 14.

166. Further, whether software is hosted on a server at the client's headquarters, in some other building the client owns or rents, in a colocation arrangement in a data center owned by some other entity, or in the cloud, makes no practical difference from a technical perspective. A client's own IT professionals, or a third-party support provider like Rimini, will securely access the client's software environment in the same manner (*e.g.*, via VPN) and perform the necessary work. Use of the software is the same. Testing of the software is the same.

167. In both colocation and cloud-hosting arrangements, the client has ultimate control over its software environments. The client is able to impose access restrictions on other users. And the client can move or delete the computing resource (*e.g.*, the virtual machine containing the client's software environments) or close its colocation or cloud account at any time.

168. Based on the foregoing, it is my opinion that a company's cloud account is the company's own computer systems.

169. Further, the documents I have reviewed indicate that Rimini's clients who use Windstream to host their PeopleSoft software exercise ultimate control over their Windstream accounts. [redacted]

143 Deposition of Jeff Waide (Windstream/TierPoint), Oct. 17, 2019, p. 31–32.

144 *Id.* at pp. 34–35 and Ex. 1820.

145 Deposition of [redacted]), Dec. 1, 2016, pp. 112, 114–16, 124–25; Deposition of Jeff Waide (Windstream/TierPoint), Oct. 17, 2019, pp. 36–37.



146 Frederiksen-Cross Post-Injunction Rpt., ¶ 169.

147 Deposition of [redacted]), Sept. 20, 2019, p. 54.

[redacted]

172. Further, my opinion that a cloud account constitutes a business's "own computer systems" does not change if the cloud account exists solely to provide a location for a vendor to access the business's software to provide services to the business (such as third-party support for the software). Indeed, regardless of whether the business provides a vendor a dedicated account on a cloud server or a server in the business's building, that account (and the server space it occupies) would still be, as a technical matter, part of the business's computer systems.

173. The deposition testimony I have reviewed is consistent with this opinion, making clear that both Rimini's clients and Windstream view a client's Windstream accounts as the client's "own computer systems." [redacted]

[redacted] [redacted]

148 Deposition of [redacted] Dec. 1, 2016, pp. 122–23.

149 Deposition of [redacted]), Sept. 20, 2019, p. 20.

150 Deposition of [redacted]), Dec. 1, 2016, p. 125.

151 Deposition of Jeff Waide (Windstream/TierPoint), Oct. 17, 2019, p. 37.

152 Frederiksen-Cross Post-Injunction Rpt., ¶ 171.



[153] Deposition of Jeff Waide (Windstream/TierPoint), Oct. 17, 2019, at 31-37.

[154] Deposition of Richard Allison, Mar. 28, 2018, pp. 124–26. Mr. Allison, Oracle's licensing executive, testified that he believes that compliance with Oracle's license agreements depends on the ownership of the building in which a server is located.

[155] Frederiksen-Cross Post-Injunction Rpt., ¶ 174.



156 Rimini's Second Supplemental Response to Oracle's Supplemental Interrogatory No. 3, Dec. 27, 2019, Ex. A-1.

157 RSI007099151.

158 Frederiksen-Cross Post-Injunction Rpt., ¶ 178.



159 *Id.* ¶ 183.

160 Deposition of [redacted] September 20, 2019, p. 64.

161 [redacted] 3-SUB00000180 ( [redacted]

162 Frederiksen-Cross Post-Injunction Rpt., ¶ 181.

**2. ALLEGED ORACLE CODE OR DOCUMENTS ON RIMINI'S SYSTEMS**

[redacted]

[redacted]

[redacted]

[redacted]

[163] *Id.* ¶ 185.

[164] *Id.* ¶ 372 [redacted]

[165] *Id.* ¶ 185.

[166] *Id.*

[167] *Id.* ¶ 186.



[168] *Id.* ¶¶ 186, 286.

[169] *Id.* ¶ 187.

[170] I discussed [redacted] at length in my *Rimini II* Rebuttal Report (¶¶ 189–411) and incorporate that discussion by reference here.



171 https://www.ssa.gov/employer/efw/19efw2.pdf#zoom=100.







[172] I note that the Rimini procedure is titled



[173] Frederiksen-Cross Post-Injunction Rpt., ¶ 286.

[174] ECF No. 1297 (Rimini Opp. to Mtn. to Compel), pp. 16–23; ECF No. 1297-4 (Mendillo Decl.).

[175] Frederiksen-Cross Post-Injunction Rpt., ¶ 189.



[176] *Id.* Ex. 47.

[177]

178 *Id.*

179 *Id.*

180 Frederiksen-Cross Post-Injunction Rpt., ¶ 191.

181 *Id.*

[182] R2 Astrachan Rebuttal Rpt., ¶¶ 207–15.

[183] Frederiksen-Cross Post-Injunction Rpt., ¶ 192.



[184] *Id.* ¶ 194.

[185] RSI007285466.



**2.5 Supposed "Other" Examples of Oracle Intellectual Property on Rimini's Systems**

[186] RSI007954666



[187] Frederiksen-Cross Post-Injunction Rpt., ¶ 195.

[188] *Id.* ¶ 197.

[189] Trial Tr., pp. 839, 846.



190 Frederiksen-Cross Post-Injunction Rpt., ¶ 198.

191 *Id.*

192 

193 R2 Astrachan Rebuttal Rpt., ¶¶ 594–601.

194 Interview with James Butler, Senior Vice President & Chief Ethics and Compliance Officer.

**2.6 Alleged PeopleSoft Documentation on Rimini's Systems**

**2.7 Alleged Copying of Updates Across Multiple Clients**

195 *Id.* ¶ 199.

196 *Id.*

197 Deposition of Craig Mackereth, Jan. 17, 2020, Ex. 1852 (RSI007050433).

198 Frederiksen-Cross Post-Injunction Rpt., ¶ 202.



[199] *Id.* ¶ 203.

[200] *Id.* Ex. 18.

[201] *Id.* ¶ 205.

[202] *Id.* ¶ 204.

[203] *Id.* ¶ 205.



[204] *Id.* ¶ 206.

[205] *Id.* ¶ 207.

[206] *Id.*

[207] *Id.* Heading IV.A.

## VIII. ALLEGED PEOPLESOFT "CROSS-USE"

[REDACTED]

[REDACTED]

### 1. USE OF CODEANALYZER DOES NOT VIOLATE THE INJUNCTION

222. Rimini's PeopleSoft team uses a set of proprietary tools that it developed—called the Automation Framework, or "AFW"—to communicate with and manage remote software environments belonging to its numerous clients.[208] As explained above, when Rimini transitioned to Process 2.0, it no longer had any Oracle software environments on its own systems. Its clients' software environments are hosted on those clients' own computer systems, either on the clients' physical premises, or the cloud. The AFW tools facilitate development work in the Process 2.0 remote system. Rimini recently received a patent on aspects of AFW.[209]

223. I explained the AFW tools in great detail in my two reports in *Rimini II*.[210] I am familiar with the AFW tools from my extensive discussion of those tools in *Rimini II*, my analysis of Oracle's two experts' opinions regarding those tools in *Rimini II*, my review of the code and documentation for the tools, and from witnessing the tools used in various

---

[208] Rimini Street Automation Framework, RSI2_031195051.

[209] U.S. Patent No. 10,509,639 (inventors Jim Benge, Rick Frank, Don Sheffield, and Doug Baron).

[210] *See*, for example, R2 Astrachan Opening Rpt., ¶¶ 80–83, 85–110; R2 Astrachan Rebuttal Rpt. ¶¶ 85, 102–31, 163–87.

demonstrations of Rimini's processes. One AFW tool, discussed at length by me, Ms. Frederiksen-Cross, and Oracle's expert Christian Hicks in *Rimini II*, is known as CodeAnalyzer.

224. I provided a detailed analysis of CodeAnalyzer in my reports in *Rimini II* and incorporate that discussion by reference.[211] [redacted] Given that fact and my extensive discussion of the tool, I provide only a high-level summary of the tool for background purposes.

[redacted]

[211] R2 Astrachan Opening Rpt., ¶¶ 101–05; R2 Astrachan Rebuttal Rpt., ¶¶ 102–10.

[212] *See* R2 Astrachan Rebuttal Rpt., ¶¶ 168–70; R2 Astrachan Opening Rpt., ¶ 109.

[213] *See* R2 Astrachan Rebuttal Rpt., ¶ 168.

[214] *See id.* ¶¶ 168–70; R2 Astrachan Opening Rpt., ¶ 109.

[215] *See* R2 Astrachan Rebuttal Rpt., ¶ 170.

[216] Deposition of Christian Hicks, Aug. 15, 2018, pp. 294–95.



[217] R2 Astrachan Opening Rpt., ¶¶ 101–05.

[218] *Id.* ¶ 100.

[219] *Id.*

[220] Deposition of Christian Hicks, Aug. 15, 2018, p. 165; *see id.* at pp. 166, 174–76.

[221] R2 Astrachan Opening Rpt., ¶ 104.

[222] *Id.*



223 *Id.* ¶ 105.

224 RSI006850037 (email from Jim Benge stating that [REDACTED]).

225 RSI007120993 (spreadsheet describing [REDACTED]).

226 This appears to have been accomplished by changing the password to [REDACTED]. RSI007099173.

227 Frederiksen-Cross Post-Injunction Rpt., ¶ 213.

228 *Id.* ¶ 214.

[229] *See*, for example, *id.* ¶ 216 (chart showing that

[230] Frederiksen-Cross Post-Injunction Rpt., ¶¶ 218, 220.

[231] *Id.* ¶ 218.

[232] *Id.*

233 RSI007485168, RSI007226382, RSI007981849, -SUB00000194-0010.

234 In a footnote, Ms. Frederiksen-Cross asserts that

235 Frederiksen-Cross Post-Injunction Rpt., ¶ 221.

236 Deposition of Christian Hicks, Aug. 15, 2018, p. 165; *see id.* at pp. 166, 174–76.

**1.4 Rimini's Responses to Requests for Admission Are Correct**

237 Frederiksen-Cross Post-Injunction Rpt., ¶ 224.

238 Deposition of Christian Hicks, Aug. 15, 2018, p. 165; *see id.* at pp. 166, 174–76; *see also* Deposition of Barbara Frederiksen-Cross, Sept. 19, 2018, p. 115.

239 Frederiksen-Cross Post-Injunction Rpt., ¶ 222.

240 Rimini's Responses to Oracle's First Supplemental Requests for Admission, Jan. 17, 2020, p. 8.



### 2. USE OF THE AFW TRANSFERFILES TOOL IS NOT "CROSS-USE"

238. AFW has another tool called TransferFiles. As discussed in my *Rimini II* reports,[242] it allows Rimini to transfer a file from Rimini's systems to a Rimini client's remote environment. TransferFiles is *one way only*. It transfers files from Rimini to the client's computer systems; but it cannot transfer files from a client's computer system back to Rimini's systems. Additionally, it cannot transfer files from a client's computer systems to a different client's computer systems, either directly or indirectly.

241 R2 Hicks Supp. Rpt., ¶ 8.8.2.

242 *See*, for example, R2 Astrachan Rebuttal Rpt., ¶ 171.



[243] Frederiksen-Cross Post-Injunction Rpt., ¶ 225.

[244] *Id.* ¶ 160; RSI006948969; RSI007981843.

[245] *See* R2 Astrachan Rebuttal Rpt., ¶¶ 171–72.

[246] Frederiksen-Cross Post-Injunction Rpt., ¶ 229.



[redacted]

[redacted]

[redacted]

---

247 R2 Astrachan Opening Rpt., ¶ 110.

248 Deposition of James Benge, Feb. 23, 2018, p. 173; Rimini Street Automation Framework, RSI2_031195051 at p. -057; Deposition of Richard Frank, Feb. 28, 2018, pp. 72–74.

249 Oracle's Expert in *Rimini II* who opined on [redacted] R2 Hicks Supplemental Rpt., ¶ 6.2.1.4.1 (p. 24).



[250] Frederiksen-Cross Post-Injunction Rpt., ¶ 231.

[251] *Id.*

[252] http://agilemanifesto.org/.



[253] Scrumban: Essays on Kanban Systems for Lean Software Development, Corey Ladis, Modus Cooperandi Press, 2011.

[254] *See*, for example, R2 Astrachan Opening Rpt., ¶¶ 74–108; R2 Astrachan Rebuttal Rpt., ¶¶ 89–101, 132–33, 154–56.

[255] R2 Astrachan Opening Rpt. ¶¶ 84–90, 106–08; R2 Astrachan Rebuttal Rpt., ¶¶ 89, 91–95.

[256]





[257] Frederiksen-Cross Post-Injunction Rpt., ¶ 232.

[258] *Id.* ¶ 240 (emphasis added).

[259] *Id.* ¶¶ 233–39; *see id.* ¶ 92.



[260] Deposition of Craig Mackereth, Jan. 17, 2020, pp. 228–30.

[261] Frederiksen-Cross Post-Injunction Rpt., ¶ 241.

[262] Frederiksen-Cross Post-Injunction Rpt., ¶¶ 243–59.

[263] R2 Frederiksen-Cross Rebuttal Rpt., ¶ 217.



264 Frederiksen-Cross Post-Injunction Rpt., ¶ 243.

265 My knowledge of Rimini's



[266] Frederiksen-Cross Post-Injunction Rpt., ¶ 249.



[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

---

267 R2 Astrachan Rebuttal Rpt., Exhibit [redacted]

268 Frederiksen-Cross Post-Injunction Rpt., ¶ 257.

269 Screenshot from Frederiksen-Cross Post-Injunction Rpt., ¶ 257.



[redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted]

[redacted] [redacted]

[redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted]

270 R2 Astrachan Opening Rpt., ¶ 109; R2 Astrachan Rebuttal Rpt., ¶ 189.

271 In *Rimini II*, Ms. Frederiksen-Cross opined that [redacted] I discussed these files individually at length in my Rimini II Rebuttal Report. *See* R2 Astrachan Rebuttal Rpt., ¶¶ 190–414.

272 Frederiksen-Cross Post-Injunction Rpt., ¶ 268.



## 7. RIMINI'S USE OF CLIENT ENVIRONMENTS IS NOT "CROSS-USE"

273 *Id.* ¶ 269.

274 *Id.* ¶¶ 270–71.

275 RSI007226397, RSI007226398, RSI007226399.

276 Frederiksen-Cross Post-Injunction Rpt., ¶ 272.



[277] *Id.* ¶ 274; RSI007421994.

[278] RSI007421994 at '2001.

[279] Frederiksen-Cross Post-Injunction Rpt., ¶ 275.

[280] *Id.* ¶ 276.



281 *Id.* ¶ 279.

282 *Id.* ¶ 283.

283 *Id.* ¶ 285.



[284] *Id.* ¶ 290.

[285] *Id.* ¶ 291.

[286] *Id.* ¶ 293.



[287] Deposition of Craig Mackereth, Jan. 17, 2020, pp. 243–44.

[288] *Id.* at pp. 210–12.

[289] Frederiksen-Cross Post-Injunction Rpt., ¶ 297; *id.* ¶ 294.

[290] For example, R2 Frederiksen-Cross Supplemental Rpt., ¶¶ 455–57, 466–67; *id.*, Exhibit III.1.



[291] *Id.* ¶ 296.



[292] R2 Astrachan Rebuttal Rpt., ¶ 557.

[293] Frederiksen-Cross Post-Injunction Rpt., ¶ 300.

[294] Deposition of Craig Mackereth, Jan. 17, 2020, pp. 228–30.



[295] Frederiksen-Cross Post-Injunction Rpt., ¶ 301.

[296] *Id.*

[297] *Id.* ¶ 302.



[298] *Id.* ¶ 322.

[299] *Id.* ¶ 304.

[300] *Id.*

[301] *Id.*

[302] Deposition of Craig Mackereth, Jan. 17, 2020, pp. 210–12.



303 Frederiksen-Cross Post-Injunction Rpt., ¶ 320.

304 RSI007407738.

305 *Id.*

306 RSI007399628.

307 Frederiksen-Cross Post-Injunction Rpt., Heading IV.D.3.



## X. JD EDWARDS SOFTWARE SOURCE CODE

305. I understand that the Injunction prohibits Rimini from copying "J.D. Edwards software source code," and that this provision in the Injunction stems from (some) JD Edwards license agreements. I further understand that the proper interpretation of this term as used in the Injunction is a disputed legal issue.

306. I understand that Rimini believes that "J.D. Edwards software source code" means "closed code" in the JD Edwards software.

[308] Frederiksen-Cross Post-Injunction Rpt., ¶ 324.



307. As a computer scientist, I do not have an opinion regarding the legal definition, or industry understanding of the term "J.D. Edwards software source code" as used in the Injunction. However, I do have opinions relevant to this issue, which I set forth below.

308.

[309] *Id.* ¶ 313.

[310] R2 Astrachan Opening Rpt., ¶¶ 129–31.



## XI. ALLEGED "DISTRIBUTION" OF SOFTWARE

### 1. ALLEGED ACTS OF DISTRIBUTION

311 *See*, for example, Frederiksen-Cross Post-Injunction Rpt., ¶ 306 (identifying the checking in and out of source code during use of Object Management Workbench and the promotion of objects).



[312] *Id.* ¶¶ 332–33.



**2.**

313 In one instance, Ms. Frederiksen-Cross alleges t

## XII. ALLEGED "OTHER" VIOLATIONS

[314] *Rimini I*, 879 F.3d at 952.

[315] *Id.* at 953.

[316] Frederiksen-Cross Post-Injunction Rpt., ¶ 360.



## XIII. MS. FREDERIKSEN-CROSS'S "CASE STUDIES"

317 *Id.* ¶ 363.

318 *Id.* ¶ 364.

319 *Id.* ¶ 365.

320 *Id.* ¶ 381.

321 *Id.*





[322] Frederiksen-Cross Post-Injunction Rpt., ¶ 372.



DESTROYED RECORDS ARE MISLEADING AND WRONG

323 Interview with James Butler, Senior Vice President & Chief Ethics and Compliance Officer.

324 Frederiksen-Cross Post-Injunction Rpt., ¶ 382.



2.

[330] *See* RSI_AFW_004,

[331] R2 Astrachan Rebuttal Rpt., ¶ 660.



[332] Indeed, she admits that



351. I thus find Ms. Frederiksen-Cross' criticisms of Rimini's records to be unfounded.

[333] Deposition of Craig Mackereth, Oct. 9, 2017, p. 58.