# EXHIBIT M

# Excerpts from October 17, 2019 deposition of TierPoint's (fka Windstream) 30(b)(6) corporate representative, Jeff Russell Waide

```
 1              UNITED STATES DISTRICT COURT
 2                  DISTRICT OF NEVADA
 3            Case No. 2:10-cv-0106-LRH-VCF
 4
 5    ORACLE USA, INC, a Colorado   )
 6    corporation; ORACLE AMERICA,  )
 7    INC., a Delaware corporation  )
 8    and ORACLE INTERNATIONAL      )
 9    CORPORATION, a California     )
10    corporation,                  )
11          Plaintiffs,             )
                  vs.               )
12    RIMINI STREET, INC., a Nevada )
13    corporation; and SETH RAVIN,  )
14    an individual,                )
15          Defendants.             )
      _____)
16
17        VIDEOTAPED DEPOSITION OF JEFF RUSSELL WAIDE,
18        taken at 600 Fairview Road, Suite 1273,
19        Charlotte, North Carolina, commencing at
20        10:03 a.m., Thursday, October 17, 2019,
21        before Sandra Berkeland, Notary Public
22        in and for the State of North Carolina.
23
24    JOB No. 3569687
25    PAGES 1 - 42
```

Page 1

**Page 30**

1 accounts?
2    A. No.
3        MR. RODRIGUEZ: Let's go off the record for
4 just a moment, please.
5        VIDEOGRAPHER: The time on the monitor is
6 approximately 10:42 a.m. We're off the record.
7        (A discussion was held off the record.)
8        VIDEOGRAPHER: The time on the monitor is
9 approximately 10:49 a.m. We're back on the record.
10 BY MR. RODRIGUEZ:
11    Q. Mr. Waide, pending any questions from
12 Rimini's counsel, that's all I have for you today.
13        MR. RODRIGUEZ: Danielle, I do request that
14 we receive a business record that explains which
15 Rimini customers remain on TierPoint, their contract
16 dates and which services they continue to receive, if
17 any.
18        MS. MARLER: Understood. TierPoint is going
19 to provide that.
20        MR. RODRIGUEZ: Okay. Thank you. Chris?
21        MR. WHITTAKER: Yes. Let's go off the
22 record.
23        VIDEOGRAPHER: Time on the monitor is
24 approximately 10:49 a.m. We're off the record.
25        (A discussion was held off the record.)

**Page 31**

1        VIDEOGRAPHER: Time on the monitor is
2 approximately 11:02 a.m. We're back on the record.
3                EXAMINATION
4 By MR. WHITTAKER:
5    Q. Good morning, Mr. Waide. My name is Steve
6 Whittaker. I represent Rimini Street. I'm going to
7 ask you a couple of questions.
8    A. Sounds good.
9    Q. I want to talk to you about the multi-
10 tenant cloud hosting model that you were discussing
11 with opposing counsel. When a client uses
12 TierPoint's multi-tenant cloud service to host
13 software, who can access the software that is stored
14 in that account?
15    A. Just the customer.
16    Q. Can TierPoint access the software?
17    A. When you say "software," I'm assuming you're
18 talking about the compute resource, the storage
19 resource, the network resource?
20    Q. Yes. Sorry, let me clarify. If the
21 TierPoint client hosts, let's say, a software
22 application in their multi-tenant cloud account --
23    A. Yes.
24    Q. -- can TierPoint access that software
25 application?

**Page 32**

1    A. We do not access any application level stuff
2 whatsoever, no.
3    Q. Could TierPoint modify the software that is
4 stored in that account without client permission?
5    A. No.
6    Q. Could TierPoint delete the software without
7 client permission?
8    A. No.
9        MR. WHITTAKER: Let's mark this next exhibit.
10       (Court Reporter marks Sales Order
11 Exhibit 1820.)
12    Q. Are you familiar with that document,
13 Mr. Waide?
14    A. This is an old Windstream contract with a
15 master services agreement. I haven't studied it
16 prior to today.
17    Q. You haven't studied this one specifically
18 but you're generally familiar with this document?
19    A. Yes.
20    Q. I want to look at the master services
21 agreement.
22    A. Sure.
23    Q. Turn to that page. Do you see section
24 three, Rights and Obligations?
25    A. Yes.

**Page 33**

1    Q. There is a bullet, B, Acceptable Use?
2    A. Yes.
3    Q. Okay. And then it's a little bit hard to
4 see, but I'm going to read out loud the third
5 sentence that starts, "Customer acknowledges."
6        Do you see that?
7    A. Yes.
8    Q. "Customer acknowledges that company
9 exercises no control whatsoever over the content of
10 information passing through the customer equipment
11 or the company" --
12        MR. RODRIGUEZ: Chris, I'm sorry. I think
13 Danielle got disconnected. I'm very sorry. Let's go
14 off the record and I'll reconnect her.
15        VIDEOGRAPHER: The time on the monitor is
16 approximately 11:05 a.m. We're off the record.
17       (A discussion was held off the record.)
18        VIDEOGRAPHER: Time on the monitor is
19 approximately 11:06 a.m. we're back on the record.
20 BY MR. WHITTAKER:
21    Q. Okay. Mr. Waide, we were looking at
22 Exhibit 1820.
23    A. Yes.
24    Q. And specifically we're looking at the Master
25 Services Agreement that starts on the Bates page

1 that ends in 91. Do you see section three, Rights
2 and Obligations?
3   A. Yes, I do.
4   Q. And under that is B, Acceptable Use. Do you
5 see that?
6   A. Yes.
7   Q. I'm going to read the third sentence of that
8 paragraph out loud.
9   A. Sure.
10   Q. "Customer acknowledges that company
11 exercises no control whatsoever over the content of
12 information passing through the customer equipment
13 or company equipment."
14       Do you see that?
15   A. Yes.
16   Q. And then if you look up at the first
17 paragraph of the agreement, the first sentence says,
18 "This Master Services Agreement is between
19 Windstream Hosted Solutions, LLC, a Delaware Limited
20 Liability Company," and then there is "Company" with
21 a capital C. Do you see that?
22   A. Yes.
23   Q. So Company is Windstream; right?
24   A. Correct, yes.
25   Q. Okay. So going back to 3.b., is it correct

Page 34

1 that Windstream exercises no control whatsoever over
2 the content of information passing through the
3 customer equipment?
4   A. Yes.
5   Q. And the same is true of TierPoint; right?
6   A. Yes. Yes.
7   Q. Sticking with the multi-tenant cloud model,
8 what's does the word "multi-tenant" mean?
9   A. It's, again, a model where we would have
10 multiple customers subscribe to a computing platform
11 that is shared between them.
12   Q. So there is potentially a shared server on
13 which multiple clients have their own virtual
14 machines?
15   A. That's correct.
16   Q. Is that right?
17   A. Yes.
18   Q. Can you describe what a virtual machine is
19 at a high level?
20   A. I mean at a high level, it's a machine that
21 we would carve out for a customer's computing
22 environment. It's almost like a partition. I would
23 see it as -- again, I'm not -- technically, I'm not
24 a solutions architect but a virtual machine would
25 be -- have the ability to make a machine using

Page 35

1 software, if you will, to mimic a larger traditional
2 server.
3   Q. The virtual machine approximates a physical
4 machine?
5   A. That's correct, yes.
6   Q. When multiple clients have virtual machines
7 on the same server at TierPoint, are they able to
8 access each other's virtual machines?
9   A. No.
10   Q. Why not?
11   A. I'm -- it's an element of security.
12 no customer would subscribe to us if they
13 believed other customers had access to their
14 computing infrastructure and they wouldn't want
15 access to anybody else's stuff. So everybody,
16 for security reasons, would need to be kept
17 separate.
18   Q. So, is it right to say that a TierPoint
19 client purchases a virtual machine cloud account,
20 that account is for that client's exclusive use?
21   A. Yes.
22   Q. The client can designate who they want to
23 access the account; right?
24   A. That's correct.
25   Q. And so clients control who can access the

Page 36

1 software -- sorry -- strike that.
2       If a client stores software in a cloud
3 account, the client can control who has access to
4 that software?
5       MR. RODRIGUEZ: Objection. Leading.
6       THE WITNESS: Yeah. I mean, if it's a
7 software, we don't really have any knowledge of
8 what's happening in that environment but yes, I mean
9 it would be up to the customer to distinguish who
10 could have access to that.
11 BY MR. WHITTAKER:
12   Q. So is it fair to say that the virtual
13 machine on a shared server at a TierPoint data
14 center belongs to the client who purchased it?
15       MR. RODRIGUEZ: Objection. Leading.
16       THE WITNESS: From my perspective, yes.
17 BY MR. WHITTAKER:
18   Q. And so would you consider that cloud account
19 part of the client's computing resources?
20   A. Yes.
21   Q. Earlier I believe you referred to a master
22 agreement that Rimini had with TierPoint. Do you
23 recall that?
24   A. Yes.
25   Q. And there were also child accounts that were

Page 37

10 (Pages 34 - 37)

```
 1  STATE OF NORTH CAROLINA
    COUNTY OF MECKLENBURG
 2
 3           REPORTER'S CERTIFICATE
 4      I, Sandra Berkeland, Shorthand Reporter and
 5  Notary Public in and for the State of North
 6  Carolina, do hereby certify that there came before
 7  me on Thursday, the 17th day of October, 2019, the
 8  person hereinbefore named, who was by me duly sworn
 9  to testify to the truth and nothing but the truth of
10  his knowledge concerning the matters in controversy
11  in this cause; that the witness was thereupon
12  examined under oath, the examination reduced to
13  typewriting under my direction, and the deposition
14  is a true record of the testimony given by the
15  witness.
16      I further certify that I am neither attorney
17  or counsel for, nor related to or employed by, any
18  attorney or counsel employed by the parties hereto
19  or financially interested in the action.
20      IN WITNESS WHEREOF, I have hereto set my hand,
21  this the 31st day of October, 2019.
22
23
            <%9225,Signature%>
24  Sandra Berkeland, Notary Public
25  Notary Number: #201323800050
```

Page 42

12 (Page 42)