# EXHIBIT O

# Excerpts from June 19, 2020 deposition of

# Oracle's expert, Barbara Frederiksen-Cross

# PUBLIC REDACTED VERSION

# In The Matter Of:
## *Oracle v. Rimini Street*

### *Barbara Frederiksen-Cross*
### *June 19, 2020*

*HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER*



*Min-U-Script® with Word Index*

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2                    DISTRICT OF NEVADA
 3
 4   ORACLE USA, INC., et al.,
 5           Plaintiffs,
 6   vs.              Case No.:  2:10-cv-00106-LRH-VCF
 7   RIMINI STREET, INC., et al.,
 8           Defendants.
     ------------------------------/
 9
10
11   * HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER *
12              REMOTELY CONDUCTED VIDEOTAPED
13              EXPERT WITNESS DEPOSITION OF
14               BARBARA FREDERIKSEN-CROSS
15                   Wilsonville, Oregon
16                   (Witness's location)
17                  Friday, June 19, 2020
18
19
20
21   Stenographically reported by:
     LORRIE L. MARCHANT, RMR, CRR, CCRR, CRC
22   California CSR No. 10523
     Washington CSR No. 3318
23   Oregon CSR No. 19-0458
     Texas CSR No. 11318
24
25   Job No.:  2020-86014
```

Page 2

```
 1       UNITED STATES DISTRICT COURT
 2       DISTRICT OF NEVADA
 3
 4   ORACLE USA, INC., et al.,
 5       Plaintiffs,
 6   vs.         Case No.:  2:10-cv-00106-LRH-VCF
 7   RIMINI STREET, INC., et al.,
 8       Defendants.
     ----------------------------/
 9
10
11
12       BE IT REMEMBERED that on Friday, June 19,
13   2020, commencing at the hour of 8:58 a.m. PDT,
14   thereof, at the offices of Wilsonville, Oregon
15   (witness's location), before me, LORRIE L. MARCHANT,
16   CSR, RMR, CRR, CCRR, CRC, a Certified Stenographic
17   Shorthand Reporter for the State of California,
18   personally appeared
19       BARBARA FREDERIKSEN-CROSS,
20   called as a witness by the Defendant herein, who,
21   being by me first duly sworn/affirmed, was thereupon
22   examined and testified as hereinafter set forth.
23       ---oOo---
24
25
```

Page 3

```
 1             A P P E A R A N C E S
 2         (All appearances remotely via Zoom)
 3
     Appearing as counsel on behalf of Plaintiffs:
 4
             MORGAN, LEWIS & BOCKIUS, LLP
 5       BY:  JOHN POLITO, ESQ.
             LINDSEY SHINN, ESQ.
 6       One Market, Spear Street Tower
         San Francisco, CA 94105
 7       (415) 442-1000
         john.polito@morganlewis.com
 8       lindsey.shinn@morganlewis.com
 9       BY:  JACOB J.O. MINNE, ESQ.
         1400 Page Mill Road
10       Palo Alto, CA 94304
         (650) 843-7280
11       jacob.minne@morganlewis.com
12   Appearing as counsel on behalf of Defendants:
13       GIBSON, DUNN & CRUTCHER, LLP
         BY:  ERIC D. VANDEVELDE, ESQ.
14       333 South Grand Avenue
         Los Angeles, CA 90071
15       (213) 229-7000
         evandevelde@gibsondunn.com
16
         BY:  CASEY J. McCRACKEN, ESQ.
17            CHRIS WHITTAKER, ESQ.
         3161 Michelson Drive
18       Irvine, CA 92612
         (949) 451-3800
19       cmccracken@gibsondunn.com
         cwhittaker@gibsondunn.com
20
     Also present:
21
         John P. Reilly, Rimini in-house Counsel
22       Lisa Debrosse Johnson, Rimini in-house
                                        Counsel
23       Jim Maroulis, Oracle in-house Counsel
         Aydaline Garcia, Zoom host
24       Juan Torres, documents technician
25              ---oOo---
```

Page 4

```
 1                  I N D E X
 2              INDEX OF EXAMINATION
 3   EXAMINATION BY                                PAGE
 4    MR. VANDEVELDE                                  5
 5              ---oOo---
 6     INDEX OF EXHIBITS MARKED FOR IDENTIFICATION
 7    EXHIBIT       DESCRIPTION                   PAGE
 8   Exhibit 1854 Corrected Post-Injunction         17
                  Expert Report of Barbara Ann
 9                Frederiksen-Cross
10   Exhibit 1855 Corrected Post-Injunction         18
                  Surrebuttal Expert Report of
11                Barbara Ann Frederiksen-Cross
12   Exhibit 1856 Rebuttal Expert Report of         29
                  Professor Owen Astrachan, dated
13                March 13, 2020
14   Exhibit 1857 Document produced in native       71
                  format, RSI006953646
15
     Exhibit 1858 Diagram                           96
16
     Exhibit 1859 Diagram                          120
17
     Exhibit 1860 Diagram                          135
18
     Exhibit 1861 Diagram                          142
19
     Exhibit 1862 Diagram                          185
20
     Exhibit 1863 PDF version of spreadsheet       189
21
     Exhibit 1864 Oracle USA vs. Rimini Street,    247
22                Inc., Opinion
23              ---oOo---
24
25
```

Page 21

1  I wanted something printed a different way. So
2  where I felt that I needed to give input, I did.
3      BY MR. VANDEVELDE:
4  Q.  Got it.
5      Did you personally review and approve all
6  the exhibits attached to your report?
7  A.  I did, yes.
8  Q.  Okay.
9      MR. VANDEVELDE: If the document technician
10 could show Exhibit 1854, paragraph 56.
11     MR. POLITO: And pardon me, Eric, for these
12 documents, we're not going to require that a full
13 copy be sent since we all have a copy. But just to
14 be clear, this is the corrected report. It doesn't
15 include other materials, like the redline version or
16 the errata? I'm just trying to figure out where the
17 document ends since we don't have a physical copy.
18     MR. VANDEVELDE: Oh. Well, the document we
19 marked is just the report itself, John. It is not
20 all the exhibits.
21     MR. POLITO: Okay. Thank you.
22     MR. VANDEVELDE: So 1854 is just the
23 report.
24     MR. POLITO: And 1855, the same thing for
25 the surrebuttal.

Page 22

1      MR. VANDEVELDE: Is just the surrebuttal.
2      MR. POLITO: And the last question, I
3  apologize.
4      MR. VANDEVELDE: Sure. No problem.
5      MR. POLITO: You mentioned Tab 1 and Tab 2.
6  Is there something you're referring to that you
7  intended to send to us that had tabs in it?
8      MR. VANDEVELDE: No, John. That's just our
9  internal reference. If I had a box of documents
10 physically, I would have them -- tab numbers. I'm
11 just letting the document technician know which one
12 I'm referring to before I mark it.
13     MR. POLITO: Thank you.
14     MR. VANDEVELDE: You'll get the pleasure of
15 doing the same potentially next week, I assume.
16     BY MR. VANDEVELDE:
17 Q.  Okay. Ms. Frederiksen-Cross, before you,
18 this is paragraph 56 of your opening report. And as
19 you write:
20     "As explained in my Rimini II
21     reports, a PeopleSoft environment is an
22     installed copy of Oracle's copyrighted
23     PeopleSoft software."
24     I'll also represent that in Exhibit XX of
25 your opening report in Rimini II, you wrote that an

Page 23

1  environment is typically computing machine, real or
2  virtual, in which a specific system is installed and
3  capable of being run.
4      So my question to you is did you find any
5  evidence that Rimini had any PeopleSoft environments
6  on Rimini's systems in the post-injunction time
7  period?
8      MR. POLITO: Objection. Overbroad.
9      THE WITNESS: Let me just double check my
10 table of contents here. But as I sit here, the only
11 ones that I recall specifically were the ZZ
12 environments, you know, that they had retained for
13 litigation purposes that were produced in the
14 context of the other litigation.
15     BY MR. VANDEVELDE:
16 Q.  Got it.
17     So other than those, you found no evidence
18 that Rimini had installed on its own computer
19 systems any PeopleSoft environments?
20     MR. POLITO: Same objections.
21     THE WITNESS: During the post-injunction
22 time period as bounded by the injunction, that is my
23 recollection, yes.
24     BY MR. VANDEVELDE:
25 Q.  Okay. How about for -- same question as to

Page 24

1  JDE.
2      MR. POLITO: Objection. Overbroad. Object
3  to the form of the question.
4      THE WITNESS: I'm thinking, Counsel. I do
5  not recall any JDE environments post injunction.
6  Again, I'm trying to recall whether there were any
7  ZZ/JDE, and I don't -- I don't think so, that those
8  were even cc'd. But I don't recall as I sit here
9  any active environments, if I can qualify my
10 question that way -- or my answer that way.
11     BY MR. VANDEVELDE:
12 Q.  Okay. And when you say "active," you mean
13 the ones that were preserved, that were ZZ'ed for
14 litigation purposes?
15 A.  Well, I would call those archived.
16 Q.  Archived.
17 A.  And I -- anything that was preserved for
18 litigation purposes from the standpoint of this
19 question is a free pass.
20     But by "active," I mean those that were
21 actively being used for development, testing, or
22 customer use.
23 Q.  Okay. And I'm asking not just about being
24 used. I'm asking about presence. So let me ask
25 again.

Page 25

1   After the injunction, did you find any
2   evidence, putting aside ZZ, the archived
3   environments, any evidence that Rimini stored or
4   possessed on its systems any JDE environment?
5       MR. POLITO: Objection. Overbroad.
6   Compound.
7       THE WITNESS: I do not recall any, Counsel.
8       BY MR. VANDEVELDE:
9   Q.  Okay.  Same question as to Oracle database.
10      After the injunction, did you find any
11  evidence, putting aside any ZZ ones, if they did
12  exist, any evidence that Rimini stored or possessed
13  on its systems any Oracle database environments?
14      MR. POLITO: Objection. Overbroad.
15  Compound. Vague.
16      THE WITNESS: With respect to the materials
17  that were produced for my inspection, Counsel -- and
18  I should qualify that for all of the answers.
19      With respect to the materials that I was
20  provided production, I did not see any full-blown
21  Oracle database system on Rimini's own production of
22  materials.
23      BY MR. VANDEVELDE:
24  Q.  After the injunction, putting aside any
25  archived-for-litigation-purposes materials, did you

Page 26

1   see any evidence of any Oracle software environments
2   at all, any Oracle software?
3       MR. POLITO: Objection. Overbroad.
4   Compound. Vague.
5       THE WITNESS: With respect to, for
6   instance -- and I'm sure we'll go there eventually,
7   but with respect, for instance, to the Windstream
8   environments, there was Oracle environments there
9   and PeopleSoft environments there.  So you didn't
10  qualify that question to Rimini's systems.
11      BY MR. VANDEVELDE:
12  Q.  I think I did.  But, yeah, I meant Rimini's
13  systems.
14  A.  On Rimini's internal systems, I do not
15  recall seeing any Oracle database installation.
16  Q.  I asked about any Oracle software, not
17  limited to JD, Oracle database, or PeopleSoft, just
18  any Oracle software environments at all on Rimini's
19  systems after the injunction.
20      MR. POLITO: So -- sorry. Objection.
21  Vague. Compound. Overbroad.
22      THE WITNESS: I'm going to have to ask you
23  to clarify.  When we're talking about environments,
24  it's a very easy answer, you know.  But when you
25  talk about software generally, I would include

Page 27

1   things like updates or portions of updates to
2   software.
3       And we did find some evidence with respect
4   to some of these composite pieces, for instance, on
5   the FTP servers.  And so if you can clarify when you
6   ask software, whether you're talking about the
7   running installation or what exactly.
8       BY MR. VANDEVELDE:
9   Q.  Yeah.  No, I understand.  I'm talking about
10  environments, as you defined them.
11      MR. POLITO: Hold on.  The objections are
12  compound. Overbroad.
13      THE WITNESS: In the post-injunction
14  period, I did not find running environments for the
15  enjoined products on Rimini's systems.
16      BY MR. VANDEVELDE:
17  Q.  Let's talk about your definition of
18  "derivative works."
19      Did you apply the same definition for
20  "derivative works" that you used in your expert
21  reports in Rimini II?
22  A.  I set forth in my report the expert -- or
23  the interpretation of that term as I applied it
24  here.  And I believe it is the same as Rimini II,
25  but I haven't compared them word for word, so ...

Page 28

1       MR. VANDEVELDE: Okay.  And, actually, if
2   the document technician could show paragraph 13 of
3   her opening report, which is 1854.
4       BY MR. VANDEVELDE:
5   Q.  So you write:
6       "I understand that Section 101 of the
7       Copyright Act defines 'derivative work'
8       and 'relevant parts' as 'a work based
9       upon one or more preexisting work, such
10      as a translation, or any other form in
11      which a work may be recast, transformed,
12      or adapted.'"
13      Were you provided this definition by Oracle
14  counsel?
15  A.  I was.  That was a legal definition that I
16  was provided.
17  Q.  Did Oracle counsel provide you any further
18  definition or guidance about what a derivative work
19  means?
20      MR. POLITO: Objection. Overbroad.
21      THE WITNESS: Not that I can think of as I
22  sit here, Counsel, beyond what was recorded in my
23  Rimini II report also.
24      BY MR. VANDEVELDE:
25  Q.  And if, for example, that word,

Page 145

1  but rather just says Rimini shall not use a specific
2  licensee's environment to development or test
3  software updates for modifications for the benefit
4  of any other licensee.
5      BY MR. VANDEVELDE:
6  Q.  Was any Oracle -- strike that.
7      Could the engineer -- do you contend it's a
8  violation of the injunction for the engineer to
9  create a dev instruction that says delete line,
10 let's say, 200 from file X?
11     MR. POLITO: Objection. Incomplete
12 hypothetical. Vague.
13     THE WITNESS: Assuming that -- again, that
14 the development work to develop the fix was done on
15 Client A's system and tested there, and then the
16 Rimini engineer writes that dev spec, are you saying
17 is the creation of a document that says that a
18 violation, or were you asking is the use of that
19 document a violation?
20     BY MR. VANDEVELDE:
21 Q.  To start with, just the creation of that
22 document.
23     MR. POLITO: Same objections.
24     THE WITNESS: Yeah. It would depend in
25 part on what the document contains. But in this

Page 146

1  really narrow hypothetical, where it just instructs
2  someone to go to a particular file and delete a
3  particular line, and it hasn't been shared with
4  other customers or used on other customer
5  environments, and it doesn't actually contain the
6  line, it just says "go to this file, delete this
7  line," that is probably is not a violation of
8  anything.
9      BY MR. VANDEVELDE:
10 Q.  But once that instructions is used with
11 Client B, you contend that's a violation of the
12 injunction?
13     MR. POLITO: Objection. Incomplete
14 hypothetical. Vague. Calls for a legal conclusion.
15     THE WITNESS: Under my understanding of the
16 injunction, again, that Rimini engineer has now used
17 the Client A's specific environment to develop and
18 test software updates or modifications and is now
19 using that for the benefit of another client.
20     So as the injunction is written, that is my
21 understanding, is that it would be a violation.
22     BY MR. VANDEVELDE:
23 Q.  What if instead of saying -- the dev
24 instruction, instead of saying "delete line 200," it
25 said "delete the line where Function F is called,"

Page 147

1  and then it's got the name of the function in the
2  dev instruction? Is the creation of that dev
3  instruction, in your view, a violation of the
4  injunction?
5      MR. POLITO: Objection. Incomplete
6  hypothetical. Vague. Object to the extent it calls
7  for a legal conclusion.
8      THE WITNESS: And, again, I'm going to read
9  a couple of things in here. Assuming, first of all,
10 that the dev instruction is created on Client A's
11 system and only ever used for Client A's system, and
12 it doesn't contain Oracle code, then the existence
13 of that document at that point does not constitute a
14 violation.
15     It's when that document is used to
16 propagate that solution for a benefit of another
17 customer. And so we're not talking a copying issue
18 here. We're really just talking a cross-use issue.
19     BY MR. VANDEVELDE:
20 Q.  How -- stepping aside from the
21 hypothetical -- and maybe just take this down. And
22 this will be the last short line of questioning.
23 Take down the exhibit.
24     How can Rimini implement the same update
25 for multiple clients without, in your view,

Page 148

1  violating the injunction?
2      MR. POLITO: Objection. Vague. Incomplete
3  hypothetical. Object to the extent it calls for a
4  legal conclusion.
5      THE WITNESS: I wasn't asked, Counsel, to
6  specifically identify or address how Rimini could
7  adjust its business practices to ensure that it
8  didn't fall afoul of the injunction. So I haven't
9  thought that hypothetical through with sufficient
10 diligence to be able to offer you any answer of how
11 they could do that.
12     As I said in my other deposition, I think,
13 the first point would be perhaps to confer with
14 their counsel to get guidance on what actions are
15 permitted and what actions are not permitted. And
16 then to address their business process accordingly
17 in ways --
18     BY MR. VANDEVELDE:
19 Q.  So Rimini -- if -- if Rimini identified --
20 if Rimini has a Client A that has a very serious
21 bug, it's very serious, it causes a complete
22 malfunction. The PeopleSoft software is not able to
23 function properly. And it's a very simple fix. It
24 requires the deletion of one line in an Oracle file.
25 And 50 other clients have the same version of

Page 161

BY MR. VANDEVELDE:
Q. So in this paragraph, on the fourth line, you said:
  "Instead of developing updates only as needed and only for a particular customer, Rimini groups customers together and provides semi-regular software bundles, such that multiple customers receive the same updates."
  What do you mean by "only as needed"?
A. Well, as discussed probably in more detail in my Rimini II report, it's clear that Rimini was attempting to consolidate some of the code, for instance, the tax --
  (Stenographer clarification.)
  THE WITNESS: -- the tax960st, I believe, was the one I discussed in my first report, with an eye to moving the customer base towards a more consolidated code base that would be easier for Rimini to maintain with blanket changes that could be issued to all customers.
  And so what I'm talking about there is the fact that obviously for Rimini, if groups of customers have exactly the same software -- and they had developed tools to verify that they used in the

Page 162

preinjunction period. They are able to determine that the exact same change could be sent to a customer.
  And in many cases, the testing can also be shortcut so that they don't have to do a full test, but rather a partial test, to take advantage of the symmetry in those environments.
  BY MR. VANDEVELDE:
Q. Did you identify in your analysis in this case any update implemented for a client after the injunction that you contend the client did not need?
A. I don't recall specifically if I did or didn't, Counsel.
Q. If you did, would it be in your report?
A. It would be in my report, yes.
Q. Do you contend that the injunction prohibits Rimini from identifying and grouping customers together based upon what updates they need?
  MR. POLITO: Objection to the extent it calls for a legal conclusion.
  THE WITNESS: I don't think the injunction addresses Rimini's ability to document the versions of software, for instance, that its customers are using. It's rather grouping them from the

Page 163

standpoint of distributing updates and using updates that were developed on one customer's machine to distribute to multiple customers. That's my understanding.
  BY MR. VANDEVELDE:
Q. Is the grouping alone sufficient to violate the injunction in your view, or is it only once the updates are delivered or implemented for each of the clients in that grouping?
  MR. POLITO: Objection. Compound.
  THE WITNESS: You lost me a little bit there, Counsel. Can you just ask the question, again or ask it as a two-part question so I can address each part individually?
  BY MR. VANDEVELDE:
Q. Is the grouping in and of itself, in your view, a violation of the injunction, meaning identifying the group of clients that may need a particular update?
  MR. POLITO: Objection. Asked and answered.
  THE WITNESS: Yeah, I don't think that identifying what software customers are using or what updates they might be is -- or what -- what parts of that software Rimini update is enjoined.

Page 164

BY MR. VANDEVELDE:
Q. Got it.
  Do you contend that the injunction prohibits updates if they are put out on a semi-regular basis?
  MR. POLITO: Objection. Vague.
  THE WITNESS: To the extent that they're developed on one customer's environment and then distributed to other customers, it's my understanding that that -- whether it's a regular basis or a sporadic basis wouldn't matter. It's the action that they're taking that matters.
  MR. VANDEVELDE: If we could show paragraph 41 of the same document.
  BY MR. VANDEVELDE:
Q. I won't read the whole paragraph, but this paragraph pertains to Rimini's quality assurance -- QA process; correct?
A. That's correct, yes.
Q. And you contend that in certain ways, Rimini's QA process constitutes cross-use, in violation of the injunction?
A. To the extent that they are creating test plans or test data or test results on one customer's machine and then reusing those for the support of

Page 213

1    Whereas the system is typically the -- as
2    I've defined elsewhere in my report, it's the actual
3    computer and the software that constitutes how it's
4    configured for a particular purpose.  So --
5        BY MR. VANDEVELDE:
6    Q.  The --
7    A.  -- the software -- the computer with the
8    software running on it.
9    Q.  Can a virtual machine ever be a computer
10   system?
11       MR. POLITO: Objection.  Overbroad.  Object
12   to the extent it calls for a legal conclusion.
13       THE WITNESS: A virtual machine is really,
14   from a technical perspective, a very smart piece of
15   software that pretends to be a computer system.  But
16   the virtual machine doesn't have an independent
17   existence.  It must still run on a physical computer
18   system.
19       So I would draw a distinction between a
20   virtual machine and a computer system for that as
21   well as for other reasons.
22       BY MR. VANDEVELDE:
23   Q.  So the answer is, no, you don't think
24   there's any distinction?  Sorry.  You think that a
25   virtual machine can never be a computer system?

Page 214

1        MR. POLITO: Same objections.
2        THE WITNESS: A virtual machine can provide
3    the services comparable to those provided by -- or
4    perhaps even almost identical to those provided by a
5    particular computer system, but it is separate from
6    the computer system upon which it runs, even if
7    there's only one virtual machine on the system.
8        BY MR. VANDEVELDE:
9    Q.  You refer in your paragraph 14 to Amazon
10   Web Services.
11       Did you analyze any client's Amazon Web
12   Services account in connection with this report or
13   your analysis in this case?
14   A.  I do not recall specific analysis with
15   respect to any AWS account, no.  But I am aware that
16   there are some AWS accounts from the work that I did
17   in the Rimini II case.
18   Q.  Are you aware -- or sorry.  Strike that.
19       Did you determine that any Rimini clients
20   stored their PeopleSoft software support materials
21   in any AWS account after the injunction was entered
22   in this case?
23       MR. POLITO: Objection.  Vague.
24       THE WITNESS: I'm sorry.  Would you ask
25   that again, Counsel.  Am I aware that who stored the

Page 215

1    PeopleSoft materials?
2        BY MR. VANDEVELDE:
3    Q.  Did you determine that any Rimini client
4    stored their PeopleSoft software support materials
5    in any AWS account after the injunction was entered
6    in this case?
7        MR. POLITO: Objection.  Vague.  Compound.
8        THE WITNESS: Give me just a moment to
9    reflect, Counsel.  I don't recall rendering an
10   opinion on that.
11       Can you ask the question one more time?
12       BY MR. VANDEVELDE:
13   Q.  Did you determine that any Rimini client
14   stored their PeopleSoft software and support
15   materials in any AWS account after the injunction
16   was entered in this case?
17       MR. POLITO: Same objections.
18       THE WITNESS: As I sit here, I do not
19   recall offering any opinion on customer's behavior
20   with respect to where they were storing materials in
21   an AWS account.
22       BY MR. VANDEVELDE:
23   Q.  In this paragraph 14, you say:
24       "The plain meaning of 'facilities' is
25       limited to locations or premises owned or

Page 216

1        leased."
2        Let's pause there.
3        Is there a difference in your mind between
4    locations and premises?
5    A.  There is somewhat.  I mean, I have visited,
6    for instance, colocation premises that had within
7    their facility a -- specific locations, for
8    instance, a particular floor of the premise might be
9    dedicated to a specific customer, or a specific cage
10   within the facility might be dedicated to a specific
11   customer for security reasons.  So I don't think of
12   the two as being identical.
13   Q.  Which one is which?  I don't understand
14   your example.  Which one is the location?  Which one
15   is the premise?
16   A.  The premise generally would correspond to
17   the geographical position of a building or a campus,
18   and the location might further refine premise by
19   identifying a specific building or floor or cage
20   within that location.
21   Q.  And so when you mean "location," does that
22   mean only physical locations?
23       MR. POLITO: Objection.  Overbroad.
24       THE WITNESS: That is my understanding of
25   it with respect to facilities, yes.  It's a

Page 253

1 would at least shut off access to the machines if a
2 customer wasn't paying for them. So the control
3 seems to be with Windstream and Rimini.
4     BY MR. VANDEVELDE:
5 Q. So you are offering an opinion as to who
6 controls a cloud account holder's virtual machine as
7 between a cloud provider and a cloud account holder?
8     MR. POLITO: Objection. Sorry. Objection.
9 Vague. Compound. Objection to the extent it calls
10 for a legal conclusion.
11     THE WITNESS: I think you're giving me an A
12 or a B choice, Counsel. And what I'm saying here is
13 that in the case of the dev and test environments
14 used for PeopleSoft, there actually -- actually,
15 there's a third party in the picture, Rimini.
16     So you have the customer, who may be the
17 account holder of record with Windstream in terms of
18 payment. You have Windstream, who ultimately
19 controls whether that environment continues to spin
20 up if somebody doesn't pay. And then you have
21 Rimini, who dictates the control and access to
22 the -- to the specific computer.
23     BY MR. VANDEVELDE:
24 Q. Did you consider whether control can be
25 delegated in that situation?

Page 254

1     MR. POLITO: Objection. Vague. Incomplete
2 hypothetical. I apologize. I muted myself before I
3 was done. Object to the extent it calls for a legal
4 conclusion.
[redacted]

Page 255

[redacted]
9 Q. Did you analyze any, for example, access
10 control lists for those virtual machines?
11 A. In the context of this case, I don't
12 believe that I was given ACL lists. I did look at
13 some ACL lists in the context of the Rimini II
14 matter, where, in most cases, it appeared that the
15 users that had been defined to the machine were
16 primarily or exclusively Rimini users.
17 Q. That's not evidence that after the entry of
18 the injunction, is it?
19     (Stenographer clarification.)
20     MR. VANDEVELDE: After entry of the
21 injunction, is it?
22     MR. POLITO: Objection. To the extent it
23 calls for a legal conclusion. Objection. Vague.
24     THE WITNESS: I would have to look back to
25 the specific dates that that material was produced.

Page 256

1     BY MR. VANDEVELDE:
2 Q. Did you review any access control lists
3 after the entry of the injunction?
4 A. You're asking did I review any after that
5 point in time? Not were any of the ones I reviewed
6 from after that point in time, if I'm understanding
7 your question.
8 Q. Good clarification.
9     Did you review any access control list that
10 were created or that -- as they existed after entry
11 of the injunction?
12 A. And that's what I was saying. I don't know
13 without looking back to the specific dates on
14 materials I received. I couldn't say dispositively
15 that I had not because I don't recall the dates of
16 those materials. And there was some overlap in
17 Rimini's later productions with the time frame, if
18 I'm recalling the time frame of their productions
19 correctly.
20 Q. Did you analyze any access control lists in
21 your report in this Rimini I proceeding?
22 A. I do not.
23 Q. Okay. Did you analyze any network
24 configurations for virtual machines in your report
25 in this proceeding?

Page 257

1  A.  Beyond identifying some of the
2  ▮ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬
3  ▮ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬
4  ▮
5  Q.  Did you analyze whether a -- folder
6  permissions on client systems after entry of the
7  injunction?
8      MR. POLITO: Objection.  Vague.  Overbroad.
9  Incomplete hypothetical.
10     THE WITNESS: Again, Counsel, I'm not sure
11  that I received any evidence for folder permissions
12  that I know as I sit here to be after the time
13  period of the injunction.  So I'm not able to answer
14  that question without looking back to the underlying
15  evidence and identifying the dates that I have.  I
16  would present that analysis in my report.
17     BY MR. VANDEVELDE:
18  Q.  Your report doesn't analyze any folder
19  permissions after entry of the injunction; correct?
20  A.  There may be a quotation in there from -- I
21  believe it was COE, about what the customer was
22  representing with respect to its access, but I did
23  not verify individual folder permission accesses or
24  comment on any in this report.
25  Q.  Your report doesn't analyze the

Page 258

1  installation of any software -- or uninstallation of
2  any software, does it?
3      MR. POLITO: Objection.  Compound.  Vague.
4      THE WITNESS: I would have to refresh my
5  recollection with respect to whether any of the dev
6  instructions specifically uninstalled programs or
7  replaced them in the provision of the update.  But
8  beyond something like that, I don't recall anything
9  that would have been in this report.
10     BY MR. VANDEVELDE:
11  Q.  Your report doesn't analyze the
12  configurations of client machines, does it?
13  A.  I provide some analysis with respect to the
14  AFW configurations in the way that those client
15  machines -- based on the somewhat limited evidence I
16  have, interact with AFW on Rimini's servers.  So I
17  do provide some analysis specifically directed to
18  the AFW and FTP servers.
19  Q.  Do you provide any --
20  A.  I don't talk about their configuration in
21  any more broader sense.  It's very specific to the
22  facts of this case.
23  Q.  Are you holding yourself out as an expert
24  in ERP software licensing?
25  A.  No.  That is not expertise that I was hired

Page 259

1  for in this matter.
2  Q.  In preparing your report, did you speak to
3  anyone who worked at PeopleSoft?
4  A.  By "PeopleSoft," I assume you're including
5  the parent company, Oracle.
6  Q.  Let's break it down.
7      Before the acquisition, did you speak to
8  anyone who worked at PeopleSoft before Oracle
9  acquired it?
10  A.  I don't know whether any of the Oracle
11  individuals with whom I spoke in the preparation of
12  the Rimini report may have worked for Oracle
13  before -- or may have worked for PeopleSoft before
14  the acquisition because I know some employees
15  transferred over.  So I don't know the answer to
16  that as I sat here.
17  Q.  I believe at the outset of this deposition,
18  you said you had not spoken to any Oracle employees
19  in connection with the preparation of your report in
20  this matter.
21     Is that still the case?
22  A.  In preparation with -- with respect to the
23  reports in the post-injunction matter.  The only
24  Oracle individual I can recall speaking with at all
25  was counsel for Oracle, not any of their technical

Page 260

1  people.  And I think he was on a couple of calls I
2  was on.  I don't recall any specific in-depth
3  conversations with him at all, but I am aware that
4  he was present on a couple of calls.
5  Q.  Do you know -- do you know whether he
6  worked at PeopleSoft?
7  A.  I don't know that.  I don't know that at
8  all.  And so that's what I'm saying is I really
9  don't know.  But he's the only Oracle individual
10  that I can recall having even said hello to since
11  the beginning of this report -- or these reports,
12  actually.  My opening report and the rebuttal
13  report.
14  Q.  Are you offering any facts about what may
15  or may not have motivated PeopleSoft to include
16  facilities restriction in some of their licensing
17  agreements?
18     MR. POLITO: Objection.  Calls for a legal
19  conclusion.
20     THE WITNESS: I provide, I believe, my
21  understanding of why such a -- why such a
22  restriction might exist from a technical basis, but
23  I do not opine specifically on Oracle or
24  PeopleSoft's motives in implying that.
25     I just give some technical background about

Page 261

1  why virtualized machines are different than physical
2  machines, and why some of those considerations might
3  be something that a licensor of software might want
4  to consider.
5      BY MR. VANDEVELDE:
6  Q.  Who would you think has superior knowledge
7  of the intent behind the provisions in Oracle's
8  PeopleSoft licenses, yourself or Richard Allison,
9  who is Oracle's executive vice president and head of
10 licensing?
11     MR. POLITO: Objection. Vague. Outside
12 the scope. To the extent it calls for a legal
13 conclusion.
14     THE WITNESS: You're saying who -- who have
15 more understanding of Oracle's motivations?
16     BY MR. VANDEVELDE:
17 Q.  Or the PeopleSoft software licenses, you or
18 Richard Allison, who's head of licensing at Oracle?
19     MR. POLITO: Same objections.
20     THE WITNESS: I don't know the answer to
21 that because I don't know if Mr. Allison was there
22 when those licenses were written. But if he was,
23 then he would be in a much better position than I to
24 speak to Oracle or PeopleSoft's motivation. And if
25 he wasn't, then it's probably somebody else that you

Page 262

1  haven't named yet.
2      MR. VANDEVELDE: Why don't we take a
3  10-minute break that if works for you.
4      MR. POLITO: That's okay with me.
5      Barb?
6      THE WITNESS: Works fine for me.
7      MR. VANDEVELDE: Great. Let's do that.
8  Thank you.
9      THE VIDEOGRAPHER: The time is 4:33. We
10 are going off the record.
11     (Recess taken, from 4:33 to 4:46.)
12     THE VIDEOGRAPHER: The time is 4:46. We
13 are back on the record.
14     BY MR. VANDEVELDE:
15 Q.  Ms. Frederiksen-Cross, you understand
16 you're still under oath?
17 A.  I do.
18 Q.  Would you agree that JDE support customers
19 may need tax updates, tax, legal, and regulatory
20 updates?
21 A.  I would expect that they might, yes.
22 Q.  Okay. So if the law changes, if a JDE
23 client licensee can't update their software, then
24 that would pose a problem for them?
25     MR. POLITO: Objection. Overbroad.

Page 263

1      THE WITNESS: If a JDE client using that
2  software was unable to update it to accommodate some
3  change in law, I think that would be problematical
4  for them if they were using that part of the
5  software.
6      BY MR. VANDEVELDE:
7  Q.  Let's look at your opening report, which is
8  1854. Paragraph 313, if that could be put up. It's
9  towards the end. Around page 115, although mine
10 might be paged slightly differently.
11 A.  That's the paragraph that says "based on my
12 experience in the industry"?
13 Q.  Yeah. It says "Based" --
14 A.  At PDF -- or at page 116 of the printed
15 copy, and it's probably off by a few in the PDF.
16 Q.  Okay. Great. Yeah, there it is.
17     It says:
18     "Based on my experience in the
19     industry and my review of JD Edwards
20     support materials, 'open code' and
21     'closed code' are both 'source code.'
22     'Source code' means source code: Code in
23     human-readable format."
24     Does opening a code file, regardless of
25 whether it's open code or closed code, cause the

Page 264

1  file to be temporarily copied into RAM?
2      MR. POLITO: Objection. Assumes facts.
3  Vague.
4      THE WITNESS: At least a part of the file
5  would be typically -- or will be copied into RAM.
6  And, you know, in modern systems, it's normally the
7  whole file.
8      BY MR. VANDEVELDE:
9  Q.  And so viewing the file would also cause a
10 copy of at least a portion of the file to be loaded
11 into RAM?
12     MR. POLITO: Same objections.
13     THE WITNESS: That is correct, yes.
14     BY MR. VANDEVELDE:
15 Q.  And necessarily modifying a code file,
16 regardless of whether it's open or closed, would
17 necessitate a portion or all of that file being
18 copied into RAM?
19     MR. POLITO: Objection. Assumes facts.
20 Vague.
21     THE WITNESS: Short of using a -- a desk
22 editor against the raw bytes of the disk, to edit a
23 file it would necessitate copying it into RAM.
24     BY MR. VANDEVELDE:
25 Q.  Same with compiling the file?

Page 269

1  A.  That is correct.
2  Q.  So by logic, you're testifying that Rimini
3  is prohibited under the injunction from opening a
4  JDE code file regardless of whether it's open or
5  closed code?
6  A.  That appears to be consistent with the
7  language of the -- I mean, that is my understanding
8  as a technical person of this language.
9      If I was told I could not copy a file, I
10 would read from that, as a software engineer, that I
11 could not modify that file.
12 Q.  And you couldn't even view that file;
13 correct?
14 A.  That's correct as well.
15 Q.  And you couldn't compile that file?
16 A.  That is also correct.
17 Q.  How could Rimini direct, even assuming it's
18 allowed, the licensee to take certain actions,
19 without being able to look at any of the code?
20      MR. POLITO: Objection.  Incomplete
21 hypothetical.
22      THE WITNESS: That's an interesting
23 question, Counsel.  And, again, another thing that I
24 was not asked to analyze or tried to discover in the
25 course of my work.  So I don't have an answer for

Page 270

1  that.
2      BY MR. VANDEVELDE:
3  Q.  Let's turn to the Oracle database.
4      When an Oracle database is run, is the
5  Oracle database software, or at least a portion of
6  it, temporarily loaded -- temporarily loaded into
7  RAM?
8  A.  Yes, it is.
9  Q.  And would you agree that Oracle database
10 needs to be running to, for example, run a query
11 against the database?
12 A.  So long as the query is against the Oracle
13 database and not some other type of database, yes.
14 Q.  Okay.  And so to develop a query and to
15 test that query, you would need to run it against
16 the Oracle database, which would need to be in RAM;
17 correct?
18 A.  The database management software would be
19 in RAM.  The portions of the data you were querying
20 or portions of the data that make up that database
21 would be brought into RAM as the query ran.
22      But you probably wouldn't -- if it was a
23 large database, you would probably do that in
24 chunks.  You wouldn't bring the entire database into
25 RAM.

Page 271

1  But if your point is that the database --
2  the software that controls the database and that
3  performs the search has to be in RAM, I would agree
4  with you.
5  Q.  Does configuring Oracle database and then
6  testing those configurations require running the
7  database software?
8      MR. VANDEVELDE: Objection.  Overbroad.
9  Exceeds the scope.
10     THE WITNESS: Some configuration options,
11 those that are done through central configuration
12 files, can be done without running the database.
13 But significant changes that would affect the
14 database operation, you know, the allocation of
15 storage, the allocation of buffers, any kind of
16 structuring change, those would require the DBMS
17 software to be brought into memory --
18     (Stenographer clarification.)
19     THE WITNESS: -- the database management
20 software to be brought into memory and run in order
21 for you to make that change.
22     BY MR. VANDEVELDE:
23 Q.  Even for simple -- what you call simple
24 configurations, if you wanted to test those simple
25 configurations, you would have to run the database

Page 272

1  software?
2  A.  In virtually all circumstances.  There may
3  be some configurations that you could change, that
4  you could test without that.  For instance,
5  redirecting the software to a new location for
6  storage of data.  You might be able to confirm that
7  the data was being stored in that location by
8  looking at the storage records of the operating
9  system.
10     But to see if the data looked right or if
11 there was any defect in that process or any
12 unintended consequence, you would need to test it,
13 and that would mean running the software.
14 Q.  Oracle database can be run on its own,
15 right, meaning without an application layer on top
16 of it?
17 A.  It does provide some built-in
18 functionality, yes.
19 Q.  And you could also have Oracle database
20 serve as a -- serve as a database for an -- sorry.
21 Strike that.
22     You can also have Oracle database serve as
23 a database underneath an ERP application; correct?
24 A.  Some ERP applications, yes.
25 Q.  One of them is PeopleSoft; correct?

Page 273

1  A.  Sure.
2  Q.  JDE is another one?
3  A.  M-hm.  That's correct.  Yes.
4  Q.  Also non-Oracle ERP applications, like SAP
5  ERP applications; correct?
6  A.  I am aware that there are other vendors who
7  provide ERP applications that run on Oracle.  I just
8  can't answer in the absolute that every ERP
9  application out there can run on Oracle.  I
10  suspect --
11  Q.  I'm not asking you that.  I'm asking
12  whether SAP is one of them that can run an Oracle
13  database.
14  A.  My recollection is that it is, yes.
15  Q.  Assume there's a PeopleSoft environment,
16  and its underlying database is Oracle database.
17      If you develop and test updates for that
18  PeopleSoft environment that interact with the
19  underlying Oracle database, that would require that
20  Oracle database or a portion of it be run and loaded
21  into memory; correct?
22      MR. POLITO: Objection.  Incomplete
23  hypothetical.
24      BY MR. VANDEVELDE:
25  Q.  Did you say "correct"?

Page 274

1  A.  Yeah, if you were -- if you were actually
2  testing the application and the part of it that used
3  the database, that would be true for certain, yes.
4  Q.  And that's true if SAP or the Application
5  Layer 2; correct?
6      MR. POLITO: Same objection.
7      THE WITNESS: I haven't analyzed the SAP
8  code, so I can't address whether there are corner
9  cases where that might not be true.
10      But as a general principle, if SAP is
11  running on top of Oracle and you are testing any
12  change to SAP that affects its interaction with the
13  Oracle database, that would be true.
14      BY MR. VANDEVELDE:
15  Q.  Do you contend that the injunction
16  prohibits Rimini from running Oracle database?
17      MR. POLITO: Object to the extent it calls
18  for a legal conclusion.
19      THE WITNESS: My understanding of the
20  injunction is that the court has said specifically
21  that Rimini Street shall not reproduce, prepare
22  derivative works from, or distribute Oracle database
23  software.
24      And so based on just the plain meaning of
25  those words, again, as a technical person, I would

Page 275

1  be concerned that the prohibition against
2  reproducing the software could extend to not even
3  making a copy in memory because that is reproducing
4  at least a part of the software, the part that
5  you're interacting with.
6      BY MR. VANDEVELDE:
7  Q.  Are you offering that opinion?
8  A.  Well, it --
9      MR. POLITO: Same objection.
10      THE WITNESS: You're asking me to make a
11  legal interpretation of the court's ruling.  I'm
12  telling you how I would understand it as a technical
13  person, that if Rimini is reproducing the Oracle
14  software -- that is to say, creating a copy of it --
15  that that would be a prohibited act.  That's my
16  understanding as a technical person reading the
17  words the court wrote.
18      BY MR. VANDEVELDE:
19  Q.  Even if that copy is only in RAM?
20      MR. POLITO: Same objections.
21      THE WITNESS: I don't see any carve-out for
22  RAM copies in the injunction, Counsel, so I would
23  have to assume, absent other clarification, that
24  that would mean even copies in RAM.
25  ///

Page 276

1      BY MR. VANDEVELDE:
2  Q.  Even a portion of it?
3      MR. POLITO: Same objection.
4      THE WITNESS: Even a portion would be
5  Oracle database software.  So to the extent that
6  that portion was a portion of the Oracle database
7  software, it appears to me to be prohibited here
8  based on the clear wording of the injunction.
9      BY MR. VANDEVELDE:
10  Q.  Do you recall whether the Ninth Circuit
11  ever analyzed the issue of RAM copies in this case?
12      MR. POLITO: Object to the extent it calls
13  for a legal conclusion.  Overbroad.  Outside the
14  scope.
15      THE WITNESS: I don't recall specifically.
16  I was thinking of that as I gave you my answer,
17  Counsel, because I don't recall specifically that
18  they were ruling on that.  But if you want to direct
19  me to any part of their ruling, I'm happy to review
20  it with you.
21      BY MR. VANDEVELDE:
22  Q.  No.  I'm asking you whether you recall the
23  Ninth Circuit discussing RAM copies.  It sounds like
24  no, but if you recall something, let me know.
25      MR. POLITO: Same objection.  Asked and

Case 2:10-cv-00106-LRH-VCF   Document 1383-15   Filed 07/31/20   Page 14 of 14

Oracle v.
Rimini Street
HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
Barbara Frederiksen-Cross
June 19, 2020

Page 293

1  on that kind of system, it might be in the same
2  physical block of memory, but it is a different
3  chunk of memory that's allocated to the video
4  processor.  And where a separate processing units is
5  completely separate.
6      BY MR. VANDEVELDE:
7  Q.  Is that -- okay.  And I'm going to use the
8  word "video buffer" --
9      (Stenographer clarification.)
10     BY MR. VANDEVELDE:
11 Q.  I'm going to use the phrase "video buffer."
12     Is that display adapter memory continually
13 painting the pixels on the screen to display an
14 image?
15 A.  Typically it is, yes.
16 Q.  Many times a second?
17 A.  Again, typically it is 60 cycles or better
18 normally for ...
19     MR. VANDEVELDE: Okay.  Why don't we take a
20 quick break.  I think we're getting close.
21     Does that work with you, Barbara and John?
22     MR. POLITO: Fine with me.
23     MR. VANDEVELDE: Okay.  Let's do ten more
24 minutes.  I think we're close.  All right.  Thank
25 you.

Page 294

1      THE VIDEOGRAPHER: The time is 5:27.  We
2  are going off the record.
3      (Recess taken, from 5:27 to 5:45.)
4      THE VIDEOGRAPHER: The time is 5:45.  We
5  are back on the record.
6      MR. VANDEVELDE: We have no further
7  questions at this time.
8      MR. POLITO: All right.  Give us five
9  minutes.
10     MR. VANDEVELDE: Okay.
11     THE VIDEOGRAPHER: The time is 5:45, and we
12 are going off the record.
13     (Recess taken, from 5:45 to 5:53.)
14     THE VIDEOGRAPHER: The time is 5:53.  We
15 are back on the record.
16     MR. POLITO: Great.
17     So Oracle has no questions.  Thanks very
18 much.
19     MR. VANDEVELDE: Great.  Thanks all.  Have
20 a good evening and --
21     THE VIDEOGRAPHER: The time is --
22     (Simultaneous speakers - unclear.)
23     MR. POLITO: We have a protective order
24 agreement in this case, so just -- this is highly
25 confidential until it's redesignated/dedesignated as

Page 295

1  agreed by the parties.
2      THE VIDEOGRAPHER: Shall we go off the
3  record now?
4      MR. POLITO: Yes, please.
5      MR. VANDEVELDE: Thanks, everyone, for you
6  help.  Have a good evening.
7      (Stenographer clarification.)
8      THE VIDEOGRAPHER: The time is 5:54.  This
9  concludes the deposition.  Thank you.
10     THE STENOGRAPHER: Okay.  I just need to
11 check.
12     Eric, you have a standing order.
13     And, John, do you also need the e-mailed
14 rough and a 2-day expedite also?
15     MR. POLITO: I'm sure we have a standing
16 order.  I probably don't have the authority to
17 change it, so ...
18     THE STENOGRAPHER: Okay.  I don't see the
19 standing order on here.  I can double-check, but if
20 it sounds right to you --
21     MR. POLITO: It sounds right to me.  I can
22 have our paralegal reach out to you with
23 confirmation because she is the person in charge.
24     THE STENOGRAPHER: Sounds good.  All right.
25     (Deposition concluded at 5:54 p.m.)

Page 296

1                  REPORTER'S CERTIFICATE
2           I, LORRIE L. MARCHANT, Certified Shorthand
3  Reporter, Certificate No. 10523, for the State of
4  California, hereby certify that BARBARA
5  FREDERIKSEN-CROSS  was by me duly sworn/affirmed to
6  testify to the truth, the whole truth and nothing
7  but the truth in the within-entitled cause; that
8  said deposition was taken at the time and place
9  herein named; that the deposition is a true record
10 of the witness's testimony as reported to the best
11 of my ability by me, a duly certified shorthand
12 reporter and a disinterested person, and was
13 thereafter transcribed under my direction into
14 typewriting by computer; that request [  ] was [ X ]
15 was not made to read and correct said deposition.
16          I further certify that I am not interested
17 in the outcome of said action, nor connected with,
18 nor related to any of the parties in said action,
19 nor to their respective counsel.
20          IN WITNESS WHEREOF, I have hereunto set my
21 hand this 22nd day of June, 2020.
22
23          _____
24          LORRIE L. MARCHANT, RMR, CRR, CCRR, CRC
           Stenographic Certified Shorthand Reporter #10523
25