GIBSON, DUNN & CRUTCHER LLP
MARK A. PERRY (*pro hac vice*)
1050 Connecticut Avenue, N.W.
Washington, DC  11101
Telephone: 202.955.8500
mperry@gibsondunn.com

GIBSON, DUNN & CRUTCHER LLP
JEFFREY T. THOMAS (*pro hac vice*)
BLAINE H. EVANSON (*pro hac vice*)
JOSEPH A. GORMAN (*pro hac vice*)
CASEY J. MCCRACKEN (*pro hac vice*)
3161 Michelson Drive
Irvine, CA  92612-4412
Telephone: 949.451.3800
jtthomas@gibsondunn.com
bevanson@gibsondunn.com
jgorman@gibsondunn.com
cmccracken@gibsondunn.com

GIBSON, DUNN & CRUTCHER LLP
SAMUEL LIVERSIDGE (*pro hac vice*)
ERIC D. VANDEVELDE (*pro hac vice*)
333 South Grand Avenue
Los Angeles, CA  90071-3197
Telephone: 213.229.7000
sliversidge@gibsondunn.com
evandevelde@gibsondunn.com

*Attorneys for Defendant*
*Rimini Street, Inc.*

RIMINI STREET, INC.
DANIEL B. WINSLOW (*pro hac vice*)
6601 Koll Center Parkway, Suite 300
Pleasanton, CA 94566
Telephone: (925) 264-7736
dwinslow@riministreet.com

RIMINI STREET, INC.
JOHN P. REILLY (*pro hac vice*)
3993 Howard Hughes Parkway, Suite 500
Las Vegas, NV 89169
Telephone: (336) 908-6961
jreilly@riministreet.com

HOWARD & HOWARD ATTORNEYS PLLC
W. WEST ALLEN (Nevada Bar No. 5566)
3800 Howard Hughes Parkway, Suite 1000
Las Vegas, NV 89169
Telephone: (702) 667-4843
wwa@h2law.com

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| ORACLE USA, INC., et al., | Case No. 2:10-cv-00106-LRH-VCF |
| Plaintiffs, | **MOTION TO EXCLUDE DECLARATION AND OPINIONS OF ORACLE'S EXPERT, BARBARA FREDERIKSEN-CROSS** |
| v. | |
| RIMINI STREET, INC., et al., | **ORAL ARGUMENT REQUESTED** |
| Defendants. | ***PUBLIC REDACTED VERSION*** |

1

# TABLE OF CONTENTS

2

Page

3    I. INTRODUCTION ........................................................................................................1

4    II. LEGAL STANDARD ...............................................................................................3

5    III. ARGUMENT ..........................................................................................................4

6          A.    Ms. Frederiksen-Cross's Opinions Are Unreliable Because They Are
                Based On Unsound Methodologies And The Wrong Legal Standards .............5

7
                1.    The "Copying" Opinions Failed To Apply A Required
8                      Methodology ........................................................................................5

9                2.    The "Derivative Works" Opinions Applied the Wrong Legal
                      Standard ............................................................................................12

10
                3.    The "Distribution" Opinions Applied the Wrong Legal Standard........15

11
          B.    The BFC Declaration Is Irrelevant Because Process 2.0 Is More Than
12               Colorably Different From Process 1.0 ................................................................18

13               1.    The BFC Declaration Ignores The *TiVo* Standard ...............................20

14               2.    The Opinions Regarding So-Called "Cross-Use" Highlight The
                      Irrelevance Of The BFC Declaration ....................................................21

15    IV. CONCLUSION........................................................................................................24

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*A.A. v. Raymond*,
  2013 WL 3816565 (E.D. Cal. July 22, 2013) .................................................................4

*Abbott Labs. v. TorPharm, Inc.*,
  503 F.3d 1372 (Fed. Cir. 2007).....................................................................................4

*Antonick v. Elec. Arts, Inc.*,
  2014 WL 245018 (N.D. Cal. Jan. 22, 2014) .................................................................8

*Antonick v. Elec. Arts, Inc.*,
  841 F.3d 1062 (9th Cir. 2016).........................................................................2, 12, 15

*Apple Comput., Inc. v. Microsoft Corp.*,
  35 F.3d 1435 (9th Cir. 1994)..........................................................1, 5, 6, 7, 10

*Atari Games Corp. v. Nintendo of Am. Inc.*,
  975 F.2d 832 (Fed. Cir. 1992) ........................................................................................6

*Atl. Recording Corp. v. Howell*,
  554 F. Supp. 2d 976 (D. Ariz. 2008)......................................................................16, 17

*Estate of Barabin v. AstenJohnson, Inc.*,
  740 F.3d 457 (9th Cir. 2014).........................................................................................3

*Brown Bag Software v. Symantec Corp.*,
  960 F.2d 1465 (9th Cir. 1992).................................................................................5, 6

*Cartoon Network LP, LLLP v. CSC Holdings, Inc.*,
  536 F.3d 121 (2d Cir. 2008)........................................................................................16

*Cavalier v. Random House, Inc.*,
  297 F.3d 815 (9th Cir. 2002)..................................................................................6, 10

*Comput. Assocs. Int'l v. Altai, Inc.*,
  982 F.2d 693 (2d Cir. 1992) .........................................................................................6

*Copeland v. Bieber*,
  2016 WL 7079569 (E.D. Va. Sept. 8, 2016)................................................................11

*Daubert v. Merrell Dow Pharm., Inc.*,
  509 U.S. 579 (1993)...............................................................................................1, 3

*Digital Drilling Data Sys., L.L.C. v. Petrolink Servs., Inc.*,
  --- F.3d ---, 2020 WL 3603953 (5th Cir. 2020) .........................................................8

Gibson, Dunn & Crutcher LLP

# TABLE OF AUTHORITIES
(continued)

Page(s)

*DropzoneMS, LLC v. Cockayne*,
  2019 WL 7630788 (D. Or. Sept. 12, 2019)...........................................................1, 10, 11

*Ellis v. Costco Wholesale Corp.*,
  657 F.3d 970 (9th Cir. 2011)...................................................................................4

*Ets-Hokin v. Skyy Spirits, Inc.*,
  225 F.3d 1068 (9th Cir. 2000)................................................................................7

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*,
  499 U.S. 340 (1991)................................................................................................5

*Gates Rubber Co. v. Bando Chem. Indus., Ltd.*,
  9 F.3d 823 (10th Cir. 1993)..........................................................................6, 7, 10

*Kaseberg v. Conaco, LLC*,
  2019 WL 1641161 (S.D. Cal. Apr. 16, 2019)....................................................3, 11

*Lewis Galoob Toys, Inc. v. Nintendo of Am., Inc.*,
  964 F.2d 965 (9th Cir. 1992)..................................................................................12

*Litchfield v. Spielberg*,
  736 F.2d 1352 (9th Cir. 1984)................................................................................12

*Lust By & Through Lust v. Merrell Dow Pharm., Inc.*,
  89 F.3d 594 (9th Cir. 1996).....................................................................................3

*Mayo Clinic v. Elkin*,
  2010 WL 5421322 (D. Minn. Dec. 27, 2010)........................................................11

*McCullough Tool Co. v. Well Surveys, Inc.*,
  395 F.2d 230 (10th Cir. 1968)................................................................................24

*Micro Star v. Formgen Inc.*,
  154 F.3d 1107 (9th Cir. 1998).....................................................................1, 12, 15

*Mirage Editions, Inc. v. Albuquerque A.R.T. Co.*,
  856 F.2d 1341 (9th Cir. 1988)................................................................................12

*Nationwide Transp. Fin. v. Cass Info. Sys.*,
  523 F.3d 1051 (9th Cir. 2008)...........................................................................1, 3

*nCube Corp. v. SeaChange Int'l, Inc*,
  732 F.3d 1346 (Fed. Cir. 2013)..............................................................................20

*Newton v. Diamond*,
  388 F.3d 1189 (9th Cir. 2004)..................................................................................8

Gibson, Dunn &
Crutcher LLP

# TABLE OF AUTHORITIES
(continued)

Page(s)

*In re Novatel Wireless Sec. Litig.*,
846 F. Supp. 2d 1104 (S.D. Cal. 2012) ...............................................................4

*Oracle USA, Inc. v. Rimini Street, Inc.*,
879 F.3d 948 (9th Cir. 2018).................................................................18, 21

*Paycom Payroll, LLC v. Richison*,
758 F.3d 1198 (10th Cir. 2014)...........................................................10

*Perfect 10, Inc. v. Amazon.com, Inc.*,
508 F.3d 1146 (9th Cir. 2007)...........................................................12

*Rentmeester v. Nike, Inc.*,
883 F.3d 1111 (9th Cir. 2018), *overruled on other grounds by Skidmore as*
*Tr. for Randy Craig Wolfe Tr. v. Zeppelin*, 952 F.3d 1051 (9th Cir. 2020)...................5, 6

*Sony Comput. Entm't, Inc. v. Connectix Corp.*,
203 F.3d 596 (9th Cir. 2000)...........................................................7

*TiVo Inc. v. EchoStar Corp.*,
646 F.3d 869 (Fed. Cir. 2011)...........................................................2, 4, 20

*United States v. Am. Soc'y of Composers, Authors & Publishers*,
627 F.3d 64 (2d Cir. 2010)...........................................................16

*Williamson Oil Co. v. Philip Morris USA*,
346 F.3d 1287 (11th Cir. 2003)...........................................................4

*Yesh Music, LLC v. Amazon.com, Inc.*,
249 F. Supp. 3d 645 (E.D.N.Y. 2017) ...........................................................17

**Statutes**

17 U.S.C. § 106(3) ...........................................................2, 15, 16, 17

17 U.S.C. § 502(a) ...........................................................1

**Rules**

Fed. R. Civ. P. 43(c)...........................................................4

Fed. R. Civ. P. 56(c)(2)...........................................................4

Fed. R. Evid. 402 ...........................................................3

Fed. R. Evid. 702 ...........................................................1, 3

**TABLE OF AUTHORITIES**
(continued)

Page(s)

**Treatises**

4 Nimmer on Copyright, § 13.03[F][1]..............................................................1, 6, 7

4 Nimmer on Copyright, § 13.03[F][2][b] .................................................................7

4 Nimmer on Copyright, § 13.03[F][3]...................................................................7, 8

4 Patry on Copyright, § 13:9 .................................................................................16

Gibson, Dunn &
Crutcher LLP

# I.     INTRODUCTION

Oracle's Motion for an Order to Show Cause (ECF No. 1368 ("OSC Mot.")) relies almost exclusively on the opinions of its professional expert witness, Barbara Frederiksen-Cross, as expressed in her Declaration (ECF No. 1368-1 ("BFC Decl.")).  Those opinions, however, are not admissible under Federal Rules of Evidence 702 and 402.  Accordingly, Rimini moves to exclude the Declaration and all opinions expressed therein, and objects to the Court's consideration of those opinions in connection with Oracle's OSC Motion.

***First,*** the Court entered the *Rimini I* injunction "pursuant to 17 U.S.C. § 502(a)" of the Copyright Act.  All of Ms. Frederiksen-Cross's opinions pertaining to the exclusive rights secured to Oracle by the Copyright Act are *unreliable*, and thus must be excluded, because she applied the wrong analytical methodology or an erroneous legal standard (or both).  *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993); *Nationwide Transp. Fin. v. Cass Info. Sys.*, 523 F.3d 1051, 1059 (9th Cir. 2008).  Ms. Frederiksen-Cross's opinions do not meet the standards imposed by Federal Rule of Evidence 702.

*Reproduction.*  Proof of "copying" between two works requires a specific methodology called "analytic dissection," which consists of filtering out the non-expressive (and not copyrightable) components of a work, and then comparing the remaining elements to determine whether the remaining similarities between *protected* elements are "substantial."  *Apple Comput., Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1443 (9th Cir. 1994); 4 Nimmer on Copyright, § 13.03[F][1].  Ms. Frederiksen-Cross failed to perform analytic dissection, and instead merely opined that certain lines of Rimini and Oracle code "match," without any consideration of whether that code is protectable.  Ms. Frederiksen-Cross committed *this exact same error* in a recent case, in which the court excluded her testimony and held that her failure to "distinguish[] unprotectable source code from purportedly protectable source code" compelled a finding of no infringement as a matter of law.  *DropzoneMS, LLC v. Cockayne*, 2019 WL 7630788, at *14 (D. Or. Sept. 12, 2019).  The same result is warranted here.

*Derivative Works.*  A derivative work must "substantially incorporate protected material from the preexisting work."  *Micro Star v. Formgen Inc.*, 154 F.3d 1107, 1110 (9th Cir. 1998).

This again necessitates analytic dissection, as the "substantially incorporate" test is practically identical to the "substantial similarity" test for reproductions. *Antonick v. Elec. Arts, Inc.*, 841 F.3d 1062, 1065–66 (9th Cir. 2016). Ms. Frederiksen-Cross failed to apply this methodology. She also applied the wrong legal standards to assess whether a software file is a derivative work, analyzing whether the file "depends on" or "extends the functionality of" Oracle software, without regard to whether the file actually incorporates Oracle expression, let alone protected expression. These errors require exclusion.

*Distribution.* Ms. Frederiksen-Cross repeated the same error with regard to alleged "distribution," failing to even contend, let alone prove, that any file allegedly "distributed" by Rimini was substantially similar to Oracle software. In addition, under copyright law, "distribution" requires proof that software "changed hands" through a transfer of ownership, and that the distribution was "to the public," among other things. *See* 17 U.S.C. § 106(3). However, Ms. Frederiksen-Cross admitted at her deposition that she applied a lay understanding of the term "distribute" (*i.e.*, merely sending something somewhere), without regard to any of the legal elements of that term, which she did not analyze. Accordingly, her opinions that Rimini "distributed" Oracle software are methodologically unsound because they are not tethered to the legal standard for a distribution.

**Second,** all of Ms. Frederiksen-Cross's opinions are *irrelevant* to Rimini's compliance with the *Rimini I* injunction. She did not opine that Rimini has continued to engage in the conduct that the jury found to constitute innocent infringement and that was affirmed on appeal in *Rimini I*. Rather, she focused exclusively on *unadjudicated* conduct—certain aspects of Rimini's revised support processes (Process 2.0)—that is fundamentally different from the aspects of Rimini's former support processes (Process 1.0) that were adjudged at trial. Such conduct cannot as a matter of law form the basis for a contempt finding. *TiVo Inc. v. EchoStar Corp.*, 646 F.3d 869, 882 (Fed. Cir. 2011). Ms. Frederiksen-Cross did not assess whether Rimini's current processes are "more than colorably different" from those adjudicated at trial. Rather, she simply parroted her *Rimini II* opinions; but whatever weight those opinions might be entitled to in that case, they are irrelevant in this contempt proceeding.

The irrelevance of Ms. Frederiksen-Cross's opinions is particularly glaring with respect to what Oracle misleadingly calls "cross-use."  This is not a term or concept found in the Copyright Act, the case law, or even in Oracle's license agreements.  Oracle invented it for purposes of this litigation, and the BFC Declaration applies a definition of "cross-use" (supplied by Oracle's counsel) that has never been endorsed by this Court or the Ninth Circuit, is inconsistent with Oracle's licenses and its own testimony, and would effectively preclude Rimini (or any IT consultant) from using its own knowledge and its own work product.  This new theory is totally unmoored from the theory of "cross-use" Oracle presented at trial, and cannot as a matter of law form the basis of a contempt finding.  Ms. Frederiksen-Cross's opinions based on this and other unadjudicated conduct are irrelevant and should be excluded.

## II.   LEGAL STANDARD

"Irrelevant evidence is not admissible."  Fed. R. Evid. 402.  "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case."  Fed. R. Evid. 702.

The "proponent of the expert" carries "the burden of proving admissibility" of the expert testimony.  *Lust By & Through Lust v. Merrell Dow Pharm., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996).  "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful."  *Daubert*, 509 U.S. at 591.  In addition to relevance, expert testimony must be reliable.  *Id.* at 589.  Reliability turns on "the soundness of [the expert's] methodology."  *Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 463 (9th Cir. 2014); *see also Kaseberg v. Conaco, LLC*, 2019 WL 1641161, at *6 (S.D. Cal. Apr. 16, 2019) (excluding opinions for failing to apply appropriate methodology).  Expert opinions based on the application of incorrect legal standards must be excluded because they are irrelevant, not "helpful" to the trier of fact, and not reliable.  *Nationwide*, 523 F.3d at 1059 (excluding expert opinions based on

"erroneous statements of law"); *Williamson Oil Co. v. Philip Morris USA*, 346 F.3d 1287, 1323 (11th Cir. 2003) (same); *see also In re Novatel Wireless Sec. Litig.*, 846 F. Supp. 2d 1104, 1108 (S.D. Cal. 2012) (same).[1]

In contempt proceedings involving redesigned processes, the Seventh Amendment and due process considerations require the Court to undergo a threshold analysis of whether the redesigned process is "more than colorably different" than the process adjudicated in the underlying trial. *TiVo*, 646 F.3d at 882. If it is, adjudication of that new process in a summary contempt proceeding is not appropriate; the issues need to be decided by a jury in a separate infringement suit. *Id.* at 881–82; *Abbott Labs. v. TorPharm, Inc.*, 503 F.3d 1372, 1380 n.3 (Fed. Cir. 2007) ("Requiring disputed issues to be tried through full litigation rather than summary proceedings eliminates due process concerns for the defendant accused of violating an injunction.").

## III.   ARGUMENT

Ms. Frederiksen-Cross's opinions are inadmissible, and her Declaration should not be considered by the Court in connection with Oracle's OSC Motion, for two distinct reasons: (A) all of her opinions pertaining to exclusive rights under the Copyright Act are unreliable because they do not employ proper methodologies or they rely on the wrong legal standards, or both; and (B) all of her opinions are irrelevant because they pertain to unadjudicated conduct (Process 2.0) that is more than colorably different than the conduct tried to the jury and affirmed on appeal (Process 1.0).

---

[1] Although the Court may rely on declarations in deciding whether to issue an OSC (Fed. R. Civ. P. 43(c)), it should apply the summary judgment evidentiary standard. *See* Fed. R. Civ. P. 56(c)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."). Courts routinely scrutinize expert testimony for admissibility and reliability in connection with non-dispositive motions. *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011) (class certification); *A.A. v. Raymond*, 2013 WL 3816565, at *4 (E.D. Cal. July 22, 2013) (preliminary injunction). If an OSC were to issue, Oracle would be required to discharge its heightened standard of proof at trial using only *admissible* evidence.

4

MOTION TO EXCLUDE OPINIONS OF ORACLE'S EXPERT, BARBARA FREDERIKSEN-CROSS
CASE NO. 2:10-CV-00106-LRH-VCF

**A.      Ms. Frederiksen-Cross's Opinions Are Unreliable Because They Are Based On Unsound Methodologies And The Wrong Legal Standards**

The injunction prohibits reproducing, creating derivative works from, and distributing certain Oracle software under certain conditions.  Those terms—"reproducing," "derivative works," and "distributing"—are exclusive rights under the Copyright Act, and the injunction uses those terms of art with their legal meanings.  Ms. Frederiksen-Cross, however, failed to apply the correct legal standards for determining whether a "reproduction," "derivative work," or "distribution," has occurred, and accordingly her opinions are methodologically unsound.

**1.      The "Copying" Opinions Failed To Apply A Required Methodology**

Determining whether a work was "copied" requires a specific technical analysis called "analytic dissection," which consists of separating the work into expressive and non-expressive components, filtering out the non-expressive (and not copyrightable) components, and then comparing the remaining elements to determine whether the remaining similarities between *protected* elements are "substantial."  *Apple Comput.*, 35 F.3d at 1443.  Ms. Frederiksen-Cross failed to perform the required analytic dissection, and accordingly, she has no reliable basis to opine that Rimini "copied" Oracle software.  This error infects virtually all of her opinions.

**a.      Substantial Similarity And Analytic Dissection**

To establish that Rimini invaded the reproduction right, Oracle must prove (1) that it owns a valid copyright in its software, and (2) that Rimini copied protected elements of that software.  *Rentmeester v. Nike, Inc.*, 883 F.3d 1111, 1116–17 (9th Cir. 2018), *overruled on other grounds by Skidmore as Tr. for Randy Craig Wolfe Tr. v. Zeppelin,* 952 F.3d 1051 (9th Cir. 2020); *Brown Bag Software v. Symantec Corp.*, 960 F.2d 1465, 1472 (9th Cir. 1992).  The "second element has two distinct components:  'copying' and 'unlawful appropriation.'"  *Rentmeester*, 883 F.3d at 1117.  "Proof of unlawful appropriation—that is, *illicit* copying—is necessary because copyright law does not forbid all copying."  *Id.* (emphasis in original).  To prove unlawful appropriation, Oracle must prove that two works are "substantially similar," meaning that "the similarities between the two works must be 'substantial' and they *must involve protected elements* of the plaintiff's work."  *Id.* (emphasis added).  Not every portion or element of a copyrighted work is protected.  *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499

U.S. 340, 348 (1991) ("[T]he mere fact that a work is copyrighted does not mean that every element of the work may be protected."). Only substantial similarities between the *protected* elements are relevant to a substantial similarity analysis. *Cavalier v. Random House, Inc.*, 297 F.3d 815, 822 (9th Cir. 2002) ("A court must take care to inquire only whether the *protectible elements, standing alone*, are substantially similar.") (emphasis in original); *Apple Comput.*, 35 F.3d at 1443 (holding that "only those elements of a work that are protectable" may be compared in a substantial similarity analysis).

Determining whether two works are "substantially similar" requires a two-part analysis, consisting of the "extrinsic test" and the "intrinsic test." *Rentmeester*, 883 F.3d at 1118. "The extrinsic test assesses the objective similarities of the two works, focusing only on the protectable elements of the plaintiff's expression." *Id.* Because the Court "must take care to inquire only whether the *protectible elements, standing alone*, are substantially similar," a court "must filter out and disregard the non-protectible elements in making its substantial similarity determination." *Cavalier*, 297 F.3d at 822 (emphasis in original). The methodology of filtering out the unprotectable elements is known as "analytic dissection." *Apple Comput.*, 35 F.3d at 1443; *Brown Bag Software*, 960 F.2d at 1476. After performing analytic dissection and the "extrinsic test," any protectable elements that remain are compared to corresponding elements of the defendant's work to determine "holistic[ly]" whether they are "substantially similar in 'total concept and feel;'" that is the intrinsic test. *Rentmeester*, 883 F.3d at 1118.[2]

Analytic dissection is particularly important in software cases because the functional aspects of computer code are not protectible expression, and programmers are constrained by many external factors, including interoperability requirements and the mandates of logic and

---

[2]  Circuits around the country have adopted essentially the same analytic dissection approach, although they sometimes refer to it by other names, such as the "Abstraction-Filtration-Comparison" test. *See, e.g.*, 4 Nimmer on Copyright, § 13.03[F][1][c] (explaining required process for "successively filtering out unprotected material"); *Comput. Assocs. Int'l v. Altai, Inc.*, 982 F.2d 693, 706 (2d Cir. 1992) ("Abstraction-Filtration-Comparison" test); *Atari Games Corp. v. Nintendo of Am. Inc.*, 975 F.2d 832, 839 (Fed. Cir. 1992); *Gates Rubber Co. v. Bando Chem. Indus., Ltd.*, 9 F.3d 823, 834 (10th Cir. 1993) (noting that "[d]etermining which elements of a [computer] program are protectable is a difficult task" and adopting the Abstraction-Filtration-Comparison test); *see also Apple Comput.*, 35 F.3d at 1445 (noting that "[o]ther courts perform the same analysis, although articulated differently," and citing cases).

efficiency.  4 Nimmer, § 13.03[F][1][a] at 13-126 (noting that "computer programming is as much a science as an art" and "[a]uthors of computer programs do not always have the broad range of choices of expression available to authors of traditional literary works"); *see also Sony Comput. Entm't, Inc. v. Connectix Corp.*, 203 F.3d 596, 599 (9th Cir. 2000) ("Copyrighted software ordinarily contains both copyrighted and unprotected or functional elements."). Among other things, a proper substantial similarity analysis for software must filter out:

- <u>Similarities dictated by logic and efficiency</u>.  There may be only a limited number of ways to implement a software solution in an efficient or logical way.  In such cases, under the merger doctrine (*see Ets-Hokin v. Skyy Spirits, Inc.*, 225 F.3d 1068, 1082 (9th Cir. 2000)), an idea and its expression merge, and the particular expression is unprotectible.  4 Nimmer, § 13.03[F][2][b]; *see also Gates Rubber*, 9 F.3d at 838 (applying merger doctrine in analytic dissection of software).

- <u>Indispensable features</u>.  Relatedly, under the doctrine of scène à faire, "when similar features of [software] are as a practical matter indispensable, or at least standard, in the treatment of a given [idea], they are treated like ideas and are therefore not protected by copyright."  *Apple Comput.*, 35 F.3d at 1444.  Accordingly, features of software programs that are standard must be filtered out of any substantial similarity comparison.

- <u>Similarities dictated by external considerations</u>.  "[I]t is virtually impossible to write a program to perform particular functions in a specific computing environment without employing standard techniques."  4 Nimmer, § 13.03[F][3] at 13-138.2.  Thus, a proper analysis must "eliminate[e] from consideration elements that are not original, or that flow naturally from considerations external to the author's creativity."  *Id.*  In the ERP software context, this would include conventional code that pulls required employee data from a database, for example.

- <u>Target industry practices</u>.  Professor Nimmer notes that "[p]erhaps the most significant external factors influencing program design are the business practices and technical requirements of the end user."  *Id.* § 13.03[F][3][d] at 13-143.  This is particularly true for software designed to comply with tax and legal requirements, where state and federal tax

authorities impose strict requirements on how data is reported, sequenced, and formatted (*e.g.*, certain income reporting must precisely match the data fields in IRS Form 1099).

- <u>Computer industry programming practices</u>.   "Most programmers rely on a number of traditional solutions to recurring problems in their programming." *Id.* § 13.03[F][3][e][i] at 13-144.   Thus, similarity between code solving a routine problem is not necessarily evidence of copying, nor are routine and commonplace solutions protected.

After analytic dissection, the protectable elements that remain (if any) must be compared to the corresponding elements of the allegedly infringing work to determine whether the similarities are "substantial." *See*, *e.g.*, *Antonick v. Elec. Arts, Inc.*, 2014 WL 245018, at *6 (N.D. Cal. Jan. 22, 2014) (finding similarities insubstantial as a matter of law despite jury finding that defendant copied code).   The relevant inquiry is "whether a substantial portion of the protectable material in the plaintiff's work was appropriated—not whether a substantial portion of defendant's work was derived from plaintiff's work." *Newton v. Diamond*, 388 F.3d 1189, 1195 (9th Cir. 2004).   Even where analytic dissection shows protectable elements of software are copied verbatim, that is not an actionable "reproduction" absent evidence that the copied material is substantial either quantitatively or qualitatively, in relation to the plaintiff's work as a whole.   *Digital Drilling Data Sys., L.L.C. v. Petrolink Servs., Inc.*, --- F.3d ---, 2020 WL 3603953, at *5–6 (5th Cir. 2020) (affirming summary judgment of non-infringement where defendant copied 5% of plaintiff's schema but plaintiff could not prove the copied material was qualitatively important to the copyrighted software as a whole).

### b.   Ms. Frederiksen-Cross's Opinions

The BFC Declaration provides opinions that Rimini allegedly "copied" Oracle code, and implies in each case that the Rimini files are substantially similar to Oracle's code, but Ms. Frederiksen-Cross never performed analytic dissection.

For example, Ms. Frederiksen-Cross opined that █████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████

Gibson, Dunn &
Crutcher LLP

1 ██████████████████████████████████████████████████

2 ████████████████████████████████████████████

3      Her analysis ended there.   █████████████████████████

4 ██████████████████████████████████████████████████

5 ██████████████████████████████████████████████████

6 ███████████████████████    And because she did not perform any analytic

7 dissection, she did not even reach the step of determining whether any portions of Oracle's

8 work were protectable, and if so, whether any similarities in the protectable expression

9 constitute a substantial portion of PeopleSoft as a whole.  In contrast, Rimini's technical expert,

10 Duke Computer Science Professor Owen Astrachan, performed analytic dissection and

11 concluded that the matching code is not protectable because it is "dictated by external

12 constraints not indicative of copying."   Declaration of Professor Owen Astrachan, Ex. A

13 (Rebuttal Report) ("Astrachan Reb. Rpt.") ¶¶ 195–202.

14      Ms. Frederiksen-Cross provided a similar non-analysis of a different Oracle file,

15 ████████████   BFC Decl. ¶ 87.  She again claimed ████████████████████

16 ██████████████████████████████████████████████████

17 ███████████████████████   Once again, Rimini's expert, Professor

18 Astrachan, performed the legally required analytic dissection analysis for these files and

19 determined that the matching code is not protectable.  He noted that the supposed "matching"

20 lines of code simply write out information such as name, state, zip code, and wages to an

21 electronic W-2 form to be submitted to the Social Security Administration ("SSA").  Astrachan

22 Reb. Rpt. ¶¶ 182–91. The fields that must be written on the form, as well as their position and

23 length, are all strictly dictated by SSA requirements, and as a result there are a very limited

24 number of ways to write the code.  *Id.* ¶¶ 183–85 (Professor Astrachan's analysis showing SSA

25 requirements that dictate the matching portion of code).  Professor Astrachan also noted that

26 there were minor differences in the code, "which is consistent with two developers following

27 strict requirements but implementing slightly different solutions to achieve the same end."  *Id.*

28 ¶ 186.

There are numerous other examples in which Ms. Frederiksen-Cross provided even less analysis—or often no analysis at all.[3]  Moreover, Ms. Frederiksen-Cross submitted a surrebuttal report to respond to some portions of Professor Astrachan's report, but she *did not respond* to his analytic dissection or perform any analytic dissection analysis of her own.

### c.   Ms. Frederiksen-Cross's Opinions Should Be Excluded

Ms. Frederiksen-Cross's failure to perform analytic dissection renders her opinions regarding "copying" and substantial similarity fundamentally unreliable and irrelevant, and it would be legal error to rely on them.  Courts have uniformly adopted analytic dissection as a rigorous process to ensure that the focus is on "whether the *protectible elements, standing alone, are substantially similar.*" *Cavalier*, 297 F.3d at 822 (emphasis in original).  As a matter of law, this Court "must filter out and disregard the non-protectible elements in making its substantial similarity determination." *Id.*  Ms. Frederiksen-Cross did not do that.  She performed the wrong analysis—indiscriminately noting "matching" lines of code without regard for whether they are protected.  *See Apple Comput.*, 35 F.3d at 1446 ("[T]he party claiming infringement may place *no* reliance upon any similarity in expression resulting from unprotectable elements.") (emphasis in original); *see also, e.g.*, *Paycom Payroll, LLC v. Richison*, 758 F.3d 1198, 1206–08 (10th Cir. 2014) (vacating and remanding infringement determination for failure to perform analytic dissection); *Gates Rubber*, 9 F.3d at 845, 849 (similar).

Courts routinely exclude experts who fail to perform analytic dissection.  *DropzoneMS, LLC v. Cockayne*, 2019 WL 7630788, at *14 (D. Or. Sept. 12, 2019) (excluding Ms. Frederiksen-Cross's declaration and finding her comparisons of source code insufficient as a

---

[3]  *See, e.g.*, BFC Decl. ¶ 15 (alleging Rimini "copies" its own work, but not alleging the work is substantially similar to Oracle material), ¶ 31 (opining that Dev Instructions "contain pieces of actual code in them" without noting that the code is Rimini code, not substantially similar to any Oracle code), ¶ 36 (referring to "copying" of "code" without mentioning that the code is Rimini code not alleged to be substantially similar to Oracle code), ¶ 40 (opining that Rimini "distribute[s] identical copies of update files to multiple customers" without identifying the files or alleging that these Rimini updates contain Oracle code or are substantially similar), ¶ 44 (opining that Rimini transferred 22,591 files, without alleging that any contain Oracle code or are substantially similar), ¶¶ 47–48 (opining that Rimini sent the file rsistfli.sqr to clients, but failing to note that the file is a Rimini-created file not alleged to contain Oracle code or be substantially similar), ¶¶ 52–60, 82, 85, 108–13, 117–18 (no opinions that files mentioned contain Oracle code or are substantially similar).

matter of law to establish infringement where she failed to filter out unprotected elements of code); *Kaseberg*, 2019 WL 1641161, at *6 (excluding expert's substantial similarity opinion where she "perform[ed] none of the analytical dissection that is the hallmark of the extrinsic test"); *Copeland v. Bieber*, 2016 WL 7079569, at *5 (E.D. Va. Sept. 8, 2016) (excluding expert who failed to perform analytic dissection); *Mayo Clinic v. Elkin*, 2010 WL 5421322, at *6 (D. Minn. Dec. 27, 2010) (excluding software expert's opinions regarding substantial similarity because the expert "failed to use [the] proper methodology" of the Abstraction-Filtration-Comparison test).

Another district court in the Ninth Circuit recently excluded Ms. Frederiksen-Cross's opinions and held them insufficient as a matter of law to establish infringement for precisely this reason. *DropzoneMS,* 2019 WL 7630788, at *14.   There, as here, Ms. Frederiksen-Cross concluded that "[t]he side-by-side comparisons plainly show that there are substantial blocks of identical source code present in the [defendant] and [plaintiff] software." *Id.* at *7.   However, she failed to perform any analytic dissection or filtration analysis to separate protectable code from unprotectable code, and accordingly, the Court granted summary judgment of non-infringement.  *Id.* at *14.   After reciting the black-letter Ninth Circuit law requiring analytic dissection, the Court held that, "[h]ere, plaintiff does not even attempt to distinguish unprotectable source code from protectable source code." *Id.*   It noted that while "[t]he report contains nearly 280 pages of side-by-side computer-generated comparisons of the DZ source code and the Flare source code, some of which show identical or similar lines of code," some of the code was not protectable and "there is no 'filtration analysis' in the Frederiksen-Cross Declaration." *Id.*   Accordingly, the Court held that "[w]ithout expert testimony distinguishing unprotectable source code from purportedly protectable source code, [the copyright infringement] claim fails as a matter of law." *Id.*

The same result should apply here. *See*, *e.g.*, *Copeland*, 2016 WL 7079569, at *5.   Ms. Frederiksen-Cross failed to apply the proper legal test, and accordingly her opinions that Rimini invaded Oracle's exclusive right to reproduce the copyrighted software, as secured by the injunction, are methodologically unsound and unreliable and therefore should be excluded.

### 2.    The "Derivative Works" Opinions Applied the Wrong Legal Standard

Ms. Frederiksen-Cross's opinions that certain Rimini-created documents or files are derivative works should be excluded because she applied the wrong legal standard for determining whether a work is a derivative work.

Under controlling Ninth Circuit precedent, to constitute a "derivative work" of copyrighted material in the software context, a work must "substantially incorporate protected material from the preexisting work." *Micro Star*, 154 F.3d at 1110; *Lewis Galoob Toys, Inc. v. Nintendo of Am., Inc.*, 964 F.2d 965, 969 (9th Cir. 1992); *see also Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1161 (9th Cir. 2007); *Mirage Editions, Inc. v. Albuquerque A.R.T. Co.*, 856 F.2d 1341, 1343–44 (9th Cir. 1988); *Litchfield v. Spielberg*, 736 F.2d 1352, 1357 (9th Cir. 1984) (holding that to be a derivative work, "the infringing work must incorporate in some form a portion of the copyrighted work").  The requirement that the work "substantially incorporate protected material from the preexisting work" is equivalent to a "substantial similarity" analysis. *Antonick*, 841 F.3d at 1065–66 (noting that to prove software was a derivative work within the meaning of copyright law, plaintiff "had to prove copyright infringement," including proving extrinsic and intrinsic similarity).

The injunction prohibits Rimini from creating derivative works of Oracle software in some circumstances.  ECF No. 1166 ¶¶ 4–6, 10.  Ms. Frederiksen-Cross opined extensively on derivative works, claiming that certain Rimini updates to Oracle software, certain documentation of Rimini's solutions, and other files are derivative works and that, accordingly, they violate the injunction.  BFC Decl. ¶¶ 14, 29, 83–87, 106, 109.  But in reaching that conclusion, Ms. Frederiksen-Cross did not analyze the dispositive legal issue of whether the Rimini work in question "substantially incorporates protected material" from the Oracle work. In the five reports that Ms. Frederiksen-Cross has submitted in *Rimini II* and this post-injunction proceeding, she has ***never*** stated that black-letter legal test in her reports, nor purported to apply it, and the BFC Declaration is no different. *Id.* ¶ 83.

Instead, she purported to apply her own tests to identify derivative works that are *not* the Ninth Circuit's test.  She has never articulated a single, consistent set of criteria to determine

a derivative work, but has variously opined that a work is derivative if it "depends on" Oracle software, is "based on" Oracle software, "does not operate independently from" Oracle software, is designed to be executed using Oracle software, or "extends the functionality" of Oracle software, without regard to whether the work actually incorporates any protected expression. ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████   *see* Astrachan Reb. Rpt. ¶¶ 42–43.   For example, she opined that Rimini's updates, whether or not they incorporate any Oracle code or other protected material, ███████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████   Declaration of Eric D. Vandevelde (Vandevelde Decl.), Ex. B ¶ 210.   At her deposition, Ms. Frederiksen-Cross confirmed that this was the "legal definition" of "derivative work" that she applied for purposes of her analysis, and that "these are the criteria I used." *Id*., Ex. D at 35:13–36:11, 38:12–39:6, 135:12–137:23; *Id*., Ex. F.  None of those tests are the law.

Rimini's expert, Professor Astrachan, pointed out in his rebuttal report that Ms. Frederiksen-Cross failed to apply the Ninth Circuit's "substantially incorporates protected material" test. *See*, *e.g.*, Astrachan Reb. Rpt. ¶¶ 42–43.  In response, Ms. Frederiksen-Cross submitted a "surrebuttal" report, in which she again eschewed the Ninth Circuit's test, and instead articulated her test as whether Rimini's works were "based upon" Peoplesoft, "can only be run successfully in a PeopleSoft environment," "call on preexisting variables in PeopleSoft and existing tools," or "modify the PeopleSoft tools"—again without regard to whether

Rimini's works substantially incorporate Oracle protected material.  Vandevelde Decl., Ex. C ¶ 45.  Again, none of those are the law.

Ms. Frederiksen-Cross's flawed analysis of ██████████████████████████████████
████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████

████████     That analysis applied the wrong legal standard.   Accordingly, it is an unsound methodology and must be excluded.

As another example, Ms. Frederiksen-Cross opined that ████████████████████████
████████████████████████████████████████████████████████████████████████████

██████ She did not opine that the files contain any Oracle code or copyrighted expression—and in fact, they are a set of Rimini-created files.  *Id.*  Yet Ms. Frederiksen-Cross opined that ████████
████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████

14

1 ████████████████████████████████████████

2 ████████████████████████████████████████

3 ████████████████████████████████████████

4 ████████████████████████████████████████

5 ███████████████████████████████ That is the wrong legal

6 test.  To determine whether the file alone, as emailed by Rimini to its client, is a derivative

7 work, Ms. Frederiksen-Cross had to analyze whether the file "substantially incorporates

8 protected material from the preexisting work" (*Micro Star*, 154 F.3d at 1110), by conducting a

9 substantial similarity test.  *Antonick*, 841 F.3d at 1065–66.  She did not do that.

10 　　　Because Ms. Frederiksen-Cross applied the wrong legal standard to analyze whether a

11 Rimini work is a "derivative work" within the meaning of the Copyright Act and the injunction,

12 her opinions regarding alleged derivative works are neither relevant nor reliable.  They should

13 be excluded.

14 　　**3.　　The "Distribution" Opinions Applied the Wrong Legal Standard**

15 　　　Ms. Frederiksen-Cross's opinions regarding alleged "distribution" of Oracle software

16 suffer from the same fatal flaw as her "reproduction" and "derivative works" opinions—she

17 failed to show that any of the supposedly "distributed" works substantially incorporate

18 protectable Oracle expression.  Indeed, the BFC Declaration does not opine, let alone establish

19 with evidence, analysis, or analytic dissection, that any of the alleged distributions is an Oracle

20 software file, or is substantially similar to Oracle software.  BFC Decl. ¶¶ 108–13.  None of

21 them are.  Astrachan Reb. Rpt. ¶ 318.

22 　　　Additionally, even if these files did contain Oracle software or were deemed derivative

23 works (they do not and are not), Ms. Frederiksen-Cross's opinions should be excluded because

24 she did not apply the legal definition of "distribution."  Her opinions that Rimini violated the

25 injunction via alleged "distribution" are thus fundamentally unreliable and misleading.

26 　　　The injunction prohibits Rimini from "distribut[ing]" certain Oracle software or

27 documentation.  *See, e.g.*, ECF No. 1166 ¶ 3.  As with the terms "reproduce" and "derivative

28 works," the term "distribute" is a term of art referring to the distribution right under the

Copyright Act. 17 U.S.C. § 106 (enumerating a copyright holder's exclusive rights, including to "distribute copies" of the copyrighted work). To infringe the distribution right, one must "distribute copies … of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending." 17 U.S.C. § 106(3). Thus, courts have held that multiple elements must be satisfied to constitute a distribution. First, "[t]he plain meaning of that section requires an identifiable copy of the work to *change hands* in one of the prescribed ways for there to be a distribution." *Atl. Recording Corp. v. Howell*, 554 F. Supp. 2d 976, 985 (D. Ariz. 2008) (emphasis added); *see also* 4 Patry on Copyright, § 13:9. Second, there must be an "actual distribut[ion]" of an "unauthorized copy" of the work—authorized copies are not distributions. *Atl. Recording Corp.*, 554 F. Supp. 2d at 983. Third, the distribution must be "to the public." 17 U.S.C. § 106(3). Provisions of a work to single entities, and private dissemination are not distributions "to the public." *See Cartoon Network LP, LLLP v. CSC Holdings, Inc.*, 536 F.3d 121, 139 (2d Cir. 2008) (holding that "to the public" in the context of the performance clause of the Copyright Act does not encompass providing a single subscriber with a single unique copy); *United States v. Am. Soc'y of Composers, Authors & Publishers*, 627 F.3d 64, 75 (2d Cir. 2010).

The BFC Declaration contains a section on alleged "distribution" (BFC Decl. ¶¶ 108–13), but it never references, let alone analyzes, whether any of the elements of a "distribution" are met within the meaning of the Copyright Act. At her deposition, Ms. Frederiksen-Cross admitted that she did not use the term "distribution" in its legal sense within the meaning of the Copyright Act, but "in a more common, technical meaning of distributing something from Point A to Point B." Vandevelde Decl., Ex. D at 82:23–83:4. Oracle's counsel never informed her of the legal definition of a "distribution." *Id.* at 83:5–8. She confirmed that her use of the term "distribution" does not take into account any element of a change in ownership, as is required by 17 U.S.C. § 106(3). *Id.* at 84:6–15.

An example is illustrative. Ms. Frederiksen-Cross opined that █████████

█████████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████████████

1

2

3

4         But if one were to apply the correct legal definition

5 under the Copyright Act, one could never conclude that this was a "distribution." It does not

6 involve any software "changing hands" either by "transfer of ownership," "rental," "lease, or

7 lending"—Easter Seals merely obtained *its own* software, as modified by Rimini. *See* 17 U.S.C.

8 § 106(3); *Atl. Recording Corp.*, 554 F. Supp. 2d at 985. Further, the transfer of Easter Seals'

9 licensed software from Easter Seals' computer system to Easter Seals is not "unauthorized."

10 The transfer from one Easter Seals system to another Easter Seals system is also not a transfer

11 "to the public." *Yesh Music, LLC v. Amazon.com, Inc.*, 249 F. Supp. 3d 645, 659 (E.D.N.Y.

12 2017) (Amazon's streaming of a user's music to the user from the user's designated music

13 locker is not a distribution "to the public"). And it is well-settled that merely making available

14 files for others to download is not a "distribution," even if the files are in fact downloaded,

15 because the eventual dissemination is initiated by the receiving party. *Atl. Recording Corp.*,

16 554 F. Supp. 2d at 986 (holding as a matter of law that placing copyrighted files in a "Shared

17 Folder" for the public to download is not a violation of the distribution right); 4 Patry § 13:11.50

18 (those who make a file available in a folder "are not themselves distributing it, and are hardly

19 therefore distributing copies; instead, third parties are reaching in[] … and taking an electronic

20 file"). Ms. Frederiksen-Cross did not analyze any of these issues, and did not evaluate whether

21 any of the criteria necessary for a "distribution" under the Copyright Act were met.

22 Accordingly, there is no basis for her opinion that Rimini's provision of Easter Seals' own

23 software update to Easter Seals via an FTP folder is a "distribution" that allegedly violates the

24 injunction.

25         Because Ms. Frederiksen-Cross did not apply the legal definition of "distribution" when

26 she concluded that Rimini made distributions in violation of the injunction, her opinions lack a

27 reliable basis and should be excluded.

28

**B.      The BFC Declaration Is Irrelevant Because Process 2.0 Is More Than Colorably Different From Process 1.0**

The central issue in *Rimini I* was whether two aspects of Rimini's former support processes (Process 1.0)—which Oracle called "local hosting" and "cross-use"—were within the scope of Oracle's customer licenses.  *Oracle USA, Inc. v. Rimini Street, Inc.*, 879 F.3d 948, 956, 959 (9th Cir. 2018) ("*Rimini I*").  On summary judgment, the Court construed the licenses and ruled that they did not permit Rimini to store Oracle environments on its own systems ("local hosting") or to use generic development environments for more than one client ("cross-use").  ECF No. 474 at 13, 18.  Both of these acts, under the Court's license constructions, invaded Oracle's exclusive right to authorize (or prevent) *reproduction* of its copyrighted software.

Rimini invested millions of dollars to redesign its systems to conform to the Court's license constructions.  By the end of July 2014, Rimini had transitioned to Process 2.0, in which all environments are stored on client-controlled systems and development environments are siloed by client.  ECF No. 906 at 4–5; ECF No. 1130 at 3–4; *see also* ECF No. 1049 at 6, 8.  Since then, Rimini has not engaged in either "local hosting" or "cross-use" as those concepts were litigated at trial and affirmed on appeal in *Rimini I*.  *See* Opp. to OSC Mot. at 5; Benge Decl. ¶ 7, and Process 2.0 tutorial ███████████████████████.

Rimini then filed *Rimini II*—a declaratory judgment action—seeking a ruling from this Court that Process 2.0 is consistent with the Copyright Act and the license agreements.  Rimini sought to consolidate the two proceedings, or otherwise to have Process 2.0 considered by the *Rimini I* jury, but Oracle opposed those requests.  *See* ECF No. 1323 at 6–8.  In a series of rulings, the Court agreed with Oracle that *Rimini I* would be limited to Process 1.0—the former processes that Rimini used before July 2014.  *Id.*  The Court ruled, in no uncertain terms, that Process 2.0 "is not relevant to any claim or issue in" *Rimini I*, and thus all "claims, issues, and evidence related to [Process 2.0] are being addressed solely in" *Rimini II*.  ECF No. 723 at 3.

After a trial, the *Rimini I* jury found Rimini liable for "innocent" infringement of Oracle's copyrights—meaning that Rimini did not know and "had no reason to believe" that its conduct was unlawful.  ECF No. 896 at 6; ECF No. 880 at 43.  The *Rimini I* judgment has been

affirmed on appeal and Rimini has paid Oracle more than $90 million for its past conduct. ECF No. 1372–15 at 5. Going forward, the Court has already made clear that the injunction prohibits "only acts that have already been determined to be unlawful, and which have been affirmed on appeal." ECF No. 1164 at 9. The only such acts were the forms of local hosting and "cross-use" adjudicated in *Rimini I*—and it is undisputed that Rimini has not engaged in those acts since the injunction was entered.

The role of a contempt proceeding is to enforce clear boundaries as enshrined in a court order. For example, suppose that the leaseholder of a parcel of land has hired a lumberjack to remove timber (which the leaseholder has the undisputed right to do), and the *landowner* complains that the lumberjack's use of trucks has damaged the property; the jury finds an innocent trespass, and the court enjoins the further use of trucks. The lumberjack can be found in contempt if (and only if) the landowner proves that he again used trucks to remove trees in defiance of the court's order. If, by contrast, the lumberjack uses helicopters (or donkeys or barges or anything more than colorably different than trucks) to remove the felled trees, he cannot be in contempt even if the landowner contends that the new method exceeds the scope of the authorization. Determining liability (if any) for unadjudicated acts requires a second proceeding on the merits. The situation here is directly analogous—Rimini's clients hired Rimini to support their software; Oracle obtained an injunction against two adjudicated aspects of Rimini's Process 1.0 (local hosting and use of generic environments), and Rimini fundamentally changed its support processes to Process 2.0 (remote support of client-hosted, client-specific environments).

Oracle's accusations of contempt are all based on acts that have *never* been adjudicated by this Court or the Ninth Circuit. After convincing this Court to keep Process 2.0 entirely out of the *Rimini I* proceedings until final judgment was entered, Oracle now argues that certain aspects of Process 2.0 violate the *Rimini I* injunction. The BFC Declaration is essentially Oracle's sole evidentiary support for this theory.

1. **The BFC Declaration Ignores The *TiVo* Standard**

To challenge Process 2.0 in this contempt proceeding (as distinguished from *Rimini II*), Oracle bears the burden of establishing that the challenged aspects of Process 2.0 are not more than colorably different from the aspects of Process 1.0 previously adjudicated and affirmed on appeal. *TiVo*, 646 F.3d at 883; Rimini's Mot. for Jury Trial (filed concurrently) at 15–17. The colorable differences test is a question of fact that the Court typically undertakes to answer with the benefit of expert testimony. *See, e.g.*, *nCube Corp. v. SeaChange Int'l, Inc*, 732 F.3d 1346, 1348 (Fed. Cir. 2013).

To determine whether a redesigned process is "more than colorably different" from that previously adjudicated, the Court must focus on differences between "those aspects of the accused product [or process] that were previously alleged to be, and were a basis for, the prior finding of infringement, and the modified features of the newly accused product [or process]." *TiVo*, 646 F.3d at 882. The Court should focus on those elements the plaintiff "previously contended, and proved" infringed. *Id.* "Where one or more of those elements previously found to infringe has been modified, or removed," the court must analyze whether that modification is "significant," and if it is, "[c]ontempt is then inappropriate." *Id.*

The BFC Declaration does not address whether Rimini's redesigned Process 2.0 is more than colorably different from Process 1.0. Moreover, Ms. Frederiksen-Cross failed to conduct the analysis that would allow her to render an opinion on colorable differences. She did not review the trial testimony in this matter. She did not analyze what was "contended, and proved" at trial. *TiVo*, 646 F.3d at 882. She did not perform any comparison of Rimini's Process 1.0 to Process 2.0, nor did she specifically analyze Rimini's removal of the aspects of Process 1.0 that were the basis of the Court's infringement finding—*i.e.*, local hosting and "cross-use" of generic environments.

In contrast to Oracle's "ignore *TiVo*" approach, Rimini's expert, Professor Astrachan, conducted the required analysis, focusing on the aspects of Process 1.0 that Oracle accused at trial, and concluded that Process 1.0 and 2.0 are "fundamentally" different. Astrachan Reb. Rpt. ¶¶ 17–21, 143–60. Oracle has no contrary evidence. *See* Opp. to OSC Mot. at 15–16.

MOTION TO EXCLUDE OPINIONS OF ORACLE'S EXPERT, BARBARA FREDERIKSEN-CROSS
CASE NO. 2:10-CV-00106-LRH-VCF

Tellingly, Ms. Frederiksen-Cross submitted a surreply report in response to Professor Astrachan, but *did not respond* to any of those opinions.

While the *legal* significance of the *TiVo* standard is addressed in Rimini's Opposition to the OSC Motion, the *evidentiary* consequence is straightforward:  *If* Oracle must satisfy the *TiVo* standard for this Court to issue a show-cause order, as Rimini contends, *then* the entire BFC Declaration is irrelevant.  That is because all of the acts, or conduct, addressed by Ms. Frederiksen-Cross are more than colorably different than the acts adjudicated at trial (and affirmed on appeal), and thus beyond the ken of this contempt proceeding.  Whatever weight her opinions on Process 2.0 may be entitled to in *Rimini II*, they may be given no consideration by the Court in the context of assessing Rimini's compliance with the *Rimini I* injunction.

### 2.    The Opinions Regarding So-Called "Cross-Use" Highlight The Irrelevance Of The BFC Declaration

"Cross-use" is not a term in any license agreement or the Copyright Act; it is a term made up by Oracle and is therefore completely malleable.  Ms. Frederiksen-Cross claims that Rimini committed "cross-use" after imposition of the injunction, but her theory of what conduct constitutes "cross-use" is completely different from the theory Oracle espoused at trial.  Using the same neologism to describe entirely different conduct does not satisfy the *TiVo* standard.

Prior to judgment, "cross-use" referred to "the creation of development environments, under color of a license of one customer, to support other customers," and thus the *intermingling of Oracle code between clients*.  *Rimini I*, 879 F.3d at 956.  As the evidence at trial showed, this consisted of the use of "generic" environments—for example, associated with a version of PeopleSoft software but not with any particular client—to create updated Oracle files (containing Oracle code) that were then sent to multiple clients.  ECF No. 785 (Trial Tr.) at 204:10–205:5.  For example, at trial, a different Oracle expert testified that Rimini "cross-used" software by having a generic environment that "had originally been built for this particular customer to use as [version] 8[.]81, but [Rimini] would then use that routinely as a place in which [it] could test and develop fixes [for all clients with] that version of that software."  *Id.* at 202:19–203:3.  Those fixes contained Oracle code and were disseminated to all clients with

that version, thus intermingling Oracle software between clients.  He specifically contrasted the use of generic environments to using *client-specific* environments, *i.e.*, having "an environment for each client."  *Id.* at 204:10–205:5.

Ms. Frederiksen-Cross did not opine that Rimini continues to use generic environments.  And she concedes that each client has its own environment.

Instead, she presented an entirely new theory of "cross-use," that has nothing to do with copying any of Client A's *software* under color of Client A's license to provide to Client B (as in *Rimini I*), but is instead based on the reuse of Rimini's *knowledge*.  Ms. Frederiksen-Cross, who is also Oracle's expert in *Rimini II*, was asked by Oracle's counsel to assume that any use of "one customer's licensed Oracle software constitutes cross-use" if that use "benefits another customer."  Vandevelde Decl., Ex. B ¶ 17.  Ms. Frederiksen-Cross contends that if Rimini creates an update for Client A in Client A's environment using solely Client A's licensed software, and then *reuses its knowledge* to later create a similar or identical update for Client B in Client B's environment using solely Client B's licensed software, Rimini has "cross-used" Client A's software.  *Id.* ¶¶ 272, 365; *Id.*, Ex. A at 185:19–186:11, 233:19–234:8, 248:21–249:18, 162:25–163:18:, 170:6–171:24; 211:24–213:15; *Id.*, Ex. D at 117:21–118:20, 130:17–131:2; *see also* Astrachan Reb. Rpt. ¶¶ 46–66; Declaration of Professor Owen Astrachan, Ex. B (Supplemental Report) ¶¶ 41–42 (recounting Ms. Frederiksen-Cross's testimony).

For example, she opined in *Rimini II* that it is "cross-use" if a developer uses "the specific knowledge of what needs to be updated, how it needs to be updated, how it needs to be tested" that was learned from working on Client A's software when working for a subsequent client.  Vandevelde Decl., Ex. A at 143:24–144:3.  She opined that if a developer works in Client A's environment and develops his own solution for an update and "determine[s] what the change needed to be and generally where it needed to be" and then "appl[ies] that knowledge in the second environment, then I would say yes, you're cross using that knowledge and the update itself."  *Id.* at 151:20–22.  She testified that if Rimini writes its own code to solve a problem for Client A, it can *never write that code again for any other client*.  Indeed, Ms. Frederiksen-Cross testified that if a developer "learned on customer A's environment what

program needed to be changed and where the change needed to go in the program and what specifically he needed to change," making the same change for a second client (separately, in the second client's environment) is "cross-use" under her definition. *Id.* at 175:16–176:2; *see id.* at 193:16–195:1 (testifying that if a Rimini engineer learns what needs to be fixed while fixing the issue for Client A and then tries to fix the issue for Client B, Client B is "benefitting from the work done on customer A's license … when you make that change to customer B"). She testified again that if an engineer wrote a line of code to fix a problem for Client A and "remembered exactly the code he wrote," he could not rely on that knowledge to write the same code for Client B because "he's relying on the work done in the system of Client A … when he goes to Client B."  Vandevelde Decl., Ex. D at 130:15–131:2; *see also id.* at 120:3–15; *Id.*, Ex. E.  She testified that if a fix required Rimini to *delete* a line of Oracle code, the engineer who figured that out for Client A could not then delete the same line of code for Client B without committing "cross-use," because, again, he would be using his knowledge of what to delete. *Id.*, Ex. D at 143:24–145:4; *see also id.* at 141:22–145:4; *Id.*, Ex. G.  In addition, she testified that one Rimini developer working on Client A cannot tell a different Rimini developer working on Client B anything he learns about the problem.  *Id.*, Ex. A at 248:21–250:5.

Applying this novel theory of "cross-use," the BFC Declaration opined ███████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████  Rather, her opinion is that Rimini's reuse of its own knowledge and work product is "cross-use" in violation of the injunction.  *Id.*; *see* OSC Mot. at 15–16.

Yet, Ms. Frederiksen-Cross could not answer the question of how, if reusing Rimini's knowledge is prohibited, a Rimini developer who solved a problem for Client A could ever solve the same problem for Client B or C.  Vandevelde Decl., Ex. A at 213:7–15 ("my solution

would be to go and confer with counsel and find out what the legal answer is"), 216:4–217:1, 171:23–24 ("I can't think of an example as I sit here that would not be cross-use.").

In *Rimini II*, the parties vigorously dispute the viability of Oracle's new knowledge "cross-use" theory, and that issue is the subject of a summary judgment motion in *Rimini II*. *Rimini II*, 14-01699, ECF No. 927 at 17–22.  The Court can and should decide this issue in *Rimini II*.  But that dispute has nothing to do with any issue actually litigated and decided on summary judgment or at trial in *Rimini I*.  Neither this Court, a jury, nor the Ninth Circuit has ever been presented with, let alone decided, the issue of whether reusing Rimini's own knowledge and work product between clients—as opposed to copying Oracle files between clients—violates Oracle's license agreements.  That question raises a host of factual and legal issues that cannot be decided in this contempt proceeding as a matter of law.

The *TiVo* standard draws the line between conduct that can be adjudicated in contempt proceedings (conduct that is the same as, or "merely colorably different" from adjudicated conduct) and conduct that must be resolved in a plenary proceeding.  *McCullough Tool Co. v. Well Surveys, Inc.*, 395 F.2d 230, 233 (10th Cir. 1968).  Ms. Frederiksen-Cross ignored that line in addressing conduct that was never adjudicated and is fundamentally different from adjudicated conduct.  Accordingly, her opinions have no relevance to this contempt proceeding.  While they can be addressed in (and only in) *Rimini II*, the Court cannot rely on them in considering Oracle's request for an OSC.

## IV.    CONCLUSION

Ms. Frederiksen-Cross's opinions regarding "copying," substantial similarity, derivative works, and distribution should be excluded because she applies the wrong law.  Specifically, the Court should exclude paragraphs 14–15, 28–31, 36, 39–44, 47–48, 51–65, 77–87, 94, 96–99, 106–13, 117–18 of the BFC Declaration on these grounds.  In addition, the BFC Declaration should be excluded in its entirety as irrelevant because it accuses solely conduct that was not adjudicated and is more than colorably different from adjudicated conduct.

Dated:  July 31, 2020

GIBSON, DUNN & CRUTCHER LLP


By:   /s/ Eric D. Vandevelde
                    Eric D. Vandevelde

*Attorneys for Defendant*
*Rimini Street, Inc.*

Gibson, Dunn &
Crutcher LLP