# EXHIBIT A

# Excerpts from September 19, 2018 deposition of

# Oracle's expert, Barbara Frederiksen-Cross

# PUBLIC REDACTED VERSION

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1            UNITED STATES DISTRICT COURT
 2               DISTRICT OF NEVADA
 3      Case No. 2:14-cv-01699-LRH-CWH

        _____
 4
        RIMINI STREET, INC., a Nevada
 5      corporation
 6                  Plaintiff,
                v.
 7
        ORACLE AMERICA, INC., a Delaware
 8      corporation; and ORACLE
        INTERNATIONAL CORPORATION, a
 9      California corporation
10                  Defendants.

        _____
11
        ORACLE AMERICA, INC., a Delaware
12      corporation; and ORACLE
        INTERNATIONAL CORPORATION, a
13      California corporation
14                  Counterclaimants,
15                  v.
16      RIMINI STREET, INC., a Nevada
        corporation;  SETH RAVIN, an
17      individual,
18                  Counterdefendants,

        _____
19
20            VIDEOTAPED DEPOSITION OF
21            BARBARA FREDERIKSEN-CROSS
22     *HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY*
23      DATE TAKEN:  SEPTEMBER 19, 2018
24      REPORTED BY:  PAUL J. FREDERICKSON, CCR, CSR
        JOB NO. 2972276
25      PAGES 1 - 354

                                        Page 1
```

I N D E X

BARBARA FREDERIKSEN-CROSS
  By Mr. Vandevelde: 10

Request for information:  None
Request for documents:  None

INDEX TO EXHIBITS

EXHIBIT 4251                          18
Frederiksen-Cross Surrebuttal
Exhibit A, Frederiksen-Cross CV
EXHIBIT 4252                          43
Supplemental Expert Report of
Barbara Frederiksen-Cross,
258 pages
EXHIBIT 4253                         265
Frederiksen-Cross Exhibit MMM
EXHIBIT 4254                         265
Frederiksen-Cross Exhibit SSS
EXHIBIT 4255                         284
Exhibit: Source Code
EXHIBIT 4256                         302
Frederiksen-Cross Exhibit PPP

Page 6

EXHIBIT 4257                         329
Frederiksen-Cross Exhibit III

Page 7

SEPTEMBER 19, 2018
       [9:11 a.m.]
       THE VIDEOGRAPHER:  Good morning.
    We're going on the record at 9:11   09:11:19
a.m. on September 19, 2018.  Please note   09:11:25
that the microphones are sensitive and   09:11:31
may pick up whispering, private   09:11:33
conversation and cellular interference.   09:11:35
Please silence all cell phones and place   09:11:38
away from the microphones as they   09:11:40
interfere with deposition audio.  Audio   09:11:43
and video recording will continue to   09:11:46
take place unless all parties agree to   09:11:49
go off the record.   09:11:51
    This is media number 1 of the   09:11:52
videorecorded deposition of Barbara   09:11:54
Frederiksen-Cross, taken by counsel for   09:11:58
plaintiff in the matter of Rimini Street   09:12:00
Incorporated versus Oracle International   09:12:02
Corporation, filed in the United States   09:12:08
District Court, District of Nevada, Case   09:12:11
Number 2:14-CV-01699-LRH-CWH.   09:12:13
    This deposition is being held at   09:12:25
555 Mission Street, Suite 3000, San   09:12:29
Francisco, California 94105.   09:12:34

Page 8

    My name is Brandon Miller for the   09:12:37
firm Veritext Legal Solutions, and I'm   09:12:39
the videographer.  The court reporter is   09:12:41
Paul Frederickson from the firm Veritext   09:12:43
Legal Solutions.  I'm not related to any   09:12:47
party in this action, nor am I   09:12:48
financially interested in the outcome.   09:12:51
    Counsel and all present in the   09:12:52
room will now state their appearances   09:12:54
and affiliations for the record.   09:12:55
    MR. VANDEVELDE:  Eric Vandevelde,   09:12:58
with Gibson Dunn, on behalf of Rimini   09:12:59
Street.   09:13:02
    MR. McCRACKEN:  Casey McCracken,   09:13:02
from Gibson Dunn, representing Rimini   09:13:04
Street and Seth Ravin.   09:13:06
    MS. JOHNSON:  Lisa Johnson, with   09:13:06
Rimini Street, for Mr. Ravin and Rimini   09:13:08
Street.   09:13:11
    MR. REILLY:  John Reilly,   09:13:11
Associate General Counsel, Rimini   09:13:14
Street, representing Rimini Street.   09:13:15
    MR. POLITO:  John Polito, Morgan   09:13:16
Lewis & Bockius, on behalf of defendants   09:13:20
and counterclaimants, Oracle   09:13:21

Page 9

3 (Pages 6 - 9)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 142

```
 1    A.   Yes.                 12:30:06
 2    Q.   Okay.                12:30:07
 3         And you're saying it's consistent   12:30:07
 4  with the court's prior rulings and also    12:30:09
 5  discussion in the Ninth Circuit briefing.   12:30:12
 6  Whose briefing, Oracle's or Rimini, is it    12:30:14
 7  consistent with?                12:30:16
 8    A.   It was my understanding -- or it   12:30:19
 9  is my understanding that it's consistent with   12:30:20
10  the -- what the court said --        12:30:21
11    Q.   Okay.                12:30:23
12    A.   -- in that hearing with respect to   12:30:24
13  the -- both the characterization of cross-use   12:30:26
14  and the fact that there are many different   12:30:30
15  forms of cross-use.              12:30:32
16    Q.   All right.            12:30:33
17         If you could turn to paragraph 23.   12:30:33
18  It says:                   12:30:41
19         I understand that any development   12:30:41
20  or testing of an update to the Oracle software   12:30:43
21  with one customer's licensed Oracle software   12:30:46
22  constitutes cross-use if the update is provided   12:30:50
23  to another customer and that such cross-use   12:30:53
24  violates all relevant Oracle licenses."   12:30:57
25         In this paragraph, when you say   12:31:00
```

Page 143

```
 1  the word "update," what are you referring to?   12:31:02
 2    A.   This would encompass other update   12:31:15
 3  to an individual program, update to the   12:31:18
 4  software product as a whole, or even update to   12:31:22
 5  the environment. Any form of modification that   12:31:26
 6  was performed using one customer's license and   12:31:31
 7  then that modification irrespective of its   12:31:34
 8  scope once provided to another license or   12:31:39
 9  licensee, a different customer would be   12:31:42
10  cross-use.                  12:31:46
11    Q.   So did -- yeah. I guess what I'm   12:31:47
12  getting at is, when you say "update" here, are   12:31:49
13  you talking about a specific implementation of   12:31:52
14  an update or an update itself? So, for   12:31:57
15  example, let's say ten clients need to update   12:32:02
16  their payroll software to accommodate Arizona,   12:32:07
17  our previous example. Are you saying that an   12:32:13
18  update is -- the update in the abstract that   12:32:15
19  all ten of those customers need or the   12:32:17
20  particular implementation for each of those ten   12:32:20
21  customers?                  12:32:22
22         MR. POLITO: Objection, vague,   12:32:23
23  compound, incomplete hypothetical.   12:32:25
24    A.   I would characterize it as --   12:32:31
25  certainly, it could be the update itself, but   12:32:36
```

Page 144

```
 1  it could also be the specific knowledge of what   12:32:38
 2  needs to be updated, how it needs to be   12:32:42
 3  updated, how it needs to be tested. You know,   12:32:46
 4  any of those things as well, to the extent that   12:32:48
 5  they were developed on one customer's   12:32:50
 6  environment and provided to another customer   12:32:53
 7  would really sort of fall within that rubric.   12:32:57
 8    Q.   Do you consider Break Fix updates,   12:33:01
 9  do those fall within this definition of update   12:33:06
10  that you use in this paragraph?        12:33:08
11         MR. POLITO: Objection, vague.   12:33:11
12    A.   A Break Fix that was shared across   12:33:12
13  customers would. I didn't do extensive   12:33:15
14  analysis of Break Fix updates. My focus was   12:33:18
15  primarily on the tax and regulatory. But I can   12:33:20
16  conceive of no situation where one developed in   12:33:24
17  one customer's environment and then provided to   12:33:27
18  other customers would not fall within this   12:33:30
19  definition as well.              12:33:32
20    Q.   Did you do -- you said you didn't   12:33:34
21  do extensive analysis. Did you do any analysis   12:33:36
22  of Break Fix updates?            12:33:38
23    A.   I believe I mix -- I mention a   12:33:42
24  couple of fix updates in my report in the   12:33:44
25  context -- not of PeopleSoft, but of some of   12:33:47
```

Page 145

```
 1  the other products. So --           12:33:49
 2    Q.   Are you offering any opinions that   12:33:53
 3  any Break Fix updates were cross-used?   12:33:54
 4         MR. POLITO: Objection, overbroad.   12:33:57
 5    A.   Let me refresh my recollection   12:33:58
 6  with respect to Break Fix, counsel. I just   12:34:00
 7  don't know if we gave specific example of those   12:34:09
 8  or not.                    12:34:11
 9         [Pause.]                12:34:12
10    A.   Would you just restate your   12:34:30
11  question again for me, please?         12:34:31
12    Q.   Are you offering any opinions that   12:34:33
13  any Break Fix updates were cross-used?   12:34:35
14         MR. POLITO: Objection, overbroad.   12:34:39
15         [Pause.]                12:35:25
16
17
18
19
20
21
22
23    Q.   Well, why don't we -- why don't we   12:35:55
24  move on? We'll get to those later.   12:35:56
25         In paragraph 23, you use the word   12:35:58
```

1  "provided." You say "constitutes cross-use if      12:36:01
2  the update is provided...."                         12:36:03
3          Do you mean provided in any way?           12:36:06
4  Or how do you define that word "provided" is        12:36:13
5  the better question?                               12:36:15
6      A.   I would think really provided in          12:36:18
7  any way to the other customer aside from those     12:36:25
8  specific operations that are allowed under the      12:36:30
9  license, which will -- again, you would need to     12:36:33
10 turn to the license to be certain.                 12:36:37
11     Q.   So if a Rimini engineer goes into          12:36:38
12 client -- I use client A and B for initial and     12:36:42
13 subsequent client. So if an engineer goes into      12:36:45
14 client A's environment and codes an update, and    12:36:52
15 client B needs that same update, engineer          12:36:52
16 remotely accesses, logs into client B's            12:36:55
17 environment and codes, retypes, that same          12:36:59
18 update, is that providing the same update or        12:37:01
19 not under your definition under 23?                12:37:04
20         MR. POLITO:  Objection, incomplete        12:37:06
21 hypothetical.                                       12:37:08
22     A.   It -- it depends how -- what --            12:37:10
23 what they're referencing and what they're -- I     12:37:12
24 mean, just the fact that they're typing doesn't    12:37:15
25 mean that they're not providing the same           12:37:16

Page 146

1  update. Are they looking at the original            12:37:18
2  update? Are they looking at pseudocode for the     12:37:21
3  original update? Are they looking at specific      12:37:23
4  programmatic instructions about make this          12:37:26
5  change at line 43 or line 43, do X? In those       12:37:28
6  cases, I would say yes, that update is being       12:37:33
7  provided to the other customer because the         12:37:37
8  second customer is benefiting directly from the    12:37:39
9  characterization of the update that was            12:37:44
10 developed on the first --                          12:37:46
11     Q.   What about if the update is just          12:37:48
12 one line and the engineer remembers that one       12:37:50
13 line and retypes it in client B's environment?     12:37:54
14 Is that providing it?                              12:37:58
15         MR. POLITO:  Objection, incomplete         12:38:01
16 hypothetical.                                       12:38:02
17     A.   It's my understanding that it can         12:38:02
18 be, counsel, because it's my understanding that    12:38:04
19 just memorization of something can be a form of    12:38:06
20 copying.                                            12:38:11
21     Q.   Even though that one line is              12:38:11
22 Rimini's creation, a Rimini engineer typed it,     12:38:13
23 doesn't contain Oracle code --                     12:38:17
24     A.   But --                                     12:38:19
25     Q.   -- providing that same retyping           12:38:20

Page 147

1  that same line in client B's environment is        12:38:22
2  cross-use in your opinion?                          12:38:25
3          MR. POLITO:  Same objections.             12:38:26
4      A.   Well, just to be clear, we                12:38:27
5  excluded any examples that were that small from    12:38:29
6  our analysis with respect to ident- -- or the     12:38:31
7  examples we identify of -- of cross-use.            12:38:35
8          But I think, speaking in a purely         12:38:38
9  hypothetical sense divorced from the facts of      12:38:41
10 the case, yeah, that memorization, even of a       12:38:44
11 single line. Because one of the things you're      12:38:47
12 -- you're imputing into your hypothetical that     12:38:50
13 you haven't really clarified, source code isn't    12:38:51
14 like a piece of paper where you just write         12:38:54
15 something down. You have to figure out where       12:38:56
16 in the code to make the change. You have to        12:38:57
17 know how to test the change. You know, you         12:39:00
18 might be making a one line change, but it's --     12:39:04
19 the one line change requires work beyond just      12:39:06
20 typing 80 characters of text. So --                12:39:10
21     Q.   If you remember the context then         12:39:13
22 and you then go into client B's and with that      12:39:15
23 context in mind, you retype it, in your            12:39:19
24 opinion, that's cross-use?                          12:39:21
25     A.   Sure, because you --                      12:39:22

Page 148

1          MR. POLITO:  Objection, vague.            12:39:24
2      A.   -- you may have memorized from           12:39:25
3  client A a certain thing that you can search       12:39:27
4  quickly to get you to that context. So, again,     12:39:30
5  it's situational. It depends what you're           12:39:32
6  referencing. But to the extent you're making      12:39:33
7  any reference to the work you did on client A      12:39:35
8  in order to incorporate that work into another    12:39:38
9  client's environment, you're cross using it.       12:39:40
10     Q.   Okay.                                     12:39:42
11         And so just to circle back to the         12:39:43
12 word "provided." So provided doesn't depend on    12:39:46
13 actual copying of the code like copy, paste or     12:39:49
14 transfer through a file. It can be -- it's         12:39:52
15 broader than that?                                 12:39:54
16         MR. POLITO:  Objection, misstates         12:39:55
17 facts incomplete hypothetical.                     12:39:56
18     A.   Again, it depends in my                   12:39:58
19 understanding on whether the benefit of the       12:40:02
20 work associated with that fix was -- that was     12:40:05
21 derived from the initial prototyping is carried   12:40:10
22 forward into the new environment when that         12:40:14
23 update is provided. So you're providing the       12:40:17
24 same update, and you are providing it in a way     12:40:20
25 that relies in any way on your use of the          12:40:22

Page 149

38 (Pages 146 - 149)

| | Page 150 | | | Page 152 |
|---|---|---|---|---|
| 1 | original customer's environment in order to 12:40:26 | | 1 | to you. Do you want to keep going? 12:42:46 |

**Page 150**

1  original customer's environment in order to   12:40:26
2  provide that update to the second customer.   12:40:28
3      Q.   What if the coding of the update   12:40:32
4  in client B's environment requires some change   12:40:49
5  to it so that the implementation of that update   12:40:53
6  in client A and client B's environment are   12:40:56
7  different, is it still cross-use?   12:40:59
8      MR. POLITO:  Objection, incomplete   12:41:02
9  hypothetical.   12:41:03
10     A.   Is customer B still receiving some   12:41:05
11  benefit from the work that was done in customer   12:41:08
12  A's environment?  For instance, you've got a   12:41:11
13  40-line change, and there's a one-line change   12:41:12
14  in customer B's environment to change the   12:41:15
15  customer name?  Absolutely, it would still be   12:41:17
16  cross-use.  But if you want to give me a set of   12:41:20
17  hypothetical facts, I'll -- I'll evaluate them   12:41:23
18  as best I can.   12:41:27
19     Q.   What if it's just the one-line   12:41:29
20  change in client A's environment and a similar   12:41:30
21  but not identical one-line change needs to   12:41:33
22  happen in client B's environment?   12:41:36
23     A.   How do --   12:41:39
24     MR. POLITO:  Objection, vague,   12:41:40
25  incomplete hypothetical.   12:41:42

Page 150

**Page 151**

1      A.   Yeah.  In your hypothetical, how   12:41:42
2  did you determine what the change should be,   12:41:43
3  where the change should be applied, and how the   12:41:47
4  change should be applied?   12:41:51
5      Q.   By -- by using client A's   12:41:52
6  environment.  The engineer goes in client A's   12:41:54
7  environment and figure outs -- figures out   12:41:59
8  where the change needs to be and the gist of   12:42:00
9  what the change needs to say and then does the   12:42:02
10  same thing, although with a slightly different   12:42:04
11  implementation of that one line on client B's   12:42:07
12  environment.  Is that cross-use?   12:42:09
13     MR. POLITO:  Objection, vague.   12:42:11
14     A.   Again, that's not -- that's not   12:42:12
15  consistent with the kinds of examples I give in   12:42:13
16  my report, counsel.  But since you've -- you've   12:42:17
17  stipulated that the work was done in client A's   12:42:21
18  to determine what the change needed to be and   12:42:24
19  generally where it needed to be and that you   12:42:27
20  were applying that knowledge in the second   12:42:29
21  environment, then I would say yes, you're cross   12:42:31
22  using that knowledge and the update itself,   12:42:33
23  which you've said is similar but with a minor   12:42:36
24  change.   12:42:38
25     MR. VANDEVELDE:  Should -- I defer   12:42:38

Page 151

**Page 152**

1  to you.  Do you want to keep going?   12:42:46
2  Let's go off the record just one second.   12:42:47
3      THE VIDEOGRAPHER:  Going off the   12:42:49
4  record at 12:43 p.m.   12:42:51
5      [Luncheon recess at 12:43 p.m.]   13:27:53
6      13:27:53

Page 152

**Page 153**

1      AFTERNOON SESSION   13:27:59
2      [Resuming at 1:35 p.m.]   13:28:00
3      THE VIDEOGRAPHER:  We're back on   13:34:39
4  the record at 1:35 p.m.  Continuing   13:34:48
5  media number 3.   13:34:51
6      EXAMINATION CONTINUING   13:34:51
7  BY MR. VANDEVELDE:   13:34:51
8      Q.   All right.  Do you understand   13:34:54
9  you're still under oath?   13:34:55
10     A.   Yes, I do, counsel.   13:34:56
11     Q.   If you could turn to paragraph 24   13:34:59
12  of your supplemental report.  It says:   13:35:00
13      "I understand that any   13:35:08
14  reproduction of, distribution or creation of   13:35:09
15  derivative works with one customer's licensed   13:35:13
16  Oracle software constitutes cross-use if that   13:35:16
17  reproduction, distribution or creation of   13:35:19
18  derivative works benefits another customer."   13:35:21
19      What do you mean by benefits?   13:35:27

Page 153

39 (Pages 150 - 153)

1 Circuit's opinion used the word "benefit"?  13:40:44
2    A.   I think it used a more strained  13:40:49
3 term, something like under color of one license  13:40:51
4 on behalf of another or -- or a little bit more  13:40:54
5 complex language. I quote it in my report if  13:40:57
6 you would like to me to find it.  13:40:59
7    Q.   So are you aware that it did not  13:41:01
8 use the word "benefit"?  13:41:03
9    A.   The specific section that I'm  13:41:04
10 recalling I do not recall using the -- the word  13:41:06
11 "benefit." I didn't -- I didn't memorize the  13:41:09
12 entire ruling, but the passages that I most  13:41:11
13 clearly recall did not.  13:41:13
14    Q.   Do you know whether the district  13:41:15
15 court used the word "benefit"?  13:41:16
16    A.   I don't recall specifically as I  13:41:18
17 sit here, counsel.  13:41:20
18    Q.   Do you know any court that has  13:41:21
19 ever applied the test you articulate here in 24  13:41:26
20 with respect to cross-use --  13:41:32
21    MR. POLITO: Objection.  13:41:33
22 BY MR. VANDEVELDE:  13:41:34
23    Q.   -- using the word "benefit"?  13:41:34
24    MR. POLITO: I'm sorry, counsel.  13:41:36
25    Objection, misstates testimony,  13:41:36

Page 158

1    overbroad, vague, outside the scope.  13:41:39
2    A.   My recollection is that the  13:41:48
3 language was not used solely for similar  13:41:49
4 language to that which I would have attempted  13:41:53
5 to capture here.  13:41:56
6    Q.   Let's say -- let's say Rimini has  13:41:59
7 a client, client A, that needs an update, and  13:42:05
8 there is no client B. It only has one client.  13:42:09
9 Rimini creates the update. And six months  13:42:13
10 later, client B signs up with Rimini. Is it  13:42:19
11 cross-use under your definition to -- for  13:42:24
12 Rimini to leverage that prior update they had  13:42:28
13 created in client B's environment?  13:42:31
14    MR. POLITO: Objection, vague,  13:42:34
15    incomplete hypothetical.  13:42:35
16    A.   It's my understanding that the  13:42:41
17 specific behaviors that the court prohibited,  13:42:44
18 which I understand to be cross-use in the  13:42:48
19 Rimini 1 matter, extend to future customers as  13:42:50
20 well. So in your scenario, if -- if it would  13:42:54
21 be cross-use with a current customer, it would  13:42:57
22 also be cross-use with a -- the same behavior  13:42:59
23 with a future customer would also constitute  13:43:02
24 cross-use.  13:43:04
25    Q.   Yeah. And let's break that down.  13:43:05

Page 159

1 I mean, let's just focus on client A. Client A  13:43:07
2 has an environment, Rimini engineer goes in and  13:43:09
3 provides an update. Is that cross-use? There  13:43:12
4 is no client B yet. It's just -- is that  13:43:15
5 cross-use then?  13:43:17
6    MR. POLITO: Objection, incomplete  13:43:18
7    hypothetical. Object to the extent it  13:43:20
8    calls for a legal conclusion, misstates  13:43:21
9    testimony.  13:43:23
10 BY MR. VANDEVELDE:  13:43:23
11    Q.   Under your definition of cross-use  13:43:23
12 as applied in your report.  13:43:25
13    A.   Let me clarify your hypothetical.  13:43:27
14 This is in your hypothetical something that  13:43:29
15 Rimini is completely -- is creating completely  13:43:34
16 from scratch without reference to anything from  13:43:36
17 any other customer or any other place. It's --  13:43:38
18 they're coming in, and it's the brand new, the  13:43:42
19 first act, if you will.  13:43:43
20    Q.   Uh-huh, yes.  13:43:44
21    A.   They're coming in and creating the  13:43:46
22 very first mod ever created. Was that an act  13:43:47
23 of cross-use? Not at that point in time  13:43:50
24 because there has been no use or provision to  13:43:52
25 another customer.  13:43:55

Page 160

1    Q.   Okay.  13:43:56
2    And then six months down -- down  13:43:57
3 the road, Rimini gets client B, client B signs  13:44:01
4 up with Rimini, and client B has the same  13:44:04
5 issue.  13:44:06
6    A.   Uh-huh.  13:44:07
7    Q.   Can Rimini leverage that prior  13:44:08
8 work it did, that knowledge, know-how, update,  13:44:11
9 code, to provide to client B --  13:44:16
10    MR. POLITO: Objection.  13:44:16
11    Q.   -- without being cross-use?  13:44:18
12    MR. POLITO: Objection, calls for  13:44:20
13    a legal conclusion, incomplete  13:44:22
14    hypothetical, vague.  13:44:23
15    A.   Would you either substitute  13:44:25
16 something for the word "leverage" or clarify  13:44:27
17 what you mean by leverage? Just that's kind of  13:44:29
18 a fuzzy term really.  13:44:32
19    Q.   Well, let's keep it to provide the  13:44:33
20 same update. Rimini created a particular file,  13:44:35
21 it's 100 percent Rimini code, to help client A.  13:44:38
22 Client B doesn't exist yet. Six months down  13:44:41
23 the road, client B signs up with Rimini. They  13:44:46
24 have the same issue that client A had. Can  13:44:48
25 Rimini use that same code that it created, 100  13:44:51

Page 161

41 (Pages 158 - 161)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1 percent Rimini code, to fix that issue with       13:44:53
2 client B's environment --       13:44:56
3        MR. POLITO: Objection.       13:44:57
4 BY MR. VANDEVELDE:       13:44:57
5    Q.    -- or is that cross-use under your       13:44:57
6 definition?       13:44:59
7        MR. POLITO: Objection, calls for       13:45:00
8 a legal conclusion, incomplete       13:45:02
9 hypothetical, vague.       13:45:03
10    A.    I need two more clarifications if       13:45:05
11 you'll indulge me here, counsel. The first is,       13:45:06
12 is this code, for instance, that is       13:45:09
13 modification to PeopleSoft or some other Oracle       13:45:11
14 component? It's not just some hypothetical       13:45:14
15 standalone that --       13:45:16
16    Q.    Yeah, it's in connection with       13:45:18
17 PeopleSoft environment.       13:45:20
18    A.    Okay. And the other thing is,       13:45:21
19 just to be sure that we are absolutely clear,       13:45:23
20 when you say "Rimini creates it," they create       13:45:25
21 it totally from scratch in your hypothetical?       13:45:27
22    Q.    Well, it fits within the context       13:45:30
23 of client A's environment.       13:45:32
24    A.    Right, right.       13:45:34
25    Q.    Client A has a PeopleSoft       13:45:35
                                              Page 162

1 environment. Let's take the Arizona payroll       13:45:36
2 example. Rimini creates an update. Let's say       13:45:39
3 ten -- let's say it's ten lines of code, Rimini       13:45:42
4 wrote those ten lines of code. And client B       13:45:44
5 six months later signs up, and they need those       13:45:48
6 same ten lines of code. Can Rimini use those       13:45:51
7 same ten lines of code in client B's       13:45:56
8 environment, or is that cross-use?       13:45:59
9        MR. POLITO: Objection, calls for       13:46:00
10 a legal conclusion, incomplete       13:46:03
11 hypothetical.       13:46:04
12    A.    As I understand cross-use, that       13:46:05
13 would be cross-use.       13:46:07
14    Q.    Okay.       13:46:08
15    A.    Because, again, the first -- the       13:46:08
16 fix was developed in the first client's       13:46:10
17 environment and then is being applied for the       13:46:14
18 benefit of a second client.       13:46:16
19    Q.    Okay.       13:46:18
20        So which part of that is       13:46:23
21 cross-use?       13:46:28
22        MR. POLITO: Objection, vague.       13:46:29
23 BY MR. VANDEVELDE:       13:46:30
24    Q.    The provision of those ten lines       13:46:30
25 of code to client B?       13:46:32
                                              Page 163

1        MR. POLITO: Objection, vague,       13:46:35
2 incomplete hypothetical, calls for a       13:46:38
3 legal conclusion.       13:46:38
4    A.    What are the other parts that you       13:46:40
5 contemplate when you say --       13:46:41
6    Q.    I don't know. I'm asking you. I       13:46:42
7 suggested one. It doesn't have to be that one.       13:46:44
8 But what specifically is the cross-use in that       13:46:46
9 -- in that hypothetical?       13:46:48
10        MR. POLITO: Objection, calls for       13:46:49
11 a legal conclusion, vague, incomplete       13:46:50
12 hypothetical.       13:46:52
13    A.    The provision to another customer       13:46:54
14 for that customer's benefit.       13:47:00
15    Q.    Does it matter how it's provided       13:47:02
16 whether its file is transferred or the ten       13:47:05
17 lines are copy, pasted or the engineer       13:47:11
18 remembers those ten lines, or is that       13:47:13
19 irrelevant? It's still cross-use?       13:47:16
20        MR. POLITO: Objection, calls for       13:47:19
21 a legal conclusion.       13:47:20
22    A.    With respect to the material I       13:47:21
23 provided an opinion on, counsel, in my report,       13:47:22
24 I don't site examples of memorization. I have       13:47:26
25 set that issue aside with respect to what I --       13:47:31
                                              Page 164

1 I point to in my report.       13:47:34
2        With respect to your question of:       13:47:37
3 Does it matter if it comes in as a file that's       13:47:39
4 applied as a patch or as perhaps a snippet of       13:47:42
5 code in a textual file, or even by Rimini       13:47:44
6 looking at one client's screen and typing at       13:47:49
7 the other? I would consider all of those to be       13:47:51
8 acts of provision that would constitute       13:47:54
9 cross-use of that fix.       13:47:57
10    Q.    Why -- why does the provision of       13:47:58
11 those ten lines of code that Rimini created,       13:48:04
12 why is that cross-use? Who is benefiting from       13:48:06
13 it --       13:48:11
14        MR. POLITO: Objection.       13:48:11
15 BY MR. VANDEVELDE:       13:48:12
16    Q.    -- other than client B?       13:48:12
17        MR. POLITO: Pardon me.       13:48:13
18        Objection, compound, calls for a       13:48:15
19 legal conclusion, vague, incomplete       13:48:17
20 hypothetical.       13:48:21
21    A.    The two beneficiaries in the       13:48:24
22 scenario that you describe are, first of all,       13:48:27
23 of course, Rimini because it doesn't have to       13:48:29
24 recreate a solution, retest the solution, go       13:48:32
25 through all of the burden of defining the       13:48:36
                                              Page 165

42 (Pages 162 - 165)

1 solution. You know, it's able to, to use your   13:48:38
2 word, to leverage the solution that it had   13:48:42
3 already developed.   13:48:46
4         The second beneficiary is client   13:48:46
5 B, who you've already articulated in your   13:48:50
6 hypothetical needs that fix. And so getting   13:48:52
7 that fix for their use is a benefit to client   13:48:56
8 B.   13:49:00
9     Q.   But your definition in paragraph   13:49:01
10 24 is benefits another customer. So what about   13:49:02
11 the provision of that fix to client B benefits   13:49:07
12 another customer? Who is that other customer?   13:49:12
13         MR. POLITO: Objection, misstates   13:49:16
14 document.   13:49:17
15     A.   That's client B in our scenario.   13:49:17
16 Client A is the originating customer, if I   13:49:19
17 understood your hypothetical correctly. And   13:49:21
18 client B is the other customer who is receiving   13:49:24
19 that fix for its benefit, because, as you   13:49:26
20 stated in your hypothetical, they need it.   13:49:29
21         Did I misconstrue some part of the   13:49:37
22 question?   13:49:39
23     Q.   No. You -- you identified the   13:49:39
24 cross-use as the provision to client B;   13:49:40
25 correct?   13:49:45

Page 166

1     A.   That's correct.   13:49:45
2     Q.   Okay.   13:49:45
3         So what other customer benefits   13:49:47
4 from the provision of the fix to client B?   13:49:52
5         MR. POLITO: Objection, misstates   13:49:55
6 document, asked and answered.   13:49:56
7     A.   I'm trying to understand your   13:50:00
8 question, counsel. And I'm sorry, let me just   13:50:01
9 restate what I understand your hypothetical to   13:50:04
10 be to make sure I didn't get something wrong.   13:50:06
11         You're saying Rimini develops a   13:50:08
12 fix in customer A's environment, ten-line fix.   13:50:10
13 A while down the road, customer B comes along   13:50:15
14 and says, "Hey, I need a fix for X," and Rimini   13:50:19
15 goes, "Aha, I have that." Then I -- and Rimini   13:50:22
16 takes the fix they had developed for customer A   13:50:26
17 and provides that fix to customer B. That's   13:50:29
18 the -- the scenario that I'm -- I'm talking   13:50:34
19 about here or that -- and the customer   13:50:37
20 receiving the -- the benefit another customer,   13:50:40
21 the -- another customer in your hypothetical,   13:50:44
22 as I understand it, is customer B, who is   13:50:46
23 benefiting from the work that we've done on   13:50:50
24 customer A's environment.   13:50:54
25     Q.   So you're looking back and saying   13:50:56

Page 167

1 that original work in client A's environment   13:50:58
2 was cross-used because it benefited a future   13:51:00
3 customer, client B?   13:51:04
4     A.   The cross-use occurs when it's   13:51:05
5 provided to customer B. Just as the court's   13:51:07
6 ruling, as I understand it, contemplated that   13:51:15
7 cross-use could occur for a future customer,   13:51:18
8 and that's clearly the -- the situation here   13:51:23
9 that I understand you to be offering in your   13:51:26
10 hypothetical.   13:51:28
11     Q.   Let's unpack the word "provision."   13:51:31
12 When -- are you saying that the provision is   13:51:34
13 the distribution? Like what is -- what is the   13:51:37
14 reproduction derivative work or distribution   13:51:40
15 you're talking about when you say "the   13:51:43
16 provision of the fix"?   13:51:45
17         MR. POLITO: Misstates testimony.   13:51:47
18     A.   Okay. In the beginning, we have   13:51:57
19 the reproduction; that is to say, we are taking   13:51:58
20 some reproduction, distribution or creation of   13:52:02
21 derivative work. We are reproducing some --   13:52:07
22 something that already exists on customer A's   13:52:10
23 environment that's a part of PeopleSoft,   13:52:13
24 whether it's an Oracle-supplied fix or a   13:52:15
25 Rimini-supplied fix. We're reproducing that,   13:52:18

Page 168

1 maybe copying it onto a thumb drive or   13:52:22
2 something that we send to another customer,   13:52:25
3 maybe distributing it via FTP. Any -- any   13:52:27
4 means of actually taking that original content   13:52:31
5 that was developed for customer B -- A or   13:52:42
6 use -- or developed using customer A's   13:52:44
7 environment, I guess to be more clear, and   13:52:47
8 delivering that to another customer. So   13:52:50
9 whether you deliver it via looking at the   13:52:51
10 screen and typing the same changes, or deliver   13:52:56
11 it via sending it via AFW or via FTP or via   13:52:58
12 email, any -- any point at which that work is   13:53:05
13 delivered to someone not the licensee is -- is   13:53:10
14 really I guess the best fence I can put about   13:53:13
15 it.   13:53:16
16     Q.   Well, wait just let me pause   13:53:17
17 there. Are you saying that the recipient   13:53:18
18 doesn't have -- that's not part of the   13:53:21
19 hypothetical?   13:53:22
20     A.   No, no, it's not the original   13:53:22
21 licensee.   13:53:24
22     Q.   The original licensee. Okay.   13:53:24
23     A.   So you have customer A has   13:53:25
24 customer A's license. Customer B has customer   13:53:27
25 B's license. We hope they do. As soon as you   13:53:31

Page 169

43 (Pages 166 - 169)

1  take the fruit of the labor you have done in   13:53:33
2  customer A's environment and provide that fruit   13:53:35
3  to customer B, who was not the original   13:53:39
4  licensee, it's my understanding that you've --   13:53:43
5  you've committed an act of cross-use.   13:53:45
6      Q.   So let me make it more stark.   13:53:49
7  Let's say the update is just one line of code,   13:53:51
8  just a simple line of code.  And can the same   13:53:54
9  engineer who solved the problem and added that   13:54:00
10  one line of code to client A's environment add   13:54:02
11  that same line of code six months later to   13:54:05
12  client B's environment?   13:54:07
13      MR. POLITO:  Objection, incomplete   13:54:08
14  hypothetical, calls for speculation,   13:54:10
15  vague.   13:54:12
16      A.   Again, you know, I specifically   13:54:14
17  excluded from my analysis very small examples   13:54:17
18  like that because of my concern that the work   13:54:20
19  required to determine in any particular case   13:54:24
20  whether a single line of code was or was not   13:54:27
21  necessarily cross-use might outweigh the -- the   13:54:30
22  benefit of doing so.   13:54:34
23      But the answer -- it's the same   13:54:37
24  answer I gave you before lunch, is it will   13:54:39
25  depend very much on what was entailed in the   13:54:41

Page 170

1  development of that code.  If the development   13:54:43
2  of that single line of code relied on the use   13:54:45
3  of customer A's environment to identify where   13:54:50
4  the code should be -- or identify what the line   13:54:54
5  of code should be, identify where the line of   13:54:59
6  code should be asserted or deleted, identify   13:55:01
7  how to test the code, actually test the one   13:55:04
8  line to make sure it was the right line to do   13:55:07
9  in the right place and insert it in the light   13:55:09
10  way.  You know, if any of that activity on   13:55:12
11  behalf of customer A is then conveyed via the   13:55:15
12  provision of that line of code, whether it's   13:55:23
13  the line of code itself or a reduced testing   13:55:25
14  time or -- or any other benefit that -- that   13:55:28
15  customer A received that wasn't -- customer B   13:55:33
16  is now getting that benefit without having its   13:55:36
17  own license been used to achieve that benefit.   13:55:40
18  That's where the cross-use occurs.   13:55:45
19      So you're not -- you're providing   13:55:48
20  something to a customer that was not created or   13:55:49
21  developed using their license.   13:55:53
22      And I think in that context, you   13:55:55
23  know, I -- I can't think of an example as I sit   13:55:58
24  here that would not be cross-use.  I mean, I --   13:56:02
25  there is maybe some remote corner case where   13:56:05

Page 171

1  it's only a one-line file, and it has nothing   13:56:08
2  to do with the environment.  And -- you know, I   13:56:10
3  just -- we can go into hypotheticals forever.   13:56:12
4  But --   13:56:14
5      Q.   Do you agree that engineers get   13:56:15
6  more proficient and gain experience as they   13:56:18
7  perform their work over time?   13:56:22
8      MR. POLITO:  Objection, vague.   13:56:24
9      A.   With respect to what type of work?   13:56:30
10      Q.   PeopleSoft engineer who has worked   13:56:33
11  on -- would you agree that a PeopleSoft   13:56:35
12  engineer who is working day in and day out in a   13:56:37
13  PeopleSoft environment acquires knowledge and   13:56:39
14  gains experience about where things are   13:56:42
15  located, about how things function, about   13:56:43
16  different modules, et cetera, would you think   13:56:45
17  that they gain experience and knowledge and   13:56:47
18  proficiency in their job over time?   13:56:50
19      MR. POLITO:  Objection, vague,   13:56:53
20  compound.   13:56:56
21      A.   One would hope that they do so.   13:56:59
22      Q.   So how -- do you believe that the   13:57:04
23  same engineer can service both client A and   13:57:08
24  client B in my hypothetical where both needed   13:57:13
25  the same line of code?   13:57:16

Page 172

1      MR. POLITO:  Objection, vague,   13:57:17
2  calls for a legal conclusion, incomplete   13:57:18
3  hypothetical, vague as to "in my   13:57:20
4  hypothetical."   13:57:23
5      A.   In the hypothetical where you   13:57:23
6  postulated most recently, and I assume that's   13:57:31
7  the one where we're still talking about, that's   13:57:33
8  a single-line change is developed --   13:57:36
9      Q.   Yes.   13:57:37
10      A.   -- for customer A and then   13:57:38
11  customer B comes along and needs that change   13:57:40
12  and it is provided to customer B, you would   13:57:42
13  have to look to the allowable behavior first   13:57:45
14  under the contract to determine what -- what   13:57:50
15  the license permits a particular customer to   13:57:56
16  do.   13:57:59
17      And then you would have to look at   13:58:00
18  the specific actions of the individual, in this   13:58:04
19  case, your hypothetical software engineer.   13:58:09
20      With respect to -- and you would   13:58:11
21  also have to look at what was required in   13:58:16
22  developing the fix.  So, for instance, Did it   13:58:18
23  need to be tested?  Did you need to figure out   13:58:20
24  where to insert the line of code?  All of the   13:58:22
25  factors that I talked about before.  And say,   13:58:24

Page 173

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  okay, was -- was any of that used -- was any of   13:58:27
2  that knowledge used directly -- this specific   13:58:31
3  knowledge of this specific fix, not the general   13:58:37
4  knowledge of how PeopleSoft is hung together,   13:58:39
5  but the specific knowledge of a specific fix or   13:58:42
6  update or change.  Was that specific knowledge   13:58:44
7  re-used for the benefit of the other customer?   13:58:47
8      Q.    Well, let me make it more --   13:58:49
9      A.    And --            13:58:51
10     Q.    Let me make it more concrete.   13:58:51
11          The engineer wants to implement --   13:58:55
12  he knows that client A needs to implement this   13:58:58
13  fix.  He doesn't know what file it's going to   13:59:00
14  go in at first.            13:59:03
15     A.    Okay.          13:59:04
16     Q.    So he goes into client A's   13:59:04
17  environment, spends sometime and figures out,   13:59:07
18  "Oh, it should go in this particular file, in"   13:59:10
19  -- "in client A's environment."  You would   13:59:13
20  agree that's knowledge; right?  He now knows   13:59:15
21  where the fix should go?       13:59:18
22          MR. POLITO:  Objection, vague.   13:59:20
23     A.    Well, he has identified where the   13:59:22
24  fix goes in one particular environment.   13:59:23
25     Q.    And then he implements that   13:59:25

Page 174

1  one-line fix.  And six months later client B   13:59:26
2  comes on the scene, and client B needs that   13:59:30
3  same one-line fix.  Can the same engineer go   13:59:33
4  into client B's environment and add that one   13:59:39
5  line already knowing the file that it needs to   13:59:42
6  go into, or does that fall under cross-use as   13:59:45
7  you applied in your analysis?   13:59:47
8          MR. POLITO:  Objection, incomplete   13:59:50
9      hypothetical, vague, compound.   13:59:51
10     A.    Again, as I said before, counsel,   13:59:53
11  it's a little more complex than just adding a   13:59:55
12  line of code, because you have to know where to   13:59:57
13  add that -- add the line of code.   14:00:00
14     Q.    Yeah.  In my hypothetical, you   14:00:01
15  learned where.       14:00:04
16     A.    And you have to know what that   14:00:04
17  code is.  So he learned on customer A's   14:00:05
18  environment what program needed to be changed   14:00:07
19  and where the change needed to go in the   14:00:09
20  program and what specifically he needed to   14:00:12
21  change.  That was all work done under color of   14:00:14
22  customer A's license.  And then he goes to   14:00:18
23  customer B and applies that same update.   14:00:23
24          My understanding is that that   14:00:27
25  would be prohibited under the ruling from   14:00:29

Page 175

1  Rimini 1 and the instruction I've given with   14:00:33
2  respect to the interpretation of that ruling.   14:00:37
3      Q.    Well, let's --        14:00:39
4      A.    And it's -- it's a licensing issue   14:00:40
5  --            14:00:40
6      Q.    Yeah.          14:00:40
7      A.    -- with respect to what Oracle   14:00:42
8  permits.        14:00:43
9      Q.    You -- you've learned a lot about   14:00:44
10  PeopleSoft in connection with your work on this   14:00:45
11  case; right?       14:00:47
12     A.    A fair amount I think, yes.   14:00:49
13     Q.    Yeah.  You reviewed a lot of code?   14:00:50
14     A.    Yes.          14:00:53
15     Q.    PeopleSoft code.     14:00:54
16          If you got some subsequent   14:00:55
17  engagement and you needed to analyze a   14:00:57
18  particular function, and you knew from your   14:00:59
19  prior work on this case exactly where it was,   14:01:02
20  that's using your knowledge in this case for   14:01:04
21  that subsequent case.  Is that -- would that be   14:01:08
22  cross-use?        14:01:10
23          MR. POLITO:  Objection, calls for   14:01:11
24      a legal conclusion, outside the scope,   14:01:12
25      incomplete hypothetical.   14:01:13

Page 176

1      A.    Before I did something like that,   14:01:15
2  I would want to consult with counsel both about   14:01:17
3  the terms of my protective order and -- and the   14:01:19
4  terms of the -- the license on the system where   14:01:22
5  I had learned that.  I -- I don't know the   14:01:24
6  answer to that, counsel, without, you know,   14:01:26
7  actually committing the study that would be   14:01:29
8  required to determine what was allowed.   14:01:31
9          I would assume that I was not   14:01:33
10  allowed to do that both under the terms of --   14:01:34
11  of the protective order and the terms of   14:01:37
12  whatever license may have pertained with   14:01:41
13  respect to the materials that were produced.   14:01:44
14  You know, this is a little bit nonstandard.   14:01:46
15  I'm not a licensee of Oracle.  I've been given   14:01:48
16  access to Oracle materials in the context of   14:01:51
17  litigation.  But I certainly wouldn't undertake   14:01:53
18  that without speaking to counsel about whether   14:01:55
19  I was even allowed to work on an Oracle   14:01:59
20  PeopleSoft case or environment.   14:02:03
21     Q.    Can a Rimini engineer work on   14:02:06
22  multiple clients without cross using?   14:02:08
23          MR. POLITO:  Objection, incomplete   14:02:12
24      hypothetical, calls for speculation.   14:02:13
25     A.    I think the answer to that   14:02:17

Page 177

45 (Pages 174 - 177)

1    MR. POLITO:  Misstates prior    14:06:46
2  testimony.    14:06:47
3    A.    I'm still not understanding your    14:06:49
4  --    14:06:49
5    Q.    You said -- you said a blank line.    14:06:51
6  So are you comparing it - it's de minimis    14:06:53
7  relative to the file?  It's de minimis relative    14:06:57
8  to the module?  It's de minimis relative to the    14:06:58
9  entire program?  What is -- what are you    14:07:00
10  comparing it against?    14:07:03
11    MR. POLITO:  Objection, misstates    14:07:04
12  prior testimony, vague, compound.    14:07:05
13    A.    I am comparing -- in concluding    14:07:07
14  that that line is de minimis, I am, first of    14:07:10
15  all, looking at the amount of content that was    14:07:14
16  char- -- copied, the actual number of    14:07:16
17  characters or words, the size of the copying.    14:07:19
18  So in both of these cases, I've postulated it's    14:07:21
19  a very small amount.    14:07:24
20    I'm also considering the value.    14:07:25
21  Is it a negligible value to the software that's    14:07:28
22  the recipient or not?  And, you know, the sad    14:07:32
23  fact with computer software is that almost any    14:07:36
24  line if removed from a program, if it's an    14:07:39
25  actual line of code, will, in all likelihood,    14:07:42

Page 182

1  cause that program to fail in at least some    14:07:45
2  instances, rendering the software less -- less    14:07:48
3  reliable and, therefore, less valuable.    14:07:51
4    So in -- in computer software    14:07:53
5  sense, even a single line of code is certainly    14:07:57
6  not negligible.  Now, it may still be trivial,    14:08:00
7  as I say, if it's something that really has no    14:08:02
8  functional operation and is extremely short,    14:08:05
9  doesn't really embody any particular expressive    14:08:08
10  creation as it exists.  Then those are the    14:08:12
11  factors I look for in assessing trivial and    14:08:17
12  negligible.  I don't look specifically to a    14:08:19
13  numeric quantum of X compared to Y or X over Y    14:08:23
14  as you suggest it would be the -- perhaps the    14:08:28
15  --    14:08:28
16    Q.    I'm not suggesting that you    14:08:31
17  provide a numeric quantum, at least at this    14:08:33
18  point.  But I'm asking, de minimis has to be    14:08:36
19  relative to something.  Would you agree?    14:08:39
20    MR. POLITO:  Objection, misstates    14:08:41
21  prior testimony.    14:08:43
22  BY MR. VANDEVELDE:    14:08:43
23    Q.    If you had a -- if you had a 17    14:08:44
24  syllable haiku standing alone, if you copied    14:08:47
25  all 17 syllables, that wouldn't be de minimis.    14:08:51

Page 183

1  Would you agree?    14:08:54
2    A.    Oh, certainly, yes.  You copied    14:08:55
3  the whole thing.    14:08:57
4    Q.    If you had a 17 syllable haiku in    14:08:58
5  a 5,000 page book of haikus, and you copied    14:09:01
6  that one, would that be de minimis or not?    14:09:05
7    A.    I do not think that would be de    14:09:07
8  minimis --    14:09:09
9    Q.    Okay.    14:09:09
10    A.    -- if you copied the entire thing,    14:09:09
11  even if it was a 5,000 page book.    14:09:12
12    Q.    That's what I'm asking.  So are    14:09:13
13  you saying it's not de minimis even relative to    14:09:16
14  the entire registered copyrighted work?    14:09:19
15    MR. POLITO:  Objection, vague.    14:09:21
16    A.    I do not think that the -- that    14:09:22
17  the entire registered copyright work, that's    14:09:25
18  not my understanding that that's the    14:09:30
19  appropriate comparand.    14:09:34
20    [Reporter clarification.]    14:09:35
21    Q.    Okay.    14:09:35
22    What's the appropriate comparand    14:09:35
23  in your view?    14:09:37
24    A.    Well, again, I think it's just an    14:09:38
25  assessment just directly with respect to what    14:09:39

Page 184

1  was copied.  Is it trivial?  Is it negligible?    14:09:42
2  Does it -- does it attribute anything of value    14:09:47
3  as the starting point?  And then, you know,    14:09:52
4  there is for practical reasons I think even    14:09:54
5  with code some lower boundary that you would    14:09:56
6  need to apply.    14:09:59
7    In order to be ultra conservative    14:10:01
8  in my report, I've really used a 20-percent    14:10:05
9  boundary, but often, that was hundreds of lines    14:10:07
10  of similarity.  And I -- you know, that we used    14:10:09
11  as a cutoff point in our -- in our de minimis    14:10:11
12  counts and the exhibits I prepared.  But I    14:10:14
13  actually think that's maybe an artificially    14:10:18
14  high boundary.    14:10:20
15    Q.    Based on what?    14:10:22
16    A.    Based on having looked at some of    14:10:24
17  the stuff we actually excluded using that    14:10:25
18  boundary.    14:10:28
19    Q.    If Rimini runs a test in client    14:10:29
20  A's environment and then uses the knowledge it    14:10:33
21  gains in order to avoid doing a similar test in    14:10:36
22  client B's environment, is that cross-use under    14:10:39
23  your definition?    14:10:42
24    MR. POLITO:  Objection, incomplete    14:10:43
25  hypothetical.    14:10:44

Page 185

47 (Pages 182 - 185)

1      A.    Runs a test in customer A's         14:10:45
2  environment and uses the knowledge gained from   14:10:47
3  that test to avoid having to retest in customer   14:10:49
4  B's?  That is cross-use of that first        14:10:52
5  customer's environment.  They are using the     14:10:54
6  knowledge resulting from that test to the      14:10:57
7  benefit of customer B by not having to spend    14:11:01
8  their CPU cycles or their -- you know, their     14:11:04
9  resource to do that test and not having to      14:11:06
10  incur the delay that -- whatever it was, that    14:11:08
11  was associated with that testing.          14:11:11
12      Q.    What if client B doesn't exist at   14:11:13
13  the time?  So engineer -- Rimini engineer goes   14:11:15
14  into client A's environment.  It runs a test    14:11:17
15  and gains some knowledge that the test worked    14:11:19
16  based on the update that they implemented.      14:11:22
17  Client B comes along six months later.  They    14:11:24
18  implement the same update and decide they don't   14:11:26
19  need to run the test because they know it      14:11:29
20  works.  Is that still cross-use even though at    14:11:31
21  the time the -- the update was provided to      14:11:36
22  client A they didn't know that client B even    14:11:39
23  existed?                    14:11:42
24      MR. POLITO:  Hold on.          14:11:43
25      A.    I would deem it to be so --     14:11:44

Page 186

1      MR. POLITO:  Sorry.  Hold on one   14:11:46
2  second.                    14:11:48
3      Objection, vague, incomplete      14:11:52
4  hypothetical.                14:11:54
5      MR. POLITO:  Sorry.          14:11:54
6      Please go ahead.            14:11:58
7      A.    I would deem it to be so in the   14:11:59
8  instance where their decision not to cast in     14:12:02
9  the second environment was based on their use    14:12:09
10  of that testing in the first environment.      14:12:11
11      Q.    What's the copy or reproduction or   14:12:14
12  derivative work in this example that        14:12:17
13  constitutes cross-use?              14:12:19
14      A.    Well, you said you've moved the   14:12:22
15  fix across.  That's the -- the copy        14:12:24
16  reproduction or derivative work.  And the -- in   14:12:27
17  your specific example.  And the benefit is not   14:12:32
18  only a fix, but also the benefit of the reduced   14:12:36
19  testing and anything that was -- whether it's    14:12:38
20  resource consumption or the reduced time delay   14:12:41
21  before the test is benefited.  And, of course,   14:12:47
22  Rimini is also a clear beneficiary of the      14:12:49
23  cross-use in this particular instance because    14:12:53
24  Rimini is not having to provide the personnel    14:12:55
25  and the time to do the second test.  They're --   14:12:57

Page 187

1  they're freeing their resource to move on to    14:13:01
2  some other activity.              14:13:04
3      Q.    So Rimini's knowledge that the   14:13:08
4  test works is part of what informs your       14:13:15
5  analysis that it's cross-use; Rimini benefits    14:13:15
6  because they know the test works?          14:13:17
7      MR. POLITO:  Objection, misstates   14:13:20
8  the prior testimony.              14:13:22
9      A.    That's not what I said.  It's --   14:13:22
10  it's Rimini's use of knowledge in a new       14:13:23
11  environment, Rimini's reliance on the use made   14:13:25
12  of customer A's environment for the testing and   14:13:30
13  for the development of the fix.  When that is    14:13:34
14  just automatically propagated to another client   14:13:42
15  environment, Rimini is benefiting both from not   14:13:42
16  having to redevelop the fix and not having to    14:13:47
17  retest the fix.                14:13:49
18      So it's not from their knowledge     14:13:50
19  of the fix, but it's from their ability to --    14:13:51
20  to transfer and benefit from that knowledge     14:13:56
21  when they move to a second environment.       14:14:00
22      Q.    What about this -- what about this   14:14:04
23  hypo?  Ten clients need the same update.  Ten    14:14:06
24  different engineers, independent Rimini       14:14:14
25  engineers, independently implement that update,   14:14:15

Page 188

1  no cross-use, according to your definition.  A   14:14:17
2  single Rima -- Rimini QA engineer goes into the   14:14:27
3  first of those ten that got the update and      14:14:30
4  tests it and knows it works.  Is it cross-use    14:14:33
5  if that QA engineer goes into client's B, C, D,   14:14:37
6  et cetera, and does shorter versions of tests    14:14:41
7  because he knows that it worked for client A?    14:14:43
8      MR. POLITO:  Objection, incomplete   14:14:45
9  hypothetical.                14:14:47
10      A.    There are some gaps there.  Are   14:14:47
11  we -- are the ten engineers supplying the same   14:14:49
12  solution in -- let's use the PeopleSoft soft --   14:14:52
13  environment, for example.            14:14:55
14      Q.    Yeah.              14:14:56
15      A.    Or one Oracle -- one of the Oracle   14:14:56
16  product environments.             14:14:58
17      Q.    Yeah, if it's an Oracle environment.   14:14:59
18  The ten implementations of that same update are   14:15:01
19  different, are not cross-use.  They're used by   14:15:06
20  ten different engineers.  Seems like they have   14:15:10
21  to be under your definition of cross-use.  And   14:15:13
22  now their testing needs to happen.  So a QA     14:15:15
23  engineer goes into the first one and knows that   14:15:19
24  it works in client A's environment.  And now    14:15:21
25  the same QA engineer goes into client B.  And    14:15:24

Page 189

1 although it's slightly different, they know 14:15:29
2 that they can run a shorter version of the 14:15:29
3 test. Is that cross-use? 14:15:33
4     MR. POLITO: Objection, vague -- 14:15:33
5   Q.   -- under your definition? 14:15:34
6     MR. POLITO: I'm sorry, counsel. 14:15:35
7 Incomplete hypothetical. 14:15:36
8   A.   As best I understand your 14:15:38
9 hypothetical, counsel, where ten engineers have 14:15:39
10 completely, independently applied ten different 14:15:44
11 changes in ten different environments, I'm not 14:15:48
12 sure how you get to the reuse of testing under 14:15:53
13 your hypothetical. Because if they had done it 14:15:56
14 completely independently, how would they be 14:15:59
15 able to rely on the results from the 14:16:01
16 other -- other test? You know, if they're 14:16:06
17 applying exactly the same change -- 14:16:07
18   Q.   Yeah, I'm not saying they avoid 14:16:07
19 it. I'm saying they can reduce -- 14:16:07
20   A.   -- and so somehow something has -- 14:16:10
21 is coordinated -- 14:16:12
22   Q.   -- they can reduce -- 14:16:12
23   A.   -- so that they're doing the exact 14:16:12
24 same change, then, yes, they're benefiting 14:16:15
25 from the -- 14:16:16

Page 190

1     MR. POLITO: Objection, asked -- 14:17:09
2   Q.   -- without cross-using under your 14:17:10
3 definition? 14:17:13
4     MR. POLITO: Objection, asked and 14:17:13
5 answered, incomplete hypothetical. 14:17:14
6   A.   Again, counsel, with my 14:17:19
7 understanding of the definition of cross-use, 14:17:21
8 it depends exactly on what they do. There's 14:17:23
9 not a blanket yes or no answer. It would 14:17:28
10 depend exactly on what they do. Do they reuse 14:17:32
11 any component of the work done on customer A's 14:17:37
12 environment for the benefit of customer B? 14:17:40
13 Then my understanding of what's been prohibited 14:17:43
14 under cross-use is that that would be 14:17:46
15 disallowed. If somehow there were able to do 14:17:48
16 that, you know, the individual was able to do 14:17:52
17 that without any reference to anything that was 14:17:55
18 done on behalf of customer A, without any 14:17:59
19 benefit or shortening of testing or, you know, 14:18:02
20 basically followed what the license requires, 14:18:05
21 do the change from scratch on customer B 14:18:07
22 somehow without -- without referencing anything 14:18:10
23 they had done on A, it may well be. One would 14:18:12
24 look to the license term. 14:18:15
25 BY MR. VANDEVELDE: 14:18:15

Page 192

1   Q.   Okay. 14:16:16
2     [Cross-talk. Simultaneous talking 14:16:16
3 by counsel and the witness.] 14:16:16
4   A.   -- the testing because they know 14:16:18
5 that that exact same change works or that -- 14:16:18
6 that that solution works. 14:16:21
7   Q.   Or the similar change works? 14:16:21
8   A.   That's -- yeah, that solution 14:16:23
9 works. And they don't have to test A, B, C and 14:16:24
10 D because somehow they can infer that. I would 14:16:27
11 be uncomfortable with that scenario as a 14:16:30
12 customer myself, but -- but if the hypothesis 14:16:32
13 is that they do that, and they don't have to 14:16:36
14 redo the testing, that's a benefit to Rimini. 14:16:38
15     THE COURT REPORTER: By the way, 14:16:46
16 when there's cross-talk, I'm writing her 14:16:47
17 answer down. 14:16:49
18     MR. VANDEVELDE: Yeah, that's 14:16:50
19 fine. 14:16:50
20   Q.   So let's say two clients -- put 14:16:51
21 aside testing for a second and go back to just 14:16:53
22 the -- the development of updates. If two 14:16:56
23 clients need the exact same update, can the 14:16:58
24 same Rimini engineer provide it for those two 14:17:04
25 clients -- 14:17:08

Page 191

1   Q.   Or -- or can they reuse their 14:18:17
2 knowledge, though, from the solution they 14:18:19
3 provide for client A? 14:18:21
4     MR. POLITO: Objection, vague, 14:18:23
5 asked and answered, incomplete 14:18:24
6 hypothetical. 14:18:25
7   A.   Again, I think we did cover this 14:18:27
8 earlier, but it depends on specifically what 14:18:29
9 the knowledge is and how they're using it. 14:18:32
10   Q.   And I think you said earlier, if 14:18:36
11 you -- if you gain knowledge about where to 14:18:37
12 implement the fix, what the fix should be, 14:18:40
13 right, how it fits into the context, then you 14:18:45
14 used that knowledge for client B, then that 14:18:48
15 would be cross-use under your definition? 14:18:50
16   A.   If you develop the knowledge of 14:18:52
17 where, what and when on customer A -- let's -- 14:18:54
18 let's use a hypothetical here. It takes me a 14:18:57
19 week to figure out exactly what needs to be 14:19:01
20 changed because I have to research the bug. I 14:19:03
21 have to figure out what the bug is. I have to 14:19:05
22 figure out what program the bug is. I have to 14:19:08
23 study the program and how it operates. And I 14:19:11
24 have to say, "Ah, I can fix this with a single 14:19:13
25 line. Lucky me. I can do that just by making 14:19:17

Page 193

49 (Pages 190 - 193)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



1 this one little tweak right here." You know,   14:19:20
2 I -- that -- when you say one line, you're kind   14:19:23
3 of assuming that that's just something that's   14:19:26
4 really a quick instantaneous, "I can do that."   14:19:30
5 But that's not the way code really works in the   14:19:34
6 real world.   14:19:37
7        So now I go to customer B, and   14:19:39
8 they're having the same problem. And I want to   14:19:41
9 help them out. And I go, "Oh, I know exactly   14:19:45
10 what I did on customer A. I remember, you   14:19:48
11 know, I did all that testing to make sure my   14:19:52
12 fix was going to fix everything and wasn't   14:19:54
13 going to break anything after I applied it."   14:19:56
14 So, you know, maybe I spent two entire weeks on   14:19:58
15 customer A just making sure this is the right   14:20:01
16 fix. Now I go to customer B, and I just go,   14:20:03
17 "Oh, I know what that was. I remember exactly.   14:20:06
18 I remember the exact line. I remember the   14:20:08
19 exact place in the code it needs to go. I   14:20:09
20 remember the exact way I need to insert it.   14:20:12
21 And I don't even need to test it because this   14:20:14
22 is" -- "this is the same thing."   14:20:17
23        Then you're benefiting from that.   14:20:17
24 You're benefiting from the work done on   14:20:20
25 customer A's license over those few weeks when   14:20:22
Page 194

1 you take that change to customer B.   14:20:25
2        Now, maybe instead your engineer   14:20:27
3 goes to customer B's environment, and they go,   14:20:30
4 "I kind of remember I changed something, and   14:20:33
5 I'm going to totally figure it out from   14:20:35
6 scratch. I'm not even sure this environment is   14:20:37
7 identical. So I've really got to do some work   14:20:39
8 here and figure this out."   14:20:41
9        In the second scenario, where   14:20:43
10 there's no reuse of the knowledge on -- on --   14:20:45
11 from customer A, or you're only using your   14:20:46
12 high-level generalized knowledge of the   14:20:49
13 PeopleSoft, you know, product suite. And this   14:20:52
14 is an HRMS product, so I'm going to look in the   14:20:54
15 HRMS library, you know, at a very high level.   14:20:58
16 Then you're -- you know, there may be   14:20:59
17 hypothetically be a way that he can do that   14:21:01
18 without cross-use.   14:21:04
19    Q.    But in your -- the initial part of   14:21:05
20 your answer, you talked about someone who did a   14:21:07
21 lot of work and figured it out, and, you know,   14:21:09
22 figured out what to write and tested it and   14:21:11
23 knows it works. So in your opinion, any   14:21:13
24 customer who would benefit from that experience   14:21:17
25 and knowledge gained from that engineer, that   14:21:21
Page 195

1 would be cross-use if that same engineer solved   14:21:25
2 that same problem for those other customers?   14:21:28
3        MR. POLITO: Objection, incomplete   14:21:31
4 hypothetical.   14:21:32
5    A.    Assuming that their solution of   14:21:33
6 that problem relied on the use of the first   14:21:36
7 customer's environment, that is -- is my   14:21:39
8 understanding. You know, if their solution   14:21:43
9 didn't rely on the use of the first customer's   14:21:46
10 environment, we would have a different   14:21:48
11 hypothetical.   14:21:50
12    Q.    Turn to paragraph 222 for a   14:22:11
13 second.   14:22:13
14        It says:   14:22:24
25        So what if -- I think we covered   14:22:53
Page 196

1 this in a slightly different context. But what   14:22:57
2 if the subsequent customer, client B, doesn't   14:23:00
3 exist yet? Would you -- would this not be   14:23:04
4 cross-use because there could not -- the   14:23:08
5 engineer could not have formed an intent to   14:23:10
6 cross-use since they didn't know about client   14:23:12
7 B?   14:23:14
8        MR. POLITO: Objection, asked and   14:23:15
9 answered. Object to the extent it calls   14:23:16
10 for a legal conclusion.   14:23:18
22 that your scenario is a hypothetical   14:23:55
23 completely, you know, I can -- I can try to   14:23:58
24 apply a construction of what -- what my   14:24:00
25 understanding would be in that scene.   14:24:02
Page 197

50 (Pages 194 - 197)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    THE WITNESS: Do you mind if we    14:32:54
2  take a short break at sometime soon,    14:33:05
3  counsel?    14:33:07
4    MR. VANDEVELDE: Sure. Yeah.    14:33:07
5    THE VIDEOGRAPHER: This marks the    14:33:11
6  end of media number 3. We're going off    14:33:12
7  the record at 2:33 p.m.    14:33:14
8    [Recess at 2:33 p.m.]    14:33:16
9    [Resuming at 2:54 p.m.]    14:41:29
10    THE VIDEOGRAPHER: We're back on    14:54:05
11  the record at 2:54 p.m., and this marks    14:54:15
12  the beginning of media number 4 in the    14:54:17
13  deposition of Barbara Frederiksen-Cross.    14:54:19
14    EXAMINATION CONTINUING    14:54:19
15  BY MR. VANDEVELDE:    14:54:19
16    Q.  Do you understand you're still    14:54:23
17  under oath?    14:54:24
18    A.  I do, sir.    14:54:25
19    Q.  Let's do another hypothetical.    14:54:27
20  Two clients of Rimini need the same update, and    14:54:32
21  there's one engineer.  Rimini only has one    14:54:35
22  engineer.  And the engineer goes into client    14:54:40
23  A's environment, spends two weeks to solve the    14:54:43
24  problem.  He learns where the problem is.  He    14:54:45
25  learns how to fix it.  He learns what the    14:54:48

Page 206

1  solution is.  How does that engineer implement    14:54:50
2  the same fix to client B's environment without    14:54:55
3  cross-using as you apply the definition?    14:55:02
4    MR. POLITO: Object to the form,    14:55:05
5    vague, incomplete hypothetical.    14:55:06
6    A.  I have really not tried to assess    14:55:11
7  how Rimini can or should set up its business    14:55:14
8  model.  That's been outside the remit of what    14:55:18
9  I've been asked to do, counsel.  I -- in the    14:55:20
10  scenario you propose, what I would suggest is    14:55:26
11  that the engineer talk to Rimini's counsel    14:55:29
12  and -- and, you know, that they examine the    14:55:32
13  licenses and figure out what they need to do to    14:55:34
14  stay in compliance with the license.  I -- I    14:55:37
15  haven't been asked to figure out what that    14:55:40
16  would be, and I'm -- I'm not prepared to try to    14:55:42
17  think of a scenario as I sit here.  I just    14:55:44
18  don't have an answer to that question.    14:55:46
19    Q.  So can you think of a way that    14:55:49
20  they -- that engineer could implement the fix    14:55:51
21  in client B's environment without cross-using,    14:55:56
22  as you defined that term?    14:55:59
23    MR. POLITO: Same objections,    14:56:01
24    asked and answered.    14:56:02
25    A.  Well, the first step would be to    14:56:04

Page 207

1  not use the -- the work done under customer A's    14:56:06
2  license when doing the fix for customer B.    14:56:17
3  Now, what that would entail, you know, in a    14:56:20
4  specific instance would have to be determined    14:56:23
5  on an instance by instance basis.    14:56:24
6    Q.  So in my hypo, it's the -- there's    14:56:27
7  only one engineer at the company --    14:56:28
8    A.  Uh-huh.    14:56:28
9    Q.  -- and they identify the problem    14:56:30
10  in client A's environment.  They learned where    14:56:33
11  it is.  They learned how to fix it.  They    14:56:36
12  learned what the solution is like.  It took two    14:56:38
13  weeks to do.  And now client B is the exact    14:56:42
14  same issue.  The engineer knew that.  And can    14:56:45
15  you think of a way, given that the engineer has    14:56:50
16  acquired that knowledge -- I think you called    14:56:54
17  it the what, where and how of how to fix the    14:56:56
18  problem to client A's environment.  Can that    14:57:01
19  engineer implement that fix in client B's    14:57:03
20  environment without cross-using, as you defined    14:57:06
21  that term?    14:57:10
22    MR. POLITO: Objection, vague,    14:57:10
23    asked and answered, incomplete    14:57:12
24    hypothetical, compound, beyond the    14:57:13
25    scope.    14:57:18

Page 208

1    A.  And my answer would be, again,    14:57:21
2  because any fix is going to be somewhat    14:57:23
3  situationally dependent, is to examine, you    14:57:26
4  know, the behaviors that have specifically been    14:57:31
5  prohibited, the use of customer A's environment    14:57:34
6  for the benefit of customer B or on behalf of    14:57:38
7  the -- the update rolled out to customer B, and    14:57:42
8  to figure out how to do that, you know, whether    14:57:46
9  it was to completely develop that update from    14:57:48
10  scratch, you know, not use the identical    14:57:52
11  solution.    14:57:54
12    Q.  How does the engineer forget what    14:57:57
13  he's learned about the what, when and where of    14:57:59
14  the issue in client A's environment?    14:58:01
15    MR. POLITO: Objection, outside    14:58:04
16    the scope, calls for speculation.    14:58:05
17    A.  Honestly, counsel, you know, I --    14:58:09
18  that's outside the scope of what I -- I    14:58:11
19  undertook to try to understand.  I took my    14:58:15
20  understanding of what cross-use was prohibited    14:58:17
21  and applied to that --    14:58:21
22    Q.  I'm asking you to apply that    14:58:22
23  definition to my hypothetical.    14:58:23
24    MR. POLITO:    14:58:24
25    Ms. Frederiksen-Cross, had you completed    14:58:24

Page 209

53 (Pages 206 - 209)

1 your answer before counsel interrupted?   14:58:26
2 THE WITNESS: I was close to the   14:58:29
3 end of my answer.   14:58:30
4 A. I was just saying that I had   14:58:30
5 applied my understanding of cross-use as best I   14:58:32
6 could in my analysis with respect to the actual   14:58:36
7 situations and the actual evidence that I was   14:58:41
8 provided. That was not a situation that I saw,   14:58:44
9 as you describe it --   14:58:50
10 Q. I'm asking you to apply the   14:58:52
11 definition you've applied throughout your   14:58:54
12 report for cross-use to my hypothetical.   14:58:56
13 A. I --   14:58:59
14 MR. POLITO: Same objections.   14:58:59
15 A. But with all due respect, counsel,   14:59:04
16 the best answer I can give you is look at what   14:59:06
17 the license limits, look at what the court has   14:59:08
18 limit, and don't do the limited things.   14:59:13
19 Q. You have a definition of cross-use   14:59:15
20 in your report. We looked at them, right,   14:59:16
21 paragraphs 22 through 24? You said you applied   14:59:18
22 them throughout your report; is that correct?   14:59:20
23 A. Yes. You're not asking me about   14:59:23
24 something I did in my report, though. I didn't   14:59:24
25 try to construct a business model for Rimini in   14:59:26

Page 210

1 my report.   14:59:29
2 Q. I'm not asking you to construct a   14:59:29
3 business model. I'm asking what I think is a   14:59:31
4 fairly simple hypothetical. Ask me if you need   14:59:33
5 any clarifying information.   14:59:36
6 An engineer acquires that   14:59:38
7 knowledge about where the problem is, how to   14:59:42
8 fix it, spends quite a bit of time, two weeks,   14:59:44
9 in doing so in client A's environment, figures   14:59:48
10 how to develop and implement the fix, tests it.   14:59:50
11 Client B also needs that fix. How under your   14:59:53
12 definition of cross-use can that engineer   14:59:57
13 implement that fix in client B's environment --   15:00:01
14 MR. POLITO: Asked and answered --   15:00:03
15 BY MR. VANDEVELDE:   15:00:03
16 Q. -- without, as you define, it   15:00:06
17 cross-using?   15:00:07
18 MR. POLITO: Asked and answered,   15:00:08
19 outside the scope, incomplete   15:00:09
20 hypothetical, compound, vague.   15:00:10
21 A. By reimplementing the fix in a way   15:00:13
22 that does not reuse the work from customer A's   15:00:15
23 environment.   15:00:18
24 Q. What if -- but in my hypothetical,   15:00:19
25 the engineer has acquired knowledge and   15:00:23

Page 211

1 experience about where the issue is, how to fix   15:00:25
2 it. How does that engineer forget what he or   15:00:28
3 she has learned when they need to go or want to   15:00:31
4 go implement it in client B's environment?   15:00:34
5 MR. POLITO: Same objections.   15:00:36
6 A. Counsel, you know, I've -- I've   15:00:41
7 given you the best answer I can to this   15:00:41
8 question. I think you've asked it three or   15:00:44
9 four times now, and, you now, the issue that is   15:00:46
10 a stumbling block I believe for both of us is   15:00:51
11 the -- my understanding that the cross-use as   15:00:55
12 prohibited in this specific instance of these   15:01:00
13 specific parties in the color and context of   15:01:03
14 the specific litigations that have gone before   15:01:06
15 creates a standard that -- that, as I   15:01:13
16 understand it, prohibits Rimini from reusing   15:01:14
17 the solution that was developed for one   15:01:20
18 customer, using the license of that customer in   15:01:25
19 another customer's environment.   15:01:31
20 And -- and the only thing that I   15:01:33
21 can -- the only answer I have is that they have   15:01:34
22 to look to what the license permits. And, you   15:01:37
23 know, it is to follow the -- the guidance of   15:01:41
24 that license and the court's guidance. And   15:01:44
25 that would be, for instance, to develop a fix   15:01:46

Page 212

1 from scratch in the second customer's   15:01:51
2 environment without reference to the solution   15:01:54
3 that had been used before.   15:01:57
4 Q. But what about --   15:02:00
5 A. And how the engineer would do   15:02:01
6 that, I don't know, counsel. You know, I think   15:02:02
7 that would be a -- a question -- if I were a   15:02:04
8 software engineer and I was aware of this   15:02:07
9 litigation and I was aware of the limitations   15:02:09
10 of the license and I was aware of the court's   15:02:12
11 instruction with respect to cross-use, my   15:02:14
12 solution would be to go and confer with counsel   15:02:18
13 and find out what the legal answer is. I'm not   15:02:20
14 a lawyer, and I can't presume to tell you what   15:02:23
15 the legal answer is.   15:02:26
16 Q. I'm just asking you to apply your   15:02:27
17 definition. Can you think of a way that that   15:02:29
18 engineer, who has acquired all that knowledge   15:02:31
19 about where the issue is, how to fix it, what   15:02:32
20 to do, that the testing has worked, can you   15:02:35
21 think of a way for that engineer to implement   15:02:38
22 that same fix in client B's environment --   15:02:41
23 MR. POLITO: Same --   15:02:41
24 Q. -- without cross-using as you   15:02:44
25 define it?   15:02:46

Page 213

54 (Pages 210 - 213)

1     MR. POLITO: Same objections.      15:02:47
2     A.   Again, you know, counsel, coming      15:02:52
3  back to the prohibition on the use of one      15:02:56
4  customer's licensed environment for the benefit   15:02:58
5  of another customer, I would say the only way   15:03:00
6  that I can hypothesize is to find a way to      15:03:04
7  recreate -- or not to recreate, but to create a   15:03:06
8  from scratch that fix in the new environment.   15:03:09
9  So create a new fix, create a new test plan, to   15:03:13
10  do it the way the license requires.  One      15:03:17
11  customer, one environment.           15:03:19
12        And what would be specifically      15:03:26
13  required in a specific instance is something I   15:03:29
14  can't tell you without more details in this      15:03:30
15  hypothetical.              15:03:32
16     Q.   How can that engineer recreate the   15:03:35
17  fix from scratch without using the knowledge in   15:03:44
18  their brain gained from the work performed in   15:03:47
19  client A's environment?           15:03:50
20        MR. POLITO: Objection, calls for   15:03:52
21  speculation, outside the scope, asked      15:03:52
22  and answered, incomplete hypothetical,      15:03:54
23  vague.                15:03:56

▇▇▇  ▇▇  ▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

                                        Page 214

2     Q.   You said --           15:04:05
3        MR. VANDEVELDE: I'm going to move   15:04:08
4  to strike as -- it's nonresponsive.      15:04:08
5     A.   Well --              15:04:09
6        MR. VANDEVELDE: It's         15:04:10
7  nonresponsive.              15:04:11
8  BY MR. VANDEVELDE:           15:04:11
9     Q.   I'm asking you to answer my      15:04:11
10  question.  Let me get more concrete.      15:04:13
11     A.   I'm giving you the best answer I   15:04:14
12  can counsel.              15:04:16
13     Q.   No, no.  Let me finish my      15:04:16
14  question.  You're asking -- you're not      15:04:17
15  responding to my questions.           15:04:18
16        If the issue in client A's      15:04:21
17  environment is that they notice a problem where   15:04:24
18  a test, a conditional test is wrong, and they   15:04:27
19  -- instead of a 1, it should be a zero, that's   15:04:32
20  the fix.  It's that simple.  But it took      15:04:36
21  sometime for the engineer to find the issue, to   15:04:39
22  figure it out, to realize that that 1 needed to   15:04:43
23  be changed to a zero, took two weeks, let's      15:04:47
24  say.  And then they tested it.  Engineer gained   15:04:51
25  the knowledge that the testing worked.  Now,   15:04:54

                                        Page 215

1  client B has the exact same issue in their   15:04:56
2  file.  That one character needs to be changed.   15:04:58
3     A.   Uh-huh.              15:05:03
4     Q.   How under your definition of      15:05:04
5  cross-use can that engineer implement that same   15:05:07
6  fix in client B's environment without      15:05:10
7  cross-using?              15:05:13
8        MR. POLITO:              15:05:13
9     Ms. Frederiksen-Cross, before counsel   15:05:13
10     interrupted to strike your answer that   15:05:15
11     you had not completed, had you completed   15:05:17
12     your answer to his prior question?      15:05:18
13        THE WITNESS: No.         15:05:21
14     A.   I just wanted to say you've asked   15:05:21
15  me the same question over and over.  I've given   15:05:23
16  you the best answer I have to that question, is   15:05:25
17  that that -- that's a legal question.  I'm not   15:05:28
18  a lawyer.  That engineer would have to consult   15:05:30
19  with Rimini's counsel to understand what      15:05:34
20  actions were permissible and what were not.   15:05:37
21  And counsel I'm sure would tell them, you know,   15:05:39
22  what -- how to go about that or at least, you   15:05:41
23  know, what the parameters of what they couldn't   15:05:43
24  do are.  I'm -- I'm not counsel for Rimini.   15:05:45
25  I'm not a lawyer.  I've given you the best   15:05:49

                                        Page 216

1  answer I can.              15:05:52
2  BY MR. VANDEVELDE:           15:05:52
3     Q.   I'm not asking you to render legal   15:05:53
4  conclusions.  You've applied your definition of   15:05:55
5  cross-use to all sorts of conduct, haven't you?   15:05:58
6     A.   I certainly have --         15:06:02
7     Q.   All right.           15:06:03
8     A.   -- with respect to conduct I      15:06:04
9  actually observed.              15:06:05
10     Q.   I'm asking you to do the         15:06:06
11  hypothetical.  Are you refusing to answer the   15:06:07
12  hypothetical?              15:06:09
13        MR. POLITO: Objection, misstates   15:06:10
14     testimony, asked and answered,         15:06:10
15     incomplete hypothetical, outside the      15:06:11
16     scope, calls for a legal conclusion.   15:06:13
17     A.   Counsel, my understanding that the   15:06:17
18  prohibited -- prohibition and the         15:06:19
19  characterization of what constitutes cross-use   15:06:24
20  was provided by the court and -- and framed by   15:06:27
21  Rimini's licenses -- or by -- I'm sorry, by the   15:06:34
22  customer's licenses.  And you are now asking   15:06:36
23  me: How could somebody do something and not   15:06:39
24  fall afoul of those guidelines?  And I'm      15:06:43
25  telling you that's a legal decision, and I'm   15:06:45

                                        Page 217

                                  55 (Pages 214 - 217)

1   not a lawyer.                           15:06:48
2        Q.    But you're doing it with other --    15:06:48
3   with respect to other conduct.  You've just    15:06:50
4   said you were.  You've applied your definition    15:06:52
5   of -- of cross-use.  Whether you got it from    15:06:54
6   the court or from counsel or whatever it is,    15:06:56
7   you are applying that definition to all sorts    15:06:57
8   of conduct that you claim to have analyzed in    15:06:59
9   this case.  I'm asking you to do it to my    15:07:02
10  hypothetical.                           15:07:04
11       MR. POLITO:  Is there a question    15:07:05
12       pending?                           15:07:07
13       MR. VANDEVELDE:  Yes.              15:07:08
14       MR. POLITO:  What's the question,    15:07:09
15       counsel?                           15:07:10
16  BY MR. VANDEVELDE:                       15:07:10
17       Q.    How -- is there a way for that    15:07:11
18  engineer to implement that same fix that    15:07:13
19  requires changing one code -- or sorry, one    15:07:15
20  character in client B's environment to    15:07:18
21  implement that without cross-using as you've    15:07:20
22  defined and applied throughout your report?    15:07:23
23       MR. POLITO:  Objection, incomplete    15:07:25
24       hypothetical, outside the scope, vague.    15:07:26
25       Object to the extent it calls for a    15:07:30

Page 218

1   legal conclusion.                        15:07:32
2        A.    I think I understand where we    15:07:35
██████████████████████      █████████
██████████████████████      █████████
██████████████████████
6        MR. VANDEVELDE:  Move to strike as    15:07:44
7   nonresponsive.                           15:07:45
8        A.    No.  Listen to me.            15:07:45
9        MR. VANDEVELDE:  Move to strike as    15:07:46
10  nonresponsive.                           15:07:47
11  BY MR. VANDEVELDE:                       15:07:48
12       Q.    Are you refusing to answer my    15:07:48
13  hypothetical, yes or no?                 15:07:50
14       MR. POLITO:                         15:07:51
15       Ms. Frederiksen-Cross, before counsel    15:07:51
16       moved to strike an answer that you    15:07:53
17       hadn't completed, had you finished that    15:07:54
18       answer?                            15:07:56
19       A.    I think I've answered this    15:07:57
20  hypothetical with my best answer four or five    15:07:58
21  times now, and I'm trying to explain to you    15:08:01
22  that your hypothetical doesn't match the facts    15:08:03
23  of this case.  It's not the cross-use that I --    15:08:05
24  the way that I applied cross-use.        15:08:07
25  BY MR. VANDEVELDE:                       15:08:09

Page 219

1        Q.    That's why it's called a       15:08:09
2   hypothetical.  I'm asking you to answer it.    15:08:10
3        A.    And you're asking me to render    15:08:12
4   what to me is it a legal opinion about what --    15:08:15
5   how Rimini could do something.  And I have not    15:08:16
6   evaluated that situation.  I'm not going to    15:08:18
7   make up a legal opinion when I'm not a lawyer    15:08:20
8   sitting in the spot in a deposition.  I    15:08:22
9   think --                                 15:08:25
10       Q.    You've applied your definition --    15:08:25
11  you've testified under oath that you've applied    15:08:28
12  your definition to other conduct.  I'm asking    15:08:30
13  you to apply your definition to the    15:08:32
14  hypothetical conduct that I have laid out for    15:08:33
15  you.  If you need more information, ask me, but    15:08:35
16  you're required to answer the hypothetical.    15:08:38
17       MR. POLITO:  Is there a question    15:08:39
18       pending, counsel?                   15:08:41
19       MR. VANDEVELDE:  I've asked it    15:08:43
20       multiple times --                   15:08:44
21       A.    My point --                   15:08:44
22       Q.    How can that engineer implement    15:08:52
23  the fix in client B's environment without    15:08:53
24  constituting cross-use as you have defined and    15:08:58
25  used it throughout your report?          15:09:01

Page 220

1        MR. POLITO:  Objection -- I'm        15:09:04
2   sorry, objection, incomplete             15:09:07
3   hypothetical, asked and answered, calls    15:09:09
4   for a legal conclusion, outside the      15:09:10
5   scope.                                   15:09:12
6        A.    My best answer to you, counsel, is    15:09:15
7   that they could create the fix for customer B    15:09:17
8   without reference to their use of customer A's    15:09:24
9   environment.                             15:09:27
10       Q.    It's in the engineer's head.  He    15:09:28
11  knows the knowledge from all the work he did in    15:09:30
12  client A's environment.  How can he do that    15:09:33
13  without reference to that knowledge in his    15:09:36
14  brain?                                   15:09:38
15       MR. POLITO:  Objection, calls for    15:09:39
16       speculation, outside the scope,      15:09:40
17       incomplete hypothetical, asked and    15:09:41
18       answered.                          15:09:42
19       A.    With respect, for instance, to    15:09:44
20  testing, counsel, he could test thoroughly in    15:09:45
21  customer B's environment using fresh test data    15:09:51
22  and a fresh test plan.  With respect to how he    15:09:57
23  implements the code, even for something as    15:10:00
24  simple as the hypothetical that you have    15:10:02
25  posited, there are many different ways that one    15:10:04

Page 221

56 (Pages 218 - 221)

1 takes one day or two days.  But it's shorter.   15:19:21
2        Is that cross-use because he        15:19:25
3 relied on the specific knowledge and experience   15:19:27
4 he gained in solving that same problem in    15:19:29
5 company A's environment?       15:19:31
6        MR. POLITO:  Same objections.     15:19:32
7     A.   And he's applying the exact same    15:19:36
8 update that he applied in company A's      15:19:38
9 environment?          15:19:41
10    Q.   He's not copying it.  He remembers  15:19:41
11 how he did it.  He retypes it.       15:19:43
12    A.   That's still copying it.  I mean,    15:19:44
13 just because he's copying it from memory as    15:19:46
14 opposed to copying it from a sheet of paper or   15:19:48
15 copying it looking at a screen, that's still     15:19:50
16 copying.          15:19:53
17    Q.   Does -- does it matter if it's      15:19:53
18 different?          15:19:54
19        MR. POLITO:  Objection.  I'm      15:19:54
20 sorry.          15:19:55
21    A.   If I memorize a poem -- sorry.     15:19:55
22        MR. POLITO:  Objection, calls for   15:19:57
23 a legal conclusion, vague.       15:19:59
24 BY MR. VANDEVELDE:        15:19:59
25    Q.   Does it matter if it's identically  15:20:00
                                                Page 230

1 retyped or if he changes the specific way in     15:20:03
2 which he implements the fix that's needed in    15:20:06
3 company B's environment?       15:20:08
4     A.   I think it does, counsel.  If I     15:20:10
5 memorize a literary work and try to present it   15:20:13
6 as my own work, that's a wrongness.      15:20:16
7     Q.   But what if it still takes him two  15:20:21
8 days instead of two weeks?  He may implement it  15:20:22
9 differently, but he still saved a lot of time.    15:20:25
10       MR. POLITO:  Objection, incomplete  15:20:27
11 hypothetical, vague.        15:20:29
12    A.   I don't think the issue is the     15:20:42
13 savings of time, counsel, so much as whether    15:20:44
14 the same fix and the same testing that he did    15:20:48
15 under the license of one customer is then     15:20:56
16 provided to the other customer.  That's my     15:21:01
17 understanding of where he crosses the line.     15:21:03
18 And --          15:21:06
19    Q.   Provided because he remembered the  15:21:07
20 solution?          15:21:08
21       MR. POLITO:  Objection, vague.     15:21:10
22    A.   I -- as I've said, I don't think    15:21:12
23 it matters how he got possession of the same    15:21:14
24 fix.  If he is applying the same fix that he     15:21:17
25 developed based on the use of one customer's    15:21:21
                                                Page 231

1 environment in another customer's environment,   15:21:24
2 absent any differences in the license or in any   15:21:27
3 of the other things that -- that come into play   15:21:32
4 here, I -- I just -- I don't think he can do it   15:21:34
5 that way.  He has to find a different way to do   15:21:38
6 it.            15:21:40
7     Q.   What if -- what if the engineer at  15:21:41
8 company A, over the course of years, he solves   15:21:45
9 hundreds and hundreds of issues, acquires a     15:21:48
10 wealth of knowledge about specific problems and  15:21:50
11 specific ways of solving them?  And he switches  15:21:53
12 jobs and goes to company B, and company B has    15:21:57
13 an issue.  And it's not identical to the      15:22:02
14 hundreds of the issues he solved at company A,   15:22:05
15 but there is experience and knowledge he is     15:22:08
16 leveraging about those specific solutions that   15:22:09
17 he had developed at a prior employer.      15:22:12
18       Can he leverage all that knowledge  15:22:15
19 and experience about specific problems,      15:22:17
20 specific solutions in crafting a fix for the     15:22:20
21 issue that company B is experiencing?      15:22:26
22       MR. POLITO:  Objection, compound,  15:22:28
23 vague as to the undefined terms        15:22:31
24 "knowledge" and "experience," incomplete   15:22:33
25 hypothetical.          15:22:36
                                                Page 232

1     A.   Again, I keep coming back to this,  15:22:39
2 but I feel like somehow we're talking past each  15:22:42
3 other.          15:22:45
4        It depends on exactly what that    15:22:46
5 knowledge is and how he leverages it in      15:22:48
6 applying the fix.         15:22:53
7     Q.   What knowledge is okay, and what   15:22:53
8 knowledge is not okay?  I think you said     15:22:55
9 generalized and then specific.  So how do you    15:22:57
10 draw the line between generalized knowledge and  15:23:00
11 specific knowledge --        15:23:02
12       MR. POLITO:  Objection.        15:23:02
13 BY MR. VANDEVELDE:        15:23:03
14    Q.   -- about what's in an engineer's    15:23:03
15 brain?          15:23:05
16       MR. POLITO:  I'm sorry, counsel.   15:23:05
17       Objection, vague, outside the     15:23:06
18 scope, calls for legal conclusion.        15:23:08
19    A.   If the engineer had gained       15:23:29
20 knowledge of a specific solution strategy,     15:23:33
21 specific testing strategy, even a specific code  15:23:36
22 problem in environment A and how that      15:23:42
23 particular problem could be fixed or remedied,   15:23:48
24 when he goes to another customer's       15:23:55
25 environment --         15:23:58
                                                Page 233

                                        59 (Pages 230 - 233)

1    Q.    Companies?                  15:24:00
2    A.    Or companies. I'm sorry, yes,        15:24:01
3    customer, company. When he's now operating        15:24:01
4    under a different customer's license, it's my     15:24:04
5    understanding that the specific knowledge         15:24:07
6    related to that update, its testing, et cetera,   15:24:12
7    the factors we have described are what he is      15:24:18
8    not free to reuse.                        15:24:21
9          The generalized knowledge he may     15:24:24
10   have acquired through his years of training,      15:24:27
11   years of working with the PeopleSoft or JDE or    15:24:30
12   whatever environment, generalized knowledge       15:24:33
13   that wasn't specific to a particular update,      15:24:36
14   which is to the specific use he had made of the   15:24:38
15   system in customer A, he would probably be free   15:24:41
16   to reuse.                                 15:24:44
17         But the specific knowledge he        15:24:46
18   derived specifically in that context through      15:24:48
19   the use of customer A's environment, as I         15:24:51
20   understand the cross-use prohibition, he could    15:24:54
21   not use.                                  15:24:58
22   Q.    All right.                          15:24:58

Page 234

3    Q.    Assume -- let's assume that --      15:26:37
4    that Rimini customers or clients do use ePack.    15:26:44
5    Will you go along with that assumption?           15:26:47
6    A.    Sure.                               15:26:49
7    Q.    I know you may not recollect         15:26:50
8    that --                                   15:26:51
9    A.    I don't recollect that as I sit      15:26:51
10   here.                                     15:26:53
11   Q.    -- or believe that, but let's        15:26:53
12   assume that for a second, and that the tool       15:26:54
13   helps Rimini clients install the updates that     15:26:55
14   Rimini has developed for them and put on          15:27:02
15   their -- developed on their system. Understand    15:27:04
16   that? Are you willing to go along with that       15:27:06
17   assumption?                               15:27:08
18   A.    I'm understanding where you're at    15:27:09
19   so far.                                   15:27:10
20   Q.    Okay.                               15:27:10
21         Let's say Rimini only had one        15:27:12
22   client and that client was having an issue or     15:27:14
23   difficulty installing the update bundles. And     15:27:18
24   so Rimini created the ePack script to help the    15:27:22
25   client install those update bundles. Would        15:27:27

Page 236



1    that be cross-use if there was only one           15:27:31
2    customer?                                 15:27:34
3          MR. POLITO: Objection, incomplete   15:27:35
4    hypothetical.                             15:27:36
5    A.    So in your hypothetical, Rimini is   15:27:38
6    responding to the needs of a specific customer    15:27:44
7    and in that customer's own environment           15:27:46
8    developing a tool to help them?                  15:27:49
9          [Reporter clarification.]           15:27:50
10   Q.    Yes.                                15:27:50
11   A.    And your question is, would that     15:27:52
12   customer's use of that tool that Rimini          15:27:57
13   developed be cross-use?                     15:28:00
14   Q.    Yes. Is there any cross-use in       15:28:03
15   that hypothetical?                         15:28:04
16   A.    No.                                 15:28:05
17   Q.    Okay.                               15:28:05
18         Now, let's bring other customers     15:28:07
19   into the hypothetical. So Rimini has other        15:28:12
20   customers that are encountering the same issue.   15:28:14
21   They are having difficulty installing update      15:28:17
22   bundles. There's a lot of files that need to      15:28:21
23   be copied different places and configurations     15:28:23
24   that need to be set, so the ePack script helps    15:28:25
25   them do that. Other customers have a need for     15:28:28

Page 237

60 (Pages 234 - 237)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



Page 246

1   [Pause.]                          15:42:28
2   Q.   Why don't -- why don't we move on?  15:43:01
3   And if -- if you find one later and your   15:43:04
4   counsel wants to ask you about it, he can do so   15:43:06
5   on redirect.                       15:43:08
6        In paragraph 200 you say:      15:43:09
7   "Details about Oracle's PeopleSoft   15:43:16
8   schema."                          15:43:18
9        It crosses pages 51, 52. Do you   15:43:21
10  see that?                          15:43:23
11  A.   I'm almost there with you,     15:43:26
12  counsel. 200, yes.                  15:43:27
13  Q.   Yeah. The second line, it says:   15:43:30
14  "Details about PeopleSoft schema."   15:43:32
15       You suggest it's into -- you put   15:43:35
16  into technical specifications. What do you   15:43:37
17  mean by details about Oracle's PeopleSoft   15:43:39
18  schema? Do you mean database table names?   15:43:42
19  A.   Database table and field names,   15:43:44
20  but a little bit more than just the table   15:43:47
21  names.                             15:43:50
22  Q.   Okay.                         15:43:50

Page 247

21  Q.   Let me make a hypothetical. Let's   15:46:02
22  say an engineer at Rimini working for client A   15:46:05
23  figures out that a particular table, let's call   15:46:12
24  it state tax table, needs to be changed in some   15:46:16
25  way. A different engineer implementing the   15:46:19

Page 248

1   same fix, the same update for client B emails   15:46:24
2   the first engineer and says, "Hey, do you know   15:46:31
3   what table will need to be changed to implement   15:46:33
4   this fix?" And the engineer replies, "The   15:46:37
5   state tax table." Is that cross-use because   15:46:40
6   the name of the table was referenced?   15:46:43
7        MR. POLITO: Objection, incomplete   15:46:45
8   hypothetical.                      15:46:46
9   A.   Where the knowledge and use of the   15:46:52
10  first customer's licensed environment was used   15:46:56
11  to derive that information, the first   15:47:00
12  customer's license was used to derive that   15:47:05
13  information, it's my understanding that it's   15:47:08
14  cross-use for that use of the first customer's   15:47:14
15  environment to be used on behalf of a second or   15:47:20
16  different customer for use in that customer's   15:47:25
17  licensed -- that second customer's licensed   15:47:30
18  environment.                       15:47:33
19       Now, again, your -- your          15:47:33
20  hypothetical is -- is extremely strained   15:47:35
21  because we're talking about a single table   15:47:36
22  name, and that, again, is not the kind of thing   15:47:38
23  that I offer opinion on in my report. But if   15:47:40
24  I'm following your hypothetical correctly, to   15:47:43
25  the extent that that knowledge and that   15:47:46

Page 249

63 (Pages 246 - 249)



**Page 250**

1  technical specification that -- that's being   15:47:50
2  shared between the two engineers verbally or   15:47:52
3  written was the product of the use of a first   15:47:55
4  customer's environment, it's my understanding   15:47:58
5  that that would be cross-use.   15:48:00
6  Q.   Even if it's -- even if that   15:48:02
7  communication and the sharing of knowledge is   15:48:05
8  just the particular table that needs to be   15:48:06
9  fixed or updated?   15:48:11
10  A.   Well, again, you're choosing an   15:48:15
11  extreme case here.  But under my understanding   15:48:17
12  of -- of what's prohibited in cross-use because   15:48:20
13  the first customer's environment was used to   15:48:22
14  create that knowledge, then the reuse of that   15:48:26
15  creation in a second customer's environment,   15:48:30
16  even for a comparatively simple fix, would   15:48:33
17  be -- constitute a form of cross-use.   15:48:37
18  Q.   Okay.   15:48:39
19        Back to technical specifications   15:48:41
20  for a second.  And we'll get to the EBS one I   15:48:42
21  think you found earlier.   15:48:45
22        But are you offering any opinions   15:48:47
23  that any technical specifications with respect   15:48:49
24  to the Siebel product line contain any Oracle   15:48:51
25  code are being cross-used?   15:48:55

**Page 251**

1  A.   For Siebel?   15:48:59
2  Q.   Yeah.   15:49:01
3  A.   I -- let me check, but I do not   15:49:07
4  recall having done so for Siebel.   15:49:09
5        [Pause.]   15:49:31
6  Q.   Were you able to find any by   15:50:51
7  searching your report?   15:50:53
8  A.   I'm just -- just closing in on   15:50:54
9  that area now, counsel.   15:50:55
10        I don't recall any specifically in   15:51:52
11  the Siebel environment, counsel.   15:51:56
12  Q.   Okay.   15:51:57

**Page 252**

**Page 253**

1        [Pause.]   15:53:23
2  Q.   Why don't we -- why don't we move   15:54:54
3  on again?  You have searchable versions of your   15:54:56
4  report.  It's been a number of minutes.  If   15:54:59
5  you've found one later, your counsel can ask   15:55:02
6  you on redirect.   15:55:04
7        Why don't we turn to paragraph 21   15:55:05
8  of your -- of your supplemental report?  Switch   15:55:07
9  topics.  Let's talk about --   15:55:13
10  A.   I'm sorry, paragraph 21?   15:55:16
11  Q.   Paragraph 21.   15:55:18
12        You write:   15:55:28

Veritext Legal Solutions
866 299-5127

```
1        *************************
2          CERTIFICATE
3        *************************
4           I, PAUL J. FREDERICKSON, CA
     Certified Shorthand Reporter No. 13164 and
5    WA Certified Court Reporter No. 2419, do
     hereby certify:
6           That prior to being examined,
7    the witness named in the foregoing
8    deposition was by me duly sworn or affirmed
9    to testify to the truth, the whole truth and
10   nothing but the truth;
11          That said deposition was taken
12   down by me in shorthand at the time and
13   place therein named, and thereafter reduced
14   to print by means of computer-aided
15   transcription; and the same is a true,
16   correct and complete transcript of said
17   proceedings.
            I further certify that I am not
18   interested in the outcome of the action.
            Witness my hand this 26th day
19   of September 2018.
20
21
22
23   PAUL J. FREDERICKSON, CCR, CSR
24   WA CCR 2419  CA CSR 13164
25   Expiration date: March 31, 2019
```

                                                  Page 354

Veritext Legal Solutions
866 299-5127