# EXHIBIT D

# Excerpts from the June 19, 2020 deposition of

# Oracle's expert, Barbara Frederiksen-Cross

# PUBLIC REDACTED VERSION

# In The Matter Of:

*Oracle v.*
*Rimini Street*

---

*Barbara Frederiksen-Cross*
*June 19, 2020*

*HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER*

---



*Min-U-Script® with Word Index*

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2                   DISTRICT OF NEVADA
 3
 4   ORACLE USA, INC., et al.,
 5         Plaintiffs,
 6   vs.             Case No.:  2:10-cv-00106-LRH-VCF
 7   RIMINI STREET, INC., et al.,
 8         Defendants.
     _____/
 9
10
11   * HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER *
12            REMOTELY CONDUCTED VIDEOTAPED
13            EXPERT WITNESS DEPOSITION OF
14              BARBARA FREDERIKSEN-CROSS
15                 Wilsonville, Oregon
16                 (Witness's location)
17                Friday, June 19, 2020
18
19
20
21   Stenographically reported by:
     LORRIE L. MARCHANT, RMR, CRR, CCRR, CRC
22   California CSR No. 10523
     Washington CSR No. 3318
23   Oregon CSR No. 19-0458
     Texas CSR No. 11318
24
25   Job No.:  2020-86014
```

Page 2

```
 1        UNITED STATES DISTRICT COURT
 2        DISTRICT OF NEVADA
 3
 4   ORACLE USA, INC., et al.,
 5        Plaintiffs,
 6   vs.        Case No.:  2:10-cv-00106-LRH-VCF
 7   RIMINI STREET, INC., et al.,
 8        Defendants.
     _____/
 9
10
11
12        BE IT REMEMBERED that on Friday, June 19,
13   2020, commencing at the hour of 8:58 a.m. PDT,
14   thereof, at the offices of Wilsonville, Oregon
15   (witness's location), before me, LORRIE L. MARCHANT,
16   CSR, RMR, CRR, CCRR, CRC, a Certified Stenographic
17   Shorthand Reporter for the State of California,
18   personally appeared
19        BARBARA FREDERIKSEN-CROSS,
20   called as a witness by the Defendant herein, who,
21   being by me first duly sworn/affirmed, was thereupon
22   examined and testified as hereinafter set forth.
23        ---oOo---
24
25
```

Page 3

```
 1                A P P E A R A N C E S
 2           (All appearances remotely via Zoom)
 3
     Appearing as counsel on behalf of Plaintiffs:
 4
           MORGAN, LEWIS & BOCKIUS, LLP
 5      BY:  JOHN POLITO, ESQ.
             LINDSEY SHINN, ESQ.
 6      One Market, Spear Street Tower
        San Francisco, CA 94105
 7      (415) 442-1000
        john.polito@morganlewis.com
 8      lindsey.shinn@morganlewis.com
 9      BY:  JACOB J.O. MINNE, ESQ.
        1400 Page Mill Road
10      Palo Alto, CA 94304
        (650) 843-7280
11      jacob.minne@morganlewis.com
12   Appearing as counsel on behalf of Defendants:
13        GIBSON, DUNN & CRUTCHER, LLP
       BY:  ERIC D. VANDEVELDE, ESQ.
14     333 South Grand Avenue
       Los Angeles, CA 90071
15     (213) 229-7000
       evandevelde@gibsondunn.com
16
       BY:  CASEY J. McCRACKEN, ESQ.
17          CHRIS WHITTAKER, ESQ.
       3161 Michelson Drive
18     Irvine, CA 92612
       (949) 451-3800
19     cmccracken@gibsondunn.com
       cwhittaker@gibsondunn.com
20
21   Also present:
22        John P. Reilly, Rimini in-house Counsel
          Lisa Debrosse Johnson, Rimini in-house
23                                          Counsel
          Jim Maroulis, Oracle in-house Counsel
24        Aydaline Garcia, Zoom host
          Juan Torres, documents technician
25                ---oOo---
```

Page 4

```
 1                    I N D E X
 2              INDEX OF EXAMINATION
 3   EXAMINATION BY                              PAGE
 4   MR. VANDEVELDE                                 5
 5                   ---oOo---
 6    INDEX OF EXHIBITS MARKED FOR IDENTIFICATION
 7   EXHIBIT      DESCRIPTION                    PAGE
 8   Exhibit 1854 Corrected Post-Injunction        17
                  Expert Report of Barbara Ann
 9                Frederiksen-Cross
10   Exhibit 1855 Corrected Post-Injunction        18
                  Surrebuttal Expert Report of
11                Barbara Ann Frederiksen-Cross
12   Exhibit 1856 Rebuttal Expert Report of        29
                  Professor Owen Astrachan, dated
13                March 13, 2020
14   Exhibit 1857 Document produced in native      71
                  format, RSI006953646
15
     Exhibit 1858 Diagram                          96
16
     Exhibit 1859 Diagram                         120
17
     Exhibit 1860 Diagram                         135
18
     Exhibit 1861 Diagram                         142
19
     Exhibit 1862 Diagram                         185
20
     Exhibit 1863 PDF version of spreadsheet      189
21
     Exhibit 1864 Oracle USA vs. Rimini Street,   247
22                Inc., Opinion
23                   ---oOo---
24
25
```

Page 5

1    FRIDAY, JUNE 20, 2020
2    WILSONVILLE, OREGON
3    (Witness's location)
4    8:58 a.m. PDT
5    THE VIDEOGRAPHER: We are going on the
6 record on June 19th, 2020, at approximately
7    8:58 a.m. Pacific Time. My name is Aydaline Garcia.
8 I'll be the tech monitor on today's deposition. And
9 Juan Torres will be the document tech.
10    Will the court reporter please swear in the
11 witness.
12    THE STENOGRAPHER: Okay. Before I swear in
13 the witness, I will ask Counsel to stipulate on the
14 record that due to the current National Emergency
15 pandemic, the stenographer may swear in the deponent
16 even though she is not in the physical presence of
17 the deponent, and that there is no objection to that
18 at this time, nor will there be an objection to it
19 at a future date.
20    MR. VANDEVELDE: No objection.
21    MR. POLITO: No objection.
22    BARBARA FREDERIKSEN-CROSS,
23 FIRST DULY SWORN/AFFIRMED, TESTIFIED AS FOLLOWS:
24    EXAMINATION BY MR. VANDEVELDE
25    MR. VANDEVELDE: All right. And sorry.

Page 6

1 Did we say we'll do appearances later; you'll have
2 them -- insert them later?
3    THE STENOGRAPHER: I can do that.
4    MR. VANDEVELDE: Okay. Great.
5    BY MR. VANDEVELDE:
6 Q. Good morning, Ms. Frederiksen-Cross.
7 A. Good morning.
8 Q. Do you understand that you're under oath
9    and testifying under penalty of perjury today?
10 A. I do.
11 Q. Is there any reason that you cannot give
12    truthful and accurate testimony?
13 A. No.
14 Q. Do you live still in Hubbard, Oregon?
15 A. That is correct, yes.
16 Q. Okay. And where are you physically located
17    right now?
18 A. I'm currently in a hotel meeting room in
19    Wilsonville, Oregon.
20 Q. Okay. So we're obviously doing this
21    remotely.
22    Have you ever given a deposition remotely
23    before?
24 A. Not by video, no.
25 Q. Okay.

Page 7

1 A. I think I had one telephonic deposition
2 once, but ...
3 Q. Got it.
4    And you're in a hotel room. I'm in my
5 office. Counsel is in their offices and homes.
6 We're not all in the same room. The court reporter
7 and videographer that are all attending this
8 proceeding, and it's being transcribed as if it were
9 in person.
10    You are on video, and I understand the
11 videographer is recording video of you along
12 throughout the proceeding while we're on the record.
13 You may see others on the video screen, but they are
14 not being recorded, including myself and your
15 counsel, Mr. Polito.
16    If at any time you experience technical
17 difficulties, will you let me know?
18 A. Yes. And if it's a sound issue and I'm not
19 sure you can hear me, I will wave my hands
20 frantically or something just to signal that we have
21 an issue.
22    Just as a housekeeping matter, can I get
23 the phone number -- maybe somebody could put it in
24 the text box for the folks who are hosting this
25 video in case I need to reach out to their tech

Page 8

1 support.
2 Q. Sure. If someone from Lexitas could have
3 the number inserted into the chat, that would be
4 great.
5    FEMALE SPEAKER: I will mention that your
6 computer is having, like, a glitch on your end. So
7 I'm not sure if -- how you're connected in the
8 conference room.
9    THE WITNESS: Is that mine or --
10    MR. VANDEVELDE: I can hear her and see her
11 fairly well. Why don't we -- why don't we keep
12 going, and we'll see -- we'll see how it progresses.
13    BY MR. VANDEVELDE:
14 Q. Ms. Frederiksen-Cross, at times I'm going
15 to show you exhibits, but we'll have to do that
16 electronically. And we can kind of work that out as
17 we get to our first exhibit.
18    Do you have any physical papers or
19 materials with you that relate to the case?
20 A. Yes, sir, I do.
21 Q. Okay. And what are they?
22 A. I have a binder that contains my corrected
23 expert report, the supplement report, and my
24 declaration from this matter. And I have, as loose
25 paper, the injunction and then the Ninth Circuit's

Page 33

BY MR. VANDEVELDE:
Q. Did you also consider whether it needs to be in a concrete or permanent form?
   MR. POLITO: Same objections.
   THE WITNESS: I do not recall applying a test of permanent form, but rather fixed a intangible form or recorded in a concrete form.
BY MR. VANDEVELDE:
Q. How do you define the phrase "substantially incorporate protected material" as you applied it in your report?
   MR. POLITO: Objection. It misstates testimony. Calls for a legal conclusion.
   THE WITNESS: Well, for example -- and I don't think you want me to walk through every example in the report, but --
BY MR. VANDEVELDE:
Q. You lost your audio.
A. Oh, I'll try to speak up. Do you have me now? Hello.
Q. Oh, there you are. Now I can hear you.
A. So, for example, a modification to an Oracle PeopleSoft environment, that -- the resultant derivative for that environment is modified still substantially incorporates protected material from

Page 34

Oracle's original PeopleSoft environment.
   Similarly, a program that is a modified version of an Oracle program would substantially incorporate Oracle materials. And, likewise, a document, for instance, that contains excerpts of Oracle code or screenshots of the Oracle materials, whether they were in text form or in screenshot form, would be substantially incorporating those protected materials to the extent they appear in the document.
Q. You gave the example of a translation with respect to you would -- you suggested that a translation would not contain any literal copying of the preexisting work.
   Are there any other examples you can think of where there's no literal copying, but it still substantially incorporates?
   MR. POLITO: Objection. Overbroad. Calls for a legal conclusion. Outside the scope.
   THE WITNESS: Well, I guess, you know, there's -- if you're looking at incorporates from the technical standpoint, for instance, even an act, like, zipping a file changes its representation such that if you open a zip file, you don't -- you wouldn't see the underlying work that was in the zip

Page 35

file because it's compressed in the encoding of the zip.
   And so any -- any comparable encoding, for instance, embedding the lines of a file in XML or, you know, changing -- changing the format of the file in a way, that it can easily be changed back via translation or via subsequent processing, I think would still substantially incorporate the protected material even if they weren't visible on their face when you open two files and look at them side by side.
BY MR. VANDEVELDE:
Q. Let's look at paragraph 210 of your opening report, which is 1854.
   MR. VANDEVELDE: If the document technician can scroll down to paragraph 2 -- oh, no. Sorry. Different document. 1854.
BY MR. VANDEVELDE:
Q. In that paragraph, in the second bullet point you state:
   "Rimini's updates are derivative works because they extend the features and functionality of the existing PeopleSoft software, rely for their operation on the underlying PeopleSoft

Page 36

architectural framework, and do not operate independently from the PeopleSoft components on which they rely."
   Do you contend that that is the legal definition of "derivative work" under the Copyright Act?
   MR. POLITO: Objection. Calls for a legal conclusion.
   THE WITNESS: With respect to a transformation or extension that's fixed in a tangible form, yes.
BY MR. VANDEVELDE:
Q. Was that your expert opinion, or is this your understanding from counsel?
   MR. POLITO: Objection. Calls for a legal conclusion.
   THE WITNESS: I'm stating my opinion here, and it's based on the guidance I was given of copyright law by counsel.
BY MR. VANDEVELDE:
Q. So your bullet point 2 you're contending is your expert opinion?
   MR. POLITO: Objection. Calls for a legal conclusion. Vague.
   THE WITNESS: I am not an attorney. So I

Page 37

1  am using the "derivative work" here in the sense
2  that a technical person would use that in the
3  context of the understanding I've been given of the
4  law.
5      I certainly don't intend to offer any legal
6  opinions, Counsel, just to be clear. But as a
7  technical person, it is my opinion that those
8  updates are derivative works or derived from the
9  PeopleSoft software which they rely upon and which
10 they extend or modify.
11     BY MR. VANDEVELDE:
12 Q. Okay. So this -- just so I'm understanding
13 you, this is not an understanding you obtained from
14 Oracle counsel?
15     MR. POLITO: Objection. Vague.
16     THE WITNESS: This is my opinion based on
17 my understanding of the law as provided by counsel.
18     BY MR. VANDEVELDE:
19 Q. Is this definition something you applied in
20 your analysis throughout your work in this case in
21 evaluating whether something is a derivative work?
22     MR. POLITO: Objection. Misstates the
23 document.
24     THE WITNESS: In some parts I did. I mean,
25 there was some cases where I'm opining on -- on

Page 38

1  derivative work that falls within this bullet. But
2  there are also other cases where I am looking at
3  examples of derivative work, for instance, the
4  modified and extension of a PeopleSoft environment
5  that's captured in the first bullet or the
6  application of changes to an existing environment as
7  is captured in the third.
8      So I think it's -- it's not fair to divorce
9  this one bullet from the paragraph in saying what I
10 did for the entirety of my analysis.
11     BY MR. VANDEVELDE:
12 Q. Okay. But -- but in your analysis -- I
13 guess take all three bullets.
14     These are the criteria that you used to
15 evaluate whether something was a derivative work?
16     MR. POLITO: Objection. Misstates prior
17 testimony. Asked and answered.
18     THE WITNESS: Well, I used these criteria
19 in combination with my review of the evidence to see
20 what the specific evidence held with respect to
21 these different bullet points.
22     BY MR. VANDEVELDE:
23 Q. Well, I mean, of course, you have to look
24 at the evidence. I get that.
25     But these are the criteria you used to

Page 39

1  evaluate the evidence?
2      MR. POLITO: Objection. Misstates prior
3  testimony. Object to the extent it calls for a
4  legal conclusion. Asked and answered.
5      THE WITNESS: I would say, Counsel, these
6  are principal points within the criteria I used. I
7  think in my report I elaborate somewhat on my
8  findings with respect to these, and it may be
9  clearer as -- if we go to individual sections where
10 I'm discussing a particular derivative work and my
11 reasoning for finding it so.
12     BY MR. VANDEVELDE:
13 Q. Do you -- you agree that PeopleSoft relies
14 on an operating system for its own operation?
15     MR. POLITO: Objection. Incomplete
16 hypothetical. Vague. Object to the extent it calls
17 for a legal conclusion.
18     THE WITNESS: The versions of PeopleSoft I
19 am aware of all run in environments which also have
20 an operating system. It's not always the same
21 operating system. But the PeopleSoft software, at
22 least the offerings from Oracle that I am aware of,
23 run on platforms that do themselves have an
24 operating system.
25 ///

Page 40

1      BY MR. VANDEVELDE:
2  Q. Are you aware of a version of PeopleSoft
3  that can run without an operating system?
4      MR. POLITO: Objection. Vague.
5      THE WITNESS: I think we covered that in my
6  earlier deposition, Counsel. I am not aware of any
7  specific version of PeopleSoft that runs without an
8  operating system.
9      BY MR. VANDEVELDE:
10 Q. Does PeopleSoft -- can it operate
11 independently from an operating system? Maybe
12 that's the same way of asking the same question, but
13 I'll ask it that way just to make clear.
14     Can PeopleSoft operate completely
15 independently from an operating system?
16     MR. POLITO: Objection. Vague.
17     THE WITNESS: Again, for the offerings that
18 I am aware of, the ones that I've looked at in the
19 context of this case, it does not operate
20 independently without an operating system.
21     BY MR. VANDEVELDE:
22 Q. Does PeopleSoft enable a functionality that
23 an operating system does not?
24     MR. POLITO: Objection. Vague. Exceeds
25 the scope.

Page 81

[redacted]

      BY MR. VANDEVELDE:
Q.  Got it.
      MR. VANDEVELDE: If you could take down the document, please.
      BY MR. VANDEVELDE:
Q.  Your report discusses alleged distributions.
    How do you define that term as you use it in your report?
A.  Do you want to direct me to a particular paragraph where I've used that, Counsel?
Q.  I don't have one handy, but you used the word "distributions" a number of times.
    How do you think of distributions in your analysis?
A.  Well, a distribution, for instance, in the context of a PeopleSoft update, is the transfer, whether electronically or otherwise, of the specifics of that update from where it was created

Page 82

on one customer's machine.
    (Witness's video and audio freezes.)
    MR. VANDEVELDE: Can we go off the record, please.
    THE VIDEOGRAPHER: The time is 10:55 p.m. We are going off the record.
    (Recess taken, from 10:55 to 11:04.)
    THE VIDEOGRAPHER: The time is 11:04. We are back on the record.
    BY MR. VANDEVELDE:
Q.  Ms. Frederiksen-Cross, do you understand you're still under oath?
A.  I do, Counsel.
Q.  Do you understand that the term "definition" [sic] is a legal term under the Copyright Act?
    MR. POLITO: Objection. The term --
    BY MR. VANDEVELDE:
Q.  Distribution. Distribution.
    MR. POLITO: Objection. Misstates the document. Or misstates the law, I should say.
    BY MR. VANDEVELDE:
Q.  I'm just asking if you understand that the term definition -- "distribution" is in the Copyright Act.

Page 83

A.  I believe that it is. But I'm not a lawyer, Counsel. I'm using the term "distribution" in a more common, technical meaning of distributing something from Point A to Point B.
Q.  Did Oracle counsel give you any definition for the word "distribution" to apply to your analysis.?
A.  Not that I recall, Counsel.
Q.  Does a distribution, as you use it in your analysis, require a change of ownership?
    MR. POLITO: Object to the extent it calls for a legal conclusion.
    THE WITNESS: My understanding -- and, again, this is a lay person's understanding, not a legal understanding -- is that in order to distribute something, like a piece of software, it can be a distribution of a copy of that software, for instance.
    Because typically with software, unless it's on a physical media, the possession -- set aside ownership for a minute because that's a slippery slope, but the possession of the program isn't tied to a single physical tangible device. You can have multiple electronic copies, and you could be distributing a copy to someone else who

Page 84

then has possession of that copy.
    Now, whether they own it or not, that's a whole 'nother kettle of fish because I don't even know how ownership intersects with this.
    BY MR. VANDEVELDE:
Q.  Okay. So when you use the word "distribution" in your report, it was not a definition that had an element of a change of ownership; correct?
    MR. POLITO: Objection. Vague. Misstates testimony.
    THE WITNESS: I think that is generally, correct. If I come across an example where I am using it in the context of ownership, I'll point that out, but with --
    BY MR. VANDEVELDE:
Q.  Okay. So, for example, if Company A copies a file from one of its computers to another of its computers, would you call that a distribution as you use it in your report?
    MR. POLITO: Objection. Incomplete hypothetical.
    THE WITNESS: Assuming that they're separate machines or separate environments, I might say that that code was distributed to another

Page 113

1  scenario that has violated the injunction.
2      BY MR. VANDEVELDE:
3  Q.  Let's assume we're using JDE instead of
4  PeopleSoft.  JDE, there's no facilities,
5  restrictions on licensees.  There's no injunction
6  paragraph about restricting it away from Rimini
7  computers -- sorry, there's no injunction provision
8  about the licensee only having it on their own
9  computer system.  So let's say this is JDE.
10     Same answer?
11     MR. POLITO: Objection.  Vague.  Compound.
12 Incomplete hypothetical.  Object to the extent it
13 calls for a legal conclusion.
14     THE WITNESS: What I read in the injunction
15 with respect to JDE -- and this is specifically
16 paragraph 8.  The original injunction was:
17     "Rimini Street shall not copy or
18     access J.D. Edwards' software or source
19     code to carry out development and testing
20     of software updates."
21     Now, I realize that the court dropped the
22 access provision, but they left the copy provision
23 in.  So JDE is a little bit different scenario.
24     For the Rimini engineer to open that file
25 so he can insert his line, whether he does it at

Page 114

1  Client A's systems or from somewhere else, that
2  Rimini engineer is creating a copy of the software
3  at the time he's engaging in that edit process.  And
4  a copy, again, when he stores it back with the edit
5  effected, a more permanent copy.
6      And so under my understanding of the
7  injunction, that would not be allowed by that
8  specific paragraph 8.
9      BY MR. VANDEVELDE:
10 Q.  Okay.  Let's assume now -- let's go back to
11 PeopleSoft, and let's assume that Rimini has made
12 this change in Client A's environment.  They have
13 fixed the problem.
14     Understand?
15 A.  I understand.
16 Q.  Now, assume that six months later, Client B
17 hires Rimini for support.
18 A.  Okay.
19 Q.  And Client B has a license to the same
20 PeopleSoft software.  It's licensed.  Third-party
21 support is allowed.  And Client B is hosting its own
22 development environment on its own systems.  And
23 Client B is experiencing the very same bug that
24 Client A was experiencing in the exact same Oracle
25 file.

Page 115

1  Are you with me?
2  A.  I think so, yes.
3  Q.  Okay.  Putting aside the display adapter
4  memory issues -- and that will be true in all these
5  hypotheticals, because we'll deal with that later.
6      Putting aside those issues, do you contend
7  that it would be a violation of the injunction for
8  the Rimini engineer to remotely connect to
9  Client B's environment and make the same change he
10 made for Client A?
11     MR. POLITO: Objection.  Incomplete
12 hypothetical.  Vague.  Compound.  Object to the
13 extent it calls for a legal conclusion.
14     THE WITNESS: Well, again, when you say
15 that the Rimini engineer is connecting to Client B's
16 system, I have the same problem with it that I had
17 in the original hypothetical, that --
18     BY MR. VANDEVELDE:
19 Q.  And I told you to assume -- we'll deal with
20 the display adapter later.  The only copies are the
21 RAM copies on the client's systems.
22 A.  So let's modify that hypothetical to
23 encompass that.
24 Q.  I've already instructed you assume that the
25 display adapter memory is not an issue.

Page 116

1      MR. POLITO: Same objections.
2      THE WITNESS: Okay.  So give me the pieces,
3  again, so we have a clear record.
4      BY MR. VANDEVELDE:
5  Q.  Client B has hired Rimini six months later.
6  Rimini has already fixed the bug or the issue for
7  Client A.  Client B has a license to the same
8  PeopleSoft software.  They have their own
9  development environment on their own systems.
10 They're experiencing the very same bug that Client A
11 was experiencing in the exact same Oracle file.
12     Do you contend it would violate the
13 injunction for the Rimini engineer to log in to,
14 remotely, Client B's environment and make the same
15 change that he had previously made for Client A?
16     MR. POLITO: Incomplete hypothetical.
17 Vague.  Compound.  Calls for a legal conclusion.
18     THE WITNESS: And in your hypothetical,
19 Counsel, setting aside for the moment the issue of
20 RAM, which I want to be careful to keep repeating
21 that, because I've already expressed that I think
22 that is an issue, your hypothetical seems to ignore
23 all of the testing and research and all of the rest
24 of the -- the work that would have happened on
25 Client A's system to develop that update, even if

Page 117

1  it's a one-line update.
2      You have to find what problem has the --
3  what program has the problem, where that problem is.
4  You have to create your update, which maybe you do
5  sitting back at your desk. But then you have to
6  apply it on customer's machine and test it to know
7  that you fixed the problem.
8      So to the extent that the Rimini engineer
9  is now going to Customer B and providing that
10 one-line change, he is doing so informed by the work
11 that was performed leading up to identifying and
12 writing that one line on Customer A's machine. And
13 then successfully following the insertion of that
14 line, the testing and all of the rest of it.
15     So I think in that scenario, providing that
16 same fix to Customer B, by just taking what you
17 already had and going to Customer B and say, Here, I
18 know this fixes the problem, I do understand that to
19 be prohibited under the injunction.
20     BY MR. VANDEVELDE:
21 Q.  Does it matter how much or little
22 efficiency is gained? For example, let's say it
23 takes the engineer 50 hours of work to diagnose the
24 issue, figure out where the problem was, that it was
25 in this file that we see in the diagram. To come up

Page 118

1  with the Rimini-written line of code, it takes 50
2  hours. And then in Client B, it takes 10 minutes.
3      Is that relevant or irrelevant to your
4  analysis?
5      MR. POLITO: Objection. Vague. Incomplete
6  hypothetical.
7      THE WITNESS: It is not relevant to my
8  analysis of whether that act would be prohibited.
9  Because it appears that the second customer is
10 gaining the benefit of work that was done on the
11 first customer's environment.
12     It might be relevant to other
13 determinations, for instance, relating maybe to the
14 damages person or something, but it's not related to
15 the determination of whether that act of -- of using
16 the benefit of the knowledge gained on Client A's
17 system when you develop that update, then applying
18 that for the benefit of the another customer when
19 you apply that update elsewhere. That doesn't seem
20 to be diluted in any way here.
21     BY MR. VANDEVELDE:
22 Q.  Does it matter whether it's the same
23 engineer that did the work for Client A that does
24 the work for Client B or it's a different engineer?
25     MR. POLITO: Objection. Incomplete

Page 119

1  hypothetical.
2      THE WITNESS: Not in the hypothetical as
3  you have posed it, Counsel. I wouldn't think that
4  that would make a difference. Because Customer B is
5  still gaining the benefit of the development time
6  and the testing time that occurred on Customer A's
7  environment. And that fix is now being reused on a
8  new customer's system.
9      BY MR. VANDEVELDE:
10 Q.  Does it matter whether it's one line of
11 Rimini-written code or ten lines of Rimini-written
12 code?
13     MR. POLITO: Objection. Incomplete
14 hypothetical.
15     THE WITNESS: In terms of taking that
16 update and replicating the derivative work both with
17 respect to the file and with respect to the
18 environment that was created on Customer A's machine
19 in a new customer's environment, I do not think that
20 the number of lines is relevant there.
21     MR. VANDEVELDE: Got it.
22     If we could show -- if we could mark Tab 10
23 and display it to the witness, I would appreciate
24 it.
25     DOCUMENT TECHNICIAN: And, Counsel, I'll

Page 120

1  send it through. There it is, I think.
2      BY MR. VANDEVELDE:
3  Q.  So assume -- here's another diagram to aid
4  in the questions I'll ask about a hypothetical.
5      So in this hypothetical, assume the
6  following: Client A and Client B each have a
7  license to PeopleSoft. Each hosts its own
8  development environment on its own systems. Each
9  has the same Oracle file. Again, red lines are
10 Oracle code in that file. The Rimini engineer has
11 already remotely connected to Client A's environment
12 and made an update by adding a line of
13 Rimini-written code. And that's the blue line.
14 It's 100 percent Rimini-written. It's not like any
15 Oracle code.
16     Again, are the derivative works so far the
17 modified file in Client A's systems and the modified
18 environment as a whole on Client A's systems?
19     MR. POLITO: Before any objections, I don't
20 have an exhibit number for this one.
21     MR. VANDEVELDE: Oh, sorry. I forgot to
22 mark it. It's 1859, I think.
23     (Marked for identification purposes,
24     Exhibit 1859.)
25     MR. POLITO: Thank you.

Page 125

 1  wherever that code was run and expanded.
 2  Q.  Yeah.  So if that blue line was a pound
 3  include and it was run, to the extent there's a copy
 4  made, it would be on Client A's systems; right?
 5       MR. POLITO: Objection.  Form.
 6       THE WITNESS: The -- sorry.  Go ahead.
 7       MR. POLITO: Objection.  Vague.  Thank you.
 8       THE WITNESS: The copy would be made on
 9  Client A's systems, but I think your question was
10  was this a derivative work.  And if the lines of
11  code that Rimini supplied are invoking or pulling
12  into memory that Oracle code, it colors the degree
13  to which that line of Rimini code is or is not
14  derived from Oracle code.
15       BY MR. VANDEVELDE:
16  Q.  So the inclusion of pound includes in those
17  Rimini lines, does that make it a derivative work,
18  in your opinion?
19  A.  Again, it --
20       MR. POLITO: Objection.  Pardon me.
21  Objection.  Incomplete hypothetical.  Object to the
22  extent it calls for a legal conclusion.
23       THE WITNESS: Yeah, it may well.  And
24  that's an area that -- I mean, it's a difficult case
25  to evaluate in some senses because it -- I would

Page 126

 1  want to look at the totality of your hypothetical 50
 2  lines of code and see how much Oracle functionality
 3  that code embodied vis-a-vis things like include
 4  statements where, as you say, you know, if that code
 5  was written by a Rimini but was a copy of an Oracle
 6  table, maybe just adding a prefix to each name, so
 7  it wasn't an identical table, it might be written
 8  entirely by Rimini, but derived entirely from
 9  Oracle.
10       So it's difficult to separate in a vague
11  hypothetical the kind of distinctions that you are
12  making.  There's not an absolute black and white,
13  that all code Rimini authors isn't a derivative
14  work, nor is there --
15       (Stenographer clarification.)
16       THE WITNESS: -- is not a derivative work,
17  nor is there a hard ruler that says all code Rimini
18  writes is a derivative work, of course.  You know.
19  It's a situational case-by-case evaluation that I
20  think you would need to make.
21       BY MR. VANDEVELDE:
22  Q.  And in going back to earlier questions, you
23  would have to do some comparison, whether in your
24  brain, as I think so you mentioned, or by actually
25  doing a comparison against Oracle code or other

Page 127

 1  Oracle IP.  That comparison would have to be made;
 2  correct?
 3       MR. POLITO: Objection.  Objection.  Asked
 4  and answered.  Misstates testimony.  Calls for a
 5  legal conclusion.  Compound.
 6       THE WITNESS: Yeah.  In the case of, for
 7  instance, includes of SQC code, I don't think that
 8  it would be necessary to look at the SQC rather than
 9  to verify that it was the Oracle SQC.
10       So from the standpoint of when you say
11  comparison, there would be additional analysis
12  required.  But whether that analysis was technically
13  a comparison or some other type of determination to
14  understand how this code was or was not coupled to
15  the Oracle product.
16       BY MR. VANDEVELDE:
17  Q.  But that analysis would involve some
18  evaluation or some comparison or analysis of what
19  Oracle's code and other intellectual property is;
20  correct?
21       MR. POLITO: Objection.  Vague.  Compound.
22  Calls for a legal conclusion.
23       THE WITNESS: I don't mean to be humorous
24  here, but what do you mean by "what Oracle's code
25  is"?  You mean the totality of its function and its

Page 128

 1  expression?  Are you talking only of its expression,
 2  only of its function, or some combination of both
 3  that is less than the totality of either?
 4       BY MR. VANDEVELDE:
 5  Q.  When you're evaluating whether this Rimini
 6  line of code or lines of code is a derivative work,
 7  you have to also in some form, whether in your brain
 8  or another form, think about what the preexisting
 9  work is, the copyrighted work; correct?
10       MR. POLITO: Objection to the extent it
11  calls for a legal conclusion.  Vague.  Incomplete
12  hypothetical.
13       THE WITNESS: It is my understanding that
14  you would want to consider the original work in
15  determining if something was a derivation.
16       BY MR. VANDEVELDE:
17  Q.  That's what I'm asking.
18       Is that correct?
19  A.  And I'm agreeing.  I'm saying that that is
20  my understanding, yes.
21  Q.  Okay.  Looking back at this diagram, I
22  think you answered that -- let me just confirm
23  because it's a different diagram than the first one.
24       I would assume you would contend that if
25  that Rimini line of code -- again, assuming that

Page 129

1  it's 100 percent Rimini-written. It is not anything
2  like, let alone identical, to Oracle code.
3     If that blue line is added to Client B's
4  systems, you would say that that's cross-use and a
5  violation of the injunction?
6     MR. POLITO: Objection. Asked and
7  answered. Incomplete hypothetical.
8     THE WITNESS: If that line of code were
9  provided to Client B as an update that was developed
10 on Client A's system, that would be a violation of
11 the injunction.
12    BY MR. VANDEVELDE:
13 Q. Does it matter how the blue line of code
14 might be inserted into Client B's version of the
15 Oracle file, a copy of the Oracle file?
16    MR. POLITO: Objection. Incomplete
17 hypothetical. And, Counsel, for clarity, are you
18 still asking her to ignore how it was inserted, per
19 your prior instruction?
20    BY MR. VANDEVELDE:
21 Q. I'm asking if it's relevant. And I'll just
22 give you an example. You can think of other ones
23 potentially.
24    Does it matter if, for example, they copy
25 and paste the blue line of code from Client A's to

Page 130

1  Client B's systems or if they send the blue line of
2  code as a separate file from Client A to Rimini and
3  then Rimini to Client B? Does the mechanism of
4  transfer of that blue line of Rimini code, is that
5  material to your analysis of whether cross-use has
6  occurred when that blue line is inserted into
7  Client B's Oracle file?
8  A. If the blue line is transferred to Client B
9  in any form, it would be my understanding that that
10 was not a permitted act. Now --
11 Q. And if the engineer remembers the blue line
12 of code?
13    MR. POLITO: Objection. Incomplete
14 hypothetical.
15    THE WITNESS: Again, that's a very strange
16 example, of a single line in a single program.
17    Again, the circumstances matter if the
18 engineer remembered exactly the code he wrote,
19 exactly what he fixed, exactly where he fixed it,
20 and he relied on that very specific and detailed
21 knowledge to re-create that update for another
22 customer, then it would be my understanding that
23 because he's relying on the work done in the system
24 of Client A to identify the change and to implement
25 the change and to test the change, when he goes to

Page 131

1  Client B with the certainty that that is the change
2  required, that that would be impermissible.
3     BY MR. VANDEVELDE:
4  Q. Can the engineer -- say the engineer
5  remembers the specific line of code he developed for
6  Client A, in Client A's systems, and Client B -- and
7  let's say there are other clients have the same
8  issue in the same Oracle file.
9     Can that engineer ever use that Rimini line
10 of code with those other customers?
11    MR. POLITO: Objection. Calls for a legal
12 conclusion. Vague. Incomplete hypothetical.
13    THE WITNESS: My understanding of the
14 injunction is that it prohibits specifically the
15 preparation of a -- of a update or a derivative work
16 on one client's system and provision of that update
17 or derivative work to another client's system.
18    Now, in theory, I think it might be
19 possible say that the -- a very simplistic
20 situation, someone had transposed the digits of the
21 date. So instead of saying "2019," it said "2091."
22    It's certainly the case, I think, that a
23 developer might independently identify that problem
24 and make that change and test that change and
25 implement that fix, and the result could conceivably

Page 132

1  be, in a simple one-line fix like this, a line of
2  code that was identical because you're really just
3  fixing "2091" to "2019."
4     So can the Rimini engineer reuse the line
5  of code? No, I don't believe they can because
6  that's transferring the update from one system to
7  the other. Could they independently go to a system
8  and independently develop a change that -- where
9  that one line in your example happened to look the
10 same, I think that that might -- that might be
11 possible and not be considered a cross-use.
12    But it's a real corner case because we're
13 talking about updates that are many, many, many,
14 many lines in most cases. And this is sort of
15 taking an observed structure of that to -- of what
16 we see in the actual evidence to a very thin example
17 that we're using as a hypothetical.
18    BY MR. VANDEVELDE:
19 Q. So are you saying whether or not the
20 engineer can implement this line of code to
21 Client B's system depends on whether they remember
22 the line of code precisely? If they don't -- it's
23 fuzzy, maybe they can use it. If they remember it
24 precisely, they can't use it?
25    MR. POLITO: Objection. Misstates

Page 133

1   testimony.
2       THE WITNESS: No, that's -- that's not what
3   I'm saying, Counsel.
4       I'm saying that if the engineer, whether
5   the original engineer or another engineer, relies on
6   the work done in Client A's system to understand
7   what the problem is and where the fix needs to be
8   and how the fix needs to be implemented, if they
9   rely on that detailed knowledge of -- rely on that
10  work that was done on Client A's system, to have the
11  detailed knowledge of where to make the fix and they
12  go make that fix somewhere else, then my
13  understanding is that that is no longer general
14  knowledge and know-how, but is very specific
15  implementation for a very specific solution to a
16  very specific bug, and that that is impermissible
17  under the injunction, as I understand it.
18      BY MR. VANDEVELDE:
19  Q.  So, yeah, let's actually talk about a bug.
20      So let's say it was a bug. It was a severe
21  bug in the Oracle file. And let's expand it to the
22  Rimini solution is ten lines of code.
23      So Rimini had to diagnose the bug. Had to,
24  you know, look at where in the environment it was.
25  It found -- the Rimini engineer found that it was in

Page 134

1   the Oracle file. And the solution for the bug that
2   the Rimini engineer develops is ten lines of code.
3   It is 100 percent Rimini-written. It is not like,
4   let alone identical, or substantially similar to any
5   Oracle intellectual property.
6       And then other clients, like Client B, have
7   the same PeopleSoft version, the same Oracle file.
8   Are experiencing the same severe bug. And the
9   engineer -- can the engineer ever insert those ten
10  lines of code to solve the bug for other customers?
11      MR. POLITO: Objection. Asked and
12  answered. Incomplete hypothetical. Calls for a
13  legal conclusion. Compound. Vague.
14      THE WITNESS: Under my understanding of the
15  injunction -- and I'm looking now specifically at
16  the paragraph numbered six, which says that:
17      "Rimini Street shall not prepare" --
18  I'm sorry -- "shall not reproduce,
19      prepare derivative works from, or use
20      PeopleSoft software or documentation on
21      one licensee's computer system to
22      support, troubleshoot, or perform
23      development or testing for any other
24      licensee, including specifically that
25      Rimini Street shall not use a specific

Page 135

1       licensee's PeopleSoft environment to
2       develop or test software updates or
3       modifications for the benefit of any
4       other licensee."
5       Under the language, as I understand it, in
6   that paragraph of the injunction, Rimini would be
7   prohibited from reusing that update that it
8   developed on Client A's system for the benefit of
9   any other customer.
10      MR. VANDEVELDE: If we could mark as
11  Exhibit 1890 [sic] Tab No. 11.
12      (Marked for identification purposes,
13      Exhibit 1860.)
14      MR. VANDEVELDE: Oh, sorry.  1860.
15      BY MR. VANDEVELDE:
16  Q.  So this is another diagram that will aid in
17  me asking questions about hypothetical. This one is
18  similar to the previous exhibit we looked at.
19      Here, Client A and Client B each have a
20  license to PeopleSoft. Each hosts its own
21  development environment on its own systems. Each
22  has the same Oracle file. Again, the red lines are
23  Oracle code in that file.
24      The Rimini engineer has already gone into
25  Client A's environment and made an update by

Page 136

1   creating a new file entirely of Rimini-written code.
2   Again, assume that the blue Rimini code is unlike
3   and not substantially similar to any Oracle IP.
4       And so, again, let me just confirm. I
5   think I know your answer, but the development
6   environment on Client A's systems, that would now be
7   a modified -- sorry, that would now be a derivative
8   work with the inclusion of the blue Rimini code
9   file; correct?
10      MR. POLITO: Objection.
11      THE WITNESS: Yes, it would.
12      MR. POLITO: Sorry. Objection. Incomplete
13  hypothetical. Object to the extent it calls for a
14  legal conclusion.
15      BY MR. VANDEVELDE:
16  Q.  You said, "Yes, it would"?
17  A.  That would be my understanding, that by
18  modifying the PeopleSoft environment, that is --
19  that modified environment is still a derivative work
20  of the PeopleSoft environment.
21  Q.  Got it.
22      But the red Oracle file in Client A's
23  systems, that has not been modified. So it is not a
24  derivative work; correct?
25  A.  It's still the original work if it's not

Page 137

1 been modified.
2 Q. Okay. Just confirming.
3    And, again, I think we have talked about
4 this in connection with lines of code, but how about
5 the Rimini code, the blue file, in isolation? Would
6 you contend that that is a derivative work?
7    And, again, given the assumption that I'm
8 asking you to assume, which is that it is entirely
9 Rimini-written code, that is not like or let alone
10 identical to any Oracle IP. It is not substantially
11 similar to any Oracle IP.
12    MR. POLITO: Objection. Incomplete
13 hypothetical. Compound. Object to the extent it
14 calls for a legal conclusion.
15    THE WITNESS: In this case, where we were
16 talking about a specific file that satisfies some
17 particular function, I think there is not a blanket
18 yes/no answer. It depends what that Rimini code
19 does and how it relates to the Oracle environment.
20    So if that Rimini code is an extension or a
21 transformation of that Oracle environment, it is
22 still a -- my understanding would be that it is
23 still a derivative work of that environment.
24    But hypothetically, maybe that code doesn't
25 even use any Oracle functionality. It doesn't even

Page 138

1 really use the environment. It is only confined to
2 using some capability of the underlying operating
3 system, like creating a list of directories. Then,
4 you know, there are situations that I could think my
5 way into that says this program could be divorced
6 from the environment and still used in the
7 environment or used on the same environment and not
8 be derivative work.
9    But to the extent that that specific file
10 serves as an extension to the PeopleSoft environment
11 or a modifier or it would transform some aspect of
12 that environment, then I would understand it to be a
13 derivative work.
14    BY MR. VANDEVELDE:
15 Q. Now, would you contend it's an violation of
16 the injunction for Rimini to create the same Rimini
17 file with the blue code in Client B's environment if
18 Client B is having the same issue and needs the same
19 functionality or code?
20    MR. POLITO: Objection. Incomplete
21 hypothetical. Object to the extent it calls for a
22 legal conclusion. Vague.
23    THE WITNESS: Again, assuming that that
24 Rimini code that was written by Rimini was written
25 based on an analysis of Client A's environment to

Page 139

1 identify the problem, and modification of Client A's
2 environment via the addition of this file, and in
3 subsequent testing of Client A's environment, you
4 know, all things that would have to -- that you
5 didn't mention in your hypothetical, but it would be
6 a part of the actual occurrence of this kind of
7 maintenance, then I think that reuse of that file on
8 Customer B's environment would be a violation,
9 again.
10    BY MR. VANDEVELDE:
11 Q. But Rimini would not be able to use this
12 file with any other client even if they were
13 experiencing the same bug or problem that Client A
14 had experienced?
15    MR. POLITO: Objection. Asked and
16 answered. Object to the extent it calls for a legal
17 conclusion. Vague. Incomplete hypothetical.
18    THE WITNESS: And, again, yes, it is my
19 opinion that it would be impermissible. And that's
20 based on my understanding that the injunction says:
21    "Rimini Street shall not use a
22    specific licensee's PeopleSoft
23    environment to develop or test software
24    updates or modifications for the benefit
25    of any other licensee."

Page 140

1    BY MR. VANDEVELDE:
2 Q. Does it matter where the blue Rimini file
3 was first created? For example, if it was first
4 created on Rimini's systems while solving the
5 problem for Client A, does that affect your analysis
6 at all?
7    MR. POLITO: Objection. Incomplete
8 hypothetical.
9    THE WITNESS: Well, I would want to also to
10 examine how it was developed and where it was
11 tested. And so if it was developed under Rimini's
12 system, but it was developed on Rimini's system
13 based on an analysis of Client A's system to
14 diagnose the problem and to determine what needed to
15 be done as a resolution, and if it was tested on
16 Customer A's system, then certainly it would be a
17 violation, as I understand the injunction.
18    BY MR. VANDEVELDE:
19 Q. If Rimini transfers the blue file from
20 Client A to Rimini's systems, and then Rimini
21 transfers it again from Rimini's systems to
22 Client B's systems, is any red Oracle code copied?
23    MR. POLITO: Objection of the incomplete
24 hypothetical.
25    THE WITNESS: Okay. So here we're moving

Page 141

1  away from cross-use to copying, and we're focusing
2  the same set of facts as in the prior hypothetical,
3  where the blue code is completely Rimini-authored
4  and looks nothing like any Oracle documentation or
5  Oracle code or other Oracle IP?
6      BY MR. VANDEVELDE:
7  Q.  Correct.
8  A.  And you're just asking if Rimini -- if
9  Rimini created that code -- ask your question again
10 and given those hypothetical fact are established.
11 Q.  If Rimini transferred the blue file from
12 the Client A's systems to Rimini's systems and then
13 transferred again from Rimini's systems to
14 Client B's systems, is any red Oracle code copied?
15     MR. POLITO: Same objection.
16     THE WITNESS: If just the blue code is
17 copied, and that code bears no relationship to the
18 Oracle IP, then Rimini is not copying Oracle code or
19 Oracle -- they're not copying the red code in your
20 example here.
21     MR. VANDEVELDE: Got it.
22     If we could mark as Exhibit 1861 -- and
23 this is the last one --
24     MR. POLITO: We've been going about an hour
25 and 15.  Barb, are you okay for one more, or do you

Page 142

1  need a break now?
2      THE WITNESS: I can do one more, and then
3  it would be nice to grab some lunch actually.
4      MR. VANDEVELDE: Yeah.  Let's do that.  I
5  don't think it will be very long.
6      So if we could mark as Exhibit 1861 Tab 12
7  and display it.
8      (Marked for identification purposes,
9      Exhibit 1861.)
10     THE WITNESS: And you said 1861, Counsel?
11     BY MR. VANDEVELDE:
12 Q.  Yes.
13     MR. POLITO: I'm still waiting for file via
14 chat, please.
15     MR. VANDEVELDE: Okay.  It will come.  Let
16 me know when you get it, John.
17     MR. POLITO: I have it.
18     MR. VANDEVELDE: Yeah.  Okay.  Great.
19     BY MR. VANDEVELDE:
20 Q.  So this is another diagram to aid in
21 questions I'll ask about hypothetical.
22     In this one I would like you to assume that
23 Client A and Client B each have a licensed to
24 PeopleSoft.  Each host its own development
25 environment on its own systems.  Each has the same

Page 143

1  Oracle file.  It's the file with the red lines.  's
2  Oracle code in that file.  The Rimini engineer has
3  already gone into Client A's environment and made an
4  update by deleting a line that had a bug.
5      Just to confirm, I think you would agree
6  that the Oracle file on Client A's system with that
7  line deleted, that's a derivative work; correct?
8      MR. POLITO: Objection.  Calls for a legal
9  conclusion.
10     THE WITNESS: That would be my
11 understanding as a technical matter, that that
12 work -- that file is still derived from the
13 original, even though it has one less line.
14     BY MR. VANDEVELDE:
15 Q.  And the development environment as a whole
16 with that modified file, that would be a derivative
17 work as you define and apply it in your analyses?
18     MR. POLITO: Same objection.
19     THE WITNESS: Yes.  As I understand it from
20 the technical perspective, having that one small
21 change, the environment is still a derived
22 environment from the original environment.
23     BY MR. VANDEVELDE:
24 Q.  Okay.  Would you contend that if the Rimini
25 engineer connected to Client B's system, who was

Page 144

1  having the same issue in the same file, the same
2  bug, and the Rimini engineer deleted that same line,
3  that that would be a violation of the injunction?
4      MR. POLITO: Objection.  Incomplete
5  hypothetical.  Object to the extent it calls for a
6  legal conclusion.
7      THE WITNESS: Again, based on my
8  understanding, to the extent that -- and assuming
9  that the Rimini engineer had to have used
10 Customer A's PeopleSoft environment to develop this
11 fix, to identify the problem and to figure out one
12 line to remove and to test that fix.
13     And so, again, it's my understanding that
14 Rimini's reuse of that fix for another customer, to
15 the benefit of that other customer, would -- would
16 violate the injunction.
17     BY MR. VANDEVELDE:
18 Q.  Does it matter how many lines we're talking
19 about?  For example, if it was ten deleted lines
20 instead of one deleted line?
21     MR. POLITO: Object.  Calls for a legal
22 conclusion.
23     THE WITNESS: As I sit here, I do not think
24 it would.  The injunction language doesn't seem to
25 include any restrictions on the size of the update,

Page 145

1  but rather just says Rimini shall not use a specific
2  licensee's environment to development or test
3  software updates for modifications for the benefit
4  of any other licensee.
5      BY MR. VANDEVELDE:
6  Q.  Was any Oracle -- strike that.
7      Could the engineer -- do you contend it's a
8  violation of the injunction for the engineer to
9  create a dev instruction that says delete line,
10 let's say, 200 from file X?
11     MR. POLITO: Objection. Incomplete
12 hypothetical. Vague.
13     THE WITNESS: Assuming that -- again, that
14 the development work to develop the fix was done on
15 Client A's system and tested there, and then the
16 Rimini engineer writes that dev spec, are you saying
17 is the creation of a document that says that a
18 violation, or were you asking is the use of that
19 document a violation?
20     BY MR. VANDEVELDE:
21 Q.  To start with, just the creation of that
22 document.
23     MR. POLITO: Same objections.
24     THE WITNESS: Yeah. It would depend in
25 part on what the document contains. But in this

Page 146

1  really narrow hypothetical, where it just instructs
2  someone to go to a particular file and delete a
3  particular line, and it hasn't been shared with
4  other customers or used on other customer
5  environments, and it doesn't actually contain the
6  line, it just says "go to this file, delete this
7  line," that is probably is not a violation of
8  anything.
9      BY MR. VANDEVELDE:
10 Q.  But once that instructions is used with
11 Client B, you contend that's a violation of the
12 injunction?
13     MR. POLITO: Objection. Incomplete
14 hypothetical. Vague. Calls for a legal conclusion.
15     THE WITNESS: Under my understanding of the
16 injunction, again, that Rimini engineer has now used
17 the Client A's specific environment to develop and
18 test software updates or modifications and is now
19 using that for the benefit of another client.
20     So as the injunction is written, that is my
21 understanding, is that it would be a violation.
22     BY MR. VANDEVELDE:
23 Q.  What if instead of saying -- the dev
24 instruction, instead of saying "delete line 200," it
25 said "delete the line where Function F is called,"

Page 147

1  and then it's got the name of the function in the
2  dev instruction? Is the creation of that dev
3  instruction, in your view, a violation of the
4  injunction?
5      MR. POLITO: Objection. Incomplete
6  hypothetical. Vague. Object to the extent it calls
7  for a legal conclusion.
8      THE WITNESS: And, again, I'm going to read
9  a couple of things in here. Assuming, first of all,
10 that the dev instruction is created on Client A's
11 system and only ever used for Client A's system, and
12 it doesn't contain Oracle code, then the existence
13 of that document at that point does not constitute a
14 violation.
15     It's when that document is used to
16 propagate that solution for a benefit of another
17 customer. And so we're not talking a copying issue
18 here. We're really just talking a cross-use issue.
19     BY MR. VANDEVELDE:
20 Q.  How -- stepping aside from the
21 hypothetical -- and maybe just take this down. And
22 this will be the last short line of questioning.
23 Take down the exhibit.
24     How can Rimini implement the same update
25 for multiple clients without, in your view,

Page 148

1  violating the injunction?
2      MR. POLITO: Objection. Vague. Incomplete
3  hypothetical. Object to the extent it calls for a
4  legal conclusion.
5      THE WITNESS: I wasn't asked, Counsel, to
6  specifically identify or address how Rimini could
7  adjust its business practices to ensure that it
8  didn't fall afoul of the injunction. So I haven't
9  thought that hypothetical through with sufficient
10 diligence to be able to offer you any answer of how
11 they could do that.
12     As I said in my other deposition, I think,
13 the first point would be perhaps to confer with
14 their counsel to get guidance on what actions are
15 permitted and what actions are not permitted. And
16 then to address their business process accordingly
17 in ways --
18     BY MR. VANDEVELDE:
19 Q.  So Rimini -- if -- if Rimini identified --
20 if Rimini has a Client A that has a very serious
21 bug, it's very serious, it causes a complete
22 malfunction. The PeopleSoft software is not able to
23 function properly. And it's a very simple fix. It
24 requires the deletion of one line in an Oracle file.
25 And 50 other clients have the same version of

Page 165

1 another customer, I do contend that that violates
2 the cross-use.
3 Q. Got it.
4    And there's references to reducing testing
5 efforts or doing less testing. Is that relevant to
6 your analysis? Or if, for example, the testing
7 takes the same amount of time, but it uses a common
8 test plan, that would still be a violation of the
9 injunction in your view?
10    MR. POLITO: Objection. Compound.
11    THE WITNESS: Where that test plan is
12 developed and the use of a specific customer's
13 environment to verify the tests or to, you know,
14 capture information about expected results,
15 et cetera, then, yes, I think that would still
16 violate the injunction.
17    BY MR. VANDEVELDE:
18 Q. Regardless of -- if the tests for Client B,
19 for example, takes just as long as the initial
20 testing for Client A?
21    MR. POLITO: Objection. Incomplete
22 hypothetical.
23    THE WITNESS: Yeah. You're not -- in
24 examining how long it takes to test, you're ignoring
25 the work that was done to develop the test plan as a

Page 166

1 first case, and you're also ignoring, again, the
2 language of the injunction with respect to that
3 prohibition on:
4    "Rimini Street shall not use a
5    specific" --
6    (Stenographer clarification.)
7    THE WITNESS: "Rimini Street shall not use
8    a specific licensee's PeopleSoft
9    environment to develop or test software
10    updates or modifications for the benefit of
11    another licensee."
12    So even just the act of testing that -- or
13 developing the fix in the first place and then
14 testing it so that you know this is the fix, when
15 you transport that knowledge to another environment,
16 you may be running through the same set of tests,
17 but you've already benefited from the fact of
18 developing that test -- or developing that test plan
19 of what to test and what not to test and how to test
20 it and what specific steps to take in the test.
21    And so you're still benefiting from having
22 developed that plan even if you simply re-execute
23 the plan in a new environment for a new customer.
24    BY MR. VANDEVELDE:
25 Q. Got it. Got it.

Page 167

1 So -- and I'm just trying to confirm. So
2 even -- even if the test in the subsequent client
3 happens to take equally long or even longer, for
4 whatever reason, you would still contend that that's
5 improper cross-use, in violation of the injunction,
6 because of the knowledge of the first -- and work
7 that went into the testing the first client?
8 A. Well --
9    MR. POLITO: Objection. Pardon me.
10 Objection. Incomplete hypothetical. Vague.
11    THE WITNESS: Yeah, it's not specifically
12 because of the knowledge. It's because that way
13 that knowledge was acquired; that is to say, the
14 test plan was developed through the use the first
15 customer's environment.
16    So that environment is being used to create
17 the testing document that's then being followed in
18 other environments to confirm that the software is
19 operating correctly.
20    BY MR. VANDEVELDE:
21 Q. And regardless of how little or long
22 subsequent testing takes, you would contend that's a
23 violation of the injunction?
24    MR. POLITO: Objection. Asked and
25 answered. Incomplete hypothetical.

Page 168

1    THE WITNESS: Well, to the extent that the
2 use of that test plan benefits the other customer,
3 that's really the key, is does the use of that test
4 plan benefit the other customer? Because then
5 you're piggybacking on the testing work that was
6 done in the first customer's environment.
7    BY MR. VANDEVELDE:
8 Q. When the engineer is testing an update for
9 Client A and there's no other clients, you would
10 agree that that testing is for the benefit of
11 Client A; correct?
12    MR. POLITO: Objection. Incomplete
13 hypothetical.
14    THE WITNESS: So let me make sure I
15 understand your hypothetical. You're saying Rimini
16 only -- this is -- we're back to Rimini only has one
17 customer. This is Customer 0. And Rimini is
18 developing a test plan for some change that they
19 plan to make or had made to that system. And that's
20 the only customer that exists, and the plan is
21 developed right there on the customer's machine
22 and -- that's where we're at in your hypothetical;
23 right?
24    BY MR. VANDEVELDE:
25 Q. Yes.

Page 293

1  on that kind of system, it might be in the same
2  physical block of memory, but it is a different
3  chunk of memory that's allocated to the video
4  processor. And where a separate processing units is
5  completely separate.
6      BY MR. VANDEVELDE:
7  Q. Is that -- okay. And I'm going to use the
8  word "video buffer" --
9      (Stenographer clarification.)
10     BY MR. VANDEVELDE:
11 Q. I'm going to use the phrase "video buffer."
12     Is that display adapter memory continually
13 painting the pixels on the screen to display an
14 image?
15 A. Typically it is, yes.
16 Q. Many times a second?
17 A. Again, typically it is 60 cycles or better
18 normally for ...
19     MR. VANDEVELDE: Okay. Why don't we take a
20 quick break. I think we're getting close.
21     Does that work with you, Barbara and John?
22     MR. POLITO: Fine with me.
23     MR. VANDEVELDE: Okay. Let's do ten more
24 minutes. I think we're close. All right. Thank
25 you.

Page 294

1      THE VIDEOGRAPHER: The time is 5:27. We
2  are going off the record.
3      (Recess taken, from 5:27 to 5:45.)
4      THE VIDEOGRAPHER: The time is 5:45. We
5  are back on the record.
6      MR. VANDEVELDE: We have no further
7  questions at this time.
8      MR. POLITO: All right. Give us five
9  minutes.
10     MR. VANDEVELDE: Okay.
11     THE VIDEOGRAPHER: The time is 5:45, and we
12 are going off the record.
13     (Recess taken, from 5:45 to 5:53.)
14     THE VIDEOGRAPHER: The time is 5:53. We
15 are back on the record.
16     MR. POLITO: Great.
17     So Oracle has no questions. Thanks very
18 much.
19     MR. VANDEVELDE: Great. Thanks all. Have
20 a good evening and --
21     THE VIDEOGRAPHER: The time is --
22     (Simultaneous speakers - unclear.)
23     MR. POLITO: We have a protective order
24 agreement in this case, so just -- this is highly
25 confidential until it's redesignated/dedesignated as

Page 295

1  agreed by the parties.
2      THE VIDEOGRAPHER: Shall we go off the
3  record now?
4      MR. POLITO: Yes, please.
5      MR. VANDEVELDE: Thanks, everyone, for you
6  help. Have a good evening.
7      (Stenographer clarification.)
8      THE VIDEOGRAPHER: The time is 5:54. This
9  concludes the deposition. Thank you.
10     THE STENOGRAPHER: Okay. I just need to
11 check.
12     Eric, you have a standing order.
13     And, John, do you also need the e-mailed
14 rough and a 2-day expedite also?
15     MR. POLITO: I'm sure we have a standing
16 order. I probably don't have the authority to
17 change it, so ...
18     THE STENOGRAPHER: Okay. I don't see the
19 standing order on here. I can double-check, but if
20 it sounds right to you --
21     MR. POLITO: It sounds right to me. I can
22 have our paralegal reach out to you with
23 confirmation because she is the person in charge.
24     THE STENOGRAPHER: Sounds good. All right.
25     (Deposition concluded at 5:54 p.m.)

Page 296

1                REPORTER'S CERTIFICATE
2      I, LORRIE L. MARCHANT, Certified Shorthand
3  Reporter, Certificate No. 10523, for the State of
4  California, hereby certify that BARBARA
5  FREDERIKSEN-CROSS  was by me duly sworn/affirmed to
6  testify to the truth, the whole truth and nothing
7  but the truth in the within-entitled cause; that
8  said deposition was taken at the time and place
9  herein named; that the deposition is a true record
10 of the witness's testimony as reported to the best
11 of my ability by me, a duly certified shorthand
12 reporter and a disinterested person, and was
13 thereafter transcribed under my direction into
14 typewriting by computer; that request [ ] was [ X ]
15 was not made to read and correct said deposition.
16     I further certify that I am not interested
17 in the outcome of said action, nor connected with,
18 nor related to any of the parties in said action,
19 nor to their respective counsel.
20     IN WITNESS WHEREOF, I have hereunto set my
21 hand this 22nd day of June, 2020.
22
23     _____
24     LORRIE L. MARCHANT, RMR, CRR, CCRR, CRC
        Stenographic Certified Shorthand Reporter #10523
25