# Exhibit 41
## Excerpts from the June 30, 2020 Deposition of Owen Astrachan
## REDACTED

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

ORACLE USA, INC., et al.,

Plaintiffs,

vs. Case No. 2:10-cv-00106-LRH-VCF

RIMINI STREET, INC., et al.,

Defendants.

_____________________________/

VIDEO-RECORDED DEPOSITION OF OWEN ASTRACHAN, PH.D.

REMOTE ZOOM PROCEEDING

Raleigh, North Carolina

Tuesday, June 30, 2020

REPORTED BY:

LESLIE ROCKWOOD ROSAS, RPR, CSR 3462

Pages 1 - 281 Job No. 4135801

applying more detail.

Q. Understood.

When did you begin to work on your supplemental report which is dated June 26, 2020?

A. Soon after Ms. Frederiksen-Cross served her what I believe is called a surrebuttal report. And I'd have to look at my logs and file to see precisely when, but it was reasonably or immediately soon thereafter. 08:23:35

Q. You testified that you prepared for your deposition in Rimini II for between five and seven days running between six to nine hours a day. 08:23:57

Do you recall that?

A. That sounds about right.

Q. And was your preparation for this deposition today similar in terms of time? 08:24:11

A. It was likely not quite as much time in terms of meeting with counsel, since I was at home so we would meet by Zoom. And in the previous cases, I was located where those depositions were going to be taken place.

So perhaps more of that time was spent with me by myself rather than with counsel, although we did have many Zoom meetings as part of preparing for the deposition. 08:24:31

Q. How many Zoom meetings do you think you had with counsel in preparation for this deposition? 08:24:50

A More than five and fewer than twenty

Q Okay Do you have an estimate for the total amount of time that you've spent with counsel preparing for this deposition?

A I haven't added up all the numbers in the spreadsheet of data that I keep for that I'm guessing that it's probably 40, 50 hours 08:25:02

Q Is that an estimate or a guess?

A It's a rough estimate It's not a guess

Q In your Rimini II deposition, you testified that you had never looked at any Rimini servers Does it remain correct that you've never looked at any Rimini servers? 08:25:29

MR VANDEVELDE: Misstates testimony

THE WITNESS: I'm not sure what you mean by "looked " Do you mean I traveled to Rimini Street and observed their servers? 08:25:44

Q BY MR SMITH: Correct Inspected

MR VANDEVELDE: Objection Vague, misstates prior testimony 08:25:55

THE WITNESS: I have not traveled to Rimini Street

Q BY MR SMITH: You also testified during your August 2018 deposition that you have never looked at any Rimini hardware 08:26:06

Does that remain correct?

MR. VANDEVELDE: Objection. Misstates prior testimony.

THE WITNESS: Again, if by "looked at" hardware, you mean I was in the room where I could see the hardware, that's correct, I have not done that. 08:26:15

Q. BY MR. SMITH: And is it correct that you have never inspected any of the servers of any of Rimini's customers?

MR. VANDEVELDE: Objection. Vague. 08:26:30

THE WITNESS: Again, if by "inspect" you mean I was in the room with them, I have not seen them. If by "inspect," you mean had access to that company, never.

Q. BY MR. SMITH: Okay. Have you ever logged into any Rimini server at any time? 08:26:47

A. I have not logged into any such server. I do not have access.

Q. Have you ever logged into any server of any Rimini customer at any time?

A. I have not. Again, I do not have access credentials to Rimini Street's client servers. 08:27:02

Q. You testified in your August deposition in 2018 that your general technical analysis was based on what Rimini engineers and their documentation told you about Rimini processings. 08:27:23

Do you recall that?

MR VANDEVELDE: Objection Misstates prior testimony

If you're going to ask about those prior testimonies, please show it to him so he can confirm that you're accurately reading it 08:27:31

THE WITNESS: I don't remember all the wording that's in my deposition or my report from Rimini II What you're stating sounds generally correct, but I'd have to look at the wording to see if it's precise 08:27:48

Q BY MR SMITH: Sure And I'm not particularly interested in the exact wording, but let me just ask you this question: Is it true that your technical analysis of Rimini's processes for this proceeding was based upon what Rimini engineers and Rimini documentation told you? 08:28:05

A Yes, I think that's basically correct

Q Are your opinions based upon anything else other than what Rimini's documents and Rimini's engineers told you, other than your experience?

A Well, I was going to say my experience counts for a reasonable amount in understanding those documents and talking with engineers But those -- that's the material that I've used to form my opinions 08:28:25

Q Did you do anything in connection with your work in this proceeding to verify the accuracy of Rimini's 08:28:41

representations either in documents or provided to you orally?

MR VANDEVELDE: Objection Vague

THE WITNESS: I've listened to and read material from Rimini Street engineers, and based on what I've read, formed opinions But I -- so if the question is -- I'm not sure what the question is 08:29:00

Those are the -- as I've stated, those are the sources of information that I've used, as well as my experience, to understand the material 08:29:17

Q BY MR SMITH: Did you undertake any factual investigation to verify the accuracy of any Rimini representation that was made to you?

MR VANDEVELDE: Objection Vague, asked and answered 08:29:34

THE WITNESS: If there were terms that I didn't understand, I'm sure I looked them up For example, I -- to understand some aspect of PeopleSoft, I would have looked at some PeopleSoft documentation, which is not Rimini Street documentation 08:29:47

But if you're asking just in terms of Rimini's processes, then I relied on Rimini engineers and Rimini personnel

Q BY MR SMITH: Did you personally do anything to confirm that no Rimini developer has copied Oracle code 08:30:06

to its systems since the Injunction went into effect?

MR VANDEVELDE: Objection Asked -- asked and answered, outside the scope

THE WITNESS: My -- my purpose here was to analyze and evaluate what Ms Frederiksen-Cross wrote in her report, and to the extent that I had questions for the Rimini engineers, information about what she wrote, that's what I did I was engaged to evaluate and analyze her report 08:30:22

Q BY MR SMITH: You testified that if you had questions for the Rimini engineers about what Barbara Frederiksen-Cross wrote, you would ask them; is that correct? 08:31:05

MR VANDEVELDE: Misstates prior testimony

THE WITNESS: I think I talked about both FTI and Rimini engineers as being available if I had questions 08:31:20

Q BY MR SMITH: And did you ask any Rimini engineers in connection with your reports in this proceeding any questions? 08:31:34

A That would be outlined in my report So all the footnotes in my report and rebuttal report I think with reasonable accuracy, if not with total accuracy, and I believe it's total accuracy, all the people with whom I've had conversations with in regard to this report 08:31:55

Q. And based upon your report, it appears that the only conversation you had was with Mr. Butler; is that correct?

A. Again, I'd have to review the footnotes to ensure that what you're saying is correct. 08:32:09

Q. Do you recall having any discussions with any Rimini personnel other than Mr. Butler in connection with the preparation of your reports in this proceeding?

A. I'd want to review, again, completely my report to ascertain whether what you're saying is correct. 08:32:24

Q. Okay. If you'd go to Exhibit 1856, which is your rebuttal report.

A. Yes.

Q. And if you go to Exhibit B, which starts on page 1 -- well -- 08:32:44

A. I've got it.

Q. You've got it. Okay.

At the back of this document, page 28 and 29, there's a list of interviews and demonstrations.

A. Yes, I see that. 08:33:06

Q. Okay. And all but one of these interviews and demonstrations that you list in this Exhibit B took place before your August 2018 deposition at Rimini II; correct?

A. I don't recall that, but I'm sure we could go through and ascertain whether that is, in fact, the case. 08:33:47

Q. Okay. Do you recall any of the interviews and/or demonstrations that are listed here in this Exhibit B as taking place prior -- or after the deposition of you in August of 2018?

A. In my report, as you mentioned previously, I have a footnote where I discussed an interview with James Butler. 08:34:06

Q. Yeah. Is that the only one you recall taking place after your last deposition in August of 2018?

A. That's what I recall at this time, that's correct. 08:34:23

Q. And you spoke with Mr. Butler about the 934 documents that hit on Ms. Frederiksen-Cross's search for files on any servers that contain Oracle copyright statements; right? 08:34:47

MR. VANDEVELDE: Objection. Misstates documents.

THE WITNESS: That was -- those -- that's what I cite in my report and they're among other things. So if we look through my report for notes that reference that interview, I think you'll see two such footnotes. 08:35:03

Q. BY MR. SMITH: Okay. I maybe missed the other one. What was the other one with respect to Mr. Butler?

A. There is a footnote on page 114 and there's a footnote on page 7 that reference my interview with 08:35:20

Mr Butler

Q Understood

So your discussions with Mr Butler related to the 934 documents identified by Ms Frederiksen-Cross in her report as well as files on the Salesforce system; is 08:36:03 that correct?

A That's correct

Q Did you talk to Mr Butler about anything else other than those two topics?

A On that, I don't recall all the things that we 08:36:18 talked about, but there are the two references in my report to that conversation

Q Okay Do you know if FTI Consulting performed any interviews of any Rimini individuals?

A I don't know 08:36:35

Q Other than your discussion with Mr Butler, did you personally do anything to confirm that no Rimini developer has copied Oracle code to its systems since the Injunction went into effect?

MR VANDEVELDE: Asked and answered, outside the 08:37:07 scope

THE WITNESS: I want to reiterate that my capture was in alignment with that of Ms Frederiksen-Cross's report, and that's the task that I was given 08:37:22

Page 30

Q BY MR SMITH: So did you do anything to confirm whether or not Rimini developers copied Oracle code to its systems since the Injunction went into effect?

MR VANDEVELDE: Asked and answered, argumentative 08:37:34

THE WITNESS: I analyzed Ms Frederiksen-Cross's allegations, and in my report, I explained why I don't believe they are well-founded

Q BY MR SMITH: Are you going to refuse to answer my question? I'm just asking if you did anything to 08:37:48 confirm whether or not a Rimini developer has copied Oracle code to its systems since the Injunction went into effect

MR VANDEVELDE: Asked and answered, fourth time 08:38 00

THE WITNESS: What I did was analyze and evaluate Ms Frederiksen-Cross's allegations and wrote about why I think they are incorrect in her analysis of how the Injunction is not being maintained -- upheld, and that's the analysis and evaluation that I did 08:38:19

Q BY MR SMITH: Did that analysis and evaluation include any work to confirm that a Rimini developer did or did not copy Oracle code onto Rimini systems after the Injunction was put in place?

MR VANDEVELDE: Asked and answered for the 08:38:36

Page 31

fifth time

THE WITNESS: To the extent that Ms Frederiksen-Cross wrote that such episodes happened, I evaluated and analyzed her allegations, and as I said, indicated that they were not well-founded That was the 08:38:49 evaluation and analysis that I did with respect to the Injunction and Rimini practice

Q BY MR SMITH: Have you ever had the opportunity to personally observe Rimini's software development team perform testing of updates? 08:39:08

MR VANDEVELDE: Objection Vague

THE WITNESS: If -- I -- I want to make sure I understand the question

I think what you're asking is did I watch Rimini engineers log into a client environment and perform an 08:39:21 update

Q BY MR SMITH: Correct

A I did not observe that

Q Did you ever observe a Rimini engineer logging into a client environment to update or fix files? 08:39:36

MR VANDEVELDE: Objection Vague

THE WITNESS: I did not observe Rimini engineers logging into a client system in the act of performing an update

Q BY MR SMITH: Did you observe Rimini engineers 08:39:55

Page 32

logging into a client system for any purpose?

A I did not see Rimini engineers log into a client system

Q Did you observe any Rimini engineers creating a Dev Instruction? 08:40:11

A I did not witness the creation of a Dev Instruction in real time, no

Q Did you witness the creation of a tech spec in real time?

MR VANDEVELDE: What did you say, tech -- 08:40:27

MR SMITH: Tech spec

THE WITNESS: I believe you're speaking of the JD Edwards equivalent of a Dev Instruction in this case

Q BY MR SMITH: Yes, a technical specification I call them tech specs 08:40:40

A I did not see the real-time creation of a tech spec

Q Is there a reason why you did not speak with any of the eight individuals you spoke with previously at Rimini to discuss with them Rimini's compliance with the 08:41:07 Injunction?

MR VANDEVELDE: Objection Vague

THE WITNESS: As I've stated, in evaluating and analyzing Ms Frederiksen-Cross's opinions, I had access to the information I needed to do such evaluation and 08:41:26

Page 33



Page 150

Page 151

Page 152

Page 154

Page 156

9

2

05

Page 155

Page 157

before?

A The first time that I bought a computer myself was 1980 or 1981

Q And at that time there was no internet and there was no cloud; right? 17:07:21

A Technically, there was an internet

Q There was no internet for use in 1981, outside of military or government use; correct?

A Or academic use

Q Or academic use? 17:07:36

A Yes There was no commercial use of the internet at that juncture, that's correct

Q In your report, paragraph -- well, it's on page 51 and it's footnote 141 You reference encyclopedia definition of colocation at PCMAG com; 17:08:06 correct?

A That's an accurate representation of my footnote

Q Did you review the PC Magazine -- strike that

What is the PC Magazine encyclopedia? 17:08:22

A It's a resource available on the web to explain terminology and vocabulary related to computing

Q And do you consider it to be a legitimate source?

A I consider it to be a reasonable reference and 17:08:43

that the definition of colocation that's there agrees with my understanding of what colocation means, yes.

Q. Okay. Did you review PC Magazine's encyclopedia's definition of the term "computer system"?

A. Not that I recall. 17:09:07

Q. Would you be surprised to know that it does not include any cloud components?

MR. VANDEVELDE: Assumes facts, vague. If you want to put it in front of him, you can.

THE WITNESS: Your question is would I be 17:09:20 surprised. I am very rarely surprised these days.

Q. BY MR. SMITH: In your report, you include virtual machines in your definition of computer resource; right?

A. I'm going to look in my report for virtual 17:09:40 machine. I just -- I want to make sure that you've used the term "virtual machine" in conjunction with computing, of course.

Q. Yeah. I'm referring to paragraph 167, where you write in the second sentence: "The client is able to 17:10:01 impose access restrictions on other users" -- strike that.

Third sentence. Then you go on: "And the client can move or delete the computing resource, e.g., the virtual machine containing the client's software 17:10:14

environments "

A Yes So the "e g " makes it clear that a virtual machine is an example of a computing resource

Q Okay And that was my question: You include virtual machines in your definition of computer resource; 17:10:28 right?

MR VANDEVELDE: Asked and answered

THE WITNESS: I'm explaining computer re -- computing resource here in -- as part of this paragraph, and as an example of such a computing resource, I do 17:10:43 include the word "virtual machine," yes

Q BY MR SMITH: What is a virtual machine?

A At a high level, it's software that emulates a particular hardware environment

Q What do you mean by "emulates"? 17:11:05

A If I buy a server and install an operating system on it, and that server has a certain amount of memory and a certain amount of disk space, and it allows a certain number of network ports to be open, then that server, which is hardware, in conjunction with the 17:11:25 operating system that's running on it and the memory and the disk that's associated with it, comprises a computing resource

Now, it's possible that you can create software, in this case, a virtual machine, and the keyword is 17:11:41

virtual, which as I understand it, means "not really." So it's not really a machine, but functionally, it's the same as a machine.

So rather than buying the hardware and installing the memory and installing the disk and 17:12:00 ensuring that the right number of ports are there, what I have is software that is for all intents and purposes meaning functionally the same as if I have hardware, but in fact, it is software that can be configured far more easily than the hardware running the operating system. 17:12:22

So the virtual machine gives you the advantage of not having to, for example, have physical memory because you can configure the virtual machine so that it has more memory by simply changing some software parameters rather than by going to buy memory. 17:12:41

So the software allows the flexibility of an actual machine, whereas because it's software, it's much easier to configure and build at scale than buying new hardware.

Q. Okay. In paragraph 174 of your report, you 17:12:57 discuss ultimate control or control of a software environment; correct?

Sorry, are you looking at a different paragraph?

A. I do not use the word "ultimate."

Q. Yeah. You talk about control. I thought the 17:14:29



Page 266

Page 268

Page 267

Page 269

[redacted]

Page 270

[redacted]

THE WITNESS: The Injunction uses the phrase "software source code," and as I've indicated before, Rimini believes that refers to closed code 18:29:52

Page 271

I've also explained in my previous answers that in analyzing whether Rimini Street had, for example, reproduced or prepared derivative works, that we have to analyze the entirety of what that, for example, tech spec might be, to determine if, in fact, it is a reproduction 18:30:07 or a derivative work And simply including a variable name would not mean that it is either a reproduction or a derivative work as I've explained previously today

[redacted]

Page 272

[redacted]

MR SMITH: Well, strike that

Let's go off the record for one second I think I only have a few more questions, and then we'll wrap it up 18:32:46

MR VANDEVELDE: Okay

THE VIDEOGRAPHER: We are going off the record The time is 9:32 p m

(Recess )

THE VIDEOGRAPHER: We are back on the record 18:42:04

Page 273

STATE OF CALIFORNIA ) ss:
COUNTY OF MARIN )

I, LESLIE ROCKWOOD ROSAS, RPR, CSR NO. 3462, do hereby certify:

That the foregoing deposition testimony was taken before me at the time and place therein set forth and at which time the witness was administered the oath;

That testimony of the witness and all objections made by counsel at the time of the examination were recorded stenographically by me, and were thereafter transcribed under my direction and supervision, and that the foregoing pages contain a full, true and accurate record of all proceedings and testimony to the best of my skill and ability.

I further certify that I am neither counsel for any party to said action, nor am I related to any party to said action, nor am I in any way interested in the outcome thereof.

IN WITNESS WHEREOF, I have subscribed my name this 2nd day of July, 2020.

LESLIE ROCKWOOD ROSAS, RPR, CSR NO. 3462