# Exhibit 4

## Excerpts from the Aug. 21, 2018 Deposition of Owen Astrachan Taken in the *Rimini II* Case

## REDACTED

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

---oOo---

RIMINI STREET, INC., a Nevada corporation,
Plaintiff,

vs. No. 2:14-cv-01699-LRH-CWH

ORACLE, INTERNATIONAL CORPORATION, a California corporation, et al.,
Defendants.

___________________________/

DEPOSITION OF PROFESSOR OWEN ASTRACHAN

SAN FRANCISCO, CALIFORNIA

TUESDAY, AUGUST 21, 2018

REPORTED BY:

ANDREA M. IGNACIO, CSR, RPR, CRR, CCRR, CLR ~

CSR LICENSE NO. 9830

JOB NO. 2975945

Pages 1 - 349

So I would stand by that statement of "generally not a derivative work."

Q And when is pseudocode a derivative work?

MR. VANDEVELDE: Calls for a legal conclusion. You can apply the sum -- assumed definition in your report.

THE WITNESS: In -- in my rebuttal report, I apply analytic dissection. And if you gave me two files, one of which was pseudocode and one of which was not, I could apply the same methodology to determine if one was a derivative work that I applied in the situations that I did in my report.

MR. SMITH: Q. At various points, your rebuttal report discusses the concept of know-how; right?

A I believe that's correct, yes.

Q And you opine that Oracle's experts' use of the term "cross-use" encompasses know-how; right?

A That's generally something that sounds right. I'd have to look at my specific wording, but yes.

Q How do you define the term "know-how"?

A I don't know if I -- in my report, I have a definition. I would -- if I do have such a term in my report, then I'd be happy to rely on that.

Q It's not in your report. That's why I'm

asking you how you define the term.

A My understanding of know-how is knowledge gained from performing an action.

Q Would you agree with me that a printout of Oracle copyrighted code would represent more than know-how?

MR. VANDEVELDE: Objection; vague.

THE WITNESS: I think a printout of Oracle code would not be something that I considered nor -- know-how. I don't have a "more" or "less" to associate with that.

MR. SMITH: Okay.

Q If a developer memorized Oracle copyrighted code and then retyped it somewhere else, would that be the use of know-how?

A The definition of know-how I gave previously was knowledge gained from performing an action. I think I would not consider memorizing to be the knowledge gained. But obviously, it would adhere to that definition.

Q So your definition is knowledge gained from performing something, but not memorization -- excluding memorization; is that right?

MR. VANDEVELDE: Asked and answered.

THE WITNESS: I gave a very general

definition of know-how, that I stand behind. I think that, if somebody memorized code and then wrote it down, that would not be what I meant by knowledge gained from performing an action.

MR. SMITH: Q. Is it your opinion that Rimini is using only its own know-how to provide support and maintenance of Oracle software products to its customers?

A I think in my reports, I talk about many things that Rimini does to support its customers.

Q I understand that.

But is it your opinion that it's using only its know-how?

MR. VANDEVELDE: Misstates the report, and vague.

THE WITNESS: No, it's not my opinion that Rimini is only using know-how. They write code. That's not know-how. They do many things as part of supporting their customers.

MR. SMITH: Q. You're familiar with the term "MD5 hash"; correct?

A Yes, I am familiar with MD5 hash.

Q And an MD5 hash value is an identifier that marks a unique file; is that correct?

MR. VANDEVELDE: Objection; vague.

THE WITNESS: I wouldn't characterize it as an identifier. It can be used to identify a file.

MR. SMITH: Q. Two files that have the same MD5 hash value are identical; correct?

A That's correct.

Q However, if there's even one difference between two files, such as an extra period or a space, the two documents would have different MD5 hash values; is that right?

A That's correct.

I want to make a small addendum, that we're in the realm of what occurs in -- every day, because there are people that have discovered ways to create files with the same MD5 hash, but that doesn't happen in actual everyday occurrence.

So yes, a change in one character would change the MD5 sum.

Q Okay. So therefore, I could copy 99 percent of one file, put it into another file, and the two files would have different hash values?

A Any two different files have different hash values.

Q Do you agree that updates for ERP software change over time?

MR. VANDEVELDE: Objection; vague and

Page 130

confusing.

THE WITNESS: "Update" is a term that I've used in my reports, and Ms. Frederiksen-Cross uses in her reports. So if you're asking about a Rimini update, those change over time.

MR. SMITH: Yeah.

Page 131

Page 134

[redacted]

Page 136

[redacted]

MR. SMITH: Q. Is a DIF file or change set consistent with software development best practices for recording actual changes?

MR. VANDEVELDE: Objection; vague.

THE WITNESS: Software development best practices encompass a wide variety of skills, guidelines, practices. I think that the DIF file, and the code that creates it, are consistent with best practices.

MR. SMITH: Q. Can you tell what the actual changes were to software code by looking at the DIF file itself?

A A DIF file captures the changes between two files, and by itself, with only the DIF file, cannot be used to recreate the software that was used to generate the DIF file.

Q You'd need to have the code before file as well; right?

A That's correct. You must have the code before file, as well as the DIF file, to generate the code after file.

Q DIF files have no use for purposes of

Page 135

[redacted]

Page 137

providing software updates without the code before file?

MR. VANDEVELDE: Objection; vague.

THE WITNESS: The existence of a DIF file in and of itself will capture the fact that an update was made. So it has a purpose simply by existing.

MR. SMITH: Q. But that purpose cannot be fulfilled unless you have the code before file?

A I've just spoken of multiple purposes that the DIF file has. The existence of the DIF file, and the readable material in it, will tell me something about the fact that it was part of an update.

Actually, recreating the update, using the applied DIF functionality, would use the DIF file for a different purpose than the fact that its existence tells me that an update was made.

Q Okay. You indicated now, and previously, that you can read a DIF file. But it's just a collection of numbers; right?

MR. VANDEVELDE: Objection; vague.

THE WITNESS: It is an XML file, and I can look at those numbers and see what they are. There is, I think, some header information in it, too.

MR. SMITH: Q. And looking at those numbers to see what they are, can you do anything --



Page 138

MR. VANDEVELDE: Objection; vague.

MR. SMITH: Q. -- other than look at them?

MR. VANDEVELDE: Same objection.

THE WITNESS: The numerical parts of a DIF file are used in the applied DIF functionality of it. And so those numbers themselves are part of what would happen when I use apply DIF to use the DIF file to recreate the file in the code after folder.

MR. SMITH: Understood.

Page 140

Page 139

Page 141

Page 214

purpose of software code. I think the purpose of software code is to be run and executed.

On the other hand, software code is maintained, and so developers understand that it will be read by humans.

But it's not -- its purpose is not to be read by humans. Its purpose is to be part of a program that's run and executed by a computer.

MR. SMITH: Q. Is a better way to say it that software code is written so that it can be read by humans?

MR. VANDEVELDE: Objection; vague.

THE WITNESS: I think that developers in general understand that software is not written once and run many times, but it's written and maintained.

And that, as general software development practice, it's understood that other developers will be reading that code, and thus, it should be readable.

MR. SMITH: Okay.

Q You indicate in your rebuttal report that it's your understanding that eight types of elements, that are deemed un-protectable, should be excluded from consideration as part of any assessment of substantial similarity through analytic dissection; right?

Page 215

A If you're referring to paragraph 227 in my report --

Q Yes.

A -- I see seven bullets in paragraph 227.

Q How about paragraph 205?

A (Witness complies.)

Yes. I see eight bullets in paragraph 205.

Q And you don't cite anything to support your understanding that these eight elements should be deemed un-protectable in connection with any analytic dissection; correct?

A I see no such citation here.

Q And there's likewise no citation in paragraph 227; correct?

A That's correct.

Q Who is it that has deemed these elements, the eight elements you identify in paragraph 205, and the seven elements you identify in paragraph 227, as un-protectable?

A In 205, I write that I understand this to be the case. And I don't recall whether that was me reading about analytic dissection and talking to counsel. So that would have been some process that went back and forth between my reading about analytic dissection and talking with counsel.

Page 216

Q You haven't identified the eight elements in paragraph 205 in any published article; correct?

A Are you asking if I've seen these in a published article?

Q You have not --

A Or --

Q -- identified the eight elements in paragraph 205 in any published article?

A I don't cite that.

Q That you've written?

A That I've written?

Q Yes.

A Oh, I have not written -- that's correct. I have not written about analytic dissection.

Q And you haven't provided any speeches regarding analytic dissection, where you mention these eight excludable elements; correct?

A That's correct.

Q You came up with this list of eight elements for purposes of your expert witness services to Rimini; right?

MR. VANDEVELDE: Misstates testimony; calls for a legal conclusions.

And I'll instruct you not to divulge the contents of any communications that you had with

Page 217

counsel.

THE WITNESS: My analysis, using analytic dissection in this report, was for the purposes of this case; that's correct.

MR. SMITH: Q. Is your report in this case the first time you've ever applied these eight elements of analytic dissection?

A I have looked at some of these elements in other considerations, but I don't recall these eight specific elements. But certain -- some of them were part of the analysis that I did, for example, as part of Google v. Oracle.

Q Did you provide these same eight elements in connection with your opinions in Oracle v. Google?

A Not that I recall. I did not supply these same eight.

Q Are you representing or opining that these eight elements listed in 205 -- paragraph 205 constitute the accepted legal standard for analytic dissection?

MR. VANDEVELDE: Calls for a legal conclusion.

THE WITNESS: I'm making no legal conclusions or statements in my report.

MR. SMITH: Q. Are you representing or

Page 250
Page 252
Page 251
Page 253

CERTIFICATE OF REPORTER

I, ANDREA M. IGNACIO, hereby certify that the witness in the foregoing deposition was by me duly sworn to tell the truth, the whole truth, and nothing but the truth in the within-entitled cause;

That said deposition was taken in shorthand by me, a disinterested person, at the time and place therein stated, and that the testimony of the said witness was thereafter reduced to typewriting, by computer, under my direction and supervision;

That before completion of the deposition, review of the transcript [x] was [ ] was not requested. If requested, any changes made by the deponent (and provided to the reporter) during the period allowed are appended hereto.

I further certify that I am not of counsel or attorney for either or any of the parties to the said deposition, nor in any way interested in the event of this cause, and that I am not related to any of the parties thereto.

Dated: August 24, 2018

ANDREA M. IGNACIO,
RPR, CRR, CCRR, CLR, CSR No. 9830