# Exhibit 6

# Excerpts from the Corrected Post-Injunction Surrebuttal Expert Report of Barbara Ann Frederiksen-Cross

# REDACTED

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| ORACLE USA, INC.; a Colorado corporation; ORACLE AMERICA, INC.; a Delaware corporation; and ORACLE INTERNATIONAL CORPORATION, a California corporation,<br><br>Plaintiffs,<br><br>v.<br><br>RIMINI STREET, INC., A NEVADA CORPORATION; AND SETH RAVIN, AN INDIVIDUAL,<br><br>Defendants. | CIVIL CASE NO. 2:10-cv-0106<br><br>LRH-VCF |

Corrected Post-Injunction Surrebuttal Expert Report of Barbara Ann Frederiksen-Cross

Corrected Post-Injunction Surrebuttal Expert Report of Barbara Frederiksen-Cross
HIGHLY CONFIDENTIAL INFORMATION—ATTORNEYS' EYES ONLY



16.     There are numerous other instances where Rimini copied Oracle source code into the JDE105328 tech spec.  In total, the JDE105328 tech spec addresses ▇ different subsections of the Oracle source code file ▇▇▇▇: (1) ▇▇▇▇▇ (2) ▇▇▇▇▇▇▇▇; (3) ▇▇▇▇▇▇▇; (4) ▇▇▇▇▇▇▇ and (5) ▇▇▇▇▇▇  Within each subsection in Rimini's tech spec, I found evidence that Rimini copied Oracle source code directly from the corresponding subsection in the Oracle source code file ▇▇▇▇▇.  Attached as Exhibit A is a side-by-side that shows each line of code in the ▇▇▇▇ section of Rimini's tech spec that Rimini appears to have copied directly from the Oracle source code file ▇▇▇▇▇

17.     Rimini also copies protected expression from Oracle software when it saves ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇.[21] ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇.[22]  I understand that Professor Astrachan does not believe that ▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇.[23]  I disagree.  It is my understanding from counsel that user interfaces are copyrightable as compilations and that individual user interface elements are also protectable.  I further understand that the copyrightability of user interface elements is subject to the same process of analytical dissection as are other works.  Here, t▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇ include numerous non-functional visual elements, including the selection of color, shape, size and shading of the buttons, drop down menus, and banner text.[24]  Similarly,

---

[21] *See, e.g.,* Opening Report ¶¶ 97, 247-249, 251, 256, 262, 264
[22] *See, e.g., id.* ¶ 324.
[23] Astrachan Report ¶ 268
[24] Opening Report ¶ 247.

Oracle elected to include particular pictographic elements that are paired with save, search, add and notify functions. The Oracle software engineers also selected where all the user control features would be in relation to one another. The design, creation, selection and arrangement of these features are non-trivial portions of protected expression that Rimini has copied wholesale via ▓▓▓▓▓▓▓▓. This copying was not a singular occurrence, but rather is endemic to Rimini's ▓▓▓▓▓▓▓▓, and ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.[25]

18.  The examples of Rimini copying discussed herein are not intended to in any way limit any other examples of Rimini's copying of Oracle software and support materials discussed in my report.

### 2. The Injunction is Not Limited To Literal Copying of Oracle IP

19.  Professor Astrachan bases his alleged "Fundamental Error #1: Accusing Copying of Files with No Oracle IP" on injunction paragraphs 2 and 6-10.[26] But Professor Astrachan's analysis apparently fails to consider that neither my report nor the Injunction are limited to literal copying of Oracle-written files. Rather, those paragraphs of the Injunction also provide that "Rimini Street shall not":

- "prepare derivative works from … PeopleSoft [or] J.D. Edwards … unless solely in connection with work for a specific customer…"[27];
- "prepare derivative works from, or use PeopleSoft software or documentation on one licensee's computer system to support, troubleshoot, or perform development or testing for any other licensee…"[28];
- "distribute … any derivative work created from or within J.D. Edwards software or documentation"[29]
- "prepare derivative works from, or use J.D. Edwards software or documentation on one licensee's computer system to support, troubleshoot, or perform development or testing for any other licensee … ."[30]

---

[25] *Id.* ¶ 265.
[26] In order to specifically respond to Professor Astrachan's alleged Fundamental Error 1, I have discussed particular aspects of these injunction restrictions cited by Professor Astrachan below. This does not limit my opinions on the many ways in which Rimini has violated the injunction, discussed more fully in my opening report.
[27] Injunction ¶ 2(a).
[28] Injunction ¶ 6.
[29] Injunction ¶ 7.
[30] Injunction ¶ 10

electronic distribution, because *physical* files are never truly "moved" or "sent" electronically.

36. Further, Professor Astrachan's characterization of Rimini's ▉▉▉▉▉ is an incomplete characterization of Rimini's support processes. In addition to the ▉▉▉▉▉ described here by Professor Astrachan, Rimini also implements a number of more automated processes to transfer files, including distribution of PeopleSoft and JD Edwards files via AFW, email, FTP Servers, ShareFile and copy-paste.[59]

E. ASTRACHAN'S ALLEGED "FUNDAMENTAL ERROR #5: ACCUSING THE USE OF ▉▉▉▉▉ AND ▉▉▉▉▉"

37. Professor Astrachan's report provides no definition of ▉▉▉▉▉ " or ▉▉▉▉▉ or how those terms provide an exception to the Injunction.[60] His "fundamental error #5" assumes (incorrectly) that the Injunction contains a carve-out for Rimini's use of these undefined concepts."[61] It does not. Professor Astrachan also cannot provide a citation showing that the definition of cross-use I have been provided includes any reference to "knowledge" or "know-how," because such an assumption, so-phrased, does not exist.[62]

38. In addition, Professor Astrachan's criticism of my opinion are purely hypothetical, whereas the evidence in this case and the analysis I provided show that Rimini's processes encompass much more than reliance on any alleged general knowledge. The evidence shows that Rimini's business model is built around a prototype/retrofit (or Scrum/Kanban) model, which permits Rimini to leverage and replicate identical or near-identical work product across multiple customers. It is my opinion that this conduct constitutes cross-use that is prohibited by the Injunction. This is shown particularly in my case studies about Rimini updates HCM200255 and HCM200440/HCM200511.[63] These illustrate Rimini's concerted effort to development once and replicate everywhere—i.e.,cross-use.[64]

---

[59] Opening Report ¶ 325-340.
[60] I understand the concept of "know-how" sometimes appears in the trade secret context and is not a defense to copyright infringement.
[61] Astrachan Report ¶ 41.
[62] Opening Report ¶ 15.
[63] Opening Report ¶¶ 365-379.
[64] Professor Astrachan's objection to my use of the phrase "leverage that effort" is puzzling, as it appears in the *introductory paragraph* of the HCM200255 case study, just before I detail all the evidence that shows Rimini modified Oracle code on Scrum environments, created Dev Instructions with specific lines references and variable names in that Oracle code along with instructions on how to modify it (all while logged into that Scrum environment), and used that detailed Dev Instruction to retrofit the exact same update in Kanban customers.

16

39.     Conversely, nowhere in Professor Astrachan's opinion about ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[65] The occurrence of such a scenario is not the "crux" of my opinion; it is an edge-case hypothetical that Professor Astrachan cannot even substantiate. Even in the case of JD Edwards, Professor Astrachan bases his conclusion on assumptions and does not provide any evidence or analysis of how ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[66] In any case, as noted above, the act of memorizing and retyping is still copying, and thus regardless of whether Rimini's JDE developers replicate identical updates by taking highly-detailed notes or through rote memorization from the prototype customer environment, such actions are cross-use in violation of the Injunction.

40.     These principles apply to the other places in Professor Astrachan's report where he cites "fundamental error #5." For example, Rimini developers do not merely happen to learn the results of the testing done on the prototype customer, which they then cannot forget and are thus forced to rely on when testing the Kanban customers.[67] Rather, as explained in my report, Rimini's entire testing process is built on the concept of leveraging the tests, test plans, and results from early QA customers to decrease the testing work on subsequent customers.[68]

41.     Similarly, Professor Astrachan has not provided any evidence that Dev Instructions ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[69] To the contrary, the Dev Instructions include much more than this. As discussed in my opinion, they contain specific ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[70] And Professor Astrachan concedes that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[71] I understand that Professor Astrachan testified during his *Rimini II* deposition that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

Opening Report ¶¶ 365, 366-76. Professor Astrachan does not dispute any of this evidence. Astrachan ¶ 326.
[65] Astrachan Report ¶ 258.
[66] Astrachan Report ¶ 287.
[67] Astrachan Report ¶ 280.
[68] *See, e.g.,* Opening Report ¶¶ 243, 272 [just the intro pars, not the substantive analysis pars].
[69] Astrachan Report ¶ 282.
[70] *See, e.g.*, Opening Report ¶¶ 283-289 [from section "Rimini's Use of Dev Instructions Constitutes Cross-Use"].
[71] Astrachan Report ¶ 283. Professor Astrachan instead asserts that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *Id.* ¶¶ 191 193.

17

███████████████████.[72]  On this, I agree with Professor Astrachan; ████████████████

42. Professor Astrachan's opinion is further undermined by Rimini's use and treatment of Dev Instructions. For one, AFW TransferFiles records show that on multiple occasions, Rimini sent the same ████████████████████████.[73] This suggests the ███████████████████████████████████████████████ ███████████████████████████████████████████. It is my opinion that if Dev Instructions were merely ████████████████ there would be no reason to ██████ ████████████████████████████ Similarly, I understand that Rimini put into place an entire process for ███████████████████████████████████████████████████ ████. Based on my 35 years of forensic software analysis experience, such a process suggests that the document being reviewed is a substantive and formal document that goes far beyond any notes about solving a problem generally. Finally, I understand that Rimini has conceded that it ████████████████████████████████████████████████████████████████████████.[74] This fact alone indicates to me that Rimini developers do not create Dev Instructions from, or limit the contents of Dev Instructions to their own knowledge or know-how, much less solely in connection with work for only that customer. Instead, this suggests, at a minimum, that Rimini developers are █████████████████████████████████████████████████████████ █████████████████ This is cross-use—using one customer's environment for the benefit of other customers.

---

[72] Aug. 21, 2018 Deposition of Professor Owen Astrachan at 127:2-3 ██████████████████████ ██████████████), 127:8-10 ███████████████████████████████████████████████████ ███████████████), 127:13-20 ████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████ 128:1-4 ███████████████████████ ██████████████████████████████████████████), 128:16-18 ███████████████████████████ █████████████████ (emphasis added).
[73] For example, ████████████ was designated a Scrum client for update HCM200505. Ex. 40. On ████ separate occasions, each ████████████ apart, a Rimini engineer sent the customer-associated environment a file named ████████████████████████████████████████████████" Ex. 43 (see time indexes ████████████████████████████████████). I understand that Rimini has not produced a file with this file name and is refusing to, or cannot, identify a file with identical contents. To the extent Rimini produces and identifies these three files, I reserve the right to supplement my report.
[74] ECF No. 1297, Opp. to Oracle's Mot. to Compel at 22 ████████████████████████████ ████████████████████████████████████████████████████████

local hosting that, regardless of whether the systems can be made to appear the same to the end user, require consideration by IT professionals and could lead reasonable licensors to restrict the use of cloud systems.

### A. THE LANGUAGE OF THE INJUNCTION DOES NOT SUPPORT PROFESSOR ASTRACHAN'S CONCLUSIONS AS TO CLOUD HOSTING

50. Professor Astrachan's opinion states that he ███████████████████████ ██████████████████████████"[90] Yet he comes to the conclusion that ███████████ ████████████████████████████████████[91] Accordingly, because he refuses to provide an express understanding of the Injunction, the reader is forced to infer his implicit understanding of the meaning of the Injunction. This appears to be that ████ ████████████████████████████████████████████████████████████████████ ██████████████████████████[92] I disagree.

51. The Injunction provides in relevant part that "Rimini shall not ... reproduce, prepare derivative works from, or use PeopleSoft software or documentation on, with, or to any computer systems other than a specific licensee's own computer systems."[93] I further understand that the Ninth Circuit upheld the finding of infringement, writing "[w]e agree with Oracle that 'facilities under the control of a third party' could not qualify as 'the licensee's facilities.' It was not only sensible but also necessary for the district court to read a requirement of 'control' into the definition of '[a licensee's] facilities.' The record supports the district court's conclusion that the Rimini servers where the copying took place were 'outside the control of the [customers].'"[94] Finally, I understand that on adjudicating this restriction, the Ninth Circuit upheld this provision as to PeopleSoft, writing "the PeopleSoft license limits the licensee to using the licensed Software '*at its facilities* . . . .'"[95]

52. My conclusion that Rimini has violated the Injunction by creating copies of

---

[90] Astrachan Report ¶ 163.
[91] *Id.* ¶ 168.
[92] *Id.* ¶¶ 165 ████████
████████████████
[93] Injunction Paragraph
[94] *Oracle USA, Inc. v. Rimini St., Inc.*, 879 F.3d 948, 960 (9th Cir.)
[95] *Oracle USA, Inc. v. Rimini St., Inc.*, 783 F. App'x 707, 710 (9th Cir. 2019), *cert. denied*, 140 S. Ct. 850, 205 L. Ed. 2d 465 (2020).

PeopleSoft software outside of a customer's locally hosted own computer systems, including by ▇▇▇, is consistent with the statements above.[96] In particular, cloud-hosted services provided by companies like Windstream environments cannot be considered the customers' "own computer systems" because the customers do not own the hardware, and additionally because neither the software nor the hardware is located at the customers' facilities. Further, Rimini—not the customer—exercises primary if not exclusive control over these environments as a condition for support from Rimini.[97]

### B. THERE IS NO TECHNICAL BASIS TO UNDERSTAND A "CUSTOMER'S OWN COMPUTER SYSTEMS" TO ENCOMPASS CLOUD-HOSTED ENVIRONMENTS

53. Even considering the similarities and differences between local and cloud hosting, I disagree with Professor Astrachan's conclusion that ▇▇▇. For example, such systems have different security considerations that IT managers must take into account in deciding how to structure their systems, and that may lead a reasonable licensor to restrict hosting to locally owned and controlled machines.

54. Remote hosting arrangements like cloud hosting require the placement of data on hardware in the physical possession of a third party. This may create concerns for the customer software licensee, who may have confidential information such as salary details and social security numbers in their internal database. And this is also a concern for the licensor: if sensitive data are being sent over the Internet, as opposed to just over a company's intranet, the licensor may be expected to include or improve encryption and other protections of data in transit between the server, where the information is being processed, and the user terminal, where the information is being displayed.

55. A licensor may also be wary of cloud hosting for the sake of its own proprietary software and information. This is especially true where a software environment contains human-readable source code, as is the case with PeopleSoft and its COBOL, SQR, and SQC code, which is readable and modifiable—consistent with the terms of the license—by the customer.

---

[96] Opening Report ¶¶ 38-39, 76-77, 166-174.
[97] Id. ¶¶167-173; Astrachan Report ¶ 169

██████████████████████████████████████"[128]

71.     Professor Astrachan's statement does not rebut my conclusion that the displayed code is copied to Rimini's systems. Astrachan does not explain the relevant distinction between code being encoded as text and stored in memory as opposed to code being encoded as an image and stored in memory. The encoding format does not affect a human's ability to read it when it is displayed on a screen. Indeed, all information in a computer is stored as an encoded value. For example, a letter may be encoded in a computer as a ".txt" document where the ones and zeros in the computer memory are read and processed into Unicode characters and then printed out and displayed, or may be scanned and stored as a .bmp or .jpg file, which is processed as a series of color values before it is printed or displayed. Both are still a copy of the original letter. Similarly here, since the result is for the copied text to be displayed on the screen of the Rimini employee, Professor Astrachan's report does not rebut my conclusions regarding display adapters.

*[signature]*
Barbara Ann Frederiksen-Cross
June 12, 2020

---

[128] Astrachan Report ¶ 209.

31