GIBSON, DUNN & CRUTCHER LLP
MARK A. PERRY (*pro hac vice*)
1050 Connecticut Avenue, N.W.
Washington, DC 11101
Telephone: 202.955.8500
mperry@gibsondunn.com

GIBSON, DUNN & CRUTCHER LLP
JEFFREY T. THOMAS (*pro hac vice*)
BLAINE H. EVANSON (*pro hac vice*)
JOSEPH A. GORMAN (*pro hac vice*)
CASEY J. MCCRACKEN (*pro hac vice*)
3161 Michelson Drive
Irvine, CA 92612-4412
Telephone: 949.451.3800
jtthomas@gibsondunn.com
bevanson@gibsondunn.com
jgorman@gibsondunn.com
cmccracken@gibsondunn.com

GIBSON, DUNN & CRUTCHER LLP
SAMUEL LIVERSIDGE (*pro hac vice*)
ERIC D. VANDEVELDE (*pro hac vice*)
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: 213.229.7000
sliversidge@gibsondunn.com
evandevelde@gibsondunn.com

RIMINI STREET, INC.
DANIEL B. WINSLOW (*pro hac vice*)
6601 Koll Center Parkway, Suite 300
Pleasanton, CA 94566
Telephone: 925.264.7736
dwinslow@riministreet.com

RIMINI STREET, INC.
JOHN P. REILLY (*pro hac vice*)
3993 Howard Hughes Parkway, Suite 500
Las Vegas, NV 89169
Telephone: 336.908.6961
jreilly@riministreet.com

HOWARD & HOWARD ATTORNEYS PLLC
W. WEST ALLEN (Nevada Bar No. 5566)
3800 Howard Hughes Parkway, Suite 1000
Las Vegas, NV 89169
Telephone: 702.667.4843
wwa@h2law.com

*Attorneys for Defendant*
*Rimini Street, Inc.*

# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| ORACLE USA, INC., et al.,<br><br>　　　　　Plaintiffs,<br><br>　v.<br><br>RIMINI STREET, INC., et al.,<br><br>　　　　　Defendants. | CASE NO. 2:10-cv-00106-LRH-VCF<br><br>**RIMINI'S RESPONSE TO ORACLE'S RESPONSES AND OBJECTIONS TO RIMINI'S NOTICE OF DEMONSTRATIVES** |

On September 5, 2020, the day after the hearing on Oracle's spoliation motion, Oracle filed an unsolicited five-page brief without seeking leave of court, making substantive arguments that Oracle failed to make during the hearing. ECF No. 1428. Although not styled as a "motion," Oracle's brief also requests an order striking from the record a demonstrative timeline that Rimini filed in advance of, and that was used at, the hearing.

Oracle's request should be denied. First, the Court already considered the demonstrative and found it "helpful"; it makes little sense to strike something the Court affirmatively welcomed. Second, use of demonstratives is common and expected, particularly in complex cases. Third, Oracle had *more* notice than usual. Typically, demonstratives are physically handed out in the courtroom *at* a hearing; here, because the hearing was via video (due to COVID-19), Rimini filed and served the demonstrative a few hours in advance of the hearing.

In contrast, Oracle's post-hearing substantive brief is improper. If Oracle had additional arguments to make, it was required to make them during the hearing, when Rimini's counsel could have responded, and not during a post-hearing filing that is styled as an "objection" but really is an attempt to make arguments that should have been made at the status conference. Rimini responds briefly since it was unable to address these belated points at the hearing.

**<u>Undisputed, Dispositive Facts</u>:** While Oracle's post-hearing brief purports to raise certain factual disputes with Rimini's demonstrative timeline (discussed below), Oracle does *not* dispute other critical facts that are dispositive of its spoliation motion. Specifically, Oracle does not dispute that at the time TransferFiles runs, the tool (a) does *not* delete or alter the original file; and (b) creates a bit-for-bit identical copy of the file on at least one client's machine. ECF No. 1423, Fact No. 6. Oracle does not dispute that the tool has worked this way since its creation in **2013**, that Oracle's experts had the source code showing exactly how the tool worked since **2015**, and that Oracle's experts analyzed it, understood it, and wrote about it in as early as **2017**. *Id.*, Fact Nos. 1–5. Oracle also does not dispute that—in **2017**—the parties specifically discussed how to handle transitory FTP copies, and that Oracle proposed that Rimini would only have to produce *one copy* of a file, along with a list of which clients received the file. *Id.*, Fact No. 11. Further, Oracle does not dispute that it never asked for the tool to be

modified until August 2019. ECF No. 1423, Fact No. 10. And when Oracle changed its mind during post-injunction discovery, Rimini changed the tool to address Oracle's concern. *Id.*, Fact No. 12. Those facts, all of which remain undisputed, compel denial of Oracle's motion. The tool creates *copies* of files, does not alter or delete the original, and thus does not "spoliate" anything. If Oracle wanted duplicate FTP copies saved indefinitely (*e.g.*, in case the originals were later modified, moved, or renamed) it was incumbent upon Oracle to say so. *See* The Sedona Principles, Third Edition: Best Practices, Recommendations & Principles for Addressing Electronic Document Production, 19 Sedona Conf. J. 1, 111 (2018) ("Sedona Principles") ("A party's preservation obligation does not require 'freezing' of all ESI.").[1] Instead, Oracle sat silently for years.

**1. <u>Oracle's Argument that "Far More Than 466 Files Are At Issue"</u>:** Oracle reaches its "15,218" files figure by misleadingly counting the same, exact, bit-for-bit identical file dozens, or even hundreds, of times. *See, e.g.*, ECF No. 1363-2 (Oracle's Expert's Rpt.) ¶ 132 (98 copies of same file sent at same time to 98 clients); ECF No. 1363-3 (Oracle's Expert's Supp. Rpt.) ¶ 24 (six instances of more than 100 copies of same file sent at same time to 100 clients). Thus, if Rimini uses TransferFiles to transfer the same file to 100 clients in the same button press, the original file remains on Rimini's system and a copy is created on each of the 100 clients' systems, for a total of 100 new copies. In that process, 100 temporary, intermediate FTP copies are also created, which last for mere seconds. Oracle counts these as 100 "deleted" FTP files, and when Rimini produces the original file, Oracle counts these as 99 instances of spoliation. That is misleading because production of the original file plus the log that shows to whom it was sent gives Oracle full information.

Moreover, Oracle ignores *Oracle's own letter* attaching a list of **466** files, which Oracle described as the "list of the specific files" it sought. ECF No. 1423, Fact No. 15. Rimini produced 460 (99%) of those 466. *Id.*, Fact. No. 17. The remaining six files, though irrelevant, were available by discovery of Rimini's clients near the time the TransferFiles tool was used,

---

[1] Available at https://thesedonaconference.org/sites/default/files/publications/The%20Sedona%20Principles%20Third%20Edition.19TSCJ1.pdf

had Oracle timely requested.  Oracle previously represented during *Rimini II* that Rimini could satisfy its discovery obligations by producing one copy of each software patch, fix, and update and identifying each client to whom it was sent.  *Id.*, Fact No. 11.  That is exactly what Rimini did, and when Oracle changed its mind, Rimini modified the tool.  *Id.*, Fact No. 12.

Oracle's "Raley's" example only underscores how the TransferFiles tool does *not* spoliate files.  The logs show that Rimini sent a file named "rsistfli.sqr" to a client 18 times over three days, and Oracle speculates that the file may have been different each time.  Even assuming that is true, the file was never deleted.  ECF No. 1423, Fact No. 6.  After the first transfer, the original remained on Rimini's system; there was no spoliation.  *Id.*  If Rimini then modified it and re-saved it as the same file name, then the original was overwritten *at that time*, but that is not spoliation; companies are entitled to continue to work on their files, and no case holds that editing and resaving a document is a violation of Rule 37.  *See* Sedona Principles at 112 (explaining that "ESI is constantly being cached, rewritten, moved, and copied" and noting that word processing programs routinely overwrite copies).  In August 2019, Oracle decided for the first time that it wanted the intermediate FTP files kept permanently because these files, by virtue of never being edited, would show frozen-in-time-snapshots of files to the extent they were later modified, and Rimini accommodated that request.[2]

**2.  Oracle's Argument that "Rimini Did Not Produce 72 Out of 78 Outstanding Files":**  Again, Oracle reveals that its complaint isn't with any deletion, but with the fact that Rimini's files could be "moved, renamed, and modified" between the time of transfer and the time of collection in discovery.  ECF No. 1428 at 2.  But moving, renaming, and modifying files in the ordinary course of business is not spoliation.  Oracle's example of a file named

---

[2] Not only did Rimini have no duty to avoid overwriting files as it worked, or to create an archive of frozen-in-time snapshots, there was no reason to think that work-in-progress versions of files were relevant.  Oracle's theory at the time was that Rimini files sent *to multiple clients* constitute "cross-use," and these early versions of files sent to Raley's were sent only to Raley's, not multiple clients.  It was only in August 2019 that Oracle changed its mind as to the relevance of these files that were sent to just one client.  *See* ECF No. 1423, Fact No. 11.  Moreover, Oracle's theory has been that Rimini engages in "cross-use" *regardless* of the contents of the files it sends to clients, *i.e.*, that Rimini's know-how and work product—even work product containing no protectible Oracle expression whatsoever—violates the injunction.  ECF No. 1368 at 13–14; ECF No. 1385 at 19–20.

"HCM200064 dev instructions [Updated].txt", which was renamed to "[Updated #2]" and eventually renamed to "[Final]" shows again that Oracle is complaining about the *renaming* or *modification* of files, which is not spoliation. Rimini produced the version of the file that existed at the time of collection, which was the version labeled "[Final]."

**3. Oracle's Argument that Oracle Continued to Investigate via Expert Discovery:** Oracle's argument that it waited until July 2020 to file its motion because it needed expert discovery is pretextual. The undisputed facts are that Oracle has had the TransferFiles source code since 2015, its experts long ago analyzed and wrote about that source code in 2017 and 2018, and Oracle never suggested that the tool should be changed until August 2019 (and despite disagreeing that there was an issue with how TransferFiles worked, Rimini promptly did so). ECF 1423, Facts Nos. 1–5, 12.

**4. Oracle's Argument that "*Rimini II* Discovery On AFW TransferFiles Has Limited Relevance; Post-Injunction Transferred Files Are Highly Relevant":** Oracle claims it "did not focus on" these FTP files in *Rimini II*, but that the files later became relevant to "Rimini's compliance with the Injunction" (ECF No. 1428 at 4). That highlights Oracle's change in position. Throughout the five years of *Rimini II* discovery, Oracle never once expressed any concern regarding TransferFiles or how it worked, never once suggested that Rimini could never modify any files sent to clients (or that Rimini must instead maintain duplicate copies of transitory FTP files), and indeed, Oracle represented that all it needed for discovery was one copy of each update and a list of clients that received it. Rimini also did not believe there was an issue with the way TransferFiles worked—because it *creates* copies and does not delete or alter the original. Rimini also explained to Oracle how the tool worked (even though Oracle already knew) in a December 2018 letter, and invited Oracle to respond, but Oracle ignored the invitation. ECF No. 1423, Fact No. 8. Oracle changed its mind in August 2019, and Rimini promptly changed the tool, demonstrating Rimini's reasonableness, not spoliation. Oracle disputes the significance of its August 2017 letter, but cannot disavow its counsel's representation, and it cannot dispute that the parties specifically discussed how to handle transitory FTP copies and that Oracle could have but did not (until years later) raise any

issue about them.

Finally, Oracle attempts to dispute Fact No. 14—that Oracle has not cited a single one of the 10,834 intermediate files produced after TransferFiles was modified in September 2019, other than one "[Final]" version of a file that would have been produced anyway. But Oracle cites only the "[Final]" file referenced in Fact No. 14 itself, and inexplicably (perhaps mistakenly) cites that same file again and another file produced *before* the TransferFiles tool was changed. ECF No. 1428 at 4 (citing ECF No. 1368 at 23 n.12). Thus, Fact No. 14 is correct—and demonstrates that nearly 11,000 of the very things Oracles claims were spoliated (transitory FTP copies, supposedly of prior *versions* of files) have proved utterly irrelevant to Oracle's "cross-use" and other contempt theories, and thus Oracle has suffered no prejudice.

\*    \*    \*

In sum, it is indisputable that (1) the TransferFiles tool creates copies and does not alter or delete the original file; (2) Oracle and its experts knew how the tool worked since at least 2017; (3) Oracle never suggested that Rimini could not move, rename, or modify the original files sent via TransferFiles; (4) Oracle did not ask Rimini to modify the tool to retain intermediate FTP copies until August 2019, shortly after which Rimini modified the tool to accommodate Oracle's request; and (5) Rimini thereafter produced 10,834 intermediate files, and Oracle has cited only one—and it was a "[Final]" version that would have been produced in any event. Oracle's motion should be denied on these facts because there was no spoliation, Rimini acted reasonably, Oracle's motion was untimely, and Oracle has suffered no prejudice.

Dated: September 8, 2020

GIBSON, DUNN & CRUTCHER LLP

By: */s/ Eric D. Vandevelde*
Eric D. Vandevelde

*Attorneys for Defendant*
*Rimini Street, Inc.*