1

2

3

4

5

UNITED STATES DISTRICT COURT

6

DISTRICT OF NEVADA

7

\* \* \*

8

ORACLE USA, INC.; a Colorado
corporations; ORACLE AMERICA, INC.; a
Delaware corporation; and ORACLE
INTERNATIONAL CORPORATION, a
California corporation,

Case No. 2:10-cv-00106-LRH-VCF

9

ORDER

10

11

Plaintiffs,

12

v.

13

RIMINI STREET, INC., a Nevada
corporation; and SETH RAVIN, an
individual,

14

15

Defendants.

16

17

Before the Court are several pending motions. Rimini Street, Inc. and Seth Ravin

18

(collectively "Rimini") move this Court for (1) an order enforcing the Court's orders and judgment

19

separating the instant action[1] from *Rimini Street, Inc. v. Oracle International Corp.*, Case

20

No. 2:14-cv-01699-LRH-DJA (ECF Nos. 1323); (2) an order excluding the declaration and

21

opinions of Oracle's expert, Barbara Frederiksen-Cross (ECF Nos. 1390, 1392-s); [2] and (3) a jury

22

23

[1] To be consistent with the Court's orders in both causes of action, the Court uses "*Oracle I*" to refer to the
entirety of the above captioned case and "*Rimini II*" to refer to the entirety of case number 2:14-cv-01699-
LRH-DJA. Unless otherwise indicated, ECF Numbers articulated throughout this Order refer to the *Oracle I*
docket.

24

25

26

27

28

[2] The parties filed portions of their briefing and attached exhibits under seal. The Court will refer to the
sealed pleadings with an "-s" designation and, for clarity, will cite to the sealed document for pinpoint
citations unless otherwise noted. While the Court would prefer to keep all the sealed information
confidential, some of it is necessary to resolve the pending motions. The Court will therefore include the
information unredacted in this Order where appropriate. The Court recognizes that the parties have privacy
interests in the confidential information, but the public has an even greater interest in the reasoning behind
the Court's Order.

1

trial (ECF No. 1387, 1389-s). Oracle USA, Inc., Oracle America, Inc., and Oracle International Corporation (collectively "Oracle") moves this Court for an order to show cause why Rimini should not be held in contempt for violating the permanent injunction operable in this case (ECF Nos. 1365, 1368-s) and for Rule 11 sanctions (ECF No. 1348). Oracle also moves this Court for Rule 37(e) sanctions against defendants (ECF Nos. 1359). This issue was referred to Magistrate Judge Cam Ferenbach, who issued a Report and Recommendation to deny Oracle's motion for sanctions (ECF No. 1431). Accordingly, Oracle objected (ECF No. 1434). Finally, due to the sensitive nature of the information contained within the briefing and exhibits, the parties move to seal numerous documents. ECF Nos. 1325, 1334, 1367, 1384, 1388, 1391, 1394, 1404, 1408, 1413, 1417, 1427, 1435, 1439. The parties have properly responded and replied to all pending motions, and each is ripe for review. For the reasons contained within this Order, the Court grants in part and denies in part the parties' substantive motions and grants the parties' motions to seal *nunc pro tunc*.

## I.      BACKGROUND

This action has an extensive 11-year history that includes two causes of action. In brief, and relevant to the pending motions, Oracle develops, manufactures, and licenses computer software, particularly Enterprise Software Programs. Oracle also provides after-license software support services to customers who license its copyrighted software. Rimini is a company that provides similar after-license software support services to customers licensing Oracle's copyrighted software and competes directly to provide those services. Seth Ravin is the owner and CEO of Rimini.

### A.  *Oracle I* Litigation

Oracle first sued Rimini in 2010, alleging that Rimini infringed several of Oracle's copyrights when it, *inter alia*, used work that it completed for one client for the benefit of other clients, which Oracle claimed was a violation of its software copyrights. Following the filing of dispositive motions, the Court granted summary judgment to Oracle on some of its copyright infringement claims. Of importance to these proceedings was the Court's finding that Rimini violated the "facilities restriction" within PeopleSoft's standard licensing agreement when it

1  hosted its clients' development environments on its own computer systems, a process called "local

2  hosting." ECF No. 474; *Oracle USA, Inc. v. Rimini Street, Inc.*, 6 F.Supp.3d 1086, 1096–98 (D.

3  Nev. 2014). The Court further held that Rimini was infringing on Oracle's copyrights for Oracle

4  Database when it downloaded many copies of the software off Oracle's network and failed to

5  adhere to the Developer License. ECF No. 476; *Oracle USA, Inc. v. Rimini Street, Inc.*, 6 F.Supp.3d

6  1108, 1115–20 (D. Nev. 2014). Later, after a month-long trial, a jury found in favor of Oracle on

7  other copyright infringement claims related to Oracle's J.D. Edwards and Siebel software.

8         On appeal, the Ninth Circuit affirmed both this Court's grant of summary judgment and all

9  of the jury's verdict on infringement violations under the Copyright Act, only reversing regarding

10  violations of the California Computer Data Access and Fraud Act ("CDAFA") and the Nevada

11  Computer Crimes Law ("NCCL").[3]  *Oracle USA, Inc. v. Rimini Street, Inc.*, 879 F.3d 948, 962

12  (9th Cir. 2018). Given its rulings, the Ninth Circuit vacated this Court's issuance of a permanent

13  injunction and remanded to the Court to determine whether it would again issue a permanent

14  injunction based solely on Rimini's copyright infringement and without reference to the reversed

15  state law computer claims. *Id.* at 964.[4]

16         On August 14, 2018, this Court granted Oracle's renewed motion for a permanent

17  injunction, which enjoins Rimini from continuing to infringe on Oracle's copyrighted software.

18  ECF No. 1164; *Oracle USA, Inc. v. Rimini Street, Inc.*, 324 F.Supp.3d 1157 (D. Nev. 2018). In

19  relevant part, the injunction provides:

20  ///

21  ///

22  ///

23

24  [3] The Ninth Circuit upheld the jury's $35.6 million judgment against Rimini for its infringement and the Court's award of approximately $22.4 million in prejudgment interest against Rimini, while reversing the

25  jury's $14.4 million award associated with the state law computer access claims. *Oracle USA, Inc. v. Rimini Street, Inc.*, 879 F.3d 948, 953, 962–64 (9th Cir. 2018).

26

27  [4] The Ninth Circuit also upheld this Court's decision to grant Oracle the "full costs" of the litigation, which included expert witness fees, e-discovery expenses, and jury consultant fees. *Id.* at 965–66. The Supreme Court granted certiorari on this issue, reversing the Ninth Circuit and holding that the Copyright Act only

28  allows a district court to authorize awards for litigation expenses expressly listed in the costs statute. *Rimini Street, Inc. v. Oracle USA, Inc.*, 139 S. Ct. 873 (2019).

a. Rimini Street shall not reproduce, prepare derivative works from, or distribute PeopleSoft, J.D. Edwards, or Siebel software or documentation unless solely in connection with work for a specific customer that holds a valid, written license agreement for the particular PeopleSoft, J.D. Edwards, or Siebel software and documentation authorizing Rimini Street's specific conduct;
. . .

**PeopleSoft**

3. Rimini Street shall not distribute PeopleSoft software or documentation or any derivative works created from or with PeopleSoft software or documentation;

4. Rimini Street shall not reproduce, prepare derivative works from, or use a specific licensee's PeopleSoft software or documentation other than to support the specific licensee's own internal data processing operations;

5. Rimini Street shall not reproduce, prepare derivative works from, or use PeopleSoft software or documentation on, with, or to any computer systems other than a specific licensee's own computer systems;

6. Rimini Street shall not reproduce, prepare derivative works from, or use PeopleSoft software or documentation on one licensee's computer systems to support, troubleshoot, or perform development or testing for any other licensee, including specifically, that Rimini Street shall not use a specific licensee's PeopleSoft environment to develop or test software updates or modifications for the benefit of any other licensee[.]

**J.D. Edwards**

7. Rimini Street shall not distribute J.D. Edwards software or documentation or any derivative works created from or within J.D. Edwards software or documentation;

8. Rimini Street shall not copy J.D. Edwards software source code to carry out development and testing of software updates;

. . .

10. Rimini Street shall not reproduce, prepare derivative works from, or use J.D. Edwards software or documentation on one licensee's computer systems to support, troubleshoot, or perform development or testing for any other licensee, including, specifically, that Rimini Street shall not use a specific licensee's J.D. Edwards environment to develop or test software updates or modifications for the benefit of any other licensee;

. . .

**Oracle Database**

15. Rimini Street shall not reproduce, prepare derivative works from, or distribute Oracle Database software.

ECF No. 1166 (modified per the Ninth Circuit's order).

///

4

In granting the permanent injunction, the Court noted that the balance of the hardships weighed in favor of its issuance because Oracle was only seeking to enjoin acts that had already been determined to be unlawful and that had been affirmed on appeal. ECF No. 1164 at 9. The Ninth Circuit affirmed this permanent injunction, except instructing the Court to strike paragraphs nine and thirteen, and the words "or access" in paragraphs eight and twelve. ECF No. 1236; *Oracle USA, Inc. v. Rimini Street, Inc.*, 783 Fed.Appx.707, 710–11 (9th Cir. 2019) (unpublished) ("The injunction enjoins 'local hosting' as to PeopleSoft, J.D. Edwards, and Siebel. But only the PeopleSoft license limits the licensee to using the licensed Software '*at its facilities* . . . .' (emphasis added), which is the basis for the local hosting requirement. . . . 'Accessing' a copyrighted work is not an infringing activity under the Copyright Act.").[5]

On April 4, 2019, the Court granted Oracle's motion to reopen discovery to determine if Rimini has been complying with the permanent injunction. ECF Nos. 1199; 1215; 1218. The parties engaged in discovery for approximately a year and a half. ECF No. 1354. Following close of discovery, the parties filed the six now pending substantive motions.

**B.  *Rimini II* Litigation**

In October 2014, Rimini filed a separate complaint against Oracle for declaratory judgment. *Rimini II*, ECF No. 1. This complaint stemmed from the Court's granting of summary judgment to Oracle in *Oracle I* on the issue of whether Rimini infringed six of Oracle's PeopleSoft and Database copyrights. At the time of filing the second action, Rimini maintained that by July 31, 2014, it had changed its company policies to comply with the Court's February 13, 2014 summary judgment Order, by transitioning to something it dubbed "Process 2.0" support services. *Id*. at 3. Despite Rimini's assertions that it had ceased infringing on Oracle's copyrights, Oracle was skeptical and counterclaimed, alleging eight causes of action, including copyright infringement, regarding Rimini's new Process 2.0. *Rimini II*, ECF Nos. 21, 22-s.

After extensive, lengthy, and contentious discovery and motion practice, including the filing of amended complaints by both Oracle and Rimini, the parties filed seven motions for summary judgment, consisting of more than 2,800 pages of briefing and 43,000 pages of

---

[5] *Denying cert.*, 140 S.Ct. 850 (Jan. 13, 2020) (Mem.).

supporting exhibits, declarations, and appendices. On September 14, 2020, the Court issued its 94-page order granting in part and denying in part these motions. *Rimini II*, ECF No. 1253; *Rimini Street, Inc. v. Oracle International Corp.*, 473 F.Supp.3d 1158 (D. Nev. 2020). In relevant part, the Court held that Rimini had infringed four of Oracle's copyrights—PeopleSoft HRMS 8.9 (TX 7-065-381); PeopleTools 8.46.17 (TX 7-092-772); PeopleSoft HRMS 8.3 (TX 5-469-032); and PeopleTools 8.48.10 (TX 7-092-819)—while following its new Process 2.0 support services for its clients Campbell Soup and City of Eugene. *Rimini II*, ECF No. 1253 at 65–66. First, the Court held that when Rimini "prototyped" a PeopleSoft update in Campbell Soup's development environment that the client did not want, and then provided that update to another of Rimini's clients, Toll Brothers, without separately developing the update in Toll Brothers development environment, Rimini had violated the "internal data processing operations" provision of the PeopleSoft license. Second, the Court held that Rimini created a derivative work when it created an update using Oracle's PeopleTools Application Designer utility in the City of Eugene's system. While creation of that derivative work was licensed for City of Eugene, the Court found that because Rimini was using City of Eugene's development environment to "prototype" the update, and then distributed that update to multiple other clients without separate development, Rimini was violating the "internal data processing operations" provision of the license.

The parties filed their 935-page proposed joint pretrial order on December 19, 2020, but due to the parties' inability to agree on a proposed trial date, trial has not yet been set.

## II.     THE PARTIES' MOTIONS TO SEAL

There is a general presumption that court records should be open and accessible to the public. *Hagestad v. Tragesser*, 49 F.3d 1430, 1434 (9th Cir. 1995). With non-dispositive motions, this presumption is automatically overcome by a showing that the material to be filed under seal is being done so pursuant to a valid protective order. *Foltz v. State Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122, 1135 (9th Cir. 2003) (citing *Phillips ex rel. Estates of Byrd v. General Motors Corp.*, 307 F.3d 1206, 1213 (9th Cir. 2002)). The parties seek to seal the following non-dispositive filings, pursuant to the operative protective order in this case (ECF No. 55), and the protective order in place in *Rimini II* (*Rimini II*, ECF No. 58):

- Exhibit A and portions of Exhibit B to the Declaration of Eric D. Vandevelde, filed in support of Rimini's motion to enforce the Court's orders and judgment separating *Oracle I* from *Rimini II* (ECF No. 1325)

- Portions of Oracle's opposition to Rimini's motion to enforce the Court's orders and judgment separating *Oracle I* from *Rimini II* and accompanying exhibits (ECF No. 1334)

- Portions of Rimini's motion to exclude the declaration and opinions of Oracle's expert, Barbara Frederiksen-Cross, and accompanying exhibits (ECF No. 1391); portions of Oracle's opposition to the motion and accompanying exhibits (ECF No. 1408); and portions of Rimini's reply to the motion (ECF No. 1417)

- Portions of Rimini's motion for a jury trial and accompanying exhibits (ECF No. 1388) and its reply to the motion (ECF No. 1413)

- Portions of Oracle's motion for an order to show cause why Rimini should not be held in contempt and accompanying exhibits (ECF No. 1367); portions of Rimini's opposition to Oracle's motion and accompanying exhibits (ECF No. 1384); and portions of Oracle's reply to its motion and accompanying exhibits (ECF No. 1404).

- Video presentation titled "BengeDeclarationProcess2.0.pm4" and contained on the DVD and USB drive manually filed (ECF No. 1393) in connection with its opposition to Oracle's motion for an order to show cause (ECF No. 1394)

- Oracle's objections to Magistrate Judge Ferenbach's Report and Recommendation on Oracle's motion for Rule 37 sanctions (ECF No. 1435); Rimini's opposition to Oracle's objections to the Report and Recommendation (ECF No. 1439)[6]

- Oracle's response and objections to Rimini's Notice of Demonstratives (ECF No. 1427)

The Court has reviewed these motions to seal and the underlying documents and finds that the filings should be sealed as requested. The information the parties seek to seal consists of "non-public, technologically and commercially sensitive information," and proprietary business and technical information, that has been designated "Confidential" or "Highly Confidential Information – Attorneys' Eyes Only" under the protective orders. The Court recognizes the significant risk of competitive injury and potential prejudice to the parties if their proprietary information is released to the public. *See Center for Auto Safety v. Chrysler Group, LLC*, 809 F.3d 1092, 1097 (9th Cir. 2016) (quoting *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 598 (1978)) (articulating that compelling reasons may exist to seal a record if it may be used "as sources of business information that might harm a litigant's competitive standing."); *Hologram USA, Inc. v. Pulse Evolution Corp.*, Case No. 2:14-cv-00772-GMN-NJK, 2015 WL 105793, at * 1-2 (D. Nev.

---

[6] The Court notes that Oracle's objection and Rimini's corresponding opposition contain similar information as that already sealed in relation to Oracle's motion for Rule 37(e) sanctions. *See* ECF No. 1425.

Jan. 7, 2015) (granting the plaintiff's motion to seal when the underlying filing contained "sensitive, proprietary, and technical information," disclosure of which was likely to injure the plaintiff's competitive posture). The Court further notes that the parties have filed redacted versions of the sealed filings (where appropriate) in the public record, narrowly tailoring their requests to seal and limiting any harm to the public. Accordingly, the Court grants the parties' motions to seal *nunc pro tunc*.

## III.     THE PARTIES' SUBSTANTIVE MOTIONS

### A.   Rimini's motion to enforce the Court's orders and judgment separating *Oracle I* from *Rimini II* is denied.

Before the Court is Rimini's motion to enforce the Court's orders and judgment separating *Oracle I* from *Rimini II*. ECF No. 1323. Oracle opposed (ECF Nos. 1333, 1335-s) and Rimini replied (ECF No. 1347). For the reasons below, the Court denies Rimini's motion.

In April 2019, the Court reopened discovery in this case so that Oracle could determine whether Rimini was/is complying with the permanent injunction. Following the close of fact discovery, Oracle served Rimini with Barbara Frederiksen-Cross's Post-Injunction Expert Report on January 31, 2020. ECF No. 1324 ¶ 2. This report provides, in relevant part, that three processes at issue in *Rimini II* violate the permanent injunction: cloud hosting ("Rimini consistently violates the Injunction by reproducing and creating derivative works based upon PeopleSoft software on servers and virtual machines hosted by Windstream."); cross-use by prototyping updates in one customer's environment for the use and benefit of other Rimini customers; and Rimini's use of its AFW Tools software to send the prototyped updates to its clients. ECF Nos. 1324-1; 1326-s at 6–8. Believing that these issues are not covered by the injunction, Rimini motions the Court to prohibit Oracle from arguing that Rimini should be held in contempt for violating the injunction as it relates to any Process 2.0 support services. In support, Rimini argues that the Court has previously drawn a stark divide between this case, *Oracle I*, which can only deal with Process 1.0 claims and issues, and *Rimini II*, which can only deal with Process 2.0 claims and issues.

///

///

8

1    Rimini points to four of the Court's orders to support its contention:

2    • Order regarding case management conference, in relevant part:

3        This case has been pending for nearly five years and, under the Court's
     supervision, fact and expert discovery has been completed. The parties require
4    leave of Court to engage in any further discovery other than the supplementation
     required by Rule 26(e). Moreover, Oracle has offered to stipulate not to seek
5    damages in this case for the period on or after the District Court's February 13,
     2014 order, and the Court will hold Oracle to that offer. Accordingly, the February
6    13, 2014 order is not a basis to reopen discovery, and the Court declines to do so.
     While the District Court will decide the admissibility of Rimini's expert's opinion
7    on the proposed method of calculating damages, the full discovery on that theory
     has been conducted. Discovery will remain closed, and the case will remain as it
8    was put in at the close of discovery, not thereafter.

9    ECF No. 515 at 3.

10   • Order denying consolidation of *Oracle I* and *Rimini II*, in relevant part:

11       Here, though commonality exists between the two actions, the court,
     nevertheless, finds consolidation inappropriate because of the distinct litigation
12   postures the cases are currently in. (citation omitted). In the present action,
     consolidation would lead to an unreasonable delay of trial, as this case is currently
13   set for trial in September and has been pending on the court's docket since 2010.
     In contrast, the *Rimini* action was just initiated in the fall of 2014 and has yet to
14   begin discovery, let alone pre-discovery motions. Such an unreasonable delay in a
     trial is sufficient cause to deny consolidation.
15

16   ECF No. 669 at 5.

17   • Order granting of Oracle's motion in limine to exclude evidence and argument related to
     Rimini's Process 2.0 support service, in relevant part:
18

19       The court has reviewed Oracle's motion and finds that Rimini's new service
     support model is not relevant to any claim or issue in this action. In their opposition,
20   defendants argue that Rimini's new support model constitutes a non-infringing
     alternative to its old process and that evidence of this process is relevant to show
21   that non-infringing alternatives were available to Rimini at the time of the alleged
     infringement. However, the court finds that defendants' claim that the new support
22   model is non-infringing is speculative. . . . Further, all claims, issues, and evidence
     related to the new support model are being addressed solely in [*Rimini II*].
23   Therefore, the court finds that evidence of Rimini's new service model is not
     relevant to this action and the court shall grant Oracle's motion accordingly.

24   ECF No. 723 at 3.

25   • Order granting the permanent injunction, in relevant part:

26       Finally, because Oracle seeks to enjoin only acts that have already been determined
     to be unlawful, and which have been affirmed on appeal, the balance of hardships
27   weighs in favor of issuing a permanent injunction.
     . . .
28

9

1

2

3

> Further, an injunction against future copyright infringement would not harm the public's access to competitive after-license software support services because Rimini Street has repeatedly represented to the court that its current business model is not based on its prior infringing conduct.

4    ECF No. 1164 at 9.

5        The Court has reviewed its prior orders, the permanent injunction, and the lengthy record

6    before it. The Court agrees with Rimini that certain issues related to Process 2.0 are currently being

7    litigated in *Rimini II*: whether cloud hosting or Rimini's AFW Tools software constitute copyright

8    infringement are open questions for the jury to decide in that case. As the Court made clear in its

9    Order granting the permanent injunction, the injunction does not enjoin conduct that has yet to be

10   adjudicated unlawful. *See id.*

11       However, the Court does not agree that the stark divide between the two cases—that

12   *Oracle I* only concerns Process 1.0 while *Rimini II* only concerns Process 2.0—exists. The Court

13   issued the above relevant orders, in part, because this case has such a lengthy history. The Court

14   found it necessary, in its inherit discretion to manage its caseload, to place some stopping point on

15   discovery and the pre-trial process in *Oracle I*. Had it not, this case would not yet have gone to

16   trial and would still be languishing in pre-trial motion practice more than eleven years since its

17   filing. Additionally, issues related to Process 1.0 are being litigated in *Rimini II*: the Court's

18   September 14, 2020 summary judgment order specifically permits Oracle to argue for either lost

19   profits or fair market value license damages for Oracle's so-called "gap customers."[7] *See Rimini*

20   *II*, ECF No. 1253 at 75-81. As Rimini did not change its support services to Process 2.0 until the

21   end of July 2014, necessarily, these gap customers were serviced following Process 1.0, and the

22   stark line Rimini argues exists between the two cases clearly does not.

23       Moreover, the permanent injunction does not just enjoin Process 1.0. Rather, the injunction

24   enjoins Process 1.0 *conduct* that has been adjudicated (and upheld on appeal) is infringing Oracle's

25   copyrights. The conduct enjoined includes violating Oracle's software licenses by reproducing or

26   preparing derivative works not solely for the support of a client's internal data processing

27

28   ───────────────
     [7] "Gap customers" is defined as clients Rimini gained from December 5, 2011 (the close of fact discovery in *Oracle I*) to February 13, 2014 (the end of the *Oracle I* damages period). *Rimini II*, ECF No. 1253 at 75.

operations, local hosting, and cross using one client's Oracle software environment to develop and test updates and modifications for the benefit of another licensee. Process 2.0 could include such conduct, just as Process 1.0 did.

If the Court has been unclear in its prior rulings, it will not be so here. In no uncertain terms, there is <u>no</u> separate and delineated line between *Oracle I* and *Rimini II* based solely on Process 1.0 and 2.0. Accordingly, the Court cannot grant Rimini's motion to enforce an order that does not exist. However, the permanent injunction only enjoins conduct that has been adjudicated unlawful. The Court made this clear in its Order granting the permanent injunction, and on Oracle's assurance that it would not seek to hold Rimini in contempt for conduct not yet adjudicated in *Rimini II*. *See* ECF No. 1117 at 18, 25 n.3, 28 ("Because Oracle seeks only to enjoin illegal actions or copying that this Court has found to be outside the scope of any license, and because Rimini claims that it no longer infringes, the balance of hardships tips entirely in favor of Oracle. . . . To be clear, Oracle is not asking now for a ruling on the merits of the issues in dispute in *Rimini II*. Instead, Oracle asks the Court for a permanent injunction restraining Rimini from continuing to commit the infringement that this Court and the jury have already determined to constitute copyright infringement. . . . Oracle's requested relief is appropriately tailored to prevent future occurrences of the conduct adjudged to constitute copyright infringement in this case."); ECF No. 1174 at 23-24 (articulating that it would be "bad faith" for Oracle to go beyond the clear terms of the injunction). Both parties are bound by their respective representations to this Court. While it should not need to rule on such an obvious fact, the Court expects all parties in this litigation to follow its orders and judgments and comport themselves with the professionalism their positions require. The Court will tolerate no less. Accordingly, if *Rimini II* results in findings that Rimini's Process 2.0 conduct is still infringing Oracle's copyrights, Oracle could then move for contempt and argue that Rimini's later conduct is "the same type or class as the unlawful acts which the court has found to have been committed" in *Oracle I*. *See Orantes-Hernandez v. Thornburgh*, 919 F.2d 549, 564 (9th Cir. 1990) (quoting *N.L.R.B. v. Express Publ'g Co.*, 312 U.S. 426, 435 (1941)) (articulating that the "district court has 'broad powers to restrain acts which are of the same type or class as unlawful acts which the court has found to have been committed or whose

commission in the future, unless enjoined, may be fairly anticipated from the defendant's conduct in the past.").

### B. Rimini's motion to exclude the declaration and opinions of Oracle's expert, Barbara Frederiksen-Cross, is denied.

Before the Court is Rimini's motion to exclude the declaration and opinions of Oracle's expert Barbara Frederiksen-Cross because (1) her opinions are unreliable because she did not apply "analytic dissection"; and (2) her opinions are irrelevant because they pertain to unadjudicated conduct. ECF Nos. 1390, 1392-s. Oracle opposed (ECF Nos. 1407, 1409-s), and Rimini replied (ECF Nos. 1416, 1418-s). For the reasons below, the Court denies Rimini's motion.

Federal Rule of Evidence 702 governs the admissibility of expert testimony, providing:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

FED R. EVID. 702. Expert testimony must rest on a reliable foundation and be relevant to the task at hand. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993).

To determine the reliability of the principles and methods used, the court looks to: (1) whether a theory or technique can be or has been tested; (2) whether it has been subjected to peer review and publication; (3) the known or potential rate of error; (4) whether there are standards controlling the technique's operation; and (5) whether the theory or technique has general acceptance within the relevant scientific community. *Id.* at 592–94. "These factors are 'meant to be helpful, not definitive, and the trial court has discretion to decide how to test an expert's reliability as well as whether the testimony is reliable, based on the particular circumstances of the particular case.'" *Pyramid Techs., Inc. v. Hartford Cas. Ins. Co.*, 752 F.3d 807, 814 (9th Cir. 2014) (quoting *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010)). However, the Court notes that "*Daubert* is meant to protect *juries* from being swayed by dubious scientific testimony. When the district court sits as the finder of fact, there is less need for the gatekeeper to keep the gate when the gatekeeper is keeping the gate only for himself." *United States v. Flores*, 901 F.3d 1150, 1165

(9th Cir. 2018) (quoting *David E. Watson, P.C. v. United States*, 668 F.3d 1008, 1015 (8th Cir. 2012)) (emphasis in original). Thus, when the Court is the trier of fact, and not just the gatekeeper, it may admit evidence, even if it may later exclude it or disregard it if it fails to meet the Rule 702 standard. *Id.* (quoting *In re Salem*, 465 F.3d 767, 777 (7th Cir. 2006)).

There can be no dispute that Ms. Frederiksen-Cross is an expert in forensic software analysis—she has 45 plus years of experience as a software developer and consultant and is trained in forensic analysis of computer software in the context of copyright infringement. ECF No. 1368-1-s ¶¶ 3–4. Her expert opinions have been considered in *Rimini II*, among other cases in this Circuit,[8] and the Court sees no reason, based on her qualifications or experience, that her opinions should be excluded here.[9] Rather, Rimini argues that her opinions are unreliable because she used "unsound methodologies" and "applied the wrong legal standard."

The Court sits as the trier of fact in this contempt proceeding and as such may admit evidence that it may later disregard if it finds that it does not meet the Rule 702 standard. Additionally, the Court need not find that an expert articulated the correct legal standard in her opinion because it is the Court's purview to decide the law. *See Plexxikon Inc. v. Novartis Pharms. Corp.*, 2020 WL 2301213, at * 2 (N.D. Cal. May 8, 2020) (slip copy). The Court has reviewed Frederiksen-Cross's declaration and expert report and finds that it will likely help the Court decide the issues of fact in these contempt proceedings. The Court is in the unique position to consider her opinions in relation to the law and will not exclude her opinions outright even if it may disregard them when reaching its final decision.

Rimini further argues that Frederiksen-Cross's entire declaration and opinion is irrelevant and therefore should be excluded because she failed to analyze how Rimini's support Process 1.0, enjoined in *Oracle I*, is "more than colorably different" than its new support Process 2.0, currently

---

[8] *See DropzoneMS, LLC v. Cockayne*, Case No. 3:16-cv-02348-YY, 2019 WL 7630788, at *6 (D. Or. Sept. 12, 2019) ("Frederiksen-Cross is undoubtedly an expert in forensic software analysis. . . . (detailing 44 years of experience designing, developing, and analyzing computer software; listing extensive publication and presentation history; and analyzing computer software as an expert witness in arbitrations and federal district courts across the country).").

[9] Rimini argues for the first time in its reply that Frederiksen-Cross is unqualified. This argument was never made in its original motion and Rimini only points to her not having a bachelor's degree in support. The Court sees no reason to address this argument further.

being adjudicated in *Rimini II*. This standard is based on the Federal Circuit's opinion in the patent case, *TiVo Inc. v. EchoStar Corp.*, 646 F.3d 869 (Fed. Cir. 2011). However, the Court agrees with its sister court in the Central District of California and finds that the "more than colorably different" standard articulated in *TiVo* is only used to determine "whether an injunction against *patent* infringement has been violated." *TiVo*, 646 F.3d at 881 (emphasis added); *Disney Enters., Inc. v. VidAngel Inc.*, Case No. CV 16-04109-AB(PLAx), 2017 WL 6820015, at *2 (C.D. Cal. Sept. 13, 2017).[10] Accordingly, the Court does not need to determine whether Rimini's new support Process 2.0 is more than colorably different than its prior Process 1.0 to proceed with these contempt proceedings. And whether Frederiksen-Cross conducted such an analysis is not relevant to the Court's ruling. The Court is well equipped to determine what in Frederiksen-Cross's declaration and opinion is relevant to its rulings, and as the fact finder, the Court may later exclude the opinion or disregard it if it fails to meet federal evidentiary standards.  Rimini's motion is therefore denied.

**C. Oracle's motion for an order to show cause why Rimini should not be held in contempt is granted in part and denied in part.**

Before the Court is Oracle's motion for an order to show cause why Rimini should not be held in contempt for violating the Court's permanent injunction. ECF Nos. 1365, 1368-s. Rimini opposed (ECF Nos. 1382, 1385-s), and Oracle replied (ECF Nos. 1401, 1405-s). For the reasons below, the Court grants in part and denies in part Oracle's motion.

### 1. Legal Standard

Pursuant to Title 18, United States Code, Section 401, a court may hold any party in civil contempt who fails to comply with or violates a court order. 18 U.S.C. § 401(3). A party "fails to act as ordered by the court when [it] fails to take 'all the reasonable steps within [its] power to

---

[10] The *VidAngel* Court found:

> [T]he act sought to be restrained in the instant case was not VidAngel's use of a technology that infringed upon a patent. The Order sought to restrain VidAngel from using Plaintiffs' copyrighted works without a license or otherwise engaging in activities that violated Plaintiffs' exclusive rights under the Copyright Act and the Digital Millennium Copyright Act. Thus, the injunction is proper in scope as it only restrains "acts which are the same type or class as [the likely] unlawful acts which the court has found to have been committed or whose commission in the future, unless enjoined, may be fairly anticipated from the defendant's conduct in the past." *Orantes-Hernandez*, 919 F.2d at 564.

*VidAngel Inc.*, 2017 WL 6820015, at *2.

[e]nsure compliance with the court's order.'" *In re Crystal Palace Gambling Hall, Inc.*, 817 F.2d 1361, 1365 (9th Cir. 1987) (quoting *Shuffler v. Heritage Bank*, 720 F.2d 1141, 1146–47 (9th Cir. 1983)). "The party alleging civil contempt must demonstrate that the alleged contemnor violated the court's order by 'clear and convincing evidence,' not merely a preponderance of the evidence." *In re Dual-Deck Video Cassette Recorder Antitrust Litigation*, 10 F.3d 693, 695 (9th Cir. 1993) (quoting *Vertex Distrib., Inc. v. Falcon Foam Plastics, Inc.*, 689 F.2d 885, 889 (9th Cir. 1982)). In doing so, the moving party must cite to specific provisions of the injunction the enjoined party has allegedly violated and allegations of noncompliance. *Reynolds v. Roberts*, 207 F.3d 1288, 1298 (11th Cir. 2000). If the moving party has stated a case of noncompliance, the Court shall issue an order to show cause why the enjoined party should not be held in contempt for violating its order, and schedule a hearing on the issue. *Id.*

### 2.  Discussion

Oracle asserts that Rimini is violating the permanent injunction as to three of its software systems: PeopleSoft, J.D. Edwards, and Oracle Database. As the provisions of the permanent injunction vary based on software, the Court will address each in turn.

### i.  *PeopleSoft*

First, Oracle alleges that Rimini is violating paragraphs 4 and 6 of the permanent injunction by continuing to impermissibly and unlawfully cross-use its PeopleSoft software through (1) Rimini's prototype/retrofit support service model; (2) Rimini's creation and use of "Dev Instructions"; (3) Rimini's use of its AFW Tools software (TransferFiles); and (4) by continuing to test updates in one client's environment that are then reused for other clients. As a preliminary matter, neither Rimini's Dev Instructions nor its AFW Tools software were before the Court or held to be unlawful in *Oracle I*. Moreover, whether these support services constitute copyright infringement is squarely before the Court in *Rimini II* and the Court has not yet ruled on the lawfulness of these support processes. It is inappropriate to make a determination as to the validity of these services for the first time in contempt proceedings, and therefore, the Court denies Oracle's motion as it relates to the Dev Instructions and AFW Tools software outright.

///

Whether Rimini's prototype/retrofit support service model constitutes copyright infringement is also squarely before the Court in *Rimini II*—specifically, whether this support process uses one client's environment under color of license for another client. Oracle alleges that two updates constitute unlawful cross-use under this support model: HCM200443 and HCM200440. Oracle argues that Rimini prototyped the development of HCM200443 in 10 client environments, which took approximately 9 days of developer time (averaging 1 day per client), and then retrofitted that update in 72 client environments between February 27 and April 1, 2019 (averaging .44 days per client). Update HCM200440 was prototyped in 11 client environments over approximately a month and half (averaging 4.2 days per client) and then retrofitted in 74 client environments between June 4 and 17, 2019 (averaging .2 days per client). Because retrofitting the update was more streamlined and took a fraction of the time as prototyping the update, including not requiring QA analysis, Oracle argues that Rimini's conduct constitutes unlawful cross-use.

The Court has made no ruling at this time that the prototype/retrofit support process always constitutes unlawful cross-use. And the Court will not make a blanket finding that whenever an update is built quicker for one client than another, that means that Rimini uses one client's environment under color of license for another client, and violates the permanent injunction. It is common sense that Rimini's engineers would get better and faster at conducting a task with more experience. Indeed, both parties in this case likely picked their respective counsel for the exact reason that each had experience in copyright litigation. It would be inapposite to find that simply because Rimini's developers are able to develop updates faster, with less testing, after they have built the update for another client, Rimini is violating the permanent injunction against cross-use. *See In re Dual-Deck Video Cassette Recorder Antitrust Litigation*, 10 F.3d at 695 ("Indeed, lawyers who learn from and use their experience obtained in discovery under such an order would have to change fields, and never do antitrust work again, lest they 'use' what they learned in a prior case 'in any way whatsoever' in any 'other action.'"). Such a finding is outside the scope of the permanent injunction and outside the scope of any factual or legal findings from *Oracle I* which form the basis and reasoning for the permanent injunction.

However, in *Rimini II*, the Court did find that this prototype/retrofit support service constituted copyright infringement as it related to Rimini's work with two specific clients: Campbell Soup and City of Eugene. *Rimini II*, ECF No. 1253 at 39-55; *Rimini Street, Inc. v. Oracle International Corp.*, 473 F.Supp.3d 1158 (D. Nev. 2020). First, when Rimini created and tested its PPACA Phase 1 update HCM104286 in Campbell Soup's environment, even knowing that Campbell Soup did not want the update, such copying was not for Campbell Soup's sole "internal data processing operations." *Id.* at 43–44. And, when this update was then sent to Rimini's client Toll Brothers (without any *separate development or testing* in a Toll Brothers environment), the Court held that Rimini used Campbell Soup's development environment, under color of Campbell Soup's license, to develop the update for the benefit of Toll Brothers in violation of the "internal data processing operations" provision of the license. *Id.* at 45–46. It is clear to the Court that such conduct violates the permanent injunction; specifically, paragraph 4 ("reproduce, prepare derivative works from, or use a specific licensee's PeopleSoft software or documentation other than to support the specific licensee's *own internal data processing operations*."); and paragraph 6 ("use [of] a specific licensee's PeopleSoft environment to develop or test software updates or modifications *for the benefit* of any other licensee."). ECF No. 1166 ¶¶ 4, 6 (emphasis added). Because the Court finds, by clear and convincing evidence, that Rimini is violating the permanent injunction, the Court issues an order to show cause why Rimini should not be held in contempt. Consequently, at the hereafter hearing, the parties will not be permitted to re-argue the at-issue conduct; rather, the parties are only permitted to argue whether Rimini should be held in contempt for such a violation, and what sanctions are appropriate, taking into account that damages will be assessed by the jury in *Rimini II* for this conduct.

The next was in relation to Rimini's development and testing of its PPACA Phase 3 update HCM104288 in City of Eugene's development environment.  The Court first held that the update incorporated into the development environment was a derivative work, the creation and testing of which was licensed. *Rimini II*, ECF No. 1253 at 51–52; *Rimini Street, Inc. v. Oracle International Corp.*, 473 F.Supp.3d 1158 (D. Nev. 2020). Next, the Court looked at the individual update and held that it too was a derivative work: it substantially incorporated protected material from the

17

preexisting work because Rimini used the PeopleTools Application Designer utility (which is part of Oracle's PeopleTools software) to create the update, and the update could not be used with any software programs other than PeopleSoft. *Id.* at 52–53. This update was also expressly licensed for use by City of Eugene. *Id.* at 53. However, what was not expressly licensed was when Rimini "prototyped" the update in City of Eugene's environment, and then sent it to three other clients without any testing or development in their respective environments—such development could not be solely for City of Eugene's "internal data processing operations." *Id.* Of particular note to the Court's analysis was that City of Eugene's license also included provision 4.1, which prohibits the marketing or distribution of any updates developed under City of Eugene's license. *Id.* at 54. Accordingly, the Court held that in that instance, Rimini's prototyping of the update and later distribution of the update to other clients, also violated section 4.1 of the license (a provision not included in all PeopleSoft licenses). *Id.* Again, it is clear to the Court that this conduct also violates the permanent injunction; specifically, paragraph 4 ("reproduce, prepare derivative works from, or use a specific licensee's PeopleSoft software or documentation other than to support the specific licensee's *own internal data processing operations*."); and paragraph 6 ("use [of] a specific licensee's PeopleSoft environment to develop or test software updates or modifications *for the benefit* of any other licensee."). ECF No. 1166 ¶¶ 4, 6 (emphasis added). Because the Court finds, by clear and convincing evidence, that Rimini is violating the permanent injunction, the Court issues an order to show cause why Rimini should not be held in contempt. Consequently, at the hereafter hearing, the parties will not be permitted to re-argue the at-issue conduct; rather, the parties are only permitted to argue whether Rimini should be held in contempt for such a violation, and what sanctions are appropriate, taking into account that damages will be assessed by the jury in *Rimini II* for this conduct.

Finally, Oracle argues that Rimini is violating paragraph 6 of the permanent injunction when it creates a single "test plan," that it uses with multiple clients, and consists of Rimini running an update in a client's PeopleSoft environment, taking screenshots of that customer's environment to show what a successful update looks like, and saving the screenshots to Rimini's SpiraTeam system. ECF No. 1368-1-s ¶ 49. Rimini's expert, Owen Astrachan provides:

> A "test case" is "a Rimini-created document (typically in the Spira database) that is essentially a plan for testing a client's PeopleSoft (or JD Edwards) software to make sure than [sic] an update was implemented correctly. For example, if a tax regulation change required a reporting form to have an additional box containing an employee's health insurance election, the update would change the code so that when the report is generated, the new box is included. A test plan would likely include having a tester generate the report and then checking to see if the report has the box. The plan could also include generating other reports to make sure they do *not* have the extra box—*i.e.*, to make sure that the update did not cause problems with other functions. There could be many tests that a tester should perform to ensure that the required update functionality exists and that no other functionality "broke" in the process, and the "test case" sets forth those tests so that a Quality Assurance employee can run through them.

ECF No. 1386-1-s ¶ 264 (emphasis in original). If a subsequent Rimini client needs the same or a similar update, Rimini may use the same test plan, *i.e.*, the same list of tests to run to ensure the functionality of the update, for the subsequent client. *Id.* ¶ 265. The parties agree that these test cases may contain screenshots of the Oracle software successfully running the update, but neither believes these screenshots constitute infringing conduct. *Id.* ¶ 266; ECF No. 1368-1-s ¶ 52.

Oracle argues that because Rimini may use the test case for multiple customers, Rimini is violating paragraph 6 of the permanent injunction because the testing "benefits" multiple Rimini clients. The Court disagrees. The Court finds that the test case is not "testing" as provided for in paragraph 6 of the permanent injunction; rather, the test case is simply the plan for how Rimini will test a specific update. To be unlawful cross-use under this permanent injunction and the law of *Oracle I*, Rimini must use one client's environment under color of license for *another* client. Nothing in the record would support a finding that Rimini is prohibited from using the same tests to ensure functionality of an update. Like above, it is common sense that Rimini's engineers would use the same tests to ensure functionality of an update. Therefore, so long as Rimini is testing the update in its client's individual environments, the testing itself (and necessarily, the copies made in the process of testing the update) is for the benefit of each individual client.

However, that was not always the case—in at least two instances, Rimini used City of Eugene's Windstream environment ("COEX" or "COE") for the general purpose of testing updates for other customers. Frederiksen-Cross provides that a W-2 update was tested in COEX for Rimini client JHN and that it was not tested in JHN's environment. ECF No. 1368-1-s ¶ 70. Frederiksen-Cross further provides that Rimini update "rsi940.sqr" was tested in COE and then sent to all

clients in scope. *Id.* ¶ 71. This appears to be a classic example of unlawful cross-use and Rimini using one client's environment under color of license for another client. Further, while Rimini does not dispute this cross-use testing in its opposition, its expert Owen Astrachan disagrees with both points in his Rebuttal Expert Report, dated March 13, 2020. ECF No. 1386-1-s ¶¶ 278-279. Given the conflicting accounts from the parties' experts, the Court finds that an evidentiary hearing on this issue is required. The Court, as fact finder, must hear from both parties competing experts to determine if Rimini's testing in this context constitutes unlawful cross-use in violation of the permanent injunction. Accordingly, the Court issues an order to show cause as to this conduct.

Second, Oracle argues that Rimini is violating paragraph 5 of the permanent injunction through its use of Windstream cloud-hosting to facilitate its support services. This is an issue squarely before the Court in *Rimini II* and the Court has made no ruling on the lawfulness of such conduct. Indeed, in the Court's September 2020 order on summary judgment in *Rimini II*, the Court specifically held that it is a disputed question of material fact as to whether the license agreements expressly allow for cloud hosting, and if they do, whether the client exercised control such that the cloud constituted the client's "facility." *Rimini II*, ECF No. 1253 at 90–91; *Rimini Street, Inc. v. Oracle International Corp.*, 473 F.Supp.3d 1158 (D. Nev. 2020). Paragraph 5 of the permanent injunction provides that Rimini will not provide support services other than on the "licensee's own computer systems." ECF No. 1166 ¶ 5. This provision was included specifically because Rimini was unlawfully hosting its client's software on its own servers and the client had no control over what Rimini was doing. It was this conduct that was held unlawful and in violation of the facilities provision of the client's license. It has never been adjudicated whether cloud hosting is permitted under either a specific client's license or under the general facilities provision of the PeopleSoft license. Nor has it been adjudicated whether a client's own computer systems would include its cloud-based servers. Accordingly, Oracle's motion for an order to show cause as it relates to Windstream, and/or cloud hosting in general, will not be considered in these contempt proceedings.

Oracle also argues that Rimini is violating paragraph 5 of the permanent injunction because it maintains Oracle software and support materials on its systems: (1) one third of the lines of code

in Rimini's "RSPCMPAY.cbl" file was copied from Oracle's PeopleSoft PSPTARRY.cbl source code file; (2) Rimini saved this "RSPCMPAY.cbl" file to its system and distributed it 14 times to 7 customers; (3) Oracle's "psptaxdt.dms" source code (including the Oracle copyright notice) modified only slightly with Rimini added code; (4) internal emails containing PeopleSoft copyrighted documentation; and (5) two PeopleSoft Payroll update documents bearing copyright notices.

As to the RSPCMPAY.cbl file, Rimini argues that Oracle's expert, Barbara Frederiksen-Cross, did not properly conduct an analytical dissection, as required by the Ninth Circuit, *citing Rentmeester v. Nike, Inc.*, 883 F.3d 1111, 1118 (9th Cir. 2018); *Apple Comput., Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1443 (9th Cir. 1994), and in a separate motion, requests the Court exclude her declaration and opinions for this reason. As addressed above, the Court declines to exclude her declaration and opinions and considers this issue on its merits.

 It is well settled that not all copying violates the Copyright Act; but rather, a plaintiff must prove "copying of protectable expression beyond the scope of the license." *MAI Systems Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 517 (9th Cir. 1993) (quoting *S.O.S., Inc. v. Payday, Inc.*, 886 F.2d 1081, 1085 (9th Cir. 1989)). "Copying may be shown by circumstantial evidence of access and substantial similarity of both the general ideas and expression between the copyrighted work and the allegedly infringing work." *Apple Comput.*, 35 F.3d at 1442. Analytic dissection refers to the process of determining whether the allegedly similar features are "elements of a work that are protectable and used without the author's permission." *Id.* at 1442-43.

In pertinent part, the permanent injunction prohibits Rimini from distributing PeopleSoft software or documentation, and from reproducing and preparing derivative works outside the scope of the license. Frederiksen-Cross analyzed the discovery and provided that:

> Rimini also copied substantial portions of the PeopleSoft file PSPTARRY.cbl into its 'RSPCMPAY.cbl' file, which was saved to Rimini's internal system and distributed at least 14 times to 7 different clients between December 19, 2018 and July 2, 2019. Comparing these two files shows that 32.74% of lines from the Rimini file match lines from the GA version of the Oracle file. . . . I provided a "complete side-by-side comparison of these files, with Rimini's RSPCMPAY.cbl on the [right] and Oracle's PSPTARRY.cbl on the [left] and highlighting content in the Rimini file matching the Oracle file, which shows substantial similarities between

1   these files and protected expression copied from the Oracle file to the RS-prefixed
2   file.

3   ECF No. 1368-1-s ¶ 77 (cleaned up). She goes on to provide that she reviewed the matching lines

4   of code and determined that there was no programing rational or standard that would require using

5   the same code and they are "idiosyncrasies" from the Oracle code. *Id.* ¶ 78.

6        Rimini does not dispute that the RSPCMPAY.cbl file is on its computer systems, but just

7   disputes that it copied substantial portions from Oracle's PSPTARRY.cbl file. Rimini's expert,

8   Owen Astrachan, opines:

> I note that the two files look very different and are designed to accomplish different
> tasks. The Oracle file is almost four times as long as the Rimini file. Moreover, the
> Oracle file is designed to "load the tax array with the YTD balances" while the
> Rimini file performs different functions[.] . . . In other words, the Rimini file is
> designed to augment the functionality of an Oracle file by loading additional, more
> detailed data. Given the differences between these two files, in my opinion the
> overall concept and feel of the Rimini file is different from the Oracle file.
>      . . .
>      In my opinion, the similar code in both columns is dictated by external
> constraints and therefore is not indicative of copying. The procedures in both blocks
> of code are designed to pull data from a database using the PTPSQLRT API. To
> use the API, the code must refer to its name—"PTPSQLRT"—which is why
> "PTPSQLRT" appears multiple times in both columns. Moreover, both programs
> must use standard programing language constructs (e.g., CALL, USING, FETCH,
> SET) to instruct the program how to use the API to find the data (e.g., "SET
> FETCH-YTD-END of S-YTD TO TRUE").

18  ECF No. 1386-1-s ¶¶ 197–199.

19       Given these conflicting accounts of the two files, the Court finds that an evidentiary hearing

20  on this issue is required. The Court, as fact finder, must hear from both parties competing experts

21  to determine if Rimini's file contains protected Oracle expression that Rimini is prohibited from

22  having on its systems. Accordingly, the Court issues an order to show cause as to this file.

23       As to the "psptaxdt.dms" source code file and emails containing PeopleSoft copyrighted

24  documentation and PeopleSoft Payroll update documents, Rimini does not dispute that such

25  content is on its systems. Rather, it contends that the content was sent to it by a client, contrary to

26  express instructions. However, "[t]he absence of willfulness does not relieve from civil contempt."

27  *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191 (1949). While Rimini may not have

28  willfully intended to violate the permanent injunction by having such content on its computer

systems, it is uncontradicted that such content is on its systems and that it is a violation of the permanent injunction. Rimini's intent may affect what sanction the Court finds is appropriate for the violation, but the Court still finds it necessary to issue an order to show cause why Rimini should not be held in contempt for these violations of paragraph 5 of the permanent injunction. *See TiVo*, 646 F.3d at 880 ("Although a defendant's diligence and good faith efforts are not a defense to contempt, these factors may be considered in assessing penalties, a matter as to which the district court has considerable discretion."). Because the Court finds, by clear and convincing evidence, that Rimini is violating the permanent injunction, the Court issues an order to show cause why Rimini should not be held in contempt. Consequently, at the hereafter hearing, the parties will not be permitted to re-argue the at-issue conduct; rather, the parties are only permitted to argue whether Rimini should be held in contempt for such a violation, and what sanctions are appropriate.

Third, Oracle argues that Rimini's updates and modifications are derivative works, the creation of which violates paragraphs 4, 5 and 6 of the permanent injunction. Oracle argues that every single update and modification of Oracle's software constitutes a derivative work and is therefore a violation of the permanent injunction. The Court disagrees. Preliminarily, whether a particular stand-alone update or modification is a derivative work is a fact specific inquiry, and the Court will not make a blanket ruling that every modification and every update that Rimini has created for PeopleSoft is a derivative work. The Court and the parties agree that when that update or modification is applied to the PeopleSoft environment, the entire environment is a derivative work—Rimini conceded this point and the Court specifically held so in its September 2020 summary judgment order in *Rimini II*. *Rimini II*, ECF No. 1253 at 51–52; *Rimini Street, Inc. v. Oracle International Corp.*, 473 F.Supp.3d 1158 (D. Nev. 2020). But the Court further held that such creation of derivative works may be expressly authorized by a client's license. *Id.*

The Court has made clear that the permanent injunction enjoins *unlawful*, infringing conduct. And Rimini is not enjoined from creating derivative works—paragraph 4 of the permanent injunction specifically provides that derivative works may be made so long as they are for the licensee's own internal data processing operations. What is unlawful, and thus prohibited

by this permanent injunction, is the creation of derivative works that are outside the scope of, or in violation of the client's license.

Here, Oracle points to only one example of a derivative work that violates the permanent injunction: Rimini's 1099 update that was emailed to Easter Seals in 2018. It is not clear from the record before the Court where this update came from, where it was developed, and for what client. If the update was developed for Easter Seals, in Easter Seals environment, and Easter Seals is permitted under its license to create derivative works and have a third-party servicer create those derivative works for it, then the Court could not find Rimini's conduct was a violation of the permanent injunction. However, because the Court lacks necessary information to make this finding, an evidentiary hearing is needed to determine if the creation and distribution of the update violated the permanent injunction. Accordingly, the Court issues an order to show cause on this issue.

*ii.   J.D. Edwards*

First, Oracle argues that Rimini is violating paragraph 8 of the permanent injunction by copying J.D. Edwards source code when it develops and tests updates. Oracle articulates that J.D. Edwards "source code" includes software files ".h" and ".c" files (written in the C programing language), Business Functions, Interactive Applications, Batch Applications, and Event Rules code. ECF No. 1368-s at 29. There are two types of J.D. Edwards software at-issue here—J.D. Edwards EnterpriseOne and J.D. Edwards World. As to J.D. Edwards EnterpriseOne, Rimini allegedly copies source code (1) whenever it uses Oracle's Object Management Workbench, i.e., whenever Rimini opens the program ("checked out"), closes the program ("checked in"), or the contents of the program are displayed; (2) when it "promotes" source code files between environments (i.e., from a development to a testing environment); and (3) when Rimini copied source code file, prvtsidx.plb onto its own systems where it was then modified. As to J.D. Edwards World, Rimini is allegedly copying source code when (1) Rimini developers display the source code in source editors; and (2) when they promote source code from one environment to another. Finally, Oracle alleges that Rimini violates the injunction as to both J.D. Edwards programs when it creates technical specification documents (like the "Dev Instructions" discussed above): the

technical specification document for Rimini's JDE105328 update copied source code from Oracle file R89078652 and from J.D. Edwards World A9.3 source code file P06767.

The parties dispute the meaning of the term "source code" within the injunction: Oracle maintains that "source code" refers to both "open code" (code that the licensee may modify to create tax, legal, and regulatory updates to its software) and "closed code" (code that the licensee does not have access to and would need to reverse engineered or "decompile"), while Rimini maintains that the term only refers to closed code. Rimini further argues that reading the injunction to mean both open and closed code would make paragraph 10 of the injunction superfluous and would operate as a total ban on Rimini support services for J.D. Edwards software because every time Rimini accesses the software, copies of source code are made.

The Court finds that the parties dispute over the definition of source code is material to the Court's ruling, and therefore, an evidentiary hearing on the issue is necessary before the Court can determine whether Rimini's conduct violates the injunction. As to the technical specification documents, this was not previously before the Court or held to be unlawful in *Oracle I*, and like with the Dev Instructions, the Court has not yet ruled on the lawfulness of this support process. However, Rimini fails to address this content in its opposition, though its expert, Owen Astrachan, addressed it in his Supplemental Expert Report, dated June 26, 2020, opining that the at-issue code was not copied. ECF No. 1368-2-s ¶ 22. Given the conflicting expert opinions, the Court finds that evidentiary hearing is needed to determine if this technical instruction did in fact copy Oracle source code in violation of the permanent injunction.

Second, Oracle alleges that Rimini is violating paragraph 10 of the permanent injunction by unlawfully cross using Oracle's software and creating derivative works. Oracle argues that Rimini is committing unlawful cross-use by copying source code into technical specification documents and copying testing procedures. Like above with PeopleSoft, the Court has made no ruling at this time that the prototype/retrofit support process always constitutes unlawful cross-use. And the Court will not make a blanket finding that whenever an update is built quicker for one client than another, that means that Rimini uses one client's environment under color of license

1    for another client and violates the permanent injunction. It is common sense that Rimini's

2    engineers would get better and faster at conducting a task with more experience.

3          As to creating derivative works, the Court has made clear that the permanent injunction

4    enjoins *unlawful*, infringing conduct. And Rimini is not enjoined from creating derivative works—

5    paragraph 10 of the permanent injunction specifically provides that derivative works may be made

6    so long as it is not for the benefit of another licensee. What is unlawful, and thus prohibited by this

7    permanent injunction, is the creation of derivative works that are outside the scope of, or in

8    violation of the client's license. Accordingly, Oracle has failed to show by clear and convincing

9    evidence that Rimini is violating the paragraph 10 of the permanent injunction.

10          Finally, Oracle argues that Rimini is violating paragraphs 3 and 17 of the permanent

11    injunction, pertaining to both PeopleSoft and J.D. Edwards, by distributing updates to its clients.

12    As discussed above, the Court has not ruled on whether Rimini's distribution software programs,

13    particularly TransferFiles, are unlawful or violate the Copyright Act. But the Court need not rule

14    on that specific issue to deny Oracle's motion—to read the injunction to prohibit all distribution

15    of Rimini updates to its client's would be a complete ban on Rimini support services. That was

16    neither the intention nor the purpose of the permanent injunction and such a reading would be

17    outside its scope. Further, such a reading would render other provisions of the injunction

18    superfluous—to say that Rimini is permitted to create derivative works within the scope of the

19    license but that it can't distribute the derivative work to its client would be an absurd result.

20          As to the specific examples Oracle provides, the Court finds that an order to show cause

21    may issue in part. As to one client, Petco, Rimini was unable to conduct QA testing due to an issue

22    with the client's environment; Rimini chose to not test the update because it had previously been

23    tested and worked for other clients before distribution. ECF No. 1368-1-s ¶ 114. Rimini is not

24    required to test updates and if Rimini chooses to send a client an untested update, developed in

25    that client's environment, the Court cannot find that conduct violates the injunction. However, as

26    to update HCM200049, delivered to Rimini's client Matheson Trucking, without any indication it

27    was developed or tested in that client's environments, is a clear violation of the permanent

28    injunction. *See id.* ¶ 115. Because the Court finds, by clear and convincing evidence, that Rimini

is violating the permanent injunction, the Court issues an order to show cause why Rimini should not be held in contempt. Consequently, at the hereafter hearing, the parties will not be permitted to re-argue the at-issue conduct; rather, the parties are only permitted to argue whether Rimini should be held in contempt for such a violation, and what sanctions are appropriate. As to update HCM2000105, delivered to clients Rockefeller Group International and Home Shopping Network, is not clear whether the update was sent directly to these clients or developed and tested in their own environments. Therefore, the Court finds an evidentiary hearing is required to determine whether Rimini's conduct violates the permanent injunction.

### iii. Oracle Database

Finally, Oracle argues that Rimini is violating paragraph 15 of the permanent injunction when it develops and tests updates in J.D. Edwards and PeopleSoft environments that contain Oracle Database because that results in copying Oracle Database. ECF No. 1368-1-s ¶ 120. Oracle's expert, Barbara Frederiksen-Cross, estimated that this occurred in 305 of Rimini's customers' environments. *Id.* ¶ 121. In opposition, Rimini argues that paragraph 15 does not prohibit it from copying Oracle Database if it is doing so pursuant to a valid Oracle License and Service Agreement or a Developer License; to do otherwise would be a ban on all copying of Oracle Database.[11]

On summary judgment, the Court held that Rimini was infringing on Oracle's copyrights for Oracle Database. *See* ECF No. 476. Specifically, the Court held that the Developer License, under which authorization Rimini downloaded Oracle Database, did not permit Rimini to make unlimited copies of the software on Rimini's systems, use that software to create updates and bug fixes for Oracle's Enterprise Software programs, or use those copies to create commercial support services for its clients. *Id.* at 9–12. The Court also found that, although many of Rimini's clients are authorized to use Oracle Database under their Oracle License and Service Agreement ("OLSA"), because Rimini downloaded Oracle Database directly from Oracle, rather than receive access through its clients, Rimini's use of the software was restricted to the provisions of the

---

[11] The Court notes that this is the same argument Rimini made when it initially objected to the permanent injunction. *See* ECF No. 1130 at 28.

1    Developer License. *Id.* at 12–13. The Ninth Circuit upheld the Court's summary judgment ruling.

2    *Oracle USA, Inc. v. Rimini Street, Inc.*, 879 F.3d 948, 960 (9th Cir. 2018).

3          The Court entered the at-issue permanent injunction, with the following provision

4    pertaining to Oracle Database:

5          15. Rimini Street shall not reproduce, prepare derivative works from, or distribute
             Oracle Database software.
6

7    ECF No. 1166 ¶ 15. When the Court implemented this provision, the Court reasoned that the

8    balance of the hardships weighed in favor of the permanent injunction, in part, because Oracle was

9    only seeking to enjoin acts that had been determined to be unlawful and upheld on appeal. ECF

10   No. 1164 at 9. The Ninth Circuit upheld the permanent injunction, specifically holding that it was

11   not overly broad, but did not address the Oracle Database provision specifically. *Oracle USA, Inc.*

12   *v. Rimini Street, Inc.*, 783 Fed.Appx.707, 710–11 (9th Cir. 2019).

13         Given the extensive record in this case and the Court's previous orders, it is clear that this

14   provision does not prohibit all copying of Oracle Database. To read paragraph 15 to prohibit all

15   copying, would make previous paragraphs of the permanent injunction related to PeopleSoft and

16   J.D. Edwards superfluous—Rimini is permitted to make copies of these software programs when

17   doing so is within the scope of the software license. If copies of Oracle Database are necessarily

18   made when Rimini is providing support services for these other Enterprise Software programs,

19   and those copies are expressly permitted under their respective licenses, the Oracle Database

20   copies cannot be prohibited by the permanent injunction. Here, Oracle has not provided clear and

21   convincing evidence that the copies of Oracle Database, made in the approximately 305 client

22   systems, were not expressly authorized by the clients' licenses, or that Rimini violated the

23   permanent injunction. Therefore, the Court shall not issue an order to show cause as to Oracle

24   Database.

25         **D.  Rimini's motion for a jury trial is denied.**

26         Before the Court is Rimini's motion for a jury trial. ECF Nos. 1387, 1389-s. Oracle

27   opposed (ECF No. 1403, *errata* ECF No. 1411) and Rimini replied (ECF Nos. 1412, 1414-s). For

28   the reasons below, the Court denies Rimini's motion.

Generally, civil contempt proceedings only require notice and an opportunity to be heard. *International Union, United Mine Workers of America v. Bagwell*, 512 U.S. 821, 826–27, 831 (1994). It is only when contempt proceedings are criminal that heighted due process protections are required. *Id.* at 831. "[W]hether a contempt is civil or criminal turns on the 'character and purpose' of the sanction involved." *Id.* at 827. A sanction is "civil if it coerces compliance with a court order or is a remedial sanction meant to compensate the complainant for actual losses. A criminal sanction, in contrast, generally seeks to punish a completed act of disobedience." *Parsons v. Ryan*, 949 F.3d 443, 455 (9th Cir. 2020) (cleaned up).

Oracle requests the following sanctions under the Court's inherent authority for Rimini's alleged violations of the permanent injunction: (1) an order barring Rimini from providing support services for Oracle's PeopleSoft or J.D. Edwards product lines; (2) impoundment of the infringing copies and Rimini's computer systems, or alternatively, require that they be placed in escrow so that Oracle can monitor Rimini's compliance and until Rimini demonstrates compliance with the permanent injunction; (3) attorneys' fees and costs for successfully mounting these contempt proceedings; and (4) compensatory damages. Oracle further requests that it be permitted to reopen discovery for the narrow purpose of determining the amount of compensatory damages Oracle should be awarded. ECF No. 1368 at 34-35. Rimini argues that a complete ban on Rimini providing support services and the impoundment of its computers are punitive sanctions and thus, a jury trial and heighted due process protections are required in these contempt proceedings. ECF No. 1387 at 15–19. Oracle, in its response to this motion, withdrew its request for a complete ban on Rimini support services, but argues that impoundment is a coercive sanction, routinely permitted in civil contempt proceedings. ECF No. 1411-2 at 22-24

As Oracle has withdrawn its first requested sanction, the Court sees no reason to address whether a complete ban on Rimini support services would be a punitive or compensatory sanction. Second, impoundment is a statutory remedy permitted under the Copyright Act for copyright infringement. 17 U.S.C. § 503. In a civil contempt proceeding, the Court may find impoundment appropriate if Rimini willfully violated the Court's orders, but heightened due process protections are not required to reach such a finding. *See National Research Bureau, Inc. v. Kucker*, 481 F.Supp.

612, 615–16 (S.D.N.Y. 1979). Third, it is well established that the prevailing party may be awarded attorneys' fees and costs in civil contempt proceedings and the Court has discretion to determine if a fee award is an appropriate remedial measure. *See Perry v. O'Donnell*, 759 F.2d 702, 705-06 (9th Cir. 1985). Finally, compensatory damages may be awarded for Oracle's actual damages and any additional profits of the infringer. 17 U.S.C. § 504. Oracle's motion for an order to show cause does not address a specific amount in damages it has suffered due to Rimini's alleged contumacious conduct but asks the Court to reopen discovery if Rimini is held in contempt. If the Court finds Rimini in contempt, the Court will determine at that time how to fashion equitable and appropriate sanctions and reopen discovery if it sees fit to do so. At this time, the Court does not find that these requested sanctions are punitive; therefore, heighted due process protections and/or a jury trial are not required.

Rimini's further arguments as to why it is entitled to a jury trial pertain to Rimini's position that the complained of conduct is currently being adjudicated in *Rimini II*. As the Court found above, there are material issues of fact and a jury trial will be held in *Rimini II* on a number of issues Oracle has raised in its motion for an order to show cause. Because the Court declines to entertain those issues in this contempt proceeding, the Court need not address Rimini's additional arguments for a jury trial. Accordingly, Rimini's motion for a jury trial is denied.

**E.  Oracle's motion for Rule 11 sanctions is denied.**

Oracle moves this Court, under its inherent authority, Federal Rule of Civil Procedure 11, and 28 U.S.C. § 1927, to impose sanctions on Rimini and its outside counsel, Gibson, Dunn & Crutcher, LLP ("Gibson Dunn") because Rimini filed its motion to enforce (discussed above in Part III.A) in an attempt to re-litigate (for the seventh time) the scope of the permanent injunction. ECF No. 1348. Rimini opposed (ECF No. 1350) and Oracle responded (ECF No. 1353). For the reasons below, the Court denies Oracle's motion.

1.  Legal Standard

There are three sources of sanctioning power: Rule 11 of the Federal Rules of Civil Procedure, 28 U.S.C. § 1927, and the Court's inherent power to regulate itself. *See United States v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen and Helpers of America, AFL-CIO*, 948

F.2d 1338, 1342–43 (2d Cir. 1991) ("*Brotherhood*"). Oracle seeks sanctions against Rimini pursuant to all three.

Under Rule 11, the Court may, on a party's motion, after notice and a reasonable opportunity to respond, impose appropriate sanctions against another party for any violation of Rule 11(b) of the Federal Rules of Civil Procedure. *See* FED. R. CIV. P. 11(c)(1). Here, Oracle represents that on April 20, 2020, it served Rimini with notice it intended to file a motion for sanctions unless Rimini withdrew its above discussed motion to enforce (ECF No. 1323). ECF No. 1348 at 6. When Rimini had not withdrawn its motion within 21-days, Oracle filed this motion for sanctions on May 12, 2020. *Id.*  Accordingly, Oracle has satisfied the procedural requirements of Rule 11(c)(2).

"One of the fundamental purposes of Rule 11 is to 'reduce frivolous claims, defenses or motions and to deter costly meritless maneuvers, . . . thereby avoiding delay and unnecessary expense in litigation.'" *Christian v. Mattel, Inc.*, 286 F.3d 1118, 1127 (9th Cir. 2002) (quoting *Golden Eagle Distrib. Corp. v. Burroughs Corp.*, 801 F.2d 1531, 1536 (9th Cir 1986)). Rule 11 provides, in pertinent part,

> **(b) Representations to the Court.** By presenting to the court a pleading, written motion, or other paper--whether by signing, filing, submitting, or later advocating it--an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:
>> (1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;
>> (2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law; . . .
> . . .
> (c)(4) . . . The sanction may include nonmonetary directives; an order to pay a penalty into court; or, if imposed on motion and warranted for effective deterrence, an order directing payment to the movant of part or all of the reasonable attorney's fees and other expenses directly resulting from the violation.

FED. R. CIV. P. 11. By its terms, Rule 11 sanctions apply only to documents parties submit to the court, not to the conduct of those parties. *Christian*, 286 F.3d at 1130. Prior to filing a document, each party has a duty to "conduct a reasonable factual investigation" and to "perform adequate legal research" confirming that the positions taken in the document are "warranted by existing law or a good faith alteration of existing law." *Id.* at 1127 (quoting *Golden Eagle*, 801 F.2d at 1537).

In determining whether the factual and legal inquiry was reasonable, the court applies an objective standard of reasonableness. *Brotherhood*, 948 F.2d at 1344 (citing *Business Guides, Inc. v. Chromatic Commc'ns Enter.s., Inc.*, 498 U.S. 533, 549–50 (1991)).

> Alternatively, sanctions are available under 28 U.S.C. § 1927, which provides:
>
> > Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiples the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorney's fees reasonably incurred because of such conduct.

A section 1927 sanction differs from a Rule 11 sanction by requiring the heightened showing of bad faith, by allowing the court to impose an award of fees *sua sponte*, and by bringing conduct outside of the pleadings within the ambit of sanctionable activities. *See* GEORGENE M. VAIRO, RULE 11 SANCTIONS: CASE LAW, PERSPECTIVES, AND PREVENTATIVE MEASURES 760–62 (Richard G. Johnson ed., 3d ed. 2003). As a penal statute, section 1927 discourages unnecessary delays in litigation by requiring the offending party to compensate other litigants for costs due to the dilatory conduct. *See Roadway Express, Inc. v. Piper*, 447 U.S. 752, 759–60 (1980). To award sanctions, the movant must show that the offending party (1) multiplied the proceedings (2) in a vexatious and unreasonable manner, causing (3) an increase in the cost of the proceedings. *Shields v. Shetler*, 120 F.R.D. 123, 127 (D. Colo. 1988). A "vexatious" multiplication of the proceedings occurs when the party acts recklessly, plus "something more," such as frivolousness, harassment, or an improper purpose. *Fink v. Gomez*, 239 F.3d 989, 993–94 (9th Cir. 2001) ([R]ecklessness suffices for § 1927, but bad faith is required for sanctions under the court's inherent power."); *see B.K.B. v. Maui Police Dep't*, 276 F.3d 1091, 1107 (9th Cir. 2002) (finding recklessness plus knowledge sufficient for section 1927 sanctions). Before a court imposes section 1927 sanctions, the offending party must be given notice and an opportunity to be heard. *T.W. Elec. Serv., Inc v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 638 (9th Cir. 1987).

Finally, the court may sanction an offending party pursuant to its inherent power "to manage [its] own affairs so as to achieve the orderly and expeditious disposition of cases." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991) (quoting *Link v. Wabash R. Co.*, 370 U.S. 626, 630–31 (1962)). In this circuit, a showing of bad faith is required to support sanctions under the

Court's inherent authority. *Fink*, 239 F.3d at 993. Due to the "very potency" of the Court's inherent power—encompassing, for example, the imposition of attorneys' fees if a court finds that "the very temple of justice has been defiled," *Chambers*, 501 U.S. at 44–46 (quoting *Universal Oil Products Co. v. Root Refining Co.*, 328 U.S. 575, 580 (1946))—courts favor restraint and discretion in its exercise and require a particularized showing of bad faith, *Brotherhood*, 948 F.2d at 1345.

### 2. Discussion

Oracle motions this Court for sanctions against Rimini for vexatious litigation because Rimini filed its motion to enforce the court's orders and judgment separating *Oracle I* from *Rimini II*. Oracle argues that this motion is improperly duplicative and an attempt to relitigate (for the seventh time) the scope of the permanent injunction, which this Court (and the Ninth Circuit on appeal) held was not overly broad. In opposition, Rimini argues that it was compelled to file the at issue motion because it appeared that Oracle would violate the Court's orders and attempt to litigate issues currently being adjudicated in *Rimini II* in these contempt proceedings.

The Court is concerned with both parties' conduct. It agrees with Oracle that Rimini's motion is procedurally improper—if Oracle decided to raise issues in contempt proceedings outside the scope of the permanent injunction, that should be discussed in relation to Oracle's motion for an order to show cause, not some preemptive strike styled motion. However, it does not agree with Oracle that Rimini's conduct is completely baseless. At the time Rimini filed its motion to enforce, it appeared, based on Oracle's expert's post-injunction report, that Oracle intended to bring contempt proceedings relating to issues currently being adjudicated in *Rimini II*—specifically related to cloud hosting and Rimini's AFW Tools software. Given that Oracle has made multiple representations to the Court that it would not attempt to expand the scope of the injunction to issues not yet adjudicated unlawful, and this Court's specific ruling that the injunction was narrowly tailored to only enjoin acts that have already been adjudicated unlawful, Rimini's concern was, to some extent, founded.

Both sides appear to have behaved improperly, but the Court finds that sanctions are not appropriate under Rule 11, section 1927, or the Court's inherent authority. The Court does not find

that anything in the record supports a finding that Rimini acted in bad faith by filing its motion. Nor does the Court find that Rimini's motion was vexatious or unreasonable given Oracle's conduct, or that it was for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation. The Court has been previously impressed with the way the parties have been able to work together professionally throughout this case's eleven-year history, even with highly contentious matters. The Court is greatly concerned that these two motions indicate a breakdown in amicable proceedings and strongly cautions the parties against reaching a point that zealous advocacy overshadows professional conduct.

### F. The Court adopts and accepts Magistrate Judge Ferenbach's Report and Recommendation and overrules Oracle's objections. Accordingly, Oracle's motion for Rule 37(e) sanctions is denied.

Before the Court is Oracle's motion for Rule 37(e) sanctions. ECF Nos. 1359; 1363-s. Rimini opposed (ECF Nos. 1372; 1374-s), and Oracle replied (ECF Nos. 1376; 1379-s). This pending motion was referred to Magistrate Judge Cam Ferenbach under 28 U.S.C. § 636(b)(1)(B) and Local Rule IB 1-4, who issued a Report and Recommendation that this Court deny Oracle's motion. ECF No. 1431. Accordingly, Oracle objected (ECF Nos. 1434; 1436-s), and Rimini replied (ECF Nos. 1438; 1440-s).

The Court conducted a *de novo* review of the matter and has fully considered the pleadings and memoranda of the parties, including Oracle's objection to the Report and Recommendation and Rimini's response, and other relevant matters of record under 28 U.S.C. § 636(b)(1)(B) and Local Rule IB 3-2. Accordingly, the Court accepts and adopts Judge Ferenbach's Report and Recommendation, overrules Oracle's objections, and accordingly, denies Oracle's motion for Rule 37(e) sanctions.

## IV.   CONCLUSIONS

IT IS THEREFORE ORDERED that the parties' motions to seal (ECF Nos. 1325, 1334, 1367, 1384, 1388, 1391, 1394, 1404, 1408, 1413, 1417, 1427, 1435, 1439) are **GRANTED** ***nunc pro tunc***.

IT IS FURTHER ORDERED that Rimini's motion to enforce the Court's orders and judgment separating *Oracle I* from *Rimini II* (ECF Nos. 1323) is **DENIED.**

IT IS FURTHER ORDERED that Rimini's motion to exclude the declarations and opinions of Oracle's expert, Ms. Frederiksen-Cross, (ECF Nos. 1390, 1392-s) is **DENIED**.

IT IS FURTHER ORDERED that Oracle's motion for an order to show cause why Rimini should not be held in contempt (ECF Nos. 1365, 1368-s) is **GRANTED in part and DENIED in part**. In accordance with this Order, Rimini is ORDERED to **SHOW CAUSE** why it should not be held in contempt for violating the permanent injunction, no later than Monday, May 10, 2021. Oracle shall file any response within 30 days of Rimini's filing; Rimini shall file any reply within 10 days of Oracle's response. Rimini's show cause brief and Oracle's response shall not exceed 30 pages and Rimini's reply shall not exceed 15 pages, excluding non-substantive portions of the filing, including tables of contents, tables of authorities, and signature pages. Exhibits are not to exceed 100 pages. No extensions will be granted for either party unless extenuating circumstances are shown.

IT IS FURTHER ORDERED that a hearing on the above discussed issues will be held in a courtroom to be designated at the Bruce R. Thompson Courthouse in Reno, Nevada, commencing on September 20, 2021, at 9:00 a.m. Each side will have 1 hour for opening and closing statements, and presentation of evidence/witness testimony shall not exceed 3 days per side. Participating counsel must appear in-person, but it is left to the parties' discretion to have any of its witnesses appear by ZOOM video conferencing. The parties are directed to contact Courtroom Deputy Katie Sutherland, at Katie_Sutherland@nvd.uscourts.gov, for ZOOM connectivity instructions. In accordance with this Order, the parties should not re-argue conduct the Court has found, by clear and convincing evidence, violates the permanent injunction, and the Court cautions the parties to strictly stay within the bounds articulated above for its argument and evidence presentation; violations will not be tolerated.

IT IS FURTHER ORDERED that the parties are to submit a proposed joint pre-hearing order no later than Friday, August 20, 2021, which should include: a brief statement of the issues to be tried; a list of admitted facts and contested facts to be tried; stipulated exhibits; any exhibits objected to and why; depositions to be offered and/or objections; and witnesses to be called. No motions in limine will be heard without leave of the Court.

1    IT IS FURTHER ORDERED that Rimini's motion for a jury trial (ECF Nos. 1387, 1389-s)

2  is **DENIED**.

3    IT IS FURTHER ORDERED that Oracle's motion for Rule 11 sanctions (ECF No. 1348)

4  is **DENIED**.

5    IT IS FURTHER ORDERED that Judge Ferenbach's Report and Recommendation (ECF

6  No. 1431) is **ADOPTED and ACCEPTED**. Oracle's objections to the Report and

7  Recommendation (ECF Nos. 1434; 1436-s) are **OVERRULED**. Accordingly, Oracle's motion for

8  Rule 37(e) sanctions (ECF Nos. 1359; 1363-s) is **DENIED.**

9    IT IS SO ORDERED.

10    DATED this 31st day of March, 2021.

11

12    _____
     LARRY R. HICKS
13    UNITED STATES DISTRICT JUDGE

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28