1          UNITED STATES DISTRICT COURT
                 DISTRICT OF NEVADA
2     BEFORE THE HONORABLE LARRY R. HICKS, SENIOR DISTRICT JUDGE
                     ---o0o---
3

4     ORACLE USA, INC., et al,      :
                                    :
5                  Plaintiffs,      :
                                    :  No. 2:10-cv-0106-LRH-VCF
6          -vs-                     :
                                    :  September 20, 2021
7     RIMINI STREET, INC., et al,   :
                                    :  Reno, Nevada
8                  Defendants.      :
                                    :  Volume 1
9     _____:

10

11              TRANSCRIPT OF EVIDENTIARY HEARING

12

13    APPEARANCES:

14    FOR THE PLAINTIFF:        Richard J. Pocker
                                Benjamin P. Smith
15                              William A. Isaacson
                                Jessica Phillips
16                              Sharon R. Smith
                                Corey Houmand
17                              Zachary Hill
                                Attorneys at Law
18

19    FOR THE DEFENDANTS:       W. West Allen
                                Eric Vandevelde
20                              Samuel G. Liversidge
                                Ilissa Samplin
21                              Casey J. McCracken
                                Attorneys at Law
22

23

24    Reported by:             Margaret E. Griener, CCR #3, FCRR
                                Official Reporter
25                              400 South Virginia Street
                                Reno, Nevada 89501

1                 RENO, NEVADA, MONDAY, SEPTEMBER 20, 2021, 9:07 A.M.

2                                   ---o0o---

3

4                 THE COURT:  Good morning.  Have a seat, please.

5                 THE CLERK:  This is the date and time set for a

6    hearing on contempt and evidentiary hearing in case number

7    2:10-cv-0106-LRH-VCF, Oracle USA, Incorporated, et al., versus

8    Rimini Street, Incorporated, et al.

9                 Counsel, please state your name for the record,

10   beginning with plaintiffs.

11                MR. POCKER:  Good morning, your Honor.

12                On behalf of the plaintiff, the Oracle entities,

13   I'm Richard Pocker, with Bois, Schiller & Flexner.  Present

14   with at counsel table is Benjamin Smith of the Law Firm of

15   Morgan, Lewis & Bokius.

16                And in accordance with the Court's instructions

17   about seating in the courtroom, we additionally have four of

18   our other counsel seated in the gallery behind me,

19   Mr. Isaacson, Bill Isaacson, from Paul, Weiss, Jessica

20   Phillips from Paul, Weiss, Sharon Smith from Morgan Lewis,

21   Corey Houmand from Morgan Lewis; and Zach Hill from Morgan

22   Lewis.

23                THE COURT:  All right.

24                MR. POCKER:  And as well, your Honor, we have a

25   representative of the Oracle companies, Mr. Jim Maroulis, who

 1   is also seated in that area.

 2                   THE COURT:  All right.  Thank you, Mr. Pocker.

 3                   I welcome all counsel to the courtroom.

 4                   And let me hear from the defense, please.

 5                   MR. ALLEN:  Good morning, your Honor.  West

 6   Allen of Howard & Howard on behalf of Rimini Street,

 7   Incorporated.

 8                   Also today with us on behalf of Rimini Street is

 9   the Executive Vice-President and Chief Legal Officer, Mr. Dan

10   Winslow in the audience.  And here with me also from the

11   Gibson Dunn team is Mr. Eric Vandevelde, and I'll let him

12   introduce his colleagues.

13                   MR. VANDEVELDE:  Good morning, your Honor.

14                   Eric Vandevelde from Gibson Dunn, and with me

15   from Gibson Dunn is Samuel Liversidge, Ilissa Samplin, Casey

16   McCracken, and a number of other Gibson Dunn attorneys are

17   here present as well.

18                   Thank you.

19                   THE COURT:  All right.  Thank you.

20                   Well, I welcome all of you to the courtroom.

21   We, obviously, have a crowd.  Interestingly, one of my clerks

22   was mentioning we had a double murder trial last month and we

23   never had as many people in the courtroom as we have in

24   the courtroom for this particular hearing.

25                   But I don't take it lightly, I seriously do

1    appreciate the interest and professionalism and the issues

2    that are involved relative to this case.

3            I would tell you I have been given the

4    stipulation regarding exhibits.  It was filed as documents

5    number 15 and 16 in our case file.  I do approve it.  I am

6    signing off on it at this time, as we speak.

7            Obviously I appreciate the agreement of the

8    parties on the exhibits, and I think those will be explained

9    to me as we move along in this hearing.

10           So at this time, I had previously issued the

11   order ten days ago or so concerning Oracle going forward in

12   this matter.  Mr. Pocker, who is going to be carrying that

13   load?

14           MR. POCKER:  Initially, your Honor, it will be

15   me.  As with any complex matter, we've divided a good deal of

16   the work amongst ourselves, so you may see all of us at some

17   point or another.

18           But as a preliminary matter, before opening

19   statements --

20           COURT REPORTER:  I'm sorry.  Mr. Pocker, could

21   you take your mask down when you speak?

22           MR. POCKER:  Sure.  Gladly.

23           COURT REPORTER:  Thank you.

24           THE COURT:  Well, let me state first for the

25   benefit of everyone, you're welcome to use the podium, and

1    obviously the podium works very well for purposes of our court

2    reporter.

3                    We have the plastic bags up there, Katie?

4                    THE CLERK:  Yes, sir.

5                    THE COURT:  And it's a pain, but after each

6    person speaks, the plastic bag will be removed from the

7    microphone, and the next person who steps up can then place

8    their plastic bag over the microphone.

9                    It creates a noise as they're taken off and put

10   on, but I have found that they work very well.  That allows

11   counsel to remove their masks so when they're speaking we can

12   all hear a little better as we're moving through the hearing.

13                   Mr. Pocker, go ahead, please.

14                   MR. POCKER:  All right.  Thank you, your Honor.

15                   The preliminary matter I wish to raise had to do

16   with the timing of this hearing and some clarification of the

17   terms.

18                   The Court had indicated in hours how much time

19   was allotted for opening statements, but as to the

20   presentation of our evidence and the rest of the hearing it

21   was designated in days, three days for each side.

22                   For planning purposes, and to make sure this

23   goes as smoothly as possible, is it the Court's intention for

24   those days to be defined in a certain number of court hours

25   such that we would be keeping that kind of time, or are we

1    just reserving the first three days for anything Oracle wants

2    to put on, and then the next three for Rimini Street?

3                    If we just have a better feel, we could make

4    this a lot more efficient, perhaps faster in presentation.

5                    THE COURT:  All right.  Well, I would tell you

6    what I envision and envisioned in issuing that order.

7                    Obviously we're dealing with greater magnitudes

8    than I had appreciated at the time, but I'm still of the view

9    that the respective cases can be presented in three days on

10   each side.

11                   Now, my court day would be to start promptly at

12   9:00 in the morning, go through until roughly noon, the noon

13   hour, and start back up at 1:30, and go through until

14   five o'clock depending on where we are with a witness or an

15   issue.  We take a morning break of approximately 15 to

16   20 minutes and an afternoon break of about the same, both

17   midafternoon and midmorning.

18                   That's the schedule I normally envision.  If

19   someone has a witness or an issue that requires or at least

20   would invite some accommodation to extend an hour or close

21   down a little early, perhaps even start earlier the next day

22   or go later the next evening, that's acceptable to me.  We'll

23   work with it as we go through.

24                   We have obviously some manpower issues in the

25   building, so it's difficult to go -- you know, on the outside,

1    say, 5:30.  I've gone as late as 6:00 recently with pandemic-

2    related limitations, but I prefer not to do that.

3                 That's my view of our schedule.  If anyone has

4    any questions about that, you're welcome to raise them at any

5    time.

6                 MR. POCKER:  Your Honor, the one follow-up

7    question I would have with respect to that is we anticipate

8    that we might not need three days for the presentation of

9    Oracle's evidence.  If that is the case, and there's

10   additional time left over, is the Court structuring this like

11   a trial proceeding where we might be able to use that in

12   rebuttal or --

13                THE COURT:  Yes.  I would allow rebuttal time

14   based on time which wasn't used out of the three days, and I

15   would accommodate some surrebuttal if that be necessary, and

16   obviously because that would not be easily anticipated.  It

17   may require some greater time, but, I'll work with counsel.

18                I will tell you that I don't have any other

19   matters scheduled these two weeks.  I'm hopeful, and my view

20   has been and remains, that three days on each side should have

21   been adequate to cover the issues here, but I've learned from

22   this case before that it's a bumpy road.

23                MR. VANDEVELDE:  Your Honor -- and that

24   makes perfect sense to us.  I just have one clarifying

25   question, which is that the three days, do the parties'

1    cross-examination count towards that three days?  We assumed

2    so, but I just wanted to clarify.

3                    THE COURT:  Yes, they will.  And what I'm saying

4    is I'm flexible, but I don't want to see needless excesses.

5                    MR. VANDEVELDE:  Got it.  Thank you, your Honor.

6                    THE COURT:  All right.

7                    MR. POCKER:  All right, your Honor.  At this

8    point, I would be presenting the opening statement on behalf

9    of Oracle -- and also removing the plastic, and is it

10   acceptable to place this plastic on?

11                   THE COURT:  Yes.

12                   MR. POCKER:  And I apologize for the noise.

13                   Thank you, your Honor.

14                   In addition, we've prepared, and I think the

15   Rimini Street lawyers have as well, slide presentations to

16   accompany our opening statements, and I'd like to provide a

17   copy of those to the Court if the Court is willing to accept

18   that.

19                   THE COURT:  Yes, please.

20                   MR. POCKER:  Well, good morning, your Honor.

21                   And while I realize that the current proceeding

22   is not a trial, and an opening statement may be a bit of an

23   aberration, I think they're useful in this particular sense.

24                   This case has been around a long, long time, and

25   where we're at in the proceedings now, of course, involves

1   the injunction issued by the Court initially in 2016,

2   appealed, revised slightly, and now back before this Court,

3   entered in November of 2018.

4           That's why we're here in the larger sense, but

5   more specifically, and what I'll be addressing in my opening,

6   is a little tour of the evidence beyond that of the experts

7   with a goal toward showing the Court some of the areas within

8   the proceedings to date, and with the voluminous paper and

9   electronic images that are exhibits in this case, that there

10  are some crucial facts that will assist the Court in its role

11  here.

12          So why are we here?  We're here because there's

13  an injunction, and instead of analyzing the lengthy pages of

14  the injunction, we've summarized in our first slide the six

15  main areas that are impacted by the provisions of the

16  injunction that we're here to adjudicate with respect to

17  Rimini's conduct.

18          We have paragraph 5 which quite simply provides

19  that,

20          "Rimini Street shall not use PeopleSoft

21      software or documentation on any computer systems

22      other than on the Client's computer systems."

23          This was litigated six years ago.  It's the law

24  of the case, and it's a provision of the injunction.

25          Paragraphs 4 and 6 are before the Court today

1    because Rimini is prohibited from using a Client's PeopleSoft

2    environment to support or troubleshoot for any other client.

3              Paragraph 6 is also implicated with respect to

4    another of the violations.  "Rimini is not allowed to use a

5    Client's PeopleSoft environment to develop or test software

6    updates or modifications for any other Client.

7              And Rimini, in paragraph 5, is prohibited from

8    preparing derivative works from PeopleSoft software on any

9    computer system other than the Client's computer systems.

10             Paragraph 8 implicates J.D. Edwards copyrights

11   at issue in this case, and that provision provides that Rimini

12   is not permitted to copy J.D. Edwards software source code,

13   and we'll discuss that in detail in a little bit.

14             And finally, Rimini is prohibited under the

15   injunction, paragraph 15, from reproducing the Oracle database

16   software.

17             Now, all of these provisions are clear,

18   unambiguous, and have been litigated all the way through the

19   appellate courts, so there should be no doubt as to what they

20   mean and how they should be applied.

21             What we're here to do today, and our evidence

22   will accomplish this goal, is to demonstrate that Rimini is in

23   contempt of the injunction, and as to slide 3 here, we check

24   off the three things that Rimini -- or that Oracle is required

25   to do and will do, on the basis of the evidence presented.

1            First, we'll show that Rimini violated the

2    injunction, and we'll do that with respect to the eight

3    specified violations that the Court has not already

4    adjudicated.

5            Secondly, we will demonstrate from the evidence

6    that Rimini's violations are not substan -- indicate they did

7    not substantially comply with the injunction.

8            And, lastly, we will demonstrate that Rimini's

9    violations, because they're not based on any sort of good

10   faith and reasonable interpretation of the injunction, warrant

11   further action and sanctions, i.e., they should be held in

12   contempt and there should be a remedy.

13           The one thing that Rimini will not be able to

14   do, although you'll hear all kinds of explanations for what

15   went on with respect to these ten identified violations, they

16   will not be able to demonstrate that they took all reasonable

17   steps to comply with the injunction.

18           Now, how will we do this?

19           Primarily, your Honor, you'll be hearing the

20   evidence from our expert witness Barbara Frederiksen-Cross.

21   Her testimony will be detailed, it will be technical, it will

22   be thorough, and I'm not going to go into it here again in our

23   opening, but, what it will demonstrate is the who, what,

24   where, and when of the activity that's been specified in those

25   ten violations.

1              It will go beyond that to some extent in that it

2    will show you how the processes are working in Rimini based

3    upon the exposure that we've been given to their evidence, and

4    it's quite limited in this proceeding, but she'll be analyzing

5    quite a bit of the activity there, and be available, as the

6    Court clearly contemplated, for questioning and explanations

7    as to any technical issue you might have.

8              In addition to that, there's other evidence in

9    this case, and that's what I wanted to highlight a little bit

10   in the opening.  Much of it is communications, documents,

11   activities on the part of Rimini Street employees and

12   officials.

13             I'll highlight a handful of exhibits that

14   demonstrate some very important facts about the task that the

15   Court is about to face.  They might not necessarily impact the

16   individual technical activity of Rimini Street, but they go to

17   this broader issue, which is Rimini Street has claimed that so

18   little of what occurred in this case, or is complained of,

19   occurred, and that almost all of it was not Rimini's fault, it

20   was isolated incidents created by the clients, whatever the

21   explanation might be.

22             We're going to demonstrate that that's not

23   really true, and that, under the circumstances, the Court is

24   entitled to take into consideration Rimini's activities, its

25   attitudes toward the injunction, its communications regarding

 1   the injunction, and its explanations about why it took certain

 2   actions which are revealed by internal e-mail versus what

 3   they've told the Court and what they've told the public.

 4              So that's where we're going with respect to the

 5   objectives.  But despite the injunction -- and the reason

 6   we're here is that Rimini continues to engage in a pattern and

 7   practice of prohibited conduct.  In many ways it's here we go

 8   again.

 9              On slide 4 we've set out some of the

10   pronouncements of the Court at various times in this

11   litigation including three excerpts from the February 2014

12   order on our motion for summary judgment, and these excerpts

13   clearly demonstrate what the Court found with respect to what

14   activity Rimini Street could and could not engage in with

15   respect to the license that was at issue in this litigation.

16              It's clear, it's a matter of record.  That's

17   what Rimini was supposed to be complying with, and the

18   behavior should have been in conjunction with the judgments of

19   this Court the whole time.

20              So, what is Rimini's real practice today?

21              Well, we're going to demonstrate -- in fact, I

22   think it's already been demonstrated in the Court's prior

23   finding -- that Rimini continues to store PeopleSoft software

24   and documentation on its systems despite the earlier rulings

25   which are reflected not only in the Court's summary judgment

1    order, but in the injunction as well.

2                    Rimini continues to cross-use, and they treat

3    PeopleSoft environments as if they're generic environments and

4    using one Client's software environment to do prohibited

5    activity for other clients.  It's still going on.

6                    And, lastly, Rimini continues to make copies of

7    the J.D. Edwards source code.

8                    Now, they have an ostensible explanation for

9    that that sprang out of nowhere, and we'll discuss that in

10   detail in a little bit, but they have never previously

11   challenged the meaning of "source code" as it is applied in

12   the injunction at any stage of the proceedings we've been

13   through.

14                   And that's an important thing to remember, your

15   Honor, in deciding whether or not there's good faith in making

16   the argument that, oh, we didn't understand exactly what

17   source code meant in the injunction, or it has a meaning other

18   than that which is being applied in these proceedings.

19                   So contrary to its assertions the evidence is

20   going to show that Rimini has not substantially complied with

21   the injunction.  Their argument is, "If you find violations,

22   they're all accidental.  We tried.  We just couldn't control

23   this stuff.  We're in substantial compliance."  Absolutely

24   not.

25                   And what demonstrates that, and the categories

1     of evidence that are going to assist you in that ruling, first

2     of all, Rimini did not take all reasonable steps to comply

3     with the injunction.  In fact it did virtually nothing, and

4     that's just a matter of what the evidence shows.

5               We were only permitted limited discovery in this

6     particular proceeding, but the limited discovery has already

7     provided and established multiple violations just based on

8     what little we did, and ten of those, of course, are before

9     this Court for adjudication.

10              At this evidentiary hearing Oracle will

11    establish additional violations of paragraph 5, the cross-use.

12    And this is for the purpose of showing that there's a pattern

13    of this.  There's a pattern of impertinence, resistance to the

14    terms of the injunction, and it goes straight to Rimini's

15    consistent disregard for court orders.

16              Nothing stopped there, and the Court in its

17    prior orders noted that because Rimini has made this assertion

18    that this doesn't happen very often, that our expert and our

19    evidence can certainly highlight the fact that it is more

20    common than they proclaim.

21              And this is perfectly fine, just as under

22    Rule 404 evidence, we would be able to show a pattern of

23    conduct or a lack of mistake on Rimini's part.  So you'll hear

24    a little bit more of that.  It won't be overdone, but we are

25    going to present evidence in that area.

1             We're also going to examine, and we ask the

2    Court to consider Rimini's adherence, or compliance, with what

3    it calls its Acceptable Use Policy which -- it's in evidence.

4    It's a thick publication which allegedly is distributed to all

5    the Rimini employees and should govern their conduct with

6    respect to a lot of different subject matters, most notably

7    how they handle third-party intellectual property.

8             You will see from the very activity that's

9    highlighted in these violations, and the evidence of the

10   communications amongst Rimini Street employees, that this

11   is a policy that is akin to -- well, its lofty, but it's a

12   Potemkin village as far as an example of what really occurs

13   within the ethical structure of Rimini.  We suspect they'll

14   emphasize it quite a bit, but we would ask that the Court pay

15   close attention to the evidence of does anybody ever really

16   follow it or is it window dressing.

17             Despite claiming that Oracle has unearthed only

18   a small number of violations, Rimini absolutely refused in the

19   discovery process to provide complete discovery into the

20   alleged 12,000 updates that it supposedly has done in this

21   period.

22             And our reason for seeking that, and obviously

23   Rimini's reason for resisting it, is if we found this many

24   violations in the limited discovery we have now, what might

25   there be in the other 12,000 updates that were extended and

1    sent around, and the problem is we don't know.

2              Yet they use it as a justification for arguing

3    that what Oracle has shown is *de minimis* and not worthy of

4    contempt, and that's an important consideration there.  If

5    everything is going so great at Rimini, and they're so in

6    compliance, why did they resist any evidence about these

7    12,000 other updates they claim comply with the injunction?

8              Now, recognizing that Rimini Street -- and the

9    Court will remember the very contentious litigation leading up

10   to the issuance of the injunction.  It was quite heated in

11   both directions, and Rimini Street resisted it on a number of

12   grounds, including the claim that entry of the injunction

13   could devastate its business, if not put them out of business.

14             And so they were very, very resistant all

15   through the briefing process.  They appealed it to the Ninth

16   Circuit, as is their right, but when it was finally entered in

17   November 2018, Oracle understandably had some doubts, given

18   Rimini Street's attitude about the injunction, whether there

19   would be compliance.

20             So in an effort to informally kind of head off

21   where we are here today, in January of 2019, Oracle's

22   attorneys communicated with Rimini Street, and asked for

23   confirmation from Rimini that their support practices were in

24   compliance with the injunction.  Rimini refused to respond.

25             We approached them again in conjunction with two

1   other issues.  We wanted to discuss with them a process by

2   which we could preserve and maybe even escrow materials

3   related to that support process so that we could determine

4   whether or not they had made the changes and that all was

5   going well.  They did not respond affirmatively to that as

6   well.

7            Thirdly, we asked -- and this should have been

8   just a routine matter, we've done it in this litigation

9   before.  There was a protective order in Rimini II, the case

10  still pending before your Honor, which we wished to -- we

11  wished to allow the materials gathered in Rimini II under the

12  protective order to be used in Rimini I, this case here, in

13  the event that there was any sort of injunction enforcement.

14            Simple process.  We have done it in the other

15  direction with respect to the evidence gathered in the two

16  cases.  Rimini opposed it.

17            As a result Oracle went to court seeking

18  discovery in preparation for ultimately seeking contempt

19  against Rimini Street as the evidence so warranted.

20            Rimini Street resisted.  They resisted on all

21  kinds of grounds, everything from we couldn't do it because

22  Rimini II was still pending to, oh, it would put them out of

23  business, it was overreach, we had no basis.

24            But ultimately the Court granted us the option

25  of moving forward with discovery with a view toward evaluating

1    whether or not Rimini Street was in contempt.

2              Well, that proceeding just took it one step

3    further.  We had lengthy discovery, but most of it involved

4    hearings with Magistrate Judge Ferenbach fighting over whether

5    Rimini could produce things.

6              They resisted producing documents.  They

7    resisted depositions.  They resisted witnesses, and in the end

8    their attitude was clear, "We don't want you to know what it

9    is we're doing."

10             Well, let's talk specifically about some other

11   facts that demonstrate that Rimini is certainly not in

12   substantial compliance.  Rimini has made only superficial

13   efforts to comply with that injunction.

14             And as to slide 8 -- if Mr. Spalding can put

15   that up there -- the injunction has always been a business

16   problem for Rimini because if they comply with it, they're

17   unable to operate that business model based on infringing

18   Oracle's copyrights that really were the basis of that

19   company, and the Court's adjudicated -- or has already held

20   that in several of the orders in this case.

21             If they actually complied with the injunction,

22   it would be problematic for them, so they take a number of

23   avenues to avoid the horrific impact that they appear to be

24   facing.

25             They know for one thing that if they change

1    their process their process is going to be more expensive.  It

2    may not be as profitable.  They can't continue to charge half

3    of what Oracle charges.  There's some concern there obviously

4    with respect -- as a motivation for why they don't want to

5    comply with the injunction.

6              They also were in the process of raising money

7    after the injunction was entered, talking to investors,

8    seeking further investment in the company.  It doesn't look

9    good if an injunction is in effect which embraces restrictions

10   on so many of its business processes.

11             So there were -- their approach to that in their

12   press releases constantly misstates the status of the legal

13   proceedings and the impact of the injunction.  They need to

14   downplay that impact in order to do business as usual.

15             What we have displayed on this particular slide

16   is a couple of exhibits that the Court should pay close

17   attention to when thinking about the motivations of Rimini

18   Street, the impact of their activities, and why they're not

19   doing what they should be doing and doing what they are.

20             OREX Exhibit 16, which is an excerpt that is

21   quoted at the top left corner of page 8 of the slides, this is

22   in reference to the March 31st, 2021 order that this Court

23   entered.  And maybe it's appropriate that it was issued on

24   April Fools' Day, but the Rimini press release claimed:

25                  "The Court rules in Rimini Street's favor on

1        key matters, denies Oracle's motions and cites

2        'common sense' and 'absurd result' in denying

3        Oracle's claim."

4                Now, they did not mention that it was facing

5   contempt for violating the injunction.

6                So, what was the order really all about in

7   reality?  The Court ruled that Rimini violated the injunction.

8                But in the spin machine at Rimini they decided,

9   no, that's not really what happened, and that was how they

10  interfaced with the public.

11                Then during a May 10th, 2021 earnings call,

12  where Rimini Street's CEO, Seth Ravin, was explaining the

13  financial impact to the company and its activities, he decides

14  to tell the public that the Court has.

15        "...affirmed that there has been no finding

16        of infringement by the court of the company's

17        enterprise software support process 2.0 or automation

18        framework, AFW tools."

19                Now, that's a mouthful, and it's contained in

20  OREX Exhibit 0093.

21                But in reality what happened is that when this

22  Court entered its order on March 31st of 2021, it made

23  specific reference to the fact that in the other case, in

24  Rimini II, this Court has held that Rimini has infringed four

25  of Oracle's copyrights while following its new process 2.0

 1    support services; so clearly a blatant lie to the public

 2    designed to reassure its investors.

 3                There's a similar statement down at the lower

 4    left corner of page 8.  It comes also from Exhibit 93.  It

 5    characterizes this hearing by basically saying that this

 6    proceeding, the injunction matter.

 7                "...is complete, and that the evidentiary

 8         hearing was set solely to address Rimini's motion for

 9         reconsideration."

10                Well, there is no motion for reconsideration

11    pending before the Court here, and we've quoted in the bottom

12    right corner the actual order that set this hearing and what

13    it's all about, again, an effort on Rimini Street to downplay

14    the impact of the injunction, downplay its problems that it's

15    encountered in its claims in Rimini II, and indicative of an

16    attitude and a posture that is, quite ironically, contemptuous

17    of the Court's orders.

18                Now, there's a rare instance of honesty in some

19    of the -- with respect to the effects of the injunction in a

20    couple of important exhibits, and I wanted to highlight those

21    for the Court's consideration as the case proceeds.  Those are

22    exhibits 66 and 70, and they're important because they

23    demonstrate that Rimini acknowledged the injunction -- that

24    the injunction impacted its JDE support practices.

25                Now, what are these documents?  Exhibit 66

1    consists of a presentation that was made to investors, and

2    we've highlighted -- we've excerpted and highlighted a rare

3    moment of candor where Rimini actually admits, back in

4    February of 2017, that,

5              "The injunction," if it in fact is

6        implemented, "would limit the process of Rimini's

7        currently offered J.D. Edwards support services."

8              Right there an acknowledgment that if it follows

9    the injunction, there could be a bad impact.

10             Now, the other exhibit at the bottom, Exhibit

11   70, is taken from a lengthier document, JDE World Software

12   Overview, which is kind of a guide for people at Rimini

13   Street, and others who might want to make use of the JDE

14   Edwards software.

15             At the first part of the excerpt there's a

16   reference that -- or Rimini is clearly referencing Oracle

17   software and help information there, but the bottom two

18   paragraphs are interesting, and the one that's highlighted in

19   yellow says,

20             "We are unable to do development in JDE World

21        Software while the injunction is in place.  We are

22        able to work on functional and data related cases

23        while the injunction is in place."

24             And the last part is -- the next sentence is,

25             "You would not be able to debug programs as

1        this will bring up the source code."

2              Clearly they're acknowledging that access to

3   source code, based on the Court's ruling in the injunction, is

4   not an option.

5              And it's interesting that the yellow highlighted

6   portion, second sentence, says, yeah, but there's still

7   certain support we can give with respect to J.D. Edwards, but

8   it's a clear acknowledgment that the injunction says "Thou

9   shalt not access source code."

10             Now, despite that honesty, and despite this

11  belief that what we're doing we will no longer be able to

12  completely do, Rimini made absolutely no changes to its J.D.

13  Edwards support practices.

14             And on slide 10 there's reference to another

15  exhibit.  This one is early in the presentation.  It's OREX,

16  O-R-E-X, 2, and this it is an e-mail dated November 10th which

17  is a couple of days after the entry of the injunction -- or

18  actually the lifting of the stay and the effective date of the

19  injunction.

20             And it's from Ray Grigsby who the Court may

21  remember from trial six or seven years ago.  He's reaching out

22  to all the JDE engineers that are in his employ, and he sends

23  an e-mail.

24             The very first sentence says,

25             "We do not believe that we need to make any

—25—

1           changes to current support processes for J.D.

2           Edwards, to comply with the injunction."

3                    Okay.  Well, I guess the problems highlighted in

4     the other exhibits weren't really a problem for them, or they

5     deliberately knew that to comply with the injunction would not

6     be in their particular interest.

7                    Exhibit 14, which is on slide 11, is also pretty

8     important because it applies to the PeopleSoft practices.

9                    Now, a lot of injunction provisions impact the

10    provision of PeopleSoft and its support.  This particular

11    e-mail was similar to that Mr. Grigsby sent in that it was

12    from Jim Benge to the people working at Rimini in the

13    PeopleSoft area, and although it is -- it kind of acknowledges

14    it's going to have to look at its practices, it's going to

15    have to decide what impact injunction has, but the only two

16    things they do, and it's highlighted in yellow, is he claims

17    that,

18           "As a part our injunction compliance plan,

19       the PeopleSoft team will immediately stop using two"

20       automating -- "automation utilities until further

21       notice."

22                    And he references the Code Analyzer and the Dev

23    Review tool.

24           "These are the only two changes to our

25       current PeopleSoft support service, which we are

1          implementing out of an abundance of caution...."

2                    And it's interesting here as well, your Honor,

3     you'll recall, and it's a matter of record, that Rimini

4     resisted the entry of the injunction because of the changes it

5     would have to make, the impact on its business, and all the --

6     a parade of horribles.

7                    And then, when the injunction is actually put

8     into place, the first thing they do is say, "We're not

9     changing much of anything."

10                    So clearly they're not taking the injunction

11    seriously, they're not applying it by its plain language, and

12    it's evidence that further explains why all these various

13    violations of the injunction have occurred.

14                    Now, in slide 12 you'll note that Rimini Street

15    has also interposed its alleged efforts to remind clients of

16    what they should do with copyrighted files that they're --

17    they've sent to Rimini Street, and they shouldn't send them,

18    and, oh, you know, "We want to make sure our clients

19    understand what our policies are."

20                    They believe that's helpful in demonstrating

21    substantial compliance with the injunction.  But the evidence

22    indicates otherwise because, if you look closely at what's

23    been provided, we find that Rimini, despite its claims that it

24    has reminded clients not to send copyrighted files, has not

25    identified a single reminder that was sent to any of those

1     Rimini customers who are implicated in violation number 1.

2                    You'll recall that Rimini's explanation was, "We

3     don't control what our clients send here.  Anything sent to

4     us," you know, "came from the clients."

5                    And you have at the left side here three

6     representations that have been made by Rimini in its pleadings

7     with respect to how thorough and how comprehensive these

8     warnings are to the clients not to send copyrighted material.

9                    But on the right the number zero reflects the

10    fact that within all this discovery that's been provided and

11    all the exhibits there are no reminders or communications with

12    the actual companies that they claim sent this material to

13    them.

14                    Again, the evidence reveals a lot, but what's

15    not in evidence reveals even more, and instead of modifying

16    its practices or defending them, Rimini's response to the

17    injunction was actually to make it more difficult for anybody

18    to determine what they were doing.

19                    And as slide 13 demonstrates -- and you'll

20    remember I referenced Barbara Frederiksen-Cross earlier in the

21    argument.  She is our expert, our technical expert, with

22    respect to Rimini's activities.

23                    She has commented in quite strong words, and

24    this will be part of her testimony as well, upon Rimini's

25    recordkeeping practices because it's obvious that what's going

1    on here is Rimini's resistance to scrutiny, Rimini's

2    resistance to being monitored, to being accountable under the

3    injunction is only aided by the fact that they have frankly

4    not developed much of a recordkeeping system with respect to

5    keeping track of the changes it makes, the modifications it

6    makes, and what happens with them.

7              She goes so far in her report -- and this will

8    be reflected in her testimony, too -- to state that in her

9    over 20 years as a forensic analyst, "I have not seen a poorer

10   example of recordkeeping for complex software development than

11   that presented by Rimini."

12             Now, this evidence is important in two regards.

13             One, the inference can be that Rimini's

14   practices are deliberately opaque, deliberately sloppy,

15   deliberately not very professional in order to make it hard to

16   determine what it's actually doing and disguise the violations

17   of the injunction.

18             Second of all, it just demonstrates how

19   difficult, on a limited discovery plate, it is to go forward

20   and to realistically figure out what did they send and to

21   whom, and that's very important in this case, given the

22   importance of the cross-use issue and the wide array of

23   activities that we've uncovered.

24             Now, the evidence also demonstrates that Rimini

25   does not substantially comply with the injunction.  Even if

```
 1   there's violations, they'll argue that they're in substantial

 2   compliance.   That is ridiculous.

 3               Their resistance to scrutiny, as I mentioned

 4   before, carried all the way into the discovery process in this

 5   particular case, and what we have in slide number 15 -- and

 6   it's in the briefing already before the Court but I think it

 7   bears revisiting in this particular context -- Rimini was able

 8   to persuade Magistrate Judge Ferenbach that discovery with

 9   respect to potential violations of the injunction should be

10   extremely limited.

11               And one of the benchmarks and a lot of the

12   discussion that was had referenced the amount of discovery

13   that was necessary in Rimini I and Rimini II in order to

14   determine what Rimini Street was doing.

15               And if you see this chart, it's a comparison of

16   the volume of discovery that was permitted and conducted in

17   Rimini I, the volume that was conducted in Rimini II, and then

18   the post-injunction Rimini I proceedings.

19               And you'll see that the number of custodians was

20   limited to 10 by Judge Fernbach, very few requests for

21   production of documents, 15, requests for admissions were down

22   to 10.   More importantly, interrogatories were limited to

23   five, and only one party deposition was permitted.   We were

24   only permitted to serve five subpoenas for document production

25   of testimony to nonparties.
```

1              And when you look at the volume of discovery

2      that was necessary to generate the record in Rimini I and

3      Rimini II, it's just a small fraction.

4              And I realize, and I was involved in the -- back

5      in the discussion when Magistrate Judge Ferenbach was looking

6      at it also from the standpoint of you don't need much

7      discovery in order to prove they violated, and if you have a

8      violation, then you can revisit all this or take it on up with

9      Judge Hicks.

10              So, that was his take on it.  He bought Rimini's

11      argument that we didn't need enough discovery in order to

12      probe their practices.

13              Now, why is that significant?  It's significant

14      not only to demonstrate Rimini Street's continued effort to

15      keep secret what they're doing over there and not be subject

16      to scrutiny by this Court, by Oracle, or by anybody else, but

17      it also shows how remarkable that on the limited discovery

18      that we were permitted to do we determined -- and this Court

19      will determine as well -- that there were at least these 10

20      violations of the injunction based on such a limited record.

21              So if Rimini Street is substantially

22      complying -- and now we'll go to slide 16 -- why are we here

23      to discuss 10 violations which are identified from such

24      limited discovery?

25              Our position is this is the tip of the iceberg.

1    But the Court has limited its discussion to these, so we'll go

2    about proving them.  You've already found two of them, and

3    below are the eight that will additionally be proved by

4    Oracle's evidence, and, ironically, from Rimini Street's as

5    well.

6              And most of them involve cross-use, access to

7    source code, as well as the creation of derivative works, all

8    of the subjects that were prohibited -- all the activity, I

9    should say, that was prohibited by the injunction and all of

10   them subjects of the earlier litigation.

11             The breadth, depth, and substantive nature of

12   these 10 separate violations confirms this is a pattern, and

13   Rimini has a pattern of violating this particular injunction,

14   and, consequently, there's no substantial compliance.

15             They're already -- if you look at Exhibit -- or,

16   I'm sorry, page 17, Rimini Street has already adjudicated it

17   as being in violation of the prohibition about keeping Oracle

18   software and Oracle copyrighted material on its systems, and

19   you'll hear more from Barbara Frederiksen-Cross on this.

20             This is no minor, "Oh, my God, we just forgot,"

21   or "We accidently had an Oracle pamphlet on our website," or

22   "We had accidently something with an Oracle copyright."  This

23   is extensive, and she'll describe the volume of material

24   that's found on the site and their apparent lack of

25   explanation for why it would be there.

1          And some of it is so darn obvious.  It has

2    Oracle copyright notices on it, and yet it's on the system.

3          And Rimini's explanation, "Oh, it's isolated,

4    there aren't very many of them."  Well, are you checking?  Are

5    you looking?  How could something with an Oracle copyright

6    notice get by your legal eagles who are trying to keep you in

7    compliance with the injunction?

8          So it's evidence, again, just from the fact that

9    they're there, that Rimini Street doesn't take its obligation

10   seriously at all.

11         Likewise, there's already an adjudication by the

12   Court of a cross-use violation with respect to Matheson

13   Trucking.  That one isn't up for debate anymore.  It's only a

14   question at this point, does the Court find them in contempt

15   for this violation, and we submit that you should, and then

16   what remedy should there be.

17         Now, the Matheson Trucking violation is closely

18   connected with some of the other violations that will still be

19   adjudicated later with respect to other Rimini clients, and

20   you're going to see it pretty much is the same activity,

21   different day.

22         In fact the evidence is going to show, and the

23   experts will talk about this, and you'll see the e-mail trails

24   as well from Rimini Street, that there was a period of five

25   business days after the injunction is entered in which there

1    were at least three instances of cross-use, and all of this

2    cross-use involves the use of the City of Eugene environment.

3              And it's no different than what this Court sat

4    through, and the jury determined way back when, that you can't

5    use one client's environment to assist in working on the other

6    clients of Rimini Street.  It's cross-use.  It's blatant

7    cross-use.

8              And not only has it been already determined here

9    with Matheson Trucking, but you'll see that the same conduct

10   occurred with respect to the other named clients.

11             So where does this all lead us?  I mean, what --

12   exactly what is the purpose of all of this?

13             Obviously the purpose is for the evidence to

14   come out and for the Court to have a better evidentiary record

15   to decide these issues, but on the basis of the violations

16   that already have been determined, and the eight that we're

17   about to, Rimini must be held in contempt.

18             Now, why do we go to that extreme?

19             And on slide 20, we've listed seven specific

20   things that are going to be demonstrated by the evidence

21   in this case all of which are worthy of contempt.

22             We know that Rimini stored access and used

23   PeopleSoft files and documentation on its computer systems.

24   You've already found that.

25             Rimini used the City of Eugene's environment as

1    the functional equivalent of a generic environment, and that's

2    exactly the kind of conduct that led to Rimini I and is

3    embraced by the prohibitions in the injunction.  It became the

4    go-to place for cross-use, the City of Eugene, Oregon.

5              It's unquestioned that Rimini copied Oracle's

6    source code; can't do that.  That's a contemptible violation.

7              Rimini created its one version of files for all

8    clients, and you'll see that in the discussion -- or hear that

9    in the discussion of the Rockefeller Group and the Home

10   Shopping Network and the updates that were prepared for them.

11   It's the same old process of cross-use on a mass scale.

12             Rimini even maintained an Oracle database file

13   on its system.  That's clearly -- paragraph 15 is very clear

14   about that being a prohibited offense.

15             And lastly it maintained derivative works.

16   You'll hear about the Easter Seals derivative work and some

17   others that are on the Rimini Street system.

18             So it's the variety of these violations, the

19   differences, and how they correspond to what's already been

20   adjudicated, that makes this situation in which it's not a

21   bunch of accidental events.  This is contemptible conduct and

22   it's demonstrated in a number of areas.

23             Now, there are important facts that make it even

24   worse than simply contemptible, they make it sanctionable.

25   With respect to the PeopleSoft files and documentation on

1    Rimini's system, those Oracle copyrighted materials contain

2    code and substantial portions of Oracle code, and they're on

3    Rimini's system.  Again, that was one of the big violations

4    that led to the original litigation.

5              Not only that, after Oracle -- after they

6    receive Oracle code, even if it's from their clients, Rimini

7    did not instruct those clients not to send Oracle code.  As

8    I've mentioned before, there's no communications back to them

9    saying, "Oh, yeah, don't do this again; don't do it ever."

10             There's no evidence of notification being sent

11   to what is called security@riministreet.com, and in their

12   presentation and in some of the policies that are already in

13   evidence, you'll see that employees who receive third-party

14   software or copyrighted materials from clients are supposed to

15   report that incident to Rimini at security@riministreet.com.

16   There's no evidence that that was done in connection with any

17   of these supposed accidental receipts of copyrighted material.

18             Not only that, after receiving the code from the

19   clients, Ms. Frederiksen-Cross has determined they accessed

20   some of this code.  They didn't -- even if they realize it's

21   Oracle stuff, and they could have sent it back, they could

22   have done something, they actually made use of it.  They

23   accessed and it made use of it.  In fact in some instances

24   they used it and accessed it months after it was actually

25   received.

1            Now, the other interesting thing is that these

2    instances of Oracle software and copyrighted material were

3    forwarded to other people within Rimini.  They weren't

4    isolated.  Some of them went all the way up to senior

5    executives.

6            And there's absolutely no demonstration -- and

7    Ms. Frederiksen-Cross will testify about her observations --

8    that any of this stuff was quarantined, and that's been a big

9    thing Rimini Street has insisted upon in its pleadings that,

10   well, you know, it got here, and it was supposed to be

11   quarantined, not used; it's exactly the opposite.

12           And none of these are isolated instances.  They

13   all appear to be happening for the same reason and with the

14   same general disregard for Oracle's software.

15           On to slide 22, please.

16           We referenced it before as an instance of

17   cross-use, but City of Eugene environment has been used as the

18   functional equivalent of the generic environment.

19           Well, why is that so wrong?  Well, in addition

20   to being a violation of the injunction and contrary to the

21   rulings in the original Rimini I case, there are some

22   aggravating factors here.

23           It certainly is evidence of lack of good faith

24   on Rimini's part in complying with the injunction.  Nothing

25   was more clearly adjudicated earlier in this case, at the

1    Ninth Circuit, at all levels, than cross-use is forbidden.  So

2    they have no good faith belief that they could do this under

3    any interpretation of the injunction, the licenses, or the

4    prior rulings of the Court.

5              They also show -- and this is an interesting one

6    because it will require the Court to actually hear the

7    testimony and look at the e-mail communications, but when

8    Rimini realized through the briefing in this case that it had

9    engaged in cross-use with respect to a couple of these tax

10   updates, they went back and they have conjured a pretext, and

11   it's a notably inconsistent and implausible explanation.

12             But they now claim that every one of the people,

13   the clients who received the update in question, the tax

14   update, was ultimately -- it was believed by them mistakenly

15   to require that update.  So they prepared it in City of

16   Eugene, the City of Eugene was going to use it, so were the

17   other clients, and yet that is demonstrably not the process

18   that was used in this particular case.

19             And common sense would say -- one of the tax

20   updates deals with modifications that need to be made for

21   employees and contractors who are living in the Virgin

22   Islands.  Now, common sense says the City of Eugene would

23   probably not need to have its software updated to deal with

24   employees in the Virgin Islands.

25             Yet, if you look at Rimini Street's conjured

 1    explanation, it's, "Well, you know, we did it -- we started in

 2    City of Eugene because they were going to need this."

 3    Clearly, they did not.

 4                    What they did -- and it's amply demonstrated in

 5    the briefing already and in the e-mail chains that you'll see,

 6    is that there was -- were development -- was development and

 7    testing of updates that went to Smead, Matheson Trucking,

 8    which we've already found, Spherion, and I believe one other

 9    client, that were based upon -- they were completely tested

10    and developed in City of Eugene's environment.

11                    Classic cross-use supported by the evidence,

12    but, more importantly, it demonstrates another reason why,

13    unless Rimini Street is found in contempt and sanctioned,

14    they'll continue to do things like manufacturing explanations

15    after the fact in order to try to influence this Court.

16                    They don't respect these rulings, and everything

17    I've outlined about their behavior in the litigation and with

18    respect to the public and with respect to what they say about

19    the injunction shows that.

20                    The Oracle source code issue -- and that would

21    be slide 22 -- pretty much -- Rimini pretty much admits that

22    they access J.D. Edwards source code.

23                    What they don't admit is that to do so is a

24    violation of the injunction, and they have this new-fangled

25    explanation, which we never saw anywhere until after the

1   injunction was in place, appealed, and pretty much set in

2   stone, that when the Court used the term "source code," it

3   meant closed code versus open code.

4                And you'll hear some testimony from some guy --

5   it's Stephen Lanchak, or whatever, who claims that he's the

6   expert on industry understanding and all this.

7                And, first, you should evaluate whether any one

8   person can really speak for an entire industry like the

9   software world, but that's a separate point.

10               But his explanation is that there is this

11  distinction between these two types of codes.

12               Their other expert, Mr. Astrachan, he's not

13  really gotten that far, but he sees it as possibly an issue.

14  He's saying, "Oh, I don't know what code is meant in the

15  injunction."

16               But the bottom line about all of this is, if

17  this were a real issues, it would have been brought up,

18  perhaps, in the original trial when the original determination

19  was made that they're improperly accessing J.D. Edwards

20  software and source code.  But, no, we heard nothing about

21  that at trial.

22               And then, when you run up to the injunction --

23  and this Court knows, and those of us who have been here a

24  while know every conceivable challenge to that injunction was

25  made.  Every argument was made.  It was vociferously

1    litigated.  But nowhere in all of that did anybody say, "Your

2    Honor, you can't enjoin us from accessing source code unless

3    what you're saying is closed code and not open code."

4                    It's never been litigated, and the reason it's

5    never been litigated, as you'll see from the evidence, is that

6    it's just this phony issue, this after-the-fact, conjured

7    explanation.  "Oh, this is why we're doing it.  This is why

8    we're violating the injunction, because we thought source code

9    meant this."  Who knew?  It's just so transparently a

10   smokescreen.

11                   And I would also keep in mind with respect to

12   that just the brazen -- well, brazen is the word, to suggest

13   to the Court that you don't know what you meant when the word

14   source code was used in the injunction.

15                   Under these circumstances, your Honor, it's just

16   further evidence that you have to filter everything that you

17   hear for Rimini's evidence with an eye toward their resistance

18   from the beginning about having an injunction, their

19   resistance to doing anything at their company to comply with

20   the injunction, their resistance to being even asked, well,

21   what are you doing now?  Does it comply?  Their resistance to

22   providing evidence so that we can determine whether they can

23   comply.

24                   And then this constant effort to come up with

25   explanations to show that black is really white, the sky is

1    cloudy rather than blue, it permeates this entire case.

2                 The technical stuff you'll hear from the

3    experts, it will be well beyond my area of expertise, but I

4    think it is important to continually filter what you hear,

5    through what we know already as a matter of fact.

6                 Slide 24 merely addresses another reason they

7    should be held in contempt, and that is this notion of

8    creating one version for all files.

9                 This was the practice that was at the heart of

10   the first Oracle-Rimini case.  You can't just develop it on

11   one client's software and then distribute it to all of your

12   other clients.  You have to use that software only for the

13   benefit of the client that has the license.

14                They try to say that they were in substantial

15   compliance with it.  They're not.  You'll see that with

16   respect to the wide dissemination of some of these updates

17   that are issue here.  This is no accident, this is a pattern.

18                And in slide 25 we talk about the Oracle

19   database file.  I think what's significant about this is not

20   only the paragraph in the injunction that said, "Thou shalt

21   not have Oracle database," but the guy who received it,

22   there's no evidence they told, the client, Don't send this to

23   us anymore."

24                There's no evidence that he was disciplined for

25   his failure to do so.  In fact our contention is based on the

1    evidence that he was not.

2                   There's no evidence that it was quarantined like

3    it's supposed to do under the Rimini Street policies, and it

4    was in clear violation of its acceptable use policy which

5    appears to be basically there for window dressing.

6                   Another basis for contempt which we've talked

7    about a little bit is this copying of J.D. Edwards source

8    code.  Their arguments about open versus closed,

9    notwithstanding, they just want to -- they want to continue to

10   do this, and that's the only reason they've come up with the

11   distinction now.

12                  But this is egregious.  It is so clear from the

13   injunction that they're not to do this, and when they do this,

14   they have essentially just readopted the corrupt business

15   model that was denounced in the first case.

16                  Now, what's really aggravating about it and why

17   it's sanctionable contempt are the following factors:

18                  Rimini never sought clarification from the

19   Court.  If it was really concerned, or had the opinion that

20   open and closed code -- there was a distinction, they would

21   have raised that earlier.  We've been through the litigation

22   aspect of it, but they would have sought some sort of

23   clarification.  What does source code mean?

24                  Instead, the first time we hear about it is when

25   there's a contempt motion, and they came up with this

distinction.  The timing is interesting.  It happened only in November 2018, which supports the view that it was conjured, that it's made up, it's not a real issue.  It's another effort just to derail the injunction.

And the other interesting thing, and there are exhibits to this effect, is that Rimini's open code/closed code distinction contradicts its own long-standing approach to how it worked with J.D. Edwards software.

And you can go back to the two exhibits I cited earlier where they talk about, "You know, if this injunction goes into effect, we're not going to be able to access code. We can do some J.D. Edwards work, but we're not going to be able to do that."

Everybody at the technical end knew that, but when it comes to trying to get out of the injunction, suddenly open and closed code is an issue.

That factor alone shows there's behavior here that is just calculated to not substantially comply, but to come up with an excuse for why you don't have to.

In fact this also reflects on Rimini's consistent contention that if they can't access JDE's source code that they will be unable to do their job.  They won't be able to do anything, it's designed to be modified by the purchasers and the licensees and all this.  And yet their own exhibits -- and we've pointed out a couple of them already --

1    say there are things you can do for your clients who have J.D.

2    Edwards software that don't require accessing the code.

3                And they even reference what they call an "over

4    the shoulder approach," which is, I guess, to get online and,

5    you know, basically have the client access the code and

6    remotely assist them somehow.

7                So this is nonsense about, "Oh, my God, it

8    couldn't mean this in the injunction.  The judge couldn't have

9    meant this because that would put us out of business."  No, it

10   won't.  It will just require you to not do the piece of work

11   that requires accessing the source code.

12               And really what this is, this entire argument

13   and how it will be baked into whatever appeal will occur, it's

14   all designed just to attack the validity of the injunction one

15   more time.  It's vague, it's not being interpreted

16   appropriately, whatever the argument will be here and on

17   appeal.

18               So it's just a disguised collateral attack, and

19   it reveals so much of what we know about what the evidence

20   will show.  You can really interpret Rimini's activities in no

21   other way then as a transparent attempt to not comply, ever,

22   with the injunction, to read it however they choose, and to

23   confuse this Court with these ridiculous arguments in order to

24   evade accountability.

25               Slide number 27 simply highlights the fact

1   that -- and the Court will hear the actual evidence on

2   development of the update for Easter Seals.  This is another

3   example of cross-use and wide distribution.  But, more

4   importantly, it reflects a derivative work that is stored on

5   Rimini's system, and that's something that the injunction has

6   prohibited.

7            There's a little bit of debate, obviously, in

8   the papers about what's a derivative work and what isn't.  But

9   that's ultimately for the Court to decide, and the witnesses

10  will assist with a lot of evidence in that regard.

11           So, finally, just to wrap up, what do we do with

12  a company that refuses to comply with a court order, and how

13  do we obtain that compliance?  Because, really, that's the

14  ultimate reason.  We find out what happened, and then it's,

15  like, okay, what are we going to do about these folks to make

16  sure this stops happening.

17           And that's where the issue of sanctions comes

18  in.  And, again, the aggravating factors and some of the

19  aspects of this case that show that sanctions are warranted,

20  you've got City of Eugene and the environment, a blatant

21  violation of the findings earlier in the case and the

22  injunction.

23           You've got all of these after-the-fact

24  explanations that are clearly evidentiarily not supported as

25  to why they're doing cross-use or why it wasn't cross-use.

46

1     The fact that they went to that extreme shows, without some

2     sort of sanction or restriction, they're not going to comply

3     with an injunction or any court order.

4            The protected source code was distributed to

5     multiple customers.  That's an extreme behavior there, and, as

6     a result, well, Oracle is damaged in the sense of there's no,

7     first of all, observance of their intellectual property

8     rights, but, second of all, those intellectual property rights

9     are blatantly violated.

10           And the funny thing is Rimini actually concedes

11    that it has Oracle derivative works on its system.  Their

12    explanations as to why they're not derivative works is

13    something else again.

14           They keep coming up with this false distinction

15    between closed code and open code.  Again, that's an

16    aggravating factor why there needs to be a sanction.

17           Why should that type of behavior in defense of

18    their activities be countenanced when it reveals so much about

19    how they view the injunction.

20           And, lastly, when we say what do we do about

21    this, and you'll hear more from Ms. Frederiksen-Cross with

22    respect to this because she's been inside Rimini's system,

23    she's encountered difficulty in some aspects as to trying to

24    figure out where documents are and what things are doing.

25           But she has some suggestions, based on her long

1    experience and her expert status, as to measures that could be

2    used to modify Rimini Street's behavior or make them

3    accountable, and in some essence just make sure this doesn't

4    happen again, and she'll go into greater detail.

5              But, in summary, some sort of third-party

6    monitoring is important in this particular case, and the

7    reason it is, is if Rimini is consistent with its litigation

8    behavior and its business behavior in the future, we'll just

9    be here again in two-and-a-half years from now.

10             I mean, this whole process started with us

11   simply asking, in January 2019, are you guys complying with

12   the injunction, and here we are.  It's two-and-a-half -- more

13   than two-and-a-half years later, and it's still not resolved.

14             So unless there's somebody -- apparently, it

15   takes somebody right in their stuff to get them to behave, and

16   the Court should consider third-party monitoring.

17             In addition to that we have suggested here, and

18   highlighted here, some sort of an archival requirement on

19   behalf of Rimini.

20             One of the biggest issues at the discovery

21   stage, and you'll find it in this adjudication stage as well,

22   is how we determine what Rimini actually did and who they sent

23   it to, and kind of the equivalent to the modern day paper

24   trail issue.  They don't say what they sent around.

25             During the discovery proceedings we found that a

1   lot of copies were routinely misplaced, destroyed, placed

2   elsewhere.  It's the kind of situation where accountability is

3   needed so that we know what they're up to.

4          And lastly, and we've requested this in filings

5   with the Court as well, to the extent that the Court is not

6   willing to fashion its sanctions now, we would like an

7   opportunity to do limited discovery on damages if that's

8   appropriate, if further violations are found, et cetera, and

9   with respect to what the appropriate monitoring or supervisory

10  remedy might be.

11         And that's something that's seriously -- the

12  irony is that Rimini Street will make a case, basically, that

13  they tried their hardest and they tried their best and they

14  have all these policies, and, "Boy, I don't know how this

15  stuff happened.  It's an isolated instance."

16         Well, if they can't control themselves, somebody

17  has to, and it's not at a huge intrusion.  These things have

18  been done all over the country, these court-appointed

19  monitors, and it's kind of at that stage.

20         And Barbara Frederiksen-Cross will give you a

21  number of other ways that we can figure out what they're doing

22  and make sure nothing else happens.

23         And, if nothing else, it seems they need that

24  kind of adult supervision.  Otherwise this Court, Oracle, a

25  different Court, who knows, is going to be doing this same

1    type of proceeding for years and years.  So it's important

2    that whatever we do to them with respect to these violations,

3    it have lasting and meaningful impact.

4              Your Honor, that's a perhaps scattered but

5    comprehensive review of what we think is important that won't

6    necessarily come out of the mouths of the experts.

7              But this is important, and it's important in the

8    sense that we've already found violations so the "so what" and

9    "what happens" is largely the issue before the Court, and we'd

10   ask you to consider all the evidence that we've highlighted in

11   that respect.

12             Thank you.

13             THE COURT:  Thank you, Mr. Pocker.

14             Well, I don't want to interrupt the opening

15   statement on behalf of Rimini, so we'll go ahead and take a

16   break at this time and reconvene -- well, let's make it 10:40,

17   the Court will reconvene.

18             Thank you.

19                  (A recess was taken.)

20             THE COURT:  You may have a seat, please.

21             We are reassuming after our morning break.  And,

22   Mr. Vandevelde, go ahead, please.

23             MR. VANDEVELDE:  Thank you, your Honor.

24             Before I start, I just wanted to make sure I

25   handed out three copies of my opening presentation to your

1    Honor's courtroom deputy.  Hopefully, one of them made their

2    way to you.

3                    THE COURT:  I have one in front of me.

4                    MR. VANDEVELDE:  Great.  Terrific.

5                    And we've also prepared a somewhat large

6    demonstrative to demonstrate the 10 issues that are at play.

7    I'm going to put it on the easel.

8                    THE COURT:  Okay.  All right.  Go ahead, please.

9                    MR. VANDEVELDE:  The Court set this hearing

10   because it had questions about 10 discreet issues, the ones

11   you see here on the board and on the screen before you, and

12   we're here to present evidence that answers your Honor's

13   questions.

14                    Your Honor identified these issues based on an

15   intense year-and-a-half lengthy period of discovery involving

16   hundreds of pages of expert reports, terabytes of data

17   produced or made available to Oracle in which Oracle wrote

18   extensive briefing accusing virtually every aspect of Rimini's

19   system as violating the injunction.  You heard that this

20   morning.

21                    And now Oracle is saying they didn't get enough

22   discovery, even though we produced millions upon millions of

23   documents, and Oracle had live 24/7 access to Rimini's

24   systems.

25                    And what I mean by that is, literally, Oracle

1    had credentials to access Rimini's systems for all of the

2    updates we're talking about.  For them to now come and want to

3    relitigate discovery, they want a do-over.  They raised all

4    those issues to Magistrate Judge Ferenbach.  They want to

5    convert this to another discovery proceeding have this process

6    never end.

7            This hearing is about those 10 issues.  It's not

8    about discovery.  Discovery closed long ago.

9            Now, the 10 issues involve highly technical

10   processes involving ERP software, and we're here to address

11   them as directly and straightforwardly as possible, and we

12   believe the evidence you'll hear will show that Rimini should

13   not be held in contempt, and certainly that Oracle cannot

14   prove by clear and convincing evidence, which is their burden,

15   and you did not hear from them this morning, that contempt is

16   warranted.

17           Now, here's a roadmap for what I'll be covering.

18   It's on the screen -- slide 2 of your screen in front of you.

19   I'll talk about how Rimini wants to lawfully compete in the

20   marketplace, Rimini's good faith understanding of your Honor's

21   injunction, it's compliance efforts, Oracle's expansive

22   interpretation of the injunction which contradicts your

23   Honor's rulings, and then I'll talk about the two violations

24   the Court found and also the eight disputed issues.

25           Now, since the earliest days of this litigation

1    from the Court's summary judgment order back in February 2014

2    in this case, through the injunction, and by choosing to file

3    the Rimini II case and seek your Honor's blessing that its

4    process 2.0 is lawful, Rimini has merely wanted to compete in

5    the marketplace.  The Ninth Circuit has already confirmed that

6    Rimini has that right.

7                The question -- really, the only question in

8    this case is the manner, how can Rimini do that, and Oracle

9    won't say.  All they say is no, no, no, and they are expanding

10   their theory of what cross-use means to the point of

11   absurdity.

12               You'll hear in the evidence they are literally

13   now at a place where they are saying Rimini can't use its own

14   know-how and knowledge and experience.  Those words did not

15   come out of Oracle counsel's mouth.

16               They don't want to confront the implications of

17   what they're saying.  They're not putting it in those words,

18   but that's what it means.  They are saying Rimini can't use

19   its own know-how.  It can't use its own creative expression

20   when it supports its clients.

21               We are far beyond the outermost limits of the

22   Copyright Act, on the verge of a due process issue, if Oracle

23   takes the position that Rimini can't reuse its know-how and

24   can't reuse its creative expression.

25               Yet despite all this murkiness, the case -- as

1    the cases have progressed, Rimini has willingly changed and

2    adapted its processes at great expense to comply with the

3    Court's orders.

4                    Sometimes when Rimini disagreed, it would not be

5    an understatement to say that Rimini has hung on your Honor's

6    every word at every hearing, in every order, to do its best to

7    make sure it is on the right side of what your Honor has said

8    is okay, and that's not easy when you're talking about complex

9    software.

10                    If anything, Rimini has been overly cautious,

11   overly conservative, sometimes to its detriment, in the

12   marketplace.

13                    As just one example, even though Rimini strongly

14   believes that its AFW tools are unlawful, it suspended use of

15   them pending the outcome of Rimini II.  That shows compliance.

16   That shows deference.

17                    Rimini fundamentally changed its processes more

18   than seven years ago, in response to your Honor's orders, to

19   move all of its clients' environments off of its systems and

20   back to those clients.

21                    And now Rimini has a remote support model where

22   Rimini remotely connects to each client's environment in each

23   client's system.  Those environments are kept separate and

24   siloed.  That's Rimini's support model.

25                    And then Rimini proactively filed the Rimini II

1    case seeking your Honor's blessing that Process 2.0 is lawful.

2    That is not contemptuous conduct.

3                    Rimini has certainly fought for the right to

4    exist and compete in the marketplace.  But, I would submit its

5    conduct has been careful, respectful, and, frankly, laudable,

6    and not, as Oracle falsely suggests, the action of some

7    scofflaw.

8                    And Rimini is not the same company it was during

9    Rimini I.  It's now 15 years old.  It has 1500 employees.  It

10   services thousands of clients in nearly 150 countries.  It's

11   publicly traded.  It's owned by investors.  It's controlled by

12   a board of directors.  Its clients range from some of the most

13   sophisticated Fortune 500 companies in the world to

14   governments, schools, hospitals, small and medium businesses

15   all over the world.

16                   Every year Rimini is diagnosing and solving

17   problems for its clients, thousands upon thousands of updates,

18   remotely connecting to each client's separate siloed

19   environment and performing its work.

20                   And there's no dispute -- there's literally no

21   dispute, there never has been, that each and every client

22   environment in those client systems, and all of the millions

23   of files within those client environments is fully licensed

24   and paid for.

25                   And as this Court knows, clients hire Rimini to

1    solve their enterprise software problems, and not just on a

2    reactive basis, on a proactive basis.  It's a proactive

3    consulting model.

4                    Yes, sometimes systems can crash and a client

5    will call up Rimini for immediate help, but many times a

6    problem could affect multiple clients.  Rimini hires Rimini as

7    a consultant to figure out the solution when new tax laws or

8    new tax forms or new regulations are passed, and its clients,

9    they don't want to be thinking about that.  That's not their

10   core competency.

11                   So, for example Matheson Trucking who you heard

12   about, they're a transportation company.  They don't want to

13   be thinking about new tax laws or how it impacts their

14   software.  They hire Rimini to figure it out.  That's what

15   Rimini does.  That's why they hire Rimini.

16                   And so you'll see evidence that when Rimini

17   realizes a bug or some other problem in Oracle software

18   affects many clients, for example, all clients in Nevada or

19   all clients in the United States, Rimini is not just expected

20   to fix that for all the clients, it's required to under its

21   contracts.

22                   It doesn't wait for those client systems to

23   crash before they encounter the problem.  If Rimini knows that

24   a client is going to be impacted by a changing forum, it has

25   the right and authority to go into that client's environment

1    and make the update.

2            Now, a critical aspect of this proceeding is

3    that one of the elements Oracle has to prove, and they

4    acknowledged that this morning, is that Rimini did not have a

5    good faith and reasonable understanding of the injunction, and

6    they haven't just conceded it, they've embraced it.

7            This is from their brief.  It says,

8            "Oracle must show that Rimini's violations

9        were not based on a good faith and unreasonable

10       interpretation of the injunction by clear and

11       convincing evidence."

12           And that injunction, your Honor's injunction, it

13   can't be understood in a vacuum, and in fact your Honor has

14   said so.  Your Honor has said that,

15           "Permanent injunction only enjoins conduct

16       that has been adjudicated unlawful."

17           And the injunction was narrowly tailored to only

18   enjoin acts that have already been adjudicated unlawful.  They

19   have to be adjudicated, and, if they are, they had to be

20   adjudicated unlawful.

21           And there are four aspects of the injunction

22   that are adjudicated by the 10 issues.

23           Now, two of the issues, as you see here on slide

24   10, are regarding PeopleSoft local hosting, several of the

25   issues regard PeopleSoft cross-use, two of the issues involve

1    J.D. Edwards software source code, and one issue involves

2    a single Oracle database file that Oracle only recently

3    disclosed as an alleged violation of paragraph 15 of the

4    injunction, and there's no expert opinions on that file.

5                    Now, what was actually adjudicated as to these

6    four aspects of the injunction?

7                    Well, first on local hosting, as the Court will

8    remember, in February of 2014, it ruled that the facilities

9    restriction in PeopleSoft licenses meant that Rimini could not

10   host, in your Honor's words, "environments on Rimini's

11   systems."  The Court said it wasn't allowed.

12                   And so in direct response to your Honor's

13   orders, Rimini removed all environments, and it moved them at

14   great cost from its own systems back to all its clients, and

15   it is undisputed that there is not a single environment on

16   Rimini's systems ever since.  There's not a single one.

17                   And so instead of being about environments, like

18   the conduct in Rimini I, the evidence you'll hear about are

19   about individual files that Rimini's clients sent to Rimini

20   against Rimini's express instruction, and that's in the

21   context of thousands of updates involving millions of files.

22                   Now, second, on cross-use, in that same summary

23   judgment order the Court ruled that the internal use provision

24   of the licenses meant that Rimini can't use generic

25   environments, that is environments not dedicated to any

1    particular customer where the software is intermingled to

2    develop updates for multiple customers.

3              But, the Court did not somehow prohibit Rimini

4    using know-how or knowledge or experience or its own creative

5    expression.

6              There are four disputed cross-use issues, and

7    every single one involves Rimini's own work product, its own

8    creative expression.

9              In every instance, what is being accused, and

10   Oracle's counsel didn't talk about this or get into the

11   details, is Rimini's own creative expression, no Oracle code,

12   creative expression that Rimini wrote that is the product of

13   its engineers' skill and ingenuity and experience.

14             Now, Oracle will not come right out and say

15   that, that that is banned, but that is the implication of what

16   they're saying, that know-how is prohibited, that reuse of

17   creative expression is prohibited.

18             And the reason they're not saying it, your

19   Honor, is because your Honor has already rejected that

20   position.  The Court, in its OSC, held that,

21             "Engineers can leverage their knowledge and

22       experience to get better and faster at their jobs."

23             That is common sense your Honor said.

24             And then in its summary judgment order in Rimini

25   II, the Court said,

1           "Rimini engineers can leverage their prior

2      work and work product."  It wrote, "It is generally

3      not cross-use for a Rimini engineer to create an

4      update file for client A, exclusively using client

5      A's software, and then to create the same update

6      file," that's work product, "the same update file for

7      client B using client B's software, nor is it

8      cross-use for a Rimini engineer to memorize and

9      replicate the work."

10          Again, that's work product.

11          Now, so if a Rimini engineer writes his or her

12  own code, their own creative expression, to solve a problem

13  for client A, the Court has ruled that Rimini engineer can

14  memorize, can create that exact same update file as your Honor

15  wrote in its summary judgment order.

16          As long as the work product is Rimini's, it's

17  truly Rimini's, and doesn't incorporate Oracle code, there's

18  nothing in the injunction that prohibits Rimini, which the

19  Court says the injunction reaches only unlawful conduct as we

20  saw that would prohibit Rimini from writing down its own

21  creative expression.

22          Oracle can't use the Copyright Act, it licenses,

23  or your Honor's injunction, as some kind of bar on creativity,

24  or a bar on writing down creative expression, or a bar on

25  reusing your creative expression which is a manifestation of

```
 1    your knowledge and skill and ingenuity.  That would undermine
 2    the entire Copyright Act.  The Copyright Act is to foster
 3    creativity.
 4                    Now, third, on JDE, the definition of J.D.
 5    Edwards software source code was not adjudicated in Rimini I.
 6    No expert wrote a report on it or opined on it.  The issue
 7    between accessible open code and inaccessible closed code was
 8    not before your Honor.
 9                    But, you'll hear from Rimini's own sworn
10    30(b)(6) witness, its corporate representative, a senior
11    vice-president of global customer support, who testified,
12    under oath that third-party providers are permitted to, in her
13    words, "make JDE source code changes..."  -- source code
14    changes --  "...and to develop custom code solutions."
15                    Oracle is now trying to create a special rule
16    for Rimini that says the exact opposite, that Rimini can't
17    copy, can't modify the very code, the very code that you have
18    to modify to keep your software functioning properly, the very
19    code that Oracle provides tools to copy and modify, the very
20    code that an entire industry, literally for decades, has been
21    copying and modifying.
22                    And remember, the injunction says it only
23    prohibits "unlawful conduct."  So if copying and modifying
24    this open code, is unlawful, it's unlawful for the world.
25    It's unlawful for everyone, and the licenses don't distinguish
```

 1    between the licensee and support providers.

 2              So under Oracle's position -- and, again, they

 3    will say this -- the implications of what they're saying is

 4    that no one can create updates for JDE ever.

 5              Fourth and finally on database, the Court said

 6    that the conduct at issue in Rimini I was that, quote,

 7         "Rimini downloaded Oracle database directly

 8         from Oracle, rather than receive access through its

 9         clients.  Rimini's use of software was restricted to

10         the provisions of the developer license."

11              The Court, in other words, held that Rimini's

12    use of those Oracle downloads, not client licensed copies of

13    database, was not permissible.

14              But the data -- the developer license isn't at

15    issue in this case, nor is any local hosting issue with

16    respect to database, and you'll see zero evidence of Rimini

17    downloading database directly to its systems, or using

18    database on its systems.  That evidence doesn't exist.

19              And the license that does govern database, the

20    Oracle License and Service Agreement, the OLSA, doesn't have a

21    facilities restriction.  There's no facilities restriction in

22    OLSA which governs database.  So the single database file you

23    heard about, that's not a violation of the injunction.

24              Now, I want to spend a moment talking about

25    Rimini's compliance efforts.

1            Rimini has undertaken substantial compliance

2    efforts to comply with your Honor's orders.  First, as I

3    mentioned earlier, more than seven years ago, in direct

4    response to the Court's orders, Rimini moved all of its client

5    systems.  It implemented Process 2.0, it moved those client

6    systems back to its clients at tremendous effort, and it now

7    remotely connects to each of those client environments.

8    They're kept separate and siloed.

9            Second, also years before the injunction, Rimini

10   enhanced its Acceptable Use Policy, which you heard a little

11   bit about, its AUP, to help ensure the compliance with the

12   licenses and your Honor's orders.

13           The AUP, in fact, your Honor, is more

14   restrictive than the Court's injunction in some ways because

15   there's only a PeopleSoft local hosting prohibition in the

16   injunction.  There's none for any other product line.

17           But the AUP says that Rimini engineers should

18   not have any Oracle or any other third-party software on its

19   systems.

20           Rimini trains people on the AUP.  They created a

21   mandatory reporting obligation for people to report violations

22   of the AUP, and when the injunction came out and became

23   effective, Rimini focused heavily on compliance, distributing

24   the injunction immediately, educating people on it, making

25   people acknowledge that they had received and understood it.

1          And you'll hear also evidence that Rimini

2     educated its own clients on the injunction, that their clients

3     should not be sending Oracle or any other third-party IP to

4     Rimini.

5          And then finally, as I noted earlier, after the

6     injunction was issued Rimini took a conservative approach with

7     respect to its AFW tools.  It believes they are entirely

8     lawful, and we'll see what happens in Rimini II.  But taking

9     that conservative approach, it temporarily suspended the use

10    of them pending the outcome in Rimini II.

11          Now, in contrast to Rimini's reasonable and, I

12    would submit, accurate understanding of your Honor's

13    injunction, Oracle's expansive interpretation fundamentally

14    contradicts what your Honor has said about it.

15          Essentially, right after the injunction took

16    effect, Oracle started accusing Rimini of violating it based

17    on discovery in Rimini II, and for more than a year Oracle

18    took extremely broad, further discovery in this proceeding,

19    including having, as I mentioned at the outset, live, 24/7

20    access directly to Rimini's systems.  They could literally log

21    in to Rimini's developer and testing systems to see what was

22    going on.  So the notion that Oracle didn't have visibility

23    into what Rimini was doing is simply false.

24          And interestingly, that chart that was displayed

25    by Oracle's counsel about the discovery and RFPs and rogs and

1    depositions, you know what it didn't have on it?  It didn't

2    have on it the fact that Oracle was literally living inside of

3    Rimini's systems for years.

4            And Judge Ferenbach, just like Judge Hoffman

5    before him, commended Rimini for its efforts, noted the

6    incredible amount of discovery it had produced.

7            And so Oracle's claim that Rimini has somehow

8    stonewalled or hidden the ball from Oracle, that is just

9    simply a false narrative.

10            Now, from the ocean of data that Oracle had and

11    had access to, Oracle moved last year for an OSC.  Now, in

12    that motion they accused the world.  They accused Process 2.0,

13    they accused things that had never before been an issue, had

14    never before been adjudicated.  They accused things like AFW

15    and code analyzer and transfer files and dev instructions, and

16    clients' use of cloud systems, none of which -- none of which

17    were ever litigated or adjudicated.

18            That shows you what they're trying to do to your

19    Honor's injunction.  They are trying to stretch the words of

20    your Honor's injunction and have it cover things that had

21    never been covered before, and your Honor correctly rejected

22    all of that.  Your Honor said all of those issues are going to

23    be adjudicated as part of Rimini II.

24            And, in fact, as to other of their theories,

25    your Honor rejected them outright.  For example, on the notion

1    of reuse of know-how and work product, for example, on the

2    issue of testing.

3              The Court rejected Oracle's argument that

4    Rimini's creation of its own work product, documents in the

5    form of test plans and test cases, was somehow cross-use.

6              Oracle had argued that because, quote, Rimini

7    may use a test case for multiple customers, Rimini is

8    violating the injunction because the testing, quote, "benefits

9    other clients."

10             The Court said it disagreed.  It said it finds.

11             "...that the test case is not 'testing' as

12        provided for in paragraph 6 of the injunction,

13        rather," it "is simply the plan for how Rimini will

14        test the specific update.

15             "Nothing in the record would support a

16        finding that Rimini is prohibited from using the same

17        tests" -- again, that's work product -- "to ensure

18        functionality of an update."

19             And again, those test cases, those test plans,

20    those are Rimini's work product, it's Rimini-created

21    expression, and your Honor said it's permissible and can be

22    used with multiple clients.

23             But even putting aside all the issues that your

24    Honor deferred for Rimini II, or that your Honor rejected

25    outright as to the 10 discreet issues set for this hearing,

1    Oracle cannot show that Rimini acted contemptuously, and

2    Oracle's remaining theories take the Court's words in the

3    injunction and distort and expand them beyond all recognition.

4              So on local hosting, Oracle claims that files

5    e-mailed by clients against Rimini's instruction not to are

6    somehow willful conduct.

7              Second, on cross-use, Oracle claims that Rimini

8    can't reuse its own knowledge, its own work product to support

9    multiple clients.

10             In fact, Oracle's expert testified, and you're

11   going to hear from her during this proceeding, that if 50

12   clients have the same issue, the same problem, and Rimini

13   solves that problem for the first client, Oracle's expert has

14   said that you can't -- Rimini can never reuse that solution

15   again, never, or that you have to magically unlearn what you

16   knew from developing that solution or else its unlawful

17   cross-use.

18             In fact, here's the testimony of Oracle's

19   expert.

20                  (Video recording played.)

21             She said "prohibited from relying on knowledge."

22   That is stunning.

23             They don't use those words, they won't say those

24   words, they won't knowledge those words, but, those are their

25   words.  That is their position.

1            No law can prohibit the reuse of knowledge and

2  creative expression.  It is one thing to say that you can't

3  take Oracle's copyright expression and put it into your work

4  product and then use it with multiple clients, we get that,

5  but that is not what is happening.

6            The injunction doesn't say consultants can't

7  reuse their knowledge, their own work product, their own

8  creative expression, or, as Ms. Frederiksen-Cross testified,

9  that if you do, you can use it once, but then never again.

10 That's not -- that's what's at stake here because that's what

11 Oracle's position is.

12           Now, third, on JDE, Oracle's position is that

13 the injunction prohibits Rimini from copying and even looking

14 at JDE code, the accessible, human readable code that Oracle

15 provides to its customers.  Oracle doesn't dispute that.  And

16 that it encourages to be copied and modified.  Oracle doesn't

17 dispute that.

18           And that Oracle provides tools to copy and

19 modify that code.  Again, Oracle doesn't dispute that.  And

20 that, indeed, have to be copied and modified in order to keep

21 the software functioning properly.

22           And, again, because the injunction, as your

23 Honor has held, only covers "unlawful conduct," this goes way

24 beyond Rimini.  They won't knowledge the implications, they

25 won't admit the implications, but because the injunction only

1    covers "unlawful conduct," what their position really is, is

2    that JDE updates are unlawful, period.  They're illegal.

3    That's what their position is.

4            And no company would hire Rimini or any other

5    provider if they couldn't access and copy and modify and

6    develop updates that have to be updated, or develop updates

7    that have to be implemented to keep that client software

8    functioning properly.

9            It would be like if you're a mechanic, and the

10   car manufacturer says you're not allowed to open the hood to

11   look at the engine.  That's what Oracle's theory is.  It is

12   facially absurd.

13           And this is -- it is important.  This is

14   Oracle's litigation-only position.  What you heard this

15   morning, that's not what they're saying outside in the world.

16   That's not what they're telling the marketplace.

17           In fact, Oracle's general counsel has

18   acknowledged that access and copying open code is permitted.

19   Oracle's sworn 30(b)(6) witness has acknowledged that open and

20   accessible code can be copied and modified to develop updates.

21           Oracle is saying the exact opposite today.  They

22   actually encourage it.  They provide tools for it, and it has

23   to be modified.  There's an entire industry built on

24   accessing, copying, and modifying accessible code to implement

25   JDE updates.

1                Fourth, on database.  Even though Oracle has

2    never disclosed, even as of right now, any expert analysis

3    tying this particular single Oracle database file to a

4    violation of paragraph 15 of the injunction, Oracle now claims

5    this paragraph has an implicit local hosting prohibition.

6    But, that's not what paragraph 15 says.

7                Here's the text of paragraph 15.  There's no

8    local hosting prohibition in there, and database, as I said,

9    is governed by OLSA which doesn't have as a facilities

10   restriction at all.

11               And the Ninth Circuit has held that there cannot

12   be a prohibition on local hosting absent a facilities

13   restriction.  In fact, that's why the Ninth Circuit struck

14   local hosting prohibitions as to JDE and Siebel.

15               It wrote,

16           "Only the PeopleSoft license limits the

17       licensee to using the licensed software at its

18       facilities, which is the basis for the local hosting"

19       restriction.

20               Again, the OLSA doesn't have a license -- sorry,

21   a facilities restriction as to database, and so Oracle's

22   attempt to imply one is wrong.

23               So I now want to turn to the 10 issues actually

24   set for this hearing, and I'm going to start with the two

25   violations the Court found.

1           It has to do with -- Issue Number 1 has to do

2   with PeopleSoft local hosting.  The evidence will show that

3   the violations concern three instances where 11 files were

4   sent by clients to Rimini engineers either via e-mail or

5   by uploading them to Rimini's customer support portal thereby

6   automatically creating copies on Rimini's systems.

7           Here's an example of one of the e-mails in

8   question.  It's an e-mail from client from R.R. Donnelley,

9   arijit.ray@rrd.com.  You can see that in the green

10  highlighting on this slide 136.

11          That's sent to two Rimini engineers noting that

12  Mr. Ray was attaching a .dms file from R.R. Donnelley's

13  production environment.

14          All the other files at issue in Issue Number 1

15  one show the same thing.  In every instance the client

16  e-mailed or uploaded the file to Rimini.

17          So, Oracle asked the question how did these

18  files get on Rimini's systems.  The answer is the clients sent

19  them.

20          Now, while the Court found that these

21  client-sent files violated the injunction, the evidence will

22  show, even though it is not Rimini's burden, that Rimini is in

23  substantial compliance.

24          First, the individual files sent by clients is

25  vastly different than what was adjudicated in Rimini I.  That

1    conduct, in the Court's words, is about "compliance."  The

2    Court remembers the trial.  It was about the cloning and

3    hosting and using of generic environments, what was called the

4    software library.  You will see no evidence of any locally

5    hosted environments in this proceeding, none.

6              Second, the violations were not willful.  Rimini

7    did not seek to put these files on its systems for its own

8    purposes.  There's no indication that any employee used these

9    files for Rimini's purposes, and the initial copying was not

10   some conscious act by a Rimini engineer.  It was the result of

11   how e-mail works.  That's how the files got on Rimini's

12   systems, sent by Rimini clients.

13             And Rimini supported nearly 400 clients for

14   PeopleSoft and JDE during the relevant time period.  Each of

15   those clients has tens of thousands of files, and Rimini

16   interacts with those files on a daily basis.

17             Given the scale of Rimini's operations, it is

18   not realistic, nor the logic, but that the clients, against

19   Rimini's express instruction not to, will never send Rimini

20   some files.

21             Third, Rimini took reasonable steps to comply

22   with a local hosting prohibition.  I touched on this earlier,

23   but after your Honor's summary judgment order way back in

24   2014, Rimini took extraordinary efforts to move all those

25   environments off of its systems and back to its clients.

1              And Rimini established policies, trained its

2    employees, educated its clients, and I'm going to show you the

3    warning that Rimini shows to clients who want to interact with

4    Rimini in the context of a support ticket.

5              Here's the Web portal that clients see.  So,

6    Oracle focused on the word "reminder," and it had a humongous

7    zero on one of their slides.  But what they didn't say, they

8    didn't show this slide, they didn't show this warning.

9              It says,

10             "Important information.  Please do not upload

11        any third party software (for example, code...)"

12        amongst other things.

13             "All access to your supported products will

14        be via remote access...."

15             Those are the reminders.  They show up every

16   single time a client comes to Rimini, thousands upon

17   thousands.  So that number zero, that should have been

18   probably in the tens of thousands, that was false.

19             Now, Oracle tries to manufacture willfulness by

20   claiming that Rimini somehow solicited its clients to send

21   these files, but that's a misrepresentation of the evidence.

22             Sure, sometimes a Rimini engineer will say,

23   "Hey, I'd like to see this file of yours," to a client.  That

24   client, as this warning instructs, is supposed to put it in a

25   particular place on the client server, and then, as indicated

1    by this notice, Rimini is supposed to log in and access it

2    remotely.

3              And fourth and finally, you will not hear any

4    evidence, because there is none, that Oracle was in any way

5    harmed by these violations.

6              Oracle does not dispute that every client held a

7    valid and fully paid-for license.  There's simply no evidence

8    of damage of any sort.

9              On Issue 2, the Court found a cross-use

10   violation involving an update for Matheson Trucking.  That's

11   come up a couple times.  The Court said there was no

12   "indication it was developed or tested" in Matheson's

13   environments.

14             And let me be clear.  We are not rearguing that

15   violation, I'm not rearguing that violation today, but we will

16   present evidence, even though it is not our burden,

17   demonstrating why Rimini should not be held in contempt.

18             The update was to a Rimini written file that

19   fixed the alignment of certain Xs printed in certain boxes of

20   an IRS form.  So you see here in slide 40, here's what the

21   form looked like, and it showed the misalignment issues where

22   you see the Xs not inside the box or partially overlapping

23   with the box.

24             You'll hear from Rimini witnesses that because

25   this was a federal IRS form, Rimini planned to implement it

1    for clients in the United States.  It's a federal form.

2    Rimini created an update in the form of a file, rsi940, which

3    resided on Rimini's systems because it's Rimini's creative

4    expression.

5              And what's critical, there is not even an

6    allegation that that file, rsi940a, contains any protectible

7    Oracle expression whatsoever.  It's Rimini's creative product.

8              Rimini tested the file in City of Eugene's

9    environment because City of Eugene is in Oregon which is in

10   the United States, and this is a federal form, and Rimini's

11   testing was for City of Eugene.

12             The evidence, including this e-mail in January

13   of 2019, will show that Rimini did complete development for

14   Matheson -- MAT is an abbreviation for Matheson -- and it says

15   development was completed and that it should be ready to go.

16             The evidence will also show that the files were

17   retrieved and tested in Matheson's environment to make sure

18   that they worked.

19             Rimini then provided Matheson with informal

20   delivery of the update.  That means delivery early, outside

21   the normal schedule that Rimini has.  And the very next day

22   Rimini tested it in Matheson's environment in its QA process.

23             Now, although the Court found a violation,

24   Rimini should not be held in contempt.  Rimini, in good faith,

25   believed that its work for City of Eugene on a federal form --

1    and City of Eugene is in the United States -- was for City of

2    Eugene.  That file, rsi940, contains no Oracle protected

3    expression, and its work in Matheson's environment to develop

4    and test it in Matheson was for Matheson.  That is permitted.

5    It is not prohibited by the injunction.

6              And, again, as with all these issues, like Issue

7    1 and every single one of them, you will not hear any evidence

8    of any harm to Oracle.

9              Now, I'm going to turn to the eight disputed

10   issues starting with -- and here they are grouped again by

11   category, the PeopleSoft local hosting issue, the four

12   disputed cross-use issues, the J.D. Edwards software source

13   code issues, there are two of them, and then the Oracle

14   database file.

15             As to each of these issues Oracle carries the

16   burden to prove it by clear and convincing evidence, and they

17   can't.  It does not support a finding that there's a violation

18   at all, or that there should be a finding of contempt.

19             Now, Issue 5 concerns -- which is a local

20   hosting issue, concerns a file called rspcmpay.cbl, it's a

21   Cobol file, and an Oracle file called psptarry.cbl.

22             And the Court asked the question whether the

23   Rimini file contains protected Oracle expression from the

24   Oracle file and thus that Rimini would be prohibited from

25   having it on its local systems.

1            Under binding Ninth Circuit law and the law of

2    other circuits as well, the question -- the answer to that

3    question turns on the issue of substantial similarity, and

4    that, in turn, requires analytic dissection.

5            You're going to hear from Professor Owen

6    Astrachan from Duke University.  He's one of the country's

7    foremost software experts in academics.

8            He conducted analytic dissection, and you'll

9    hear his opinion that these two files are not remotely,

10   substantially similar.  He separated out the protectible

11   versus nonprotectible expression.  He concluded that the files

12   have different purposes and functions, and that Oracle's line

13   matching methodology, which I'll talk more about in a second,

14   that it's not reliable.

15           Now, in contrast, Oracle's expert used the same

16   line matching methodology, a tool, a rote line matching tool,

17   where that tool and her opinions were deemed inadmissible.

18   They were excluded, not reliable.

19           Oracle's expert failed to perform analytic

20   dissection, failed to distinguish between protectible and

21   nonprotectible expression, failed to consider external

22   constraints on code, failed to consider the structure and

23   sequence of an organization of the code, and so, because the

24   two files not substantially similar, there is no local hosting

25   violation on Issue Number 5.

1               I'll now turn to the cross-use issues.  There's

2    several disputes issues, four of them concerning alleged

3    cross-use, but, again, every single one involved Rimini's

4    knowledge and own creative expression.

5               Again, those terms were never mentioned in

6    Oracle's opening.  They're dirty words to them because they

7    know your Honor has said it's permissible, but every single

8    one involves Rimini's know-how and creative expression.

9               Now, Issue 3 concerns an update for Johnson

10   Controls to fix a problem where, if text was too long in

11   certain boxes, as being demonstrated here, it was being cut

12   off.  You can see where the red arrows are on the W-2 form.

13   We all know what a W-2 form is.

14               And because it's a federal form, again, like the

15   one we saw previously, the problem affected U.S. clients

16   including Johnson Controls, and, yes, also City of Eugene.

17   City of Eugene is in Oregon which is in the United States, and

18   it's affected by W-2 changes.

19               As you'll hear, Rimini's solution involved

20   reducing the font size in one of the boxes, in an Adobe .pdf

21   document, not Oracle code, and changing the PeopleSoft

22   configuration to allow more digits in one of the other boxes.

23               And so even though the solution didn't involve

24   touching Oracle code at all, Oracle's theory -- again, they

25   won't admit this -- is that that is unlawful cross-use, that

1    Rimini's reuse of its knowledge in figuring out the solution,

2    reducing the font size and making a settings change, that it

3    is unlawful for Rimini to do that with any other client.

4              And, frankly, that is mind boggling.  Let's take

5    a step back.  Oracle's position is that Rimini, once it

6    changes the font size of a .pdf document for one client, it

7    can't go into another client's environment and change the

8    .pdf -- the font size of that .pdf.

9              That's facially absurd.  It's not the law, and

10    it directly contradicts your Honor's rulings on the reuse of

11    know-how.

12              Now, Issue 4 concerns the same rsi940a file that

13    we saw in Issue 2 but this time it relates to an update to

14    Spherion and Smead, and as we just saw in the W-2 issue,

15    there's another misalignment issue with the Xs.

16              Now, Rimini developed a solution for City of

17    Eugene using City of Eugene's environment because it was a

18    change to another federal tax form, it's Form 940 of IRS

19    Schedule A.

20              Now, as it turned out, City of Eugene ended up

21    not needing it, but not because it doesn't operate in the

22    British -- in the U.S. Virgin Islands.  Everyone knows it

23    doesn't operate there.  It didn't need it because of its own

24    particular tax situation that year and what states happened to

25    specify credit tax reductions that year.

1            So after it was developed in City of Eugene, the

2    fact that Rimini ended up not having to deliver it doesn't

3    somehow retroactively make the experience it gained and the

4    knowledge it learned somehow unlawful cross-use.

5            Like all of these alleged cross-use issues,

6    Oracle claims Rimini can't use its own creative work product.

7    Oracle says that because Rimini figured out the solution for

8    the City of Eugene, as we heard Ms. Frederiksen-Cross say,

9    that solution can never be used again.  That is not what your

10   Honor ruled, and, in fact, your Honor has ruled the opposite.

11           Issue 6 concerns two more IRS forms, 1099-INT

12   and 1099-MISC.  The two corresponding Rimini files are called

13   rsi1099i and 1099m.  Rimini sent these two files for Easter

14   Seals as part of an update.

15           And the central question your Honor had was

16   whether these two files were unlawful derivative works.  On

17   that question, Oracle's expert offered no opinion, none, and

18   so that ends the analysis under binding Ninth Circuit law.

19           Now, Oracle, in its briefing, continues to argue

20   that these files are derivative works because they are, quote,

21   "Tailored to operate only with and modify Oracle's PeopleSoft

22   software."  But that's not the law, and that never has been.

23           Any software program, even Oracle's software,

24   runs on top of another software program, so just like Oracle's

25   software is tailored to operate with Windows doesn't make it a

1   derivative work of Windows, and just like Rimini's creative

2   expression is tailored to operate with PeopleSoft, doesn't

3   make it a derivative work of PeopleSoft.  There has to be

4   substantial incorporation of protected Oracle expression.

5               That is not the case here, and so these files

6   are not substantially similar, and they cannot be derivative

7   works, and so there's no violation.

8               Now, Issue 10, another example of Oracle's

9   wildly expanded cross-use theory.  The issue concerns an

10  update Rimini developed for clients in 2018.  That was when

11  the first client needed the update, and it relates to an

12  Oregon quarterly tax problem, and then later Rockefeller and

13  Home Shopping Network became clients and they needed the

14  update the next year.

15              The solution consisted of a Rimini written file,

16  wrote from scratch, called rsiqtrtx, as well as making changes

17  to various online objects in each client's separate siloed

18  environment.

19              Now, Rimini-created files were Rimini's own

20  creative expression.  There's no allegation whatsoever they

21  contained any protected Oracle code, and the evidence will

22  show that months later, after the development of that file for

23  the first client, Rockefeller and Home Shopping Network hired

24  Rimini, and they needed the update, and Rimini used its prior

25  know-how, its prior creative expression, its prior work

1    product, to solve the same problem for Rockefeller and Home

2    Shopping Network, and that included creating and modifying the

3    same objects in Rockefeller's separate environment and Home

4    Shopping Network's separate environment.

5              Now, Oracle cries cross-use even though

6    Rockefeller and Home Shopping Network weren't even clients of

7    Rimini at the time of the original development.  So, we need

8    to pause there and step back because it's a temporal

9    conundrum.

10             Oracle is saying that when Rockefeller and Home

11   Shopping Network, who were not clients when the first client's

12   development environment was used, that somehow, when the work

13   is performed for them, it retroactively makes the copies used

14   in the first client's inventory a retroactively unlawful

15   process.  That's not what the injunction says.  It is not a

16   violation to reuse your own know-how, your own work product,

17   and use it to support multiple clients.

18             Now, Issues 7 and 9 concern JDE support in

19   paragraph 8 of the injunction, and they turn on the same

20   question, which is whether your Honor's injunction prohibits

21   the copying and modifying of accessible, open JDE code that

22   has to be copied and modified in order for the software to be

23   kept up-to-date.

24             Now, Issue 7 raises that question directly.

25   Issue 9 raises it in the context of a specific Rimini-created

1   technical specification, and I'll start with Issue Number 7.

2           The evidence will show that when a company buys

3   a J.D. Edwards software license, what they're getting is they

4   receive both open code portions and closed code portions of

5   the software; inaccessible, inaccessible.

6           Now, Oracle accuses Rimini of making up that,

7   but the facts are that when you license JDE a portion of the

8   code is presented to you and provided to you in open

9   accessible form, and some of it is provided in closed,

10  inaccessible, compiled form.  It's not the labels that matter,

11  it's the facts that matter.

12          And Oracle doesn't dispute that JDE comes with

13  open code which Oracle encourages licensees and support

14  providers to copy and modify, that Oracle provides tools for

15  them to copy and modify, and that has to be copied and

16  modified in order to keep the software up to date.

17          And Oracle also doesn't dispute the fact --

18  maybe they dispute the label but not the fact that when you

19  license JDE you get closed, inaccessible portions of the JDE

20  software that cannot be read or understood without decompiling

21  or disassembling or reverse engineering, and Oracle doesn't

22  provide the closed code because it's the guts, it's the heart,

23  it's the architecture of the software.

24          Now, Oracle argues that paragraph 8 of the

25  injunction prohibits Rimini from copying any and all JDE code,

1    any and all, even the open, accessible code portions.

2                    But what that means, even though, again, Oracle

3    will never come right out and say this, is that that means

4    despite an entire decades-long industry of copying and

5    modifying and developing updates for JDE, that that is now

6    illegal, that your Honor's injunction has literally made an

7    entire industry illegal.

8                    Oracle's expert is offering her opinion that

9    your Honor's injunction makes developing updates illegal,

10   period, for anyone.  That's the implications of what their

11   position is, and, again, it's not just for third-party support

12   providers but licensees, too.

13                   JDE licenses do not distinguish on this point

14   between the licensee and support providers in terms of who can

15   copy and modify source code.  This isn't a situation where a

16   licensee gets some rights and a support provider doesn't.

17                   And so Oracle's position -- again, they won't

18   say this -- is essentially that no one in the world can

19   develop updates for JDE software, and, importantly, I said

20   this earlier, I'll say it again, that's not what they're

21   saying out in the world.  That's not what they're saying

22   to customers, that's not what they're saying to licensees,

23   that's not what they're telling the third-party support

24   industry, and its own actions and its own sworn testimony

25   prove it.

1              Oracle conducted an audit of the third-party

2    support provider named Spinnaker.  You see this here in slide

3    155.  Spinnaker is a JDE support provider.

4              The CEO of Spinnaker provided a sworn

5    declaration regarding its processes.  He wrote that,

6         "Fixes, updates, and custom codes solutions

7       developed by Spinnaker may take the form of source

8       code changes."

9              This is the CEO a support provider putting in a

10   sworn declaration that they do do source code changes.

11             Now, Buffy Ransom, seen here in this slide,

12   slide 156, she is a Senior Vice-President of Global Customer

13   Support.  She was designated as a 30(b)(6) witness in Rimini

14   II.  She testified about that audit of third-party support

15   provider Spinnaker, and she testified that Spinnaker's

16   descriptions of its processes, including custom code solutions

17   and source code changes, was accurate.

18             And she was asked a series of questions.  She

19   was asked:

20         "And Oracle viewed those support policies as

21       respectful of and noninfringing of Oracle's

22       intellectual property?"

23             And, as Oracle's corporate representative,

24       she said, "Yes."

25             "And also that the support processes

1 described in paragraph 14 do not violate Oracle

2 license agreements license agreements with its

3 clients; is that correct?

4  "Correct.

5  "And is it fair to say that Oracle concluded

6 that it was proper for Spinnaker to develop fixes,

7 updates, and custom code solutions" -- that's what

8 we're talking about your Honor, custom code

9 solutions, "for its customers that may take the form

10 of source code changes..."

11  Her answer is, "Yes."

12  Your Honor, that is binding.  Oracle should be

13 estopped from even taking the opposite position now.  They

14 can't put up a 30(b)(6) witness who testifies one way, that

15 custom code solutions are lawful and comply with the licenses,

16 that code changes are lawful and comply with the licenses and

17 that Oracle thinks it's proper, and then come into this court

18 today and say that that is wrong, to disavow that sworn

19 testimony and say the exact opposite.

20  And not only did Oracle's 30(b)(6) witness

21 testify to this, it's what Oracle's own general counsel

22 testified to.  Their own assistant general counsel -- not

23 testified to, I'm sorry -- wrote a letter about to Spinnaker

24 seven years ago, and here's that letter.  She wrote,

25  "We have determined that (a) Spinnaker's

1              current practices and procedures are respectful of

2              and do not infringe upon Oracle's intellectual

3              property rights and (b) do not violate Oracle's

4              license agreements with its clients,"

5    signed Deborah Miller, Oracle America and Oracle International

6    Corporation, Associate General Counsel.

7              So that's Oracle's consistent position for seven

8    years by its corporate representative and its own Assistant

9    General Counsel in litigation and out of litigation, yet,

10   Oracle now comes today and says the exact opposite.

11             Now, Oracle didn't mention any of this to your

12   Honor.  They didn't talk about Spinnaker.  They didn't talk

13   about Ms. Ransom.  They didn't talk about their own Assistant

14   General Counsel blessing Spinnaker's processes which involve

15   custom code solutions.

16             Instead what you heard them take was a totally

17   different approach where they tried to play "gotcha" with

18   Rimini documents, where -- during that period when your Honor

19   issued the injunction and before it was stayed where Rimini is

20   scrambling, admittedly scrambling, trying to figure out what

21   it means, what if any changes need to happen.  They needed to

22   figure out what processes may need to be altered.

23             And Rimini wanted to be conservative.  They wanted

24   to take a conservative approach as they always do, and so,

25   yes, they considered using an over-the-shoulder approach.

—87—

1     Yes, they talked to clients about an over-the-shoulder

2     approach.   That was their conservative position.

3               But in early December 2016 when the injunction was

4     stayed, you know, that by that time, it was reissued two years

5     later, it was clear that Oracle's position -- again, even

6     though they won't say this, is an effective ban on JDE update

7     support.

8               That the very code that Oracle provides in open

9     form, that is accessible, that is intended to be modified,

10    that an entire industry has been copying and modifying for

11    decades, you'll hear that testimony, and because your Honor

12    has said that the injunction only reaches "unlawful conduct,"

13    again, this is beyond Rimini.   This is Oracle taking the

14    position that an entire industry is acting illegally.

15              Now, in addition to Oracle doing an about-face on

16    this issue and rewriting paragraph 8 as you see here on slide

17    159 to prohibit copying of any and all J.D. Edwards code, even

18    open code, it's important to note that that suggestion is

19    completely superfluous of other provisions of your Honor's

20    injunction like this portion of paragraph 10.

21              Oracle says that paragraph 8 means Rimini can't copy

22    any code for any development and testing of any update,

23    period, not for client A, not for client B, not for any

24    client.

25              Now, paragraph 10 says that Rimini can't develop and

1    test updates or modifications for the benefit of another

2    client.   In other words, Rimini can't use client A's JDE

3    software for the benefit of some other client B, but that

4    would be entirely superfluous of paragraph 8.

5              Developing updates necessarily requires copying

6    code.   So if paragraph 8 means you can't develop updates,

7    period, why do you need a paragraph 10 that says you can't

8    develop updates for another client?

9              Finally, Stephen Lanchak.   He'll be the only JDE

10   expert you'll hear from during this hearing.   He'll testify

11   that the industry would never understand your Honor's

12   injunction, as Oracle claims but won't admit directly, to make

13   it illegal to copy and modify the open code portions of JDE.

14             He'll testify that Oracle designs and encourages JDE

15   open code to be copied and be modified, and that copying and

16   modifying that code has to be done in order to keep the

17   software up to date.

18             He'll testify that Oracle's interpretation would

19   essentially be a ban on Rimini from being able to provide

20   updates to JDE, and, again, not just for Rimini, not just for

21   other support providers, but even for licensees.   The entire

22   industry is what's implicated by Oracle's position.

23             Now, Issue 9 is easily resolved in light of Issue 7.

24   Issue 9 concerns a single JDE technical specification or tech

25   spec.   Tech specs are Rimini created work product that guide

1    development of updates for clients.

2              And the Court asked whether this technical

3    instruction did in fact copy JDE software source code in

4    violation of paragraph 8 of the injunction.

5              Well, first, even if it's true that Rimini copied

6    any code, it was the accessible open code portions that I've

7    been discussing which is not a violation of the injunction.

8              Second, Oracle's claim that Rimini copied any code

9    at all is highly misleading.  The tech spec at issue is a

10   49-page document that describes how to implement a particular

11   update for a particular client, and it's by adding Rimini code

12   to an existing Oracle file -- Rimini's code standing alone to

13   an existing Oracle file with instructions of where to place

14   that Rimini written code that's Rimini creative expression.

15             And you'll hear about this tech spec in more detail,

16   but here's an excerpt of it.  It consists of hundreds and

17   hundreds of lines of Rimini written code.

18             There's no allegation that that code you see in the

19   blue box on this slide is not Rimini code.  That is Rimini

20   written creative expression, and in between those large swaths

21   of Rimini written code are markers that you see in the red box

22   that reference where in the client's environment Rimini's code

23   should be inserted.

24             And, in fact, those markers, as you see, have a

25   series of periods, ellipses, showing that Rimini was

1    consciously avoiding using Oracle code.

2         Now, Rimini creating its own new and original

3    expression in this code in the blue box, there's not even an

4    allegation that that's not Rimini code, and merely indicating

5    where it should be inserted within a client's environment,

6    that is not a violation of the injunction.  That is reuse of

7    know-how and work product.

8         And last on Issue 8, it concerns a single Oracle

9    database file called prvtsidx.plb.  Oracle's expert across

10   multiple reports, in a sworn declaration, first suggested it

11   was a PeopleSoft file, then she said it was a JDE file, and

12   now it's acknowledged that it's a database file.

13        Now, database wasn't even part of discovery in this

14   proceeding.  It's only being raised now because of the errors

15   in the expert's report.

16        And so more than a year after Oracle's motion for an

17   OSC, and six months after your Honor's OSC and on the eve of

18   this hearing Oracle realized its error and now pivoted and

19   says that it's a violation of paragraph 15 of the injunction,

20   not paragraph 8.

21        But Oracle's only disclosed expert analysis as to

22   this file is that it contains JDE software source code which

23   is completely wrong.  It's in error.  They have no disclosed

24   expert opinion about this file linking it to paragraph 15 of

25   the injunction, and the evidence will show that this file was

1    in fact uploaded by a client -- like the other hosting issues

2    we saw -- uploaded by a client to Rimini's system.

3            But as noted earlier, and as you see here again,

4    paragraph 15 of the injunction, there's no local hosting

5    provision in there.  You can see it right there on slide 164.

6    There's no local hosting prohibition as to database.

7            And Oracle's counsel, I think he used the words -- I

8    wrote them down -- "Thou shall not have Oracle database on

9    Rimini's systems," where is that language in paragraph 15?

10   There's no reference to Rimini's systems.

11           And, again, the Ninth Circuit said there cannot be a

12   local hosting prohibition absent a facilities restriction.

13   There has to be a facilities restriction in order to justify a

14   local hosting prohibition.

15           So Oracle's attempt now to suggest that your Honor's

16   paragraph 15 has an implicit local hosting prohibition is

17   wrong.

18           Database is governed by the OLSA which doesn't have

19   a facilities restriction, And so the fact that a client

20   happened to send this file to Rimini and it ended up on

21   Rimini's system, that's not a violation of the injunction.

22           Now, those are the 10 issues your Honor set for this

23   hearing and that you'll hear about and hear evidence of in

24   this proceeding.

25           Rimini fundamentally overhauled processes in direct

1    response to your Honor's orders and is seeking your Honor's

2    blessing as to Process 2.0 and the reuse of its know-how.

3         It has always taken a deferential, conservative

4    approach because what it wants more than anything is simply

5    the right to exist, the right to compete, and it shouldn't

6    be -- the only question is how.  The answer to that question

7    shouldn't hinge on Oracle's expanding notions OF what

8    cross-use means.

9         Oracle says the injunction prohibits Rimini from

10   reusing its own knowledge and experience, prohibits Rimini

11   from writing down its own creative expression and reusing that

12   with its clients, and prohibits Rimini, in the face of an

13   entire industry built on accessing and copying and modifying

14   JDE source code, that that entire industry is illegal and that

15   no one can develop updates for JDE software.

16        That's wrong.  It subverts the Copyright Act, it

17   undermines the Copyright Act, and it is not, I would submit,

18   based on our good faith understanding of your Honor's

19   injunction, what the Court intended.

20        And after all the evidence is presented, even though

21   it is Oracle's heavy burden to prove otherwise, we will ask

22   you to find that Rimini is not in contempt, that it is in

23   substantial compliance, and to discharge the OSC.

24        Thank you, your Honor.

25             THE COURT:  Thank you, Mr. Vandevelde.

1              Mr. Pocker, what do you anticipate is your next

2    and first witness?

3              MR. POCKER:  Our first and next witness is

4    Ms. Frederiksen-Cross, our expert, which will be a lengthy

5    examination, I believe.

6              THE COURT:  Okay.

7              Well, what we'll do, we'll go ahead and take our

8    luncheon break now but reconvene at 1:15.  Does that work with

9    everyone?

10             MR. VANDEVELDE:  Yes, your Honor.

11             THE COURT:  All right.  Let's do that.

12             Thank you very much.  Court will be adjourned

13   until 1:15.

14                   (The noon recess was taken.)

15                        --o0o--

16

17

18

19

20

21

22

23

24

25

1          RENO, NEVADA, MONDAY, SEPTEMBER 20, 2021, 1:17 P.M.

2                              ---o0o---

3

4                    THE COURT:  Have a seat, please.

5                    All right.  The record will show we're

6     reconvened after the lunch break and prepared to proceed with

7     Oracle's first witness.

8                    MR. SMITH:  Thank you, your Honor.  Oracle calls

9     Ms. Barbara Frederiksen-Cross to the stand.

10                    BARBARA FREDERIKSEN-CROSS,
              called as a witness on behalf of the Plaintiff,
11                was sworn and testified as follows:

12                    THE CLERK:  Please state your name for the

13     record.

14                    THE WITNESS:  Barbara Frederiksen-Cross,

15     F-r-e-d-e-r-i-k-s-e-n-C-r-o-s-s.

16                    THE COURT:  And, Ms. Frederiksen-Cross, you're

17     free to remove your mask.

18                    All right.  Mr. Smith, go ahead, please.

19                    MR. SMITH:  Thank you, your Honor.

20                    Good afternoon.

21                    THE WITNESS:  Good afternoon, counsel.

22                         DIRECT EXAMINATION

23     BY MR. SMITH:

24     Q    Are you currently employed, Ms. Frederiksen-Cross?

25     A    Yes, I am.

1    Q    Where are you employed?

2    A    JurisLogic LLC.  It's a Portland, Oregon firm.

3    Q    What is the business of JurisLogic LLC?

4    A    We provide services to corporate clients and to

5    litigation matters and law enforcement related to analysis of

6    computer-based evidence, and most specifically source code,

7    but we also handle other forms of computer-based evidence as

8    well.

9    Q    Does JurisLogic provide forensic work?

10   A    We do forensic work, and we also do things like technical

11   due diligence in the context of mergers and acquisitions and

12   evaluation of computer software for trade secret, patent,

13   copyright.

14   Q    How long have you personally been involved in forensics

15   work?

16   A    My work in that field initially started in the mid '80s,

17   and it's been the full-time focus of my practice since 1997.

18   Q    For purposes of illustrating your educational background,

19   did you work with us to prepare some demonstratives?

20   A    I did.

21              MR. SMITH:  And with the Court's permission, I

22   will pass up some demonstratives that were shared with

23   opposing counsel last evening.

24              THE COURT:  You may do so.

25              MR. SMITH:  And may I approach the witness,

1    your Honor?

2                    THE COURT:  You may.

3    BY MR. SMITH:

4    Q   Okay.  Ms. Frederiksen-Cross, with respect to the

5    demonstratives that I just handed to you --

6                    MR. SMITH:  And with the Court's permission, I'd

7    like to display the second slide in the stack.

8                    THE COURT:  You may.

9    BY MR. SMITH:

10   Q   Can you please set forth your educational background for

11   us.

12   A   Sure.  I received my initial training in computer

13   software when I was in junior high and high school, but

14   received an Associate of Applied Science Degree in Computer

15   Programming in 1974 at the age of 18.

16          After that, I received technical training from IBM

17   initially in internals of operating systems and databases and

18   telecommunications systems, and throughout the years I've also

19   received training from Amdahl, Hitachi Data Systems, Verhoef,

20   and in the SAS Institute, Merrill Consultants, Microsoft, and

21   other specialty providers for training in that computer field.

22          Most of my advanced training in operating systems

23   internals came from IBM, Amdahl, and Microsoft, and those, in

24   addition to what I listed before, included diagnostics and a

25   lot of training related to systems performance engineering.

1              And then my training in forensic analysis for

2    computer software came principally from my mentor Andy

3    Johnson-Laird who was one of the early pioneers in that field.

4    I also received some training through my involvement with law

5    enforcement activities.

6    Q    Okay.  And does the next slide in your demonstrative set

7    forth your work experience?

8    A    Yes, it does.

9    Q    Can you briefly describe that work experience.

10   A    I have a little over 47 years experience in software

11   development for pay and about 35 years total experience in

12   forensic analysis.

13             I've served as a computer programming instructor for

14   various consulting firms, again, on areas related to

15   performance and database and telecommunication systems.

16             I've been a systems programmer and systems

17   administrator in multiple different platforms, including main

18   frames, midrange systems, and network computer systems.

19             For a number of years I was the regional manager for

20   a software consulting services company.  That business has

21   since been retired as I moved into forensics full time.

22             I've done development for operating system

23   extensions and modifications, and served as Nike's team leader

24   for storage and capacity/management for three years, and then

25   for Pacific Telecom for a comparable period of time.

1    Q    Okay.  Do you have a slide setting forth your business

2    and litigation consulting experience?

3    A    Yes, I do.

4    Q    Can you please describe your legal consulting and expert

5    testimony experience.

6    A    This was -- would include some experience in the

7    negotiation of software development licenses and also auditing

8    software licenses for -- both for software compliance, license

9    compliance in terms of the number of copies deployed,

10   et cetera, software system audits.

11            And that spans kind of a wide spectrum of activities

12   from whether or not the audited systems worked to

13   security-related features with respect to the systems and

14   audits generally related to the security and use of the system

15   to ensure that there was no inappropriate use of the system,

16   obviously software development and programming throughout that

17   47 years.

18            Forensic software analysis, I've been involved in

19   over a hundred civil and criminal matters -- a number of

20   smaller ones that I don't count in that number, but a hundred

21   that had any real substance, and that included working as a

22   consultant to the Federal Bureau of Investigation and the

23   Hillsboro High Tech Crime Team in Hillsboro, Oregon.

24   Q    Let me stop you there for a second.

25            Can you describe your work for the Federal Bureau of

1   Investigation in a little bit more detail.

2                    (Discussion held off the record.)

3   BY MR. SMITH:

4   Q    I said can I stop you there, and can you please describer

5   your experience --

6                    THE COURT:  And, Mr. Smith, if it's convenient

7   to you, you're welcome to sit down and speak into the

8   microphone.

9                    MR. SMITH:  Okay.  That might be easier.  Thank

10  you, your Honor.  That's better.  Yes.

11  BY MR. SMITH:

12  Q    Do you have my question?

13  A    Yeah, I think so.

14        The work I did for the FBI was principally

15  surrounding a computer sabotage case and an investigation in

16  criminal trade secret theft.

17        And then I also consulted with respect to some

18  processes and procedures for the appropriate handling of

19  electronic evidence and advised on some techniques related to

20  handling very large quantities of evidence.

21  Q    Okay.  Can you continue with your description of your

22  litigation experience with respect to source code analysis.

23  A    Yeah.  I performed source code analysis in over 40

24  copyright and trade secret matters that directly involve the

25  comparison of source code and/or object code to detect copying

 1   and derivative works.

 2            My clients in these matters were Caterpillar,

 3   Computer Associates, Compuware, FOREX, Capital Markets,

 4   LexisNexis, Symantech, and a number of smaller clients that

 5   probably wouldn't have the same name recognition, and I've

 6   also done source code analysis in the context of at least 35

 7   patent disputes.

 8   Q   Okay.  Over the course of your career have you had the

 9   opportunity to author publications and make presentations?

10   A   I have.

11   Q   And does the next slide highlight those activities?

12   A   It does.

13   Q   And can you describe those activities for us.

14   A   Sure.  I have authored, co-authored, and presented

15   approximately 75 papers or presentations that span a variety

16   of topics, including cyber liabilities, software security,

17   reverse engineering, appropriate processes for search and

18   seizure in criminal investigations, electronic discovery,

19   techno-archeology, which is the investigation of software

20   development and failed software development projects.

21            And I think that covers most of it.

22            There's also been a fairly significant amount of

23   work in the area of consumer liability where it involved the

24   collection and analysis of evidence to answer questions like

25   who knew what when and was there a coverup.

1   Q    Okay.  Have you had the opportunity to teach any courses

2   or lecture on software issues?

3   A    A number of these lectures were delivered at legal

4   symposia where my audience was directed primarily to attorneys

5   and corporate counsel covering areas such as discovery and

6   production of electronic evidence.

7            Some of the papers I presented were also peer

8   reviewed papers to software development groups like Pacific

9   Software -- Pacific Northwest Software Quality conferences,

10  and then some were to law enforcement agencies.

11  Q    Have you previously been qualified as an expert?

12  A    I have, yes.

13  Q    And in what areas have you qualified previously as an

14  expert?

15  A    The analysis of computer software, the analysis of

16  computer source code, the analysis of computer development

17  practices, the discovery, preservation, and analysis of

18  computer-based evidence generally.

19  Q    Ms. Frederiksen-Cross, were you retained by Oracle in

20  connection with its litigations involving Rimini Street?

21  A    I was, yes.

22  Q    And when did that occur?

23  A    I think my initial retention, which was in the context of

24  the Rimini II matter, was late 2017, or in about that time

25  frame, late 2017 or very early 2018.

1    Q    What was the nature of the work that you performed in

2    Rimini II?

3    A    In Rimini II I was reviewing evidence from a number of

4    sources related to Rimini software development and

5    distribution practices.

6    Q    Was there a particular time period you focused on for

7    purposes of your analyses in the Rimini II case?

8    A    Those materials spanned from roughly 2011 through 2018.

9    Q    And what types of materials did you review in connection

10   with your work in Rimini II?

11   A    There was quite a variety of materials produced there.

12   They included machine images which were actually the complete

13   image of computer systems of some of Rimini's clients, source

14   code that was produced by Rimini, both from its own systems

15   and those systems, information related to Rimini's automated

16   tools and the way those tools operated, deposition testimony

17   from Rimini witnesses and the associated exhibits which might

18   include e-mails and other documents, technical documentation

19   for Rimini's updates.

20          And then there was a variety of information also

21   produced by Oracle, so, for instance, copies of Oracle's

22   source code and copies of Oracle's updates and update

23   documentation.

24   Q    Did you have any involvement in what has been called

25   Rimini I prior to your retention for this proceeding?

1   A   No, I did not.

2   Q   And when were you asked to work in this proceeding?

3   A   As best I recall, my involvement in these proceedings

4   started in fall or late 2019, somewhere in the fourth quarter

5   of 2019.

6   Q   And what were you asked to do in the fourth quarter of

7   2019?

8   A   My remit here was to review evidence that was produced in

9   context of the post-injunction period, primarily to understand

10  whether Rimini's current support processes and the way that it

11  supported its customers and developed its software was

12  consistent with the Court's injunction.

13  Q   Was there a particular time period you focused on for

14  purposes of your analyses in this proceeding?

15  A   Yes, there was.  That time period started roughly

16  November 2018 when I understand the injunction to have been

17  issued.  There was a little bit of overlap with some of the

18  Rimini II materials.

19  Q   Do you have a demonstrative outline of the materials you

20  reviewed in connection with your work in this proceeding?

21  A   I do, yes.

22                  MR. SMITH:  And if we can show slide 6.

23  BY MR. SMITH:

24  Q   Can you briefly explain the materials you reviewed as

25  identified on your demonstrative.

1   A    Yes.   They included the Court's injunction rulings, legal

2   pleadings that have been filed by both parties.

3            I looked back to my expert reports from Rimini II,

4   as well as the expert report of Christian Hicks for background

5   on some of the prior processes just to have that background

6   fresh in mind;

7            Discovery responses, deposition transcript of Craig

8   MacKereth and the exhibits thereto;

9            Information from Rimini's AFW DevTrack, Jira, Spira

10  systems, as well as information from the shared network

11  drives, the SalesForce system and the SharePoint system.

12           There were custodial documents produced from 10

13  Rimini employees;

14           Some functional and technical specifications that

15  were produced in the context of this litigation, and also a

16  list of customers who had received updates;

17           Some of the internal e-mails between Rimini

18  individuals, and also some of the e-mails between Rimini and

19  its customers that were produced as a result of the custodial

20  production;

21           Documents that describe Rimini's support processes;

22           A sample of five productions from third parties;

23           Some portions of the underlying AFW data that

24  related to how files had been transferred, the portion of that

25  system used to transfer files between Rimini and its

1    customers.

2           I also reviewed these materials sometimes in the

3    context of Oracle source files and/or documentation that had

4    been produced for my review;

5           Some Rimini source code files that I compared to the

6    Oracle source code files.  It wasn't nearly the volume as in

7    Rimini II, but we did do some source code comparisons;

8           And information that was extracted from Spira, which

9    is a system that Rimini uses to track its testing, and Jira,

10   which is a system Rimini uses to track some of its development

11   activities;

12          And then also SalesForce records.

13   Q   Okay.  Your demonstrative indicates that you reviewed the

14   expert reports from Rimini II.  Did you rely upon your work

15   performed in the Rimini II case in this proceeding?

16   A   Not more than to provide information and understanding of

17   how the support practices that I was already familiar with,

18   you know, I refreshed my understanding of those, and with

19   respect to, for instance, information I had learned about the

20   format of some of Rimini's logs, for instance, that helped me

21   to read logs that were produced in this matter.

22   Q   Was there any difference in the quantity of materials

23   that you were provided to review in the Rimini II proceeding

24   in comparison to this proceeding?

25   A   Very huge difference, yes.

1    Q    And can you explain what that very huge difference was.

2    A    Well, the difference was both in character and quantity.

3         In Rimini II, for instance, we had entire machine

4    images which let us do some kinds of analysis, like forensic

5    analysis, to understand from the Windows system logs and from

6    artifacts in the recycle bin how certain files had come into

7    being or how certain machine images had come into being.

8         We didn't have that kind of evidence here.

9         In the Rimini II matter, there were over 600 client

10   machine images that were -- or information provided from over

11   600 clients and often multiple images.  So, for instance, a

12   development in a staging image.

13        In this matter, again, it was a much smaller scope

14   with respect to the third-party productions and didn't include

15   any images.

16        We had a much broader spectrum of source code in the

17   Rimini II matter that included basically all of the available

18   update information that Rimini had at that time, and here it

19   was a much narrower slice of source code.

20        With respect to some of the other artifacts that had

21   been -- that I've examined in Rimini II that related to

22   Rimini's then-current process, after the injunction Rimini had

23   ceased using some of those processes, so obviously that was a

24   difference here as well.

25        Far fewer depositions.  I think there were about 50

1  depositions that were provided in Rimini II as compared to a

2  much smaller number here.  I think the only one I saw here was

3  the MacKereth deposition.

4  Q    Just so we're clear, what is a "machine image"?

5  A    A machine image is essentially a complete image of all

6  aspects of that machine.

7            In the case of Rimini II, these were provided to us

8  as virtual machine images so they were copies of the actual

9  Rimini environment, including everything from files that were

10  in the delete bin to the operating system configuration and

11  operating system logs.

12  Q    And in Rimini II did you review machine images from

13  Rimini's clients?

14  A    Yes.

15  Q    And is it your understanding that that's where the

16  development occurs is on the customer's environment?

17  A    Yes.  Well, some of those environments were housed on

18  Rimini's system, just to be clear, during that -- or had been

19  prior to that time period, and so there were also some images

20  called see ZZ images that were now litigation-preserved copies

21  of systems that had previously been on Rimini's own system.

22  Q    Were you assisted by anyone in connection with your work

23  in this proceeding?

24  A    Yes, I was.  I was assisted by my colleague, Wilford

25  Thompson who aided me in some of my analysis and in processing

1    the data in this case.

2              And then Strohs, my colleagues at Strohs actually

3    housed the data, so they would receive the production from the

4    discovery firm and load it into a database for us so that we

5    could work with it there.

6    Q    Did you prepare and submit reports in this proceeding?

7    A    Yes, I did.

8    Q    And how many reports did you prepare and submit?

9    A    Three, I believe.

10   Q    Do you -- or did you have the opportunity to consider the

11   Court's order to show cause hearing and the briefing that led

12   to that -- let me rephrase that.

13             Did you have the opportunity to consider the Court's

14   order to show cause order and the briefing that led to that?

15   A    Yes, I did.

16   Q    And approximately how many hours have you worked in

17   connection with your engagement in this proceeding?

18   A    I think to date it's probably on the order of 700 hours

19   in this matter, and then personally about a thousand hours in

20   the Rimini II matter, somewhere between a thousand and 1200.

21   Q    And what is your billable rate?

22   A    $525 an hour.

23   Q    Through your work in this proceeding,

24   Ms. Frederiksen-Cross, have you formed any opinions?

25   A    I have.

1   Q    And did you work with us to prepare a demonstrative

2   outlining your opinions?

3   A    Yes, I did.

4   Q    So turning to slides 7 through 10 of your demonstratives,

5   can you please explain what your opinions are that you have

6   reached in this proceeding.

7   A    Certainly.  Based on my understanding as a technical

8   person, I'm not an attorney, of the Court's injunction,

9   Rimini's post-injunction conduct does not conform to the

10  injunction as I understand it.  So that's my first opinion

11  just as an overall opinion.

12          Secondly, with respect to specific paragraphs of

13  that injunction, the ones that I found that Rimini's behavior

14  doesn't conform to are paragraph 5.

15          And specifically they are Rimini accepted and

16  maintained Oracle copyrighted code and documentation on its

17  system.  They accepted maintenance of Oracle copyrighted

18  materials that weren't subsequently isolated, or at least I

19  was presented no evidence that they had been isolated or

20  quarantined or locked down in any sense to prevent any

21  inadvertent or deliberate access to those materials.

22          They copied protection expression from a PeopleSoft

23  program psptarry.cbl into a Rimini program, and they

24  distributed a derivative form of a 1099 update for Easter

25  Seals from Rimini seals meaning -- from Rimini's system,

1    meaning that distribution from Rimini to the client shows that

2    Rimini had that material on its system as well.

3    Q    Okay.  How about the next slide.

4    A    My third opinion was that Rimini continues its process of

5    cross-using environments from one customer as it conducts the

6    development, testing, and troubleshooting of its updates, and

7    also, in instances where it is troubleshooting or testing on

8    behalf of one customer, then for the benefit of another

9    customer which I understand to be contrary to paragraphs 4 and

10   5 of the injunction.

11        And some specific examples of that include Rimini's

12   use of the PeopleSoft environment associated with the City of

13   Eugene, Oregon, to test a file that was then provided to other

14   customers, their use of the City of Eugene's PeopleSoft

15   environment to test a file named rsi940a.sqr that was provided

16   to Matheson Trucking;

17        Its use of the City of Eugene's PeopleSoft

18   environment to diagnose and fix a bug regarding to printing on

19   W-2 forms for Johnson Controls;

20        And its development of one of its one code for all

21   fixes, that is to say a code file that was intended for use

22   amongst all of Rimini's customers as a part of the fix for

23   HCM200105, and this fix was related to Oregon quarterly tax

24   reporting and supplied in the file rsiqtrtx.sqr to Rockefeller

25   Group and Home Shopping Network.

1    Q    What is your fourth opinion?

2    A    My fourth opinion is that Rimini's copying of JD Edwards

3    source code as it is practiced in the provision of JDE support

4    appears to violate what I understand to be the Court's

5    injunction under the prohibition against copying J.D. Edwards

6    source code.

7         And based on what I've seen, they regularly copy

8    J.D. Edwards source code while developing and testing updates,

9    so that appears to apply to paragraph number 8 of the

10   injunction.

11        And then they also copied portions of J.D. Edwards

12   source code from Oracle's source code files into technical

13   specification documents which also appears to violate

14   paragraph number 8 as I understand it.

15   Q    What is opinion number six?

16   A    Rimini's --

17   Q    I'm sorry, 5.

18   A    Five.  Rimini's prvtsidx.plb file, or Rimini's possession

19   of that file, appears -- on its own systems appears to me to

20   be inconsistent with my understanding of the prohibition

21   regarding Oracle database -- regarding Rimini maintaining

22   Oracle database materials on its system.

23   Q    Now, how about number 6.

24   A    The limited production that we had in the OSC matter here

25   I think constrained somewhat the analysis of these -- or my

1    analysis because there was not quite the richness of field of

2    the evidence that we had seen before, and based on what I did

3    see, I believe that a broader production would have probably

4    yielded other examples.

5    Q    Number 7.

6    A    Rimini's recordkeeping, as I had noted previously in my

7    Rimini II, is somewhat fragile in that some records are not

8    retained that someone would expect a company of its size and

9    maturity to maintain with respect to the way that it develops

10   its software and the way that it distributes its software and

11   the way that it tests its software.

12            And generally, you know, with respect to what it

13   does, where it does it, who does it, and who it's distributed

14   to, and when it's done, the record is often incomplete.

15            And I think that -- I'm not attempting to apply any

16   opinion about why they do that, but the effect of this

17   recordkeeping and their changes of recordkeeping over time

18   serve to conceal rather than reveal what their actual

19   practices are, and so that renders it somewhat difficult to

20   evaluate whether or not they are fully complying with the

21   Court's injunction.

22   Q    What is your opinion number 8 if we are allowed to

23   present it, Ms. Barbara Frederiksen-Cross?

24            MR. VANDEVELDE:  And, your Honor, objection to

25   this opinion.  This opinion and a series of them in support of

1    this later in this deck were disclosed last night at 9:07 p.m.

2    We have never seen this opinion before.  It's not in any of

3    her reports.  She didn't testify about it.

4                    Rule 26 requires Oracle to disclose in a

5    complete way all expert opinions.  Opinion number 8 has never

6    been disclosed before.

7                    She has no opinions in her reports about

8    sanctions, about remedies, about monitorships.  Those words

9    don't appear in her reports.  There's nothing even remotely

10   akin to them.

11                   Expert discovery closed over a year ago in July

12   of 2020.  Nothing has changed since then.  If she had these

13   opinions, she could have put them in before.

14                   The prejudice is extreme.  Like I said, we

15   received this opinion literally last night at 9:07 p.m.

16                   As your Honor will recall, we moved on an

17   emergency basis to strike additional opinions.  That was

18   30 days ago, and there was prejudice then.  This is even more

19   prejudicial.

20                   She should not be able to offer opinions on

21   opinions that have never been disclosed before.

22                   THE COURT:  All right.

23                   Mr. Smith?

24                   MR. SMITH:  Yes, your Honor.

25                   This opinion we advised Rimini we would be

—114—

 1    providing if the Court requested it, and this is entirely at

 2    your discretion whether or not you would like to hear what

 3    Ms. Frederiksen-Cross has to say about monitoring sanctions

 4    now or later or never.

 5               I mean, maybe we can do it later as well.  We

 6    thought it might make sense to do it in the context of this

 7    proceeding because it flows from her opinions.

 8               THE COURT:  All right.  I'm going to sustain the

 9    objection at this time.  It may be that at a later time, if

10    things turn out that way, that the Court would consider it.

11    But for purposes of this hearing, the objection is sustained.

12               MR. SMITH:  Understood, thank you.

13    BY MR. SMITH:

14    Q    Okay.  Ms. Frederiksen-Cross, let's start with your first

15    opinion which I understand to be a general opinion that

16    Rimini's post-injunction conduct does not conform to the

17    injunction, and we're going to talk about specific instances

18    of that later this afternoon, but can you describe what you

19    mean just generally by the claim that Rimini's post-injunction

20    conduct does not conform to the injunction.

21    A    Certainly.  In my analysis of the materials provided in

22    this current OSC review, I located copyrighted materials,

23    copyrighted Oracle materials, on Rimini's systems.

24               I saw evidence that Rimini continued to create

25    derivative works and to cross-use those derivative works

1    across multiple customers, and that also included -- or also

2    saw evidence that J.D. Edwards source code was being copied by

3    Rimini, and that Rimini copied and used an Oracle database

4    file, prutsidx.plb [sic], which -- can I offer just a little

5    explanation about that Oracle file?  Because I know that

6    there's kind of a point of contention there.

7    Q    Sure.

8    A    The file was originally identified by me as a J.D.

9    Edwards file because it was included in the J.D. Edwards

10   distribution disk, and it's my understanding that the parties

11   have since come to agree that that is properly considered an

12   Oracle file, an Oracle database file, as opposed to a J.D.

13   Edwards file.  So I just wanted to make that clarification.

14            J.D. Edwards conversion 9.1 on requires Oracle as

15   its database, and prior to that Oracle database was an option,

16   so I'm assuming that that must be the reason that it was

17   included in the distribution of materials where I found it in

18   version 9.0 of JDE.

19            That was what led me to understand, initially that

20   it was a JDE file, and then subsequently, as this file has

21   been discussed, the parties, as I understand it, have agreed

22   that it's a part of the Oracle database system.

23   Q    Let's start with the first bullet point here.

24            Did you find instances of copyrighted material,

25   Oracle copyrighted material, on Rimini's systems?

1    A    Yes, I did.

2    Q    How did you do that?

3    A    My process for identifying Oracle copyrighted materials

4    was based principally on searching for Oracle copyrights, JDE

5    copyrights, PeopleTools copyrights, PeopleSoft copyrights in

6    their various spelling incarnations.  But, it's a very simple

7    script that you learn that just searches the production

8    specifically for copyright statements.

9    Q    And were the copyrighted materials you found on Rimini's

10   system isolated incidents?

11   A    I would not characterize them as such.  The list, for

12   instance, for Oracle within 15 of copyright, or JDE within 15

13   of copyright, or PeopleSoft or PeopleTools, initially revealed

14   about -- a little over 4,000 instances.

15            And then in order to review those more fully, we

16   winnowed it down a little bit to those that would be most

17   relevant, so we looked for -- we filtered out things that were

18   not files that started with a PO indicator that's used for

19   some of Oracle's updates, or that were specifically the file

20   types that are source code for Oracle, or that were text-based

21   files such as documentation.

22            And so we winnowed that initial number down to a

23   smaller number that we really focused in on.

24   Q    What was that small number?

25   A    As best I recall it here, I think it was about 1100 files

1    at that point, and then with respect to the source code

2    specifically, 900, I think, and 84, just shy of a 1000.

3    Q    Are you aware of Rimini's and its experts contentions

4    regarding your counts of Oracle copyrighted material found on

5    Rimini's systems?

6    A    I am.

7    Q    And could you explain what that contention is or at least

8    your understanding of their contention.

9    A    Well, my understanding is that with respect to the source

10   code files, for instance, that Professor Astrachan, Rimini's

11   expert, has taken the position that all but 90 of those files

12   were uploaded by Oracle's customers, and it doesn't explain

13   the other 90 that appear to have been uploaded to Rimini's

14   systems by Rimini engineers.

15          But that's -- my understanding of their position is

16   that the majority of this content was initially at least

17   uploaded by Oracle's -- I'm sorry, by Rimini's customers.  I

18   didn't mean to say Oracle's customers, sorry.

19   Q    With respect to the second bullet on this demonstrative

20   of your opinions, what's your general opinion regarding the

21   creation of derivative works?

22   A    Rimini continues to create derivative works, as I

23   understand that term to have been used by the Court, both in

24   the context of its PeopleSoft and JDE practices when it

25   modifies, extends, or creates content that is designed to run

1    specifically within the PeopleSoft or JDE environments and

2    which is dependent on those environments completely for its

3    operation and existence, that is to say, it cannot run

4    independently of those environments.

5            But it's also my opinion based on what I have seen

6    that they continue the practice of creating some derivative

7    works that are done by incorporating Oracle code directly into

8    software that they are developing as Rimini code.

9    Q    Based upon your analysis from the Rimini II proceedings

10   and this proceeding, has Rimini's practices with respect to

11   the creation of derivative works changed?

12   A    There have been some changes, as I think as we saw in one

13   of the opening slides.  There are some tools that Rimini no

14   longer uses.

15           But overall the practice of creating things in

16   customer environments, using those environments that are

17   dependent for the development act on use of those

18   environments, either for the creation or testing, and the

19   resultant files, are dependent solely on the PeopleSoft or JDE

20   environments they're directed to.  Overall, not much has

21   changed there.  There are some specific tooling changes,

22   however.

23   Q    What is your general opinion regarding cross-use?

24   A    That Rimini continues the practice of cross-use, that is

25   to say, the use of one customer's environment to develop

1    changes or to perform testing and specifically problem

2    diagnosis that they're doing on behalf of other customers, and

3    I'll present some examples of that as we go on today.

4    Q    In connection with your work in this proceeding, did you

5    find that the instances of cross-use were isolated?

6    A    That does not appear to be the case to me, no.

7    Q    And what is the basis for that statement?

8    A    Well, for example, there are cases where Rimini will

9    develop a particular update in a particular customer's

10   environment and then ship it to all of its customers which, to

11   my understanding, constitutes a pretty broad cross-use.

12   Rimini has quite a number of customers.

13            It also seems to be a pervasive process that as they

14   are developing, they will develop in one or two customer

15   environments that are essentially prototype environments, and

16   then once they have developed the fix and tested it in a

17   customer environment or environments, they will then ship that

18   fix to other customers as well.

19   Q    What is your general opinion regarding J.D. Edwards

20   source code?

21   A    Rimini's own documents state that they have made no

22   significant change or no real change to the J.D. Edwards

23   practice, and so they are still continuing to modify the

24   Oracle-shipped JDE source code in some instances when they are

25   performing maintenance for customers.

1           Some maintenance for JDE doesn't require source

2    code, but for ones that do require source code changes,

3    they're modifying the JDE source code which I understand,

4    based on the wording of the injunction, to be inappropriate.

5           I also see examples where they have copied portions

6    of J.D. Edwards source code into documentation that they are

7    using to guide developers in the deployment of Rimini-created

8    fixes across client environments.

9    Q    With regard to the last bullet point here, copying and

10   use of Oracle database files, does that reach to the

11   prvtsidx.plb file?

12   A    That is correct.

13           MR. VANDEVELDE:  Sorry to interrupt, but, your

14   Honor, objection to this as well.

15           As your Honor knows, and as I stated in the

16   opening, there has been no expert disclosure as to this file

17   as it relates to Oracle database still.

18           So, we received that supplemental report 30 days

19   that your Honor struck.  We received opinions relating to

20   monitorships last night.

21           And with respect to the prvtsidx.plb file as it

22   relates to database, we have yet to receive any expert

23   disclosure whatsoever as to how paragraph 15 in the injunction

24   might prohibit that use.

25           So it's a clear Rule 26 violation, it's

1    self-enforcing under Rule 37, and we ask that she not be able

2    to opine on that.

3                    THE COURT:  Mr. Smith?

4                    MR. SMITH:  Yes, your Honor.  The file at issue,

5    the prvtsidx.plb file, was the subject of extensive expert

6    disclosure and discussion by both parties.

7                    There was simply a misunderstanding, or there

8    may still be a misunderstanding as to what type of file it is,

9    but Ms. Frederiksen-Cross's analysis of that file should still

10   be fully allowed in this proceeding because it was disclosed

11   to Rimini and was the subject -- or the subject of an

12   opportunity for discovery.

13                   MR. VANDEVELDE:  Your Honor, if I can respond.

14                   The disclosed opinion of Ms. Frederiksen-Cross

15   as to that file was that it contained JDE software source

16   code.  That was an error.  It was a mistake.

17                   And there is no disclosed expert opinion as to

18   that file, as to paragraph 15 of the injunction.  It's not in

19   her reports, it wasn't in her deposition.

20                   Yes, she has referenced that file in her reports

21   but only to say that it contains JDE software source code

22   which is in error.  There is no other disclosed opinion about

23   that file.

24                   THE COURT:  Mr. Smith, do you have a response to

25   that?

1          MR. SMITH:  Yes.  There is an extensive

2    side-by-side comparison that Ms. Barbara Frederiksen-Cross

3    conducted with respect to that file, and I submit that that

4    shows substantial similarity between the two files.

5          You can call it a J.D. Edwards source code file,

6    you can call it an Oracle database file, there is still

7    copying shown by that demonstrative which was the subject of

8    discovery.

9          MR. VANDEVELDE:  Your Honor, her opinion as to

10   paragraph -- or actually in opening statement Oracle said that

11   their theory as to paragraph 15 regarding database is that it

12   has a local hosting prohibition.  It doesn't.  She has never

13   tied that file to any theory relating to database.

14          Yes, there's a side-by-side comparison, but what

15   she says about that comparison is that it is JDE software

16   source code.  That is false or in error at a minimum, and

17   there's no disclosed opinion as to this file as it relates to

18   database.

19          THE COURT:  I'm going to allow her to testify to

20   it.  I'm not going to limit cross-examination on behalf of

21   Rimini pertaining to these issues.

22          It appears to the Court that although the title

23   may have been incorrect, that the parties were dealing with a

24   commonly understood issue, and I'm therefore going to allow

25   her to testify.

1          MR. SMITH:  Thank you, your Honor.

2    BY MR. SMITH:

3    Q    And I think we heard from you that you had an opportunity

4    to analyze this prvtsidx.plb file; is that correct?

5    A    That is correct, yes.

6    Q    And what is your opinion regarding that file?

7    A    That file is a file that contains an Oracle copyright.

8              A plb file is a way of wrapping some of the Oracle

9    plsql code that's used to interact with the database.

10             The file, as I mentioned, is present I now know in

11   both the JDE distribution materials that I looked at in later

12   versions of JDE and also in the Oracle database distribution

13   that goes to Oracle customers when they're installing it, and

14   that file was found on Rimini's systems.

15   Q    Ms. Frederiksen-Cross, are you aware of Rimini's

16   Acceptable Use Policy?

17   A    I have seen documents that describe aspects of that

18   policy, yes.

19             MR. SMITH:  And now I would like to show you --

20   or distribute for the Court and opposing counsel, we have

21   taken the exhibits that we intend to use with

22   Ms. Frederiksen-Cross and placed them into a binder, a series

23   of binders, actually, that are in sequence for the exam.  We

24   thought that might be easier than paper shuffling associated

25   with a number of binders.

1          So, with the Court's permission we will

2   distribute copies of that binder to the Court and also to

3   opposing counsel, and the witness, I believe, also has a copy

4   set for her to the left.

5          THE COURT:  All right.  Is there any objection

6   to that procedure?

7          MR. VANDEVELDE:  There was extensive discussions

8   about exhibits with respect to this witness.  As long as it

9   corresponds to the agreements the parties had as to those

10  exhibits, then we have no objection.

11         MR. SMITH:  There are exhibits in the binders

12  that are still subject to admission, they are simply in the

13  order, but I expect to have a fight about the introduction of

14  exhibits before she's allowed to talk about it.

15         MR. VANDEVELDE:  No objection, your Honor.

16         THE COURT:  All right.  Let's proceed that way

17  then.

18         MR. SMITH:  And, Ms. Frederiksen-Cross, if you

19  could pick up binder number one, please.

20         THE COURT:  I appreciate the parties'

21  cooperation with regard to these exhibits.

22  BY MR. SMITH:

23   Q   So, Ms. Frederiksen-Cross, if you would look at the first

24  tab which is Oracle Exhibit 17 which has been preadmitted, can

25  you describe what this document is.

1    A    Yes.   This is a copy of Rimini's Acceptable Use Policy

2    and User Agreement effective September 4th, 2018.

3    Q    What is your understanding generally of this policy?

4    A    That -- of the policy or the document?   Sorry.

5    Q    Of the policy.

6    A    With respect to the use of Oracle's intellectual

7    property, or the intellectual property of other third parties,

8    this document sets forth some guidelines that basically say if

9    you receive them, don't use them, notify security, that

10   they're not to be used for any purpose, not to be

11   maintained -- you know, don't ask for them, don't use them,

12   don't copy them.

13   Q    If I could direct your attention to page 8 of 26, and

14   Section 9.1.1.4, this states,

15            "You may not," underline, "share a client's

16         (a) installation media, or, (b), other company's

17         software or materials with any other clients or use

18         it for another client."

19            What is your understanding of that statement?

20   A    Basically that Rimini is prohibiting the sharing or use,

21   that is to say the cross-use of any other company's software

22   or materials between clients.

23   Q    If you take a look at Section 9.4 of this policy, what is

24   your understanding of that provision?

25   A    9.4 relates to if an employee has downloaded, copied,

1    distributed, or otherwise used any other company's software or

2    materials other than authorized by the client's license or

3    maintenance agreement.  If you become aware of such use, you

4    must notify, in I guess an e-mail, security@riministreet.com.

5    Q   Can you take a look at Section 10.1.2.1 which is on the

6    same page, and provide me with -- or provide the Court with

7    your understanding of what non-use data is.

8    A   Yes, it defines non-use data as information that is

9    provided by a customer that's sensitive either because it's

10    third-party software material, for instance code or similar

11    sensitive material, or, alternatively, it could be sensitive

12    client material like personal identifiable information.  So

13    that's characterized as non-use data.

14    Q   And would you consider Oracle copyrighted materials to be

15    non-use data?

16    A   I would based on the description given here.

17    Q   If you could take a look finally at Section 33 which is

18    the appendix which provides some, quote, can't copy rules.

19          Can you provide the Court with your understanding of

20    the can't copy rules.

21    A   Do you have a page number for that counsel?  Sorry.

22    Q   Yes, it's 26 of 26, the last page.

23    A   Thank you.

24          Can't copy here is specifically identified to mean

25    other companies' software and materials that are not licensed

1    to Rimini Street.

2    Q    And would you consider Oracle copyrighted materials to

3    fit within can't copy content?

4    A    Yes, it specifically gives Oracle as one of the examples

5    here.  And that's -- the Rimini user is told not to bring the

6    content onto the computer, not to move it from one client to

7    another, not to move this content onto a client's system

8    unless Rimini has permission to do so.

9              And if you see -- again, if you see this

10   information, don't copy it, don't delete it, don't forward it,

11   but promptly report it to security@riministreet.com.

12   Q    Based upon your review of Rimini's post-injunction

13   support practices, do you have an opinion as to whether or not

14   Rimini employees comply with the provisions we just went

15   through?

16   A    Although I did see a few isolated incidents of

17   compliance, by and large I saw no evidence that Rimini was

18   complying with this policy in most cases where I found Oracle

19   content.

20   Q    Are you aware of what Rimini describes as its Process

21   2.0?

22   A    I am.

23   Q    Do you have an understanding as to when Rimini changed

24   its processes from 1.0 to 2.0?

25   A    My recollection is that change started in about July of

1    2014.

2    Q    How, if at all, do Rimini's post-injunction support

3    practices differ from the support practices of Rimini that you

4    analyzed in Rimini II?

5    A    Well, again, as I mentioned earlier, after the Court's

6    injunction ruling was upheld, I see that Rimini had stopped

7    using a couple of tools, specifically Code Analyzer and

8    DevReview.

9          And that also in the -- in the Rimini 2.0 phase,

10   Rimini migrated from its machine those customer images that it

11   had previously been hosting either to wind stream images -- I

12   mean, to wind stream environment, or back to the client's home

13   environment.

14   Q    I'd like to show you -- or please take a look at

15   Exhibit 14 which is the next tab in your binder which was also

16   preadmitted.  Do you recognize this document?

17   A    I do.

18   Q    And are you relying upon this document in any way in

19   connection with your opinions?

20   A    Yes.  This is a document where Mr. Benge e-mails to

21   PeopleSoft developers, or the PeopleSoft team, some of the

22   members of the PeopleSoft team, a PeopleSoft injunction

23   compliance notice.

24          And here, it basically calls out that,

25              "Until further notice, the PeopleSoft team

1          will immediately stop using the Code Analyzer and

2          DevReview tool.  These are the only changes to our

3          current PeopleSoft support services."

4    Q    Was it significant to you that these were the only two

5    changes that Rimini made to its support services?

6    A    It was because I would have expected Rimini to also give

7    some guidance about the use of customer environments on behalf

8    of the support of other customers, and to make maybe more

9    clear to the developers, you know, more specific guidance

10   about what behaviors were allowed and not allowed.

11   Q    If you could take a look at Exhibit 2, which is the next

12   exhibit in your binder, and has also been preadmitted, do you

13   recognize this document?

14   A    Yes.  This is a similar notice from Mr. Grigsby to J.D.

15   Edwards development team relating to J.D. Edwards injunction

16   compliance.

17   Q    Was this document important to your analysis?

18   A    It was.  Again, this document sets forth in the middle of

19   the page,

20          "We do not believe we need to make any

21          changes to our support process for J.D. Edwards to

22          comply with the injunction."

23   Q    I'd like to return to the demonstrative outline of your

24   opinions and take a look at slide 12.

25          What is your second opinion, Ms. Frederiksen-Cross?

1    A    That in Rimini's post-injunction conduct they appear to

2    have failed to conform to my understanding of what paragraph 5

3    of the injunction requires, specifically by the acts of

4    accepting and maintaining Oracle copyrighted code and

5    documentation on Rimini's systems.

6    Q    And let me just remind for everyone what paragraph 5 of

7    the injunction provides.

8         Are there subcomponents to your opinion number two

9    regarding compliance with paragraph 5 of the injunction?

10   A    Yes.  There are several different flavors of behavior

11   that I note were probably outside the conformance with this

12   paragraph.

13   Q    Okay.  Can we take a look at a summary of those.

14   A    Yes.

15   Q    And can you please explain the components of this opinion

16   that Rimini accepted and maintained Oracle copyrighted code

17   and documentation on its system without any apparent reporting

18   or action being taken by Rimini.

19   A    As specific examples of the kinds of copyrighted

20   materials that I mentioned earlier, finding psptaxdt.dsm

21   source is an Oracle file that I found on Rimini's systems.

22         I also found PeopleSoft documentation on Rimini's

23   systems, and PeopleSoft document -- specifically documentation

24   both provided by G6 Hospitality and documentation provided by

25   Texas Children's Hospital.

1          MR. SMITH:  Okay.  Let's start with the

2    psptaxdt.dms source code file.  And for the Court's benefit

3    I'm going to display, with the Court's permission, the Court's

4    prior statement in the order to show cause order as to this

5    file.

6          THE COURT:  You may do so.

7    BY MR. SMITH:

8    Q    Is it your understanding, Ms. Frederiksen-Cross, that the

9    presence of this file on Rimini's systems has already been

10   found to be a violation of the injunction?

11   A    It's my understanding that the Court has found this to be

12   so, yes, and you've got the significant section highlighted at

13   the bottom of the page here.

14   Q    What, then, is your opinion with respect to this

15   psptaxdt.dms file?

16   A    Again, that its presence on Rimini's system appears to --

17   not to conform with paragraph 5 of the injunction.

18   Q    Anything further with regard to your opinion as to why

19   this -- why this is not in conformity with paragraph 5?

20   A    Let me look back at paragraph 5.

21          Well, specifically, I guess because its presence on

22   Rimini's system indicates that it has been placed on a

23   computer system other than a specific licensee's own computer

24   system.

25   Q    To refresh everyone's recollection, what is this file,

1  the psptaxdt.dms?

2  A   This is an Oracle file containing an Oracle copyright

3  that was also modified by Rimini.  So essentially the copy of

4  the file found on Rimini's system is a derivative work of the

5  original Oracle file.

6       And it is a .dms file which is a file that is used

7  in interactions with the Oracle PeopleSoft environment to

8  process certain taxes and tax distributions, and it also --

9  any of those exemptions for the State of Washington.

10  Q   Can you please take a look at the next exhibit in your

11  binder which is preadmitted Oracle Exhibit 1337, and tell me

12  if you recognize that document.

13  A   Yes, this is the file we're talking about.  This is the

14  copy specifically that was found on Rimini's systems.

15  Q   And how do you know that what we have marked as

16  Exhibit 1337 is an Oracle copyrighted file?

17  A   Well, amongst other things, it contains an Oracle

18  copyright.  But I also compared it to the Oracle version of

19  this file and found that there were minimal changes.

20       MR. VANDEVELDE:  Objection.  Foundation, your

21  Honor.

22  BY MR. SMITH:

23  Q   Did you find --

24       MR. SMITH:  I'm sorry.

25       THE COURT:  Go ahead and establish foundation if

1    you can.

2    BY MR. SMITH:

3    Q    Yes.  My question was only how do you know that this

4    is -- or why is it your opinion that this document is an

5    Oracle copyrighted file?

6    A    Because on its face it bears an Oracle copyright, and

7    because its contents are largely in conformance with the

8    contents of the same named file that was produced to me by

9    Oracle.

10                   MR. VANDEVELDE:  Same objection, your Honor.

11                   THE COURT:  The objection is overruled.

12   BY MR. SMITH:

13   Q    Did you find a copy of this psptaxdt.dms file in more

14   than one location on Rimini's systems?

15   A    Yes.  This file was found both in Rimini e-mail

16   attachments and as a SalesForce attachment.

17   Q    And how was this file found on Rimini's systems?

18   A    This is one of the files that we found using the simple

19   search for the copyright, so copyright within a close

20   proximity to Oracle to help us identify files that had Oracle

21   copyrights.

22   Q    So this was just a word search?

23   A    Yeah.  It's a very simple script search.  It allows you

24   to, say, search for this word within this proximity of another

25   word.

1   Q   Okay.  You mention that you compared this file which was

2   found on Rimini's systems to a file provided to you by Oracle.

3           If you take a look at the exhibit which has been

4   preadmitted, Exhibit 221, is that the file you used for

5   comparison?

6   A   Yes, it is.

7   Q   How did you go about comparing the Rimini -- the Oracle

8   file found on Rimini's systems with the Oracle file?

9   A   We compared it both using a normalized line match tool,

10  and also using a tool called ARAXIS which is -- ARAXIS MERGE,

11  technically, which is a tool which allows you to display two

12  files side-by-side and to highlight the similarities or

13  differences depending on how you have the tool configured.

14  Q   What is a normalized line match tool?

15  A   Normalized line match just means that you do the initial

16  comparison ignoring differences that are upper case, lower

17  case, or that are differences in white space.

18          So, for instance, if there was a tab versus four

19  spaces, it would not flag that as a difference in the initial

20  pass.

21          So, it's a way of assessing similarity, ignoring

22  differences that are only related to things like line wraps or

23  white space or character case.

24  Q   Okay.  If you look at Exhibit -- or if you could take a

25  look at Exhibit 20, this one has not been preadmitted, but can

1    you just describe for the record what this is.

2     A    Sure.  This is a side-by-side that compares, on the

3    left-hand side, the Oracle-produced copy of file psptaxdt.dms

4    and, on the right-hand side, the file that we found in the

5    Rimini production with the same name.

6              And the side-by-side gives a few metrics about the

7    compare, and then it shows -- it indicates any differences in

8    the two files by marking certain lines with a highlighted

9    color, for instance, purple or green, depending on the nature

10   of the difference.

11             MR. SMITH:  Okay.  And so, your Honor, given

12   that the two underlying source code files are in evidence, we

13   would move this comparison, which is in essence a summary of

14   evidence, into evidence.  We could also mark it as a

15   demonstrative.

16             MR. VANDEVELDE:  Your Honor, I have no objection

17   to her talking about this.  We're only talking about two

18   files.  It's not a proper 2006 summary.  It's clearly

19   demonstrative.  She can talk about it.

20             It shouldn't be admitted into evidence.  It's

21   hearsay prepared outside the court and brought into court.

22             So, again, I have no problem her talking about

23   it.  It shouldn't be formally admitted.  It's not voluminous.

24   It's only two files we're talking about.

25             THE COURT:  I will admit it, but with those

1    qualifications that you have indicated.  In other words, I

2    admit it subject to your objection, and I will overrule the

3    objection.

4                          (Plaintiffs' Document Exhibit 20 received
                            in evidence.)
5    BY MR. SMITH:

6    Q    Can you describe the comparison that is shown in this

7    Exhibit 20.

8    A    This, as I say, the file that was supplied to me by

9    Oracle is shown on the left side.  The file found on the

10   Rimini system is shown on the right side.

11           The line numbers representing these files were

12   affixed by the comparison process to allow reference to files

13   more easily, or for discussion of these lines more easily.

14           And then examples of differences are shown.  For

15   instance, if you look at line 19 on both sides, you see that

16   one version had a copyright of 1988 and 2013, and the other

17   version had a copyright of 1988 and 2015.  So, they are

18   slightly different versions of the underlying file.

19   Q    If you look at the next page, there's some green

20   highlighting near the top.  What does that reflect?

21   A    Green reflects code that was present on the right side

22   but not on the left side.

23           And so what we see here is just some comments that

24   are part of a Rimini Street modification log.  So it's often

25   the case that programmers will put some sort of annotation in

1    a program when they change it to indicate the reason -- what

2    change they made and the reason for the change, and, in this

3    case, even when they made it.

4            So it identifies the change, but this isn't actual

5    functional code, it's just a comment.

6    Q    Based upon your review and analysis of Oracle Exhibit 20,

7    what conclusions did you reach?

8    A    If you page through the rest of the file, what you find

9    is that there were a small number of lines that were added by

10   Rimini as a part of that particular change.

11           So if you go, for instance, to page -- I believe

12   it's page 7, yes, you can see four lines that were added there

13   on the right-hand side highlighted in green.

14           And if you page through the remaining 16 pages, you

15   find a couple of other lines that were added in the code, but

16   the code is basically unchanged.  It's just these very few

17   lines that were added.

18   Q    You indicated previously, Ms. Frederiksen-Cross, that

19   this file, the psptaxdt.dms, was found in addition to Rimini's

20   e-mail's system and its SalesForce system.

21           My question to you is what is Rimini's SalesForce

22   system to your understanding?

23   A    Rimini appears, based on the records I have examined from

24   that system, to use SalesForce, which is a third-party

25   product, to track its communications with its customers, or at

1    least some of its communications with customers.

2              So, for instance, customers can enter a problem that

3    they're having in SalesForce, and then you might see an

4    exchange within the SalesForce record for that particular

5    issue between some of the Rimini engineers as they discuss the

6    problem, and sometimes there's additional information provided

7    by the customer, or from Rimini back to the customer, that's

8    recorded in the SalesForce system.  So it's a vehicle for

9    communication, really.

10   Q    You indicated previously that Rimini's SalesForce records

11   were provided to you in connection with your work in this

12   case; is that right?

13   A    In a form they were, yes.

14   Q    And how were Rimini's SalesForce records provided to you?

15   What form?

16   A    Rimini -- SalesForce sits on top of the database that is

17   constructed of several different tables, and what they

18   provided to us was a series of dumps of those database tables.

19             And then because SalesForce can have attachments

20   attached to it, they produced a file of Bates-numbered

21   attachments and kind of a cross-reference that would allow us

22   to tie those attachments back to the original SalesForce

23   records from which they had been produced.

24             So it was basically as a series of five or

25   six comma separated value table dumps, and then this

1    cross-reference index, and then the file of Bates-numbered

2    attachments that had been a part of the SalesForce system.

3    Q    Do you have a demonstrative that shows what you were

4    provided in connection with these table dumps?

5    A    It shows a sample of a table dump, yeah.

6                MR. SMITH:  And with the Court's permission, I'd

7    like to display a demonstrative that Ms. Frederiksen-Cross

8    prepared in that regard.

9                THE COURT:  All right.

10               THE WITNESS:  This is -- just to be clear, this

11   has actually been loaded into an Excel spreadsheet just to

12   make it a little bit easier to read.  As provided to us, each

13   column was just separated by commas.

14   BY MR. SMITH:

15   Q    Okay.  So what is this?

16   A    This is just a sample of one of the tables that is a part

17   of this SalesForce system.

18               And I apologize, some of the columns are truncated a

19   little bit, but basically there is in the first column

20   information that allows you to tie some of these tables

21   together, and then you have an account number and an account

22   ID, a case ID, a case number, et cetera.

23               So these are some of the things that would be a part

24   of a -- of the underlying data that the SalesForce system

25   would display to a user of that system.

1  Q   Was the SalesForce data that was provided to you in this

2  format voluminous?

3  A   It was, yes.

4  Q   Were you are able to analyze the SalesForce data that was

5  provided to you in this format?

6  A   It's very difficult to work with in this format, so we

7  wrote a program that would tie the various constituent pieces

8  together and display it in a HTML, in a format similar to that

9  used by the SalesForce, but also displaying those Bates number

10 references to the attachments so we could easily locate

11 attachments if we wanted to call them up.

12 Q   Just so I'm clear, you had to write software to translate

13 this data?

14 A   Yes.

15 Q   And was that time-consuming?

16 A   Very.

17 Q   Do you have an estimate of the amount of time it took to

18 translate the SalesForce data that was produced by Rimini?

19 A   I don't remember the specific number of hours, but it

20 took a few weeks to put together and to verify that it was,

21 you know, put together accurately and working property.

22 Q   Are you aware of other ways in which SalesForce data can

23 be produced for purposes of litigation?

24 A   Yeah.  SalesForce has the ability to export its records

25 as a -- in several formats, one of which is -- that I have

1    commonly seen before is just as a .pdf format so you can dump

2    the SalesForce records to a .pdf that looks very much like the

3    native SalesForce interface that one would work with.

4    Q    I would like to draw your attention to Exhibit 13 which

5    is preadmitted and which is the next tab in your binder.

6              What is this document?

7    A    Well, this is one of the specific case numbers, in this

8    case, case number 161623, that I have printed from the HTML

9    that we reconstructed from this SalesForce production.  But

10   it's selecting out just one specific case number, so it's just

11   one of the many cases that was in the SalesForce data.

12   Q    And did you create this document based upon the raw data

13   that Rimini provided?

14   A    Yes, this document is created from the underlying data

15   that Rimini provided.

16             In some cases I think I gave a little bit more

17   friendly description of what the fields were to make it a

18   little more comprehensible and legible.

19   Q    What customer is this SalesForce record for?

20   A    This one is for RR Donnelley and Sons.

21   Q    And does this record indicate how at least one copy of

22   the file came onto Rimini's systems, the file being the

23   psptaxdt.dms file?

24   A    It does, yes.

25   Q    If I could direct your attention to the seventh page of

1    this exhibit which is really page 8 of 12.  Does this page

2    show how the file came to be on Rimini's systems?

3    A    Yes.  If you look at the bottom box on page 8 of 12 where

4    it shows Bates number rsi007567905, and then there's an

5    attachment ID that was an attachment ID from the Rimini table,

6    and below that the same psptaxdt.dms, this is a record from

7    the Rimini SalesForce data that shows how that particular

8    attachment got placed in the SalesForce system.

9    Q    What day did that particular psptaxdt.dms file get

10   attached to the Rimini SalesForce system?

11   A    March 27th of 2019.

12   Q    Did the act of uploading the file onto Rimini's

13   SalesForce system require a copy of that file to be made?

14   A    Yes, it would require a copy to be placed in the

15   SalesForce attachments.

16   Q    What is your understanding of what happened after the

17   psptaxdt.dms file was uploaded to the Rimini's systems?

18   A    Give me just a moment here to refresh my recollection

19   here.

20         Well, you see -- if you move up to the second from

21   the top box, that -- wait.

22         There is some correspondence that's been cut into

23   this record from Arjit Ray that indicates that they're finding

24   that this -- that the psptaxdt file that Rimini delivered as a

25   fix to this issue is an old version which is missing some of

1    the updates.

2    Q    If you look on page -- I guess it's 9 of 12 in the second

3    box, is that what you're referring to?

4    A    No, I was kind of setting the stage for that.

5         At the point prior to this upload there's some

6    question about the version of the file, and then if you go to

7    page 9 of 12, you can see, for instance in the second box,

8    that -- and I apologize, I'm sure I can't pronounce this name

9    right -- Venugopal Nabhi is responding to Arjit that, you

10   know, they can see only one dms script that you've attached.

11        And he has gone in and looked at the change log in

12   that file, so he has opened the file to look at that

13   modification log at the head of the file to identify the date

14   of the file and what fix it came from.

15   Q    So is it your opinion that this sentence,

16        "I can see only one dms script, psptaxdt that

17        you have attached, and it has a change log that reads

18        as 9/5/2018 rsi-rcm2069," that that reflects an act

19        of opening the file?

20   A    Yes, that would reflect opening that file.

21        And if you remember when we looked at the file a

22   moment ago, at line 25 of that file that information with the

23   date and the particular HCM fix number that it was associated

24   with is in the green box in that file on the right-hand side.

25   Q    Do you understand the Venugopal Nabhi to be a Rimini

1    Street employee?

2    A    I do, yes.

3    Q    Would a software source code file need to be opened to

4    view its change log?

5    A    Yes, it would.

6    Q    Directing your attention to page 10 of 12, is there any

7    other evidence that Rimini opened or reviewed the psptaxdt.dms

8    file?

9    A    The short answer is yes.  I'm just looking for it here.

10            You said on page 10 of 12?

11    Q    I think it's on page 10 of 12 -- 10 of 11, sorry, 10 of

12    11.  It's the second -- it's the first full box on page 11 of

13    12 or 10 of 11 depending on which numbers you're using.

14    A    I don't have a 10 of 11.  I think -- I'm not sure my

15    pages are numbered quite the same as yours, I'm sorry.

16    Q    Would you like me to show you my page?

17    A    If you wouldn't mind.  That would maybe help.  I'm not

18    sure that --

19            THE COURT:  It may appear on the monitor as

20    well.

21            THE WITNESS:  Of course, sure.

22            So here again, he's -- I'm going to say Venu for

23    lack of mangling his name worse, is reaching out to the RR

24    Donnelley client and saying,

25            "We're curious to know where you got this

1          version.  This has not yet been released to any of

2          our clients.  It's scheduled to be released in P-02

3          the middle of the month."

4     BY MR. SMITH:

5     Q    Are you aware of any means by which Rimini could have

6     determined the version of the file that was in the possession

7     of RR Donnelley without opening the psptaxdt.dms file?

8     A    I am not aware of that.  Obviously, they did some

9     analysis with respect to this file to be able to figure out

10    what fix it was associated with and to know that this fix

11    hadn't been released to any clients yet.

12    Q    Would the opening of the psptaxdt.dms file on Rimini's

13    systems create another copy of the file?

14    A    It would create a copy in memory at the time the file was

15    opened for reviewed.

16    Q    Did you come across evidence that anyone at Rimini

17    reported the presence of this file on Rimini's systems to

18    security@riministreet.com?

19    A    I have seen no such evidence.

20    Q    Did you come across any communication from Rimini to RR

21    Donnelley advising them not to upload additional files?

22    A    No.

23    Q    Have you reviewed Professor Owen Astrachan's reports in

24    this case?

25    A    I have.

1    Q   Are you aware of his contentions regarding this file?

2    A   That it was updated by a Rimini customer, or that it was

3  uploaded by a Rimini customer, yes.

4    Q   Are you aware of his contention that it was "locked

5  down"?

6    A   I know he made that statement, but he didn't provide any

7  description other than a conversation, and I have not been

8  able to verify or see any evidence that it was locked down.

9         This was -- this file was just in the normal

10  attachments folder that was provided to us from the Rimini

11  system.

12    Q   Did you check the metadata of this psptaxdt.dms file?

13    A   Yes, that's how I know this file came from the normal

14  attachments folder, the same one we see being used for other

15  attachments.

16    Q   Had the file been locked down or isolated in some way,

17  would you expect the metadata to show something different?

18    A   I would expect that most likely it would, yes.

19    Q   Did you find additional instances of Oracle copyrighted

20  material on Rimini's systems?

21    A   I did, yes.

22    Q   And returning to your demonstrative showing the

23  components of opinion number two, what is the next instance of

24  copyrighted material on Rimini's systems that you analyzed?

25    A   The next instance was PeopleSoft documentation that was

1     received from G6 Hospitality and which came via an e-mail.

2     Q     And do you understand that the Court has already found

3     the presence of PeopleSoft documentation on Rimini's systems

4     to be a violation?

5     A     I understand that, yes.

6     Q     And then what is your opinion with regard to this

7     PeopleSoft documentation on Rimini's systems?

8     A     That this would be an example of that kind of violation.

9     Q     What type of PeopleSoft documentation from G6 Hospitality

10    was found on Rimini's systems?

11    A     This PeopleSoft documentation was a series of actual

12    PeopleSoft files, documentation files, that were part of

13    what's called a bundle.  So that would be an update that

14    contains typically more than one specific change.

15              And so there were several actual documents in this

16    series of files that were updated that bear the Oracle

17    copyright and are various forms of documentation related to

18    that bundle.

19    Q     Well, did you review evidence showing how these files

20    came onto Rimini's systems?

21    A     Yes, I did.

22    Q     If you could take a look at what has been preadmitted as

23    Exhibits 4, 5, 6, 7, 8, 9, 10, 11 and 12.

24    A     Yes.

25    Q     What are -- what is this compendium of exhibits?

1   A    Four is an e-mail -- actually a series of e-mail

2   exchanges between G6 and Rimini, and it tells the story of how

3   this bundle came to be on -- or how this bundle of

4   documentation came to be on Rimini's system.

5           And then the exhibits 5 through -- 5, 6, 7, 8, 9,

6   10, 11 and 12 are parts of this bundle.

7   Q    Okay.

8   A    Or parts of this -- the documentation that came with this

9   bundle.

10  Q    So looking at Exhibit 4, and if you could look at page 4

11  of Exhibit 4, do you see an e-mail from Ram Veerachamy to

12  Barbara MacEachern and Kelly Day at Rimini Street?

13  A    I do.

14  Q    And this e-mail states, "Hi, Barbara, please find the

15  attached image 28 documentation."  Do you have an

16  understanding of what image 28 documentation is?

17  A    That image 28 is a part of this bundle and seems to be

18  used rather frequently from what I've seen to refer to this

19  bundle.

20  Q    If you look at Oracle Exhibit 9, what is Oracle Exhibit 9

21  with somewhat more specificity?

22  A    Oracle Exhibit 9 is a PeopleSoft payroll for North

23  America, or documentation related to a PeopleSoft payroll for

24  North America fix, specifically released 9.2 PeopleSoft update

25  image 28.

1    Q    Okay.  Back to Oracle Exhibit 4.

2              If you look at the second page of Exhibit 4, do you

3    see that Rimini's Barbara MacEachern writes back to G6

4    Hospitality and indicates, quote,

5              "We were looking for the functional user

6         documentation.  Do you have that."

7              My question to you is what is functional user

8    documentation.

9    A    That would be user documentation associated with the

10   changes for that particular fix.

11             Sometimes a fix requires a user to make changes in

12   how they use the software, and sometimes it also contains

13   information related to the actual application of the fix.  So,

14   as a user of this fix, what you need to do to make use of the

15   fix.

16   Q    And does this exhibit indicate what happened next?

17   A    Yes.  If you go to page 1, the G6 -- e-mail from G6

18   Veerachamy Ramamoorthy -- let me spell that for the court

19   reporter, V-e-e-r-a-c-h-a-m-y, R-a-m-a-m-o-o-r-t-h-y -- is

20   writing back to Rimini Street saying,

21             "These are the documents that are related to

22        payroll for image 28.  Let me know if these are the

23        ones."

24   Q    Then what happened?

25   A    That e-mail comes in on November 27th at 1:55 a.m., and I

1    would have to translate the UTC time code on the subsequent

2    e-mail, but on that same day Barbara MacEachern at Rimini

3    forwards that to -- that package of documentation to other

4    Rimini employees.  So she forwards the e-mail with the

5    attachments attached.

6    Q    And in the e-mail to Mr. Benge and Ms. Blackmarr,

7    Ms. MacEachern of Rimini writes,

8              "I'm not sure if you have seen these yet, but

9         here are the docs for PUM 28 along with Tax 2018-D."

10              What is PUM 28, or what does that mean?

11   A    That's a PeopleSoft update again referring to this image

12   28 and tax 2018-D which is another component of that bundle.

13   Q    Did Rimini's receipt of the PeopleSoft files from G6

14   Hospitality create copies of the files on Rimini's systems?

15   A    Yes, it did.

16   Q    Did the forwarding of the files to Shelley Blackmarr and

17   Jim Benge create additional copies of the files on Rimini's

18   systems?

19   A    Normally it would do so.  I would need a little bit more

20   information about the specifics and how their e-mail system is

21   configured, but generally speaking it would do so.

22   Q    If Ms. MacEachern from Rimini opened the PeopleSoft

23   documentation upon receipt from G6 Hospitality, would that

24   create an additional copy on Rimini's systems?

25   A    Opening the file would create a temporary copy in memory,

1    but because these are Microsoft Word and Excel files, Word and

2    Excel also would create a temporary copy on the hard disk for

3    as long as that file was open.

4            And then, if you opted to save it, or if you made

5    any changes, that saved file would be saved, and if you closed

6    it without printing or saving, then it would delete the

7    temporary copy.

8    Q    Would that be true for every e-mail recipient of these

9    files?

10   A    For any e-mail recipient who opened any of these files,

11   yes, they would be creating at least in the memory copy and

12   then the temporary disk copy and potentially, if they saved it

13   somewhere, a more permanent copy.

14   Q    Do you have any opinions regarding Rimini's response to

15   the receipt of this PeopleSoft documentation from G6?

16   A    Well, we examined the log we had received of, you know,

17   the communications to the security team and didn't find any

18   evidence that there had been a communication about this.

19           We don't see any evidence in the e-mails that we

20   received that they responded back to say don't send us any

21   more of these.  You know, as we saw, they had specifically

22   requested these documents from G6 in the first place.

23           But we don't see any evidence that they followed the

24   designated Acceptable Use Policy with respect to these

25   documents either for notification or for a note telling the

1   client not to do this again.

2   Q   Does the fact that this documentation was forwarded to

3   Shelley Blackmarr and Mr. Benge have any significance to you?

4   A   Well, particularly to send it to Mr. Benge because, if

5   you recall, the PeopleSoft AUP notification that we looked at

6   a little bit earlier today was sent out by Mr. Benge.

7          So clearly he has the authority to say this is what

8   you should be doing, and he received copies of this

9   documentation, but, again, we didn't find any evidence that he

10  had followed the very procedures he was asking other employees

11  to follow.

12  Q   In connection with your review did you come across any

13  evidence that Exhibits 5 through 12, Oracle Exhibits 5

14  through 12 were quarantined or impounded in any way?

15  A   I haven't seen that evidence, no.

16  Q   Did you review the metadata for this documentation?

17  A   I did, and, again, it came from the custodial e-mail

18  system.

19  Q   Did you find an additional instance of Oracle copyrighted

20  material on Rimini's systems?

21  A   Yes, I did.

22  Q   And returning to your demonstrative, does this last

23  example involve the Texas Children's Hospital?

24  A   That is correct, yes.

25  Q   And if you could take a look at Exhibit 94 which should

153

1    be next in your binder and has been preadmitted, can you tell

2    me what -- can you tell the Court what Exhibit 94 is.

3    A    Yes.   This is another Oracle file.   This one contains

4    PeopleSoft payroll for North America tax update 18-E, tax

5    update notes release 9.1, so the release notes for this

6    particular Oracle update.

7    Q    So does this release note documentation contain an Oracle

8    copyright notification?

9    A    Yes.   It contains both the notation that it is PeopleSoft

10   proprietary and confidential at the bottom of each page, and,

11   on the second page of this document, a copyright notification

12   just like the other documents we looked at.

13   Q    And so was this another document that you found by using

14   a simple word search?

15   A    Simple word search for "copyrights," yes.

16   Q    Does this -- do you know where this -- well, what is a

17   share file?   Can you tell us what a share file is.

18   A    A share file is a term that's used typically in

19   description of the Citrix product that is a piece of software

20   that allows or facilitates the creation of storage areas that

21   can be shared amongst multiple people.

22        So, for instance, you might have all your developers

23   share in a share area, or you might create a share file for

24   communication outside your corporation.   So it can be used

25   both internally and externally.

1    But it is -- you can think of it as a storage

2 location similar to a normal folder on a hard drive.  It's got

3 a little bit more sophistication than that, but it can be used

4 to manage and store files on a system or in the cloud.

5 Q Where was -- or where did you find the file that we've

6 marked as Oracle 94?

7 A This was found in the share file of Rimini employee

8 Thomas Glazer -- or, I'm sorry, in the user shares that were

9 set up within the share file for Mr. Glazer.

10 Q Are the user shares and share files part of Rimini's

11 computer systems?

12 A I understand them to be, based on this production, yes.

13 Q And how do you know the document came from the share file

14 folder of Tom Glazer of Rimini?

15 A Well, if you go to OREX 95, the next exhibit, we have the

16 metadata associated with this file, and so you can match again

17 using the Bates numbers on the first page of this -- of

18 OREX_0094 to the Bates number shown as the control number in

19 the production from the e-discovery provider and match those

20 up to see that it's the same file.

21    You can see the custodian was the share file system.

22 But then if you read down, you see -- in the path name you see

23 Rimini Street, slash, user share, slash, Thomas Glazer, slash,

24 TCH.

25    So this indicates the location within the share file

 1    system, you know, within the hierarchy of folders, and it's in

 2    Mr. Glazer's folder.

 3    Q    Does Exhibit 95, preadmitted Exhibit 95 that you were

 4    referring to, does it show the date it was -- the document

 5    which we've marked as Exhibit 94 was placed into Mr. Glazer's

 6    share file or user share?

 7    A    Yes.  If you look at the date created, that would

 8    represent the date that this file was created in that

 9    particular location.

10            So if -- when you move a copy of a file to a new

11    folder, the date created will represent the date that that

12    copy was placed in the folder.

13    Q    And what date does this indicate the copy was placed in

14    the folder?

15    A    November 30th, 2019, so about 10 months after that

16    e-mail.

17    Q    Okay.  If you could take a look at Exhibit 96.  Do you

18    recognize Exhibit 96 which has also been preadmitted?

19    A    Yes.  This was another PeopleSoft payroll for North

20    America user documentation 2019 U.S. payroll tax table updates

21    documentation that was also found in Mr. Glazer's share file.

22    Q    Does Exhibit 96, the PeopleSoft payroll for North America

23    documentation, contain any Oracle copyright notice?

24    A    Yes.  As with the other files, on the second page it

25    contains the Oracle copyright notice, and on each page it

1    contains the PeopleSoft proprietary and confidential

2    designation.

3    Q    Okay.  And now with reference to what has been

4    preadmitted as Oracle 97, which I think you referenced just a

5    moment ago, what is Exhibit 97?

6    A    This, again, is the metadata that is associated with this

7    particular file that we were just discussing, rsi007954231.

8    This is the metadata that shows where that file was retrieved

9    from.

10            So, again, it shows that the custodian was the share

11   file system, and the path was Mr. Thomas Glazer's user shares

12   within the share file system.

13   Q    And does this show the date upon which the PeopleSoft

14   documentation, which is identified as Oracle 96, was placed

15   into Mr. Glazer's share file system?

16   A    Yes.  Again, if you look at the "date created" line, it

17   shows this was placed into the share file on November 30th,

18   2019.

19   Q    Would the placement of these documents which we have

20   marked as Exhibits 94 and 96 into the share file system create

21   copies of the files?

22   A    Yes.  The copy would be -- the initial file would have

23   been received in the e-mail, and then the copy of this file

24   would have been placed in the share file location.

25   Q    Are you aware of Rimini Street's contention that this tax

1    update 18-E documentation, which I think is 96 -- I'm sorry,

2    94 and Exhibit 96 -- strike that.

3            Are you aware of Rimini's contention that Exhibits

4    94 and 96, the PeopleSoft documentation, were provided to it

5    by a customer?

6    A    I am aware of that, yes.

7    Q    And are you aware of evidence to that effect?

8    A    Yes.

9            MR. SMITH:  And at this time, your Honor, we

10   would like your permission to have Ms. Frederiksen-Cross

11   address a document that was not considered by her until after

12   the OSC order was issued but is on Rimini's exhibit list that

13   there's no objection to.

14           We would expect to have it come in through

15   Mr. Benge or other witnesses, and would likely be subject to

16   rebuttal, a rebuttal case, but fits within the context of what

17   we're discussing right now, and this is Defense Exhibit 110.

18           THE COURT:  Mr. Vandevelde?

19           MR. VANDEVELDE:  Hold on, your Honor.  I'm just

20   checking our exhibit list.

21           No objection, your Honor.

22           THE COURT:  You may proceed Mr. Smith.

23               (Plaintiffs' Document 110 received in
                    evidence.)

24   BY MR. SMITH:

25   Q    Ms. Frederiksen-Cross, directing your attention to the

1    next tab in your binder which is Defense Exhibit 110, is this

2    the evidence that you understand Rimini is pointing to as

3    to -- as to show how these files came onto its system?

4    A    Yes, I understand this e-mail chain to be that evidence.

5    Q    Does this e-mail show that the tax update 18-E

6    documentation was sent to Rimini by Texas Children's Hospital?

7    A    Yeah.  If you read through the entire e-mail chain, it

8    does.

9    Q    Okay.  If you look at the second to the last page at the

10   bottom, do you see an e-mail from Eric S. MacAfee, at

11   texaschildrens.org to Thomas Glazer at riministreet.com?

12   A    Yes, indicating that the -- that he is attaching the 18-E

13   release notes.

14   Q    And given the fact that the 18-E documentation was sent

15   to Rimini by a customer, is it still your opinion that Rimini

16   is not acting in conformity with paragraph 5 of the

17   injunction?

18   A    That is my opinion, yes.

19            For instance, on this same page we were just looking

20   at, page 5, if you look up a little bit higher on the page,

21   you see, for instance, that the -- this is being forwarded.

22            "Kevin, please take a look," asking Kevin Wood at

23   Rimini Street to take a look at this forwarded function that's

24   being sent by Tom Glazer the individual who initially received

25   it, and you see them thanking the client for providing this

1    file.

2    Q    Is there any significance to the fact, in your mind, that

3    the file was e-mailed to Rimini Street in January of 2019 but

4    then was placed into the share file folders of Mr. Glazer 10

5    months later?

6    A    Well, it shows that Rimini was not only receiving this

7    file but deliberately saving a copy of this file on another

8    location outside of Mr. Glazer's e-mail attachments on the

9    share file system.

10   Q    Is there an indication in Exhibit 110 that the

11   documentation was provided to Mr. Benge?

12   A    Yes.  If you look at the second page, the one Bates

13   ending 59712, you see lower on that page that Mr. Glazer is

14   cc-ing several Rimini employees including Mr. Benge.

15            And he says, "Jim, sorry, forget to cc you on this."

16            So, he is also providing copies of this document to

17   Mr. Benge and others.

18            MR. VANDEVELDE:  Objection.  It misstates the

19   document, your Honor.  There's no indication that it was

20   forwarded, the attachment.

21            THE COURT:  I'm sorry.  I didn't understand

22   your --

23            MR. VANDEVELDE:  Objection.  It misstates the

24   document.  It's forwarded, but there's no indication that the

25   release notes were actually forwarded unless she can point to

1    something else.

2                        THE COURT:  All right.

3                        Would you clarify that, Mr. Smith, if that's

4    correct.

5                        MR. SMITH:  My only clarification would be that

6    the subject line does indicate "forward."

7                        THE COURT:  All right.

8                        I'll admit it and allow the testimony.  I

9    understand it may be subject to cross-examination, and I also

10   accept the limitations that have been stated by          Mr.

11   Vandevelde.

12                       THE WITNESS:  And I think, just to clarify, that

13   it says that the e-mail has been forwarded, and the e-mail

14   that was forwarded also contains images of where Mr. Glazer

15   had put copies of the release notes.

16                       But these are on the PeopleSoft directory.  It's

17   not clear which specific machine it's on, but it appears to be

18   the remote desktop connection.  So, it may have been to

19   another Rimini machine or another client's machine.

20                       So in addition to this copy, he's also placing a

21   copy somewhere.

22   BY MR. SMITH:

23    Q    With respect to the documentation that was found both in

24   the e-mail files and the share files of Rimini from Texas

25   Children's Hospital, did you find any evidence that any of the

1  copies were quarantined?

2  A   I did not see any evidence that would demonstrate to me

3  that those copies had been quarantined.

4  Q   Did you find any evidence that Texas Children's Hospital

5  was advised not to submit documentation to -- or copyrighted

6  documentation to Rimini?

7  A   I have not seen any such evidence.

8  Q   Did you see any evidence of any reports to

9  security@riministreet.com with respect to this documentation?

10  A   Again, I saw no evidence that this was reported to Rimini

11  Street security.

12  Q   In addition to the psptaxdt.dms file, the PeopleSoft

13  documentation for G6 Hospitality, and the PeopleSoft

14  documentation or Texas Children's Hospital, did you find any

15  other instances of Oracle copyrighted material on Rimini's

16  systems?

17  A   There were other instances, yes.  As I explained earlier,

18  when we ran our searches we found quite a variety of materials

19  on Rimini's system based on the inclusion of Oracle copyright.

20  Q   Returning to your demonstratives, and slide 17, do you

21  have some additional examples of Oracle copyrighted material

22  that you found on Rimini's systems?

23  A   Yes.  This lists some additional examples which are

24  related specifically to source code entities.

25  Q   And what is the first example of yours?

1    A    PSPTCALC.lis.

2    Q    Okay.  And now we have an unfortunate binder break, but

3    I'm going to bring up another binder to you and for the Court.

4              The binder that you have before you, though,

5    Ms. Frederiksen-Cross, can you take a look at Exhibit 98,

6    which is the last tab in that binder, and tell me if you

7    recognize it.

8    A    Yes, I do.

9    Q    And then -- have you already secured the second binder?

10   A    No, I haven't.

11              THE COURT:  I assume you're going to be spending

12   some time on the second binder.  Before we get into that, why

13   don't we go ahead and take our afternoon break.

14              MR. SMITH:  Very good.

15              THE COURT:  We'll take a break until 3:25.

16              Thank you very much.

17                    (A recess was taken.)

18              THE COURT:  Have a seat, please.

19              Let's go ahead with your examination regarding

20   Volume II.

21              MR. SMITH:  Thank you, your Honor.

22              We're going to actually straddle Volumes I and

23   II.

24              And with respect to Exhibits 98 and 99

25   which are the next exhibits that I'd like to examine

1    Ms. Frederiksen-Cross on, there is a remaining objection, I

2    believe, from defense side.

3                    THE COURT:  All right.

4                    MR. VANDEVELDE:  No objection, your Honor, to

5    those.

6                    THE COURT:  All right.

7                        (Plaintiffs' Document Exhibits 98 and 99
                           received in evidence.)
8    BY MR. SMITH:

9    Q   So, Ms. Frederiksen-Cross, can you look at Exhibit 98 and

10   Exhibit 99, and please tell us what they are.

11   A   Yes, I can.

12           Exhibit 98 is an e-mail exchange between Evergreen

13   Support and Rimini, and Exhibit 99 is a file that Evergreen

14   uploads -- or attaches to an e-mail, rather, and sends to

15   Rimini in response to that exchange.

16   Q   Okay.  Let's start with Exhibit 98, which is the e-mail,

17   and directing your attention to the second to the last page,

18   do you see the e-mail from Rimini's Manjula Hosalli to

19   Evergreen Support asking about Cobol compile requests?

20   A   I assume you're looking at the bottom of the page there.

21           "This is Manjula.  Could you please compile

22       Cobols for the HRMS91_v2 instance.  Our QA folks have

23       moved four updated Cobols."

24           Is that what you're referencing?

25   Q   Well, I was just going to ask you what does it mean --

1    what's the request to compile Cobols?  What does that mean?

2    A   That means to take the source code version of the program

3    and translate it into a machine readable version.

4    Q   And then do you see on the second page of Exhibit 98

5    there's a request from Ms. Manjula Hasali to Evergreen Support

6    reading,

7              "Could you please place the PSPTCALC.lis file

8         somewhere in server 10.2.251.108, and share the

9         location with us."

10             What is the significance of that e-mail?

11   A   What they're asking for is sort of explained by the page

12   that was in between here that we skipped over.

13             But basically when you are compiling Cobol

14   programming in the PeopleSoft environment that program may

15   include portions of other prewritten code.

16             And so for debugging purposes you want to see the

17   program in its entirety with all of those inclusions fully

18   expanded.

19             So here what they're asking, that .lis file, is that

20   expanded listing of that Cobol program with any of the

21   inclusions that were brought in during the compilation from

22   other files included within that.

23             So it's the source code that corresponds to the

24   program as it would run when it were actually executed in the

25   environment.

1    Q    Okay.  So is a .lis file a collection of other types of

2    files?

3    A    In the PeopleSoft environment specifically, generally it

4    would be multiple files.  It doesn't have to be in pure Cobol

5    land.

6            But in the PeopleSoft environment, because there are

7    inclusions that you put in a Cobol program in order to allow

8    it to interoperate with the PeopleSoft environment, these are

9    source code files provided by Oracle, then when you compile

10   that file, you need those inclusions, and you need the

11   corresponding listing to be able to debug problems.

12   Q    Okay.  On the first page of Exhibit 98 it looks like

13   Evergreen Support wrote to Rimini saying, "I found it now and

14   have attached it."

15           Do you understand they attached the .lis file,

16   l-i-s?

17   A    Yeah.  If you look at the top of page 2 of 5, after they

18   have requested the .lis file, she replies, "I can't find it,"

19   and they give her some guidance where to look for it, and then

20   she attaches it and sends it in the e-mail.

21   Q    Okay.  Did Greg, of Evergreen Support, attach it?

22   A    That is what the signature says, yeah.  The e-mail is

23   from -- it just says Evergreen Support, but it's signed Greg

24   so I assume that the individual's name was Greg.

25   Q    And did the e-mailing of the file cause a copy of the

1    file to be placed on Rimini's systems?

2    A   Yes, it did.

3    Q   Now, if you look at the attachments to Exhibit 98, which

4    is Exhibit 99, is that the .lis file?

5    A   It is.

6    Q   Does the .lis file contain any Oracle copyright notices

7    in it?

8    A   Quite a few, actually.

9    Q   Why does it contain more than one copyright notice?

10   A   Well, the initial copyright notice appears to be

11   associated with the PeopleSoft program, PSPTCALC.  That's the

12   one you see on the first page.

13           If you look elsewhere in the program, just ahead of

14   the Cobol copyright notice you'll notice that there is a

15   comment for a copy statement.

16           And so, for instance, just at random, if you turn to

17   page 57, near the middle of the page you'll see an asterisk

18   and it says copy PCSTARRY, the tax array program, and then

19   below that you will see the expansion of what was copied in,

20   and that expansion includes a Cobol -- or an Oracle copyright

21   at the top of page 146.

22   Q   And so let me just interrupt you.

23           MR. SMITH:  We don't have any video display here

24   on this end.  I think they do on defense side.  I just want to

25   make sure the Court has --

1          THE COURT:  I do.  You should have on your side,

2     too.

3          THE WITNESS:  I have the first one, the

4     copyright popped out.

5               (Discussion held off the record.)

6     BY MR. SMITH:

7     Q    Okay.  So is the size of this .lis file significant to

8     you in any way?  It's, I think, 260 pages or something.  It's

9     265 pages.

10    A    It just demonstrates the overall size of this particular

11    program when it's fully expanded with all of these included

12    files expanded out.

13    Q    And when you say included files, what do you mean?

14    A    Well, going back to that one that you had on the --

15    highlighted a moment ago from page 57, it -- you see that

16    there is a -- following line 29-61, there is a copy statement

17    for PCSTARRY, and then you'll see following that the

18    inclusions that -- the code that was brought in as a result of

19    that copy statement.

20          So I think we spoke of this earlier, I apologize if

21    we didn't, but programmers often put frequently used routines

22    or data descriptions into reusable files that will just have a

23    snippet of some particular logic or some particular file

24    layout because they know they're going to use it in many

25    different places.

1          And they call it into a program like a Cobol program

2    using a copy statement, and that just says during the

3    compilation of this program, the compiler, in a pre-compiler

4    step, sees those copy statements and says, "Ah, I know what to

5    do with this, I'll go get that chunk of code and just paste it

6    right in here where it belongs."

7          So it gets longer and longer and longer depending on

8    how many of these you have.  But then the output -- this

9    listing corresponds to the output of what would actually be

10   compiled by the compiler when it finishes the compilation

11   process.  So it's like step one of the compilation.

12   Q   Okay.  Does Exhibit 99, in your opinion, contain Oracle

13   protected expression?

14   A   Yes.

15          MR. SMITH:  And at this time, your Honor, I

16   would like permission to use the next exhibit in the book,

17   which is Exhibit 100, which was not an e-mail -- a specific

18   e-mail that's considered by Ms. Frederiksen-Cross in

19   connection with her reports but is simply a continuation of

20   Exhibit 98 which is an e-mail that she considered in her

21   reports.

22          MR. VANDEVELDE:  No objection, your Honor.

23          THE COURT:  All right.  You may do so.

24   BY MR. SMITH:

25   Q   And so directing your attention to Exhibit 100,

1    Ms. Frederiksen-Cross, do you recognize this document?

2    A    I do, yes.

3    Q    And does this document indicate in any way Rimini's

4    treatment of the RSCTCALC Cobol file that was uploaded or

5    provided to it by its customer?

6    A    Just a clarification if you'll permit it.

7            If they ask for the ps -- I'm in the wrong binder.

8    Let me just find it in this e-mail.

9            They ask for the PSPTCALC.lis file, and so then what

10   they're saying is that using this .lis file basically, you

11   know, they have requested the file, they've got it, and now

12   they say, "Thanks."

13           You know, issues with RSCTCALC.Cobol, so that's one

14   of the components here.  "We have fixed it and placed the

15   updated file," and then they give the location where they have

16   put the updated file after they diagnosed this problem and

17   fixed it.

18   Q    Okay.  So let me make sure I have this straight.

19           On page 2 of Exhibit 100 Evergreen Support writes to

20   Rimini saying, "I cannot find the PSPTCALC.lis"; is that

21   right?

22   A    Right.

23   Q    And what is a PSPTCALC.lis file?

24   A    That is the full expansion of this list.

25   Q    Is that an Oracle file?

1    A    It is, yes.

2    Q    Okay.  And then the customer, Evergreen Support, writes

3    back to Rimini and provides it with the RSCTCALC.Cobol file,

4    or it indicates that there was an issue with the

5    RSCTCALC.Cobol file.  Is that your understanding?

6    A    That is correct.  It appears that what was provided back,

7    the listing that was provided was PSPTCALC.Cobol, so the basic

8    PeopleSoft version after compilation or after full expansion.

9         But if you go to the second page of that long

10   listing file, which is page 2 of 265, you see that the --

11   there is a copy on that page for RSCTCALC, which is an RSI

12   copybook, so an RSI written chunk of code that has been

13   incorporated into the Oracle file at some point.

14        And so now they're writing back that, okay, we used

15   the list, we found the problem with our code that we had added

16   to it, and everything is good now, here's where the fix is.

17   Q    Okay.  So those two exhibits together indicate to you

18   that Rimini used the file that was supplied to them by

19   Evergreen Support to solve this case or to troubleshoot this

20   case.

21   A    That is correct, yes.

22   Q    Would review of the .lis file to diagnose an issue with

23   RSCTCALC.Cobol create another copy of the .lis file on

24   Rimini's systems?

25   A    Well, when they received the file, it would have been the

1    copy received in the e-mail.  When they opened the file to

2    review it, then that would have created an in memory copy

3    during the time that they were working to diagnose this

4    problem and looking at the full expansion to figure out what

5    the problem was.  So, there would have been that in memory

6    copy created.

7    Q    Did you come across any evidence of anyone at Rimini

8    advising Evergreen Support not to send Oracle PeopleSoft files

9    to Rimini?

10   A    No, I did not.

11   Q    Did you come across any evidence that PSPTCACL.lis file

12   attached to the e-mail to Rimini from Evergreen Support was

13   quarantined by Rimini in any way?

14   A    No.  And just to be clear, I find that significant

15   because it includes the full textural source code for all of

16   the Oracle copybooks that we see with their associated

17   copyrights scattered throughout this program.

18   Q    And can you explain in a little bit greater detail why

19   you find that to be significant?

20   A    Well, it means that in this provision of this .lis file,

21   you are actually providing the parent file, if you will, and

22   all of the individual inclusions that are in it, or at least

23   the source code for all the individual inclusions that are in

24   it are fully expanded.

25              That's why this file is 260 plus pages long, is

1    because it's not just the base file but it's with all of those

2    inclusions fully expanded.  So the source code for all of

3    those inclusions is present here.

4              And so especially in this case, I would have thought

5    there would have been care taken to make sure that this was

6    sequestered in some way.

7    Q    Did you review the metadata of the .lis file which we

8    marked as Exhibit 99?

9    A    I think that I did, though I do not see it here in my

10   binder.

11   Q    This is one where we did not print out the metadata

12   report, but is this a document that you considered

13   in connection with the SalesForce -- in connection with your

14   work?

15   A    Yes, specifically in connection with -- it was found in

16   the e-mail.

17   Q    And did the metadata review that you conducted, if you

18   recall, show anything about quarantining this file?

19   A    No.  It appeared to be in the normal attachments location

20   for -- in the inbox.

21   Q    Okay.  Can we go to your next example of additional

22   Oracle copyrighted material being found on Rimini's systems,

23   and what instance is this?

24   A    This is an instance that involves two specific source

25   code files, gettxdta.sqc and getstdta.sqc, that were provided

1   to Rimini from its client Guest Services.

2   Q    Could you please take a look at the next tab in your

3   binder which is Exhibit 103 and tell me if you recognize it.

4   It's been preadmitted.

5   A    Yes, I recognize this.

6   Q    If I said 93, I may have misspoke, I meant 103.

7   A    103.

8   Q    And what is the case number for this SalesForce case?

9   A    This is a SalesForce case for Guest Services with number

10   158235.

11   Q    And directing your attention to page 4 of 7 of this

12   exhibit, does this page show the attachment of a file by Guest

13   Services, Inc., to Rimini's SalesForce system?

14   A    Yes, it does.  You see on the very bottom box the client

15   is saying, "I have attached a copy of the program," and in the

16   box right above that you see the SalesForce record identifying

17   what was attached which is Bates number rsi007487681, and it

18   is the file gettxdta.sqc.txt.

19   Q    And what type of file is gettxdta.sqc.txt?

20   A    That is an Oracle SQC program which is a type of -- SQC

21   is one of the two types of files that are used with Oracle's

22   SQR programs.  SQR is the recording function, and SQC is

23   essentially the copied component.  If you want to put

24   something in one of those reusable components, you name it SQC

25   just to distinguish it.

1    Q    Can I call it a PeopleSoft file?

2    A    I'm happy to call it that.  It's much shorter, yes.

3    Q    Okay.  Did the act of attaching this PeopleSoft file,

4    gettxdta.sqc.txt, create a copy of the file on Rimini's

5    systems?

6    A    Yes, it did.

7    Q    And would the uploading of any file to Rimini's

8    systems -- SalesForce systems create a copy of the record on

9    Rimini's systems?

10   A    A copy of the file that was uploaded, yes.

11   Q    But would the uploading of any file into the SalesForce

12   system create a copy of that file on Rimini's systems?

13   A    Yes.

14   Q    And would the e-mailing of any file to Rimini create a

15   copy of that file on Rimini's systems?

16   A    Yes, it would.

17   Q    Does this exhibit -- I think you've already pointed it

18   out, but does this Exhibit 103 identify the Bates page of the

19   file that was attached?

20   A    Yes, it does.  It's in that second box from the bottom on

21   page 4 of 7.

22   Q    And did you review the file with the Bates page

23   rsi007487681?

24   A    Yes, I did.

25   Q    If you look at Exhibit 231, is that the file that was

1  attached to Rimini's systems?

2   A    Yes, it is.

3   Q    Did you use this file for any purpose in connection with

4  your analysis in this case?

5   A    Well, again, I looked at it to establish whether or not

6  it had an Oracle copyright, which it does, and then I compared

7  it to a file of the same name that was provided to me by

8  Oracle to understand how similar or different it was to the

9  Oracle file.

10   Q    Okay.  And directing your attention to Exhibit 222 --

11              THE CLERK:  May I interrupt?

12              MR. SMITH:  Yes.

13                   (Discussion held off the record.)

14  BY MR. SMITH:

15   Q    Okay.  So directing your attention to Exhibit 222 --

16   A    Yes.

17   Q    -- is this the Oracle file that you used for a basis of

18  comparison to the file that was uploaded onto Rimini's

19  systems?

20   A    Yes, it is.

21   Q    And is Exhibit 222 -- well, tell me what -- if you -- if

22  you want to -- well -- Exhibit 222 is a gettxdta file; is that

23  correct?

24   A    Yes.

25   Q    And is this also a file that was uploaded by Rimini's

1   customers to Rimini's systems, or is this the Oracle file?

2   A   No.  Exhibit 231, 0231, is the Rimini file, and Exhibit

3   222 is the Oracle file of the same name that I compared it to.

4   Q   Okay.  And then is Exhibit 201 your comparison that you

5   conducted between 222 and 201?

6   A   That is correct, yes.

7   Q   I'm sorry.  I said it wrong again.  Between 231 and 222.

8   A   Thank you, yes.  Between the Rimini file and the Oracle

9   file.

10              MR. SMITH:  All right.  So my apologies for

11   that.

12              So going back to Exhibit 231, I think there is

13   still an objection to this code file made by Rimini.

14              MR. VANDEVELDE:  No objection, your Honor.

15              THE COURT:  All right.

16              MR. SMITH:  So I would move Exhibit 231 into

17   evidence.

18              THE COURT:  It's admitted.

19                   (Plaintiff's Document Exhibit 231
                      received in evidence.)

20              MR. SMITH:  And then going back to Exhibit 201,

21   there's also an objection to this exhibit by Rimini, which is

22   the comparison.

23              MR. VANDEVELDE:  No objection, your Honor.

24              I'll just object that, again, this should be a

25   demonstrative in our view.  It's not voluminous.  It's

1    comparing two files.  But, know your Honor has overruled that

2    objection.

3               THE COURT:  Well, I'm treating it fundamentally

4    as a demonstrative, but it's admitted.

5               THE CLERK:  Will you repeat the exhibit number?

6    I'm sorry.

7               MR. SMITH:  Exhibit 201 is what is being

8    admitted as the comparison.

9                        (Plaintiff's Document Exhibit 201
                          received in evidence.)
10   BY MR. SMITH:

11   Q    Okay.  So, Ms. Frederiksen-Cross, do you recognize

12   Exhibit 201?

13   A    I do.

14   Q    What is this?

15   A    Again, this is a side-by-side comparison that I prepared

16   that shows a comparison of the Oracle file on the left-hand

17   side and the file that was -- with the same name that was

18   retrieved from Rimini's system on the right-hand side.  That

19   file is gettxdta.sqc.

20   Q    And based upon this comparison and your analysis of it,

21   did you come to any conclusions as to whether the PeopleSoft

22   file uploaded to Rimini's systems contained Oracle protected

23   expression?

24   A    Yes, it does.

25   Q    Okay.  So returning now to Exhibit 103, which is the

1   SalesForce case that we started with and to which the first

2   file was attached --

3   A    Yes.

4   Q    -- does this show any action taken by Rimini to

5   quarantine the gettxdta.sqc.txt file that was uploaded by

6   Guest Services on January 2nd of 2019?

7   A    Your question is specifically does it show any quarantine

8   activity?  No, I don't see any quarantine activity in here.

9   Q    Does this exhibit reflect any communication from Rimini

10  to Guest Services, Inc., to not upload such files?

11  A    No, I see no such advice in here.

12  Q    Did you ever come across any evidence of anyone at Rimini

13  Street advising anyone at Guest Services not to upload files?

14  A    I have not seen such advice, no.

15  Q    Now, did you review the metadata for the gettxdta.sqc.txt

16  file which was uploaded by Guest Services to Rimini Street

17  SalesForce system on January 2nd of 2019?

18  A    Yes, I did.

19  Q    And did that metadata indicate to you that Rimini had

20  quarantined that file in any way?

21  A    There was nothing evident in that metadata to suggest it

22  had been quarantined.

23  Q    Now I'd like to direct your attention to Exhibit 104,

24  which has been preadmitted.  And is this another SalesForce

25  case for Guest Services, Inc.?

1   A   Yes, it is.

2   Q   And what number, or what case number is this case for

3   Guest Services, Inc.?

4   A   This is 162214.

5   Q   And what does this case or this document Exhibit 104

6   show?

7   A   This is another example a few weeks later than the one we

8   just looked at when Guest Services is again uploading Oracle

9   copyrighted content to Rimini's system.

10  Q   And is that shown on the second box of the first page of

11  this Exhibit 104?

12  A   Yes, it is.

13  Q   And what was the attachment name that was uploaded by

14  Guest Services to Rimini Street systems?

15  A   This is the second file I mentioned earlier,

16  getstdta.sqc, with Bates number rsi007786983.

17  Q   And did you review the file with the Bates stamp

18  rsi007486983?

19  A   I did, yes.

20  Q   If you could take a look at Exhibit 233 which I believe

21  has been preadmitted.

22                  MR. VANDEVELDE:  What number did you say?

23                  MR. SMITH:  233.

24                  MR. VANDEVELDE:  No, you need to seek admission.

25                  MR. SMITH:  I do not believe there is a

1    preadmission on this one, your Honor.  We would move for the

2    admission of Exhibit 233.

3                    MR. VANDEVELDE:  No objection, your Honor.

4                    THE COURT:  It's admitted.

5                        (Plaintiff's Document Exhibit 233
                          received in evidence.)

6    BY MR. SMITH:

7    Q    What is Exhibit 233, Ms. Frederiksen-Cross?

8    A    Again, this is a copy of the getstdta program we were

9    just discussing.  You can confirm from the Bates number in the

10   bottom that this is the version from Rimini's file.

11   Q    In other words, Exhibit 233 is the file that was uploaded

12   by Guest Services onto Rimini Street's SalesForce system as

13   shown in exhibit 104?

14   A    That is correct.

15   Q    Okay.  Does Exhibit 233 contain any Oracle copyright

16   notice?

17   A    Yes, it does.  It's right on the first page.

18   Q    And did you use this file, Exhibit 233, for purposes of

19   comparison?

20   A    Yes, I did.

21   Q    And did you compare -- well, let me ask you this first.

22        Is Exhibit 233 PeopleSoft source code?

23   A    It's PeopleSoft source code that was uploaded to Rimini

24   SalesForce system.  Yes.

25   Q    And then did you compare this file, Exhibit 233, with an

1    Oracle version of the same source code?

2    A    Yes, I did.

3    Q    And is that reflected in Exhibit 213 which I do -- which

4    has been preadmitted?

5    A    Yes, 213 is the Oracle file that I used for the

6    comparison.

7    Q    And Exhibit 213 is also a source code file; is that

8    right?

9    A    It is.  It is a source code file for the same program

10    gettxdta.

11    Q    Is your comparison between these two PeopleSoft source

12    code files shown on Exhibit 203?

13    A    Yes, it is.

14                MR. SMITH:  And we would move to admit, subject

15    to defense counsel's limitations, 203.

16                MR. VANDEVELDE:  No objection, subject to those

17    limitations.

18                THE COURT:  It's admitted and accepted with

19    those limitations.

20                        (Plaintiff's Document Exhibit 203
                           received in evidence.)
21    BY MR. SMITH:

22    Q    What does your comparison that we've marked as

23    Exhibit 203 show, Ms. Frederiksen-Cross?

24    A    Well, that both versions contain the same Oracle

25    copyright.  The version on the left-hand side is the Oracle

1    file I was provided.  The version on the right-hand side is

2    the Rimini file I have provided.

3                And if you go in a couple of pages, you will see

4    that Rimini made -- again, you know, added a modification note

5    to the file.

6                And if you page through -- this is a nice short one,

7    only six pages.  If you page through, you can see that, for

8    instance, on page 4 of 6, they added a couple of lines of code

9    to this file.

10               And I think there's a couple more on whatever

11   page -- maybe not.  No, just those two, the comment and a line

12   of code added at line 81 on page 4 of 6 on the right-hand

13   side, and a blank line added, and then an exclamation RSI HCM

14   200382 comment just indicating the fix number that this

15   particular change was associated with.

16   Q    I may have asked -- I may have failed to ask earlier, but

17   to the extent there's no highlighting between the left-hand --

18   or in the left-hand side or the right-hand side, does that

19   mean that the code is exactly the same between the two files?

20   A    That is correct, yes.

21   Q    Now, based upon your comparison Exhibit -- based on

22   the comparison shown in Exhibit 203, did you come to any

23   conclusions as to whether the PeopleSoft file uploaded to

24   Rimini's systems contained protected expression?

25   A    Yes, I did.  Yes, it does.

1    Q    Now, returning to Exhibit 104, which is the SalesForce

2    case, can you tell when this case was closed?

3    A    Let me get there.

4    Q    This second case for Guest Services, when that second

5    case was closed.

6    A    Yes.  If you look down about 10 or 12 lines, you see a

7    date opened and then alongside that a date closed.  So this

8    SalesForce case was closed on February 12th of 2019.

9    Q    Okay.  Between the date the first Oracle file was

10   uploaded to Rimini's systems by Guest Services on January 2nd

11   of 2019, and as shown in Exhibit Oracle 103, and then the

12   closing of the second case on February 12th of 2019, did you

13   come across any evidence of anyone at Rimini advising anyone

14   at Guest Services, Inc., not to send PeopleSoft files to

15   Rimini?

16                    MR. VANDEVELDE:  Just so the record is clear, I

17   don't have a real time.  I think there was an accidental

18   misstatement about the first date.  I think you said

19   January 2nd.

20                    MR. SMITH:  I did say January 2nd.  And that was

21   with reference to the first Guest Services case that is shown

22   on exhibit 103.

23                    MR. VANDEVELDE:  Okay.

24                    THE WITNESS:  And I think, just for clarity,

25   you're referring to the date that file was uploaded as opposed

1     to the date that case was opened.  That may be the confusion.

2                 MR. SMITH:  Oh, yes.  Correct.

3                 THE WITNESS:  But in answer to your question, I

4     did not see any evidence that Guest Services was instructed

5     not to upload code, and, you know, the evidence of OREX 104

6     seems to indicate that even more strongly since they uploaded

7     another file a few weeks later.

8     BY MR. SMITH:

9     Q    Did you come across any evidence that the

10    getstdta.sqc.txt file uploaded by Guest Services, Inc.,

11    in this second case that closed on February 12th of 2019 was

12    quarantined by Rimini in any way?

13    A    It did not appear so from the metadata.

14    Q    Now, returning to your demonstratives, do you have a

15    final additional example of copyrighted materials being found

16    on Rimini's systems?

17    A    Yes.  Another example would be five files which were

18    uploaded to the Rimini system by the University of Oklahoma

19    Health Sciences Center, and those would be files tax920us.txt,

20    tax922us.txt, tax920.txt, tax921us.txt, and tax923us.txt.

21    Q    Could you please direct your attention to what has been

22    preadmitted as Exhibit 105.

23    A    I'm there.

24    Q    Can you describe what this document is for the record.

25    A    Yes.  This is another SalesForce -- or another printout

1    that I've created from the SalesForce data that I was

2    provided.  This one is University of Oklahoma Health Sciences

3    Center, case number 164037.

4    Q    And what is the date this case began?

5    A    The date shown that the case was opened here is

6    February 13th of 2019.

7    Q    What is the date that this case was closed?

8    A    March 26th of 2019.

9    Q    And does this document, Exhibit 105, contain entries

10   showing Rimini's work on this case during the intervening time

11   between those two dates?

12   A    Yes, it does.

13   Q    Based upon your review of this exhibit, did Rimini

14   receive PeopleSoft code files from the University of Oklahoma

15   Health Sciences Center?

16   A    Yes, they did.

17   Q    And directing your attention to page 6 of 18, in the

18   middle of the page, does this show the uploading of a file

19   entitled tax920us.txt?

20   A    Yes, it does, with Bates number rsi007539876

21   corresponding to that particular attachment.

22            MR. SMITH:  Okay.  Your Honor, I'd now like to

23   move into evidence that attachment, which I believe there's

24   still an objection to, which is Oracle Exhibit 232.

25            MR. VANDEVELDE:  No objection, your Honor.

1          THE COURT:  It's admitted.

2                    (Plaintiff's Document Exhibit 232
                     received in evidence.)

3     BY MR. SMITH:

4     Q    Directing your attention, Ms. Frederiksen-Cross, to

5     Exhibit 232, is that the attachment that we just referenced in

6     the SalesForce case on page 6 of 18?

7     A    Yes, that can be confirmed by comparing the Bates

8     numbers.

9     Q    And what type of file is tax920us.txt?

10    A    It is an Oracle PeopleSoft file bearing Oracle's

11    copyright, which also has a Rimini Street modification log

12    showing that this file was modified by Rimini.

13    Q    Does the file that is attached to Rimini Street systems

14    and we've marked as Exhibit 232 contain any Oracle copyright

15    notice?

16    A    Yes, it does.

17    Q    Did you compare the tax920us.txt file found on Rimini's

18    systems to Oracle code?

19    A    Yes, I did.

20    Q    The next exhibit in your binder is Exhibit 216, which has

21    been preadmitted.  Is this the code that you used as the basis

22    for your comparison?

23    A    That is correct, yes.

24    Q    And is Exhibit 216 the file that you used for purposes of

25    comparison to the file attached to the Rimini SalesForce case

1    entitled tax920us.txt?

2    A    Yes, it is.

3    Q    And can you take a look at Oracle Exhibit 202.

4    A    Okay.

5    Q    Is this the comparison that you ran between the Rimini --

6    or the file found on Rimini's systems and the Oracle

7    PeopleSoft software code?

8    A    Yes, it is.

9    Q    And that would be for tax920us; is that correct?

10   A    Tax920us.sqr, yes.

11              MR. SMITH:  This one has not been preadmitted,

12   your Honor.  We would move Exhibit 202 into evidence subject

13   to the same qualifications.

14              MR. VANDEVELDE:  Agreed, your Honor.

15              THE COURT:  Admitted subject to that

16   qualification.

17                      (Plaintiff's Document Exhibit 202
                         received in evidence.)
18   BY MR. SMITH:

19   Q    Can you please inform us, Ms. Frederiksen-Cross, what is

20   Exhibit 202.

21   A    Exhibit 202 is another one of those side-by-side

22   comparisons showing on the left the native Oracle file, and on

23   the right the file that was uploaded to Rimini's system.

24   Q    And based upon the comparison that you conducted, does

25   the file found on Rimini's system contain protected Oracle

1   expression?

2    A   Yes, it does.

3    Q   Now, returning to the SalesForce exhibit for the

University of Oklahoma Health Sciences Center, which I'd like

you to keep handy and that we have marked as Exhibit 105, we

just discussed page 6 and the uploading of tax920us.txt.

7           Does the bottom of page 6 of 18 of Exhibit 105 show

any uploading of other files?

9    A   Yes, it does, another file, actually, singular, on this

page.

11   Q   Okay.  And on the bottom of page 6 of 18, what file is

shown as being uploaded there?

13   A   That is tax922us.txt, with a Bates number rsi007539877.

14   Q   And what type of file is tax922us.txt?

15   A   Again, this is another PeopleSoft file.

16   Q   PeopleSoft software source code?

17   A   Yes.

18   Q   And I think you have already read into the record the

Bates stamp that is shown on Exhibit 105 for this file; is

that right?

21   A   That is correct, ends in 9877.

22   Q   Okay.  And now directing your attention to Exhibit 229,

which is in our next binder, do you recognize what we have

marked as Exhibit 229?

25   A   Yes, I do.

1          MR. SMITH:  And this one has not been

2  preadmitted, but we would move for the admission Exhibit 229,

3  your Honor.

4          MR. VANDEVELDE:  No objection.

5          THE COURT:  It's admitted.

6                  (Plaintiff's Document Exhibit 229
                    received in evidence.)

7  BY MR. SMITH:

8  Q    What is Exhibit 229?

9  A    Again, this is an Oracle PeopleSoft file for creation of

10 federal W-2c files.

11 Q    And is this a file that was found on Rimini's systems?

12 A    Yes, it is.

13 Q    Does this file contain any Oracle copyright notice?

14 A    Yes, it does.

15 Q    Did you compare what we have marked as Exhibit 229 with

16 the file tax922us to Oracle code?

17 A    Yes, I did.

18 Q    And is the document we have marked as Exhibit 214 the

19 Oracle code that you used as a basis for your comparison?

20 A    That is correct.

21          MR. SMITH:  We would move for the admission of

22 Exhibit 214, your Honor, which has not been preadmitted.

23          MR. VANDEVELDE:  No objection.

24          THE COURT:  It's admitted.

25

1                       (Plaintiff's Document Exhibit 214
                            received in evidence.)
2    BY MR. SMITH:

3    Q    And just so the record is clear, is Exhibit 214 the

4    Oracle file you used as the basis for your comparison?

5    A    It is, yes.

6    Q    And is your comparison shown by Exhibit 199, the next

7    exhibit?

8    A    That is correct.

9              MR. SMITH:  We would move for the admission

10   Exhibit 199, your Honor, subject to the same qualifications.

11             MR. VANDEVELDE:  Agreed, your Honor.

12             THE COURT:  Admitted.

13                      (Plaintiff's Document Exhibit 199
                            received in evidence.)
14   BY MR. SMITH:

15   Q    And what is Exhibit 199, Ms. Frederiksen-Cross?

16   A    Again, this is another side-by-side for that PeopleSoft

17   update, 2016 to 2019, that contains tax922us.

18   Q    Based upon the comparison that you conducted, does the

19   file found on Rimini's systems contain Oracle protected

20   expression?

21   A    Yes, it did.  There were only a handful of lines that

22   were changed from the base Oracle file.

23   Q    Returning to -- I hope you kept it handy -- returning to

24   Exhibit 105 which is the SalesForce case from which these

25   files derive --

1   A    Yes, I have it here.

2   Q    -- does Exhibit 105 indicate why the University of

3   Oklahoma Health Sciences Center uploaded the tax920us and

4   tax922us files onto Rimini's systems?

5   A    It does, yes.

6   Q    And what does it indicate?

7          Because page numbers have changed a little bit, if I

8   could direct your attention to the bottom of page 5 of 18.

9   That's the start of a SalesForce entry indicating there's a

10  meeting planned for Friday morning.

11  A    Right.  This is -- yes, I see that.

12  Q    And then do you see the next SalesForce entry at

13  8:33 a.m., I presume, indicating that the meeting was in

14  progress?

15  A    Let me find that -- again, my page numbers seem to be a

16  little bit off from yours.

17          What was that time again, counsel?

18  Q    The first full box on page 6 of 18, it indicates created

19  date of February 15th, 2019, at 8:33.

20  A    Yes, I see that.  "Meeting in progress" is the comment.

21  Q    Yes.  And did you understand that to be a meeting between

22  the University of Oklahoma Health Sciences Center and Rimini

23  Street?

24  A    That is my understanding, yes.

25  Q    And then what does the next box indicate at 8:35?

1    A    At 8:35 it indicates that an attachment has been

2    uploaded, "please have a look."

3             And just below that, in the third box on the page,

4    you see that that attachment is tax920us.txt, that file with

5    the Bates number ending 9876 is the one we just looked at.

6    Q    What does that sequence of events suggest to you?

7    A    That this file was under discussion and uploaded while

8    that meeting was still in progress.

9    Q    Is there any evidence in the SalesForce record, Exhibit

10   105, that Rimini used the files uploaded by the University of

11   Oklahoma Health Sciences Center to assess the problem reported

12   by the University of Oklahoma Health Sciences Center?

13   A    Yes.

14   Q    And directing your attention, hopefully, to near the

15   bottom of page 7 of 18, the last full box on that page, I

16   believe.

17   A    Yes.  There are actually two boxes on this page that

18   indicate that.  That box -- the last full box on page 7,

19             "Thanks for uploading SQR, looks at the SQR.

20       I confirmed that the calendar year is being picked up

21       from the W-2c install table.  This is the one

22       referenced in People code."

23             And then if you look at the top box on that --

24   Q    Let me just stop you there for this box.

25   A    Okay.

1    Q    So do you understand Jai Ramachandran to work for Rimini?

2    A    I do, yes.

3    Q    And then do you understand the recipients of the e-mail

4    which is pasted in this box to be from the University of

5    Houston Health Sciences Center -- sorry, University of

6    Oklahoma Health Sciences Center?

7    A    I was going to say not Houston, but, yes, and I'm not

8    sure about Nechole Whitlock, the other individual cc'd on the

9    e-mail.

10   Q    Okay.  And so do you understand this to be an e-mail that

11   Rimini sent to the University of Oklahoma Health Sciences

12   Center?

13   A    Yes, I do.

14   Q    What is the significance of the first line of that e-mail

15   which says,

16              "Thanks for uploading the SQR, looks at the

17        SQR.  I confirmed that the calendar year is being

18        picked up from the W-2c install table."

19   A    Well, again, this indicates to me that they received the

20   file, they opened the file, and that they used this file to

21   diagnose the problem, or at least to attempt to diagnose the

22   problem.

23              And so they would have, in the process of opening

24   and looking at that file, created a copy in memory, and that

25   they were actually using this file.

1    Q    Did you find it significant that the Rimini

2  representative thanked its client for uploading PeopleSoft

3  software?

4    A    Well, again, it seems to me that this exchange was

5  happening with respect to that file uploading during the

6  meeting, so my presumption based on this was that they had

7  requested the upload, or at least not told them not to upload

8  it during that meeting.

9    Q    Are there other instances of Rimini requesting the

10  University of Oklahoma Health Sciences Center to send

11  PeopleSoft code in this exhibit?

12   A    There are.

13   Q    And directing your attention to page 11 of 18 near the

14  bottom, there is an e-mail message from Mr. Ramachandran --

15  I'm sorry, a SalesForce message from Mr. Ramachandran stating

16  in part,

17            "Hi, Sarah.  Can you or Dean provide us the

18       last modified date for the three SQRs.  I want to see

19       if they may have missed any updates from Oracle."

20            Did the customer thereafter upload additional

21  code files to Rimini's systems?

22   A    Yes.

23   Q    And what code files were uploaded to Rimini's systems

24  after that?

25   A    Let's see.  That was at 1157.  Those would be tax920.txt

1    with the Bates number rsi007543542.

2            There's a couple of others.  Let me just locate them

3    here.

4            Which is the one we just looked at?  I'm sorry, I've

5    gotten my fingers out of order here in the file.

6    Q    The one that you just mentioned, which I think was the

7    first of the subsequent uploads, was tax920.txt at the bottom

8    of page 11 of 18.

9    A    Okay.  And then a moment or two later, at the bottom of

10   page 12 of 18, you see the upload of tax922us.txt with Bates

11   number rsi007543545.

12   Q    And is there one immediately before that as well?

13   A    Yes.  That would be tax921us.txt with Bates number

14   rsi007543543.

15           And then there is one more on the next page, page 13

16   of 18, in the first box, which is tax923us.txt with Bates

17   number rsi007543544.

18   Q    Okay.  And did you review all of these four additional

19   uploads, tax921us.txt, tax922us.txt, tax920.txt, and

20   tax923us.txt?

21   A    Yes.

22   Q    What types of files are these?

23   A    These are, again, Oracle PeopleSoft files one or two of

24   which have been modified by Rimini and a couple of which were

25   unmodified by Rimini.

1    Q    Okay.  And did we already discuss tax922us.txt which we

2    marked, I think, as Exhibit 229?

3    A    I believe that we have, but let me just check that.

4              Yes, we discussed that Exhibit 229.

5    Q    Can you turn to Exhibit 234 which is back -- I shouldn't

6    say back -- which is in the next binder, binder 3.

7    A    Yes, I'm there.

8    Q    Okay.  And what is Exhibit 234?

9    A    Exhibit 234 is the file from the Rimini system with Bates

10   number rsi007543542 which is the tax920 file.

11              MR. SMITH:  And for the sake of efficiency, your

12   Honor, what I'd like to do is move into evidence Exhibits 235,

13   236, and 234, which I think there's still an outstanding

14   objection to.

15              MR. VANDEVELDE:  No objection, your Honor.

16              THE COURT:  They are admitted.

17                   (Plaintiff's Document Exhibits 234, 235,
                      and 236 received in evidence.)
18   BY MR. SMITH:

19   Q    So Ms. Frederiksen-Cross, is Exhibit 234 one of the

20   PeopleSoft files that was uploaded onto Rimini's SalesForce

21   system by the University of Oklahoma Health Sciences Center?

22   A    Yes, it was.

23   Q    And does this document indicate -- or does it contain any

24   Oracle copyright notice?

25   A    Yes, it does.

197

1    Q    If you look at Exhibit 235, is that another file tax921

2    that was uploaded onto Rimini's systems by the University of

3    Oklahoma Health Sciences Center?

4    A    Yes, it was.

5    Q    And does that contain Oracle copyright notices?

6    A    Yes, it does.

7    Q    And then finally Exhibit 236, is this the tax923us file

8    that was uploaded by the University of Oklahoma Health

9    Sciences Center onto Rimini's systems?

10   A    Yes, it was -- yes, it is.

11   Q    And does this Exhibit 236 contain any Oracle copyright

12   notice?

13   A    Yes, it does.

14   Q    Did you compare each of these files to the corresponding

15   Oracle files?

16   A    Yes, I did.

17   Q    Are the Oracle code files what you -- are the Oracle code

18   files that you used for comparison what has been preadmitted

19   as Exhibits 223, 217, and 224 in your binder?

20   A    That is correct.

21   Q    And did you conduct comparisons between the files found

22   on Rimini's systems and these Oracle code files?

23   A    I did, yes.

24   Q    And based upon the comparisons you conducted, do the

25   files found on Rimini's system and identified as Exhibits 234,

1    235 and 236 contain Oracle copyrighted expression?

2    A    Yes, they do.

3    Q    And for the sake of efficiency, did you prepare a graphic

4    regarding the percentage of lines that matched between

5    Exhibits 234, 235, and 236, and the corresponding Oracle

6    PeopleSoft software code files?

7    A    Yes, I did.

8              MR. SMITH:  And with your Honor's permission, I

9    would like to display a graphic summarizing that comparison.

10             THE COURT:  You may, subject to the earlier

11   limitations.

12             MR. VANDEVELDE:  And, your Honor, I believe this

13   it is just from her demonstrative presentation.

14             THE COURT:  Oh, all right.  Thank you.

15             MR. SMITH:  Yes.  This is just a demonstrative.

16   BY MR. SMITH:

17   Q    And, Ms. Frederiksen-Cross, can you walk us through this

18   demonstrative.

19   A    Yes.  Just in the interest of efficiency I wanted to

20   summarize these so we didn't have to go through the

21   side-by-sides.

22             In the first box you have my findings with respect

23   to the comparison of the two tax920 programs, tax920.sqr for

24   Oracle, and the tax920.txt for Rimini.  Those files were

25   identical.

1        With respect to the comparison in the middle, which

2   shows the tax921us.sqr from Oracle and tax921us.txt from --

3   that was found on Rimini's system, there was a 99.77 match.

4   There were only a couple of lines that had been changed.

5        And then finally, the third comparison, the Oracle

6   file tax923us.sqr, compared to tax923us.txt that we located on

7   the Rimini system, again, those were identical files.

8   Q   Okay.  And now returning back to Exhibit 105, which is

9   the SalesForce case, and directing your attention to

10  approximately the middle of page 13, do you see in the second

11  to the last full box, I guess, there's a statement from Sarah

12  Washam, I believe, at the University of Oklahoma Health

13  Sciences Center, stating, "I have uploaded the four SQRS for

14  the processes"?

15  A   I see that, yes.

16  Q   And do you understand that to refer to the tax920.txt,

17  tax921us.txt, tax922us.txt, and tax923us.txt files that were

18  uploaded on about February 26th of 2019?

19  A   That is correct, yes.  That's my understanding.

20  Q   And then in the middle -- more in the middle of the page

21  there's a response from Mr. Ramachandran of Rimini to Sarah,

22  which states, quote,

23              "The only place where the flags are closed is

24          when running the tax920 print program."

25                  Do you see that?

1   A    Yes, I see that.

2   Q    Does that statement have any significance to you?

3   A    Well, it means that once they received that file they

4   opened it and looked at it to identify where a particular

5   flag -- a flag is like a programming switch, you can set a

6   value and it tells you what to do next.

7              So he's basically saying the only place those flags

8   are closed is when running the tax920 program.  So he would

9   have opened that program and looked at the logic in it to

10  understand that.

11  Q    Okay.  And if he had opened the tax920 program, would

12  that have created a copy on Rimini's systems?

13  A    It would have in memory while you were viewing the

14  program, yes.

15  Q    And would that be in addition to the copy that was

16  created by the uploading from the University of Oklahoma

17  Health Sciences Center?

18  A    That is correct, yes.

19  Q    Directing your attention to the bottom of page 14 of 18,

20  do you see the entry from Mr. Ramachandran to Sarah which

21  states,

22              "I am not sure which version of the print

23         program he is referring to.  I was looking at the

24         tax920.sqr that is attached to the case."

25                   Does that statement have any significance to

1   you?

2   A   Yes.  Again, it tells me that Mr. Ramachandran had opened

3   the file that had been uploaded, the one we discussed, the

4   tax920.sqr, and was looking at that file.

5   Q   Have you reviewed each of the entries in this SalesForce

6   record which we have marked as Exhibit 105?

7   A   I have, yes.

8   Q   And did you find any message from Rimini to the

9   University of Oklahoma Health Sciences Center advising them

10   not to upload files?

11   A   No, I did not.

12   Q   Did you come across any evidence that the files uploaded

13   by the University of Oklahoma Health Sciences Center were

14   quarantined by Rimini in any way?

15   A   No.  The only thing that I see is on page 15 there is a

16   comment from Jai saying,

17            "I'm waiting for your help desk to have it

18        restored.  I cannot use the attached SQR as I'm not

19        allowed to download it to my PC."

20            But then it appears that he ultimately went

21   ahead and looked at that.

22   Q   In connection with your work in this proceeding more

23   generally, did you come across any instances where Rimini

24   followed its Acceptable Use Policy with respect to the receipt

25   of copyrighted Oracle material?

1   A   I have seen sporadic instances where there was some sort

2   of a follow-up when a file was received.  So there are at

3   least incidental following of that procedure, but it does not

4   appear to me that it was followed at all consistently.

5   Q   Okay.  Returning to your demonstratives and slide 19,

6   what is the next component of your opinion that Rimini's

7   post-injunction support conduct does not conform to paragraph

8   5 of the injunction?

9   A   This opinion is based on Rimini's copying of what I

10  believe to be protected expression from Oracle file

11  psptarry.cbl into a Rimini file rscmpay.cbl.

12  Q   And the Rimini file is rspcmpay.cbl?

13  A   Rspcmpay.cbl, yes.

14  Q   And where did you find that file?

15  A   That file was found in Rimini's production through the

16  search for Oracle copyright -- excuse me, no, that's not

17  right.  I'm mixing up my files here.

18      Rspcmpay -- I'm drawing a blank on where I found

19  that one.

20  Q   If it helps, I can direct your attention to

21  Exhibit 237 which has been preadmitted.

22  A   Thank you.

23      This is just the RSI program description, or listing

24  of that program.

25      I'm sorry, I'm drawing a blank on where this one

1   came from as I sit here.

2   Q    That's okay.

3        Do you recognize -- well, do you know that it came

4   from Rimini's systems?

5   A    Yes, I do know that.

6              MR. VANDEVELDE:   Objection, foundation.

7   BY MR. SMITH:

8   Q    And how do you know that it came from Rimini's systems?

9   A    Well, in part from the Rimini Bates number affixed to

10  this document which indicates it came from Rimini's

11  production.

12  Q    Okay.  So what is Exhibit 237?

13  A    This is a program that identifies itself in the comments

14  as a program that augments the TARRY function by breaking out

15  common pay in more detail.

16       Tarry is an Oracle PeopleSoft tax array that's used

17  in the computation of taxes.

18  Q    So are you in the program description right now?

19  A    Yeah, I'm in the block of comments below program

20  description.

21  Q    Okay.  And one up --

22  A    Yes.  Thank you.

23  Q    Program description, that box.  There you go.

24       So the first part reads, "RSI program performs two

25  functions," you understand RSI to refer to Rimini Street?

1   A    Yes, this is a description of this rspcmpay program.

2   Q    And the first is "Accumulates year-to-date grosses for

3   common paymasters.  This augments TARRY" -- is that how you

4   would pronounce that?

5   A    I would pronounce it that way, yes.

6   Q    Okay.

7   A    Just knowing what it does.  Otherwise it would be TARRY.

8   Q    Okay.  And what do you understand the phrase "this

9   augments TARRY" to mean?

10  A    Well, that that this program is extending the function of

11  the PeopleSoft program psptarry.

12  Q    So I have it clear, is it your understanding that this

13  statement, "It accumulates year-to-date grosses for common

14  paymasters.  This augments TARRY," means that Rimini created

15  this file based upon a TARRY file?

16  A    Well, this statement alone wouldn't tell me that, but my

17  inspection of the two files leads me to conclude that it was

18  derived from TARRY.

19  Q    Okay.  Did you review a TARRY file for purposes of

20  analyzing this file found on Rimini's systems known as

21  rspcmpay.cbl?

22  A    I did, yes.

23  Q    And was this TARRY file produced by Oracle?

24  A    The TARRY file that I compared to was produced by Oracle,

25  yes.

1   Q    Okay.  Let me direct your attention to Exhibit 225.  Is
2   this the psptarry file produced by Oracle?
3   A    Yes, it is.
4   Q    And because there's a lot of letters that don't
5   necessarily go together on this, is it okay with you if I
6   refer to the rspcmpay.cbl file, which is the subject of this
7   opinion, as the Rimini file, and the psptarry.cbl file as the
8   Oracle file?
9   A    That would be fine.
10  Q    Now, you indicated that you compared the Rimini file to
11  the Oracle file; is that right?
12  A    That is correct.
13  Q    And how did you do that?
14  A    Again, initially locating or doing a comparison of these
15  files by doing normalized line match, and then subsequently by
16  using the ARAXIS MERGE software to allow me to prepare a
17  side-by-side comparison that allows one just to navigate the
18  comparison a little more easily.
19  Q    Okay.  And in connection with your ARAXIS comparison, did
20  you notice or take account of the fact that the Rimini file is
21  shorter than the Oracle file?
22  A    Yes, I did.
23  Q    And did that have any significance to you?
24  A    Not really because I was focused on the areas that appear
25  to have been derived from that file in the Rimini file.

1          I don't dispute that they didn't copy the entire

2    file or incorporate the entire file, but based on my analysis

3    of these two files, it appears to me that Rimini incorporated

4    portions of the Oracle file as it created the Rimini file.

5    Q    Rimini also contends that the Rimini file has a different

6    function than the Oracle file.  Do you agree with that

7    contention?

8    A    To a certain extent.  That is to say, it augments the

9    functionality of the Oracle file, as it says in the comments,

10   by providing more granularity in one specific area of the

11   processing with respect to the accumulation of these

12   year-to-date pay values.

13   Q    Can you identify for us the next exhibit in your binder

14   which should be 175.

15   A    175 is the side-by-side that I prepared with ARAXIS that

16   shows, again, with highlighting where there are similarities

17   and differences in these programs.

18              MR. SMITH:  Okay.  Your Honor, I would move to

19   admit 175 subject to the same conditions.

20              MR. VANDEVELDE:  Agreed.  No objection as a

21   demonstrative.

22              THE COURT:  Thank you.  It's admitted pursuant

23   to that.

24                   (Plaintiff's Document Exhibit 175
                        received in evidence.)
25

1    BY MR. SMITH:

2    Q    With reference to the first page of this exhibit, what is

3    shown on the left-hand side of the document?

4    A    The left-hand side shows the PeopleSoft TARRY program.

5    The right-hand side shows the Rimini rscmpay file.

6    Q    What does the purple highlighting reflect in this

7    document?

8    A    Purple highlighting indicates a line that has some

9    similarities and some differences.

10   Q    What does the green highlighting reflect?

11   A    The green highlighting reflects lines that are present in

12   the program on the right-hand side but not present in the

13   program on the left-hand side.

14          And, conversely, the sort of salmon-colored

15   highlighting, I guess you would call it, or light orange

16   highlighting, indicates lines that are present on the

17   left-hand side that are not present on the right-hand side.

18   Q    Okay.  And if the text is not highlighted in any color,

19   that means the text is the same; is that right?

20   A    That is correct.

21   Q    What did your analysis of this code comparison show, or

22   what conclusions did you draw from your analysis of this code

23   comparison?

24   A    Well, after I prepared the code comparison, I then

25   obviously looked at the contents of the lines that were

1    similar to understand whether those lines were the product of

2    any constraint, or any constraint that I was able to identify,

3    and in evaluating that, some of the lines that are matched in

4    white I think are not relevant or probative with respect to

5    any copying.

6            Some of the lines that are shown in white are more

7    significant lines that appear to me to be Oracle's creative

8    expression that was incorporated into the Rimini file, and

9    then there were also some other similarities generally with

10   the layout and structure of the program.

11   Q    Okay.  With respect to the amount of lines that match,

12   what was the amount of lines that matched?

13   A    If you take just a gross number of lines, it was roughly

14   a third of the lines.

15   Q    And was there anything particularly interesting about

16   some of the line matches?

17   A    Some of them were interesting, yes.

18   Q    In what way?

19   A    Well, because there were some similarities in these files

20   that didn't have any clear explanation for why Rimini's file

21   should contain code that was also in the Oracle file.

22           So, for instance, there were things that were being

23   defined within these two respective files that happened to use

24   the same names and defined things in the same order with the

25   same descriptions for the fields, you know, basically lines

—209—

1    that matched that were not the product of any outside

2    constraint.

3    Q    Okay.  If you take a look at page 29 of 57 of this code

4    comparison --

5    A    Okay, I'm there with you.

6    Q    -- and if you look at Oracle line 895, for example, on

7    the left, which I think corresponds to line 370 on the right,

8    was there anything in particular about that line or

9    surrounding lines that was significant to you?

10   A    Well, yes.  This is setting a value for one of those

11   programming switches that's used to kind of keep track of

12   where you are in the logic, or what the current state of the

13   program is.

14        And it's interesting -- it was interesting to me

15   that they were both setting a value that was using the same

16   identifier of the value of that switch and the same switch

17   name, and this particular line is not constrained in any way.

18        And of forensic interest as well, there are some

19   aberrations in the white space in both of these lines that

20   have no functional purpose with respect to the line.

21        But, if you notice, there are multiple spaces after

22   S dash YTD, and after the word "to" in both lines.  So, again,

23   these are nonfunctional similarities that suggest to me, or

24   further suggest to me some copying in addition to some other

25   things I see in this file.

1    Q    Okay.  Is the spacing irregularity also shown on line 902

2    of the Oracle file?

3    A    This is another such spacing irregularity, yes.

4         So following the closing quote after DISC before the

5    word "to" you see a similar spacing irregularity.

6    Q    Is a similar spacing irregularity shown on line 908 of

7    the Oracle file?  Does that show a spacing irregularity as

8    well?

9    A    Yes, it does.

10   Q    If you look a page 6 of 57 of your code comparison, does

11   this show another instance of spacing irregularity or double

12   spacing irregularity?

13        Directing your attention to a little bit below 139

14   on the left.

15   A    Yes, in the assignment of the value zero, and then there

16   are two spaces before the COMP.

17   Q    Is there any programming requirement for double spacing

18   like that seen in both the Oracle and Rimini code?

19   A    No, there is no programming requirement for that.

20   Q    What conclusion do you draw from the existence of double

21   spacing in both the Oracle code and the Rimini code?

22   A    Well, taken in isolation, they would not tell me anything

23   dispositive.  But taken in the same lines, in the same

24   context, in similar sections of the program, and if you look

25   at the line that starts on the previous page, 134 and 42, 134

1   on the left and 142 -- 42 on the right, you see that this is

2   in an area that's been carved out in the memory of the

3   computer called S-YTD, and the 01 indicates that this is the

4   top level of a compound data structure that will be broken

5   down into more pieces.

6          So, again, when you go to the next page then, line

7   135 on the left-hand side, you see that that fetch YTD-SW that

8   we were discussing a moment ago when we were in a different

9   part of the program is the same name assigned to this

10  processing switch in both programs.  There is no constraint

11  requiring that.

12         And then on the next line below that, the lines that

13  start with 88 provide a named value that can be used in

14  association with that switch, and here again the named values

15  are the same in both programs and provided in the same order,

16  again, with no constraint that would dictate that this should

17  be so.

18  Q    What section -- or what's the category or part of the

19  code that you're referring to when you referred to line 134 on

20  the left?

21  A    That is the portion of the code that is what is called in

22  Cobol an 01 level data element that is named S-YTD for that

23  assemblage of code.

24  Q    Okay.  And is the 01 data element part of the structural

25  or organizational portion of the code?

1    A    It is a part of that, yes.  It's a way of structuring the

definition of a storage area within the program.

3    Q    And do you consider this structural portion of the code

to be the same between the file found on Rimini's systems and

the Oracle code?

6    A    Yes, I do.  I would just observe, on the right-hand, you

see that indicator NOCBGN, that's actually just a compiler

directive that's basically telling the compiler that there's

nothing to do in this particular element, don't try to expand

10   it or change it.

11   Q    Now, I think I understand, you were --

12   A    So it's an auto part of the data name is the point that

13   I'm making.

14   Q    Does this portion of the code, the 01 level data element,

15   show not only an organizational similarity but literal word

16   similarity between the two files?

17            MR. VANDEVELDE:  Your Honor, I'm going to lodge

18   an objection.  Her reports, across multiple reports and in her

19   deposition, she offered no analysis regarding structure or

20   sequence or organization.  She simply attached this screen

21   shot of the code comparison.

22            She has never before identified any of the

23   elements she's talking about today.  That's a violation,

24   again, of Rule 26, and should be excluded.

25            She has never before provided these opinions.

```
 1    We have had no notice of any of these opinions she has

 2    provided.

 3                 The only thing she did with respect to this file

 4    was include the code comparison file, and offered no opinions

 5    whatsoever about the structure, the sequence, the

 6    organization.  She didn't identify any constraints or

 7    nonconstraints.  All of this is new to us.  It's, yet again,

 8    another undisclosed expert opinion.

 9                 THE COURT:  Mr. Smith?

10                 MR. SMITH:  Yes, your Honor.

11                 This code comparison was contained in

12    Ms. Frederiksen-Cross's report.  It was contained along with

13    text indicating that the two files being compared and shown by

14    this comparison were substantially similar, and that the

15    Rimini file, the file found on Rimini's system, contained

16    protected expression.

17                 Those were her opinions.  Those are still her

18    opinions.  She's simply explaining why those are her opinions

19    now, and the fact that Rimini did not ask her any questions

20    about her conclusions that the files are substantially similar

21    and that the Rimini file, or the file found on Rimini's

22    systems, contains protected expression during her deposition,

23    there's nothing we can do about that.

24                 THE COURT:  All right.

25                 MR. VANDEVELDE:  Your Honor, the Rule 26
```

1      requires the basis for her opinion.  Saying they're

2      substantially similar, that may be a high level opinion, the

3      rule requires a basis.

4                    Our expert is a rebuttal to her opinions.

5      He's had no notice of any of these opinions.  He would have

6      provided counters to her opinions.

7                    She has never analyzed any of these elements

8      that we have heard.  Literally, today, is the first time I

9      have heard any opinion relating to structure, sequence,

10     organization, constraints, the naming of variables, anything.

11     All she did was attach this single file to her report, claim

12     they were similar.

13                    The rule requires notice of the basis for her

14     opinions, and that has not been provided.

15                    THE COURT:  Well, let me step back a moment.

16                    The testimony is helpful to me in understanding

17     the significance of different parts of these components.

18                    I understand your objection, but at the same

19     time it appears to me that the testimony is tied directly to

20     exhibits and evidence that everyone -- I'm missing anything

21     that's a surprise here.

22                    MR. VANDEVELDE:  Under Rule 26 the expert is

23     required to disclose her expert opinions and the bases for

24     those opinions.

25                    All she has done in her reports is attach the

1    file and say they're similar.  She is required to provide the

2    bases for that opinion of similarity, that there's, you know,

3    structure, sequence, organization, other line matches.  She

4    hasn't done anything of that.  This is literally the first

5    time we have ever heard that.

6                    We haven't had a chance for our expert to digest

7    these opinions which are new for the first time.  We haven't

8    had a chance to submit written reports in response.  We didn't

9    get a chance to depose her because she didn't disclose any

10   opinions on these topics.

11                    She's required under Rule 26(a)(2) to disclose

12   the bases for her opinions, and she hasn't done that.

13                    THE COURT:  All right.  Well, I'll tell you I'm

14   starting to get a little weary on the testimony myself.  It's

15   five minutes to 5:00.  I'll give you a ruling in the morning

16   and we'll start promptly at 9:00 a.m.

17                    MR. VANDEVELDE:  I appreciate that, your Honor.

18                    MR. SMITH:  Thank you, your Honor.

19                    THE COURT:  I appreciate both sides' position.

20                    As I stated, the testimony has been helpful to

21   me in understanding some of these charts and diagrams.  And I

22   understand the defense objection as well.

23                    MR. VANDEVELDE:  Thank you.

24                    THE COURT:  Thank you.

25                    We'll be adjourned.  We'll start promptly in the

1    morning at 9:00 a.m.  I'll give you a ruling then.

2                   MR. VANDEVELDE:  Thanks.

3                      (Proceedings Adjourned.)

4                           -oOo-

5

6           I certify that the foregoing is a correct
            transcript from the record of proceedings
7           in the above-entitled matter.

8           /s/Margaret E. Griener        9/21/2021
             Margaret E. Griener, CCR #3, FCRR
9            Official Reporter
                           -oOo-

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              I N D E X

2

                                                            PAGE:

3

4    PLAINTIFFS' OPENING STATEMENT                             8

5    DEFENDANTS' OPENING STATEMENT                            49

6

7    PLAINTIFF'S WITNESSES:                                 PAGE:

8      FREDERIKSEN-CROSS, Barbara

9        Direct Examination by Mr. Smith                      94

10

11   PLAINTIFF'S EXHIBITS:                    ID     EVIDENCE

12     20 -                                                 136
       98 -                                                 163
13     99 -                                                 163
       110 -                                                157
14     175 -                                                206
       199 -                                                170
15     201 -                                                177
       202 -                                                187
16     203 -                                                181
       214 -                                                190
17     229 -                                                189
       231 -                                                176
18     232 -                                                186
       233 -                                                180
19     234 -                                                196
       235 -                                                196
20     236 -                                                196

21

22

23

24

25

1

**$**

**$525** [1] - 108:22

**'**

**'80s** [1] - 95:16
**'absurd** [1] - 21:2
**'common** [1] - 21:2
**'testing'** [1] - 65:11

**/**

**/s/Margaret** [1] - 216:8

**0**

**0093** [1] - 21:20
**01** [4] - 211:3, 211:22, 211:24, 212:14
**0231** [1] - 176:2

**1**

**1** [6] - 1:8, 27:1, 70:1, 70:14, 75:7, 149:17
**1.0** [1] - 127:24
**10** [33] - 24:14, 29:20, 29:22, 30:19, 30:23, 31:12, 50:6, 50:10, 51:7, 51:9, 56:22, 56:24, 65:25, 69:23, 80:8, 87:20, 87:25, 88:7, 91:22, 104:12, 109:4, 144:6, 144:10, 144:11, 144:13, 144:14, 147:23, 148:6, 155:15, 159:4, 183:6
**10.1.2.1** [1] - 126:5
**10.2.251.108** [1] - 164:8
**100** [3] - 168:17, 168:25, 169:19
**1000** [1] - 117:2
**103** [7] - 173:3, 173:6, 173:7, 174:18, 177:25, 183:11, 183:22
**104** [6] - 178:23, 179:5, 179:11, 180:13, 183:1, 184:5
**105** [10] - 184:22, 185:9, 188:5, 188:7, 188:19, 190:24, 191:2, 192:10, 199:8, 201:6
**1099** [1] - 109:24
**1099-INT** [1] - 79:11
**1099-MISC** [1] - 79:12

**1099m** [1] - 79:13
**10:40** [1] - 49:16
**10th** [2] - 21:11, 24:16
**11** [11] - 25:7, 70:3, 144:11, 144:12, 144:13, 144:14, 147:23, 148:6, 194:13, 195:8
**110** [5] - 157:17, 157:23, 158:1, 159:10, 217:13
**1100** [1] - 116:25
**1157** [1] - 194:25
**12** [16] - 26:14, 129:24, 142:1, 142:3, 143:2, 143:7, 144:6, 144:10, 144:11, 144:13, 147:23, 148:6, 152:13, 152:14, 183:6, 195:10
**12,000** [3] - 16:20, 16:25, 17:7
**1200** [1] - 108:20
**12th** [3] - 183:8, 183:12, 184:11
**13** [4] - 27:19, 141:4, 195:15, 199:10
**1337** [2] - 132:11, 132:16
**134** [3] - 210:25, 211:19
**135** [1] - 211:7
**136** [2] - 70:10, 217:12
**139** [1] - 210:13
**13th** [1] - 185:6
**14** [4] - 25:7, 85:1, 128:15, 200:19
**142** [1] - 211:1
**146** [1] - 166:21
**15** [22] - 4:5, 6:15, 10:15, 29:5, 29:21, 34:13, 54:9, 57:3, 69:4, 69:6, 69:7, 90:19, 90:24, 91:4, 91:9, 91:16, 116:12, 120:23, 121:18, 122:11, 201:15
**150** [1] - 54:10
**1500** [1] - 54:9
**155** [1] - 84:3
**156** [1] - 84:12
**157** [1] - 217:13
**158235** [1] - 173:10
**159** [1] - 87:17
**15th** [1] - 191:19
**16** [4] - 4:5, 20:20, 30:22, 137:14
**161623** [1] - 141:8
**162214** [1] - 179:4

**163** [2] - 217:12, 217:13
**164** [1] - 91:5
**164037** [1] - 185:3
**17** [3] - 31:16, 124:24, 161:20
**170** [1] - 217:14
**175** [5] - 206:14, 206:15, 206:19, 206:24, 217:14
**176** [1] - 217:17
**177** [1] - 217:15
**18** [13] - 96:15, 185:17, 186:6, 188:7, 188:11, 191:8, 191:18, 192:15, 194:13, 195:8, 195:10, 195:16, 200:19
**18-E** [5] - 153:4, 157:1, 158:5, 158:12, 158:14
**180** [1] - 217:18
**181** [1] - 217:16
**186** [1] - 217:18
**187** [1] - 217:15
**189** [1] - 217:17
**19** [2] - 136:15, 202:5
**190** [1] - 217:16
**196** [3] - 217:19, 217:19, 217:20
**1974** [1] - 96:15
**1988** [2] - 136:16, 136:17
**199** [5] - 190:6, 190:10, 190:13, 190:15, 217:14
**1997** [1] - 95:17
**1:15** [2] - 93:8, 93:13
**1:17** [1] - 94:1
**1:30** [1] - 6:13
**1:55** [1] - 149:25

**2**

**2** [8] - 24:16, 51:18, 73:9, 78:13, 129:11, 165:17, 169:19, 170:10
**2.0** [10] - 21:17, 21:25, 52:4, 54:1, 62:5, 64:12, 92:2, 127:21, 127:24, 128:9
**20** [11] - 1:6, 2:1, 6:16, 28:9, 33:19, 94:1, 134:25, 136:4, 136:7, 137:6, 217:12
**200382** [1] - 182:14
**2006** [1] - 135:18
**201** [7] - 176:4, 176:5,

176:20, 177:7, 177:9, 177:12, 217:15
**2011** [1] - 102:8
**2013** [1] - 136:16
**2014** [5] - 13:11, 52:1, 57:8, 71:24, 128:1
**2015** [1] - 136:17
**2016** [3] - 9:1, 87:3, 190:17
**2017** [3] - 23:4, 101:24, 101:25
**2018** [8] - 9:3, 17:17, 43:2, 80:10, 101:25, 102:8, 103:16, 125:2
**2018-D** [2] - 150:9, 150:12
**2019** [22] - 17:21, 47:11, 74:13, 103:4, 103:5, 103:7, 142:11, 155:15, 155:20, 156:18, 159:3, 178:6, 178:17, 183:8, 183:11, 183:12, 184:11, 185:6, 185:8, 190:17, 191:19, 199:18
**2020** [1] - 113:12
**2021** [6] - 1:6, 2:1, 20:22, 21:11, 21:22, 94:1
**203** [6] - 181:12, 181:15, 181:20, 181:23, 182:22, 217:16
**206** [1] - 217:14
**213** [3] - 181:3, 181:5, 181:7
**214** [5] - 189:18, 189:22, 190:1, 190:3, 217:16
**216** [2] - 186:20, 186:24
**217** [1] - 197:19
**22** [2] - 36:15, 38:21
**221** [1] - 134:4
**222** [7] - 175:10, 175:15, 175:21, 175:22, 176:3, 176:5, 176:7
**223** [1] - 197:19
**224** [1] - 197:19
**225** [1] - 205:1
**229** [2] - 188:22, 188:24, 189:2,

**189**:6, 189:8, 189:15, 196:2, 196:4, 217:17
**231** [7] - 174:25, 176:2, 176:7, 176:12, 176:16, 176:19, 217:17
**232** [5] - 185:24, 186:2, 186:5, 186:14, 217:18
**233** [11] - 179:20, 179:23, 180:2, 180:5, 180:7, 180:11, 180:15, 180:18, 180:22, 180:25, 217:18
**234** [9] - 196:5, 196:8, 196:9, 196:13, 196:17, 196:19, 197:25, 198:5, 217:19
**235** [6] - 196:12, 196:17, 197:1, 198:1, 198:5, 217:19
**236** [7] - 196:13, 196:17, 197:7, 197:11, 198:1, 198:5, 217:20
**237** [2] - 202:21, 203:12
**24** [1] - 41:6
**24/7** [2] - 50:23, 63:19
**25** [2] - 41:18, 143:22
**26** [8] - 113:4, 120:25, 125:13, 126:22, 212:24, 213:25, 214:22
**26(a)(2** [1] - 215:11
**260** [2] - 167:8, 171:25
**265** [2] - 167:9, 170:10
**26th** [2] - 185:8, 199:18
**27** [1] - 44:25
**27th** [2] - 142:11, 149:25
**28** [8] - 148:15, 148:16, 148:17, 148:25, 149:22, 150:9, 150:10, 150:12
**29** [1] - 209:3
**29-61** [1] - 167:16
**2:10-cv-0106-LRH-VCF** [2] - 1:5, 2:7
**2nd** [5] - 178:6, 178:17, 183:10, 183:19, 183:20

2

## 3

**3** [5] - 1:24, 10:23, 77:9, 196:6, 216:8
**30** [2] - 113:18, 120:18
**30(b)(6** [5] - 60:10, 68:19, 84:13, 85:14, 85:20
**30th** [2] - 155:15, 156:17
**31st** [2] - 20:22, 21:22
**33** [1] - 126:17
**35** [2] - 97:11, 100:6
**37** [1] - 121:1
**370** [1] - 209:7
**3:25** [1] - 162:15

## 4

**4** [14] - 9:25, 13:9, 78:12, 110:9, 147:23, 148:10, 148:11, 149:1, 149:2, 173:11, 174:21, 182:8, 182:12
**4,000** [1] - 116:14
**40** [2] - 73:20, 99:23
**400** [2] - 1:25, 71:13
**404** [1] - 15:22
**42** [2] - 210:25, 211:1
**47** [2] - 97:10, 98:17
**49** [1] - 217:5
**49-page** [1] - 89:10
**4th** [1] - 125:2

## 5

**5** [24] - 9:18, 10:7, 15:11, 75:19, 76:25, 109:14, 110:10, 111:17, 130:2, 130:6, 130:9, 131:17, 131:19, 131:20, 147:23, 148:5, 152:13, 158:16, 158:20, 165:17, 191:8, 202:8
**50** [2] - 66:11, 106:25
**500** [1] - 54:13
**57** [4] - 166:17, 167:15, 209:3, 210:10
**59712** [1] - 159:13
**5:00** [1] - 215:15
**5:30** [1] - 7:1

## 6

**6** [17] - 9:25, 10:3,

---

**65**:12, 79:11, 103:22, 111:23, 147:23, 148:5, 182:8, 182:12, 185:17, 186:6, 188:6, 188:7, 188:11, 191:18, 210:10
**600** [2] - 106:9, 106:11
**66** [2] - 22:22, 22:25
**6:00** [1] - 7:1

## 7

**7** [13] - 81:18, 81:24, 82:1, 88:23, 109:4, 112:5, 137:12, 147:23, 148:5, 173:11, 174:21, 192:15, 192:18
**70** [2] - 22:22, 23:11
**700** [1] - 108:18
**75** [1] - 100:15

## 8

**8** [23] - 10:10, 19:14, 20:21, 22:4, 81:19, 82:24, 87:16, 87:21, 88:4, 88:6, 89:4, 90:8, 90:20, 111:9, 111:14, 112:22, 113:5, 125:13, 142:1, 142:3, 147:23, 148:5, 217:4
**81** [1] - 182:12
**84** [1] - 117:2
**88** [1] - 211:13
**895** [1] - 209:6
**89501** [1] - 1:25
**8:33** [2] - 191:13, 191:19
**8:35** [2] - 191:25, 192:1

## 9

**9** [11] - 81:18, 81:25, 88:23, 88:24, 143:2, 143:7, 147:23, 148:5, 148:20, 148:22
**9.0** [1] - 115:18
**9.1** [2] - 115:14, 153:5
**9.1.1.4** [1] - 125:14
**9.2** [1] - 148:24
**9.4** [2] - 125:23, 125:25
**9/21/2021** [1] - 216:8
**9/5/2018** [1] - 143:18

---

**90** [2] - 117:11, 117:13
**900** [1] - 117:2
**902** [1] - 210:1
**908** [1] - 210:6
**93** [2] - 22:4, 173:6
**94** [8] - 152:25, 153:2, 154:6, 155:5, 156:20, 157:2, 157:4, 217:9
**940** [1] - 78:18
**95** [3] - 154:15, 155:3
**96** [8] - 155:17, 155:18, 155:22, 156:14, 156:20, 157:1, 157:2, 157:4
**97** [2] - 156:4, 156:5
**98** [11] - 162:5, 162:24, 163:7, 163:9, 163:12, 163:16, 164:4, 165:12, 166:3, 168:20, 217:12
**9876** [1] - 192:5
**9877** [1] - 188:21
**99** [8] - 162:24, 163:7, 163:10, 163:13, 164:4, 168:12, 172:8, 217:13
**99.77** [1] - 199:3
**9:00** [3] - 6:12, 215:16, 216:1
**9:07** [3] - 2:1, 113:1, 113:15

## A

**A's** [2] - 59:5, 88:2
**A.M** [1] - 2:1
**a.m** [4] - 149:25, 191:13, 215:16, 216:1
**abbreviation** [1] - 74:14
**aberration** [1] - 8:23
**aberrations** [1] - 209:19
**ability** [1] - 140:24
**able** [19] - 7:11, 11:13, 11:16, 15:22, 23:22, 23:25, 24:11, 29:7, 43:11, 43:13, 43:23, 88:19, 113:20, 121:1, 140:4, 145:9, 146:8, 165:11, 208:2
**about-face** [1] - 87:15
**above-entitled** [1] - 216:7
**absent** [2] - 69:12, 91:12
**absolutely** [4] - 14:23,

---

**16**:18, 24:12, 36:6
**absurd** [2] - 68:12, 78:9
**absurdity** [1] - 52:11
**abundance** [1] - 26:1
**academics** [1] - 76:7
**accept** [2] - 8:17, 160:10
**acceptable** [3] - 6:22, 8:10, 42:4
**Acceptable** [6] - 16:3, 62:10, 123:16, 125:1, 151:24, 201:24
**accepted** [4] - 109:15, 109:17, 130:16, 181:18
**accepting** [1] - 130:4
**access** [18] - 24:2, 24:9, 31:6, 33:22, 38:22, 43:11, 43:21, 44:5, 50:23, 51:1, 61:8, 63:20, 64:11, 68:5, 68:18, 72:13, 73:1, 109:21
**access...** [1] - 72:14
**accessed** [3] - 35:19, 35:23, 35:24
**accessible** [9] - 60:7, 67:14, 68:20, 68:24, 81:21, 82:9, 83:1, 87:9, 89:6
**accessing** [6] - 39:19, 40:2, 44:2, 44:11, 68:24, 92:13
**accident** [1] - 41:17
**accidental** [4] - 14:22, 34:21, 35:17, 183:17
**accidently** [2] - 31:21, 31:22
**accommodate** [1] - 7:15
**accommodation** [1] - 6:20
**accompany** [1] - 8:16
**accomplish** [1] - 10:22
**accordance** [1] - 2:16
**account** [3] - 139:21, 205:20
**accountability** [2] - 44:24, 48:2
**accountable** [2] - 28:2, 47:3
**Accumulates** [1] - 204:2
**accumulates** [1] - 204:13
**accumulation** [1] - 206:11

---

**accurate** [2] - 63:12, 84:17
**accurately** [1] - 140:21
**accused** [5] - 58:9, 64:12, 64:13, 64:14
**accuses** [1] - 82:6
**accusing** [2] - 50:18, 63:16
**acknowledge** [1] - 62:25
**acknowledged** [5] - 22:23, 56:4, 68:18, 68:19, 90:12
**acknowledges** [1] - 25:13
**acknowledging** [1] - 24:2
**acknowledgment** [2] - 23:8, 24:8
**acquisitions** [1] - 95:11
**Act** [6] - 52:22, 59:22, 60:2, 92:16, 92:17
**act** [5] - 71:10, 118:17, 142:12, 143:18, 174:3
**acted** [1] - 66:1
**acting** [2] - 87:14, 158:16
**action** [4] - 11:11, 54:6, 130:18, 178:4
**actions** [2] - 13:2, 83:24
**activities** [13] - 12:11, 12:24, 20:18, 21:13, 27:22, 28:23, 44:20, 46:18, 97:5, 98:11, 100:11, 100:13, 105:11
**activity** [10] - 11:24, 12:5, 12:16, 13:14, 14:5, 16:8, 31:8, 32:20, 178:8
**acts** [2] - 56:18, 130:3
**actual** [9] - 22:12, 27:12, 45:1, 107:8, 112:18, 137:4, 147:11, 147:15, 149:13
**adapted** [1] - 53:2
**added** [9] - 137:9, 137:12, 137:15, 137:17, 170:15, 182:4, 182:8, 182:12, 182:13
**adding** [1] - 89:11
**addition** [11] - 8:14, 12:8, 36:19, 47:17, 87:15, 96:24,

3

137:19, 160:20, 161:12, 200:15, 209:24
**additional** [15] - 7:10, 15:11, 113:17, 138:6, 145:21, 146:19, 150:17, 150:24, 152:19, 161:21, 161:23, 172:21, 184:15, 194:20, 195:18
**additionally** [2] - 2:17, 31:3
**address** [3] - 22:8, 51:10, 157:11
**addresses** [1] - 41:6
**addressing** [1] - 9:5
**adequate** [1] - 7:21
**adherence** [1] - 16:2
**adjourned** [2] - 93:12, 215:25
**Adjourned** [1] - 216:3
**adjudicate** [1] - 9:16
**adjudicated** [17] - 11:4, 19:19, 31:16, 32:19, 34:20, 36:25, 56:16, 56:18, 56:19, 56:20, 56:22, 57:5, 60:5, 64:14, 64:17, 64:23, 70:25
**adjudication** [3] - 15:9, 32:11, 47:21
**administrator** [1] - 97:17
**admission** [6] - 124:12, 179:24, 180:2, 189:2, 189:21, 190:9
**admissions** [1] - 29:21
**admit** [9] - 38:23, 67:25, 77:25, 88:12, 135:25, 136:2, 160:8, 181:14, 206:19
**admits** [2] - 23:3, 38:21
**admitted** [14] - 135:20, 135:23, 176:18, 177:4, 177:8, 180:4, 181:18, 186:1, 187:15, 189:5, 189:24, 190:12, 196:16, 206:22
**admittedly** [1] - 86:20
**Adobe** [1] - 77:20
**adult** [1] - 48:24
**advanced** [1] - 96:22
**advice** [2] - 178:11, 178:14

**advised** [3] - 99:19, 113:25, 161:5
**advising** [5] - 145:21, 171:8, 178:13, 183:13, 201:9
**affect** [1] - 55:6
**affected** [2] - 77:15, 77:18
**affects** [1] - 55:18
**affirmatively** [1] - 18:5
**affirmed** [1] - 21:15
**affixed** [2] - 136:12, 203:9
**after-the-fact** [1] - 40:6, 45:23
**afternoon** [5] - 6:16, 94:20, 94:21, 114:18, 162:13
**AFW** [6] - 21:18, 53:14, 63:7, 64:14, 104:9, 104:23
**age** [1] - 96:15
**agencies** [1] - 101:10
**aggravating** [4] - 36:22, 42:16, 45:18, 46:16
**ago** [13] - 4:11, 9:23, 24:21, 51:8, 53:18, 62:3, 85:24, 113:11, 113:18, 143:22, 156:5, 167:15, 211:8
**agree** [2] - 115:11, 206:6
**agreed** [4] - 115:21, 187:14, 190:11, 206:20
**agreement** [2] - 4:7, 126:3
**Agreement** [2] - 61:20, 125:2
**agreements** [4] - 85:2, 86:4, 124:9
**ahead** [11] - 5:13, 49:15, 49:22, 50:8, 93:7, 94:18, 132:25, 162:13, 162:19, 166:13, 201:21
**aided** [2] - 28:3, 107:25
**akin** [2] - 16:11, 113:10
**al** [4] - 1:4, 1:7, 2:7, 2:8
**alignment** [1] - 73:19
**allegation** [4] - 74:6, 80:20, 89:18, 90:4
**alleged** [5] - 16:20, 26:15, 57:3, 77:2, 79:5
**allegedly** [1] - 16:4

**ALLEN** [1] - 3:5
**Allen** [2] - 1:19, 3:6
**allotted** [1] - 5:19
**allow** [10] - 7:13, 18:11, 77:22, 122:19, 122:24, 136:12, 138:21, 160:8, 165:7, 205:16
**allowed** [9] - 10:4, 57:11, 68:10, 112:22, 121:10, 124:14, 129:10, 201:19
**allows** [6] - 5:10, 133:23, 134:11, 139:20, 153:20, 205:17
**almost** [1] - 12:19
**alone** [3] - 43:17, 89:12, 204:16
**alongside** [1] - 183:7
**altered** [1] - 86:22
**alternatively** [1] - 126:11
**Amdahl** [2] - 96:19, 96:23
**America** [6] - 86:5, 148:23, 148:24, 153:4, 155:20, 155:22
**amount** [6] - 29:12, 64:6, 100:22, 140:17, 208:11, 208:12
**amply** [1] - 38:4
**analyses** [2] - 102:7, 103:14
**analysis** [32] - 69:2, 79:18, 90:21, 95:5, 97:1, 97:12, 98:18, 99:22, 99:23, 100:6, 100:24, 101:15, 101:16, 101:17, 106:4, 106:5, 107:25, 111:25, 112:1, 114:21, 118:9, 121:9, 129:17, 137:6, 145:9, 175:4, 177:20, 206:2, 207:21, 207:22, 212:19
**analyst** [1] - 28:9
**analytic** [3] - 76:4, 76:8, 76:19
**analyze** [2] - 123:4, 140:4
**analyzed** [3] - 128:4, 146:24, 214:7
**Analyzer** [3] - 25:22,

128:7, 129:1
**analyzer** [1] - 64:15
**analyzing** [3] - 9:13, 12:4, 204:20
**Andy** [1] - 97:2
**annotation** [1] - 136:25
**answer** [7] - 70:18, 76:2, 85:11, 92:6, 100:24, 144:9, 184:3
**answers** [1] - 50:12
**anticipate** [2] - 7:7, 93:1
**anticipated** [1] - 7:16
**apologies** [1] - 176:10
**apologize** [4] - 8:12, 139:18, 143:8, 167:20
**apparent** [2] - 31:24, 130:17
**appeal** [2] - 44:13, 44:17
**appealed** [3] - 9:2, 17:15, 39:1
**appear** [11] - 19:23, 36:13, 113:9, 117:13, 119:6, 130:1, 144:19, 184:13, 202:4, 205:24, 208:7
**APPEARANCES** [1] - 1:13
**appeared** [1] - 172:19
**appellate** [1] - 10:19
**appendix** [1] - 126:18
**application** [1] - 149:13
**Applied** [1] - 96:14
**applied** [3] - 10:20, 14:11, 14:18
**applies** [1] - 25:8
**apply** [2] - 111:9, 112:15
**applying** [1] - 26:11
**appointed** [1] - 48:18
**appreciate** [5] - 4:1, 4:7, 124:20, 215:17, 215:19
**appreciated** [1] - 6:8
**approach** [11] - 20:11, 43:7, 44:4, 63:6, 63:9, 86:17, 86:24, 86:25, 87:2, 92:4, 95:25
**approached** [1] - 17:25
**appropriate** [5] - 20:23, 48:8, 48:9, 99:18, 100:17
**appropriately** [1] -

44:16
**approve** [1] - 4:5
**April** [1] - 20:24
**ARAXIS** [5] - 134:10, 205:16, 205:19, 206:15
**archeology** [1] - 100:19
**architecture** [1] - 82:23
**archival** [1] - 47:18
**area** [9] - 3:1, 15:25, 25:13, 41:3, 100:23, 153:23, 206:10, 211:2, 212:2
**areas** [8] - 9:7, 9:15, 34:22, 97:14, 101:5, 101:13, 153:20, 205:24
**argue** [2] - 29:1, 79:19
**argued** [1] - 65:6
**argues** [1] - 82:24
**arguing** [1] - 17:2
**argument** [8] - 14:16, 14:21, 27:21, 30:11, 39:25, 44:12, 44:16, 65:3
**arguments** [2] - 42:8, 44:23
**arijit.ray@rrd.com** [1] - 70:9
**Arjit** [2] - 142:23, 143:9
**array** [3] - 28:22, 166:18, 203:16
**arrows** [1] - 77:12
**artifacts** [2] - 106:6, 106:20
**aside** [1] - 65:23
**aspect** [3] - 42:22, 50:18, 56:2
**aspects** [6] - 45:19, 46:23, 56:21, 57:6, 107:6, 123:17
**assemblage** [1] - 211:23
**assertion** [1] - 15:17
**assertions** [1] - 14:19
**assess** [1] - 192:11
**assessing** [1] - 134:21
**assigned** [1] - 211:9
**assignment** [1] - 210:15
**assist** [5] - 9:10, 15:1, 33:5, 44:6, 45:10
**Assistant** [2] - 86:8, 86:13
**assistant** [1] - 85:22
**assisted** [2] - 107:22, 107:24

4

**Associate** [2] - 86:6, 96:14
**associated** [11] - 102:17, 110:12, 123:24, 143:23, 145:10, 149:9, 154:16, 156:6, 166:11, 171:16, 182:15
**Associates** [1] - 100:3
**association** [1] - 211:14
**assume** [3] - 162:11, 163:20, 165:24
**assumed** [1] - 8:1
**assuming** [1] - 115:16
**asterisk** [1] - 166:17
**Astrachan** [3] - 39:12, 76:6, 117:10
**Astrachan's** [1] - 145:23
**attach** [3] - 165:21, 214:11, 214:25
**attached** [19] - 138:20, 142:10, 143:10, 143:17, 148:15, 150:5, 165:14, 165:15, 171:12, 173:15, 173:17, 174:19, 175:1, 178:2, 186:13, 186:25, 200:24, 201:18, 212:20
**attaches** [2] - 163:14, 165:20
**attaching** [3] - 70:12, 158:12, 174:3
**attachment** [12] - 133:16, 142:5, 142:8, 159:20, 173:12, 179:13, 185:21, 185:23, 186:5, 192:1, 192:4
**attachments** [15] - 133:16, 138:19, 138:21, 138:22, 139:2, 140:10, 140:11, 142:15, 146:10, 146:14, 146:15, 150:5, 159:8, 166:3, 172:19
**attack** [2] - 44:14, 44:18
**attempt** [4] - 44:21, 69:22, 91:15, 193:21
**attempting** [1] - 112:15
**attention** [25] - 16:15, 20:17, 125:13, 141:4, 141:25,

144:6, 157:25, 163:17, 168:25, 173:11, 175:10, 175:15, 178:23, 184:21, 185:17, 186:4, 188:22, 191:8, 192:14, 194:13, 199:9, 200:19, 202:20, 205:1, 210:13
**attitude** [3] - 17:18, 19:8, 22:16
**attitudes** [1] - 17:25
**attorney** [1] - 109:8
**Attorneys** [2] - 1:17, 1:21
**attorneys** [3] - 3:16, 17:22, 101:4
**audience** [2] - 3:10, 101:4
**audit** [2] - 84:1, 84:14
**audited** [1] - 98:12
**auditing** [1] - 98:7
**audits** [2] - 98:10, 98:14
**augments** [5] - 203:14, 204:3, 204:9, 204:14, 206:8
**AUP** [6] - 62:11, 62:13, 62:17, 62:20, 62:22, 152:5
**author** [1] - 100:9
**authored** [2] - 100:14
**authority** [2] - 55:25, 152:7
**authorized** [1] - 126:2
**auto** [1] - 212:12
**automated** [1] - 102:15
**automatically** [1] - 70:6
**automating** [1] - 25:20
**automation** [2] - 21:17, 25:20
**available** [3] - 12:5, 50:17, 106:17
**avenues** [1] - 19:23
**avoid** [1] - 19:23
**avoiding** [1] - 90:1
**aware** [13] - 117:3, 123:15, 126:3, 127:20, 140:22, 145:5, 145:8, 146:1, 146:4, 156:25, 157:3, 157:6, 157:7

**B**

**B's** [1] - 59:7
**background** [4] -

95:18, 96:10, 104:4, 104:5
**bad** [1] - 23:9
**bag** [2] - 5:6, 5:8
**bags** [1] - 5:3
**baked** [1] - 44:13
**ball** [1] - 64:8
**ban** [2] - 87:6, 88:19
**banned** [1] - 58:15
**bar** [3] - 59:23, 59:24
**Barbara** [13] - 11:20, 27:20, 31:19, 48:20, 94:9, 94:14, 112:23, 122:2, 148:12, 148:14, 149:3, 150:2, 217:8
**BARBARA** [1] - 94:10
**base** [2] - 172:1, 190:22
**based** [43] - 7:14, 11:9, 12:2, 15:7, 19:17, 24:3, 30:20, 38:9, 41:25, 46:25, 50:14, 56:9, 63:16, 92:18, 95:6, 95:7, 101:18, 109:7, 111:7, 112:2, 116:4, 116:20, 118:5, 118:9, 120:4, 126:16, 127:12, 137:6, 137:23, 141:12, 154:12, 161:19, 177:20, 182:21, 185:13, 187:24, 190:18, 194:6, 197:24, 202:9, 204:15, 206:2
**bases** [3] - 214:23, 215:2, 215:12
**basic** [1] - 170:7
**basis** [18] - 10:25, 18:23, 19:18, 33:15, 42:6, 55:2, 69:18, 71:16, 113:17, 119:7, 175:17, 186:21, 189:19, 190:4, 214:1, 214:3, 214:13
**Bates** [24] - 138:20, 139:1, 140:9, 142:4, 154:17, 154:18, 159:12, 173:17, 174:18, 174:22, 179:16, 179:17, 180:9, 185:20, 186:7, 188:13, 188:19, 192:5, 195:1, 195:10, 195:13, 195:16, 196:9, 203:9

**Bates-numbered** [2] - 138:20, 139:1
**bear** [1] - 147:16
**bearing** [1] - 186:10
**bears** [2] - 29:7, 133:6
**became** [3] - 34:3, 62:22, 80:13
**become** [1] - 126:3
**BEFORE** [1] - 1:2
**began** [1] - 185:4
**beginning** [2] - 2:10, 40:18
**behalf** [11] - 2:12, 3:6, 3:8, 8:8, 47:19, 49:15, 94:10, 110:8, 119:2, 122:20, 129:7
**behave** [1] - 47:15
**behavior** [10] - 13:18, 38:17, 43:17, 46:5, 46:17, 47:2, 47:8, 109:13, 130:10
**behaviors** [1] - 129:10
**behind** [1] - 2:18
**belief** [2] - 24:11, 37:2
**believes** [2] - 53:14, 63:7
**belongs** [1] - 168:6
**below** [7] - 31:3, 142:6, 166:19, 192:3, 203:19, 210:13, 211:12
**benchmarks** [1] - 29:11
**benefit** [6] - 4:25, 41:13, 88:1, 88:3, 110:8, 131:2
**benefits** [1] - 65:8
**Benge** [11] - 25:12, 128:20, 150:6, 150:17, 152:3, 152:4, 152:6, 157:15, 159:11, 159:14, 159:17
**Benjamin** [2] - 1:14, 2:14
**best** [4] - 48:13, 53:6, 103:3, 116:25
**better** [5] - 5:12, 6:3, 33:14, 58:22, 99:10
**between** [31] - 39:11, 46:15, 60:7, 61:1, 76:20, 83:14, 89:20, 104:17, 104:18, 104:25, 108:20, 122:4, 125:22, 138:5, 148:2, 163:12, 164:12, 176:5, 176:7, 176:8, 181:11, 182:17, 182:19, 183:9,

185:11, 187:5, 191:21, 197:21, 198:4, 212:4, 212:16
**beyond** [7] - 9:6, 12:1, 41:3, 52:21, 66:3, 67:24, 87:13
**big** [2] - 35:3, 36:8
**biggest** [1] - 47:20
**Bill** [1] - 2:19
**billable** [1] - 108:21
**bin** [2] - 106:6, 107:10
**binder** [24] - 123:22, 124:2, 124:19, 128:15, 129:12, 132:11, 141:5, 153:1, 158:1, 162:2, 162:3, 162:4, 162:6, 162:9, 162:12, 169:7, 172:10, 173:3, 186:20, 188:23, 196:6, 197:19, 206:13
**binders** [3] - 123:23, 123:25, 124:11
**binding** [3] - 76:1, 79:18, 85:12
**bit** [24] - 8:22, 10:13, 12:5, 12:9, 14:10, 15:24, 16:14, 42:7, 45:7, 62:11, 99:1, 103:17, 116:16, 139:12, 139:19, 141:16, 150:19, 152:6, 154:3, 158:20, 171:18, 191:7, 191:16, 210:13
**black** [1] - 40:25
**Blackmarr** [3] - 150:6, 150:16, 152:3
**blank** [3] - 182:13, 202:18, 202:25
**blatant** [2] - 22:1, 33:6, 45:20
**blatantly** [1] - 46:9
**blessing** [4] - 52:3, 54:1, 86:14, 92:2
**block** [1] - 203:19
**blue** [3] - 41:1, 89:19, 90:3
**board** [2] - 50:11, 54:12
**boggling** [1] - 78:4
**Bois** [1] - 2:13
**Bokius** [1] - 2:15
**book** [1] - 168:16
**bottom** [20] - 22:11, 23:10, 23:17, 39:16, 131:13, 142:3, 153:10, 158:10,

5

163:20, 173:14, 174:20, 180:10, 188:7, 188:11, 191:8, 192:15, 194:14, 195:7, 195:9, 200:19
**bought** [1] - 30:10
**box** [28] - 73:22, 73:23, 89:19, 89:21, 90:3, 142:3, 142:21, 143:3, 143:7, 143:24, 144:12, 173:14, 173:16, 174:20, 179:10, 191:18, 191:25, 192:3, 192:15, 192:18, 192:23, 192:24, 193:4, 195:16, 198:22, 199:11, 203:23
**boxes** [5] - 73:19, 77:11, 77:20, 77:22, 192:17
**Boy** [1] - 48:14
**brazen** [2] - 40:12
**breadth** [1] - 31:11
**break** [9] - 6:15, 6:16, 49:16, 49:21, 93:8, 94:6, 162:2, 162:13, 162:15
**breaking** [1] - 203:14
**brief** [1] - 56:7
**briefing** [8] - 17:15, 29:6, 37:8, 38:5, 50:18, 79:19, 108:11, 108:14
**briefly** [2] - 97:9, 103:24
**bring** [3] - 24:1, 127:5, 162:3
**British** [1] - 78:22
**broad** [2] - 63:18, 119:11
**broader** [3] - 12:17, 106:16, 112:3
**broken** [1] - 211:4
**brought** [4] - 39:17, 135:21, 164:21, 167:18
**Buffy** [1] - 84:11
**bug** [2] - 55:17, 110:18
**building** [1] - 6:25
**built** [2] - 68:23, 92:13
**bullet** [3] - 115:23, 117:19, 120:9
**bumpy** [1] - 7:22
**bunch** [1] - 34:21
**bundle** [9] - 147:13, 147:18, 148:3,

148:6, 148:9, 148:17, 148:19, 150:12
**burden** [5] - 51:14, 70:22, 73:16, 75:16, 92:21
**Bureau** [2] - 98:22, 98:25
**business** [15] - 17:13, 18:23, 19:15, 19:17, 20:10, 20:14, 26:5, 32:25, 42:14, 44:9, 47:8, 95:3, 97:20, 98:1
**businesses** [1] - 54:14
**buys** [1] - 82:2
**BY** [35] - 94:23, 96:3, 96:9, 99:3, 99:11, 103:23, 114:13, 123:2, 124:22, 131:7, 132:22, 133:2, 133:12, 136:5, 139:14, 145:4, 157:24, 160:22, 163:8, 167:6, 168:24, 175:14, 177:10, 180:6, 181:21, 184:8, 186:3, 187:18, 189:7, 190:2, 190:14, 196:18, 198:16, 203:7, 207:1

---

### C

**calculated** [1] - 43:18
**calendar** [2] - 192:20, 193:17
**candor** [1] - 23:3
**cannot** [9] - 51:13, 66:1, 69:11, 80:6, 82:20, 91:11, 118:3, 169:20, 201:18
**capacity/ management** [1] - 97:24
**Capital** [1] - 100:3
**car** [1] - 68:10
**care** [1] - 172:5
**career** [1] - 100:8
**careful** [1] - 54:5
**carried** [1] - 29:4
**carries** [1] - 75:15
**carrying** [1] - 4:12
**carved** [1] - 211:2
**case** [90] - 2:6, 4:2, 4:5, 7:9, 7:22, 8:24, 9:9, 9:24, 10:11,

12:9, 12:18, 18:9, 18:12, 19:20, 21:23, 22:21, 28:21, 29:5, 33:21, 36:21, 36:25, 37:8, 37:18, 41:1, 41:10, 42:15, 45:19, 45:21, 47:6, 48:12, 52:2, 52:3, 52:8, 52:25, 54:1, 61:15, 65:7, 65:11, 80:5, 99:15, 102:7, 105:15, 107:7, 108:1, 119:6, 134:16, 134:17, 134:23, 136:25, 137:3, 138:12, 139:22, 141:7, 141:8, 141:10, 145:24, 157:16, 170:19, 170:20, 172:4, 173:8, 173:9, 175:4, 178:1, 178:25, 179:2, 179:5, 183:2, 183:4, 183:5, 183:8, 183:12, 183:21, 184:1, 184:11, 185:3, 185:4, 185:5, 185:7, 185:10, 186:6, 186:25, 190:24, 199:9, 200:24
**cases** [10] - 6:9, 18:16, 23:22, 53:1, 65:5, 65:19, 119:8, 127:18, 141:11, 141:16
**Casey** [1] - 1:21, 3:15
**categories** [1] - 14:25
**category** [2] - 75:11, 211:18
**Caterpillar** [1] - 100:2
**caution...** [1] - 26:1
**cautious** [1] - 53:10
**cc** [2] - 159:14, 159:15
**cc'd** [1] - 193:8
**cc-ing** [1] - 159:14
**CCR** [2] - 1:24, 216:8
**ceased** [1] - 106:23
**Center** [19] - 184:19, 185:3, 185:15, 188:4, 191:3, 191:22, 192:11, 192:12, 193:5, 193:6, 193:12, 194:10, 196:21, 197:3, 197:9, 199:13, 200:17, 201:9, 201:13
**central** [1] - 79:15

**CEO** [3] - 21:12, 84:4, 84:9
**certain** [11] - 5:24, 13:1, 24:7, 73:19, 77:11, 106:6, 106:7, 132:8, 135:8, 206:8
**certainly** [7] - 15:19, 19:11, 36:23, 51:13, 54:3, 109:7, 114:21
**certify** [1] - 216:6
**cetera** [3] - 48:8, 98:10, 139:22
**chain** [2] - 158:4, 158:7
**chains** [1] - 38:5
**challenge** [1] - 39:24
**challenged** [1] - 14:11
**chance** [3] - 215:6, 215:8, 215:9
**change** [18] - 19:25, 78:2, 78:7, 78:18, 119:22, 127:25, 137:1, 137:2, 137:4, 137:10, 143:11, 143:17, 144:4, 147:14, 182:15, 212:10
**changed** [9] - 53:1, 53:17, 113:12, 118:11, 118:21, 127:23, 190:22, 191:7, 199:4
**changes** [27] - 18:4, 24:12, 25:1, 25:24, 26:4, 28:5, 60:14, 77:18, 78:6, 80:16, 84:8, 84:10, 84:17, 85:16, 86:21, 112:17, 118:12, 118:21, 119:1, 120:2, 129:2, 129:5, 129:21, 132:19, 149:10, 149:11, 151:5
**changes..** [2] - 60:13, 85:10
**changing** [3] - 26:9, 55:24, 77:21
**character** [2] - 106:2, 134:23
**characterize** [1] - 116:11
**characterized** [1] - 126:13
**characterizes** [1] - 22:5
**charge** [1] - 20:2
**charges** [1] - 20:3
**chart** [2] - 29:15, 63:24

**charts** [1] - 215:21
**check** [3] - 10:23, 146:12, 196:3
**checking** [2] - 32:4, 157:20
**Chief** [1] - 3:9
**Children's** [6] - 130:25, 152:23, 158:6, 160:25, 161:4, 161:14
**choose** [1] - 44:22
**choosing** [1] - 52:2
**Christian** [1] - 104:4
**chunk** [2] - 168:5, 170:12
**Circuit** [8] - 17:16, 37:1, 52:5, 69:11, 69:13, 76:1, 79:18, 91:11
**circuits** [1] - 76:2
**circumstances** [2] - 12:23, 40:15
**cited** [1] - 43:9
**cites** [1] - 21:1
**Citrix** [1] - 153:19
**City** [26] - 33:2, 33:25, 34:4, 36:17, 37:15, 37:16, 37:22, 38:2, 38:10, 45:20, 74:8, 74:9, 74:11, 74:25, 75:1, 77:16, 77:17, 78:16, 78:17, 78:20, 79:1, 79:8, 110:12, 110:14, 110:17
**civil** [1] - 98:19
**claim** [9] - 17:7, 17:12, 21:3, 27:12, 37:12, 64:7, 89:8, 114:19, 214:11
**claimed** [2] - 12:17, 20:24
**claiming** [2] - 16:17, 72:20
**claims** [9] - 22:15, 25:16, 26:23, 39:5, 66:4, 66:7, 69:4, 79:6, 88:12
**clarification** [6] - 5:16, 42:18, 42:23, 115:13, 160:5, 169:6
**clarify** [3] - 8:2, 160:3, 160:12
**clarifying** [1] - 7:24
**clarity** [1] - 183:24
**classic** [1] - 38:11
**clear** [24] - 10:17, 13:16, 19:8, 24:8, 34:13, 42:4, 42:12, 51:14, 56:10, 73:14, 75:16, 87:5, 107:4,

107:18, 120:25,
129:9, 139:10,
140:12, 160:17,
171:14, 183:16,
190:3, 204:12,
208:20
**clearly** [12] - 12:6,
13:13, 22:1, 23:16,
24:2, 26:10, 34:13,
36:25, 38:3, 45:24,
135:18, 152:7
**CLERK** [5] - 2:5, 5:4,
94:12, 175:11, 177:5
**clerks** [1] - 3:21
**client** [57] - 10:2, 38:9,
41:13, 41:22, 44:5,
54:21, 54:22, 54:23,
55:4, 55:22, 55:24,
59:4, 59:7, 59:13,
61:12, 62:4, 62:5,
62:7, 66:13, 68:7,
70:8, 70:15, 70:21,
72:16, 72:23, 72:24,
72:25, 73:6, 78:3,
78:6, 80:11, 80:23,
87:23, 87:24, 88:2,
88:3, 88:8, 89:11,
91:1, 91:2, 91:19,
106:9, 110:1, 120:8,
125:18, 126:12,
127:6, 144:24,
152:1, 158:25,
173:1, 173:14, 194:2
**Client** [1] - 10:6
**client's** [17] - 33:5,
41:11, 53:22, 53:23,
54:18, 55:25, 78:7,
80:17, 81:11, 81:14,
89:22, 90:5, 125:15,
126:2, 127:7,
128:12, 160:19
**Client's** [5] - 9:22,
10:1, 10:5, 10:9,
14:4
**client-sent** [1] - 70:21
**clients** [78] - 12:20,
14:5, 26:15, 26:18,
26:24, 27:3, 27:4,
27:8, 32:19, 33:6,
33:10, 34:8, 35:6,
35:7, 35:14, 35:19,
37:13, 37:17, 41:12,
44:1, 52:20, 53:20,
54:10, 54:12, 54:17,
54:25, 55:6, 55:8,
55:18, 55:19, 55:20,
57:14, 57:19, 61:9,
62:6, 63:2, 65:9,
65:22, 66:5, 66:9,
66:12, 67:4, 70:4,

70:18, 70:24, 71:12,
71:13, 71:15, 71:18,
71:25, 72:2, 72:3,
72:5, 72:20, 74:1,
77:15, 80:10, 80:13,
81:6, 81:11, 81:17,
85:3, 86:4, 87:1,
89:1, 92:12, 95:4,
100:2, 100:4,
102:13, 106:11,
107:13, 125:17,
125:22, 145:2,
145:11
**clients'** [2] - 53:19,
64:16
**cloning** [1] - 71:2
**close** [4] - 6:20, 16:15,
20:16, 133:19
**closed** [22] - 39:3,
40:3, 42:8, 42:20,
43:16, 46:15, 51:8,
60:7, 82:4, 82:9,
82:19, 82:22,
113:11, 151:5,
183:2, 183:5, 183:7,
183:8, 184:11,
185:7, 199:23, 200:8
**closely** [2] - 26:22,
32:17
**closing** [2] - 183:12,
210:4
**cloud** [2] - 64:16,
154:4
**cloudy** [1] - 41:1
**co** [1] - 100:14
**co-authored** [1] -
100:14
**Cobol** [11] - 75:21,
163:19, 164:13,
164:20, 165:4,
165:7, 166:14,
166:20, 168:1,
169:4, 211:22
**Cobols** [3] - 163:22,
163:23, 164:1
**Code** [3] - 25:22,
128:7, 129:1
**code** [220] - 10:12,
14:7, 14:11, 14:17,
24:1, 24:3, 24:9,
31:7, 34:6, 35:2,
35:6, 35:7, 35:18,
35:20, 38:20, 38:22,
39:2, 39:3, 39:14,
39:20, 40:2, 40:3,
40:8, 40:14, 42:8,
42:20, 42:23, 43:7,
43:11, 43:16, 43:22,
44:2, 44:5, 44:11,
46:4, 46:15, 57:1,

58:11, 59:12, 59:17,
60:5, 60:7, 60:13,
60:14, 60:17, 60:19,
60:20, 60:24, 64:15,
67:14, 67:19, 68:18,
68:20, 68:24, 75:13,
76:22, 76:23, 77:21,
77:24, 80:21, 81:21,
82:4, 82:8, 82:13,
82:22, 82:25, 83:1,
83:15, 84:8, 84:10,
84:16, 84:17, 85:7,
85:8, 85:10, 85:15,
85:16, 86:15, 87:8,
87:17, 87:18, 87:22,
88:6, 88:13, 88:15,
88:16, 89:3, 89:6,
89:8, 89:11, 89:12,
89:14, 89:17, 89:18,
89:19, 89:21, 89:22,
90:1, 90:3, 90:4,
90:22, 92:14, 95:6,
99:22, 99:23, 99:25,
100:6, 101:16,
102:14, 102:22,
105:5, 105:6, 105:7,
106:16, 106:19,
109:16, 110:20,
110:21, 111:3,
111:6, 111:8,
111:12, 115:2,
116:20, 117:1,
117:10, 118:7,
118:8, 119:20,
119:24, 122:0,
120:3, 120:6,
121:16, 121:21,
122:5, 122:16,
123:9, 126:10,
130:4, 130:16,
131:2, 135:12,
136:21, 137:5,
137:15, 137:16,
144:3, 150:1,
161:24, 164:2,
164:15, 164:23,
165:9, 167:18,
168:5, 170:12,
170:15, 171:15,
171:23, 172:2,
172:25, 176:13,
180:22, 180:23,
181:1, 181:7, 181:9,
181:12, 182:8,
182:12, 182:19,
184:5, 185:14,
186:18, 186:21,
187:7, 188:16,
189:16, 189:19,
192:22, 194:11,
194:21, 194:23,

197:17, 197:22,
198:6, 207:21,
207:22, 207:24,
208:21, 209:3,
210:10, 210:18,
210:21, 211:19,
211:21, 211:23,
211:25, 212:3,
212:5, 212:14,
212:21, 213:4,
213:11
**code.** [1] - 72:11
**code/closed** [1] - 43:6
**codes** [2] - 39:11, 84:6
**collateral** [1] - 44:18
**colleague** [1] - 107:24
**colleagues** [2] - 3:12,
108:2
**collection** [2] -
100:24, 165:1
**color** [2] - 135:9,
207:18
**colored** [1] - 207:14
**column** [2] - 139:13,
139:19
**columns** [1] - 139:18
**coming** [1] - 46:14
**comma** [1] - 138:25
**commas** [1] - 139:13
**commended** [1] - 64:5
**comment** [6] - 137:5,
166:15, 182:11,
182:14, 191:20,
201:16
**commented** [1] -
27:23
**comments** [4] -
136:23, 203:13,
203:19, 206:9
**common** [7] - 15:20,
37:19, 37:22, 58:23,
203:15, 204:3,
204:13
**commonly** [2] -
122:24, 141:1
**communicated** [1] -
17:22
**communication** [5] -
138:9, 145:20,
151:18, 153:24,
178:9
**communications** [9] -
12:10, 12:25, 16:10,
27:11, 35:8, 37:7,
137:25, 138:1,
151:17
**COMP** [1] - 210:16
**companies** [3] - 2:25,
27:12, 54:13
**companies'** [1] -

126:25
**company** [11] - 19:19,
20:8, 21:13, 40:19,
45:12, 54:8, 55:12,
68:4, 82:2, 97:20,
112:8
**company's** [4] -
21:16, 125:16,
125:21, 126:1
**comparable** [1] -
97:25
**compare** [6] - 135:7,
180:21, 180:25,
186:17, 189:15,
197:14
**compared** [11] -
105:5, 107:1,
132:18, 134:1,
134:9, 175:6, 176:3,
199:6, 204:24,
205:10, 213:13
**compares** [1] - 135:2
**comparing** [3] - 134:7,
177:1, 186:7
**comparison** [50] -
29:15, 99:25,
105:24, 122:2,
122:14, 122:15,
134:5, 134:16,
135:13, 136:6,
136:12, 175:18,
176:4, 176:22,
177:8, 177:15,
177:16, 177:20,
180:19, 181:6,
181:11, 181:22,
182:21, 182:22,
186:22, 186:25,
187:5, 187:24,
189:19, 190:4,
190:6, 190:18,
197:18, 198:9,
198:23, 199:1,
199:5, 205:14,
205:17, 205:18,
205:19, 207:21,
207:23, 207:24,
209:4, 210:10,
212:21, 213:4,
213:11, 213:14
**comparisons** [4] -
105:7, 187:22,
197:21, 197:24
**compendium** [1] -
147:25
**compete** [4] - 51:19,
52:4, 54:4, 92:5
**competency** [1] -
55:10
**compilation** [5] -

7

164:21, 168:3,
168:10, 168:11,
170:8
**compile** [4] - 163:19,
163:21, 164:1, 165:9
**compiled** [2] - 82:10,
168:10
**compiler** [5] - 168:3,
168:10, 212:7, 212:8
**compiling** [1] - 164:13
**complained** [1] -
12:18
**complete** [6] - 16:19,
22:7, 74:13, 102:12,
107:5, 113:5
**completed** [1] - 74:15
**completely** [5] -
24:12, 38:9, 87:19,
90:23, 118:2
**complex** [3] - 4:15,
28:10, 53:8
**compliance** [28] -
14:23, 16:2, 17:6,
17:19, 17:24, 19:12,
25:18, 26:21, 29:2,
31:14, 32:7, 41:15,
45:13, 51:21, 53:15,
61:25, 62:1, 62:11,
62:23, 70:23, 71:1,
92:23, 98:8, 98:9,
127:17, 128:23,
129:16, 130:9
**complied** [2] - 14:20,
19:21
**comply** [24] - 11:7,
11:17, 15:2, 17:7,
19:13, 19:16, 20:5,
25:2, 25:5, 28:25,
40:19, 40:21, 40:23,
43:18, 44:21, 45:12,
46:2, 53:2, 62:2,
71:21, 85:15, 85:16,
127:14, 129:22
**complying** [6] - 13:17,
30:22, 36:24, 47:11,
112:20, 127:18
**component** [3] -
150:12, 173:23,
202:6
**components** [5] -
130:15, 146:23,
169:14, 173:24,
214:17
**compound** [1] - 211:4
**comprehensible** [1] -
141:18
**comprehensive** [2] -
27:7, 49:5
**computation** [1] -
203:17

**Computer** [2] - 96:14,
100:3
**computer** [24] - 9:21,
9:22, 10:9, 33:23,
95:6, 95:7, 95:12,
96:12, 96:21, 97:2,
97:13, 97:18, 99:15,
101:15, 101:16,
101:18, 102:13,
127:6, 131:23,
154:11, 211:3
**computer-based** [3] -
95:6, 95:7, 101:18
**Compuware** [1] -
100:3
**conceal** [1] - 112:18
**conceded** [1] - 56:6
**concedes** [1] - 46:10
**conceivable** [1] -
39:24
**concern** [3] - 20:3,
70:3, 81:18
**concerned** [1] - 42:19
**concerning** [2] - 4:11,
77:2
**concerns** [8] - 75:19,
75:20, 77:9, 78:12,
79:11, 80:9, 88:24,
90:8
**conclude** [1] - 204:17
**concluded** [2] - 76:11,
85:5
**conclusion** [1] -
210:20
**conclusions** [5] -
137:7, 177:21,
182:23, 207:22,
213:20
**conditions** [1] -
206:19
**conduct** [25] - 9:17,
13:7, 15:23, 16:5,
33:9, 34:2, 34:21,
54:2, 54:5, 56:15,
57:18, 59:19, 60:23,
61:6, 66:6, 67:23,
68:1, 71:1, 87:12,
109:9, 114:16,
114:20, 130:1,
197:21, 202:7
**conducted** [10] -
29:16, 29:17, 76:8,
84:1, 122:3, 172:17,
176:5, 187:24,
190:18, 197:24
**conducts** [1] - 110:5
**conferences** [1] -
101:9
**confidential** [2] -
153:10, 156:1

**configuration** [2] -
77:22, 107:10
**configured** [2] -
134:13, 150:21
**confirm** [1] - 180:9
**confirmation** [1] -
17:23
**confirmed** [4] - 52:5,
186:7, 192:20,
193:17
**confirms** [1] - 31:12
**conform** [7] - 109:9,
109:14, 114:16,
114:20, 130:2,
131:17, 202:7
**conformance** [2] -
130:11, 133:7
**conformity** [2] -
131:19, 158:16
**confront** [1] - 52:16
**confuse** [1] - 44:23
**confusion** [1] - 184:1
**conjunction** [2] -
13:18, 17:25
**conjured** [4] - 37:10,
37:25, 40:6, 43:2
**connected** [1] - 32:18
**connecting** [1] - 54:18
**connection** [19] -
35:16, 101:20,
102:9, 103:20,
107:22, 108:17,
119:4, 128:19,
138:11, 139:4,
152:12, 160:18,
168:19, 172:13,
172:15, 175:3,
201:22, 205:19
**connects** [2] - 53:22,
62:7
**conscious** [1] - 71:10
**consciously** [1] - 90:1
**consequently** [1] -
31:14
**conservative** [7] -
53:11, 63:6, 63:9,
86:23, 86:24, 87:2,
92:3
**consider** [11] - 16:2,
47:16, 49:10, 76:21,
76:22, 108:10,
108:13, 114:10,
126:14, 127:2, 212:3
**consideration** [3] -
12:24, 17:4, 22:21
**considered** [6] -
86:25, 115:11,
157:11, 168:18,
168:20, 172:12
**consisted** [1] - 80:15

**consistent** [5] - 15:15,
43:21, 47:7, 86:7,
103:12
**consistently** [1] -
202:4
**consists** [2] - 23:1,
89:16
**constant** [1] - 40:24
**constantly** [1] - 20:12
**constituent** [1] - 140:7
**constitutes** [1] -
119:11
**constrained** [2] -
111:25, 209:17
**constraint** [5] - 208:2,
209:2, 211:10,
211:16
**constraints** [3] -
76:22, 213:6, 214:10
**constructed** [1] -
138:17
**consultant** [2] - 55:7,
98:22
**consultants** [1] - 67:6
**Consultants** [1] -
96:20
**consulted** [1] - 99:17
**consulting** [5] - 55:3,
97:14, 97:20, 98:2,
98:4
**consumer** [1] - 100:23
**consuming** [1] -
140:15
**contain** [18] - 35:1,
153:7, 155:23,
166:6, 166:9,
168:12, 180:15,
181:24, 185:9,
186:14, 187:25,
189:13, 190:19,
196:23, 197:5,
197:11, 198:1,
208:21
**contained** [8] - 21:19,
80:21, 121:15,
177:22, 182:24,
213:11, 213:12,
213:15
**containing** [1] - 132:2
**contains** [16] - 74:6,
75:2, 75:23, 90:22,
121:21, 123:7,
132:17, 147:14,
149:12, 153:3,
153:9, 155:25,
156:1, 160:14,
190:17, 213:22
**contemplated** [1] -
12:6
**contempt** [21] - 2:6,

10:23, 11:12, 17:4,
18:18, 19:1, 21:5,
32:14, 33:17, 33:21,
38:13, 41:7, 42:6,
42:17, 42:25, 51:13,
51:15, 73:17, 74:24,
75:18, 92:22
**contemptible** [3] -
34:6, 34:21, 34:24
**contemptuous** [2] -
22:16, 54:2
**contemptuously** [1] -
66:1
**contends** [1] - 206:5
**content** [7] - 117:16,
117:25, 127:3,
127:6, 127:7,
127:19, 179:9
**contention** [9] - 41:25,
43:21, 115:6, 117:7,
117:8, 146:4,
156:25, 157:3, 206:7
**contentions** [2] -
117:3, 146:1
**contentious** [1] - 17:9
**contents** [3] - 133:7,
133:8, 207:25
**context** [14] - 29:7,
57:21, 72:4, 81:25,
95:11, 100:6,
101:23, 103:9,
104:15, 105:3,
114:6, 117:24,
157:16, 210:24
**continually** [1] - 41:4
**continuation** [1] -
168:19
**continue** [5] - 20:2,
38:14, 42:9, 99:21,
118:6
**continued** [2] - 30:14,
114:24
**continues** [8] - 13:6,
13:23, 14:2, 14:6,
79:19, 110:4,
117:22, 118:24
**continuing** [1] -
119:23
**contractors** [1] -
37:21
**contracts** [1] - 55:21
**contradicts** [4] - 43:7,
51:22, 63:14, 78:10
**contrary** [3] - 14:19,
36:20, 110:9
**contrast** [2] - 63:11,
76:15
**control** [4] - 14:22,
27:3, 48:16, 154:18
**controlled** [1] - 54:11

8

**Controls** [3] - 77:10, 77:16, 110:19
**conundrum** [1] - 81:9
**convenient** [1] - 99:6
**conversation** [1] - 146:7
**conversely** [1] - 207:14
**conversion** [1] - 115:14
**convert** [1] - 51:5
**convincing** [3] - 51:14, 56:11, 75:16
**cooperation** [1] - 124:21
**copied** [17] - 34:5, 67:16, 67:20, 68:20, 81:22, 82:15, 88:15, 89:5, 89:8, 109:22, 111:11, 115:2, 115:3, 120:5, 125:25, 166:19, 173:23
**copies** [20] - 14:6, 48:1, 49:25, 61:12, 70:6, 81:13, 98:9, 102:21, 102:22, 107:8, 107:20, 124:2, 150:14, 150:17, 152:8, 156:21, 159:16, 160:15, 161:1, 161:3
**copy** [68] - 8:17, 10:12, 60:17, 60:19, 67:18, 68:5, 82:14, 82:15, 83:15, 87:21, 88:13, 89:3, 111:7, 124:3, 125:1, 125:12, 126:18, 126:20, 126:24, 127:3, 127:10, 132:3, 132:14, 133:13, 135:3, 141:21, 142:13, 142:14, 145:13, 145:14, 150:24, 150:25, 151:2, 151:7, 151:11, 151:12, 151:13, 155:10, 155:12, 155:13, 156:22, 156:23, 159:7, 160:20, 160:21, 165:25, 166:15, 166:18, 167:16, 167:19, 168:2, 168:4, 170:11, 170:23, 171:1, 171:2, 171:6, 173:15, 174:4,

174:8, 174:10, 174:12, 174:15, 180:8, 193:24, 200:12, 200:15, 206:1
**copybook** [1] - 170:12
**copybooks** [1] - 171:16
**copying** [23] - 42:7, 60:21, 60:23, 67:13, 68:18, 68:24, 71:9, 81:21, 82:25, 83:4, 87:10, 87:17, 88:5, 88:15, 92:13, 99:25, 111:2, 111:5, 120:9, 122:7, 202:9, 208:5, 209:24
**Copyright** [6] - 52:22, 59:22, 60:2, 92:16, 92:17
**copyright** [39] - 31:22, 32:2, 32:5, 67:3, 95:13, 99:24, 116:8, 116:12, 116:13, 123:7, 132:2, 132:18, 133:6, 133:19, 136:16, 136:17, 147:17, 153:8, 153:11, 155:23, 155:25, 161:19, 166:6, 166:9, 166:10, 166:14, 166:20, 167:4, 175:6, 180:15, 181:25, 186:11, 186:14, 189:13, 196:24, 197:5, 197:11, 202:16
**copyrighted** [35] - 26:16, 26:24, 27:8, 31:18, 35:1, 35:14, 35:17, 36:2, 109:16, 109:17, 114:22, 114:23, 115:24, 115:25, 116:3, 116:9, 117:4, 126:14, 127:2, 130:4, 130:16, 130:19, 132:16, 133:5, 146:19, 146:24, 152:19, 161:5, 161:15, 161:21, 172:22, 179:9, 184:15, 198:1, 201:25
**copyrights** [10] - 10:10, 19:18, 21:25, 116:4, 116:5, 133:21, 153:15,

171:17
**core** [1] - 55:10
**Corey** [2] - 1:16, 2:21
**corner** [3] - 20:21, 22:4, 22:12
**corporate** [5] - 60:10, 84:23, 86:8, 95:4, 101:5
**Corporation** [1] - 86:6
**corporation** [1] - 153:24
**correct** [25] - 85:3, 85:4, 120:12, 123:4, 123:5, 152:24, 160:4, 170:6, 170:21, 175:23, 176:6, 180:14, 182:20, 184:2, 186:23, 187:9, 188:21, 189:20, 190:8, 197:20, 199:19, 200:18, 205:12, 207:20, 216:6
**correctly** [1] - 64:21
**correspond** [1] - 34:19
**correspondence** [1] - 142:22
**corresponding** [5] - 79:12, 165:11, 185:21, 197:14, 198:5
**corresponds** [4] - 124:9, 164:23, 168:9, 209:7
**corrupt** [1] - 42:14
**cost** [1] - 57:14
**counsel** [19] - 2:9, 2:14, 2:18, 3:3, 5:11, 7:17, 58:10, 63:25, 68:17, 85:21, 85:22, 91:7, 94:21, 95:23, 101:5, 123:20, 124:3, 126:21, 191:17
**Counsel** [3] - 86:6, 86:9, 86:14
**counsel's** [2] - 52:15, 181:15
**count** [2] - 8:1, 98:20
**countenanced** [1] - 46:18
**counters** [1] - 214:6
**countries** [1] - 54:10
**country** [1] - 48:18
**country's** [1] - 76:6
**counts** [1] - 117:4
**couple** [14] - 20:16, 22:20, 24:17, 37:9,

43:25, 73:11, 128:7, 137:15, 182:3, 182:8, 182:10, 195:2, 195:24, 199:4
**course** [4] - 8:25, 15:8, 100:8, 144:21
**courses** [1] - 101:1
**court** [14] - 5:1, 5:24, 6:11, 15:15, 18:17, 21:16, 45:12, 46:3, 48:18, 85:17, 93:12, 135:21, 149:18
**COURT** [74] - 1:1, 2:4, 2:23, 3:2, 3:19, 4:20, 4:23, 4:24, 5:5, 6:5, 7:13, 8:3, 8:6, 8:11, 8:19, 49:13, 49:20, 50:3, 50:8, 92:25, 93:6, 93:11, 94:4, 94:16, 95:24, 96:2, 96:8, 99:6, 113:22, 114:8, 121:3, 121:24, 122:19, 124:5, 124:16, 124:20, 131:6, 132:25, 133:11, 135:25, 139:9, 144:19, 157:18, 157:22, 159:21, 160:2, 160:7, 162:11, 162:15, 162:18, 163:3, 163:6, 167:1, 168:23, 176:15, 176:18, 177:3, 180:4, 181:18, 186:1, 187:15, 189:5, 189:24, 190:12, 196:16, 198:10, 198:14, 206:22, 213:9, 213:24, 214:15, 215:13, 215:19, 215:24
**Court** [94] - 5:18, 7:10, 8:17, 9:1, 9:2, 9:7, 9:10, 9:25, 11:3, 12:6, 12:15, 12:23, 13:3, 13:10, 13:13, 13:19, 15:9, 15:16, 16:2, 16:14, 17:9, 18:24, 20:16, 20:22, 20:25, 21:7, 21:14, 21:22, 21:24, 22:11, 24:20, 29:6, 30:16, 30:18, 31:1, 32:12, 32:14, 33:3, 33:14, 37:4, 37:6, 38:15, 39:2, 39:23, 40:13, 42:19, 44:23, 45:1,

45:9, 47:16, 48:5, 48:24, 48:25, 49:9, 49:17, 50:9, 51:24, 54:25, 57:7, 57:11, 57:23, 58:3, 58:20, 58:25, 59:13, 59:19, 61:5, 61:11, 65:3, 65:10, 69:25, 70:20, 71:2, 73:9, 73:11, 74:23, 75:22, 89:2, 92:19, 114:1, 114:10, 117:23, 122:22, 123:20, 124:2, 126:6, 126:19, 131:11, 147:2, 153:2, 162:3, 166:25
**Court's** [29] - 2:16, 5:23, 13:22, 13:25, 19:19, 22:17, 22:21, 24:3, 52:1, 53:3, 62:4, 62:14, 66:2, 71:1, 95:21, 96:6, 103:12, 104:1, 108:11, 108:13, 109:8, 111:4, 112:21, 124:1, 128:5, 131:2, 131:3, 139:6
**court-appointed** [1] - 48:18
**courtroom** [6] - 2:17, 3:3, 3:20, 3:23, 3:24, 50:1
**courts** [1] - 10:19
**cover** [2] - 7:21, 64:20
**covered** [1] - 64:21
**covering** [2] - 51:17, 101:5
**covers** [3] - 67:23, 68:1, 100:21
**coverup** [1] - 100:25
**Craig** [1] - 104:7
**crash** [2] - 55:4, 55:23
**create** [22] - 59:3, 59:5, 59:14, 60:15, 61:4, 114:24, 117:22, 141:12, 145:13, 145:14, 150:14, 150:17, 150:24, 150:25, 151:2, 153:23, 156:20, 170:23, 174:4, 174:8, 174:12, 174:14
**created** [23] - 12:20, 34:7, 62:20, 65:20, 74:2, 80:19, 81:25, 88:25, 120:7, 141:14, 155:7,

155:8, 155:11,
156:16, 171:2,
171:6, 185:1,
191:18, 193:24,
200:12, 200:16,
204:14, 206:4
**creates** [2] - 5:9,
117:25
**creating** [7] - 41:8,
70:6, 81:2, 90:2,
118:6, 118:15,
151:11
**creation** [7] - 31:7,
65:4, 117:21,
118:11, 118:18,
153:20, 189:9
**creative** [25] - 52:19,
52:24, 58:4, 58:8,
58:11, 58:12, 58:17,
59:12, 59:21, 59:24,
59:25, 67:2, 67:8,
74:3, 74:7, 77:4,
77:8, 79:6, 80:1,
80:20, 80:25, 89:14,
89:20, 92:11, 208:7
**creativity** [2] - 59:23,
60:3
**credentials** [1] - 51:1
**credit** [1] - 78:25
**cries** [1] - 81:5
**Crime** [1] - 98:23
**criminal** [3] - 98:19,
99:16, 100:18
**critical** [2] - 56:2, 74:5
**CROSS** [2] - 94:10,
217:8
**Cross** [45] - 11:20,
27:20, 31:19, 35:19,
36:7, 46:21, 48:20,
67:8, 79:8, 93:4,
94:9, 94:14, 94:16,
94:24, 96:4, 101:19,
108:24, 112:23,
114:3, 114:14,
121:14, 122:2,
123:15, 123:22,
124:18, 124:23,
129:25, 131:8,
137:18, 139:7,
157:10, 157:25,
162:5, 163:1, 163:9,
168:18, 169:1,
177:11, 180:7,
181:23, 186:4,
187:19, 190:15,
196:19, 198:17
**cross** [49] - 8:1, 14:2,
15:11, 28:22, 31:6,
32:12, 33:1, 33:2,
33:6, 33:7, 34:4,

34:11, 36:17, 37:1,
37:9, 38:11, 45:3,
45:25, 52:10, 56:25,
57:22, 58:6, 59:3,
59:8, 65:5, 66:7,
66:17, 73:9, 75:12,
77:1, 77:3, 77:25,
79:4, 79:5, 80:9,
81:5, 92:8, 110:5,
114:25, 118:23,
118:24, 119:5,
119:11, 122:20,
125:21, 138:21,
139:1, 160:9
**Cross's** [2] - 121:9,
213:12
**cross-examination** [3]
- 8:1, 122:20, 160:9
**cross-reference** [2] -
138:21, 139:1
**cross-use** [43] - 14:2,
15:11, 28:22, 31:6,
32:12, 33:1, 33:2,
33:6, 33:7, 34:4,
34:11, 36:17, 37:1,
37:9, 38:11, 45:3,
45:25, 52:10, 56:25,
57:22, 58:6, 59:3,
59:8, 65:5, 66:7,
66:17, 73:9, 75:12,
77:1, 77:3, 77:25,
79:4, 79:5, 80:9,
81:5, 92:8, 114:25,
118:23, 118:24,
119:5, 119:11,
125:21
**cross-using** [1] -
110:5
**crowd** [1] - 3:21
**crucial** [1] - 9:10
**curious** [1] - 144:25
**current** [9] - 8:21,
25:1, 25:25, 86:1,
103:10, 106:22,
114:22, 129:3,
209:12
**custodial** [3] - 104:12,
104:19, 152:17
**custodian** [2] -
154:21, 156:10
**custodians** [1] - 29:19
**custom** [7] - 60:14,
84:6, 84:16, 85:7,
85:8, 85:15, 86:15
**customer** [22] - 58:1,
60:11, 70:5, 110:5,
110:8, 110:9,
118:16, 119:14,
119:17, 126:9,
128:10, 129:7,

138:7, 141:19,
146:2, 146:3, 157:5,
158:15, 169:5,
170:2, 194:20
**Customer** [1] - 84:12
**customer's** [3] -
107:16, 118:25,
119:9
**customers** [28] - 27:1,
46:5, 58:2, 65:7,
67:15, 83:22, 85:9,
103:11, 104:16,
104:19, 105:1,
110:14, 110:22,
115:1, 117:12,
117:17, 117:18,
119:2, 119:10,
119:12, 119:18,
119:25, 123:13,
129:8, 137:25,
138:1, 138:2, 176:1
**cut** [2] - 77:11, 142:22
**cyber** [1] - 100:16

## D

**daily** [1] - 71:16
**damage** [1] - 73:8
**damaged** [1] - 46:6
**damages** [1] - 48:7
**Dan** [1] - 3:9
**darn** [1] - 32:1
**dash** [1] - 209:22
**Data** [1] - 96:19
**data** [28] - 23:22,
50:16, 61:14, 64:10,
104:23, 108:1,
108:3, 126:7, 126:8,
126:13, 126:15,
139:24, 140:1,
140:4, 140:13,
140:18, 140:22,
141:11, 141:12,
141:14, 142:7,
167:22, 185:1,
211:4, 211:22,
211:24, 212:12,
212:14
**Database** [1] - 91:18
**database** [44] - 10:15,
34:12, 41:19, 41:21,
57:2, 61:5, 61:7,
61:13, 61:16, 61:17,
61:18, 61:19, 61:22,
69:1, 69:3, 69:8,
69:21, 75:14, 90:9,
90:12, 90:13, 91:6,
91:8, 97:15, 108:4,
111:21, 111:22,
115:3, 115:12,

115:15, 115:22,
120:10, 120:17,
120:22, 122:6,
122:11, 122:13,
122:18, 123:9,
123:12, 138:16,
138:18
**databases** [1] - 96:17
**date** [31] - 2:5, 9:8,
24:18, 81:23, 82:16,
88:17, 108:18,
143:13, 143:23,
155:4, 155:7, 155:8,
155:11, 155:13,
156:13, 156:16,
183:7, 183:9,
183:18, 183:25,
184:1, 185:4, 185:5,
185:7, 191:19,
194:18, 204:2,
204:13, 206:12
**dated** [1] - 24:16
**dates** [1] - 185:11
**days** [16] - 4:11, 5:21,
5:24, 6:1, 6:9, 7:8,
7:14, 7:20, 7:25, 8:1,
24:17, 32:25, 51:25,
113:18, 120:18
**de** [1] - 17:3
**deal** [2] - 4:15, 37:23
**dealing** [2] - 6:7,
122:23
**deals** [1] - 37:20
**Dean** [1] - 194:17
**debate** [2] - 32:13,
45:7
**Deborah** [1] - 86:5
**debug** [2] - 23:25,
165:11
**debugging** [1] -
164:16
**decades** [3] - 60:20,
83:4, 87:11
**decades-long** [1] -
83:4
**December** [1] - 87:3
**decide** [3] - 25:15,
33:15, 45:9
**decided** [1] - 21:8
**decides** [1] - 21:13
**deciding** [1] - 14:15
**deck** [1] - 113:1
**declaration** [3] - 84:5,
84:10, 90:10
**decompiling** [1] -
82:20
**dedicated** [1] - 57:25
**deemed** [1] - 76:17
**Defendants** [1] - 1:8
**DEFENDANTS** [1] -

1:19
**DEFENDANTS'** [1] -
217:5
**defending** [1] - 27:16
**Defense** [2] - 157:17,
158:1
**defense** [6] - 3:4,
46:17, 163:2,
166:24, 181:15,
215:22
**deference** [1] - 53:16
**deferential** [1] - 92:3
**deferred** [1] - 65:24
**defined** [3] - 5:24,
208:23, 208:24
**defines** [1] - 126:8
**definition** [2] - 60:4,
212:2
**Degree** [1] - 96:14
**delete** [3] - 107:10,
127:10, 151:6
**deliberate** [1] - 109:21
**deliberately** [5] - 25:5,
28:14, 28:15, 159:7
**deliver** [1] - 79:2
**delivered** [2] - 101:3,
142:24
**delivery** [2] - 74:20
**demonstrably** [1] -
37:17
**demonstrate** [14] -
10:22, 11:5, 11:8,
11:16, 11:23, 12:14,
12:22, 13:13, 13:21,
19:11, 22:23, 30:14,
50:6, 161:2
**demonstrated** [5] -
13:22, 33:20, 34:22,
38:4, 77:11
**demonstrates** [6] -
14:25, 27:19, 28:18,
28:24, 38:12, 167:10
**demonstrating** [2] -
26:20, 73:17
**demonstration** [1] -
36:6
**demonstrative** [21] -
50:6, 97:6, 103:19,
103:25, 105:13,
109:1, 117:19,
122:7, 129:23,
135:15, 135:19,
139:3, 139:7,
146:22, 152:22,
176:25, 177:4,
198:13, 198:15,
198:18, 206:21
**demonstratives** [7] -
95:19, 95:22, 96:5,
109:4, 161:20,

10

184:14, 202:5
**denies** [1] - 21:1
**denounced** [1] - 42:15
**denying** [1] - 21:2
**dependent** [3] - 118:2, 118:17, 118:19
**deployed** [1] - 98:9
**deployment** [1] - 120:7
**depose** [1] - 215:9
**deposition** [7] - 29:23, 102:16, 104:7, 107:3, 121:19, 212:19, 213:22
**depositions** [4] - 19:7, 64:1, 106:25, 107:1
**depth** [1] - 31:11
**deputy** [1] - 50:1
**derail** [1] - 43:4
**derivative** [22] - 10:8, 31:7, 34:15, 34:16, 45:4, 45:8, 46:11, 46:12, 79:16, 79:20, 80:1, 80:3, 80:6, 100:1, 109:24, 114:25, 117:21, 117:22, 118:6, 118:11, 132:4
**derive** [1] - 190:25
**derived** [2] - 204:18, 205:25
**describe** [12] - 31:23, 97:9, 98:4, 98:25, 100:13, 104:21, 114:18, 123:17, 124:25, 135:1, 136:6, 184:24
**described** [1] - 85:1
**describer** [1] - 99:4
**describes** [2] - 89:10, 127:20
**description** [10] - 99:21, 126:16, 141:17, 146:7, 153:19, 202:23, 203:18, 203:20, 203:23, 204:1
**descriptions** [3] - 84:16, 167:22, 208:25
**designated** [3] - 5:21, 84:13, 151:24
**designation** [1] - 156:2
**designed** [4] - 22:2, 43:23, 44:14, 117:25
**designs** [1] - 88:14
**desk** [1] - 201:17
**desktop** [1] - 160:18
**despite** [8] - 13:5,

13:24, 16:17, 24:10, 26:23, 52:25, 83:4
**destroyed** [1] - 48:1
**detail** [7] - 10:13, 14:10, 47:4, 89:15, 99:1, 171:18, 203:15
**detailed** [1] - 11:21
**details** [1] - 58:11
**detect** [1] - 99:25
**determination** [1] - 39:18
**determine** [7] - 18:3, 27:18, 28:16, 29:14, 30:19, 40:22, 47:22
**determined** [7] - 30:18, 33:4, 33:8, 33:16, 35:19, 85:25, 145:6
**detriment** [1] - 53:11
**dev** [1] - 64:15
**Dev** [1] - 25:22
**devastate** [1] - 17:13
**develop** [17] - 10:5, 41:10, 58:2, 60:14, 68:6, 68:20, 75:3, 83:19, 85:6, 87:25, 88:6, 88:8, 92:15, 118:25, 119:9, 119:14
**developed** [9] - 28:4, 38:10, 73:12, 78:16, 79:1, 80:10, 84:7, 103:11, 119:16
**developer** [3] - 61:10, 61:14, 63:21
**developers** [4] - 120:7, 128:21, 129:9, 153:22
**developing** [7] - 66:16, 83:5, 83:9, 88:5, 111:8, 118:8, 119:14
**development** [28] - 23:20, 28:10, 38:6, 45:2, 74:13, 74:15, 80:22, 81:7, 81:12, 87:22, 89:1, 97:11, 97:22, 98:7, 98:16, 100:20, 101:8, 101:16, 102:4, 105:10, 106:12, 107:16, 110:6, 110:20, 118:17, 129:15
**develops** [1] - 112:9
**DevReview** [2] - 128:8, 129:2
**DevTrack** [1] - 104:9
**diagnose** [5] - 110:18, 170:22, 171:3,

193:21
**diagnosed** [1] - 169:16
**diagnosing** [1] - 54:16
**diagnosis** [1] - 119:2
**diagnostics** [1] - 96:24
**diagrams** [1] - 215:21
**dictate** [1] - 211:16
**differ** [1] - 128:3
**difference** [7] - 105:22, 105:25, 106:1, 106:2, 106:24, 134:19, 135:10
**differences** [9] - 34:19, 134:13, 134:16, 134:17, 134:22, 135:7, 136:14, 206:21, 207:9
**different** [17] - 16:6, 32:21, 33:3, 48:25, 70:25, 76:12, 86:17, 97:17, 130:10, 136:18, 138:17, 146:17, 167:25, 175:8, 206:5, 211:8, 214:17
**difficult** [5] - 6:25, 27:17, 28:19, 112:19, 140:6
**difficulty** [1] - 46:23
**digest** [1] - 215:6
**digits** [1] - 77:22
**diligence** [1] - 95:11
**direct** [10] - 57:12, 62:3, 91:25, 125:13, 141:25, 178:23, 184:21, 191:8, 202:20, 205:1
**Direct** [1] - 217:9
**DIRECT** [1] - 94:22
**directed** [2] - 101:4, 118:20
**directing** [15] - 144:6, 157:25, 163:17, 168:25, 173:11, 175:10, 175:15, 185:17, 186:4, 188:22, 192:14, 194:13, 199:9, 200:19, 210:13
**direction** [1] - 18:15
**directions** [1] - 17:11
**directive** [1] - 212:8
**directly** [10] - 51:11, 61:7, 61:17, 63:20, 78:10, 81:24, 88:12, 99:24, 118:7, 214:19

**directors** [1] - 54:12
**directory** [1] - 160:16
**dirty** [1] - 77:6
**disagreed** [2] - 53:4, 65:10
**disassembling** [1] - 82:21
**disavow** [1] - 85:18
**DISC** [1] - 210:4
**discharge** [1] - 92:23
**disciplined** [1] - 41:24
**disclose** [4] - 113:4, 214:23, 215:9, 215:11
**disclosed** [12] - 57:3, 69:2, 90:21, 90:23, 113:1, 113:6, 113:21, 121:10, 121:14, 121:17, 121:22, 122:17
**disclosure** [3] - 120:16, 120:23, 121:6
**discovery** [42] - 15:5, 15:6, 16:19, 16:24, 18:18, 18:25, 19:3, 27:10, 28:19, 29:4, 29:8, 29:12, 29:16, 30:1, 30:7, 30:11, 30:17, 30:24, 47:20, 47:25, 48:7, 50:15, 50:22, 51:3, 51:5, 51:8, 63:17, 63:18, 63:25, 64:6, 90:13, 100:18, 101:5, 101:17, 104:7, 108:4, 113:11, 121:12, 122:8, 154:19
**discreet** [2] - 50:10, 65:25
**discretion** [1] - 114:2
**discuss** [6] - 10:13, 14:9, 18:1, 30:23, 138:5, 196:1
**discussed** [4] - 115:21, 188:6, 196:4, 201:3
**discussing** [5] - 89:7, 156:7, 157:17, 180:9, 211:8
**discussion** [8] - 29:12, 30:5, 31:1, 34:8, 34:9, 121:6, 136:13, 192:7
**Discussion** [3] - 99:2, 167:5, 175:13
**discussions** [1] - 124:7
**disguise** [1] - 28:16

**disguised** [1] - 44:18
**disk** [3] - 115:10, 151:2, 151:12
**display** [8] - 96:7, 131:3, 134:11, 139:7, 139:25, 140:8, 166:23, 198:9
**displayed** [2] - 20:15, 63:24
**displaying** [1] - 140:9
**dispositive** [1] - 210:23
**dispute** [10] - 54:20, 54:21, 67:15, 67:17, 67:19, 73:6, 82:12, 82:17, 82:18, 206:1
**disputed** [4] - 51:24, 58:6, 75:9, 75:12
**disputes** [2] - 77:2, 100:7
**disregard** [2] - 15:15, 36:14
**dissection** [2] - 76:4, 76:8, 76:20
**dissemination** [1] - 41:16
**distinction** [6] - 39:11, 42:11, 42:20, 43:1, 43:7, 46:14
**distinguish** [4] - 60:25, 76:20, 83:13, 173:25
**distort** [1] - 66:3
**distribute** [3] - 41:11, 123:20, 124:2
**distributed** [5] - 16:4, 46:4, 109:24, 112:13, 126:1
**distributes** [1] - 112:10
**distributing** [1] - 62:23
**distribution** [7] - 45:3, 102:5, 110:1, 115:10, 115:17, 123:11, 123:12
**distributions** [1] - 132:8
**DISTRICT** [3] - 1:1, 1:1, 1:2
**divided** [1] - 4:15
**dms** [4] - 70:12, 132:6, 143:10, 143:16
**do-over** [1] - 51:3
**docs** [1] - 150:9
**document** [39] - 23:11, 29:24, 77:21, 78:6, 89:10, 124:25, 125:4, 125:8, 128:16, 128:18,

11

128:20, 129:13,
129:17, 129:18,
130:23, 132:12,
133:4, 141:6,
141:12, 141:14,
153:11, 153:13,
154:13, 155:4,
157:11, 159:16,
159:19, 159:24,
169:1, 169:3,
172:12, 179:5,
184:24, 185:9,
189:18, 196:23,
203:10, 207:3, 207:7
**Document** [14] -
136:4, 157:23,
163:7, 176:19,
177:9, 180:5,
181:20, 186:2,
187:17, 189:6,
190:1, 190:13,
196:17, 206:24
**documentation** [52] -
9:21, 13:24, 33:23,
34:25, 102:18,
102:23, 105:3,
109:16, 116:21,
120:6, 130:5,
130:17, 130:22,
130:23, 130:24,
146:25, 147:3,
147:7, 147:9,
147:11, 147:12,
147:17, 148:4,
148:8, 148:15,
148:16, 148:23,
149:6, 149:8, 149:9,
150:3, 150:23,
151:15, 152:2,
152:9, 152:16,
153:7, 155:20,
155:21, 155:23,
156:14, 157:1,
157:4, 158:6,
158:14, 159:11,
160:23, 161:5,
161:6, 161:9,
161:13, 161:14
**documents** [21] - 4:4,
12:10, 19:6, 22:25,
29:21, 46:24, 50:23,
65:4, 86:18, 102:18,
104:12, 104:21,
111:13, 119:21,
123:17, 147:15,
149:21, 151:22,
151:25, 153:12,
156:19
**done** [14] - 16:20,
18:8, 18:14, 35:16,
35:22, 48:18, 88:16,

97:22, 100:6,
112:14, 118:7,
214:25, 215:4,
215:12
**Donnelley** [5] - 70:8,
141:20, 144:24,
145:7, 145:21
**Donnelley's** [1] -
70:12
**double** [4] - 3:22,
210:11, 210:17,
210:20
**doubt** [1] - 10:19
**doubts** [1] - 17:17
**down** [18] - 4:21, 6:21,
22:3, 29:21, 59:20,
59:24, 91:8, 92:11,
99:7, 109:20,
116:16, 116:22,
146:5, 146:8,
146:16, 154:22,
183:6, 211:5
**download** [1] - 201:19
**downloaded** [2] -
61:7, 125:25
**downloading** [1] -
61:17
**downloads** [1] - 61:12
**downplay** [1] - 20:14,
22:13, 22:14
**draw** [3] - 141:4,
207:22, 210:20
**drawing** [2] - 202:18,
202:25
**dressing** [2] - 16:16,
42:5
**drive** [1] - 154:2
**drives** [1] - 104:11
**due** [2] - 52:22, 95:11
**Duke** [1] - 76:6
**dump** [2] - 139:5,
141:1
**dumps** [3] - 138:18,
138:25, 139:4
**Dunn** [4] - 3:11, 3:14,
3:15, 3:16
**during** [14] - 21:11,
54:8, 66:11, 71:14,
86:18, 88:10,
107:18, 164:21,
168:2, 171:3,
185:10, 194:5,
194:8, 213:22
**During** [1] - 47:25

---

**E**

---

**e-discovery** [1] -
154:19
**e-mail** [56] - 13:2,

24:16, 24:23, 25:11,
32:23, 37:7, 38:5,
70:4, 70:8, 71:11,
74:12, 126:4,
133:15, 147:1,
148:1, 148:11,
148:14, 149:17,
149:25, 150:2,
150:4, 150:6,
150:20, 151:8,
151:10, 152:17,
155:16, 156:23,
158:4, 158:5, 158:7,
158:10, 159:8,
160:13, 160:24,
163:12, 163:14,
163:16, 163:18,
164:10, 165:20,
165:22, 168:17,
168:18, 168:20,
169:8, 171:1,
171:12, 172:16,
193:3, 193:9,
193:10, 193:14,
194:14
**e-mail's** [1] - 137:20
**e-mailed** [3] - 66:5,
70:16, 159:3
**e-mailing** [2] - 165:25,
174:14
**e-mails** [6] - 70:7,
102:18, 104:17,
104:18, 128:20,
151:19
**eagles** [1] - 32:6
**earliest** [1] - 51:25
**early** [6] - 6:21, 24:15,
74:20, 87:3, 97:3,
101:25
**earnings** [1] - 21:11
**easel** [1] - 50:7
**easier** [3] - 99:9,
123:24, 139:12
**easily** [6] - 7:16,
88:23, 136:13,
140:10, 205:18
**Easter** [4] - 34:16,
45:2, 79:13, 109:24
**easy** [1] - 53:8
**educated** [2] - 63:2,
72:2
**educating** [1] - 62:24
**educational** [2] -
95:18, 96:10
**Edwards** [35] - 10:10,
10:12, 14:7, 23:7,
23:14, 24:7, 24:13,
25:2, 38:22, 39:19,
42:7, 43:8, 43:12,
44:2, 57:1, 60:5,

75:12, 82:3, 87:17,
111:2, 111:5, 111:8,
111:11, 115:2,
115:9, 115:13,
115:14, 119:19,
119:22, 120:6,
122:5, 129:15,
129:21
**effect** [6] - 20:9, 43:6,
43:11, 63:16,
112:16, 157:7
**effective** [4] - 24:18,
62:23, 87:6, 125:2
**effects** [1] - 22:19
**efficiency** [3] - 196:11,
198:3, 198:19
**efficient** [1] - 6:4
**effort** [6] - 17:20,
22:13, 30:14, 40:24,
43:3, 62:6
**efforts** [7] - 19:13,
26:15, 51:21, 61:25,
62:2, 64:5, 71:24
**egregious** [1] - 42:12
**eight** [5] - 11:2, 31:3,
33:16, 51:24, 75:9
**either** [5] - 70:4,
118:18, 126:9,
128:11, 151:25
**electronic** [4] - 9:9,
99:19, 100:18, 101:6
**element** [4] - 211:22,
211:24, 212:9,
212:14
**elements** [3] - 56:3,
212:23, 214:7
**ellipses** [1] - 89:25
**elsewhere** [2] - 48:2,
166:13
**embraced** [2] - 34:3,
56:6
**embraces** [1] - 20:9
**emergency** [1] -
113:17
**emphasize** [1] - 16:14
**employ** [1] - 24:22
**employed** [2] - 94:24,
95:1
**employee** [4] - 71:8,
125:25, 144:1, 154:7
**employees** [13] -
12:11, 16:5, 16:10,
35:13, 37:21, 37:24,
54:9, 72:2, 104:13,
127:14, 150:4,
152:10, 159:14
**encounter** [1] - 55:23
**encountered** [2] -
22:15, 46:23
**encourage** [1] - 68:22

**encourages** [3] -
67:16, 82:13, 88:14
**end** [4] - 19:7, 43:14,
51:6, 166:24
**ended** [3] - 78:20,
79:2, 91:20
**ending** [1] - 159:13,
192:5
**ends** [2] - 79:18,
188:21
**enforcement** [4] -
18:13, 95:5, 97:5,
101:10
**enforcing** [1] - 121:1
**engage** [2] - 13:6,
13:14
**engaged** [1] - 37:9
**engagement** [1] -
108:17
**engine** [1] - 68:11
**engineer** [6] - 59:3,
59:8, 59:11, 59:13,
71:10, 72:22
**engineering** [3] -
82:21, 96:25, 100:17
**engineers** [8] - 24:22,
58:21, 59:1, 62:17,
70:4, 70:11, 117:14,
138:5
**engineers'** [1] - 58:13
**enhanced** [1] - 62:10
**enjoin** [2] - 40:2,
56:18
**enjoins** [1] - 56:15
**ensure** [3] - 62:11,
65:17, 98:15
**enter** [1] - 138:2
**entered** [6] - 9:3,
17:16, 20:7, 20:23,
21:22, 32:25
**enterprise** [2] - 21:17,
55:1
**entire** [17] - 39:8, 41:1,
44:12, 60:2, 60:20,
68:23, 83:4, 83:7,
87:10, 87:14, 88:21,
92:13, 92:14, 106:3,
158:7, 206:1, 206:2
**entirely** [2] - 63:7,
88:4, 114:1
**entirety** [1] - 164:17
**entities** [2] - 2:12,
161:24
**entitled** [4] - 12:24,
185:19, 187:1, 216:7
**entries** [2] - 185:9,
201:5
**entry** [6] - 17:12,
24:17, 26:4, 191:9,
191:12, 200:20

12

**environment** [45] - 10:2, 10:5, 14:4, 33:2, 33:5, 33:25, 34:1, 36:17, 36:18, 38:10, 45:20, 53:22, 54:19, 54:22, 55:25, 57:15, 70:13, 74:9, 74:17, 74:22, 75:3, 78:7, 78:17, 80:18, 81:3, 81:4, 81:12, 89:22, 90:5, 107:9, 107:16, 110:12, 110:15, 110:18, 118:25, 119:10, 119:17, 128:12, 128:13, 132:7, 164:14, 164:25, 165:3, 165:6, 165:8
**environments** [29] - 14:3, 53:19, 53:23, 54:23, 57:10, 57:13, 57:17, 57:25, 62:7, 71:3, 71:5, 71:25, 73:13, 107:17, 110:5, 118:1, 118:2, 118:4, 118:16, 118:18, 118:20, 119:15, 119:17, 120:8, 129:7
**envision** [2] - 6:6, 6:18
**envisioned** [1] - 6:6
**equivalent** [3] - 34:1, 36:18, 47:23
**Eric** [4] - 1:19, 3:11, 3:14, 158:10
**ERP** [1] - 51:10
**error** [5] - 90:18, 90:23, 121:16, 121:22, 122:16
**errors** [1] - 90:14
**escrow** [1] - 18:2
**especially** [1] - 172:4
**essence** [2] - 47:3, 135:13
**essentially** [8] - 42:14, 63:15, 83:18, 88:19, 107:5, 119:15, 132:3, 173:23
**establish** [3] - 15:11, 132:25, 175:5
**established** [2] - 15:7, 72:1
**estimate** [1] - 140:17
**estopped** [1] - 85:13
**et** [7] - 1:4, 1:7, 2:7, 2:8, 48:8, 98:10, 139:22
**ethical** [1] - 16:13
**Eugene** [20] - 33:2,

34:4, 36:17, 37:16, 37:22, 38:2, 45:20, 74:9, 74:11, 74:25, 75:1, 75:2, 77:16, 77:17, 78:17, 78:20, 79:1, 79:8, 110:13
**Eugene's** [6] - 33:25, 38:10, 74:8, 78:17, 110:14, 110:17
**evade** [1] - 44:24
**evaluate** [2] - 39:7, 112:20
**evaluating** [2] - 18:25, 208:3
**evaluation** [1] - 95:12
**eve** [1] - 90:17
**evening** [2] - 6:22, 95:23
**event** [1] - 18:13
**events** [2] - 34:21, 192:6
**Evergreen** [12] - 163:12, 163:13, 163:19, 164:5, 165:13, 165:21, 165:23, 169:19, 170:2, 170:19, 171:8, 171:12
**evidence** [142] - 5:20, 7:9, 9:6, 10:21, 10:25, 11:5, 11:20, 12:3, 12:8, 14:19, 15:1, 15:4, 15:19, 15:22, 15:25, 16:3, 16:9, 16:15, 17:6, 18:15, 18:19, 26:12, 26:21, 27:14, 27:15, 28:12, 28:24, 31:4, 32:8, 32:22, 33:13, 33:20, 35:10, 35:13, 35:16, 36:23, 38:11, 40:5, 40:16, 40:17, 40:22, 41:22, 41:24, 42:1, 42:2, 44:19, 45:1, 45:10, 49:10, 50:12, 51:12, 51:14, 52:12, 55:16, 56:11, 57:18, 61:16, 61:18, 63:1, 70:2, 70:21, 71:4, 72:21, 73:4, 73:7, 73:16, 74:12, 74:16, 75:7, 75:16, 80:21, 82:2, 90:25, 91:23, 92:20, 95:6, 95:7, 99:19, 99:20, 100:24, 101:6, 101:18, 102:3, 103:8, 106:8, 109:19, 112:2, 114:24, 115:2,

127:17, 135:12, 135:14, 135:20, 136:4, 144:7, 145:16, 145:19, 146:8, 147:19, 151:18, 151:19, 151:23, 152:9, 152:13, 152:15, 157:7, 157:23, 158:2, 158:4, 160:25, 161:2, 161:4, 161:7, 161:8, 161:10, 163:7, 171:7, 171:11, 176:17, 176:19, 177:9, 178:12, 180:5, 181:20, 183:13, 184:4, 184:5, 184:9, 185:23, 186:2, 187:12, 187:17, 189:6, 190:1, 190:13, 192:9, 196:12, 196:17, 201:12, 206:24, 214:20
**EVIDENCE** [1] - 217:11
**evident** [1] - 178:21
**evidentiarily** [1] - 45:24
**evidentiary** [4] - 2:6, 15:10, 22:7, 33:14
**EVIDENTIARY** [1] - 1:11
**exact** [5] - 59:14, 60:16, 68:21, 85:19, 86:10
**exactly** [5] - 14:16, 33:12, 34:2, 36:11, 182:19
**exam** [1] - 123:23
**EXAMINATION** [1] - 94:22
**Examination** [1] - 217:9
**examination** [5] - 8:1, 93:5, 122:20, 160:9, 162:19
**examine** [2] - 16:1, 162:25
**examined** [3] - 106:21, 137:23, 151:16
**example** [20] - 16:12, 28:10, 45:3, 53:13, 55:11, 55:18, 64:25, 65:1, 70:7, 72:11, 80:8, 119:8, 147:8, 152:23, 161:25,

172:21, 179:7, 184:15, 184:17, 209:6
**examples** [9] - 110:11, 112:4, 119:3, 120:5, 127:4, 130:19, 136:14, 161:21, 161:23
**Excel** [3] - 139:11, 151:1, 151:2
**excerpt** [3] - 20:20, 23:15, 89:16
**excerpted** [1] - 23:2
**excerpts** [2] - 13:11, 13:12
**excesses** [1] - 8:4
**exchange** [4] - 138:4, 163:12, 163:15, 194:4
**exchanges** [1] - 148:2
**exclamation** [1] - 182:13
**excluded** [2] - 76:18, 212:24
**exclusively** [1] - 59:4
**excuse** [2] - 43:19, 202:16
**executed** [1] - 164:24
**Executive** [1] - 3:9
**executives** [1] - 36:5
**exemptions** [1] - 132:9
**Exhibit** [142] - 20:20, 21:20, 22:4, 22:25, 23:10, 25:7, 31:15, 124:24, 128:15, 129:11, 132:11, 132:16, 134:4, 134:24, 134:25, 136:4, 136:7, 137:6, 141:4, 148:10, 148:11, 148:20, 148:22, 149:1, 149:2, 152:25, 153:2, 155:3, 155:5, 155:17, 155:18, 155:22, 156:5, 157:2, 157:17, 158:1, 159:10, 162:5, 163:9, 163:10, 163:12, 163:13, 163:16, 164:4, 165:12, 166:3, 166:4, 168:12, 168:17, 168:20, 168:25, 169:19, 172:8, 173:3, 174:18, 174:25, 175:10, 175:15, 175:21,

175:22, 176:2, 176:4, 176:12, 176:16, 176:19, 176:20, 177:7, 177:9, 177:12, 177:25, 178:23, 179:5, 179:11, 179:20, 180:2, 180:5, 180:7, 180:11, 180:15, 180:18, 180:22, 180:25, 181:3, 181:7, 181:12, 181:20, 181:23, 182:21, 182:22, 183:1, 183:11, 184:22, 185:9, 185:24, 186:2, 186:5, 186:14, 186:20, 186:24, 187:3, 187:12, 187:17, 187:20, 187:21, 188:5, 188:7, 188:19, 188:22, 188:24, 189:2, 189:6, 189:8, 189:15, 189:18, 189:22, 190:1, 190:3, 190:6, 190:10, 190:13, 190:15, 190:24, 191:2, 192:9, 196:2, 196:4, 196:5, 196:8, 196:9, 196:19, 197:1, 197:7, 197:11, 199:8, 201:6, 202:21, 203:12, 205:1, 206:24
**exhibit** [25] - 23:10, 24:15, 129:12, 132:10, 134:3, 142:1, 149:16, 154:15, 157:12, 157:20, 168:16, 173:12, 174:17, 176:21, 177:5, 178:9, 180:13, 183:22, 185:13, 186:20, 188:3, 190:7, 194:11, 206:13, 207:2
**EXHIBITS** [1] - 217:11
**Exhibits** [12] - 147:23, 152:13, 156:20, 157:3, 162:24, 163:7, 196:12, 196:17, 197:19, 197:25, 198:5
**exhibits** [25] - 4:4, 4:8, 9:9, 12:13, 20:16,

22:20, 22:22, 25:4,
27:11, 43:6, 43:9,
43:25, 102:17,
104:8, 123:21,
124:8, 124:10,
124:11, 124:14,
124:21, 147:25,
148:5, 162:25,
170:17, 214:20
**exist** [3] - 54:4, 61:18,
92:5
**existence** [2] - 118:3,
210:20
**existing** [2] - 89:12,
89:13
**expand** [2] - 66:3,
212:9
**expanded** [7] - 80:9,
164:18, 164:20,
167:11, 167:12,
171:24, 172:2
**expanding** [2] - 52:9,
92:7
**expansion** [5] -
166:19, 166:20,
169:24, 170:8, 171:4
**expansive** [2] - 51:21,
63:13
**expect** [5] - 112:8,
124:13, 146:17,
146:18, 157:14
**expected** [2] - 55:19,
129:6
**expense** [1] - 53:2
**expensive** [1] - 20:1
**experience** [16] - 47:1,
52:14, 58:4, 58:13,
58:22, 79:3, 92:10,
97:7, 97:9, 97:10,
97:11, 98:2, 98:5,
98:6, 99:5, 99:22
**expert** [41] - 11:20,
15:18, 27:21, 39:6,
39:12, 47:1, 50:16,
57:4, 60:6, 66:10,
66:13, 66:19, 69:2,
76:15, 76:19, 79:17,
83:8, 88:10, 90:9,
90:21, 90:24, 93:4,
98:4, 101:11,
101:14, 104:3,
104:4, 105:14,
113:5, 113:11,
117:11, 120:16,
120:22, 121:5,
121:17, 213:8,
214:4, 214:22,
214:23, 215:6
**expert's** [1] - 90:15
**expertise** [1] - 41:3

**experts** [6] - 9:6,
32:23, 41:3, 49:6,
76:7, 117:3
**explain** [7] - 103:24,
106:1, 109:5, 117:7,
117:12, 130:15,
171:18
**explained** [3] - 4:8,
161:17, 164:11
**explaining** [2] - 21:12,
213:18
**explains** [1] - 26:12
**explanation** [12] -
12:21, 14:8, 27:2,
31:25, 32:3, 37:11,
38:1, 38:25, 39:10,
40:7, 115:5, 208:20
**explanations** [7] -
11:14, 12:6, 13:1,
38:14, 40:25, 45:24,
46:12
**export** [1] - 140:24
**exposure** [1] - 12:3
**express** [2] - 57:20,
71:19
**expression** [42] -
52:19, 52:24, 58:5,
58:8, 58:11, 58:12,
58:17, 59:12, 59:21,
59:24, 59:25, 65:21,
67:2, 67:3, 67:8,
74:4, 74:7, 75:3,
75:23, 76:11, 76:21,
77:4, 77:8, 80:2,
80:4, 80:20, 80:25,
89:14, 89:20, 90:3,
92:11, 109:22,
168:13, 177:23,
182:24, 188:1,
190:20, 198:1,
202:10, 208:8,
213:16, 213:22
**extend** [1] - 6:20
**extended** [1] - 16:25
**extending** [1] - 204:10
**extends** [1] - 117:25
**extensions** [1] - 97:23
**extensive** [5] - 31:23,
50:18, 121:5, 122:1,
124:7
**extent** [4] - 12:1, 48:5,
182:17, 206:8
**external** [1] - 76:21
**externally** [1] - 153:25
**extracted** [1] - 105:8
**extraordinary** [1] -
71:24
**extreme** [4] - 33:18,
46:1, 46:5, 113:14
**extremely** [2] - 29:10,

63:18
**eye** [1] - 40:17

# F

**F-r-e-d-e-r-i-k-s-e-n-**
**C-r-o-s-s** [1] - 94:15
**face** [4] - 12:15, 87:15,
92:12, 133:6
**facially** [2] - 68:12,
78:9
**facilitates** [1] - 153:20
**facilities** [10] - 57:8,
61:21, 69:9, 69:12,
69:18, 69:21, 91:12,
91:13, 91:19
**facing** [2] - 19:24,
21:4
**fact** [39] - 13:21, 15:3,
15:19, 21:23, 23:5,
27:10, 28:3, 32:8,
32:22, 35:23, 38:15,
40:6, 41:5, 41:25,
43:20, 44:25, 45:23,
46:1, 56:13, 62:13,
64:2, 64:24, 66:10,
66:18, 68:17, 69:13,
79:2, 79:10, 82:17,
82:18, 89:3, 89:24,
91:1, 91:19, 152:2,
158:14, 159:2,
205:20, 213:19
**factor** [2] - 43:17,
46:16
**factors** [3] - 36:22,
42:17, 45:18
**facts** [6] - 9:10, 12:14,
19:11, 34:23, 82:7,
82:11
**failed** [7] - 76:19,
76:20, 76:21, 76:22,
100:20, 130:2,
182:16
**failure** [1] - 41:25
**fair** [1] - 85:5
**fairly** [1] - 100:22
**faith** [9] - 11:10,
14:15, 36:23, 37:2,
51:20, 56:5, 56:9,
74:24, 92:18
**fall** [1] - 103:4
**false** [5] - 46:14,
63:23, 64:9, 72:18,
122:16
**falsely** [1] - 54:6
**familiar** [1] - 105:17
**fangled** [1] - 38:24
**far** [5] - 16:12, 28:7,
39:13, 52:21, 106:25
**fashion** [1] - 48:6

**faster** [2] - 6:4, 58:22
**fault** [1] - 12:19
**favor** [1] - 20:25
**FBI** [1] - 99:14
**FCRR** [2] - 1:24, 216:8
**features** [1] - 98:13
**February** [10] - 13:11,
23:4, 52:1, 57:8,
183:8, 183:12,
184:11, 185:6,
191:19, 199:18
**federal** [7] - 73:25,
74:1, 74:10, 74:25,
77:14, 78:18, 189:10
**Federal** [2] - 98:22,
98:25
**Ferenbach** [5] - 19:4,
29:8, 30:5, 51:4,
64:4
**Fernbach** [1] - 29:20
**fetch** [1] - 211:7
**few** [8] - 29:20,
127:16, 135:6,
137:16, 140:20,
166:8, 179:7, 184:7
**fewer** [1] - 106:25
**field** [4] - 95:16, 96:21,
97:3, 112:1
**fields** [2] - 141:17,
208:25
**fight** [1] - 124:13
**fighting** [1] - 19:4
**figure** [9] - 28:20,
46:24, 48:21, 55:7,
55:14, 86:20, 86:22,
145:9, 171:4
**figured** [1] - 79:7
**figuring** [1] - 78:1
**file** [359] - 4:5, 34:12,
41:19, 52:2, 57:2,
57:4, 59:4, 59:6,
59:14, 61:22, 69:3,
70:12, 70:16, 72:23,
73:18, 74:2, 74:6,
74:8, 75:2, 75:14,
75:20, 75:21, 75:23,
75:24, 78:12, 80:15,
80:22, 89:12, 89:13,
90:9, 90:11, 90:12,
90:22, 90:24, 90:25,
91:20, 110:13,
110:15, 110:21,
110:24, 111:18,
111:19, 115:4,
115:5, 115:8, 115:9,
115:12, 115:13,
115:20, 116:19,
120:11, 120:16,
120:21, 121:4,
121:5, 121:8, 121:9,

121:15, 121:18,
121:20, 121:23,
122:3, 122:5, 122:6,
122:13, 122:17,
123:4, 123:6, 123:7,
123:12, 123:10,
123:14, 130:21,
131:2, 131:5, 131:9,
131:15, 131:25,
132:2, 132:4, 132:5,
132:6, 132:13,
132:16, 132:19,
133:5, 133:8,
133:13, 133:15,
133:17, 134:1,
134:2, 134:4, 134:8,
135:3, 135:4, 136:8,
136:9, 136:18,
137:8, 137:19,
138:20, 139:1,
141:22, 141:23,
142:2, 142:9,
142:12, 142:13,
142:17, 142:24,
143:6, 143:12,
143:13, 143:14,
143:19, 143:20,
143:21, 143:22,
143:24, 144:3,
144:8, 145:6, 145:7,
145:9, 145:12,
145:13, 145:14,
145:17, 146:1,
146:9, 146:12,
146:13, 146:16,
150:25, 151:3,
151:5, 153:3,
153:17, 153:18,
153:23, 154:5,
154:7, 154:9,
154:13, 154:16,
154:20, 154:21,
154:25, 155:6,
155:8, 155:10,
155:21, 156:7,
156:8, 156:11,
156:12, 156:15,
156:17, 156:20,
156:22, 156:23,
156:24, 159:1,
159:3, 159:4, 159:7,
159:9, 161:12,
163:13, 164:7,
164:19, 165:1,
165:10, 165:15,
165:18, 165:25,
166:1, 166:4, 166:6,
167:7, 167:23,
169:4, 169:9,
169:10, 169:11,
169:15, 169:16,

14

169:23, 169:25, 170:3, 170:5, 170:10, 170:13, 170:18, 170:22, 170:23, 170:25, 171:1, 171:11, 171:20, 171:21, 171:25, 172:1, 172:7, 172:18, 173:12, 173:18, 173:19, 174:1, 174:3, 174:4, 174:7, 174:10, 174:11, 174:12, 174:14, 174:15, 174:19, 174:22, 174:25, 175:3, 175:7, 175:9, 175:17, 175:18, 175:22, 175:25, 176:1, 176:2, 176:3, 176:8, 176:9, 176:13, 177:16, 177:17, 177:19, 177:22, 178:2, 178:5, 178:16, 178:20, 179:15, 179:17, 180:10, 180:11, 180:18, 180:25, 181:5, 181:7, 181:9, 182:1, 182:2, 182:5, 182:9, 182:23, 183:9, 183:25, 184:7, 184:10, 185:18, 186:9, 186:10, 186:12, 186:13, 186:17, 186:24, 186:25, 187:6, 187:22, 187:23, 187:25, 188:9, 188:11, 188:14, 188:15, 188:19, 189:9, 189:11, 189:13, 189:16, 190:4, 190:19, 190:22, 192:4, 192:7, 193:20, 193:24, 193:25, 194:5, 195:5, 196:9, 196:10, 197:1, 197:7, 199:6, 200:3, 201:3, 201:4, 202:2, 202:10, 202:11, 202:12, 202:14, 202:15, 204:15, 204:19, 204:20, 204:23, 204:24, 205:2, 205:6, 205:7, 205:8, 205:10, 205:11, 205:20, 205:21, 205:25,

206:2, 206:4, 206:5, 206:6, 206:9, 207:5, 208:8, 208:20, 208:21, 209:25, 210:2, 210:7, 212:4, 213:3, 213:4, 213:15, 213:21, 214:11, 215:1
**filed** [3] - 4:4, 53:25, 104:2
**files** [128] - 26:16, 26:24, 33:23, 34:7, 34:25, 41:8, 54:23, 57:19, 57:21, 64:15, 66:4, 70:3, 70:14, 70:18, 70:21, 70:24, 71:7, 71:9, 71:11, 71:15, 71:16, 71:20, 72:21, 74:16, 76:9, 76:11, 76:24, 79:12, 79:13, 79:16, 79:20, 80:5, 80:19, 104:24, 104:25, 105:3, 105:5, 105:6, 106:6, 107:9, 111:12, 116:18, 116:21, 116:25, 117:10, 117:11, 118:19, 120:10, 122:4, 133:18, 133:20, 134:12, 135:8, 135:12, 135:18, 135:24, 136:11, 136:12, 145:21, 147:12, 147:16, 147:19, 150:13, 150:14, 150:16, 150:17, 151:1, 151:9, 151:10, 154:4, 154:10, 155:24, 156:21, 158:3, 160:24, 164:22, 165:2, 165:4, 165:9, 167:12, 167:13, 167:22, 171:8, 172:25, 173:21, 177:1, 178:10, 178:13, 181:12, 182:19, 183:14, 184:17, 184:19, 185:14, 188:8, 189:10, 190:25, 191:4, 192:10, 194:21, 194:23, 195:22, 195:23, 196:20, 197:14, 197:15, 197:17, 197:18, 197:21, 197:22, 197:25, 198:6, 198:24,

199:7, 199:17, 201:10, 201:12, 202:17, 204:17, 205:15, 206:3, 208:19, 208:23, 212:16, 213:13, 213:20
**filings** [1] - 48:4
**filter** [2] - 40:16, 41:4
**filtered** [1] - 116:17
**final** [1] - 184:15
**finally** [10] - 10:14, 17:16, 45:11, 61:5, 63:5, 73:3, 88:9, 126:17, 197:7, 199:5
**financial** [1] - 21:13
**findings** [2] - 45:21, 198:22
**fine** [2] - 15:21, 205:9
**fingers** [1] - 195:5
**finishes** [1] - 168:10
**Firm** [1] - 2:14
**firm** [2] - 95:2, 108:4
**firms** [1] - 97:14
**first** [56] - 4:24, 6:1, 9:14, 11:1, 15:1, 23:15, 24:24, 26:8, 39:7, 41:10, 42:15, 42:24, 46:7, 57:7, 62:2, 66:13, 70:24, 80:11, 80:23, 81:11, 81:14, 89:5, 90:10, 93:2, 93:3, 94:7, 109:10, 114:14, 115:23, 124:23, 139:19, 144:12, 151:22, 154:17, 161:25, 165:12, 166:12, 167:3, 178:1, 179:10, 180:17, 180:21, 183:9, 183:18, 183:21, 191:18, 193:14, 195:7, 195:16, 198:22, 203:24, 204:2, 207:2, 214:8, 215:4, 215:7
**fit** [1] - 127:3
**fits** [1] - 157:16
**five** [9] - 6:14, 29:23, 29:24, 32:24, 104:22, 111:18, 138:24, 184:17, 215:15
**fix** [20] - 55:20, 77:10, 110:18, 110:22, 110:23, 119:16, 119:18, 142:25, 143:14, 143:23,

145:10, 148:24, 149:10, 149:11, 149:13, 149:14, 149:15, 170:16, 182:14
**fixed** [3] - 73:19, 169:14, 169:17
**fixes** [4] - 84:6, 85:6, 110:21, 120:8
**flag** [3] - 134:19, 200:5
**flags** [2] - 199:23, 200:7
**flavors** [1] - 130:10
**flexible** [1] - 8:4
**Flexner** [1] - 2:13
**flows** [1] - 114:7
**focus** [1] - 95:17
**focused** [6] - 62:23, 72:6, 102:6, 103:13, 116:23, 205:24
**folder** [4] - 146:10, 146:14, 154:2, 154:14, 155:2, 155:11, 155:12, 155:14
**folders** [2] - 155:1, 159:4
**folks** [2] - 45:15, 163:22
**follow** [4] - 7:6, 16:16, 152:11, 202:2
**follow-up** [2] - 7:6, 202:2
**followed** [4] - 151:23, 152:10, 201:24, 202:4
**following** [6] - 21:25, 42:17, 167:16, 167:17, 202:3, 210:4
**follows** [2] - 23:8, 94:11
**font** [4] - 77:20, 78:2, 78:6, 78:8
**Fools'** [1] - 20:24
**FOR** [2] - 1:14, 1:19
**forbidden** [1] - 37:1
**foregoing** [1] - 216:6
**foremost** [1] - 76:7
**forensic** [8] - 28:9, 95:9, 95:10, 97:1, 97:12, 98:18, 106:4, 209:18
**forensics** [2] - 95:14, 97:21
**FOREX** [1] - 100:3
**forget** [1] - 159:15
**forgot** [1] - 31:20
**form** [20] - 65:5, 73:20, 73:21, 73:25, 74:1, 74:2, 74:10, 74:25,

77:12, 77:13, 77:14, 78:18, 82:9, 82:10, 84:7, 85:9, 87:9, 109:24, 138:13, 138:15
**Form** [1] - 78:18
**formally** [1] - 135:23
**format** [6] - 105:20, 140:2, 140:5, 140:6, 140:8, 141:1
**formats** [1] - 140:25
**formed** [1] - 108:24
**forms** [5] - 55:8, 79:11, 95:7, 110:19, 147:17
**forth** [5] - 96:10, 97:7, 98:1, 125:8, 129:18
**Fortune** [1] - 54:13
**forum** [1] - 55:24
**forward** [5] - 4:11, 18:25, 28:19, 127:10, 160:6
**forwarded** [9] - 36:3, 152:2, 158:21, 158:23, 159:20, 159:24, 159:25, 160:13, 160:14
**forwarding** [1] - 150:16
**forwards** [2] - 150:3, 150:4
**foster** [1] - 60:2
**fought** [1] - 54:3
**foundation** [3] - 132:20, 132:25, 203:6
**four** [13] - 2:17, 21:24, 56:21, 57:6, 58:6, 75:11, 77:2, 134:18, 137:12, 148:1, 163:23, 195:18, 199:13
**fourth** [7] - 61:5, 69:1, 73:3, 103:4, 103:6, 111:1, 111:2
**fraction** [1] - 30:3
**fragile** [1] - 112:7
**frame** [1] - 101:25
**frames** [1] - 97:18
**framework** [1] - 21:18
**frankly** [3] - 28:3, 54:5, 78:4
**Frederiksen** [47] - 11:20, 27:20, 31:19, 35:19, 36:7, 46:21, 48:20, 67:8, 79:8, 93:4, 94:9, 94:14, 94:16, 94:24, 96:4, 101:19, 108:24, 112:23, 114:3,

114:14, 121:9,
121:14, 122:2,
123:15, 123:22,
124:18, 124:23,
129:25, 131:8,
137:18, 139:7,
157:10, 157:25,
162:5, 163:1, 163:9,
168:18, 169:1,
177:11, 180:7,
181:23, 186:4,
187:19, 190:15,
196:19, 198:17,
213:12
**FREDERIKSEN** [2] -
94:10, 217:8
**Frederiksen-Cross**
[45] - 11:20, 27:20,
31:19, 35:19, 36:7,
46:21, 48:20, 67:8,
79:8, 93:4, 94:9,
94:14, 94:16, 94:24,
96:4, 101:19,
108:24, 112:23,
114:3, 114:14,
121:14, 122:2,
123:15, 123:22,
124:18, 124:23,
129:25, 131:8,
137:18, 139:7,
157:10, 157:25,
162:5, 163:1, 163:9,
168:18, 169:1,
177:11, 180:7,
181:23, 186:4,
187:19, 190:15,
196:19, 198:17
**FREDERIKSEN-
CROSS** [2] - 94:10,
217:8
**Frederiksen-Cross's**
[2] - 121:9, 213:12
**free** [1] - 94:17
**frequently** [2] -
148:18, 167:21
**fresh** [1] - 104:6
**Friday** [1] - 191:10
**friendly** [1] - 141:17
**front** [2] - 50:3, 51:18
**full** [11] - 95:17, 97:21,
144:12, 169:24,
170:8, 171:4,
171:15, 191:18,
192:15, 192:18,
199:11
**full-time** [1] - 95:17
**fully** [9] - 54:23, 73:7,
112:20, 116:15,
121:10, 164:17,
167:11, 171:24,

172:2
**function** [5] - 158:23,
173:22, 203:14,
204:10, 206:6
**functional** [8] - 23:22,
34:1, 36:18, 104:14,
137:5, 149:5, 149:7,
209:20
**functionality** [2] -
65:18, 206:9
**functioning** [3] -
60:18, 67:21, 68:8
**functions** [2] - 76:12,
203:25
**fundamentally** [4] -
53:17, 63:13, 91:25,
177:3
**funny** [1] - 46:10
**future** [1] - 47:8

## G

**G6** [12] - 130:24,
147:1, 147:9, 148:2,
149:3, 149:17,
150:13, 150:23,
151:15, 151:22,
161:13
**gained** [1] - 79:3
**gallery** [1] - 2:18
**gathered** [2] - 18:11,
18:15
**General** [3] - 86:6,
86:9, 86:14
**general** [8] - 36:14,
68:17, 85:21, 85:22,
114:15, 117:20,
118:23, 119:19
**generally** [10] - 59:2,
98:14, 101:18,
112:12, 114:19,
125:3, 150:21,
165:3, 201:23, 208:9
**generate** [1] - 30:2
**generic** [5] - 14:3,
34:1, 36:18, 57:24,
71:3
**getstdta** [1] - 180:8
**getstdta.sqc** [2] -
172:25, 179:16
**getstdta.sqc.txt** [1] -
184:10
**gettxdta** [2] - 175:22,
181:10
**gettxdta.sqc** [2] -
172:25, 177:19
**gettxdta.sqc.txt** [5] -
173:18, 173:19,
174:4, 178:5, 178:15
**Gibson** [4] - 3:11,

3:14, 3:15, 3:16
**given** [8] - 4:3, 12:3,
17:17, 28:21, 71:17,
126:16, 135:11,
158:14
**Gladly** [1] - 4:22
**Glazer** [9] - 154:8,
154:9, 154:14,
154:23, 158:11,
158:24, 159:4,
159:13, 160:14
**Glazer's** [6] - 155:2,
155:5, 155:21,
156:11, 156:15,
159:8
**Global** [1] - 84:12
**global** [1] - 60:11
**go-to** [1] - 34:4
**goal** [2] - 9:7, 10:22
**God** [2] - 31:20, 44:7
**gotcha** [1] - 86:17
**govern** [2] - 16:5,
61:19
**governed** [2] - 69:9,
91:18
**governments** [1] -
54:14
**governs** [1] - 61:22
**granted** [1] - 18:24
**granularity** [1] -
206:10
**graphic** [2] - 198:3,
198:9
**great** [4] - 17:5, 50:4,
53:2, 57:14
**greater** [4] - 6:7, 7:17,
47:4, 171:18
**green** [8] - 70:9,
135:9, 136:19,
136:21, 137:13,
143:24, 207:10,
207:11
**Greg** [3] - 165:21,
165:23, 165:24
**Griener** [3] - 1:24,
216:8, 216:8
**Grigsby** [3] - 24:20,
25:11, 129:14
**gross** [1] - 208:13
**grosses** [2] - 204:2,
204:13
**grounds** [2] - 17:12,
18:9
**Group** [2] - 34:9,
110:25
**grouped** [1] - 75:10
**groups** [1] - 101:8
**guess** [7] - 25:3, 44:4,
126:4, 131:21,
143:2, 199:11,

207:15
**Guest** [18] - 173:1,
173:9, 173:12,
178:6, 178:10,
178:13, 178:16,
178:25, 179:3,
179:8, 179:14,
180:12, 183:4,
183:10, 183:14,
183:21, 184:4,
184:10
**guidance** [3] - 129:7,
129:9, 165:19
**guide** [3] - 23:12,
88:25, 120:7
**guidelines** [1] - 125:8
**guts** [1] - 82:22
**guy** [2] - 39:4, 41:21
**guys** [1] - 47:11

## H

**half** [5] - 20:2, 47:9,
47:12, 47:13, 50:15
**hand** [21] - 135:3,
135:4, 137:13,
143:24, 177:16,
177:18, 181:25,
182:1, 182:12,
182:17, 182:18,
207:3, 207:4, 207:5,
207:12, 207:13,
207:17, 211:7, 212:6
**handed** [2] - 49:25,
96:5
**handful** [2] - 12:13,
190:21
**handle** [2] - 16:7, 95:7
**handling** [2] - 99:18,
99:20
**handy** [2] - 188:5,
190:23
**happy** [1] - 174:2
**hard** [3] - 28:15,
151:2, 154:2
**hardest** [1] - 48:13
**harm** [1] - 75:8
**harmed** [1] - 73:5
**Hasali** [1] - 164:5
**HCM** [2] - 143:23,
182:13
**HCM200105** [1] -
110:23
**head** [2] - 17:20,
143:13
**Health** [19] - 184:19,
185:2, 185:15,
188:4, 191:3,
191:22, 192:11,
192:12, 193:5,

193:6, 193:11,
194:10, 196:21,
197:3, 197:8,
199:12, 200:17,
201:9, 201:13
**hear** [34] - 3:4, 5:12,
11:14, 15:23, 31:19,
34:8, 34:16, 37:6,
39:4, 40:17, 41:2,
41:4, 42:24, 45:1,
46:21, 51:12, 51:15,
52:12, 57:18, 60:9,
63:1, 66:11, 73:3,
73:24, 75:7, 76:5,
76:9, 77:19, 87:11,
88:10, 89:15, 91:23,
114:2
**heard** [12] - 39:20,
50:19, 55:11, 61:23,
62:10, 68:14, 79:8,
86:16, 123:3, 214:8,
214:9, 215:5
**HEARING** [1] - 1:11
**hearing** [22] - 2:6,
3:24, 4:9, 5:12, 5:16,
5:20, 11:19, 15:10,
22:5, 22:8, 22:12,
50:9, 51:7, 53:6,
65:25, 69:24, 88:10,
90:18, 91:23,
108:11, 114:11
**hearings** [1] - 19:4
**hearsay** [1] - 135:21
**heart** [2] - 41:9, 82:22
**heated** [1] - 17:10
**heavily** [1] - 62:23
**heavy** [1] - 92:21
**held** [16] - 11:11,
19:19, 21:24, 33:17,
41:7, 51:13, 58:20,
61:11, 67:23, 69:11,
73:6, 73:17, 74:24,
99:2, 167:5, 175:13
**help** [6] - 23:17, 55:5,
62:11, 133:20,
144:17, 201:17
**helped** [1] - 105:20
**helpful** [3] - 26:20,
214:16, 215:20
**helps** [1] - 202:20
**Hi** [2] - 148:14, 194:17
**HICKS** [1] - 1:2
**Hicks** [2] - 30:9, 104:4
**hidden** [1] - 64:8
**hierarchy** [1] - 155:1
**high** [3] - 96:13, 214:2
**High** [1] - 98:23
**higher** [1] - 158:20
**highlight** [6] - 12:9,
12:13, 15:19, 22:20,

100:11, 134:12
**highlighted** [14] -
16:9, 23:2, 23:18,
24:5, 25:3, 25:16,
47:18, 49:10,
131:12, 135:8,
137:13, 167:15,
207:18
**highlighting** [10] -
70:10, 136:20,
182:17, 206:16,
207:6, 207:8,
207:10, 207:11,
207:15, 207:16
**highlights** [1] - 44:25
**highly** [2] - 51:9, 89:9
**Hill** [2] - 1:17, 2:21
**Hillsboro** [2] - 98:23
**hinge** [1] - 92:7
**hire** [4] - 54:25, 55:14,
55:15, 68:4
**hired** [1] - 80:23
**hires** [1] - 55:6
**Hitachi** [1] - 96:19
**Hoffman** [1] - 64:4
**hold** [1] - 157:19
**home** [1] - 128:12
**Home** [8] - 34:9,
80:13, 80:23, 81:1,
81:3, 81:6, 81:10,
110:25
**honesty** [2] - 22:18,
24:10
**Honor** [99] - 2:11,
2:24, 3:5, 3:13, 4:14,
5:14, 7:6, 7:23, 8:5,
8:7, 8:13, 8:20,
11:19, 14:15, 18:10,
26:2, 40:2, 40:15,
49:4, 49:23, 50:14,
53:7, 56:13, 56:14,
58:19, 58:23, 59:14,
60:8, 62:13, 63:14,
64:21, 64:22, 64:25,
65:21, 65:24, 67:23,
77:7, 79:10, 79:15,
85:8, 85:12, 86:12,
86:18, 87:11, 91:22,
92:24, 93:10, 94:8,
94:19, 96:1, 99:10,
112:24, 113:16,
113:24, 120:14,
120:15, 120:19,
121:4, 121:13,
122:9, 123:1,
124:15, 132:21,
133:10, 135:11,
135:16, 157:9,
157:19, 157:21,
159:19, 162:21,

163:4, 168:15,
168:22, 176:14,
176:23, 177:1,
180:1, 180:3,
185:22, 185:25,
187:12, 187:14,
189:3, 189:22,
190:10, 190:11,
196:12, 196:15,
198:12, 206:18,
212:17, 213:10,
213:25, 215:17,
215:18
**Honor's** [30] - 50:1,
50:12, 51:20, 51:23,
52:3, 53:5, 53:18,
54:1, 56:12, 57:10,
57:12, 59:23, 62:2,
62:12, 63:12, 64:19,
64:20, 71:23, 78:10,
81:20, 83:6, 83:9,
87:19, 88:11, 90:17,
91:15, 92:1, 92:18,
198:8
**HONORABLE** [1] - 1:2
**hood** [1] - 68:10
**hope** [1] - 190:23
**hopeful** [1] - 7:19
**hopefully** [2] - 50:1,
192:14
**horribles** [1] - 26:6
**horrific** [1] - 19:23
**Hosalli** [1] - 163:18
**Hospital** [6] - 130:25,
152:23, 158:6,
160:25, 161:4,
161:14
**Hospitality** [7] -
130:24, 147:1,
147:9, 149:4,
150:14, 150:23,
161:13
**hospitals** [1] - 54:14
**host** [1] - 57:10
**hosted** [1] - 71:5
**hosting** [24] - 56:24,
57:7, 61:15, 62:15,
66:4, 69:5, 69:8,
69:12, 69:14, 69:18,
70:2, 71:3, 71:22,
75:11, 75:20, 76:24,
91:1, 91:4, 91:6,
91:12, 91:14, 91:16,
122:12, 128:11
**Houmand** [2] - 1:16,
2:21
**hour** [3] - 6:13, 6:20,
108:22
**hours** [5] - 5:18, 5:24,
108:16, 108:18,

108:19, 140:19
**housed** [2] - 107:17,
108:3
**Houston** [2] - 193:5,
193:7
**Howard** [2] - 3:6
**HRMS91_v2** [1] -
163:22
**HTML** [2] - 140:8,
141:8
**huge** [3] - 48:17,
105:25, 106:1
**human** [1] - 67:14
**humongous** [1] - 72:6
**hundred** [2] - 98:19,
98:20
**hundreds** [3] - 50:16,
89:16, 89:17
**hung** [1] - 53:5

**I**

**i.e** [1] - 11:11
**IBM** [2] - 96:16, 96:23
**iceberg** [1] - 30:25
**ID** [5] - 139:22, 142:5,
217:11
**identical** [2] - 198:25,
199:7
**identifiable** [1] -
126:12
**identified** [10] - 11:15,
26:25, 30:23, 50:14,
103:25, 115:8,
126:24, 156:14,
197:25, 212:22
**identifier** [1] - 209:16
**identifies** [2] - 137:4,
203:13
**identify** [7] - 133:20,
143:13, 174:18,
200:4, 206:13,
208:2, 213:6
**identifying** [2] - 116:3,
173:16
**ignoring** [2] - 134:16,
134:21
**II** [42] - 18:9, 18:11,
18:22, 21:24, 22:15,
29:13, 29:17, 30:3,
52:3, 53:15, 53:25,
58:25, 63:8, 63:10,
63:17, 64:23, 65:24,
84:14, 101:24,
102:2, 102:3, 102:7,
102:10, 103:18,
104:3, 105:7,
105:14, 105:15,
105:23, 106:3,
106:9, 106:17,

106:21, 107:1,
107:7, 107:12,
108:20, 112:7,
118:9, 128:4,
162:20, 162:23
**Ilissa** [2] - 1:20, 3:15
**illegal** [6] - 68:2, 83:6,
83:7, 83:9, 88:13,
92:14
**illegally** [1] - 87:14
**illustrating** [1] - 95:18
**image** [11] - 102:13,
106:12, 107:4,
107:5, 148:15,
148:16, 148:17,
148:25, 149:22,
150:11
**images** [14] - 9:9,
102:12, 106:4,
106:7, 106:10,
106:11, 106:15,
107:8, 107:12,
107:19, 107:20,
128:10, 128:11,
160:14
**immediate** [1] - 55:5
**immediately** [4] -
25:19, 62:24, 129:1,
195:12
**impact** [12] - 12:15,
19:23, 20:13, 20:14,
20:18, 21:13, 22:14,
23:9, 25:9, 25:15,
26:5, 49:3
**impacted** [3] - 9:15,
22:24, 55:24
**impacts** [1] - 55:13
**impertinence** [1] -
15:13
**implausible** [1] -
37:11
**implement** [3] - 68:24,
73:25, 89:10
**implemented** [3] -
23:6, 62:5, 68:7
**implementing** [1] -
26:1
**implicated** [3] - 10:3,
27:1, 88:22
**implicates** [1] - 10:10
**implication** [1] - 58:15
**implications** [5] -
52:16, 61:3, 67:24,
67:25, 83:10
**implicit** [2] - 69:5,
91:16
**imply** [1] - 69:22
**importance** [1] - 28:22
**important** [18] - 12:14,
14:14, 17:4, 22:20,

22:22, 25:8, 28:12,
28:21, 34:23, 41:4,
47:6, 49:1, 49:5,
49:7, 68:13, 87:18,
129:17
**Important** [1] - 72:10
**importantly** [4] -
29:22, 38:12, 45:4,
83:19
**impounded** [1] -
152:14
**improperly** [1] - 39:19
**inaccessible** [5] -
60:7, 82:5, 82:10,
82:19
**inadmissible** [1] -
76:17
**inadvertent** [1] -
109:21
**inappropriate** [2] -
98:15, 120:4
**inbox** [1] - 172:20
**INC** [2] - 1:4, 1:7
**Inc** [6] - 173:13,
178:10, 178:25,
179:3, 183:14,
184:10
**incarnations** [1] -
116:6
**incident** [1] - 35:15
**incidental** [1] - 202:3
**incidents** [3] - 12:20,
116:10, 127:16
**include** [6] - 98:6,
102:18, 106:14,
110:11, 164:15,
213:4
**included** [12] - 81:2,
96:24, 98:21,
102:12, 104:1,
106:17, 115:1,
115:9, 115:17,
164:22, 167:11,
167:13
**includes** [2] - 166:20,
171:15
**including** [10] - 13:11,
17:12, 63:19, 74:12,
77:16, 84:16, 97:17,
100:16, 107:9,
159:14
**inclusion** [1] - 161:19
**inclusions** [9] -
164:17, 164:21,
165:7, 165:10,
167:18, 171:22,
171:23, 172:2, 172:3
**incomplete** [1] -
112:14
**inconsistent** [2] -

37:11, 111:20
**incorporate** [2] -
59:17, 206:2
**incorporated** [3] -
170:13, 206:3, 208:8
**Incorporated** [3] - 2:7,
2:8, 3:7
**incorporating** [1] -
118:7
**incorporation** [1] -
80:4
**incorrect** [1] - 122:23
**incredible** [1] - 64:6
**indeed** [1] - 67:20
**independently** [1] -
118:4
**index** [1] - 139:1
**indicate** [15] - 11:6,
137:1, 141:21,
149:16, 155:13,
160:6, 169:3,
170:17, 178:19,
184:6, 191:2, 191:6,
191:25, 192:18,
196:23
**indicated** [6] - 5:18,
72:25, 136:1,
137:18, 138:10,
205:10
**indicates** [15] - 26:22,
105:13, 131:22,
135:7, 142:23,
149:4, 154:25,
170:4, 191:18,
192:1, 193:19,
203:10, 207:8,
207:16, 211:3
**indicating** [6] - 90:4,
158:12, 182:14,
191:9, 191:13,
213:13
**indication** [5] - 71:8,
73:12, 159:10,
159:19, 159:24
**indicative** [1] - 22:15
**indicator** [2] - 116:18,
212:7
**individual** [7] - 12:16,
57:19, 70:24,
158:24, 171:22,
171:23, 193:8
**individual's** [1] -
165:24
**individuals** [1] -
104:18
**industry** [13] - 39:6,
39:8, 60:20, 68:23,
83:4, 83:7, 83:24,
87:10, 87:14, 88:11,
88:22, 92:13, 92:14

**inference** [1] - 28:13
**influence** [1] - 38:15
**inform** [1] - 187:19
**informal** [1] - 74:19
**informally** [1] - 17:20
**information** [19] -
23:17, 72:10,
102:15, 102:20,
104:9, 104:10,
105:8, 105:16,
105:19, 106:10,
106:18, 126:8,
126:12, 127:10,
138:6, 139:20,
143:22, 149:13,
150:20
**infringe** [1] - 86:2
**infringed** [1] - 21:24
**infringement** [1] -
21:16
**infringing** [1] - 19:17
**ing** [1] - 159:14
**ingenuity** [2] - 58:13,
60:1
**initial** [8] - 71:9, 96:12,
101:23, 116:22,
134:15, 134:19,
156:22, 166:10
**injunction** [190] - 9:1,
9:13, 9:14, 9:16,
9:24, 10:15, 10:23,
11:2, 11:7, 11:10,
11:17, 12:25, 13:1,
13:5, 14:1, 14:12,
14:17, 14:21, 15:3,
15:14, 17:7, 17:10,
17:12, 17:18, 17:24,
18:13, 19:13, 19:15,
19:21, 20:5, 20:7,
20:9, 20:13, 21:5,
21:7, 22:6, 22:14,
22:19, 22:23, 22:24,
23:5, 23:9, 23:21,
23:23, 24:3, 24:8,
24:17, 24:19, 25:2,
25:5, 25:9, 25:15,
25:18, 26:4, 26:7,
26:10, 26:13, 26:21,
27:17, 28:3, 28:17,
28:25, 29:9, 29:18,
30:20, 31:9, 31:13,
32:7, 32:25, 34:3,
36:20, 36:24, 37:3,
38:19, 38:24, 39:1,
39:15, 39:22, 39:24,
40:8, 40:14, 40:18,
40:20, 41:20, 42:13,
43:4, 43:10, 43:15,
44:8, 44:14, 44:22,
45:5, 45:22, 46:3,

46:19, 47:12, 50:19,
51:21, 51:22, 52:2,
56:5, 56:10, 56:12,
56:15, 56:17, 56:21,
57:4, 57:6, 59:18,
59:19, 59:23, 60:22,
61:23, 62:9, 62:14,
62:16, 62:22, 62:24,
63:2, 63:6, 63:13,
63:15, 64:19, 64:20,
65:8, 65:12, 66:3,
67:6, 67:13, 67:22,
67:25, 69:4, 70:21,
75:5, 81:15, 81:19,
81:20, 82:25, 83:6,
83:9, 86:19, 87:3,
87:12, 87:20, 88:12,
89:4, 89:7, 90:6,
90:19, 90:25, 91:4,
91:21, 92:9, 92:19,
103:9, 103:12,
103:16, 104:1,
106:22, 109:8,
109:9, 109:10,
109:13, 110:10,
111:5, 111:10,
112:21, 114:16,
114:17, 114:19,
114:20, 120:4,
120:23, 121:18,
127:12, 128:2,
128:6, 128:22,
129:15, 129:22,
130:1, 130:3, 130:7,
130:9, 131:10,
131:17, 158:17,
202:7, 202:8
**inserted** [2] - 89:23,
90:5
**inside** [3] - 46:22,
64:2, 73:22
**insisted** [1] - 36:9
**inspection** [1] -
204:17
**install** [2] - 192:21,
193:18
**installation** [1] -
125:16
**installing** [1] - 123:13
**instance** [32] - 22:18,
36:16, 48:15, 58:9,
70:15, 102:21,
105:19, 105:20,
106:3, 106:11,
116:12, 117:10,
126:10, 134:18,
135:9, 136:15,
137:11, 138:2,
143:7, 146:23,
146:25, 152:19,

153:22, 158:19,
158:21, 163:22,
166:16, 172:23,
172:24, 182:8,
208:22, 210:11
**instances** [17] - 33:1,
35:23, 36:2, 36:12,
70:3, 110:7, 114:17,
115:24, 116:14,
119:5, 119:24,
146:19, 161:15,
161:17, 194:9,
201:23, 202:1
**instead** [5] - 9:13,
27:15, 42:24, 57:17,
86:16
**Institute** [1] - 96:20
**instruct** [1] - 35:7
**instructed** [1] - 184:4
**instruction** [4] -
57:20, 66:5, 71:19,
89:3
**instructions** [3] -
2:16, 64:15, 89:13
**instructor** [1] - 97:13
**instructs** [1] - 72:24
**intellectual** [7] - 16:7,
46:7, 46:8, 84:22,
86:2, 125:6, 125:7
**intend** [1] - 123:21
**intended** [3] - 87:9,
92:19, 110:21
**intense** [1] - 50:15
**intention** [1] - 5:23
**interact** [2] - 72:3,
123:9
**interactions** [1] -
132:7
**interacts** [1] - 71:16
**interest** [4] - 4:1, 25:6,
198:19, 209:18
**interesting** [11] -
23:18, 24:5, 26:2,
36:1, 37:5, 43:1,
43:5, 208:15,
208:17, 209:14
**interestingly** [2] -
3:21, 63:24
**interface** [1] - 141:3
**interfaced** [1] - 21:10
**intermingled** [1] -
58:1
**internal** [3] - 13:2,
57:23, 104:17
**internally** [1] - 153:25
**internals** [2] - 96:17,
96:23
**International** [1] -
86:5
**interoperate** [1] -

165:8
**interposed** [1] - 26:15
**interpret** [1] - 44:20
**interpretation** [6] -
11:10, 37:3, 51:22,
56:10, 63:13, 88:18
**interpreted** [1] - 44:15
**interrogatories** [1] -
29:22
**interrupt** [4] - 49:14,
120:13, 166:22,
175:11
**intervening** [1] -
185:10
**introduce** [1] - 3:12
**introduction** [1] -
124:13
**intrusion** [1] - 48:17
**inventory** [1] - 81:14
**Investigation** [2] -
98:22, 99:1
**investigation** [2] -
99:15, 100:19
**investigations** [1] -
100:18
**investment** [1] - 20:8
**investors** [4] - 20:7,
22:2, 23:1, 54:11
**invite** [1] - 6:20
**involve** [7] - 31:6,
51:9, 56:25, 77:23,
86:14, 99:24, 152:23
**involved** [8] - 4:2,
19:3, 30:4, 77:3,
77:19, 95:14, 98:18,
100:23
**involvement** [3] -
97:4, 102:24, 103:3
**involves** [6] - 8:25,
33:2, 57:1, 58:7,
77:8, 172:24
**involving** [5] - 50:15,
51:10, 57:21, 73:10,
101:20
**IP** [1] - 63:3
**ironically** [2] - 22:16,
31:4
**irony** [1] - 48:12
**irregularity** [7] -
210:1, 210:3, 210:5,
210:6, 210:7,
210:11, 210:12
**IRS** [4] - 73:20, 73:25,
78:18, 79:11
**Isaacson** [3] - 1:15,
2:19
**Islands** [3] - 37:22,
37:24, 78:22
**isolated** [11] - 12:20,
32:3, 36:4, 36:12,

48:15, 109:18,
109:19, 116:10,
119:5, 127:16,
146:16
**isolation** [1] - 210:22
**issuance** [1] - 17:10
**issue** [40] - 6:15, 6:19,
10:11, 12:7, 12:17,
13:15, 28:22, 38:20,
39:13, 40:6, 41:17,
43:3, 43:16, 45:17,
47:24, 49:9, 52:22,
57:1, 60:6, 61:6,
61:15, 64:13, 65:2,
66:12, 70:14, 75:11,
75:20, 76:3, 78:14,
78:15, 80:9, 87:16,
89:9, 121:4, 122:24,
138:5, 142:25,
170:4, 170:22
**Issue** [18] - 70:1,
70:14, 73:9, 75:6,
75:19, 76:25, 77:9,
78:12, 78:13, 79:11,
80:8, 81:24, 81:25,
82:1, 88:23, 88:24,
90:8
**issued** [7] - 4:10, 9:1,
20:23, 63:6, 86:19,
103:17, 157:12
**Issues** [1] - 81:18
**issues** [37] - 4:1, 6:24,
7:21, 18:1, 33:15,
39:17, 47:20, 50:6,
50:10, 50:14, 51:4,
51:7, 51:9, 51:24,
56:22, 56:23, 56:25,
58:6, 64:22, 65:23,
65:25, 69:23, 73:21,
75:6, 75:10, 75:12,
75:13, 75:15, 77:1,
77:2, 79:5, 91:1,
91:22, 101:2,
122:21, 169:13
**issuing** [1] - 6:6
**itself** [1] - 203:13

## J

**J.D** [33] - 10:10, 10:12,
14:7, 23:7, 24:7,
24:12, 25:1, 38:22,
39:19, 42:7, 43:8,
43:12, 44:1, 57:1,
60:4, 75:12, 82:3,
87:17, 111:5, 111:8,
111:11, 115:2,
115:8, 115:9,
115:12, 115:14,
119:19, 119:22,

120:6, 122:5,
129:14, 129:15,
129:21
**Jai** [2] - 193:1, 201:16
**January** [9] - 17:21,
47:11, 74:12, 159:3,
178:6, 178:17,
183:10, 183:19,
183:20
**JD** [1] - 111:2
**JDE** [53] - 22:24,
23:11, 23:13, 23:20,
24:22, 60:4, 60:13,
61:4, 67:12, 67:14,
68:2, 68:25, 69:14,
71:14, 81:18, 81:21,
82:7, 82:12, 82:19,
82:25, 83:5, 83:13,
83:19, 84:3, 87:6,
88:2, 88:9, 88:13,
88:14, 88:20, 88:24,
89:3, 90:11, 90:22,
92:14, 92:15, 111:3,
115:18, 115:20,
116:4, 116:12,
117:24, 118:1,
118:19, 119:24,
120:1, 120:3,
121:15, 121:21,
122:15, 123:11,
123:12
**JDE's** [1] - 43:21
**Jessica** [2] - 1:15,
2:19
**Jim** [4] - 2:25, 25:12,
150:17, 159:15
**Jira** [2] - 104:9, 105:9
**job** [1] - 43:22
**jobs** [1] - 58:22
**Johnson** [4] - 77:9,
77:16, 97:3, 110:19
**Johnson-Laird** [1] -
97:3
**Judge** [8] - 19:4, 29:8,
29:20, 30:5, 30:9,
51:4, 64:4
**JUDGE** [1] - 1:2
**judge** [1] - 44:8
**judgment** [7] - 13:12,
13:25, 52:1, 57:23,
58:24, 59:15, 71:23
**judgments** [1] - 13:18
**July** [2] - 113:11,
127:25
**junior** [1] - 96:13
**JurisLogic** [3] - 95:2,
95:3, 95:9
**jury** [1] - 33:4
**justification** [1] - 17:2
**justify** [1] - 91:13

## K

**Katie** [1] - 5:3
**keep** [11] - 30:15,
32:6, 40:11, 46:14,
60:18, 67:20, 68:7,
82:16, 88:16, 188:5,
209:11
**keeping** [3] - 5:25,
28:5, 31:17
**Kelly** [1] - 148:12
**kept** [4] - 53:23, 62:8,
81:23, 190:23
**Kevin** [2] - 158:22
**key** [1] - 21:1
**kind** [17] - 5:25, 17:20,
23:12, 25:13, 34:2,
47:23, 48:2, 48:19,
48:24, 59:23, 98:11,
106:8, 115:6,
138:21, 143:4,
147:8, 209:11
**kinds** [4] - 11:14,
18:21, 106:4, 130:19
**know-how** [12] -
52:14, 52:19, 52:23,
58:4, 58:16, 65:1,
77:8, 78:11, 80:25,
81:16, 90:7, 92:2
**knowing** [1] - 204:7
**knowledge** [14] -
52:14, 58:4, 58:21,
60:1, 66:8, 66:21,
66:24, 67:1, 67:7,
67:24, 77:4, 78:1,
79:4, 92:10
**known** [1] - 204:20
**knows** [6] - 39:23,
48:25, 54:25, 55:23,
78:22, 120:15

## L

**label** [1] - 82:18
**labels** [1] - 82:10
**lack** [4] - 15:23, 31:24,
36:23, 144:23
**Laird** [1] - 97:3
**Lanchak** [2] - 39:5,
88:9
**land** [1] - 165:5
**language** [2] - 26:11,
91:9
**large** [4] - 50:5, 89:20,
99:20, 127:17
**largely** [1] - 49:9,
133:7
**larger** [1] - 9:4
**LARRY** [1] - 1:2
**last** [18] - 3:22, 23:24,

64:11, 90:8, 95:23,
113:1, 113:15,
120:9, 120:20,
126:22, 152:22,
158:9, 162:6,
163:17, 192:15,
192:18, 194:18,
199:11
**lasting** [1] - 49:3
**lastly** [5] - 11:8, 14:6,
34:15, 46:20, 48:4
**late** [4] - 7:1, 101:24,
101:25, 103:4
**laudable** [1] - 54:5
**law** [10] - 9:23, 67:1,
76:1, 78:9, 79:18,
79:22, 95:5, 97:4,
101:10
**Law** [3] - 1:17, 1:21,
2:14
**lawful** [5] - 52:4, 54:1,
63:8, 85:15, 85:16
**lawfully** [1] - 51:19
**laws** [2] - 55:7, 55:13
**lawyers** [1] - 8:15
**layout** [2] - 167:24,
208:10
**lead** [1] - 33:11
**leader** [1] - 97:23
**leading** [1] - 17:9
**leads** [1] - 204:17
**learn** [1] - 116:7
**learned** [3] - 7:21,
79:4, 105:19
**least** [14] - 6:19,
30:19, 33:1, 100:6,
109:18, 117:7,
117:16, 138:1,
141:21, 151:11,
171:22, 193:21,
194:7, 202:3
**lecture** [1] - 101:2
**lectures** [1] - 101:3
**led** [5] - 34:2, 35:4,
108:11, 108:14,
115:19
**left** [22] - 7:10, 20:21,
22:4, 27:5, 124:4,
135:3, 136:9,
136:22, 177:16,
181:25, 182:17,
182:18, 187:22,
207:3, 207:4,
207:13, 207:17,
209:7, 210:14,
211:1, 211:7, 211:20
**left-hand** [10] - 135:3,
177:16, 181:25,
182:17, 182:18,
207:3, 207:4,

207:13, 207:17,
211:7
**legal** [5] - 20:12, 32:6,
98:4, 101:3, 104:1
**Legal** [1] - 3:9
**legible** [1] - 141:18
**lengthier** [1] - 23:11
**lengthy** [4] - 9:13,
19:3, 50:15, 93:4
**letter** [2] - 85:23,
85:24
**letters** [1] - 205:4
**level** [4] - 211:4,
211:22, 212:14,
214:2
**levels** [1] - 37:1
**leverage** [2] - 58:21,
59:1
**Lewis** [4] - 2:15, 2:20,
2:21, 2:22
**LexisNexis** [1] - 100:4
**liabilities** [1] - 100:16
**liability** [1] - 100:23
**library** [1] - 71:4
**license** [16] - 13:15,
41:13, 61:10, 61:14,
61:19, 69:16, 69:20,
73:7, 82:3, 82:7,
82:19, 85:2, 86:4,
98:8, 126:2
**License** [1] - 61:20
**licensed** [4] - 54:23,
61:12, 69:17, 126:25
**licensee** [4] - 61:1,
69:17, 83:14, 83:16
**licensee's** [1] - 131:23
**licensees** [5] - 43:24,
82:13, 83:12, 83:22,
88:21
**licenses** [11] - 37:3,
57:9, 57:24, 59:22,
60:25, 62:12, 83:13,
85:15, 85:16, 98:7,
98:8
**lie** [1] - 22:1
**lifting** [1] - 24:18
**light** [2] - 88:23,
207:15
**lightly** [1] - 3:25
**likely** [2] - 146:18,
157:15
**likewise** [1] - 32:11
**limit** [2] - 23:6, 122:20
**limitations** [6] - 7:2,
160:10, 181:15,
181:17, 181:19,
198:11
**limited** [14] - 12:4,
15:5, 15:6, 16:24,
28:19, 29:10, 29:20,

29:22, 30:17, 30:20, 30:24, 31:1, 48:7, 111:24
**limits** [2] - 52:21, 69:16
**line** [34] - 39:16, 62:16, 76:12, 76:16, 134:9, 134:14, 134:15, 134:22, 136:11, 136:15, 143:22, 156:16, 160:6, 167:16, 182:11, 182:12, 182:13, 193:14, 205:15, 207:8, 208:16, 209:6, 209:7, 209:8, 209:17, 209:20, 210:1, 210:6, 210:25, 211:6, 211:12, 211:19, 215:3
**lines** [29] - 89:17, 135:8, 136:13, 137:9, 137:12, 137:15, 137:17, 182:8, 183:6, 190:21, 198:4, 199:4, 207:11, 207:16, 207:25, 208:1, 208:3, 208:6, 208:7, 208:11, 208:12, 208:13, 208:14, 208:25, 209:9, 209:19, 209:22, 210:23, 211:12
**linking** [1] - 90:24
**lis** [12] - 164:19, 165:1, 165:15, 165:18, 166:4, 166:6, 167:7, 169:10, 170:22, 170:23, 171:20, 172:7
**LIS** [1] - 165:16
**list** [6] - 104:16, 116:11, 157:12, 157:20, 169:24, 170:15
**listed** [2] - 33:19, 96:24
**listing** [6] - 164:20, 165:11, 168:9, 170:7, 170:10, 202:23
**lists** [1] - 161:23
**literal** [1] - 212:15
**literally** [10] - 50:25, 52:12, 54:20, 60:20, 63:20, 64:2, 83:6,

113:15, 214:8, 215:4
**litigated** [6] - 9:23, 10:18, 40:1, 40:4, 40:5, 64:17
**litigation** [19] - 13:11, 13:15, 17:9, 18:8, 31:10, 35:4, 38:17, 42:21, 47:7, 51:25, 68:14, 86:9, 95:5, 98:2, 99:22, 104:15, 107:20, 140:23
**litigation-only** [1] - 68:14
**litigation-preserved** [1] - 107:20
**litigations** [1] - 101:20
**live** [2] - 50:23, 63:19
**Liversidge** [2] - 1:20, 3:15
**living** [2] - 37:21, 64:2
**LLC** [2] - 95:2, 95:3
**load** [2] - 4:13, 108:4
**loaded** [1] - 139:11
**local** [22] - 56:24, 57:7, 61:15, 62:15, 66:4, 69:5, 69:8, 69:12, 69:14, 69:18, 70:2, 71:22, 75:11, 75:19, 75:25, 76:24, 91:4, 91:6, 91:12, 91:14, 91:16, 122:12
**locally** [1] - 71:4
**locate** [2] - 140:10, 195:2
**located** [2] - 114:22, 199:6
**locating** [1] - 205:14
**location** [9] - 133:14, 154:2, 154:25, 155:9, 156:24, 159:8, 164:9, 169:15, 172:19
**locked** [4] - 109:20, 146:4, 146:8, 146:16
**lodge** [1] - 212:17
**lofty** [1] - 16:11
**log** [9] - 63:20, 73:1, 136:24, 143:11, 143:13, 143:17, 144:4, 151:16, 186:11
**logic** [4] - 71:18, 167:23, 200:9, 209:12
**logs** [4] - 105:20, 105:21, 106:5, 107:11
**long-standing** [1] - 43:7
**look** [57] - 20:8, 25:14,

26:22, 30:1, 31:15, 37:7, 37:25, 68:11, 124:23, 125:23, 126:5, 126:17, 128:14, 129:11, 129:24, 130:13, 131:20, 132:10, 134:3, 134:24, 134:25, 136:15, 136:19, 142:3, 143:2, 143:12, 147:22, 148:10, 148:20, 149:2, 152:25, 155:7, 155:17, 156:16, 158:9, 158:20, 158:22, 158:23, 159:12, 162:5, 163:9, 165:17, 165:19, 166:3, 166:13, 173:2, 174:25, 179:20, 183:6, 187:3, 192:2, 192:23, 197:1, 209:3, 209:6, 210:10, 210:24
**looked** [16] - 73:21, 104:3, 116:17, 123:11, 143:11, 143:21, 152:5, 153:12, 175:5, 179:8, 192:5, 195:4, 200:4, 200:9, 201:21, 207:25
**looking** [12] - 30:5, 32:5, 67:13, 144:9, 148:10, 149:5, 158:19, 163:20, 171:4, 193:24, 200:23, 201:4
**looks** [4] - 141:2, 165:12, 192:19, 193:16
**lower** [3] - 22:3, 134:16, 159:13
**lunch** [1] - 94:6
**luncheon** [1] - 93:8

**M**

**MacAfee** [1] - 158:10
**MacEachern** [5] - 148:12, 149:3, 150:2, 150:7, 150:22
**machine** [15] - 21:8, 102:12, 106:3, 106:7, 106:10, 107:4, 107:5, 107:6, 107:8, 107:12, 128:10, 160:17,

160:19, 164:3
**MacKereth** [2] - 104:8, 107:3
**magically** [1] - 66:15
**Magistrate** [4] - 19:4, 29:8, 30:5, 51:4
**magnitudes** [1] - 6:7
**mail** [56] - 13:2, 24:16, 24:23, 25:11, 32:23, 37:7, 38:5, 70:4, 70:8, 71:11, 74:12, 126:4, 133:15, 147:1, 148:1, 148:11, 148:14, 149:17, 149:25, 150:2, 150:4, 150:6, 150:20, 151:8, 151:10, 152:17, 155:16, 156:23, 158:4, 158:5, 158:7, 158:10, 159:8, 160:13, 160:24, 163:12, 163:14, 163:16, 163:18, 164:10, 165:20, 165:22, 168:17, 168:18, 168:20, 169:8, 171:1, 171:12, 172:16, 193:3, 193:9, 193:10, 193:14, 194:14
**mail's** [1] - 137:20
**mailed** [3] - 66:5, 70:16, 159:3
**mailing** [2] - 165:25, 174:14
**mails** [6] - 70:7, 102:18, 104:17, 104:18, 128:20, 151:19
**main** [2] - 9:15, 97:17
**maintain** [1] - 112:9
**maintained** [5] - 34:12, 34:15, 109:16, 125:11, 130:16
**maintaining** [2] - 111:21, 130:4
**maintenance** [4] - 109:17, 119:25, 120:1, 126:3
**majority** [1] - 117:16
**manage** [1] - 154:4
**manager** [1] - 97:19
**mandatory** [1] - 62:21
**mangling** [1] - 144:23
**manifestation** [1] - 59:25
**Manjula** [3] - 163:18,

163:21, 164:5
**manner** [1] - 52:8
**manpower** [1] - 6:24
**manufacture** [1] - 72:19
**manufacturer** [1] - 68:10
**manufacturing** [1] - 38:14
**March** [4] - 20:22, 21:22, 142:11, 185:8
**Margaret** [2] - 1:24, 216:8
**mark** [1] - 135:14
**marked** [13] - 132:15, 154:6, 155:5, 156:20, 172:8, 181:22, 186:14, 188:5, 188:24, 189:15, 189:18, 196:2, 201:6
**markers** [2] - 89:21, 89:24
**marketplace** [5] - 51:20, 52:5, 53:12, 54:4, 68:16
**Markets** [1] - 100:3
**marking** [1] - 135:8
**Maroulis** [1] - 2:25
**mask** [2] - 4:21, 94:17
**masks** [1] - 5:11
**mass** [1] - 34:11
**MAT** [1] - 74:14
**match** [8] - 134:9, 134:14, 134:15, 154:16, 154:19, 199:3, 205:15, 208:11
**matched** [4] - 198:4, 208:3, 208:12, 209:1
**matches** [2] - 208:16, 215:3
**matching** [3] - 76:13, 76:16
**material** [20] - 27:8, 27:12, 31:18, 31:23, 35:17, 36:2, 110:2, 115:24, 115:25, 117:4, 126:10, 126:11, 126:12, 146:20, 146:24, 152:20, 161:15, 161:21, 172:22, 201:25
**materials** [31] - 18:2, 18:11, 35:1, 35:14, 102:8, 102:9, 102:11, 103:18, 103:19, 103:24, 105:2, 105:22,

109:18, 109:21,
111:22, 114:21,
114:22, 114:23,
115:17, 116:3,
116:9, 123:11,
125:17, 125:22,
126:2, 126:14,
126:25, 127:2,
130:20, 161:18,
184:15
**Matheson** [12] - 32:12,
32:17, 33:9, 38:7,
55:11, 73:10, 74:14,
74:19, 75:4, 110:16
**Matheson's** [4] -
73:12, 74:17, 74:22,
75:3
**matter** [21] - 4:12,
4:15, 4:18, 5:15,
13:16, 15:4, 18:8,
22:6, 26:3, 41:5,
82:10, 82:11,
101:24, 105:21,
106:9, 106:13,
106:17, 108:19,
108:20, 111:24,
216:7
**matters** [7] - 7:19,
16:6, 21:1, 95:5,
98:19, 99:24, 100:2
**maturity** [1] - 112:9
**McCracken** [2] - 1:21,
3:16
**mean** [17] - 10:20,
33:11, 42:23, 44:8,
47:10, 50:25, 114:5,
114:19, 117:18,
126:24, 128:12,
150:10, 163:25,
164:1, 167:13,
182:19, 204:9
**meaning** [4] - 14:11,
14:17, 109:25, 110:1
**meaningful** [1] - 49:3
**means** [16] - 52:10,
52:18, 74:20, 83:2,
83:3, 86:21, 87:21,
88:6, 92:8, 134:15,
145:5, 164:2,
171:20, 200:3,
204:14, 207:19
**meant** [9] - 14:17,
39:3, 39:14, 40:9,
40:13, 44:9, 57:9,
57:24, 173:6
**measures** [1] - 47:1
**mechanic** [1] - 68:9
**media** [1] - 125:16
**medium** [1] - 54:14
**meeting** [7] - 191:10,

191:13, 191:20,
191:21, 192:8,
194:6, 194:8
**members** [1] - 128:22
**memorize** [2] - 59:8,
59:14
**memory** [8] - 145:14,
150:25, 151:11,
171:2, 171:5,
193:24, 200:13,
211:2
**mention** [3] - 21:4,
86:11, 134:1
**mentioned** [10] - 29:3,
35:8, 62:3, 63:19,
77:5, 123:10, 128:5,
130:20, 179:15,
195:6
**mentioning** [1] - 3:22
**mentor** [1] - 97:2
**merely** [3] - 41:6, 52:4,
90:4
**MERGE** [1] - 134:10,
205:16
**mergers** [1] - 95:11
**Merrill** [1] - 96:20
**message** [3] - 194:14,
194:15, 201:8
**metadata** [13] -
146:12, 146:17,
152:16, 154:16,
156:6, 156:8, 172:7,
172:11, 172:17,
178:15, 178:19,
178:21, 184:13
**methodology** [2] -
76:13, 76:16
**metrics** [1] - 135:6
**microphone** [3] - 5:7,
5:8, 99:8
**Microsoft** [3] - 96:20,
96:23, 151:1
**mid** [1] - 95:16
**midafternoon** [1] -
6:17
**middle** [8] - 129:18,
145:3, 166:17,
185:18, 199:1,
199:10, 199:20
**midmorning** [1] - 6:17
**midrange** [1] - 97:18
**might** [16] - 7:8, 7:11,
12:7, 12:15, 12:21,
16:24, 23:13, 48:10,
99:9, 102:17, 114:6,
120:24, 123:24,
138:3, 153:22,
153:23
**migrated** [1] - 128:10
**Miller** [1] - 86:5

**millions** [4] - 50:22,
54:22, 57:21
**mind** [5] - 40:11, 78:4,
104:6, 144:17, 159:2
**minimal** [1] - 132:19
**minimis** [1] - 17:3
**minimum** [1] - 122:16
**minor** [1] - 31:20
**minutes** [2] - 6:16,
215:15
**misalignment** [2] -
73:21, 78:15
**misleading** [1] - 89:9
**misplaced** [1] - 48:1
**misrepresentation** [1]
- 72:21
**missed** [1] - 194:19
**missing** [2] - 142:25,
214:20
**misspoke** [1] - 173:6
**misstatement** [1] -
183:18
**misstates** [3] - 20:12,
159:18, 159:23
**mistake** [2] - 15:23,
121:16
**mistakenly** [1] - 37:14
**misunderstanding** [2]
- 121:7, 121:8
**mixing** [1] - 202:17
**model** [5] - 19:17,
42:15, 53:21, 53:24,
55:3
**modern** [1] - 47:23
**modification** [4] -
136:24, 143:13,
182:4, 186:11
**modifications** [5] -
10:6, 28:5, 37:20,
88:1, 97:23
**modified** [13] - 43:23,
67:16, 67:20, 68:20,
68:23, 81:22, 82:16,
87:9, 88:15, 132:3,
186:12, 194:18,
195:24
**modifies** [1] - 117:25
**modify** [12] - 47:2,
60:17, 60:18, 60:19,
67:19, 68:5, 79:21,
82:14, 82:15, 83:15,
88:13, 119:23
**modifying** [11] -
27:15, 60:21, 60:23,
68:24, 81:2, 81:21,
83:5, 87:10, 88:16,
92:13, 120:3
**moment** [9] - 23:3,
61:24, 142:18,
143:22, 156:5,

167:15, 195:9,
211:8, 214:15
**MONDAY** [2] - 2:1,
94:1
**money** [1] - 20:6
**monitor** [1] - 144:19
**monitored** [1] - 28:2
**monitoring** [4] - 47:6,
47:16, 48:9, 114:3
**monitors** [1] - 48:19
**monitorships** [2] -
113:8, 120:20
**month** [2] - 3:22,
145:3
**months** [5] - 35:24,
80:22, 90:17,
155:15, 159:5
**Morgan** [4] - 2:15,
2:20, 2:21
**morning** [15] - 2:4,
2:11, 3:5, 3:13, 6:12,
6:15, 8:20, 49:21,
50:20, 51:15, 56:4,
68:15, 191:10,
215:15, 216:1
**most** [10] - 16:6, 19:3,
31:6, 54:12, 95:6,
96:22, 100:21,
116:16, 127:18,
146:18
**motion** [6] - 13:12,
22:8, 22:10, 42:25,
64:12, 90:16
**motions** [1] - 21:1
**motivation** [1] - 20:4
**motivations** [1] -
20:17
**mouth** [1] - 52:15
**mouthful** [1] - 21:19
**mouths** [1] - 49:6
**move** [18] - 4:9, 53:19,
71:24, 127:6, 127:7,
135:13, 142:20,
155:10, 176:16,
180:1, 181:14,
185:23, 187:12,
189:2, 189:21,
190:9, 196:12,
206:18
**moved** [7] - 57:13,
62:4, 62:5, 64:11,
97:21, 113:16,
163:23
**moving** [2] - 5:12,
18:25
**MR** [136] - 2:11, 2:24,
3:5, 3:13, 4:14, 4:22,
5:14, 7:6, 7:23, 8:5,
8:7, 8:12, 8:20,
49:23, 50:4, 50:9,

93:3, 93:10, 94:8,
94:19, 94:23, 95:21,
95:25, 96:3, 96:6,
96:9, 99:3, 99:9,
99:11, 103:22,
103:23, 112:24,
113:24, 114:12,
114:13, 120:13,
121:4, 121:13,
122:1, 122:9, 123:1,
123:2, 123:19,
124:7, 124:11,
124:15, 124:18,
124:22, 131:1,
131:7, 132:20,
132:22, 132:24,
133:2, 133:10,
133:12, 135:11,
135:16, 136:5,
139:6, 139:14,
145:4, 157:9,
157:19, 157:24,
159:18, 159:23,
160:5, 160:22,
162:14, 162:21,
163:4, 163:8,
166:23, 167:6,
168:15, 168:22,
168:24, 175:12,
175:14, 176:10,
176:14, 176:16,
176:20, 176:23,
177:7, 177:10,
179:22, 179:23,
179:24, 179:25,
180:3, 180:6,
181:14, 181:16,
181:21, 183:16,
183:20, 183:23,
184:2, 184:8,
185:22, 185:25,
186:3, 187:11,
187:14, 187:18,
189:1, 189:4, 189:7,
189:21, 189:23,
190:2, 190:9,
190:11, 190:14,
196:11, 196:15,
196:18, 198:8,
198:12, 198:15,
198:16, 203:6,
203:7, 206:18,
206:20, 207:1,
212:17, 213:10,
213:25, 214:22,
215:17, 215:18,
215:23, 216:2
**multiple** [17] - 15:7,
46:5, 55:6, 58:2,
65:7, 65:22, 66:9,
67:4, 81:17, 90:10,

97:17, 106:11, 115:1, 153:21, 165:4, 209:21, 212:18
**murder** [1] - 3:22
**murkiness** [1] - 52:25
**must** [4] - 33:17, 56:8, 115:16, 126:4

## N

**Nabhi** [2] - 143:9, 143:25
**name** [16] - 2:9, 94:12, 100:5, 135:5, 143:8, 144:23, 154:22, 165:24, 173:24, 175:7, 176:3, 177:17, 179:13, 209:17, 211:9, 212:12
**named** [7] - 33:10, 84:2, 110:15, 133:8, 211:13, 211:14, 211:22
**names** [1] - 208:24
**naming** [1] - 214:10
**narrative** [1] - 64:9
**narrower** [1] - 106:19
**narrowly** [1] - 56:17
**native** [2] - 141:3, 187:22
**nature** [3] - 31:11, 102:1, 135:9
**navigate** [1] - 205:17
**near** [4] - 136:20, 166:17, 192:14, 194:13
**nearly** [3] - 54:10, 71:13, 105:6
**necessarily** [4] - 12:15, 49:6, 88:5, 205:5
**necessary** [3] - 7:15, 29:13, 30:2
**Nechole** [1] - 193:8
**need** [21] - 7:8, 20:13, 24:25, 30:6, 30:11, 37:20, 37:23, 38:2, 48:23, 78:23, 81:7, 86:21, 86:22, 88:7, 129:20, 144:3, 149:14, 150:19, 165:10, 179:24
**needed** [5] - 48:3, 80:11, 80:13, 80:24, 86:21
**needing** [1] - 78:21
**needless** [1] - 8:4
**needs** [1] - 46:16

**negotiation** [1] - 98:7
**Network** [7] - 34:10, 80:13, 80:23, 81:2, 81:6, 81:11, 110:25
**network** [2] - 97:18, 104:10
**Network's** [1] - 81:4
**NEVADA** [3] - 1:1, 2:1, 94:1
**Nevada** [3] - 1:7, 1:25, 55:18
**never** [29] - 3:23, 14:10, 38:25, 40:4, 40:5, 42:18, 51:6, 54:21, 64:13, 64:14, 64:21, 66:14, 66:15, 67:9, 69:2, 71:19, 77:5, 79:9, 79:22, 83:3, 88:11, 113:2, 113:5, 113:21, 114:4, 122:12, 212:22, 212:25, 214:7
**new** [10] - 21:25, 38:24, 55:7, 55:8, 55:13, 90:2, 155:10, 213:7, 215:7
**new-fangled** [1] - 38:24
**next** [39] - 5:7, 6:2, 6:21, 6:22, 23:24, 74:21, 80:14, 93:1, 93:3, 97:6, 100:11, 110:3, 128:15, 129:11, 132:10, 136:19, 141:5, 146:23, 146:25, 149:16, 153:1, 154:15, 158:1, 162:25, 168:16, 172:21, 173:2, 186:20, 188:23, 190:6, 191:12, 191:25, 195:15, 196:6, 200:6, 202:6, 206:13, 211:6, 211:12
**nice** [1] - 182:6
**night** [3] - 113:1, 113:15, 120:20
**Nike's** [1] - 97:23
**Ninth** [8] - 17:15, 37:1, 52:5, 69:11, 69:13, 76:1, 79:18, 91:11
**NOCBGN** [1] - 212:7
**noise** [2] - 5:9, 8:12
**non** [4] - 126:7, 126:8, 126:13, 126:15
**non-use** [4] - 126:7, 126:8, 126:13,

126:15
**nonconstraints** [1] - 213:7
**none** [7] - 36:12, 62:16, 64:16, 71:5, 73:4, 79:17, 79:19
**nonfunctional** [1] - 209:23
**noninfringing** [1] - 84:21
**nonparties** [1] - 29:25
**nonprotectible** [2] - 76:11, 76:21
**nonsense** [1] - 44:7
**noon** [3] - 6:12, 93:14
**normal** [5] - 74:21, 146:9, 146:13, 154:2, 172:19
**normalized** [4] - 134:9, 134:14, 134:15, 205:15
**normally** [2] - 6:18, 150:19
**North** [5] - 148:22, 148:24, 153:4, 155:19, 155:22
**Northwest** [1] - 101:9
**notably** [2] - 16:6, 37:11
**notation** [1] - 153:9
**note** [6] - 26:14, 87:18, 130:11, 151:25, 153:7, 182:4
**noted** [5] - 15:17, 63:5, 64:5, 91:3, 112:6
**notes** [5] - 153:5, 158:13, 159:25, 160:15
**nothing** [13] - 15:3, 15:16, 36:24, 39:20, 48:22, 48:23, 59:18, 65:15, 113:9, 113:12, 178:21, 212:9, 213:23
**notice** [22] - 25:21, 32:6, 73:1, 128:23, 128:25, 129:14, 155:23, 155:25, 166:9, 166:10, 166:14, 180:16, 186:15, 189:13, 196:24, 197:12, 205:20, 209:21, 213:1, 214:5, 214:13
**notices** [3] - 32:2, 166:6, 197:5
**notification** [1] - 35:10, 151:25, 152:5, 153:8, 153:11

**notify** [2] - 125:9, 126:4
**noting** [1] - 70:11
**notion** [3] - 41:7, 63:22, 64:25
**notions** [1] - 92:7
**notwithstanding** [1] - 42:9
**November** [8] - 9:3, 17:17, 24:16, 43:2, 103:16, 149:25, 155:15, 156:17
**nowhere** [2] - 14:9, 40:1
**Number** [4] - 70:1, 70:14, 76:25, 82:1
**number** [71] - 2:6, 3:16, 4:5, 5:24, 16:18, 17:11, 19:22, 27:1, 27:9, 29:5, 29:19, 34:22, 44:25, 48:21, 72:17, 97:19, 98:9, 98:19, 98:20, 100:4, 101:3, 102:3, 107:2, 111:9, 111:14, 111:15, 111:23, 112:5, 112:22, 113:5, 116:22, 116:23, 116:24, 119:12, 123:25, 124:19, 126:21, 130:8, 137:9, 139:21, 139:22, 140:9, 140:19, 141:8, 141:10, 142:4, 143:23, 146:23, 154:18, 173:8, 173:9, 173:17, 177:5, 179:2, 179:16, 179:22, 180:9, 182:14, 185:3, 185:20, 188:13, 192:5, 195:1, 195:11, 195:13, 195:17, 196:10, 203:9, 208:13
**numbered** [3] - 138:20, 139:1, 144:15
**numbers** [7] - 136:11, 141:7, 144:13, 154:17, 186:8, 191:7, 191:15

## O

**o'clock** [1] - 6:14
**oath** [1] - 60:12

**object** [2] - 99:25, 176:24
**objection** [38] - 112:24, 114:9, 114:11, 120:14, 124:5, 124:10, 124:15, 132:20, 133:10, 133:11, 135:16, 136:2, 136:3, 157:13, 157:21, 159:18, 159:23, 163:1, 163:4, 168:22, 176:13, 176:14, 176:21, 176:23, 177:2, 180:3, 181:16, 185:24, 185:25, 189:4, 189:23, 196:14, 196:15, 203:6, 206:20, 212:18, 214:18, 215:22
**objectives** [1] - 13:5
**objects** [2] - 80:17, 81:3
**obligation** [2] - 32:9, 62:21
**observance** [1] - 46:7
**observations** [1] - 36:7
**observe** [1] - 212:6
**obtain** [1] - 45:13
**obvious** [2] - 27:25, 32:1
**obviously** [14] - 3:21, 4:7, 5:1, 6:7, 6:24, 7:16, 16:22, 20:3, 33:13, 45:7, 98:16, 106:23, 145:8, 207:25
**occur** [2] - 44:13, 101:22
**occurred** [4] - 12:18, 12:19, 26:13, 33:10
**occurs** [2] - 16:12, 107:16
**ocean** [1] - 64:10
**OF** [3] - 1:1, 1:11, 92:7
**offense** [1] - 34:14
**offer** [2] - 113:20, 115:4
**offered** [4] - 23:7, 79:17, 212:19, 213:4
**offering** [1] - 83:8
**Officer** [1] - 3:9
**Official** [2] - 1:24, 216:9
**officials** [1] - 12:12
**often** [5] - 15:18, 106:11, 112:14,

136:24, 167:21
**Oklahoma** [18] -
184:18, 185:2,
185:14, 188:4,
191:3, 191:22,
192:11, 192:12,
193:6, 193:11,
194:10, 196:21,
197:3, 197:8,
199:12, 200:16,
201:9, 201:13
**old** [3] - 34:11, 54:9,
142:25
**OLSA** [5] - 61:20,
61:22, 69:9, 69:20,
91:18
**once** [4] - 67:9, 78:5,
119:16, 200:3
**one** [110] - 3:21, 7:6,
7:24, 11:13, 14:4,
19:2, 19:25, 23:18,
24:15, 28:13, 29:11,
29:23, 32:13, 33:5,
34:7, 35:3, 37:5,
37:12, 37:19, 38:8,
39:7, 41:8, 41:11,
44:14, 47:20, 50:1,
50:3, 53:13, 56:3,
57:1, 57:16, 58:7,
61:4, 67:2, 69:22,
70:7, 70:15, 72:7,
75:7, 76:6, 77:3,
77:8, 77:15, 77:20,
77:22, 78:6, 83:18,
85:14, 92:15, 97:3,
107:2, 110:5, 110:8,
110:20, 118:12,
118:25, 119:14,
124:19, 127:4,
127:6, 133:14,
133:18, 134:25,
136:16, 139:16,
140:25, 141:3,
141:7, 141:10,
141:11, 141:20,
141:21, 143:10,
143:16, 146:14,
147:14, 153:3,
159:12, 166:9,
166:12, 167:3,
167:14, 168:11,
169:13, 172:11,
173:21, 173:24,
179:7, 180:1, 182:6,
185:2, 187:11,
187:21, 189:1,
192:5, 192:21,
195:4, 195:6,
195:12, 195:15,
195:23, 196:19,

201:3, 202:19,
202:25, 203:21,
205:17, 206:10,
209:10
**ones** [5] - 50:10,
98:20, 109:13,
120:2, 149:23
**online** [2] - 44:4,
80:17
**opaque** [1] - 28:14
**open** [23] - 39:3, 40:3,
42:8, 42:20, 43:6,
43:16, 46:15, 60:7,
60:24, 68:10, 68:18,
68:19, 81:21, 82:4,
82:8, 82:13, 83:1,
87:8, 87:18, 88:13,
88:15, 89:6, 151:3
**opened** [15] - 143:12,
144:3, 144:7,
145:15, 150:22,
151:10, 171:1,
183:7, 184:1, 185:5,
193:20, 200:4,
200:9, 200:11, 201:2
**opening** [20] - 4:18,
5:19, 8:8, 8:16, 8:22,
9:5, 11:23, 12:10,
49:14, 49:25, 77:6,
118:13, 120:16,
122:10, 143:19,
143:20, 145:7,
145:12, 150:25,
193:23
**OPENING** [2] - 217:4,
217:5
**operate** [6] - 19:17,
78:21, 78:23, 79:21,
79:25, 80:2
**operated** [1] - 102:16
**operating** [5] - 96:17,
96:22, 97:22,
107:10, 107:11
**operation** [1] - 118:3
**operations** [1] - 71:17
**opine** [1] - 121:2
**opined** [1] - 60:6
**opinion** [52] - 42:19,
76:9, 79:17, 83:8,
90:24, 109:10,
109:11, 110:4,
111:1, 111:2,
111:15, 112:16,
112:22, 112:25,
113:2, 113:5,
113:15, 113:25,
114:15, 117:20,
118:5, 118:23,
119:19, 121:14,
121:17, 121:22,

122:9, 122:17,
123:6, 127:13,
129:25, 130:8,
130:15, 131:14,
131:18, 133:4,
143:15, 146:23,
147:6, 158:15,
158:18, 168:12,
202:6, 202:9, 205:7,
213:8, 214:1, 214:2,
214:9, 215:2
**opinions** [32] - 57:4,
76:17, 108:24,
109:2, 109:5, 113:5,
113:7, 113:13,
113:17, 113:20,
113:21, 114:7,
117:20, 120:19,
128:19, 129:24,
151:14, 212:25,
213:1, 213:4,
213:17, 213:18,
214:4, 214:5, 214:6,
214:14, 214:23,
214:24, 215:7,
215:10, 215:12
**opportunity** [7] - 48:7,
100:9, 101:1,
108:10, 108:13,
121:12, 123:3
**opposed** [3] - 18:16,
115:12, 183:25
**opposing** [3] - 95:23,
123:20, 124:3
**opposite** [7] - 36:11,
60:16, 68:21, 79:10,
85:13, 85:19, 86:10
**opted** [1] - 151:4
**option** [3] - 18:24,
24:4, 115:15
**Oracle** [293] - 2:7,
2:12, 2:25, 4:11, 6:1,
8:9, 10:15, 10:24,
15:10, 16:17, 17:3,
17:17, 18:17, 20:3,
23:16, 30:16, 31:17,
31:18, 31:21, 31:22,
32:2, 32:5, 34:12,
35:1, 35:2, 35:5,
35:6, 35:7, 35:21,
36:2, 38:20, 41:10,
41:18, 41:21, 46:6,
46:11, 48:24, 50:17,
50:21, 50:23, 50:25,
51:13, 52:8, 52:15,
52:22, 54:6, 55:17,
56:3, 56:8, 57:2,
58:11, 58:14, 59:17,
59:22, 60:15, 60:19,
61:7, 61:8, 61:12,

61:20, 62:18, 63:3,
63:16, 63:17, 63:22,
64:2, 64:8, 64:10,
64:11, 65:6, 66:1,
66:4, 66:7, 67:14,
67:15, 67:16, 67:18,
67:19, 68:21, 69:1,
69:3, 69:4, 70:17,
72:6, 72:19, 73:4,
73:6, 74:7, 75:2,
75:8, 75:13, 75:15,
75:21, 75:23, 75:24,
77:21, 77:24, 79:6,
79:7, 79:19, 80:4,
80:21, 81:5, 81:10,
82:6, 82:12, 82:13,
82:14, 82:17, 82:21,
82:24, 83:2, 84:1,
84:20, 85:1, 85:5,
85:12, 85:17, 86:5,
86:10, 86:11, 87:8,
87:13, 87:15, 87:21,
88:12, 88:14, 89:12,
89:13, 90:1, 90:8,
90:18, 91:8, 92:9,
94:8, 101:19,
102:21, 105:3,
105:6, 109:16,
109:17, 111:21,
111:22, 113:4,
114:23, 115:3,
115:5, 115:12,
115:14, 115:15,
115:22, 115:25,
116:3, 116:4,
116:12, 116:20,
117:4, 118:7,
119:24, 120:10,
120:17, 122:6,
122:10, 123:7,
123:8, 123:12,
123:13, 124:24,
126:14, 127:2,
127:4, 127:18,
130:4, 130:16,
130:21, 132:2,
132:5, 132:7,
132:11, 132:16,
132:17, 132:18,
133:5, 133:6, 133:9,
133:20, 134:2,
134:7, 134:8, 135:3,
136:9, 137:6,
146:19, 147:16,
148:20, 148:22,
149:1, 152:13,
152:19, 153:3,
153:6, 153:7, 154:6,
155:23, 155:25,
156:4, 156:14,
161:15, 161:19,

161:21, 165:9,
166:6, 166:20,
168:12, 169:25,
170:13, 171:8,
171:16, 172:22,
173:20, 175:6,
175:8, 175:9,
175:17, 176:1,
176:3, 176:8,
177:16, 177:22,
179:8, 180:15,
181:1, 181:5,
181:24, 181:25,
183:9, 183:11,
185:24, 186:10,
186:14, 186:18,
187:3, 187:6,
187:22, 187:25,
189:9, 189:13,
189:16, 189:19,
190:4, 190:19,
190:22, 194:19,
195:23, 196:24,
197:5, 197:11,
197:15, 197:17,
197:22, 198:1,
198:5, 198:24,
199:2, 199:5,
201:25, 202:10,
202:16, 203:16,
204:23, 204:24,
205:2, 205:8,
205:11, 205:21,
206:4, 206:6, 206:9,
208:21, 209:6,
210:2, 210:7,
210:18, 210:21,
212:5
**ORACLE** [1] - 1:4
**Oracle's** [71] - 7:9,
17:21, 19:18, 21:1,
21:3, 21:25, 31:4,
34:5, 36:14, 51:21,
58:10, 61:2, 63:13,
63:25, 64:7, 65:3,
66:2, 66:10, 66:13,
66:18, 67:3, 67:11,
67:12, 68:11, 68:14,
68:17, 68:19, 69:21,
76:12, 76:15, 76:19,
77:6, 77:24, 78:5,
79:17, 79:21, 79:23,
79:24, 80:8, 83:8,
83:17, 84:21, 84:23,
85:20, 85:21, 86:2,
86:3, 86:7, 87:5,
88:18, 88:22, 89:8,
90:9, 90:16, 90:21,
91:7, 91:15, 92:7,
92:21, 94:7, 102:21,
102:22, 111:12,

116:19, 117:12, 117:17, 117:18, 125:6, 173:21, 186:10, 208:7
**Oracle-produced** [1] - 135:3
**Oracle-Rimini** [1] - 41:10
**Oracle-shipped** [1] - 119:24
**orange** [1] - 207:15
**order** [43] - 4:11, 6:6, 13:12, 14:1, 18:9, 18:12, 20:14, 20:22, 21:6, 21:22, 22:12, 28:15, 29:13, 30:7, 30:11, 38:15, 44:23, 45:12, 46:3, 52:1, 53:6, 57:23, 58:24, 59:15, 67:20, 71:23, 81:22, 82:16, 88:16, 91:13, 108:11, 108:14, 108:18, 116:15, 124:13, 131:4, 157:12, 165:7, 195:5, 208:24, 211:15
**orders** [11] - 15:15, 15:17, 19:20, 22:17, 53:3, 53:18, 57:13, 62:2, 62:4, 62:12, 92:1
**Oregon** [8] - 34:4, 74:9, 77:17, 80:12, 95:2, 98:23, 110:13, 110:23
**OREX** [6] - 20:20, 21:20, 24:15, 24:16, 154:15, 184:5
**OREX_0094** [1] - 154:18
**organization** [5] - 76:23, 212:20, 213:6, 214:10, 215:3
**organizational** [2] - 211:25, 212:15
**original** [8] - 35:4, 36:21, 39:18, 81:7, 90:2, 132:5, 138:22
**originally** [1] - 115:8
**OSC** [8] - 58:20, 64:11, 90:17, 92:23, 111:24, 114:22, 157:12
**ostensible** [1] - 14:8
**otherwise** [5] - 26:22, 48:24, 92:21, 126:1, 204:7
**ourselves** [1] - 4:16
**outcome** [2] - 53:15,

63:10
**outermost** [1] - 52:21
**outline** [2] - 103:19, 129:23
**outlined** [1] - 38:17
**outlining** [1] - 109:2
**output** [2] - 168:8, 168:9
**outright** [2] - 64:25, 65:25
**outset** [1] - 63:19
**outside** [8] - 6:25, 68:15, 74:20, 130:11, 135:21, 153:24, 159:8, 209:1
**outstanding** [1] - 196:13
**over-the-shoulder** [2] - 86:25, 87:1
**overall** [4] - 109:11, 118:15, 118:20, 167:10
**overdone** [1] - 15:24
**overhauled** [1] - 91:25
**overlap** [1] - 103:17
**overlapping** [1] - 73:22
**overly** [2] - 53:10, 53:11
**overreach** [1] - 18:23
**overrule** [1] - 136:2
**overruled** [2] - 133:11, 177:1
**Overview** [1] - 23:12
**Owen** [2] - 76:5, 145:23
**own** [41] - 43:7, 43:24, 52:13, 52:19, 57:14, 58:4, 58:7, 58:11, 59:12, 59:20, 60:9, 63:2, 65:4, 66:8, 67:7, 71:7, 77:4, 78:23, 79:6, 80:19, 81:16, 83:24, 85:21, 85:22, 86:8, 86:13, 90:2, 92:10, 92:11, 102:14, 107:21, 111:19, 119:21, 131:23
**owned** [1] - 54:11

## P

**P-02** [1] - 145:2
**p.m** [2] - 113:1, 113:15
**P.M** [1] - 94:1
**Pacific** [3] - 97:25, 101:8, 101:9
**package** [1] - 150:3
**page** [96] - 20:21,

22:4, 31:16, 125:13, 126:6, 126:21, 126:22, 129:19, 131:13, 136:19, 137:8, 137:11, 137:12, 137:14, 141:25, 142:1, 142:3, 143:2, 143:7, 144:6, 144:10, 144:11, 144:12, 144:16, 148:10, 149:2, 149:17, 153:10, 153:11, 154:17, 155:24, 155:25, 158:9, 158:19, 158:20, 159:12, 159:13, 163:17, 163:20, 164:4, 164:11, 165:12, 165:17, 166:12, 166:17, 166:21, 167:15, 169:19, 170:9, 170:10, 170:11, 173:11, 173:12, 174:18, 174:21, 174:22, 179:10, 180:17, 182:6, 182:7, 182:8, 182:11, 182:12, 185:17, 185:18, 186:6, 188:6, 188:7, 188:10, 188:11, 191:7, 191:8, 191:15, 191:18, 192:3, 192:15, 192:17, 192:18, 194:13, 195:8, 195:10, 195:15, 199:10, 199:20, 200:19, 201:15, 207:2, 209:3, 210:10, 210:25, 211:6
**PAGE** [2] - 217:2, 217:7
**pages** [9] - 9:13, 50:16, 137:14, 144:15, 167:8, 167:9, 171:25, 182:3, 182:7
**paid** [2] - 54:24, 73:7
**paid-for** [1] - 73:7
**pain** [1] - 5:5
**pamphlet** [1] - 31:21
**pandemic** [1] - 7:1
**paper** [3] - 9:8, 47:23, 123:24
**papers** [4] - 45:8, 100:15, 101:7, 101:8

**parade** [1] - 26:6
**paragraph** [47] - 9:18, 10:3, 10:7, 10:10, 10:15, 15:11, 34:13, 41:20, 57:3, 65:12, 69:4, 69:5, 69:6, 69:7, 81:19, 82:24, 85:1, 87:16, 87:20, 87:21, 87:25, 88:4, 88:6, 88:7, 89:4, 90:19, 90:20, 90:24, 91:4, 91:9, 91:16, 109:14, 111:9, 111:14, 120:23, 121:18, 122:10, 122:11, 130:2, 130:6, 130:9, 130:12, 131:17, 131:19, 131:20, 158:16, 202:7
**paragraphs** [4] - 9:25, 23:18, 109:12, 110:9
**parent** [1] - 171:21
**part** [28] - 12:11, 15:23, 23:15, 23:24, 25:18, 27:24, 36:24, 64:23, 79:14, 90:13, 110:22, 115:22, 136:24, 137:10, 139:2, 139:16, 139:23, 147:12, 148:17, 154:10, 194:16, 203:9, 203:24, 211:9, 211:18, 211:24, 212:1, 212:12
**partially** [1] - 73:22
**particular** [39] - 3:24, 8:23, 15:6, 20:15, 25:6, 25:10, 29:5, 29:7, 31:13, 37:18, 47:6, 58:1, 69:3, 72:25, 78:24, 89:10, 89:11, 102:6, 103:13, 119:9, 137:10, 138:4, 142:7, 142:9, 143:23, 149:10, 153:6, 155:9, 156:7, 167:10, 167:23, 182:15, 185:21, 200:4, 209:8, 209:17, 212:9
**particularly** [2] - 152:4, 208:15
**parties** [9] - 4:8, 104:2, 104:22, 115:10, 115:21, 121:6, 122:23, 124:9, 125:7

**parties'** [2] - 7:25, 124:20
**parts** [3] - 148:6, 148:8, 214:17
**party** [16] - 16:7, 29:23, 35:13, 47:5, 47:16, 60:12, 62:18, 63:3, 72:11, 83:11, 83:23, 84:1, 84:14, 106:14, 126:10, 137:24
**pass** [2] - 95:22, 134:20
**passed** [1] - 55:8
**paste** [1] - 168:5
**pasted** [1] - 193:4
**patent** [2] - 95:12, 100:7
**path** [2] - 154:22, 156:11
**pattern** [7] - 13:6, 15:12, 15:13, 15:22, 31:12, 31:13, 41:17
**Paul** [2] - 2:19, 2:20
**pause** [1] - 81:8
**pay** [5] - 16:14, 20:16, 97:11, 203:15, 206:12
**paymasters** [2] - 204:3, 204:14
**payroll** [7] - 148:22, 148:23, 149:22, 153:4, 155:19, 155:20, 155:22
**PC** [1] - 201:19
**PCSTARRY** [2] - 166:18, 167:17
**pdf** [6] - 77:20, 78:6, 78:8, 141:1, 141:2
**peer** [1] - 101:7
**pending** [5] - 18:10, 18:22, 22:11, 53:15, 63:10
**people** [10] - 3:23, 23:12, 25:12, 36:3, 37:12, 62:20, 62:21, 62:24, 62:25, 153:21
**People** [1] - 192:22
**PeopleSoft** [98] - 9:20, 10:1, 10:5, 10:8, 13:23, 14:3, 25:8, 25:10, 25:13, 25:19, 25:25, 33:23, 34:25, 56:24, 56:25, 57:9, 62:15, 69:16, 70:2, 71:14, 75:11, 77:21, 79:21, 80:2, 80:3, 90:11, 109:22, 110:12, 110:14, 110:17, 116:5,

116:13, 117:24,
118:1, 118:19,
128:21, 128:22,
128:25, 129:3,
130:22, 130:23,
132:7, 146:25,
147:3, 147:7, 147:9,
147:11, 147:12,
148:22, 148:23,
148:24, 150:11,
150:13, 150:22,
151:15, 152:5,
153:4, 153:9,
155:19, 155:22,
156:1, 156:13,
157:4, 160:16,
161:12, 161:13,
164:14, 165:3,
165:6, 165:8,
166:11, 170:8,
171:8, 174:1, 174:3,
177:21, 180:22,
180:23, 181:11,
182:23, 183:14,
185:14, 186:10,
187:7, 188:15,
188:16, 189:9,
190:16, 194:2,
194:11, 195:23,
196:20, 198:6,
203:16, 204:11,
207:4
**PeopleTools** [2] -
116:5, 116:13
**percentage** [1] - 198:4
**perfect** [1] - 7:24
**perfectly** [1] - 15:21
**perform** [2] - 76:19,
119:1
**performance** [2] -
96:25, 97:15
**performed** [4] - 81:13,
99:23, 102:1, 105:15
**performing** [2] -
54:19, 119:25
**performs** [1] - 203:24
**perhaps** [4] - 6:4,
6:21, 39:18, 49:4
**period** [15] - 16:21,
32:24, 50:15, 68:2,
71:14, 83:10, 86:18,
87:23, 88:7, 97:25,
102:6, 103:9,
103:13, 103:15,
107:19
**periods** [1] - 89:25
**permanent** [2] - 56:15,
151:13
**permeates** [1] - 41:1
**permissible** [3] -

61:13, 65:21, 77:7
**permission** [9] -
95:21, 96:6, 124:1,
127:8, 131:3, 139:6,
157:10, 168:16,
198:8
**permit** [1] - 169:6
**permitted** [9] - 10:12,
15:5, 29:16, 29:23,
29:24, 30:18, 60:12,
68:18, 75:4
**person** [4] - 5:6, 5:7,
39:8, 109:8
**personal** [1] - 126:12
**personally** [2] - 95:14,
108:19
**persuade** [1] - 29:8
**pertaining** [1] - 122:21
**pervasive** [1] - 119:13
**phase** [1] - 128:9
**Phillips** [2] - 1:15,
2:20
**phony** [1] - 40:6
**phrase** [1] - 204:8
**pick** [1] - 124:19
**picked** [2] - 192:20,
193:18
**piece** [2] - 44:10,
153:19
**pieces** [2] - 140:7,
211:5
**pioneers** [1] - 97:3
**pivoted** [1] - 90:18
**place** [14] - 5:7, 8:10,
23:21, 23:23, 26:8,
34:4, 39:1, 52:13,
72:25, 89:13,
151:22, 164:7,
199:23, 200:7
**placed** [14] - 48:1,
123:22, 131:22,
142:8, 142:14,
155:5, 155:12,
155:13, 156:14,
156:17, 156:24,
159:4, 166:1, 169:14
**placement** [1] -
156:19
**places** [1] - 167:25
**placing** [1] - 160:20
**plain** [1] - 26:11
**plaintiff** [1] - 2:12
**PLAINTIFF** [1] - 1:14
**Plaintiff** [1] - 94:10
**Plaintiff's** [11] -
176:19, 177:9,
180:5, 181:20,
186:2, 187:17,
189:6, 190:1,
190:13, 196:17,

206:24
**PLAINTIFF'S** [2] -
217:7, 217:11
**plaintiffs** [2] - 1:5,
2:10
**Plaintiffs'** [3] - 136:4,
157:23, 163:7
**PLAINTIFFS'** [1] -
217:4
**plan** [2] - 25:18, 65:13
**planned** [2] - 73:25,
191:10
**planning** [1] - 5:22
**plans** [2] - 65:5, 65:19
**plastic** [5] - 5:3, 5:6,
5:8, 8:9, 8:10
**plate** [1] - 28:19
**platforms** [1] - 97:17
**play** [2] - 50:6, 86:17
**played** [1] - 66:20
**plb** [1] - 123:8
**pleadings** [3] - 27:6,
36:9, 104:2
**plsql** [1] - 123:9
**plus** [1] - 171:25
**PO** [1] - 116:18
**POCKER** [10] - 2:11,
2:24, 4:14, 4:22,
5:14, 7:6, 8:7, 8:12,
8:20, 93:3
**Pocker** [8] - 1:14,
2:13, 3:2, 4:12, 4:20,
5:13, 49:13, 93:1
**podium** [2] - 4:25, 5:1
**point** [14] - 4:17, 8:8,
32:14, 39:9, 52:10,
83:13, 115:6,
115:23, 117:1,
120:9, 143:5,
159:25, 170:13,
212:12
**pointed** [2] - 43:25,
174:17
**pointing** [1] - 158:2
**policies** [6] - 26:19,
35:12, 42:3, 48:14,
72:1, 84:20
**Policy** [6] - 16:3,
62:10, 123:16,
125:1, 151:24,
201:24
**policy** [8] - 16:11,
42:4, 123:18, 125:3,
125:4, 125:5,
125:23, 127:18
**poorer** [1] - 28:9
**popped** [1] - 167:4
**portal** [2] - 70:5, 72:5
**portion** [8] - 24:6,
82:7, 87:20, 104:24,

211:21, 211:25,
212:3, 212:14
**portions** [12] - 35:2,
82:4, 82:19, 83:1,
88:13, 89:6, 104:23,
111:11, 120:5,
164:15, 206:4
**Portland** [1] - 95:2
**position** [22] - 30:25,
52:23, 58:20, 61:2,
66:25, 67:11, 67:12,
68:1, 68:3, 68:14,
78:5, 83:11, 83:17,
85:13, 86:7, 87:2,
87:5, 87:14, 88:22,
117:11, 117:15,
215:19
**possession** [2] -
111:18, 145:6
**possible** [2] - 5:23,
51:11
**possibly** [1] - 39:13
**post** [9] - 29:18,
103:9, 109:9,
114:16, 114:19,
127:12, 128:2,
130:1, 202:7
**post-injunction** [9] -
29:18, 103:9, 109:9,
114:16, 114:19,
127:12, 128:2,
130:1, 202:7
**posture** [1] - 22:16
**Potemkin** [1] - 16:12
**potential** [1] - 29:9
**potentially** [1] -
151:12
**practice** [8] - 13:7,
13:20, 41:9, 95:17,
118:6, 118:15,
118:24, 119:23
**practiced** [1] - 111:3
**practices** [19] - 17:23,
22:24, 24:13, 25:8,
25:14, 27:16, 27:25,
28:14, 30:12, 86:1,
101:17, 102:5,
105:17, 112:19,
117:24, 118:10,
127:13, 128:3
**pre** [1] - 168:3
**pre-compiler** [1] -
168:3
**preadmission** [1] -
180:1
**preadmitted** [23] -
124:24, 128:16,
129:12, 132:11,
134:4, 134:25,
141:5, 147:22,

153:1, 155:3,
155:18, 156:4,
173:4, 178:24,
179:21, 181:4,
184:22, 186:21,
187:11, 189:2,
189:22, 197:18,
202:21
**prefer** [1] - 7:2
**prejudice** [2] - 113:14,
113:18
**prejudicial** [1] -
113:19
**preliminary** [2] - 4:18,
5:15
**preparation** [1] -
18:18
**prepare** [6] - 95:19,
108:6, 108:8, 109:1,
198:3, 205:16
**prepared** [10] - 8:14,
34:10, 37:15, 50:5,
94:6, 135:21, 139:8,
177:15, 206:15,
207:24
**preparing** [1] - 10:8
**presence** [5] - 131:9,
131:16, 131:21,
145:17, 147:3
**present** [14] - 2:13,
3:17, 15:25, 50:12,
73:16, 112:23,
119:3, 123:10,
136:21, 172:3,
207:11, 207:12,
207:16, 207:17
**presentation** [8] -
5:20, 6:4, 7:8, 23:1,
24:15, 35:12, 49:25,
198:13
**presentations** [3] -
8:15, 100:9, 100:15
**presented** [8] - 6:9,
10:25, 28:11, 82:8,
92:20, 100:14,
101:7, 109:19
**presenting** [1] - 8:8
**preservation** [1] -
101:17
**preserve** [1] - 18:2
**preserved** [1] - 107:20
**president** [1] - 60:11
**President** [2] - 3:9,
84:12
**press** [2] - 20:12,
20:24
**presume** [1] - 191:13
**presumption** [1] -
194:6
**pretext** [1] - 37:10

**pretty** [6] - 25:7, 32:20, 38:21, 39:1, 119:11
**prevent** [1] - 109:20
**previous** [1] - 210:25
**previously** [10] - 4:10, 14:10, 77:15, 101:11, 101:13, 107:21, 112:6, 128:11, 137:18, 138:10
**prewritten** [1] - 164:15
**primarily** [3] - 11:19, 101:4, 103:9
**principally** [3] - 97:2, 99:14, 116:4
**print** [3] - 172:11, 199:24, 200:22
**printed** [2] - 73:19, 141:8
**printing** [2] - 110:18, 151:6
**printout** [1] - 184:25
**proactive** [2] - 55:2
**proactively** [1] - 53:25
**probative** [1] - 208:4
**probe** [1] - 30:12
**problem** [24] - 17:1, 19:16, 25:4, 55:6, 55:17, 55:23, 59:12, 66:12, 66:13, 77:10, 77:15, 80:12, 81:1, 119:1, 135:22, 138:2, 138:6, 169:16, 170:15, 171:4, 171:5, 192:11, 193:21, 193:22
**problematic** [1] - 19:22
**problems** [5] - 22:14, 25:3, 54:17, 55:1, 165:11
**procedure** [2] - 124:6, 202:3
**procedures** [3] - 86:1, 99:18, 152:10
**proceed** [3] - 94:6, 124:16, 157:22
**proceeding** [31] - 7:11, 8:21, 12:4, 15:6, 19:2, 22:6, 49:1, 51:5, 56:2, 63:18, 66:11, 71:5, 90:14, 91:24, 102:25, 103:2, 103:14, 103:20, 105:15, 105:23, 105:24, 107:23, 108:6, 108:17,

108:23, 109:6, 114:7, 118:10, 119:4, 121:10, 201:22
**Proceedings** [1] - 216:3
**proceedings** [10] - 8:25, 9:8, 14:12, 14:18, 20:13, 29:18, 47:25, 103:3, 118:9, 216:6
**proceeds** [1] - 22:21
**Process** [5] - 54:1, 62:5, 64:12, 92:2, 127:20
**process** [29] - 16:19, 17:15, 18:1, 18:3, 18:14, 20:1, 20:6, 21:17, 21:25, 23:6, 29:4, 34:11, 37:17, 47:10, 51:5, 52:4, 52:22, 74:22, 81:15, 106:22, 110:4, 116:3, 119:13, 129:21, 132:8, 136:12, 168:11, 193:23
**processes** [20] - 12:2, 20:10, 25:1, 51:10, 53:2, 53:17, 84:5, 84:16, 84:25, 86:14, 86:22, 91:25, 99:18, 100:17, 103:10, 104:5, 104:21, 106:23, 127:24, 199:14
**processing** [3] - 107:25, 206:11, 211:10
**proclaim** [1] - 15:20
**produce** [1] - 19:5
**produced** [21] - 50:17, 50:22, 64:6, 102:11, 102:14, 102:21, 103:8, 104:12, 104:15, 104:19, 105:4, 105:21, 133:8, 135:3, 138:20, 138:23, 140:18, 140:23, 204:23, 204:24, 205:2
**producing** [1] - 19:6
**product** [24] - 58:7, 58:12, 59:2, 59:6, 59:10, 59:16, 62:16, 65:1, 65:4, 65:17, 65:20, 66:8, 67:4, 67:7, 74:7, 79:6, 81:1, 81:16, 88:25,

90:7, 137:25, 153:19, 208:1, 209:1
**production** [15] - 29:21, 29:24, 70:13, 101:6, 104:20, 108:3, 111:24, 112:3, 116:7, 135:5, 141:9, 154:12, 154:19, 202:15, 203:11
**productions** [2] - 104:22, 106:14
**products** [1] - 72:13
**professional** [1] - 28:15
**professionalism** [1] - 4:1
**Professor** [3] - 76:5, 117:10, 145:23
**profitable** [1] - 20:2
**program** [49] - 79:23, 79:24, 109:23, 137:1, 140:7, 164:2, 164:14, 164:17, 164:20, 164:24, 165:7, 166:11, 166:13, 166:18, 167:11, 168:1, 168:3, 171:17, 173:15, 173:20, 180:8, 181:9, 199:24, 200:8, 200:9, 200:11, 200:14, 200:23, 202:23, 202:24, 203:13, 203:14, 203:18, 203:19, 203:23, 203:24, 204:1, 204:10, 204:11, 207:4, 207:12, 207:13, 208:10, 209:13, 210:24, 211:9, 212:2
**programmer** [1] - 97:16
**programmers** [2] - 136:25, 167:21
**Programming** [1] - 96:15
**programming** [7] - 97:13, 98:16, 164:14, 200:5, 209:11, 210:17, 210:19
**programs** [6] - 23:25, 173:22, 198:23, 206:17, 211:10, 211:15
**progress** [3] - 191:14, 191:20, 192:8

**progressed** [1] - 53:1
**prohibit** [5] - 58:3, 59:20, 67:1, 87:17, 120:24
**prohibited** [15] - 10:1, 10:7, 10:14, 13:7, 14:4, 31:8, 31:9, 34:14, 45:6, 58:16, 58:17, 65:16, 66:21, 75:5, 75:24
**prohibiting** [1] - 125:20
**prohibition** [13] - 31:17, 62:15, 69:5, 69:8, 69:12, 71:22, 91:6, 91:12, 91:14, 91:16, 111:5, 111:20, 122:12
**prohibitions** [2] - 34:3, 69:14
**prohibits** [8] - 59:18, 60:23, 67:13, 81:20, 82:25, 92:9, 92:10, 92:12
**projects** [1] - 100:20
**promptly** [4] - 6:11, 127:11, 215:16, 215:25
**pronounce** [3] - 143:8, 204:4, 204:5
**pronouncements** [1] - 13:10
**proper** [3] - 85:6, 85:17, 135:18
**properly** [4] - 60:18, 67:21, 68:8, 115:11
**property** [8] - 16:7, 46:7, 46:8, 84:22, 86:3, 125:7, 140:21
**proprietary** [2] - 153:10, 156:1
**protected** [13] - 46:4, 75:2, 75:23, 80:4, 80:21, 168:13, 177:22, 182:24, 187:25, 190:19, 202:10, 213:16, 213:22
**protectible** [3] - 74:6, 76:10, 76:20
**protection** [1] - 109:22
**protective** [2] - 18:9, 18:12
**prototype** [1] - 119:15
**prove** [6] - 30:7, 51:14, 56:3, 75:16, 83:25, 92:21
**proved** [1] - 31:3
**provide** [15] - 8:16,

16:19, 68:22, 82:22, 88:19, 95:4, 95:9, 105:16, 126:6, 126:19, 146:6, 194:17, 211:13, 215:1
**provided** [46] - 15:7, 26:23, 27:10, 65:12, 74:19, 82:8, 82:9, 84:4, 105:23, 106:10, 107:1, 107:7, 110:13, 110:15, 114:21, 126:9, 130:24, 134:2, 138:6, 138:11, 138:14, 138:18, 139:4, 139:12, 140:1, 140:5, 141:13, 141:15, 146:10, 157:4, 159:11, 165:9, 169:5, 170:6, 170:7, 172:25, 175:7, 182:1, 182:2, 185:2, 211:15, 212:25, 213:2, 214:6, 214:14
**provider** [7] - 68:5, 83:16, 84:2, 84:3, 84:9, 84:15, 154:19
**providers** [7] - 60:12, 61:1, 82:14, 83:12, 83:14, 88:21, 96:21
**provides** [10] - 9:18, 10:11, 60:19, 67:15, 67:18, 82:14, 87:8, 126:18, 130:7, 170:3
**providing** [6] - 40:22, 114:1, 158:25, 159:16, 171:21, 206:10
**proving** [1] - 31:2
**provision** [6] - 9:24, 10:11, 25:10, 57:23, 91:5, 111:3, 125:24, 171:20
**provisions** [6] - 9:15, 10:17, 25:9, 61:10, 87:19, 127:14
**proximity** [2] - 133:20, 133:24
**prutsidx.plb** [1] - 115:4
**prvtsidx.plb** [6] - 90:9, 111:18, 120:11, 120:21, 121:5, 123:4
**ps** [1] - 169:7
**psptarry** [2] - 204:11, 205:2
**psptarry.cbl** [4] -

75:21, 109:23,
202:11, 205:7
**psptaxdt** [2] - 142:24,
143:16
**psptaxdt.dms** [15] -
131:2, 131:15,
132:1, 133:13,
135:3, 137:19,
141:23, 142:6,
142:9, 142:17,
144:7, 145:7,
145:12, 146:12,
161:12
**psptaxdt.dsm** [1] -
130:20
**PSPTCACL.lis** [1] -
171:11
**PSPTCALC** [1] -
166:11
**PSPTCALC.Cobol** [1]
- 170:7
**PSPTCALC.lis** [5] -
162:1, 164:7, 169:9,
169:20, 169:23
**public** [5] - 13:3,
21:10, 21:14, 22:1,
38:18
**publication** [1] - 16:4
**publications** [1] -
100:9
**publicly** [1] - 54:11
**PUM** [2] - 150:9,
150:10
**purchasers** [1] - 43:24
**pure** [1] - 165:4
**purple** [3] - 135:9,
207:6, 207:8
**purpose** [5] - 15:12,
33:12, 33:13,
125:10, 175:3,
209:20
**purposes** [14] - 5:1,
5:22, 71:8, 71:9,
76:12, 95:18, 102:7,
103:14, 114:11,
140:23, 164:16,
180:18, 186:24,
204:19
**pursuant** [1] - 206:22
**put** [21] - 5:9, 6:2,
17:13, 18:22, 19:14,
26:7, 44:9, 50:7,
67:3, 71:7, 72:24,
85:14, 113:13,
136:25, 140:20,
140:21, 160:15,
165:7, 167:21,
169:16, 173:23
**putting** [3] - 52:17,
65:23, 84:9

## Q

**QA** [2] - 74:22, 163:22
**qualification** [1] -
187:16
**qualifications** [3] -
136:1, 187:13,
190:10
**qualified** [2] - 101:11,
101:13
**Quality** [1] - 101:9
**quantities** [1] - 99:20
**quantity** [2] - 105:22,
106:2
**quarantine** [3] - 178:5,
178:7, 178:8
**quarantined** [12] -
36:8, 36:11, 42:2,
109:20, 152:14,
161:1, 161:3,
171:13, 178:20,
178:22, 184:12,
201:14
**quarantining** [1] -
172:18
**quarter** [2] - 103:4,
103:6
**quarterly** [2] - 80:12,
110:23
**questioning** [1] - 12:6
**questions** [6] - 7:4,
50:10, 50:13, 84:18,
100:24, 213:19
**quite** [13] - 9:18, 12:4,
12:5, 16:14, 17:10,
22:16, 27:23,
102:11, 112:1,
119:12, 144:15,
161:18, 166:8
**quote** [8] - 61:6, 65:6,
65:8, 79:20, 126:18,
149:4, 199:22, 210:4
**quoted** [2] - 20:21,
22:11

## R

**R.R** [2] - 70:8, 70:12
**raise** [2] - 5:15, 7:4
**raised** [3] - 42:21,
51:3, 90:14
**raises** [2] - 81:24,
81:25
**raising** [1] - 20:6
**Ram** [1] - 148:11
**Ramachandran** [6] -
193:1, 194:14,
194:15, 199:21,
200:20, 201:2
**Ramamoorthy** [1] -

149:18
**RAMAMOORTHY** [1] -
149:19
**ran** [2] - 161:18, 187:5
**random** [1] - 166:16
**range** [1] - 54:12
**Ransom** [2] - 84:11,
86:13
**rare** [2] - 22:18, 23:2
**rate** [1] - 108:21
**rather** [6] - 41:1, 61:8,
65:13, 112:18,
148:18, 163:14
**Ravin** [1] - 21:12
**raw** [1] - 141:12
**Ray** [3] - 24:20, 70:12,
142:23
**rcm2069** [1] - 143:18
**reach** [2] - 120:10,
137:7
**reached** [1] - 109:6
**reaches** [2] - 59:19,
87:12
**reaching** [2] - 24:21,
144:23
**reactive** [1] - 55:2
**read** [7] - 44:22,
82:20, 105:21,
139:12, 154:22,
158:7, 188:18
**readable** [2] - 67:14,
164:3
**reading** [1] - 164:6
**readopted** [1] - 42:14
**reads** [2] - 143:17,
203:24
**ready** [1] - 74:15
**real** [6] - 13:20, 39:17,
43:3, 98:21, 119:22,
183:17
**realistic** [1] - 71:18
**realistically** [1] - 28:20
**reality** [2] - 21:7, 21:21
**realize** [3] - 8:21, 30:4,
35:20
**realized** [2] - 37:8,
90:18
**realizes** [1] - 55:17
**really** [21] - 12:23,
16:12, 16:15, 19:18,
21:6, 21:9, 25:4,
39:8, 39:13, 40:25,
42:16, 42:19, 44:12,
44:20, 45:13, 52:7,
68:1, 116:23, 138:9,
142:1, 205:24
**rearguing** [2] - 73:14,
73:15
**reason** [14] - 13:5,
16:22, 16:23, 36:13,

38:12, 40:4, 41:6,
42:10, 45:14, 47:7,
58:18, 115:16,
137:1, 137:2
**reasonable** [6] -
11:10, 11:16, 15:2,
56:5, 63:11, 71:21
**reassuming** [1] -
49:21
**reassure** [1] - 22:2
**rebuttal** [5] - 7:12,
7:13, 157:16, 214:4
**receipt** [4] - 150:13,
150:23, 151:15,
201:24
**receipts** [1] - 35:17
**receive** [8] - 35:6,
35:13, 61:8, 82:4,
108:3, 120:22,
125:9, 185:14
**received** [38] - 35:25,
37:13, 41:21, 62:25,
96:12, 96:14, 96:16,
96:19, 97:4, 104:16,
113:15, 120:18,
120:19, 136:4,
147:1, 151:16,
151:20, 152:8,
156:23, 157:23,
158:24, 163:7,
170:25, 171:1,
176:19, 177:9,
180:5, 181:20,
186:2, 187:17,
189:6, 190:1,
190:13, 193:19,
196:17, 200:3,
202:2, 206:24
**receiving** [2] - 35:18,
159:6
**recently** [2] - 7:1, 57:2
**recess** [3] - 49:19,
93:14, 162:17
**recipient** [2] - 151:8,
151:10
**recipients** [1] - 193:3
**recognition** [2] - 66:3,
100:5
**recognize** [11] -
128:16, 129:13,
132:12, 155:18,
162:7, 169:1, 173:3,
173:5, 177:11,
188:23, 203:3
**recognizing** [1] - 17:8
**recollection** [3] -
127:25, 131:25,
142:18
**reconsideration** [2] -
22:9, 22:10

**reconstructed** [1] -
141:9
**reconvene** [3] - 49:16,
49:17, 93:8
**reconvened** [1] - 94:6
**record** [28] - 2:9,
13:16, 26:3, 30:2,
30:20, 33:14, 65:15,
94:5, 94:13, 99:2,
112:14, 135:1,
138:4, 141:19,
141:21, 142:6,
142:23, 167:5,
173:16, 174:8,
175:13, 183:16,
184:24, 188:18,
190:3, 192:9, 201:6,
216:6
**recorded** [1] - 138:8
**recording** [2] - 66:20,
173:22
**recordkeeping** [6] -
27:25, 28:4, 28:10,
112:6, 112:17
**records** [8] - 105:12,
112:7, 137:23,
138:10, 138:14,
138:23, 140:24,
141:2
**recycle** [1] - 106:6
**red** [2] - 77:12, 89:21
**reducing** [2] - 77:20,
78:2
**reductions** [1] - 78:25
**refer** [4] - 148:18,
199:16, 203:25,
205:6
**reference** [13] - 20:22,
21:23, 23:16, 24:14,
44:3, 89:22, 91:10,
136:12, 138:21,
139:1, 156:3,
183:21, 207:2
**referenced** [7] - 27:20,
29:12, 36:16,
121:20, 156:4,
186:5, 192:22
**references** [2] - 25:22,
140:10
**referencing** [2] -
23:16, 163:24
**referred** [1] - 211:19
**referring** [6] - 143:3,
150:11, 155:4,
183:25, 200:23,
211:19
**reflect** [5] - 136:20,
143:20, 178:9,
207:6, 207:10
**reflected** [3] - 13:25,

28:8, 181:3
**reflects** [6] - 27:9, 43:20, 45:4, 136:21, 143:18, 207:11
**refresh** [2] - 131:25, 142:18
**refreshed** [1] - 105:18
**refused** [2] - 16:18, 17:24
**refuses** [1] - 45:12
**regard** [7] - 45:10, 56:25, 120:9, 124:21, 131:18, 139:8, 147:6
**regarding** [19] - 4:4, 12:25, 56:24, 84:5, 110:18, 111:21, 117:4, 117:20, 118:23, 119:19, 122:11, 123:6, 130:9, 146:1, 151:14, 162:19, 198:4, 212:19
**regards** [1] - 28:12
**regional** [1] - 97:19
**regularly** [1] - 111:7
**regulations** [1] - 55:8
**reissued** [1] - 87:4
**rejected** [5] - 58:19, 64:21, 64:25, 65:3, 65:24
**related** [20] - 7:2, 18:3, 23:22, 95:5, 96:25, 97:14, 98:13, 98:14, 99:19, 102:4, 102:15, 104:24, 106:21, 110:23, 134:22, 147:17, 148:23, 149:13, 149:21, 161:24
**relates** [6] - 78:13, 80:11, 120:17, 120:22, 122:17, 125:25
**relating** [4] - 120:19, 122:13, 129:15, 214:9
**relative** [1] - 4:2
**release** [7] - 20:24, 153:5, 153:7, 158:13, 159:25, 160:15
**released** [4] - 145:1, 145:2, 145:11, 148:24
**releases** [1] - 20:12
**relevant** [3] - 71:14, 116:17, 208:4
**reliable** [2] - 76:14, 76:18

**relitigate** [1] - 51:3
**rely** [1] - 105:14
**relying** [2] - 66:21, 128:18
**remaining** [3] - 66:2, 137:14, 163:1
**remains** [1] - 7:20
**remarkable** [1] - 30:17
**remedies** [1] - 113:8
**remedy** [3] - 11:12, 32:16, 48:10
**remember** [8] - 14:14, 17:9, 24:21, 27:20, 57:8, 60:22, 140:19, 143:21
**remembers** [1] - 71:2
**remind** [2] - 26:15, 130:6
**reminded** [1] - 26:24
**reminder** [2] - 26:25, 72:6
**reminders** [2] - 27:11, 72:15
**remit** [1] - 103:8
**remote** [3] - 53:21, 72:14, 160:18
**remotely** [7] - 44:6, 53:22, 54:18, 62:7, 73:2, 76:9, 113:9
**remove** [2] - 5:11, 94:17
**removed** [2] - 5:6, 57:13
**removing** [1] - 8:9
**renders** [1] - 112:19
**Reno** [2] - 1:7, 1:25
**RENO** [2] - 2:1, 94:1
**repeat** [1] - 177:5
**rephrase** [1] - 108:12
**replicate** [1] - 59:9
**replies** [1] - 165:18
**report** [11] - 28:7, 35:15, 60:6, 62:21, 90:15, 104:4, 120:18, 127:11, 172:12, 213:12, 214:11
**reported** [3] - 145:17, 161:10, 192:11
**Reported** [1] - 1:24
**REPORTER** [2] - 4:20, 4:23
**Reporter** [2] - 1:24, 216:9
**reporter** [2] - 5:2, 149:19
**reporting** [3] - 62:21, 110:24, 130:17
**reports** [19] - 50:16, 90:10, 104:3,

105:14, 108:6, 108:8, 113:3, 113:7, 113:9, 121:19, 121:20, 145:23, 161:8, 168:19, 168:21, 212:18, 214:25, 215:8
**represent** [2] - 155:8, 155:11
**representations** [1] - 27:6
**representative** [5] - 2:25, 60:10, 84:23, 86:8, 194:2
**representing** [1] - 136:11
**reproducing** [1] - 10:15
**request** [2] - 164:1, 164:5
**requested** [6] - 48:4, 114:1, 151:22, 165:18, 169:11, 194:7
**requesting** [1] - 194:9
**requests** [2] - 29:20, 29:21, 163:19
**require** [9] - 7:17, 37:6, 37:15, 44:2, 44:10, 120:1, 120:2, 142:13, 142:14
**required** [5] - 10:24, 55:20, 214:23, 215:1, 215:11
**requirement** [3] - 47:18, 210:17, 210:19
**requires** [11] - 6:19, 44:11, 76:4, 88:5, 113:4, 115:14, 130:3, 149:11, 214:1, 214:3, 214:13
**requiring** [1] - 211:11
**reserving** [1] - 6:1
**resided** [1] - 74:3
**resist** [1] - 17:6
**resistance** [8] - 15:13, 28:1, 28:2, 29:3, 40:17, 40:19, 40:20, 40:21
**resistant** [1] - 17:14
**resisted** [7] - 17:11, 18:20, 19:6, 19:7, 26:4
**resisting** [1] - 16:23
**resolved** [2] - 47:13, 88:23
**respect** [66] - 7:7, 9:16, 10:3, 11:2, 11:15, 13:4, 13:13,

13:15, 16:6, 18:15, 20:4, 22:19, 24:7, 27:7, 27:22, 28:4, 29:9, 32:12, 32:19, 33:10, 34:25, 37:9, 38:16, 38:18, 40:11, 41:16, 46:22, 48:9, 49:2, 49:11, 61:16, 63:7, 96:4, 98:13, 99:17, 99:22, 105:19, 106:14, 106:20, 109:12, 112:9, 112:12, 117:1, 117:9, 117:19, 118:10, 120:21, 122:3, 124:8, 125:6, 131:14, 145:9, 151:24, 160:23, 161:9, 162:24, 194:5, 198:22, 199:1, 201:24, 206:11, 208:4, 208:11, 209:20, 213:3
**respectful** [3] - 54:5, 84:21, 86:1
**respective** [2] - 6:9, 208:23
**respond** [3] - 17:24, 18:5, 121:13
**responded** [1] - 151:20
**responding** [1] - 143:9
**response** [10] - 27:16, 53:18, 57:12, 62:4, 92:1, 121:24, 151:14, 163:15, 199:21, 215:8
**responses** [1] - 104:7
**rest** [2] - 5:20, 137:8
**restored** [1] - 201:18
**restricted** [1] - 61:9
**restriction** [11] - 46:2, 57:9, 61:21, 69:10, 69:13, 69:19, 69:21, 91:12, 91:13, 91:19
**restrictions** [1] - 20:9
**restrictive** [1] - 62:14
**result** [5] - 18:17, 46:6, 71:10, 104:19, 167:18
**result'** [1] - 21:2
**resultant** [1] - 118:19
**retained** [2] - 101:19, 112:8
**retention** [2] - 101:23, 102:25
**retired** [1] - 97:21

**retrieved** [3] - 74:17, 156:8, 177:18
**retroactively** [3] - 79:3, 81:13, 81:14
**return** [1] - 129:23
**returning** [11] - 146:22, 152:22, 161:20, 177:25, 183:1, 184:14, 188:3, 190:23, 199:8, 202:5
**reusable** [2] - 167:22, 173:24
**reuse** [13] - 52:23, 52:24, 58:16, 65:1, 66:8, 66:14, 67:1, 67:7, 78:1, 78:10, 81:16, 90:6, 92:2
**reusing** [3] - 59:25, 92:10, 92:11
**reveal** [1] - 112:18
**revealed** [2] - 13:2, 116:13
**reveals** [4] - 27:14, 27:15, 44:19, 46:18
**reverse** [2] - 82:21, 100:17
**Review** [1] - 25:23
**review** [23] - 49:5, 102:9, 103:8, 105:4, 105:23, 107:12, 114:22, 116:15, 127:12, 137:6, 147:19, 152:12, 152:16, 170:22, 171:2, 172:7, 172:17, 174:22, 178:15, 179:17, 185:13, 195:18, 204:19
**reviewed** [9] - 101:8, 103:20, 103:24, 105:2, 105:13, 144:7, 145:15, 145:23, 201:5
**reviewing** [1] - 102:3
**revised** [1] - 9:2
**revisit** [1] - 30:8
**revisiting** [1] - 29:7
**rewriting** [1] - 87:16
**RFPs** [1] - 63:25
**Richard** [2] - 1:14, 2:13
**richness** [1] - 112:1
**ridiculous** [2] - 29:2, 44:23
**right-hand** [11] - 135:4, 137:13, 143:24, 177:18, 182:1, 182:12,

28

182:18, 207:5,
207:12, 207:17,
212:6
**rights** [4] - 46:8,
83:16, 86:3
**RIMINI** [1] - 1:7
**Rimini** [480] - 2:8, 3:6,
3:8, 6:2, 8:15, 9:20,
10:1, 10:4, 10:7,
10:11, 10:14, 10:22,
10:24, 11:1, 11:13,
12:2, 12:11, 12:16,
12:17, 13:6, 13:14,
13:17, 13:23, 14:2,
14:6, 14:20, 15:2,
15:17, 16:5, 16:10,
16:13, 16:18, 17:5,
17:8, 17:11, 17:18,
17:22, 17:23, 17:24,
18:9, 18:11, 18:12,
18:16, 18:19, 18:20,
18:22, 19:1, 19:5,
19:11, 19:12, 19:16,
20:17, 20:24, 20:25,
21:7, 21:8, 21:12,
21:24, 22:13, 22:15,
22:23, 23:3, 23:12,
23:16, 24:12, 25:12,
26:3, 26:14, 26:17,
26:23, 27:1, 27:6,
28:11, 28:24, 29:7,
29:13, 29:14, 29:17,
29:18, 30:2, 30:3,
30:14, 30:21, 31:4,
31:13, 31:16, 32:9,
32:19, 32:24, 33:6,
33:17, 33:22, 33:25,
34:2, 34:5, 34:7,
34:12, 34:17, 35:6,
35:15, 36:3, 36:9,
36:21, 37:8, 37:25,
38:13, 38:21, 41:10,
42:3, 42:18, 46:10,
47:2, 47:7, 47:19,
47:22, 48:12, 49:15,
51:12, 51:19, 52:3,
52:4, 52:6, 52:8,
52:13, 52:18, 52:23,
53:1, 53:4, 53:5,
53:10, 53:13, 53:15,
53:17, 53:21, 53:22,
53:25, 54:3, 54:8,
54:9, 54:16, 54:25,
55:5, 55:6, 55:14,
55:15, 55:16, 55:19,
55:23, 56:4, 57:9,
57:13, 57:18, 57:19,
57:24, 58:3, 58:12,
58:24, 59:1, 59:3,
59:8, 59:11, 59:13,
59:18, 59:20, 60:5,

60:16, 61:6, 61:7,
61:16, 62:1, 62:4,
62:9, 62:17, 62:20,
62:23, 63:1, 63:4,
63:6, 63:8, 63:10,
63:16, 63:17, 63:23,
64:5, 64:7, 64:23,
65:6, 65:7, 65:13,
65:16, 65:20, 65:24,
66:1, 66:7, 66:12,
66:14, 67:13, 67:24,
68:4, 70:4, 70:11,
70:16, 70:22, 70:25,
71:6, 71:10, 71:12,
71:13, 71:15, 71:19,
71:21, 71:24, 72:1,
72:3, 72:4, 72:16,
72:20, 72:22, 73:1,
73:17, 73:18, 73:24,
73:25, 74:2, 74:8,
74:13, 74:19, 74:21,
74:22, 74:24, 75:23,
75:24, 78:3, 78:5,
78:16, 79:2, 79:6,
79:7, 79:12, 79:13,
80:10, 80:15, 80:19,
80:24, 81:7, 81:25,
82:6, 82:25, 84:13,
86:18, 86:19, 86:23,
87:13, 87:21, 87:25,
88:2, 88:19, 88:20,
88:25, 89:5, 89:8,
89:11, 89:14, 89:17,
89:19, 89:21, 89:25,
90:2, 90:4, 91:20,
91:25, 92:9, 92:10,
92:12, 92:22,
101:20, 101:24,
102:2, 102:3, 102:4,
102:7, 102:10,
102:14, 102:17,
102:25, 103:18,
104:3, 104:13,
104:17, 104:18,
104:25, 105:5,
105:7, 105:9,
105:10, 105:14,
105:15, 105:23,
106:3, 106:9,
106:17, 106:18,
106:21, 106:22,
107:1, 107:7, 107:9,
107:12, 108:20,
109:15, 109:23,
109:25, 110:1,
110:2, 110:4,
111:21, 112:7,
113:25, 114:24,
115:3, 117:14,
117:22, 118:8,
118:9, 118:13,

118:24, 119:8,
119:12, 120:7,
121:11, 122:21,
125:20, 127:1,
127:5, 127:8,
127:14, 127:17,
127:20, 127:23,
128:3, 128:4, 128:6,
128:9, 128:10,
129:5, 129:6,
130:16, 130:18,
132:3, 133:15,
134:7, 135:5,
136:10, 136:24,
137:10, 137:23,
138:5, 138:7,
138:16, 140:18,
141:13, 141:15,
142:5, 142:7,
142:10, 142:24,
143:25, 144:7,
144:5, 145:16,
145:20, 146:2,
146:3, 146:10,
148:2, 148:12,
149:20, 150:2,
150:4, 150:7,
150:22, 154:7,
154:14, 154:23,
156:25, 158:2,
158:6, 158:15,
158:23, 159:3,
159:6, 159:14,
160:19, 160:24,
161:6, 161:10,
163:13, 163:15,
165:13, 169:20,
170:3, 170:18,
171:7, 171:9,
171:12, 171:13,
173:1, 174:14,
176:2, 176:8,
176:13, 176:21,
178:4, 178:9,
178:12, 178:16,
178:19, 179:14,
180:12, 180:23,
182:2, 182:4,
183:13, 183:15,
184:12, 184:18,
185:13, 186:11,
186:12, 186:13,
186:25, 187:5,
191:22, 192:10,
193:1, 193:11,
194:1, 194:9,
195:24, 195:25,
196:9, 198:24,
199:7, 199:21,
201:8, 201:14,
201:23, 202:11,

202:12, 203:9,
203:25, 204:14,
205:7, 205:10,
205:20, 205:25,
206:3, 206:4, 206:5,
207:5, 208:8,
210:18, 210:21,
213:15, 213:19,
213:21
**Rimini's** [210] - 9:17,
11:6, 11:8, 12:19,
12:24, 13:20, 15:14,
15:23, 16:2, 16:23,
22:8, 23:6, 27:2,
27:16, 27:22, 27:24,
28:1, 28:13, 30:10,
32:3, 35:1, 35:3,
36:24, 40:17, 43:6,
43:20, 44:20, 45:5,
46:22, 50:18, 50:23,
51:1, 51:20, 53:24,
56:8, 57:10, 57:16,
57:19, 57:20, 58:7,
58:11, 59:16, 59:17,
60:9, 61:9, 61:11,
61:25, 63:11, 63:20,
63:21, 64:3, 65:4,
65:20, 66:5, 70:5,
70:6, 70:18, 70:22,
71:9, 71:11, 71:17,
71:19, 74:3, 74:7,
74:10, 77:3, 77:8,
77:19, 78:1, 80:1,
80:19, 89:12, 89:22,
91:2, 91:9, 91:10,
91:21, 102:13,
102:15, 102:19,
103:10, 104:9,
104:21, 105:20,
106:22, 107:13,
107:18, 107:21,
109:9, 109:13,
109:25, 110:11,
110:22, 111:2,
111:16, 111:18,
112:6, 114:16,
114:19, 114:23,
115:25, 116:9,
117:3, 117:5,
117:10, 117:13,
117:17, 118:10,
119:21, 123:14,
123:15, 125:1,
127:12, 128:2,
130:1, 130:5,
130:21, 130:22,
131:9, 131:16,
131:22, 132:4,
132:14, 133:14,
133:17, 134:2,
134:8, 137:19,

137:21, 138:10,
138:14, 141:22,
142:2, 142:12,
142:17, 145:12,
145:17, 146:20,
146:24, 147:3,
147:7, 147:10,
147:20, 148:4,
149:3, 150:13,
150:14, 150:17,
150:24, 151:14,
152:20, 154:10,
157:3, 157:12,
161:15, 161:19,
161:22, 163:18,
166:1, 169:3,
170:24, 172:22,
173:13, 174:4,
174:7, 174:9,
174:12, 174:15,
175:1, 175:18,
175:25, 176:1,
177:18, 177:22,
179:9, 180:10,
182:24, 183:10,
184:16, 185:10,
186:17, 187:6,
187:23, 187:25,
189:11, 190:19,
191:4, 194:21,
194:23, 196:20,
197:2, 197:9,
197:22, 197:25,
199:3, 200:12,
202:6, 202:9,
202:15, 203:4,
203:8, 203:10,
204:20, 208:20,
212:4, 213:15,
213:21
**Rimini-created** [4] -
65:20, 80:19, 81:25,
120:7
**riministreet.com** [1] -
158:11
**road** [1] - 7:22
**roadmap** [1] - 51:17
**Rockefeller** [7] - 34:9,
80:12, 80:23, 81:1,
81:6, 81:10, 110:24
**Rockefeller's** [1] -
81:3
**rogs** [1] - 63:25
**role** [1] - 9:10
**rote** [1] - 76:16
**roughly** [4] - 6:12,
102:8, 103:15,
208:13
**routine** [1] - 18:8
**routinely** [1] - 48:1

routines [1] - 167:21
RR [4] - 141:20, 144:23, 145:7, 145:20
rscmpay [1] - 207:5
rscmpay.cbl [1] - 202:11
RSCTCALC [2] - 169:4, 170:11
RSCTCALC.Cobol [4] - 169:13, 170:3, 170:5, 170:23
rsi [1] - 143:18
RSI [6] - 170:11, 170:12, 182:13, 202:23, 203:24, 203:25
rsi-rcm2069 [1] - 143:18
rsi007486983 [1] - 179:18
rsi007487681 [2] - 173:17, 174:23
rsi007539876 [1] - 185:20
rsi007539877 [1] - 188:13
rsi007543542 [2] - 195:1, 196:10
rsi007543543 [1] - 195:14
rsi007543544 [1] - 195:17
rsi007543545 [1] - 195:11
rsi007567905 [1] - 142:4
rsi007786983 [1] - 179:16
rsi007954231 [1] - 156:7
rsi1099i [1] - 79:13
rsi940 [2] - 74:2, 75:2
rsi940a [2] - 74:6, 78:12
rsi940a.sqr [1] - 110:15
rsiqtrtx [1] - 80:6
rsiqtrtx.sqr [1] - 110:24
rspcmpay [2] - 202:18, 204:1
rspcmpay.cbl [5] - 75:20, 202:12, 202:13, 204:21, 205:6
Rule [8] - 15:22, 113:4, 120:25, 121:1, 212:24, 213:25, 214:22,

215:11
rule [3] - 60:15, 214:3, 214:13
ruled [6] - 21:7, 57:8, 57:23, 59:13, 79:10
rules [3] - 20:25, 126:18, 126:20
ruling [5] - 15:1, 24:3, 128:6, 215:15, 216:1
rulings [7] - 13:24, 36:21, 37:4, 38:16, 51:23, 78:10, 104:1
run [4] - 39:22, 117:25, 118:3, 164:24
running [2] - 199:24, 200:8
runs [1] - 79:24

**S**

S-YTD [2] - 211:3, 211:22
sabotage [1] - 99:15
sake [2] - 196:11, 198:3
SalesForce [60] - 104:11, 105:12, 133:16, 137:20, 137:21, 137:24, 138:3, 138:4, 138:8, 138:10, 138:14, 138:16, 138:19, 138:22, 139:2, 139:17, 139:24, 140:1, 140:4, 140:9, 140:18, 140:22, 140:24, 141:2, 141:3, 141:9, 141:11, 141:19, 142:7, 142:8, 142:10, 142:13, 142:15, 172:13, 173:8, 173:9, 173:13, 173:16, 174:8, 174:11, 178:1, 178:17, 178:24, 180:12, 180:24, 183:1, 183:8, 184:25, 185:1, 186:6, 186:25, 188:3, 190:24, 191:9, 191:12, 192:9, 194:15, 196:20, 199:9, 201:5
salmon [1] - 207:14
salmon-colored [1] - 207:14
sample [3] - 104:22,

139:5, 139:16
Samplin [2] - 1:20, 3:15
Samuel [2] - 1:20, 3:15
sanction [2] - 46:2, 46:16
sanctionable [2] - 34:24, 42:17
sanctioned [1] - 38:13
sanctions [6] - 11:11, 45:17, 45:19, 48:6, 113:8, 114:3
Sarah [4] - 194:17, 199:11, 199:21, 200:20
SAS [1] - 96:20
sat [1] - 33:3
save [1] - 151:4
saved [3] - 151:5, 151:12
saving [1] - 151:6, 159:7
saw [13] - 38:25, 59:20, 77:15, 78:13, 78:14, 91:2, 107:2, 114:24, 115:2, 118:12, 127:17, 151:21, 161:10
scale [2] - 34:11, 71:17
scattered [2] - 49:4, 171:17
Schedule [1] - 78:19
schedule [3] - 6:18, 7:3, 74:21
scheduled [2] - 7:19, 145:2
Schiller [1] - 2:13
school [1] - 96:13
schools [1] - 54:14
Science [1] - 96:14
Sciences [19] - 184:19, 185:2, 185:15, 188:4, 191:3, 191:22, 192:11, 192:12, 193:5, 193:6, 193:11, 194:10, 196:21, 197:3, 197:9, 199:13, 200:17, 201:9, 201:13
scofflaw [1] - 54:7
scope [1] - 106:13
scrambling [2] - 86:20
scratch [1] - 80:16
screen [4] - 50:11, 51:18, 212:20
script [4] - 116:7,

133:23, 143:10, 143:16
scrutiny [3] - 28:1, 29:3, 30:16
seals [1] - 109:25
Seals [4] - 34:16, 45:2, 79:14, 109:25
search [8] - 100:17, 133:19, 133:22, 133:23, 133:24, 153:14, 153:15, 202:16
searches [2] - 116:7, 161:18
searching [1] - 116:4
seat [4] - 2:4, 49:20, 94:4, 162:18
seated [2] - 2:18, 3:1
seating [1] - 2:17
second [35] - 24:6, 28:18, 46:8, 57:22, 62:9, 66:7, 71:6, 76:13, 89:8, 96:7, 98:24, 117:19, 129:25, 142:20, 143:2, 143:7, 144:12, 149:2, 153:11, 155:24, 158:9, 159:12, 162:9, 162:12, 163:17, 164:4, 170:9, 174:20, 179:10, 179:15, 183:4, 183:12, 184:11, 199:10
secondly [2] - 11:5, 109:12
secret [4] - 30:15, 95:12, 99:16, 99:24
section [2] - 131:12, 211:18
Section [4] - 125:14, 125:23, 126:5, 126:17
sections [1] - 210:24
secured [1] - 162:9
security [6] - 98:13, 98:14, 100:16, 125:9, 151:17, 161:11
security-related [1] - 98:13
security@
riministreet.com [6] - 35:11, 35:15, 126:4, 127:11, 145:18, 161:9
see [101] - 4:16, 8:4, 16:8, 29:15, 29:19, 32:20, 32:23, 33:9,

34:8, 35:13, 38:5, 40:5, 41:15, 50:11, 55:16, 56:23, 61:16, 63:8, 63:21, 70:9, 71:4, 72:5, 72:23, 73:20, 73:22, 77:12, 84:2, 87:16, 89:18, 89:21, 89:24, 91:3, 91:5, 107:20, 112:3, 120:5, 127:9, 127:16, 128:6, 136:15, 136:23, 137:12, 138:3, 142:20, 143:7, 143:10, 143:16, 146:8, 146:14, 148:11, 149:3, 151:19, 151:23, 154:20, 154:21, 154:22, 158:10, 158:21, 158:25, 159:13, 161:2, 161:8, 163:18, 164:4, 164:16, 166:12, 166:17, 166:19, 167:15, 167:17, 170:10, 171:16, 172:9, 173:14, 173:16, 178:8, 178:11, 182:3, 182:7, 183:6, 184:4, 191:11, 191:12, 191:20, 192:4, 194:18, 194:25, 195:10, 199:10, 199:15, 199:25, 200:1, 200:20, 201:15, 209:25, 210:5, 211:1, 211:7, 212:7
seek [3] - 52:3, 71:7, 179:24
seeking [6] - 16:22, 18:17, 18:18, 20:8, 54:1, 92:1
seem [1] - 191:15
sees [2] - 39:13, 168:4
seizure [1] - 100:18
selecting [1] - 141:10
self [1] - 121:1
self-enforcing [1] - 121:1
send [15] - 26:17, 26:24, 27:3, 27:8, 28:20, 35:7, 41:22, 71:19, 72:20, 91:20, 151:20, 152:4, 171:8, 183:14, 194:10
sending [1] - 63:3

**sends** [3] - 24:22, 163:14, 165:20
**Senior** [1] - 84:12
**senior** [2] - 36:4, 60:10
**SENIOR** [1] - 1:2
**sense** [10] - 7:24, 8:23, 9:4, 37:19, 37:22, 46:6, 49:8, 58:23, 109:20, 114:6
**sense'** [1] - 21:2
**sensitive** [3] - 126:9, 126:11
**sent** [23] - 17:1, 25:11, 26:17, 26:25, 27:3, 27:12, 35:10, 35:21, 47:22, 47:24, 57:19, 70:4, 70:11, 70:18, 70:21, 70:24, 71:12, 79:13, 152:6, 158:6, 158:14, 158:24, 193:11
**sentence** [4] - 23:24, 24:6, 24:24, 143:15
**separate** [8] - 31:12, 39:9, 53:23, 54:18, 62:8, 80:17, 81:3, 81:4
**separated** [3] - 76:10, 138:25, 139:13
**SEPTEMBER** [2] - 2:1, 94:1
**September** [2] - 1:6, 125:2
**sequence** [7] - 76:23, 123:23, 192:6, 212:20, 213:5, 214:9, 215:3
**sequestered** [1] - 172:6
**series** [9] - 84:18, 89:25, 112:25, 123:22, 138:18, 138:24, 147:11, 147:16, 148:1
**seriously** [4] - 3:25, 26:11, 32:10, 48:11
**serve** [2] - 29:24, 112:18
**served** [2] - 97:13, 97:23
**server** [2] - 72:25, 164:8
**service** [1] - 25:25
**Service** [1] - 61:20
**Services** [18] - 173:1, 173:9, 173:13, 178:6, 178:10, 178:13, 178:16, 178:25, 179:3,

179:8, 179:14, 180:12, 183:4, 183:10, 183:14, 183:21, 184:4, 184:10
**services** [7] - 22:1, 23:7, 54:10, 95:4, 97:20, 129:3, 129:5
**set** [14] - 2:5, 13:9, 22:8, 22:12, 39:1, 50:9, 65:25, 69:24, 91:22, 96:10, 97:6, 124:4, 154:9, 200:5
**Seth** [1] - 21:12
**sets** [2] - 125:8, 129:18
**setting** [4] - 98:1, 143:4, 209:10, 209:15
**settings** [1] - 78:2
**seven** [6] - 24:21, 33:19, 53:18, 62:3, 85:24, 86:7
**seventh** [1] - 141:25
**several** [8] - 19:20, 56:24, 77:2, 130:10, 138:17, 140:25, 147:15, 159:14
**shall** [2] - 9:20, 91:8
**shalt** [2] - 24:9, 41:20
**share** [27] - 125:15, 153:17, 153:18, 153:23, 154:7, 154:9, 154:10, 154:13, 154:21, 154:23, 154:25, 155:6, 155:21, 156:10, 156:12, 156:15, 156:17, 156:20, 156:24, 159:4, 159:9, 160:24, 164:8
**shared** [3] - 95:22, 104:10, 153:21
**SharePoint** [1] - 104:11
**shares** [3] - 154:8, 154:10, 156:11
**sharing** [1] - 125:20
**Sharon** [2] - 1:16, 2:20
**Shelley** [2] - 150:16, 152:3
**ship** [2] - 119:10, 119:17
**shipped** [1] - 119:24
**Shopping** [8] - 34:10, 80:13, 80:23, 81:2, 81:4, 81:6, 81:11, 110:25
**short** [2] - 144:9,

182:6
**shorter** [2] - 174:2, 205:21
**shot** [1] - 212:21
**shoulder** [3] - 44:4, 86:25, 87:1
**show** [50] - 11:1, 12:2, 14:20, 15:22, 32:22, 37:5, 40:25, 44:20, 45:19, 51:12, 56:8, 66:1, 70:2, 70:15, 70:22, 72:2, 72:8, 72:15, 74:13, 74:16, 80:22, 82:2, 90:25, 94:5, 103:22, 108:11, 108:14, 123:19, 128:14, 131:4, 142:2, 144:16, 146:17, 155:4, 156:13, 158:3, 158:5, 172:18, 173:12, 178:4, 178:7, 179:6, 181:23, 185:18, 188:7, 207:21, 210:7, 210:11, 212:15
**showed** [1] - 73:21
**showing** [8] - 9:7, 15:12, 89:25, 146:22, 147:19, 185:10, 186:12, 187:22
**shown** [22] - 17:3, 122:7, 136:6, 136:9, 136:10, 136:14, 154:18, 179:10, 180:13, 181:12, 182:22, 183:11, 183:21, 185:5, 188:12, 188:19, 190:6, 207:3, 208:6, 210:1, 210:6, 213:13
**shows** [25] - 15:4, 30:17, 38:19, 43:17, 46:1, 53:15, 53:16, 64:18, 72:3, 110:1, 122:4, 135:7, 139:3, 139:5, 142:4, 142:7, 156:8, 156:10, 156:17, 159:6, 177:16, 199:2, 206:16, 207:4, 207:5
**shuffling** [1] - 123:24
**shy** [1] - 117:2
**sic** [1] - 115:4
**side** [52] - 5:21, 6:10, 7:20, 27:5, 53:7, 122:2, 122:14, 134:12, 135:2,

135:3, 135:4, 135:6, 136:9, 136:10, 136:21, 136:22, 137:13, 143:24, 163:2, 166:24, 167:1, 177:15, 177:17, 177:18, 181:25, 182:1, 182:13, 182:18, 187:21, 190:16, 198:21, 205:17, 206:15, 207:3, 207:4, 207:5, 207:12, 207:13, 207:17, 211:7
**side-by-side** [10] - 122:2, 122:14, 134:12, 135:2, 135:6, 177:15, 187:21, 190:16, 205:17, 206:15
**side-by-sides** [1] - 198:21
**sides** [2] - 136:15, 198:21
**sides'** [1] - 215:19
**Siebel** [1] - 69:14
**signature** [1] - 165:22
**signed** [2] - 86:5, 165:23
**significance** [8] - 152:3, 159:2, 164:10, 193:14, 200:2, 200:25, 205:23, 214:17
**significant** [13] - 30:13, 41:19, 100:22, 119:22, 129:4, 131:12, 167:7, 171:14, 171:19, 194:1, 208:7, 209:9
**signing** [1] - 4:6
**siloed** [4] - 53:24, 54:18, 62:8, 80:17
**similar** [19] - 22:3, 25:11, 76:10, 76:24, 80:6, 126:10, 129:14, 140:8, 154:2, 175:8, 208:1, 210:5, 210:6, 210:24, 213:14, 213:20, 214:2, 214:12, 215:1
**similarities** [6] - 134:12, 206:16, 207:9, 208:9, 208:19, 209:23
**similarity** [6] - 76:3, 122:4, 134:21,

212:15, 212:16, 215:2
**simple** [6] - 18:14, 116:6, 133:18, 133:23, 153:14, 153:15
**simply** [14] - 9:18, 34:24, 44:25, 47:11, 63:23, 64:9, 65:13, 73:7, 92:4, 121:7, 124:12, 168:19, 212:20, 213:18
**single** [14] - 26:25, 57:2, 57:15, 57:16, 58:7, 61:22, 69:3, 72:16, 75:7, 77:3, 77:7, 88:24, 90:8, 214:11
**singular** [1] - 188:9
**sit** [2] - 99:7, 203:1
**site** [1] - 31:24
**sits** [1] - 138:16
**situation** [4] - 34:20, 48:2, 78:24, 83:15
**six** [7] - 9:14, 9:23, 24:21, 90:17, 111:15, 138:25, 182:7
**size** [7] - 77:20, 78:2, 78:6, 78:8, 112:8, 167:7, 167:10
**skill** [2] - 58:13, 60:1
**skipped** [1] - 164:12
**sky** [1] - 40:25
**slash** [3] - 154:23
**slice** [1] - 106:19
**slide** [38] - 8:15, 9:14, 10:23, 13:9, 19:14, 20:15, 24:14, 25:7, 26:14, 27:19, 29:5, 30:22, 33:19, 36:15, 38:21, 41:6, 41:18, 44:25, 51:18, 56:23, 70:10, 72:8, 73:20, 84:2, 84:11, 84:12, 87:16, 89:19, 91:5, 96:7, 97:6, 98:1, 100:11, 103:22, 110:3, 129:24, 161:20, 202:5
**slides** [4] - 20:21, 72:7, 109:4, 118:13
**slightly** [2] - 9:2, 136:18
**sloppy** [1] - 28:14
**small** [5] - 16:18, 30:3, 54:14, 116:24, 137:9
**smaller** [5] - 98:20, 100:4, 106:13, 107:2, 116:23

**Smead** [2] - 38:7, 78:14

**Smith** [13] - 1:14, 1:16, 2:14, 2:20, 94:18, 99:6, 113:23, 121:3, 121:24, 157:22, 160:3, 213:9, 217:9

**SMITH** [81] - 94:8, 94:19, 94:23, 95:21, 95:25, 96:3, 96:6, 96:9, 99:3, 99:9, 99:11, 103:22, 103:23, 113:24, 114:12, 114:13, 121:4, 122:1, 123:1, 123:2, 123:19, 124:11, 124:18, 124:22, 131:1, 131:7, 132:22, 132:24, 133:2, 133:12, 135:11, 136:5, 139:6, 139:14, 145:4, 157:9, 157:24, 160:5, 160:22, 162:14, 162:21, 163:8, 166:23, 167:6, 168:15, 168:24, 175:12, 175:14, 176:10, 176:16, 176:20, 177:7, 177:10, 179:23, 179:25, 180:6, 181:14, 181:21, 183:20, 184:2, 184:8, 185:22, 186:3, 187:11, 187:18, 189:1, 189:7, 189:21, 190:2, 190:9, 190:14, 196:11, 196:18, 198:8, 198:15, 198:16, 203:7, 206:18, 207:1, 213:10, 215:18

**smokescreen** [1] - 40:10

**smoothly** [1] - 5:23

**snippet** [1] - 167:23

**software** [99] - 9:21, 10:5, 10:8, 10:12, 10:16, 13:23, 14:4, 21:17, 23:14, 23:17, 28:10, 31:18, 35:14, 36:2, 36:14, 37:23, 39:9, 39:20, 41:11, 41:12, 43:8, 44:2, 51:10, 53:9, 55:1, 55:14, 55:17, 57:1,

58:1, 59:5, 59:7, 60:5, 60:18, 61:9, 62:18, 67:21, 68:7, 69:17, 71:4, 72:11, 75:12, 76:7, 79:22, 79:23, 79:24, 79:25, 81:22, 82:3, 82:5, 82:16, 82:20, 82:23, 83:19, 88:3, 88:17, 89:3, 90:22, 92:15, 95:12, 96:13, 97:2, 97:10, 97:20, 98:7, 98:8, 98:10, 98:16, 98:18, 100:16, 100:19, 100:20, 101:2, 101:8, 101:15, 102:4, 103:11, 112:10, 112:11, 118:8, 121:15, 121:21, 122:15, 125:17, 125:21, 126:1, 126:10, 126:25, 140:12, 144:3, 149:12, 153:19, 187:7, 188:16, 194:3, 198:6, 205:16

**Software** [4] - 23:11, 23:21, 101:9

**solely** [2] - 22:8, 118:19

**solicited** [1] - 72:20

**solution** [10] - 55:7, 66:14, 66:16, 77:19, 77:23, 78:1, 78:16, 79:7, 79:9, 80:15

**solutions** [7] - 60:14, 84:6, 84:16, 85:7, 85:9, 85:15, 86:15

**solve** [4] - 55:1, 59:12, 81:1, 170:19

**solves** [1] - 66:13

**solving** [1] - 54:16

**someone** [2] - 6:19, 112:8

**sometimes** [8] - 53:4, 53:11, 55:4, 72:22, 105:2, 138:6, 149:11, 149:12

**somewhat** [5] - 50:5, 111:25, 112:7, 112:19, 148:21

**somewhere** [5] - 103:4, 108:20, 151:13, 160:21, 164:8

**Sons** [1] - 141:20

**sophisticated** [1] - 54:13

**sophistication** [1] -

154:3

**sorry** [23] - 4:20, 31:16, 69:20, 85:23, 111:17, 117:17, 117:18, 120:13, 125:4, 126:21, 132:24, 144:11, 144:15, 154:8, 157:1, 159:15, 159:21, 176:7, 177:6, 193:5, 194:15, 195:4, 202:25

**sort** [11] - 11:9, 18:13, 42:22, 46:2, 47:5, 47:18, 73:8, 136:25, 164:11, 202:1, 207:14

**sought** [2] - 42:18, 42:22

**source** [86] - 10:12, 14:7, 14:11, 14:17, 24:1, 24:3, 24:9, 31:7, 34:6, 38:20, 38:22, 39:2, 39:20, 40:2, 40:8, 40:14, 42:7, 42:23, 43:21, 44:11, 46:4, 57:1, 60:5, 60:13, 75:12, 83:15, 84:7, 84:10, 84:17, 85:10, 89:3, 90:22, 92:14, 95:6, 99:22, 99:23, 99:25, 100:6, 101:16, 102:13, 102:22, 105:3, 105:5, 105:6, 105:7, 106:16, 106:19, 111:3, 111:6, 111:8, 111:12, 115:2, 116:20, 117:1, 117:9, 119:20, 119:24, 120:1, 120:2, 120:3, 120:6, 121:15, 121:21, 122:5, 122:16, 130:21, 131:2, 135:12, 144:3, 161:24, 164:2, 164:23, 165:9, 171:15, 171:23, 172:2, 172:24, 180:22, 180:23, 181:1, 181:7, 181:9, 181:11, 188:16

**sources** [1] - 102:4

**South** [1] - 1:25

**space** [3] - 134:17, 134:23, 209:19

**spaces** [3] - 134:19,

209:21, 210:16

**spacing** [9] - 210:1, 210:3, 210:5, 210:6, 210:7, 210:11, 210:12, 210:17, 210:21

**Spalding** [1] - 19:14

**span** [1] - 100:15

**spanned** [1] - 102:8

**spans** [1] - 98:11

**speaking** [2] - 5:11, 150:21

**speaks** [1] - 5:6

**spec** [3] - 88:25, 89:9, 89:15

**special** [1] - 60:15

**specialty** [1] - 96:21

**specific** [19] - 21:23, 33:19, 65:14, 81:25, 109:12, 110:11, 114:17, 118:21, 129:9, 130:19, 131:23, 140:19, 141:7, 141:10, 147:14, 160:17, 168:17, 172:24, 206:10

**specifically** [22] - 9:5, 19:10, 95:6, 109:15, 116:8, 116:19, 117:2, 118:1, 119:1, 126:24, 127:4, 128:7, 130:3, 130:23, 131:21, 132:14, 148:24, 151:21, 161:24, 165:3, 172:15, 178:7

**specification** [3] - 82:1, 88:24, 111:13

**specifications** [1] - 104:14

**specificity** [1] - 148:21

**specifics** [1] - 150:20

**specified** [2] - 11:3, 11:24

**specify** [1] - 78:25

**specs** [1] - 88:25

**spectrum** [2] - 98:11, 106:16

**spell** [1] - 149:18

**spelling** [1] - 116:6

**spend** [1] - 61:24

**spending** [1] - 162:11

**Spherion** [2] - 38:8, 78:14

**spin** [1] - 21:8

**Spinnaker** [8] - 84:2, 84:3, 84:4, 84:7, 84:15, 85:6, 85:23, 86:12

**Spinnaker's** [3] - 84:15, 85:25, 86:14

**Spira** [2] - 104:9, 105:8

**sporadic** [1] - 202:1

**sprang** [1] - 14:9

**spreadsheet** [1] - 139:11

**SQC** [4] - 173:20, 173:22, 173:24

**SQR** [7] - 173:22, 192:19, 193:16, 193:17, 201:18

**SQRs** [1] - 194:18

**SQRS** [1] - 199:13

**stack** [1] - 96:7

**stage** [5] - 14:12, 47:21, 48:19, 143:4

**staging** [1] - 106:12

**stake** [1] - 67:10

**stamp** [2] - 179:17, 188:19

**stand** [1] - 94:9

**standing** [2] - 43:7, 89:12

**standpoint** [1] - 30:6

**start** [14] - 6:11, 6:13, 6:21, 49:24, 69:24, 82:1, 114:14, 115:23, 131:1, 163:16, 191:9, 211:13, 215:16, 215:25

**started** [9] - 38:1, 47:10, 63:16, 95:16, 103:4, 103:15, 116:18, 127:25, 178:1

**starting** [2] - 75:10, 215:14

**starts** [1] - 210:25

**State** [1] - 132:9

**state** [6] - 2:9, 4:24, 28:8, 94:12, 119:21, 209:12

**statement** [18] - 8:8, 8:22, 22:3, 49:15, 119:7, 122:10, 125:19, 131:4, 146:6, 166:15, 167:16, 167:19, 168:2, 199:11, 200:2, 200:25, 204:13, 204:16

**STATEMENT** [2] - 217:4, 217:5

**statements** [5] - 4:19, 5:19, 8:16, 116:8, 168:4

**states** [5] - 78:24,

125:14, 148:14, 199:22, 200:21
**States** [5] - 55:19, 74:1, 74:10, 75:1, 77:17
**STATES** [1] - 1:1
**stating** [2] - 194:15, 199:13
**status** [2] - 20:12, 47:1
**stay** [1] - 24:18
**stayed** [2] - 86:19, 87:4
**step** [6] - 19:2, 78:5, 81:8, 168:4, 168:11, 214:15
**Stephen** [2] - 39:5, 88:9
**steps** [4] - 5:7, 11:17, 15:2, 71:21
**still** [19] - 6:8, 14:5, 18:10, 18:22, 24:6, 32:18, 47:13, 119:23, 120:17, 121:8, 121:9, 122:6, 124:12, 158:15, 176:13, 185:24, 192:8, 196:13, 213:17
**stipulation** [1] - 4:4
**stone** [1] - 39:2
**stonewalled** [1] - 64:8
**stop** [5] - 25:19, 98:24, 99:4, 129:1, 192:24
**stopped** [2] - 15:16, 128:6
**stops** [1] - 45:16
**storage** [4] - 97:24, 153:20, 154:1, 212:2
**store** [2] - 13:23, 154:4
**stored** [2] - 33:22, 45:4
**story** [1] - 148:2
**straddle** [1] - 162:22
**straight** [2] - 15:14, 169:18
**straightforwardly** [1] - 51:11
**stream** [2] - 128:11, 128:12
**Street** [51] - 1:25, 2:8, 3:6, 3:8, 6:2, 8:15, 9:20, 12:11, 12:16, 12:17, 13:14, 16:10, 17:8, 17:11, 17:22, 18:19, 18:20, 19:1, 20:18, 22:13, 23:13, 26:14, 26:17, 29:14,

30:21, 31:16, 32:9, 32:24, 33:6, 34:17, 36:9, 38:13, 42:3, 48:12, 101:20, 127:1, 136:24, 144:1, 148:12, 149:20, 154:23, 158:23, 159:3, 161:11, 178:13, 178:16, 179:14, 186:11, 186:13, 191:23, 203:25
**STREET** [1] - 1:7
**Street's** [9] - 17:18, 20:25, 21:12, 30:14, 31:4, 37:25, 47:2, 156:25, 180:12
**stretch** [1] - 64:19
**strike** [2] - 113:17, 157:2
**Strohs** [2] - 108:2
**strong** [1] - 27:23
**strongly** [2] - 53:13, 184:6
**struck** [2] - 69:13, 120:19
**structural** [2] - 211:24, 212:3
**structure** [8] - 16:13, 76:22, 208:10, 211:4, 212:19, 213:5, 214:9, 215:3
**structuring** [2] - 7:10, 212:1
**stuff** [6] - 14:23, 35:21, 36:8, 41:2, 47:15, 48:15
**stunning** [1] - 66:22
**subcomponents** [1] - 130:8
**subject** [19] - 16:6, 30:15, 121:5, 121:11, 122:7, 124:12, 136:2, 157:15, 160:6, 160:9, 181:14, 181:16, 187:12, 187:15, 190:10, 198:10, 205:6, 206:19
**subjects** [2] - 31:8, 31:10
**submit** [9] - 32:15, 54:4, 63:12, 92:17, 108:6, 108:8, 122:3, 161:5, 215:8
**subpoenas** [1] - 29:24
**subsequent** [2] - 150:1, 195:7
**subsequently** [3] -

109:18, 115:20, 205:15
**substan** [1] - 11:6
**substance** [1] - 98:21
**substantial** [13] - 14:23, 19:12, 26:21, 29:1, 31:14, 35:2, 41:14, 62:1, 70:23, 76:3, 80:4, 92:23, 122:4
**substantially** [11] - 11:7, 14:20, 28:25, 30:21, 43:18, 76:10, 76:24, 80:6, 213:14, 213:20, 214:2
**substantive** [1] - 31:11
**subverts** [1] - 92:16
**suddenly** [1] - 43:15
**suggest** [6] - 40:12, 91:15, 178:21, 192:6, 209:23, 209:24
**suggested** [2] - 47:17, 90:10
**suggestion** [1] - 87:18
**suggestions** [1] - 46:25
**suggests** [1] - 54:6
**summarize** [1] - 198:20
**summarized** [1] - 9:14
**summarizing** [1] - 198:9
**summary** [11] - 13:12, 13:25, 47:5, 52:1, 57:22, 58:24, 59:15, 71:23, 130:13, 135:13, 135:18
**superficial** [1] - 19:12
**superfluous** [2] - 87:19, 88:4
**supervision** [1] - 48:24
**supervisory** [1] - 48:9
**supplemental** [1] - 120:18
**supplied** [2] - 110:24, 136:8, 170:18
**Support** [12] - 84:13, 163:13, 163:19, 164:5, 165:13, 165:21, 165:23, 169:19, 170:2, 170:19, 171:8, 171:12
**support** [49] - 10:2, 17:23, 18:3, 21:17, 22:1, 22:24, 23:7, 24:7, 24:13, 25:1,

25:10, 25:25, 53:21, 53:24, 60:11, 61:1, 65:15, 66:8, 70:5, 72:4, 75:17, 81:17, 81:18, 82:13, 83:11, 83:14, 83:16, 83:23, 84:2, 84:3, 84:9, 84:14, 84:20, 84:25, 87:7, 88:21, 103:10, 104:21, 105:17, 111:3, 112:25, 127:13, 128:2, 128:3, 129:3, 129:5, 129:8, 129:21, 202:7
**supported** [5] - 38:11, 45:24, 71:13, 72:13, 103:11
**supports** [2] - 43:2, 52:20
**supposed** [7] - 13:17, 35:14, 35:17, 36:10, 42:3, 72:24, 73:1
**supposedly** [1] - 16:20
**surprise** [1] - 214:21
**surrebuttal** [1] - 7:15
**surrounding** [2] - 99:15, 209:9
**suspect** [1] - 16:13
**suspended** [2] - 53:14, 63:9
**sustain** [1] - 114:8
**sustained** [1] - 114:11
**SW** [1] - 211:7
**swaths** [1] - 89:20
**switch** [5] - 200:5, 209:16, 211:10, 211:14
**switches** [1] - 209:11
**sworn** [8] - 60:9, 68:19, 83:24, 84:4, 84:10, 85:18, 90:10, 94:11
**Symantech** [1] - 100:4
**symposia** [1] - 101:4
**system** [84] - 10:9, 28:4, 32:2, 34:13, 34:17, 35:1, 35:3, 45:5, 46:11, 46:22, 50:19, 53:23, 91:2, 91:21, 97:22, 98:10, 98:14, 98:15, 104:11, 104:25, 105:9, 105:10, 106:5, 107:10, 107:11, 107:18, 107:21, 109:17, 109:25, 110:2, 111:22, 115:22, 116:10, 127:7,

130:17, 131:16, 131:22, 131:23, 131:24, 132:4, 136:10, 137:20, 137:22, 137:24, 138:8, 139:2, 139:17, 139:24, 139:25, 142:8, 142:10, 142:13, 146:11, 148:4, 150:20, 152:18, 154:4, 154:21, 155:1, 156:11, 156:12, 156:15, 156:20, 158:3, 159:9, 161:19, 173:13, 174:12, 177:18, 178:17, 179:9, 180:12, 180:24, 184:18, 187:23, 187:25, 196:9, 196:21, 197:25, 199:3, 199:7, 213:15
**Systems** [1] - 96:19
**systems** [116] - 9:21, 9:22, 10:9, 13:24, 31:18, 33:23, 50:24, 51:1, 53:19, 54:22, 55:4, 55:22, 57:11, 57:14, 57:16, 61:17, 61:18, 62:5, 62:6, 62:19, 63:20, 63:21, 64:3, 64:16, 70:6, 70:18, 71:7, 71:12, 71:25, 74:3, 75:25, 91:9, 91:10, 96:17, 96:18, 96:22, 96:25, 97:15, 97:16, 97:18, 98:12, 98:13, 102:13, 102:14, 102:15, 104:10, 107:21, 111:19, 114:23, 115:25, 117:5, 117:14, 123:14, 130:5, 130:21, 130:23, 131:9, 132:14, 133:14, 133:17, 134:2, 134:8, 141:22, 142:2, 142:17, 145:13, 145:17, 146:20, 146:24, 147:3, 147:7, 147:10, 147:20, 150:14, 150:18, 150:24, 152:20, 154:11, 161:16, 161:22, 166:1, 170:24, 172:22, 174:5,

174:8, 174:9, 174:12, 174:15, 175:1, 175:19, 176:1, 177:22, 179:14, 182:24, 183:10, 184:16, 186:13, 186:18, 187:6, 189:11, 190:19, 191:4, 194:21, 194:23, 197:2, 197:9, 197:22, 200:12, 203:4, 203:8, 204:20, 212:4, 213:22

## T

**tab** [7] - 124:24, 128:15, 134:18, 141:5, 158:1, 162:6, 173:2
**table** [8] - 2:14, 138:25, 139:4, 139:5, 142:5, 155:20, 192:21, 193:18
**tables** [4] - 138:17, 138:18, 139:16, 139:20
**Tailored** [1] - 79:21
**tailored** [3] - 56:17, 79:25, 80:2
**TARRY** [11] - 203:14, 204:3, 204:7, 204:9, 204:14, 204:15, 204:18, 204:19, 204:23, 204:24, 207:4
**Tarry** [1] - 203:16
**task** [1] - 12:14
**tax** [20] - 37:9, 37:13, 37:19, 55:7, 55:8, 55:13, 78:18, 78:24, 78:25, 80:12, 110:23, 132:8, 150:12, 153:4, 155:20, 156:25, 158:5, 166:18, 203:16
**Tax** [1] - 150:9
**tax920** [5] - 196:10, 198:23, 199:24, 200:8, 200:11
**tax920.sqr** [3] - 198:23, 200:24, 201:4
**tax920.txt** [6] - 184:20, 194:25, 195:7, 195:19, 198:24,

199:16
**tax920us** [2] - 187:9, 191:3
**tax920us.sqr** [1] - 187:10
**tax920us.txt** [7] - 184:19, 185:19, 186:9, 186:17, 187:1, 188:6, 192:4
**tax921** [1] - 197:1
**tax921us.sqr** [1] - 199:2
**tax921us.txt** [5] - 184:20, 195:13, 195:19, 199:2, 199:17
**tax922us** [3] - 189:16, 190:17, 191:4
**tax922us.txt** [7] - 184:20, 188:13, 188:14, 195:10, 195:19, 196:1, 199:17
**tax923us** [1] - 197:7
**tax923us.sqr** [1] - 199:6
**tax923us.txt** [5] - 184:20, 195:16, 195:20, 199:6, 199:17
**taxes** [2] - 132:8, 203:17
**TCH** [1] - 154:24
**teach** [1] - 101:1
**Team** [1] - 98:23
**team** [8] - 3:11, 25:19, 97:23, 128:21, 128:22, 128:25, 129:15, 151:17
**tech** [4] - 88:24, 88:25, 89:9, 89:15
**Tech** [1] - 98:23
**technical** [16] - 11:21, 12:7, 12:16, 27:21, 41:2, 43:14, 51:9, 82:1, 88:24, 89:2, 95:10, 96:16, 102:18, 104:14, 109:7, 111:12
**technically** [1] - 134:11
**techniques** [1] - 99:19
**techno** [1] - 100:19
**techno-archeology** [1] - 100:19
**Telecom** [1] - 97:25
**telecommunication** [1] - 97:15
**telecommunications** [1] - 96:18

**temporal** [1] - 81:8
**temporarily** [1] - 63:9
**temporary** [4] - 150:25, 151:2, 151:7, 151:12
**ten** [4] - 4:11, 11:15, 11:25, 15:8
**tens** [2] - 71:15, 72:18
**terabytes** [1] - 50:16
**term** [3] - 39:2, 117:23, 153:18
**terms** [5] - 5:17, 15:14, 77:5, 83:14, 98:9
**terrific** [1] - 50:4
**test** [12] - 10:5, 65:5, 65:7, 65:11, 65:14, 65:19, 75:4, 88:1, 110:13, 110:15
**tested** [6] - 38:9, 73:12, 74:8, 74:17, 74:22, 119:16
**testified** [8] - 60:11, 66:10, 67:8, 84:14, 84:15, 85:22, 85:23, 94:11
**testifies** [1] - 85:14
**testify** [8] - 36:7, 85:21, 88:10, 88:14, 88:18, 113:3, 122:19, 122:25
**testimony** [17] - 11:21, 27:24, 28:8, 29:25, 37:7, 39:4, 66:18, 83:24, 85:19, 87:11, 98:5, 102:16, 160:8, 214:16, 214:19, 215:14, 215:20
**testing** [12] - 38:7, 63:21, 65:2, 65:8, 74:11, 87:22, 105:9, 110:6, 110:7, 111:8, 118:18, 119:1
**tests** [2] - 65:17, 112:11
**Texas** [6] - 130:25, 152:23, 158:6, 160:24, 161:4, 161:14
**texaschildrens.org** [1] - 158:11
**text** [6] - 69:7, 77:10, 116:20, 207:18, 207:19, 213:13
**text-based** [1] - 116:20
**textural** [1] - 171:15
**thanked** [1] - 194:2
**thanking** [1] - 158:25
**THE** [87] - 1:2, 1:14,

1:19, 2:4, 2:5, 2:23, 3:2, 3:19, 4:24, 5:4, 5:5, 6:5, 7:13, 8:3, 8:6, 8:11, 8:19, 49:13, 49:20, 50:3, 50:8, 92:25, 93:6, 93:11, 94:4, 94:12, 94:14, 94:16, 94:21, 95:24, 96:2, 96:8, 99:6, 113:22, 114:8, 121:3, 121:24, 122:19, 124:5, 124:16, 124:20, 131:6, 132:25, 133:11, 135:25, 139:9, 139:10, 144:19, 144:21, 157:18, 157:22, 159:21, 160:2, 160:7, 160:12, 162:11, 162:15, 162:18, 163:3, 163:6, 167:1, 167:3, 168:23, 175:11, 176:15, 176:18, 177:3, 177:5, 180:4, 181:18, 183:24, 184:3, 186:1, 187:15, 189:5, 189:24, 190:12, 196:16, 198:10, 198:14, 206:22, 213:9, 213:24, 214:15, 215:13, 215:19, 215:24
**theft** [1] - 99:16
**themselves** [1] - 48:16
**then-current** [1] - 106:22
**theories** [2] - 64:24, 66:2
**theory** [6] - 52:10, 68:11, 77:24, 80:9, 122:11, 122:13
**thereafter** [1] - 194:20
**thereby** [1] - 70:5
**therefore** [1] - 122:24
**thereto** [1] - 104:8
**they've** [6] - 13:3, 26:17, 42:10, 56:6, 169:11
**thick** [1] - 16:4
**thinking** [3] - 20:17, 55:9, 55:13
**thinks** [1] - 85:17
**third** [24] - 16:7, 35:13, 47:5, 47:16, 60:4, 60:12, 62:18, 63:3, 67:12, 71:21, 72:11, 83:11, 83:23, 84:1,

84:14, 104:22, 106:14, 110:4, 125:7, 126:10, 137:24, 192:3, 199:5, 208:14
**third-party** [14] - 16:7, 35:13, 47:5, 47:16, 60:12, 62:18, 63:3, 83:11, 83:23, 84:1, 84:14, 106:14, 126:10, 137:24
**thirdly** [1] - 18:7
**Thomas** [4] - 154:8, 154:23, 156:11, 158:11
**Thompson** [1] - 107:25
**thorough** [2] - 11:22, 27:7
**Thou** [3] - 24:8, 41:20, 91:8
**thousand** [2] - 108:19, 108:20
**thousands** [8] - 54:10, 54:17, 57:21, 71:15, 72:16, 72:17, 72:18
**three** [18] - 5:21, 6:1, 6:2, 6:9, 7:8, 7:14, 7:20, 7:25, 8:1, 10:24, 13:11, 27:5, 33:1, 49:25, 70:3, 97:24, 108:9, 194:18
**throughout** [3] - 96:18, 98:16, 171:17
**ticket** [1] - 72:4
**tie** [3] - 138:22, 139:20, 140:7
**tied** [2] - 122:13, 214:19
**time-consuming** [1] - 140:15
**timing** [2] - 5:16, 43:1
**tip** [1] - 30:25
**title** [1] - 122:22
**today** [13] - 3:8, 9:25, 10:21, 13:20, 17:21, 68:21, 73:15, 85:18, 86:10, 119:3, 152:6, 212:23, 214:8
**together** [6] - 139:21, 140:8, 140:20, 140:21, 170:17, 205:5
**Tom** [2] - 154:14, 158:24
**took** [10] - 11:16, 13:1, 19:2, 63:6, 63:15, 63:18, 71:21, 71:24, 140:17, 140:20
**tool** [10] - 25:23,

76:16, 76:17, 129:2,
134:9, 134:10,
134:11, 134:13,
134:14
**tooling** [1] - 118:21
**tools** [11] - 21:18,
53:14, 60:19, 63:7,
67:18, 68:22, 82:14,
102:16, 118:13,
128:7
**top** [9] - 20:21, 79:24,
136:20, 138:16,
142:21, 165:17,
166:21, 192:23,
211:4
**topics** [2] - 100:16,
215:10
**total** [1] - 97:11
**totally** [1] - 86:16
**touched** [1] - 71:22
**touching** [1] - 77:24
**tour** [1] - 9:6
**toward** [4] - 9:7,
12:25, 18:25, 40:17
**towards** [1] - 8:1
**track** [5] - 28:5, 105:9,
105:10, 137:25,
209:11
**trade** [3] - 95:12,
99:16, 99:24
**traded** [1] - 54:11
**trail** [1] - 47:24
**trails** [1] - 32:23
**trained** [1] - 72:1
**training** [8] - 96:12,
96:16, 96:19, 96:21,
96:22, 96:25, 97:1,
97:4
**trains** [1] - 62:20
**TRANSCRIPT** [1] -
1:11
**transcript** [2] - 104:7,
216:6
**transfer** [2] - 64:15,
104:25
**transferred** [1] -
104:24
**translate** [4] - 140:12,
140:18, 150:1, 164:3
**transparent** [1] -
44:21
**transparently** [1] -
40:9
**transportation** [1] -
55:12
**treat** [1] - 14:2
**treating** [1] - 177:3
**treatment** [1] - 169:4
**tremendous** [1] - 62:6
**trial** [7] - 3:22, 7:11,

8:22, 24:21, 39:18,
39:21, 71:2
**tried** [4] - 14:22,
48:13, 86:17
**tries** [1] - 72:19
**troubleshoot** [2] -
10:2, 170:19
**troubleshooting** [2] -
110:6, 110:7
**Trucking** [7] - 32:13,
32:17, 33:9, 38:7,
55:11, 73:10, 110:16
**true** [3] - 12:23, 89:5,
151:8
**truly** [1] - 59:17
**truncated** [1] - 139:18
**try** [3] - 38:15, 41:14,
212:9
**trying** [7] - 32:6,
43:15, 46:23, 60:15,
64:18, 64:19, 86:20
**turn** [8] - 69:23, 75:9,
76:4, 77:1, 81:19,
114:10, 166:16,
196:5
**turned** [1] - 78:20
**turning** [1] - 109:4
**turns** [1] - 76:3
**two** [56] - 7:19, 17:25,
18:15, 23:17, 25:15,
25:19, 25:24, 28:12,
31:2, 39:11, 43:9,
47:9, 47:12, 47:13,
51:23, 56:23, 56:25,
69:24, 70:11, 75:13,
76:9, 76:24, 79:11,
79:12, 79:13, 79:16,
87:4, 119:14, 122:4,
129:4, 130:8,
134:11, 135:8,
135:12, 135:17,
135:24, 146:23,
170:17, 172:24,
173:21, 177:1,
181:11, 182:11,
182:19, 185:11,
192:17, 195:9,
195:23, 198:23,
203:24, 204:17,
206:3, 208:23,
210:16, 212:16,
213:13
**two-and-a-half** [3] -
47:9, 47:12, 47:13
**tying** [1] - 69:3
**type** [8] - 46:17, 49:1,
121:8, 147:9,
173:19, 173:20,
186:9, 188:14
**types** [6] - 39:11,

102:9, 116:20,
165:1, 173:21,
195:22
**typically** [2] - 147:14,
153:18

## U

**U.S** [3] - 77:15, 78:22,
155:20
**ultimate** [1] - 45:14
**ultimately** [5] - 18:18,
18:24, 37:14, 45:9,
201:20
**unable** [3] - 19:17,
23:20, 43:22
**unambiguous** [1] -
10:18
**unchanged** [1] -
137:16
**uncovered** [1] - 28:23
**under** [18] - 10:14,
12:23, 15:21, 18:11,
28:2, 37:2, 40:15,
42:3, 55:20, 60:12,
61:2, 76:1, 79:18,
111:5, 121:1, 192:7,
214:22, 215:11
**underline** [1] - 125:15
**underlying** [5] -
104:23, 135:12,
136:18, 139:24,
141:14
**undermine** [1] - 60:1
**undermines** [1] -
92:17
**understandably** [1] -
17:17
**understatement** [1] -
53:5
**understood** [5] -
56:13, 62:25, 82:20,
114:12, 122:24
**undertaken** [1] - 62:1
**undisclosed** [1] -
213:8
**undisputed** [1] - 57:15
**unearthed** [1] - 16:17
**unfortunate** [1] -
162:2
**United** [5] - 55:19,
74:1, 74:10, 75:1,
77:17
**UNITED** [1] - 1:1
**University** [20] - 76:6,
184:18, 185:2,
185:14, 188:4,
191:2, 191:22,
192:10, 192:12,
193:4, 193:5,

193:11, 194:10,
196:21, 197:2,
197:8, 199:12,
200:16, 201:9,
201:13
**unlawful** [19] - 53:14,
56:16, 56:18, 56:20,
59:19, 60:23, 60:24,
60:25, 66:16, 67:23,
68:1, 68:2, 77:25,
78:3, 79:4, 79:16,
81:14, 87:12
**unlearn** [1] - 66:15
**unless** [5] - 38:13,
40:2, 47:14, 127:8,
159:25
**unmodified** [1] -
195:25
**unquestioned** [1] -
34:5
**unreasonable** [1] -
56:9
**up** [44] - 4:3, 5:7, 6:13,
7:6, 17:9, 19:15,
24:1, 30:8, 32:13,
36:4, 39:17, 39:22,
40:24, 42:10, 42:25,
43:3, 43:19, 45:11,
46:14, 48:3, 55:5,
72:15, 73:11, 78:20,
79:2, 81:23, 82:6,
82:16, 85:14, 88:17,
91:20, 95:22,
124:19, 140:11,
142:20, 154:9,
154:20, 158:20,
162:3, 192:20,
193:18, 202:2,
202:17, 203:21
**up-to-date** [1] - 81:23
**update** [38] - 37:13,
37:14, 37:15, 45:2,
56:1, 59:4, 59:5,
59:6, 59:14, 65:14,
65:18, 73:10, 73:18,
74:2, 74:20, 77:9,
78:13, 79:14, 80:10,
80:11, 80:14, 80:24,
87:6, 87:22, 89:11,
102:22, 106:18,
109:24, 119:9,
147:13, 148:24,
150:11, 153:4,
153:5, 153:6, 157:1,
158:5, 190:17
**updated** [7] - 37:23,
68:6, 146:2, 147:16,
163:23, 169:15,
169:16
**updates** [40] - 10:6,

16:20, 16:25, 17:7,
34:10, 37:10, 37:20,
38:7, 41:16, 51:2,
54:17, 57:21, 58:2,
61:4, 68:2, 68:6,
68:20, 68:25, 83:5,
83:9, 83:19, 84:6,
85:7, 88:1, 88:5,
88:6, 88:8, 88:20,
89:1, 92:15, 102:19,
102:22, 104:16,
110:6, 111:8,
116:19, 143:1,
155:20, 194:19
**upheld** [1] - 128:6
**upload** [11] - 72:10,
143:5, 145:21,
178:10, 178:13,
184:5, 194:7,
194:20, 195:10,
201:10
**uploaded** [38] - 70:16,
91:1, 91:2, 117:12,
117:13, 117:17,
142:17, 146:3,
169:4, 174:10,
175:18, 175:25,
177:22, 178:5,
178:16, 179:13,
180:11, 180:23,
182:23, 183:10,
183:25, 184:6,
184:10, 184:18,
187:23, 188:12,
191:3, 192:2, 192:7,
192:10, 194:23,
196:20, 197:2,
197:8, 199:13,
199:18, 201:3,
201:12
**uploading** [13] - 70:5,
142:12, 174:7,
174:11, 179:8,
185:18, 186:6,
188:8, 192:19,
193:16, 194:2,
194:5, 200:16
**uploads** [3] - 163:14,
195:7, 195:19
**upper** [1] - 134:16
**USA** [2] - 1:4, 2:7
**useful** [1] - 8:23
**User** [1] - 125:2
**user** [13] - 127:5,
139:25, 149:5,
149:7, 149:9,
149:11, 149:14,
154:8, 154:10,
154:23, 155:6,
155:20, 156:11

**uses** [3] - 105:9, 105:10, 118:14
**usual** [1] - 20:14
**UTC** [1] - 150:1
**utilities** [1] - 25:20

**V**

**vacuum** [1] - 56:13
**vague** [1] - 44:15
**valid** [1] - 73:7
**validity** [1] - 44:14
**value** [7] - 138:25, 200:6, 209:10, 209:15, 209:16, 210:15, 211:13
**values** [2] - 206:12, 211:14
**VANDEVELDE** [44] - 3:13, 7:23, 8:5, 49:23, 50:4, 50:9, 93:10, 112:24, 120:13, 121:13, 122:9, 124:7, 124:15, 132:20, 133:10, 135:16, 157:19, 159:18, 159:23, 163:4, 168:22, 176:14, 176:23, 179:22, 179:24, 180:3, 181:16, 183:16, 183:23, 185:25, 187:14, 189:4, 189:23, 190:11, 196:15, 198:12, 203:6, 206:20, 212:17, 213:25, 214:22, 215:17, 215:23, 216:2
**Vandevelde** [7] - 1:19, 3:11, 3:14, 49:22, 92:25, 157:18, 160:11
**variables** [1] - 214:10
**variety** [5] - 34:18, 100:15, 102:11, 102:20, 161:18
**various** [7] - 13:10, 26:12, 80:17, 97:14, 116:6, 140:7, 147:17
**vastly** [1] - 70:25
**Veerachamy** [2] - 148:11, 149:18
**VEERACHAMY** [1] - 149:19
**vehicle** [1] - 138:8
**Venu** [1] - 144:22
**Venugopal** [2] - 143:9, 143:25

**verge** [1] - 52:22
**Verhoef** [1] - 96:19
**verify** [2] - 140:20, 146:8
**version** [18] - 34:7, 41:8, 115:18, 132:18, 136:16, 136:17, 142:25, 143:6, 145:1, 145:6, 164:2, 164:3, 170:8, 180:10, 181:1, 181:25, 182:1, 200:22
**versions** [3] - 123:12, 136:18, 181:24
**versus** [6] - 2:7, 13:2, 39:3, 42:8, 76:11, 134:18
**via** [3] - 70:4, 72:14, 147:1
**vice** [1] - 60:11
**Vice** [2] - 3:9, 84:12
**vice-president** [1] - 60:11
**Vice-President** [2] - 3:9, 84:12
**video** [2] - 66:20, 166:23
**view** [8] - 6:8, 7:3, 7:19, 18:25, 43:2, 46:19, 144:4, 176:25
**viewed** [1] - 84:20
**viewing** [1] - 200:13
**village** [1] - 16:12
**violate** [4] - 85:1, 86:3, 111:4, 111:13
**violated** [5] - 11:1, 21:7, 30:7, 46:9, 70:21
**violating** [6] - 21:5, 31:13, 40:8, 50:19, 63:16, 65:8
**violation** [32] - 27:1, 30:8, 31:17, 32:12, 32:15, 32:17, 34:6, 36:20, 38:24, 42:4, 45:21, 57:3, 61:23, 69:4, 73:10, 73:15, 74:23, 75:17, 76:25, 80:7, 81:16, 89:4, 89:7, 90:6, 90:19, 91:21, 120:25, 131:10, 147:4, 147:8, 212:23
**violations** [33] - 10:4, 11:3, 11:6, 11:9, 11:15, 11:25, 14:21, 15:7, 15:11, 16:9, 16:18, 16:24, 26:13, 28:16, 29:1, 29:9,

30:20, 30:23, 31:12, 32:18, 33:15, 34:18, 35:3, 48:8, 49:2, 49:8, 51:23, 56:8, 62:21, 69:25, 70:3, 71:6, 73:5
**Virgin** [3] - 37:21, 37:24, 78:22
**Virginia** [1] - 1:25
**virtual** [1] - 107:8
**virtually** [2] - 15:3, 50:18
**visibility** [1] - 63:22
**vociferously** [1] - 39:25
**Volume** [2] - 1:8, 162:20
**volume** [5] - 29:16, 29:17, 30:1, 31:23, 105:6
**Volumes** [1] - 162:22
**voluminous** [4] - 9:8, 135:23, 140:2, 176:25
**vs** [1] - 1:6

**W**

**W-2** [5] - 77:12, 77:13, 77:18, 78:14, 110:19
**W-2c** [3] - 189:10, 192:21, 193:18
**wait** [2] - 55:22, 142:21
**waiting** [1] - 201:17
**walk** [1] - 198:17
**wants** [3] - 6:1, 51:19, 92:4
**warning** [3] - 72:3, 72:8, 72:24
**warnings** [1] - 27:8
**warrant** [1] - 11:10
**warranted** [3] - 18:19, 45:19, 51:16
**Washam** [1] - 199:12
**Washington** [1] - 132:9
**ways** [4] - 13:7, 48:21, 62:14, 140:22
**weary** [1] - 215:14
**Web** [1] - 72:5
**website** [1] - 31:21
**weeks** [4] - 7:19, 140:20, 179:7, 184:7
**Weiss** [2] - 2:19, 2:20
**welcome** [5] - 3:3, 3:20, 4:25, 7:4, 99:7
**West** [1] - 1:19
**west** [1] - 3:5
**whatsoever** [4] - 74:7,

80:20, 120:23, 213:5
**white** [6] - 40:25, 134:17, 134:23, 208:4, 208:6, 209:19
**Whitlock** [1] - 193:8
**whole** [2] - 13:19, 47:10
**wide** [4] - 28:22, 41:16, 45:3, 98:11
**wildly** [1] - 80:9
**Wilford** [1] - 107:24
**wilful** [2] - 66:6, 71:6
**willfulness** [1] - 72:19
**William** [1] - 1:15
**willing** [2] - 8:17, 48:6
**willingly** [1] - 53:1
**wind** [2] - 128:11, 128:12
**window** [2] - 16:16, 42:5
**Windows** [3] - 79:25, 80:1, 106:5
**winnowed** [2] - 116:16, 116:22
**Winslow** [1] - 3:10
**wish** [1] - 5:15
**wished** [2] - 18:10, 18:11
**WITNESS** [8] - 94:14, 94:21, 139:10, 144:21, 160:12, 167:3, 183:24, 184:3
**witness** [15] - 6:14, 6:19, 11:20, 60:10, 68:19, 84:13, 85:14, 85:20, 93:2, 93:3, 94:7, 94:10, 95:25, 124:3, 124:8
**witnesses** [5] - 19:7, 45:9, 73:24, 102:17, 157:15
**WITNESSES** [1] - 217:7
**Wood** [1] - 158:22
**Word** [2] - 151:1
**word** [12] - 40:12, 40:13, 53:6, 72:6, 133:22, 133:24, 133:25, 153:14, 153:15, 209:22, 210:5, 212:15
**wording** [1] - 120:4
**words** [19] - 27:23, 52:14, 52:17, 57:10, 60:13, 61:11, 64:19, 66:2, 66:23, 66:24, 66:25, 71:1, 77:6, 88:2, 91:7, 113:8, 136:1, 180:11
**works** [17] - 5:1, 10:8,

31:7, 34:15, 46:11, 46:12, 71:11, 79:16, 79:20, 80:7, 100:1, 114:25, 117:21, 117:22, 118:7, 118:11
**world** [8] - 39:9, 54:13, 54:15, 60:24, 64:12, 68:15, 83:18, 83:21
**World** [2] - 23:11, 23:20
**worse** [2] - 34:24, 144:23
**worthy** [2] - 17:3, 33:21
**wrap** [1] - 45:11
**wrapping** [1] - 123:8
**wraps** [1] - 134:22
**write** [1] - 140:12
**writes** [5] - 59:11, 149:3, 150:7, 169:19, 170:2
**writing** [5] - 59:20, 59:24, 92:11, 149:20, 170:14
**written** [8] - 73:18, 80:15, 89:14, 89:17, 89:20, 89:21, 170:12, 215:8
**wrote** [13] - 50:17, 58:12, 59:2, 59:15, 60:6, 69:15, 80:16, 84:5, 85:23, 85:24, 91:8, 140:7, 165:13

**X**

**Xs** [3] - 73:19, 73:22, 78:15

**Y**

**year** [14] - 50:15, 54:16, 63:17, 64:11, 78:24, 78:25, 80:14, 90:16, 113:11, 192:20, 193:17, 204:2, 204:13, 206:12
**year-and-a-half** [1] - 50:15
**year-to-date** [3] - 204:2, 204:13, 206:12
**years** [21] - 9:23, 24:21, 28:9, 47:9, 47:13, 49:1, 53:18, 54:9, 62:3, 62:9, 64:3, 85:24, 86:8,

87:4, 96:18, 97:10,
97:11, 97:19, 97:24,
98:17
**yellow** [3] - 23:19,
24:5, 25:16
**yielded** [1] - 112:4
**YTD** [4] - 209:22,
211:3, 211:7, 211:22
**YTD-SW** [1] - 211:7

## Z

**Zach** [1] - 2:21
**Zachary** [1] - 1:17
**zero** [5] - 27:9, 61:16,
72:7, 72:17, 210:15
**ZZ** [1] - 107:20